# Exhibit G

## (Libra Indenture)

Dated as of October 17, 2006

LIBRA CDO LIMITED,
as Issuer

LIBRA CDO, LLC,
as Co-Issuer

LASALLE BANK NATIONAL ASSOCIATION
as Trustee

————————————

**INDENTURE**

————————————

# TABLE OF CONTENTS

1.  DEFINITIONS AND INTERPRETATION ...................................................................3

    1.1  Definitions.............................................................................................................3
    1.2  Assumptions as to Collateral Debt Securities, Etc.............................................97
    1.3  Rules of Construction. ......................................................................................100

2.  THE SECURED NOTES ..........................................................................................100

    2.1  Forms Generally.................................................................................................100
    2.2  Authorized Amount; Note Interest Rate; Stated Maturity; Denominations.......101
    2.3  Execution, Authentication, Delivery and Dating................................................102
    2.4  Registration, Transfer and Exchange of Notes. ................................................104
    2.5  Mutilated, Defaced, Destroyed, Lost or Stolen Notes. .....................................109
    2.6  Payment of Principal and Interest; Rights Preserved.........................................110
    2.7  Persons Deemed Owners. ...................................................................................113
    2.8  Cancellation. ......................................................................................................113
    2.9  Additional Issuance of Notes. ...........................................................................114

3.  CONDITIONS PRECEDENT ....................................................................................115

    3.1  General Provisions. ............................................................................................115
    3.2  Security for Notes. .............................................................................................118
    3.3  Custodianship; Transfer of Collateral Debt Securities and Eligible
         Investments. ......................................................................................................120

4.  SATISFACTION AND DISCHARGE..........................................................................122

    4.1  Satisfaction and Discharge of Indenture. ..........................................................122
    4.2  Application of Amounts in Trust. .......................................................................123
    4.3  Repayment of Amounts Held by Paying Agent..................................................124

5.  EVENTS OF DEFAULT; REMEDIES........................................................................124

    5.1  Events of Default. ..............................................................................................124
    5.2  Acceleration of Maturity; Rescission and Annulment........................................126
    5.3  Collection of Indebtedness and Suits for Enforcement by Trustee.....................128
    5.4  Remedies.............................................................................................................130
    5.5  Preservation of Collateral. .................................................................................132
    5.6  Trustee May Enforce Claims Without Possession of Notes. ..............................134
    5.7  Application of Cash Collected. ...........................................................................134
    5.8  Limitation on Suits.............................................................................................134

5.9    Unconditional Rights of Noteholders to Receive Principal and Interest and of any Senior Swap Counterparty to Receive Outstanding Swap Counterparty Amount and Senior Swap Interest Amounts ..................135

5.10  Restoration of Rights and Remedies. ..................135

5.11  Rights and Remedies Cumulative. ..................136

5.12  Delay or Omission Not Waiver. ..................136

5.13  Control by Controlling Class. ..................136

5.14  Waiver of Past Defaults. ..................137

5.15  Undertaking for Costs. ..................137

5.16  Waiver of Stay or Extension Laws. ..................138

5.17  Sale of Collateral. ..................138

5.18  Action on the Notes. ..................139

6.    THE TRUSTEE ..................139

6.1    Certain Duties and Responsibilities. ..................139

6.2    Notice of Default. ..................141

6.3    Certain Rights of Trustee. ..................141

6.4    Authenticating Agents. ..................143

6.5    Not Responsible for Recitals or Issuance of Notes. ..................144

6.6    May Hold Notes. ..................144

6.7    Cash Held in Trust. ..................144

6.8    Compensation and Reimbursement. ..................144

6.9    Corporate Trustee Required; Eligibility. ..................146

6.10  Resignation and Removal; Appointment of Successor. ..................146

6.11  Acceptance of Appointment by Successor. ..................147

6.12  Merger, Conversion, Consolidation or Succession to Business of Trustee. ..................148

6.13  Co-Trustees. ..................148

6.14  Certain Duties Related to Delayed Payment of Proceeds. ..................149

6.15  Representations and Warranties of the Bank. ..................150

6.16  Exchange Offers. ..................151

6.17  Fiduciary for Noteholders Only; Agent For Other Secured Parties. ..................151

6.18  Withholding. ..................151

7.    COVENANTS ..................152

7.1    Payment of Principal and Interest on the Notes and Amounts Owing to a Senior Swap Counterparty and to the Credit Default Swap Counterparty. ..................152

7.2    Maintenance of Office or Agency. ..................152

7.3    Cash for Note Payments to be Held in Trust. ..................153

7.4    Existence of Co-Issuers. ..................155

7.5    Protection of Collateral. ..................155

7.6    Opinions as to Collateral. ..................157

7.7    Performance of Obligations. ..................158

7.8    Negative Covenants. ..................159

7.9    Statement as to Compliance. ..................161

| | | |
|---|---|---|
| 7.10 | Co-Issuers May Not Consolidate, Etc. | 161 |
| 7.11 | Successor Substituted | 161 |
| 7.12 | No Other Business | 162 |
| 7.13 | Reaffirmation of Rating; Annual Rating Review. | 162 |
| 7.14 | Reporting | 163 |
| 7.15 | Calculation Agent | 163 |
| 7.16 | Amendment of Certain Documents. | 164 |
| 7.17 | Purchase of Collateral. | 164 |
| 7.18 | Senior Swap Agreement; Rights of Senior Swap Counterparty under the Indenture; Replacement of the Senior Swap Counterparty | 167 |
| 7.19 | Notional Principal Contract Treatment. | 170 |

| 8. | SUPPLEMENTAL INDENTURES | 171 |
|---|---|---|
| 8.1 | Supplemental Indentures Without Consent of Noteholders | 171 |
| 8.2 | Supplemental Indentures With Consent of Noteholders | 174 |
| 8.3 | Execution of Supplemental Indentures. | 177 |
| 8.4 | Effect of Supplemental Indentures | 178 |
| 8.5 | Reference in Notes to Supplemental Indentures. | 178 |

| 9. | REDEMPTION OF SECURED NOTES | 178 |
|---|---|---|
| 9.1 | Redemption of Senior Notes. | 178 |
| 9.2 | Notice to Trustee of Optional Redemption, Tax Redemption or Clean-Up Call Redemption. | 181 |
| 9.3 | Notice of Auction Call Redemption, Optional Redemption, Tax Redemption, Clean-Up Call Redemption or Maturity by the Co-Issuers. | 181 |
| 9.4 | Notes Payable on Redemption Date. | 182 |
| 9.5 | Auction Call Redemption. | 182 |
| 9.6 | Clean-Up Call Redemption. | 185 |

| 10. | ACCOUNTS, ACCOUNTINGS AND RELEASES | 185 |
|---|---|---|
| 10.1 | Collection of Cash | 185 |
| 10.2 | Principal Collection Account; Interest Collection Account; Reserve Account; Custodial Account; Synthetic Security Counterparty Account; Issuer Collateral Account; Senior Swap Collateral Account; Interest Reserve Account; Closing Date Expense Account. | 186 |
| 10.3 | Payment Account. | 197 |
| 10.4 | Expense Account. | 197 |
| 10.5 | Uninvested Proceeds Account. | 198 |
| 10.6 | Reports by Trustee. | 199 |
| 10.7 | Accountings. | 200 |
| 10.8 | Release of Securities. | 210 |
| 10.9 | Reports by Independent Accountants. | 211 |
| 10.10 | Reports to Rating Agencies, Etc. | 211 |

10.11 Tax Matters. ................................................................212
10.12 No Gross Up. ................................................................212

11.   APPLICATION OF CASH ..............................................213

11.1 Disbursements of Cash from Payment Account. ...............213
11.2 Securities Accounts. ....................................................228

12.   PURCHASE AND SALE OF COLLATERAL DEBT SECURITIES;
      SUBSTITUTION ..........................................................228

12.1 Sale and Substitution of Collateral Debt Securities. ..........228
12.2 Eligibility Criteria and Trading Restrictions ....................233
12.3 Conditions Applicable to all Transactions Involving Sale or Grant ..........249
12.4 Proposed Plans. ..........................................................250

13.   SECURED PARTIES' RELATIONS ..................................250

13.1 Subordination. ...........................................................250
13.2 Standard of Conduct. ..................................................254

14.   MISCELLANEOUS .......................................................254

14.1 Form of Documents Delivered to Trustee. ........................254
14.2 Acts of Noteholders. ...................................................255
14.3 Notices, Etc., to Trustee, the Co-Issuers, the Collateral Manager, the
      Hedge Counterparties, the Credit Default Swap Counterparty, the Senior
      Swap Counterparties and the Rating Agencies. ..................255
14.4 Notices and Reports to Noteholders; Waiver. ...................258
14.5 Effect of Headings and Table of Contents. ......................258
14.6 Successors and Assigns. ..............................................259
14.7 Severability. .............................................................259
14.8 Benefits of Indenture ..................................................259
14.9 Governing Law. .........................................................259
14.10 Submission to Jurisdiction. .........................................259
14.11 Counterparts. ...........................................................260
14.12 Waiver of Jury Trial. .................................................260
14.13 Judgment Currency. ..................................................260
14.14 Confidential Treatment of Documents. ...........................260
14.15 Consent to Posting of Documents on Repository. .............261
14.16 Liability of Co-Issuers. ..............................................261

15.   ASSIGNMENT OF COLLATERAL MANAGEMENT AGREEMENT, ETC. ............262

15.1 Assignment. .............................................................262
15.2 No Impairment. ........................................................262

15.3    Termination, Etc. ........................................................................262
15.4    Issuer Agreements, Etc. ...............................................................263

16.     HEDGE AGREEMENTS ...............................................................264

## SCHEDULES

Schedule A    Schedule of Closing Collateral Debt Securities
Schedule B    LIBOR Formula
Schedule C    [RESERVED]
Schedule D    Loss Scenario/Recovery Rate Matrices
Schedule E    Auction Procedures
Schedule F    Standard & Poor's Asset Classes
Schedule G    Standard & Poor's Types of Asset-Backed Securities Ineligible for Notching
Schedule H    Moody's and Standard & Poor's Notching of Asset-Backed Securities
Schedule I    Scheduled Class X Target Principal Amount

## EXHIBITS

Exhibit A-1    Form of Regulation S Global Note
Exhibit A-2    Form of Restricted Global Note
Exhibit A-3    Form of Definitive Note
Exhibit B-1    Form of Rule 144A Transfer Certificate
Exhibit B-2    Form of Regulation S Transfer Certificate
Exhibit C    Form of Funding Certificate
Exhibit D    Form of Opinion of Cadwalader, Wickersham & Taft LLP
Exhibit E    Form of Opinion of Maples and Calder
Exhibit F    Form of Opinion of Bell, Boyd & Lloyd, LLC
Exhibit G    Form of Opinion of In-house counsel to the Trustee
Exhibit H    Form of Opinion of Kennedy Covington Lobdell & Hickman, L.L.P.
Exhibit I    Form of Opinion of Seyfarth Shaw LLC as local counsel to the Trustee
Exhibit J:    Form of Opinion of In-house Counsel to the Credit Default Swap Counterparty
Exhibit K:    Form of Opinion of In-house Counsel to the Senior Swap Counterparty
Exhibit L:    Form of Investor Certification
Exhibit M:    Form-Approved Synthetic Securities
Exhibit N:    Form-Approved Credit Default Swap Agreement
Exhibit O:    Form of Investment Agreement

THIS INDENTURE dated as of October 17, 2006 among LIBRA CDO LIMITED, an exempted company with limited liability incorporated and existing under the laws of the Cayman Islands (the "**Issuer**"), LIBRA CDO, LLC, a limited liability company formed and existing under the laws of the State of Delaware (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**"), and LASALLE BANK NATIONAL ASSOCIATION, a national banking association, as trustee (herein, together with its permitted successors in the trusts hereunder, called the "**Trustee**").

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the issuance of the Notes as provided in this Indenture. All covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Noteholders, each Hedge Counterparty (if any), the Credit Default Swap Counterparty, the Senior Swap Counterparty, any Prior Senior Swap Counterparty, each Synthetic Security Counterparty (but only, for each Synthetic Security Counterparty other than the Credit Default Swap Counterparty, to the extent of assets credited to the Synthetic Security Counterparty Account for the benefit of such Synthetic Security Counterparty), the Collateral Manager and the Trustee (collectively, the "**Secured Parties**"). The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with its terms have been done.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all accounts, general intangibles, chattel paper, instruments, securities, investment property, commercial tort claims, deposit accounts, documents, goods and letter-of-credit rights and any and all other personal property (other than Excepted Property and Excluded Assets) of any type or nature owned by it, including (a) the Collateral Debt Securities, Reserve Account Investments and U.S. Agency Securities that the Issuer causes to be delivered to the Trustee (directly or through a Securities Intermediary) on the Closing Date (listed on the Schedule of Closing Collateral Debt Securities), all Collateral Debt Securities and Equity Securities that are delivered to the Trustee (directly or through a Securities Intermediary) after the Closing Date pursuant to the terms hereof (including the Collateral Debt Securities and Equity Securities listed, as of the Ramp-Up Completion Date, on the schedule of Collateral Debt Securities delivered by the Issuer pursuant to Section 7.17(c)) and all payments thereon or with respect thereto, (b) the Accounts (but with respect to any Synthetic Security Counterparty Account and each Asset Hedge Account, subject to the prior lien of the applicable Synthetic Security Counterparty or Asset Hedge Counterparty (as applicable) with respect to which each such account (or sub-account thereof) relates) and the Reserve Account Investments, Eligible Investments and U.S. Agency Securities purchased with funds on deposit in said accounts and all income from the investment of funds therein, (c) income from the investment of

funds in any Synthetic Security Counterparty Account or Asset Hedge Account, (d) the Hedge Agreements, the Senior Swap Agreement and the Credit Default Swap Agreement, (e) the Collateral Management Agreement, the Collateral Administration Agreement, the Note Purchase Agreement, the Placement Agreement, the Preference Share Paying Agency Agreement and any Subscription Agreement, (f) all Cash delivered to the Trustee (directly or through a Securities Intermediary) and (g) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses (collectively, the "**Collateral**"). Such Grants are made, however, to the Trustee to hold in trust to secure the Notes equally and ratably without prejudice, priority or distinction between any Note and any other Note by reason of difference in time of issuance or otherwise, except as expressly provided in this Indenture, and to secure (i) the payment of all amounts due (A) on the Notes, (B) to the Credit Default Swap Counterparty under the Credit Default Swap Agreement, (C) to the Senior Swap Counterparty under the Senior Swap Agreement, (D) to any Prior Senior Swap Counterparty under this Indenture in respect of its Outstanding Swap Counterparty Amount and Senior Swap Interest Amounts thereon, (E) to any Synthetic Security Counterparty to the extent of assets credited to a Synthetic Security Counterparty Account with respect to such Synthetic Security and (F) to the Hedge Counterparties under the Hedge Agreements, in each case in accordance with their respective terms, (ii) the payment of all other sums payable under this Indenture (including the Collateral Management Fee and all amounts payable to the Collateral Manager under the Collateral Management Agreement) and (iii) compliance with the provisions of this Indenture, the Credit Default Swap Agreement, the Senior Swap Agreement, any Synthetic Securities and the Hedge Agreements, all as provided in this Indenture (collectively, the "**Secured Obligations**").

Except to the extent otherwise provided in this Indenture, the Issuer does hereby constitute and irrevocably appoint the Trustee the true and lawful attorney of the Issuer, with full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer with respect to the Collateral held for the benefit and security of the Secured Parties and to ask, require, demand, receive, settle, compromise, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of any of the Collateral held for the benefit and security of the Secured Parties, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the Trustee may deem to be necessary or advisable in the premises. The power of attorney granted pursuant to this Indenture and all authority hereby conferred are granted and conferred solely to protect the Trustee's interest in the Collateral held for the benefit and security of the Secured Parties and shall not impose any duty upon the Trustee to exercise any power. This power of attorney shall be irrevocable as one coupled with an interest prior to the payment in full of all the obligations secured hereby.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein. Upon the occurrence of any Event of Default with respect to the Notes, and in addition to any other rights available under this Indenture or any other instruments included in the Collateral held for the benefit and security of the Secured Parties or otherwise available at law or in equity, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject

to compliance with any mandatory requirements of applicable law, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public or private sale.

It is expressly agreed that anything therein contained to the contrary notwithstanding, the Issuer shall remain liable under any instruments included in the Collateral to perform all the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and except as otherwise expressly provided herein, the Trustee shall not have any obligations or liabilities under such instruments by reason of or arising out of this Indenture, nor shall the Trustee be required or obligated in any manner to perform or fulfill any obligations of the Issuer under or pursuant to such instruments or to make any payment, to make any inquiry as to the nature or sufficiency of any payment received by it, to present or file any claim, or to take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

The designation of the Trustee in any transfer document or record is intended and shall be deemed, first, to refer to the Trustee as a purchaser of Collateral as custodian on behalf of the Issuer and second, to refer to the Trustee as secured party on behalf of the Secured Parties, provided that the Grant made by the Issuer to the Trustee pursuant to the Granting Clauses hereof shall apply to any Collateral bearing such designation.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties herein to the best of its ability such that the interests of the Secured Parties may be adequately and effectively protected.

None of the Trustee, the Noteholders or the other Secured Parties (other than with respect to clause (iv) below and subject to the prior lien of the Issuer or the Senior Swap Counterparty, as applicable, to the extent they are entitled to any amounts credited thereto, pursuant to the terms of the Senior Swap Agreement) shall have any legal, equitable or beneficial interest in or claim to (i) the Preference Share Distribution Account (as defined in the Preference Share Paying Agency Agreement) or any amounts on deposit therein, (ii) any assets of the Co-Issuer, (iii) except as set forth in clause (c) of the first sentence of the Granting Clause, the Synthetic Security Counterparty Account or Asset Hedge Account or (iv) the Senior Swap Collateral Account or any amounts on deposit therein (collectively, the "**Excluded Assets**").

## 1. DEFINITIONS AND INTERPRETATION

### 1.1 Definitions.

(a)     Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture. Whenever any reference is made to an amount the determination of which is governed by Section 1.2, the provisions of Section 1.2 shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

"**Account**" means any of the Interest Collection Account, the Principal Collection Account, the Uninvested Proceeds Account, each Issuer Collateral Account, each Synthetic

Security Counterparty Account, the Payment Account, the Expense Account, the Closing Date Expense Account, the Custodial Account, the Reserve Account, the Senior Swap Collateral Account, the Interest Reserve Account, each Hedge Counterparty Collateral Account, each Asset Hedge Account and any subaccount thereof that the Trustee deems necessary or appropriate.

"**Account Control Agreement**" means the Account Control Agreement, dated as of the Closing Date, among the Issuer, the Trustee and the Custodian, as modified and supplemented and in effect from time to time.

"**Accountants' Report**" means a report of a firm of Independent certified public accountants of recognized national reputation appointed by the Issuer pursuant to Section 10.9(a), which may be the firm of Independent accountants that reviews or performs procedures with respect to the financial reports prepared by the Issuer or the Collateral Manager.

"**Act**" and "**Acts**" of Noteholders have the meanings specified in Section 14.2.

"**Additional Issuance**" has the meaning specified in Section 2.9.

"**Administration Agreement**" means the Administration Agreement, dated October 17, 2006, between the Administrator and the Issuer, as modified and supplemented and in effect from time to time.

"**Administrative Expenses**" means amounts due or accrued with respect to any Quarterly Distribution Date and payable by the Issuer or the Co-Issuer to (i) the Trustee pursuant to Section 6.8 or any co-trustee appointed pursuant to Section 6.13, (ii) the Collateral Administrator under the Collateral Administration Agreement, (iii) the Preference Share Paying Agent under the Preference Share Paying Agency Agreement, (iv) the Administrator under the Administration Agreement, (v) the Independent accountants, agents and counsel of the Issuer for reasonable fees and expenses (including amounts payable in connection with the preparation of tax forms on behalf of the Co-Issuers), (vi) the Rating Agencies for fees and expenses in connection with any rating (including any credit estimates and the annual fee payable with respect to the monitoring of any rating) of the Senior Swap Agreement and the Notes, including fees and expenses due or accrued in connection with any rating of the Collateral Debt Securities, (vii) the Collateral Manager under this Indenture and the Collateral Management Agreement (including amounts payable by the Issuer to any Indemnified Party (as defined in the Collateral Management Agreement) pursuant to Section 14 of the Collateral Management Agreement), (viii) any other Person in respect of any governmental fee, registered office fee, charge or tax in relation to the Issuer or the Co-Issuer (in each case as certified by an Authorized Officer of the Issuer or the Co-Issuer to the Trustee) and (ix) any other Person in respect of any other fees or expenses (including indemnities) permitted under this Indenture and the documents delivered pursuant to or in connection with this Indenture and the Notes; *provided* that Administrative Expenses shall not include (a) any amounts due or accrued with respect to the actions taken on or in connection with the Closing Date (other than up to U.S.$150,000 which may be withdrawn from the Expense Account for such purpose, provided that the Collateral Manager has approved in writing each such withdrawal in advance), (b) amounts payable in respect of the Notes or Preference Shares, (c) amounts payable under the Hedge Agreements, the Credit Default Swap Agreement or the Senior Swap Agreement, (d) amounts payable to any Prior Senior Swap

Counterparty under a Senior Swap Agreement or hereunder and (e) any Collateral Management Fee payable pursuant to the Collateral Management Agreement.

"**Administrator**" means Deutsche Bank (Cayman) Limited and any successor thereto appointed under the Administration Agreement.

"**Affected Class**" means any Class of Notes that would suffer a reduction in the amount of any Distribution that would otherwise be payable to any such Class in accordance with the Priority of Payments by reason of the occurrence of a Tax Event.

"**Affiliate**" or "**Affiliated**" means, with respect to a specified Person, (a) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (b) any other Person who is a director, Officer, employee, member or general partner of such Person or any such other Person described in clause (a) above. For the purposes of this definition, "**control**" of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise; *provided* that no other special purpose company to which the Administrator provides directors and acts as share trustee or administrator shall be an Affiliate of the Issuer or the Co-Issuer.

"**Aggregate Amortized Cost**" means, with respect to any Principal Only Security or Zero Coupon Bond, (a) on the date of acquisition thereof by the Issuer, the cost of purchase thereof and (b) on any date thereafter, the present value of all remaining payments on such security discounted to such date of determination as of each subsequent Quarterly Distribution Date at a discount rate per annum equal to the internal rate of return on such security as calculated by the Collateral Manager in good faith and in the exercise of its judgment at the time of purchase thereof by the Issuer.

"**Aggregate Outstanding Amount**" means, when used with respect to any of the Notes at any time, the aggregate principal amount of such Notes Outstanding at such time plus, in the case of Class C Notes, Class D Notes and Class X Notes, any Class C Deferred Interest, Class D Deferred Interest or Class X Deferred Interest, as the case may be.

"**Aggregate Outstanding Swap Counterparty Amount**" means, with respect to any date of determination, the sum of (a) the Outstanding Swap Counterparty Amount for the Senior Swap Counterparty and (b) the aggregate of all Outstanding Swap Counterparty Amounts for all Prior Senior Swap Counterparties, if any.

"**Aggregate Principal Balance**" means, when used with respect to any Pledged Securities as of any date of determination, the sum of the Principal Balances on such date of determination of all such Pledged Securities.

"**Aggregate Ramp-Up Par Amount**" means U.S.$1,500,000,000.

"**Applicable Recovery Rate**" means, with respect to any Collateral Debt Security on any Measurement Date, the lower of (a) an amount equal to the percentage for such Collateral Debt Security set forth in the Moody's recovery rate matrix set forth in Part I of <u>Schedule D</u> in (x) the

table corresponding to the relevant Specified Type of Collateral Debt Security, (y) the column in such table setting forth the Moody's Rating of such Collateral Debt Security as of the date of issuance of such Collateral Debt Security and (z) the row in such table opposite the percentage of the Issue of which such Collateral Debt Security including, for senior only bonds, all other bonds which are *pari passu* in terms of losses, is a part relative to the total capitalization of (including both debt and equity securities issued by) the relevant issuer of or obligor on such Collateral Debt Security, determined on the original issue date of such Collateral Debt Security, provided that (1) if such Collateral Debt Security is a U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security, it shall be treated as an ABS Type Diversified Security for the purposes of applying the recovery rate in Part I of Schedule D, (2) if the timely payment of principal of and interest on such Collateral Debt Security is guaranteed (and such guarantee ranks equally and ratably with the guarantor's senior unsecured debt) by another Person, unless such Collateral Debt Security is a U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security, such amount shall be 30%, (3)(A) if such Collateral Debt Security is a REIT Debt Security other than a REIT Debt Security—Health Care or REIT Debt Security—Mortgage, such amount shall be 40% and (B) if such Collateral Debt Security is a REIT Debt Security—Health Care or REIT Debt Security—Mortgage, such amount shall be 10%, and (4) if such Collateral Debt Security is a Reinsurance Security, such amount shall be assigned by Moody's upon the purchase of each such Collateral Debt Security and (b) an amount equal to the percentage for such Collateral Debt Security set forth in the Standard & Poor's recovery rate matrix set forth in Part II of Schedule D in (x) the applicable table, (y) the row in such table opposite the Standard & Poor's Rating of such Collateral Debt Security at the time of issuance of such Collateral Debt Securities and (z) (i) for purposes of determining the Standard & Poor's Weighted Average Recovery Rate, the column in such table below the current rating of the respective Class of Notes or (ii) for purposes of determining the Calculation Amount, in the column in such table below the current rating of the Class of Outstanding Notes with the highest rating by Standard & Poor's. The Issuer shall request Moody's and Standard & Poor's assign a recovery rate to any Synthetic Security that is not a Form-Approved Synthetic Security prior to the acquisition thereof.

"**Asset-Backed Security**" means (i) a security issued by an entity formed for the purpose of holding or investing and reinvesting in a pool, either fixed or revolving (the composition of which cannot vary as a result of a decision by the Collateral Manager and its Affiliates), of receivables, debt obligations, debt securities, finance leases or other similar assets subject to specified acquisition or investment and management criteria designed to assure the servicing or timely distribution of proceeds to holders of the securities or (ii) a beneficial interest in a trust, all of the assets of which would satisfy the Eligibility Criteria.

"**Asset Hedge Account**" means any Securities Account designated as an "Asset Hedge Account" and established in the name of the Trustee pursuant to Section 16.1(e).

"**Asset Hedge Counterparty**" means any counterparty or permitted assignee or successor of a counterparty that enters into a Deemed Floating Asset Hedge Agreement with the Issuer.

"**Assignor Senior Swap Counterparty**" means, for the period from and including the applicable Senior Swap Early Assignment Date to but excluding the date on which the applicable

Outstanding Swap Counterparty Amount is reduced to zero, any Senior Swap Counterparty which has assigned all of its future contingent payment obligations to an assignee Senior Swap Counterparty without being fully reimbursed by such assignee Senior Swap Counterparty or otherwise for its Outstanding Swap Counterparty Amount as of the applicable Senior Swap Early Assignment Date, together with any assignees of and successors to such Assignor Senior Swap Counterparty's rights hereunder to receive its Outstanding Swap Counterparty Amount, Senior Swap Premium Amount (if applicable) and Senior Swap Interest Amounts thereon.

"**Assumed Reinvestment Rate**" means, with respect to any Account or fund securing the Notes, the greater of (a) LIBOR *minus* 1.00% and (b) zero.

"**Auction**" has the meaning specified in <u>Section 9.5</u>.

"**Auction Call Redemption**" has the meaning specified in <u>Section 9.5</u>.

"**Auction Call Redemption Amount**" means the sum of (a) the Total Senior Redemption Amount *plus* (b) the amount of any accrued and unpaid Subordinated Collateral Management Fee (unless otherwise waived by the Collateral Manager in whole or in part) and any interest accrued thereon; *provided* that Holders of at least a Majority of the respective voting rights (with respect to each Senior Swap Counterparty, voting separately) or Holders of at least 66-⅔% of the Aggregate Outstanding Amount of any Affected Class of Notes, as the case may be, may elect, in connection with any Auction Call Redemption, to receive less than 100% of (a) with respect to each Senior Swap Counterparty, amounts owed to it (but not owed to any other Senior Swap Counterparty) under the Senior Swap Agreement and (b) with respect to Holders, the portion of the Sale Proceeds from the Collateral Debt Securities and the Balance of all Reserve Account Investments and Eligible Investments and Cash in the Accounts (other than any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Issuer Collateral Account, the Senior Swap Collateral Account and any Synthetic Security Counterparty Account) that would otherwise be payable to Holders of such Class if such sum were to equal the Auction Call Redemption Amount as defined without reference to this proviso, in which case the Auction Call Redemption Amount shall be reduced accordingly for purposes of this definition.

"**Auction Date**" has the meaning specified in <u>Section 9.5</u>.

"**Auction Procedures**" has the meaning specified in <u>Section 9.5</u>.

"**Auction Purchase Agreement**" has the meaning specified in <u>Schedule E</u>.

"**Authenticating Agent**" means, with respect to the Notes or any Class of the Notes, the Person designated by the Trustee, if any, to authenticate such Notes on behalf of the Trustee pursuant to <u>Section 6.4</u>.

"**Authorized Officer**" means (i) with respect to the Issuer, any Officer of the Issuer who is authorized to act for the Issuer in matters relating to, and binding upon, the Issuer, (ii) with respect to the Co-Issuer, any Officer who is authorized to act for the Co-Issuer in matters relating to, and binding upon, the Co-Issuer, (iii) with respect to the Collateral Manager, any Officer, employee or agent of the Collateral Manager who is authorized to act for the Collateral Manager in matters relating to, and binding upon, the Collateral Manager with respect to the subject

matter of the request, certificate or order in question and (iv) with respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"**Average Life**" means, on any Measurement Date with respect to any Collateral Debt Security, the quotient obtained by *dividing* (i) the sum of the products of (a) the number of years (rounded to the nearest one tenth thereof) from such Measurement Date to the respective dates of each successive Scheduled Distribution of principal of such Collateral Debt Security and (b) the respective amounts of principal of such Scheduled Distributions *by* (ii) the sum of all successive Scheduled Distributions of principal on such Collateral Debt Security.

"**Balance**" means at any time, with respect to the Reserve Account Investments, Cash or Eligible Investments in any Account at such time, the aggregate of the (i) current balance of the Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) principal amount of interest-bearing corporate and government securities, money market accounts, repurchase obligations and Investment Agreements; and (iii) purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"**Bank**" means LaSalle Bank National Association, a national banking association, in its individual capacity and not as Trustee.

"**Bankruptcy Code**" means the United States Bankruptcy Code, Title 11 of the United States Code, as amended or where the context requires, the applicable insolvency provisions of the laws of the Cayman Islands.

"**Base Rate**" has the meaning set forth in Schedule B.

"**Base Rate Reference Bank**" has the meaning set forth in Schedule B.

"**Beneficial Owner**" means any Person owning an interest in a Global Note as reflected on the books of the Depositary or on the books of a Depositary Participant or on the books of an indirect participant for which a Depositary Participant of the Depositary acts as agent.

"**Board of Directors**" means the directors of the Issuer duly appointed in accordance with the Issuer Charter.

"**Bond Purchase Request**" has the meaning given to such term in the Senior Swap Agreement.

"**Business Day**" means a day on which commercial banks and foreign exchange markets settle payments in New York City and London and any other city in which the Corporate Trust Office is located and, in the case of the final payment of principal of any Note, the place of presentation of such Note.

"**Calculation Agent**" has the meaning specified in <u>Section 7.15</u>.

"**Calculation Amount**" means, with respect to any Collateral Debt Security at any time, that (i) is a Defaulted Security, (ii) is a Deferred Interest PIK Bond, (iii) has a Moody's Rating of below "Caa3" or (iv) was received upon acceptance of an Offer under the circumstances described in clause (a) of the definition of "Principal Balance," the lesser of (a) the Fair Market Value of such Collateral Debt Security and (b) the amount obtained by *multiplying* the Applicable Recovery Rate *by* the Principal Balance of such Collateral Debt Security; *provided*, *however*, that the Calculation Amount for any Collateral Debt Security that has been a Defaulted Security for more than three years shall be zero.

"**Calculation Period**" means, with respect to any Quarterly Distribution Date, (i) in the case of the initial Calculation Period, the period from, and including, the Closing Date to, but excluding, the first Quarterly Distribution Date and (ii) thereafter, the period from, and including, the Quarterly Distribution Date immediately following the last day of the immediately preceding Calculation Period to, but excluding, the next succeeding Quarterly Distribution Date.

"**Case**" means the case or interpolation of appropriate cases chosen by the Collateral Manager as currently applicable to the Collateral Debt Securities for purposes of the Weighted Average Premium/Spread Test and the Moody's Weighted Average Rating Test.

"**Cash**" means such funds denominated with currency of the United States of America as at the time shall be legal tender for payment of all public and private debts, including funds credited to a deposit account or a Securities Account.

"**CDS Agreement Transactions**" means the Synthetic Securities in the form of credit default swap transactions entered into by the Issuer with the Credit Default Swap Counterparty under the Credit Default Swap Agreement; *provided* that CDS Agreement Transactions that reference Fixed Rate Collateral Debt Securities shall not exceed in the aggregate 30% of all CDS Agreement Transactions.

"**CDS Termination Payment**" has the meaning given to such term in <u>Section 7.18(b)</u>.

"**Certificated Security**" has the meaning specified in <u>Section 8-102(a)(4)</u> of the UCC.

"**Certificate of Authentication**" has the meaning specified in <u>Section 2.3(f)</u>.

"**Class**" means each of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class X Notes.

"**Class A Notes**" means the U.S.$150,000,000 Class A Senior Secured Floating Rate Notes due 2046 issued by the Co-Issuers on the Closing Date that bear interest at a rate per annum equal to LIBOR *plus* 0.42%.

"**Class A/B Interest Coverage Ratio**" means, as of any Measurement Date, the ratio (expressed as a percentage) obtained by dividing:

(i)   (a) the sum of the cash interest payments (or any purchase discount in the case of Eligible Investments or premiums in the case of Synthetic Securities) received or expected to be received, including Proceeds of any sold Collateral Debt Security which represents accrued interest (unless such accrued interest is required to be classified as Principal Proceeds as provided in clauses (7) and (8) in the definition thereof) in the Due Period in which such Measurement Date occurs on the Collateral Debt Securities, the Eligible Investments and the Reserve Account Investments (other than cash received from Defaulted Obligations and Deferred Interest PIK Bonds) held in any of the Accounts, *plus* (b) amounts available in the Interest Reserve Account that are expected to be transferred to the Interest Collection Account, *plus* (c) without duplication, amounts scheduled to be received by the Issuer from any Hedge Counterparty under any Hedge Agreement less any amounts scheduled to be paid to any Hedge Counterparty under any Hedge Agreement (in each case, other than termination payments and termination receipts related to such Hedge Agreements), *minus* (d) amounts expected to be paid on the next Quarterly Distribution Date under clauses (A) through (E) under Section 11.1(i); by

(ii)   an amount not less than U.S.$1.00 equal to the sum of (a) the interest payments due on the Class A Notes on the following Quarterly Distribution Date and the Class B Notes on the following Quarterly Distribution Date and (b) the aggregate of the Senior Swap Premium Amounts and Senior Swap Interest Amounts payable to the Senior Swap Counterparties on the following Quarterly Distribution Date.

"**Class A/B Interest Coverage Test**" means, for so long as any Class A Notes or Class B Notes remain Outstanding, a test satisfied on any Measurement Date occurring after the last day of the Reinvestment Period if the Class A/B Interest Coverage Ratio is equal to or greater than 112.0%.

"**Class A/B Overcollateralization Ratio**" means, as of any Measurement Date, the number (expressed as a percentage) calculated by *dividing* (a) the Net Outstanding Portfolio Collateral Balance on such Measurement Date *by* (b) the Aggregate Outstanding Swap Counterparty Amount of the Senior Swap Counterparties *plus* the Remaining Unfunded Notional Amount *plus* the Aggregate Outstanding Amount of the Class A Notes *plus* the Aggregate Outstanding Amount of the Class B Notes.

"**Class A/B Overcollateralization Test**" means, for so long as any Class A Notes or Class B Notes remain Outstanding, a test satisfied on any Measurement Date occurring after the last day of the Reinvestment Period if the Class A/B Overcollateralization Ratio on such Measurement Date is equal to or greater than 109.0%.

"**Class B Notes**" means the U.S.$82,500,000 Class B Secured Floating Rate Notes due 2046 issued by the Co-Issuers on the Closing Date that bear interest at a rate per annum equal to LIBOR *plus* 0.52%.

"**Class C Deferred Interest**" means, with respect to the Class C Notes, any interest due on such Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Quarterly Distribution Date and which pursuant to Section 2.6(a) is deferred until the Quarterly Distribution Date on which such interest is available to be paid in accordance with the Priority of Payments.

"**Class C Interest Coverage Ratio**" means, as of any Measurement Date, the ratio (expressed as a percentage) obtained by dividing:

(i)    (a) the sum of the cash interest payments (or any purchase discount in the case of Eligible Investments or premiums in the case of Synthetic Securities) received or expected to be received, including Proceeds of any sold Collateral Debt Security which represents accrued interest (unless such accrued interest is required to be classified as Principal Proceeds as provided in clauses (7) and (8) in the definition thereof) in the Due Period in which such Measurement Date occurs on the Collateral Debt Securities, the Eligible Investments and the Reserve Account Investments (other than cash received from Defaulted Obligations and Deferred Interest PIK Bonds) held in any of the Accounts, *plus* (b) amounts available in the Interest Reserve Account that are expected to be transferred to the Interest Collection Account, *plus* (c) without duplication, amounts scheduled to be received by the Issuer from any Hedge Counterparty under any Hedge Agreement less any amounts scheduled to be paid to any Hedge Counterparty under any Hedge Agreement (in each case, other than termination payments and termination receipts related to such Hedge Agreements), *minus* (d) amounts expected to be paid on the next Quarterly Distribution Date under clauses (A) through (E) under Section 11.1(i); by

(ii)    an amount not less than U.S.$1.00 equal to the sum of (a) the interest payments due on the Class A Notes, Class B Notes and the Class C Notes (including interest on the Class C Deferred Interest, but excluding the Class C Deferred Interest) on the following Quarterly Distribution Date and (b) the aggregate of the Senior Swap Premium Amounts and Senior Swap Interest Amounts payable to the Senior Swap Counterparties on the following Quarterly Distribution Date.

"**Class C Interest Coverage Test**" means, for so long as any Class C Notes remain Outstanding, a test satisfied on any Measurement Date occurring after the last day of the Reinvestment Period if the Class C Interest Coverage Ratio is equal to or greater than 108.0%.

"**Class C Notes**" means the U.S.$90,000,000 Class C Secured Deferrable Floating Rate Notes due 2046 issued by the Co-Issuers on the Closing Date that bear interest at a rate per annum equal to LIBOR *plus* 1.40%.

"**Class C Overcollateralization Ratio**" means, as of any Measurement Date, the number (expressed as a percentage) calculated by *dividing* (a) the Net Outstanding Portfolio Collateral Balance on such Measurement Date *by* (b) the Aggregate Outstanding Swap Counterparty Amount of the Senior Swap Counterparties *plus* the Remaining Unfunded Notional Amount *plus* the Aggregate Outstanding Amount of the Class A Notes *plus* the Aggregate Outstanding Amount of the Class B Notes *plus* the Aggregate Outstanding Amount of the Class C Notes including, for the avoidance of doubt and without duplication, the Class C Deferred Interest.

"**Class C Overcollateralization Test**" means, for so long as any Class A Notes and Class B Notes remain Outstanding, a test satisfied on any Measurement Date occurring after the last day of the Reinvestment Period if the Class C Overcollateralization Ratio on such Measurement Date is equal to or greater than 104.3%.

"**Class D Cap Amount**" means, with respect to any Quarterly Distribution Date, an amount equal to 0.9375% multiplied by the original principal amount of Class D Notes set forth in Section 2.2(b).

"**Class D Deferred Interest**" means, with respect to the Class D Notes, any interest due on such Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Quarterly Distribution Date and which pursuant to Section 2.6(a) is deferred until the Quarterly Distribution Date on which such interest is available to be paid in accordance with the Priority of Payments.

"**Class D Interest Coverage Ratio**" means, as of any Measurement Date, the ratio (expressed as a percentage) obtained by dividing:

(i) (a) the sum of the cash interest payments (or any purchase discount in the case of Eligible Investments or premiums in the case of Synthetic Securities) received or expected to be received, including Proceeds of any sold Collateral Debt Security which represents accrued interest (unless such accrued interest is required to be classified as Principal Proceeds as provided in clauses (7) and (8) in the definition thereof) in the Due Period in which such Measurement Date occurs on the Collateral Debt Securities, the Eligible Investments and the Reserve Account Investments (other than cash received from Defaulted Obligations and Deferred Interest PIK Bonds) held in any of the Accounts, *plus* (b) amounts available in the Interest Reserve Account that are expected to be transferred to the Interest Collection Account, *plus* (c) without duplication, amounts scheduled to be received by the Issuer from any Hedge Counterparty under any Hedge Agreement less any amounts scheduled to be paid to any Hedge Counterparty under any Hedge Agreement (in each case, other than termination payments and termination receipts related to such Hedge Agreements), *minus* (d) amounts expected to be paid on the next Quarterly Distribution Date under clauses (A) through (E) under Section 11.1(i); by

(ii) an amount not less than U.S.$1.00 equal to the sum of (a) the interest payments due on the Class A Notes, Class B Notes, the Class C Notes (including interest on the Class C Deferred Interest, but excluding the Class C Deferred Interest) and the Class D Notes (including interest on the Class D Deferred Interest, but excluding the Class D Deferred Interest) on the following Quarterly Distribution Date and (b) the aggregate of the Senior Swap Premium Amounts and Senior Swap Interest Amounts payable to the Senior Swap Counterparties on the following Quarterly Distribution Date.

"**Class D Interest Coverage Test**" means, for so long as any Class D Notes remain Outstanding, a test satisfied on any Measurement Date occurring after the last day of the Reinvestment Period if the Class D Interest Coverage Ratio is equal to or greater than 105.0%.

"**Class D Notes**" means the U.S.$52,500,000 Class D Mezzanine Secured Deferrable Floating Rate Notes due 2046 issued by the Co-Issuers on the Closing Date that bear interest at a rate per annum equal to LIBOR *plus* 3.30%.

"**Class D Overcollateralization Ratio**" means, as of any Measurement Date, the number (expressed as a percentage) calculated by *dividing* (a) the Net Outstanding Portfolio Collateral Balance on such Measurement Date *by* (b) the Aggregate Outstanding Swap Counterparty

Amount of the Senior Swap Counterparties *plus* the Remaining Unfunded Notional Amount *plus* the Aggregate Outstanding Amount of the Class A Notes *plus* the Aggregate Outstanding Amount of the Class B Notes *plus* the Aggregate Outstanding Amount of the Class C Notes *plus* the Aggregate Outstanding Amount of the Class D Notes including, for the avoidance of doubt and without duplication, the Class C Deferred Interest and the Class D Deferred Interest.

"**Class D Overcollateralization Test**" means, for so long as any Class of Notes remains Outstanding, a test satisfied on any Measurement Date occurring after last day of the Reinvestment Period if the Class D Overcollateralization Ratio on such Measurement Date is equal to or greater than 101.8%.

"**Class Scenario Default Rate**" means, with respect to any Class of Notes rated by Standard & Poor's, at any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with Standard & Poor's rating of such Class of Notes on the Closing Date, determined by application of the Standard & Poor's CDO Monitor at such time.

"**Class X Deferred Interest**" means, with respect to the Class X Notes, any interest due on such Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Quarterly Distribution Date and which pursuant to Section 2.6(a) is deferred until the Quarterly Distribution Date on which such interest is available to be paid in accordance with the Priority of Payments.

"**Class X Notes**" means the U.S.$62,400,000 Class X Deferrable Notes due 2046 issued by the Co-Issuers on the Closing Date that bear interest at the Class X Stated Rate.

"**Class X Payment Allocation**" means, with respect to each Quarterly Distribution Date until the Aggregate Outstanding Amount of the Class X Notes is reduced to zero, the following amounts in the following order of priority: *first*, Class X Deferred Interest, *second*, the Class X Rated Interest due and payable in respect of such Quarterly Distribution Date, *third*, any due and unpaid Scheduled Class X Target Principal Amount in respect of any previous Quarterly Distribution Dates and *fourth*, the Scheduled Class X Target Principal Amount due and payable in respect of such Quarterly Distribution Date.

"**Class X Rated Interest**" means, with respect to the Class X Notes, on any Quarterly Distribution Date, the aggregate amount of interest accrued at the Class X Stated Rate during the Due Period ending immediately prior to such Quarterly Distribution Date on the Aggregate Outstanding Amount of Class X Notes as of the first day of such Due Period (after giving effect to any payment of the Scheduled Class X Target Principal Amount on any preceding Quarterly Distribution Date).

"**Class X Stated Rate**" means, with respect to the Class X Notes for any Due Period, a fixed rate *per annum* equal to 6.00% that shall be computed on the basis of a 360-day year comprised of twelve 30-day months, as provided under the terms of such Notes.

"**Clean-Up Call Redemption**" has the meaning specified in Section 9.6(a).

"**Clearing Agency**" means an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"**Clearing Corporation**" has the meaning specified in Section 8-102(a)(5) of the UCC.

"**Clearstream, Luxembourg**" means Clearstream Banking, Luxembourg S.A.

"**Closing Date**" means October 17, 2006.

"**Closing Date Expense Account**" means the Securities Account designated the "Closing Date Expense Account" and established in the name of the Trustee pursuant to Section 10.2(p).

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Co-Issuer**" means Libra CDO, LLC, a limited liability company formed under the laws of the State of Delaware.

"**Co-Issuers**" means the Issuer and Co-Issuer.

"**Collateral**" has the meaning specified in the Granting Clauses.

"**Collateral Administration Agreement**" means the Collateral Administration Agreement, dated as of the Closing Date, among the Issuer, the Collateral Manager and the Collateral Administrator relating to certain functions performed by the Collateral Administrator for the Issuer and the Collateral Manager with respect to this Indenture and the Collateral, as amended from time to time.

"**Collateral Administrator**" means the Bank and any successor appointed as Collateral Administrator pursuant to the Collateral Administration Agreement.

"**Collateral Debt Security**" means (i) an Asset-Backed Security, a REIT Debt Security, a Mortgage Finance Company Security or a Synthetic Security that, in each case, satisfies each of the Eligibility Criteria when purchased by the Issuer, (ii) any Deliverable Obligations and (iii) any Synthetic Security Collateral that satisfies the Eligibility Criteria set forth in Section 12.2 as to which the lien of the Synthetic Security Counterparty has been released following the termination of the Synthetic Security.

"**Collateral Management Agreement**" means the Collateral Management Agreement, dated as of the Closing Date, between the Issuer and the Collateral Manager relating to the Notes and the Collateral, as amended from time to time in accordance with the terms thereof.

"**Collateral Management Fee**" means the Senior Collateral Management Fee and the Subordinated Collateral Management Fee.

"**Collateral Manager**" means Lehman Brothers Asset Management LLC, unless a successor Person shall have become the collateral manager pursuant to the provisions of the Collateral Management Agreement, and thereafter Collateral Manager shall mean such successor Person.

"**Collateral Quality Tests**" means the Moody's Asset Correlation Test, the Moody's Weighted Average Rating Test, the Moody's Minimum Weighted Average Recovery Rate Test, the Weighted Average Life Test, the Standard & Poor's CDO Monitor Test, the Standard & Poor's Minimum Weighted Average Recovery Rate Test and the Weighted Average Premium/Spread Test.

"**Collection Accounts**" means the Interest Collection Account and the Principal Collection Account.

"**Controlling Class**" means:

(a)    so long as the Outstanding Swap Counterparty Amount with respect to any Senior Swap Counterparty or the Remaining Unfunded Notional Amount is greater than zero, the Senior Swap Counterparty(ies); *provided* that (i) a Terminated Senior Swap Counterparty shall not form part of the Controlling Class for purposes of this definition if it has failed, upon the occurrence of a Senior Swap Early Termination Date, to pay the Senior Swap Early Termination Date Payment owing by it to the Issuer and such failure is continuing and (ii) unless otherwise agreed by each of the Senior Swap Counterparties and notified in writing by the Senior Swap Counterparties to the Trustee, the Collateral Manager and the Credit Default Swap Counterparty and the Issuer, the relative percentage voting rights of the Senior Swap Counterparties as of any date of determination shall be based upon (A) in the case of the Senior Swap Counterparty, the sum of the Outstanding Swap Counterparty Amount with respect to such Senior Swap Counterparty and the Remaining Unfunded Notional Amount under the Senior Swap Agreement as of such date of determination and (B) in the case of a Prior Senior Swap Counterparty, the Outstanding Swap Counterparty Amount (calculated in accordance with clause (b) of the definition thereof) of such Prior Senior Swap Counterparty as of such date of determination; and

(b)    otherwise, the Class A Notes or, if there are no Class A Notes Outstanding, *then*, the Class B Notes or, if there are no Class A Notes or Class B Notes Outstanding, *then*, the Class C Notes, or, if there are no Class A Notes, Class B Notes or Class C Notes Outstanding, *then* the Class D Notes or, if there are no Senior Notes Outstanding, *then* the Class X Notes.

"**Corporate Trust Office**" means the designated corporate trust office of the Trustee, currently located at 181 West Madison, 32nd Floor, Chicago, IL 60602, Attention: CDO Trust Services Group—Libra CDO Limited, Telephone: +1 312 904 1770, Facsimile: +1 312 896 5097, or such other address as the Trustee may designate from time to time by notice to the Noteholders, the Hedge Counterparties, the Collateral Manager and the Co-Issuers or the principal corporate trust office of any successor Trustee.

"**Coverage Tests**" means the Overcollateralization Tests and the Interest Coverage Tests.

"**Credit Default Swap Agreement**" means (a) the ISDA Master Agreement (Multicurrency—Cross Border) (together with the schedule and any confirmations thereto) dated as of October 17, 2006, between the Issuer and the Credit Default Swap Counterparty under

which the Issuer, as seller, and the Credit Default Swap Counterparty, as buyer, shall from time to time enter into CDS Agreement Transactions and (b) any Form-Approved Credit Default Swap Agreement entered into by the Issuer after the Closing Date.

"**Credit Default Swap Counterparty**" means (a) Lehman Brothers Special Financing Inc., in its capacity as buyer of credit protection under the CDS Agreement Transactions entered into under the Credit Default Swap Agreement, together with its successors and assigns in such capacity or (b) any Synthetic Security Counterparty (including one that replaces an existing Credit Default Swap Counterparty) by entering into a Form-Approved Credit Default Swap Agreement.

"**Credit Default Swap Payment**" has the meaning specified in the Senior Swap Agreement.

"**Credit Derivatives Definitions**" means the 2003 ISDA Credit Derivatives Definitions, as published by the International Swaps and Derivatives Association, Inc. and as the same may be amended, modified or otherwise supplemented from time to time.

"**Credit Event**" means, with respect to any Synthetic Security, any event identified in the related Underlying Instruments as a "credit event" for purposes of the Credit Derivatives Definitions incorporated by reference therein.

"**Credit Improved Security**" means any Collateral Debt Security or any other security included in the Collateral that (i) the Collateral Manager believes, based on its reasonable business judgment, has significantly improved in credit quality and (ii) that is not publicly rated by Moody's or that is publicly rated by Moody's, and Moody's has withdrawn or reduced its long-term ratings on any of the Class A Notes or Class B Notes by one or more subcategories or reduced its long-term ratings on any of the Class C Notes or Class D Notes by two or more subcategories below the ratings in effect on the Closing Date (disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded any such reduced or withdrawn ratings of the Notes, as applicable, to at least their initial long-term rating), (a) that has been upgraded or put on a watch list for possible upgrade by one or more rating subcategories by one or more Rating Agencies since it was acquired by the Issuer; (b) as to which the Collateral Manager believes, based on its reasonable business judgment, that the issuer thereof has, since such Collateral Debt Security was purchased by the Issuer, either (i) shown significantly improved financial results or (ii) raised a substantial amount of equity; or (c) that has increased in price to 102% or more of its original purchase price paid therefor by the Issuer (or, in the case of a Synthetic Security, 102% or more of its original Fair Market Value), since the date on which such Collateral Debt Security was acquired.

"**Credit Protection Amount**" has the meaning specified in the Senior Swap Agreement.

"**Credit Protection Funding Request**" has the meaning given to such term in the Senior Swap Agreement.

"**Credit Protection Payment**" means any "Floating Amount" payable by the seller of protection under (and as defined in) a CDS Agreement Transaction or the Underlying Instruments relating to a Synthetic Security structured as a credit default swap.

"**Credit Risk Security**" means any Collateral Debt Security or any other security included in the Collateral that satisfies any of the following:

(a) if Moody's has not withdrawn or reduced its long-term ratings on any of the Class A Notes or Class B Notes by one or more subcategories or reduced its long-term ratings on any of the Class C Notes or Class D Notes by two or more subcategories below the ratings in effect on the Closing Date (disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded any such reduced or withdrawn ratings of the Notes, as applicable, to at least their initial long-term rating), the Collateral Manager believes (as of the date of the Collateral Manager's determination based upon currently available information reasonably available to the Collateral Manager) that such Collateral Debt Security has a significant risk of declining in credit quality and, with lapse of time, becoming a Defaulted Security;

(b)(i) if such Collateral Debt Security is not publicly rated by Moody's or (ii) if such Collateral Debt Security is publicly rated by Moody's at any time when Moody's has withdrawn or reduced its long-term ratings on any of the Class A Notes or Class B Notes by one or more subcategories or reduced its long-term ratings on any of the Class C Notes or Class D Notes by two or more subcategories below the ratings in effect on the Closing Date (disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded any such reduced or withdrawn ratings of the Notes, as applicable, to at least their initial long-term rating), such Collateral Debt Security has been downgraded or put on a watch list for possible downgrade by Moody's by one or more rating subcategories since it was acquired by the Issuer and the Collateral Manager believes, based on its reasonable business judgment, any Collateral Debt Security has a significant risk of declining in credit quality; or

(c) at any time, such Collateral Debt Security is a Written-Down Security and the Collateral Manager believes, based on its reasonable business judgment, any Collateral Debt Security has a significant risk of declining in credit quality.

"**Current Portfolio**" means the portfolio (measured by Principal Balance) of (a) the Collateral Debt Securities, (b) Principal Proceeds or Uninvested Proceeds held as Cash, (c) Eligible Investments purchased with Principal Proceeds or Uninvested Proceeds and (d) the Supersenior Excess existing immediately prior to the Sale or maturity of a Collateral Debt Security or immediately prior to the proposed acquisition of or entry into a Collateral Debt Security, as the case may be.

"**Current Spread**" means, as of any date of determination, (i) with respect to any Collateral Debt Security which is a Floating Rate Collateral Debt Security, the stated spread above LIBOR at which interest accrues on such Floating Rate Collateral Debt Security; (ii) with respect to any Collateral Debt Security which is a Deemed Floating Rate Collateral Debt Security, the Deemed Floating Rate *plus* the Deemed Floating Spread, each related to such Deemed Floating Rate Collateral Debt Security; and (iii) with respect to any Collateral Debt Security which is a Fixed Rate Collateral Debt Security, the spread over the interpolated swap rate, as determined by the Collateral Manager at the time of acquisition of such Fixed Rate Collateral Debt Security.

"**Custodial Account**" means the Securities Account designated the "Custodial Account" and established at the Custodian in the name of the Trustee pursuant to Section 10.2(k).

"**Custodian**" has the meaning specified in Section 3.3(a).

"**Deemed Floating Asset Hedge Agreement**" means, with respect to a Fixed Rate Collateral Debt Security, an interest rate swap having a notional amount (or scheduled notional amounts) equal to the Principal Balance (as it may be reduced by expected amortization) of such Fixed Rate Collateral Debt Security; *provided* that (a) at the time of entry into a Deemed Floating Asset Hedge Agreement, (i) the notional amount of such Deemed Floating Asset Hedge Agreement is equal to the principal amount of the related Fixed Rate Collateral Debt Security (as calculated at such time) and (ii) the related Asset Hedge Counterparty satisfies the Hedge Counterparty Ratings Requirement, (b) the Rating Agencies and the Trustee are notified prior to the Issuer's entry into a Deemed Floating Asset Hedge Agreement, and shall be provided with the identity of the relevant Asset Hedge Counterparty and copies of the hedge documentation and notional schedule, (c) the applicable master agreement or schedule attached thereto either (i) is a Form-Approved Asset Hedge Agreement or (ii) satisfies the Rating Condition, and (d) such Deemed Floating Asset Hedge Agreement is priced at then-current market rates.

"**Deemed Floating Rate**" means, with respect to any Deemed Floating Rate Asset Hedge Agreement, the floating rate in excess of LIBOR that the related Asset Hedge Counterparty agrees to pay on such Deemed Floating Rate Asset Hedge Agreement at the time such hedge is executed.

"**Deemed Floating Rate Collateral Debt Security**" means a Fixed Rate Collateral Debt Security the interest rate of which is hedged into a Floating Rate Collateral Debt Security using a Deemed Floating Asset Hedge Agreement; *provided* that, if applicable to the relevant Collateral Debt Security, at the time of entry into a Deemed Floating Asset Hedge Agreement, the (x) average life of such Deemed Floating Rate Collateral Debt Security would not increase or decrease by more than one year from its expected average life if it were to prepay at either 50% or 150% of the average rate of prepayment during the period of six consecutive months immediately preceding the current month (or in the case of newly issued securities, its pricing speed) and (y) such Deemed Floating Rate Collateral Debt Security is rated at least "Ba1" by Moody's (and, if rated "Ba1" by Moody's, such Collateral Debt Security has not been placed on a watch list for possible downgrade).

"**Deemed Floating Spread**" means the difference between the stated rate at which interest accrues on each Fixed Rate Collateral Debt Security that comprises a Deemed Floating Rate Collateral Debt Security (excluding all Defaulted Securities and Deferred Interest PIK Bonds) and the related Fixed Payment Rate.

"**Default**" means any Event of Default or any occurrence that, with notice or the lapse of time or both, would become an Event of Default.

"**Defaulted Hedge Termination Payment**" means any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement by reason of an "Event of Default" or "Termination Event" as to which the Hedge Counterparty is the

"Defaulting Party" or the sole "Affected Party" (each as defined in the relevant Hedge Agreement).

"**Defaulted Interest**" means (a) with respect to the Notes, any interest due and payable in respect of any Note which is not punctually paid or duly provided for on the applicable Quarterly Distribution Date or at Stated Maturity and which remains unpaid or (b) with respect to a Prior Senior Swap Counterparty or the Senior Swap Counterparty, any Senior Swap Interest Amount due and payable in respect of its Outstanding Swap Counterparty Amount which is not punctually paid or duly provided for on the applicable Quarterly Distribution Date or at Stated Maturity and which remains unpaid. In no event shall interest which is deferred as Class C Deferred Interest, Class D Deferred Interest or Class X Deferred Interest in accordance with Section 2.6(a) constitute Defaulted Interest.

"**Defaulted Security**" means any Collateral Debt Security or any other security included in the Collateral:

(a) with respect to which there has occurred and is continuing a payment default thereunder (without giving effect to any applicable grace period or waiver); *provided* that (x) a payment default of up to the earlier of five days or the next Quarterly Distribution Date with respect to which the Collateral Manager certifies in writing to the Trustee, in its judgment is due to non-credit and non-fraud related reasons shall not cause a Collateral Debt Security to be classified as a Defaulted Security and (y) no Collateral Debt Security shall be a Defaulted Security if all payments of principal and interest due thereon (including deferred interest and Defaulted Interest and any interest due thereon) have been paid in full in cash;

(b) with respect to which there has occurred a default (other than any payment default) which entitles the holders thereof, with the giving of notice or passage of time or both, to accelerate the maturity of all or a portion of the principal amount of such obligation, and such default has not been cured or waived;

(c) as to which a bankruptcy, insolvency, or receivership proceeding has been initiated with respect to the issuer of such Collateral Debt Security, or there has been proposed or effected any distressed exchange or other debt restructuring where the issuer of such Collateral Debt Security has offered the holders thereof a new security or package of securities that, in the judgment of the Collateral Manager, either (x) amounts to a diminished financial obligation or (y) has the purpose of helping the borrower to avoid default, provided that a security that was acquired in exchange for a Collateral Debt Security in connection with a distressed exchange or other debt restructuring shall not constitute a "Defaulted Security" if it satisfies the requirements of the definition of a "Collateral Debt Security" including the Eligibility Criteria in Section 12.2 at the time it is acquired and has paid and is currently paying scheduled interest and principal;

(d) as to which the Collateral Manager knows the issuer thereof is (or is reasonably expected by the Collateral Manager to be, as of the next scheduled payment distribution date) in default (without giving effect to any applicable grace period or waiver) as to payment of principal and/or interest on another obligation (and such default

has not been cured or waived) which is senior to or *pari passu* in right of payment to, and (in the case of Asset-Backed Securities only) is secured by the same collateral as, such Collateral Debt Security, except that a Collateral Debt Security shall not constitute a "Defaulted Security" under this clause (d) if the Collateral Manager, in its judgment, determines that on the next scheduled payment distribution date of such Collateral Debt Security such issuer shall make payments required to be made on such Collateral Debt Security on such date and the Rating Condition with respect to Standard & Poor's is satisfied in respect of such determination; *provided* that this exception shall not apply where the issuer of such Collateral Debt Security is (or is reasonably expected by the Collateral Manager to be) in default as to payment of principal and/or interest of another obligation that is senior to or *pari passu* in right of payment to such Collateral Debt Security;

        (e)    that is received upon acceptance of an Offer for another Collateral Debt Security which Offer expressly stated that failure to accept such Offer might result in a default under the related Underlying Instruments and with respect to which no payment of interest or principal has yet been received;

        (f)    that (x) has a Moody's Rating of "Ca" or "C" or (y) is rated "CC", "D" or "SD" by Standard & Poor's or was rated "CC", "D" or "SD" by Standard & Poor's prior to having its rating withdrawn;

        (g)    that is a Defaulted Synthetic Security;

        (h)    that is a Synthetic Security (other than a Defaulted Synthetic Security) with respect to which there is a Synthetic Security Counterparty Defaulted Obligation; or

        (i)    that is a debt obligation delivered to the Issuer upon the occurrence of a Credit Event under a Synthetic Security that is not a Deliverable Obligation,

*provided* that, in respect of any Collateral Debt Security that constitutes a Defaulted Security pursuant to sub-clause (x) or (y) of clause (f) above only, such Collateral Debt Security shall not be treated as a Defaulted Security other than for purposes of calculating the Net Outstanding Portfolio Collateral Balance so long as (i) such Collateral Debt Security is not a PIK Bond with respect to which any principal has been deferred and capitalized, (ii) interest in respect of such Collateral Debt Security was paid in full on the immediately preceding payment date for such Collateral Debt Security and (iii) the Collateral Manager believes in the exercise of its judgment that the interest in respect of such Collateral Debt Security shall be paid in full on the next payment date for such Collateral Debt Security.

The Collateral Manager shall be deemed to have knowledge of all information received by it that is delivered to it in accordance with Section 14.3(d) and shall be responsible under the Collateral Management Agreement (to the extent provided therein) for obtaining and reviewing information available to it in its capacity as a collateral manager of national standing (except to the extent any such information has been withheld from the Collateral Manager by the Trustee or the Issuer). Notwithstanding the foregoing, the Collateral Manager may declare any Collateral Debt Security to be a Defaulted Security if, in the Collateral Manager's judgment, the credit

quality of the issuer of such Collateral Debt Security has significantly deteriorated such that there is a reasonable expectation of payment default as of the next Due Date.

Nothing in this definition of "Defaulted Security" shall be deemed to require any employees (including any portfolio manager or credit analyst) of the Collateral Manager to obtain, use or share with or otherwise distribute to any other Person (a) any information that they would be prohibited from obtaining, using, sharing or otherwise distributing by virtue of the Collateral Manager's internal policies relating to confidential communications or (b) material non-public information.

"**Defaulted Synthetic Security**" means a Synthetic Security referencing a Reference Obligation that would, if such Reference Obligation were a Collateral Debt Security, constitute a Defaulted Security under paragraphs (a), (b), (c), (d), (e) or (f) of the definition thereof.

"**Defaulted Synthetic Termination Payment**" means, with respect to any Synthetic Security, any termination payment (and any accrued interest thereon) payable by the Issuer pursuant to the Underlying Instruments relating thereto (including, if applicable, the Credit Default Swap Agreement) as a result of an "Event of Default" or "Termination Event" as to which the relevant Synthetic Security Counterparty is the "Defaulting Party" or the sole "Affected Party" (each as defined in such Underlying Instruments).

"**Defeased Synthetic Security**" means any Synthetic Security that requires payment by the Issuer after the date upon which it is Granted to the Trustee and that satisfies the following: (a) the Issuer has caused to be deposited in a Synthetic Security Counterparty Account Synthetic Security Collateral in an amount at least equal to the aggregate of all further payments (contingent or otherwise) that the Issuer is or may be required to make to the Synthetic Security Counterparty under the Synthetic Security; (b) the Underlying Instruments relating to such Synthetic Security contain "non-petition" provisions with respect to the Issuer and "limited-recourse" provisions limiting the Synthetic Security Counterparty's rights in respect of the Synthetic Security to the funds and other property credited to the Synthetic Security Counterparty Account related to such Synthetic Security; and (c) the Underlying Instruments relating to such Synthetic Security contain provisions to the effect that upon the occurrence of an "Event of Default" or "Termination Event", if any, where the Synthetic Security Counterparty is the sole "Defaulting Party" or the sole "Affected Party" (each, as defined in the ISDA Master Agreement relating to such Synthetic Security) (x) the Issuer may terminate its obligations under such Synthetic Security and, upon such termination, any lien in favor of the Synthetic Security Counterparty over its related Synthetic Security Counterparty Account shall be terminated and (y) the Issuer shall no longer be obligated to make any payments to the Synthetic Security Counterparty with respect to such Synthetic Security.

"**Deferred Interest PIK Bond**" means a PIK Bond with respect to which payment of interest either in whole or in part has been deferred or capitalized in an amount equal to the amount of interest payable in respect of the lesser of (a) one payment period and (b) a period of six months; but only until such time as payment of interest on such PIK Bond has resumed and all capitalized or deferred interest has been paid in accordance with the terms of the Underlying Instruments. For the purposes of the Overcollateralization Tests only, a PIK Bond with a Moody's Rating of at least "Baa3" (and, if such rating is "Baa3", such PIK Bond has not been

placed on a watch list for possible downgrade) shall not be a Deferred Interest PIK Bond unless interest, either in whole or in part, has been deferred and capitalized in an amount equal to the amount of interest payable in respect of the lesser of (x) two payment periods and (y) a period of one year.

"**Deferred Notes Principal**" means, (a) with respect to any Determination Date occurring on or prior to the Determination Date immediately following the last day of the Reinvestment Period, the sum of (i) the Deferred Notes Principal as of the Determination Date relating to the preceding Quarterly Distribution Date that was not paid to Noteholders in respect of principal pursuant to Section 11.1(i) or sub-clauses (A) through (K)(a)(I) (inclusive) of Section 11.1(ii) on such preceding Quarterly Distribution Date (or, in the case of the first Determination Date, zero) *plus* (ii) the excess (if any) of (A) the Note Reduction Amount for the Due Period relating to the preceding Quarterly Distribution Date over (B) the amount of Principal Proceeds paid to Noteholders in respect of principal pursuant to Section 11.1(i) or sub-clauses (A) through (K)(a)(II) (inclusive) of Section 11.1(ii) on such preceding Quarterly Distribution Date, and (b) with respect to any Determination Date occurring after the Determination Date immediately following the last day of the Reinvestment Period, the sum of (i) the Deferred Notes Principal as of the Determination Date relating to the preceding Quarterly Distribution Date that was not paid to Noteholders in respect of principal pursuant to Section 11.1(i) or sub-clauses (A) through (L)(a)(I) (inclusive) of Section 11.1(ii) on such preceding Quarterly Distribution Date *plus* (ii) the excess (if any) of (A) the Note Reduction Amount for the Due Period relating to the preceding Quarterly Distribution Date over (B) the amount of Principal Proceeds paid to Noteholders in respect of principal pursuant to Section 11.1(i) or sub-clauses (A) through (L)(a)(II) (inclusive) of Section 11.1(ii) on such preceding Quarterly Distribution Date.

"**Definitive Note**" has the meaning specified in Section 2.1(c).

"**Deliverable Obligation**" means a debt obligation that may be or is delivered to the Issuer upon the occurrence of a Credit Event under a Synthetic Security that (a) satisfies the criteria set forth in paragraphs (1) through (4), (6) through (10), (12) through (33) and (35) through (39) of the Eligibility Criteria at the time such debt obligation is delivered or (b) satisfies the criteria set forth in paragraphs (7) through (10) of the Eligibility Criteria at the time such debt obligation is delivered and the Rating Condition.

"**Depositary**" means, with respect to the Notes issued in the form of one or more Global Notes, the Person designated as Depositary pursuant to Section 2.2(e) or any successor thereto appointed pursuant to the applicable provisions of this Indenture.

"**Depositary Participant**" means a broker, dealer, bank or other financial institution or other Person for whom from time to time the Depositary effects book-entry transfers and pledges of notes deposited with the Depositary.

"**Designated Maturity**" has the meaning set forth in Schedule B.

"**Determination Date**" means the last day of a Due Period.

"**Discount Security**" means a Collateral Debt Security (other than a Synthetic Security) purchased at a purchase price of (exclusive of accrued interest) or a Synthetic Security with a price determined for the Reference Obligation at the time of acquisition thereof by the Collateral Manager in good faith using current initial net cashflows and market spreads of (a) if such Collateral Debt Security is a Floating Rate Security (or a Synthetic Security, the Reference Obligation related to which is a Floating Rate Security) and has a Moody's Rating of "Aa3" or higher or a Standard & Poor's Rating of "AA-" or higher, less than 92% of the par amount thereof (provided that if the fair market value of such Collateral Debt Security equals or exceeds 95% of its principal balance for a period of 60 consecutive Business Days, such Collateral Debt Security shall no longer to which is be considered a "Discount Security"); (b) if such Collateral Debt Security is a Fixed Rate Security (or a Synthetic Security, the Reference Obligation related to which is a Fixed Rate Security) and has a Moody's Rating of "Aa3" or higher or a Standard & Poor's Rating of "AA-" or higher, less than 85% of the par amount thereof (provided that if the fair market value of such Collateral Debt Security equals or exceeds 90% of its principal balance for a period of 60 consecutive Business Days, such Collateral Debt Security shall no longer be considered a "Discount Security"); or (c) if such Collateral Debt Security has a Moody's Rating of "A1" or below and a Standard & Poor's Rating of "A+" or below, less than 75% of the par amount thereof (provided that if the fair market value of such Collateral Debt Security equals or exceeds 85% of its principal balance for a period of 60 consecutive Business Days, such Collateral Debt Security shall no longer be considered a "Discount Security"); *provided* that the Aggregate Principal Balance of such Collateral Debt Securities listed in clauses (a), (b) and (c) above may not exceed 5% of the Net Outstanding Portfolio Collateral Balance; and *provided*, *further*, that with respect to a Synthetic Security, the Synthetic Security shall be included as a Collateral Debt Security having the characteristics of the related Reference Obligation.

"**Discount Security Haircut Amount**" means, with respect to any Discount Security, an amount equal to the greater of (a) zero and (b)(i) the Principal Balance of such Collateral Debt Security minus (ii) the purchase price (exclusive of accrued interest) of such Discount Security minus (iii) an amount equal to (A) all principal payments received by the Issuer with respect to such Discount Security multiplied by (B) a fraction the numerator of which is such purchase price and the denominator of which is the Principal Balance of such Discount Security at the time of the purchase thereof by the Issuer.

"**Discretionary Sale Security**" means any Collateral Debt Security sold in accordance with Section 12.1(a)(v).

"**Discretionary Trading Percentage**" has the meaning specified in Section 12.1(a)(v).

"**Distribution**" means any payment of principal, interest or fee or any dividend or premium payment made on, or any other distribution in respect of, an obligation or security.

"**Dollar**" or "**U.S.$**" means a dollar or other equivalent unit in such coin or currency of the United States as at the time shall be legal tender for all debts, public and private.

"**DTC**" means The Depository Trust Company, a New York corporation.

"**Due Date**" means each date on which a Distribution is due on a Pledged Security.

"**Due Period**" means, with respect to any Quarterly Distribution Date, the period commencing on the day immediately following the fifth Business Day prior to the immediately preceding Quarterly Distribution Date (or on the Closing Date, in the case of the Due Period relating to the first Quarterly Distribution Date) and ending on the fifth Business Day prior to such Quarterly Distribution Date, except that, in the case of the Due Period that is applicable to the Quarterly Distribution Date relating to the Stated Maturity of the Notes, such Due Period shall end on the day preceding the Stated Maturity.

"**Eligibility Criteria**" has the meaning specified in <u>Section 12.2</u>.

"**Eligible Investments**" means any Dollar-denominated investment that is one or more of the following (and may include investments for which the Trustee and/or its Affiliates provides services or receives compensation):

    (a)    Cash;

    (b)    direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States;

    (c)    demand and time deposits in, certificates of deposit of, bankers' acceptances payable within 183 days of issuance issued by, or Federal funds sold by any depository institution or trust company incorporated under the laws of the United States (including the Bank) or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have a credit rating of not less than "AA+" by Standard & Poor's and not less than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's) and not less than "AA+" by Standard & Poor's in the case of long-term debt obligations, or "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and "A-1+" (or "A-1" in the case of overnight time deposits offered by the Bank so long as it acts as Trustee hereunder and is not on negative credit watch with negative implications) by Standard & Poor's in the case of commercial paper and short-term debt obligations; *provided* that, in the case of commercial paper and short-term debt obligations with a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "AA+" by Standard & Poor's;

    (d)    unleveraged repurchase obligations with respect to (i) any security described in clause (b) above or (ii) any other Registered security issued or guaranteed by an agency or instrumentality of the United States (in each case without regard to the stated maturity of such security), in either case entered into with a U.S. Federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term rating is not less

than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's) and not less than "AA+" by Standard & Poor's or whose short-term credit rating is "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and "A-1+" by Standard & Poor's at the time of such investment; *provided* that (i) in each case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's) and (ii) if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "AA+" by Standard & Poor's;

(e) Registered debt securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States or any state thereof that have a credit rating of not less than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's) and not less than "AA+" by Standard & Poor's;

(f) commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such investment a credit rating of "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and "A-1+" by Standard & Poor's; *provided* that (i) in each case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's), and (ii) if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "AA+" by Standard & Poor's;

(g) Investment Agreements issued by any bank (if treated as a deposit by such bank), or a Registered Investment Agreement issued by any insurance company or other corporation or entity organized under the laws of the United States or any state thereof, in each case that has a credit rating of "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and "A-1+" by Standard & Poor's (and pursuant to a form of Investment Agreement that satisfies the Rating Condition with respect to Standard & Poor's); *provided* that (i) in each case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's (and, if such rating is "Aa2", such rating is not on watch for possible downgrade by Moody's) and (ii) if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "AA+" by Standard & Poor's; and

(h) investments in any money market fund or similar investment vehicle (including those for which the Bank or its affiliates may act as manager or advisor, whether or not for a fee) having at the time of investment therein a credit rating of "P-1" by Moody's and "A-1+" by Standard & Poor's; *provided*, that (x) if such investment has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "A1" by Moody's and a rating of "AAAm" or "AAAm/G" by Standard & Poor's, and (y) payments in respect of such

investment are not subject to any material amount of deduction or withholding in respect of tax under section 871 and 881 of the Code, taking into account the American Jobs Creation Act of 2004 and any amendments promulgated hereafter;

and, in each case (other than clause (a)), (i) with a stated maturity (giving effect to any applicable grace period) no later than the Business Day immediately preceding the Quarterly Distribution Date next following the Due Period in which the date of investment occurs and (ii) either shall be treated as indebtedness for U.S. federal income tax purposes, or the Issuer has received advice from Cadwalader, Wickersham & Taft LLP or an Opinion of Counsel of other nationally recognized U.S. tax counsel experienced in such matters to the effect that such investment shall not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes or otherwise subject the Issuer to U.S. federal income tax on a net income tax basis; *provided* that Eligible Investments may not include (i) any Interest Only Security, (ii) any security purchased at a price in excess of 100% of the par value thereof, (iii) any investment the income from which is or will be subject to deduction or withholding for or on account of any withholding or similar tax unless the payor is required to make "gross up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required, (iv) any security whose repayment is subject to substantial non credit related risk as determined in the judgment of the Collateral Manager, (v) any security the rating of which by Standard & Poor's includes the subscript "p", "pi", "q", "r" or "t", (vi) any Asset Backed Security, (vii) any Floating Rate Collateral Debt Security (other than overnight time deposits offered by the Bank so long as the Bank serves as Trustee hereunder) whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread or (viii) any security that is the subject of an Offer. Eligible Investments may be obligations of any of, and may be purchased from, the Trustee, the Collateral Manager and their respective Affiliates, and may include obligations for which the Trustee or an Affiliate thereof or the Collateral Manager or an Affiliate thereof receives compensation for providing services.

"**End Value**" has the meaning specified in <u>Section 9.5</u>.

"**Entitlement Holder**" has the meaning specified in Section 8-102(a)(7) of the UCC.

"**Entitlement Order**" has the meaning specified in Section 8-102(a)(8) of the UCC.

"**Equity Security**" means any equity security acquired by the Issuer in exchange for a Defaulted Security.

"**ERISA**" means the United States Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Plans**" means employee benefit plans as defined in Section 3(3) of ERISA.

"**Euroclear**" means Euroclear Bank S.A./N.V., as operator of the Euroclear System.

"**Event of Default**" has the meaning specified in <u>Section 5.1</u>.

"**Excepted Property**" means (a) the U.S.$250 of capital contributed by the owners of the Issuer's ordinary shares in accordance with the Issuer Charter and U.S.$250 representing a profit fee to the Issuer for issuing the Notes, together with, in each case, any interest accruing thereon and the bank account in which such Cash is held, (b) the shares of the Co-Issuer and any assets of the Co-Issuer. and (c) the Preference Share Distribution Account and any funds credited thereto or deposited therein.

"**Excepted Securities**" means, for purposes of Part II of <u>Schedule D</u>, (a) cash flow structured finance obligations not rated by Standard & Poor's the cash flow of which is primarily from non-U.S. sources, (b) collateralized bond obligations the underlying collateral of which consists primarily of collateralized debt obligations, (c) collateralized bond obligations the underlying collateral of which is distressed debt, (d) obligations secured by contingent deferred sales charges, asset-based sales charges, shareholder servicing fees and other similar fees associated with the marketing and distribution of interests in, and management and servicing of, mutual funds registered under the Investment Company Act, (e) Catastrophe Bonds, (f) the first loss tranche of any securitization, (g) synthetic obligations (other than those expressly provided for in this Indenture), (h) synthetic collateralized debt obligations (other than those expressly provided for in this Indenture), (i) combination securities, (j) Re-REMICs, (k) market value collateralized debt obligations, (l) net interest margin securities, (m) Project Finance Securities, (n) Principal Only Securities, (o) Interest Only Securities or (p) Structured Settlement Securities.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended.

"**Expense Account**" means the Securities Account designated the "Expense Account" and established in the name of the Trustee pursuant to <u>Section 10.4</u>.

"**Exposure Reduction Amount**" means, with respect to any time on any date after the last day of the Reinvestment Period, the greater of (i) zero and (ii) the sum of (a) the aggregate Principal Amortizations plus (b) the aggregate Notional Amount of the CDS Agreement Transactions which terminated since the last day of the Reinvestment Period.

"**Fair Market Value**" means, in respect of any Defaulted Security or Deferred Interest PIK Bond at any time, either (i) an amount equal to (x) the median of the bona fide bids for such Collateral Debt Security obtained by the Collateral Manager at such time from any three nationally recognized dealers, which dealers are Independent from one another and from the Collateral Manager, (y) if the Collateral Manager is in good faith unable to obtain bids from three such dealers, the lesser of the bona fide bids for such Collateral Debt Security obtained by the Collateral Manager at such time from any two nationally recognized dealers chosen by the Collateral Manager, which dealers are Independent from each other and the Collateral Manager or (z) if the Collateral Manager is in good faith unable to obtain bids from two such dealers, the bona fide bid for such Collateral Debt Security obtained by the Collateral Manager at such time from any nationally recognized dealer chosen by the Collateral Manager, which dealer is Independent from the Collateral Manager, or (ii) if the Collateral Manager is unable to obtain any bids, the lesser of the prices for such Collateral Debt Security on such date provided by two pricing services chosen by the Collateral Manager, which pricing services are Independent from each other and the Collateral Manager and which satisfy the Rating Condition with respect to Standard & Poor's, provided that (1) pending confirmation that the Rating Condition with

respect to Standard & Poor's is satisfied with respect to a pricing service, the Fair Market Value may be determined based on prices provided by such pricing service, (2) if the Collateral Manager is unable in good faith to obtain bona fide bids on such Collateral Debt Security pursuant to any of subclauses (x), (y) and (z) of clause (i) but is able to obtain bona fide bids from the requisite number of dealers with respect to the same security in a principal amount other than the principal amount of such Collateral Debt Security in accordance with such subclause, the "Fair Market Value" of such Collateral Debt Security shall be equal to the amount determined pursuant to such subclause using the bona fide bids (or the bona fide bid) obtained for such security in such other principal amount adjusted to reflect the actual principal amount of such Collateral Debt Security, (3) if, after giving effect to the determination of the "Fair Market Value" of a Collateral Debt Security pursuant to subclause (z) of clause (i) above, the aggregate outstanding principal amount of all Collateral Debt Securities the "Fair Market Value" of which was determined pursuant to such subclause (z) exceeds 10% of the Net Outstanding Portfolio Collateral Balance, the "Fair Market Value" of such Collateral Debt Security will be 95% of the bid obtained by the Collateral Manager pursuant to such subclause (z) and (4) if the Collateral Manager is in good faith unable to obtain bona fide bids for such Collateral Debt Security from at least one nationally recognized dealer or to obtain prices from at least two such pricing services, the "Fair Market Value" of such Collateral Debt Security will be the value of such Collateral Debt Security as determined by the Collateral Manager in good faith and in the exercise of its reasonable business judgment and the Collateral Manager shall notify the Trustee and each Rating Agency that it has determined the Fair Market Value of such Collateral Debt Security pursuant to this clause (4); *provided* that any "Fair Market Value" determined pursuant to this clause (4) shall only apply for 30 consecutive days whereupon such "Fair Market Value" shall either be determined based upon bona fide bids or obtained prices in accordance with the foregoing clauses of this definition or be deemed to be zero until the requisite bona fide bids or prices can be obtained; *provided*, *further*, that the Collateral Manager shall only determine the "Fair Market Value" pursuant to this clause (4) if (i) the Collateral Manager determines the "Fair Market Value" of such Collateral Debt Security in the manner described in this clause (4) for other purposes as well and (ii) the Collateral Manager assigns the same "Fair Market Value" to such Collateral Debt Security for all other purposes; and *provided*, *further*, that for purposes of determining the "Fair Market Value" of a Synthetic Security, the Synthetic Security will be included as a Collateral Debt Security having the characteristics of the related Reference Obligation.

"**Financial Asset**" has the meaning specified in Section 8-102(a)(9) of the UCC.

"**Financing Statement**" means a financing statement relating to the Collateral naming the Issuer as debtor and the Trustee on behalf of the Secured Parties as secured party.

"**Fitch**" means Fitch, Inc. and any successor or successors thereto.

"**Fixed Payment Rate**" means, with respect to any Deemed Floating Asset Hedge Agreement, the fixed rate that the Issuer agrees to pay on such Deemed Floating Asset Hedge Agreement at the time such swap is executed.

"**Fixed Rate Collateral Debt Security**" means any Collateral Debt Security, other than a Floating Rate Collateral Debt Security or a Hybrid Security.

"**Floating Rate Collateral Debt Security**" means any Collateral Debt Security other than a Hybrid Security or Synthetic Security (a) that is expressly stated to bear interest based upon a floating rate index for Dollar-denominated obligations commonly used as a reference rate in the United States or the United Kingdom or (b) the interest payments on which are derived primarily from underlying assets that bear interest based on a floating rate index.

"**Flow Through Investment Vehicle**" means any entity (a) that would be an investment company but for the exception in Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act and the amount of whose investment in the Notes (including in all Classes of the Notes) and Preference Shares exceeds 40% of its total assets (determined on a consolidated basis with its subsidiaries), (b) as to which any Person owning any equity or similar interest in the entity has the ability to control any investment decision of such entity or to determine, on an investment by investment basis, the amount of such Person's contribution to any investment made by such entity, (c) that was organized or reorganized for the specific purpose of acquiring a Note or Preference Share or (d) as to which any Person owning an equity or similar interest in which was specifically solicited to make additional capital or similar contributions for the purpose of enabling such entity to purchase a Note or Preference Share.

"**Form-Approved Asset Hedge Agreement**" means a Deemed Floating Asset Hedge Agreement with respect to which (a) the related Fixed Rate Collateral Debt Security or any Floating Rate Collateral Debt Security could be purchased by the Issuer without any required action by the Rating Agencies and (b) the documentation of which conforms in all respects other than changes relating to the identity, nature and jurisdiction of the counterparty and the economic terms of the relevant transaction (as certified to the Trustee by the Collateral Manager) to a form which each of the Rating Agencies has confirmed within 10 Business Days in writing of their receipt thereof will not require satisfaction of the Rating Condition if it is used as the basis for a Deemed Floating Asset Hedge Agreement for purposes hereof; *provided* that (i) either Rating Agency may revoke its consent to the use of a Form-Approved Asset Hedge Agreement upon 30 days' prior written notice to the Trustee and the Collateral Manager (provided that such revocation shall not affect any existing Deemed Floating Asset Hedge Agreement) and (ii) the Issuer shall provide the Rating Agencies with a copy of each Deemed Floating Asset Hedge Agreement entered into pursuant to any Form-Approved Asset Hedge Agreement promptly following the execution thereof.

"**Form-Approved Credit Default Swap Agreement**" means the ISDA Master Agreement (Multicurrency—Cross Border) entered into by the Issuer for the purpose of effecting credit default swaps, the documentation of which conforms in all respects (other than changes relating to the identity, nature and jurisdiction of the counterparty and the economic terms of the relevant transaction) to a form as to which the Rating Condition was previously satisfied (as certified to the Trustee by the Collateral Manager); *provided* that (i) any Form-Approved Credit Default Swap Agreement shall be approved by the Senior Swap Counterparty and each of the Rating Agencies prior to the initial use thereof, (ii) any material amendment to any Form-Approved Credit Default Swap Agreement must satisfy the Rating Condition; *provided* that any amendment to any Form-Approved Credit Default Swap Agreement must satisfy the Rating Condition with respect to Standard & Poor's, (iii) either Rating Agency may cancel a Form-Approved Credit Default Swap Agreement (but not any Credit Default Swap Agreement previously entered into by the Issuer) by 30 days' prior written notice to the Trustee and the

Collateral Manager and (iv) the Issuer shall provide the Rating Agencies with a copy of each Credit Default Swap Agreement entered into pursuant to any Form-Approved Credit Default Swap Agreement promptly following the execution thereof. As of the date of this Indenture and until consent is revoked by the Rating Agencies, an agreement in the form attached hereto as Exhibit N and the Credit Default Swap Agreement shall be a Form-Approved Credit Default Swap Agreement.

"**Form-Approved Synthetic Security**" means a Synthetic Security (including a CDS Agreement Transaction) (a)(i) the Reference Obligation of which, if it were a Collateral Debt Security, could be purchased by the Issuer without satisfaction of the Rating Condition or with respect to which the Rating Condition has been satisfied or (ii) the Reference Obligation of which would satisfy clause (i) but for (x) the currency in which it is payable, and such Synthetic Security is payable in U.S. Dollars and does not expose the Issuer to currency risk or (y) the frequency of the scheduled periodic payments of interest on such Reference Obligation, (b) entered into pursuant to the Credit Default Swap Agreement or other documentation which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the Notional Amount, the effective date, the termination date and other similarly necessary changes) to a form previously approved in writing by the Rating Agencies for use by the Issuer, *provided* that any material amendment to a Form-Approved Synthetic Security and any new Form-Approved Synthetic Security must be approved by the Senior Swap Counterparties; *provided*, *further* that any amendment to a Form-Approved Synthetic Security and any new Form-Approved Synthetic Security must be approved by Standard & Poor's, and (c) for which the Issuer has provided to each of the Rating Agencies notice of the purchase of such Synthetic Security within five days after such purchase, requesting the relevant Rating Agency's determination of the Moody's Applicable Recovery Rate and Moody's Rating or Standard & Poor's Applicable Recovery Rate and Standard & Poor's Rating, as applicable, with respect to such Synthetic Security; *provided* that either of the Rating Agencies may revoke its consent to the use of a Form-Approved Synthetic Security with respect to any prospective purchase by the Issuer of a Synthetic Security upon 30 days' prior written notice to the Trustee and Collateral Manager (provided that such revocation shall not affect the continuing effectiveness of any Synthetic Security already entered into under such cancelled Form-Approved Synthetic Security or the determination of the Moody's Recovery Rate, Standard & Poor's Recovery Rate, Standard & Poor's Rating and Moody's Rating with respect to any such Synthetic Security). As of the date of this Indenture and until consent is revoked by the Rating Agencies, a confirmation in the form attached hereto as Exhibit M shall be a Form-Approved Synthetic Security; and *provided*, *further*, that the Credit Default Swap Agreement shall not be required to satisfy clause (c) above.

"**Funded Amount**" means with respect to (a) any funded Synthetic Security, the excess, if any of (1) the aggregate Notional Amount theretofore paid by the Issuer to the related Synthetic Security Counterparty or standing to the credit of the applicable Synthetic Security Counterparty Account in favor of the applicable Synthetic Security Counterparty in respect thereof over (2) the principal or Notional Amounts theretofore paid by the related Synthetic Security Counterparty to the Issuer in respect thereof and (b) any Synthetic Security that is an unfunded Synthetic Security, zero.

"**Global Notes**" means the Regulation S Global Notes and the Restricted Global Notes.

"**Grant**" means to grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge and create a security interest in and right of set-off against, deposit, set over and confirm. A Grant of the Pledged Securities, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate continuing right to claim for, collect, receive and receipt for principal, interest and fee payments in respect of the Pledged Securities or such other instruments, and all other Cash payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"**Hedge Agreements**" means the Deemed Floating Asset Hedge Agreements (if any) and any other hedge agreements entered into for the purpose of mitigating interest rate risk or mismatches in the timing of cashflows (but not, for the avoidance of doubt, currency hedge agreements or synthetic security hedge agreements).

"**Hedge Counterparty**" means any counterparty or permitted assignee or successor of a counterparty that enters into a Hedge Agreement with the Issuer.

"**Hedge Counterparty Collateral Account**" means each Securities Account designated a "Hedge Counterparty Collateral Account" and established in the name of the Trustee pursuant to Section 16.1(d).

"**Hedge Counterparty Ratings Requirement**" means, with respect to any Hedge Counterparty (i)(A) the long-term senior unsecured debt of such party is rated at least "Aa3" by Moody's (and if rated "Aa3", such rating is not on watch for possible downgrade by Moody's), if such party has a long term rating only or (B) the long-term senior unsecured debt of such party is (x) rated at least "A1" by Moody's (and if rated "A1" is not on watch for possible downgrade by Moody's) or (y) is rated "A2" by Moody's and has posted collateral in respect of its obligations satisfactory to Moody's based on the form of the ISDA Credit Support Annex; (ii) the short-term debt of such party is rated "P-1" by Moody's (and is not on watch for possible downgrade by Moody's) and (iii) the short-term unsecured debt of such party is rated at least "A-1" by Standard & Poor's or, if no such short-term rating is available, the long-term senior unsecured debt of such party is rated at least "A+" by Standard & Poor's; *provided* that, should a Rating Agency effect an overall downward adjustment of its required ratings for hedge counterparties in collateralized debt obligation transactions, then the applicable Hedge Counterparty Ratings Requirement will be subject to satisfaction of the Rating Condition with respect to the applicable Rating Agency.

"**Highest Auction Price**" means, with respect to an Auction Call Redemption, the greater of (a) the highest price bid by any Listed Bidder for all of the Collateral Debt Securities and (b) the sum of the highest prices bid by one or more Listed Bidders for each Subpool. In each case, the price bid by a Listed Bidder shall be the Dollar amount which the Collateral Manager certifies to the Trustee based on the Collateral Manager's review of the bids, which certification shall be binding and conclusive.

"**Holder**" means a Noteholder and/or a Preference Shareholder as the context may require.

"**Hybrid Security**" means any Collateral Debt Security (including but not limited to Asset-Backed Securities the payments on which depend on the cash flow from adjustable rate mortgages) that, pursuant to its Underlying Instruments, bears interest at a fixed rate for a limited period of time, after which it bears interest based upon a floating rate index for Dollar-denominated obligations commonly used as a reference rate in the United States or the United Kingdom.

"**Indenture**" means this instrument and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"**Independent**" means, as to any Person, any other Person (including, in the case of an accountant, or lawyer, a firm of accountants or lawyers and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, (ii) is not connected with such Person as an Officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions and (iii) if required to deliver an opinion or certificate to the Trustee pursuant to this Indenture, states in such opinion or certificate that the signer has read this definition and that the signer is Independent within the meaning hereof. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

"**Indorsement**" has the meaning specified in Section 8-102(a)(11) of the UCC.

"**Initial Purchasers**" means, collectively, Lehman Brothers Inc. and Lehman Brothers International (Europe).

"**Initial Rating**" means (i) with respect to the Class A Notes, "Aaa" by Moody's and "AAA" by Standard & Poor's; (ii) with respect to the Class B Notes, "Aa2" by Moody's and "AA" by Standard & Poor's; (iii) with respect to the Class C Notes, "A2" by Moody's and "A" by Standard & Poor's; (iv) with respect to the Class D Notes, "Baa2" by Moody's and "BBB" by Standard & Poor's; and (v) with respect to the Class X Notes, "BBB-" by Standard & Poor's.

"**Initial Investment Agreement**" means the Investment Agreement, dated as of October 17, 2006, among the Issuer, Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A. New York branch, and the Trustee under which amounts in the Reserve Account will be invested in Eligible Investments.

"**Instruction**" has the meaning specified in Section 8-102(a)(12) of the UCC.

"**Instrument**" has the meaning specified in Section 9-102(a)(47) of the UCC.

"**Interest Collection Account**" means the Securities Account designated the "Interest Collection Account" and established in the name of the Trustee pursuant to Section 10.2(a).

"**Interest Coverage Ratios**" means each of the Class A/B Interest Coverage Ratio, the Class C Interest Coverage Ratio, and the Class D Interest Coverage Ratio.

"**Interest Coverage Tests**" means each of the Class A/B Interest Coverage Test, the Class C Interest Coverage Test and the Class D Interest Coverage Test.

"**Interest Distribution Amount**" means, with respect to any Class of Notes, on any Quarterly Distribution Date, the sum of (i) the aggregate amount of interest accrued at the Note Interest Rate (calculated pursuant to Section 7.15(b)) for such Class during the Interest Period ending immediately prior to such Quarterly Distribution Date on the Aggregate Outstanding Amount of the Notes of such Class on the first day of such Interest Period (after giving effect to any redemption of the Notes of such Class or other payment of principal of the Notes of such Class on any preceding Quarterly Distribution Date) *plus* (ii) any Defaulted Interest in respect of the Notes of such Class and accrued interest thereon, to the extent such Defaulted Interest was not paid when due. The Interest Distribution Amount with respect to the Class C Notes and Class D Notes shall not include Class C Deferred Interest or Class D Deferred Interest (but shall include interest on such Class C Deferred Interest and Class D Deferred Interest).

"**Interest Only Security**" means any Collateral Debt Security that does not provide for payment or repayment of a stated principal amount in one or more installments on or prior to the date two Business Days prior to the Stated Maturity of the Notes.

"**Interest Period**" means, with respect to the Notes and the Senior Swap Agreements (a) in the case of the initial Interest Period, the period from and including the Closing Date (or, in the case of the first Interest Period following the Senior Swap Early Withdrawal Date and with respect to the Outstanding Swap Counterparty Amount of a Prior Senior Swap Counterparty only, from and including the Senior Swap Early Withdrawal Date) to, but excluding the first Quarterly Distribution Date (or, in the case of the first Interest Period following the Senior Swap Early Withdrawal Date and with respect to the Outstanding Swap Counterparty Amount of a Prior Senior Swap Counterparty only, to but excluding the first Quarterly Distribution Date following the Senior Swap Early Withdrawal Date), and (b) thereafter, the period from and including the Quarterly Distribution Date immediately following the last day of the immediately preceding Interest Period to, but excluding, the next succeeding Quarterly Distribution Date.

"**Interest Proceeds**" means, with respect to any Due Period and with respect to both amounts received and amounts related to such Due Period, the sum (without duplication) of: (1) all payments of interest (including (a) payments of fixed premium amounts in respect of Synthetic Securities (including CDS Agreement Transactions) (net of premium payments with respect to related Short Synthetic Securities), (b) any Interest Reimbursements received by the Issuer in respect of any CDS Agreement Transactions or other Synthetic Securities structured as credit default swaps and all payments received by the Issuer under a Short Synthetic Security in respect of a failure to pay interest under the related Reference Obligation and (c) the portion of any Sale Proceeds received in respect of the Sale of any Synthetic Security that is attributable to accrued but unpaid fixed premium amounts payable by the related Synthetic Security

Counterparty) on the Collateral Debt Securities received in Cash by the Issuer during such Due Period that is to be deposited in the Interest Collection Account during such Due Period (excluding (w) payments in respect of accrued interest included in Principal Proceeds, (x) payments in respect of deferred interest on Deferred Interest PIK Bonds previously capitalized and treated as "Principal Proceeds" pursuant to clause (8) of the definition thereof, (y) interest on any Collateral Debt Security that is required to be paid to an Asset Hedge Counterparty in accordance with the terms of a Deemed Floating Asset Hedge Agreement and (z) payments of interest in respect of Defaulted Securities and Written-Down Securities (but only so long as the aggregate amount of payments received by the Issuer in respect of any such Defaulted Security or Written-Down Security exceeds the original principal amount of such Defaulted Security or Written-Down Security)); (2) all accrued interest received in Cash by the Issuer with respect to Collateral Debt Securities sold by the Issuer (excluding payments in respect of accrued and unpaid interest on any Credit Improved Security, Credit Risk Security or any Collateral Debt Security sold pursuant to a discretionary sale that, in each case, is sold and reinvested at the option of the Collateral Manager in any substitute Collateral Debt Security, Sale Proceeds received in respect of Defaulted Securities and Written-Down Securities (but only so long as the aggregate amount of payments received by the Issuer in respect of any such Defaulted Security or Written-Down Security exceeds the original principal amount of such Defaulted Security or Written-Down Security) and payments in respect of accrued interest included in Principal Proceeds pursuant to clause (7) of the definition of Principal Proceeds); (3) all payments of interest (including any amount representing the accreted portion of a discount from the face amount of an Eligible Investment) on Reserve Account Investments, Eligible Investments or U.S. Agency Securities in the Collection Accounts, , the Reserve Account and the Uninvested Proceeds Account received in Cash by the Issuer during such Due Period and all payments of principal, including repayments, on Eligible Investments purchased with amounts from the Interest Collection Account received by the Issuer during such Due Period; (4) all amendment and waiver fees, all late payment fees, and all other fees and commissions received in Cash by the Issuer during such Due Period in connection with such Collateral Debt Securities, Eligible Investments, Reserve Account Investments and U.S. Agency Securities (other than fees and commissions received in respect of Defaulted Securities and Written-Down Securities (but only so long as the aggregate amount of payments received by the Issuer in respect of any such Defaulted Security or Written-Down Security exceeds the original principal amount of such Defaulted Security or Written-Down Security) and yield maintenance payments included in Principal Proceeds pursuant to clause (9) of the definition thereof); (5) all payments received pursuant to any Hedge Agreement or any Deemed Floating Asset Hedge Agreement (excluding any payments received by the Issuer by reason of an Event of Default or Termination Event (as defined in the relevant Hedge Agreement) that are required to be used for the purchase of a replacement Hedge Agreement) less any deferred premium payments payable by the Issuer under such Hedge Agreement during such Due Period; (6) all amounts to be transferred by the Trustee from the Interest Reserve Account to the Interest Collection Account in accordance with Section 10.2(o); (7) all amounts to be transferred from the Closing Date Expense Account to the Interest Collection Account; and (8) any amounts received in respect of Negative Amortization Capitalization Amounts for such Due Period; *provided* that (A) Interest Proceeds shall in no event include any Excepted Property, (B) if the presence of a legal or business holiday, whether applicable to the Notes, Credit Default Swaps or Senior Swaps, in each case, in accordance with this Indenture or applicable to any Collateral Debt Security in accordance with its Underlying

Instruments, causes a Scheduled Distribution on any Collateral Debt Security or other security held as Collateral to be received in the period between the end of the Due Period in which such payment would otherwise have been received and the related Quarterly Distribution Date, such payment will be deemed to have been received during such Due Period and (C) for purposes of clause (8) of this definition, at any time when any Negative Amortization Capitalization Amounts have accrued on a Negative Amortization Security, (x) first, unscheduled payments of principal in respect thereof and (y) second (but only if the related payment report delivered to investors indicates that the aggregate Negative Amortization Capitalization Amount (if any) in respect thereof has remained the same or decreased in the related reporting period), scheduled payments of principal in respect thereof shall be deemed to be applied to the reduction of such aggregate Negative Amortization Capitalization Amount and therefore constitute "Interest Proceeds" for purposes of this definition until such aggregate Negative Amortization Capitalization Amount has been reduced to zero.

"**Interest Reimbursement**" means, with respect to any Synthetic Security structured as a credit default swap (including any CDS Agreement Transaction), an "Interest Shortfall Reimbursement Payment Amount" under and as defined in the Credit Default Swap Agreement or related Underlying Instruments (as applicable) or any similar amount (howsoever described).

"**Interest Reserve Account**" means the Securities Account designated the "Interest Reserve Account" and established in the name of the Trustee pursuant to Section 10.2(o).

"**Investment Agreement**" means the Initial Investment Agreement or any replacement guaranteed reinvestment agreement from a bank, insurance company or other corporation or entity organized under the laws of the United States or any state thereof under which no payments are subject to any withholding tax; *provided* that such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Rating Agency is at any time lower than the rating required pursuant to the terms of this Indenture to be assigned to such agreement in order to permit the purchase thereof.

"**Investment Company Act**" means the United States Investment Company Act of 1940, as amended, and the rules thereunder.

"**Issue**" or "**Issue of Collateral Debt Securities**" means Collateral Debt Securities issued by the same issuer, secured by the same collateral pool having the same terms and conditions (as to, among other things, coupon, maturity, security and subordination).

"**Issuer**" means Libra CDO Limited, an exempted company with limited liability incorporated and existing under the law of the Cayman Islands.

"**Issuer Charter**" means the Memorandum and Articles of Association of the Issuer, filed under the Companies Law (2004 Revision) of the Cayman Islands, as modified and supplemented and in effect from time to time and certain resolutions passed by the Directors of the Issuer prior to the Closing Date.

"**Issuer Collateral Account**" has the meaning specified in Section 10.2(m).

"**Issuer Order**" and "**Issuer Request**" mean, respectively, a written order or a written request (which may be in the form of a standing order or request), in each case dated and signed in the name of the Issuer by an Authorized Officer of the Issuer and (if appropriate) the Co-Issuer, or by an Authorized Officer of the Collateral Manager where permitted pursuant to this Indenture or the Collateral Management Agreement, as the context may require or permit.

"**Junior Facility Amount**" means U.S.$225,000,000.

"**Knowledgeable Employee**" has the meaning specified in Rule 3c-5 promulgated under the Investment Company Act.

"**Lehman Brothers Asset Management LLC**" means Lehman Brothers Asset Management LLC, a limited liability company organized under the laws of the State of Delaware.

"**LIBOR**" means the London interbank offered rate as calculated in accordance with Schedule B.

"**LIBOR Business Day**" has the meaning set forth in Schedule B.

"**LIBOR Determination Date**" has the meaning set forth in Schedule B.

"**Listed Bidders**" has the meaning set forth in Schedule E.

"**London Banking Day**" has the meaning set forth in Schedule B.

"**Majority**" means (a) with respect to any Class or Classes of Notes, the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Class or Classes, as the case may be and (b) where the Senior Swap Counterparties are the Controlling Class and a reference is made to a Majority of the Controlling Class, the relevant Senior Swap Counterparty(ies) holding more than 66-⅔% of the respective voting rights assigned to the Senior Swap Counterparties, as determined in accordance with sub-clause (a)(ii) of the definition of "Controlling Class."

"**Majority-in-Interest of Preference Shares**" means more than 50% of the issued and outstanding Preference Shares.

"**Margin Stock**" means "margin stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System.

"**Maturity**" means, with respect to any Note, the date on which all Outstanding unpaid principal of such Note becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"**Maximum Swap Notional Amount**" has the meaning specified in the Senior Swap Agreement.

"**Measurement Date**" means any of the following: (a) the Closing Date, (b) the Ramp-Up Completion Date, (c) any date after the Ramp-Up Completion Date upon which the Issuer acquires or disposes of any Collateral Debt Security, (d) any date after the Ramp-Up Completion Date on which a Collateral Debt Security becomes a Defaulted Security, (e) each Determination Date, (f) the ninth day of any calendar month (other than any calendar month in which a Determination Date occurs and any calendar month ending prior to the Ramp-Up Completion Date) and (g) with written notice of two Business Days to the Issuer and the Trustee, any other Business Day that either Rating Agency, the Senior Swap Counterparty or a Majority of any Class of Notes requests to be a "Measurement Date"; *provided* that if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date will be the next succeeding day that is a Business Day.

"**Monthly Report**" has the meaning specified in Section 10.7(a).

"**Moody's**" means Moody's Investors Service, Inc. and any successor or successors thereto.

"**Moody's Asset Correlation Percentage**" means a percentage determined in accordance with any of the one or more asset correlation methodologies provided from time to time to the Collateral Manager and the Trustee by Moody's as selected by the Collateral Manager in its sole discretion; *provided* that the Collateral Manager shall give reasonably detailed instructions to the Trustee based on consultations between the Trustee, the Collateral Manager and Moody's as to the application of such methodology.

"**Moody's Asset Correlation Test**" means a test that is satisfied on any Measurement Date on or after the Ramp-Up Completion Date if the Moody's Asset Correlation Percentage (calculated based on a model that assumes 100 separate obligors or such other number of obligors as the Collateral Manager on behalf of the Issuer may agree in writing with Moody's or that otherwise satisfies the Rating Condition with respect to Moody's) is less than or equal to 21.5% on such Measurement Date (as the same shall be adjusted with the written consent of Moody's or in a manner that otherwise satisfies the Rating Condition with respect to Moody's in order to take into account any adjustment to the number of obligors in accordance with the foregoing).

"**Moody's Below B3 Haircut Amount**" means, as of any Measurement Date, 50% of the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds) that have a Moody's Rating below "B3".

"**Moody's Below Ba3 Haircut Amount**" means, as of any Measurement Date, 20% of the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds) that have a Moody's Rating below "Ba3" by Moody's but that have a Moody's Rating of at least "B3".

"**Moody's Below Baa3 Haircut Amount**" means, as of any Measurement Date, 10% of the excess (if any) of (a) the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds) that have a Moody's Rating below "Baa3" but have a Moody's Rating of at least "Ba3" over (b) 10% of the Aggregate Principal

Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds).

"**Moody's Haircut Amount**" means, as of any Measurement Date, the sum (without duplication) of (i) the Moody's Below Baa3 Haircut Amount *plus* (ii) the Moody's Below Ba3 Haircut Amount *plus* (iii) the Moody's Below B3 Haircut Amount *plus* (iv) the aggregate Discount Haircut Amount for all Discount Securities; *provided* that a Collateral Debt Security shall only be included in one of clauses (i) through (iv), which shall be the clause that results in the greatest Moody's Haircut Amount.

*provided* that for purposes of the definitions of "Moody's Below B3 Haircut Amount," "Moody's Below Ba3 Haircut Amount," "Moody's Below Baa3 Haircut Amount" and "Moody's Haircut Amount," a Synthetic Security shall be included as a Collateral Debt Security having the characteristics of the related Reference Obligation.

"**Moody's Minimum Weighted Average Recovery Rate Test**" means a test satisfied, as of any Measurement Date on or after the Ramp-Up Completion Date, if the Moody's Weighted Average Recovery Rate is greater than or equal to 25.5%.

"**Moody's Notching Approved Security**" means any Collateral Debt Security that (a) Moody's confirms in writing to the Collateral Manager may constitute a "Moody's Notching Approved Security" for purposes of this definition (a copy of which confirmation the Collateral Manager shall promptly forward to the Trustee) and (b) the Collateral Manager has notified the Trustee shall constitute a "Moody's Notching Approved Security" for purposes of this definition; *provided* that, with respect to any Collateral Debt Security that complies with the requirements of the foregoing clause (a), the Collateral Manager may, in its sole discretion at any time and from time to time, upon notice to the Trustee, withdraw or reinstate its designation of a Collateral Debt Security as a "Moody's Notching Approved Security" for purposes of this definition.

"**Moody's Rating**" means, with respect to any Collateral Debt Security, the Rating thereof determined in accordance with clause (a) of the definition of "Rating."

"**Moody's Rating Factor**" means, for purposes of computing the Moody's Weighted Average Rating Factor, the number assigned below to the Moody's Rating applicable to each Collateral Debt Security.

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

For purposes of the Moody's Weighted Average Rating Test, if a Collateral Debt Security does not have a Moody's Rating assigned to it at the date of acquisition thereof, the

Moody's Rating Factor with respect to such Collateral Debt Security shall be 10,000 for a period of 90 days from the acquisition of such Collateral Debt Security, and after such 90 day period, if such Collateral Debt Security is not rated by Moody's and no other security or obligation of the issuer thereof or obligor thereon is rated by Moody's and the Issuer or the Collateral Manager seeks to obtain an estimate of a Moody's Rating Factor, then the Moody's Rating Factor of such Collateral Debt Security will be deemed to be such estimate thereof as may be assigned by Moody's upon the request of the Issuer or the Collateral Manager.

"**Moody's Weighted Average Rating Factor**" means the number determined on any Measurement Date by dividing (i) the sum of the series of products obtained for any Pledged Collateral Debt Security that is not a Defaulted Security, Deferred Interest PIK Bond, Written-Down Security or Equity Security, by *multiplying* (a) the Principal Balance on such Measurement Date of each such Pledged Collateral Debt Security *by* (b) its respective Moody's Rating Factor on such Measurement Date *by* (ii) the Aggregate Principal Balance on such Measurement Date of all Collateral Debt Securities that are not Defaulted Securities, Deferred Interest PIK Bonds, Written-Down Security or Equity Security and rounding the result up to the nearest whole number.

"**Moody's Weighted Average Rating Test**" means a test satisfied on any Measurement Date on or after the Ramp-Up Completion Date if the Moody's Rating Weighted Average Rating Factor of the Collateral Debt Securities is equal to a numerical value of 480.

"**Moody's Weighted Average Recovery Rate**" means, as of any Measurement Date, the number, expressed as a percentage, obtained by summing the products obtained by *multiplying* the Principal Balance of each Collateral Debt Security, other than a Defaulted Security or a Deferred Interest PIK Bond, by its "Applicable Recovery Rate" (determined for purposes of this definition pursuant to clause (a) of the definition of "Applicable Recovery Rate"), *dividing* such sum *by* the Aggregate Principal Balance of all such Collateral Debt Securities and rounding up the result to the first decimal place.

"**Negative Amortization Capitalization Amount**" means, with respect to any Negative Amortization Security and any specified period of time, the aggregate amount of accrued interest thereon that has been capitalized as principal pursuant to the related Underlying Instruments during such period, as the same may be reduced from time to time pursuant to and in accordance with the related Underlying Instruments.

"**Negative Amortization Haircut Amount**" means, with respect to any Negative Amortization Security on any date of determination, the excess (if any) of (a) the Negative Amortization Capitalization Amount therefor (if any) for the period from and including the date of issuance thereof to but excluding such date of determination over (b) the sum of (i) 5% of the original principal amount of such Negative Amortization Security upon issuance and (ii) the amount by which such Negative Amortization Security has already been haircut pursuant to the operation of sub-clause (B) of the proviso to the definition of "Net Outstanding Portfolio Collateral Balance" (taking into account the proviso to the definition of "Negative Amortization Security" below in the case of such sub-clause (B)).

"**Negative Amortization Security**" means an RMBS Security which (a) permits the related mortgage loan or mortgage loan obligor for a specified period of time to make no repayments of principal and payments of interest in amounts that are less than the interest payments that would otherwise be payable thereon based upon the stated rate of interest thereon, (b) to the extent that interest proceeds received in respect of the related underlying collateral are insufficient to pay interest that is due and payable thereon, permits principal proceeds received in respect of the related underlying collateral to be applied to pay such interest shortfall and (c) to the extent that the aggregate amount of interest proceeds and principal proceeds received in respect of the related underlying collateral are insufficient to pay interest that is due and payable thereon, permits such unpaid interest to be capitalized as principal and itself commence accruing interest at the applicable interest rate, in each case pursuant to the related Underlying Instruments.

"**Net Outstanding Portfolio Collateral Balance**" means, on any Measurement Date, an amount equal to (a) the Aggregate Principal Balance on such Measurement Date of all Collateral Debt Securities *plus* (b) the Aggregate Principal Balance of all Principal Proceeds and Uninvested Proceeds held as Cash and Eligible Investments and U.S. Agency Securities purchased with Principal Proceeds or Uninvested Proceeds and any amount on deposit at such time in the Principal Collection Account or the Uninvested Proceeds Account (without duplication) *plus* (c) the Supersenior Excess as of such Measurement Date *minus* (d) the Aggregate Principal Balance on such Measurement Date of all Collateral Debt Securities that are (i) Defaulted Securities or Deferred Interest PIK Bonds or (ii) Equity Securities *plus* (e) for each Defaulted Security or Deferred Interest PIK Bond, the Calculation Amount with respect to such Defaulted Security or Deferred Interest PIK Bond; *provided* that (x) solely for the purpose of calculating the Net Outstanding Portfolio Collateral Balance in connection with the Overcollateralization Tests, the "Net Outstanding Portfolio Collateral Balance" means (A) the amount determined pursuant to the preceding clauses of this definition *minus* (B) the greater of (1) the Standard & Poor's Haircut Amount and (2) the Moody's Haircut Amount *minus* (C) for each Negative Amortization Security, the Negative Amortization Haircut Amount (if any) with respect to such Negative Amortization Security and (y) the provisions of the preceding proviso and the definitions used therein may be modified in order to comply with any amendments or modifications to the applicable Rating Agency criteria if the Rating Condition is satisfied with respect thereto.

"**Non-LIBOR Floating Rate Collateral Debt Security**" means a Floating Rate Collateral Debt Security that bears interest based upon a floating rate index for Dollar-denominated obligations other than the London interbank offered rate.

"**Note Acceleration Date**" means the Quarterly Distribution Date occurring in November 2013.

"**Note Break-Even Default Rate**" means, with respect to any Class of Notes rated by Standard & Poor's, at any time, the maximum percentage of defaults (as determined by application of the Standard & Poor's CDO Monitor) which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain such that, after giving effect to Standard & Poor's assumptions on recoveries and timing and to the Priority of Payments, will result (i) in the case of the Class C Notes and the Class D Notes, in sufficient funds remaining for the payment in full

of principal of and interest on such Class of Notes in full by its Stated Maturity and (ii) in the case of the Class A Notes and Class B Notes, in sufficient funds remaining for the payment in full of principal and the timely payment of interest on such Class of Notes.

"**Note Interest Rate**" means, with respect to the Notes of any Class for any Interest Period, the annual rate at which interest accrues on the Notes of such Class for such Interest Period, as specified in <u>Section 2.2</u>.

"**Note Purchase Agreement**" means the Note Purchase Agreement, dated as of October 17, 2006, among each of the Co-Issuers, the Initial Purchasers and the Co-Purchaser.

"**Note Reduction Amount**" means, with respect to any Quarterly Distribution Date, an amount equal to the greater of (a) zero and (b)(i) the Note Share *multiplied by* (ii) the Total Reduction Amount.

"**Note Register**" and "**Note Registrar**" have the respective meanings specified in <u>Section 2.4(a)</u>.

"**Note Share**" means, for each Quarterly Distribution Date as of the related Determination Date, the ratio of (a)(i) the Aggregate Outstanding Amount of the Senior Notes immediately following the previous Quarterly Distribution Date (or in the case of the first Quarterly Distribution Date, the initial Aggregate Outstanding Amount of the Senior Notes) *minus* (ii) the Deferred Notes Principal to (b) the sum of (i) the Aggregate Outstanding Amount of the Senior Notes immediately following the previous Quarterly Distribution Date (or in the case of the first Quarterly Distribution Date, the initial Aggregate Outstanding Amount of the Notes) *plus* (ii) the Aggregate Outstanding Swap Counterparty Amount of the Senior Swap Counterparties immediately following the previous Quarterly Distribution Date (or in the case of the first Quarterly Distribution Date, the Outstanding Swap Counterparty Amount on the Closing Date) *plus* (iii) the Remaining Unfunded Notional Amount immediately following the operation of the Priority of Payments on the previous Quarterly Distribution Date (or in the case of the first Quarterly Distribution Date, the Remaining Unfunded Notional Amount on the Closing Date); *provided* that, for purposes of this definition, "Aggregate Outstanding Amount" shall not include Class C Deferred Interest (with respect to the Class C Notes) and shall not include Class D Deferred Interest (with respect to the Class D Notes).

"**Note Valuation Report**" has the meaning specified in <u>Section 10.7(b)</u>.

"**Noteholder**" means the Person in whose name a Note is registered in the Note Register.

"**Notes**" means the Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class X Notes authorized by, authenticated and delivered under, this Indenture.

"**Notes Default Rate Differential**" means, with respect to any Class of Notes rated by Standard & Poor's, at any time, the rate calculated by subtracting the Class Scenario Default Rate at such time from the Note Break-Even Default Rate for such Class of Notes at such time. The Notes Default Rate Differential is based on a proprietary model developed by Standard & Poor's, the application of which may change from time-to-time as directed by Standard & Poor's.

"**Notional Amount**" means, with respect to any Synthetic Security (including any CDS Agreement Transaction), (a) the "Floating Rate Payer Calculation Amount" as defined in the Credit Derivatives Definitions, (b) the "notional amount" as defined in the related Underlying Instruments or (c) or any similar term in the related Underlying Instruments that refers to the par amount of indebtedness that would be valued for purposes of determining the cash or physical settlement obligations of the parties thereto.

"**Notional Amount Shortfall**" means, at any time, any excess (if any) of (a) the aggregate Remaining Exposure of all CDS Agreement Transactions over (b) the sum of (i) the Remaining Unfunded Notional Amount *plus* (ii) the aggregate principal balance of all Reserve Account Investments credited to the Reserve Account (A) excluding any portion thereof consisting of Principal Proceeds and any investment income on Reserve Account Investments that has been irrevocably designated for transfer to the Interest Collection Account but (B) including any other investment income on Reserve Account Investments credited to the Reserve Account.

"**Offer**" means, with respect to any security, (a) any offer by the issuer of such security or by any other Person made to all of the holders of such security to purchase or otherwise acquire such security (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to convert or exchange such security into or for Cash, securities or any other type of consideration or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

"**Offering**" means the offering of the Notes and the Preference Shares under the Offering Memorandum.

"**Offering Memorandum**" means the final Offering Memorandum, dated October 15, 2006, prepared and delivered in connection with the offer and sale of the Notes and the Preference Shares, as amended or supplemented on or prior to the Closing Date.

"**Officer**" means, (a) with respect to the Issuer, any director and with respect to any other corporation, the Chairman of the Board of Directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity, (b) with respect to the Co-Issuer, the managing member or any duly appointed manager of the Co-Issuer and (c) with respect to any bank or trust company acting as trustee of an express trust or as custodian, any Trust Officer.

"**Opinion of Counsel**" means a written opinion addressed to the Trustee and each Rating Agency (each, a "**Recipient**"), in form and substance reasonably satisfactory to each Recipient, of an attorney at law admitted to practice in any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer or the Co-Issuer, as the case may be, and which attorney shall be reasonably satisfactory to the Trustee. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such Opinion of Counsel and shall

either be addressed to each Recipient or shall state that each Recipient shall be entitled to rely thereon.

"**Optional Redemption**" has the meaning specified in <u>Section 9.1(a)</u>.

"**Outstanding**" means, with respect to the Notes or a particular Class of the Notes, as of any date of determination, all of the Notes or all of the Notes of such Class theretofore authenticated and delivered under this Indenture except:

> (a)      Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

> (b)      Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes; *provided* that, if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

> (c)      Notes in exchange for, or in lieu of, other Notes which have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a holder in due course; and

> (d)      Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in <u>Section 2.5</u>, as applicable;

*provided* that in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (1) Notes beneficially owned by the Issuer or the Co-Issuer or any other obligor upon the Notes or any Affiliate of any of them shall be disregarded and deemed not to be Outstanding and (2) Notes beneficially owned by the Collateral Manager, any Affiliate of the Collateral Manager or any account for which the Collateral Manager or an Affiliate of the Collateral Manager acts as investment adviser (and for which the Collateral Manager or such Affiliate has discretionary authority) shall be disregarded and deemed not to be Outstanding with respect to any assignment or termination of, any of the express rights or obligations of the Collateral Manager under the Collateral Management Agreement or this Indenture (including the exercise of any rights to remove the Collateral Manager or terminate the Collateral Management Agreement or approve or object to a Replacement Manager (as defined in the Collateral Management Agreement)), or any amendment or other modification of the Collateral Management Agreement or this Indenture increasing the rights or decreasing the obligations of the Collateral Manager except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that the Trustee knows to be beneficially owned in the manner indicated in clause (1) or (2) above shall be so disregarded.  Notes owned in the manner indicated in clause (1) or (2) above that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer, the Co-Issuer, the Collateral Manager or any other obligor upon the Notes or any Affiliate of the Issuer, the Co-Issuer, the Collateral Manager or

such other obligor or an account for which the Collateral Manager or an Affiliate of the Collateral Manager acts as investment adviser (and for which the Collateral Manager or such Affiliate has discretionary authority).

"**Outstanding Swap Counterparty Amount**" means, with respect to any date of determination, (a) with respect to a Senior Swap Counterparty, an amount not less than zero equal to (i) the sum of all payments made by the Senior Swap Counterparty to the Issuer pursuant to the Senior Swap Agreement from and including the effective date of the Senior Swap Agreement to and including such date of determination *less* (ii) the sum of all Swap Reduction Payments made by the Issuer to such Senior Swap Counterparty from and including the effective date of the Senior Swap Agreement to and including such date of determination; *provided*, *however*, that the definition under this clause (a) shall be subject to such adjustment agreed to by the Senior Swap Counterparty and the applicable Prior Senior Swap Counterparty as are needed in the event there is a Prior Senior Swap Counterparty to avoid any duplication with the amount in clause (b) of this definition; and (b) with respect to a Prior Senior Swap Counterparty, the greater of (i) zero and (ii)(A) the sum of the Outstanding Swap Counterparty Amount on the Senior Swap Early Withdrawal Date with respect to such Prior Senior Swap Counterparty, and, without duplication, if such Prior Senior Swap Counterparty is a Terminated Senior Swap Counterparty, the termination payment paid by it pursuant to the Senior Swap Agreement as a result of an "Early Termination Date" thereunder *minus* (B) the aggregate of all amounts which (1) the Prior Senior Swap Counterparty receives from any assignee or replacement counterparties or liquidity facility providers which provide financing for the Issuer's payment obligations under the CDS Agreement Transactions and (2) are expressly stated in a written instrument executed by such Prior Senior Swap Counterparty and such assignee, replacement counterparties or liquidity facility providers to be paid in reduction of its Outstanding Swap Counterparty Amount *minus* (C) the aggregate of all amounts paid to the Prior Senior Swap Counterparty in respect of its Outstanding Swap Counterparty Amount pursuant to the operation of the Priority of Payments after such Senior Swap Early Withdrawal Date.

"**Overcollateralization Ratios**" means each of the Class A/B Overcollateralization Ratio, the Class C Overcollateralization Ratio and the Class D Overcollateralization Ratio.

"**Overcollateralization Tests**" means each of the Class A/B Overcollateralization Test, the Class C Overcollateralization Test and the Class D Overcollateralization Test.

"**Paying Agent**" means any Person authorized by the Issuer to pay the principal of or interest on any Notes or make any payments to a Credit Default Swap Counterparty or Senior Swap Counterparty on behalf of the Issuer as specified in Section 7.2.

"**Payment Account**" means the Securities Account designated the "Payment Account" and established in the name of the Trustee pursuant to Section 10.3.

"**Permanent Reduction Amount**" means, with respect to any date of determination, the sum of (i) the aggregate amount of all Principal Proceeds and Interest Proceeds applied on or prior to such date of determination by the Issuer pursuant to Sections 11.1(i)(H), (K), (N) and (V) and Sections 11.1(ii)(C), (E), (H), (L) and (M) to the reduction of the Outstanding Swap Counterparty Amount under the Senior Swap Agreement or the Indenture or as a deposit to the

Reserve Account *plus* (ii) the aggregate amount of all Principal Proceeds which the Collateral Manager elects, on or prior to such date of determination and pursuant to <u>Section 11.1(ii)(K)</u>, to apply to the reduction of the Outstanding Swap Counterparty Amount under the Senior Swap Agreement or the Indenture or as a deposit to the Reserve Account in reduction of the Remaining Unfunded Notional Amount *plus* (iii) the sum of the amounts of the Supersenior Excess which the Collateral Manager elects, during the Reinvestment Period, on or prior to such date of determination, to apply to reduce permanently the Remaining Unfunded Notional Amount pursuant to <u>Section 7.18(g)</u> *plus* (iv) the sum of the amount of Uninvested Proceeds pursuant to <u>Section 11.1(iii)</u> applied after the Closing Date and on or prior to such date of determination to the reduction of the Outstanding Swap Counterparty Amount under the Senior Swap Agreement or the Indenture or a deposit to the Reserve Account *plus* (v) the aggregate amount of all Principal Proceeds applied during the period from but excluding the last day of the Reinvestment Period to and including such date of determination by the Issuer pursuant to <u>Section 11.1(ii)(J)</u> to the reduction of the Outstanding Swap Counterparty Amount *plus* (vi) to the extent it is not duplicative of any amounts paid in clauses (i) through (v) above, the Exposure Reduction Amount after the last day of the Reinvestment Period.

"**Permitted Reference Obligation**" means any Asset-Backed Security or REIT Debt Security that is a Specified Type of Asset-Backed Security or REIT Debt Security and which, if purchased by the Issuer, would satisfy paragraphs (1) through (39) of <u>Section 12.2</u>.

"**Person**" means an individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"**PIK Bond**" means any Collateral Debt Security that, pursuant to the terms of the related Underlying Instruments, permits the payment of interest thereon to be deferred, diverted or capitalized as additional principal thereof (even if sufficient interest proceeds would have been available to pay interest on the Collateral Debt Security) or that issues identical securities in place of payments of interest in Cash (even if sufficient interest proceeds would have been available to pay interest on the Collateral Debt Security); *provided* that as of the date of such Collateral Debt Security's inclusion in the Collateral, such Collateral Debt Security has paid in Cash all interest accrued thereon up to and including such date.

"**Placement Agreement**" means the Placement Agreement, dated as of October 17, 2006, among each of the Co-Issuers, the Initial Purchasers and the Co-Purchaser.

"**Plan**" means a "plan" as defined in Section 4975(e)(1) of the Code.

"**Plan Asset Regulation**" means the regulation issued by the United States Department of Labor that, under specified circumstances, requires plan fiduciaries, and entities with certain specified relationships to a Plan, to "look through" investment vehicles (such as the Issuer) and treat as an "asset" of the plan each underlying investment made by such investment vehicle.

"**Pledged Collateral Debt Security**" means as of any date of determination, any Collateral Debt Security that has been Granted to the Trustee and has not been released from the lien of this Indenture pursuant to <u>Section 10.8</u>.

"**Pledged Securities**" means on any date of determination, (a) the Collateral Debt Securities, Equity Securities, Reserve Account Investments, U.S. Agency Securities and Eligible Investments that have been Granted to the Trustee and (b) all non-Cash proceeds thereof, in each case, to the extent not released from the lien of this Indenture pursuant hereto.

"**Preference Share Documents**" means the Issuer Charter, certain resolutions of the Board of Directors relating to the issue of the Preference Shares, this Indenture and the Preference Share Paying Agency Agreement.

"**Preference Share Paying Agency Agreement**" means the Preference Share Paying Agency Agreement dated as of the Closing Date between the Issuer, the Preference Share Paying Agent and the Preference Share Registrar.

"**Preference Share Paying Agent**" means LaSalle Bank National Association (or any successor thereto), as Preference Share Paying Agent for the Preference Shares, or any Person authorized by the Issuer from time to time to make payments on the Preference Shares and to deliver notices to the Preference Shareholders on behalf of the Issuer.

"**Preference Share Register**" and "**Preference Share Registrar**" have the respective meanings specified in the Preference Share Paying Agency Agreement.

"**Preference Shareholders**" means the Persons in whose names Preference Shares are registered in the ownership register relating to the Preference Shares maintained by the Preference Share Registrar.

"**Preference Shares**" means the 78,000 Preference Shares issued by the Issuer pursuant to the Issuer Charter.

"**Principal Amortization**" means, with respect to any CDS Agreement Transaction, any payment of principal paid to the holders of the related Reference Obligation.

"**Principal Balance**" or "**par**" means, with respect to any Pledged Security (excluding, for the avoidance of doubt, any Short Synthetic Security except for as referred to in clause (b) herein), as of any date of determination, the outstanding principal amount of such Pledged Security; *provided* that:

> (a)     the Principal Balance of a Collateral Debt Security received upon acceptance of an Offer for another Collateral Debt Security, which Offer expressly states that failure to accept such Offer may result in a default under the Underlying Instruments of such tendered Collateral Debt Security, shall be deemed to be the Calculation Amount of such received Collateral Debt Security until such time as Interest Proceeds and Principal Proceeds, as applicable, are received when due with respect to such received Collateral Debt Security;

(b)  the Principal Balance of any Synthetic Security shall be equal to (i) in the case of a Synthetic Security that is a credit default swap (including any CDS Agreement Transaction), (A)  at any time prior to the delivery of a notice of physical settlement, the remaining Notional Amount of such Synthetic Security *minus* the aggregate remaining Notional Amount of related Short Synthetic Securities or (B) at any time following the delivery of a notice of physical settlement but prior to the receipt by the Issuer of the related Deliverable Obligations, (I) in the case of an exercise in whole, the Physical Settlement Amount of such Synthetic Security and (II) in the case of an exercise in part, the sum of the delivery amount and the remaining Notional Amount after giving effect to such delivery, in each case determined in accordance with the Underlying Instruments relating thereto and net of the aggregate applicable Notional Amount of related Short Synthetic Securities or (ii) in the case of any other Synthetic Security, the aggregate amount of the repayment obligations of the Synthetic Security Counterparty payable to the Issuer through the maturity of such Synthetic Security;

(c)  the Principal Balance of any Equity Security, unless otherwise expressly stated herein, shall be deemed to be zero;

(d)  the Principal Balance of any PIK Bond (including any Deferred Interest PIK Bond) shall be equal to the outstanding principal amount thereof (exclusive of any principal thereof representing capitalized interest);

(e)  the Principal Balance of any Eligible Investment that does not pay Cash interest on a current basis will be the lesser of par or the original issue price thereof;

(f)  the Principal Balance of any Written-Down Security shall be reduced to reflect the percentage by which the aggregate par amount of the entire Issue of which such Written-Down Security is a part (taking into account all securities ranking senior in priority of payment thereto and secured by the same pool of collateral) exceeds the aggregate par amount (including reserved interest or other amounts available for overcollateralization) of all collateral securing such Issue (excluding defaulted collateral), as determined by the Collateral Manager using customary procedures and information available in the servicer reports relating to such Written-Down Security;

(g)  the Principal Balance of a Zero Coupon Bond shall be the sum of (i) the original issue price thereof *plus* (ii) the aggregate amount of interest accreted thereon to but excluding such date of determination in accordance with the provisions of the related Underlying Instruments (or any other agreement between the issuer thereof and the original purchasers thereof) relating to the reporting of income by the holders of, and deductions by the issuer of, such Zero Coupon Bond for U.S. federal income tax purposes; and

(h)  the Principal Balance of a Negative Amortization Security shall be (i) the original principal amount of such Negative Amortization Security on the date of issuance thereof (which amount shall in no event be adjusted to reflect any Negative Amortization Capitalization Amounts thereon) *minus* (ii) the aggregate amount of all payments made in respect of principal thereof (excluding any payments made in respect of Negative

Amortization Capitalization Amounts for any period) from and including the date of issuance thereof to but excluding such date of determination.

"**Principal Collection Account**" means the Securities Account designated the "Principal Collection Account" and established in the name of the Trustee pursuant to Section 10.2(b).

"**Principal Only Security**" means any Collateral Debt Security (other than a Zero Coupon Bond) that does not provide for the periodic payment of interest.

"**Principal Proceeds**" means, with respect to any Due Period, the sum (without duplication) of: (1) any Uninvested Proceeds transferred from the Uninvested Proceeds Account to the Principal Collection Account (x) on or before the first Determination Date as of which a Ratings Confirmation Failure has occurred (after application of funds on such Quarterly Distribution Date in accordance with the Priority of Payments) or (y) on the first Quarterly Distribution Date relating to the Determination Date following receipt of the Ratings Confirmation; (2) all payments of principal on the Collateral Debt Securities and Eligible Investments received in Cash by the Issuer during such Due Period (excluding any amount representing the accreted portion of a discount from the face amount of an Eligible Investment and any amounts received in respect of Negative Amortization Capitalization Amounts but including (i) prepayments or mandatory sinking fund payments, (ii) payments in respect of optional redemptions, exchange offers, tender offers and interest (other than payments of principal of Eligible Investments acquired with Interest Proceeds or Uninvested Proceeds), (iii) recoveries, deferred or capitalized interest or any other amounts on Defaulted Securities and Written-Down Securities, in each case up to an amount equal to the original principal amount of such Defaulted Securities or Written-Down Securities, as the case may be, (iv) the Sale Proceeds of a Sale of any Equity Security and any amounts received as a result of optional redemptions, exchange offers, tender offers for any Equity Securities and (v) any Principal Reimbursements received by the Issuer in respect of any CDS Agreement Transactions or other Synthetic Securities structured as credit default swaps other than those described in the foregoing clause (y), in each case received in Cash by the Issuer during such Due Period); (3) Sale Proceeds received by the Issuer during such Due Period (excluding those included in Interest Proceeds as defined above); (4) all amendment, waiver, late payment fees and other fees and commissions, received in Cash by the Issuer during the related Due Period in respect of Defaulted Securities and Written-Down Securities; (5) any proceeds resulting from the termination, liquidation or reduction of the notional amount of a Hedge Agreement or the Credit Default Swap Agreement, to the extent such proceeds exceed the cost of entering into a replacement Hedge Agreement or Credit Default Swap Agreement in accordance with the requirements hereof; (6) all payments received in Cash by the Issuer during such Due Period that represent call or prepayment amounts; (7) all payments of interest on Collateral Debt Securities received in Cash by the Issuer to the extent that they represent accrued interest purchased with Principal Proceeds or Uninvested Proceeds after the Ramp-Up Completion Date; (8) all payments received in Cash by the Issuer in respect of deferred interest on Deferred Interest PIK Bonds previously capitalized; (9) all yield maintenance payments received in Cash by the Issuer during such Due Period; (10) proceeds of any assets standing to the credit of the Reserve Account and any proceeds of such proceeds; (11) all amounts to be transferred by the Trustee from the Interest Reserve Account to the Principal Collection Account in accordance with Section 10.2(o); (12) all amounts to be transferred by the Trustee from the Closing Date Expense Account to the Principal Collection

Account; (13) all payments received by the Issuer under a Short Synthetic Security in respect of a failure to pay, or write-down of, principal under the related Reference Obligation, net of any Principal Reimbursements paid by the Issuer in respect of any Short Synthetic Security; and (14) all other payments received in connection with the Collateral Debt Securities, Reserve Account Investments and Eligible Investments that are not included in Interest Proceeds; *provided* that (i) in no event will Principal Proceeds include any Excepted Property and (ii) if the presence of a legal or business holiday causes a Scheduled Distribution on any Collateral Debt Security or other security held as Collateral to be received in the period between the end of the Due Period in which such payment would otherwise have been received and the related Quarterly Distribution Date, such payment will be deemed to have been received during such Due Period.

"**Principal Reimbursement**" means, with respect to any Synthetic Security structured as a credit default swap (including any CDS Agreement Transaction), any "Writedown Reimbursement Payment Amount" or "Principal Shortfall Reimbursement Payment Amount" under and as defined in the Credit Default Swap Agreement or related Underlying Instruments (as applicable) or any similar amount (howsoever described).

"**Prior Senior Swap Counterparty**" means any Assignor Senior Swap Counterparty or Terminated Senior Swap Counterparty.

"**Priority of Payments**" has the meaning specified in <u>Section 11.1</u>.

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**Proposed Plan**" means a plan proposed by the Collateral Manager, in its reasonable business judgment, on behalf of the Issuer to the Rating Agencies prior to the Ramp-Up Completion Date and consented to by the Senior Swap Counterparty (which consent shall not be unreasonably withheld), which Proposed Plan may include a proposal to (a) make payments of principal of and accrued interest on the Aggregate Outstanding Amount of the Notes or a payment on a Credit Default Swap Agreement in accordance with the Priority of Payments, (b) sell a portion of the Collateral, (c) extend the Ramp-Up Completion Date, (d) amend this Indenture pursuant to <u>Section 8</u> hereof, including, without limitation, the requirements necessary to satisfy each of the Collateral Quality Tests and any of the Eligibility Criteria in which case all references herein to any Collateral Quality Test, Eligibility Criteria or any other provision modified pursuant to the related Proposed Plan, from the date of satisfaction of the Rating Condition, with respect to such Proposed Plan, shall be deemed to refer to such item as so modified or (e) any other action as may be proposed in a Proposed Plan that satisfies the Rating Condition. In accordance with this Indenture, the terms and conditions of any Proposed Plan proposed by the Collateral Manager, on behalf of the Issuer, and in respect of which the Rating Condition has been satisfied, as described above, shall be set forth in a supplemental indenture entered into pursuant to <u>Section 8</u> hereof.

"**Proposed Portfolio**" means the portfolio (measured by Principal Balance) of (a) the Collateral Debt Securities, (b) Principal Proceeds or Uninvested Proceeds held as Cash, (c) Eligible Investments purchased with Principal Proceeds or Uninvested Proceeds and (d) the

Supersenior Excess resulting from the Sale or maturity of a Collateral Debt Security or a proposed acquisition of or entry into a Collateral Debt Security, as the case may be.

"**Pure Private Collateral Debt Security**" means any Collateral Debt Security other than (a) a Collateral Debt Security that was issued pursuant to an effective registration statement under the Securities Act or (b) a privately placed Collateral Debt Security that is eligible for resale under Rule 144A or Regulation S under the Securities Act.

"**Qualified Bidder List**" means a list of not less than three and not more than fourteen Persons prepared by the Collateral Manager and delivered to the Trustee on the Closing Date, as may be amended and supplemented by the Collateral Manager from time to time upon written notice to the Trustee; *provided* that any such notice shall only be effective on any Auction Date if it was received by the Trustee at least two Business Days prior to such Auction Date.

"**Qualified Bidders**" means the Persons, which may include the Collateral Manager and any of its Affiliates, whose names appear from time to time on the Qualified Bidder List.

"**Qualified Institutional Buyer**" has the meaning given to such term in Rule 144A under the Securities Act.

"**Qualified Purchaser**" means (i) a "qualified purchaser" as defined in the Investment Company Act, (ii) with respect to Preference Shares sold to Accredited Investors only, a Knowledgeable Employee with respect to the Issuer or (iii) a company beneficially owned exclusively by one or more "qualified purchasers" and/or Knowledgeable Employees with respect to the Issuer.

"**Qualifying Foreign Obligor**" means a corporation, partnership, trust or other entity organized in any of Australia, Canada, France, Germany, Ireland, the Netherlands, the Netherlands Antilles, New Zealand, Sweden, Switzerland or the United Kingdom, so long as the unguaranteed, unsecured and otherwise unsupported long-term Dollar sovereign debt obligations of such country are rated "Aa2" or higher by Moody's and "AA" or higher by Standard & Poor's.

"**Qualifying Investment Vehicle**" means a Flow-Through Investment Vehicle as to which all of the beneficial owners of any securities issued by the Flow-Through Investment Vehicle have made, and as to which (in accordance with the document pursuant to which the Flow-Through Investment Vehicle was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer or the Issuers, as the case may be, and the Note Registrar (or, with respect to the Preference Shares, the Preference Share Registrar) each of the representations set forth herein and in (a) the Offering Memorandum and a Subscription Agreement or (b) the transfer certificate pursuant to which Notes or Preference Shares were transferred to such Flow-Through Investment Vehicle (in each case, with appropriate modifications to reflect the indirect nature of their interests in the Notes or the Preference Shares).

"**Quarterly Asset Amount**" means, with respect to any Quarterly Distribution Date, the aggregate Principal Balance of the Collateral Debt Securities (and Synthetic Securities), including amounts invested in Eligible Investments or on deposit in the Principal Collection

Account, on the first day of the Calculation Period commencing on the preceding Quarterly Distribution Date or, in the case of the first Calculation Period, on the Closing Date.

"**Quarterly Distribution Date**" means the 6th day of each February, May, August and November, beginning in February 2007; *provided* that (i) the final Quarterly Distribution Date shall be November 6, 2046 and (ii) if any such date is not a Business Day, the relevant Quarterly Distribution Date will be the next succeeding Business Day.

"**Ramp-Up Completion Date**" means the date that is the earlier of (a) January 10, 2007 and (b) the first date on which the Aggregate Principal Balance of the Pledged Collateral Debt Securities plus any Principal Proceeds received in respect of any such Pledged Collateral Debt Securities is at least equal to the Aggregate Ramp-Up Par Amount.

"**Ramp-Up Notice**" has the meaning specified in <u>Section 7.17(d)</u>.

"**Rating**" means:

(a)     with respect to any Asset-Backed Security, REIT Debt Security or Mortgage Finance Company Security, for determining the Moody's Rating as of any date of determination:

(i)     if such Asset-Backed Security or REIT Debt Security has a Moody's rating, the Moody's Rating shall be such rating, or, if such Collateral Debt Security does not have a Moody's rating, but the Issuer or the Collateral Manager on behalf of the Issuer has requested that Moody's assign a rating to such Collateral Debt Security, the Moody's Rating shall be the rating so assigned by Moody's;

(ii)     if such Asset-Backed Security or REIT Debt Security does not have a Moody's rating and no such rating has been assigned in accordance with clause (i) above, then the Moody's Rating of such Asset-Backed Security or REIT Debt Security may be determined using any one of the methods below:

(A)     with respect to any ABS Type Residential Security that does not have a Moody's rating, if such ABS Type Residential Security is publicly rated by Standard & Poor's, then the Moody's Rating thereof will be (1) one subcategory below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is "AAA"; (2) two rating subcategories (or, in the case of Alt-A or mixed pool RMBS Securities, three rating subcategories) below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is below "AAA" but above "BB+"; and (3) three rating subcategories (or, in the case of Alt-A or mixed pool RMBS Securities, four rating subcategories) below the Moody's equivalent rating assigned by Standard & Poor's if the rating assigned by Standard & Poor's is below "BBB-";

(B)    with respect to any CMBS Conduit Security that does not have a Moody's rating, (x) if Moody's has rated a tranche or class of CMBS Conduit Security senior to the relevant Issue, then the Moody's Rating thereof shall be one and one-half rating subcategories below the Moody's equivalent rating assigned by Standard & Poor's for purposes of determining the Moody's Rating Factor and one rating subcategory below the Moody's equivalent rating assigned by Standard & Poor's for all other purposes and (y) if Moody's has not rated any such tranche or class and Standard & Poor's has rated the subject CMBS Conduit Security, then the Moody's Rating thereof will be two rating subcategories below the Moody's equivalent rating assigned by Standard & Poor's;

(C)    with respect to notched ratings on any other type of Asset-Backed Securities, the Moody's Rating shall be determined in conjunction with the notching conventions set forth in Part I of Schedule H; and

(D)    with respect to any other type of Asset-Backed Securities or REIT Debt Securities designated as a Specified Type after the date hereof pursuant to clause (a)(24) or clause (b)(11) of the definition thereof, respectively, pursuant to any method specified by Moody's;

(iii)    with respect to any Mortgage Finance Company Security or corporate guarantees on Asset-Backed Securities or REIT Debt Securities, if such Mortgage Finance Company Securities or corporate guarantees do not have a Moody's rating but another security or obligation of the issuer or guarantor thereof (an "**other security**") has a Moody's rating, and no rating has been assigned in accordance with clause (i) above, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be determined as follows:

(A)    if the Mortgage Finance Company Security or corporate guarantee is a senior secured obligation of the issuer, guarantor or obligor and the other security is also a senior secured obligation, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be the rating of the other security;

(B)    if the Mortgage Finance Company Security or corporate guarantee is a senior unsecured obligation of the issuer, guarantor or obligor and the other security is a senior secured obligation, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be one rating subcategory below the rating of the other security;

(C)     if the Mortgage Finance Company Security or corporate guarantee is a subordinated obligation of the issuer, guarantor or obligor and the other security is a senior secured obligation that is:

(1)     rated "Ba3" or higher by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be three rating subcategories below the rating of the other security; or

(2)     rated "B1" or lower by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be two rating subcategories below the rating of the other security;

(D)     if the Mortgage Finance Company Security or corporate guarantee is a senior secured obligation of the issuer, guarantor or obligor and the other security is a senior unsecured obligation that is:

(1)     rated "Baa3" or higher by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be the rating of the other security; or

(2)     rated "Ba1" or lower by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be one rating subcategory above the rating of the other security;

(E)     if the Mortgage Finance Company Security or corporate guarantee is a senior unsecured obligation of the issuer, guarantor or obligor and the other security is also a senior unsecured obligation, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be the rating of the other security;

(F)     if the Mortgage Finance Company Security or corporate guarantee is a subordinated obligation of the issuer, guarantor or obligor and the other security is a senior unsecured obligation that is:

(1)     rated "B1" or higher by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be two rating subcategories below the rating of the other security; or

(2)     rated "B2" or lower by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be one rating subcategory below the rating of the other security;

(G)    if the Mortgage Finance Company Security or corporate guarantee is a senior secured obligation of the issuer, guarantor or obligor and the other security is a subordinated obligation that is:

(1)    rated "Baa3" or higher by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be one rating subcategory above the rating of the other security;

(2)    rated below "Baa3" but not rated "B3" by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be two rating subcategories above the rating of the other security; or

(3)    rated "B3" by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be "B2";

(H)    if the Mortgage Finance Company Security is a senior unsecured obligation of the issuer, guarantor or obligor and the other security is a subordinated obligation that is:

(1)    rated "Baa3" or higher by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be one rating subcategory above the rating of the other security; or

(2)    rated "Ba1" or lower by Moody's, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall also be one rating subcategory above the rating of the other security; and

(I)    if the Collateral Debt Security is a subordinated obligation of the issuer, guarantor or obligor and the other security is also a subordinated obligation, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be the rating of the other security;

(iv)    with respect to Mortgage Finance Company Securities or corporate guarantees issued by U.S., U.K. or Canadian issuers or guarantors or by any other Qualifying Foreign Obligor, if such Mortgage Finance Company Security or corporate guarantee does not have a Moody's rating, and no other security or obligation of the issuer or guarantor thereof is rated by Moody's, then the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee may be determined using any one of the methods below:

(A)    (1)    if such Mortgage Finance Company Security or corporate guarantee is publicly rated by Standard & Poor's, then the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee shall be (x) one rating subcategory below the Moody's equivalent of the rating assigned by Standard & Poor's if such security is rated "BBB-" or higher by Standard & Poor's and (y) two subcategories below the Moody's equivalent of the rating assigned by Standard & Poor's if such security is rated "BB+" or lower by Standard & Poor's; and

(2)    if such Mortgage Finance Company Security or corporate guarantee is not publicly rated by Standard & Poor's but another security or obligation of the issuer is publicly rated by Standard & Poor's (a "**parallel security**"), then the Moody's equivalent of the rating of such parallel security will be determined in accordance with the methodology set forth in subclause (1) above, and the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee will be determined in accordance with the methodology set forth in clause (iii) above (for such purpose treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (2));

(B)    if such Mortgage Finance Company Security or corporate guarantee does not have a Moody's Rating and is not publicly rated by Standard & Poor's, and no other security or obligation of the guarantor has a Moody's Rating or is publicly rated by Standard & Poor's, then the Issuer or the Collateral Manager on behalf of the Issuer, may present such Mortgage Finance Company Security or corporate guarantee to Moody's for an estimate of such Collateral Debt Security's rating factor, from which its corresponding Moody's Rating may be determined, which shall be its Moody's Rating;

(C)    with respect to a Mortgage Finance Company Security or corporate guarantee issued by a U.S. corporation, if (1) neither the issuer nor any of its Affiliates is subject to reorganization or bankruptcy proceedings, (2) no debt securities or obligations of the issuer are in default, (3) none of the issuer, guarantor or any of their Affiliates have defaulted on any debt during the past two years, (4) the issuer or guarantor has been in existence for the past five years, (5) the issuer or guarantor is current on any cumulative dividends, (6) the fixed-charge ratio for the issuer or guarantor exceeds 125% for each of the past two fiscal years and for the most recent quarter, (7) the issuer or guarantor had a net annual profit before tax in the past fiscal year and the most recent quarter and (8) the annual financial statements of the issuer or guarantor are unqualified and certified by a firm of independent accountants of national reputation, and quarterly statements are unaudited but signed by a corporate officer,

the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee will be "B3";

(D)     with respect to a Mortgage Finance Company Security or corporate guarantee issued by a non-U.S. issuer, if (1) none of the issuer, guarantor or any of their Affiliates is subject to reorganization or bankruptcy proceedings and (2) no debt security or obligation of the issuer or guarantor has been in default during the past two years, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee will be "Caa2"; and

(E)     if a debt security or obligation of the issuer or guarantor has been in default during the past two years, the Moody's Rating of such Mortgage Finance Company Security or corporate guarantee will be "Ca";

*provided* that:

(I)     in respect of any U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security, if such U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security is not assigned a Moody's Rating pursuant to clause (i) above, the Moody's Rating will be the rating assigned to the relevant guarantor of such U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security by Moody's,

(II)     the Moody's Rating of any Moody's Notching Approved Security shall be one rating subcategory below the Moody's Rating that would be applicable to such Collateral Debt Security if determined in accordance with the foregoing,

(III)     the ratings of no more than 10.0% of the Aggregate Principal Balance of all Collateral Debt Securities that are not Moody's Notching Approved Securities may be assigned rating factors derived via notching from single-rated instruments,

(IV)     with respect to any one Rating Agency, the single-rated notched bucket for Collateral Debt Securities that are not Moody's Notching Approved Securities may be no larger than 7.5% of the Aggregate Principal Balance of all Collateral Debt Securities,

(V)     the Aggregate Principal Balance of Collateral Debt Securities the Moody's Rating of which is based on a Standard & Poor's rating may not exceed (1) with respect to Collateral Debt Securities that are not Moody's Notching Approved Securities, 20.0% of the Aggregate Principal Balance of all Collateral Debt Securities and (2) with respect to Collateral Debt Securities that are Moody's Notching Approved Securities, 20.0% of the Aggregate Principal Balance of all Collateral Debt Securities, and the balance of the Collateral Debt Securities must be rated by Moody's or assigned Moody's rating estimates,

(VI)     other than for the purposes of paragraphs (5) and (26) of the Eligibility Criteria, if a Collateral Debt Security (A) is placed on a watch list for possible

upgrade by Moody's, the Moody's Rating applicable to such Collateral Debt Security shall be two rating subcategories above the Moody's Rating applicable to such Collateral Debt Security immediately prior to such Collateral Debt Security being placed on such watch list and (B) if a Collateral Debt Security is placed on a watch list for possible downgrade by Moody's, the Moody's Rating applicable to such Collateral Debt Security shall be two rating subcategories (or, in the case of a Collateral Debt Security below the Moody's Rating applicable to such Collateral Debt Security immediately prior to such Collateral Debt Security being placed on such watch list, and

(VII)   the Moody's Rating of any Form-Approved Synthetic Security shall be the Moody's Rating that would be applicable to the related Reference Obligation if determined in accordance with the foregoing; and

(b)      for determining the Standard & Poor's Rating as of any date of determination:

(i)      with respect to any Asset-Backed Security or REIT Debt Security:

(A)     if Standard & Poor's has assigned a rating to such Collateral Debt Security either publicly or privately (provided that with respect to a private or confidential rating, consent of the party that obtained such rating shall be provided to Standard & Poor's), the Standard & Poor's Rating shall be the rating assigned thereto by Standard & Poor's (or, in the case of a REIT Debt Security, the issuer credit rating assigned by Standard & Poor's);

(B)     if such Collateral Debt Security is not rated by Standard & Poor's but the Issuer or the Collateral Manager on behalf of the Issuer has requested that Standard & Poor's assign a rating to such Collateral Debt Security, the Standard & Poor's Rating shall be the rating so assigned by Standard & Poor's; *provided* that if the Issuer or the Collateral Manger on behalf of the Issuer applies to Standard & Poor's for a credit estimate of such Collateral Debt Security for purposes of obtaining a Standard & Poor's Rating, such credit estimate shall be requested prior to or upon acquisition of the Collateral Debt Security and shall be re-applied for on each one-year anniversary of such acquisition; and *provided*, *further*, that pending receipt from Standard & Poor's of such rating, (x) if such Collateral Debt Security is of a type listed on Schedule G or is not eligible for notching in accordance with Schedule H, such Collateral Debt Security shall have a Standard & Poor's Rating of "CCC-" and (y) if such Collateral Debt Security is not of a type listed on Schedule G and is eligible for notching in accordance with Schedule H, the Standard & Poor's Rating of such Collateral Debt Security shall be the rating assigned in accordance with Schedule H until such time as Standard & Poor's shall have assigned a rating thereto;

(C)    if such Collateral Debt Security is a Collateral Debt Security that has not been assigned a rating by Standard & Poor's pursuant to clause (A) or (B) above, but is guaranteed by a corporate guarantee (which meets the then current publicly-available guarantee criteria of Standard & Poor's), the issuer of which is rated by Standard & Poor's, the Standard & Poor's Rating shall be the rating so assigned to such guarantor; or

(D)    if such Collateral Debt Security is a Collateral Debt Security that has not been assigned a rating by Standard & Poor's pursuant to clause (A), (B) or (C) above, and is not of a type listed on Schedule G, the Standard & Poor's Rating of such Collateral Debt Security shall be the rating determined in accordance with Part II of Schedule H; *provided* that if any Collateral Debt Security shall, at the time of its purchase by the Issuer, be on watch for a possible upgrade or downgrade by Moody's, the Standard & Poor's Rating of such Collateral Debt Security shall be one subcategory above or below, respectively, the rating otherwise assigned to such Collateral Debt Security in accordance with Part II of Schedule H;

(ii)    any Mortgage Finance Company Security will be determined as follows:

(A)    if there is an issuer credit rating of the issuer of such Mortgage Finance Company Security, or a guarantor that unconditionally and irrevocably guarantees the full payment of principal and interest on such Collateral Debt Security (with such form of guarantee meeting Standard & Poor's then-current criteria for guarantees), then the Standard & Poor's Rating of such Mortgage Finance Company Security shall be the issuer rating of such issuer or such guarantor assigned by Standard & Poor's (regardless of whether there is a published rating by Standard & Poor's on the Mortgage Finance Company Security held by the Issuer) (provided that with respect to a private or confidential rating, consent of the party that obtained such rating shall be provided to Standard & Poor's);

(B)    if the criteria set forth in clause (A) above does not apply, then the Issuer or the Collateral Manager on behalf of the Issuer, may apply to Standard & Poor's for a corporate credit estimate of the issuer, which shall be the Standard & Poor's Rating of such Mortgage Finance Company Security; *provided* that if the Issuer or the Collateral Manager on behalf of the Issuer applies to Standard & Poor's for a corporate credit estimate of the issuer, such credit estimate shall be requested prior to or upon acquisition of such Mortgage Finance Company Security and shall be re-applied for on each one-year anniversary of such acquisition; and *provided*, *further*, that pending receipt from Standard & Poor's of such corporate credit estimate, such Collateral Debt Security shall have a Standard & Poor's Rating of "CCC-" if the Collateral Manager believes

that such corporate credit estimate will be at least "CCC-" and the Aggregate Principal Balance of all Collateral Debt Securities having a Standard & Poor's Rating by reason of this proviso does not exceed 5.0% of the Aggregate Principal Balance of all Collateral Debt Securities;

(C)     with respect to any Synthetic Security the Reference Obligation of which is a Mortgage Finance Company Security, the Standard & Poor's Rating of such Synthetic Security shall be the rating assigned thereto by Standard & Poor's in connection with the acquisition thereof by the Issuer upon request of the Issuer or the Collateral Manager;

(D)     if such Mortgage Finance Company Security is not rated by Standard & Poor's, but another security or obligation of the issuer is rated by Standard & Poor's and neither the Issuer nor the Collateral Manager obtains a Standard & Poor's Rating for such Mortgage Finance Company Security pursuant to clause (B) above, then the Standard & Poor's Rating of such Mortgage Finance Company Security shall be determined as follows:  (x) if there is a rating by Standard & Poor's on a senior secured obligation of the issuer, then the Standard & Poor's Rating of such Mortgage Finance Company Security shall be one subcategory below such rating; (y) if there is a rating on a senior unsecured obligation of the issuer by Standard & Poor's, then the Standard & Poor's Rating of such Mortgage Finance Company Security shall equal such rating; and (z) if there is a rating on a subordinated obligation of the issuer by Standard & Poor's, then the Standard & Poor's Rating of such Mortgage Finance Company Security shall be one subcategory above such rating if such rating is higher than "BB+", and shall be two subcategories above such rating if such rating is "BB+" or lower;

(E)     if a debt security or obligation of the issuer of such Mortgage Finance Company Security has been in default during the past two years, the Standard & Poor's Rating of such Mortgage Finance Company Security will be "D"; or

(F)     if there is no issuer credit rating published by Standard & Poor's and such Mortgage Finance Company Security is not rated by Standard & Poor's, and no other security or obligation of the issuer is rated by Standard & Poor's and neither the Issuer nor the Collateral Manager obtains an Standard & Poor's Rating for such Mortgage Finance Company Security pursuant to subclause (B) above, then the Standard & Poor's Rating of such Mortgage Finance Company Security may be determined using any one of the methods provided below:

(1)     if such Mortgage Finance Company Security is publicly rated by Moody's, then the Standard & Poor's Rating of such Mortgage Finance Company Security will be (1) one subcategory below the Standard & Poor's equivalent of the public

rating assigned by Moody's if such Mortgage Finance Company Security is rated "Baa3" or higher by Moody's and (2) two subcategories below the Standard & Poor's equivalent of the public rating assigned by Moody's if such Mortgage Finance Company Security is rated "Ba1" or lower by Moody's;

(2)     if such Mortgage Finance Company Security is not publicly rated by Moody's but a security with the same ranking is publicly rated by Moody's then the Standard & Poor's Rating of such parallel security will be determined in accordance with the methodology set forth in subclause (1) above, and the Standard & Poor's Rating of such Mortgage Finance Company Security will be determined in accordance with the methodology set forth in clause (D) above (for such purposes treating the parallel security as if it were rated by Standard & Poor's at the rating determined pursuant to this subclause (2)); or

(iii)     any Form-Approved Synthetic Security will be determined based upon the Standard & Poor's Rating of the related Reference Obligation as determined in accordance with sub-clauses (b)(i) and (b)(ii) above;

*provided* that, in regard to sub-clauses (b)(i)(A), (b)(i)(B) and (b)(ii)(A) through (F) above and, to the extent any of the such clauses apply to the Reference Obligation of a Form-Approved Synthetic Security, sub-clause (b)(iii), (1) if a Collateral Debt Security (or, in the case of a Form-Approved Synthetic Security, the related Reference Obligation) (x) is placed on a watch list for possible upgrade by Standard & Poor's, the Standard & Poor's Rating applicable to such Collateral Debt Security shall be one rating subcategory above the Standard & Poor's Rating applicable to such Collateral Debt Security (or, in the case of a Form-Approved Synthetic Security, the related Reference Obligation) immediately prior to such Collateral Debt Security (or, in the case of a Form-Approved Synthetic Security, the related Reference Obligation) being placed on such watch list or (y) is placed on a watch list for possible downgrade by Standard & Poor's, the Standard & Poor's Rating applicable to such Collateral Debt Security shall be one rating subcategory below the Standard & Poor's Rating applicable to such Collateral Debt Security (or, in the case of a Form-Approved Synthetic Security, the related Reference Obligation) immediately prior to such Collateral Debt Security or Reference Obligation (as applicable) being placed on such watch list, (2) the Rating of not more than 20% of the Aggregate Principal Balance of all Collateral Debt Securities may be determined pursuant to clause (b)(i)(D), (b)(ii)(F) above or (to the extent clauses (b)(i)(D) or (b)(ii)(F) are applicable thereto) (b)(iii); and *provided*, *further*, that in respect of any U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security, the Standard & Poor's Rating will be the rating assigned to the relevant guarantor of such Collateral Debt Security by Standard & Poor's if such U.S. Agency Guaranteed Security or FHLMC/FNMA Guaranteed Security is not assigned a Standard & Poor's Rating pursuant to (b)(i)(A) above and such security is not rated by Moody's.

"**Rating Agency**" means each of (i) Moody's, for so long as any of the Outstanding Notes are rated by Moody's (including any private or confidential rating) and (ii) Standard & Poor's, for so long as any of the Outstanding Notes are rated by Standard & Poor's (including any private or confidential rating) or, with respect to Pledged Securities generally, if at any time Moody's or Standard & Poor's ceases to provide rating services with respect to Asset-Backed Securities, any other nationally recognized investment rating agency selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes.

"**Rating Condition**" means, with respect to any action taken or to be taken hereunder, a condition that is satisfied when each of Moody's and Standard & Poor's (or if expressly so specified in respect of such action, the specified Rating Agency) has confirmed in writing, to the Issuer, the Trustee, each Hedge Counterparty, each Senior Swap Counterparty and the Collateral Manager that such action will not result in the withdrawal, reduction or other adverse action with respect to its then-current rating (including any private or confidential ratings or credit estimates) of any Class of Notes or the Senior Swap Agreement.

"**Rating Confirmation**" has the meaning specified in Section 7.17(d).

"**Rating Determining Party**" means, with respect to any Hedge Agreement or Synthetic Security, (a) unless clause (b) applies with respect to the Hedge Agreement or Synthetic Security, the related Hedge Counterparty or Synthetic Security Counterparty or any transferee thereof or (b) any Affiliate of the related Hedge Counterparty or Synthetic Security Counterparty or any transferee thereof that unconditionally and absolutely guarantees (pursuant to a form of guarantee that satisfies the Rating Condition with respect to Standard & Poor's) the obligations of such Hedge Counterparty or Synthetic Security Counterparty or such transferee, as the case may be, under the Hedge Agreement or Synthetic Security. For the purpose of this definition, no direct or indirect recourse against one or more shareholders of a Hedge Counterparty or Synthetic Security Counterparty or any such transferee (or against any Person in control of, or controlled by, or under common control with, any such shareholder) shall be deemed to constitute a guarantee, security or support of the obligations of such Hedge Counterparty or Synthetic Security Counterparty or any such transferee.

"**Ratings Confirmation Failure**" has the meaning specified in Section 7.17(d).

"**Ratings Event**" means, at any time after the date hereof, the occurrence of any of the following with respect to a Hedge Counterparty: (i) the long-term senior unsecured debt rating of the Rating Determining Party from Moody's is withdrawn, suspended or falls to or below "A2", if the Rating Determining Party has a long-term rating only; (ii) the long-term senior unsecured debt rating of the Rating Determining Party from Moody's is withdrawn, suspended or falls to or below "A3" or the short-term senior unsecured debt rating of the Hedge Counterparty, if no such rating is available, the Rating Determining Party or, if no such rating is available, a guaranteed Affiliate thereof from Moody's, if so rated by Moody's, falls to or below "P–2"; or (iii) the long-term senior unsecured rating of the Rating Determining Party from Standard & Poor's is withdrawn, suspended or falls below "BBB-" or the short-term senior unsecured rating of the Rating Determining Party from Standard & Poor's is withdrawn, suspended or falls below "A-3".

"**Ratings Threshold**" means, with respect to a Hedge Counterparty, (a) either (i) the unsecured, unguaranteed and otherwise unsupported short-term debt obligations of the related Rating Determining Party are rated at least "A-1" by Standard & Poor's or (ii) if the related Rating Determining Party does not have a short-term rating from Standard & Poor's, the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of such Rating Determining Party are rated at least "A+" by Standard & Poor's, and (b)(i)(x) the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of the related Rating Determining Party are rated at least "A2" by Moody's (and, if rated "A2" by Moody's, such rating is not on watch for possible downgrade) and (y) the unsecured, unguaranteed and otherwise unsupported short-term debt obligations of such Rating Determining Party are rated "P-1" by Moody's (and such rating is not on watch for possible downgrade) or (ii) if there is no Moody's short-term debt obligations rating, the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of such Rating Determining Party are rated at least "Aa3" by Moody's (and if rated "Aa3" by Moody's, such rating is not on watch for possible downgrade).

"**Record Date**" means the date on which the Holders of Notes entitled to receive a payment in respect of principal or interest on the succeeding Quarterly Distribution Date or Redemption Date are determined, such date as to any Quarterly Distribution Date or Redemption Date being (i) in respect of Global Notes, the Business Day prior to such Quarterly Distribution Date or Redemption Date and (ii) in respect of Definitive Notes, the 15th day (whether or not a Business Day) prior to such Quarterly Distribution Date or Redemption Date.

"**Redemption Date**" means any date set for a redemption of Senior Notes pursuant to <u>Section 9.1</u> or <u>Section 9.5</u>, as applicable, or, if such date is not a Business Day, the next following Business Day.

"**Redemption Date Statement**" has the meaning specified in <u>Section 10.7(c)</u>.

"**Redemption Price**" means, with respect to the Senior Notes of any Class to be redeemed pursuant to <u>Section 9.1</u> or <u>Section 9.5</u>, an amount (determined without duplication) equal to (A)(i) the Aggregate Outstanding Amount of such Senior Note being redeemed *plus* (ii) accrued interest thereon (including Defaulted Interest, interest on Defaulted Interest and any Class C Deferred Interest or Class D Deferred Interest, as applicable, and interest thereon), (B) solely with respect to a Tax Redemption, any lesser amount agreed to in writing by the Holders of at least a Majority of the respective voting rights or Holders of at least 66-⅔% of the aggregate outstanding principal amount (with respect to a Class of Senior Notes of an Affected Class), as the case may be.

"**Reference Banks**" has the meaning specified in <u>Schedule B</u>.

"**Reference Obligation**" means a Permitted Reference Obligation in respect of which the Issuer has entered into or otherwise acquired a Synthetic Security; *provided* that the Issuer shall not enter into any CDS Agreement Transaction unless the related Reference Obligation is an RMBS Security, CMBS Security or CDO Security.

"**Reference Obligor**" means the obligor on a Reference Obligation.

"**Registered**" means in registered form for U.S. federal income tax purposes and issued after July 18, 1984; *provided* that a certificate of interest in a trust that is treated as a grantor trust for U.S. federal income tax purposes shall not be treated as Registered unless each of the obligations or securities held by the trust was issued after that date.

"**Registered Form**" has the meaning specified in Section 8-102(a)(13) of the UCC.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Definitive Note**" has the meaning set forth in <u>Section 2.4(b)(i)(F)</u>.

"**Regulation S Global Note**" has the meaning set forth in <u>Section 2.1(a)</u>.

"**Regulation S Note**" has the meaning set forth in <u>Section 2.1(a)</u>.

"**Regulation S Transfer Certificate**" has the meaning set forth in <u>Section 2.4(b)(i)(C)</u>.

"**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 221, or any successor regulation.

"**Reinvestment Period**" means the period from the Closing Date and ending on and including the first to occur of (i) the Quarterly Distribution Date immediately following the date that the Collateral Manager (with the written consent of a Majority-in-Interest of Preference Shares) notifies the Trustee, the Credit Default Swap Counterparty, the Senior Swap Counterparties and each Hedge Counterparty that, in light of the composition of Collateral Debt Securities, general market conditions and other factors (including any change in U.S. federal tax law requiring tax to be withheld on payments to the Issuer with respect to obligations or securities held by the Issuer), the Collateral Manager (in its sole discretion) has determined that investments in additional Collateral Debt Securities within the foreseeable future would either be impractical or not beneficial to the Issuer and the Reinvestment Period should end; (ii) the Quarterly Distribution Date occurring in November 2010; (iii) the termination of the Reinvestment Period as a result of the occurrence of an Event of Default; and (iv) the Determination Date on which the Net Outstanding Portfolio Collateral Balance, as a result of losses in the value of Collateral Debt Securities, is less than the Aggregate Ramp-Up Par Amount by an amount equal to or greater than U.S.$78,000,000; *provided* that, (x) if the Collateral Manager had previously terminated the Reinvestment Period pursuant to clause (i) above, the Collateral Manager may (in its sole discretion) reinstate the Reinvestment Period if such notice of reinstatement is delivered prior to the Determination Date related to the Quarterly Distribution Date occurring in November 2010, and (y) the Coverage Tests shall not apply other than upon the termination of the Reinvestment Period pursuant to clause (ii) above.

"**REIT Debt Security**" means a debt security issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision).

"**REIT Trust Preferred CDO Security**" means an Asset-Backed Security issued by an entity formed for the purpose of holding or investing and reinvesting in a pool of trust preferred securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision).

"**Relevant Jurisdiction**" means, as to any obligor on any Collateral Debt Security, any jurisdiction (a) in which the obligor is incorporated, organized, managed and controlled or considered to have its seat, (b) where an office through which the obligor is acting for purposes of the relevant Collateral Debt Security is located, (c) in which the obligor executes Underlying Instruments or (d) in relation to any payment, from or through which such payment is made. With respect to any Collateral Debt Security that is a Synthetic Security, each reference in this definition to (i) the "obligor" shall include reference to the relevant Reference Obligor and Synthetic Security Counterparty and (ii) the Underlying Instruments shall also include reference to the documents evidencing or otherwise governing such Reference Obligation.

"**Relevant Persons**" has the meaning specified in Section 2.7.

"**Remaining Exposure**" means with respect to (a) any Synthetic Security (other than a CDS Agreement Transaction or Short Synthetic Security) at any time, the excess, if any, of (i) the Total Exposure of such Synthetic Security at such time over (ii) the Funded Amount of such Synthetic Security at such time or (b) with respect to any CDS Agreement Transaction under which the Issuer is the seller of protection and any related Short Synthetic Security (if applicable), (i) the Total Exposure under such CDS Agreement Transaction *minus* (ii) the Total Exposure of the Credit Default Swap Counterparty under any CDS Agreement Transaction that is a related Short Synthetic Security (if any).

"**Remaining Unfunded Notional Amount**" means, with respect to a Senior Swap Agreement, (a) on or prior to the occurrence of the Senior Swap Early Termination Date thereunder, the amount defined as the "Remaining Unfunded Notional Amount" in such Senior Swap Agreement and (b) at any time after the Senior Swap Early Termination Date thereunder, zero.

"**Remaining Unfunded Reduction Amount**" means, as of any Determination Date, the excess (if any) of (a) the Remaining Unfunded Notional Amount determined immediately after giving effect to the operation of the Priority of Payments on the preceding Quarterly Distribution Date over (b) the excess (if any) of (i) the Remaining Exposure of all CDS Agreement Transactions on such Determination Date over (ii) an amount equal to (A) the Reserve Account Balance on such Determination Date (determined prior to the transfer described in the immediately succeeding clause (B)) *minus* (B) the amount to be transferred from the Reserve Account to the Payment Account on the related Quarterly Distribution Date pursuant to Section 10.2(j) for application in accordance with the Priority of Payments.

"**REMIC**" means a real estate mortgage investment conduit within the meaning of Section 860D of the Code.

"**Repository**" means the internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at www.cdolibrary.com and maintained by The Bond Market Association or its successors.

"**Re-REMIC**" means an Asset-Backed Security the issuer of which is a REMIC (within the meaning of the Code) and whose holders are entitled to receive payments that depend

entirely on the cash flow from one or more subordinated tranches of securities issued by other REMICs.

"**Reserve Account**" has the meaning specified in Section 10.2(j).

"**Reserve Account Investments**" means (i) any Eligible Investment or any investment that satisfies the definition of "Eligible Investments" except that the counterparty thereto has a long-term rating of not less than "AA-" by Standard & Poor's and not less than "Aa3" by Moody's (and, if rated "Aa3" by Moody's, such rating is not on watch for possible downgrade by Moody's) and a short-term credit rating of at least "A-1+" (or "A-1" in the case of overnight time deposits offered by the Bank so long as it acts as Trustee hereunder) by Standard & Poor's and "P-1" by Moody's (and, if so rated by Moody's, such rating is not on watch for possible downgrade by Moody's) at the time of such investment, (ii) commercial paper maturing no later than the Business Day prior to the Quarterly Distribution Date next succeeding the date of investment in such commercial paper a credit rating of "P-1" by Moody's (and, if so rated by Moody's, such rating is not on watch for possible downgrade by Moody's) and "A-1+" by Standard & Poor's, (iii) debt securities which would satisfy the definition of Collateral Debt Securities but which have a Moody's Rating of "Aaa" and a Standard & Poor's Rating of "AAA", provided that such debt securities are floating rate securities with an average life of less than two years, or (iv) other investments the acquisition of which would satisfy the Rating Condition, in each case which mature no later than the Stated Maturity; *provided* that (A) Reserve Account Investments may not include any investment the income from or proceeds of disposition of which is or will be subject to deduction or withholding for or on account of any withholding or similar tax unless the payor is required to make "gross up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required and (B) any assets credited to the Reserve Account in response to (a) a requirement to cure a failure of any of the Coverage Tests or (b) a requirement to fund the Reserve Account pursuant to Section 11.1(a)(ii)(L)(a)(IV) shall, in each case, be invested only to Reserve Account Investments satisfying clauses (i) or (ii) of this definition. The Credit Default Swap Counterparty will bear any par value losses of Reserve Account Investments standing to the credit of the Reserve Account to the extent any amounts payable by the Issuer to the Credit Default Swap Counterparty under the Credit Default Swap is made using such Reserve Account Investments.

"**Resolution**" means, with respect to the Issuer a resolution of the Board of Directors of the Issuer and, with respect to the Co-Issuer, a resolution of the managing member or any duly-appointed manager of the Co-Issuer.

"**Restricted Definitive Note**" has the meaning set forth in Section 2.4(b)(i)(F).

"**Restricted Global Note**" has the meaning set forth in Section 2.1(b).

"**Restricted Preference Share**" means Preference Share substantially in the form included as an exhibit to the Preference Share Paying Agency Agreement.

"**Restricted Note**" has the meaning set forth in Section 2.1(b).

"**Rule 144A**" means Rule 144A under the Securities Act.

"**Rule 144A Information**" means such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

"**Rule 144A Transfer Certificate**" has the meaning set forth in Section 2.4(b)(i)(B).

"**Sale**" has the meaning specified in Section 5.17.

"**Sale Proceeds**" means all proceeds received as a result of Sales of Pledged Securities in connection with an Optional Redemption or Tax Redemption or pursuant to Section 12.1(a), 12.1(b) or 12.1(c) or an Auction, net of any reasonable out-of-pocket expenses of the Collateral Manager or the Trustee in connection with any such Sale (including any trading gains with respect to the termination of any CDS Agreement Transaction).

"**Schedule of Closing Collateral Debt Securities**" means the list of Collateral Debt Securities securing the Notes that is attached as Schedule A, which Schedule shall include the Principal Balance, the interest rate, the stated maturity, the Moody's Rating and the Standard & Poor's Rating of such Collateral Debt Security.

"**Scheduled Class X Target Principal Amount**" means a payment to be applied on each Quarterly Distribution Date, to the extent funds are available pursuant to the Priority of Payments, to reduce the Aggregate Outstanding Amount of Class X Notes in an amount with respect to such Quarterly Distribution Date as set forth in Schedule I attached hereto.

"**Scheduled Distribution**" means, with respect to any Pledged Security, for each Due Date, the scheduled payment in Cash of principal and/or interest and/or fee due on such Due Date with respect to such Pledged Security, determined in accordance with the assumptions specified in Section 1.2.

"**Second Currency**" has the meaning specified in Section 14.13.

"**Secured Parties**" has the meaning specified in the Preliminary Statement of this Indenture.

"**Securities Account**" has the meaning specified in Section 8-501(a) of the UCC.

"**Securities Act**" means the United States Securities Act of 1933, as amended.

"**Securities Intermediary**" has the meaning specified in Section 8-102(a)(14) of the UCC.

"**Security**" has the meaning specified in Section 8-102(a)(15) of the UCC.

"**Security Certificate**" has the meaning specified in Section 8-102(a)(16) of the UCC.

"**Security Entitlement**" has the meaning specified in Section 8-102(a)(17) of the UCC.

"**Senior Collateral Management Fee**" means the fee payable to the Collateral Manager in arrears on each Quarterly Distribution Date pursuant to Section 7 of the Collateral Management Agreement, in an amount equal to 0.10% per annum of the Quarterly Asset Amount for such Quarterly Distribution Date; *provided* that the Senior Collateral Management Fee will be payable on each Quarterly Distribution Date only to the extent of funds available for such purpose in accordance with the Priority of Payments. Any Senior Collateral Management Fee that is due but unpaid as a result of the operation of the Priority of Payments will be deferred (without any interest accruing thereon) and will be payable on each subsequent Quarterly Distribution Date on which funds are available therefor in accordance with and subject to the Priority of Payments, until paid in full. Any Senior Collateral Management Fee accrued but not paid prior to the resignation or removal of a Collateral Manager shall continue to be payable to such Collateral Manager on the Quarterly Distribution Date immediately following the effectiveness of such resignation or removal.

"**Senior Notes**" means, collectively, the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes.

"**Senior Swap Agreement**" means the ISDA Master Agreement (Multicurrency—Cross Border) (together with the Schedule, Credit Support Annex and Confirmation thereto), dated as of October 17, 2006, between the Issuer and the Senior Swap Counterparty, together with any replacement agreement therefor; *provided* that in the event that two or more Senior Swap Agreements remain outstanding in whole or part as a result of any Senior Swap Early Withdrawal Date, the term "Senior Swap Agreement" shall be deemed to refer to all such Senior Swap Agreements or the applicable Senior Swap Agreement, as the context may require; and *provided*, *further*, that any replacement agreement shall have satisfied the Rating Condition at the time of replacement with respect to Standard & Poor's.

"**Senior Swap Collateral Account**" has the meaning specified in Section 10.2(n).

"**Senior Swap Counterparty**" means (a) the counterparty to the Issuer under the Senior Swap Agreement, which is initially Société Générale, New York Branch or (b) any permitted assignee or successor with respect to which the Rating Condition has been satisfied (in each case for so long as no Senior Swap Early Termination Date has occurred with respect to such Senior Swap Counterparty); *provided* that in the event that there are two or more Senior Swap Counterparties with continuing rights in respect of their respective Outstanding Swap Counterparty Amounts or otherwise under the Senior Swap Agreement as a result of any Senior Swap Early Withdrawal Date, the term "Senior Swap Counterparty" shall be deemed to refer to all such Senior Swap Counterparties or the applicable Senior Swap Counterparty, as the context may require.

"**Senior Swap Early Assignment Date**" means, with respect to any Assignor Senior Swap Counterparty, the date on which such Assignor Senior Swap Counterparty assigned all of its future contingent payment obligations to an assignee Senior Swap Counterparty.

"**Senior Swap Early Termination Date**" means an "Early Termination Date" under and as defined in the Senior Swap Agreement.

"**Senior Swap Early Termination Date Payment**" means the net termination payment (if any) payable by the Senior Swap Counterparty upon the occurrence of the Senior Swap Early Termination Date pursuant to the Senior Swap Agreement.

"**Senior Swap Early Withdrawal Date**" means (a) with respect to a Terminated Senior Swap Counterparty, the applicable Senior Swap Early Termination Date and (b) with respect to an Assignor Senior Swap Counterparty, the applicable Senior Swap Early Assignment Date.

"**Senior Swap Interest Amount**" means (a) with respect to a Senior Swap Counterparty, the amount specified as "Party B Payment Amount III" (or any equivalent amount, howsoever described) in the Senior Swap Agreement and (b) with respect to a Prior Senior Swap Counterparty, interest on such Prior Senior Swap Counterparty's Outstanding Swap Counterparty Amount which shall be deemed to accrue on such Outstanding Swap Counterparty Amount (determined as of the first day of each Interest Period and after giving effect to any payment of such Outstanding Swap Counterparty Amount occurring on such day) from the applicable Senior Swap Early Withdrawal Date with respect to such Prior Senior Swap Counterparty until such Outstanding Swap Counterparty Amount is paid in full at a per annum rate equal to LIBOR *plus* 0.32% and will be payable in arrears on each Quarterly Distribution Date. Interest accruing on a Prior Senior Swap Counterparty's Outstanding Swap Counterparty Amount for any Interest Period and interest on Defaulted Interest thereon shall (i) accrue for the period from and including the first day of such Interest Period to but excluding the last day of such Interest Period and (ii) be computed on the basis of a 360-day year and the actual number of days elapsed. To the extent lawful and enforceable, interest shall accrue on Defaulted Interest in respect of any Senior Swap Interest Amount owing to a Prior Senior Swap Counterparty at a per annum rate equal to LIBOR *plus* 0.32% until such Defaulted Interest is paid in full and shall form part of the accrued Senior Swap Interest Amount until paid. For purposes hereof, the term "Senior Swap Interest Amount" shall include Defaulted Interest thereon and interest on such Defaulted Interest.

"**Senior Swap Counterparties**" means the Senior Swap Counterparty and each Prior Senior Swap Counterparty (if any).

"**Senior Swap Premium Amount**" means (a) with respect to a Senior Swap Counterparty, the amount specified as "**Party B Payment Amount I**" (or any equivalent amount, howsoever described) in the Senior Swap Agreement and (b) with respect to a Prior Senior Swap Counterparty, zero.

"**Senior Swap Reduction Amount**" means, with respect to any Quarterly Distribution Date, an amount equal to (a) the Total Reduction Amount *minus* (b) the Note Reduction Amount.

"**Servicer**" means, with respect to any Collateral Debt Security (other than CDO Securities), the entity that, absent any default, event of default or similar condition (however described), is primarily responsible for managing, servicing, monitoring and otherwise administering the cash flows from which payments to investors in such Collateral Debt Security are made.

"**Short Synthetic Security**" means a Synthetic Security (which may include a CDS Agreement Transaction) pursuant to which the Issuer transfers the credit risk associated with a Reference Obligation on an existing long Synthetic Security to a Synthetic Security Counterparty, provided that the aggregate notional amount of all such Synthetic Securities referencing the same Reference Obligation does not exceed the aggregate notional amount of the existing long Synthetic Securities referencing the same Reference Obligation (including CDS Agreement Transactions).

"**Sovereign**" means, when used with respect to any country or obligations, the central or federal executive or legislative governmental authority of such country or, insofar as any obligations are concerned, any agency or instrumentality of such governmental authority (including any central bank or central monetary authority) to the extent such obligations are fully backed by the general taxing power of such governmental authority.

"**Special Purpose Vehicle Jurisdiction**" means (x) the Cayman Islands, the Bahamas, Bermuda, the Netherlands Antilles, the Channel Islands and any other jurisdiction that is commonly used as the place of organization of special or limited purpose vehicles that issue Asset-Backed Securities, (y) that generally impose no or nominal tax on the income of such special purpose vehicle and (z) the designation of which as a Special Purpose Vehicle Jurisdiction satisfies the Rating Condition.

"**Specified Assets**" means, at any time, (a) Principal Proceeds or Uninvested Proceeds held as Cash and (b) Eligible Investments purchased with Principal Proceeds or Uninvested Proceeds.

"**Specified Change**" means any amendment or waiver of, or supplement to, an Underlying Instrument governing or relating to a Collateral Debt Security that (a) reduces the principal amount of such Collateral Debt Security, (b) reduces the rate of interest or any fee payable on such Collateral Debt Security, (c) postpones the Due Date of any Scheduled Distribution in respect of such Collateral Debt Security, (d) alters the *pro rata* allocation or sharing, or the relative priorities, of Distributions required by such Underlying Instrument, (e) releases any material guarantor of such Collateral Debt Security from its obligations, (f) terminates or releases any material lien or security interest securing such Collateral Debt Security or (g) changes any of the provisions of such Underlying Instrument specifying the number or percentage of lenders or holders required to effect any of the foregoing; *provided* that any amendment, waiver or supplement referred to in any of clauses (a) through (g) shall constitute a "Specified Change" only to the extent the Issuer would be affected thereby.

"**Specified Currency**" has the meaning specified in Section 14.13.

"**Specified Event of Default**" means the occurrence and continuation of any Event of Default other than an Event of Default described in Section 5.1(f) or (g).

"**Specified Person**" has the meaning specified in Section 2.5(a).

"**Specified Place**" has the meaning specified in Section 14.13.

"**Specified Type**" means

(a)     with respect to any Asset-Backed Security, whether such Asset-Backed Security is: (1) an Automobile Security; (2) a Bank Guaranteed Security; (3) a Car Rental Receivable Security; (4) a CDO Security; (5) a CMBS Conduit Security; (6) a CMBS Large Loan Security; (7) a CMBS Credit Tenant Lease Security; (8) a CMBS Security; (9) a CMBS Single Property Security; (10) a Consumer ABS Security; (11) a CRE CDO Security; (12) a Credit Card Security; (13) an Equipment Leasing Security; (14) an FHLMC/FNMA Guaranteed Security; (15) a Franchise Security; (16) a Home Equity Loan Security; (17) an Insurance Company Guaranteed Security; (18) a Manufactured Housing Security; (19) an Oil and Gas Security; (20) a Project Finance Security; (21) a Re-REMIC; (22) a Reinsurance Security; (23) a REIT Debt Security; (24) a RMBS Security; (25) a Residential A Mortgage Security; (26) a Residential B/C Mortgage Security; (27) a Small Business Loan Security; (28) a Student Loan Security; (29) a Synthetic Structured Finance Security; (30) a Tax Lien Security; (31) a Time Share Security; (32) a U.S. Agency Guaranteed Security or (33) any other type of Asset-Backed Security designated as a "**Specified Type**" (and designated as an "ABS Type Diversified Security," an "ABS Type Residential Security" or an "ABS Type Undiversified Security"), in order to comply with Rating Agency criteria, together with any specification by (A) Moody's of a method for determining the "Rating" thereof pursuant to clause (a)(ii)(D) of the definition thereof or (B) Standard & Poor's of a method for determining the "Rating" thereof pursuant to clause (b)(i)(B) or (b)(i)(C) of the definition thereof) in a notice from the Collateral Manager to the Trustee, subject to (x) written confirmation provided by Moody's and Standard & Poor's to the Issuer, the Trustee and the Collateral Manager that such designation satisfies the Rating Condition and (y) the approval of the Senior Swap Counterparty.  If any type of Asset-Backed Security shall be designated as an additional Specified Type pursuant to the foregoing clause (30), the definition of each Specified Type of Asset-Backed Security in existence prior to such designation shall be construed to exclude such newly-designated Specified Type of Asset-Backed Security; and

(b)     with respect to any REIT Debt Security, whether such REIT Debt Security is (1) a REIT Debt Security—Diversified; (2) a REIT Debt Security—Health Care; (3) a REIT Debt Security—Hotel; (4) a REIT Debt Security—Industrial; (5) a REIT Debt Security—Mortgage; (6) a REIT Debt Security—Multi-Family; (7) a REIT Debt Security—Office; (8) a REIT Debt Security—Residential; (9) a REIT Debt Security—Retail; (10) a REIT Debt Security—Storage; or (11) any other type of REIT Debt Security designated as a "Specified Type," in order to comply with Rating Agency criteria, together with any specification by (A) Moody's of a method for determining the "Rating" thereof pursuant to clause (a)(ii)(D) of the definition thereof or (B) Standard & Poor's of a method for determining the "Rating" thereof pursuant to clause (b)(i)(B) or (b)(i)(C) of the definition thereof) in a notice from the Collateral Manager to the Trustee so long as each of Moody's and Standard & Poor's has confirmed in writing to the Issuer, the Trustee and the Collateral Manager that such designation satisfies the Rating Condition.  If any type of REIT Debt Security shall be designated as an additional Specified Type pursuant to the foregoing clause (11), the definition of each Specified Type of REIT Debt Security in existence prior to such designation shall be construed to exclude such newly-designated Specified Type of REIT Debt Security;

*provided* that any U.S. Agency Securities retained by the Issuer after the Ramp-Up Completion Date that are not included in another Specified Type shall be treated as a separate Specified Type.

"**Standard & Poor's**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor or successors thereto.

"**Standard & Poor's Below B- Haircut Amount**" means as of any Measurement Date, 50% of the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds) that have a Standard & Poor's Rating below "B-".

"**Standard & Poor's Below BB- Haircut Amount**" means as of any Measurement Date, 30% of the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds) that have a Standard & Poor's Rating below "BB-" but that have a Standard & Poor's Rating of at least "B-".

"**Standard & Poor's Below BBB- Haircut Amount**" means, as of any Measurement Date, 10% of the excess (if any) of (a) the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds) that have a Standard & Poor's Rating below "BBB-" but have a Standard & Poor's Rating of at least "BB-" over (b) 10% of the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities or Deferred Interest PIK Bonds).

"**Standard & Poor's CDO Monitor**" is the dynamic, analytical computer program provided by Standard & Poor's to the Collateral Manager and the Trustee (together with all assumptions and instructions necessary to run such model) on or after the date of receipt by the Issuer of Standard & Poor's Rating Confirmation with respect to the initial ratings for the purpose of estimating the default risk of Collateral Debt Securities, as modified by Standard & Poor's from time to time.

"**Standard & Poor's CDO Monitor Notification Test**" means a test satisfied on any Measurement Date on or after the Ramp-Up Completion Date if after giving effect to the Sale of a Collateral Debt Security or the purchase of a Collateral Debt Security (or both), as the case may be, on such Measurement Date the Notes Default Rate Differential of the Proposed Portfolio is positive or if the Notes Default Rate Differential of the Proposed Portfolio is negative prior to giving effect to such Sale or purchase, the extent of compliance is improved after giving effect to the Sale or purchase of a Collateral Debt Security; *provided* that the Standard & Poor's CDO Monitor Notification Test shall not apply to the Sale of a Defaulted Security or a Credit Risk Security; and *provided*, *further*, that for purposes of determining the Standard & Poor's CDO Monitor Notification Test, unless otherwise specified, a Synthetic Security shall be included as a Collateral Debt Security having the characteristics of the related Reference Obligation and not of the Synthetic Security.

"**Standard & Poor's Haircut Amount**" means, as of any Measurement Date, the sum (without duplication) of (i) the Standard & Poor's Below BBB- Haircut Amount *plus* (ii) the Standard & Poor's Below BB- Haircut Amount *plus* (iii) the Standard & Poor's Below B- Haircut Amount *plus* (iv) the aggregate Discount Haircut Amount for all Discount Securities;

*provided* that a Collateral Debt Security shall only be included in one of clauses (i) through (iv), which shall be the clause that results in the greatest Standard & Poor's Haircut Amount.

*provided* that for purposes of the definitions of "Standard & Poor's Below B- Haircut Amount," "Standard & Poor's Below BB- Haircut Amount," "Standard & Poor's Below BBB- Haircut Amount" and "Standard & Poor's Haircut Amount," a Synthetic Security shall be included as a Collateral Debt Security having the characteristics of the related Reference Obligation.

"**Standard & Poor's Minimum Weighted Average Recovery Rate Test**" means a test satisfied on any Measurement Date on or after the Ramp-Up Completion Date, if the Standard & Poor's Weighted Average Recovery Rate is equal to or greater than (a) with respect to the Class A Notes, 27.0%, (b) with respect to the Class B Notes, 32.0%, (c) with respect to the Class C Notes, 37.5% and (d) with respect to the Class D Notes, 44.0%.

"**Standard & Poor's Rating**" means, with respect to any Collateral Debt Security, the Rating thereof determined in accordance with clause (b) of the definition of "Rating."

"**Standard & Poor's Weighted Average Recovery Rate**" means as of any Measurement Date, the number, expressed as a percentage, obtained by summing the products obtained by *multiplying* the Principal Balance of each Collateral Debt Security, other than a Defaulted Security, by its "Applicable Recovery Rate" (determined for purposes of this definition pursuant to clause (b) of the definition of "Applicable Recovery Rate") and *dividing* such sum *by* the Aggregate Principal Balance of all such Collateral Debt Securities.

"**Stated Maturity**" means, with respect to any Note, November 6, 2046 or, if such date is not a Business Day, the next following Business Day.

"**Step-Down Security**" means a security which by the terms of the related Underlying Instrument provides for a decrease, in the case of a Fixed Rate Collateral Debt Security, in the per annum interest rate on such security or, in the case of a Floating Rate Collateral Debt Security, in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; *provided* that (i) a Step-Down Security shall not include any such security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer or any such security where the decrease is linked to a clean-up call or certain events as laid out in the Underlying Instruments or (ii) with respect to which in calculating any Overcollateralization Test or Collateral Quality Test by reference to the spread (in the case of a floating rate Step-Down Security) or coupon (in the case of a fixed rate Step-Down Security) of a Step-Down Security, the spread or coupon on any date shall be deemed to be the lowest spread or coupon, respectively, scheduled to apply to such Step-Down Security on or after such date.

"**Step-Up Security**" means a security which by the terms of the related Underlying Instrument provides for an increase, in the case of a Fixed Rate Collateral Debt Security, in the per annum interest rate on such security or, in the case of a Floating Rate Collateral Debt Security, in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; *provided* that a Step-Up Security shall not include any such security (i) that provides for payment of a constant rate of interest at all times after the date of acquisition by the Issuer or any such security where the decrease is linked to a clean-up call or certain events as laid

out in the Underlying Instruments or (ii) with respect to which, in calculating any Overcollateralization Test or Collateral Quality Test that is determined in part by reference to the spread thereon (in the case of a floating rate Step-Up Security) or coupon thereon (in the case of a fixed rate Step-Up Security), the Collateral Manager elects to apply on the relevant Measurement Date the stated spread or coupon in effect on such date.

"**Subordinate Interests**" has the meaning specified in <u>Section 13.1(a), (b), (c), (d), (e)</u> or <u>(f)</u> as applicable.

"**Subordinated Collateral Management Fee**" means the fee payable to the Collateral Manager in arrears on each Quarterly Distribution Date pursuant to Section 7 of the Collateral Management Agreement, in an amount (as certified by the Collateral Manager to the Trustee) equal to 0.10% per annum of the Quarterly Asset Amount for such Quarterly Distribution Date; *provided* that the Subordinated Collateral Management Fee will be payable on each Quarterly Distribution Date only to the extent of funds available for such purpose in accordance with the Priority of Payments. Any accrued and unpaid Subordinated Collateral Management Fee that is due but unpaid as a result of the operation of the Priority of Payments will be deferred (without any interest accruing thereon) and will be payable on shall be payable on (i) any subsequent Quarterly Distribution Date on which funds are available therefor in accordance with the Priority of Payments and (ii) the occurrence of a Redemption Date. Any Subordinated Collateral Management Fee accrued but not paid prior to the resignation or removal of a Collateral Manager shall continue to be payable to such Collateral Manager on the Quarterly Distribution Date immediately following the effectiveness of such resignation or removal.

"**Subpool**" means each of the groups of Collateral Debt Securities designated by the Collateral Manager in accordance with the Auction Procedures on which Listed Bidders may provide a separate bid in an Auction.

"**Subscription Agreement**" means each Subscription Agreement dated on or prior to the Closing Date entered into between each purchaser of Preference Shares and either Initial Purchaser.

"**Supersenior Excess**" means, with respect to any date and time of determination, the amount, if any, by which (a) the sum of (i) the Remaining Unfunded Notional Amount plus (ii) the Reserve Account Balance *exceeds* (b) the aggregate Remaining Exposure under all CDS Agreement Transactions (including, for these purposes, the Remaining Exposure of all CDS Agreement Transactions for which the applicable trade date has occurred but excluding the Remaining Exposure of all CDS Agreement Transactions with respect to which the Issuer has entered into a binding commitment to sell, assign, terminate or otherwise liquidate, in each case regardless of the effective date thereof), as the same may be adjusted from time to time in accordance with <u>Section 7.18(g)</u>.

"**Swap Reduction Payment**" has the meaning specified in the Senior Swap Agreement.

"**Synthetic Security**" means any credit default swap (including any CDS Agreement Transaction), total return swap, credit linked note, derivative instrument, structured note or trust certificate purchased, or entered into, by the Issuer with or from a Synthetic Security

Counterparty (including, without limitation, from the Credit Default Swap Counterparty under the Credit Default Swap Agreement) that provides for payments closely correlated to the default, recovery upon default and other expected loss characteristics of a Permitted Reference Obligation (other than the risk of default of the related Synthetic Security Counterparty), but that may provide for payments based on a maturity shorter than or a principal amount, interest rate, currency, premium, payment terms or other non-credit terms different from that of the related Reference Obligation, provided that (i) any "Credit Event" under any Synthetic Security that can result in termination and settlement of the Synthetic Security prior to its scheduled maturity date shall not include restructuring, repudiation, moratorium, obligation default or obligation acceleration unless such Synthetic Security may be settled only through a physical settlement of a Deliverable Obligation to the Issuer, and not in Cash; (ii) a Deemed Floating Asset Hedge Agreement entered into by the Issuer with respect to a Collateral Debt Security held by the Issuer shall not be deemed to be a "Synthetic Security"; (iii) if such Synthetic Security requires or permits physical settlement upon the occurrence of a Credit Event thereunder or otherwise by delivery of one or more deliverable obligations, each such deliverable obligation must itself be a Permitted Reference Obligation on the date the Issuer enters into such Synthetic Security; (iv) the acquisition, ownership or disposition of such Synthetic Security will not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes or otherwise subject the Issuer to net income tax; and (v) amounts receivable by the Issuer will not be subject to withholding tax in respect of the Synthetic Security or the Synthetic Security Counterparty or the Reference Obligor is required to make "gross-up" payments that cover the full amount of any such withholding tax.

For purposes of the Overcollateralization Tests, unless otherwise specified, a Synthetic Security shall be included as a Collateral Debt Security having the characteristics of the Synthetic Security and not of the related Reference Obligation.

For purposes of the Moody's Asset Correlation Test and the Weighted Average Life Test, a Synthetic Security will be included as a Collateral Debt Security having the characteristics and Average Life of the related Reference Obligation (and the issuer thereof will be deemed to be the related Reference Obligor) and not of the Synthetic Security. For purposes of the Collateral Quality Tests other than the Moody's Asset Correlation Test and the Weighted Average Life Test, for purposes of the Standard & Poor's CDO Monitor Notification Test, and for determining the Moody's Rating and Standard & Poor's Rating of a Synthetic Security, a Synthetic Security will be included as a Collateral Debt Security having the characteristics of the Synthetic Security and not of the related Reference Obligation.

"**Synthetic Security Collateral**" means, in connection with any Synthetic Security, (i) any floating rate security that is rated "AAA" by Standard and Poor's and "Aaa" by Moody's and matures no later than the Stated Maturity, the expected average life of which does not exceed the expected average life of the related Reference Obligation by more than one year, and which is a credit card security that entitles the holders thereof to receive payments that depend on the cash flow from balances outstanding under revolving consumer credit card accounts or an RMBS Security, (ii) any Eligible Investment or any investment of a type described in the definition of "Eligible Investments" but with respect to which the counterparty thereto has a long-term rating of not less than "AA-" by Standard & Poor's and not less than "Aa3" by Moody's (and, if rated "Aa3" by Moody's, such rating is not on watch for possible downgrade by Moody's) or a

short-term credit rating of not less than "A-1+" by Standard & Poor's and "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) at the time of such investment, (iii) commercial paper maturing no later than the Business Day prior to the Quarterly Distribution Date next succeeding the date of investment in such commercial paper having at the time of such investment a credit rating of "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and not less than "A-1+" by Standard & Poor's, or (iv) other investments the acquisition of which would satisfy the Rating Condition, in each case which mature no later than the Stated Maturity, provided that with respect to clause (i), the market value risk and credit risk on such credit card securities and RMBS Securities shall be hedged through the use of total return swaps, which use shall be subject to the Rating Condition.

"**Synthetic Security Counterparty**" means any entity (including, without limitation, the Credit Default Swap Counterparty) that is required to make payments on a Synthetic Security (whether premium payments, as a result of a Credit Event thereunder or based upon payments received from one or more Reference Obligors on one or more related Reference Obligations).

"**Synthetic Security Counterparty Account**" has the meaning specified in Section 10.2(l).

"**Synthetic Security Counterparty Defaulted Obligation**" means a Synthetic Security (other than a Defaulted Synthetic Security) with respect to which:

      (a)      the long-term debt obligations of such Synthetic Security Counterparty are rated less than "A3" by Moody's (or, if rated "A3", are on watch for possible downgrade by Moody's) or the short-term debt obligations of the Synthetic Security Counterparty are rated "D" or "SD" by Standard & Poor's, or cease to be rated; *provided* that the foregoing shall not apply in the case of a Synthetic Security in respect of which the value of assets standing to the credit of the related Issuer Collateral Account (which value will be marked-to-market no less frequently than monthly) is at least equal to any termination payment that would be due to the Issuer upon the early termination of such Synthetic Security; or

      (b)      the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security.

"**Synthetic Security Counterparty Ratings Requirement**" means a requirement which will be satisfied if (i) either (A) the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of the Rating Determining Party with respect to the related Synthetic Security Counterparty are rated at least "Aa3" by Moody's (and, if rated "Aa3", such rating is not on watch for possible downgrade) and no short-term rating is available from Moody's, or (B)(1) the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of the Rating Determining Party with respect to the related Synthetic Security Counterparty are rated at least "A1" by Moody's (and, if rated "A1", such rating is not on watch for possible downgrade) and (2) the unsecured, unguaranteed and otherwise unsupported short-term debt obligations of such Rating Determining Party are rated at least "P-1" by Moody's (and, if rated "P-1", such rating is not on watch for possible downgrade), and (ii) either (A) the unsecured, unguaranteed and otherwise unsupported senior long-term debt obligations of the

Rating Determining Party with respect to the related Synthetic Security Counterparty are rated at least "AA-" by Standard & Poor's, (B) the unsecured, unguaranteed and otherwise unsupported short-term debt obligations of the Rating Determining Party with respect to the related Synthetic Security Counterparty are rated "A-1+" by Standard & Poor's, or (C) subject to the satisfaction of the Rating Condition by Standard & Poor's, the unsecured, unguaranteed and otherwise unsupported senior long-term debt obligations of the Rating Determining Party with respect to the related Synthetic Security Counterparty are rated at least "A+" by Standard & Poor's.; *provided* that if on any date the Synthetic Security Counterparty fails to satisfy the criteria set forth in clauses (i) or (ii) above, within 30 days of such failure or, if the Synthetic Security Counterparty is rated below "BBB+" by Standard & Poor's and its short-term rating is below "A-2" by Standard & Poor's, within 10 days of such failure, either (A) post cash or collateral in an amount that satisfies the Rating Condition, (B) assign or transfer all of its rights and obligations to a counterparty that satisfies the criteria set forth in clauses (i) or (ii) above, as applicable, (C) cause an entity who satisfies the criteria set forth in clauses (i) and (ii) above to issuer in favor of the Issuer a credit support annex that satisfies the Rating Condition, or (D) take other steps as may be required by the Rating Agencies to satisfy the Rating Condition.

"**Tax Event**" means the occurrence, whether or not as a result of any change in law or interpretations, of any of the following: (i) any obligor is, or on the next scheduled payment date under any Collateral Debt Security any obligor will be, required to deduct or withhold from any payment under any Collateral Debt Security to the Issuer for or on account of any tax, and such obligor is not, or will not be, required to pay to the Issuer such additional amount as is necessary to ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding occurred, (ii) the Issuer, a Synthetic Security Counterparty, a Credit Default Swap Counterparty, the Senior Swap Counterparty or a Hedge Counterparty is required to deduct or withhold from any payment under a Synthetic Security, a Credit Default Swap Agreement, the Senior Swap Agreement or a Hedge Agreement for or on account of any tax and the Issuer is obligated, or such Synthetic Security Counterparty, a Credit Default Swap Counterparty, the Senior Swap Counterparty or such Hedge Counterparty is not obligated, to make a gross-up payment or (iii) any net-basis tax measured by or based on the income of the Issuer is imposed on the Issuer.

"**Tax Materiality Condition**" means a condition which will be satisfied during any twelve-month period if any combination of Tax Events results, in aggregate, in a payment by, or charge or tax burden to, the Issuer in excess of U.S.$1,000,000.

"**Tax Redemption**" has the meaning specified in <u>Section 9.1(a)(ii)</u>.

"**Terminated Senior Swap Counterparty**" means, for the period from and including the applicable Senior Swap Early Termination Date to but excluding the date on which the applicable Outstanding Swap Counterparty Amount is reduced to zero, any Senior Swap Counterparty with respect to which a Senior Swap Early Termination Date has occurred, together with any assignees of and successors to such Terminated Senior Swap Counterparty's rights hereunder to receive its Outstanding Swap Counterparty Amount and Senior Swap Interest Amounts thereon.

"**Termination Payment Funding Request**" has the meaning given to such term in the Senior Swap Agreement.

"**Total Exposure**" means with respect to any Synthetic Security structured as a credit default swap (including a CDS Agreement Transaction), the sum (without duplication) of (a) the maximum aggregate Credit Protection Payments or other periodic payments and (b) the maximum net settlement amount (whether at the time funded or unfunded) that, in each case, the seller of protection could be required to pay or otherwise transfer to the buyer of protection thereunder, in each case to the extent such obligation to make such payment or transfer has not expired or been terminated pursuant to the Underlying Instruments relating to such Synthetic Security.

"**Total Reduction Amount**" means, with respect to any Quarterly Distribution Date, (a) the sum of (i) the Remaining Unfunded Reduction Amount for the related Determination Date *plus* (ii)(A) for purposes of clause (K)(a)(II) of Section 11.1(ii), the remaining Principal Proceeds available after the application thereof on such Quarterly Distribution Date pursuant to clauses (A) through (J) (inclusive) of Section 11.1(ii) or (B) for purposes of clause (L)(a)(II) of Section 11.1(ii), the remaining Principal Proceeds available after the application thereof on such Quarterly Distribution Date pursuant to clauses (A) through (K) of Section 11.1(ii) (inclusive) *minus*, (b) with respect to any Quarterly Distribution Date occurring prior to the last day of the Reinvestment Period, an amount determined by the Collateral Manager in its sole discretion and notified to the Trustee on the related Determination Date.

"**Total Senior Redemption Amount**" has the meaning specified in Section 9.1(b).

"**Trading Plan**" means series of sales and/or purchases of Collateral Debt Securities (a) that is completed within the lesser of 10 Business Days and the period of time between the date on which the first purchase or sale is made pursuant to such Trading Plan and the next succeeding Determination Date and (b) that results in the purchase of Collateral Debt Securities having an Aggregate Principal Balance of not more than 5% of the Net Outstanding Portfolio Collateral Balance. The time period for a Trading Plan shall commence on the first date on which the Issuer sells or purchases (or commits to sell or purchase) a Collateral Debt Security included in such Trading Plan and shall end on the last day on which the Issuer sells or purchases (or commits to sell or purchase) a Collateral Debt Security included in such Trading Plan.

"**Trading Termination Payment**" means a termination payment to be made by the Issuer to the Credit Default Swap Counterparty that is not a Credit Protection Amount, to terminate a CDS Agreement Transaction in accordance with Section 7.18(b) hereof prior to its scheduled termination date, other than a Defaulted Synthetic Termination Payment or a payment in respect of any "Early Termination Date" (as defined for purposes of the Credit Default Swap Agreement).

"**Trading Termination Receipt**" means, in respect of a Trading Termination Payment, a termination payment to be made to the Issuer by the Credit Default Swap Counterparty under a related Short Synthetic Security prior to its scheduled termination date (other than a termination payment in respect of any "Early Termination Date" as defined for purposes of the Credit Default Swap Agreement).

"**Transfer Agent**" means the Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"**Trust Officer**" means, when used with respect to the Trustee (or the bank in any other capacity), any officer within the CDO Trust Services Group of the Corporate Trust Office (or any successor group of the Trustee) authorized to act for and on behalf of the Trustee, including any vice president, assistant vice president or other officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such Officers, respectively, or to whom any corporate trust matter is referred within the Corporate Trust Office because of such person's knowledge of and familiarity with the particular subject.

"**Trustee**" means LaSalle Bank National Association, a national banking association, solely in its capacity as trustee hereunder, unless a successor Person shall have become the Trustee pursuant to the applicable provisions of this Indenture, and thereafter Trustee shall mean such successor Person.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York.

"**Uncertificated Security**" has the meaning specified in Section 8-102(a)(18) of the UCC.

"**Underlying Instruments**" means the indenture or other agreement pursuant to which a Pledged Security has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Pledged Security or of which the holders of such Pledged Security are the beneficiaries.

"**Uninvested Proceeds**" means, at any time, the proceeds received by the Issuer on the Closing Date from (x) the initial issuance of the Notes and Preference Shares (net of all expenses related to the offering of the Notes and Preference Shares) and (y) any net premium payable by the Hedge Counterparty to the Issuer pursuant to any Hedge Agreement, to the extent such proceeds have not been deposited in the Expense Account, the Interest Reserve Account, the Closing Date Expense Account, the Reserve Account or invested in Collateral Debt Securities (including the deposit of any required amounts in a Synthetic Security Counterparty Account and including the purchase of accrued interest on any Collateral Debt Security) in accordance with the terms of this Indenture. Gains paid to the Issuer on the Closing Date with respect to the sale of U.S. Treasury securities acquired in connection with warehousing arrangements entered into prior to the Closing Date shall also be treated as "Uninvested Proceeds" and shall be deposited in the Uninvested Proceeds Account on the Closing Date.

"**Uninvested Proceeds Account**" has the meaning specified in Section 10.5.

"**United States**" and "**U.S.**" means the United States of America, including the States thereof and the District of Columbia.

"**Unregistered Securities**" has the meaning specified in Section 5.17(c).

"**U.S. Agency Securities**" means Registered obligations of (i) the U.S. Treasury, (ii) any U.S. Federal agency or (iii)(a) the Federal National Mortgage Association, (b) the Student Loan

Marketing Association or (c) the Federal Home Loan Mortgage Corporation, in each case with a stated maturity that does not exceed the Stated Maturity.

"**U.S. Person**" has the meaning given in Regulation S under the Securities Act.

"**U.S. Treasury Benchmark**" means, for any Collateral Debt Security, the interest rate on U.S. Treasury securities used as a benchmark for that Collateral Debt Security by two market-makers, selected by the Collateral Manager, in that Collateral Debt Security.

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56 (2001).

"**Weighted Average Life**" means, on any Measurement Date in respect of any Collateral Debt Security other than a Defaulted Security or Deferred Interest PIK Bond, the number obtained by (a) summing the products obtained by *multiplying* (i) the Average Life at such time of each such Collateral Debt Security *by* (ii) the outstanding Principal Balance of such Collateral Debt Security and (b) *dividing* such sum *by* the Aggregate Principal Balance at such time of all such Collateral Debt Securities other than Defaulted Securities or Deferred Interest PIK Bonds.

"**Weighted Average Life Test**" means a test satisfied as of any Measurement Date if the Weighted Average Life of all Collateral Debt Securities (other than Defaulted Securities and Deferred Interest PIK Bonds) as of such Measurement Date is less than or equal to (a) 6.75 years on or after the Ramp-Up Completion Date to and including the Quarterly Distribution Date in November 2010 and (b) 2.75 years thereafter.

"**Weighted Average Premium/Spread**" means, as of any Measurement Date, a number (rounded up to the next 0.001%) equal to (a) the sum of (i) the sum of the products obtained by *multiplying* (A) the fixed rate premium percentage per annum payable by the applicable Synthetic Security Counterparty to the Issuer under each Synthetic Security structured as a credit default swap (including any CDS Agreement Transaction) by (B) the Notional Amount of such Synthetic Security and (ii) the sum of the products obtained by *multiplying* (A) the Current Spread on each Collateral Debt Security that is a Floating Rate Collateral Debt Security, Deemed Floating Rate Collateral Debt Security or Fixed Rate Collateral Debt Security (other than a Defaulted Security, a Written-Down Security or a Deferred Interest PIK Bond) as of such date by (B) the Principal Balance of such Collateral Debt Security as of such date *minus* (iii) the sum of the products obtained by multiplying (A) the fixed rate premium percentage per annum payable to the applicable Synthetic Security Counterparty by the Issuer under each Short Synthetic Security structured as a credit default swap (including any CDS Agreement Transaction) by (B) the Notional Amount of such Short Synthetic Security, *divided* by (b) the sum of (i) the aggregate Notional Amount of all Synthetic Securities *plus* (ii) the Aggregate Principal Balance of all Collateral Debt Securities that are Floating Rate Collateral Debt Securities, Deemed Floating Rate Collateral Debt Securities or Fixed Rate Collateral Debt Securities (excluding all Defaulted Securities, Written-Down Securities and Deferred Interest PIK Bonds) *minus* (iii) the aggregate Notional Amount of Short Synthetic Securities. For purposes of this definition, (1) a PIK Bond shall be deemed to be a Deferred Interest PIK Bond so long as any interest thereon has been deferred and capitalized for at least one payment date (until payment of interest on such

PIK Bond has resumed and all capitalized and deferred interest has been paid in accordance with the terms of the Underlying Instruments) and (2) no contingent payment of interest will be included in such calculation.

"**Weighted Average Premium/Spread Test**" means a test that is satisfied on any Measurement Date on or after the Ramp-Up Completion Date if, as of such Measurement Date, the Weighted Average Premium/Spread is equal to or greater than 1.43%.

"**Written-Down Security**" means any Collateral Debt Security other than a Defaulted Security as to which the aggregate par amount of such Collateral Debt Security and all other securities secured by the same pool of collateral that rank *pari passu* with or senior in priority of payment to such Collateral Debt Security exceeds the aggregate par amount (including reserved interest or other amounts available for overcollateralization) of all collateral securing such securities (excluding defaulted collateral); *provided* that, upon receipt of written notice of such event, the Trustee shall notify Standard & Poor's of any Collateral Debt Security that becomes a Written-Down Security.

"**Zero Coupon Bond**" means a security (other than a Step-Up Security) that, pursuant to the terms of its Underlying Instruments, on the date on which it is purchased by the Issuer, does not provide for the periodic payment of interest or provides that all payments of interest will be deferred until the final maturity thereof.

(b)    In addition, except as otherwise specified herein or as the context may otherwise require, the following additional terms have the respective meanings set forth below for all purposes of this Indenture.

"**ABS Chassis Securities**" means Asset-Backed Securities (other than Aircraft Leasing Securities, Oil and Gas Securities, Project Finance Securities and Restaurant and Food Services Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of chassis (other than automobiles) to commercial and industrial customers, generally having the following characteristics: (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying chassis; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the chassis for their stated residual value, subject to payments at the end of lease term for excess usage.

"**ABS Container Securities**" means Asset-Backed Securities (other than Aircraft Leasing Securities, Oil and Gas Securities, Project Finance Securities and Restaurant and Food Services Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of containers to commercial and industrial customers, generally having the following characteristics: (1) the

leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying containers; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the containers for their stated residual value, subject to payments at the end of lease term for excess usage.

"**ABS Franchise Securities**" means (1) Oil and Gas Securities and (2) Restaurant and Food Services Securities, to the extent that such Oil and Gas Securities or Restaurant and Food Services Securities entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such securities) on the cash flow from a pool of franchise loans made to operators of franchises.

"**ABS Natural Resource Receivable Security**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend on the cash flow from the sale of products derived from the right to harvest, mine, extract or exploit a natural resource such as timber, oil, gas and minerals, generally having the following characteristics:  (i) the contracts have standardized payment terms, (ii) the contracts are the obligations of a few consumers of natural resources and accordingly represent an undiversified pool of credit risk and (iii) the repayment stream on such contracts is primarily determined by a contractual payment schedule.

"**ABS Type Diversified Securities**" means (1) Automobile Securities; (2) Car Rental Receivable Securities; (3) Credit Card Securities; (4) Student Loan Securities; and (5) any other type of Asset-Backed Securities that become a Specified Type after the date hereof pursuant to clause (a)(24) of the definition thereof and is designated as "ABS Type Diversified Securities" in connection therewith.

"**ABS Type Residential Securities**" means (1) Home Equity Loan Securities; (2) Manufactured Housing Securities; (3) Residential A Mortgage Securities; (4) Residential B/C Mortgage Securities; (5) Time Share Securities and (6) any other type of Asset-Backed Securities that become a Specified Type after the date hereof pursuant to clause (a)(24) of the definition thereof and is designated as "ABS Type Residential Securities" in connection therewith.

"**ABS Type Undiversified Securities**" means each Specified Type of Asset-Backed Securities, other than (a) ABS Type Diversified Securities or (b) ABS Type Residential Securities; and any other type of Asset-Backed Securities that becomes a Specified Type after the date hereof pursuant to clause (a)(24) of the definition thereof and is designated as "ABS Type Undiversified Securities" in connection therewith.

"**Aerospace and Defense Securities**" means Asset-Backed Securities (including an enhanced equipment trust certificates) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of aircraft, vessels and telecommunications equipment to businesses for use in the provision of

goods or services to consumers, the military or the government, generally having the following characteristics: (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying equipment; (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage or wear and tear; and (5) the obligations of the lessors or sublessors may be secured not only by the leased equipment but also by other assets of the lessee, sublessee or guarantees granted by third parties.

"**Aircraft Leasing Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a portfolio consisting of aircraft leases and subleases, generally having the following characteristics: (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying equipment; (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage or wear and tear; and (5) the obligations of the lessors or sublessors may be secured not only by the leased equipment but also by other assets of the lessee or sublessee or guarantees granted by third parties. For purposes of this definition, Aircraft Leasing Securities shall include enhanced equipment trust certificates with respect to aircraft.

"**Automobile Securities**" means Asset-Backed Securities (other than Recreational Vehicle Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from prime installment sale loans made to finance the acquisition of, or from leases of, automobiles, generally having the following characteristics: (1) the loans or leases may have varying contractual maturities; (2) the loans or leases are obligations of numerous borrowers or lessees and accordingly represent a very diversified pool of obligor credit risk; (3) the borrowers or lessees under the loans or leases generally do not have a poor credit rating; (4) the repayment stream on such loans or leases is primarily determined by a contractual payment schedule, with early repayment on such loans or leases predominantly dependent upon the disposition of the underlying vehicle; and (5) such leases typically provide for the right of the lessee to purchase the vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"**Bank Guaranteed Securities**" means Asset-Backed Securities as to which, (a) if interest thereon is not timely paid when due, or the principal thereof is not timely paid at stated legal maturity, a national banking association organized under United States law or banking corporation organized under the laws of a state of the United States has undertaken in an

irrevocable letter of credit or other similar instrument to make such payment against the presentation of documents, but only if such letter of credit or similar instrument (1) expires no earlier than such stated maturity (or contains "evergreen" provisions entitling the beneficiary thereof to draw the entire undrawn amount thereof upon the failure of the expiration date of such letter of credit or other similar instrument to be extended beyond its then current expiry date), (2) provides that payment thereunder is independent of the performance by the obligor on the relevant Asset-Backed Security and (3) was issued by a bank having a credit rating assigned by each nationally recognized statistical rating organization that currently rates the relevant Asset-Backed Security higher than the credit rating assigned by such rating organization to such Asset-Backed Security, determined without giving effect to such letter of credit or similar instrument or (b) the timely payment of interest on, or the payment of principal of at stated legal maturity is, in the judgment of the Collateral Manager, dependent upon an irrevocable letter of credit or other similar instrument undertaken by a national banking association organized under United States law or a banking corporation organized under the laws of a state of the United States, provided that any Asset-Backed Security falling within this definition shall be excluded from the definition of each other Specified Type of Asset-Backed Security.

"**Bank Trust Preferred CDO Securities**" means CDO Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CDO Securities) on the cash flow from a pool of trust preferred securities issued by a wholly-owned trust subsidiary of a U.S. financial institution which uses the proceeds of such issuance to purchase a portfolio of debt securities issued by its parent.  They generally have the following characteristics: (1) the trust securities are non-amortizing preferred stock securities; (2) the trust securities have a 30-year maturity with a 5- or 10- year non-call period; and (3) the trust securities are subordinated debt.

"**Car Rental Receivable Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of vehicles to car rental systems (such as Hertz, Avis, National, Dollar, Budget, etc.) and their franchisees, generally having the following characteristics:  (1) the leases and subleases have varying contractual maturities; (2) the subleases are obligations of numerous franchisees and accordingly represent a very diversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee or third party of the underlying vehicle; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"**Catastrophe Bonds**" means Asset-Backed Securities that entitle the holders thereof to receive a fixed principal or similar amount and a specified return on such amount, generally having the following characteristics:  (1) the issuer of such Asset-Backed Security has entered into a swap, insurance contract or similar arrangement with a counterparty pursuant to which such issuer agrees to pay amounts to the counterparty upon the occurrence of certain specified events, including but not limited to:  hurricanes, earthquakes and other events; and (2) payments

on such Asset-Backed Security depend primarily upon the occurrence and/or severity of such events.

"**CDO Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from other Asset-Backed Securities (other than loans secured primarily by commercial real estate), generally having the following characteristics: (1) the debt securities have varying contractual maturities; (2) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of debt securities depending on numerous factors specific to the particular issuers or obligors and upon whether, in the case of loans or securities bearing interest at a fixed rate, such securities include an effective prepayment premium; and (3) proceeds from such repayments can for a limited period and subject to compliance with certain eligibility criteria be reinvested in additional debt securities.

"**CLO Securities**" means Collateral Debt Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Collateral Debt Securities) on the cash flow from a portfolio that includes any commercial and industrial bank loans which are generally rated by Moody's and Standard & Poor's.

"**CMBS Conduit Securities**" means Asset-Backed Securities (i) (A) issued by a single-seller or multi-seller conduit under which the holders of such Asset-Backed Securities have recourse to a specified pool of assets (but not other assets held by the conduit that support payments on other series of securities) and (B) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of commercial mortgage loans generally having the following characteristics: (1) the commercial mortgage loans have varying contractual maturities; (2) the commercial mortgage loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the commercial mortgage loans are obligations of a relatively limited number of obligors (with the creditworthiness of individual obligors being less material than for CMBS Large Loan Securities and Credit Tenant Lease Securities) and accordingly represent a relatively undiversified pool of obligor credit risk; (4) upon original issuance of such Asset-Backed Securities no 10 commercial mortgage loans account for more than 75% of the Aggregate Principal Balance of the entire pool of commercial mortgage loans supporting payments on such securities and such pool contains at least 50 such loans; and (5) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium or (ii) backed by a pool of securities where at least 80% of the Aggregate Principal Balance of the underlying pool consists of securities described in (i) above.

"**CMBS Credit Tenant Lease Securities**" means Asset-Backed Securities (other than CMBS Large Loan Securities, CMBS Single Property Securities and CMBS Conduit Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets

designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of commercial mortgage loans made to finance the acquisition, construction and improvement of properties leased to corporate tenants (or on the cash flow from such leases). They generally have the following characteristics: (1) the commercial mortgage loans or leases have varying contractual maturities; (2) the commercial mortgage loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the leases are secured by leasehold interests; (4) the commercial mortgage loans or leases are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (5) payment thereof can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans or termination of leases depending on numerous factors specific to the particular obligors or lessees and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium; and (6) the creditworthiness of such corporate tenants is the primary factor in any decision to invest in these securities.

"**CMBS Large Loan Securities**" means Asset-Backed Securities (other than CMBS Conduit Securities, CMBS Credit Tenant Lease Securities and CMBS Single Property Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of commercial mortgage loans made to finance the acquisition, construction and improvement of properties. They generally have the following characteristics: (1) the commercial mortgage loans have varying contractual maturities; (2) the commercial mortgage loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the commercial mortgage loans are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (4) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium; and (5) the valuation of individual properties securing the commercial mortgage loans is the primary factor in any decision to invest in these securities.

"**CMBS Securities**" means CMBS Conduit Securities, CMBS Credit Tenant Lease Securities and CMBS Large Loan Securities (including CMBS Single Property Securities), CRE CDO Securities and any Asset Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset Backed Securities) on the cash flow from a portfolio of loans secured primarily by commercial real estate.

"**CMBS Single Property Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from one or more commercial mortgage loans made to finance the acquisition, construction and improvement of a single property. They generally have the following characteristics: (1) the commercial mortgage loans have varying contractual maturities; (2) the commercial mortgage loans are secured by real property purchased or improved with the

proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the commercial mortgage loans or leases are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; and (4) payment thereof can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans or termination of leases depending on numerous factors specific to the particular obligors or lessees and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium.

"**Combination Securities**" means any Securities consisting of two or more separate component securities, including a debt security component and/or an equity security component.

"**Consumer ABS Securities**" means Automobile Securities, Car Rental Receivable Securities, Credit Card Securities and Student Loan Securities.

"**CRE CDO Securities**" means collateralized debt obligations, collateralized bond obligations or collateralized loan obligations (including, without limitation, any synthetic collateralized debt obligations or synthetic collateralized loan obligations) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such CRE CDO Securities) on the cash flow from (and not the market value of) a portfolio of securities related to commercial mortgage property.

"**Credit Card Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from balances outstanding under prime revolving consumer credit card accounts, generally having the following characteristics: (1) the accounts have standardized payment terms and require minimum monthly payments; (2) the balances are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; and (3) the repayment stream on such balances does not depend upon a contractual payment schedule, with early repayment depending primarily on interest rates, availability of credit against a maximum credit limit and general economic matters.

"**EETC Security**" means an enhanced equipment trust certificate.

"**Emerging Market Country**" means any Sovereign jurisdiction the long-term Dollar denominated Sovereign debt obligations of which are rated below "Aa2" by Moody's or the foreign currency issuer credit rating of such jurisdiction is rated below "AA" by Standard & Poor's.

"**Emerging Market Obligor**" means any obligor of a security (i) that is organized under the laws of an Emerging Market Country, Japan, Taiwan or Singapore or (ii) that is a Sovereign (whether or not a Sovereign issuer) or another governmental issuer of an Emerging Market Country, Japan, Taiwan or Singapore; *provided, however*, that this definition may be revised (i) with the prior written approval of a majority of the Aggregate Outstanding Amount of the Controlling Class and (ii) upon satisfaction of the Rating Condition with respect to such revision.

"**Emerging Market Security**" means any security (i) the obligor of which is an Emerging Market Obligor or (ii) that is a Structured Finance CDO Security the Underlying Instruments of which permit more than 20% of its assets to be invested in securities the obligors of which are Emerging Market Obligors, or (iii) that is a Synthetic Security based in whole or in part on a security described in clause (i) or (ii) above.

"**Equipment Leasing Securities**" means Asset-Backed Securities (other than Aircraft Leasing Securities, Healthcare Securities, Oil and Gas Securities and Restaurant and Food Services Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of equipment (other than automobiles) to commercial and industrial customers, generally having the following characteristics: (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying equipment; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage.

"**FHLMC/FNMA Guaranteed Securities**" means any Asset-Backed Security as to which the timely payment of interest when due, and the payment of principal no later than the stated legal maturity, is fully and unconditionally guaranteed by the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association but only if such guarantee (x) expires no earlier than such stated maturity and (y) is independent of the performance by the obligor on the relevant Asset-Backed Security; *provided* that any Asset-Backed Security falling within this definition shall be excluded from the definition of each other type of Asset-Backed Security.

"**Floorplan Receivable Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) upon assets that will consist of a revolving pool of receivables arising from the purchase and financing by domestic retail motor vehicle dealers for their new and used automobile and light-duty truck inventory. The receivables are comprised of principal receivables and interest receivables. In addition to receivables arising in connection with designated accounts, the trust assets may include interests in other floorplan assets, such as: (1) participation interests in pools of assets existing outside the trust and consisting primarily of receivables arising in connection with dealer floorplan financing arrangements originated by a manufacturer or one of its Affiliates; (2) participation interests in receivables arising under dealer floorplan financing arrangements originated by a third party and participated to a manufacturer; (3) receivables originated by a manufacturer under syndicated floorplan financing arrangements between a motor vehicle dealer and a group of lenders; or (4) receivables representing dealer payment obligations arising from purchases of vehicles.

"**Franchise Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Asset-Backed Securities) primarily on the cash flow from balances outstanding on franchise loans secured by the cash flow generated at franchise or chain-store establishments, typically fast-food chains, service stations, convenience stores or funeral homes, as well as liens on real estate, furniture, fixtures and equipment, the proceeds of which were used to acquire, refinance or create a source of working capital for such franchise establishments, generally having the following characteristics: (1) the franchise loans have standardized payment terms and require minimum monthly payments; (2) the franchise loans are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (3) repayment of such securities can vary substantially from their contractual payment schedules and depends entirely upon the rate at which the franchise loans are repaid; and (4) environmental liabilities and legal liabilities of the franchisees may affect their ability to repay the franchise loans.

"**Future Flow Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from trade accounts receivable, entertainment royalties, structured litigation settlements or ticket receivables.

"**Guaranteed Corporate Debt Security**" means a CDO Security guaranteed as to ultimate or timely payment of principal or interest, including a CDO Security guaranteed by a monoline financial insurance company.

"**Healthcare Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from (i) leases and subleases of equipment to hospitals, non-hospital medical facilities, physicians and physician groups for use in the provision of healthcare services or (ii) Medicare, Medicaid or any other third-party payor receivables related to medical, hospital or other health care related expenses, charges or fees.

"**High-Yield CLO Securities**" means CLO Securities which entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such CLO Securities) on the cash flow from a portfolio that includes any commercial and industrial bank loans that are obligations of issuers that have a Moody's Rating below "Baa3". For purposes of clarity, "High-Yield CLO Securities" shall not include High-Yield CDO Securities

"**Home Equity Loan Securities**" means any Asset-Backed Security that entitles the holder thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from balances (including revolving balances) outstanding under loans or lines of credit secured by (primarily by a second priority lien on) single family residential real estate the proceeds of which loans or lines of credit are not used to purchase such real estate or to purchase or construct dwellings thereon (or to refinance indebtedness previously so used), and

that generally have the following characteristics: (1) where applicable, the weighted average credit score based on the credit scoring models developed by Fair, Isaac & Company with respect to the obligors on all such underlying loans upon origination is greater than or equal to 625 and such security is ineligible to be classified as a Residential A Mortgage Security; (2) the balances have standardized payment terms and require minimum monthly payments; (3) the balances are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (4) the repayment stream on such balances does not depend on a contractual repayment schedule, with early repayment depending primarily on interest rates, availability of credit against a maximum line of credit and general economic matters; and (5) the line of credit or loan may be secured by residential real estate with a market value (determined on the date of origination of such line of credit or loan) that is less than the original proceeds of such line of credit or loan.

"**Insurance Company Guaranteed Securities**" means any Asset-Backed Security as to which the timely payment of interest when due, and the payment of principal no later than stated legal maturity, is (a) unconditionally guaranteed pursuant to an insurance policy, guarantee or other similar instrument issued by an insurance company organized under the laws of a state of the United States, but only if such insurance policy, guarantee or other similar instrument (i) expires no earlier than such stated maturity, (ii) provides that payment thereunder is independent of the performance by the obligor on the relevant Asset-Backed Security and (iii) is issued by an insurance company having a credit rating assigned by each nationally recognized statistical rating organization that currently rates such Asset-Backed Security higher than the credit rating assigned by such rating organization to such Asset-Backed Security determined without giving effect to such insurance policy, guarantee or other similar instrument or (b) in the judgment of the Collateral Manager, dependent upon an insurance policy, guarantee or other similar instrument issued by an insurance company organized under the laws of a state of the United States, provided that any Asset-Backed Security falling within this definition shall be excluded from the definition of each other type of Asset-Backed Security.

"**Lottery Receivable Security**" means an Asset-Backed Security that (a) entitles the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Asset-Backed Security) upon an arrangement that compensates a winner of a state lottery with one lump sum payment in exchange for a pledge of the lottery payments that individual would have received over a future period of time and (b) is backed by a diversified pool of payments received from various state lottery commissions in exchange for a lump sum payment to a bona fide winner of a given state lottery.

"**Manufactured Housing Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from manufactured housing (also known as mobile homes and prefabricated homes) installment sales contracts and installment loan agreements, generally having the following characteristics: (1) the contracts and loan agreements have varying, but typically lengthy contractual maturities; (2) the contracts and loan agreements are secured by the manufactured homes and, in certain cases, by mortgages and/or deeds of trust on the real estate to which the manufactured homes are deemed permanently affixed; (3) the contracts and/or loans

are obligations of a large number of obligors and accordingly represent a relatively diversified pool of obligor credit risk; (4) repayment thereof can vary substantially from the contractual payment schedule, with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium; and (5) in some cases, obligations are fully or partially guaranteed by a governmental agency or instrumentality.

"**Monoline Guaranteed Securities**" means any Asset-Backed Security as to which the timely payment of interest when due, and the payment of principal no later than stated legal maturity, is unconditionally guaranteed pursuant to an insurance policy, guarantee or other similar instrument issued by a monoline insurer organized under the laws of a state of the United States, but only if such insurance policy, guarantee or other similar instrument (1) expires no earlier than such stated maturity, (2) provides that payment thereunder is independent of the performance by the obligor on the relevant Asset-Backed Security and (3) is issued by a monoline insurer having a credit rating assigned by a nationally recognized statistical rating organization that currently rates such Asset-Backed Security which is higher than the credit rating assigned by such rating organization to such Asset-Backed Security determined without giving effect to such insurance policy, guarantee or other similar instrument. Notwithstanding anything herein to the contrary, any Collateral Debt Security that qualifies as a Monoline Guaranteed Security shall not qualify as any other specified type for so long as such Collateral Debt Security qualifies as a Monoline Guaranteed Security.

"**Mortgage Finance Company Security**" means a debt security (other than an Asset-Backed Security or a REIT Debt Security), which may be secured or unsecured issued by a mortgage-related finance company that, if subordinate by its terms, is subordinated only to indebtedness for borrowed money, trade claims, capitalized leases or other similar obligations.

"**Mortgage-Related Securities**" means Mortgage Finance Company Securities, CMBS Securities, ABS Type Residential Securities, REIT Debt Securities, U.S. Agency Guaranteed Securities, FHLMC/FNMA Guaranteed Securities and ABS Type Undiversified Securities that are mortgage-related.

"**Mutual Fund Fees Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of brokerage fees and costs relating to various mutual funds, generally having the following characteristics: (1) the brokerage arrangements have standardized payment terms and require minimum payments; (2) the brokerage fees and costs arise out of numerous mutual funds and accordingly represent a very diversified pool of credit risk; and (3) the collection of brokerage fees and costs can vary substantially from the contractual payment schedule (if any), with collection depending on numerous factors specific to the particular mutual funds, interest rates and general economic matters.

"**NIM Security**" means a net-interest margin security.

"**Oil and Gas Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing

or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from (a) a pool of franchise loans made to operators of franchises that provide oil and gasoline and provide other services related thereto and (b) leases or subleases of equipment to such operators for use in the provision of such goods and services. They generally have the following characteristics: (1) the loans, leases or subleases have varying contractual maturities; (2) the loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the obligations of the lessors or sublessors of the equipment may be secured not only by the leased equipment but also the related real estate; (4) the loans, leases and subleases are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (5) payment of the loans can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium; (6) the repayment stream on the leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, a sublessee or third party of the underlying equipment; (7) such leases and subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of a lease term for excess usage or wear and tear; and (8) the ownership of a franchise right or other similar license and the creditworthiness of such franchise operators is the primary factor in any decision to invest in these securities.

"**Other ABS Securities**" means Asset-Backed Securities that do not currently belong in any of the Specified Types of Asset-Backed Securities.

"**Project Finance Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from (1) the sale of products, such as electricity, nuclear energy, steam or water, in the utility industry by a special purpose entity formed to own the assets generating or otherwise producing such products and such assets were or are being constructed or otherwise acquired primarily with the proceeds of debt financing made available to such entity on a limited-recourse basis (including recourse to such assets and the land on which they are located) or (2) fees or other usage charges, such as tolls collected on a highway, bridge, tunnel or other infrastructure project, collected by a special purpose entity formed to own one or more such projects that were constructed or otherwise acquired primarily with the proceeds of debt financing made available to such entity on a limited-recourse basis (including recourse to the project and the land on which it is located).

"**Recreational Vehicle Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from installment sale loans made to finance the acquisition of, or from leases of, recreational vehicles, generally having the following characteristics: (1) the loans or leases may have varying contractual maturities; (2) the loans or leases are obligations of numerous borrowers or lessors and accordingly represent a very diversified pool of obligor credit risk; (3) the borrowers or lessees under the loans or leases generally do not have a poor credit rating; (4)

the repayment stream on such loans or leases is primarily determined by a contractual payment schedule, with early repayment on such loans or leases predominantly dependent upon the disposition of the underlying recreational vehicle; and (5) such leases typically provide for the right of the lessee to purchase the recreational vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"**Reinsurance Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend in part on the premiums from reinsurance policies held by a special purpose vehicle created for such purpose, generally having the following characteristics: (1) proceeds from the security are invested in a collateral account; (2) such collateral account is subject to claims from the reinsurance policies; and (3) the repayment of principal on the security is dependent on the exercise of the reinsurance policies.

"**REIT Debt Securities—Diversified**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of mortgages on a portfolio of diverse real property interests, provided that (a) any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security and (b) any REIT Debt Security falling within any other REIT Debt Security description set forth herein shall be excluded from this definition.

"**REIT Debt Securities—Health Care**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of mortgages on hospitals, clinics, sport clubs, spas and other health care facilities and other similar real property interests used in one or more similar businesses, provided that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Hotel**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of hotels, motels, youth hostels, bed and breakfasts and other similar real property interests used in one or more similar businesses, including assets in the form of mortgages on any of the foregoing, provided that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Industrial**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of factories, refinery plants, breweries and other similar real property interests used in one or more similar businesses, including assets in the form of mortgages on any of the foregoing, provided that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Mortgage**" means REIT Debt Securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision) whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of

proceeds to holders of the REIT Debt Securities) of mortgages, commercial mortgage-backed securities, collateralized mortgage obligations and other similar mortgage-related securities (including REIT Debt Securities issued by a hybrid form of such trust that invests in both commercial real estate and commercial mortgages), provided that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Multi-Family**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of multi-family dwellings such as apartment blocks, condominiums and co-operative owned buildings, including assets in the form of mortgages on any of the foregoing, provided that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Office**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of office buildings, conference facilities and other similar real property interests used in the commercial real estate business, including assets in the form of mortgages on any of the foregoing, provided that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type REIT Debt Security.

"**REIT Debt Securities—Residential**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of residential mortgages (other than multi-family dwellings) and other similar real property interests, provided that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Retail**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of retail stores, restaurants, bookstores, clothing stores and other similar real property interests used in one or more similar businesses, including assets in the form of mortgages on any of the foregoing, provided that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**REIT Debt Securities—Storage**" means REIT Debt Securities whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the REIT Debt Securities) of storage facilities and other similar real property interests used in one or more similar businesses, including assets in the form of mortgages on any of the foregoing, provided that any REIT Debt Security falling within this definition shall be excluded from the definition of each other Specified Type of REIT Debt Security.

"**Residential A Mortgage Securities**" means Asset-Backed Securities (other than Residential B/C Mortgage Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from residential mortgage loans secured (on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate (single or multi-family properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having the following characteristics: (1) the mortgage loans have generally been underwritten to the standards of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (without regard to the size of the loan); (2) the mortgage loans have standardized payment terms and require minimum monthly payments; (3) the mortgage loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling; and (5) where applicable, the weighted average credit score based on the credit scoring models developed by Fair, Isaac & Company with respect to the obligors on all such underlying loans upon origination is 625 or higher.

"**Residential B/C Mortgage Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from residential mortgage loans secured by subprime residential real estate (single or multi-family properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having the following characteristics:  (1) the mortgage loans have generally not been underwritten to the standards of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (without regard to the size of the loan); (2) the mortgage loans have standardized payment terms and require minimum monthly payments; (3) the mortgage loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling; and (5) where applicable, the weighted average credit score based on the credit scoring models developed by Fair, Isaac & Company with respect to the obligors on all such underlying loans is 675 or lower.

"**Restaurant and Food Services Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from (a) a pool of franchise loans made to operators of franchises that provide goods and services relating to the restaurant and food services industries and (b) leases or subleases of equipment to such operators for use in the provision of such goods and services. They generally have the following characteristics:  (1) the loans, leases or subleases have varying contractual maturities; (2) the loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the obligations of the lessors or sublessors of the equipment may be secured not only by the leased equipment but also the related real estate; (4) the loans, leases and subleases are

obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (5) payment of the loans can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium; (6) the repayment stream on the leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, a sublessee or third party of the underlying equipment; (7) such leases and subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of a lease term for excess usage or wear and tear; and (8) the ownership of a franchise right or other similar license and the creditworthiness of such franchise operators is the primary factor in any decision to invest in these securities.

"**RMBS Securities**" means Residential A Mortgage Securities, Residential B/C Mortgage Securities, Home Equity Loan Securities and FHLMC/FNMA Guaranteed Securities.

"**Small Business Loan Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from general purpose corporate loans made to "small business concerns" (generally within the meaning given to such term by regulations of the United States Small Business Administration), including but not limited to those (a) made pursuant to Section 7(a) of the United States Small Business Act, as amended, and (b) partially guaranteed by the United States Small Business Administration. Small Business Loan Securities generally have the following characteristics: (1) the loans have payment terms that comply with any applicable requirements of the Small Business Act, as amended; (2) the loans are obligations of a relatively limited number of borrowers and accordingly represent an undiversified pool of obligor credit risk; and (3) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium.

"**Specified Type Securities**" means any security that is one of the following: CDO Securities, Automobile Securities, CMBS Securities, Credit Card Securities, Equipment Leasing Securities, Home Equity Loan Securities, REIT Debt Securities, Residential A Mortgage Securities, Residential B/C Mortgage Securities, Small Business Loan Securities and Student Loan Securities.

"**Stadium Receivables Securities**" means Asset Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset Backed Securities) on the cash flow from ticket receipts and other revenue including, without limitation, concession and paraphernalia sales, received by a property manager of stadiums.

"**Structured Finance CDO Securities**" means CDO Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the

servicing or timely distribution of proceeds to holders of the CDO Securities) on the market value of, credit exposure to, or cash flow from, a portfolio consisting substantially of Asset-Backed Securities (excluding CMBS Securities and CDO Securities).

"**Structured Settlement Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from receivables representing the right of litigation claimants to receive future scheduled payments under settlement agreements that are funded by annuity contracts, which receivables may have varying maturities.

"**Student Loan Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from loans made to students (or their parents) to finance educational needs, generally having the following characteristics: (1) the loans have standardized terms; (2) the loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (3) the repayment stream on such loans is primarily determined by a contractual payment schedule, with early repayment on such loans predominantly dependent upon interest rates and the income of borrowers following the commencement of amortization; and (4) such loans may be fully or partially insured or reinsured by the United States Department of Education.

"**Tax Lien Securities**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of tax obligations owed by businesses and individuals to state and municipal governmental taxing authorities, generally having the following characteristics: (1) the obligations have standardized payment terms and require minimum payments; (2) the tax obligations are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; and (3) the repayment stream on the obligation is primarily determined by a payment schedule entered into between the relevant tax authority and obligor, with early repayment on such obligation predominantly dependent upon interest rates and the income of the obligor following the commencement of amortization.

"**Time Share Securities**" means Asset-Backed Securities (other than Residential A Mortgage Securities, Residential B/C Mortgage Securities and Home Equity Loan Securities) that entitle the holders thereof to receive payments that depend primarily on the cash flow from residential mortgage loans (secured on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate the proceeds of which were used to purchase fee simple interests in timeshare estates in units in a condominium, generally having the following characteristics: (1) the mortgage loans have standardized payment terms and require minimum monthly payments; (2) the mortgage loans are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (3) repayment of such securities can vary substantially from their contractual payment schedules and depends entirely upon the rate at which the mortgage loans are repaid; and (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early prepayment of individual loans depending

on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium and with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling and generally no penalties for early repayment.

"**Tobacco Bonds**" means Structured Settlement Securities resulting from tobacco-related litigation.

"**U.S. Agency Guaranteed Security**" means any Asset-Backed Security as to which the timely payment of interest when due, and the payment of principal no later than stated legal maturity, is (a) (1) fully and unconditionally guaranteed by a U.S. Federal agency the obligations of which are backed by the full faith and credit of the United States, but only if such guarantee (x) expires no earlier than such stated maturity and (y) is independent of the performance by the obligor on the relevant Asset-Backed Security or (b) in the judgment of the Collateral Manager dependent upon the credit of a U.S. Federal agency backed by the full faith and credit of the United States; *provided* that any Asset-Backed Security falling within this definition shall be excluded from the definition of each other type of Asset-Backed Security.

(c)     Capitalized terms incorporated herein by reference to defined terms in the Senior Swap Agreement shall, with respect to a Prior Senior Swap Counterparty and where the context requires, continue to have the meanings specified in the Prior Senior Swap Agreement relating to such Prior Senior Swap Counterparty as if they were defined herein notwithstanding the occurrence of a Senior Swap Early Withdrawal Date with respect to such Prior Senior Swap Counterparty.

1.2     Assumptions as to Collateral Debt Securities, Etc.

(a)     The provisions set forth in this Section 1.2 shall be applied in connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Security, or any payments on any other assets included in the Collateral, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Securities and on any other amounts that may be received for deposit in the Collection Accounts.

(b)     All calculations with respect to Scheduled Distributions on the Pledged Securities securing the Notes and any determination of the Average Life of any Collateral Debt Security, and any determination of the rate at which interest accrues on any Pledged Security, shall be made by the Collateral Manager using (in the case of the Collateral Debt Securities) the assumptions that (i) no Pledged Security defaults or is sold except for Pledged Securities that the Collateral Manager has identified for sale during the relevant Due Period and the sale of which, in the Collateral Manager's reasonable business judgment, is expected to be settled in whole on or prior to the last day of the current Due Period, (ii) prepayment of any Pledged Security during any month occurs at a rate equal to the average rate of prepayment (expressed as a percentage of the applicable pricing prepayment curve calculated as of the last Determination Date) during the period of six consecutive months immediately preceding the current month (or, with respect to any Pledged Security that has not been outstanding for at least six consecutive calendar months, at the rate of prepayment assumed at the time of issuance of such Pledged Security), (iii) any

clean-up call with respect to a Pledged Security will be exercised when economic to the Person or Persons entitled to exercise such call and (iv) no other optional redemption of any Pledged Security will occur except for those that have actually occurred or as to which irrevocable notice thereof shall have been given.

(c)     For purposes of determining compliance with the Overcollateralization Tests, except as otherwise specified in the Overcollateralization Tests, there shall be excluded all scheduled payments (whether of principal, interest, fees or other amounts) including payments to the Issuer in respect of Defaulted Securities, Deferred Interest PIK Bonds or any Hedge Agreement, as to which the Collateral Manager or the Issuer has determined in its reasonable business judgment will not be made in Cash or will not be received when due.

(d)     For purposes of calculating the Interest Coverage Ratios, expected interest payments on the Collateral Debt Securities and the Eligible Investments will not include any scheduled interest payments which the Collateral Manager expects will not be made in cash during the applicable Due Period (including on any assets currently deferring interest unless and until such assets actually pay interest) and amounts scheduled to be received under any Hedge Agreement which the Collateral Manager expects will not be made prior to the applicable Quarterly Distribution Date.

(e)     For each Due Period, the Scheduled Distribution on any Pledged Security (other than (i) a Defaulted Security, (ii) a Written-Down Security or (iii) a Deferred Interest PIK Bond, which, in each case except as otherwise provided herein, shall be assumed to have a Scheduled Distribution of zero) shall be the sum (without duplication) of (x) the total amount of payments and collections in respect of such Pledged Security (including Sale Proceeds arising from the Sale of such Pledged Security received during the Due Period and not reinvested in Collateral Debt Securities or retained in the Principal Collection Account for subsequent reinvestment pursuant to Section 12.2 and expected Sale Proceeds from Collateral Debt Securities, the sale of which the Collateral Manager expects will be settled in whole on or prior to the last day of the current Due Period,) that, if paid as scheduled, will be available in the Collection Accounts at the end of the Due Period for payment on the Notes and of certain expenses of the Issuer and the Co-Issuer *plus* (y) any such amounts received in prior Due Periods that were not disbursed on a previous Quarterly Distribution Date (provided that such sum shall be computed without regard to any amounts excluded from the determination of compliance with the Overcollateralization Tests pursuant to Section 1.2(c)).

(f)     Subject to Section 1.2(c), each Scheduled Distribution receivable with respect to a Pledged Security shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Interest Collection Account or the Principal Collection Account, as the case may be, and, except as otherwise specified, to earn interest at the Assumed Reinvestment Rate; *provided* that if the presence of a legal or business holiday (whether pursuant to this Indenture or pursuant to the terms of any Underlying Instrument) causes a Scheduled Distribution with respect to a Pledged Security to be received in the period between the end of the Due Period in which such Scheduled Distribution would otherwise have been received and the related Quarterly Distribution Date, such Scheduled Distribution will be deemed to have been received during such Due Period. All such funds shall be assumed to continue to earn interest until the date on which they are required to be available

in the Collection Accounts for transfer to the Payment Account and application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable pursuant to this Indenture.

(g)     With respect to any Collateral Debt Security as to which any interest or other payment thereon is subject to withholding tax of any Relevant Jurisdiction, each Distribution thereon shall, for purposes of the Coverage Tests and the Collateral Quality Tests, be deemed to be payable net of such withholding tax unless the issuer thereof or obligor thereon is required to make additional payments sufficient on an after tax basis to cover any withholding tax imposed on payments to the Issuer with respect thereto. On any date of determination, the amount of any Scheduled Distribution due on any future date shall be assumed to be made net of any such uncompensated withholding tax based upon withholding tax rates in effect on such date of determination.

(h)     Any reference to the fee payable to the Trustee or in the definition of "Senior Collateral Management Fee" or "Subordinated Collateral Management Fee" in Section 1.1(a) to an amount calculated with respect to a period at per annum rate shall be computed on the basis of a 360-day year of twelve 30-day months.

(i)     For the purpose of determining any payment to be made on any Quarterly Distribution Date pursuant to any applicable clause of Section 11.1(i) or (ii), any Coverage Test referred to in such clause shall be calculated as of the relevant Quarterly Distribution Date after giving effect to all payments to be made on such Quarterly Distribution Date prior to such payment in accordance with Section 11.1(i) or (ii).

(j)     For the purpose of all calculations made under this Indenture or the Senior Swap Agreement which are based on the Remaining Exposure under the CDS Agreement Transactions, the Trustee and the Issuer shall assume that the Remaining Exposure is the amount (if positive) equal to (i) the Remaining Exposure shown on the most recent report delivered by the Credit Default Swap Counterparty *plus* (ii) the aggregate initial Notional Amount of all CDS Agreement Transactions that are not Short Synthetic Securities which the Issuer entered into since the date of such report *plus* (iii) the sum of any Principal Reimbursements paid to the Issuer under CDS Agreement Transactions since the date of such report *minus* (iv) the sum of any Principal Reimbursements paid by the Issuer under CDS Agreement Transactions that are related Short Synthetic Securities since the date of such report *minus* (v) the aggregate Notional Amount of CDS Agreement Transactions that are not related Short Synthetic Securities or CDS Agreement Transactions hedged by Short Synthetic Securities which have terminated since the date of such report *minus* (vi) the aggregate initial Notional Amount of all related Short Synthetic Securities which the Issuer entered into since the date of such report. Alternatively, the Trustee or the Issuer may request a statement from the Credit Default Swap Counterparty of the Remaining Exposure and may rely on such statement in making any calculation hereunder or under the Senior Swap Agreement.

(k)     Unless otherwise specified, all percentages resulting from test calculations shall be rounded, if necessary, to the nearest 1/100th of a percentage point and all numbers shall be rounded, if necessary, to the nearest 1/100th.

(l)     Unless otherwise specifically provided herein, all calculations required to be made and all reports which are to be prepared pursuant to this Indenture shall be made on the basis of the trade date for the acquisition, purchase, sale, disposition, liquidation or other transfer of an asset.

1.3     Rules of Construction.

Unless the context otherwise clearly requires:

(a)     the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)     whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)     the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)     the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)     any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(f)     any reference herein to any Person, or to any Person in a specified capacity, shall be construed to include such Person's successors and assigns or such Person's successors in such capacity, as the case may be; and

(g)     all references in this instrument to designated "Sections," "clauses" and other subdivisions are to the designated Sections, clauses and other subdivisions of this instrument as originally executed, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Section, clause or other subdivision.

## 2.     THE SECURED NOTES

2.1     Forms Generally.

(a)     Notes offered and sold in reliance on Regulation S (each, a "**Regulation S Note**") shall be issued in fully Registered Form without interest coupons and, substantially in the form of the note attached as Exhibit A-1 (each, a "**Regulation S Global Note**") with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, which shall be deposited with the Trustee, as custodian for DTC and registered in the name of DTC or a nominee of DTC, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.  The Aggregate Outstanding Amount of each Regulation S Global Note

may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as the case may be.

(b)     Notes offered and sold in the United States pursuant to an exemption from the registration requirements of the Securities Act under Rule 144A ("**Restricted Notes**") shall be issued in fully Registered Form without interest coupons and substantially in the form of the note attached as <u>Exhibit A-2</u> (each, a "**Restricted Global Note**"), with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, which shall be deposited with the Trustee, as custodian for DTC and registered in the name of DTC or a nominee of DTC, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.  The Aggregate Outstanding Amount of each Restricted Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as the case may be.  Interests in Restricted Global Notes will be shown on, and transfers thereof will be effected only through, records maintained by DTC and its direct and indirect participants.

(c)     Regulation S Global Notes and Restricted Global Notes may also be exchanged under the limited circumstances set forth in <u>Section 2.4</u> for notes in definitive fully Registered Form without interest coupons, substantially in the form of the certificated note attached as <u>Exhibit A-3</u> (each a "**Definitive Note**"), which may be either a Regulation S Definitive Note or a Restricted Definitive Note, with such legends as may be applicable thereto, which shall be duly executed by the Issuer and the Co-Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.

(d)     The Co-Issuers in issuing the Notes may use "CUSIP," "ISIN" or "private placement" numbers (if then generally in use), and, if so, the Trustee will indicate the "CUSIP," "ISIN" or "private placement" numbers of the Notes in notices of redemption and related materials as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption and related materials.

2.2     <u>Authorized Amount; Note Interest Rate; Stated Maturity; Denominations</u>.

(a)     The aggregate principal amount of Notes which may be issued under this Indenture may not exceed U.S.$437,400,000, excluding (i) Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.4, 2.5 or 8.5 and (ii) additional Notes issued in accordance with the provisions of Section 2.9.

(b)     Such Notes shall be divided into five Classes, in each case having designations, original principal amounts, Note Interest Rates and Stated Maturities set forth in the table below:

| Designation | Original Principal Amounts | Note Interest Rate | Note Stated Maturity |
|---|---|---|---|
| Class A Notes | U.S.$150,000,000 | 3-month LIBOR + 0.42% | November 6, 2046 |
| Class B Notes | U.S.$82,500,000 | 3-month LIBOR + 0.52% | November 6, 2046 |
| Class C Notes | U.S.$90,000,000 | 3-month LIBOR + 1.40% | November 6, 2046 |
| Class D Notes | U.S.$52,500,000 | 3-month LIBOR + 3.30% | November 6, 2046 |
| Class X Notes | U.S.$62,400,000 | 6.00% | November 6, 2046 |

The Notes will be issuable in minimum denominations of U.S.$500,000 and, in each case, only in integral multiples of U.S.$1,000 in excess of such minimum denominations.

(c)     Interest shall accrue on the Aggregate Outstanding Amount of each Class of Notes (determined as of the first day of each Interest Period and after giving effect to any payment of principal occurring on such day) from the Closing Date until such Notes are paid in full and will be payable in arrears on each Quarterly Distribution Date. To the extent lawful and enforceable, interest shall accrue on Defaulted Interest in respect of any Note at the Note Interest Rate applicable to such Note until such Defaulted Interest is paid in full. Interest accruing for any Interest Period shall accrue for the period from and including the first day of such Interest Period to but excluding the last day of such Interest Period. Interest on the Senior Notes and interest on the Defaulted Interest in respect thereof will be computed on the basis of a 360-day year and the actual number of days elapsed. Interest on the Class X Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

(d)     The Notes shall be redeemable as provided in Sections 9 and 12.

(e)     The Depositary for the Global Notes shall initially be DTC.

(f)     The Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers executing such Notes as evidenced by their execution of such Notes.

(g)     For all purposes hereof, all of the Class A Notes are entitled to receive payments *pari passu* among themselves, all of the Class B Notes are entitled to receive payments *pari passu* among themselves, all of the Class C Notes are entitled to receive payments *pari passu* among themselves, all of the Class D Notes are entitled to receive payments *pari passu* among themselves, all of the Class X Notes are entitled to receive payments *pari passu* among themselves and all of the Preference Shares are entitled to receive payments *pari passu* among themselves, in each case based upon the respective outstanding principal amounts thereof.

2.3     Execution, Authentication, Delivery and Dating.

(a)     The Notes shall be executed on behalf of the Co-Issuers by an Authorized Officer of each of the Co-Issuers. The signatures of such Authorized Officers on the Notes may be manual or facsimile (including in counterparts).

(b)     Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of either of the Co-Issuers shall bind such Person, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the

authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

(c)     At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver Notes executed by the Co-Issuers to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

(d)     Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date.  All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(e)     Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original aggregate principal amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced.  In the event that any Note is divided into more than one Note in accordance with this Section 2, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Notes.

(f)     No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication (the "**Certificate of Authentication**"), substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual or facsimile signature of one of their Authorized Officers.  Such certificate upon any Note and registration in the Note Register shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

(g)     <u>Book-Entry Provisions</u>.  This Section 2.3(g) shall apply only to Global Notes deposited with or on behalf of the Depositary.

The Co-Issuers shall execute and the Trustee shall, in accordance with this Section 2.3(g), authenticate and deliver initially one or more Global Notes, as applicable, that (i) shall be registered in the name of the nominee of the Depositary for such Global Notes and (ii) shall be delivered by the Trustee to such Depositary or pursuant to such Depositary's instructions or held by the Trustee as custodian for the Depositary.

Depositary Participants shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Trustee, as custodian for the Depositary or under the Global Note, as applicable, and the Depositary shall be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of such Global Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as

between the Depositary and the Depositary Participants, the operation of customary practices governing the exercise of the rights of a Holder of any Global Note.

(h) <u>Certificated Notes</u>. Except as provided in <u>Section 2.4</u>, owners of beneficial interests in Global Notes will not be entitled to receive physical delivery of certificated Notes.

2.4 <u>Registration, Transfer and Exchange of Notes</u>.

(a) <u>Registration of Notes</u>. The Trustee is hereby appointed as the registrar of the Notes (the "**Note Registrar**"). The Trustee is hereby appointed as a Transfer Agent with respect to the Notes. The Note Registrar shall keep, on behalf of the Issuer, a register (the "**Note Register**") for the Notes in its Corporate Trust Office in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of and the registration of transfers of Notes. Upon any resignation or removal of the Note Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of the Note Registrar. The Co-Issuers may not terminate the appointment of the Note Registrar or any Transfer Agent or appoint a new Note Registrar or Transfer Agent without the consent of a Majority of the Controlling Class.

Except as otherwise set forth in this <u>Section 2.4</u>, upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers to be maintained as provided in <u>Section 7.2</u>, the Co-Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like aggregate principal amount.

At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal amount, upon surrender of the Notes to be exchanged at such office or agency. Whenever any Note is surrendered for exchange, the Co-Issuers shall execute and the Trustee shall authenticate and deliver the Notes that the Noteholder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Co-Issuers evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Co-Issuers and the Note Registrar duly executed, by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith and expenses of delivery (if any) not made by regular mail.

(b)  Transfers of Notes.

(i)  Subject to <u>Section 2.4(b)(iv)</u>, exchanges or transfers of beneficial interests in a Global Note may be made only in accordance with the rules and regulations of the Depositary and the transfer restrictions contained in the legend on such Global Note and exchanges or transfers of interests in a Global Note may be made only in accordance with the following:

(A)  Subject to clauses (B) through (F) of this <u>Section 2.4(b)(i)</u>, transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.

(B)  The Trustee shall cause the exchange or transfer of any beneficial interest in a Regulation S Global Note for a beneficial interest in a Restricted Global Note upon provision to the Trustee and the Issuer of a written certification in substantially the form of <u>Exhibit B-1</u> (a "**Rule 144A Transfer Certificate**").

(C)  The Trustee shall cause the exchange or transfer of any beneficial interest in a Restricted Global Note for a beneficial interest in a Regulation S Global Note upon provision to the Trustee and the Issuer of a written certification substantially in the form of <u>Exhibit B-2</u> (a "**Regulation S Transfer Certificate**");

(D)  An owner of a beneficial interest in a Regulation S Global Note may transfer such interest in the form of a beneficial interest in such Regulation S Global Note without the provision of written certification;

(E)  An owner of a beneficial interest in a Restricted Global Note may transfer such interest in the form of a beneficial interest in such Restricted Global Note without the provision of written certification;

(F)  In the event Definitive Notes are issued pursuant to <u>Section 2.4(b)(v)</u>, the Trustee shall cause the transfer of (i) any beneficial interest in a Global Note for a Definitive Note that is a Regulation S Note (a "**Regulation S Definitive Note**"), upon provision to the Trustee and the Issuer of a Regulation S Transfer Certificate or (ii) any beneficial interest in a Global Note for a Definitive Note that is a Restricted Note (a "**Restricted Definitive Note**"), upon provision to the Trustee and the Issuer of a Rule 144A Transfer Certificate;

(ii)  Subject to <u>Section 2.4(b)(iv)</u>, in the event Definitive Notes are issued pursuant to <u>Section 2.4(b)(v)</u>, the Trustee shall cause the transfer of (i) any Definitive Note for a beneficial interest in a Regulation S Global Note, upon provision to the Trustee and the Issuer of a Regulation S Transfer Certificate or (ii) any Definitive Note for a beneficial interest in a Restricted Global Note, upon provision to the Trustee and the Issuer of a Rule 144A Transfer Certificate.

(iii)  Upon acceptance for exchange or transfer of a beneficial interest in a Global Note for a Definitive Note, or upon acceptance for exchange or transfer of a

Definitive Note for a beneficial interest in a Global Note, each as provided herein, the Trustee shall instruct the Depositary to adjust the principal amount of such Global Note on its records to evidence the date of such exchange or transfer and the change in the principal amount of such Global Note.

(iv)     Subject to the restrictions on transfer and exchange set forth in this Section 2.4 and to any additional restrictions on transfer or exchange specified in the Definitive Notes, the Noteholder of any Definitive Note may transfer or exchange the same in whole or in part (in a principal amount equal to the minimum authorized denomination or any larger authorized amount) by surrendering such Definitive Note at the Corporate Trust Office or at the office of any Transfer Agent, together with (x) in the case of any transfer, an executed instrument of assignment and (y) in the case of any exchange, a written request for exchange.  Following a proper request for transfer or exchange, the Trustee shall (provided it has available in its possession an inventory of Definitive Notes), within five Business Days of such request if made at such Corporate Trust Office, or within ten Business Days if made at the office of a Transfer Agent (other than the Trustee), authenticate and make available at such Corporate Trust Office or at the office of such Transfer Agent, as the case may be, to the transferee (in the case of transfer) or Noteholder (in the case of exchange) or send by first class mail (at the risk of the transferee in the case of transfer or Noteholder in the case of exchange) to such address as the transferee or Noteholder, as applicable, may request, a Definitive Note or Notes, as the case may require, for a like aggregate principal amount and in such authorized denomination or denominations as may be requested.  The presentation for transfer or exchange of any Definitive Note shall not be valid unless made at the Corporate Trust Office or at the office of a Transfer Agent by the registered Noteholder in person, or by a duly authorized attorney-in-fact.  Beneficial interests in Global Notes shall be exchangeable for Definitive Notes only under the limited circumstances described in Section 2.4(b)(v).

(v)     Interests in a Global Note deposited with or on behalf of the Depositary pursuant to Section 2.1 hereunder shall be transferred (A) to the owners of such interests in the form of Definitive Notes only if such transfer otherwise complies with this Section 2.4 (including clauses (b)(i) and (b)(ii)) and (1) the Depositary notifies the Issuer that it is unwilling or unable to continue as Depositary for the Notes, (2) the Depositary ceases to be a "clearing agency" registered under the Exchange Act and a successor Depositary is not appointed by the Issuer within 90 days of such notice, (3) if the transferee of an interest in a Global Note is required by law to take physical delivery of securities in definitive form, (4) there is an Event of Default under the Notes or (5) if the transferee is unable to pledge its interest in a Global Note or (B) to the purchaser thereof in the form of one or more Definitive Notes in accordance with the provisions of Section 2.4(b)(i).

(vi)     If interests in any Global Note are to be transferred to the Beneficial Owners thereof in the form of Definitive Notes pursuant to Section 2.4(b)(v), such Global Note shall be surrendered by the Depositary, or its custodian on its behalf, to the Corporate Trust Office or to the Transfer Agent located in Chicago, Illinois, and the Trustee shall authenticate and deliver without charge, upon such transfer of interests in

such Global Note, an equal aggregate principal amount of Definitive Notes of authorized denominations. The Definitive Notes transferred pursuant to this Section 2.4 shall be executed, authenticated and delivered only in the denominations specified in Section 2.2(b) and registered in such names as the Depositary shall direct in writing.

(vii)     For so long as one or more Global Notes are Outstanding:

(A)     the Trustee and its directors, Officers, employees and agents may deal with the Depositary for all purposes (including the making of distributions on, and the giving of notices with respect to, the Global Notes);

(B)     unless otherwise provided herein, the rights of Beneficial Owners shall be exercised only through the Depositary and shall be limited to those established by law and agreements between such Beneficial Owners and the Depositary;

(C)     for purposes of determining the identity of and principal amount of Notes beneficially owned by a Beneficial Owner, the records of the Depositary shall be conclusive evidence of such identity and principal amount and the Trustee may conclusively rely on such records when acting hereunder;

(D)     the Depositary will make book-entry transfers among its Depositary Participants and will receive and transmit distributions of principal of and interest on the Global Notes to such Depositary Participants; and

(E)     the Depositary Participants shall have no rights under this Indenture under or with respect to any of the Global Notes held on their behalf by the Depositary, and the Depositary may be treated by the Trustee and its agents, employees, officers and directors as the absolute owner of the Global Notes for all purposes whatsoever.

(c)     Legends.  Any Note issued upon the transfer, exchange or replacement of Notes shall bear such applicable legend set forth in the relevant Exhibit hereto unless there is delivered to the Trustee, the Note Registrar, Collateral Manager, the Issuer and the Co-Issuer such satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required by any of the Trustee, the Note Registrar, Collateral Manager, the Issuer and the Co-Issuer to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A or Regulation S, as applicable, and to ensure that neither of the Co-Issuers nor the pool of Collateral becomes an investment company required to be registered under the Investment Company Act.  Upon provision of such satisfactory evidence, the Trustee, at the direction of the Collateral Manager, the Issuer and (in the case of any Note) the Co-Issuer, shall authenticate and deliver Notes that do not bear such applicable legend.

(d)     Withholding Certification.  The Holder understands that each of the Co-Issuers, the Trustee or any Paying Agent shall require certification acceptable to it (i) as a condition to the payment of principal of and interest on any Notes without, or at a reduced rate of, U.S. withholding or backup withholding tax, and (ii) to enable each of the Co-Issuers, the Trustee and

any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Notes or the Holder of such Notes under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). In addition, each of the Co-Issuers, the Trustee or any Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each Holder agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

(e)     Tax Treatment.  Each Holder hereby agrees that, for purposes of U.S. federal, state and local income and franchise tax and any other income taxes, (i) the Issuer will be treated as a corporation, (ii) the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class X Notes will be treated as indebtedness of the Issuer, and (iii) the Preference Shares will be treated as equity in the Issuer; the Holder agrees to such treatment and agrees to take no action inconsistent with such treatment, unless required by law.

(f)     Expenses; Acknowledgment of Transfer.  Transfer, registration and exchange shall be permitted as provided in this Section 2.4 without any charge to the Noteholder except for the expenses of delivery (if any) not made by regular mail.  Registration of the transfer of a Note by the Trustee shall be deemed to be the acknowledgment of such transfer on behalf of the Co-Issuers.

(g)     Surrender upon Final Payment.  Upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office of the Trustee or at the office of any Paying Agent.

(h)     Repurchase and Cancellation of Notes.  The Co-Issuers will not purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the Outstanding Notes except upon the redemption of the Notes in accordance with the terms of this Indenture and the Notes.  The Co-Issuers will promptly cancel all Notes acquired by them pursuant to any payment, purchase, redemption, prepayment or other acquisition of Notes pursuant to any provision of this Indenture and no Notes may be issued in substitution or exchange for any such Notes.

(i)     Compliance with Transfer Restrictions.  Notwithstanding anything contained herein to the contrary, neither the Trustee nor the Note Registrar shall be responsible for ascertaining whether any transfer complies with the registration provisions of or exemptions from the Securities Act, applicable state securities laws, the rules of any Depositary, ERISA, the Code or the Investment Company Act; *provided* that if a certificate is specifically required by the express terms of this Section 2.4 to be delivered to the Trustee or the Note Registrar by a

purchaser or transferee of a Note, the Trustee or the Note Registrar, as the case may be, shall be under a duty to receive and examine the same to determine whether the certificate substantially complies on its face with the express terms of this Indenture and shall promptly notify the party delivering the same if such transfer does not comply with such terms. To the extent applicable to the Issuer, the Issuer shall impose additional transfer restrictions to comply with the USA PATRIOT Act, and any such transfer restrictions shall be binding on each Noteholder. The Issuer shall notify the Trustee and the Note Registrar of the imposition of any such transfer restrictions.

(j)     <u>Flow Through Investment Vehicles; Qualified Purchaser Status</u>. No transfer of a Note may be made to a Flow Through Investment Vehicle other than a Qualifying Investment Vehicle. Any purported transfer that is not in compliance with this <u>Section 2.4</u> will be void and shall not be given effect for any purpose hereunder.

2.5     <u>Mutilated, Defaced, Destroyed, Lost or Stolen Notes</u>.

If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Co-Issuers, the Trustee and the Transfer Agent (each, a "**Specified Person**") evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (b) there is delivered to the Specified Persons such security or indemnity as may reasonably be required by them to save each of them harmless then, in the absence of notice to the Specified Persons that such Note has been acquired by a bona fide purchaser, the Co-Issuers shall execute and shall direct the Trustee to authenticate, and upon Issuer Request the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note of the same Class as such mutilated, defaced, destroyed, lost or stolen Note, of like tenor (including the same date of issuance) and equal principal amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a serial number not contemporaneously outstanding to the Noteholder.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Co-Issuers in their discretion may, instead of issuing a new Note, pay such Note without requiring surrender thereof *except* that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this <u>Section 2.5</u>, the Co-Issuers, the Trustee or any Transfer Agent may require the payment by the registered holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this <u>Section 2.5</u> in lieu of any mutilated, defaced, destroyed, lost or stolen Note, shall constitute an original additional contractual obligation of the Co-Issuers and such new Note shall be entitled, subject to the second paragraph of this <u>Section 2.5</u>, to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section 2.5 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

2.6     Payment of Principal and Interest; Rights Preserved.

(a)     Each Class of Notes shall accrue interest during each Interest Period applicable to such Class at the applicable Note Interest Rate specified in Section 2.2.  Interest on each Class of Notes shall be due and payable on each Quarterly Distribution Date; *provided* that (i) payment of interest on the Class B Notes is subordinated to the payment on each Quarterly Distribution Date of the interest due and payable on the Class A Notes (together with Defaulted Interest thereon and interest on such Defaulted Interest, if any), (ii) payment of interest on the Class C Notes is subordinated to the payment on each Quarterly Distribution Date of the interest due and payable on the Class A Notes and Class B Notes (together Deferred Interest and Defaulted Interest thereon and interest on Defaulted Interest, if any), (iii) payment of interest on the Class D Notes is subordinated to the payment on each Quarterly Distribution Date of the interest due and payable on the Class A Notes, the Class B Notes and the Class C Notes (together with Deferred Interest, Defaulted Interest thereon and interest on Defaulted Interest, if any) and (iv) payments of interest on all Notes are subordinated to the payment on each Quarterly Distribution Date of other amounts in accordance with the Priority of Payments.  Except as provided in Sections 5.5, 12.2 and 12.3, no payment shall be made by the Co-Issuers hereunder other than on a Quarterly Distribution Date.

So long as any Class A Notes or Class B Notes are Outstanding, any interest due on the Class C Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Quarterly Distribution Date shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Quarterly Distribution Date on which such interest is available to be paid in accordance with the Priority of Payments.  So long as any Class A Notes, Class B Notes or Class C Notes are Outstanding, any interest due on the Class D Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Quarterly Distribution Date shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Quarterly Distribution Date on which such interest is available to be paid in accordance with the Priority of Payments.  As provided pursuant to the terms of the Notes, any payments of the Class X Rated Interest or the Scheduled Class X Target Principal Amount on the Class X Notes which are not available to be paid as a result of the operation of the Priority of Payments on any Quarterly Distribution Date shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Quarterly Distribution Date on which amounts are available to be paid in accordance with the Priority of Payments.  Class C Deferred Interest on the Class C Notes accrued to any Quarterly Distribution Date shall bear interest at the Note Interest Rate applicable to such Class and shall be payable on the first Quarterly Distribution Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  Class D Deferred Interest on the Class D Notes accrued to any Quarterly Distribution Date shall bear interest at the Note Interest Rate applicable to such Class and shall be payable on the first Quarterly Distribution Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  Class X Deferred Interest on the Class X Notes accrued to any Quarterly Distribution Date shall bear interest at the Class X Stated Rate and shall be payable on the first Quarterly Distribution Date on which funds are permitted to be used for

such purpose in accordance with the Priority of Payments. Payments of the Scheduled Class X Target Principal Amount which have been deferred as a result of the operation of the Priority of Payments shall not accrue interest thereon.

(b)     The principal of each Note shall be payable no later than the Stated Maturity thereof unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise; *provided*, *further*, that, so long as any Class A Notes are Outstanding, except as provided in <u>Section 9</u> and the Priority of Payments, the payment of principal of the Class B Notes, Class C Notes and Class D Notes (x) may only occur after principal of the Class A Notes has been paid in full and (y) shall be subordinated to the payment on each Quarterly Distribution Date of the principal and interest due and payable on the Class A Notes and other amounts payable in accordance with the Priority of Payments; *provided*, *further*, that, so long as any Class A Notes and Class B Notes are Outstanding, except as provided in <u>Section 9</u> and the Priority of Payments, the payment of principal of the Class C Notes and Class D Notes (x) may only occur after principal of the Class A Notes and Class B Notes has been paid in full and (y) shall be subordinated to the payment on each Quarterly Distribution Date of the principal and interest due and payable on the Class A Notes, the Class B Notes and other amounts payable in accordance with the Priority of Payments; *provided*, *further*, that, so long as any Class A Notes, Class B Notes or Class C Notes are Outstanding, except as provided in <u>Section 9</u> and the Priority of Payments, the payment of principal of the Class D Notes (x) may only occur after principal of the Class A Notes, Class B Notes and Class C Notes has been paid in full and (y) shall be subordinated to the payment on each Quarterly Distribution Date of the principal and interest due and payable on the Class A Notes, the Class B Notes and the Class C Notes and other amounts payable in accordance with the Priority of Payments; and *provided*, *further* that any payment of principal of any Class of Notes (other than the most senior Class of Notes then Outstanding) which is not paid, in accordance with the Priority of Payments, on any Quarterly Distribution Date (other than the Stated Maturity or a Redemption Date) shall not be considered "due and payable" for purposes of <u>Section 5.1(a)</u> until the Quarterly Distribution Date on which such principal is required to be paid in accordance with the Priority of Payments.

(c)     So long as the Coverage Tests are satisfied and no Event of Default has occurred and is continuing, principal will not be payable on any Class of Notes except (i) upon the occurrence of an Optional Redemption or Tax Redemption, (ii) in accordance with the Priority of Payments, the case of the Class D Notes, a portion of Interest Proceeds will be applied to pay principal of the Class D Notes, (iii) upon the occurrence of a Ratings Confirmation Failure, (iv) if the Collateral Manager directs the Trustee to apply Principal Proceeds to redeem Senior Notes in accordance with clause (K) of <u>Section 11.1(ii)</u> and (v) after the Reinvestment Period, on each Quarterly Distribution Date principal will be payable from Principal Proceeds in accordance with the Priority of Payments.

(d)     As a condition to the payment of principal of and interest on any Note without the imposition of U.S. withholding tax, each of the Co-Issuers, the Trustee or any Paying Agent shall require certification acceptable to it to enable each of the Co-Issuers, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Note or the Holder of such Note under any present or future law or regulation of the Cayman Islands or the United

States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). In addition, each of the Co-Issuers, the Trustee or any Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each Holder agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments. The Issuer shall not be obligated to pay any additional amounts to the Holders or beneficial owners of the Notes as a result of deduction or withholding for or on account of any present or future taxes, duties, assessments or governmental charges with respect to the Notes.

(e)     Payments in respect of principal of and interest on the Notes shall be payable by wire transfer in immediately available funds to a Dollar account maintained by the Noteholders in accordance with wire transfer instructions received by any Paying Agent on or before the Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States mailed by first class mail to the address of such Noteholder as it appears on the Note Register at the close of business on the Record Date for such payment.

(f)     The principal of and interest on any Note which is payable on a Redemption Date or in accordance with the Priority of Payments on a Quarterly Distribution Date and is punctually paid or duly provided for on such Redemption Date or Quarterly Distribution Date shall be paid to the Person in whose name that Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such payment. All such payments that are mailed or wired and returned to the Paying Agent shall be held for payment as herein provided at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2.

Payments to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of such Class registered in the name of each such Holder on the Record Date for such payment bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date.

(g)     Payment of any Defaulted Interest may be made in any other lawful manner in accordance with the Priority of Payments if notice of such payment is given by the Trustee to the Co-Issuers and the Noteholders, and such manner of payment shall be deemed practicable by the Trustee.

(h)     All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Quarterly Distribution Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note

issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i)     Notwithstanding anything to the contrary contained herein, the obligations of the Co-Issuers under the Notes and this Indenture are limited-recourse obligations of the Co-Issuers, secured by and payable solely from the proceeds of the Collateral, and following realization of the Collateral, any claims of the Noteholders and the other Secured Parties shall be extinguished and shall not thereafter revive.  No recourse shall be had against any Officer, member, director, employee, security holder or incorporator of the Co-Issuers or their respective successors or assigns for the payment of any amounts payable under the Notes or this Indenture.  It is understood that the foregoing provisions of this <u>Section 2.6(i)</u> shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished.  It is further understood that the foregoing provisions of this <u>Section 2.6(i)</u> shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person.

(j)     Subject to the foregoing provisions of this <u>Section 2.6</u> and the provisions of <u>Sections 2.4</u> and <u>2.5</u>, each Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest and principal that were carried by such other Note.

(k)     Interest on Defaulted Interest shall accrue at the applicable Note Interest Rate.

2.7     <u>Persons Deemed Owners</u>.

The Co-Issuers, the Trustee and any agent of any of them (collectively, the "**Relevant Persons**") shall treat the Person in whose name any Note on the Note Register is registered as the owner of such Note on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and no Relevant Person shall be affected by notice to the contrary.

2.8     <u>Cancellation</u>.

All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, shall promptly be canceled by it and may not be reissued or resold.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this <u>Section 2.8</u>, except as expressly permitted by this Indenture.  All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Co-Issuers shall direct by an Issuer Order that they be returned to it.  Any Notes purchased by the Co-Issuers shall be immediately delivered to the Trustee for cancellation.

2.9     Additional Issuance of Notes.

Prior to the end of the Reinvestment Period, subject to the prior consent of the Collateral Manager, each Senior Swap Counterparty, a Majority of the Controlling Class, a Special-Majority-in-Interest of Preference Shareholders (including, for such purpose, any applicable Collateral Manager Securities) and the Credit Default Swap Counterparty, the Co-Issuers may, in one or more issuances, issue and sell additional Notes having an Aggregate Outstanding Amount up to but not exceeding 100% of the original Aggregate Outstanding Amount of the Notes, in accordance with the terms of this Indenture; *provided* that with respect to any such additional issuance (an "**Additional Issuance**") the following additional conditions are met: (i) the Initial Ratings of the Notes as of the Closing Date have not been reduced or withdrawn; (ii) the Rating Condition shall have been satisfied with respect to such issuance; (iii) the additional Notes are issued for Cash and the net proceeds of such additional issuance are used to purchase additional Collateral Debt Securities and, if applicable, to enter into Hedge Agreements; (iv) the Notes of each Class are issued *pro rata* in accordance with the initial Aggregate Outstanding Amount of the respective Classes of Notes; (v) in connection with such issuance of Notes, the Issuer issues additional Preference Shares having terms substantially the same as those of the Preference Shares issued on the Closing Date for Cash in an amount such that, after giving effect to the issuance of the Notes and Preference Shares, the ratio of Preference Shares to Notes is equal to or greater than the ratio of Preference Shares to Notes on the Closing Date and uses the net proceeds of such issuance of Preference Shares to purchase additional Collateral Debt Securities and, if applicable, to enter into Hedge Agreements; (vi) the terms and conditions of the additional Notes of each Class are identical to those of the initial Notes of such Class (except that (1) the issue price may be different from that of the initial price of such Class of Notes and (2) the interest due on the additional Notes will accrue from the issue date of such additional Notes and will be payable commencing on the first Quarterly Distribution Date following the issue date of such additional Notes); (vii) the additional Notes of each Class rank *pari passu* in all respects with the initial Notes of such Class; (viii) the Aggregate Outstanding Amount of the additional Notes issued in connection with such issuance is not less than 5% of the initial Aggregate Outstanding Amount of the Notes; (ix) the Issuer shall have obtained advice from Cadwalader, Wickersham & Taft LLP or an Opinion of Counsel of other nationally recognized U.S. tax counsel experienced in such matters that (1) such additional issuance will not cause the Issuer to be engaged in a U.S. trade or business or otherwise subject to U.S. federal income taxation on a net income basis, (2) such additional issuance will not adversely affect the tax characterization of any outstanding Class of Notes as characterized at the time of issuance and (3) any such additional Notes will be accorded the same tax characterization for U.S. federal income tax purposes as the original Notes of such Class, (x) the additional Notes of each Class will, to the extent reasonably practicable, be offered first to holders of Notes of such Class in such amounts as are necessary to preserve their *pro rata* holding of Notes of such Class and (xi) the Issuer (or the Collateral Manager on its behalf) shall have delivered to the Trustee an Officer's Certificate certifying that the foregoing conditions have been met.

### 3. CONDITIONS PRECEDENT

3.1    <u>General Provisions</u>.

The Notes may be executed by the Co-Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee (or an Authenticating Agent on its behalf) upon Issuer Request, upon receipt by the Trustee (and, in the case of clause (f) below, Moody's) of the following:

(a)    (i)    an Officer's certificate of the Issuer, (A) evidencing the authorization by Resolution of the execution and delivery of, and the performance of the Issuer's obligations under, this Indenture, the Collateral Administration Agreement, the Credit Default Swap Agreement, the Account Control Agreement, the Senior Swap Agreement, the Preference Share Paying Agency Agreement, the Collateral Management Agreement and the Hedge Agreements, in each case as may be amended on or prior to, and as in effect on, the Closing Date, and the execution, authentication and delivery of the Notes and the issuance of the Preference Shares and specifying the Stated Maturity, the original principal amount and the Note Interest Rate with respect to each Class of Notes to be authenticated and delivered, and (B) certifying that (1) the attached copy of such Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon; and

(ii)    an Officer's certificate of the Co-Issuer (A) evidencing the authorization by Resolution of the execution and delivery of, and the performance of the Co-Issuer's obligations under, this Indenture, as may be amended on or prior to, and as in effect on, the Closing Date, and the execution, authentication and delivery of the Notes and specifying the Stated Maturity, the principal amount and Note Interest Rate of each Class of Notes to be authenticated and delivered, and (B) certifying that (1) the attached copy of such Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b)    (i) either (A) a certificate of the Issuer, or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel to the Issuer satisfactory in form and substance to the Trustee on which the Trustee is entitled to rely to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes and the Preference Shares, or (B) an Opinion of Counsel to the Issuer satisfactory in form and substance to the Trustee to the effect that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Notes and the Preference Shares except as may have been given; and

(ii)    either (A) a certificate of the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of

Counsel to the Co-Issuer satisfactory in form and substance to the Trustee on which the Trustee is entitled to rely to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes, or (B) an Opinion of Counsel to the Co-Issuer satisfactory in form and substance to the Trustee that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Notes except as may have been given;

(c)     (i) an opinion of Cadwalader, Wickersham & Taft LLP, special New York counsel to the Co-Issuers, dated the Closing Date, substantially in the form of Exhibit D;

(ii)     an opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit E;

(iii)     an opinion of Bell, Boyd & Lloyd LLC, counsel to the Collateral Manager (including with respect to Delaware law), dated the Closing Date, substantially in the form of Exhibit F;

(iv)     an opinion of in-house counsel to the Trustee, dated the Closing Date, substantially in the form of Exhibit G;

(v)     an opinion of Kennedy Covington Lobdell & Hickman, L.L.P., counsel to the Trustee, dated the Closing Date, substantially in the form of Exhibit H;

(vi)     an opinion of Seyfarth Shaw LLC, local counsel to the Trustee, dated the Closing Date, substantially in the form of Exhibit I;

(vii)     an opinion of in-house counsel to the Credit Default Swap Counterparty, dated the Closing Date, substantially in the form of Exhibit J; and

(viii)     an opinion of in-house counsel to the Senior Swap Counterparty, dated the Closing Date, substantially in the form of Exhibit K.

(d)     an Officer's certificate of the Issuer, stating that the Issuer is not in Default under this Indenture and that the issuance of the Notes and the Preference Shares will not result in a breach of any of the terms, conditions or provisions of, or constitute a Default under, the Issuer Charter, any indenture or other agreement or instrument to which the Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or by which it may be bound or to which it may be subject; that no Event of Default shall have occurred and be continuing; that all of the representations and warranties contained herein are true and correct as of the Closing Date; that all conditions precedent provided in this Indenture and the Preference Share Paying Agency Agreement relating to the authentication and issuance of the Notes and the delivery of the Preference Shares applied for (including in Section 3.2) have been complied with; and that all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid;

(e)     an Officer's certificate of the Co-Issuer stating that the Co-Issuer is not in Default under this Indenture and that the issuance of the Notes will not result in a breach of any of the

terms, conditions or provisions of, or constitute a Default under, the Certificate of Formation or operating agreement of the Co-Issuer, any indenture or other agreement or instrument to which the Co-Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Co-Issuer is a party or by which it may be bound or to which it may be subject; that no Event of Default shall have occurred and be continuing; that all of the representations and warranties contained herein are true and correct as of the Closing Date; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes applied for have been complied with; and that all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid;

(f)    an Accountant's Report (A) confirming the information (other than the Principal Balance and the Purchase Price) with respect to each Collateral Debt Security set forth in the Schedule of Closing Collateral Debt Securities attached hereto as <u>Schedule A</u> and the information provided by the Issuer with respect to every other asset forming part of the Collateral, by reference to such sources as shall be specified therein, and confirming that each Collateral Debt Security satisfies paragraphs (2) through (6), (11), (12) and (21) through (36) of the Eligibility Criteria, (B) confirming that the Aggregate Principal Balance of the Collateral Debt Securities which the Issuer has purchased or entered into binding commitments to purchase on or prior to the Closing Date is at least equal to 90% of the Aggregate Ramp-Up Par Amount, (C) confirming the results of each Collateral Quality Test other than the Moody's Asset Correlation Test and the Standard & Poor's CDO Monitor Test as of the Closing Date and that the Issuer is in compliance with those Collateral Quality Tests for which compliance is mandatory as of the Closing Date, (D) confirming each of the Overcollateralization Ratios on the Closing Date and (E) specifying the procedures undertaken by them to review data and computations relating to the foregoing statements;

(g)    an executed counterpart of the Collateral Administration Agreement, the Note Purchase Agreement, the Placement Agreement, the Credit Default Swap Agreement, the Senior Swap Agreement, the Account Control Agreement and the Collateral Management Agreement, together with each document to be delivered on the Closing Date pursuant thereto;

(h)    [Reserved];

(i)    delivery of the Financing Statement for filing with the Recorder of Deeds in the District of Columbia;

(j)    evidence of the registration of a charge against the Issuer in the Cayman Islands;

(k)    an executed copy of the Preference Share Paying Agency Agreement;

(l)    an Issuer Order executed by the Issuer and the Co-Issuer directing the Trustee to (i) authenticate the Notes specified therein, in the amounts set forth therein and registered in the name(s) set forth therein and (ii) deliver the authenticated Notes to the Issuer to hold on behalf of the Co-Issuer or as otherwise directed by the Issuer or the Co-Issuer;

(m)    executed copies of the Subscription Agreements between the Issuer and the purchasers of the Preference Shares; and

(n)     such other documents as the Trustee may reasonably require.

3.2     Security for Notes.

Prior to the issuance of the Notes on the Closing Date, the Issuer shall cause the following conditions to be satisfied:

(a)     Grant of Security Interest; Delivery of Collateral Debt Securities. The Grant pursuant to the Granting Clauses of this Indenture of all of the Issuer's right, title and interest in and to the Collateral and the transfer of all Collateral Debt Securities purchased by the Issuer on the Closing Date (as set forth in the Schedule of Closing Collateral Debt Securities) to the Trustee in the manner provided in Section 3.3(b).

(b)     Certificate of the Issuer. The delivery to the Trustee of a certificate of an Authorized Officer of the Issuer or the Collateral Manager, for and on behalf of the Issuer, dated as of the Closing Date, to the effect that, in the case of each Collateral Debt Security Granted to the Trustee for inclusion in the Collateral acquired by the Issuer on the Closing Date and immediately prior to the delivery thereof on the Closing Date:

(i)     the Issuer is the owner of such Collateral Debt Security free and clear of any liens, claims or encumbrances of any nature whatsoever except for those Granted pursuant to this Indenture and encumbrances arising from due bills, if any, with respect to interest, or a portion thereof, accrued on such Collateral Debt Security prior to the first payment date and owed by the Issuer to the seller of such Collateral Debt Security;

(ii)     the Issuer has acquired its ownership in such Collateral Debt Security in good faith, and in the exercise of its reasonable business judgment, without notice of any adverse claim (within the meaning given to such term by Section 8-102(a)(1) of the UCC), except as described in clause (i) above;

(iii)     the Issuer has not assigned, pledged or otherwise encumbered any interest in such Collateral Debt Security (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(iv)     in the case of each Collateral Debt Security, the Issuer has full right to Grant a security interest in and assign and pledge all of its right, title and interest in such Collateral Debt Security to the Trustee;

(v)     the information set forth with respect to such Collateral Debt Security in the Schedule of Closing Collateral Debt Securities is correct in all material respects;

(vi)     each Collateral Debt Security included in the Collateral satisfies the requirements of the definition of "Collateral Debt Security" and is transferred to the Trustee as required by Section 3.2(a);

(vii)     each Collateral Debt Security was acquired in accordance with all applicable requirements of Section 12.2; and

(viii) upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral (assuming that any Clearing Corporation, Securities Intermediary or other entity not within the control of the Issuer involved in the Grant of Collateral takes the actions required of it under Section 3.3(b) for perfection of that interest) and a Securities Entitlement with respect to Financial Assets.

(c)    Rating Letters.  The delivery to the Trustee of an Officer's certificate of the Issuer, to the effect that (i) attached thereto are true and correct copies of (A) a letter signed by Standard & Poor's confirming that the Class A Notes have been rated "AAA" by Standard & Poor's and a letter signed by Moody's confirming that the Class A Notes have been rated "Aaa" by Moody's, (B) a letter signed by Standard & Poor's confirming that the Class B Notes have been rated at least "AA" by Standard & Poor's and a letter signed by Moody's confirming that the Class B Notes have been rated at least "Aa2" by Moody's, (C) a letter signed by Standard & Poor's confirming that the Class C Notes have been rated at least "A" by Standard & Poor's and a letter signed by Moody's confirming that the Class C Notes have been rated at least "A2" by Moody's, (D) a letter signed by Standard & Poor's confirming that the Class D Notes have been rated at least "BBB" by Standard & Poor's and a letter signed by Moody's confirming that the Class D Notes have been rated at least "Baa2" by Moody's, (E) a letter signed by Standard & Poor's confirming that the Class X Notes have been rated at least "BBB-" by Standard & Poor's (with respect to the ultimate payment of the Class X Rated Interest and the ultimate return of the Scheduled Class X Target Principal Amount), and (F) a letter signed by Standard & Poor's confirming that the Senior Swap Agreement has received a credit estimate of "AAA" by Standard & Poor's and a letter signed by Moody's confirming that the Senior Swap Agreement has received a credit estimate of "Aaa" by Moody's (which credit estimates address the likelihood of the payment of the Outstanding Swap Counterparty Amount under the Senior Swap Agreement by the Issuer), and (ii) each such rating is in full force and effect on the Closing Date.

(d)    Accounts.  The delivery by the Trustee of evidence of the establishment of the Payment Account, the Interest Collection Account, the Principal Collection Account, the Expense Account, the Closing Date Expense Account, the Uninvested Proceeds Account, the Custodial Account, the Reserve Account, the Senior Swap Collateral Account, any Hedge Counterparty Collateral Account, the Interest Reserve Account, any Asset Hedge Account, the Synthetic Security Counterparty Account and the Issuer Collateral Account to be established on the Closing Date.

(e)    Funding Certificate.  The delivery to the Trustee of a Funding Certificate, duly executed by an Authorized Officer of the Issuer, relating to, among other things, the disposition of the proceeds of the issuance of the Notes and the Preference Shares, dated the Closing Date, in substantially the form of Exhibit C hereto.

(f)    Schedule of Collateral Debt Securities.  The delivery to the Trustee of the Schedule of Collateral Debt Securities.

(g)    Proceeds of the Preference Shares.  The Issuer has received U.S.$15,600,000 from the issuance of the Preference Shares.

3.3    Custodianship; Transfer of Collateral Debt Securities and Eligible Investments.

(a)    The Trustee shall hold all Certificated Securities and Instruments in physical form at the office of a custodian appointed by it in Chicago, Illinois (together with any successor, the "**Custodian**"). Initially, such Custodian shall be LaSalle Bank National Association, with its address at 181 West Madison, 32nd Floor, Chicago, IL 60602, Attention: CDO Trust Services Group—Libra CDO Limited, Telephone: +1 312 904 1770, Facsimile: +1 312 904 5097. Any successor custodian shall be a state or national bank or trust company which is not an Affiliate of the Issuer or the Co-Issuer and has a combined capital and surplus of at least U.S.$250,000,000 and a rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's.

(b)    Each Collateral Debt Security, Equity Security, Eligible Investment, Reserve Account Investment and U.S. Agency Security shall be credited to the appropriate Account. Each time that the Issuer, or the Collateral Manager on behalf of the Issuer, shall direct or cause the acquisition of any Collateral Debt Security, Equity Security, Reserve Account Investment, U.S. Agency Security or Eligible Investment, the Collateral Manager (on behalf of the Issuer) shall, if such Collateral Debt Security, Equity Security, Reserve Account Investment, U.S. Agency Security or Eligible Investment has not already been transferred to the Custodial Account and credited thereto, cause the transfer of such Collateral Debt Security, Equity Security, Reserve Account Investment, U.S. Agency Security or Eligible Investment to the Custodian to be held in and credited to the Custodial Account for the benefit of the Trustee in accordance with the terms of this Indenture. The security interest of the Trustee in the funds or other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, be released. The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Debt Security, Equity Security, Reserve Account Investment, U.S. Agency Security or Eligible Investment so acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Collateral Debt Security, Equity Security, Reserve Account Investment, U.S. Agency Security or Eligible Investment. On the Closing Date and on each day any Collateral is acquired or otherwise becomes subject to the lien of this Indenture, the Issuer represents and warrants to the Trustee as follows:

(i)    This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral in favor of the Trustee, which security interest has priority over all other claims, encumbrances and liens on the Collateral, and is enforceable as such against creditors of, and purchasers from, the Issuer.

(ii)    The Collateral consists of "general intangibles" and "financial assets" (each within the meaning of the applicable Uniform Commercial Code).

(iii)    (a) The Issuer's rights under any Hedge Agreement, the Collateral Management Agreement, the Collateral Administration Agreement, the Senior Swap Agreement, the Credit Default Swap Agreement, Synthetic Securities, the Subscription Agreements, the Note Purchase Agreement and the Placement Agreement constitute "general intangibles" (as defined in the applicable Uniform Commercial Code) and (b) the

assets credited to the Accounts constitute "financial assets" under the applicable Uniform Commercial Code.

(iv)     All Cash, U.S. Agency Securities, Eligible Investments and Reserve Account Investments will be credited to one of the Accounts. The Custodian for each Account has agreed to treat all assets credited to the Accounts as "financial assets" (within the meaning of the applicable Uniform Commercial Code) and to treat the Person for whom the Account is maintained as entitled to exercise the rights that comprise such financial assets pursuant to the terms of the Account Control Agreement.

(v)     The Issuer has received all consents and approvals required by the terms of the Underlying Instrument of each item of Collateral to pledge to the Trustee its rights and interests in each Collateral.

(vi)     In order to perfect the security interest in the Collateral granted to the Trustee hereunder, the Issuer shall:

(A)     in the case of a "financial asset" credited to the Accounts, (1) deliver on the Closing Date to the Trustee a fully executed Account Control Agreement pursuant to which the Custodian, as Securities Intermediary, has agreed to comply with all instructions originated by the Trustee directing disposition of the funds in the Accounts without further consent by the Issuer; and (2) take all steps necessary to cause the Custodian, as Securities Intermediary, to identify in its records the Trustee as the Person having a security entitlement against the Custodian, as Securities Intermediary, in each of the Accounts; and

(B)     in the case of a "general intangible" or an "account" (within the meaning of the applicable Uniform Commercial Code), cause, within 10 days of the Closing Date (or 10 days of the acquisition date of such account), the filing of a Financing Statement in the proper filing office in the appropriate jurisdictions under applicable law.

(vii)     The Accounts are not maintained in the name of any Person other than the Issuer or the Trustee. The Issuer has not consented to the Securities Intermediary of any Account complying with entitlement orders of any Person other than the Trustee.

(viii)     Other than the security interest Granted to the Trustee pursuant to this Indenture, the Issuer owns and has good and marketable title to the Collateral free and clear of any lien, claim or encumbrance of any Person.

(ix)     Other than the security interest Granted to the Trustee pursuant to this Indenture the Issuer has not Granted any security interest in, or otherwise conveyed, any of the Collateral. The Issuer has not authorized the filing of, and is not aware of, any financing statements against it that include a description of collateral covering the Collateral other than any financing statement relating to the security interest Granted to the Trustee hereunder.

(x)     The Issuer is not aware of any judgment, Pension Benefit Guaranty Corporation or tax lien filed against the Issuer.

The Trustee and the Co-Issuers (x) shall not, without satisfying the Rating Condition, waive any of the representations and warranties set forth in this Section 3.3(b) or a breach thereof and (y) shall provide each Rating Agency with prompt written notice of any breach of the representations and warranties set forth in this Section 3.3(b) of which the Trustee and the Co-Issuers have knowledge. The representations and warranties set forth in this Section 3.3(b) shall survive until all obligations under the Notes under this Indenture have been fully paid and shall be deemed to be repeated on each date on which Collateral is delivered as if made at and as of that time.

## 4.     SATISFACTION AND DISCHARGE

4.1     Satisfaction and Discharge of Indenture.

This Indenture shall be discharged and shall cease to be of further effect with respect to the Collateral securing the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, as provided herein (including as provided in the Priority of Payments and Section 13), (iv) the rights, obligations and immunities of the Trustee hereunder, (v) the rights and immunities of the Collateral Manager hereunder and under the Collateral Management Agreement, and (vi) the rights of the Secured Parties as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them (including, without limitation, amounts payable under Section 11.1 to a Prior Senior Swap Counterparty hereunder or under the Senior Swap Agreement in respect of its Outstanding Swap Counterparty Amount and Senior Swap Interest Amounts thereon and any accrued Senior Swap Premium Amounts not paid pursuant to the terms of the Senior Swap Agreement); and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(a)     either:

(i)     all Notes theretofore authenticated and delivered (other than (A) Notes which have been mutilated, defaced, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.5 and (B) Notes for whose payment Cash has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3) have been delivered to the Trustee for cancellation; or

(ii)     all Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable, or (B) will become due and payable at their Stated Maturity within one year, or (C) are to be called for redemption pursuant to Section 9.1 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Co-Issuers pursuant to Section 9.3 and the Issuer has irrevocably deposited or caused to be deposited with the Trustee, in trust for such purpose, Cash or noncallable direct obligations of the United States in an amount sufficient, as verified by a firm of nationally

recognized Independent certified public accountants, to pay and discharge the entire indebtedness on all Notes not theretofore delivered to the Trustee for cancellation, including all principal and interest (including Class C Deferred Interest, Class D Deferred Interest, Defaulted Interest and interest on Defaulted Interest, interest on Class C Deferred Interest and interest on Class D Deferred Interest, if any) accrued to the date of such deposit (in the case of Notes which have become due and payable) or to the Stated Maturity or the Redemption Date, as the case may be; *provided* that (x) such obligations are entitled to the full faith and credit of the United States and (y) this subclause (ii) shall not apply if an election to act in accordance with the provisions of <u>Section 5.5(a)</u> shall have been made and not rescinded;

(b)     the Issuer has paid or caused to be paid all other sums payable hereunder (including all amounts payable pursuant to any Hedge Agreement, the Credit Default Swap Agreement, any Synthetic Securities, the Senior Swap Agreement (including, without limitation, amounts payable under <u>Section 11.1</u> to (i) the reduction of the Outstanding Swap Counterparty Amount under the Senior Swap Agreement and the Remaining Unfunded Notional Amount to zero and (ii) a Prior Senior Swap Counterparty hereunder or under the Senior Swap Agreement in respect of its Outstanding Swap Counterparty Amount and Senior Swap Interest Amounts thereon), the Collateral Administration Agreement, the Administration Agreement, the Preference Share Paying Agency Agreement and the Collateral Management Agreement and in each case (where applicable) including all termination payments) and no other amounts will become due and payable by the Issuer; and

(c)     the Co-Issuers have delivered to the Trustee Officers' certificates and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Collateral Manager, the Hedge Counterparties, the Senior Swap Counterparties, the Credit Default Swap Counterparty and, if applicable, the Noteholders, as the case may be, under <u>Sections 2.6, 4.1, 4.2, 5.9, 5.18, 6.7, 6.8, 7.1, 7.3, 13.1</u> and <u>14.16</u> shall survive such satisfaction and discharge.

4.2     <u>Application of Amounts in Trust</u>.

All amounts deposited with the Trustee pursuant to <u>Section 4.1</u> for the payment of principal of and interest on the Notes and amounts payable pursuant to the Hedge Agreements, the Administration Agreement, the Collateral Administration Agreement, the Senior Swap Agreement (including, without limitation, amounts payable under <u>Section 11.1</u> to (i) the reduction of the Aggregate Outstanding Swap Counterparty Amount and the Remaining Unfunded Notional Amount to zero, (ii) the payment of accrued Senior Swap Interest Amounts or Senior Swap Premium Amounts and (iii) a Prior Senior Swap Counterparty hereunder or under the Senior Swap Agreement in respect of its Outstanding Swap Counterparty Amount and Senior Swap Interest Amounts thereon), the Credit Default Swap Agreement and the Collateral Management Agreement shall be held in trust and applied by it in accordance with the provisions of the Notes, the Preference Share Paying Agency Agreement and this Indenture, including the Priority of Payments, for the payment either directly or through any Paying Agent, as the Trustee

may determine, to the Person entitled thereto of the respective amounts in respect of which such amounts have been deposited with the Trustee; but such amounts need not be segregated from other funds held by the Trustee except to the extent required herein or required by law.

4.3     Repayment of Amounts Held by Paying Agent.

In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all amounts then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such amounts.

**5.     EVENTS OF DEFAULT; REMEDIES**

5.1     Events of Default.

"**Event of Default**" wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     a default in the payment of (1) any Senior Swap Premium Amount or Senior Swap Interest Amount when the same becomes due and payable under the Senior Swap Agreement or hereunder, in each case which default continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee or the Administrator, such default continues for a period of five Business Days) or (2) any interest (i) on any Class A Note or Class B Note when the same becomes due and payable, in each case which default continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Issuing and Paying Agent) or the Note Registrar, such default continues for a period of five Business Days); or (ii) if there are no Class A Notes or Class B Notes Outstanding, on any Class C Note when the same becomes due and payable, which default continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Paying Agent) or the Note Registrar, such default continues for a period of five Business Days); or (iii) if there are no Class A Notes, Class B Notes or Class C Notes Outstanding, on any Class D Note, when the same becomes due and payable, which default continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Paying Agent) or the Note Registrar, such default continues for a period of five Business Days);

(b)     a default in the payment of (1) any Outstanding Swap Counterparty Amount when the same becomes due and payable under the Senior Swap Agreement or hereunder, which default continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee or the Administrator,

such default continues for a period of five Business Days); or (2) principal of any Note when the same becomes due at its Stated Maturity or Redemption Date (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Paying Agent) or the Note Registrar, such default continues for a period of five Business Days);

(c)     the failure on any Quarterly Distribution Date to disburse amounts available in the Interest Collection Account or Principal Collection Account in accordance with the order of priority set forth under Section 11.1 (other than a default in payment described in clause (a) or (b) above), which failure continues for a period of three Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Paying Agent) or the Note Registrar, such default continues for a period of five Business Days);

(d)     either Co-Issuer or the pool of Collateral becomes an investment company required to be registered under the Investment Company Act;

(e)     a default in the performance, or breach, of any other covenant or other agreement (other than the covenant to meet the Collateral Quality Tests, the Coverage Tests or the Eligibility Criteria (it being understood that with respect to the purchase or Sale of any Collateral Debt Security all conditions applicable thereto hereunder, including those specified in Section 12, shall be satisfied)) of the Issuer or the Co-Issuer under this Indenture or any representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith proves to be incorrect in any material respect when made, and the continuation of such default or breach for a period of 30 days (or, if such default, breach or failure has an adverse effect on the validity, perfection or priority of the security interest granted thereunder, 15 days) after any of the Issuer, the Co-Issuer or the Collateral Manager has actual knowledge thereof or after notice thereof to the Issuer and the Collateral Manager by the Trustee, the Holders of at least 25% in Aggregate Outstanding Amount of Notes of any Class, any Senior Swap Counterparty or any of the Hedge Counterparties;

(f)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) winding up, liquidation, reorganization or other relief in respect of the Issuer or the Co-Issuer or its debts, or of a substantial part of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Issuer or the Co-Issuer or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days; or an order or decree approving or ordering any of the foregoing shall be entered; or the Issuer or its assets shall become subject to any event that, under the applicable laws of the Cayman Islands, has an analogous effect to any of the foregoing;

(g)     the Issuer or the Co-Issuer shall (i) voluntarily commence any proceeding or file any petition seeking winding up, liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 5.1(f), (iii) apply for or consent to the appointment of a receiver, trustee, custodian,

sequestrator, conservator or similar official for the Issuer or the Co-Issuer or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing; or the Issuer shall cause or become subject to any event with respect to the Issuer that, under the applicable laws of the Cayman Islands, has an analogous effect to any of the foregoing; or

(h)     on any Determination Date after the Reinvestment Period, if the ratio (expressed as a percentage) obtained by dividing (A) the aggregate par value on such Determination Date of all (i) Collateral Debt Securities (*provided* that the aggregate par value of any Defaulted Security shall be deemed to be the lower of (i) its Market Value and (ii) its Applicable Recovery Rate), (ii) Principal Proceeds held as cash and (iii) Eligible Investments purchased with Principal Proceeds by (B) the sum of (i) the aggregate outstanding amount of the Class A Notes, (ii) the Aggregate Outstanding Swap Counterparty Amount and (iii) the Remaining Unfunded Notional Amount, is less than 99%.

If either of the Co-Issuers shall obtain knowledge, or shall have reason to believe, that an Event of Default shall have occurred and be continuing, such Co-Issuer shall promptly notify the Trustee, the Preference Share Paying Agent, the Collateral Manager, the Noteholders, the Credit Default Swap Counterparty, the Senior Swap Counterparties, each Hedge Counterparty and each Rating Agency in writing of such an Event of Default.

In the event that there is a payment default on any Notes resulting from an administrative error or omission by the Trustee, the Administrator, a Paying Agent (other than the Preference Share Paying Agent) or the Note Registrar, the Trustee shall promptly notify the Rating Agencies and the Collateral Manager of such payment default.

5.2     Acceleration of Maturity; Rescission and Annulment.

(a)     If an Event of Default occurs and is continuing (other than an Event of Default specified in Section 5.1(f) or 5.1(g)), (i) the Trustee may with the consent of a Majority of the Controlling Class, or shall (at the direction of the Holders of a Majority of the Controlling Class by notice to the Co-Issuers), or (ii) a Majority of the Controlling Class, by notice to the Co-Issuers and the Trustee, may (A) declare the Aggregate Outstanding Swap Counterparty Amount (including any future additions to such Outstanding Swap Counterparty Amount as a result of payments by the Senior Swap Counterparty) to be immediately due and payable, (B) declare the principal of all of the Notes to be immediately due and payable, and upon any such declaration such principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall become immediately due and payable and (C) terminate the Reinvestment Period. If an Event of Default specified in Section 5.1(f) or 5.1(g) occurs, (1) the Outstanding Swap Counterparty Amount (including any future additions to such Outstanding Swap Counterparty Amount as a result of payments by the Senior Swap Counterparty) shall automatically become due and payable, (2) all unpaid principal, together with all accrued and unpaid interest of all of the Notes, and other amounts payable hereunder, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Noteholder and (3) the Reinvestment Period shall terminate. Notwithstanding the foregoing, if an Event of Default specified in Section 5.1(a) or 5.1(b) occurs and is continuing solely with

respect to a default in the payment of any principal of or interest, on Notes of a Class other than the Controlling Class, neither the Trustee nor the Holders of such non-Controlling Class shall have the right to declare such principal and other amounts to be immediately due and payable.

(b)     At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Cash due has been obtained by the Trustee as hereinafter provided in this <u>Section 5</u>, a Majority of the Controlling Class, by written notice to the Co-Issuers and the Trustee (which shall forward a copy of such notice to the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Hedge Counterparties), may rescind and annul such declaration and its consequences if:

(i)     the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)     all overdue installments of principal of and interest on the Notes (including, in the case of the Class C Notes and Class D Notes, any Class C Deferred Interest and any Class D Deferred Interest);

(B)     interest upon Class C Deferred Interest at the applicable Note Interest Rate and, to the extent that payment of such interest is lawful, upon Defaulted Interest at the applicable Note Interest Rate;

(C)     interest upon Class D Deferred Interest at the applicable Note Interest Rate and, to the extent that payment of such interest is lawful, upon Defaulted Interest at the applicable Note Interest Rate;

(D)     any accrued and unpaid amounts (including termination payments, if any) payable by the Issuer pursuant to the Hedge Agreements, the Credit Default Swap Agreement and to any Senior Swap Counterparty hereunder or under the Senior Swap Agreement in reduction of its Outstanding Swap Counterparty Amount, Senior Swap Interest Amounts thereon, Senior Swap Premium Amounts and the Remaining Unfunded Notional Amount, in each case to zero; and

(E)     all unpaid taxes and Administrative Expenses and other sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel;

(ii)     the Trustee has determined that all Events of Default, other than the nonpayment of the principal of or interest on the Notes that have become due solely by such acceleration, have been cured and a Majority of the Controlling Class by written notice to the Trustee has agreed with such determination or waived all Events of Default giving rise to such acceleration as provided in <u>Section 5.14</u>; and

(iii)     subject to <u>Section 5.2(c)</u> below, the Hedge Agreements in effect immediately prior to the declaration of such acceleration shall remain in effect.

At any such time as the Majority of the Controlling Class shall notify the Trustee in writing that it wishes to rescind and annul such declaration and its consequences, the Trustee

shall preserve the Collateral in accordance with the provisions of <u>Section 5.5</u>; <u>provided</u> that, if such preservation of the Collateral is rescinded pursuant to <u>Section 5.5</u>, the Notes may subsequently be accelerated pursuant to <u>Section 5.2(a)</u>, notwithstanding any previous rescission and annulment of a declaration of acceleration pursuant to this <u>Section 5.2(b)</u>.

No such rescission and annulment shall affect any subsequent Default or impair any right consequent thereon.

(c)    The Issuer shall not terminate the Senior Swap Agreement, the Credit Default Swap Agreement or any Hedge Agreement in effect immediately prior to a declaration of acceleration unless the liquidation of the Collateral has begun and such declaration is no longer capable of being rescinded or annulled.

5.3    <u>Collection of Indebtedness and Suits for Enforcement by Trustee</u>.

The Co-Issuers covenant that if a Default shall occur in respect of the payment of the Outstanding Swap Counterparty Amount of a Prior Senior Swap Counterparty or any Senior Swap Interest Amount thereon or the payment of any principal of or interest on any Class A Note, the payment of principal of or interest on any Class B Note, the payment of principal of or any interest on any Class C Note (but, with respect to interest, only after the Class A Notes and Class B Notes and all interest accrued thereon have been paid in full), the payment of principal of or interest on any Class D Note (but with respect to interest, only after the Class A Notes, Class B Notes and Class C Notes and all interest accrued thereon have been paid in full), the Co-Issuers will (x) upon demand of the Trustee, the Prior Senior Swap Counterparty and any affected Noteholder, pay to the Trustee, for the benefit of the Holder of such Note and the Prior Senior Swap Counterparty, the whole amount, if any, then due and payable to the Prior Senior Swap Counterparty and on such Note for principal and interest (or Outstanding Swap Counterparty Amount and Senior Swap Interest Amounts, as applicable) with interest upon the overdue principal amount (or Outstanding Swap Counterparty Amount, as applicable) and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest (or Senior Swap Interest Amount, as applicable) at the applicable Note Interest Rate (or, with respect to any Outstanding Swap Counterparty Amount and Senior Swap Interest Amount, at a per annum rate equal to LIBOR plus 0.32% and (y) upon demand of the Trustee or a Senior Swap Counterparty, pay to the Trustee for the benefit of such Senior Swap Counterparty, the whole amount, if any, then due and payable hereunder or under the Senior Swap Agreement to the Senior Swap Counterparty for its Outstanding Swap Counterparty Amount, accrued Senior Swap Interest Amounts thereon and accrued Senior Swap Premium Amounts and, in each case in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, such Noteholder and the Prior Senior Swap Counterparty and their respective agents and counsel.

If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a Proceeding for the collection of the sums so due and unpaid, and may, and shall, upon the direction by a Majority of the Controlling Class, prosecute such Proceeding to judgment or final decree, and may enforce

the same against the Co-Issuers or any other obligor upon the Notes and collect the Cash adjudged or decreed to be payable in the manner provided by law out of the Collateral.

If an Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Secured Parties by such appropriate Proceedings as the Trustee shall deem most effectual (if no direction by a Majority of the Controlling Class is received by the Trustee) or as the Trustee may be directed by a Majority of the Controlling Class, to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer or any other obligor upon the Notes under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Notes, or the creditors or property of the Issuer, the Co-Issuer or such other obligor, the Trustee, regardless of whether (x) the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise, (y) the Outstanding Swap Counterparty Amount of any Senior Swap Counterparty, any accrued Senior Swap Interest Amounts thereon and any accrued Senior Swap Premium Amounts shall then be due and payable as expressed herein or in the Senior Swap Agreement or by declaration or otherwise and (z) the Trustee shall have made any demand pursuant to the provisions of this <u>Section 5.3</u>, shall be entitled and empowered, upon direction by a Majority of the Controlling Class and by intervention in such Proceedings or otherwise:

(a)     to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Notes and any amount owing to a Prior Senior Swap Counterparty hereunder or under the Senior Swap Agreement in respect of its Outstanding Swap Counterparty Amount or any Senior Swap Interest Amounts thereon, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee), the Noteholders and any Prior Senior Swap Counterparty allowed in any Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Notes or to the creditors (including any Prior Senior Swap Counterparty) or property of the Issuer, the Co-Issuer or such other obligor;

(b)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Notes and any Prior Senior Swap Counterparty, upon the direction of such Holders and such Prior Senior Swap Counterparty, respectively, in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or Person performing similar functions in comparable Proceedings; and

(c)    to collect and receive any Cash or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Noteholders or any Prior Senior Swap Counterparty and of the Trustee on behalf of the Noteholders, any Prior Senior Swap Counterparty and the Trustee; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Noteholders and any Prior Senior Swap Counterparty to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Noteholders or any Prior Senior Swap Counterparty, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder or any Prior Senior Swap Counterparty, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or the rights of any Prior Senior Swap Counterparty hereunder or under the Senior Swap Agreement, or to authorize the Trustee to vote in respect of the claim of any Noteholder or any Prior Senior Swap Counterparty in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any action or Proceedings instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the reasonable expenses, disbursements and compensation of the Trustee, each predecessor trustee and their respective agents and attorneys and counsel, shall be for the benefit of the Secured Parties and payable to the Secured Parties in accordance with the Priority of Payments.

In any Proceedings brought by the Trustee on behalf of the Holders, the Trustee shall be held to represent, subject to Section 6.17, all the Secured Parties, if applicable, pursuant to Section 6.17.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.3 except in accordance with Section 5.5(a).

5.4    Remedies.

(a)    If an Event of Default shall have occurred and be continuing, and the Outstanding Swap Counterparty Amount of a Prior Senior Swap Counterparty or the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may after notice to the Collateral Manager, the Noteholders, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Hedge Counterparties, and shall, upon direction by a Majority of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i) institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral any Cash adjudged due;

(ii) sell all or a portion of the Collateral or rights of interest therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17;

(iii) institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv) exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Secured Parties hereunder; and

(v) exercise any other rights and remedies that may be available at law or in equity;

provided that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 except in accordance with Section 5.5(a).

The Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking firm of national reputation as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 and as to the sufficiency of the proceeds and other amounts receivable with respect to the Collateral to make the required payments of principal of and interest on the Notes, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b) If an Event of Default as described in Section 5.1(e) shall have occurred and be continuing, the Trustee may, and at the request of the Holders of not less than 25% of the Aggregate Outstanding Amount of Notes of any Class, any Senior Swap Counterparty or any Hedge Counterparty shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section, and enforce any equitable decree or order arising from such proceeding.

(c) Upon any Sale, whether made under the power of Sale hereby given or by virtue of judicial proceedings, any Noteholder or Secured Party or any of their respective Affiliates may bid for and purchase the Collateral or any part thereof and, upon compliance with the terms of Sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability.

Upon any Sale, whether made under the power of Sale hereby given or by virtue of judicial proceedings, the receipt of the Trustee, or of the Officer making a Sale under judicial proceedings, shall be a sufficient discharge to the purchaser or purchasers at any Sale for its or their purchase Cash, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such Sale, whether under any power of Sale hereby given or by virtue of judicial proceedings, shall bind the Co-Issuers, the Trustee and the Noteholders, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)     Notwithstanding any other provision of this Indenture, the Trustee may not, prior to the date which is one year and one day, or, if longer, the applicable preference period then in effect, after the payment in full of all Notes and the Aggregate Outstanding Swap Counterparty Amount, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Federal or state bankruptcy or similar laws.  Nothing in this Section 5.4 shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or, if longer, the applicable preference period then in effect, in (A) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer under the Bankruptcy Code or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Trustee, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding.

5.5     Preservation of Collateral.

(a)     If an Event of Default shall have occurred and be continuing when any Class of Notes is Outstanding or any Outstanding Swap Counterparty Amount or the Remaining Unfunded Notional Amount is greater than zero, the Trustee shall retain the Collateral securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the Priority of Payments and the provisions of Sections 10, 12 and 13 unless:

(i)     the Trustee determines that the anticipated net proceeds of a Sale of the Collateral (after deducting the reasonable expenses of such Sale) would be sufficient to reduce the Aggregate Outstanding Swap Counterparty Amount of the Senior Swap Counterparties, accrued Senior Swap Interest Amounts, accrued Senior Swap Premium Amounts and the Remaining Unfunded Notional Amount to zero hereunder and under the Senior Swap Agreement (as applicable), to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Class C Deferred Interest, Class D Deferred Interest, Defaulted Interest and interest on Defaulted Interest and interest on Class C Deferred Interest and Class D Deferred Interest, if any), due and unpaid Administrative Expenses as limited by clauses (B) and (Q) of Section 11.1(i), any accrued and unpaid amounts which are or may become payable by the Issuer pursuant to (1) the Hedge Agreements and the Credit Default Swap Agreement, including termination payments, if any (assuming, for this purpose, that the Hedge Agreements and the Credit Default Swap Agreement have been terminated by reason of an "Event of Default" or "Termination Event" thereunder with respect to which the relevant counterparty to the Issuer is not the "Defaulting Party" or sole "Affected Party" (each, as defined in the relevant Hedge Agreement or the Credit Default Swap Agreement)) net of all amounts

owing to the Issuer by any Hedge Counterparty and (2) a Majority in Aggregate Outstanding Amount of the Controlling Class agree with such determination; or

(ii)     the Holders of at least 66-⅔% of the Controlling Class and the holders of at least 66-⅔% of the other Classes voting as a single class, the Credit Default Swap Counterparty and the Hedge Counterparties, if any, direct the Sale of the Collateral; *provided* that (i) no consent of the Senior Swap Counterparty, the Credit Default Swap Counterparty or a particular Hedge Counterparty will be required if (A) no early termination or liquidation payment would be owing by the Issuer to such Person upon the termination of the Senior Swap Agreement, the Credit Default Swap Agreement or related Hedge Agreement (as applicable) by reason of an "Event of Default" or "Termination Event" under (and as defined in) the Senior Swap Agreement, the Credit Default Swap Agreement or related Hedge Agreement (as applicable) or (B) in the case of the consent rights of the Credit Default Swap Counterparty or any Hedge Counterparty, the Credit Default Swap Counterparty or the relevant Hedge Counterparty (as applicable) is the "Defaulting Party" or sole "Affected Party" with respect to an "Event of Default" or "Termination Event" under (and as defined in) the Credit Default Swap Agreement or related Hedge Agreement (as applicable) and (ii) no consent of a Terminated Senior Swap Counterparty will be required if it has failed to pay the Senior Swap Early Termination Date Payment owing by it to the Issuer for deposit in the Reserve Account and such failure is continuing.

In the event the Trustee retains Collateral pursuant to this Section 5.5(a), the Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer, the Collateral Manager, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Hedge Counterparties.  So long as such Event of Default is continuing, any such retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b)     Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Collateral securing the Notes if prohibited by applicable law.

(c)     In determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee shall obtain bid prices with respect to each security contained in the Collateral from two nationally recognized dealers, as specified by the Collateral Manager in writing, which are Independent from each other and the Collateral Manager, at the time making a market in such securities and shall compute the anticipated Sale Proceeds on the basis of the lower of such bid prices for each such security.  For the purposes of making the determinations required pursuant to Section 5.5(a)(i), the Trustee shall apply the standards set forth in Section 9.1(b).  In addition, for the purposes of determining issues relating to the execution of a Sale of the Pledged Securities and the execution of a Sale thereof in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee may retain and rely on an opinion of an Independent investment banking firm of national reputation.

The Trustee shall deliver to the Noteholders, the Collateral Manager, the Hedge Counterparties, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Co-Issuers a report stating the results of any determination required pursuant to

<u>Section 5.5(a)(i)</u> no later than 10 days after making such determination. The Trustee shall make the determinations required by <u>Section 5.5(a)(i)</u> within 30 days after an Event of Default and at the request of a Majority of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to <u>Section 5.5(a)(i)</u>. In the case of each calculation made by the Trustee pursuant to <u>Section 5.5(a)(i)</u>, the Trustee shall obtain a letter of an Independent certified public accountant confirming the accuracy of the computations of the Trustee and certifying their conformity to the requirements of this Indenture. In determining whether the Holders of the requisite Aggregate Outstanding Amount of any Class of Notes have given any direction or notice or have agreed pursuant to <u>Section 5.5(a)</u>, any Holder of a Note of a Class who is also a Holder of Notes of another Class or any Affiliate of any such Holder shall be counted as a Holder of each such Note for all purposes.

(d)     If an Event of Default shall have occurred and be continuing at a time when no Note is Outstanding, the Trustee shall retain the Collateral securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the Priority of Payments and the provisions of <u>Section 10</u> and <u>Section 12</u> unless a Majority-in-Interest of Preference Shares direct the Sale of the Collateral.

5.6     <u>Trustee May Enforce Claims Without Possession of Notes</u>.

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in <u>Section 5.7</u>.

5.7     <u>Application of Cash Collected</u>.

Any Cash collected by the Trustee with respect to the Outstanding Swap Counterparty Amount of any Senior Swap Counterparty and the Notes pursuant to this <u>Section 5</u> and any Cash that may then be held or thereafter received by the Trustee with respect to the Outstanding Swap Counterparty Amount of any Prior Senior Swap Counterparty and the Notes hereunder shall be applied subject to <u>Section 13.1</u> and in accordance with the provisions of <u>Section 11.1</u>, at the date or dates fixed by the Trustee.

5.8     <u>Limitation on Suits</u>.

No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)     such Holder has previously given to the Trustee written notice of an Event of Default;

(b)     except as otherwise provided in <u>Section 5.9</u>, the Holders of at least 25% of the most senior Class of Notes Outstanding or any Hedge Counterparty, the Credit Default Swap Counterparty or a Senior Swap Counterparty shall have made written request to the Trustee to

institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holder or Holders, Hedge Counterparty, Credit Default Swap Counterparty or Senior Swap Counterparty, as applicable, have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(c)     the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(d)     no direction inconsistent with such written request has been given to the Trustee during such 30-day period by a Majority of the Controlling Class;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders of the Notes or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments.

If the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall follow the instructions of the group representing the higher percentage of interest in the Controlling Class, notwithstanding any other provisions of this Indenture.

5.9     Unconditional Rights of Noteholders to Receive Principal and Interest and of any Senior Swap Counterparty to Receive Outstanding Swap Counterparty Amount and Senior Swap Interest Amounts.

Notwithstanding any other provision in this Indenture (but subject to Section 2.6(i)), the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Note as such principal and interest become due and payable and any Prior Senior Swap Counterparty or Senior Swap Counterparty, as applicable, shall have the right, which is absolute and unconditional, to receive hereunder or under the Senior Swap Agreement its Outstanding Swap Counterparty Amount, any Senior Swap Interest Amounts thereon and any Senior Swap Premium Amounts, in each case in accordance with Section 13.1 and the Priority of Payments.  Furthermore, subject to the provisions of Section 5.8, the Holder of any Note and any Senior Swap Counterparty shall have the right to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder or such Senior Swap Counterparty, as applicable.  The rights of a Senior Swap Counterparty to receive its Outstanding Swap Counterparty Amount, Senior Swap Interest Amounts and Senior Swap Premium Amounts shall be as set forth in the Senior Swap Agreement.

5.10     Restoration of Rights and Remedies.

If the Trustee, any Senior Swap Counterparty or Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been

discontinued or abandoned for any reason, or has been determined adversely to the Trustee, such Senior Swap Counterparty or such Noteholder, then and in every such case the Co-Issuers, the Trustee, the Senior Swap Counterparty and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Secured Parties shall continue as though no such Proceeding had been instituted.

5.11    Rights and Remedies Cumulative.

No right or remedy herein conferred upon or reserved to the Trustee, any Senior Swap Counterparty or the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

5.12    Delay or Omission Not Waiver.

No delay or omission of the Trustee, any Senior Swap Counterparty or any Noteholder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Section 5 or by law to the Trustee, any Senior Swap Counterparty or the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee, such Senior Swap Counterparty or the Noteholders, as the case may be.

5.13    Control by Controlling Class.

Notwithstanding any other provision of this Indenture (but subject to the proviso in the definition of "Outstanding" in Section 1.1(a)), a Majority of the Controlling Class shall have the right to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee for exercising any trust, right, remedy or power conferred on the Trustee; *provided* that:

(a)    such direction shall not conflict with any rule of law or with this Indenture;

(b)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; *provided* that, subject to Section 6.1, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received satisfactory indemnity against such liability as set forth below);

(c)    the Trustee shall have been provided with indemnity satisfactory to it; and

(d)    any direction to the Trustee to undertake a Sale of the Collateral shall be made only pursuant to, and in accordance with, Sections 5.4 and 5.5.

5.14    Waiver of Past Defaults.

Prior to the time a judgment or decree for payment of the Cash due has been obtained by the Trustee, as provided in this Section 5, a Majority of the Controlling Class may on behalf of the Controlling Class and the Holders of all the other Notes waive any past Default and its consequences, except a Default:

(a)    (i) in the payment of the principal of any Note or (ii) in the payment of interest on the Class A Notes and Class B Notes (including Defaulted Interest and interest on Defaulted Interest, if any) or, (iii) after the Class A Notes and Class B Notes have been paid in full, on the Class C Notes (including Class C Deferred Interest and interest on Class C Deferred Interest, Defaulted Interest and interest on Defaulted Interest, (if any)) or, (iv) after the Class A Notes, the Class B Notes and the Class C Notes have been paid in full, on the Class D Notes (including Class D Deferred Interest and interest on Class D Deferred Interest, Defaulted Interest and interest on Defaulted Interest, (if any)) or (v) in the payment of the Aggregate Outstanding Swap Counterparty Amount, Senior Swap Interest Amounts thereon, any Senior Swap Premium Amounts and any other amounts accrued and unpaid or otherwise owed to the Senior Swap Counterparties; or

(b)    in respect of a covenant or provision hereof that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note affected thereby or the Senior Swap Counterparties; or

(c)    arising under Section 5.1(f) or 5.1(g).

In the case of any such waiver, (i) the Co-Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto, and (ii) the Trustee shall promptly give written notice of any such waiver to the Collateral Manager, the Credit Default Swap Counterparty, the Senior Swap Counterparties, each Hedge Counterparty and each Holder of Notes.  The Rating Agencies shall be notified promptly by the Issuer of any such waiver.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

5.15    Undertaking for Costs.

All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; *provided* that the provisions of this Section 5.15 shall not apply to any suit instituted by the Trustee, the Credit Default Swap Counterparty, any Senior Swap Counterparty or any

Noteholder, or group of Noteholders, holding in the aggregate more than 10% in Aggregate Outstanding Amount of Class of Notes constituting the Controlling Class, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note on or after the Stated Maturity expressed in such Note (or, in the case of redemption, on or after the applicable Redemption Date).

5.16   Waiver of Stay or Extension Laws.

The Co-Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force (including but not limited to filing a voluntary petition under Chapter 11 of the Bankruptcy Code and by the voluntary commencement of a proceeding or the filing of a petition seeking winding up, liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect), which may affect the covenants, the performance of or any remedies under this Indenture; and the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

5.17   Sale of Collateral.

(a)     The power to effect any sale, termination, liquidation or other disposition (a "**Sale**") of any portion of the Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired until the entire Collateral shall have been sold or all amounts secured by the Collateral shall have been paid.  The Trustee may upon notice to the Noteholders, the Credit Default Swap Counterparty and the Senior Swap Counterparties and shall, upon direction of a Majority of the Controlling Class from time to time, postpone any Sale by announcement made at the time and place of such Sale; *provided* that (i) if the Sale is rescheduled for a date more than 10 Business Days after the date of the determination by the Trustee pursuant to Section 5.5, such Sale shall not occur unless and until the Trustee has again made the determination required by Section 5.5. The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale and (ii) the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7.

(b)     The Trustee may bid for and acquire any portion of the Collateral in connection with a public Sale thereof, by crediting all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7.  The Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)     If any security included in the Collateral is not registered under the Securities Act ("**Unregistered Securities**"), the Trustee may seek an Opinion of Counsel, or, if no such

Opinion of Counsel can be obtained and with the consent of a Majority of the Controlling Class, seek a no-action position from the United States Securities and Exchange Commission or any other relevant Federal or state regulatory authorities, regarding the legality of a public or private Sale of such Unregistered Securities (the costs of which, in each case, shall be reimbursable to the Trustee pursuant to Section 6.8 hereof).

(d)     The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a Sale thereof.  In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Collateral in connection with a Sale thereof, and to take all action necessary to effect such Sale.  No purchaser or transferee at such a Sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any Cash.

5.18     Action on the Notes.

The Trustee's right to seek and recover judgment on the Notes or on behalf of any of the Secured Parties owed any amount under this Indenture or otherwise under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Secured Parties shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer or the Co-Issuer.

**6.     THE TRUSTEE**

6.1     Certain Duties and Responsibilities.

(a)     Except during the continuance of an Event of Default:

(i)     the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; *provided* that, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform to the requirements of this Indenture and shall promptly, but in any event within three Business Days in the case of an Officer's certificate furnished by the Collateral Manager, notify the party delivering the same if such certificate or opinion does not so conform.  In the case of an Officer's Certificate to be provided by the Collateral Manager or the Issuer, if a corrected form shall not have been delivered to the Trustee within 15 Business Days after such notice from the Trustee, the Trustee shall so notify the Noteholders.

(b)     In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from a Majority of the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, *except* that:

(i)     this subclause (c) shall not be construed to limit the effect of subclause (a) of this Section 6.1;

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith (A) in accordance with the written direction of the Issuer, the Collateral Manager, the Controlling Class or the requisite Noteholders specified by the terms of this Indenture relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or (B) exercising any trust or power conferred upon the Trustee, under this Indenture; and

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it (if the amount of such funds or risk or liability does not exceed the amount payable to the Trustee pursuant to Section 11.1(i)(B) net of the amounts specified in Section 6.8(a)(i), the Trustee shall be deemed to be reasonably assured of such repayment) unless such risk or liability relates to performance of its ordinary services, including under Section 5, under this Indenture.

(d)     For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Default or Event of Default described in Section 5.1(d), 5.1(e), 5.1(f) or 5.1(g) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or such a Default, as the case may be, is received by the Trustee at the Corporate Trust Office.  For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or such a Default, as the case may be, such reference shall be construed to refer only to such an Event of Default or such a Default, as the case may be, of which the Trustee is deemed to have notice as described in this Section 6.1(d).

(e)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this <u>Section 6</u>.

(f)     The Trustee shall, upon reasonable (but no less than one Business Day's) prior written notice to the Trustee, permit any Holder of a Note or any Senior Swap Counterparty (or representative thereof), during the Trustee's normal business hours, to examine all books of account, records, reports and other papers of the Trustee (other than items protected by attorney-client privilege) relating to the Notes, the rights of a Prior Senior Swap Counterparty hereunder or under the Senior Swap Agreement (as applicable), to make copies and extracts therefrom (the reasonable out-of-pocket expenses incurred in making any such copies or extracts to be reimbursed to the Trustee by such Holder or Senior Swap Counterparty, as applicable) and to discuss the Trustee's actions, as such actions relate to the Trustee's duties with respect to the Notes or such Senior Swap Counterparty, with the Trustee's officers and employees responsible for carrying out the Trustee's duties with respect to the Notes or such Senior Swap Counterparty.

(g)     With respect to the security interests created hereunder, the Trustee acts as a fiduciary for the Noteholders only, and serves as a collateral agent for the Hedge Counterparties, the Credit Default Swap Counterparty and the Collateral Manager and representative of the Senior Swap Counterparties.

6.2     <u>Notice of Default</u>.

Promptly (and in no event later than two Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to <u>Section 5.2</u>, the Trustee shall mail to the Collateral Manager, each Rating Agency (for so long as any Notes are Outstanding), the Preference Share Paying Agent, each Hedge Counterparty, the Senior Swap Counterparties, the Credit Default Swap Counterparty and to all Holders of Notes, as their names and addresses appear on the Note Register, notice of all Defaults hereunder known to the Trustee, unless such Default shall have been cured or waived; *provided* that the Trustee shall provide to Standard & Poor's notice of all Defaults actually known to it which have been waived.

6.3     <u>Certain Rights of Trustee</u>.

Except as otherwise provided in <u>Section 6.1</u>:

(a)     the Trustee may rely and shall be protected in acting or refraining from acting in good faith and in reliance upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)     whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the

absence of bad faith on its part, rely upon an Officer's certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other Persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)      as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)      the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)      the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper documents, but the Trustee, in its discretion, may and, upon the written direction of a Majority of any Class, any Senior Swap Counterparty or any Rating Agency, shall make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and, the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Collateral Manager, to examine the books and records of the Co-Issuers and the Collateral Manager relating to the Notes, the Senior Swap Agreement, the rights of any Prior Senior Swap Counterparty hereunder or under the Senior Swap Agreement and the Collateral, personally or by agent or attorney during normal business hours; *provided* that the Trustee shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law or by any regulatory authority and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g)      the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys; *provided* that the Trustee shall not be responsible for any misconduct or negligence on the part of any agent (other than any Affiliate of the Trustee) appointed and supervised, or attorney appointed, with due care by it hereunder;

(h)      the Trustee shall not be liable for any action it takes or omits to take in good faith that, in the exercise of its judgment, it reasonably and, after the occurrence and during the continuance of an Event of Default, prudently believes to be authorized or within its rights or powers hereunder;

(i)      nothing herein shall be construed to impose an obligation on the part of the Trustee to recalculate, evaluate or (absent manifest error) verify any report, certificate or information received from the Issuer, the Credit Default Swap Counterparty or Collateral

Manager (unless and except to the extent otherwise expressly set forth herein or upon the request of a Rating Agency or a Majority of the Controlling Class);

(j) the Trustee shall not be responsible or liable for the actions or omissions of, or (absent manifest error) any inaccuracies in the records of, any non-Affiliated custodian, clearing agency, common depository, Euroclear or Clearstream, Luxembourg or for the acts or omissions of the Collateral Manager or either Co-Issuer;

(k) to the extent any defined term hereunder, or any calculation required to be made or determined by the Trustee hereunder, is dependent upon or defined by reference to generally accepted accounting principles in the United States in effect from time to time (GAAP), the Trustee shall be entitled to request and receive (and rely upon) instruction from the Issuer or the accountants appointed pursuant to Section 10.9 as to the application of GAAP in such connection, in any instance; and

(l) the Trustee shall not be liable to the Noteholders for any action taken or omitted by it at the direction of the Issuer, the Co-Issuer, the Collateral Manager and/or the Holders of the Notes under the circumstances in which such direction is required or permitted by the terms of this Indenture.

6.4 Authenticating Agents.

Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with issuance, transfers and exchanges under Sections 2.4, 2.5 and 8.5, as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by those Sections to authenticate such Notes. For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section 6.4 shall be deemed to be the authentication of Notes "by the Trustee".

Any entity into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any entity succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor entity.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers. Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers.

The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto,

and the Trustee shall be entitled to be reimbursed for such payments, subject to <u>Section 6.8</u>.  The provisions of <u>Sections 2.8, 6.5</u> and <u>6.6</u> shall be applicable to any Authenticating Agent.

6.5     <u>Not Responsible for Recitals or Issuance of Notes</u>.

The recitals contained herein and in the Notes, other than the Certificate of Authentication thereon, shall be taken as the statements of the Co-Issuers, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), of the Collateral or of the Notes.  The Trustee shall not be accountable for the use or application by the Co-Issuers of the Notes or the proceeds thereof or any Cash paid to the Co-Issuers pursuant to the provisions hereof.

6.6     <u>May Hold Notes</u>.

The Trustee, any Paying Agent, the Note Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates, with the same rights it would have if it were not Trustee, Paying Agent, Note Registrar or such other agent.

6.7     <u>Cash Held in Trust</u>.

Cash held by the Trustee hereunder shall be held in trust to the extent required herein.  The Trustee shall be under no liability for interest on any Cash received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.

6.8     <u>Compensation and Reimbursement</u>.

(a)     The Issuer agrees:

(i)     to pay the Trustee on each Quarterly Distribution Date (in accordance with the Priority of Payments) reasonable compensation for all services, including custodial services (as provided in a separate fee letter between the Issuer and the Trustee), rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii)     except as otherwise expressly provided herein, to reimburse the Trustee (subject to any written agreement between the Issuer and the Trustee) in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to <u>Section 5.4, 5.5, 5.17, 6.3(c), 10.7</u> or <u>10.9</u>, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith but only to the extent any such securities transaction charges have not been waived during a Due Period due to the Trustee's receipt of a

payment from a financial institution with respect to certain Eligible Investments, as specified by the Collateral Manager);

(iii)    to indemnify the Trustee (whether in its individual capacity or as Trustee) and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder; and

(iv)    to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to Section 6.14.

(b)    The Issuer may remit payment for such fees and expenses to the Trustee or, in the absence thereof, the Trustee may from time to time deduct payment of its fees and expenses hereunder from Cash on deposit in the Payment Account for the Notes on a Quarterly Distribution Date in accordance with Section 11.1.

(c)    The Trustee hereby agrees not to cause the filing, in its capacity as Trustee and in any individual or other capacity in respect of which it has been appointed under this Indenture, of any bankruptcy, liquidation or insolvency proceeding against the Issuer for the non-payment to the Trustee of any amounts provided by this Section 6.8 until at least one year and one day, or, if longer, the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture and the final redemption of the Preference Shares.

(d)    The amounts payable to the Trustee pursuant to Section 6.8(a) (other than amounts received by the Trustee from financial institutions under clause (a)(ii) above) shall not, except as provided by Sections 11.1(i)(Q) and 11.1(ii)(N), exceed on any applicable Quarterly Distribution Date the payment limitation described in Section 11.1(i)(B) for such Quarterly Distribution Date, and the Trustee shall have a lien ranking senior to that of the Noteholders upon all property and funds held or collected as part of the Collateral to secure payment of amounts payable to the Trustee under this Section 6.8 not to exceed such amount with respect to any Quarterly Distribution Date; *provided* that (A) the Trustee shall not institute any proceeding for enforcement of such lien except in connection with an action pursuant to Section 5.3 or 5.4 for the enforcement of the lien of this Indenture for the benefit of the Secured Parties and (B) the Trustee may only enforce such a lien in conjunction with the enforcement of the rights of the Secured Parties in the manner set forth in Section 5.4.

Fees applicable to periods shorter than a calendar quarter shall be prorated based on the actual number of days within such period.  The Trustee shall, subject to the Priority of Payments, receive amounts pursuant to this Section 6.8 and Section 11.1(i) and (ii) only to the extent that the payment thereof will not result in an Event of Default and the failure to pay such amounts to the Trustee will not, by itself, constitute an Event of Default.  Subject to Section 6.10, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder and hereby agrees not to cause the

filing of a petition in bankruptcy against the Co-Issuers for the nonpayment to the Trustee of any amounts provided by this <u>Section 6.8</u> until at least one year and one day, or, if longer, the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture.  No direction by a Majority of the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

6.9 <u>Corporate Trustee Required; Eligibility</u>.

There shall at all times be a Trustee hereunder which shall be a national banking association, corporation or trust company organized and doing business under the laws of the United States or of any State thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by Federal or state authority, having a long-term senior unsecured debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", is not on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a short-term debt rating of "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and having an office within the United States.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this <u>Section 6.9</u>, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this <u>Section 6.9</u>, it shall resign immediately in the manner and with the effect hereinafter specified in this <u>Section 6</u>.

6.10 <u>Resignation and Removal; Appointment of Successor</u>.

(a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this <u>Section 6</u> shall become effective until the acceptance of appointment by the successor Trustee under <u>Section 6.11</u>.

(b) The Trustee may resign at any time by giving written notice thereof to the Co-Issuers, the Noteholders, the Collateral Manager, each Hedge Counterparty, the Credit Default Swap Counterparty, the Senior Swap Counterparties, each Rating Agency and the Preference Share Paying Agent.  Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor trustee or trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor trustee or trustees, together with a copy to each Noteholder; *provided* that such successor Trustee shall be appointed only upon the written consent of a Majority of each Class and the Senior Swap Counterparties or, at any time when an Event of Default shall have occurred and be continuing, by a Majority of the Controlling Class.  If no successor trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee or any Holder of a Note, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)     Subject to Section 6.10(a), the Trustee may be removed at any time by Act of Holders of at least 66-⅔% of the Aggregate Outstanding Amount of the Senior Notes or, at any time when an Event of Default shall have occurred and be continuing, by Act of a Majority of the Controlling Class or any Senior Swap Counterparty that forms part of the Controlling Class, delivered in writing to the Trustee and to the Co-Issuers.

(d)     If at any time:

(i)     the Trustee shall cease to be eligible under Section 6.9 and shall fail to resign after written request therefor by the Co-Issuers or by any Holder; or

(ii)     the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case (subject to Section 6.10(a)), (A) the Co-Issuers, by Issuer Order, may remove the Trustee, or (B) subject to Section 5.15, any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason, the Co-Issuers, by Issuer Order, shall promptly appoint a successor Trustee.  If the Co-Issuers shall fail to appoint a successor Trustee within 60 days after such resignation, removal or incapability or the occurrence of such vacancy, a successor Trustee may be appointed by Act of a Majority of the Controlling Class delivered to the Issuer and the retiring Trustee.  The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers.  If no successor Trustee shall have been so appointed by the Co-Issuers or such Holders and shall have accepted appointment in the manner hereinafter provided, subject to Section 5.15, any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first class mail, postage prepaid, to the Collateral Manager, each Rating Agency, the Credit Default Swap Counterparty, the Senior Swap Counterparties, each Hedge Counterparty and the Holders as their names and addresses appear in the Note Register.  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.  If the Co-Issuers fail to mail such notice within 10 days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

6.11     Acceptance of Appointment by Successor.

Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee an instrument accepting such appointment.  Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become

effective and such successor Trustee, without any other act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Co-Issuers or a Majority of any Class or the successor Trustee, such retiring Trustee shall, upon payment of its charges, fees, indemnities and expenses then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and Cash held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in Section 6.8(d).  Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

No successor Trustee shall accept its appointment unless (a) at the time of such acceptance such successor shall (i) have long-term debt rated at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a short-term debt rating of "P-1" by Moody's (and such rating is not on watch for possible downgrade by Moody's) and (ii) be qualified and eligible under this Section 6 and (b) the Rating Condition with respect to the appointment of such successor Trustee shall have been satisfied with respect to Standard & Poor's and written notice shall have been given to Moody's.  No appointment of a successor Trustee shall become effective if a Majority of the Controlling Class objects to such appointment; and no appointment of a successor Trustee shall become effective until the date 10 days after notice of such appointment has been given to each Noteholder and the Senior Swap Counterparties.

6.12    Merger, Conversion, Consolidation or Succession to Business of Trustee.

Any Person into which the Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder; *provided* that such Person shall be otherwise qualified and eligible under this Section 6, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

6.13    Co-Trustees.

At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee shall have power to appoint one or more Persons to act as co-trustee, jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to Section 5.6 and to make such claims and enforce such rights of action on behalf of the Holders of the Notes subject to the other provisions of this Section 6.13.

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee.  If the Co-Issuers do

not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have power to make such appointment. The Trustee shall provide notice of appointment of a co-trustee to the Rating Agencies.

Should any written instrument from the Co-Issuers be required by any co-trustee so appointed for more fully confirming to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers. The Co-Issuers agree to pay (subject to the Priority of Payments) for any reasonable fees and expenses in connection with such appointment.

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(a)     the Notes shall be authenticated and delivered and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by the Trustee;

(b)     the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly, as shall be provided in the instrument appointing such co-trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by a co-trustee;

(c)     the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.13, and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Co-Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.13;

(d)     no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee or any other co-trustee hereunder;

(e)     the Trustee shall not be liable by reason of any act or omission of a co-trustee; and

(f)     any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

6.14     Certain Duties Related to Delayed Payment of Proceeds.

In the event that the Trustee shall not have received a payment with respect to any Pledged Security on its Due Date (unless otherwise directed by the Collateral Manager in connection with any Pledged Security with respect to which there was a default in payment during the preceding Due Period as to which the Collateral Manager is taking action under the Collateral Management Agreement), (a) the Trustee shall promptly notify the Issuer and the

Collateral Manager in writing and (b) unless within three Business Days (or the end of the applicable grace period for such payment, if longer) after such notice (i) such payment shall have been received by the Trustee, or (ii) the Issuer, in its absolute discretion (but only to the extent permitted by Section 10.2(d)), shall have made provision for such payment satisfactory to the Trustee in accordance with Section 10.2(d), the Trustee shall request the issuer of such Pledged Security, the trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request. In the event that such payment is not made within such time period, the Trustee, subject to the provisions of Section 6.1(c)(iv), shall take such action as the Collateral Manager shall direct in writing. Any such action shall be without prejudice to any right to claim a Default under this Indenture. In the event that the Issuer or the Collateral Manager requests a release of a Pledged Security and/or delivers a new Collateral Debt Security in connection with any such action under the Collateral Management Agreement, such release and/or delivery shall be subject to Section 10.8 and Section 12, as the case may be. Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Security received after the Due Date thereof to the extent the Issuer previously made provisions for such payment satisfactory to the Trustee in accordance with Section 10.2(d) and this Section 6.14 and such payment shall not be deemed part of the Collateral.

6.15    Representations and Warranties of the Bank.

(a)    Organization.  The Bank has been duly organized and is validly existing as a national banking association under the laws of the United States of America and has the power to conduct its business and affairs as a trustee.

(b)    Authorization; Binding Obligations.  The Bank has the corporate power and authority to perform the duties and obligations of Trustee, Note Registrar and Transfer Agent under this Indenture.  The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant hereto.  This Indenture has been duly executed and delivered by the Bank.  Upon execution and delivery by the Co-Issuers, this Indenture will constitute the legal, valid and binding obligation of the Bank enforceable in accordance with its terms.

(c)    Eligibility.  The Bank is eligible under Section 6.9 to serve as Trustee hereunder.

(d)    No Conflict.  Neither the execution, delivery and performance of this Indenture, nor the consummation of the transactions contemplated by this Indenture, (i) is prohibited by, or requires the Bank to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon the Bank or any of its properties or assets, or (ii) will violate any provision of, result in any default or acceleration of any obligations under, result in the creation or imposition of any lien pursuant to, or require any consent under, any agreement to which the Bank is a party or by which it or any of its property is bound.

(e)    No Proceedings.  There are no proceedings pending, or to the best knowledge of the Bank, threatened against the Bank before any Federal, state or other governmental agency,

authority, administrator or regulatory body, arbitrator, court or other tribunal, foreign or domestic, that could have a material adverse effect on the Collateral or any action taken or to be taken by the Bank under this Indenture.

6.16    Exchange Offers.

The Collateral Manager may, on behalf of the Issuer, instruct the Trustee pursuant to an Issuer Order to, and the Trustee shall, take any of the following actions with respect to a Collateral Debt Security or Equity Security as to which an exchange offer has been made: (i) exchange such instrument for other securities or a mixture of securities and other consideration pursuant to such exchange offer (and in making a determination whether or not to exchange any security, none of the restrictions set forth in Section 12.2 or 12.3 shall be applicable); and (ii) give consent, grant waiver, vote or exercise any or all other rights or remedies with respect to any such Collateral Debt Security or Equity Security. Absent any such instruction, the Trustee shall be fully protected in refraining from taking any action.

6.17    Fiduciary for Noteholders Only; Agent For Other Secured Parties.

With respect to the security interests created hereunder, the pledge of any portion of the Collateral to the Trustee is to the Trustee as representative of the Senior Swap Counterparties and Noteholders and agent for the other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any portion of the Collateral and the endorsement to or registration in the name of the Trustee of any portion of the Collateral (including without limitation as Entitlement Holder of the Custodian Account) are all undertaken by the Trustee in its capacity as representative of the Noteholders and as agent for the other Secured Parties. The Trustee shall not by reason of this Indenture be deemed to be acting as fiduciary for the Senior Swap Counterparties, Hedge Counterparties or the Collateral Manager, *provided* that the foregoing shall not limit any of the express obligations of the Trustee under this Indenture.

6.18    Withholding.

If any amount is required to be deducted or withheld from any payment to any Noteholder, such amount shall reduce the amount otherwise distributable to such Noteholder. The Trustee is hereby authorized to withhold or deduct from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally required to be withheld or deducted (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate proceedings and legally withholding payment of such tax, pending the outcome of such proceedings). The amount of any withholding tax imposed with respect to any Noteholder shall be treated as Cash distributed to such Noteholder at the time it is deducted or withheld by the Issuer or the Trustee, as applicable, and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.18. If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with such Noteholder in making such claim so long as such Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred. Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes.

## 7. COVENANTS

7.1    <u>Payment of Principal and Interest on the Notes and Amounts Owing to a Senior Swap Counterparty and to the Credit Default Swap Counterparty</u>.

The Issuer will duly and punctually pay (i) all principal of and interest on the Notes (including Defaulted Interest and interest thereon, Class C Deferred Interest, Class D Deferred Interest and Class X Deferred Interest and interest on Class C Deferred Interest, Class D Deferred Interest and Class X Deferred Interest, if any) in accordance with the terms of the Notes and this Indenture, (ii) the Outstanding Swap Counterparty Amount of any Prior Senior Swap Counterparty and the Senior Swap Counterparty and all Senior Swap Interest Amounts thereon, and (iii) all payments due the Credit Default Swap Counterparty in accordance with the Credit Default Swap Agreement. Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Noteholder shall be considered as having been paid by the Issuer to such Noteholder for all purposes of this Indenture. The rights of the Senior Swap Counterparty to receive its Outstanding Swap Counterparty Amount, Senior Swap Premium Amounts and Senior Swap Interest Amounts shall be as set forth in the Senior Swap Agreement. The rights of the Credit Default Swap Counterparty to receive Credit Protection Payments shall be as set forth in the Credit Default Swap Agreement.

The Trustee hereby provides notice to each Noteholder and Prior Senior Swap Counterparty that the failure of such Noteholder or Prior Senior Swap Counterparty (as applicable) to provide the Trustee with appropriate tax certifications may result in amounts being withheld from payments to such Noteholder or Prior Senior Swap Counterparty (as applicable) under this Indenture and that amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Issuer as provided above.

7.2    <u>Maintenance of Office or Agency</u>.

The Co-Issuers hereby appoint the Trustee as Paying Agent for the payment of principal of and interest on the Notes. The Co-Issuers hereby appoint CT Corporation, 111 Eighth Avenue, New York, NY 10011, as the Co-Issuers' agent where notices and demands to or upon the Co-Issuers in respect of the Notes or this Indenture may be served and where such Notes may be surrendered for registration of transfer or exchange.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; *provided* that (A) the Co-Issuers will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Co-Issuers in respect of the Notes and this Indenture may be served, (B) no Paying Agent shall be appointed in a jurisdiction which would subject payments on the Notes to withholding tax as a result of the Paying Agent being located therein and (C) the Co-Issuers may not terminate the appointment of any Paying Agent without the consent of each Preference Shareholder. The Co-Issuers shall give prompt written notice to the Trustee, the Collateral Manager, each Rating Agency, the Senior Swap Counterparties and the Noteholders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made at and notices and demands may be served on the Co-Issuers, and Notes may be presented and surrendered for payment to the Paying Agent at its office (and the Co-Issuers hereby appoint the same as their agent to receive such respective presentations, surrenders, notices and demands).

For so long as any Class of Notes is listed on a stock exchange and such exchange shall so require, the Co-Issuers shall maintain a listing agent, a paying agent and an agent where notices and demands to or upon the Co-Issuers in respect of any Notes so listed may be served and where such Notes may be surrendered for registration of transfer or exchange.

7.3     Cash for Note Payments to be Held in Trust.

All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Issuer by the Trustee or a Paying Agent with respect to payments on the Notes.  All payment of amounts due and payable with respect to any Preference Shares shall be made on behalf of the Issuer by the Trustee to the Preference Share Paying Agent for distribution to the Preference Shareholders in accordance with the Preference Share Paying Agency Agreement.  All payment of amounts due and payable to the Senior Swap Counterparties shall be made on behalf of the Issuer by the Trustee to the Senior Swap Counterparty in accordance with the provisions of the Senior Swap Agreement and this Indenture (as applicable) including, without limitation, the definitions of "Outstanding Swap Counterparty Amount" and "Senior Swap Interest Amount" and Sections 11.1 and 13.1.

When the Co-Issuers shall have a Paying Agent that is not also the Note Registrar, they shall furnish, or cause the Note Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

Whenever the Co-Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Quarterly Distribution Date or Redemption Date, as the case may be, direct the Trustee to deposit on such Quarterly Distribution Date or Redemption Date, as the case may be, with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent that funds are then available for such purpose in the Payment Account or Principal Collection Account, as the case may be), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act.  Any Cash deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for credit to the appropriate Account.

The initial Paying Agent shall be as set forth in Section 7.2.  At the direction of a Majority of the Controlling Class, the Issuer shall, by Issuer order, appoint additional successor

Paying Agents; *provided* that so long as any Class of Notes is rated by the Rating Agencies and with respect to any additional or successor Paying Agent for the Notes, (i) either (a) the Paying Agent for the Notes has a rating of not less than "Aa3" (and, if rated "Aa3", such rating is not on watch for downgrade) and "P-1" (and such rating is not on watch for downgrade) by Moody's and a rating of not less than "AA-" and not less than "A-1+" by Standard & Poor's or (ii) the applicable Rating Condition with respect to the appointment of such Paying Agent shall have been satisfied. In the event that (i) such successor Paying Agent ceases to satisfy the foregoing rating requirements or (ii) the Rating Condition with respect to the appointment of such Paying Agent shall not have been satisfied, the Co-Issuers shall promptly remove such Paying Agent and appoint a successor Paying Agent. The Co-Issuers shall not appoint any Paying Agent (other than an initial Paying Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by Federal and/or state and/or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee (and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 7.3, that such Paying Agent will:

(a)    allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Quarterly Distribution Date and Redemption Date among such Holders in the proportion specified in the instructions set forth in the applicable Note Valuation Report or Redemption Date Statement or as otherwise provided herein, in each case to the extent permitted by applicable law;

(b)    hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(c)    if such Paying Agent is not the Trustee, immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment;

(d)    if such Paying Agent is not the Trustee, immediately give the Trustee notice of any Default by the Issuer or the Co-Issuer (or any other obligor upon the Notes) in the making of any payment required to be made; and

(e)    if such Paying Agent is not the Trustee at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Co-Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such Cash.

Except as otherwise required by applicable law, any Cash deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest on any Note and remaining unclaimed for two years after such principal or interest has become due and payable shall be paid to the Co-Issuers on Issuer Request; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer or the Co-Issuer for payment of such amounts and all liability of the Trustee or such Paying Agent with respect to such trust Cash (but only to the extent of the amounts so paid to the Co-Issuers) shall thereupon cease. The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Co-Issuers, any reasonable means of notification of such release of payment, including mailing notice of such release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in Cash due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

7.4     Existence of Co-Issuers.

The Issuer and the Co-Issuer shall, to the maximum extent permitted by applicable law, maintain in full force and effect their existence and rights as an exempted company incorporated and registered under the laws of the Cayman Islands and as a limited liability company organized under the laws of the State of Delaware, respectively, and shall obtain and preserve their qualification to do business in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes or any of the Collateral.

The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular board of directors' and shareholders', or other similar, meetings) or registrations are followed. Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding. Without limiting the foregoing, (a) the Issuer shall not have any subsidiaries other than the Co-Issuer, (b) the Co-Issuer shall not have any subsidiaries and (c) the Issuer and the Co-Issuer shall not (i) have any employees, (ii) engage in any transaction with any shareholder that would constitute a conflict of interest or (iii) pay dividends or other similar distributions other than in accordance with the terms of this Indenture, provided that the foregoing shall not prohibit the Issuer from entering into the transactions contemplated by the Administration Agreement and the Preference Share Paying Agency Agreement with the Administrator.

7.5     Protection of Collateral.

(a)     The Collateral Manager on behalf of the Issuer, shall from time to time when deemed necessary or desirable by the Issuer, execute and deliver all such supplements and amendments hereto and all such Financing Statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to:

(i)     Grant more effectively all or any portion of the Collateral;

(ii)     maintain, preserve and perfect the lien (and the first priority nature thereof) of this Indenture or to carry out more effectively the purposes hereof;

(iii)     maintain, preserve, perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations);

(iv)     enforce any of the Pledged Securities or other instruments or property included in the Collateral;

(v)     preserve and defend title to the Collateral and the rights therein of the Trustee and the Holders of the Notes and other Secured Parties against the claims of all Persons and parties; or

(vi)     (x) pay or cause to be paid any and all taxes levied or assessed upon either of the Co-Issuers upon or in respect of all or any part of the Collateral and timely file all tax returns and information statements as required, and (y) if required to prevent the withholding or imposition of United States income tax, deliver or cause to be delivered a United States Internal Revenue Service Form W-8BEN or successor applicable form, to each issuer, counterparty or paying agent with respect to (as applicable) an item included in the Collateral at the time such item included in the Collateral is purchased or entered into and thereafter prior to the expiration or obsolescence of such form.

In addition, the Issuer hereby authorizes and designates the Trustee its agent and attorney-in-fact to execute and file upon written instruction any Financing Statement, continuation statement or other instrument required pursuant to this Section 7.5; *provided* that such appointment shall not impose upon the Trustee any of the Issuer's or the Collateral Manager's obligations under this Section 7.5. The Trustee may rely on the opinion of counsel to be delivered pursuant to Section 7.6 in connection with filing any continuation statement. The Issuer agrees that a carbon, photographic, photostatic or other reproduction of this Indenture or of a Financing Statement is sufficient as a Financing Statement.

(b)     The Trustee shall not (i) except in accordance with Section 10.8(a), (b) or (c), as applicable, remove any portion of the Collateral that consists of Cash or is evidenced by an Instrument, certificate or other writing (A) from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.6 (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1(c), if no Opinion of Counsel has yet been delivered pursuant to Section 7.6) or (B) from the possession of the Person who held it on such date or (ii) cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (A) located in a different jurisdiction from the jurisdiction in which such ownership or pledge was recorded at such date or (B) other than the Person on whose books such ownership or pledge was recorded at such date, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(c)     The Issuer shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Securities that secure the Notes.

(d)     The Issuer shall enforce all of its material rights and remedies under the Collateral Management Agreement, the Hedge Agreements, the Account Control Agreement, the Administration Agreement, the Collateral Administration Agreement, the Credit Default Swap Agreement, the Senior Swap Agreement, the Preference Share Paying Agency Agreement and the Underlying Instruments in respect of a Synthetic Security (including its rights and remedies in respect of any guarantor of the obligations of a Synthetic Security Counterparty under a Synthetic Security).  The Issuer will not enter into any agreement amending, modifying or terminating the Account Control Agreement, any Hedge Agreement, the Senior Swap Agreement or the Collateral Administration Agreement without (i) 10 days' prior notice to each Rating Agency, the Collateral Manager, the Credit Default Swap Counterparty, the Senior Swap Counterparties, each Noteholder materially adversely affected thereby, each Hedge Counterparty affected thereby and the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder), (ii) the consent of any Hedge Counterparty, the Credit Default Swap Counterparty and any Senior Swap Counterparty that forms part of the Controlling Class if such amendment, modification or termination could be reasonably expected to materially adversely affect such Person and (iii) the Rating Condition with respect to each Rating Agency relating to such amendment, modification or termination shall have been satisfied.

(e)     Without at least 30 days' prior written notice to the Trustee, Standard & Poor's and the Collateral Manager, the Issuer shall not change its name, or the name under which it does business, from the name shown on the signature pages hereto, and will take such actions as are necessary to ensure that the lien and security interest created by this Indenture with respect to the Collateral remains a valid and perfected first priority lien and shall furnish an Opinion of Counsel (which shall include assumptions and qualifications substantially similar to those set forth in Exhibit D) to such effect.

(f)     The Issuer will enter into a Credit Default Swap Agreement on the Closing Date in the form attached hereto as Exhibit N.  Upon termination of the Credit Default Swap Agreement pursuant to the terms thereof, the Issuer shall use reasonable efforts to enter into a replacement Credit Default Swap Agreement that (i) either (A) satisfies the Rating Condition or (B) is a Form-Approved Credit Default Swap Agreement and (ii) satisfies Section 12.3(d) hereof.

(g)     The Issuer will enter into the Investment Agreement on the Closing Date in the form attached hereto as Exhibit O.  Upon the termination of the Investment Agreement, the Issuer shall provide written notice of such termination to Standard & Poor's.

7.6     Opinions as to Collateral.

On or before September 30 in each calendar year, commencing in 2007, the Issuer shall furnish to the Trustee and each Rating Agency (with copies to each Hedge Counterparty, the Credit Default Swap Counterparty and the Senior Swap Counterparties) an Opinion of Counsel (which shall include assumptions and qualifications substantially similar to those set forth in Exhibit D) stating that, in the opinion of such counsel, as of the date of such opinion, the lien and

security interest created by this Indenture with respect to the Collateral remains a valid and perfected first priority lien and describing the manner in which such security interest shall remain perfected.

7.7    Performance of Obligations.

(a)    If an Event of Default has occurred and is continuing, without prior consent of a Majority of the Controlling Class, the Co-Issuers shall not take any action, and shall use their best efforts not to permit any action to be taken by others, that would release any Person from such Person's covenants or obligations under any security included in the Collateral, except in the case of enforcement action taken with respect to any Defaulted Security in accordance with the provisions hereof and as otherwise required hereby. The Co-Issuers may not enter into any amendment or waiver of or supplement to any Underlying Instrument with respect to any security included in the Collateral without the prior consent of a Majority of the Controlling Class and the Hedge Counterparties; *provided* that, notwithstanding anything in this Section 7.7(a) to the contrary, the Co-Issuers may enter into any amendment or waiver of or supplement to any such Underlying Instrument:

(i)    if such amendment, supplement or waiver is required by the provisions of any Underlying Instrument or by applicable law (including the USA PATRIOT Act) (other than pursuant to an Underlying Instrument),

(ii)    if such amendment, supplement or waiver is necessary to cure any ambiguity, inconsistency or formal defect or omission in such Underlying Instrument,

(iii)    to the extent expressly permitted or authorized by any amendment of or supplement to this Indenture entered into in accordance with Section 8.1 or 8.2 (but subject to the conditions therein specified),

(iv)    to make any other change deemed necessary by the Issuer or the Collateral Manager on its behalf (but only if, as of the date of any such proposed amendment, waiver or supplement occurring on or after the Ramp-Up Completion Date, the Collateral Quality Tests and, if during the Reinvestment Period the Overcollateralization Tests are satisfied), or

(v)    to make any other change deemed necessary by the Issuer or the Collateral Manager on its behalf (but only if (A) such proposed amendment, waiver or supplement does not effect a Specified Change and (B) such change does not materially adversely affect the interests of the Noteholders or the Senior Swap Counterparties in the Collateral as determined by the Collateral Manager on behalf of the Issuer.

When used in connection with a Collateral Debt Security that is a Synthetic Security, each reference in this Section 7.7 to any Underlying Instrument shall include reference to the Underlying Instrument pursuant to which the Reference Obligation has been issued or created as well as any agreement creating or otherwise governing such Synthetic Security.

(b)    The Co-Issuers may, with the prior written consent of a Majority of each Class, a Majority-in-Interest of Preference Shares, the Credit Default Swap Counterparty, any Senior

Swap Counterparty that forms part of the Controlling Class and the Hedge Counterparties (except in the case of the Collateral Management Agreement as initially executed), contract with other Persons, including the Collateral Manager and the Bank, for the performance of actions and obligations to be performed by the Co-Issuers hereunder by such Persons and the performance of the actions and other obligations with respect to the Collateral of the nature set forth in the Collateral Management Agreement by the Collateral Manager. Notwithstanding any such arrangement, the Co-Issuers shall remain liable for all such actions and obligations. In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Co-Issuers; and the Co-Issuers will punctually perform, and use their best efforts to cause the Collateral Manager or such other Person to perform, all of their obligations and agreements contained in the Collateral Management Agreement or such other agreement.

(c)     The Issuer shall treat all acquisitions of Collateral Debt Securities as "purchases" for tax, accounting and reporting purposes.

7.8     <u>Negative Covenants</u>.

(a)     The Issuer will not and, with respect to clauses (ii), (iii), (iv) and (ix), the Co-Issuer will not:

(i)     sell, assign, participate, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Collateral, except as (A) expressly permitted by this Indenture and (B) a Grant of a security interest in a Synthetic Security Counterparty Account to secure the Issuer's obligations to a Synthetic Security Counterparty pursuant to the terms of the Synthetic Security;

(ii)     claim any credit on, make any deduction from, or dispute the enforceability of, the payment of the principal or interest payable in respect of the Notes (other than amounts required to be paid, deducted or withheld in accordance with any applicable law or regulation of any governmental authority) or assert any claim against any present or future Noteholder or the Senior Swap Counterparty by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(iii)     (A) incur or assume or guarantee any indebtedness, other than the Notes and this Indenture and the transactions contemplated hereby; (B) issue any additional class of securities except as provided under this Indenture or the Preference Share Paying Agency Agreement, or (C) issue any additional shares or stock, *provided* that the Co-Issuers may issue additional Notes in accordance with Section 2.9 and the Issuer may issue additional Preference Shares in accordance with the Preference Share Paying Agency Agreement

(iv)     (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as

may be expressly permitted hereby, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the proceeds thereof, or (C) take any action that would permit the lien of this Indenture not to constitute a valid first priority security interest in the Collateral;

(v)     except for any agreements involving the purchase and Sale of Collateral having customary purchase or Sale terms and documented with customary loan trading documentation (but not excepting any Synthetic Security or any Hedge Agreement), enter into any agreements unless such agreements contain "non-petition" and "limited-recourse" provisions;

(vi)    use any of the proceeds of the Notes issued hereunder or the Preference Shares or payments received from the Senior Swap Counterparty, the Credit Default Swap Counterparty or any Hedge Counterparty (A) to extend "purpose credit" within the meaning given to such term in Regulation U or (B) to purchase or otherwise acquire any Margin Stock;

(vii)   permit the aggregate book value of all Margin Stock held by the Issuer on any date to exceed the net worth of the Issuer on such date (excluding any unrealized gains and losses) on such date;

(viii)  amend the Collateral Management Agreement except in accordance with Section 15 and the terms of the Collateral Management Agreement;

(ix)    dissolve or liquidate in whole or in part, except as permitted hereunder and to the maximum extent permitted by applicable law;

(x)     amend any "non-petition" or "limited-recourse" provisions contained in this Indenture, the Notes, any Hedge Agreement, the Preference Share Paying Agency Agreement, the Collateral Management Agreement, the Administration Agreement, the Senior Swap Agreement, the Credit Default Swap Agreement or the Collateral Administration Agreement or amend the "non-petition" or "limited-recourse" provisions of any other documents relating to this transaction to which it is a party without satisfying the Rating Condition relating with respect to each Rating Agency;

(xi)    terminate the Credit Default Swap Agreement unless (A) no Transactions remain outstanding under (and as defined in) the Credit Default Swap Agreement or (B) the Issuer has entered into a replacement therefor pursuant to a Form-Approved Credit Default Swap Agreement;

(xii)   enter into or otherwise acquire any Synthetic Security if such acquisition would result in a Notional Amount Shortfall; or

(xiii)  enter into any CDS Agreement Transaction unless the related Reference Obligation is an RMBS Security, CMBS Security or CDO Security.

(b)     Neither the Issuer nor the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral, or enter into or engage in any business with respect to any part of the Collateral except as expressly permitted by this Indenture and the Collateral Management Agreement.

(c)     The Co-Issuer will not invest any of its assets in "securities" (as such term is defined in the Investment Company Act), and will keep all of its assets in Cash.

(d)     For so long as any of the Notes are Outstanding, the Co-Issuer shall not transfer, and the Issuer shall not permit the Co-Issuer to issue, any capital stock of the Co-Issuer to any Person other than the Issuer.  For so long as the Notes are Outstanding, the Issuer shall not transfer or otherwise dispose of the capital stock of the Issuer issued to it.

7.9     Statement as to Compliance.

On or before January 31 in each calendar year commencing in 2007 or immediately if there has been a Default in the fulfillment of an obligation under this Indenture, the Issuer shall deliver to the Trustee, the Preference Share Paying Agent, each Senior Swap Counterparty, each Noteholder and Preference Shareholder making a written request therefor, the Paying Agent located in Ireland, each Hedge Counterparty and each Rating Agency an Officer's certificate stating, as to each signer thereof, that:

(a)     a review of the activities of the Issuer and of the Issuer's performance under this Indenture during the twelve-month period ending on December 31 of such year has been made under such Officer's supervision; and

(b)     to the best of such Officer's knowledge, based on such review, the Issuer has fulfilled all of its obligations under this Indenture throughout the period, or, if there has been a Default in the fulfillment of any such obligation, specifying each such Default known to such Officer and the nature and status thereof, including actions undertaken to remedy the same.

7.10     Co-Issuers May  Not Consolidate, Etc.

(a)     The Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person.

(b)     The Co-Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person.

7.11     Successor Substituted.

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Co-Issuer, in accordance with Section 7.10, the Person formed by or surviving such consolidation or merger (if other than the Issuer or the Co-Issuer), or, the Person to which such transfer or conveyance is made, shall succeed to, and be substituted for, and may exercise every right and power of, and shall be bound by each obligation or covenant of, the Issuer or the Co-Issuer, as the case may be, under this Indenture with the same effect as if such Person had been named as the Issuer or the Co-Issuer, as the case may be, herein.  In the

event of any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this <u>Section 7</u> may be dissolved, wound-up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

7.12    <u>No Other Business</u>.

The Issuer shall not engage in any business or activity other than (i) acquiring and disposing of, and investing and reinvesting in, Collateral Debt Securities, Equity Securities, Reserve Account Investments, U.S. Agency Securities and Eligible Investments for its own account and entering into and terminating CDS Agreement Transactions and other Synthetic Securities, (ii) entering into, and performing its obligations under, the Indenture, any Hedge Agreement, the Credit Default Swap Agreement, the Senior Swap Agreement, the Collateral Management Agreement, the Collateral Administration Agreement, the Note Purchase Agreement, the Placement Agreement and the Preference Share Paying Agency Agreement, (iii) issuing, selling and redeeming the Notes and the Preference Shares (as applicable), (iv) pledging the Collateral as security for its obligations in respect of the Notes and otherwise for the benefit of the Secured Parties, (v) owning the capital stock of the Co-Issuer and (vi) other activities incidental to the foregoing. The Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and such other activities as are incidental thereto or connected therewith. The Issuer shall not engage in any business or activity or hold any asset that would cause the Issuer to be engaged in a U.S. trade or business for U.S. federal income tax purposes, except as the result of ownership of Equity Securities and Defaulted Securities in accordance with the provisions of this Indenture or equity securities received in an exchange under <u>Section 6.16</u>.   Except for the amendment and restatement of the Issuer Charter on the date hereof, the Issuer will ensure that the Issuer Charter will not be amended, and the Issuer will not amend the Certificate of Formation or operating agreement of the Co-Issuer without satisfying the Rating Condition.

7.13    <u>Reaffirmation of Rating; Annual Rating Review</u>.

(a)     So long as any Class of the Notes remains Outstanding or the Aggregate Outstanding Swap Counterparty Amount or the Remaining Unfunded Notional Amount is greater than zero, on or before November 6 in each year commencing in 2007, the Co-Issuers shall obtain and pay for an annual review of the rating or credit estimate of the Senior Swap Agreement and each Class of Notes from each Rating Agency.

(b)     The Co-Issuers shall promptly notify the Trustee in writing and the Trustee shall promptly notify the Noteholders, the Preference Shareholders, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Hedge Counterparties if at any time the rating or credit estimate of the Senior Swap Agreement or any Class of Notes has been, or is known will be, changed or withdrawn.

7.14    Reporting.

At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or Beneficial Owner of a Note, the Co-Issuers shall promptly furnish or cause to be furnished Rule 144A Information to such Holder or Beneficial Owner, to a prospective purchaser of such Note designated by such Holder or Beneficial Owner or to the Trustee for delivery to such Holder or Beneficial Owner or a prospective purchaser designated by such Holder or Beneficial Owner, as the case may be, in order to permit compliance by such Holder or Beneficial Owner with Rule 144A under the Securities Act in connection with the resale of such Note by such Holder or Beneficial Owner.

7.15    Calculation Agent.

(a)    The Co-Issuers hereby agree that for so long as any of the Senior Notes remain Outstanding the Co-Issuers will at all times cause there to be an agent appointed to calculate LIBOR in respect of each Interest Period in accordance with the terms of Schedule B (the "**Calculation Agent**"), which agent shall be a financial institution, subject to supervision or examination by Federal or state authority, having a rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating is not on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and having an office within the United States. The Co-Issuers have initially appointed the Trustee as Calculation Agent for purposes of determining LIBOR for each Interest Period. The Calculation Agent may be removed by the Co-Issuers at any time. If the Calculation Agent is unable or unwilling to act as such, is removed by the Co-Issuers or fails to determine the Note Interest Rate for any Class of Senior Notes for any Interest Period, the Co-Issuers will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in Dollar deposits in the international Eurodollar market and which does not control or is not controlled by or under common control with the Co-Issuers or any of their Affiliates. The Calculation Agent may not resign its duties without a successor having been duly appointed. The determination of the Note Interest Rate for each Class of Senior Notes for each Interest Period by the Calculation Agent shall (in the absence of manifest error) be final and binding on all parties.

(b)    The Calculation Agent shall, as soon as possible after 11:00 a.m. (London time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (New York City time) on the Business Day immediately following each LIBOR Determination Date, calculate the Note Interest Rate for each Class of Senior Notes for the related Interest Period and the amount of interest for the related Interest Period payable in respect of each Class of Senior Notes (in each case rounded to the nearest cent, with half a cent being rounded upward) on the related Quarterly Distribution Date and will communicate such rates and amounts and the related Quarterly Distribution Date to the Co-Issuers, the Trustee, each Paying Agent (other than the Preference Share Paying Agent), the Depositary, the Custodian, Euroclear and Clearstream, Luxembourg. The Calculation Agent will also specify to the Co-Issuers the quotations upon which the Note Interest Rate for each Class of Senior Notes is based, and in any event the Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (New York City time) on each LIBOR Determination Date if it has not determined and is not in the process of determining such Note Interest Rates, together with its reasons therefor.

7.16    Amendment of Certain Documents.

Prior to entering into any amendment to the Account Control Agreement, Management Agreement, the Collateral Administration Agreement, the Administration Agreement, the Credit Default Swap Agreement, the Senior Swap Agreement or any Hedge Agreements (provided that the amendment to such Hedge Agreement, Credit Default Swap Agreement or Senior Swap Agreement has been consented to by the relevant Hedge Counterparty, the Credit Default Swap Counterparty or the Senior Swap Counterparty, as applicable), the Issuer shall provide notice of such amendment to each Noteholder materially adversely affected thereby, the Credit Default Swap Counterparty (if materially adversely affected thereby) and each Senior Swap Counterparty that is materially adversely affected thereby, shall obtain the consent of the relevant Senior Swap Counterparty if required by the Senior Swap Agreement or the agreement being amended and shall obtain the written confirmation from each Rating Agency that the entry by the Issuer into such amendment satisfies the Rating Condition with respect to each Rating Agency; *provided* that the Rating Condition with respect to Standard & Poor's need not be satisfied (but prior written notice to Standard & Poor's must still be given) (i) to amend the terms of any documents for the purpose of facilitating compliance by the Issuer with any exemption from registration under the Investment Company Act, (ii) to cure any ambiguity or manifest error or correct or supplement any provision contained therein that is manifestly defective or inconsistent with any other provision contained in any other contract to which the Issuer is a party or in the Offering Memorandum or make any modification that is of a formal, minor or technical nature or which is made to correct a manifest error and (iii) to make any change required by any stock exchange on which any Class of Notes or the Preference Shares are listed in order to permit or maintain such listing, or to de-list any Class of Notes or the Preference Shares from any stock exchange where permitted under this Indenture.  Prior to entering into any waiver in respect of any of the foregoing agreements, the Issuer shall provide each Noteholder (if materially adversely affected thereby), each Rating Agency, the Senior Swap Counterparties, the Credit Default Swap Counterparty, each Hedge Counterparty and the Trustee with written notice thereof and otherwise comply with the requirements of Section 7.5(d).  The Issuer will not enter into any amendment to the Preference Share Paying Agency Agreement, the Collateral Administration Agreement or any Hedge Agreements without the written consent of the Collateral Manager and, with respect to Hedge Agreement only, the Senior Swap Counterparties, if such amendment alters the rights or obligations of the Collateral Manager in any respect, and the Collateral Manager will not be bound by any such amendment unless the Collateral Manager (and the Senior Swap Counterparties with respect to an amendment to a Hedge Agreement) has consented in writing thereto.

7.17    Purchase of Collateral.

(a)    The Issuer will use its best efforts to purchase or enter into binding agreements to purchase, on or before the Ramp-Up Completion Date, Collateral Debt Securities having an Aggregate Principal Balance, together with the Aggregate Principal Balance of all Eligible Investments purchased with Principal Proceeds, not less than the Aggregate Ramp-Up Par Amount (assuming, for these purposes, (i) settlement in accordance with customary settlement procedures in the relevant markets on the Ramp-Up Completion Date of all agreements entered into by the Issuer to acquire Collateral Debt Securities scheduled to settle on or following the

Ramp-Up Completion Date and (ii) that each such Collateral Debt Security is a Pledged Collateral Debt Security).

(b)     The Issuers shall promptly notify each of the Rating Agencies when a Collateral Debt Security becomes a Written-Down Security.

(c)     No later than 10 Business Days after the Ramp-Up Completion Date, the Issuer (or the Collateral Manager on its behalf) shall deliver or cause to be delivered to the Trustee, each Rating Agency and the Senior Swap Counterparty a list of all Collateral Debt Securities and Equity Securities held by the Issuer (or with respect to which the Issuer has entered into a binding agreement to purchase) on the Ramp-Up Completion Date, the most recent Monthly Report (if any) and an Accountant's Report (A) confirming the information (other than the Principal Balance and the Purchase Price) with respect to each Collateral Debt Security set forth on an updated Schedule of Collateral Debt Securities and the information provided by the Issuer with respect to every other asset forming part of the Collateral, by reference to such sources as shall be specified therein, (B) confirming compliance with each Collateral Quality Test, (C) confirming each of the Overcollateralization Ratios on the Ramp-Up Completion Date, (D) to the extent not covered by (B) and (C), compliance with each of the Eligibility Criteria set forth in paragraphs (5) through (7), (11), (12) and (21) through (38) of <u>Section 12.2</u> for each Pledged Collateral Debt Security held by the Issuer on the Ramp-Up Completion Date and (E) specifying the procedures undertaken by them to review data and computations relating to the foregoing statements. Notwithstanding anything to the contrary in this clause (c), if the Ramp-Up Completion Date shall occur on the Closing Date, the delivery of (A) a copy of the Accountants' Report delivered under <u>Section 3.1(f)</u> to the Trustee, each Rating Agency and the Senior Swap Counterparty demonstrating compliance by the Issuer with each Collateral Quality Test (other than the Standard & Poor's CDO Monitor Notification Test), each Overcollateralization Test and each of the Eligibility Criteria set forth in paragraphs (5) through (7), (11), (12) and (21) through (38) of <u>Section 12.2</u> and (B) the Schedule of Closing Collateral Debt Securities shall be deemed to satisfy the requirements of this clause (c).

(d)     No later than two Business Days after the Ramp-Up Completion Date, the Issuer shall notify each of the Rating Agencies, each Senior Swap Counterparty and each Hedge Counterparty in writing of the occurrence of the Ramp-Up Completion Date (each, a "**Ramp-Up Notice**") and request in writing that each of Standard & Poor's and Moody's confirm in writing within 15 days thereafter that it has not reduced or withdrawn the ratings (including any private or confidential ratings) assigned by it on the Closing Date to the Notes. If either Standard & Poor's or Moody's has provided written instruction that it will not confirm the ratings or the credit estimate assigned by it with respect to the rights of the Senior Swap Counterparties to receive their respective Outstanding Swap Counterparty Amounts, Senior Swap Premium Amounts and Senior Swap Interest Amounts or to any Class of Notes, as applicable, to the Trustee prior to the date 15 days after the delivery of the Ramp-Up Notice, a "**Ratings Confirmation Failure**" will occur. In the event of a Ratings Confirmation Failure, provided a Proposed Plan is not successful, the Issuer will, to the extent that funds are available for such purpose in accordance with the Priority of Payments, apply Uninvested Proceeds, then Interest Proceeds, then Principal Proceeds to *first*, reduce the Aggregate Outstanding Swap Counterparty Amount of the Senior Swap Counterparties until it is paid in full, *second*, reduce the Remaining Unfunded Notional Amount to zero by making a deposit into the Reserve Account, and,

*third*, prepay principal of the Senior Notes sequentially in direct order of Seniority on the first Quarterly Distribution Date relating to the first Determination Date thereafter to the extent necessary in accordance with the Priority of Payments for each of the Rating Agencies to confirm the ratings or credit estimates (including private and confidential ratings) on such Class of Notes and the rights of the Senior Swap Counterparties to receive their respective Outstanding Swap Counterparty Amounts, Senior Swap Premium Amounts and Senior Swap Interest Amounts thereon to the ratings assigned by it to such rights of the Senior Swap Counterparties and each such Class of Notes on the Closing Date (a "**Rating Confirmation**") (and, pending such Rating Confirmation on such Quarterly Distribution Date, each subsequent purchase of any Collateral Debt Security shall be subject to the satisfaction of the Rating Condition); *provided* that if the Ramp-Up Completion Date occurs on the Closing Date (as shall be evidenced by the Accountants' Report delivered on the Closing Date under Section 3.1(f) and the Schedule of Closing Collateral Debt Securities), then, notwithstanding anything to the contrary in this Section 7.17, (i) delivery of a copy of such Accountants' Report and the Schedule of Closing Collateral Debt Securities to the Rating Agencies shall constitute a Ramp-Up Notice, (ii) the initial assignment by Moody's and Standard & Poor's of their ratings to the Notes on the Closing Date shall constitute a Rating Confirmation and (iii) no further action by the Issuer shall be required in connection with the Ramp-Up Completion Date under this Indenture (including, without limitation, under this Section 7.17. The notional amount of any Hedge Agreement may be reduced in connection with a redemption of Senior Notes on any such Quarterly Distribution Date by reason of any Ratings Confirmation Failure by an amount proportionately equal to the principal amount of Senior Notes so redeemed, subject to the satisfaction of the Rating Condition with respect to Standard & Poor's.

(e)     The Issuer shall cause to be delivered to Standard & Poor's by electronic mail on or prior to the Ramp-Up Completion Date a Microsoft Excel file that provides the following information (to the extent such information is not confidential) with respect to each Collateral Debt Security:  (i) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (ii) the CUSIP or other applicable identification number associated with such Collateral Debt Security and Reference Obligation, (iii) the par value of such Collateral Debt Security, (iv) the type of issue (including, by way of example, whether such Collateral Debt Security or Reference Obligation is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee, (v) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Debt Security and Reference Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (vi) the coupon (in the case of a Collateral Debt Security which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Debt Security which bears interest at a floating rate), (vii) the Standard & Poor's Industry Classification Group for such Collateral Debt Security and Reference Obligation, (viii) the stated maturity date of such Collateral Debt Security and Reference Obligation, (ix) the Standard & Poor's Rating of such Collateral Debt Security and Reference Obligation or the issuer thereof, as applicable and (x) the principal balance in Cash and Eligible Investments.

7.18 <u>Senior Swap Agreement; Rights of Senior Swap Counterparty under the Indenture; Replacement of the Senior Swap Counterparty</u>.

(a)      If the Issuer is required to make a Credit Protection Payment to the Credit Default Swap Counterparty pursuant to the Credit Default Swap Agreement and the sum of the amounts on deposit in (i) the Uninvested Proceeds Account, (ii) the Principal Collection Account and (iii) the Reserve Account are insufficient to pay the full amount of such Credit Protection Payment, then the Collateral Manager on the Issuer's behalf shall deliver a Credit Protection Funding Request to the Senior Swap Counterparty by 11:00 a.m. (New York City time) at least two Business Days prior to the Business Day on which such Credit Protection Payment is required to be paid to the Credit Default Swap Counterparty for the amount required (after taking into account the application of amounts in the Uninvested Proceeds Account, Principal Collection Account and Reserve Account for such purpose) to pay the full amount of such Credit Protection Payment.

(b)      If the Issuer is required to make a payment to the Credit Default Swap Counterparty pursuant to the Credit Default Swap Agreement with respect to a trading loss incurred as a result of the termination of a CDS Agreement Transaction (a "**CDS Termination Payment**") which is a Trading Termination Payment and the sum of the amounts on deposit in (i) the Uninvested Proceeds Account, (ii) the Principal Collection Account and (iii) the Reserve Account are insufficient to pay the full amount of such CDS Termination Payment, then the Collateral Manager on the Issuer's behalf shall deliver a Termination Payment Funding Request to the Senior Swap Counterparty by 11:00 a.m. (New York City time) at least two Business Days prior to the Business Day on which such CDS Termination Payment is required to be paid to the Credit Default Swap Counterparty for the amount required (after taking into account the application of amounts in the Uninvested Proceeds Account, Principal Collection Account and Reserve Account for such purpose) to pay the full amount of such CDS Termination Payment.

(c)      If the Issuer has entered into a commitment to purchase a Collateral Debt Security and the sum of the amounts on deposit in (i) the Uninvested Proceeds Account, (ii) the Principal Collection Account and (iii) solely to the extent that distribution of such amounts would not result in a Notional Amount Shortfall, the Reserve Account are insufficient to pay the full purchase price of such Collateral Debt Security, then the Collateral Manager on the Issuer's behalf shall deliver a Bond Purchase Request to the Senior Swap Counterparty by 11:00 a.m. (New York City time) at least two Business Days prior to the settlement date for the purchase of such Collateral Debt Security for the amount required (after taking into account the application of amounts in the Uninvested Proceeds Account, the Principal Collection Account and the Reserve Account that, in each case, are available for such purpose (which, in the case of amounts in the Reserve Account, shall be the portion of such available amounts that may be distributed without causing a Notional Amount Shortfall)) to pay the full purchase price of such Collateral Debt Security.

(d)      Each Credit Protection Funding Request, Termination Payment Funding Request and Bond Purchase Request shall be made in writing (and may be made by electronic mail or facsimile only if permitted in accordance with the notice provisions set forth in the Senior Swap Agreement) to the Senior Swap Counterparty and shall contain the applicable amount requested by the Collateral Manager on the Issuer's behalf to the Senior Swap Counterparty to pay the

relevant Credit Protection Amount, purchase price of the Collateral Debt Security being acquired or Trading Termination Payment (as applicable); *provided* that (i) no Bond Purchase Request shall be made hereunder (A) except during the Reinvestment Period (provided that, subject to the foregoing, the settlement date for a Bond Purchase Request may occur at any time within 20 Business Days after the last day of the Reinvestment Period), (B) if the Aggregate Outstanding Swap Counterparty Amount (determined based solely on trade date information available with respect to all other Credit Protection Funding Requests, Termination Payment Funding Requests and Bond Purchase Requests that are submitted at or prior to the exact time at which the relevant Bond Purchase Request is made hereunder and without reference to any Credit Protection Funding Request, Termination Payment Funding Request and Bond Purchase Request information received subsequent to such time, in each case regardless of the settlement dates of such requests) as of the immediately preceding day exceeds (or, as a result of the payment of the requested Bond Purchase Payment would exceed) U.S.$225,000,000, and (C) if the relevant acquisition would result in a Notional Amount Shortfall; (ii) no Termination Payment Funding Request shall be made hereunder in an amount greater than the excess (if any) of (A) the Trading Termination Payment over (B) any Trading Termination Receipt received or to be received by the Issuer as a result of the termination of any related Short Synthetic Security (which termination shall be effected on or prior to the date specified for funding of such Trading Termination Payment in the related Termination Payment Funding Request); and (iii) in no event shall the amount of any payment by the Senior Swap Counterparty to be made to the Issuer on any day exceed the Remaining Unfunded Notional Amount (which shall be calculated without taking into account such payment but taking into account any Swap Reduction Payment paid by the Issuer on the same date).

(e)     If an "Event of Default" or "Termination Event" (each as defined in the Senior Swap Agreement) occurs as to which the Senior Swap Counterparty is the "defaulting party" or the "affected party" (each as defined in the Senior Swap Agreement), then the Collateral Manager on the Issuer's behalf shall deliver a notice to the Senior Swap Counterparty designating an "Early Termination Date" under (and as defined in) the Senior Swap Agreement (and indicating the amounts, including if applicable the Senior Swap Early Termination Date Payment, payable by the Senior Swap Counterparty to the Issuer). If the Issuer receives a notice from the Senior Swap Counterparty designating an "Early Termination Date" under (and as defined in) the Senior Swap Agreement, then the Issuer shall deliver notice to the Senior Swap Counterparty of the amounts, including if applicable the Senior Swap Early Termination Date Payment, payable by the Senior Swap Counterparty pursuant to the Senior Swap Agreement to the Issuer.

(f)     Notwithstanding the termination of the Senior Swap Agreement, the Issuer hereby undertakes that it will pay amounts owing in respect of the Outstanding Swap Counterparty Amount of a Prior Senior Swap Counterparty and Senior Swap Interest Amounts thereon to such Prior Senior Swap Counterparty after the applicable Senior Swap Early Withdrawal Date subject to and in accordance with the Priority of Payments and in accordance with the terms hereof (including, without limitation, clause (h) below and the definitions of "Outstanding Swap Counterparty Amount" and "Senior Swap Interest Amount").

(g)     During the Reinvestment Period, if a Supersenior Excess exists, the Collateral Manager on behalf of the Issuer may elect upon notice to the Trustee, the Senior Swap

Counterparty and the Credit Default Swap Counterparty to reduce the Supersenior Excess (but not to less than zero) by making a permanent reduction of the Remaining Unfunded Notional Amount (pursuant to clause (iii) of the definition of Permanent Reduction Amount) in which case the Trustee and the Issuer will record such permanent reduction in their respective books and records where appropriate. If on any Determination Date occurring after the last day of the Reinvestment Period any Coverage Test is not satisfied, the Issuer shall permanently reduce the Supersenior Excess by the lesser of (i) the amount thereof and (ii) the amount required to satisfy each such Overcollateralization Test, by making a permanent reduction of the Remaining Unfunded Notional Amount (pursuant to clause (ii) of the definition of "Permanent Reduction Amount").

(h)     Following (and notwithstanding) the occurrence of the Senior Swap Early Withdrawal Date:

(i)     the Outstanding Swap Counterparty Amount of a Prior Senior Swap Counterparty shall accrue interest during each Interest Period at the rate specified in clause (b) of the definition of "Senior Swap Interest Amount,"

(ii)     Senior Swap Interest Amounts on the Outstanding Swap Counterparty Amount of a Prior Senior Swap Counterparty shall be due and payable on each Quarterly Distribution Date subject to and in accordance with the Priority of Payments,

(iii)     no payment shall be made by the Issuer hereunder to a Prior Senior Swap Counterparty other than on a Quarterly Distribution Date (including any Redemption Date),

(iv)     any Senior Swap Interest Amount due on the Outstanding Swap Counterparty Amount of a Prior Senior Swap Counterparty which is not available to be paid as a result of the operation of the Priority of Payments on any Quarterly Distribution Date shall bear interest at the rate specified in clause (b) of the definition of "Senior Swap Interest Amount" until the first Quarterly Distribution Date on which funds are available to be used for such purpose in accordance with the Priority of Payments,

(v)     the Outstanding Swap Counterparty Amount of a Prior Senior Swap Counterparty shall be payable no later than the Stated Maturity of the Notes unless it becomes due and payable at an earlier date by in connection with a declaration of acceleration or call for redemption of the Notes or otherwise,

(vi)     as a condition to the payment to a Prior Senior Swap Counterparty hereunder without the imposition of U.S. withholding tax, the Trustee shall require certification acceptable to it to enable each of the Co-Issuers, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments to a Prior Senior Swap Counterparty under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification may include U.S. federal income tax

forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). Each Prior Senior Swap Counterparty agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification promptly upon learning that any form previously provided has become obsolete or incorrect,

(vii)     the Issuer shall not be obligated to pay any additional amounts to a Prior Senior Swap Counterparty as a result of deduction or withholding for or on account of any present or future taxes, duties, assessments or governmental charges with respect to payments required to be made to such Prior Senior Swap Counterparty hereunder,

(viii)     payments in respect of the Outstanding Swap Counterparty Amount of a Prior Senior Swap Counterparty and Senior Swap Interest Amounts thereon shall be payable by wire transfer in immediately available funds to a Dollar account maintained by such Prior Senior Swap Counterparty in accordance with wire transfer instructions received by the Trustee on or before the Determination Date or, if no wire transfer instructions are received by the Trustee, by a Dollar check drawn on a bank in the United States mailed by first class mail to the address of such Prior Senior Swap Counterparty most recently received by the Trustee at the close of business on such Determination Date,

(ix)     all reductions in the Outstanding Swap Counterparty Amount of a Prior Senior Swap Counterparty effected by payments made in respect thereof on any Quarterly Distribution Date or Redemption Date shall be binding upon all assignees and transferees of the rights of such Prior Senior Swap Counterparty hereunder,

(x)     the provisions of <u>Section 2.6(i)</u> shall apply to all amounts due and payable to a Prior Senior Swap Counterparty hereunder but shall not otherwise cause them to be due and payable, and

(xi)     the voting and other consensual rights of a Prior Senior Swap Counterparty hereunder (whether as the Controlling Class or otherwise) shall continue for so long as the Outstanding Swap Counterparty Amount of such Prior Senior Swap Counterparty is greater than zero.

(i)     The Issuer shall obtain the written consent of the Credit Default Swap Counterparty (which consent shall not be unreasonably withheld or delayed) prior to consenting to any replacement Senior Swap Counterparty under the Senior Swap Agreement.

7.19     <u>Notional Principal Contract Treatment</u>.

The Issuer will treat each "Transaction" under and as defined in the Credit Default Swap Agreement as a "notional principal contract" (as defined in Treasury Regulations Section 1.446-3) for all applicable U.S. tax purposes, except as otherwise may be required by any taxing authority under applicable law or pursuant to a change in tax law.

## 8. SUPPLEMENTAL INDENTURES

8.1    Supplemental Indentures Without Consent of Noteholders.

Without the consent of the Noteholders, the Preference Shareholders, the Hedge Counterparties, if any (except to the extent required by the related Hedge Agreement), each Senior Swap Counterparty (except to the extent required by the Senior Swap Agreement), the Credit Default Swap Counterparty (except to the extent required by the Credit Default Swap Agreement) or, except as provided below, the Co-Issuers, when authorized by Resolutions, and the Trustee, at any time and from time to time subject to the requirement provided below in this Section 8.1 with respect to the ratings of the Notes and subject to Section 8.3, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(a)    to evidence the succession of another Person to the Issuer or the Co-Issuer and the assumption by any such successor Person of the covenants of the Issuer or the Co-Issuer herein and in the Notes pursuant to Section 7.10 or 7.11;

(b)    to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Senior Swap Counterparties, the Holders of all of the Notes or to surrender any right or power herein conferred upon the Co-Issuers;

(c)    to convey, transfer, assign, mortgage or pledge any property to or with the Trustee;

(d)    to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Sections 6.10, 6.12 and 6.13;

(e)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations) or to subject to the lien of this Indenture any additional property;

(f)    to modify the restrictions on and procedures for resales and other transfers of the Notes in accordance with any change in any applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(g)    to correct any inconsistency, defect or ambiguity in this Indenture or to correct any manifest error in any provision of this Indenture upon receipt by the Trustee of written direction from the Issuer describing in reasonable detail such error and the modification necessary to correct such error;

(h)     to obtain ratings on one or more Classes of the Notes or the Senior Swap Agreement from any rating agency;

(i)     to accommodate the issuance of Notes or Preference Shares in exchange for existing Notes or Preference Shares, as the case may be, to be held in global form through the facilities of DTC, Euroclear or Clearstream, Luxembourg or otherwise or the listing of the Notes or Preference Shares on any exchange;

(j)     solely, in order to, and solely to the extent required to accommodate the listing or de-listing of any Notes or Preference Shares on any stock exchange,

(k)     to make any non-material administrative changes as the Co-Issuers deem appropriate;

(l)     to prevent the Issuer from being treated as engaged in a United States trade or business for U.S. federal income tax purposes or otherwise subject to U.S. federal, state, local or foreign income or franchise tax on a net income tax basis or to prevent the imposition of withholding tax on any payment to the Issuer; *provided* that there is no adverse effect on the cash flows disbursed in accordance with the Priority of Payments;

(m)     to avoid the Issuer or the Co-Issuer or the Collateral being required to register as an investment company under the Investment Company Act;

(n)     to accommodate the issuance of any Class of Notes as Definitive Notes;

(o)     to make any change to the Indenture necessary in order to conform this Indenture to a Proposed Plan (excluding any changes to the Eligibility Criteria); or

(p)     with the consent of the Senior Swap Counterparties, to give effect to any financing arrangements entered into by the Issuer (which need not be documented by an ISDA Master Agreement and may involve the issuance of debt securities or other instruments by the Issuer) following the occurrence of any Senior Swap Early Withdrawal Date that satisfy the Rating Condition and paragraph (8) of the Eligibility Criteria.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

The Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the interests of any Noteholder or Preference Shareholder, the Credit Default Swap Counterparty, any Senior Swap Counterparty or any Hedge Counterparty would be materially adversely affected thereby.  Unless notified by (i) a Majority of any Class of Notes or a Majority-in Interest of Preference Shares that such Class or the Preference Shares will be materially adversely affected, (ii) any Hedge Counterparty, any Senior Swap Counterparty, the Credit Default Swap Counterparty that such Hedge Counterparty, Senior Swap Counterparty, Credit Default Swap Counterparty will be materially adversely affected, the Trustee shall be

entitled to rely upon an Opinion of Counsel delivered pursuant to Section 8.3 hereof as to whether the interests of any Noteholder, Preference Shareholder, Hedge Counterparty, Credit Default Swap Counterparty, Senior Swap Counterparty would be materially adversely affected by any such supplemental indenture; *provided* that, where any supplemental indenture reflects any proposed amendments or modifications that are quantitative or financial in nature, any counsel providing such opinion shall be entitled to rely upon a certificate of the Collateral Manager (which the Collateral Manager is not obligated to provide) stating that any proposed amendment or modification will not materially adversely affect the interests of any Noteholder, Preference Shareholder, Credit Default Swap Counterparty, Senior Swap Counterparty or Hedge Counterparty, to the extent of such quantitative or financial amendment or modification; *provided* that in no event shall any Holder, Preference Shareholder, Hedge Counterparty, Senior Swap Counterparty or Credit Default Swap Counterparty be materially adversely affected by any issuance of Notes or Preference Shares in exchange for existing Notes or Preference Shares, as the case may be, in the manner contemplated by Section 8.1(i) in order to accommodate their issuance through the facilities of Euroclear or Clearstream, Luxembourg. The Trustee shall not enter into any such supplemental indenture pursuant to clause (f), (g) or (n) of this Section 8.1 without the written consent of the Collateral Manager. In addition, the Trustee may not enter into any supplemental indenture without the written consent of the Collateral Manager if such supplemental indenture alters the rights or obligations of the Collateral Manager in any respect, and the Collateral Manager will not be bound by any such supplemental indenture unless the Collateral Manager has consented thereto. At the cost of the Co-Issuers, the Trustee shall provide to the Noteholders and the Preference Share Paying Agent for distribution to the Preference Shareholders, the Hedge Counterparties, the Senior Swap Counterparties and the Credit Default Swap Counterparty a copy of any proposed supplemental indenture at least 20 days prior to the execution thereof by the Trustee and a copy of the executed supplemental indenture after its execution; *provided* that no such notice shall be required in connection with any issuance of Notes or Preference Shares in exchange for existing Notes or Preference Shares, as the case may be, in the manner contemplated by Section 8.1(i) in order to accommodate their issuance through the facilities of Euroclear or Clearstream, Luxembourg. At the cost of the Co-Issuers, the Trustee shall provide to each Rating Agency a copy of any proposed supplemental indenture at least 20 days prior to the execution thereof by the Trustee, and, for so long as the Aggregate Outstanding Swap Counterparty Amount or the Remaining Unfunded Notional Amount is greater than zero or any Notes are Outstanding, request that the Rating Condition with respect to each Rating Agency with respect to such supplemental indenture be satisfied and, as soon as practicable after the execution by the Trustee and the Issuer of any such supplemental indenture, provide to each Rating Agency a copy of the executed supplemental indenture; *provided* that no such copy shall be required to be provided in advance of execution and delivery in connection with any issuance of Notes or Preference Shares in exchange for existing Notes or Preference Shares, as the case may be, in the manner contemplated by Section 8.1(i) in order to accommodate their issuance through the facilities of Euroclear or Clearstream, Luxembourg. The Trustee shall not enter into any supplemental indenture pursuant to this Section 8.1 if, with respect to such supplemental indenture, the Rating Condition with respect to each Rating Agency would not be satisfied; *provided* that the Trustee may, with the consent of the Holders of 100% of the Aggregate Outstanding Amount of Notes of each Class, the Credit Default Swap Counterparty, each Senior Swap Counterparty that forms part of the Controlling Class and each Hedge Counterparty enter into any such supplemental indenture

notwithstanding any such reduction or withdrawal of the ratings of any Outstanding Class of Notes.

The Trustee shall not enter into any such supplemental indenture unless the Trustee has received advice from Cadwalader, Wickersham & Taft LLP or an Opinion of Counsel of other nationally recognized U.S. tax counsel experienced in such matters that (i) the modification will not cause the Noteholders to experience any material change to the timing, character or source of the income from the Notes, and (ii) the proposed supplemental indenture will not cause the Issuer to be treated as engaged in a U.S. trade or business or otherwise subject to U.S. federal income tax on a net income tax basis.

For purposes of this <u>Section 8.1</u>, the interests of any Hedge Counterparty or Senior Swap Counterparty, the Credit Default Swap Counterparty shall be deemed not to be materially adversely affected by, and a Hedge Counterparty, a Senior Swap Counterparty and the Credit Default Swap Counterparty shall have no right of consent in relation to, any supplemental indenture with respect to (i) the appointment of any successor Collateral Manager in accordance with the Collateral Management Agreement and (ii) any change to the Senior Collateral Management Fee, the Subordinate Management Fee, the Collateral Management Fee or otherwise in respect of the fees, liabilities and expenses to apply to such successor Collateral Manager.

8.2    <u>Supplemental Indentures With Consent of Noteholders</u>.

With the consent of (x) the Holders of not less than a Majority of each Class of Notes materially adversely affected thereby (if any Class of Notes is materially adversely affected thereby) and a Majority-in-Interest of Preference Shares (if the Preference Shareholders are materially adversely affected thereby), by Act of said Noteholders or by written consent of the Preference Shareholders (which consent shall be evidenced by an Officer's certificate of the Issuer certifying that such consent has been obtained) delivered to the Trustee and the Co-Issuers) and (y) each Hedge Counterparty (to the extent required in the related Hedge Agreement), of each Senior Swap Counterparty that is materially adversely affected thereby, the Credit Default Swap Counterparty (to the extent required in the Credit Default Swap Agreement) (delivered by the relevant Hedge Counterparties and Senior Swap Counterparties and the Credit Default Swap Counterparty) to the Trustee and the Co-Issuers), the Trustee and Co-Issuers may, subject to <u>Section 8.3</u>, enter into one or more indentures supplemental hereto to add any provisions to, or change in any manner or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Holders of the Notes of such Class or the Preference Shares, the Credit Default Swap Counterparty, any Senior Swap Counterparty or the Hedge Counterparties, as the case may be, under this Indenture; *provided* that notwithstanding anything in this Indenture to the contrary, no such supplemental indenture shall be entered into, without the consent of each Holder of each Outstanding Note of each Class and each Preference Share (which consent shall be evidenced by an Officer's certificate of the Issuer certifying that such consent has been obtained), the Credit Default Swap Counterparty (to the extent required in the Credit Default Swap Agreement), each Senior Swap Counterparty that is materially adversely affected thereby and the Hedge Counterparties (to the extent required in the related Hedge Agreement) if such supplemental indenture:

(a)     changes the Stated Maturity of the principal of or the due date of any installment of interest on any Note, reduces the principal amount thereof or the Note Interest Rate thereon, or the Redemption Price with respect thereto, changes the earliest date on which the Issuer may redeem any Note, changes the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on the Notes, changes any place where, or the coin or currency in which, any Note or the principal thereof or interest thereon is payable, or impairs the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date);

(b)     deletes the requirement of the consent of any Senior Swap Counterparty or reduces the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class and Holders of Preference Shares, in each case whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain Defaults hereunder or their consequences provided for in this Indenture;

(c)     impairs or adversely affects the Collateral pledged under this Indenture except as otherwise expressly permitted in this Indenture;

(d)     permits the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or terminates such lien on any property at any time subject hereto (other than in connection with the Sale thereof in accordance with this Indenture) or deprives the Holder of any Note or any Senior Swap Counterparty of the security afforded by the lien of this Indenture;

(e)     reduces the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or remove any other Secured Party, in each case whose consent is required to request that the Trustee preserve the Collateral or rescind the Trustee's election to preserve the Collateral pursuant to Section 5.5 or to sell or liquidate the Collateral pursuant to Section 5.4 or 5.5;

(f)     modifies the provisions of Section 5.15;

(g)     modifies any of the provisions of this Section 8.2 requiring the consent of any Senior Swap Counterparty, Noteholders or Preference Shareholders, except to increase the percentage of Outstanding Notes or Preference Shares whose Holders' consent is required for any such action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of each Senior Swap Counterparty that forms part of the Controlling Class or the Holder of each Outstanding Note and Preference Share adversely affected thereby;

(h)     modifies the definition of the term "Outstanding," Section 11.1 or Section 13.1;

(i)     changes the permitted minimum denominations of any Class of Notes;

(j)     modifies any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of (i) any payment of interest on or principal of any Note or the rights of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained herein or (ii) any deposit into the Reserve Account; or

(k)      changes the provisions of this Indenture relating to the calculation or due date of, or the application of proceeds of any Collateral to, (i) the payment of any Outstanding Swap Counterparty Amount, any Senior Swap Interest Amount, any Senior Swap Premium Amount or any other payment to be made to a Senior Swap Counterparty or (ii) the reduction or calculation of the Remaining Unfunded Notional Amount.

The Trustee may not enter into any such supplemental indenture under this <u>Section 8.2</u> unless (1)(x) the Rating Condition with respect to Standard & Poor's shall have been satisfied with respect to such supplemental indenture or (y) consent of 100% of the Noteholders of each Affected Class of Notes and each Senior Swap Counterparty that is materially adversely affected thereby is obtained and (2) notice of such supplemental indenture has been provided to Moody's.

Notwithstanding the foregoing, the Trustee and the Co-Issuers may, with the consent of the Collateral Manager and a Special-Majority-in-Interest of Preference Shareholders, enter into a supplemental indenture at any time prior to the end of the Reinvestment Period in order to facilitate the issuance of additional Notes in accordance with the provisions of Section 2.9.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this <u>Section 8.2</u>, the Trustee, at the expense of the Co-Issuers shall mail to the Noteholders, each Hedge Counterparty, the Credit Default Swap Counterparty, the Senior Swap Counterparties, the Preference Share Paying Agent, the Collateral Manager and each Rating Agency a copy of such proposed supplemental indenture (or a description of the substance thereof) and shall request that the Rating Condition with respect to each Rating Agency with respect to such supplemental indenture be satisfied. If the Senior Swap Agreement or any Class of Notes is then rated by either Rating Agency, the Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the Rating Condition with respect to each Rating Agency would not be satisfied with respect to such supplemental indenture, unless each Holder of Notes of each Class whose rating or credit estimate will be reduced or withdrawn and the Senior Swap Counterparty has, after notice that the proposed supplemental indenture would result in such reduction or withdrawal of the rating or credit estimate of the Senior Swap Agreement or the Class of Notes held by such Holder, consented to such supplemental indenture. Unless notified by a Majority of any Class of Notes or a Majority-in-Interest of Preference Shares that such Class of Notes or the Preference Shares will be materially adversely affected, or by a Hedge Counterparty that such Hedge Counterparty will be materially adversely affected, or by the Credit Default Swap Counterparty that it will be materially adversely affected, or by a Senior Swap Counterparty that it will be materially adversely affected, the Trustee may, consistent with the written advice of counsel, determine whether or not such Class of Notes, the Preference Shares, the Credit Default Swap Counterparty, such Senior Swap Counterparty or such Hedge Counterparty would be materially adversely affected by such change (after giving notice of such change to the Holders of the Notes and the Preference Shares and to the Hedge Counterparties, the Senior Swap Counterparties, the

Credit Default Swap Counterparty. Such determination shall be conclusive and binding on all present and future Holders, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Hedge Counterparties. The Trustee shall not be liable for any such determination made in good faith and in reliance in good faith upon an Opinion of Counsel delivered to the Trustee as described in <u>Section 8.3</u>.

It shall not be necessary for any Act of Noteholders or any consent of Preference Shareholders under this <u>Section 8.2</u> to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act or consent shall approve the substance thereof.

Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to this <u>Section 8.2</u>, the Trustee, at the expense of the Co-Issuers, shall mail to the Noteholders, the Preference Share Paying Agent (for forwarding to the Preference Shareholders), the Hedge Counterparties, the Senior Swap Counterparties, the Credit Default Swap Counterparty, the Collateral Manager and each Rating Agency a copy thereof. Any failure of the Trustee to publish or mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture. In addition, the Issuer shall cause to be delivered a copy of any executed supplemental indenture to the Repository for posting on the Repository in the manner described in <u>Section 14.3</u>.

For purposes of this <u>Section 8.2</u>, the interests of the Hedge Counterparties, the Senior Swap Counterparties and the Credit Default Swap Counterparty shall be deemed not to be materially adversely affected by, and the Hedge Counterparties, the Senior Swap Counterparties and the Credit Default Swap Counterparty shall have no right of consent in relation to, any supplemental indenture with respect to (i) the appointment of any successor Collateral Manager in accordance with the Collateral Management Agreement and (ii) any change to the Collateral Management Fee or otherwise in respect of the fees, liabilities and expenses to apply to such successor Collateral Manager.

8.3    <u>Execution of Supplemental Indentures</u>.

In executing or accepting the additional trusts created by any supplemental indenture permitted by this <u>Section 8</u> or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to <u>Sections 6.1</u> and <u>6.3</u>) shall be fully protected in relying in good faith upon an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been complied with; *provided* that the Trustee shall execute and deliver upon the request of the Issuer or the Collateral Manager, and shall be fully protected in entering into, any supplemental indenture contemplated by <u>Section 8.1(i)</u> in order to consummate the issuance through the facilities of Euroclear or Clearstream, Luxembourg of Notes or Preference Shares in exchange for existing Notes or Preference Shares, as the case may be. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or indemnities under this Indenture or otherwise. The Trustee shall not enter into any supplemental indenture (including a supplemental indenture entered into pursuant to <u>Section 8.1</u> or <u>8.2</u>) that modifies the rights or increases the obligations of the Collateral Manager, the Senior Swap Counterparty or the Credit Default Swap Counterparty in any respect without the written consent of such affected Person, and none of the Collateral

Manager, the Senior Swap Counterparties, the Credit Default Swap Counterparty shall be bound by any amendment to this Indenture which reduces the rights or increases the obligations of such affected Person unless such affected Person shall have consented thereto in writing.

8.4     Effect of Supplemental Indentures.

Upon the execution of any supplemental indenture under this Section 8, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder, and every Holder of Preference Shares shall be bound thereby.

8.5     Reference in Notes to Supplemental Indentures.

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Section 8 may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Co-Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Co-Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

## 9.     REDEMPTION OF SECURED NOTES

9.1     Redemption of Senior Notes.

(a)     (i) The Senior Notes shall be redeemable on any Quarterly Distribution Date occurring on or after the Quarterly Distribution Date in November 2010 at the option of a Majority-in-Interest of Preference Shares (such redemption, an "**Optional Redemption**") from Sale Proceeds arising from the Sale of Pledged Securities and all other funds in the Accounts (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and the Senior Swap Collateral Account) on such Quarterly Distribution Date, in whole but not in part, as specified by the Issuer, at the written direction of a Majority-in-Interest of Preference Shares, at the applicable Redemption Price therefor; *provided* that (A) no such Optional Redemption may be effected prior to the Quarterly Distribution Date occurring in November 2010, (B) such Sale Proceeds and all Cash, Reserve Account Investments and Eligible Investments credited to the Accounts (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and the Senior Swap Collateral Account) on the relevant Quarterly Distribution Date must be at least sufficient to pay all Administrative Expenses set forth in Section 11.1(i)(B), redeem the Senior Notes and reduce the Aggregate Outstanding Swap Counterparty Amount of the Senior Swap Counterparties and Remaining Unfunded Notional Amount to zero and pay any other amounts accrued and unpaid or otherwise owed to the Senior Swap Counterparties, the Hedge Counterparties, and the Credit Default Swap Counterparty simultaneously in accordance with the procedures described in Section 9.1(b) and (C) such Sale Proceeds are used to make such a redemption.

(ii)     In addition, upon the occurrence of a Tax Event, the Senior Notes shall be redeemable by the Issuer on any Quarterly Distribution Date in whole but not in part (A) at the written direction of a Majority of an Affected Class of Senior Notes or (B) at the direction of a Majority-in-Interest of Preference Shares (such redemption, a "**Tax Redemption**") from Sale Proceeds arising from the Sale of Collateral and all other funds in the Accounts (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and the Senior Swap Collateral Account) on such Quarterly Distribution Date at the applicable Redemption Price (exclusive of installments of principal and interest due on or prior to such date, provided payment of which shall have been made or duly provided for, to the Holders of the Senior Notes as provided in this Indenture); *provided* that (x) such Sale Proceeds and all Cash, Reserve Account Investments and Eligible Investments credited to the Accounts (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and the Senior Swap Collateral Account) on the relevant Quarterly Distribution Date must be at least sufficient to pay all Administrative Expenses set forth in Section 11.1(i)(B), redeem the Senior Notes at the Redemption Price (exclusive of installments of principal, interest due on or prior to such date, provided payment of which shall have been made or duly provided for, to the Holders of the Senior Notes) and reduce the Aggregate Outstanding Swap Counterparty Amount and Remaining Unfunded Notional Amount to zero and pay any other amounts accrued and unpaid or otherwise owed to the Senior Swap Counterparties, the Hedge Counterparties and the Credit Default Swap Counterparty simultaneously in accordance with the procedures described in Section 9.1(b), (y) such Sale Proceeds are used to make such a redemption and (z) the Tax Materiality Condition is satisfied.

(iii)     In the event of an Optional Redemption or a Tax Redemption pursuant to Section 9.1(a)(i) or (ii), respectively, unless a Majority of the Preference Shareholders have directed the Issuer to redeem the Preference Shares on such Quarterly Distribution Date, the amount of Collateral Debt Securities sold, terminated or otherwise liquidated in connection with such Optional Redemption or Tax Redemption shall not exceed the amount necessary for the Issuer to obtain the Total Senior Redemption Amount.

(b)     The Senior Notes shall not be redeemed pursuant to Sections 9.1(a) or 9.5 unless at least four Business Days before the scheduled Redemption Date, the Collateral Manager shall have furnished to the Trustee, the Credit Default Swap Counterparty, the Senior Swap Counterparties and each Hedge Counterparty evidence (which evidence may be in the form of facsimile or electronic mail indicating firm bids), that the Collateral Manager on behalf of the Issuer has entered into a binding agreement or agreements with a financial institution or institutions (or any affiliate of such financial institution or any transferee thereof that guarantees the obligations of such financial institution or such transferee, as the case may be) whose long term unsecured debt obligations are at least "A-1" by Standard & Poor's (other than such obligations whose rating is based on the credit of a person other than such institution) and whose short term unsecured debt obligations have a credit rating of "P-1" by Moody's (which rating is not on watch for possible downgrade by Moody's), to sell, terminate or otherwise liquidate, not later than the Business Day immediately preceding the scheduled Redemption Date, for Cash in immediately available funds, all or part of the Collateral Debt Securities for Sale Proceeds

which, when added to the Balance of all Reserve Account Investments, Cash and Eligible Investments maturing on or prior to the scheduled Redemption Date credited to the Accounts (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and the Senior Swap Collateral Account) on the relevant Quarterly Distribution Date, is at least equal to an amount sufficient to pay any accrued and unpaid amounts payable under the Priority of Payments prior to the payment of the Senior Notes (including (i) any termination payments and other amounts which are or may become payable by the Issuer pursuant to the Hedge Agreements, the Credit Default Swap Agreement, (ii) any payments payable by the Issuer to a Senior Swap Counterparty under the Senior Swap Agreement or this Indenture such that the Aggregate Outstanding Swap Counterparty Amount, the Remaining Unfunded Notional Amount, the Senior Swap Interest Amounts, the Senior Swap Premium Amounts and any other amounts accrued and unpaid or otherwise owed to the Senior Swap Counterparties are reduced to zero as a result of such termination, and (iii) all Administrative Expenses without regard to the U.S. dollar limitation set forth in <u>Section 11.1(i)(B)</u>), and any fees and expenses incurred by the Trustee and the Collateral Manager in connection with such Sale of Collateral Debt Securities payable by the Issuer and to redeem the Senior Notes on the scheduled Redemption Date at the applicable Redemption Prices (the aggregate amount required to make all such payments, the "**Total Senior Redemption Amount**") or, in the case of an Auction Call Redemption, the Auction Call Redemption Amount.

Notwithstanding anything herein to the contrary, in connection with any Tax Redemption, holders of at least a Majority of the respective voting rights (with respect to each Senior Swap Counterparty, voting separately) or Holders of at least 66-⅔% of the Aggregate Outstanding Amount of any Affected Class of Senior Notes, as the case may be, may elect to receive less than 100% of (a) with respect to each Senior Swap Counterparty, amounts owed to it (but not owed to any other Senior Swap Counterparty) under the Senior Swap Agreement and (b) with respect to Holders, the Redemption Price that would otherwise be payable to Holders of such Affected Class (and the minimum Sale Proceeds requirements will be reduced accordingly).

(c)     Installments of principal and interest, due on or prior to a Redemption Date shall continue to be payable to the Holders of such Senior Notes as of the relevant Record Dates according to their terms.  The election of the Issuer to redeem any Senior Notes pursuant to this <u>Section 9.1</u> shall be evidenced by an Issuer Order from the Collateral Manager directing the Trustee to make the payment to the Paying Agent of the Redemption Price of all of the Senior Notes to be redeemed from funds in the Payment Account in accordance with the Priority of Payments.  The Issuer shall deposit, or cause to be deposited, the funds required for an Optional Redemption or Tax Redemption pursuant to this <u>Section 9.1</u> in the Payment Account on or before the fifth Business Day prior to the Redemption Date or, if later, upon receipt.

(d)     The Issuer shall set the Redemption Date and the applicable Record Date and give notice thereof to the Trustee pursuant to <u>Section 9.2</u>.

(e)     Any amounts applied to the redemption of the Senior Notes pursuant to this <u>Section 9.1</u> shall be applied in accordance with the Priority of Payments.

9.2     Notice to Trustee of Optional Redemption, Tax Redemption or Clean-Up Call Redemption.

In the event of any redemption pursuant to Section 9.1 or 9.6, the Issuer shall, at least 45 days (but not more than 90 days) prior to the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, each Rating Agency, each Hedge Counterparty, the Credit Default Swap Counterparty, the Senior Swap Counterparties the Collateral Manager and each Paying Agent of such Redemption Date, the applicable Record Date, the principal amount of each Class of Senior Notes to be redeemed on such Redemption Date and the Redemption Price of such Senior Notes in accordance with Section 9.1.

9.3     Notice of Auction Call Redemption, Optional Redemption, Tax Redemption, Clean-Up Call Redemption or Maturity by the Co-Issuers.

Notice of redemption pursuant to Section 9.1, 9.5 or 9.6 or the Maturity of any Class of Notes shall be given by the Trustee by first class mail, postage prepaid, mailed not less than 10 Business Days prior to the applicable Redemption Date or Stated Maturity to the Senior Swap Counterparties and each Holder of Senior Notes to be redeemed pursuant to Section 9.1 or 9.5 or to mature, at such Holder's address in the Note Register with a copy to each Rating Agency, the Credit Default Swap Counterparty and each Hedge Counterparty.

All notices of redemption shall state:

(a)     the applicable Redemption Date;

(b)     the applicable Record Date;

(c)     the Redemption Price;

(d)     the principal amount of each Class of Senior Notes to be redeemed and that interest on such principal amount of Senior Notes shall cease to accrue on the date specified in the notice; and

(e)     the place or places where such Senior Notes are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Issuer to be maintained as provided in Section 7.2.

The Issuer shall have the option to withdraw the notice of redemption up to the third Business Day prior to the scheduled Redemption Date by written notice to the Trustee, each Rating Agency, the Credit Default Swap Counterparty, the Senior Swap Counterparties, each Hedge Counterparty and the Collateral Manager, but only if (i) the Collateral Manager shall be unable to deliver the sale agreement or agreements or certifications described in Section 9.1(b) in form satisfactory to the Trustee or (ii) solely with respect to an Optional Redemption, a Majority-in-Interest of the Preference Shareholders have requested that such notice of redemption be withdrawn. During the period when a notice of redemption may be withdrawn, the Issuer shall not terminate any Hedge Agreement, the Credit Default Swap Agreement or the Senior Swap Agreement, and the Hedge Agreements, the Credit Default Swap Agreement and the Senior Swap Agreement shall not be terminable by the relevant Hedge Counterparty, the Credit Default

Swap Counterparty or the Senior Swap Counterparties, respectively, in relation to such notice of redemption.

At the cost of the Co-Issuers, the Trustee shall give notice of any withdrawal by overnight courier guaranteeing next day delivery, sent not later than the third Business Day prior to the scheduled Redemption Date, to each Holder of Senior Notes to be redeemed at such Holder's address in the Note Register, to the Senior Swap Counterparties, the Credit Default Swap Counterparty and to each Hedge Counterparty.

Notice of redemption shall be given by the Co-Issuers or, at the Co-Issuers' request, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of any Senior Note selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

9.4     Notes Payable on Redemption Date.

Notice of redemption having been given as aforesaid, the Senior Notes so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) such Senior Notes shall cease to bear interest on the Redemption Date. Upon final payment on a Senior Note to be redeemed, the Holder shall present and surrender such Senior Note at the place specified in the notice of redemption on or prior to such Redemption Date; *provided* that if there is delivered to the Co-Issuers and the Trustee (i) in the case of a Holder that is not a Qualified Institutional Buyer, such security or indemnity as may be required by them to save each of them harmless and (ii) an undertaking thereafter to surrender such Senior Note, then, in the absence of notice to the Co-Issuers and the Trustee that the applicable Senior Note has been acquired by a bona fide purchaser, such final payment shall be made without presentation or surrender. Installments of interest on Senior Notes of a Class so to be redeemed whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Senior Notes, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date according to the terms and provisions of Section 2.6(e).

If any Senior Note called for redemption shall not be paid upon surrender thereof for redemption, the funded or unfunded principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Note Interest Rate for each successive Interest Period during which the Senior Note remains Outstanding.

9.5     Auction Call Redemption.

In accordance with the procedures set forth in Schedule E (the "**Auction Procedures**"), the Trustee shall, at the expense of the Issuer, conduct an auction (the "**Auction**") of the Collateral Debt Securities if, on or prior to the Note Acceleration Date, the Senior Notes have not been (and on the Note Acceleration Date will not be) redeemed in full. The Auction shall be conducted on a date no later than 10 Business Days prior to (1) the Note Acceleration Date and (2) if the Senior Notes are not redeemed in full on the related Quarterly Distribution Date, each Quarterly Distribution Date thereafter until the Senior Notes have been redeemed in full (each

such date, an "**Auction Date**"). Notwithstanding the foregoing, the Trustee shall not conduct an Auction on an Auction Date if an Auction was conducted on the preceding Auction Date and the Collateral Manager notifies the Trustee that, due to market conditions, an Auction on such Auction Date is unlikely to be successful. Any of the Collateral Manager, the Preference Shareholders, the Trustee, the Credit Default Swap Counterparty, the Senior Swap Counterparties or their respective Affiliates may, but shall not be required to, bid at the Auction. The Trustee shall sell, terminate or otherwise liquidate the Collateral Debt Securities and, in the case of Collateral Debt Securities that are not Synthetic Securities, transfer such Collateral Debt Securities (which may be divided into up to eight Subpools) to the highest bidder therefor (or to the highest bidder for each Subpool) at the Auction provided that:

  (i)  the Auction has been conducted in accordance with the Auction Procedures;

  (ii)  with respect to Collateral Debt Securities other than Synthetic Securities:

    (A)  the Trustee has received bids for such Collateral Debt Securities (or for each of the related Subpools) from at least two Qualified Bidders (including the winning Qualified Bidder) for (x) the purchase of such Collateral Debt Securities or (y) the purchase of each Subpool; and

    (B)  the bidder(s) who offered the Highest Auction Price for such Collateral Debt Securities (or the related Subpools) enter(s) into a written agreement with the Issuer, in a form provided by the Collateral Manager (which the Issuer shall execute if the conditions set forth in (i) through (iv) of this <u>Section 9.5</u> are satisfied, which execution shall constitute certification by the Issuer that such conditions have been satisfied) that obligates such highest bidders (or the highest bidder for each Subpool) to purchase all such Collateral Debt Securities (or the relevant Subpool) with the closing of such purchase (and full payment in Cash to the Trustee) to occur on or prior to the sixth Business Day following the relevant Auction Date;

  (iii)  with respect to each Synthetic Security, the Issuer (or the Collateral Manager on behalf of the Issuer) will request that the calculation agent under such Synthetic Security determine the net termination payment payable by or to the Issuer on the date six Business Days prior to the termination date of the relevant Synthetic Security and will notify the Trustee of such amount and, in the case of a Defeased Synthetic Security, the Trustee shall determine the amount (if any) that will be released from the related Synthetic Security Counterparty Account based on the information it receives with respect to the net termination payment; and

  (iv)  the Collateral Manager certifies to the Trustee that the (I) the Highest Auction Price obtained with respect to the Collateral Debt Securities (other than Synthetic Securities) pursuant to clause (ii) above *plus* (II) the aggregate net termination payments that would be payable to the Issuer by Synthetic Security Counterparties (including, if applicable, the Credit Default Swap Counterparty) as determined pursuant to clause (iii) above *minus* (III) the excess (if any) of (A) the aggregate net termination payments

that would be payable under Defeased Synthetic Securities by the Issuer to Synthetic Security Counterparties as determined pursuant to clause (iii) above over (B) the balance of all Eligible Investments standing to the credit of the Synthetic Security Counterparty Accounts *plus* (IV) the Balance of all Reserve Account Investments, Eligible Investments and Cash held by the Issuer (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and the Senior Swap Collateral Account) *plus* (V) the aggregate amount (if any) that will be released from the Synthetic Security Counterparty Accounts following payment of the net termination payments described in the foregoing clauses (II) and (III) (the resulting amount of the preceding clauses (I), (II), (III), (IV) and (V), the "**End Value**") will be at least equal to the Auction Call Redemption Amount.

If all of the conditions set forth in clauses (i), (ii), (iii) and (iv) of this <u>Section 9.5</u> have been met, (x) the Trustee shall sell and transfer the Collateral Debt Securities that are not Synthetic Securities (or each related Subpool), without representation, warranty or recourse, to the highest bidder that has offered the Highest Auction Price (or the highest bidder for each Subpool, as the case may be) and (y) the Issuer will terminate the transactions under each Synthetic Security, in each case, in accordance with and upon completion of the Auction Procedures. Notwithstanding the foregoing, but subject to the satisfaction of the conditions set forth in clauses (i), (ii), (iii) and (iv) of this <u>Section 9.5</u>, the Collateral Manager or one of its Affiliates, although it may not have been the highest bidder, will have the option to purchase the Collateral Debt Securities that are not Synthetic Securities (or any Subpool) for a purchase price equal to the highest bid therefor. The Trustee shall deposit the Sale Proceeds from the Sale of the Collateral Debt Securities and net termination payments received in respect of the Collateral Debt Securities, together with any Synthetic Security Collateral released from the Synthetic Security Counterparty Accounts, in the Collection Accounts, and the Senior Notes, the Class X Notes and the Preference Shares shall be redeemed on the Quarterly Distribution Date immediately following the relevant Auction Date (such redemption, an "**Auction Call Redemption**").

If (x) any of the foregoing conditions is not met with respect to any Auction, (y) the highest bidder (or the highest bidder for any Subpool) or the Collateral Manager or its Affiliate, as the case may be, fails to pay the purchase price for any Collateral Debt Security that is not a Synthetic Security or (z) the relevant Synthetic Security Counterparty fails to pay any net termination payment owing to the Issuer under any Synthetic Security, in each case before the sixth Business Day following the relevant Auction Date (and, in the case of a failure by the highest bidder to pay for a Subpool or a failure by a Synthetic Security Counterparty to pay a net termination payment owing to the Issuer, the End Value is less than the Auction Call Redemption Amount), (a) the Auction Call Redemption shall not occur on the Quarterly Distribution Date following the relevant Auction Date, (b) the Trustee shall give notice of the withdrawal pursuant to <u>Section 9.3</u>, (c) subject to clause (e) below, the Trustee shall decline to consummate such Sale and shall not solicit any further bids or otherwise negotiate any further Sale of Collateral Debt Securities in relation to such Auction, (d) the Issuer shall not terminate any Synthetic Securities in relation to such Auction and (e) unless the Notes are redeemed in full prior to the next succeeding Auction Date, or the Collateral Manager notifies the Trustee that market conditions are such that such Auction would not likely be successful, the Trustee shall conduct another Auction on the next succeeding Auction Date.

9.6    Clean-Up Call Redemption.

At the direction of the Collateral Manager, the Senior Notes will be subject to redemption by the Issuer, in whole but not in part (a "<u>Clean-Up Call Redemption</u>"), at the Redemption Price, on any Quarterly Distribution Date on which the Aggregate Outstanding Amount of the Senior Notes is less than or equal to 10% of the original Aggregate Outstanding Amount of the Notes as of the Closing Date.  Any such redemption may only be effected on a Quarterly Distribution Date and only from (a) the Sale Proceeds of the Collateral and (b) the Balance of the Cash and Eligible Investments in the Interest Collection Account, the Interest Reserve Account, the Principal Collection Account, the Uninvested Proceeds Account, the Expense Account and the Payment Account on such Quarterly Distribution Date.

Any Clean-Up Call Redemption is subject to (i) the purchase of the Collateral (other than the Cash and Eligible Investments referred to in clause (b) of this sentence) by the Collateral Manager or any of its Affiliates from the Issuer, on the scheduled Redemption Date, for a purchase price in Cash at least equal to (a) the Total Senior Redemption Amount *minus* (b) the Balance of the Cash and Eligible Investments in the Interest Collection Account, the Interest Reserve Account, the Principal Collection Account, the Uninvested Proceeds Account, the Expense Account and the Payment Account, and (ii) the receipt by the Trustee on behalf of the Issuer from the Collateral Manager, prior to such purchase, of certification from the Collateral Manager that the sum so received satisfies clause (i).  Upon receipt by the Trustee on behalf of the Issuer of the certification referred to in the preceding sentence, the Trustee (pursuant to written direction from the Collateral Manager on behalf of the Issuer) and the Issuer shall take all actions necessary to sell, assign and transfer the Collateral to the Collateral Manager upon payment in immediately available funds of the Redemption Price.  The Trustee shall deposit such payment into the Collection Accounts on behalf of the Issuer and apply the funds therein in accordance with the Priority of Payments on such Redemption Date.

If such Redemption Price is not paid in full in immediately available funds on the Redemption Date, the Trustee on behalf of the Issuer shall decline to consummate the sale and shall give notice (in accordance with <u>Sections 9.2</u> and <u>9.3</u>) that the Clean-Up Call Redemption will not occur.  Any direction of the Collateral Manager requiring a Clean-Up Call Redemption shall be given in writing to the Issuer, with a copy to the Trustee, at least 10 Business Days prior to the relevant Quarterly Distribution Date.  The Issuer shall, upon receipt from the Collateral Manager of a direction in writing to effect a Clean-Up Call Redemption, set the Redemption Date and the Record Date for any redemption pursuant to this <u>Section 9.6</u> and give written notice thereof to the Trustee pursuant to <u>Section 9.2</u> hereof.

## 10.    ACCOUNTS, ACCOUNTINGS AND RELEASES

10.1    <u>Collection of Cash</u>.

(a)    Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Cash and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Securities, in accordance with the terms and conditions of such Pledged Securities.  The Trustee shall

segregate and hold all such Cash and property received by it in trust for the Secured Parties and shall apply it as provided in this Indenture.

(b) Each of the parties hereto hereby agrees to cause the Custodian and any other Securities Intermediary that holds any Cash or other property for the Issuer or the Co-Issuer in an Account to agree with the parties hereto that (x) each Account is a Securities Account in respect of which the Trustee is the Entitlement Holder, (y) the Cash, Securities and other property credited to an Account are to be treated as Financial Assets under Section 8 of the UCC and (z) the "securities intermediary's jurisdiction" (within the meaning of Section 8-110 of the UCC) for such purpose will be the State of New York. In no event may any Financial Asset held in any Account be registered in the name of, payable to the order of, or specially Indorsed to, the Issuer unless such Financial Asset has also been Indorsed in blank or to the Custodian or other Securities Intermediary that holds such Financial Asset in such Account. Each Account shall be held and maintained at an office located in the State of New York or Illinois. In addition, any Account may include any number of subaccounts deemed necessary or appropriate by the Trustee for convenience in administering such account.

10.2    Principal Collection Account; Interest Collection Account; Reserve Account; Custodial Account; Synthetic Security Counterparty Account; Issuer Collateral Account; Senior Swap Collateral Account; Interest Reserve Account; Closing Date Expense Account.

(a) The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "**Interest Collection Account**," which may be a subaccount of the Custodial Account and which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit, in addition to the deposits required pursuant to Section 10.8(d), (i) all amounts, if any, received by the Issuer pursuant to the Hedge Agreements (other than amounts received by the Issuer by reason of an event of default or termination event (each as defined in the relevant Hedge Agreement) or other comparable event that are required, pursuant to Section 16.1(d) to be used for the purchase by the Issuer of a replacement Hedge Agreement), (ii) all proceeds received from the Sale of any Collateral to the extent such proceeds constitute "Interest Proceeds" (unless simultaneously reinvested pursuant to Section 10.2(f) in other Collateral Debt Securities, subject to the Eligibility Criteria, or in Eligible Investments), (iii) all proceeds of funds released from the Issuer Collateral Account for the purpose of deposit to the Interest Collection Account, and (iv) all other Interest Proceeds.

(b) The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "**Principal Collection Account**," which may be a subaccount of the Custodial Account and which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties, into which the Trustee shall from time to time deposit, in addition to the deposits required pursuant to Section 10.8(d), (i) all Uninvested Proceeds remaining in the Uninvested Proceeds Account on the first Quarterly Distribution Date relating to (x) the first Determination Date following the occurrence of a Ratings Confirmation Failure or (y) the first Determination Date on or after which the Issuer obtains a Rating Confirmation, (ii) all proceeds received from the Sale of any Collateral to the extent such proceeds constitute "Principal Proceeds" (unless simultaneously reinvested in other Collateral Debt Securities, subject to the Eligibility Criteria, or in Eligible Investments),

including payments of interest on Collateral Debt Securities received in Cash by the Issuer to the extent that they represent accrued interest purchased with Principal Proceeds, and (iii) all other Principal Proceeds.

(c)     The Issuer may, but under no circumstances shall be required to, deposit or cause to be deposited from time to time such Cash in a Collection Account as it deems, in its sole discretion, to be advisable and by notice to the Trustee may designate that such Cash is to be treated as Principal Proceeds or Interest Proceeds hereunder at its discretion. All Cash deposited from time to time in a Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided. The Collection Accounts shall remain at all times with a financial institution having a long-term debt rating of at least "BBB+" by Standard & Poor's and at least "Baa1" by Moody's (and, if rated "Baa1", such rating is not on watch for possible downgrade by Moody's) and a combined capital and surplus of a least U.S.$200,000,000.

(d)     All Distributions, any deposit required pursuant to Section 10.2(e) and any net proceeds from the Sale of a Collateral Debt Security or Equity Security received by the Trustee shall be immediately deposited into the Interest Collection Account or the Principal Collection Account, as the case may be (unless, in the case of proceeds received from the Sale of any Collateral, such proceeds are simultaneously reinvested pursuant to Section 10.2(f) in other Collateral Debt Securities, subject to the Eligibility Criteria, or in Eligible Investments). Subject to Sections 10.2(f), 10.2(g) and 11.2, all amounts deposited in the Collection Accounts, together with any securities in which funds included in such property are or will be invested or reinvested during the term of this Indenture, and any income or other gain realized from such investments, shall be held by the Trustee in the Collection Accounts as part of the Collateral subject to disbursement and withdrawal as provided in this Section 10.2. By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Collection Accounts during a Due Period, and amounts received in prior Due Periods and retained in the Collection Accounts, as so directed in Eligible Investments. The Trustee, within one Business Day after receipt of any Distribution or other proceeds which are not Cash, shall so notify the Issuer and the Issuer shall, within five Business Days of receipt of such notice from the Trustee, sell such Distribution or other proceeds for Cash in an arm's-length transaction to a Person that is not an Affiliate of the Issuer or the Collateral Manager and deposit the proceeds thereof in the Interest Collection Account or the Principal Collection Account, as the case may be, for investment pursuant to this Section 10.2; *provided* that the Issuer need not sell such Distributions or other proceeds if it delivers an Officer's certificate to the Trustee certifying that such Distributions or other proceeds constitute Collateral Debt Securities or Eligible Investments. Notwithstanding the foregoing, the Trustee shall pay interest received in respect of any Collateral Debt Security that is the subject of a Deemed Floating Asset Hedge Agreement to the relevant Asset Hedge Counterparty in accordance with the terms of such Deemed Floating Asset Hedge Agreement.

(e)     If, prior to the occurrence of an Event of Default, the Issuer shall not have given any investment directions pursuant to Section 10.2(f), the Trustee shall seek instructions from the Collateral Manager within three Business Days after transfer of such funds to a Collection Account. If the Trustee does not thereupon receive written instructions from the Issuer within

five Business Days after transfer of such funds to a Collection Account, it shall invest and reinvest the funds held in such Collection Account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (c) of the definition thereof. After the occurrence of an Event of Default, the Trustee shall invest and reinvest such Cash as fully as practicable in Eligible Investments of the type described in clause (c) of the definition thereof maturing not later than the earlier of (i) 30 days after the date of such investment or (ii) the Business Day immediately preceding the next Quarterly Distribution Date. All Interest Proceeds from such investments shall be deposited in the Interest Collection Account, and all Principal Proceeds from such investments shall be deposited in the Principal Collection Account. Any gain or loss with respect to an Eligible Investment shall be allocated in such a manner as to increase or decrease, respectively, Principal Proceeds and/or Interest Proceeds in the proportion which the amount of Principal Proceeds and/or Interest Proceeds used to acquire such Eligible Investment bears to the purchase price thereof. The Trustee shall not in any way be held liable by reason of any insufficiency of such Collection Account resulting from any loss relating to any such investment.

(f) During the Reinvestment Period (and thereafter to the extent necessary to acquire Collateral Debt Securities pursuant to contracts entered into during the Reinvestment Period), the Collateral Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, (i) reinvest Principal Proceeds in Collateral Debt Securities and (ii) reinvest Interest Proceeds to purchase accrued interest in respect of Collateral Debt Securities, in each case, as permitted under and in accordance with the requirements of Section 12 and such Issuer Order. Any such purchased accrued interest shall be purchased first with Interest Proceeds to the extent available therefor, and, if Interest Proceeds are insufficient, with Principal Proceeds or Uninvested Proceeds; *provided* that, during the period from the Closing Date to the Ramp-Up Completion Date, purchased accrued interest shall be purchased first with Uninvested Proceeds, then with Interest Proceeds and then with Principal Proceeds.

(g) The Trustee shall transfer to the Payment Account for application pursuant to Section 11.1 and in accordance with the calculations and the instructions contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.7(b), on or prior to the Business Day prior to each Quarterly Distribution Date, any amounts then held in the Collection Account other than (i) Interest Proceeds or Principal Proceeds received after the end of the Due Period with respect to such Quarterly Distribution Date and (ii) amounts that the Issuer is entitled to reinvest in accordance with Section 12.2 and which the Issuer so elects to reinvest in accordance with the terms of this Indenture; *except* that, to the extent that Principal Proceeds in the Principal Collection Account as of such date are in excess of the amounts required to be applied pursuant to the Priority of Payments up to and including the next Quarterly Distribution Date as shown in the Note Valuation Report with respect to such Quarterly Distribution Date, the Issuer may direct the Trustee to retain such excess amounts in the Principal Collection Account and not to transfer such excess amounts to the Payment Account.

(h) The Trustee shall apply amounts on deposit in the Collection Accounts in accordance with any Redemption Date Statement delivered to the Trustee in connection with the redemption of Notes pursuant to Section 9.1.

(i)     The Trustee shall, upon Issuer Order and without regard to the Priority of Payments, apply (i) amounts on deposit in the Principal Collection Account (A) in accordance with Section 12.2 and (B) to the payment of Principal Reimbursements payable by the Issuer under Short Synthetic Securities but only to the extent that amounts in deposit in the Uninvested Proceeds Account are insufficient therefor and (ii) amounts on deposit in the Interest Collection Account to the payment of fixed premium amounts and Interest Reimbursements payable by the Issuer under Short Synthetic Securities.

(j)     The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "**Reserve Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties. The Trustee shall, upon receipt of an Issuer Order, deposit in the Reserve Account, in each case for investment in Reserve Account Investments in accordance with the written instructions of the Collateral Manager on behalf of the Issuer, (i) such amounts as are required to be deposited into the Reserve Account pursuant to the Priority of Payments in connection with any reduction of the Remaining Unfunded Notional Amount, (ii) any Principal Reimbursements received by the Issuer after the Reinvestment Period in respect of any CDS Agreement Transactions and (iii) any Senior Swap Early Termination Date Payment.

Any funds or other property standing to the credit of the Reserve Account may be withdrawn therefrom (1) to fund any Remaining Exposure under the CDS Agreement Transactions, (2) to fund trading termination payments payable by the Issuer in respect of the termination of individual CDS Agreement Transactions, (3) if on any Determination Date there exists a Note Reduction Amount, for deposit in the Payment Account for distribution as Principal Proceeds in accordance with the Priority of Payments on the related Quarterly Distribution Date to the extent that such withdrawal will not cause or increase a Notional Amount Shortfall, (4) for deposit in the Principal Collection Account upon any Optional Redemption, Auction Call Redemption or Tax Redemption or the liquidation in full of the Collateral upon the Stated Maturity of the Notes or following the occurrence of an Event of Default, (5) to fund the acquisition of Collateral Debt Securities prior to the end of the Reinvestment Period so long as no such acquisition will result in a Notional Amount Shortfall and (6) to the payment of fixed premium amounts, Principal Reimbursements and Interest Reimbursements payable by the Issuer under Short Synthetic Securities which are CDS Agreement Transactions.

On any date on which the Issuer is required to fund any Remaining Exposure, purchase price of a Collateral Debt Security or trading termination payment in respect of a CDS Agreement Transaction, at the direction of the Collateral Manager, the Issuer shall apply amounts standing to the credit of the Reserve Account to the satisfaction thereof but only to the extent that there are insufficient funds available therefor standing to the credit of *first*, the Uninvested Proceeds Account and *second*, the Principal Collection Account. If on any Determination Date relating to a Quarterly Distribution Date there exists a Note Reduction Amount, Reserve Account Investments in an amount equal to the greater of (A) the Supersenior Excess and (B) such Note Reduction Amount (or such lesser amount as may be required (x) by minimum denomination and transfer requirements applicable to the Reserve Account Investments or (y) to not cause a Notional Amount Shortfall) may at the direction of the Collateral Manager on behalf of the Issuer (or, in the case of any Supersenior Excess or Note Reduction Amount occurring after the Reinvestment Period, shall) be liquidated and the

proceeds of such liquidation shall be transferred to the Principal Collection Account for application as Principal Proceeds in accordance with the Priority of Payments on the Quarterly Distribution Date relating to such Determination Date. On the date on which substantially all of the Issuer's assets have been sold or otherwise disposed of and all Synthetic Securities terminated, the Issuer shall, by Issuer Order, direct the Trustee to transfer all funds and other property standing to the credit of the Reserve Account to the Principal Collection Account for application as Principal Proceeds in accordance with the Priority of Payments. All funds credited to the Reserve Account shall be invested in Reserve Account Investments at the direction of the Collateral Manager on behalf of the Issuer.

Except to the extent required in order for the Issuer to comply with its obligations in respect of any Remaining Exposure or trading termination payments in respect of a CDS Agreement Transaction or that such transfer would cause or increase a Notional Amount Shortfall, the Trustee, upon receipt of an Issuer Order, shall transfer, on the Business Day immediately preceding each Quarterly Distribution Date, all interest and other income received in respect of Reserve Account Investments standing to the credit of the Reserve Account to the Interest Collection Account for application as Interest Proceeds in accordance with the Priority of Payments on such Quarterly Distribution Date. Until any such transfer, all interest and other income from the Reserve Account Investments standing to the credit of the Reserve Account will be deposited in the Reserve Account. Any gain realized from Reserve Account Investments standing to the credit of the Reserve Account will be credited to the Reserve Account, and any loss resulting from the Senior Swap Agreement or such Eligible Investments will be charged to the Reserve Account. The Trustee shall give the Issuer, the Credit Default Swap Counterparty, Standard & Poor's and the Senior Swap Counterparties prompt notice if the Reserve Account or any funds or other property standing to the credit of the Reserve Account shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Reserve Account shall remain at all times with the Trustee or with a financial institution having a long-term debt rating of at least "Baa1" by Moody's (and if rated "Baa1", such rating shall not be on watch for downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a combined capital and surplus in excess of U.S.$200,000,000.

(k)     The Trustee shall, prior to the Closing Date, cause the Custodian to establish a Securities Account which shall be designated as the "**Custodial Account**," which shall be in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties and to which the Trustee shall from time to time cause Collateral to be credited. All Collateral from time to time standing to the credit of the Custodial Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided. The Trustee agrees to give the Issuer and Standard & Poor's immediate notice if the Custodial Account or any property or funds standing to the credit of the Custodial Account, shall become subject to any writ, order judgment, warrant of attachment, execution or similar process. The Issuer shall not have any legal, equitable or beneficial interest in the Custodial Account other than in accordance with the Priority of Payments.

(l)     The Trustee shall cause to be established a Securities Account (and any sub-ledgers deemed applicable by the Trustee) for each Defeased Synthetic Security which shall each be designated as a "**Synthetic Security Counterparty Account**" and shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the related Synthetic Security

Counterparty. The Trustee shall create a separate sub-account of the Synthetic Security Counterparty Account for each Synthetic Security Agreement entered into by the Issuer.

Upon Issuer Order, the Trustee, the Issuer, the Synthetic Security Counterparty and the Custodian shall enter into an account control agreement with respect to such account in a form substantially similar to the Account Control Agreement entered into on the Closing Date. The Issuer shall also Grant to the Trustee for the benefit of the other Secured Parties, subject to the prior lien of the relevant Synthetic Security Counterparty, a security interest in any Synthetic Security Collateral or other amounts standing to the credit of a Synthetic Security Counterparty Account. Upon the termination of a Defeased Synthetic Security, the prior lien of the related Synthetic Security Counterparty over any Synthetic Security Collateral standing to the credit of the related Synthetic Security Counterparty Account shall be automatically released, and any remaining Synthetic Security Collateral credited to such Synthetic Security Counterparty Account shall become subject to a first ranking lien in favor of the Secured Parties.

Except for investment earnings on the Synthetic Security Collateral, the Issuer shall not have any legal, equitable or beneficial interest in any of the Synthetic Security Counterparty Accounts other than in accordance with this Indenture, the applicable Defeased Synthetic Security and applicable law. Upon the establishment of any Synthetic Security Counterparty Account, the Issuer shall notify the relevant Synthetic Security Counterparty of the Trustee's security interest therein and obtain the Synthetic Security Counterparty's written acknowledgement of such security interest. The fact that the terms of a Defeased Synthetic Security do not require the Issuer immediately to deposit Synthetic Security Collateral in the related Synthetic Security Counterparty Account shall not prevent the establishment of such Account.

Upon the purchase of any Synthetic Security Collateral, the Issuer shall, by Issuer Order executed by the Collateral Manager, instruct the Trustee to deposit such Synthetic Security Collateral in the related Synthetic Security Counterparty Account. In addition, upon any amount becoming due and payable by the Issuer under a Defeased Synthetic Security, the Issuer shall, by Issuer Order executed by the Collateral Manager, instruct the Trustee to withdraw such amount from the related Synthetic Security Counterparty Account and pay such amount to the applicable Synthetic Security Counterparty.

All deposits into, and payments made out of, the Synthetic Security Counterparty Account shall be made without regard to either Priority of Payments or the occurrence of any Event of Default (other than an Event of Default described in Section 5.1(f) or (g)). The Trustee shall be entitled to receive and rely upon, and shall act in accordance with, any Issuer Order from the Issuer, or the Collateral Manager acting on its behalf, with respect to all withdrawals, deposits and other actions to be taken pursuant to the Synthetic Security Counterparty Account, and such Issuer Order shall include such information as the Trustee reasonably may require. Nothing herein, or otherwise, shall be construed to cause the Trustee to have any fiduciary duties to any Synthetic Security Counterparty.

Amounts credited to a Synthetic Security Counterparty Account shall be invested in Synthetic Security Collateral until they are withdrawn by the Trustee at the direction of the Collateral Manager on behalf of the Issuer and applied to the payment of any amounts payable

by the Issuer to the related Synthetic Security Counterparty in accordance with the terms of such Defeased Synthetic Security. In particular:

(i)     Interest payments and redemption premium on the Synthetic Security Collateral shall constitute property of the Issuer and shall be paid to the Trustee and deposited into the Interest Collection Account for application as Interest Proceeds in accordance with the Priority of Payments. Principal payments on the Synthetic Security Collateral prior to the termination of the Defeased Synthetic Security shall be held in the applicable Synthetic Security Counterparty Account and invested in Eligible Investments until reinvested in Synthetic Security Collateral in accordance with the terms hereof and the related Defeased Synthetic Security at the direction of the Collateral Manager on behalf of the Issuer.

(ii)    In the event a Defeased Synthetic Security structured as a credit default swap is terminated prior to its scheduled maturity without the occurrence of a Credit Event, the Collateral Manager, on behalf of the Issuer shall cause such portion of the related Synthetic Security Collateral or other amounts deposited in the Synthetic Security Counterparty Account pursuant to this Indenture that, in each case, is required to make any termination payment owed to the related Synthetic Security Counterparty (other than any Defaulted Synthetic Termination Payment owing to any other Synthetic Security Counterparty) to be delivered to the related Synthetic Security Counterparty and shall cause the remaining related Synthetic Security Collateral (if any) to the extent not required to be Granted to the related Synthetic Security Counterparty to be released from the lien of the related Synthetic Security Counterparty and delivered to the Trustee free of such lien.

(iii)   In the event that no Credit Event under a Defeased Synthetic Security structured as a credit default swap has occurred prior to the termination or scheduled maturity of the Defeased Synthetic Security, upon the termination or scheduled maturity of the Defeased Synthetic Security, the related Synthetic Security Counterparty's lien on the Synthetic Security Collateral (if any) related to the applicable Defeased Synthetic Security shall be released and the Collateral Manager on behalf of the Issuer shall take or cause the taking of any and all other actions necessary to create in favor of the Trustee a valid, perfected, first-priority security interest in such released Synthetic Security Collateral under applicable law and regulations (including without limitation Articles 8 and 9 of the Uniform Commercial Code in effect at the time of such release).

(iv)    Upon the occurrence of a Credit Event under a Defeased Synthetic Security structured as a credit default swap, at the direction of the Collateral Manager by Issuer Order, the Trustee shall instruct the Custodian to deliver the portion of the related Synthetic Security Collateral (if any) and/or other amounts deposited in the Synthetic Security Counterparty Account pursuant to this Indenture that is necessary to satisfy the Issuer's payment obligations in respect of Remaining Exposure thereunder to the related Synthetic Security Counterparty upon delivery of the relevant Deliverable Obligations to the Issuer.

(v)     In the event that the Issuer is required to deliver the Synthetic Security Collateral to the related Synthetic Security Counterparty or to liquidate the Synthetic

Security Collateral and deliver Cash in accordance with the Underlying Instruments relating to such Defeased Synthetic Security.

(vi)     Any Synthetic Security Collateral released from the lien of the related Synthetic Security Counterparty which satisfies the definition of Eligible Investments shall be treated as Eligible Investments and any Synthetic Security Collateral released from the lien of the related Synthetic Security Counterparty which satisfies the definition of Collateral Debt Security shall be treated as a Collateral Debt Security and in either case may be retained by the Trustee or sold by the Collateral Manager subject to the restrictions set forth herein, and the Collateral Manager shall instruct the Trustee with respect to such treatment of Synthetic Security Collateral.  Any Cash received upon the maturity or liquidation of the Synthetic Security Collateral released to the Trustee shall be deemed to be Principal Proceeds.

The Collateral Manager on behalf of the Issuer shall direct the Trustee in writing to withdraw any other amounts held in a Synthetic Security Counterparty Account after payment of all amounts owing from the Issuer to the related Synthetic Security Counterparty in accordance with the terms of the related Defeased Synthetic Security from such Synthetic Security Counterparty Account and deposit such amounts in the Principal Collection Account for application as Principal Proceeds in accordance with the terms of this Indenture.

Except for interest and redemption premium on the Synthetic Security Collateral credited to a Synthetic Security Counterparty Account payable to the Issuer in accordance with the foregoing, amounts contained in a Synthetic Security Counterparty Account shall not be considered to be an asset of the Issuer for purposes of any of the Collateral Quality Tests, the Standard & Poor's CDO Monitor Test or the Overcollateralization Tests, but the Defeased Synthetic Security that relates to the Synthetic Security Counterparty Account shall be considered an asset of the Issuer for such purposes.

Each Synthetic Security Counterparty Account shall remain at all times with a financial institution organized and doing business under the laws of the United States or any State thereof, authorized under such laws to exercise corporate trust powers and having a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating shall not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a combined capital and surplus in excess of U.S.$200,000,000.

(m)     The Trustee shall, prior to the Closing Date, cause to be established one or more Securities Accounts which shall each be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties (individually or collectively, as the context may require, an "**Issuer Collateral Account**").  The Trustee shall deposit into the Issuer Collateral Account any premiums received from the Credit Default Swap Counterparty in accordance with the terms of the Credit Default Swap Agreement and the underlying CDS Agreement Transactions.  If at any time such amounts in the Issuer Collateral Account credited to payments under the Credit Default Swap Agreement exceed any related collateral requirements set forth thereunder, such excess will be withdrawn from the Issuer Collateral Account and deposited to the Interest Collection Account.  If the terms of any Synthetic Security require the Synthetic Security Counterparty to secure its obligations with respect to such Synthetic Security, at the

time the Issuer enters into such Synthetic Security, the Trustee will on behalf of the Issuer, at the direction of the Collateral Manager, create a sub-account of the Issuer Collateral Account for the benefit of the Secured Parties and the Issuer and credit thereto all funds and other property that are received from the related Synthetic Security Counterparty to secure the obligations of such Synthetic Security Counterparty in accordance with the terms of the related Synthetic Securities.

Amounts on deposit in an Issuer Collateral Account shall be invested in Synthetic Security Collateral that satisfies Eligibility Criteria (7), (8), (9) and (10) as directed by an Issuer Order executed by the Collateral Manager and in accordance with the terms of the applicable Synthetic Security. Income received on amounts on deposit in each Issuer Collateral Account shall be withdrawn from such account and paid to the related Synthetic Security Counterparty or the Issuer in accordance with the applicable Synthetic Security.

Posted collateral on deposit in each Issuer Collateral Account will not be included in the Collateral and will not be available to make payments under the Notes other than as a result of an event of default, default or termination event (howsoever described) under the related Synthetic Security caused by the related Synthetic Security Counterparty. Amounts contained in any Issuer Collateral Account shall not be considered to be an asset of the Issuer for purposes of any of the Collateral Quality Tests or the Overcollateralization Tests, but the Issuer's right, title and interest in, to and under any Synthetic Security that relates to an Issuer Collateral Account shall be considered assets of the Issuer.

Upon the occurrence of an event of default, default or termination event (howsoever described) under the related Synthetic Security, amounts contained in the related Issuer Collateral Account shall, as directed by the Collateral Manager by Issuer Order, be withdrawn by the Trustee and applied to the payment of any termination payment or other amount payable by the related Synthetic Security Counterparty to the Issuer as a result of such event of default, default or termination event (howsoever described). Any excess amounts held in a Issuer Collateral Account after payment of all amounts owing from the related Synthetic Security Counterparty to the Issuer as a result of such event of default, default or termination event (howsoever described) shall be withdrawn from such Issuer Collateral Account and paid to the related Synthetic Security Counterparty in accordance with the applicable Synthetic Security.

Each Issuer Collateral Account shall remain at all times with a financial institution having a long-term debt rating of at least "BBB+" by Standard & Poor's and at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and a combined capital and surplus in excess of U.S.$200,000,000.

(n) The Trustee shall, prior to the Closing Date, cause to be established a single, segregated Securities Account which shall be designated as a "Senior Swap Collateral Account" and shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer and (subject to the prior lien of the Issuer to the extent it is entitled to any amounts credited thereto pursuant to the Senior Swap Agreement) the Senior Swap Counterparty (such account, the "**Senior Swap Collateral Account**"). The Trustee shall deposit into the applicable Senior Swap Collateral Account all collateral received from the Senior Swap Counterparty to secure its obligations in accordance with the terms of the Senior Swap Agreement which shall satisfy Eligibility Criteria (7), (8), (9) and (10). Funds on deposit in the Senior Swap Collateral

Account, if invested, shall be invested in Eligible Investments at the direction of the Collateral Manager on behalf of the Issuer.

Property on deposit in the Senior Swap Collateral Account shall be withdrawn from such account and paid to the Senior Swap Counterparty or, in respect of amounts accrued and payable to the Issuer under the Senior Swap Agreement, the Issuer pursuant to and in accordance with the Credit Support Annex. Income received on funds and other property on deposit in the Senior Swap Collateral Account shall be withdrawn from such account and paid to the Senior Swap Counterparty on a monthly basis and on any Business Day that posted collateral in the form of Cash is transferred to the Senior Swap Counterparty pursuant to the Credit Support Annex to the Senior Swap Agreement. The provisions in such Credit Support Annex shall govern the amount and timing of any posting of collateral to, or return of posted collateral from, the Senior Swap Collateral Account. In the event that the Senior Swap Counterparty is no longer required to post collateral pursuant to the Senior Swap Agreement, all funds and other property on deposit in the Senior Swap Collateral Account shall be withdrawn and distributed to the Senior Swap Counterparty.

Funds and other property on deposit in the Senior Swap Collateral Account will not be included in the Collateral and will not be available to make payments under the Notes except to the extent that the Issuer becomes entitled as a secured party to realize the collateral posted under the Senior Swap Agreement pursuant to the terms thereof and applies the proceeds thereof in accordance with the terms hereof to make such payments. Amounts contained in the Senior Swap Collateral Account shall not be considered to be an asset of the Issuer for purposes of any of the Collateral Quality Tests or the Overcollateralization Tests, but the Issuer's right, title and interest in, to and under the Senior Swap Agreement shall be considered an asset of the Issuer.

Upon the occurrence of an "event of default" or "termination event" under (and as defined in) the Senior Swap Agreement and solely as permitted thereunder, funds and other property deposited in the Senior Swap Collateral Account shall, as directed by the Collateral Manager by Issuer Order, be withdrawn by the Trustee and applied to the payment of any termination payment or other amount due and payable by the Senior Swap Counterparty to the Issuer under the Senior Swap Agreement as a result of such "event of default" or "termination event." Upon the occurrence of the Senior Swap Early Termination Date and after the payment in full of the Senior Swap Early Termination Date Payment to the Issuer by the Senior Swap Counterparty, all funds and other property standing to credit of the Senior Swap Collateral Account will be paid or otherwise returned to the Senior Swap Counterparty in accordance with the Senior Swap Agreement and without regard to the Priority of Payments.

The Senior Swap Collateral Account shall remain at all times with a financial institution having a long-term debt rating of at least "BBB+" by Standard & Poor's and at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and a combined capital and surplus in excess of U.S.$200,000,000.

(o)     The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "**Interest Reserve Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties. Any and all funds at any time on deposit in, or

otherwise to the credit of, the Interest Reserve Account shall be held in trust by the Trustee for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties. Except as provided in Sections 11.1 and 11.2, the only permitted withdrawal from or application of funds on deposit in, or otherwise standing to the credit of, the Interest Reserve Account, at the discretion of the Collateral Manager and shall be as set forth in the following two sentences. On or before the first Quarterly Distribution Date, amounts on deposit in the Interest Reserve Account shall, at the discretion of the Collateral Manager and upon Issuer Order, be designated as Interest Proceeds or Principal Proceeds, as applicable, transferred into the Interest Collection Account or Principal Collection Account, as applicable, and applied by the Trustee on behalf of the Issuer to make payments in accordance with 11.1(a)(i). Any amounts remaining in the Interest Reserve Account (after giving effect to any transfers therefrom as of such date in accordance with this Section 10.2(o)) shall be designated as Principal Proceeds and transferred on behalf of the Issuer into the Principal Collection Account for application in accordance with Section 11.1(a)(ii) and (y) upon such transfer the Interest Reserve Account shall be closed and no further deposits therein shall occur.

The Trustee agrees to give the Co-Issuers and Standard & Poor's prompt notice if the Interest Reserve Account or any funds on deposit in either, or otherwise standing to the credit of the Interest Reserve Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.

By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall on behalf of the Issuer, invest all funds received into the Interest Reserve Account during a Due Period, and amounts received in prior Due Periods and retained in the Interest Reserve Account, as so directed in Eligible Investments. All interest and other income from such investments shall be deposited in the Interest Reserve Account, any gain realized from such investments shall be credited to the Interest Reserve Account and any loss resulting from such investments shall be charged to the Interest Reserve Account. Neither the Trustee nor the Collateral Manager shall in any way be held liable by reason of any insufficiency of the Interest Reserve Account resulting from any loss relating to any such investment.

(p)     The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "**Closing Date Expense Account,**" which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Closing Date Expense Account shall be held in trust by the Trustee for the benefit of the Issuer and, to the extent provided for herein, the Secured Parties. Any amount deposited therein on the Closing Date shall be used for the payment of fees and expenses accrued as of the Closing Date at the direction of the Collateral Manager at any time on or prior to the second Quarterly Distribution Date following the Closing Date. On the second Quarterly Distribution Date following the Closing Date any amounts remaining in the Closing Date Expense Account shall be designated as Interest Proceeds or Principal Proceeds at the Collateral Manager's discretion, transferred to the Interest Collection Account or Principal Collection Account, as applicable, and applied by the Trustee on behalf of the Issuer to make payments in accordance with Section 11.1(a)(i) or (ii), as applicable, and the Closing Date Expense Account

shall be closed. By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, on behalf of the Issuer, invest all funds received into the Closing Date Expense Account, as so directed in Eligible Investments. All interest and other income from such investments shall be deposited in the Closing Date Expense Account, any gain realized from such investments shall be credited to the Closing Date Expense Account and any loss resulting from such investments shall be charged to the Closing Date Expense Account for the benefit or the detriment of the Issuer. Neither the Trustee nor the Collateral Manager shall in any way be held liable by reason of any insufficiency of such Closing Date Expense Account resulting from any loss relating to any such investment.

10.3    Payment Account.

The Trustee shall, prior to the Closing Date, cause the Custodian to establish a Securities Account which shall be designated as the "**Payment Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Payment Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Sections 11.1 and 11.2, the only permitted withdrawal from or application of funds on deposit in, or otherwise standing to the credit of, the Payment Account shall be to pay the interest on and the principal of the Notes in accordance with their terms and the provisions of this Indenture and, upon Issuer Order, to pay Administrative Expenses and other amounts specified therein, each in accordance with the Priority of Payments. The Trustee agrees to give the Issuer, the Credit Default Swap Counterparty, the Senior Swap Counterparties, Standard & Poor's and the Hedge Counterparties prompt notice if the Payment Account or any funds on deposit therein, or otherwise standing to the credit of the Payment Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments. The Payment Account shall remain at all times with a financial institution having a long-term debt rating of at least "BBB+" by Standard & Poor's and at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and a combined capital and surplus in excess of U.S.$200,000,000.

10.4    Expense Account.

(a)    The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "**Expense Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise to the credit of, the Expense Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Sections 11.1 and 11.2, the only permitted withdrawal from or application of funds on deposit in, or otherwise standing to the credit of, the Expense Account shall be to pay (on any day other than a Quarterly Distribution Date) accrued and unpaid Administrative Expenses of the Co-Issuers (other than fees and expenses of the Trustee). On the Closing Date, the Trustee shall deposit into the Expense Account an amount equal to U.S.$150,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Notes and the Preference Shares. In addition, on each Quarterly Distribution Date on which the balance of the Expense Account is less than

U.S.$150,000, additional amounts will be deposited therein to the extent that funds are available therefor in accordance with the priority described under Section 11.1(i) and (ii) to the extent necessary to cause the Balance of all Eligible Investments and Cash in the Expense Account immediately after such deposit to equal U.S.$150,000. Thereafter, the Trustee shall transfer to the Expense Account from the Payment Account amounts required to be deposited therein pursuant to Section 11.1 and in accordance with the calculations and the instruction contained in the Note Valuation Report prepared by the Issuer pursuant to Section 10.7(b).

(b)     The Trustee agrees to give the Issuer, Standard & Poor's, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Hedge Counterparties prompt notice if the Expense Account or any funds on deposit in either, or otherwise standing to the credit of the Expense Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Expense Account shall remain at all times with a financial institution having a long-term debt rating of at least "BBB+" by Standard & Poor's and at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and a combined capital and surplus in excess of U.S.$200,000,000. By Issuer Order executed by an Authorized Officer of the Collateral Manager and delivered to the Trustee no later than the Determination Date prior to any Quarterly Distribution Date, the Collateral Manager may direct the Trustee to apply amounts standing to the credit of the Collection Account to the Expense Account to the extent funds are available therefor in accordance with the Priority of Payments; *provided* that the Aggregate Principal Balance of Eligible Investments standing to the credit of the Expense Account immediately after giving effect to any such transfer does not exceed U.S.$150,000.

(c)     By Issuer Order executed by an Authorized Officer of the Collateral Manager (which may be in the form of standing instructions), the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Expense Account during a Due Period, and amounts received in prior Due Periods and retained in the Expense Account, as so directed in Eligible Investments. All interest and other income from such investments shall be deposited in the Expense Account, any gain realized from such investments shall be credited to the Expense Account and any loss resulting from such investments shall be charged to the Expense Account. The Trustee shall not in any way be held liable by reason of any insufficiency of such Expense Account resulting from any loss relating to any such investment.

10.5     Uninvested Proceeds Account.

(a)     The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "**Uninvested Proceeds Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties, into which the Trustee shall deposit on the Closing Date the Uninvested Proceeds in relation to the Collateral Debt Securities to be purchased after the Closing Date. The Collateral Manager on behalf of the Issuer may only direct the Trustee to, and upon such direction the Trustee shall, apply all funds standing to the credit of the Uninvested Proceeds Account (i) to the acquisition of (A) Collateral Debt Securities (which shall be credited to the Custodial Account upon the acquisition thereof), (B) Eligible Investments, (C) U.S. Agency Securities, in each case as designated by the Collateral Manager or (D) upfront payments payable by the Issuer in

connection with the acquisition of Synthetic Securities, *provided* that after the Ramp-Up Completion Date, the Issuer shall not be permitted to hold any U.S. Agency Securities in the Uninvested Proceeds Account unless such U.S. Agency Securities would be eligible for purchase by the Issuer as a Collateral Debt Security on the Ramp-Up Completion Date (in which case such investment shall be deemed to be a Collateral Debt Security), (ii) to fund trading termination or assignment payments payable by the Issuer in respect of the termination or assignment of individual CDS Agreement Transactions, or (iii) if a Ratings Confirmation Failure has occurred and is continuing on the first Determination Date occurring thereafter, to cure any Ratings Confirmation Failure by applying such funds on the related Quarterly Distribution Date (A) *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero, (B) *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, (C) *third*, to the payment of principal of the Notes in direct order of seniority, in each case to the extent necessary to obtain a Rating Confirmation, and (D) *fourth*, to the payment of fixed premium amounts, Principal Reimbursements and Interest Reimbursements payable by the Issuer under Short Synthetic Securities. All interest and other income from such investments shall be deposited in the Uninvested Proceeds Account, any gain realized from such investments shall be credited to the Uninvested Proceeds Account, and any loss resulting from such investments shall be charged to the Uninvested Proceeds Account. The Trustee shall not in any way be held liable by reason of any insufficiency of the Unused Proceeds Account resulting from any loss relating to any such investment. Funds and other property standing to the credit of the Uninvested Proceeds Account may be transferred to a Synthetic Security Counterparty Account in order to fund the acquisition by the Issuer of any Synthetic Security Collateral to the extent required pursuant to the terms of the related Defeased Synthetic Security.

(b) On the first Determination Date, investment earnings on Eligible Investments and U.S. Agency Securities standing to the credit of the Uninvested Proceeds Account will be transferred to the Interest Collection Account and applied as Interest Proceeds on the first Quarterly Distribution Date following the Closing Date. Amounts credited to the Uninvested Proceeds Account and applied to pay expenses related to the issuance of the Notes on the Closing Date and certain anticipated post-closing expenses will not be treated as principal or interest. The Trustee shall on the Quarterly Distribution Date relating to the first Determination Date occurring more than 20 days after the Ramp-Up Completion Date, transfer Uninvested Proceeds to the Payment Account to the extent such funds are required to cure any Ratings Confirmation Failure pursuant to <u>Section 11.1(iii)</u> and shall transfer any Uninvested Proceeds remaining after such application to the Principal Collection Account to be treated as Principal Proceeds. The Trustee shall not in any way be held liable by reason of any insufficiency of such Uninvested Proceeds Account resulting from any loss relating to any such investment.

10.6    <u>Reports by Trustee</u>.

The Trustee shall supply in a timely fashion to each Rating Agency, the Credit Default Swap Counterparty, the Senior Swap Counterparties, each Hedge Counterparty, the Issuer, and the Collateral Manager any information regularly maintained by the Trustee that the Issuer, the Senior Swap Counterparty or the Collateral Manager may from time to time request with respect to the Pledged Securities or any Account reasonably needed to complete the Note Valuation

Report or to provide any other information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 10.7 or to permit the Collateral Manager to perform its obligations under the Collateral Management Agreement. The Trustee shall forward to the Collateral Manager and to any Holder of a Note shown on the Note Register, any Preference Shareholder, the Credit Default Swap Counterparty, any Senior Swap Counterparty or any Hedge Counterparty upon request therefor, copies of notices and other writings received by it from the issuer of any Collateral Debt Security or from any Clearing Agency with respect to any Collateral Debt Security advising the holders of such security of any rights that the holders might have with respect thereto (including notices of calls and redemptions of securities) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer.

As promptly as possible following the delivery of each Monthly Report and Note Valuation Report to the Trustee pursuant to Section 10.7(a) or (b), as applicable, the Issuer shall cause a copy of such report to be delivered to the Repository for posting on the Repository in the manner described in Section 14.3 and to Intex Solutions, Inc. In connection therewith, each of the Co-Issuers and the Trustee acknowledges that each Monthly Report and Note Valuation Report shall be posted to the Repository for use in the manner described in the section headed "Terms of Use" on the Repository.

10.7    Accountings.

(a)    Monthly.  On the 11th Business Day of each month (other than a month in which a Quarterly Distribution Date occurs), commencing on December 15, 2006, the Issuer or the Collateral Administrator acting on behalf of the Issuer shall compile and provide or make available to each Rating Agency, the Trustee, the Collateral Manager, the Credit Default Swap Counterparty, each Senior Swap Counterparty, each Hedge Counterparty and each Transfer Agent and, upon written request therefor, any Holder of a Note shown on the Note Register and any Preference Shareholder a monthly report (the "**Monthly Report**").  The Monthly Report shall contain the following information and instructions with respect to the Pledged Securities included in the Collateral and determined as of the fifth day of each calendar month:

(a)    (x) the Aggregate Principal Balance of all Collateral Debt Securities, together with a calculation, in reasonable detail, of the sum of (A) the Aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities, Deferred Interest PIK Bonds and Written-Down Securities) *plus* (B) with respect to each Defaulted Security or Deferred Interest PIK Bond, the Calculation Amount of such Defaulted Security or Deferred Interest PIK Bond *plus* (C) with respect to each Written-Down Security, the Aggregate Principal Balance of all such Written-Down Securities and (y) the Aggregate Principal Balance of all Collateral Debt Securities and any Principal Proceeds received in respect of any such Collateral Debt Securities as of the Ramp-Up Completion Date;

(b)    the Balance of all Reserve Account Investments, Eligible Investments and Cash in each of the Interest Collection Account, the

Principal Collection Account, the Reserve Account and the Expense Account;

(c)    the nature, source and amount of any proceeds in the Collection Accounts, including Interest Proceeds, Principal Proceeds and Sale Proceeds, received since the date of determination of the last Monthly Report (or, if more recent, the date of determination of the last Note Valuation Report);

(d)    to the extent available with respect to each Collateral Debt Security, Reserve Account Investment and Eligible Investment, its Principal Balance, annual interest rate, stated maturity, issuer, Moody's Rating and Standard & Poor's Rating (as of the date of acquisition and as of the date of such Monthly Report); *provided* that any individual shadow rating or any non-public rating (including credit estimates) by Moody's or Standard & Poor's of a Collateral Debt Security obtained by the Collateral Manager on behalf of the Issuer shall not be disclosed in any Monthly Report or Note Valuation Report but shall instead be represented by an asterisk;

(e)    the identity of each Collateral Debt Security that was sold or disposed of pursuant to Section 12.1 (indicating whether such Collateral Debt Security is a Defaulted Security, Credit Improved Security or Credit Risk Security (in each case, as reported in writing to the Issuer by the Collateral Manager) and whether such Collateral Debt Security was sold pursuant to Section 12.1(a)(i), (ii), (iii), (iv) or (v)) or Granted to the Trustee since the date of determination of the most recent Monthly Report;

(f)    the identity of each Collateral Debt Security that is a Defaulted Security, Deferred Interest PIK Bond or a Written-Down Security, its principal amount, the Fair Market Value thereof and the date on which it became a Defaulted Security or Written-Down Security, together with a list of each Defaulted Security or Deferred Interest PIK Bond, the Fair Market Value of which is determined pursuant to clause (3) of the proviso to the definition thereof and the value assigned by the Collateral Manager thereto;

(g)    the identity of each Collateral Debt Security which has been upgraded or downgraded by one or more Rating Agencies;

(h)    the Aggregate Principal Balance of all Fixed Rate Collateral Debt Securities (other than Deemed Floating Rate Collateral Debt Securities) or Deemed Fixed Rate Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(i)      the Aggregate Principal Balance of all Floating Rate Collateral Debt Securities (other than Deemed Fixed Rate Collateral Debt Securities) or Deemed Floating Rate Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(j)      the Aggregate Principal Balance of all Deemed Fixed Rate Collateral Debt Securities or Deemed Floating Rate Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(k)      the Aggregate Principal Balance of all Pure Private Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(l)      the Aggregate Principal Balance of all Collateral Debt Securities (other than an Insurance Company Guaranteed Security, U.S. Agency Guaranteed Securities or FHLMC/FNMA Guaranteed Securities) that are guaranteed as to ultimate or timely payment of principal or interest;

(m)      the percentage of all Collateral Debt Securities at each rating category for Moody's and Standard & Poor's;

(n)      (i) the Aggregate Principal Balance of all Collateral Debt Securities with a Moody's Rating of "Caa1" or below, (ii) the Aggregate Principal Balance and aggregate Calculation Amount of all Collateral Debt Securities with a Moody's Rating of below "Caa3", (iii) the Moody's Below B3 Haircut Amount, (iv) the Moody's Below Ba3 Haircut Amount, (v) the Moody's Below Baa3 Haircut Amount, (vi) the Standard & Poor's Below B- Haircut Amount, (vii) the Standard & Poor's Below BB- Haircut Amount and (viii) the Standard & Poor's Below BBB- Haircut Amount;

(o)      the identity of and the Aggregate Principal Balance of all Collateral Debt Securities whose Moody's Rating is determined as provided in clause (a)(ii) of the definition of "Rating" and the identity of and the Aggregate Principal Balance of all Collateral Debt Securities whose Standard & Poor's Rating is determined as provided in clause (b)(i)(C) or (b)(i)(B) of the definition of "Rating";

(p)      with respect to each Issue of Collateral Debt Securities, the Aggregate Principal Balance of all Collateral Debt Securities that are part of such Issue (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(q)      with respect to each Servicer of Collateral Debt Securities, the Aggregate Principal Balance of all Collateral Debt Securities serviced

by such Servicer (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(r) with respect to each Synthetic Security Counterparty, (A) the rating, if any, thereof by Standard & Poor's and (B) the Aggregate Principal Balance of all Collateral Debt Securities acquired from such Synthetic Security Counterparty and its Affiliates;

(s) (i) the Aggregate Principal Balance of (A) all Synthetic Securities and (B) all Short Synthetic Securities and (ii) the aggregate annual fixed rate premium payable by the Issuer under all Short Synthetic Securities;

(t) with respect to each Specified Type of Asset-Backed Security (except for REIT Debt Securities—Healthcare, REIT Debt Securities—Mortgage and related Synthetic Securities), the Aggregate Principal Balance of all Collateral Debt Securities consisting of such Specified Type of Asset-Backed Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(u) the Aggregate Principal Balance of all PIK Bonds, Principal Only Securities and Zero Coupon Bonds (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(v) the Aggregate Principal Balance of all Collateral Debt Securities with a Stated Maturity occurring later than the Stated Maturity of the Notes;

(w) (a) the Aggregate Principal Balance of all CDO Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities), (b) with respect to any single issuer of CDO Securities, the Aggregate Principal Balance of all CDO Securities issued by such issuer and (c) with respect to any single collateral manager of CDO Securities, the Aggregate Principal Balance of all CDO Securities managed by such collateral manager.

(x) the Aggregate Principal Balance of all Collateral Debt Securities that are Step-Down Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(y) the Aggregate Principal Balance of all Collateral Debt Securities with attached Equity Securities;

(z) the Aggregate Principal Balance of all Collateral Debt Securities that are Mortgage Finance Company Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(aa)    the Aggregate Principal Balance of all Collateral Debt Securities that are Insurance Company Guaranteed Securities (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(bb)    the identity of and Aggregate Principal Balance of all Collateral Debt Securities that are on watch for possible upgrade or downgrade by a Rating Agency;

(cc)    the Aggregate Principal Balance of all Collateral Debt Securities related to obligors incorporated or organized in any jurisdiction other than the United States of America or any State thereof or a Special Purpose Vehicle Jurisdiction (together with the Aggregate Principal Balance of any Synthetic Securities related thereto);

(dd)    (x) after the last day of the Reinvestment Period, a calculation in reasonable detail necessary to determine compliance with each Coverage Test, and, in the case of each Coverage Test, a comparison of such Coverage Ratio on such date to such Coverage Ratio as of the last day of the Reinvestment Period, (y) a statement (confirmed by the Collateral Manager based on its independent application of the Standard & Poor's CDO Monitor Notification Test to the Collateral Debt Securities on the date of determination) of whether the Standard & Poor's CDO Monitor Notification Test was satisfied, and if not, the extent to which the Standard & Poor's CDO Monitor Notification Test was not satisfied and (z) the Standard & Poor's Scenario Default Rate, Note Break-Even Default Rate and Notes Default Rate Differential with respect to each Class of Notes;

(ee)    a calculation in reasonable detail necessary to determine compliance with each Collateral Quality Test;

(ff)    a calculation in reasonable detail necessary to determine the estimated remaining average life (on an aggregate basis) of all Collateral Debt Securities that are not Synthetic Securities (using reasonable assumptions as set forth in such calculation), as provided by the Collateral Manager;

(gg)    [Reserved];

(hh)    the Notional Amount of each Synthetic Security and premium payable by the applicable Synthetic Security Counterparty to the Issuer under such Synthetic Security;

(ii)    with respect to a Pledged Collateral Debt Security that is part of a single tranche within a multiple tranche issuance, (a) the original size of such tranche expressed as a percentage of the total capital structure with respect to such issuance and (b) the relative seniority of such Pledged Collateral Debt Security within such issuance;

(jj)     the Remaining Unfunded Notional Amount, the Reserve Account Balance, the Permanent Reduction Amount, the Outstanding Swap Counterparty Amount and the Remaining Exposure of all CDS Agreement Transactions; and

(kk)     with respect to each Negative Amortization Security, the aggregate Negative Amortization Capitalization Amounts (if any) that have accrued thereon (as the same may be reduced from time to time in accordance with sub-clause (C) of the proviso to the definition of "**Interest Proceeds**").

In addition, the Issuer shall also indicate in each such Monthly Report the respective percentage of the Net Outstanding Portfolio Collateral Balance for each aggregate amount referred to in clauses (h) through (cc) above.

In addition, in conjunction with the delivery of each Monthly Report, the Collateral Administrator on behalf of the Issuer shall provide to Standard & Poor's by electronic mail a Microsoft Excel file that provides the following information (to the extent such information is not confidential) with respect to each Collateral Debt Security:  (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP or other applicable identification number associated with such Collateral Debt Security and Reference Obligation, (c) the par value of such Collateral Debt Security, (d) the type of issue (including, by way of example, whether such Collateral Debt Security is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee, (e) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Debt Security and Reference Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (f) the coupon (in the case of a Collateral Debt Security which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Debt Security which bears interest at a floating rate), (g) the Standard & Poor's Industry Classification Group for such Collateral Debt Security and Reference Obligation, (h) the stated maturity date of such Collateral Debt Security and Reference Obligation and (i) the Standard & Poor's Rating of such Collateral Debt Security and Reference Obligation or the issuer thereof, as applicable.

Upon receipt of each Monthly Report, the Collateral Manager shall compare the information contained therein to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer and the Trustee if the information contained in the Monthly Report does not conform to the information maintained by the Collateral Manager with respect to the Collateral.  In the event that any discrepancy exists, the Trustee and the Issuer, or the Collateral Manager on behalf of the Issuer, shall attempt to resolve the discrepancy.  If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days cause the Independent accountants appointed by the Issuer pursuant to Section 10.9 to review such Monthly Report and the Trustee's or Collateral Manager's records to determine the cause of such discrepancy.  If such review reveals an error in the Monthly Report or the Trustee's or Collateral Manager's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture.

(b)     Quarterly Distribution Date Accounting.  The Issuer shall render or cause to be rendered an accounting ("**Note Valuation Report**"), determined as of each Determination Date, and deliver or make available the Note Valuation Report to each Rating Agency, the Trustee, each Paying Agent, the Collateral Manager, the Credit Default Swap Counterparty, each Senior Swap Counterparty, each Hedge Counterparty, each Transfer Agent and, upon written request therefor, any Holder of a Note shown on the Note Register and any Preference Shareholder, not later than the related Quarterly Distribution Date.  The Note Valuation Report shall contain the following information (determined, unless otherwise specified below, as of the related Determination Date):

(a)     the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class on the first day of the immediately preceding Interest Period, the amount of principal payments to be made on the Notes of each Class on the next Quarterly Distribution Date, the amount of any Class C Deferred Interest, if any, the amount of any Class D Deferred Interest, if any, the amount of any Class X Deferred Interest, if any, and the Aggregate Outstanding Amount of the Notes of each Class and as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class after giving effect to the principal payments, if any, on the next Quarterly Distribution Date;

(b)     the Interest Distribution Amount payable to the Holders of the Notes for the related Quarterly Distribution Date (in the aggregate and by Class) and the amount payable to Holders of Preference Shares, for such Quarterly Distribution Date;

(c)     the Note Interest Rate for each Class of Notes for the Interest Period preceding the next Quarterly Distribution Date;

(d)     the Administrative Expenses payable on the next Quarterly Distribution Date on an itemized basis;

(e)     for the Interest Collection Account:

(1)     the Balance on deposit in the Interest Collection Account at the end of the related Due Period;

(2)     the amounts payable from the Interest Collection Account pursuant to Section 11.1(i) on the next Quarterly Distribution Date; and

(3)     the Balance remaining in the Interest Collection Account immediately after all payments and deposits to be made on such Quarterly Distribution Date;

(f)     for the Principal Collection Account:

(1)     the Balance on deposit in the Principal Collection Account at the end of the related Due Period;

(2)     the amounts payable from the Principal Collection Account pursuant to Section 11.1(ii) on the next Quarterly Distribution Date; and

(3)     the Balance remaining in the Principal Collection Account immediately after all payments and deposits to be made on such Quarterly Distribution Date;

(g)     the Balance on deposit in the Uninvested Proceeds Account, the Expense Account, the Closing Date Expense Account, the Interest Reserve Account, each Asset Hedge Account, the Reserve Account, each Hedge Counterparty Collateral Account, any Synthetic Security Counterparty Account and any Issuer Collateral Account at the end of the related Due Period;

(h)     The Senior Collateral Management Fee and the Subordinated Collateral Management Fee, if any to be paid on the next Quarterly Distribution Date;

(i)     the amounts to be paid to the Senior Swap Counterparty and to any Prior Senior Swap Counterparty  in respect of its Outstanding Swap Counterparty Amount and Senior Swap Interest Amounts thereon pursuant to the Senior Swap Agreement or this Indenture (as applicable); and

(j)     the amount to be paid to the Preference Share Paying Agent on such Quarterly Distribution Date for distribution to the Preference Shareholders.

Each Note Valuation Report shall constitute instructions to the Trustee to withdraw on the related Quarterly Distribution Date from the Payment Account and pay or transfer amounts set forth in such report in the manner specified, and in accordance with the priorities established in, Sections 11.1(i) and (ii).

In addition to the Note Valuation Report, upon the written request of any Holder of a Note shown on the Note Register, the Credit Default Swap Counterparty, any Senior Swap Counterparty, any Hedge Counterparty or either Rating Agency, the Issuer shall deliver to such Holder, the Credit Default Swap Counterparty, such Senior Swap Counterparty, such Hedge Counterparty or Rating Agency, as the case may be, a report containing the number and identity of each Collateral Debt Security held by the Issuer on the last day of the Due Period most recently ended (indicating whether any such Collateral Debt Security is a Defaulted Security (as reported in writing to the Trustee by the Collateral Manager)).

In addition to the foregoing information, each Note Valuation Report shall include a statement to the following effect:

"The Investment Company Act of 1940, as amended (the "**Investment Company Act**"), requires that each holder of a Note issued by the Co-Issuers (or beneficial interest therein) that is a U.S. Person be (x) a "qualified purchaser" as defined in Section 2(a)(51)(A) of the Investment Company Act and related rules or (y) a company each of whose beneficial owners is a qualified purchaser or a "knowledgeable employee" with respect to the Issuer (each a "**Qualified Purchaser**").  Under the rules, each of the Co-Issuers or an agent acting on its behalf must have a "reasonable belief" that each holder of its outstanding securities that is a U.S. Person, including transferees, is a Qualified Purchaser, a company each of whose beneficial owners is a Qualified Purchaser.  Consequently, each resale of a Note in the United States or to a U.S. Person must be made pursuant to Rule 144A under the Securities Act of 1933, as amended (the "**Securities Act**"), solely to a purchaser that is a "qualified institutional buyers" ("**Qualified Institutional Buyer**") within the meaning of Rule 144A and a Qualified Purchaser.  Each transferee of a Restricted Note will be deemed to represent at the time of purchase that:  (i) the transferee is a Qualified Institutional Buyer and also a Qualified Purchaser; (ii) the transferee is not a dealer described in paragraph (a)(1)(ii) of Rule 144A unless such transferee owns and invests on a discretionary basis at least U.S.$25,000,000 in securities of issuers that are not Affiliated Persons of the dealer; (iii) the transferee is not a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan; (iv) the transferee and each account for which it is purchasing, is required to hold and transfer at least the minimum denominations of the Notes specified in the Indenture and (v) the transferee will provide written notice of the foregoing, and of any applicable restrictions on transfer, to any subsequent transferee.

The Co-Issuers direct that the recipient of this notice, and any recipient of a copy of this notice, provide a copy to any Person having an interest in the Note with respect to which this Note Valuation Report is delivered, as indicated on the books of The Depository Trust Company or on the books of a participant in The Depository Trust Company or on the books of an indirect participant for which such participant in The Depository Trust Company acts as agent.

Notwithstanding any other restrictions on transfer contained herein, if either of the Co-Issuers determines that any beneficial owner of a Restricted Note (or any interest therein) (A) is a U.S.

Person and (B) is not both a Qualified Institutional Buyer and also (x) a Qualified Purchaser, either of the Co-Issuers may require, by notice to such Holder, that such Holder sell all of its right, title and interest to such Restricted Note (or interest therein) to a Person that is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser, with such sale to be effected within 30 days after notice of such sale requirement is given. If such beneficial owner fails to effect the transfer required within such 30-day period, (i) upon written direction from the Issuer, the Trustee shall, and is hereby irrevocably authorized by such beneficial owner, to cause its interest in such Note to be transferred in a commercially reasonable sale (conducted by the Trustee in accordance with Section 9-610 of the Uniform Commercial Code as in effect in the State of New York as applied to securities that are sold on a recognized market or that are the subject of widely distributed standard price quotations) to a Person that certifies to the Trustee and the Collateral Manager, in connection with such transfer, that such Person is (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser and (b) pending such transfer, no further payments will be made in respect of such Note held by such beneficial owner. As used in this paragraph, the term "U.S. Person" has the meaning given such terms in Regulation S under the Securities Act."

(c) <u>Redemption Date Instructions</u>. Not less than five Business Days after receiving an Issuer Request requesting information regarding a redemption pursuant to Sections 9.1 or 9.5 of the Notes of a Class as of a proposed Redemption Date set forth in such Issuer Request, the Trustee shall provide the necessary information (to the extent it is available to the Trustee) to the Issuer, the Collateral Manager, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Hedge Counterparties, and the Issuer shall compute the following information and provide such information in a statement (the "**Redemption Date Statement**") delivered to the Trustee, the Collateral Manager, the Credit Default Swap Counterparty and the Hedge Counterparties:

(i) the Aggregate Outstanding Amount of the Notes of the Class or Classes to be redeemed as of such Redemption Date;

(ii) the amount of accrued interest due on such Notes as of the last day of the Interest Period immediately preceding such Redemption Date;

(iii) the amount in the Accounts (other than in any Hedge Counterparty Collateral Account, any Asset Hedge Account, any Synthetic Security Counterparty Account, any Issuer Collateral Account and the Senior Swap Collateral Account) available for application to the redemption of such Notes; and

(iv) each Outstanding Swap Counterparty Amount, the Remaining Unfunded Notional Amount and any other amounts due to any Senior Swap Counterparty.

(d)     If the Trustee shall not have received any accounting provided for in this Section 10.7 on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall use reasonable efforts to cause such accounting to be made by the applicable Quarterly Distribution Date or Redemption Date.  To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.7 as a result of the failure of the Issuer to provide such information or reports, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be reimbursed pursuant to Section 6.8.

10.8     Release of Securities.

(a)     If no Event of Default has occurred and is continuing and subject to Section 12, the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager and delivered to the Trustee at least two Business Days prior to the settlement date for any Sale of a security certifying that the conditions set forth in Section 12.1 are satisfied, direct the Trustee to release such security from the lien of this Indenture against receipt of payment therefor.

(b)     The Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager and delivered to the Trustee at least two Business Days prior to the date set for redemption or payment in full of a Pledged Security, certifying that such security is being redeemed or paid in full, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such security, if in physical form, duly endorsed, or, if such security is a Clearing Corporation Security, to cause it to be presented, to the appropriate paying agent therefor on or before the date set for redemption or payment, in each case against receipt of the redemption price or payment in full thereof.

(c)     If no Event of Default has occurred and is continuing and subject to Section 12, the Issuer may, by Issuer Order executed by an Authorized Officer of the Collateral Manager and delivered to the Trustee at least two Business Days prior to the date set for an exchange, tender or Sale, certifying that a Collateral Debt Security is subject to an Offer and setting forth in reasonable detail the procedure for response to such Offer, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such security, if in physical form, duly endorsed, or, if such security is a Clearing Corporation Security, to cause it to be delivered, in accordance with such Issuer Order, in each case against receipt of payment therefor.

(d)     The Trustee shall deposit any proceeds received by it from the disposition of a Pledged Security in the Interest Collection Account or the Principal Collection Account, as the case may be, unless simultaneously applied to the purchase of other Collateral Debt Securities or Eligible Investments as permitted under and in accordance with requirements of Section 12 and this Section 10.

(e)     The Trustee shall, upon receipt of an Issuer Order at such time as there are no Notes Outstanding and all obligations of the Co-Issuers hereunder have been satisfied, release the Collateral from the lien of this Indenture.

(f)     The Issuer may retain agents (including the Collateral Manager) to assist the Issuer in preparing any notice or other report required under this Section 10.8.

10.9     Reports by Independent Accountants.

(a)     At the Closing Date the Issuer shall appoint a firm of Independent certified public accountants of recognized national reputation for purposes of preparing and delivering the reports or certificates of such accountants required by this Indenture.  Upon any resignation by such firm, the Issuer shall promptly appoint, by Issuer Order delivered to the Trustee, the Credit Default Swap Counterparty, each Senior Swap Counterparty, each Hedge Counterparty and each Rating Agency a successor thereto that shall also be a firm of Independent certified public accountants of recognized national reputation.  If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee, the Collateral Manager and each Rating Agency of such failure in writing.  If the Issuer shall not have appointed a successor within 10 days thereafter, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized national reputation.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer or by the Trustee as provided in Section 11.1.

(b)     On or before May 6 of each year (commencing in 2007), the Issuer shall cause to be delivered to the Trustee, the Collateral Manager and each Rating Agency an Accountants' Report specifying the procedures applied and their associated findings with respect to the Monthly Reports prepared in the month in which a Quarterly Distribution Date occurs, the Note Valuation Reports and any Redemption Date Statements prepared in the preceding year.  At least 90 days prior to the Quarterly Distribution Date occurring in May 2007 (and, if at any time a successor firm of Independent certified public accountants is appointed, to the Quarterly Distribution Date following the date of such appointment), the Issuer shall deliver to the Trustee an Accountant's Report specifying in advance the procedures that such firm will apply in making the aforementioned findings throughout the term of its service as accountants to the Issuer.  The Trustee shall promptly forward a copy of such Accountant's Report to each Hedge Counterparty, the Credit Default Swap Counterparty, each Senior Swap Counterparty and each Holder of Notes of the Controlling Class, at the address shown on the Note Register.  The Issuer shall not approve the institution of such procedures if a Majority of the Controlling Class, by notice to the Issuer, the Collateral Manager and the Trustee within 30 days after the date of the related notice to the Trustee, object thereto.

(c)     Any statement delivered to the Trustee pursuant to clause (b) above shall be delivered by the Trustee to any Holder of a Note shown on the Note Register upon written request therefor.

10.10     Reports to Rating Agencies, Etc.

(a)     In addition to the information and reports specifically required to be provided to the Rating Agencies, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Hedge Counterparties pursuant to the terms of this Indenture, the Credit Default Swap Agreement, the Senior Swap Agreement or the Hedge Agreements (as the case may be), the

Issuer shall provide or cause to be provided to the Rating Agencies, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Hedge Counterparties with (i) all information, notices or reports delivered to the Trustee hereunder, (ii) such additional information as the Rating Agencies, the Credit Default Swap Counterparty, the Senior Swap Counterparties or the Hedge Counterparties may from time to time reasonably request and such information may be obtained and provided without unreasonable burden or expense, (iii) prompt notice of any decision of the Collateral Manager to agree to any consent, waiver or amendment to any Underlying Instrument that modifies the cash flows of any Collateral Debt Security and (iv) notice of any waiver given pursuant to Section 5.14. The Issuer shall promptly notify the Trustee, the Hedge Counterparties, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Collateral Manager if the rating of any Class of Notes has been, or it is known by the Issuer that such rating will be, changed or withdrawn.

(b)     All reports provided to Standard & Poor's under Section 10.6 and 10.7 shall be provided in the Trustee's standard electronic format.

10.11   Tax Matters.

(a)     The Issuer, the Co-Issuer, the Trustee agree, and each Holder and beneficial owner of Notes, by accepting a Note, agrees to treat such Notes as indebtedness solely of the Issuer and not of the Co-Issuer for U.S. Federal, state and local income and franchise tax purposes, to report all income (or loss) in accordance with such treatment and not to take any action inconsistent with such treatment unless otherwise required by any taxing authority under applicable law.

(b)     The Issuer has not elected and agrees not to elect to be treated as other than a corporation for U.S. federal income tax purposes.

(c)     If required to prevent the withholding or imposition of United States income tax, the Issuer shall deliver or cause to be delivered a United States Internal Revenue Service Form W-8BEN or successor applicable form, to each issuer, counterparty or paying agent with respect to any Collateral Debt Security at the time such Collateral Debt Security is purchased or entered into and thereafter prior to the expiration or obsolescence of such form.

(d)     The Issuer shall not file, or cause to be filed, any income or franchise tax return in the United States or any state of the United States unless it shall have obtained advice from Cadwalader, Wickersham & Taft LLP or an Opinion of Counsel of other nationally recognized U.S. tax counsel experienced in such matters prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

10.12   No Gross Up.

The Issuer shall not be obligated to pay any additional amounts to the Holders or beneficial owners of the Notes as a result of any withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges.

## 11.    APPLICATION OF CASH

11.1    Disbursements of Cash from Payment Account.

Notwithstanding any other provision in this Indenture, but subject to the other clauses of this Section 11 and Section 13.1, on each Quarterly Distribution Date, the Trustee shall disburse amounts transferred to the Payment Account from the Collection Accounts pursuant to Section 10.2(g) as follows and for application by the Trustee in accordance with the following priorities (the "**Priority of Payments**"):

(i)      On each Quarterly Distribution Date, Interest Proceeds with respect to the related Due Period shall be applied in the order of priority stipulated below:

(A)      on any Quarterly Distribution Date, to the payment of taxes and filing and registration fees owed by the Co-Issuers, if any;

(B)      on any Quarterly Distribution Date, (a) *first*, to the payment to the Trustee of an amount not to exceed the greater of (x) U.S.$6,250 and (y) 0.0065% of the Quarterly Asset Amount, (b) *second*, to the payment, in the following order, to the Trustee, the Collateral Administrator, the Preference Share Paying Agent and the Administrator, of accrued and unpaid fees, expenses and other amounts (excluding fees paid pursuant to sub-clause (a) above) owing to them under this Indenture, the Collateral Administration Agreement, the Preference Share Paying Agency Agreement and the Administration Agreement, as applicable, (c) *third*, to the payment of other accrued and unpaid Administrative Expenses of the Co-Issuers (excluding indemnification amounts and fees, expenses and other amounts described in sub-clauses (a) and (b) above, the Collateral Management Fee and principal of and interest on the Notes) and (d) *fourth*, if the balance of all Eligible Investments and Cash in the Expense Account on the related Determination Date is less than U.S.$150,000, for deposit to the Expense Account of such amount that is the lesser of (i) U.S.$150,000 and (ii) an amount that would have caused the balance of all Eligible Investments and cash in the Expense Account immediately after such deposit to equal U.S.$150,000; *provided* that the aggregate amount of the payments made on such Quarterly Distribution Date and on the three immediately preceding Quarterly Distribution Dates, collectively, pursuant to sub-clauses  (b), (c) and (d) above shall not exceed U.S.$150,000;

(C)      on any Quarterly Distribution Date, to the payment to the Credit Default Swap Counterparty of any unpaid termination payment (excluding any Defaulted Synthetic Termination Payment) payable by the Issuer in connection with the termination in full of the Credit Default Swap Agreement, together with any accrued interest thereon;

(D)      on any Quarterly Distribution Date, to the payment to the Collateral Manager of accrued and unpaid Senior Collateral Management Fee;

(E)     on any Quarterly Distribution Date, to the payment of all amounts scheduled to be paid to any Hedge Counterparty pursuant to any Hedge Agreement, together with any termination payments (and any accrued interest thereon) payable by the Issuer pursuant to any Hedge Agreement to which the Hedge Counterparty is a party other than a Defaulted Hedge Termination Payment;

(F)     on any Quarterly Distribution Date, to the payment of (a) *first*, any Senior Swap Premium Amount payable to the Senior Swap Counterparty in respect of the related Interest Period or that have accrued in respect of any prior Interest Period but remain unpaid, *pro rata* based on the respective Senior Swap Premium Amounts owed to each of the Senior Swap Counterparties and (b) *second*, any Senior Swap Interest Amounts (including Defaulted Interest and accrued interest thereon) payable to the Senior Swap Counterparties in respect of the related Interest Period, *pro rata* based on the respective Senior Swap Interest Amounts owed to each of the Senior Swap Counterparties;

(G)     on any Quarterly Distribution Date, to the payment of the Interest Distribution Amount with respect to, *first*, the Class A Notes and *second*, the Class B Notes (in each case including Defaulted Interest and accrued interest thereon);

(H)     (a) on any Quarterly Distribution Date, if after the last day of the Reinvestment Period (so long as there is any Outstanding Swap Counterparty Amount or Remaining Unfunded Notional Amount is in excess of zero or any Class A Notes or Class B Notes remain Outstanding) the Class A/B Overcollateralization Test or the Class A/B Interest Coverage Test is not satisfied on the related Determination Date:

> (I)     *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

> (II)     *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

> (III)     *third*, to the payment of principal of, first, the Class A Notes (until the Class A Notes have been paid in full) and *then*, the Class B Notes,

in each case to the extent necessary to cause the Class A/B Overcollateralization Test or the Class A/B Interest Coverage Test, as applicable, to be satisfied as of such Determination Date, and *then*

(b) on the Quarterly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Senior Swap Agreement, the Class A Notes or the Class B Notes, after giving effect to the application of Uninvested Proceeds (if any) on the Quarterly Distribution Date relating to the first Determination Date occurring thereafter:

(I) *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II) *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III) *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full) and *second*, the Class B Notes,

in each case to the extent necessary to obtain a Rating Confirmation;

(I) on any Quarterly Distribution Date, the payment of the Interest Distribution Amount with respect to the Class C Notes (including Defaulted Interest and accrued interest thereon and on Class C Deferred Interest but excluding Class C Deferred Interest);

(J) on any Quarterly Distribution Date, to the payment of Class C Deferred Interest;

(K) (a) on any Quarterly Distribution Date, if after the last day of the Reinvestment Period (so long as there is any Outstanding Swap Counterparty Amount or Remaining Unfunded Notional Amount is in excess of zero or any Class C Notes remain Outstanding) the Class C Overcollateralization Test or the Class C Interest Coverage Test is not satisfied on the related Determination Date after giving effect to the application of Interest Proceeds in accordance with clauses (H) and (J) above:

(I) *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II) *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III) *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full)), *second*, the Class B Notes (until the Class B Notes have been paid in full) and *third*, the Class C Notes,

in each case to the extent necessary to cause the Class C Overcollateralization Test or the Class C Interest Coverage Test, as applicable, to be satisfied as of such Determination Date and *then*

(b) on the Quarterly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Class C Notes, after giving effect to the application of Uninvested Proceeds (if any) on the Quarterly Distribution Date relating to the first Determination Date occurring thereafter:

(I) *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II) *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III) *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full) and *third*, the Class C Notes,

in each case to the extent necessary to obtain a Rating Confirmation;

(L) on any Quarterly Distribution Date, to the payment of the Interest Distribution Amount with respect to the Class D Notes (including Defaulted Interest and accrued interest thereon and on Class D Deferred Interest but excluding Class D Deferred Interest);

(M) on any Quarterly Distribution Date, to the payment of Class D Deferred Interest;

(N) (a) on any Quarterly Distribution Date, if after the last day of the Reinvestment Period (so long the Aggregate Outstanding Swap Counterparty Amount or Remaining Unfunded Notional Amount is in excess of zero or any Class D Note remains Outstanding) the Class D Overcollateralization Test or the Class D Interest Coverage Test is not satisfied on the related Determination Date after giving effect to the application of Interest Proceeds in accordance with clauses (H), (J), (K) and (M) above:

(I) *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II) *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III) *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full)), *second*, the Class B Notes (until the Class B Notes have been paid in full), third, the Class C Notes (until the Class C Notes have been paid in full) and fourth, the Class D Notes,

in each case to the extent necessary to cause the Class D Overcollateralization Test or the Class D Interest Coverage Test, as applicable, to be satisfied as of such Determination Date and *then*

(b) on the Quarterly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Class D Notes, after giving effect to the application of Uninvested Proceeds (if any) on the Quarterly Distribution Date relating to the first Determination Date occurring thereafter:

(I) *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II) *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III) *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes (until the Class C Notes have been paid in full) and *fourth*, the Class D Notes,

in each case to the extent necessary to obtain a Rating Confirmation;

(O) [Reserved];

(P) on any Quarterly Distribution Date, to the payment to the Collateral Manager of accrued and unpaid Subordinated Collateral Management Fee (and any interest accrued thereon);

(Q) on any Quarterly Distribution Date, to the payment of, *first*, all other accrued and unpaid Administrative Expenses of the Co-Issuers (including any accrued and unpaid fees, expenses and other amounts owing, in the following order, to the Trustee, the Collateral Administrator, the Preference Share Paying Agent and the Administrator under this Indenture, the Collateral Administration Agreement, the Preference Share Paying Agency Agreement and the Administration Agreement, as applicable) not paid pursuant to clause (B) above in the order of priority set forth therein (whether as the result of the limitations on amounts set forth therein or otherwise) and, *second*, if the balance of all Eligible Investments and Cash in the Expense Account is less than U.S.$150,000 after giving effect to any deposit to the Expense Account pursuant to paragraph (B) above, for deposit to the Expense Account the lesser of (i) U.S.$150,000 or (ii) such amount required to cause the balance of all Eligible Investments and cash in the Expense Account to equal U.S.$150,000;

(R) [Reserved];

(S) on any Quarterly Distribution Date (i) up to and including the Quarterly Distribution Date occurring in November 2010, to the payment of principal of the Class D Notes, in an amount on such Quarterly Distribution Date equal to the lesser of (a) the Class D Cap Amount and (b) all remaining Interest Proceeds, and (ii) after November 2010 but prior to a successful Auction Call Redemption, to the payment of principal on the Class D Notes in an amount on such Quarterly Distribution Date equal to 10% of the remaining Interest Proceeds;

(T) [Reserved];

(U) on any Quarterly Distribution Date, to the payment of (a) any Defaulted Hedge Termination Payments (and any accrued interest thereon) and (b) any Defaulted Synthetic Termination Payments; provided that the aggregate amount of the payments made on such Quarterly Distribution Date pursuant to subclauses (a) and (b) above shall not exceed U.S.$20,000;

(V) on the Note Acceleration Date and on each Quarterly Distribution Date thereafter:

> (I) *first*, to the payment of principal of, *first*, the Class D Notes (until the Class D Notes have been paid in full), *second*, the Class C Notes (until the Class C Notes have been paid in full), *third*, the Class B Notes (until the Class B Notes have been paid in full) and *fourth*, the Class A Notes (until the Class A Notes have been paid in full);

(II)     *second*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero;

(III)     *third*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero; and

(W)     on any Quarterly Distribution Date, to the payment of the Class X Payment Allocation until the aggregate principal amount of the Class X Notes has been reduced to zero; and

(X)     on any Quarterly Distribution Date, to the Preference Share Paying Agency for distribution to the Preference Shareholders in accordance with the terms of the Preference Share Paying Agency Agreement.

(ii)     On each Quarterly Distribution Date, Principal Proceeds with respect to the related Due Period shall be distributed in the order of priority set forth below:

(A)     on any Quarterly Distribution Date, to the payment of the amounts referred to in clauses (A) through (E) under <u>Section 11.1(i)</u> in the same order of priority specified therein, but only to the extent not paid in full thereunder;

(B)     on any Quarterly Distribution Date, to the payment of the amounts referred to in clauses (F) and (G) under <u>Section 11.1(i)</u> in the same order of priority specified therein, but only to the extent not paid in full thereunder;

(C)     (a) on any Quarterly Distribution Date, if after the last day of the Reinvestment Period (so long as there is any Outstanding Swap Counterparty Amount or Remaining Unfunded Notional Amount is in excess of zero or any Class A Notes or Class B Notes remain Outstanding) the Class A/B Overcollateralization Test or the Class A/B Interest Coverage Test is not satisfied on the related Determination Date, after giving effect to the application of Interest Proceeds pursuant to (H) under with <u>Section 11.1(i)</u> above:

(I)     *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II)     *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III)    *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full) and *then*, the Class B Notes,

in each case to the extent necessary to cause the Class A/B Overcollateralization Test or the Class A/B Interest Coverage Test, as applicable, to be satisfied as of such Determination Date and *then*

(b)    on the Quarterly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Senior Swap Agreement, the Class A Notes or the Class B Notes, after giving effect to (x) the application of Uninvested Proceeds (if any) on the Quarterly Distribution Date relating to the first Determination Date occurring thereafter and (y) the application of Interest Proceeds pursuant to (H) under Section 11.1(i) above:

(I)    *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II)    *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III)    *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full) and *then*, the Class B Notes,

in each case to the extent necessary in order to obtain a Rating Confirmation;

(D)    on any Quarterly Distribution Date occurring after the Reinvestment Period, to the payment of the amounts referred to in clause (I) under Section 11.1(i) , but only to the extent not paid in full thereunder and to the extend that payment of such amounts does not cause a pro forma failure of the Class AB Overcollateralization Test or the Class AB Interest Coverage Test;

(E)    (a) on any Quarterly Distribution Date, if after the last day of the Reinvestment Period (so long as there is any Outstanding Swap Counterparty Amount or Remaining Unfunded Notional Amount is in excess of zero or any Class C Notes remain Outstanding) the Class C Overcollateralization Test or the Class C Interest Coverage Test is not satisfied on the related Determination Date, after giving effect to (x) the application of Interest Proceeds pursuant to clauses (H), (J) and (K) under Section 11.1(i) above and (y) the application of Principal Proceeds in accordance with clause (C) above:

(I)     *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II)     *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III)     *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full) and *third*, the Class C Notes,

in each case to the extent necessary to cause the Class C Overcollateralization Test or the Class C Interest Coverage Test, as applicable, to be satisfied as of such Determination Date and *then*

(b)     on the Quarterly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Class C Notes, after giving effect to (x) the application of Uninvested Proceeds (if any) on the Quarterly Distribution Date relating to the first Determination Date occurring thereafter, (y) the application of Principal Proceeds in accordance with clause (C) above and (z) the application of Interest Proceeds pursuant to clauses (H) and (K) under Section 11.1(i) above:

(I)     *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II)     *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III)     *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full) and *third*, the Class C Notes,

in each case to the extent necessary in order to obtain a Rating Confirmation;

(F)     [Reserved];

(G)     on any Quarterly Distribution Date occurring after the Reinvestment Period, to the payment of the amounts referred to in clause (L) under <u>Section 11.1(i)</u> , but only to the extent not paid in full thereunder and to the extend that payment of such amounts does not cause a pro forma failure of the Class AB Overcollateralization Test, the Class AB Interest Coverage Test, the Class C Overcollateralization Test or the Class C Interest Coverage Test;

(H)     (a) on any Quarterly Distribution Date, if after the last day of the Reinvestment Period (so long as there is any Outstanding Swap Counterparty Amount or Remaining Unfunded Notional Amount is in excess of zero or any Class D Notes remain Outstanding) the Class D Overcollateralization Test or the Class D Interest Coverage Test is not satisfied on the related Determination Date after giving effect to (x) the application of Interest Proceeds pursuant to clauses (H), (J), (K), (M) and (N) under <u>Section 11.1(i)</u> above and (y) the application of Principal Proceeds in accordance with clauses (C) and (E) above:

(I)     *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II)     *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III)     *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes (until the Class C Notes have been paid in full) and *fourth*, the Class D Notes;

in each case to the extent necessary to cause the Class D Overcollateralization Test or the Class D Interest Coverage Test, as applicable, to be satisfied as of such Determination Date, *then*

(b)     on the Quarterly Distribution Date relating to the first Determination Date after the occurrence of a Ratings Confirmation Failure with respect to the Class D Notes, after giving effect to (x) the application of Uninvested Proceeds (if any) on the Quarterly Distribution Date relating to the first Determination Date occurring thereafter, (y) the application of Principal Proceeds in accordance with clauses (C) and (E) above and (z) the application of Interest Proceeds pursuant to clauses (H), (K) and (N) under <u>Section 11.1(i)</u> above:

(I)     *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective

Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II)     *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III)     *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes (until the Class C Notes have been paid in full) and *fourth*, the Class D Notes,

in each case to the extent necessary in order to obtain a Rating Confirmation;

(I)     [Reserved];

(J)     on any Quarterly Distribution Date, to make a payment to the Senior Swap Counterparty (a) until the Aggregate Outstanding Swap Counterparty Amount under the Senior Swap Agreement is reduced to the Junior Facility Amount and (b) prior to the last day of the Reinvestment Period, in connection with any disposition of a Collateral Debt Security the purchase of which was funded by the Senior Swap Counterparty pursuant to the Senior Swap Agreement, to reduce the Aggregate Outstanding Swap Counterparty Amount by the amount so funded, if the Issuer obtains a synthetic position with respect to such Collateral Debt Security by selling protection on such Collateral Debt Security pursuant to a CDS Agreement Transaction where the notional amount applicable to the new related Reference Obligation is equal to the Principal Balance of such Collateral Debt Security as of the time immediately prior to the sale of such Collateral Debt Security;

(K)     on any Quarterly Distribution Date on or prior to the last day of the Reinvestment Period, to the Principal Collection Account to be held therein as "Principal Proceeds" deemed received during the Due Period related to the next succeeding Quarterly Distribution Date (and invested in Eligible Investments pending application thereof to acquire additional Collateral Debt Securities in accordance with the Eligibility Criteria set forth in this Indenture), provided that on any Quarterly Distribution Date prior to the last day of the Reinvestment Period, the Collateral Manager may, if the Collateral Manager (in its sole discretion) determines that investments in additional Collateral Debt Securities in the near future would either be impractical or not beneficial to the Issuer, direct the Trustee by notice given no later than the related Determination Date to apply all or a portion of the Principal Proceeds remaining on such Quarterly Distribution Date after the payment of all amounts payable pursuant to clauses (A) through (J) of this Section 11.1(ii) either:

(a)      if (i) the Net Outstanding Portfolio Collateral Balance is equal to or greater than 50% of the Aggregate Ramp-Up Par Amount (on a *pro forma* basis), (ii) no Event of Default has occurred and is continuing and (iii) the Coverage Tests are currently met as of such Quarterly Distribution Date (on a *pro forma* basis):

(I)      *first*, to the payment of principal of the Senior Notes (*pro rata* in accordance with the respective Aggregate Outstanding Amounts of the Senior Notes) in an amount equal to the Deferred Notes Principal on the related Determination Date,

(II)      *second*, to the payment of principal of the Senior Notes (*pro rata* in accordance with the respective Aggregate Outstanding Amounts of the Senior Notes) in an amount equal to the Note Reduction Amount for the related Due Period,

(III)      *third*, to make a payment to the Senior Swap Counterparties in reduction of the Aggregate Outstanding Swap Counterparty Amount in an amount not exceeding the lesser of (x) the Senior Swap Reduction Amount and (y) the amount necessary to reduce the Aggregate Outstanding Swap Counterparty Amount to zero, and

(IV)      *fourth*, to make a deposit into the Reserve Account in an amount not exceeding the lesser of (x) the portion of the Senior Swap Reduction Amount not applied pursuant to the foregoing clause (III) and (y) the amount necessary to reduce the Remaining Unfunded Notional Amount to zero; or

(b)      if any of the conditions set forth in sub-clauses (i) or (ii) of clause (a) above are not satisfied,

(I)      *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II)      *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III)      *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes

have been paid in full), *third*, the Class C Notes, including any Class C Deferred Interest (until the Class C Notes have been paid in full) and *fourth*, the Class D Notes, including any Class D Deferred Interest;

(L)     on any Quarterly Distribution Date after the last day of the Reinvestment Period and prior to the Note Acceleration Date, either:

(a)     if (i) the Net Outstanding Portfolio Collateral Balance is equal to or greater than 50% of the Aggregate Ramp-Up Par Amount (on a *pro forma* basis), (ii) no Event of Default has occurred and is continuing and (iii) the Coverage Tests are met on the applicable Determination Date and the Coverage Tests have not previously failed to be met on any Determination Date related to a Quarterly Distribution Date (on a *pro forma* basis) after the last day of the Reinvestment Period:

(I)     *first*, to the payment of principal of the Senior Notes (*pro rata* in accordance with the respective Aggregate Outstanding Amounts of the Senior Notes) in an amount equal to the Deferred Notes Principal on the related Determination Date,

(II)     *second*, to the payment of principal of the Senior Notes (*pro rata* in accordance with the respective Aggregate Outstanding Amounts of the Senior Notes) in an amount equal to the Note Reduction Amount for the related Due Period,

(III)     *third*, to make a payment to the Senior Swap Counterparties in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero, and

(IV)     *fourth*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero; or

(b)     if any of the conditions set forth in sub-clauses (i), (ii) or (iii) of clause (a) above are not satisfied,

(I)     *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II)     *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III)    *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes, including any Class C Deferred Interest (until the Class C Notes have been paid in full) and *fourth*, the Class D Notes, including any Class D Deferred Interest;

(M)    on the Note Acceleration Date and on each Quarterly Distribution Date thereafter,

(I)    *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(II)    *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero, and

(III)    *third*, to the payment of principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes including any Class C Deferred Interest (until the Class C Notes have been paid in full) and *fourth*, the Class D Notes including any Class D Deferred Interest;

(N)    on any Quarterly Distribution Date, to the payment of the amounts referred to in clauses (P) and (Q) under Section 11.1(i) in the same order of priority specified therein, but only to the extent not paid in full thereunder;

(O)    [Reserved];

(P)    [Reserved];

(Q)    on any Quarterly Distribution Date, to the Class X Noteholders the payment of the amount referred to in clause (W) under Section 11.1(i), but only to the extent not paid in full thereunder;

(R)    on any Quarterly Distribution Date, to the payment of the amounts referred to in clause (U) under Section 11.1(i), but only to the extent not paid in full thereunder; and

(S)    on any Quarterly Distribution Date, to the Preference Share Paying Agent for distribution to the Preference Shareholders in accordance with the provisions of the Preference Share Paying Agency Agreement.

(iii)    On the Quarterly Distribution Date relating to the first Determination Date occurring more than 20 days after the Ramp-Up Completion Date, if a Ratings Confirmation Failure has occurred, Uninvested Proceeds will be applied, prior to the application of Interest Proceeds and Principal Proceeds for such purposes:

(A)    *first*, to make a payment to the Senior Swap Counterparties (*pro rata* based on their respective Outstanding Swap Counterparty Amounts) in reduction of the Aggregate Outstanding Swap Counterparty Amount until it is reduced to zero,

(B)    *second*, to make a deposit into the Reserve Account, until the Remaining Unfunded Notional Amount is reduced to zero and

(C)    *third*, to pay the principal of, *first*, the Class A Notes (until the Class A Notes have been paid in full), *second*, the Class B Notes (until the Class B Notes have been paid in full), *third*, the Class C Notes (until the Class C Notes have been paid in full) and *fourth*, the Class D Notes (until the Class D Notes have been paid in full),

in each case to the extent necessary to obtain a Rating Confirmation.

(iv)    Not later than 12:00 p.m., New York City time, on or before the Business Day preceding each Quarterly Distribution Date, the Issuer shall, pursuant to Section 10.2(g) or 10.5 (as applicable), remit or cause to be remitted to the Trustee for deposit in the Payment Account an amount of Cash sufficient to pay the amounts described in Sections 11.1(i), (ii) and (iii) required to be paid on such Quarterly Distribution Date.

(v)    If, on any Quarterly Distribution Date, the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by the statements furnished by the Issuer pursuant to Section 10.7(a) or 10.7(b), the Trustee shall make the disbursements called for in the order and according to the priority set forth under Sections 11.1(i) and (ii), subject to Section 13.1, to the extent that funds are available therefor.

(vi)    Except as otherwise expressly provided in this Section 11.1, if on any Quarterly Distribution Date, Interest Proceeds and Principal Proceeds received in the related Due Period is insufficient to make the full amount of the disbursements required by any lettered subclause of Section 11.1(i) or Section 11.1(ii) to different Persons, the Trustee shall make the disbursements called for by such subclause ratably in accordance with the respective amounts of such disbursements in such subclause then due and payable to the extent that funds are available therefor.

(vii)    In determining the amounts to be paid on any Quarterly Distribution Date occurring after the last day of the Reinvestment Period pursuant to each clause of Section 11.1(i) and Section 11.1(ii), if the distribution of all amounts available to be paid pursuant to any such clause would cause the Issuer to fail any Overcollateralization Test or Interest Coverage Test referred to in any clause with a higher priority, the Trustee shall

reduce the distribution for any such clause by the minimum amount necessary so that, after giving effect to such distribution, the Issuer would not fail such Overcollateralization Test or Interest Coverage Test, as applicable, referred to in the clause with a higher priority.

(viii)    Any amounts to be paid to the Preference Share Paying Agent pursuant to clause (X) under Section 11.1(i) or clause (S) under Section 11.1(ii) will be released from the lien of this Indenture.

11.2    Securities Accounts.

All Cash held by, or deposited with, the Trustee in any Account pursuant to the provisions of this Indenture, and not invested in Collateral Debt Securities, Reserve Account Investments or Eligible Investments as herein provided, shall be deposited in one or more Securities Accounts, maintained at a financial institution having a long-term rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating is not on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a combined capital and surplus of at least U.S.$200,000,000, to be held in trust for the benefit of the Secured Parties. To the extent Cash deposited in a Securities Account (except with respect to amounts on deposit in the Payment Account) exceeds amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation, or any agencies succeeding to the insurance functions thereof, and are not fully collateralized by direct obligations of the United States, such excess shall be invested in Eligible Investments (pursuant to and as provided in Sections 10.2, 10.3 and 10.4).

**12.    PURCHASE AND SALE OF COLLATERAL DEBT SECURITIES; SUBSTITUTION**

12.1    Sale and Substitution of Collateral Debt Securities.

(a)    Except as otherwise expressly permitted or required by this Indenture, the Issuer will not sell or otherwise dispose of any Collateral Debt Security; *provided* that, subject to satisfaction of any applicable conditions in Section 10.8, so long as (A) no Event of Default has occurred and is continuing and (B) on or prior to the trade date for such Sale the Collateral Manager has certified to the Trustee that each of the conditions applicable to such Sale set forth below has been satisfied, the Collateral Manager on behalf of the Issuer acting pursuant to the Collateral Management Agreement may direct the Trustee in writing to sell, terminate or otherwise liquidate, and the Trustee shall sell, terminate or otherwise liquidate in the manner directed by the Collateral Manager in writing (which writing shall specify whether such security is a Defaulted Security, Equity Security, Credit Risk Security or Credit Improved Security, if applicable, or whether such security is otherwise permitted to be sold, terminated or otherwise liquidated pursuant to this Section 12.1(a)):

(i)    any Defaulted Security at any time;

(ii)    any Equity Security at any time;

(iii)     any Credit Risk Security at any time (whether or not the applicable Sale Proceeds are reinvested), provided that Sale Proceeds from such sale may only be reinvested if the Collateral Manager believes in good faith and in the exercise of its judgment that Sale Proceeds from the Sale thereof can be reinvested in (or in the case of a CDS Agreement Transaction, allocated to) one or more substitute Collateral Debt Securities having an Aggregate Principal Balance of not less than 100% of such Sale Proceeds (excluding accrued interest purchased with Interest Proceeds) (or, in the case of a CDS Agreement Transaction, having an aggregate Notional Amount not less than 100% of the Notional Amount of the CDS Agreement Transaction being terminated without causing a Notional Amount Shortfall); *provided*, *further*, that (a) during or after the Reinvestment Period, such substitute Collateral Debt Securities satisfy the Collateral Quality Tests or, if immediately prior to such reinvestment the Collateral Quality Tests were not satisfied, the extent of compliance with the Collateral Quality Tests will be maintained or improved and (b) after the Reinvestment Period, such substitute Collateral Debt Securities satisfy paragraphs (5) and (12) of Section 12.2.

(iv)     any Credit Improved Security at any time (A) during the Reinvestment Period if the Collateral Manager believes in good faith and in the exercise of its judgment that proceeds from the Sale of such Collateral Debt Security can be reinvested in accordance with Section 12.2 within 20 Business Days after the trade date on which such Collateral Debt Security is sold, terminated or otherwise liquidated in one or more substitute Collateral Debt Securities having an Aggregate Principal Balance of not less than 100% of the Principal Balance of the Collateral Debt Security being sold, terminated or otherwise liquidated and the Coverage Tests and the Collateral Quality Tests are satisfied or, if immediately prior to such reinvestment, either of the Coverage Tests or the Collateral Quality Tests are not satisfied, the extent of compliance with the Coverage Tests and the Collateral Quality Tests will be maintained or improved and (B) after the Reinvestment Period if the Sale Proceeds (excluding accrued interest) from such Sale (1) are not less than 100% of the Principal Balance of the Credit Improved Security being sold and, (2) are deposited in the Principal Collection Account and disbursed in accordance with the Priority of Payments; *provided*, that the reinvestment after the Reinvestment Period satisfies paragraphs (5) and (12) of Section 12.2; and

(v)     without limiting the foregoing, any Collateral Debt Security that is not a Defaulted Security, an Equity Security, a Credit Risk Security or a Credit Improved Security at any time during the Reinvestment Period, provided that (A) the Collateral Manager believes in good faith that Sale Proceeds from the Sale of such Collateral Debt Security can be reinvested in (or, in the case of a CDS Agreement Transaction, allocated to) (1) within two Business Days of the trade date on which such Collateral Debt Security is sold in one or more substitute Collateral Debt Securities having an Aggregate Principal Balance of not less than 100% of the Principal Balance of the Collateral Debt Security being sold, terminated or otherwise liquidated (without, in the case of a CDS Agreement Transaction, causing a Notional Amount Shortfall) or (2) within 30 days after such Collateral Debt Security is sold, in one or more substitute Collateral Debt Securities having an Aggregate Principal Balance of at least 105% of the Principal Balance of the Collateral Debt Security being sold, terminated or otherwise liquidated (without, in the case of a CDS Agreement Transaction, causing a Notional Amount Shortfall), (B) no

Rating Agency has withdrawn its rating (including any private or confidential rating), if any, of any Class of Notes or reduced the rating assigned to any Class A Notes or Class B Notes below the rating in effect on the Closing Date by one or more rating subcategories or reduced the ratings assigned to any Class C Notes or Class D Notes by two or more rating subcategories (C) such substitute Collateral Debt Securities satisfy the Collateral Quality Tests or, if immediately prior to such reinvestment, the Collateral Quality Tests are not satisfied, the extent of compliance with the Collateral Quality Tests will be maintained or improved and (D) the Aggregate Principal Balance of (x) all such Sales (other than Sales of U.S. Agency Securities that are Collateral Debt Securities) effected for any calendar year (beginning on the Ramp-Up Completion Date) does not exceed 20% of the Net Outstanding Portfolio Collateral Balance as of the first day of such period and (y) all such Sales (including Sales of U.S. Agency Securities that are Collateral Debt Securities) effected during any twelve-month period (beginning on the Ramp-Up Completion Date) does not exceed 20% of the Net Outstanding Portfolio Collateral Balance as of the first day of such period of the sum (without duplication) of (I) the Aggregate Principal Balance on such Measurement Date of all Collateral Debt Securities *plus* (II) the Aggregate Principal Balance of all Principal Proceeds and Uninvested Proceeds held as Cash and Eligible Investments and U.S. Agency Securities purchased with Principal Proceeds or Uninvested Proceeds and any amount on deposit at such time in the Principal Collection Account or the Uninvested Proceeds Account as of the first day of such period (such percentage, the "**Discretionary Trading Percentage**"); *provided* that the Discretionary Trading Percentage described in clauses (x) and (y) will be reduced to 0% if, as of any Determination Date, the Net Outstanding Portfolio Collateral Balance, as a result of losses in the value of Collateral Debt Securities, is less than the Aggregate Ramp-Up Par Amount by an amount equal to or greater than U.S.$60,000,000; *provided* further that (i) any disposition of a Collateral Debt Security shall not count towards the Discretionary Trading Percentage if the Issuer obtains a position with respect to such Collateral Debt Security by selling protection on such Collateral Debt Security pursuant to a CDS Agreement Transaction where the notional amount applicable to the new related Reference Obligation is equal to the Principal Balance of such Collateral Debt Security as of the time immediately prior to the sale of such Collateral Debt Security, (ii) the Issuer may purchase a Collateral Debt Security without regard to the Discretionary Trading Percentage if such Collateral Debt Security represents the cash position of a Reference Obligation with respect to which the Issuer was the seller of protection pursuant to a CDS Agreement Transaction and the Issuer traded out of such synthetic position within 30 days prior to the purchase of such Collateral Debt Security; and (iii) the Discretionary Trading Percentage will be reduced to 0% if and for so long as any of the Class A Notes or the Class B Notes have been downgraded by one or more notches from its original public rating or the Class C Notes or the Class D Notes have been downgraded by two or more notches from its original public rating; *provided*, *further*, that the Discretionary Trading Percentage shall be restored in the event (i) the Notes that had been downgraded are subsequently upgraded to their original rating in the case of the Class A Notes or the Class B Notes, or to a rating within one notch of its original public rating in the case of the Class C Notes or the Class D Notes or (ii) a Majority of each Class of Notes consents to such restoration.

*provided* that if the Collateral Manager has received written notice of termination or has provided written notice of resignation pursuant to the Collateral Management Agreement, the Collateral Manager will only be permitted to direct the Issuer to dispose of Credit Risk Securities and Defaulted Securities.

(b)      The Issuer will:

(i)      sell, terminate or otherwise liquidate any Defaulted Security within one year after the related Collateral Debt Security became a Defaulted Security (or within one year of such later date as such security may first be sold, terminated or otherwise liquidated in accordance with its terms), provided that (A) the Issuer shall not be required to sell, terminate or otherwise liquidate such Defaulted Security if the Rating Condition with respect to Moody's is satisfied with respect to the retention of such Defaulted Security, (B) the Issuer shall not be obligated to sell, terminate or otherwise liquidate any Collateral Debt Security that is a Defaulted Security solely because it is rated "CC", "D" or "SD" by Standard & Poor's, (C) the Issuer shall not be obligated to sell, terminate or otherwise liquidate any Collateral Debt Security that is a Defaulted Security for up to three years after such Collateral Debt Security became a Defaulted Security, so long as the Aggregate Principal Balance of all Collateral Debt Securities that are Defaulted Securities does not exceed 5% of the Net Outstanding Portfolio Collateral Balance and (D) any Defaulted Security that is held for more than three years shall be treated as having a Principal Balance of zero;

(ii)      sell, terminate or otherwise liquidate each Equity Security that is not Margin Stock and complies with Eligibility Criteria (7), (8), (9) and (10) or any security or other consideration that is received in an exchange that complies with Eligibility Criteria (7), (8), (9) and (10) within one year after the Issuer's receipt thereof (or within one year of such later date as such Equity Security or other security or consideration may first be sold, terminated or otherwise liquidated in accordance with its terms and applicable law); and

(iii)      sell, terminate or otherwise liquidate each Equity Security or security or other consideration that is received in an exchange (other than an Equity Security described in clause (i) above) and any Defaulted Security that does not comply with Eligibility Criteria (7), (8), (9) and (10) not later than five Business Days after the Issuer's receipt thereof (or within five Business Days or such later date as such security or consideration may first be sold, terminated or otherwise liquidated in accordance with its terms and applicable law).

Notwithstanding any other provision herein, the Issuer may not hold any asset unless the asset satisfies clause (8) of the Eligibility Criteria.  The Issuer shall immediately (i) dispose of any asset that does not satisfy clause (8) of the Eligibility Criteria or (ii) transfer any asset that does not satisfy clause (8) of the Eligibility Criteria to a subsidiary that is treated as a corporation for U.S. federal tax purposes.

(c)      After the Issuer has notified the Trustee of an Optional Redemption or Tax Redemption in accordance with <u>Section 9.2</u>, an Auction Call Redemption in accordance with

Section 9.5 or a Clean-Up Call Redemption in accordance with Section 9.6, the Collateral Manager on behalf of the Issuer acting pursuant to the Collateral Management Agreement may at any time direct the Trustee in writing to sell, terminate or otherwise liquidate, and the Trustee shall sell, terminate or otherwise liquidate in the manner directed by the Collateral Manager in writing, any Collateral Debt Security without regard to the foregoing limitations in Section 12.1(a); *provided* that:

(i)     in connection with an Auction Call Redemption, Optional Redemption or Tax Redemption, the Sale Proceeds therefrom must be used to pay certain expenses and redeem all of the Notes in whole but not in part pursuant to Sections 9.1(a) and (b) or 9.5, as the case may be, and upon any such Sale the Trustee shall release such Collateral Debt Security pursuant to Section 10.8;

(ii)     in connection with an Auction Call Redemption, Optional Redemption or Tax Redemption, the Issuer may not direct the Trustee to sell (and the Trustee shall not be required to release) a Collateral Debt Security pursuant to this Section 12.1(c) unless:

(A)     the Collateral Manager on behalf of the Issuer certifies to the Trustee that (1) in its judgment based on calculations included in the certification (which shall include the sales prices of the Collateral Debt Securities), the Sale Proceeds from the Sale of one or more of the Collateral Debt Securities (based on the criteria set forth in Section 9.1(b)) and all Cash and proceeds from Eligible Investments will be at least equal to the Total Senior Redemption Amount (adjusted pursuant to the second paragraph of Section 9.1(b)) or the Auction Call Redemption Amount, as applicable, and (2) an Independent bond pricing service (which shall be one or more broker-dealers selected by the Collateral Manager that are rated "P-1" by Moody's (and such ratings are not on watch for possible downgrade by Moody's) and at least "A-1" by Standard & Poor's and that make a market in the applicable Collateral Debt Securities) has confirmed (which confirmation may be in the form of a firm bid) the sales prices contained in the certification in clause (1) above (and attaching a copy of such confirmation); and

(B)     the Independent accountants appointed by the Issuer pursuant to Section 10.9 shall confirm in writing the calculations made in Section 12.1(c)(ii)(A)(1) above;

(iii)     in connection with an Auction Call Redemption, Optional Redemption or Tax Redemption, all the Collateral Debt Securities to be sold, terminated or otherwise liquidated pursuant to this Section 12.1(c) must be sold, terminated or otherwise liquidated in accordance with the requirements set forth in Section 9.1(b); and

(iv)     the Collateral Manager shall sell, terminate or otherwise liquidate any Collateral Debt Security pursuant to this Section 12.1(c) only at a price that, in its judgment is not substantially less than the Fair Market Value of such Collateral Debt Security.

## 12.2   Eligibility Criteria and Trading Restrictions.

The Issuer may (a) purchase Asset-Backed Securities, REIT Debt Securities and Mortgage Finance Company Securities or enter into Synthetic Securities on the Closing Date, (b) during the Reinvestment Period (and after the Reinvestment Period, in respect of commitments entered into prior to the end of the Reinvestment Period), apply Uninvested Proceeds, Principal Proceeds and Sale Proceeds received during the Reinvestment Period to purchase or enter into Asset-Backed Securities, REIT Debt Securities, Mortgage Finance Company Securities or Synthetic Securities and (c) during the Reinvestment Period (and after the Reinvestment Period, in respect of commitments entered into prior to the end of the Reinvestment Period), in connection with Principal Amortizations and the termination of individual CDS Agreement Transactions, enter into additional CDS Agreement Transactions, in each case only if, after giving effect to such investment, each of the following criteria (the "**Eligibility Criteria**") is satisfied:

| | |
|---|---|
| Assignable | (1)     the Underlying Instrument pursuant to which such security was issued permits the Issuer to purchase it and pledge it to the Trustee and such security is a type subject to Article 8 or Article 9 of the UCC; |
| Jurisdiction of Issuer | (2)     the obligor on or issuer of such security (x) is organized or incorporated under the law of the United States or a State thereof or in a Special Purpose Vehicle Jurisdiction or (y) is a Qualifying Foreign Obligor; |
| Dollar Denominated | (3)     such security is denominated and payable only in Dollars and may not be converted into a security payable in any other currency; |
| Fixed Principal Amount | (4)     such security requires the payment of a fixed amount of principal in Cash no later than its stated maturity or termination date; |
| Rating | (5)     such security has a Standard & Poor's Rating of at least "BB" (and such rating does not include the subscript "p", "pi", "q", "r" or "t") and has a Moody's Rating of at least "Ba2"; *provided* that Collateral Debt Securities having a Moody's Rating of "Ba1" or "Ba2" or having a Standard & Poor's Rating of "BB+" or "BB" do not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance; |
| Issuer or Obligor not Owned or Managed by the Collateral Manager | (6)     with respect to CDO Securities, the obligor on or issuer of such security is not a fund or other entity owned or managed by the Collateral Manager or any of its Affiliates; |
| Registered | (7)     such security is Registered; |

No U.S. Tax ....................................  (8)     either (A) such security is issued by an entity that is treated as a corporation that is not a United States real property holding corporation as defined in section 897(c)(2) of the Code for U.S. federal income tax purposes, (B) such security is treated as indebtedness for U.S. federal income tax purposes, or (C) the Issuer has received advice from Cadwalader, Wickersham & Taft LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters to the effect that the acquisition, ownership and disposition of such security will not cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes or otherwise subject the Issuer to U.S. federal income tax on a net income basis;

No Withholding Tax ......................  (9)     such security does not provide for any payments which are or will be subject to deduction or withholding for or on account of any withholding or similar tax, unless the obligor on or issuer of such security is required to make "gross-up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required;

ERISA ...........................................  (10)    such security is not a security that, pursuant to 29 C.F.R. Section 2510.3-101, (x) would be treated as an equity interest in an entity and (y) if held by an employee benefit plan subject to ERISA, would cause such employee benefit plan to be treated as owning an undivided interest in each of the underlying assets of such entity for purposes of ERISA; *provided*, that this restriction shall not apply to any security issued by an entity that issues securities which are covered by Department of Labor Prohibited Transaction Exemption 2002-41 or an equivalent exemption;

Excluded Securities.........................  (11)    such security (or in the case of a Synthetic Security, the Reference Obligation of such security) is not a Defaulted Security, a Written-Down Security, a Credit Risk Security, a Non-Libor Floating Rate Debt Security, a High Yield CLO Security, an Emerging Market Security, a Manufactured Housing Security, a Catastrophe Bond, a Structured Settlement Security, a Tobacco Bond, a Deferred Interest PIK Bond, a NIM Security, an Interest Only Security, a Mutual Fund Fees Security, an Aircraft Leasing Security, an EETC Security, a Future Flow Security, a Healthcare Security, a Lottery Receivable

Security, a Restaurant and Food Services Security, an ABS Natural Resource Receivable Security, a Floorplan Receivable Security, a Recreational Vehicle Security, an ABS Container Security, an ABS Chassis Security, a Guaranteed Corporate Debt Security, an Oil and Gas Security, a Project Finance Security, a Stadium Receivable Security, a Combination Security, a REIT Trust Preferred CDO Security, a Bank Trust Preferred Security, a Franchise Security, a Reinsurance Security, a Tax Lien Security, a Hybrid Security, an Equity Security, a Synthetic Security pursuant to which the Issuer transfers the credit risk associated with the related Reference Obligation to the Synthetic Security Counterparty or a security that accrues interest at a floating rate that moves inversely to a reference rate or index;

Limitation on Stated Final Maturity    (12)   (A) if the stated maturity of such security occurs later than the Stated Maturity of the Notes, the Aggregate Principal Balance of all such Collateral Debt Securities does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that the expected maturity of such Collateral Debt Securities shall not be later than the Stated Maturity of the Notes; and *provided*, *further*, that the stated maturity of such Collateral Debt Security shall not be later than 5 years past the Stated Maturity of the Notes; and (B)(i) the Aggregate Principal Balance of all Collateral Debt Securities having an average life of less than 8 years is at least 60.0% of the Net Outstanding Portfolio Collateral Balance, (ii) subject to clause (iii), no Collateral Debt Security may have an average life in excess of 13 years and (iii) no CDO Security may have an average life in excess of 10 years;

No Foreign Exchange Controls.......    (13)   such security is not a security issued by an issuer located in a country that imposes foreign exchange controls that effectively limit the availability or use of Dollars to make when due the scheduled payments of principal of and interest on such security;

No Substantial Non-Credit-
  Related Risk ...............................    (14)   such security is not a security whose timely repayment is subject to substantial non-credit-related risk, as reasonably determined by the Collateral Manager;

No Margin Stock............................    (15)   such security and any Equity Security acquired in connection with such security is not Margin Stock;

| | |
|---|---|
| Investment Company Act ............... | (16)   the acquisition of such security would not cause the Issuer or the pool of Collateral to be required to register as an investment company under the Investment Company Act; and if the issuer of such security is excepted from the definition of an "investment company" solely by reason of <u>Section 3(c)(1)</u> of the Investment Company Act, then either (x) such security does not constitute a "voting security" for purposes of the Investment Company Act or (y) the aggregate principal amount of such security is less than 10.0% of the entire Issue of which such security is a part; |
| No Debtor-in-Possession Financing...................................... | (17)   such security is not a financing by a debtor-in-possession in any insolvency proceeding; |
| Conversion or Exchange into Equity Securities; Attached Equity Securities .......................... | (18)   (A) such security is not a security that by the terms of its Underlying Instruments provides for conversion or exchange (whether mandatory, at the option of the issuer or the holder thereof or otherwise) into equity capital at any time prior to its maturity and (B) such security is not purchased as a unit with an attached equity security; |
| Not Subject to an Offer or a Call for Redemption..................... | (19)   such security is not the subject of an Offer and has not been called for redemption; |
| No Future Advances ........................ | (20)   after the acquisition of such security, the Issuer is not required by the Underlying Instruments related thereto to make any payment or advance to the issuer thereof or to the related Synthetic Security Counterparty under the related Underlying Instruments (other than a Defeased Synthetic Security); |
| Fixed Rate Collateral Debt Securities...................................... | (21)   if such security is a Fixed Rate Collateral Debt Security, the Aggregate Principal Balance of all such Collateral Debt Securities does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that Fixed Rate Collateral Debt Securities shall not include Synthetic Securities and Deemed Floating Rate Collateral Debt Securities; |
| Floating Rate Collateral Debt Securities; Deemed Floating Rate Collateral Debt Securities ............ | (22)   (A) if such security is a Deemed Floating Rate Collateral Debt Security, any Deemed Floating Asset Hedge Agreement entered into with respect to such |

Deemed Floating Rate Collateral Debt Security conforms to all the requirements set forth in the definition of "Deemed Floating Asset Hedge Agreement" and (B) if such security is a Floating Rate Collateral Debt Security or Deemed Floating Rate Collateral Debt Security, it must bear interest at a spread in excess of LIBOR;

Deemed Floating Rate
Collateral Debt Securities ............ (23) if such security is a Deemed Floating Rate Collateral Debt Security, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance;

Pure private Collateral
Debt Securities ............................ (24) if such security was not (A) issued pursuant to an effective registration statement under the Securities Act or (B) a privately placed security that is eligible for resale under Rule 144A or Regulation S under the Securities Act, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance;

Downgraded Assets ........................ (25) if such security either (x) has been downgraded since the date of issuance thereof or (y) is on negative credit watch by Moody's or Standard & Poor's for possible downgrade, (i) the Aggregate Principal Balance of all such Collateral Debt Securities does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance and (ii) such security is rated at least "BBB" by Standard & Poor's and is rated at least "Baa2" by Moody's (and if rated "BBB" by Standard & Poor's or "Baa2" by Moody's, such rating is not on negative watch for possible downgrade), provided that the Issuer may not acquire any Collateral Debt Security that has been downgraded (I) by more than two subcategories by Standard & Poor's or Moody's from the original rating of such Collateral Debt Security by such Rating Agency or (II) more than once by Standard & Poor's or Moody's;

Single RMBS Servicer .................... (26) with respect to the Servicer of RMBS Securities being acquired, the Aggregate Principal Balance of all Collateral Debt Securities serviced by such single RMBS

Servicer (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed (A) if the Servicer (or, if an Affiliate of such Servicer is required to perform the obligations of such Servicer, such Affiliate) is publicly ranked "Strong" by Standard & Poor's (and, if publicly ranked "Strong," is not on servicer outlook "Negative" by Standard & Poor's) or if no servicer ranking is available, its long-term senior unsecured debt rating is at least "AA", 20.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that the Aggregate Principal Balance of all Collateral Debt Securities serviced by up to two such Servicers may each constitute up to 25.0% of the Net Outstanding Portfolio Collateral Balance for so long as such Servicer maintains such ratings by Standard & Poor's; (B) if the Servicer (or, if an Affiliate of such Servicer is required to perform the obligations of such Servicer, such Affiliate) is publicly ranked "Above Average" by Standard & Poor's or is publicly ranked "Strong" by Standard & Poor's and is on servicer outlook "Negative" by Standard & Poor's, or if no servicer ranking is available, its long-term senior unsecured debt rating is at least "A-" but less than "AA", 15.0% of the Net Outstanding Portfolio Collateral Balance; (C) if the Servicer (or, if an Affiliate of such Servicer is required to perform the obligations of such Servicer, such Affiliate) is publicly ranked "Average" or is publicly ranked "Above Average" by Standard & Poor's and is on servicer outlook "Negative" by Standard & Poor's, or if no servicer ranking is available, its long-term senior unsecured debt rating is at least "BB+" but less than "A-", 7.5% of the Net Outstanding Portfolio Collateral Balance; and (D) if the Servicer (or, if an Affiliate of such Servicer is required to perform the obligations of such Servicer, such Affiliate) is publicly ranked "Below Average"/"Weak" by Standard & Poor's or is publicly ranked "Average" by Standard & Poor's and is on servicer outlook "Negative" by Standard & Poor's, or if no servicer ranking is available, its long-term senior unsecured debt rating is "BB" or lower, or it does not have a Standard & Poor's long-term senior unsecured debt rating, 6.0% of the Net Outstanding Portfolio Collateral Balance;

Synthetic Securities..........................

(27)    if such security is a Synthetic Security then (A) unless the Synthetic Security Counterparty's obligations under such Synthetic Security are fully collateralized pursuant to collateral arrangements that satisfy the Rating Condition or such Synthetic Security is a

CDS Agreement Transaction, such Synthetic Security is acquired from a Synthetic Security Counterparty that satisfies (or with a guarantor that satisfies) the Synthetic Security Counterparty Ratings Requirement, (B)(1)(x) unless such Synthetic Security is a Form-Approved Synthetic Security, the Rating Condition with respect to each Rating Agency has been satisfied with respect to the acquisition of such Synthetic Security and (y) unless such Synthetic Security is a Form-Approved Synthetic Security, (i) each of the Rating Agencies has assigned an Applicable Recovery Rate to such Synthetic Security, (ii) Moody's shall have assigned a Moody's Rating and Moody's Rating Factor to such Synthetic Security, and (iii) Standard & Poor's shall have assigned a Standard & Poor's Rating to such Synthetic Security, (C) if such Synthetic Security provides for any payment to be made by the Issuer after the acquisition thereof by the Issuer, it is either (x) a Defeased Synthetic Security or (y) a CDS Agreement Transaction, (D) if such Synthetic Security is a Defeased Synthetic Security, such security complies with the requirements of the definition of Defeased Synthetic Security, (E) the Aggregate Principal Balance of any Synthetic Security which has multiple Reference Obligations does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance, (F) if such Synthetic Security is a CDS Agreement Transaction, the acquisition of such Synthetic Security will not result in a (or increase any existing) Notional Amount Shortfall (G) the Aggregate Principal Balance of any Synthetic Securities that the Reference Obligations of which are Fixed Rate Securities does not exceed 30.0% of the Net Outstanding Portfolio Collateral Balance, and (H) the Aggregate Principal Balance of any Synthetic Securities that are not CDS Agreement Transactions does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

Other ABS Securities...................... (28) if such security is an Other ABS Security, (A) with respect to the particular Other ABS Security being acquired, the Aggregate Principal Balance of all Other ABS Securities within an individual sector (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 3.0% of the Net Outstanding Portfolio Collateral Balance; (B) the Aggregate Principal Balance of all Collateral Debt Securities that are Other ABS Securities does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance; and (C) no such Other ABS Security

shall be publicly rated below "A-" by Standard & Poor's or publicly rated below "A3" by Moody's;

Specified Type ...............................  (29)  with respect to the following Specified Types:

(i) with respect to Equipment Leasing Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that such Collateral Debt Securities are publicly rated "A" or higher by Standard & Poor's, if rated by Standard & Poor's or publicly rated "A2" or higher by Moody's, if rated by Moody's, (B) the Aggregate Principal Balance of all such Collateral Debt Securities that are publicly rated "A" by Standard & Poor's or publicly rated "A2" by Moody's (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 2.5% of the Net Outstanding Portfolio Collateral Balance, and (C) the Aggregate Principal Balance of all such Collateral Debt Securities that are serviced by the same Servicer does not exceed 2.5% of the Net Outstanding Portfolio Collateral Balance;

(ii) [Reserved]

(iii) with respect to RMBS Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) comprises at least 80.0% of the Net Outstanding Portfolio Collateral Balance, (B) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) with a credit score based on the credit scoring models developed by Fair, Isaac & Company (which the Collateral Manager shall provide) (w) under 600 does not exceed 0% of the Net Outstanding Portfolio Collateral Balance; *provided* that Collateral Debt Securities from up to three such issuers with a credit score under 600 will be permitted, (x) under 625 does not exceed 60.0% of the Net Outstanding Portfolio Collateral Balance (such Collateral Debt Securities, "Subprime RMBS Securities"), (y) higher than or equal to 625 but lower than 700 does not exceed 65.0% of the Net Outstanding Portfolio Collateral

Balance (such Collateral Debt Securities, "Midprime RMBS Securities") and (z) equal to or higher than 700 does not exceed 40.0% of the Net Outstanding Portfolio Collateral Balance (such Collateral Debt Securities, "Prime RMBS Securities"), (C) the Aggregate Principal Balance of all such Collateral Debt Securities that are Negative Amortization Securities (provided such securities are publicly rated at least "BBB" by Standard & Poor's or are publicly rated at least "Baa2" by Moody's (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 3.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that the Aggregate Principal Balance of all such Collateral Debt Securities that are Negative Amortization Securities and are backed by Hybrid Securities does not exceed (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) 1.0% of the Net Outstanding Portfolio Collateral Balance, and (D) the Aggregate Principal Balance of all such Collateral Debt Securities that are backed by a pool of second lien collections does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance.

(iv) with respect to CMBS Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 20.0% of the Net Outstanding Portfolio Collateral Balance, (B) with respect to CMBS Credit Tenant Lease Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 1.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that no CMBS Credit Tenant Lease Securities acquired by the Issuer will be publicly rated below "Baa2" by Moody's or publicly rated below "BBB" by Standard & Poor's (at the time of the Issuer's acquisition thereof), (C) with respect to CMBS Single Property Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 1.0% of the Net Outstanding Portfolio Collateral Balance; *provided,* that no CMBS Single Property Securities acquired by the Issuer will be

publicly rated below "Baa2" by Moody's or publicly rated below "BBB" by Standard & Poor's (at the time of the Issuer's acquisition thereof), (D) the Aggregate Principal Balance of all Collateral Debt Securities that are CMBS Large Loan Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that (i) no CMBS Large Loan Security shall be publicly rated below "BBB" by Standard & Poor's or will be publicly rated below "Baa2" by Moody's, (ii) the percentage of the Net Outstanding Portfolio Collateral Balance comprised of Collateral Debt Securities that are CMBS Large Loan Securities that are publicly rated "Baa1" or below by Moody's or are publicly rated "BBB+" or below by Standard & Poor's does not exceed 2.5% and (iii) the percentage of the Net Outstanding Portfolio Collateral Balance comprised of Collateral Debt Securities that are CMBS Large Loan Securities that are publicly rated "A3" or higher by Moody's or are publicly rated "A-" or higher by Standard & Poor's does not exceed 7.5%;

(v) with respect to Automobile Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any synthetic securities the Reference Obligations of which are such securities) does not exceed 7.5% of the Net Outstanding Portfolio Collateral Balance and (B) no such security will be publicly rated below "Baa2" by Moody's or be publicly rated below "BBB" by Standard & Poor's; *provided* that such Automobile Securities shall only consist of "prime" Automobile Securities (as determined by the Collateral Manager);

(vi) with respect to REIT Debt Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance and (B) no such security will be publicly rated below "Baa2" by Moody's or be publicly rated below "BBB" by Standard & Poor's;

(vii) with respect to Credit Card Securities, (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of

which are such securities) does not exceed 7.5% of the Net Outstanding Portfolio Collateral Balance and (B) no such security shall be publicly rated below "Baa2" by Moody's or be publicly rated below "BBB" by Standard & Poor's; *provided* that such Credit Card Securities shall only consist of "prime" Credit Card Securities (as determined by the Collateral Manager);

(viii) with respect to Small Business Loan Securities, the Aggregate Principal Balance of all Collateral Debt Securities that are Small Business Loan Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

(ix) with respect to Student Loan Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 7.5% of the Net Outstanding Portfolio Collateral Balance, provided that with respect to Student Loan Securities that are not guaranteed by the U.S. Department of Education and that are rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 2.5% of the Net Outstanding Portfolio Collateral Balance;

(x) with respect to CDO Securities (or any Synthetic Securities the Reference Obligations of which are CDO Securities), (A) the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance, (B) each such Collateral Debt Security entitles the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders thereof) on the cash flow from a portfolio of collateral comprised primarily of real estate related Asset Backed Securities, (C) the Aggregate Principal Balance of all such Collateral Debt Securities issued by any single issuer does not exceed 1.5% of the Net Outstanding Portfolio Collateral Balance, (D) with respect

to Structured Finance CDO Securities, the Aggregate Principal Balance of all such Collateral Debt Securities does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance, (E) no such Collateral Debt Security shall have a Moody's rating below "A3" or a Standard & Poor's rating of below "A-", (F) if such CDO Security is backed by a portfolio of Asset-Backed Securities that must be publicly rated at least "A3" by Moody's or be publicly rated at least "A-" by Standard & Poor's, and such CDO Security is not a part of a class that is the lowest or second-lowest in terms of subordination with respect to all other issued classes of securities and may not be the lowest or second lowest tranche of the respective issuer, (G) with respect to Synthetic Structured Finance CDO Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 10.0% of the Net Outstanding Portfolio Collateral Balance, (H) with respect to CRE CDO Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 7.5% of the Net Outstanding Portfolio Collateral Balance and (I) the Aggregate Principal Balance of all such Collateral Debt Securities managed by any single collateral manager does not exceed 2.5% of the Net Outstanding Portfolio Collateral Balance; *provided* that no CDO Securities are managed by Lehman Brothers Asset Management LLC; *provided* further that CDO Securities not specified in this clause (x) will not be permitted; and *provided* further that if a CDO Security is the only tranche issued by the issuer of such CDO Security and it was offered to only one investor (such security, a "Bespoke CDO Security"), it will not be permitted for acquisition. For avoidance of doubt, a Bespoke CDO Security which is a correlation based trade, in either funded or unfunded form, will also not be permitted for acquisition;

(xi)    [Reserved];

(xii)    with respect to Car Rental Receivable Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

(xiii) with respect to Time Share Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 3.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that no such security shall be publicly rated below "A3" by Moody's or be publicly rated below "A-" by Standard & Poor's;

(xiv) [Reserved]; and

(xv) with respect to Consumer ABS Securities, the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 7.5% of the Net Outstanding Portfolio Collateral Balance;

PIK Bonds ......................................... (30) if such security is a PIK Bond (including mezzanine tranches of CMBS/CRE CDOs), the Aggregate Principal Balance of all such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

Interest Paid Less Frequently than Quarterly .............................. (31) the Aggregate Principal Balance of all such Collateral Debt Securities that pay interest less frequently than quarterly does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

Step-Down Securities / Step-Down Securities .............................. (32) if such security is a Step-Down Security, the Aggregate Principal Balance of all such Collateral Debt Securities does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance and if such security is a Step-Up Security, the Aggregate Principal Balance of all such Collateral Debt Securities does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

Backed by Obligations of Qualifying Foreign Obligors ........ (33) the Aggregate Principal Balance of all Collateral Debt Securities related to Qualifying Foreign Obligors (together with the Aggregate Principal Balance of any Synthetic Securities related thereto) does not exceed 5.0% of the Net Outstanding Portfolio Collateral Balance;

| | |
|---|---|
| Number of Issuers............................ | (34) the aggregate number of obligors in respect of Collateral Debt Securities is not less than 100; |
| Certain Issuer Concentrations......... | (35) with respect to all Collateral Debt Securities acquired by the Issuer: |

(i) the Aggregate Principal Balance of all Collateral Debt Securities issued by a single issuer (together with the Aggregate Principal Balance of any Synthetic Securities related thereto) does not exceed 1.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that for each of two issuers, the securities of each such issuer may comprise up to 1.5% of the Net Outstanding Portfolio Collateral Balance;

(ii) the Aggregate Principal Balance of all such Collateral Debt Securities publicly rated "BB+" by Standard & Poor's or publicly rated "Ba1" by Moody's issued by any single issuer does not exceed 0.75% of the Net Outstanding Portfolio Collateral Balance; *provided* that for each of two issuers, the securities of each such issuer may comprise up to 1.0% of the Net Outstanding Portfolio Collateral Balance; and

(iii) the Aggregate Principal Balance of all such Collateral Debt Securities publicly rated "BB" by Standard & Poor's or publicly rated "Ba2" by Moody's issued by any single issuer does not exceed 0.50% of the Net Outstanding Portfolio Collateral Balance;

*provided* that (x) for the avoidance of doubt if there is a split rating under (i), (ii) and (iii) above, the lower rating shall apply, (y) the Aggregate Principal Balance of all Collateral Debt Securities issued by such issuer shall not exceed all applicable percentages specified in any such clause describing the highest grouping of ratings, and (z) the Aggregate Principal Balance of all Collateral Debt Securities issued by such issuer having ratings described in each such clause applicable to such securities shall not exceed all applicable percentages specified in such clause;

Monoline Guaranteed Securities.....   (36) if such security is a Monoline Guaranteed Security insured by a single monoline, the Aggregate Principal Balance of such Collateral Debt Securities (together with the Aggregate Principal Balance of any Synthetic Securities the Reference Obligations of which are such securities) does not exceed 3.0% of the Net Outstanding Portfolio Collateral Balance; *provided* that the related guarantor of

each such Monoline Guaranteed Security must be publicly rated at least "Aa3" by Moody's and be publicly rated at least "AA-" by Standard & Poor's;

[Reserved] ...................................... (37) [Reserved];

[Reserved] ...................................... (38) [Reserved]; and

Collateral Quality Tests .................. (39) if such security is acquired on or after the Ramp-Up Completion Date, (A) each of the Collateral Quality Tests is satisfied or, if immediately prior to such acquisition one or more of the Collateral Quality Tests was not satisfied, the extent of compliance with each such Collateral Quality Test will be maintained or improved and (B) the Standard & Poor's CDO Monitor Notification Test is satisfied or, if immediately prior to such investment the Standard & Poor's CDO Monitor Notification Test was not satisfied, the result is closer to compliance and the Issuer shall have promptly delivered to the Trustee, the Noteholders, each Hedge Counterparty, each Senior Swap Counterparty and Standard & Poor's an Officer's certificate specifying the extent to which the Standard & Poor's CDO Monitor Notification Test was not satisfied;

*provided* that, in the case of the Eligibility Criteria set forth in paragraphs (12), (21) through (30) and (32) through (36) above, if prior to such investment such Eligibility Criteria is not satisfied, such Eligibility Criteria shall be deemed to be satisfied if, after giving effect to such investment, the extent of compliance with such Eligibility Criteria is maintained or improved.

Each calculation made to determine compliance with the Eligibility Criteria set forth in paragraphs (12), (21) through (30) and (32) through (35) above will be made with the assumption that the Net Outstanding Portfolio Collateral Balance will remain unchanged by the sale or purchase of the applicable Collateral Debt Security and substitute Collateral Debt Security.

With regard to a Synthetic Security, the requirements set forth in the Eligibility Criteria will apply to the applicable underlying Reference Obligation rather than the Synthetic Security itself (except with respect to paragraph (9), which shall apply to both the applicable Reference Obligation and the Synthetic Security, and to paragraph (27) which shall apply to the Synthetic Security). For purposes of determining compliance with the Eligibility Criteria in the case of Synthetic Securities, the relevant Reference Obligations will be considered as if such Reference Obligations were Collateral Debt Securities.

If the Issuer has previously entered into a commitment to acquire an obligation or security to be granted to the Trustee for inclusion in the Collateral as a Pledged Collateral Debt Security, then the Eligibility Criteria other than those described in paragraphs (7) through (10) above need not be satisfied (x) on the date of such grant if the Eligibility Criteria were satisfied on the date on which the Issuer entered into such commitment or (y) on the date on which the Issuer entered into such commitment if the Eligibility Criteria were or will be satisfied on the

date of such grant. Notwithstanding the foregoing, the Issuer may only enter into commitments to acquire securities for inclusion in the Collateral if such commitments to acquire securities do not extend beyond a 60-day period.

During the Reinvestment Period, the Collateral Manager shall use reasonable commercial efforts to cause the Issuer to reinvest any Principal Proceeds received during a Due Period in substitute Collateral Debt Securities during the same Due Period in which such Principal Proceeds are received (or, if later, the date by which the Issuer is required to reinvest proceeds received in connection with the disposition of a Collateral Debt Security in accordance with Section 12.1).

Notwithstanding the foregoing provisions, (A) Cash on deposit in the Collection Accounts may be invested in Eligible Investments, pending investment in Collateral Debt Securities and (B) if an Event of Default shall have occurred and be continuing, no Collateral Debt Security may be acquired unless it was the subject of a commitment entered into by the Issuer prior to the occurrence of such Event of Default.

In order to ensure that the Issuer is not treated as engaged in a U.S. trade or business for U.S. federal income tax purposes, the Issuer and the Collateral Manager shall observe the guidelines set forth in the Collateral Management Agreement on their activities and on the Collateral Debt Securities that may be purchased. Accordingly, although a particular prospective investment may satisfy the Eligibility Criteria, it may be ineligible for purchase by the Issuer and the Collateral Manager as a result of these limitations and restrictions.

Notwithstanding the foregoing, with respect to any series of trades in which the Issuer commits to purchase and/or sell multiple Collateral Debt Securities pursuant to a Trading Plan, compliance with the Eligibility Criteria may, at the option of the Collateral Manager, be measured by determining the aggregate effect of such Trading Plan on the Issuer's level of compliance with the Eligibility Criteria rather than considering the effect of each purchase and sale of such Collateral Debt Securities individually. The Issuer (or the Collateral Manager on its behalf) may enter into a Trading Plan only if (1) as evidenced by an Officer's certificate of the Collateral Manager delivered to the Trustee on or prior to the earliest event specified in the related Trading Plan, the Eligibility Criteria are expected to be satisfied as of the scheduled completion date of the related Trading Plan, (2) Moody's has not withdrawn or reduced (and not restored) the rating of any Class of Notes by more than one rating subcategory (in the case of the Class A Notes) or two rating subcategories (in the case of the Class B Notes, Class C Notes or Class D Notes) below their respective Initial Ratings and (3) the level of compliance with each of the Eligibility Criteria that was not satisfied at the time of completion of any prior Trading Plan (if any) is equal to or better than the level of compliance with such Eligibility Criteria prior to the initiation of such previous Trading Plan. Upon completion of a Trading Plan, the Collateral Manager will deliver to the Trustee an Officer's certificate of the Collateral Manager specifying whether each of the Eligibility Criteria was satisfied.

If at any time any two Trading Plans that were previously implemented result in the deterioration in the Issuer's level of compliance with any of the Eligibility Criteria, other than due to (x) a failure of a counterparty or issuer to comply with any of its payment or delivery obligations to the Issuer or any other default by such counterparty or issuer for reasons beyond

the control of the Issuer or any other terms that were agreed with the Issuer at or prior to the commencement of such Trading Plan or (y) an error or omission of an administrative or operational nature made by any bank, broker-dealer, clearing corporation or other similar financial intermediary holding funds, securities or other property directly or indirectly for the account of the Issuer, notice will be provided to Standard & Poor's and the Issuer will be prohibited from entering into any additional Trading Plans notwithstanding that such Trading Plan was executed in good faith, until the Issuer's level of compliance is restored to its prior level. The time period for each such Trading Plan shall be measured from the earliest trade date to the latest trade date of any such amounts. The Collateral Manager may only specify one Trading Plan per trade date. The Collateral Manager will provide notice to Standard & Poor's of any failed Trading Plan. Once compliance is restored to its prior level the Collateral Manager may request, and Standard & Poor's may restore the Issuer's ability to implement Trading Plans.

12.3    Conditions Applicable to all Transactions Involving Sale or Grant

(a)    Any transaction effected under this Section 12 or under Section 10.2 shall be conducted on an arm's-length basis for fair market value and in accordance with the requirements of the Collateral Management Agreement. The Collateral Manager may direct the Trustee (acting on behalf of the Issuer) to acquire an obligation to be included in the Collateral directly or indirectly from the Collateral Manager or any of its Affiliates, acting as principal or agent, or any account or portfolio for which the Collateral Manager or any of its Affiliates serve as investment advisor or sell any obligation included in the Collateral directly or indirectly to the Collateral Manager or any of its Affiliates, acting as principal or agent, or any account or portfolio for which the Collateral Manager or any of its Affiliates serve as investment adviser, in each case only to the extent that (i) such purchases or Sales are made for fair market value (as determined in good faith by the Collateral Manager at the time such obligation is acquired or sold) and otherwise on arms' length terms and (ii) the Collateral Manager determines that such purchases are consistent with the investment guidelines and objectives of the Issuer, the restrictions contained in this Indenture and applicable law. The Trustee shall have no responsibility to oversee compliance with this clause by the other parties.

(b)    Upon any Grant pursuant to this Section 12, all of the Issuer's right, title and interest to the Pledged Security or Securities shall be Granted to the Trustee pursuant to this Indenture, such Pledged Security or Securities shall be registered in the name of the Trustee, and, if applicable, the Trustee shall receive such Pledged Security or Securities. The Trustee shall also receive, not later than the date of delivery of any Collateral Debt Security delivered after the Closing Date, (i) an Officer's certificate of the Collateral Manager certifying that, as of the date of such Grant, such Grant complies with the applicable conditions of and is permitted by this Section 12 (and setting forth, to the extent appropriate, calculations in reasonable detail necessary to determine such compliance) and (ii) an Officer's certificate of the Issuer containing the statements set forth in Section 3.2(b).

(c)    Notwithstanding anything contained in this Section 12 to the contrary, the Issuer shall, subject to Section 12.3(d), have the right to effect any transaction which has been consented to by the Hedge Counterparties and Holders of Notes evidencing 100% of the Aggregate Outstanding Amount of each Class of Notes and each Preference Shareholder and of which each Rating Agency has been notified in advance.

(d)     Notwithstanding anything to the contrary in this Indenture, in no event may the Issuer (i) engage in any business or activity that would cause the Issuer to be treated as engaged in a U.S. trade or business for U.S. federal income tax purposes or (ii) acquire or hold any asset that is an equity interest in an entity that is fiscally transparent and engaged in a U.S. trade or business for U.S. federal income tax purposes or the acquisition or ownership of which otherwise would subject the Issuer to net income tax in any jurisdiction outside the Issuer's jurisdiction of incorporation.   The foregoing shall not, however, preclude the Issuer from holding Equity Securities, Defaulted Securities or securities received in an exchange pending their Sale in accordance with <u>Section 12.1(b)(ii)</u>; *provided* that, notwithstanding any other provision herein, the Issuer may not hold any asset unless the asset satisfies clause (8) of the Eligibility Criteria. The Issuer shall immediately (i) dispose of any asset that does not satisfy clause (8) of the Eligibility Criteria or (ii) transfer any asset that does not satisfy clause (8) of the Eligibility Criteria to a subsidiary that is treated as a corporation for U.S. federal tax purposes.

12.4     <u>Proposed Plans</u>.

If on the Ramp-Up Completion Date any of the Collateral Quality Tests, the Coverage Tests or the Eligibility Criteria are not satisfied, (i) the Collateral Manager, on behalf of the Issuer, may provide a Proposed Plan for satisfying such tests or limitations to each of Moody's and Standard & Poor's and (ii) the Issuer will be prohibited from purchasing additional Collateral Debt Securities (unless the first such purchase satisfies the Proposed Plan and the Proposed Plan satisfies the Rating Condition with respect to Moody's and Standard & Poor's); provided that such prohibition will not apply to purchases of Collateral Debt Securities which the Issuer had committed to make prior to the effective date of such prohibition. In such event, the Collateral Manager shall give written notice to the Trustee, the Hedge Counterparties and the Noteholders that the Issuer is prohibited from purchasing additional Collateral Debt Securities other than pursuant to the above.

## 13.     SECURED PARTIES' RELATIONS

13.1     <u>Subordination</u>.

(a)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Senior Swap Counterparties, the Hedge Counterparties and the Holders of the Notes agree for the benefit of the Hedge Counterparties, and the Credit Default Swap Counterparty that payments to be made under the Notes, the payments to be made to the Senior Swap Counterparties pursuant to the Senior Swap Agreement or this Indenture and the Issuer's rights in and to the Collateral (solely with respect to all amounts payable to the Hedge Counterparties and the Credit Default Swap Counterparty pursuant to <u>Sections 11.1(i)(C), 11.1(i)(E)</u> and <u>11.1(ii)(A)</u>, the Subordinate Interests) shall be subordinate and junior to the rights of the Hedge Counterparties and the Credit Default Swap Counterparty with respect to payments to be made to the Hedge Counterparties and the Credit Default Swap Counterparty pursuant to the Hedge Agreements or Credit Default Swap Agreement (as applicable) to the extent and in the manner set forth in <u>Section 11.1</u> and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with <u>Section 5</u>, including as a result of an Event of Default specified in <u>Section 5.1(f)</u> or <u>(g)</u>, all amounts payable to the Hedge Counterparties and

the Credit Default Swap Counterparty pursuant to <u>Section 11.1</u> shall be paid in Cash before any further payment or distribution is made on account of the Subordinate Interests.

(b)      Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Notes agree for the benefit of the Senior Swap Counterparties that payments to be made under the Notes and the Issuer's rights in and to the Collateral (solely with respect to all amounts payable to the Senior Swap Counterparties pursuant to <u>Sections 11.1(i)</u> and <u>11.1(ii)</u>, the Subordinate Interests) shall be subordinate and junior to the rights of the Senior Swap Counterparties with respect to payments to be made to the Senior Swap Counterparties pursuant to the Senior Swap Agreement or this Indenture to the extent and in the manner set forth in <u>Section 11.1</u> and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with <u>Section 5</u>, including as a result of an Event of Default specified in <u>Section 5.1(f)</u> or <u>(g)</u>, all amounts payable to the Senior Swap Counterparties pursuant to <u>Section 11.1</u> shall be paid in Cash before any further payment or distribution is made on account of the Subordinate Interests.

(c)      Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class B Notes, the Class C Notes, the Class D Notes and the Class X Notes agree for the benefit of the Holders of the Class A Notes that the Class B Notes, the Class C Notes, the Class D Notes and the Class X Notes and the Issuer's rights in and to the Collateral (with respect to the Class A Notes, the Subordinate Interests) shall be subordinate and junior to the Class A Notes to the extent and in the manner set forth in this Indenture, including as set forth in <u>Section 11.1</u> and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with <u>Section 5</u>, including as a result of an Event of Default specified in <u>Section 5.1(f)</u> or <u>(g)</u>, the Class A Notes shall be paid in full in Cash, before any further payment or distribution is made on account of the Subordinate Interests, in either case, in accordance with the Priority of Payments.  The Holders of Notes evidencing Subordinate Interests and the holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class A Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(d)      Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes, the Class D Notes and the Class X Notes agree for the benefit of the Holders of the Class B Notes that the Class C Notes, the Class D Notes and the Class X Notes and the Issuer's rights in and to the Collateral (with respect to the Class B Notes, the Subordinate Interests) shall be subordinate and junior to the Class B Notes to the extent and in the manner set forth in this Indenture, including as set forth in <u>Section 11.1</u> and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with <u>Section 5</u>, including as a result of an Event of Default specified in <u>Section 5.1(f)</u> or <u>(g)</u>, the Class B Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests, in either case, in accordance with the Priority of Payments.  The Holders of Notes evidencing Subordinate Interests and the holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class B

Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class B Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(e)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class D Notes and the Class X Notes agree for the benefit of the Holders of the Class C Notes that the Class D Notes and the Class X Notes and the Issuer's rights in and to the Collateral (with respect to the Class C Notes, the Subordinate Interests) shall be subordinate and junior to the Class C Notes to the extent and in the manner set forth in this Indenture, including as set forth in <u>Section 11.1</u> and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with <u>Section 5</u>, including as a result of an Event of Default specified in <u>Section 5.1(f)</u> or <u>(g)</u>, the Class C Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests, in either case, in accordance with the Priority of Payments.  The Holders of Notes evidencing Subordinate Interests and the holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class C Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class C Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(f)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer agrees for the benefit of the Holders of the Class D Notes that the Class X Notes and the Issuer's rights in and to the Collateral (with respect to the Class D Notes, the Subordinate Interests) shall be subordinate and junior to the Class D Notes to the extent and in the manner set forth in this Indenture, including as set forth in <u>Section 11.1</u> and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with <u>Section 5</u>, including as a result of an Event of Default specified in <u>Section 5.1(f)</u> or <u>(g)</u>, the Class D Notes shall be paid in full in Cash or, to the extent a Majority of the Class D Notes consent, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests.  The Holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class D Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class D Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(g)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer agrees for the benefit of the Holders of the Class X Notes that the Issuer's rights in and to the Collateral (with respect to the Class X Notes, the Subordinate Interests) shall be subordinate and junior to the Class X Notes to the extent and in the manner set forth in this Indenture, including as set forth in <u>Section 11.1</u> and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with <u>Section 5</u>, including as a result of an Event

of Default specified in <u>Section 5.1(f)</u> or <u>(g)</u>, the Class X Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests. The Holders of equity in the Issuer and the Co-Issuer agree, for the benefit of the Holders of the Class X Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class X Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(h)    In the event that notwithstanding the provisions of this Indenture, any holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until all amounts payable to the Senior Swap Counterparties pursuant to <u>Section 11.1(i)(E)</u>, the Hedge Counterparties pursuant to <u>Section 11.1(i)(F)</u> or the Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class X Notes, as the case may be, shall have been paid in full in Cash in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Senior Swap Counterparties, the Hedge Counterparties and the Holders of the Notes, in accordance with this Indenture; *provided* that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including this <u>Section 13.1</u>.

(i)    Each Holder of Subordinate Interests agrees with the Senior Swap Counterparties, the Hedge Counterparties and all Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class X Notes, as the case may be, that such Holder of Subordinate Interests shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this Indenture including this <u>Section 13.1</u>; *provided* that after all amounts payable to the Hedge Counterparties pursuant to <u>Section 11.1(i)(E)</u>, the Senior Swap Counterparties pursuant to <u>Section 11.1(i)(F)</u> or in respect of principal of and accrued interest on the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class X Notes, as the case may be, have been paid in full, the Holders of Subordinate Interests shall be fully subrogated to the rights of the Senior Swap Counterparties, the Hedge Counterparties or the Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class X Notes, as the case may be. Nothing in this <u>Section 13.1</u> shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

(j)    The Trustee shall not institute any Proceeding for enforcement of the lien of the Trustee or any other Secured Party other than in connection with an action pursuant to <u>Section 5.3</u> or <u>Section 5.4</u> for enforcement of the lien of this Indenture for the benefit of the Noteholders, and the Trustee may only enforce its lien or the lien of any other Secured Party only in conjunction with the enforcement of the rights of the Noteholders in accordance with <u>Section 5.4</u> hereof.

13.2    Standard of Conduct.

In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Secured Party under this Indenture, subject to the terms and conditions of this Indenture, including Section 5.9, a Secured Party or Secured Parties shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Secured Party, the Issuer, or any other Person.

**14.    MISCELLANEOUS**

14.1    Form of Documents Delivered to Trustee.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer, the Co-Issuer or the Collateral Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Authorized Officer of the Issuer, the Co-Issuer or the Collateral Manager or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer, the Co-Issuer, the Collateral Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer, the Collateral Manager or such other Person, unless such Authorized Officer of the Issuer, the Co-Issuer or the Collateral Manager or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.  Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer or the Co-Issuer, stating that the information with respect to such matters is in the possession of the Issuer or the Co-Issuer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default is a condition precedent to the taking of any action by the Trustee at the request or direction of the Issuer or the Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to the Co-Issuers' rights to make such request or

direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default as provided in Section 6.1(d).

14.2    Acts of Noteholders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer.  Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the Act of the Noteholders as applicable, signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this Section 14.2.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)    The principal amount and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Note Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of such Note and of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note.

14.3    Notices, Etc., to Trustee, the Co-Issuers, the Collateral Manager, the Hedge Counterparties, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Rating Agencies.

Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(a)    the Trustee by any Noteholder or by the Issuer or the Co-Issuer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Trustee addressed to it at its Corporate Trust Office, or at any other address previously furnished in writing to the Co-Issuers or Noteholder by the Trustee;

(b)    the Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible

form, to the Issuer addressed to it at c/o Deutsche Bank (Cayman) Limited, P.O. Box 1984 GT, Elizabethan Square, Grand Cayman, Cayman Islands, Tel +1 345 949-8244, Fax +1 345 949 5223, Attention: Global Transaction Banking, Trust & Securities Services - Corporate Services Division, or at any other address previously furnished in writing to the Trustee by the Issuer;

(c)  the Co-Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Co-Issuer addressed to it at Deutsche International Corporate Services (Delaware) LLC, Deutsche International Corporate Services (Delaware) LLC, 1011 Centre Road, Suite 200, Wilmington, Delaware 19805, Attention: Trust & Securities Services—Corporate Services Division, or at any other address previously furnished in writing to the Trustee by the Co-Issuer;

(d)  the Collateral Manager by the Co-Issuers or the Trustee shall be sufficient for every purpose hereunder if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Collateral Manager addressed to Lehman Brothers Asset Management LLC, 190 South LaSalle Street, Suite 2400, Chicago, IL, 60603, facsimile no. +1 312 559 0143, Attention:  CDO Portfolio Management Group, with copies to:  Bell, Boyd & Lloyd LLC, 70 West Madison, Suite 3100, Chicago, Illinois 60606, facsimile no. +1 312 827 8128, Attention:  Kevin J. McCarthy or at any other address previously furnished in writing to the Co-Issuers or the Trustee by the Collateral Manager;

(e)  the Rating Agencies by the Co-Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, in the case of Moody's, addressed to Moody's Investors Service, 99 Church Street, New York, New York 10007, facsimile no. +1 212 553 0355, Attention: CBO/CLO Monitoring; and in the case of Standard & Poor's, addressed to Standard & Poor's, 55  Water  Street,  New  York,  New  York  10041,  via  electronic  mail  to CDO_Surveillance@Standardandpoors.com,  facsimile  no.  +1  212  438  2650,  Attention: Structured Finance Ratings, Asset-Backed Surveillance Group – CBO/CLO;

(f)  the Hedge Counterparties by the Co-Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered or sent by overnight courier service or by facsimile in legible form to each Hedge Counterparty addressed to it at the address specified in the related Hedge Agreements or at any other address previously furnished in writing to the Issuer or the Trustee by such Hedge Counterparty;

(g)  the Credit Default Swap Counterparty by the Co-Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered or sent by overnight courier service or by facsimile in legible form to the Credit Default Swap Counterparty addressed to it at the address specified in the Credit Default Swap Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Credit Default Swap Counterparty;

(h)     the Senior Swap Counterparty by the Co-Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered or sent by overnight courier service or by facsimile in legible form to the Senior Swap Counterparty addressed to it at the address specified in the Senior Swap Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Senior Swap Counterparty, with a copy to any Person providing credit protection to the Senior Swap Counterparty to the address specified by the Senior Swap Counterparty;

(i)     the Prior Senior Swap Counterparty by the Co-Issuers, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered or sent by overnight courier service or by facsimile in legible form to the Prior Senior Swap Counterparty addressed to it at the address specified in its Prior Senior Swap Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Prior Senior Swap Counterparty;

(j)     to the Repository by the Issuer shall be made available to the Repository by electronic mail as a pdf (portable document format) file at CDO Library, c/o The Bond Market Association, 360 Madison Avenue (18th Floor), New York, NY 10017; Electronic mail address: admin@cdolibrary.com; *provided* that the Issuer shall be identified in the electronic mail message that accompanies the delivery of any document and shall apply the following procedures in converting the document to a pdf file:

(i)     the pdf file shall be made from the original document by printing directly from the application in which the document was created (Microsoft Word, Quark Xpress, etc.) or by using Adobe Acrobat Distiller;

(ii)     all fonts shall be embedded when converting the original document to a pdf file; and

(iii)     the pdf file shall not be made from scanned pages.

Delivery of any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents made as provided above will be deemed effective:  (1) if in writing and delivered in person or by overnight courier service, on the date it is delivered; (2) if sent by facsimile transmission, on the date that transmission is received by the recipient in legible form (as evidenced by the sender's written record of a telephone call or other communication to the recipient in which the recipient acknowledged receipt of such facsimile transmission); and (3) if sent by mail, on the date that mail is delivered or its delivery is attempted; in each case, unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

14.4    <u>Notices and Reports to Noteholders; Waiver</u>.

Except as otherwise expressly provided herein, where this Indenture provides for a report to Holders or for a notice to Holders of Notes of any event,

(a)    such notice shall be in writing and mailed, first-class postage prepaid, to each Holder of a Note affected by such event, at the address of such Holder as it appears in the Note Register, not earlier than the earliest date and not later than the latest date, prescribed for the giving of such report or notice;

(b)    such report shall be made available, by the Trustee, each month to Noteholders via the Trustee's internet website, initially located at www.cdotrustee.com.  The Trustee shall have the right to change the method such reports are distributed in order to make such distribution more convenient and/or more accessible to the Noteholders and the Trustee shall provide timely notification (in any event, not less than 30 days) to all Noteholders; and

(c)    such report or notice shall be in the English language.

Any such reports or notices may also be made available to any Beneficial Owners upon request therefor in the form of <u>Exhibit L</u> attached hereto certifying that it is a holder of a beneficial interest in any Note.  Such reports and notices will be deemed to have been sufficiently given on the date of such mailing or availability, as applicable.

The Trustee will deliver to the Holder of any Note shown on the Note Register any readily available information or notice requested to be so delivered, at the expense of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Note shall affect the sufficiency of such notice with respect to other Holders of Notes.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

14.5    <u>Effect of Headings and Table of Contents</u>.

The Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

14.6    Successors and Assigns.

All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

14.7    Severability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

14.8    Benefits of Indenture.

The Hedge Counterparties (if any), the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Collateral Manager shall be third party beneficiaries of each agreement or obligation in this Indenture.  Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Collateral Manager, the Noteholders, the Credit Default Swap Counterparty, the Senior Swap Counterparties and the Hedge Counterparties, any benefit or any legal or equitable right, remedy or claim under this Indenture.

14.9    Governing Law.

This Indenture and each Note shall be construed in accordance with, and this Indenture, each Note and all matters arising out of or relating in any manner to this Indenture or the Notes (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York.

14.10    Submission to Jurisdiction.

Each of the Co-Issuers hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan in The City of New York and of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan in The City of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to the Notes or this Indenture, and the Co-Issuers hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court.  The Co-Issuers hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.  The Co-Issuers irrevocably consent to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of the Co-Issuers' agent in New York set forth in Section 7.2.  The Co-Issuers agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

14.11    Counterparts.

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

14.12    Waiver of Jury Trial.

THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY (BUT NO OTHER JUDICIAL REMEDIES) IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE AND THE TRANSACTIONS CONTEMPLATED HEREBY.

14.13    Judgment Currency.

This is an international financing transaction in which the specification of Dollars (the "**Specified Currency**"), and the specification of the place of payment, as the case may be (the "**Specified Place**"), is of the essence, and the Specified Currency shall be the currency of account in all events relating to payments of or on the Notes.  The payment obligations of the Co-Issuers under this Indenture and the Notes shall not be discharged by an amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on conversion to the Specified Currency and transfer to the Specified Place under normal banking procedures does not yield the amount of the Specified Currency at the Specified Place.  If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder or the Notes in the Specified Currency into another currency (the "**Second Currency**"), the rate of exchange which shall be applied shall be that at which in accordance with normal banking procedures the Trustee could purchase the Specified Currency with the Second Currency on the Business Day next preceding that on which such judgment is rendered.  The obligation of the Co-Issuers in respect of any such sum due from the Co-Issuers hereunder shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by the Trustee of any sum adjudged to be due hereunder or under the Notes in the Second Currency the Trustee may in accordance with normal banking procedures purchase and transfer to the Specified Place the Specified Currency with the amount of the Second Currency so adjudged to be due; and the Co-Issuers hereby, as a separate obligation and notwithstanding any such judgment (but subject to the Priority of Payments as if such separate obligation in respect of each Class of Notes constituted additional principal owing in respect of such Class of Notes), agree to indemnify the Trustee and each Noteholder against, and to pay the Trustee or such Noteholder, as the case may be, on demand in the Specified Currency, any difference between the sum originally due to the Trustee or such Noteholder, as the case may be, in the Specified Currency and the amount of the Specified Currency so purchased and transferred.

14.14    Confidential Treatment of Documents.

Except as otherwise provided in this Indenture and in the "*Listing and General Information*" section of the Offering Memorandum or as required by law, this Indenture, the

Administrative Agreement, the Collateral Management Agreement, the Credit Default Swap Agreement, the Senior Swap Agreement, the Hedge Agreements, all Monthly Reports, the Note Valuation Report and each transfer certificate shall be treated by the Trustee and the Collateral Manager as confidential and shall only be distributed to the Persons and in the manner designated herein. The Trustee shall provide a copy of this Indenture to any Holder of a beneficial interest in any Note upon written request therefor substantially in the form of Exhibit L attached hereto certifying that it is such a Holder. Notwithstanding anything herein or in any of the documents contemplated by this Indenture to the contrary, effective from the date of commencement of discussions with respect to the transactions contemplated hereby, the Trustee, the other parties to the documents and the Holders and beneficial owners of the Notes and the Preference Shares, and each employee, representative or other agent of the Trustee or such holders, may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated hereby and all materials of any kind, including opinions or other tax analyses, that are provided to such holders relating to such tax treatment and tax structure. This authorization to disclose the tax treatment and tax structure does not permit disclosure of information identifying a Co-Issuer, the Collateral Manager or any other party to the transactions contemplated hereby, or the pricing (except to the extent that pricing is relevant to tax structure or tax treatment) of the Offering.

14.15  Consent to Posting of Documents on Repository.

The Issuer hereby consents to (a) the posting of the final Offering Memorandum, this Indenture, the Hedge Agreements, the Credit Default Swap Agreement, the Senior Swap Agreement and the periodic reports to be delivered pursuant to the transaction documents and any amendments or other modifications thereto on the Repository for use in the manner provided in the Repository; and (b) the display of its name on the Repository in connection therewith. Notwithstanding anything herein to the contrary, none of the Issuer, the Co-Issuer and the Trustee makes any representation or warranty to The Bond Market Association (or any successor thereto) or any Affiliate thereof or any Person having or obtaining access to the information maintained in the Repository or to any of such Person's Affiliates regarding the accuracy or completeness of any information, document, report or other communication transmitted to the Repository, and no Person having or obtaining access to the information maintained in the Repository shall have any rights under this Indenture or otherwise by reason of the transmission of any such information, document, report or other communication to the Repository.

14.16  Liability of Co-Issuers.

Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, *inter alia*, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other of the Co-Issuers. In particular, neither of the Co-Issuers shall be entitled to petition or take any other steps for the winding up or bankruptcy of the other of the Co-Issuers or shall have any claim in respect of any assets of the other of the Co-Issuers while any of the Notes are Outstanding.

**15.** **ASSIGNMENT OF COLLATERAL MANAGEMENT AGREEMENT, ETC.**

15.1   <u>Assignment</u>.

The Issuer, in furtherance of the covenants of this Indenture, and as security for the Notes and amounts payable to the Noteholders and the Senior Swap Counterparties and other obligations to the Secured Parties hereunder and the performance and observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Secured Parties, all of the Issuer's estate, right, title and interest in, to and under the Collateral Management Agreement, the Collateral Administration Agreement, the Credit Default Swap Agreement, the Senior Swap Agreement and the Hedge Agreements, including (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Collateral Manager or any other party thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; *provided* that the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Collateral Management Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including as set forth in <u>Section 15.4</u>), which license shall be and is hereby deemed to be automatically revoked (A) upon the occurrence of an Event of Default hereunder until such time, if any, as such Event of Default is cured or waived, (B) upon the occurrence of a termination for "cause" specified in Section 11(d) of the Collateral Management Agreement or (C) upon a default in the performance, or breach, of any material covenant, representation, warranty or other agreement of the Collateral Manager under the Collateral Management Agreement or in any certificate or writing delivered pursuant thereto if Holders of at least 25% of the Aggregate Outstanding Amount of the Notes of any Class give notice of such default or breach to the Trustee and the Collateral Manager and such default or breach (if remediable) continues for a period of 30 days after receipt of such notice.

15.2   <u>No Impairment</u>.

The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Collateral Management Agreement, the Collateral Administration Agreement, the Credit Default Swap Agreement, the Senior Swap Agreement and the Hedge Agreements nor shall any of the obligations contained in the Collateral Management Agreement be imposed on the Trustee.  For the avoidance of doubt, in no event will the Trustee be required to assume the obligations of the Collateral Manager under the Collateral Management Agreement.

15.3   <u>Termination, Etc.</u>

Upon the redemption and cancellation of the Notes and the payment of all other Secured Obligations and the release of the Collateral from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Secured Parties shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Collateral

Management Agreement, the Collateral Administration Agreement, the Credit Default Swap Agreement, the Senior Swap Agreement and the Hedge Agreements shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

15.4 Issuer Agreements, Etc.

The Issuer represents that it has not executed any other assignment of the Collateral Management Agreement, the Collateral Administration Agreement, the Credit Default Swap Agreement, the Senior Swap Agreement and the Hedge Agreements. The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably specify. The Issuer hereby agrees, and hereby undertakes to obtain the agreement and consent of the Collateral Manager in the Collateral Management Agreement to the following:

(a) the Collateral Manager consents to the provisions of this assignment and agrees to perform any provisions of this Indenture applicable to the Collateral Manager;

(b) the Collateral Manager acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Collateral Management Agreement to the Trustee for the benefit of the Secured Parties, and the Collateral Manager agrees that all of the representations, covenants and agreements made by the Collateral Manager in the Collateral Management Agreement are also for the benefit of the Trustee and the other Secured Parties;

(c) the Collateral Manager shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Collateral Management Agreement;

(d) except as otherwise set forth herein and therein, the Collateral Manager shall continue to serve as Collateral Manager under the Collateral Management Agreement notwithstanding that the Collateral Manager shall not have received amounts due it under the Collateral Management Agreement because sufficient funds were not then available hereunder to pay such amounts. The Collateral Manager agrees not to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under any bankruptcy, insolvency, reorganization or similar laws until at least one year and one day, or, if longer, the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture and the reduction of the Aggregate Outstanding Swap Counterparty Amount and Remaining Unfunded Notional Amount to zero; *provided* that nothing in this clause shall preclude, or be deemed to estop, the Collateral Manager (A) from taking any action prior to the expiration of the aforementioned one year and one day period, or, if longer, the applicable preference period then in effect, in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Collateral Manager or (B) from commencing against the Issuer or the Co-Issuer or any

properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding;

(e)     the Collateral Manager irrevocably submits to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes or this Indenture, and the Collateral Manager irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court. The Collateral Manager irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The Collateral Manager irrevocably consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of the Collateral Manager. The Collateral Manager agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

## 16.     HEDGE AGREEMENTS

(a)     On the Closing Date (or any date on which the Issuer enters into a Hedge Agreement including a replacement Hedge Agreement), (i) the Hedge Counterparty entering into the Hedge Agreements on such date (or any Affiliate of such Hedge Counterparty that shall have absolutely and unconditionally guaranteed (pursuant to a form of guarantee that satisfies all applicable then-current publicly-available rating criteria of the Rating Agencies) the obligations of such Hedge Counterparty under the Hedge Agreement) shall satisfy the Hedge Counterparty Ratings Requirement and (ii) the Issuer shall assign any such Hedge Agreement to the Trustee pursuant to this Indenture and such Hedge Counterparty shall consent to such assignment. The Issuer may in its discretion enter into one or more Deemed Floating Asset Hedge Agreements upon or following the acquisition of a Collateral Debt Security that in each case either (A) satisfy the Rating Condition or (B) are Form-Approved Asset Hedge Agreements with respect to which details of the Collateral Debt Security that is the subject of such acquisition have been provided to each of the Rating Agencies. The Issuer shall not enter into any hedge agreement (including any Hedge Agreement) the payments from which are subject to withholding tax unless only the Hedge Counterparty is required to withhold and the Hedge Counterparty is required to pay additional amounts to the Issuer sufficient to cover any withholding tax due on payments made by such hedge counterparty, subject to the Issuer making customary tax representations.

(b)     The Trustee shall, on behalf of the Issuer and in accordance with the Note Valuation Report, pay amounts due to each Hedge Counterparty under any Hedge Agreement on any Quarterly Distribution Date in accordance with <u>Section 11.1</u>.

(c)     In respect of any Hedge Counterparty, if:

(i)     (w)(i) the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of such Rating Determining Party are rated below "A1" by Moody's (or are rated "A1" and on watch for downgrade by Moody's) or (ii) the unsecured, unguaranteed and otherwise unsupported short-term debt obligations of such Rating Determining Party are rated below "P-1" by Moody's (or are rated "P-1" and on

watch for downgrade by Moody's), (x) if such Rating Determining Party does not have a short-term rating from Moody's, the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of such Rating Determining Party are rated below "Aa3" by Moody's (or are rated "Aa3" and on watch for downgrade by Moody's), then the relevant Hedge Counterparty shall, within 10 Business Days of such ratings downgrade, enter into an agreement with the Issuer providing for the posting of collateral, which agreement satisfies the Rating Condition or (y) if such Rating Determining Party does not have a short-term rating from Standard & Poor's, the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of such Rating Determining Party are rated below "A+" by Standard & Poor's or the short-term debt obligations of such Rating Determining Party are rated below "A-1" by Standard & Poor's, then the relevant Hedge Counterparty shall, within 10 Business Days of such ratings downgrade, enter into an agreement with the Issuer providing for the posting of collateral, which agreement satisfies the Rating Condition;

(ii)     such Rating Determining Party fails to satisfy the Ratings Threshold, then the relevant Hedge Counterparty shall use its best efforts to assign its rights and obligations in and under the related Hedge Agreement (at its own expense) to another Hedge Counterparty that has ratings at least equal to the Hedge Counterparty Ratings Requirement; *provided* that (x) neither the Issuer nor the new Hedge Counterparty is required to deduct or withhold on account of tax unless only the new Hedge Counterparty is required to withhold and the new Hedge Counterparty is required to pay additional amounts to the Issuer sufficient to cover any withholding tax due on payments made by such new Hedge Counterparty and (y) if such Hedge Counterparty has not assigned its rights and obligations within 30 days after such failure, it shall be a "termination event" where the Hedge Counterparty is the sole affected party and such Hedge Counterparty shall accept any bona fide bid received from another Hedge Counterparty that has ratings at least equal to the Hedge Counterparty Ratings Requirement (even if no other bids are received) and satisfies clause (x) above.

(d)     The Trustee shall, prior to the entry into a Hedge Agreement, cause to be established one or more Securities Accounts, each of which shall be designated a "**Hedge Counterparty Collateral Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties. The Trustee shall deposit all collateral received from any Hedge Counterparty under a Hedge Agreement in the related Hedge Counterparty Collateral Account. Any and all funds at any time on deposit in, or otherwise standing to the credit of, any Hedge Counterparty Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties and shall be invested in Eligible Investments specified by the relevant Hedge Counterparty; *provided* that in the absence of such specification, such amounts shall be invested in Eligible Investments of the type described in clause (c) of the definition thereof. The Trustee shall not be held liable in any way by reason of any insufficiency of such Hedge Counterparty Collateral Account resulting from any loss relating to any such investment. The only permitted withdrawal from or application of funds on deposit in, or otherwise standing to the credit of, the Hedge Counterparty Collateral Account shall be (i) for application to obligations of the relevant Hedge Counterparty to the Issuer under the related Hedge Agreement that are not paid when due (whether when scheduled or upon early termination) or (ii) to return collateral to such Hedge Counterparty when and as required by the

related Hedge Agreement. No assets credited to any Hedge Counterparty Collateral Account shall be considered an asset of the Issuer for purposes of any of the Overcollateralization Tests unless and until the Issuer or the Trustee on its behalf is entitled to foreclose on such assets in accordance with the terms of the relevant credit support documents related to the related Hedge Agreement. Each Hedge Counterparty Collateral Account shall remain at all times with a financial institution having a combined capital and surplus of at least U.S.$200,000,000 and a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's.

(e) The Trustee shall, on or prior to the entry into a Deemed Floating Asset Hedge Agreement, cause to be established one or more Securities Accounts, each of which shall be designated an "**Asset Hedge Account**," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the relevant Asset Hedge Counterparty. The Trustee shall deposit all amounts that are received in respect of interest on the Collateral Debt Security that is the subject of such Deemed Floating Asset Hedge Agreement and are required to be paid to the related Asset Hedge Counterparty in accordance with the terms of such Deemed Floating Asset Hedge Agreement in the related Asset Hedge Account. As directed by an Issuer Order executed by the Collateral Manager in writing, amounts on deposit in an Asset Hedge Account shall be invested in Eligible Investments until such amounts are paid to the related Asset Hedge Counterparty in accordance with the terms of the related Deemed Floating Asset Hedge Agreement. Any amounts (whether investment earnings on Eligible Investments or otherwise) remaining in an Asset Hedge Account on any Quarterly Distribution Date that are not required to pay any amounts due to any Asset Hedge Counterparty under the related Deemed Floating Asset Hedge Agreement shall be transferred to the Interest Collection Account on such Quarterly Distribution Date and applied as Interest Proceeds in accordance with the Priority of Payments on such Quarterly Distribution Date. Each Asset Hedge Account shall remain at all times with a financial institution having a combined capital and surplus of at least U.S.$200,000,000 and a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", such rating must not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's.

(f) Upon the default by the Hedge Counterparty thereto in the payment when due of its obligations to the Issuer under such Hedge Agreement, the Issuer shall forthwith provide telephonic notice (promptly confirmed in writing) thereof to the Trustee and, if applicable, any guarantor of the Hedge Counterparty's obligations under such Hedge Agreement. Upon its receipt of such notice (or, if earlier, when the Trustee becomes aware of such default) the Trustee shall make a demand on the relevant Hedge Counterparty, or any guarantor, if applicable, demanding payment forthwith. The Trustee shall give notice to the Noteholders and each Rating Agency upon the continuance of the failure by the relevant Hedge Counterparty to perform its obligations for two Business Days following a demand made by the Trustee on such Hedge Counterparty.

(g) If at any time a Hedge Agreement becomes subject to early termination due to the occurrence of an "event of default" or a "termination event" (each as defined in the related Hedge Agreement) attributable to the Hedge Counterparty thereto, the Issuer and the Trustee shall take such actions (following the expiration of any applicable grace period) to enforce the rights of the Issuer and the Trustee thereunder as may be permitted by the terms of the Hedge

Agreement and consistent with the terms hereof, and the Issuer (or the Collateral Manager on its behalf) shall use the proceeds of any such actions (including the proceeds of the liquidation of any collateral pledged by such Hedge Counterparty) to enter into a replacement Hedge Agreement satisfying the Rating Condition, and with a Hedge Counterparty with respect to which the Rating Condition shall have been satisfied. Costs attributable to entering into a replacement Hedge Agreement following an "event of default" where the Hedge Counterparty was the defaulting party or a "termination event" where the Hedge Counterparty is the sole affected party shall be borne by such Hedge Counterparty as provided in the relevant Hedge Agreement. In determining the amount payable under the terminated Hedge Agreement, the Issuer shall seek quotations from reference market-makers that satisfy the Hedge Counterparty Ratings Requirement. In addition, the Issuer shall use its best efforts to cause the termination of the Hedge Agreement to become effective simultaneously with the entry into a replacement Hedge Agreement described as aforesaid, and in any event, shall enter into a replacement Hedge Agreement within 60 days of any termination of the Hedge Agreement. The Rating Condition with respect to Standard & Poor's must be satisfied prior to any designation by the Issuer of an "Early Termination Date" under and as defined in any Deemed Floating Asset Hedge Agreement, and the Issuer shall notify each of the Rating Agencies of the amount payable by or to the Issuer under any terminated Deemed Floating Asset Hedge Agreement promptly following the determination thereof.

(h)     Each Hedge Agreement shall provide that any amount payable to the relevant Hedge Counterparty thereunder shall be subject to the Priority of Payments.

IN WITNESS WHEREOF, we have set our hands as of the date first written above.

LIBRA CDO LIMITED, as Issuer
Executed as a Deed

By: _____
Name: Simon Wetherell
Title: Director

LIBRA CDO, LLC
By: DEUTSCHE INTERNATIONAL
CORPORATE SERVICES (DELAWARE)
LLC, as sole manager of LIBRA CDO, LLC

By: _____
    Name:
    Title:

LASALLE BANK NATIONAL
    ASSOCIATION, as Trustee

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, we have set our hands as of the date first written above.

LIBRA CDO LIMITED, as Issuer
Executed as a Deed

By: _____
Name:
Title:

LIBRA CDO, LLC

By: _____
Name:   **J. Bruce Herd**
Title:   President

LASALLE BANK NATIONAL
ASSOCIATION, as Trustee

By: _____
Name:
Title:

IN WITNESS WHEREOF, we have set our hands as of the date first written above.

LIBRA CDO LIMITED, as Issuer
Executed as a Deed

By: _____
Name:
Title:

LIBRA CDO, LLC
By: DEUTSCHE INTERNATIONAL
CORPORATE SERVICES (DELAWARE)
LLC, as sole manager of LIBRA CDO, LLC

By: _____
Name:
Title:

LASALLE BANK NATIONAL
ASSOCIATION, as Trustee

By: _____
Name:
Title:   Barbara A. Wolf
         Vice President