WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Ralph I. Miller
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                                     :

In re                                        :        Chapter 11 Case No.

LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :        08-13555 (JMP)

                   Debtors.            :        (Jointly Administered)
------------------------------------------------------------------x

**DECLARATION OF ROBERT HERSHAN IN SUPPORT OF THE DEBTORS'
MOTION, PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR APPROVAL OF
A SETTLEMENT AGREEMENT AMONG LBSF, LBHI, AND SOCIÉTÉ
GÉNÉRALE, NEW YORK BRANCH AND CERTAIN RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Robert Hershan, declare:

1.      I am over the age of 18 years and make these statements of my own personal knowledge, my review of the business records of Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI") (together with LBSF, the "Debtors"), and/or my consultation with employees of the Debtors. If called to testify, I could testify to the truth of the matters set forth herein.

2.      I submit this declaration in support of the Debtors' Motion, Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rule 9019, for

Approval of a Settlement Agreement Among LBSF, LBHI, and Société Générale, New York Branch ("SG") and Certain Related Relief (the "Motion").[1]

3. I am a Managing Director with Alvarez and Marsal North America, LLC. I was assigned to the LBHI matter on September 17, 2008. One of my primary areas of responsibility includes managing a portfolio of the Debtors' derivatives transactions with counterparties that are special purpose entities. In that role I have independently reviewed, have become familiar with and have personal knowledge regarding certain transactions that the Debtors entered into before their bankruptcy with special purposes entities, including the transactions with Libra CDO Limited ("Libra") and MKP Vela CBO, Ltd. ("Vela") that are the subject of the Motion. I have been the primary representative for the Debtors in connection with the Libra and Vela transactions, including the negotiation of the Settlement Agreement with SG. I have reviewed the Motion and it accurately reflects the terms of the Settlement Agreement.

**The Libra and Vela CDSA Transactions**

4. The Libra credit default swap agreement is governed by a 1992 ISDA Master Agreement, dated as of October 17, 2006 (together with the schedule and confirmations thereto, each dated October 17, 2006, the "Libra CDSA"). The Vela credit default swap agreement is governed by a 1992 ISDA Master Agreement, dated as of November 16, 2006 (together with the amended and restated schedule, credit support annex, and amended and restated confirmations thereto, each dated April 23, 2008, the "Vela CDSA," and, together with the Libra CDSA, the "CDSAs").

5. The obligations of both Libra and Vela to LBSF under the Libra CDSA and Vela CDSA are secured by separate credit default swap agreements with SG,

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

pursuant to which SG is obligated to advance funds to Libra and/or Vela, as applicable, so that Libra and/or Vela can meet their respective obligations to LBSF under the CDSAs (the "Senior Swap Agreements").

6. In connection with the commencement of the Debtors' chapter 11 cases, the indenture trustees of Libra and Vela purported to designate an Early Termination Date under the Libra CDSA and the Vela CDSA as of October 10, 2008 and September 30, 2008, respectively. The Debtors have challenged the propriety and validity of both purported terminations. In May 2009, the Debtors commenced an adversary proceeding seeking, among other things, a declaration that the purported termination of the Libra CDSA was invalid and ineffective. Although the Debtors have not yet commenced an adversary proceeding challenging the validity of the early termination of the Vela CDSA or the modification of LBSF's payment priority, the Debtors anticipate filing such a complaint as contemplated by the Settlement Agreement.

## LBSF's Efforts to Market Its Interest in the Libra CDSA

7. The Debtors have invested significant resources to comprehensively analyze the issues in dispute with respect to the Libra and Vela transactions. The decision to enter into the Settlement Agreement was made after a careful analysis of, among other things, the uncertainties surrounding the litigation, the market for potential assignees and negotiations with several such parties. Prior to entering the Settlement Agreement, LBSF engaged an advisor (the "Advisor") to market and sell or assign its interest in the Libra CDSA. LBSF, together with its Advisor, undertook a process of identifying potential assignees on the basis of a variety of factors, including the credit rating required to satisfy the rating condition set out in the Libra CDSA, familiarity with

complex commercial transaction such as the CDSAs and the financial capabilities of potential assignees, to facilitate a timely analysis and competitive bid.

