**DAY PITNEY LLP**
Joshua W. Cohen (JC-2978)
James J. Tancredi (JT-3269)
One Audubon Street
New Haven, CT 06511-6433
Telephone:   (203) 752-5000
Facsimile:   (203) 752-5001

– and –

7 Times Square
New York, NY  10036-7311
Telephone:   (212) 297-5800
Facsimile:   (212) 916 2940

*Counsel to Fidelity National Title Insurance Company*

| | |
|---|---|
| **Hearing Date:** | **October 20, 2010** |
| **Hearing Time:** | **10:00 A.M.** |
| **Objection Date:** | **October  13, 2010** |

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., et al., | Case No. 08-13555 (JMP) |
| Debtors. | Jointly Administered |

**FIDELITY NATIONAL TITLE INSURANCE COMPANY'S MOTION TO COMPEL COMPLIANCE WITH REQUIREMENTS OF TITLE INSURANCE POLICIES INSURING DEEDS OF TRUST HELD BY THE BANKRUPTCY ESTATE OF DEBTOR LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTIONS 105, 362, 365 AND 1107 OF THE BANKRUPTCY CODE**

Fidelity National Title Insurance Company ("Fidelity"), party-in-interest in these jointly administered Chapter 11 cases, by its undersigned counsel, respectfully moves for an Order compelling Debtor Lehman Commercial Paper Inc. ("LCPI") to comply with the terms, provisions and requirements of certain title insurance policies (as identified herein) (the "policies") insuring deeds of trust held by the bankruptcy estate of LCPI.  LCPI has failed to

comply with its clear obligation under the policies to cooperate with Fidelity in the defense of

certain pending foreclosure actions and with Fidelity's evaluation of the parties' rights under the

policies with respect to tendered claims.  LCPI's failure to cooperate provides Fidelity with

grounds to deny coverage under the policies.  However, Fidelity appeals to the Court to protect

LCPI from its self-destructive conduct by compelling LCPI to comply with and to perform its

duties under the policies: (i) as part of LCPI's duty to cure outstanding defaults in anticipation of

its assumption of the policies; (ii) as adequate protection for continued performance by Fidelity

under the policies; and (iii) as part of LCPI's duty, as debtor-in-possession, to protect and

preserve estate property.

In support of this Motion, Fidelity states as follows:

## I.    PRELIMINARY STATEMENT:

1.    As more particularly described below, this matter concerns LCPI's failure to

comply with its obligation to cooperate with Fidelity concerning Fidelity's evaluation and

assessment of claims tendered by LCPI against certain title insurance policies insuring deeds of

trust held by LCPI's bankruptcy estate and Fidelity's defense of certain Foreclosure Actions (as

defined herein) underlying those claims.

2.    LCPI is (or was) the Administrative Agent on three syndicated loans made to

finance certain real estate development projects in Southern California known as "McAllister

Ranch," "McSweeny Farms" and "Summerwind Ranch" (collectively, the "Projects").  LCPI

also participated in each of those syndicated loans as a lender.  Fidelity issued certain title

insurance policies to LCPI, as Administrative Agent, with respect to certain deeds of trust

recorded against the Projects to secure the loans.  LCPI tendered certain claims against those title

insurance policies, seeking defense and indemnification relative to mechanics' liens filed against

the Projects.[1] Each of the referenced title insurance policies imposes on LCPI the obligation to cooperate with Fidelity in connection with Fidelity's investigation of both the title insurance claims tendered by LCPI and the available defenses to the assertions of priority over LCPI's lien position by the holders of the mechanics' liens.

3.        Despite its contractual duty to cooperate with Fidelity, including its duty to act in good faith and to engage in fair dealing with Fidelity, LCPI has played "hide the ball" and has failed to grant Fidelity ready access to relevant information, materials and witnesses.  LCPI has denied any duty to cooperate and purposefully has refused to cooperate with Fidelity in its review of the tendered claims, asserting that its only obligation is to assist Fidelity in defending active foreclosure actions.  At the same time, LCPI has undertaken clandestine settlement negotiations in which it sought to use coverage under the referenced policies as currency to achieve a settlement that would prejudice Fidelity's rights.  LCPI's conduct with respect to the referenced policies and the claims by LCPI thereunder provides Fidelity with a basis to deny coverage.  Rather than proceed immediately to deny title insurance coverage to LCPI on the basis that it has failed to satisfy the cooperation requirements under the referenced title insurance policies, Fidelity seeks the Court's assistance in compelling LCPI to cooperate with Fidelity and to share expeditiously with Fidelity the information, documentation and access to witnesses necessary to allow Fidelity to evaluate the tendered claims and to defend LCPI's rights against the assertions of priority by the mechanics' lien holders.[2]

---

[1] Fidelity has undertaken a defense of the mechanics' lien actions in response to LCPI's tenders of the claims against the title insurance policies, subject to a broad reservation of rights.

[2] In connection with this Motion, Fidelity does not seek a determination as to coverage with respect to any pending or future title insurance claim.  However, in the absence of the requested relief, Fidelity will be compelled to pursue a judicial determination as to the effect on coverage of LCPI's failure to cooperate.  Fidelity does not concede that LCPI can establish that its tendered title insurance claims trigger coverage under the policies, as LCPI has deprived Fidelity of the information, documentation and access to witnesses necessary for Fidelity to make a coverage determination.

II.    **JURISDICTION, VENUE, AND AUTHORITY:**

4.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and

157.  Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    This is a core proceeding, as that term is defined in 28 U.S.C. § 157(b)(2)(A), (M)

and (O).

6.    The statutory authorities for the relief requested herein are §§ 105, 362, 365 and

1107 of the Bankruptcy Code.

III.    **FACTUAL BACKGROUND:**

**UNDERLYING LOANS**

7.    A different single-purpose entity holds title to each of the Projects:  LBREP/L-

SunCal McAllister Ranch LLC holds title to McAllister Ranch; LBREP/L-SunCal McSweeny

Farms LLC holds title to McSweeny Farms; and LBREP/L-SunCal Summerwind Ranch LLC

holds title to Summerwind Ranch.  These three single-purpose entities collectively shall be

referred to herein as the "Owners."  (See Affidavit of Michael E. Busch, Esq. in Support of

Fidelity National Title Insurance Company's Motion to Compel Compliance With Requirements

of Title Insurance Policies Insuring Deeds of Trust Held By the Bankruptcy Estate of Debtor

Lehman Commercial Paper Inc. Pursuant to Sections 105, 362, 365 and 1107 of the Bankruptcy

Code, 9/21/10, ¶ 7 (hereinafter "Busch Aff.")).

8.    The Owners are wholly owned subsidiaries of LBREP/L-SunCal Master I LLC

(the "Parent").  The Parent and the Owners are debtors in the jointly administered Chapter 11

bankruptcy cases styled In re LBREP/L-SunCal Master I, LLC, et al., pending in the United

States Bankruptcy Court for the Central District of California and consolidated under Case No.

8:08-bk-15588-ES (the "SunCal Master Bankruptcy").  Alfred H. Siegel has been appointed

Chapter 11 trustee (the "SunCal Trustee") in the SunCal Master Bankruptcy.  (Busch Aff. ¶ 8).

The SunCal Master Bankruptcy is distinct from the bankruptcy cases of the SunCal Debtors, as that term is defined and utilized in the Motion of the SunCal Debtors For An Order Determining That The Automatic Stay Does Not Apply; Or, In The Alternative, Granting Relief From Stay [Doc. ID 8539]. The two bankruptcy cases have separate debtors, creditors and parties-in-interest, all with separate and distinct issues.

9.      LCPI, as Syndication Agent and Administrative Agent for different pools of lenders, agreed to advance funds to the Parent totaling $395 million to finance the development of the Projects. These advances are evidenced by three separate loans. (Busch Aff. ¶ 9).

10.     The first loan ("First Loan"), in the amount of $235 million, closed escrow on January 19, 2006. The Owners guaranteed the Parent's repayment of the First Loan to LCPI and offered their respective Projects as security for their guarantees. Accordingly, each Owner executed a deed of trust in favor of LCPI, which provided security for the First Loan. The deeds of trust were recorded on January 23, 2006, in first position against title to each of the Projects ("First Deeds of Trust"). (Busch Aff. ¶ 10).

11.     The second loan ("Second Loan"), in the amount of $85 million, also closed escrow on January 19, 2006. As with the First Loan, the Owners guaranteed the Parent's repayment of the Second Loan to LCPI and offered their respective Projects as security for their guarantees. Each Owner executed a separate deed of trust in favor of LCPI, as security for its guarantee of the Parent's repayment of the Second Loan. These deeds of trust were recorded on January 23, 2006, in second position against each of the Projects ("Second Deeds of Trust"). (Busch Aff. ¶ 11).

12.     The third loan ("Third Loan"), in the amount of $75 million, closed escrow on February 6, 2007. Once again, the Owners guaranteed the Parent's repayment of the Third Loan to LCPI and offered their respective Projects as security for their guarantees. Each Owner

executed a separate deed of trust in favor of LCPI, as security for its guarantee of the Parent's

repayment of the Third Loan. These deeds of trust were recorded on February 9, 2007, in third

position against title to the Projects ("Third Deeds of Trust"). The three loans, totaling $395

million, collectively are referred to herein as the "Loans."[3]  (Busch Aff. ¶ 12).

14.     On information and belief, the proceeds from the Loans were intended, among

other things, to finance the acquisition, construction, and development of the Projects. (Busch

Aff. ¶ 13).

14.     On information and belief, a portion of the proceeds from the First Loan were

used to satisfy first priority liens on the Projects in favor of Lehman ALI, Inc. ("Lehman ALI").

Lehman ALI provided the Owners with financing, which was utilized by the Owners to acquire

the properties on which the Projects were to be built. The first liens on the Projects in favor of

Lehman ALI, which were satisfied by a portion of the proceeds of the First Loan, were recorded

prior to the commencement of any work on the Projects. (Busch Aff. ¶ 14).

## TITLE INSURANCE POLICIES

### General Title Insurance Law

15.     In connection with title insurance on a mortgage or deed of trust securing a loan,

the title insurer undertakes to indemnify the named insured lender against losses if liens or

adverse claims exist against the property that were not disclosed in the title policy and that are

senior in priority to the insured's lien. See Lawrence v. Chicago Title Ins. Co., 192 Cal. App. 3d

70, 74 (Cal. Ct. App. 1987). "[A] title insurance policy is a contract of indemnity, not one of

guarantee. The insurer does not represent that the title is in any particular condition, but only

agrees to indemnify to the extent the insured suffers a loss caused by defects in the title." Karl v.

