DAY PITNEY LLP
Joshua W. Cohen (JC-2978)
James J. Tancredi (JC-3269)
One Audubon Street
New Haven, CT 06511-6433
Telephone:  (203) 752-5000
Facsimile:   (203) 752 -5001

– and –

7 Times Square
New York, NY  10036-7311
Telephone:  (212) 297-5800
Facsimile:   (212) 916 2940

*Counsel to Fidelity National Title Insurance Company*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: <br><br> LEHMAN BROTHERS HOLDINGS INC., et al., <br><br> Debtors. | Chapter 11 <br><br> Case No. 08-13555 (JMP) <br><br> Jointly Administered |

**AFFIDAVIT OF MICHAEL E. BUSCH, ESQ. IN SUPPORT OF**
**FIDELITY NATIONAL TITLE INSURANCE COMPANY'S MOTION TO COMPEL**
**COMPLIANCE WITH REQUIREMENTS OF TITLE INSURANCE POLICIES**
**INSURING DEEDS OF TRUST HELD BY THE BANKRUPTCY ESTATE OF DEBTOR**
**LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTIONS 105, 362, 365 AND**
**1107 OF THE BANKRUPTCY CODE**

I, Michael E. Busch, Esq., being duly sworn, hereby declare as follows:

1.   I am a Senior Vice-President for Fidelity National Title Insurance Company

("Fidelity") with the title of Regional Major Claims Counsel.  I submit this Affidavit in support

of Fidelity's Motion to Compel Compliance with Requirements of Title Insurance Policies

Insuring Deeds of Trust Held by the Bankruptcy Estate of Debtor Lehman Commercial Paper

Inc. Pursuant to Sections 105, 362, 365 and 1107 of the Bankruptcy Code (hereinafter the "Motion to Compel"). The facts set forth herein are true, based upon my own personal knowledge, except as to those matters stated on information and belief, which matters I believe to be true. If called upon to testify as a witness in this matter, I could and would testify competently thereto.

2. I have held the position of Regional Major Claims Counsel with Fidelity since September 1, 2008. Before that, I was in the private practice of law at various law firms for more than 20 years. My private law practice included work as an outside counsel for various title insurance companies.

3. I am the custodian of and maintain, in the ordinary course of business, files (hereinafter referred to as the "File") that contain, *inter alia*, documents and records in Fidelity's possession pertaining to the following matters that are the subject of Fidelity's Motion to Compel: (a) the title insurance Policies (as defined herein and in the Motion to Compel); (b) the First Loan, the Second Loan and the Third Loan (as defined herein and in the Motion to Compel); (c) the deeds of trust (as defined herein and in the Motion to Compel); and (d) the Claims and the Foreclosure Actions (as defined herein and in the Motion to Compel). As custodian of the File relevant to these matters, I am authorized to submit this Affidavit on Fidelity's behalf.

### McAllister Ranch, McSweeny Farms and Summerwind Ranch

4. Documents received by Fidelity and maintained in the File reflect that Debtor Lehman Commercial Paper Inc. ("LCPI") is (or was) the Administrative Agent on three syndicated loans made to finance certain real estate development projects in Southern California known as McAllister Ranch, McSweeny Farms and Summerwind Ranch (collectively, the

"Projects"). Such records also reflect that LCPI participated in each of those syndicated loans as a lender.

5. Fidelity issued certain title insurance Policies to LCPI, as Administrative Agent, with respect to certain deeds of trust recorded against the Projects to secure the referenced loans. LCPI was the original named insured under the Policies. However, upon information and belief, on or about April 22, 2008, LCPI assigned certain of its interests as beneficiary of the deeds of trust recorded against the Projects to Gramercy Warehouse Funding I LLC ("Gramercy") and to Square Mile Structured Debt (One) LLC and Square Mile Structured Debt (Two) LLC (collectively, "Square Mile"). LCPI, Gramercy and Square Mile are referred to collectively herein as the "Insureds."

6. Fidelity's Insureds tendered claims against the Policies for defense of certain mechanics' lien foreclosure actions that had been filed in the State of California in connection with the Projects. Fidelity's Insureds also sought indemnification from Fidelity in the event that any mechanics' liens were determined to have priority over their deeds of trust on each of the Projects, as insured and subject to the provisions of the Policies. I am the in-house counsel at Fidelity to whom the claims tendered by Fidelity's Insureds are assigned for administration.

