# EXHIBIT A

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

William R. Maguire
Direct Dial: 212-837-6879
maguire@hugheshubbard.com

November 4, 2009

By Electronic Mail
Hamish P.M. Hume, Esq.
Boies, Schiller & Flexner LLP
5301 Wisconsin Ave., NW
Washington, DC 20015

Re:     *In re Lehman Brothers Holdings Inc., et al.*, Case No. 08-
13555 (JMP) (Bankr. S.D.N.Y.) (Jointly Administered); *In
re Lehman Brothers Inc.*, Case No. 08-1420 (JMP) (Bankr.
S.D.N.Y.)

Dear Hamish:

I write concerning two discrete issues. The first concerns a potential expert issue and the second is just to confirm that you are distributing documents as you receive them from third parties.

First, with respect to Barclays' claim for $769 million from LBI's Rule 15c3-3 customer reserve account, I know we have a contractual dispute as to whether Barclays' contractual entitlement is conditional on regulatory approval (based on there being a sufficient excess in the account), as the Trustee maintains, or is unconditional, as Barclays' maintains.

Please advise me whether Barclays is also taking the position that LBI's Rule 15c3-3 account had, in fact, an excess of $769 million or more, properly computed in compliance with the Rule, as of September 19, 2008.

The reason I raise the latter issue is to make sure neither of us suffers any surprises as we approach the expert phase of our schedule. As you may know, the Trustee filed an affidavit by Daniel McIsaac, dated October 5, 2009, in support of the Trustee's Allocation motion. The McIsaac affidavit demonstrates that substantial errors were made in Lehman's Rule 15c3-3 calculation for September 19, 2008, and that there was a shortfall in the 15c3-3 reserve that exceeded some $3.7 billion as of September 19, 2008. Please advise me if, for any reason Barclays proposes to dispute this testimony or the existence of the shortfall. Assuming Barclays reserves the right to dispute this shortfall with expert testimony, then I would propose that you take Mr. McIsaac's affidavit as the Trustee's expert report on this issue, and that Barclays provide its rebuttal report on January 10, along with its other expert reports.

60833444_1.doc

New York    ■    Washington, D.C.    ■    Los Angeles    ■    Miami    ■    Jersey City    ■    Paris    ■    Tokyo

2

Second, Barclays has served subpoenas on a number of third parties, including Lazard and Simpson Thacher.  Please advise if Barclays has received documents in response to these or any other subpoenas issued by Barclays and please confirm your agreement that Barclays will provide copies of all documents it obtains from any subpoenaed third parties within three days of their receipt.  Counsel for LBHI and the Creditors' Committee will also require notification and copies of documents on the same timetable.

Very truly yours,

Bill

WRM/NJO

cc.    Robert W. Gaffey, Jones Day
       James C. Tecce, Quinn Emanuel Urquart Oliver & Hedges

60833444_1.doc

# EXHIBIT B

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern

Attorneys for Barclays Capital Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:                                ) | |
|                                       ) | |
| Lehman Brothers Inc.,                 ) | Case No. 08-01420 (JMP) |
|                                       ) | SIPA |
|                      Debtor.          ) | |
|                                       ) | |
|                                       ) | |
|                                       ) | |
| In re:                                ) | Chapter 11 |
|                                       ) | |
| Lehman Brothers Holdings Inc., et al. ) | Case No. 08-13555 (JMP) |
|                                       ) | (Jointly Administered) |
|                      Debtors.         ) | |
|                                       ) | |

**BARCLAYS CAPITAL INC.'S THIRD REQUEST FOR PRODUCTION OF
DOCUMENTS TO THE TRUSTEE IN THE SECURITIES INVESTOR
PROTECTION ACT LIQUIDATION OF LEHMAN BROTHERS INC.**

Barclays Capital Inc. ("Barclays"), through its attorneys and pursuant to Rule

7034 of the Federal Rules of Bankruptcy Procedure and Rule 34 of the Federal Rules of

Civil Procedure, serves this Third Request for Production and Inspection of Documents

on James W. Giddens, as Trustee in the Securities Investor Protection Act Liquidation of

Lehman Brothers Inc. (the "Trustee").

The Trustee is to produce, at the offices of Boies, Schiller & Flexner, LLP, 575 Lexington Avenue, 7th Floor, New York, New York 10022, within thirty (30) days after service of this Document Request, the documents identified herein:

## DEFINITIONS AND INSTRUCTIONS

1.      Pursuant to Rule 7026-1 of the Local Bankruptcy Rules of the Southern District of New York, these Requests incorporate by reference the Uniform Definitions in Discovery Requests set forth in Rule 26.3 the Local Rules of the Southern District of New York.

2.      "$7 Billion Cash Amount" shall mean the $7 billion in cash that was understood by Barclays as of the time of the September 22, 2008 Closing to have been posted to a Barclays account at JPMC because certain collateral had not been transferred to Barclays as anticipated in the Fed Replacement Transaction.

3.      "15c3-3 Asset" shall mean any assets that LBHI and LBI agreed to transfer to Barclays from LBI's 15c3-3 account, including those ultimately referenced in paragraph 8(ii) of the Clarification Letter.

4.      The words "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to make the request intelligible and to bring within the scope of these requests any document that might be deemed outside its scope by another construction.

5.      "Acquired Financial Assets" shall mean the Repo Collateral, the Clearance Box Assets, the 15c3-3 Asset, the Exchange-Traded Derivatives, and the Margin.

6.      "Asset Purchase Agreement" or "APA" means the Asset Purchase Agreement, dated as of September 16, 2008, among Lehman Brothers Holdings Inc.,

Lehman Brothers Inc., LB 745 LLC, and Barclays Capital Inc.

7.   "Barclays" means Barclays Capital Inc. and all subsidiaries and affiliates thereof.

8.   "BNYM" means Bank of New York Mellon.

9.   The "Clarification Letter" means the letter agreement dated as of September 20, 2008, addressed from Barclays Capital Inc. to Lehman Brothers Holdings Inc., Lehman Brothers Inc., and LB 745 LLC, Attn. Steven Berkenfeld, Esq., executed on September 22, 2008.

10.   "Clearance Box Assets" shall mean the assets referenced in paragraph 1(a)(ii)(B) of the Clarification Letter.

11.   The "December 2008 JPMC Settlement Approval Motion" means the Motion under 11 U.S.C. §§ 105 & 365 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement, filed on December 5, 2008, Docket No. 387 in Case No. 08-1420 (JMP).

12.   The term "document" has the broadest meaning accorded to it under the Federal Rules of Civil Procedure, and includes but is not limited to all written, printed, typed, reported, recorded, pictorial or graphic matter, however produced or reproduced, now or at the time of possession, custody or control, including, but not limited to, all court submissions, drafts, letters, telegrams, telexes, e-mail transmissions, cables, professionals' time records, telephone records and notations, invoices, ledgers, journals, and other formal and informal books of record and account, logs, studies, summaries, minutes, agendas, bulletins, notices, announcements, charts, manuals, models, graphs, instructions, financial statements, photographs, videotapes, microfilm, other film or tapes,

3

reports, brochures, publications, books, memoranda, notes, notebooks, drafts, worksheets, contracts, agreements, proposed contracts or agreements (whether or not actually consummated), computer data, computer printouts, graphics, statistics, interoffice memos, computer programs, computer software, tape recordings, transcriptions, drafts of the foregoing items, articles of newspapers, magazines and other publications, purchase orders, lists, proposals, plans, specifications, addenda, statements, receipts, confirmations slips, evidence of payments, bills, diaries, calendars, Day Timers, time records, bills of lading, canceled checks (both sides), audiotapes and copies or reproductions of the foregoing upon which notations in writing have been made which do not appear on the originals.

13.    "Exchange Traded Derivatives" means the exchange traded derivatives positions encompassed by section 1(a)(ii)(C) of the Clarification Letter, exclusive of any Margin posted in respect of those positions.

14.    "Fed Replacement Transaction" means the transaction by which Barclays stepped into the shoes of the New York Federal Reserve (the "Fed") in providing Lehman Brothers Inc. funding of $45 billion on September 18, 2008, as described in the Declaration of Shari D. Leventhal in Support of Trustee's Motion for Entry of an Order Approving a Settlement Agreement, which was submitted in support of the December 2008 JPMC Settlement Approval Motion.

15.    "First Amendment to the Asset Purchase Agreement" means the First Amendment to Asset Purchase Agreement dated as of September 19, 2008, among Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC, and Barclays Capital Inc.

4

16.    "Interested Party" shall mean Weil, Gotshal & Manges LLP; Simpson

Thacher & Bartlett LLP; Milbank, Tweed, Hadley & McCloy LLP; LBHI; the Official

Committee of Unsecured Creditors of LBHI; Deloitte & Touche LLP; Alvarez & Marsal;

Houlihan Lokey Howard & Zukin Capital, Inc; and Lazard Freres & Co. LLC.

17.    "JPMC" means JP Morgan Chase Bank, N.A.

18.    "JPMC Settlement Assets" shall mean the assets and cash transferred to

Barclays as a result of the settlement agreement entered into by JPMC, the LBI Trustee,

and Barclays as of December 22, 2008.

19.    "LBI" means Lehman Brothers Inc.

20.    "LBI Trustee" means James W. Giddens, Trustee in the Securities Investor

Protection Act Liquidation of Lehman Brothers Inc.

21.    "LBHI" means Lehman Brothers Holdings Inc. and all subsidiaries and

affiliates thereof, including LBI.

22.    "Margin" means any property, whether in the form of securities, letters of

credit, cash, or any other form, posted by or on behalf of LBI, whether as margin,

guaranty or clearing fund deposits, or any other form, to secure obligations in respect of

the Exchange Traded Derivatives.

23.    The "Movants" refer to LBHI, the Official Committee of Unsecured

Creditors of LBHI and the LBI Trustee.

24.    "OCC" means The Options Clearing Corporation, all affiliates and

subsidiaries thereof, and any agent, servant, employee or representative of any of the

foregoing.

25.    "Purchase Agreement" shall be defined as that term is defined in the Sale

Orders.

26.    "Repo Collateral" means the collateral actually transferred to Barclays as part of the Fed Replacement Transaction, which shall be defined for purposes of these Requests to include the $7 Billion Cash Amount.

27.    "Reserve Account" means Special Reserve Bank Account for the Exclusive Benefit of Customers pursuant to 17 C.F.R. § 240.15c3-3(e).

28.    "Rule 60 Motion" refers to each of the Motions filed by the Movants on September 15, 2009, including

(a) the Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and granting other relief,

(b) the Motion of Lehman Brothers Holdings Inc., pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the SIPA Sale Order and Joinder in Official Committee of Unsecured Creditors' Motions for Relief from SIPA Sale Order,

(c) the Trustee's Motion for Relief Pursuant to the Sale Orders or, alternatively, for Certain Limited Relief Under Rule 60(b),

(d) the Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., pursuant to 11 U.S.C. § 105(A), Fed. R. Civ. P. 60(B), and Fed. R. Bankr. P. 9024, for Relief from Order under 11 U.S.C. §§ 105(A), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order), and Joinder in Debtors' and SIPA

Trustee's Motions for an Order Under Rule 60(B) to Modify Sale Order, and Joinders to (a) – (d) above.

29. "Sale Orders" means the Court's (i) Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008, and (ii) Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings Inc. Chapter 11 Proceeding.

30. "Sale Transaction" means the transaction in which assets were transferred to Barclays and liabilities were assumed by Barclays pursuant to the Purchase Agreement.

31. "September 22, 2008 Closing" or the "Closing" shall mean the closing of the Sale Transaction that occurred on the morning of September 22, 2008.

32. "TAA" means the Transfer and Assumption Agreement entered into as of September 20, 2008 among LBI, Barclays and OCC.

33. "You" and "Your" refers to the entity or individual upon whom these Requests are served, and any agent, servant, employee or representative of that entity or individual.

34. The singular form of a word shall be interpreted as plural, and the plural form of a word shall be interpreted as singular, as required by the context to make the requests intelligible and to bring within the scope of the requests any information or

7

documents which might otherwise be considered to be beyond their scope.

35.    Each document requested herein shall be produced as it is kept in the usual and regular course of business.

36.    These requests are continuing, so as to require supplemental responses in the event that LBHI, or any person or entity acting on its behalf, obtains additional information or documents called for by these requests between the time of the original response and the time of trial.

37.    If any objection is made to all or part of a document request, produce documents (or parts of documents) responsive to those portions of the request to which no objections is made, and produce documents (or parts of documents) responsive to the request to the extent they are not covered by the objection(s).

38.    These requests call for the production of all documents within the responding party's possession, custody or control, regardless of the physical location of the documents or their actual custodian. If any responsive documents are believed to be in the custody of other persons, such as current or former attorneys or accountants for the responding party (or any entity controlled or operated by the responding party) but are not being produced by the responding party, please identify the person(s) in whose custody such potentially responsive documents are believed to be located, and state the reasons why the documents are not being produced in response to these requests.

39.    If any objection is made to all or part of a document request, produce documents (or parts of documents) responsive to those portions of the request to which no objections is made, and produce documents (or parts of documents) responsive to the request to the extent they are not covered by the objection(s).

8

40.    If any document called for by these requests is withheld on the ground of privilege or any other ground, identify the specific ground upon which the objection is based and the particular request objected to.  Identify the information withheld or objected to by furnishing sufficient information to describe the document in a subpoena and in all events by furnishing the following information: (a) identify the document, specifying its author, addressee(s), date, subject matter and person(s) to whom copies were furnished; (b) describe the document in a manner sufficient to identify it and its location; and (c) as to each such document, set forth each and every fact which constitutes the basis on which privilege is claimed.

41.    All requested documents must be produced pursuant to the specifications set forth below:

A.    Production of Electronically Stored Information

i.    Form of Production.  Please provide all documents as Group IV single page tiff format files imaged at 300 dpi.  Name each tiff file with a unique name matching the Bates number labeled on the corresponding page.  Group every 1000 tiffs into a new folder; do not create a separate folder for each document.

ii.    Image Load File.  Provide an image load file (Opticon file) that contains document boundaries.

iii.    Document Text.  For documents that were originally stored as native electronic files and which do not have redactions, the extracted (not OCRed), full text from the body of each document will be produced in separate

9

.txt files named for the bates number of the associated image, in the same directory as the image.

For documents that were originally stored as native electronic files and which have redactions, the OCR text will be produced from the redacted image(s) associated with each document, in separate .txt files named for the bates number of the associated image, in the same directory as the image. Any redacted, privileged material should be clearly labeled to show the redactions on the tiff image.

iv.    Special File Types. For files created by Excel or other spreadsheet programs, PowerPoint or other presentation programs, database files, and any other file types that reasonably require viewing in their native format for a full understanding of their content and meaning, produce the file in native format. The produced file should be named with the bates number of the first page of the corresponding tiff production of the document (e.g., "ABC00001.xls").

v.    De-Duplication. Please produce a single unique copy of a given e-mail message and its attachments or standalone file, with a field of semicolon-delimited references to each custodian/location in which a copy originally appeared. For e-mail messages, please consolidate duplicates based on an MD5 hash generated from BCC, Body, CC, From, IntMsgID, To, and Attach (semicolon delimited string of first level attachments in the e-mail) properties. For e-mail attachments or standalone electronic files, please consolidate duplicates based on an MD5 hash of the entire file.

vi.    <u>Document Metadata.</u>  Produce extracted metadata for each

document in the form of a .dat file, and include the following fields where

applicable.

| | |
|---|---|
| Bates Range Begin | The bates label of the first page of the document |
| Bates Range End | The bates label of the last page of the document |
| Bates Family Range Begin | The bates label of the first page of a family of documents (e.g., email and attachment) |
| Bates Family Range End (optional) | The bates label of the last page of a family of documents |
| Subject (Email Metadata) | The subject line of an e-mail |
| File Name (Metadata) | The filename of an e-mail attachment or stand-alone e-file |
| Sent Date (Email Metadata) | For email, the sent date/time stamp of the message in the custodian's time zone |
| Send Date (Email Metadata) Time | If you are unable to provide date and time in a single field above, provide the time portion separately |
| Created Date (Blended Metadata) | For efiles or attachments, the MS Office creation date/time, or PDF creation date/time, or operating system creation date/time, in the custodian's time zone |
| Created Date (Blended Metadata) Time | If you are unable to provide date and time in a single field above, provide the time portion separately |
| Last Modified Date (Blended Metadata) | For efiles or attachments, the MS Office last modified date/time, or PDF last modified date/time, or operating system last modified date/time, in the custodian's time zone |
| Last Modified Date (Blended Metadata) Time | If you are unable to provide date and time in a single field above, provide the time portion separately |
| Author (MS Metadata) | The author of a stand-alone efile or attachment |
| From (Email Metadata) | The sender of an email message |
| To (Email Metadata) | The recipients of an email message |
| CC (Email Metadata) | The copyee(s) of an email message |
| BCC (Email Metadata) | The blind copyee(s) of an email message |
| Custodian | The custodian in whose file the document was found |
| Source | Path to e-mail archive or original path to standalone files |
| Source Folder | Folder within e-mail archive or original path to standalone files |
| MD5 | The calculated MD5 hash value of the document |

| | |
|---|---|
| NativeFile | The file path to the location of the native file if produced |
| Confidential Stamp | The confidentiality designation, if any, for the document pursuant to any protective order in the case, as it appears on the image. |

B.    Production of Paper Documents

    i.    Form of Production. Produce all documents originally maintained in paper files as Group IV single page tiff format files imaged at 300 dpi. Name each tiff file with a unique name matching the Bates number labeled on the corresponding page. Group every 1000 tiffs into a new folder; do not create a separate folder for each document.

    ii.    Image Load File. Provide an image load file (Opticon file) that contains document boundaries.

    iii.    Document Text. The OCR text will be produced from the image(s) associated with each document, with the text from each document stored in a separate .txt file named for the beginning bates number of the document, in the same directory as the image of the first page of the document.

    iv.    Document Metadata. Produce data for each document in the form of a .dat file including the following fields where applicable:

| | |
|---|---|
| Bates_Begin | The bates label of the first page of the document |
| Bates_End | The bates label of the last page of the document |
| Attach_Begin | The bates label of the first page of a family of documents (e.g., email and attachment) |
| Attach_End (Optional) | The bates label of the last page of a family of documents |
| Custodian | The custodian in whose file the document was found |

v.    <u>Unitization of Documents.</u>  In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The parties should re-unitize improperly unitized documents.

vi.    <u>Parent-Child Relationships.</u>  Parent-child relationships (the association between an attachment and its parent document) should be preserved.

## REQUESTED DOCUMENTS

1.    All documents You may use to support Your claims and defenses

2.    All documents in Your possession, custody, or control that are relevant to the issues raised by Your Rule 60 motion and that have not already been produced.

3.    All organization charts for LBI for the period from September 22, 2008 to the present.

5.    Any analyses, reconciliations or communications concerning the sufficiency of the LBI estate's assets to satisfy customer claims.

6.    Any analyses, reconciliations or communications concerning the amounts held or required to be held, including but not limited to any excess amounts, in LBI's Reserve Account.

7.    Documents sufficient to show each transaction in any security that LBI was party to from September 20, 2008 through and including December 31, 2008.

8.    Documents sufficient to show the identity and quantity of any security in LBI's clearance boxes as of September 22, 2008.

9.    All documents relating to any offer the Trustee made to acquire securities that were transferred to Barclays as a result of the Sale Transaction.

10.    All documents relating to the Clarification Letter, any draft of the Clarification Letter, any language contained in the Clarification Letter or any draft of the Clarification Letter, and/or the meaning of any language contained in the Clarification Letter or any draft of the Clarification Letter.

11.    All documents relating to the TAA, any draft of the TAA, any language contained in the TAA or any draft of the TAA, and/or the meaning of any language contained in the TAA or any draft of the TAA.

12.    All documents relating to any of the following provisions of the APA: the definition of "Business" on p. 2 of the final APA, the definition of "Purchased Assets" on pp. 6-7 of the final APA, APA § 2.5, and APA § 8.12.

13.    All documents relating to the OCC, LBI's accounts at the OCC, options traded by LBI through the OCC, futures traded by LBI through the OCC, and Margin posted with the OCC.

14.    All documents reflecting or relating to communications between the OCC and either LBI or the Trustee from September 16, 2008 to the present.

15.    All documents relating to which customer accounts were and were not to be transferred to Barclays in connection with the Sale Transaction.

16.    All documents relating to whether Barclays was acquiring Exchange Traded Derivatives and/or Margin in connection with the Sale Transaction.

17.    All documents relating to the value of the Exchange Traded Derivatives and/or the Margin at any time from September 15, 2008 to the present.

18.    All documents relating to the margin requirements imposed on LBI by the OCC and any other domestic or foreign exchange as of September 16, 17, 18, 19, 20, 21, 22, and 23, 2008.

19.    All documents relating to the $4.5 billion figure referenced in relation to "derivatives" in Exhibit 19 (marked during the August 6, 2009 Rule 2004 deposition of Steven Berkenfeld).

20.    All documents relating to Your and/or LBI's communications and/or dealings with LBI's affiliates relating to Exchange Traded Derivatives and Margin.

21.    All documents relating to Your analysis and consideration of the December 2008 JPMC Settlement Approval Motion and Your representations to the Court concerning that motion.

22.    All documents concerning Your involvement in the presentation to the court concerning the December 2008 JPMC Settlement.

23.    All documents reflecting any analysis concerning LBI's ability to transfer customer accounts or satisfy customer claims after delivery of some or all of the Acquired Financial Assets.

Dated: New York, New York
November 12, 2009

BOIES, SCHILLER & FLEXNER LLP

By:    _____
Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

16

# EXHIBIT C

William R. Maguire
Seth D. Rothman
Neil J. Oxford
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

Attorneys for James W. Giddens, as
Trustee for the SIPA Liquidation of Lehman Brothers, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>      LEHMAN BROTHERS INC.,<br><br>                              Debtor. | Case No. 08-01420 (JMP) SIPA |

## THE TRUSTEE'S RESPONSES AND OBJECTIONS TO BARCLAYS CAPITAL INC.'S THIRD REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 7034 of the Federal Rules of Bankruptcy Procedure and Rule 34 of the Federal Rules of Civil Procedure, James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI") hereby responds and objects to Barclays Capital Inc.'s ("Barclays") Third Request For Production Of Documents To The Trustee In The Securities Investor Protection Act Liquidation Of Lehman Brothers Inc. (the "Requests").

### GENERAL OBJECTIONS

1.      The Trustee objects to the Requests to the extent they are vague, ambiguous, argumentative, unreasonably cumulative or duplicative, overly broad, unduly burdensome or oppressive, or seek information or documents that are not relevant to the claims

2

or defenses of any party or to the subject matter involved in this action, nor reasonably calculated to lead to the discovery of admissible evidence.

2.    The Trustee objects to the Requests to the extent they seek information or documents or otherwise purport to impose obligations upon the Trustee beyond those permitted by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules and/or any applicable Order of the Court.  Specifically, the Trustee objects to the Requests to the extent they purport to demand a written response or production of responsive documents within a different timeframe than that set forth in Federal Rule of Civil Procedure 34(b)(2)(A).

3.    The Trustee objects to the Requests to the extent they seek information or documents that are protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, confidentiality orders or agreements, or that are otherwise immune or protected from disclosure.  The Trustee does not intend to waive any applicable protections or privileges through the supplying of information or production of documents in response to the Requests; on the contrary, the Trustee specifically intends to preserve any and all applicable protections or privileges.

4.    Pursuant to Federal Rule of Evidence 502, the inadvertent production of any document shall not constitute a waiver of any privilege or any other ground for objecting to discovery with respect to such document or any other document, or with respect to the subject matter thereof or the information contained therein; nor shall such inadvertent production waive the Trustee's right to demand that such documents be returned or to object to the use of the document or the information contained therein during this or any other proceeding.

60860317_1.DOC

5.     The Trustee objects to the Requests as overly broad and unduly burdensome to the extent they call for the identification of "all" documents when all relevant facts can be obtained from fewer than "all" documents. The Trustee objects to the Requests to the extent they seek documents other than those that can be located upon a search of files where such documents can reasonably be expected to be found.

6.     The Trustee objects to the Requests as overly broad and unduly burdensome to the extent they seek documents in the possession of "any agent, servant, employee or representative of" the Trustee. The Trustee employs and has retained many attorneys, accountants, professionals, paralegals, assistants, and other staff who may have "sent, received, created, reviewed or revised" documents responsive to the Requests, and the burden of searching the files of personnel other than the Trustee and the staff who were principally involved in the events described in the Requests far outweighs the possibility of finding any responsive documents that are not merely duplicative. Accordingly, subject to and without waiving his objections, the Trustee will search his own files, those of his staff or his counsel who were principally involved in the events described in the Requests.

7.     The Trustee objects to the Requests as irrelevant, overly broad and unduly burdensome to the extent they seek electronic and paper documents reflecting communications between or among the Trustee and: (i) his staff; (ii) HHR attorneys; (iii) the Securities Investor Protection Corporation; and (iv) Deloitte & Touche LLP and other Deloitte entities, all or almost all of which will be either privileged or redundant of information otherwise available. Accordingly, the Trustee will not undertake to search for or produce such electronic and paper documents, but, subject to and without waiving his objections, the Trustee will produce copies of other responsive, non-privileged, non-objectionable external electronic and paper

60860317_1.DOC

4

correspondence from the files of the Trustee and those of his staff and his counsel who were principally involved in the events described in the Requests.

8.    The Trustee objects to the Requests to the extent they seek personnel files, self evaluations, evaluations by others, financial disclosures or other information such as social security numbers, computer passwords, home telephone numbers and other private information, on the grounds that disclosure would invade the privacy rights of the individuals affected and would be irrelevant to the claims or defenses of any party or to the subject matter of the Requests, nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee will not produce such documents or information.

9.    The Trustee objects to the Requests to the extent they call for information or documents that are outside of the Trustee's possession, custody or control or are obtainable from some other source that is more convenient, less burdensome or less expensive. The Trustee objects to the Requests to the extent that the proposed discovery outweighs its likely benefit.

10.    The Trustee objects to the Requests to the extent they seek electronically stored information from sources that are not reasonably accessible because of undue burden or cost.

11.    The Trustee is responding to the Requests without waiving or intending to waive, but on the contrary, preserving and intending to preserve: (a) the right to object, on the grounds of competency, privilege, relevance, or materiality, or any other proper grounds, to the use of such documents or information for any purpose, in whole or in part, in any subsequent proceedings, in this action or in any other action; (b) the right to object on all grounds, at any time, to document requests or other discovery procedures involving or relating to the subject of

60860317_1.DOC

5

the Requests to which the Trustee has responded herein; and (c) the right at any time to revise,

correct, add to, or clarify any of the answers made herein.

12.    Because of the overly broad nature of the Requests, it is not possible for

the Trustee to anticipate all possible grounds for objection with respect thereto. The Trustee

reserves the right to supplement or correct these responses and to raise any additional objections

deemed necessary and appropriate in light of the results of any further review.

## OBJECTIONS TO "DEFINITIONS AND INSTRUCTIONS"

1.    The Trustee objects to the "Definitions and Instructions" to the extent they

attempt to impose obligations on the Trustee different from those authorized by the Federal

Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy

Rules, and/or any applicable Order of this Court.

2.    The Trustee objects to Definition and Instruction 33, defining the term

"You," as overly broad, unduly burdensome and oppressive in that it defines "You" as including

persons and or entities other than the Trustee and his staff.

3.    The Trustee objects to Definition and Instruction 38 to the extent it calls

for the production of documents believed to be in the custody of other persons, including the

Trustee's current or former attorneys or accountants.

4.    The Trustee objects to Definition and Instruction 40 on the grounds that it

is overbroad, unduly burdensome and oppressive insofar as it seeks information unnecessary to a

determination of the validity of a claim of privilege or work product. If the Trustee withholds

any documents on grounds of privilege, the Trustee will provide a privilege log in compliance

with Federal Rule of Civil Procedure 26(b)(5) and Federal Rules of Bankruptcy Procedure 7026-

1 and 7034-1.

60860317_1 DOC

6

5.    The Trustee objects to Definition and Instruction 41, setting forth specifications for production, as overly broad, unduly burdensome and oppressive.

6.    The Trustee objects to Definition and Instruction 41(b)(iv), setting forth specifications for production of special file types, as overly broad, unduly burdensome and oppressive. Subject to his objections, the Trustee will produce copies of responsive, non-privileged documents and electronically-stored information in Tag Image File Format ("TIFF") with bates labeling on each page for identification. Subject to his objections, the Trustee will produce electronically-stored information in native format for specific bates ranges upon Barclays' specific request.

7.    The Trustee objects to Definition and Instruction 41(b)(v), setting forth specifications for de-duplication, as unduly burdensome and oppressive. The Trustee will de-duplicate documents in accordance with his internal procedures, and, subject to his objections, will provide MD5 hash values and the fields used for de-duplication upon Barclays' request.

8.    The Trustee objects to Definition and Instruction 41(b)(vi), setting forth specifications for production of document metadata, as overly broad, unduly burdensome and oppressive. The Trustee will produce extracted metadata only to the extent it is available for each document in the form of a .dat file, and include the fields specified in the Definition and Instruction to the extent available.

9.    To the extent the Trustee agrees to produce documents or information, it will do so in accordance with Federal Rule of Civil Procedure 34(b)(2)(E), Federal Rule of Bankruptcy 7034, the Local Bankruptcy Rules, and any applicable Order of this Court, including the entry of an appropriate Confidentiality Stipulation And Protective Order Between the Trustee, Hughes Hubbard & Reed LLP And Barclays Capital Inc.

60860317_1.DOC

## RESPONSES TO INDIVIDUAL DOCUMENT REQUESTS

The Trustee incorporates his General Objections and Objections To "Definitions And Instructions" in the responses that follow. Any specific objections set forth in the responses are in addition to those objections and, unless otherwise specified, the Trustee's responses are limited in accordance with each of his objections.

**REQUEST FOR PRODUCTION NO. 1:**

All documents You may use to support Your claims and defenses.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure.

The Trustee cannot at this time anticipate all of the documents that he may use to support his claims and defenses, except that the Trustee may support his claims and defenses using any and all documents produced in this matter by any party or third party, as well as any publicly available documents. To the extent that the Trustee may rely on any documents not produced by any party or third party in this matter or publicly available, the Trustee will produce, subject to and without waiving any of his objections, copies of any responsive, non-privileged, non-objectionable documents within a reasonable time of becoming aware of any such documents. The Trustee reserves the right to supplement its responses, objections, or productions with respect to this Request.

8

**REQUEST FOR PRODUCTION NO. 2:**

All documents in Your possession, custody, or control that are relevant to the issues raised by Your Rule 60 motion and that have not already been produced.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

The Trustee objects to this Request, and in particular, to the term "relevant," on the grounds that it is overly broad, unduly burdensome, vague and ambiguous. The Trustee objects to this Request to the extent it calls for a legal conclusion. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee has produced, or will be producing in response to Barclays' previous requests, responsive, non-privileged, non-objectionable documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 3:**

All organizational charts for LBI for the period from September 22, 2008 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. After conducting a diligent search, the Trustee has ascertained that he does not currently have any documents responsive to this

60860317_1.DOC

Request. The Trustee reserves the right to supplement its responses, objections, or productions

with respect to this Request.

**REQUEST FOR PRODUCTION NO. 4 (erroneously identified as Request 5):**

Any analyses, reconciliations or communications concerning the sufficiency of the LBI estate's assets to satisfy customer claims.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly

burdensome, vague and ambiguous, and seeks documents and information neither relevant to this

matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee

objects to this Request to the extent it seeks documents or information protected from discovery

by the attorney-client privilege, the work product doctrine, the common interest privilege, or that

are otherwise immune or protected from disclosure. The Trustee objects to this Request to the

extent that it is duplicative of Barclays' previous requests. The Trustee refers Barclays to the

Motion For Order Approving Trustee's Allocation Of Property Of The Estate, dated and filed

October 5, 2009 (LBI Docket No. 1866).

**REQUEST FOR PRODUCTION NO. 5 (erroneously identified as Request 6):**

Any analyses, reconciliations or communications concerning the amounts held or required to be held, including but not limited to any excess amount, in LBI's Reserve Account.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly

burdensome, vague and ambiguous, and seeks documents and information neither relevant to this

matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee

objects to this Request to the extent it seeks documents or information protected from discovery

by the attorney-client privilege, the work product doctrine, the common interest privilege, or that

are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent it seeks documents created, sent, or received after March 13, 2009; any such documents are likely to be privileged and the burden of searching for such documents outweighs any possible benefit. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee refers Barclays to the Motion For Order Approving Trustee's Allocation Of Property Of The Estate, dated and filed October 5, 2009 (LBI Docket No. 1866).

**REQUEST FOR PRODUCTION NO. 6 (erroneously identified as Request 7):**

Documents sufficient to show each transaction in any security that LBI was party to from September 20, 2008 through and including December 31, 2008.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee has produced, or will be producing in response to Barclays' previous requests, responsive, non-privileged, non-objectionable documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 7 (erroneously identified as Request 8):**

Documents sufficient to show the identity and quantity of any security in LBI's clearance boxes as of September 22, 2008.

60860317_1.DOC

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

   The Trustee objects to this Request on the grounds that it is overly broad, unduly

burdensome, vague and ambiguous, and seeks documents and information neither relevant to this

matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee

objects to this Request to the extent it seeks documents or information protected from discovery

by the attorney-client privilege, the work product doctrine, the common interest privilege, or that

are otherwise immune or protected from disclosure. The Trustee objects to this Request to the

extent that it is duplicative of Barclays' previous requests. After conducting a diligent search,

the Trustee has ascertained that he does not currently have any documents responsive to this

Request. The Trustee reserves the right to supplement its responses, objections, or productions

with respect to this Request.

**REQUEST FOR PRODUCTION NO. 8 (erroneously identified as Request 9):**

   **All documents relating to any offer the Trustee made to acquire securities
that were transferred to Barclays as a result of the Sale Transaction.**

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

   The Trustee objects to this Request on the grounds that it is overly broad, unduly

burdensome, vague and ambiguous, and seeks documents and information neither relevant to this

matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee

objects to this Request to the extent it seeks documents or information protected from discovery

by the attorney-client privilege, the work product doctrine, the common interest privilege, or that

are otherwise immune or protected from disclosure. The Trustee objects to this Request to the

extent it seeks documents created, sent, or received after March 13, 2009; any such documents

are likely to be privileged and the burden of searching for such documents outweighs any

possible benefit. The Trustee objects to this Request to the extent that it is duplicative of

Barclays' previous requests.  Due to the vagueness of this request, the Trustee is unable to

ascertain whether he may have documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 9 (erroneously identified as Request 10):**

     All documents relating to the Clarification Letter, any draft of the
Clarification Letter, any language contained in the Clarification Letter or any draft of the
Clarification Letter, and/or the meaning of any language contained in the Clarification
Letter or any draft of the Clarification Letter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

     The Trustee objects to this Request on the grounds that it is overly broad, unduly

burdensome, vague and ambiguous, and seeks documents and information neither relevant to this

matter nor reasonably calculated to lead to the discovery of admissible evidence.  The Trustee

objects to this Request to the extent it seeks documents or information protected from discovery

by the attorney-client privilege, the work product doctrine, the common interest privilege, or that

are otherwise immune or protected from disclosure.  The Trustee objects to this Request to the

extent it seeks documents created, sent, or received after March 13, 2009; any such documents

are likely to be privileged and the burden of searching for such documents outweighs any

possible benefit.  The Trustee objects to this Request to the extent that it is duplicative of

Barclays' previous requests.  The Trustee has produced, or will be producing in response to

Barclays' previous requests, all responsive, non-privileged, non-objectionable documents

responsive to this request.

**REQUEST FOR PRODUCTION NO. 10 (erroneously identified as Request 11):**

     All documents relating to the TAA, and draft of the TAA, any language
contained in the TAA or any draft of the TAA, and/or the meaning of any language
contained in the TAA or any draft of the TAA.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

  The Trustee objects to this Request on the grounds that it is overly broad, unduly

burdensome, vague and ambiguous, and seeks documents and information neither relevant to this

matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee

objects to this Request to the extent it seeks documents or information protected from discovery

by the attorney-client privilege, the work product doctrine, the common interest privilege, or that

are otherwise immune or protected from disclosure. The Trustee objects to this Request to the

extent it seeks documents created, sent, or received after March 13, 2009; any such documents

are likely to be privileged and the burden of searching for such documents outweighs any

possible benefit. The Trustee objects to this Request to the extent that it is duplicative of

Barclays' previous requests. The Trustee has produced, or will be producing in response to

Barclays' previous requests, all responsive, non-privileged, non-objectionable documents

responsive to this request.

**REQUEST FOR PRODUCTION NO. 11 (erroneously identified as Request 12):**

  **All documents relating to any of the following provisions of the APA: the
definition of "Business" on p. 2 of the final APA, the definition of "Purchased Assets" on
pp. 6-7 of the final APA, APA § 2.5, and APA § 8.12.**

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

  The Trustee objects to this Request on the grounds that it is overly broad, unduly

burdensome, vague and ambiguous, and seeks documents and information neither relevant to this

matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee

objects to this Request to the extent it seeks documents or information protected from discovery

by the attorney-client privilege, the work product doctrine, the common interest privilege, or that

are otherwise immune or protected from disclosure. The Trustee objects to this Request to the

extent it seeks documents created, sent, or received after March 13, 2009; any such documents

are likely to be privileged and the burden of searching for such documents outweighs any

possible benefit. The Trustee objects to this Request to the extent that it is duplicative of

Barclays' previous requests. The Trustee has produced, or will be producing in response to

Barclays' previous requests, all responsive, non-privileged, non-objectionable documents

responsive to this request.

**REQUEST FOR PRODUCTION NO. 12 (erroneously identified as Request 13):**

All documents relating to the OCC, LBI's accounts at the OCC, options
traded by LBI through the OCC, futures traded by LBI through the OCC, and Margin
posted with the OCC.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly

burdensome, vague and ambiguous, and seeks documents and information neither relevant to this

matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee

objects to this Request to the extent it seeks documents or information protected from discovery

by the attorney-client privilege, the work product doctrine, the common interest privilege, or that

are otherwise immune or protected from disclosure. The Trustee objects to this Request to the

extent it seeks documents created, sent, or received after March 13, 2009; any such documents

are likely to be privileged and the burden of searching for such documents outweighs any

possible benefit. The Trustee objects to this Request to the extent that it is duplicative of

Barclays' previous requests. The Trustee has produced, or will be producing in response to

Barclays' previous requests, all responsive, non-privileged, non-objectionable documents

responsive to this request.

