Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.

9            Debtors.

10   - - - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14            Debtor.

15   - - - - - - - - - - - - - - - - - - - - - -x

16            United States Bankruptcy Court

17            One Bowling Green

18            New York, New York

19

20            September 10, 2010

21            10:08 AM

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

Page 2

1

2    Motion in Limine of Movants for an Order Excluding the Expert

3    Testimony of Professor Paul Pfleiderer

4

5    Motion in Limine of BCI for an Order Excluding the Expert

6    Testimony of John P. Garvey, Mark E. Slattery, Joseph Schwaba,

7    John J. Schneider, John J. Olvany, Harrison J. Goldin, and

8    Professor Mark E. Zmijewski

9

10   Motion in Limine of BCI for an Order Excluding the Expert

11   Testimony of Daniel McIsaac Regarding LBI's Obligations Under

12   SEC Rules 15c3-1, 15c3-3 and/or the Securities Investor

13   Protection Act

14

15   Motion in Limine of BCI for an Order Excluding the Expert

16   Testimony of Daniel McIsaac Relating to Exchange-Traded

17   Derivatives ("ETDs") and ETD Margin

18

19

20

21

22

23

24   Transcribed by:  Ellen S. Kolman

25

Page 3

1

2   A P P E A R A N C E S :

3   JONES DAY

4         Attorneys for the Movant, LBHI

5         222 East 41st Street

6         New York, NY 10017

7

8   BY:   ROBERT W. GAFFEY, ESQ.

9         JAYANT W. TAMBE, ESQ.

10        ARTHUR J. MARGULIES, ESQ.

11        BENJAMIN ROSENBLUM, ESQ.

12        WILLIAM J. HINE, ESQ.

13

14

15  WEIL GOTSHAL & MANGES LLP

16        Attorneys for Debtor

17        767 Fifth Avenue

18        New York, NY 10153

19

20  BY:  DIANE HARVEY, ESQ.

21        HARVEY R. MILLER, ESQ.

22        JACQUELINE MARCUS, ESQ.

23        ROBERT J. LEMONS, ESQ.

24        SHAI WAISMAN, ESQ.

25

Page 4

1

2   WEIL GOTSHAL & MANGES LLP

3        Attorneys for Debtor

4        1300 Eye Street, N.W.

5        Suite 900

6        Washington, DC 20005

7

8   BY:  RALPH I. MILLER, ESQ.

9        ROBERT M. NOVICK, ESQ.

10

11

12   KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP

13        Attorneys for Debtor

14        1633 Broadway

15        21st Floor

16        New York, NY 10019

17

18   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

19        Attorneys for Debtor

20        101 Park Avenue

21        New York, NY 10178

22

23   BY:  JERROLD LYLE BREGMAN, ESQ.

24        LYNN P. HARRISON, III, ESQ.

25        STEVEN J. REISMAN, ESQ.

Page 5

1

2    BINGHAM MCCUTCHEN LLP

3         Attorneys for Debtor

4         399 Park Avenue

5         New York, NY 10022

6

7    BY:  JOSHUA DORCHAK, ESQ.

8

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11        Attorneys for Debtor

12        1177 Avenue of the Americas

13        New York, NY 10036

14

15   BY:  PAUL B. O'NEILL, ESQ.

16        THOMAS T. JANOVER, ESQ.

17

18

19

20

21

22

23

24

25

Page 6

1

2   HUGHES HUBBARD & REED LLP

3        Attorneys for Movant, James W. Giddens, SIPC Trustee

4        One Battery Park Plaza

5        New York, NY 10004

6

7   BY:   NEIL J. OXFORD, ESQ.

8        CHRISTOPHER K. KIPLOK, ESQ.

9        DANIEL STEVEN LUBELL, ESQ.

10        JEFFREY S. MARGOLIN, ESQ.

11        SARAH K. LOOMIS CAVE, ESQ.

12        WILLIAM R. MAGUIRE, ESQ.

13

14

15   DUANE MORRIS LLP

16        Attorneys for Aron Oliner as Chapter 11 Trustee of the

17          Kontrabecki Group

18        1540 Broadway

19        New York, NY 10036-4086

20

21   BY:  WILLIAM HEUER, ESQ.

22

23

24

25

Page 7

```
 1
 2    SILLS CUMMIS EPSTEIN & GROSS P.C
 3         Attorneys for Alfred H. Siegel, Trustee
 4         30 Rockefeller Plaza
 5         New York, NY 10112
 6
 7    BY:  ANDREW HOWARD SHERMAN, ESQ.
 8
 9
10    MILBANK, TWEED, HADLEY & MCCLOY LLP
11         Attorneys for Official Committee of Unsecured Creditors
12         1 Chase Manhattan Plaza
13         New York, NY 10005
14
15    BY:  DENNIS F. DUNNE, ESQ.
16
17    QUINN EMANUEL URQUHART& SULLIVAN LLP
18         Attorneys for Official Committee of Unsecured Creditors
19         51 Madison Avenue
20         22nd Floor
21         New York, NY 10010
22
23    BY:  ROBERT K. DAKIS, ESQ.
24
25
```

Page 8

1

2    BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays Capital, Inc.

4         5301 Wisconsin Avenue NW

5         Washington, DC 20015

6

7    BY:   HAMISH P.M. HUME, ESQ.

8

9    BOIES, SCHILLER & FLEXNER LLP

10        Attorneys for Barclays Capital, Inc.

11        575 Lexington Avenue

12        New York, NY 10022

13

14   BY:   JONATHAN D. SCHILLER, ESQ.

15

16

17

18

19

20

21

22

23

24

25

Page 9

1                    P R O C E E D I N G S

2          THE COURT:  Be seated, please.  Has there been any

3    discussion about the order in which this is going to be

4    presented?  There are a number of pending, somewhat complex,

5    motions in limine to be heard today.

6          MR. TAMBE:  Good morning, Jay Tambe on behalf of LBHI.

7    There have been some discussions, Your Honor, about sequencing

8    and collapsing some of these motions into one set of arguments.

9    What we have discussed with Barclays is that the motions

10   concerning Professor Pfleiderer and the motion -- their motion

11   concerning the valuation experts; Professors Zmijewski,

12   Mr. Olvany, Slattery and those individuals will be argued

13   jointly.  The movants will go first with respect to those two

14   motions in limine followed by Barclays.  We will argue

15   separately the motion in limine concerning Daniel McIsaacs

16   (sic).  That's a separate motion in limine.

17          In terms of time, we are happy to follow Your Honor's

18   guidance on this.  We have discussed briefly allocating some

19   time.  We don't have complete agreement on time allocation.

20   We'd like an hour and fifteen minutes for the first part for

21   the movants, an hour and fifteen minutes for Barclays for the

22   first part and then roughly fifteen minutes per side for the

23   McIsaac's motion.

24          THE COURT:  Okay.  That's fine.  Mr. Hume?

25          MR. HUME:  The only amendment to that is if it's

1   agreeable with the trustee, it may be more efficient to also

2   collapse the McIsaac arguments since it's the same expert on

3   two different issues.  We'd be prepared to explain our two

4   points, sit down and let them respond.

5           THE COURT:  I think it makes sense to collapse it

6   myself.  We're talking about the same witness.

7           MR. OXFORD:  That's fine with the trustee, Your Honor.

8           THE COURT:  Okay.

9           MR. TAMBE:  Your Honor, may I approach?

10          THE COURT:  Yes.

11          Somebody has very long hair.

12          MR. TAMBE:  May it please the Court.  Your Honor, Jay

13  Tambe from Jones Day on behalf of Lehman Brothers Holdings,

14  Inc.  We're here to present Your Honor with arguments on two

15  sets of motions in limine.  There's a motion in limine

16  concerning Professor Pfleiderer and whether Professor

17  Pfleiderer's expert opinion should be excluded and there's a

18  motion filed by Barclays as to whether the testimony and

19  opinions of several of movant's experts should be excluded.

20  And Barclays has moved to exclude in their entirety the

21  opinions expressed by the following seven experts that were

22  proffered by the movants.

23          What I would like to do, Your Honor, would again with

24  the Court's indulgence, is spend maybe ten or fifteen minutes

25  laying out some broad themes that I think apply to the

Page 11

1   valuation case and how the valuation case fits into all of the

2   various matters the Court has been hearing testimony about over

3   the last several weeks so that we can then gauge whether it's

4   appropriate for Professor Pfleiderer to express the opinions

5   that he professes to express and what is the value and

6   reliability of the opinions that have been expressed by the

7   movant's various experts and to what issues in this case those

8   opinions are relevant.

9           THE COURT:  Okay.

10          MR. TAMBE:  From the very beginning of these

11   proceedings, Your Honor, one of the issues that the movants

12   have stressed is that full disclosure on a number of matters

13   was not made to the Court when the Court was asked to consider

14   whether or not to approve the asset purchase agreement.  And,

15   in particular, one of the positions that we staked out early on

16   in our Rule 60(b) motion and have presented evidence on, and

17   this is page 3 of the materials, Your Honor, that throughout

18   the week information was conveyed to the Court which suggested

19   that Barclays was effectively paying fair value for the assets

20   it was acquiring.  And, indeed, when Barclays purported

21   assumption of liabilities as in integral part of the

22   transaction was factored into the mix all information conveyed

23   to the Court indicated that Barclays was providing significant

24   value to the debtors' estates.  It has been our position and we

25   believe we have submitted evidence to the fact that the

Page 12

1    information upon which the Court was asked to rely was simply

2    wrong; it was incomplete.

3         The other aspect of our motion that we have focused on

4    and we submitted evidence on, is what did Barclays actually get

5    in this transaction?  And it's not that the long term benefits

6    and the risks that Barclays assumed.  Yes, it was buying an

7    ongoing -- assets related to an ongoing business, there were

8    employees involved, there was intellectual property involved,

9    there was a business -- there were business teams that they

10   were taking on.  They were taking on risks associated with

11   those business teams and if they were successful in managing

12   and running those business teams, they stood to make a lot of

13   money and if they didn't manage those properly, they -- there

14   were immense risks.  That's not what the valuation case is

15   about.  The valuation case is about what did Barclays get on

16   day one?  When the -- when the sale motion was approved, what

17   did Barclays walk out with on day one?  Not was it successful

18   in running these businesses in the six months, the twelve

19   months, the eighteen months, following acquisition.  It's did

20   they walk out here, walk out of this courthouse with more value

21   than was disclosed to the Court and more value that was

22   approved by the Court as part of the approval of the sale

23   motion?

24        One of the findings the Court made in the sale order

25   was the following: this is paragraph 19 of the sale order and

08-13555-mg    Doc 11728    Filed 09/13/10    Entered 09/30/10 15:45:46    Main Document
Lehman Brothers Holdings, Inc.
Pg 13 of 132

Page 13

1    257 in evidence.  "The consideration provided by the purchaser

2    to the debtors and LBI pursuant to the purchase agreement for

3    its purchase of the debtors' interest in the purchased assets

4    constitutes reasonably equivalent value and fair consideration

5    under the Bankruptcy Code."  That finding, necessarily, Your

6    Honor, was based on what the Court was told about values and

7    valuation.  There's been a lot of discussion in this case about

8    the disclosures that were made in the APA about the seventy

9    billion dollar long position.  And we've had testimony from any

10   number of witnesses that that seventy billion dollar number

11   that appeared in the APA that was presented for the Court's

12   consideration was a negotiated number; it was not Lehman's book

13   value although it was purported to be Lehman's book value in

14   the documentation the Court was given.

15          There was a discount, there was a buffer.  Witness

16   after witness from the highest levels of management at Barclays

17   has said they intended for there to be a buffer in the

18   transaction.  Martin Kelly has testified, yes, we stayed up all

19   night and negotiated a five billion dollar discount.  There's

20   no dispute as to the fact that there was a negotiation of

21   values that was never disclosed to the Court.

22          Towards the end of the week, there were disclosures

23   made on the 19th of September.  There were disclosures made

24   about what had happened to the assets.  What wasn't stated

25   because the lawyers were not fully advised as to what was going

Page 14

1    on behind the scenes, they were told, well, the assets had

2    declined to a value of 47.4 billion dollars and Barclays is

3    assuming liabilities in the range of 45.5 billion dollars.  And

4    that was attributed to market movements and market forces.  The

5    evidence that's been presented in this Court, Your Honor, from

6    James Seery and a number of other individuals, is that there

7    was a frantic exercise the morning of the 19th to mark down the

8    value of assets, the liquidation values, to come up with a

9    negotiated number.  And that negotiated number which was hashed

10   out on the basis of liquidation values was then factored into

11   that 47.4 billion dollar number presented to the Court.

12           Again, the Court wasn't told the process that had let

13   up to that.  The Court wasn't told that there was excess

14   collateral.  According to information, that was in Barclays own

15   files as of Friday afternoon that there was roughly seven

16   billion dollars of excess collateral.  They may have had doubts

17   about the value of that collateral, they may have believed that

18   the collateral truly wasn't worth that amount, but there was no

19   disclosure made to the Court about those values.

20           If you try and graph out or picture how do these

21   disclosures that were made to the Court on the 17th and the

22   19th, how do they match up with what actually happened?  And

23   what we've tried to do on this slide, this is slide 9 in our

24   presentation materials, based on the work that's been done by

25   the various experts by a lot of the documents that we got from

Page 15

1   Barclays as part of discovery and post 60(b) motion discovery,

2   is fine allocate.  Well, what was the Court told versus what

3   actually happened?  And both on the 17th and the 19th, if one

4   looked at the numbers that were disclosed to the Court, the

5   impression that one was left with and the only conclusion that

6   one could draw given the information provided, is that there

7   was a total net benefit to the estate as a result of this

8   transaction.  So, on -- and in the asset purchase agreement

9   filed with the Court on the 17th and the disclosures made in

10  court on the 17th, if one were to -- if one were to total up

11  the numbers that were given to the Court, you would see a

12  significant net total benefit to the estate.  Similarly, even

13  with the movement in the transaction and the representations

14  made in court on the 19th about so-called market movements,

15  there was still a net total benefit to the estate of 1.85

16  billion dollars.

17         What really happened, and this is on acquisition,

18  we're not factoring in stuff that happened post-acquisition

19  where Barclays may have earned profits by successfully managing

20  the business, on day one of acquisition if you properly value

21  the assets that they actually received and you properly valued

22  the liabilities that they actually assumed, what Barclays

23  walked out with on day one was an 11.2 billion dollar day one

24  profit-- an immediate gain to the bottom line.  And that, we

25  submit, simply wasn't disclosed to the Court  --could not have

Lehman Brothers Holdings, Inc.

Page 16

1   been factored into the Court's determination of whether there

2   was reasonably equivalent value or fair consideration paid.

3          Moving on, Your Honor, to slide 19 and the acquisition

4   balance sheet, Your Honor has heard testimony from various

5   witnesses as to how the information about what actually

6   transpired gradually began to become known to LBHI, to LBI, to

7   the creditors' committee.  And one of the facts, disclosures,

8   that was significant in that process was the publication in

9   February of 2009 of Barclays acquisition balance sheet.  And

10  what was presented in that balance sheet was an acquisition

11  gain of about 2.2 billion pounds.

12         There wasn't any detailed backup of support behind a

13  financial statement, but the fact that on acquisition there was

14  the significant gain certainly caught the attention of the

15  movants here and we began to ask even more questions than we

16  had been asking.  We discussed with Mr. Romain, Your Honor, I

17  believe it was last week, how you can trace back from the

18  acquisition balance sheet to actually the individual

19  calculations and the individual valuations.  It was a period of

20  months and months and months before we got that level of detail

21  to really understand where that gain was coming from.

22         And if you could just put up, Steve, 102-Native?

23         You may recall, Your Honor, maybe with a little bit of

24  pain, we went through this spreadsheet with Mr. Romain and we

25  talked about how numbers on this summary sheet feed into the

Page 17

1   acquisition balance sheet, the bottom line numbers that get

2   published as part of the annual reports and filing.  But that

3   behind these numbers lies the real detail as to what Barclays

4   really did in valuing each piece of collateral.

5          Now, before we have this detail -- you can go back to

6   the slide now -- before we have this detail and understanding

7   of exactly what lay behind the acquisition balance sheet, this

8   is what we were told by Barclays in an effort to explain that

9   gain.  And in papers filed in this court, Barclays said the

10  accounting gain is irrelevant to the fairness of the sale

11  transaction and it is not a basis for seeking discovery.  The

12  fact that thus far the acquired businesses have performed well

13  and have generated an accounting gain has no bearing on the

14  adequacy of consideration when the transaction closed.  Have

15  those business performed poorly or if they perform poorly in

16  the future, Barclays would not be entitled to a purchase price

17  adjustment.

18         Citation, "LBHI is not entitled to a purchase price

19  adjustment based on the positive performance of those

20  businesses thus far under Barclays' management."  That was

21  false.  The acquisition balance sheet and the gains shown on

22  the acquisition balance sheet had nothing to do with the

23  positive performances of those businesses post-acquisition.  It

24  had everything to do with the hidden values, the undisclosed

25  values that Barclays acquired immediately upon acquisition.

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 18 of 132

Page 18

1    And, in fact, even the acquisition balance sheet understated

2    the value of those assets and that's what the valuation experts

3    are here to talk about, Your Honor, is to talk about what are

4    really the values or was the acquisition balance sheet and the

5    accounting that was done around the acquisition balance sheet

6    simply the culmination of what began early the week of

7    September 15th as an effort to have a buffer -- to have this

8    buffer to protect Barclays against adverse price movements.

9    And we submit that's exactly what's going on here.

10          The APA is very clear as to when the closing occurred.

11   And 4.1 of the APA states, "Unless otherwise agreed by the

12   parties in writing, the closing shall be deemed effective and

13   all rights, title and interest of seller to be acquired by

14   purchaser thereunder shall be considered to have passed to

15   purchaser as of 12:01 a.m. New York time on the closing date."

16          The closing occurred on the 22nd and by agreement of

17   the parties, 4.1, all title, right and interest passed to

18   Barclays at 12:01 a.m. on Monday morning the 22nd of September.

19   Notwithstanding that, the acquisition balance sheet actually

20   values these securities at various times long after the early

21   morning hours of 12 -- of September 22nd.  The JPM assets are

22   valued as of December.  Some of the most illiquid principle

23   mortgage trading group assets are valued as of September 30th

24   and even the equities, even the equities which were exchanged,

25   traded for the most part, those are valued not as of the

Page 19

1    beginning of business on the 22nd, they're valued as of the

2    close of business on the 22nd and that was a deliberate choice

3    because the markets moved against Barclays during the day on

4    the 22nd.  And they did not want to include that movement in

5    trading profit and loss post-acquisition.  That was thrown into

6    the buffer because there was a buffer for that kind of an

7    adjustment to be thrown into.

8            If I could take a moment to talk about the buffer and

9    why it's important.  We know from Mr. Romaine that the

10   acquisition balance sheet wasn't prepared on September 23rd or

11   September 24th, it was prepared over a period of months, five

12   months plus.  It finally gets published in February of 2009 and

13   what you have is throughout that process you have traders like

14   Mr. King and Mr. Yang and others who have these assets that

15   have been acquired from Lehman on their trading books and

16   they're managing their profit and loss with respect to those

17   assets.  And they're seeing what's happening to these assets in

18   October, in November, in December of 2008.  And at the same

19   time, they're being asked to provide input, what liquidity

20   adjustment should we be making as of September 22nd?  What

21   price should we be using on these securities as of September

22   22nd?  And there are consequences, Your Honor, of making

23   liquidity adjustments and price adjustments in December when

24   you know what that asset is going to be worth in December and

25   ascribe a value to it as of September 22nd.  Just a

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 20 of 132

Page 20

1    hypothetical bond, X, Y, Z, bond.

2           Say, the Bank of New York, Barclays' collateral agent,

3    have that valued, marked, at a hundred dollars on the 19th of

4    September.  In February of 2009, Barclays looks back and

5    assigns a value of seventy-five dollars to that bond.  As of

6    December 31 when they're actually holding that bond that's part

7    of that portfolio, it has a value of seventy-five dollars.

8    From a trading perspective, that bond was acquired at seventy-

9    five and as of December end was valued at seventy-five -- zero

10   profit and loss.

