WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Peter Gruenberger, Esq.
Holly E. Loiseau, Esq.
Robert Lemons, Esq.

*Attorneys for Debtor and Plaintiff LBSF*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| LEHMAN BROTHERS SPECIAL FINANCING INC.<br><br>Plaintiff,<br><br>v.<br><br>PT MOBILE-8 TELECOM TBK<br><br>Defendant. | Adv. Proc. No. 10-<br>_____ |

**COMPLAINT OF LEHMAN BROTHERS SPECIAL FINANCING INC.
AGAINST PT MOBILE-8 TELECOM TBK FOR BREACH OF CONTRACT,
VIOLATION OF THE AUTOMATIC STAY, VIOLATION OF THE ADR
PROCEDURES ORDER AND DECLARATORY RELIEF**

Plaintiff Lehman Brothers Special Financing Inc. ("LBSF" or "Lehman")

as debtor-in-possession, as and for its Adversary Complaint against Defendant PT

Mobile-8 Telecom Tbk ("Mobile-8" or "Defendant" and together with Lehman the

"Parties"), hereby allege as follows:

## INTRODUCTION

1.      This complaint presents a straightforward case of the Defendant, Mobile 8's, willful and knowing, repeated violations of the automatic stay and this Court's own ADR Procedures Order.  At every turn, Mobile-8 has flaunted its utter disregard for the Bankruptcy Code, the authority of this Court, and the orderly and efficient administration of Debtors' estates.   Mobile-8 and LBSF entered into an ISDA Agreement and a Confirmation, defined herein, in August 2007.   Mobile-8 subsequently defaulted on its obligations under the Confirmation and has repeatedly refused to pay the amounts it owes in respect of the ISDA Agreement and the Confirmation.   These withheld payments constitute property of LBSF's estate, and Mobile-8's refusal to pay these amounts is an attempt to exercise control over property of the estate in clear and direct violation of the automatic stay.   LBSF's attempts to efficiently and expeditiously resolve its dispute with Mobile-8 through the ADR process have been thwarted by Mobile-8's refusal to proceed to mediation in direct violation of the Court's ADR Procedures Order which makes participation in mediation mandatory and requires that derivatives counterparties participate in good faith.   After initially engaging in the ADR process through the notice and response stage and joining LBSF for a series of telephonic settlement conferences, Mobile-8 subsequently ignored repeated communications from LBSF, the case manager, and the mediator seeking to schedule a date for the mediation.   Instead, as LBSF only recently discovered, Mobile-8 brought an action in an Indonesian court, seeking damages against LBSF in the amount of $15 million.   In this action, Mobile-8 claimed that the Parties' ISDA Agreement and Confirmation were invalid from their inception, alleged

that LBSF committed a tort under Indonesian law by sending Mobile-8 "fictitious bills" for the amounts due and payable by Mobile-8 to LBSF under their contract, and asserted that in committing this alleged tort, LBSF caused millions of dollars of damage to Mobile-8's "good image, name and reputation."  Further, in the Jakarta Action, Mobile-8 has requested that LBSF be prohibited from taking any action or initiating any proceeding to challenge the allegations in the Jakarta Action.  Apart from being completely frivolous, Mobile-8's Jakarta Action is yet another violation of the automatic stay, and further demonstrates Mobile-8's refusal to participate in good faith in the Court-ordered ADR process.

2.      Even though LBSF provided proper addresses and other contact information for both LBSF's in-house and outside counsel,  Mobile-8 failed to provide LBSF with notice of the Jakarta Action in a timely manner at the proper address. Therefore, LBSF first received a copy of the complaint in the Jakarta Action days *after* it was to appear before the court in Jakarta.  It is possible that a default judgment will soon be entered against LBSF in Indonesia.  The entry of such judgment could negatively impact the orderly and efficient administration of LBSF's estate for the benefit of all creditors.  To the extent that Mobile-8 does obtain a judgment against LBSF in the Jakarta Action, it is possible that such judgment could be enforced against LBSF's property abroad and would reduce recovery for legitimate creditors of the estate.  Indeed, Mobile-8 has detracted from the orderly administration of the estate merely by bringing the Jakarta Action, requiring the estate to devote resources to enforcing its rights under

the Bankruptcy Code.  Mobile-8 has likewise wasted LBSF's time and resources in its failure to comply with the ADR Procedures Order.

3.      Through this adversary proceeding, LBSF seeks to recover monetary damages for Mobile-8's breach of the ISDA Agreement and Confirmation, to obtain a declaratory judgment that Mobile-8 is in violation of the automatic stay and the ADR Procedures Order and that the Jakarta Action is void *ab initio*, to enforce the automatic stay and enjoin Mobile-8 from pursing the Jakarta Action, to compel turnover of the amounts owed by Mobile-8 to LBSF, and to recover sanctions for Mobile-8's repeated, deliberate, and knowing violations of the Bankruptcy Code and the ADR Procedures Order.

## JURISDICTION AND VENUE

4.      This is a civil proceeding arising in a case under the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, within the meaning of 28 U.S.C. § 1334.  It is properly brought as an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5.      The Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 1334(e)(1), and 28 U.S.C. § 157(b).

6.      This is a core proceeding under 28 U.S.C. § 157(b).

7.      Venue is proper in this district under 28 U.S.C. § 1409(a).

8.    The Court has personal jurisdiction over Defendant pursuant to the parties' ISDA Agreement and Confirmation, as defined herein, which provide for the application of the laws of the State of New York and pursuant to which the parties submitted to the jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York.

## PARTIES AND RELATED ENTITIES

9.    Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), Lehman Brothers Holdings, Inc. ("LBHI") and certain of its subsidiaries (collectively, the "Debtors") commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  LBSF commenced its chapter 11 case on October 3, 2008.  LBSF's chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only, and the cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  LBSF's principal place of business is located at 1271 Sixth Avenue, New York, New York 10020 and LBSF is authorized to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.    Mobile-8 is an Indonesian telecommunications company established under the laws of the Republic of Indonesia.  Mobile-8's principal place of business is located at Menara Kebon Sirih, 18th Floor, Jl. Kebon Sirih Kav. 17-19, Jakarta 10340.

## DERIVATIVES CONTRACTS AND THE ADR PROCEDURES ORDER

11.    The Debtors are parties to hundreds of thousands of derivatives contracts in which the obligations and values are keyed to one or more underlying assets or indices

of asset values and subject to movements in the financial markets.  Parties enter into derivative contracts for a variety of reasons that include:  (i) hedging against business risks; (ii) speculating in the changes of market rates or prices; and/or (iii) financing.

12.     Derivative contracts are typically memorialized by widely used standard forms, such as ISDA Master Agreements, which are forms developed by the International Swaps and Derivatives Association, Inc. ("ISDA") to document swap transactions between two counterparties.  Counterparties may make certain elections relating to the standard form through the use of a schedule and may utilize a credit support annex, another ISDA standard form document, to document credit support for the ISDA Master Agreement.  The parties then enter into individual transactions under the ISDA Master Agreement.  These individual transactions are customarily documented in the form of confirmations, which may set forth, among other things, the terms and conditions (certain of which may modify the terms and conditions of the standard forms), specified quantities and delivery dates for physical transactions, specified methodologies for calculation of payment amounts, and specified payment dates for financial transactions.

