WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Peter Gruenberger, Esq.
Holly E. Loiseau, Esq.
Robert Lemons, Esq.

*Attorneys for Debtor and Plaintiff LBSF*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
|  |  |
| :--- | :--- |
| | : | |
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| | : | |

------------------------------------------------------------------x

**DECLARATION OF HOLLY E. LOISEAU IN SUPPORT OF MOTION OF
LEHMAN BROTHERS SPECIAL FINANCING INC. PURSUANT TO SECTION
362 OF THE BANKRUPTCY CODE FOR ENFORCEMENT OF THE
AUTOMATIC STAY AND FOR SANCTIONS FOR VIOLATION OF
THE ADR PROCEDURES ORDER**

I, HOLLY E. LOISEAU, declare under penalty of perjury as follows:

1.      I am a partner in the firm of Weil, Gotshal & Manges LLP, counsel for

Lehman Brothers Special Financing, Inc ("LBSF").  I submit this declaration in support

of the *Motion of Lehman Brothers Special Financing Inc. Pursuant to Section 362 of the*

*Bankruptcy Code for Enforcement of the Automatic Stay and for Sanction for Violation of*

*the ADR Procedures Order* (the "Motion").  The following is true to the best of my own

personal knowledge and/or belief:

2.      LBSF and the Mobile-8 entered into a long-form confirmation, dated as of

August 8, 2007 (the "Confirmation"), documenting the swap transaction between LBSF

and Mobile-8 with a notional amount of $100,000,000 identified by Global ID No.

3267721 (the "Transaction").  A true and correct copy of the Confirmation is attached

hereto as Exhibit A.

3.      The Confirmation incorporates by reference the terms of the 1992 form

ISDA Master Agreement (the "ISDA Agreement").  A true and correct copy of the ISDA

Agreement is attached hereto as Exhibit B.

4.      The first payment under the Confirmation became due by LBSF payable

to Mobile-8 on March 3, 2008 in the amount of $440,000 (the "March 2008 Payment").

LBSF paid this amount to Mobile-8 on March 3, 2008.  A true and correct copy of the

March 2008 Invoice is attached hereto as Exhibit C.

5.      The second payment under the Confirmation became due by Mobile-8

payable to LBSF on September 2, 2008 in the amount of $2,047,567 (the "September

2008 Missed Payment").  Mobile-8 failed to make this payment.  A true and correct copy

of the September 2008 Invoice is attached hereto as Exhibit D.

6.      Commencing on September 15, 2008, and periodically thereafter (as

applicable, the "Commencement Date"), Lehman Brothers Holdings, Inc. ("LBHI") and

certain of its subsidiaries (collectively, the "Debtors") commenced with this Court

voluntary cases under chapter 11 of the Bankruptcy Code.  LBSF commenced its chapter

11 case on October 3, 2008.

7.      On September 22, 2008, Mobile-8 sent a letter to LBSF noting that it

recently learned of LBHI's chapter 11 filing and asking whether the bankruptcy filing

would have any direct or indirect legal effect on Mobile-8.  A true and correct copy of the

September 22, 2008 Letter is attached hereto as <u>Exhibit E</u>.

8.      The third payment under the Confirmation became due by Mobile-8

payable to LBSF on March 2, 2009 in the amount of $381,250 (the "<u>March 2009 Missed</u>

<u>Payment</u>").  Mobile-8 failed to make this payment.  A true and correct copy of the March

2009 Invoice is attached hereto as <u>Exhibit F</u>.

9.      On March 16, 2009, LBSF delivered a notice to Mobile-8 exercising its

right under the ISDA Agreement to demand adequate assurance of performance with

respect to the Transaction (the "<u>Request for Adequate Assurance</u>").  A true and correct

copy of the Request for Adequate Assurance is attached hereto as <u>Exhibit G</u>.

10.     Mobile-8 failed to provide adequate assurance of performance and LBSF

sent a Notice of Early Termination on March 31, 2009, designating April 7, 2009 as the

Early Termination Date (the "<u>Early Termination Notice</u>").  A true and correct copy of the

Early Termination Notice is attached hereto as <u>Exhibit H</u>.

11.     On May 5, 2009, Mobile-8 sent a letter to LBSF, purporting to terminate

the Transaction (the "<u>Mobile-8 Purported Termination Letter</u>").  A true and correct copy

of the Mobile-8 Purported Termination Letter is attached hereto as <u>Exhibit I</u>.

12.     LBSF sent a Notice of Amount Payable on June 18, 2009 (the

"<u>Calculation Statement</u>"), notifying Mobile-8 that it owed a Termination Payment in the

amount of $2,560,472.  A true and correct copy of the Calculation Statement is attached

hereto as <u>Exhibit J</u>.

13.     On November 23, 2009, LBSF served a derivatives ADR notice on

Mobile-8 pursuant to the ADR Procedures Order (the "<u>ADR Notice</u>").  In the ADR

Notice, LBSF demanded payment of $2,560,472, plus interest in the amount of $236,226 in respect of amounts due and owing by Mobile-8 to LBSF in connection with the Transaction. A true and correct copy of the ADR Notice is attached hereto as Exhibit K.

14.    On December 29, 2009, LBSF received a letter from Mobile-8 in response to the ADR Notice (the "ADR Response"). In the ADR Response, Mobile-8 expressed its belief that LBSF, and not Mobile-8, defaulted on the Transaction, and alleged that LBSF had engaged in some form of unspecified "fraudulent misrepresentation." Mobile-8 provided no basis for this assertion. Mobile-8 further alleged that it had terminated the Transaction by way of its letter to LBSF on May 5, 2009. A true and correct copy of the ADR Response is attached hereto as Exhibit L.

15.    On January 13, 2010, LBSF sent a Reply to the ADR Response (the "ADR Reply"). In the Reply, LBSF explained that Mobile-8's purported termination on May 5, 2009 was ineffective because LBSF had already terminated the Transaction, and refuted Mobile-8's unsubstantiated misrepresentation allegation. A true and correct copy of the ADR Reply is attached hereto as Exhibit M.

16.    The Parties engaged in a telephonic Initial Settlement Conference on February 8, 2010 which lasted approximately 40 minutes, and had subsequent calls on February 22, 2010 for approximately 20 minutes, and March 16, 2010 for approximately 90 minutes.

17.    On or about February 22, 2010, LBSF became aware of the September 2008 Missed Payment, bringing the total amount owed by Mobile-8 to LBSF to $4,608,039, plus interest. During the course of the February 22, 2010 call, LBSF requested that Mobile-8 either provide evidence that it made the September 2008 Missed

Payment, or immediately transmit payment in the amount of $2,047,567.03 to LBSF.

LBSF reiterated this demand by letter dated February 23, 2010 (the "February 23, 2010

Letter").  A true and correct copy of the February 23, 2010 Letter is attached hereto as

Exhibit N.

18.    On March 29, 2010, LBSF transmitted the ADR Notice, Response and

Reply to the Court-appointed mediators at JAMS, the mediation facility.

19.    In an effort to schedule the mediation between the Parties, the JAMS case

administrator (the "Case Administrator") sent Mobile-8 email messages on March 31,

2010, April 12, 2010, April 14, 2010, April 22, 2010, and April 27, 2010.  The Case

Administrator further attempted to contact Mobile-8 through its website-based inquiry

form on May 7, 2010, and by telephone.  Mobile-8 responded to none of these messages,

and the Case Administrator's call to Mobile-8's main phone line was neither answered

nor directed to voice mail.  A true and correct copy of a letter from the Case

Administrator to the Court detailing these attempts ("Case Administrator Letter") is

attached hereto as Exhibit O.

20.    On May 7, 2010,  the Court-appointed mediator (the "Mediator") sent a

letter to Mobile-8 indicating that he had been selected to mediate the Parties' dispute, and

requesting that Mobile-8 provide its availability for a conference call to discuss

scheduling the mediation (the "Mediator Letter").  A copy of the ADR Procedures Order

was attached to the letter.  The package was sent via email, facsimile, and Federal

Express.  Mobile-8 did not respond.  A true and correct copy of the letter from the

Mediator to Mobile-8 is attached hereto as Exhibit P.

21.     On September 10, 2010, LBSF received both an Indonesian and an English language copy of a complaint allegedly filed on May 26, 2010 by Mobile-8 against LBSF in the Civil Court, Niaga, HAM Jakarta Pusat, Indonesia (civil case No. 247/Pdt.G/2010PN.Jkt.Pst) (the "Jakarta Action").  The copy of the Jakarta Action was forwarded to LBSF by the Consulate General of the Republic of Indonesia, and was accompanied by a letter dated August 27, 2010.  The address on the letter and on the complaint was incorrect, causing further delay before LBSF received notice of the Jakarta Action.  Mobile-8 erroneously directed the complaint to LBSF's former headquarters at 745 Seventh Avenue, New York, NY 10019, which was sold to Barclays in September 2008, and did not serve LBSF's outside counsel with the complaint.  Barclays forwarded the package to LBSF on September 3, 2010, and it was received by LBSF on or around September 10, 2010.  A true and correct copy of the Jakarta Action (Indonesian language version omitted) is attached hereto as Exhibit Q.

22.     LBSF engaged local counsel in Jakarta and learned that a second hearing on September 29, 2010 had been noticed in two Indonesian newspapers.  A true and correct copy of the two newspaper summons are attached as Exhibit R.

23.     In the Jakarta Action, Mobile-8 alleges that the Transaction never became binding upon the Parties because the Parties did not execute an ISDA Form and that, as a result, the actions taken by LBSF to bill Mobile-8 for the September 2008 Missed Payment and the March 2009 Missed Payment constituted a tort under Indonesian law. Mobile-8 further alleges that LBSF is in violation of Bank Indonesia Regulation No. 7/31/PBI/2005 on Derivative Transactions (the "Indonesia Bank Regulation").  A true

and correct copy of the unofficial English-language translation of the Indonesia Bank Regulation is attached hereto as <u>Exhibit S</u>.

24.     In the Jakarta Action, Mobile-8 seeks immediate relief from the court to prohibit LBSF from challenging the claims or initiating any proceedings related to the same matter.

25.     On September 24, 2010 LBSF sent a letter to Mobile-8's counsel advising Mobile-8 that its initiation and pursuit of the Jakarta Action constitutes a violation of the automatic stay.  LBSF stated that  Mobile-8 must terminate the Jakarta Action immediately and advised Mobile-8 that LBSF would file pleadings with the Bankruptcy Court to enforce the automatic stay and for appropriate sanctions if Mobile-8 failed to file a notice of withdrawal of the Jakarta Action prior to September 29, 2010.  A true and correct copy of the September 24 Letter is attached hereto as <u>Exhibit T</u>.

26.     Mobile-8 did not respond to the September 24 Letter or withdraw the Jakarta Action.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed in Washington, District of Columbia, on October 1, 2010.

/s/  Holly E. Loiseau
Holly E. Loiseau

# **<u>EXHIBIT A</u>**

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 08 August, 2007 |
| To: | PT Mobile-8 Telecom Tbk. |
| | Attention:    Documentation Unit |
| From: | Lehman Brothers Special Financing Inc. |
| | Confirmations Group |
| | Facsimile:    (+1) 646-885-9553 (United States of America) |
| | Telephone:    (+44) 207-102-6771 (United Kingdom) |
| Effort Id: | 1543713 |
| Global Id: | 3267721 |

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and PT Mobile-8 Telecom Tbk. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019



advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application

**General Terms:**

| | |
|---|---|
| Trade Date: | 8 August 2007 |
| Effective Date: | 15 August, 2007 |
| Termination Date: | 1 March, 2013, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 100,000,000.00 |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 1st calendar day of each March and September, from and including 1st March, 2008 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Calculation Period: | Commencing the 1st calendar day of each March and September in each year, every previous Payment Date (inclusive) to the Payment Date (exclusive), provided that the Initial Calculation Period shall be from Effective Date (inclusive) to the first Payment Date (exclusive) |
| Fixed Rate: | 10.45% |
| Fixed Rate Day Count Fraction: | 30/360 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 1st calendar day of each March and September, from and including 1st March, 2008 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Calculation Period: | Commencing the 1st calendar day of each March and September in each year, every previous Payment Date (inclusive) to the Payment Date (exclusive), provided that the Initial Calculation Period shall be from Effective Date (inclusive) to the first Payment Date (exclusive) |

| | |
|---|---|
| Floating Amount | 11.25% x Range Accrual |
| Range Accrual: | The number of days in a Calculation Period where the Range Index is greater than or equal to 0.00%, divided by the total number of days in the Calculation Period. |
| Range Index: | "Range Index" means 30Y EUR SWAP REF – 2Y EUR SWAP REF |

"30Y EUR SWAP REF" means:

For any day within a Calculation Period, the annual swap rate for EUR swap transactions with a maturity of 30 years, which appears on the Reuters Screen ISDAFIX2 under the heading "EURIBOR Basis - EUR" and above the caption "11.00 AM C.E.T" as of 11:00 a.m. Frankfurt Time on such day (or if such day is not a Business Day the immediately preceding Business Day). Provided, however, that the rate for any day from and including the Rate Cut Off Date to the last day of the Calculation Period shall be deemed to be the rate in effect on the Rate Cut Off Date. "Rate Cut Off Date" means the 5th Business Day prior to the last day of the Calculation Period.

"2Y EUR SWAP REF" means:

For any day within a Calculation Period, the annual swap rate for EUR swap transactions with a maturity of 2 years, which appears on the Reuters Screen ISDAFIX2 under the heading "EURIBOR Basis - EUR" as of 11:00 a.m. C.E.T as of 11:00 a.m. Frankfurt Time on such day (or if such day is not a Business Day the immediately preceding Business Day). Provided, however, that the rate for any day from and including the Rate Cut Off Date to the last day of the Calculation Period shall be deemed to be the rate in effect on the Rate Cut Off Date. "Rate Cut Off Date" means the 5th Business Day prior to the last day of the Calculation Period.

| | |
|---|---|
| Floating Rate Day Count Fraction: | 30/360 |
| Business Days: | New York; TARGET Settlement Day |
| Calculation Agent: | Party A, provided, however, where Party B disputes any determination, calculation or estimate, then (i) the relevant party shall pay the amount, if any, that is not in dispute and (ii) the parties shall promptly appoint an independent third party that would qualify as a Reference Market-maker (a "Substitute Calculation Agent") to resolve the dispute the determination of which shall be final and binding absent manifest error. Party B agrees to immediately notify Party A if it |



disputes any of Party A's calculation.

**Miscellaneous:**

Office:
For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office.

Transfer:
Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Governing Law:
New York law; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Termination Currency:
USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

**Additional Termination Events.** Each of the following shall constitute an Additional Termination Event (as such terms is defined and used in the ISDA Form); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these Additional Termination Events:

(i)     **Adequate Assurance of Performance.** Party B fails to provide Adequate Assurances of Performance in accordance with the following provision. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

In the event that Party A has commercially reasonable grounds for insecurity concerning Party B's ability to perform any of its obligations under this Transaction, Party A may demand that Party B provide to Party A's reasonable satisfaction, Adequate Assurance of Performance in the form of written undertakings and/or evidence pertaining to Party B's ability, readiness and/or commitment to perform its obligations under this Transaction. Party B shall provide such written undertaking and/or evidence within three (3) Business Days of demand by Party A (the "Written Assurance Delivery Period").

Party A may withhold or suspend its obligations under this Transaction throughout the Written Assurance Delivery Period until it receives the relevant Adequate Assurance of Performance from Party B.

(ii)    **Sovereign Debt.** The Republic of Indonesia (a) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, any of its obligations, or (b) declares or imposes a moratorium, standstill or deferral, whether de facto or de jure, in each case in respect of its debt (whether principal, interest or otherwise) and, in either case, Party A determines in its reasonable judgment that Party B's ability to perform its obligations under this Agreement is likely to be materially affected by such debt

Risk ID: 1609725L / Effort ID: 1543713 / Global Deal ID: 3267721

Page 4 of 8

moratorium. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii)    **Material Amendment.** Any constituent document of Party B is amended or modified in a manner which, in a commercially reasonable judgment of Party A, may have a material adverse effect on Party A under this Agreement or any Transaction hereunder or on the ability or authority of Party B to perform its obligations under this Agreement or any Transaction hereunder. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv)    **Repudiation or Moratorium.** Party B or any authorized officer acting on behalf of Party B, whether pursuant to the ruling of any governmental authority with jurisdiction over Party B, or for any other reason, disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, or declares or imposes a moratorium, standstill, roll-over or deferral, whether de facto or de jure, on (i) any payment or other obligations of Party B with respect to Specified Indebtedness in an amount exceeding the Threshold Amount or (ii) any other obligations of Party B which in the aggregate exceed the Threshold Amount for the payment or repayment of money and, in either case, Party A determines in its reasonable judgment that Party B's ability to perform its obligations under this Agreement is likely to be materially affected by such repudiation or moratorium. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(v)    **Sovereign Event.** Party B is not able to discharge its obligations with respect to a Transaction through the relevant booking office as a result of any law (other than bankruptcy, insolvency or similar laws), order or other action by, or threat of any such law, order or other action by or on behalf of, any governmental or other similar authority (de jure or de facto) at the location of such office. Party A determines in its reasonable judgment that Party B's ability to perform its obligations under this Agreement is likely to be materially affected by such sovereign event. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(vi)    **Non-Convertibility Event.** Party A has determined in a commercially reasonable manner that either of the following has occurred and that any such occurrence has not been satisfactorily cured: (1) a local market condition has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Indonesian Rupiah for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange or (2) an action or failure to act by the government of the Republic of Indonesia or any agency or regulatory authority thereof has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Indonesian Rupiah for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange and, in either case, Party A determines in its reasonable judgment that Party B's ability to perform its obligations under this Agreement is likely to be materially affected by such non-convertibility event. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(vii)    **Revocation/Loss of License.** The voluntary or involuntary revocation, suspension or loss, in whole or in substantial part, of any material license, approval or enabling permit of Party B's from the Ministry of Communications and Information Technology. For the purpose of the foregoing Additional Termination Event, Party B shall be the Affected Party.

Risk ID: 1609725L / Effort ID: 1543713 / Global Deal ID: 3267721

**Additional Representations of Party B.** Party B represents to Party A in accordance with Section 3 of the ISDA Form (which representations will be deemed to be repeated by Party B at all times until termination of this Transaction) that:

(1)    Subject to applicable laws and regulations from time to time, no authorization or approval or other action by, and no notice to or filing with, and no license or other certification from, any governmental or quasi-governmental authority, regulatory or self-regulatory body or any other entity or party is required to be obtained by or on behalf of Party B for the due execution, delivery, registration, filing or performance by Party B of its obligations under this Transaction (other than any required filings or reporting to Bank of Indonesia with respect to the transfer of foreign exchange to and from abroad, which Party B agrees will be made in full compliance with applicable law and which shall not affect Party B's other duties or obligations hereunder) at the time of entering into this Transaction. Party B represents and warrants that no agreement, law, regulation, decree, rule or other writing or pronouncement by any entity will affect the legality, validity or enforceability of the obligations of Party B hereunder, which obligations will be satisfied on the terms, conditions and manner set forth in this Confirmation for this Transaction.

(2)    (i)    **Complex Risks.** It understands that this Transaction is subject to complex risks which may arise without warning and which may at times be volatile, and that losses may occur quickly and in unanticipated magnitude.

    (ii)    **Sophisticated Investor.** It is a sophisticated investor able to evaluate the terms, conditions and risks of this Transaction and accepts such terms, conditions and risks.

    (iii)    **Assumption of Risks.** It is capable of assuming, and assumes, all risks (financial and otherwise) associated with this Transaction.

    (iv)    **Liability Management.** This Transaction has been entered into solely in connection with the portfolio, asset, risk, treasury and liability management of Party B.

    (v)    **Compliance with Laws.** It is in all material respects in compliance with all applicable laws, rules, regulations, interpretations, guidelines, procedures and policies of applicable regulatory authorities affecting Party B, this Transaction or the performance of Party B's obligations.

    (vi)    **No Restrictions.** There are no provisions in any of its internal management regulations or any other non-public documents which restrict in any way its ability to execute, deliver and perform its obligations under this Transaction.

    (vii)    **Confirmation of Corporate Benefit.** This Transaction is for the interest and to the benefit of Party B, and as long as it is entered without duress and misrepresentations, Party B waives its right to invoke the nullity of this Transaction.

(3)    (i) It has sufficient currency holdings, (ii) it will have sufficient currency holdings on the relevant payment date or (iii) subject to its compliance with applicable laws and regulations, including those relating to exchange controls, it is legally able to acquire additional foreign currency holdings required to timely pay the amounts due to Party A under this Transaction in the amount and currencies stipulated.

Events of Default.

(i)     Section 5(a)(i) of the ISDA Form shall be revised so that the words "before the third Local Business Day" on the last line thereof shall be replaced in their entirety with the words "before the first Local Business Day".

(ii)    Section 5(a)(vii)(4)(B) and 5(a)(vii)(7) of the ISDA Form shall be revised so that the words "30 days" shall be replaced in their entirety with the words "15 days".

Early Termination.  Section 6(d)(ii) of the ISDA Form shall be revised so that the words "two Local Business Days" occurring on line four thereof shall be replaced in their entirety with the words "one Local Business Day".

Waiver of Article 1266.  The parties to this Transaction waive the provisions of the second and third sentences of Article 1266 of the Indonesian Civil Code (only to the extent that such Article is or is deemed to be applicable) which would require judicial intervention to give effect to a termination of the obligations of the parties under this Transaction.

Arbitration.  Without prejudice to the provisions of Section 13(b) of the ISDA Form, any dispute, controversy or claim arising out of or in connection with this Transaction, including any question regarding its/their existence, validity or termination, shall be referred to and finally resolved by arbitration under the auspices of the American Arbitration Association in accordance with the rules of that Association, which Rules are deemed to be incorporated by reference into this Agreement. The tribunal shall consist of three arbitrators. One arbitrator shall be nominated by each party. The third arbitrator, who shall act as chairman, shall be nominated by these two arbitrators. The place of arbitration shall be New York, New York. The language of the arbitration shall be English.

Definitions. Section 14 of the ISDA Form is hereby amended as follows:

The definition of "Stamp Tax" shall be deemed to include Stamp Duty.



Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9553 (United States of America), Attention: Confirmations Group.

Yours sincerely,                              Accepted and agreed to:

Lehman Brothers Special Financing Inc.        PT Mobile-8 Telecom Tbk.

By:                                           By:
Name: Anatoly Kozlov                          Name:
Title:  Authorized Signatory                  Title:

Execution time will be furnished upon Counterparty's written request.

Risk ID: 1609725L / Effort ID: 1543713 / Global Deal ID: 3267721

Page 8 of 8



# EXHIBIT B

(Multicurrency — Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of .......................................

.......................................................... and ...........................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.    Interpretation**

(a)    *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions*.

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA® 1992**

(ii)    *Liability*. If: —

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    ***Default Interest; Other Amounts.*** Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    ***Basic Representations.***

(i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)      *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.      Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)      any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)      any other documents specified in the Schedule or any Confirmation; and

(iii)      upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

   (i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

   (ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

   (iii)    *Credit Support Default.*

      (1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

      (2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

      (3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

   (iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

   (v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

   (vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

**ISDA® 1992**

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

7

**ISDA® 1992**

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to
a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting
Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default,
designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of
all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as
applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur
immediately upon the occurrence with respect to such party of an Event of Default specified in
Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately
preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the
occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent
analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of
it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction
and will also give such other information about that Termination Event as the other party may reasonably
require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax
Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the
Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate
an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require
such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after
it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of
the Affected Transactions to another of its Offices or Affiliates so that such Termination Event
ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that
effect within such 20 day period, whereupon the other party may effect such a transfer within
30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the
prior written consent of the other party, which consent will not be withheld if such other party's
policies in effect at such time would permit it to enter into transactions with the transferee on the
terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there
are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days
after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If: —

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may
be, has not been effected with respect to all Affected Transactions within 30 days after an
Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional
Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not
the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger,
any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more
than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event
Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not
more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9                                                    **ISDA® 1992**

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

### 7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

### 8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

9.    **Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.   **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.   **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.    Notices

(a)      *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)   if in writing and delivered in person or by courier, on the date it is delivered;
>
> (ii)  if sent by telex, on the date the recipient's answerback is received;
>
> (iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);
>
> (iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or
>
> (v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)      *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.    Governing Law and Jurisdiction

(a)      *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)      *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

> (i)   submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and
>
> (ii)  waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)      *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.





