Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9            Debtors.

10   - - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14            Debtor.

15   - - - - - - - - - - - - - - - - - - - - -x

16            United States Bankruptcy Court

17            One Bowling Green

18            New York, New York

19

20            September 29, 2010

21            3:03 PM

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

Page 2

1

2      CONTINUED EVIDENTIARY HEARING re (i) Motion of Debtor to Modify

3      the September 20, 2008 Sale Order and Granting Other Relief;

4      (ii) Motion of the Trustee for Relief Pursuant to the Sale

5      Orders or, Alternatively, for Certain Limited Relief Under Rule

6      60(b); (iii) the Motion of Official Committee of Unsecured

7      Creditors of Lehman Brothers Holdings Inc., Authorizing and

8      Approving (A) Sale of Purchased Assets Free and Clear of Liens

9      and Other Interests and (B) Assumption and Assignment of

10     Executory Contracts and Unexpired Leases, Dated September 20,

11     2008 (and Related SIPA Sale Order) and Joinder in Debtors' and

12     SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify

13     Sale Order; (iv) All Joinders Thereto and Related Adversary

14     Proceedings; and (v) Motion of Barclays Capital Inc. to Enforce

15     the Sale Order and Secure Delivery of All Undelivered Assets

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Lisa Bar-Leib

Page 3

1

2    A P P E A R A N C E S :

3    JONES DAY

4           Attorneys for the Movant, LBHI

5           222 East 41st Street

6           New York, NY 10017

7

8    BY:   ROBERT W. GAFFEY, ESQ.

9           JAYANT W. TAMBE, ESQ.

10

11   HUGHES HUBBARD & REED LLP

12          Attorneys for Movant, James W. Giddens, SIPC Trustee

13          One Battery Park Plaza

14          New York, NY 10004

15

16   BY:   WILLIAM R. MAGUIRE, ESQ.

17

18   BOIES, SCHILLER & FLEXNER LLP

19          Attorneys for Barclays Capital, Inc.

20          333 Main Street

21          Armonk, NY 10504

22

23   BY:   JONATHAN D. SCHILLER, ESQ.

24

25

Page 4

1

2    BOIES, SCHILLER & FLEXNER LLP

3           Attorneys for Barclays Capital, Inc.

4           401 East Las Olas Boulevard

5           Suite 1200

6           Fort Lauderdale, FL 33301

7

8    BY:   TODD THOMAS, ESQ.

9

10   STUTMAN TREISTER & GLATT

11          Attorneys for Elliot Management

12          1901 Avenue of the Stars

13          12th Floor

14          Los Angeles, CA 90067

15

16   BY:   ANTHONY ARNOLD, ESQ.

17          WHITMAN L. HOLT, ESQ.

18          (TELEPHONICALLY)

19

20

21

22

23

24

25

08-13555-mg    Doc 11772    Filed 10/04/10    Entered 10/04/10 16:46:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 5 of 119

Page 5

1                    P R O C E E D I N G S

2          THE COURT:  Good morning.  Be seated, please.  Good

3     afternoon.  When last we were together, we were going to argue

4     something about Mr. Fogarty's deposition testimony.

5          MR. MAGUIRE:  If it please the Court, Bill Maguire for

6     the SIPA trustee.  Your Honor, we have a foundation objection

7     to Mr. Fogarty's testimony.  And since the Court has already

8     heard that testimony, there's only one very discreet portion as

9     to which we're pressing the objection.  And that is,

10    specifically, to the testimony that he provided at page 51

11    starting at line 3 through 11 and then again on page 51

12    starting at line 19 through the following page at line 2.  And

13    that specifically is where Mr. Fogarty is asked about the

14    parenthetical that was added to the clarification letter

15    concerning property held to secure exchange traded derivatives.

16    And the basis for our objection is the testimony at which was

17    played that Mr. Fogarty has no basis to offer that testimony.

18    Specifically, at page 48 at line 7, he testified, "Because I

19    didn't fully understand the transaction, we were -- I was never

20    sure of anything in that transaction."  And again, at page 49,

21    he was asked about the parenthetical, specifically about the

22    very words that he's asked about, and on page 50, at line 5, he

23    answers, "I don't understand this piece."  He's asked then

24    whether he recalls asking Weil to clarify.  He says he does

25    not.  He's asked at line 9:

1   "Q.  Do you know if you had an understanding of that at the

2   time?

3   "A.  I don't recall focusing on the exchange-traded

4   derivatives."

5           He is asked again:

6   "Q.  And just to be clear, it's your testimony that you're not

7   sure if the parenthetical 'and any property that may be held to

8   security obligations under such derivative' is referring to

9   collateral or not?"

10          He starts to answer:  "I don't".  There's an

11   objection.  He continues the answer:

12   "A.  I don't understand that what means.

13   "Q.  Do you believe it to be referring to collateral?

14   "A.  Property -- I read it to -- it reads as property."

15          I think it's fairly clear from the witness' testimony

16   there and elsewhere in the transcript about how befuddled he

17   was and the lack of knowledge he has that he has no basis to

18   interpret a legal document or, frankly, to give any

19   understanding that would be of any assistance to the trier of

20   fact.

21          MR. THOMAS:  Your Honor, Barclays offers his testimony

22   solely for the witness' state of mind not for the legal

23   interpretation of that provision.

24          THE COURT:  The fact that he was befuddled about the

25   document?  I don't understand what you mean by solely for his

Page 7

1    state of mind.

2           MR. THOMAS:  Well, Your Honor, if I could pull up the

3    transcript pages at issue, what he is originally asked about

4    his understanding of that provision -- and the blue designated

5    portions are portions of this transcript that are designated by

6    movants.  And on the left page, page 50, you can see his

7    initial answer to these lines of questions is "I don't know."

8    But when pressed further and asked if he understood -- "My

9    question to you" -- in yellow on page 51:

10   "Q.  My question to you is, do you believe that that's

11   referring to collateral?"

12          And he said presumably they're the same thing.  So

13   he's giving -- they have designated the blue portion.  They

14   have designated the answer that they like to some of the same

15   questions.  By -- their objection would have the effect of

16   making his testimony incomplete and, we would say, inaccurate

17   on this issue.

18          THE COURT:  Well --

19          MR. THOMAS:  In his state of mind --

20          THE COURT:  Let me just break in for one second.  I'm

21   just trying to understand the scope of the objection raised by

22   Mr. Maguire.  How much of the testimony that we're talking

23   about is within the scope of the objection?  Is it only the

24   yellow or is it yellow and blue?

25          MR. MAGUIRE:  It's just the yellow, Your Honor.  I

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 8

1    believe it's line 3 through 11 and then I believe it's 19

2    through I think it might go over to the beginning of the next

3    page.

4              THE COURT:  Frankly, I'm inclined to wipe everything

5    out, blue and yellow, relating to this subject and found none

6    of it to be particularly helpful or probative of anything.  And

7    this witness' state of mind on this subject is a matter of no

8    particular concern to me.  I don't understand why any of this

9    is, frankly, in the record.  When we were looking at the

10   videotape yesterday, I guessed right that this was going to be

11   the subject of your objection and, frankly, did not see

12   anything valuable in his testimony.  If you can tell me how

13   it's probative of anything, that would be helpful, too.  I'd

14   like an offer of proof.

15             MR. THOMAS:  Yes, Your Honor.  I'd be happy to.  The

16   witness' understanding and movants' understanding here are

17   relevant for a number of reasons.  One is because the timing of

18   this issue of their motion and the legal bars that Barclays

19   submits preclude their claims.  In response, they are seeking

20   to alter a sale order which they obtained and defended all the

21   way through appeal in March of 2009.  Their justification for

22   doing that is, in large part, that they did not understand the

23   terms of the sale contract.  A&M says in their reply -- LBHI

24   says in their reply brief, A&M struggled for months to

25   understand what happened in the sales contract.  The committee

1   says in their reply brief, on the Rule 60 motion, says "The

2   committee did not develop a meaningful understanding of the

3   sales transaction until after receiving Rule 2004 discovery."

4   That is their defense to the legal bars.  And we respectfully

5   submit that evidence showing that they were informed about the

6   terms of the sales transaction and they had an understanding

7   about the general terms and what was being conveyed.

8         THE COURT:  What does that have to do with the

9   testimony in question, though?  The testimony in question,

10  unless I'm missing something, is about that famous

11  parenthetical in the clarification letter.  The witness had

12  nothing to do with the clarification letter, acknowledged

13  during questioning that he really didn't fully understand the

14  clarification letter or the transaction at all.  I understand

15  the general points you're making but I don't understand how

16  this witness' testimony in yellow advances the point you're

17  trying to make.  Maybe if you go through the particular

18  questions and answers and connect it to your argument I'll

19  understand it better.  But I don't get it right now.

20        MR. THOMAS:  Absolutely, Your Honor.  The -- it is

21  relevant if Alvarez & Marsal, as administrator of the LBHI

22  estate and reporting to the committee -- if they had an

23  understanding that this group of assets, exchange traded

24  derivatives and related collateral, was going over to Barclays

25  as part of the deal -- they had that understanding and had the

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 10 of 119

Page 10

1    understanding it wasn't contained, for example, in the estimate

2    of trading assets.  Also if they had this understanding and it

3    was going over and they didn't know what the amount was of

4    those assets then as a matter of Black Letter contract law,

5    they are deemed to have assumed a risk associated with that

6    uncertainty.  And there's case law saying that that cannot be

7    the basis of a Rule 60 motion from estate which is what they

8    have here.  They allege --

9             THE COURT:  But we're just talking about certain

10   excerpts from the testimony of one witness who, frankly,

11   limited the weight to be accorded his testimony throughout by

12   noting repeatedly that he didn't understand the transaction

13   which is somewhat helpful to the movants' case because he said

14   repeatedly he didn't understand the transaction.  It's also

15   true that A&M had nothing to do with the sale transaction.

16   That's absolutely clear.  So, I'm not sure what we're getting

17   at by hammering on the yellow.  What's in the yellow that is

18   competent evidence?

19             MR. THOMAS:  The competent evidence just in the

20   yellow --

21             THE COURT:  I'm barely -- I'm having a very hard time

22   reading it because it's so faint even when I've looked closely.

23   Let's just see what we're talking about?

24   "Q.  It reads as 'any property that may be held to security

25   obligations under such derivative."

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 11 of 119

Page 11

1          I think that's probably a typo.  Probably should mean

2     "to secure obligations" instead of "to security".  But that's

3     how it reads.  "My question to you is do you believe that

4     that's referring to collateral?"

5          "Objection."

6     "A.  Property held for security obligations and collateral

7     presumably are the same thing."

8          Now let's just stop with that answer.  How does that

9     help me find any disputed fact in this case?

10          MR. THOMAS:  Your Honor --

11          THE COURT:  That's completely vague evidence from a

12     lay witness who is not a lawyer, who had nothing to do with

13     crafting the language and who while I found to be extremely

14     credible as a video witness, very clearly knows nothing about

15     this subject and doesn't help me.

16          MR. THOMAS:  Your Honor --

17          THE COURT:  By the way, much of his testimony doesn't

18     help me.

19          MR. THOMAS:  May I respond?

20          THE COURT:  Sure.

21          MR. THOMAS:  The witness testified that he was

22     specifically charged with understanding in September of 2008

23     not only the terms of the contract including this disputed term

24     of the contract but also understanding what went over.  Movants

25     are saying they didn't have any understanding of the contract

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 12

1    and that's a big part of their justification on waiting a year

2    to bring these issues to the Court.  This is evidence the fact

3    that he understood.  He did testify that he reviewed the

4    clarification letter and attempted to understand its

5    provisions.  This is evidence that he understood that there was

6    this bucket of assets, ETD collateral, going over to Barclays.

7    And that is relevant because as part of now what they're saying

8    they didn't understand -- they didn't understand Barclays was

9    going to get all these assets.  They didn't understand that the

10   assets -- Barclays might get a gain.  It's relevant if -- this

11   person's knowledge, a managing director of Alvarez & Marsal, is

12   clearly imputed to Alvarez & Marsal and the estate.  Now we

13   would say, as a legal matter in the Second Circuit, that all of

14   the knowledge of the actual individuals for Lehman negotiating

15   the deal is imputed to the movants.  But as an alternative,

16   certainly the fact that Alvarez & Marsal people understand the

17   terms of the deal is very relevant for a number of contract

18   arguments -- issues and for the issues of whether they have

19   waived, they're estopped, whether there could be an exception

20   to the mandate rule.

21          THE COURT:  I hear all the arguments you're making but

22   we're talking about two lines of testimony.  Connect what

23   you've said to those --

24          MR. THOMAS:  Okay.

25          THE COURT:  -- two lines of testimony.

Page 13

```
 1             MR. THOMAS:  These two lines of testimony, when read

 2    together, says that Alvarez & Marsal, unquestionably Lehman at

 3    this time --

 4             THE COURT:  I don't think you can use the word

 5    "unquestionably" --

 6             MR. THOMAS:  Sorry.

 7             THE COURT:  -- in anything you're telling me right

 8    now --

 9             MR. THOMAS:  Sorry.

10             THE COURT:  -- because I saw the same video that you

11    saw.  And I saw a witness repeatedly say that, despite best

12    efforts, he didn't really understand this transaction all that

13    well.  And this is consistent with that theme in his testimony.

14    To say that he is somehow acknowledging an important point in

15    your case in this little excerpt I think is stating too much.

16    I also think you should never say "unquestionably" to me --

17             MR. THOMAS:  I withdraw that.  I'm sorry.

18             THE COURT:  -- because everything that we're doing

19    here demonstrates that there are meaningful questions.

20             MR. THOMAS:  I withdraw it.  May I --

21             THE COURT:  Sure.

22             MR. THOMAS:  -- May I finish on this particular point?

23    It is a theme of their case that they didn't understand the

24    contract and he said it about 500 times -- he said it many

25    times during his deposition.  But this is evidence that they
```

Page 14

1    really did, when you get down to the specifics, they understood

2    the basics of the deal.  They reviewed the contracts, they met

3    with Weil, they met with Lehman personnel to understand the

4    deal.  Here, this is just evidence that he understood that, as

5    part of the sale transaction, one of the things going over to

6    Barclays was ETD associated collateral and that included cash.

7    And that's relevant -- their knowledge of that at this point in

8    time in September of 2008 is relevant.

9            THE COURT:  Okay.  I hear your argument.  I'm unmoved

10   by it.  And I don't view, frankly, the yellow or the blue as

11   probative of very much.  I believe that Mr. Fogarty gave very

12   credible testimony but testimony that wasn't particular useful

13   for either side.  When I saw the testimony as it was being

14   played yesterday morning, my immediate reaction, because I knew

15   there was an objection, was that the objection would likely be

16   about the parenthetical.  Because as I was hearing him testify

17   about the parenthetical, I viewed him as having no basis for

18   giving any testimony with respect to the parenthetical

19   including all of the yellow.  So the objection is sustained.

20   And to the extent that means that the yellow is stricken, it's

21   stricken.

22           But I hear your points.  I just think your points are

23   overstated relative to this disputed testimony.

24           MR. THOMAS:  Your Honor, may I introduce Mr. Coles,

25   the next video witness?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 15

 1            THE COURT:  Oh, sure.

 2            MR. THOMAS:  I'm sorry.

 3            THE COURT:  Are there any objections as to his

 4    testimony?

 5            MR. GAFFEY:  Not from the debtor, Your Honor.

 6            MR. THOMAS:  With the Court's permission, we'd like to

 7    distribute a binder with the relevant exhibits to the

 8    deposition.

 9            THE COURT:  Okay.

10            MR. THOMAS:  And, Your Honor, David Coles was a

11    managing director at Alvarez & Marsal at the time of the sales

12    transaction and became LBHI's CFO, comptroller and co-treasurer

13    on or about September 26th, 2008.  And --

14            THE COURT:  How long is this?

15            MR. THOMAS:  It's forty-eight minutes, Your Honor.

16            THE COURT:  Okay.

17            MR. THOMAS:  And if I might add just two more

18    sentences for why we're offering him.  He was -- briefly.  He

19    was mentioned at the end of Mr. Fogarty's deposition as being a

20    person who worked on matters such as the transaction

21    adjustments to the balance sheet involving comp and cure.  And

22    he was also mentioned as someone who was at the meeting where

23    the liability and/or valuation issue was discussed.

24        (Begin playing video deposition testimony of David Coles)

25    DIRECT EXAMINATION

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 16 of 119

Page 16

1   BY MR. THOMAS:

2   Q.   Mr. Coles, can you please state your full name and address

3   for the record?

4   A.   David James Coles, 21 East 66th Street, New York, NY

5   10065.

6   Q.   Can you please give a brief general description of your

7   educational background?

8   A.   Sure.  I a UK chartered accountant.  I have a degree in

9   economics.  And I started my career with Arthur Andersen in the

10  UK.  I spent about four years in the audit practice before

11  moving across into corporate recovery.  I went by the -- I've

12  got a lot of investigations on behalf of secured lenders and

13  one or two companies in receivership.  And then I had the

14  opportunity towards the end of my sixth year at Andersen UK to

15  move across to the U.S. and move to Andersen's New York office

16  and was there for about two years doing turnaround type work.

