WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Scarlett E. Collings

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ─────────────────────────────────────────x | | Chapter 11 |
| In re: | : | |
| | | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | : | |
| | | |
| Debtors. | : | |
| ─────────────────────────────────────────x | | |
| LEHMAN BROTHERS FINANCIAL PRODUCTS INC., | : | |
| | | |
| Plaintiff, | : | |
| | | |
| -against- | : | Adversary Proceeding |
| | | No. _____ (JMP) |
| NEBRASKA INVESTMENT FINANCE AUTHORITY, | | |
| | : | |
| Defendant. | | |
| ─────────────────────────────────────────x | | |

**ADVERSARY COMPLAINT**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Financial Products Inc. ("LBFP" or "Plaintiff"), a debtor and debtor in possession in the above-captioned jointly administered case of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in possession (collectively, the "Debtors," and together with its non-debtor affiliates, "Lehman"), by and through its undersigned counsel, brings this

1

Adversary Complaint against Nebraska Investment Finance Authority ("NIFA" or "Defendant"), and respectfully alleges as follows:

## INTRODUCTION

At its core, this adversary proceeding involves a valuation dispute. LBFP maintains that the entire premise upon which NIFA based its valuation of the terminated transactions is flawed. NIFA applied the incorrect—and ultimately less favorable to LBFP—rate of interest to five of the eight terminated transactions involved in this dispute. Specifically, NIFA's request for bids from leading dealers, the quotations it received in response, and its ultimate calculation of the amounts owed under the Master Agreement[1] (as defined below) applied the Actual Bond Rate (as defined below), which is more favorable to NIFA, instead of the Alternative Floating Rate (as defined below), which is more favorable to LBFP.

The improper interest rate application and ensuing flawed valuation derive from a single *ultra vires* event that would, if given legal effect, drastically change the parties' rights and obligations under the transactions. Two days after LBHI filed its bankruptcy petition, Robert Taylor ("Taylor"), NIFA's sales contact for its trades with LBFP who happened to be a Managing Director of Lehman Brothers Inc. ("LBI"), executed a document, the Consent to Removal of Remarketing Agent (the "Consent"), that would, in effect, drastically reduce the value to LBFP of the swap transactions between LBFP and NIFA. However, Taylor did not have authority to execute the Consent on behalf of LBFP. As such, his act was *ultra vires*, thus making the Consent invalid and void *ab initio*.

Alternatively, to the extent the Consent is valid and enforceable (and LBFP maintains that it is not), it is a voidable transfer under section 548 of Title 11 of the United States Code (the

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Master Agreement. A true and correct copy of the Master Agreement is annexed hereto as Exhibit A.

2

"Bankruptcy Code"). The Consent was executed within weeks of LBFP's bankruptcy filing, and it constitutes a transfer of an interest in LBFP's property.

Under the VRDO Transactions (as defined below), LBFP was the floating rate payer, and the floating rate that LBFP was required to pay was the rate of interest paid on the related VRDO Bonds (as defined below) (such rate of interest, the "Actual Bond Rate"). A different floating rate equal to a certain percentage of LIBOR (such floating rate, the "Alternative Floating Rate"), however, would apply to the VRDO Transactions upon the occurrence of certain events, one of which was LBI ceasing to be the remarketing agent for the VRDO Bonds, *unless* LBFP consented in writing to LBI not being the remarketing agent.

Because Taylor executed the Consent, NIFA alleges that the Actual Bond Rate, which would be *less favorable* to LBFP, continued to apply as the floating rate, rather than the *more favorable* Alternative Floating Rate. As NIFA's sales contact at LBFP, Taylor was intimately familiar with the VRDO Transactions and had full knowledge of the effect that the Consent would have on the applicable floating rate and, ultimately, the valuation of these transactions. The Consent was executed by Taylor on September 17, 2008, only two days after the highly publicized and historic chapter 11 filing of LBFP's ultimate parent company, LBHI. The fate of Lehman was unknown and the prospect of continued employment of its employees was speculative at best. Upon information and belief, Taylor entered into the Consent on LBFP's behalf with the actual intent to hinder, delay, or defraud the present or future creditors of LBFP, which act also benefited his client, NIFA. Thus, the execution of the Consent constitutes a voidable transfer.

