UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
:
In re:                                                            :         Chapter 11 Case No.
                                                                  :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                          :         08-13555 (JMP)
                                                                  :
                                          Debtors.                :         (Jointly Administered)
                                                                  :
-----------------------------------------------------------------x

## PARTIAL TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr.P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| **Jade Tree I, L.L.C.** | **JPMorgan Chase Bank, N.A.** |
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee should be sent:

    P.O. Box 6463
    New York, New York 10150
    E-mail: loans@jadetree.net
    Phone: N/A
    Last Four Digits of Acct #: N/A

With a copy to:
Esbin & Alter, LLP
497 South Main Street
New City, NY 10956
Attention: Scott L. Esbin
Phone: 845-634-7909
Facsimile: 845-634-4160
E-Mail: sesbin@esbinalter.com

Name and Address where transferee payments should be sent (if different from above): N/A

Court Claim # (if known): 66653
Amount of Claim: $264,000,000.00
Amount of Claim to be Transferred: $25,000,000.00
Date Claim Filed: May 20, 2010

Name and Address of Transferor:

JPMorgan Chase Bank, N.A.
Mail Code: NY1-A436
One Chase Manhattan Plaza – Floor 26
New York, New York 10005
ATTN: Susan McNamara

**\*\*PLEASE SEE ATTACHED DOCUMENTS\*\***

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____                    Date: October 4, 2010
    Transferee/Transferee's Agent
    Scott L. Esbin/Authorized Signatory

*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.*

**EXHIBIT B2**

**PARTIAL EVIDENCE OF TRANSFER OF CLAIM**

TO:  Clerk, United States Bankruptcy Court, Southern District of New York

AND TO:  JPMORGAN CHASE BANK, N.A.

JPMORGAN CHASE BANK, N.A., with offices located at Mail Code: NY1-A436, One Chase Manhattan Plaza, Floor 26, New York, New York 10005, ATTN: Susan McNamara ("Assignor"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and pursuant to the terms of a Partial Assignment of Claim Agreement dated as of the date hereof, does hereby certify that it has unconditionally and irrevocably sold, transferred and assigned to JADE TREE I, L.L.C., with an address of P.O. Box 6463, New York, New York 10150 ("Assignee"), all right, title and interest in and to the claim of Assignor against LEHMAN BROTHERS SPECIAL FINANCING INC. (originally owned by Harbinger Capital Partners Master Fund I, Ltd.) in the amount of $25,000,000, docketed as Claim No. 66653 (the "Transferred Claim"), in the case entitled *In re Lehman Brothers Holdings Inc., et al.*, Chapter 11 Case No. 08-13555 (Jointly Administered) (JMP), pending in the United States Bankruptcy Court, Southern District of New York.

Assignor hereby waives any notice or hearing requirements imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, and stipulates that an order may be entered recognizing this transfer and sale of the Transferred Claim as an unconditional assignment and sale and Assignee herein as the valid owner of the Transferred Claim.  You are hereby requested to make all future payments and distributions, and to give all notices and other communications, in respect to the Transferred Claim to Assignee.

IN WITNESS WHEREOF, dated as of the 4 day of October, 2010.

ASSIGNOR:

JPMORGAN CHASE BANK, N.A.

By: _____
(Signature of authorized corporate officer)

Name: _____David A. Martinez_____

Title: _____Authorized Signatory_____

ASSIGNEE:

JADE TREE I, L.L.C.

By: _____

Name:  Scott L. Esbin

Title:   Authorized Signatory

| United States Bankruptcy Court/Southern District of New York | | **PROOF OF CLAIM** |
| --- | --- | --- |
| Lehman Brothers Holdings Claims Processing Center c/o Epiq Bankruptcy Solutions, LLC FDR Station, P.O. Box 5076 New York, NY 10150-5076 | | |

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) | Unique Identification Number: 888020050 |
| --- | --- | --- |
| Name of Debtor Against Which Claim is Held Lehman Brothers Special Financing Inc. | Case No. of Debtor: 08-13888 | Filed: USBC - Southern District of New York Lehman Brothers Holdings Inc., Et Al. 08-13555 (JMP)        0000066653 |

NOTE: This form should not be used to make a claim for an administrative expense arising *after* the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities. (See definition on reverse side.)

| Name and address of Creditor: (and name and address where notices should be sent if different from Creditor) | ☒ Check this box to indicate that this claim amends a previously filed claim. |
| --- | --- |
| Harbinger Capital Partners Master Fund I, Ltd. c/o Harbinger Capital Partners LLC 450 Park Avenue, 30th Floor New York, New York 10022 Attention: Corrine Glass  Telephone number: 212-339-5134    Email Address: cglass@harbingercapital.com | **Court Claim Number:** 0000014213 (*If known*)  Filed on: September 16, 2009 |
| Name and address where payment should be sent (if different from above)    Telephone number:        Email Address: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.  ☐ Check this box if you are the debtor or trustee in this case. |

**1.   Amount of Claim:** (I) $264,000,000.00 Termination and Settlement Agreement Claim -- See Appendix; and
(II) unliquidated Cross Margining and Netting Agreement Claim – See Appendix

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete Item 5.

If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☒ Check this box if all or part of your claim is based on a Derivative Contract.*

☐ Check this box if all or part of your claim is based on a Guarantee.*

***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

**2.   Basis for Claim:** Derivative Contract and Cross Margining and Netting Agreement – See Appendix
(See instruction #2 on reverse side.)

**3.   Last four digits of any number by which creditor identifies debtor:** _____
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4.   Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:    ☐ Real Estate    ☐ Motor Vehicle    ☐ Other

Describe: _____

Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____

Amount of Secured Claim: $_____ Amount Unsecured: $_____

**5.   Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

**Amount entitled to priority:**
$_____

**6.   Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

**7.   Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.   Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (*See definition of "redacted" on reverse side.*) If the documents are voluminous, attach a summary.
**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**
If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED / RECEIVED
MAY 2 0 2010
EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: May 19, 2010 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.    Ian Estus, VP    By: Harbinger Capital Partners LLC, its investment manager | |
| --- | --- | --- |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

### Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**

Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).** If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9).**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity owed a debt by the debtor that arose on or before the date of the bankruptcy filing. See 11 U.S.C. §101 (10)

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150-5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket com as of July 27, 2009.

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claim Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

A/73377595.2

### Appendix

This <u>amended</u> Proof of Claim (this "**Claim**") is filed by Harbinger Capital Partners Master Fund I, Ltd., formerly known as Harbert Distressed Investment Master Fund, Ltd. ("**Claimant**") against Lehman Brothers Special Financing Inc. (the "**Debtor**"), and amends the Proof of Claim (Court Claim Number: 0000014213) filed by Claimant against the Debtor on September 16, 2009.

This Claim has two components, as described in detail below: (I) a $264,000,000.00 <u>allowed</u>, general unsecured claim based on a Termination and Settlement Agreement dated as of May 10, 2010 (the "**Termination and Settlement Agreement**") by and between Claimant, the Debtor and Lehman Brothers Holdings Inc.; and (II) an <u>unliquidated</u> claim based on the Cross Margining and Netting Agreement (as defined below).

### I.    Allowed Claim Arising from the Termination and Settlement Agreement

Pursuant to the Termination and Settlement Agreement, Claimant holds an <u>allowed</u>, general unsecured claim against the Debtor in the amount of $264,000,000.00.

Claimant incorporates herein by reference the amended Derivative Questionnaire that will be submitted by Claimant in connection with this claim, which will include a copy of the Termination and Settlement Agreement.

**Amount: $264,000,000.00**

### II.    Claim Arising from the Cross Margining and Netting Agreement

Pursuant to that certain Cross Margining and Netting Agreement dated as of December 18, 2007 (the "**Cross Margining and Netting Agreement**," attached to this Claim as **Exhibit A**) by and among Claimant, the Debtor, Lehman Brothers International (Europe) ("**LBIE**"), and Lehman Brothers Inc. ("**LBI**," and, together with the Debtor and LBIE, the "**Lehman Entities**"), the Lehman Entities were permitted to transfer collateral posted by Claimant between accounts at the various Lehman Entities based on applicable margin requirements, and the Lehman Entities agreed that Securities and Cash Collateral (each as defined therein) would be treated by each Lehman Entity as "financial assets" under Article 8 of the Uniform Commercial Code as in effect in the State of New York. LBIE is currently in possession of Claimant's Securities and Cash Collateral, which LBIE failed to deliver to Claimant upon Claimant's instructions, thereby violating LBIE's Article 8 responsibilities. The Debtor is liable to Claimant for losses incurred because of LBIE's failure to treat Securities and Cash Collateral as "financial assets" and, accordingly, to comply with its Article 8 duties. The Debtor is liable to Claimant for (a) the value of the Securities and Cash Collateral held by LBIE, less the amount of any margin loans extended pursuant to the documents referenced in the Cross Margining and Netting Agreement, which are available upon request; plus (b) applicable interest; and (c) legal fees and out-of-pocket expenses incurred by Claimant by reason of pursuit of recovery of Claimant's Securities and Cash Collateral under the Cross Margining and Netting Agreement and the documents referenced therein. The aggregate amount of this claim is as yet unknown.

**Amount: Unliquidated; to be determined**

### Reservation of Rights as to Claim (II) Above

Claimant reserves its right to amend and/or supplement this Claim for the purposes and to the extent permitted by applicable law.

Claimant reserves all of its rights and defenses, whether under title 11 of the United States Code or other applicable law, as to any claims that may be asserted against Claimant by the Debtor, including, without limitation, any rights of setoff and/or recoupment not expressly asserted above. Claimant further reserves all of its rights as against (a) the other debtors in these chapter 11 proceedings; (b) LBIE; and (c) LBI.

A/73377595.2

Claimant further reserves all rights accruing to it, and the filing of this Claim is not and shall not be deemed or construed as (i) a waiver, release, or limitation of Claimant's rights against any person, entity, or property (including, without limitation, the Debtor or any other person or entity that is or may become a debtor in a case pending in this Court); (ii) a consent by Claimant to the jurisdiction or venue of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (iii) a waiver, release, or limitation of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the U.S. Constitution; (iv) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (v) a waiver, release, or limitation of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a U.S. District Court Judge; (vi) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving Claimant; (vii) an election of remedies; or (viii) a consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

4

## **EXHIBIT A**

Cross Margining and Netting Agreement, dated as of December 18, 2007, by and among Harbinger Capital Partners Master Fund I, Ltd., Lehman Brothers International (Europe), Lehman Brothers Inc. and Lehman Brothers Special Financing Inc.

December 18, 2007
Execution Version

RBM CMNA

## Cross Margining and Netting Agreement

Cross Margining and Netting Agreement ("CMN Agreement") dated as of December 18, 2007, by and among Harbinger Capital Partners Master Fund I, Ltd. ("Counterparty"), Lehman Brothers International (Europe) ("LBIE"), Lehman Brothers Inc. ("LBI") and Lehman Brothers Special Financing Inc. ("LBSF"). LBIE, LBI and LBSF are hereinafter referred to collectively as the "Lehman Brothers Entities" and each as a "Lehman Brothers Entity".

### WITNESSETH:

WHEREAS, the Lehman Brothers Entities have made, and may from time to time make, extensions of credit to Counterparty pursuant to Base Contracts that the Lehman Brothers Entities have entered into, or may from time to time enter into, with Counterparty;

WHEREAS, Counterparty has requested the Lehman Brothers Entities to enter into this CMN Agreement in order to reduce its operational expense in respect of the Base Contracts; and

WHEREAS, the Lehman Brothers Entities wish to reduce their collective risk in respect of Counterparty.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Definitions.

Capitalized terms used in this CMN Agreement and not otherwise defined herein shall have the meanings ascribed thereto in Exhibit I.

2.    Margin Requirements; Excesses and Deficits.

2.1: *Calculation of Margin Requirement.* By the Margin Notification Deadline on each Business Day, one or more Lehman Brothers Entities shall (i) determine the Basic Margin Requirement for each Base Contract, (ii) determine the Additional Margin Requirement for all of the Base Contracts, and (iii) determine the Margin Requirement for each Base Contract by allocating the Additional Margin Requirement between the Base Contracts as they shall determine in their sole discretion. For the avoidance of doubt, it is the intention of the parties that, for so long as this CMN Agreement is in effect, separate margin calls will not be issued under this CMN Agreement and the Base Contracts.

1

2.2. *Transfer of Margin Requirement.* Subject to Sections 2.3 and 2.4, (i) to the extent that the Margin Requirement determined in respect of any Base Contract pursuant to Section 2.1 is due to a Lehman Brothers Entity from Counterparty, Counterparty shall Transfer Eligible Credit Support with a Value equal to that Margin Requirement to that Lehman Brothers Entity and (ii) to the extent that the Margin Requirement so determined in respect of any Base Contract is due to Counterparty from a Lehman Brothers Entity, that Lehman Brothers Entity shall Transfer Eligible Credit Support with a Value equal to that Margin Requirement to Counterparty.

2.3. *Application of Excesses to Deficits.* If Eligible Credit Support is due from one or more Lehman Brothers Entities to Counterparty pursuant to Section 2.2 in respect of any Base Contract (that Base Contract being "in Excess") at the same time that Eligible Credit Support is due from Counterparty to one or more Lehman Brothers Entities in respect of any other Base Contract (that Base Contract being "in Deficit"), each Lehman Brothers Entity that is a party to a Base Contract in Excess (each such Lehman Brothers Entity, a "**Lehman Brothers Transferor**") shall, subject to Section 4.2, Transfer on behalf of Counterparty Eligible Credit Support otherwise due to Counterparty to one or more Lehman Brothers Entities party to a Base Contract in Deficit (each such Lehman Brothers Entity, a "**Lehman Brothers Transferee**") to reduce the amount such Base Contract is in Deficit, until such Base Contract in Excess is no longer in Excess or there are no more Base Contracts in Deficit; provided, however, that if the Lehman Brothers Transferor does not Transfer Eligible Credit Support pursuant to this Section 2.3, the Lehman Brothers Transferor shall not be in breach of this Section 2.3 or Section 2.2 but Counterparty shall be relieved of its obligations to Transfer Eligible Credit Support to the Lehman Brothers Transferees to the extent (but only to the extent) of the amount of such Eligible Credit Support not Transferred by the Lehman Brothers Transferor. Eligible Credit Support to be Transferred by the Lehman Brothers Transferors shall be allocated among the Lehman Brothers Transferees as they agree.

2.4. *Transfer of Remaining Excesses.* Subject to Section 5.8 hereof, to the extent that a Base Contract remains in Excess after the Transfers set forth in Section 2.3 (a "**Remaining Excess**"), upon receipt of a written request from Counterparty, the relevant Lehman Brothers Transferor shall Transfer to Counterparty Eligible Credit Support the Value of which does not exceed such Remaining Excess.

2.5. *Manner of Delivery and Holding Transferred Credit Support.* Eligible Credit Support Transferred by a Lehman Brothers Entity to Counterparty or by Counterparty (or by a Lehman Brothers Entity on Counterparty's behalf) to a Lehman Brothers Entity pursuant to this Section 2 in respect of any Base Contract shall be delivered and held subject to the terms on which Eligible Credit Support is required to be Transferred and, if applicable, held under that Base Contract, whether such Eligible Credit Support is Transferred to fulfill a Basic Margin Requirement or the portion of the Additional Margin Requirement allocated to that Base Contract.

3.    Timing of Transfers.

3.1. *Transfers by the Lehman Brothers Entities.* Any Transfer that is required to be made pursuant to Section 2.4 shall be made by the Transfer Deadline on the Business

2

Day a written request is received by the relevant Lehman Brothers Entity unless such request is received after 2:00 p.m., in which case such Lehman Brothers Entity shall make such Transfer by the Transfer Deadline on the following Business Day.

3.2. *Transfers by Counterparty.* By the Margin Notification Deadline on each Business Day, a Lehman Brothers Entity shall, by a single notice, notify Counterparty of the aggregate amount of Eligible Credit Support required to be Transferred by Counterparty in respect of the Margin Requirements (after taking account of any Transfers that have been or will be made by the Lehman Brothers Entities on Counterparty's behalf as set forth in Section 2.3). By the Transfer Deadline on each Business Day, Counterparty shall make all Transfers required to be made pursuant to such notice, unless such notice is sent after the Margin Notification Deadline, in which case Counterparty shall make all Transfers required to be made pursuant to such notice by the Transfer Deadline on the following Business Day.

4.     Allocation of Credit Support; Netting of Transfers; Cash Transfers; Regulatory Requirements; U.S. Dollar Equivalent.

4.1. *Allocation of Credit Support.* To the extent that any Transfer from one Lehman Brothers Entity to another takes place or is deemed to take place pursuant to Section 2.3, this Section 4.1 or Section 4.2, the Transfer shall be deemed to satisfy (in whole or, as the case may be, in part) the obligation pursuant to Section 2.2 of the Lehman Brothers Transferor to Transfer the relevant Eligible Credit Support to Counterparty and Counterparty's obligation to Transfer the relevant Eligible Credit Support to the Lehman Brothers Transferee. Accordingly, any such Transfer or deemed Transfer shall be deemed to constitute the Transfer of Credit Support from the Lehman Brothers Transferor to Counterparty and the Transfer of Credit Support from Counterparty to the Lehman Brothers Transferee as a return of, or an addition to, Credit Support pursuant to the terms of a Base Contract, or as a repricing of a Base Contract, as determined by the Lehman Brothers Transferor or the Lehman Brothers Transferee, as applicable, in its sole discretion pursuant to the terms of the Base Contract in Excess or in Deficit, as applicable. Without prejudice to Section 2.2, which Lehman Brothers Entity will act as Lehman Brothers Transferor or Lehman Brothers Transferee shall be determined by the Lehman Brothers Entities in their sole discretion, except that where a Transfer is necessary for any Regulatory Requirements to be satisfied, the Transfer shall first be effected in such a way as to satisfy those Regulatory Requirements.

