JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Jayant W. Tambe
Aviva Warter Sisitsky
Toni-Ann Citera

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                           :
In re:                                     :     Chapter 11
                                           :
LEHMAN BROTHERS HOLDINGS INC., et al.,     :     Case No. 08-13555 (JMP)
                                           :
                   Debtors.                :     (Jointly Administered)
                                           :
------------------------------------------------------------x
```

**NOTICE OF MOTION OF DEBTORS PURSUANT TO SECTION 105(a)
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019(a)
FOR AUTHORIZATION AND APPROVAL OF THE GLOBAL
SETTLEMENT AMONG THE DEBTORS AND THE AMBAC SETTLING PARTIES**

**PLEASE TAKE NOTICE** that a hearing on the annexed Motion of Lehman Brothers

Holdings Inc. ("LBHI") together with Lehman Brothers Special Financing Inc. ("LBSF"),

Lehman Brothers Derivative Products Inc. ("LBDP") and Structured Asset Securities

Corporation ("SASC," and together with LBHI, LBSF and LBDP, the "Debtors" and collectively

with their affiliated debtors and debtors in possession in the above-captioned chapter 11 cases,

the "Lehman Debtors"), Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy

Rule 9019(a) for Authorization and Approval of the Global Settlement Among the Debtors and

the Ambac Settling Parties (the "Motion"), will be held before the Honorable James M. Peck,

United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton

Customs House, Courtroom 601, One Bowling Green, New York, New York 10004

(the "Bankruptcy Court"), on **October 20, 2010 at 10:00 a.m. (Prevailing Eastern Time)**

(the "Hearing").

      **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion shall be in

writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the

Bankruptcy Court for the Southern District of New York, shall set forth the name of the

objecting party, the basis for the objection and the specific grounds thereof, shall be filed with

the Bankruptcy Court electronically in accordance with General Order M-242 (which can be

found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document

Format (PDF), Microsoft Word, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon (i) the chambers of the

Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn:  Corrine Ball, Jayant W.

Tambe, Aviva Warner Sisitsky and Toni-Ann Citera) and Weil Gotshal & Manges LLP, 767

Fifth Avenue, New York, New York 10153 (Attn:  Richard P. Krasnow, Lori R. Fife, Shai Y.

Waisman, and Jacqueline Marcus), attorneys for the Debtor; (iii) the Office of the United States

Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New

York 10004 (Attn:  Andy Velez-Rivera, Paul Schwartzberg, Brian Masumoto, Linda Riffkin, and

Tracy Hope Davis); (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza,

New York, New York 10005 (Attn:  Dennis F. Dunne, Dennis O'Donnell, and Evan Fleck) and

Quinn Emanuel Urquhart Oliver & Hedges, LLP, 51 Madison Avenue, 22nd Floor, New York,

New York 10010 (Attn: Susheel Kirpalani), attorneys for the official committee of unsecured creditors appointed in these cases; and (v) Sheppard Mullin Richter & Hamilton LLP, 30 Rockefeller Plaza, 24th floor, New York, New York 10112 (Attn:  Malani J. Cademartori), so as to be received no later than October 13, 2010 at 4:00 p.m. (Prevailing Eastern Time) (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:    October 5, 2010
          New York, New York

Respectfully submitted,

/s/  Corinne Ball
Corinne Ball
Jayant W. Tambe
Aviva Warter Sisitsky
Toni-Ann Citera
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Jayant W. Tambe
Aviva Warter Sisitsky
Toni-Ann Citera

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                    :
In re:                              :      Chapter 11
                                    :
LEHMAN BROTHERS HOLDINGS INC., et al.,   :   Case No. 08-13555 (JMP)
                                    :
              Debtors.              :      (Jointly Administered)
                                    :
------------------------------------------------------------X
```

## MOTION OF DEBTORS PURSUANT TO SECTION 105(a)
## OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019(a)
## FOR AUTHORIZATION AND APPROVAL OF THE GLOBAL
## SETTLEMENT AMONG THE DEBTORS AND THE AMBAC SETTLING PARTIES

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") together with Lehman Brothers Special

Financing Inc. ("LBSF"), Lehman Brothers Derivative Products Inc. ("LBDP") and Structured

Asset Securities Corporation ("SASC," and together with LBHI, LBSF and LBDP, the "Debtors"

and collectively with their affiliated debtors and debtors in possession in the above-captioned

chapter 11 cases, the "Lehman Debtors") file this Motion of Debtors Pursuant to Section 105(a)

of the Bankruptcy Code and Bankruptcy Rule 9019(a) for Authorization and Approval of the

Global Settlement Among the Debtors and the Ambac Settling Parties (the "Motion") and respectfully represent:

## PRELIMINARY STATEMENT

1.      By this Motion, the Debtors seek approval of a global settlement agreement (the "Global Settlement")[1] by and among the Debtors, on the one hand, and, (i) Ambac Assurance Corporation ("Ambac"), a regulated insurance company, on behalf of itself and as the Management Services Provider of the Segregated Account of Ambac (the "Segregated Account"), pursuant to the authority delegated to Ambac by the Commissioner of Insurance for the State of Wisconsin, as rehabilitator (the "Rehabilitator") of the Segregated Account; (ii) the Segregated Account; (iii) Ambac Credit Products, LLC ("ACP"), a wholly owned subsidiary of Ambac; and (iv) Ambac Financial Services, LLC ("AFS"), another wholly owned subsidiary of Ambac (AFS together with ACP and Ambac, the "Ambac Parties," and, collectively with the Segregated Account, the "Ambac Settling Parties," and together with the Debtors, the "Parties" and each a "Party"), on the other hand.

2.      The Global Settlement provides a comprehensive resolution to the claims asserted by the Debtors and the Ambac Settling Parties against each other.  In particular, the Global Settlement provides that:  (i) the Ambac Parties withdraw any and all proofs of claim filed against the Debtors, which exceed in the aggregate $6.1 billion; (ii) the Debtors and the Ambac Settling Parties release each other from any liability under certain disputed prepetition derivatives transactions, including the release by the Debtors of claims for payments that the Debtors believe may be owed to them; and (iii) the Debtors and the Ambac Settling Parties each agree to comprehensive mutual releases of the Parties and certain related persons of such Parties

---

[1]      The salient provisions of the Global Settlement are described herein.  A copy of the Global Settlement will be provided to parties in interest upon written request to the Debtors' counsel.

with respect to any transactions or proceedings occurring before the effective date of the Global Settlement. The Global Settlement also resolves the complex interplay of jurisdictional and legal issues surrounding the Debtors' chapter 11 cases in New York and the rehabilitation proceedings in Wisconsin involving the Ambac Settling Parties.

3.     By eliminating more than $6.1 billion in claims against the Debtors, granting the Debtors broad releases related to the conduct underlying such claims and by eliminating the need to engage in protracted, complex litigation in multiple jurisdictions (and the inherent uncertainty related thereto) in exchange for the Debtors' release of the Ambac Settling Parties, the Global Settlement is fair, equitable and in the best interests of the Debtors' estates, their creditors and all parties in interest in these chapter 11 cases. For this very reason, the Creditors' Committee (as defined below) supports the Global Settlement. And for this same reason, this Court should enter an order, substantially in the form of the proposed order attached hereto as <u>Exhibit A</u>, approving the Global Settlement.

## JURISDICTION

4.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

5.     The Debtors seek, pursuant to section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") and rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), authorization to enter into the Global Settlement to compromise and settle, among other items, certain claims asserted by the Ambac Parties against the Debtors' bankruptcy estates in their chapter 11 cases pending before this Court. The terms of the settlement are reflected in the Global Settlement. Entry of an order by this

Court substantially in the form of <u>Exhibit A</u> is a condition precedent to the effectiveness of the Global Settlement.

## **<u>BACKGROUND</u>**

I. **New York vs. Wisconsin**

    A.    <u>The Debtors' Chapter 11 Cases in this Court in New York</u>

    6.    On September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries, including LBSF, LBDP and SASC, commenced voluntary cases under chapter 11 of the Bankruptcy Code with this Court. The Lehman Debtors' chapter 11 cases have been consolidated for procedural purposes and are being jointly administered pursuant to rule 1015(b) of the Bankruptcy Rules. The Lehman Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

    7.    On September 17, 2008, the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "<u>Creditors' Committee</u>").

    8.    On July 2, 2009, the Bankruptcy Court entered the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form, dated July 2, 2009 [Docket No. 4271] establishing September 22, 2009 at 5:00 p.m. as the deadline for filing proofs of claim against the Lehman Debtors in these chapter 11 cases (the "<u>Bar Date Order</u>"). Notice of entry of the Bar Date Order and the deadline for filing proofs of claim in the Lehman Debtors chapter 11 cases was served on, among others, Ambac, and published in accordance with the Bar Date Order [Docket Nos. 4309, 4349, 9395, 9930 and 10276].

9.      On September 21 and 22, 2009, Ambac filed 60 proofs of claim in these chapter 11 cases asserting over $6.1 billion in aggregate amounts owed by the Debtors to the Ambac Parties as set forth in additional detail in <u>Exhibit B</u> hereto (the "<u>Proofs of Claim</u>").  The Proofs of Claim are premised on the Debtors' purported breach of obligations related to their various roles in certain residential mortgage-backed securities transactions entered into with the Ambac Parties (the "<u>RMBS Transactions</u>").