8. Due to the current economic environment, several potential assignees were not qualified or were otherwise unable to become assignees. LBSF and its advisors identified five potential assignees that met the criteria for assignment, and LBSF entered into confidentiality agreements with those parties. LBSF then continued more detailed discussions on the terms of assignment with potential assignees and provided documentation of the Libra CDSA to facilitate diligence and bidding. In the spring of 2009, LBSF's marketing efforts culminated in a stalking-horse offer by Deutsche Bank, AG London Branch ("DB") that provided for LBSF's assumption and assignment of its interest in the Libra CDSA upon the entry of a final judgment invalidating the Libra Early Termination.

9. After LBSF received the offer from DB, LBSF eventually consummated a stalking horse letter agreement for the assignment and sale of the Libra CDSA and negotiated a break-up fee with DB (the "Letter Agreement"). On June 1, 2009, the Court approved the Debtors' entry into the Letter Agreement and break-up fee with DB, and entered the Order Pursuant to Section 363 of the Bankruptcy Code Approving the Letter Agreement, Including the Payment of the Break-Up Fee, Among Deutsche Bank AG, London Branch and Certain Debtors [Docket No. 3709]. Following the Court's approval of the Letter Agreement, LBSF and SG briefed their respective cross-motions for summary judgment, which were argued on August 26, 2009.

### LBSF's Efforts to Market Its Interest in the Vela CDSA

10. Similar to efforts made with respect to the Libra CDSA, LBSF and its Advisor took steps to market the Vela CDSA. Although there was general interest in LBSF's position in the Vela CDSA and potential assignees were identified, LBSF was not able to reach an agreement to assume and assign the Vela CDSA.

### The Settlement Agreement Was Reached After Arms'-Length Bargaining

11. The Settlement Agreement was negotiated over a period of eight months, in good faith, and as a result of arm's length bargaining. It is not a product of fraud or collusion. The Settlement Agreement is the product of well-informed judgment by the Debtors and achieves a very fair result for the Debtors that will provide significant value – likely, at least four hundred forty-five million dollars – to LBSF's estate.

12. The Debtors have been negotiating the terms of the settlement with SG since late November of 2009. Over the course of eight months, representatives of the Debtors and SG had numerous communications regarding potential settlement parameters, including settlement value and the mechanics of structuring a potential settlement. While the initial settlement offers of SG were unacceptable to the Debtors, as a result of continued settlement negotiations, SG increased its offer over time and eventually reached the level that is now acceptable to the Debtors. During this time, as the Debtors and SG continued to negotiate a settlement, the Debtors were engaged with their counsel and also with the official committee of unsecured creditors appointed in these cases ("the "Creditors' Committee") and its professionals in substantive discussions regarding potential settlement ranges and other issues related to the settlement, and also during this time the Creditors' Committee and/or its professionals met with SG on at least two separate occasions to discuss the settlement terms.

**The Settlement Agreement Is Reasonable and Satisfies the Standard for Approval.**

13. The Settlement Agreement is reasonable and in the best interests of the Debtors, their estates and their creditors. As a result of the Settlement Agreement, it is likely LBSF will receive a minimum of $445 million consisting of an immediate payment of $370 million and $75 million guaranteed by SG.[2] The Settlement Agreement also allows LBSF to assert the Termination Claim against the parties to the Vela and Libra CDSAs, other than SG, thereby maximizing its opportunity to increase the total amount that LBSF may recover to approximately $516.6 million (minus expenses).