Commonwealth Land Title Ins. Co., 20 Cal. App. 4th 972, 978 (Cal. Ct. App. 1993).

---

[3] LCPI owns approximately 30% of the First Loan, 15% of the Second Loan and 65% of the

16.     Title insurance involves first party coverage and, therefore, serves a different purpose than third party coverage.  A "first party claimant" is a named insured or beneficiary, such as the policyholder or a coinsured.  Cal. Title Insurance Practice: Theories and Defenses in Title Company Actions (Cont. Ed. Bar 2d ed. 1998) § 1.3, p. 326, citing Montrose Chem Corp. v. Admiral Ins. Co., 10 Cal. 4th 645, 663 (Cal. 1995).  In contrast, a "third party claimant" asserts a claim "against . . . the interests insured under an insurance policy."  Id.  Title insurance is intended to cover losses sustained by the insured, not third parties.  See Crosky, et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2009), § 6:2504, p. 6H-2 ("Title insurance is another type of 'first party' insurance.  Whether purchased by or on behalf of the property owner or lender, benefits run directly to the insured party").

17.     Since title insurance is designed to indemnify only the insured, except for valid assignees within the scope of the policy's definition of "insured," no person other than a named insured or its successor may enforce the title policy against the insurer.  See Grable v. National Trust and Savings, 164 Cal. App. 2d 710, 713 (Cal. Ct. App. 1958) (borrower could not recover under title policy issued to lender absent assignment, even though policy was paid for by borrower); Kenny v. Safeco Title Ins. Co., 113 Cal. App. 3d 557, 561-62 (Cal. Ct. App. 1980) (seller of real property could not recover under title policy issued to buyer); Walters v. Marler, 83 Cal. App. 3d 1, 33 (Cal. Ct. App. 1978) (buyer could not recover on policy issued to lender).  Fidelity issued a total of five title insurance policies to LCPI to insure the priority of the First Deeds of Trust, the Second Deeds of Trust and the Third Deeds of Trust.

Third Loan.

**The Policies**

18.     Fidelity issued a 1970 form ALTA Loan Policy (10-17-70 and 10-17-84) No. 27-44-94-120334 (the "First Loan Policy"), dated January 19, 2006, naming as insured LCPI and its successors and/or assigns as their interests may appear, with policy limits of $235 million, insuring the priority of the First Deeds of Trust, subject to the provisions of the First Loan Policy.  (Busch Aff. ¶ 15).  A true and correct copy of the First Loan Policy is attached as Exhibit A to the Affidavit of Michael E. Busch, Esq. filed herewith.

19.     Fidelity issued a 1970 form ALTA Loan Policy (10-17-70 and 10-17-84) No. 27-44-94-120335 (the "Second Loan Policy"), dated January 19, 2006, naming as insured LCPI and its successors and/or assigns as their interests may appear, with policy limits of $85 million, insuring that the Second Deeds of Trust were recorded junior only to the First Deeds of Trust, subject to the provisions of the Second Loan Policy.  (Busch Aff. ¶ 16).  A true and correct copy of the Second Loan Policy is attached as Exhibit B to the Affidavit of Michael E. Busch, Esq. filed herewith.

20.     Fidelity thereafter issued three separate 1992 form ALTA Loan Policies, Nos. CAFNT0925-0925-0199-0259902517 (McAllister Ranch), CAFNT0925-0925-0199-0259902518 (McSweeny Farms), and CAFNT0925-0925-0199-0259902519 (Summerwind Ranch) (collectively, the "Third Loan Policies" and, together with the First Loan Policy and the Second Loan Policy, the "Policies"), each dated February 9, 2007, naming as insured LCPI, as Administrative Agent, and its successors and/or assigns as their interests may appear, with policy limits of $25 million each, insuring that the Third Deeds of Trust were recorded junior only to the First Deeds of Trust and the Second Deeds of Trust, subject to the provisions of the Third Loan Policies.  (Busch Aff. ¶ 17).  True and correct copies of the Third Loan Policies are

attached as Exhibits C, D and E, respectively, to the Affidavit of Michael E. Busch, Esq. filed herewith.

21.    Most forms of insurance, such as casualty insurance or errors and omissions insurance, provide coverage for loss caused by a future event, often not within the control of the insured party.  In contrast, a title insurance policy generally indemnifies against losses that arise from conditions of title that exist as of the date of the policy.  The mechanics' lien coverage of the Policies at issue here is intended to protect LCPI from losses arising from liens recorded after the issuance of the operative Policy but for which work was contracted before the date of the Policy, if the liens are asserted to have priority over the insured trust deeds due to construction work having commenced prior to the recording of the insured trust deeds.  The Policies also are intended to cover liens arising from work contracted for or commenced after issuance of the applicable Policy, provided that the loan secured by the insured trust deed was intended for and was actually used to pay for the construction giving rise to the competing liens.  (See Busch Aff., Exhibits A through E).

22.    On information and belief, on or about April 22, 2008, LCPI recorded assignments of its beneficial interests as Agent under the Second Deeds of Trust to Gramercy Warehouse Funding I, LLC ("Gramercy").  (Busch Aff. ¶ 5).  Pursuant to the provisions of the Policies, by virtue of the recorded assignments, Gramercy alleges it is entitled to benefits, if any, under the Second Loan Policy.

23.    On information and belief, on or about April 22, 2008, LCPI recorded assignments of its beneficial interests as Agent under the Third Deeds of Trust to Square Mile Structured Debt (One), LLC and Square Mile Structured Debt (Two), LLC (collectively, "Square Mile").  (Busch Aff. ¶ 5).  Pursuant to the provisions of the Third Loan Policies, by virtue of the

recorded assignments, Square Mile alleges it is entitled to benefits, if any, under the Third Loan
Policies.

24.      The Policies do not contain a choice of law provision.  However, the California
law of contracts applies to the Court's analysis of the terms, provisions and requirements of the
Policies.  As the United States Supreme Court held in Klaxon Co. v. Stentor Electric
Manufacturing Co., 313 U.S. 487, 496-97 (1941), the forum state's conflict of law rules apply to
a determination as to whether the law of the forum state, or the law of another state, applies in
analyzing the parties' rights and liabilities under a contract made and to be performed in a state
other than the state in which the court sits.  See In Re Ionosphere Clubs, 111 B.R. 436, 439 n.3
(Bankr. S.D.N.Y. 1990) (citing Klaxon); In re McCorhill Pub., Inc., 86 B.R. 783, 791 (Bankr.
S.D.N.Y. 1988) (same).  Because this Court sits in the State of New York, New York conflict of
law rules apply to the Court's determination of the appropriate state law that governs the
Policies.  See Ionosphere, 111 B.R. at 439 n.3.  "New York choice of law principles require a
court to apply the law of the state with the most significant relationship with the particular issue
in conflict. . . ."  Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank, 98 N.Y.2d 238, 245 (N.Y.
2002) (citations omitted); see Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309,
317 (N.Y. 1994) (noting New York applies a "grouping of contacts" or "center of gravity"
analysis in determining choice of law in contract cases).  In applying this test, New York courts
consider the place of contracting, the places of negotiation and performance, the location of the
subject matter of the contract and the domicile or place of business of the contracting parties.
See Zurich, 84 N.Y.2d at 317.  Each of the Policies at issue was entered into in California.
Fidelity negotiated the Policies from California and is defending the Foreclosure Actions in
California.  The subject matter of each Policy—real property in California and the deeds of trust
securing the Debtors' obligations under the First Loan, the Second Loan and the Third Loan—

were created, and are recorded, in California.  Finally, Fidelity is domiciled and maintains a

place of business in California.  (Busch Aff. ¶ 18).  All of these factors militate heavily in favor

of applying California law of contracts to the Policies.

## DEBTORS' INTENDED TREATMENT OF THE POLICIES

25.    On or about April 14, 2010, the Debtors filed their amended Joint Chapter 11 Plan

of Lehman Brothers Holdings Inc. And Its Affiliated Debtors (the "Plan") [Doc. ID 8330] and

the corresponding Debtors' Disclosure Statement For Joint Chapter 11 Plan Of Lehman Brothers

Holdings Inc. And Its Affiliated Debtors Pursuant to Section 1125 Of The Bankruptcy Code (the

"Disclosure Statement") [Doc. ID 8332].

26.    Section 10.5 of the Plan provides, in pertinent part, "All of the Debtors' insurance

policies and agreements, documents, or instruments relating thereto, are treated as executory

contracts and shall be deemed assumed under the Plan."  Plan, § 10.5 (emphasis added).

27.    Similarly, Section X.F.4 of the Disclosure Statement states, in pertinent part:

"Pursuant to the Plan, all of the Debtors' insurance policies and any agreements, documents or

instruments relating thereto are treated as executory contracts and shall be deemed assumed

under the Plan."  Disclosure Statement, § X.F.4.

28.    On information and belief, the Policies are included in the "insurance policies and

agreements, documents, or instruments relating thereto" that the Debtors intend to assume under

the terms of the Plan pursuant to 11 U.S.C. § 365.

29.    Section X.F.5 of the Disclosure Statement provides:

> Except as may otherwise be agreed to by the parties, within thirty
> (30) days after the Effective Date, the Debtors will cure any and all
> undisputed defaults under any executory contract or unexpired
> lease assumed by the Debtors pursuant to the Plan, in accordance
> with Section 365(b) of the Bankruptcy Code.  All disputed defaults
> that are required to be cured will be cured either within thirty (30)
> days of the entry of a Final Order determining the amount, if any,

of the Debtor's liability with respect thereto or as may otherwise
be agreed to by the parties.

Disclosure Statement, § X.F.5.  Pursuant to this provision, and consistent with the statutory

requirements of 11 U.S.C. § 365(b)(1)(A), the Debtors have indicated an express intention to

cure outstanding defaults under executory contracts being assumed under the Plan, including any

defaults under the Policies.

## TENDER OF CLAIMS UNDER THE POLICIES

30.     In or about February, 2008, the Parent defaulted on the Loans and the Owners

failed to complete development of the Projects.[4]  (Busch Aff. ¶ 19).

31.     After the Owners ceased work on the Projects, many contractors recorded

mechanics' liens against the Projects.  On information and belief, mechanics' liens with face

amounts totaling $27,232,695.54 have been recorded against title to the Projects ($15,215,594.22

against McAllister Ranch; $5,213,720.12 against McSweeny Farms; and $6,785,381.20 against

Summerwind Ranch).  (Busch Aff. ¶ 20).  A summary schedule of the recorded mechanics' liens

is attached as Exhibit F to the Affidavit of Michael E. Busch, Esq. filed herewith.