## Underlying Loans

7. Documents contained in the File reflect that a different single-purpose entity holds title to each of the Projects: LBREP/L-SunCal McAllister Ranch LLC holds title to McAllister Ranch; LBREP/L-SunCal McSweeny Farms LLC holds title to McSweeny Farms; and LBREP/L-SunCal Summerwind Ranch LLC holds title to Summerwind Ranch. These three single-purpose entities collectively shall be referred to herein as the "Owners."

8. The File also reflects that the Owners are wholly owned subsidiaries of LBREP/L-SunCal Master I LLC (the "Parent"). Upon information and belief, the Parent and the Owners are debtors in the jointly administered Chapter 11 bankruptcy cases styled In re LBREP/L-SunCal Master I, LLC, et al., pending in the United States Bankruptcy Court for the Central District of California and consolidated under Case No. 8:08-bk-15588-ES (the "SunCal Master Bankruptcy"). Upon information and belief, Alfred H. Siegel has been appointed Chapter 11 trustee (the "SunCal Trustee") in the SunCal Master Bankruptcy.

9. Documents received by Fidelity and maintained in the File reflect that LCPI, as Syndication Agent and Administrative Agent for different pools of lenders, agreed to advance funds to the Parent totaling $395 million to finance the development of the Projects. These advances are evidenced by three separate loans, as described in the following paragraphs.

10. Documents received by Fidelity and maintained in the File reflect that the first loan ("First Loan"), in the amount of $235 million, closed escrow on January 19, 2006 and that the Owners guaranteed the Parent's repayment of the First Loan to LCPI and offered their respective Projects as security for their guarantees. Each Owner executed a deed of trust in favor of LCPI, which provided security for the First Loan. Documents received by Fidelity and maintained in the File reflect that the deeds of trust were recorded on January 23, 2006, in first position against title to each of the Projects ("First Deeds of Trust").

11. Documents received by Fidelity and maintained in the file reflect that the second loan ("Second Loan"), in the amount of $85 million, also closed escrow on January 19, 2006 and that, as with the First Loan, the Owners guaranteed the Parent's repayment of the Second Loan to LCPI and offered their respective Projects as security for their guarantees. Each Owner executed a separate deed of trust in favor of LCPI, as security for its guarantee of the Parent's repayment

of the Second Loan. Documents received by Fidelity and maintained in the File reflect that these deeds of trust were recorded on January 23, 2006, in second position against each of the Projects ("Second Deeds of Trust").

12. Documents received by Fidelity and maintained in the File reflect that the third loan ("Third Loan"), in the amount of $75 million, closed escrow on February 6, 2007 and that, once again, the Owners guaranteed the Parent's repayment of the Third Loan to LCPI and offered their respective Projects as security for their guarantees. Each Owner executed a separate deed of trust in favor of LCPI, as security for its guarantee of the Parent's repayment of the Third Loan. Documents received by Fidelity and maintained in the File reflect that these deeds of trust were recorded on February 9, 2007, in third position against title to the Projects ("Third Deeds of Trust"). The three loans, totaling $395 million, collectively are referred to herein as the "Loans."

13. Upon information and belief, the proceeds from the Loans were intended, among other things, to finance the acquisition, construction, and development of the Projects.

14. Upon information and belief, and based upon my review of documents contained in the File, a portion of the proceeds from the First Loan were used to satisfy first priority liens on the Projects in favor of Lehman ALI, Inc. ("Lehman ALI"). Upon information and belief, Lehman ALI provided the Owners with financing, which was utilized by the Owners to acquire the properties on which the Projects were to be built. It is also my understanding and belief that the first liens on the Projects in favor of Lehman ALI, which were satisfied by a portion of the proceeds of the First Loan, were recorded prior to the commencement of any work on the Projects.

## The Policies

15. Fidelity issued a 1970 form ALTA Loan Policy (10-17-70 and 10-17-84) No. 27-44-94-120334 (the "First Loan Policy"), dated January 19, 2006, naming as insured LCPI and its successors and/or assigns as their interests may appear, with policy limits of $235 million, insuring the priority of the First Deeds of Trust, subject to the provisions of the First Loan Policy. A true and accurate copy of the First Loan Policy is attached hereto as Exhibit A.