**REQUEST FOR PRODUCTION NO. 13 (erroneously identified as Request 14):**

All documents reflecting or relating to communications between the OCC
and either LBI or the Trustee from September 16, 2008 to the present.

60860317_1.DOC

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

      The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent it seeks documents created, sent, or received after March 13, 2009; any such documents are likely to be privileged and the burden of searching for such documents outweighs any possible benefit. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee has produced, or will be producing in response to Barclays' previous requests, all responsive, non-privileged, non-objectionable documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 14 (erroneously identified as Request 15):**

      All documents relating to which customer accounts were and were not to be transferred to Barclays in connection with the Sale Transaction.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

      The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent it seeks documents created, sent, or received after March 13, 2009; any such documents

are likely to be privileged and the burden of searching for such documents outweighs any possible benefit. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee has produced, or will be producing in response to Barclays' previous requests, all responsive, non-privileged, non-objectionable documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 15 (erroneously identified as Request 16):**

All documents relating to whether Barclays was acquiring **Exchange Traded Derivatives and/or Margin in connection with the Sale Transaction.**

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent it seeks documents created, sent, or received after March 13, 2009; any such documents are likely to be privileged and the burden of searching for such documents outweighs any possible benefit. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee has produced, or will be producing in response to Barclays' previous requests, all responsive, non-privileged, non-objectionable documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 16 (erroneously identified as Request 17):**

All documents relating to the value of the **Exchange Traded Derivatives and/or Margin from September 15, 2008 to the present.**

60860317_1 DOC

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent it seeks documents created, sent, or received after March 13, 2009; any such documents are likely to be privileged and the burden of searching for such documents outweighs any possible benefit. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee has produced, or will be producing in response to Barclays' previous requests, all responsive, non-privileged, non-objectionable documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 17 (erroneously identified as Request 18):**

All documents relating to the margin requirements imposed on LBI by the OCC and any other domestic or foreign exchange as of September 16, 17, 18, 19, 20, 21, 22, and 23, 2008.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee objects to this Request as unduly burdensome to the extent it seeks documents that are already in Barclays' possession; such documents are as available to Barclays as they are to the Trustee. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest

60860317_1.DOC

privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent it seeks documents created, sent, or received after March 13, 2009; any such documents are likely to be privileged and the burden of searching for such documents outweighs any possible benefit. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee has produced, or will be producing in response to Barclays' previous requests, all responsive, non-privileged, non-objectionable documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 18 (erroneously identified as Request 19):**

All documents relating to the $4.5 billion figure referenced in relation to "derivatives" in Exhibit 19 (marked during the August 6, 2009 Rule 2004 deposition of Steven Berkenfeld).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent it seeks documents created, sent, or received after March 13, 2009; any such documents are likely to be privileged and the burden of searching for such documents outweighs any possible benefit. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee has produced, or will be producing in response to Barclays' previous requests, all responsive, non-privileged, non-objectionable documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 19 (erroneously identified as Request 20):**

All documents relating to Your and/or LBI's communications and/or dealings with LBI's affiliates relating to Exchange Traded Derivatives and Margin.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee further objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent it seeks documents created, sent, or received after March 13, 2009; any such documents are likely to be privileged and the burden of searching for such documents outweighs any possible benefit. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee has produced, or will be producing in response to Barclays' previous requests, all responsive, non-privileged, non-objectionable documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 20 (erroneously identified as Request 21):**

All documents relating to Your analysis and consideration of the December 2008 JPMC Approval Motion and Your representations to the Court concerning that motion.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery

20

by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent it seeks documents created, sent, or received after March 13, 2009; any such documents are likely to be privileged and the burden of searching for such documents outweighs any possible benefit. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee has produced, or will be producing in response to Barclays' previous requests, all responsive, non-privileged, non-objectionable documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 21 (erroneously identified as Request 22):**

> All documents concerning Your involvement in the presentation to the court concerning the December 2008 JPMC Settlement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent it seeks documents created, sent, or received after March 13, 2009; any such documents are likely to be privileged and the burden of searching for such documents outweighs any possible benefit. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee has produced, or will be producing in response to Barclays' previous requests, all responsive, non-privileged, non-objectionable documents responsive to this request.

60860317_1.DOC

**REQUEST FOR PRODUCTION NO. 22** (erroneously identified as Request 23):

All documents reflecting any analysis concerning LBI's ability to transfer customer accounts or satisfy customers claims after delivery of some or all of the Acquired Financial Assets.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

The Trustee objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, and seeks documents and information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. The Trustee objects to this Request to the extent it seeks documents or information protected from discovery by the attorney-client privilege, the work product doctrine, the common interest privilege, or that are otherwise immune or protected from disclosure. The Trustee objects to this Request to the extent it seeks documents created, sent, or received after March 13, 2009; any such documents are likely to be privileged and the burden of searching for such documents outweighs any possible benefit. The Trustee objects to this Request to the extent that it is duplicative of Barclays' previous requests. The Trustee refers Barclays to the Motion For Order Approving Trustee's Allocation Of Property Of The Estate, dated and filed October 5, 2009 (LBI Docket No. 1866).

22

Dated:        New York, New York
              December 2, 2009

                                        HUGHES HUBBARD & REED LLP


                                        By: /s/ William R. Maguire
                                            William R. Maguire

                                        Seth D. Rothman
                                        Neil J. Oxford
                                        One Battery Park Plaza
                                        New York, New York 10004-1482
                                        Telephone: (212) 837-6000
                                        Fax: (212) 422-4726

                                        *Attorneys for James W. Giddens, as
                                        Trustee for the SIPA Liquidation of Lehman
                                        Brothers Inc.*

60860317_1.DOC

## AFFIRMATION OF SERVICE

I, Carl W. Mills, an attorney admitted to practice in the courts of the State of New York, affirm under penalty that on December 2, 2009 I caused a true and correct copy of the foregoing to be served upon the parties listed on the attached Service List A by electronic mail and on the attached Service List B by first class mail.

Dated:    New York, New York
          December 2, 2009

          _____
          Carl W. Mills

### SERVICE LIST A

hhume@bsfllp.com
jschiller@bsfllp.com
jstern@bsfllp.com
jshaw@bsfllp.com
cgreen@bsfllp.com

rwgaffey@jonesday.com
jtambe@jonesday.com
wjhine@jonesday.com
tschaffer@jonesday.com

jamestecce@quinnemanuel.com
susheelkirpalani@quinnemanuel.com
ericataggart@quinnemanuel.com
tylerwhitmer@quinnemanuel.com
erickay@quinnemanuel.com

## SERVICE LIST B

Jack G. Stern
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022

Robert W. Gaffey
Jones Day
222 East 41st Street
New York, New York 10017

James C. Tecce
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

# EXHIBIT D

B256 (Form 256 – Subpoena in a Case under the Bankruptcy Code) (12/07)

# UNITED STATES BANKRUPTCY COURT

Southern _____ District of __New York__

| | |
|---|---|
| In re  Lehman Brothers Inc., | **SUBPOENA IN A CASE UNDER** |
| Debtor | **THE BANKRUPTCY CODE** |
| Case No. 08-01420 (JMP), SIPA | • XXXXX. •  (Jointly Administered) |
| In re Lehman Brothers Holdings, Inc., et. al., | |
| X̶X̶           Debtors. | XXXXX _____ |
| Case No. 08-13555 (JMP), Chapter 11 | |

To:    Deloitte
       1633 Broadway. New York, NY 10020

☐ YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

### See Schedule A

| PLACE | DATE AND TIME |
|---|---|
| Boies, Schiller & Flexner, LLP | Thirty (30) days from service of this |
| 575 Lexington Avenue, 7th Floor | subpoena |
| New York, NY 10022 | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this proceeding that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Rule 30(b)(6), Federal Rules of Civil Procedure, made applicable in bankruptcy cases and proceedings by Rules 1018, 7030, and 9014, Federal Rules of Bankruptcy Procedure.

| ISSUING OFFICER'S SIGNATURE AND TITLE | DATE |
|---|---|
| _Christopher M. Green_ , Attorney | 10/08/09 |

ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER

Christopher M. Green. Boies, Schiller & Flexner. LLP, 333 Main Street, Armonk, NY 10504, (914) 749-8200, Attorneys for Barclays Capital Inc.

* If the bankruptcy case is pending in a district other than the district in which the subpoena is issued, state the district under the case number.

B256 (Form 256 – Subpoena in a Case under the Bankruptcy Code) (12/07)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____          _____
                         DATE                                          SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2007, made applicable in cases under the Bankruptcy Code by Rule 9016, Federal Rules of Bankruptcy Procedure:

(c) Protecting a Person Subject to a Subpoena.
   (1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
   (2) Command to Produce Materials or Permit Inspection.
      (A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
      (B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
         (i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
         (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
   (3) Quashing or Modifying a Subpoena.
      (A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
         (i) fails to allow a reasonable time to comply;
         (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
         (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
         (iv) subjects a person to undue burden.
      (B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
         (i) disclosing a trade secret or other confidential research, development, or commercial information;
         (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
         (iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
      (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
         (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
         (ii) ensures that the subpoenaed person will be reasonably compensated.

(d) Duties in Responding to a Subpoena.
   (1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
      (A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
      (B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
      (C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
      (D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
   (2) Claiming Privilege or Protection.
      (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
         (i) expressly make the claim; and
         (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim
      (B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) Contempt.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## SCHEDULE A

## GENERAL DEFINITIONS AND INSTRUCTIONS

1.    The term "document" has the broadest meaning accorded it under the Federal

Rules of Civil Procedure, and includes but is not limited to all written, printed, typed,

reported, recorded, pictorial or graphic matter, however produced or reproduced, now or

at the time of possession, custody or control, including, but not limited to, all court

submissions, drafts, letters, telegrams, telexes, e-mail transmissions, cables,

professionals' time records, telephone records and notations, invoices, ledgers, journals,

and other formal and informal books of record and account, logs, studies, summaries,

minutes, agendas, bulletins, notices, announcements, charts, manuals, models, graphs,

instructions, financial statements, photographs, videotapes, microfilm, other film or

tapes, reports, brochures, publications, books, memoranda, notes, notebooks, drafts,

worksheets, contracts, agreements, proposed contracts or agreements (whether or not

actually consummated), computer data, computer printouts, graphics, statistics,

interoffice memos, computer programs, computer software, tape recordings,

transcriptions, drafts of the foregoing items, articles of newspapers, magazines and other

publications, purchase orders, lists, proposals, plans, specifications, addenda, statements,

receipts, confirmations slips, evidence of payments, bills, diaries, calendars, Day

Timers, time records, bills of lading, canceled checks (both sides), audiotapes and copies

or reproductions of the foregoing upon which notations in writing have been made

which do not appear on the originals.

2.    As used herein, the words "and" and "or" shall be construed either conjunctively

or disjunctively as required by the context to make the request intelligible and to bring

1

within the scope of these requests any document that might be deemed outside its scope by another construction.

3.      As used herein, "Asset Purchase Agreement" means the Asset Purchase Agreement, dated as of September 16, 2008, among Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC, and Barclays Capital Inc.

4.      As used herein, "Barclays" means Barclays Capital Inc. and all subsidiaries and affiliates thereof.

5.      As used herein, the "Clarification Letter" means the letter, dated as of September 20, 2008, from Barclays Capital Inc. to Lehman Brothers Holdings Inc., Lehman Brothers Inc., and LB 745 LLC, Attn. Steven Berkenfeld, Esq.

6.      As used herein, the "December 2008 JPMC Settlement Approval Motion" means the Motion under 11 U.S.C. §§ 105 & 365 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement, filed on December 5, 2008, Docket No. 387 in Case No. 08-1420 (JMP).

7.      As used herein, "First Amendment to the Asset Purchase Agreement" means the First Amendment to Asset Purchase Agreement dated as of September 19, 2008, among Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC, and Barclays Capital Inc.

8.      As used herein "LBHI" means Lehman Brothers Holdings Inc. and all subsidiaries and affiliates thereof, including Lehman Brothers Inc.

9.      As used herein, "You" refers to the entity or individual upon whom this Schedule A is served, and any agent, servant, employee or representative of that entity or individual.

2

10.    The singular form of a word shall be interpreted as plural, and the plural form of a

word shall be interpreted as singular, as required by the context to make the requests

intelligible and to bring within the scope of the requests any information or documents

which might otherwise be considered to be beyond their scope.

11.    Each document requested herein shall be produced as it is kept in the usual and

regular course of business.

12.    These requests are continuing, so as to require supplemental responses in the

event that the responding party or any person or entity acting on its behalf, obtains

additional information or documents called for by these requests between the time of the

original response and the time of trial.

13.    If any objection is made to all or part of a document request, produce documents

(or parts of documents) responsive to those portions of the request to which no objections

is made, and produce documents (or parts of documents) responsive to the request to the

extent they are not covered by the objection(s).

14.    These requests call for the production of all documents within the responding

party's possession, custody or control, regardless of the physical location of the

documents or their actual custodian.  If any responsive documents are believed to be in

the custody of other persons, such as current or former attorneys or accountants for the

responding party (or any entity controlled or operated by the responding party) but are

not being produced by the responding party, please identify the person(s) in whose

custody such potentially responsive documents are believed to be located, and state the

reasons why the documents are not being produced in response to these requests.

15.    If any objection is made to all or part of a document request, produce documents (or parts of documents) responsive to those portions of the request to which no objections is made, and produce documents (or parts of documents) responsive to the request to the extent they are not covered by the objection(s).

16.    If any document called for by these requests is withheld on the ground of privilege or any other ground, identify the specific ground upon which the objection is based and the particular request objected to. Identify the information withheld or objected to by furnishing sufficient information to describe the document in a subpoena and in all events by furnishing the following information: (a) identify the document, specifying its author, addressee(s), date, subject matter and person(s) to whom copies were furnished; (b) describe the document in a manner sufficient to identify it and its location; and (c) as to each such document, set forth each and every fact which constitutes the basis on which privilege is claimed.

17.    All requested documents must be produced pursuant to the specifications set forth below:

    A.    <u>Production of Electronically Stored Information</u>

        i.    <u>Form of Production.</u> Please provide all documents as Group IV single page tiff format files imaged at 300 dpi. Name each tiff file with a unique name matching the Bates number labeled on the corresponding page. Group every 1000 tiffs into a new folder; do not create a separate folder for each document.

        ii.    <u>Image Load File.</u> Provide an image load file (Opticon file) that contains document boundaries.

iii.    Document Text. For documents that were originally stored as native electronic files and which do not have redactions, the extracted (not OCRed), full text from the body of each document will be produced in separate .txt files named for the bates number of the associated image, in the same directory as the image.

For documents that were originally stored as native electronic files and which have redactions, the OCR text will be produced from the redacted image(s) associated with each document, in separate .txt files named for the bates number of the associated image, in the same directory as the image. Any redacted, privileged material should be clearly labeled to show the redactions on the tiff image.

iv.    Special File Types. For files created by Excel or other spreadsheet programs, PowerPoint or other presentation programs, database files, and any other file types that reasonably require viewing in their native format for a full understanding of their content and meaning, produce the file in native format. The produced file should be named with the bates number of the first page of the corresponding tiff production of the document (e.g., "ABC00001.xls").

v.    De-Duplication. Please produce a single unique copy of a given e-mail message and its attachments or standalone file, with a field of semicolon-delimited references to each custodian/location in which a copy originally appeared. For e-mail messages, please consolidate duplicates based on an MD5 hash generated from BCC, Body, CC, From, IntMsgID, To, and Attach (semicolon delimited string of first level attachments in the e-mail) properties.

5

For e-mail attachments or standalone electronic files, please consolidate duplicates based on an MD5 hash of the entire file.

vi.    <u>Document Metadata.</u> Produce extracted metadata for each document in the form of a .dat file, and include the following fields where applicable.

| | |
|---|---|
| Bates Range Begin | The bates label of the first page of the document |
| Bates Range End | The bates label of the last page of the document |
| Bates Family Range Begin | The bates label of the first page of a family of documents (e.g., email and attachment) |
| Bates Family Range End (optional) | The bates label of the last page of a family of documents |
| Subject (Email Metadata) | The subject line of an e-mail |
| File Name (Metadata) | The filename of an e-mail attachment or stand-alone e-file |
| Sent Date (Email Metadata) | For email, the sent date/time stamp of the message in the custodian's time zone |
| Send Date (Email Metadata) Time | If you are unable to provide date and time in a single field above, provide the time portion separately |
| Created Date (Blended Metadata) | For efiles or attachments, the MS Office creation date/time, or PDF creation date/time, or operating system creation date/time, in the custodian's time zone |
| Created Date (Blended Metadata) Time | If you are unable to provide date and time in a single field above, provide the time portion separately |
| Last Modified Date (Blended Metadata) | For efiles or attachments, the MS Office last modified date/time, or PDF last modified date/time, or operating system last modified date/time, in the custodian's time zone |
| Last Modified Date (Blended Metadata) Time | If you are unable to provide date and time in a single field above, provide the time portion separately |
| Author (MS Metadata) | The author of a stand-alone efile or attachment |
| From (Email Metadata) | The sender of an email message |
| To (Email Metadata) | The recipients of an email message |
| CC (Email Metadata) | The copyee(s) of an email message |
| BCC (Email Metadata) | The blind copyee(s) of an email message |
| Custodian | The custodian in whose file the document was found |
| Source | Path to e-mail archive or original path to standalone files |

| | |
|---|---|
| Source Folder | Folder within e-mail archive or original path to standalone files |
| MD5 | The calculated MD5 hash value of the document |
| NativeFile | The file path to the location of the native file if produced |
| Confidential Stamp | The confidentiality designation, if any, for the document pursuant to any protective order in the case, as it appears on the image. |

B.    Production of Paper Documents

i.    Form of Production. Produce all documents originally maintained in paper files as Group IV single page tiff format files imaged at 300 dpi. Name each tiff file with a unique name matching the Bates number labeled on the corresponding page. Group every 1000 tiffs into a new folder; do not create a separate folder for each document.

ii.    Image Load File. Provide an image load file (Opticon file) that contains document boundaries.

iii.    Document Text. The OCR text will be produced from the image(s) associated with each document, with the text from each document stored in a separate .txt file named for the beginning bates number of the document, in the same directory as the image of the first page of the document.

iv.    Document Metadata. Produce data for each document in the form of a .dat file including the following fields where applicable:

| | |
|---|---|
| Bates_Begin | The bates label of the first page of the document |
| Bates_End | The bates label of the last page of the document |
| Attach_Begin | The bates label of the first page of a family of documents (e.g., email and attachment) |

| Attach End (Optional) | The bates label of the last page of a family of documents |
| Custodian | The custodian in whose file the document was found |

v.    <u>Unitization of Documents.</u>  In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized).  The parties should re-unitize improperly unitized documents.

vi.    <u>Parent-Child Relationships.</u>  Parent-child relationships (the association between an attachment and its parent document) should be preserved.

## REQUESTED DOCUMENTS

1.    All documents sent, received, created, reviewed or revised by You after September 30, 2008, and before March 13, 2009, concerning any assets transferred or liabilities assumed by Barclays under the Asset Purchase Agreement, as originally drafted and executed, or as subsequently amended by the First Amendment to the Asset Purchase Agreement or by the Clarification Letter.  This request includes but is not limited to any analyses, reconciliations or communications concerning the Barclays transaction or the assets or liabilities involved in that transaction, whether the assets or liabilities were actually transferred or not, and whether the assets or liabilities were subject to transfer under the original Asset Purchase Agreement or under a subsequent amendment.  This request includes documents relating to assets that You understand Barclays believes were required to be transferred under the Asset Purchase Agreement, as subsequently amended by the First Amendment to the Asset Purchase Agreement or by the Clarification Letter.

# EXHIBIT E

# Deloitte.

Deloitte LLP
1633 Broadway
New York, NY 10019-6754
USA

Tel: +1 212 492 4000
Fax: +1 212 492 4201
www.deloitte.com

October 21, 2009

**Via Facsimile and Mail**

Christopher M. Green, Esq.
Boies, Schiller & Flexner, LLP
333 Main Street
Armonk, NY 10504

> Re:    *In re Lehman Brothers Inc., and*
> *In re Lehman Brothers Holdings, Inc., et al.*
> Subpoena addressed to Deloitte LLP

Dear Mr. Green:

I write regarding the subpoena dated October 9, 2009 incorrectly addressed to "Deloitte,"
presumably Deloitte LLP (the "Responding Entity"), in the above-referenced matters
(collectively, the "Action"). As a threshold issue, Deloitte LLP does not perform professional
services and has no documents responsive to the requests in the subpoena.

While I will be prepared to discuss the subpoena with you, in the interim, the Responding
Entity is objecting to the subpoena for the reasons detailed above and below and reserves all
rights relating to this matter.

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, as incorporated into the Federal
Rules of Bankruptcy Procedure by Rule 9016, the Responding Entity's objections to the
subpoena are as follows:

1.    The Responding Entity objects to the subpoena to the extent that it purports to require
      the production of documents which are protected by the attorney-client privilege, the
      work-product doctrine, or any other applicable privilege, rule, or duty of confidentiality
      which precludes or limits production or disclosure of information therein;

2.    The subpoena is unduly vague and ambiguous, precluding the Responding Entity from
      identifying the documents that are sought;

Member of
Deloitte Touche Tohmatsu

PAGE 2/6 * RCVD AT 10/21/2009 3:56:21 PM [Eastern Daylight Time] * SVR:RIGHTFAX/5 * DNIS:8300 * CSID: * DURATION (mm-ss):02-28

Christopher M. Green, Esq.
October 21, 2009
Page 2

3.   The Responding Entity objects to the subpoena as it is overly broad, calling for the
     production of documents that are not relevant to the issues in the Action and that are
     not reasonably calculated to lead to the discovery of admissible evidence;

4.   Many of the documents and the information requested by the subpoena are available
     from the debtors and/or the debtors' counsel and the Responding Entity should not be
     put to the time and expense of producing such documents;

5.   The Responding Entity objects to the General Definitions and Instructions in Schedule
     A in that they are overly broad, ambiguous and vague, including, but not limited to, the
     extent to which they purport to encompass more than just the named entities
     themselves.  As such, the purported definitions are so ambiguous and vague that it
     would make any search for documents impossible;

6.   The Responding Entity objects to General Definition and Instruction No. 9 in Schedule
     A to the extent that it purports to include entities other than the entity to which the
     subpoena was addressed;

7.   The Responding Entity objects to the subpoena to the extent that it calls for the
     production of any documents that are not in its possession, custody or control. The
     Responding Entity also objects to the scope of the subpoena as overbroad, unduly
     burdensome and oppressive, and not reasonably calculated to lead to the discovery of
     admissible evidence to the extent that it purports to require the Responding Entity to
     search not only its own offices for relevant documents, but also the offices of other
     entities not subject to its control within the meaning of the Federal Rules;

8.   The Responding Entity objects to the subpoena to the extent that it purports to impose
     any obligations upon the Responding Entity beyond those required by the Federal
     Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, or the Local
     Rules;

9.   The Responding Entity objects to the subpoena to the extent that it purports to require
     the Responding Entity to produce documents related to individuals, entities and/or
     clients that are not at issue in the Action and/or are not parties to the Action,
     documents related to work unrelated to the subject matter of the Action or documents
     relating to other actions;

10.  The Responding Entity objects to the subpoena to the extent it seeks the production of
     electronically stored documents in their native form.  Production of documents,
     including electronically stored information ("ESI"), in native form prevents the

Christopher M. Green, Esq.
October 21, 2009
Page 3

Responding Entity from adequately labeling and controlling its production. If and
when the Responding Entity produces documents, including ESI, pursuant to the
subpoena, the Responding Entity will produce such documents, including ESI, in a
reasonably useable form within the meaning of the Federal Rules; specifically,
producing in a hard-copy format or in single-page TIFF format, with load files
demarcating document boundaries;

11.    The Responding Party objects to the subpoena to the extent it purports to impose upon
the Responding Entity an obligation to preserve any documents or electronically stored
information. Due to the ambiguities and deficiencies in the subpoena noted above, the
Responding Entity is currently unable, without undue burden and expense, to
determine what documents or information should, pursuant to the terms of the
subpoena, be preserved or maintained outside of the Responding Entity's record
retention policies (which include the preservation of working papers and certain tax
materials for certain periods of time), if any. Moreover, even if the Responding Entity
were able to ascertain which categories of documents or information to preserve for the
subpoena, because of the defects in the subpoena, efforts to preserve such documents
or information would require an undue burden and unreasonable expense, which the
Responding Entity, as a non-party to the Action, is not required to undertake pursuant
to the Federal Rules of Civil Procedure. If and when the Responding Entity is able to
ascertain and limit the scope of the subpoena, the Responding Entity will take
reasonable steps to ensure that documents responsive to the subpoena are preserved so
that they might be produced in the Action;

12.    The Responding Entity objects to the subpoena to the extent it purports to impose an
obligation to preserve and/or produce any documents or information that is newly
created or received after the receipt of the Request because efforts to preserve and/or
produce such documents or information would require an undue burden and
unreasonable expense, which the Responding Entity is not required to undertake
pursuant to the Federal Rules of Civil Procedure;

13.    The Responding Entity objects to the subpoena to the extent it purports to impose an
obligation to preserve and/or produce transient or dynamic data, such as metadata,
RAM, cookies or data on dynamic databases, because such data is not material to the
Action and efforts to preserve and/or produce such data would require an undue burden
and unreasonable expense, which the Responding Entity, as a non-party to the Action,
is not required to undertake pursuant to the Federal Rules of Civil Procedure;

14.    The Responding Entity objects to the subpoena on the grounds that it calls for the
production of documents which constitute proprietary information, trade secrets or
other confidential, research, development or commercial information of the

P.05/06

Christopher M. Green, Esq.
October 21, 2009
Page 4

Responding Entity. These materials have been developed at great expense and effort and are not and could not be at issue in the Action. Moreover, disclosure of such documents would be competitively harmful to the Responding Entity, as the Responding Entity is not aware of any confidentiality stipulation that currently provides adequate protection for their production. Further, such documents are not relevant to the issues in the Action. Accordingly, they will not be produced;

15. The Responding Entity objects to the subpoena insofar as it purports to require preservation and/or production of ESI from disaster recovery systems. ESI on such disaster recovery systems is not reasonably accessible within the meaning of the Federal Rules of Civil Procedure because of the undue burden and cost associated with recovering ESI from such sources. Moreover, the Responding Entity reasonably believes that such ESI is likely duplicative of information stored on its sources' active file systems. Accordingly, the Responding Entity will continue with the routine, good faith operation of its electronic information systems, including the normal recycling of storage media for its disaster recovery systems;

16. The Responding Entity objects to the subpoena insofar as it purports to require preservation and/or production of ESI that is not stored on its active systems, but is stored on systems, backup tapes and other media that are no longer part of its normal business operations. Such ESI is not reasonably accessible and likely is duplicative of ESI available from other more readily accessible sources. Because of the lack of relevance of such ESI and the cost associated with searching, preserving and accessing these data sources, the Responding Entity, a non-party to this matter, will not preserve and/or search the above-described ESI sources in response to this Request;

17. The Responding Entity objects to the subpoena to the extent that it calls for the production of documents which are not within the Southern District of New York, where the subpoena was served. As such, the subpoena is improper, unduly burdensome and imposes undue expense on the Responding Entity;

18. The subpoena requests confidential information of the Responding Entity's clients and/or the Responding Entity. Therefore, the Responding Entity objects to the subpoena absent entry of a confidentiality order protecting the confidentiality of the documents. No documents will be produced absent such a confidentiality order; and

19. The Responding Entity objects to producing the materials sought by the subpoena in the absence of your client's prior written commitment to pay for all reasonable costs of production, including the processing of electronic documents.

OCT-21-2009  16:03                                                              P.06/06

Christopher M. Green, Esq.
October 21, 2009
Page 5

In making the above objections, the Responding Entity is not suggesting or implying in any way that it has documents responsive to the subpoena.  The Responding Entity expressly reserves the right to amend, expand or delete any part of the objections stated herein.

Given these objections, the Responding Entity will not produce any documents on November 11, 2009.  However, as indicated above, I will be prepared to discuss these objections with you.

Thank you for your anticipated cooperation.

Very truly yours,

Linda M. Beyer
Associate General Counsel

cc:    Seth D. Rothman, Esq. (via fax & mail)

# EXHIBIT F

Contains Highly Confidential Portions

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS           Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                   Debtors.

10

      ----------------------x

11

12          PARTIALLY HIGHLY CONFIDENTIAL

13     VIDEOTAPED DEPOSITION OF DANIEL McISAAC

14               New York, New York

15                April 6, 2010

16     * * *(Pages 12-23 have been designated highly

17     confidential.)* * *

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 29428

Contains Highly Confidential Portions

| Page 2 | Page 3 |
|---|---|
| 1 | 1 |
| 2    April 6, 2010 | 2    A P P E A R A N C E S : |
| 3 | 3 |
| 4    VIDEOTAPED deposition of DANIEL | 4 |
| 5    McISAAC, held at offices of Boies | 5    JONES DAY, LLP |
| 6    Schiller & Flexner, LLP, 575 Lexington | 6    Attorneys for Lehman Brothers, Inc. |
| 7    Avenue, New York, New York, before Kathy S. | 7      222 East 41st Street |
| 8    Klepfer, a Registered Professional | 8      New York, New York 10017 |
| 9    Reporter, Registered Merit Reporter, | 9    BY: BART GREEN, ESQ. |
| 10    Certified Realtime Reporter, Certified | 10 |
| 11    Livenote Reporter, and Notary Public | 11    BOIES, SCHILLER & FLEXNER, LLP |
| 12    of the State of New York. | 12    Attorneys for Barclays |
| 13 | 13      10 North Pearl Street |
| 14 | 14      Albany, New YOrk 12207 |
| 15 | 15    BY: TRICIA J. BLOOMER, ESQ. |
| 16 | 16      AMY L. NEUHARDT, ESQ. |
| 17 | 17      LOUIS SMITH, ESQ. |
| 18 | 18      HEATHER KING, ESQ. |
| 19 | 19      - AND - |
| 20 | 20    CLEARY GOTTLIEB STEEN & HAMILTON LLP |
| 21 | 21    Attorneys for Barclays |
| 22 | 22      One Liberty Plaza |
| 23 | 23      New York, New York 10006 |
| 24 | 24    BY: DAVID AMAN, ESQ. |
| 25 | 25 |

| Page 4 | Page 5 |
|---|---|
| 1 | 1    D. McIsaac |
| 2    A P P E A R A N C E S: (Cont'd) | 2    THE VIDEOGRAPHER: This is the start |
| 3 | 3    of the tape labeled number 1 of the |
| 4    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP | 4    videotaped deposition of Daniel McIsaac in |
| 5    Attorneys for the Creditors Committee | 5    the matter In re: Lehman. Today is April |
| 6      51 Madison Avenue | 6    6, 2010. The time is approximately 9:37. |
| 7      22nd Floor | 7    My name is Michael Pineiro from TSG |
| 8      New York, New York 10010 | 8    Reporting, Inc. and I'm the legal video |
| 9    BY: ERIC M. KAY, ESQ. | 9    specialist. The court reporter is Kathy |
| 10 | 10    Klepfer, in association with TSG Reporting. |
| 11    HUGHES, HUBBARD & REED, LLP | 11    Will the court reporter please swear |
| 12    Attorneys for the SIPA Trustee | 12    in the witness. |
| 13      One Battery Park Plaza | 13      * * * |
| 14      New York, New York 10004 | 14    DANIEL McISAAC, called as a |
| 15    BY: NEIL J. OXFORD, ESQ. | 15    witness, having been duly sworn by a Notary |
| 16      AMINA HASSAN, ESQ. | 16    Public, was examined and testified as |
| 17      FARA TABATABAI, ESQ. | 17    follows: |
| 18 | 18    EXAMINATION BY |
| 19 | 19    MS. BLOOMER: |
| 20 | 20    Q.  Good morning, Mr. McIsaac. |
| 21 | 21    A.  Good morning. |
| 22 | 22    Q.  My name is Tricia Bloomer. I'm with |
| 23 | 23    Boies, Schiller & Flexner and we represent |
| 24 | 24    Barclays Capital in this matter. |
| 25 | 25    A.  Uh-huh. |

Contains Highly Confidential Portions

| Page 290 |
|---|

D. McIsaac

1
2    A.    I have seen nothing that said they --
3    it was not enforced at that time.
4    Q.    Would your answer be the same as of
5    the 12th?
6    A.    The same. I have seen nothing before
7    that time.
8    Q.    Okay. Now, if there were -- if these
9    assets were seized on the 19th and it did cause
10    a need to adjust the amount in the reserve
11    account, at what time -- when would that deposit
12    be required?
13    A.    I believe I answered that before. 10
14    A.M. Tuesday morning, if that deposit was
15    required.
16    Q.    Okay. Could you just tell me which
17    regulation it is that would require a credit in
18    the reserve formula for the seizure of assets on
19    the 19th?
20    A.    I believe the credit goes into the
21    reserve formula because you would have customer
22    assets allocating to a loan.
23    Q.    Okay.
24    A.    A bank loan.
25    Q.    Is that in 15c3-3?

| Page 291 |
|---|

D. McIsaac

1
2    A.    Yes, it is.
3    Q.    Could you show me where in this
4    exhibit?
5    A.    Could you give me the interpretation
6    memos? It would be a lot easier to find it.
7    Q.    Absolutely. Yes. That would be in
8    Exhibit 695.
9         (Exhibit 695, Customer Protection -
10    Reserves and Custody of Securities SEA Rule
11    15c3-3, marked for identification, as of
12    this date.)
13    A.    I believe it's on page 2625 of the
14    FINRA Interpretation Handbook.
15    Q.    Okay. What portion of this on page
16    2625?
17    A.    It says "Proprietary Bank Loans versus
18    Customer Account Long."
19    Q.    Okay. Do you rely on anything else
20    for your opinion that if there were assets
21    seized, there would have to be a credit to the
22    reserve calculation?
23    A.    I believe there are other portions
24    within here that talk about the same thing --
25    Q.    This is the proprietary source?

| Page 292 |
|---|

D. McIsaac

1
2    A.    Customer property allocating to
3    proprietary bank loan.
4    Q.    Okay. Now, I'm going to move on to
5    coding errors. Your rebuttal report discusses
6    two alleged coding errors: One regarding the
7    classification of Woodlands Bank as a customer
8    or non-customer?
9    A.    Right.
10    Q.    And another relating to an error in
11    the ADP system; is that correct?
12    A.    Correct.
13    Q.    Are you aware of any other alleged
14    coding errors that would have affected the
15    credit side of LBI's reserve calculation as of
16    September 19, 2008?
17    A.    The ADP -- there were two instances of
18    a ADP. It was certain accounts were not -- were
19    picked up as customers. They should have been
20    non-customer, as well as the allocation. But
21    they're both this here.
22    Q.    So there's nothing other than what is
23    discussed in your reports in the way of coding
24    errors that you have identified?
25    A.    That I am aware of at this time, no.

| Page 293 |
|---|

D. McIsaac

1
2    Q.    Were you asked by the Trustee to
3    identify transactions or events that might have
4    required adjustments on the debit side of the
5    reserve calculation?
6    A.    All issues brought to my attention by
7    the Trustee would have been reviewed. There was
8    no indication of only reviewing the credit side.
9    In fact, the coding errors did have an impact on
10    both the debit and credit side.
11    Q.    Okay. Did you make any independent
12    effort to look for transactions or events that
13    would have required an adjustment to the reserve
14    calculation other than what was identified by
15    the Trustee for you?
16    A.    Nothing else was brought to my
17    attention that would have required that.
18    Q.    I understand. Did you make any
19    independent effort to look for additional
20    transactions or events?
21    A.    I did not.
22    Q.    Do you know if the Trustee looked for
23    errors that would have caused an adjustment on
24    the debit side of the reserve formula?
25    A.    I believe the Trustee and their

Contains Highly Confidential Portions

## Page 294

D. McIsaac

1  advisors looked for all and any adjustments that
2  would have impacted the 9/19 calculation.
3  Q.  Do you know if the Trustee and its
4  advisors have completed its -- their analysis of
5  any and all adjustments that would have impacted
6  the 9/19 calculation?
7  A.  I believe the Trustee and their
8  advisors are still researching facts and figures
9  as of the 19th of September, if anything was
10  to come to their attention, I believe they would
11  bring it up at that point in time. It was my
12  understanding as of the time I filed the
13  rebuttal report that no additional items have
14  been found.
15  Q.  So you believe the analysis is still
16  ongoing?
17  A.  I believe it's still in process, yes.
18  Q.  But you do believe that the Trustee
19  and its financial advisors have engaged in the
20  process?
21  MR. OXFORD: Objection. Form.
22  Q.  Do you understand the question?
23  A.  I don't know what process you're
24  talking about they engaged in.

## Page 295

D. McIsaac

1  Q.  The process of identifying -- the
2  process of identifying any and all adjustments
3  that would have impacted the 9/19 calculation?
4  A.  I believe they're still doing work as
5  it relates to 9/19, and as I said in my rebuttal
6  report, I don't think anything came to their
7  attention by the time I filed that report.
8  Q.  Okay. In paragraph 16 of your
9  rebuttal report, you say that the Woodland
10  assets had actually been seized. What did you
11  base that on?
12  A.  They were part of the assets that were
13  in the free box that was taken by Chase.
14  Q.  So it's the same Chase matter as we've
15  already discussed?
16  A.  No. These were never locked up in a
17  seg account because the account was coded as a
18  non-customer, not a customer.
19  Q.  On what day do you believe these were
20  seized?
21  A.  When Chase seized all the assets
22  versus the bank loan, which I assume was the
23  19th.
24  Q.  Which you assume was the 19th?