11          On the other hand, if they had actually valued it at

12   the Bank of New York custodial mark, then the trader sees an

13   immediate twenty-five dollar loss, trading loss,that the trader

14   is responsible for.  If they were able to mark that bond at

15   fifty as opposed to a hundred or seventy-five, then the trader

16   gets a twenty-five dollar profit, trading profit, which he gets

17   to enjoy as part of his bonuses, as part of his performance, or

18   to defray other losses in parts of his portfolio.  So, there's

19   a powerful incentive there, Your Honor, to try and manage the

20   valuation and manage the pricing and there was room to do that.

21   There was room to do that because there was excess collateral

22   in the Fed repo.  There was an excess value there.

23          And you lay out all of the different valuations that

24   have been done of the Fed repo collateral and the clearance

25   box. And if you look at a custodial prices, there's a slide 31,

Page 21

```
1    the Bank of New York price and the JPMorgan price from

2    September 17th, and you look at the prices that have been

3    calculated by movant's experts who have gone through CUSIP by

4    CUSIP and done valuations and then you compare it to Barclays'

5    exit price, you see an undervaluation of a little over five

6    billion dollars with respect to the repo collateral and

7    clearance box assets.  If you isolate it just to the repo

8    collateral, it's a-- it's an undervaluation by Barclays of just

9    about five billion dollars.

10            And if you look at a broad range of valuations of what

11   was going on with this collateral during that week and

12   subsequently, your valuations on the Fed repo assets of 50

13   billion, 50.6 billion.  If you look at a combined Bank of New

14   York valuations and JPMorgan valuations, that's about 52

15   billion.  The movants have independently valued these assets at

16   50.5 billion and then you've got Barclays' price with roughly a

17   5 billion dollar undervaluation which lines up almost exactly

18   with the liquidation analysis that was done by Mr. Seery and

19   the traders at Lehman who then came up with a negotiated price,

20   the negotiated buffer, the buffer that was going to protect

21   Barclays from changes in valuation, market fluctuations.  And

22   we submit, Your Honor, the prices that they ultimately have

23   ascribed to these assets, really aren't liquidation values.

24            Now, Barclays would have the Court believe that this

25   was mere coincidence.  I think the Court is free to draw its
```

Page 22

1   own inferences from testimony, from witnesses, from analysis

2   and from opinions.  You're going to hear a lot from -- you have

3   already heard a lot from King and Romain and other witnesses

4   about certain aspects of the valuation.  But Barclays is not

5   putting up before Your Honor a single person from the product

6   control group who actually ascribed the prices.  No such

7   witness is going to take that witness chair.

8        The traders who provided those prices to the PCG group

9   for them to then put into the acquisition balance sheet, none

10  of those traders have taken that witness chair.  They claim

11  that PricewaterhouseCoopers blessed all of this, although you

12  have to take Mr. Romain's word about negative assurances from

13  auditors and what that really means.

14       No one from PwC has been put out to say, yeah, this

15  was the right way to do it and, in fact, these are the right

16  values.  No.  Instead what they have proposed is that Professor

17  Pfleiderer who spoke to someone, who spoke to folks from PCG

18  Group, who spoke to someone at Barclays, who spoke to PwC is

19  going to bless these valuations and say, well, they look

20  reasonable to me.  And we'll get into the details of what's

21  wrong with that type of opinion and that type of testimony from

22  Professor Pfleiderer.  Why it is utterly lacking in any

23  expertise.  There was really no ground up independent valuation

24  work done.  He wasn't allowed to do it.  He didn't do it in

25  this case.  He may have done it in other cases and that may

Page 23

1   have persuaded Your Honor to find him to be a credible expert

2   witness.  He didn't do that work in this case.

3           Before we move into discussing Professor Pfleiderer

4   and his opinions in detail, I think the point does need to be

5   made that there were valuations of collateral received by

6   Barclays before this Court met on the 19th of September and

7   heard testimony and proffers and statements from lawyers about

8   whether to approve the sale motion.  And, in particular, this

9   is a document that has been discussed with a number of

10  witnesses and it's Movant's 200.  9/19, September 19th, e-mail,

11  it's the middle of the day, 11:51; there's a calculation in

12  there.  There's a calculation of the repo collateral and with a

13  calculation that totaled up to 52.19 which includes the

14  securities received as well as cash received.  And we know that

15  52.19 number is a number that Barclays didn't simply crumple up

16  and throw in a garbage bin.  That number shows up in the

17  earliest versions of the acquisition balance sheet.  That was a

18  number that was available to Barclays that has been seen by

19  senior management at Barclays on Friday the 19th before they

20  appeared before Your Honor.

21          Mr. Ricci was asked about that document.  What I'd

22  like you to agree with me about, sir, is that there's excess

23  collateral in the repo that's something of a cushion, is it

24  not, against, yes, that's correct.  They saw that as a cushion.

25  They recognized that as a cushion and I was perfectly

Page 24

1    consistent with what the negotiators at Barclays have been

2    asked to do which is to make sure, to ensure that there was a

3    cushion in the assets being purchased but no one told this

4    Court about that cushion.

5         Now, we've had testimony from Ms. Leventhal.  There

6    were submissions by Ms. Leventhal, affidavits filed in this

7    court by Ms. Leventhal about valuation as well.  So, the values

8    that were available to Barclays on September 19th, were values

9    that came from Barclays own custodial agent back in New York.

10   Barclays also had available to it valuations from JPMorgan

11   which was the Fed's custodial agent.  And there are laws that

12   govern valuation when the Fed is lending money with a meaning

13   to market value.  That was market value.  What JPM ascribed to

14   those assets was market value.  And Ms. Levental and Mr. Moore

15   submitted declarations in this court in December talking about

16   the 50.6 billion dollars of value in the Fed repo collateral.

17   Now, Barclays would have the Court run away from that and say

18   well, that really wasn't 50.6; it was something else.

19        And finally, before we got to Mr. Pfleiderer, one

20   other issue that surfaces time and again in Barclays'

21   presentation and their arguments is, well, the Fed repo is one

22   thing, what we got on Thursday night into Friday was -- was an

23   entirely different animal.  We got securities we'd never seen

24   before.  And we made some progress with Mr. King, Your Honor,

25   about really sort of taking that broad generic statement apart

Page 25

1    and saying was it really that different and what was different

2    about it?

3            Well, we've looked at it.  We've looked at how much of

4    the collateral overlapped and how much of the price

5    differential, the disagreement that we have with Barclays about

6    valuation can be ascribed to Fed repo collateral; the stuff

7    that overlapped.  And how much of that differential can be

8    attributed to the non-overlapping securities.  And if you look

9    at that difference, Your Honor, the vast majority of the price

10   differential is not on the new stuff, it's on the stuff that

11   was common to the Fed repo and to Barclays' repo.  So, it

12   wasn't because they got new securities that they hadn't seen

13   before that gave them a lot of uncertainty about what they were

14   getting and that's where all the valuation differences were.

15   And, in fact, although Mr. King didn't do this calculation for

16   us, what he told us is the new securities were largely

17   equities, large equity positions.  Well, those aren't the tough

18   to value securities, Your Honor.  And what this shows, what

19   this analysis shows that was done by our experts, what this

20   shows is most of the price differential is attributable to the

21   portion of the collateral that overlapped between the Fed and

22   the Barclays' repos.

23           The analysis that was done internally by Mr. Yang for

24   Mr. King, again, using Barclays' valuations, also found

25   overlap.  And what they found is for the collateral that

Page 26

1    overlapped, the price difference between JPMorgan and the Bank

2    of New York was less than 0.1 percent.  Two independent

3    custodial agents, both of whom have awesome responsibilities in

4    the overnight repo market.  You saw the testimony that Mr.

5    Zubrow gave of the FCIC.  How carefully JPM was monitoring

6    asset values.  How careful JPM was to make sure that they were

7    adequately protected.  Well, that's the same JPM, Your Honor,

8    that's valuing securities in that turbulent week for the Fed

9    and their values come in at 0.1 percent different from BoNY for

10   the overlapping piece.  And yet, Professor Pfleiderer and

11   Barclays would have this Court disregard those values entirely

12   of no use, of no moment, useless.  But let's get to Professor

13   Pfleiderer and what he has done and not done.

14        To put it mildly, Your Honor, all that Professor

15   Pfleiderer has done is validate Barclays' valuation without

16   independently verifying any part of it.  He's taken a look at

17   what they've done and he told us in his deposition he spoke to

18   folks, he spoke to Landerman (ph.) and Washdell (ph.) and

19   Teague (ph.); these are individuals who work in the product

20   control group.  Had conversations with them.  Looked at

21   documents.  Took a lot of comfort for the fact that PwC had

22   done an audit that worked.  And basically concluded, well,

23   that's a reasonable process and reasonable procedure.

24        What Professor Pfleiderer will not tell you from that

25   witness chair is whether any one of these valuations was

Page 27

1   actually correct because he didn't do that work.  He wasn't

2   asked to do that work.  He's got a generic opinion.  A laying

3   of hands in the work that was done by Barclays.  And he has

4   pronounced it to be fit.  He has no expertise involved in that,

5   Judge.  There's no analysis that he brought to bear to reach

6   that conclusion.  That's not what he regularly does.  In fact,

7   he has no trading experience.  He never worked in an investment

8   bank or a financial institution.  No experience with most of

9   the complex securities that were being valued here.  And he

10  lacks familiarity with the types of models that we use.  Models

11  that we use both by Barclays and by movant's experts to value

12  some of these securities.

13          I'm not going to minimize his experience, Your Honor,

14  or his significant qualifications.  He's a smart man.  And when

15  he does the work that requires him to bring to bear his

16  intelligence and his experience and his expertise, he may well

17  qualify as a proper testifying expert but he didn't do that

18  here.

19          Let me go back to 102-N, please.

20          One of the things we talked to Professor Pfleiderer

21  about in his deposition is we went to 102 Native.  This is the

22  inner plumbing, the inner workings of the acquisition balance

23  sheet.  And we asked them to take a walk with us to some of

24  those tabs just like I've tried to get Mr. Romain to do with

25  us.  And we went down to the rate staff   -- if you could go

Page 28

1    there, please.  And I said, well, there's a lot of information

2    on there.  Did you go and verify any of that information?  Did

3    you double-check that?  Did you look at the liquidity discounts

4    that were being taken?  The prices that were being taken?  Why

5    take a price from Column X and not Column Y?  And the reality

6    became very evident to us very quickly.  He hadn't done any of

7    that work.  He hadn't done any of that detail work on any of

8    these CUSIPs.  In fact, he declined to profess any view as to

9    whether any particular valuation was correct or incorrect.

10          Can we go back to slide 1, please?

11          And we went through various aspects of that spread

12    sheet to see, well, maybe he looked at this set of CUSIPs or

13    maybe that set of CUSIPs.  And here's what he said to us.  "I'm

14    certainly not offering the opinion that if one goes CUSIP by

15    CUSIP that I agree with every particular mark.  I looked at a

16    process.  I looked at the fact that extreme care was taken in

17    the development of these -- that PricewaterhouseCoopers has

18    audited this.  And I came to a conclusion that this provided a

19    good upper bound."  How could he possibly know that's a good

20    upper bound if he hasn't done the detail work?  That's just a

21    guess, Judge, as to what the realizable value of this would be

22    in an orderly but quick, fairly quick sale of this inventory.

23    Again, not a trader.  Has no experience in trading.  This is a

24    large inventory of CUSIPs, of securities.  Doesn't have any

25    expertise.  No experience to opine that this would be a good

1    upper bound as to the realizable values.

2         Asked him some more questions about this.  Other

3    CUSIPs.  "I haven't gone and said here's a CUSIP that I would

4    disagree with because that wasn't the process.  I looked at

5    aggregates.  I looked at marks that were being placed by Bank

6    of New York and the adjustments that were made and found that

7    those were reasonable estimates of what could be achieved --

8    excuse me -- in an orderly exit and that's my conclusion."

9    There's no analysis.  No reliance materials have been turned

10   over to say he did this -- that kind of comparison.  He looked

11   at those prices and said, okay, I'm going to go look at some

12   market data and I'm going to compare these two and say, well,

13   is that a reasonable estimate of what could be achieved in an

14   orderly exit?  He blessed the process or what he believed was

15   the process followed by the Barclays' traders.

16        We had a discussion about getting another set of

17   CUSIPs and he said, "I neither agree nor disagree with marking

18   them all the way down to zero.  I certainly agree that they

19   should be very significantly marked down.  Whether you mark

20   them down to zero or two cents or five cents is not something

21   I'd offer an opinion about without doing some more due

22   diligence on it."  He didn't do any.

23        When we discussed 102-N -- if we can go back to 102-N,

24   please, Steve -- with Mr. Romain -- and go back to summary

25   sheet, please -- one of the points we focused on was that there

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 30 of 132

Page 30

1    are two types of adjustments that are being made to these

2    prices.

3            And if you could highlight D -- it looks like Row 14.

4            If you look at that number, that's a PCG value that is

5    different than the BoNY value and you'll see there's about a

6    three billion dollar -- two and a half billion dollar

7    difference there.  But that's not the only adjustment that's

8    being made.  There's a liquidity adjustment that's being made

9    as well and that's an adjustment to take prices from mid to

10   bit.  In concept, we don't disagree that that is something that

11   should be done, but should be done appropriately.  What you

12   would see here there's an additional 1.8 billion dollars of

13   change in value from 42.5 down to 40.6 and that's because of

14   liquidity adjustments.  And we asked Professor Pfleiderer,

15   "Well, did you go and examine these liquidity adjustments?  How

16   could you satisfy yourself that that was the right liquidity

17   adjustment?"  And by way of example, there was a ten percent

18   liquidity adjustment that was taken on certain agency

19   securities.  And agency securities are Freddie's, Fannie's,

20   Ginny's -- ten percent.  And if you actually go and look to see

21   what the effect is of taking that type of ten percent across

22   the board liquidity discount, it drives the implied yields into

23   the stratosphere.  Hundreds of percent implied yields.  What

24   that suggests to you is that's not a proper price.  There's

25   something wrong with that ten percent adjustment.

Page 31

1          Other than taking Barclays' word for that ten percent

2     liquidity adjustment being proper, Professor Pfleiderer who

3     undoubtedly probably has the economic tools to try and test

4     that, didn't do it.  Didn't do it.  Didn't do the analysis,

5     Judge.

6          We've talked on a couple of occasions with a couple of

7     different witnesses about particular large positions where

8     there's a real difference of opinion.  The Pine CLO, a

9     structured product which is about a 500 million dollar

10    difference.  Well, we asked Professor Pfleiderer about that.

11    I'm not sure I have a slide for this one.  But on the Pine CLO,

12    I probed him.  I said, "How did you satisfy yourself that this

13    500 million dollar difference was rational and reasonable?

14    What did you do?"  And what he told us is, they did some poking

15    around with his analysts and they went on Google.  And they

16    looked on Google to see what they could find out about the Pine

17    CLO.  That's a shockingly cursory type of analysis that was

18    done on this security where there's a significant difference of

19    views as to how that should have been properly valued.  Half a

20    billion dollars, Judge.  Even in this case, that's a material

21    amount of money.

22          Same thing for the Giant Stadium bonds.  That's a

23    security that was initially taken in for acquisition balance

24    sheet purposes at ten cents on the dollar, forty cents on the

25    dollar.  And before the year was out, was marked up to a

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 32 of 132

Page 32

1    hundred cents on the dollar.  There's your trading profit.

2           For acquisition balance sheet purposes, ten cents; for

3    trading P&L at the end of the year, a hundred cents.  Well, we

4    asked Professor Pfleiderer, "What did you do to satisfy

5    yourself that that was reasonable?"  Nothing.  He has no

6    experience with option rate securities.  He has no experience

7    with that type of market.  He had no real opinion or analysis

8    to offer to support that.  And one of the statements he made in

9    the midst of his deposition and I think really at least to my

10   view, says it all.  He said, "It would be rather presumptuous

11   of me to say that Barclay's who is marking this at the actual

12   sale that they realized is wrong."  If he thought it was

13   presumptuous of him to conclude that Barclays was wrong, what

14   type of analysis is he doing?  Barclays is generally right and

15   it would be presumptuous of me to say that they are wrong.

16   That's not an independent analysis at all, Your Honor.  He's

17   simply accepting their methodology and their process without

18   any rigorous testing or analysis.

19           Now, he did say in his deposition, and he took great

20   comfort from the fact that he had spoken with Mr. Landerman,

21   Mr. Teague, Mr. Washdell and these are folks who work in the

22   Product Control Group.  So, these are the folks at Barclays who

23   would have worked with Mr. King, Mr. Yang, other traders, in

24   developing the prices that ultimately end up in the acquisition

25   balance sheet.  So, we deposed these folks.  They won't be

Page 33

1    taking the stand as far as we know and we asked them, "Well,

2    what do you remember about Pfleiderer -- Professor Pfleiderer?"

3    This is Mr. Teague.  Mr. Teague, was responsible for valuing

4    some of the most difficult to value, asset-backed securities,

5    the PMTG assets.

6    "Q.  Just to get the best of your recollection as you sit here,

7    you don't have a specific recollection of any e-mail traffic of

8    Professor Pfleiderer, do you, sir?

9    "A.  No, I do not.

10   "Q.  And do you have any specific recollections of a

11   conversation you've had with Professor Pfleiderer?

12   "A.  No, I do not."

13        I asked him some more.

14   "Q.  Have you spoken with an individual by the name of

15   Professor Pfleiderer?

16   "A.  I believe there's been -- apologies, one moment.  He's

17   the -- can you refresh me as to who he is?  I know he's done

18   the -- I know he was part of the depositions, correct?"

19        I go on.

20   "Q.  Well, you tell me.  What does that name mean to you?

21   "A.  I'm trying to think.  If I've had I've had -- I believe

22   there's been some e-mails involving the professor.  I just

23   don't think I've ever had any -- much in the way of

24   conversations with him.

25   "Q.  Do you remember as you sit here today a single

Page 34

1    conversation with Professor Pfleiderer?

2            "THE WITNESS:  Can we take a break?

3            "MR. TAMBE:  'No', I said.  'It's not a good time to

4    take a break.  I would like you to answer the question.'

5    "A.  If anything, it's just me trying to piece it all together.

6    I may have been on calls with the professor.  But I think any

7    conversations have been more.

8    "Q  Well, if there was any e-mail traffic, where?

9    "A.  He may have been in the background.  But no, I'm not quite

10   sure to be honest."

11           And that continues.  It's not just Mr. Teague.  It's

12   Mr. Landerman, Mr. Washdell.  These are the folks who actually

13   did the number crunching, who did the back-and-forth with the

14   traders that rolls up into that acquisition balance sheet.

15   Professor Pfleiderer claims to have taken great comfort in

16   having spoken with these folks.  Satisfied himself they did a

17   robust job.  And yet, they don't seem to have any real

18   recollection of having dealt with him.

19           Well, the other thing Professor Pfleiderer said is,

20   "Well, there were policies and procedures and like any good

21   bank Barclays has extensive policies and procedures and I think

22   those policies and procedures were followed here and that gives

23   me comfort that they got it right."  Well, here's the problem

24   with that, Your Honor, while Barclays may have had some

25   policies and procedures, the policies and procedures that were

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 35 of 132

Page 35

1    turned over by Mr. -- by Professor Pfleiderer as part of his

2    reliance materials, for the most part postdated the

3    acquisition.  And the reason, there's a reason why they

4    postdated the acquisition.  A lot of the assets that were

5    acquired by Barclays were assets that they had not previously

6    traded.  They did not have policies in place to address the

7    valuation of those types of assets.  And, again, Mr. Teague,

8    Mr. Landerman, Mr. Washdell, told us the procedures they used

9    and they weren't following set policies, they were developing

10   ad hoc policies to deal with the Lehman assets with the active

11   assistance of the traders, Mr. King and company.

12          Now, there was another source of potential information

13   that was available to Mr. Teague, Mr. Landerman and

14   Mr. Washdell, which again could have fed into some reliability,

15   some robustness and the analysis.  They could have spoken to

16   the traders who actually manage these positions.  They didn't

17   and Professor Pfeiderer didn't either.  So, the folks who had

18   put on these positions who might know a thing or two about some

19   complex securities, how they were put on by Lehman, you don't

20   have to accept Lehman's mark if you think you want to do the

21   valuation yourself.  You don't have to do that.  But talk to

22   the traders.  They didn't do that.

23          Mr. Teague was asked,

24   "Q.  Did any other former Lehman valuation professionals play a

25   role in the acquisition balance sheet valuation?