13.     In some cases, derivatives counterparties may elect to use what is commonly referred to as a long-form confirmation – a document that specifies the terms of a derivatives transaction, which functions as both a schedule and a trade confirmation. The long-form confirmation is typically used where the derivatives counterparties wish to engage in a derivatives trade but have not yet executed an ISDA Master Agreement.  The long-form confirmation typically states that it supplements, forms a part of and is subject

to the terms of, a standard form ISDA Master Agreement (whether or not one has been executed by the derivatives counterparties).

14. On September 17, 2009, this Court entered the *Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts* (the "ADR Procedures Order") [Docket No. 5207], with the stated goal of promoting judicial efficiency and the expedient resolution of disputes pertaining to derivatives contracts pursuant to which one or more Debtors assert that monetary recovery is due a Debtor from a counterparty.

15. Pursuant to the ADR Procedures Order, a Debtor may serve on a counterparty a notice containing sufficient information regarding the derivatives dispute to make the counterparty aware of the nature of Debtor's affirmative claim, a brief explanation setting forth the basis for the demand and the amount, and its demand for settlement. The counterparty must respond within thirty days of receipt of the notice, either accepting the settlement demand, or declining to settle for the amount stated in the demand and providing a brief explanation setting forth the reasons for such denial. The Debtor may then, within fifteen days from the date of receipt of the response, serve a reply in which the Debtor may modify its settlement demand, respond to any counteroffer, provide additional information in support of its demands, or reject any counteroffer. During the notice and response stage, either party may request an initial settlement conference.

16. To the extent that the derivatives dispute is not resolved during the notice and response stage, the dispute will proceed to mediation. The Debtors may initiate the

mediation by transmitting a copy of the notice, response, and reply to the court-approved mediators for allocation to a specific mediator. Once a specific mediator has been selected and notice of such selection is conveyed to the parties, the parties must then coordinate with the mediator to schedule the initial mediation date.

17.    The ADR Procedures Order requires each party to participate in good faith. To the extent that the Court determines that a party has not complied with the Derivatives ADR Procedures in good faith, the Court may issue such sanctions as it deems appropriate. The ADR Procedures Order specifies that sanctions against a derivatives counterparty that fails to participate in good faith may include, but are not limited to, "(i) attorneys' fees incurred by the Debtors with respect to the Derivatives ADR Procedures after the sending of an ADR Package; (ii) fees and costs of the Mediator; and (iii) an award of the Derivatives ADR Dispute up to the amount specified in the Derivatives ADR Notice."

## TRANSACTIONS BETWEEN THE PARTIES

18.    LBSF and the Mobile-8 entered into a long-form confirmation, dated as of August 8, 2007 (the "Confirmation," a copy of which is attached hereto as "Exhibit A"), pursuant to which the Parties agreed to be bound by the terms of the 1992 form ISDA Master Agreement, as if such agreement had been executed by the Parties as of even date therewith (together with the Confirmation, the "ISDA Agreement" a copy of which is attached hereto as "Exhibit B"). The Confirmation documented the swap transaction between LBSF and the Counterparty with a notional amount of $100,000,000 identified by Global ID No. 3267721 (the "Transaction"). Mobile-8, as the "Fixed Amount Payer"

agreed to pay LBSF, on the first calendar day of each March and September, from and including March 1, 2008 to and including March 1, 2013, a fixed rate equal to 10.45% of the notional amount of $100,000,000.  In exchange,  LBSF, as the "Floating Rate Payer" agreed to pay Mobile-8 what is known as a "range accrual" coupon.  Each day during a payment period, the 30-year and the 2-year Euro swap rates are observed.  For each day on which the 30-year rate exceeds the 2-year rate, the range accrual coupon "accrues." The range accrual coupon varies based upon the number of days during the period that the 30-year Euro swap rate is observed to be higher than the 2-year Euro swap rate.  On days where the 30-year rate exceeds the 2-year rate, the coupon is 11.25%.  Otherwise, the coupon is 0%.  At the end of each payment period, these amounts are netted and if the range accrual coupon is determined to be higher than the fixed 10.45% rate, a net amount is payable to Mobile-8.  Where the range accrual coupon is lower than the fixed 10.45% rate, a net amount is payable to LBSF.

19.    The Confirmation states that the Transaction will be governed by New York law, *see* Ex. A at 4, and incorporates the terms of the ISDA Agreement.  *See* Ex. A at 1.   The ISDA Agreement provides that "[w]ith respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably  . . . submits . . . to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York." *See* Ex. B at ¶ 13(b)(i).  The ISDA Agreement further states that each party "waives any objection which it may have at any time to the laying of venue of any Proceedings

brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party." *Id.* at ¶ 13(b)(ii).

20.     The first payment under the Confirmation became due by LBSF payable to Mobile-8 on March 3, 2008 in the amount of $440,000 (the "March 2008 Payment"). LBSF paid this amount on March 3, 2008.

21.     On information and belief, Mobile-8 experienced a change in management sometime in mid-2008, and Mobile-8's new management sought to invalidate the Transaction between the parties to avoid making any further payments that became due under the Transaction.

22.     The second payment under the Confirmation became due by Mobile-8 payable to LBSF on September 2, 2008 in the amount of $2,047,567 (the "September 2008 Missed Payment").  Mobile-8 failed to make this payment.

23.     The third payment under the Confirmation became due by Mobile-8 payable to LBSF on March 2, 2008 in the amount of $381,250 (the "March 2009 Missed Payment").  Mobile-8 also failed to make this payment.

24.     On March 16, 2009, LBSF delivered a notice to Mobile-8 exercising its right under the ISDA Agreement to demand adequate assurance of performance with respect to the Transaction.  Mobile-8 failed to provide adequate assurance of performance

and LBSF sent a Notice of Early Termination on March 31, 2009, designating April 7, 2009 as the Early Termination Date.

25.     On May 5, 2009, Mobile-8 sent a letter to LBSF, purporting to terminate the Transaction.  Such purported termination was ineffective because the Transaction had already been terminated at that time by LBSF.  At no time did Mobile-8 send any type of notice of payments due or valuation statement to LBSF.

26.     LBSF sent a Notice of Amount Payable on June 18, 2009 (the "Calculation Statement"), notifying Mobile-8 that it owed a Termination Payment in the amount of $2,560,472.  This Termination Payment included the March 2008 Missed Payment in the amount of $381,250, but, due to a clerical error, incorrectly excluded the September 2008 Missed Payment.[1]  Mobile-8 failed to make the required Termination Payment.

27.     Interest has continued to accrue on the September 2008 Missed Payment and on the Termination Payment.  As of September 17, 2010, Mobile-8 owed to LBSF a total of $5,869,178.54 comprised of (i) $2,560,472 in respect of the Termination Payment, plus $577,410.35 in interest; and (ii) $2,047,576.03 in respect of the September 2008 Missed Payment, plus $683,720.16 in interest.

---

[1] The correct Termination Payment, including the September 2008 Missed Payment is $4,608,039.