*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

..................................................................              ..................................................................
              (Name of Party)                                              (Name of Party)

By: ..........................................................              By: ..........................................................
    Name:                                                              Name:
    Title:                                                               Title:
    Date:                                                                Date:

                         **ISDA® 1992**

(Multicurrency — Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

## SCHEDULE
## to the
## Master Agreement

dated as of ....................................................................

between ........................................................... and ...........................................................
("Party A")                                                    ("Party B")

Part 1.  **Termination Provisions.**

(a)      *"Specified Entity"* means in relation to Party A for the purpose of: —

Section 5(a)(v),      ...............................................................................................

Section 5(a)(vi),     ...............................................................................................

Section 5(a)(vii),    ...............................................................................................

Section 5(b)(iv),     ...............................................................................................

and in relation to Party B for the purpose of:—

Section 5(a)(v),      ...............................................................................................

Section 5(a)(vi),     ...............................................................................................

Section 5(a)(vii),    ...............................................................................................

Section 5(b)(iv),     ...............................................................................................

(b)      *"Specified Transaction"* will have the meaning specified in Section 14 of this Agreement unless

another meaning is specified here  .................................................................................

...............................................................................................................................

...............................................................................................................................

(c)      The *"Cross Default"* provisions of Section 5(a)(vi) will/will not * apply to Party A

will/will not * apply to Party B

If such provisions apply:—

*"Specified Indebtedness"* will have the meaning specified in Section 14 of this Agreement unless

another meaning is specified here .................................................................................

...............................................................................................................................

-----

\*    Delete as applicable.

ISDA® 1992

*"Threshold Amount"* means ..................................................................................................................
..............................................................................................................................................................

(d)  The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will/will not * apply to Party A
will/will not * apply to Party B

(e)  The *"Automatic Early Termination"* provision of Section 6(a) will/will not * apply to Party A
will/will not * apply to Party B

(f)  *Payments on Early Termination*. For the purpose of Section 6(e) of this Agreement: —

   (i)  Market Quotation/Loss * will apply.

   (ii)  The First Method/The Second Method * will apply.

(g)  *"Termination Currency"* means ........................................................ , if such currency is specified and
freely available, and otherwise United States Dollars.

(h)  *Additional Termination Event* will/will not apply*. The following shall constitute an Additional

Termination Event: — ...................................................................................................................................

..............................................................................................................................................................

..............................................................................................................................................................

..............................................................................................................................................................

..............................................................................................................................................................

..............................................................................................................................................................

For the purpose of the foregoing Termination Event, the Affected Party or Affected Parties shall be: — ...

..............................................................................................................................................................

Part 2. **Tax Representations**.

(a)  *Payer Representations*. For the purpose of Section 3(e) of this Agreement, Party A will/will not* make the
following representation and Party B will/will not* make the following representation: —

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue
authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax
from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made
by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy
of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the
satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy
and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of
this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of
this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on
clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of
material prejudice to its legal or commercial position.

(b)  *Payee Representations*. For the purpose of Section 3(f) of this Agreement, Party A and Party B make the
representations specified below, if any:

   (i)  The following representation will/will not* apply to Party A and will/will not apply to Party B: —

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits"
provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the
Specified Treaty with respect to any payment described in such provisions and received or to be received

---

*  Delete as applicable.

20                                                                              **ISDA® 1992**

by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

If such representation applies, then: —

*"Specified Treaty"* means with respect to Party A    ...........................................................................................

*"Specified Jurisdiction"* means with respect to Party A    ...................................................................................

*"Specified Treaty"* means with respect to Party B    ...........................................................................................

*"Specified Jurisdiction"* means with respect to Party B    ...................................................................................

(ii) The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the Specified Jurisdiction.

If such representation applies, then: —

*"Specified Jurisdiction"* means with respect to Party A    ...................................................................................

*"Specified Jurisdiction"* means with respect to Party B    ...................................................................................

(iii) The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

(A) It is entering into each Transaction in the ordinary course of its trade as, and is, either (1) a recognised U.K. bank or (2) a recognised U.K. swaps dealer (in either case (1) or (2), for purposes of the United Kingdom Inland Revenue extra statutory concession C17 on interest and currency swaps dated March 14, 1989), and (B) it will bring into account payments made and received in respect of each Transaction in computing its income for United Kingdom tax purposes.

(iv) Other Payee Representations: —    ....................................................................................................

.............................................................................................................................................................

.............................................................................................................................................................

.............................................................................................................................................................

N.B. The above representations may need modification if either party is a Multibranch Party.

---

\* Delete as applicable.

**ISDA® 1992**

Part 3. **Agreement to Deliver Documents**.

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable: —

(a) Tax forms, documents or certificates to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| ...................................... | ............................................... | ............................................... |
| ...................................... | ............................................... | ............................................... |
| ...................................... | ............................................... | ............................................... |
| ...................................... | ............................................... | ............................................... |
| ...................................... | ............................................... | ............................................... |

(b) Other documents to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| ...................................... | ............................................... | ............................................... | Yes/No* |
| ...................................... | ............................................... | ............................................... | Yes/No* |
| ...................................... | ............................................... | ............................................... | Yes/No* |
| ...................................... | ............................................... | ............................................... | Yes/No* |
| ...................................... | ............................................... | ............................................... | Yes/No* |

Part 4. **Miscellaneous**.

(a)  *Addresses for Notices*. For the purpose of Section 12(a) of this Agreement: —

Address for notices or communications to Party A: —

Address: ................................................................................................................................................

Attention: ................................................................................................................................................

Telex No.: ....................................................................... Answerback: ...............................................

Facsimile No.: ................................................................ Telephone No: ...............................................

Electronic Messaging System Details: ..............................................................................................

Address for notices or communications to Party B: —

Address: ................................................................................................................................................

Attention: ................................................................................................................................................

Telex No.: ....................................................................... Answerback: ...............................................

\* Delete as applicable.

**ISDA® 1992**

Facsimile No.: .................................................................. Telephone No.: .................................................

Electronic Messaging System Details: ...........................................................................................................

(b) *Process Agent.* For the purpose of Section 13(c) of this Agreement: —

Party A appoints as its Process Agent ..........................................................................................................

Party B appoints as its Process Agent ..........................................................................................................

(c) *Offices.* The provisions of Section 10(a) will/will not* apply to this Agreement.

(d) *Multibranch Party.* For the purpose of Section 10(c) of this Agreement: —

Party A is/is not* a Multibranch Party and, if so, may act through the following Offices: —

.....................................     .....................................     .........................................

.....................................     .....................................     .........................................

Party B is/is not* a Multibranch Party and, if so, may act through the following Offices: —

.....................................     .....................................     .........................................

.....................................     .....................................     .........................................

(e) *Calculation Agent.* The Calculation Agent is ..................................................., unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f) *Credit Support Document.* Details of any Credit Support Document: — .........................................
.......................................................................................................................................................
.......................................................................................................................................................
.......................................................................................................................................................

(g) *Credit Support Provider.* Credit Support Provider means in relation to Party A, ...............................
.......................................................................................................................................................
.......................................................................................................................................................

Credit Support Provider means in relation to Party B, ...............................................................
.......................................................................................................................................................
.......................................................................................................................................................

(h) *Governing Law.* This Agreement will be governed by and construed in accordance with English law/the laws of the State of New York (without reference to choice of law doctrine) *.

---

* Delete as applicable.

**ISDA® 1992**

(i)  *Netting of Payments*. Subparagraph (ii) of Section 2(c) of this Agreement will not apply to the following Transactions or groups of Transactions (in each case starting from the date of this Agreement/in each case starting from ……………………………… *) …………………………….……….

……………………………………………………………………………………………………………

……………………………………………………………………………………………………………

(j)  *"Affiliate"* will have the meaning specified in Section 14 of this Agreement unless another meaning is specified here

……………………………………………………………………………………………………………

……………………………………………………………………………………………………………

**Part 5. Other Provisions.**

---

\* Delete as applicable.

**ISDA® 1992**

# EXHIBIT C

# LEHMAN BROTHERS

### * * * R E V I S E D * * *

**To:**   Derivative Operations
PT MOBILE-8 TELECOM Tbk

**From:**   Derivative Middle Office
Lehman Brothers Special Financing Inc.

For Settlement and Payments please contact Derivative Operations at:
Phone: (212) 526-0200  Fax: (212)526-1795 or (212)526-6336

**Date:**   February 26, 2008

**Re:**   Calculation of amount due March 03, 2008
USD 100,000,000.00 / JPY 1.00 Swap Transaction
Maturing March 01, 2013

*Our Reference:* 1609725L / 3267721

FIXED AMOUNT:
PT MOBILE-8 TELECOM to LBSF Inc.

Calculation Period from August 15, 2007 to March 03, 2008

USD 100,000,000.00 x 10.45000% x 198 / 360 =                         USD 5,747,500.00

FIXED AMOUNT:
LBSF Inc. to PT MOBILE-8 TELECOM

Calculation Period from August 15, 2007 to March 03, 2008

USD 100,000,000.00 x 11.25000% x 198 / 360 =                         USD 6,187,500.00

Amount due PT MOBILE-8 TELECOM                                      USD 440,000.00

LBSF Inc. will pay USD 440,000.00 to PT MOBILE-8 TELECOM on March 03, 2008 in immediately available funds, as per the following instructions:

*Payment Instructions*
Inst: BEIIDJAXXX
BANK MANDIRI (PERSERO), PT.
Benf A/C: 123-000-301-0156
PT Mobile-8 Telecom
/bnf/swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# **EXHIBIT D**

# LEHMAN BROTHERS

### * * * R E V I S E D * * *

**To:**  Derivative Operations
PT MOBILE-8 TELECOM Tbk

**From:**  Derivative Middle Office
Lehman Brothers Special Financing Inc

For Settlement and Payments please contact Derivative Operations at:
Phone: (212) 526-0200  Fax: (212)526-1795 or (212)526-6336

**Date:**  August 26, 2008

**Re:**  Calculation of amount due September 02, 2008
USD 100,000,000.00 / JPY 1.00 Swap Transaction
Maturing March 01, 2013

*Our Reference:* 1609725L / 3267721

FIXED AMOUNT:
PT MOBILE-8 TELECOM to LBSF Inc.

Calculation Period from March 03, 2008 to September 02, 2008

USD 100,000,000.00 x 10.45000% x 179 / 360 =                          USD 5,195,972.22

FIXED AMOUNT:
LBSF Inc. to PT MOBILE-8 TELECOM

Calculation Period from March 03, 2008 to September 02, 2008

USD 100,000,000.00 x 6.33197% x 179 / 360 =                          USD 3,148,396.19

Amount due LBSF Inc.                                                    USD 2,047,576.03


You are kindly requested to pay USD 2,047,576.03 to LBSF Inc. on September 02, 2008 in immediately available funds, as per the following instructions:

*Payment Instructions*
Inst: CHASUS33XXX
JPMORGAN CHASE BANK, N.A.
A/C:
Benf A/C: 066143543
LEHMAN BROTHERS SPECIAL FINANCE
SLHIUS3SXXX
/bnf/ref:swaps


Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# EXHIBIT E

**PT. Mobile-8 Telecom Tbk.**
18th Floor, Menara Kebon Sirih
Jl. Kebon Sirih Kav.17-19
Jakarta 10340, Indonesia
Phone: +62-21 392 0218
Fax: +62-21 392 0219

Jakarta, 22 September 2008
No: 42/M8-LGL/IX/2008

*06 2107 PTMO*

To:
**Lehman Brothers Special Financing Inc.**
**Lehman Brothers Inc.**
745 Seventh Avenue, New York NY 10019

**Attn: Mr. Anatoly Kozlov**

Dear Sir,

Due to Lehman Brothers Holding Inc. bankruptcy file under Chapter 11 as stated in your
public announcement, we would like to request your further advice regarding our recent
discussion on Swap, and please let us know if any legal effect direct and/ or in-directly
affected to Mobile-8 in this difficult situation.

Sincerely yours,

**Anthony C. Kartawiria**
Director


Cc:
1. James S. Lee
   Managing Director, Head of Risk Solutions Group - Asia
   Lehman Brothers Asia Limited - 26/F, Two International Finance Centre
   8 Finance Street, Central, Hong Kong

2. File

# **EXHIBIT F**

# LEHMAN BROTHERS

### * * * R E V I S E D * * *

**To:**     Derivative Operations
          PT MOBILE-8 TELECOM Tbk

**From:**   Derivative Middle Office
          Lehman Brothers Special Financing Inc

          For Settlement and Payments please contact Derivative Operations at:
          Phone:  (212) 526-0200  Fax:  (212)526-1795 or (212)526-6336

**Date:**   April 29, 2009

**Re:**     Calculation of amount due March 02, 2009
          USD 0.00 / JPY 1.00 Swap Transaction
          Maturing April 07, 2009

          *Our Reference:* 1609725L / 3267721

FIXED AMOUNT:
PT MOBILE-8 TELECOM to LBSF Inc.

Calculation Period from September 02, 2008 to March 02, 2009

       USD 100,000,000.00 x 10.45000% x 180 / 360 =                          USD 5,225,000.00

FIXED AMOUNT:
LBSF Inc. to PT MOBILE-8 TELECOM

Calculation Period from September 02, 2008 to March 02, 2009

       USD 100,000,000.00 x 9.68750% x 180 / 360 =                           USD 4,843,750.00

Amount due LBSF Inc.                                                          USD 381,250.00

You are kindly requested to pay USD 381,250.00 to LBSF Inc. on March 02, 2009 in immediately available funds, as per the following instructions:

                    *Payment Instructions*
                    Inst: CITIUS33XXX
                    CITIBANK N.A.
                    Benf A/C: 30784731
                    LEHMAN BROTHERS SPECIAL FINANCE
                    SLHIUS3SXXX
                    /bnf/ref:swaps

Would you like to confirm payments and retrieve reset calculations online? Please contact us at *212-526-0200* and we will grant you access to our eSAP system. This can be found at www.lehmanlive.com

# EXHIBIT G

# LEHMAN BROTHERS

March 16, 2009

**BY TELECOPIER AND COURIER**

PT. Mobile-8 Telecom Tbk.
18th Floor, Menara Kebon Sirih
Jl Kebon Sirih Kav. 17-19
Jakarta 10340, Indonesia
Attn:    Anthony C. Kartawiria
T/C: +62-21 392 0219

> Re:    **In re Lehman Brothers Holdings Inc., et al., Chapter 11**
> **Case No. 08-13555 (JMP) (jointly administered)**

Ladies and Gentlemen:

I am the head of the Derivatives Legal team for Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, including Lehman Brothers Special Financing, Inc. ("LBSF") (collectively, the "Debtors"). Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). LBSF commenced its voluntary chapter 11 case on October 3, 2008.

Reference is hereby made to that certain Transaction Confirmation dated 8 August 2007 (the "Confirmation") between LBSF and PT. Mobile-8 Telecom Tbk. ("Counterparty"). Terms used and not otherwise defined herein shall have the meanings ascribed thereto in the Confirmation.

As a consequence of recent ratings actions relative to Counterparty's credit ratings by Moody's Investors Service and Standard & Poor's Ratings Services, LBSF has determined it has commercially reasonable grounds for insecurity concerning Counterparty's ability to perform its obligations under the Confirmation and hereby demands, pursuant to paragraph "(i)" of the "Additional Termination Events" provisions of the Confirmation, that Counterparty provide "Adequate Assurance of Performance in the form of written undertakings and/or evidence pertaining to [Counterparty's] ability, readiness and/or commitment to perform its obligations under [the Confirmation]." Such Adequate Assurance of Performance must be provided within the Written Assurance Delivery Period as set forth in the Confirmation and may be sent to me at locke.mcmurray@lehman.com.

Thank you for your attention to this matter.

Very truly yours,

Locke R. McMurray

cc:    Kevin Chichester
       Robert Lemons (Weil Gotschal)

# EXHIBIT H

# LEHMAN BROTHERS

**BY TELECOPIER AND COURIER**

March 31, 2009

PT. Mobile-8 Telecom Tbk.
18th Floor, Menara Kebon Sirih
Jl Kebon Sirih Kav. 17-19
Jakarta 10340, Indonesia
Attn: Anthony C. Kartawiria
T/C: +62-21 392 0219

Re:  Notice of Early Termination Date

Dear Sir or Madam:

Reference is hereby made to the certain Confirmation dated as of August 8, 2007, with the Global Id: 3267721 (the "Confirmation"), which incorporates the form of the ISDA Master Agreement (Multicurrency - Cross Border) (the "ISDA Form") between Lehman Brothers Special Financing Inc. ("Lehman") and PT. Mobile-8 Telecom Tbk. ("Counterparty") and the letter dated March 16, 2009 (the "Assurance Letter") whereby Lehman requested that Counterparty provide Adequate Assurance of Performance. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in the Confirmation, the ISDA Form and the Assurance Letter.

Kindly be advised that as of today's date Lehman has not received an Adequate Assurance of Performance from counterparty within the Written Assurance Delivery Period, as set forth in the Confirmation and consequently an Additional Termination Event has occurred and is continuing with respect to Counterparty. Pursuant to the Adequate Assurance of Performance provision of the Confirmation and Section 5 (b) (v) (Right to Terminate Following Additional Termination Event) of the ISDA Form, Lehman, as the Non-defaulting Party, hereby designates April 7, 2009, as the Early Termination Date in relation to the Transaction.

In accordance with Section 12(a) of the Master Agreement, this notice is being delivered during normal business hours and will be deemed effective on the date it is delivered.

Lehman reserves all of its rights under the ISDA Form, the Confirmation and under the Transaction outstanding between us.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name: James Fogarty
Title: President and Chief Operating Officer

LEHMAN BROTHERS SPECIAL FINANCING INC
1271 SIXTH AVENUE, NEW YORK, NEW YORK  10020

# **EXHIBIT I**

**PT. Mobile-8 Telecom Tbk**
18th Floor, Menara Kebon Sirih
Jl. Kebon Sirih Kav. 17-19
Jakarta 10340, Indonesia

www.mobile-8.com

Ref.09/M8-LGL/V/2009
Jakarta, May 5th 2009

**To**
**Lehman Brothers Holding Inc.**      **Lehman Brother Special Financing Inc.**
**1271 Sixth Avenue,40th floor**      **1271 Sixth Avenue,New York**
**New York 10020**                    **New York 10020**

                                      **Attn.: James Fogarty**
**Attn.: Locke R.Mc.Murray**              **President and Chief Operating Officer**

Dear Sir,

We refer to the facts than Lehman Brothers Holding Inc. ("LBHI") and it s affiliated
debtors, including Lehman Brothers Special Financing Inc. ("LBSF") have serious
financial problems and has commenced their chapter 11 at the bankruptcy court in
the United States of America.

The above chapter 11 proceeding is authentic evidence that LBSF and LBHI have
mislead and committed misrepresentation as proven by the fact that from the
beginning of the transaction it is now proven that LBHI and LBSF do not have the
ability to perform their financial obligations on the swap and derivative transaction,
and therefore have committed defaults under the confirmation dated as August 8th
2007 Global id : 3267721.

As a result of such occurrences and continuance misleading and misrepresentation,
we hereby terminate the confirmation dated August 8th 2007 with the Global Id:
3267721 and any related documents.

Your Sincerely,
**PT.Mobile-8 Telecom, Tbk**

**Anthony C.Kartawiria**
**Director**

**CC: File.**



# EXHIBIT J

# LEHMAN BROTHERS

**BY COURIER**

June 18, 2009

PT. Mobile-8 Telecom Tbk.
18th Floor, Menara Kebon Sirih
Jl Kebon Sirih Kav. 17-19
Jakarta 10340, Indonesia
Attn: Anthony C. Kartawiria

> Re: Notice of Amount Payable Under Section 6(d)(i) of the form of the ISDA Master Agreement (Multicurrency - Cross Border) (the "ISDA Form") incorporated in to the certain Confirmation dated as of August 8, 2007, with the Global Id: 3267721 (the "Confirmation") between Lehman Brothers Special Financing Inc. ("Lehman") and PT. Mobile-8 Telecom Tbk. ("Counterparty")

Dear Sir:

Reference is hereby made to the Master Agreement referenced above.

In accordance with the termination notice dated March 31, 2009 previously sent to you, whereby we designated April 7, 2009 as the Early Termination Date, we hereby notify you, pursuant to Section 6(d)(i) of the Master Agreement, that the amount payable under Section 6(d)(i) of the Master Agreement is USD 2,560,472 (the "Termination Payment") and such Termination Payment is payable by Counterparty to Lehman on the date this notice is effective (the "Payment Date"). This amount does not reflect the interest accrued and accruing pursuant to the Master Agreement.

We note that "Market Quotation" applies to the calculation of the amount payable under Section 6(d)(i) of the Master Agreement. However, Lehman has made the determination, and reasonably believes, that Market Quotation would not produce a commercially reasonable result. Accordingly, Lehman has calculated the Termination Payment in accordance with the "Loss" methodology pursuant to Clause "(b)" of the definition of Settlement Amount set forth in Section 14 of the Master Agreement. As set forth on the attached Annex A, Lehman has ascribed a value of USD 2,179,222 to the Transaction under the Master Agreement as of the Early Termination Date. Additionally, there is a net amount of USD 381,250 in favor of Lehman in respect of amounts due on March 2, 2009 but not paid prior to the Early Termination Date .

Kindly remit the Termination Payment to Lehman on the Payment Date in immediately available funds to: Citibank NA New York, 388 Greenwich Street, New York, New York 10013, ABA No. 021-000-089, Acc't No. 3078-4731 (Lehman Brothers Special Financing Inc – DIP)

In accordance with Section 10(a) of the Master Agreement, this notice is being delivered by overnight courier during normal business hours and will be deemed effective on the date of delivery.

Lehman reserves all of its rights under the Agreement and under each Transaction outstanding between us.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name: William Fox
Title: Chief Financial Officer, Controller and Senior
Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC
1271 SIXTH AVENUE, NEW YORK, NEW YORK 10020

# **EXHIBIT K**

### Derivatives ADR Notice

Derivatives ADR Notice No.: 113


Debtor(s):              Lehman Brothers Special Financing Inc. ("LBSF")

Derivatives
Counterparties:         PT Mobile-8 Telecom Tbk ("PT Mobile-8 Telecom")


Derivatives Contracts: Confirmation, dated as of August 8, 2007, between PT Mobile-8
                       Telecom and LBSF ("Confirmation")

Settlement Demand:   (a) $2,179,222 on account of the amount owed LBSF by PT
                     Mobile-8 Telecom as a Settlement Amount under the
                     Confirmation;

                     (b) $381,250 on account of a missed payment under the
                     Confirmation owed LBSF by PT Mobile-8 Telecom on March 2,
                     2009; and

                     (c) $236,226.13 on account of interest accrued as of November 20,
                     2009 and additional interest accruing thereafter.   With respect to
                     the Settlement Amount owed, such interest has been calculated at
                     the Termination Rate (as incorporated by reference in the
                     Confirmation) for the period between April 7, 2009 and June 21,
                     2009 and at the Default Rate (as incorporated by reference in the
                     Confirmation) since June 21, 2009.   With respect to the missed
                     payment, such interest has been calculated at the Default Rate
                     since March 2, 2009.

Explanation of Basis for Settlement Demand: LBSF delivered a notice to PT Mobile-8
Telecom on March 16, 2009, exercising its right under the Confirmation to demand
Adequate Assurance of Performance.   LBSF was prompted to request Adequate
Assurance after receiving notice that PT Mobile-8 had defaulted on outstanding bonds.