17  And then at the end of that two years, I started work with

18  Alvarez & Marsal who were CRO on an assignment.  And we were

19  providing support to the CRO.  And then for the next two years,

20  I was largely working with A&M but still an employee of

21  Andersen.  So at the end of those two years, I had gotten my

22  green card, felt comfortable about leaving Andersen and

23  switched across to A&M.  And at that time, A&M was less than

24  twenty people.  I think today is seventy, I believe.  So that

25  would be thirteen years ago.  And I've been a managing director

08-13555-mg    Doc 11772    Filed 10/04/10    Entered 10/04/10 16:46:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 17 of 119

Page 17

1    since 2000.

2    Q.    In the last two years at A&M, how would you describe your

3    duties and responsibilities?

4    A.    The last few years had been culmination of management

5    roles in turnarounds and management roles that have often led

6    to liquidations and wind downs.

7    Q.    And -- but for nonaccounts, can you describe generally

8    what turnarounds are?

9    A.    Yes.    Turnarounds is where there might be a salvageable

10    business and you're attempting to improve the operations,

11    perhaps refinance it.    Usually it doesn't involve a bankruptcy.

12    And then a liquidation probably does involve a bankruptcy and

13    there's no go forward enterprise.

14    Q.    And what is your current position today?

15    A.    I am chief restructuring officer at Finlay Enterprises

16    Inc. which at one point was a billion dollar jewelry retailer

17    that -- it ran the jewelry concessions with any number of

18    department store chains.    And then in the late 2000s, it

19    diversified into specialty stores and we weren't able to

20    salvage as a go forward business enterprise either and so

21    liquidated through this past (indiscernible).

22    Q.    Are you still a managing director at Alvarez?

23    A.    Yes.

24    Q.    When did you move over to Finlay?

25    A.    Finlay commenced in mid-February 2009.

Page 18

1    Q.    When did you first have any interaction with Lehman?

2    A.    September 16th, 2008.

3    Q.    When you switched to Finlay in February of '09, did that

4    kind of end your involvement with Lehman?

5    A.    Substantively yes.  I remained a director and might still

6    be a director of some (indiscernible) foreign subsidiaries.

7    We've been slowly moving me off those slates but it's a very

8    complex old chart so I may still be hanging up there on a few

9    slates.

10   Q.   On about September 26th, 2008, were you appointed CFO of

11   Lehman?

12   A.   I don't remember the exact date.  That would sound about

13   right.

14   Q.   CFO, comptroller and co-treasurer?

15   A.   I think that's right, too.

16   Q.   Do you still hold any of those titles?

17   A.   No.

18   Q.   And approximately how long did you function as CFO of

19   LBHI?

20   A.   Through probably mid-February of 2009.

21   Q.   And in a turnaround environment like this, what does the

22   CFO/comptroller/co-treasurer do?

23   A.   Well, this one, I think, early on we realized it wasn't a

24   turnaround.  It was a controlled wind down liquidation.  It

25   was -- job number one really was trying to control cash and get

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 19

```
 1    a sense for liquidity.  It was trying to support each of the

 2    separate business units.  And it was taking stock of the assets

 3    and balance sheets of all of the entities that we now found

 4    ourselves responsible for.  So this was the residual estate

 5    following the sale to BarCap and also subsequent to the other

 6    administrations going on in the world, in Asia and in Europe.

 7    Q.   Was part of that effort or process of taking stock -- did

 8    it involve an assessment of what assets and liabilities had

 9    gone over to Barclays as part of the transaction and what had

10    stayed at Lehman?

11    A.   Yes.

12    Q.   I'm going to show you a document that we'll mark as 583A.

13    (BCI Exhibit 538A, e-mail involving Martin Kelly, was hereby

14    marked for identification as of this date.)

15    This is an e-mail -- the second internal e-mail -- excuse me --

16    the first internal e-mail from him to Kelly Martin (sic).

17    Says, "I'd like to inquire about your availability to meet with

18    David Coles, Jim Fogarty and myself for about an hour to review

19    the balance sheet and, in particular, the anticipated post-

20    transaction balances."  Is that -- "post-transaction balances",

21    does that refer to the effort to make sure Lehman had taken

22    stock of the assets and liabilities that went over to Barclays

23    and the ones that stayed behind that you were responsible for?

24    A.   Yes.

25    Q.   Okay.  And did you in fact meet on or about September 28th
```

Page 20

1   with -- September 18th -- excuse me -- 2008 with Kelly Martin?

2   A.   I can't recall.  Actually, it's Martin Kelly.

3   Q.   Martin Kelly.  Thank you.  You recall having any meetings

4   with him that first week of the Lehman bankruptcy?

5   A.   I can't recall that it was the first week.  I do remember

6   a couple of meetings that Martin attended.  We did attempt to

7   go through the trial balance that he was compiling.

8   Q.   Would that have been sometime between the filing of the

9   bankruptcy around the 15th of September and before the closing

10  of the Barclays transaction on the 22nd of September?

11  A.   Probably -- I'm not sure.  But it certainly was in those

12  first two weeks post-filing.

13  Q.   Okay.  And here there's a reference by Mr. Kelly for

14  making this meeting happen today, September 18th.  Did you know

15  one way or the other whether it happened on that day?

16  A.   I don't.

17  Q.   Do you recognize this e-mail chain involving you dated

18  September 18th and 19th of 2008?

19  A.   I don't.

20  Q.   You mean -- you have any reason to doubt that this was an

21  e-mail chain that you participated in?

22  A.   No.

23  Q.   The e-mail that appears to be from you on September 18th

24  to Kristi Wong -- can you recall who Kristi Wong is?

25  A.   Yes.

1    Q.    Who is that?

2    A.    She worked under Martin Kelly.  So was -- as an accounting

3    manager.  And I think Martin Kelly was comptroller.

4    Q.    Okay.  In what appears to be here an e-mail, you write,

5    "Some colleagues and I met with Martin Kelly on Tuesday" -- I

6    guess, as an initial matter, that Tuesday would be September

7    16th -- "on Tuesday and discussed the consolidated balance

8    sheet and the likely post-BarCap sale, BS."  Do you see that?

9    A.    Yes.

10   Q.    Does that refresh your recollection as to the time frame

11   in which you would have met with Mr. Kelly?

12   A.    Yes.

13   Q.    So was that on approximately September 16th, 2008?

14   A.    Yes.

15   Q.    And a reference to "the likely post-BarCap sale, BS".  Can

16   you just break that out what you mean?

17   A.    Yes.  So there would have been a consolidated balance

18   sheet at the time of the sale.  What we were looking to get

19   from Martin and Kristi was a breakout of what assets might and

20   liabilities were being sold or assumed by BarCap pursuant to

21   that sale and what was left with the residual estate that we as

22   LBHI's new executive office group had responsibility for.

23   Q.    Okay.  But at some point you had discussions with Weil

24   Gotshal about the terms of the sale transaction and what was

25   conveyed --

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 22 of 119

Page 22

1   A.   Yes.

2   Q.   -- and what wasn't.  Do you see "Bonus Payable", "Cure

3   Amounts", Accounts Payable"?  Do you see those lines?

4   A.   Yes.

5   Q.   And in following those lines over, do you see that there's

6   a -- listed as a two billion dollar transaction adjustment

7   crossing the "Bonus Payable" amount?

8   A.   Yes.

9   Q.   Do you have any understanding as to the reason for that

10  transaction adjustment?

11  A.   Yes.  I made a note before getting this sheet but it was

12  my understanding that the transaction with BarCap had a feature

13  in it whereby BarCap assumed a -- the bonus pool for the

14  employees it offered positions to.  And in addition, it sought

15  to have the estate assume and assign a vast quantity of

16  executory contracts.  And this was an estimate of the cure

17  amounts necessary to be able to effect that.

18  Q.   That's from the second line?

19  A.   Yes.

20  Q.   And what was the basis -- let's break it down.  On the

21  compensation -- first of all, did you read the asset purchase

22  agreement or the final purchase agreement as amended by the

23  clarification letter?

24  A.   I may have had a copy.  I don't now recall whether I read

25  it page for page or simply got like an executive summary of it.

Page 23

1   A colleague of mine, Jim Fogarty, was more on point on the

2   transaction in those first few days.

3   Q.   Do you know if the accrual amounts with respect to

4   compensation also included severance -- potential severance

5   liability that Barclays was assuming as far as the purchase

6   agreement?

7   A.   I don't recall.

8   Q.   What was -- for whatever understanding you had with

9   respect to the compensation or the transaction adjustment here,

10  what was the basis for that understanding?

11  A.   To the extent that the purchase of BarCap was assuming the

12  liability that would otherwise have been paid by LBI then it

13  was taking credit for the assumption of those liabilities in

14  arriving at its net purchase consideration.

15  Q.   Who told you that?

16  A.   I think I got that from my lead at the (indiscernible).

17  Q.   And was it your understanding whether the number that was

18  encapsulated is an estimate of what Barclays actually would

19  assume in terms of cure based upon their election of certain --

20  another U.S. contract or was it an estimate of potential

21  exposure meaning that Barclays could incur up to that amount if

22  they assumed all the contracts?

23       MR. GAFFEY:   Objection to form of the question.

24  A.   Not exactly (indiscernible).   It -- what I had typically

25  seen and what I would have assumed here is that the number is

Page 24

1    the maximum exposure.  And then you typically see a purchaser

2    use its existing business relationships with numbers to

3    negotiate lesser amounts.

4    Q.   Is it your understanding in this transaction that Barclays

5    had the discretion to pick and choose which contracts it was

6    going to assume?

7            MR. GAFFEY:  Objection to form.

8    A.   That it is the case, yes.

9    Q.   Based on the 19th, can you recall whether when you got

10   this, did that kind of stand to you seeing the large

11   transaction investments?

12   A.   It wasn't the largest number on there.  In those early

13   days of being on the case, our whole -- I think my whole team

14   struggled with a renewed -- sorry -- a new level of materiality

15   that had come into play here because we were dealing with

16   billions of -- almost trillions of dollars.  So I think I would

17   have noted that column.  I would have been perhaps more

18   interested in the liquidity situation to make sure that those

19   assets that were very liquid were under my control, secure, and

20   that I was the custodian of those.

21   Q.   So your understanding of this transaction investment

22   figure here that you call the 1645, that -- at this -- so

23   somebody at this point would have already -- someone in office

24   services would have already tried to compile all those

25   contracts and come up with a number?

08-13555-mg    Doc 11772    Filed 10/04/10    Entered 10/04/10 16:46:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 25 of 119

Page 25

1          MR. GAFFEY:  Objection to the form of the question.

2     A.   I'm not exactly sure how that number was arrived at

3     specifically.  I know that the tasks that that group were

4     undertaking -- I did mention that it was usually a Herculean

5     task for an organization to reach out across its subsidiaries,

6     get a copy of every executory contract and then attempt to

7     figure out how much could be -- would need to be paid to cure

8     it.  If this came out on -- came to me probably on the 19th, so

9     it might have been done on the 18th, that was pretty

10    spectacular to get that close to the real number for what must

11    have been thousands of executory contracts.

12    Q.   So that's a number that would just be in existence on your

13    system that you could pull up?  It involved a lot of work.

14    A.   I've never seen it maintained that way.

15    Q.   Have you seen and experienced those estimates ending up

16    being off by a wide margin?

17    A.   Yes.  But if on the trying to identify the pool and then

18    by what ultimately a purchaser might be able to negotiate to

19    get these contracts assumed and assigned out.

20    Q.   Is that based on your experience in the business?  Is it

21    understood that these are fairly, you know, rough estimates and

22    difficult estimates to come up with?

23    A.   It's easier to know the -- it's difficult to work out the

24    total potential exposure but it's possible, and then from that

25    total exposure it's typical for the actual liability that is

08-13555-mg    Doc 11772    Filed 10/04/10    Entered 10/04/10 16:46:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 26 of 119

Page 26

1    settled by a purchaser to be markedly lower than that.

2    Q.    And so you're getting this on -- it looks like the 19th,

3    and you may not remember the exact timeline or dates but just

4    kind of order of magnitude, you had gotten this the 19th, when

5    do you think you would have kind of gone over it and met with

6    these folks to get a sense of how this was calculated?

7    A.    Probably within seven days of receiving this.

8    Q.    Did you have any follow-up after that with them?

9    A.    Yes, and this group was also a group that I seem to recall

10    we were very dependent on to run our back office with the

11    estate because so many of the systems and processes went across

12    with BarCap that we, the residual estate, needed that

13    transition of services agreement back with BarCap for BarCap to

14    provide us with things that we were used to having and which

15    were essential.

16        So my discussions with Terry and people who worked with

17    Terry would have been in connection with this cure payment

18    amount generally but also the process and also the process of

19    providing the residual estate with transitional services.  His

20    group, for instance, would have managed -- within that group

21    and that building they managed the whole tiny reimbursement for

22    that travel and entertainment and we needed to continue to

23    operate systems as they had operated before and keep employees

24    in place to manage down the assets, so it was important that we

25    had a process by which we could determine who was an employee

Page 27

```
 1    of the estate, who was an employee of -- now of BarCap and how

 2    we were going to settle out people's T&E, for instance.

 3    Q.   And when you got that sense of understanding how they had

 4    calculated this transaction adjustment for cure amounts,

 5    was -- did it seem like they had undergone a reasonable process

 6    in trying to come up with that amount to you, or did you have

 7    any further questions or --

 8    A.   I don't think I was --

 9              MR. GAFFEY:  Objection to the form of the question.

10    A.   I don't think I was in a position to know how thorough

11    that was.  I do remember reflecting on the enormity of the

12    task.  I don't now remember how many contracts that comprised

13    but I believe it was the biggest thing that anybody had seen at

14    that point in terms of a company going through a bankruptcy

15    that had such short notice with such little planning.

16    Q.   And what was that?  Would that be a short amount of time,

17    a couple of days to come up with that type of estimate?

18    A.   I don't think so.  I mean, this -- this was presumably the

19    best they could come up with in two days.  It can take a lot

20    longer than that.

21    Q.   Yeah.  I guess what I was asking, compared to other

22    situations, was having just a couple of days to come up with

23    these estimates a shorter period of time than you have seen in

24    other situations?

25    A.   It was very short.
```

Page 28

1    Q.   And then so they explained what they had done and then was

2    there -- did you have any follow-up beyond that in terms of any

3    further occasion to -- for looking precisely how they had done

4    the estimate in more details?

5         MR. GAFFEY:  Objection to form of the question.

6    A.   I didn't think -- I didn't think -- I myself didn't

7    further explore the original estimate, but we did check in from

8    time to time on how much had actually been incurred to assume

9    and assign contracts, and I remember that number being very low

10   relative to 1,645.  I seem to recall it being around 300

11   million around the time that I left, which would have been in

12   mid February.

13   Q.   Were you surprised by how much lower the actual amount of

14   cure assumed by Barclays was --

15   A.   Yes.

16   Q.   -- compared to the estimate?  And did the surprise cause

17   you to take any further action or look into anything else?

18   A.   It -- I think this is all -- this was all post-BAPCPA

19   where you have 90 days -- sorry, you had 210 days to assume or

20   assign.  And so I think I knew going in that there could be

21   seven months to determine whether or not the buyer chose to

22   take on the contract and have the estate cured and have it

23   assigned across to them.  So I -- knowing that there was 210

24   days in there, I may not have fully understood quite what the

25   60-day batch of contracts was and how that fit into the 210

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 29

1    days, but I would have known from a legal perspective that they

2    really had seven months to figure out whether to assume or

3    assign and cure, and hence we wouldn't know until the end of

4    seven months what the real number was.

5    Q.    Okay.  And did you discuss with each of them how they kind

6    of went about coming up with this -- the estimate, the

7    transaction adjustment for cure?

8            MR. GAFFEY:    Objection to form of the question.

9    A.    I don't know if I actually ever asked that question, but I

10   would have assumed that -- and I did assume at the time that

11   they knew what contracts Lehman was -- had signed and was

12   responsible for and that they had analyzed that universe of

13   contracts and attempted to figure out what, if anything, was

14   owed by Lehman.

15   Q.    So I mean, you mentioned BarCap, you don't have any

16   knowledge of anyone from Barclays at the time, pre-sale, being

17   involved in this, do you?

18   A.    Pre-sale, no.

19   Q.    But in the pre-closing days you're not aware of any

20   involvement by anyone from Barclays in that estimated process,

21   is that correct?

22   A.    I'm not, but I'd be surprised if someone from Barclays

23   hadn't taken a look at that and got comfortable that was a -- a

24   solid number.