Regardless of whether the Consent is invalid as *ultra vires* or avoidable as a fraudulent transfer, NIFA applied the incorrect interest rate as the floating rate when it solicited replacement

3

quotes from leading dealers and calculated the amounts owed under the Master Agreement based on that incorrect floating rate. In doing so, NIFA acted neither reasonably nor in good faith in valuing the VRDO Transactions and, as such, has breached its duties and obligations under the express terms of the Master Agreement. LBFP is, therefore, entitled to receive damages so that it may enjoy the full benefit of its bargain under the Master Agreement.

## JURISDICTION AND VENUE

1. This is a civil proceeding arising in a case under the Bankruptcy Code within the meaning of 28 U.S.C. § 1334. It is properly brought as an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2. This Court has jurisdiction to entertain the claims asserted herein pursuant to 28 U.S.C. § 1334(b) (civil cases arising under title 11), 28 U.S.C. § 1334(e)(1) (district court's exclusive jurisdiction over property of the estate), and 28 U.S.C. § 157(b) (core proceedings arising under title 11). This is a core proceeding under 28 U.S.C. § 157(b).

3. Venue is proper in this district under 28 U.S.C. §§ 157(a), 1408, and 1409(a).

4. The statutory prerequisites for the relief requested herein are sections 105(a), 548(a)(1)(A), 550, and 551 of the Bankruptcy Code, section 2201 of Title 28 of the United States Code, Federal Rule of Civil Procedure 57, and Rule 7001 of the Bankruptcy Rules.

## PARTIES AND RELATED ENTITIES

5. Lehman was formerly the fourth largest investment bank in the United States. For more than 150 years, Lehman was a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients, and individuals worldwide. Lehman's headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America, and the Asia Pacific region.

6. Beginning on September 15, 2008, and periodically thereafter, the Debtors filed with this Court voluntary cases under chapter 11 of the Bankruptcy Code. LBFP commenced its chapter 11 case on October 5, 2008. LBFP's chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only, and the cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). LBFP is a Delaware corporation with its current principal business address at 1271 Sixth Avenue, 40th Floor, New York, New York 10020. LBFP is authorized to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. Upon information and belief, Defendant NIFA is a corporate instrumentality exercising public functions, organized and existing under the laws of the State of Nebraska with its principal place of business at 200 Commerce Court, 1230 "O" Street, Lincoln, Nebraska 68508.

## FACTUAL ALLEGATIONS

**A.    The Background Documents**

8. NIFA issued a series of single family housing revenue bonds (collectively, the "Bonds") pursuant to its General Indenture of Trust, dated as of July 1, 1994 (the "General Indenture"), and individual supplemental indentures of trust (each, a "Supplemental Indenture," and together with the General Indenture, the "Indenture"), all between NIFA and Wells Fargo Bank, National Association, as trustee. The details of the Bonds are as follows:

| **Series of Bonds** | **Summit ID Number** | **CUSIP** |
| --- | --- | --- |
| 2000 Series F | 236115P | 63967CXM9 |
| 2001 Series B | 259619P | 63967CYG1 |
| 2001 Series E | 304139P | 63967CZS4 |
| 2002 Series B | 329459P | 63967CB50 |
| 2002 Series E | 377761P | 63967CD74 |
| 2003 Series B | 490283P | 63967CF64 |

5

| Series of Bonds | Summit ID Number | CUSIP |
|---|---|---|
| 2003 Series E | 517709P | 63967CH70 |
| 2004 Series B | 619733P | 63967CK50 |

9. In connection with the issuance of the Bonds, NIFA and LBFP entered into eight interest rate swap transactions (collectively, the "Transactions"). The Transactions entered into in connection with the 2003 Series B, 2003 Series E, and 2004 Series B Bonds were ordinary fixed-for-floating swap transactions (the "Swap Transactions"), while the remaining five were variable rate demand obligation transactions (the "VRDO Transactions") that were entered into in connection with the 2000 Series F, 2001 Series B, 2001 Series E, 2002 Series B, and 2002 Series E Bonds (the "VRDO Bonds"). Under the VRDO Transactions, LBFP was to receive a fixed rate on the respective notional amounts of the VRDO Transactions and pay a floating rate equal to the rate on the VRDO Bonds as determined from time to time in auctions conducted by LBI pursuant to the Remarketing Agreements (as defined below).