4.2. *Optional Netting.* If Counterparty and any Lehman Brothers Entity would otherwise be required pursuant to one or more Base Contracts to Transfer on the same day Credit Support, payments or deliveries to or among one another in the same currency or in the same type of non-cash asset, one or more Lehman Brothers Entities may, at their option, calculate the netting of any or all such Transfers so that fewer Transfers need be made. One or more Lehman Brothers Entities shall determine whether and the extent to which any such netting results in a deemed Transfer from a Lehman Brothers Entity to Counterparty and from Counterparty (acting through a Lehman Brothers Entity or Entities on its behalf) to a Lehman Brothers Entity, the nature of such Transfer, and the allocation of such Transfer to one or more Base Contracts pursuant to Section 4.1.

3

[New York #931306 v34]

**4.3.** *Reallocation of Credit Support and Collateral.* One or more Lehman Brothers Entities may, at any time and to satisfy or secure one or more Obligations of any Lehman Brothers Affiliate to Counterparty or Counterparty to any Lehman Brothers Affiliate, or to reallocate any Credit Support from a Base Contract with one Lehman Brothers Entity to another Base Contract with another Lehman Brothers Entity, elect to Transfer, cause to be Transferred, or allocate Credit Support, Collateral or payments to one or more Lehman Brothers Affiliates or to itself (the "Transferee"). Any such Transfer shall be deemed to constitute (a) the Transfer to Counterparty of Credit Support from the Lehman Brothers Entity to which such Credit Support had been allocated and (b) the Transfer of Credit Support from Counterparty to the Transferee pursuant to the terms of any Base Contract or other arrangement between Counterparty and the Transferee and (where applicable) this Agreement. Any Transfer by a Lehman Brothers Affiliate of a payment otherwise due from a Lehman Brothers Entity to Counterparty to a Lehman Brothers Entity shall be considered to be a collection by such other Lehman Brothers Entity on Receivables Collateral.

**4.4.** *Cash Transfers.* Notwithstanding anything to the contrary in any Base Contract, if a Lehman Brothers Entity has been Transferred non-cash Credit Support under a Base Contract and such Lehman Brothers Entity is required pursuant to Section 2 to Transfer Eligible Credit Support in respect of such Base Contract to Counterparty, such Lehman Brothers Entity may satisfy such Obligation by Transferring cash, even if such Base Contract does not provide for repricing. In such a case, such Lehman Brothers Entity shall be deemed to have Transferred such cash as Eligible Credit Support to Counterparty under such Base Contract and to have retained the non-cash Eligible Credit Support as Eligible Credit Support under such Base Contract.

**4.5.** *Regulatory Requirements.* Notwithstanding anything to the contrary herein, all actions of each party hereto, and all calculations hereunder, are subject to all Regulatory Requirements. Without limiting the foregoing, no Transfer of Credit Support or payment (including by means of netting) shall be made or required if such Transfer would violate any Regulatory Requirement, and any Lehman Brothers Entity shall have the right to require any Transfer of Credit Support from Counterparty at any time in order to satisfy any Regulatory Requirement. Notwithstanding anything to the contrary herein, no Lehman Brothers Entity shall be required under any provision of this Agreement to take any action to satisfy a Regulatory Requirement applicable to Counterparty if, after taking such action, any Regulatory Requirement applicable to any Lehman Brothers Entity would fail to be satisfied.

**4.6** *U.S. Dollar Equivalents.* All Basic Margin Requirements and Additional Margin Requirements in currencies other than U.S. Dollars shall be converted into and expressed in their U.S. Dollar Equivalents, unless otherwise determined by one or more Lehman Brothers Entities in their sole discretion.

**4.7** *Interest.* (a) In the event there is no other agreement that provides for interest to be paid upon cash Credit Support Transferred by a Lehman Brothers Entity to Counterparty in respect of a Base Contract, Counterparty shall pay interest upon any cash Credit Support Transferred by a Lehman Brothers Entity in respect of such Base Contract

[New York #93J306 v34]

4

at the Applicable Rate from (and including) the date such cash Credit Support is Transferred to (but excluding) the date on which such cash Credit Support is returned.

(b) In the event there is no other agreement that provides for interest to be paid upon cash Credit Support Transferred by Counterparty to a Lehman Brothers Entity in respect of a Base Contract, Lehman shall pay interest upon any cash Credit Support Transferred by Counterparty in respect of such Base Contract at the customary rate for such market.

5.    Remedies upon Close-out Event.

5.1. *Close-out.* Upon the occurrence and during the continuance of any Close-out Event, each Lehman Brothers Entity shall be entitled at any time and from time to time, without prior notice, to cause the Close-out of any or all Base Contracts, determine related Settlement Amounts, and take such other actions as may be permitted or provided for under any of the Base Contracts (but without regard to any cure periods, notice requirements, dispute resolution provisions or other timing requirements specified in any such Base Contract) or Applicable Law; provided, however, that no Lehman Brothers Entity may exercise any rights or remedies hereunder with respect to a Close-out Event (and such Close-out Event shall be waived) if Counterparty has given written notice to the Lehman Brothers Entities specifying the occurrence of such Close-out Event and a Lehman Brothers Entity has not commenced exercising such rights or remedies within forty-five (45) days after the Lehman Brothers Entities have received such written notice from Counterparty (such 45 day period to be extended to the extent a grace period applies to such Close-out Event). Subject to Section 5.2, upon Close-out of any Base Contract, the Settlement Amount for such Base Contract shall be due.

5.2. *Other Remedies upon Close-out Event.* Upon the occurrence of any Close-out Event, each Lehman Brothers Entity shall have the right to net the U.S. Dollar Equivalents of the Settlement Amounts due from it to Counterparty and from Counterparty to such Lehman Brothers Entity under all Base Contracts between Counterparty and such Lehman Brothers Entity, so that a single settlement payment (the "Net Settlement Payment") shall be payable by or to Counterparty and such Lehman Brothers Entity, which Net Settlement Payment shall be immediately due and payable (subject to the other provisions hereof, to the provisions of any Base Contract, except as modified hereby, or Applicable Law granting a Lehman Brothers Entity rights relating to collateral, setoff, netting and recoupment). Each Lehman Brothers Entity shall also be entitled to:

(a) exercise all rights and remedies of a secured party under the UCC in respect of the Collateral;

(b) retain, liquidate, apply, collect on and set off any or all Collateral delivered under any Contract against any Net Settlement Payment or other Obligation owed to it or any other Lehman Brothers Entity under any Contract;

(c) set off and net any Net Settlement Payment or other Obligation owed by it or any other Lehman Brothers Entity under any Contract against (i) any Credit

5

[New York #931506 v34]

Support pledged to Counterparty by any Lehman Brothers Entity under any Contract and (ii) any Net Settlement Payment or other Obligation owed by Counterparty to it or any other Lehman Brothers Entity; and

(d) exercise any other remedies provided under this CMN Agreement or Applicable Law.

**5.3.** *Interest.* Interest shall be payable on each Net Settlement Payment (or any other amount) owed to a Lehman Brothers Entity by Counterparty, after taking into account the provisions herein in relation to collateral, setoff, netting and recoupment, at the Applicable Default Rate, as determined by the Lehman Brothers Entity to which such Net Settlement Payment is owed, from (and including) the date such Net Settlement Payment (or any other amount) is due to (but excluding) the date that such Net Settlement Payment (or any other amount) is paid or otherwise satisfied.

**5.4.** *Priorities.* Unless otherwise agreed by the relevant Lehman Brothers Entities, the exercise of remedies under this Section 5 shall be subject in all events to the priority of security interests as set forth in Section 6 hereof, the relative rights of a First Priority Lehman Brothers Entity and of the Second Priority Lehman Brothers Entities, and the setoff, recoupment and other rights of a Lehman Brothers Entity party to a Base Contract that is Receivables Collateral being prior to the security interest of the Lehman Brothers Entities in such Receivables Collateral.

**5.5.** *Collection and Similar Rights.* In the event any Obligation of Counterparty to a Lehman Brothers Affiliate is satisfied by application of Credit Support or Collateral held by or transferred to another Lehman Brothers Affiliate or by any offset or netting of an Obligation to Counterparty from another Lehman Brothers Affiliate, such other Lehman Brothers Affiliate shall immediately Transfer to such Lehman Brothers Affiliate the amount so applied or netted. If a Lehman Brothers Entity exercises its rights against Receivables Collateral by collecting on such Receivables Collateral from another Lehman Brothers Entity that is the account debtor thereon, such other Lehman Brothers Entity shall immediately Transfer to such Lehman Brothers Entity the amount to be collected thereunder.

**5.6.** *No Discharge.* Counterparty's Obligations to the Lehman Brothers Entities shall not be discharged by the exercise of any remedy set forth in any Contract or otherwise except to the extent the exercise of such remedies is final and complete and has not been objected to by any person or entity prior to the expiration of all applicable statutes of limitations.

**5.7.** *Stays.* If the exercise of any right pursuant to this Section 5 shall be avoided or set aside by a court or shall be restrained, stayed or enjoined under Applicable Law, then the Obligations in respect thereof shall be reinstated, or in the event of restraint, stay or injunction, preserved in the amounts (including any interest thereon) as of the date of restraint, stay or injunction between the applicable Lehman Brothers Entities, on the one hand, and Counterparty, on the other, until such time as such restraint or injunction shall no longer prohibit exercise of such right.

6

[New York #931306 v34]

5.8. *No Transfers.* No Lehman Brothers Entity shall be required to Transfer any Credit Support or any other amounts hereunder to Counterparty (including for Transfer by Counterparty to any Lehman Brothers Entity) if a Close-out Event, or an event that with the passage of time or the giving of notice, or both, would become a Close-out Event, has occurred with respect to Counterparty, or if such Transfer would cause a Base Contract to be in Deficit.

5.9. *Order of Remedies.* Subject to Section 6.2, in exercising any remedies under any Contract or otherwise, each Lehman Brothers Entity shall be entitled to exercise such remedies, with respect to such of the Obligations, and in such order, as it determines in its sole discretion.

6.    Collateral.

6.1. *Grant of Security Interest.* Without prejudice to any prior security interest granted in favor of any Lehman Brothers Entity, Counterparty hereby grants to each Lehman Brothers Entity a security interest in and assigns by way of security, all Collateral, to secure all of Counterparty's Obligations to such Lehman Brothers Entity.

6.2. *Priority; Waiver*

6.2.1. All Securities and Cash Collateral pledged by Counterparty in connection with a particular Base Contract shall secure first Counterparty's Obligations under that Base Contract and second, Counterparty's Obligations under all other Base Contracts and this CMN Agreement. Each Lehman Brothers Entity that does not have a first lien on any Securities and Cash Collateral (with respect to such Securities and Cash Collateral, a "**Second Priority Lehman Brothers Entity**") shall take no action in respect of such Securities and Cash Collateral without the consent of the Lehman Brothers Entity having a first lien on such Securities and Cash Collateral (with respect to such Securities and Cash Collateral, the "**First Priority Lehman Brothers Entity**"), and the First Priority Lehman Brothers Entity shall be entitled to exercise all remedies in respect thereof (without being required to consult with any Second Priority Lehman Brothers Entity except to the extent required by Applicable Law, and each Second Priority Lehman Brothers Entity hereby waives any right to be so consulted to the extent permitted by Applicable Law). Each Second Priority Lehman Brothers Entity agrees that its security interest is subject and subordinate to any interest in such Securities and Cash Collateral in favor of any derivatives clearing organization, contract market or futures commission merchant in respect of any futures or commodity option position of Counterparty that is subject to regulation under the Commodity Exchange Act, and in no event will such Second Priority Lehman Brothers Entity have any right to exercise any remedies in respect of such Securities and Cash Collateral until such time as all Obligations with respect to the First Priority Lehman Brothers Entity and any related obligations to any such derivatives clearing organization, contract market or futures commission merchant have been satisfied in full. Each Second Priority Lehman Brothers Entity acknowledges that Counterparty's rights in such Securities and Cash

Collateral, and such Lehman Brothers Entity's lien thereon, are subject to the insolvency of the First Priority Lehman Brothers Entity, including the customer property allocation rules under the applicable securities and commodities laws.

6.2.2.    All Receivables Collateral (and all Securities and Cash Collateral delivered but not yet allocated to a particular Base Contract) shall secure all Obligations under all Base Contracts without preference or priority, and all Lehman Brothers Entities shall be entitled to take such actions as they determine in their sole discretion in respect of any foreclosure or other application of, or collection on, any such Securities and Cash Collateral and Receivables Collateral, including, without limitation, the priority of each Lehman Brothers Entity's rights in the proceeds of any such foreclosure, application or collection. Any conflicting claims to Securities and Cash Collateral and Receivables Collateral between the Lehman Brothers Entities shall be resolved as the Lehman Brothers Entities shall agree. The setoff, recoupment and other rights of each Lehman Brothers Entity with respect to a Base Contract to which such Lehman Brothers Entity is a party are prior to any other rights in respect of that Base Contract that constitute Receivables Collateral.

6.2.3.    Counterparty waives any right it may have of first requiring any Lehman Brothers Entity to proceed against or claim payment from any other person or enforce any guarantee or security before enforcing its rights against the Collateral.

**6.3. Control; Notification of Security Interest; Further Assurances.**

6.3.1.    Counterparty and each Lehman Brothers Entity acknowledge and agree that any Securities and Cash Collateral held by a Lehman Brothers Entity shall be held by such Lehman Brothers Entity for itself as secured party and also as agent, representative and bailee for each other Lehman Brothers Entity and, as such, each Lehman Brothers Entity shall, subject to Section 6.2, comply with any entitlement orders or other instructions or directions originated by such other Lehman Brothers Entity with respect to the Securities and Cash Collateral without any further consent of Counterparty. Each Lehman Brothers Entity and Counterparty further agree that, subject to Section 6.2.1., with respect to any commodity contracts carried in an account maintained on the books of any Lehman Brothers Entity, each such Lehman Brothers Entity shall apply any value distributed on account of any commodity contract carried in any such account as directed by any other Lehman Brothers Entity without further consent by Counterparty. Each Lehman Brothers Entity and Counterparty agree that all Securities and Cash Collateral credited to any securities account maintained on the books of any Lehman Brothers Entity shall be treated as a financial asset for purposes of the UCC. For purposes of Articles 8 and 9 of the UCC, to the extent that Counterparty has any control with respect to any Collateral, upon the occurrence of a Close-out Event, Counterparty shall no longer have any control over such Collateral. For purposes of Articles 8 and 9 of the UCC, to the extent that Counterparty has any right to originate entitlement orders or other instructions or directions with respect to any Securities and Cash Collateral or any

8

[New York #951308 v34]

commodity contracts, Counterparty shall no longer have any such right upon the occurrence of a Close-out Event.

6.3.2.  Each Lehman Brothers Entity hereby notifies each other Lehman Brothers Entity of its security interest and assignment by way of security under Section 6.1, each Lehman Brothers Entity acknowledges such notice from each other Lehman Brothers Entity and each Lehman Brothers Entity consents to the security interest and assignment by way of security. Counterparty and each Lehman Brothers Entity agree that Counterparty's grant of the security interest and assignment by way of security under Section 6.1 shall not be a breach of any restriction on assignment in this CMN Agreement or any Base Contract or otherwise.

6.3.3.  Counterparty agrees that at any time and from time to time, at the expense of Counterparty, it will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that any Lehman Brothers Entity may request, in order to perfect and protect each grant of a security interest and assignment by way of security under Section 6.1 or to enable any Lehman Brothers Entity to exercise or enforce its rights and remedies hereunder with respect to the Collateral or any part thereof (including, without limitation, the filing of any UCC financing statements, whether initial filings, amendments or continuations deemed necessary or appropriate by any Lehman Brothers Entity).

6.3.4.  Counterparty hereby irrevocably grants each Lehman Brothers Entity a power of attorney, with full authority to act in the place and stead of Counterparty, under a power coupled with an interest, and in the name of Counterparty or otherwise, from time to time in such Lehman Brothers Entity's discretion to take any action and to execute any instrument which such Lehman Brothers Entity may deem necessary or advisable to accomplish the purposes of this CMN Agreement or to effectuate each grant of a security interest and assignment by way of security under Section 6.1. Each Lehman Brothers Entity is authorized, without limitation, to prepare and file UCC financing statements, whether initial filings, amendments or continuations, with respect to the Collateral, at Counterparty's expense.

6.3.5.  Without at least 90 days' prior written notice to each Lehman Brothers Entity, Counterparty shall not change its name, type of organization or jurisdiction of organization (or the organizational identification number, if any, issued by such jurisdiction to Counterparty), its place of business, or if it has more than one place of business, its chief place of business and chief executive office, each as set forth in Schedule III hereto, or otherwise change its form.

6.4. *Characterization.*  It is the parties' intention that Title Transfer Credit Support characterized as such under the terms of a Base Contract shall continue to be characterized as such.