B.      <u>Ambac's Rehabilitation Proceedings in the Rehabilitation Court</u>

10.     Eighteen months after the Debtors filed their chapter 11 cases and six months after the Ambac Parties filed their Proofs of Claim, Ambac commenced rehabilitation proceedings on March 24, 2010 by (i) establishing the Segregated Account under Wisconsin law for the purpose of segregating certain segments of its financial guaranty insurance business; and (ii) filing a petition in the Circuit Court of Dane County, Wisconsin (the "<u>Rehabilitation Court</u>") to take control of and to rehabilitate the Segregated Account.  On that same day, the Rehabilitation Court entered the Order for Rehabilitation (the "<u>Rehabilitation Order</u>"),[2] pursuant to which the Segregated Account was placed into rehabilitation (the "<u>Rehabilitation Proceedings</u>").  The Segregated Account is currently being administered by the Rehabilitator pursuant to the Wisconsin Insurers Rehabilitation and Liquidation Act (Chapter 645 of the Wisconsin Statutes).

11.     Liabilities allocated to the Segregated Account include substantially all of Ambac's financial guaranty insurance policies issued in connection with residential mortgage backed securities transactions (including the RMBS Transactions) and credit default swap transactions.  As described in more detail below, included among the liabilities allocated to the

---

[2]      A copy of the Rehabilitation Order is attached hereto as <u>Exhibit C</u>.

Segregated Account are (i) the financial guaranty insurance policies relating to the RMBS Transactions, which form Ambac's basis for its Proofs of Claim; and (ii) two derivative-based financial guaranty policies to which the Debtors are counterparties. Assets allocated to the Segregated Account include Ambac's equity interest in certain of its subsidiaries, including ACP, as well as obligations of Ambac's general account.

12. Concurrently with the commencement of the Rehabilitation Proceedings, the Rehabilitation Court entered an Order for Temporary Injunctive Relief in connection with the Rehabilitation Proceedings (the "Temporary Injunction"),[3] which purports to, among other things:

- *enjoin* holders of financial guaranty insurance policies allocated to the Segregated Account (the "Segregated Policyholders") *from terminating and settling derivatives transactions with ACP or from commencing any action to enforce their rights with respect to such agreements or the related policies*;

- require the Segregated Policyholders to continue paying premiums on such policies;

- disregard contractual provisions in agreements relating to guaranteed transactions if such provisions would permit a Segregated Policyholder to strip an Ambac Party of control, consent and direction rights under financial guaranty insurance policies allocated to the Segregated Account;

- *prohibit parties from commencing or prosecuting any legal proceedings in connection with the Segregated Account*, including any actions, claims or lawsuits with respect to financial guaranty insurance policies transferred to the Segregated Account or against subsidiaries whose equity interest was transferred to the Segregated Account; and

- vest the Rehabilitation Court with *exclusive jurisdiction* over matters relating to any of the forgoing.

**II. Implications of the Temporary Injunction on the Debtors' Relationships with the Ambac Parties and on the Debtors' Chapter 11 Proceedings**

13. The italicized language in paragraph 12 above, highlights provisions in the Temporary Injunction that could directly conflict with provisions of the Bankruptcy Code and

---

[3] A copy of the Temporary Injunction is attached hereto as Exhibit D.

orders of this Court, and could inhibit the orderly administration of the Debtors' estates.[4]  Among

other potential consequences, the Temporary Injunction issued by the Rehabilitation Court by its

terms purports to enjoin the Debtors from pursuing any actions, claims or lawsuits with respect

to the financial guaranty insurance policies relating to the RMBS Transactions, which underlie,

in part, the Proofs of Claim, thereby potentially impairing the Debtors' ability to contest the

Proofs of Claim.  Similarly, the broad scope of the Temporary Injunction purportedly precludes

the Debtors from terminating and litigating the early termination rights under certain derivative-

related financial guaranty insurance transactions that have been allocated to the Segregated

Account.  Set forth below are descriptions of such RMBS Transactions and derivatives

transactions.

A.    **The RMBS Transactions**

14.    Prior to the commencement of the Debtors' chapter 11 cases, the Debtors

and certain of their non-debtor affiliates entered into the RMBS Transactions with certain of the

Ambac Parties.

15.    The RMBS Transactions were securitization transactions typically

effected pursuant to several related documents, including an indenture and sale, assignment,

servicing and trust agreements.  In the RMBS Transactions, LBHI and its affiliates often had

multiple roles.  For example, in a typical RMBS Transaction, a non-debtor affiliate of LBHI may

have originated mortgage loans and then sold them to LBHI, as sponsor and seller, which, in turn,

would have sold them to SASC.  SASC, as the depositor, would then have deposited these

mortgage loans into a securitization trust, which issued securities to investors.  A non-debtor

affiliate of LBHI would service the mortgage loans and Lehman Brothers Inc. would serve as an

---

[4]    The Debtors contend that the Bankruptcy Court has exclusive jurisdiction and in no way admit that the Debtors are subject to the jurisdiction of the Rehabilitation Court or the Temporary Injunction.

underwriter in the distribution of such securities, including various tranches of notes and certificates.

16.    To enhance the ratings and marketability of securities issued in connection with the RMBS Transactions, Ambac issued financial guaranty insurance policies in favor of the transaction trustees for the benefit of securityholders and derivative counterparties (the "<u>RMBS Policies</u>").  As part of these complex arrangements, the Debtors entered into various contractual arrangements, including derivatives agreements, with transactional parties such as the trust, and insurance and indemnity agreements with Ambac.

17.    The Proofs of Claim assert contingent claims purportedly owed by the Debtors for purported breaches of obligations under various agreements comprising the RMBS Transactions, including, among others, certain of the RMBS Policies.  The Debtors would contest the Proofs of Claim.  Under the Global Settlement, the Ambac Parties would agree to withdraw all of their Proofs of Claim, thereby foreclosing the Ambac Parties from reasserting such claims against the Debtors on any basis in the future.  Such withdrawal would eliminate more than $6.1 billion in claims against the Debtors' estates.  In addition, the Global Settlement would eliminate the need for the Debtors to undertake potentially protracted and expensive litigation to determine whether the Temporary Injunction issued by the Rehabilitation Court has the effect of impairing the ability of the Debtors to contest the Proofs of Claim filed by the Ambac Parties.  Such a litigation could involve proceedings in two different forums.

B.    **The Insured Derivatives Transactions**

18.    Ambac also provided credit enhancement to the Debtors in connection with complex derivatives transactions involving structured financial products through its "transformer" subsidiaries, including AFS, which entered into interest rate and currency derivatives, and ACP, which entered into credit derivatives.  In these transactions, Ambac would

issue to a Debtor a financial guaranty insurance policy guaranteeing the payment obligations of the relevant transformer subsidiary, including the obligation to pay an amount in certain circumstances upon the early termination of the derivative transaction.

19.     The Parties would address specifically in the Global Settlement three disputes relating to financial guarantee insurance policies issued in connection with such derivatives transactions:  (i) the financial guaranty insurance policy no. SF0812BE (the "Belle Haven Policy") issued by Ambac to LBSF as Credit Support Provider to ACP in connection with an ISDA Master Agreement entered into between ACP and LBSF, dated as of May 24, 2006 (together with the Schedule thereto, the Confirmation entered into thereunder and the Belle Haven Policy, the "Belle Haven Transaction"); (ii) the financial guaranty insurance policy no. SF0835BE (the "FIP Policy") issued by Ambac to LBSF as Credit Support Provider to ACP in connection with an ISDA Master Agreement between LBSF and ACP, dated as of August 23, 2006 (together with the Schedule thereto, the Confirmation entered into thereunder and the FIP Policy, the "FIP Transaction"); and (iii) the financial guaranty insurance policy no. SWLP0189BE (the "AFS Policy" and together with the Belle Haven Policy, the FIP Policy and the RMBS Policies, the "Policies") issued by Ambac to LBSF in connection with the ISDA Master Agreement, between LBSF and AFS, dated as of September 9, 2003 (together with the Schedule thereto, the Confirmations entered into thereunder and the AFS Policy, the "AFS Transaction", and together with the Belle Haven Transaction and the FIP Transaction, the "Ambac Insured Derivatives Transactions").

20.     The ISDA Master Agreement for each of these Ambac Insured Derivatives Transactions enumerated certain "Events of Default" that allowed the non-defaulting party to designate an early termination date upon which the relevant Ambac Insured Derivatives

Transaction would be terminated.  One such Event of Default involves the commencement of bankruptcy or insolvency proceedings by a Party to the transaction or its credit support provider.[5]

21.     Upon the chapter 11 filing by LBHI (which had guaranteed LBSF's obligations under the Belle Haven Transaction), ACP notified LBSF by letter that it was exercising its rights to terminate the Belle Haven Transaction as of September 18, 2008. Additionally, on September 25, 2008, ACP sent a "Notice of an Event of Default and Calculation Statement" to LBSF (the "<u>Belle Haven Calculation Letter</u>") designating September 18, 2008 as the Early Termination Date and claiming that LBSF owed ACP $27,900.15 in accrued and unpaid fixed payments under the terminated Belle Haven Transaction, notwithstanding that the fair value of the Belle Haven Transaction was substantially in favor of LBSF.  The Debtors contend that they are entitled to the fair value of the Belle Haven Transaction.  On September 8, 2010, the Rehabilitator allocated the Belle Haven Policy to the Segregated Account, *nunc pro tunc* to March 24, 2010, and thus the Belle Haven Policy is purportedly subject to the Temporary Injunction.