14. Although the Letter Agreement with DB or a potential sale transaction for the Vela CDSA *could in theory* result in a greater recovery for LBSF's estate, there are significant risks associated with those transactions that might prevent LBSF from ever recovering *any* value from SG. Specifically, realization of any proceeds from the DB transaction or a potential transaction involving the Vela CDSA are contingent upon: (i) the entry of a fully litigated judgment nullifying the Libra Early Termination or the Vela Early Termination, as applicable, (ii) success on all appeals, and (iii) approval of the assignment transactions. This process could take years to complete, and there is risk that LBSF's recoveries from the transactions may be significantly limited. The Debtors have considered these potential alternatives and their associated risks and believe, in the exercise of the Debtors' business judgment, that the Settlement Agreement is the best available transaction for the Debtors.

15. The Settlement Agreement also avoids continued litigation with SG with respect to the Libra and Vela transactions and eliminates the risks and costs associated

---

[2] While the SG Guarantee is theoretically subject to reduction to the extent SG makes Advances to Libra or Vela and such Advances are not reimbursed to SG from the Global Escrow Account, it is highly doubtful that such a reduction would ever arise.

with that litigation. I am familiar with and have been advised by counsel of the risks to the Debtors of continued litigation against SG. The results of litigation are not certain and further litigation (including the potential for a drawn out appellate process) necessarily will be time-consuming and costly to the Debtors. The certainty of an immediate cash payment by SG is a better alternative for the Debtors than continued litigation with SG.

16. In addition, if the Settlement Agreement is approved, LBSF will be in a better position to recover the approximately $128 million in collateral that LBSF had posted with Libra, because if and when SG becomes the assignee, its current credit rating should help eliminate the need to continue to post that collateral.

17. Based upon all of these considerations, and after consultation with various employees of the Debtors, counsel and other estate advisors, I believe that the Debtors' decision to enter into the Settlement Agreement is supported by sound business reasons and is in the best interests of the Debtors, their estates and creditors. Indeed, it is the collective view of the most senior employees of the Debtors and their professionals familiar with these transactions that this proposed settlement is a fair and equitable result for creditors and is in the best interests of the Debtors. Moreover, the Creditors' Committee supports the Settlement Agreement.

18. LBHI's participation in the Settlement Agreement is reasonable and necessary to allow a global resolution between SG and the Debtors. LBHI played a limited role in the Libra and Vela Credit Default Swap transactions as credit support provider for LBSF. LBHI has no claim to affirmative recoveries under the Libra and Vela Credit Default Swap transactions, but only an obligation to pay LBSF's obligations

to the extent LBSF cannot satisfy such obligations. As such, LBHI's release of its claims against SG with respect to the Libra and Vela transactions is unlikely to have any economic impact on LBHI's estate and should be approved.

**LBSF Has Exercised Sound Business Judgment in Agreeing to Enter into the Libra Assignment Agreement and the Vela Assignment Agreement.**

19. The Assignment Agreements are immensely beneficial to LBSF's estate. The Assignment Agreements are integral components of the Settlement Agreement, will enable LBSF to recover substantial amounts from SG, and will maximize LBSF's opportunity to realize additional recoveries from the transactions. Without the Assignment Agreements, SG will not enter into a settlement with the Debtors that allows the Debtors to continue to assert the Termination Claim because SG will not bear the risk that, after a settlement in which SG makes a substantial payment, a court may find that SG is required to continue to perform under the Senior Swap Agreements.

20. Notwithstanding the assignment of LBSF's interest in the CDSAs to SG, LBSF is maintaining an economic interest in both transactions. Under the sharing agreement, as set forth in the Settlement Agreement, if there is any recovery under the Libra CDSA and the Vela CDSA by SG, as assignee, then, after reimbursement of costs, the parties have agreed to share the proceeds of such recoveries. LBSF has a right of priority to collect the first $100 million with $75 million guaranteed by SG. Thus, other than the break-up fee payable to DB of $20 million, there is no economic loss to LBSF's estate as a result of the Assignment Agreements. Accordingly, LBSF's entry into the Assignment Agreements represents a reasonable exercise of LBSF's business judgment and is in the best interests of creditors.

21. I am not aware of any parties that have any liens, claims, encumbrances, or interests in the Libra CDSA or the Vela CDSA.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 20th day of September, 2010.

*/s/ Robert Hershan*
Robert Hershan