32.     A number of the mechanics' lien holders have commenced suit in California

seeking to foreclose on their mechanics' liens, to recover money damages or both.  In each of the

pending actions that seeks to foreclose a mechanics' lien and names one or more of the Fidelity

Insureds as a defendant, the holder of the mechanics' lien asserts that its lien has priority over the

insured deeds of trust.  (Busch Aff. ¶ 21).

33.     In early Spring 2008, LCPI, Gramercy and Square Mile tendered certain claims

(the "Initial Claims") to Fidelity under the Policies, seeking defense and indemnification with

---

[4] Each of the Parent and the Owners were forced into involuntary bankruptcy proceedings in the
Central District of California.  The bankruptcy cases of the Parent and each of the Owners are jointly
administered as the SunCal Master Bankruptcy.

-12-

respect to eleven (11) actions pending in California related to the Projects.  Since that time, LCPI

tendered three (3) additional claims (collectively, the "Additional Claims" and, together with the

Initial Claims, the "Claims") to Fidelity, seeking defense and indemnification with respect to

three (3) additional pending actions.  Of the pending actions tendered to Fidelity for defense and

indemnification, ten (10) of the actions seek to foreclose mechanics' liens recorded against the

Projects (collectively, the "Foreclosure Actions").  (Busch Aff. ¶ 22).  A summary schedule of

the Foreclosure Actions is attached as Exhibit G to the Affidavit of Michael E. Busch, Esq. filed

herewith.  In each of the Foreclosure Actions, the mechanics' lien claimants assert priority over

the insured deeds of trust and other interests recorded against title to the Projects.  In the

aggregate, the mechanics' liens that are the subject of the Foreclosure Actions total more than

$12 million.[5]  (Busch Aff. ¶ 23).

34.     As its preliminary response to the Claims, subject to a comprehensive reservation

of rights, Fidelity is providing a defense to the Foreclosure Actions on behalf of LCPI and

Gramercy with respect to the causes of action asserting priority over their insured trust deeds.[6]

Pending conclusion of its review and investigation of the Claims, Fidelity has not yet made a

determination whether it has an obligation to indemnify LCPI.  (Busch Aff. ¶ 24).

35.     In developing its preliminary response to the Foreclosure Actions, Fidelity has

endeavored to determine whether LCPI has an absolute defense to the claims of priority

including, among other potential grounds, through application of the doctrine of equitable

---

[5] All but one of the  Foreclosure Actions is stayed as a result of the SunCal Master Bankruptcy.
However, due to the fact that, under California mechanics' lien law, a break in priority for one mechanics'
lienor or contractor is a break in priority for all mechanics whose goods or services are provided to the
same work of improvement, see Cal. Civ. Code § 3134; Connolly Dev., Inc. v. Superior Court, 17 Cal. 3d
803, 808 (Cal. 1976), appeal dismissed, 429 U.S. 1056 (1978),  the active Foreclosure Action will serve
as a test case and may result in LCPI being collaterally estopped from challenging priority in the
Foreclosure Actions that are currently stayed.

[6] Square Mile is not a named party in any of the Foreclosure Actions.

subrogation—specifically, whether LCPI is equitably subrogated to the first priority lien position of Lehman ALI by virtue of the satisfaction of Lehman ALI's liens from proceeds of the First Loan. (Busch Aff. ¶ 26). As outlined in detail below, Fidelity's ability to assess the viability of any equitable subrogation claim has been stymied by LCPI's failure to cooperate.

36.    The general rules of priority are subject to certain exceptions based on the principles of equity. One such exception is the doctrine of equitable subrogation. Under this doctrine, a lender who refinances a senior lien (the "subrogee"), without the actual knowledge of existing junior liens, is subrogated to the priority position of the existing senior lienholder, while junior lien claimants remain in their junior positions. 2 Bernhardt, Cal. Mortgage and Deed of Trust Practice (Con.Ed.Bar. 2008), § 9.85. This substitution of the subrogee for the senior lienholder has been called "a sort of assignment by operation of equity." Offer v. Superior Court, 194 Cal. 114, 119 (Cal. 1924).

37.    In the context of real property, the elements of equitable subrogation are: (i) the subrogee advanced money to retire an encumbrance; (ii) at the instance of the property owner or the encumbrancer secured by the property; (iii) under an express or implied understanding that the advance was to be secured by a senior lien on the property; (iv) the subrogee was not a volunteer; (v) the advance is not already secured by a senior lien; (vi) the subrogee is not chargeable with culpable or inexcusable neglect; and (vii) subrogation will not work an injustice to the rights of others. Lawyers Title Ins. Corp. v. Feldsher, 42 Cal. App. 4th 41, 48 (Cal. Ct. App. 1996); Smith v. State Savings & Loan Assn., 175 Cal. App. 3d 1092, 1096 (Cal. Ct. App. 1985); Katsivalis v. Serrano Reconveyance Co., 70 Cal. App. 3d 200, 210 (Cal. Ct. App. 1977).

38.    California cases evaluating a claim for equitable subrogation typically begin by assessing whether the subrogee had "actual knowledge" of an existing lien at the time it advanced funds. Feldscher, 42 Cal. App. 4th at 46. Although not one of the enumerated

"elements," the definition of equitable subrogation inherently requires that the subrogee be ignorant of an intervening lien at the time it advances funds.  See id. at 53-54.

39.    Additionally, in order to qualify for the remedy of equitable subrogation, the subrogee must not be charged with "culpable and inexcusable neglect" in failing to protect the senior priority position of its security interest.  Id. at 53-54; Parker v. Tout, 207 Cal. 590, 592 (Cal. 1929); Simon Newman Co. v. Fink, 206 Cal. 143, 146 (Cal. 1928).

40.    As part of its evaluation of the Claims and development of a strategy for defense of the claims of priority, Fidelity must assess (among other issues) the viability of a claim of equitable subrogation.  In connection with such an evaluation, Fidelity must ascertain whether LCPI (or any other participant in the First Loan) had actual knowledge of the asserted mechanics' liens at the time it made the First Loan and must consider whether the holders of mechanics' liens could charge LCPI (or any other participants in the First Loan) with culpable or inexcusable neglect in the closing or administration of the First Loan.  Fidelity must also understand how the loan proceeds from the First Loan and the Second Loan were disbursed and/or applied at closing.  (Busch Aff. ¶ 27).

## THE DUTY TO COOPERATE

### LCPI's Duty To Cooperate In Defense Of The Foreclosure Actions

41.    The Policies expressly require each insured to cooperate with Fidelity and to provide "all reasonable aid" to Fidelity in defending all actions or proceedings challenging the priority of the lien of the insured deed of trust.

42.    Section 3 of both the First Loan Policy and the Second Loan Policy provides, in relevant part:

> (e)  In all cases where this policy permits or requires the Company [Fidelity] to prosecute or provide for the defense …, the insured hereunder shall secure to the Company [Fidelity] the right to so prosecute or provide defense in such action …, and permit the

-15-

Company [Fidelity] to use, at its option, the name of such insured
for such purpose.  Whenever requested by the Company [Fidelity],
such insured shall give the Company [Fidelity] <u>all reasonable aid
in any such action or proceeding, in effecting settlement, securing
evidence, obtaining witnesses, or prosecuting or defending such
action or proceeding</u>, and the Company [Fidelity] shall reimburse
such insured for any expense so incurred.

(Busch Aff., Exhibit A, First Loan Policy, Section 3(e) (emphasis added); Busch Aff., Exhibit B,

Second Loan Policy, Section 3(e) (emphasis added).

43.      Section 4 of the Third Loan Policy provides, in relevant part:

(d) Whenever requested by the Company [Fidelity], the insured, at
the Company's [Fidelity's] expense, <u>shall give the Company
[Fidelity] all reasonable aid</u> (i) in any action or proceeding,
securing evidence, obtaining witnesses, prosecuting or defending
the action or proceeding, or effecting settlement, and (ii) in any
other lawful act which in the opinion of the Company [Fidelity]
may be necessary or desirable to establish the title to the estate or
interest or the lien of the insured mortgage, as insured.  If the
Company [Fidelity] is prejudiced by the failure of the insured to
furnish the required cooperation, the Company's obligations to the
insured under the policy shall terminate, including any liability or
obligation to defend, prosecute, or continue any litigation, with
regard to the matter or matters requiring such cooperation.

(Busch Aff., Exhibits C, D & E, Third Loan Policy, Section 4(d) (emphasis

added).

44.      In light of the foregoing provisions, because the Foreclosure Actions challenge

the priority of the First Deeds of Trust, the Second Deeds of Trust, and the Third Deeds of Trust,

LCPI, Gramercy, and Square Mile (collectively, the "Lenders"), as Fidelity's insureds, are

contractually required to cooperate with Fidelity in defending these actions and to provide "all

reasonable aid" in connection therewith.

45.      However, the obligation to cooperate falls largely on LCPI because LCPI was the

Syndication and Administrative Agent under all three Loans throughout the active life of the

Loans.[7]  (Busch Aff. ¶ 27).  Consequently, neither Gramercy nor Square Mile is in possession of the information and documentation necessary for Fidelity to challenge the alleged priority of the mechanics' liens.  (Busch Aff. ¶ 28).

### LCPI'S Duty Of Good Faith And Fair Dealing And To Cooperate In Fidelity's Claims Investigation

46.    In addition to the contractual obligation to provide "all reasonable aid" with regard to the defense of the Foreclosure Actions, the Lenders—primarily LCPI—have a duty to cooperate with Fidelity by providing Fidelity with all information in their possession, custody or control reasonably required by Fidelity to determine the parties' respective rights and obligations under the Policies.

47.    The Third Loan Policy, which derives from the 1992 ALTA Loan Policy title insurance form, provides in relevant part:

> [T]he insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company [Fidelity] and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company [Fidelity], all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company [Fidelity], the insured claimant shall grant its permission, in writing, for any authorized representative of the Company [Fidelity] to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage.

(Busch Aff., Exhibits C, D & E, Third Loan Policy, Section 5).