16. Fidelity issued a 1970 form ALTA Loan Policy (10-17-70 and 10-17-84) No. 27-44-94-120335 (the "Second Loan Policy"), dated January 19, 2006, naming as insured LCPI and its successors and/or assigns as their interests may appear, with policy limits of $85 million, insuring that the Second Deeds of Trust were recorded junior only to the First Deeds of Trust, subject to the provisions of the Second Loan Policy. A true and accurate copy of the Second Loan Policy is attached hereto as Exhibit B.

17. Fidelity issued three separate 1992 form ALTA Loan Policies, Nos. CAFNT0925-0925-0199-0259902517 (McAllister Ranch), CAFNT0925-0925-0199-0259902518 (McSweeny Farms), and CAFNT0925-0925-0199-0259902519 (Summerwind Ranch) (collectively, the "Third Loan Policies" and, together with the First Loan Policy and the Second Loan Policy, the "Policies"), each dated February 9, 2007, naming as insured LCPI, as Administrative Agent, and its successors and/or assigns as their interests may appear, with policy limits of $25 million each, insuring that the Third Deeds of Trust were recorded junior only to the First Deeds of Trust and the Second Deeds of Trust, subject to the provisions of the Third Loan Policies. True and accurate copies of the Third Loan Policies are attached hereto as Exhibits C, D and E, respectively.

18.     Fidelity negotiated the Policies from California, where Fidelity is domiciled, maintains a place of business and is defending the Foreclosure Actions. The subject matter of each Policy—real property in California and the deeds of trust securing the Debtors' obligations under the First Loan, the Second Loan and the Third Loan—is located and/or recorded in California.

## Tender of Claims Under the Policies

19.     Upon information and belief, in or about February, 2008, the Parent defaulted on the Loans and the Owners failed to complete development of the Projects.

20.     Upon information and belief, mechanics' liens with face amounts totaling $27,232,695.54 have been recorded against title to the Projects ($15,215,594.22 against McAllister Ranch; $5,213,720.12 against McSweeny Farms; and $6,785,381.20 against Summerwind Ranch). A summary schedule of the recorded mechanics' liens, which is maintained by Fidelity in the File in the ordinary course of business, is attached hereto as Exhibit F. The information reflected in Exhibit F is based on records and information that Fidelity has received and maintained in the File.

21.     Upon information and belief and based on my review of documents received by Fidelity and maintained in the File, a number of the mechanics' lien holders have commenced suit in California seeking to foreclose on their mechanics' liens, to recover money damages or both. Based upon my review of documents and pleadings contained in the File, in each of the pending actions that seeks to foreclose a mechanics' lien and names one or more of the Fidelity Insureds as a defendant, the holder of the mechanics' lien asserts that its lien has priority over the deeds of trust insured under the Policies.

22. In early Spring 2008, LCPI, Gramercy and Square Mile tendered certain claims (the "Initial Claims") to Fidelity under the Policies, seeking defense and indemnification with respect to eleven (11) actions pending in California related to the Projects. Since that time, LCPI tendered three (3) additional claims (collectively, the "Additional Claims" and, together with the Initial Claims, the "Claims") to Fidelity, seeking defense and indemnification with respect to three (3) additional pending actions. Of the pending actions tendered to Fidelity for defense and indemnification, ten (10) of the actions seek to foreclose mechanics' liens recorded against the Projects (collectively, the "Foreclosure Actions"). A summary schedule of the Foreclosure Actions, which is maintained by Fidelity in the File in the ordinary course of business, is attached hereto as Exhibit G. The information contained in Exhibit G is based on records and information Fidelity has received and maintained in the File.

23. Upon information and belief, in each of the Foreclosure Actions, the mechanics' lien claimants assert priority over the insured deeds of trust and other interests recorded against title to the Projects. In the aggregate, the mechanics' liens that are the subject of the Foreclosure Actions total more than $12 million.

24. Subject to a comprehensive reservation of rights, Fidelity is providing a defense to the Foreclosure Actions on behalf of LCPI and Gramercy with respect to the causes of action asserting priority over their insured trust deeds. Pending conclusion of Fidelity's review and investigation of the Claims, Fidelity has not yet made a determination whether it has an obligation to indemnify LCPI (to the extent LCPI has suffered any loss, to date, which Fidelity denies).