## Page 296

D. McIsaac

1  A.  Yes.
2  Q.  Okay. In rebuttal paragraph 18, this
3  is referring to I believe the ADP Broadridge
4  issue?
5  A.  Uh-huh.
6  Q.  You say that, "As part of a review
7  performed by Barclays," and you emphasize "by
8  Barclays," "at the request of the S.E.C.,
9  Barclays performed a partial recalculation of
10  the reserve formula to adjust for these known
11  discrepancies which revealed, as a result of the
12  coding errors, a $213 million shortfall."
13  And I -- you can turn to Exhibit 8 if
14  you want, that's what you cite, but I'd like to
15  know what your basis is for saying that Barclays
16  did a recalculation --
17  A.  I believe Barclays employees were the
18  ones sending the information to ADP and
19  requesting that a recalculation was done.
20  Q.  Okay. And do you know whether those
21  Barclays employees were Barclays employees
22  performing work for the Trustee under the TSA?
23  A.  I don't know in what capacity, but the
24  letterhead on the note to ADP at Broadridge was

## Page 297

D. McIsaac

1  Barclays.
2  Q.  I'm going to mark as Exhibit 696 a
3  declaration of Robert Martini dated April 5,
4  2010, and after she hands it to you my first
5  question will be have you seen it before.
6  (Exhibit 696, Declaration of Robert
7  Martini, marked for identification, as of
8  this date.)
9  A.  No, I have not.
10  Q.  Would you read paragraphs 5 through 7?
11  Let me know when you're through.
12  (Document review.)
13  A.  I've read it. I'm sorry, 5 through 7?
14  Okay.
15  Q.  Okay. Assuming that what Mr. Martini
16  says in his declaration is true, would that
17  change your opinion that Barclays performed a
18  recalculation of the reserve formula as set
19  forth in paragraph 18 of your rebuttal report?
20  A.  I saw a letter going from Barclays to
21  Broadridge directing them to make the changes.
22  They did all the research and directed them to
23  make the changes. Whether the employees who
24  actually did the calculation were TSA employees

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

      LEHMAN BROTHERS INC.,          Case No. 08-01420 (JMP) SIPA

                 Debtor.

### AFFIDAVIT OF DANIEL MCISAAC

STATE OF NEW YORK   )
                :    ss:
COUNTY OF NEW YORK  )

        Daniel McIsaac, being duly sworn, deposes and says:

        1.    I have been retained by Hughes Hubbard & Reed LLP ("Hughes Hubbard"), attorneys for James W. Giddens as Trustee for the Liquidation of Lehman Brothers Inc. (the "Trustee" and "LBI," respectively), to provide expert analysis and opinions on various matters related to formulation of principles and methodology for the allocation of the LBI assets under the Trustee's control between the fund of customer property and LBI's general estate.

### I.    BACKGROUND AND QUALIFICATIONS

        2.    For approximately 30 years, I have held executive positions in financial institutions and public accounting firms, specializing in the accounting and regulatory compliance issues facing securities broker-dealers. My curriculum vitae is attached as Exhibit 1.[1]

        3.    Currently, I serve as Chairman of the Capital Committee of the Securities Industry and Financial Markets Association ("SIFMA"), a membership organization comprised

---

1.  All exhibits referenced herein are attached to this affidavit.

of participants in the financial industry, including securities firms, U.S.-registered broker-dealers and asset managers. The Capital Committee is focused on regulatory and legislative issues that impact the regulatory capital and customer protection activities of member firms. From 2004 until early 2006, I served as president of the Financial Management Division of SIFMA, which focuses on matters relating to financial and regulatory issues in the securities industry. I have also served in various capacities on industry committees and task forces responsible for development, interpretation and compliance with regulations promulgated by the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").

4.    I also have many years of private sector experience with regulated broker-dealers, including UBS Securities LLC ("UBS"), Dean Witter Reynolds and Drexel Burnham Lambert, dealing primarily with SEC reporting and compliance. Most recently, from 1994 until June 2009, I served as the regulatory controller for UBS, directing all regulatory calculations and filings, including weekly computations of the firm's reserve requirement under SEC Rule 15c3-3 (the "Customer Protection Rule" or "Rule 15c3-3"), monthly Financial and Operational Combined Uniform Single ("FOCUS") Reports, and daily as well as monthly Commodity Futures Trading Commission ("CFTC") segregation calculations. I was also responsible for managing all regulatory relationships and served as the firm's industry representative in regulatory matters.

5.    Based on my experience in the public and private sectors, I am fully familiar with the SEC rules governing financial responsibility of SEC-registered broker-dealers and the protection of customer property, and with industry practices regarding the handling of customer property and compliance with SEC customer protection rules.

3

## II.    INDUSTRY REGULATIONS FOR THE SAFEGUARDING OF CUSTOMER PROPERTY

6.    As a broker-dealer registered with the Securities and Exchange Commission, LBI was subject to SEC Rules designed to insure financial responsibility and to protect the broker-dealer's customers: (a) Rule 15c3-1, commonly referred to as the "Net Capital Rule," establishes minimum net capital requirements in order to operate as a broker-dealer; and (b) Rule 15c3-3 essentially provides that customer property in excess of margin requirements may not be used to support borrowing by the broker-dealer, but must be maintained at all times in good control locations and free of liens, or corresponding amounts segregated and available unconditionally to satisfy customer claims in the event of a liquidation.

### A.    The Net Capital Rule

7.    The SEC's Net Capital Rule requires every broker-dealer to maintain at all times specified minimum levels of liquid assets, or net capital, sufficient to enable a firm to liquidate in an orderly fashion. In this way, the Net Capital Rule ensures that a broker-dealer is able to compensate customers and creditors fully if it is forced to cease its operations.

8.    Under the Net Capital Rule, a broker-dealer computes its net worth subject to certain exclusions as prescribed by SEC rules For example, the firm excludes assets not readily convertible into cash such as fixed assets, prepaid items, certain unsecured, partly secured, and other outstanding receivables, and insurance claims. See 17 C.F.R. § 240.15c3-1(c)(2)(iv).

9.    To compute its "net capital," the broker-dealer computes its equity under Generally Accepted Accounting Principles ("GAAP") and adjusts that amount by making certain additions and subtractions, including percentage reductions ("haircuts") in the market value of its securities and commodities positions. In theory, a calculation of "net capital" greater than zero

would mean the "liquid assets" owned by a broker-dealer could be sold to repay all its obligations, even those not then due, other than any qualifying subordinated debt that the Net Capital Rule treated as regulatory capital.

10.    The Net Capital Rule establishes two methods of compliance.  The "Aggregate Indebtedness Standard" seeks to ensure a broker-dealer's aggregate indebtedness does not exceed 1500 percent of its net capital.  In other words, the firm's aggregate indebtedness could not be more than 15 times the amount of its net capital.  This method measures "liquid assets" of the broker-dealer against most of its unsecured indebtedness.  The "liquid assets" serve as the "cushion" to cover full repayment of that unsecured debt.

11.    The "Alternative Standard" uses a percentage of monies owed by customers to effectuate customer transactions as a baseline for the net capital requirement.  Under this standard, "a broker or dealer shall not permit its net capital to be less than the greater of $250,000 or 2 percent of aggregate debit items computed in accordance with the Formula for Determination of Reserve Requirement for Brokers and Dealers (Exhibit A to Rule 15c3-3, § 240.15c3-3a)."  17 C.F.R. § 240.15c3-1.  (See Ex. 2 (Exhibit A to Rule 15c3-3, the "Reserve Formula").)

12.    Additionally, in 2004, the SEC established the Consolidated Supervised Entity ("CSE") program, which incorporates certain modifications into the Alternative Standard.  A firm accepted into this program must maintain tentative net capital of not less than $1 billion and net capital of not less than $500 million, and it must provide same-day notification to the SEC if its tentative net capital falls below $5 billion.  If a firm accepted into this program and therefore undertakes supplemental reporting, recordkeeping, and notification obligations, among

5

other things, it is permitted to use firm designed market and credit risk models in lieu of

deductions required in sections (c)(2)(iv), (vi), and (vii) of SEC Rule 15c3-1.

13.    Customers, the investment community and regulators rely on a broker-

dealer's compliance with the Net Capital Rule and on the availability of the liquid assets that are

counted as part of the regulatory capital. When a broker-dealer falls out of net capital

compliance, it must immediately report the violation to the SEC and cease operations until it

resumes compliance.

B.    The Customer Segregation Rule

14.    SEC Rule 15c3-3, often referred to in industry terms as the Customer

Segregation Rule or the Customer Protection Rule, was established by the SEC to safeguard and

restrict the use of customer assets, whether in the form of securities or cash.

15.    The Customer Protection Rule contains two important requirements. First,

it ensures safekeeping of customer securities by requiring that a broker-dealer have physical

possession or "good control" of all fully-paid and excess margin securities carried for the

accounts of customers, and insure that customer fully paid and excess margin securities are not

subject to liens based on the obligations of the broker-dealer. Second, it requires the broker-

dealer to maintain funds in a special bank account for the exclusive benefit of customers (the

"Reserve Account") in an amount sufficient to cover the net amounts that the broker-dealer owes

to customers.

1.    Safekeeping of Customer Securities

16.    The first part of Rule 15c3-3 requires a broker-dealer to have physical

possession or "control" of all fully paid and excess margin securities carried for the accounts of

customers. Excess margin securities are securities bought by customers on margin that are in

6

excess of that amount the broker-dealer may hypothecate (or pledge) to finance the customers'

margin purchases. Where a broker dealer is not in actual possession of a customer's securities,

the broker-dealer remains in compliance with the Rule so long as it maintains effective "control"

over the securities.

17.    Rule 15c3-3 defines the term "control" and specifies circumstances under

which customer securities may be in the physical possession of a person other than the broker-

dealer. A broker-dealer has control over the securities if there is certainty that the broker-dealer

can obtain them promptly, without the payment of money or value. For example, securities at a

domestic bank that are not subject to any right, charge, security interest, lien or claim of any kind

in favor of a bank or any person claiming through the bank are generally deemed to be in good

control locations. Typically, the broker-dealer and bank execute a "no-lien letter," in which the

bank agrees not to assert any lien or right to property held in customer accounts. In industry

terms, a location that meets the requirements is called a "good control location." Conversely,

securities not held free of liens in good control locations might not be readily accessible to a

broker-dealer for a variety of reasons. For example, the securities might be subject to a lien or

the securities might be held by a foreign bank in an account that has not been approved by the

SEC.

18.    If customer securities are not within the broker-dealer's possession or in a

good control location, the broker-dealer must obtain possession or control promptly. 17 C.F.R.

§ 240.15c3-3(d). Paragraph (d) requires the broker-dealer, "[n]ot later than the next business

day" to "determine from his books or records the quantity of fully paid securities and excess

margin securities in his possession or control and the quantity of fully paid securities and excess

margin securities not in his possession or control." Id. If the broker-dealer does not have

possession or control, it must take action to obtain those or similar securities, and may be required to use its own funds to purchase securities or make deposits in the Reserve Account, defined below, in order to cover the deficit. 17 C.F.R. § 240.15c3-3(d)(1)-(3).

### 2.    The Reserve Account for the Exclusive Benefit of Customers

19.    The second part of Rule 15c3-3 requires the broker-dealer to maintain bank deposits "for the Exclusive Benefit of Customers" (the Reserve Account), in an amount equal to the net amount that the broker-dealer owes to customers and to settle customers' transactions. 17 C.F.R. § 240.15c3-3(e). The broker-dealer is required to obtain written notification from each bank holding its Reserve Account confirming that the amounts are being held for the exclusive benefit of customers and that the amounts are being kept separate from other accounts maintained by the broker-dealer at the bank. 17 C.F.R. § 240.15c3-3(f). Additionally, the broker-dealer is required to obtain a written agreement with the bank holding its Reserve Account providing that the amounts in the Reserve Account will not be used as security for a loan and that the amounts are subject to no right, charge, security interest, lien, or claim of any kind. Id.

20.    A computation is made each week as of close of business on Friday (or as required by the SEC) using a "Reserve Formula" to determine what is required to be kept on deposit. See 17 C.F.R. § 240.15c3-3(e)(3); see also Ex. 2.

21.    Pursuant to the Reserve Formula, the broker-dealer calculates the total amount of "credit items," essentially monies owed by the broker-dealer to customers and those used to effectuate customer transactions, which include: (i) balances that represent money obligations to customers; (ii) amounts that the broker-dealer has obtained through the use of customer property; and (iii) certain reserves for operational inefficiencies. Subtracted from the

total of credit items are "debit items," basically monies owed to the broker-dealer by customers

and/or to satisfy customer transactions, consisting of essentially secured receivables from

customers or other persons involved with financing transactions on behalf of customers (such

debit items are reduced by 3%). See 17 C.F.R. § 240.15c3-3(e)(1); Ex. 2.

22.    If the credits exceed the debits, the broker-dealer must deposit the excess

in the Reserve Account.[2]  If the debits exceed the credits, no deposit is necessary.[3]  Required

deposits must be made no later than one hour after the opening of banking business on the

second following business day, that is, by 10 a.m. the Tuesday following the typical Friday

calculation date.  17 C.F.R. § 240.15c3-3(e)(3).  Paragraph (g) of the Customer Protection Rule

allows the broker-dealer to make withdrawals from the Reserve Account only when a current

Reserve Formula computation indicates that excess cash or qualified securities have been

deposited.  17 C.F.R. § 240.15c3-3(g).

## III.    LBI'S COMPLIANCE WITH CUSTOMER PROTECTION RULES

### A.    LBI's Systems for Computing its Reserve Requirements

23.    LBI maintained highly specialized and complex information systems to

track the location and status of customer securities for purposes of the Rule 15c3-3 segregation

requirement, as well as the constant fluctuation of customer credits and debits.  In addition, these

systems were also used to perform the weekly Reserve Formula allocation and to track the

ending customer debit and credit balances for purposes of computing the Reserve Account

---

2.    See 17 C.F.R. § 240.15c3-3(e)(1).  The broker-dealer may not withdraw these funds unless another Reserve Formula computation is made before withdrawal which shows that no deposit, or a lesser deposit is necessary. 17 C.F.R. § 240.15c3-3(g).

3.    This, in effect, would represent a case where customers of the broker-dealer owe the broker-dealer more than the broker-dealer owes the customers.

requirement. In formulating my opinion, I worked closely with the Trustee's financial advisors to understand LBI's systems.

24.    In general, the Reserve Formula computation requires input from many areas of the firm and includes automated reports, manual calculations, reconciliations and analysis of cash and operational accounts, manual adjustments and detailed analysis of amounts and variances from prior computations. The computation utilizes both the general ledger and the stock record to determine the firm's net exposure to customers. When an account is opened it is assigned a "code" or included in a range that designates what "category" of accounts it should be grouped with, for example whether customer or non-customer. These groupings are used to summarize both the cash balances in the accounts as well as the security market values that are included in the computation. Reports are either provided by or generated from the general ledger to provide customer receivable and payable balances as well as contract values for other Reserve Formula items. The specific items required to be included in the Reserve Formula are detailed in a schedule appended as an exhibit to SEC Rule 15(c)3-3 titled "Formula For Determination of Reserve Requirement of Brokers and Dealers under § 240.15c3-3. (See Ex. 2.) System generated reports are used to allocate the stock record positions into includable and excludable buckets based on market value of the securities. Other amounts included in the Formula are calculated either through reconciliations or calculations performed within the group or department of the firm responsible for preparing the computation as well other areas throughout the firm. In addition, various reconciliations and analyses provide the basis for manual adjustments to system generated reports. The amounts provided from all sources are summarized in Excel spreadsheets that perform various arithmetic calculations that become the source of the summarized computation. Given the complexity of these processes, errors may

occur and broker-dealers usually include a cushion (an amount in excess of the computed Reserve Account requirement) in the Reserve Formula to compensate for such errors.

25.    I have been informed that LBI's automated systems tracked over tens of thousands of accounts, each coded in a way that would allow correct treatment of cash and securities for purposes of Rule 15c3-3 compliance as well as other purposes. The ability of LBI's computer systems to produce accurate accounting for customer property depended on correct "coding" of each of these accounts. On a regular basis, manual adjustments and interpretation of the system generated amounts are required to achieve compliance. As discussed below, errors in coding of accounts significantly impacted LBI's reserve computation.

26.    Further, each "control location" for LBI customer securities must comply with its agreement regarding the safekeeping and status of the securities in their custody, especially regarding whether the securities may or may not be pledged or otherwise serve as collateral for the debts of LBI. As discussed below, errors and disputes in this category appear to be responsible for significant instances of non-compliance and consequent seizure or detention of customer property by custodians to satisfy claimed debts of LBI.

### B.    LBI's Reserve Calculations Immediately Before and After September 19, 2008

27.    On Friday, September 12, 2008, its last day of "normal" operation prior to Lehman Brothers Holding Inc.'s chapter 11 bankruptcy filing, LBI's calculation for its Reserve Account requirement stood at $5.7 billion. As of the following Friday, September 19, 2008, the day LBI's SIPC liquidation commenced (the "Filing Date"), in the face of large stock record and general ledger breaks as well as the general collapse of LBI's liquidity, LBI employees prepared

a reserve account computation showing that the lock up requirement had declined to about $600 million, an average decrease of over one billion dollars a day.[4]

28. During the last week of LBI's operation as a broker-dealer and immediately thereafter, its Rule 15c3-3 compliance systems and personnel also confronted technical difficulties caused by bank account freezes, as well as large numbers of general ledger and stock record breaks. LBI personnel recognized that significant manual effort was needed to resolve various issues surrounding the information provided by the various systems and used for the Reserve Formula.[5]

29. The reserve computation prepared during the weekend of September 20 and 21 appears to have been further hampered by the lack of access to certain electronic systems. On September 18, 2008, JPMorgan Chase ("Chase"), LBI's primary clearing bank, reportedly discontinued LBI's real-time electronic access to the accounts LBI maintained at Chase. (See,

---

4. As shown in Exhibit 3 (Rule 15c3-3 Reserve Computation graph), up until the week before the Filing Date, the lock up requirement was generally in the $3 billion to $6 billion range.

5. At 9:08 p.m. on September 20, LBI's financial controller noted "many breaks/fails" and that he had "a large team working now and through the night to resolve." (See Ex. 4.)

   The same evening, another LBI employee reported that the reserve formula "gives a net debit of 1.9 billion" without taking account of such potentially significant items as bank overdrafts, unapplied customer cash, stock record breaks or money fund fails. The same email noted also "around 8 bil worth of breaks" that were "due to the banks being frozen last Friday." (See Ex. 5.)

   Around the same time, LBI's vice-president in charge of customer reserves, reported that "the customer reserve is showing a net debit over 1 billion" although "[t]his number is not final since there are over 6 billion in stock record breaks that must be resolved." (See Ex. 6.)

   During the weekend of September 20-21, LBI employees were under time pressure to complete a reserve calculation as of September 19 and worked around the clock to complete the calculation. In the process, several drafts of the reserve computation were prepared, and LBI employees appear to have made manual adjustments and assumptions to get the computation done within the time limit, although there was "so little transparency into the way the data is structured it's hugely frustrating on all sides." (See Ex. 7.)

   Several drafts of the reserve computation were circulated during the weekend, each showing different lock-up requirements. (See, e.g., Exs. 8-21.) At 12:59 a.m. on September 22, LBI's calculations were still showing a reserve requirement of $3.1 billion. (See Ex. 22.) However, by the end of the day on September 22, the reserve requirement was reported to be only $556 million. (See Ex. 23; see also Ex. 24 (LBI's final calculation as of September 19, 2008, reflecting a reserve requirement of $569 million).)

e.g., Exs. 25, 26.) Inability to monitor these accounts would have impeded LBI's ability to keep up-to-date records and to process settlements of both customer and firm transactions on a timely and automated basis.

30.    Due to these factors, LBI appears to have relied to a significant extent on manual adjustments, with resulting susceptibility to human error. These manual adjustments are evident from LBI's correspondence during this weekend. (See Exs. 5, 6, 7, 27.) In particular, as evident by internal LBI correspondence during the weekend of September 20 and 21, the processing of trades flowing through the Chase clearance, custody and customer segregated accounts resulted in an unusually large amount of "breaks." (See, e.g., Ex. 5.) For LBI to prepare its reserve calculation during this weekend, it would have had to resolve these "breaks" through manual processes and adjustments to data produced by LBI's information systems. These manual processes likely contributed to some of the errors in LBI's reserve calculations as of September 19.

31.    Given the foregoing factors and the degree of confusion and market disorder that surrounded the failure of LBI, reconstructing and evaluating the accuracy of the various iterations of the Reserve Formula calculations carried out by LBI personnel would be difficult, and in any event would not be a useful exercise. Based on my investigations and discussions with the Trustee's financial advisors, I have concluded that LBI either omitted entirely or incorrectly reported significant items in the Reserve Formula calculation, resulting in understatement of credits or overstatement of debits. Some of the necessary adjustments are described below.

C.    Lapses in LBI's Rule 15c3-3 Compliance

    1.    Items Omitted or Incorrectly Reported in the Reserve Formula

        a.    FID Accounts Maintained at Chase

32.    LBI maintained accounts at Chase for certain of its Fixed Income Division prime broker clients (the "FID Accounts"). I have been informed that as of the Filing Date, approximately $630 million in customer securities and approximately $258 million in cash were held by Chase in these accounts.

33.    I have been informed that LBI had obtained a no-lien letter regarding the FID Accounts, but on September 19, Chase seized and liquidated the $630 million in securities associated with the FID Accounts to satisfy LBI's debts to Chase. I understand there is a dispute between the Trustee and Chase regarding Chase's position that it was entitled to seize the securities because the no-lien letter was no longer valid due to a course of dealing between Chase and LBI employees.

34.    The fact of a dispute as to Chase's ability to seize property in the FID Accounts to satisfy debts of LBI means that property in the Chase FID Accounts were at risk, and that the value of the securities should be included as a credit in the Reserve Formula computation.

35.    With respect to the cash contained in the FID Accounts, LBI's Reserve Account computation should have included such customer cash balances as a credit. However, after Chase swept the accounts and terminated LBI's access to its electronic systems, LBI no longer had the ability to view the balances in these Chase accounts. I was informed that the cash received of $258 million was not recorded by LBI as a customer payable because it had been swept by Chase without LBI's knowledge. Thus, when LBI prepared its final reserve

computation over the September 20-21 weekend, the payable was not included as a credit in the Reserve Formula. Nor did it reflect the $630 million in securities that were seized by Chase. Taking account of both cash and securities, the Reserve Account deficit attributable to these events is not less than $891 million.

### b.    Account Coding Errors

36.    To effectuate the correct allocation to customers for purposes of Rule 15c3-3 segregation and the Reserve Account requirements, LBI's automated systems depended on correct coding of an account as "customer" or "noncustomer" at the time of account creation. Thus, when LBI employees established customer accounts, they would assign account numbers that would instruct LBI's automated systems to include debits and credits and the corresponding securities as customer in the Rule 15c3-3 reserve computation, and otherwise to distinguish them from non-customer accounts. Included as non-customers were LBI affiliates that had signed subordination agreements,[6] and LBI affiliates that had not (some of which may be customers, depending on the circumstances).

37.    It is already clear that certain customer accounts were improperly classified in LBI's systems as non-customer. One such account was for Woodlands Bank, a U.S. domiciled Lehman affiliate which I have been informed was not a signatory to a subordination agreement but was coded in the subordinated affiliate account range. Based on this coding, segregation instructions were not applied to Woodlands' securities. This resulted in a segregation failure affecting securities that ultimately were seized by Chase to cover a debt of LBI. Therefore, the failure to properly segregate these securities should require an additional

---

6.    Under Rule 15c3-3(a)(1), customer does not include a "person to the extent that person has a claim for property or funds which by contract, agreement, or understanding, or by operation of law, is part of the capital of the broker or dealer or is subordinated to the claims of creditors of the broker or dealer." 17 C.F.R. § 240.15c3-3(a)(1).

15

credit to be added to the Reserve Formula, and a corresponding increase in the Reserve Account
deposit requirement in the amount of the market value of the Woodlands' securities, which I
have been informed is $534 million.[7]

38.    Other coding errors gave "customer" coding to non-customer accounts.
Such errors led to a reserve shortfall to the extent that debits in such mis-coded accounts exceed
credits, thereby reducing the Reserve Account requirement.  In addition, errors detected in LBI's
service providers' allocation program used in the calculation of the Reserve Formula caused
additional shortfalls.  According to research carried out by former LBI (now Barclays) personnel,
correction of these errors results in the addition of $213 million to the Reserve Account
requirement, with further adjustment possible as further errors are discovered.  (See Ex. 28.)

c.    Assets Subject to LBIE Administration

39.    Lehman Brothers International (Europe) ("LBIE") acted as custodian for
some of LBI's customer business and thus held some of LBI's customers' securities.  I
understand that as of September 19, 2008, LBI had no less than $439 million in customer
securities in custody with LBIE.  (See Ex. 29.)  Because LBIE was considered a "good control
location," LBI did not reflect credits in the Reserve Formula for the value of the securities held at
LBIE, or take other steps to obtain possession of equivalent securities, as would otherwise have
been required.

40.    LBIE's insolvency filing in the United Kingdom was a material change in
its condition, and meant that LBI no longer had prompt access to securities held by LBIE or the
ability to control their transfer.  LBIE accordingly ceased to be a good control location, and an

---

7.  I have been informed from the Trustee's advisors that LBI also coded other accounts containing a significant
amount of property as accounts for affiliates subject to subordination agreements. The account holders have
nevertheless submitted customer claims. In the event they are determined to be customer accounts, there would
be a significant additional shortfall in segregated customer property.

additional credit of no less than $439 million should have been included in the Reserve Formula as of September 19, 2008.

### d.    Customer Cash Claimed by LBIE

41.    The Trustee's investigation has further revealed that about $2.3 billion allegedly owed to LBIE's customers was not included as a credit in LBI's reserve computation as of September 19, 2008. Prior to insolvency, LBIE submitted trades to LBI for execution on behalf of its customers. On a daily basis, LBI and LBIE reconciled and settled their positions. On September 10, 2008, LBI's position with LBIE showed a payable of approximately $2.3 billion to LBIE in an account used for LBIE customers' transactions. (See Exs. 30, 31, 32.)

42.    LBI personnel identified the issue, investigated it and "[s]uspect[ed] it relate[d] to large client transfers." (See Ex. 31-35.) The payable appears to have been related to LBIE customer trades. (See Ex. 36.) LBI's Senior Vice President of Regulatory Reporting observed that resolution of this issue was "critical for the reserve." (See Ex. 35.) It appears that the balance was still being investigated by LBI when, on September 15, 2008, LBIE went into administration.

43.    Ultimately, for reasons that are unclear, LBI personnel determined that the amount should not be included in the Reserve Formula, and when it performed its September 19, 2008 reserve calculation, the $2.3 billion was not included as a credit. In fact, based on my discussion with the Trustee's financial advisors and my review of the September 19 calculation, it appears that this amount was manually removed from the Reserve Formula.

44.    I have not seen any document to suggest that this amount was actually transferred or paid out to LBIE or its customers. Therefore, under SEC rules, LBI should have included this customer obligation as a "credit" in the Reserve Formula. I also understand that

17

LBIE has submitted a customer claim for the $2.3 billion corresponding to this amount, thus creating an actual shortfall to the extent this is allowed as a customer claim.

### e.    OCC Deposit

45.    LBI also included as a debit in its September 19, 2008 Reserve Formula computation a $507 million deposit LBI made with the Options Clearing Corporation ("OCC") to secure customer-related obligations of LBI. (See Ex. 24; see also Ex. 37.)  The inclusion of this amount as a debit is in accordance with the rules and had the effect of reducing the Reserve Account requirement in the amount of $507 million (less 3%).  I understand that the Trustee is now involved in a dispute with Barclays over entitlement to the OCC Deposit.  The use of the debit in the Reserve Formula is analogous to a deposit in the reserve bank account, and, if the Trustee is not successful in securing this deposit for the benefit of customers, the Reserve Formula debit should be eliminated.  This would create an additional customer property shortfall.

### f.    Customer Property Seizure During Transfer Process

46.    During the period immediately preceding and following the Chapter 11 filing of LBHI, many customers of LBI attempted to withdraw cash and move securities to other brokers.  To the extent that actual delivery of cash was made to customers, this would reduce LBI's Reserve Account requirement.  Actual delivery of securities would also relieve LBI of Rule 15c3-3 custody requirements as to the delivered property.  However, interruptions in the delivery process during the period surrounding the LBI filing had the effect of exposing customer cash and securities to third party seizure.

47.    This situation occurred with cash from liquidation of customers' foreign money market fund positions.  During normal operations, customers holding money market funds denominated in non-US currencies were tracked by LBI on its "ADP" system, which in turn fed information regarding customer holdings into the Rule 15c3-3 calculations.  During the

week of September 15, I have been informed that according to LBI's books and records,

customers holding approximately $82 million in such money market fund positions attempted to

withdraw, instructing LBI to liquidate and wire transfer the proceeds to their banks. To carry out

this instruction, LBI's process included moving the proceeds of the liquidation of money market

fund positions from LBI's ADP system, and recording them instead through LBI's "RISC"

system, which was designed to handle foreign currency transactions and conversions, but (unlike

ADP) did not automatically feed information regarding customer obligations into the Rule 15c3-

3 calculation.

48.    Following the liquidation of foreign money market fund positions and

prior to wire transfer, the proceeds were deposited in an account at Citibank London. This

account apparently did not have a "no-lien" letter, and following the September 19 LBI filing,

the funds were seized by the bank. Because the foreign money market fund liquidation proceeds

and the customer obligations they represented were then being tracked by the RISC system, an

appropriate credit in the Rule 15c3-3 calculation was not automatic, but depended on manual

intervention to identify them as funds owed to customers. The notification to the preparers of the

Reserve Formula computation apparently did not occur, and I have been informed that the

resulting credit was not included in the September 19, 2008 Reserve Formula. The result was

under-reported Reserve Formula credits in the amount of $82 million, with a corresponding

shortfall in the Reserve Account.

49.    In my opinion, the incidents identified in (a) through (f) above will result

in a shortfall in the customer property of LBI. Had these items been identified prior to the Filing

Date, LBI management would have been compelled, pursuant to its customer protection

obligations, to devote all free resources of LBI, whether customer or proprietary, to meet its

customer protection obligations. My calculations show that the currently known issues aggregate to approximately $4.9 billion and show a current shortfall in the Reserve Account of approximately $3.7 billion.

### 2.   Items Currently Under Investigation

50.   The items identified below have been identified as having the potential to increase LBI's Reserve Account obligation if further investigation supports the conclusion that they were not correctly accounted for in LBI's Reserve Formula calculation. Similarly, as the liquidation continues, further items arising from custody issues, adjustments to customer and other general ledger balances, and other Reserve Formula errors may be identified.

### a.   Chase Bank Overdraft

51.   LBI's main operating account at Chase, used for both customer and proprietary transactions, developed a large overdraft. (See Exs. 5, 38.) To cover this overdraft, beginning on September 18, Chase seized LBI cash and collateral held at Chase, and it has taken the position that, despite seizing and liquidating billions of dollars in collateral, the bank is still owed billions of dollars on this overdraft. (See Exs. 39, 40.)

52.   Under Rule 15c3-3, overdrafts are "credit" items that are required to be reflected in the reserve computation. (See Ex. 41 (Excerpt of FINRA Interpretations of Financial and Operational Rules, Customer Protection – Reserves and Custody of Securities SEA Rule 15c3-3, at 2656 (2008).) When LBI computed its reserve requirement as of September 19, it was required to reflect the overdrafts at Chase on the credit side of the Reserve Formula, increasing the reserve requirement dollar-for-dollar.

53.   From my review of LBI's internal documents, it appears that LBI personnel computing the reserve requirement as of September 19 during the weekend of

September 20-21 were aware of this issue. As noted, above, an LBI internal e-mail dated September 20, 2008 circulating a "Rough Estimate for 15c3-3" warned that the estimate had not taken account of "Bank overdrafts" and numerous other items. (See Ex. 5.) While one responder stated that, "We cannot possibly solve this," (id.), others decided that the Chase overdraft could be characterized as merely a "secured loan," and thus it was left out of LBI's Rule 15c3-3 Reserve Formula computation (id.). Others again raised the overdraft on the Chase account the following day, and were advised: "[w]e should ignore this." (See Ex. 38.) Despite this instruction, my review of internal emails indicated that the overdraft remained an open item into the following week that required further investigation.

54.    Should further investigation reveal that the account was an under-secured overdraft account, LBI was required to include, at the very least, the amount related to customer activity as a "credit" in the formula, and arguably the entire overdraft amount if the customer component could not be readily ascertained.

b.    **Inclusion of Unsecured Debits in Reserve Formula**

55.    The Reserve Formula permits customer credits to be offset by customer debits, thus reducing the cash lock-up requirement by amounts owed by customers to the broker-dealer. An important limitation on this rule is that the customer debits so deducted must be fully secured by collateral held by the broker-dealer. (See Ex. 2; see also Ex. 42 (Excerpt of FINRA, Interpretations of Financial and Operational Rules, Customer Protection – Reserves and Custody of Securities, SEA Rule 15c3-3, at 2721-22 (2008)).)

56.    Investigation is continuing on the question of whether during the period preceding the Filing Date, LBI's Rule 15c3-3 calculation included unsecured or under-secured customer debits to be used in the Reserve Formula. Should the investigation reveal such use of

unsecured or under-secured customer debits, the Trustee would be required to allocate property

as necessary to remedy the shortfall.

c.    **Customer Securities Included in the Barclays Repo**

57.    I understand that prior to its bankruptcy, LBI and Barclays entered into a

repurchase, or repo, transaction (the "Barclays Repo") to provide temporary liquidity to LBI in

its final week of operation whereby approximately $49.7 billion in LBI securities were

transferred to Barclays in return for a cash loan of $45 billion.

58.    Based on information provided by the Trustee's financial advisors, it

appears that customer securities were included in the Barclays Repo transaction. This inclusion

was permissible under SEC Rule 15c3-3 so long as LBI included credits in the Reserve Formula

to the greater of the market value of the securities included in the repo or the contract value

associated with these securities. If the Trustee's investigation reveals that LBI overlooked

certain customer securities included in the Barclays Repo when doing its Reserve Formula

calculation, there would be a further shortfall in the Reserve Account.

d.    **Assets Detained by Foreign Banks**

59.    To treat a foreign bank as a good control location for Rule 15c3-3

purposes, a broker-dealer is required to submit an application to the SEC requesting such

treatment, and the bank must agree in writing to appropriate custody obligations. LBI treated

certain foreign banks as good control locations for purposes of custody of LBI customer

securities.

60.    I am informed that certain banks have refused to turn over to the Trustee

the customer securities they were holding on behalf of LBI, ostensibly in their capacities as good

control locations. Investigation is continuing into whether the foreign banks were correctly

22

treated by LBI as good control locations. If they were not, there will be an additional shortfall in

property required to be segregated for customers.

e.    **Other Reserve Computation Errors and Omissions**

61.    Also under review are certain other items in LBI's Reserve Formula

computation. LBI included many billions in customer debit items for stock borrows and fails to

deliver attributable to customer transactions. It is not possible at this time to forecast what

portion of these debit items will actually be realized, as there will be litigation and collectability

issues to address on a case-by-case basis. In the event that LBI does not realize the full claimed

value of the debit items, there will be an additional shortfall in customer property. The full

extent of this issue will not be known until the Trustee completes the process of closing-out and

recovering on these open transactions.

62.    The Trustee is also investigating whether the reserve computation was

performed with appropriate market values of customer securities. In at least one case, the

Trustee has identified a discrepancy between what LBI's systems showed as the market value of

a customer's securities and what the customer now claims as the market value. As the correct

market values are determined, adjustments, whether to increase or decrease the amount that

should have been locked up in the Reserve Account, may be required.

Daniel McIsaac

Sworn to and subscribed before
me this 5 th day of ocþßeß 2009

Notary Public State of New York

STEVEN SHEPPARD DICESARE
Notary Public, State of New York
No. 02DI6110913
Qualified in New York County
Commission Expires June 1, 2012

# DOCUMENT SEPERATOR

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

       LEHMAN BROTHERS INC.,    Case No. 08-01420 (JMP) SIPA

                Debtor.

**AFFIDAVIT OF DANIEL MCISAAC**

STATE OF NEW YORK   )
               :   ss:
COUNTY OF NEW YORK )

Daniel McIsaac, being duly sworn, deposes and says:

1.    I have been retained by Hughes Hubbard & Reed LLP ("Hughes Hubbard"), attorneys for James W. Giddens as Trustee for the Liquidation of Lehman Brothers Inc. (the "Trustee" and "LBI," respectively), to provide expert analysis and opinions on various matters related to formulation of principles and methodology for the allocation of the LBI assets under the Trustee's control between the fund of customer property and LBI's general estate.

I.    **BACKGROUND AND QUALIFICATIONS**

2.    For approximately 30 years, I have held executive positions in financial institutions and public accounting firms, specializing in the accounting and regulatory compliance issues facing securities broker-dealers. My curriculum vitae is attached as Exhibit 1.[1]

3.    Currently, I serve as Chairman of the Capital Committee of the Securities Industry and Financial Markets Association ("SIFMA"), a membership organization comprised

---

1.  All exhibits referenced herein are attached to this affidavit.

2

of participants in the financial industry, including securities firms, U.S.-registered broker-dealers and asset managers. The Capital Committee is focused on regulatory and legislative issues that impact the regulatory capital and customer protection activities of member firms. From 2004 until early 2006, I served as president of the Financial Management Division of SIFMA, which focuses on matters relating to financial and regulatory issues in the securities industry. I have also served in various capacities on industry committees and task forces responsible for development, interpretation and compliance with regulations promulgated by the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").

4.     I also have many years of private sector experience with regulated broker-dealers, including UBS Securities LLC ("UBS"), Dean Witter Reynolds and Drexel Burnham Lambert, dealing primarily with SEC reporting and compliance. Most recently, from 1994 until June 2009, I served as the regulatory controller for UBS, directing all regulatory calculations and filings, including weekly computations of the firm's reserve requirement under SEC Rule 15c3-3 (the "Customer Protection Rule" or "Rule 15c3-3"), monthly Financial and Operational Combined Uniform Single ("FOCUS") Reports, and daily as well as monthly Commodity Futures Trading Commission ("CFTC") segregation calculations. I was also responsible for managing all regulatory relationships and served as the firm's industry representative in regulatory matters.

5.     Based on my experience in the public and private sectors, I am fully familiar with the SEC rules governing financial responsibility of SEC-registered broker-dealers and the protection of customer property, and with industry practices regarding the handling of customer property and compliance with SEC customer protection rules.

3

## II.    INDUSTRY REGULATIONS FOR THE SAFEGUARDING OF CUSTOMER PROPERTY

6.    As a broker-dealer registered with the Securities and Exchange Commission, LBI was subject to SEC Rules designed to insure financial responsibility and to protect the broker-dealer's customers:  (a) Rule 15c3-1, commonly referred to as the "Net Capital Rule," establishes minimum net capital requirements in order to operate as a broker-dealer; and (b) Rule 15c3-3 essentially provides that customer property in excess of margin requirements may not be used to support borrowing by the broker-dealer, but must be maintained at all times in good control locations and free of liens, or corresponding amounts segregated and available unconditionally to satisfy customer claims in the event of a liquidation.

### A.    The Net Capital Rule

7.    The SEC's Net Capital Rule requires every broker-dealer to maintain at all times specified minimum levels of liquid assets, or net capital, sufficient to enable a firm to liquidate in an orderly fashion.  In this way, the Net Capital Rule ensures that a broker-dealer is able to compensate customers and creditors fully if it is forced to cease its operations.