Page 36

```
 1    "A.  No.

 2    "Q.  No?

 3    "A.  No.  Didn't.

 4    "Q.  And were the former Lehman employees that went over to

 5    Barclays", -- this is Mr. Landerman, "were they involved in the

 6    valuation of the securities that were required?

 7    "A.  No."

 8    "Q.  Were they consulted in any way in the process of valuing

 9    securities?

10    "A.  To a very limited extent."

11          So, you have valuation folks at Barclays upon who

12    Professor Pfleiderer apparently relies who haven't gone to a

13    source of reliable information that they could have used to at

14    least get some information about these securities.  Instead

15    they relied on their own traders and we don't know what else

16    they relied on because they are not going to be testifying

17    here.  They're not able to tell us with any degree of certainty

18    what exactly they did and what exactly they relied on.

19          We asked them a series of questions; Mr. Landerman,

20    Mr. Teague, Mr. Washdell, to say, okay, you have these new

21    assets, well, did you compare the assets you were getting from

22    Lehman and look to see if Barclays had other similar assets on

23    its books and how it was valuing those assets?  Did you do that

24    side-by-side comparison so you were consistent in your

25    valuation?  And time again, they said, they didn't do that
```

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 37 of 132

Page 37

1   check.  They didn't do that check at all.  And, again, to draw

2   the comparison on the contrast between the way the Lehman

3   assets were valued and how assets in the ordinary course at

4   Barclays would be valued, the trader marks would play a

5   significant role.  The trader marks would roll up into the

6   financial statements after the group had price tested the

7   trader marks.  Well, they didn't ask the Lehman traders for how

8   they would have valued these securities, how they carried these

9   securities.

10        So, we went to yet another proffered basis for

11   Professor Pfleiderer's comfort so that this was a reasonable

12   process and that was PwC audit.  And as I mentioned earlier,

13   Your Honor, when the report was issued in January and the

14   reliance materials were turned over, there were very few

15   documents from PwC included in Professor Pfleiderer's reliance

16   materials.  But Barclays and Professor Pfleiderer took great

17   comfort from the fact that PwC had done some type of audit.

18   And I asked him that.  I asked him at his deposition, "You've

19   taken some comfort in the report that you prepared on the fact

20   that Barclays' valuation of the acquisition of securities was

21   audited by PwC, correct?"  And he said, "That is certainly a

22   factor in reaching my conclusion."  Mind you, Your Honor, he is

23   not an auditor.  He doesn't profess to be providing any kind of

24   an accounting opinion as to the adequacy of an audit.  On that

25   issue, he's no different than any one of us in this room who's

Page 38

1    providing a lay view as to the fact that PwC has done something

2    in reviewing the work done by Barclays.  So, we probed a little

3    more.  We said,

4    "Q.  Well, do you know whether PwC did the type of price check

5    analysis we just talked about with respect to the securities

6    that were sold and for which Barclays used the sales price as

7    the price of which they value the security?"

8          These, Your Honor, are the internal sales that we've

9    talked to a couple of witnesses about.

10   "A.  They may have, but I don't have direct knowledge of that.

11   "Q.  Well, do you have any reason to believe they did it?

12   "A.  I have no reason to believe they did.  I have no reason to

13   believe they did not."

14         And I asked them,

15   "Q.  Well, did you speak with anyone in PwC in the preparation

16   of your report?

17   "A.  I did not."

18         He claims to take great comfort from the fact that PwC

19   was involved.  Lays it out in his opinion.  Provides for

20   reliance materials that are but a fraction of the materials

21   that are turned over later by PwC.  So, without the benefit of

22   any of those materials, he is perfectly comfortable opining, I

23   can take great comfort from PwC's involvement, but hasn't

24   spoken to anyone from PwC in preparing his report.

25         Asked about other matters that PwC may or may not have

Page 39

1    reviewed.

2    "Q.  But you don't know whether this one was reviewed and if

3    they did review it you don't know what they did to review it?

4    "A.  Again, I did not as I said before, 'I did not talk to

5    anyone at Pricewaterhouse', so, I don't know.  I don't know the

6    specifics."

7            When we were sitting here last week in court, we got

8    yet another declaration from Professor Pfleiderer.  And I think

9    that's his third declaration after his report.  And now he says

10   in paragraph 5, "Well, I've looked at a whole bunch of

11   additional materials.  A large volume.  Since submitting my

12   initial report, I have reviewed a large volume of additional

13   documents produced by PwC that support this observation.  These

14   documents confirm that PwC perform extensive, detailed,

15   thorough and independent testing of Barclays' marks.  Concluded

16   that Barclays' valuation methods were reasonable and found no

17   material understatement of asset values by Barclays."

18           Well, here's was PwC has to say about what they did.

19   SFG, which is a group within Barclays, did not obtain prices

20   from third parties to confirm a market price including external

21   quotes, trades or pricing service data from the agency RMBS,

22   nonagency RMBS securities or other MBS securities; i.e., they

23   took Barclays' word for it.

24           One of movant's experts, Mr. John Garvey, is an

25   accountant.  He is going to provide an opinion about accounting

Page 40

1    issues.  And one of the things he is going to talk about, Your

2    Honor, what exactly does that audit mean?  Is it really an

3    independent valuation of the assets?  And Mr. Garvey will

4    testify it is not.  It's a lot of different things, but it's

5    not an independent valuation of the assets.

6         In addition to a lot of other issues that pervade the

7    PwC documents, we know because of this exchange of e-mails

8    between Mr. Romain and PwC that among the things that PwC was

9    being asked to audit, was a valuation of these securities at

10   dates other than the agreed upon contractual date when the

11   assets transferred from Lehman to Barclays.  And they took no

12   exception to the use of the 22nd -- they took no exception to

13   the use of December 22nd.  Clearly, what they were passing on

14   in whatever depth they passed on these issues, was not a

15   valuation CUSIP by CUSIP off the securities as of 12:01 a.m. on

16   the 22nd of September.

17        There are other opinions that Professor Pfleiderer

18   offers on a variety of other issues including, I believe, he

19   says he has looked at some GFS data and on the basis of the GFS

20   data, he concludes that there was no negotiated five billion

21   dollar discount at inception.

22        So, he's looked at some numbers which suggest to him

23   that there was no five billion dollar discount at inception

24   although Mr. Kelly has testified about that under oath although

25   there are contemporaneously documents from within Lehman

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 41 of 132

Page 41

1   talking about the five billion dollar loss against Lehman

2   marks.  And although Mr. Varley and Mr. Diamond have admitted

3   that it was essential, a precondition to have a buffer and

4   there was a negotiated price for Lehman's assets early in that

5   week.

6          That opinion that he is offering, Your Honor, is not

7   relevant to any issue.  It simply contradicts sworn testimony

8   on the basis of incomplete analysis of data that we would

9   submit is far from complete, it's not reliable and was changed

10  some 7,000 times after the acquisition.

11         Professor Pfleiderer talks about the risks that

12  Barclays assumes.  Again, not an issue here, Your Honor.  No

13  one here is denying that Barclays did assume some risks.  But

14  they made disclosures and the parties made disclosures to this

15  Court about what the fair exchange was.  What the consideration

16  was for the assumption of those risks and the acquisition of

17  very valuable assets.

18         No matter what risks they assumed, that is not going

19  to excuse, Your Honor, less than full disclosure, less than a

20  fulsome disclosure on the critical issues Your Honor was asked

21  to pass on as part of the sale motion.

22         The accounting gain on acquisition.  All Professor

23  Pfleiderer is doing there, Your Honor, is simply recounting how

24  the acquisition balance sheet was prepared, how the accounting

25  game came about.  Again, he is not an accountant.  Not his area

Lehman Brothers Holdings, Inc.

Page 42

1    of expertise.  He's simply reading a document that Barclays

2    prepared.  Mr. Romain could have done the same thing; should

3    have done the same thing.  It gets no more compelling.  It gets

4    no more persuasive putting it in the mouth of Professor

5    Pfleiderer.  That's not expert opinion.

6            And, finally, I believe intruding on the providence of

7    the Court offers several opinions in the reasonableness of the

8    Court's findings concerning the benefit of the sale

9    transaction.  For the reasons stated in our motion papers, we

10   would seek to exclude Professor Pfleiderer's opinion for all

11   those reasons.  I will now move onto discuss the motion against

12   the movant's experts.

13           Mr. McIsaac will be dealt with separately.  I'll

14   address the first six.  And just so we can put some context

15   around these six, the first four, Professors Zmijewski, who is

16   the deputy dean at the Chicago Booth School of Business,

17   Mr. Olvany, Mr. Schwaba and Mr. Slattery are the folks who did

18   valuation work.  They actually drilled down into specific

19   CUSIPs.  They divided up the portfolio according to their

20   expertise and valued those securities.

21           Mr. Garvey is a CPA.  He does not do any valuation but

22   what he does provide opinions on are accounting issues,

23   accounting principles that ought to govern the consideration of

24   valuation and what's appropriate and what's not.

25           And Mr. Schneider is a custom and practice in the

Page 43

1    industry expert and he can talk about tri-party repo custodial

2    issues.  What are -- you know, what is that industry?  How do

3    they measure -- how do they come up with prices?  What are the

4    relevant risks that these custodial agents take on when they

5    price securities as part of tri-party repos?  And, again, by

6    way of context how these different valuations fit together.

7           Professor Zmijewski looked at equities and he also

8    valued the JPM securities.  So, that's the first item on slide

9    115 and the last item on slide 115.  And the other experts

10   valued the other securities there.  And you'll see the number

11   of CUSIPs they valued, the differential between their opinions

12   and the value of these securities versus where Barclays'

13   acquisition balance sheet puts those values and the total

14   undervaluation by Barclays.

15          The opposition to these experts is very broad and

16   initially it is based on legal arguments that these experts

17   should be excluded simply because Barclays is going to prevail

18   on its legal arguments.  We've addressed those legal arguments.

19   We're here on an evidentiary hearing, Your Honor.  I'm happy to

20   address those arguments further but those have been briefed.

21   Let's talk about what their real objections might be to some of

22   these folks and let's start with Professor Zmijewski.

23          Barclays has not challenged his qualifications.  I

24   don't think they could in all good faith.  Thirty years of

25   experience in accounting, economics, finance, PhD, MBA,

Lehman Brothers Holdings, Inc.

Page 44

1    professor of accounting, deputy dean of the Booth School from

2    1984 to the present, founder of an economic consulting firm as

3    well.

4         There's two things that -- three things that Professor

5    Zmijewski will do.  He's certainly going to value the

6    particular CUSIPs that he was responsible for; the equities and

7    the JPM valuation.  But Professor Zmijewski will also summarize

8    the other valuation outlets.  To collect and summarize and

9    present in one place what the overall valuation picture looks

10   like.  And in that sense, he will collect the various items

11   that appear on the Barclays opening balance sheet versus how

12   the movants would value those items on the opening balance

13   sheet.  And how if you compare that to the representations that

14   were made to the Court on the 19th of September, what is the

15   excess value over and above that which was represented to the

16   Court on the 19th.

17        And starting with the acquisition gain as reported, of

18   what slide 121 simply sets out is how do these numbers all fit

19   together?  The undervaluation if the securities that were

20   included in the acquisition balance sheet were properly valued

21   what would the appropriate value be?  Other adjustments for

22   unreported assets and transaction costs and overvalued are

23   liabilities assumed.  And that's a reference to the comp item,

24   Your Honor.  And that's what results in that overall economic

25   gain to Barclays on day one.

Page 45

1          The complaints against Professor Zmijewski are that

2     he's relied on other testifying experts.  Well, each of those

3     other testifying experts will testify, will be subject to

4     cross-examination.  As part of his overall presentation of the

5     valuation picture, he is -- he has worked with those experts

6     and he's going to provide Your Honor an overall aggregate

7     picture of what the valuation puzzle looks like.  Nothing wrong

8     with doing that.  He's perfectly permitted to do that and

9     there's no prejudice to Barclays because they've had every

10    opportunity to depose those folks and they'll get to cross-

11    examine them on the stand.

12         The complaints about his valuation of the JPM

13    inventory.  And clearly, one of the objections we have to the

14    value ascribed by Barclays to JPM inventory is that's being

15    valued as of December and not as of the time of the acquisition

16    which is September 2008.

17         Professor Zmijewski also talks about the valuation of

18    the equities.  Again, simply correcting for that date as

19    opposed to valuing them at the end of the 22nd, valuing them as

20    of the end of the 19th, the last point in time with his

21    reliable pricing data available that can used as of 12:01 a.m.,

22    that's a 290 million dollar difference.  A 290 million dollar

23    swing just with respect to equities on that one day.  And

24    they're pushing it from trading the P&L back into acquisition

25    balance accounting.

Lehman Brothers Holdings, Inc.

Page 46

1          The other aspect of his opinion on equities deals with

2     a bid offer adjustment.  And you might recall, Your Honor, we

3     talked about 102-N; there's two types of adjustments.  There's

4     a price adjustment or a liquidity adjustment.  On equities, the

5     liquidity adjustment was done using data from December to

6     adjust prices from September.  There's no policy, no procedure,

7     nothing in Barclays' materials that supports that kind of

8     backdated bid offer adjustment where you use market data from

9     December to try and make adjustments to prices from September.

10    And that's 251 million dollars that results from that

11    adjustment done by Barclays.

12         There are many different ways of looking at the seven

13    billion dollar JPM issue.  One of the ways of looking at that

14    issue is I believe the way the Court saw that issue on the

15    22nd.  And there was a lot of discussion about valuation at

16    that hearing and here's how the Court described what it was

17    hearing.

18         It said, "I believe, if I'm understanding the

19    transaction correctly that the working premise of it is that

20    the 1.25 billion dollars in cash consideration which is going

21    to Barclays upon approval along with the securities that have

22    been identified, is intended to compensate Barclays diminution

23    in value over time those securities such that Barclays is

24    receiving the same seven billion dollars in value assuming it's

25    approved today and consummated tomorrow."  That's a connection

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 47 of 132

Page 47

1    Your Honor made based on the evidence presented to Your Honor

2    about the respective values of the securities.  "Am I right in

3    understanding that?" Your Honor said.  "That's a premise that I

4    have.  I just want to confirm it.  And then assuming that's

5    correct, I want to know what the current value of the

6    transaction is."

7            No one disabused Your Honor of your understanding that

8    really what was being sought to achieve through the December

9    settlement is providing Barclays the same seven billion dollars

10   in value that they were supposed to get as of September 2008.

11   So, one way of valuing the JPM collateral and cash is that

12   seven billion dollars at closing it was worth seven billion.

13           Professor Zmijewski has done an independent analysis

14   and not merely rested on that issue.  He's gone back and taken

15   a look at the prices ascribed by JPMorgan to that collateral as

16   of the 17th, that was the last day that they priced those.

17   Looked at the claim amount, the seven billion dollar claim

18   amount which was the subject of the settlement and he's

19   ascribed a value of 6.6 billion to the package of securities

20   and cash.  So, slightly less than the seven billion dollars and

21   what he has done is taken into account price movements between

22   the 17th and the 19th, pre-closing.  Pre-closing price

23   movements should properly be adjusted for.  He's made that

24   adjustment.  Post-closing, once risk of loss has passed to

25   Barclays, that's trading P&L.  That is not acquisition

Page 48

1    accounting -- acquisition valuation.  And that shows you, Your

2    Honor, on this slide 127 what the difference is.  That's a 1.6

3    billion dollar difference just on that one adjustment.

4           I'm going to skip over some of these slides and get

5    into the details on the equity.  Again, the details are in the

6    report.  There is a big price differential between value and

7    the equities as of the open on the 22nd versus the close of the

8    22nd.  He values them as of the close on the 19th because

9    that's the date of the most reliable market data that's

10   available when the markets -- when you go to value securities

11   at 12:01 a.m. on the 22nd.

12          There's been a lot of talk, by the way, Your Honor,

13   about the markets moving down over the weekend.  And Professor

14   Zmijewski looked at that.  Not true.  For the equities, not

15   true.  If you look at world indices, global indices, generally,

16   the markets opened up on Monday compared to the Friday close.

17   It was during the day on Monday that the markets -- the equity

18   markets proceeded to die down but by that time, the deal had

19   closed, risk of loss had passed.  And Mr. Washdell put a number

20   on that.  What's the impact of taking the 22nd versus the 19th?

21   And he said, 304 million dollars.  That's the impact.

22          Just briefly on the bid offer adjustment that was done

23   on the equities, this is using December data to do a bid out --

24   bid offer adjustment back in September.  No explanation as to

25   why.  The same type of data they used in December was, in fact,

Page 49

1   available on September 19th and the 22nd.  Not used.

2          Market data.  Reliable market data.  The same type of

3   data they used in December was available in September.

4          We'll move down quickly to the rest of these folks,

5   Your Honor.  Mr. Olvany, you looked at corporates, emerging

6   markets, rates, valued 22 different CUSIPs, 300 million dollar

7   differential.

8          Again, his qualifications are not challenged.  He's

9   got twenty years of experience in trading, sales, sales

10  management, major financial institutions, Your Honor.

11         We have an in-depth analysis of the Giants Stadium

12  bonds and that is in sharp contrast to what Mr. Teague, the PCG

13  analyst from Barclays said he did.  He said he just did a

14  cursory analysis of the Giants Stadium bonds.  Barclays didn't

15  have an auction grade business.  He didn't dig into it deeply.

16  But on this particular occasion because the BoNY prices were

17  low, they took the BoNY prices.  Without any questions asked.

18  No analysis done.  No double-checking by Professor Pfleiderer

19  and none by PwC.

20         Look what already happened to the Giants Stadium bond

21  prices post-closing.  They've taken in at 58 million, write

22  them off to 308 million a month later and write them off to a

23  hundred percent by the end of December.  And Mr. Olvany will

24  testify and tell you why that was improper.  Why all of the

25  reasons given for marking up those securities in September and

Page 50

1    October and December, in fact, the reasons that were known and

2    knowable to the market as of the date of closing.

3             Professor Schwaba -- Mr. Schwaba, he's challenged on

4    qualifications but only with respect to valuing option rate

5    securities.  He's got thirty-five years experience, Your Honor,

6    in fixed income and derivative markets.  Worked with municipal

7    securities in every position he has held since 1982.  He used

8    well-established, well-settled bond pricing methods including

9    looking at actual traded prices on the 19th of September the

10   very day this Court was hearing the sale motion, actual prices

11   in the market to come up with valuation for these securities.

12            Now, the part that they really take issue with,

13   Barclays really takes issue with is his valuation of the

14   auction rates securities where there's a price differential of

15   twenty-five million dollars.  What they skipped entirely over

16   is item number 1.  Those are seven bonds that Barclays valued

17   at one-tenth of one penny.  No reason given for why they're

18   valued at one-tenth of one penny.  That's 107 million dollar

19   difference.  And until we pointed it out to them, Mr. Teague

20   and the Product Control Group, PricewaterhouseCoopers, the

21   bonded auditors, Professor Pfleiderer who had done extensive

22   analysis, no one spotted this.  And what was the reason given?

23   The reason given by Mr. Teague was, well, it was inadvertent.

24   We just simply didn't notice that we'd left a one-tenth of one

25   penny price in the acquisition balance sheet.  That's what

Page 51

1     Mr. Teague had to say.  Starting with his deposition testimony

2     at 166, line 17.

3     "Q.  So, you basically priced it at close to zero?

4     "A.  As a placeholder.  We didn't know.  We didn't have any

5     data at all in the document.

6     "Q.  And if it was meant to be a placeholder, what were your

7     plans for updating that placeholder?

8     "A.  I believe that was -- I don't have that in front of me.

9     That was one of the assets that was brought up by the previous

10    deposition.  I believe that was just an oversight on our side.

11    "Q.  I'm sorry.  What was an oversight?  Pricing it at one-

12    tenth of one penny was an oversight?

13    "A.  Yes.  I believe that was an oversight on our part.  We had

14    no data to mark those assets.

15    "Q.  What have you done to correct that oversight?

16    "A.  The oversight itself was brought up after the opening

17    balance sheet was closed.  So, if they revalued it, maybe it's

18    a trading profit for whoever had those securities on their

19    books.

20    "Q.  When did you become aware of it?" towards the bottom of

21    page 167.  "Well, you became aware of it because of the

22    testimony that was provided in this case, right?

23    "A.  Correct.

24    "Q.  So, we brought it to your attention?

25    "A.  That's correct."