## **THE ADR PROCESS**

28.     On November 23, 2009, LBSF served a derivatives ADR notice on Mobile-8 pursuant to the ADR Procedures Order (the "ADR Notice").  In the ADR Notice, LBSF demanded payment of $2,560,472, plus interest,[2] in respect of amounts due and owing by Mobile-8 to LBSF in connection with the Transaction.

29.     On December 29, 2009, LBSF received a letter from Mobile-8 in response to the ADR Notice (the "ADR Response").  In the ADR Response, Mobile-8 expressed its belief that LBSF, and not Mobile-8, defaulted on the Transaction, and alleged that LBSF had engaged in some form of unspecified "fraudulent misrepresentation."  Mobile-8  provided no basis for this assertion.  Mobile-8 further alleged that it had terminated the Transaction by way of its letter to LBSF on May 5, 2009.

30.     On January 13, 2010, LBSF sent a Reply to the ADR Response (the "ADR Reply").  In the Reply, LBSF explained that Mobile-8's purported termination on May 5, 2009 was ineffective because LBSF had already terminated the Transaction, and refuted Mobile-8's unsubstantiated misrepresentation allegation.

31.     The Parties engaged in a telephonic Initial Settlement Conference on February 8, 2010 which lasted approximately 40 minutes, and had subsequent calls on February 22, 2010 for approximately 20 minutes, and March 16, 2010 for approximately 90 minutes.  After the Initial Settlement Conference, but before the February 22, 2010 call, LBSF became aware of the September 2008 Missed Payment, bringing the total

---

[2] As of November 20, 2009, interest had accrued in the amount of $236,226.

12

amount owed by Mobile-8 to LBSF to $4,608,039, plus interest.  During the course of the February 22, 2010 call, LBSF requested that Mobile-8 either provide evidence that it made the September 2008 Missed Payment, or immediately transmit payment in the amount of $2,047,567.03 to LBSF.  LBSF reiterated this demand by letter dated February 23, 2010.

32.    On March 29, 2010, LBSF transmitted the ADR Notice, Response and Reply to the Court-appointed mediators at JAMS, the mediation facility.

33.    In an effort to schedule the mediation between the Parties, the JAMS case administrator (the "Case Administrator") sent Mobile-8 email messages on March 31, 2010, April 12, 2010, April 14, 2010, April 22, 2010, and April 27, 2010.  The Case Administrator further attempted to contact Mobile-8 through its website-based inquiry form on May 7, 2010, and by telephone.  Mobile-8 responded to none of these messages, and the Case Administrator's call to Mobile-8's main phone line was neither answered nor directed to voice mail.

34.    On May 7, 2010, the Court-appointed mediator (the "Mediator") sent a letter to Mobile-8 indicating that he had been selected to mediate the Parties' dispute, and requesting that Mobile-8 provide its availability for a conference call to discuss scheduling the mediation.  A copy of the ADR Procedures Order was attached to the letter.  The package was sent via email, facsimile, and Federal Express.  Mobile-8 did not respond.

35.    LBSF received no further contact from Mobile-8 until September 10, 2010 when it first received a copy of the Jakarta Action, defined herein.

## THE JAKARTA ACTION

36.    On September 10, 2010, LBSF received both an Indonesian and an English language copy of a complaint allegedly filed on May 26, 2010 by Mobile-8 against LBSF in the Civil Court, Niaga, HAM Jakarta Pusat, Indonesia (civil case No. 247/Pdt.G/2010PN.Jkt.Pst) (the "Jakarta Action").  The copy of the Jakarta Action was forwarded to LBSF by the Consulate General of the Republic of Indonesia, and was accompanied by a letter dated August 27, 2010.  The address on the letter and on the complaint was incorrect, causing further delay before LBSF received notice of the Jakarta Action.  Despite having received numerous communications from both LBSF and LBSF's outside counsel during the ADR process, all of which provided accurate contact information for both LBSF and its counsel, Mobile-8 erroneously directed the complaint to LBSF's former headquarters at 745 Seventh Avenue, New York, NY 10019, which was sold to Barclays in September 2008, and did not serve LBSF's outside counsel with the complaint.  Barclays forwarded the package to LBSF on September 3, 2010, and it was received by LBSF on or around September 10, 2010.

37.    The letter accompanying the Jakarta Action indicated that an initial proceeding was scheduled to take place before the court in Jakarta on September 8, 2010 at 10:00 a.m., local time – several days prior to the date upon which LBSF first received actual notice of the pending Jakarta Action.  LBSF engaged local counsel in Jakarta and

learned that a second hearing on September 29, 2010 had been noticed in two Indonesian newspapers.

38.     In the Jakarta Action, Mobile-8 seeks to have the Transaction deemed invalid and brings several causes of action against LBSF, all premised upon the alleged invalidity of the Confirmation.  Specifically, Mobile-8 selectively quotes the language of the Confirmation to suggest, incorrectly, that the Confirmation would only become binding and effective when and if the parties execute a form ISDA Master Agreement (the "ISDA Form").

39.     Contrary to Mobile-8's assertions in the Jakarta Action, the express terms of the Confirmation state that "[t]his Confirmation evidences a complete and binding agreement between [LBSF] and [Mobile-8] as to the terms of the Transaction to which this Confirmation relates."

40.     The Confirmation further states that unless and until the Parties execute a form ISDA Master Agreement, "this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction."

41.     Mobile-8 alleges that the Transaction never became binding upon the Parties because the Parties did not execute an ISDA Form.  As a result, Mobile-8 alleges that the actions taken by LBSF to bill Mobile-8 for the September 2008 Missed Payment

15

and the March 2009 Missed Payment constituted a tort under Indonesian law.  Mobile-8's complaint ignores the facts that the Confirmation is a binding agreement and the Confirmation incorporated by reference the terms and conditions of the ISDA Agreement.

42.     Mobile-8 further alleges that LBSF is in violation of Bank Indonesia Regulation No. 7/31/PBI/2005 on Derivative Transactions (the "Indonesia Bank Regulation").   In fact, the Confirmation is fully compliant with the Indonesia Bank Regulation which requires that derivatives transactions shall be governed by contracts, and specifies that derivatives contracts must include the following terms: (a) ceiling on the derivative transaction; (b) base currency used; (c) currency or instrument to be exchanged; (d) settlement of the derivative transaction; (e) book keeping of gains/losses arising from the derivative transaction; (f) recording of unrealized gains or losses; (g) method or means of the derivative transaction; (h) amount of commission; (i) use of conversion rate; (j) advice and confirmation of the derivative transaction; (k) confidentiality; and (l) domicile and governing law.   These terms are included within the Confirmation itself, even without reference to the ISDA Agreement that is incorporated by reference into the Parties' Confirmation.

43.     Because the Confirmation is a valid, binding and enforceable contract between the Parties, there is no basis for Mobile-8's tort claims arising out of LBSF's attempts to contact Mobile-8 to receive payment of the amounts due under the Confirmation.

<u>COUNT I</u>

**(Breach of the ISDA Master Agreement by Failure to Make the Required
Termination Payment)**

44.     Lehman repeats and realleges each and every allegation set forth in paragraphs 1 through 43 as if fully set forth herein.