PT Mobile-8 Telecom failed to provide Adequate Assurance of Performance and LBSF
sent a Notice of Early Termination on March 31, 2009, designating April 7, 2009 as the
Early Termination Date.

LBSF sent a Notice of Amount Payable on June 18, 2009, notifying PT Mobile-8 that it
owed a Termination Payment in the amount of $2,560,472.  This Termination Payment
included a missed payment under the Confirmation in the amount of $381,250 due to
LBSF on March 2, 2009 but not paid prior to the Early Termination Date.

In addition to the settlement amount owed, interest has accrued at the Applicable Rate in the amount of $236,226.13 as of November 20, 2009 and continues to accrue.

Date of Derivatives ADR Notice:      November 23, 2009

Date of Service:      November 24, 2009

Response Due Date:      December 24, 2009


Debtor Contact:      Locke R. McMurray
Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 40th Floor
New York, New York    10020
Telephone Number: (212) 526-7186
Email: locke.mcmurray@lehman.com

WGM Contact:      Holly Loiseau
Weil, Gotshal & Manges LLP
1300 Eye Street, NW
Suite 900
Washington, DC    20005
Telephone Number: (202) 682-7144
Email: holly.loiseau@weil.com

# **EXHIBIT L**

**PT. Mobile-8 Telecom Tbk**
18th Floor, Menara Kebon Sirih
Jl. Kebon Sirih Kav. 17-19
Jakarta 10340, Indonesia

www.mobile-8.com

Ref.240/M8Tbk-CS/XII/2009                    Jakarta, December 21th 2009

To
**Lehman Brothers Holding Inc.**      **Weil, Gotshal & Manges LLP**
**1271 Sixth Avenue,40th floor**        **1300 Eye Street, NW**
**New York 10020**                      **Suite 900, Washington DC 20005**

**Attn: Locke R. McMurray**            **Attn: Holly Loiseau**

Dear Sir,

We would like to inform you:

1. Since Lehman Brothers Holding Inc. ("LBHI") and it's affiliated debtors, including Lehman Brothers Special Financing Inc. ("LBSF") have serious financial problems and has commenced their chapter 11 at the bankruptcy court in the United States of America, we are in the position that LBHI and LBSF do not have the ability to perform their financial obligations on the swap and derivative transaction.

2. We believe LBHI and LBSF are in default instead of Mobile-8 due to misleading and misrepresentation.

3. Considering on the above, Mobile-8 is on the position as stated the letter dated May 5th, 2009 as attached and refused any Settlement Demand since we are in the position that Mobile-8 has the right to claim your misleading and misrepresentation instead of yours.

Your Sincerely,
**PT.Mobile-8 Telecom, Tbk**

**Anthony C.Kartawiria**               **Yopie Widjaya**
**Director**                           **Director**

CC: File.



# **<u>EXHIBIT M</u>**

**Reply to the Response to the Derivatives ADR Notice**

Debtor(s):                          Lehman Brothers Special Financing Inc. ("LBSF")

Derivatives Counterparty:           PT Mobile-8 Telecom Tbk ("PT Mobile-8 Telecom")

Response to Derivatives ADR Notice No.: 113

☐ Agree to Counteroffer

☒ Denial of Counteroffer


Explanation of Basis for Denial of Counteroffer:

LBSF rejects the $0 counteroffer from PT Mobile-8 Telecom and confirms its original
settlement demand because PT Mobile-8 Telecom failed to pay the Termination Payment
due under the Confirmation. Pursuant to the terms of the Confirmation, LBSF sent a
Notice of Early Termination to PT Mobile-8 Telecom on March 31, 2009, designating
April 7, 2009 as the Early Termination Date.

PT Mobile-8 Telecom's purported termination on May 5, 2009 was ineffective. The
Confirmation had already been terminated at that time by LBSF and any subsequent
purported termination by PT Mobile-8 Telecom was entirely meaningless and without
merit.

There is no basis for PT Mobile-8 Telecom's misrepresentation claim, which we construe
as asserting a fraud in the inducement-type defense. The pleading requirements of Rule
9(b) of the Federal Rules of Civil Procedure state that a party alleging fraud must "state
with particularity the circumstances constituting fraud." To adequately plead a cause of
action for fraudulent inducement, PT Mobile-8 Telecom must allege that LBSF made a
false representation of a material fact, that LBSF made such misrepresentation
knowingly, that the misrepresentation made was justifiably relied upon by PT Mobile-8
Telecom, and that some injury or damage resulted to PT Mobile-8 Telecom.

PT Mobile-8 Telecom has no cause of action for fraud in the inducement since LBSF
neither misstated any material fact, nor omitted to state a fact necessary to make some
other statement not materially misleading. PT Mobile-8 Telecom is asserting fraudulent
inducement based only upon LBSF's bankruptcy filing in September 2008. It asserts no
false representation of material fact on or around August 8, 2007 when the parties entered
into the Confirmation. At this time, LBSF was fully able to perform its financial
obligations under the Confirmation and PT Mobile-8 Telecom can show no knowing
misrepresentation of material fact with regard to LBSF's ability to perform.

Debtor Contact:      Locke R. McMurray
Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 40th Floor
New York, New York  10020
Telephone Number:  (646) 285-9700
Email: locke.mcmurray@lehmanholdings.com

Lawrence Brandman
Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 40th Floor
New York, New York  10020
Telephone Number:  (646) 285-9650
Email: lawrence.brandman@lehmanholdings.com

WGM Contact:      Holly Loiseau
Weil, Gotshal & Manges LLP
1300 Eye Street
NW Suite 900
Washington D.C.  20005
Telephone Number:  (202) 682-7144
Email: holly.loiseau@weil.com

2

# EXHIBIT N

# WEIL, GOTSHAL & MANGES LLP

1300 EYE STREET, NW
SUITE 900
WASHINGTON, DC 20005
(202) 682-7000
FAX: (202) 857-0939

AUSTIN
BEIJING
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SILICON VALLEY
SINGAPORE
WARSAW

HOLLY E. LOISEAU
DIRECT LINE (202) 682-7144
E-MAIL: holly.loiseau@weil.com

February 23, 2010

**VIA EMAIL & FEDERAL EXPRESS**

Herman Subianto
PT Mobile-8 Telecom Tbk
18th Floor, Menara Kebon Sirih
Jl. Kebon Sirih Kav. 17-19
Jakarta 10340, Indonesia

Re:    **Lehman ADR Notice No. 113**

Dear Herman:

This letter follows up on our most recent conference call regarding the above-referenced matter. During our call, we indicated that our records show an additional missed payment of $2,047,576.03 that should have been made by PT Mobile 8 to Lehman on September 8, 2008. This missed payment represents an amount that PT Mobile 8 owes to Lehman in addition to the amounts indicated in the ADR Notice and settlement demand. As we requested on the call, if PT Mobile 8 did in fact make this payment, please send us confirmation of the payment in the form of a wire transfer receipt or equivalent documentation by Friday, February 26, 2010. If we do not receive confirmation of the payment, Lehman will increase its settlement demand to $5,416,996.50.

WEIL, GOTSHAL & MANGES LLP

Herman Subianto
February 23, 2010
Page 2

      If we cannot come to a resolution informally in the near term, we suggest that we refer this matter to one of the bankruptcy court-approved mediators without delay. Please contact me if you have any questions or if you would like to discuss resolution of this matter.

Best regards,

Holly E. Loiseau

Enclosures

cc:    Lawrence Brandman

# EXHIBIT O



THE RESOLUTION EXPERTS®

June 3, 2010

**VIA REGULAR MAIL**
Honorable James M. Peck
United States Bankruptcy Judge
United States Bankruptcy Court
One Bowling Green
New York, NY 10004

      **Re:**   **Lehman Brothers Holdings vs. PT Mobile-8**
            **ADR Notice No. 102**

Dear Judge Peck:

I am the Case Manager at JAMS handling the above referenced mediation. We have made numerous efforts to schedule this mediation in accordance with the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors under Derivatives Contracts; However, we have not received any response from PT Mobile-8 and in effect, are unable to schedule a mediation date. Enclosed please find copies of the correspondence sent by JAMS to the defendants. The items enclosed are as follows:

1. Email dated March 31, 2010
2. Email dated March 31, 2010
3. Email dated April 12, 2010
4. Letter dated April 14, 2010
5. Email dated April 22, 2010
6. Email dated April 27, 2010
7. Email receipt for online Inquiry Submission on PT Mobile-8 website dated May 7, 2010
8. Letter from David Geronemus enclosing Order dated May 7, 2010 with Federal Express confirmation and fax confirmation

I have also attempted to call PT Mobile-8 at 011-62-21-392-0218 which was ineffective because a receptionist did not answer and there was no voicemail connected.

Respectfully,

Srividya Mandava
JAMS Case Manager
smandava@jamsadr.com
Fax# 212-751-4099

Encl.

**Mandava Srividya**

| | |
|---|---|
| **From:** | Mandava Srividya |
| **Sent:** | Wednesday, March 31, 2010 9:24 AM |
| **To:** | 'Hren, Eileen' |
| **Cc:** | Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus' |
| **Subject:** | RE: Mediation Referral - PT Mobile-8 |

Dear Counsel:

I am the Case Manager with JAMS who is handling the administration for the above referenced matter. The Mediators have decided that David Geronemus will be mediating this matter. His availability is as follows:
*May 19, 2010

Please provide me with your availability subject to Mediator Geronemus' as soon as possible so I may reserve a mutually convenient date. If this date does not work, please let me know and I will provide additional availability. After a date is confirmed by all parties, I will schedule a conference call with you and the Mediator.

Additionally, please provide me with contact information of any additional persons who will be participating in the conference call and/or the mediation. This will ensure that Mediator Geronemus' disclosures will be the most accurate.

Please contact me directly with any questions. My direct dial is 212-607-2787. Have a nice day.

Best regards,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

---

**From:** Hren, Eileen [mailto:eileen.hren@weil.com]
**Sent:** Monday, March 29, 2010 6:07 PM
**To:** Mandava Srividya
**Cc:** Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus'
**Subject:** Mediation Referral - PT Mobile-8

Vidya,

Please find the attached request for mediation with PT Mobile-8, and the relevant ADR notice, response and reply.

Thank you,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

1

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

**Mandava Srividya**

| | |
|---|---|
| **From:** | Mandava Srividya |
| **Sent:** | Wednesday, March 31, 2010 5:53 PM |
| **To:** | 'Hren, Eileen' |
| **Cc:** | Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus' |
| **Subject:** | RE: Mediation Referral - PT Mobile-8 |

Dear Counsel:

Please note that David is no longer available on the May 19th date I offered in my previous email. Additional availability for David is as follows:
*June 11 and 22

Please provide me with your availability subject to the two dates above. Additionally, please provide me with names and contact information for any additional participants so David's disclosures will be accurate. I can be contacted directly at 212-607-2787. Have a nice day.

Best regards,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

**From:** Hren, Eileen [mailto:eileen.hren@weil.com]
**Sent:** Monday, March 29, 2010 6:07 PM
**To:** Mandava Srividya
**Cc:** Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus'
**Subject:** Mediation Referral - PT Mobile-8

Vidya,

Please find the attached request for mediation with PT Mobile-8, and the relevant ADR notice, response and reply.

Thank you,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly

prohibited. If you have received this communication in error, please immediately notify us by email
(postmaster@weil.com), and destroy the original message. Thank you.

**Mandava Srividya**

| | |
|---|---|
| **From:** | Mandava Srividya |
| **Sent:** | Monday, April 12, 2010 4:21 PM |
| **To:** | Herman Subianto; Christoporus |
| **Subject:** | RE: Mediation Referral - PT Mobile-8 |

**Importance:**      High

Dear Counsel:

Please let me know if you are available on June 22 for this mediation. Thank you and have a nice day.

Best,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

**From:** Hren, Eileen [mailto:eileen.hren@weil.com]
**Sent:** Friday, April 02, 2010 3:25 PM
**To:** Mandava Srividya
**Cc:** Loiseau, Holly; locke.mcmurray@lehmanholdings.com; lawrence.brandman@lehmanholdings.com; Gruenberger, Peter; Herman Subianto; Christoporus
**Subject:** RE: Mediation Referral - PT Mobile-8

Vidya,

Lehman is available to participate in the mediation on June 22.

Thanks,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

**From:** Mandava Srividya [mailto:smandava@jamsadr.com]
**Sent:** Wednesday, March 31, 2010 5:53 PM
**To:** Hren, Eileen
**Cc:** Loiseau, Holly; locke.mcmurray@lehmanholdings.com; lawrence.brandman@lehmanholdings.com; Gruenberger, Peter; Herman Subianto; Christoporus
**Subject:** RE: Mediation Referral - PT Mobile-8

Dear Counsel:

Please note that David is no longer available on the May 19th date I offered in my previous email. Additional availability for David is as follows:
*June 11 and 22

1

Please provide me with your availability subject to the two dates above. Additionally, please provide me with names and contact information for any additional participants so David's disclosures will be accurate. I can be contacted directly at 212-607-2787. Have a nice day.

Best regards,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

**From:** Hren, Eileen [mailto:eileen.hren@weil.com]
**Sent:** Monday, March 29, 2010 6:07 PM
**To:** Mandava Srividya
**Cc:** Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus'
**Subject:** Mediation Referral - PT Mobile-8

Vidya,

Please find the attached request for mediation with PT Mobile-8, and the relevant ADR notice, response and reply.

Thank you,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

## Mandava Srividya

| | |
|---|---|
| **From:** | Mandava Srividya |
| **Sent:** | Thursday, April 22, 2010 2:25 PM |
| **To:** | 'Herman Subianto'; 'Christoporus' |
| **Subject:** | RE: Mediation Referral - PT Mobile-8 |

Please provide me with your availability.

Thanks,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

**From:** Mandava Srividya
**Sent:** Monday, April 12, 2010 4:21 PM
**To:** Herman Subianto; Christoporus
**Subject:** RE: Mediation Referral - PT Mobile-8
**Importance:** High

Dear Counsel:

Please let me know if you are available on June 22 for this mediation. Thank you and have a nice day.

Best,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

**From:** Hren, Eileen [mailto:eileen.hren@weil.com]
**Sent:** Friday, April 02, 2010 3:25 PM
**To:** Mandava Srividya
**Cc:** Loiseau, Holly; locke.mcmurray@lehmanholdings.com; lawrence.brandman@lehmanholdings.com; Gruenberger, Peter; Herman Subianto; Christoporus
**Subject:** RE: Mediation Referral - PT Mobile-8

Vidya,

Lehman is available to participate in the mediation on June 22.

Thanks,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

1

**From:** Mandava Srividya [mailto:smandava@jamsadr.com]
**Sent:** Wednesday, March 31, 2010 5:53 PM
**To:** Hren, Eileen
**Cc:** Loiseau, Holly; locke.mcmurray@lehmanholdings.com; lawrence.brandman@lehmanholdings.com; Gruenberger, Peter; Herman Subianto; Christoporus
**Subject:** RE: Mediation Referral - PT Mobile-8

Dear Counsel:

Please note that David is no longer available on the May 19th date I offered in my previous email. Additional availability for David is as follows:
*June 11 and 22

Please provide me with your availability subject to the two dates above. Additionally, please provide me with names and contact information for any additional participants so David's disclosures will be accurate. I can be contacted directly at 212-607-2787. Have a nice day.

Best regards,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

**From:** Hren, Eileen [mailto:eileen.hren@weil.com]
**Sent:** Monday, March 29, 2010 6:07 PM
**To:** Mandava Srividya
**Cc:** Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus'
**Subject:** Mediation Referral - PT Mobile-8

Vidya,

Please find the attached request for mediation with PT Mobile-8, and the relevant ADR notice, response and reply.

Thank you,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

## Mandava Srividya

| | |
|---|---|
| **From:** | Hren, Eileen [eileen.hren@weil.com] |
| **Sent:** | Tuesday, April 27, 2010 2:39 PM |
| **To:** | Herman Subiano; Christoporus |
| **Cc:** | Loiseau, Holly; Mandava Srividya |
| **Subject:** | FW: Mediation Referral - PT Mobile-8 |

Dear Herman,

As we mentioned in our last letter, we have referred the dispute between Lehman and PT Mobile-8 to the court-approved mediator, who we hope can help us reach a resolution in this matter. Could you please respond to Vidya (cc'd above) and let her know if PT Mobile-8 is able to participate in the mediation on June 22?

Thank you,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

---

**From:** Mandava Srividya [mailto:smandava@jamsadr.com]
**Sent:** Tuesday, April 27, 2010 2:36 PM
**To:** Hren, Eileen
**Subject:** FW: Mediation Referral - PT Mobile-8

Hi Eileen,

As discussed on the phone earlier, below please find the email sent to all parties.

Best,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

---

**From:** Mandava Srividya
**Sent:** Wednesday, March 31, 2010 5:53 PM
**To:** 'Hren, Eileen'
**Cc:** Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus'
**Subject:** RE: Mediation Referral - PT Mobile-8

Dear Counsel:

Please note that David is no longer available on the May 19th date I offered in my previous email. Additional availability for David is as follows:
*June 11 and 22

1

Please provide me with your availability subject to the two dates above. Additionally, please provide me with names and contact information for any additional participants so David's disclosures will be accurate. I can be contacted directly at 212-607-2787. Have a nice day.

Best regards,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

**From:** Hren, Eileen [mailto:eileen.hren@weil.com]
**Sent:** Monday, March 29, 2010 6:07 PM
**To:** Mandava Srividya
**Cc:** Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus'
**Subject:** Mediation Referral - PT Mobile-8

Vidya,

Please find the attached request for mediation with PT Mobile-8, and the relevant ADR notice, response and reply.

Thank you,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

**Mandava Srividya**

| | |
|---|---|
| **From:** | Corporate - Mobile8 [corporate_communications@mobile-8.com] |
| **Sent:** | Friday, May 07, 2010 9:37 AM |
| **To:** | Mandava Srividya |
| **Subject:** | Copy of: Corporate - Mobile8 Enquiry |

Copy of:

This is an enquiry e-mail via http://www.mobile-8.com/corporate/ from:
Srividya Mandava <smandava@jamsadr.com>

I have been trying to contact Herman Subianto, Christoporus Suswandi and Anthony Kartawiria
in regards to a court ordered mediation with Lehman Brothers Special Financing, Inc. Please
provide me with a means of contacting Mr. Subianto, Mr. Siswandi, and/or Mr. Kartawiria at
your earliest convenience. Additionally, please let me know if these individuals do not work
for your company anymore; If this is the case, please provide me with contact information for
your legal department or whoever is responsible for handling this matter. Thank you and have
a nice day.

Perusahaan:
JAMS

Alamat Perusahaan:
620 Eighth Avenue, 34 Floor, NYC, 10018

No. Handphone:
212-607-2787

Ditujukan Ke:
Corporate Communications

1



**THE RESOLUTION EXPERTS®**

April 14, 2010

**Via Regular Mail**
Mr. Anthony Kartawiria
PT Mobile-8 Telecom Tbk
18th Floor, Menara Kebon Sirih
Jl. Kebon Sirih Kav. 17-19
Jakarta 10340,
Indonesia

      Re:   <u>Lehman Brothers Holdings vs. PT Mobile-8</u>
              Reference #: 1425006349

Dear Mr. Kartawiria:

I am the Case Manager at JAMS handling the above referenced mediation. The Mediators have decided that David Geronemus will be mediating this matter. I have sent several emails in attempts to schedule a mediation session with all parties. I have been emailing the following individuals at your office:
Herman Subianto at herman.subianto@mobile-8.com
Christophorus Siswandi at christophorus.siswandi@mobile-8.com.

Enclosed please find the emails I sent to the aforementioned individuals at your company. I have not received responses to any of my emails from PT Mobile-8. Please contact me at your earliest convenience so we can move forward with scheduling. Thank you for your attention to this matter and have a nice day.

Very truly yours,

Srivi ya Mandava
Case Manager
smandava@jamsadr.com
Fax# 212-751-4099

Encl.

**Mandava Srividya**

| | |
|---|---|
| **From:** | Mandava Srividya |
| **Sent:** | Wednesday, March 31, 2010 9:24 AM |
| **To:** | 'Hren, Eileen' |
| **Cc:** | Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus' |
| **Subject:** | RE: Mediation Referral - PT Mobile-8 |

Dear Counsel:

I am the Case Manager with JAMS who is handling the administration for the above referenced matter. The Mediators have decided that David Geronemus will be mediating this matter. His availability is as follows:
*May 19, 2010

Please provide me with your availability subject to Mediator Geronemus' as soon as possible so l may reserve a mutually convenient date. If this date does not work, please let me know and I will provide additional availability. After a date is confirmed by all parties, I will schedule a conference call with you and the Mediator.

Additionally, please provide me with contact information of any additional persons who will be participating in the conference call and/or the mediation. This will ensure that Mediator Geronemus' disclosures will be the most accurate.

Please contact me directly with any questions. My direct dial is 212-607-2787. Have a nice day.

Best regards,
Vidya


Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

---

**From:** Hren, Eileen [mailto:eileen.hren@weil.com]
**Sent:** Monday, March 29, 2010 6:07 PM
**To:** Mandava Srividya
**Cc:** Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus'
**Subject:** Mediation Referral - PT Mobile-8

Vidya,

Please find the attached request for mediation with PT Mobile-8, and the relevant ADR notice, response and reply.

Thank you,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

1

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

## Mandava Srividya

| | |
|---|---|
| **From:** | Mandava Srividya |
| **Sent:** | Wednesday, March 31, 2010 5:53 PM |
| **To:** | 'Hren, Eileen' |
| **Cc:** | Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus' |
| **Subject:** | RE: Mediation Referral – PT Mobile-8 |

Dear Counsel:

Please note that David is no longer available on the May 19th date I offered in my previous email. Additional availability for David is as follows:
*June 11 and 22

Please provide me with your availability subject to the two dates above. Additionally, please provide me with names and contact information for any additional participants so David's disclosures will be accurate. I can be contacted directly at 212-607-2787. Have a nice day.

Best regards,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

**From:** Hren, Eileen [mailto:eileen.hren@weil.com]
**Sent:** Monday, March 29, 2010 6:07 PM
**To:** Mandava Srividya
**Cc:** Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus'
**Subject:** Mediation Referral – PT Mobile-8

Vidya,

Please find the attached request for mediation with PT Mobile-8, and the relevant ADR notice, response and reply.

Thank you,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly

3

prohibited. If you have received this communication in error, please immediately notify us by email
(postmaster@weil.com), and destroy the original message. Thank you.

**Mandava Srividya**

| | |
|---|---|
| **From:** | Mandava Srividya |
| **Sent:** | Monday, April 12, 2010 4:21 PM |
| **To:** | Herman Subianto; Christoporus |
| **Subject:** | RE: Mediation Referral - PT Mobile-8 |

**Importance:**      High

Dear Counsel:

Please let me know if you are available on June 22 for this mediation. Thank you and have a nice day.

Best,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

---

**From:** Hren, Eileen [mailto:eileen.hren@weil.com]
**Sent:** Friday, April 02, 2010 3:25 PM
**To:** Mandava Srividya
**Cc:** Loiseau, Holly; locke.mcmurray@lehmanholdings.com; lawrence.brandman@lehmanholdings.com; Gruenberger, Peter; Herman Subianto; Christoporus
**Subject:** RE: Mediation Referral - PT Mobile-8

Vidya,

Lehman is available to participate in the mediation on June 22.

Thanks,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

---

**From:** Mandava Srividya [mailto:smandava@jamsadr.com]
**Sent:** Wednesday, March 31, 2010 5:53 PM
**To:** Hren, Eileen
**Cc:** Loiseau, Holly; locke.mcmurray@lehmanholdings.com; lawrence.brandman@lehmanholdings.com; Gruenberger, Peter; Herman Subianto; Christoporus
**Subject:** RE: Mediation Referral - PT Mobile-8

Dear Counsel:

Please note that David is no longer available on the May 19th date I offered in my previous email. Additional availability for David is as follows:
*June 11 and 22

5

Please provide me with your availability subject to the two dates above. Additionally, please provide me with names and contact information for any additional participants so David's disclosures will be accurate. I can be contacted directly at 212-607-2787. Have a nice day.