25   Q.    Well, what --

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 30

```
 1    A.   I mean, if I was Barclays I'd want that number to be as

 2    high as possible.

 3    Q.   Well, did you have -- did you have any discussions with

 4    Barclays about any involvement in estimating that number?

 5    A.   No.

 6    Q.   And just to be clear, you're not aware that anyone from

 7    Barclays was involved in coming up with that estimate?

 8    A.   No.

 9    Q.   Are the -- the transaction adjustment of 1,645, on the

10    left you have these amounts in the columns, 831, 917, do you

11    see those?  701 --

12    A.   Yes.

13    Q.   What is your understanding of what those would be and why

14    they would be entries by a transaction adjustment.

15         MR. GAFFEY:  Objection to form of question and

16    foundation.

17    A.   What would be typically in a balance sheet is that the

18    balance sheet would include an amount for accounts payable.

19    Those are amounts due to third parties for the provision of

20    goods and services that haven't been paid for as of the date of

21    that balance sheet.  It's not typical in a going-concern

22    balance sheet to have anything included there for cure payment,

23    for instance.

24         So I would have read "cure payment/accounts payable" to

25    mean that in the case of these two estimated period end balance
```

Page 31

1    sheets these first two columns, 831 and 917, that that relates

2    to an accounts payable balance and that the cure payments

3    description applies to the transaction adjustment amount that's

4    further into the spreadsheet.

5         And I would have also known from experience that

6    companies, unless they've had quite a lot of time after the

7    date of a close for a balance sheet, find it very difficult to

8    estimate what their accruals and liabilities are because often

9    those amounts aren't known until a vendor sends an invoice at,

10   let's say, the end of the month.  And here we have a stub

11   period that ends at the -- on the 17th.  It's even more

12   difficult because you may end up having to apportion an invoice

13   that is for a longer period.

14   Q.   Let me show you the document we'll mark as 585A.  Do you

15   recognize this chain involving yourself and others on September

16   22, 2008?

17   (BCI Exhibit 585A, e-mail chain dated September 22, 2008

18   involving Mr. Schwaba, was hereby marked for identification as

19   of this date)

20   A.   I don't remember this specific e-mail but I recognize

21   these names, with the exception of Brent Bellengra (ph.).

22   Q.   The original entire e-mail from Marie Stewart -- who is

23   Marie Stewart?

24   A.   I think she was SEC reporting for Lehman and then moved

25   across to BarCap.

1   Q.   Her e-mail, Subject: "David Coles of A&M needs to talk to

2   you at 4 p.m. today about GL structure", et cetera.  "He wants

3   to get a handle on reporting for MainCo and what Barclays' need

4   to" --  Is that consistent with your recollection of some of

5   what you're trying to get a handle on, what assets and

6   liabilities had gone over and what assets and liabilities

7   remained with Lehman that you were going to be responsible for?

8   A.   Yes.

9   Q.   And on the top of that Kristie Wong writes, "Just spoke to

10  him.  He just wants to be in the loop on how we are segregating

11  assets being sold to Barclays from the rest."  But what does

12  that mean "how we're segregating assets"?

13  A.   It's typical for a company to run a trial balance for a

14  general ledger account structure, and knowing that the --

15  knowing now that Barclays purchased the infrastructure I wanted

16  to make sure that it was capable of continuing to maintain and

17  report to us a statement of its assets, liabilities, the P&L

18  and the cash flow going forward because we were very reliant on

19  Barclays because all of that backbone, if you will, went across

20  to Barclays as a part of the transaction, yet we were

21  responsible for a significant number of assets and value of

22  assets and needed to be able to first understand what we were

23  responsible for and then slowly monetize those assets.

24  Q.   And did you have further regular correspondence or

25  communications with Kristie Wong in this time period?

Page 33

```
 1   A.   Yes.

 2        MR. GAFFEY:  Objection to the form of the question.

 3   Q.   The people you were interacting with at Lehman, whether

 4   they stayed at Lehman or went over to BarCap -- Barclays, were

 5   they cooperative in providing you information?

 6   A.   Four out of ten.

 7   Q.   Is that good or bad in your experiences?

 8   A.   It was pretty bad, but we all recognized that they had

 9   probably put in some really long days in the -- right up to the

10   filing and right after the filing and that their employer had

11   changed.  For those people that had moved across to BarCap they

12   were now employed by BarCap, and although they were obligated,

13   or BarCap was obligated, to provide transitional services, we

14   were probably going to be deemphasized as a priority.  So it

15   was necessary for us to continue to chase things so that we got

16   some attention.

17   Q.   So you had to do more chasing and asking than you would

18   have like to.  Was there ever a point in time when they flat

19   out refused to give you something you needed?

20   A.   No.

21   Q.   My question to you is do you recall attending a meeting on

22   or about September 29, 2008 with folks from Alvarez, Weil,

23   Gotshal and a couple of Lehman or former Lehman executives,

24   Paolo Tonucci and Alex Kirk, to discuss the details of the

25   Barclays transaction?
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 34

```
 1    A.   I recall a meeting with those times and place.  Whether I

 2    was at this one on the 29th I'm not sure.  Paolo was a

 3    difficult person to track down.

 4    Q.   And you have no reason to -- if others recall that you

 5    were there you have no reason to doubt that you were at this

 6    meeting?

 7    A.   Correct.

 8    Q.   And do you recall the purpose of the meeting?

 9    A.   No.

10    Q.   And looking at page 4889 do you recall at this meeting,

11    which you may or may not have been at, which may or may not

12    have been led by Mr. Fogarty, do you recall there being a flip

13    sheet resembling the chart at the top of 4889?

14    A.   I don't.

15    Q.   Do you recall generally that Barclays put, paid, or was to

16    give forty-five billion dollars in cash in return for getting

17    securities that were marked at roughly in the 49.7 billion

18    dollar range?

19         MR. GAFFEY:  Objection to form.

20    A.   Generally, yes.

21    Q.   Do you know, you've probably discussed with the company

22    during this period of time, during that week of September 15th

23    after the bankruptcy filing, do you know whether the marks on

24    the company's securities were being updated daily?

25         MR. GAFFEY:  Objection to form.  Foundation.
```

Page 35

1    A.    I don't remember.

2    Q.    Looking on 4889 is there a -- almost near the bottom

3    there's a note there where it says "Paid 38", that's 38

4    billion, "cash to buy 42.9 billion Lehman assets".  It says

5    "value different valuation 5.1", and then under 32.9 billion it

6    says "38", which would be 38 billion.  Do you recall at this

7    meeting there being a discussion of a difference in valuation,

8    or a question of valuation, proper valuation, for the assets

9    that came over through Barclays?

10          MR. GAFFEY:  Objection to the form of the question --

11   A.    I --

12          MR. GAFFEY:  -- and the foundation.

13   A.    I think I do recall being aware of that difference in

14   valuation.  Whether I became aware of it at this point in time,

15   I'm not sure.  I liken some of this a little bit to that scene

16   in Close Encounters where the lights are flashing up on the

17   board, and you can see what the lights are flashing, but you've

18   got no idea what it really means.

19   Q.    At some point did you have an understanding that the

20   valuation difference arose because when securities that were

21   marked as about forty-three billion dollars were transferred to

22   Barclays, Barclays filtered them and said this isn't worth

23   forty-three billion dollars.  We think it's worth more like

24   thirty-eight billion dollars.

25          MR. GAFFEY:  Objection to the form of the question.

Page 36

```
 1    A.    You're educating me at this point.

 2    Q.    What do you recall the difference between the forty-three

 3    billion number and the thirty-eight billion dollar number and

 4    the five billion dollar valuation difference?

 5          MR. GAFFEY:  Objection to the form of the question.

 6    A.    Very little other than that difference being five

 7    billion --

 8    Q.    Do you recall --

 9    A.     -- to marks.

10    Q.    Do you recall attending a presentation to the creditors'

11    committee on October 8th that concluded with a description of

12    that difference?

13    A.    No, but if that -- that was probably our first creditor

14    committee meeting, and I certainly attended that and presented.

15    That could well have been the number.

16    Q.    And turning the page to 4891, and, under assets, do you

17    see where it says thirty-eight billion and then the five

18    billion --

19    A.    Yes.

20    Q.     -- and the forty-three billion?  Does that refresh your

21    recollection of the description of that difference at this

22    meeting?

23          MR. GAFFEY:  Objection to the form of the question.

24    A.    No.  It doesn't describe the difference.  It just restates

25    it.
```

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 37 of 119

Page 37

1   Q.   Does the fact that the five billion dollar difference is

2   included in this manner, does that, maybe, refresh your

3   recollection as to the nature of the five billion dollar

4   difference other than it weights the marks and the difference

5   in valuation?

6   A.   That isn't what it says.

7   Q.   Yet on the required page it refers to the different

8   valuation and it's referring to Lehman assets, correct?

9   A.   So are you now asking me to interpret these notes?  Is

10   that what the question is?

11   Q.   The question is clear.

12       MR. GAFFEY:  Objection to form and foundation.

13   A.   I think I said I remember the five billion number.  It was

14   to do with marks, and I'm not sure that I learned that at this

15   meeting, if, indeed, I was at this meeting.

16   Q.   Look me go and ask you to turn to an exhibit previously

17   marked as 461-A.  It's entitled "Lehman Brothers Holdings Inc.

18   Report to Unsecured Creditors' Committee October 8, 2008".  On

19   the second page you're listed as, apparently, someone

20   responsible for a presentation on significant transactions.

21   A.   Yes.

22   Q.   Do you recognize this document?

23   A.   Yes.

24   Q.   Is this part of the presentation that Alvarez gave to the

25   creditors' committee?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 38

 1    A.    Yes.

 2    Q.    Did you help prepare this written presentation?

 3    A.    Yes.

 4    Q.    Did you help present the presentation?

 5    A.    Yes.

 6    Q.    And can you tell me, if you would turn to page 4531, did

 7    you help prepare or contribute to the content on page 4531?

 8    A.    No.

 9    Q.    Were you there when this was presented to the creditors'

10    committee?

11    A.    Yes.

12    Q.    Under "Asset Purchase" do you see where it says "43.1

13    billion repo assets, book value for Lehman stale marks,

14    negotiated a 5 billion dollar reduction"?

15    A.    Yes.

16    Q.    Does that refresh your recollection as to the five billion

17    dollar difference between the forty-three billion and thirty-

18    eight billion relating to an issue concerning whether the

19    Lehman marks were stale?

20         MR. GAFFEY:  Objection to form.

21    A.    Well, this page might have been my first actual

22    understanding of how that five billion fit into the

23    transaction.

24    Q.    The five billion that's referred to in the notes on the

25    meeting with Weil and former Lehman employees Kirk and Tonucci

08-13555-mg    Doc 11772    Filed 10/04/10    Entered 10/04/10 16:46:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 39 of 119

Page 39

1    on or about September 29th, do you know what -- do you have any

2    recollection of whether that was explained to you, the five

3    billion dollars, at the time and what was said about that?

4          MR. GAFFEY:  Objection to the form of the question.

5    Foundation.

6    A.   I remember certainly marks was used.  I'm seeing stale

7    marks here.  I think that's Jim quoting from that meeting, and

8    it's stale in inverted commas.

9    Q.   And looking at these other documents, does it refresh your

10   recollection at all about their discussion at the meeting with

11   Kirk and Tonucci and Weil about this five billion dollar

12   valuation issue or difference.

13         MR. GAFFEY:  Objection to the form of the question.

14   A.   And it's -- it's bringing back some memories, yes.

15   Q.   Can you just describe what it was that was explained to

16   you at the meeting with Kirk and Tonucci?

17   A.   I don't remember that.

18   Q.   Well, what were the memories it was bringing back?

19   A.   I remember the marks.  I remember the word stale.  I

20   remember five billion.

21   Q.   Is it fair to say that at the time you had either

22   understood or were asking --

23         MR. GAFFEY:  Objection to form.

24   A.   I don't think I knew what it meant.  I was starting at

25   flashing lights.

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 40 of 119

Page 40

1    Q.   Well, again, do you recall -- you don't recall the

2    description of it given to you in the Kirk, Tonucci and Weil

3    meeting on or about the 29th of September?

4    A.   I recall stale marks, five billion.

5    Q.   When you understood that there was this valuation

6    difference or issue with respect to Lehman's marks on certain

7    securities that had been transferred to Barclays, did it

8    surprise you or cause you any concern or cause you to take any

9    follow-up action?

10        MR. GAFFEY:  Objection to form.

11   A.   No.  It didn't.  It didn't surprise me, because I didn't

12   know what it meant.

13   Q.   Do you recall what it meant at the time or do you have any

14   recollection of not knowing what it meant?

15   A.   I --

16        MR. GAFFEY:  Objection to form.

17   A.   I didn't -- I didn't focus enormously on it.  I was

18   comforted that Jim Fogarty was hunting this stuff down.

19   Q.   And based upon your understanding of the conditions at

20   Lehman the week of September 15th, would it surprise you if

21   Lehman's marks by the end of that week were stale and not

22   updated or accurate?

23        MR. GAFFEY:  Objection to the form of the question and

24   lack of foundation.

25   A.   I wouldn't have had a basis for it and including

Page 41

1    determination.

2    Q.   Do you recall at the meeting with Kirk and Tonucci and

3    Weil whether someone from Alvarez asked about the five billion

4    dollar difference or whether it was volunteered by Kirk or

5    Tonucci?

6          MR. GAFFEY:  Objection to form.

7    Q.   Do you have any basis or reason to believe that anyone

8    working for Lehman or Barclays did anything improper or acted

9    in bad faith in connection with this transaction?

10         MR. GAFFEY:  Objection to the form and foundation.

11   A.   I don't, but I have seen many times when a company is

12   being purchased and there is an estate that has certain assets,

13   and those individuals representing the estate are assumed to be

14   employees of the purchaser.  Those employees are in a

15   conflicted situation, and those employees would have to have

16   very robust integrity to be switching hands and yet

17   representing the estate in the process of switching hands over

18   to the new employee.  It's a tough position to put employees

19   in.

20   Q.   In employment commonly occurs out of necessity?

21   A.   It -- yes.

22   Q.   And were you aware that Lehman employees involved in

23   negotiating the deal were also, at the same time, negotiating

24   employment agreements with Barclays?

25   A.   Only after the fact.

Page 42

1   Q.   Putting aside that potential for conflict, you're not

2   aware of any evidence of anyone acting in bad faith in

3   connection with the sales transaction.  Is that correct?

4        MR. GAFFEY:  Objection to form and foundation.

5   A.   I'm not aware of anything in particular there.

6        (End playing of video deposition testimony of David Coles)

7        THE COURT:  That's the end of the Coles deposition.

8   We're going to take a ten minute break.

9        I want to just provide notice to counsel that Mr.

10  Coles appeared this summer as a live witness in a litigation

11  within the Finlay bankruptcy case.  And so he is a witness

12  familiar to me.  And none of his testimony related in any way

13  to any of the issues that are presently before the Court.  But

14  he testified in his capacity as an executive of Finlay

15  enterprises.

16       We'll adjourn for ten minutes.

17       (Recess from 4:08 p.m. until 4:22 p.m.)

18       THE COURT:  Be seated, please.

19       MR. TAMBE:  Good afternoon, Your Honor.  Jay Tambe

20  from Jones Day for Lehman Brothers Holdings.  The movants will

21  call their next witness, Mr. Joseph Schwaba.  And that's a

22  slight change, I believe, from the schedule you have.

23       THE COURT:  Oh, that's a surprise.  I was expecting

24  Mr. Slattery.

25       MR. TAMBE:  And the only reason for the change is the

Page 43

1   following is the change in the schedule, Your Honor, given the

2   time that we have today versus the time that's now available

3   tomorrow.

4           THE COURT:  That's fine.

5           MR. TAMBE:  Mr. Schwaba?

6           THE COURT:  I take it this is acceptable to Barclays.

7           MR. HUME:  Yes, Your Honor.

8           THE COURT:  Mr. Schwaba, please raise your right hand.

9       (Witness sworn)

10          THE COURT:  Be seated, please.

11  DIRECT EXAMINATION

12  BY MR. TAMBE:

13  Q.   Good afternoon, Mr. Schwaba.

14  A.   Good afternoon.

15  Q.   Could you please describe for the Court your educational

16  background?

17  A.   Yes.  I'm a graduate of the University of Notre Dame,

18  1967.  I -- after that, I went into the United States Marine

19  Corp as an officer for three years, tour of duty in Vietnam.  I

20  was released honorably in 1970.  And I went -- enrolled in

21  Northwestern University's graduate school of management where I

22  got an MBA in finance in 1972 -- MBA in finance in 1972.

23  Q.   Okay.  Is that graduate school the school that's now

24  referred to as Kellogg?

25  A.   That is correct.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 44

1    Q.   Can you briefly give us an overview of your work

2    experience?  And in particular, focus on the experience that

3    you have as it relates to the work  you've done in this case.

4    A.   Certainly.  I have over thirty-five years experience in

5    the fixed income and municipal markets.  I've been active as a

6    trader, a hedger, a risk manager, asset liability management.

7    I've held various positions in institutions both on a

8    consulting and senior management basis.  In all these

9    activities, I've focused on valuation in many respects and

10   specifically, discounted cash flow and a comparables analysis

11   as I did in this case.

12   Q.   Okay.  So through the course of your thirty-five year

13   career, you have used many of the same valuation techniques

14   that you've used on this assignment?

15   A.   That is correct.

16   Q.   And let's go through some of your specific prior work

17   experiences.  And if you could start back in time with your

18   first position when you left Kellogg.

19   A.   Well, when I left Kellogg, I went to work for an

20   investment banking firm and actually started using discounted

21   cash flow there.  In terms of relevant experience, I would

22   characterize my stint at A.G. Becker in 1977 through '82 where

23   I focused on practicing valuation techniques in the context of

24   both trading strategies and hedging the firm's position in the

25   fixed income markets in terms of both fixed rate and floating

Page 45

```
 1    rate.  And I used both discounted cash flow and comparables

 2    analysis there.