10. The Transactions were governed by the ISDA Master Agreement (Local Currency-Single Jurisdiction), dated as of November 1, 2000, between LBFP and NIFA (the "ISDA Agreement" and, together with the Schedule and the Confirmations thereto, the "Master Agreement"). Specifically, LBFP and NIFA executed the following Confirmations:

| Series of Bonds | Trade Date | Confirmation Date |
|---|---|---|
| 2000 Series F | November 1, 2000 | November 1, 2000 |
| 2001 Series B | March 14, 2001 | April 3, 2001 |
| 2001 Series E | October 16, 2001 | November 27, 2001 |
| 2002 Series B | February 5, 2002 | March 19, 2002 |
| 2002 Series E | July 23, 2002 | August 8, 2002 |
| 2003 Series B | April 30, 2003 | June 10, 2003 |
| 2003 Series E | September 3, 2003 | October 9, 2003 |
| 2004 Series B | January 7, 2004 | January 29, 2004 |

6

Taylor did not execute the ISDA Agreement, the Schedule, or the Confirmations on behalf of LBFP. These documents were executed by individuals with LBFP signatory authority, including T. Courtney Jenkins, Diana Nottingham, and Allyson Carine.

11. In connection with the VRDO Bonds, NIFA and LBI entered into the following remarketing agreements (collectively, the "Remarketing Agreements") pursuant to which LBI agreed to provide the services of a remarketing agent:

| Series of Bonds | Remarketing Agreement |
|---|---|
| 2000 Series F | Remarketing Agreement dated as of November 1, 2000 |
| 2001 Series B | Remarketing Agreement dated as of April 1, 2001 |
| 2001 Series E | Remarketing Agreement dated as of November 1, 2001 |
| 2002 Series B | Remarketing Agreement dated as of March 1, 2002 |
| 2002 Series E | Remarketing Agreement dated as of August 1, 2002 |

LBFP and NIFA entered into the VRDO Transactions in connection with the issuance of the VRDO Bonds and the Remarketing Agreements.

**B.    The Consent to Removal of Remarketing Agent**

12. The Supplemental Indentures and the Remarketing Agreements allowed NIFA to remove LBI as the remarketing agent and appoint a successor remarketing agent. Pursuant to the Confirmations governing the VRDO Transactions (the "VRDO Confirmations"), the floating rate to apply to the VRDO Transactions following any such removal would depend on whether LBFP consented to the removal and replacement of the remarketing agent or not. If LBFP consented to the removal and replacement of LBI as remarketing agent, then the Actual Bond Rates would apply to the calculation of damages, which would have been a less favorable rate to LBFP under the prevailing interest rate environment in September 2008. On the other hand, if LBFP did not consent to the removal and replacement of LBI as remarketing agent, or if any purported consent is determined to be invalid, then the Alternative Floating Rate would apply to the calculation of

7

damages, which would have been a more favorable rate to LBFP under the prevailing interest rate environment in September 2008.

13. With respect to each of the five Remarketing Agreements, on September 17, 2008, Taylor and Timothy Kenny ("Kenny") purported to execute the Consent on behalf of LBFP and NIFA, respectively. According to the Consent, NIFA sought and purported to receive LBFP's consent to the removal of LBI as the remarketing agent and the appointment of J.P. Morgan Securities Inc. as the successor remarketing agent with respect to the VRDO Bonds. Taylor was not authorized to execute the Consent for LBFP. Although Taylor was a Managing Director and authorized signatory of LBI, the VRDO Confirmations require *LBFP's*, not LBI's, consent to apply the Actual Bond Rate after the replacement of LBI as remarketing agent. Taylor's status and capacity as a Managing Director of LBI is irrelevant. Thus, the Consent is invalid and unenforceable.

**C.  The Termination, Replacement, and Valuation of the Transactions**

14. In connection with the sale of Lehman's North-American capital markets business to Barclays Capital Inc. ("Barclays") in late September 2008, Taylor departed Lehman and joined Barclays.

15. Two months after the invalid replacement of the remarketing agent and Taylor's departure from Lehman for Barclays, on November 25, 2008, following an Event of Default under Section 5(a)(vii) of the Master Agreement resulting from LBFP's bankruptcy filing, NIFA delivered a termination notice (the "Early Termination Notice") to LBFP designating November 25, 2008 as the Early Termination Date (the "Early Termination Date") for the Transactions.