9

[New York #931306 v34]

7.    Non-Exclusive.

     Each Lehman Brothers Entity's rights under this CMN Agreement (including in respect of the Basic and Additional Margin Requirements and remedies upon a Close-out Event) are in addition to, and not in limitation or exclusion of, any other rights which it may have (whether under the Base Contracts, any other agreement, by operation of law or otherwise), and nothing herein shall prevent any Lehman Brothers Entity from exercising any right such party may have under any Base Contract, Applicable Law or otherwise to cause the termination, liquidation or acceleration of any Base Contract or exercising any right under any security or credit support arrangement relating to any Base Contract, any right to net or set off payments which may arise under any Base Contract, under Applicable Law or otherwise, or any other right or remedy of such party. The provisions of this CMN Agreement shall supersede any provisions contained in any of the Base Contracts (i) that are inconsistent with the terms of this CMN Agreement or (ii) that would otherwise limit the rights and remedies given to the Lehman Brothers Entities herein, including without limitation any provisions relating to the valuation of Credit Support, the delivery of Credit Support, the amount and nature of Credit Support required to be Transferred, the delivery of notices, the timing of notices, Credit Support deliveries or Close-out and dispute resolution procedures relating to Credit Support or Close-out. All determinations and calculations by a Lehman Brothers Entity of any amounts hereunder or under any Base Contract, including the Basic Margin Requirement for each Base Contract and the Additional Margin Requirement, shall be conclusive absent manifest error. Each Base Contract is hereby incorporated into this CMN Agreement, and this CMN Agreement is hereby incorporated into each Base Contract; and any transfer (including any pledge) hereunder or under any Base Contract shall be a transfer "under" and "in connection with" each Base Contract.

8.    Representations and Warranties.

     8.1.   *Representations and Warranties of each Party.*   Each party hereto represents and warrants, and shall be deemed to represent and warrant as of the date hereof and as of the time it enters into any Base Contract, to each of the other parties hereto as follows:

     (a)    it has full power and authority to execute and deliver this CMN Agreement, to enter into such Base Contract and to perform its obligations hereunder and thereunder and has taken all necessary action to authorize such execution, delivery and performance;

     (b)    it has entered into or, as the case may be, will enter into the Contracts as principal;

     (c)    the person signing this CMN Agreement on its behalf is, and any person representing it in entering into a Base Contract is, duly authorized to do so on its behalf;

     (d)    it has obtained all authorizations of any governmental or regulatory body required in connection with the Contracts and such authorizations are in full force and effect;

10

[New York #731306 v34]

(e)    the execution, delivery and performance of this CMN Agreement, and any Base Contract either have been or will be, prior to entering into each Base Contract, duly authorized by all necessary corporate action and do not and will not violate any law, ordinance, charter, by-law, or rule applicable to it or any transactional restriction or agreement binding on or affecting such party or any of its assets; and

(f)    this CMN Agreement has been, and any Base Contract has been or will be at the time it is entered into, duly and properly executed and delivered by such party and constitutes and will constitute the legal, valid and binding obligation of such party enforceable in accordance with its terms, except as the enforcement of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect relating to creditors' rights, and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

8.2.  *Additional Counterparty Representations.*  Counterparty represents and warrants, and shall be deemed to represent and warrant as of the date hereof, as of the time it enters into any Base Contract and as of the time it pledges any Collateral or transfers any Credit Support thereunder or hereunder, to each of the Lehman Brothers Entities as follows:

(a)    the Lehman Brothers Entities have a valid, perfected and enforceable security interest in, all Collateral that is, or that is expressed to be, pledged by Counterparty to a Lehman Brothers Entity;

(b)    it is the sole owner of or otherwise has the right to Transfer any Credit Support it transfers to a Lehman Brothers Entity under the relevant Base Contract free and clear of any security interest, lien, encumbrance or other restriction (other than a lien routinely imposed on all securities in a relevant clearance system);

(c)    each transfer made or obligation incurred pursuant to each Base Contract (i) is being made without intent to hinder, delay, or defraud any entity to which it is or will become, on or after the date that such transfer is made or such obligation is incurred, indebted, (ii) is being made in exchange for reasonably equivalent value and (iii) will not cause it to become insolvent;

(d)    it is not engaged in business or a transaction, or is about to engage in business or a transaction, for which its remaining property is an unreasonably small capital;

(e)    it is not insolvent or unable to pay its debts within the meaning of Applicable Law and is not unable to pay its debts as they mature and it is paying and it anticipates for the foreseeable future that it will continue to pay, its debts as they mature;

(f)    except for security interests or other encumbrances created by the Base Contracts or hereunder in favor of the Lehman Brothers Entities, no person has or will have any right, title, claim or interest (by way of lien, mortgage, pledge, charge,

11

security interest or other encumbrance, or otherwise) in, against, or to the Collateral or Credit Support;

(g)    no pledge of Collateral or delivery of Credit Support violates any agreement by which it is bound;

(h)    it has and will materially benefit from executing and delivering this CMN Agreement and from entering into the Base Contracts;

(i)    it has entered into, is entering into and will enter into the Contracts in good faith and for the purpose of carrying on its business and there are reasonable grounds for believing that entering into the Contracts will benefit it;

(j)    Counterparty's exact legal name, type of organization and jurisdiction of organization (together with the organizational identification number, if any issued by such jurisdiction to Counterparty), its place of business, or if it has more than one place of business, its chief place of business and chief executive office, at the date of this Agreement and for the four months immediately preceding the date of this Agreement are as set forth in Schedule III; and

(k)    Counterparty is a "financial institution" as defined in and pursuant to FDICIA.

8.3.    *Acknowledgements.*

8.3.1.    Counterparty recognizes that the Lehman Brothers Entities, in allocating Credit Support, in exercising remedies upon a Close-out Event, or in taking any other action contemplated hereby, will be attempting, but will be under no obligation to Counterparty, to minimize the Lehman Brothers Entities' economic risks in connection with the Base Contracts and otherwise and the impact to the Lehman Brothers Entities of any insolvency or bankruptcy of Counterparty, (including, without limitation, application of any safe harbor provisions for financial contracts under the Bankruptcy Code).

8.3.2.    Each party recognizes that there are no third-party beneficiaries of this CMN Agreement other than the Lehman Brothers Affiliates. Counterparty hereby acknowledges that Lehman Brothers Affiliates are intended to be third party beneficiaries of this CMN Agreement.

8.3.3    Each Party intends that (i) each transfer of Collateral and Credit Support and each payment to be made under any Contract is a "margin payment", "settlement payment", and "transfer" within the meaning of Sections 362, 546 and 548 of Title 11 of the Bankruptcy Code; (ii) each obligation under any Contract is an obligation to make a "margin payment", "settlement payment" and "payment" within the meaning of Sections 362 and 560 of the Bankruptcy Code; (iii) this CMN Agreement constitutes a "netting contract" within the meaning of and as defined in FDICIA; (iv) each payment entitlement and payment obligation hereunder constitutes a "covered contractual payment entitlement" or "covered

12

contractual payment obligation", respectively, as defined in FDICIA; (v) this CMN Agreement is a "master netting agreement" and the parties are "master netting agreement participants" within the meaning of and as such terms are used in any law, rule, regulation, statute, or order applicable to the parties' rights herein, whether now or hereafter enacted or made applicable, including Sections 362, 546, 561 and 562 of the Bankruptcy Code; (vi) each Base Contract is a "swap agreement," "forward contract," "securities contract", "repurchase agreement" or "commodity contract" within the meaning of the Bankruptcy Code; (vii) all pledges of Collateral under the Base Contracts and hereunder are transfers under and in connection with "swap agreements", or "margin payments" or "settlement payments" within the meaning of the Bankruptcy Code; (viii) all Collateral and Credit Support is held or has been transferred to margin, guarantee, secure and settle "swap agreements", "forward contracts", "securities contracts", "repurchase agreements" and "commodities contracts" as part of a single integrated business relationship and arrangement; and (ix) the exercise of remedies under Section 6 are protected by FDICIA and Sections 362, 555, 556, 559, 560 and 561 of the Bankruptcy Code.

8.3.4.   COUNTERPARTY ACKNOWLEDGES THAT ALLOCATIONS OF CREDIT SUPPORT PURSUANT TO SECTION 4.1 TO A LEHMAN BROTHERS ENTITY OTHER THAN LBI AND TRANSFERS OF CREDIT SUPPORT FROM LBI PURSUANT TO SECTION 2 OR 5 MAY RESULT IN THE LOSS BY COUNTERPARTY OF RIGHTS AND PROTECTIONS AFFORDED BY RULES 15C3-3, 8C-1 AND 15C2-1 UNDER THE SECURITIES EXCHANGE ACT OF 1934, THE SECURITIES INVESTOR PROTECTION ACT OF 1970 AND ANY "EXCESS" SIPC COVERAGE LBI MAY MAINTAIN.

8.3.5.   In connection with the negotiation of and the entering into this CMN Agreement and each Base Contract, Counterparty acknowledges and agrees that: (i) each Lehman Brothers Entity is acting for its own account and is not acting as a fiduciary for, or a financial or investment advisor to Counterparty (or in any similar capacity); (ii) Counterparty is not relying upon any communications (whether written or oral) from any Lehman Brothers Entity as investment advice or as a recommendation to enter into this CMN Agreement or any Base Contract, it being understood that information and explanations related to the terms and conditions of this CMN Agreement or any Base Contract shall not be considered investment advice or a recommendation to enter into this CMN Agreement or any Base Contract; (iii) Counterparty has not received from any Lehman Brothers Entity any assurance or guarantee as to the expected results of this CMN Agreement or any Base Contract; and (iv) Counterparty has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own independent investment, hedging, and trading decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by any Lehman Brothers Entity.

[New York #931306 v34]

9.    Miscellaneous.

9.1. *Entire Agreement.*  This CMN Agreement shall constitute the entire and exclusive understanding and agreement by the parties with respect to the matters addressed herein.

9.2. *Single Relationship.*  Each party acknowledges and agrees that (a) each Contract has been entered into in consideration of and in reliance upon the fact that all Contracts constitute a single business relationship and have been made in consideration of each other, and (b) the performance by Counterparty of each and every Obligation under any Contract is a condition precedent to the performance by each Lehman Brothers Entity of any Obligation to Counterparty, whether or not arising under such Contract or any other Contract. No failure by any Lehman Brothers Entity to fulfill any obligation under this CMN Agreement shall constitute a breach or default under any Contract, nor shall it discharge or affect in any way Counterparty's obligations under any Contract.

9.3. *Assignment.*  Each Lehman Brothers Entity shall have the right to assign its rights and delegate its obligations in respect of any Base Contract or any transaction under any Base Contract to another Lehman Brothers Entity, and, upon such delegation, the assignee Lehman Brothers Entity may release the assignor Lehman Brothers Entity from its obligations to Counterparty in respect of such Base Contract or transaction without further consent of Counterparty.  Counterparty may not assign its rights or delegate its obligations under any Contract without the prior written consent of each Lehman Brothers Entity, and any purported assignment or delegation absent such consent is null and void. To the extent the prior sentence is unenforceable under Applicable Law, and consistent with Section 9.2, Counterparty may not assign its rights or delegate its obligations under any Contract without the prior written consent of each Lehman Brothers Entity unless it assigns its rights and delegates its obligations under all Contracts, and any purported assignment or delegation absent such consent is null and void. Subject to the foregoing, all Contracts shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

9.4.    *Termination.* Any Lehman Brothers Entity may terminate this CMN Agreement on seventy-five (75) days' prior written notice to Counterparty and the other Lehman Brothers Entities, or immediately with contemporaneous written notice if required by any Regulatory Requirement (in each case, the date such termination becomes effective, the "CMN Agreement Termination Date"), but no such termination shall affect any Base Contract, the security interest of any Lehman Brothers Entity in any Collateral, or the ownership, setoff, netting and recoupment rights of any Lehman Brothers Entity in any Title Transfer Credit Support; provided, however, such 75 day period shall immediately be reduced to 30 days upon the occurrence of a Cessation Event described in paragraphs (a), (b) and/or (c) of the definition of Cessation Event. Notwithstanding the provisions of any Base Contract, on or prior to the CMN Agreement Termination Date, each Lehman Brothers Entity party to a Base Contract shall in its sole discretion determine and notify Counterparty of the margin requirements under such Base Contract necessary to comply with any applicable Regulatory Requirements and to protect itself from any potential credit exposure to Counterparty in respect of such Base Contract.  Such margin requirements shall be effective as of the CMN Agreement

14

Termination Date and Counterparty's obligations in respect of such margin requirements shall survive the termination of this CMN Agreement.

9.5 *Adjustment Relating to Interest.*  The obligations of the Lehman Brothers Entities in respect of interest provided in Section 5.3 shall be reduced to the same extent that interest provided therein may not lawfully be included in calculating the obligations of Counterparty in respect of any Settlement Amount or Net Settlement Payment.

9.6 *Notices.*  Unless otherwise specified, all notices and other communications to be given to a party hereunder orally or in writing shall be given to the address, telex (if confirmed by the appropriate answerback), fax (confirmed if requested) or telephone number and to the individual or department specified with respect to such party on Schedule II or such other address, telex, telecopy or telephone number as such party may hereafter specify for the purpose of notice given in accordance with this paragraph. Unless otherwise specified, any notice, instruction or other communication, shall be effective upon receipt if given in accordance with this paragraph. Without limiting the provisions of Section 7, the notice provisions of this CMN Agreement supersede the notice provisions of any Base Contract in respect of determinations of margin requirements, transfers of Credit Support, the occurrence of a Close-out Event and the Close-out of such Base Contract.

9.7 *Interpretation; Headings and Subheadings.*  References in this CMN Agreement to "pledge" or "pledgor" include a grant of a security interest in Collateral and to the party granting such security interest and references to Base Contract Collateral or Credit Support "held by" or "transferred to" a party include Base Contract Collateral or Credit Support held directly or indirectly by such party or over which such party has direct or indirect control, or with respect to which such party has perfected a security interest by filing or registration. The headings and subheadings of this CMN Agreement are for convenience of reference only and shall not affect the meaning or construction of any provision hereof.  Unless indicated otherwise, all times used herein are New York City time.

9.8 *Governing Law; Severability.*  THIS AGREEMENT AND EACH BASE CONTRACT THAT IS NOT EXPRESSED TO HAVE A GOVERNING LAW PROVISION AND ALL MATTERS ARISING FROM OR RELATING TO THIS AGREEMENT AND EACH SUCH BASE CONTRACT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO CONFLICTS OF LAW DOCTRINE.  Wherever possible, each provision of this CMN Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this CMN Agreement shall be prohibited by or invalid or unenforceable under such laws, such provision shall be ineffective to the extent of such prohibition, invalidity or unenforceability without otherwise affecting the validity or enforceability of such provision or the remaining provisions of this CMN Agreement.

9.9 *Jurisdiction; Process.*

15

[New York #531306 v34]

9.9.1.  With respect to any suit, action, claim, or proceedings relating to this CMN Agreement (collectively, "Proceedings"), each party irrevocably and unconditionally:

(i)  submits to the jurisdiction of the courts of the State of New York and United States federal courts located in New York, New York;

(ii)  waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum, and further waives the right to object, with respect to such Proceedings, that such court does not have jurisdiction over such party; and

(iii)  WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY PROCEEDINGS.

9.9.2.  Counterparty hereby appoints the Process Agent specified in Schedule IV hereto to receive, for it and on its behalf, service of process in any suit, action or proceedings relating to this CMN Agreement and any Base Contract. If for any reason the Process Agent is unable to act as such, Counterparty will promptly notify the Lehman Brothers Entities and within thirty (30) days appoint a substitute process agent acceptable to the Lehman Brothers Entities. Counterparty irrevocably consents to service of process given in the manner provided for written notices in Section 9.6 hereof. Nothing in this CMN Agreement will affect the right of any party to serve process in any other manner permitted by law.

9.10 *Costs of Enforcement.*  Counterparty shall be liable for and shall, on demand, indemnify and hold harmless each Lehman Brothers Entity for and against all reasonable out-of-pocket expenses, including, without limitation, reasonable legal fees and any stamp, registration, documentation or similar taxes or costs of collection, incurred by such Lehman Brothers Entity by reason of the enforcement or protection of its rights under any Contract.

9.11 *Counterparts.*  This CMN Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

9.12 *Amendments; Waivers.*  No amendment, modification, supplement or waiver in respect of this CMN Agreement shall be effective unless in writing and signed by all of the parties hereto. No failure or delay by any party hereto in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

16

[New York #931306 v34]

IN WITNESS WHEREOF, the parties have signed this CMN Agreement as of the date stated above.

HARBINGER CAPITAL PARTNERS
MASTER FUND I, LTD.
By: Harbinger Capital Partners Offshore
Manager, LLC

By: _____
Name: _____
Title: _____William R. Lucas, Jr._____
             Executive Vice President


LEHMAN BROTHERS
INTERNATIONAL (EUROPE)



By: _____
Name: _____
Title: _____


LEHMAN BROTHERS SPECIAL
FINANCING INC.



By: _____
Name: _____
Title: _____


LEHMAN BROTHERS INC.



By: _____
Name: _____
Title: _____

17

[New York #931305 v34]

IN WITNESS WHEREOF, the parties have signed this CMN Agreement as of the date stated above.

HARBINGER CAPITAL PARTNERS
MASTER FUND I, LTD.

By:_____
Name:_____
Title:_____

LEHMAN BROTHERS
INTERNATIONAL (EUROPE)

By:_____
Name:_____
Title: HUW MERRIMAN
AUTHORISED SIGNATORY

LEHMAN BROTHERS SPECIAL
FINANCING INC.

By:_____
Name:_____
Title:_____

LEHMAN BROTHERS INC.

By:_____
Name:_____
Title:_____

17

[New York #931306 v34]

IN WITNESS WHEREOF, the parties have signed this CMN Agreement as of the date stated above.

HARBINGER CAPITAL PARTNERS
MASTER FUND I, LTD.

By:_____
Name:_____
Title:_____


LEHMAN BROTHERS
INTERNATIONAL (EUROPE)

By:_____
Name:_____
Title:_____


LEHMAN BROTHERS SPECIAL
FINANCING INC.

By:_____
Name:  T. COURTNEY JENKINS
Title:    VICE PRESIDENT


LEHMAN BROTHERS INC.