22.     Under the FIP Transaction, Ambac's commencement of the Rehabilitation Proceedings and the allocation of the FIP Policy by the Rehabilitator to the Segregated Account

---

[5] Specifically, Section 5(a)(vii)(4) in the relevant ISDA Master Agreement for each Ambac Insured Derivatives Transaction provides, in pertinent part:

Events of Default and Termination Events

(a)     *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party . . . of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(vii) Bankruptcy. The party, any Credit Support Provider of such party . . . (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation . . . .

triggered an Event of Default. As a result, LBSF contends that it has the right to terminate the FIP Transaction and to calculate an early termination payment based upon the losses suffered by LBSF upon such early termination. The FIP Transaction was placed into the Segregated Account on March 24, 2010 and thus is purportedly subject to the Temporary Injunction.

23. As with the Belle Haven Transaction termination, AFS notified LBSF that it was terminating the AFS Transaction as a result of LBHI's chapter 11 filing. By letter dated, December 8, 2008 (the "Setoff Letter"), AFS stated that it owed LBSF $35,699,791.65 upon early termination of the AFS Transaction. AFS indicated in the Setoff Letter however that it would exercise a purported right of setoff to reduce the amount that it admittedly owed to LBSF by (i) $26,905.83, which LBSF allegedly owed ACP on account of the early termination of the Belle Haven Transaction; and (ii) $73,917.97, which LBSF allegedly owed ACP on account of accrued and unpaid fixed amounts under the FIP Transaction. After giving effect to such setoffs, AFS claimed that it only owed LBSF $35,598,967 in connection with the early termination of the AFS Transaction. The Debtors maintain, among other things, that such setoff was improper due to the lack of mutuality among the parties to the various swap agreements.

24. Under the Global Settlement, the Debtors and the Ambac Settling Parties would release the other Parties from any liability under any of the Ambac Insured Derivatives Transactions. Specifically, in respect of the Policies issued in connection with the Ambac Insured Derivatives Transactions, the Global Settlement would render moot the payment disputes under the Belle Haven and AFS Transactions and the dispute under the FIP Transaction relating to the right of LBSF to terminate the FIP Transaction and pursue an early termination payment thereunder. As in connection with the disputes relating to the Proofs of Claim, such release

would eliminate the possibility of costly and protracted litigation in two different forums to determine the scope and effect of the Temporary Injunction of the Rehabilitation Court.

## III. The Global Settlement

25. Subject to this Court's approval, the Global Settlement resolves any and all claims among the Debtors and the Ambac Settling Parties relating to the Proofs of Claim and the Ambac Insured Derivatives Transactions. This Global Settlement is the result of approximately three months of arm's length, good faith negotiations.[6]

26. The salient terms of the Global Settlement are as follows:[7]

- <u>Withdrawal of Proofs of Claims</u>. Upon the Effective Date, each of the Ambac Parties shall withdraw, in their entirety, each of the Proofs of Claim, and any and all claims (whether secured, unsecured, scheduled, priority, non priority, or administrative priority) filed or asserted, or that could have been filed or asserted, by, or on behalf of, any of the Ambac Parties or certain related persons (the "<u>Released Ambac Parties</u>").

- <u>Termination of the FIP Transaction</u>. The FIP Transaction and all related control rights or voting agreements, or other contracts and agreements among Ambac or ACP, on the one hand, and LBSF and/or LBHI, on the other hand, including the FIP Policy and the guarantee of LBHI, with respect to the FIP Transaction, shall be terminated in full and be of no further force or effect, and no Party shall owe any amounts or have any early termination or payment obligations or any other obligations in respect of such agreements.

- <u>No Further Payment Obligations</u>. No Released Ambac Party shall owe any Debtors or certain related persons (the "<u>Released Lehman Parties</u>") any obligation under any Policy, other financial guaranty policies or similar financial accommodations related to any of the Ambac Insured Derivatives Transactions. No Party owes or shall owe any other Party any payment amounts or have any early termination or payment obligations or other

---

[6] The Debtors and the Ambac Settling Parties entered into (a) a Tolling and Forbearance Agreement, dated September 14, 2010 (including amendments thereto), and (b) a Letter Agreement, dated June 22, 2010 (including amendments thereto), which extends the deadline for the Debtors to file an objection or any other pleading relating to the Temporary Injunction in the Rehabilitation Court. The Parties intend to extend these agreements through the Effective Date of the Global Settlement.

[7] The summary of the terms of the Global Settlement set forth in this Motion is provided for the convenience of the Court and parties in interest and does not modify the terms of the Global Settlement in any manner. To the extent terms of this Motion and terms of the Global Settlement are inconsistent, the terms of the Global Settlement shall govern.

obligations in connection with the Belle Haven Policy, the Belle Haven Transaction, the AFS Policy and the AFS Transaction;

- <u>Mutual Releases – Ambac Settling Parties</u>.  As of the Effective Date, the Debtors will forever release the Released Ambac Parties from any and all claims that a Debtor may now have, have ever had or may in the future have, against a Released Ambac Party, as a result of any transactions or proceedings occurring, actions taken or omissions to act occurring on or prior to the effective date of the Global Settlement including, but not limited to, the following:  the RMBS Transactions, the Ambac Insured Derivatives Transactions, the Policies, the Proofs of Claim, the Rehabilitation Proceedings and the Debtors' chapter 11 proceedings.

- <u>Mutual Releases – Debtors</u>.  As of the Effective Date, the Ambac Parties will forever release the Released Lehman Parties from any and all claims that an Ambac Party may now have, have ever had or may in the future have, against a Released Lehman Party as a result of any transactions or proceedings occurring, actions taken or omissions to act occurring on or prior to the effective date of the Global Settlement including, but not limited to, the following:  the RMBS Transactions, the Ambac Insured Derivatives Transactions, the Policies, the Proofs of Claim, the Rehabilitation Proceedings and the Debtors' chapter 11 proceedings.

- <u>Mutual Releases – Limitations</u>.  Notwithstanding the foregoing, the Parties are not releasing, acquitting, discharging or waiving any of the following:

  - obligations and actions imposed on the Parties by the Global Settlement;

  - the interest, as represented by the relevant trustee, of (a) a Released Lehman Party and (b) a Released Ambac Party (to the extent such Released Ambac Party's interest is by way of subrogation) in securities issued under any transaction;

  - obligations and claims arising out of or related to any servicing agreement or any similar non-financial contractual performance obligations or undertakings;

  - any release provided to a Released Lehman Party by the Ambac Parties solely to the extent necessary to preserve such Ambac Parties' claims or causes of action against any person or entity that is not a Released Lehman Party when it is determined by a court of law that such release would bar, limit or otherwise diminish, in any way, directly or indirectly, any such claims or causes of action or the assertion by the Ambac Parties thereof.  The Ambac Parties, however, shall never assert any such claim in connection therewith against any Released Lehman Party.

- **No Modification to Bar Date Order; Sufficiency of Notice Thereof.** Nothing in the Global Settlement shall be deemed to toll, extend, modify, enlarge or otherwise affect the Bar Date Order. The Ambac Parties agree that they have received timely notice of the Bar Date Order.

- **Non-Assistance to Third Parties.** No Party will materially assist with or pursue indirectly through any trustee or similar agent any claims that such Party has released pursuant to the terms and conditions of the Global Settlement.

## ARGUMENT

27.    Approval of the Global Settlement is proper because it (i) eliminates in excess of $6.1 billion in general unsecured claims asserted against the Debtors' estates; (ii) eliminates the potential for a complex multi-jurisdictional battle between this Court and the Rehabilitation Court over the Parties' respective rights under the Proofs of Claim and the Ambac Insured Derivatives Transactions; (iii) conserves the Debtors' limited capital and human resources that would otherwise be depleted by litigation relating to the foregoing; and (iv) is supported by the Creditors' Committee.

## I.    The Applicable Legal Standard Governing Approval of the Global Settlement

28.    Bankruptcy Rule 9019(a) provides that, "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In granting a motion pursuant to rule 9019(a), a court must find that the proposed settlement is fair and equitable and is in the best interests of the estate. Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007) (applying "fair and equitable" standard to settlements pursuant to Bankruptcy Rule 9019); In re Enron Corp., No. 02 Civ. 8489, 2003 WL 230838, at *2

(S.D.N.Y. Jan. 31, 2003) ("A bankruptcy court may approve a settlement where the proposed settlement is both fair and equitable and in the best interests of the estate.") (quotation omitted).

29.    In determining whether a proposed compromise or settlement is fair and equitable, a court should consider the following interrelated factors:

- the balance between the litigation's possibility of success and the settlement's future benefits;

- the likelihood of complex and protracted litigation, with its attendant expense, inconvenience and delay, including the difficulty in collecting on any judgment;

- the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;

- whether other parties in interest support the settlement;

- the competence and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;

- the nature and breadth of releases to be obtained by officers and directors; and

- the extent to which the settlement is the product of arm's length bargaining.

Iridium Operating LLC, 478 F.3d at 462 (citing In re WorldCom, Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).  The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court.  Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994).  Moreover, a court need only ensure that the settlement does not fall "below the lowest point in the range of reasonableness."  In re Drexel Burnham Lambert Group, Inc., 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991) (citing Cosoff v. Rodman (In re W.T. Grant, Co.), 699 F.2d 599, 608 (2d Cir. 1983)).  Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements."  In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

30.     While a court must "evaluate . . . all . . . factors relevant to a fair and full assessment of the wisdom of the proposed compromise," <u>Anderson</u>, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, <u>W.T. Grant Co.</u>, 699 F.2d at 608, or conduct a full independent investigation.  <u>Drexel Burnham Lambert</u>, 134 B.R. at 496.  "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact . . . .  The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness."  <u>Nellis</u>, 165 B.R. at 123 (internal citations omitted).