48.    The First Loan Policy and the Second Loan Policy employ an earlier form title insurance policy, the 1970 ALTA Loan Policy form.  Joyce Palomar, in her treatise on title

---

[7] The assignments to Gramercy and Square Mile did not occur until after the Loans went into default and construction of the Projects ceased.  Gramercy and Square Mile assert that they did not receive the requested files.  (Busch Aff. ¶ 28).

insurance law, prepared a side-by-side comparison of the 1970 policy form and the 1992 policy

form.  See Joyce Palomar, Title Insurance Law (2009), App. C2, at 16. [8]  In that comparison,

with regard to the above-quoted "cooperation" provision set forth in Section 5 of the 1992 policy

form, she notes: "The duty of the insured to cooperate in these activities is implicit in the 1970

Policy."  Id.  Consequently and as more fully articulated below, while the cooperation clause

found in Section 5 of the Third Loan Policy is not express in either the First Loan Policy or the

Second Loan Policy, LCPI has an implicit, broad duty to cooperate nonetheless.

49.      "When a contract fails to address an issue, the court has a duty to fill in the gaps

of the contract to preserve and effectuate the overall intentions of the contracting parties . . .

'[A] contract includes not only the terms that have been expressly stated but those implied

provisions indispensable to effectuate the intentions of the parties.'"  State Farm Fire & Cas. Co.

v. Tan, 691 F. Supp. 1271, 1273 (S.D. Cal. 1988) (citing Cal. Civ. Code § 1656 and Tonkin

Construction Co. v. County of Humboldt, 188 Cal. App. 3d 828, 832 (Cal. Ct. App. 1987)).

50.      LCPI's duty to cooperate with Fidelity in connection with its investigation of the

Claims under the First Loan Policy and the Second Loan Policy derives not only from the

implied contractual provisions in the Policies, but also from LCPI's implied duty of good faith

and fair dealing.  "'[T]here is an implied covenant of good faith and fair dealing in every contract

that neither party will do anything which will injure the right of the other to receive the benefits

of the agreement.'"  Kransco v. Int'l Ins. Co., 23 Cal. 4th 390, 400 (Cal. 2000) (quoting

Comunale v. Traders & General Ins. Co., 50 Cal. 2d 654, 658 (Cal. 1958)).

51.      Courts have clearly held that the duty of good faith and fair dealing is implied in

every insurance contract.  See Kransco, 23 Cal. 4th at 400 (citations omitted) ("[T]he 'duty of

---

[8] A copy of Appendix C2, showing the side-by-side comparison of the two policy forms is
attached as Exhibit H to the Affidavit of Michael E. Busch, Esq. filed herewith.

good faith and fair dealing in an insurance policy is a two-way street, running from the insured to his insurer as well as vice versa."); Ctr. Found. v. Chi. Ins. Co., 227 Cal. App. 3d 547, 560 (Cal. Ct. App. 1991) ("It was (and still is) the law that the covenants of good faith and fair dealing implied by law to exist in every contract are binding upon both parties, the insurer as well as the insured."); Liberty Mut. Ins. Co. v. Altfillisch Constr. Co., 70 Cal. App. 3d 789, 797 (Cal. Ct. App. 1977) (holding covenant of good faith and fair dealing is applicable to policies of insurance); see also Federated Dep't Store, Inc. v. Twin City Fire Ins. Co., 28 A.D.3d 32, 37 (N.Y. App. Div. 2006) (holding the covenant of good faith and fair dealing is an integral part of an insurance contract).

52.       "'If a contract is such that a certain performance by one party is necessary in order to earn the compensation that has been promised him, and that performance can not be rendered without the active co-operation of the other party, a promise to render such co-operation will usually be implied.'  3 Arthur L. Corbin, Corbin on Contracts § 570 (1960). Furthermore, 'in any kind of contract, if the right of one party to compensation is conditional upon the rendition of some . . . performance by him or on his behalf, it is nearly always a breach of contract for the other party to act so as to prevent or to hinder and delay . . . the performance of the condition.' Id. § 571." Mimbs v. Commercial Life Ins. Co., 832 F. Supp. 354, 358 (S.D. Ga. 1993).

53.       "The purpose of the cooperation provision is 'to protect the interests of the insurer.' . . . This is particularly true where the insured is the only nonadversary source of information available to the insurer." Arton v. Liberty Mut. Ins. Co., 163 Conn. 127, 134 (Conn. 1972) (internal citations omitted); see also Security Mut. Ins. Co. v. Acker-Fitzsimons Corp., 31 N.Y.2d 436, 440 (N.Y. 1972) ("Notice provisions in insurance policies afford the insurer an opportunity to protect itself . . . and . . . [a]bsent a valid excuse, a failure to satisfy the notice

requirement vitiates the policy."). "[A]n insurer . . . has a reasonable expectation that if the insured suffers a loss claimed to be covered under the . . . policy, the insured will promptly and accurately furnish it with all the information and evidence pertinent to the claim that is known to the insured." California Cas. Gen. Ins. Co. v. Superior Court of San Bernardino, 173 Cal. App. 3d 274, 283 (Cal. Ct. App. 1985), overruled on other grounds by Kransco, 23 Cal. 4th at 407.

54.    Under the terms of the First Loan Policy and the Second Loan Policy, provided there is coverage, Fidelity has an obligation, "without undue delay" to "provide for the defense of an insured in all litigation consisting of actions or proceedings commenced against such insured . . . to the extent that such litigation is founded upon an alleged defect, lien, encumbrance, or other matter insured against by this policy." (Exhibit A to Busch Aff., First Loan Policy, Section 3(a) (emphasis added)); Exhibit B to Busch Aff., Second Loan Policy, Section 3(a) (emphasis added)).

55.    To comply with its requirement to act "without undue delay" to provide for a defense to litigation that "is founded upon an alleged defect, lien, encumbrance, or other matter insured against by" the First Loan Policy and/or the Second Loan Policy, Fidelity must make a prompt determination as to whether the Claims are "founded upon an alleged defect, lien, encumbrance, or other matter insured against by" the First Loan Policy and/or the Second Loan Policy and are otherwise covered under the Policies. However, Fidelity is unable to make such a determination without the cooperation of LCPI to provide all information relevant to Fidelity's assessment of the Claims. Consistent with the duty of good faith and fair dealing and the established contract law principles articulated above, LCPI's failure to provide such cooperation would frustrate the purpose of the Policies from the perspective of Fidelity and would constitute a breach of the First Loan Policy and the Second Loan Policy.

56.     What is more, Fidelity has both a duty and a right thoroughly to investigate the Claims.  California law imposes upon the insurer an obligation to investigate the claim thoroughly.  See Gentry v. State Farm Mut. Auto. Ins. Co., No. Civ. S-09-0671, 2010 U.S. Dist. LEXIS 74815, at *13 (E.D. Cal. 2010) (citations omitted) (holding insurer has a duty "to thoroughly and fairly investigate, process and evaluate the insured's claim"); Jordan v. Allstate Ins. Co., 148 Cal. App. 4th 1062, 1073-74 (Cal. Ct. App. 2007) (holding the insurer has an obligation to investigate thoroughly all grounds for the insured's claim); see also Cal. Code Regs. tit. 10, § 2695.7(d) (providing that each "insurer shall conduct and diligently pursue a thorough, fair and objective investigation" in connection with evaluating coverage and settling claim disputes).  In light of Fidelity's obligation and right to conduct a thorough investigation of the Claims, the express and implied contractual duties of cooperation—articulated above with respect to the Policies—require LCPI to cooperate with Fidelity and to provide Fidelity with all information, documentation and access to witnesses reasonably necessary to determine the rights and obligations of the parties under the Policies with respect to the Claims.

57.     Further, LCPI bears the burden of establishing its entitlement to coverage.  Courts routinely recognize that "the production of an insured's books and records, when requested, is a reasonable condition precedent to recovery."  Horton v. Allstate Ins. Co., 467 N.E.2d 284, 285 (Ill. App. Ct. 1984) (internal citations omitted); see also Farmer v. Allstate Ins. Co., 396 F. Supp. 2d 1379, 1382 (N.D. Ga. 2005) (holding failure to produce requested documentation was a condition precedent and barred recovery under fire policy).   LCPI's failure or refusal to cooperate would hinder or delay Fidelity's satisfaction of its contractual obligations under the Policies to investigate the Claims and would "injure the right of" Fidelity to make a determination as to coverage.

## LCPI'S FAILURE TO PERFORM ITS EXPRESS AND IMPLIED DUTY TO COOPERATE WITH FIDELITY IN ITS CLAIMS INVESTIGATION AND DEFENSE OF THE FORECLOSURE ACTIONS

58.     As more fully articulated below, despite repeated requests from Fidelity, LCPI has failed and refused to provide Fidelity with documents, information and access to witnesses relevant to Fidelity's investigation of the Claims and defense of the Foreclosure Actions. LCPI's failure to cooperate has prevented Fidelity from fulfilling its duty to make a prompt determination as to whether the Claims are covered under the Policies, has made discovery and investigation relative to the Foreclosure Actions more difficult and has generally frustrated the purpose of the Policies from Fidelity's perspective. Left uncured, LCPI's failure to cooperate provides Fidelity with a basis to deny coverage with respect to the Claims and with potential grounds to challenge LCPI's assumption of the Policies under the Plan.

59.     Prior to the Parent's default under the Loans, LCPI (as Syndication and Administrative Agent) was responsible for due diligence, administration, and disbursement of all three Loans. On information and belief, as part of these responsibilities, LCPI maintained budgetary and construction oversight of all three Projects. (Busch Aff. ¶ 28).

60.     On information and belief, as the current or former Syndication and Administrative Agent under all three Loans, LCPI has possession, custody and/or control over all documents, witnesses, and electronic data pertinent to the origination, administration, and disbursement of the Loans and the planning, designing, and construction of the Projects. Fidelity has been informed by Gramercy and Square Mile that LCPI maintained, and still maintains, control of the aforementioned documentation and information through and including April, 2008. (Busch Aff. ¶ 29). Gramercy and Square Mile assumed their roles as agents in April 2008, after the Parent defaulted under the Loans and the Owners ceased construction on the Projects.

61.     Fidelity has repeatedly requested that LCPI produce documentation and information reasonably required to:  (1) assess, evaluate, and defend against the Foreclosure Actions and recorded lien claims; and (2) complete Fidelity's assessment of the Claims and determination as to whether the tendered Claims are insured against by the Policies.[9]  (Busch Aff. ¶ 30).  A summary of the information, documentation and access to third party witnesses requested by Fidelity from LCPI is attached as Exhibit I to the Affidavit of Michael E. Busch, Esq. filed herewith.