25. Upon information and belief, Square Mile is not a named party in any of the Foreclosure Actions.

26. In developing its preliminary response to the Foreclosure Actions, Fidelity has endeavored to determine whether LCPI has an absolute defense to the claims of priority including, among other potential grounds, through application of the doctrine of equitable subrogation—specifically, whether LCPI is equitably subrogated to the first priority lien position of Lehman ALI by virtue of the satisfaction of Lehman ALI's liens from proceeds of the First Loan.

27. As part of its evaluation of the Claims and development of a strategy for defense of the claims of priority, Fidelity must assess (among other issues) the viability of a claim of equitable subrogation. In connection with such an evaluation, Fidelity must ascertain whether LCPI (or any other participant in the First Loan) had actual knowledge of the asserted mechanics' liens at the time it made the First Loan and must consider whether the holders of mechanics' liens could charge LCPI (or any other participants in the First Loan) with culpable or inexcusable neglect in the closing or administration of the First Loan. Fidelity must also understand how the loan proceeds from the First Loan and the Second Loan were disbursed and/or applied at closing.

### LCPI's Failure to Cooperate With Fidelity's Investigation and Defense of the Foreclosure Actions

28. Upon information and belief, prior to the Parent's default under the Loans, LCPI (as Syndication and Administrative Agent) was responsible for due diligence, administration, and disbursement of all three Loans. Upon further information and belief, as part of these responsibilities, LCPI maintained budgetary and construction oversight of all three Projects.

29. Upon information and belief, as the current or former Syndication and Administrative Agent under all three Loans, LCPI has possession, custody and/or control over all documents, witnesses, and electronic data pertinent to the origination, administration, and

disbursement of the Loans and the planning, designing, and construction of the Projects. Fidelity has been informed by Gramercy and Square Mile that LCPI maintained, and still maintains, control of the aforementioned documentation and information through and including April, 2008.

30. In connection with its investigation of the Claims and its defense of the Foreclosure Actions, Fidelity has requested various forms of information from LCPI. Fidelity has repeatedly requested that LCPI produce documentation and information reasonably required to: (1) assess, evaluate, and defend against the Foreclosure Actions and recorded lien claims; and (2) complete Fidelity's assessment of the Claims and determination as to whether the tendered Claims are insured against by the Policies. Fidelity sought the same information from Gramercy and Square Mile, each of which advised Fidelity that LCPI controls the requested information. A summary of the information, documentation and access to third party witnesses requested by Fidelity from LCPI, which is maintained by Fidelity in the File in the ordinary course of business, is attached hereto as Exhibit I. The information contained in Exhibit I is derived from and based on information and documents received by Fidelity and maintained in the File.

31. Despite Fidelity's requests, LCPI has failed to provide Fidelity with documents, information and access to witnesses relevant to Fidelity's defense and investigation of the Foreclosure Actions. For example, LCPI has: (a) provided the same documents numerous times; (b) provided incomplete records; (c) refused to identify third party inspection and disbursement agents engaged by LCPI and to authorize the third party inspection and disbursement agents to release records to Fidelity; (d) refused to identify witnesses, including employees or former employees, with relevant information; and (e) refused to allow Fidelity to contact LCPI-controlled witnesses or LCPI-controlled third parties with pertinent information.

32.   Further, rather than provide a complete set of documents and information in an orderly fashion and in an organized format, LCPI, through various counsel in California, New York and Florida, has: (i) provided reams of duplicative and nonresponsive documents; (ii) refused to produce certain documents requested; (iii) identified potential witnesses under the express proviso that Fidelity could not contact them; and (iv) stated—through its attorneys—that LCPI did not have any obligation to provide information to enable Fidelity to conduct an investigation into whether the Claims are covered under the Policies.