8.    Under the Net Capital Rule, a broker-dealer computes its net worth subject to certain exclusions as prescribed by SEC rules  For example, the firm excludes assets not readily convertible into cash such as fixed assets, prepaid items, certain unsecured, partly secured, and other outstanding receivables, and insurance claims.  See 17 C.F.R. § 240.15c3-1(c)(2)(iv).

9.    To compute its "net capital," the broker-dealer computes its equity under Generally Accepted Accounting Principles ("GAAP") and adjusts that amount by making certain additions and subtractions, including percentage reductions ("haircuts") in the market value of its securities and commodities positions.  In theory, a calculation of "net capital" greater than zero

4

would mean the "liquid assets" owned by a broker-dealer could be sold to repay all its obligations, even those not then due, other than any qualifying subordinated debt that the Net Capital Rule treated as regulatory capital.

10. The Net Capital Rule establishes two methods of compliance. The "Aggregate Indebtedness Standard" seeks to ensure a broker-dealer's aggregate indebtedness does not exceed 1500 percent of its net capital. In other words, the firm's aggregate indebtedness could not be more than 15 times the amount of its net capital. This method measures "liquid assets" of the broker-dealer against most of its unsecured indebtedness. The "liquid assets" serve as the "cushion" to cover full repayment of that unsecured debt.

11. The "Alternative Standard" uses a percentage of monies owed by customers to effectuate customer transactions as a baseline for the net capital requirement. Under this standard, "a broker or dealer shall not permit its net capital to be less than the greater of $250,000 or 2 percent of aggregate debit items computed in accordance with the Formula for Determination of Reserve Requirement for Brokers and Dealers (Exhibit A to Rule 15c3-3, § '240.15c3-3a)." 17 C.F.R. § 240.15c3-1. (See Ex. 2 (Exhibit A to Rule 15c3-3, the "Reserve Formula").)

12. Additionally, in 2004, the SEC established the Consolidated Supervised Entity ("CSE") program, which incorporates certain modifications into the Alternative Standard. A firm accepted into this program must maintain tentative net capital of not less than $1 billion and net capital of not less than $500 million, and it must provide same-day notification to the SEC if its tentative net capital falls below $5 billion. If a firm is accepted into this program and therefore undertakes supplemental reporting, recordkeeping, and notification obligations, among

5

other things, it is permitted to use firm designed market and credit risk models in lieu of

deductions required in sections (c)(2)(iv), (vi), and (vii) of SEC Rule 15c3-1.

13.    Customers, the investment community and regulators rely on a broker-

dealer's compliance with the Net Capital Rule and on the availability of the liquid assets that are

counted as part of the regulatory capital. When a broker-dealer falls out of net capital

compliance, it must immediately report the violation to the SEC and cease operations until it

resumes compliance.

**B.    The Customer Segregation Rule**

14.    SEC Rule 15c3-3, often referred to in industry terms as the Customer

Segregation Rule or the Customer Protection Rule, was established by the SEC to safeguard and

restrict the use of customer assets, whether in the form of securities or cash.

15.    The Customer Protection Rule contains two important requirements. First,

it ensures safekeeping of customer securities by requiring that a broker-dealer have physical

possession or "good control" of all fully-paid and excess margin securities carried for the

accounts of customers, and insure that customer fully paid and excess margin securities are not

subject to liens based on the obligations of the broker-dealer. Second, it requires the broker-

dealer to maintain funds in a special bank account for the exclusive benefit of customers (the

"Reserve Account") in an amount sufficient to cover the net amounts that the broker-dealer owes

to customers.

**1.    Safekeeping of Customer Securities**

16.    The first part of Rule 15c3-3 requires a broker-dealer to have physical

possession or "control" of all fully paid and excess margin securities carried for the accounts of

customers. Excess margin securities are securities bought by customers on margin that are in

6

excess of that amount the broker-dealer may hypothecate (or pledge) to finance the customers'

margin purchases. Where a broker dealer is not in actual possession of a customer's securities,

the broker-dealer remains in compliance with the Rule so long as it maintains effective "control"

over the securities.

17.   Rule 15c3-3 defines the term "control" and specifies circumstances under

which customer securities may be in the physical possession of a person other than the broker-

dealer. A broker-dealer has control over the securities if there is certainty that the broker-dealer

can obtain them promptly, without the payment of money or value. For example, securities at a

domestic bank that are not subject to any right, charge, security interest, lien or claim of any kind

in favor of a bank or any person claiming through the bank are generally deemed to be in good

control locations. Typically, the broker-dealer and bank execute a "no-lien letter," in which the

bank agrees not to assert any lien or right to property held in customer accounts. In industry

terms, a location that meets the requirements is called a "good control location." Conversely,

securities not held free of liens in good control locations might not be readily accessible to a

broker-dealer for a variety of reasons. For example, the securities might be subject to a lien or

the securities might be held by a foreign bank in an account that has not been approved by the

SEC.

18.   If customer securities are not within the broker-dealer's possession or in a

good control location, the broker-dealer must obtain possession or control promptly. 17 C.F.R.

§ 240.15c3-3(d). Paragraph (d) requires the broker-dealer, "[n]ot later than the next business

day" to "determine from his books or records the quantity of fully paid securities and excess

margin securities in his possession or control and the quantity of fully paid securities and excess

margin securities not in his possession or control." Id. If the broker-dealer does not have

7

possession or control, it must take action to obtain those or similar securities, and may be required to use its own funds to purchase securities or make deposits in the Reserve Account, defined below, in order to cover the deficit. 17 C.F.R. § 240.15c3-3(d)(1)-(3).

2.    The Reserve Account for the Exclusive Benefit of Customers

19.    The second part of Rule 15c3-3 requires the broker-dealer to maintain bank deposits "for the Exclusive Benefit of Customers" (the Reserve Account), in an amount equal to the net amount that the broker-dealer owes to customers and to settle customers' transactions. 17 C.F.R. § 240.15c3-3(c). The broker-dealer is required to obtain written notification from each bank holding its Reserve Account confirming that the amounts are being held for the exclusive benefit of customers and that the amounts are being kept separate from other accounts maintained by the broker-dealer at the bank. 17 C.F.R. § 240.15c3-3(f). Additionally, the broker-dealer is required to obtain a written agreement with the bank holding its Reserve Account providing that the amounts in the Reserve Account will not be used as security for a loan and that the amounts are subject to no right, charge, security interest, lien, or claim of any kind. Id.

20.    A computation is made each week as of close of business on Friday (or as required by the SEC) using a "Reserve Formula" to determine what is required to be kept on deposit. See 17 C.F.R. § 240.15c3-3(e)(3); see also Ex. 2.

21.    Pursuant to the Reserve Formula, the broker-dealer calculates the total amount of "credit items," essentially monies owed by the broker-dealer to customers and those used to effectuate customer transactions, which include: (i) balances that represent money obligations to customers; (ii) amounts that the broker-dealer has obtained through the use of customer property; and (iii) certain reserves for operational inefficiencies. Subtracted from the

8

total of credit items are "debit items," basically monies owed to the broker-dealer by customers

and/or to satisfy customer transactions, consisting of essentially secured receivables from

customers or other persons involved with financing transactions on behalf of customers (such

debit items are reduced by 3%). See 17 C.F.R. § 240.15c3-3(e)(1); Ex. 2.

22.    If the credits exceed the debits, the broker-dealer must deposit the excess

in the Reserve Account.[2]  If the debits exceed the credits, no deposit is necessary.[3]  Required

deposits must be made no later than one hour after the opening of banking business on the

second following business day, that is, by 10 a.m. the Tuesday following the typical Friday

calculation date.  17 C.F.R. § 240.15c3-3(e)(3).  Paragraph (g) of the Customer Protection Rule

allows the broker-dealer to make withdrawals from the Reserve Account only when a current

Reserve Formula computation indicates that excess cash or qualified securities have been

deposited.  17 C.F.R. § 240.15c3-3(g).

## III.    LBI'S COMPLIANCE WITH CUSTOMER PROTECTION RULES

### A.    LBI's Systems for Computing its Reserve Requirements

23.    LBI maintained highly specialized and complex information systems to

track the location and status of customer securities for purposes of the Rule 15c3-3 segregation

requirement, as well as the constant fluctuation of customer credits and debits.  In addition, these

systems were also used to perform the weekly Reserve Formula allocation and to track the

ending customer debit and credit balances for purposes of computing the Reserve Account

---

2.    See 17 C.F.R. § 240.15c3-3(e)(1).  The broker-dealer may not withdraw these funds unless another Reserve
Formula computation is made before withdrawal which shows that no deposit, or a lesser deposit is necessary.
17 C.F.R. § 240.15c3-3(g).

3.    This, in effect, would represent a case where customers of the broker-dealer owe the broker-dealer more than
the broker-dealer owes the customers.

9

requirement. In formulating my opinion, I worked closely with the Trustee's financial advisors to understand LBI's systems.

24.    In general, the Reserve Formula computation requires input from many areas of the firm and includes automated reports, manual calculations, reconciliations and analysis of cash and operational accounts, manual adjustments and detailed analysis of amounts and variances from prior computations. The computation utilizes both the general ledger and the stock record to determine the firm's net exposure to customers. When an account is opened it is assigned a "code" or included in a range that designates what "category" of accounts it should be grouped with, for example whether customer or non-customer. These groupings are used to summarize both the cash balances in the accounts as well as the security market values that are included in the computation. Reports are either provided by or generated from the general ledger to provide customer receivable and payable balances as well as contract values for other Reserve Formula items. The specific items required to be included in the Reserve Formula are detailed in a schedule appended as an exhibit to SEC Rule 15(c)3-3 titled "Formula For Determination of Reserve Requirement of Brokers and Dealers under § 240.15c3-3. (See Ex. 2.) System generated reports are used to allocate the stock record positions into includable and excludable buckets based on market value of the securities. Other amounts included in the Formula are calculated either through reconciliations or calculations performed within the group or department of the firm responsible for preparing the computation as well as other areas throughout the firm. In addition, various reconciliations and analyses provide the basis for manual adjustments to system generated reports. The amounts provided from all sources are summarized in Excel spreadsheets that perform various arithmetic calculations that become the source of the summarized computation. Given the complexity of these processes, errors may

# DOCUMENT SEPERATOR

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | (Jointly Administered) |
| Debtors. | |
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) SIPA |
| Debtor. | |

### Rebuttal Report of Daniel McIsaac

March 14, 2010

## I.    **INTRODUCTION**

1.    I previously submitted an Affidavit dated October 5, 2009 (the "October 5 Affidavit") and a Supplemental Affidavit dated February 18, 2010 (the "February 18 Affidavit") on behalf of James W. Giddens as Trustee for the Liquidation of Lehman Brothers Inc. (the "Trustee" and "LBI," respectively), in support of the Motion For Order Approving Trustee's Allocation Of Property Of The Estate (the "Allocation Motion"), providing expert analysis and opinions on various matters related to the Allocation Motion. The Court granted the Allocation Motion on March 2, 2010.[1]

2.    My October 5 Affidavit was designated in this matter as the Trustee's expert report on issues relating to LBI's Rule 15c3-3 reserve calculation. I submit this report to rebut the expert report of Peter U. Vinella, dated January 8, 2010 (the "Vinella Report") and submitted on behalf of Barclays Capital Inc. ("Barclays"), and to provide further documentary evidence and information in support of the statements in my October 5 Affidavit. I previously described my training and background in my October 5 Affidavit and also attached my curriculum vitae to that affidavit. (Oct. 5 Aff. ¶¶ 2-5, Ex. 1.) As I explained in my October 5 Affidavit, I am fully familiar with the SEC rules governing financial responsibility of SEC-registered broker-dealers and the protection of customer property, and with industry practices regarding the handling of customer property and compliance with SEC customer protection rules. (*Id.* at ¶ 5.)

---

1.    The Court granted authority to the Trustee to re-allocate Estate property to compensate for four of the six known compliance issues identified in my October 5 Affidavit and deferred determination of the other two until a future date. (*See* Order Approving Trustee's Motion for Allocation of Property of the Estate, dated March 2, 2010.)

3.      I am being compensated for my time at an hourly rate of $650 plus direct

out of pocket expenses.  This compensation is not contingent upon the substance of this report or

the outcome of this matter.

4.      I reserve the right to alter or amend this report and any of the opinions

rendered herein to take into account any changes in the factual predicates to my opinions or any

rulings or interpretations by competent authorities that render any opinion expressed in this

report incorrect or that require any qualification thereof.

## II.    LBI'S COMPLIANCE WITH CUSTOMER PROTECTION RULES

5.      In my October 5 Affidavit, I explained that as a broker-dealer registered

with the SEC, LBI was required to comply with SEC Rule 15c3-3, which is designed to protect

the broker-dealer's customers.  (Oct. 5 Aff. ¶ 6.)  The rule, also known as the Customer

Protection Rule, requires the broker-dealer to segregate and maintain bank deposits in accounts

"for the Exclusive Benefit of Customers" (the "Customer Reserve Accounts") and to hold in its

possession or at "good control locations" the customers' fully paid for and excess margin

securities.  (*See* 17 C.F.R. § 240.15c3-3; *see also* Oct. 5 Aff. Ex. 1 ¶¶ 14-22.)  I also explained

that a broker-dealer is required to confirm possession or control of customer securities on a daily

basis, and to make calculations on a regular basis (or as required by the SEC) using a "Reserve

Formula" to determine what is required to be kept on deposit.  (*See* 17 C.F.R. § 240.15c3-

3(e)(3); *see also* Oct. 5 Aff. Ex. 1 ¶¶ 19-22.)

6.      I concluded in my October 5 Affidavit that, based on my investigations

and discussions with the Trustee's financial advisors, there were significant lapses in LBI's

compliance with Rule 15c3-3.  I then identified the following items that were either omitted

entirely or incorrectly reported in LBI's Reserve Formula calculation: (i) FID Accounts

Maintained at Chase; (ii) Account Coding Errors; (iii) Assets Subject to LBIE Administration;

3

(iv) Customer Cash Claimed by LBIE; (v) OCC Deposit; and (vi) Customer Property Seizure During Transfer Process. I also identified other items that the Trustee was continuing to investigate, the outcome of which had the potential to impact LBI's Customer Reserve Account obligation.

7.    In this rebuttal report, I have been asked to address the following five items: FID Accounts Maintained at Chase; Account Coding Errors; Assets Subject to LBIE Administration; Customer Property Seizure During Transfer Process; and OCC Deposit.[2] With respect to the first four of these items, Mr. Vinella claims that my October 5 Affidavit did not provide sufficient evidence to support my factual assertions. (Vinella Report at 14-19, 21.) Below, I provide additional evidence showing that LBI did not properly account for these items in its Rule 15c3-3 Reserve Formula and that, as a result, LBI's Customer Reserve Account was — and remains – significantly underfunded. I also explain that, if Barclays prevails in its claim for the OCC Deposit that LBI included in the Reserve Formula, and in the event that the LBI Estate does not have sufficient assets to replace the amount of the OCC Deposit, the shortfall in customer property will be correspondingly increased.

## A.    FID Accounts Maintained at Chase

8.    In my October 5 Affidavit, I explained that as of September 18, 2008, JP Morgan Chase ("Chase") terminated LBI's access to its electronic systems and began seizing assets, including $630 million in securities[3] and $258 million in cash in the Fixed Income Division ("FID") prime broker client accounts of LBI, to cover a multi-billion-dollar overdraft in

---

2.    I understand that the Trustee is continuing to investigate the Customer Cash Claimed by LBIE and may seek determination on this issue at a later date.

3.    As noted below, the exact total for the FID securities is $633,073,602, not $630 million, as stated in my October 5 Affidavit.

LBI's main operating account at Chase. (Oct. 5 Aff. ¶¶ 32-35, Exs. 25, 26, 39.) I incorrectly stated in my October 5 Affidavit that Chase had *liquidated* the $630 million in securities subsequent to the seizure, a statement that I corrected in my February 18 Affidavit. (Feb. 18 Aff. ¶ 2.) Nevertheless, seizure of customer property by a custodian, whether or not that property is liquidated, is inconsistent with applicable rules and the no-lien status of these FID Accounts, and indicates that these securities were at risk.

9.    By the morning of September 19, 2008, LBI had lost access to the electronic systems at Chase and to the collateral and cash in the FID Accounts. (*See* Oct. 5 Aff. ¶ 29, Exs. 25-26.) As Mr. Vinella stated at his deposition: "Chase would no longer allow access to their systems, at that point [LBI] didn't know what the condition of the securities were . . . . Chase just decided not to communicate anymore, and [LBI] had no idea of where [the securities] were, and at that point . . . [they] could no longer conduct business in any reasonable way." (Transcript of the Deposition of Peter Vinella, dated February 5, 2010 ("Vinella Tr.") 139:12-141:9, 180:20-181:10.) Once LBI lost its ability to access the assets in the FID Accounts, those Accounts were no longer being held in a "good control location," as required under the rules. *See* Broker-Dealers; Maintenance of Certain Basic Reserves, Exchange Act Release No. 34,9856, 37 Fed. Reg. 25224, 25225 (Nov. 29, 1972).

10.    The SEC rules are clear that when a customer's assets are not securely held by the broker-dealer or at a good control location, a corresponding credit must be included in the broker-dealer's Reserve Formula, thereby increasing the reserve requirement. *See* FINRA, Interpretations of Financial and Operational Rules, Customer Protection – Reserves and Custody of Securities, SEA Rule 15c3-3 ("Rule 15c3-3 Interpretations"), at 2625 (2008) (requiring a credit in the reserve computation where a customer's long positions allocate to a proprietary

5

bank loan). As Mr. Vinella conceded at his deposition, once LBI no longer had access to the FID Accounts and was no longer able to determine whether it could promptly get the FID assets back from Chase, the correct treatment should have been to include the value of those assets as a credit in the Reserve Formula. (Vinella Tr. 141:24-143:10.) Under the applicable rules, because the FID assets were at risk of seizure (and in fact were seized)[4] to satisfy payment of LBI proprietary loans, LBI was required to include a credit in the Reserve Formula for the value of these assets. *See* Rule 15c3-3 Interpretations at 2625.

11.    In his report, Mr. Vinella asserts that my October 5 Affidavit did not provide sufficient factual support for the amount of the FID assets seized by Chase, the makeup of the assets, or the nature of the seizure. (Vinella Report at 14.) Mr. Vinella also asserts that my October 5 Affidavit did not provide any information regarding whether the FID assets had been or might in the future be returned to the LBI estate. (Vinella Report at 15.)

12.    As of September 19, 2008, the FID Accounts contained $126,105,927 in demand deposit accounts and $131,756,109 in excess cash, for a cash total of $257,862,036. (*See* Ex. 2 (providing a summary of the property held in the FID Accounts).) The securities in the FID Accounts totaled $633,073,602, consisting of $585,743,554 in BDA accounts and $47,330,048 in physicals. (*Id.*) The total assets in the FID Accounts therefore equaled $890,935,638. (*Id.*)

13.    Contrary to Mr. Vinella's assertions, the possibility that the FID assets might be returned to the estate is irrelevant under Rule 15c3-3. The only relevant point in time

---

4.    (*See* Ex. 1 (December 5, 2008 Substitution Agreement between the Trustee and Chase regarding the FID securities that Chase was holding "to secure the obligations of LBI to" Chase).) The former LBI employees that Mr. Vinella interviewed in connection with his report also confirmed that Chase had seized the FID Accounts. (*See* Vinella Tr. 141:5-9, 173:23-174:14.)

for the purpose of determining the accuracy of LBI's reserve calculation as of September 19, 2008 is September 19, 2008. As explained above and in my October 5 Affidavit, as of September 19, 2008, the FID Accounts were not at a good control location and LBI should have included the value of these securities as a credit in the Reserve Formula. LBI's failure to include in its reserve computation the $258 million in cash and the $633 million in securities in the FID Accounts was therefore a failure to protect and reserve for customer property as required by applicable rules.

**B.     Account Coding Errors**

**1.     Woodlands Bank Securities**

14.     As I explained in my October 5 Affidavit, LBI erroneously maintained customer property of Woodlands Bank in an account coded as "subordinate affiliate," and based on this coding, failed to segregate this customer's securities or otherwise reserve for obligations to this customer. (Oct. 5 Aff. ¶¶ 36-37.) Again, Mr. Vinella does not dispute that, if LBI incorrectly coded Woodlands as a non-customer, the securities held in the Woodlands accounts should have been added to the Reserve Formula, but asserts that my October 5 Affidavit did not provide sufficient factual support regarding the amount and nature of the funds at issue, and Woodlands' status as a customer or non-customer. (Vinella Report at 15.)

15.     I explained in my February 18 Affidavit that, subsequent to my October 5 Affidavit, the Trustee's financial advisors reconciled the Woodlands accounts and the Trustee issued a "Notice of Trustee's Determination of Claim," finding that the net equity value of the Woodlands accounts is $523,056,346.41. (Feb. 18 Aff. ¶ 3, Ex. 1.) I previously concluded that LBI's failure to segregate Woodlands' securities required an additional credit to be added to the Reserve Formula, which would have had the effect of increasing the reserve requirement. (Oct.

5 Aff. ¶ 37.) In light of the Notice of Trustee's Determination of Claim, the correct adjustment is $523,056,346.41.

16.    In the course of determining Woodlands' claim, the Trustee concluded that Woodlands was in fact a customer of LBI. (*See* Ex. 3.) LBI's coding of Woodlands' accounts as "subordinate affiliate" was therefore erroneous. (*See* Ex. 4 (showing subordinate affiliate account ranges); Ex. 5 (showing Woodlands account numbers falling within the subordinated range).) Mr. Vinella agreed at his deposition that this coding was in error, noting that he understood from a former LBI employee that Woodlands did not have a subordination letter and "should have been treated as a customer." (Vinella Tr. 181:14-24.) Had LBI complied with the applicable rules, it would have coded the account correctly and included the Woodlands securities, along with all other customers' fully paid for and excess margin securities, in established accounts subject to a no-lien letter. Absent compliance with the applicable rules, and consistent with the FID Accounts adjustment described above, LBI was required to include a credit in the Reserve Formula for the value of the Woodlands securities, which were also seized to cover LBI's obligations. Because LBI did not segregate the securities or reserve for them, the computed reserve was short by approximately $523 million.

## 2.    Other Coding Errors

17.    My October 5 Affidavit also identified other coding errors that led to a shortfall totaling approximately $213 million in LBI's Reserve Account. (Oct. 5 Aff. ¶ 38.) I concluded that correction of these errors would result in the addition of $213 million to the Reserve Account requirement. (*Id.*) Again, Mr. Vinella does not disagree that the Reserve Formula should be adjusted to account for such errors, but states that my October 5 Affidavit did not provide sufficient information supporting them. (Vinella Report at 17.)

8

18.    First, as Exhibit 28 to my October 5 Affidavit shows, an error in the allocation program logic used by LBI's vendor, Broadridge (formerly ADP), caused certain customer securities to be allocated incorrectly.[5] (*See* Oct. 5 Aff. Ex. 28; Exs. 6 & 7 (examples of how the securities were allocated before and after this error was corrected).)  Second, additional documents attached to this report show that the accounts in the "944" range were miscoded as customer rather than fails, which led to the erroneous inclusion in the Reserve Formula of credits and debits associated with these accounts. (*See* Ex. 6 (Barclays' request to Broadridge to reclassify these accounts); Ex. 7 (list of 944 accounts affected by this error).)  As part of a review performed *by Barclays* at the request of the SEC, Barclays performed a partial recalculation of the Reserve Formula to adjust for these known discrepancies, which revealed, as a result of the coding errors, a $213 million shortfall. (Ex. 8 (Barclays' revised reserve computation); Exs. 9 & 10 (allocation matrix before and after corrections).)  Accordingly, a $213 million adjustment to the computation is called for to correct the error.

C.    **Assets Subject to LBIE Administration**

19.    In my October 5 Affidavit, I noted that LBI used Lehman Brothers International Europe ("LBIE"), which acted as custodian for some of LBI's customer business, as a good control location. (Oct. 5 Aff. ¶ 39.)  On September 15, 2008, LBIE entered insolvency proceedings in the United Kingdom.  At that time, LBI should have included a credit in the Reserve Formula to reflect the approximately $439 million in customer securities in custody at LBIE because LBIE could no longer be considered a "good control location." (*Id.* at ¶ 40.)

---

5.    Mr. Vinella identifies Exhibit 28 to my October 5 Affidavit as a "memorandum from LBI to Broadridge." (Vinella Report at 17.)  In fact, Barclays – not LBI – prepared Exhibit 28, as Vinella conceded at his deposition. (Vinella Tr. 267:7-16.)

20.     A bankrupt entity could not satisfy the requirements for a good control

location because the securities lodged with such an entity would not, as required by the rules, be

freely transferable and available to the broker-dealer without payment of money or value.[6] *See*

Guidelines for Control Locations for Foreign Securities, Exchange Act Release No. 34,10429,

1973 WL 149250, at *2 (Oct. 19, 1973). It follows, then, that if a broker-dealer becomes aware

that the circumstances of a designated control location have changed materially, the broker-

dealer must take immediate action to obtain possession or control of like securities or increase its

reserve requirement by a corresponding amount. As LBI did not obtain possession or control of

like securities, it was required to adjust its reserve requirement in the amount of $439 million.

(*See* Oct. 5 Aff., Ex. 29 (LBI's claim detailing securities); *see also* Ex. 12 (LBI screen printout of

securities held at LBIE).)

21.     Mr. Vinella notes in his report that I did not provide information regarding

"whether the assets [held at LBIE] were returned to LBI, which would make the entire matter

moot." (Vinella Report at 18.) As noted Section I.A above, it is irrelevant under Rule 15c3-3

whether these assets were returned to the estate. Mr. Vinella conceded at his deposition that

once LBI determined that LBIE was no longer a good control location, the value of the assets

held at LBIE should have been added to the Reserve Formula. (Vinella Tr. 153:6-12.) Mr.

Vinella also agreed that once LBIE entered insolvency proceedings in the United Kingdom, it

was no longer a good control location under the relevant requirements. (Vinella Tr. 152:25-

153:5.) As the assets held at LBIE were not in a good control location as of September 19, 2008,

LBI's failure to account for those assets in its Reserve Formula put it out of compliance with

---

6.  Moreover, I have been informed that according to a recent U.K. court decision in the LBIE administration
    proceedings, if LBIE had failed to segregate securities for LBI's customers, LBI would not have a stake in the
    bankrupt entity's Client Money Pool. (Ex. 11 (U.K. Order).)

Rule 15c3-3. Because LBI did not obtain possession or control of like securities, it was required to adjust its reserve requirement in the amount of $439 million.

**D.    Customer Property Seizure During Transfer Process**

22.    As I explained in my October 5 Affidavit, during the week of September 15, 2008, customers holding approximately $82 million in money market fund positions attempted to withdraw their assets, instructing LBI to liquidate and wire transfer the proceeds to their banks. Prior to wire transfer, the proceeds were deposited in an account at Citibank London, which apparently did not have a "no-lien" letter, and the funds were seized by the bank to satisfy LBI's obligations to the bank. The details of the circumstances that led to this seizure are more fully explained in my October 5 Affidavit. (*See* Oct. 5 Aff. ¶¶ 46-48; *see also* Ex. 13 (Barclays e-mail describing the issue).)

23.    To elaborate further, upon giving the bank instruction to wire the funds to the customers, LBI debited its customer accounts as if they had already been paid. The fact that the bank did not wire the funds to the customers required LBI to re-establish the customer payable; specifically, compliance with Rule 15c3-3 required LBI to identify and reserve for customers' free cash balances, including the $82 million in cash balances resulting from the liquidation of the identified customers' money market fund positions. (*See* Ex. 14 (account statements and printouts showing underlying detail to $82 million in cash balances).) Because LBI did not include a credit for this amount in the Reserve Formula, the reserve requirement was short in the amount of $82 million. This shortfall in customer property must also be cured.

**E.    The OCC Deposit**

24.    I explained in my October 5 Affidavit that LBI included as a debit in its September 19, 2008 reserve calculation a $507 million deposit it had made at the Options

Clearing Corporation (the "OCC"). The inclusion of the OCC Deposit in the Reserve Formula

reduced the reserve requirement by $507 million (less 3%, per Rule 15c3-3's mandatory 3%

haircut rule for debits). *See* Rule 15c3-3 Interpretations at 2604. I also noted that the Trustee is

involved in a dispute with Barclays over entitlement to the OCC Deposit and that, if the Trustee

is not successful in securing this Deposit for the benefit of customers, the shortfall in the

Customer Reserve Accounts will be correspondingly increased. (Oct. 5 Aff. ¶ 45.)

       25.    I understand that Barclays argues that the Trustee should nevertheless be

required to transfer the OCC Deposit to Barclays. If the Trustee were to divert to Barclays assets

that have been included in the reserve calculation as "customer property," without assurances

that the Estate would be able to replace those assets, the result would be a deficit of $507 million

in the property available to satisfy customer claims.

## III.    THE EFFECT ON THE RESERVE CALCULATION OF LBI'S DECLINING CUSTOMER BASE

       26.    In his report, Mr. Vinella identifies an "exodus of customers" from LBI

prior to and during the week of September 15, 2008 as an item that would have reduced LBI's

reserve requirement, and that was allegedly not accounted for in LBI's reserve calculation as of

September 19, 2008. (Vinella Report at 4-5.) Mr. Vinella did not provide, nor has he seen, any

documentary evidence of such an exodus of customers. (Vinella Tr. 257:18-258:8.)

Nevertheless, even assuming that LBI's customer base was declining at a significant rate, Mr.

Vinella agrees that that decline was properly accounted for in the Reserve Formula that LBI

performed as of September 17, 2008. (Vinella Report at 5; Vinella Tr. 258:10-21.)

       27.    Mr. Vinella also conceded at his deposition that he has not seen any

evidence to suggest that the reserve calculation done on September 19 did not also take account

of the LBI customers that had left the firm prior to September 17. (Vinella Tr. 260:9-23.) Mr.

Vinella stated, however, that he believed that the September 19 reserve calculation did not take account of the customers that left LBI on September 18 and 19. (*Id.* at 261:14-17.) I have not seen any evidence -- nor does Mr. Vinella present any evidence – that LBI, having properly accounted for the customers that had left the firm as of September 17, 2008, failed in its September 19 reserve calculation to properly account for the customers that left the firm on September 18 and 19.

28.     Moreover, even if LBI's September 19 reserve calculation did not take account of any customers that had left the firm on September 18 and 19, the mere fact that a customer account left LBI would not necessarily lead to a reduction in the reserve requirement. For example, as Mr. Vinella conceded at his deposition, if a customer account had debits that exceeded its credits, the loss of that account would *increase*, not decrease, the reserve requirement. (Vinella Tr. 253:22-254:7.) The loss of a customer account with equal debits and credits would have only a minimal effect on the reserve requirement. In fact, only the loss of accounts with free credit balances – that is, accounts with unencumbered credits – would have a significant impact on the reserve requirement. Therefore, Mr. Vinella's argument does not change my opinion.

## IV.   OBSTACLES TO RE-RUNNING THE RESERVE CALCULATION AS OF SEPTEMBER 19, 2008

29.     Mr. Vinella asserts in his report that "Mr. McIsaac chooses not to perform a calculation of LBI's Reserve Requirement independently as of the date of the SIPA Liquidation, although he had access to the necessary data to do so," as "[t]his data is maintained in the LBI systems under the control of the Trustee." (Vinella Report at 6 & n.8.) This statement is incorrect. After the closing of the sale transaction on September 22, 2008, Barclays

took control of LBI's systems, including the legacy systems that store the information necessary to re-run the reserve calculation as of September 19, 2008.

30.    Additionally, several of the key LBI regulatory personnel with knowledge of how LBI's systems operated with respect to the reserve calculation are currently employees of Barclays. The Trustee does not have access to these individuals. These personnel would, however, have been available to Mr. Vinella as he was writing and researching his report. Indeed, Mr. Vinella interviewed several former LBI employees, who are currently employees of Barclays, in connection with his report. (Vinella Tr. 115:24-117:5.)

31.    Mr. Vinella's failure to consider the obstacles to re-running the reserve calculation explains his allegation that my October 5 Affidavit "considers only factors that would increase the Reserve Requirement" and "fails to provide the results of any analysis [Mr. McIsaac] performed, if any, as to possible errors associated with credits and debits that would have *reduced* the Reserve Requirement." (Vinella Report at 5-6.) Contrary to Mr. Vinella's assertion, there was no bias in the way in which the items listed in my October 5 Affidavit were identified -- they were simply those items that were identified by the Trustee's financial professionals in the course of reviewing LBI's books and records. The Trustee's professionals did not, as Mr. Vinella suggests, perform an analysis of possible errors that would have increased the reserve requirement, and deliberately fail to perform a similar analysis of possible errors that would have decreased the reserve requirement, nor were they in a position to do so. Performing such analyses would require the Trustee's professionals to review and verify every line item included in the reserve calculation, correct any erroneous entries, and then re-run the reserve calculation to gauge the effect of each correction. As noted below, this would not, as a practical matter, be cost effective or possible to complete.

14

32.     Even if the Trustee had unlimited access to LBI's systems and former LBI

employees, re-running the reserve calculation as of September 19, 2008 would be a substantial

undertaking that would require many months, significant funds, and a large number of

knowledgeable personnel to complete.  As a threshold matter, all of LBI's books and records as

of September 19, 2008 would have to be reviewed and reconciled, a process that would itself

take months to accomplish.  At that point, personnel would need to modify the information in the

allocations in LBI's legacy systems manually or, in the likely event that the legacy systems could

not be modified manually, reconstruct those systems, including all of the accounts, balances, and

codings, from the ground up.  Under the circumstances, re-running the reserve calculation as of

September 19 is simply not feasible.

33.     Importantly, re-running the reserve calculation would not change the

impact of the items identified in my October 5 Affidavit and discussed above, which would still

necessitate a substantial increase in LBI's reserve requirement.  Moreover, I understand that,

since my October 5 Affidavit, the Trustee's financial professionals have made significant

progress with respect to the reconciliation of LBI's books and records as of September 19, 2008.

As part of these reconciliation activities, the Trustee's financial professionals have not become

aware of any information that would change the conclusions in my October 5 and February 18

Affidavits, nor have they identified any significant additional items that would decrease LBI's

reserve requirement.

March 14, 2010
New York, New York

_____
Daniel McIsaac

15

## APPENDIX A: DOCUMENTS RELIED UPON

SEC Rule 15c3-3

17 C.F.R. § 240.15c3-3 – Customer protection – reserves and custody of securities

Broker-Dealers; Maintenance of Certain Basic Reserves, Exchange Act Release No. 34,9856, 37 Fed. Reg. 25224, 25225 (Nov. 29, 1972).

FINRA, Interpretations of Financial and Operational Rules, Customer Protection -- Reserves and Custody of Securities, SEA Rule 15c3-3

Guidelines for Control Locations for Foreign Securities, Exchange Act Release No. 34,10429, 1973 WL 149250 (Oct. 19, 1973).

LBI_MCISAAC_000001 – LBI_MCISAAC_002661

# EXHIBIT H

Page 6767

1

2               UNITED STATES BANKRUPTCY COURT

3               SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5        In Re:

6                              Chapter 11

7        LEHMAN BROTHERS        Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,   (Jointly Administered)

9                  Debtors.

10       ------------------------x

11

12       B E F O R E :   HON. JAMES M. PECK,

13                       U.S. BANKRUPTCY JUDGE

14

15                              U.S. Bankruptcy Court

16                              One Bowling Green

17                              New York, New York

18

19                              September 10, 2010

20                              10:08 a.m.