Page 52

1            Finally, Mr. Slattery who valued RMBS, various rates,

2       securities, which are interest rate securities of various

3       types, and various PMTG assets.  Again, principal, mortgage

4       trading and group assets.  Those are the classifications given

5       to these assets by Barclays.

6            You don't seriously question his qualifications.  He's

7       got twenty years of experience in the fixed income industry,

8       value and securities, financial modeling, risk management.

9       Dealt with these types of securities in 2008 when the market

10      was melting.  Knew the challenges posed by market movement and

11      brought that experience to bear in valuing the securities he

12      was asked about.  And one of the pieces that he focused on was

13      what's the appropriate bid-ask adjustment?  What's the

14      appropriate spread?  Has Barclays gone too far in taking too

15      wide a bid-ask adjustment?  And clearly, we disagree with the

16      bid-ask adjustments that were taken by Barclays.  Mr. Slattery

17      sets up what the appropriate analysis is.  How the Court should

18      consider it.  They may disagree with that, but, Your Honor,

19      that doesn't go to Daubert; that goes to weight.  They can

20      argue that case to Your Honor.  That's not a reason to exclude

21      him from appearing before Your Honor and giving the Court the

22      benefit of that analysis.  No one from Barclays is going to do

23      anything close to what these folks are going to do on

24      valuation.

25            One of the securities he was responsible for pricing

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 53 of 132

Page 53

1    was the Pine CLO.  And he will go into the details of how that

2    should have been priced.  Why it was improper to price it at

3    roughly 500 million dollars below where it was eventually

4    priced.  And it has been written up.  It was written up by

5    Barclays as of December 31.  Again, a trading profit excluded

6    from the acquisition balance sheet.  But whichever trader got

7    that Pine CLO on his or her books picked up about a 353 million

8    dollar gain as trading P&L.  Again, you can do that, you can

9    assign these kinds of low values but you have a buffer.  The

10   buffer that was so essential for senior management to have.

11           In closing, Your Honor, just briefly on Mr. Garvey who

12   is an accountant.  Again, no serious challenge to his

13   qualifications.  He's going to talk about a couple of key

14   concepts.  He's going to testify about what's the appropriate

15   measurement date and why it is appropriate given the APA and

16   given that closing occurred before the markets open on the

17   22nd, why it is appropriate to have valued the securities using

18   data from the close of the 19th.

19           He's going to comment also briefly, Your Honor, on

20   what it is that PwC did and didn't do and whether it, in fact,

21   qualifies as an independent valuation.  He is an auditor.

22   That's what he does.  That's what he has done.  He is qualified

23   to give opinions on accounting issues.  Professor Pfleiderer is

24   not.

25           And finally, Mr. Schneider.  And Mr. Schneider has

Page 54

1    extensive experience in dealing with a variety of financial

2    arrangements on Wall Street including repo agreements.  Has

3    intimate knowledge of who the main actors are:  JPMorgan and

4    the Bank of New York.  Has provided an expert opinion on the

5    role played by these custodial agents and pricing securities

6    and the responsibilities they have in making sure they get it

7    right.  And if they're going to err.  They're not going to err

8    on the side of overvaluing securities.  They're going to err on

9    the side of undervaluing securities.  So, this notion that

10   those values were inflated by JPMorgan and BoNY simply has no

11   competent evidentiary support.  I'm happy to answer any

12   questions the Court might have.

13          THE COURT:  None right now.  Thank you.

14          MR. TAMBE:  Thank you, Your Honor.

15          MR. HUME:  Your Honor, would it make sense to take a

16   short break or shall I begin?

17          THE COURT:  Let's just proceed.

18          MR. HUME:  Good morning, Your Honor.  May it please

19   the Court?  Hamish Hume from Boies, Schiller representing

20   Barclays.

21      Your Honor, perhaps like Mr. Tambe, I'll being with just a

22   briefer overview before coming to the substance of our motions.

23   We've heard a lot from the movants from the beginning of this

24   case about numbers.  High numbers that they believe should

25   apply to the assets versus Barclays' numbers that are lower.  I

Page 55

1    believe the public record will reflect and if the Court permits

2    Professor Pfleiderer to testify he will explain that as the

3    Court may also independently recall, in September 2008 in the

4    middle of that financial crisis there was profound concern

5    around the world amongst regulators, rating agencies, financial

6    press, etcetera, that financial institutions were not marking

7    certain kinds of assets accurately and that rating agencies

8    were not scrutinizing those assets accurately and that that's

9    why this financial bubble was bursting.  And the principal

10   culprits were securitized products, illiquid financial

11   products, collateralized loan obligations, collateralized

12   mortgage obligations, asset-backed securities, special uniquely

13   structured products like Pine, which I'll talk more about, that

14   didn't -- couldn't be valued easily, were not being valued

15   properly and were inflating the balance sheets of financial

16   institutions around the world.  And I just feel it necessary to

17   note as a threshold matter that it is -- the Court has

18   previously said that part of the nature of this proceeding and

19   the importance of transparency in this is its broader import

20   for financial institution regulation.  That this was  the --

21   one of the seminal events of the financial crisis and now we

22   have an airing of everything that happened in this portion of

23   that tragedy of the failure of Lehman and the Barclays'

24   acquisition.  And it is at least note -- worth noting that at

25   least to me and I think to the Barclays' side, there is some

Page 56

1    sense if irony that from that posture of September 2, 2008 and

2    concern that all these assets were overvalued, Barclays is now

3    being sued for ten billion dollars, eleven billion dollars,

4    thirteen billion dollars, eight billion dollars, the number

5    keeps changing but it's huge because we supposedly marked the

6    assets down too low and our auditors just didn't notice.  It's

7    not true.  As Gary Romain told you it would require a collusion

8    and conspiracy that even they are not willing to allege.  They

9    just like to insinuate it.

10         Now, with that beginning, I also would like to -- we

11   do have a demonstrative binder which I'd like to hand out.  I

12   would also like to take the Court back to where we were when we

13   hired Professor Pfleiderer and why we hired him, what we asked

14   him to do and what he's done.

15         THE COURT:  I have something called the "bench mama

16   binder".  I didn't look inside it, though.

17         MR. HUME:  The first slide is really an overview, so,

18   we can go to the second slide.

19         In September of 2009, the movant's filed their Rule 60

20   motions and we really heard a recitation of their major themes

21   from the beginning of Mr. Tambe's presentation.  They alleged

22   there was a discount, there was an unjustified windfall.  The

23   economics of the sale were not adequately disclosed and there

24   were lots of allegations about values of the assets using

25   things like what Mr. Tambe showed you:  An e-mail saying fifty-

Page 57

1    two, an e-mail that summarized BoNY marks and the seven

2    billion, the seven billion that never came, the BoNY marks that

3    Barclays never ever thought were reliable, an e-mail that the

4    author of which gave an affidavit saying these were not our

5    valuation.  He was deposed.  His deposition is designated.  We

6    can bring him in.  He knows nothing more than that he just

7    forwarded on that information.  But there were lots of numbers.

8    Lots of allegations.

9         And the allegations, the second bullet point, did not

10   rely upon any expert opinion.  They'd have these CUSIP lists as

11   we've shown the Court throughout the trial since the closing,

12   since before the closing.  They didn't hire experts then to

13   value it.  They didn't -- the allegations in the Rule 60(b)

14   didn't rely on any independent value location of the assets or

15   the values actually booked on the balance sheet which have been

16   audited by PwC.  Instead, the allegations were there was five

17   billion dollar discount.  There were these e-mails.  There were

18   deposition testimony.  It was confused but they had a story and

19   they told it.  There was a five billion dollar discount at the

20   beginning of the deal and then it was delivered through the

21   repo.  And then there's a 4.1 billion dollar gain and that came

22   from the discount.

23        They virtually ignored  -- except in one sentence in

24   paragraph 13 and one statement in a footnote in note 24 in an

25   eighty-page brief -- they virtually ignored the fact that our

Page 58

1    acquisition balance sheet actually showed values for the

2    securities much lower than their theory explained.  And that

3    they had been told that the value of the repo collateral was

4    actually 45.5 billion, the clearance box assets another billion

5    and a half.  It didn't all add up to fifty.  The reason we had

6    a gain, as the Court was told by Gary Romain, was there was net

7    value in the exchange traded derivatives.  Net value that

8    Barclays did not and could not know about at the time of the

9    closing that movants did not know about, that was the

10   consequence of Barclays taking on the risk of those positions

11   and they're being margin there.  And half of the gain related

12   to these intangibles.  They didn't address any of that.  They

13   ignored it in a way that made it seem like they were going to

14   play fast and loose with the numbers  -- an expression I used

15   for this Court the first time I appeared before you in this

16   matter.  So, we hire an expert to explain the big picture and

17   what had actually happened to actually look at the numbers and

18   explain them to the Court.  We did, of course, believe the

19   Court should dismiss this proceeding as a matter of law but we

20   thought if it was going to come to evidence, expert testimony

21   might be helpful.  And I should note that in discussing the

22   scheduling, we said, now, are you guys going to hire experts to

23   prove up these allegations?  Because you're the plaintiff.  You

24   should have your experts go first and then we'll have our

25   experts.

Page 59

1           The Court may remember there was a lot jostling about

2    scheduling.  That didn't work for them.  They said, what do we

3    need experts for?  We said, well, you're saying a lot of things

4    about numbers.  We think we better make sure you know what

5    you're talking about because it's not the numbers we have on

6    our acquisition balance sheet.

7           They didn't make this case then that we had lied on

8    our acquisition balance sheet.  It's not what they were saying.

9    They were just saying there was an e-mail with the number

10   fifty-two.  We said, okay.  We still think you all ought to

11   have -- if you're going to have experts you should go first.

12   They refused.  So, we went first.  We hired Professor

13   Pfleiderer.  He put his report out first which was unusual

14   given that they're the plaintiff.  And here's what he did -- if

15   we could go to tab 4.  I'm going to skip over his

16   qualifications because I don't actually think there's seriously

17   an issue.

18          If he's allowed to testify, Your Honor, Professor

19   Pfleiderer has done a number of analyses that will assist this

20   Court in evaluating the persistent claim from movants that

21   there was a five billion discount in the repo collateral.  What

22   he has done is look at what was actually received, review it,

23   and analyze why it was that BoNY marks could or couldn't be

24   used.  And I think before I get into the details, I think the

25   big picture difference of perspective that we have from what

Page 60

1    the movants have is what Professor Pfleiderer's approach was is

2    to say what were these assets?  What types of assets were they?

3    Does it make sense that you can't just take the BoNY marks or

4    is there some across the board five billion dollar write-down

5    as movants claim?  That was his analysis.

6           What he found and what he has done numerous analyses

7    to demonstrate is that over sixty-six percent of the assets

8    that came over are illiquid meaning Level 2 or Level 3 assets.

9    Assets which it is impossible to value based upon a daily

10   transaction price.  There is no market that you can just look

11   to and say what's it trading it?  It has to be valued through

12   modeling.  And many of them the modeling is not easy to define.

13   There are some third-party pricing sources which even movant's

14   experts don't believe are completely accurate.  There's also an

15   extremely important difference between how the repo custodians

16   like BoNY value these marks by marking them at the mid point

17   between the bid and the ask and marking them at the bid or exit

18   price as Barclays was required to do.  Professor Pfleiderer

19   explains that.

20          The difference between mid and bid is going to be very

21   small for assets that are liquid.  S&P 500 stocks at a normal

22   market.  For Level 2 or Level 3 assets, mortgage backed

23   securities, collateralized mortgage obligations and the like,

24   it could be a significant bid-ask.  For an asset that doesn't

25   trade at all, it can be an enormous bid-ask.  You don't really

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 61 of 132

Page 61

1    know what anyone will pay for it.

2         I would like to just briefly show Your Honor some of

3    this analysis in Professor Pfleiderer's report.  If I could --

4    I cite you a range of paragraphs where he does this but let's

5    jump if we could to his report and I'd like to show Appendix 4

6    and then Appendix 6.  In fact, maybe let's start with Appendix

7    6.  And what this analysis is going to show, Your Honor, is the

8    work Professor Pfleiderer did to analyze the difference between

9    the BoNY marks and the Barclays' marks to try to understand why

10   there was a difference and see whether it was justified or not

11   justified.  That is the nature of his expert testimony.  If we

12   have a technical problem, I can move on.  Well, it's Appendix

13   6, so, you need to look at the page number up there.

14        Let's move on and we'll come back to it later.  The

15   point that I wanted to show Your Honor is that in his

16   appendices to his reports, he lists out all the different kinds

17   of assets that came over and where the biggest discrepancies

18   were between BoNY marks and Barclays' marks to see was it just

19   uniform, was it just a hatchet job, let's knock five billion

20   off or do you see very small differences on assets that are

21   easy to value and very large differences on some of the assets

22   that are most illiquid and most difficult to value.  And that

23   is what he sees and that is what his opinion will show and

24   demonstrate and explain to the Court.

25        He's also done a number of analyses, as I've said, on

Page 62

1    the nature of the illiquid assets, what's Level 1 versus Level

2    2 versus Level 3, which he has recently supplemented and is

3    very relevant to determining how easy it is to value these

4    assets.

5           Let's go to the next slide, tab 5.  Still to this day,

6    Your Honor, the movants are telling you that the reference in

7    the APA to seventy billion dollars of long positions -- to a

8    book value of seventy billion was overstated by five billion

9    dollars.  Professor Pfleiderer, unlike their experts, has

10   actually tried to analyze the Lehman data to determine whether

11   that is true.  Their experts have not -- none of their experts

12   have looked at this.  It's not true.  Professor Pfleiderer is

13   the person who found out that it's not true by looking at the

14   data movants requests from his GFS system which hadn't even

15   occurred to us to look at.  They brought it to our attention

16   and Professor Pfleiderer reviewed it and said this doesn't --

17   this completely undermines what they're saying.  Let's get all

18   the data.  Let's get it for every day.  He got it.  He analyzed

19   it and he showed that it shows exactly the opposite.  It shows

20   that the long positions were actually lower than seventy

21   billion dollars on September 12th, 15th and 16th and the rest

22   of the week.  For every day that week.

23          And can we show this?  Can we show his supp -- his

24   declaration of April 23rd and the exhibits -- the first exhibit

25   to it?  Is that possible to pull up?  Okay.  Now, can we show

Page 63

1    the exhibits?

2        (Pause)

3            MR. HUME:  Okay.  There it is.  Now, this is the GFS

4    data that Professor Pfleiderer had analyzed and summarized.

5    And the total on the bottom shows the total for everything in

6    the GFS system in the Lehman inventory by its GAAP asset class.

7    It includes a line item for mortgages.  As Your Honor will

8    recall from the other times we've gone through this evidence

9    with witnesses, the mortgages were not included in the APA's

10   definition of the long positions.  And there was a good reason

11   for that.  They were the hardest and most illiquid assets.

12   That's where most of the problems were in that original

13   inventory.  They were too difficult to value.  Barclays thought

14   they were worth way less than Lehman, like half as much.  They

15   excluded half of them from the deal altogether and thought the

16   other half was still overvalued.  They are not in the long

17   positions.  If you pull out the 6.5 from the September 12th

18   column for this inventory, you're left with inventory of about

19   fifty-six billion.  In fact, less than fifty-six billion.  Now

20   the one thing this doesn't include is the line item in the long

21   positions called "Collateralized Short Term Agreements".  Those

22   are essentially loan repayments for repos that Barclays has

23   done where it is owed money from counterparties.  It's not

24   securities that can be remarked.  There is actually no record

25   evidence that there was any intention done to remarking them

Page 64

1    and I don't think they can be remarked.  They are listed on

2    every document as ten billion dollars.  So if you add ten but

3    subtract mortgages from every number on this page, you are at

4    less than seventy.  The actual Lehman marks for the long

5    positions were not higher than seventy billion dollars.

6    Movants keep telling you that they were and there's no actual

7    data showing that they were.  They say well, forget about the

8    data.  Don't look at the data.  Exclude the data and exclude

9    the expert who looked at the data.  That's what they want the

10   Court to do because Martin Kelly wrote an e-mail at 5 a.m.

11   saying there was a five billion dollar loss.  Five billion

12   dollar loss.  He didn't say, as Mr. Tambe said, we stayed up

13   all night negotiating a discount.  He said, we stayed up all

14   night, the deal's done and there's a five billion dollar all

15   and economic loss versus our marks.  Which marks was he talking

16   about?  I don't know.  September 12th?  Before it's actually --

17   before the mortgages are included or excluded?  I don't know.

18   Is he talking about the fact that the mortgages are not going

19   to be worth 6.5 in this deal?  I don't know.  But he's not

20   talking about long positions as defined in the APA being worth

21   five billion more than seventy billion because the data doesn't

22   show that.

23          And it's not that we are contradicting the testimony

24   of the witnesses.  Can we show the excerpt from Bart McDade's

25   trial testimony from April 27th, 2010?  Bart McDade, who

Page 65

1    testified extensively about this five billion, said it wasn't a

2    discount, said there was a negotiation over changing values and

3    the values had to be updated and the marks were stale.  That

4    was his testimony.  He said this:

5    "Q.  Mr. McDade, if you as the president of Lehman Brothers

6    wanted to know what the difference was between the valuation

7    number estimating the value of Lehman assets and the Friday

8    night Lehman marks estimating the value of those same assets,

9    am I correct that you would compare the valuation number with

10   the results from the GFS system?

11   "A.  Yes."

12          That's what Bart McDade said in trial.  Movants don't

13   want you to see the GFS data.

14          We're grateful that Your Honor has allowed the data in

15   and we hope you will allow Professor Pfleiderer to come in to

16   explain it including to explain this latest allegation that

17   there were 7,000 adjustments which Professor Pfleiderer

18   addresses in a declaration he submitted on September 1st where

19   he explains that he analyzed those adjustments:  (a) they were

20   made during an Alvarez & Marsal live environment.  Movants made

21   them in October; and (b) the sum total of all those adjustments

22   was approximately a hundred million dollars not five billion.

23   Professor Pfleiderer should be allowed to come in to explain

24   this to you.

25          Please move to slide 6, if we can go back.  The other

Page 66

1    thing Professor Pfleiderer has done with the GFS data is to

2    analyze the extent to which Lehman was updating the marks, an

3    issue that's been disputed and discussed in this trial.  As you

4    remember, there's an Alvarez & Marsal presentation from October

5    2008 saying what the marks were, a negotiated reduction of five

6    billion from stale marks.  It's a document we've emphasized to

7    the Court to show that movants' theory and beliefs of a five

8    billion dollar discount have been known to them since the week

9    of the sale.  Creditors' committee have similar documents.  But

10   then they say to explain away, they say, well, wait a minute.

11   The marks weren't really stale.  We were deceived because the

12   marks were not stale.

13        Well, Professor Pfleiderer has analyzed the extent to

14   which the marks were being updated.  Can we show briefly -- the

15   easiest way to do this may be -- he did it in his original

16   report, Your Honor, and then he had to slightly tweak very

17   nonmaterial clerical errors.  And so I might like to just show

18   the revised Exhibits 4 and 5 which are again attached to that

19   same September 1 declaration.  But again, this is -- was an

20   analysis done in his January 2010 report.

21        I don't know if it's possible to blow that chart up a

22   little bit.

23        Professor Pfleiderer looked at some of the more liquid

24   assets and looked at the extent to which their marks were

25   changing on the GFS system.  Look, for example, at Ceago (ph.),

Page 67

1    the first one.

2            Can you highlight that first line?

3            It does have a markup .435 on the 12th then .345 on

4    the 15th, .345 on the 16th, 17th, 18th, 19th.  It doesn't

5    change.  Bart McDade said the marks are not getting regularly

6    updated that week.  Movants contest that.  This data seems to

7    support it at least for certain kinds of assets.

8            And if you just look down each column.  The next one,

9    LCOR Alexandria LLC, .117 from the 12th all the way through to

10   the end of the next week.  Doesn't change.  Most of these just

11   do not change.  Insurance note cap taxable, .922, doesn't

12   change.  This is in the worst week of the financial crisis

13   after Lehman files for bankruptcy and the marks aren't

14   changing.  He calls this stickiness.  He's done an extensive

15   analysis of it.  It's relevant to the Court's understanding of

16   the facts and the assertions movants have made.  We hope the

17   Court will allow him to come in and explain it.

18           Let's go to tab 7.  These allegations -- again, I'd

19   just like to emphasize.  Professor Pfleiderer's report was

20   broader than defending the acquisition balance sheet valuations

21   because they didn't attack those valuations.  He did look at

22   them 'cause he wanted to make sure that when he said there was

23   no five billion dollar discount in the repo, he was confirming

24   that Barclays valuations were accurate and that the reason they

25   were different from BoNY was justified.