45.     Pursuant to the ISDA Agreement, LBSF, as the Non-Defaulting Party, was required to provide Mobile-8, as the Defaulting Party, with a calculation of the amount payable upon Early Termination.  ISDA Agreement, § 6(d)(i).  Mobile-8 was required to make the Termination Payment on or before June 18, 2009.  ISDA Agreement, § 6(d)(ii).

46.     Mobile-8 failed to make any payment to LBSF in respect of the Early Termination Date and accordingly breached the ISDA Agreement and its obligations to LBSF thereunder.

47.     Mobile-8's breach of the ISDA Agreement by failing to make the required Termination Payment resulted in damages to LBSF in the amount $2,560,472, plus interest.  LBSF should be awarded damages in an amount to be determined at trial but, in all events, no less than $2,560,472, representing the Termination Payment, plus interest at the Applicable Rate accruing from and including the Early Termination Date, through the date of payment.

## COUNT II

### (Breach of the ISDA Master Agreement by Failure to Make the Required September 2008 Missed Payment)

48.    Lehman repeats and realleges each and every allegation set forth in paragraphs 1 through 47 as if fully set forth herein.

49.    Pursuant to the terms of the Confirmation, a payment in the amount of $2,047,567 became payable by Mobile-8 to LBSF on September 1, 2008.  Mobile-8 was contractually required to make this September 2008 Missed Payment and failed to do so.

50.    Mobile-8's failure to make the September 2008 Missed Payment constitutes a breach of the Confirmation and its obligations thereunder.

51.    Mobile-8's breach of the Confirmation by failing to make the required September 2008 Missed Payment resulted in damages to LBSF in the amount $2,047,576.  LBSF should be awarded damages in an amount to be determined at trial but, in all events, no less than $2,047,576, representing the September 2008 Missed Payment, plus interest at the Default Rate accruing from and including September 1, 2008, through the date of payment.

## COUNT III

### (Declaratory Judgment that Mobile-8 Is Willfully Violating the Automatic Stay by Pursuing the Jakarta Action)

52.    Lehman repeats and realleges each and every allegation set forth in paragraphs 1 through 51 as if fully set forth herein.

53.    Pursuant to section 362(a)(1) of the Bankruptcy Code, the filing of a voluntary case under chapter 11 of the Bankruptcy Code operates to stay "the

commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).

54.    The Jakarta Action is a judicial proceeding brought by Mobile-8 against LBSF in which Mobile-8 has sought judgment on a claim that arose prior to the commencement of LBSF's chapter 11 case and is therefore an action of the kind barred by 11 U.S.C. § 362(a)(1).  Specifically, the Jakarta Action is premised on the invalidity of the ISDA Agreement and Confirmation, entered into by the Parties on or about August 7, 2007.  The collateral claims in which Mobile-8 alleges tort damages and injury to its professional standing are all premised upon the initial finding that the ISDA Agreement is invalid and unenforceable.

55.    As a direct and proximate result of Mobile-8's initiation of the Jakarta Action, LBSF has suffered, and continues to suffer, significant damages, including (but not limited to) the accumulation of legal costs and fees (including attorneys' fees and expenses) incurred by reason of the enforcement and protection of its rights.

56.    Under section 105(a) of the Bankruptcy Code, this Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under this section, this Court may order that the Jakarta action is void *ab initio*, enjoin Mobile-8 from pursuing the Jakarta Action and grant damages to punish violations of the automatic stay.

57.    Accordingly, LBSF is entitled to (1) a declaratory judgment that Mobile-8 acted in express violation of sections 362 of the Bankruptcy Code by initiating the Jakarta Action and that the Jakarta action is void *ab initio*; and (2) pursuant to section 105(a) of the Bankruptcy Code, LBSF is entitled to an order enjoining Mobile-8 from pursuing the Jakarta Action and an award of monetary damages, in an amount to be determined at trial and including (but not limited to) LBSF's costs and attorneys' fees and expenses, on account of Mobile-8's knowing and willful violation of the automatic stay.

### COUNT IV

**(Declaratory Judgment that Mobile-8 Is Willfully Violating the Automatic Stay by Withholding Payment of the Termination Payment)**

58.    Lehman repeats and realleges each and every allegation set forth in paragraphs 1 through 57 as if fully set forth herein.

59.    Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a voluntary case under chapter 11 of the Bankruptcy Code operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" absent an order of the Bankruptcy Court granting relief from the stay.  11 U.S.C. § 362(a)(3).

60.    The Termination Payment constitutes property of LBSF's estate, and Mobile-8's withholding thereof constituted, and continues to constitute, an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

61.    As a direct and proximate result of Mobile-8's withholding of the Termination Payment, LBSF has suffered, and continues to suffer, significant damages, including (but not limited to) loss of use of the amounts owed by Mobile-8 and all

accrued but unpaid interest, the opportunity cost associated therewith, and the accumulation of legal costs and fees (including attorneys' fees and expenses) incurred by reason of the enforcement and protection of its rights under the ISDA Agreement.

62.    Under section 105(a) of the Bankruptcy Code, this Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under this section, this Court may order that the Jakarta action is void *ab initio*, enjoin Mobile-8 from pursuing the Jakarta Action and grant damages to punish violations of the automatic stay.

63.    Accordingly, LBSF is entitled to (1) a declaratory judgment that Mobile-8 acted in express violation of sections 362 of the Bankruptcy Code by withholding payment of the Termination Payment; and (2) pursuant to section 105(a) of the Bankruptcy Code, LBSF is entitled to an order enjoining Mobile-8 from pursuing the Jakarta Action and an award of monetary damages, in an amount to be determined at trial and including (but not limited to) LBSF's actual damages, costs, and attorneys' fees and expenses, on account of Mobile-8's knowing and willful violation of the automatic stay.

## COUNT V

### (Turnover of the September 2008 Missed Payment and the Termination Payment Pursuant to Section 542(b) of the Bankruptcy Code)

64.    Lehman repeats and realleges each and every allegation set forth in paragraphs 1 through 63 as if fully set forth herein.

65.    Pursuant to the terms of the Confirmation, a payment in the amount of $2,047,567 became payable by Mobile-8 to LBSF on September 1, 2008. Mobile-8 was contractually required to make this September 2008 Missed Payment and failed to do so.

66.    Pursuant to the ISDA Agreement, LBSF, as the Non-Defaulting Party, was required to provide Mobile-8, as the Defaulting Party, with a calculation of the amount payable upon Early Termination.  ISDA Agreement, § 6(d)(i).  Mobile-8 was required to make the Termination Payment on or before June 18, 2009.  ISDA Agreement, § 6(d)(ii).

67.    The payments due to LBSF under the ISDA Agreement and Confirmation constitute property of the LBSF estate under section 541(a) of  the Bankruptcy Code.

68.    Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, *shall pay such debt to*, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."   11 U.S.C. § 542(b) (emphasis added).   Section 542(b) of the Bankruptcy Code clearly obligated Mobile-8 to pay the Termination Payment and the September 2008 Missed Payment "on demand" and its failure to do so was in express violation of the Bankruptcy Code.

69.    Accordingly, LBSF requests an order compelling Mobile-8 to turn over the Termination Payment and the September 2008 Missed Payment pursuant to section 542(b) of the Bankruptcy Code as it constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code.  Additionally, LBSF asserts a claim for interest at the Applicable Rate, as specified in the ISDA Agreement.