Best regards,
Vidya

Srividya Mandava
JAMS Case Manager
212-607-2787 (direct dial)
212-751-4099 (facsimile)

**From:** Hren, Eileen [mailto:eileen.hren@weil.com]
**Sent:** Monday, March 29, 2010 6:07 PM
**To:** Mandava Srividya
**Cc:** Loiseau, Holly; 'locke.mcmurray@lehmanholdings.com'; 'lawrence.brandman@lehmanholdings.com'; Gruenberger, Peter; Herman Subianto; 'Christoporus'
**Subject:** Mediation Referral - PT Mobile-8

Vidya,

Please find the attached request for mediation with PT Mobile-8, and the relevant ADR notice, response and reply.

Thank you,

Eileen Hren
Weil, Gotshal & Manges
1300 I Street, NW
Washington, DC 20005
202-682-7209

*Admitted to practice in New York only. Practicing under the supervision of members of the D.C. Bar.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.



www.jamsadr.com                    **THE RESOLUTION EXPERTS**                    **Offices Nationwide**

# Fax Cover

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| | Mr. Anthony Kartawiria | | | | |
| | Mr. Christophorus Siswandi | | | | |
| **To:** | Mr. Herman Subianto | **Phone:** | | **Fax:** | +62-21-3920219 |
| **From:** | Srividya Mandava | **Phone:** | 212-607-2787 | | |
| **Date:** | May 7, 2010 | **Pages (Including Cover):** | 20 | | |

**Re:**

Lehman Brothers Special Financing Inc. vs. PT Mobile-8 Telecom

**Comments:**

Dear Sirs:

Enclosed please find the following items:

1. Letter from Mediator David Geronemus
2. Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors under Derivatives Contracts

If these individuals are no longer with the firm, please provide the enclosed items to the legal department or to other appropriate individual.

Regards,
Vidya

Srividya Mandava
**Case Manager**

212-607-2787 (direct dial)

smandava@jamsadr.com

This facsimile transmission is confidential. If you have received this transmission in error, please notify
the sender at the number listed below and discard the transmission. Thank you for your assistance.

**620 Eighth Avenue • 34th Floor • New York, NY 10018 • Tel 212.751.2700 • Fax 212.751.4099**



THE RESOLUTION EXPERTS®

May 7, 2010

<u>Via Federal Express, Email, and Facsimile</u>
Mr. Anthony Kartawiria
Mr. Christophorus Siswandi
Mr. Herman Subianto
PT Mobile-8 Telecom Tbk
18th Floor, Menara Kebon Sirih
Jl. Kebon Sirih Kav. 17-19
Jakarta 10340, Indonesia

   Re: Lehman Brothers Special Financing Inc. vs. PT Mobile-8 Telecom
     ADR Notice No. 102

Dear Mr. Kartawiria, Mr. Siswandi, and Mr. Subianto:

I have been selected to mediate the above referenced dispute pursuant to the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors under Derivatives Contracts signed by Hon. James M. Peck of the United States Bankruptcy Court for the Southern District of New York on September 17, 2009. I would like to arrange for a conference call to discuss scheduling the mediation and other organizational matters. My availability is as follows:

New York: May 20, 2010 at 9:00 PM    Jakarta: May 21 at 8:00 AM
New York: May 21, 2010 at 9:00 AM or 10:00 AM  Jakarta: May 21 at 8:00 PM or 9:00 PM

At your earliest convenience, please let me know if you are available at one of these times and if you are not, when you would be available. Additionally, please provide me with the names and contact information for the individuals who will be participating in the conference call.

I understand that representatives of Lehman Brothers Special Financing Inc. will be available at the above times.

You can contact me via email at dgeronemus@jamsadr.com or by phone at 203-255-8787. I look forward to speaking with you.

Very truly yours,

David Geronemus, Esq.
Mediator

Cc: Locke McMurray, Eileen Hren, Holly Loiseau, Lawrence Brandman, Peter Gruenberger
  (All via email only)

Encl.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :    08-13555 (JMP)
                                          :
              Debtors.                    :    (Jointly Administered)
                                          :
                                          :
------------------------------------------------------------x

## ALTERNATIVE DISPUTE RESOLUTION PROCEDURES ORDER FOR AFFIRMATIVE CLAIMS OF DEBTORS UNDER DERIVATIVES CONTRACTS

The following alternative dispute resolution procedures (the "Derivatives ADR Procedures") are ORDERED to apply in the chapter 11 cases of Lehman Brothers Holdings, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession in various chapter 11 proceedings consolidated for procedural purposes only (collectively, "the Debtors").

### FINDINGS

On motion of Debtors, the Court FINDS that numerous open and terminated derivatives contracts, including any derivative contract that is a "swap agreement" or "forward contract", in each case, as such term is defined in section 101 of the Bankruptcy Code, exist as to which one or more Debtors assert that monetary recovery is due to a Debtor from a counterparty, its affiliates, or related parties (the "Derivatives Contracts with Recovery Potential"). The Court further FINDS that certain common issues exist regarding these contracts, including questions involving appropriateness of setoff, termination, valuation and computation of termination payments, and notice. The Court further FINDS that substantial value may be recovered for the estates of Debtors, and judicial efficiency can be promoted, if expedient resolution of disputes and recoveries under such contracts can be achieved without the need for trial of adversary proceedings or other litigation. The Court further FINDS that similar proceedings ordered in

other complex chapter 11 cases have contributed to effective administration of the proceedings and have reduced costs for all parties.

The procedures described below are ORDERED to promote consensual recovery with respect to the Derivatives Contracts with Recovery Potential, and to encourage effective communication between the affected parties, consultation, negotiation, and, when necessary, mediation procedures.

1.  Standing Mediation Order.  All provisions of the General Order #M-143, adopted January 17, 1995, providing for Procedures Governing Mediation of Matters in Bankruptcy Cases and Adversary Proceedings in the Bankruptcy Court for the Southern District of New York and all existing and further amendments thereto (the "Standing Order") shall apply to the mediations to be conducted under this Order.

2.  Derivatives ADR Counterparties.  To date, the Debtors have identified approximately two hundred fifty (250) counterparties (which number will surely increase) to Derivatives Contracts with Recovery Potential with whom there is reasonable cause for Debtors to believe that disagreement exists over the amounts that may be owed to Debtors under such contracts (whether or not an actual lawsuit or adversary proceeding has been commenced), whether from a counterparty to a Derivatives Contract with a Recovery Potential, an affiliate of such counterparty or a person or entity who exercised or failed to exercise duties in relation to such a contract (collectively, the "Derivatives Counterparties"); provided, however, that the term Derivatives Contract with Recovery Potential shall not include any cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction or repurchase agreement in respect of securities or loans.

2

3.  <u>Derivatives ADR Disputes</u>. Any Debtor may designate any dispute regarding

a Derivatives Contract with Recovery Potential to the Derivatives ADR Procedures by serving

on a Derivatives Counterparty a copy of this Order and a Derivatives ADR Notice (as defined

below) (collectively, the "<u>Derivatives ADR Package</u>").

a.  Debtors shall not implement Derivatives ADR Procedures with respect

to a Derivatives Contract with Recovery Potential that (i) has not been purportedly terminated

and (ii) with respect to which a Derivatives Counterparty has not failed to make a payment, or

perform any other obligation, due, if any, to the Debtor(s) (without regard to any provision in a

Derivatives Contract with Recovery Potential that purports to permit a Derivatives Counterparty

to withhold performance by reason of a default by a Debtor or its affiliates).

b.  Debtors shall make commercially reasonable efforts to minimize the

frequency of service of Derivatives ADR Notices on any one Derivatives Counterparty.

c.  Any trustee, indenture trustee or party acting in a fiduciary capacity in

connection with a trust or other financing arrangement that relates to the applicable Derivatives

Contract with any of the Debtors (such persons or entities collectively referred to as "<u>Indenture

Trustees</u>," and each singly as an "<u>Indenture Trustee</u>") shall be subject to this Order.

d.  For purposes of the Derivatives ADR Procedures, service on or notice

to a Derivatives Counterparty or Indenture Trustee, as the case may be, shall be deemed adequate

if such service or notice is provided to such Derivatives Counterparty, such Indenture Trustee, a

legal guardian, estate representative, or other representative and such party's counsel who have

appeared in these cases by (i) email and (ii) at the option of the Debtors either (x) hand delivery,

or (y) first class mail, or (z) overnight mail.

4.    Settlement of Disputes During the Derivatives ADR Procedures.  Nothing

contained herein shall prevent the parties from settling, and the parties are encouraged to settle, a

Derivatives ADR Dispute at any time before, during, or following the designation of a

Derivatives ADR Dispute to the Derivatives ADR Procedures by the mutual consent of the

parties, provided that such settlement

a.    complies with (i) the Order, dated December 16, 2008, authorizing the

Debtors to establish procedures for the settlement or assumption and

assignment of prepetition derivative contracts [Docket 2257]; (ii) the

Order, dated January 29, 2009, authorizing the consensual assumption and

assignment of prepetition derivative contracts [Docket No. 2667], or

(iii) other orders in these bankruptcy cases permitting such settlement, or

b.    is approved by specific order of the Court.

Any settlement discussions between any of the parties and the Official Unsecured Creditors'

Committee (the "Creditors' Committee"), the contents of any papers submitted during the

mediation stage described below, and all discussions in mediation shall remain confidential and

privileged and shall not be discoverable or admissible as evidence in any subsequent litigation of

the Derivatives ADR Dispute or elsewhere, except as provided by further order of this Court.

5.    Participation Mandatory.

a.    Unless otherwise provided in a specific order applicable to a particular

Derivatives ADR Dispute or a particular Derivatives Counterparty or Indenture Trustee with

Authority (as defined below), after service of a Derivatives ADR Package on a Derivatives

Counterparty or Indenture Trustee with Authority (i) compliance with the Derivatives ADR

Procedures in this Order is mandatory in the specified Derivatives ADR Disputes for the

4

applicable Debtor or Debtors, Derivatives Counterparty and Indenture Trustee with Authority;

and (ii) no party is required to settle or compromise any dispute or enter into a particular

settlement or compromise, but each Debtor serving a Derivatives ADR Package, each

Derivatives Counterparty, and each Indenture Trustee with Authority must serve the required

responses, engage in the specified communications to discuss settlement, participate in any

mediation in good faith, follow directions of the mediator, and otherwise comply with the

Derivatives ADR Procedures specified below for all Derivatives ADR Disputes covered by such

Derivatives ADR Package.

      b.    With respect to any Derivatives ADR Package served on an Indenture

Trustee, within the period provided in paragraph 8(b) for service of a response thereto by an

Indenture Trustee, Debtors and such Indenture Trustee shall review the governing documents to

determine whether the Indenture Trustee has authority to participate and to settle the Derivatives

ADR Dispute covered by the Derivatives ADR Notice on behalf of holders ("Authority").

          i.    If the Indenture Trustee has Authority, it shall participate in

the Derivatives ADR Procedures on behalf of holders to the

extent authorized by such documents.

         ii.    If the Indenture Trustee lacks Authority via the governing

documents, it shall contact the holders for which it acts as

Indenture Trustee through the clearing systems or when possible

by a direct written communication that: (v) advises such holders

that the Debtors dispute holders' claims; (w) transmits to them the

applicable Derivatives ADR Notice; (x) invites them to participate

in the Derivatives ADR Procedures as an alternative to litigation;

> (y) encourages them to communicate directly with the Debtors; and (z) offers to take holders' direction in accordance with the governing documents to participate in the Derivatives ADR Procedures on behalf of such directing holders.
>
> iii.    In taking the steps outlined in this paragraph 5(b), Indenture Trustees shall make commercially reasonable efforts to act as promptly as possible under the prevailing circumstances.

c.    Nothing contained in this paragraph 5 with respect to Indenture Trustees shall relieve or be construed to relieve any Derivatives Counterparty from compliance with this Order.

d.    All rights, remedies, claims and defenses of any Derivatives Counterparty, Indenture Trustees, holders and Debtor in good faith compliance with the Derivatives ADR Procedures shall not be impaired, waived or compromised in any further proceedings in these cases should no settlement or compromise result from participation in these Derivatives ADR Procedures. Participation in the Derivatives ADR Procedures by a Derivatives Counterparty, Indenture Trustee, or holder shall not waive the defense of lack of in personam jurisdiction, if any, which defense shall be preserved.

6.    No Substitute For Claims Procedures. The Derivatives ADR Procedures are not intended and shall not be utilized as a substitute for chapter 11 claims procedures. Nothing contained herein, however, shall (a) prevent a Derivatives Counterparty from asserting in any respect to a Derivatives ADR Notice and elsewhere during the course of a Derivatives ADR Dispute a right to assert valid and enforceable setoff rights with respect to a Debtor's claim of a Derivatives Contract with Recovery Potential or any other valid defense to a Debtor's demand

6

thereunder or (b) be construed to abridge, enlarge, or otherwise modify the rights and obligations

of Debtors or Derivatives Counterparties under a Derivatives Contract with Recovery Potential

or applicable law or to provide a right or remedy under a Derivatives Contract with Recovery

Potential to Debtors or Derivatives Counterparties that is not provided thereby or by applicable

law.

       7.   Debtor's Rights As to Proceedings Previously or Hereafter Commenced by

Derivatives Counterparties.  If a Derivatives Counterparty previously has commenced, any

action or proceeding in any other court or forum, or any action or proceeding in any other court

or forum following service upon it of a Derivatives ADR Package, the Debtors reserve their

right, pursuant to the order dated December 18, 2008 [Docket No. 2306], to remove to this Court

any such lawsuit, proceeding, or claim and to defend or take action in any such other court or

proceeding to protect the estate of Debtors, despite the incomplete status of the steps prescribed

under the Derivatives ADR Procedures.

## NOTICE/RESPONSE STAGE

       8.   Notice/Response.  The initial stage of the Derivatives ADR Procedures will be

a notice/response stage, providing the parties with an opportunity to exchange settlement offers,

schedule settlement meetings or conference calls, and, if possible, resolve a Derivatives ADR

Dispute on a consensual basis (the "Notice/Response Stage"). The Notice/Response Stage shall

include:

       a.   Derivatives ADR Notice.  Debtors shall serve upon a Derivatives

           Counterparty or Indenture Trustee (and its attorneys who have appeared in

           these cases) a notice containing sufficient information regarding the

           Derivatives ADR Dispute to make the Derivatives Counterparty or

           Indenture Trustee aware of the nature of Debtor's affirmative claim, a

7

brief explanation setting forth the basis for the demand and the amount, and of its demand for settlement (which demand shall have been determined with the benefit of consultation between Debtors and the Creditors' Committee), including an amount of monetary recovery Debtor(s) would accept in full settlement and compromise (a "Derivatives ADR Notice"). Service of a completed Derivatives ADR Notice in the form annexed to this Order as Exhibit "A" shall presumptively be deemed to comply with this Order.

b.    Derivatives Counterparty's Response to Notice. A Derivatives Counterparty must respond to the Derivatives ADR Notice in writing within thirty (30) calendar days from the date of the Derivatives Counterparty's receipt of the Notice. An Indenture Trustee with Authority contained in the governing documents must respond to the Derivatives ADR Notice in writing within forty-five (45) calendar days from the date of such Indenture Trustee's receipt of the Derivatives ADR Notice, and an Indenture Trustee with Authority obtained by way of direction from holders pursuant to paragraph 5(b) above, must respond to the Derivatives ADR Notice within thirty (30) days from the date of receipt of such direction from holders. The response options available to a Derivatives Counterparty or an Indenture Trustee with Authority are as follows (the "Responses"):

i.    Agreeing to Settle the Demand. If a Derivatives Counterparty or an Indenture Trustee with Authority agrees

8

to settle the demand in the Derivatives ADR Notice, the

Counterparty shall state in writing that the offer of

settlement in the Derivatives ADR Notice is accepted.  The

parties will then execute a settlement and general release

(including a confidentiality provision) and, if the matter is

in litigation, the Debtor shall dismiss any applicable claims

in a lawsuit or adversary proceeding with prejudice upon

execution of the release; or

ii.     Denying the Demand.  A Derivatives Counterparty or

Indenture Trustee with Authority may decline to settle for

the amount stated in the demand in the Derivatives ADR

Notice, in which case the Derivatives Counterparty or

Indenture Trustee with Authority must include a brief

explanation in the Response to the Derivatives ADR Notice

setting forth the reason(s) for such denial.  In addition, the

Derivatives Counterparty or Indenture Trustee with

Authority may provide a counteroffer to the demand in the

Derivatives ADR Notice.  Service of a completed Response

to a Derivatives ADR Notice in the form annexed to this

Order as Exhibit "B" shall presumptively be deemed to

comply with this Order.

c.      Failure to Respond.  Failure to provide a timely Response to the

Derivatives ADR Notice, as described in paragraphs 8(b)(i) and (ii), may

9

result, at the option of Debtors, either in an application to the Court (with

notice to any applicable Derivatives Counterparty or Indenture Trustee)

for Sanctions (as defined below) as set forth below, including an order or

judgment for recovery of amounts demanded by Debtors in the

Derivatives ADR Notice, or immediate entry into the mediation stage.

d.    Reply to Response.  The Debtor shall have fifteen (15) days from the date

of the receipt of the Response to serve a Reply to the Response to the

Derivatives ADR Notice (which Response shall have been determined

with the benefit of consultation between Debtors and the Creditors'

Committee), in which the Debtor shall (i) modify its Demand, (ii) respond

to any counteroffer, (iii) provide additional information in support of its

demands in the Derivatives ADR Dispute, or (iv) reject any counteroffer

in which case the Derivatives ADR Dispute will automatically proceed to

the Mediation Stage.

9.  Request for Initial Settlement Conference.  At any time in the

Notice/Response Stage, either a Debtor, Derivatives Counterparty or Indenture Trustee with

Authority may request an initial telephonic settlement conference by written request, to be held

within ten (10) calendar days, and, in the case of Indenture Trustees with Authority, to be held

within fifteen (15) business days.  Within four (4) business days of a receipt of such a request,

the other parties must respond by acceptance of one of the proposed dates and times or by a

proposal for an initial settlement call no later than five (5) calendar days from the earliest date set

forth in the written request.  In the case of Indenture Trustees with Authority, within ten (10)

business days of a receipt of such a request, the other parties must respond by acceptance of one

10

of the proposed dates and times or by a proposal for an initial settlement call no later than fifteen

(15) business days from the earliest date set forth in the written request. If an acceptable date

cannot be achieved through this process, the parties shall immediately proceed to the Mediation

Stage. At least one hour shall be reserved for the initial conference to discuss settlement. No

mediator or representative of the Court will participate in this discussion, but the initial

conference call specified in this paragraph, together with any continuations or rescheduled

settlement calls or meetings arising from that initial settlement conference, will be covered by

Rule 408 of the Federal Rules of Evidence and analogous state evidentiary provisions, the

confidentiality provisions of this Order shall apply to this call or series of calls as if a mediator

were present. Settlement conferences during the Notice/Response Stage may be held in person if

both parties agree in writing.

## MEDIATION STAGE

       10. <u>Mediation</u>. Derivatives ADR Disputes that are not resolved through the

Notice/Response Stage will proceed to mediation (the "<u>Mediation Stage</u>"). The Debtors shall

transmit on a rolling basis as promptly as possible to the mediators appointed pursuant to

paragraph 10(a) hereof sets of Derivatives ADR Notices and any applicable Response(s) and

Replies thereto for purposes of allocating specific mediations pursuant to paragraph 10(b)(i)

hereof.

       a.    <u>Choice of Mediator</u>. James Freund, David Geronemus and Ralph Mabey

                are APPOINTED as the mediators for Derivatives ADR Disputes reaching

                the Mediation Stage. If any named mediator is not available to serve as

                mediator, an alternate mediator shall be selected by the Court upon notice

                to the Debtors, the Creditors' Committee, all Derivatives Counterparties

                and Indenture Trustees.

11

b.  <u>Powers of Mediator</u>.  The mediators shall have the broadest possible discretion consistent with the Standing Order, including (i) the manner of allocating among themselves specific mediations on a fair and equitable basis; and (ii) the ability to consolidate mediations involving the same Derivatives Counterparty upon application by such Derivatives Counterparty and consultation with the Debtors.

c.  Once a specific mediator has been selected and notice of such selection has been conveyed to the parties, the Debtor and the Derivatives Counterparty or Indenture Trustee with Authority together shall contact the mediator to schedule the initial mediation date.

d.  <u>Mediation Sites</u>.  All mediation proceedings will take place in New York, New York, unless agreed to by the parties and the mediator.

e.  <u>Mediation Briefs</u>.  Any party to a Mediation may submit a Mediation Brief, with service upon the other parties to the Mediation and upon the Creditors' Committee; provided, however, the Mediator may order that the parties to serve upon each other, the Mediator, and the Creditors' Committee a Mediation Brief.  If a party to the Mediation opts to serve a Mediation Brief upon another party to the Mediation hereunder, such Mediation Brief shall also be filed with the Mediator and the Creditors' Committee.  Any such Mediation Brief shall be served and filed so as to be received no later than five (5) calendar days prior to the scheduled initial Mediation Date.  No Mediation Brief shall be filed with the Court.

12

f.    Appearance at Mediations.  Unless otherwise ordered by the mediator all

participants in the mediation for the applicable Derivatives ADR Dispute,

must appear in person with a business principal who has settlement

authority; *provided, however*, that, to the extent acceptable to the

mediator, the business principal with settlement authority on behalf of a

Derivatives Counterparty may attend the mediation by video conference at

the sole expense of the Derivatives Counterparty.  The Creditors'

Committee may attend and participate in all mediations hereunder.

Counsel may also be present and participate.

g.    End of Mediation.  The mediation shall end upon request of a party and

concurrence by the mediator.

### OTHER PROVISIONS

11. Deadlines.  Notwithstanding any of the provisions set forth above, any of the

deadlines contained herein may be modified by: (i) the mutual consent of the Debtors and the

Derivatives Counterparty or (ii) the Bankruptcy Court, for cause shown.

12. Sanctions for Parties.  Each Debtor, Derivatives Counterparty and Indenture

Trustee must participate in good faith with these Derivatives ADR Procedures with regard to the

ADR Disputes specified in the applicable Derivatives ADR Notice.  If, after notice and a

hearing, the Court determines that a party has not complied with the Derivatives ADR

Procedures in good faith in connection with any Derivatives ADR Dispute, the Debtors,

Derivatives Counterparty or Indenture Trustee, as the case may be, may be subject to such

sanctions as the Court deems appropriate (the "Sanctions").  If a mediator reports to the Court

that any party subject to this Order is not cooperating in good faith with the Derivatives ADR

Procedures, the Court may, without the need for further motion by any party, schedule a hearing

13

and order Sanctions. Litigation with respect to the issuance of Sanctions shall not delay the commencement of the Mediation Stage of these procedures upon completion of the Notice/Response Stage. Sanctions may include, but are not limited to:

      a.      <u>Against Debtors</u>: (i) attorneys' fees incurred by a Derivatives Counterparty (including an Indenture Trustee with Authority) with respect to the Derivatives ADR Procedures after the receipt of an ADR Package; (ii) fees and costs of the Mediator; (iii) termination of the Derivatives ADR Procedures as to one or more Derivatives Contracts with Potential Recovery; and/or (iii) rejection of some or all claims asserted by Debtors in the applicable Derivatives ADR Dispute.

      b.      <u>Against Derivatives Counterparties (including Indenture Trustees with Authority)</u>: (i) attorneys' fees incurred by the Debtors with respect to the Derivatives ADR Procedures after the sending of an ADR Package; (ii) fees and costs of the Mediator; (iii) an award of the Derivatives ADR Dispute up to the amount specified in the Derivatives ADR Notice.