 3         That was followed, in 1986, at Prudential-Bache

 4    Securities, again, where I was engaged in both proprietary

 5    trading and strategy design working with different trading

 6    desks and institutional clients.  And again, I used discounted

 7    cash flow and comparables analysis as I did in this case.

 8    Q.   AT both A.G. Becker and Prudential, did the fixed income

 9    securities that you dealt with include municipal securities?

10    A.   That's correct.

11    Q.   Okay.  I'm going to hand up a binder which has a copy of

12    your resume and we can go through the rest of your work with

13    the help of that binder.  Just give me one moment.

14    A.   Sure.

15            MR. TAMBE:  Your Honor, may I approach?

16            THE COURT:  Yes.  Thank you.

17            THE WITNESS:  Thank you.

18    Q.   If you could, Mr. Schwaba, please turn in that binder to

19    the tab 1A.  So it's -- there's a 1A.  Do you have it?  And

20    that's Movants' Trial Exhibit 154A.

21    A.   Yes.

22    Q.   Could you describe for the Court what that document is?

23    A.   That is my curriculum vitae.

24    Q.   Okay.  And does this list the various places that you've

25    been employed starting in '86 to the present?
```

Page 46

1   A.   Let's see.  Yes, it does.

2   Q.   Okay.  And it also lists your education, your military

3   service as well as professional registrations and memberships,

4   correct?

5   A.   That is correct.

6   Q.   Okay.  Now focusing on --

7          MR. TAMBE:  Your Honor, we move Movants' Trial Exhibit

8   154A into evidence.

9          MR. HUME:  No objection.

10  (Movants' Trial Exhibit 154A, curriculum vitae of Joseph

11  Schwaba, was hereby received into evidence as of this date.)

12  Q.   Mr. Schwaba, going to page 3 of your curriculum vitae,

13  there's a --

14         MR. TAMBE:  The next page, please.

15  Q.   -- there's an employer listed there, Bank of America,

16  formerly Continental Bank.  Could you describe for the Court

17  what you did at Continental Bank between 1986 and 1990?

18  A.   Yes.  I had two main functions.  One was to enter the U.S.

19  primary dealership.  Basically, I managed a number of trading

20  desks in the U.S. government securities trading and government

21  agencies trading and included municipals as well.  The -- I

22  also set up a global swap options trading business which also

23  had fixed income associated with it.  And that was a very

24  successful business.  In both of these main activities made

25  extensive use of discounted cash flow and comparables analysis

Page 47

1    as well.

2    Q.   Now your time at Bank of America/Continental Bank in this

3    time period, '86 to '90, the 1987 stock market crash happened

4    while you were there.

5    A.   Yes, it did.

6    Q.   Did you have any special responsibilities or duties

7    related to dealing with the crash, the aftermath of the crash,

8    while at this employer?

9    A.   Yes.  I was very involved in that in terms of managing

10   various types of positions.  And one position in particular was

11   municipal bond positions that I was managing to liquidate in an

12   orderly fashion during that period of time.

13   Q.   Okay.  Moving on forward in time, where did you go to work

14   next?

15   A.   After Bank of America, I started my own firm, Schwaba &

16   Associated, a consulting firm.  And during that period of time,

17   the most relevant experience I had was setting up my own global

18   risk analysis software and -- which focused on fixed and

19   floating rate securities and, particularly, discounted cash

20   flow analysis.

21   Q.   Was this a valuation software?

22   A.   It was valuation software and I also trained my clients'

23   employees in the use of this software.

24   Q.   And the clients that you had developed the software for

25   and the employees that you trained, was this a global banking

08-13555-mg    Doc 11772    Filed 10/04/10    Entered 10/04/10 16:46:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 48 of 119

Page 48

 1    institution?

 2    A.    It was a Swiss banking institution.

 3    Q.    Where did you go to work next after Schwaba & Associates?

 4    A.    After that, I went to work for ABN AMRO North America.

 5    They had actually been a client of mine on a consulting basis.

 6    And they asked that I come on board.  There were two functions.

 7    One was to joint a multi-institution task force in setting up

 8    improved margining and credit capability between and among

 9    major banks that were trading with each other.  The second

10    function was to work with various fund managers and/or trading

11    desks at ABN AMRO and advise them on strategy development.

12    Q.    Now, after you left ABN AMRO, did you go back to Schwaba &

13    Associates?

14    A.    Yes, I did, and engaged in a number of investment banking

15    activities.  One relevant experience, in particular, was

16    working with an online broker that was setting up a new

17    technology oriented company that took advantage of extensive

18    amounts of software to go online and advertise and execute

19    services in terms of fixed income and made --

20    Q.    You may want to keep the microphone a little bit closer --

21    A.    -- and made extensive use of both discounted cash flow and

22    comparable analysis as I do in this case.

23    Q.    Moving forward to the time period of 2003 through 2009,

24    which I guess includes the financial crisis of 2008 --

25    A.    Yes.

Page 49

1    Q.    -- where were you employed during that time period?

2    A.    I went to work for Federal Home Loan Bank of Pittsburgh.

3    And my -- I had two main duties there, generally speaking.

4    One, I came on board as a senior officer at the bank, was

5    active in the asset liability management committee which had

6    primary -- responsible for managing the bank's assets and

7    liabilities on an ongoing basis.  Formerly, also along with

8    that, I was actually manager of market risk for the bank, had a

9    staff under me and I was responsible for managing the positions

10   on an ongoing basis for the bank.  During that period of time,

11   I successfully oversaw the transition to a more complete up to

12   date asset liability modeling system and was, again, a voting

13   member of the bank's asset liability committee.

14   Q.    In your positions at the Federal Home Loan Bank of

15   Pittsburgh, did you have occasion to value and risk manage

16   municipal securities?

17   A.    Yes, we did.

18   Q.    Just orders of magnitude, can you give a sense of how

19   large the overall portfolio was, the assets that were being

20   managed by or being held by the Federal Home Loan Bank of

21   Pittsburgh?

22   A.    As of December 2008, I think the total assets were about

23   ninety billion.

24   Q.    And how much of that was municipal securities?

25   A.    Approximately 585 million.

Page 50

1   Q.   Okay.  And in the course of valuing and risk managing

2   those positions, were you making any trading decisions

3   instructing people to buy or sell securities?

4   A.   In my capacity in the asset liability management

5   committee, it was an ongoing basis to manage the positions,

6   monitor the positions and determine on an ongoing basis the

7   value.

8   Q.   Taking a step back from some of your specific employments,

9   when you from time to time had to value or risk manage

10  municipal securities over the course of your career, what types

11  of information sources have you typically used to get

12  information about prices in that sector?

13  A.   Typically, Bloomberg and MSRB which is Municipal

14  Securities Rulemaking Board.

15  Q.   Now, MSRB data, is that something you used in this case?

16  A.   Yes.

17  Q.   And what is MSRB data?

18  A.   That is a traded data under the auspices of the MSRB which

19  is the federal regulator of markets and trading municipal

20  bonds.  All dealers and trading houses report their trades to

21  the MSRB within fifteen minutes of transaction.

22  Q.   So it's actual market transaction data.

23  A.   Actual market transactions.

24  Q.   Okay.  Just taking your attention back to your CV, Exhibit

25  154A, the last page there which lists your professional

1   registrations and professional memberships, I assume those are

2   memberships and registrations you had while you were actively

3   working for financial institutions, is that correct?

4   A.   That is correct.

5   Q.   Are those active registrations and memberships --

6   A.   They are not active now, no.

7   Q.   But while you were working in the financial sector

8   actively for banks, you had Series 3, Series 7, Series 63

9   registrations, is that correct?

10  A.   That is correct.

11  Q.   And you have the various professional memberships that are

12  listed on that page, correct?

13  A.   That's correct.

14  Q.   Okay.  Before we get to your opinions, just in terms of

15  the methodologies that you have employed and the relationship

16  between your methodologies and your prior work experience,

17  you've talked a couple of times now about discounted cash flow

18  and comparables.  Could you please describe for the Court in

19  terms of your prior work experience and your application here

20  what's the DCF, or discounted cash flow, methodology?

21  A.   Sure.  Discounted cash flow is a means of valuing bonds or

22  determining bond payments and then discounting those typically

23  at a level that's above the risk free rate based on market

24  risk.

25       Comparables analysis is a method for valuing municipal

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 52

1   bonds by comparing relevant and similar bonds in order to

2   arrive at a market-based valuation.  Criteria are involved in

3   that.

4   Q.   And what are those criteria?

5   A.   Criteria typically -- are maturity, credit rating,

6   geographic location, types of bonds and revenue sources.

7   Q.   And are those the criteria that you used in valuing the

8   municipal bonds at issue here?

9   A.   That is correct.

10  Q.   Now, I know there's been some discussion in motion papers

11  and the like about failed auction-rate securities.

12  A.   Yes.

13  Q.   Did you include in any kind of follow-on analysis a review

14  of failed auction-rate securities and the effect that has on

15  your comparables analysis?

16  A.   I did.

17  Q.   And what did that follow-on analysis show you?

18  A.   It showed that auction-rate securities that had failed

19  actually traded at par on September 19th, 2008.

20  Q.   So when you included in your analysis, your comparability

21  analysis, this factor of failed auction-rate securities, did

22  that significant affect any of your opinions that you reached

23  in this case?

24  A.   You mean, in my init --

25  Q.   Did it affect your initial opinions in any way?

Page 53

1    A.    No, it did not.

2    Q.    Okay.  Did you make any minor adjustments to your initial

3    opinions?

4    A.    Yes.  I did make some minor adjustments.

5    Q.    Okay.  And can you give the Court some indication of the

6    magnitude of those adjustments?

7    A.    The magnitude of the adjustments was less than -- about

8    180,000 in terms of undervaluation differences.

9    Q.    And in terms of the overall size of the positions that you

10   were valuing, what was the total dollar amount of the positions

11   that you were valuing?

12   A.    341 million approximately.

13          MR. TAMBE:  Your Honor, we tender Mr. Schwaba as an

14   expert in the valuation of municipal securities.

15          MR. HUME:  No objection, Your Honor.

16          THE COURT:  He's accepted as an expert in that area.

17          MR. TAMBE:  Thank you, Your Honor.

18   Q.    Mr. Schwaba, if we could turn in the binder that's before

19   you to tab 1B, B as in boy.  Are you there, sir?  And it's

20   Movants' Exhibit 154B.  Are you there, sir?

21   A.    I'm --

22   Q.    Do you have the document --

23   A.    Yes, I have it.

24   Q.    Okay.

25   A.    154B.  Got it.

Page 54

```
 1    Q.   Right.  Could you describe for the Court what this

 2    document is, please?

 3    A.   Yes.  This is an expert report that I compiled --

 4    Q.   It says at the bottom of the first page of this report,

 5    "Corrected version, September 27, 2010".  Do you see that?

 6    A.   Yes, I do.

 7    Q.   Okay.  Could you describe generally for the Court the

 8    nature of the changes that were made to your original expert

 9    report?

10    A.   Yes.  There were two changes.  There was an errata which

11    was a relatively minor amount and then a -- subsequent to my

12    declaration, I changed that I talked about a little bit before.

13    Q.   So let's take each of those in turn.  First, let's just --

14    dealing with Exhibit M154B, your corrected expert report, do

15    you know whether a copy of that's been provided to Barclays?

16    A.   I believe it has.

17    Q.   You mentioned an errata.  If you could turn in your binder

18    to tab 2, which is Movants' Trial Exhibit 918.  Do you have tab

19    2 there, sir?

20    A.   Yes.  I think I do here.

21         (Pause)

22    A.   I'm sorry.

23    Q.   It's on the screen as well.  It's just a question of

24    identifying.  Is that the errata sheet that you were

25    referring --
```

Page 55

1    A.    Yes --

2    Q.    -- to, sir?

3    A.    -- that is.

4    Q.    And so this is an errata sheet that you prepared soon

5    after you prepared your expert report?

6    A.    That is correct.

7    Q.    And the updated or corrected expert report, M154B includes

8    these changes that are reflected?

9    A.    That is correct.

10   Q.    Okay.  And you have reviewed your expert report before

11   testifying here today?

12   A.    Yes, sir.

13   Q.    Okay.  And would you adopt the statements and the

14   conclusions in your expert report as your testimony on the

15   stand?

16   A.    I would.

17          MR. TAMBE:  Your Honor, we offer Movants' 154B in

18   evidence.

19          MR. HUME:  No objection, Your Honor, although maybe

20   it's an objection.  I think for completeness you ought to have

21   both.

22          MR. TAMBE:  The original as well as --

23          MR. HUME:  I would think so, so we can see the

24   changes.

25          THE COURT:  What are you objecting to?

Page 56

1          MR. HUME:  For completeness, I would think we would

2    want the original report and the corrected report.

3          THE COURT:  Okay.  Any problem with that?

4          MR. TAMBE:  We have no objection, Your Honor.  It's

5    Movants' Trial Exhibit 154 is the original report.  Happy to

6    offer that in evidence as well.

7          MR. HUME:  No objection.

8          THE COURT:  Then it's admitted both in its original

9    and the amended form.

10   (Movants' Trial Exhibit 154 and 154B, Joseph Schwaba's expert

11   report in both its original and amended form, was hereby

12   received into evidence as of this date.)

13   BY MR. TAMBE:

14   Q.   Now, Mr. Schwaba, if you could turn to tab 3 of the binder

15   before you, please.  Are you there, sir?

16   A.   Yes, I am.

17   Q.   Could you describe for the Court what this document is?

18   A.   Yes.  This is the declaration.

19   Q.   And for what purpose did you prepare this declaration?

20   A.   I prepared this declaration to adapt the amended analysis

21   that I had made with regard to failed auction-rate securities.

22   Q.   Okay.  Did you also in this declaration address some of

23   the criticisms that have been leveled against you by Barclays?

24   A.   Yes.  I responded to Barclays questions and any questions

25   that I just talked about.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 57

1    Q.   And you have reviewed this declaration before today?

2    A.   That is correct.

3    Q.   And would you adopt as your testimony today the statements

4    set forth in this declaration?

5    A.   Yes, I would.

6    Q.   Your Honor, we often Movants' Trial Exhibit 825 in

7    evidence.

8           MR. HUME:  No objection.

9           THE COURT:  It's admitted.

10   (Movants' Trial Exhibit 825, declaration of Joseph Schwaba, was

11   hereby received into evidence as of this date.)

12   Q.   Mr. Schwaba, in preparation for your testimony here today,

13   did you prepare some small number of demonstrative slides?

14   A.   Yes, I did.

15          MR. TAMBE:  Your Honor, may I approach?

16          THE COURT:  Yes.  Thank you.

17   Q.   Before we get to the slides, if you could start by

18   describing for the Court the particular securities that you

19   valued.  I understand you valued about twenty-six CUSIPs or

20   twenty-six separate securities.  So how did that collection of

21   securities get them together?

22   A.   Navigant experts had determined a threshold of a million

23   dollars or greater than a million dollars between Barclays and

24   Bank of New York custodian.  That addressed nineteen out of

25   twenty-six.  There were seven other securities that I had --

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 58

```
 1    were valued by Barclays at a tenth of a penny.  And to me, that

 2    seemed facially incorrect.

 3    Q.    So of the twenty-six securities, if I understood your

 4    testimony, nineteen were ones where there was a delta of a

 5    million dollars or more between Barclays' valuation and the

 6    Bank of New York's valuation --

 7    A.    That's correct.

 8    Q.    -- plus or minus.

 9    A.    Yes.

10    Q.    And the other seven, you said, were ones which were valued

11    at one-tenth of one cent --

12    A.    That's right.

13    Q.    -- by Barclays.

14    A.    Yes, sir.

15    Q.    Okay.  And then again, in broad strokes, with respect to

16    that collection of securities, could you describe what tools or

17    methodologies you used to value those securities?

18    A.    I'm sorry.  Say the question again.

19    Q.    Yes.  With respect to those twenty-six securities, what

20    tools or methodologies generally did you use to value those?

21    A.    Well, I used a combination of both discount cash flow and

22    comparables analysis.