8

16. On December 23, 2008, NIFA delivered a settlement notice (the "Settlement Notice") to LBFP summarizing how it determined the amounts owed with respect to the Swap Transactions and the VRDO Transactions.

17. With respect to the three Swap Transactions, NIFA applied Market Quotation, sought quotations from leading dealers, and used the quotations it received from three leading dealers to calculate the amounts owed. By doing so, NIFA determined that it owed LBFP a total of $890,178.29 in connection with the Swap Transactions.

18. With respect to the VRDO Transactions, on November 17, 2008, Swap Financial Group LLC, on behalf of NIFA, sent to various leading dealers a Request for Market Quotations and Replacement Interest Rate Swaps (the "Request") that cited the Actual Bond Rate, rather than the Alternative Floating Rate, as the floating rate that NIFA received from LBFP in connection with the VRDO Transactions. NIFA received quotations from three leading dealers for each of these transactions—a sufficient number of quotes to apply Market Quotation. One of the quotations was obtained from Barclays, through Taylor—NIFA's same former sales contact at LBFP. Of the quotations obtained by NIFA from three leading dealers, only the Barclays quotes—prepared by Taylor or at Taylor's direction, upon information and belief—support the position that NIFA is "in the money" under the VRDO Transactions. The quotes obtained by NIFA from the other two independent third parties support the position that LBFP is "in the money" under the VRDO Transactions.

19. NIFA maintains that it was "informed that no party in the swap market would actually execute a transaction providing for a Floating Rate Option [as defined in the VRDO Confirmations] equal to the actual interest rate on the [VRDO] Bonds" and that "the Market Quotations that NIFA did receive did not, in NIFA's reasonable belief . . . produce a

9

commercially reasonable result." NIFA, therefore, reverted to Loss and, in doing so, used the Barclays quotes, which were the *only* favorable quotes NIFA had received from the three leading dealers that provided quotes to calculate the amounts owed. NIFA maintains that the Barclays quotes "most accurately reflect the true value of a Floating Rate Option equal to the interest rate on the VRDO Bonds and the ultimate Settlement Amount" because, presumably, it was prepared by or at the direction of Taylor. As a result, NIFA ultimately calculated that it was owed a total of $7,455,389.09 from LBFP in connection with the VRDO Transactions.

20. NIFA's request for quotations and the quotations it received in response thereto with respect to the VRDO Transactions are based on an inapplicable floating rate of interest. In short, the premise of NIFA's entire valuation of the five VRDO Transactions is entirely flawed.

21. Under the VRDO Confirmations, upon the occurrence of LBI ceasing to be the remarketing agent for the VRDO Bonds without LBFP's written consent to replacement of LBI as the remarketing agent, the Alternative Floating Rate would apply as the floating rate.[2] LBFP has never consented in writing to the replacement of LBI as the remarketing agent for the VRDO Bonds, and any purported consent given by Taylor on behalf of LBFP was unauthorized and void. Alternatively, to the extent that LBFP did validly consent to the replacement of LBI as remarketing agent, such Consent is a voidable transfer effected in order to hinder, delay or defraud LBFP's creditors. Therefore, the floating rate applicable in respect of each of the VRDO Transactions was the Alternative Floating Rate as follows:

---

[2] "   Upon the occurrence of an Alternative Floating Rate Date, the Floating Rate Option shall be the Alternative Floating Rate Option. An 'Alternative Floating Rate Date' shall occur upon the occurrence . . . of any of the following: . . . (5) the [VRDO Bonds] are not underwritten by [LBI] or [LBI] is not the Remarketing Agent in respect of the [VRDO Bonds] or is replaced or terminated as the Remarketing Agent for the [VRDO Bonds], unless [LBFP] consents in writing to [LBI] not being the underwriter or the Remarketing Agent; (6) . . . *[LBFP]* has not consented in writing to the selection of the Remarketing Agent in respect of the [VRDO Bonds]; . . . ." VRDO Confirmations, at 3-4 (emphasis added).

| **Series of Bonds** | **NIFA Receives** |
|---|---|
| 2000 Series F | 64% of the arithmetic mean of USD-LIBOR-BBA |
| 2001 Series B | 64% of the arithmetic mean of USD-LIBOR-BBA |
| 2001 Series E | 67% of the arithmetic mean of USD-LIBOR-BBA |
| 2002 Series B | 67% of the arithmetic mean of USD-LIBOR-BBA |
| 2002 Series E | 67% of the arithmetic mean of USD-LIBOR-BBA |

These Alternative Floating Rates are the correct rates that should have been applied when requesting quotations from leading dealers and when valuing the VRDO Transactions. NIFA failed to use the correct rates in the Request and consequently its calculation of the amounts owed under the Master Agreement with respect to the VRDO Transactions is wrong.