By:_____
Name:  T. COURTNEY JENKINS
Title:    VICE PRESIDENT


17

[New York #931306 v34]

Schedule I

## SCHEDULE OF BASE CONTRACTS

Each of following agreements shall be a Base Contract:

Margin Lending Agreement between (i) Lehman Brothers International (Europe) and Lehman Brothers Inc. and (ii) Counterparty, dated and/or executed on or about March 1, 2007, as amended from time to time (the "MLA")

Global Master Securities Lending Agreement between Counterparty and Lehman Brothers International (Europe), dated and/or executed on or about March 1, 2007, as amended from time to time.

Customer Account Agreement - Prime Brokerage between Lehman Brothers Inc. and Counterparty, dated and/or executed on or about March 1, 2007, as amended from time to time

ISDA Master Agreement between Lehman Brothers Special Financing Inc. and Counterparty, dated and/or executed on or about May 26, 2005, as amended from time to time

Global Master Repurchase Agreement between Counterparty and Lehman Brothers International (Europe), dated and/or executed on or about August 14, 2006, as amended from time to time

18

Schedule II

ADDRESSES FOR NOTICES

**Counterparty:**

Address:
Harbinger Capital Partners Master Fund I, Ltd.
c/o Harbinger Capital Partners Offshore Manager, LLC
One Riverchase Parkway South
Birmingham, AL 35244

Phone: 205 987 5761
Fax: 205 987 5726
Attention of: Susan Shalhoop

**Lehman Brothers Entities:**

**Lehman Brothers International (Europe)**

Address:       25 Bank Street
               London E14 5LE
               England

Legal:
    Attention of: Alison McCombie-Lawrence
    Phone: +44 20 710 21126
    E-mail: amccombi@lehman.com

Margin:
    Attention of: Cross Margin (Adam Willis)
    Phone: +44-20-710-21325

19

**Each Lehman Brothers Entity other than Lehman Brothers International (Europe)**

Address:      745 7th Avenue
              New York, NY 10019
              USA

Legal:
    Attention of: Scott Willoughby
    Phone: +1 212 526 7118
    E-mail: swilloug@lehman.com

Margin:
    Attention of: Cross Margin (Lee Wigden)
    Phone: +1 201 499 6479
    E-mail: crossmargin@lehman.com

### Schedule III

Counterparty's exact legal name, type of organization, jurisdiction of organization (together with the organizational identification number, if any issued by such jurisdiction to Counterparty), place of business, or if it has more than one place of business, its chief place of business and chief executive office, are as of the date of this CMN Agreement and for the four preceding months:

Harbinger Capital Partners Master Fund I, Ltd., a Cayman Islands exempted company, with its place of business at c/o International Fund Services (Ireland) Limited, Third Floor, Bishop's Square, Redmond's Hill, Dublin 2, Ireland.

21

Schedule IV

PROCESS AGENT

Harbert Management Corporation, One Riverchase Parkway South, Birmingham, AL 35244.

Schedule V

## COMMITTED MARGIN PORTFOLIO
### AND
## COMMITTED ADDITIONAL MARGIN REQUIREMENT

**I.    Committed Margin Portfolio**

As at the date of this CMN Agreement, the Committed Margin Portfolio shall include only the following eligible transactions, countries and currencies, as amended from time to time by the Lehman Brothers Entities upon 75 days prior written notice:

Eligible transactions must be denominated in Eligible Currencies and shall mean:

- Corporate Bonds - issued by entities who are organized under the laws of, and whose principal place of business is located in, one of the below listed Eligible Countries. For example, a U.S. dollar-denominated bond distributed in the United States whose ultimate credit risk is an operating company in China, would not be eligible.
- Government Bonds - issued by the sovereign governments of the below listed Eligible Countries.
- Interest Rate Swaps - Swaps whose floating rate is based exclusively on USD LIBOR, GBP LIBOR, EURIBOR, or JPY LIBOR.
- Money Market Futures - EuroDollar Futures ("ED Futures") and Fed Fund Futures.
- Bond and Note Futures - Bond and Note Futures on eligible Government Debt.
- CDS (single name and index) - CDS on a reference entity that is the issuer of eligible Corporate or Government Bonds.
- Equities — common stock issued by entities who are organized under the laws of, and whose principal place of business is located in, one of the below listed Eligible Countries.
- Convertible Bonds - issued by entities who are organized under the laws of, and whose principal place of business is located in, one of the below listed Eligible Countries.
- Listed Stock Options - Options whose underlying stock is issued by entities who are organized under the laws of, and whose principal place of business is located in, one of the below listed Eligible Countries.
- FX Forwards in which both currencies in the currency pair are Eligible Currencies
- FX Futures in which both currencies in the currency pair are Eligible Currencies (except Finex Dollar Index Futures)
- Cash balances in Prime Brokerage accounts

Eligible Countries:

"**G-10 Country**" means Belgium, Canada, France, Germany, Italy, Japan, the Netherlands, Sweden, Switzerland, the United Kingdom and the United States.

"**Euro-Zone Non G-10**" means Austria, Finland, Greece (Government Bonds only), Ireland, Portugal (Government Bonds only), and Spain.

"**Non Euro-Zone Non G-10**" means Australia, Denmark, Iceland, New Zealand and Norway.

23

"**G-22 Country**" means the union of G-10 Country, Euro-Zone Non G-10 and Non Euro-Zone Non-G10.

Eligible currencies:
"**G-10 Country Currency**" means CAD, CHF, EUR, GBP, JPY, SEK, and USD.

"**Euro-Zone Non G-10 Currency**" means EUR.

"**Non Euro-Zone Non G-10 Currency**" includes AUD, DKK, NOK, and NZD.

For other countries, the eligibility of products is restricted as outlined.

<u>Non G-22 Hard Currency[1] Sovereign Bonds:</u> Argentina, Brazil, Chile, Colombia, Ecuador, Mexico, Panama, Peru, Uruguay, Venezuela, Bulgaria, Croatia, Czech Republic, Estonia, Hungary, Latvia, Lithuania, Poland, Romania, Russia, Slovakia, Slovenia, Turkey, Ukraine, China, Hong Kong, India, Indonesia, Malaysia, Philippines, Kazakhstan, Singapore, South Korea, Taiwan, Thailand, Egypt, Israel, South Africa, Qatar, UAE.

<u>Non G-22 Hard Currency Corporate Bonds:</u> Argentina, Brazil, Chile, Mexico, Venezuela, Puerto Rico, Czech Republic, Hungary, Poland, Russia, Turkey, China, Hong Kong, India, Indonesia, Malaysia, Philippines, Kazakhstan, Singapore, South Korea, Taiwan, Thailand, Israel, South Africa, Qatar, UAE.

<u>Non G-22 Local Currency Sovereign Bonds:</u> Brazil, Hungary, Mexico, Poland, Russia, South Africa, Turkey.

<u>Non G-22 FX Products[2]:</u> Argentina[3], Brazil, Chile[3], China[3], Czech Republic[3], Egypt[3], Hong Kong[3], Hungary, Indonesia[3], Israel[3], India[3], Mexico, Malaysia[3], Philippines[3], Poland, Russia, Saudi Arabia[3], Singapore[3], South Korea[3], South Africa, Thailand[3], Turkey, Taiwan[3].

<u>Non G-22 Equities:</u> Brazil, Mexico, Chile, Argentina, Taiwan, Hong Kong, Korea, Singapore, China, Thailand, Malaysia, Indonesia, India, Philippines, Russia, Hungary, Poland, Turkey, Czech Republic, Egypt, Israel, South Africa, Saudi, Arabia

During the Commitment Period, the Committed Margin Terms shall apply only to Loans (as defined in the MLA) of cash under the MLA to the extent the Loan Value generated by the application of the Committed Margin Rates to the Committed Margin Portfolio is

---

[1] "Hard-currency" refers to USD, EUR, JPY, GBP, CHF, CAD

[2] All FX spot trades associated with currencies from these countries are eligible. For Product Types Fx Forwards and Fx Futures only crosses which involve one of these EMG currencies and one of either USD, EUR, JPY are eligible

[3] Only spot FX trades.

24

no greater than the Maximum Loan Value. Any portion of the Loan Value in excess of the Maximum Loan Value shall not be subject to the Committed Margin Terms.

"**Loan Value**" means at any time the aggregate of cash lent by the Lehman Brothers Entities.

Prior to the delivery of a notice of termination of the Committed Margin Terms on any Business Day during the Commitment Period (each, a "**Determination Date**"), the maximum Loan Value covered under the Committed Margin Terms in Section III below (the "**Maximum Loan Value**") shall be limited to the Look-Back Loan Value.

The "**Look-Back Loan Value**" shall on any Business Day be equal to 110% of the average of the Loan Value excluding the Non-Committed Portion (as defined below) on each Determination Date during the immediately preceding twenty (20) Business Days, but excluding, such Business Day (the "**Calculation Period**").

Such average will be calculated on a each Determination Date during the Commitment Period. Further, to the extent that, during the Calculation Period the Loan Value on any given day is greater than the Look-Back Loan Value, such portion of the Loan Value that is in excess of the Look-Back Loan Value (the "**Non-Committed Portion**") shall be treated as loans on Other Transactions as defined herein and shall not be included in the determination of the Look-Back Loan Value for such Calculation Period. For the avoidance of doubt, the definition of, and value ascribed to, the Look-Back Loan Value shall never include any Non-Committed Portion.

If at any time during the Commitment Period, a Lehman Brothers Entity provides Counterparty with a notice of termination of the Committed Margin Terms, the Maximum Loan Value on each day for the remainder of the Commitment Period shall be equal to the lowest of (i) the Look-Back Loan Value as of the date such notice of termination is given, (ii) the then prevailing Loan Value as of the date such notice of termination is given, or (iii) the lowest Loan Value on any day subsequent to the date such notice of termination was given. All such calculations shall exclude the Non-Committed Portion.

## Substitution

In the event that a Lehman Brothers Entity provides Counterparty with notice of the termination of the Commitment Period, all transactions entered into upon or after the provision of such notice will not be governed by the terms of this Schedule and will be entered into upon such other terms as are acceptable to the Lehman Brothers Entities in their sole discretion and notified to Counterparty. Counterparty may, however, substitute securities with other securities in the same or a higher quality category as set forth below (i.e., substitute a stock in the Russell 3000 with another component stock in an "E1" or "E2" category index). Long positions may only be substituted for other long positions and short positions may only be substituted for other short positions. New securities positions must be delivered prior to the Lehman Brothers Entities releasing substituted positions. Moreover, any substitution shall be subject to the following: (i) the net total of

25

such substitutions shall not cause the Loan Value to exceed the Maximum Loan Value;
(ii) all portfolio and margin requirements must be satisfied; and (iii) the new positions
would be of similar or better quality as compared to the existing positions.

Equity Products Substitution Categories:

| E1 (Highest Quality) | E2 (Medium Quality) | E3 (Lower Quality) |
|---|---|---|
| U.S. Common | U.S. Common | Europe Common |
| S&P 500 | S&P 400 Mid Cap | FTSE Small Cap Index |
| | S&P 600 Small Cap | German DAX Mid Cap Index |
| Europe Common | Russell 1000 | |
| Austrian Traded ATX Index (ATX) | Russell 2000 | Asia |
| BEL 20 Index (BEL20) | Russell 3000 | TOPIX 500 (Tokyo) |
| Swiss Market Index (SMI) | The S&P / Toronto Stock Exchange | |
| Dax 30 (DAX) | (excluding securities under $5.00) | |
| KFX Copenhagen Share Index | | |
| (KFX) | U.S. Other | |
| IBEX 35 Index (IBEX) | ADRs | |
| Hex 25 Index (HEX25) | ETFs | |
| CAC-40 (CAC) | | |
| FTSE 100 Index (UKX) | Europe Common | |
| MIB 30 (MIB30) | SPI Swiss Performance Index (SPI) | |
| Amsterdam Exchange Index (AEX) | HDAX | |
| OBX stock Index (OBX) | DAX 100 Price Index | |
| OMX Stockholm Index (OMX) | Spain MA Madrid Index (MADX) | |
| | SBF120 (SBF 120) | |
| Asia Common | SBF 250 | |
| Nikkei 225 | The Portugal PSI·20 | |
| S&P ASX | FTSE 250 Index (MCX) | |
| The Australian All Ordinaries | MIB Telematico (MIBTEL) | |
| | Amsterdam Midkap Index (AMX) | |
| | | |
| | Asia | |
| | Nikei 300 | |
| | Hang Seng Index | |
| | The Australian 20 Leaders | |
| | Singapore All Equities Index | |
| | The Straits Times Index (Singapore) | |

Fixed Income Products Substitution Categories:

1) Investment Grade Bonds can be substituted with other Investment Grade Bonds of
equal or better credit quality.

2) Non-Investment Grade Bonds can only be substituted with either Investment Grade
Bonds or other Non-Investment Grade Bonds of equal or better credit quality.

**II.    Other Transactions:**

All transactions not within the scope of the Committed Margin Portfolio defined above
shall be considered "Other Transactions" and will not qualify for the Committed Margin
Terms defined in Section III below. The margin terms for such Other Transactions will
be reviewed and approved on a case-by-case basis by the Lehman Brothers Entities in
accordance with the MLA and/or the relevant ISDA Master Agreement.  For the
avoidance of doubt, the Margin Requirement (as defined in the MLA) set in accordance

with the MLA is subject to change at the sole discretion of the relevant Lehman Brothers Entity with respect to all Other Transactions.

### III.    Committed Margin Terms:

**Committed Additional Margin Requirement:**

The Lehman Brothers Entities shall determine the total margin charge each Business Day by running a series of stress tests outlined in Table 1, Table 2, Table 3, Table 4 and Table 5 (each a "Test") on the Committed Margin Portfolio and calculating the loss with respect to each such Test on the Committed Margin Portfolio. Additionally, a portfolio liquidation cost will be calculated as outlined in Table 7. On any given day, the absolute value of the calculated loss of the Test which results in the largest U.S. dollar amount with respect to the Committed Margin Portfolio plus the liquidation cost shall be the Committed Additional Margin Requirement with respect to the Committed Margin Portfolio.

For any portfolio the diversification index of the portfolio (denoted $DI_P$) is defined as the portfolio VaR divided by the sum of the VaR for each position in the portfolio:

$$DI_P = Max\left\{20\%, \frac{TotalPortfolioVaR}{\sum_i VaR_i}\right\}$$

The diversification index for credit (denoted $DI_{cr}$) will have $TotalPortfolioVaR$ replaced by $PortfolioCreditVaR$ and position level VaR, $VaR_i$, replaced by $CVaR_i$ or the credit VaR for the i$^{th}$ position of the portfolio:

$$DI_{cr} = Max\left\{20\%, \frac{PortfolioCreditVaR}{\sum_i CVaR_i}\right\}$$

The diversification index for equity (denoted $DI_{eq}$) will have $TotalPortfolioVaR$ replaced by $PortfolioEquityVaR$ and position level VaR, $VaR_i$, replaced by $EqVaR_i$ or the equity VaR for the i$^{th}$ position of the portfolio:

$$DI_{eq} = Max\left\{20\%, \frac{PortfolioEquityVaR}{\sum_i EqVaR_i}\right\}$$

27

Further definitions:

- Spread01 means the U.S. Dollar change in position value due to a 1 basis point tightening in the credit spread.
- IRPV01 means the U.S. Dollar change in position value due to a 1 basis point tightening in the yield.
- NetSpread01 means for a given collection of positions, the sum of position Spread01's.
- Delta ($\Delta$) means the U.S. Dollar change in the position value with respect to a $1 increase in the equity value, multiplied by spot price of the underlying.
- Net Issuer Delta means for all positions from a given issuer, the sum of position Delta's.
- VaR shall mean the average of the worst percentile corresponding to the VaR Confidence Level of daily losses derived over the VaR Data Period appropriately scaled by the VaR Holding Period.
- VaR Confidence Level means 99%.
- VaR Data Period means the daily data period commencing on January 4, 1999 to the present date (growing time series).
- VaR Holding Period is five days.
- VaR Parameters means the VaR Confidence Level, the VaR Data Period, and the VaR Holding Period.
- VaR Methodology means the value-at-risk methodology used by one or more Lehman Brothers Entities in their sole discretion to determine the VaR based on a number of factors, including but not limited to the VaR Parameters, historical risk factors over the VaR Data Period, such as prices, interest rates, volatility and spread, and current sensitivities and other factors each as determined by one or more Lehman Brothers Entities in their sole discretion, for the given VaR Portfolio.
- Liquid default swap indices are the more recent CDX.HY, CDX.IG and iTraxx series as determined at Lehman Brothers sole discretion.
- A/B FX rate represents the current exchange rate in terms of number of units of B required to purchase 1 unit of A
- $Notional_{USD}^{Aleg}$ is the notional of the leg of the FX transaction that has a currency equal to currency A (defined in Appendix D), converted to USD at the current spot A/USD FX rate.
- $\Delta_{USD}^{Aleg}$ means the discounted notional of the A currency leg of an FX Forward, converted to USD at the current spot A/USD FX rate.
- $\rho_{USD}^{Aleg}$ ($\rho_{USD}^{Bleg}$) is the change in the FX forward's value in USD when the interest rate of the A (B) currency falls by 1%.
- $PV_{USD}$ represents the transaction's net present value, converted to USD.