## II.     Approval of the Global Settlement is Proper Under The Applicable Legal Standard

31.     The Global Settlement is fair and equitable, and entry into the Global Settlement is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.  The Global Settlement reduces the general unsecured claims pool by more than $6.1 billion in exchange for releasing the Ambac Parties from certain claims relating to the Ambac Insured Derivatives Transactions.

32.     Given the complexities of the RMBS Transactions and the Ambac Insured Derivatives Transactions and, absent approval of the Global Settlement, the Debtors will spend months, if not years, prosecuting the Proofs of Claim and litigating the termination rights under the Ambac Insured Derivatives Transactions.

33.     While the Debtors are currently under the protection of jointly administered chapter 11 proceedings under the federal Bankruptcy Code before this Court in New York, the Ambac Settling Parties are being rehabilitated in a Wisconsin state court under a state-sanctioned insurance rehabilitation statute.  The interplay of the automatic stay imposed by the Bankruptcy Code in these chapter 11 cases and the Temporary Injunction issued by the Rehabilitation Court will further complicate the prosecution of the Proofs of Claim and any

litigation over the termination rights under the Ambac Insured Derivatives Transactions. Absent

entry into the Global Settlement, the Debtors will likely be required to dedicate an extraordinary

amount of time and resources to resolve the complex multi-jurisdictional litigation that will

ensue before even getting to the merits of the claims. Needless to say, the litigation costs will be

substantial.

34.     Further, the commencement of litigation by any of the Parties would

necessitate a detailed review and analysis of each RMBS Transaction forming the basis of each

Proof of Claim as well as the underlying structured financial instruments governing each Ambac

Insured Derivatives Transaction. Because the RMBS Transactions and the Ambac Insured

Derivatives Transactions are comprised of complicated and highly structured financial

transactions, any analysis is also likely to require the retention by the Debtors of industry experts

with the requisite knowledge and experience needed to evaluate a complex and intertwined

network of agreements thereunder. Additionally, the review, privilege log preparation and

ultimate production of voluminous amounts of documents in connection with litigation-born

discovery would further burden the limited capital and human resources of the Debtors' estates.

35.     Finally, even if the Debtors pursue an aggressive and costly bi-

jurisdictional litigation strategy with respect to the Proofs of Claim and the Ambac Insured

Derivatives Transactions, the outcome of such litigation remains highly speculative. And, the

Debtors' prosecution of the Proofs of Claim pursuant to a lengthy and litigious claims

prosecution strategy would yield, at best, no better result than that which will be immediately

realized upon consummation of the Global Settlement  – namely, the elimination of the 60 Proofs

of Claim asserting claims against the Debtors in excess of $6.1 billion. Likewise, even if the

Debtors were to ultimately prevail on any actions seeking monetary relief from Ambac on

account of the Ambac Insured Derivatives Transactions, the cash payout received in the Rehabilitation Proceedings would likely be only a fraction of the face amount of any claim the Debtors may ultimately acquire.

36.     Lastly, the Debtors have been advised that the Creditors' Committee supports the Global Settlement and the relief requested herein.[8]

37.     Accordingly, as set forth herein and in the Declaration of Daniel Ehrmann in Support of this Motion, filed contemporaneously herewith, entry into the Global Settlement is in the Debtors' best interests.  The Debtors have reasonably and appropriately exercised their sound business judgment in entering into the Global Settlement as a comprehensive resolution to the complex and contentious issues arising out the Debtors' relationship with the Ambac Parties. The Debtors, therefore, request that the Motion be granted.

## NOTICE

38.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635] on (i) the U.S. Trustee; (ii) counsel for the Creditor's Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the Ambac Settling Parties; (vii) counsel for the Ambac Parties; (viii) the Rehabilitator; (ix) counsel for the Rehabilitator; and (x) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

---

[8]     Certain of the Debtors will be entering into an agreement allocating value between or among the Debtors in light of the Global Settlement, the terms of which are subject to the review and approval of the Creditors' Committee.

## NO PRIOR REQUEST

39.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief

requested herein and such other and further as it deems just and proper.


Dated:     New York, New York
           October 5, 2010

Respectfully submitted,


 /s/  Corinne Ball
Corinne Ball
Jayant W. Tambe
Aviva Warter Sisitsky
Toni-Ann Citera
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

# EXHIBIT A

*[Proposed Order]*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x
:
In re: : Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*, : Case No. 08-13555 (JMP)
:
Debtors. : (Jointly Administered)
:
--------------------------------------------------------------x

**ORDER PURSUANT TO SECTION 105(a)
OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULE 9019(a) AUTHORIZING AND APPROVING THE GLOBAL
SETTLEMENT AMONG THE DEBTORS AND THE AMBAC SETTLING PARTIES**

This matter coming before the Court on the Motion of Debtors Pursuant to

Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a) for Authorization and

Approval of the Global Settlement Among the Debtors and the Ambac Settling Parties

(the "Motion"),[1] filed by debtors Lehman Brothers Holdings Inc., Lehman Brothers Special

Financing Inc., Lehman Brothers Derivative Products Inc. and Structured Asset Securities

Corporation in the above-captioned chapter 11 cases (collectively, the "Debtors"); the Court

having reviewed the Motion and having considered the statements of counsel and the evidence

adduced with respect to the Motion at a hearing before the Court (the "Hearing"); and the Court

having found and determined the relief sought in the Motion is in the best interests of the

Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases

set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefore, it is

---
[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

ADJUDGED, FOUND AND DETERMINED:

A.    This Court has jurisdiction over the Motion and the Global Settlement pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).  Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Motion and granted in this Order include, without limitation, sections 105(a) of the Bankruptcy Code, and Bankruptcy Rule 9019.

C.    The Ambac Parties received proper, timely, adequate and sufficient notice of entry of the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form, dated July 2, 2009 [Docket No. 4271] (the "Bar Date Order") establishing September 22, 2009 at 5:00 p.m. as the deadline for filing proofs of claim against any of the Debtors in the Bankruptcy Proceedings.

D.    As evidenced by the affidavits and certificates of service filed with the Court, the Court finds that:  (1) proper, timely, adequate and sufficient notice of the Motion and the Global Settlement has been provided by the Debtors; (2) such notice, and the form and manner thereof, was good, sufficient, reasonable and appropriate under the circumstances prevailing in these chapter 11 cases; and (3) no other or further notice of the Motion or the Global Settlement is or shall be required.

E.    A reasonable opportunity to object to and to be heard at the Hearing on the Motion and the relief requested therein has been given as required by the Bankruptcy Code and all Bankruptcy Rules to all persons entitled to notice.

F.    Entry into the Global Settlement is in the best interests of the Debtors and their respective estates, creditors and other parties in interest, and represents the fair, reasonable and appropriate exercise of the Debtors' sound business judgment.

G.    The Global Settlement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Debtors and the Ambac Settling Parties in good faith, without collusion and from arm's length bargaining positions.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED as set forth herein.

2.    The Global Settlement is approved in its entirety.  The Debtors are authorized to enter into, and perform their obligations under, the Global Settlement, pursuant to Bankruptcy Rule 9019.

3.    The Ambac Parties shall hereby withdraw the Proofs of Claim in their entirety.  The Ambac Parties and any entity (as such term is defined in the Bankruptcy Code) claiming through them or on their behalf, whether directly, derivatively or otherwise, shall be barred from filing, asserting or reasserting any and all claims (whether secured, unsecured, scheduled, priority, non priority or administrative priority) against the Lehman Debtors that could be or could have been filed or asserted by, or on behalf of, such parties.

4.    The Debtors and their successors are authorized to take any and all actions necessary or appropriate to implement the terms of this Order and the Global Settlement.

5.    Nothing in this Order or in the Global Settlement shall be deemed to toll, extend, modify or otherwise affect the Bar Date Order, including, without limitation, the bar dates for asserting proofs of claim against the Lehman Debtors for parties in interest in these chapter 11 cases.

6.     The Court shall retain jurisdiction to hear and determine all matters arising from, related to or in connection with the implementation, interpretation, enforcement or application of this Order and the Global Settlement.