62.     Despite Fidelity's repeated requests,  LCPI has sidestepped the requests or engaged in delay tactics to avoid its duty to cooperate by, for instance: (a) providing the same documents numerous times; (b) providing incomplete records; (c) refusing to identify third party inspection and disbursement agents engaged by LCPI and to authorize them to release records to Fidelity; (d) refusing to identify witnesses, including employees or former employees, with relevant information; and (e) refusing to allow Fidelity to contact LCPI-controlled witnesses or LCPI-controlled third parties with pertinent information.  (Busch Aff. ¶ 31).

63.     Through various counsel in California, New York and Florida, LCPI also has engaged in legal tactics designed to avoid or delay compliance with the cooperation provisions of the Policies.  Specifically, rather than provide a complete set of documents and information in an orderly fashion and in an organized format, LCPI has: (i) provided reams of duplicative and nonresponsive documents; (ii) refused to produce certain documents requested; (iii) identified potential witnesses under the express proviso that Fidelity could not contact them; and (iv) baldly stated—through its attorneys—that LCPI did not have any obligation to provide information to

---

[9] Fidelity sought the same information from Gramercy and Square Mile, each of which advised Fidelity that LCPI controls the requested information.  (Busch Aff. ¶ 30).

enable Fidelity to conduct an investigation into whether the Claims are covered under the

Policies.  (Busch Aff. ¶ 32).

64.    Fidelity (through its outside coverage counsel) has sent no fewer than 15

communications to LCPI (through its various attorneys) requesting the documentation and

information required to evaluate the validity, priority, and extent of the mechanics' liens and to

ascertain whether coverage for the tendered Claims exists under the Policies.  Specifically,

counsel for Fidelity sent counsel for LCPI letters and/or e-mail correspondence dated September

17, 2008, October 9, 2008, October 15, 2008, October 23, 2008, October 29, 2008, November

17, 2008, November 21, 2008, December 8, 2008, December 18, 2008, January 6, 2009, May 27,

2009, June 3, 2009, August 27, 2009, October 27, 2009 and February 5, 2010.[10]  (Busch Aff. ¶

33).

65.    At LCPI's instruction, Fidelity directed its inquiries to <u>three different sets of LCPI</u>

<u>attorneys</u>:  (1) attorneys at Allen Matkins Leck Gamble Mallory and Natsis LLP; (2) attorneys at

Cadwalader Wickersham and Taft LLP; and (3) attorneys at Weil Gotshal & Manges LLP.

Despite repeated requests directed to each of these firms, none of the attorneys provided full and

complete cooperation with Fidelity.  Many categories of documentation and information

requested in the referenced correspondence have not been provided and remain outstanding.

(Busch Aff. ¶ 34).

66.    Fidelity's communications to LCPI and its counsel described in detail the

categories of information reasonably required by Fidelity to defend the pending Foreclosure

---

[10] The communications exchanged between Fidelity and LCPI concerning the requested
information, documentation and access to witnesses are protected under California law as part of the
claims investigation privilege.  Consequently, Fidelity does not attach to this Motion the actual
correspondence exchanged with LCPI.  However, Fidelity will make such correspondence available for <u>in</u>
<u>camera</u> review should the Court desire to see such correspondence in connection with its consideration of
the relief requested herein.

Actions and to investigate coverage obligations, risk exposure, and reasonable reserves. (Busch Aff. ¶ 35).

67.    In order to evaluate whether the mechanics' liens have achieved priority over LCPI's insured trust deeds, the merits of any defenses to the Foreclosure Actions, including application of the doctrine of equitable subrogation as referenced above, and whether the tendered Claims are insured under the Policies, Fidelity must have all construction related documents with respect to the Projects. In its communications with LCPI's counsel, Fidelity has identified specific categories of construction documents that it seeks including, without limitation:  records evidencing commencement of construction on the Projects; records of construction interruption and/or cessation at the Projects; documents reflecting sequencing, scheduling and the geographic scope of work; records evidencing construction completion; conditional and unconditional lien releases; inspection reports; preliminary lien notices; and correspondence between or among the Owners, the Parent, LCPI, and the mechanics' lien claimants. (Busch Aff. ¶ 36).

68.    Documents pertaining to Loan administration by LCPI and its agents are necessary to assess the extent, validity and priority of the asserted mechanics' liens, the merits of any defenses to the Foreclosure Actions, including application of the doctrine of equitable subrogation as referenced above, and to confirm that the tendered Claims are insured under the Policies. Specifically, information regarding the creation, performance and modification of LCPI's Loans is necessary to establish, among other things, the extent of any loss claimed under the Policies. Coverage under the Policies is not triggered unless and until LCPI has disbursed the entirety of its construction loan. This includes, without limitation, any funds set aside for "development," funds intended to pay for contractor work, or funds set aside in response to stop notices served by contractors, because a title insurer does not assume the obligation to pay for

the development of a project when the lender refuses to use existing, committed funds to pay for the work performed. (Busch Aff. ¶ 37). See Bankers Trust Co. v. Transamerica Title Ins. Co., 594 F.2d 231, 234 (10th Cir. 1979) ("[w]here . . . work was performed and payment was not made up to the amount of the lender's loan commitment, the resulting mechanic's liens must be considered to have been created or suffered by the insured claimant and such liens are expressly excluded from coverage"); American Sav. and Loan Ass'n v. Lawyers Title Ins. Corp., 793 F.2d 780, 785 (6th Cir. 1986) ("[s]ince full payment [of the loan commitment] could have satisfied the lien claims against the property, the lender's failure to pay satisfied the definitional requirement of the term 'created'"); Brown v. St. Paul Title Ins. Corp., 634 F.2d 1103 (8th Cir. 1980). Furthermore, Fidelity must understand the facts and circumstances surrounding the making and administration of the Loans in order to assess the "culpable or inexcusable neglect" prong of the test for application of the doctrine of equitable subrogation. (Busch Aff. ¶ 37).

69.    Fidelity has identified several categories of loan documents including, without limitation: set aside agreements; documents relating to third-party agreements to indemnify LCPI for losses sustained on the Loans; stop notices; records concerning loan fund segregation after receipt of stop notices; loan disbursement files, including accounting and other records of loan balances throughout the duration of the Loans; records of disbursement and inspection agents retained by LCPI; records of payments made by the Parent or other parties with respect to the Loans; underwriting documentation between LCPI and its investors or affiliates; offering memoranda; underwriting guidelines; the contact information for any construction and disbursement agents utilized by LCPI; and contact information for current or former LCPI employees relative to: (1) Loan origination; (2) Loan administration and disbursement; (3) disbursement requests; (4) Loan balancing; and (5) construction inspection procedures and records. (Busch Aff. ¶ 38).

70.     LCPI has provided some of the requested documentation and information, but has

<u>failed to provide entire categories of information</u> requested.  Examples of LCPI's failure to

cooperate include:

    a.  At the outset, Fidelity forwarded a "Questionnaire to Construction Lender,"

requiring that LCPI provide information to assist Fidelity in its investigation.

LCPI responded by producing boiler-plate discovery responses from one of the

Foreclosure Actions that did not respond to the actual questions and that were

entirely inadequate.  According to LCPI's counsel at Allen Matkins Leck Gamble

Mallory and Natsis LLP, LCPI was justified in refusing to provide the

information on the form because it was allegedly not a "construction lender,"

even though the Loans were intended for development and construction of the

Projects.

    b.  LCPI, through its counsel Cadwalader Wickersham and Taft LLP

("Cadwalader"), expressly prohibited Fidelity from contacting third parties

holding pertinent information, such as construction inspection agent M. Delvin &

Associates ("Delvin") and apparent loan disbursement agent TriMont Real Estate

Advisors ("Trimont").  Moreover, after more than a year, LCPI refuses to confirm

whether or not Trimont was its disbursement agent for the subject Loans, despite

Cadwalader's promises to do so.  Furthermore, LCPI refuses to execute a letter

authorizing LCPI's purported agents to release documents to Fidelity or to

provide personnel to answer Fidelity's questions relating to their knowledge

regarding the Loans or the Projects.

    c.  Cadwalader also provided Fidelity with the names of two purportedly

knowledgeable witnesses.  Immediately thereafter, LCPI's other counsel at Weil

-27-

Gotshal & Manges LLP expressly prohibited Fidelity from contacting those

witnesses. LCPI has neither identified any other witnesses nor agreed to make

anyone available for sworn statements as authorized and/or required under the

Third Loan Policies.

d. LCPI has failed to provide loan disbursement documents and information. Other

than representations by LCPI's attorneys, LCPI has refused to produce any

documents, records or witnesses to confirm that the Loans were fully disbursed.

(Busch Aff. ¶ 39).

71.     As prime evidence of its inconsistency, counsel to LCPI has acknowledged in

correspondence that Fidelity has a duty to complete a coverage review expeditiously and has

demanded that Fidelity immediately complete its coverage analysis with respect to the Claims.

However, LCPI has stated that it has no duty to cooperate in Fidelity's investigation into whether

the Claims fall within coverage under the Policies. Consistent with this policy interpretation,

LCPI has refused to provide the information that Fidelity requested, has refused to allow Fidelity

to interview witnesses or take sworn statements, and has indicated that it will only respond to

those requests by Fidelity that LCPI concludes are necessary to defend LCPI in the Foreclosure

Actions. (Busch Aff. ¶ 40). As noted above, this position is contrary to LCPI's clear duty to

cooperate with Fidelity in connection with its thorough investigation and determination, "without

undue delay," whether the Claims fall within policy coverage and trigger Fidelity's duty to

defend under the Policies. This lack of cooperation provides Fidelity with grounds to deny

coverage with respect to the Claims and, left unresolved, may be an impediment to LCPI's

assumption of the Policies under the Plan.

72.     The Policies are contracts; they provide that Fidelity has not just an obligation but

a right to conduct a thorough examination of each claim. As stated above, California law

establishes this right and obligates the insurer to investigate the claim thoroughly.  See Gentry f. State Farm Mut. Ins. Co., 2010 U.S. Dist. LEXIS 74815 at *13 (E.D. Cal. 2010); Jordan v. Allstate Ins. Co., 148 Cal. App. 4th 1062, 1073-74 (Cal. Ct. App. 2007); Cal. Code Regs. tit. 10, § 2695.7(d).  LCPI's actions—and inaction—have prevented Fidelity from completing its evaluation and assessment of the Claims and its determination of the parties' respective rights and obligations under the Policies and have hindered Fidelity's ability effectively to defend LCPI's interests in the Foreclosure Actions.