33.   Fidelity (through its outside coverage counsel) has sent no fewer than 15 communications to LCPI (through its various attorneys) requesting the documentation and information required to evaluate the validity, priority, and extent of the mechanics' liens and to ascertain whether coverage for the tendered Claims exists under the Policies. Specifically, at my or other claims counsel's direction, counsel for Fidelity sent counsel for LCPI letters and/or e-mail correspondence dated September 17, 2008, October 9, 2008, October 15, 2008, October 23, 2008, October 29, 2008, November 17, 2008, November 21, 2008, December 8, 2008, December 18, 2008, January 6, 2009, May 27, 2009, June 3, 2009, August 27, 2009, October 27, 2009 and February 5, 2010.[1]

34.   At LCPI's instruction, Fidelity (through its counsel) directed its inquiries to three different sets of LCPI attorneys: (1) attorneys at Allen Matkins Leck Gamble Mallory and Natsis LLP; (2) attorneys at Cadwalader Wickersham and Taft LLP; and (3) attorneys at Weil Gotshal & Manges LLP. Despite repeated requests directed to each of these firms, none of the

---

[1] The communications exchanged between Fidelity and LCPI concerning the requested information, documentation and access to witnesses are protected under California law as part of the claims investigation privilege. Consequently, the actual correspondence exchanged with LCPI is not attached to this Affidavit. However, such correspondence will be made available for in camera review should the Court desire to see such correspondence in connection with its consideration of the relief requested in Fidelity's Motion to Compel.

attorneys provided full and complete cooperation with Fidelity. Many categories of documentation and information requested in the referenced correspondence have not been provided and remain outstanding.

35. Fidelity's communications to LCPI and its counsel described in detail the categories of information reasonably required by Fidelity to defend the pending Foreclosure Actions and to investigate coverage obligations, risk exposure, and reasonable reserves.

36. In order to evaluate whether the mechanics' liens have achieved priority over LCPI's insured trust deeds, the merits of any defenses to the Foreclosure Actions, including application of the doctrine of equitable subrogation as referenced above, and whether the tendered Claims are insured under the Policies, Fidelity requires all construction related documents with respect to the Projects. In its communications with LCPI's counsel, Fidelity's counsel has identified specific categories of construction documents that it seeks including, without limitation: records evidencing commencement of construction on the Projects; records of construction interruption and/or cessation at the Projects; documents reflecting sequencing, scheduling and the geographic scope of work; records evidencing construction completion; conditional and unconditional lien releases; inspection reports; preliminary lien notices; and correspondence between or among the Owners, the Parent, LCPI, and the mechanics' lien claimants.

37. Fidelity also requires documents pertaining to Loan administration by LCPI and its agents. Those documents are necessary to assess the extent, validity and priority of the asserted mechanics' liens, the merits of any defenses to the Foreclosure Actions, including application of the doctrine of equitable subrogation as referenced above, and to confirm that the tendered Claims are insured under the Policies. Specifically, Fidelity requires information

regarding the creation, performance and modification of LCPI's Loans to establish, among other things, the extent of any loss claimed under the Policies. Coverage under the Policies is not triggered unless and until LCPI has disbursed the entirety of its construction loan. This includes, without limitation, any funds set aside for "development," funds intended to pay for contractor work, or funds set aside in response to stop notices served by contractors. Furthermore, Fidelity must understand the facts and circumstances surrounding the making and administration of the Loans in order to assess the "culpable or inexcusable neglect" prong of the test for application of the doctrine of equitable subrogation.

38. In its requests to LCPI for documents and information, Fidelity has identified several categories of loan documents including, without limitation: set aside agreements; documents relating to third-party agreements to indemnify LCPI for losses sustained on the Loans; stop notices; records concerning loan fund segregation after receipt of stop notices; loan disbursement files, including accounting and other records of loan balances throughout the duration of the Loans; records of disbursement and inspection agents retained by LCPI; records of payments made by the Parent or other parties with respect to the Loans; underwriting documentation between LCPI and its investors or affiliates; offering memoranda; underwriting guidelines; the contact information for any construction and disbursement agents utilized by LCPI; and contact information for current or former LCPI employees relative to: (1) Loan origination; (2) Loan administration and disbursement; (3) disbursement requests; (4) Loan balancing; and (5) construction inspection procedures and records.