21

22       Reported by:

23       MARY F. BOWMAN, RPR, CRR

24       JOB NO:  30230

25

Page 6768

```
 1
 2              APPEARANCES:
 3
 4   JONES DAY
 5   Attorneys for Lehman Brothers, Inc.
 6      222 East 41st Street
 7      New York, New York 10017
 8   BY: ROBERT W. GAFFEY, ESQ.
 9       WILLIAM J. HINE, ESQ.
10       TRACY V. SCHAFFER, ESQ.
11
12
13
14   BOIES SCHILLER & FLEXNER, LLP
15   Attorneys for Barclays
16      333 Main Street
17      Armonk, New York 10504
18   BY: DAVID BOIES, ESQ.
19       JONATHAN SCHILLER, ESQ.
20       TRICIA J. BLOOMER, ESQ.
21
22
23
24
25
```

Page 6769

```
 1
 2              APPEARANCES:
 3
 4   QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5   Attorneys for the Creditors Committee
 6      51 Madison Avenue
 7      New York, New York 10010
 8   BY: JAMES TECCE, ESQ.
 9       ERIC KAY, ESQ.
10
11
12   HUGHES HUBBARD & REED, LLP
13   Attorneys for the SIPA Trustee
14      One Battery Park Plaza
15      New York, New York 10004
16   BY: WILLIAM MAGUIRE, ESQ.
17       NEIL OXFORD, ESQ.
18
19
20
21
22
23
24
25
```

Page 6770

```
 1           Oral Argument - Mr. Tambe
 2      THE COURT: Be seated, please.
 3      Has there been any discussion about
 4   the order in which this is going to be
 5   presented? There are a number of pending
 6   somewhat complex motions in limine to be
 7   heard today.
 8      MR. TAMBE: Good morning, your Honor.
 9   Jay Tambe on behalf of LBHI.
10      There have been some discussions about
11   sequencing and collapsing some of these
12   motions into one set of arguments. What we
13   have discussed with Barclays is that the
14   motions concerning Professor Pfleiderer and
15   their motion concerning the valuation
16   experts, Professor Zmijewski, Olvany,
17   Slattery, and those individuals will be
18   argued jointly. The Movants will go first
19   with respect to those two motions in limine
20   followed by Barclays.
21      We will argue separately a motion in
22   limine concerning Daniel McIsaac. That is a
23   separate motion in limine.
24      In terms of time, we are happy to
25   follow your Honor's guidance on this. We
```

Page 6771

```
 1   have discussed briefly calculating some
 2   time. We don't have complete agreement on
 3   time allocation.
 4      We would like an hour and 15 minutes
 5   for the first part for the Movants, an hour
 6   and 15 minutes for Barclays for the first
 7   part, and then roughly 15 minutes per side
 8   for McIsaac's motion.
 9      THE COURT: OK, that's fine.
10      MR. HUME: The only amendment to that
11   is, if it is agreeable with the Trustee, it
12   may be efficient to collapse the McIsaac
13   arguments, since it is the same argument on
14   the same issues. We would be happy to
15   explain our two points.
16      THE COURT: I think it makes sense to
17   collapse it myself, since we are talking
18   about the same witness.
19      MR. OXFORD: That's fine with the
20   Trustee, your Honor.
21      MR. TAMBE: May I approach?
22      THE COURT: Yes, you may.
23      MR. TAMBE: May it please the Court,
24   your Honor, Jay Tambe from Jones Day on
25
```

2 (Pages 6768 to 6771)

Page 6940

Decision

1
2 moment, all of the motions that I heard this
3 morning are denied. That's good news and
4 bad news for everybody.
5     The Court believes that valuation
6 testimony from the Movants' witnesses
7 assembled under the auspices of the Chicago
8 consulting firm of Navigant would be useful,
9 and any issues identified by Barclays
10 concerning the reliability or consistency of
11 methods used by individual witnesses such as
12 Mr. Slattery can be tested during
13 cross-examination of Mr. Slattery and all of
14 the other witnesses who are the subject of
15 this motion.
16     As for the legal arguments made by
17 Barclays, the Court reserves judgment at
18 this time as to the efficacy that those
19 arguments and as to the ultimate relevance
20 of the valuation evidence to be presented.
21 The Court does note that considerable
22 evidence regarding valuation, including
23 evidence relating to the acquisition balance
24 sheet, already has been presented during the
25 trial, and as a result, the Court believes

Page 6941

Decision

1
2 that Movants should have the opportunity to
3 fully present their case regarding the
4 reasonableness of that accounting treatment
5 by Barclays.
6     The Court expects to be able to
7 allocate appropriate weight to the testimony
8 in light of questions raised regarding
9 methodology and most importantly
10 reliability.
11     In effect, I always have the ability
12 to discount testimony, and for those of you
13 who are familiar with my decision in Iridium
14 recognize that I have done that as to
15 witnesses who have testified and I don't
16 need a Daubert motion to determine whether
17 or not a particular expert is credible and
18 whether or not I should rely on the expert's
19 testimony.
20     That reference to Iridium brings me to
21 Professor Paul Pfleiderer. Professor
22 Pfleiderer, as I think everybody knows in
23 this courtroom, was qualified as an expert
24 during the Iridium trial a number of years
25 ago. My prior experience with that witness

Page 6942

Decision

1
2 was a positive experience, but that in no
3 way influences the current decision to
4 permit him to testify.
5     He is without doubt a qualified
6 expert, but the Movants will have a full
7 opportunity by means of their questioning to
8 challenge his methods and to point out
9 whether his experience is actually relevant
10 experience that fits the matters in
11 controversy in this case.
12     Now, I am going to take a few moments
13 and think about McIsaac and I will come
14 back. Let's take a 15-minute break.
15     Did you wish to say something to me?
16     MR. SCHILLER: If it is any help to
17 the Court, we do not plan on doing anything
18 further today. We won't be presenting video
19 after your Honor's ruling on McIsaac today.
20 We will wait until the 20th. I wanted your
21 Honor to know --
22     THE COURT: That's terrific because I
23 wasn't planning to observe any video.
24     Adjourned for 15 minutes.
25     (Recess)

Page 6943

Decision

1
2     THE COURT: I am going to incorporate
3 by reference into the McIsaac ruling the
4 things I said just before the break, but
5 this ruling is slightly different.
6     It seems to me that the objection in
7 respect of Mr. McIsaac's expertise with a
8 myriad exchange-traded derivatives raises a
9 reasonable question in my mind as to his
10 expertise in this area.
11     I am not comfortable excluding his
12 testimony based on the current record. I
13 recognize that it is likely that he will be
14 called, although I'm not predicting to a
15 certainty that he will be called, as an
16 expert on the subject of 15c3-3. To the
17 extent that he is called as an expert
18 witness in that area, I have no concerns as
19 to his expertise.
20     Both in respect of his apparently not
21 knowing all that much about SIPA and
22 questions concerning the turning over of
23 documents from Deloitte, those two subject
24 matters are matters that don't concern me in
25 terms of this Daubert motion.

45 (Pages 6940 to 6943)

Page 6944

Decision

1
2 But I say that without prejudice to
3 Barclays' rights, if they choose to exercise
4 them further, to seek to obtain additional
5 discovery.
6 I do have concern, however, that I
7 don't have sufficient information yet to
8 decide the question of Rule 702 expertise in
9 the area of exchange-traded derivatives and
10 believe that there should be an opportunity
11 to voir dire Mr. McIsaac on that subject at
12 the time of his testimony. I would like to
13 have an opportunity to see more than just
14 the snippets of deposition testimony that I
15 had seen in submissions and played live
16 today.
17 I don't know what he did in connection
18 with the various transactions that were
19 referenced. I don't know to what extent he
20 may have other experience in the area of
21 exchange-traded derivatives, nor do I
22 understand what it means when he says that
23 he doesn't have expertise in the area of
24 risk. I don't know if that's an
25 acknowledgment that effectively undermines

Page 6945

Decision

1
2 his expertise or if he was talking about
3 something else altogether unrelated to
4 margin.
5 If it relates directly to margin, it
6 is probably a disqualifying comment, but it
7 may not be.
8 So it is a mixed bag as it relates to
9 McIsaac. The motion is denied in terms of
10 disqualification from testifying, but all
11 rights are reserved with respect to his
12 ability to testify as an expert on the
13 subject of exchange-traded derivatives.
14 That takes care of all these motions.
15 And now would I like to say a few words in
16 acknowledgment of my law clerk, David
17 Meshkoff, who is leaving chambers to go on a
18 life adventure, and I hope to see him in
19 good shape about a year from now.
20 I want to thank him publicly for his
21 good service and it has been a pleasure to
22 work with him.
23 As far as our schedule is concerned,
24 our next scheduled trial date is September
25 20 at 9:30. And we are in the expert phase,

Page 6946

Decision

1
2 so one of my questions is if you can tell me
3 what should I be expecting when next I see
4 you.
5 MR. TAMBE: Your Honor, on the 20th,
6 you would certainly expect to see Professor
7 Zmijewski, we will start off the expert
8 phase with Professor Zmijewski. And --
9 THE COURT: Will that be a whole day?
10 MR. TAMBE: I think it will be most of
11 the day. As we prepare to present him, if
12 we think we can get started on another
13 expert on the 20th itself, we will let the
14 Court know and certainly let counsel know by
15 Monday a week in advance of the hearing date
16 and we will let the Court know as well.
17 THE COURT: That week we have the
18 20th, 21st and 24th. There are some issues
19 involving my schedule the following week
20 which is the week of September 27. I need
21 to be away the night of September 28th. And
22 I don't come back until roughly the early
23 afternoon on the 29th.
24 For scheduling purposes, while it will
25 potentially be disruptive to the flow of

Page 6947

Decision

1
2 testimony, I could see you on the 28th, but
3 I would have to leave by 11 a.m. I don't
4 know if you want an hour and a half of time,
5 but that's a possibility.
6 On the 29th, I won't be back until
7 probably 2 o'clock in the afternoon. I
8 could give you, just to be on the safe side,
9 assuming I could get all the court services
10 that I require, a late session from say 3 to
11 6, if you wanted three hours of time that
12 day. And you can think about that. And let
13 my chambers know what you prefer.
14 MR. SCHILLER: Your Honor, if I may
15 address the Court on the fact that we have
16 not completed our fact case. We, as I
17 mentioned the other day, we have some video
18 deposition and we are considering calling a
19 live witness and we will notify Movants on
20 Monday.
21 If your Honor prefers that we wait
22 until the expert phase is done -- I am
23 asking whether we do it first thing on the
24 20th.
25 THE COURT: You can do it in any order

46 (Pages 6944 to 6947)

# EXHIBIT I

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al*, | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF ROBERT MARTINI

I, Robert Martini, pursuant to 28 U.S.C. § 1746 declare as follows:

1.      I make this declaration on my personal knowledge.  If called to testify, I would testify competently as follows.

2.      I am currently a Director on the Regulatory Reporting team at Barclays Capital.  My position, which I have held since March 1, 2009, includes managing compliance with U.S. Securities and Exchange Commission ("SEC") Rule 15c3-3 for Barclays Capital Inc.  Prior to that, I was an Associate Director on the Regulatory Reporting team at Barclays Capital since August 2007

3.      I understand from the Rebuttal Report of Daniel McIsaac dated March 14, 2010, that Mr McIsaac asserts

- After Barclays acquired certain assets of Lehman Brothers Inc.'s ("LBI") U.S broker-dealer business in September 2008, Barclays took control of all LBI systems that stored information necessary to re-run the SEC Rule 15c3-3 reserve calculation as of September 19, 2008;

- The key LBI regulatory personnel with knowledge of how LBI's systems operated with regard to the reserve calculation are Barclays' employees that the Trustee cannot access;

EXHIBIT

828

6/24/10

BCI Exhibit No.
**647**

- The Trustee cannot re-run the reserve calculation to account for any identified discrepancies; and

- Barclays is able to re-run the reserve calculation for identified discrepancies.

4.    Mr. McIsaac's statements are incorrect. Although Barclays acquired LBI's systems, its employees are entitled to access only the information located on those systems that is associated with the "Business" acquired by Barclays from Lehman pursuant to the Asset Purchase Agreement, including the Clarification Letter thereto, between Barclays, LBI and other Lehman entities (the "Purchase Agreement").

5.    Under a Transition Services Agreement ("TSA") between the Trustee and Barclays, certain Barclays' employees work *solely* for the Trustee and certain others perform some services for the Trustee when requested by the Trustee to do so. Under the Purchase Agreement and the TSA, the Trustee has the right to access all LBI information contained in the LBI systems and can authorize people working for, or on behalf of, the Trustee pursuant to the TSA or otherwise to access such information.

6.    The Trustee has, or has access to, the relevant information necessary to re-run LBI's September 17, 2008 or September 19, 2008 reserve calculations, including to account for any discrepancies that may have been identified later by the Trustee related to those calculations.

7.    In contrast, Barclays cannot re-run LBI's September 17, 2008 or September 19, 2008 reserve calculations or account for any discrepancies that may have been identified related to those calculations. Barclays is not entitled to access all the relevant information on LBI's systems as of on or about September 17, 2008 or September 19, 2008 with regard to the 15c3-3 reserve calculations. Barclays also does

2

not have access to the relevant information (including information on balances and positions at LBI's custodians and banks, fails and the status of cleared items) necessary to re-run the reserve calculations to account for any discrepancies discovered later

I declare under penalty of perjury that the foregoing is true and correct  Executed this 5th day of April, 2010, in New York, New York.

_____
Robert Martin

3

# EXHIBIT J

Page 1

1

2                    UNITED STATES BANKRUPTCY COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4          ------------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al,    (Jointly Administered)

9                    Debtors.

10         ------------------------x

11

12              DEPOSITION OF ROBERT A. MARTINI

13                   New York, New York

14                   June 24, 2010

15

16    Reported by:

17    MARY F. BOWMAN, RPR, CRR

18    JOB NO. 31568

19

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4                    June 24, 2010
 5                    11:00 a.m.
 6
 7
 8          Deposition of ROBERT A. MARTINI, held
 9   at the offices of Hughes, Hubbard & Reed, LLP,
10   One Battery Park Plaza, New York, New York,
11   before Mary F. Bowman, a Registered Professional
12   Reporter, Certified Realtime Reporter, and
13   Notary Public of the State of New York and New
14   Jersey.
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
 1
 2                    APPEARANCES:
 3
 4   JONES DAY, LLP
 5   Attorneys for Lehman Brothers, Inc.
 6     222 East 41st Street
 7     New York, New York  10017-6702
 8   BY: TERRY McMAHON, ESQ.
 9
10
11   BOIES, SCHILLER & FLEXNER, LLP
12   Attorneys for Barclays and The Witness
13     5301 Wisconsin Ave. NW
14     Washington, DC  20015
15   BY: AMY NEUHARDT, ESQ.
16       HEATHER KING, ESQ.
17
18   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
19   Attorneys for the Creditors Committee
20     51 Madison Avenue, 22nd Floor
21     New York, New York  10010
22   BY: ROBERT DAKIS, ESQ.
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
 1
 2                    APPEARANCES:
 3
 4   HUGHES, HUBBARD & REED, LLP
 5   Attorneys for the SIPA Trustee
 6     One Battery Park Plaza
 7     New York, New York  10004-1482
 8   BY: NEIL OXFORD, ESQ.
 9       FARA TABATABAI, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
 1
 2
 3
 4
 5          IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that filing and sealing be
 8   and the same are hereby waived.
 9          IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15          IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

2  (Pages 2 to 5)

| Page 98 | Page 99 |
|---|---|

**Page 98**

MARTINI

1  opinion that a recalculation was necessary in
2  this case?
3      WITNESS' ATTORNEY: Objection to form.
4  That mischaracterizes his testimony.
5      Q. OK. Well, let's deal with that. Is
6  it your belief, sir, that in order to ascertain
7  what the reserve requirement was on
8  September 19, 2008, it was necessary for
9  someone, whether that be the trustee, his staff
10 or Barclays, to do a full recalculation of the
11 reserve requirement?
12     WITNESS' ATTORNEY: Object to form.
13     A. I am sorry, can you repeat that
14 question.
15     Q. Sure, can you read it back.
16     (Record read)
17     WITNESS' ATTORNEY: Same objection.
18     A. I would say yes.
19     Q. Why?
20     A. Based on the nature of the
21 discrepancies outlined here.
22     Q. Where is here, sir? You're pointing
23 to your declaration, which discrepancies do you
24 outline in your declaration?
25

TSG Reporting - Worldwide    877-702-9580

**Page 99**

MARTINI

1      WITNESS' ATTORNEY: Objection to form.
2      A. There were discrepancies in paragraph
3  18,--
4      Q. Paragraph 18 of what, sir?
5      A. 693.
6      Q. Anything else, sir?
7      WITNESS' ATTORNEY: Objection, form.
8      A. He has them. I have to go through
9  every paragraph. He has them in paragraph 7 --
10     Q. Well, maybe we can do it this way, is
11 it your belief, sir, that because of the
12 specified and identified discrepancies in
13 Mr. Melsaae's report and affidavit, it is
14 necessary to do a full recalculation of the 15c3
15 reserve calculation as of September 19, 2008?
16     WITNESS' ATTORNEY: Objection to form.
17     A. I would say the process to do the
18 recalculation would be to start from scratch.
19     Q. I understand what the process is, sir.
20 I am asking why it is your belief that that
21 process is necessary in order to come to a
22 determination of the 15c3-3 reserve requirement
23 as of September 19, 2008?
24     A. The fact he has noted discrepancies,
25

TSG Reporting - Worldwide    877-702-9580

| Page 100 | Page 101 |
|---|---|

**Page 100**

MARTINI

1  as well as conversation that I have had as I
2  previously stated with individuals that have
3  said that there is a reconciliation being --
4  taking place by the TSA team.
5      Q. I am handing you what has been marked
6  previously in these depositions as Exhibit 599.
7  You are welcome of course to look at the whole
8  document. I am only going to ask you I think
9  about the e-mail. But let me know when you have
10 had an opportunity to review that document and
11 then we can proceed.
12     A. OK.
13     Q. Have you seen this document before,
14 sir?
15     A. I've seen this e-mail.
16     Q. Have you seen the attachment to the
17 e-mail or just the e-mail?
18     A. I have -- I'm not sure if I have seen
19 the attachment or all of these schedules. I may
20 have. I can't recall if I have seen the entire
21 schedule. I've seen the e-mail though.
22     Q. When did you see the e-mail?
23     A. I think this goes back to some point
24 in early 2009 as there was identified an issue

TSG Reporting - Worldwide    877-702-9580

**Page 101**

MARTINI

1  with the ADP system that may have impacted
2  Barclays' calculation as well. So in that
3  e-mail, there was -- something was identified as
4  being a problem within ADP's allocation. Many
5  firms use ADP, so it was a street-wide issue so
6  that information was sent to me, sent to me
7  through Matt Huey.
8      Q. Matt Huey sent you this e-mail, sir?
9      A. Either sent me the e-mail or discussed
10 the issue with me. Or maybe, maybe it came from
11 Joel, Joel could have done it as well. I don't
12 know who I got the e-mail from. Honestly, I
13 would have to go back and check, but I've seen
14 it. I remember seeing this.
15     Q. Do you remember seeing this e-mail at
16 about the time it was sent early January of
17 2009?
18     A. I remember this as being an issue some
19 point in '09.
20     Q. OK, did you see this document in
21 preparation for your deposition?
22     A. I did.
23     Q. We have talked about who Bill Burke
24 is?
25

TSG Reporting - Worldwide    877-702-9580

Page 102

MARTINI

1
2    A.    Um-hm, yes.
3    Q.    Who is Daniram Sudarsan?  Apologies if
4    I am murdering that.
5    A.    A individual who works for Alex
6    Crepeau.
7    Q.    And he was an employee of Barclays in
8    January '09?
9         WITNESS' ATTORNEY:  Objection, form.
10   A.    Yes, I believe so.
11   Q.    Who is Kendall McLaughlin?
12   A.    He was the predecessor to Alex
13   Crepeau.
14   Q.    What was his title if you know in
15   January 2009?
16   A.    I believe senior vice president or,
17   excuse me, director.
18   Q.    What was he responsible for?
19   A.    Regulatory operations.
20   Q.    Is he with Barclays today, sir?
21   A.    No.
22   Q.    Do you know where he is employed?
23   A.    Citigroup.
24   Q.    When did he move to Citigroup if you
25   know?

TSG Reporting - Worldwide    877-702-9580

Page 103

MARTINI

1
2    A.    Some point in the summer of 2009, I
3    believe.
4    Q.    Salvatore Buonocore?
5    A.    He is somebody in operations.  I don't
6    really interact with him.  I don't know if he is
7    still here or not.
8    Q.    He was, to your knowledge, a Barclays
9    employee?
10   A.    Yup.
11   Q.    In January of '09?
12   A.    Yup.  Yes.
13   Q.    Do you see the Sudarsan writes to
14   Mr. McLaughlin, "Kendall, we had a meeting where
15   Sal and myself discussed with Bill and Joel the
16   revised reserve formula as of 9/19/08 based on
17   the revised allocation of the books produced by
18   Broadridge.  The net effect was that the reserve
19   requirement increased by 213 ml, do you see
20   that?
21   A.    Um-hm.  Yes.
22   Q.    Can you, do you have an understanding
23   of what Mr. Sudarsan was talking about when he
24   sent that e-mail?
25   A.    I understand what the issue is, yes.

TSG Reporting - Worldwide    877-702-9580

Page 104

MARTINI

1
2    Q.    Can you tell me what the issue is on
3    this?
4    A.    He is saying he identified two issues
5    and a net impact of 213 million.  One issue
6    increased the requirement by 468 million due to
7    a double allocation and another issue resulted
8    in a benefit of 255 million.
9    Q.    Were you involved in contemporaneous
10   discussions with the individuals on this e-mail
11   about this subject?
12        WITNESS' ATTORNEY:  Objection, form.
13   A.    This issue was only raised to me as a
14   result of the ADP issue, the fact that there was
15   a double allocation of 097.  So make sure that
16   that was not an impact to Barclays Capital,
17   Barclays Capital ADP 293 allocation which is a
18   legacy system for Barclays.
19   Q.    This e-mail concerns Barclays'
20   employees revising the LBI reserve formula as of
21   September 19, 2008, do you agree?
22        WITNESS' ATTORNEY:  Objection,
23   mischaracterizes the document.
24   A.    Say that one more time, please.
25   Q.    Do you agree, sir, that this e-mail

TSG Reporting - Worldwide    877-702-9580

Page 105

MARTINI

1
2    concerns Barclays' employees calculating a
3    revised LBI reserve formula as of September
4    18 -- sorry, 19, 2008?
5         WITNESS' ATTORNEY:  Same objection.
6    A.    I would say this is not a revised
7    reserve formula.  This is two issues that were
8    identified and someone is saying the net effect
9    of those two issues will have X amount of impact
10   to the reserve requirement.
11   Q.    But not to the Barclays reserve
12   requirement, the LBI reserve requirement,
13   correct?
14   A.    Correct.
15   Q.    And with effect from or on the LBI
16   reserve formula as of September 19, 2008,
17   correct?
18   A.    Correct.
19   Q.    Do you know why they did that?
20        WITNESS' ATTORNEY:  Objection to form.
21   A.    Why they did --
22   Q.    Why they calculated the effect of
23   these adjustments on the LBI reserve requirement
24   as of September 19, 2008?
25   A.    I don't know.  My understanding would

TSG Reporting - Worldwide    877-702-9580

| Page 106 | Page 107 |
|---|---|

**Page 106**

MARTINI

1           MARTINI
2  be having some understanding of this particular
3  issue that was happening was -- there was
4  questions from the SEC for, I believe, Kendall
5  McLaughlin to go back and ascertain customer
6  assets or location of customer assets that were
7  not segregated and through that review, two
8  issues came up, these two issues.
9      Q.  How is it you came to this
10  understanding, sir?
11      A.  Discussions with individuals at the
12  time.
13      Q.  And which individuals, sir?
14      A.  Kendall, Daniram would have been aware
15  that they were doing something like that.
16      Q.  Do you know, sir, whether the net
17  effect of these adjustments on the LBI reserve
18  formula as of September 19, 2008, this 213
19  million adjustment referenced in Exhibit 599 was
20  communicated by Barclays to the SEC?
21      WITNESS' ATTORNEY: Objection to form.
22      A.  I don't know.
23      Q.  Do you agree that this e-mail reflects
24  an adjustment to the reserve requirement for LBI
25  as of September 19, 2008 on September 17, 2008?

TSG Reporting - Worldwide    877-702-9580

**Page 107**

MARTINI

1           **MARTINI**
2      **WITNESS' ATTORNEY: Objection to form.**
3      A.  Based on this is what the document
4  says. So it says as of 9/19. I have no
5  knowledge what day they looked at it.
6      Q.  Do you agree, sir, that Barclays was
7  able to account for those identified
8  discrepancies that you have just testified to by
9  adjusting the reserve calculation to the tune of
10  213 million dollars?
11      **WITNESS' ATTORNEY: Objection to form.**
12      A.  Sorry, if you can rephrase that for
13  me.
14      MR. OXFORD: Sure, can you read it
15  back, please, Mary.
16      (Record read)
17      Q.  NOTE: 213)?
18      **WITNESS' ATTORNEY: Same objection.**
19      A.  I don't know the answer to that
20  question. You are saying is Barclays able to
21  adjust the reserve formula for this?
22      Q.  Yes.
23      A.  This one adjustment? I suppose
24  somebody could say that you could put that as
25  one component or one adjustment to a number, to

TSG Reporting - Worldwide    877-702-9580

| Page 108 | Page 109 |
|---|---|

**Page 108**

MARTINI

1           MARTINI
2  the reserve calculation, yes.
3      Q.  Do you know whether Barclays reran the
4  LBI reserve formula as of September 19, 2008 –
5      A.  When we say --
6      WITNESS' ATTORNEY: Objection to form.
7      A.  When you say Barclays, who do we mean?
8      Q.  I mean anybody employed by Barclays or
9  working at the direction of Barclays.
10      WITNESS' ATTORNEY: Those are two
11  different things.
12      A.  So nobody at the direction -- working
13  for Barclays for Barclays Capital Inc. would
14  have performed any 15c3 calculation for LBI.
15      Q.  Why not?
16      A.  We weren't asked to. Why would we?
17      Q.  Was Barclays asked to calculate the
18  net effect of the adjustments reflected in this
19  e-mail on the reserve formula for LBI as of
20  September 19, 2008?
21      WITNESS' ATTORNEY: Objection to form.
22      A.  I was never instructed. I did not --
23  first of all, the time of this e-mail, it would
24  have been Matthew Huey, and to my knowledge, he
25  was not instructed by the SEC or anyone to do a

TSG Reporting - Worldwide    877-702-9580

**Page 109**

MARTINI

1           MARTINI
2  calculation.
3      Q.  To your knowledge, sir, was anybody at
4  Barclays asked to calculate the net effect on
5  the reserve requirement for LBI as of
6  September 19th, 2008 as a consequence of the
7  errors that are identified in Exhibit 599?
8      WITNESS' ATTORNEY: Objection to form.
9      A.  I have no knowledge of those
10  discussions, no knowledge of anybody who
11  instructed to change the reserve requirement as
12  of 9/19.
13      Q.  You have no knowledge whether Barclays
14  was asked to calculate the net effect on LBI's
15  reserve requirement?
16      A.  Not to my knowledge.
17      WITNESS' ATTORNEY: Objection to form.
18      Q.  Back to your declaration, sir.
19  Keeping with paragraph 4, after you say that
20  Mr. McIsaac's statements are incorrect, you say,
21  "Although Barclays acquired LBI's systems, its
22  employees are entitled to access only the
23  information located on those systems that is
24  associated with the 'Business' acquired by
25  Barclays from Lehman pursuant to the asset

TSG Reporting - Worldwide    877-702-9580

Page 110

MARTINI

1
2    purchase agreement, including the clarification
3    letter thereto between Barclays, LBI and other
4    Lehman entities," and you define that as the
5    "purchase agreement." Do you see that, sir?
6        A.  Yes.
7        Q.  Have you ever seen the asset purchase
8    agreement?
9        A.  No.
10       Q.  Have you ever seen the clarification
11   letter to the purchase agreement?
12       A.  No.
13       Q.  And you're not a lawyer, sir?
14       A.  No.
15       WITNESS' ATTORNEY: I am sorry, what's
16   the question? OK.
17       Q.  Is this statement in paragraph 4 that
18   I just read based on your personal knowledge,
19   sir?
20       WITNESS' ATTORNEY: Objection to form.
21       A.  This is based on my personal knowledge
22   of understanding the business of Barclays
23   Capital, knowing that it acquired certain assets
24   of LBI and that those assets were contained in a
25   system called ADP 224, that my team computed

TSG Reporting - Worldwide    877-702-9580

Page 111

MARTINI

1
2    reserve calculations for after the acquisition.
3        Q.  OK, and you testified, sir, under
4    penalty of perjury, that you have personal
5    knowledge that pursuant to the asset purchase
6    agreement and the clarification letter, Barclays
7    only has -- sorry, is only entitled to access to
8    information located on those systems associated
9    with "the business acquired by Lehman," correct?
10       A.  Yes.
11       WITNESS' ATTORNEY: No, that
12   mischaracterizes the statement in his
13   declaration. You can quote the declaration,
14   but you reversed it there.
15       A.  Please repeat for me.
16       Q.  Well, I think I had my answer, but
17   let's try and break it up. You say that you
18   have -- withdrawn.
19       Do you have personal knowledge, sir,
20   of what -- of what the business is that Barclays
21   acquired from Lehman pursuant to the asset
22   purchase agreement and the clarification letter?
23       A.  I have knowledge in my position at
24   Barclays that we did not acquire 100 percent of
25   the assets of LBI. We acquired certain assets

TSG Reporting - Worldwide    877-702-9580

Page 112

MARTINI

1
2    that, quote/unquote, is referred to as the
3    business. The most notable business, as I have
4    said before, was the wealth business, and that
5    those assets that we acquired, my team has
6    access to the computer reserve calculation for.
7        Q.  It is true, sir, your knowledge about
8    what Barclays acquired is based on a practical
9    experience in the business, correct?
10       A.  Practical experience in the business
11   and my understanding of the activities of
12   Barclays Capital.
13       Q.  You haven't reviewed the asset
14   purchase agreement, have you, sir?
15       WITNESS' ATTORNEY: Asked and
16   answered.
17       A.  I am sorry?
18       WITNESS' ATTORNEY: I objected. You
19   can answer.
20       A.  I have not reviewed the asset purchase
21   agreement.
22       Q.  You have never seen it?
23       A.  I've not seen it.
24       Q.  You have never seen the clarification
25   letter, sir?

TSG Reporting - Worldwide    877-702-9580

Page 113

MARTINI

1
2        A.  No.
3        Q.  Do you even know what the
4    clarification letter is, sir?
5        WITNESS' ATTORNEY: Object to form.
6        A.  No.
7        Q.  Would you recognize the document if I
8    put it in front of you?
9        A.  No.
10       Q.  Would you recognize the asset purchase
11   agreement if I put it in front of you?
12       A.  By the title maybe.
13       Q.  But you don't know?
14       A.  Don't know.
15       Q.  Tell me how it is that you're able to
16   testify from your personal knowledge about what
17   Barclays is entitled to do underneath those --
18   under those two documents that you have never
19   seen and you may not recognize?
20       WITNESS' ATTORNEY: Objection, you are
21   mischaracterizing his declaration.
22       A.  My statement refers to the assets that
23   Barclays acquired that I see in our books and
24   records subsequent to the acquisition date that
25   my team creates a customer reserve from.

TSG Reporting - Worldwide    877-702-9580

Page 114

MARTINI

1
2  So I'm not a lawyer. I was not
3  involved in the sale. I could not tell you
4  specifically if you put all the assets on a
5  schedule which ones we acquired, which one we
6  didn't. But I know, to my personal knowledge of
7  the firm, we did not acquire 100 percent of the
8  LBI assets and I can look at a record under the
9  control of my team and having access to the
10 records of what we have on our books and
11 records.
12  Q.  You mentioned, I believe it was this
13 morning, sir, that one of the things that
14 Barclays would need in order to rerun LBI's
15 reserve calculation as of September 19, 2008
16 would be certain key employees?
17  A.  Yes.
18  Q.  Of LBI? Yes?
19  A.  Yes.
20  Q.  And I think you mentioned Bill Burke
21 as one of those key employees?
22  A.  Yes.
23  Q.  Is there anybody else who is on that
24 list of key employees?
25  A.  I don't know the full list. I only

TSG Reporting - Worldwide    877-702-9580

Page 115

MARTINI

1
2  know that Bill Burke, to my knowledge, ran the
3  15c3 calculation for LBI. So he is the point
4  person. He is responsible for the calculation.
5  Are there other people in the firm? Yes,
6  probably.
7  Q.  To your knowledge, sir, was Mr. Burke
8  involved in calculating the effect on the
9  reserve requirement of the — of LBI as of
10 September 19, 2008 that was identified in
11 Exhibit 599?
12  WITNESS' ATTORNEY:  Objection to form.
13  A.  I don't know. I don't know what his
14 role was.
15  Q.  Is it your testimony, sir, because
16 Mr. Burke worked for the TSA, he wouldn't be
17 available to Barclays to assist them with
18 rerunning LBI's 15c3 calculation as of
19 September 19, 2008?
20  A.  My understanding is Barclays doesn't
21 have access to Mr. Burke regarding the LBI
22 calculation unless the trustee instructs us.
23  Q.  Could you know whether request has
24 been made by Barclays at any time to the trustee
25 for Barclays to use the services of Mr. Burke

TSG Reporting - Worldwide    877-702-9580

Page 116

MARTINI

1
2  notwithstanding that he is primarily employed
3  under the TSA?
4  WITNESS' ATTORNEY:  You can answer
5  only to the extent that you don't reveal
6  matters that were discussed in
7  attorney/client conversations.
8  Please rephrase that question.
9  Q.  Sure. Do you know whether any request
10 has been made by Barclays at any time to the
11 trustee for Barclays to use the services of Mr.
12 Burke notwithstanding that he is primarily
13 employed by TSA?
14  WITNESS' ATTORNEY:  Same instruction.
15  A.  I'm not aware that Barclays has asked
16 the trustee to use Bill Burke. I'm not aware of
17 that.
18  Q.  Was Mr. Potenciano involved in the
19 calculation of the 15c3-3 reserve formula when
20 he was employed by Lehman?
21  A.  Yes.
22  Q.  And he is now employed by Barclays,
23 correct?
24  A.  Yes.
25  Q.  And you have unfettered access to

TSG Reporting - Worldwide    877-702-9580

Page 117

MARTINI

1
2  Mr. Potenciano's services, right?
3  WITNESS' ATTORNEY:  Object to form.
4  A.  Yeah, Mr. Potenciano worked within my
5  team, yes.
6  Q.  And Mr. Sudarson is also employed on
7  your team, right?
8  A.  Not on my team. He is operations.
9  Q.  He is part of the operations control
10 group?
11  A.  Yes.
12  Q.  And he is employed by Barclays,
13 correct?
14  A.  Yes.
15  Q.  And he used to be employed by Lehman,
16 correct?
17  A.  Yes.
18  Q.  And he was in Lehman's operations
19 control group, wasn't he?
20  A.  Yes, I believe regulatory operations.
21  Q.  And in that capacity, he was involved
22 in the calculations of Lehman's 15c3-3 reserve
23 formulas during his employment by Lehman?
24  A.  He would have — the nature of that
25 role is he would have worked with Bill Burke

TSG Reporting - Worldwide    877-702-9580

Page 118

MARTINI

1    team to analyze information.
2
3    Q.  So that's a yes?
4        WITNESS' ATTORNEY:  Objection form.
5    A.  The answer is, I am saying, he does
6    not compute the reserve requirement. He is an
7    individual who may supply information to Bill
8    Burke or his team.
9    Q.  Do you know Kleber Rodriguez?
10   A.  I know of him.
11   Q.  Have you ever met him?
12   A.  I've met him.
13   Q.  Do you know what his position was at
14   Lehman in the fall of 2008?
15   A.  I don't know specifically what his
16   role was.
17   Q.  Do you know whether he had any
18   involvement in the computation of the Lehman's
19   15c3-3 reserve formula?
20   A.  I don't know specifically what his
21   involvement was.
22   Q.  Can you turn to paragraph 6 of your
23   declaration, please.
24   A.  OK.
25   Q.  You write, sir, that the trustee has

TSG Reporting - Worldwide    877-702-9580

Page 119

MARTINI

1
2    or has access to the relevant information
3    necessary to rerun LBI's September 17, 2008 or
4    September 19, 2008 reserve calculations
5    including to account for any discrepancies that
6    may have to be identified later by the trustee
7    related to those calculations. Do you see that?
8    A.  Yes.
9    Q.  What do you mean by "relevant
10   information," sir?
11   A.  I mean any adjustments that would be
12   needed to be incorporated, adjustments from
13   identified errors or reconciliation processes.
14   Q.  But you don't know one way or the
15   other whether any such errors have been
16   identified here, sir?
17       WITNESS' ATTORNEY:  Objection to form.
18   A.  To the trustee?
19   Q.  I think you said "by the trustee" not
20   "to the trustee" in your sentence here, sir.
21       WITNESS' ATTORNEY:  Objection, he
22   didn't say anything about the trustee in his
23   original answer.
24       MR. OXFORD:  I am not talking about
25   his original answer. I'm talking about his

TSG Reporting - Worldwide    877-702-9580

Page 120

MARTINI

1
2    declaration.
3    Q.  Let's start this again. You said that
4    by relevant information, sir, in paragraph 6 of
5    your declaration, you made any adjustments that
6    would be needed to be incorporated from
7    identification errors or reconciliation
8    processes, correct?
9    A.  Yes, sir, any relevant information
10   meaning books and records of LBI.
11   Q.  But sitting here today, sir, you don't
12   know one way or the other whether or not there
13   are any adjustments that need to be incorporated
14   in the reserve formula calculation —
15       WITNESS' ATTORNEY:  Objection to form.
16   Q.  -- to take account of identified
17   errors through the reconciliation process, do
18   you?
19       WITNESS' ATTORNEY:  Same objection.
20   A.  I am sorry, that one you are going to
21   have to break up for me. Sorry, I apologize.
22       MR. OXFORD:  Can you read it back
23   please, Mary.
24       (Record read)
25   A.  Yeah, I would say I don't work on the

TSG Reporting - Worldwide    877-702-9580

Page 121

MARTINI

1
2    LBI calculation. I was not a Lehman employee,
3    so I don't know the full scope of what they have
4    identified or not identified.
5    Q.  In fact, you don't know anything about
6    the scope of what has been identified, if
7    anything, do you, sir?
8        WITNESS' ATTORNEY:  Objection to form.
9    A.  As far as?
10   Q.  Errors that would need to be accounted
11   for in the rerunning of Lehman's 15c3-3
12   calculation as of September 19, 2008?
13       WITNESS' ATTORNEY:  Objection, form.
14   A.  I don't have knowledge of items except
15   for what's in here of an identifier that I have
16   been exposed to.
17   Q.  And just for the record, sir, do you
18   agree that when you said in here —
19   A.  Yes.
20   Q.  -- you were referring to the errors
21   identified and described in Exhibit 599?
22   A.  Yes.
23       MR. OXFORD:  We have been going about
24   an hour after lunch, if we want to take five
25   minutes.

TSG Reporting - Worldwide    877-702-9580

# EXHIBIT K

## EXPERT REPORT OF PETER VINELLA

in the matters of

In Re: Lehman Brothers Holdings, Inc., et al., Debtors

and

In Re: Lehman Brothers, Inc., Debtor

January 8, 2010



# Table of Contents

I.      SUMMARY OF CONCLUSIONS ................................................................ 3

II.     QUALIFICATIONS ................................................................................... 8

III.    COMPENSATION ..................................................................................... 8

IV.     SOURCES FOR REPORT .......................................................................... 9

V.      KEY FACTUAL MISCONCEPTIONS IN THE McISAAC AFFIDAVIT ..... 9

VI.     MR. McISAAC'S RECOMMENDED RESERVE ACCOUNT ADJUSTMENTS ........ 13

        A.    FID Accounts ................................................................... 14

        B.    Alleged Account Coding Errors ........................................ 15

        C.    Assets Subject to LBIE Administration ............................ 18

        D.    Customer Cash Claimed by LBIE ..................................... 19

        E.    OCC Deposit .................................................................... 20

        F.    Customer Property Seized During the Transfer Process .......... 21

VII.    MR. McISAAC'S DISCUSSION OF "ITEMS CURRENTLY UNDER INVESTIGATION" ........ 22

        A.    Alleged JPMC Overdraft .................................................. 22

        B.    Alleged Unsecured Debits in the Reserve Requirement Formula ......... 24

        C.    Alleged Customer Securities Included in the Barclays Repo ......... 25

        D.    Alleged Assets Detained by Foreign Banks ...................... 26

EXHIBIT A:   CURRICULUM VITAE OF PETER VINELLA ............................. 28

EXHIBIT B:   ADDITIONAL BACKGROUND ............................................... 38

EXHIBIT C:   DOCUMENTS REVIEWED .................................................... 42

EXHIBIT D:   LBI FOCUS REPORT, Form X-17a5 (July 31, 2008) .............. 45

EXHIBIT E:   LBI FOCUS REPORT, Form X-17a5 (August 31, 2008) .......... 46

EXHIBIT F:   LEHMAN BROTHERS INC. CONSOLIDATED 15c3-3 RESERVE FORMULA ........ 47

At the request of Barclays Capital, Inc. ("Barclays"), I offer the following report in response to the Affidavit of Daniel McIsaac dated October 5, 2009 (the "McIsaac Affidavit"), which has been designated by James W. Giddens, as Trustee (the "Trustee") for the Securities Investor Protection Act ("SIPA") Liquidation of Lehman Brothers, Inc. ("LBI"), as an expert report in support of The Trustee's Motion for the Relief Pursuant to Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b) filed September 15, 2009 (the "Rule 60 Motion").