Page 68

1         But he also gave broader opinions about whether this

2    was a fair transaction, whether we did pay fair value.  What

3    does it mean to pay fair value in a transaction like this?  Was

4    the fact that we had a gain and negative goodwill evidence that

5    we did not pay fair value?  And on this, I would like to just

6    pause a moment, Your Honor.  I think there is a danger of what

7    I believe is a naïve presentation here, that if Barclays had an

8    acquisition gain movants want the Court to believe, that means

9    value transferred from the estate to Barclays.  And they say,

10   shock, that's not what was supposed to happen; it was supposed

11   to be the other way around.  That really is missing the point

12   of the transaction and everything the Court was told at the

13   time about the assets in the transaction.  The asset values

14   were plummeting.  They were disintegrating.  And the business

15   was disintegrating.  Without an acquisition, you have no

16   traders to manage the assets.  The market will implode even

17   worse than it was imploding.  And those illiquid securities are

18   not going to fetch forty-five or forty-six or anything close to

19   that in cash to be purchased.  They're going to be worth in the

20   thirties or less.  They're going to go way down.

21        So the notion that this was value the estate had that

22   it just transferred over to Barclays, no one knew about it and

23   it was a gift, is completely misleading and false.  And

24   Professor Pfleiderer will explain that based on his

25   understanding of financial markets and his expertise in

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 69 of 132

Page 69

1   valuation and the financial industry.

2        Let's go to the next tab, please.  Now, I'd like to

3   respond briefly to the experts' criticisms before I move on to

4   our criticisms of their experts.  They say that he was not

5   personally involved, that he just rubberstamps what Barclays

6   did.  As I've tried to show and will show with going through

7   his report, he does an extensive analysis of the data.  He went

8   through all of the spreadsheets.  He understands the nature of

9   the assets and his purpose was to analyze which assets were

10  marked differently from BoNY, why they were marked differently

11  and did it withstand his analysis as a valuation expert?  And

12  it did.

13       If we can go to tab 10.  The movants have suggested

14  that if all he did -- if all Professor Pfleiderer is doing is

15  giving the Court an opinion that the Barclays' valuation

16  methods were reasonable, that somehow makes it inadmissible,

17  that he has to independently come up with a number, specific

18  number, in order for it to be admissible.  That is not correct.

19  There is not a single case that holds that and there are

20  legions of cases saying that you can come in to testify as to a

21  methodology.  We give an example here.  Perhaps it's corny but

22  a doctor can come in and explain that another doctor acted

23  reasonably.  He doesn't have to redo the operation.  He can say

24  what the conduct that was done was within the range of what a

25  reasonable doctor would do.  Professor Pfleiderer is saying the

Page 70

1    valuations here are within a reasonable range.  These are

2    accurate fair market values.  There was no effort here to hide

3    five billion dollars of gain.  And he's looked at it from

4    multiple different perspectives.  That is admissible testimony.

5    There's no case saying you have to come up with your own

6    number.  And in fact, it is, in this circumstance, artificial

7    to try to come up with your own number when you're valuing

8    assets over two-thirds of which were not trading at the time.

9    And it is not accurate that movants' experts do come up with an

10   independent valuation.  They simply take Barclays' valuation

11   methods and tweak them and revise them, move them to another

12   date.  They use the same data.  They use the same concepts of

13   adjusting from mid to bid.  They just tweak the numbers a

14   little bit to inflate them.  That's not really an independent

15   valuation; it's just inflating the numbers.  So we have cases

16   here showing valuation methodology opinions are admissible.

17          Let's flip to slide 13.  Professor Pfleiderer is also

18   criticized for relying on staff.  There are lots of quotes that

19   you were shown of Barclays' valuation professionals not

20   remembering his name, saying I think the professor was on the

21   call, I don't know.  Yes.  It's true.  Professor Pfleiderer

22   used staff to gather data, to process data.  It's no question

23   that happened.  These interviews that were conducted, he was on

24   the phone.  I know that.  But there were also other people in

25   the room and on the phone.  His staff, working to gather the

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 71 of 132

Page 71

1   data to interview the witnesses.  He testified in his

2   deposition that he asked questions and his staff asked

3   questions.  The valuation professionals at Barclays didn't

4   distinguish between who was asking the questions, who was the

5   professor, who's the testifying expert.  They weren't geared up

6   to be litigation witnesses.  They were geared up to answer

7   questions candidly from people who were asking them.  The law

8   clearly allows Professor Pfleiderer to use staff to assist him.

9   And, in fact, it's completely standard practice that he did so.

10          We cite to you on slide 14 numerous deposition quotes

11   where Professor Pfleiderer explains the extensive review that

12   he did of the backup spreadsheets underlying Barclays'

13   valuation.  He combs through those spreadsheets.  Mr. Tambe

14   cites the deposition testimony where he says I didn't look at

15   it CUSIP by CUSIP.  What he says is, I looked at it column by

16   column.  I looked at the structure of the calculations.  I

17   looked at the types of CUSIPs and I looked at the nature of the

18   calculations.  And he did it himself personally reviewing the

19   native format of all of those backup spreadsheets.

20          I'm going to flip through the next few so I can move

21   on to movants' experts.  I think I've covered what's in slide

22   15 and 16.  And let me move on then to movants' valuation

23   experts.

24          We have three different arguments for why they should

25   be excluded.  The first is what we believe is the illogical and

Page 72

1    self-contradictory nature of their methodologies and unreliable

2    methods.  It's precisely because they purport to do these

3    independent valuations and yet don't and use methods that are

4    unreliable we think they are actually across the Daubert line

5    when Professor Pfleiderer, in a more cautious opinion, is not.

6           The second two bullets relate to our legal arguments

7    which I will come back to, Your Honor, after covering their

8    methods.

9           Tab 18.  There's an illogical disconnect between what

10   their experts have said in their reports, what Mr. Tambe is

11   insinuating or maybe explicitly saying this morning and what

12   they say in deposition.  Are the movants saying or not saying

13   that when Barclays published its acquisition balance sheet,

14   audited by PwC, filed with the Securities Exchange Commission,

15   filed with the FSA, are they saying or not saying that it was a

16   material understatement by five billion dollars.  That's a very

17   serious allegation.  Very serious.  And there's no question

18   five billion dollars would be material.  On a gain of four

19   billion, five billion would more than double the gain.  There's

20   no accountant who's going to say that's not material.  And yet

21   they won't say it.  They say it and then they don't say it.

22   They insinuate it and then they deny it.  They're not willing

23   to say Barclays lie but they want the Court to kind of believe

24   they lied.  It's not true.

25           In his expert report, the expert accountant says the

Page 73

1    acquisition balance sheet is not representative of the values

2    Barclays received.  I asked him in deposition, "Just so the

3    question is clear, my question is do you have an opinion, Mr.

4    Garvey, as to whether Barclays materially misstated the value

5    of the assets acquired in the Lehman Brothers acquisition on

6    its Form 6K filed with the SEC in February 2009?"

7    "A.  My opinions are in my report.  I don't have that opinion."

8         Came back later in the deposition -- there's ellipses

9    missing between these Q and As, just to make sure that there

10   wasn't a hang-up on this material point, I said, "I'm asking

11   you, are you giving an opinion that Barclays filed Form 6K with

12   the SEC in a manner that understated the value of the assets it

13   acquired from Lehman?"  In the deposition, I previously made

14   clear, I want to remove the word "materially" now from my

15   question.  So I asked it that way.  His answer:  "So let me

16   understand it.  So whether or not if it's off by one dollar?

17   Is that what you're asking me?"

18   "Q.  Do you know, do you have an opinion, whether it's off,

19   whether it's inaccurate, the SEC form that was filed by

20   Barclays?

21   "A.  I did not undertake to have an opinion on the accuracy of

22   this filing."

23        Their lead expert, who summarizes all of the valuation

24   work they did, Professor Zmijewski, said the same thing.  It's

25   illogical.  It doesn't make sense.  It's self-contradictory.

Page 74

1    And that is a grounds for exclusion.

2         Tab 19 is a quote from movant's reply brief in support

3    of their motion to exclude Professor Pfleiderer.  But it's an

4    encapsulation of what they've done to find five billion dollars

5    of write-down.  I think they think it's helpful for them to lay

6    it out for the Court.  I think it's helpful to lay it out for

7    the Court because I think it shows that it's a reverse

8    engineering -- tweak this, tweak that, tweak the next thing and

9    we can come up with five billion.  It is not -- they've had

10   discovery of our valuation methods, discovery of all our

11   acquisition balance sheets, e-mails, all the PwC documents.

12   They haven't found a single document that says make sure you

13   write it down by five million (sic).  Get it below fair market

14   value.  Nothing like that.  What they do is reverse engineer to

15   mark it up.

16        And the first thing they do, which I think is the best

17   evidence that they're not even talking about real economic

18   value here -- they're just trying to get a high number -- is

19   they quarrel with the valuation date which accounts for almost

20   half the five billion dollar difference.  But the biggest piece

21   of that -- and I apologize.  This footnote is hard to read.

22   It's their footnote.  I don't know if you can blow it up.  The

23   biggest piece of that 2.3 billion dollars is -- relates to the

24   December 2008 settlement, which is 1.65 billion dollars of the

25   total difference.  The last thing in the footnote, "See

Page 75

1    Barclays' use of a December 22 date, three months after the

2    sale transaction, to value the JPM inventory."  1.675 billion.

3            None of their experts, Judge -- none of their experts

4    are saying that what we actually got on December 22nd, when

5    this Court approved that settlement, was worth more on that day

6    than what we booked.  What we booked was three and three-

7    quarters billion in securities, one and a quarter billion in

8    cash.  Five billion.  Not exactly.  A little less than that.

9    Maybe another numerical coincidence but it was basically five

10   billion dollars transferred to Barclays in December 2008.  No

11   one quarrels that that's what it was worth in December.  No one

12   quarrels that before that, we didn't have it.  We had nothing.

13   We had a dispute over seven billion that we thought we'd been

14   promised.  And the Court's heard a lot about that dispute and

15   how it was resolved.  The claim was actually for seven billion

16   in cash.  But they say no.  What you have to do is take the

17   securities you got in December and figure out what they worth

18   in September and that's the value you're stuck with for

19   purposes of this lawsuit.  I don't know if they think for

20   purposes of the acquisition balance sheet.  But for purposes of

21   this lawsuit, they want to say that's what we got.  But we

22   didn't get it.  We didn't have it.  And their experts even

23   say -- I asked Mr. Garvey:  "Well, what if the settlement had

24   given us some   stock -- we just got the same value, 3.75

25   billion in assets that happened to have been worth five times

Page 76

1   that in September, fifteen or twenty billion.  Should that be

2   what we booked?  Should that be what is considered for the

3   windfall?"

4   "A.  Yes.  Yes."  That's what you're stuck with.  It doesn't

5   make any sense.

6          The rest of the valuation issues I'm going to come to.

7   The liquidity discount is based on their expert, Slattery,

8   which I will summarize.  And then they picked two extremely

9   illiquid, difficult-to-value securities.  And on both of them,

10  it's true, by the end of 2008, Barclays had marked them up from

11  what they had marked them at for September 22nd.  Their experts

12  marked them even higher and say -- rely upon things that

13  Barclays -- events that occurred after September 22nd that

14  changed the value of them and say well, that ought to all

15  relate back to September 22nd.  That's improper valuation

16  methodology by their own experts' admission.

17         Let me go to tab 20, please.  Here's the -- putting

18  aside the JPMorgan December 2008 settlement, the valuation date

19  for about a 300 million dollar portion of their inflation of

20  our values relates to this change from September 19th to 22nd.

21  Their expert, Mr. Garvey, is their accounting expert.  He is

22  there to answer to Mr. Romain whom you heard from.  Mr. Romain

23  explained that Barclays did initially use September 19th and

24  then at PwC's suggestion, used September 22nd which is, in

25  fact, the actual closing date.

Page 77

1          In deposition, Mr. Garvey said that his belief was

2    that the valuation date should be September 19th because that

3    was the closing date.  I asked him:  "Is that opinion based on

4    the understanding that September 19, 2008 was the date of

5    closing?"

6    "A.  It's based on my understanding that that was the date of

7    the closing, yes."

8          As the Court knows, that is factually false.  An

9    expert can and should be excluded when they base their opinions

10   on facts that are simply contrary to the record.  Now I'm sure

11   my friends will get up and remind you or demonstrate to you

12   that after two or three questions and answers like this and a

13   request for a break and then a second break, Mr. Garvey came

14   back and clarified his answer because his lawyer told him that

15   the closing was September and he said that doesn't change

16   anything.  But this is what he said first, more than once.

17         Let's go to tab 21, please.  This is the issue I

18   already described regarding the December 2008 settlement.  But

19   there is a point that I didn't make aside from the fact that

20   they're treating us as having received value when we didn't

21   have it.  What Professor Zmijewski does is he goes back to

22   September 17th values for the assets delivered to Barclays in

23   the summer.  But the September 17th values he uses are from

24   JPMorgan.  And their values that JPMorgan itself cautioned were

25   unreliable in two different e-mails.  One, Exhibit 640, an e-

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 78 of 132

Page 78

1  mail that was sent in early October, the counsel for JPMorgan

2  circulated those very same CUSIPs and said "I understand that

3  these collateral values were furnished principally by third

4  party pricing sources and we caution against using those values

5  as reliable indicators of realizable value."  That's JPMorgan's

6  lawyer talking about his client's own marks.  If he's willing

7  to doubt them and caution against reliance on them, I think

8  that we know there's good reason to be skeptical.

9      They do it again in November.  "Please note that the

10  'collateral value'", the number Professor Zmijewski relies on,

11  "was obtained from third party pricing sources.  JPMorgan

12  cautions that may not be a reliable indicator of realizable

13  value."

14      These e-mails are sent after September but they are

15  not saying I caution that they may be out of date 'cause that

16  was September and that is October.  They're saying, these come

17  from these third party sources and they may not be reliable.

18  The third party sources they're referring to are these third

19  party vendors.  You'll hear about them:  INTEX, FTID, other

20  sources of data that are used by financial institutions for

21  illiquid assets that don't trade.  And they give their best

22  effort to give marks but most traders and valuation

23  professionals recognize that they have to be taken with a huge

24  grain of salt, particularly, in the middle of a financial

25  crisis.

1           So for that reason, in addition, this 1.7 billion

2    dollar valuation adjustment that Professor Zmijewski uses on

3    the December settlement we think is arbitrary and unreliable

4    and a basis for exclusion.

5           Please let's go to tab 22.  The other piece of

6    analysis Professor Zmijewski does is to analyze the value of

7    the equities Barclays received.  And you heard a little bit

8    from Mr. Tambe about the bid-ask quotes.  And I think, if I

9    heard him correctly, he criticized Barclays for not using bid-

10   ask quotes in September.  They used them in December.  And

11   here's why.  And, by the way, I think Professor Zmijewski does

12   the same thing but he does it differently.  You can't use a

13   bid -- a bid-ask quote doesn't get stored forever in a system

14   so that today that we can look up on September 19th at 10 a.m.

15   or 11 a.m. what was the bid in the ask on X security.  It

16   doesn't get stored by most vendors.  You can't find it for most

17   securities and especially not securities that are not actively

18   trading.  So what Barclays did for the -- I can't remember how

19   many CUSIPs he got for the equities.  He found a subset that

20   had bid-ask information that was available from September.  It

21   found the same bid-ask quotes in December.  And it found the

22   ratio between the two.  And it applied that ratio to all the

23   equities to compare what is the general bid-ask relationship

24   between what's happening in the market in December and

25   September.  It's a very reasonable methodology.  If anything,

Page 80

1    it overstates values rather than understates because the

2    equities that don't have any bid-ask information at all from

3    September are going to be the most illiquid ones.  These were

4    not all S&P 500 securities.  Many of them were over-the-counter

5    or convertible equities not actively trading.  What Professor

6    Zmijewski does is he only uses the historical data and he does

7    not ensure that the bid and the ask are actually

8    contemporaneous.  So he can get a bid from one point in time

9    and an ask from another point in time and he can actually end

10   up with an inversion, a negative bid-ask which shows that the

11   data is unreliable by which I mean, he can show an ask below a

12   bid which can never be the case if it's contemporaneous or

13   nearly contemporaneous.  Again, it's an unreliable method and a

14   basis for exclusion.

15           Tab 23 simply summarizes the fact that the only other

16   thing Professor Zmijewski does is summarize what all the other

17   experts say.  And he admits if they have errors, he has errors.

18   In fact, he's admitted that for that chart you saw with the

19   windfall that he calculated that relies on this assertion that

20   Barclays was supposed to have a 1.85 billion dollar loss in the

21   transaction comes from Mr. Golden, an expert that movants have

22   withdrawn.  So already one piece -- one of the legs he stands

23   on has been pulled out.

24           That's Professor Zmijewski.

25           Tab 24 addresses Professor Slattery's methods.  You

Page 81

1    may recall that other than timing, the next big chunk of date

2    that the movants' experts used to tweak upward Barclays' values

3    are the bid-offer adjustments.  It's very important to note

4    movants' experts do not dispute that it was appropriate for

5    Barclays to mark the assets at a bid price and exit price, a

6    price at which they can actually sell the asset.  Again, the

7    difference between that and a midpoint price or an ask price is

8    not going to be significant for liquid heavily traded assets

9    but could be very significant for illiquid assets.  The repo

10   custodians do not typically mark at bid.  They mark at mid

11   prices so there is a need for an adjustment.  Movants' experts

12   adjust when they supposedly independently value assets.  They

13   adjust from the BoNY price.  They are also lower than the BoNY

14   price.  They just take a smaller adjustment, a smaller

15   percentage.  Their judgment on how illiquid the asset was is

16   different -- would be a generous way of describing it.  Their

17   desire to inflate the value of Barclays received would be

18   another way of describing it.

19          What Mr. Slattery does, his methodology for coming up

20   with a smaller bid-ask spread than Barclays did, is to go to a

21   1997 textbook to find a chapter in that textbook that has a

22   table with estimates of bid-offer spreads for certain kinds of

23   bonds.  A column that says "Normal" and -- or "Typical" and a

24   column that says "Distressed".  There's no data underlying that

25   single table in that book.  It says "Source:  Lehman Brothers"

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 82 of 132

Page 82

1    and a few others.  But it doesn't cite data; it doesn't say

2    where.  The author just maybe called someone up?  I don't know.

3    He didn't know.  It's just there in a 1997 book.  He then uses

4    that ratio of "Typical" to "Distressed" in that one piece of

5    paper in that 1997 book and applies that to data he gathered

6    from 1992 to 2002 and other data from 2001.

7         He admits in depositions that this technique he came

8    up has never been validated by an academic researcher, never

9    used by himself before this case and, to the best of his

10   knowledge, no other valuation professional in history has ever

11   used this technique.  This is not the kind of methodology on

12   which this case should be revaluing assets nor does it

13   withstand the Daubert standard.

14        Pine is the other big thing that Slattery does.  And

15   we can go to tab 25.  You've heard a lot about Pine.  It may be

16   helpful to go first to tab 26.  This is Pine as best as I can

17   show it pictorially, Your Honor.  Pine is a collateralized loan

18   obligation created by Lehman for Lehman and only for Lehman.

19   It was never going to be traded.  It was just going to be used

20   for financing transactions.

21        Pine held through a participation agreement both the

22   right to receive proceeds from and the obligation to fund a

23   series of leveraged loans to over fifty different corporate

24   borrowers all of which were actually counterparties directly

25   with a Lehman affiliate, LCPI, that, by the time of the

Page 83

1    Barclays acquisition, was bankrupt.  So LCPI holds leveraged

2    loans, obligations to fund loans to borrowers.  If the

3    borrowers are able to repay those loans, they repay them to

4    LCPI.  LCPI pays that out to Pine.  If the borrowers need to

5    draw down on those leveraged loans and borrow more, LCPI turns

6    to Pine and Pine is obligated to fund LCPI.  That's how a

7    participation agreement works.

8         At the time Barclays acquired the senior tranche in

9    Pine, 697 million dollars was already borrowed on these

10   leveraged loans.  So all these fifty borrowers had an

11   obligation at some point to repay approximately 700 million.