## COUNT VI

### (Declaratory Judgment that Mobile-8 Is Willfully Violating the
### ADR Procedures Order)

70.    Lehman repeats and realleges each and every allegation set forth in paragraphs 1 through 69 as if fully set forth herein.

71.    The ADR Procedures Order provides that participation in the ADR process is mandatory, and requires that all parties "participate in good faith, follow directions of the mediator, and otherwise comply with the Derivatives ADR Procedures…." ADR Procedures Order ¶ 5.

72.    A party that fails to comply with the ADR Procedures Order is subject to such sanctions as the Court deems appropriate.  ADR Procedures Order ¶ 12.  The ADR Procedures Order specifies that sanctions against a derivatives counterparty that fails to participate in good faith may include, but are not limited to, "(i) attorneys' fees incurred by the Debtors with respect to the Derivatives ADR Procedures after the sending of an ADR Package; (ii) fees and costs of the Mediator; and (iii) an award of the Derivatives ADR Dispute up to the amount specified in the Derivatives ADR Notice."  ADR Procedures Order, ¶ 12(b).

73.    Mobile-8 is in clear and willful violation of the ADR Procedures Order. After initially responding to the ADR Notice and participating in three settlement calls, Mobile-8 abruptly ended its participation in the ADR process, refusing to respond to LBSF, the Case Administrator, or the Mediator.  Mobile-8's filing of the Jakarta Action on May 26, 2010 further evidences Mobile-8's failure to participate in good faith.

23

Mobile-8's failure to participate in good faith and its failure to follow the directions of the mediator are sanctionable by this Court.

74.    Imposition of sanctions on Mobile-8 in the amount specified in the Derivatives ADR Notice plus attorneys' fees incurred by the Debtor after the transmittal of the ADR Package will prevent Mobile-8 from benefiting from its failure to comply with the ADR Procedures Order.  It will further serve as a disincentive to other derivatives counterparties who may consider refusing to participate in the ADR process.

75.    Accordingly, LBSF asks the Court to sanction Mobile-8 by (i)  ordering Mobile-8 to pay the attorneys' fees incurred by Debtors with respect to the ADR Procedures after the transmittal of the ADR Package to the Court-appointed mediators; (ii) ordering Mobile-8 to pay any fees and costs of the Mediator; and (iii) awarding to LBSF the amount specified in the Derivatives ADR Notice.

## **PRAYER FOR RELIEF**

WHEREFORE, Lehman respectfully requests that judgment be entered as follows:

A.    On Count I, a judgment finding that Mobile-8 breached the ISDA Agreement by failing to pay to LBSF the Termination Amount and awarding LBSF damages in an amount to be determined at trial but, in all events, no less than the sum of $2,560,472, plus accrued but unpaid interest;

24

B.      On Count II, a judgment finding that Mobile-8 breached the terms of the Transaction and awarding LBSF damages in an amount to be determined at trial but, in all events, no less than the sum of $2,047,576,  plus accrued, but unpaid, interest;

C.      On Count III, a declaratory judgment that in initiating the Jakarta Action, Mobile-8 has acted in express violation of section 362 of the Bankruptcy Code and that the Jakarta Action is void *ab initio*; and that pursuant to section 105(a) of the Bankruptcy Code, LBSF is entitled to an order enjoining Mobile-8 from pursuing the Jakarta Action and an award of damages, in an amount to be determined at trial and including (but not limited to) LBSF's costs and attorneys' fees and expenses, incurred on account of Mobile-8's knowing and willful violation of the automatic stay;

D.      On Count IV, a declaratory judgment that in withholding the Termination Amount payable by Mobile-8 to LBSF under the ISDA Agreement, Mobile-8 has acted in express violation of section 362 of the Bankruptcy Code; and that pursuant to section 105(a) of the Bankruptcy Code, LBSF is entitled to an order enjoining Mobile-8 from pursuing the Jakarta Action and an award of damages, in an amount to be determined at trial and including (but not limited to) LBSF's actual damages, costs, and attorneys' fees and expenses, incurred on account of Mobile-8's knowing and willful violation of the automatic stay;

E.      On Count V, a judgment that the September 2008 Missed Payment and the Termination Payment are property of the LBSF bankruptcy estate under section 541 of the Bankruptcy Code and requiring Mobile-8 to turn over, under section 542 of the Bankruptcy Code, the sum of $4,608,048, plus interest thereon, as applicable;

25

F.    On Count VI, a declaratory judgment that in refusing to participate in good faith in the ADR process, Mobile-8 has willfully violated the Court's ADR Procedures Order, and LBSF is entitled to an award of sanctions including (i) attorneys' fees incurred by Lehman with respect to the ADR Procedures after the transmittal of the ADR Package to the Court-appointed mediators; (ii) fees and costs of the Mediator; and (iii) the amount specified in the Derivatives ADR Notice;

G.    For such other and further relief, including interest, costs, and attorneys' fees, as the Court deems just and proper.

Dated:  New York, New York
          October 1, 2010

/s/ Robert Lemons
Peter Gruenberger, Esq.
Robert Lemons, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0019
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

- and -

Holly E. Loiseau
WEIL, GOTSHAL & MANGES LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 682-7000
Facsimile:  (202) 857-0940

*Attorneys for Debtors and Plaintiffs LBSF and LBHI*

# **EXHIBIT A**

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 08 August, 2007 |
| To: | PT Mobile-8 Telecom Tbk. |
| | Attention:    Documentation Unit |
| | |
| From: | Lehman Brothers Special Financing Inc. |
| | Confirmations Group |
| | Facsimile:    (+1) 646-885-9553 (United States of America) |
| | Telephone:    (+44) 207-102-6771 (United Kingdom) |
| | |
| Effort Id: | 1543713 |
| Global Id: | 3267721 |

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and PT Mobile-8 Telecom Tbk. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019



advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application

**General Terms:**

| | |
|---|---|
| Trade Date: | 8 August 2007 |
| Effective Date: | 15 August, 2007 |
| Termination Date: | 1 March, 2013, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 100,000,000.00 |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 1st calendar day of each March and September, from and including 1st March, 2008 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Calculation Period: | Commencing the 1st calendar day of each March and September in each year, every previous Payment Date (inclusive) to the Payment Date (exclusive), provided that the Initial Calculation Period shall be from Effective Date (inclusive) to the first Payment Date (exclusive) |
| Fixed Rate: | 10.45% |
| Fixed Rate Day Count Fraction: | 30/360 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 1st calendar day of each March and September, from and including 1st March, 2008 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Calculation Period: | Commencing the 1st calendar day of each March and September in each year, every previous Payment Date (inclusive) to the Payment Date (exclusive), provided that the Initial Calculation Period shall be from Effective Date (inclusive) to the first Payment Date (exclusive) |

| | |
|---|---|
| Floating Amount | 11.25% x Range Accrual |
| Range Accrual: | The number of days in a Calculation Period where the Range Index is greater than or equal to 0.00%, divided by the total number of days in the Calculation Period. |
| Range Index: | "Range Index" means  30Y EUR SWAP REF – 2Y EUR SWAP REF |

"30Y EUR SWAP REF" means:

For any day within a Calculation Period, the annual swap rate for EUR swap transactions with a maturity of 30 years, which appears on the Reuters Screen ISDAFIX2 under the heading "EURIBOR Basis - EUR" and above the caption "11.00 AM C.E.T" as of 11:00 a.m. Frankfurt Time on such day (or if such day is not a Business Day the immediately preceding Business Day).  Provided, however, that the rate for any day from and including the Rate Cut Off Date to the last day of the Calculation Period shall be deemed to be the rate in effect on the Rate Cut Off Date. "Rate Cut Off Date" means the 5th Business Day prior to the last day of the Calculation Period.