      13. <u>Confidentiality</u>. The confidentiality provisions of section 5.0 of the Standing Order are hereby incorporated by reference into this Order. No statements or arguments made or positions taken by the mediator, the applicable Debtors, Derivatives Counterparties, Indenture Trustee or the Creditors' Committee during any part of the alternative dispute resolution process, including Settlement Conferences and the Mediation Stage may be disclosed by the mediator or any such parties or their attorneys and advisors to the Court or any third party; *provided, however*, that Indenture Trustees may disclose such statements, arguments and positions as may become necessary with their respective noteholders and advisors subject to these same

confidentiality provisions. Similarly, all briefs, records, reports, and other documents received or made by the mediator while serving is such capacity shall remain confidential and not be provided to the Court, unless they would be otherwise admissible. In addition, the mediator shall not be compelled to disclose such records, reports, and other documents in connection with any hearing held by the Court; *provided, however*, the mediator shall on a monthly basis beginning 60 days following entry of this Order report to the Court the status of the mediation efforts but shall not disclose the content thereof, which report shall include the number of ADR Notices served on Derivatives Counterparties, the number of settlements reached after mediation, the number of mediations still pending, the number of mediations that have terminated without settlement, and the cumulative dollar amount of settlements reached with Derivatives Counterparties following service of ADR Notices. Rule 408 of the Federal Rules of Evidence shall apply to all aspects of the Derivatives ADR Procedures including Settlement Conferences and Mediation Stage.

14. Jury Trial, Arbitration and Exclusive Foreign Forum Selection Rights Unaffected. Unless a Derivatives Counterparty, Indenture Trustee or a Debtor affirmatively waives its right to a jury trial, arbitration or exclusive foreign forum selection that otherwise may exist, participation in the Derivatives ADR Procedures shall not waive or otherwise modify such rights. All parties' rights and defenses to contest the assertion of a jury trial or arbitration or exclusive foreign forum selection right by any other party are fully preserved.

15. Fees. Except as otherwise provided herein, each party to the Mediation shall bear its own counsel fees and other costs of the Derivatives ADR Procedures, including Mediation; *provided, however*, that (i) the Debtors shall pay the reasonable fees and costs charged by the Mediator unless otherwise ordered by the Court pursuant to the terms of this

15

Order and (ii) nothing contained herein shall be deemed to vary the terms of any Derivative

Contract with Recovery Potential in respect of the reimbursement of fees and expenses.

**SO ORDERED:**

Dated: New York, New York
        September 17, 2009

                        *s/ James M. Peck*
                UNITED STATES BANKRUPTCY JUDGE

16

Exhibit A

**Form of Derivatives ADR Notice**

Derivatives ADR Notice No.: _____

Debtor(s): _____    Derivatives Counterparty: _____
           Name(s)                                              Name(s)

                                          or

                                  Indenture Trustee: _____
                                                         Name

Derivatives Contract: _____
_____
_____

Settlement Demand: $ _____

Explanation of Basis for Settlement Demand: _____
_____
_____
_____
_____
_____
_____
_____

Date of Derivatives ADR Notice: _____

Date of Service:                   _____

Response Due Date:            _____

Debtor Contact:     [Name]
                   [Address]
                   Telephone Number: _____
                   Email: _____

Exhibit B

**Form of Response to Derivatives ADR Notice**


Derivatives Counterparty: _____
                                    Name

       or

Indenture Trustee with Authority: _____
                                          Name

Response to Derivatives ADR Notice No.: _____


☐  Agree to Settlement Demand

☐  Denial of Settlement Demand              ☐  Counteroffer

                                            Counteroffer Amount:  $_____


Explanation of Basis for Counteroffer/Denial of Settlement Demand: _____
_____
_____
_____
_____
_____
_____
_____
_____


Counterparty Contact:  [Name]
                       Telephone Number: _____
                       Email: _____

P. 1

```
TX Report
```

(FRI) MAY  7 2010 16:06

| User/Account | : |
| TOTAL DEST. | : 2stations |
| PAGES | : 20page |

| DOCUMENT# | : 8302665-243 |
| TIME STORED | : MAY  7 16:01 |
| TX START DATE | : MAY  7 16:01 |
| DURATION | : 19sec |

FIN.  : 1stations

| No. | DESTINATION | RESULT | No. | DESTINATION | RESULT | No. | DESTINATION | RESULT |
|-----|-------------|--------|-----|-------------|--------|-----|-------------|--------|
| #182 | Srividya | OK | | | | | | |



www.jamsadr.com          THE RESOLUTION EXPERTS          Offices Nationwide

# Fax Cover

|  | Mr. Anthony Kartawiria<br>Mr. Christophorus Siswandi | | | |
|--|--|--|--|--|
| **To:** | Mr. Herman Subianto | **Phone:** | **Fax:** | +62-21-3920219 |
| **From:** | **Srividya Mandava** | **Phone:** | 212-607-2787 | |
| **Date:** | May 7, 2010 | **Pages (Including Cover):** | 20 | |

**Re:**

Lehman Brothers Special Financing Inc. vs. PT Mobile-8 Telecom

⏺ **Print page** | **Close** ❌



## Detailed Results

| Tracking no.: 867276186710 | Select time format: **12H** |
| --- | --- |

| **Delivered** | **Delivered**<br>Signed for by: .DUDI |
| --- | --- |

| Shipment Dates | Destination |
| --- | --- |
| Ship date   May 7, 2010<br>Delivery date   May 10, 2010 4:59 PM | JAKARTA ID<br>Proof of Delivery |

### Shipment Facts

| Service type | Priority Envelope | Delivered to | Mailroom |
| --- | --- | --- | --- |
| Weight | 0.5 lbs/.2 kg | Reference | 1425004680 |

### Shipment Travel History

Select time zone: Local Scan Time

All shipment travel activity is displayed in local time for the location

| Date/Time | Activity | Location | Details |
| --- | --- | --- | --- |
| May 10, 2010 4:59 PM | Delivered | JAKARTA ID | |
| May 10, 2010 1:54 PM | On FedEx vehicle for delivery | JAKARTA ID | |
| May 10, 2010 1:28 PM | At local FedEx facility | JAKARTA ID | |
| May 10, 2010 12:05 PM | Int'l shipment release | CENGKARENG ID | |
| May 10, 2010 10:54 AM | In transit | CENGKARENG ID | Package available for clearance |
| May 8, 2010 2:15 AM | Departed FedEx location | MEMPHIS, TN | |
| May 8, 2010 12:55 AM | Arrived at FedEx location | MEMPHIS, TN | |
| May 7, 2010 11:25 PM | Departed FedEx location | NEWARK, NJ | |
| May 7, 2010 10:13 PM | Arrived at FedEx location | NEWARK, NJ | |
| May 7, 2010 9:47 PM | Left FedEx origin facility | NEW YORK, NY | |
| May 7, 2010 7:48 PM | Picked up | NEW YORK, NY | Tendered at FedEx Kinko's, now FedEx Office |

# **EXHIBIT P**



THE RESOLUTION EXPERTS®

May 7, 2010

<u>Via Federal Express, Email, and Facsimile</u>
Mr. Anthony Kartawiria
Mr. Christophorus Siswandi
Mr. Herman Subianto
PT Mobile-8 Telecom Tbk
18th Floor, Menara Kebon Sirih
Jl. Kebon Sirih Kav. 17-19
Jakarta 10340, Indonesia

      Re:    Lehman Brothers Special Financing Inc. vs. PT Mobile-8 Telecom
             ADR Notice No. 102

Dear Mr. Kartawiria, Mr. Siswandi, and Mr. Subianto:

I have been selected to mediate the above referenced dispute pursuant to the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors under Derivatives Contracts signed by Hon. James M. Peck of the United States Bankruptcy Court for the Southern District of New York on September 17, 2009. I would like to arrange for a conference call to discuss scheduling the mediation and other organizational matters. My availability is as follows:

New York: May 20, 2010 at 9:00 PM            Jakarta: May 21 at 8:00 AM
New York: May 21, 2010 at 9:00 AM or 10:00 AM     Jakarta: May 21 at 8:00 PM or 9:00 PM

At your earliest convenience, please let me know if you are available at one of these times and if you are not, when you would be available. Additionally, please provide me with the names and contact information for the individuals who will be participating in the conference call.

I understand that representatives of Lehman Brothers Special Financing Inc. will be available at the above times.

You can contact me via email at dgeronemus@jamsadr.com or by phone at 203-255-8787. I look forward to speaking with you.

Very truly yours,

David Geronemus, Esq.
Mediator

Cc:    Locke McMurray, Eileen Hren, Holly Loiseau, Lawrence Brandman, Peter Gruenberger
       (All via email only)

Encl.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                :

In re                           :     Chapter 11 Case No.
                                :

**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,   :     **08-13555 (JMP)**
                                :

              **Debtors.**       :     **(Jointly Administered)**
                                :
                                :
---------------------------------------------------------x

### ALTERNATIVE DISPUTE RESOLUTION PROCEDURES ORDER FOR
### AFFIRMATIVE CLAIMS OF DEBTORS UNDER DERIVATIVES CONTRACTS

        The following alternative dispute resolution procedures (the "Derivatives ADR Procedures") are ORDERED to apply in the chapter 11 cases of Lehman Brothers Holdings, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession in various chapter 11 proceedings consolidated for procedural purposes only (collectively, "the Debtors").

### FINDINGS

        On motion of Debtors, the Court FINDS that numerous open and terminated derivatives contracts, including any derivative contract that is a "swap agreement" or "forward contract", in each case, as such term is defined in section 101 of the Bankruptcy Code, exist as to which one or more Debtors assert that monetary recovery is due to a Debtor from a counterparty, its affiliates, or related parties (the "Derivatives Contracts with Recovery Potential"). The Court further FINDS that certain common issues exist regarding these contracts, including questions involving appropriateness of setoff, termination, valuation and computation of termination payments, and notice. The Court further FINDS that substantial value may be recovered for the estates of Debtors, and judicial efficiency can be promoted, if expedient resolution of disputes and recoveries under such contracts can be achieved without the need for trial of adversary proceedings or other litigation. The Court further FINDS that similar proceedings ordered in

other complex chapter 11 cases have contributed to effective administration of the proceedings and have reduced costs for all parties.

The procedures described below are ORDERED to promote consensual recovery with respect to the Derivatives Contracts with Recovery Potential, and to encourage effective communication between the affected parties, consultation, negotiation, and, when necessary, mediation procedures.

1.  Standing Mediation Order.  All provisions of the General Order #M-143, adopted January 17, 1995, providing for Procedures Governing Mediation of Matters in Bankruptcy Cases and Adversary Proceedings in the Bankruptcy Court for the Southern District of New York and all existing and further amendments thereto (the "Standing Order") shall apply to the mediations to be conducted under this Order.

2.  Derivatives ADR Counterparties.  To date, the Debtors have identified approximately two hundred fifty (250) counterparties (which number will surely increase) to Derivatives Contracts with Recovery Potential with whom there is reasonable cause for Debtors to believe that disagreement exists over the amounts that may be owed to Debtors under such contracts (whether or not an actual lawsuit or adversary proceeding has been commenced), whether from a counterparty to a Derivatives Contract with a Recovery Potential, an affiliate of such counterparty or a person or entity who exercised or failed to exercise duties in relation to such a contract (collectively, the "Derivatives Counterparties"); provided, however, that the term Derivatives Contract with Recovery Potential shall not include any cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction or repurchase agreement in respect of securities or loans.

2

3. <u>Derivatives ADR Disputes</u>. Any Debtor may designate any dispute regarding a Derivatives Contract with Recovery Potential to the Derivatives ADR Procedures by serving on a Derivatives Counterparty a copy of this Order and a Derivatives ADR Notice (as defined below) (collectively, the "<u>Derivatives ADR Package</u>").

a. Debtors shall not implement Derivatives ADR Procedures with respect to a Derivatives Contract with Recovery Potential that (i) has not been purportedly terminated and (ii) with respect to which a Derivatives Counterparty has not failed to make a payment, or perform any other obligation, due, if any, to the Debtor(s) (without regard to any provision in a Derivatives Contract with Recovery Potential that purports to permit a Derivatives Counterparty to withhold performance by reason of a default by a Debtor or its affiliates).

b. Debtors shall make commercially reasonable efforts to minimize the frequency of service of Derivatives ADR Notices on any one Derivatives Counterparty.

c. Any trustee, indenture trustee or party acting in a fiduciary capacity in connection with a trust or other financing arrangement that relates to the applicable Derivatives Contract with any of the Debtors (such persons or entities collectively referred to as "<u>Indenture Trustees</u>," and each singly as an "<u>Indenture Trustee</u>") shall be subject to this Order.

d. For purposes of the Derivatives ADR Procedures, service on or notice to a Derivatives Counterparty or Indenture Trustee, as the case may be, shall be deemed adequate if such service or notice is provided to such Derivatives Counterparty, such Indenture Trustee, a legal guardian, estate representative, or other representative and such party's counsel who have appeared in these cases by (i) email and (ii) at the option of the Debtors either (x) hand delivery, or (y) first class mail, or (z) overnight mail.

3

4.    <u>Settlement of Disputes During the Derivatives ADR Procedures</u>.  Nothing
contained herein shall prevent the parties from settling, and the parties are encouraged to settle, a
Derivatives ADR Dispute at any time before, during, or following the designation of a
Derivatives ADR Dispute to the Derivatives ADR Procedures by the mutual consent of the
parties, provided that such settlement

a.    complies with (i) the Order, dated December 16, 2008, authorizing the
Debtors to establish procedures for the settlement or assumption and
assignment of prepetition derivative contracts [Docket 2257]; (ii) the
Order, dated January 29, 2009, authorizing the consensual assumption and
assignment of prepetition derivative contracts [Docket No. 2667], or
(iii) other orders in these bankruptcy cases permitting such settlement, or

b.    is approved by specific order of the Court.

Any settlement discussions between any of the parties and the Official Unsecured Creditors'
Committee (the "Creditors' Committee"), the contents of any papers submitted during the
mediation stage described below, and all discussions in mediation shall remain confidential and
privileged and shall not be discoverable or admissible as evidence in any subsequent litigation of
the Derivatives ADR Dispute or elsewhere, except as provided by further order of this Court.

5.    <u>Participation Mandatory</u>.

a.    Unless otherwise provided in a specific order applicable to a particular
Derivatives ADR Dispute or a particular Derivatives Counterparty or Indenture Trustee with
Authority (as defined below), after service of a Derivatives ADR Package on a Derivatives
Counterparty or Indenture Trustee with Authority (i) compliance with the Derivatives ADR
Procedures in this Order is mandatory in the specified Derivatives ADR Disputes for the

4

applicable Debtor or Debtors, Derivatives Counterparty and Indenture Trustee with Authority;

and (ii) no party is required to settle or compromise any dispute or enter into a particular

settlement or compromise, but each Debtor serving a Derivatives ADR Package, each

Derivatives Counterparty, and each Indenture Trustee with Authority must serve the required

responses, engage in the specified communications to discuss settlement, participate in any

mediation in good faith, follow directions of the mediator, and otherwise comply with the

Derivatives ADR Procedures specified below for all Derivatives ADR Disputes covered by such

Derivatives ADR Package.

      b.     With respect to any Derivatives ADR Package served on an Indenture

Trustee, within the period provided in paragraph 8(b) for service of a response thereto by an

Indenture Trustee, Debtors and such Indenture Trustee shall review the governing documents to

determine whether the Indenture Trustee has authority to participate and to settle the Derivatives

ADR Dispute covered by the Derivatives ADR Notice on behalf of holders ("Authority").

           i.     If the Indenture Trustee has Authority, it shall participate in

the Derivatives ADR Procedures on behalf of holders to the

extent authorized by such documents.

          ii.     If the Indenture Trustee lacks Authority via the governing

documents, it shall contact the holders for which it acts as

Indenture Trustee through the clearing systems or when possible

by a direct written communication that: (v) advises such holders

that the Debtors dispute holders' claims; (w) transmits to them the

applicable Derivatives ADR Notice; (x) invites them to participate

in the Derivatives ADR Procedures as an alternative to litigation;

5

(y) encourages them to communicate directly with the Debtors;
and (z) offers to take holders' direction in accordance with the
governing documents to participate in the Derivatives ADR
Procedures on behalf of such directing holders.

iii.    In taking the steps outlined in this paragraph 5(b), Indenture
Trustees shall make commercially reasonable efforts to act as
promptly as possible under the prevailing circumstances.

c.    Nothing contained in this paragraph 5 with respect to Indenture Trustees
shall relieve or be construed to relieve any Derivatives Counterparty from compliance with this
Order.

d.    All rights, remedies, claims and defenses of any Derivatives Counterparty,
Indenture Trustees, holders and Debtor in good faith compliance with the Derivatives ADR
Procedures shall not be impaired, waived or compromised in any further proceedings in these
cases should no settlement or compromise result from participation in these Derivatives ADR
Procedures. Participation in the Derivatives ADR Procedures by a Derivatives Counterparty,
Indenture Trustee, or holder shall not waive the defense of lack of in personam jurisdiction, if
any, which defense shall be preserved.

6.    No Substitute For Claims Procedures. The Derivatives ADR Procedures are
not intended and shall not be utilized as a substitute for chapter 11 claims procedures. Nothing
contained herein, however, shall (a) prevent a Derivatives Counterparty from asserting in any
respect to a Derivatives ADR Notice and elsewhere during the course of a Derivatives ADR
Dispute a right to assert valid and enforceable setoff rights with respect to a Debtor's claim of a
Derivatives Contract with Recovery Potential or any other valid defense to a Debtor's demand

6

thereunder or (b) be construed to abridge, enlarge, or otherwise modify the rights and obligations

of Debtors or Derivatives Counterparties under a Derivatives Contract with Recovery Potential

or applicable law or to provide a right or remedy under a Derivatives Contract with Recovery

Potential to Debtors or Derivatives Counterparties that is not provided thereby or by applicable

law.

       7.  Debtor's Rights As to Proceedings Previously or Hereafter Commenced by

Derivatives Counterparties.  If a Derivatives Counterparty previously has commenced, any

action or proceeding in any other court or forum, or any action or proceeding in any other court

or forum following service upon it of a Derivatives ADR Package, the Debtors reserve their

right, pursuant to the order dated December 18, 2008 [Docket No. 2306], to remove to this Court

any such lawsuit, proceeding, or claim and to defend or take action in any such other court or

proceeding to protect the estate of Debtors, despite the incomplete status of the steps prescribed

under the Derivatives ADR Procedures.

### NOTICE/RESPONSE STAGE

       8.  Notice/Response.  The initial stage of the Derivatives ADR Procedures will be

a notice/response stage, providing the parties with an opportunity to exchange settlement offers,

schedule settlement meetings or conference calls, and, if possible, resolve a Derivatives ADR

Dispute on a consensual basis (the "Notice/Response Stage").  The Notice/Response Stage shall

include:

      a.    Derivatives ADR Notice.  Debtors shall serve upon a Derivatives

              Counterparty or Indenture Trustee (and its attorneys who have appeared in

              these cases) a notice containing sufficient information regarding the

              Derivatives ADR Dispute to make the Derivatives Counterparty or

              Indenture Trustee aware of the nature of Debtor's affirmative claim, a

brief explanation setting forth the basis for the demand and the amount,

and of its demand for settlement (which demand shall have been

determined with the benefit of consultation between Debtors and the

Creditors' Committee), including an amount of monetary recovery

Debtor(s) would accept in full settlement and compromise (a "Derivatives

ADR Notice"). Service of a completed Derivatives ADR Notice in the

form annexed to this Order as Exhibit "A" shall presumptively be deemed

to comply with this Order.

b.    Derivatives Counterparty's Response to Notice. A Derivatives

Counterparty must respond to the Derivatives ADR Notice in writing

within thirty (30) calendar days from the date of the Derivatives

Counterparty's receipt of the Notice. An Indenture Trustee with Authority

contained in the governing documents must respond to the Derivatives

ADR Notice in writing within forty-five (45) calendar days from the date

of such Indenture Trustee's receipt of the Derivatives ADR Notice, and an

Indenture Trustee with Authority obtained by way of direction from

holders pursuant to paragraph 5(b) above, must respond to the Derivatives

ADR Notice within thirty (30) days from the date of receipt of such

direction from holders. The response options available to a Derivatives

Counterparty or an Indenture Trustee with Authority are as follows (the

"Responses"):

   i.    Agreeing to Settle the Demand. If a Derivatives

         Counterparty or an Indenture Trustee with Authority agrees

8

to settle the demand in the Derivatives ADR Notice, the
Counterparty shall state in writing that the offer of
settlement in the Derivatives ADR Notice is accepted. The
parties will then execute a settlement and general release
(including a confidentiality provision) and, if the matter is
in litigation, the Debtor shall dismiss any applicable claims
in a lawsuit or adversary proceeding with prejudice upon
execution of the release; or

ii.    Denying the Demand. A Derivatives Counterparty or
Indenture Trustee with Authority may decline to settle for
the amount stated in the demand in the Derivatives ADR
Notice, in which case the Derivatives Counterparty or
Indenture Trustee with Authority must include a brief
explanation in the Response to the Derivatives ADR Notice
setting forth the reason(s) for such denial. In addition, the
Derivatives Counterparty or Indenture Trustee with
Authority may provide a counteroffer to the demand in the
Derivatives ADR Notice. Service of a completed Response
to a Derivatives ADR Notice in the form annexed to this
Order as Exhibit "B" shall presumptively be deemed to
comply with this Order.

c.    Failure to Respond. Failure to provide a timely Response to the
Derivatives ADR Notice, as described in paragraphs 8(b)(i) and (ii), may

9

result, at the option of Debtors, either in an application to the Court (with
notice to any applicable Derivatives Counterparty or Indenture Trustee)
for Sanctions (as defined below) as set forth below, including an order or
judgment for recovery of amounts demanded by Debtors in the
Derivatives ADR Notice, or immediate entry into the mediation stage.

d.    Reply to Response. The Debtor shall have fifteen (15) days from the date
of the receipt of the Response to serve a Reply to the Response to the
Derivatives ADR Notice (which Response shall have been determined
with the benefit of consultation between Debtors and the Creditors'
Committee), in which the Debtor shall (i) modify its Demand, (ii) respond
to any counteroffer, (iii) provide additional information in support of its
demands in the Derivatives ADR Dispute, or (iv) reject any counteroffer
in which case the Derivatives ADR Dispute will automatically proceed to
the Mediation Stage.

9.    Request for Initial Settlement Conference. At any time in the
Notice/Response Stage, either a Debtor, Derivatives Counterparty or Indenture Trustee with
Authority may request an initial telephonic settlement conference by written request, to be held
within ten (10) calendar days, and, in the case of Indenture Trustees with Authority, to be held
within fifteen (15) business days. Within four (4) business days of a receipt of such a request,
the other parties must respond by acceptance of one of the proposed dates and times or by a
proposal for an initial settlement call no later than five (5) calendar days from the earliest date set
forth in the written request. In the case of Indenture Trustees with Authority, within ten (10)
business days of a receipt of such a request, the other parties must respond by acceptance of one

10

of the proposed dates and times or by a proposal for an initial settlement call no later than fifteen

(15) business days from the earliest date set forth in the written request. If an acceptable date

cannot be achieved through this process, the parties shall immediately proceed to the Mediation

Stage. At least one hour shall be reserved for the initial conference to discuss settlement. No

mediator or representative of the Court will participate in this discussion, but the initial

conference call specified in this paragraph, together with any continuations or rescheduled

settlement calls or meetings arising from that initial settlement conference, will be covered by

Rule 408 of the Federal Rules of Evidence and analogous state evidentiary provisions, the

confidentiality provisions of this Order shall apply to this call or series of calls as if a mediator

were present. Settlement conferences during the Notice/Response Stage may be held in person if

both parties agree in writing.

## **MEDIATION STAGE**

   10. Mediation. Derivatives ADR Disputes that are not resolved through the

Notice/Response Stage will proceed to mediation (the "Mediation Stage"). The Debtors shall

transmit on a rolling basis as promptly as possible to the mediators appointed pursuant to

paragraph 10(a) hereof sets of Derivatives ADR Notices and any applicable Response(s) and

Replies thereto for purposes of allocating specific mediations pursuant to paragraph 10(b)(i)

hereof.

    a. Choice of Mediator. James Freund, David Geronemus and Ralph Mabey

      are APPOINTED as the mediators for Derivatives ADR Disputes reaching

      the Mediation Stage. If any named mediator is not available to serve as

      mediator, an alternate mediator shall be selected by the Court upon notice

      to the Debtors, the Creditors' Committee, all Derivatives Counterparties

      and Indenture Trustees.