23    Q.    And as we go through the various securities or groups of

24    securities that you valued, I might ask you some questions

25    about where you applied discounted cash flow --
```

Page 59

1    A.    Sure.

2    Q.    -- versus comparables.  Just starting with the top line in

3    terms of what the overall valuation difference is between the

4    values that you arrived at and the values ascribed by Barclays,

5    is that what is set out on slide 3 of your presentation

6    materials?

7    A.    That is correct.

8    Q.    And that's about 150 million dollar difference, is that

9    right?

10   A.    Yes, sir.

11   Q.    Now, did you do any analysis to see how that's broken out?

12   You said there were some securities that were valued at one-

13   tenth of one penny.  Did you categorize and break out this 150

14   million dollar difference in any way?

15   A.    Yes, I did.  I broke it out in three categories.

16   Q.    Okay.  And is that set out in your presentation materials?

17   A.    Yes, it is.

18   Q.    Turning to slide 5, is that the breakout of 150 -- roughly

19   150 million dollars across three categories?

20   A.    That is correct.

21   Q.    And could you describe for the Court what those three

22   categories are?

23   A.    Yes.  The first category is the tenth of a penny valuation

24   by Barclays on seven CUSIPs.  That was for a difference of

25   107.8 million which is seventy-two percent of the total.  The

Page 60

1    second category is a twenty percent discount that Barclays

2    applied applying to fifteen of those CUSIPs worth a difference

3    of approximately thirty-eight million dollars.  And then the

4    third category -- there were three zero coupon bonds and one

5    fixed rate bond, four bonds altogether CUSIPs, for four million

6    dollars totaling a little under 150 million.

7    Q.   Okay.  The bonds that were valued by Barclays at one-tenth

8    of one penny, could you briefly describe what kind of bonds

9    were these?

10   A.   Yes.  There was one floating rate note, state of

11   Massachusetts floating rate note.  Second, there were five

12   variable rate demand obligations, a form of adjustable rate

13   security.  And then one fixed rate bond.

14   Q.   And you have those described in your materials as well?

15   A.   I do.

16   Q.   And is that on slide 6, the breakout of those seven bonds?

17   A.   Let's see.  I think -- yes, they are.

18   Q.   Now, we won't go through every single one of these CUSIPs.

19   But just in terms of methodology, taking the Massachusetts

20   state floating rate note bond, that's one that's valued at, it

21   looks like, 750 dollars by Barclays.  You valued that at sixty-

22   one million dollars.  That's a delta of sixty-one million

23   dollars roughly.

24   A.   That is correct.

25   Q.   How did you value that bond?

Page 61

1    A.    I applied this discounted cash flow methodology to that

2    bond.

3    Q.    And could you describe briefly how you went about doing

4    that?

5    A.    Yes.  I constructed a yoke curve and applied it to all the

6    bond payments of the Massachusetts, then took an OAS, or option

7    adjustment spread, which I got from looking at the MSRB

8    database, an equivalent state of Massachusetts -- there was an

9    identical state of Massachusetts bond calculated in an option

10   adjusted spread of that of fifteen basis points.  I then went

11   back and took the remaining twenty-nine years of bond payments

12   and applied the discount rate that I had calculated and derived

13   the price of 81.78 and a value of 61.3 million off of that.

14   Q.    And in your presentation materials, do you have some

15   information about the Massachusetts state floating rate note

16   that you valued?

17   A.    Yes, I do.

18   Q.    Okay.  And if we could just turn -- pardon me for the

19   whiplash but, on slide 11, is that some information about the

20   general Massachusetts state --

21   A.    Yes.

22   Q.    -- floating rate note that you just described?

23   A.    It's a very high credit rating issued and backed by the

24   state of Massachusetts.  The general obligation bond has

25   twenty-nine years of remaining expected payments.  There's no

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 62 of 119

Page 62

1   history to fault with this bond and as I said, it's backed by

2   the state of Massachusetts' pledge to use all legally available

3   resources, including tax revenues, to repay the bondholders.

4   It's a floating rate bond priced off LIBOR --

5   Q.   Now --

6   A.   -- on a quarterly basis.

7   Q.   Now you've described your methodology of creating this

8   discounted cash flow analysis and using an option adjusted

9   spread, et cetera.  What is your understanding of Barclays'

10  methodology for valuing this bond, I think, at 750 dollars as

11  opposed to sixty-one million dollars?

12  A.   I don't know what their methodology is.

13  Q.   Did you see any deposition testimony or exhibits that

14  describe how it is that they had arrived at this value?

15  A.   Sean Teague, in his deposition, described it, as I

16  believe, an oversight.

17  Q.   Now that was an application of a discounted cash flow

18  methodology.  I want to go back to the slide we were looking at

19  which was the one-tenth of one penny bonds.  Did you apply a

20  comparables analysis to value any of these bonds?

21  A.   Yes.  The variable rate demand obligations.

22  Q.   So again, using one of the VRDOs, variable rate demand

23  obligations, as an example, could you describe to the Court how

24  you went about using a comparables analysis to do your

25  valuation?

Page 63

```
 1   A.    Certainly.  I went to the universe of traded securities at

 2   the MSRB on September 19th, 2008.

 3   Q.    How many trades were reported, actual transactions

 4   reported --

 5   A.    A single CUSIP basis, 12,416 trades.

 6   Q.    So on a CUSIP, on a per issue basis, there were 12,000

 7   issues that traded?

 8   A.    That's right.

 9   Q.    And there's more transactions than that?  There were

10   multiple transactions?

11   A.    Right.  Yes.

12   Q.    Okay.  What did you do next?

13   A.    Well, I applied this criteria that I had talked about, the

14   five criteria, and applied it to the universe of securities and

15   selected five comparables that were -- had displayed those

16   similar characteristics.  And they were often the -- in one of

17   the examples, for example, Pennsylvania and most others -- it's

18   almost all others as well, they had the same issuer, the same

19   type of bond and had other similar characteristics as well.

20   Q.    So let's go to the example that you said.  Those

21   Pennsylvania example -- again, pardon me for the whiplash.

22   Let's go to -- is that the bond you were talking about?

23   A.    That is the bond I was just talking about.

24   Q.    So describe for the Court, if you could, the comparables

25   analysis with respect to this bond, again, valued by Barclays
```

08-13555-mg    Doc 11772    Filed 10/04/10    Entered 10/04/10 16:46:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 64 of 119

Page 64

1    at one-tenth of one penny, valued by you at par.

2    A.    Yes.  There were five criterion used to compare as I had

3    indicated before:  the maturity, the credit rating, the bond

4    type, the revenue sources and geographic location.  In this

5    selection, all the comparables were from the same issuer, all

6    the trans --

7    Q.    What does that mean, from the same issuer?  Exactly the

8    same issuer, Pennsylvania State Turnpike --

9    A.    That is correct, yes.

10   Q.    So five other bonds issued by the same issuer traded on

11   that day, September 19th?

12   A.    That is correct, at par.

13   Q.    And what did they trade at?

14   A.    They traded at par.

15   Q.    Again, and you applied par there for your valuation?

16   A.    Yes.  Again, the -- I took the average price of the

17   selected similar bonds and the price was par.

18   Q.    Again, do you have any explanation for Barclays'

19   methodology, one-tenth of one penny at this point?

20   A.    No, I don't.

21   Q.    Moving to the next category.  I think -- we had a category

22   of one-tenth of one penny.  The next category was the twenty

23   percent discount.  First of all, what do you mean by twenty

24   percent discount?

25   A.    Discount from par.

Page 65

1    Q.   So those were securities where the price applied to

2    Barclays was twenty percent off?

3    A.   That's right.

4    Q.   Slide 8 -- does that summarize basically the valuation

5    difference that's attributable to that twenty percent

6    discounted set of bonds?

7    A.   That is correct.

8    Q.   And again, within this collection of fifteen securities,

9    can you describe the different types of securities that are

10   included in here?

11   A.   Sure.  There are five variable rate demand obligations,

12   nine auction-rate securities and one hybrid adjustable bond.

13   Q.   And could you describe for the Court what two of the

14   methodologies you used to value these fifteen securities?

15   A.   Yes.  The comparables analysis, again, was used for the

16   VRDOs.  Likewise, the auction rates.  And then the hybrid

17   adjustables was discounted cash flow for that particular bond.

18   Q.   Did you use exactly the same comparables analysis for

19   these VRDOs as you used in your first category?

20   A.   That's correct.

21   Q.   And how would you decide whether to pick discounted cash

22   flow or comparables?  Why pick one or the other with respect to

23   these bonds?

24   A.   Well, for the VRDOs, as an example, they're reset -- their

25   rates are reset on a very short term basis and it's very --

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 66 of 119

Page 66

1    it's pretty formulaic as well.  On the auction-rate securities,

2    they also have a very short reset period and, of course, the

3    rate is determined by the market so it doesn't limit -- those

4    two categories do not lend themselves well to discounted cash

5    flow.

6    Q.   And again, in terms of application of your comparables

7    analysis, you used your five criteria to select comparables

8    from the securities that actually traded on the 19th, is that

9    correct?

10   A.   That is correct.

11   Q.   Now, we had some discussion at the beginning about failed

12   auction-rate securities.  And you went and did some further

13   analysis to determine the effect of failed auction-rate

14   securities.  Could you describe that analysis to the Court,

15   please?

16   A.   Yes.  I looked at the analysis specifically on September

17   19th and discovered that ninety-three failed auction-rate

18   securities actually traded at par on September 19th.

19   Q.   Now were there any securities, auction-rate securities,

20   that had not experienced any failed auctions that also traded

21   on that day?

22   A.   That is correct.  Roughly, sixty-four, I believe they

23   were.

24   Q.   Okay.  So of those sixty-four securities, auction-rate

25   securities, traded on the 19th, had not experienced a failure,

Page 67

1    what did they trade at?

2    A.   At par.

3    Q.   Okay.  And you said there were ninety-three securities,

4    auction-rate securities, that traded on the 19th that had

5    experience failed auctions and those traded at par as well,

6    sir?

7    A.   That is correct.

8    Q.   If you could describe where auction -- municipal auction-

9    rate securities fit into this world of adjustable municipal

10   securities?  And how do they work?  What's different or similar

11   about them?

12   A.   Well, again, they're auction rate.  They have a very short

13   reset period which means they periodically auction it in the

14   market based on investor interest in it.  And if there's not

15   enough interest in that at a so-called clearing rate, a maximum

16   rate is set on those securities.

17   Q.   Okay.  Did you look to see what the maximum rate was for

18   the auction-rate securities that were in this twenty-six CUSIPs

19   that you valued?

20   A.   Yes, I did.

21   Q.   Okay.  And what were the rates?

22   A.   They ranged from -- I think the lowest was 11.78 percent

23   to 18 percent.

24   Q.   And that's the rate that would apply if you experienced

25   failed auctions, is that right?

Page 68

1    A.    That's correct.

2    Q.    Now the fact that an auction has failed, does that

3    generally in this space mean that the issuer is in default of

4    its obligations?

5    A.    No, it does not.

6    Q.    Interest is still being paid?

7    A.    That's correct.

8    Q.    Is it a reflection of that the credit is going to be

9    downgraded because the auction has failed?

10   A.    No.

11   Q.    And is there any connection between the maximum rate and

12   the likelihood that the auction-rate securities are actually

13   going to be redeemed by the issuer?

14   A.    There probably is a relationship there because the higher

15   the maximum rate versus current market rates the more likely it

16   is that the bond would be redeemed.

17   Q.    Now, when you went back and did this analysis and looked

18   at what had happened to failed auction-rate securities on the

19   19th, you said I think at the beginning of your testimony there

20   was a slight adjustment to your valuation, is that right?

21   A.    That is correct.

22   Q.    And what was the reason for that slight adjustment to your

23   valuation?

24   A.    There were -- I believe out of the nine auction-rate

25   securities, there were two where there was a slight difference.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 69

1    They had been under the previous price slightly above par.  And

2    again, that accounted for the -- I believe it was roughly

3    182,000 in difference.

4    Q.    Just going back to the comparables that you used, were

5    there VRDO and other adjustable securities that actually traded

6    in the market on the 19th that traded above par, sir?

7    A.    Umm --

8    Q.    In your sample size, the 12,000 issues.

9    A.    Yeah.  I believe there were.

10   Q.    Just to finish off this category, we've talked about the

11   VRDOs, the auction rates.  How about the hybrid adjustable?

12   Was that a discounted cash flow or was that a comparables

13   analysis?

14   A.    That would be a discounted cash flow.

15   Q.    Now the last category you had talked about was four other

16   CUSIPs.  I believe you had a zero coupon bond and another type

17   of bond.  The zero coupon and a fixed rate bond.

18   A.    There were three zero coupons and one fixed rate bond.

19   Q.    And what methodology did you use to value those?

20   A.    Discounted cash flow.

21   Q.    And that was application of the discounted cash flow

22   methodology the same way you described before?

23   A.    That is correct.

24   Q.    And does slide 10, sir, then summarize the valuations and

25   the valuation differences between your valuations and Barclays'

Page 70

1    valuations across these three categories of bonds?

2    A.   Yes, sir.

3         MR. TAMBE:  If I could just have a moment, Your Honor.

4         THE COURT:  Sure.

5    (Pause)

6         MR. TAMBE:  Thank you very much, Mr. Schwaba.

7         THE WITNESS:  Yes, sir.

8         MR. HUME:  May it please the Court, Hamish Hume from

9    Boies Schiller & Flexner for Barclays.

10   CROSS-EXAMINATION

11   BY MR. HUME:

12   Q.   Good to meet you, Mr. Schwaba.  We haven't met before.

13   A.   Yes, sir.

14   Q.   Mr. Schwaba, am I correct that of the twenty-six municipal

15   bonds that you valued, not a single one traded on September

16   19th, 2008?

17   A.   I'm not so sure that's true.  The -- certainly for some of

18   the bonds that was true.

19   Q.   Okay.  So just so it's clear, if I ask the question this

20   way, to your knowledge, am I correct that you have no knowledge

21   of any one of the twenty-six municipal bonds that you valued

22   actually being purchased or sold on September 19th, 2008?

23   A.   Yes.

24   Q.   And am I correct that in your work in this case, you have

25   not identified any entities that on September 19th, 2008 were

08-13555-mg    Doc 11772    Filed 10/04/10    Entered 10/04/10 16:46:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 71 of 119

Page 71

1    in the market to buy any one of those twenty-six municipal

2    bonds?

3    A.   I had not indentified entities.  But they're -- clearly,

4    trades were done under the -- in the context of the MSRB as

5    traded securities.

6    Q.   With respect to the twenty-six bonds you valued, am I

7    correct that you did not identify any actual purchasers of

8    those bonds on September 19th, 2008?

9    A.   It's true I didn't identify, but that didn't mean that

10   there weren't trades done.

11   Q.   Did you perform any analysis, Mr. Schwaba, of the extent

12   of trading activity in any one of those twenty-six bonds?

13   A.   No.  But I did do some analysis in terms of, again, trades

14   that were happening.  For example, Barclays itself priced four

15   of these auction rate security bonds the same universe as the

16   ninety-three securities at part on September 19th.

17   Q.   Mr. Schwaba, my question is simply irrespective of how

18   Barclays valued the securities, you don't have any analysis of

19   how many if any of these securities were changing hands on or

20   around September 19th, 2008?

21   A.   Well, actually, I believe I do have a handle in terms that

22   I know that ninety-three failed auction securities had traded

23   hands.  But it didn't apply to ours -- or mine, rather, but --

24   and I had no direct knowledge.  But I do know that trades were

25   happening.

Page 72

1    Q.    The ninety-three that you referenced did not include any

2    of the twenty-six that you valued, correct?

3    A.    That's correct.

4    Q.    And am I correct that if a person who owned one of these

5    twenty-six municipal bonds wanted to sell them on September

6    19th, 2008, there was no guarantee that they would be able to

7    find a buyer?

8    A.    There was no guarantee but that doesn't mean that they

9    couldn't have found a buyer.

10   Q.    All right.  Is it true that in trying to sell a security

11   for which there may or may not be a buyer, the seller might

12   have to lower the price in order to get a buyer?

13   A.    It's theoretically true.

14   Q.    Okay.  Have you ever personally had the experience, Mr.

15   Schwaba, of trying to sell a municipal bond and learning that

16   you cannot sell it for the price shown that day on your broker-

17   dealer statement for the value for that bond?  Have you ever

18   had that experience?

19   A.    Have I personally had that experience?

20   Q.    Yes.

21   A.    No.  I have not personally had that experience.

22   Q.    Have you had that experience in connection with any of the

23   financial institutions you've worked with in which they have

24   not been able to sell a municipal bond for the price shown on

25   their daily statement from their broker-dealer?

Page 73

1    A.   I can't recall that happening.

2    Q.   Am I correct that the comparables that you looked at, to

3    the extent you used comparables analyses, were all municipal

4    bonds that did transact and trade on September 19th, 2008?

5    A.   That would be correct.

6    Q.   And would you agree with me that municipal bonds that are

7    transacting on September 19th, 2008 are likely to be more

8    liquid than municipal bonds that were not transacting on

9    September 19th, 2008?

10   A.   By virtue of the fact that they're trading, but that's not

11   necessarily a measurement of liquidity.

12   Q.   Are you familiar with the concept of Level 1, Level 2 and

13   Level 3 categorizations for assets?

14   A.   Generally familiar.

15   Q.   Did you perform any analysis to determine whether the

16   twenty-six bonds you valued were Level 1, 2 or 3?

17   A.   I did not perform that analysis.

18   Q.   Would it surprise you to learn -- would it be consistent

19   with your understanding that all twenty-six of those municipal

20   bonds were categorized by Lehman as Level 2?

21   A.   That wouldn't surprise me.

22   Q.   And is it your understanding that a Level 2 bond or Level

23   2 asset does not have a reliable daily transaction price, that

24   it has to be valued through some other method than using a

25   reliable daily transaction price in that particular CUSIP?

Page 74

1    A.   Repeat the question, please.

2    Q.   Is it your unders -- am I correct, is it your

3    understanding that a Level 2 asset is one which cannot be

4    valued by a daily transaction price in that CUSIP?

5    A.   I'm generally familiar with that.

6    Q.   And are you familiar with the fact that a Level 2 asset

7    might have a daily transaction price because, say, one or two

8    people sold the CUSIP that day but that doesn't mean that the

9    third person holding that CUSIP is going to get the same price?

10   A.   It could be.  But again, I think the comparability

11   analysis and the criterion that I set out is a good indication

12   of value.

13   Q.   Am I correct, Mr. Schwaba, that you did not perform any

14   analysis to determine how many of the comparable securities you

15   used in your comparables analysis were categorized as Level 1,

16   2 or 3?

17   A.   That is correct.

18   Q.   And am I correct that those securities might include Level

19   2 securities even though there may have been a few transactions

20   in that security on September 19th?

21   A.   They could have also included Level 1.

22   Q.   It could have been either Level 1 or Level 2, correct?

23   A.   That's true.

24   Q.   Okay.  Now you gave some testimony about auction-rate

25   securities.  Do you recall that?

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 75 of 119

Page 75

1   A.   Yes.

2   Q.   And there were auction-rate securities in the selection of

3   twenty-six municipal bonds that you valued, correct?

4   A.   That is correct.

5   Q.   And are you also familiar with the concept of adjustable-

6   rate securities?

7   A.   Yes, I am.

8   Q.   Okay.  And before I ask you the next question, let me just

9   confirm something.  Am I correct that prior to your engagement

10   in this case, you do not have any direct recollection of any

11   involvement with auction-rate securities?

12   A.   Yes.  However, I have thirty-five years experience in the

13   fixed income and municipal markets.

14   Q.   I understand that.  I'm just specifically asking about

15   auction-rate securities.  Am I correct that prior to your

16   involvement in this case, you don't have any direct

17   recollection of any involvement with auction-rate securities?

18   A.   That is correct.

19   Q.   Now, I'd like to put up a demonstrative of our own which

20   is -- this is the first one, Schwaba 1.  Would you agree with

21   me, Mr. Schwaba, that as this demonstrative shows, auction-rate

22   securities are a subset of a broader category described as

23   adjustable-rate securities?

24   A.   I would accept that.

25   Q.   When you say you would accept that, would you agree with

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 76 of 119

Page 76

1    that?

2    A.   Yes, I would.

3    Q.   All right.  And in other words, would you agree that

4    auction-rate securities are adjustable-rate securities whose

5    adjustable rates are determined and set through an auction?

6    A.   That is correct.

7         MR. HUME:  Could I show the second demonstrative,

8    please?

9    Q.   Now, I think you were actually asked that question in

10   deposition.  The question was:  "So can we agree on the

11   definition of auction-rate securities as adjustable-rate

12   securities whose adjustable rate is determined through an

13   auction process?"

14   "A.   I would accept that."

15        Do you see that?

16   A.   Yes, I do.

17   Q.   And would you agree that that's an accurate definition of

18   auction-rate securities?

19   A.   Yes.

20   Q.   Okay.  Now could I now ask you to look --

21        MR. HUME:  And, by the way, we do have a binder of

22   exhibits.  Maybe we should hand that up.

23        (Pause)

24        THE COURT:  Thank you.

25        (Pause)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 77

1    Q.    Sorry for the disruption.

2    A.    Sure.

3    Q.    Do you have a copy of the binder?

4    A.    No, I don't.

5    Q.    No you don't?

6    A.    I'm sorry.  You mean -- no.  I was never handed one.

7    Q.    Okay.

8         (Pause)

9             MR. HUME:  And could we just put up the demonstrative

10   again, please?

11   Q.    Now I just want to -- you would agree, again, as this

12   demonstrative shows, that auction-rate securities are a subset

13   of adjustable-rate securities, correct?

14   A.    Yes.

15   Q.    And You would agree that those auction-rate securities are

16   adjustable-rate securities whose adjustable rate is set at

17   auction, correct?

18   A.    Determined through an auction process, yes.

19   Q.    Determined through an auction process.  Can I now refer

20   you, please -- and we'll put it up on the screen so you don't

21   need to use the binder.  But it is in tab 3 of our binder -- is

22   your declaration from July 15th -- and refer you to paragraph 7

23   and paragraph 8.  And paragraph 7 says, "As a threshold

24   matter" -- now you were responding here, as you can see if you

25   look to what we argued in our motion to exclude your and other

1   testimony.  Paragraph 7 says, "As a threshold matter, I was

2   asked questions by counsel in my deposition in this matter

3   about auction-rate securities.  Having been asked to adopt a

4   definition for auction-rate securities that equated auction-

5   rate securities to adjustable-rate securities."  Do you see

6   that?

7   A.   Yes, I do.

8   Q.   And --

9        MR. HUME:  Can we have that highlighted, please, that

10  phrase?

11  Q.   Now the question you say you were asked and answered that

12  asked you to adopt that definition is as follows, and it's the

13  one we just looked at:  "So can we agree on a definition of

14  auction-rate securities as adjustable-rate securities whose

15  adjustable rate is determined through an auction process?"  And

16  your answer was, "I would accept that."  Do you see that?

17  A.   I do.

18  Q.   Now isn't it true, Mr. Schwaba, that this question does

19  not ask you to assume a definition of auction-rate securities

20  that equates auction-rate securities with adjustable-rate

21  securities?

22  A.   There was some confusion there.  Auction-rate securities

23  are a subset of adjustable-rate securities.  Not every

24  adjustable rate is an auction-rate security.

25  Q.   Well, but my question, Mr. Schwaba, is why did you feel

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 79 of 119

Page 79

1   the need in your declaration to say that you were asked to

2   adopt the definition that equated auction-rate securities with

3   adjustable-rate securities?

4   A.   My original anal -- my analysis was talking about

5   auction -- or, excuse me -- adjustable-rate securities.   There

6   was some confusion there.

7   Q.   You go on to say:  "In answering the question and

8   subsequent questions, I understood Barclays' counsel to be

9   asking me to equate auction-rate securities with adjustable-

10  rate securities and my responses were based upon that

11  understanding."  Do you see that?

12  A.   Yes, sir.

13  Q.   And was that a truthful statement in your declaration?

14  A.   Yeah.  I was interpreting it at that particular -- in that

15  particular way.  And there was some confusion.

16  Q.   Okay.  So this is a truthful statement in your

17  declaration, correct?

18  A.   Yes.

19  Q.   Okay.  I'd like to now show you the deposition testimony

20  that follows this question and answer on pages 30, line 18, to

21  31, line 7.  This is the longer question and answer -- I'm

22  sorry.  I misspoke.  This is the longer question and answer

23  that leads up to the question and answer you block-quoted in

24  your declaration.  First question is:  "Sure.  Let's define our

25  terms.  Would it be fair to say -- would it be fair to define

08-13555-mg    Doc 11772    Filed 10/04/10    Entered 10/04/10 16:46:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 80 of 119

Page 80

 1   an adjustable-rate security as one where the interest rate is

 2   adjusted by some mechanism over time?"

 3   "A.  I would agree with that.

 4   "Q.  And one of the potential mechanisms for adjusting interest

 5   rates is an auction process, is that correct?

 6   "A.  I would agree with that.

 7   "Q.  So can we agree on a definition of auction-rate securities

 8   as adjustable-rate securities whose adjustable rate is

 9   determined through an auction process?

10   "A.  I would accept that."

11       Were those answers truthful at the time?

12   A.  Yes.

13   Q.  Is it your testimony, sir, that those questions and

14   answers were asking you to adopt a definition of auction-rate

15   securities that equated auction-rate securities with

16   adjustable-rate securities?

17   A.  To be honest about it, I was confused at the time.  And

18   I'm still not clear in terms -- I know what an adjustable-rate

19   security is.  I know what auction-rate securities are.  And I

20   don't necessarily agree -- or understand the conclusion we're

21   talking about here.

22   Q.  My question to you --

23       MR. HUME:  May we go back to the declaration, please,

24   paragraph 7?

25   Q.  My question, sir, is do you still believe, and is it still

Page 81

1    your testimony that, as stated in the first sentence of

2    paragraph 7 of your declaration, that you were asked to adopt a

3    definition for auction-rate securities that equated auction-

4    rate securities to adjustable-rate securities?

5    A.    To the extent that auction-rate securities and adjustable-

6    rate securities are instruments whose rate is determined on a

7    periodic basis.

8    Q.    Sir, I understand that in some of your testimony you said

9    you were confused -- or there was confusion.

10   A.    Right.

11   Q.    And I'm not asking you was there confusion.  I'm asking

12   you is it your testimony today that you believe that you were

13   asked in deposition by my partner, Mr. Shaw, to adopt a

14   definition for auction-rate securities that equated auction-

15   rate securities to adjustable-rate securities?  Is it your

16   testimony that that's what you believe you were asked?

17   A.    That would be correct, yes.

18   Q.    And you believe you were asked that in this question and

19   answer that you quote right here, correct?

20   A.    Exactly.  That's what it says.

21   Q.    And then you had that understanding in answering

22   subsequent questions, correct?

23   A.    I believe I did.

24   Q.    Well, you say here, "In answering" -- in paragraph 8 of

25   your declaration -- "In answering this question and subsequent

Page 82

1    questions, I understood Barclays' counsel to be asking me to

2    equate auction-rate securities with adjustable-rate securities

3    and my responses were based upon that understanding."  Do you

4    see that?

5    A.    Yes, I do.

6    Q.    And was that a truthful statement when you said it in your

7    declaration?

8    A.    Yes.

9    Q.    And does it remain truthful today?

10   A.    Based on my understanding of it, yes.

11   Q.    All right.  Could I ask you now to look at -- and we'll

12   put it up on the screen -- an excerpt from your deposition that

13   follows two pages after this question and answer, from page 33,

14   line 20, to 34, line 23.  So this over here on the left is 33,

15   line 20.  It goes to the bottom and starts up here on page 34.

16   And this is page 34 of the deposition.  You were asked the

17   question, page 33, line 20:  "How many of them were auction-

18   rate securities?"  Do you see that?

19   A.    I do.

20   Q.    And your answer is -- and he's asking about how many of

21   the bonds that you valued.  Do you recall that?

22   A.    Yes, I do.

23   Q.    And your answer is "My understanding is that there twenty

24   auction-rate or we refer to them as adjustable.  But twenty

25   were of that type."  You go on to say "except there was one

Page 83