22. All conditions precedent to suit have been performed, have occurred, or have been waived.

## COUNT I
*Declaratory Judgment – The Consent is Invalid as Ultra Vires*

23. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 22 above as if fully set forth in this cause of action.

24. Only a Managing Director of LBFP would have had authority to execute the Consent on LBFP's behalf. Taylor was *not* a Managing Director of LBFP. He had no authority to bind LBFP to the Consent, and in fact, Taylor had no authority to execute such documents on behalf of LBFP.

25. Additionally, Taylor did not possess apparent authority to enter into the Consent. NIFA knew or should have known that Taylor exceeded the scope of his authority when he executed the Consent two days after LBHI filed for chapter 11 protection and the very day the Barclays sale was announced. Although Taylor was NIFA's sales contact at LBFP, he never served as a signatory to the governing documents, *e.g.*, the ISDA Agreement, the Schedule, or any of the eight Confirmations into which the parties entered. For NIFA to assume that Taylor

11

had authority to bind LBFP on such a significant scale would be wholly inconsistent with the circumstances of the Transactions and the governing agreements between the parties. NIFA knew or should have known that Taylor lacked the requisite authority to enter into the Consent on LBFP's behalf. Because LBFP never gave Taylor such authority, the Consent is invalid and unenforceable as *ultra vires*. LBFP should not be bound by an unauthorized transaction between Taylor and NIFA.

26. By virtue of the foregoing, there exists an actual, justiciable controversy between LBFP and NIFA relating to their respective legal rights, duties, and obligations under the Bankruptcy Code, which controversy is now ripe for adjudication pursuant to 28 U.S.C. § 2201.

27. Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBFP requests a judgment declaring the rights and obligations of the parties, including a declaration that the Consent is invalid as *ultra vires*.

## ALTERNATIVE COUNT II
*Alternatively, the Consent Constitutes a Voidable*
*Transfer under Section 548 of the Bankruptcy Code*

28. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 22 above as if fully set forth in this cause of action.

29. As a matter of alternative pleading only, to the extent the Consent is valid (and LBFP maintains that it is not), the Consent constitutes a voidable transfer under section 548 of the Bankruptcy Code.

30. Section 548(a)(1)(A) of the Bankruptcy Code provides that any transfer of an interest of the debtor in property or any obligation incurred by the debtor, that was made or incurred on or within two years before the date of the filing of the debtor's petition, may be avoided if the debtor "made such transfer or incurred such obligation with actual intent to hinder,

delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A).

31. On September 17, 2008, the day the Barclays sale was announced and within weeks before LBFP filed its bankruptcy petition, LBFP entered into the Consent with NIFA. If the Consent were valid, LBFP would have consented to the removal and replacement of the remarketing agent. Consequently, a rate of interest *less favorable* to LBFP—the Actual Bond Rate—applied to the VRDO Transactions instead of the rate that would have applied had LBFP not consented—the Alternative Floating Rate. The Consent, therefore, constitutes a transfer of an interest in LBFP's property because it modified the rate applicable to the calculation of damages under the VRDO Transactions from a *more favorable* rate to LBFP to a *less favorable* rate to LBFP.