**Table 1: Univariate Scenarios**

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| Adverse Credit | Credit Improving – Short Positions [Parallel | |

28

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| Move | Spread Moves across debt maturities]: <br><br> A. G-22 Issuers: <br>   i.  Non-defaulted bonds and CDS on non-defaulted bonds – <br>     • Current Spread 0-50bp: 35% spread shock. <br>     • Current Spread 50-150bp: 28% spread shock. <br>     • Current Spread 150-700bp: 35% spread shock. <br>     • Current Spread > 700bp: 45% spread shock. <br>   ii.  Liquid default swap indices: <br>     • Current Spread 0-95bp: 15% spread shock. <br>     • Current Spread > 95bp: 21% <br>   iii.  Defaulted bonds, market value (MV) rises by 15% of their current level; CDS on defaulted bonds Mark–to–Market (MTM) changes by 15%*(Notional+MTM) <br><br> B. Non G-22 Issuers: <br>   i.  Bonds and CDS with a Current Spread less than 250 bp, 60% spread shock for sovereign issuers, 65% spread shock for corporate issuers. <br>   ii.  Bonds and CDS with a Current Spread greater than 450 bp: <br>     • Current Spread 450-600, MV rises by 11% for sovereign bonds, 13% for corporate bonds; CDS MTM changes by 11%*(Notional+MTM) for CDS on sovereign bonds, 13%*(Notional+MTM) for CDS on corporate bonds. <br>     • Current Spread 600-1000, MV rises by 14% for sovereign bonds, 18% for corporate bonds; CDS MTM changes by 14%*(Notional+MTM) for CDS on sovereign bonds, 18%*(Notional+MTM) for CDS on corporate bonds. <br>     • Current Spread > 1000, MV rises by 22% for sovereign bonds, 29% for corporate bonds; CDS MTM changes by 22%*(Notional+MTM) for CDS on | **Position Loss** <br> Non-Defaulted Corporate Bonds: <br> $Loss_i = -DI_{zi} \times \mid Spread\ 01_i \mid \times$ <br> $(CurrentSpread_i \times Shock_i)$ <br><br> Non-Defaulted Convertible Bonds (full re-pricing): <br> $Loss_i = -DI_{zi} \times$ <br> $abs\left[ \dfrac{Value(Spread'_i) -}{MV_i} \right]$ <br> where $Value(x)$ is the value of the convertible position at a spread of $x$, and $Spread'_i = CurrentSpread_i +$ <br> $X_i \times (CurrentSpread_i \times Shock_i)$ <br> where $X_i = 1$ if long the convertible, −1 otherwise. <br><br> Defaulted Bonds (corporate and convertible): <br> $Loss_i = -DI_{zi} \times \mid MV_i \mid \times Shock_i$ <br><br> CDS on defaulted bonds: <br> $Loss_i = -DI_{zi} \times$ <br> $\mid Notional_i + MTM_i \mid \times Shock_i$ <br><br> Linearly interpolated price and spread loss: <br> $Loss_i = \left( \dfrac{450 - CurrentSpread_i}{450 - 250} \right) Loss_{i,low}$ <br> $+ \left( \dfrac{CurrentSpread_i - 250}{450 - 250} \right) Loss_{i,hi}$ <br><br> **Total loss** <br> $Loss_{port} = \sum_i Loss_i$ |

| Test | Test Parameters (a "Shock") | Loss Calculation |
|------|------|------|
| | sovereign bonds, 29%*(Notional+MTM) for CDS on corporate bonds.<br>• Defaulted bonds, MV rises by 42% for sovereign and corporate bonds; CDS MTM changes by 42%*(Notional+MTM) for CDS on sovereign and corporate bonds.<br>iv.  Bonds and CDS with a Current Spread between 250 and 450 bp receive a loss equal to a linearly interpolated spread shock loss and price shock loss.<br>**Credit Worsening – Long Positions [Parallel Spread Moves across debt maturities]:**<br>A. G-22 Issuers<br>  i.  Non-defaulted bonds and CDS on non-defaulted bonds -<br>    • Current Spread 0-50bp: 65% spread shock.<br>    • Current Spread 50-150bp: 45% spread shock.<br>    • Current Spread 150-700bp: 50% spread shock.<br>    • Current Spread >700bp: 60% spread shock.<br>  ii.  Liquid Default Swap Indices:<br>    • Current Spread 0-95bp: 25% spread shock.<br>    • Current Spread > 95bp: 35% spread shock.<br>  iii.  Defaulted bonds, MV falls by 15% of their current level; CDS on defaulted bonds Mark-to-Market (MTM) decreases by 15%*(Notional+MTM)<br>B. Non G-22 Issuers<br>  i.  Bonds and CDS with a Current Spread less than 250 bp:<br>    • Current Spread less than 50 bp, 75% spread shock for sovereign issuers, 80% spread shock for corporate issuers.<br>    • Current Spread 50-250, 65% spread shock for sovereign issuers, 70% spread shock for corporate issuers.<br>  ii,  Bonds and CDS with a Current Spread greater than 450 bp: | |

| Test | Test Parameters (a "Shock") | Loss Calculation |
|------|------------------------------|------------------|
| | • Current Spread 450-600, MV decreases by 12% for sovereign bonds, 13% for corporate bonds; CDS MTM decreases by 12%*(Notional+MTM) for CDS on sovereign bonds, 13%*(Notional+MTM) for CDS on corporate bonds. <br> • Current Spread 600-1000, MV decreases by 16% for sovereign bonds, 19% for corporate bonds; CDS MTM decreases by 16%*(Notional+MTM) for CDS on sovereign bonds, 19%*(Notional+MTM) for CDS on corporate bonds. <br> • Current Spread > 1000, MV decreases by 25% for sovereign bonds, 30% for corporate bonds; CDS MTM decreases by 25%*(Notional+MTM) for CDS on sovereign bonds, 30%*(Notional+MTM) for CDS on corporate bonds. <br> • Defaulted bonds, MV decreases by 35% for sovereign and corporate bonds; CDS MTM decreases by 35%*(Notional+MTM) for CDS on sovereign and corporate bonds. <br> v. Bonds and CDS with a Current Spread between 250 and 450 bp receive a loss equal to a linearly interpolated spread shock loss and price shock loss. | |
| Credit Curve: 2 yr - 10 yr Bear Flattener | i. 0Y to 2Y spreads widen by 30% of their current spread level for G-22, 40% for non G-22; <br> ii. spreads on 10Y and beyond remain unchanged; and <br> iii. spreads between 2Y and 10Y are widened by levels implied by linear interpolation of the 2Y and 10Y spread shocks. | |
| Credit Curve: 2 yr - 10 yr Bear Steepener | i. 10Y spreads and beyond widen by 25% of their current spread level for G-22, 35% for non G-22; <br> ii. spreads on 0Y to 2Y remain unchanged; and | **Position Loss** <br> *Loss, = −Spread 01, × Shock,* |

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| | iii.  spreads between 2Y and 10Y are widened by levels implied by linear interpolation of the 2Y and 10Y spread shocks. | Total loss<br>$Loss_{port} = \sum_i Loss_i$ |
| Credit Curve:<br>10yr - 30 yr<br>Bear Flattener | i.  10Y and below spreads widen by 15% of their current spread level for G-22, 20% for non G-23;<br>ii.  spreads on 30Y and beyond remain unchanged; and<br>iii.  spreads between 10Y and 30Y are widened by levels implied by linear interpolation of the 10Y and 30Y spread shocks. | |
| Credit Curve:<br>10 yr - 30 yr<br>Bear Steepener | i.  30Y spreads widen by 15% and 90Y spreads widen by 7.5% of their current level for G-22, 20% and 10%, respectively, for non G-22;<br>ii.  spreads on 0Y to 10Y remain unchanged; and<br>iii.  spreads between 10Y and 30Y and spreads between 30Y and 90Y are widened by levels implied by linear interpolation of the 30Y and 90Y spread shocks. | |
| Basis Risk -<br>CDS widening | Corporate Issuer's Bond spread curve is unchanged, the entire CDS curve is widened by 10% of current spread level | Position Loss<br>$Loss_i = -Spread01_i \times Shock_i$<br><br>Total loss<br>$Loss_{port} = \sum_i Loss_i$ |
| Basis Risk -<br>CDS tightening | Corporate Issuer's Bond spread curve is unchanged, the entire CDS curve is tightened by 10% of current spread level | |
| Basis Risk -<br>Bond widening | Corporate Issuer's Bond spread curve is widened by 10% of current spread level, the entire CDS curve is unchanged | |
| Basis Risk -<br>Bond tightening | Corporate Issuer's Bond spread curve is tightened by 10% of current spread level, the entire CDS curve is unchanged | |
| Interest rate<br>widening | IR Curve widening:<br>i.  USD and CAD treasury curves widen by 45bp,<br>ii.  EUR, JPY and CHF treasury curves widen by 35bp, and<br>iii.  GBP, DKK, NOK and SEK treasury curves widen by 40bp. | |

32

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| | iv. AUD and NZD treasury curves widen by 50bp. | |
| | v. MXN and PLN treasury curves widen by 100bp. | |
| | vi. HUF and ZAR treasury curves widen by 150bp. | |
| | vii. BRL, RUB and TRY treasury curves widen by 350bp, 500bp and 1200bp, respectively. | Position loss:<br>$Loss_i = -IRPV01_i \times Shock_i$ |
| | viii. When IR swaps, Money Market Futures, ED futures, or Fed Fund futures are present, the portfolio receives an additional basis margin charge of 5 bp on the NetSpread01 per currency of such positions. | Basis margin charge:<br>$NetPV01_{CCY_i} = \sum_{Trades\_with\_Basis\_Risk,CCY_i} IRPV01_i$<br><br>$BasisMarginCharge = \left| \sum_{Currencies} NetPV01_{CCY_i} \times 5bock \right|$ |
| Interest rate tightening | IR Curve tightening:<br>i. USD, CAD, NOK and SEK treasury curves tighten by 40bp,<br>ii. EUR, JPY and CHF treasury curves tighten by 30bp, and<br>iii. GBP and DKK treasury curves tighten by 35bp<br>iv. AUD and NZD treasury curves tighten by 50bp<br>v. MXN and PLN treasury curves tighten by 100 bp<br>vi. HUF and ZAR treasury curves tighten by 150 bp<br>vii. BRL, RUB and TRY treasury curves tighten by 350bp, 500bp and 1200bp, respectively<br>viii. When IR swaps, Money Market Futures, ED futures, and Fed Fund futures are present, the portfolio receives an additional basis margin charge of 5 bp on the NetSpread01 per currency of such positions. | Portfolio loss:<br>$Loss_{port} = \sum_i Loss_i +$<br><br>$BasisMarginCharge$ |
| Rate Curve:<br>2yr - 10 yr<br>Bear Flattener | 0Y to 2Y rate curve widens by:<br>i. 25bp for USD and JPY,<br>ii. 30 bp for EUR, CHF and CAD,<br>iii. 35bp for GBP,<br>iv. 75% of their interest rate widening shocks for BRL, HUF, MXN, PLN, RUB, ZAR and TRY<br>v. rates on 10Y and beyond are | |

| Test | Test Parameters (a "Shock") | Loss Calculation |
|---|---|---|
| | unchanged; and<br>vi.　rates between 2 and 10Y are widened by levels implied by linear interpolation of the 2 and 10Y rate shocks.<br>vii.　No basis margin charge. | |
| Rate Curve:<br>2 yr - 10 yr<br>Bear Steepener | 10Y and beyond rate curve widens by:<br>i.　30bp for USD, EUR and CHF,<br>ii.　35bp for GBP and CAD,<br>iii.　25bp for JPY,<br>iv.　75% of their interest rate widening shocks for BRL, HUF, MXN, PLN, RUB, ZAR and TRY;<br>v.　rate curve on 0Y to 2Y are unchanged; and<br>vi.　rates between 2Y and 10Y are widened by levels implied by linear interpolation of the 2Y and 10Y rate shocks.<br>vii.　No basis margin charge. | |
| Rate Curve:<br>10yr - 30 yr<br>Bear Flattener | 10Y and below rate curve widens by:<br>i.　20bp for USD, EUR, and GBP,<br>ii.　25bp for JPY and CHF,<br>iii.　30bp for CAD,<br>iv.　65% of their interest rate widening shocks for BRL, HUF, MXN, PLN, RUB, ZAR and TRY;<br>v.　rate curve on 30Y and beyond are unchanged; and<br>vi.　rates between 10Y and 30Y are widened by levels implied by linear interpolation of the 10Y rate shock and 30Y rate.<br>vii.　No basis margin charge. | |
| Rate Curve:<br>10 yr - 30 yr<br>Bear Steepener | 30Y rate curve widens by:<br>i.　30Y: 20bp for USD, EUR, GBP, and CAD,<br>ii.　30Y: 25bp for JPY and CHF,<br>iii.　30Y: 65% of their interest rate widening shocks for BRL, HUF, MXN, PLN, RUB, ZAR and TRY;<br>iv.　90Y: 10bp for USD, EUR, GBP, CAD and CHF;<br>v.　90Y: 12.5bp for JPY,<br>vi.　90Y: 32.5% of their interest rate | |

34

| Test | Test Parameters (a "Shock") | Loss Calculation |
|------|------------------------------|-------------------|
| | widening shocks for BRL, HUF, MXN, PLN, RUB, ZAR and TRY; <br> vii. rate curve on 0Y to 10Y are unchanged; and <br> viii. rates between 10Y and 30Y and rates between 30Y and 90Y are widened by levels implied by linear interpolation of the 30Y and 90Y rate shocks. <br> ix. No basis margin charge. | |
| Treasury/Swap Basis Widening | All LIBOR curves widen 20 bp + 10 bp x $\text{Min}\{1, 2*\text{Max}\{0, 1-TimeToMaturity\}\}$ | **Position loss:** <br> $Loss_i = -IRPV01_i \times Shock_i$ <br> for LIBOR-based positions, 0 otherwise. <br><br> **Total loss** <br> $Loss_{port} = \sum_i Loss_i$ |
| Treasury/Swap Basis Tightening | All LIBOR curves tighten 20 bp + 10 bp x $\text{Min}\{1, 2*\text{Max}\{0, 1-TimeToMaturity\}\}$ | |
| Treasury/Bond and Note Futures Basis Widening | Bond and note futures rates widen 15bp ("shock"), treasury curve unchanged. | **Position loss:** <br> $Loss_i = Value_i(futuresRate_i + Shock_i) - MTM_i$ <br> for bond and note futures, 0 otherwise. $Value_i(x)$ is the value of a bond or note futures position $i$ at a yield of $x$. <br><br> **Total loss** <br> $Loss_{port} = \sum_i Loss_i$ |
| Treasury/Bond and Note Futures Basis Tightening | Bond and note futures rates tighten 15bp ("shock"), treasury curve unchanged. | |
| Adverse Equity Move | All trades with equity risk are re-priced at shocked equity levels. If the Counterparty is long equity risk, the shocks are negative, positive otherwise. The shocks are based on 90-day historical realized equity volatility. Shocks for G-22 issuers are given by linear interpolation of the following table: <br><br> | Historical 90 day equity volatility | Shock | <br> |---|---| <br> | Vol <= 15% | 10% | <br> | 25% | 15% | <br> | 40% | 25% | <br> | 70% | 43% | <br> | 85% | 56% | <br> | >=100% | 73% | | **Position loss:** <br> $Loss_i = -Di_{eq} \times \left[ \begin{array}{c} Value_i(Spo i'_i) - \\ MV_i \end{array} \right]$ <br> where $Value_i(x)$ is the value of position $i$ at an equity price of $x$, and $Spo i'_i = Spot_i \times (1 + Shock_i)$ <br><br> **Portfolio loss:** <br> $Loss_{port} = \sum_i Loss_i$ |

35

| Test | Test Parameters (a "Shock") | Loss Calculation |
|------|------------------------------|------------------|
| | Notwithstanding the foregoing, Market shocks for single stocks are floored at 15%. | |

Shocks for Brazil, Mexico, Chile, Taiwan, Hong Kong, South Korea, Singapore, Poland, Turkey, Israel, and South Africa are given by linear interpolation of the following table:

| Historical 90 day equity volatility | Shock |
|--------------------------------------|-------|
| Vol <= 25% | 17% |
| 40% | 28% |
| 70% | 47% |
| 85% | 62% |
| >=100% | 80% |

Shocks for the remaining non G-22 countries are given by linear interpolation of the following table:

| Historical 90 day equity volatility | Shock |
|--------------------------------------|-------|
| Vol <= 25% | 19% |
| 40% | 30% |
| 70% | 52% |
| 85% | 77% |
| >=100% | 88% |

## Combined Scenarios

The Lehman Brothers Entities shall calculate the loss for each position by running each such position through a series of sub-scenarios and choosing the Test that yields the greatest loss, by position. For each Test, the two applicable shock components' results are added to produce the Test's result.