Dated: _____, 2010
      New York, New York

_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

*[Proofs of Claim to be Withdrawn]*

| Proof of Claim No. | Face Amount of Proof of Claim[1] | RMBS Transaction Referenced in Proof of Claim |
|---|---|---|
| 21417 | $85,723,397.00 | SASCO 2005-2XS |
| 21418 | $60,101,000.00 | SASCO 2004-21XS |
| 21419 | $60,101,000.00 | SASCO 2004-21XS |
| 21420 | $60,101,000.00 | SASCO 2004-21XS |
| 21421 | $35,702,952.00 | SASCO 2004-17XS |
| 21422 | $35,702,952.00 | SASCO 2004-17XS |
| 21423 | $35,702,952.00 | SASCO 2004-17XS |
| 21424 | $29,766,051.96 | SASCO 2004-6XS |
| 21425 | $29,766,051.96 | SASCO 2004-6XS |
| 21426 | $29,766,051.96 | SASCO 2004-6XS |
| 21427 | $20,927,839.71 | SASCO 2004-4XS |
| 21428 | $20,927,839.71 | SASCO 2004-4XS |
| 21429 | $20,927,839.71 | SASCO 2004-4XS |
| 21430 | $5,302,000.00 | SASCO 2002-15 |
| 21431 | $5,302,000.00 | SASCO 2002-15 |
| 21432 | $577,506.00 | SASCO 2001-15A |
| 21433 | $577,506.00 | SASCO 2001-15A |
| 21434 | $428,570,329.00 | LXS 2007-14H |
| 21435 | $428,570,329.00 | LXS 2007-14H |
| 21436 | $367,495,537.00 | LXS 2007-6 |
| 21437 | $367,495,537.00 | LXS 2007-6 |
| 21438 | $271,503,966.00 | LXS 07-15N |
| 21439 | $271,503,966.00 | LXS 07-15N |
| 21445 | $23,649,750.00 | LABS 05-1 |
| 21446 | $36,732,575.00 | LXS 05-4 |
| 21447 | $36,732,575.00 | LXS 05-4 |
| 21448 | $36,732,575.00 | LXS 05-4 |
| 21449 | $61,817,324.00 | LXS 07-10H |
| 21450 | $61,817,324.00 | LXS 07-10H |
| 21451 | $61,817,324.00 | LXS 07-10H |
| 21452 | $375,752,964.00 | LXS 07-17H |
| 21453 | $375,752,964.00 | LXS 07-17H |
| 21454 | $15,248,339.00 | LABS 04-2 |
| 21455 | $124,374,852.00 | LXS 05-7N |
| 21456 | $124,374,852.00 | LXS 05-7N |
| 21457 | $93,780,725.00 | LXS 05-9N |
| 21458 | $93,780,725.00 | LXS 05-9N |
| 21459 | $101,535,163.00 | LXS 06-2N |
| 21460 | $101,535,163.00 | LXS 06-2N |
| 21461 | $132,282,292.00 | LXS 07-7N |
| 21462 | $132,282,292.00 | LXS 07-7N |
| 21463 | $271,503,966.00 | LXS 07-15N |
| 21464 | $85,723,397.00 | SASCO 2005-2XS |
| 21465 | $85,723,397.00 | SASCO 2005-2XS |
| 21466 | $97,035,937.00 | SASCO 2005-4XS |
| 21467 | $97,035,937.00 | SASCO 2005-4XS |

---

[1]    As set forth in the respective proofs of claim filed by Ambac.

| Proof of Claim No. | Face Amount of Proof of Claim[1] | RMBS Transaction Referenced in Proof of Claim |
|---|---|---|
| 21468 | $97,035,937.00 | SASCO 2005-4XS |
| 21469 | $85,061,745.00 | SASCO 2005-7XS |
| 21470 | $85,061,745.00 | SASCO 2005-7XS |
| 21471 | $85,061,745.00 | SASCO 2005-7XS |
| 21472 | $59,628,000.00 | SASCO 2005-9XS |
| 21473 | $59,628,000.00 | SASCO 2005-9XS |
| 21474 | $59,628,000.00 | SASCO 2005-9XS |
| 21475 | $20,000,000.00 | LSX 2006-19 |
| 21476 | $20,000,000.00 | LSX 2006-19 |
| 21477 | $20,000,000.00 | LSX 2006-19 |
| 21478 | $139,000,000.00 | IndyMac Home Equity Loan Callable Asset-Backed Notes, Series 2004-2 |
| 21479 | $139,000,000.00 | IndyMac Home Equity Loan Callable Asset-Backed Notes, Series 2004-2 |
| 21480 | *Undetermined.* | *None.* |
| 27992 | *Unliquidated.* | *None.* |

## EXHIBIT C

*[Rehabilitation Order]*

STATE OF WISCONSIN          CIRCUIT COURT          DANE COUNTY

In the Matter of the Rehabilitation of:

Segregated Account of Ambac Assurance Corporation

Case No.

**10CV1576**

## ORDER FOR REHABILITATION

Based on the Verified Petition and supporting brief of Sean Dilweg, the Commissioner of

Insurance of the State of Wisconsin (the "Commissioner") for rehabilitation of the segregated

account established under Wis. Stat. § 611.24 (the "Segregated Account") and allocated from

Ambac Assurance Corporation ("Ambac"), the provisions of Wis. Stat. §§ 645.01(4) and 645.31

to 645.35, and all other applicable laws, and having found that sufficient grounds and good cause

exist for the relief requested by the Commissioner,

**NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED THAT**:

1.      The Verified Petition filed by the Commissioner is granted.

2.      The Segregated Account allocated from Ambac is hereby placed in rehabilitation

pursuant to Wis. Stat. § 645.32. This Court shall be the Rehabilitation Court for all matters

relating to the Segregated Account. This proceeding pertains solely to the Segregated Account

and to the policies, contracts, rights, assets, equity ownership interests, and liabilities allocated to

it in accordance with Wis. Stat. § 611.24, and does not pertain to the policies, contracts, assets,

equity ownership interests, and liabilities remaining in Ambac's General Account.

3.      The Commissioner is hereby appointed Rehabilitator of the Segregated Account.

Any successor(s) to the Commissioner shall automatically assume this appointment as

Rehabilitator of the Segregated Account, with all the powers and duties described herein.

4.     The Rehabilitator shall have the full powers and authority granted pursuant to Wis. Stat. §§ 645.33 to 645.35 and all other applicable laws as are reasonable and necessary to fulfill his duties and responsibilities under this Order.

5.     The request of the Commissioner, as the Rehabilitator, to appoint Kimberly A. Shaul as Special Deputy Commissioner pursuant to Wis. Stat. § 645.33 is hereby granted for the purposes of carrying out the rehabilitation, and she shall have all of the powers of the Rehabilitator under Wis. Stat. §§ 645.33 to 645.35 and all other applicable laws as are reasonable and necessary to fulfill her duties and responsibilities under this Order.  Subject to further Court notice and approval, the Special Deputy Commissioner may appoint an advisory committee and/or one or more Assistant Special Deputy Commissioners to perform such duties as shall be assigned to, or required of them, from time to time by the Rehabilitator, the Special Deputy Commissioner, or this Court.  Pursuant to Wis. Stat. § 645.08(1), the Rehabilitator and Special Deputy Commissioner shall serve without bond.

6.     Pursuant to Wis. Stat. § 645.33(2), the Rehabilitator shall take possession of the assets of the Segregated Account and any subsidiaries and shall proceed in accordance with the Plan of Operation (and the exhibits thereto) which is attached to the Verified Petition.  In connection with managing the affairs of the Segregated Account in accordance with the Plan of Operation (and the exhibits thereto), the Rehabilitator and his Special Deputy Commissioner are hereby authorized to work with representatives of the Ambac General Account and to re-delegate the authority and right to operate the Segregated Account, in whole or in part, during the pendency of these rehabilitation proceedings to Ambac's officers, directors, managers, and employees, or to delegate the same in whole or in part to other qualified individuals or entities, and to rescind such delegation at any time at their discretion.  The recording of this Order with

any register of deeds in the state imparts the same notice as a deed, bill of sale, or other evidence of title recorded with that register of deeds.

7.    The Rehabilitator and Special Deputy Commissioner are hereby authorized to continue on the same terms which presently are in place with the Commissioner the following contracts for professional services: (i) a contract with Gordian Group, LLC and its subcontractor, Todd Cooper, to provide professional financial advice and assessments; (ii) a contract with Jefferies & Company, Inc. to provide professional advice on restructuring, financial issues, and securities; (iii) a contract with Robert E. Nolan Company to advise on insurance-related information technology, human resources, and other operational aspects of the business; (iv) a contract with Sitrick and Company Inc. to assist in media relations and communications; and (v) a contract with Foley & Lardner LLP for legal services and advice in these proceedings and any other matter arising out of or related to the rehabilitation of the Segregated Account. Such contracts shall terminate at the conclusion of this proceeding, absent other order of this Court. The cost for these services shall be priority administrative expenses of the Segregated Account and handled consistent with the Plan of Operation.

8.    The Rehabilitator and Special Deputy Commissioner are hereby authorized to negotiate and enter into additional contracts for professional services, providing for reasonable compensation and expenses, for such further attorneys, accountants, financial advisors, experts, and contractors as they deem necessary to effectuate the rehabilitation of the Segregated Account. Any such contracts shall be filed for approval by this Court.

9.    It is understood that the rehabilitation plan in this matter is not yet final and ready for approval pursuant to Wis. Stat. § 645.33(5). The Special Deputy Commissioner is authorized to take such actions as are reasonably necessary to finalize the plan and to bring it before the

3

Court in completed form for approval and implementation in accordance with Wis. Stat.

§ 645.33(5).

10. The Rehabilitator may, at any time, petition this Court for such other or further relief as he deems appropriate.

Dated this 24 day of March, 2010.

BY THE COURT:

Honorable William D. Johnston
Lafayette County Circuit Court Judge
Presiding by Judicial Appointment

Prepared by:
Foley & Lardner LLP
150 East Gilman Street
Post Office Box 1497
Madison, Wisconsin 53701
Telephone: (608) 257-5035
Facsimile: (608) 258-4258
*Attorneys for Petitioner Sean Dilweg,*
*Commissioner of Insurance of the*
*State of Wisconsin*

## EXHIBIT D

*[Temporary Injunction]*

STATE OF WISCONSIN        CIRCUIT COURT            DANE COUNTY

In the Matter of the Rehabilitation of:

Segregated Account of Ambac Assurance Corporation

Case No.

**10CV1576**

## ORDER FOR TEMPORARY INJUNCTIVE RELIEF

Based on the Motion for Injunctive Relief filed by the Commissioner of Insurance for the State of Wisconsin (hereinafter the "Commissioner" or the "Rehabilitator"), and the pleadings, motions, briefs and exhibits on file in this case, as well as oral argument, this Court finds that the temporary injunctive relief requested by the Commissioner is reasonable and necessary to promote the equitable and orderly rehabilitation of the segregated account of Ambac Assurance Corporation (the "Segregated Account"), a Wisconsin-domiciled insurer under Wis. Stat. § 611.24(3)(e). The Court further finds that the requested injunctive relief is authorized by Chapter 645 of the Wisconsin Statutes and that this Court has exclusive jurisdiction over matters relating to this rehabilitation proceeding.