73.     As further evidence of LCPI's failure and refusal to provide Fidelity with information relevant to the Claims and the assertions of priority over the insured deeds of trust by the holders of mechanics' liens, LCPI entertained settlement negotiations with the SunCal Trustee and the Official Committee of Unsecured Creditors in the SunCal Master Bankruptcy that included mechanisms for resolving the mechanics' lien claims asserted against the Projects. LCPI undertook these settlement negotiations in secret and did not disclose them to Fidelity. Fidelity ultimately learned of the ongoing negotiations from the SunCal Trustee.  (Busch Aff. ¶ 41).

74.     In May 2009, Fidelity requested that each Lender provide the status and substance of its settlement negotiations with the SunCal Trustee because these negotiations presumably would affect the Lenders' security interests in the Projects and alleged coverage under the Policies.  Gramercy and Square Mile notified Fidelity that neither were in negotiations with the SunCal Trustee.  Despite Fidelity's specific request, LCPI claimed it had no duty to "provide general updates to Fidelity with regard to the bankruptcy."  Rather, LCPI promised that it would provide Fidelity with a copy of any agreement reached with the SunCal Trustee at the time it reached such agreement.  (Busch Aff. ¶ 42).

75.     On October 9, 2009, the SunCal Trustee filed his Motion to Approve Compromise Between Trustee, The Official Committee of Unsecured Creditors, And Lehman Commercial Paper Inc., As Administrative Agent For First Lien Lenders (the "Compromise Motion") in the SunCal Master Bankruptcy.  (Busch Aff. ¶ 43).

76.     The Compromise Motion sought approval of a "Binding Term Sheet" that would have prejudiced Fidelity's rights under the Policies without Fidelity's approval and agreement. (Busch Aff. ¶ 43).  A copy of the Binding Term Sheet is attached as Exhibit J to the Affidavit of Michael E. Busch, Esq. filed herewith.

77.     For the reasons articulated in detail, below, Fidelity objected to the Compromise Motion, highlighting the inadequacies related to the evaluation of the mechanics' liens and the violations of Fidelity's rights under the proposed Binding Term Sheet.  In the face of that objection and the objections of a number of other parties-in-interest, the SunCal Trustee ultimately took the Compromise Motion "off calendar."   (Busch Aff. ¶ 44).

78.     LCPI executed the Binding Term Sheet on August 27, 2009.  However, prior to October 9, 2009, LCPI neither disclosed to Fidelity the status of its settlement negotiations with the SunCal Trustee and the Committee nor provided Fidelity with a copy of the Binding Term Sheet.  (Busch Aff. ¶ 45).

79.     Despite diligent efforts by Fidelity to stay abreast of the settlement negotiations, Fidelity was effectively shut out by LCPI.  The Binding Term Sheet included provisions that would have prejudiced Fidelity's rights under the Policies and, if effective, would have drastically expanded Fidelity's coverage obligations.  (Busch Aff. ¶ 46).

80.     The Binding Term Sheet purportedly would have bound Fidelity to an informal estimation process with respect to lien priority over the insured deeds of trust, without due consideration of Fidelity's express contractual right to control the defense of the lien priority

litigation.  (See Busch Aff., Exhibit A, First Loan Policy, Section 3(c) and (d); Busch Aff.,

Exhibit B, Second Loan Policy, Section 3(c) and (d); Busch Aff., Exhibits C, D & E, Third Loan

Policies, Section 4(b) and (c)).  What is more, without obtaining Fidelity's consent and approval,

LCPI sought to compromise Fidelity's due process right to a formal, judicial determination of

lien priority.  (See Busch Aff., Exhibit A, First Loan Policy, Section 3(d); Busch Aff., Exhibit B,

Second Loan Policy, Section 3(d); Busch Aff., Exhibit C, Third Loan Policies, Section 4(c)).

Moreover, the estimation process agreed to by LCPI would not have incorporated a discovery

process or established any mechanism to ensure factual reliability.  However, despite the

informality and imprecision of the proposed estimation process, it would have exposed Fidelity

to substantial liability for mechanics' liens deemed "senior" to the insured deeds of trust.

81.    Furthermore, the Binding Term Sheet sought to create a process pursuant to

which the mechanics' lien claimants' recourse would be "solely against the proceeds of the Title

Insurance Policy and not to the Properties."  In fact, the Binding Term Sheet would have created

a direct right of action by the mechanics' lien claimants against Fidelity.  As noted above, such a

process is contrary to applicable law concerning title insurance, which indemnifies only the

insured (LCPI), provided the claim is not excluded or excepted from coverage.

82.    The Binding Term Sheet also would have allowed the SunCal Trustee to sue

Fidelity directly if Fidelity failed to pay a lien claim that was deemed senior to LCPI's insured

trust deeds through the estimation process.  However, in order to have standing to sue Fidelity

under the Policies, the SunCal Trustee must be an "insured."  As defined in the Policies, an

"insured" is "the owner of the indebtedness secured by the insured mortgage," or a successor in

ownership to such indebtedness.  The SunCal Trustee does not satisfy that definition.  As such,

through the Binding Term Sheet, LCPI impermissibly sought to alter the explicit contractual

standing requirements of the Policies, to Fidelity's detriment, all without Fidelity's consent and agreement.

83.     Presumably in an effort to facilitate its ability to negotiate away Fidelity's rights, LCPI refused to allow Fidelity to participate in negotiations with the SunCal Trustee concerning settlement. (Busch Aff. ¶ 46). LCPI's conduct with respect to the settlement negotiations with the SunCal Trustee provides Fidelity with a basis to deny coverage with respect to the Claims. The end result was a failure of LCPI's earlier settlement efforts with the SunCal Trustee.

84.     LCPI's pattern of obstructionist conduct has continued in recent weeks in connection with its ongoing settlement negotiations with the SunCal Trustee. In connection with a hearing on July 14, 2010 to consider the SunCal Trustee's motion for relief from stay for authority to sell the properties on which the Projects were to be built and to commence an action in the SunCal Bankruptcy against LCPI, this Court directed the parties to resume their settlement negotiations that had originally given rise to the Binding Term Sheet. Despite the fact that LCPI and the SunCal Trustee were aware of Fidelity's objections to the Binding Term Sheet and of Fidelity's interest in any ultimate settlement, LCPI and the SunCal Trustee apparently elected to undertake their negotiations without Fidelity's participation. It was not until Fidelity contacted LCPI and the SunCal Trustee, through their counsel, to offer assistance in the negotiations that the parties agreed to provide Fidelity with an update on the status of the negotiations and the terms of a proposed settlement. (Busch Aff. ¶ 47).

85.     At the August 18, 2010 omnibus hearing in this case, LCPI advised the Court that it had reached agreement on a new settlement term sheet with the SunCal Trustee. During the course of that hearing, LCPI committed to provide Fidelity with a copy of the new settlement term sheet and to maintain a dialogue with Fidelity concerning the proposed settlement. (Busch Aff. ¶ 48).

-32-

86.    Notwithstanding LCPI's commitment, and despite Fidelity's request, LCPI did not provide Fidelity with a copy of the new settlement term sheet during LCPI's negotiations with the SunCal Trustee.  Rather, Fidelity received a copy of the new settlement term sheet (styled as the Binding Amended and Restated Term Sheet) for the first time on September 2, 2010 when LCPI filed its Motion of Lehman Commercial Paper Inc. Pursuant to Section 105 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 for Approval of That Certain Amended and Restated Compromise By and Among Lehman Commercial Paper, Inc., Alfred H. Siegel, As Chapter 11 Trustee for the SunCal Debtors, and the Official Committee of Unsecured Creditors in the SunCal Bankruptcy Cases in this Court.  (Busch Aff. ¶ 49). Fidelity's response and limited objections to the Binding Amended and Restated Term Sheet will be contained in a separate filing that Fidelity intends to make prior to the established objection deadline.

87.    As noted throughout this Motion, LCPI's conduct in connection with the Policies gives Fidelity a basis to deny coverage.  However, to avoid prejudice to LCPI's creditors on account of LCPI's egregious conduct with respect to the Claims and the Policies, Fidelity has elected not to act on such conduct at this time.  Rather, in an effort to ameliorate the current adversarial relationship between Fidelity and LCPI, Fidelity brings this Motion and seeks the Court's assistance to avoid further violations of the Policies by LCPI and potential harm to LCPI's bankruptcy estate.

## IV.    LEGAL ARGUMENT:

### THE COURT SHOULD DIRECT LCPI TO FURNISH FIDELITY WITH INFORMATION RELATED TO THE CLAIMS AND THE FORECLOSURE ACTIONS IN ANTICIPATION OF PLAN CONFIRMATION

88.    LCPI's refusal to comply with its duty of cooperation under the Policies is entirely inconsistent with LCPI's stated intentions to assume the Policies under the terms of the

-33-

Plan and may create an impediment to such assumption. In anticipation of LCPI's assumption of

the Policies under the Plan and LCPI's statutory obligation to cure all defaults in connection

therewith, the Court should compel LCPI immediately to satisfy its duty of cooperation under the

Policies.

## Applicable Legal Standards

89.    In a case under Chapter 11 of the United States Bankruptcy Code (hereinafter, the

"Code"), Section 365 of the Code allows the trustee to assume or reject an executory contract "at

any time before the confirmation of a plan," subject to Bankruptcy Court approval.  11 U.S.C. §

365(d)(2); see Route 5 Co., LLC v. Penn Traffic Co., 524 F.3d 373, 379 (2d Cir. 2008); In re

Empire Equities Cap. Corp., 405 B.R. 687, 689 (Bankr. S.D.N.Y. 2009); In re EnCap Golf

Holdings, LLC, No. 08-18581, 2008 Bankr. LEXIS 4037, at *8-9 (Bankr. D.N.J. Dec. 24, 2008);

In re Conseco, Inc., 330 B.R. 673, 686 (Bankr. N.D. Ill. 2005) (noting that insurance contracts

are generally considered executory contracts).  Pursuant to Section 1107 of the Code, a debtor-

in-possession holds the same authority as a trustee to assume or reject an executory contract.  See

11 U.S.C. § 1107(a); Penn Traffic, 524 F.3d at 378-79.  Further, Section 1123(b)(2) of the Code

provides that a debtor-in-possession may "provide for the assumption . . . of any executory

contract" in a plan of reorganization filed with the Bankruptcy Court under Chapter 11.  See In re

Texaco Inc., 254 B.R. 536, 556-57 (Bankr. S.D.N.Y. 2000) (so noting).