39. The File maintained by Fidelity related to LCPI reflects that LCPI has provided some of the requested documentation. However, LCPI has failed to provide entire categories of

information requested. Following are examples of documents and information that LCPI has failed to provide:

    a. Fidelity forwarded a "Questionnaire to Construction Lender," requiring that LCPI provide information to assist Fidelity in its investigation. In response, LCPI produced to Fidelity boiler-plate discovery responses from one of the Foreclosure Actions that did not respond to the actual questions and that were entirely inadequate. According to LCPI's counsel at Allen Matkins Leck Gamble Mallory and Natsis LLP, LCPI was justified in refusing to provide the information on the form because it was allegedly not a "construction lender," even though the Loans were intended for development and construction of the Projects.

    b. LCPI, through its counsel Cadwalader Wickersham and Taft LLP ("Cadwalader"), expressly prohibited Fidelity from contacting third parties holding pertinent information, such as construction inspection agent M. Delvin & Associates ("Delvin") and apparent loan disbursement agent TriMont Real Estate Advisors ("Trimont"). Moreover, after more than a year, LCPI refuses to confirm whether or not Trimont was its disbursement agent for the subject Loans, despite Cadwalader's promises to do so. Furthermore, LCPI refuses to execute a letter authorizing LCPI's purported agents to release documents to Fidelity or to provide personnel to answer Fidelity's questions relating to their knowledge regarding the Loans or the Projects.

    c. Cadwalader also provided Fidelity with the names of two purportedly knowledgeable witnesses. Immediately thereafter, LCPI's other counsel at Weil Gotshal & Manges LLP expressly prohibited Fidelity from contacting those

witnesses. LCPI has neither identified any other witnesses nor agreed to make anyone available for sworn statements as authorized and/or required under the Third Loan Policies.

   d. LCPI has failed to provide loan disbursement documents and information. Other than representations by LCPI's attorneys, LCPI has refused to produce any documents, records or witnesses to confirm that the Loans were fully disbursed.

40.  Counsel to LCPI has acknowledged in correspondence to Fidelity, contained in the File, that Fidelity has a duty to complete a coverage review expeditiously and has demanded that Fidelity immediately complete its coverage analysis with respect to the Claims. However, LCPI has stated that it has no duty to cooperate in Fidelity's investigation into whether the Claims fall within coverage under the Policies. Consistent with this policy interpretation, LCPI has refused to provide the information that Fidelity requested, has refused to allow Fidelity to interview witnesses or take sworn statements, and has indicated that it will only respond to those requests by Fidelity that LCPI concludes are necessary to defend LCPI in the Foreclosure Actions.

### LCPI's Negotiations with the SunCal Trustee and the Official Committee of Unsecured Creditors in the SunCal Master Bankruptcy

41.  On information and belief, in 2009 LCPI entertained settlement negotiations with the SunCal Trustee and the Official Committee of Unsecured Creditors in the SunCal Master Bankruptcy that included mechanisms for resolving the mechanics' lien claims asserted against the Projects. LCPI did not disclose these settlement negotiations to Fidelity. Fidelity ultimately learned of the ongoing negotiations, but only when a motion to approve the compromise was filed with the Bankruptcy Court

42. In May 2009, Fidelity requested that each of the Insureds provide the status and substance of its settlement negotiations with the SunCal Trustee because these negotiations presumably would affect the security interests in the Projects and alleged coverage under the Policies. Gramercy and Square Mile notified Fidelity that neither were in negotiations with the SunCal Trustee. Despite Fidelity's specific request, LCPI claimed it had no duty to "provide general updates to Fidelity with regard to the bankruptcy." Rather, LCPI promised that it would provide Fidelity with a copy of any agreement reached with the SunCal Trustee at the time it reached such agreement.

43. Upon information and belief, on October 9, 2009, the SunCal Trustee filed his Motion to Approve Compromise Between Trustee, The Official Committee of Unsecured Creditors, And Lehman Commercial Paper Inc., As Administrative Agent For First Lien Lenders (the "Compromise Motion") in the SunCal Master Bankruptcy. The Compromise Motion sought approval of a "Binding Term Sheet" that would have prejudiced Fidelity's rights under the Policies without Fidelity's approval and agreement. A true and accurate copy of the Binding Term Sheet is attached hereto as Exhibit J.

44. Fidelity objected to the Compromise Motion. In the face of that objection and the objections of a number of other parties-in-interest, the SunCal Trustee ultimately took the Compromise Motion "off calendar."

45. Upon information and belief, LCPI executed the Binding Term Sheet on August 27, 2009. However, prior to October 9, 2009, LCPI neither disclosed to Fidelity the status of its settlement negotiations with the SunCal Trustee and the Committee nor provided Fidelity with a copy of the Binding Term Sheet.