This report contains a statement of my opinions to date and the basis and reasons therefore, the data or other information considered in forming my opinions, exhibits which provide a summary of or support for my opinions, and my qualifications.

The opinions expressed herein are solely mine and are based on the information I have reviewed and the work I have performed to date. Should additional documents or other information be provided to me, my opinions as expressed herein could change, and therefore, I reserve the right to revise my report accordingly.

## I.    SUMMARY OF CONCLUSIONS

The McIsaac Affidavit asserts that there was and is a deficit in LBI's Rule 15c3-3 Reserve Account as of September 19, 2008[1] based on a series of assertions that I find

---

[1]    Throughout his affidavit, Mr. McIsaac makes references to adjustments to the Reserve Account as well as to the adjustments to the Reserve Requirement (what he often calls the "Reserve Formula"). While related concepts, these are not exactly the same.

Report of Peter U. Vinella        Page 3 of 47            January 8, 2010

flawed, speculative, inadequately explained, and unsupported by the limited evidence he

identifies. Mr. McIsaac's failure to adequately explain the basis for his opinions makes it

difficult to fully assess their validity, but even the limited information provided in his

affidavit does make clear that his analysis is flawed in a number of respects:

*First,* in his discussion of LBI's operations and reporting during the week of

September 15, Mr. McIsaac does not appear to take into account the fact that LBI was

successfully able to fund LBI's balance sheet, meet all cash requirements, and close its

books each day during the week of September 15 until September 19 when JP Morgan

Chase ("JPMC"), LBI's clearing bank, prohibited LBI staff from accessing its accounts.[2]

*Second,* to the extent Mr. McIsaac seeks to justify his opinions and conclusions by

comparing LBI's Reserve Requirement as of September 19 to those computed prior to

September 15 or to historical averages, this comparison is not relevant.[3]

On September 15, Lehman Brothers Holdings, Inc. ("LBHI"), LBI's holding

company, filed for bankruptcy and Lehman Brothers Europe, Inc. ("LBIE"), LBI's

affiliate European broker-dealer, filed for administration.[4] This led to a significant exodus

---

sufficiently funded. The Reserve Requirement plus the cushion is commonly called the
"Lockup Requirement". Firms also frequently leave an excess in their Reserve Accounts
above and beyond their calculated Lockup Requirements.

Therefore, an adjustment to the Reserve Account is required only when there is an upward
adjustment to the Reserve Requirement that exceeds the cushion in the Lockup Requirement
plus any excess in the account itself (the sum of which is referred to here as the "Cushion").

[2]    Interviews with Barclays employees and former LBI employees

[3]    *See* paragraph 25, McIsaac Affidavit and Ex 3, McIsaac Affidavit

[4]    Interviews with Barclays employees and former LBI employees

of customers and customer assets from LBI, which, logically, should have led to a significantly lower Reserve Requirement.

If a comparison between the Reserve Requirement as of September 19 and other LBI Reserve Requirements were even relevant, more appropriate reference points would be the Reserve Requirements as of September 16 and September 17, which were calculated under the observation of the SEC and the Financial Industry Regulatory Authority ("FINRA").[5] These more recent calculations more accurately reflected the declining customer base and indeed show declining Reserve Requirements.[6]

*Third,* on a related note, although customer accounts (numbering in the tens of thousands) were transferred from LBI to other broker-dealers in the weeks prior to SIPA Liquidation, Mr. McIsaac does not provide any analysis regarding whether the corresponding reduction to the Reserve Requirement as of September 19 as a result of those transfers was overstated, understated, or completely correct.

*Fourth,* Mr. McIsaac's affidavit asserts that the LBI Reserve Requirement as of September 19 was inaccurately calculated. Yet, in his analysis of the flaws in that calculation, he considers only factors that would increase the Reserve Requirement.[7]

---

[5]    Interviews with former LBI employees and Ex F

[6]    *See* Ex F

[7]    For a description of the specifics of the Reserve Requirement formula ("Reserve Formula"), *see* paragraph 21-22, pages 7-8, McIsaac Affidavit and Ex. 2, McIsaac Affidavit

Specifically, he focuses almost entirely on credit items that he alleges should be increased, thus increasing the Reserve Requirement. He also considers (albeit to a lesser extent) debit items that he alleges should be reduced, which would also increase the Reserve Requirement. However, Mr. McIsaac fails to provide the results of any analysis he performed, if any, as to possible errors associated with credits and debits that would have *reduced* the Reserve Requirement.

As such, his analysis is more of an exercise to confirm that the calculation of the Reserve Requirement as of September 19 was flawed than an attempt to accurately estimate the Reserve Requirement itself.

*Fifth,* on a related note, Mr. McIsaac chooses not to perform a calculation of LBI's Reserve Requirement independently as of the date of the SIPA Liquidation, although he had access to the necessary data to do so.[8] He did not even try to provide a reasonably rigorous approximation in his affidavit.

While he points to a few concrete issues that, if substantiated, could indeed increase the Reserve Requirement as of September 19, Mr. McIsaac also discusses many speculative and unsupported issues that, if accurate, could (in his opinion) materially increase the credit component of the Reserve Requirement formula, hence, increasing the Reserve Requirement. All the while, Mr. McIsaac ignores other issues that, if incorrect as of September 19 would have had the opposite effect, such as insufficient adjustments for

---

[8]    This data is maintained in the LBI systems under the control of the Trustee

the aforementioned substantial number of transferred customer accounts during the relevant time frame or coding errors that would have permitted a decrease in the Reserve Requirement.

With respect to Mr. McIsaac's specific opinion that LBI's Reserve Requirement as of September 19 required upward adjustments of $4.9 billion, resulting in a deficit in the Reserve Account of $3.7 billion; his opinion suffers from the following additional flaws:[9]

*First,* Mr. McIsaac often relies on speculative assertions for which he offers either no factual support or minimal and inadequate factual support. If Mr. McIsaac substantiates those assertions, I reserve the right to update my opinions accordingly.

*Second,* Mr. McIsaac fails to address the fact that LBI routinely kept a sizable Cushion in its Reserve Account to account for errors and does not determine whether any or all of the purported shortfalls he identifies would have been covered by the Cushion.[10]

In addition to making specific proposed adjustments to LBI's Reserve Requirement on allegedly known items, he also asserts that there are a number of additional items "under investigation" that may or may not have resulted in errors in the Reserve Requirement calculation. Mr. McIsaac's opinion with respect to said items under

---

[9] *See* paragraph 49, page 18, McIsaac Affidavit
[10] *See* Ex F and interviews with former LBI employees

Report of Peter U. Vinella          Page 7 of 47                    January 8, 2010

investigation is supported by little or no factual evidence, and he does not even conclude that such adjustments will ever be necessary.

As such, this portion of Mr. McIsaac's affidavit is pure speculation on hypothetical situations. If Mr. McIsaac ever concludes that such adjustments do, in fact, need to be made and provides the factual basis for his conclusion, I reserve the right to update my report accordingly.

## II.    QUALIFICATIONS

My name is Peter U. Vinella. I am currently a Managing Director at LECG, LLC ("LECG"), an expert services and advisory firm. I have more than 25 years' experience working in the financial services industry, both as a senior executive in large financial institutions and as a consultant. I am intimately familiar with broker-dealer operations in general as well as many critical aspects of this matter under consideration. This is based on my experience as a senior executive at two major broker-dealers, as the president and CEO (and other positions) of Wilmington Trust Conduit Services ("WTCS"), and in several relevant previous consulting engagements. My curriculum vitae is attached as Exhibit A, and additional background particularly relevant to this matter is attached as Exhibit B.

## III.    COMPENSATION

I have been retained in this matter with compensation at my standard hourly rate of $650.00. Other members of my firm also have performed work at their standard hourly rates under my direction. We also are reimbursed for out-of-pocket expenses.

Report of Peter U. Vinella            Page 8 of 47            January 8, 2010

## IV.    SOURCES FOR REPORT

My evaluation draws upon my knowledge of financial markets, experience working in the financial services industry, and my specific knowledge of broker-dealer operations, particularly as it relates to customer accounts and assets, end-of-day processing, and repurchase agreements ("Repos").

In this matter, I reviewed a number of documents, including, but not limited to, the McIsaac Affidavit and exhibits, the Adversary Complaint filed by the Trustee on November 16, 2009 ("Adversary Complaint"), the Rule 60 Motion, the Asset Purchase Agreement between Barclays and Lehman dated September 16, 2008 ("APA"), as well as the subsequent amendment ("APA Amendment") and clarification letter ("Clarification Letter"), which together comprised the single purchase agreement.

I also interviewed several ex-LBI and Barclays employees and reviewed various LBI and Barclays internal reports.

## V.    KEY FACTUAL MISCONCEPTIONS IN THE McISAAC AFFIDAVIT

I address in Sections VI and VII below Mr. McIsaac's specific assertions regarding his proposed adjustments to LBI's Reserve Requirement and additional matters under investigation. Before addressing those points, however, I have the following overarching observations regarding the McIsaac Affidavit:

*First,* one of the key premises of Mr. McIsaac's affidavit is that the state of LBI's operations following the default of LBHI on September 15 made it virtually impossible to adequately compute its Reserve Requirement and, by inference, to maintain its balance

sheet, meet all cash requirements, and successfully close its books during the week of September 15.[11] [12] This does not appear to be correct.

Rather, it is my understanding from discussions with former LBI personnel that, due in part to liquidity provided through Repos with the Federal Reserve Bank of New York ("FRBNY") and with Barclays, LBI was successfully able to fund LBI's balance sheet, meet all cash requirements, and close its books each day during the week of September 15 until September 19, when JPMC prohibited LBI staff from accessing its accounts.[13] Additionally, LBI was able to successfully transfer tens of thousands of customer accounts and unwind tens of billions of dollars worth of tri-party Repo positions that week.[14] Moreover, it was able to successfully compute its Reserve Requirement at least through September 17.[15] All of the activity was performed under the observation of representatives from the SEC and FINRA, who were onsite at LBI's offices during the week of September 15.[16]

*Second*, in his affidavit, Mr. McIsaac points to LBI's Reserve Requirement as of September 12 as well as past Reserve Requirements prior to the week of September 15

---

[11] *See* paragraphs 27-31, pages 10-12, McIsaac Affidavit

[12] The operations came to halt on September 19 as a result of JMPC shutting off access to its systems. Interviews with former LBI employees

[13] Interviews with Barclays employees and former LBI employees

[14] Interviews with former LBI employees

[15] *See* Ex F

[16] Interviews with Barclays employees and former LBI employees

that range between $3 and $6 billion.[17] [18] To the extent that Mr. McIsaac uses past Reserve Requirements as a justification for his ultimate conclusion that the proper Reserve Requirement as of September 19 should have been at least $4.9 billion, the comparison is unjustified.

Neither the historical average Reserve Requirements nor the Reserve Requirement as of September 12 are reasonable reference points to the Reserve Requirement as of September 19 because they reflect calculations made prior to a significant exodus of customers that occurred after the bankruptcy of LBHI and the administration of LBIE on September 15.[19] Instead, the Reserve Requirement calculations as of September 16 and September 17 would be a more accurate reference point (to the extent that a reference point is even appropriate) because they reflected the declining customer base.[20]

The last clean Reserve Requirement calculation performed by LBI as of September 17 and observed by the SEC and FINRA did, indeed, show a significant drop of approximately $4 billion from the one computed as of September 12, and was

---

[17]  *See* paragraph 27, page 10, McIsaac Affidavit
[18]  *See* footnote 4, page 11, McIsaac Affidavit
[19]  Interviews with former LBI employees
[20]  *See* Ex F

Report of Peter U. Vinella         Page 11 of 47                    January 8, 2010

substantially less than the adjusted Reserve Requirement of at least $4.9 billion proposed by Mr. McIsaac in his affidavit.[21]

    *Third,* Mr. McIsaac does not include in his affidavit any analysis of the impact of customer accounts (numbering in the tens of thousands) that were transferred from LBI to other broker-dealers in the weeks prior to SIPA Liquidation, including some of the Private Asset Management ("PAM") accounts.[22] To the extent the September 19 Reserve Requirement did not accurately reflect the magnitude of these departures, a downward adjustment to Mr. McIsaac's total proposed Reserve Requirement adjustments would be expected.[23]

    *Fourth,* I note that the LBI Lockup Requirement was $2.77 billion as of September 16 and $1.77 billion as of September 17, including a $225 million cushion added in the formula.[24] [25] Given the continuing exodus of clients, including PAM accounts which began to be transferred from LBI to other broker-dealers on September

---

[21]  *See* paragraph 49, page 16, McIsaac Affidavit

[22]  Interviews with former LBI employees

[23]  The maximum Reserve Requirement is calculated based on the amount of customer assets held at a broker-dealer. As such, as billions of dollars of assets left LBI, one would expect a significant drop in the Reserve Requirement. Mr. McIsaac does not mention this drop in assets in his affidavit

[24]  *See* Ex F

[25]  The calculations played an important part in keeping LBI afloat during the week of September 15. Given its cash needs, LBI's senior management directed that Reserve Requirements be calculated daily and that excesses in the Reserve Account be deposited in LBI's general operating account. This began on September 17 (for the calculation as of September 16) since LBI had just finished locking up the Reserve Account on September 16 for the Reserve Requirement calculation as of September 12. These calculations and subsequent withdrawals were observed closely by the SEC and FINRA. Interviews with former LBI employees

18, there should have been an additional significant drop in the Reserve Requirement as of September 18.[26] One would expect that the Reserve Requirement would have been even lower as of September 19, without regard, of course, to the issues Mr. McIsaac identifies in his affidavit.

### VI. MR. McISAAC'S RECOMMENDED RESERVE ACCOUNT ADJUSTMENTS

I now turn to Mr. McIsaac's specific testimony regarding adjustments to the Reserve Requirement.

In paragraph 49 of his affidavit, Mr. McIsaac recommends a number of specific adjustments to LBI's Reserve Requirement as of September 19, totaling $4.9 billion in upward adjustments. With respect to this figure, Mr. McIsaac notably does not attempt to independently compute LBI's Reserve Requirement.[27] Instead, Mr. McIsaac identifies a series of "incidents", all of which focus on allegedly necessary *credits* to the Reserve Requirement that, collectively, "will result in a shortfall of customer property".[28] Those "incidents" are:

1.    The treatment of Fixed Income Division prime broker client accounts (the "FID Accounts") (McIsaac Affidavit at ¶¶ 32-35);

2.    Purported account coding errors (*ibid.* at ¶¶ 36-38);

---

[26]    Interviews with former LBI employees

[27]    *See* paragraph 31, page 12, McIsaac Affidavit

[28]    Note that I believe that Mr. McIsaac uses the term "customer property" in the context of a SIPA Liquidation as opposed to "customer assets" under SEC Rule 15c3

3.    The treatment of assets subject to LBIE administration (*ibid.* ¶¶ 39-40);

4.    The treatment of customer cash claimed by LBIE (*ibid.* ¶¶ 41-44);

5.    The treatment of a $507 million deposit made with the Options Clearing
      Corporation ("OCC") (*ibid.* at ¶¶ 45); and,

6.    The treatment of customer property seized during the transfer process
      (*ibid.* ¶¶ 46-47).

I address each of these matters below.

## A.    FID Accounts

Mr. McIsaac asserts that assets associated with certain FID Accounts held at
JPMC were "at risk" on September 19 and should have been included as a credit in the
Reserve Requirement calculation.[29] Those assets were purportedly seized by JPMC on
September 19 and totaled "$891 million" [sic] ($630 million in securities and $258
million in cash).[30] Mr. McIsaac provides no factual support for (1) his figures, (2) his
description of the makeup of the assets, or (3) the nature of the seizure. Without this
factual support, Mr. McIsaac's assertions are speculative at best. When and if Mr.
McIsaac provides the basis for his assertions on this point, I reserve the right to amend
my report regarding this matter.

---

[29]    *See* paragraphs 32-35, page 13, McIsaac Affidavit
[30]    *Ibid.* The correct sum would be $888 million

As a related point, if LBI were required to continue to fund a Reserve Account after the SIPA Liquidation began, it would be important to determine whether JPMC ever returned the assets. Mr. McIsaac provides no factual information regarding that possibility, but does acknowledge the existence of a dispute between LBI's estate and JPMC regarding the assets, which at minimum raises the possibility that the assets might be returned in the future.[31]

### B.    Alleged Account Coding Errors

Mr. McIsaac claims that the incorrect coding of customer accounts as non-customer accounts and related problems improperly reduced LBI's Reserve Requirements. He specifically cites a few examples that he claims led to a $747 million shortfall in the Reserve Requirement as of September 19. Mr. McIsaac's analysis is flawed for several reasons.

*First*, Mr. McIsaac relies upon the example of Woodlands Bank.[32] In that case, an LBI affiliate was coded as a non-customer, but apparently had not signed the subordination letter required to exempt it from customer status. According to Mr. McIsaac, this error resulted in an alleged $534 million shortfall in the Reserve Requirement. However, Mr. McIsaac provides no factual support for his assertions regarding the amount or nature of the funds at issue. Nor does he appear to have investigated Woodland Bank's actual status as a customer or non-customer. As such, Mr.

---

[31]    *See* paragraph 33, page 13, McIsaac Affidavit
[32]    *See* paragraph 37, page 14, McIsaac Affidavit

McIsaac's assertions on Woodland Bank are speculative at best. Should Mr. McIsaac provide factual support for his conclusions, I reserve the right to amend my report regarding this matter.

*Second*, Mr. McIsaac asserts that other unidentified non-customer accounts were miscoded as customer accounts that produced debits greater than credits. If corrected, they would have produced a higher Reserve Requirement.[33] However, without (1) identifying the accounts, (2) providing factual information regarding the coding of the accounts, (3) providing the net asset balances of the accounts, and (4) stating the amount of the purportedly necessary adjustment to the Reserve Requirement as of September 19, Mr. McIsaac's assertions again amount to pure speculation. If, in the future, the factual basis for Mr. McIsaac's assertions is identified, I reserve the right to amend my report to address those assertions.

*Third*, in a footnote, Mr. McIsaac asserts that there were unidentified non-customers who executed subordination letters, but nonetheless filed claims with the Trustee. Mr. McIsaac asserts that, should these non-customers prevail, the Reserve Requirement would again have to be adjusted upwards.[34] Once again, without identifying the non-customers and providing the nature of their claims against the estate and the amount of assets at issue, Mr. McIsaac's assertions are speculative. I again reserve the right to amend my report should Mr. McIsaac provide factual support for this claim.

---

[33] *See* paragraph 38, page 15, McIsaac Affidavit
[34] *See* footnote 7, page 15, McIsaac Affidavit

Report of Peter U. Vinella          Page 16 of 47                    January 8, 2010

*Fourth,* Mr. McIsaac also claims that other errors detected in "LBI's service providers' allocation program used in the calculation of the Reserve Requirement caused additional shortfalls" in the reserve amount.[35] Mr. McIsaac provides a single memorandum as support for this assertion: a December 30, 2008 memorandum from ~~LBI~~ Barclays to Broadridge, LBI's ADP outsource provider (the "Broadridge Memo"), which discusses an alleged error arising from a rather arcane error condition regarding the alleged duplicate allocation of "streetside positions."[36] Mr. McIsaac then includes an ambiguous claim that "correction of these errors results in the addition of $213 million to the Reserve Account."[37]

It is unclear from the McIsaac Affidavit whether this purportedly necessary $213 million correction arises from only the alleged error described in the Broadridge Memo, from other unidentified alleged coding errors, or from some combination thereof.

Regardless of what Mr. McIsaac intended to convey, the only support provided for this $213 million assertion is the Broadridge Memo.[38] This memorandum and its attachments do not quantify the resulting alleged error in any way that would support Mr. McIsaac's claim of a $213 million shortfall in the Reserve Account. Should Mr. McIsaac provide support for his assertion, I reserve the right to amend my report accordingly.

---

[35] *See* paragraph 38, page 15, McIsaac Affidavit

[36] *See* Ex 28, McIsaac Affidavit

[37] *See* paragraph 38, page 15, McIsaac Affidavit

[38] The memorandum contained in Ex 28 of the McIsaac Affidavit contains a number of appendices. When reviewed in detail, it is unclear where the $213 million figure arises from

*Fifth*, Mr. McIsaac addresses only coding errors that in his view require increases to the Reserve Requirement. There is no apparent attempt by Mr. McIsaac to identify or quantify coding errors that would require downward adjustments to the Reserve Requirement.

### C.    Assets Subject to LBIE Administration

Mr. McIsaac asserts that when LBIE went into insolvency proceedings in the UK on September 15, $439 million in LBI customers' securities held by LBIE became at risk, and as a result, that amount should have been added to any subsequent Reserve Requirement calculations.[39]

It is my understanding from discussions with LBI managers that LBI routinely added LBI customer assets held by LBIE to the Lockup Requirement calculations as a prudent safeguard.[40] Mr. McIsaac does not provide any information as to whether this amount was actually left out of the Reserve Requirement calculation or whether the assets were returned to LBI, which would make the entire matter moot.[41] Once again, Mr.

---

[39]  *See* paragraphs 39-40, pages 15-16, McIsaac Affidavit

[40]  Interviews with former LBI employees

[41]  Ex. 29 to the McIsaac Affidavit provides a report presumably of LBI securities held at LBIE. However, the exhibit does not reflect the source system of the report or explain how it demonstrates that the funds were not included in the Reserve Requirement calculation (*see* Ex. 29, McIsaac Affidavit). In fact, I was told by former LBI operations managers that LBI customers' LBIE positions were maintained on the ITS system and their value was included in LBI's Lockup Requirement (interviews with former LBI employees). Given this fact, I would require substantially more information from Mr. McIsaac showing that the LBIE positions were not reflected in the Reserve Requirement to confirm the accuracy of his claims on this point

McIsaac's assertion is speculative. I reserve the right to amend my report should Mr.

McIsaac provide the basis for his assertion.

### D.    Customer Cash Claimed by LBIE

Mr. McIsaac claims that another $2.3 billion should have been included as a

credit in the Reserve Requirement calculation to reflect money held by LBI and allegedly

owed to LBIE's customers.[42] There are several problems with this assertion:

*First,* the few emails cited by Mr. McIsaac in support of his assertion suggest that

there was not an actual obligation to LBIE customers, but there was instead an incorrect

code assigned to the transaction that was subsequently corrected, leaving this large LBIE

cash balance (as opposed to a customer balance) at LBI.[43]

*Second,* it is not clear who LBI's counterparties were in the transactions that are

the subject of the emails cited by Mr. McIsaac. Typically, in such situations, there would

be a series of *back-to-back* trades in which (a) LBIE would execute a transaction with its

customer and then (b) LBIE would execute a subsequent transaction with LBI for the

same securities under the same terms. In such a case, LBIE would be LBI's counterparty,

not LBIE's customer. These are known in the industry as "intercompany trades".[44] If

---

[42]    *See* paragraphs 41-44, pages 16 and 17, McIsaac Affidavit

[43]    The transaction did involve LBIE customer assets. However, LBI confirmed that the LBIE
customer was satisfied before the obligation to LBIE was removed from the Reserve
Requirement calculation. Goel email, September 11, 2008, 12:09 p.m., Ex. 36, McIsaac
Affidavit, and interviews with former LBI employees

[44]    In the context of this alleged problem, the intercompany trade was one between two affiliated,
non-consolidating broker-dealers, LBIE and LBI. Such transactions between such affiliated
broker-dealers are exempt from SEC Rule 15c3 treatment. *See* SEC Rule 15c3-3(a).1

these were intercompany trades, LBIE would be a non-customer under SEC Rule 15c3-3, and any resulting obligation to LBIE was properly excluded from the Reserve Requirement calculations.[45] In fact, I was told by several former LBI managers that these were, indeed, intercompany trades between affiliated broker-dealers.[46]

Furthermore, while it was not required to do so, LBI typically increased its Reserve Requirement when such intercompany trades involved LBIE or LBI customers in order to ensure regulatory compliance, as it originally did in this case.[47] Once it was confirmed that the customer obligation had been fulfilled and the only remaining obligation was between LBIE and LBI, that obligation was properly removed from the Reserve Requirement calculation manually, as noted by Mr. McIsaac (although it appears the reason for this was "unclear" to him).[48]

### E.    OCC Deposit

Mr. McIsaac observes that a $507 million deposit that LBI made at the OCC to "secure customer-related obligations of LBI" was correctly reflected as a debit in LBI's Reserve Requirement calculation.[49] He takes issue not with the original treatment of said deposit as a debit, but with the fact that it should be removed from the Reserve

---

[45]  SEC Rule 15c3 excludes broker-dealers from being customers (*see Ibid.*)
[46]  Interviews with former LBI employees
[47]  Interviews with former LBI employees
[48]  *Ibid.* and paragraph 43, page 16, McIsaac Affidavit
[49]  *See* paragraph 45, page 17, McIsanc Affidavit

Requirement calculation as of September 19 because the Trustee and Barclays are currently in a dispute over the rights to these funds.[50]

According to Mr. McIsaac, if the Trustee is not able to recover these funds, this amount should be removed from the debit side of the Reserve Requirement calculation.[51] Barclays was not even granted rights to these funds until the approval of the APA on September 20, so this dispute could not have affected the validity of the debit in calculations of the Reserve Requirement as of any prior date.

### F.    Customer Property Seized During the Transfer Process

Finally, Mr. McIsaac asserts that $82 million associated with the liquidation of foreign money market funds allegedly seized by Citibank during the week of September 15 should have been added to the Reserve Requirement, but was not.[52] Again, he merely states that this amount was not added to the Reserve Requirement as fact, but does not provide any supporting evidence. Thus, again, Mr. McIsaac's conclusions are highly speculative. Should Mr. McIsaac provide further information in support of his assertion, I reserve the right to amend my report.

---

[50]  *Ibid.*

[51]  *Ibid.*

[52]  *See* paragraphs 47-48, pages 17-18, McIsaac Affidavit

Report of Peter U. Vinella          Page 21 of 47               January 8, 2010

VII.    MR. McISAAC'S DISCUSSION OF "ITEMS CURRENTLY UNDER
INVESTIGATION"

In addition to the $4.9 billion in adjustments that Mr. McIsaac claims should be made to LBI's Reserve Requirement as of September 19, he also asserts that there are a number of additional items "under investigation" that may or may not have had a material impact on the Reserve Requirement as of September 19. Those items are:

1.    An alleged overdraft at JPMC (McIsaac Affidavit at ¶¶ 51-54);

2.    Purported inclusion of unsecured debits in the Reserve Requirement formula (*ibid.* at ¶¶ 55-56);

3.    Alleged customer securities purportedly included in the Barclays Repo (*ibid.* at ¶¶ 57-58);

4.    Alleged assets detained by foreign banks (*ibid.* at ¶¶ 59-60); and,

5.    Other alleged unspecified matters relating to LBI's debit items for stock borrows and the market valuation of customer securities (*ibid.* at ¶¶ 61-62).

I address each of these matters below.

A.    Alleged JPMC Overdraft

Mr. McIsaac claims that an alleged large overdraft at JPMC on September 19 should have been included in the credit side of the Reserve Requirement calculation as of

September 19, as per FINRA requirements.[53] Mr. McIsaac's sole support for this claim is a series of emails discussing the alleged overdraft.[54]

There is no factual support provided to show whether the issue was ever resolved. This absence of support is significant because it appears from reading the emails that the LBI staff at the time did not believe there was truly an overdraft.[55] Moreover, former LBI senior operations managers have stated that they believed the reported overdraft was due to a JPMC problem stemming from delays in effecting a $45 billion term Repo with Barclays and a $7 billion box loan from JPMC the night before.[56] In fact, they stated that later the morning of September 19, the mistaken overdraft had been resolved, though JPMC apparently continued to freeze LBI accounts.[57]

Because Mr. McIsaac provides so little support for his assertions and the support he does provide appears to suggest that there was not a problem, there is insufficient evidence to support his conclusions. Additionally, his assertions are contradicted by former LBI personnel.

---

[53]  See paragraph 51, page 19 and Ex.38, McIsaac Affidavit

[54]  See Ex. 38, McIsaac Affidavit

[55]  Ibid. Also, interviews with former LBI employees

[56]  A possible cause of the overdraft was a problem with correctly pledging the box loan to Barclays the night before. See Declaration of Shari Leventhal. This could have possibly caused JPMC's systems to incorrectly treat the Repo as terminated and enter a $45 billion debit in LBI's accounts

[57]  Interviews with former LBI employees

Report of Peter U. Vinella          Page 23 of 47          January 8, 2010

Should Mr. McIsaac provide further information regarding the resolution of the alleged overdraft and its treatment by LBI, I reserve the right to amend my report.

### B.    Alleged Unsecured Debits in the Reserve Requirement Formula

Mr. McIsaac correctly cites the FINRA interpretation of SEC Rule 15c3-3 that requires customer debits included in the Reserve Requirement calculation, such as margin loans, to be fully secured by customer collateral.[58] From this requirement, however, Mr. McIsaac states without citations or corroborating evidence that during some undefined period prior to September 19, there was some question as to LBI's Reserve Requirement calculations and whether unsecured or under-secured debits were improperly included in said calculations.[59]

Without further information as to the nature of and justifications for this claim, Mr. McIsaac's assertions are mere supposition. Mr. McIsaac's assertions are particularly questionable given that LBI filed a monthly and quarterly Financial and Operational Combined Uniform Single Report ("FOCUS Report") with the regulators through July 2008, all of which appear to be in good order.[60] [61] Further, as discussed previously,

---

[58]    *See* paragraphs 55-56, pages 20-21, McIsaac Affidavit

[59]    *Ibid.*

[60]    Interviews with former LBI employees

[61]    LBI had prepared the August 2008 FOCUS Report that was to be submitted September 24, 2008. *Ibid.* and *see* Ex D and Ex E.

during the week of September 15, LBI performed at least two Reserve Requirement calculations under the observation of representatives from the SEC and FINRA.[62][63]

Should Mr. McIsaac provide further information regarding this issue and its treatment by LBI, I reserve the right to amend my report.

### C.    Alleged Customer Securities Included In the Barclays Repo

Mr. McIsaac claims that it is possible that customer assets were included among the collateral delivered by LBI in the $45 billion term Repo with Barclays and that, if that had occurred, such assets had to be included as credits in the Reserve Requirement calculation.[64]

Because Mr. McIsaac does not provide any information confirming the facts of his premise, he cannot conclude either that customer assets were indeed used as part said Repo or, if they were, that they were not properly treated in the Reserve Requirement calculation.

Should Mr. McIsaac provide further information regarding this issue and its treatment by LBI, I reserve the right to amend my report.

---

[62]   *Ibid.*

[63]   I was told that FINRA was at LBI was performing their annual audit and the SEC arrived in early September when LBHI's stock started to take a beating. From the time of their arrival, the regulators worked closely with LBI staff in resolving potential problems. Interviews with former LBI employees

[64]   *See* paragraph 58, page 21, McIsaac Affidavit

Report of Peter U. Vinella           Page 25 of 47                January 8, 2010

D.    Alleged Assets Detained by Foreign Banks

Mr. McIsaac states, without citation, that some unidentified foreign banks holding

LBI customer securities failed or refused to turn over those assets to the Trustee when

requested and that investigation is continuing into whether such accounts were correctly

treated as good control locations as set forth in SEC Rule 15c3.[65] [66] Without further

information regarding this situation, it is impossible to determine the accuracy of Mr.

McIsaac's opinion on this point.

Should Mr. McIsaac provide further information regarding this issue and its

treatment by LBI, I reserve the right to amend my report.

---

[65]    *See* paragraphs 59-60, pages 21 and 22, McIsaac Affidavit

[66]    *See* SEC Rule 15c3-3(f)

This concludes my report.


Respectfully,

Peter Vinella

# EXHIBIT L

Page 1

1              Highly Confidential

2       UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------X

5    IN RE:

6                        Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC. et al.,

9                Debtors.

10   ----------------------------X

11

12            HIGHLY CONFIDENTIAL

13       DEPOSITION OF PETER VINELLA

14          New York, New York

15          February 5, 2010

16

17

18   Reported by:

     Bonnie Pruszynski, RMR

19   JOB NO. 28243

20

21

22

23

24

25

Page 2

```
1         Highly Confidential
2          February 5, 2010
3            9:30 a.m.
4
5
6      Deposition of PETER VINELLA, held at
7   Jones Day, LLP, 222 East 41st Street, New
8   York, New York, before Bonnie Pruszynski,
9   Registered Professional Reporter, Registered
10  Merit Reporter, Certified LiveNote Reporter,
11  and a Notary Public of the State of New
12  York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
1         Highly Confidential
2   A P P E A R A N C E S :
3   JONES DAY, LLP
4   Attorneys for Lehman Brothers, Inc.
5       222 East 41st Street
6       New York, New York 10017-6702
7   BY:    KELLY CARRERO, ESQ.
8          K. ADAM BLOOM, ESQ.
9   BOIES, SCHILLER & FLEXNER, LLP
10  Attorneys for Barclays
11      5301 Wisconsin Avenue, N.W.
12      Washington, D.C. 20015
13  BY:    AMY NEUHARDT, ESQ.
14         HEATHER KING, ESQ.
15
16  HUGHES HUBBARD & REED, LLP
17  Attorneys for SIPA Trustee
18      One Battery Park Plaza
19      New York, New York 10004
20  BY:    NEIL J. OXFORD, ESQ.
21         FARA TABATABAI, ESQ.
22  QUINN EMMANUEL
23  Attorneys for the Creditors Committee
24      51 Madison Avenue
25      New York, New York
    BY:    ROBERT DAKIS, ESQ.
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
1         Highly Confidential
2   A P P E A R A N C E S (continued):
3   Also Present:  David Aman, Esq.
4          Cleary, Gottlieb Steen & Hamilton
5          Chris Harris, Deloitte & Touche
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
1     Highly Confidential - P. Vinella
2         (Exhibit 590 marked for
3   identification as of this date.)
4         (Exhibit 591 marked for
5   identification as of this date.)
6         (Exhibit 592 marked for
7   identification as of this date.)
8         (Exhibit 593 marked for
9   identification as of this date.)
10        (Exhibit 594 marked for
11  identification as of this date.)
12        (Exhibit 595 marked for
13  identification as of this date.)
14        (Exhibit 596 marked for
15  identification as of this date.)
16        (Exhibit 597 marked for
17  identification as of this date.)
18        (Witness sworn.)
19  PETER VINELLA,
20      called as a witness, having been first
21      duly sworn, was examined and testified
22      as follows:
23  EXAMINATION
24  BY MR. OXFORD:
25      Q    Good morning, Mr. Vinella.
```

TSG Reporting - Worldwide    877-702-9580

Page 98

P. Vinella

MS. NEUHARDT: Well, you asked him a very broad question at first, which obviously I assumed then you would break it down after he started to answer.

But I specifically want to make sure that he does not get into -- and I am looking at the stip, if you have the stip available. Maybe we can go off the record if you don't and we can talk about it.

He does not have to disclose communications between people working under his direction, so that is all these contractors he just named for you.

He does not have to disclose communications with the party disclosing the expert, so that would include people at Barclays except to the extent that he relied on those communications for original facts, which I believe we produced the notes that show that.

And drafts I don't think is really relevant to that particular question you asked.

So, that is what I am relying on with

TSG Reporting - Worldwide    877-702-9580

Page 99

P. Vinella

my instruction to him

MR. OXFORD: Your instruction, just so we have a clear record, is what, Amy?

MS. NEUHARDT: The instruction is -- well, first, let's go -- the question is, how did you -- let's go back to the question, which I think was, what did you do to analyze -- let's get the question read.

(Recess taken.)

MR. OXFORD: Back on the record. Could you repeat my question, please, Bonnie.

(Record read.)

MS. NEUHARDT: And I would instruct the witness that when you respond to that question, you should not reveal any information gleaned in that analysis that ended up not being a source you relied upon in your report.

THE WITNESS: Okay.

A    The first document that I received was Mr. McIsaac's affidavit, and we were asked to read through that and come up with some basic questions around the scope of Mr. McIsaac's

TSG Reporting - Worldwide    877-702-9580

Page 100

P. Vinella

affidavit, some of the conclusions he made and the supporting documentation he provided to make those conclusions.

The other thing we looked into was the ability or the possibility of independently computing the 3-3 reserve calculation.

Q    Taking those in reverse order, sir, is it correct to say that you elected not to independently compute the 3-3 reserve computation?

A    That's true.

Q    Tell me why that is.

MS. NEUHARDT: Without revealing communications with counsel.

A    We had a very short time frame in which to produce the report, and we were working over the holiday season, so it didn't seem to be practical to try to attempt a calculation like that.

Also, we set up a phone call with a number -- and this through the attorneys -- with a number of the ex-Lehman staff that was still at Barclays to find out how many people were still available that understood the operations.

Again, the 3-3 calculation was the

TSG Reporting - Worldwide    877-702-9580

Page 101

P. Vinella

result of lots of operational systems and operations staff working with those systems, and we needed to know how many were still available that could help us understand that, where the data was.

We were told that there had been a staff of close to 100 Deloitte consultants trying to recreate the books and records of Lehman, and given the fact that not all the people were available, that they already had a very large staff working for close to a year at that point, not longer than a year, trying to recreate the books and records, it didn't seem to be practical to try to independently compute the 3-3 calculation in this time frame.

And there was also a question of whether we would even have access to the data that Deloitte had. If we had access to that, that might have made a difference in the decision.

Q    What was the answer to the question how many people of the ex-Lehman operations staff were available who understood the operations that you would need to recalculate the c3 calculation as of 9/19?