12   But there was still a right on the part of those borrowers to

13   draw down another 1.1 billion dollars in unfunded obligations.

14   And if they did, Pine was legally obligated to fund.  Pine

15   already held 367 million dollars.  So that 367 couldn't just be

16   paid out.  It was liable to be called for funding obligations

17   through LCPI.

18        Now, what are the risks in holding a piece -- a

19   tranche in this kind of entity?  Well, first of all, at the

20   bottom of the page, you have a risk that these borrowers will

21   not repay.  At the time of the transaction, the average S&P

22   rating for the kinds of borrowers here was, I think, eighty-two

23   percent risk -- or twenty-eight percent risk of non-repayment.

24   So there's immediately something like a twenty percent risk

25   you're not going to get repaid to LCPI.  Then there's a risk

Page 84

1    that LCPI, since it's bankrupt, can't pass any proceeds back up

2    to Pine.  Then there's a further risk that the 367 million Pine

3    holds will be called upon to fund the borrowers which then

4    compounds the amount of exposure for whether the funding will

5    come back.

6           And this is more controversial, but there is

7    potentially a risk that more of the 1.14 billion will be

8    called.  On that, it's important to note, and it was understood

9    at the time, that the people obligated to do that were Lehman

10   affiliates, the junior tranches.  It was what's called an

11   inverted structure.  They had the obligation to fund Pine not

12   Barclays.

13          However, if the borrowers are going to go bankrupt

14   unless they get funding, Barclays might conclude it has to

15   fund.  In addition, there's a conceivable legal risk that a

16   Court would restructure this or interpret this indenture in a

17   way that might put Barclays on the hook.  Those are the risks.

18          What's it worth on September 22nd, 2008, putting aside

19   the fact that you don't even know any of this until a few days

20   later that no one's going to buy it?  No way anyone's going to

21   buy that.  What's it worth?  Barclays came up with a value

22   taking into account all of those risks.  Professor Slattery

23   comes along and changes that valuation based upon the fact that

24   he either ignores the fact that there's a funding risk on that

25   367 million or he concludes that something that happened in

Page 85

1    late October which minimized that risk should be attributed

2    back to the September 22nd value.  Either way it's improper and

3    it's an unreliable method for valuing it.

4            And I would like to play what Mr. Slattery said about

5    Pine which you've heard about in Mr. Slattery's deposition.  If

6    we have the ability to play MS-2?

7        (Begin video deposition of first excerpt of Mr. Slattery)

8    Q.   Do you know when the Pine CLO was created?

9    A.   The origination date?  No, I do not.

10   Q.   Do you know for what purpose the Pine CLO was created?

11   A.   I do not know.

12   Q.   Do you know whether the Pine CLO was created with the

13   intent that it be marketed to investors?

14   A.   I do not know that -- have no knowledge, no.

15       (End video deposition of first excerpt of Mr. Slattery)

16           MR. HUME:  Could I just play quickly MS-4?

17       (Begin video deposition of second excerpt of Mr. Slattery)

18   Q.   What was the market for CLO's life in September of 2008?

19   A.   I don't have an opinion to the market for the CLOs in

20   September 2008.

21   Q.   And I take it you were not in any way involved in the

22   market for CLOs of the type represented by the Pine tranche A1

23   in September of 2008.

24   A.   Specifically that segment of the market, I was not.

25   Q.   Were any members of your team?

Page 86

1    A.   Not that I'm aware of.

2         (End video deposition of second excerpt of Mr. Slattery)

3         MR. HUME:  And finally, this is brief, MS-3.

4         (Begin video deposition of third excerpt of Mr. Slattery)

5    Q.   So your view is that the (indiscernible) you performed was

6    intended to predict what a willing buyer at that time in that

7    market would pay for the Pine CLO A1 tranche.

8    A.   I don't know if I would use the word "predict".  We tended

9    to quantify the price, the value of the A1 tranche of the Pine

10   CLO as of the 19th, yes.

11   Q.   And my question, just so we're clear, is in your mind is

12   there a difference between the value of the A1 tranche of Pine

13   CLO and what a willing buyer would pay for it on that date?

14   A.   I would agree (indiscernible) see that it's possible.

15        (End video deposition of third excerpt of Mr. Slattery)

16        MR. HUME:  And, Your Honor, I think that shows that he

17   didn't know what the market was for these kinds of products.

18   He's not even saying what a willing buyer would pay for the

19   product.  That's not a basis on which to reach a reliable

20   valuation.

21        I'm going to move quickly through the remaining

22   experts so I can summarize our legal arguments briefly before I

23   close.  Their expert, Mr. Olvany, similarly to what Mr.

24   Slattery does with Pine, uses ex post information to value

25   these giant stadium bonds.  These were failed auction rate

Page 87

```
 1    securities.  These were also assets that were not liquid, not

 2    valuable at the time.  And that's September 2008 period.  It is

 3    true that in November 2008, Goldman Sachs sponsored a new

 4    auction which brought value back to these bonds.  But they had

 5    failed at auction in March, have been no auction since then.

 6    And as Professor Pfleiderer can explain, if you don't have an

 7    auction for an auction rate security, you don't know what you

 8    have.  You have something that you can't sell, that is

 9    completely illiquid.  That's the way in which you trade in

10    auction rate security.  It's the only way.

11         Mr. Schneider, their repo custodian expert, is really

12    giving an abstract view that in his opinion repo custodians

13    know what they're doing.  He admitted, I have not seen a list

14    of assets.  I did not analyze it in any way.  Did not do

15    anything other -- I did not do anything other than see a list

16    of assets.  So he's seen the list but he didn't analyze it.  He

17    made no effort to determine whether the BoNY values were

18    accurate or whether the types of assets in the repo collateral

19    were those that are typically in the repo collateral.

20    Professor Pfleiderer, by contrast, has submitted testimony and

21    data analysis showing that over thirty percent, I believe,

22    maybe more, of the repo collateral would not satisfy the

23    bankruptcy rules on what constitutes a repo transaction.

24    Outside the bounds of even what a repo transaction is.  It's

25    such unusual collateral.  JPMorgan has given testimony to
```

Page 88

1    Congress in the last week.  Mr. Zubrow or Mr. Tambe cited

2    saying this was inappropriate collateral what Lehman was using.

3    He uses that exact phrase:  "inappropriate collateral".

4         Those are a summary, Your Honor, of the methodological

5    criticisms we have of the movants' experts.  I'd like to close

6    by briefly summarizing our legal arguments.  We were criticized

7    by movants of trying to retread arguments that the Court held

8    on April 9th.  It wasn't willing to decide this case based on

9    the papers.  We obviously understand that and respect that.

10   But there has now been several weeks of trial and there are

11   arguments that have not been decided one way or the other.

12        There are two distinct legal arguments which either

13   dispose of the need for movants' experts or would at least

14   sharpen the question of what exactly it is they're trying to

15   prove and must prove to be legally relevant to the issue before

16   the Court.  The purchase agreement doesn't provide any

17   valuation.  The sale order doesn't provide valuations.  The

18   lead lawyer for Lehman, Harvey Miller, agreed that Barclays was

19   acquiring these assets irrespective of their values.  It

20   doesn't mean values were irrelevant to what people were doing

21   that week.  It was relevant to Barclays.  You've seen e-mails

22   saying they were scared to death.  Rich Ricci:  "I am worried."

23   Rich Ricci.  If he thought that 52 was a real number, he would

24   not have been worried.  He was worried because he knew it

25   wasn't a real number.  So values were relevant.  But there was

Page 89

1    no rep or warranty that we definitely get such a value or we

2    are capped at such a value.  It was, we're buying the business.

3    That was Harvey Miller's testimony.  That's what the contract

4    and sale order say.

5         In that context and where the movants and the

6    creditors were given the list of CUSIPs before the closing,

7    they have a meeting with Michael Klein where he says it's 49.9

8    but it could be forty-four or it could be forty-five.  They

9    write e-mails saying we don't know if it's forty-five or forty-

10   nine.  We've got a five billion.  There's one thing that is

11   clear.  The values were uncertain.  Highly uncertain.  The

12   committee says, we can find marks for some of them but not for

13   a lot.

14        This deal closed with acknowledged uncertainty.  You

15   can't have mutual mistake when there's acknowledged

16   uncertainty.  And if there was acknowledged uncertainty at the

17   time and they believed the marks might be higher, they were

18   required to come forward and say, we need a true-up, we need a

19   valuation cap, we need something, if that's what they thought

20   they were entitled to.  But they didn't.  And there's a reason

21   they didn't.  Barclays wouldn't have agreed and they wanted to

22   split the sale.  Were in the middle of a most catastrophic

23   crisis since the Great Depression and they're not about to come

24   in and start tweaking with it.  They're not going to appeal the

25   sale order.  They're not going to ask you to put a provision.

Page 90

```
 1     They're not going to ask for reconsideration.  They knew the

 2     sale was in the best interest for them and for customers, so

 3     they didn't do it.  They came back a year later.  There's no

 4     way to understand that other than that they waited until the

 5     time seemed right.  And with the uncertainty of those values at

 6     the time, they can't come in now and hire eight experts or six

 7     experts to come in and say, well, now we've looked at it and

 8     now we think the value is x and therefore you got too much.

 9     All of our legal bars that we outlined in our brief should

10     prevent that.

11             Now there's a separate legal argument which is more

12     directly acutely focused on the movants' experts and doesn't

13     necessarily sweep across this entire proceeding the way the

14     argument I just made arguably does.  In December 2008 -- if you

15     can go to tab 35.  The SIPC trustee for LBI asked this Court to

16     approve a settlement.  As part of that request, the trustee's

17     motion said -- recounted facts of the repo transaction and that

18     by advancing the forty-five billion, Barclays was entitled to

19     49.7.  Citing to Shari Leventhal's declaration.  Nowhere in

20     that motion does it say, but, of course, Barclays is capped at

21     47.4.  Does not say that.  Nor did Mr. Kobak say that when he

22     came to this Court and asked this Court to approve the

23     settlement.  A settlement -- the transferred value -- it was

24     uncertain value valued by Barclays just under five billion

25     dollars, the same five billion dollars they now want the Court
```

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 91 of 132

Page 91

1    to order Barclays to give back.

2         The trustee said these assets should be transferred to

3    Barclays because it "really accomplishes the very transaction

4    contemplated in the purchase agreement as approved by this

5    Court".

6         That settlement agreement -- the Court approved the

7    settlement.  Tab 36 shows what's in the settlement agreement

8    that was attached to the trustee's motion that the trustee

9    signed and that the Court approved.  It was a broad release

10   between the trustee, Barclays and JPMorgan, a mutual release.

11   Because Barclays was giving up a claim for seven billion

12   dollars to receive assets that were worth much less than that.

13   Turns out to be about five billion.  So it was a mutual

14   release.  And here's what the trustee's relief to Barclays was.

15   "On behalf of LBI and the LBI estate, trustee hereby does and

16   shall be deemed to forever release, waive and discharge each of

17   JPMorgan and BarCap from and in respect of all claims, whether

18   known or unknown, foreseen or unforeseen, suspected or

19   unsuspected, liquidated or unliquidated, contingent or fixed,

20   currently existing or hereafter arising, in law, equity or

21   otherwise, relating to the subject funds" -- that was the seven

22   billion -- "the replacement transaction" -- that was the entire

23   repo transaction -- "or the delivered securities" -- what was

24   transferred to Barclays in December 2008.  That was the release

25   the trustee gave us in exchange for a release Barclays gave the

Page 92

1    trustee.  The Court approved that release in an order dated

2    December 22, 2008.  That order has not been challenged under

3    Rule 60(b).  The time for challenging it has passed.

4         The repo collateral -- and I don't think there's any

5    factual dispute about this -- was owned by LBI.  That is the

6    legal entity that owned that repo collateral.  That's what

7    Shari Leventhal's declaration says.  It's what all the

8    documents say.  I don't think anyone contradicts that.  So LBI

9    had the claim for any repo collateral it thought it should not

10   have to give Barclays or should get back from Barclays.  LBI is

11   the entity that gave us the release.  It's Black letter law

12   that a release by the party with a claim bars other parties

13   whose claims are purely derivative of the party giving the

14   release.  A parent company can only have a derivative claim to

15   LBI's entitlement, to LBI's property.  Creditors of the parent

16   company can only have a derivative claim.  They are barred by

17   that release.

18        Now, Your Honor, I'm very mindful of the fact that a

19   lot was said on December 22nd, 2008 about reserving rights.

20   And the creditors' committee said they needed to understand

21   things better.  But I'm also mindful of the fact that no one

22   stood up that day and said, Your Honor, there is a 47.4 billion

23   dollar cap and if this settlement gives them a penny more, it's

24   got to come back.  No one said that.  They waited another nine

25   months to try out that theory.  They said they needed

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 93 of 132

Page 93

1    information.  They said no collateral estoppel.  Court's order

2    says it was not be collateral estoppel or otherwise prejudice

3    any other matter.  We don't seek to use this release to bar the

4    trustee's arguments over the clearance box assets or any of the

5    movants' arguments, both the clearance box assets, the exchange

6    traded derivatives margin, the 15c3 assets.  The repo

7    collateral was settled.  And ironically, it was settled through

8    the transfer of five billion dollars, the five billion dollar

9    discount the committee's documents were talking about in

10   September and October and November.  And they asked for

11   information; we gave them information.  They didn't tell us or

12   the Court what they really -- what they later argued or what

13   their internal documents were saying at the time.  It was still

14   a time of extreme financial uncertainty, of extreme crisis.

15   The sale was still obviously a good thing and, apparently, they

16   didn't want to get in the way of that.  But for whatever

17   reason, they didn't say then what they're saying now.

18           In fact, we can go to tab 38.  The trustee responded

19   to the committee's objection -- the committee did object to

20   that settlement by saying this.  The one remaining objection,

21   Mr. Kobak said, the objection of the committee.  And their

22   objection, as I understand it, is primarily that they seek

23   extensive information about some background facts.  Then he

24   says this:  "The information that they seek we think really has

25   nothing to do with this aspect of the purchase agreement

Page 94

1    itself.  And it's just using this motion as a vehicle either to

2    reopen the Court's approval of the purchase agreement or to

3    investigate unrelated claims and transactions.  We think it's

4    too late to do the former."  And then with respect to the

5    latter, they can investigate if it's another issue, some other

6    issue.  They can take discovery and get information.

7         The Court's order overruled the committee's objection

8    as the trustee asked the Court to do.  It's simply not possible

9    to understand that release in that order as having any meaning

10   whatsoever that the movants can do what they're doing now.

11   They have to be legally barred from coming back here now to say

12   well, actually, we think the value is more than Barclays

13   thought it was.  It's not even like they discovered that

14   Barclays booked it and thinks it's fifty billion.  I mean,

15   they're actually coming in to say we're going to revalue it,

16   these CUSIP lists that we've had since September, and ask you

17   to undo -- in fact, they're not even asking you to undo the

18   release.  They're just asking you to ignore it.

19        Your Honor, the trustee himself in deposition -- the

20   trustee's 30(b)(6) representative himself in deposition

21   admitted that when he asked this Court to approve that December

22   settlement, the trustee had not reached any conclusion one way

23   or another as to whether the repo collateral in its entirety,

24   including what was being transferred in the settlement, was

25   worth more or less than 47.4 billion dollars.  I had to ask him

Page 95

1    the question twice because I didn't understand it.  He said no.

2    We reserved all rights.  I said, well, you asked for the Court

3    to approve a settlement and you're saying you thought it might

4    be transferring more than 47.4 billion and you gave us a

5    release but you thought you reserved all rights.  And he said,

6    yes.  We didn't know whether it was worth more or less.  Did

7    you tell the Court there was a 47.4 billion cap in some

8    clawback?  No, not exactly.

9          Your Honor, if there's anything -- I think I've been

10   clear that I don't think there's anything that can undo this

11   release.  But if there is anything that can undo this release,

12   it's got to be something more than treating us as receiving

13   assets at September values that JPMorgan disclaims that we

14   didn't get until December.  It's got to be something more than

15   looking up a new bid-offer adjustment from a 1997 textbook to

16   recalculate Barclays' bid-offer adjustment.  It's got to be

17   something more than saying you should use September 19th not

18   September (sic) 22nd.

19         The experts from the movants are trying to rescue a

20   theory that was launched before the movants knew that the value

21   of that repo collateral was not what the BoNY mark said.

22   They're reverse engineering a higher number.  It's not a basis

23   for undoing that release.  And I think on that basis, at a

24   minimum, our Daubert motion should be granted.

25         I don't have anything else, Your Honor, unless you

Page 96

 1    have questions.

 2         THE COURT:  Okay.  Thank you.  I don't think there's

 3    going to be an opportunity for rebuttal since rebuttal time

 4    wasn't reserved.  And I've had an opportunity prior to the

 5    argument to review the very extensive materials that have been

 6    submitted in connection with the motions that have been argued

 7    to this point.

 8         What I'm going to do is we'll take a lunch break and

 9    return at 1:45 to argue the McIsaac matter.  And I'll try to

10    give you a ruling from the bench this afternoon on everything.

11         And the presentations were excellent on both sides

12    and, in part, served as, I guess, preview of closing arguments

13    that I might be seeing as well.  Thank you very much for your

14    excellent presentations.  We're adjourned till 1:45.

15         (Recess from 12:32 p.m. until 1:49 p.m.)

16         THE COURT:  Be seated, please.  It's time for McIsaac.

17         MR. HUME:  Thank you, Your Honor.  Hamish Hume again

18    for Barclays.  I'll be presenting argument much more briefly,

19    Your Honor, on McIsaac, at least from our side.  We have a

20    motion to exclude his testimony both that's proffered on the

21    issue of the 15c3 reserve requirement and on the issue of

22    exchange traded derivatives.  And we have a few demonstratives

23    on these starting at slide 39 of the binder.

24         I'll address the 15c3 issue first and briefly -- our

25    arguments are laid out in our papers.  I think I would

Page 97

1    summarize them in two categories.  One relates to the

2    information he relied on and our access to it.  And the other

3    are two distinct legal issues that we think preclude his 15c3

4    testimony.

5              Let me begin with the two legal issues.  And it

6    actually would be slide 40 so it'll be out of order.  The first

7    is -- it's not actually fully laid out in the slide.  But Mr.

8    McIsaac is proffering testimony about shortfalls in the 15c3

9    reserve at LBI on September 19th.  He doesn't actually perform

10   a full calculation of the 15c3 reserve requirement but he does

11   allege a series of shortfalls on that day.

12             I think for two reasons -- and this slide is not

13   particularly helpful for the two points I want to make

14   actually.

15             THE COURT:  So I won't look at it.

16             MR. HUME:  Sorry.  The two legal points, I think, that

17   we have made and would make on this are, number one, once LBI

18   goes into SIPC liquidation, the 15c3 regime is really no longer

19   in effect.  That's anyway our legal argument.  And there may be

20   a legal dispute over that.  But we don't think Mr. McIsaac is

21   qualified or is not the place of an expert to give an opinion

22   on that legal dispute.  And he admits he has no experience in

23   the conduct of SIPA liquidations.

24             Clearly, the 15c3 reserve requirement is to protect

25   customers.  Once you're in a SIPC liquidation, it is then up to

Page 98

1    the trustee to determine how best to protect customers.  And if

2    the trustee decides to transfer property, the statute clearly

3    authorizes him to transfer any property, with Court approval,

4    to protect customers.  And so, we don't think the 15c3 reserve

5    requirement operates in the same way after a SIPC liquidation.

6    So for that one reason, we think his opinion is legally

7    irrelevant.  And he doesn't have experience to talk about the

8    relevance, if any, of the 15c3 requirement in a SIPC

9    liquidation.

10         The second legal argument we have is familiar to the

11   Court, I think, from our briefing that it's Barclays' position

12   that it was represented that there were these assets that could

13   be transferred.  It was represented that there were excess

14   assets in the requirement but there was also an agreement that

15   we would get the value one way or the other.  And we believe

16   the trustee had the authority to approve that and did approve

17   that.  And I know there is obviously a dispute about that, a

18   dispute about the Court's approval of that.  It was described

19   to the Court by Harvey Miller in his first report to the Court

20   after the transaction.

21         There's a legal dispute about it.  I don't think an

22   expert is necessary or proper to opine on that dispute.  So

23   those are the two legal arguments with respect to Mr. McIsaac's

24   15c3 testimony.