"2Y EUR SWAP REF" means:

For any day within a Calculation Period, the annual swap rate for EUR swap transactions with a maturity of 2 years, which appears on the Reuters Screen ISDAFIX2 under the heading "EURIBOR Basis - EUR" as of 11:00 a.m. C.E.T as of 11:00 a.m. Frankfurt Time on such day (or if such day is not a Business Day the immediately preceding Business Day).  Provided, however, that the rate for any day from and including the Rate Cut Off Date to the last day of the Calculation Period shall be deemed to be the rate in effect on the Rate Cut Off Date. "Rate Cut Off Date" means the 5th Business Day prior to the last day of the Calculation Period.

| | |
|---|---|
| Floating Rate Day Count Fraction: | 30/360 |
| Business Days: | New York; TARGET Settlement Day |
| Calculation Agent: | Party A, provided, however, where Party B disputes any determination, calculation or estimate, then (i) the relevant party shall pay the amount, if any, that is not in dispute and (ii) the parties shall promptly appoint an independent third party that would qualify as a Reference Market-maker (a "Substitute Calculation Agent") to resolve the dispute the determination of which shall be final and binding absent manifest error. Party B agrees to immediately notify Party A if it |

disputes any of Party A's calculation.

**Miscellaneous:**

    Office:                      For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office.

    Transfer:               Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

    Governing Law:        New York law; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

    Termination Currency:   USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

**Additional Termination Events.** Each of the following shall constitute an Additional Termination Event (as such terms is defined and used in the ISDA Form); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these Additional Termination Events:

    (i)       **Adequate Assurance of Performance.** Party B fails to provide Adequate Assurances of Performance in accordance with the following provision. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

             In the event that Party A has commercially reasonable grounds for insecurity concerning Party B's ability to perform any of its obligations under this Transaction, Party A may demand that Party B provide to Party A's reasonable satisfaction, Adequate Assurance of Performance in the form of written undertakings and/or evidence pertaining to Party B's ability, readiness and/or commitment to perform its obligations under this Transaction. Party B shall provide such written undertaking and/or evidence within three (3) Business Days of demand by Party A (the "Written Assurance Delivery Period").

             Party A may withhold or suspend its obligations under this Transaction throughout the Written Assurance Delivery Period until it receives the relevant Adequate Assurance of Performance from Party B.

    (ii)      **Sovereign Debt.** The Republic of Indonesia (a) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, any of its obligations, or (b) declares or imposes a moratorium, standstill or deferral, whether de facto or de jure, in each case in respect of its debt (whether principal, interest or otherwise) and, in either case, Party A determines in its reasonable judgment that Party B's ability to perform its obligations under this Agreement is likely to be materially affected by such debt

moratorium. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii) **Material Amendment.** Any constituent document of Party B is amended or modified in a manner which, in a commercially reasonable judgment of Party A, may have a material adverse effect on Party A under this Agreement or any Transaction hereunder or on the ability or authority of Party B to perform its obligations under this Agreement or any Transaction hereunder. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv) **Repudiation or Moratorium.** Party B or any authorized officer acting on behalf of Party B, whether pursuant to the ruling of any governmental authority with jurisdiction over Party B, or for any other reason, disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, or declares or imposes a moratorium, standstill, roll-over or deferral, whether de facto or de jure, on (i) any payment or other obligations of Party B with respect to Specified Indebtedness in an amount exceeding the Threshold Amount or (ii) any other obligations of Party B which in the aggregate exceed the Threshold Amount for the payment or repayment of money and, in either case, Party A determines in its reasonable judgment that Party B's ability to perform its obligations under this Agreement is likely to be materially affected by such repudiation or moratorium. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(v) **Sovereign Event.** Party B is not able to discharge its obligations with respect to a Transaction through the relevant booking office as a result of any law (other than bankruptcy, insolvency or similar laws), order or other action by, or threat of any such law, order or other action by or on behalf of, any governmental or other similar authority (de jure or de facto) at the location of such office. Party A determines in its reasonable judgment that Party B's ability to perform its obligations under this Agreement is likely to be materially affected by such sovereign event. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(vi) **Non-Convertibility Event.** Party A has determined in a commercially reasonable manner that either of the following has occurred and that any such occurrence has not been satisfactorily cured: (1) a local market condition has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Indonesian Rupiah for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange or (2) an action or failure to act by the government of the Republic of Indonesia or any agency or regulatory authority thereof has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Indonesian Rupiah for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange and, in either case, Party A determines in its reasonable judgment that Party B's ability to perform its obligations under this Agreement is likely to be materially affected by such non-convertibility event. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(vii) **Revocation/Loss of License.** The voluntary or involuntary revocation, suspension or loss, in whole or in substantial part, of any material license, approval or enabling permit of Party B's from the Ministry of Communications and Information Technology. For the purpose of the foregoing Additional Termination Event, Party B shall be the Affected Party.

**Additional Representations of Party B.** Party B represents to Party A in accordance with <u>Section 3</u> of the ISDA Form (which representations will be deemed to be repeated by Party B at all times until termination of this Transaction) that:

(1)    Subject to applicable laws and regulations from time to time, no authorization or approval or other action by, and no notice to or filing with, and no license or other certification from, any governmental or quasi-governmental authority, regulatory or self-regulatory body or any other entity or party is required to be obtained by or on behalf of Party B for the due execution, delivery, registration, filing or performance by Party B of its obligations under this Transaction (other than any required filings or reporting to Bank of Indonesia with respect to the transfer of foreign exchange to and from abroad, which Party B agrees will be made in full compliance with applicable law and which shall not affect Party B's other duties or obligations hereunder) at the time of entering into this Transaction. Party B represents and warrants that no agreement, law, regulation, decree, rule or other writing or pronouncement by any entity will affect the legality, validity or enforceability of the obligations of Party B hereunder, which obligations will be satisfied on the terms, conditions and manner set forth in this Confirmation for this Transaction.

(2)    (i)    **Complex Risks.** It understands that this Transaction is subject to complex risks which may arise without warning and which may at times be volatile, and that losses may occur quickly and in unanticipated magnitude.

    (ii)    **Sophisticated Investor.** It is a sophisticated investor able to evaluate the terms, conditions and risks of this Transaction and accepts such terms, conditions and risks.

    (iii)    **Assumption of Risks.** It is capable of assuming, and assumes, all risks (financial and otherwise) associated with this Transaction.

    (iv)    **Liability Management.** This Transaction has been entered into solely in connection with the portfolio, asset, risk, treasury and liability management of Party B.

    (v)    **Compliance with Laws.** It is in all material respects in compliance with all applicable laws, rules, regulations, interpretations, guidelines, procedures and policies of applicable regulatory authorities affecting Party B, this Transaction or the performance of Party B's obligations.