11

b.   <u>Powers of Mediator</u>.  The mediators shall have the broadest possible discretion consistent with the Standing Order, including (i) the manner of allocating among themselves specific mediations on a fair and equitable basis; and (ii) the ability to consolidate mediations involving the same Derivatives Counterparty upon application by such Derivatives Counterparty and consultation with the Debtors.

c.   Once a specific mediator has been selected and notice of such selection has been conveyed to the parties, the Debtor and the Derivatives Counterparty or Indenture Trustee with Authority together shall contact the mediator to schedule the initial mediation date.

d.   <u>Mediation Sites</u>.  All mediation proceedings will take place in New York, New York, unless agreed to by the parties and the mediator.

e.   <u>Mediation Briefs</u>.  Any party to a Mediation may submit a Mediation Brief, with service upon the other parties to the Mediation and upon the Creditors' Committee; provided, however, the Mediator may order that the parties to serve upon each other, the Mediator, and the Creditors' Committee a Mediation Brief.  If a party to the Mediation opts to serve a Mediation Brief upon another party to the Mediation hereunder, such Mediation Brief shall also be filed with the Mediator and the Creditors' Committee.  Any such Mediation Brief shall be served and filed so as to be received no later than five (5) calendar days prior to the scheduled initial Mediation Date.  No Mediation Brief shall be filed with the Court.

12

f.    <u>Appearance at Mediations</u>.  Unless otherwise ordered by the mediator all

participants in the mediation for the applicable Derivatives ADR Dispute,

must appear in person with a business principal who has settlement

authority; *provided, however*, that, to the extent acceptable to the

mediator, the business principal with settlement authority on behalf of a

Derivatives Counterparty may attend the mediation by video conference at

the sole expense of the Derivatives Counterparty.  The Creditors'

Committee may attend and participate in all mediations hereunder.

Counsel may also be present and participate.

g.    <u>End of Mediation</u>.  The mediation shall end upon request of a party and

concurrence by the mediator.

## OTHER PROVISIONS

11. <u>Deadlines</u>.  Notwithstanding any of the provisions set forth above, any of the

deadlines contained herein may be modified by: (i) the mutual consent of the Debtors and the

Derivatives Counterparty or (ii) the Bankruptcy Court, for cause shown.

12. <u>Sanctions for Parties</u>.  Each Debtor, Derivatives Counterparty and Indenture

Trustee must participate in good faith with these Derivatives ADR Procedures with regard to the

ADR Disputes specified in the applicable Derivatives ADR Notice.  If, after notice and a

hearing, the Court determines that a party has not complied with the Derivatives ADR

Procedures in good faith in connection with any Derivatives ADR Dispute, the Debtors,

Derivatives Counterparty or Indenture Trustee, as the case may be, may be subject to such

sanctions as the Court deems appropriate (the "<u>Sanctions</u>").  If a mediator reports to the Court

that any party subject to this Order is not cooperating in good faith with the Derivatives ADR

Procedures, the Court may, without the need for further motion by any party, schedule a hearing

and order Sanctions. Litigation with respect to the issuance of Sanctions shall not delay the commencement of the Mediation Stage of these procedures upon completion of the Notice/Response Stage. Sanctions may include, but are not limited to:

    a.    <u>Against Debtors</u>: (i) attorneys' fees incurred by a Derivatives Counterparty (including an Indenture Trustee with Authority) with respect to the Derivatives ADR Procedures after the receipt of an ADR Package; (ii) fees and costs of the Mediator; (iii) termination of the Derivatives ADR Procedures as to one or more Derivatives Contracts with Potential Recovery; and/or (iii) rejection of some or all claims asserted by Debtors in the applicable Derivatives ADR Dispute.

    b.    <u>Against Derivatives Counterparties (including Indenture Trustees with Authority)</u>: (i) attorneys' fees incurred by the Debtors with respect to the Derivatives ADR Procedures after the sending of an ADR Package; (ii) fees and costs of the Mediator; (iii) an award of the Derivatives ADR Dispute up to the amount specified in the Derivatives ADR Notice.

    13. <u>Confidentiality</u>. The confidentiality provisions of section 5.0 of the Standing Order are hereby incorporated by reference into this Order. No statements or arguments made or positions taken by the mediator, the applicable Debtors, Derivatives Counterparties, Indenture Trustee or the Creditors' Committee during any part of the alternative dispute resolution process, including Settlement Conferences and the Mediation Stage may be disclosed by the mediator or any such parties or their attorneys and advisors to the Court or any third party; *provided, however*, that Indenture Trustees may disclose such statements, arguments and positions as may become necessary with their respective noteholders and advisors subject to these same

14

confidentiality provisions. Similarly, all briefs, records, reports, and other documents received

or made by the mediator while serving is such capacity shall remain confidential and not be

provided to the Court, unless they would be otherwise admissible. In addition, the mediator shall

not be compelled to disclose such records, reports, and other documents in connection with any

hearing held by the Court; *provided, however*, the mediator shall on a monthly basis beginning

60 days following entry of this Order report to the Court the status of the mediation efforts but

shall not disclose the content thereof, which report shall include the number of ADR Notices

served on Derivatives Counterparties, the number of settlements reached after mediation, the

number of mediations still pending, the number of mediations that have terminated without

settlement, and the cumulative dollar amount of settlements reached with Derivatives

Counterparties following service of ADR Notices. Rule 408 of the Federal Rules of Evidence

shall apply to all aspects of the Derivatives ADR Procedures including Settlement Conferences

and Mediation Stage.

14. Jury Trial, Arbitration and Exclusive Foreign Forum Selection Rights

Unaffected. Unless a Derivatives Counterparty, Indenture Trustee or a Debtor affirmatively

waives its right to a jury trial, arbitration or exclusive foreign forum selection that otherwise may

exist, participation in the Derivatives ADR Procedures shall not waive or otherwise modify such

rights. All parties' rights and defenses to contest the assertion of a jury trial or arbitration or

exclusive foreign forum selection right by any other party are fully preserved.

15. Fees. Except as otherwise provided herein, each party to the Mediation shall

bear its own counsel fees and other costs of the Derivatives ADR Procedures, including

Mediation; *provided, however*, that (i) the Debtors shall pay the reasonable fees and costs

charged by the Mediator unless otherwise ordered by the Court pursuant to the terms of this

Order and (ii) nothing contained herein shall be deemed to vary the terms of any Derivative

Contract with Recovery Potential in respect of the reimbursement of fees and expenses.

**SO ORDERED:**

Dated: New York, New York
      September 17, 2009

                              _s/ James M. Peck_
                              UNITED STATES BANKRUPTCY JUDGE

16

<u>Exhibit A</u>

**<u>Form of Derivatives ADR Notice</u>**

Derivatives ADR Notice No.: _____

<u>Debtor(s)</u>: _____          <u>Derivatives Counterparty</u>: _____
                   Name(s)                                                      Name(s)

                                          or

                                          <u>Indenture Trustee</u>: _____
                                                                      Name

<u>Derivatives Contract</u>: _____
_____
_____


<u>Settlement Demand</u>: $ _____

<u>Explanation of Basis for Settlement Demand</u>: _____
_____
_____
_____
_____
_____
_____
_____


<u>Date of Derivatives ADR Notice</u>: _____

<u>Date of Service</u>:                _____

<u>Response Due Date</u>:            _____


<u>Debtor Contact</u>:    [Name]
                        [Address]
                        Telephone Number: _____
                        Email: _____

<u>Exhibit B</u>

**<u>Form of Response to Derivatives ADR Notice</u>**

<u>Derivatives Counterparty</u>: _____
Name

    or

<u>Indenture Trustee with Authority</u>: _____
Name

<u>Response to Derivatives ADR Notice No.</u>: _____

☐ Agree to Settlement Demand

☐ Denial of Settlement Demand      ☐ Counteroffer

                                 <u>Counteroffer Amount</u>: $_____

<u>Explanation of Basis for Counteroffer/Denial of Settlement Demand</u>: _____
_____
_____
_____
_____
_____
_____
_____
_____

<u>Counterparty Contact</u>:  [Name]
                      Telephone Number: _____
                      Email: _____

# EXHIBIT Q

**PENGADILAN NEGERI/NIAGA/HAM JAKARTA PUSAT**
**JALAN GAJAH MADA NO. 17**
Telp.(K) 63850224-(H) 63850223-(P) 6348630
**J A K A R T A - 1 0 1 3 0**

| | | |
|---|---|---|
| Nomor | : W10.01/5408.PDT.02.VI.10.04. | **Jakarta, 16Juni 2010** |
| Lampiran | : - | |
| Perihal | : Bantuan Panggilan Sidang Pertama. | |
| | **No.247/Pdt.G/2010/PN.Jkt.Pst** | Kepada Yth, |

Kepada Yth,
Departemen Luar Negeri
Cq.Dirjen Protokol dan
Konsuler.
Jl. Taman Pejambon No.2-6
Jakarta Pusat.
Di -

**J A K A R T A**

Bersama ini dengan hormat, kami mohon bantuan saudara untuk dapat kiranya menunjuk dan memerintahkan seorang Jurusita Pengganti yang berhak untuk itu, guna memanggil dengan resmi kepada :

**Lehman Brothers Special Financing Inc.,**berkedudukan di 745 Seventh Avenue, New York NY 10019, Amerika Serikat selaku " **TERGUGAT** ".

Supaya ia/mereka datang menghadap dipersidangan Pengadilan Negeri Jakarta Pusat di Gedung yang telah ditentukan untuk itu di Jalan Gajah Mada No. 17 Jakarta Pusat, yang akan dilangsungkan pada ;--

" **HARI : RABU** ,TANGGAL : **08 SEPTEMBER 2010**, JAM : **10.00 WIB** "

Perlu hadir diwaktu itu dalam rangka pemeriksaan perkara yang telah didaftarkan di Kepaniteraan Pengadilan Negeri Jakarta Pusat, Daftar No. **247/PDT.G/2010/PN.JKT.PST;**Dalam perkara antara;

**PT. Mobile-8 Telecom Tbk** , -----------------Sebagai **PENGGUGAT** ;

**L A W A N**

**Lehman Brothers Special Financing Inc,**-------Sebagai **TERGUGAT** ;

Kemudian kepada **TERGUGAT** agar diserahkan turunan Surat Gugatan dari Penggugat dengan diberitahukan kepada ia/mereka dapat mengajukan jawaban baik tertulis maupun lisan yang ditandatangani sendiri maupun kuasanya yang sah dan diserahkan pada persidangan tersebut diatas ;

Dan dimohonkan agar relaas panggilan sidang ini dapat kami terima secepatnya , Kemudian mengenai segala sesuatu dalam penyampaian Panggialn Sidang ini kami serahkan sepenuhnya kepada saudara.

Demikian atas bantuan saudara, kami ucapkan terima kasih.

A.n. K E T U A
PENGADILAN NEGERI/NIAGA/HAM/TPKOR DAN HI
JAKARTA PUSAT
WAKIL PANITERA

CORIANA J. SARAGIH, SH, MH
NIP 19641007199103 2 002

**CONSULATE GENERAL OF THE REPUBLIC OF INDONESIA**
5 East 68th Street
New York, NY 10065
Tel. (212) 879-0600, Fax. (212) 570-6206

No. 156/Cons/VIII/2010                                    New York, August 27th  2010
Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, NY 10019

Dear  Sir/ Madam,

The Consulate General of the Republic of Indonesia in New York, would like to inform you that
we have been requested by the Civil Court/ Niaga/ HAM Jakarta Pusat, Indonesia to forward a
Summons on civil case No. 247/Pdt.G/2010PN.Jkt.Pst. between:

**PT. Mobile-8 Telecom Tbk, as Plaintiff**

Against

**Lehman Brothers Special Financing Inc., as Defendant**

to appear before a proceeding in this court (address: Jalan Gajah Mada No. 17 Jakarta Pusat) on
Wednesday, 08 September 2010, at 10.00 am local time.

Please find attached receipt to be signed and return it to Indonesian Consulate General, 5 East
68th Street New York, NY 10065.

Thank you for your attention.

                                                        Sincerely Yours,


                                                        Zahermann Muabezi
                                                        Counselor/ Consul

**2**

**CONSULATE GENERAL OF THE REPUBLIC OF INDONESIA**
5 East 68th Street
New York, NY 10065
Tel. (212) 879-0600, Fax. (212) 570-6206

Consular Section
Indonesian Consulate General
5 East 68th Street
New York, NY 10065

Subject:      case No. 247/Pdt.G/2010PN.Jkt.Pst

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, NY 10019

Dear Sir,

I have acknowledged the receipt of letter No. 156/Cons/VIII/2010, dated August 27th 2010
from The Indonesian Consulate General in New York.

Signature          : _____

Name               : _____

Date               : _____

**3**

*(Official Translation)*

0143/88.01/HPH

May 26, 2010

To:

**HEAD OF CENTRAL JAKARTA DISTRICT COURT**

Central Jakarta District Court

Jl. Gajah Mada No. 17,

Central Jakarta

**Subject: LAWSUIT OF TORT**

Dear Sir,

The undersigned, **Hotman Paris Hutapea, S.H., M.Hum., Subagio Aridarmo, S.H.** and **Donald R.O. Pardosi, S.H.**, the Advocates, whose office is situated at the Office of Advocate and Legal Consultant **HOTMAN PARIS & PARTNERS**, having address at Summitmas I Building, 18th Floor, Jalan Jenderal Sudirman Kavling 61-62, Jakarta 12069, acting for and on behalf of **PT Mobile-8 Telecom Tbk**, an incorporated company established under the laws of the Republic of Indonesia, having address at Menara Kebon Sirih, 18th Floor, Jl. Kebon Sirih Kav. 17-19, Jakarta 10340, base on Special Power of Attorney, dated May 14

4

(fourteenth), 2010 (Original Power of Attorney is attached),
hereinafter referred to as **"Plaintiff"**.

**The Plaintiff herewith intends to make a lawsuit of Tort**
against:

**Lehman Brothers Special Financing Inc.**, located in 745 Seventh
Avenue, New York NY 10019, United States, hereinafter refered
to as **"Defendant"**.

The reasons for this lawsuit are as follows:

**I. FACTUAL CRONOLOGY:**

I.1. Whereas the **Plaintiff** is a national company having
been listed in the public stock exchange (go public),
whose shares belong to the public.

I.2. That the **Defendant** is a company established under the
laws of the State of Delaware of the United States of
America specializing business in foreign currency
speculation (Swap Transaction or derivatives), but
doing businesses in all over the world, as well as in
Indonesia.



5

I.3.  Whereas in the mid year 2007, the speculation staff
of   the   Defendant   had   repeatedly   come   to   the
Plaintiff's office in Jakarta requiring the Plaintiff
to  unhesitatingly  do  business  in  foreign  currency
speculation   (Swaps   and   Derivatives   Transactions)
where  the  Defendant  promised  to  provide  profitable
percentage,  and  he  specified  that  the  speculation
business  was  safe  and  the  Plaintiff  would  have  been
protected , since the speculators would sign the terms
and  conditions  as  required  by  **ISDA**  (*INTERNATIONAL
SWAP  AND  DERIVATIVES  ASSOCIATION,  INC.*)  **AGREEMENT,
THE  MASTER  AGREEMENT**  (hereinafter  referred  to  as
**"ISDA   Master   Agreement"**).   The   Defendant   also
explained   that   the   transactions   of   swaps   and
derivatives would only be binding **the Plaintiff** and
**the Defendant** if the Plaintiff and **the Defendant** have
negotiated  and  agreed  to  sign  **ISDA Master Agreement**
as the main agreement. The Defendant promised to send
immediately  the  concept  of  ISDA  Agreement  Master
Agreement.

I.4.  whereas according to the testimony of the **Plaintiff**,
the initial concept of **ISDA MASTER AGREEMENT** simply
consisted  of  the  rules  and  procedures  of  foreign
currency   speculation   (Swaps   and   Derivatives
Transaction), including all the matters concerning the

terms of <u>default</u> (defaulted), guarantees, ways of doing transactions of swaps and derivatives, incumbency or rights and liabilities of the parties and the <u>jurisdiction</u> of the court to settle if any cases, which is not exclusive (or not bound by the judiciary of any country), which must be performed at a Court in New York or in the United Kingdom or any other court in another country (as well as a Court in Indonesia).

I.5.  Whereas as a preliminary talk and negotiation, **The Defendant** sent a letter to the **Plaintiff**, dated **August 8, 2007** (*vide Evidence/ Poof P-1*) which only consisted of information, general explanation and pointers, and specified the name of agreement to be signed stating that: **"TRANSACTIONS OF SWAP/DERIVATIVES" <u>WILL ONLY BE CONSIDERED TO EXIST AND BE EFFECTIVE</u> AND BE LEGALLY BINDING AFTER THE PLAINTIFF and THE DEFENDANT PENGGUGAT and HAVE DISCUSSED and AGREED THE TERMS AND CONDITIONS, and SIGNED THE ISDA MASTER AGREEMENT.**

I.6.  The **Plaintiff** quotes here the statement of the second paragraph in the letter of the **Defendant**, dated August 8, 2007 (*vide* **evidence P-1**) stating as follows:



7

"...., **_you and we agree to use all reasonable efforts_**
**_promptly to negotiate, execute and deliver an_**
**_agreement in the form of ISDA Master Agreement_**
**_(Multicurrency-Cross Border) (the "ISDA Form")_**,
**_with such modifications as you and we will in good_**
**_faith agree. Upon the execution by you and us of_**
**_such agreement, this Confirmation shall supplement_**,
**_form a part of, and be subject to that agreement_**
**_(the "Agreement")._**"

Hence, it has been proved that the letter of the
**Defendant**, dated August 8, 2007 (vide evidence P-1)
simply consisted of information of currency
speculation business plan (swaps and derivatives),
there is no newly binding agreement nor any legally
binding transaction, as it will only occur and come
into force when the Plaintiff and Defendant have
signed **ISDA Master Agreement** to be the Master
Agreement.

I.7. Whereas within the period of about (10) months, the
**Plaintiff** often made calls to the **Defendant** requiring
it to send the draft of ISDA Agreement Master
Agreement, which, in essence, questioning WHY the
concept of **ISDA MASTER AGREEMENT** is still not sent
yet. Further, with the letter dated **July 25, 2008**

8

No.: 31/M8-LGL/VII/2008 **(vide evidence P-2), the Plaintiff** sent a letter again to **the Defendant** to questioning the same purpose, **WHY the Defendant** had not sent the concept of **ISDA (MASTER AGREEMENT)** to **the Plaintiff,** and **WHEN** the concept of **ISDA (INTERNATIONAL SWAP DERIVATIVES ASSOCIATION, INC.) MASTER AGREEMENT** would start to be discussed / negotiated.

For clear understanding, as quoted from the Plaintiff's letter, dated July 25, 2008 No.: 31/M8-LGL/VII/2008 (vide evidence P-2) it is said as follows:

*"We would like to inform you, as the new management of PT Mobile-8 Telecom Tbk, we believe that some documentation regarding ISDA Master Agreement (Multi Currency Cross Border) (the "ISDA") has been missing to discuss and/or to elaborate and/or to negotiate between both parties."*

I.8.  Whereas as the responses to the **Plaintiff's** letter, dated July 25, 2008 **(vide evidence P-2)**, then for the first time on **August 1, 2008 at 3:15 PM** The Defendant sent a letter via e-mail to **the Plaintiff (vide evidence P-3)**, essentially consisting of THE CONCEPT

**9**

**OF ISDA MASTER AGREEMENT** (*vide evidence P-4*); For clear understanding here below it is quoted the content of e-mail from the **Defendant,** on August 1, 2008 (*vide evidence P-3*) as follows:

"*With reference to letter dated 25 July 2008 from Mobile-8 to Lehman Brothers Special Financing requesting clarification on ISDA Master Agreement (Multi-Currency Cross Border) ("ISDA"), please find attached a draft ISDA agreement for your review and further considerations.*"

Latter on, in the third paragraph it is quoted as follows:

"*My colleague, Anita Chiu, from Transaction Management Group (copied on this mail) will be responsible for negotiation of ISDA on behalf of Lehman. Please let us know the right person on your side to liaise with to further the discussions on ISDA.*"

I.9. As quoted here below, the content of the **Defendant's** letter via e-mail on August 1, 2008 (*vide evidence P-3*), refers to 4 (four) matters:



**10**

a. It is for the first time the **Defendant** sent the **concept/draft** of ISDA Master Agreement (**vide evidence P-4**) on the mentioned date (August 1, 2008);

b. With the e-mail on August 1, 2008 (**vide evidence P-3**) the **Defendant** appointed the **Defendant** Staff, named Anita Chiu, who to be acting as a proxy of the **Defendant** to start negotiating / discussing the concept content of ISDA Master Agreement. **THIS MEANS, THE DEFENDANT RECOGNIZES THAT THERE HAVE NOT YET BEEN ANY UNDERSTANDING ON THE CONCEPT CONTENT OF ISDA MASTER AGREEMENT,** therefore, there is no Swap Derivative agreement which is valid and bind the **Plaintiff** and the **Defendant**;

c. The **Defendant** required the **Plaintiff** to appoint someone to represent the **Plaintiff** in discussing / negotiating the concept of ISDA Master Agreement (**vide evidence P-4**);

d. As the attachment of the **Defendant's** letter via e-mail on August 1, 2008 (**vide evidence P-3**), the **Defendant** has attached the document named "**the concept of ISDA Master Agreement**" (**vide evidence P-4**), which by the **Defendant** had unilaterally been

11

dated August 1, 2007. However, the concept was just
sent by the **Defendant** on August 1, 2008 which was
still in the form of "draft" or "concept".

I.10. Whereas as the responses to the **Defendant's** letter
via e-mail on August 1, 2008 (*vide evidence P-3* as
mentioned above, the **Plaintiff** sent a letter to
**Defendant**, dated August 29, 2008 No. 39/XX-
LGL/VIII/2008 (*vide evidence P-5*), which in essence,
the **Plaintiff** intends to reaffirm (reconfirm) that:

a. The **Plaintiff** and the **Defendant** are not bound by
any agreement on currency swap transactions until
**ISDA MASTER AGREEMENT** <u>**HAS FULLY AND THROUGHFULLY**</u>
been negotiated, signed and performed by the
**Plaintiff** and the **Defendant**, for the reasons that:
(i) the **Defendant** had defaulted its obligation to
negotiate with the **Plaintiff** on **THE CONCEPT OF ISDA
MASTER AGREEMENT** (*vide evidence P-4*), and (ii) the
Board of Commissioners of the **Plaintiff** never gives
any approval for the plan of swap transactions
whereas the approval for purpose is an obligation /
compulsion based on the articles of Association of
the **Plaintiff**;

12

b. Based on the matters as specified above, the **Plaintiff** and the **Defendant**, whether in the past, present or future, have no financial obligations in relation to swap transactions or any other financial transaction.