```
 1    that was an OID adjustable or auction-rate as well.  The

 2    dynamics of pricing of that were kind of a combination."  And

 3    you go -- then say, "But basically, what I'm saying is that my

 4    understanding is that the nineteen were what you would term

 5    auction-rate securities."  Do you see that?

 6    A.    I do.

 7    Q.    And was that truthful testimony when you gave it?

 8    A.    It was truthful testimony and I acknowledge that I was

 9    confused at that particular point in time.

10    Q.    Okay.  The next question is:

11    "Q.  Well, just so I'm clear, your testimony is that nineteen

12    of the securities you looked --"

13          And then you give an answer:  "Twenty were labeled as

14    adjustable-rate securities.  Okay?"

15          See that?

16    A.    I do.

17    Q.    And then the question is -- we do down here:

18    "Q.  And your testimony is that of those twenty that were

19    labeled adjustable-rate securities, nineteen of them were

20    auction-rate securities or twenty were auction-rate

21    securities?"

22          Do you see that question?

23    A.    Yes, I do.

24    Q.    And my question to you, Mr. Schwaba, is when you heard

25    that question, was it your understanding that you were being
```

Page 84

1    asked to assume and adopt a definition of auction-rate

2    securities that equated them with adjustable-rate securities?

3    A.    If I understand your answer correctly, yes.

4    Q.    Well, I want to make sure you understand my question

5    correctly.  This question that I've just pointed out to you on

6    page 34, lines 14 to 17 of your deposition is asking you:  "Of

7    the twenty that you just said were labeled as adjustable-rate

8    securities, how many were auction-rate, nineteen or twenty?"

9    Do you see that?

10   A.    Yes, I do.

11   Q.    And is it your testimony, sir, that when you were asked

12   this question you believed you were being asked to adopt a

13   definition of auction-rate securities that equated them with

14   adjustable-rate securities?

15   A.    Yes.  I was obviously in error at that time.

16   Q.    Okay.  Was your error -- I'm sorry, we'll move on quickly,

17   but was your error, Mr. Schwaba, based upon a confusion that

18   you had or was it based upon being asked by Barclays' counsel

19   to adopt a definition of auction-rate securities that equated

20   them with adjustable-rate securities?

21   A.    I believe it was an error in confusion on my part.  I

22   understand -- did understand the difference between auction-

23   rate securities and other adjustable-rate securities.

24   Q.    You go on in your declaration to say in paragraph 10 that

25   of the twenty-one adjustable-rate bonds nine were auction-rate

Page 85

1    securities, do you see that?

2    A.    That's cor -- yes, sir.

3    Q.    And so after the deposition, I take it, you went back and

4    looked and discovered that it was nine, not nineteen or twenty,

5    correct?

6    A.    I believe I knew that it was nine prior to that time.

7    Q.    But it was just confusion during the deposition?

8    A.    There was confusion on my part, yes.

9    Q.    So I want to move on past that confusion --

10    A.    Sure.

11    Q.    -- to just address these nine now.  For those nine

12    auction-rate securities, Mr. Schwaba, am I correct that all of

13    them had failed at auction prior to September 19, 2008?

14    A.    That is correct.

15    Q.    And in performing your valuation work for your initial

16    report, am I correct that you didn't look to see which ones of

17    these had failed at auction or not?

18    A.    I'm sorry, in terms of the --

19    Q.    In performing --

20    A.    Can you repeat the question, please?

21    Q.    Sure.  In performing your work in producing your initial

22    valuation report in this case, am I correct that you did not

23    examine which of those auction-rate securities had failed at

24    auction?

25    A.    I believe there was some analysis done in terms of what

Page 86

1    happened in terms of auctions.  I couldn't say that I could

2    give you an answer on all of them but I know there was some

3    analysis done on that.

4    Q.   And did you have the analysis done for you by someone

5    else?

6    A.   It was at my direction.

7    Q.   Did you ever at any time personally review how frequently

8    any one of those nine auction-rate securities had failed versus

9    not failed at auction prior to September 19, 2008?

10   A.   I believe there was some recollection but I -- or some

11   analysis on my part but I don't have a specific recollection.

12   Q.   Do you believe that analysis would have been in your work

13   papers?

14   A.   I do not believe it is, no.

15   Q.   Let me ask you to turn -- and again, we'll put it up on

16   the board if that's easier -- to tab 19 of the binder which

17   relates to one of these auction-rate securities and gives its

18   failure history prior to September 2008.  Do you recognize this

19   to be one of the auction-rate securities?

20   A.   Yes, I do.

21   Q.   And you see here in chronological order from the bottom up

22   gives its history of auctions.  January 10th it had success,

23   you see that?

24   A.   Yes, I do.

25   Q.   But starting March 20, 2008, failed auction.  Do you see

Page 87

1    that?

2    A.    I do.

3    Q.    April 24, 2008, failed auction.  Do you see that?

4    A.    Yes, sir.

5    Q.    May 29, 2008, failed auction.  Do you see that?

6    A.    I do.

7    Q.    July 3, 2008, success.  Do you see that?

8    A.    Yes.

9    Q.    And then August 7th and September 11, 2008, two separate

10   occasions, it fails at auction.  Do you see that?

11   A.    Yes, I do.

12   Q.    And am I correct, sir, that you valued this auction-rate

13   securities at 100 cents on the dollar at par?

14   A.    I do.  And in fact, I do remember seeing this as well.

15   Q.    Can I go to tab 20, please?  And do you recognize that

16   Georgetown University, D.C. Savers Taxable SERA as another one

17   of the auction-rate securities you valued?

18   A.    Yes, sir.

19   Q.    And you see here that from February 27, 2008 through to

20   August 20, 2008, on one, two, three, four, five, six successive

21   occasions it failed at auction?

22   A.    That's correct.

23   Q.    And am I correct, sir, that you valued this auction-rate

24   securities at par?

25   A.    Yes.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 88

1    Q.   And in valuing it at par, Mr. Schwaba, was the fact that

2    it had failed successively at six straight auctions relevant to

3    your valuation in any way?

4    A.   No, actually it wasn't.  The -- just because an auction

5    security failed did not mean it wasn't -- it didn't -- it

6    doesn't have value.  Barclays itself, again, priced four

7    auction-rate securities that had failed at par on September

8    19th.

9    Q.   Can I ask you to turn to tab 21, please?  Tab 21 relates

10   to the Norman, Oklahoma Regional Hospital Authority.  Do you

11   recognize this to be an auction-rate security that you valued

12   in this case?

13   A.   Yes, sir.

14   Q.   And do you see this document shows that from February 2008

15   to September 17, 2008 it failed at auction six times?

16   A.   Yes.

17   Q.   And did you take that into account in valuing this bond

18   for purposes of your valuation report in this case?

19   A.   Same answer as before.  I think, again, because -- just

20   because an auction-rate security fails does not mean it doesn't

21   have value.

22   Q.   You believe you looked at this sort of information in

23   formulating your report?

24   A.   Yes.

25   Q.   But it didn't make it into your work papers, is that

Page 89

```
 1    correct?