32. Familiar with the VRDO Transactions, the VRDO Confirmations, and the effect that the Consent would have on the applicable rates of interest and any valuations based on ensuing determinations, LBFP, through Taylor, entered into the Consent with the actual intent to hinder, delay, or defraud the present or future creditors of LBFP. This intent is further evidenced by the facts and circumstances surrounding Taylor's departure from Lehman, his arrival at Barclays, and his interactions with NIFA while at Barclays. Indeed, two months after the Consent was executed, NIFA realized the ultimate benefit from Taylor's acts. When NIFA solicited bids from several leading dealers, including Barclays, in an effort to replace the VRDO Transactions and calculate the Settlement Amount, Taylor, on behalf of Barclays, provided the *only* quotes (out of those received from three leading dealers) that generated a Settlement Amount payable by LBFP to NIFA rather than one payable *by* NIFA *to* LBFP. In view of these facts and circumstances, it is evident that when Taylor executed the Consent on LBFP's behalf,

13

he intended to hinder, delay, or defraud LBFP's present or future creditors in an effort to benefit NIFA and keep NIFA as his client.

33. Thus, to the extent that the Consent is valid and enforceable, it constitutes an actual fraudulent transfer of LBFP's property interest to or for the benefit of NIFA, which LBFP may avoid pursuant to section 548(a)(1)(A) of the Bankruptcy Code, recover under section 550 of the Bankruptcy Code, and preserve for the benefit of its estate pursuant to section 551 of the Bankruptcy Code. In this alternative Count, Plaintiff asserts its right to avoid the Consent and to recover and preserve its property interest for the benefit of its estate.

**COUNT III**
*NIFA's Breach of the Master Agreement by Failing to Act Reasonably and in Good Faith When Requesting Replacement Quotations from Leading Dealers*

34. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 22 above as if fully set forth in this cause of action.

35. Whether the Consent is invalid as *ultra vires* or avoidable as a fraudulent transfer, NIFA has failed to perform its duties and obligations under the Master Agreement reasonably and in good faith and, as a result, is liable for damages suffered by LBFP.

36. LBFP and NIFA were parties to a valid and enforceable contract—the Master Agreement. At all times relevant, LBFP performed its duties and obligations under the Master Agreement. NIFA, however, did not. Specifically, when NIFA requested replacement bids from leading dealers and performed its calculations to arrive at the Settlement Amount, it applied an incorrect rate of interest—the Actual Bond Rate—rather than the correct one—the Alternative Floating Rate. Accordingly, NIFA failed to act reasonably and in good faith in valuing the VRDO Transactions under the Master Agreement. LBFP has suffered damages as a result of NIFA's breach.

14

37. LBFP is, therefore, entitled to damages in an amount no less than the sum equal to the properly calculated early termination amount, which totals $12,770,182, plus accrued, but unpaid interest.

### COUNT IV
*NIFA's Breach of the Implied Covenant of Good Faith and Fair Dealing By Failing to Act Reasonably and in Good Faith When Requesting Replacement Quotations from Leading Dealers*

38. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 22 above as if fully set forth in this cause of action.

39. The Master Agreement is governed by New York law. Master Agreement, Part 3(e) of the Schedule. New York law imposes an implied covenant of good faith and fair dealing in every contract which requires that contracting parties refrain from arbitrary or unreasonable conduct that would prevent the other contracting party from receiving the fruits of the contract.

40. When NIFA requested replacement bids for the VRDO Transactions and performed its calculations to arrive at the Settlement Amount, it applied an incorrect rate of interest—the Actual Bond Rate—rather than the correct one—the Alternative Floating Rate. Whether the Consent is invalid as *ultra vires* or avoidable as a fraudulent transfer, NIFA did not act reasonably or in good faith in requesting replacement quotes for the VRDO Transactions using fundamentally flawed specifications and in calculating the Settlement Amount under the Master Agreement.

41. Even if the Consent were valid, NIFA's calculation of the Settlement Amount does not meet the requisite standard of care under New York law. Although NIFA received three market quotations from leading dealers—a sufficient number of quotes to perform Market Quotation—NIFA reverted to Loss. Out of these three quotes, as well as a fourth quote that it

15

subsequently received from Deutsche Bank with whom NIFA ultimately entered into replacement transactions, NIFA cherry-picked the *only* quote that resulted in it receiving a payable, *i.e.*, the Barclays quote from Taylor, when calculating its Loss. NIFA, therefore, failed to act reasonably and in good faith when valuing the VRDO Transactions under the Master Agreement.

42. NIFA, therefore, breached the implied covenant of good faith and fair dealing. As a result of such breach, LBFP should be awarded damages in an amount to be determined at trial, but no less than $12,770,182, the proper early termination amount that would have been calculated, had NIFA acted reasonably and in good faith in accordance with New York law.