Table 2: Combined Scenarios

| Risk Factors | Test | Credit Move | IR Move | Credit Spread Shock | IR Shock |
|--------------|------|-------------|---------|----------------------|----------|

| | | | | | |
|---|---|---|---|---|---|
| Credit Spreads and Interest Rates | 1 | Widen | Widen | If defaulted, then price shock shall be equal to that specified in Table 1. Otherwise, for G-22 Issuers it shall be equal to 70% of the shock specified in Table 1.<br>For non G-22 Issuers:<br>• Current Spread < 250bp it shall be 95% of the shock specified in Table 1.<br>• Current Spread >450bp it shall be 100% of the price shocks specified in Table 1. | If defaulted, then there will be no IR shock. Otherwise, for G-22 issuers it will be 70% of the IR shocks specified in Table 1.<br>For non G-22 Issuers:<br>• Current Spread < 250bp, it shall be 40% of the IR shocks specified in Table 1.<br>• Current Spread > 450bp, there is no IR shock. |
| | | | | Non G-22, Current Spread >250bp and <450bp the loss shall be linearly interpolated between the joint Credit Spread and IR loss and the Price loss. | |
| | 2 | Tighten | Tighten | If defaulted, then price shock shall be equal to that specified in Table 1. Otherwise, for G-22 Issuers, it shall be equal to 70% of the spread shock specified in Table 1.<br>For non G-22 Issuers:<br>• Current Spread < 250bp it shall be 95% of the | If defaulted, then there will be no IR shock. Otherwise, for G-22 issuers it will be 70% of the IR shocks specified in Table 1.<br>For non G-22 Issuers:<br>• Current Spread < 250bp, it shall be 40% of the IR shocks specified in Table 1.<br>• Current Spread > 450bp, there is no IR shock. |

| Risk Factors | Test | Equity Move | Credit Move | Equity Price Shock | Credit Spread Shock |
|---|---|---|---|---|---|
| | | | | • shock specified in Table 1.<br>• Current Spread >450bp it shall be 100% of the price shocks specified in Table1. | |
| | | | | Non G-22, Current Spread >250bp and <450bp the loss shall be linearly interpolated between the joint Credit Spread and IR loss and the Price loss. | |
| | 3 | Widen | Flat | Same as the shocks specified in Table 1, with the same linear interpolation for non G-22 with Current Spread between 250 and 450bp. | No shock |
| | 4 | Tighten | Flat | Same as the Shocks specified in Table 1, with the same linear interpolation for non G-22 with Current Spread between 250 and 450bp. | No shock |
| | 5 | Flat | Widen | No shock | IR Shock specified in Table 1 |
| | 6 | Flat | Tighten | No shock | IR Shock specified in Table 1 |
| Risk Factors | Test | Equity Move | Credit Move | Equity Price Shock | Credit Spread Shock |
| Equity Price and Credit Spreads | 7 | Decrease | Widen | 65% of the Equity Shock specified in Table 1. | 95% of the Credit Spread Shock specified in Table 1. |
| | 8 | Decrease | Widen | 98% of the Equity Shock specified in Table 1. | 65% of the Credit Spread Shock specified in Table 1. |
| | 9 | Increase | Tighten | 98% of the Equity Shock specified in Table1. | 85% of the Credit Spread Shock specified in Table 1. |
| | 10 | Adverse | Flat | Same as the Equity | No shock |

| | | | | Shock specified in Table 1. | | | | |
|---|---|---|---|---|---|---|---|---|
| | 11 | Flat | Widen | No shock | Same as the Credit Spread Shock specified in Table 1. | | | |
| | 12 | Flat | Tighten | No shock | Same as the Credit Spread Shock specified in Table 1. | | | |
| **Risk Factors** | **Test** | **Equity Move** | **Volatility Move** | **90-day Vol** | **Equity Price Shock[4]** | **Volatility Shock[5]** | | |
| | | | | | | **1mo** | **3mo** | **6mo** | **1yr** |
| | 13 | Increase | Decrease | 15% | 10% | -1% | -3% | -5% | -9% |
| | | | | 25% | 15% | -6% | -5% | -5% | -10% |
| | | | | 40% | 24% | -12% | -9% | -8% | -12% |
| | | | | 65% | 34% | -23% | -19% | -16% | -28% |
| | 14 | Decrease | Increase | 15% | -10% | 18% | 12% | 5% | 0% |
| | | | | 25% | -15% | 13% | 10% | 5% | 0% |
| | | | | 40% | -25% | 9% | 10% | 5% | 0% |
| | | | | 65% | -38% | 4% | 6% | 3% | -11% |
| | 15 | Increase | Increase | 15% | 10% | 59% | 45% | 45% | 52% |
| | | | | 25% | 15% | 24% | 8% | 5% | 10% |
| | | | | 40% | 25% | 13% | 6% | 5% | 6% |
| | | | | 65% | 40% | 8% | 3% | 2% | 4% |
| | 16 | Decrease | Increase | 15% | -10% | 80% | 55% | 65% | 76% |
| | | | | 25% | -15% | 64% | 38% | 28% | 27% |
| | | | | 40% | -25% | 64% | 38% | 28% | 27% |
| | | | | 65% | -40% | 64% | 38% | 28% | 27% |
| | 17 | Flat | Decrease | 34% | No change | -27% | -21% | -19% | -26% |
| | | | | 50% | | -36% | -28% | -25% | -32% |
| | | | | 66% | | -63% | -49% | -44% | -54% |
| | 18 | Flat | Increase | 34% | No change | 55% | 40% | 34% | 70% |
| | | | | 50% | | 61% | 45% | 37% | 45% |
| | | | | 66% | | 71% | 52% | 44% | 54% |
| | 19 | Adverse | Flat | Same as the Equity Shock specified in Table 1. | No shock | | | |

*(Risk Factors row label, vertical: Equity Price and Implied Volatility)*

| **Risk Factors** | **Test** | **Volatility Move** | **Credit Spread** | **Credit Spread Shock** | **Volatility Shock** |
|---|---|---|---|---|---|

[4] The equity price shock is determined by linear interpolation.

[5] The implied volatility shock is determined by bi-linear interpolation.

39

| | Test | | Move | | |
|---|---|---|---|---|---|
| Implied Volatility and Credit Spreads | 20 | Decrease | Widen | 25% of the Credit Spread Shock specified in Table 1. | 90% of the Volatility Shock as outlined in Scenario 17 of joint equity and vol scenario. |
| | 21 | Increase | Tighten | 50% of the Credit Spread Shock specified in Table 1. | 85% of the Volatility Shock as outlined in Scenario 18 of joint equity and vol scenario. |
| | 22 | Decrease | Flat | No shock. | 100% of the Volatility Shock as outlined in Scenario 17 of joint equity and vol scenario. |
| | 23 | Increase | Flat | No shock. | 100% of the Volatility Shock as outlined in Scenario 18 of joint equity and vol scenario. |
| | 24 | Flat | Widen | 100% of Credit-Spread widening shock. | No shock |
| | 25 | Flat | Tighten | 100% of Credit Spread tightening shock. | No shock |

| Risk Factors | Test | F/X Rate Move | IR Difference Move | F/X Rate Shock | IR Difference Shock |
|---|---|---|---|---|---|
| | 26 | Decrease | Widen | FX Down Shocks specified in Table 14 of Appendix D | IR Difference Widening Shocks in Table 16 of Appendix D |
| | 27 | Increase | Tighten | FX Up Shocks specified in Table 14 of Appendix D | IR Difference Tightening Shocks in Table 16 of Appendix D |
| | 28 | Decrease | Flat | FX Down Shocks specified in Table 14 of Appendix D | No shock. |
| | 29 | Increase | Flat | FX Up Shocks specified in Table 14 of Appendix D | No shock. |
| | 30 | Flat | Widen | No shock. | IR Difference Widening Shocks in Table 16 of Appendix D |

40

| | 31 | Flat | Tighten | No shock. | IR Difference Tightening Shocks in Table 16 of <u>Appendix D</u> |
|---|---|---|---|---|---|

$Loss_j^i$ shall denote the loss for position $i$ under the joint test $j$. The loss for each position under the combined scenarios is defined as:

$$Loss_i = Min(Loss_1^i, ..., Loss_{31}^i).$$

The total loss under the four combined scenarios set forth in Table 2 above is defined as

$$Loss_{port} = DI_P \times \sum_i Loss_i$$

### *Event Risk Tests*

There are two Event Risks:  Portfolio Event Risk and Single Issuer Event Risk.

**Portfolio Event Risk Test**

The event risk for the portfolio is determined by an empirical model which captures portfolio quality and issuer concentration. For each issuer, the Lehman Brothers Entities shall calculate the Loss Given Event ("LGE") (the term Event is used instead of default since a short position may have significant event risk if prices increase or spreads tighten).

For investment grade issuers, the Loss Given Event is the worst of:
   Bond Positions:
   a.  The loss from a three-notch credit rating downgrade (credit spreads widen, common stock prices unchanged).
   Equity Positions (including Convertible Bonds):
   a.  The loss from a large decrease in the per share price of the issuer's common stock (spreads unchanged).
   b.  The loss from a large increase in the per share price of the issuer's common stock (spreads unchanged).
   c.  The loss from a combination of credit spread widening and decrease in per share price of issuer's common stock.

For non investment grade issuers, the LGE is the worst of:
   1.  The loss corresponding to default.
   2.  The loss from a large equity price increase.

The determination of an issuer's rating is based on the applicable Moody's and S&P issuer ratings as determined by the Lehman Brothers Entities.  If both agencies rate the issuer, the lower of the two is used.  If only one agency has a published rating on the issuer, that rating shall be determinative.  If neither is rated by the rating agencies, the

41

Lehman Brothers Entities will use the ratings on the ultimate parent issuer if deemed appropriate to do so. Otherwise, the rating shall be spread-implied (if the portfolio includes a spread-based security of the issuer) or implied from the 90-day volatility and market capitalization of the issuer as described in <u>Appendix C</u>.

Table 3 describes the calculation of LGB for each issuer:

**Table 3: Portfolio Event Risk**

| Issuer Rating | Event Description | Credit Spread Shock (bp) | Equity Shock | 5-day Probability |
|---|---|---|---|---|
| BBB- or Higher | Three Notch Down-grade | +25 for AAA<br>+44 for AA<br>+73 for A<br>+169 for BBB | No shock | 0.15% for AAA<br>0.15% for AA<br>0.12% for A<br>0.12% for BBB |
| | Equity Price Decrease | No shock | Max{-100%, -1.5xVol_90day) | |
| | Joint Spread Widening and Equity Price Decrease | 75% of Spread Widening | 75% of equity price decrease | |
| | Equity Price Increase | No shock | +1.5xVol_90day | 0.13% |
| Below BBB- or in Default | Default | LGD (as defined below) | -100% | 0.015% for BB+<br>0.016% for BB<br>0.042% for BB-<br>0.065% for B+<br>0.111% for B<br>0.204% for B-<br>0.591% for CCC-D |
| | Equity Price Increase | No shock | +1.5xVol_90day | 0.13% |

For investment grade issuers, the loss associated with a three notch credit rating downgrade is

$$- NetSpread01 \times DownGradeShock ,$$

where the NetSpread01 is over all positions from the issuer.

For a corporate or convertible bond with issuer rating lower than BBB-, the loss given default ("LGD") is

$$Principal \times R - MV$$

42

where R is the recovery rate ("Recovery Rate"). The Recovery Rate shall be determined by the Lehman Brothers Entities in their discretion. Note that the LGD may be either negative (an actual loss) or positive (a gain in value upon default).

For a CDS referencing a bond with an issuer rating lower than BBB-, the LGD is defined as:

$$[-(1-R) \times Notional] - MTM$$

Note that for a CDS, the notional has a negative sign when the Counterparty has bought protection and the above equation would imply a gain in the event of default (as expected). The LGD for any issuer is then determined by computing the sum of the loss given default for all positions with that issuer.

The LGD for cash equity positions is $-MV$. Listed options are re-priced at a stock price of 0 with the LGD being $OptionValueAtZero - MTM$.

The portfolio loss associated with the event test is:

$$Loss_{EventTest} = EL_{Portfolio} \times \left(15 + 1.5\sqrt{herf_{Portfolio}}\right).$$

$EL_{Portfolio}$ is the expected loss for the portfolio ignoring issuers with positive LGEs:

$$EL_{Portfolio} = \sum_{Issuers,i} \min\{LGE_i, 0\} \times P_i.$$

$herf_{Portfolio}$ is the Herfindahl Index for the portfolio as measured by issuer concentration,

$$herf_{Portfolio} = \sum_{Issuers,i} (wt_i)^2,$$

where the $wt_i$'s are issuer weights equal to:

$$wt_i = 100 \times \frac{\min\{LGE_i, 0\}}{\sum_{Issuers,i} \min\{LGE_i, 0\}}.$$

**Single Issuer Event Risk Test**

The Single Issuer Event Loss is the single largest loss that results from separately taking each Issuer to default. Corporate bonds, converts, and CDS are taken to recovery, and other products with equity risk are re-priced at an equity price of 0. The single issuer loss is a fraction of these price declines as defined in Table 4.

**Table 4: Single Issuer Event Risk**

43

| Issuer Rating | | Event Description | Bond/CDS/Convertible Shock | Equity Shock | Single Issuer Event Loss |
|---|---|---|---|---|---|
| AAA to AA- | 10% | | | | |
| A+ to A- | 20% | | | | |
| BBB+ to BBB- | 25% | Default | Bonds/CDS/ Convertible equal the Recovery Rate | -100% | Single Issuer Largest Loss |
| BB+ to BB- | 30% | | | | |
| B+ to B- | 40% | | | | |
| CCC+ and below | 50% | | | | |

### *Sector Test*

All positions in the portfolio are grouped into one of the 24 GICS Industry Groups. All trades from each of the 24 sectors are grouped together. Each group receives two shocks—equity up plus credit tightening, and equity down plus credit widening as described in Table 5.

**Table 5 Sector Scenarios**

| Scenario Number | Equity Move | Credit Move | Equity Shock | Credit Spread Shock / MTM Shock (defaulted bonds) | |
|---|---|---|---|---|---|
| 1 | Decrease | Widen | See Table 6, column Long. | Current Spread | Shock |
| | | | | <50 | +50% |
| | | | | 50-150 | +25% |
| | | | | >150 | +35% |
| | | | | If defaulted, -9% MTM Shock. | |
| 2 | Increase | Tighten | See Table 6, column Short. | Current Spread | Shock |
| | | | | <50 | -25% |
| | | | | 50-150 | -20% |
| | | | | >150 | -20% |
| | | | | If defaulted, +7% MTM Shock. | |

**Table 6 Equity Sector Shocks**

| GICS Industry Group | Equity Shock | |
|---|---|---|
| | Long | Short |
| Transportation | -34% | +14% |
| Household & Personal Products | -34% | +27% |
| Technology Hardware & Equipment | -34% | +27% |

44

| | | |
|---|---|---|
| Food Beverage & Tobacco | -34% | +27% |
| Telecommunication Services | -34% | +27% |
| Commercial Services & Supplies | -23% | +14% |
| Software & Services | -23% | +27% |
| Semiconductors & Semiconductor Equipment | -23% | +27% |
| Pharmaceuticals, Biotechnology & Life Sciences | -23% | +27% |
| Health Care Equipment & Services | -23% | +14% |
| Retailing | -23% | +14% |
| Media | -23% | +14% |
| Automobiles & Components | -23% | +14% |
| Real Estate | -23% | +27% |
| Utilities | -15% | +14% |
| Materials | -15% | +14% |
| Consumer Durables & Apparel | -23% | +27% |
| Diversified Financials | -15% | +14% |
| Energy | -15% | +14% |
| Consumer Services | -15% | +14% |
| Banks | -15% | +14% |
| Insurance | -15% | +14% |
| Capital Goods | -15% | +27% |
| Food & Staples Retailing | -15% | +14% |
| NULL Long | -23% | n/a |
| NULL Short | n/a | +27% |

The loss for a sector in each of the 2 scenarios is simply the sum of the position losses.
The portfolio loss for the sector scenario is the worst loss over all sectors.

45

## Liquidation Cost

The portfolio liquidation cost is the sum of position-level liquidation costs:

$$LiquidationCost_{pfio} = \sum_{i} \left| LiqCost_i^{(r)} + LiqCost_i^{(s)} \right|$$

Table 7: Portfolio Liquidation Cost

| Risk Factor | Liquidity Shocks | Liquidity Cost Calculation |
|---|---|---|
| Credit Spread | All positions with credit spread risk receive:<br>i. Base liquidity shock as described in <u>Appendix A</u>.<br>ii. Size liquidity as described in <u>Appendix A</u>.<br>iii. Only positions that are long credit spread risk receive a stress liquidity shock as described in <u>Appendix A</u>. | $LiqCost_i^{(r)} = 4 \times DI_{ri} \times \left[ Spread\,01_i \times (StressLiq_i + SizeLiq_i) \right] + \left\| Spread\,01_i \right\| \times BaseLiq_i$ |
| Equity | All Positions with equity risk receive:<br>i. Base liquidity shock as described in <u>Appendix B</u>.<br>ii. Size liquidity shock as described in <u>Appendix B</u>.<br>iii. Only positions that are long equity risk receive a stress liquidity shock as described in <u>Appendix B</u>. | $LiqCost_i^{(r)} = 2 \times DI_{ri} \times \begin{bmatrix} \|\Delta_i\| \times (StressLiq_i + SizeLiq_i) - \\ \frac{1}{2}\Gamma_i \times (StressLiq_i + SizeLiq_i)^2 \end{bmatrix} + \|\Delta_i\| \times (BaseLiq_i) - \frac{1}{2}\Gamma_i \times (BaseLiq_i)^2$ |

## Appendix A

The base and size liquidity shocks are a function of current spread and depend on product type as described in Table 8.

Table 8 Base and Stress Credit Liquidity Shocks

| Current Spread (bp) | All credit products except convertible bonds | | convertible bonds | |
|---|---|---|---|---|
| | Base Liquidity add-on (bp) | Stress Liquidity add-on long only (bp) | Base Liquidity add-on (bp) | Stress Liquidity add-on long only (bp) |
| 0 – 50 | 2 | 3 | 8 | 12 |
| 50 – 150 | 3 | 5 | 12 | 20 |
| 150 – 700 | 5 | 10 | 20 | 30 |
| > 700 | 15 | 25 | 30 | 45 |

46

The size-based liquidity margin charge for corporate and convertible bonds increases by a basis point for every increment that the position is above the average lot size for the bond. It is the same for both long and short positions and does not apply to credit default swaps. It is equal to:

$$Max\{0, Min(5\% \times CurrentSpread,(|size|-ALS)/ALS)\}$$

size=the principal amount of the position.