Please note that, as explained in the Commissioner's Motion, the injunctive relief granted below does not apply to policies or other contracts which remain in the Ambac General Account. The injunctive relief specified below pertains to the Segregated Account, policies, contracts, assets and liabilities allocated to the Segregated Account, and the subsidiaries whose stock, limited liability member interests or other forms of ownership interests were allocated to the Segregated Account—namely, Ambac Credit Products, LLC and Ambac Conduit Funding, LLC, Juneau Investments, LLC, and Aleutian Investments, LLC.

The relief specified in this Order is complex and parties who may potentially be affected by it are encouraged to review the entire Order, including the important points of clarification set forth near the end of the Order at paragraphs 12 through 14.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Commissioner's Motion for Injunctive Relief is GRANTED, and the following first-day, temporary injunctions are hereby ENTERED:

1.      All persons and entities are enjoined and restrained from commencing or prosecuting any actions, claims, lawsuits or other formal legal proceedings in any state, federal or foreign court, administrative body or other tribunal against: the Segregated Account; or against Ambac Assurance Corporation ("Ambac" or the "Ambac General Account") in respect of the Segregated Account or policies (including financial guarantee insurance policies and surety bonds), contracts or liabilities allocated to the Segregated Account; or against any subsidiary of Ambac whose stock, limited liability company member interests, or other forms of ownership interests were allocated to the Segregated Account—namely, Ambac Credit Products, LLC and Ambac Conduit Funding, LLC, Juneau Investments, LLC, and Aleutian Investments, LLC (collectively, "the Allocated Subsidiaries"); or against the Commissioner. Wis. Stat. § 645.05(1)(f). This Court has exclusive jurisdiction over any such actions, claims or lawsuits.

2.      All persons and entities are enjoined and restrained from seeking to impose civil liability upon the Commissioner, whether or not within the confines of this proceeding (this legal proceeding, together with all filings, motions, orders, writs, and other authorizations relating thereto and the findings made in connection herewith, the "Proceedings"), arising out of any alleged act, error, or omission in the performance of his duties or involvement in this

2

rehabilitation, unless such act or omission constitutes criminal misconduct. Wis. Stat. § 645.08(2).

3. All persons and entities claiming secured, priority, preferred or other interests in any property or assets of the Segregated Account or of any of the Allocated Subsidiaries, are hereby enjoined and restrained from taking any steps to transfer, foreclose, sell, assign, garnish, levy, encumber, attach, dispose of, or exercise purported rights in or against such property or assets. Wis. Stat. § 645.05(1)(d), (g), (h), (k).

4. All policyholders and/or counterparties whose policies or contracts have been allocated to the Segregated Account, or who are counterparties to contracts with an Allocated Subsidiary (including, without limitation, in each case noteholders and any other persons claiming by or through such policyholders and/or counterparties), are enjoined and restrained from terminating, collecting on, or claiming against—or attempting to terminate, collect on, or claim against—such policies or contracts, or the transaction documents executed in connection with the issuance of such policies or contracts or related to such policies or contracts, on the basis of the Events (as defined below), or the financial condition of the Segregated Account, the Allocated Subsidiaries, or the Ambac General Account, regardless of the existence of any language in those policies, contracts, or any other agreements that would otherwise permit or require early termination. Wis. Stat. § 645.05(1)(k). As used herein, the term "Events" refers to the Proceedings and any acts taken or not taken or authorized to be taken pursuant thereto, including without limitation the failure of the Segregated Account, the Allocated Subsidiaries, or Ambac to pay amounts due under any policies, contracts, or other obligations that have been allocated to the Segregated Account or to which any of the Allocated Subsidiaries is a party.

MADI_2191158

5.      Consistent with paragraphs 1 and 9 of this Order, all policyholders and/or counterparties whose policies or contracts have been allocated to the Segregated Account, or who are counterparties to contracts with an Allocated Subsidiary (including without limitation in each case noteholders and any other persons claiming by or through such policyholders and/or counterparties), are enjoined and restrained from asserting market quotation, mark-to-market loss or "closeout amount" claims under or in relation to such policies or contracts, including financial guarantee insurance policies executed in connection with credit derivative master agreements, and are enjoined and restrained from commencing or prosecuting any actions, claims, lawsuits, administrative or other proceedings against the Segregated Account, against the Allocated Subsidiaries, against Ambac in relation to the Segregated Account, or against the Rehabilitator. Wis. Stat. § 645.05(1)(d), (f), (k).

6.      All persons and entities are hereby enjoined and restrained from: (i) taking any action to exercise any approval, consent, direction, voting, veto, or other right (the "Rights") that the Segregated Account or the Allocated Subsidiaries may have (or that the Segregated Account, the Allocated Subsidiaries or Ambac would have but for the occurrence of the Events or the financial condition of the Segregated Account, the Allocated Subsidiaries, or the Ambac General Account) under any agreements relating to policies or contracts allocated to the Segregated Account or contracts with any Allocated Subsidiary, including any credit derivative transaction agreements (including credit default swaps), interest rate or currency rate swap agreements, basis swap agreements, total return swap agreements, indentures, trust deeds, collateral management or administration agreements, credit or loan agreements, residential mortgage-backed security transaction documents, guarantee investment certificates, custodial account agreements, note purchase agreements, or other financing or transaction documents of any kind (collectively,

4

"Transaction Documents"); or (ii) willfully failing to take any action directed to be taken (including any direction to omit to take action) under any Transaction Documents pursuant to the exercise by the Rehabilitator of such Rights that the Segregated Account or the Allocated Subsidiaries may have (or that the Segregated Account, the Allocated Subsidiaries or Ambac would have but for the occurrence of the Events or the financial condition of the Segregated Account, the Allocated Subsidiaries, or the Ambac General Account) Wis. Stat. § 645.05(b), (d), (g), (k). For the avoidance of doubt, this paragraph does not enjoin or restrain any servicer (including any master servicer, sub-servicer or special servicer) from servicing underlying collateral to the extent it would be permitted to do so under the applicable Transaction Documents (without regard to the occurrence of the Events or the financial condition of the Segregated Account, the Allocated Subsidiaries, or the Ambac General Account).

7.     All persons and entities are enjoined and restrained from withholding or failing to pay or setting-off premiums or other payments (including without limitation recoveries, reimbursements, interest, deferred interest, and default interest) owed (or that would have been owed but for the occurrence of the Events or the financial condition of the Segregated Account, the Allocated Subsidiaries, or the Ambac General Account) to the Segregated Account, any Allocated Subsidiary or the Ambac General Account under or in connection with policies or contracts allocated to the Segregated Account, or contracts with an Allocated Subsidiary or any Transaction Documents associated therewith or related thereto. Wis. Stat. § 645.05(1)(g), (k); Wis. Stat. § 645.56(2)(d). A party's withholding or set-off of premiums or payments owed under or in connection with any of the aforementioned documents may result in the future disallowance or decrease of such party's claims.

MADI_2191158

8. All directors, trustees, officers, employees, agents or representatives, if any, of the Segregated Account, any Allocated Subsidiary, or the Ambac General Account are hereby enjoined and restrained from paying any claims or obligations of the Segregated Account or an Allocated Subsidiary without the consent of the Rehabilitator or his authorized representatives. Wis. Stat. § 645.05(b); Wis. Stat. § 645.07.

9. In recognition of the complex nature of these Proceedings, and for the avoidance of doubt, the following specific relief is hereby granted, the enumeration of which is intended to assist parties affected by the Proceedings to understand in detail how the more general provisions of this order may apply to their specific policies or contracts, and shall in no way limit the effect of the more general provisions of this order:

A. Credit Default Swaps: The Court has been advised by the Commissioner that among the policies, contracts, and contract liabilities allocated to the Segregated Account are financial guaranty insurance policies executed in connection with and/or as part of credit derivative transactions. Generally under such transactions, an issuer and trustee entered into an agreement pursuant to which a special purpose entity issued notes (the "Reference Obligations") secured by collateral, including without limitation mortgage-backed or other asset-backed securities. Certain entities (which may also have been purchasers of the Reference Obligations) entered into credit derivative transactions with Ambac Credit Products, LLC or one of the other Allocated Subsidiaries. Each of these credit derivative transactions (hereinafter "Credit Default Swaps") is governed by an ISDA Master Agreement, Schedule to the Master Agreement, and one or more confirmation(s) with respect to such Reference Obligation (the "Credit Default Swap Documents"). In connection with certain Credit Default Swaps, Ambac issued financial guaranty insurance policies (as a "Credit Support Provider"), now allocated to the Segregated Account, guaranteeing the obligations of its subsidiary under the Credit Default Swaps (each a "CDS Policy" and together the "CDS Policies"). For the purposes of this Paragraph 9(a), CDS Policies shall not include any policy that guarantees the obligations of Ambac Credit Products, LLC under a Credit Default Swap (i) entered into with a Settling Counterparty (as defined in Paragraph 14 below) and (ii) with respect to which a forbearance agreement is in full force and effect.