90.    "Assumption [of an executory contract] is in effect a decision to continue

performance."  Penn Traffic, 524 F.3d at 378 (holding assumption of an executory contract

continues the parties' rights to future performance under the contract).  Further, if a debtor elects

to assume an executory contract, it is deemed to have assumed the entire contract, including all

of the debtor's duties and obligations therein.  See In re Teligent, Inc., 268 B.R. 723, 728 (Bankr.

-34-

S.D.N.Y. 2001); Collier on Bankruptcy ¶ 365.03[1] (Alan N. Resnick & Henry J. Sommer eds.,

16th ed.) (hereinafter "Collier, ¶ __").

91.    Where, however, the debtor has failed to comply with the terms of an executory

contract, Section 365 of the Code mandates that the debtor fulfill three requirements before it

may assume the contract.  Section 365(b)(1) requires the debtor to: (i) cure any outstanding

default or provide the non-debtor with adequate assurance that the default will promptly be

cured; (ii) compensate the counterparty for any pecuniary loss or provide adequate assurance of

compensation; and (iii) provide adequate assurance of future performance.  11 U.S.C. §

365(b)(1)(A)-(C); see Penn Traffic, 524 F.3d at 378; Collier, ¶ 365.06[2] ("The other party to the

contract . . . that the trustee proposes to assume is entitled to insist that any defaults, whenever

they may have occurred, be cured, that appropriate compensation be provided, and that, a past

default having occurred, adequate assurance of future performance be provided.").

92.    The purpose of requiring the debtor to cure its non-performance under the

contract at issue is to ensure that the non-debtor party obtains the benefit of its bargain "by

assuring substantial compliance with the terms of the contract."  Empire Equities, 405 B.R. at

690; see In re Worldcom, Inc., 343 B.R. 486, 496-97 (Bankr. S.D.N.Y. 2006); Collier, ¶

365.06[3][b] ("The idea of cure in the Code is to provide the other party to the contract with the

benefit of its economic bargain.").  The debtor's legal obligation to cure any non-performance

applies to acts or omissions that occurred both prior to and after the debtor's filing of its Chapter

11 petition.  See 11 U.S.C. § 365(b); South St. Seaport Ltd. Pshp. v. Burger Boys (In re Burger

Boys), 94 F.3d 755, 763 (2d Cir. 1996).

93.    The debtor's duty to cure its non-performance under the contract at issue extends

to virtually all instances of non-performance, whether monetary or non-monetary.  See Empire

Equities, 405 B.R. at 691.  As a result of Congress's 2005 amendments to Section 365 of the

Code, there is now "no room for the contention that non-monetary defaults in non-lease

executory contracts are exempt from the cure obligation." Id. at 691 (analyzing the amendments

to Section 365(b)(1)(A) and (b)(2)(D)).  As this Court has held, by amending Section 365

Congress made "clear that most non-monetary defaults are not exempted from the cure

requirements." Id.; see In re 2712 Mission Partners, L.P., No. 08-32226, 2010 Bankr. LEXIS

333, at *9-10 (Bankr. N.D. Cal. Jan. 22, 2010) (holding Section 365 now clearly provides that

the debtor must cure most non-monetary defaults).

**In Anticipation of Proceedings Related to Confirmation of The Plan, The Court Should
Require LCPI to Cure Its Default Under the Policies for Breach of Its Duty of Cooperation**

94.     As discussed above, in the Plan and the Disclosure Statement, LCPI has expressly

stated its intention to treat all insurance policies to which it is a party as executory contracts and

to assume all such insurance policies.  See Plan, § 10.5; Disclosure Statement, § X.F.4.

Accordingly, it is evident that LCPI intends to assume the Policies. Further, in the Disclosure

Statement, LCPI has expressly indicated its intent to cure all outstanding defaults under all

executory contracts, including, by implication, the Policies.  See Disclosure Statement, § X.F.4.

95.     Contrary to its expressed intent to assume the Policies and to cure all outstanding

defaults, LCPI has failed to perform its contractual duty of cooperation under the Policies.

Specifically, LCPI has failed to provide Fidelity with access to information vital to Fidelity's

defense of the Foreclosure Actions and to its assessment of the Claims.  For more than one year,

LCPI has reaped the benefits of Fidelity's obligation under the Policies to defend the priority of

its deeds of trust related to the Projects.  During this time, Fidelity has been defending LCPI in

all of the Foreclosure Actions (subject to a broad reservation of rights).  Fidelity has been doing

so, however, with one hand tied behind its back.  As noted above, Fidelity repeatedly has

requested information from LCPI and its representatives that Fidelity requires to assess the

Claims and to mount an effective defense of LCPI's interests in the Foreclosure Actions,

including the doctrine of equitable subrogation discussed above.  While demanding a vigorous

defense to the Foreclosure Actions and an immediate determination of coverage, LCPI

repeatedly has prevented Fidelity from receiving the benefit of its bargain under the Policies by

failing to provide Fidelity with basic, easily identifiable information related to the construction of

the Projects and LCPI's administration of the Loans, despite clear contractual language and legal

principles mandating LCPI's cooperation.

96.     LCPI's failure to comply with its duty to cooperate has prevented Fidelity from

making a prompt determination as to coverage and has frustrated the purpose of the Policies

from Fidelity's perspective.  (Busch Aff. ¶ 51).  Cf. In re Worldcom, Inc., 343 B.R. 486, 496-97

(Bankr. S.D.N.Y. 2006) ("'Each [parties'] performance goes to the essence of what the other

party sought and expected when he entered into the . . . [contract], and without it, the party will

lose the benefit of the bargain that he thought he struck.'" (citation omitted)).  Moreover, LCPI's

actions (or failure to act) are not only jeopardizing the effectiveness of Fidelity's defense, but

also provide a basis on which Fidelity may seek to deny coverage under the Policies.  (Busch

Aff. ¶ 51).

97.     LCPI has admitted its obligation to cure outstanding defaults under the Policies in

conjunction with its assumption of the Policies under the Plan.  Consequently, it is inevitable that

LCPI must satisfy its duty of cooperation under the Policies.  In fact, it must do so prior to

confirmation of the Plan.  In light of the pendency of the Foreclosure Actions and LCPI's

insistence that Fidelity immediately determine whether the Claims fall within coverage under the

Policies, further delay in LCPI's cure of its default under the Policies is pointless.  Accordingly,

the Court should compel LCPI: (i) to comply with its duty of cooperation  under the Policies as

set forth herein; and (ii) to provide Fidelity with all requested documents, materials, information

and access forthwith.

### THE COURT SHOULD COMPEL LCPI TO SATISFY ITS DUTY OF COOPERATION UNDER THE POLICIES AS ADEQUATE PROTECTION FOR FIDELITY'S INTERESTS IN THE POLICIES

98.     In addition to requiring LCPI to address a potential impediment to assumption of the Policies under the Plan, the Court should require LCPI to perform its obligations under the Policies, including its duty of cooperation, as adequate protection for Fidelity's continued performance under the Policies.

### Applicable Legal Standards

99.     Until a debtor-in-possession assumes or rejects an executory contract, the Bankruptcy Code obligates the non-debtor party to continue its performance.  See In re El Paso Refinery, L.P., 196 B.R. 58, 72 (W.D. Tex. 1996); see also In re Bd. of Dirs. of Compania Gen. De Combustibles S.A., 269 B.R. 104, 113 (Bankr. S.D.N.Y. 2001) (noting non-debtor is obligated to continue performance under executory contract prior to assumption).  However, whereas the non-debtor is obliged to continue its performance prior to assumption or rejection, the debtor is relieved from its duty to perform.  See Calpine Energy Servs., L.P. v. Reliant Energy Electric Solutions, L.L.C. (In re Calpine Corp.), NO. 05-60200, 2009 Bankr. LEXIS 1041, at *15-16 (Bankr. S.D.N.Y. May 7, 2009) (and cases cited therein) (holding the debtor is relieved from its duty of performance during the "gap" period between the filing of its Chapter 11 petition and confirmation of its reorganization plan); El Paso Refinery, 196 B.R. at 72 ("Until an executory contract has been assumed or rejected the Code relieves the debtor of his duty to perform.").

100.     Although the non-debtor party to an executory contract cannot, during the stay period, enforce a prepetition executory contract against the debtor, see Calpine Corp., 2009 Bankr. LEXIS at *15, the non-debtor party is not without recourse or protection.  Section 363(e) of the Bankruptcy Code provides, in pertinent part, that:

> Notwithstanding any other provision of this section, at any time, on request of an
> entity that has an interest in property used . . . by the trustee, the court, with or
> without a hearing, shall prohibit or condition such use . . . as is necessary to
> provide adequate protection of such interest.

11 U.S.C. § 363(e).  In turn, Section 361 of the Bankruptcy Code provides that when adequate

protection is required under section 363 "of an interest of an entity in property," the Court may

order that the debtor provide such protection by: (1) requiring the debtor-in-possession to make a

cash payment; (2) providing the non-debtor an additional or replacement lien, if relevant; or (3)

granting such other relief "as will result in the realization by such entity of the indubitable

equivalent of such entity's interest in such property."  11 U.S.C. § 361(1)-(3).

101.    Most commonly articulated in the context of a creditor's interest in estate

property, the purpose and intent underlying the doctrine of adequate protection is to ensure that a

party with an interest in property being used by the trustee receives the benefit for which it

bargained prior to the debtor's bankruptcy and to preserve the pre-filing status quo.  See, e.g., In

re Pawtuxet Valley Prescription & Surgical Ctr., Inc., No. 07-11767, 2008 Bankr. LEXIS 868, at

*5 (Bankr. D.R.I. Mar. 10, 2008) ("It is generally understood that adequate protection relates to

maintaining the status quo for the period between filing the petition and before confirmation or

rejection of the plan of reorganization. . . .").