46.     Despite diligent efforts by Fidelity to stay abreast of the settlement negotiations, LCPI refused to allow Fidelity to participate in its negotiations with the SunCal Trustee, even though the Binding Term Sheet included provisions that would have prejudiced Fidelity's rights under the Policies and, if effective, would have drastically expanded Fidelity's coverage obligations.

47.     LCPI's pattern of conduct has continued in recent weeks in connection with its ongoing settlement negotiations with the SunCal Trustee. On information and belief, at the Court's direction, LCPI and the SunCal Trustee resumed their settlement negotiations following the July 14, 2010 omnibus hearing in this case. However, LCPI and the SunCal Trustee apparently elected to undertake their renewed negotiations without Fidelity's participation. It was not until Fidelity's counsel, at my direction, contacted LCPI and the SunCal Trustee, through their counsel, to offer assistance in the negotiations that the parties agreed to provide Fidelity with an update on the status of the negotiations and the terms of a proposed settlement.

48.     On information and belief, at the August 18, 2010 omnibus hearing in this case, LCPI advised the Court that it had reached agreement on a new settlement term sheet with the SunCal Trustee. On further information and belief, during the course of that hearing, LCPI committed to provide Fidelity with a copy of the new settlement term sheet and to maintain a dialogue with Fidelity concerning the proposed settlement.

49.     Notwithstanding that commitment, Fidelity did not receive a copy of the new settlement term sheet during LCPI's negotiations with the SunCal Trustee. Fidelity received a copy of the new settlement term sheet (styled as the Binding Amended and Restated Term Sheet) for the first time on September 2, 2010 when LCPI filed in this Court its Motion of Lehman Commercial Paper Inc. Pursuant to Section 105 of the Bankruptcy Code and Federal Rule of

Bankruptcy Procedure 9019 for Approval of That Certain Amended and Restated Compromise By and Among Lehman Commercial Paper, Inc., Alfred H. Siegel, As Chapter 11 Trustee for the SunCal Debtors, and the Official Committee of Unsecured Creditors in the SunCal Bankruptcy Cases.

50. LCPI has failed to provide Fidelity with access to information vital to Fidelity's defense of the Foreclosure Actions and to its assessment of the Claims. LCPI's continuing failure to furnish Fidelity with the information it seeks significantly impairs Fidelity's defense of LCPI's rights in the Foreclosure Actions and its evaluation of the Claims.

51. LCPI's failure to furnish Fidelity with the information it seeks has prevented Fidelity from making a prompt determination as to coverage and has frustrated the purpose of the Policies from Fidelity's perspective. Moreover, LCPI's actions (or failure to act) are not only jeopardizing the effectiveness of Fidelity's defense of the Foreclosure Actions, but also provide a basis on which Fidelity may seek to deny coverage under the Policies. LCPI's conduct with respect to its settlement negotiations with the SunCal Trustee also supports denial of coverage with respect to the Claims.

52. As a result of LCPI's failure to furnish Fidelity with the information needed to assess the Claims and to defend LCPI in the Foreclosure Actions, Fidelity's interests under the Policies—and, consequently, LCPI's interests—are at risk and are eroding. The longer it takes Fidelity to obtain the information it needs and to prepare an effective defense to the Foreclosure Actions, the greater the deterioration is to both parties' interests under the Policies. Fidelity's interests are particularly at risk because it is being forced to defend under a reservation of rights and to continue to face the potential of exposure to LCPI for indemnity under the Claims without a complete and accurate picture of its potential exposure under the Policies.

53.    While Fidelity has not yet determined whether LCPI has met its burden to establish coverage with respect to the Claims, Fidelity may seek to deny coverage because of LCPI's failure to provide the information, documentation and access to witnesses necessary for Fidelity to complete its coverage investigation unless the relief requested in Fidelity's Motion to Compel is granted.

_____
Michael E. Busch

Sworn and subscribed to before me this
21st day of September, 2010

_____
Notary Public
My Commission Expires:    Feb. 17, 2012

MAUREEN K. RANCOUR
Commission # 1791301
Notary Public - California
Orange County
My Comm. Expires Feb 17, 2012