TSG Reporting - Worldwide    877-702-9580

26  (Pages 98 to 101)

Page 102

1              P. Vinella
2      A    Could you repeat the question. I'm
3    sorry.
4      Q    You said you were on a telephone call
5    with a number of ex-Lehman staff who were still at
6    Barclays, and you said that there was a question
7    about how many were available who actually
8    understood the relevant operations; is that
9    correct?
10     A    Yes.
11     Q    What was the answer to that question
12   that you just posed?
13     A    There were a couple of problems.
14   One, some of the -- of the staff actually didn't
15   go from Lehman Brothers to Barclays. They went to
16   other banks or were unemployed.
17          There was also an agreement which I
18   was -- it was referred to as the TSA agreement,
19   and a number of the staff that would have had
20   firsthand knowledge of either the operations or
21   the 3-3 calculation itself, were, quote/unquote,
22   ring-fenced by the TSA agreement. And we wouldn't
23   necessarily have access to them as well.
24          And there was also a question of
25   whether we would have access to all the data in
     TSG Reporting - Worldwide    877-702-9580

Page 103

1              P. Vinella
2    the Lehman systems, you know, that would have data
3    through the week of the 15th, if we would have
4    access actually to that data.
5          So those were the major issues.
6      Q    Which data did you believe, sir, you
7    did not have access to, that you would have needed
8    to recalculate the c3 calculation from 9/19/08?
9      A    I believe during that conversation we
10   were told that data that was required to support
11   the customers that went from Lehman to Barclays
12   was available; however, that they weren't sure if
13   the entire set of all the Lehman customer data was
14   available at that point.
15     Q    Can you be more specific about the
16   data that might not have been available to you if
17   you decided to recalculate the c3 computation with
18   effect from 9/19/08?
19     A    We would have had to have access to
20   all the customer accounts, both cash and
21   collateral.
22          We would have had to have access to
23   reconciliation records showing that the balances
24   that were portrayed in those accounts, in either
25   MTS, ITS or the ADP system, were actually correct.
     TSG Reporting - Worldwide    877-702-9580

Page 104

1              P. Vinella
2          We would have to have access to stock
3    loan information that was using customer assets.
4          We would have to have information
5    about fixed-income sales to customers that were
6    out of principal positions.
7          Basically all the operational
8    components that go into the eight credits and the
9    six debits of the calculation. And again, it
10   can't be a subset of customer activity. It would
11   have to be all customers.
12     Q    Can you identify for me who the
13   ex-Lehman staff who were on this call were?
14     A    I can't tell you all the names
15   because there were quite a few, and this is our
16   first meeting, and the purpose of the call, again,
17   was to understand who we needed to talk to.
18          The gentlemen that I remember was
19   Bill Burke, Alastair Blackwell, Alex Crepeau or
20   Crepeau.
21     MS. NEUHARDT:  Crepeau.
22     Q    Is that C-R-E-P-E-A-U?
23     MS. NEUHARDT:  Yes.
24     A    Those are the gentlemen that I
25   remember most clearly talking on the phone.
     TSG Reporting - Worldwide    877-702-9580

Page 105

1              P. Vinella
2      Q    Did those gentlemen tell you that
3    Barclay's position was that it purchased the LBI
4    broker dealer books and records?
5      A    That question didn't come up.
6      Q    Okay.  The records that you testified
7    about to which you believe there was a question as
8    to whether or not Barclays had access, do you have
9    any basis to believe that the SIPA trustee has
10   access to all of that data?
11     A    I would -- I believe that one of the
12   conversations that -- in fact, with Bill Burke, I
13   believe he said that, and he mentioned that that's
14   what the TSA team was working on, and the Deloitte
15   team was trying to reconcile the books and records
16   as of the 19th.
17          So I -- if it wasn't explicitly
18   stated that they had it, it was implied, based on
19   the work that they were doing.
20     Q    I want to be very clear on this.  Did
21   Mr. Burke tell you that the SIPA trustee and the
22   professionals at his disposal had access to all of
23   the data necessary to rerun the c3 calculation
24   with effect from September 19th, 2008?
25     A    I believe the way he put it was they
     TSG Reporting - Worldwide    877-702-9580

Page 106

P. Vinella

1 had the ability to reconstruct the books and
2 records, not that they necessarily had the data.
3    Q    What is the difference between those
4 two concepts, sir?
5    A    One is, the ability to reconstruct
6 the books and records means that you have enough
7 information about the breaks that you can go in
8 and resolve them in some acceptable way.
9       To me, the data would mean that it's
10 already been resolved, it's sitting on a system,
11 and you just have to push a button for the
12 calculation.
13    Q    Do you agree that the recreation of
14 the c3 reserve calculation as of 9/19/2008 is a
15 substantial undertaking?
16    A    Given my understanding of the number
17 of breaks and the fact that Lehman Brothers on the
18 19th really had no independent way of
19 understanding what cash or collateral came in or
20 out of its clearing accounts, especially the ones
21 at Chase, yes, it would be a large undertaking.
22    Q    Do you agree that an important part
23 of any such undertaking would be the need to use
24 the ex-Lehman staff who were responsible for the
25

Page 107

P. Vinella

1 operations that fed into the c3 reserve
2 calculation prior to LBI's liquidation?
3    MS. NEUHARDT:  Objection, form.
4    A    It's not necessary. It's helpful,
5 but it's not necessary.  Our -- again, it's just
6 not necessary.
7    Q    Can you describe for me Ms. Jin's
8 experience with respect to SEC Rule 15c3 and in
9 particular the Customer Protection Rules?
10    A    She worked on most of the projects
11 that I have listed in my report.  And she was a
12 senior business analyst on -- that was basically
13 her title on those types of engagements.
14       Also, she ran all of operations at
15 Wilmington Trust Conduit Services, so she was
16 responsible for setting up the segregated accounts
17 for customers, responsible for monitoring all the
18 activity in those accounts.
19       We actually had the gentleman who ran
20 global broker dealer operations for ABN Amro
21 reported in to her as part of that work.
22       She was responsible for all financial
23 reporting and regulatory reporting associated with
24 the deals that we supported, so she was very
25

Page 108

P. Vinella

1 familiar with the operational aspects of the 3-3
2 calculations as well.
3    Q    When you say she was responsible for
4 the regulatory reporting associated with the deals
5 that you supported --
6    A    Yes.
7    Q    -- can you be a little more specific
8 about what you mean by that?
9    MS. NEUHARDT:  Jeanette is not the
10 expert here.  I will let him go a little
11 bit.  But I am having a hard time seeing the
12 relevance here, because she is not the one
13 who has provided an opinion here.
14       You can answer the question.
15    A    In the -- the securitizations that we
16 supported, the majority issued securities that
17 were registered in the United States and/or
18 registered offshore, and as registered securities
19 they would have to -- there was regulatory
20 reporting associated with that, whether that was
21 registered at the DTC or it was registered at the
22 Dublin Stock Exchange.
23       So part of our duties were to file
24 those types of reports showing that indeed the
25

Page 109

P. Vinella

1 condition of those securities were correct, that
2 the collateral that backed those securities was
3 actually kept in a segregated account and the
4 like.
5       So, she was responsible for that type
6 of report.
7    Q    Do you know whether Ms. Jin filed
8 reports under the Customer Protection Rules of c3?
9    A    Not the c3.
10    Q    The same questions for Mr. Armand
11 D'Accordo.
12    MS. NEUHARDT:  This is really
13 irrelevant.  What is your basis for
14 inquiring into this?  I don't see how it has
15 anything to do with Mr. Vinella's
16 qualifications.
17    MR. OXFORD:  I think it's germane.
18 These are people who worked under him at his
19 direction on this report.
20    MS. NEUHARDT:  It's his experience
21 that is at issue here, not theirs.
22       You can answer the question if you
23 want.
24       It's a continuing objection to the
25

# EXHIBIT M

| From: | william.burke@barclayscapital.com |
|---|---|
| To: | Puente, Jeffrey (US - New York) |
| Subject: | FW: Revised LBI Reserve Formula - Sept 19, 2008 |
| Date: | Friday, January 09, 2009 4:15:33 PM |
| Attachments: | ADP Customer-PAIB Reserve Calculation 091908-Updated with ADP Change PROFORMA v 010709 agreed.xls |

fyi
>
> _____
> From:      Sudarsan, Daniram: Loan Operations (NYK)
> Sent: Thursday, January 08, 2009 12:22 PM
> To:   McLaughlin, Kendall J: Loan Operations (NYK)
> Cc:   Buonocore, Salvatore: Loan Operations (NYK); Potenciano, Joel:
> Finance (NYK); Burke, William T: Finance (NYK)
> Subject:     Revised LBI Reserve Formula - Sept 19, 2008
>
> Kendall,
>
> We had a meeting where Sal and myself discussed with Bill and Joel the
> revised Reserve Formula as of 9/19/08 based on the revised allocation
> reports produced by Broadridge.
>
> The net effect was that the reserve requirement increased by $213 mln.
>
> Summary:
>
> Reclass of customers to PB fails:
>
> A benefit of $255 mln was obtained due to reclass of PB fails that
> were comprehended as customer positions in the production Reserve
> Formula as of 9/19 which was made up of a decrease in credit
> allocations of $644 and decrease in debits of $390 mln.
>
> The requirement went up by $468 mln mln due to the effect of the 097
> double allocation.
>
>
> <<ADP Customer-PAIB Reserve Calculation 091908-Updated with ADP
> Change PROFORMA v 010709 agreed.xls>>
>
> Thanks
>
> Dan
>

MOVANTS' TRIAL
EXHIBIT
756

This e-mail may contain information that is confidential, privileged or otherwise protected from
disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that you have received it in error.
Unless specifically indicated, this e-mail is not an offer to buy or sell or a solicitation to buy or sell any
securities, investment products or other financial product or service, an official confirmation of any
transaction, or an official statement of Barclays. Any views or opinions presented are solely those of the
author and do not necessarily represent those of Barclays. This e-mail is subject to terms available at
the following link: www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the
foregoing.  Barclays Capital is the investment banking division of Barclays Bank PLC, a company
registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14
5HP.  This email may relate to or be sent from other members of the Barclays Group.

EXHIBIT
509
9-8-10

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 19, 2008*
*(in 000'S)*

| | with ADP Change 09/19/2008 | Production 09/19/2008 | VARIANCE |
|---|---|---|---|
| **CUSTOMER CREDITS** | | | |
| CUSTOMER SECURITY ACCOUNTS | 8,512,491 | 8,512,491 | - |
| CUSTOMER ADJUSTMENTS | 1,059,956 | 1,059,956 | - |
| UNMAPPED CUSTOMER PAYABLE | 80 | 80 | - |
| CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) | (138,131) | - |
| CUSTOMER NETTING NB | (77,250) | (77,250) | - |
| 944 CREDITS | (446,586) | - | (446,586) |
| NON-BROKER DEALER AFFILIATES TYPE 5 | 290 | 290 | - |
| BOOKKEEPING ADJUSTMENTS | - | - | - |
| CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00094) | - | - | - |
| NON-NETWORK OFFSHR MUTUAL FUNDS | - | - | - |
| BANK OVERDRAFTS | 222,207 | 222,207 | - |
| NON-BROKER DEALER AFFILIATES - OTHER TYPES | 210,769 | 210,769 | - |
| HOUSE ACCOUNTS | 2,525 | 2,525 | - |
| TEFRA WITHHOLDING PAYABLE | 95 | 95 | - |
| LEGAL LEDGER CONTRA ACCOUNTS | 116 | 116 | - |
| BREAK VS. CUSTOMER LONG | 268,711 | 84,788 | 183,923 |
| FIRM LONG VS. CUSTOMER SHORT | (262,832) | (281,484) | 18,652 |
| NONCUST LONG VS. CUSTOMER SHORT | (6,484,698) | (6,857,319) | 372,621 |
| REVERSE REPO VS. CUSTOMER SHORT | - | - | - |
| PAIB LONG VS. CUSTOMER SHORT | (10,975) | (11,596) | 621 |
| SHORT & CREDIT INTEREST | 28,371 | 28,371 | - |
| MONEY FUND SETTLEMENTS 098-00003 & 098-20001 | 290 | 290 | - |
| UNALLOCATED CUSTOMER SHORT | - | - | - |
| **TOTAL CUSTOMER CREDITS** | 2,885,428 | 2,756,197 | 129,231 |
| | | | |
| **CUSTOMER BANK LOAN** | | | |
| OCC MARGIN | - | - | - |
| OCC MARGIN DEFICIT | - | - | - |
| OCC COMMINGLED MARGIN (NONCUST BANK LOAN) | - | - | - |
| STOCK BORROW VS. CUST BANK LOAN | 65 | - | 65 |
| STOCK BORROW VS. FIRM BANK LOAN | - | - | - |
| STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN | - | - | - |
| STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN | - | - | - |
| STOCK BORROW L/C VS FIRM BANK LOAN | - | - | - |
| FAIL TO DELIVER VS. FIRM BANK LOAN | - | - | - |
| CUSTOMER BANK LOAN VS. NON-CUST LONG | - | - | - |
| CUSTOMER LONG VS. CUSTOMER BANK LOAN | 181,664 | 181,854 | (190) |
| CUST BANK LOAN - CUST NOT LONG | - | - | - |
| NONCUST BANK LOAN - NONCUSTOMER NOT LONG | - | - | - |
| FIRM BANK LOAN - FIRM NOT LONG | - | - | - |
| **TOTAL CUSTOMER BANK LOAN** | 181,729 | 181,854 | (125) |
| | | | |
| **CUSTOMER STOCK LOAN** | | | |
| STOCK LOAN | 8,421,983 | 8,421,983 | - |
| STOCK LOAN MTM | (642,717) | (642,717) | - |
| STOCK LOAN WITH CLEARING ORG | - | - | - |
| STOCK LOAN FREE OF MONEY | 5,224,063 | 5,224,063 | - |
| STOCK LOAN MTM DEFICIT | 468 | 468 | - |
| STOCK LOAN BOB ADJUSTMENT | - | - | - |
| UNALLOCATED STOCK LOAN ADJ | - | - | - |
| STOCK LOAN VS. STOCK BORROW L/C | - | - | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW L/C | - | - | - |
| STOCK LOAN VS. REVERSE REPO | - | - | - |
| STOCK LOAN PLEDGE VS. REVERSE REPO | - | - | - |
| STOCK LOAN VS. PAIB LONG | - | - | - |
| STOCK LOAN PLEDGE VS. PAIB LONG | (80,016) | (80,009) | (7) |
| STOCK LOAN VS. STOCK BORROW | (9,344,291) | (9,344,291) | - |
| STOCK LOAN VS. STOCK BORROW PLEDGE Q | (21,386) | (21,386) | - |
| STOCK LOAN VS. STOCK BORROW PLEDGE NQ | (7,499) | (7,499) | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW | (256,503) | (256,503) | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q | (9,644) | (9,644) | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ | (28,422) | (28,422) | - |
| STOCK LOAN VS. NONCUSTOMER LONG | (249,244) | (247,637) | (1,607) |
| STOCK LOAN PLEDGE VS. NONCUSTOMER LONG | (461,907) | (461,255) | (652) |
| STOCK LOAN VS. FIRM LONG | (181,575) | (181,575) | - |
| STOCK LOAN PLEDGE VS. FIRM LONG | (334,323) | (334,323) | - |
| **TOTAL CUSTOMER STOCK LOAN** | 2,028,987 | 2,030,953 | (2,266) |

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 19, 2008*
*(in 000's)*

| | with ADP Change 09/19/2008 | Production 09/19/2008 | VARIANCE |
|---|---|---|---|
| **▓▓▓▓ CUSTOMER FAIL TO DELIVERY ▓▓▓▓▓▓** | | | |
| FAIL TO RECEIVE | 6,548,855 | 5,318,473 | 1,230,382 |
| CNS FAIL TO RECEIVE | 99,743 | 99,743 | - |
| MISC FAIL TO RECEIVE ADJUSTMENTS | - | - | - |
| OMNI FAIL TO RECEIVE ADJUSTMENTS | - | - | - |
| FAIL TO RECEIVE MTM ADJUSTMENT | - | - | - |
| FAIL TO RECEIVE AOJ. PAM MONEY MARKET FUND | 6,907 | 6,907 | - |
| FAIL TO RECEIVE VS. FAIL TO DELIVER | (545,964) | (363,249) | (182,715) |
| FAIL TO RECEIVE VS. REVERSE RRPO | - | - | - |
| FAIL TO RECEIVE VS. MTM DEFICIT | - | - | - |
| FAIL TO RECEIVE VS. STOCK BORROW | (632,486) | (488,042) | (144,444) |
| FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q. | (34,033) | (23,607) | (10,426) |
| FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - | - | - |
| FAIL TO RECEIVE VS. STOCK BORROW I/C | - | - | - |
| FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (47,642) | (25,903) | (21,739) |
| FAIL TO RECEIVE VS. FIRM LONG | (1,139,266) | (1,046,635) | (92,631) |
| FAIL TO RECEIVE VS. NONCUSTOMER LONG | (1,983,469) | (1,661,289) | (321,180) |
| FAIL TO RECEIVE VS. PAIB LONG | (7,368) | (4,066) | (3,302) |
| FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - | - | - |
| CNS FAIL TO RECEIVE VS. FIRM LONG | (55,708) | (55,709) | 1 |
| CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (12,668) | (12,668) | - |
| CNS FAIL TO RECEIVE VS. PAIB LONG | (7) | (7) | - |
| CNS FAIL TO RECEIVE ADJUSTMENT | - | - | - |
| CNS FAIL TO RECEIVE VS. STOCK BORROW | (15,169) | (15,106) | (63) |
| CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q. | (32) | (23) | (9) |
| CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - | - | - |
| CNS FAIL TO RECEIVE VS. STOCK BORROW I/C | - | - | - |
| CNS FAIL TO RECEIVE VS. REVERSE REPO | - | - | - |
| CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (2,510) | (1,487) | (1,023) |
| | | | |
| **TOTAL CUSTOMER FAIL TO RECEIVE** | 2,180,184 | 1,727,333 | 452,851 |
| | | | |
| **▓▓▓▓ FIRM SHORT VS. CUSTOMER LONG ▓▓▓▓▓▓** | - | - | |
| TOTAL FIRM SHORT | - | - | |
| FIRM OMNI SHORT | | | |
| FIRM SHORT VS. CUSTOMER LONG | 101,821 | 137,078 | (35,257) |
| NONCUSTOMER SHORT VS. CUSTOMER LONG | 2,867,507 | 3,447,193 | (579,686) |
| REPO VS. CUSTOMER LONG | 1,520,964 | 1,805,374 | (284,410) |
| PAIB SHORT VS. CUSTOMER LONG | 60,742 | 122,322 | (61,580) |
| REPO VS. UNALLOCATED | 12,674 | 5,295 | 7,379 |
| FIRM SHORT VS. UNALLOCATED | 7,187 | 5,230 | 1,957 |
| NONCUSTOMER SHORT VS. UNALLOCATED | 16,047 | 17,978 | (1,931) |
| | | | |
| **TOTAL FIRM SHORT VS. CUSTOMER LONG** | 4,686,942 | 5,640,470 | (953,528) |
| | | | |
| **▓▓▓▓ CUSTOMER DIVIDEND & INTEREST ▓▓▓▓▓▓** | | | |
| DIVIDEND & INT PAYABLES | 26,684 | 26,684 | - |
| ADJUSTMENTS FROM DIVIDEND DEPT. | (21,362) | (21,362) | - |
| | | | |
| **TOTAL CUSTOMER DIVIDENDS & INTEREST** | 5,322 | 5,322 | - |
| | | | |
| **▓▓▓▓ SECURITY CONCENTRATION 11 DAYS ▓▓▓▓▓▓** | | | |
| **▓▓▓▓ SUSPENSE ACCOUNTS ▓▓▓▓▓▓** | | | |
| SUSPENSE CREDITS & SMV: | 35,290 | 35,290 | - |
| CUSTOMER UNAPPLIED 000-01234 | 11,553 | 11,553 | - |
| ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,319 | 85,319 | - |
| | | | |
| **TOTAL SUSPENSE ACCOUNTS** | 132,162 | 132,162 | - |
| | | | |
| **▓▓▓▓ AGED TRANSFERS & REORGANIZATION ▓▓▓▓▓▓** | | | |
| TRANSFER SHORTS OVER 40 DAYS | - | - | - |
| REORG/REDEMPTION SMV OVER 7 DAYS | - | - | - |
| | | | |
| **TOTAL AGED TRANSFERS & REORGANIZATION** | - | - | - |
| | | | |
| **▓▓▓▓ OTHER ▓▓▓▓▓▓** | | | |
| OTHER CREDITS | - | - | - |
| | | | |
| **TOTAL OTHER** | - | - | - |
| | | | |
| **TOTAL CREDITS** | 12,000,454 | 12,374,291 | (373,837) |

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 19, 2008*
*(in 000'S)*

| | with ADP Change 09/19/2008 | Production 09/19/2008 | VARIANCE |
|---|---|---|---|
| **CUSTOMER DEBITS** | | | |
| CUSTOMER SECURITY ACCOUNTS | 4,946,070 | 4,946,070 | - |
| CUSTOMER NETTING LB1 (incl. 941-20159 & 941-20160) | (838,131) | (838,131) | - |
| CUSTOMER NETTING NB | (77,250) | (77,250) | - |
| 944 DEBITS | (836,398) | | (836,398) |
| CUSTOMER ADJUSTMENT | 3,492,635 | 3,492,635 | - |
| CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - | - | |
| BOOKKEEPING ADJUSTMENTS | - | - | |
| INV ADVISORY FEES RELATED TO NB MARGIN DEBITS | - | - | |
| MONEY FUND RECEIVABLE | (81,568) | (81,568) | - |
| MARGIN INTEREST | 41,227 | 41,227 | - |
| UNSECURED DEBITS | (21,006) | (21,006) | - |
| PARTLY SECURED DEBITS | (1,745) | (1,745) | - |
| NON-PURPOSE LOANS | (189,409) | (189,409) | - |
| RULE 144 UNSECURED DEBITS | - | - | |
| SECURITY CONCENTRATION | - | - | |
| | | | |
| TOTAL CUSTOMER DEBITS | 7,134,424 | 7,970,822 | (836,398) |
| | | | |
| **CUSTOMER STOCK BORROW** | | | |
| STOCK BORROW | 26,275,972 | 26,275,972 | - |
| STOCK BORROW MTM | (5,909,361) | (5,909,361) | - |
| STOCK BORROW L.O.C. | - | - | |
| STOCK BORROW VS. CUST SHORT ADJ. | - | - | |
| STOCK BORROW FREE OF MONEY | 8,438,386 | 8,438,386 | - |
| STOCK BORROW LC VS. SECURED BK LOAN | - | - | |
| STOCK BORROW L/C VS. CUSTOMER SHORT | (5,612) | (10,976) | 5,364 |
| STOCK BORROW NQ VS. CUSTOMER SHORT | - | - | |
| STOCK BORROW L/C VS. FIRM BANK LOAN | - | - | |
| STOCK BORROW NQ VS. FIRM BANK LOAN | - | - | |
| STOCK BORROW VS STOCK LOAN | (9,344,291) | (9,344,291) | - |
| STOCK BORROW VS. STOCK LOAN PLEDGE | (256,503) | (256,503) | - |
| STOCK BORROW PLEDGE Q VS. STOCK LOAN | (21,386) | (21,386) | - |
| STOCK BORROW PLEDGE NQ VS. STOCK LOAN | (7,499) | (7,499) | - |
| STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | (9,644) | (9,644) | - |
| STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | (38,422) | (38,422) | - |
| STOCK BORROW L/C VS. STOCK LOAN | - | - | |
| STOCK BORROW L/C VS. STOCK LOAN PLEDGE | - | - | |
| STOCK BORROW L/C VS. FIRM SHORT | - | - | |
| STOCK BORROW L/C VS. NONCUSTOMER SHORT | - | - | |
| STOCK BORROW VS. FIRM SHORT | (3,714,514) | (3,714,514) | - |
| STOCK BORROW VS. NONCUSTOMER SHORT | (6,679,542) | (6,670,788) | (8,754) |
| STOCK BORROW PLEDGE Q. VS FIRM SHORT | (201,992) | (201,992) | - |
| STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | (349,875) | (349,769) | (106) |
| STOCK BORROW PLEDGE NQ VS. FIRM SHORT | (794,427) | (794,427) | - |
| STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | (633,690) | (630,382) | (2,308) |
| STOCK BORROW VS. THE BOX | (156,847) | (269,782) | 113,735 |
| STOCK BORROW PLEDGE Q. VS. THE BOX | (4,614) | (38,241) | 33,627 |
| STOCK BORROW PLEDGE NQ VS. THE BOX | (13,423) | (82,771) | 69,348 |
| STOCK BORROW L/C VS. THE BOX | - | - | |
| STOCK BORROW VS. FAIL REC CNS | (15,169) | (15,106) | (63) |
| STOCK BORROW PLEDGE Q. VS. F/R CNS | (32) | (23) | (9) |
| STOCK BORROW PLEDGE NQ VS. F/R CNS | - | - | |
| STOCK BORROW L/C VS. F/R CNS | - | - | |
| STOCK BORROW L/C VS. REPO | - | - | |
| STOCK BORROW VS. REPO | (1,341,239) | (1,341,239) | - |
| STOCK BORROW PLEDGE Q. VS. REPO | (46,141) | (46,141) | - |
| STOCK BORROW PLEDGE NQ VS. REPO | (365,820) | (365,820) | - |
| STOCK BORROW VS. UNALLOCATED | (213,328) | (99,827) | (113,501) |
| STOCK BORROW PLEDGE Q. VS. UNALLOCATED | (25,215) | (1,704) | (23,511) |
| STOCK BORROW PLEDGE NQ VS. UNALLOCATED | (18,558) | (7,128) | (11,430) |
| STOCK BORROW L/C VS. UNALLOCATED | - | - | |
| STOCK BORROW VS. PAIB SHORT | (443,171) | (443,429) | 258 |
| STOCK BORROW PLEDGE Q. VS. PAIB SHORT | (215) | (215) | - |
| STOCK BORROW PLEDGE NQ VS. PAIB SHORT | (15,569) | (18,115) | 2,546 |
| STOCK BORROW L/C VS. PAIB SHORT | - | - | |
| STOCK BORROW VS. FAIL TO RECEIVE | (632,486) | (488,042) | (144,444) |
| STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | (34,033) | (23,607) | (10,426) |
| STOCK BORROW PLEDGE NQ VS. FAIL TO RECEIVE | (4,526) | (1,005) | (3,521) |
| | | | |
| TOTAL CUSTOMER STOCK BORROW | 3,370,015 | 3,632,210 | (163,196) |

**15c3-3 CUSTOMER RESERVE COMPUTATION**
**BROKER DEALER UNIT**
**AS OF SEPTEMBER 19, 2008**
*(in 000'S)*

| | with ADP Change 09/19/2008 | Production 09/19/2008 | VARIANCE |
|---|---|---|---|
| **CUSTOMER CREDIT BALANCES** | | | |
| FAIL TO DELIVER | 6,819,473 | 4,960,740 | 1,858,734 |
| CNS FAIL TO DELIVER | 1,900,343 | 1,900,343 | - |
| MISC FAIL TO DELIVER ADJUSTMENTS | 2,060,021 | 2,060,021 | - |
| OMNI FAIL TO DELIVER ADJUSTMENTS | - | - | - |
| FAIL TO DELIVER MTM ADJUSTMENT | - | - | - |
| FAIL TO DELIVER ADJUSTMENT | - | - | - |
| FAIL TO DELIVER VS. FAIL TO RECEIVE | (545,964) | (363,249) | (182,715) |
| FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (2,510) | (1,487) | (1,023) |
| FAIL TO DELIVER OVER CALENDAR 30 DAYS | (826) | (826) | - |
| FAIL TO DELIVER VS. FIRM SHORT | (885,868) | (742,968) | (142,900) |
| FAIL TO DELIVER VS. PAIB SHORT | (20,506) | (43,487) | 22,981 |
| FAIL TO DELIVER VS. REPO | (726,754) | (466,128) | (260,626) |
| FAIL TO DELIVER VS. THE BOX | (613,006) | (1,107,188) | 494,182 |
| FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (3,315,995) | (2,936,233) | (379,762) |
| FAIL TO DELIVER VS. UNALLOCATED BREAK | (1,282,951) | (276,055) | (1,006,896) |
| CNS FAIL TO DELIVER VS. FIRM SHORT | (438,105) | (452,940) | 14,835 |
| CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (660,121) | (665,286) | 5,165 |
| CNS FAIL TO DELIVER VS. PAIB SHORT | (26,172) | (62,417) | 36,245 |
| CNS FAIL TO DELIVER VS. THE BOX | (80,652) | (264,016) | 183,364 |
| CNS FAIL TO DELIVER VS. REPO | (101,016) | (96,672) | (4,344) |
| CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | (125) | | (125) |
| CNS FAIL TO DELIVER VS. UNALLOC/BREAK | (259,490) | (27,371) | (232,119) |
| CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (47,642) | (25,903) | (21,739) |
| **TOTAL CUSTOMER FAIL TO DELIVER** | 1,772,956 | 1,388,878 | 384,077 |
| **CUSTOMER MARGIN WITH OCC** | | | - |
| OCC MARGIN | | | - |
| OCC PROPRIETARY QUALIFIED COLLATERAL | 507,418 | 507,418 | - |
| OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - | - | - |
| **TOTAL CUSTOMER MARGIN WITH OCC** | 507,418 | 507,418 | - |
| **OTHER** | | | - |
| OTHER CUSTOMER DEBITS | - | - | - |
| **TOTAL OTHER** | - | - | - |
| **TOTAL CUSTOMER DEBITS** | 12,793,812 | 13,399,328 | (605,516) |
| **LESS 3% OF DEBITS** | (383,814) | (401,980) | 18,166 |
| **TOTAL DEBITS NET** | 12,409,998 | 12,997,348 | (587,350) |
| **EXCESS DEBITS OVER CREDITS** | 409,544 | 623,057 | (213,513) |
| **DEFICIT CREDITS OVER DEBITS** | | | - |

*15c3-3 P.A.I.B COMPUTATION*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 19, 2008*
*(in OOO'S)*

| | 09/19/2008 | 09/19/2008 | VARIANCE |
|---|---|---|---|
| **1. PAIB CREDITS** | | | |
| PAIB CREDITS | 2,235,573 | 2,235,573 | - |
| BREAK VS. PAIB LONG | 254,621 | 99,471 | 155,151 |
| PAIB CREDIT ADJ | (8,000) | (8,000) | - |
| PAIB DEFERRED COMMISSIONS AND IA FEES | 11,659 | 11,659 | - |
| PAIB LONG VS CUSTOMER SHORT | 10,975 | 11,596 | (621) |
| FIRM LONG vs PAIB SHORT | (3,419) | (21,967) | 18,548 |
| NONCUST LONG VS. PAIB SHORT | (331,895) | (173,085) | (158,810) |
| UNALLOCATED PAIB SHORT | 589 | - | 589 |
| PAIB SHORT VS CUSTOMER LONG | (60,742) | (122,322) | 61,580 |
| | | | |
| P.A.I.B. CREDITS: | 2,109,361 | 2,032,924 | 76,437 |
| | | | |
| **2. PAIB BANK LOAN** | | | |
| OCC MARGIN | - | - | - |
| OCC MARGIN DEFECIT | - | - | - |
| PAIB LONG VS. FIRM BANK LOAN | - | - | - |
| PAIB LONG VS. CUST BANK LOAN | 114 | 114 | - |
| PAIB LONG VS. PAIB BANK LOAN | - | - | - |
| PAIB BANK LOAN - PAIB NOT LONG | - | - | - |
| CUST BANK LOAN- CUSTOMER NOT LONG | - | - | - |
| FIRM BANK LOAN- CUSTOMER NOT LONG | - | - | - |
| | | | |
| TOTAL P.A.I.B. BANK LOAN | 114 | 114 | - |
| | | | |
| **3. PAIB STOCK LOAN** | | | |
| STOCK LOAN VS PAIB LONG | - | - | - |
| STOCK LN PLDG VS. PAIB LONG | 80,016 | 80,009 | 7 |
| | | | |
| TOTAL CUSTOMER STOCK LOAN | 80,016 | 80,009 | 7 |
| | | | |
| **4. PAIB FAIL TO RECEIVE** | | | |
| FAIL TO RECEIVE VS PAIB LONG | 7,368 | 4,066 | 3,302 |
| CNS FAIL TO RECEIVE VS PAIB LONG | 7 | 7 | - |
| | | | |
| TOTAL P.A.I.B. FAIL TO RECEIVE | 7,375 | 4,073 | 3,302 |

### 15c3-3 P.A.I.B COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
#### (In OOO'S)

| | 09/19/2008 | 09/19/2008 | VARIANCE |
|---|---|---|---|
| **5. FIRM SHORT VS PAIB LONG** | | | |
| REPO VS PAIB LONG | 49,832 | 47,883 | 1,949 |
| NONCUST SHORT VS. PAIB LONG | 348,603 | 344,571 | 4,032 |
| FIRM SHORT VS PAIB LONG | 2,646 | 11,399 | (8,753) |
| TOTAL FIRM SHORT VS P.A.I.B. LONG | 401,081 | 403,853 | (2,772) |
| | | | |
| **6. PAIB DIVIDEND & INTEREST** | | | |
| STOCK DIVIDENDS > 30 DAYS | - | - | - |
| MONEY CONTROL ADJUSTMENT | - | - | - |
| DIVIDEND & INT PAYABLES > 7 DAYS | - | - | - |
| TOTAL P.A.I.B. DIVIDENDS & INTEREST | - | - | - |
| **7. SECURITY COUNT DIFFERENCE > 7 DAYS** | - | - | - |
| **8. SUSPENSE CREDITS > SMV 7 DAYS** | - | - | - |
| **9. AGED TRANSFERS & REORGANIZATION** | | | |
| TRANSFER SHORTS OVER 40 DAYS | - | - | - |
| REORG/REDEMPTION SMV OVER 7 DAYS | - | - | - |
| TOTAL AGED TRANSFERS & REORGANIZATION | - | - | - |
| **10. OTHER** | | | |
| OTHER CREDITS | - | - | - |
| TOTAL OTHER | - | - | - |
| TOTAL PAIB CREDITS | 2,597,947 | 2,520,973 | 76,974 |

## 15c3-3 P.A.I.B COMPUTATION
## BROKER DEALER UNIT
## AS OF SEPTEMBER 19, 2008
### (in OOO'S)

| | 09/19/2008 | 09/19/2008 | VARIANCE |
|---|---|---|---|
| **12} P.A.I.B DEBITS** | | | |
| CUSTOMER SECURITY ACCOUNTS | 1,955,103 | 1,955,103 | - |
| VARIOUS PAIB DEBIT ADJ | (176,096) | (176,096) | - |
| UNSECURED DEBITS | - | - | - |
| PARTLY SECURED DEBITS | - | - | - |
| RULE 144 UNSECURED DEBITS | - | - | - |
| SECURITY CONCENTRATION | - | - | - |
| BREAK VS CUSTOMER LONG | - | - | - |
| | | | |
| P.A.I.B. DEBITS: | 1,779,007 | 1,779,007 | - |
| | | | |
| **13} PAIB STOCK BORROW** | | | |
| STOCK BORROW VS PAIB SHORT | 442,171 | 442,429 | (258) |
| STOCK BORROW Q. VS. PAIB SHORT | 215 | 215 | - |
| STOCK BORROW NQ VS. PAIB SHORT | - | - | - |
| STOCK BORROW L/C VS PAIB SHORT | - | - | - |
| | | | |
| TOTAL P.A.I.B. STOCK BORROW | 442,386 | 442,644 | (258) |
| **14} PAIB FAIL TO DELIVER** | | | |
| FAIL TO DELIVER OVER 30 DAYS | - | - | - |
| FAIL TO DELIVER VS PAIB SHORT | 20,506 | 43,487 | (22,981) |
| CNS FAIL TO DELIVER VS PAIB SHORT | 26,172 | 62,417 | (36,245) |
| CNS FAIL TO DELIVER VS THE BOX | - | - | - |
| CNS FAIL TO DELIVER VS REPO | - | - | - |
| CNS FAIL TO DELIVER VS UNALLOC./BREAK | - | - | - |
| CNS FAIL TO DELIVER VS FAIL TO RECEIVE | - | - | - |
| | | | |
| TOTAL P.A.I.B. FAIL TO DELIVER | 46,678 | 105,904 | (59,226) |
| | | | |
| **15} PAIB MARGIN WITH OCC** | | | |
| OCC MARGIN | - | - | - |
| CUSTOMER LONG SEG VS. CUST. BANK LOAN | - | - | - |
| OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - | - | - |
| | | | |
| TOTAL P.A.I.B. MARGIN WITH OCC | - | - | - |