25         Slide 39 is an independent argument for exclusion

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 99 of 132

Page 99

1    which relates to the fact that -- there are a couple of aspects

2    of this.  But Mr. McIsaac essentially just worked with

3    information given to him from Deloitte & Touche, the trustee's

4    financial advisors, who gave him information about problems

5    they identified with the 15c3 calculation.  He admitted in

6    deposition that he made no independent effort to look for

7    transaction or events that might have adjusted the reserve

8    calculation in other ways.  This is a complicated calculation

9    that involves a combination of credits and debits.  And he

10   essentially only looked at things that made the reserve

11   requirement go up or the amounts held in the reserve go down

12   and didn't look for events that would have the opposite effect,

13   that would actually shown an excess.

14        But more importantly, the information he relied on

15   came from Deloitte and we haven't been given it.  Barclays

16   asked for that information and has been denied it and Barclays

17   does not have access to the information needed to do its own

18   independent assessment of the 15c3 reserve requirement.  So

19   we're handicapped in our ability to fully assess the work he

20   did.  So that is a factual argument or an argument about

21   available information that we believe is a basis to exclude his

22   testimony.

23        Those are our arguments --

24        THE COURT:  Okay.

25        MR. HUME:  -- on that.  And they're laid out in our

Lehman Brothers Holdings, Inc.

Page 100

1  papers more.

2         Now, Mr. McIsaac was first identified, in fact, in an

3  independent proceeding relating to the trustee's motion to

4  separate customer property from estate property on this 15c3

5  calculation.  And he does have operational expertise in the

6  15c3 regime.

7         He does not, in our opinion, have expertise in the

8  world of exchange traded derivatives.  Slide 41 begins our

9  argument on that.  He has only tangential understanding of

10  exchange traded derivatives.  He has nowhere near the kinds of

11  qualifications you've seen from two fact witnesses already, Ms.

12  James and Mr. Raisler.  And certainly, nothing on the order of

13  our independent expert, Tony Leitner, who spent his entire

14  career working in trading and evaluating and working on the

15  regulatory aspects of exchange traded derivatives.  He was

16  really, to our mind, an add-on when we came forward with -- as

17  I explained this morning, we put our experts forward first in a

18  slightly unusual scheduling posture.  And it was only after we

19  did that that the trustee asked Mr. McIsaac to, in addition to

20  his 15c3 work, do exchange traded derivative report to try to

21  respond to our expert.  He has no specialized knowledge in it.

22  He's never involved in negotiating the price of an exchange

23  traded derivative acquisition or in evaluating the risk

24  associated with exchange traded derivatives.  And in giving his

25  opinion -- so we think he's not qualified, is the first point.

Page 101

1    And the second is that in giving his opinion, he really did not

2    familiarize himself with the facts relevant to the overall sale

3    transaction and, specifically, relevant to the transaction

4    involving exchange traded derivatives which, as we've tried to

5    present to the Court through fact witnesses, is a unique part

6    of the transaction where the assets are also liabilities.

7    They're derivatives that are in the money and out of the money.

8    And the margin is held there to protect against downside risk

9    and liabilities.  And as our fact witnesses have explained,

10   that margin goes with the positions.  Now that may be disputed

11   but I don't think Mr. McIsaac has any basis for disputing it.

12   And I think his admissions in deposition show that.

13          I would like to just show very briefly a few short

14   clips, about two to three minutes, from his deposition that we

15   think establish his lack of credentials in this area.  I think

16   we start with DM-4.

17          (Begin video deposition of first excerpt of Mr. McIsaac)

18   Q.   What's your understanding of the risk of a VIX position in

19   a volatile market?

20   A.   I'm not a risk man so I don't know.  I wouldn't venture to

21   guess what the risk profile is.  We would normally use quants

22   and (indiscernible) methods to track that information.

23   Q.   Do you have an understanding of the risk profile of any

24   other types of exchange traded derivatives?

25   A.   Just from the standpoint of dealing with it and

Page 102

1    understanding how the market moves not from a risk standpoint

2    or evaluating a risk standpoint.  We have other people who are

3    responsible for that.

4    Q.   Is it fair to say that you're not an expert on risk

5    management in terms of proprietary trading?

6    A.   I'm not an expert on this type of risk trading, on risk

7    management.  Again, in our firm we would have separate people

8    that would be responsible for risk management process --

9    procedures.

10        (End video deposition of first excerpt of Mr. McIsaac)

11           MR. HUME:  So, Your Honor, the purpose of showing that

12   clip -- obviously, you've heard testimony about the VIX

13   positions that were extremely risky that Barclays learned about

14   shortly before the closing.  We don't think you can evaluate

15   the nature of the transaction with respect to exchange traded

16   derivatives without understanding the risks associated with

17   taking over exchange traded derivatives and, particularly,

18   positions like the VIX positions.

19           The next clip, which is shorter, relates to something

20   else the Court has heard about which is the nature of the

21   actions being taken by the clearing corporation that week who

22   held the risk on these exchange traded derivatives and were

23   threatening to seize them and liquidate them, in particular the

24   OCC.  This is DM-8.

25           (Begin video deposition of second excerpt of Mr. McIsaac)

Page 103

1    Q.   What is your understanding of the position that the OCC

2    took during the week of September 15th with respect to Lehman

3    Brothers as a clearing member?

4    A.   I'm not sure what position the OCC took with regard to

5    that.  I thought they were going on as business as usual.  They

6    looked like they were clearing their trades, satisfying their

7    trades.  So I don't see any -- haven't seen anything that says

8    (indiscernible).

9        (End video deposition of second excerpt of Mr. McIsaac)

10          MR. HUME:  Again, Your Honor, we submit that just

11   contradicts the facts in the record which is a basis for

12   exclusion under the Daubert standard.

13          One more clip which we think shows a lack of

14   familiarity with the record and a view that contradicts the

15   facts in the record relates to the options Lehman had to look

16   for alternative buyers at the time in that week in September

17   2008.  This is DM-7.

18       (Begin video deposition of third excerpt of Mr. McIsaac)

19   Q.   When you discovered the circumstances of the transaction

20   between Lehman and Barclays, on page 7 of your report, did you

21   consider among those circumstances the options that Lehman had

22   to the deal with Barclays?

23   A.   The options that Lehman had?  I guess Lehman could have

24   decided to sell or not sell.

25   Q.   Could they have decided to sell to a different entity?

Page 104

1    A.   I'm sure they could have.

2    Q.   Do you agree that the Court is being told at the September

3    19th sale hearing that it is almost academic for Lehman to find

4    another potential buyer at that point?

5    A.   That's what it looks like, yes.  But --

6    Q.   And do --

7    A.   Excuse me.  But it also says that they weren't marketing

8    for Lehman in the first paragraph on that page.  So maybe if

9    they did, they might have been able to find other buyers.

10        (End video deposition of third excerpt of Mr. McIsaac)

11             MR. HUME:  Your Honor, if you'll indulge me, one last

12   clip and then I'll be done which we think shows that based on

13   his unfamiliarity with the record which he was confronted with

14   in his deposition, Mr. McIsaac was candid enough to admit that

15   he was changing his opinion from what was in his report, at

16   least somewhat.  DM-3.

17        (Begin video deposition of fourth excerpt of Mr. McIsaac)

18   Q.   So when you say in your report the rational seller would

19   not include margin in the deal unless it was being compensated

20   dollar for dollar, do you mean what you say in that sentence or

21   are you modifying it here today?

22   A.   You are giving me facts that were not part of my opinion.

23   What I said in my opinion was the rational purchaser would want

24   to quantify the risk in determining what additional assets it

25   needed and the rational seller would include margin on a dollar

Page 105

1   for dollar basis.  As you negotiate that, you may change your

2   mind.  You may decide I'll take fifty cents on the dollar.  I

3   may take twenty-five cents on the dollar.  I may want a dollar

4   and a half on the dollar if I think the assets are worth more.

5   That's a negotiation that would occur at that time.

6        (End deposition video of fourth excerpt of Mr. McIsaac)

7            MR. HUME:  While we disagree with that testimony, Your

8   Honor, we think it shows that he's changing it based on facts

9   he's learning about the case that he didn't know when he gave

10  his report.  We don't think he's qualified in this area.  We

11  don't think he's looked at the facts relevant to exchange

12  traded derivatives.  And so we think he should be precluded

13  from testifying on that subject.

14           MR. OXFORD:  May it please the Court.  Neil Oxford

15  from Hughes Hubbard & Reed for the SIPA trustee.  I have a

16  small binder that, with the Court's permission, I'll hand up.

17           THE COURT:  That's fine.

18       (Pause)

19           THE COURT:  Please proceed.

20           MR. OXFORD:  Thank you, Your Honor.  There are some

21  slides in the inside pocket that are primarily what I'm going

22  to refer to in my presentation.

23           Following Mr. Hume's order of argument, Mr. McIsaac's

24  testimony in this case relates, on the one hand, to the 15c3

25  assets.  And those are in dispute in this case because of

08-13555-mg   Doc 11728   Filed 09/13/10   Entered 09/30/10 15:45:46   Main Document
Lehman Brothers Holdings, Inc.
Pg 106 of 132

Page 106

1   paragraph 8 of the clarification letter.  If movants are

2   correct then Barclays' right to that 769 million dollars that

3   was locked in the 15c3 account was conditioned by, amongst

4   other things, the existence of an excess on that particular

5   date.  Movants had anticipated that Barclays would attempt to

6   show that there was an excess in the c3 account as of the date

7   of the clarification letter.  And as Mr. Hume averted to, it's

8   for that reason we designated Mr. McIsaac's report which was

9   submitted in connection with the allocation motion in this

10  Court.

11          Now Barclays have not argued in this case or have they

12  attempted to show the existence of an excess in the c3 account

13  on September 19th.  No witness has come before Your Honor and

14  explained that that happened.  Now Barclays argues for the

15  first time on the motion to exclude Mr. McIsaac that the

16  correct date is not the 19th but the correct date is the 17th.

17  That is the correct date, they say, to determine whether or not

18  there was sufficient money in the customer protection account

19  to give that 769 million dollars to Barclays.  Barclays'

20  expert, Peter Vinella, who is yet to come before this Court,

21  states in his opinion that he believes there's an excess in the

22  c3 account of 225 million dollars on the 17th.  Now, for the

23  reasons set out in our papers, Your Honor, movants disagree

24  with that calculation.  We do not believe the 17th is the

25  correct date.  We think it's inconsistent with SIPA.  We think

Lehman Brothers Holdings, Inc.

Page 107

1    it's inconsistent with the requirements of the SEC in this

2    case.  And we think it's inconsistent with the agreement that

3    was reached between the parties.

4           That said, to ensure that we cover all bases, the

5    movants intend to call Mr. McIssac to explain that the

6    adjustments that needed to be made to the customer reserve

7    calculation as of the 19th also apply to the 17th.

8           With the Court's permission, I'd like to put the

9    slides up and very briefly take you through what Mr. McIsaac

10   would say about those issues.

11          If we could have the next slide, please?

12          Mr. McIsaac has experience in the financial industries

13   practices in calculating the customer protections account.  He

14   was the chair of the capital committee of SIFMA for a number of

15   years and he has thirty years experience in either performing

16   or reviewing or supervising those calculations.  And I don't

17   believe there's a dispute today as to Mr. McIsaac's

18   qualifications as to the calculation of the customer reserve

19   account.

20          Mr. McIsaac will testify, if he is permitted, that

21   LBI's September 19th reserve calculations were unreliable.

22   He'll testify that any calculation that does show an excess on

23   that date fails to account for a number of items including

24   Barclays' claim to Lehman's margin at the OCC and also to

25   assets that were held in Lehman's European arm, LBIE, which

Page 108

1    went into bankruptcy on the 15th.

2            Mr. McIsaac will also testify that these, and perhaps

3    other, adjustments need to be made not only to the calculation

4    on the 19th but also to the calculation on the 17th.

5            Do you have the next slide, Steve?

6            Turning to the first example that Mr. McIsaac would

7    testify to, Mr. McIsaac will be able to show that Lehman's

8    calculation of the customer protection reserve on the 19th

9    included a 500 million dollar debit item for Lehman margin at

10   the OCC.  He will explain that the customer protection rule

11   allowed Lehman to reduce the money that it had set aside in the

12   customer protection account by that 500 million because that

13   was already protected at the OCC.

14           Now as Your Honor is aware, Barclays claims that it,

15   under the asset purchase agreement, is entitled to that margin.

16   And if that is true, and movants clearly don't think it is,

17   then none of that 500 million dollars can be used to protect

18   customers.  And if that 500 million dollars has to be taken out

19   of the customer protection account, then the amount in the

20   customer protection account as of the 19th and as of the 17th

21   must be increased.  And Mr. McIsaac can explain the various

22   debits and credits that go into that complex calculation.

23           Can I have the next slide, Steve?

24           And the last example I wanted to give to the Court is

25   that the LBIE assets -- the week of the 15th -- Lehman Brothers

Page 109

1   Europe went into liquidation on the 15th.  Lehman Brothers Inc.

2   had approximately 400 million dollars of assets that were in a

3   safe custody account at LBIE which meant they were not included

4   in the formula.  And LBIE's insolvency filing meant that those

5   assets were no longer in a secure location and again, Mr.

6   McIsaac would testify that these have to be added to the

7   customer reserve protection calculation as of both the 17th and

8   the 19th.

9           Now turning to Mr. Hume's criticisms of Ms. McIsaac's

10  opinions, perhaps I can deal with that in reverse order, the

11  legal arguments first.  Mr. McIsaac's not an expert on SIPA.

12  We are not calling him as an expert on SIPA.  There's no

13  dispute as to that.  He's an expert in the SEC's Rule 15c3 and

14  we are calling him to explain the trade and industry custom and

15  practice with respect to those rules and the particular debits

16  and credits that should be taken into account in calculating

17  whether or not there was an excess on the 17th or the 19th of

18  September, 2008.

19          The second legal issue that Mr. Hume raised is the

20  issue as to what is the correct date for determining the -- and

21  mine to be looked up in the customer protection account as of

22  the date of the SIPA filing.  It's briefed in our papers, Your

23  Honor, I mentioned it before.  We believe it's the 19th for the

24  reasons set out there however we do not believe that it's an

25  issue on which Mr. McIsaac has anything to offer.  His opinions

Page 110

1    are consistent with the movants' position that the 19th is the

2    correct date but movants cannot rely on Mr. McIsaac to reach

3    that conclusion.

4          Mr. Hume had two substantive criticisms of Mr.

5    McIsaac's approach.  The first is, as I heard it, that Mr.

6    McIsaac reached his opinions without endeavoring to obtain all

7    of the relevant information.  And that, we submit, is simply

8    not true.  He's testified in deposition that Deloitte reviewed

9    all of the possible adjustments that could be made that would

10   be relevant to the customer protection rule calculation and

11   brought them to his attention.

12         And if we could bring up Mr. McIsaac's deposition,

13   Steve, at page 293?

14         Your Honor, it's also in your binder at tab 1.  Page

15   293.  Starting at line 2, Mr. McIsaac is asked:

16   "Q.  Were you asked by the trustee to identify transactions or

17   events that might have required adjustments on the debit side

18   of the reserve calculation?

19   "A.  All issues brought to my attention by the trustee would

20   have been reviewed.  There was no indication of only reviewing

21   the credit side.  In fact, coding errors did have an impact on

22   both the debit and the credit side."

23         And then skipping down a couple of questions and

24   answers at line 22:

25   "Q.  Do you know if the trustee looked for errors that would've

Page 111

1   caused an adjustment on the debit side of the reserve formula?"

2            Answer which goes over to 294:

3   "A.  I believe the trustee and his advisors looked for all and

4   any adjustments that would've impacted the 9/19 calculations."

5            So it's our position that it's simply not true that

6   Mr. McIsaac did not review all relevant information; he did, as

7   that testimony from his deposition makes clear.

8            The second criticism by Mr. Hume seems to suggest that

9   the movants had withheld from Barclays the relevant information

10  that they would need to determine the accuracy or otherwise of

11  Mr. McIsaac's testimony.  And that is simply not true.  As in

12  many cases these days, Your Honor, there is a stipulation in

13  place agreed between the parties that was intended to govern

14  and in some respects limit the expert discovery in this case.

15  It was Barclays' suggestion and the movants agreed to it.

16  Baldly speaking, under that stipulation, the parties were

17  obliged to produce all data and other information upon which

18  the experts relied.  And the movants have done that in this

19  case.  Every single piece of paper that relates to Mr.

20  McIsaac's opinion have been given to Barclays.  And this is

21  news to me if there's some alleged deficiency in our

22  production.

23           THE COURT:  My understanding from Mr. Hume argued is

24  that there are materials that have not been turned over from

25  Deloitte in particular.

Page 112

1          MR. OXFORD:  That is what I understood from him to be

2     arguing in his papers, Your Honor.

3          THE COURT:  Well, is it true --

4          MR. OXFORD:  It seems, in essence --

5          THE COURT:  -- is it true that there are papers from

6     Deloitte requested by Barclays that have not been turned over?

7          MR. OXFORD:  No, I don't believe so, Your Honor, not

8     at least in connection with these.

9          It seems that Mr. Hume is arguing that Barclays is

10    entitled to what Deloitte did not give Mr. McIsaac and that is

11    a vast and very late expansion of the expert discovery in this

12    case.  It is, I submit, a total frolic.  There's no suggestion

13    of any kind that Deloitte has withheld any -- excuse me, any

14    information from Mr. McIsaac that could be relevant in any way

15    to the c3 calculation.  In fact, his testimony suggests quite

16    the opposite.  As Your Honor is aware, it's -- it was a

17    decision of this Court on April 26th that Deloitte's activities

18    at the direction of the trustee are work product, that is --

19    that is true.  But nothing has been hidden from Barclays in

20    this case.

21         Barclays say they bought the business.  With the

22    business comes the books and the records.  Barclays also took

23    over the former Lehman staff who have knowledge of the books

24    and records.  They equally, just as Deloitte, could have

25    reviewed those books and records and if there were other

Page 113

1    adjustments that they believed needed to be made going one way

2    or the other to the reserve formula calculation, they were in a

3    position to do that.  So there's no prejudice to Barclays.

4         I would also note that it's not my understanding that

5    Barclays has even requested this information, work product or

6    otherwise.  There were two document requests since September

7    and October of last year which were narrowly tailored both in

8    scope and in time to the assets and the valuation thereof that

9    Barclays claims under the asset purchase agreement.

10        So, you know, I don't they've asked for it, and I

11   think it's too late to ask for it, but I also don't think they

12   need it.  They can go off, they can do their own work and they

13   can ask Mr. McIsaac about it at trial, if he's permitted to

14   testify.  They don't need Deloitte's work product in order to

15   do that.  To the extent Deloitte's work product was relied upon

16   by Mr. McIsaac, they have it.

17        THE COURT:  Right.  Why don't you move onto the next

18   issue?

19        MR. OXFORD:  Thank you, Your Honor.

20   On the subject of exchange-traded derivatives on margin, I just

21   wanted to make one preparatory comment about the way Mr.

22   McIsaac's testimony on the subject and also Mr. Leitner's

23   testimony on the subject fits into the framework of this case.

24   It is the movants' view that what is relevant to the

25   determination of the issues before this Court is what actually

Lehman Brothers Holdings, Inc.

Page 114

1    happened.  What the parties agreed or did not agree to with

2    respect to the derivatives and with respect to the margin and

3    that is why during the movants' case we brought Mr. McDade and

4    we asked him the question.  Mr. McDade says 'there's no margin

5    in the deal and if someone had asked me to put margin in the

6    deal, I would've refused'.  We called Harvey Miller.  Mr.

7    Miller said he had no conversations about margin.

8            We also brought the key Barclay's witnesses.  We

9    brought Mr. Ricci, Mr. Diamond and Mr. Hughes and they all

10   testified that they understood that margin was in the deal.

11   When we asked them who on behalf of Lehman agreed to that they

12   couldn't identify someone.  So Barclays has a big hole in its

13   case.  They don't have an agreement that they can point to.

14   Enter Mr. Lightner.  Mr. Leitner is a derivatives expert who

15   doesn't purport to testify on what actually happened in this

16   case.  He doesn't purport to interpret the legal agreements,

17   what he says is a hypothetical, rational purchaser would not

18   have taken Lehman's derivatives positions without also getting

19   a hundred percent of the margin no matter how much that was and

20   no matter whether they needed it or not.  And with respect,

21   it's our position, Your Honor, that that is largely, if not

22   entirely, irrelevant.