    (vi)    **No Restrictions.** There are no provisions in any of its internal management regulations or any other non-public documents which restrict in any way its ability to execute, deliver and perform its obligations under this Transaction.

    (vii)    **Confirmation of Corporate Benefit.** This Transaction is for the interest and to the benefit of Party B, and as long as it is entered without duress and misrepresentations, Party B waives its right to invoke the nullity of this Transaction.

(3)    (i) It has sufficient currency holdings, (ii) it will have sufficient currency holdings on the relevant payment date or (iii) subject to its compliance with applicable laws and regulations, including those relating to exchange controls, it is legally able to acquire additional foreign currency holdings required to timely pay the amounts due to Party A under this Transaction in the amount and currencies stipulated.

Events of Default.

    (i)    Section 5(a)(i) of the ISDA Form shall be revised so that the words "before the third Local Business Day" on the last line thereof shall be replaced in their entirety with the words "before the first Local Business Day".

    (ii)    Section 5(a)(vii)(4)(B) and 5(a)(vii)(7) of the ISDA Form shall be revised so that the words "30 days" shall be replaced in their entirety with the words "15 days".

**Early Termination.** Section 6(d)(ii) of the ISDA Form shall be revised so that the words "two Local Business Days" occurring on line four thereof shall be replaced in their entirety with the words "one Local Business Day".

**Waiver of Article 1266.** The parties to this Transaction waive the provisions of the second and third sentences of Article 1266 of the Indonesian Civil Code (only to the extent that such Article is or is deemed to be applicable) which would require judicial intervention to give effect to a termination of the obligations of the parties under this Transaction.

**Arbitration.** Without prejudice to the provisions of Section 13(b) of the ISDA Form, any dispute, controversy or claim arising out of or in connection with this Transaction, including any question regarding its/their existence, validity or termination, shall be referred to and finally resolved by arbitration under the auspices of the American Arbitration Association in accordance with the rules of that Association, which Rules are deemed to be incorporated by reference into this Agreement. The tribunal shall consist of three arbitrators. One arbitrator shall be nominated by each party. The third arbitrator, who shall act as chairman, shall be nominated by these two arbitrators. The place of arbitration shall be New York, New York. The language of the arbitration shall be English.

**Definitions.** Section 14 of the ISDA Form is hereby amended as follows:

The definition of "Stamp Tax" shall be deemed to include Stamp Duty.



Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9553 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                    Accepted and agreed to:

Lehman Brothers Special Financing Inc.              PT Mobile-8 Telecom Tbk.

By:                                                 By:
Name: Anatoly Kozlov                                Name:
Title: Authorized Signatory                         Title:

Execution time will be furnished upon Counterparty's written request.

# **<u>EXHIBIT B</u>**

(Multicurrency — Cross Border)

*INT*
*K*
*1115*
*.S92*
*UN 3*
*1992*



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ......................................

................................................................ **and** ................................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

1.    **Interpretation**

(a)    *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions*.

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b) **_Change of Account_**. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c) **_Netting_**. If on any date amounts would otherwise be payable:—

(i) in the same currency; and

(ii) in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d) **_Deduction or Withholding for Tax._**

(i) **_Gross-Up_**. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1) promptly notify the other party ("Y") of such requirement;

(2) pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3) promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4) if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A) the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B) the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA® 1992**

(ii)   *Liability*. If: —

(1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)   X does not so deduct or withhold; and

(3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.   **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations*.

(i)   *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)   *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)   *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

**ISDA® 1992**

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)    any other documents specified in the Schedule or any Confirmation; and

    (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through
which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify
the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's
execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp
Tax Jurisdiction with respect to the other party.

**5.     Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit
Support Provider of such party or any Specified Entity of such party of any of the following events constitutes
an event of default (an "Event of Default") with respect to such party:—

   (i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this
   Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not
   remedied on or before the third Local Business Day after notice of such failure is given to the party;

   (ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or
   obligation (other than an obligation to make any payment under this Agreement or delivery under
   Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation
   under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance
   with this Agreement if such failure is not remedied on or before the thirtieth day after notice of
   such failure is given to the party;

   (iii)    *Credit Support Default*.

      (1)    Failure by the party or any Credit Support Provider of such party to comply with or
      perform any agreement or obligation to be complied with or performed by it in accordance
      with any Credit Support Document if such failure is continuing after any applicable grace
      period has elapsed;

      (2)    the expiration or termination of such Credit Support Document or the failing or ceasing
      of such Credit Support Document to be in full force and effect for the purpose of this Agreement
      (in either case other than in accordance with its terms) prior to the satisfaction of all obligations
      of such party under each Transaction to which such Credit Support Document relates without
      the written consent of the other party; or

      (3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in
      whole or in part, or challenges the validity of, such Credit Support Document;

   (iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f))
   made or repeated or deemed to have been made or repeated by the party or any Credit Support
   Provider of such party in this Agreement or any Credit Support Document proves to have been
   incorrect or misleading in any material respect when made or repeated or deemed to have been made
   or repeated;

   (v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or
   any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after
   giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an
   acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults,
   after giving effect to any applicable notice requirement or grace period, in making any payment or
   delivery due on the last payment, delivery or exchange date of, or any payment on early termination
   of, a Specified Transaction (or such default continues for at least three Local Business Days if there
   is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or
   rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity
   appointed or empowered to operate it or act on its behalf);

   (vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the
   occurrence or existence of (1) a default, event of default or other similar condition or event (however

5

ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

> (i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

>> (1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

>> (2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

> (ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

> (iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

> (iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

> (v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

7    ISDA® 1992



6.    **Early Termination**

(a)    ***Right to Terminate Following Event of Default***. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    ***Right to Terminate Following Termination Event***.

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    ***Transfer to Avoid Termination Event***. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    ***Two Affected Parties***. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    ***Right to Terminate***. If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8                                                                         **ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)  *Effect of Designation.*

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  *Calculations.*

(i)  *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)  *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9                                    **ISDA® 1992**

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events*.  If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

10                                                                  **ISDA® 1992**

### 7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

### 8.    Contractual Currency

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

9.     **Miscellaneous**

(a)     *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes   all oral communication and prior writings with respect thereto.

(b)     *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)     *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)     *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)     *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)     *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)     *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.     **Offices; Multibranch Parties**

(a)     If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)     Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)     If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.     **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

12                                                  **ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15

ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

...............................................................          ...............................................................
(Name of Party)                                                        (Name of Party)


By: ........................................................          By: ........................................................
    Name:                                                  Name:
    Title:                                                 Title:
    Date:                                                  Date:

ISDA® 1992

(Multicurrency — Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

## SCHEDULE
## to the
## Master Agreement

dated as of ......................................................................

between ............................................................ and ..........................................................
            ("Party A")                                     ("Party B")

**Part 1.  Termination Provisions.**

(a)    *"Specified Entity"* means in relation to Party A for the purpose of: —

Section 5(a)(v),    ..........................................................................................................

Section 5(a)(vi),    ..........................................................................................................

Section 5(a)(vii),    ..........................................................................................................

Section 5(b)(iv),    ..........................................................................................................


and in relation to Party B for the purpose of:—


Section 5(a)(v),    ..........................................................................................................