For clear understanding, as quoted from the **Plaintiff's** letter, dated August 29, 2008 (**vide Evidence P-5**), it is said:

"*We refer to our letter dated 25 July 2008 and also your email dated 1 August 2008 and previous communication in which we repeatedly states that PT Mobile-8 Telecom Tbk and Lehman Brothers Special Financing Inc. do not have any legal binding agreement on any swap transaction until ISDA Master Agreement (Multi Currency-Cross Border) (the "ISDA") to be fully negotiated, executed and delivered by Lehman Brothers Special Financing Inc. and PT Mobile-8 Telecom Tbk.*

*The fact is that until today, Lehman Brothers Special Financing Inc. neglects its obligation to negotiate the draft of ISDA with PT Mobile-8 Telecom Tbk.*



**13**

*We also refer to the fact that the Board of Commissioners of PT Mobile-8 Telecom Tbk never approves the plan for swap transaction, which Board of Commissioner's approval is compulsory requirement under the Article of Association of PT Mobile-8 Telecom Tbk.*

*Therefore, this letter is to reconfirm our mutual understanding that PT Mobile-8 Telecom Tbk and Lehman Brothers Special Financing Inc. do not have any past or current and future financial obligations on any swap transaction or any financial transaction."*

I.11. <u>FIRST EVIDENCE (I) OF TORT BY THE DEFENDANT (DEFENDANT'S LETTER, DATED SEPTEMBER 4, 2008 - VIDE EVIDENCE P-6)</u>

Whereas as the responses to **the Plaintiff's** letter, dated July 25, 2008 No.: 31/M8-LGL/VII/2008 (**vide evidence P-2**), and August 29, 2008 No.: 39/M8-LGL/VIII/2008 (*vide evidence P-5*) unpredictably the **Defendant** sent a letter, dated **September 4, 2008** (**vide evidence P-6**) to the **Plaintiff**, consisting of accusation that the **Plaintiff** had violated Article 5 (a) (1) and Article 12 (a) of ISDA Master Agreement,

14

whereas **the Plaintiff** has not yet negotiated and has never signed the draft of ISDA Master Agreement (**vide Evidence P-4**). Even on August 1, 2008, it is for the first time that **the Defendant** sent a letter via e-mail (vide Evidence P-3) specifying about the concept to be discussed, however, it has never been negotiated or agreed at all, out after one (1) month, on September 4, 2008, the **Defendant** accused the **Plaintiff** to have violated Article 5 a) i) and 12 (a) of the concept of ISDA Master Agreement.

For clear understanding, as quoted from the **Defendant's** letter, dated September 4, 2008 (**vide Evidence P-6**) it is said:

> "**We refer to the terms of the Master Agreement referenced above. Capitalized terms used herein and not defined shall have the meanings ascribed to them in the Master Agreement.**
>
> **Under the Master Agreement (and specifically, the terms of the Transactions), you were required to make a payment to us by the close of business on 2 September 2008. The amount payable was USD 2,047,576.03, and we had indicated to you on 27 August 2008 the amount payable, the due date and**

15

*the account into which such payment should be paid.*

*You are hereby notified that you have failed to make such payment. This notice constitutes a notice of failure to pay or deliver given to you in accordance with Section 5(a)(i) of the Master Agreement, if the failure to pay is not remedied by you on or before the first Local Business Day after receipt of this notice, then such failure to pay or deliver constitutes an event of Default with respect to Party B."*

*In accordance with Section 12(a) of the Master Agreement, this notice is being delivered during normal business hours and will be deemed effective today."*

The main content of the **Defendant's** letter, dated September 4, 2008 (***vide Evidence P-6***), is as follows:

a. The **Plaintiff** accused the **Defendant** to have violated (committed a breach) the content of **Article 5 (a) (i)** of **ISDA MASTER AGREEMENT**, even though the **Plaintiff HAS NEVER NEGOTIATED** and

16

**SIGNED ISDA MASTER AGREEMENT** since the concept itself was just delivered by the **Plaintiff** via e-mail on August 1, 2008 (**vide Evidence P-3**);

b.  **The Defendant** notified and also accused the **Plaintiff** that according to the content of ISDA Agreement, the **Plaintiff** has failed or defaulted to make payment in accordance with ISDA Master Agreement, and therefore the **Defendant** requested to the **Plaintiff** to make payment as much as USD 2,047,576 (two million forty seven thousand and five hundred seventy-six United States Dollars), which is according to the **Plaintiff**, its due on September 2, 2008; the **Defendant** gave a reason of his claim that the **Plaintiff** has defaulted or violated **ISDA MASTER AGREEMENT**;

Therefore, the **Defendant** is proven to have made a tort by making up a fictitious bill as much as USD 2,047,576 (two million forty seven thousand and five hundred seventy-six United States Dollars) and sent a letter to the **Defendant** dated September 4, 2008 (**vide Evidence P-6**) which the content is an untrue statement, and has improperly set up a supposition as if **ISDA MASTER AGREEMENT** had been truly signed and the **Plaintiff** had violated **ISDA MASTER**

17

**AGREEMENT,** whereas **ISDA Master Agreement** has never been signed at all.

I.12. **SECOND EVIDENCE (II) OF TORT BY THE DEFENDANT (THE DEFENDANT'S LETTER, DATED MARCH 31, 2009 – VIDE EVIDENCE P-7)**

Whereas, the **Defendant** has subsequently made up the letter, dated March 31, 2009 (**vide Evidence P-7**) notifying that **the Defendant** has terminated ISDA Master Agreement. Even in paragraphs 4 and 5 of the letter dated March 31, 2009 (**vide Evidence P-7**), the **Defendant** claimed that the termination was based on Article 12 (a) of ISDA Master Agreement, and the **Defendant** also argued that the **Defendant** had reserved his rights under ISDA Master Agreement, whereas the fact is that ISDA Agreement Master Agreement had never been approved and signed, and the **Plaintiff** had never negotiated and signed the Article 12 (a) of ISDA Master Agreement.

I.13. **THIRD EVIDENCE (III) OF TORT BY THE DEFENDANT (DEFENDANT'S LETTER, DATED JUNE 18, 2009 – VIDE EVIDENCE P-8)**



18

Whereas letter on, the of tort by the **Defendant,** who had manipulated bill and made up as if ISDA Master Agreement had been signed, was made again by the **Defendant** through the letter dated June 18, 2009 (**vide Evidence P-8)** addressed to the **Plaintiff,** where the essence of the letter is partially as follows:

a. On the top of the **Defendant's** letter, dated June 18, 2009 (**vide Evidence P-8**) it is written the following sentence:

"**Re: Notice of Amount Payable Under Section 6(d)(i) of the form of ISDA Master Agreement.**";

Note:

Whereas, the legal fact is, ISDA Master Agreement is never been signed, therefore, Article 6 (d) (i) and the concept of ISDA Master Agreement is not yet valid.

b. From the first paragraph of the **Defendant's** letter, dated June 18, 2009 (**vide Evidence P-8**) it is quoted is follows:

19

*"Reference is hereby made to the Master Agreement referenced above."*

Note:

The legal fact proves that there is no ISDA Master Agreement because ISDA Master Agreement has not yet been signed by the **Plaintiff** and the **Defendant**.

c. From the second paragraph of the letter, dated June 18, 2009 (*vide Evidence P-8*) it is quoted as follows:

*"In accordance with the termination notice dated March 31, 2009 previously sent to you, whereby we designated April 7, 2009 as the Early Termination Date, we hereby notify you, pursuant to Section 6(d)(i) of the Master Agreement, that the amount payable under the Section 6(d)(i) of the Master Agreement is USD 2,560,472 (the "Termination Payment") and such Termination Payment is payable by Counterparty to Lehman on the date this notice is effective (the "Payment Date"). This amount does not reflect the interest accrued and accruing pursuant to the Master Agreement."*

**20**

Note:

So, the **Defendant** states to have terminated ISDA Master Agreement in accordance with Article 6 (d) (i) which asking for compensation as much as USD 2,560,472 based on Article 6 (d) (i).

The legal fact is, Article 6 (d) (i) of ISDA Master Agreement has not yet been effective, and there was no binding contract between the **Plaintiff** and the **Defendant**.

d. So, it is proven that the of tort by the **Defendant** continued to happen, because on **June 18, 2009** a manipulated billing letter as much as U.S. $ 2,560,472 (two million five hundred sixty thousand and four hundred and seven twenty-two United States Dollars) had been sent by the **Defendant** on June 18, 2009 (***vide Evidence P-8***) as the compensation of Termination Payment per April 7, 2009 on the basis that, according to the **Defendant**, the billing out is of **ISDA MASTER AGREEMENT**, whereas, the **ISDA MASTER AGREEMENT** has never been negotiated, and agreed or signed at all.

e. Based on the description above, it is found the fact that until the date of registration of the

**21**

lawsuit *a quo*, **ISDA MASTER AGREEMENT is still in the form of DRAFT / CONCEPT, it was just delivered by the Plaintiff on the 1st (first) of August 2008 but has not been negotiated and signed yet. So, if ISDA MASTER AGREEMENT** has never been approved and signed, **THERE SHALL BE NO BINDING AGREEMENT** or **BINDING TRANSACTION BETWEEN THE PLAINTIFF AND THE DEFENDANT**, BECAUSE ISDA MASTER AGREEMENT specifies the following conditions, such as:

- Clauses of Breaches/Defaults;
- Clauses of Termination;
- Clauses of Taxes;
- Clauses of Liabilities of the Parties;
- Clauses of Jurisdiction (Courts) and others.

f. THEREFORE:

**WITHOUT** any signed **ISDA MASTER AGREEMENT WHICH HAS BEEN SIGNED,IT IS IMPOSSIBLE for THE PLAINTIFF AND THE DEFENDANT TO KNOW THE INCUMBENCIES OF THEIR OWNS.**

So, until the date of registration of this lawsuit in the court, **THE FACT IS:**

**22**

- The **Plaintiff** and the **Defendant** **HAVE NEVER NEGOTIATED**, **AGREED** and **SIGNED** ISDA **Master Agreement;**

- The **Plaintiff** and the **Defendant** have never signed the agreement as required by Bank Indonesia complying with its Regulation on Swap Transaction / Derivatives (Foreign Currency Speculation as stipulated in Bank Indonesia Regulation No.7/31/PBI/2005 dated September 13, 2005 on Derivative Transactions (*vide Evidence P-9*).


Based on the legal facts as above mentioned, the **Plaintiff** files the lawsuit to the Panel of Judges to declare that the three (3) letters of **the Defendant** be illegal and null and have no legal power at all, namely:

- The letter, dated September 4, 2008 (**vide Evidence P-6**);

- The letter, dated March 31, 2009 (**vide Evidence P-7**);

- The letter, dated June 18, 2009 (**vide Evidence P-8**);

**23**

**I.14. FOURTH EVIDENCE (IV) OF TORT BY THE DEFENDANT (DEFENDANT VIOLATED THE REGULATION OF BANK INDONESIA REGULATION)**

**The Defendant has violated its legal obligations to obey the Regulation of Bank Indonesia, as follows:**

**a. Default to fulfill the requirements of BANK INDONESIA REGULATION NO.7/31/PBI/2005 ON DERIVATIVE TRANSACTIONS (*vide Evidence P-9*);**

In accordance with **BANK INDONESIA REGULATION NO.7/31/PBI/2005 ON DERIVATIVE TRANSACTIONS** (*vide Evidence P-9*), it is required that derivative swap transaction shall be made in the form of **CONTRACT** practically known as ISDA Master Agreement. The contract shall be in the form of final agreement (not a draft / concept) for having been completely negotiated and signed by both parties. However, the Defendant does not fulfill **BANK INDONESIA REGULATION NO.7/31/PBI/2005 ON DERIVATIVE TRANSACTIONS** (*vide Evidence P-9*) as in reality, **ISDA MASTER AGREEMENT** is still in the form of a draft or concept and never signed. ......    .....

**24**

**b. Default to fulfill the requirements of BANK INDONESIA CIRCULAR LETTER No.10/42/DPD, dated NOVEMBER 27, 2008 ARTICLE 1 (4) (A) (vide Evidence P-10)**

BANK INDONESIA CIRCULAR LETTER No.10/42/DPD, DATED NOVEMBER 27, 2008 ARTICLE 1 (4) (A) (*vide Evidence P-10*) requires the existence of main/principal contract (**UNDERLYING CONTRACT**) or agreement.

Similarly, as specified above, the contract shall be a **FINAL** agreement (not a draft / concept) for having completed negotiated and signed by the parties, as a **MAIN/PRINCIPAL AGREEMENT** (*UNDERLYING CONTRACT*).

However, the **Defendants** does not fulfill **BANK INDONESIA CIRCULAR LETTER No.10/42/DPD**, Dated NOVEMBER 27, 2008 ARTICLE 1 (4) (A) (vide Evidence P-10) as in reality **ISDA MASTER AGREEMENT** as a principal / main contract (*underlying contract*) is still in the form of a draft/concept and never signed;

c. All incumbencies of the **Plaintiff** in the currency speculation business (swaps and derivatives) with the Defendant shall be

**25**

regulated and protected by the main/principal agreement as the *underlying contract*, here named ISDA Master Agreement which is the final agreement and signed by the parties. However, ISDA Master Agreement is still in the form of a draft , concept.

Hence, based on the legal fact, according to Bank Indonesia Regulation, the currency speculation business plan (swaps and derivatives) between the **Plaintiff** and **Defendant** can only be held and come into force when ISDA Agreement as the Master Agreement (Main Agreement) has been signed; but in fact, there are no agreement or contract having been final and signed by the **Plaintiff** and the **Defendant**.

## II. THE DEFENDANTS IS PROVEN TO HAVE MADE A TORT AGAINST THE PLAINTIFF

II.1. From the evidence described above, it is proven that <u>all the elements specified in Article 1365 of Civil Code</u> namely **"THE ACT OF TORT"**, referring to the verdict of Hoge Raad, dated January 31, 1919 in the case between Lindenbaum against Cohen, any act can



26

be considered as an ACT OF TORT if it qualifies the
following criteria:

1. **The act is contradictive to the legal obligation
   of the actor;** <u>OR</u>

2. **The act violates the rights of others;** <u>OR</u>

3. **The act violates social ethics or norms;** <u>OR</u>

4. **The act is considered to be contradictive to the
   principle of appropriateness, accuracy, and
   carefulness which must be possessed by a person
   in his/her social intercourse when getting in
   touch with the community or against the property
   of others.**

II.2.   In verdict concerning the criteria of the TORT, Hoge
        Raad applied the word "OR". It means, to prove that
        there was an act of TORT, the four criteria of tort
        shall not be cumulative of acts. If **one of the
        criteria (one element)** has been fulfilled by an act
        of tort, the act can be qualified as a TORT.

II.3.   In the case of *a quo*, the act of the **Defendant** has
        completely been considered to have violated not only
        one (1), but all, from the 1st to the 4th elements of
        Tort, namely:

        - Performing the act considered to be contradictive
          to the principle of appropriateness by manipulating

**27**

the three (3) letters, namely the letter, dated
September 4, 2008 (**vide Evidence P-6**), the letter,
dated March 31, 2009 (**vide Evidence P-7**) and the
letter, dated June 18, 2009 (**vide Evidence P-8**),
and has made up fictitious bills;

- Violating the subjective rights of the **Plaintiff**
  namely the rights of being treated fairly;

- Performing the act which is contradictive to the
  legal liabilities of the **Defendant** to obey the
  regulations of Bank Indonesia at the time of
  performing financial transaction businesses in
  Indonesia.

## III. LOSSES SUFFERED BY THE PLAINTIFF

III.1. Whereas the tort performed by the **Defendant** has
caused losses to the **Plaintiff** amounting to USD
15,250,000 (fifteen million two hundred and fifty
thousand United States Dollars), where the fault
made by the **Defendant** has different types of
causalities or causal relationship to the losses
suffered by the **Plaintiff**, with the following
details:

a. Since the date of registration of this lawsuit,
   material losses having been suffered by the
   **Plaintiff** are among others, loss of profits

**28**

amounting to USD **4,250,000 (four million two hundred and fifty thousand United States Dollars)**, whereas if the **Plaintiff** were not negligent to perform negotiation with the **Defendant** and had completed the Draft of **ISDA MASTER AGREEMENT**, swap and derivative transactions would have occurred and the **Plaintiff** would have gained benefit as much as USD **4,250,000 (four million two hundred and fifty thousand United States Dollars)** plus 6% (six percent) interest per year;

b. Immaterial Losses suffered by the **Plaintiff**, if counted, is USD **11,000,000 (Eleven million United States Dollars)**, considering that the **Plaintiff** is a publicly listed and highly reputable company which has good image and reputation in the society and business community, hence the tort performed by the **Defendant** to the **Plaintiff** by declaring that the **Plaintiff** has failed to make payment in accordance with **ISDA AGREEMENT MASTER AGREEMENT**, has destroyed the good image, name and reputation of the **Plaintiff** in business community and other institutions / agencies of authorized capital market, as the **Plaintiff**

**29**

shall make reports to Bapepam and has decreased the share value of the **Plaintiff's** Company.

III.2.    As it is already proven that the tort performed by the **Defendant** has caused material and immaterial losses to the **Plaintiff**, the **Defendant** shall be responsible in the matters and therefore, shall be given punishment to pay the losses suffered by the **Plaintiff**, such as:

a. Indemnity of material loss in the form of lost profit amounting to USD 4,250,000 (four million two hundred fifty thousand United States Dollars) in cash, plus 6% (six percent) interest per year since the date of registration of this lawsuit until it has been fully paid; and

b. Indemnity of immaterial loss amounting to **USD 11,000,000 (Eleven million United States Dollars)** in cash plus **6% (six percent) interest per year.**

## IV. APPLICATION FOR PROVISION

Being anxious that the **Defendant** would act something, which may further cause difficulty to the legal process

**30**

and would perform any action which may cause bigger losses to the **Plaintiff**, the **Plaintiff** herewith asks the Panel of Judges to produce a provisional verdict as follows:

a. Requiring the **Defendant** and/or the proxies or the representatives or any party receiving the transfer of rights and the authority, or any others, before the verdict has binding legal power (*inkracht van gewisjde*), to be status quo or not to take any action, neither legal action in the form of civil suit, bankruptcy petition against the **Plaintiff**, the arbitrary petition in the domestic and / or in foreign country, a request of execution, billing out actions, transfer of rights or cessie upon any letter / all documents of any property owned by the **Plaintiff**, both any movable or immovable matters at law institutions and/or any arbitrary bodies in the Domestic and International Countries;

b. To punish the **Defendant** to pay a penalty (*dwangsom*) to the **Plaintiff** as much as USD 50,000,000,- (fifty million rupiah) per day subsequently if the **Defendant** is negligent to conduct or violates the content of this provisions  wholly or partially.



## V.  APPLICATION FOR SECURITY ATTACHMENT

Whereas to ensure that this lawsuit will not be ineffective or fruitless (*illusioir*), and that the **Defendant** will execute the verdicts in the case of *a quo*, the plaintiff herewith appeals to the Central Jakarta District Court **TO STIPULATE THE SECURITY ATTACHMENT (*CONSERVATOIR BESLAG*) OF THE PROPERTY AND OTHER ASSETS BELONGING TO THE DEFENDANT**, for which, the details will be provided latter on. Therefore, **Plaintiff** will reserve its rights to apply for the Security Attachment of property and assets of the **Defendant**.

## VI. APPLICATION FOR DIRECTLY EXECUTABLE DECISION AND PENALTY PAYMENT (DWANGSOM)

Whereas this lawsuit is filed based on the justifiable evidences and in accordance with the prevailing and applicable laws which can be used as evidences and undeniable by the **Defendant** and in order that the verdict in the case of *a quo* can be immediately executed by the **Defendant**, so that all material and immaterial losses suffered by the plaintiff will immediately be returned, then in accordance with Article 180 HIR, the **Plaintiff** herewith appeals to the Panel of Judges to declare the case of *a quo* imposed verdict in the case of *a quo* be

**32**

executed in advance even if otherwise there is any other
legal actions against it (*uitvoerbaar bij voorraad*).

Whereas in order to ensure immediate execution as a result
of verdict in the case of *a quo*, the **Defendant** shall be
punished to make penalty payment dwangsom to the
**Plaintiff** as much as Rp. 50,000,000,- (fifty million
rupiah) per day continuously, if the **Defendant** violates
the content of this decision partially or wholly since the
verdict of *a quo* until the date of execution of the
verdict of the case of *a quo* by the **Defendant**.

**BASED ON THE LEGAL FACTS AS SPECIFIED ABOVE THE PLAINTIFF
APPEALED TO A PANEL OF JUDGES TO GIVE VERDICT AS FOLLOWS:**

**IN THE PROVISION**

1. To grant the Provisional **Plaintiff** Application entirely;

2. Requiring the **Defendant** and/or the proxies or the
representatives or any party receiving the transfer of
rights and the authority, or any others, before the verdict
has binding legal power (*inkracht van gewisjde*), to be
status quo or not to take any action, neither legal action
in the form of civil suit, bankruptcy petition against the
**Plaintiff**, the arbitrary petition in the domestic and / or

**33**

in foreign country, a request of execution, billing out

actions, registration action, transfer of rights or cessie

upon any letter / all documents of any property owned by

the **Plaintiff**, both any movable or immovable matters at law

institutions and/or any arbitrary bodies in the Domestic

and International Countries;

5. To punish the **Defendant** to pay the penalty (dwangsom) to

the **Plaintiff** as much as USD 50,000,000,- (fifty million

rupiah) per day continuously every time the **Defendant**

conduct violation against the contents of this decision

partially or wholly.

**IN THE LEGAL PROCESS OF THE CASE:**

1. To grant the lawsuit of the **Plaintiff** entirely;

2. To declare that security attachment having been stipulated
   is valid and valuable;

3. To declare that the **Defendant** has conducted a Tort;

4. To declare that the **Defendant** and the **Plaintiff** are not
   the parties and not legally bound by any a letter of
   agreement or swap and derivatives transactions or foreign
   currency exchange transactions in any form, both verbally

**34**

or in writing in any kind of letter or any others, and to declare the **Plaintiff** has no obligation of any financial liability to the **Defendant** in relation to a swap and derivatives transaction or any foreign currency exchange transaction;

5.  To declare that the concept of ISDA (International Swaps and Derivatives Association, Inc.) Master Agreement (**vide Evidence P-4**) is merely a concept, which has not yet been effective and has no legal power to the **Plaintiff** and **Defendant**;

6.  To declare that all the letters sent by the **Defendant** to the **Plaintiff**, dated September 4, 2008 (**vide Evidence P-6**, the **Defendant's** letter, dated march 31, 2009 (**vide Evidence P-7**) and the **Defendant's** letter dated June 18, 2009 (**vide Evidence P-8**) addressed to the **Plaintiff** are not legitimate and ineffective;

7.  To declare that billing out of the **Defendant** as much as USD 2,047,576 (two million forty seven thousand and five hundred seventy-six United States Dollars) provided by the **Defendant** on September 4, 2008 (**vide Evidence P-6**) and letter on, the total increased to USD 2,560,472 (two million five hundred sixty thousand and four hundred seventy-two United States Dollars) submitted with the

**35**

**Defendant's** letter dated June 18, 2009 (**vide Evidence P-8**) addressed to the **Plaintiff** as baseless and illegal wid;

8. To punish the **Defendant** to immediately indemnify the material loss to the **Plaintiff** in cash as much as USD 4,250,000 (four million two hundred and fifty thousand United States Dollars) plus 6% (six percent) interest per year from the date of registration of this lawsuit;

9. To punish the **Defendant** to immediately indemnify the immaterial loss to the **Plaintiff** in cash as much as USD 11,000,000 (Eleven million United States Dollars) and 6% (six percent) interest per year;

10. To punish the **Defendant** to pay the penalty (dwangsom) to the **Plaintiff** as much as Rp.50.000.000,- (fifty million rupiah) per day continuously every time the **Defendant** violated the contents of this verdict, either partially or wholly since the date the verdict in the case of *a quo* until the date of execution of the verdict of the case of *a quo* of the **Defendant**;

11. To declare that this verdict shall be implemented in advance even if there is any legal opposition, appeal, cassation or review (*uitvoerbaar bij voorraad*);



**36**

12. **To punish the Defendant** to pay legal costs and expenses

**O R**

If otherwise the Panel of Judges argues differently it is appealed herewith to produce a verdict fairly (ex aequo et bono).

Now therefore, we herewith provide the lawsuit and, for your honor and attention we thank you.

Faithfully Yours,

**Attorney of PT Mobile-8 Telecom Tbk (The Plaintiff)**
**HOTMAN PARIS & PARTNERS**

**Hotman Paris Hutapea, S.H., M.Hum.**         **Subagio Aridarmo, S.H.**

Advocate                                        Advocate

**Donald R.O. Pardosi, S.H.**

Advocate



**37**

**Attachment:**

- Original   Special   Letter   of   Attorney,   dated   May   14
  (fourtenth) 2010.