 2    A.    I don't believe it did.

 3    Q.    Let me just quickly go through the remainder.  Tab 22 of

 4    the binder shows California HSG Financial Agency.  Do you know

 5    what this is, what part of California this is, what agency?

 6    A.    I do not recollect.

 7    Q.    All right.  Do you recognize this to be one of the

 8    auction-rate securities you valued in this case?

 9    A.    I believe it is, yes.

10    Q.    And you see that it failed at auction on August 7, 2008?

11    A.    That's correct.

12    Q.    And I take it it's the same answer with respect to your

13    consideration of this as with the others?

14    A.    Yes, sir.

15    Q.    And tab 23, Illinois Health, do you recognize this to be

16    one of the auction-rate securities you valued in this case?

17    A.    Yes, sir.

18    Q.    And you see that it failed at auction six times leading up

19    to and including November -- September 17, 2008?

20    A.    That's correct.

21    Q.    And just so I'm clear, that means if someone held this

22    security on September 17, 2008 or September 19, 2008, there was

23    no way for them to sell it unless there was subsequently a

24    successful auction, correct?

25    A.    It could have been redeemed.
```

08-13555-mg    Doc 11772    Filed 10/04/10    Entered 10/04/10 16:46:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 90 of 119

Page 90

1    Q.    Could have been redeemed by the bank who issued it?

2    A.    Theoretically, yes.

3    Q.    Next tab shows Montana State Health Facility, do you see

4    that?

5    A.    Yes, I did.

6    Q.    Do you recognize that to be one of the auction-rate

7    securities you valued in this case?

8    A.    Yes.

9    Q.    And do you see that leading up to September 19, 2008 it

10   failed at auction, one, two, three, four, five, six times?

11   A.    Yes, sir.

12   Q.    Okay.  And do you believe you took this into account in

13   reaching your opinion?

14   A.    Yes, I did.

15   Q.    But am I correct that your opinion was to value this at

16   par irrespective of the fact that it had failed at auction six

17   times?

18   A.    That is correct.

19   Q.    And since I didn't do it clearly for the record, all the

20   other auction-rate securities that we've looked at thus far,

21   you valued each of them at par, correct?

22   A.    That is correct.

23   Q.    And the final one, tab 25, relates to New York State

24   Energy.  Do you understand what this refers to, Ration Dev

25   Authority?

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 91 of 119

Page 91

```
 1    A.   Yes, I do.

 2    Q.   Okay.  What is it?

 3    A.   That's the New York State Energy Research and Development

 4    Authority.  Its revenues are gas related revenues in Brooklyn,

 5    I believe.

 6    Q.   And do you recognize this to be one of the auction-rate

 7    securities you valued in this case?

 8    A.   Yes, I do.

 9    Q.   And you see that leading up to and including November 17,

10    2008 it failed at auction six times?

11    A.   That is correct.

12    Q.   And am I correct that you valued this security at par?

13    A.   That is right.

14    Q.   Now, Mr. Schwaba, just so we're clear, the record is

15    clear, for all seven of those CUSIPs we just looked at, you

16    recognized they failed at auction --

17    A.   Yes.

18    Q.   -- prior to September 19, 2008, and you valued each one of

19    them at par?

20    A.   That is correct.

21         MR. HUME:  And Your Honor, since the witness has

22    testified he did look at these screen shots, I would ask that

23    these exhibits be moved into evidence.

24         MR. TAMBE:  Your Honor, we have no objection.

25         THE COURT:  They're admitted.
```

Page 92

1   (Screen shots were hereby received into evidence as of this

2   date.)

3   Q.   Mr. Schwaba, am I correct that a failed auction-rate

4   securities would trade below par and may be subject to

5   restricted liquidity?

6   A.   It could happen.

7   Q.   Am I correct that in your original report, sir, you wrote

8   that failed auction-rate securities would trade below par and

9   may be subject to restricted liquidity?

10  A.   Again, I used the term "would" and what I meant to say

11  what I should have said was "could".

12  Q.   Let me ask you to refer to tab 3 of your binder which is

13  your July 15th declaration, in paragraph 17, which we'll also

14  put up on the screen.  And you state there, "In my expert

15  report dated March 15, 2010, in appendix 3, paragraph 30, I

16  state that, quote, 'failed ARS would trade below par and may be

17  subject to restricted liquidity.'"  Do you see that?

18  A.   I do.

19  Q.   You then say, "This statement incorrectly characterizes my

20  opinions regarding failed auction-rate securities."  Do you see

21  that?

22  A.   Yes, I do.

23  Q.   And so am I correct that you are saying here in your

24  declaration that a sentence written in your original report

25  incorrectly characterizes your opinion?

Page 93

1    A.    That would be correct.

2    Q.    And the reason you say it's incorrect is that,

3    essentially, it may or may not trade below par if it's failed

4    at auction, correct?

5    A.    That would be correct.

6    Q.    As you say in your deposition that, quote, second line up

7    from the bottom, "They could trade below par, but not

8    necessarily."  Do you see that?

9    A.    Yes.

10   Q.    And so is your testimony that if a -- a failed auction-

11   rate security may trade below par but may not?

12   A.    That's correct.

13   Q.    And is there any specific feature that you have identified

14   as to whether or not a failed auction-rate security will or

15   will not trade below par?

16   A.    I have not identified specific --

17   Q.    Let me ask you, am I correct that you originally

18   identified two of the auction-rate securities that had failed

19   at auction at above par?

20   A.    That is correct.

21   Q.    And then subsequently changed that par?

22   A.    That is correct.

23   Q.    And is the reason you changed it to par because you

24   realized they had failed at auction?

25   A.    Based on the analysis that I had done, they were auction-

Page 94

1   rate securities and therefore were priced at par.

2   Q.   Am I correct --

3   A.   By the way, there were -- again, I'll say again that

4   Barclays also priced four securities -- four auction-rate

5   securities that had failed at par as well on September 19th.

6   Q.   Am I correct, sir, that you valued some of these auction-

7   rate securities by looking at comparables?

8   A.   Yes.

9   Q.   Am I correct, sir, that you did not determine, in

10  selecting the comparables, whether the comparables included any

11  auction-rate securities that had failed at par?

12  A.   That was my initial analysis, that's correct.  There was

13  an amendment to the criteria, adding auction-rate securities as

14  one of those criteria.

15  Q.   Okay.  So initially you selected a group of comparables

16  without determining whether any of them had been auction-rate

17  securities that failed at par?

18  A.   That --

19  Q.   That failed at auction, correct?

20  A.   That was the adjustable-rate securities.

21  Q.   And you subsequently did an analysis -- did you -- you

22  didn't do a different analysis with different comparables, did

23  you?

24  A.   No.

25  Q.   Did you subsequently do an analysis to determine how many

Page 95

1    of your comparables happened to include auction-rate securities

2    that had failed at auction?

3    A.    The additional criterion I used was the failed auction-

4    rate securities that traded on September 19, 2008.

5    Q.    Well, you -- are you referring to what you say in your

6    declaration?  Let me just refer you to this.  In your

7    declaration which is at tab 3, paragraph 19, you refer to a

8    universe; let's just look at it and highlight it.  You say,

9    "From the universe of adjustable-rate securities that traded on

10   September 19, 2008, and using Bloomberg reported auction

11   history, I was able to identify 93 out of 157 auction-rate

12   securities that traded on September 19, 2008 and experienced a

13   failed auction on or before September 19, 2008."  Do you see

14   that?

15   A.    That's right.

16   Q.    And this was an analysis performed after your deposition

17   in this case, correct?

18   A.    That is correct.

19   Q.    And am I correct that these ninety-three securities you

20   reference in paragraph 19 of your declaration were not

21   securities that were part of your population of comparable

22   bonds used in your comparables analysis?

23   A.    There were sixteen auction rates initially, and I believe

24   eleven of those failed and they -- that might have -- they may

25   have been included in the ninety-three failed because they

08-13555-mg   Doc 11772   Filed 10/04/10   Entered 10/04/10 16:46:30   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 96 of 119

Page 96

1   failed their auction-rate securities.

2   Q.   Let me make sure I understand.  You're saying that some of

3   the securities referenced in paragraph 19 of your declaration

4   may have been in your population of comparables, is that

5   correct?

6   A.   Yes.

7   Q.   But am I correct that what you're describing in paragraph

8   19, the ninety-three securities, you're not describing your

9   population of comparables, you're describing a subsequent

10  analysis?

11  A.   I'm describing the additional criterion I used which

12  factored in the ninety-three comparables -- excuse me, ninety-

13  three auction-rate securities that failed on September 19th.

14  Q.   You're reporting on an analysis to determine how many

15  failed auction-rate securities traded on September 19th; that's

16  what you're doing in this paragraph, correct?

17  A.   That's right.

18  Q.   And you are not describing or analyzing the population of

19  comparables that you used in your valuation, correct?

20  A.   That's part of the valuation, if I understand you

21  correctly.

22  Q.   Well, but this isn't the group of comparables that you

23  used in your valuation, correct?

24  A.   Some of the comparables are included in this because

25  they --

Page 97

```
 1    Q.    Do you know how many?

 2    A.    -- failed at auction.

 3    Q.    What I'm trying to say is there may be overlap but do you

 4    know how many --

 5    A.    I believe there were -- I -- there -- I believe there were

 6    16 auction-rate securities in my original analysis that were

 7    auction-rate securities and therefore by definition would be

 8    involved in the 157 which included both.

 9    Q.    So 16 of the 157 securities referenced in paragraph 19 of

10    your declaration would have been included in your population of

11    comparables that you used in your valuation analysis?

12    A.    In my orig -- yeah, that's correct.

13    Q.    Now, am I correct, sir, that in analyzing either those

14    sixteen --

15          MR. HUME:  Let me withdraw that because I just want to

16    make one other thing clear.

17    Q.    I thought I understood in your direct testimony that you

18    said something about sixty-four of the ninety-three securities

19    that you reference in 19, paragraph 19.  Did sixty-four of the

20    ninety-three fail?

21    A.    No, no, no, 64 -- there were 157 auction-rate securities

22    on -- that traded on September 19, 2008; 93 failed, 64 did not

23    fail.

24    Q.    Okay.  Now, would you agree with me, Mr. Schwaba, that in

25    September of 2008 the market for auction-rate securities was
```

Page 98

```
 1    essentially frozen, notwithstanding these trades that you've

 2    identified?

 3    A.    I would accept that characterization up to a point.  There

 4    were ninety-three auction-rate securities trading.  There were

 5    sixty-four that had successful auction that were trading on

 6    that day.  And again, Barclays priced four securities at par on

 7    that same day as well, of failed auction-rate securities.

 8    Q.    Mr. Schwaba, were you aware of the fact that in September

 9    2008 financial institutions were offering to buy back failed

10    auction-rate securities from their individual investors?

11    A.    I'm aware of that information.

12    Q.    Did you do anything in your analysis to attempt to screen

13    out any auction-rate securities that had failed at auction that

14    traded on September 19, 2008 but traded only because they were

15    being bought back by investment houses that were offering to

16    buy back from their individual investors?

17    A.    My understanding is that that information is not able to

18    be deduced based on the information in the MSRB.

19    Q.    So you were not able to screen out for that information,

20    correct?