## COUNT V
### *Turnover of the LBFP Receivable Pursuant to Section 542(b) of the Bankruptcy Code*

43. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 22 above as if fully set forth in this cause of action.

44. Within months of LBFP's bankruptcy filing and upon receipt of the Settlement Notice, a representative of LBFP contacted NIFA to request a recalculation of the amount owed under the Master Agreement using the appropriate rate of interest. Upon information and belief, no such recalculation has been performed by NIFA.

45. LBFP is owed payment from NIFA under the Master Agreement (the "LBFP Receivable"). The LBFP Receivable is valued at $12,770,182, which amount represents the total amount due and owing, excluding interest, under the terms of the Master Agreement. The LBFP Receivable is property of the LBFP estate under section 541(a) of the Bankruptcy Code.

46. Section 542(b) of the Bankruptcy Code expressly provides that:

> . . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, *shall pay such*

>    *debt to*, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

11 U.S.C. § 542(b) (emphasis added). Section 542(b) of the Bankruptcy Code obligates NIFA to pay the matured debt "on demand," and NIFA's failure to do so is in express violation of the Bankruptcy Code.

47.     LBFP, therefore, requests an order compelling NIFA to turn over the full amount of the LBFP Receivable pursuant to section 542(b) of the Bankruptcy Code as it constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code, plus interest that has accrued at the Applicable Rate on the LBFP Receivable pursuant to section 6(d)(ii) of the Master Agreement (the "Accrued Interest").

### COUNT VI
*Declaratory Judgment – NIFA's Withholding of the
LBFP Receivable Constitutes a Violation of the Automatic Stay*

48.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 22 above as if fully set forth in this cause of action.

49.     Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a voluntary case under chapter 11 of the Bankruptcy Code likewise operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" absent an order of the Bankruptcy Court granting relief from the stay. 11 U.S.C. § 362(a)(3).

50.     The LBFP Receivable constitutes property of LBFP's estate, and NIFA's withholding therefore constituted, and continues to constitute, an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

51. Based on its incorrect valuation of the VRDO Transactions, NIFA maintains that, pursuant to the Master Agreement, it is owed a payable from LBFP, and NIFA has filed a proof of claim to that effect. This failure and refusal to pay LBFP what LBFP is rightfully owed is in clear violation of section 362(a)(3).

52. Accordingly, LBFP is entitled to a declaratory judgment that NIFA violated and continues to violate the automatic stay, specifically section 362(a)(3), by withholding the LBFP Receivable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.  On Count I, a judgment declaring that the Consent is invalid as *ultra vires*;

B.  Alternatively, on Count II, a judgment finding the Consent was an actual fraudulent transfer to or for the benefit of NIFA that is avoidable pursuant to section 548 of the Bankruptcy Code, and that pursuant to sections 550 and 551 of the Bankruptcy Code, LBFP is entitled to recover and preserve its property interest for the benefit of its estate;

C.  On Count III, a judgment finding that, by failing to act reasonably and in good faith in calculating the amounts owed under the Master Agreement, NIFA breached the Master Agreement, and that LBFP is, therefore, entitled to damages in an amount to be determined at trial but, in all events, no less than the sum equal to $12,770,182, plus the Accrued Interest;

D.  On Count IV, a judgment that NIFA breached the covenant of good faith and fair dealing under New York law and awarding damages by reason thereof in an amount to be determined at trial but, in all events, no less than the sum of $12,770,182, plus the Accrued Interest;

E. On Count V, a judgment that the LBFP Receivable is property of the LBFP estate under section 541 of the Bankruptcy Code and requiring NIFA to turn over, under section 542 of the Bankruptcy Code, the sum of $12,770,182, plus the Accrued Interest, as applicable;

F. On Count VI, a judgment finding NIFA violated the automatic stay provisions of the Bankruptcy Code; and

G. Any such other and further relief as the Court deems just and proper, including costs and attorneys' fees.

Respectfully submitted,

By: */s/ Ralph I. Miller*
Ralph I. Miller
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street NW, Suite 900
Washington, D.C. 20005-3314
Telephone: (202) 682-7000
Facsimile: (202) 857-0940

Scarlett E. Collings
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002-2755
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

*Attorney for Debtors and Debtors in Possession*

Dated:   New York, New York
         October 4, 2010