ALS = average lot size for the bond as given by linear interpolation of one of the following tables:

| Amount Outstanding ($mm) | Average Lot Size for G-22 |
|---|---|
| $50mm | $1mm |
| $300mm | $4mm |
| $700 mm | $15mm |
| $1000mm | $20mm |

| Amount Outstanding ($mm) | Average Lot Size for non G-22 Sovereigns |
|---|---|
| $300mm | $4mm |
| $700mm | $6mm |
| $3000 mm | $10mm |
| $6000mm | $17mm |

| Amount Outstanding ($mm) | Average Lot Size for non G-22 Corporates |
|---|---|
| $50mm | $1mm |
| $300mm | $4mm |
| $700 mm | $6mm |
| $1000mm | $8mm |

47

## Appendix B

The size-based equity liquidity margin charge is:

**Equation 1: Size Liquidity Shock for Equities**

$$M \times Max\{0,(NTD-2)\times \sigma^2/252\},$$

where $\sigma$ is the 90-day realized volatility for the underlying (annualized, e.g., 0.35), $NTD$[6] is the number of trading days in the portfolio for that issuer's common stock, and $M$ is 25 for G-22 currencies and 30 for non G-22 currencies. More specifically, the $NTD$ for the $j$th position from issuer $i$ is the absolute value of the net issuer delta divided by the price of the underlying (this gives an equivalent number of shares), divided by the 90-day average daily volume for the underlying.

The base and stress liquidity margin charge for equities depends on which exchange the common stock trades on as given in Table 9 for G-22 currencies and Table 10 for non G-22 currencies. If a stock trades on an exchange other than those listed below or if we are unable to determine the exchange, it shall be assigned to the middle liquidity group for the relevant region.

Table 9 G-22 Base and Stress Equity Liquidity Shocks

| Region | Exchange Name | Exchange Code | Base/Stress Liq. (bp) |
|---|---|---|---|
| North America | NASDAQ Global Select Market | UW | 9 |
| | New York Stock Exchange | UN | |
| | NASDAQ Global Select Market (GS)/Global Market (GM)/Capital Market (CM) | UQ | 20 |
| | NYSE Arca | UP | |
| | American Stock Exchange | UA | |
| | NASDAQ Capital Market | UR | |
| | OTC Bulletin Board | UU | 103 |
| EU | Amsterdam Netherlands | NA | 13 |
| | Madrid Spain | SN | |
| | Milan Italy | IM | |
| | Vienna Austria | AV | |
| | Continuous Spain | SQ | |
| | Brussels Belgium | BB | |

---

[6] For positions greater than 5 trading days, Equation 1 is split into 2 parts—the amount corresponding to the first 5 days, and the remaining, or leftover. The leftover is added to the base liquidity shock, where it is not diversified away by way of the DI multiplication.

48

| Region | Exchange Name | Exchange Code | Base/Stress Liq. (bp) |
|---|---|---|---|
| | Paris France | FP | |
| | Athens Greece | GA | |
| | Italy NM | NI | |
| | Helsinki Finland | FH | |
| | Lisbon Portugal | PL | |
| | German Xetra | GY | |
| | Dublin Ireland | ID | |
| | Luxembourg | LX | |
| | Munich Germany | GM | 70 |
| | Frankfurt Germany | GF | |
| | Hamburg Germany | GH | |
| | Stuttgart Germany | GS | |
| | Dusseldorf Germany | GD | 170 |
| | Berlin Germany | GB | |
| | Virtx | VX | 4 |
| | London Stock Exchange | LN | |
| Europe Ex-Euro | Stockholm Sweden | SS | |
| | Copenhagen Denmark | DC | 16 |
| | Oslo Norway | NO | |
| | Swiss EBS (Electronic Boerse Schweiz) | SB | |
| | Iceland | IR | |
| | Berne Switzerland | SR | 154 |
| | Tokyo Japan | JT | 11 |
| | Osaka Japan | JO | |
| Asia | JASDAQ | JQ | 33 |
| | Hercules Japan | JX | |
| | Fukuoka Japan | JF | 157 |
| Australia & NZ | Australia ASX | AU | 53 |
| | Auckland New Zealand | NZ | |

Table 10 Non G-22 Base and Stress Equity Liquidity Shocks

| Currency | Base (bp) | Stress (bp) |
|---|---|---|
| BRL | 50 | 100 |
| MXN | 75 | 150 |
| CLP | 75 | 150 |

49

| Currency | Base (bp) | Stress (bp) |
|---|---|---|
| ARS | 50 | 100 |
| TWD | 25 | 50 |
| HKD | 25 | 50 |
| KRW | 25 | 50 |
| SGD | 50 | 100 |
| CNY | 25 | 50 |
| THB | 50 | 100 |
| MYR | 50 | 100 |
| IDR | 75 | 150 |
| INR | 25 | 50 |
| PHP | 75 | 150 |
| RUB | 50 | 100 |
| HUF | 50 | 100 |
| PLN | 50 | 100 |
| TRY | 50 | 100 |
| CZK | 25 | 50 |
| EGP | 50 | 100 |
| ILS | 50 | 100 |
| ZAR | 25 | 50 |

## Appendix C

The spread implied credit rating is based on Table 11.

**Table 11 Spread-implied ratings**

| spread (bp) | Credit Rating |
|-------------|---------------|
| <40 | AAA |
| <70 | AA |
| <100 | A |
| <180 | BBB |
| <270 | BB |
| <400 | B |
| >=400 | CCC |

If the portfolio has multiple bonds from the same issuer, the lowest of the spread-implied rating is used.

If no spread-based products from the issuer are present in the portfolio, the issuer's 90-day equity volatility and market capitalization determine the issuer rating.

The Rating Score is defined as

$$RatingScore = 8.2 \times \sigma_{90\text{-}day} - 4.7 \times \frac{MktCap(\$\$mm)}{100,000}$$

If the rating score is less than or equal to 2.3 then the issuer is treated as investment grade. The appropriate downgrade shock in basis points together with the associated probability shall be calculated by linear interpolation of the probabilities defined in Table 12.

If the rating score is greater than 2.3 then the issuer is treated as non investment grade. The appropriate probability for default should be calculated by linear interpolation of the probabilities defined in Table 13.

If either the issuer's market capitalization or 90-day volatility cannot be determined by the Lehman Brothers Entities, the issuer shall be given a CCC rating.

**Table 12 Rating score mapping (IG)**

| Rating Score | Downgrade Shock (bp) | Associated Probability |
|--------------|----------------------|------------------------|
| -7.9 | 25 | 0.1534% |
| -2.9 | 44 | 0.1509% |
| 0.3 | 73 | 0.1152% |
| 2.3 | 169 | 0.1172% |

51

**Table 13 Rating score mapping (HY)**

| Rating Score | Associated Probability |
|---|---|
| 2.3 | 0.0159% |
| 4.1 | 0.1114% |
| 5 | 0.5914% |

52

# Appendix D – Joint FX / IR Difference Shock Sizes and Loss Calculations

## Table 14 FX Down / Up Shocks

| Ccy A / Ccy B | USD | EUR | AUD | NZD | CAD | CHF | GBP | JPY | DKK | NOK | SEK |
|---|---|---|---|---|---|---|---|---|---|---|---|
| USD | | | | | | | | -4%/4% | | | |
| EUR | -4%/4% | | | | | -2%/2% | | -5%/5% | -3%/3% | -3%/3% | -3%/3% |
| AUD | -3%/5% | -4%/6% | | | | -5%/4% | | -6%/5% | -5%/5% | -5%/5% | -5%/5% |
| NZD | -5%/5% | -3%/3% | -3%/3% | | | -6%/4% | | -6%/5% | -5%/5% | -5%/5% | -5%/5% |
| CAD | -3%/3% | -4%/5% | | -4%/4% | | | | -4%/4% | -3%/3% | -3%/3% | -5%/5% |
| CHF | -4%/4% | | | | | | | -5%/4% | -3%/3% | -4%/4% | -5%/4% |
| GBP | -3%/3% | -4%/4% | -4%/4% | -4%/4% | -3%/4% | -3%/3% | | -4%/4% | -3%/3% | -3%/3% | -3%/3% |
| JPY | -4%/4% | | | | | | | | -5%/5% | -5%/5% | -5%/5% |
| DKK | -4%/4% | | | | | | | -5%/5% | | | -2%/2% |
| NOK | -4%/4% | | | | | | | -5%/5% | | | -3%/3% |
| SEK | -4%/4% | | | | | | | -5%/5% | | | |

No shocks are specified for currency pairs which are greyed out.

## Table 15 FX Down / Up Shocks - non-G22 Currencies

| Country | Ccy B / Ccy A | USD | | EUR | | JPY | |
|---|---|---|---|---|---|---|---|
| | | Down | Up | Down | Up | Down | Up |
| Argentina | ARS | -15% | 10% | - | - | - | - |
| Brazil | BRL | -11% | 9% | -9% | 12% | -9% | 12% |
| Chile | CLP | -4% | 4% | - | - | - | - |
| China | CNY | -7% | 7% | - | - | - | - |
| Czech Republic | CZK | -5% | 5% | - | - | - | - |
| Egypt | EGP | -6% | 6% | - | - | - | - |
| Hong Kong | HKD | -7% | 7% | - | - | - | - |
| Hungary | HUF | -5% | 5% | -4% | 4% | -6% | 6% |
| India | INR | -5% | 5% | - | - | - | - |

53

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Indonesia | IDR | -10% | 10% | - | - | - | - | - |
| Israel | ILS | -5% | 5% | - | - | - | - | - |
| Malaysia | MYR | -7% | 7% | - | - | - | - | - |
| Mexico | MXN | -4% | 4% | -5% | 6% | - | -6% | 6% |
| Philippines | PHP | -5% | 5% | - | - | - | - | - |
| Poland | PLN | -5% | 5% | -5% | 5% | -5% | -6% | 6% |
| Russia | RUB | -15% | 10% | -7% | 7% | -10% | -10% | 15% |
| Saudi Arabia | SAR | -7% | 7% | - | - | - | - | - |
| Singapore | SGD | -7% | 7% | - | - | - | - | - |
| South Africa | ZAR | -10% | 8% | -8% | 10% | -8% | -8% | 10% |
| South Korea | KRW | -5% | 5% | - | - | - | - | - |
| Taiwan | TWD | -5% | 5% | - | - | - | - | - |
| Thailand | THB | -6% | 6% | - | - | - | - | - |
| Turkey | TRY | -15% | 15% | -10% | 12% | -10% | -10% | 12% |

54

**Table 16 IR Difference Tightening / Widening Shocks**

| ccy/ccyB | USD | EUR | AUD | NZD | CAD | CHF | GBP | JPY | DKK | NOK | SEK |
|---|---|---|---|---|---|---|---|---|---|---|---|
| USD | | | | | -20/20 | -20/20 | -20/20 | -40/40 | -30/40 | -30/40 | -30/40 |
| EUR | -30/20 | | -30/50 | -30/50 | -30/50 | -20/20 | -20/20 | -30/50 | -30/40 | -30/50 | -30/40 |
| AUD | -30/50 | | | -30/50 | -30/50 | -30/50 | | -20/50 | -30/50 | -30/50 | -30/50 |
| NZD | -30/20 | | | | | -30/50 | | -20/50 | -40/50 | -40/50 | -40/50 |
| CAD | -30/20 | | | | | | | -40/40 | -40/50 | -40/50 | -40/50 |
| CHF | -30/20 | | | | | | | -20/20 | -30/40 | -30/40 | -30/40 |
| GBP | -30/30 | | -30/50 | -30/50 | | -20/20 | | -30/40 | -30/40 | -30/40 | -20/30 |
| JPY | -40/40 | | | | | | | | | | |
| DKK | -50/40 | | | | | | | -30/40 | | -40/30 | -30/50 |
| NOK | -50/40 | | | | | | | -30/40 | -40/30 | | -40/40 |
| SEK | -50/40 | | | | | | | -30/40 | | | |

(values in bp)

**Table 17 IR Difference Tightening / Widening Shocks - non-G10 Currencies**

| Country | Currency | Tighten | Widen |
|---|---|---|---|
| Brazil | BRL | -400 | 400 |
| Hungary | HUF | -130 | 130 |
| Mexico | MXN | -100 | 100 |
| Poland | PLN | -100 | 100 |
| Russia | RUB | -400 | 400 |
| South Africa | ZAR | -120 | 120 |
| Turkey | TRY | -1200 | 1200 |

**IR Difference Shock – Add-On**

If remaining maturity < 1 year then add (IR Difference Widening) / subtract (IR Difference Tightening) 10 bp to each value in the table above

If remaining maturity >= 1 year and <=2 years then add (IR Difference Widening) / subtract (IR Difference Tightening) an amount corresponding to the linear interpolation between 10 bp and 0 bp.

If remaining maturity >2 years then make no changes to shock sizes in tables 15 and 16 above.

55

**Loss Calculations for FX / IR Difference Combined Scenarios**

**Definitions:**

In the expressions that follow in this appendix we will rely on the following definitions of shock sizes (further to those given in the main definitions section):

- $FxShock_j^{A/B}$ is the percentage shock between currencies A and B, which is found by matching the row that corresponds to A with the column that corresponds to B in Table 14.
- $IRDiffShock_j^{A,B}$ is the interest rate difference shock (in bp) between currencies A and B. This shock is found by matching the row that corresponds to A with the column that corresponds to B in Table 16.
- $IRShock_B^{Up}$ and $IRShock_B^{Down}$ are the (basis point) interest rate Up and Down moves, respectively, for currency B which are specified in Table 1 (Interest Rate Widening / Tightening).

**Product Type = F/X CASH**

Product Type = "FX Cash" will be sensitive only to F/X Shocks. F/X Shock Cash losses are given by:

$$Loss_j^i = FxShock_j^{A/USD} * Notional_{USD}^{Mkt}$$

where

- A is the non-USD currency (USD F/X Cash positions, naturally carry no risk).

**Product Type = F/X FUTURE**

ProductType = "F/X Future" will be sensitive to both F/X Shocks and IR Difference Shocks.

The FX / IR Difference Shock Futures losses are given by:

$$Loss_j^i = FxShock_j^{A/B} * Notional_{USD}^{Mkt} - \rho_{USD}^{Aleg} IRDiffShock_j^{A,B} / 100$$

where

- A is the future contract's denomination currency
- B is the other currency involved in the F/X Future.

**Product Type = F/X FORWARD**

For an F/X forward between currencies A and B, $Loss_j^i$ is calculated as:

$$Loss_j^i = \Delta_{USD}^{Aleg} FxShock_j^{A/B} - \rho_{USD}^{Bleg} IRDiffShock_j^{A,B} / 100$$

56

Currencies A and B are chosen as follows. If USD is one of the two currencies of the Forward, A is the other currency of the transaction (and B is the USD). If both currencies are non-USD, A and B are chosen according to the usual market quotation order for the currency pair (eg. EUR vs JPY is usually quoted EUR/JPY, ie. number of JPY per 1 EUR. According to our convention this means A=EUR and B=JPY).

Add-ons (apply only to ProductType=F/X Forward):

If one of either A or B is USD add to $Loss_j^i$:

$$- \max\left\{\left(\rho_{USD}^{Ales} + \rho_{USD}^{Blet}\right) IRShock_B^{Up} / 100, \left(\rho_{USD}^{Ales} + \rho_{USD}^{Blet}\right) IRShock_B^{Down} / 100\right\}$$

**Equation 2: Add-on for FX-Forwards when the USD is part of the currency pair**

If both A and B are different from USD add to $Loss_j^i$ the value given by Equation 2 and the following:

$$- \max\left\{\left(PV_{USD}\right) FxShock_{Up}^{B/USD}, \left(PV_{USD}\right) FxShock_{Down}^{B/USD}\right\}$$

57

EXHIBIT I

DEFINITIONS

"**Act of Insolvency**" means that Counterparty, or any guarantor of, or similar or other credit support provider of or with respect to, Counterparty:  (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the foregoing events; or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

"**Additional Margin Requirement**" means the sum of (i) the Committed Additional Margin Requirement, (ii) the Uncommitted Additional Margin Requirement and (iii) such additional amount, if any, as one or more Lehman Brothers Entities determine is necessary to assure that all Lehman Brothers Entities and Counterparty satisfy all Regulatory Requirements.

"**Applicable Default Rate**" means, with respect to interest to be paid by Counterparty to a Lehman Brothers Entity under Section 5.3 in respect of a Net Settlement Payment after such payment is due, the Applicable Rate plus three hundred basis points.

"**Applicable Law**" means all applicable laws, rules, regulations, policy and interpretive statements of any governmental or quasi-governmental authorities and securities, commodities and options exchanges and self-regulatory organizations, including but not limited to all initial and maintenance margin requirements.

"**Applicable Rate**" means, with respect to interest to be paid by Counterparty to a Lehman Brothers Entity under Section 4.7 in respect of Credit Support Transferred by a Lehman Brothers Entity, a rate of interest per annum (computed on the basis of daily compounding and the actual number of days elapsed over a year of such number of days as is customary for transactions involving the relevant currency in the London interbank market) equal to the average of the rates at which overnight deposits in the relevant currency are offered by two major banks (selected by the relevant Lehman Brothers Entity) in the London interbank market at or about 11:00 a.m. (London time) on each day of such period, or, if no such rates are available, a rate of interest as the relevant Lehman Brothers Entity may reasonably select.

58

"**Bankruptcy Code**" means the United States Bankruptcy Code, as the same may be amended from time to time.

"**Base Contract**" means any agreement or transaction between Counterparty and a Lehman Brothers Entity and identified in Schedule I, as the same may be supplemented or amended from time to time (and, in the case of any master agreements or umbrella agreements, including any prime brokerage agreements, identified in Schedule I, each transaction thereunder or covered thereby), and any related security agreements (other than this CMN Agreement), and any terms or conditions incorporated by reference into any of the foregoing.