In furtherance of the other injunctive relief granted above, all holders of CDS Policies (together, the "CDS Counterparties") are specifically enjoined from: (i) taking any action under or in connection with (x) Section 6(a) or 6(b) of the

MADI_2191158

ISDA Master Agreement governing any Credit Default Swap entered into with Ambac Credit Products, LLC, including without limitation declaring an Event of Default, Potential Event of Default, or Termination Event or designating an Early Termination Date, and (y) Section 2 of the ISDA Master Agreement under such Credit Default Swap to suspend any payments due from such counterparties; and (ii) taking any action under or in connection with the Credit Default Swap that such CDS Counterparty would be contractually obligated to refrain from taking, or failing to take any action under or in connection with the Credit Default Swap that such CDS Counterparty would be contractually obligated to take, in each case but for the occurrence of an Event of Default or Termination Event (as defined in the applicable Credit Default Swap Documents) where an Allocated Subsidiary or Ambac is (or would be) the defaulting party or affected party, including without limitation:

1. Regardless of the occurrence or continuance of an Event of Default, Potential Event of Default or Termination Event, a CDS Counterparty shall not, without the prior written consent of the Rehabilitator (in the case of a Credit Default Swap to which Ambac is a party) or the Allocated Subsidiary (in the case of a Credit Default Swap to which such Allocated Subsidiary is a party), take or omit to take any action, or consent or withhold its consent, or otherwise exercise or refrain from exercising any rights, in each case in respect to matters that any holder of the Reference Obligation is entitled to take (or omit to take) action, give (or withhold) consent, or exercise (or refrain from exercising) rights as such holder, including without limitation the following:

   (a) the timing and/or circumstances of redemption of such Reference Obligation at maturity or otherwise;

   (b) the timing and/or determination of the amount of interest, principal, or other amounts payable in respect of such Reference Obligation from time to time; or

   (c) any other action that is subject to any vote, approval, consent, or other action of any holder of a Reference Obligation, or to resolution by any holder of such Reference Obligation, whether or not such action would also require the consent of other persons.

2. Regardless of the occurrence or continuance of an Event of Default, Potential Event of Default, or Termination Event, no CDS Counterparty shall fail to cause all of the holders of a principal amount of such Reference Obligation equal to the Reference Obligation Notional Amount (as defined in the applicable Credit Default Swap Documents) thereof to act in accordance with the timely instructions of the Rehabilitator or an Allocated Subsidiary,

7

as the case may be, in taking or failing to take actions, giving or withholding of consent, or the exercise or non-exercise of the rights of such holder.

3.  No CDS Counterparty shall fail, with respect to the Reference Obligation, to provide to the Rehabilitator or the Allocated Subsidiary, as the case may be, copies of trustee's or noteholder's reports, notices, or other formal communications relating to the Reference Obligation promptly upon, or in any event within five business days of, receipt thereof by such CDS Counterparty.

4.  Each trustee, collateral manager, issuer, and administrator with respect to a Reference Obligation appearing in the list attached to the Plan of Operation that accompanies the Commissioner's Verified Petition is enjoined from taking any instruction to accelerate, liquidate or foreclose on the collateral underlying such Reference Obligation, including termination of derivatives forming part of such collateral without the prior written consent of the Rehabilitator.

B.  <u>Residential Mortgage-Backed Securities ("RMBS")</u>:  The Court has been advised that a number of policies allocated to the Segregated Account cover RMBS that Ambac insured directly.  RMBS are described in more detail in the Commissioner's Verified Petition and supporting brief.  In furtherance of the other injunctive relief granted above, each party to the agreements pursuant to which the notes, certificates or other instruments (the "RMBS Notes") were issued and the other transaction documents related thereto (collectively, the "RMBS Transaction Documents") is specifically enjoined from:

1.  Taking any action to (i) declare or cause an acceleration or Event of Default under the applicable RMBS Notes; (ii) effect a transfer, assignment, termination, foreclosure, or liquidation of the collateral underlying such Notes (other than servicing of the underlying mortgage notes and related loans by the mortgage loan servicer (including any master servicer, sub-servicer or special servicer) in accordance with the RMBS Transaction Documents) without regard to the occurrence of the Events or the financial condition of the Segregated Account, the Allocated Subsidiaries, or the Ambac General Account; (iii) impede, impair, restrict, or delay the delivery of information, reports, data, or mortgage loan files required to be provided to or requested by Ambac pursuant to the RMBS Transaction Documents; or (iv) impede, impair, restrict, or delay the exercise by the Rehabilitator in his own right under the RMBS Transaction Documents or as "controlling party" or "control party" (or a term with similar effect, howsoever designated, under such agreements), notwithstanding the

MADI_2191158

occurrence of an "insurer default" (or a term with similar effect, howsoever designated, under such agreements); or

2.  Willfully failing to take any action (i) to cause payments of premium and other amounts due relating to the applicable policies or RMBS Notes, including without limitation recoveries, reimbursements, interest, deferred interest and default interest, without setoff or diminution in connection with the Events or the financial condition of the Segregated Account, the Allocated Subsidiaries, or the Ambac General Account; (ii) in regard to the servicer (including any master servicer, sub-servicer or special servicer), to continue to service the underlying mortgage notes and related loans in accordance with the RMBS Transaction Documents without regard to the occurrence of the Events or the financial condition of the Segregated Account, the Allocated Subsidiaries, or the Ambac General Account; (iii) to provide or cause to provide such information, reports, data and mortgage loan files required to be provided to or requested pursuant to the RMBS Transaction Documents; or (iv) as directed by the Rehabilitator as "controlling party" or a term with similar effect, howsoever designated under the RMBS Transaction Documents, including without limitation directions in connection with the transfer of servicing; provided however, that the Segregated Account may provide to any Trustee under any RMBS Transaction Documents, to the extent such agreements permit such Trustee to request the same, reasonable indemnity to the Trustee in connection with any such direction, such indemnity to consist of an administrative claim in an amount to be determined by the Rehabilitator, subject to Court approval, with any amounts owing to the Trustee pursuant to such indemnity (to the extent allowed by this Court in the event of a dispute between the Rehabilitator and such Trustee) to be treated as an administrative cost within the meaning of Wis. Stat. § 645.68(1).

C.  Other Structured Finance Transactions: The Court has been advised that a number of policies allocated to the Segregated Account relate to other transactions Ambac insured involving various types of securitizations, including commercial asset-backed transactions (where the subjects of the securitization are commercial or intellectual property such as pharmaceutical royalties or film rights), consumer asset-backed transactions (where the subjects of the securitization are student loans, auto loans, or rights to other consumer-related payments), and other types of structured transactions. In these transactions, Ambac typically was granted "control rights" that include rights to consent to, or withhold consent to, any amendments, modifications, or waivers of the terms of the transactions or actions under the transaction documents, rights to declare or waive events of default, termination events, rapid amortization events,

MADI_2191158

or similar events, as well as rights to direct the exercise of remedies following an event of default.

        In connection with such other structured finance transactions under which notes, certificates, or other instruments (the "ABS Notes") are insured by a policy allocated to the Segregated Account (*see* Exhibit C to the Plan of Operation, which is attached at Tab 1 to the Commissioner's Verified Petition), and in furtherance of the other injunctive relief granted above, each Trustee and other transaction party (including without limitation issuers, borrowers, lenders, collateral agents, administrative agents, collateral administrators, swap counterparties, policyholders, and noteholders) is specifically enjoined from:

1.    Taking any action to (i) declare an acceleration or Event of Default, Amortization Event, Rapid Amortization Event, Suspension Event, Termination Event, Early Amortization Event, or other similar event, howsoever designated, under the applicable ABS Notes and other transaction documents relating thereto (collectively, the "ABS Transaction Documents"); (ii) exercise rights and remedies arising from or related to the ABS Transaction Documents, or exercise other rights and remedies that, but for the occurrence of the Events or the financial condition of the Segregated Account, the Allocated Subsidiaries, or the Ambac General Account, would be exercisable at the request or direction of, or with the consent of, Ambac; (iii) effect an acceleration, termination, foreclosure, or liquidation of the ABS Notes or the collateral underlying or securing such ABS Notes (other than servicing of the collateral underlying or securing such ABS Notes by the servicer (including any master servicer, sub-servicer or special servicer) to the extent such actions would otherwise be permitted without the consent of Ambac as control party pursuant to the documentation governing such servicer's obligations without regard to the occurrence of the Events or the financial condition of the Segregated Subsidiaries, the Allocated Subsidiaries, or the Ambac General Account); (iv) impede, impair, restrict, or delay the delivery of information, reports, data, or other files or access to information required to be provided to Ambac pursuant to the ABS Transaction Documents; or (v) modify, amend, waive, usurp, assume, limit, interfere with, impede, impair, restrict, delay, or fail to give full effect to the exercise by the Segregated Account of its rights as "controlling party," "series enhancer," "insurer," or "controlling secured party" (or term with similar effect, howsoever designated, under the ABS Transaction Documents) or any other rights and powers afforded to Ambac, the "controlling party," "series enhancer," "insurer," or "controlling secured party" notwithstanding the occurrence of an "insurer default" or "Ambac Default" (or term with similar effect, howsoever designated, under the ABS Transaction Documents); or

2. Willfully failing to take any action (i) to cause payments of premiums and other amounts due pursuant to the ABS Transaction Documents or other agreements relating to the applicable policy or the ABS Notes, including without limitation recoveries, reimbursements, interest, deferred interest, and default interest, without setoff or diminution in connection with the Events, the financial condition of the Segregated Account, the Allocated Subsidiaries, or the Ambac General Account, or the existence of any Event of Default, Rapid Amortization Event, Termination Event, Early Amortization Event, or other similar event, howsoever designated, under the applicable ABS Transaction Documents; or (ii) as directed by Ambac as "controlling party," "series enhancer," "insurer," "controlling secured party," or term with similar effect, howsoever designated, under the ABS Transaction Documents; provided however, that the Segregated Account may provide to the Trustee under any ABS Transaction Documents, to the extent such agreements permit it to do so, reasonable indemnity to such Trustee in connection with any such direction, such indemnity to consist of an administrative claim in an amount to be determined by the Rehabilitator, subject to Court approval, with any amounts owing to the Trustee pursuant to such indemnity (to the extent allowed by this Court in the event of a dispute between the Rehabilitator and Trustee) to be treated as an administrative cost within the meaning of Wis. Stat. § 645.68(1).