**Fidelity Is Entitled to Adequate Protection In the Form of an Order Compelling LCPI's
Cooperation With Its Assessment of the Claims and Its Defense of the Foreclosure Actions**

102.    As discussed in detail in the next Section of the Motion, the Policies are property

of LCPI's bankruptcy estate.  Under the plain language of Section 363(e) of the Bankruptcy

Code, LCPI is using the Policies by:  (a) accepting Fidelity's defense of the Foreclosure Actions

(subject to Fidelity's reservation of rights) and expecting Fidelity to continue such defense; and

(b) implicitly, if not expressly, stating its intent to assume the Policies and to cure all defaults

under the terms of the Plan.   Further, as the counterparty to each Policy that continues to be

-39-

obligated to perform pursuant to Section 365 of the Code, Fidelity unquestionably has an interest in the Policies for purposes of the analysis under Section 363(e) of the Code.  See generally Paloian v. Grupo Serla S.A. de C.V. (In re GGSI Liquidation, Inc.), 351 B.R. 529, 570 (Bankr. N.D. Ill. 2006) (noting the term "interest in property" is not defined by the Code but should be construed broadly).  Fidelity's interest in the Policies includes, but is not limited to its contractual right to LCPI's cooperation in Fidelity's assessment of the Claims and its defense of the Foreclosure Actions.

103.    While LCPI's use of the Policies is inexorably linked with Fidelity's obligation to defend LCPI, the principles of adequate protection, as applied in this case, militate conditioning such use on LCPI's full cooperation with Fidelity's assessment of the Claims and its efforts to defend against the Foreclosure Actions.  As a result of LCPI's continuing failure to furnish Fidelity with the information needed to assess the Claims and to defend LCPI in the Foreclosure Actions, Fidelity's interests under the Policies—and, consequently, LCPI's interests—are at risk and are eroding.  Indeed, the longer it takes Fidelity to obtain the information it needs and to prepare an effective defense, the greater the deterioration is to both parties' interests under the Policies.  Fidelity's interests are particularly at risk because it is being forced to defend under a reservation of rights and to continue to face the potential of exposure to LCPI for indemnity under the Claims without a complete and accurate picture of its potential exposure under the Policies.  (Busch Aff. ¶ 52).

104.    Under Sections 361 and 363 of the Bankruptcy Code, Fidelity is entitled to adequate protection of its interests in the Policies and to receive the benefit and value of its bargain.  In the context of this case, neither a cash payment nor a lien will provide adequate protection to Fidelity.  See 11 U.S.C. § 363(e).  Rather, the Court should order LCPI to provide Fidelity with the information it requires to assess the Claims and to defend LCPI in the pending

Foreclosure Actions. <u>See</u> 11 U.S.C. § 363(e)(3) (providing that the Court may grant such relief "as will result in the realization . . . of the indubitable equivalent" of the non-debtor's interest in property).

## LCPI'S RIGHTS UNDER THE POLICIES CONSTITUTE PROPERTY OF LCPI'S BANKRUPTCY ESTATE WHICH, AS A DEBTOR-IN-POSSESSION, LCPI HAS A FIDUCIARY DUTY TO PROTECT AND CONSERVE

105.      As noted at the beginning of this Motion, Fidelity does not seek a judicial determination as to coverage under the Policies with respect to the tendered Claims. That is an issue that cannot be addressed fully until Fidelity has obtained the information and documentation requested from LCPI. Rather, Fidelity comes to the Court to address LCPI's self-destructive conduct that, left unresolved, will force Fidelity to seek a judicial determination as to the effect of LCPI's failure to cooperate (both as to the availability of coverage and as to the ability of LCPI to assume the Policies under the Plan). In order to avoid these unnecessary consequences, the Court should compel LCPI to satisfy its duty of cooperation and its duty of good faith and fair dealing under the Policies in furtherance of LCPI's duty, as debtor-in-possession, to protect and preserve estate property for the benefit of its creditors.

## <u>Applicable Legal Standards</u>

106.      Section 541 of the Bankruptcy Code contains the Code's broad definition of what constitutes "property" of the bankruptcy estate. <u>See</u> 11 U.S.C. § 541; <u>see</u> <u>Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. (In re Lehman Bros. Holdings Inc.)</u>, 422 B.R. 407, 418 (Bankr. S.D.N.Y. 2010). Property of the bankruptcy estate constitutes, <i>inter alia</i>, "all legal or equitable interests of the debtor in property at the commencement of the case." 11 U.S.C. § 541(a)(1). The Second Circuit has expressly held that a debtor's rights under an insurance policy are property of the debtor's bankruptcy estate. <u>In re St. Clare's Hosp. & Health Ctr.</u>, 934 F.2d 15, 18-19 (2d Cir. 1991); <u>see</u> <u>United States Lines, Inc. v. American S.S. Owners Mut. Protection</u>

& Indem. Ass'n (In re United States Lines, Inc.), 197 F.3d 631, 637 (2d Cir. 1999), cert. denied,

529 U.S. 1038 (2000) (acknowledging that debtor's rights under certain personal injury

indemnity policies were property of the debtor's bankruptcy estate); Peterson v. 610 West 142

Owners Corp. (In re 610 W. 142 Owners Corp.), 219 B.R. 363, 371 (Bankr. S.D.N.Y. 1998) ("A

chapter 11 debtor's rights under its insurance policies are property of the estate under § 541(a) of

the Code.").

107.    A determination that a particular legal or equitable interest constitutes property of

the debtor's bankruptcy estate triggers obligations on the part of the estate fiduciary to protect

and preserve the property. Northwest Airlines Corp. v. Ass'n of Flight Attendants-CWA (In re

Northwest Airlines Corp.), 349 B.R. 338, 369 (S.D.N.Y. 2006), aff'd, 483 F.3d 160 (2d Cir.

2007). Where, as in most Chapter 11 cases, no trustee is appointed and the debtor-in-possession

occupies the role of trustee, this obligation vests in the debtor. See 11 U.S.C. § 1107(a); see also

11 U.S.C. §§ 704, 1106; In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir. 2004) (holding

where no trustee is appointed, the Code vests the debtor-in-possession with the powers that

otherwise would vest in the trustee). "The debtor-in-possession is a fiduciary, obligated to

maximize the value of the estate, treat all parties to the case fairly, and protect and conserve the

debtor's property" for the benefit of the estate's creditors. Northwest Airlines Corp., 349 B.R. at

369; see McClelland v. Grubb & Ellis Consulting Servs. Co. (In re McClelland), 418 B.R. 61, 67

(Bankr. S.D.N.Y. 2009) ("The debtor-in-possession bears a fiduciary duty to the estate and to

creditors."); In re Ngan Gung Rest., No. 95-B-40383, 2000 Bankr. LEXIS 1342, at *9-10 (Bankr.

S.D.N.Y. 2000) (holding a "trustee has the statutory duty to protect and preserve property of the

estate for purposes of maximizing a distribution to creditors"). As a fiduciary, the debtor-in-

possession is personally liable for deliberate or negligent acts or omissions that cause harm to the

bankruptcy estate. See Ngan Gung, 2000 Bankr. LEXIS at *11 (so stating).

**The Court Should Not Allow LCPI To Trigger**
**Denial of Coverage For Lack of Cooperation**

108.    LCPI's rights in and under the Policies unequivocally constitute property of

LCPI's bankruptcy estate.  Indeed, by expressing its intention to assume all insurance policies—

including, by implication, the Policies issued by Fidelity—LCPI has tacitly acknowledged that

the policies are beneficial to and constitute property of its bankruptcy estate.  See In re Footstar,

Inc., 323 B.R. 566, 568-59 (Bankr. S.D.N.Y. 2005) (holding the analysis whether to assume or

reject an executory contract properly focuses on whether, in the debtor's business judgment,

assumption would be beneficial to its estate); see also Eagle Ins. Co. v. BankVest Capital Corp.

(In re BankVest Capital Corp.), 290 B.R. 443, 448 (B.A.P. 1st Cir. 2003), aff'd, 360 F.3d 291

(1st Cir. 2004), cert. denied, 542 U.S. 919 (2004) (holding that if "a debtor wants to assume [an

executory contract] in its business judgment, . . . the debtor should be allowed to do so").

109.    However, the Policies have value only if there is coverage.  As a debtor-in-

possession, LCPI has a fiduciary obligation to its creditors and to its own bankruptcy estate to

take all steps necessary to protect and conserve the Policies for the estate.  In the context of this

case, LCPI's fiduciary duty to protect and conserve property of its estate requires it fully and

completely to satisfy its express and implied contractual duty to cooperate with Fidelity in its

defense of the Foreclosure Actions and in its evaluation and analysis of the Claims.

110.    To date, LCPI has breached its duty of cooperation by failing to provide Fidelity

with the requested information related to the Claims and the Foreclosure Actions and by denying

any duty and refusing to provide any cooperation in connection with Fidelity's coverage

investigation.  LCPI's continuing failure to furnish Fidelity with the information it seeks

significantly impairs Fidelity's evaluation of the Claims and its defense of LCPI's rights in the

Foreclosure Actions.  Moreover, LCPI's failure to cooperate and to provide "all reasonable aid"

constitutes a basis for Fidelity to deny coverage under each of the Policies and may be an

impediment to LCPI's ultimate assumption of the Policies under the Plan. By placing continued coverage under the Policies at risk, LCPI is endangering property of the estate and engaging in conduct that may constitute a breach of its fiduciary duties as a debtor-in-possession. While Fidelity has not yet determined whether LCPI has met its burden to establish coverage with respect to the Claims, Fidelity may seek to deny coverage because of LCPI's failure to provide the information, documentation and access to witnesses necessary for Fidelity to complete its coverage investigation unless the requested relief is granted. (Busch Aff. ¶ 53).

111.    Because LCPI is engaging in conduct that may result in a denial of coverage under the Policies and harm to its bankruptcy estate, Fidelity requests that the Court issue an order compelling LCPI to comply with its obligations under the Policies and applicable law forthwith.

## V.    <u>MEMORANDUM OF LAW:</u>

112.    Because the legal points and authorities upon which this Motion relies are incorporated herein, Fidelity respectfully requests that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, Fidelity respectfully requests that the Court enter an Order directing LCPI immediately to: (i) comply with its duty to cooperate with and to provide "all reasonable aid" to Fidelity in connection with Fidelity's assessment of the Claims and defense of the Foreclosure Actions; (ii) provide Fidelity with the documents and information, access to witnesses and access to third party claims and disbursement agents, as previously requested; and (iii) provide Fidelity with such other and further relief as the Court deems just and proper.

Dated at New Haven, Connecticut, this 21st day of September, 2010.

FIDELITY NATIONAL TITLE INSURANCE
COMPANY

By:      /s/ Joshua W. Cohen
Joshua W. Cohen (JC-2978)
James J. Tancredi (JT-3269)
DAY PITNEY LLP
One Audubon Street
New Haven, CT 06511-6433
Tel:     (203) 752-5008
Fax:     (203) 752-5001
E-mail: jwcohen@daypitney.com

*Counsel for Fidelity National Title Insurance
Company*