*15c3-3 P.A.I.B COMPUTATION*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 19, 2008*
*(in 000'S)*

|  | 09/19/2008 | 09/19/2008 | VARIANCE |
|---|---|---|---|
| **16) OTHER** | | | |
| OTHER PAIB DEBITS | - | - | - |
| TOTAL OTHER | - | - | - |
| **17) TOTAL PAIB DEBITS** | 2,268,071 | 2,327,555 | (59,484) |
| **20) EXCESS DEBITS OVER CREDITS** | - | - | - |
| **21) DEFICIT CREDITS OVER DEBITS** | 329,876 | 193,419 | 136,458 |

| ADP ALLOCATION INPUT | | | | | |
| --- | --- | --- | --- | --- | --- |
| BEFORE ALLOCATION LONGS: | BEGINNING BALANCE | ADJUSTMENTS | FINAL BALANCE | FINAL BALANCE | DIFFERENCE |
| Firm Long | 944,034,966,223 | | 944,034,966,223 | 944,034,966,223 | |
| Specialist Long | 0 | | | 0 | |
| Customer Long | 139,238,031,658 | | 139,238,031,658 | 24,701,562,834 | |
| Non-Customer | 26,528,040,272 | | 26,528,040,272 | 26,528,040,272 | |
| PAIB | 1,104,928,076 | | 1,104,928,076 | 1,104,928,076 | |
| Stock Borrow | 26,149,844,153 | | 26,149,844,153 | 26,149,844,153 | |
| Stock Borrow L/C | 0 | | | 0 | |
| Stock Borrow Pledge Q | 708,606,933 | | 708,606,933 | 708,606,933 | |
| Stock Borrow Pledge NQ | 1,948,546,655 | | 1,948,546,655 | 1,948,546,655 | |
| Fail To Deliver | 6,819,473,256 | 2,080,021,358 | 8,879,494,614 | 7,020,761,105 | |
| Fail To Deliver CNS | 1,900,343,364 | | 1,900,343,364 | 1,900,343,364 | |
| TOTAL LONGS | 0 | | 1,160,490,801,958 | 1,034,095,599,625 | |
| | | | | | |
| BEFORE ALLOCATION SHORTS: | | | | | |
| | | | | | |
| Firm Short | 12,188,303,529 | | 12,188,303,529 | 12,188,303,529 | |
| Specialist Short | 0 | | | 0 | |
| Customer Short | 13,837,586,009 | | 13,837,586,908 | 15,067,969,009 | |
| Non-Customer | 24,341,414,759 | | 24,341,414,759 | 24,341,414,759 | |
| PAIB | 1,044,747,393 | | 1,044,747,393 | 1,044,747,393 | |
| Stock Loan | 11,756,140,133 | | 11,756,140,133 | 11,756,140,133 | |
| Stock Loan Pledge | 1,247,189,569 | | 1,247,189,569 | 1,247,189,569 | |
| Fail To Receive | 6,548,653,531 | 6,907,207 | 6,555,762,538 | 5,325,380,501 | |
| Fail To Receive CNS | 99,743,386 | | 99,743,386 | 99,743,386 | |
| Repo | 14,961,908,292 | | 14,961,908,292 | 14,961,908,292 | |
| TOTAL SHORTS | | | 86,032,796,507 | 86,032,796,571 | |
| | | | | | |
| | | | 1,800,599,978 | 1,800,599,978 | |
| | | | TOTAL | TOTAL | |
| MTM DEFICITS | | | (642,717) | (642,717) | |
| S/L MTM | | | (5,909,361) | (5,909,361) | |
| S/B MTM | | | | | |
| | | | | | |
| Stock Borrow Loan Free of Money | | | 8,438,386 | 8,438,386 | |
| s/b free of money | | | 0 | 0 | |
| s/b vs loc | | | | | |
| s/l free of money | | | 5,224,063 | 5,224,063 | |
| | | | | | |
| Stock Borrow/Loan Deficits | | | | | |
| s/l deficits | | | | | |
| | | | | | |
| ALLOCATION WORKSHEET BY STEPS: | | | | | |
| | | | | | |
| By Steps | BEGINNING BALANCE | ADJUSTMENTS | FINAL BALANCE | FINAL BALANCE | DIFFERENCE |
| | | | | | |
| STOCK BORROW PLEDGE NQ | | | | | |
| 1A Stock Loan | 7,498,876 | | 7,498,876 | 7,498,876 | |
| 1B Stock Loan Pledge | 28,422,186 | | 28,422,186 | 28,422,186 | |
| 1C Repo | 365,819,872 | | 365,819,872 | 365,819,872 | |
| | | | | | |
| STOCK BORROW L/C | | | | | |
| 1D Stock Loan | | | - | - | |
| 1E Stock Loan Pledge | | | - | - | |
| 1F Repo | | | - | - | |
| | | | | | |
| 1 STOCK BORROW VS. | | | | | |
| 1G Stock Loan | 9,344,290,988 | | 9,344,290,988 | 9,344,290,988 | |
| 1H Stock Loan Pledge | 256,603,301 | | 256,603,301 | 256,603,301 | |
| 1I Repo | 1,341,238,979 | | 1,341,238,979 | 1,341,238,979 | |
| | | | | | |
| STOCK BORROW PLEDGE Q | | | | | |
| 1J Stock Loan | 21,385,993 | | 21,385,993 | 21,385,993 | |
| 1K Stock Loan Pledge | 9,643,834 | | 9,643,834 | 9,643,834 | |
| 1L Repo | 45,140,603 | | 45,140,603 | 45,140,603 | |
| | | | | | |
| 2 SPECIALIST LONG | | | | | |
| 2A Specialist Short | | | - | - | |
| 2B Firm Short | | | - | - | |
| | | | | | |
| 3 FIRM SHORT | | | | | |
| 3A Firm Long | 4,863,299,222 | | 4,863,299,222 | 4,863,299,222 | |
| 3B Suspended | | | - | - | |
| | | | | | |
| 4 SPECIALIST SHORT | | | | | |
| 4A Firm Long | | | - | - | |

## ALLOCATION WORKSHEET BY STEPS:

| | By Steps | BEGINNING BALANCE | ADJUSTMENTS | FINAL BALANCE | FINAL BALANCE | DIFFERENCE |
|---|---|---|---|---|---|---|
| 5 | | **FIRM LONG** | | | | |
| 5A | Firm Bank Loan | - | | - | - | |
| 51 | 5B | Remove from Firm Bank Loan | | | | | |
| | 5B | Repo | 6,293,888,802 | | 6,293,888,802 | 6,293,888,802 | |
| | 5C | Stock Loan | 181,876,436 | | 181,876,436 | 181,876,436 | |
| | 5D | Stock Loan Pledge | 334,322,516 | | 334,322,516 | 334,322,516 | |
| | 5E | Fail To Receive | 1,139,265,660 | | 1,139,265,660 | 1,046,655,474 | |
| | 5F | Fail To Receive CNS | 55,707,531 | | 55,707,531 | 55,708,765 | |
| | 5G | Transfer | 13,303,499 | | 13,303,499 | 13,332,603 | |
| | 5H | Suspended | | | | | |
| 6 | | **FIRM SHORT** | | | | |
| | 6A | Stock Borrow Pledge NQ | 794,427,401 | | 794,427,401 | 794,427,401 | |
| | 6B | Stock Borrow L/C | | | | | |
| | 6C | Stock Borrow | 3,714,514,214 | | 3,714,514,214 | 3,714,514,214 | |
| | 6D | Stock Borrow Pledge Q | 201,991,967 | | 201,991,967 | 201,991,967 | |
| | 6E | Fail To Deliver | 699,314,792 | | 886,868,450 | 742,067,574 | |
| | 6F | Fail To Deliver CNS | 438,106,032 | | 438,106,032 | 452,940,283 | |
| 7 | | **REVERSE REPO** | | | | |
| | 7A | Repo | | | - | - | |
| | 7B | Firm Short | | | - | - | |
| | 7C | Stock Loan | | | - | - | |
| | 7D | Stock Loan Pledge | | | - | - | |
| | 7E | Fail To Receive | | | - | - | |
| | 7F | Fail To Receive CNS | | | - | - | |
| | 7G | Firm Bank Loan | | | - | - | |
| | 7H | Box | | | - | - | |
| 8 | | **NON CUSTOMER LONG** | | | | |
| | 8A | Non Customer Bank Loan | - | | | | |
| | | To Be Removed From Non Customer Ban | - | | | | |
| | 8B | Customer Short | 6,484,698,020 | | 6,484,698,020 | 6,657,318,912 | |
| | 8C | Firm Short | 1,186,366,779 | | 1,186,366,779 | 1,264,455,174 | |
| 77 | 8D | Firm Bank Loan | | | | | |
| | 8E | Stock Loan | 249,244,267 | | 249,244,267 | 247,636,517 | |
| | 8F | Stock Loan Pledge | 461,906,783 | | 461,906,783 | 461,254,975 | |
| | 8G | Repo | 6,890,477,688 | | 6,890,477,688 | 6,879,466,284 | |
| | 8H | Fail To Receive | 1,982,469,388 | | 1,982,469,388 | 1,661,289,460 | |
| | 8I | Fail To Receive CNS | 12,668,116 | | 12,668,116 | 12,668,115 | |
| | 8J | Customer Bank Loan | 71,963,692 | | | | |
| | 8K | Non Customer Short | 6,940,830,463 | | 6,940,830,463 | 6,850,387,480 | |
| | 8L | Box | 1,699,301,422 | | 1,699,301,422 | 2,291,430,952 | |
| | 8M | Streetside DTC | | | | 83,058,897 | |
| | 8N | Transfer | 1,083,822 | | 1,083,822 | | |
| 9 | | **PAIB LONG** | | | | |
| | 9A | PAIB Bank Loan | - | | | | |
| | | To Be Removed From PAIB Bank Loan | - | | | | |
| | 9B | Customer Short | 10,974,838 | | 10,974,838 | 11,595,958 | |
| | 9C | Firm Short | 2,645,823 | | 2,645,823 | 11,398,797 | |
| | 9D | Firm Bk Loan | | | | | |
| | 9E | Stock Loan | | | | | |
| | 9F | Stock Loan Pledge | 80,016,085 | | 80,016,085 | 60,009,381 | |
| | 9G | Repo | 49,831,874 | | 49,831,874 | 47,883,178 | |
| | 9H | Fail To Receive | 7,367,855 | | 7,367,855 | 4,066,087 | |
| | 9I | Fail To Receive CNS | 7,129 | | 7,129 | 7,129 | |
| | 9J | Customer Short | 114,077 | | 114,077 | 114,077 | |
| | 9K | Non-Customer Short | 348,503,423 | | 348,503,423 | 344,571,220 | |
| | 9L | Box | 317,664,980 | | 317,664,980 | 436,137,770 | |
| | 9M | Streetside DTC | | | | 48,616,583 | |
| | 9N | Transfer | | | | | |
| | 9O | PAIB Short | 34,174,743 | | 34,174,743 | 29,941,186 | |
| | 9P | NonCust Long vs. PAIB Short | 302,379,460 | 29,516,748 | 331,895,208 | 173,085,311 | |
| 10 | | **NON CUSTOMER SHORT** | | | | |
| | 10A | Firm Long | 2,370,768,814 | | 2,370,768,814 | 2,437,626,262 | |
| | 10B | Reverse Repo | | | | | |
| | 10C | Stock Borrow Pledge NQ | 632,690,060 | | 632,690,060 | 630,382,368 | |
| | 10D | Stock Borrow L/C | | | | | |
| | 10E | Stock Borrow | 6,679,642,007 | | 6,679,642,007 | 6,670,768,189 | |
| | 10F | Stock Borrow Pledge Q | 340,876,354 | | 340,876,354 | 340,769,317 | |
| | 10G | Fail To Deliver | 1,803,508,874 | | 3,316,994,654 | 2,936,233,160 | |
| | 10H | Fail To Deliver CNS | 660,121,192 | | 660,121,192 | 665,286,472 | |
| 11 | | **PAIB SHORT** | | | | |
| | 11A | Firm Long | 3,419,106 | | 3,419,106 | 21,967,131 | |
| | 11B | Reverse Repo | | | | | |
| | 11C | Stock Borrow | 442,171,459 | | 442,171,459 | 442,428,656 | |
| | 11D | Stock Borrow Pldg Q | 214,631 | | 214,631 | 214,631 | |
| | 11E | Stock Borrow Pldg NQ | 16,669,295 | | 16,669,295 | 18,114,999 | |
| | 11F | Stock Borrow L/C | | | | | |

| | | By Steps | BEGINNING BALANCE | ADJUSTMENTS | FINAL BALANCE | FINAL BALANCE | DIFFERENCE |
|---|---|---|---|---|---|---|---|
| | | ALLOCATION WORKSHEET BY STEPS: | | | | | |
| | 11G | Fail To Deliver | 20,605,684 | | 20,605,684 | 43,486,514 | |
| | 11H | Fail To Deliver CNS | 26,171,685 | | 26,171,685 | 62,416,830 | |
| | 12 | CUSTOMER LONG | | | | | |
| | 12A | Customer Bank Loan | 181,663,668 | | 181,663,668 | 181,854,042 | |
| | | To Be Removed From Customer Bank Loan | - | | - | | |
| | 12B | Stock Loan | 1,827,745,781 | | 1,827,745,781 | 1,832,258,927 | |
| | 12C | Stock Loan Pledge | 62,309,591 | | 62,309,591 | 59,286,006 | |
| | 12D | Repo | 134,956,498 | -1,38,992,754 | 1,520,963,744 | 1,805,373,549 | |
| | 12E | Fail To Receive | 2,009,668,353 | 6,907,207 | 2,016,676,660 | 1,682,987,179 | |
| | 12F | Fail To Receive CNS | 7,248,720 | 6,023,057 | 12,271,777 | 14,743,525 | |
| | 12G | Non Cust Short | 2,867,506,809 | | 2,867,506,809 | 3,447,192,538 | |
| | 12H | Firm Short | 101,820,765 | | 101,820,765 | 137,078,487 | |
| | 12I | PAIB Short | 60,741,999 | | 60,741,999 | 122,322,167 | |
| | 13 | CUSTOMER SHORT | | | | | |
| | 13A | Firm Long | 262,831,652 | | 262,831,652 | 281,484,123 | |
| | 13B | Reverse Repo | - | | - | | |
| | 13C | Stock Borrow | 3,354,488,135 | | 3,354,488,135 | 3,507,321,963 | |
| | 13D | Stock Borrow Pldg Q | 24,460,403 | | 24,460,403 | 24,886,073 | |
| | 13E | Stock Borrow Pldg NQ | 6,612,261 | | 6,612,261 | 10,976,244 | |
| | 13F | Stock Borrow L/C | - | | - | | |
| | 13G | Fail To Deliver | 1,363,871,429 | | 1,363,871,429 | 968,782,340 | |
| | 13H | Fail To Deliver CNS | 263,241,457 | | 263,241,457 | 283,052,045 | |
| | 13I | Customer Long | 1,331,133,991 | | 1,331,133,991 | 2,290,179,615 | |
| | 14 | STOCK LOAN | | | | | |
| | 14A | Fail To Deliver | 17,351,139 | 97,391,273 | 114,742,412 | 112,507,376 | |
| | 14B | Fail To Deliver CNS | 8,154,035 | | 8,154,035 | 7,809,739 | |
| | | STOCK LOAN PLEDGE | | | | | |
| | 14C | Fail To Deliver | 8,147,606 | | 8,147,606 | 2,676,696 | |
| | 14D | Fail To Deliver CNS | 15,624,240 | | 15,624,240 | 14,785,610 | |
| | 15 | FAIL TO RECEIVE | | | | | |
| | 15A | Stock Borrow | 632,485,916 | | 632,485,916 | 488,042,404 | |
| | 15B | Stock Borrow Pldg Q | 34,032,988 | | 34,032,988 | 23,606,923 | |
| | 15C | Stock Borrow Pldg NQ | 4,626,805 | | 4,626,805 | 1,005,455 | |
| | 15D | Stock Borrow L/C | - | | - | | |
| | 15E | Fail To Deliver | 408,081,173 | 137,882,348 | 645,963,521 | 363,249,061 | |
| | 15F | Fail To Deliver CNS | 47,641,670 | | 47,641,670 | 25,903,025 | |
| | 16 | FAIL TO RECEIVE CNS | | | | | |
| | 16A | Stock Borrow | 16,169,120 | | 16,169,120 | 15,105,915 | |
| | 16B | Stock Borrow Pldg Q | 32,363 | | 32,363 | 23,100 | |
| | 16C | Stock Borrow Pldg NQ | - | | - | | |
| | 16D | Stock Borrow L/C | - | | - | | |
| | 16E | Fail To Deliver | 2,610,340 | | 2,610,340 | 1,486,829 | |
| | 16F | Fail To Deliver CNS | - | | - | | |
| | 17 | STOCK BORROW | | | | | |
| 156 | 17A | Firm Bank Loan | - | | - | | |
| | 17B | Customer Bank Loan | 65,076 | | 65,076 | | |
| | 17C | Box | 134,177,226 | 21,161,631 | 155,328,856 | 269,782,072 | |
| | 17D | Transfer | 717,719 | | 717,719 | | |
| | 18 | STOCK BORROW PLDG Q | | | | | |
| 160 | 18A | Firm Bank Loan | - | | - | | |
| | 18B | Customer Bank Loan | - | | - | | |
| | 18C | Box | 4,613,862 | | 4,613,862 | 38,240,872 | |
| | 18D | Transfer | 384 | | 384 | | |
| | 19 | STOCK BORROW PLDG NQ | | | | | |
| 164 | 19A | Firm Bank Loan | - | | - | | |
| | 19B | Customer Bank Loan | - | | - | | |
| | 19C | Box | 13,402,955 | | 13,402,955 | 82,771,057 | |
| | 19D | Transfer | 20,405 | | 20,405 | | |
| | 20 | STOCK BORROW L/C | | | | | |
| | 20A | Firm Bank Loan | - | | - | | |
| | 20B | Customer Bank Loan | - | | - | | |
| | 20C | Box | - | | - | | |
| | 20D | Transfer | - | | - | | |
| | 21 | FAIL TO DELIVER | | | | | |
| 172 | 21A | Firm Bank Loan | - | | - | | |
| | 21B | Customer Bank Loan | - | | - | | |
| | 21C | Repo | 700,947,443 | 25,806,399 | 726,753,842 | 466,127,698 | |
| | 21D | Box | 591,692,828 | 20,774,339 | 612,467,167 | 1,107,111,867 | |
| | 21E | Transfer | 618,964 | | 618,964 | 76,527 | |
| | 22 | FAIL TO DELIVER CNS | | | | | |

| | | By Steps | BEGINNING BALANCE | ADJUSTMENTS | FINAL BALANCE | FINAL BALANCE | DIFFERENCE |
|---|---|---|---|---|---|---|---|
| | | **ALLOCATION WORKSHEET BY STEPS:** | | | | | |
| 177 | 22A | Firm Bank Loan | | | | | |
| | 22B | Customer Bank Loan | 125,298 | | 125,298 | | |
| | 22C | Repo | 101,016,296 | | 101,016,296 | 96,671,971 | |
| | 22D | Box | 80,114,846 | 605,405 | 80,620,251 | 264,015,979 | |
| | 22E | Transfer | 32,241 | | 32,241 | | |
| | **23** | **FIRM LONG** | | | | | |
| | 23A | Customer Bank Loan | | | | | |
| | 23B | Box | 927,590,426,777 | | 927,590,426,777 | 927,826,061,146 | |
| | **24** | **CUSTOMER LONG** | | | | | |
| | 24A | Transfer | 21,153,392 | | 21,153,392 | 23,678,330 | |
| | 24B | Streetside DTC | 128,943,602,058 | | 128,943,602,058 | 12,736,764,785 | |
| | 24C | Suspended | 1,554,173,368 | | 268,176,122 | | |
| | 24D | Break | | | | | |
| | | **BREAK ACCOUNTS ALLOCATED ITEMS:** | | | | | |
| | | Stock Borrow vs. L/C | | | | | |
| | | Stock Borrow vs. Pledge Q | 26,214,491 | | 26,214,491 | 1,703,562 | |
| | | Stock Borrow vs. Pledge NQ | 78,657,176 | | 78,657,176 | 7,127,832 | |
| | | Stock Loan vs. Pledge | 286,023 | | 286,023 | 285,023 | |
| | | Reverse Repo | | | | | |
| | | Repo | | | 5,421,901 | | |
| | | Firm Long | 905,020,212 | | 905,020,212 | 661,054,981 | |
| | | Firm Short | | | | | |
| | | Customer Long | | | 534,669 | 84,787,811 | |
| | | Non Customer Short | | | | | |
| | | Stock Loan | | | | | |
| | | Stock Borrow | 212,384,233 | | 212,384,233 | 99,827,482 | |
| | | Fail To Receive | | | | | |
| | | Fail To Deliver | 1,235,995,771 | | 1,235,995,771 | 276,055,463 | |
| | | Fail To Receive CNS | 8,400,059 | (5,023,057) | 1,377,002 | | |
| | | Fail to Deliver CNS | 252,727,518 | | 252,727,518 | 27,371,410 | |
| | | PAIB Long | 254,627,216 | | 254,627,216 | 89,584,269 | |
| | | PAIB Short | | (131,036,088) | 94,096 | 9,886,475 | |
| | **26** | **UNALLOCATED POSITIONS** | | | | | |
| | | Firm Specialist Long | 20,837,206 | | 20,837,206 | 17,509,562 | |
| | | Customer Long | 40,862,006 | | 40,862,006 | 294,795,138 | |
| | | Non Customer Long | 1,344,660,483 | | 1,344,660,483 | 703,540,351 | |
| | | Stock Loan | | | 782,795 | 785,281 | |
| | | Stock Borrow | 22,095,793 | (21,151,631) | 944,162 | | |
| | | Stock Borrow Pledge Q | 60 | | 60 | 58 | |
| | | Fail To Receive | | | 30,314,547 | 28,595,432 | |
| | | Fail To Receive CNS | 9 | | 9 | 8 | |
| | | Reverse Repo | | | | | |
| | | Firm Specialist Short | 7,187,227 | | 7,187,227 | 5,230,410 | |
| | | Customer Short | | | | | |
| | | Non Customer Short | | (728,391,681) | 16,047,315 | 17,977,722 | |
| | | Stock Loan Pledge | 8,404 | | | 41 | |
| | | Stock Borrow L/C | | | | | |
| | | Stock Borrow Pledge NQ | 363 | | 363 | 364 | |
| | | Fail To Deliver | 66,829,213 | (20,774,339) | 46,054,874 | | |
| | | Fail To Deliver CNS | 7,267,954 | (505,405) | 6,762,549 | | |
| | | Repo | 7,251,937 | | 7,251,937 | 5,294,603 | |
| | **27** | **UNALLOCATED PAIB:** | | | | | |
| | | PAIB LONG | 697,206,880 | (689,142,471) | 8,064,409 | | |
| | | PAIB SHORT | | | 689,237 | | |

# Lehman Brothers
## S/B & S/L Reconcilation
## AS OF SEPTEMBER 19, 2008

| | ADJ'S | |
|---|---|---:|
| Stock Borrow Contract (per T.B.) | | |
| Domestic(Loannet) 098-60010 | | 16,055,568 |
| Domestic(Loannet) 098-60013 | | |
| International(Global 1) 098-60011 | | 10,220,405 |
| Less: Stock Borrow/Pledge NQ v. Firm Bank Loan Adj | | |
| *TOTAL (per T.B.)* | | 26,275,972 |
| Plus:Stock Borrow Free of Money | | |
| Stock Borrow L.O.C. | | |
| Plus (Adj. To ADP FOR ILLOGICAL POS.) | | |
| **TOTAL STOCK BORROW CONTRACT** | | 34,714,358 |
| Less: | | |
| Stock Borrow -Before Allocation | | 28,804,998 |
| Stock Borrow L/C -Before Allocation | | - |
| Plus (Adj. To Global 1) | | |
| **TOTAL STOCK BORROW MARKET VALUE** | | 28,804,998 |
| Difference - Stock Borrow MTM | | (5,909,361) |

| | ADJ'S | |
|---|---|---:|
| Stock Loan Contract (per T.B.) | | |
| Domestic 098-50005 | | 2,605,170 |
| Government | | |
| International 098-50006 | | 5,816,813 |
| Less: Cash Pool | | - |
| *TOTAL (per T.B.)* | | 8,421,983 |
| Plus:Stock Loan Free of Money | | |
| Plus:  Global 1 Rec. Adjustments | | - |
| **TOTAL STOCK LOAN CONTRACT** | | 13,646,046 |
| Less: | | |
| Stock Loan -Before Allocation | | 13,003,330 |
| Plus:  Cash Pool | | |
| **TOTAL STOCK LOAN MARKET VALUE** | | 13,003,330 |
| Difference - Stock Loan MTM | | (642,717) |

**LEHMAN BROTHERS INC**
**WEEKLY STOCK BORROW ALLOCATION REC**
**AS OF SEPTEMBER 19, 2008**

| | STCK BORROW | STK BRW PLD Q | STK BRW PLD NQ | TOTAL STK BORROW |
|---|---|---|---|---|
| **STOCK BORROW BEFORE ALLOCATION** | | | | |
| STOCK BORROW | 26,149,844 | 708,607 | 1,946,547 | 28,804,998 |
| UNPRICED | 0 | 0 | 0 | 0 |
| STOCK BORROW MV | 26,149,844 | 708,607 | 1,946,547 | 28,804,998 |
| | | | | |
| **ALLOCATIONS** | | | | |
| STK LOAN VS STK BORROW (1G) | 9,344,291 | 21,386 | 7,499 | 9,373,176 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 | 0 |
| STCK LN PLDG VS STK BOR (1H) | 256,503 | 9,644 | 28,422 | 294,569 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 | 0 |
| REPO VS. STOCK BORROW (1I) | 1,341,239 | 46,141 | 365,820 | 1,753,199 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 | 0 |
| FIRM SHORT VS STK BORROW (6C) | 3,714,514 | 201,992 | 794,427 | 4,710,934 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 | 0 |
| NONCUST SHORT VS. STK BORROW (10E) | 6,679,542 | 340,875 | 632,690 | 7,653,107 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 | 0 |
| PAIB SHORT VS. STOCK BORROW (11C) | 442,171 | 215 | 15,569 | 457,955 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 | 0 |
| FAIL TO RECEIVE VS. STOCK BORROW (15A) | 632,486 | 34,033 | 4,626 | 671,045 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 | 0 |
| FAIL TO RECEIVE CNS VS. STOCK BORROW (16A) | 15,169 | 32 | 0 | 15,201 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 | 0 |
| STOCK BORROW VS. FIRM BANK LOAN (17A) | 0 | 0 | 0 | 0 |
| UNPRICED / ADJUSTMENTS | 6,907 | 0 | 0 | 6,907 |
| STOCK BORROW VS. CUST BANK LOAN (17B) | 65 | 0 | 0 | 65 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 | 0 |
| STOCK BORROW VS. THE BOX (17C) | 134,177 | 4,614 | 13,403 | 152,194 |
| UNPRICED / ADJUSTMENTS | 21,152 | 0 | 0 | 21,152 |
| STOCK BORROW VS. TRANSFER | 718 | 0 | 20 | 739 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 | 0 |
| TOTAL ALLOCATION | 22,588,935 | 658,932 | 1,862,377 | 25,110,244 |
| | | | | |
| UNALLOCATED STOCK BORROW (16L) | 234,480 | 25,215 | 78,558 | 338,252 |
| ADJ. STOCK BORROW VS UNALLOCATED | (21,152) | 0 | 0 | (21,152) |
| TOTAL | 3,347,681 | 24,460 | 5,612 | 3,377,664 |
| | | | | |
| PER ALLOCATION SUMMARY RPT | 3,354,488 | 24,460 | 5,612 | 3,384,560 |
| Penalty Item for S/B NQ vs. Customer Short | | | (5,612) | (5,612) |
| Adj. To Stock Borrow vs. Cust Short | 0 | 0 | 0 | 0 |
| Stock borrow vs t/r | 0 | 0 | 0 | 0 |
| Stock borrow vs firm short | 0 | 0 | 0 | 0 |
| Stock Borrow vs. Firm Bank Loan | 0 | 0 | 0 | 0 |
| ADJ. STOCK BORROW VS UNALLOCATED | 0 | 0 | 0 | 0 |
| ADJ TO S/B VS BOX | 0 | 0 | 0 | 0 |
| TOTAL | 3,354,488 | 24,460 | 0 | 3,378,948 |
| | | | | |
| DIFF | (6,907) | 0 | 5,612 | (1,294) |
| | | | | |
| ADJ BEGINNING STOCK BORROW FBL | 0 | 0 | 0 | 0 |
| ADJ STOCK BORROW VS. CUSTOMER BANK LOAN | 65 | 0 | 0 | 65 |
| TOTAL STOCK BORROW | 3,354,653 | 24,460 | 0 | 3,379,013 |
| | | | | |
| TOTAL PER RESERVE FORMULA | | | | 3,379,015 |

DIFFERENCE FORMULA'S ALLOCATION (2)

**LEHMAN BROTHERS INC**
**WEEKLY STOCK LOAN ALLOCATION REC**
**AS OF SEPTEMBER 19, 2008**

|  | STOCK LOAN | STOCK LN PLEDGE | TOTAL STK LOAN |
|---|---|---|---|
| **STOCK LOAN BEFORE ALLOCATION** |  |  |  |
| STOCK LOAN | 11,756,140 | 1,247,190 | 13,003,330 |
| UNPRICED | 0 | 0 | 0 |
| STOCK LOAN MV | 11,756,140 | 1,247,190 | 13,003,330 |
| **ALLOCATIONS** |  |  |  |
| STK LOAN VS STK BORROW | 9,344,291 | 256,503 | 9,600,794 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 |
| STK LOAN VS STK BORROW PLDG Q | 21,386 | 9,644 | 31,030 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 |
| STOCK LOAN VS. STK BORR PLDG NQ | 7,499 | 28,422 | 35,921 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 |
| STOCK LOAN VS. STK BORR L/C | 0 | 0 | 0 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 |
| FIRM LONG VS. STOCK LOAN | 181,875 | 334,323 | 516,198 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 |
| REVERSE REPO VS. STOCK LOAN | 0 | 0 | 0 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 |
| NONCUST LONG VS. STOCK LOAN (8E) | 249,244 | 461,907 | 711,151 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 |
| PAIB LONG VS. STOCK LOAN (9E) | 0 | 80,016 | 80,016 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 |
| FAIL TO DELIVER VS. STOCK LOAN | 17,351 | 8,148 | 25,499 |
| UNPRICED / ADJUSTMENTS | 97,391 | 0 | 97,391 |
| FAIL TO DELIVER CNS VS. STOCK LOAN | 8,154 | 15,624 | 23,778 |
| UNPRICED / ADJUSTMENTS | 0 | 0 | 0 |
| TOTAL ALLOCATIONS | 9,927,192 | 1,194,587 | 11,121,779 |
| TOTAL | 1,828,948 | 52,603 | 1,881,551 |
| UNALLOCATED STOCK LOAN | 783 | 293 | 1,076 |
| TOTAL | 1,828,165 | 52,310 | 1,880,475 |
| CUST LONG VS. STOCK LOAN ALLOC | 1,827,746 | 52,310 | 1,880,055 |
| DIFF ALLOC TO CUST LONG VS. STCK LN | 420 | (0) | 420 |

| Stock Loan Vs. Clearing Org | 0 |
|---|---|
| Stock Loan Vs. Unallocated | 783 |
| Stock Loan adj for Illogical Positions | 0 |
| Stock Loan Pledge Vs. Unallocated | 293 |
| Stock Loan Deficits | 468 |
| Stock Loan Vs. Fail To Deliver | 146,668 |
| TOTAL | 2,028,268 |

| TOTAL RESERVE FORMULA | 2,028,687 |
|---|---|
| DIFF ALLOCATION TO FORMULA | (420) |

**LEHMAN BROTHERS INC**
**WEEKLY STOCK BORROW L/C ALLOCATION REC**
**AS OF SEPTEMBER 19, 2008**

| | STOCK BOR<br>LET OF CR |
|---|---|
| <u>STOCK BORROW LOC BEFORE ALLOCATION</u> | |
| STOCK BORROW LOC | 0 |
| UNPRICED | 0 |
| STOCK BORROW LOC MV | 0 |
| | |
| <u>ALLOCATIONS</u> | |
| Stock Loan Vs. Stock Borrow L/C (1D) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| Stock Loan Pledge vs. Stock Borrow L/C (1E) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| Repo Vs. Stock Borrow L/C (1F) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| Firm Short Vs. Stock Borrow L/C (6B) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| Noncustomer Short Vs. Stock Borrow L/C (10D) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| PAIB Short Vs. Stock Borrow L/C (11F) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| Fail To Receive Vs. Stock Borrow L/C (15D) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| Fail To Receive CNS Vs. Stock Borrow L/C (16D) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| Firm Bank Loan Vs. Stock Borrow L/C (20A) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| Cust Bank Loan Vs. Stock Borrow L/C (20B) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| Box Vs. Stock Borrow L/C (20C) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| Transfer Vs. Stock Borrow L/C (20D) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| TOTAL ALLOCATIONS | 0 |
| | |
| TOTAL | 0 |
| UNALLOCATED STOCK BORROW L/C | 0 |
| TOTAL | 0 |
| | |
| CUST SHORT VS. STOCK BORROW LOC ALLOC | 0 |
| | |
| DIFF ALLOC TO CUST SHORT VS. S/B LOC | 0 |

**LEHMAN BROTHERS INC**
**WEEKLY FAIL TO RECEIVE ALLOCATION REC**
**AS OF SEPTEMBER 19, 2008**

FAIL TO RECEIVE

| | |
|---|---:|
| FAIL TO RECEIVE  [022] | 6,548,855 |
| UNPRICED | 6,907 |
| FAIL TO RECEIVE MV | 6,555,763 |

ALLOCATIONS

| | |
|---|---:|
| FAIL TO REC VS. FIRM LONG (5E) | 1,139,266 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| FAIL TO REC VS. REV REPO (7E) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| FAIL TO REC VS. NONCUSTOMER LONG (8H) | 1,982,469 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| FAIL TO REC VS. PAIB LONG (9H) | 7,368 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| FAIL TO REC VS. STOCK BORROW (15A) | 632,486 |
| FAIL TO REC VS. STOCK BORROW PLDG Q (15B) | 34,033 |
| FAIL TO REC VS. STOCK BORROW PLDG NQ (15C) | 4,526 |
| FAIL TO REC VS. STOCK BORROW L/C (15D) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| FAIL TO REC VS. FAIL TO DEL (15E) | 408,081 |
| UNPRICED / ADJUSTMENTS | 137,882 |
| | |
| FAIL TO REC VS. FAIL TO DEL CNS (15F) | 47,642 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| TOTAL ALLOCATION | 4,393,753 |
| | |
| UNALLOCATED FAIL TO RECEIVE (26) | 283,317 |
| UNPRICED / ADJUSTMENTS | (253,002) |
| PLUS PENALTY ITEMS: | |
| FAIL TO REC VS. STOCK BORROW PLDG NQ (15C) | (4,526) |
| FAIL TO REC VS. STOCK BORROW L/C (15D) | 0 |
| | |
| TOTAL | 2,131,695 |
| | |
| CUST. LONG VS. FTR ((12E) | 2,016,576 |
| | |
| DIFF ALLOCATION TO CUST LONG VS. F/R | 115,120 |

LEHMAN BROTHERS INC
WEEKLY FAIL TO DELIVER ALLOCATION REC
AS OF SEPTEMBER 19, 2008

FAIL TO DELIVER BEFORE ALLOCATION

| | |
|---|---:|
| FAIL TO DELIVER (015) | 6,819,473 |
| UNPRICED | 2,060,021 |
| FAIL TO RECEIVE MV | 8,879,495 |

ALLOCATIONS

| | |
|---|---:|
| FIRM SHORT VS. FAIL TO DELIVER (6E) | 599,315 |
| UNPRICED / ADJUSTMENTS | 286,554 |
| | |
| NONCUSTOMER SHORT VS. FAIL TO DELIVER (10G) | 1,803,607 |
| UNPRICED / ADJUSTMENTS | 1,512,388 |
| | |
| PAIB SHORT VS. FAIL TO DELIVER (11G) | 20,506 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| STOCK LOAN VS. FAIL TO DELIVER (14A) | 17,351 |
| UNPRICED / ADJUSTMENTS | 97,391 |
| | |
| STOCK LOAN PLEDGE VS. FAIL TO DEL (14C) | 8,148 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| FAIL TO RECEIVE VS. FAIL TO DELIVER (15E) | 408,081 |
| UNPRICED / ADJUSTMENTS | 137,882 |
| | |
| FAIL TO RECEIVE CNS VS. FAIL TO DELIVER (16E) | 2,510 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| FIRM BANK LOAN VS. FAIL TO DELIVER (21A) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| CUST BANK LOAN VS. FAIL TO DELIVER (21B) | 0 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| FAIL TO DELIVER VS. REPO (21C) | 700,947 |
| UNPRICED / ADJUSTMENTS | 25,806 |
| | |
| FAIL TO DELIVER VS. BOX (21D) | 591,693 |
| UNPRICED / ADJUSTMENTS | 20,774 |
| | |
| FAIL TO DELIVER VS. TRANSFER (21E) | 619 |
| UNPRICED / ADJUSTMENTS | 0 |
| | |
| TOTAL ALLOCATION | 6,233,573 |
| | |
| UNALLOCATED FAIL TO DELIVER (26) | 1,302,825 |
| UNPRICED / ADJUSTMENTS | (20,774) |
| | |
| FTD vs. SUSPENSE ADJUSTMENTS | 0 |
| TOTAL | 1,363,871 |
| | |
| Customer Short Vs. Fail To Deliver (13G) | 1,363,871 |
| | |
| Difference Cust Shrt Vs. F/D to Allocations | 0 |

**LEHMAN BROTHERS INC**
**MONTHLY RESERVE FORMULA**
**FAIL TO RECEIVE / DELIVER ANALYSIS**
**AS OF SEPTEMBER 19, 2008**

| FAIL TO RECEIVE | PER T/B | | FAIL TO DELIVER | |
|---|---|---|---|---|
| BEG BAL | 6,548,855 | | BEG BAL | 6,819,473 |
| FOREIGN FAILS | - | | FOREIGN FAILS | - |
| PRIME BROKER (BT0045-A) | - | 6,548,855 | PRIME BROKER (BT0045-A) | 2,060,021 |
| | | 6,555,763 | | |
| Fail to Receive MTM Deficit | | (6,907) | Fail to Deliver > 30 Days | (826) |
| Fail to Receive MTM Adjustment | - | | Fail to Deliver MTM Adjustment | - |
| Fail to Receive adjustment - | 6,907 | | Fail to Deliver adjustment - | |
| Less: 15c3-3 ALLOCATION | (4,389,228) | | Less: 15C3-3 ALLOCATION | (7,392,734) |
| Adj Fail to Receive per 15c3-3 | 2,166,535 | | Adj Fail to Deliver per 15c3-3 | 1,485,935 |
| Fail to Recv vs Cust Long Alloc | 2,009,668 | | Fail to Delv vs Cust Short Alloc | 1,363,871 |
| Fail to Receive MTM Deficit | - | | Less:Fail to Deliver > 30 Days | (826) |
| UNPRICED (4D) | 6,907 | | UNPRICED | |
| Adj F/R vs Cust Long Alloc | 2,016,576 | | Adj F/D vs Cust Short Alloc | 1,363,045 |
| | | | Fail to Delv vs Firm Bank Loan (21A) | - |
| Unallocated Fail to Recv | 30,315 | | Fail to Delv vs Stock Loan (8B) | 122,890 |
| ADJUSTED DIFFERENCE | 119,644 | | ADJUSTED DIFFERENCE | (1) |

| FAIL TO RECEIVE CNS | | | FAIL TO Deliver CNS | |
|---|---|---|---|---|
| BEGINNING BALANCE | 99,743 | | BEGINNING BALANCE | 1,900,343 |
| Less: 15c3-3 ALLOCATION | (86,094) | | Less: 15c3-3 ALLOCATION | (1,613,323) |
| Adj Fail to Receive per 15c3-3 | 13,649 | | Adj Fail to Deliver per 15c3-3 | 287,020 |
| CNS Fail to Recv vs Cust Long Alloc | 12,272 | | CNS Fail to Delv vs Cust Short Alloc | 263,241 |
| UNPRICED | | | UNPRICED | |
| Adj CNS F/R vs Cust Long Alloc | 12,272 | | Adj CNS F/D vs Cust Short Alloc | 263,241 |
| | | | CNS Fail to Delv vs. Firm Bank Loan (22A) | - |
| Unallocated CNS Fail to Recv | 1,377 | | CNS Fail to Delv vs Stock Loan (14B) | 8,154 |
| Penalty Item: CNS FTR vs. NQ Borrows | - | | Cns Fail To Delv vs. Stk Ln Pldg (14D) | 15,624 |
| ADJUSTED DIFFERENCE | 0 | | ADJUSTED DIFFERENCE | 0 |

| | | | | |
|---|---|---|---|---|
| Total per 15c3-3 Allocation | 2,060,539 | | Total per 15c3-3 Allocation | 1,634,441 |
| Total per 15c3-3 Reserve | 2,180,184 | | Total per 15c3-3 Reserve | 1,650,065 |
| Difference | 119,645 | | Difference | 15,624 |