23           THE COURT:  What does that have to do with Mr.

24   McIsaac's ability to provide countervailing testimony?

25           MR. OXFORD:  Well, it's just -- it's context, Your

Page 115

1    Honor.  I don't think it makes Mr. McIsaac's testimony more or

2    less permissible.  It --

3            THE COURT:  You just tell me why you need it.

4            MR. OXFORD:  Well, I need it -- if Mr. Leitner comes

5    in, if they bring him, we will cross-examine him and we may

6    call Mr. -- Mr. McIsaac in rebuttal.  We may decide after

7    hearing what Mr. Leitner comes and says, if he comes at all,

8    that we don't it because as I've explained, Your Honor, it's

9    our view that this testimony is really neither here nor there.

10   It amounts to a lot of 'woulda, coulda, shoulda'.  However, we

11   don't think it's appropriate.

12           THE COURT:  Well, the Barclays position is that by his

13   own admissions during deposition, Mr. McIsaac knows nothing

14   about risk allocations and management procedures and so

15   wouldn't be in a position to testify one way or the other as to

16   whether margin would or would not ordinarily be part of a

17   transaction such as this.

18           MR. OXFORD:  Right, the clips that Mr. Hume --

19           THE COURT:  So the question is, is he qualified to

20   testify?

21           MR. OXFORD:  Yes, he -- and the answer is yes, he is

22   qualified.  If I could show -- do we have clips available?

23   Could I have Clip B, please?

24           Apparently, I have Clip B --

25       (Video Deposition Clip B begins mid-sentence)

Page 116

1    A.   -- worldwide futures business.  I worked on the -- and

2    finally you guys acquired the futures business from ABN AMRO --

3    the worldwide futures business.  I worked on the due diligence,

4    I worked on the preparation of our bid, although I didn't work

5    on the financial information, more a review -- quick review of

6    the aspects of it; how it would've impacted our firm.  I worked

7    on the due diligence, supervised the due diligence and some

8    respects of our financial professionals.  And was responsible

9    for the worldwide implantation from a finance standpoint of

10   bringing them onto our books and records.

11        (End Video Deposition Clip B)

12        MR. OXFORD:  Next could I have Clip D, for dog?

13        (Video Deposition Clip D begins mid-sentence)

14   A.   -- sometimes you may transfer the collateral that's in the

15   accounts already and then pay it back to the seller.  Just as a

16   means to do it efficiently.

17   Q.   And you -- if you were advising an entity, a seller, to

18   enter into that type of an arrangement, would you have

19   something written into an agreement somewhere to provide for a

20   true-up of that money?

21   A.   I would have something that explained what I was

22   purchasing.  And if I wasn't purchasing those assets, I might

23   have something in there saying I'll return them or else if I'm

24   not paying for them, I'd be obliged to return them.  I've done

25   a deal before; we've moved those assets over and then paid them

Page 117

1    back the next day.  It was just the ease of moving it into the

2    process of moving -- the change from things over.

3        (End Video Deposition Clip D)

4        MR. OXFORD:  Your Honor, I played that last clip in

5    particular in light of Mr. Raisler's appearance in this court

6    on Tuesday where Mr. Raisler testify as a lay witness in his

7    experience it would be 'complex and novel', I believe was his

8    phrase, for there to be a transaction in which only positions

9    and no margin were transferred from the seller to the

10   purchaser.  And we don't think that is true.  And Mr. McIsaac

11   who has experience on at least three transactions involving the

12   transfer derivatives positions says that he's got direct

13   experience of a transaction that he personally has done in

14   which exactly what Mr. Raisler says wouldn't happen, was novel

15   and complex, did happen.  So it's for those reasons, Your

16   Honor, that we think Mr. McIsaac is qualified to come and

17   testify and be a counterpoint to Mr. Leitner should Mr. Leitner

18   come.

19       THE COURT:  Okay, do you have more?

20       MR. OXFORD:  I don't need to show any other clips but

21   just to remind the Court that these references are in our

22   papers.

23       Mr. Hume talked about Mr. McIsaac being unfamiliar

24   with certain key undisputed facts.  And he said he did not take

25   them into account in his opinion.  And for the reasons we

Lehman Brothers Holdings, Inc.

Page 118

1    explain in our paper, that's not true.  Mr. McIsaac clearly

2    does take into account what he believes are the relevant facts.

3    The fact that he disagrees with Barclays as to the weight to be

4    given to those facts and the fact that he reaches a different

5    conclusion from Barclays, the fact they don't like what he

6    says, is not a reason for excluding.  I think even a cursory

7    review of Mr. McIsaac's report shows that he has a very

8    detailed review of the due diligence that Barclays did or could

9    have done that's in Section B to his report and he bases his

10   conclusions on that.  So for those reasons, we think if

11   Barclays doesn't like his answers, if they criticisms, then

12   those are matters for cross-examination at trial, not

13   exclusion.

14          And that's all I have unless you're Court -- unless

15   the Court has other questions.

16          THE COURT:  Okay, I just want to hear from Mr. Hume on

17   this discovery question although I don't want this to become a

18   discovery conference or debate.  I want to -- I want to better

19   understand what materials, if any, from Deloitte, if I

20   understand that right, have not been turned over.

21          MR. HUME:  And I wanted to rise to address just that

22   one issue too because I wanted to make sure there's no

23   disconnect in what was said here.

24          The argument I was making is Deloitte has access to

25   books and records of Lehman from before the closing on the

Page 119

1   whole Lehman business.  And it's those books and records that

2   are needed on all customers and all assets not all of which did

3   come to Barclays.  So while we acquired the books and records

4   for the business we acquired, we technically did not acquire

5   and we don't have access to books and records relating to

6   customers and assets we did not acquire.  You need the whole

7   thing to do a c3 calculation.

8           Mr. McIsaac, our allegation is, was essentially spoon-

9   fed the information.  I don't mean to be too pejorative, but he

10  was given the information from Deloitte in order for him to

11  build his report and say there's this problem, this problem,

12  that problem.  But he doesn't do a new calculation, he just

13  points out a bunch of problems that Deloitte told him.  So we

14  don't know what Deloitte has to paint the whole picture.  And

15  therefore we feel handicapped in that respect.

16          THE COURT:  Have you been given the materials that Mr.

17  McIsaac was in -- was given by Deloitte upon which he based his

18  opinion?

19          MR. HUME:  Yes, I assume so.  I trust my colleague's

20  statement on that and so that's the disconnect I do want to

21  clear up.

22          THE COURT:  Okay.

23          MR. HUME:  I think that it -- technically I understand

24  what he's saying about the stipulation.  I think it's a little

25  bit of a different situation because unlike just a normal

Page 120

1    consultant who may review things not all of which is given to

2    the expert here the consultant really has unique access to

3    information that we don't have that's needed to do the

4    calculation.

5          I do want to make sure that -- I think the facts are,

6    as we both agree, our interpretation of what we're entitled to

7    is different.

8          THE COURT:  All right and how is Barclay's prejudiced,

9    if at all, by virtue of the fact that certain unidentified

10   documents that Deloitte may have in its possession had not been

11   turned over to you if those documents were not documents that

12   Mr. McIsaac used in formulating his opinions?

13         MR. HUME:  Because it would allow us to show what his

14   opinions are failing to take into account for a complete new

15   calculation.  Our expert tells us he can't do a calculation

16   without all of the information.  Our fact witness -- our fact

17   witness, Mr. Martini, who gave an affidavit and was deposed,

18   says we don't have access to all the information for the reason

19   I just explained.  So to truly assess and recalculate the 15c3

20   requirement, which Mr. McIsaac has not done, we would need that

21   information.  And to properly attack or cross-examine him we

22   would need to say we understand what you're saying about the

23   eight things Deloitte told you but you haven't taken into

24   account all of this stuff that frankly we don't know about

25   whether it would help us or hurt us but it would be needed to

Page 121

1    paint the complete picture.

2           And in terms of asking for -- from my brief review of

3    the subpoenas, I think Mr. Oxford is correct.  The way -- the

4    only we asked for it was part of our motion to compel for work

5    product broadly.  So there -- I want to make sure I didn't

6    misstate anything on that.

7           Exhibit 16, that's our motion to compel, but it was a

8    broad motion to compel that we brought at the beginning of

9    trial.  And that's technically the formal way we asked for it.

10   We had a broad subpoena to Deloitte as well, but.

11          THE COURT:  All right.

12          MR. HUME:  Thanks.

13          THE COURT:  Does that take care of McIsaac?

14          MR. HUME:  Yes, thank you.

15          THE COURT:  All right.  Okay, I'm going to endeavor to

16   rule on each of these motions in limine.  The last one

17   involving Mr. McIsaac I may reserve on for at least the next --

18   take a ten-minute break after I give you my initial ruling and

19   provide you with my thoughts as to that separately.

20          I think I should note for the record that the motions

21   that have been filed by the parties have been very extensively

22   briefed included voluminous submissions of exhibits and

23   supplemental briefing including papers that were filed as

24   recently as a few weeks ago.

25          I understand that the motion as it relates to Harrison

Page 122

1   Goldin has been withdrawn voluntarily and I received a letter

2   from Hughes Hubbard & Reed confirming that that motion in

3   limine is not longer before the Court.

4          Each of these motions arises under Rule 702 of the

5   Federal Rules of Evidence and that rule has been interpreted by

6   a Supreme Court case by the name of Daubert and by virtue of

7   that, motions under 702 are generally known as Daubert motions.

8   Fundamentally, motions of this sort seek to exclude from

9   evidence testimony provided by experts whose testimony is

10  fundamentally unreliable for a variety of reasons.  The rule

11  itself reads, "If scientific, technical or other specialized

12  knowledge will assist the trier of fact to understand the

13  evidence or to determine a fact in issue, a witness qualified

14  as an expert by knowledge, skill, experience, training or

15  education may testify thereto in the form of an opinion or

16  otherwise."

17         And the rule continues, and I won't read every word of

18  it, but for purposes of the Daubert motion, one of the key

19  words in the rule is that the testimony of the witness be

20  'reliable'.  It is very difficult for a trial court judge

21  sitting as a Daubert gatekeeper to identify in advance of

22  hearing any actual testimony from a witness whether or not that

23  testimony will be valuable to the finder of fact and ultimately

24  reliable testimony.  So Daubert motions are, at least in my

25  experience, frequently brought, as I believe they were brought

Page 123

1    in these cases, to test in advance the reliability of evidence

2    and to give the Court a preview not only of the strength of the

3    testimony that might be offered but, more to the point, the

4    weaknesses of that testimony.

5          I believe for that reason that the Daubert motions

6    that I have seen, and they were all quite well done, more

7    likely than not were filed the view not toward prevailing but

8    toward educating the bench as to some of the infirmities in the

9    evidence to be presented during the expert phase of the case.

10         That's not to say that anybody who filed a motion had

11    any lack of faith as to the merits but I believe that the

12    general rule is that Daubert motions, except in very clear

13    cases, are rarely granted.  This case is no exception.

14         The Court has before it a number of related motions in

15    limine that seek to exclude certain witnesses from testifying

16    during the expert phase of this very protracted trial under

17    Rule 60(b).  With the exception of the McIsaac motion which I'm

18    reserving on for the moment, all of the motions that I heard

19    this morning are denied.  That's good news and bad news for

20    everybody.

21         The Court believes that valuation testimony from the

22    movants' witnesses assembled under the auspices of the Chicago

23    consulting firm, Navigant, would be useful.  And any issues

24    identified by Barclays concerning the reliability or

25    consistency of methods used by individual witnesses, such as

Lehman Brothers Holdings, Inc.

Page 124

1    Mr. Slattery, can be tested during cross-examination of Mr.

2    Slattery and all of the other witnesses who are the subject of

3    this motion.

4            As for the legal arguments made by Barclays, the Court

5    reserves judgment at this time as to the efficacy of those

6    arguments and as to the ultimate relevance of the valuation

7    evidence to be presented.  The Court does note that

8    considerable evidence regarding valuation, including evidence

9    relating to the acquisition balance sheet, already has been

10   presented during the trial and as a result, the Court believes

11   that movants should the opportunity to fully present their case

12   regarding the reasonableness of that accounting treatment by

13   Barclays.

14           The Court expects to be able to allocate appropriate

15   weight to the testimony in light of questions raised regarding

16   methodology and, most importantly, reliability.  In effect, I

17   always have the ability to discount testimony and for those of

18   you who are familiar with my decision in Iridium, recognize

19   that I have done that as to witnesses who have testified and I

20   don't need a Daubert motion to determine whether or not a

21   particular expert is credible and whether or not I should rely

22   on that expert's testimony.

23           That reference to Iridium brings me to Professor Paul

24   Pfleiderer.  Professor Pfleiderer, as I think everybody knows

25   in this courtroom, was qualified as an expert during the

Page 125

1    Iridium trial a number of years ago.  My prior experience with

2    that witness was a positive experience but that in no way

3    influences the current decision to permit him to testify.  He

4    is without doubt a qualified expert but the movants will have a

5    full opportunity by means of their questioning to challenge his

6    methods and to point out whether his experience is actually

7    relevant experience that fits the matters in controversy in

8    this case.

9           Now I'm going to take a few moments that think about

10   McIsaac and I will come back.  So let's take a -- let's take a

11   fifteen-minute break.  Do you wish to say something?

12          MR. SCHILLER:  If it's of any help to the Court, we do

13   not plan on doing anything further today, Judge.

14          THE COURT:  You do not --

15          MR. SCHILLER:  We won't be presenting video after Your

16   Honor's ruling on McIsaac today; we'll wait until the 20th.  I

17   just wanted Your Honor to know we talked with Mr. Gaffey about

18   it.

19          THE COURT:  That's terrific because I wasn't planning

20   to observe any video today.

21       (Laughter)

22       (Recess from 2:41 p.m. until 3:01 p.m.)

23          THE COURT:  Be seated, please.  I'm going to

24   incorporate by reference into the McIsaac ruling the things

25   that I said just before the break.  But this ruling is slightly

Page 126

1    different.  It seems to me that the objection in respect of Mr.

2    McIsaac's expertise in the area of exchange-traded derivatives

3    raises a reasonable question in my mind as to his expertise in

4    this area.

5            I am not comfortable excluding his testimony based on

6    the current record.  I recognize that it is likely that he will

7    be called, although I am not predicting to a certainty that

8    he'll be called, as an expert on the subject of 15c3-3.  To the

9    extent that he is called as an expert witness in that area, I

10   have no concerns as to his expertise both in respect of his

11   apparently not knowing all that much about SIPA and questions

12   concerning the turning over of documents from Deloitte.  Those

13   two subject matters are matters that don't concern me in terms

14   of this Daubert motion.  But I say that without prejudice to

15   Barclays' rights if they choose to exercise them further to

16   seek to obtain additional discovery.

17           I do have concern, however, that I don't have

18   sufficient information yet to decide the question of Rule 702

19   expertise in the area of exchange-traded derivatives and

20   believe that there should be an opportunity to voir dire Mr.

21   McIsaac on that subject at the time of his testimony.  I'd like

22   to have an opportunity to see more than just the snippets of

23   deposition testimony that I have seen in submissions and played

24   live today.

25           I don't know what he did in connection with the

Page 127

1    various transactions that were referenced.  I don't know to

2    what extent he may have other experience in the area of

3    exchange-traded derivatives nor do I understand what it means

4    when he says that he doesn't have expertise in the area of

5    risk.  I don't know if that's an acknowledgment that

6    effectively undermines his expertise or if he was talking about

7    something else altogether unrelated to margin.  If it relates

8    directly to margin, it's probably a disqualifying comment.  But

9    it may not be.

10          So it's a mixed bag as it relates to McIsaac.  The

11   motion is denied in terms of disqualification from testifying

12   but all rights are reserved with respect to his ability to

13   testify as an expert on the subject of exchange-traded

14   derivatives.

15          That takes care of all these motions.  And now I'd

16   like to say a few words in acknowledgment of my law clerk,

17   David Meskov, who is leaving chambers to go on a life adventure

18   and I hope to see him in good shape about a year from now.  I

19   want to thank him publicly for his good service and it's been a

20   pleasure to work with him.

21          As far as our schedule is concerned, our next

22   scheduled trial date is September 20th at 9:30.  And we're in

23   the expert phase so one of my questions is, if you can tell me,

24   what should I be expecting when next I see you?

25          MR. TAMBE:  Your Honor, on the 20th you would

Page 128

1  certainly expect to see Professor Zmijewski.  We will start off

2  the -- we will start off the expert phase with Professor

3  Zmijewski.

4          THE COURT:  Okay, and will that be a whole day?

5          MR. TAMBE:  I think it will be most of the day.  If --

6  as we prepare to present him, if we think we can get started on

7  another expert on the 20th itself, we will let the Court know.

8  We will certainly let counsel know by Monday, a week in advance

9  of the hearing date.  And we'll let the Court know as well.

10          THE COURT:  Okay, that week we have the 20th, the 21st

11  and the 24th.  There are some issues involving my schedule the

12  following week which is the week of the September 27th.  I need

13  to be away the night of September 28th.  And I don't come back

14  until roughly the early afternoon on the 29th.  For scheduling

15  purposes, while it will potentially be disruptive to the flow

16  of testimony I could see you on the 28th but I'd have to leave

17  by 11 a.m.  I don't know if you want an hour and half of time

18  but that's a possibility.

19          On the 29th I won't be back until probably 2 o'clock

20  in the afternoon.  I could give you, just to be on the safe

21  side, assuming I could get all of the court's services that I

22  require, a late session from say 3 to 6 if you wanted three

23  hours of time that day.  And you can think about that and let

24  my chambers know what you prefer.

25          MR. SCHILLER:  Your Honor, if I may address the Court

Page 129

1    on the fact that we are -- not completed our fact case.  We --

2    as I mentioned the other day, we have some video deposition and

3    we're considering calling a live witness and we'll notify

4    movants on Monday.  If Your Honor prefers that we wait until

5    the expert phase is done and I'm asking whether we do it first

6    thing on the 20th.

7            THE COURT:  Oh, you can do it in any way that you

8    think is sensible.  Ordinarily we would complete the fact phase

9    before going into the expert phase in any case and I can alter

10   the order to suit the convenience of the parties and witnesses

11   so it doesn't need to be with a bright line.  But if you and

12   counsel for the movants consider it appropriate to start on

13   Monday morning the 20th with the rest of your fact case as

14   opposed to starting with an expert, that's fine.  Or if you

15   want to fit that testimony into the odd days that I have just

16   identified if that works and would allow for use of that time

17   effectively, that's also a possible way to go.

18           MR. SCHILLER:  We'll discuss that and we'll advise the

19   Court next week.  The only other scheduling issue that I know

20   we'd agreed and probably failed to tell the Court is that the

21   24th, the parties do not plan to come before Your Honor on that

22   day.

23           THE COURT:  Oh, I think I did know that but neglected

24   to scratch it off my list.

25           MR. SCHILLER:  Thank you, Judge.

Page 130

1          MR. GAFFEY:  Just I think I can clear one thing up

2   now, Your Honor.  With regard to the 20th, I'd actually prefer

3   that we -- because it's scheduling experts and that's yet

4   another clock running.  If we could know we're doing the

5   experts starting on the 20th and then fit in these other little

6   fact pieces, the two videos and the -- or the videos and the

7   other witness in those smaller points, I think we can agree to

8   that now.

9          MR. SCHILLER:  Okay, well, we'll talk about it and let

10  the judge know.

11         MR. GAFFEY:  Okay?

12         THE COURT:  Why don't you talk about it; you can let

13  my chambers know.

14         MR. GAFFEY:  We will, Your Honor.

15         THE COURT:  Okay, meanwhile enjoy the weekend.

16         IN UNISON:  Thank you, Judge.

17      (Whereupon these proceedings were concluded at 3:10 p.m.)

18

19

20

21

22

23

24

25

Page 131

I N D E X

RULINGS

Page Line

5  Rule 60(b) motions seeking to       123   19

6  exclude certain witnesses

7  from testifying in

8  expert phase of trial

9  denied

10  Motion to exclude Mr. McIsaac       127   11

11  from testifying in expert

12  phase of trial denied

13  with rights reserved

Page 132

1                      C E R T I F I C A T I O N

2

3      I, Ellen S. Kolman, certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5

6

7      _____

8      Ellen S. Kolman

9

10     Veritext

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date: September 13, 2010

16

17

18

19

20

21

22

23

24

25