Section 5(a)(vi),    ..........................................................................................................

Section 5(a)(vii),    ..........................................................................................................

Section 5(b)(iv),    ..........................................................................................................

(b)    *"Specified Transaction"* will have the meaning specified in Section 14 of this Agreement unless
another meaning is specified here    ..........................................................................................

..........................................................................................................................................

..........................................................................................................................................

(c)    The *"Cross Default"* provisions of Section 5(a)(vi) will/will not * apply to Party A
                                                                will/will not * apply to Party B

If such provisions apply:—

*"Specified Indebtedness"* will have the meaning specified in Section 14 of this Agreement unless
another meaning is specified here ...........................................................................................

..........................................................................................................................................

---

\*    Delete as applicable.

ISDA® 1992

*"Threshold Amount"* means ..........................................................................................................................

..........................................................................................................................................................................

(d)   The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will/will not * apply to Party A
                                                                              will/will not * apply to Party B

(e)   The *"Automatic Early Termination"* provision of Section 6(a) will/will not * apply to Party A
                                                                              will/will not * apply to Party B

(f)   *Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement: —

   (i)   Market Quotation/Loss * will apply.

   (ii)   The First Method/The Second Method * will apply.

(g)   *"Termination Currency"* means ........................................................, if such currency is specified and
freely available, and otherwise United States Dollars.

(h)   *Additional Termination Event* will/will not apply*. The following shall constitute an Additional

Termination Event: —   .....................................................................................................................................

.........................................................................................................................................................................

.........................................................................................................................................................................

.........................................................................................................................................................................

.........................................................................................................................................................................

.........................................................................................................................................................................

For the purpose of the foregoing Termination Event, the Affected Party or Affected Parties shall be: —   ...

.........................................................................................................................................................................

## Part 2. Tax Representations.

(a)   *Payer Representations.* For the purpose of Section 3(e) of this Agreement, Party A will/will not* make the
following representation and Party B will/will not* make the following representation: —

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue
authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax
from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made
by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy
of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the
satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy
and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of
this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of
this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on
clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of
material prejudice to its legal or commercial position.

(b)   *Payee Representations.* For the purpose of Section 3(f) of this Agreement, Party A and Party B make the
representations specified below, if any:

   (i)   The following representation will/will not* apply to Party A and will/will not apply to Party B: —

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits"
provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the
Specified Treaty with respect to any payment described in such provisions and received or to be received

---

* Delete as applicable.

                                                                              **ISDA® 1992**

... 

by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

If such representation applies, then: —

*"Specified Treaty"* means with respect to Party A  ...............................................................................

*"Specified Jurisdiction"* means with respect to Party A  ...................................................................

*"Specified Treaty"* means with respect to Party B  ...............................................................................

*"Specified Jurisdiction"* means with respect to Party B  ...................................................................

(ii)  The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the Specified Jurisdiction.

If such representation applies, then: —

*"Specified Jurisdiction"* means with respect to Party A  ...................................................................

*"Specified Jurisdiction"* means with respect to Party B  ...................................................................

(iii)  The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

(A)  It is entering into each Transaction in the ordinary course of its trade as, and is, either (1) a recognised U.K. bank or (2) a recognised U.K. swaps dealer (in either case (1) or (2), for purposes of the United Kingdom Inland Revenue extra statutory concession C17 on interest and currency swaps dated March 14, 1989), and (B) it will bring into account payments made and received in respect of each Transaction in computing its income for United Kingdom tax purposes.

(iv)  Other Payee Representations: —  ....................................................................................................

....................................................................................................................................................................

....................................................................................................................................................................

....................................................................................................................................................................

N.B. The above representations may need modification if either party is a Multibranch Party.

---

* Delete as applicable.

ISDA® 1992

Part 3. **Agreement to Deliver Documents**.

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable: —

(a) Tax forms, documents or certificates to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| ............................ | ................................................ | ............................................ |
| ............................ | ................................................ | ............................................ |
| ............................ | ................................................ | ............................................ |
| ............................ | ................................................ | ............................................ |
| ............................ | ................................................ | ............................................ |

(b) Other documents to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| ...................... | ................................................ | ..................................... | Yes/No* |
| ...................... | ................................................ | ..................................... | Yes/No* |
| ...................... | ................................................ | ..................................... | Yes/No* |
| ...................... | ................................................ | ..................................... | Yes/No* |
| ...................... | ................................................ | ..................................... | Yes/No* |

Part 4. **Miscellaneous**.

(a)    *Addresses for Notices*. For the purpose of Section 12(a) of this Agreement: —

Address for notices or communications to Party A: —

Address:    ..........................................................................................................................

Attention:    ........................................................................................................................

Telex No.: .......................................................... Answerback: .........................................

Facsimile No.: .................................................... Telephone No: ........................................

Electronic Messaging System Details: ...............................................................................

Address for notices or communications to Party B: —

Address:    ..........................................................................................................................

Attention:    ........................................................................................................................

Telex No.: .......................................................... Answerback: .........................................

---

* Delete as applicable.

22

ISDA® 1992

Facsimile No.: ................................................................ Telephone No.: ...............................................

Electronic Messaging System Details: ..........................................................................................

(b)   *Process Agent.* For the purpose of Section 13(c) of this Agreement: —

Party A appoints as its Process Agent ..........................................................................................

Party B appoints as its Process Agent ..........................................................................................

(c)   *Offices.* The provisions of Section 10(a) will/will not* apply to this Agreement.

(d)   *Multibranch Party.* For the purpose of Section 10(c) of this Agreement: —

Party A is/is not* a Multibranch Party and, if so, may act through the following Offices: —

.........................................   .........................................   ...............................................

.........................................   .........................................   ...............................................

Party B is/is not* a Multibranch Party and, if so, may act through the following Offices: —

.........................................   .........................................   ...............................................

.........................................   .........................................   ...............................................

(e)   *Calculation Agent.* The Calculation Agent is ........................................................., unless otherwise
specified in a Confirmation in relation to the relevant Transaction.

(f)   *Credit Support Document.* Details of any Credit Support Document: — .......................................
......................................................................................................................................................
......................................................................................................................................................
......................................................................................................................................................

(g)   *Credit Support Provider.* Credit Support Provider means in relation to Party A, .............................
......................................................................................................................................................
......................................................................................................................................................

Credit Support Provider means in relation to Party B, .............................................................
......................................................................................................................................................
......................................................................................................................................................

(h)   *Governing Law.* This Agreement will be governed by and construed in accordance with English law/the
laws of the State of New York (without reference to choice of law doctrine) *.

---

* Delete as applicable.

ISDA® 1992

(i)    *Netting of Payments*. Subparagraph (ii) of Section 2(c) of this Agreement will not apply to the following Transactions or groups of Transactions (in each case starting from the date of this Agreement/in each case starting from ................................:.......... *) ........................................……........

........................................................................................................................................................

........................................................................................................................................................

(j)    *"Affiliate"* will have the meaning specified in Section 14 of this Agreement unless another meaning is specified here

........................................................................................................................................................

........................................................................................................................................................

**Part 5. Other Provisions.**

---

\* Delete as applicable.

ISDA® 1992