**38**



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS; FOLD AT DOTTED LINE

**CERTIFIED MAIL**™

7009 1410 0000 5871 4966

U.S. POSTAGE
PAID
NEW YORK, NY
10021
AUG 27 '10
AMOUNT
**$5.38**
0004179G-35

1000    10019

## CONSULATE GENERAL OF INDONESIA
5 EAST 68TH STREET
NEW YORK, N.Y. 10065
(212) 879-0600

*Locke McMurray*
*1271*

Lehman Brothers Special Financing Inc
745 Seventh Avenue
New York, NY 10019

# BARCLAYS

# LOCKE MCMURRY
# 212-526-7000
# 45TH

**1271 6TH AVE., NEW YORK**

$100555495

# STANDARD
**MAILROOM 412-2705**

## PCS: 1
**09/03/2010 04:27 PM**    $100555495

Instruction:

39

# **<u>EXHIBIT R</u>**

The Jakarta Post

Wednesday, September 22, 2010

---

## INVITATION LETTER FOR COURT OF DISTRICT JUSTICE JAKARTA PUSAT
Number: 247/Pdt.G/2010/PN.Jkt.Pst.

Today: **Wednesday**, Dated of **22 September, 2010**, I, **AGUS PURWOKO**, substation of process server in District justice of Jakarta Pusat, on the instruction and appointed by Chairman Justice of the said District Court to conduct this work:

### HAVE OFFICIALLY CALLED TO

Lehman Brothers Special Financing Inc. Formerly domiciled in 745 Seventh Avenue, New York NY 10019, United States, and now his certain address is unknown domestically as well as out of the legal territorial of United Country of Republic Indonesia, hereinafter referred to as **THE ACCUSED**;

In order that he/they come to appear in the Court of District Justice of Jakarta Pusat in the Building determined for that matter in Jalan Gajah Mada No. 17 Jakarta Pusat, that will be held on;...............

**"THE DAY: WEDNESDAY, DATED OF: 29 SEPTEMBER 2010, AT: 09.00 WEST INDONESIA TIME"**

He is urgently to be appeared at that time for the investigation of the dispute that has been registered in the Registration of District Justice of Jakarta Pusat, Registration Number 247/Pdt.G/2010/PN.JKT.PST; in the dispute between: ...............................................................

**PT. MOBIL-8 Telecom Tbk,** .................................................................... As **THE PLAINTIFF**

#### AGAINST

**Lehman Brothers Special Financing Inc** .................................................... As the **ACCUSED**

Further, it is confirmed to him that he/they may take the copies of the Accusation Letter of the Plaintiff in the Office of District Justice of Jakarta Pusat, and for that accusation may propose the response orally or in written undersigned by him or his legal attorney and submitted to the above court'

On the Instruction I conduct this duty through Advertisement.

The said Substitution of Process Server

Undersigned

**A G U S   P U R W O K O**
NIP. 19760818-20112-1-001



# MEDIA INDONESIA

Rabu, 22 September 2010                                                                 Halaman 10

---

**RELAAS PANGGILAN SIDANG**
**PENGADILAN NEGERI JAKARTA PUSAT**
Nomor : 247/Pdt.G/2010/PN.Jkt.Pst

Pada hari ini **RABU** , Tanggal **22 SEPTEMBER 2010**, saya AGUS PURWOKO, Jurusita Pengganti pada Pengadilan Negeri Jakarta Pusat, atas perintah dan ditunjuk oleh Hakim Ketua Majelis Pengadilan Negeri tersebut, untuk menjalankan pekerjaan ini .

**TELAH MEMANGGIL DENGAN RESMI KEPADA :**

**Lehman Brothers Special Financing Inc. Dahulu** berkedudukan di 745 Seventh Avenue, New York NY 10019, Amerika Serikat, **sekarang** tidak diketahui lagi alamatnya yang pasti baik di dalam maupun diluar wilayah Hukum Negara Kesatuan Republik Indonesia, selanjutnya disebut sebagai : **TERGUGAT** :

Supaya ia/mereka datang menghadap dipersidangan Pengadilan Negeri Jakarta Pusat di Gedung yang telah ditentukan untuk itu di Jalan Gajah Mada No. 17 Jakarta Pusat, yang akan dilangsungkan pada :

**HARI : RABU, TANGGAL : 29 SEPTEMBER 2010, JAM : 09.00 WIB**

Perlu hadir diwaktu itu dalam rangka pemeriksaan perkara yang telah didaftarkan di Kepaniteraan Pengadilan Negeri Jakarta Pusat, Daftar No. 247/Pdt.G/2010/PN.JKT.PST, Dalam perkara antara :

**PT. Mobil-8 Telecom Tbk,** ------------------------------------------- Sebagai **PENGGUGAT** :

**L A W A N**

**Lehman Brothers Special Financing Inc** ------------------------ Sebagai **TERGUGAT** :

Selanjutnya diberitahukan pula kepadanya bahwa ia/mereka dapat mengambil turunan surat gugatan penggugat dikepaniteraan Pengadilan Negeri Jakarta Pusat dan atas gugatan tersebut dapat mengajukan jawaban secara lisan atau tertulis yang ditandatangani olehnya maupun kuasanya yang sah dan diserahkan pada persidangan tersebut diatas .

Atas perintah tersebut pekerjaan ini saya Jalankan melalui iklan.

Jurusita Pengganti tersebut.

T T D

**AGUS PURWOKO**
NIP. 19760818-200112-1-001

# EXHIBIT S

Unofficial translation

BANK INDONESIA REGULATION

NUMBER: 7/31/PBI/2005

CONCERNING

DERIVATIVE TRANSACTIONS

THE GOVERNOR OF BANK INDONESIA

Considering:    a.  whereas a sound banking system and financial market are necessary to support the measures taken by Bank Indonesia to achieve and maintain stability in the rupiah;

b.  whereas the free foreign exchange system applied in Indonesia has accelerated the expansion and integration of the Indonesian financial market into the global financial market, including the derivative transactions conducted therein;

c.  whereas margin trading in foreign currency derivative transactions containing elements of speculation may be one factor influencing movement in the value of the rupiah;

d.  now therefore on the basis of the considerations referred to in letter a, letter b, and letter c, and with regard to prudential banking principles, it is deemed necessary to enact new provisions concerning derivative transactions by Banks in a Bank Indonesia Regulation;

In view of:    1.  Act Number 7 of 1992 concerning Banking (State Gazette of the Republic of Indonesia Number 31 of 1992,

Supplement ...

- 2 -

Supplement to the State Gazette of the Republic of Indonesia Number 3472) as amended by Act Number 10 of 1998 (State Gazette of the Republic of Indonesia Number 182 of 1998, Supplement to the State Gazette Number of the Republic of Indonesia 3790);

2. Act Number 23 of 1999 concerning Bank Indonesia (State Gazette of the Republic of Indonesia Number 66 of 1999, Supplement to the State Gazette of the Republic of Indonesia Number 3843) as amended by Act Number 3 of 2004 (State Gazette of the Republic of Indonesia Number 7 of 2004, Supplement to the State Gazette of the Republic of Indonesia Number 4357);

3. Act Number 24 of 1999 concerning Foreign Exchange Flows and the Exchange Rate System (State Gazette of the Republic of Indonesia Number 67 of 1999, Supplement to the State Gazette of the Republic of Indonesia Number 3844);

4. Bank Indonesia Regulation Number 5/8/PBI/2003 concerning the Application of Risk Management for Commercial Banks (State Gazette of the Republic of Indonesia Number 56 of 2003, Supplement to the State Gazette of the Republic of Indonesia Number 4292);

HAS DECREED:

To enact:     THE    BANK    INDONESIA    REGULATION CONCERNING DERIVATIVE TRANSACTIONS.

CHAPTER I ...

- 3 -

# CHAPTER I
## GENERAL PROVISIONS
### Article 1

The terminology used in this Bank Indonesia Regulation has the following meanings:

1. "Bank" is a commercial bank as referred to in Act Number 7 of 1992 concerning Banking as amended by Act Number 10 of 1998, including a branch office of a foreign bank.

2. "Derivative Transactions" are transactions based on a contract or agreement for payment in which the value is a derivative of the value of underlying instruments, such as interest rates, exchange rates, commodities, equity and indices, whether accompanied by or not accompanied by notional amounts or instruments, but not including credit derivative transactions.

3. "Margin Trading" is a Derivative Transaction without notional amount, so that movement only takes place in the margin calculated from the notional amount with an exchange rate differential and/or interest rate differential that requires or does not require a margin deposit to guarantee the execution of the transaction.

4. "Margin Deposit" is funds set aside specifically to cover loss that may be incurred from a Margin Trading transaction throughout the effective duration of the contract for the Margin Trading transaction.

5. "Maintenance Margin" is the minimum margin deposit that must be maintained throughout the effective duration of a contract for Margin Trading transaction.

6. "Margin Call" is an announcement concerning additional deposit needed to meet the minimum margin deposit agreed upon by contract.

7. "Capital ...

- 4 -

7. "Capital" is tier 1 capital and tier 2 capital as stipulated in the applicable Bank Indonesia regulatory provisions concerning the Minimum Capital Adequacy Requirement for Commercial Banks.

8. "Open Position" is the position of the base currency of a Derivative Transaction that is still open.

9. "Mark to Market" is a means of calculation based on an agreed market rate at the end of every working day on a consistent basis for open positions in order to determine loss or gain.

10. "Customer" is any party using the services of a Bank.


Article 2

(1) Banks may conduct Derivative Transactions either for their own account for the account of customers.

(2) When conducting Derivative Transactions as referred to in paragraph (1), the Bank is required to perform Mark to Market.


Article 3

When conducting Derivative Transactions, Banks are required to apply risk management as stipulated in the applicable Bank Indonesia regulatory provisions concerning Application of Risk Management for Commercial Banks.


Article 4

(1) Banks are required to provide full disclosure to customers intending to conduct Derivative Transactions.

(2) Full disclosure to customers as referred to in paragraph (1) includes but is not limited to explanations of:

a. credit ...

- 5 -

    a.  credit risk,

    b.  settlement risk, and

    c.  market risk.

    d.  the possibility that the balance of Margin Deposit may become zero or even negative, and therefore the Bank may ask the customer to add to the Margin Deposit if the customer intends to continue or close the Margin Trading transaction.

(3)  Derivative Transactions for the account of customers shall be governed by contracts.

(4)  Contracts as referred to in paragraph (3) shall cover at least the following:

    a.  ceiling on the derivative transaction;

    b.  base currency used;

    c.  currency or instrument to be exchanged;

    d.  settlement of the derivative transaction;

    e.  book keeping of gains/losses arising from the derivative transaction;

    f.  recording of unrealized gains or losses;

    g.  method or means of the derivative transaction;

    h.  amount of commission;

    i.  use of conversion rate;

    j.  advice and confirmation of the derivative transaction;

    k.  confidentiality; and

    l.  domicile and governing law.

(5)  Contracts for Margin Trading transactions, in addition to the material referred to in paragraph (4), must also state the following:

    a.  amount of Margin Deposit;

    b.  the prescribed Maintenance Margin; and

    c.  rights and obligations of the customer.

(6) <u>Contracts</u> ...

- 6 -

(6) Contracts as referred to in paragraph (4) and paragraph (5) shall be printed in large, easily legible type.


## Article 5

(1) Banks are prohibited from maintaining positions in Derivative Transactions conducted by related parties.

(2) A Bank shall be deemed to hold a position in a Derivative Transaction conducted by a related party if the Bank does not simultaneously pass on the related party transaction at the same time and in the same amount to another, non-related Bank.

(3) Related party as referred to in paragraph (1) and paragraph (2) shall be construed according to the definition of Related Party of a Bank as referred to in the applicable Bank Indonesia regulatory provisions concerning the Legal Lending Limit for Commercial Banks.


## Article 6

Banks are prohibited from providing credit and overdraft facilities to Customers for the purpose of Derivative Transactions, including the topping up of a Margin Deposit for a Margin Trading transaction.


## Article 7

(1) Banks shall only conduct Derivative Transactions in which their value is a derivative of a foreign currency and/or interest rate.

(2) The ...

- 7 -

(2) The scope of Derivative Transactions in which value is a derivative of a foreign currency and/or interest rate as referred to in paragraph (1) includes but is not limited to:

    a.  forward transactions, swaps, options, currency futures, and transactions with today and tomorrow values synthesized as Derivative Transactions; and/or

    b.  interest rate swaps, interest rate options, FRAs, and interest rate futures.

(3) Banks are prohibited from conducting Margin Trading in foreign currencies against the rupiah, whether for their own account or for the account of customers, and from conducting Derivative Transactions other than the transactions referred to in paragraph (1).

## Article 8

(1) Loss to a Bank from Derivative Transactions, measured cumulatively over the current year, shall not exceed 10% (ten percent) of Bank Capital.

(2) The maximum 10% limit on loss to a Bank as referred to in paragraph (1) shall be waived in the case of loss from Derivative Transactions not set off against gain from non-derivative transactions directly linked to the Derivative Transactions concerned.

(3) In the event that the loss of the Bank exceeds 10% (ten percent) of Bank Capital, the Bank shall be prohibited from conducting new Derivative Transactions and shall report the measures to be taken to recover the loss to Bank Indonesia by no later than the following working day.

Article 9 ...

- 8 -

Article 9

(1) A Bank conducting a Margin Trading transaction for the account of a customer, not accompanied by notional amount or instrument, shall request the customer to provide:

    a.  Margin Deposit of no less than 10% (ten percent) of the ceiling of the Margin Trading transaction; and

    b.  Maintenance Margin of no less than 50% (fifty percent) of the Margin Deposit.

(2) The Bank shall issue a Margin Call to a customer if the Margin Deposit has reached the Maintenance Margin.

(3) The Bank is required to terminate a Derivative Transaction for the account of a customer if after Margin Call, the customer does not provide additional deposit no later than the following working day.

(4) The Bank is required to report to the customer the Derivative Transaction position of that customer and provide a special report when the customer position is deemed in danger, namely when the customer faces the possibility of loss such that the available Margin Deposit will not cover the loss.

Article 10

(1) Banks shall submit weekly reports to Bank Indonesia concerning Derivative Transactions, in accordance with the Reporting Format for Derivative Transactions as presented in Appendices 1 and 2, covering:

    a.  losses/gains; and

    b.  the position of Derivative Transactions, whether for the account of the bank itself or for the account of customers.

(2) The weekly reports referred to in paragraph (1) shall be arranged according to the following periods:

a. <u>the</u> …

- 9 -

    a. the first weekly reporting period, commencing from the 1st (first) through the 7th (seventh) day of the month.

    b. the second weekly reporting period, commencing from the 8th (eighth) through the 15th (fifteenth) day of the month.

    c. the third weekly reporting period, commencing from the 16th (sixteenth) through the 23rd (twenty-third) day of the month.

    d. the fourth weekly reporting period, commencing from the 24th (twenty-fourth) day through the end of the month.

(3) Reports as referred to in paragraph (1) shall be submitted to Bank Indonesia no later than 7 (seven) working days after the end of the reporting period.

(4) The deadline for submission of reports as referred to in paragraph (3) includes the period for submission of report corrections.

## Article 11

(1) Any Bank in violation of Article 2 paragraph (2), Article 3, Article 4, Article 5, Article 6, Article 7, Article 8, Article 9, and Article 10 shall be liable to administrative sanctions in the form of written warning and a financial penalty of 10% (ten percent) of the amount of the violating transaction.

(2) The total financial penalty for a transaction as referred to in paragraph (1) shall not exceed Rp 27,000,000,000.00 (twenty-seven billion rupiahs) during 1 calendar year.

## Article 12

Any Bank that at the time of promulgation of this Bank Indonesia Regulation is holding an outstanding position in Derivative Transactions as referred to in

Article ...

- 10 -

Article 7 and that has not reached maturity shall square the position no later than 1 (one) month after the promulgation of this Bank Indonesia Regulation.

## Article 13

With the enactment of this Bank Indonesia Regulation, Decree of the Board of Managing Directors of Bank Indonesia Number 28/119/KEP/DIR dated December 29, 1995, concerning Derivative Transactions is revoked and declared no longer valid.

## Article 14

This Bank Indonesia Regulation shall come into force on the date of its enactment.

Enacted in Jakarta

Dated September 13, 2005

THE GOVERNOR OF BANK INDONESIA,

BURHANUDDIN ABDULLAH

STATE GAZETTE OF THE REPUBLIC OF INDONESIA NUMBER 85 OF 2005
DPD

Unofficial translation

**Reporting Format: Bank Derivative Transactions**                                    Appendix 1

Bank ....................................
**RECAPITULATION OF DERIVATIVE TRANSACTIONS**
Period as of date:*)

*In millions of rupiahs*

| TRANSACTION (by category of transaction) | BASE CURRENCY POSITION (in rupiahs) | | GAIN/(LOSS) | | |
|---|---|---|---|---|---|
| | Long | Short | Gain | Loss | Net Cumulative Total |
| (1) | (2) | (3) | (4) | (5) | (6)=(4)+(5) |
| **I.  With Notional Amounts** | | | | | |
| 1.  Exchange Rate | 0 | 0 | 0 | 0 | 0 |
| 2.  Interest Rate | 0 | 0 | 0 | 0 | 0 |
| 3.  Combination of 1 and 2 | 0 | 0 | 0 | 0 | 0 |
| **II. Without Notional Amounts** | | | | | |
| 1.  Exchange Rate | 0 | 0 | 0 | 0 | 0 |
| 2.  Interest Rate | 0 | 0 | 0 | 0 | 0 |
| 3.  Combination of 1 and 2 | 0 | 0 | 0 | 0 | 0 |
| Total | 0 | 0 | 0 | 0 | 0 |

| | |
|---|---|
| Bank Capital: | 0 |
| Margin deposits from related party customers: | 0 |
| Margin deposits from non-related party customers: | 0 |

**Percentage of Loss = Net Cumulative Total x 100%**
**Bank Capital**

\*) Fill in according to period:
   a. Week I for 1st through 7th
   b. Week II for 8th through 15th
   c. Week III for 16th through 23rd
   d. Week IV for 23rd through end of month.

**Reporting Format: Bank Derivative Transactions**                                                                Appendix 2

**Bank** ....................................
## RECAPITULATION OF DERIVATIVE TRANSACTIONS
Period as of date:*)

*In millions of rupiahs*

| TRANSACTION (by counterparty) | BASE CURRENCY POSITION (in rupiahs) | | GAIN/(LOSS) | | |
|---|---|---|---|---|---|
| | Long | Short | Gain | Loss | Net Cumulative Total |
| (1) | (2) | (3) | (4) | (5) | (6)=(4)+(5) |
| **I.  With Notional Amounts** | | | | | |
|   1.  Transactions with Related Customers | | | | | |
|     a. Banks | 0 | 0 | 0 | 0 | 0 |
|     b. Non-Bank | 0 | 0 | 0 | 0 | 0 |
|   2.  Transactions with Non-Related Customers | | | | | |
|     a. Banks | 0 | 0 | 0 | 0 | 0 |
|     b. Non-Bank | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| **II. Without Notional Amounts** | | | | | |
|   1.  Transactions with Related Customers | 0 | 0 | 0 | 0 | 0 |
|     a. Banks | | | | | |
|     b. Non-Bank | | | | | |
|   2.  Transactions with Non-Related Customers | 0 | 0 | 0 | 0 | 0 |
|     a. Banks | | | | | |
|     b. Non-Bank | | | | | |
| | | | | | |
| Total | 0 | 0 | 0 | 0 | 0 |
| Bank Capital: 0 | | | | | |
| Margin deposits from related party customers: 0 | | | | | |
| Margin deposits from non-related party customers: 0 | | | | | |

**Percentage of Loss = <u>Net Cumulative Total</u> x 100%**
**Bank Capital**

*) Fill in according to period:
   a. Week I for 1st through 7th
   b. Week II for 8th through 15th
   c. Week III for 16th through 23rd
   d. Week IV for 23rd through end of month.

# EXHIBIT T

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

Robert J. Lemons
+1-212-310-8924
robert.lemons@weil.com

**Weil, Gotshal & Manges LLP**

September 24, 2010

BY HAND AND FAX

Mr. Hotman Paris Hutapea, S.H., M. Hum.
Hotman Paris Partners
Summitmas I Building, 18th Floor,
Jalan Jenderal Sudirman Kavling 61-62,
Jakarta 12069 Indonesia

Re:    **In re Lehman Brothers Holdings Inc., *et al.*, Chapter 11**
       <u>**Case No. 08-13555 (JMP) (jointly administered)**</u>

Dear Sir,

We are the attorneys for Lehman Brothers Holdings Inc. ("<u>LBHI</u>"), Lehman Brothers Special Financing Inc. ("<u>LBSF</u>"), and their affiliated debtors (collectively, the "<u>Debtors</u>"). Commencing on September 15, 2008 and periodically thereafter, LBHI, LBSF, and the other Debtors commenced with the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") voluntary cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). As you know, LBSF commenced its chapter 11 case on October 3, 2008. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. The cases have been assigned Case No. 08-13555 (JMP).

It has been brought to the Debtors' attention that, without obtaining prior Bankruptcy Court approval, PT. Mobile-8 Telecom Tbk ("<u>Mobile-8</u>") filed a complaint against LBSF in the Civil Court, Niaga, HAM Jakarta Pusat, Indonesia (civil case No. 247/Pdt.G/2010PN.Jkt.Pst) (the "<u>Jakarta Action</u>").

Pursuant to section 541 of the Bankruptcy Code, the filing of a petition under chapter 11 of the Bankruptcy Code creates an estate, which is comprised of all of the debtor's property *wherever* located and by whomever held. 11 U.S.C. § 541 (emphasis added). Pursuant to section 362(a) of the Bankruptcy Code, an automatic stay went into effect with regard to LBSF on October 3, 2008, prohibiting a variety of actions designed to obtain possession of LBSF's property. The automatic stay "is effective immediately upon the filing of the petition, and any proceedings or actions described in section 362(a)(1) are void and without vitality if they occur after the automatic stay takes effect." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994); *see also, Dalton v. New Commodore Cruise Lines Ltd.*, 2004 WL 344035 *3 (S.D.N.Y. 2002).

September 24, 2010
Page 2

The automatic stay expressly prohibits:

> the commencement or continuation, including the issuance or employment
> of process, of a judicial, administrative, or other action or proceeding
> against the debtor that was or could have been commenced before the
> commencement of the case under this title, or to recover a claim against
> the debtor that arose before the commencement of a case under this title.
> \*\*\*
> any act to obtain possession of property of the estate or of property from
> the estate or to exercise control over property of the estate.
> \*\*\*
> any act to collect, assess, or recover a claim against the debtor that arose
> before the commencement of the case under this title.

11 U.S.C. §§ 362(a)(1), 362(a)(3), 362(a)(6).

Further, "since the bankruptcy stay is automatic, '[t]he action is void even where the acting party had no actual notice of the stay.'" *Hearst Magazines v. Stephen L. Geller, Inc.*, 2009 WL 812039 \*1 (S.D.N.Y.) (quoting *Dalton*, 2004 WL 344035 \*3).

Accordingly, the commencement of the Jakarta Action, which is a clear violation of the automatic stay, is void *ab initio*. Pursuant to established case law, parties may be held in contempt of court for violating the automatic stay. *See Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976); *Colon v. Hart* (*In re Colon*), 114 B.R. 890, 896 (Bankr. E.D. Pa. 1990) ("Many courts have held . . . that a willful violation of the statutory stay provision constitutes civil contempt and may be addressed as such."). Mobile-8 must immediately terminate the Jakarta Action. Unless Mobile-8 files a notice of withdrawal of the Jakarta Action prior to September 29, 2010, and provides the Debtors with confirmation of same at the address set forth above, the Debtors will file pleadings with the Bankruptcy Court to enforce the automatic stay and for appropriate sanctions.

If you have any questions regarding the foregoing, please do not hesitate to contact me.

Very truly yours,

Robert J. Lemons

cc:  Holly Loiseau, Esq.
     Locke McMurray, Esq.