21    A.    I did not -- was not able to or did not do that.

22    Q.    Can I ask you to turn quickly to tab 13 of your binder.

23    We'll put it up on the screen.  And this is an article -- an

24    online article from The Economist magazine dated August 14,

25    2008, "Kicked in the ARS".  Do you see that?
```

08-13555-mg    Doc 11772    Filed 10/04/10    Entered 10/04/10 16:46:30    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 99 of 119

Page 99

1    A.    I do.

2    Q.    At the end of the first paragraph -- well, at the

3    beginning of the first paragraph it says, "Like a Moroccan

4    bazaar was how William Galvin, Massachusetts Secretary of

5    State, described the market for auction-rate securities whose

6    collapse has left thousands of investors stuck with debt they

7    assumed they could easily sell."  Do you see that?

8    A.    Yes, I do.

9    Q.    Is that consistent with your understanding of what had

10   happened in the market for auction-rate securities in September

11   2008?

12   A.    That's another interpretation; I have not seen this one

13   before.

14   Q.    The last sentence of this paragraph says, "Banks, on the

15   other hand, have moved quickly under pressure to buy back the

16   paper they flogged in what looks like the biggest ever forced

17   bailout of Main Street by Wall Street."  Do you see that?

18   A.    I do.

19   Q.    And did you understand that to be referring to the fact

20   that state regulators had put immense pressure on major Wall

21   Street banks to buy back failed auction-rate securities from

22   their individual investors?

23   A.    That's information and I've heard words to that effect

24   before.

25   Q.    Did you --

Page 100

1   A.   I don't know that for a fact to be true.

2   Q.   Did you understand -- whatever you understood about it,

3   did you understand that those buy-back operations were not

4   going to apply to a major financial institution like Barclays

5   that happened to own failed auction-rate securities?

6   A.   I -- repeat the question again, please?

7   Q.   Well, whatever your understanding was of the buy-backs

8   referenced in this article, did you understand that it did not

9   include anyone buying back auction-rate securities from an

10  institution like Barclays?

11  A.   I did not under -- not quite understand that.  All I know

12  is that Barclays, again, priced four securities at par that had

13  failed auction-rate securities.

14  Q.   When you say they priced at par, they also took a bid

15  offer adjustment, correct?

16  A.   I don't know whether they took a bid offer adjustment or

17  not; I know they priced it at par, at 100.

18  Q.   Did -- is it correct that they then adjusted it by some

19  percentage to reflect what was a real -- what they thought was

20  a realistic exit price where they might actually be able to

21  transact in the security?

22  A.   I don't know whether they did or not.

23  Q.   Okay.  Am I correct that in your valuations you took no

24  adjustment to adjust the values you arrived at to a bid price

25  that could be a realistic transaction price for Barclays?

Page 101

1   A.   I took traded prices.  These are securities that traded in

2   the market at par.

3   Q.   Can I ask you to turn to tab 8 of your binder?

4        MR. HUME:  Before I do, Your Honor, may I ask that the

5   exhibit at tab 13, BCI Exhibit 1017, be moved into evidence for

6   the limited purpose of showing public awareness of buy-back

7   operations with respect to auction-rate securities?

8        MR. TAMBE:  We would have an objection based on

9   hearsay.  We hadn't seen this document until we got this

10  binder.  I understand it's being offered for a limited purpose

11  but we do have an objection both for lateness as well as to

12  hearsay.

13       THE COURT:  Well, it appears to have been printed off

14  the Internet on September 28, 2010.  The questions are in the

15  record about --

16       MR. HUME:  We'll deal with the --

17       THE COURT:  About what --

18       MR. HUME:  Your Honor --

19       THE COURT:  About what --

20       MR. HUME:  -- we'll withdraw the --

21       THE COURT:  -- the witness knew about this subject

22  of --

23       MR. HUME:  Right.

24       THE COURT:  -- buy-backs of auction-rate securities at

25  the time.  And before deciding on admissibility, perhaps the

Page 102

1   parties can meet and confer.  I'm going to provisionally simply

2   reserve on this.

3            MR. HUME:  Thank you, Your Honor.

4   BY MR. HUME:

5   Q.   Tab 8 of the binder, Mr. Schwaba, is a press release from

6   Credit Suisse dated September 17, 2008, do you see that?

7   A.   Yes, I do.

8   Q.   And it states, "Credit Suisse today announced that it has

9   reached a settlement agreement with the Attorney General of the

10  State of New York and the North American Securities

11  Administrators Association Task Force whereby Credit Suisse

12  will offer to repurchase, at par, auction-rate securities held

13  by eligible individual investors, charities and certain

14  businesses."  Do you see that?

15  A.   I do.

16  Q.   Did you take this information into account in determining

17  whether the auction-rate securities that you found that traded

18  at par on September 19th might reflect these kinds of buy-back

19  operations?

20  A.   My view is that by and if the time the auction-rate

21  security is traded in the market this information probably

22  would have been fact -- would have been factored in, in terms

23  of the market price, if that is in fact the case.

24  Q.   When you say "factored in", are you suggesting that

25  Barclays might be able to sell auction-rate securities to an

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 103

1   individual who would then be able to capitalize on this kind of

2   buy-back?

3   A.   No, no, no, I'm sorry, that's not at all what I'm saying.

4   Q.   Okay.

5   A.   I'm saying if I understand this -- if I understood this

6   that Barclays -- or excuse me, Credit Suisse would be dealing

7   directly with individuals at a price, whatever price it was,

8   then that's what it is.  But the MSRB data, which is publicly

9   data, those prices clearly were par.

10   Q.   Let me ask you to turn quickly to tab 9.  This is a

11   Goldman Sachs announcement dated August 21, 2008.  Do you see

12   that?  Do you see the date August 21, 2008?

13   A.   Yes, I do.

14   Q.   And it states, "The Goldman Sachs Group, Inc.. today

15   announced that Goldman Sachs & Co. has entered into a

16   settlement in principal with the Office of the Attorney General

17   of the State of New York and the Illinois Securities Department

18   on behalf of the North American Securities Administrators

19   Association regarding auction-rate securities."  Do you see

20   that?

21   A.   I do.

22   Q.   It goes on to say, "Under the settlement Goldman Sachs

23   will offer to immediately repurchase, at par, the outstanding

24   auction-rate securities that are held by its private wealth

25   management clients and were purchased through the firm prior to

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 104

1   February 11, 2008."  Do you see that?

2   A.    I do.

3   Q.    Now, am I correct, Mr. Schwaba, that you do not know how

4   many of the auction-rate securities that you identified that

5   had failed at auction and traded at par on September 19, 2008

6   were the subject of these kinds of buy-back operations?

7   A.    I do not know that.

8   Q.    Isn't it possible then, Mr. Schwaba, that all of the

9   auction-rate securities that you identified that had failed at

10  auction and traded at par on September 19, 2008 were the

11  subject of these kinds of buy-back operations?

12  A.    Are you asking me if it's possible?

13  Q.    Yes.

14  A.    It's possible, but it's also possible that they may not

15  have been.

16  Q.    You don't know one way or the other, correct?

17  A.    That's right.

18  Q.    Have you reviewed the industry announcements along this

19  line to determine whether any of them would have allowed

20  Barclays to take advantage of such repurchase operations?

21  A.    I have reviewed information related to this, but I -- it's

22  not clear to me, based on my understanding of the trades that

23  went through MSRB, that I'm able to discern whether any of

24  these agreements ended up going through this -- through that

25  path.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 105

1    Q.   If you look at tab 10 very briefly, you'll see an

2    announcement from Wachovia on August 15, 2008.   Wachovia

3    announces, "Global agreement in principal to settle auction-

4    rate securities".   Do you see that?

5    A.   Yes, I do.

6    Q.   And if you look at the second paragraph it says much the

7    same thing as the other ones, that "We understand the

8    unprecedented market conditions have created difficulties for

9    our clients, particularly those holding auction-rate

10   securities."   Do you see that?

11   A.   Yes.

12   Q.   Do you have any basis for disagreeing with that statement?

13   A.   No.

14   Q.   It then says, quote, "We are pleased to announce a

15   comprehensive solution for the liquidity needs of clients who

16   purchased auction-rate securities at Wachovia and to resolve

17   this matter with federal and state regulators."   Do you see

18   that?

19   A.   I do.

20   Q.   And let me ask you quickly to move to tab 6 of the binder,

21   BCI Exhibit 1012, which is a summary of auction-rate security

22   buy-back information for retail customers.   And you see there

23   that it summarizes for each institution the date that

24   institution announced its agreement to buy back and who it was

25   buying back from:   "Bank of America, February 13, 2008,

Page 106

1    individual investors", do you see that?

2    A.    Yes.

3    Q.    "BNY Mellon Capital Markets, settlement announced October

4    23, 2008".   Second bullet says, "Agreed to buy back ARS of

5    individual investors for ARS purchased between May and February

6    2008", do you see that?  May 2006 and February 2008.  Do you

7    see that?

8    A.    I do.

9    Q.    Now rather than walk through every one I'll just note for

10   the record that there are numerous listed here over the next

11   four pages, and, again, am I correct, Mr. Schwaba, that there's

12   no way for you to say whether any of the transactions and

13   failed auction rate securities that you identified on September

14   19, 2008 were anything other than transactions pursuant to

15   these kinds of repurchased operations?

16   A.    Again, I'll say it's not clear that there were, it's not

17   clear that there weren't, based on my understanding of the

18   transactions in the MSRB.

19   Q.    Am I correct, Mr. Schwaba, that you, in the errata that

20   you explained earlier in your direct testimony, you changed the

21   valuation of one CUSIP based upon a valuation you saw in a PwC

22   price testing memo?

23   A.    I do not recollect that.

24   Q.    Let me ask you to look at tab 26 of your binder, which is

25   a work paper of yours that was produced to us.  We've

Page 107

1   identified it as BCI Exhibit 1024.  Do you recognize that

2   document?

3   A.   Yes, I do.

4   Q.   And is that a document that reflects some of the work you

5   did to value some of the CUSIPs shown on the document?

6   A.   That is correct.

7   Q.   And if I could ask you to look at the CUSIP identified as

8   700404AA4 --

9   A.   Yes.

10  Q.    -- which is right there.  You can see it a little more

11  easily.  You value it in this document at $86.99 as it relates

12  to par, correct?

13  A.   Yes, that's -- that's --

14  Q.   In other words, a hundred dollars in that column would

15  mean par, correct?

16  A.   That's right.

17  Q.   And you value it here at 86.99, so, essentially, 86.9

18  percent of par?

19  A.   Yes.  I think there was a confusion and just a

20  transposition of numbers and that rendered the valuation, which

21  was why we put the errata in there, what I put the errata into

22  it.

23        UNIDENTIFIED SPEAKER:  I'm not sure I understood.

24  Q.   Well, originally you valued this CUSIP at over par,

25  correct?

Page 108

1    A.    I'm trying to identify -- recall what this -- the identity

2    of this CUSIP is.

3    Q.    But am I correct that in the first column the 12.35

4    million is the par amount?

5    A.    That's correct.

6    Q.    And if we look at your original report, which is at tab 1,

7    and we look at Exhibit 2, which is the last page of the report.

8    Now, this is your original report, not the corrected report.

9    Then, for that CUSIP, doesn't it show an amount greater than

10   that 12.3 million?  It shows 12.8 million, correct?

11   A.    That's right, and the second one would have been the

12   corrected one.

13   Q.    Right.  My only question right now, sir, is in your

14   original report you value that CUSIP greater than par?

15   A.    That's right.  And there is another CUSIP, also, that had

16   been, I believe, out of order as well.  One was higher than,

17   the other one was lower than by a factor of a million or two

18   million.

19   Q.    And, sir, is the reason you changed the valuation of this

20   CUSIP because you saw a value in a PwC price testing memo?

21   A.    I don't recollect that at all.

22   Q.    I'm going to ask you to look at tab 12 of your binder.

23   And you'll see there BCI Exhibit 724, which is a February 8,

24   2009 PwC memo.  Do you see that?

25   A.    Yes, I do.

Page 109

1    Q.    Did you ever review this document?

2    A.    I do recall reviewing it.

3    Q.    There is an attachment to this document called "Tab Sample

4    with Prices", which is in your binder.  We don't have all the

5    attachments, but we have this attachment, and which is now up

6    on the screen.  And it shows, about a quarter of the way up

7    from the bottom, a valuation for that CUSIP, 700404AA4.  Do you

8    see that?

9    A.    Yes.

10   Q.    And do you --

11   A.    But I -- I --

12   Q.    Do you see that it's valued at .838?

13   A.    I don't recall seeing this portion of the document.

14   Q.    Okay.  Well, let me just ask you.  Do you see that it's

15   valued at .838?

16   A.    Yes, I do.

17   Q.    And do you understand that to be 83.8 percent of par?

18   A.    I would accept that.

19   Q.    And do you understand the parentheses to reflect an actual

20   transaction in that CUSIP on September 22, 2008?

21   A.    I will accept that.

22   Q.    And would you agree than an actual transaction in a CUSIP

23   that is not liquid and not trading would be the best evidence

24   of its market value three days earlier?

25   A.    Actually, I would take issue with that.  I think it ought

Page 110

1    to at least be the same day.

2    Q.   All right.

3    A.   That's --

4    Q.   So you --

5    A.    -- September 22nd.  The date of valuation is September

6    19th.

7    Q.   Let me move on, Mr. Schwaba, to the CUSIPs you testified

8    about that were valued at .001.  Do you recall that?

9    A.   Yes.

10   Q.   And you said in your testimony that you did not have any

11   idea, or no explanation, for why Barclays valued those CUSIPs

12   at that amount.  Do you recall that?

13   A.   I do.

14   Q.   Are you not aware, sir, that Barclays was simply, on those

15   CUSIPs, adopting the BoNY marks, Bank of New York marks?

16   A.   I don't know what they were doing.  I was asked -- I

17   looked at Barclays' marks, and what struck me was that the

18   tenth of a penny marks were facially incorrect.  In my thirty-

19   five years I've never seen a, certainly an investment grade

20   security, marked at that price.

21   Q.   My question, just so the question is clear, Mr. Schwaba,

22   is did you have an awareness, from any source, in preparing

23   your work in this case that the .001 valuations applied to

24   those five CUSIPs were taken from the BoNY marks?

25   A.   No, I don't.  These were seven -- there were seven CUSIPs.

LEHMAN BROTHERS HOLDINGS INC., et al.

1   Q.   My apologies.  Did you know that BoNY had marked those

2   CUSIPs at .001?

3   A.   No, I was looking at Barclays' marks.

4   Q.   Just so I have a very clear answer.  Did you know that

5   BoNY had marked those CUSIPs at .001?

6   A.   I don't recollect that.

7   Q.   Am I correct that those CUSIPs did not show up in the

8   search Navigant did for all CUSIPs with a valuation difference

9   of greater than a million dollars between Barclays and BoNY?

10  A.   The search for the difference greater than a million

11  dollars, that criterion was established, but not by me, and I

12  took those out of the criteria, and I then established, and

13  then with reviewing other securities, and I clearly noticed the

14  tenth of a percent -- excuse me.  Tenth, yeah, tenth of a penny

15  value on those.  It struck me as facially incorrect.

16  Q.   And Barclays has acknowledged that, correct?

17  A.   I don't know whether they've acknowledged that or not.

18  Q.   But it was never brought to your awareness that the Bank

19  of New York is the institution that put those marks on those

20  CUSIPs?

21  A.   I'm just, you know, I -- I'd -- valuing the twenty-six

22  securities and that's what I -- that's what I got, based on a

23  million dollar threshold and then the seven securities.

24  Q.   So it may or may not have been brought to your attention

25  that BoNY had marked these at .001?

Page 112

1    A.    I'll admit that possibility but in terms of my

2    recollection.

3    Q.    Did you at any time consider, sir, what the FTID values --

4    are you familiar with FTID?

5    A.    Yes.

6    Q.    Do you consider at any time what values Barclays found on

7    its -- from FTID for these CUSIPs?

8    A.    I believe there was mention in my original, or my report,

9    that there was some FTID prices that Barclays --

10   Q.    Okay.

11   A.    -- could have noted but didn't.  I may not have that

12   recollection correct.

13   Q.    And, more generally, sir, were you aware that

14   PricewaterhouseCoopers, PwC, had reviewed the Barclays'

15   valuations for its municipal bond portfolio as a whole?

16   A.    I was aware that there was a review done.

17   Q.    And am I correct, sir, that you did not review the entire

18   municipal bond portfolio but only these twenty-six CUSIPs?

19   A.    That's correct.

20   Q.    And do you know how many total CUSIPs there were for

21   municipal bonds?

22   A.    I don't.  No.

23   Q.    And are you aware of the fact that Pricewaterhouse

24   concluded that Barclays' valuations for the whole municipal

25   bond portfolio were reasonable?

Page 113

1    A.    I can't recollect that conclusion.

2    Q.    Am I correct, sir, that you don't have an opinion on the

3    valuation for the entire municipal bond portfolio --

4    A.    That is --

5    Q.    -- only on the twenty-six CUSIPs you valued?

6    A.    That's exactly right.

7          MR. HUME:  Just one minute, sir.

8          (Pause)

9          MR. HUME:  Your Honor, there are some PwC documents.

10   I don't know that we need to take the time to question the

11   witness with them based on his testimony, but we would like to

12   move their admission.  They are at tab 12 of the binder, the

13   one I showed earlier, BCI-724.  I'd like to move its admission.

14         MR. TAMBE:  Objection, Your Honor, on hearsay grounds,

15   and there has been discussion between the parties on some other

16   PwC documents.  We have objected to the wholesale moving in of

17   any PwC documents.

18         MR. HUME:  Well, perhaps, Your Honor, what we need to

19   do is reserve some time to address this, because there are --

20   this binder has, I think, just two, but there are a number of

21   others we used with other witness which we think are business

22   records, and would, therefore, not be hearsay.  They would come

23   within the business record exception, and we would try to work

24   it out with counsel, but we have been trying for the last

25   couple of weeks.  We'd ask for a chance to offer them all into

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 114

1    evidence.

2            THE COURT:  Let's reserve on the admissibility of 724

3    and other comparable documents, but absent some showing or an

4    agreement it appears that you're seeking to admit the valuation

5    attachment through this document for the truth of what's stated

6    in it, and I don't know if it's a business record or whose

7    business record it is.

8            MR. HUME:  It's not just the -- we were trying to --

9    mostly we're trying to seek admission of the work papers

10   themselves, the memos that PwC did.

11           MR. TAMBE:  I don't think that fixes the problem, Your

12   Honor.  It might make it worse.

13           THE COURT:  Well, it's just past 6 o'clock.  Are

14   you --

15           MR. HUME:  Yes.

16           THE COURT:  Are you done with your cross-examination

17   at this point?

18           MR. HUME:  I have one more question.

19           THE COURT:  Let's reserve on the Pricewaterhouse

20   documents for another day.

21           MR. HUME:  Okay.

22           THE COURT:  And if you have another question of the

23   witness, ask that question.  I'm just going to ask how much

24   redirect there may be.

25           MR. TAMBE:  Maybe a total of two minutes.

1           THE COURT:  Fine.

2     BY MR. HUME:

3     Q.   Mr. Schwaba, when you were at the Federal Home Loan Bank

4     of Pittsburgh did you have any involvement at all with the

5     motion filed by the Federal Home Loan Bank of Pittsburgh in

6     this court seeking a Rule 60(b) challenge of the sale order in

7     or around October, 2008?

8     A.   No, I don't recollect that.

9           THE COURT:  But I recall that.  Mr. Tambe, why don't

10    you proceed?

11          MR. TAMBE:  Just one set of questions.

12    REDIRECT EXAMINATION

13    BY MR. TAMBE:

14    Q.   You were asked a lot of questions about settlements and

15    failed auctions.  Just to go back.  There were 157 auction rate

16    securities that traded on the 19th, correct?

17    A.   That's correct.

18    Q.   Ninety-three of those had experienced failed auctions,

19    correct?

20    A.   Yes, sir.

21    Q.   And those traded at par?

22    A.   That's correct.

23    Q.   But there were sixty-four others that had not experienced

24    any failed auctions, correct?

25    A.   That is correct.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 116

1    Q.    And those traded at par?

2    A.    Yes, sir.

3            MR. TAMBE:  Thank you, Your Honor.  No further

4    questions.

5            THE COURT:  Mr. Schwaba, you're excused.  Thank you.

6            THE WITNESS:  Thank you, sir.

7            THE COURT:  We'll resume tomorrow at 9:30.

8            MR. MAGUIRE:  Yes, Your Honor.  And Mr. Slattery will

9    be our witness tomorrow.

10            THE COURT:  Fine.  See you tomorrow.

11        (Whereupon these proceedings were concluded at 6:05 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 117

1

2                          I N D E X

3

4                      T E S T I M O N Y

5

6    WITNESS                 EXAM BY                PAGE    LINE

7    David Coles (video)     Mr. Thomas             16       1

8    Joseph Schwaba          Mr. Tambe              43      11

9    Joseph Schwaba          Mr. Hume               70      10

10   Joseph Schwaba          Mr. Tambe             115      12

11

12

13                      E X H I B I T S

14   MOVANTS'      DESCRIPTION                    ID.    EVID.

15   154A          Curriculum vitae of Joseph             29

16                 Schwaba

17   154           Joseph Schwaba's original expert       39

18                 report

19   154B          Joseph Schwaba's amended expert        39

20                 report

21   825           Declaration of Joseph Schwaba          40

22

23

24

25

Page 118

1

2                        I N D E X, cont'd

3

4                      E X H I B I T S, cont'd

5     BCI'S            DESCRIPTION                    ID.      EVID.

6     538A             E-mail involving Martin Kelly    19

7     585A             E-mail chain dated 9/22/08       31

8                      involving Mr. Schwaba

9     ---              Screen shots                             92

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 119

1

2                      C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date:  October 2, 2010

18

19

20

21

22

23

24

25