"**Basic Margin Requirement**" means, with respect to any Base Contract at any time, the amount determined by any of the Lehman Brothers Entities to be the exposure at that time of the relevant Lehman Brothers Entity to Counterparty (or vice versa) in respect of that Base Contract, determined by the Lehman Brothers Entities in accordance with any mark-to-market or other margin calculation provisions of that Base Contract (but without applying any thresholds, minimum transfer amounts, independent amounts, or haircuts or discounts on the value of Credit Support associated with that Base Contract and without regard to any notice or dispute resolution procedures provided for by such Base Contract) or, if there are no such provisions, by the Lehman Brothers Entities in a reasonable manner. If a Lehman Brothers Entity has such an exposure to Counterparty in respect of a Base Contract, the Basic Margin Requirement is an amount due to such Lehman Brothers Entity pursuant to such Base Contract; if Counterparty has such an exposure to a Lehman Brothers Entity in respect of a Base Contract, the Basic Margin Requirement is an amount due to Counterparty pursuant to such Base Contract.

"**Business Day**" means each day on which commercial banks and foreign exchange markets are generally open to settle payments in New York City.

"**Cessation Event**" means the occurrence of one or more of the following circumstances or events (and without regard to whether any such circumstances or events is continuing):

(a) If Lehman Brothers Holdings Inc. (i) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least A3 (the "Moody's Rating") as determined by Moody's Investors Service, Inc. ("Moody's"); or (ii) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least A- (the "S&P Rating") as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"); or (iii) ceases to be rated by either Moody's or S&P. For clarification, in the event either Moody's or S&P assigns a rating to Lehman Brothers Holdings Inc. that is lower than the Moody's Rating or the S&P Rating, as the case may be, then such lower rating shall be determinative; or

(b) If the end-of-day credit spread on five year credit default swaps on Lehman Brothers Holdings Inc. appearing on Markit.com, the website maintained by Markit Group Limited (or any other source reasonably selected by a Lehman Brothers Entity if such website is no longer available), (i) increases by more than 150 basis points over a three month period or (ii) exceeds 225 basis points as of the market-closing price for five consecutive Business Days; or

59

(c) If Lehman Brothers Holdings Inc. (i) fails to maintain a short-term rating (or any successor rating) of at least P-1 (the "Moody's Short-Term Rating") as determined by Moody's; or (ii) fails to maintain a short-term issue credit rating (or any successor rating) of at least A-1 (the "S&P Short-Term Rating") as determined by S&P; or (iii) ceases to be rated by either Moody's or S&P. For clarification, in the event either Moody's or S&P assigns a rating to Lehman Brothers Holdings Inc. that is lower than the Moody's Short-Term Rating or the S&P Short Term Rating, as the case may be, then such lower rating shall be determinative; or

(d) If any event, circumstance or condition occurs and/or exists which would constitute an Additional Termination Event (as defined below) under any ISDA Master Agreement included as a Base Contract hereunder, provided that (i) Counterparty is an Affected Party (as defined below) with respect to any such Additional Termination Event and (ii) for purposes of applying this definition of Cessation Event, such Additional Termination Events shall be as defined in such ISDA Master Agreement(s) as in effect on the date this CMN Agreement is initially executed (without giving effect to any amendments thereto after the date this CMN Agreement is initially executed). As used in the preceding sentence, Additional Termination Event and Affected Party shall have the meanings given such terms in each applicable ISDA Master Agreement included as a Base Contract hereunder; or

(e) Counterparty fails to timely deliver or provide any financial statements (including with respect to Counterparty's net asset value), reports or other similar information as required by any of the Base Contracts, including, without limitation, any ISDA Master Agreements included as a Base Contract hereunder; provided that any such failure is not remedied on or before the Transfer Deadline of the third Business Day after notice of such failure is given to Counterparty; or

(f)    At any time during the term of this CMN Agreement, "benefit plan investors" (within the meaning of U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101 (the "Plan Asset Regulation")) hold twenty-five percent (25%) or more of the value of any class of equity interest in Counterparty as determined in accordance with the Plan Asset Regulation.

"Close-out" means termination, cancellation, liquidation, acceleration, designation of an early termination date, acceleration of a repurchase date, other similar action or any other remedial action, as determined by the relevant Lehman Brothers Entity.

"Close-out Event" means (i) the occurrence or existence of (A) any breach, misrepresentation, default, event of default, termination event, event that, with the giving of notice or the lapse of time or both, would constitute an event of default or other similar condition or event (however described) in respect of Counterparty, or any guarantor of, or similar or other credit support provider of or with respect to, Counterparty under this CMN Agreement, any Base Contract or any other agreement between Counterparty and any Lehman Brothers Affiliate, (B) any condition which would allow a Lehman Brothers Entity to Close-out any Contract or (C) an Act of Insolvency, or (ii) Counterparty disaffirms, disclaims, repudiates or rejects, in whole or in

60

part, or challenges the validity of, any Contract or any other agreement between Counterparty and any Lehman Brothers Affiliate.

"CMN Agreement Termination Date" has the meaning set forth in Section 9.4 of this CMN Agreement.

"Collateral" means (a) all property pledged by or on behalf of Counterparty to a Lehman Brothers Entity, whether or not there are any outstanding Obligations, and all other securities, money and other property delivered by or on behalf of Counterparty to any Lehman Brothers Entity, held or carried by any Lehman Brothers Entity for the account of Counterparty, or due from any Lehman Brothers Entity to Counterparty (other than Title Transfer Credit Support) ("Securities and Cash Collateral"), and (b) all of Counterparty's right, title and interest in and to any Base Contract, subject to the setoff, netting, recoupment and other rights of the Lehman Brothers Entity party to such Base Contract ("Receivables Collateral"), and in each case all rights relating thereto and all cash and non-cash proceeds thereof.

"Commitment Period" means the period of time commencing on the date of execution of this CMN Agreement and terminating on the earlier of (i) the close of business 75 calendar days after the date on which a Lehman Brothers Entity gives Counterparty notice of termination of the Committed Margin Terms, provided that if such 75th day is not a Business Day, then the Commitment Period will terminate on the next Business Day, (ii) a Close-out Event or (iii) following a Cessation Event described in paragraphs (d), (e) and/or (f) of the definition of Cessation Event, on the date specified to Counterparty in writing by a Lehman Brothers Entity; provided, however, such 75 day period shall immediately be reduced to 30 days upon the occurrence of a Cessation Event described in paragraphs (a), (b) and/or (c) of the definition of Cessation Event. All transactions entered into upon or after the provision of such notice will not be governed by the Committed Margin Terms and will be entered into upon the terms of the MLA (in the case of transactions entered into pursuant to the MLA) or the terms of the ISDA Master (in the case of transactions entered into pursuant to the ISDA Master).

"Committed Additional Margin Requirement" means, with respect to the Committed Margin Portfolio the total calculation of margin in accordance with the Committed Margin Terms as determined by the Lehman Brothers Entities in their sole discretion.

"Committed Margin Portfolio" means (i) the transactions specified in Schedule V that one or more Lehman Brothers Entities determine in their sole discretion are eligible for the Committed Margin Terms and (ii) such additional transactions that one or more Lehman Brothers Entities determine in their sole discretion to include in the Committed Margin Portfolio, provided that a Lehman Brothers Entity provides written notice to Counterparty of any such determination.

"Committed Margin Terms" means the margin terms and method of calculation as determined by the Lehman Brothers Entities in their sole discretion and as outlined in Part III of Schedule V of this CMN Agreement which the Lehman Brothers Entities shall apply to the Committed Margin Portfolio during the Commitment Period. The Lehman Brothers Entities may amend the Committed Margin Terms upon 75 calendar days' notice to Counterparty and amend or terminate at any time following a Close-out Event and/or Cessation Event described in

61

paragraphs (d), (e) and/or (f) of the definition of Cessation Event; provided, however, such 75 day period shall immediately be reduced to 30 days upon the occurrence of a Cessation Event described in paragraphs (a), (b) and/or (c) of the definition of Cessation Event.

"**Commodity Exchange Act**" means the United States Commodity Exchange Act, as the same may be amended from time to time.

"**Contract**" means each Base Contract and this CMN Agreement.

"**Credit Support**" means (a) all property pledged by or on behalf of Counterparty to a Lehman Brothers Entity, or by a Lehman Brothers Entity to Counterparty to secure a Base Contract (including any cash Transferred, or deemed Transferred, under Section 4.4), whether or not there are any outstanding Obligations, and (b) all property transferred by or on behalf of Counterparty or a Lehman Brothers Entity to provide setoff, netting or recoupment rights under or in connection with a Base Contract, whether or not there are any outstanding Obligations under such Base Contract ("**Title Transfer Credit Support**"), and in each case all rights relating thereto and all cash and non-cash proceeds thereof.

"**Deficit**" has the meaning set forth in Section 2.3 of this CMN Agreement.

"**Eligible Credit Support**" means, subject to Section 4.4 of this CMN Agreement, in the case of Credit Support to be Transferred in respect of any Base Contract that is a reverse repurchase transaction, the "Purchased Securities" thereunder, U.S. Dollars, U.S. Treasury Securities or such other Credit Support as is agreed by the parties, and, in the case of Credit Support to be Transferred in respect of any other Base Contract, cash in U.S. Dollars or other property determined by a Lehman Brothers Entity in its sole discretion. Notwithstanding the foregoing, a Lehman Brothers Transferor shall be entitled, if it is required to transfer Eligible Credit Support otherwise due to Counterparty in respect of a reverse repurchase transaction to a Lehman Brothers Transferee to satisfy the obligation of Counterparty to such Lehman Brothers Transferee, to transfer any Credit Support such Lehman Brothers Transferor may hold under such reverse repurchase transaction.

"**Excess**" has the meaning set forth in Section 2.3 of this CMN Agreement.

"**FDICIA**" means the netting provisions of the Federal Deposit Insurance Corporation Improvement Act of 1991, and Regulation EE issued by the Board of Governors of the Federal Reserve System.

"**First Priority Lehman Brothers Entity**" has the meaning set forth in Section 6.2 of this CMN Agreement.

"**G-10 Country**" has the meaning set forth in Schedule V of this CMN Agreement.

"**G-10 Country Currency**" has the meaning set forth in Schedule V of this CMN Agreement.

62

"**Lehman Brothers Affiliate**" means (i) each Lehman Brothers Entity, (ii) any entity, whether now or hereafter existing, controlled, directly or indirectly, by any Lehman Brothers Entity, (iii) any entity, whether now or hereafter existing, that controls, directly or indirectly, any Lehman Brothers Entity or (iv) any entity, whether now or hereafter existing, directly or indirectly under common control with any Lehman Brothers Entity. For this purpose, "control" of any entity or any Lehman Brothers Entity means ownership of a majority of the voting power of the entity or any Lehman Brothers Entity.

"**Lehman Brothers Transferee**" has the meaning set forth in Section 2.3 of this CMN Agreement.

"**Lehman Brothers Transferor**" has the meaning set forth in Section 2.3 of this CMN Agreement.

"**Margin Notification Deadline**" means 10:00 a.m., New York City time; provided, however, Margin Requirement pursuant to any futures agreement (including, without limitation, any Master Institutional Futures Customer Agreement) included as a Base Contract shall not be subject to the Margin Notification Deadline.

"**Margin Requirement**" means, with respect to any Base Contract at any time, if the amount equal to (i) the Basic Margin Requirement with respect to such Base Contract that is an exposure of the relevant Lehman Brothers Entity to Counterparty, if any, plus (ii) any portion of the Additional Margin Requirement allocated to such Base Contract by one or more Lehman Brothers Entities in accordance with Section 2.1 minus (iii) the Basic Margin Requirement with respect to such Base Contract that is an exposure of Counterparty to the relevant Lehman Brothers Entity, if any, is a positive number, such amount and the Margin Requirement shall be due from Counterparty to such Lehman Brothers Entity. If such amount is a negative number, the Margin Requirement shall be the absolute value of such amount and the Margin Requirement shall be due from such Lehman Brothers Entity to Counterparty.

"**Net Settlement Payment**" has the meaning set forth in Section 5.2 of this CMN Agreement.

"**Obligations**" means, as the context requires, each and every obligation of Counterparty under, pursuant to or in connection with the Contracts to all Lehman Brothers Affiliates and all Lehman Brothers Affiliates to Counterparty under, pursuant to or in connection with the Contracts, including, without limitation, payment and delivery obligations (including in respect of any and all property pledged by or on behalf of any Lehman Brothers Entity to secure a Base Contract and Credit Support transferred to Counterparty) and any payment or delivery obligations in respect of any previously terminated transaction, in each case whether arising heretofore or hereafter, and whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, financial, physical, secured, or unsecured and howsoever arising.

"**Other Transactions**" means any transaction under a Base Contract which is not a Committed Margin Portfolio transaction.

"**Proceedings**" has the meaning given to it in Section 9.9.1.

63

"**Receivables Collateral**" has the meaning set forth in the definition of Collateral.

"**Regulatory Requirement**" means (a) with respect to any Lehman Brothers Entity or Counterparty, all requirements under Applicable Law, including without limitation all requirements as to the manner of a Lehman Brothers Entity's holding Credit Support, the manner of transfer to a Lehman Brothers Entity of Credit Support, and the amount of Credit Support transferred to a Lehman Brothers Entity in respect of any Base Contract, and (b) with respect to any Lehman Brothers Entity, (i) all requirements to hold or to have been transferred Collateral or Credit Support in respect of any Base Contract in order for such Lehman Brothers Entity to avoid any capital charges or other adverse capital consequences, intercompany collateral requirements or limitations on the volume of intercompany transactions, or any adverse tax consequences and (ii) all margin requirements imposed by any Lehman Brothers Entity as a result of Applicable Law.

"**Remaining Excess**" has the meaning set forth in Section 2.4 of this CMN Agreement.

"**Second Priority Lehman Brothers Entity**" has the meaning set forth in Section 6.2 of this CMN Agreement.

"**Securities and Cash Collateral**" has the meaning set forth in the definition of Collateral.

"**Securities Intermediary**" shall have the meaning set forth in Article 8 of the UCC.

"**Settlement Amount**" means with respect to each Base Contract, (a) the amount calculated as payable by one party to the other upon Close-out of such Base Contract, and (but without duplication) any accrued but unpaid amounts payable by one party to the other prior to such Close-out, determined in accordance with the provisions of such Base Contract, or (b) if the relevant Lehman Brothers Entity determines in its sole discretion that the determination of such amounts under the provisions of such Base Contract is impractical at the time of Close-out or if no method of determination is specified in such Base Contract, such amount as is determined by the relevant Lehman Brothers Entity in a reasonable manner as being payable upon Close-out of such Base Contract and any accrued but unpaid amounts, including, without limitation, any loss of bargain or cost of funding incurred by such Lehman Brothers Entity and, without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position that is required to put such Lehman Brothers Entity in the same economic position as it would have been but for the occurrence of the Close-out Event from which such Close-out arose. If the Obligations with respect to one or more Base Contracts have not matured, terminated, liquidated or been accelerated, then the Lehman Brothers Entities shall in good faith estimate the Settlement Amount with respect to such Base Contracts as of the date of determination in respect of such Base Contracts.

"**SIPC**" means the Securities Investor Protection Corporation.

"**Title Transfer Credit Support**" has the meaning set forth in the definition of Credit Support.

64

"Transfer" or "Transferred" means:

(a)    in the case of cash: payment or delivery by wire transfer into one or more bank accounts of the transferee;

(b)    in the case of certificated securities that cannot, or which the parties have agreed will not, be paid or delivered by book-entry: payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a valid and legally effective transfer to the transferee;

(c)    in the case of securities that must, or which the parties have agreed will, be paid or delivered by book-entry:  the crediting by a Securities Intermediary of such securities to the transferee's "securities account" (within the meaning of the UCC) maintained with such Securities Intermediary; and

(d)    in the case of other forms of property: as agreed between the parties.

In the case of a Transfer by any Lehman Brothers Entity of an Excess to satisfy a Deficit, "Transfer" means such action, if any, as determined by the relevant Lehman Brothers Entity.

"Transfer Deadline" means 5:00 p.m., New York City time.

"Transferee" has the meaning set forth in Section 4.3 of this CMN Agreement.

"UCC" means the New York Uniform Commercial Code, as in effect from time to time.

"Uncommitted Additional Margin Requirement" means such additional margin amounts for Other Transactions as may be determined by one or more Lehman Brothers Entities in their sole discretion based on the margin terms agreed for such Other Transactions between one or more Lehman Brothers Entities and the Counterparty.

"U.S. Dollar Equivalent" of an amount as of any date means (i) in respect of an amount denominated in U.S. Dollars, such amount and (ii) in respect of any amount dominated in a currency other than U.S. Dollars ("Other Currency"), the amount expressed in U.S. Dollars, as determined by one or more Lehman Brothers Entities, that would be required to purchase or sell, as appropriate, such amount of such Other Currency as of such date with or for U.S. Dollars at the rate equal to the spot exchange rate of a foreign exchange agent (selected in good faith by such Lehman Brothers Entity or Lehman Brothers Entities, as applicable) (in the city in which such foreign exchange agent is located) at such time as the Lehman Brothers Entities in their sole and absolute discretion shall determine.

"Value" means, with respect to an item of Credit Support allocated to a Base Contract under Section 4.1, as determined in a reasonable manner by one or more Lehman Brothers Entity or Entities, the U.S. Dollar Equivalent of the market value of such item of Credit

65

Support as adjusted by any haircut or discount applicable to such item of Credit Support under the terms of such Base Contract, except that the Value of any item of Credit Support that is not Eligible Credit Support shall be zero.

66

**H
A
N
D**

**D
E
L
I
V
E
R
Y**

FILED / RECEIVED

MAY 2 0 2010

EPIQ BANKRUPTCY SOLUTIONS, LLC

RECEIVED BY: _____

DATE _____

4:47PM

TIME _____