D. <u>Juneau and Aleutian Investments LLCs' Notes</u>: The Court has been advised that a number of policies allocated to the Segregated Account relate to assets of, and notes issued by, Juneau Investments, LLC ("Juneau") and Aleutian Investments, LLC ("Aleutian"). Juneau and Aleutian are finance companies that issued medium term notes (the "MT Notes") to fund purchases of debt securities. Ambac insured the payment of principal and interest by Juneau and Aleutian under the MT Notes, and also insured payments under most of the debt securities purchased by Juneau and Aleutian. Ambac also insures the obligations of subsidiary Ambac Financial Services, LLC, which entered into interest rate swap agreements with Juneau and Aleutian through which Juneau and Aleutian hedged their exposures to fluctuations in currency exchange rates and interest rates ("Related Derivatives").

In connection with the policies allocated to the Segregated Account that insure the MT Notes and certain assets owned by Juneau and Aleutian, and in furtherance of the other injunctive relief granted above, Citibank N.A. as trustee and securities intermediary is specifically enjoined from taking the following actions without the prior written consent of the Rehabilitator: (i) making payments in respect of the MT Notes or Related Derivatives other than payments at such times and in such amounts as would otherwise be required absent the occurrence of a Surety Event (as defined in the relevant transaction documents);

MADI_2191158

and (ii) taking any action to effect a foreclosure or liquidation of the collateral underlying such MT Notes.

E.    Leveraged Leases:  The Court has been advised that some of the policies allocated to the Segregated Account relate to leveraged lease transactions in which an owner trust entered into a series of transactions to purchase depreciable property from an entity (typically a transit authority or electrical power cooperative) and lease it back to the seller, with Ambac guaranteeing the seller/lessee's lease payments.  Due to downgrades in Ambac's credit ratings, lessors currently have the right to terminate the leveraged leases and seek early termination damages.

In connection with the policies issued in leveraged lease transactions that have been allocated to the Segregated Account, and in furtherance of the other injunctive relief granted above, each party thereto (including without limitation, equity investors, equity participants, owners, owner trusts, owner trust trustees, note trustees, lenders, lessors, credit default swap counterparties, payment undertaking agreement providers, and equity defeasance providers) is specifically enjoined from: (i) asserting that an event of default, termination event, or other event entitling such person or entity to terminate a transaction or any portion thereof or otherwise exercise a right or remedy has occurred in connection with any such transaction, including without limitation taking any action to declare an event of default under the applicable lease or declaring a default or termination event under any applicable credit default swap; (ii) making any demand for any payment pursuant to any party's assertion that any such event of default or termination event occurred; and (iii) failing to give effect to any right accorded to Ambac or any affiliate thereof in connection with the issuance of policies allocated to the Segregated Account under any of the documents and agreements governing such transactions or withholding premiums or other payments, including without limitation recoveries, reimbursements, interest, deferred interest, and default interest, owed under or with respect to such policies.

F.    Ambac-Insured Swaps:  The Court has been advised that among the policies and contracts allocated to the Segregated Account are policies executed as a part of interest rate, basis, total return, and/or currency swap or other swap transactions.  Most of such policies related to transactions in which issuers of interest-bearing bonds entered agreements with financial institutions to effectively fix the interest rate on the bonds.  Among the policies allocated to the Segregated Account are policies that insure the issuers' obligations under such swap agreements.

In furtherance of the other injunctive relief granted above, each financial institution party to a swap agreement insured by Ambac (where the counterparty is not Ambac Financial Services, LLC or Ambac Credit Products, LLC) allocated to the Segregated Account (*see* Exhibit C to the Plan of Operation, which is attached at Tab 1 to the Commissioner's Verified Petition) is specifically enjoined from (i) taking any action under or in connection with Section 6(a) or 6(b) of the

12

relevant ISDA Master Agreement (including the schedule and confirmation(s) forming a part thereof) (the "Swap Agreement"), as heretofore amended or modified, including without limitation declaring an Event of Default, a Potential Event of Default, or a Termination Event (each such term as defined in the Swap Agreement) or designating an Early Termination Date (as defined in the Swap Agreement); (ii) taking any action under or in connection with the Swap Agreement that such party would be contractually obligated to refrain from taking, or failing to take any action under or in connection with the Swap Agreement and any related documents, agreements, and/or policies that such party would be contractually obligated to take, in each case but for the occurrence of an Event of Default, Potential Event of Default, or Termination Event (as defined in the applicable Swap Agreement) and/or the Events or the financial condition of the Segregated Account, the Allocated Subsidiaries, or the Ambac General Account, including without limitation withholding premiums, recoveries, reimbursements, interest, deferred interest, default interest, and any other payments owed under or with respect to the Swap Agreement and any related documents, agreements, and/or policies; and (iii) making any demand for any payment on the relevant counterparty to such Swap Agreement or the credit support provider for such counterparty, or exercising any rights in respect of any collateral or security for the performance of such counterparty's obligations under the Swap Agreement, pursuant to any party's assertion that any such Potential Event of Default, Event of Default, or Termination Event occurred.

10.     Any person or entity violating the terms of this Order may be subject to the sanctions contained in Wis. Stat. § 601.64, including civil forfeiture and criminal penalties. Wis. Stat. § 645.07(4). Willful violation of this Order may also constitute good cause for the Commissioner to void or limit any policy or other contract obligations otherwise owed by the Segregated Account or an Allocated Subsidiary to the party violating this Order, including partial or full disallowance of claims.

11.     The injunctive relief granted by this Order shall issue without the posting of any bond by the Rehabilitator and his Special Deputy Rehabilitator. Wis. Stat. § 645.08(1).

12.     This Order shall remain effective until further order of the Court. If any interested parties believe any portion of this Order is unwarranted by the facts or the law, such parties may seek modification or dissolution of part or all of this Order by filing a written motion with this Court no later than 90 days following the issuance of this Order. If one or more such

13

timely motions are received, the Court may set a schedule for responsive briefing and a hearing regarding the modifications or dissolutions sought. The originals of any such motions shall be filed with the Dane County Circuit Court (with courtesy copies mailed to the undersigned, care of the Clerk of the Lafayette County Circuit Court) and served on counsel for the Commissioner.

13.     Notwithstanding anything set forth in the foregoing provisions of this Order enjoining actions, claims or lawsuits or the moratorium on making payments on account of policies or contracts allocated to the Segregated Account without the consent of the Rehabilitator (but without prejudice to paragraph 5 hereof prohibiting any assertion of any market quotation, mark-to-market or close-out loss), policyholders or other claimants should submit their notices of claim or similar demands for payment pursuant to the procedures and service requirements specified in their policies or contracts and those notices of claim or other similar demands for payment shall be tracked and recorded by the Rehabilitator or his authorized representatives so that they may be processed for payment pursuant to the terms and conditions specified in whatever form of final plan of rehabilitation is approved by this Court following notice and hearing. CDS counterparties may not trigger and submit mark-to-market claims, but may submit scheduled payment claims.

14.     Ambac has entered into a non-binding Statement of Intent with certain financial institutions (the "Settling Counterparties") that are parties to credit default swap agreements with Ambac Credit Products, LLC and corresponding financial guarantee policies issued by Ambac (together the "CDS Contracts") and certain other types of policies and agreements with Ambac pursuant to which it is anticipated that, upon completion and execution of the definitive agreements necessary to give effect to, and effectuate, the presently non-binding Statement of Intent, those policies or other contracts shall be commuted on the terms and conditions agreed to

14

by and between the Settling Counterparties and Ambac. Each such policy or other contract between a Settling Counterparty and Ambac for which there is a written forbearance agreement (a "Forbearance Agreement") in place remains in the Ambac General Account. If a policy of a Settling Counterparty which was initially allocated to the Segregated Account due to the failure of a Forbearance Agreement to be in full force and effect with respect to such policy later becomes covered by a Forbearance Agreement, such a policy may then be allocated to the Ambac General Account at such time as a Forbearance Agreement becomes in full force and effect with respect to such policy. The Forbearance Agreements establish an initial 60-day standstill period during which the parties to the Forbearance Agreement may not commence any litigation, lawsuit, or other legal process with respect to the CDS Contracts at issue and those financial institutions may not designate an early termination date, accelerate, liquidate, close out, terminate, assess or demand damages or termination, make-whole or other payments under, withhold or set off payments under, alter the payment terms of, demand collateral in respect of, or otherwise exercise remedies or enforcement rights in respect of one or more transactions to which Ambac or Ambac Credit Products, LLC is a party. After the standstill period, any party to the Forbearance Agreement at issue may proceed as permitted thereunder. For the avoidance of doubt, a Settling Counterparty shall not be subject to the injunctive relief enumerated under Paragraphs 5, 7, and 9(a) with respect to contracts or policies under which its rights are subject to a Forbearance Agreement, for as long as such Forbearance Agreement remains in full force and effect.

15. The Rehabilitator may consent to actions or failure to act which would otherwise be enjoined or restrained by this Order.

16. The Rehabilitator may petition this Court for such other or further relief as he deems appropriate as this rehabilitation proceeds.

Dated this __24ᵗʰ__ day of March, 2010.

BY THE COURT:

William D. Johnston
Lafayette County Circuit Court Judge,
Presiding by Judicial Assignment Order