Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9                    Debtors.

10   - - - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14                    Debtor.

15   - - - - - - - - - - - - - - - - - - - - - -x

16                    United States Bankruptcy Court

17                    One Bowling Green

18                    New York, New York

19

20                    September 20, 2010

21                    9:35 AM

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

Page 2

1

2    CONTINUED EVIDENTIARY HEARING re (i) Motion of Debtor to Modify

3    the September 20, 2008 Sale Order and Granting Other Relief;

4    (ii) Motion of the Trustee for Relief Pursuant to the Sale

5    Orders or, Alternatively, for Certain Limited Relief Under Rule

6    60(b); (iii) the Motion of Official Committee of Unsecured

7    Creditors of Lehman Brothers Holdings Inc., Authorizing and

8    Approving (A) Sale of Purchased Assets Free and Clear of Liens

9    and Other Interests and (B) Assumption and Assignment of

10   Executory Contracts and Unexpired Leases, Dated September 20,

11   2008 (and Related SIPA Sale Order) and Joinder in Debtors' and

12   SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify

13   Sale Order; (iv) All Joinders Thereto and Related Adversary

14   Proceedings; and (v) Motion of Barclays Capital Inc. to Enforce

15   the Sale Order and Secure Delivery of All Undelivered Assets

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 3

```
 1

 2   A P P E A R A N C E S :

 3   JONES DAY

 4        Attorneys for the Movant, LBHI

 5        222 East 41st Street

 6        New York, NY 10017

 7

 8   BY:   JAYANT W. TAMBE, ESQ.

 9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for Movant, James W. Giddens, SIPC Trustee

12        One Battery Park Plaza

13        New York, NY 10004

14

15   BY:   WILLIAM R. MAGUIRE, ESQ.

16

17   QUINN EMANUEL URQUHART & SULLIVAN, LLP

18        Attorneys for the Movant, Official Committee of Unsecured

19         Creditors

20        51 Madison Avenue

21        22nd Floor

22        New York, NY 10010

23

24   BY:   JAMES C. TECCE, ESQ.

25
```

Page 4

1

2    BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays Capital, Inc.

4         333 Main Street

5         Armonk, NY 10504

6

7    BY:   JONATHAN D. SCHILLER, ESQ.

8

9    BOIES, SCHILLER & FLEXNER LLP

10         Attorneys for Barclays Capital, Inc.

11         401 East Las Olas Boulevard

12         Suite 1200

13         Fort Lauderdale, FL 33301

14

15   BY:   TODD THOMAS, ESQ.

16

17

18

19

20

21

22

23

24

25

Page 5

1                        P R O C E E D I N G S

2              THE COURT:  Be seated, please.  Good morning.  I

3    gather that LiveNote is functioning?  Good.

4              I received a letter dated September 17th from Mr.

5    Schiller.  And I'm wondering whether or not the parties have

6    had a chance to confer and perhaps resolve these issues?

7              MR. TAMBE:  We have, Your Honor.  We've conferred and

8    we've resolved.  And I'm happy to announce to the Court what

9    the resolution is.

10             THE COURT:  Fine.  I will then take this letter and

11   turn it over.

12             MR. TAMBE:  Okay.  We had a discussion about the

13   schedule for the presentation of the expert case.  We will

14   present Professor Zmijewski from the University of Chicago

15   today, Mr. Garvey and Mr. Schneider tomorrow.  Next week, there

16   is a half day on the 30th, we understand, and we'll use that

17   half day for another one of the movants' experts.  And we

18   should be able to finish up with the movants' experts by the

19   5th of October which is the Tuesday of the following week.

20   That leaves aside for later Mr. McIsaacs (sic).  I know there

21   have been discussions between trustee's counsel and Barclays'

22   counsel about Mr. McIsaacs but we believe Mr. McIsaacs will

23   appear at sort of the end off or after Barclays' expert

24   witnesses.

25             There are two other partial days next week.  I believe

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 6 of 233

Page 6

1    the 28th and 29th or the 27th and 28th --

2            THE COURT:  It's the 28th and the 29th.

3            MR. TAMBE:  28th and the 29th.  I believe Barclays

4    will use some or all of that time to complete their fact case.

5            THE COURT:  I recall that there was a question raised

6    to one of my law clerks last week or perhaps the week before as

7    to whether the start time on the 29th was to be at 9:30 or

8    perhaps earlier in order to accommodate the schedule.  Is there

9    a need to start at 9:00 on the 28th?

10           MR. SCHILLER:  No, Your Honor, there's not.

11           THE COURT:  Fine.  We'll start at 9:30 then.

12           MR. TAMBE:  And hot off the press, Your Honor, we have

13   a calendar that we can hand out to Your Honor.

14           THE COURT:  A calendar that --

15           MR. TAMBE:  That actually reflects --

16           THE COURT:  -- details what you've just said?

17           MR. TAMBE:  That's right, Your Honor.

18           THE COURT:  Fine.

19           MR. TAMBE:  May I approach?

20           THE COURT:  Yes.  Mr. Maguire, do you have something

21   to say?

22           MR. MAGUIRE:  Just very briefly.  Bill Maguire for the

23   SIPA trustee, Your Honor.  And that is, with respect to Mr.

24   McIsaac, we have not actually finally resolved exactly where

25   best to fit him in.  I believe he'll be a fairly short expert

Page 7

1   witness.  So I don't think it will affect the schedule in any

2   fundamental way.  But we will confer further with our

3   colleagues and --

4            THE COURT:  Fine.

5            MR. MAGUIRE:  -- confirm that.

6            THE COURT:  Thanks for that.  So let's proceed.

7            MR. TAMBE:  Good morning, Your Honor.  Jay Tambe from

8   Jones Day on behalf of Lehman Brothers Holdings Inc.  The

9   movants call their first expert witness, Mr. Mark -- Professor

10  Mark Zmijewski from the University of Chicago.

11           THE COURT:  Good morning.  Please raise your right

12  hand.

13       (Witness sworn)

14           THE COURT:  Be seated, please.

15           THE WITNESS:  Thank you.

16           MR. TAMBE:  Before we get started, Your Honor, if I

17  could approach the witness and the bench with binders?

18           THE COURT:  That will be fine.

19           THE WITNESS:  Thank you.

20  DIRECT EXAMINATION

21  BY MR. TAMBE:

22  Q.   Professor Zmijewski, could you please introduce yourself

23  to the Court?

24  A.   Yes.  My name is Mark Zmijewski.

25  Q.   And where do you work?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 8

1    A.    I work at the University of Chicago's Business School.

2    I'm a professor there and also one of four academic deans.

3    Q.    Could you please describe other than your teaching

4    responsibilities at the University of Chicago and we'll deal

5    with those in some greater detail, the work that you do as a

6    principal at Chicago Partners as you just briefly provided a

7    description of what Chicago Partners is, what Chicago Partners

8    does.

9    A.    Yes.  Chicago Partners changed names.  It's currently

10   called Navigant Economics and it's part of Navigant Consulting.

11   But Chicago Partners is a litigation consulting company that

12   provides expert witnesses for accounting issues, economic

13   issues, financial economic issues, financial analysis, security

14   valuation.

15   Q.    And you are one of the founders of Chicago Partners?

16   A.    I founded Chicago Partners in 1994 with a colleague from

17   the University of Chicago.

18   Q.    Okay.  If we could take a step back and briefly go through

19   your educational background.

20   A.    Yes.  I have three degrees:  bachelor of science with a

21   major in accounting; an MBA that I completed while I was Ph.D.

22   student also with a major in accounting; and a Ph.D. with a

23   major in accounting and minors in economic and finance.

24   Q.    Okay.  As we go through your background, your educational

25   background, your professional experience, if you could please

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 9 of 233

Page 9

1    turn in the binder that I placed before you to tab 1-A.

2    A.    I see --

3    Q.    Behind tab 1, behind A.

4          MR. TAMBE:  If we could have that up on the screen?

5    That is 156A.

6    Q.    Now, Professor Zmijewski, what is this document that is

7    marked as Movants' Exhibit 156A?

8    A.    It's my resume.

9    Q.    And as we review your resume, if you could take us through

10   your employment with the University of Chicago and the various

11   positions that you hold there.

12   A.    Well, under "Academic Employment", if you look at the

13   bottom line, I started out as a rookie, assistant professor in

14   1984 at the University of Chicago.  I was promoted to associate

15   professor then promoted to effect the professor and, lastly,

16   awarded the chair in the county.

17   Q.    Okay.  And when you refer to the chair, you're referring

18   to the Leon Cal Marshall Professor of Accounting Chair, is that

19   right?

20   A.    That's correct.

21   Q.    Listed on your academic employment, one of the items, the

22   third from the bottom, is executive director, Center for

23   Research in Security Prices.  Could you explain to the Court

24   what that is?  What is that center and what does it do?  And

25   what is your involvement then with that center?

1   A.   Yes.  The Center for Research in Security Prices, called

2   CRSP, is the predominant center in academic institutions for

3   collecting security price information, stock price information

4   for New York, American and NASDAQ companies.  That's all the

5   stock market data that's relevant is collected at that

6   institution and used by pretty much every academic institution

7   to study U.S. stock markets.

8   Q.   Okay.  And is it used solely by academics or is it also

9   used by market professionals?

10  A.   It's used by some -- it's a quantitative database.  So

11  it's used by portfolio managers who look at quantitative

12  analysis to place -- to buy stocks.  And it's also used in

13  litigation.  I've used it several times and many academics and

14  nonacademics use CRSP data in litigation.

15  Q.   Moving further down in your resume, could you briefly

16  describe the types of academic research you have done and focus

17  a little bit on some of the publications that you have.

18  A.   My academic research focused on how do stock market

19  participants or market participants use information to set

20  security prices.  So one of the studies that I've conducted was

21  how the market reacts to earnings announcements.  An earnings

22  announcement comes out into the public.  How long does it take

23  for the market to react?  And based on that information, how

24  would the market react?  It's that type of work.

25  Q.   And your research papers have been published?

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 11 of 233

Page 11

1   A.   Yes.

2   Q.   And they've been published in peer review journals?

3   A.   Correct.

4   Q.   You also have, I guess, teaching responsibilities at the

5   university?

6   A.   I do.

7   Q.   And could you briefly describe the courses you have taught

8   both at the University of Chicago and I understand, previously,

9   at the State University of New York.

10  A.   Yes.  I've most recently been teaching financial strategy

11  which is a case based course on various types of transactions,

12  merges and acquisitions, LBOs, selling companies, buying

13  companies.  And also, we look at how companies capitalize

14  themselves, the financing instruments they use in their capital

15  structure.

16      Before that, I taught courses in financial analysis and

17  valuation, corporate finance, managerial accounting, financial

18  accounting, merges and acquisition accounting.

19  Q.   Moving over now to your role as a partner in Chicago

20  Partners or a principal in Chicago Partners, let me drill down

21  a little deeper into the types of work that you've done with

22  Chicago Partners as a consultant.

23  A.   I've served as an expert witness -- much of my work is

24  related to valuation, both for valuing a company, parts of a

25  company, assets of a company or valuing the securities that

Page 12

1    finance a company, debt securities, equity securities.  So much

2    of it is focused on that type of valuation work.

3        Another part of it is focused on how -- in 10(b)(5)

4    litigation, stock drop type of litigation.  How information

5    affects stock prices.  Very similar to my research.  And then

6    some of it's more on -- I've done a lot of work for the

7    Department of Justice on evaluating efficiencies, for example.

8    So some of it's looking at the financial analysis of companies

9    or industries.

10   Q.   And I take it before today, you have testified in court as

11   an expert witness?

12   A.   Yes.  I've testified several times over the past twenty

13   years.

14   Q.   Do you recall the first time you ever testified in court?

15   A.   I do.  It was twenty years ago.  I was a much younger man

16   and Mr. Boies cross-examined me for the first time.  So he

17   broke me in.

18   Q.   And I take from your answer, you have appeared from time

19   to time in cases opposite Boies Schiller, is that correct?

20   A.   That's correct.

21   Q.   And I take it from time to time, you've actually been

22   retained by the Boies Schiller firm to provide opinions and

23   services on behalf of their clients?

24   A.   That's correct.

25   Q.   And the same is true for Jones Day?

1  A.    That's correct.  I've worked for your clients and I've

2  worked against your clients.

3  Q.    The types of clients that you have done work for -- I

4  think you mentioned some work you've done for the Department of

5  Justice.  Can you give the Court just a brief overview of the

6  types of entities, companies, individuals that you might have

7  represented?

8  A.    Well, starting with the Department of Justice, I've done

9  work for the Department of Justice on how do you evaluate the

10  efficiencies in a merger transaction.  So I testified for the

11  Department of Justice in the Oracle/PeopleSoft merger and

12  discussed the credibility of the synergies or efficiencies that

13  were put forth in that merger.

14      Other work for the Department of Justice was evaluating

15  forecast, financial analysis.  Also worked -- this is back a

16  few years now -- in the savings and loan issue when the

17  government changed the regulations with respect to how goodwill

18  is counted for regulatory capital.  And I had worked on a

19  host -- a series of cases related to the impact that it would

20  have on the bank's value.

21  Q.    And away from the Department of Justice, I understand from

22  your previous answer, you've obviously done work for

23  corporations, for corporate clients?

24  A.    For corporations, large -- mostly large corporations as

25  well as individuals.  Individuals and types of individuals that

1   might hire Chicago Partners.

2        But I've also done work for class shareholders -- classes

3   of shareholders in shareholder suits.

4   Q.   And when you've testified in Court previously as an expert

5   witness, what were the subjects, the topics on which you were

6   qualified by the Court to provide opinion testimony?

7   A.   It's very broad again.  Given my educational background

8   and my research and all the teaching I've done, it really

9   covers all of that:  financial analysis, valuation, security

10  analysis, security valuation.  Covers a broad spectrum of

11  topics.

12  Q.   And in terms of your experience and skill set and prior

13  academic work that you've done, which of those did you employ

14  in the assignment at hand, this litigation?

15  A.   It would be financial analysis and valuation.

16  Q.   And before we get into the specific opinions you rendered,

17  broadly speaking, what were the topics on which you have

18  provided opinion testimony and developed opinions of this case.

19  A.   Professor Pfleiderer provided reports, submitted a report,

20  and I was asked to look at that report and comment on that

21  report.  And as part of that work, I was asked to quantify the

22  movants' claims.

23  Q.   And quantifying the movants' claims and analyzing

24  Professor Pfleiderer's report, did you employ the various

25  academic background, professional background that we've just

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 15 of 233

Page 15

1    been discussing the last few minutes.

2    A.    Yes.

3    Q.    Okay.

4         MR. TAMBE:  Your Honor, the movants tender Professor

5    Zmijewski as an expert in accounting, financial analysis and

6    valuation issues broadly to provide opinions consistent with

7    the opinions that he has provided in his expert report.

8         THE COURT:  What's the position of Barclays with

9    respect to that offer?

10        MR. SCHILLER:  No objection, Your Honor.

11        THE COURT:  The witness is accepted as an expert

12   witness in each of the areas identified by counsel.

13        MR. TAMBE:  Thank you, Your Honor.

14        THE WITNESS:  Thank you.

15        MR. TAMBE:  And, Your Honor, we'd also move into

16   evidence Exhibit M156A which is Professor Zmijewski's resume.

17        MR. SCHILLER:  No objection.

18        THE COURT:  It's admitted.

19   (Movants' Exhibit M156A, Professor Zmijewski's resume, was

20   hereby received into evidence as of this date.)

21   BY MR. TAMBE:

22   Q.   Now, in preparation for your testimony here today,

23   Professor Zmijewski, did you prepare any demonstrative slides

24   or presentation materials?

25   A.    Yes.  I call them lecture notes.

Page 16

1    Q.    And for what purpose did you prepare those?

2    A.    Some of my work is technical.  So I try to create a

3    logical way to explain some of the concepts instead of just

4    explaining them with words.

5    Q.    And the notes that you prepared, are those based on the

6    expert report and the declaration that you have previously

7    prepared in this matter?

8    A.    Yes.

9    Q.    Okay.

10            MR. TAMBE:  Your Honor, may I approach?

11            THE COURT:  Yes.

12            THE WITNESS:  Thank you.

13    Q.    Professor Zmijewski, I've handed you a bound document

14    which carries a number at the bottom, N910.  Are those the

15    slides that you prepared in preparation for your testimony here

16    today?

17    A.    They are.

18    Q.    Now you also prepared an expert report in this matter

19    earlier this year, correct?

20    A.    Correct.

21    Q.    And if you could turn in your binder, the witness binder,

22    to tab 1B which is 156B, Movants' 156B, if you could describe

23    for the Court and explain to the Court what that document is.

24    A.    This document is my expert report that I described

25    earlier.  And it's dated March 15, 2010.  However, this expert

1   report includes some edits, minor edits, but it includes some

2   edits in it.  And it was just corrected.

3   Q.   And those are edits you made in the process of reviewing

4   this report in preparation for your testimony here today, is

5   that correct?

6   A.   Yes.  Some of the changes are just a couple of word edits

7   just to make sure everything's clear.  And there is one change

8   in the numbers.  Other experts had a change in their reports.

9   Their reports feed into my reports.  So I updated my numbers

10  for the changes that they have in their report.

11  Q.   And is it your understanding that a copy of the updated

12  report has been provided to Barclays?

13  A.   I prepared a regular version of the report, a clean

14  version as well version.  And it's my understanding that you

15  gave that information to Barclays.

16  Q.   And just -- you said there were two types of changes.

17  There were some typos and word corrections.  But you also said

18  there were some numbers that changed.  Can you give the Court

19  some understanding of the change in the numbers?

20  A.   Yes.  One of the other movants' experts changed a number

21  by two million dollars.  So I changed my numbers by two million

22  dollars.

23  Q.   And that's a two million dollar change over a differential

24  on valuation of about 5.1 billion dollars, is that correct?

25  A.   Yes.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 18

1   Q.   Okay.   Now you have reviewed this report carefully before

2   appearing here in court today, correct?

3   A.   Of course.

4   Q.   And you would adopt this report as your testimony for

5   purposes of providing your opinions to this Court, correct?

6   A.   Yes.

7            MR. TAMBE:   Your Honor, we offer in evidence Exhibit

8   156B which is Professor Zmijewski's report.

9            MR. SCHILLER:   No objection, Your Honor.

10           THE COURT:   It's admitted.   I'm just going to note

11   that in other litigation in which I have been involved, parties

12   have taken the position that expert reports are not admissible

13   because they are, in effect, hearsay documents.   And in the

14   course of that litigation, I ended up admitting all expert

15   reports which happened to be the Charters Communication case

16   last year with the understanding that all parties agree that

17   for purposes of that litigation, it was appropriate, following

18   argument, that all expert reports be admitted notwithstanding

19   the ability the parties had to raise questions as to hearsay.

20   I assume, as a result of the positions being taken by the

21   parties, that no hearsay objections are being raised as to any

22   expert reports.   There may be other issues as to admissibility

23   but hearsay is not one of them.   Is that correct?

24           MR. TAMBE:   I think that's certainly true for the

25   movants.   We don't intend to object on hearsay grounds to any

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 19 of 233

Page 19

 1   of the expert reports submitted by Barclays.

 2          MR. SCHILLER:  Yes, Your Honor.

 3          THE COURT:  Fine.  Okay.  With that little

 4   explanation, this is admitted and I assume that I won't have

 5   issues with respect to admissibility in the future on other

 6   expert reports either.

 7          MR. TAMBE:  Thank you, Your Honor.

 8   (Movants' Exhibit 156B, Professor Zmijewski's expert report,

 9   was hereby received into evidence as of this date.)

10   BY MR. TAMBE:

11   Q.   Professor Zmijewski, if you could turn to tab 2 in your

12   binder, please.  And that is Movants' Trial Exhibit 821.  And

13   could you describe to the Court what that document is.

14   A.   This document is a declaration I submitted in this

15   litigation dated July 15th.

16   Q.   And for what purpose had you prepared this litigation?

17   A.   Barclays filed a motion to exclude my -- some of my

18   testimony.  And Professor Pfleiderer made some comments about

19   my report in a declaration that he wrote.  I think it was -- I

20   don't remember the date.  It was in April of this past year.

21   And I responded to Professor's Pfleiderer's comments about my

22   report.  And also, the statements that were made in Barclays'

23   motion.

24   Q.   And the matters that you set forth in your declaration, do

25   you adopt those matters or do you testify consistent with your

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 20

1   declaration from the stand today?

2   A.   Yes.

3   Q.   Okay.

4        MR. TAMBE:  And we offer, Your Honor, Movants' Exhibit

5   821 in evidence.

6        MR. SCHILLER:  Your Honor, with the understanding that

7   this will be treated under the same rubric as expert reports

8   and -- because we also have a number of declarations.  And I

9   understand movants are treating this basically as a

10  supplemental report.  And if it's understood that these fall

11  within the same rubric that Your Honor laid forth with respect

12  to the expert reports, we have no objection.

13       THE COURT:  Okay.  It's admitted.  And obviously,

14  everything in the report and everything in the declaration

15  constitutes appropriate subject matter for cross-examination.

16       MR. TAMBE:  Thank you, Your Honor.

17  (Movants' Exhibit 821, declaration of Professor Zmijewski dated

18  7/15/10, was hereby received into evidence as of this date.)

19  BY MR. TAMBE:

20  Q.   Professor Zmijewski, let's now move to the subject -- the

21  substance of the opinions that you have arrived at in this

22  matter.  If you could briefly summarize for the Court the

23  topics on which you have prepared opinions, reached

24  conclusions, again, at a fairly high level and then we'll drill

25  down into each of those through the remainder of the morning.

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 21 of 233

Page 21

1    A.   Yes.  In my report, I have twelve different opinions and

2    you can put those opinions in essentially three buckets.  One

3    bucket is the quantification of the movants' claims.  Another

4    bucket is related to GFS, the GFS database, the global funding

5    system used by Lehman as well as parts of that database, an

6    analysis of residential mortgages, for example.  And then the

7    third bucket would be comments that Barclays has made with

8    respect to how to consider -- I'll say the risk of the deal,

9    the various risks of this particular deal as well as the

10   benefits of the deal to Lehman's employees and Lehman's

11   customers, the financial markets and so forth.

12   Q.   And in the demonstrative material that you prepared, do

13   you set out this summary, this grouping of your opinions, by

14   these three categories?

15   A.   Yes.  I have a slide that essentially states what I just

16   said.

17         MR. TAMBE:  And so, Your Honor, if we could turn to

18   slide 2 in the demonstrative materials that we handed out.

19   Q.   And I have up slide 2 of movants' Exhibit 910.  Is that

20   the summary, the grouping, of your various opinions from  your

21   expert report?

22   A.   Yes.  That's what I just stated.

23   Q.   Okay.  And the detail of your opinions, the opinions that

24   you set forth in your expert report, have you also prepared a

25   slide collecting those for ease of reference?

1    A.   Just for ease of reference, I have three slides, one for

2    each one of those bullet points.  And it just -- they quote my

3    report.

4    Q.   And so, you're referring there to slides 3, 4 and 5 which

5    reproduced the opinions that are set forth in your expert

6    report by category, is that correct?

7    A.   Yes.  So this is the grouping with respect to the

8    quantification of plaintiffs' -- or, excuse me, movant's

9    claims.  The next slide is with respect to the GFS system.  And

10    the following slide is with respect to the risk and benefits of

11    the transaction.

12    Q.   And as we go through our discussion this morning, we'll

13    drill deeper into each of those opinions.

14    With respect to the first set of opinions that deal with

15    valuation issues, again, can we start at a high level in terms

16    of what the assignment was that you were looking into and work

17    our way to the conclusions that were reached by yourself.

18    A.   Yes.  I was asked -- part of what I was asked to do is

19    quantify the movants' claims.  To do that, I start out with,

20    first, understanding the claims and, second, creating a

21    framework so one can actually go through the process of

22    quantifying it and to -- as I was thinking about this and

23    looking at all the movants' claims in the various documents, I

24    boil it down, I think, to two very simple claims.  And the

25    claims are, I think, important to say it's relative.  They're

Page 23

 1   relative claims and relative to what the Court approved in the

 2   sale transaction and the value of that sale transaction.  So

 3   relative to the court-approved sale transaction and the value

 4   of that transaction, the movants claim that Barclays received

 5   more assets than it should have and paid less for those assets

 6   than it should have based on what was approved by the Court.

 7   Q.   And so, at its simplest form, that's sort of the formula

 8   that you have used as you begin this process of identifying the

 9   undervaluation of assets and the value question that you looked

10   at, is that correct?

11   A.   That sort of boils down the essence of the movants'

12   claims.  And then I created a very -- you know, it's a very

13   simple formula.  If you take it at that very, very top level, I

14   call what your claims are, the quantifications, the Barclays'

15   windfall.  And I show -- it's probably good to just show the

16   slide and there's a simple formula there.

17   Q.   So it's slide 7 --

18   A.   Yes.

19   Q.   -- on Movants' 910?

20   A.   Yes.   The last slide -- I'm sorry -- the last line on this

21   slide shows the most top level calculation of the Barclays'

22   windfall.  The actual value represents the value that Barclays

23   received as of the date of the closing, the effective closing,

24   from this transaction.  And you subtract from that what the

25   court-approved value was.  And the difference between those two

Page 24

1    is the windfall.  And according to movants, the actual value is

2    going to be larger than the court-approved value for two

3    reasons:  one, more assets were transferred than should have

4    been transferred; two, Barclays paid less for those assets than

5    were approved by the Court.  So that very simple formula

6    calculates that windfall.

7    Q.   Are you expressing any opinion, Professor Zmijewski, about

8    what the Court approved?

9    A.   No.  My focus is on the actual value and the other

10   movants' experts.  We have focused on calculating the actual

11   value.  I use a placeholder for the court-approved value that

12   the movants gave to me but it's based on your documentation.  I

13   haven't looked at that issue at all.

14   Q.   Okay.  So in your formula, when you're calculating

15   Barclays' windfall, the work that you did and the work that you

16   understand the other movants' experts did is really focused on

17   the actual value component?

18   A.   Yes.

19   Q.   And the court-approved value component is based on other

20   documents in evidence that's been submitted to His Honor?

21   A.   Correct and distilled down to a number by the movants.

22   Q.   So applying that formula, again at a high level before we

23   drill into how the actual value number was calculated, have you

24   prepared any materials that sort of set out expressing this in

25   numbers?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 25

1   A.   I did.  Again, just to use one number for the actual

2   value, there's literally more than ten thousand calculations

3   then go into that one number.  But the movants' experts

4   conclude that the actual immediate economic gain to Barclays

5   from the sale transaction was an 11.2 billion dollar immediate

6   gain.  So following that formula, we have the Barclays'

7   windfall will equal 11.2 billion dollars of a gain to Barclays

8   minus whatever the court approved the deal to be.

9   Q.   And you used a phrase before, a "placeholder".  And you

10  use a placeholder for purposes of doing the mathematical

11  calculation then of deriving what the Barclays windfall number

12  is, correct?

13  A.   Yes.  According to movants, the court-approved value in

14  this transaction was that Lehman should have recognized a gain

15  of 1.85 billion.  And therefore, Lehman should have recognized

16  a gain of 1.85 billion.  What happened is Barclays recognized a

17  gain of 11.2 billion.  To calculate the windfall, it's the sum

18  of those two numbers or approximately thirteen billion dollars.

19  Q.   Okay.  Now as we go through the morning, one of the points

20  of comparison is how does that number that you've calculated,

21  the Barclays windfall number, compare to Barclays' public

22  disclosures about the acquisition gain as calculated by

23  Barclays?  And is that something you looked at as well?

24  A.   I did.  Part of the 11.2 billion dollars is the 4.2 --

25  roughly 4.2 billion dollars that Barclays recognized as an

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 26

1   economic gain as of the date of the transaction.

2   Q.   Okay.  And so have you also prepared an analysis similar

3   to slide 8 of Movants' 910 which uses Barclays' numbers and,

4   just for point of comparison, what it looks like if you were

5   simply to accept Barclays' numbers at face value?

6   A.   I do.  It's the next slide and it's a formula just with

7   the Barclays' number inserted instead of 11.2 billion dollars.

8   So of the 11.2 billion dollars, roughly 4.2 billion comes from

9   the immediate economic gain recognized by Barclays in the sale

10  transaction.  So Barclays recognized a 4.2 billion dollar gain,

11  according to movants, and with respect to the court-approved

12  transaction, Lehman should have recognized a 1.85 billion

13  dollar gain.  Add those two numbers together and it's a six

14  billion dollar windfall.

15  Q.   Okay.  So as a point of comparison, the numbers were, at

16  the end of the day, comparing the six billion dollar number

17  based on Barclays' overall calculations versus thirteen billion

18  dollars as calculated by movants' experts, is that correct?

19  A.   That's correct.  And again, that's conditioned on using a

20  placeholder for the court-approved gain.

21  Q.   Now that differential between the thirteen and the six, is

22  that all explained by valuation differences on the securities,

23  the financial securities that were transferred from Lehman to

24  Barclays?

25  A.   No.  It's about -- there's seven billion dollars

Page 27

```
 1    difference between the six billion windfall and the thirteen

 2    billion on the previous slide.  That's seven billion dollars

 3    composed of the following parts:  first, we have about a 5.1

 4    billion dollar undervaluation of financial assets.  There's

 5    about 775 million dollars of unrecorded assets for which

 6    Barclays has a claim against Lehman.  There are some

 7    liabilities that were overstated.  And then there are some

 8    liabilities that movants believe weren't appropriately included

 9    as liabilities.  And then there's transactions costs.  So those

10    are the components.  And I have a slide that delineates all of

11    that.

12    Q.   And so just slide 10 and Movants' 910, again at a high

13    level, this identifies -- what does this identify?

14    A.   Well, if you look at the bottom row, it's the same two

15    numbers as before:  thirteen billion windfall based on movants'

16    expert; six billion based on Barclays' reported economic gain.

17    And what this slide shows that's different is the 11.2 billion

18    dollars going up from the bottom to the third row -- the 11.2

19    billion dollars, which is the movants' experts' measure of the

20    economic gain -- it shows the components of 5.1 billion for the

21    undervaluation, unrecorded assets and transactions cost of 1.4

22    billion, about a little over 500 million dollars in overstated

23    liabilities or liabilities that should not be included.

24    Q.   Okay.  Now we're going to spend much of the morning really

25    talking about components of that 5.1 billion dollar number.
```

Page 28

1    But before we get there, if we could just take a moment to get

2    a better understanding of what those other adjustments are.

3    And if you could -- you have done analysis of Barclays'

4    acquisition balance sheet and identified by line item where the

5    adjustments are that you have made and other movants' experts

6    have made to arrive at this differential between six billion

7    and thirteen billion, correct?

8    A.   Yes.  To explain that, I used movants' Exhibit 105 which

9    is the acquisition balance sheet.  And I just show the

10   difference between the acquisition balance sheet that was

11   reported by Barclays versus the movants' adjustments to that

12   balance sheet.

13   Q.   Okay.  And so we have up on the screen Movants' Exhibit

14   105.  Is that the acquisition balance sheet that you used as a

15   starting point to identify these various points of adjustment.

16   A.   It is.  I had it retyped but yes.

17   Q.   So you started with this document, you had it retyped and

18   then you've identified category by category where the

19   adjustments are, how you explain the difference between the six

20   billion and the thirteen billion, is that correct?

21   A.   Correct.

22   Q.   Okay.

23         MR. TAMBE:  If we can go back --

24   Q.   And if you could turn in the presentation materials to

25   slide 12, that's the acquisition balance sheet taken from

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 29 of 233

Page 29

1   Movants' M105, correct?

2   A.    It is.

3   Q.    Okay.  And then you have identified all the various

4   adjustments that are made to that, correct?

5   A.    Yes.  I have a series of slides that go through these

6   adjustments.

7   Q.    Okay.  So let's start with the asset side.  Would you

8   explain to the Court what those adjustments are?

9   A.    The adjustment with the (1) is Barclays' undervaluation of

10  trading portfolio assets or financial assets.  We have not only

11  myself as an expert conducting valuation, there are other

12  movants' experts conducting valuations of the various financial

13  assets of Barclays.  And when you add up all of those

14  undervaluations from each expert, the number is 5.1 billion.

15  So instead of the fair value balance sheet, the acquisition

16  balance sheet, showing -- essentially, it's 44.8 billion in

17  assets.  Movants believe the correct number is 49.9 billion

18  dollars.  So that's the first adjustment to the assets.

19  Q.    Would it help you, Professor Zmijewski, to have a pointer

20  up there so you can identify different parts of this document

21  that's up on the screen?

22  A.    That'd be great.  Thank you.

23             MR. TAMBE:  May I approach?

24             THE COURT:  Sure.

25  A.    So I spoke about this first line.

Page 30

1   Q.   Okay.  Moving on to the second line --

2   A.   Second line --

3   Q.   -- what is that?

4   A.   -- Mr. Romain testified in his depositions that Barclays

5   has claims for certain assets that it did not record.  And

6   there are documents from Mr. Romain that state what the value

7   of these assets are and indentify certain assets and the value.

8   In total, those unrecorded assets are 775 million dollars.  So

9   these are assets for which Barclays has a claim against Lehman

10  but did not record in the acquisition balance sheet.

11  Q.   Okay.  So again, if you were looking at or trying to total

12  up all of the value transferred to Barclays or claimed by

13  Barclays as of the acquisition date, you add in that 775

14  million as something that it has not yet received and hasn't

15  yet been captured by the acquisition balance sheet, is that

16  correct?

17  A.   Correct.  Barclays has various claims against Lehman.

18  Some of those claims are already in the acquisition balance

19  sheet.  However, according to Mr. Romain, 775 million of those

20  claims were not recorded as part of the acquisition balance

21  sheet.

22  Q.   And was there any independent valuation work done on that

23  item, the 775 million, by movants' experts?

24  A.   No.  We're using Mr. Romain's numbers.  There isn't enough

25  information about those assets to conduct an independent

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 31 of 233

Page 31

 1    valuation.  So we used Mr. Romain's numbers that he had in his

 2    testimony and his notes to his testimony.

 3    Q.   And before we move on to the liability side, those are the

 4    two adjustments then that are made on the asset side, is that

 5    correct?

 6    Q.   Yes.  So if you look at -- see how I can use this -- so

 7    total assets -- these are the reported market fair values of

 8    the total assets of 59.2 billion dollars of assets.  Based on

 9    movants' experts and Mr. Romain's testimony, those assets

10    should increase by 5.9 million dollars -- billion dollars.

11    Therefore, the value of the assets would be just around sixty-

12    five billion dollars.  The effect of that, if you look at the

13    bottom of this column, the 4.2 billion, this balance sheet here

14    that was provided, the acquisition balance sheet and fair

15    values, 59.2 billion dollars in assets, deduct liabilities of

16    fifty-three billion dollars, deduct some consideration that was

17    paid.  That results in a 4.2 billion dollar value which means

18    that the value of the assets transferred or purchased by

19    Barclays has a value in excess of the liabilities assumed plus

20    the compensation paid or consideration paid which means they

21    had an immediate economic gain of 4.2 billion dollars.  Those

22    are the reported numbers.  If you would add the additional

23    5.6 -- or 5.9 billion dollars there, that would -- Barclays had

24    recorded those assets -- that would have increased that 4.2

25    billion dollars by another 5.9 billion dollars.

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 32 of 233

Page 32

1    Q.    So to roughly about ten billion dollars.

2    A.    Roughly.

3    Q.    Let's move on to the liabilities side then.  There are

4    adjustments on the liabilities side as well, correct?

5    A.    Correct.

6    Q.    And if you could please explain to the Court what those

7    adjustments are.

8    A.    Yes.  The first adjustment's for -- and it's (3) -- the

9    first adjustment is an adjustment that I made to change the

10   calculation, the date of the calculation of the Option Clearing

11   Corp. liabilities.  And they were reduced by 103 million

12   dollars.  I had an access to the software company -- the

13   software, rather, Access database, from, I assume that you

14   received that from Barclays based on everything that I know.

15   So it's a Barclays database.  And Barclays used September 22nd

16   to calculate those liabilities.  That was after the 12:01 a.m.

17   effective closing.  And I valued those same liabilities using

18   the Barclays data as of September 19th and the liability was

19   reduced by 103 million dollars.

20   Q.    How about the other two items, items 4 and 5?

21   A.    The comp -- that's compensation liability.  That

22   compensation liability -- there are certain liabilities there

23   that movants have a view that should not have been included in

24   liabilities because they were not compensation.  And those add

25   up to 450 million.  And then deferred taxes are deferred taxes

Page 33

 1   that result from this deal, from the actual deal itself, onto

 2   Barclays' acquisition balance sheet.  And movants' position is

 3   that's not related to the compensation or consideration given

 4   to Lehman and shouldn't be included.

 5   Q.   There's one other item, that cure plus fourteen.  What is

 6   that?

 7   A.   There are cure liabilities.  And there was an updated

 8   schedule for cure liabilities in the documents.  And that

 9   increased liabilities by fourteen million dollars.

10   Q.   So as we walk down these adjustments, we have an increase

11   in total assets.  And is it correct that there is a decrease in

12   total liabilities?

13   A.   Correct.  The decrease in liabilities was approximately

14   one billion dollars.

15   Q.   Are there any other adjustments you made to this

16   acquisition balance sheet?

17   A.   One other adjustment, if you hit the button again, the

18   last adjustment is for transactions cost, movants' position is,

19   again, transactions cost to Barclays for this deal were not

20   part of the consideration to Barclays and were not -- something

21   that shouldn't be included in the calculation of the

22   acquisition balance sheet.

23   Q.   So with all of those adjustments, can you just sum up then

24   the bottom line number that appears on slide 13 of Movants'

25   910?

Page 34

1    A.    Yes.  When you increase the assets, decrease the

2    liabilities, make the adjustment for transactions cost, had

3    Barclays actually used those numbers for its acquisition

4    balance sheet, Barclays would have reported an economic gain

5    immediately on the transaction of 11.2 billion dollars rather

6    than the 4.2 billion dollars that it did report.

7    Q.    And slide 14, again, just sort of summarizes the

8    difference there which is undervaluation versus the other

9    components of the adjustment, is that correct?

10   A.    Yes.  And this is -- I just prepared this transition slide

11   -- now we're going to drill into the 5.1 billion dollar

12   calculation.

13   Q.    So as we get ready to drill into the 5.1 billion dollar

14   calculation, what aspects of that calculation -- we'll come

15   back to this again.  What aspects of that calculation were you

16   responsible for?

17   A.    These were -- all the financ -- the undervaluation

18   pertains to financial assets.  And I focused on two groups of

19   financial assets:  the equities, as determined by Barclays.

20   Barclays has an asset category, equities, and I revalued those.

21   And I also revalued the JPM inventory claim of seven billion

22   dollars.  So I revalue that as well.  And all the other

23   financial assets were valued by movants' other experts.

24   Q.    Now, in valuing those two categories, equities as well as

25   the JPM assets, and you've mentioned this, I think, once or

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 35

1    twice already in your testimony, what date did you use to

2    conduct that valuation?  What was the effective date at which

3    you valued those assets?

4    A.   I read the asset purchase agreement.  And in the asset

5    purchase agreement, it states -- and on the next slide I have

6    an excerpt of what it states -- but it states that the risk and

7    rewards, using my words, the risk and rewards of ownership

8    transferred as of 12:01 a.m. New York time on the closing

9    date -- and we all know the closing date is September 22nd,

10   2008.  So the measurement -- I measured all the assets that I

11   worked on -- and I understand the other movants' experts did as

12   well -- I used 12:01 a.m. New York time on September 22nd.

13   Q.   And is your understanding that the acquisition balance

14   sheet values those same financial assets as of that point in

15   time or at different points in time?

16   A.   The acquisition balance sheet did not calculate the value,

17   measure the value as of 12:01 a.m. New York time on the closing

18   date.  It used prices from other points in time.  And I list --

19   the last three bullets on that slide list for some of the

20   assets the acquisition balance sheet has September 22nd closing

21   prices, so end of day prices, not 12:01 a.m. before the market

22   opened.  It also uses some internal sales, prices that

23   occurred -- and that means sales to the trading desk within

24   Barclays, so it's internal sales within Barclays -- prices that

25   occurred between September 22nd and September 30th.  And then

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 36

1   for the JPM inventory, if you recall, there was a settlement in

2   December of 2008, December 22nd, and Barclays used December

3   22nd valuation rather than September 22nd valuation for that

4   inventory.

5   Q.   Professor Zmijewski, do you generally understand that

6   there are financial principles and financial rules, accounting

7   rules, that govern and relate to as of what point in time these

8   measurements should be made for a transaction such as this?

9   A.   Yes.  I understand that.  I've taught mergers and

10  acquisitions.  It's not a topic that I was asked to opine on at

11  all.  But accountants have different rules that apply.

12  However, those rules don't necessarily result in looking at a

13  valuation as of the effective closing, as of that point in

14  time.

15  Q.   And is it your general understanding that another of

16  movants' experts will address the effect of those accounting

17  principles and how they may or may not apply here?

18  A.   Yes.  I understand that Mr. Garvey, who is a certified

19  public accountant, is going to testify on that issue from an

20  accounting perspective.

21  Q.   All right.  Moving beyond the effective closing date

22  issue, is it your understanding that simply adjusting for the

23  date, measuring it as of 12:01, measuring the value of these

24  securities as of 12:01 a.m. on the 22nd, that fact alone is

25  responsible for all of the differences in valuation between

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 37 of 233

Page 37

1    Barclays and the movants?

2    A.   No.   That has -- that's part of the effect.   Another

3    factor is the Barclays liquidity discount, or haircut that that

4    term has been used from time to time.   And movants' experts

5    disagree with some of those discounts, liquidity discounts.

6    And then the other factor would just be inputs into valuation

7    models.

8    Q.   Now, in analyzing the financial assets and the valuation

9    of the financial assets, have you prepared any analysis that

10   describes how that 5.11 billion dollar difference between

11   Barclays and movants, how that is distributed across different

12   asset classes?

13   A.   Yes.   I prepared a couple of slides to start digging a

14   little deeper in the 5.1 billion which is what we did.   And the

15   two slides that are -- the first slide is using Barclays'

16   initial inventory asset categories.   I present a slide there

17   and show how the 5.1 billion dollar breaks down.   And I show

18   another slide by movants' experts after this.

19   Q.   Okay.

20   A.   So this slide --

21   Q.   And just for the record, that's slide 16 of Movants' 910

22   that you're describing now?

23   A.   Correct.

24   Q.   Okay.   Go ahead, please.

25   A.   So this slide, if you focus on the bottom line, there's

1    the 11. -- I'm sorry -- the 1.1 -- I'm sorry -- the 5 -- excuse

2    me.  Let's start this over again.  I'm looking at different

3    numbers.  Looking at the lower right-hand corner, that number

4    is 5.1 billion.  That is the same number that I showed earlier

5    on other slides.  So that is the total undervaluation of the

6    financial assets in the Barclays acquisition balance sheet.

7    That number is equal to, looking at column A, Barclays

8    acquisition balance sheet valuation of those assets of 44.4

9    billion versus column B, which is the movants' valuation of

10   those same assets of 49.5 billion.  The difference between

11   those two numbers is 5.1 billion.  And that represents the

12   valuation of 11,938 different CUSIPs or different types of

13   securities.  So that's the bottom line.

14       And what I show above that then is how that breaks down by

15   different asset classes:  the initial inventory which is --

16   which comes from Movants' Exhibit 102; and then the second line

17   from the bottom is the JPM inventory which comes from Movants'

18   Exhibit 103.  And I show the breakdown using Barclays'

19   categorization of assets.  We have equities.  There's 4,000

20   CUSIPs; rates, Treasury and agency securities, 1182 CUSIPs;

21   some corporate bonds, emerging market securities, residential

22   mortgage-backed securities, there's 3800 CUSIPs; principal

23   mortgage trading group, a little over a thousand CUSIPs; and

24   then the JPM inventory which has 1100 and 195.

25   Q.   The reference on slide 16 of Movants' 910, you have a

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 39 of 233

Page 39

1    reference to M102 and M103.

2           MR. TAMBE:  And again, just for the Court's reference,

3    Steve, if you could pull up M102 if you have it in native

4    format just so we could take a look at that document.

5           (Pause)

6    Q.   Professor Zmijewski, do you recognize that's on the

7    screen?

8    A.   Yes.  That's Movants' Exhibit 102.

9           MR. TAMBE:  I think the tabs at the bottom have been

10   cut off by the screen.  You may want to move it up a little

11   bit.  It's not showing the entire spreadsheet.

12   A.   And this is the summary tab.  I can describe this

13   spreadsheet in a little detail.

14   Q.   We may or may not be able to get to the tabs in the actual

15   Excel spreadsheet but why don't you describe what those tabs

16   are and how they feature in the analysis that you've done.

17   A.   All right.  They're coming.  Here they are.

18   Q.   Yep.  There they are.

19   A.   So there's a summary tab.  That's a summary of the

20   spreadsheets below it.  And I'm not good with colors.  I'm

21   going to call that pink.  The "Rates" tab, if you click on

22   that, that represents -- and if you see column C, those are

23   CUSIP numbers.  Those are the CUSIPs for all of the different

24   rate securities.  And if you add all of those rate securities,

25   there's the Barclays valuation of the rate securities in there.

Page 40

1   Q.   Okay.

2   A.   "Corps" is for corporate bonds and "EM" is for emerging

3   markets.  "RMBS" is the residential mortgages.  "PMGT" is the

4   principal mortgage trading groups.  And there's a tab for each

5   of these.  There's one tab that's missing here and it's the

6   equities.  The equities are not included in this sheet.  There

7   is an "Equities" tab; it's hidden.  I don't know if they can

8   unhide it.  Can you -- if he can unhide it --

9        (Pause)

10  Q.   And what is shown behind the "Equities" tab?

11  A.   The "Equities" tab represents the equities valuation.  But

12  the equities valuation isn't a number that was used because

13  it's the equities valuation as of September 19th not September

14  22nd.  So although there's an "Equities" tab in this

15  spreadsheet that doesn't include the equities that were

16  actually used in the valuation --

17  Q.   Right.

18  A.   -- they were equities that were calculated for September

19  19th which Barclays was initially going to use and then changed

20  to the 22nd.  So there's a separate file for the September

21  22nd.  It's just a separate file and you'd have to look to

22  another file to get the equities.

23  Q.   Okay.  So just to see the document that's now been pulled

24  up on the screen, that's one of the tabs.  I think the sheet

25  was unhidden.  And so you have a sheet up there.  Could you

Page 41

1    describe what that sheet is?

2    A.   That sheet's a summary of all the -- there's another sheet

3    on equities for September 19th and that represents the summary

4    of all the valua -- a summary of the valuation of all the

5    equities as of September 19th as valued by Barclays.  They

6    didn't use these numbers.  If you look -- if you go back to

7    that tab again -- summary tab, sorry.  And if you could

8    highlight -- nope.  The equity summary, sorry.  Yep.  And if

9    you could highlight D20, just go over that cell, cell D, as in

10   David, 20, that's the valuation of those securities as of

11   September 19th by Barclays.  And it's ten billion sixteen

12   million.

13   Q.   All right.  And you said that's not, in fact, a number

14   that gets used on the acquisition balance sheet?

15   A.   It's not.  This is September 19th.  And later, before

16   Barclays finalized its acquisition balance sheet, it changed

17   the date from September 19th to September 22nd.  And instead of

18   using that number, I believe the number is 9.7 billion dollars,

19   about 300 million dollars less than the number here.

20   Q.   Going back to -- and this is -- we've been discussing is

21   Movants' 102 native.  That's one of the spreadsheets that you

22   looked at.  The other spreadsheet that was referenced in your

23   summary page was M103.

24   A.   Correct.

25   Q.   And what is your understanding of what M103 is?

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 42 of 233

Page 42

1    A.    M103 represents -- and I believe sheet 2 -- the tab, sheet

2    2, has the summary.  That represents a summary of the JPM

3    inventory as valued by Barclays on December 22nd.  Column E is

4    what it has there.  After a liquidity adjustment -- it's column

5    F -- is the number that Barclays used for December 22nd.  And

6    then the details are in another sheet.  I think it's portfolio

7    3, just another tab on that sheet.  And that just provides the

8    details of the valuation.  I'm not sure if it's that tab or

9    another tab.  But one of the tabs there.  I don't recall the

10   name of the tab.

11   Q.    So the detail valuation information that rolls up to

12   Barclays' valuation of JPMorgan assets is found in 103N.  You

13   looked at that spreadsheet and then you made some adjustments

14   to those CUSIPs and those prices as reflected by Barclays, is

15   that correct?

16   A.    That's correct.

17   Q.    All right.  Let's go back now to your presentation

18   materials.  You said you had analyzed this 5.11 billion dollar

19   difference two ways.  One is by asset category per Barclays.

20   How else did you break out that 5.11 billion dollar difference?

21   A.    The other way I broke it out is just by expert -- movants'

22   experts.  So the next slide that I prepared shows all the

23   movants' experts.  There's myself, the first line.  And that's

24   for the equities that I valued, the 4,000 CUSIPs and the

25   resulting overvalu -- undervaluation by Barclays there is

Page 43

1   roughly 540 million.  And also, the second last line says

2   Zmijewski valuation.  That's for the JPM inventory and that's

3   for roughly 1200 CUSIPs and that's an undervaluation of -- in

4   the ballpark of 1.6 billion dollars.

5       And then we have three other experts doing work.  We have

6   Mr. Olvany who, in the parenthetical there, it's hard to read,

7   but he looked at certain -- twenty-two different CUSIPs, some

8   corporate bonds, some rates, some principal mortgage trading

9   group and emerging market securities.  Mr. Schwaba -- he looked

10  at municipal bonds, a subset of the rates, twenty-six

11  securities.  And Mr. Slattery valued 632 different

12  securities -- again, some of those are rates, some of those are

13  residential mortgages, the principal mortgage trading group.

14  And he valued those.  And in addition to that, he also used

15  third party valuations to value another 6,000 CUSIPs.  So if

16  you go to the right-hand column, you'll see the bottom right-

17  hand number is, again, the 5.1 billion.  And you can see how

18  that breaks out by expert.

19  Q.   Are you familiar with the process by which -- why is it

20  that you have different experts or different individuals

21  providing opinions on valuation on these different classes of

22  securities?

23  A.   When we started working on this matter, it was very clear

24  that there are many different securities.  And Mr. Olvany is a

25  former banker.  Mr. Schwaba is a former banker.  Mr. Slattery

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 44 of 233

Page 44

```
 1    is also a former banker.  For the equities, I have deep

 2    experience.  And although most of these securities, I think,

 3    are -- many of these securities are straightforward to value

 4    and I could value them, I don't have -- I wasn't there at the

 5    market at the time.  And I don't have the industry experience.

 6    So movants hired additional experts who really had deep

 7    industry experience to value those securities.

 8    Q.   All right.  Now we will drill down deeper into what

 9    explains your difference in valuation not he equities piece as

10    well as the JPM piece.  But one of the issues that's been

11    raised by Barclays in this litigation has to do with the

12    composition of this collateral.  And one of the claims that's

13    been made is, well, when the collateral came over, instead of

14    all of the Fed repo collateral coming over, there was new

15    stuff.  There was stuff that Barclays had not seen before.

16    Have you any analysis into the composition of the securities

17    that came over as part of the Barclays repo?

18    A.   Yes.  In one of the motions that Barclays made, there was

19    a statement that said many of the securities that it received

20    were not part of the Fed repo.  And movants asked me to

21    quantify.  Well, how many is "many"?  Let's put a number onto

22    "many".

23    Q.   And you have completed that analysis?  You've done that

24    analysis of how many overlapping securities there were with the

25    Fed repo and how many were new or different securities?
```

Page 45

1    A.    Yes.  What I did was look at all the securities that

2    Barclays has in its acquisition balance sheet, go back to the

3    Fed repo and figure out how many of those securities were

4    actually in the Fed repo, overlapping I call that, and how many

5    of the Barclays securities in the acquisition balance sheet

6    were not in the Fed repo, nonoverlapping securities.

7    Q.    Okay.

8    A.    And I have a little pie chart I prepared that just shows

9    the results of that calculation.

10   Q.    So I'll put on the screen slide 19 from Movants' 910.

11   Could you describe to the Court what that is?

12   A.    Yeah.  There are two pie charts.  I'll focus on the left

13   pie chart first.  The total value represents all of the assets,

14   financial assets, valued by Barclays excluding cash and

15   interest.  And I broke that down into the two pieces,

16   securities overlapping with the Fed repo and securities not

17   overlapping with the Fed repo, and you can see the percentages.

18   So 82.4 percent of the value of the acquisition balance sheet

19   inventory was from overlapping securities and 17.6 percent was

20   not.

21   Q.    So using Barclays' valuation for that collection of repo

22   securities, that's an eighty-two/seventeen percent split

23   overlapping versus nonoverlapping, is that correct?

24   A.    Correct.

25   Q.    Okay.  Did you also do that same analysis using movant's

Page 46

1   valuations as to what is overlapping and what's not

2   overlapping?

3   A.   Yes.  Going back to the calculations that movants made, go

4   through that same exercise.  You mark every security as either

5   overlapping or nonoverlapping and calculate how it breaks down

6   in percentage terms.  And for the movants' valuation which

7   is -- if you look at the top, it's, roughly, five billion

8   dollars larger.  The top line, Barclays' valuation -- sorry, I

9   should point -- Barclays' valuation of 43.6 versus movants'

10  valuation of 48.6.  It's roughly in the five billion dollar

11  range.  And the question is, well, did those percentages change

12  and the answer is they changed by a tenth of a percent in value

13  and there's still roughly an eighty-two/eighteen breakdown of

14  overlapping versus nonoverlapping securities.

15  Q.   Does the fact that those percentages are roughly the same,

16  eight-two/eighteen, eighty-two/eighteen, does that have any

17  significance in terms of explaining where the difference of

18  opinion is between movants and Barclays?  Is it on the

19  overlapping piece?  Is it on the nonoverlapping piece?

20  A.   What it means is -- and I prepared a slide to detail your

21  question.  But what it means that those percentages are roughly

22  the same, that means that the disagreement, or the

23  undervaluation as calculated by the movants, is roughly

24  proportional in those pieces of a pie.

25  Q.   And is that what slide 20 shows?

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 47 of 233

Page 47

1   A.    Yes.  Slide --

2   Q.    So if you could you just walk us through slide 20 as to

3   what those --

4   A.    Sure.  The first two bars show Barclays -- the first bar

5   of the first set of two show movants' valuation of 48.6.

6   Barclays' valuation of 43.6.  So you see the total

7   undervaluation, according to movants' experts, is 5.9 --

8   roughly, five billion dollars.  4.9, roughly five billion

9   dollars.

10      The next set of bars take out and just look at the

11  overlapping piece.  So how much of the four or five billion

12  dollars in total undervaluation comes from the overlapping

13  part.  And the overlapping part has an undervaluation of 4.1

14  billion.

15      And then the last two bars show that the nonoverlapping

16  part has an undervaluation of about 800,000 -- 800 million,

17  excuse me.  And if you look at the breakdown next to the 4.1

18  billion, you'll see it's eighty-three percent.  And the 800 is

19  sixteen percent.  So the breakdown is eighty-three percent of

20  the undervaluation presented by movants comes from the

21  overlapping securities and, roughly, seventeen percent comes

22  from the nonoverlapping securities.

23  Q.    Okay.  So in terms of assessing the disagreement between

24  Barclays and movants, is there a greater disagreement on the

25  nonoverlapping pieces than the overlapping pieces

Page 48

1   proportionally?

2   A.   No.

3   Q.   All right.  Now let's move into your opinions on the

4   valuation of the equities and, specifically, what you did and

5   what conclusions you reached about the valuation of the

6   equities and why your opinion in that regard is different than

7   the value assigned by Barclays.  Again, at a high level, could

8   you describe briefly to the Court how you went about valuing

9   the equities?

10  A.   Yes.  This calculation has two parts.  Part number 1 is

11  calculate the value of the equities at a different date -- at

12  an appropriate date of 12:01 a.m. September 22nd versus the

13  Barclays' valuation which was at the end of day on September

14  22nd.  Markets moved about a negative three to four percent

15  that day.  So if you just roll back Barclays' numbers -- and I

16  showed the number before was just around ten billion dollars.

17  If you roll it back three to four percent, you know that

18  Barclays, at the end of day, going from a ten billion dollar on

19  September 19th, would be somewhere about 9.7 billion dollars or

20  300 million dollars lower.  So I used September 19th not

21  September 22nd as the set of valuations for these equities.

22  That's part 1.

23  Q.   Why, Professor Zmijewski, did you think it was appropriate

24  to use close of business on the 19th prices to value securities

25  as of 12:01 a.m. on the 22nd?  Why is that appropriate?

Page 49

1   A.   I --

2   Q.   Why was it appropriate, in your view, to use close of

3   business September 19th prices to value securities as of 12:01

4   a.m. on the 22nd?

5   A.   I think so the point in time is 12:01 a.m. September 22nd

6   you can -- at least prices weren't trading at that point in

7   time.  Everybody was sleeping.  So you could use the end of day

8   Monday or you could use the end of day on Friday.  And the

9   question is, well, what happened between Friday close and 12:01

10  versus what happened after 12:01 a.m. to Monday close.  And if

11  you look at the data and you look at broad indices -- you can't

12  do this for every stock, but if you look at broad indices,

13  you'll see that over the weekend, not much happened.  It was

14  between the close on Friday and the open on Monday markets were

15  pretty stable.  And if you look at what happened between the

16  open on Monday and the close on Monday, there was a three to

17  four percent reduction in equities on that day.  And so, you

18  have two choices.  If you use September 19th, you get a correct

19  number.  If you use September 22nd, it's an incorrect number.

20  Q.   Okay.  And you have prepared analyses to summarize what

21  you've just testified about, is that correct?

22  A.   Yes.

23  Q.   So putting up and drawing your attention to slide 22 from

24  Movants' 910, could you briefly describe to the Court what that

25  slide shows?

Page 50

1    A.    Yes.    This is just what I spoke about.    The second line is

2    Barclays' midpoint valuation using September 22nd closing

3    prices of 9.725 billion dollars.    And if you use Barclays' own

4    valuation that we looked at earlier for September 19th, we saw

5    that number.    It's just over ten billion dollars, ten billion

6    and fifteen million dollars.    And --

7    Q.    And could you just --

8    A.    And the difference between those numbers is a little under

9    300 million.

10    Q.    So just the date issue is responsible for about a 300

11    million dollar difference valuation between the value that you

12    have ascribed to these securities as of 12:01 a.m. on the 22nd

13    versus the value ascribed by Barclays, correct?

14    A.    That's correct.

15    Q.    What data sources did you look at in determining the value

16    as of the close of 19 -- close of September 19th?

17    A.    Well, what I show here and what I used is Barclays' own

18    valuations as of the close of September 19th to reduce the

19    points of disagreement with Barclays since these were their own

20    valuations.    However, I also looked at Bloomberg prices and I

21    compared Bloomberg prices to the Barclays prices and saw that

22    they were close.

23    Q.    And in terms of coverage in Bloomberg, I mean, did you

24    find that there was data in Bloomberg for many of these equity

25    securities that you were valuing?

Page 51

1    A.    Yes.  If you're looking just for prices, and it's

2    Bloomberg and Capital IQ, two sources -- if you use those two

3    sources, you can calculate in value ninety-eight percent,

4    ninety-nine percent almost the entire group.

5    Q.    Of the securities that you were looking at?

6    A.    Of the securities using Bloomberg's closing prices for

7    September 19th, correct.

8    Q.    All right.  Now that difference you've just testified

9    about is about a 300 million dollar difference.  The

10   difference, as I recall from the earlier slide, is -- overall,

11   the point of disagreement here is about 540 million dollars.

12   So what's responsible or what is responsible for the rest of

13   the difference?

14   A.    What's responsible for the rest of the difference is the

15   difference in the calculation of the liquidity adjustment.  And

16   I calculate the liquidity adjustment by collecting for

17   September 19th bid-ask spread -- I guess I should take a moment

18   and just talk about the liquidity adjustment.  So we have

19   closing prices on September 19th.  Those closing prices are

20   generally viewed, since they're market prices, as mid-prices,

21   halfway between what a market maker would say here's what I'll

22   bid for versus here's what I'm asking for.  And many times, and

23   it even states it here, these are called midpoint prices.

24        It is customary to not use the midpoint price in valuing

25   these securities but to value these securities using the bid

Page 52

1    price, or sometimes called an exit price, and you value these

2    at an exit price.

3        So these represent midpoint valuations.  And we need to

4    reduce that value for an adjustment to take it from the

5    midpoint price to the bid price.  And that's a calculation that

6    I went through.

7    Q.   And the concept of making this adjustment from mid to bid,

8    that's not a concept that there's a disagreement on, is that

9    right?

10   A.   No.  Barclays calculates a mid to bid adjustment and

11   everybody calculates a mid to bid adjustment if they're going

12   through this type of calculation.

13   Q.   And the slide 25 basically described the liquidity

14   adjustment mechanism or steps?

15   A.   Yes.  And I can describe it briefly.  First, for September

16   19th, I go back to Bloomberg and I calculate the bid -- or,

17   collect, rather, the bid and the ask prices for all the

18   securities for which I can cal -- for which they have mid, bid

19   and ask prices.  And that represents about eighty-eight percent

20   of the value.  I calculate the average for that group.  And the

21   average for that group, as you see in the second indented

22   bullet, is about one and a half percent.  I apply the entire

23   one and a half percent to all the equities that Barclays

24   applied a liquidity adjustment to to calculate the liquidity

25   adjustment for these securities.  So it's one and a half

Page 53

1   percent times the equities.

2   Q.   Now, I thought when you were describing the mid to bid

3   adjustment, the adjustment would be made from mid prices to bid

4   prices.  The number you have here, which is 1.84 percent, is

5   that the mid to bid adjustment or is that the entire bid-ask

6   spread?

7   A.   Barclays uses an entire -- they don't look at the mid to

8   bid and take half of the bid-ask spread.  Barclays uses a

9   hundred percent of the bid-ask spread rather than half.  I used

10  a hundred percent of the bid-ask spread.  Also, again, reducing

11  the number of points of disagreement, I used the same spread a

12  hundred percent rather than fifty percent that Barclays used.

13  Q.   And just directionally, if you use a hundred percent of

14  the spread to make the adjustment as opposed to fifty percent,

15  what's the effect on value?

16  A.   Well, it doubles the reduction that you would have.  So I

17  used roughly 1.5 percent.  If you used only half of that, you'd

18  take half of that, .75 percent, and you'd use a smaller

19  liquidity adjustment.  You'd have a higher value.

20  Q.   And now just to recap those two different components, turn

21  to slide 26.  What have you set out on slide 26?

22  A.   The yellow bar just shows the end result.  Barclays, as of

23  the closing on September 22nd, valued the securities at nine

24  billion 343 million.  I, using September 19th closing marks,

25  value those securities at nine billion 884 million.  So the

Page 54

1   difference is 541 million dollars as the undervaluation on the

2   acquisition balance sheet.

3   Q.   Okay.  And the two components of that, the midpoint

4   valuation difference because of dates, and the difference based

5   on the mid to bid liquidity adjustment, those are the two

6   components that add up to 540 million dollars, correct?

7   A.   Correct.

8   Q.   Okay.  Now we've talked about why there's a difference on

9   the midpoint valuation.  They use a different date than you

10  did.  What explains the difference on the mid to bid liquidity

11  adjustment?  Why is that a different number for you than for

12  Barclays?

13  A.   Two reasons.  First reason is there's a different date.

14  So some of that would be for a different date.  And the second

15  reason is Barclays used a backdating methodology -- I'll call

16  it a backdating methodology -- because Barclays was actually

17  calculating the liquidity adjustment in December and used a --

18  what I believe to be an incorrect backdating methodology to

19  calculate its mid to bid adjustment back in September.  So it

20  was essentially looking back three months.  I believe the

21  methodology that Barclays used is incorrect.

22  Q.   Well, is your objection to their methodology based simply

23  on the fact that they backdated or is it that they backdated

24  and used an incorrect mathematical or statistical approach?

25  A.   As I ex -- if we go to a couple slides -- I could explain

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 55 of 233

Page 55

1    it easier with some slides.  If you just go -- skip this

2    slide -- I could explain the Barclays methodology here.  And

3    what Barclays did is for the sample of securities on December

4    18th collected bid-ask spreads -- I'm going to call them

5    spreads -- and they collected spreads for this group.  And the

6    average spread on December 18th -- and these are the equities,

7    a subset of those equities -- that was just a little under two

8    percent, 1.93 percent.  So that was the first step in the

9    process.

10        And if you could just -- yeah.  Thank you.

11        And then what Barclays does is the following.  Barclays

12   takes the 1.93 percent and, to backdate that 1.93 percent back

13   to September, multiplies it by a scaling factor.  And there's

14   nothing wrong with doing that but Barclays uses a calculation

15   of the scaling factor -- methodology to calculate the scaling

16   factor that is incorrect.

17   Q.   And can we -- can you describe to the Court what's wrong

18   about the methodology that Barclays used to calculate the

19   scaling factor?

20   A.   I have a whole series of slides that I used --

21   Q.   Tell me what button to press.

22   A.   Yeah.  Just press the button because -- it's easier if I

23   just go through this process.  So first thing, we have a 1.93

24   percent.  The next thing that Barclays did for a subset of 459

25   securities, so it's a subset of that sample -- we have the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 56

1    entire sample and then we have a subset of 459 securities --

2    Barclays collected data on September 22nd for the bid-ask

3    spread for that subset and has a .67 percent average bid-ask

4    spread for those 459 securities.  Now that's a small set

5    relative to the whole group.

6        And then, for that same 459, for December 18th, pulled out

7    of the December 18th sample the 459 and calculated the bid-ask

8    spread, average bid-ask spread, for the 459.  And that averages

9    1.16.  And based on this information then, Barclays developed a

10   scaling factor.  And the way they developed it, I believe, is

11   incorrect.

12       One way to think about the scaling factor -- and I think

13   you could hit 1 -- one way to think about the scaling factor

14   is, well, September for the 459 is .67.  December for that same

15   459 is 1.16.  So therefore, the relation between September and

16   December is fifty-eight percent.  If you take .67 percent

17   divided by 1.16 percent, that's fifty-eight percent.  So one

18   way to think about this is if you multiply fifty-eight percent

19   by the entire sample and the average bid-ask spread of 1.93

20   percent, you'll calculate a way to backdate that spread for

21   September 22nd for the entire sample.  And if you press the

22   button again there -- I did that calculation.  I show that if

23   you do that calculation, you take 1.93 percent, multiply it by

24   the ration of those first two blue bars, fifty-eight percent,

25   you get 1.12 percent.  So that's one way to think about a

Page 57

1    scaling factor.  And that's consistent with those bars.

2        Barclays used a methodology to calculate that scaling

3    factor  -- what I use here, .58, Barclays uses a scaling factor

4    that's much larger.  And if you press the button again, I just

5    show what they use.  Barclays uses a scaling factor of 2.23.

6    And Barclays multiplies 2.23 times 1.93 percent and calculates

7    a bid-ask spread of 4.32 percent.  And that's the bid-ask

8    spread that Barclays uses.

9    Q.   So --

10   A.   Now if you look at those bars, the three blue bars are all

11   facts.  You have the entire sample of December and you have the

12   459 first blue bar for September.  And look at September

13   relative to those same 459 in December.  Somehow Barclays

14   created a methodology that gave them -- even though September

15   is less than December, gave them a scaling factor of not less

16   than one but greater than one.  And it's an incorrect

17   methodology in my view.

18   Q.   Just so we understand what a scaling factor of 2.23 means,

19   does that mean that they -- does that mean 223 percent?  Is

20   that what that means?

21   A.   Yes.  Now I need to explain Barclays' sca -- how did they

22   get 2.23?  Barclays has 459 securities.  So it's difficult to

23   go through 459 calculations.  That would take a lot of time.

24   So what I did was prepare a simple example to make the point on

25   how the methodology used by Barclays results in an incorrect

Page 58

1    scaling factor.  So I prepared a couple of slides that just

2    show the effect of the Barclays methodology for this purpose.

3    Q.    Slide 34 and Movants' 910, is that the example that you've

4    prepared?

5    A.    It's the first of two -- or three slides, I think.  So we

6    start with two securities.  We're going to make our world

7    simple.  We don't have these 4,000 securities; we have two, A

8    and B.  And we're going to also make it simple because we know

9    all the facts about A and B on both dates.  So we can calculate

10   exactly what the scaling factor should be.  And Security A, the

11   bid-ask spread on 9/22, again, for a hypothetical example, is

12   .4 percent.  For Security B, 1.6 percent.  The average there

13   for -- on 9/22 for these two securities, .4 plus 1.6 is 2,

14   divided by 2 is 1.  The average bid-ask spread on that day is

15   one percent.

16        Now let's go to December 18th.  On December 18th, you have

17   3.6 percent for Security A, .4 percent for Security B.  Well,

18   take the average of that, 3.6 plus .4 is 4, divided by 2.  The

19   average is two percent.

20        So you have a two percent spread on December 18th and you

21   have a one percent spread on September 22nd.  So since we have

22   all of the data, we know exactly what the scaling factor should

23   be.  The scaling factor should be .5 because if you take .5

24   times the December spread of two percent, that is equal the

25   average spread on September of one percent.  It is a

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 59 of 233

Page 59

1     mathematical fact.  Okay?  So that's all the facts.

2         What Barclays did was the following.  Instead of using an

3     average of -- a ratio of averages, what Barclays does is for

4     each security, it looks at -- calculates the ratio of the

5     spread in September to the spread in December.  So for Security

6     A, you have .4 percent divided 3.6 percent.  So the ratio from

7     September to December is .11.  For Security B, the September

8     spread is 1.6 percent.  The December spread went down to .4

9     percent.  And because these are positive numbers and some

10    numbers can get very close to zero, .4 percent, and some of

11    them are even smaller than .4 percent, that ratio is 4.  Well,

12    we know what the correct number is.  We know the correct number

13    is .5, but this is what Barclays does.  For 459 securities,

14    calculates that ratio and takes the average.  I calculated for

15    two securities.  I take the average of 4 plus .11 divided by 2.

16    The average is 2.06.  Barclays did the same calculation for 459

17    and calculated 2.23.  And you can see, we know the factual

18    answer, mathematical fact is .5.  But because of the nature of

19    taking a spread that's a positive number and dividing by

20    another spread that could be a very small number and then

21    taking an average, you're taking an average in the skewed

22    distribution.  Truncate it at zero.  You can't go below zero.

23    And it can go out to infinity.  So there's all these very large

24    numbers.  You take the average and you get the wrong answer.

25    And in this example, you take the 2.06 average that we

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 60 of 233

Page 60

1   calculated, multiply by two percent and we calculated a four

2   percent spread here that we would use --

3   Q.    That Barclays used.

4   A.    -- for September -- now that we used here, in our example,

5   for September.  So following -- this is Barclays' approach.

6   And we know the answer is .5.  And you see that four percent is

7   larger than any spread that occurred during this period and

8   it's resulting from just this the way that Barclays calculates

9   this security by security ratio.

10      And I prepared just a little slide -- a little graph.  So

11  here we have, just like Barclays, we have the sample for

12  December, two percent -- it was 1.93, the sample for September

13  of one percent.  We don't need the 459 since we know the two

14  securities.  And we know the ratio should be .5 here.  In fact,

15  what Barclays uses and as a result of this methodology that I

16  showed just with two securities, you have a four percent number

17  that you get which is just wrong.  The correct number is .5.

18  Q.    So your example using two securities, basically,

19  duplicates the error that Barclays made with respect to their

20  valuation of the liquidity adjustment for the equity

21  securities.

22  A.    It illustrates the error, it does.  Yes.  And on the next

23  slide what I do -- so now the question is the following.  The

24  question is -- and if you'd just go back a slide.  I show for

25  these two securities these ratios.  And I said, well, the

Page 61

```
 1    lowest number you can ever get is zero.  The highest number you
 2    can get is infinity.  And Barclays has 450 calculations like
 3    this.  So the question is, well, did Barclays get some large
 4    numbers like this or did Barclays get numbers all around 1.  So
 5    I prepared a graph that shows every one of Barclays' numbers
 6    that it has for the 459 securities.
 7    Q.   Is that slide 37?
 8    A.   Yes, it is.  And I know it's a complex slide.  But every
 9    one of the bars represents the number for a tenth of a percent,
10    the number of 459 securities that falls into that range.  Where
11    are all the securities?  Well, most of the securities are down
12    in this range over here.  However, take a look.  The largest
13    one of the 459 has a value of 62.  The next largest, 47.  We
14    have another outlier of 45.  Another outlier of 37.5.  And you
15    still have all these other securities here that have very large
16    numbers.  So the average gets pulled out.
17         And if you just hit the --
18         What happens here is because you have this skewed
19    distribution truncated at zero, it's called the long right
20    tail, you get an average that is higher and not representative
21    of the whole sample.  And if you use the median, for example --
22    median meaning half of the observations are above, half are
23    below.  So it is the central point.  The answer is .68 which is
24    less than 1.  And that's similar to the .58 that we calculated
25    using the -- for Barclays using the ratio of those two
```

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 62 of 233

Page 62

1    averages.

2        So you can just see, because of the 459 and all of these

3    outliers, Barclays gets the wrong number.  Instead of getting a

4    number less than 1, they get a number more than 200 percent.

5    Q.   Okay.  So you've demonstrated that the math is wrong.  But

6    did you check to see how does the liquidity ratio that they

7    have calculated using this methodology -- how does that stack

8    up to data that was available for the 19th, for the 22nd?

9            MR. THOMAS:  Your Honor, may we have an objection and

10   just ask counsel where this is -- these analyses appear -- are

11   disclosed in his report?

12           MR. TAMBE:  They're in the reliance materials --

13           THE COURT:  You want to answer that question?

14           MR. TAMBE:  Yeah.  They're in the reliance materials.

15   They're addressed in the declaration.  The data has been

16   provided.

17           THE COURT:  It appears that there's a disconnect here.

18           MR. THOMAS:  And I just want to really make sure we're

19   on the same playing field.  This is analysis -- although the

20   underlying data may have been provided.  If we could be

21   directed to where the analysis is in the report.  And if the

22   Court would like to hear this, that's, of course, acceptable.

23   But we just hope that the same treatment is given to our expert

24   reports.

25           THE COURT:  Well, is there an objection to his

Page 63

1    question or is there just a request that you be pointed

2    where --

3            MR. TAMBE:  I'm not sure what it is.

4            THE COURT:  -- the underlying data you can look to

5    better prepare for cross-examination?

6            MR. THOMAS:  It's an objection to the question as

7    outside the scope subject to counsel pointing to where these

8    analyses were done in which case we may withdraw it if we

9    missed this.

10           MR. TAMBE:  To answer that, I don't know if I can lay

11   my hands on all of the reliance materials right now.  The

12   witness may know where this is covered in all of the work that

13   he's done, the work that's been provided.  He may be the best

14   source of the answer for the backup material.

15           THE COURT:  Why don't we reserve on the objection

16   until we find out whether or not we can answer the question

17   through the witness' own testimony.  If you can remember what

18   the question was.

19   BY MR. TAMBE:

20   Q.   I think my question was that did you compare the number

21   that they actually used, the 4.3 percent spread, using this 2.3

22   multiplier, the scaling factor -- did you compare that to the

23   spreads that were actually in the market on the 19th and the

24   22nd?

25   A.   Well, the focus here is the 22nd.  That's Barclays'

Page 64

1    valuation date.  So on the 22nd, Barclays calculated the sample

2    of 459 securities.  And just as a point of information, and

3    this might help, this comes -- now while I didn't prepare the

4    slide, this slide -- the data for this slide come directly off

5    of Barclays' calculation of its bid-ask spread of 4.32 percent.

6    So all -- every one of those data points is right off of the

7    Barclays' spreadsheet.  I don't know if that helps or not.  But

8    it's Barclays' numbers.

9         And so Barclays has 459 securities.  Barclays uses a

10   live -- these aren't the correct words.  Mr. Wachtell testified

11   about this.  Barclays subscribes to Reuters which provides

12   stock price data and other financial information similar to

13   Bloomberg.  And they have -- Barclays uses a subscription

14   called Live Database.  And live means during the day, you can

15   get all the prices based on Mr. Wachtell's testimony.  And you

16   don't have access to a lot of historical prices from my reading

17   of what he said.

18        If you call up Reuters, however, and ask Reuters, here's

19   all of our CUSIPs.  Could you give me the bid-ask spread for

20   all these CUSIPs, Reuters has a historical file that is closing

21   bid-ask spreads.  So it's not during the day.  They only can

22   give you closing bid-ask spreads.  And I did that.  So I went

23   to Reuters and calculated -- and I went to also Bloomberg for

24   September 22nd and calculated the bid-ask spreads for the

25   entire sample, which is roughly ninety percent in value of the

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 65 of 233

Page 65

1    total securities.  And if you go ahead and do that, on

2    September 22nd, you don't get 4.3 percent as an average.  You

3    do that -- if you do that, you get 1.6 percent is the average

4    on September 22nd.  Again, this is using the Bloomberg data.

5    It's not live.  It is closing bid-ask spreads on September

6    22nd.  But you can get it for the large sample.

7         And if you look at -- well, now you have a couple thousand

8    CUSIPs and each one of them has a bid-ask spread, the average

9    is 1.6 percent.  Where is 4.3 percent?  And the answer is 4.3

10   percent is in the ninety-first percentile, which means that

11   only nine percent of the observations are higher than 4.3

12   percent.  Ninety percent of the observations are lower.  So

13   it's in the right tail.  So 4.3 percent is not representative

14   of that sample.

15   Q.   And the data that you called up Reuters and got, do you

16   know whether that data was available to Barclays?

17   A.   As far as I know, anyone could call and get the data.

18   Q.   You don't have a special contract or relationship with

19   Reuters where they give you stuff they don't give Barclays?

20   A.    No.  We typically use their competitor, Bloomberg.  So

21   because Mr. Wachtell's testimony, we called Reuters and just

22   asked them for a one-off set of data for Reuters on September

23   22nd.  And they have it.  Again, it's not the live data that

24   Barclays uses.  It's closing bid-ask spreads.

25              MR. TAMBE:  I have citations I can give Your Honor and

Page 66

1    counsel for where this analysis and the bases for these

2    opinions appears in the expert report.

3              THE COURT:  Fine.  Why don't you --

4              MR. TAMBE:  I can do that at the break or I can do it

5    now.

6              THE COURT:  Why don't you provide that citation

7    material during the break?

8              MR. TAMBE:  Okay.  Thank you.

9              THE COURT:  And I think we should probably look for a

10   break sometime soon.

11             MR. TAMBE:  It's actually the perfect time for the

12   break because we're about to move on to -- well, maybe one

13   question that I think maybe you haven't asked to complete this

14   analysis.

15   Q.   You want to add something to your last answer?

16   A.   Well, if you have to ask a question, you can just ask me,

17   what's the last line say.

18   Q.   What does the last line say?

19   A.   So what the last line says -- well, what's the impact of

20   using 4.3 percent that Barclays used as opposed to using what

21   the average is for these bid-ask -- closing bid-ask spreads of

22   1.6 percent.  How big of a difference is that?  And if you go

23   on September 22nd, adjust Barclays' number and use a bid-ask

24   spread adjustment of 1.6 percent instead of 4.3 percent, it's

25   241 million dollars of a reduction in the liquidity discount

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 67 of 233

Page 67

1   which means an increase in the valuation of that amount.

2   Q.    Thank you, Professor Zmijewski.

3          MR. TAMBE:  We can take a break now, Your Honor.  The

4   next topic we'll move onto is the JPM securities.

5          THE COURT:  Fine.  Let's take a break till 11:15.

6        (Recess from 11:05 a.m. until 11:23 a.m.)

7          THE COURT:  Please be seated.  And please proceed.

8          MR. TAMBE:  Thank you, Your Honor.

9   RESUMED DIRECT EXAMINATION

10  BY MR. TAMBE:

11  Q.    Moving on to the other aspects of the valuation analysis

12  that you did, so not the equities but now the JPM, JPMorgan

13  piece, can you briefly describe to the Court what the

14  assignment there was?  What is it that you are valuing and why

15  you were valuing it?

16  A.    Yes.  As I understand the facts related to the JPM

17  inventory claim, a Fed repo was being transferred to Barclays.

18  Not all of it was able to be transferred on a day.  And at the

19  end of the day, given that not all of it was transferred,

20  Lehman, through JPMorgan, put seven billion dollars of cash

21  into an account.  The next day, what I understand was going to

22  happen is that the remaining securities would be transferred

23  and the seven billion dollars would be given back to Lehman.

24  Based on the facts as I understand them, the cash was given

25  back to Lehman by JPMorgan but the securities were never

Page 68

1    transferred.  So that's in the September time frame.

2         Subsequent, three months later -- just go three months

3    later, as one would expect, Barclays was pursuing claims and

4    finally settled those claims in December -- I think it's

5    December 22nd of 2008, three months later.  And the settlement

6    was for 1.25 billion in cash plus securities from the Fed repo.

7    And my understanding is that that payment was to reflect the

8    seven billion dollar claim back in September.  And what I do is

9    first analyze what Barclays -- how Barclays valued that.  And

10   Barclays valued those securities, cash and value of 1.25

11   billion, of course.  But it valued those securities using

12   valuations as of December 22nd, 2008 rather than back in

13   September.  And Barclays had that different valuation.  And

14   what I do in my analysis using JPMorgan as the custodian who

15   valued those securities, I used JPMorgan's valuation to

16   calculate a value of those securities in September of 2008.

17   That's the big picture of what I did.

18   Q.   And just before we get into the big picture, again, just a

19   reminder, this line item, the JPMorgan inventory issue, going

20   to slide 39 and 910, the highlighted line, could you describe

21   for the Court what that line shows?

22   A.   Yes.  That line shows the JPM inventory of -- we've

23   reviewed before -- from Movants' Exhibit 103.  There's 1195

24   CUSIPs.  The valuation based on a December valuation of those

25   securities by Barclays was 3.7 billion.  My valuation using the

1   JPM custodial valuation as of September 19th was 5.4 billion.

2   And the difference is roughly 1.6 billion dollars of an

3   undervaluation.

4   Q.   And just so we keep track of the numbers, both the

5   Barclays valuation that appears on slide 39 as well as the

6   movants' valuation on slide 39, that obviously excludes the

7   1.25 billion dollars of cash that was part of the December

8   settlement, correct?  That's just a valuation of the

9   securities?

10  A.   Correct.  That's the valuation of the securities.  The

11  cash is -- cash is cash.  It's valued at the same amount on

12  either date.

13  Q.   Okay.  Now you had described, basically, the process you

14  follow or the assignment with respect to the JPM inventory.

15  Does slide 40 basically describe what you just testified about

16  in terms of the nature of the problem and the issues you

17  addressed?

18  A.   It does.  I would -- one point that I didn't mention that

19  I should mention is the cash plus the value of the securities

20  as valued by Barclays using September 22nd valuations is 4.99

21  billion -- say, five billion dollars.  So that's the second to

22  last bullet.  That's the valuation including the cash.  So the

23  benchmark here is to measure -- for measuring undervaluation is

24  five billion dollars because that's Barclays' number.

25  Q.   Okay.  I believe in your answer, you said, as Barclays

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 70 of 233

Page 70

1    valued as of September 2008.  Was Barclays valuing the

2    securities as of September?  You may have misspoken.

3    A.   If I said that, I misspoke.  As the bullet states, in the

4    September 22nd acquisition balance sheet, Barclays valued that

5    JPM inventory claim at, roughly five billion dollars using

6    December 22nd valuation.

7    Q.   Okay.  Now you've conducted an independent valuation of

8    those same securities, correct?

9    A.   Yes, using JPM -- JPMorgan's custodial valuations.

10   Q.   Okay.  And could you describe the process that you

11   followed in conducting that calculation?

12   A.   Yes.  It just has a few simple steps to it.  Step one is

13   to add -- go to the JPM custodial valuations as of September

14   17th -- that's the last day that JPM valued the inventory.  So

15   I have the September 17th value.  I then use a methodology to

16   roll forward those values from September 17th to September

17   22nd -- September 19th, two days.  And that's then the JPM

18   valuation as of September 19th.  From that, I use Barclays'

19   liquidity adjustments for that inventory to reduce it from the

20   mid prices to the exit or the bid prices.  And that's the

21   three-step process that I use.

22   Q.   And you've prepared a slide, obviously, setting forth

23   those various steps in your analysis, is that correct?

24   A.   Yes.  Well, first, I have a slide that shows two

25   approaches.  One approach is very simply Barclays had a seven

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 71 of 233

Page 71

1   billion dollar claim.  So the first column -- one way to take a

2   look at this is on September 22nd, Barclays had a seven billion

3   dollar claim.  And it settled that claim for that same economic

4   value out in December of 2008.  So the difference between the

5   seven billion, that's the value of the claim, and the five

6   billion that they recorded that claim at -- those assets at on

7   September 22nd on the acquisition balance sheet, the difference

8   is two billion dollars.  That's one way to just calculate the

9   undervaluation relative to the value of the claim of seven

10  billion.

11      The second column shows this three-step process that I use

12  based on the JPM inventory.  So I'll point to a couple of

13  numbers.  The first line, if you look at the JPM custodial

14  price marks on September 17th, the value of those securities

15  that were transferred to Barclays is roughly six billion

16  dollars.

17      Then I went to the GFS system.  So the next line makes an

18  adjustment of 206 million to change the prices from the JPM

19  valuation on September 17th and roll it forward two days.  And

20  I do that in the following way.  We know every CUSIP in the JPM

21  inventory.  So we have every CUSIP in the JPM inventory.  And

22  GFS has some of those CUSIPs.  So step 1 in this process to

23  calculate the reduction of 206 million -- step 1 is find a

24  CUSIP in the JPM inventory, go to GFS, calculate -- if you find

25  it, calculate the change in price between September 17th and

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 72 of 233

Page 72

1   September 19th and put that in the adjusted column for

2   September 19th.

3        Now the securities -- not all the CUSIPs that were given

4   to JPM are in the GFS system.

5   Q.   I think again you misspoke.  The CUSIPs given to Barclays

6   on the GFS system.

7   A.   Okay.  Sorry.  I'll start again.  I'll retract that and

8   make sure I get it right.  So not all the CUSIPs that are in

9   the JPM inventory -- so there's 1100 CUSIPs.  Not all of those

10  CUSIPs are in GFS.  Some are missing.  So I can't use this

11  CUSIP by CUSIP adjustment process.  What I do then is for the

12  CUSIPs that are in the JPM inventory that are missing in GFS,

13  we still have the same type of assets -- asset category.  So

14  using Barclays' asset categories, what I do is go to GFS for

15  that two-day period for every asset category, calculate the

16  weighted average return for an asset category between the 17th

17  and the 19th of September.  I then go back to the JPM inventory

18  and for those CUSIPs for which I did not find a match in the

19  GFS system, I apply the, for the same asset category, this two-

20  day adjustment.  And those two steps result in the 206 million

21  dollar reduction in value or, roughly, a 3.4 percent reduction

22  in value.

23       That gets me to now a September 19th valuation for the JPM

24  inventory.  I then -- one of the tabs in the exhibits that we

25  looked at earlier, M102 I think it is, but it appears

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 73 of 233

Page 73

 1    elsewhere, has percentage liquidity adjustments for the

 2    different asset classes.  But -- that we use by Barclays.  And

 3    what I did in this calculation is I went to Barclays' document,

 4    used Barclays' liquidity adjustment for that asset class and

 5    applied it to the asset classes in the JPM inventory to

 6    calculate a reduction for a liquidity adjustment of 392 million

 7    dollars.  So we start with six billion, reduce it by 206

 8    million for the change between the 17th and 19th, reduce it by

 9    392 million for the liquidity adjustment.  And I end up with a

10    5.4 billion dollar valuation of the JPM inventory at exit

11    prices as of September 19th.

12         I then add the cash received of 1.25 billion dollars.

13    That results in a 6.6 billion dollar valuation of the claim,

14    about 400 million dollars less than the seven billion dollars,

15    compare that to the five billion dollar JPM inventory valuation

16    of Barclays on December 22nd.  And the resulting undervaluation

17    is roughly 1.6 billion dollars.

18    Q.    And just to be clear as to what that number then

19    represents, that is the difference between the movants'

20    valuation of the JPM inventory and cash versus Barclays'

21    valuation of the JPM inventory and cash, is that correct?

22    A.    Correct.

23    Q.    And Barclays has undervalued that inventory by roughly

24    1.657 billion dollars.

25    A.    That is correct.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 74

1   Q.   Okay.  Now you mentioned the GFS data that you looked at.

2   What is the GFS system?

3   A.   The Global Funding System is a large pricing database that

4   was used by Lehman Brothers at the time to collect not all of

5   its prices but many of its prices and it was the database that

6   was used to collect all the prices that were used by Lehman in

7   valuing its securities.  And I understand that fed into its

8   financial statements that it prepared.

9   Q.   Now when you were looking at the GFS data, I believe you

10  said you went to look for CUSIPs that were security identifiers

11  that were in the JPM inventory list.  And you went to GFS to

12  see if those securities appeared in GFS, is that right?

13  A.   Correct.

14  Q.   Okay.  Now were there securities that were part of the JPM

15  inventory that you could not locate in the GFS system?

16  A.   Yes.  If you go back two slides -- the first number in the

17  yellow bar there, that's 1195 CUSIPs.  That's the number of

18  CUSIPs that are in the JPM inventory.  Different securities.  I

19  looked for every one of those CUSIPs in GFS and found in the

20  900 range.  So I didn't find all of them.

21  Q.   Do you have any explanation for why securities that were

22  transferred over to Barclays as part of the transaction don't

23  appear in the GFS system?

24  A.   Well, based on some documents I read, the GFS system is

25  incomplete based on what I read and based on some analysis that

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 75

1    I conducted.  It's just not complete.

2    Q.    Now, for purposes of your analysis, you looked at GFS

3    price marks on the 17th and compared those to the 19th, is that

4    correct?

5    A.    That's correct.

6    Q.    Okay.  Did you use the prices from GFS?  Did you actually

7    use those prices for purposes of your valuation?

8    A.    Well, I did in the following sense.  I find a CUSIP in the

9    JP -- take a CUSIP in the JPM inventory, find it in GFS.  Let's

10   say the value in the JPM inventory is 100.  And then I look at

11   the percentage change in price in GFS for that security between

12   the 17th and the 19th.  So I don't use any price specifically.

13   I use the percentage change in price in GFS and multiply that

14   by the hundred dollars, in this example, to calculate the

15   September 19th value.

16   Q.    And doing that analysis, both on the CUSIP level as well

17   as the asset-wide level, or category-wide level, what does that

18   minus 3.4 percent number then signify?  What is that?

19   A.    That minus 3.4 percent -- which is equal to 206 million

20   reduction over 5.994 billion dollars in value, that's a

21   reduction of 3.4 percent.  That represents the weighted average

22   reduction in value as measured in the GFS system between

23   September 17th and September 19th.  So in a weighted average,

24   weighted by the value of the different securities, the GFS

25   price is decreased by 3.4 percent over those two days.

Page 76

1    Q.    So that's one component of the adjustment.  The other

2    component is this application to Barclays' liquidity

3    adjustment.  And is that the same thing as the mid to bid

4    adjustment that you talked about before?

5    A.    Yes, a similar concept.

6    Q.    And in this case, you did not do a separate liquidity

7    adjustment.  You simply accepted Barclays' liquidity

8    adjustments, whatever they were, is that right?

9    A.    Well, just to be clear, it's not -- Barclays' liquidity

10   adjustments aren't a dollar value.  They're percentages.  So I

11   used the Barclays' percentage liquidity adjustment for an asset

12   class and used those percentages and applied them to the 5.789

13   billion dollars.

14   Q.    Okay.  And do you mean by having done that that you agree

15   with those adjustments, those percentage adjustments?

16   A.    No.  There's always points of disagreement that you have.

17   And if you can eliminate points of disagreement, that's a good

18   thing.  And my assumption is Barclays would not disagree with

19   me using, for this purpose, the Barclays' percentage liquidity

20   adjustments.

21   Q.    Now, having used the GFS data to do this price adjustment

22   of minus 3.4 percent, this roughly 200 million dollar reduction

23   in value, did you check that to see how that price adjustment

24   compared to other market signals, other market data about what

25   was going on in the market between the 17th and the 19th?

LEHMAN BROTHERS HOLDINGS INC., et al.

1   A.    Yes.  I did two things.  First, for a subset of those

2   assets, we could just go out and collect third party prices:

3   Bloomberg, Capital IQ.  They have prices for some of these

4   securities.  So I went, for all the CUSIPs for which I could

5   collect third party prices and valued those securities on

6   September 19th using the third party prices.  And it's a

7   subset; it's not the whole set.  So it's a subset of

8   securities.  And then I compared that value to my roll forward

9   methodology to September 19th for that same subset and the

10  third party prices are slightly higher.  So had I used third

11  party prices for that subset, I would get a slightly higher

12  valuation than I used using my roll forward methodology.

13  Q.    And --

14  A.    That's the first thing I did.

15  Q.    What else did you do?

16  A.    The other thing I did was -- can we provide a benchmark?

17  So the next question I ask, well, I see 3.4 percent is the

18  weighted average change in GFS for these assets.  Question:

19  how were securities moving over these two days -- over this

20  two-day period.  Were securities moving up, down, what was

21  happening.  So I looked at various indices just again as a

22  benchmark to see if the 3.4 percent is reasonable to use.

23  Q.    And what did that show?

24  A.    If you look at the stock market over these two days, the

25  stock market was quite positive over these two days.

Page 78

1   Q.   Is that's what's shown in slide 42?

2   A.   Yes.  So over these two days, the Dow and S&P 500 and the

3   Morgan Stanley index all were positive.  And the respondents --

4   the fourth line is an index that the respondents have used.  I

5   saw a chart so I looked at that as well.  This is the S&P

6   leverage loan index.  And that went down about one percent.

7   And then there's asset-backed indices, called ABX indices, and

8   there's twenty different indices.  And if you take a look at

9   those twenty different indices over these two-day periods, it

10  ranges from minus .6 percent to nine percent.  So the range

11  is -- comes a little negative, goes positive.  But if you take

12  a look, none of those numbers is less than the three percent

13  that I used.  So it gives another layer of comfort that the GFS

14  prices, as used in this narrow way, were reasonable to use for

15  this purpose.

16  Q.   Okay.  And just so I understand that concept because we

17  have negative numbers and adjustments being made, had you used

18  any of these numbers, the reduction in value would have been

19  less?  You'd have ended up with a higher overall valuation for

20  the JPM inventory if you'd used this data as opposed to the

21  roll forward method that you used off of GFS, is that right?

22  A.   That's correct.

23  Q.   Okay.  Now, Professor Zmijewski, does that complete a

24  discussion of your analysis on the valuation topics, both the

25  equities valuation as well as the JPMorgan inventory valuation?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 79

1   A.    It does.

2   Q.    Okay.  So let's move now back.  As we discussed earlier

3   this morning, those were three categories of opinions.  You

4   have the valuation opinions, and we've discussed a number of

5   those.  I believe the second set of opinions related to GFS

6   data as well as residential mortgage securities.  And if you

7   could summarize what your opinions are on those topics as set

8   forth in your expert report.

9   A.    Well, I've conducted various analyses.  One analysis was

10  to look at a statement made by Professor Pfleiderer.  Professor

11  Pfleiderer stated that the GFS prices were sticky.  So one of

12  the analyses that I conducted is a systematic analysis of GFS

13  prices, not just for the JPM inventory -- this is a different

14  topic now -- it's for the whole database.  Everything.  And

15  then ask the question, are prices moving or not moving?  So

16  that's one of the analyses I conducted.

17       I was also asked -- were issues that were raised in the

18  litigation -- to discuss the residential mortgages and answer

19  the question, what percent of the residential mortgages from

20  Lehman were moved -- transferred to Barclays.  I was asked that

21  question.  I know it's relevant to you.  It's not part of the

22  quantification of the movants' damage claims but it's a topic

23  that is relevant to the movants.

24       And then the third analysis that I conducted was an

25  analysis of, again, a comment made by Professor Pfleiderer in a

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 80 of 233

Page 80

1    table that he has in his report, with respect to the

2    plausibility of the five billion dollar discount that was at

3    inception that was -- was and is being claimed by the movants.

4        So I looked at those three different aspects.

5    Q.    So let's take --

6    A.    They're all related to GFS data.

7    Q.    Okay.  So let's take each of those in turn.  Slide 44, is

8    that simply setting forth the opinions as set forth in your

9    expert report?

10   A.    Yes.

11   Q.    So let's move into the residential mortgage analysis you

12   did.  What did you look at and what conclusions did you reach

13   with respect to your analysis of the residential mortgages that

14   were included in this transaction?

15   A.    What I did was the following.  Searched for all the

16   residential mortgages in the GFS database, step 1.  Step 2 was

17   identify which of those mortgages, by CUSIP, which of those

18   mortgages were transferred to Barclays.  And then just

19   calculate the percentage on a value basis of the mortgages that

20   were transferred to Barclays.

21   Q.    And does slide 46 set forth or summarize your conclusions

22   in that regard?

23   A.    Yes.  The percent of the value of mortgages of the Lehman

24   mortgages in GFS that were transferred to Barclays is in the

25   seventy percent range, somewhere between sixty-five and seventy

Page 81

1     percent.  And if you ask the question, well, where did those

2     mortgages come from, most of those mortgages, ninety-six

3     percent of those mortgages were transferred as part of the repo

4     collateral.

5     Q.   And when you say ninety-six percent were transferred as

6     part of the repo collateral, how about the other four percent?

7     A.   It came from the clearance box assets.

8     Q.   Okay.  And you've broken this out into calculations by

9     CUSIP numbers, right?

10    A.   I did all these calculations by CUSIPs and I show a

11    summary on the next -- it's the next slide.

12    Q.   And turning to slide 47 and 910, can you describe what

13    that summary shows, please?

14    A.   Yes.  Going to GFS -- this is as of September 16th --

15    there were 3,913 CUSIPs that were mortgages.  And they were

16    valued in GFS at roughly six billion dollars.  I just skip down

17    two lines.  The mortgages acquired by Barclays -- so I just

18    skip down two -- sorry -- since that's what's relevant -- of

19    the 3,913, 1720 mortgages or forty-four percent of the

20    securities were transferred to Barclays.  However, if you look

21    at the value of those securities in GFS, it's 4.2 billion.  So

22    seventy percent of the value of the securities was transferred.

23    Forty-four percent of the CUSIPs; seventy percent of the value.

24    I also calculated that same number a different way.  I used

25    instead of the GFS valuation, I went to the custodial valuation

Page 82

1    of those same securities.  And it's a little lower.  The

2    custodial valuation of these securities -- so that's here --

3    wasn't the 4.2.  It's 4.0.  And if you look at, on that basis,

4    it's sixty-seven percent rather than seventy percent.  So it's

5    somewhere in the sixty-five to seventy percent range of the

6    value of the mortgages in GFS were transferred to Barclays.

7    Q.    Moving on to the next subset of opinions in this

8    collection of opinions, also relating to the GFS data, I

9    believe you said you examined or tested Professor Pfleiderer's

10   opinion about the stickiness of the GFS prices, correct?

11   A.    Yes.

12   Q.    And can you briefly describe what analysis you did in that

13   regard?

14   A.    Of course.  Professor Pfleiderer presents some analysis

15   and concludes that the prices in GFS are sticky.  He conducts

16   that analysis on a subset of securities.  So he goes to GFS,

17   the security has to have a value of greater than twenty

18   million.  The security can no longer -- cannot have more than

19   one price change between September 12th and September 19th.

20   And it only has one price change.  And he showed that, for

21   those securities, prices don't change.  But it was a small set,

22   under five percent of the total securities of the securities

23   that he analyzed.

24        What I did was ask the question what happens if you look

25   at all the securities.  All right?  So I looked at every

Page 83

 1   security in GFS and looked at how prices changed across all the

 2   securities.  And I have a different set of numbers than

 3   Professor Pfleiderer has.

 4   Q.   Just taking one step back in terms of what it is that

 5   Professor Pfleiderer did, if I understand your answer, he went

 6   looking for securities for which there was no more than one

 7   price movement and found securities that didn't have more than

 8   one price movement, is that right?

 9   A.   Yes.  He was identifying securities that didn't move in

10   price.  And there's a quote here.  So this Exhibit 4 -- this is

11   from Professor Pfleiderer so this is out of his report -- how

12   he selected his sample, Level 3 securities, greater value -- a

13   value greater than twenty million, part of GFS, available at

14   September 12th.  And he selected only if there was either no

15   price change after September 12th or, at most, one price

16   adjustment after September 12th.  So it's a subset of the

17   sample and it's less than five percent of the total sample of

18   securities.  I conducted an analysis with all the securities.

19   Q.   Okay.  And have you set forth a summary of the analysis

20   that you conducted?

21   A.   Yes.  I just summarized a part of the table in my report,

22   on the next slide, and show that, again, we have, based on

23   CUSIPs, so this is all based on CUSIPs.  This is based on

24   value.  There are 11,938 CUSIPs.  We have 44.4 billion dollars

25   in value.  How many of those CUSIPs are present on all five

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 84 of 233

Page 84

1   days in GFS?  There's 8,468.  The value of those is 37.2

2   billion.  And the question then is, well, did the prices change

3   or not.  And based on value -- I'll just focus on this column.

4   Based on value, seventy-nine percent of the CUSIPs traded on at

5   least one day between September 12th and September 19th;

6   seventy-seven traded on two days; seventy-five traded on three;

7   seventy-three percent traded on four days.  And sixty-four

8   percent of the 846 CUSIPs -- 8,468 CUSIPs valued at 37.2

9   billion.  Sixty-four percent of that value changed on every day

10  between September 12th and 19th.

11  Q.   Okay.  I think when you were describing those percentages

12  you said they traded on one day, traded on two days.  They

13  traded on prices changed?  Or they simply traded on those days?

14  A.   You're absolutely correct.  I used the word "traded" and I

15  should have said the price changed.  I apologize for that.  The

16  price changed on at least one day, two days, three days and

17  four days.  So when I said "traded", I should have said price

18  changed --

19  Q.   So --

20  A.   -- in every one of those sentences.

21  Q.   And just, therefore, to be clear, bottom line bottom

22  right-hand corner, for sixty-four percent of this population of

23  8,468 CUSIPs prices changed on all five trading days, is that

24  right?

25  A.   Correct.  That's based on value.  And if you look at the

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 85 of 233

Page 85

 1    CUSIPs, column before that, it's fifty-two percent of the

 2    securities had price changes on every day between September

 3    12th and September 19th.

 4    Q.   Another piece of analysis that you said -- you've

 5    testified that you did with reference to the GFS data was

 6    responding to Professor Pfleiderer's opinion that the five

 7    billion dollar discount at inception, on which there's been

 8    testimony, was implausible.  And he does an analysis.  Now you

 9    examined his analysis, correct?

10    A.   Yes.

11    Q.   Okay.  And could you describe briefly what it is that you

12    were responding to, what your analysis was and what your

13    conclusions were?

14    A.   I reproduced in these slides Professor Pfleiderer's table

15    4.  I think it's helpful to look at that -- this is his table

16    out of his report.  The left-hand side of this table is the

17    estimated transaction balance sheet.  It's as of September

18    16th.  And as I understand the record in this lawsuit, that was

19    given to various individuals on or around September 16th with

20    respect to what was the deal going to look like on value.

21    There isn't, based on everything that I looked at -- there

22    isn't foundation for that document with respect to, for

23    example, government and agency securities.  How do you get --

24    where are all the CUSIPs that add up to forty billion dollars?

25    We don't know.  So we don't know the foundation.  And we don't

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 86 of 233

Page 86

1    know where the CUSIPs come from.

2    Q.    When you say foundation, do you mean that in the economic

3    sense or in the legal sense?

4    A.    Oh --

5    Q.    You don't have the data that adds up to the forty billion?

6    A.    -- I'm sorry.  I'm not making any legal statements.  The

7    only statement I'm making is from an economic perspective.  So

8    from an economic perspective, how do you calculate forty

9    billion dollars?  Where are all the CUSIPs?  Answer:  we don't

10   know.  At least from the record, I couldn't find anything in

11   the record that will provide the forty billion dollar number.

12   So that's the left-hand side.

13   Q.    Just -- before you move on to the right-hand side -- just

14   to anchor the left-hand side.

15         MR. TAMBE:  If you could pull up, I believe it's M-2.

16   Q.    Is it your understanding that that information that

17   appears on the left-hand side of table 4 of Professor

18   Pfleiderer's table comes off of M-2, Movants' Exhibit 2?

19   A.    Yes.  If you look at the "Total" line -- the first "Total"

20   line here, it's 62.7.  That's the same number.  So Professor

21   Pfleiderer uses this part of the table.

22   Q.    Okay.  So this is the document then that he's doing some

23   kind of analysis or comparison off?

24   A.    Correct.

25   Q.    Okay.

Page 87

1              MR. TAMBE:  If we could go back to the deck, please?

2    Q.    Okay.  So that was the left-hand side.  Let's move to the

3    right-hand side.  What's the right-hand side of Professor

4    Pfleiderer's table?

5    A.    The right-hand side is -- it states here, "LBI balance

6    sheet by GAAP asset type, September 12".  So Professor

7    Pfleiderer, from the GFS system, has prices aggregated -- he

8    doesn't have the detail, but he has aggregated prices for these

9    same types of securities.  And you'll see there's -- government

10   and agencies is 39.17.  If you go down to "Total mortgages",

11   the third line, so here, for total mortgages, it's 6.56.

12   Professor Pfleiderer states that half of those mortgages were

13   not going to be transferred to Barclays, so he deducts half of

14   them here.  And he calculates based on GFS information, a

15   sixty-two billion dollar number after making the adjustment to

16   Barclays -- to the mortgages for mortgages that would not be

17   transferred to Barclays.

18   Q.    Is it your understanding that his analysis, these two

19   tables that he has, is based on deposition testimony or is it

20   based on an analysis of GFS data?

21   A.    As far as I know, the right-hand column is a summary of

22   GFS data.  That's based on my reading of his report.

23   Q.    And having looked at the analysis that he did, what have

24   you concluded based on your review off the same GFS data, with

25   respect to the conclusions that Professor Pfleiderer seems to

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 88 of 233

Page 88

1    draw from that data?

2    A.    Well, I'll start with Professor Pfleiderer's conclusions.

3    So his conclusion is the following:  Look at the left-hand

4    side, the balance sheet that was being given to individuals at

5    the time, at sixty-two billion dollars.  Look at the balance

6    sheet for the actual -- what's called GAAP asset type from GFS,

7    it's roughly sixty-two billion dollars.  Well, if in the GFS

8    system the value of those assets is sixty-two billion dollars,

9    and what everyone is being told on the left-hand side is sixty-

10   two billion dollars, the deal does not have a five billion

11   dollar discount embedded in it at inception, because those

12   numbers are roughly the same.  So that's Professor Pfleiderer's

13   conclusion.

14   Q.    And having analyzed the GFS data yourself, what is your

15   conclusion based on that data?

16   A.    Well, here's the big assumption.  The big assumption is

17   that GFS is complete.  Because if GFS is not complete, then

18   essentially what you need to do is, here's your starting point

19   of sixty-two billion dollars; you need to add all the

20   securities owned by Lehman that were not in GFS, to really

21   figure out well, what was the total value of the Lehman

22   securities.  And my review of GFS, as well as, I believe,

23   Professor Pfleiderer's review of GFS, concludes that GFS is not

24   complete.

25   Q.    Well, do you have any sense of how complete or incomplete

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 89

1   GFS is when you compare it to the securities that were actually

2   transferred over?  If you go to securities actually transferred

3   over, look back at the GFS data, do you have any view or

4   opinion as to the completeness of the GFS data?

5   A.   If you go to the next slide, I have a slide that has some

6   of Professor Pfleiderer's numbers on it and some of my own

7   numbers on it.

8   Q.   Is that slide 53?

9   A.   Yes.

10  Q.   Okay.  What does this show?

11  A.   I'll focus on just some analysis that I conducted myself.

12  Ignoring the position itself -- and position --

13  Q.   Could you use the pointer please --

14  A.   Yes.

15  Q.   -- because there's a lot of numbers on that slide.

16  A.   So just looking at these numbers here, so we have CUSIPs

17  transferred to Barclays.  We know that factually from the

18  acquisition balance sheet.  We have 11,938 CUSIPs that were

19  transferred.  We know that.  And then the next line, well, if

20  you go to GFS, how many CUSIPs were transferred to Barclays?

21  How many -- of the 11,938, how many can you find in GFS?

22  That's the question.  Ignoring -- so completely ignoring what

23  the position is.  So if you go to GFS, some positions are long

24  and we know only long positions were transferred.  Some

25  positions were zero; probably in accounts cleared out; and some

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 90 of 233

Page 90

```
 1   positions are negative, meaning short.  And those weren't

 2   transferred.

 3       So ignoring the fact that some of these had zeros in them

 4   and some of these had negative numbers in them, ignoring all of

 5   that, just looking for the CUSIP, the answer is that if you

 6   look, the most we could find, depending on the date -- and we

 7   look at the 12th, 15th, and 16th, so the days around the 16th

 8   balance sheet -- we see that there's at least 1,200 CUSIPs that

 9   you can't find in GFS.  So we know GFS is missing data.  It's

10   missing, you know, at least ten percent of the CUSIPs.  We know

11   that.  That's a fact.  It's not an analysis.  It's just

12   looking, you know, at the facts.  And GFS misses -- doesn't

13   have in it, about ten percent of the CUSIPs that were

14   transferred to Barclays.  So we know it's incomplete.

15   Q.   One other --

16           MR. THOMAS:  Your Honor, I'm sorry.  May we reserve

17   this objection at least?  But I think, again, this is a new

18   analysis that is not within his reports and has not been

19   disclosed to us.  And subject to counsel either pointing us to

20   where it has been disclosed or agreeing that the same leeway

21   will be provided to our witnesses, we would have to object to

22   what we believe is new analysis and testimony.  But I'm happy

23   to reserve the objection so we can --

24           THE COURT:  What's the position of the movants on

25   this?
```

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 91 of 233

Page 91

1              MR. TAMBE:  Just as we did with respect to the last

2    time this objection was raised, we have provided, at the break,

3    the citations for -- in the report and the declaration for the

4    opinions.  We'll do so again with respect to this material.

5              THE COURT:  So is it your position that the material

6    just testified to with regard to missing CUSIPs in the GFS

7    system, in fact, is already within the database turned over to

8    Barclays?

9              MR. TAMBE:  Oh, absolutely.

10             THE COURT:  Okay.

11             MR. TAMBE:  This is really an analysis of the data

12   that Professor Pfleiderer was looking at; taking a look at it

13   and saying he finds X; looking at the same data, doesn't

14   support what he finds.

15             THE COURT:  Okay.  I have no way of knowing what's

16   been turned over.  I understand an objection's been raised.

17   And I'm not going to rule on the objection as much as reserve

18   on it.  If it can be demonstrated that this is new material, I

19   may reconsider the ruling.  But I think what's really being

20   said by Barclays is that they believe this is not within the

21   data turned over.  They would like to be shown where it is

22   within the data.  And they're also asking for leeway in respect

23   of the use of new information that their experts may come up

24   with to surprise you during their phase of the trial.

25             I'm not really sure what to do with this statement,

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 92 of 233

Page 92

1    because I don't know what the facts are at this point.

2          MR. THOMAS:  Your Honor, may I clarify one thing?

3    Barclays' position isn't necessarily that the underlying data

4    that's being used here has not somehow been disclosed, but

5    rather the analysis and the points and opinions being expressed

6    here.

7          THE COURT:  So you're saying that this is beyond the

8    scope of the expert report?

9          MR. THOMAS:  That's correct, Your Honor.  And we're

10   willing to have leeway, if we can work it out with counsel.

11   Just so it goes both ways.  There's sixty-three new tabs that

12   we've been -- slides that we've been provided and have not seen

13   before.  And we can react to that.  But when it comes to a new

14   analysis on what we think is a new conclusion, we would at

15   least like to reserve our objection and try to work it out with

16   movants' counsel.

17         THE COURT:  With the understanding that it's a

18   reserved objection, you'll get a reserved ruling.

19         MR. TAMBE:  And I'll just voice my opposition to the

20   objection to what was stated.  This is not new analysis.  This

21   is fully covered in the expert report.  If they chose not to go

22   into these areas and ask Professor Zmijewski the bases for some

23   of his conclusions, that was their choice.  This is all based

24   on data that was produced or has been analyzed by Professor

25   Pfleiderer.  It has been analyzed on our side.  Lots of people

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 93 of 233

Page 93

1   have talked a lot about GFS data, whether it's complete,

2   incomplete et cetera.  So none of this a surprise or should be

3   a surprise to them.

4          THE COURT:  I understand that there's a conflicting

5   view as to whether it's new or not.  I think the parties should

6   probably talk some more about this.  My reserved ruling stands.

7   In other words, I'm not really ruling at all, because I can't

8   tell yet what's going on.

9          MR. TAMBE:  And we'll certainly discuss it with them

10   at the break.

11          THE COURT:  Fine.

12          MR. TAMBE:  I'm sorry, my last question has scrolled

13   off the screen.  Can I just have the unofficial reporter just

14   read back the last question?  I just lost my train of thought.

15          THE COURT:  Right.  And I think we're having some

16   trouble with Live Note.  At least, I'm not seeing it on my

17   screen.

18          COURT REPORTER:  Is --

19          MR. TAMBE:  No, no, no.  That's fine --

20          COURT REPORTER:  -- okay.

21          MR. TAMBE:  -- that's fine.

22          COURT REPORTER:  Or do you want me to change?

23          MR. TAMBE:  I'll move on.  I think I'll take --

24          THE COURT:  I think he wanted a question.

25          MR. TAMBE:  -- if I can get my question read back,

Page 94

1      that would be great.

2              THE COURT:  Why don't we read back the question if we

3      can find it?  And is the Live Note problem simply a problem

4      that I'm having with my computer, or is it general?

5              MR. TAMBE:  I'm seeing it scrolling on my screen, Your

6      Honor.

7              COURT REPORTER:  I could take a quick look.  Actually,

8      the objection was during an answer.  If you would like me to

9      read that for you, I will.

10             MR. TAMBE:  Yes.  The question I was asking when the

11     objection arose, please.

12             COURT REPORTER:  Okay.  "What does this show?  Can you

13     use the pointer, please, there are a lot of numbers here?

14     "A.  Just looking at these numbers here we have CUSIPs

15     transferred to Barclays.  We know factually from the

16     acquisition balance sheet we have 11,938 CUSIPs that were

17     transferred.  We have 11,938 CUSIPs that were transferred.  We

18     know that.  And then the next line, if you go to GFS, how many

19     CUSIPs are transferred to Barclays?  Of the 11,938, how many

20     can you find in GFS?  That's the question.  Ignoring -- so

21     completely ignoring what the position is.  If you go to GFS,

22     some positions are long and we know only long positions were

23     probably transferred.  Some positions were zero; probably in

24     accountants cleared out; and some positions are negative,

25     meaning short.  And those weren't transferred.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 95

1    "So ignoring the fact that some of these are zeros in them

2    and some of these had negative numbers in them, ignoring that,

3    just looking for the CUSIP, the answer is that if you look, the

4    most we could find, depending on the date -- and look at the

5    12th, 15th, and the 16th, so the days around the 16th balance

6    sheet -- we see there is at least 1,200 CUSIPs that you can't

7    find in GFS.  We know GFS is missing data.  It's missing at

8    least ten percent of the CUSIPs.  We know that that's a fact.

9    It's not an analysis.  It's just looking at the facts.  And GFS

10   misses -- doesn't have in it, about ten percent of the CUSIPs

11   that were transferred to Barclays.  So we know it's

12   incomplete."

13        And that's when there was an objection.

14   BY MR. TAMBE:

15   Q.   Okay.  Professor Zmijewski, have you completed your

16   description and discussion off the analysis that is shown on

17   slide 53?  Is there anything you want to add to that prior

18   answer?

19   A.   I do.

20   Q.   Okay.

21   A.   I apologize for speaking in a long paragraph like that.

22   Very simply, go to the acquisition balance sheet.  You can find

23   eleven -- so this information given by Barclays.  Go to that

24   information, and you can identify 11,938 CUSIPs for securities.

25   So that's where the 11,938 come from.  Then you go to GFS which

LEHMAN BROTHERS HOLDINGS INC., et al.

1    was also given to us by Barclays, or given to me by Barclays,

2    and to you, I assume.  And if you go to that data set there,

3    you can only find, of the 11,938, 10,679 CUSIPs.  So you're

4    short about ten percent of the CUSIPs.  So this is not an

5    analysis; it's just a factual representation that GFS does not

6    contain all the CUSIPs that were transferred to Barclays.  It's

7    just a fact.

8    Q.   If you'll look up -- the top panel, which is the GAAP

9    asset class and then the various columns:  9/16, 9/12, 9/15,

10   9/16, where does that data come from, sir?

11   A.   Professor Pfleiderer issued or submitted a declaration.

12   And those are Professor Pfleiderer's calculations of the value

13   of the securities on different dates from GFS.  So Professor

14   Pfleiderer went to GFS and calculated the value on each one of

15   those dates.

16   Q.   And so the top part of this panel -- slide 53, the top of

17   it is just a reproduction of what was in Professor Pfleiderer's

18   materials, his expert report and his declaration.  Is that

19   right?

20   A.   And -- yeah, so that's Professor Pfleiderer's calculation

21   through here.  And what I did is what he did on the previous

22   chart, subtract off fifty percent of the mortgages, and these

23   are the resulting numbers, his totals from GFS after

24   subtracting fifty percent of the mortgages.

25   Q.   And what is your understanding of how he prepared that

Page 97

1    table, for example, especially drawing your attention to the

2    9/12/08 column, which when you take account of the fifty

3    percent of mortgages, totals up to 59.08 billion dollars?  What

4    was his data set that he was relying on?

5    A.   It's my understanding that he used the data set that was

6    based -- that's the comprehensive data set in GFS, the global

7    funding system, and literally added up all the values of all

8    the securities.

9    Q.   Okay.  Well, if we go up one slide to 52, keeping your eye

10   on this 59.08 billion dollar number as of 9/12, how does that

11   compare to that 61.87 billion dollar number that Professor

12   Pfleiderer lists as "LBI balance sheet by GAAP asset type,

13   September 12, 2008"?

14   A.   It's lower.

15   Q.   Do you have an understanding as to why there is that

16   difference, if this is based on GFS data?

17   A.   I do not.

18   Q.   So in conclusion, looking at Professor Pfleiderer's

19   analysis off the GFS data, to opine that the five billion

20   dollar discount at inception was implausible, what conclusion

21   have you reached?

22   A.   If you'd just go down -- thank you.  Slide 54.  Well, I

23   believe it's clear, and I don't think it should be disputed,

24   since I'm just reporting facts, there are missing CUSIPs in

25   GFS.  Barclays received CUSIPs from Lehman that are not part of

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 98

1    the GFS system.  And if that's the case, then the right-hand

2    side of this balance sheet is missing securities, and

3    therefore, we don't know what the total is of all the

4    securities.  And therefore, there's no way to make a statement

5    about the plausibility of the five billion dollar discount.

6    Q.   Based on that data set?

7    A.   Based on that data set.  The only way you can make such a

8    statement is if you have the entire set of securities owned by

9    Lehman.

10   Q.   And in reaching your conclusion, are you opining one way

11   or the other on any testimony or evidence that's been submitted

12   in this hearing by live witnesses about whether there was a

13   negotiation, whether there was a discount, any of those facts?

14   A.   No.  The only testimony I'm giving is that the analysis

15   conducted by Professor Pfleiderer makes an assumption with

16   respect to the completeness of GFS, and that assumption is

17   incorrect.

18   Q.   Let's move now to the last category of opinions set forth

19   in your expert report.  And you had grouped them at the start

20   of the testimony.  If you could briefly describe to the Court

21   what that set of opinions is, what you're analyzing, what

22   you're responding to, and what your conclusions are?

23   A.   Statements were made by the respondents as well as

24   Professor Pfleiderer with respect to the risks that were taken

25   by Barclays in this transaction.  Professor Pfleiderer and

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 99

1  others, including the respondents, also make statements about

2  the benefits to employees of Lehman, customers of Lehman, the

3  financial markets.  And these statements are then somehow

4  related back to what I call the Barclays windfall as if they

5  should be considered in the Barclays windfall.  Barclays took

6  many risks, and therefore, you know, the Barclays win -- the

7  windfall, as I calculate it, shouldn't be -- should be

8  justified.  It's more like a justification; or there were so

9  many benefits to this transaction and there wasn't an

10  alternative, therefore there's justification for the Barclays

11  windfall.

12      My view on that is, as long as -- if you could just go to

13  slide 57, because I'd like to just go back -- the second line

14  in slide 57 is the formula.  So we have the -- here's the value

15  that Barclays actually was able to get from this transaction

16  immediately on the closing.  And here's what the Court approved

17  it to be.  As long as the Court -- the value of the court-

18  approved transaction -- as long as that transaction took into

19  account all the risks that everyone's talking about in these

20  documents, all the benefits, as long as at that point in time,

21  the Court approved a certain value and the Court understood and

22  Barclays understood when it agreed to it, and all parties

23  understood, that's information that was considered in that

24  court-approved value.  And it's not relevant to this cal -- to

25  the actual value in the Barclays windfall, as long as it's

1   considered there.

2       So from an economic perspective, as long as all that

3   information is considered as the -- as of the calculation of

4   the court-approved value, at that point, you can't afterwards

5   say well, I got more, but because -- excuse me -- I got more

6   value, the Barclays windfall, and that's justified because

7   there were benefits.  There were benefits, and those benefits

8   were already included in the valuation of the transaction in

9   the court-approved value.  So they should be irrelevant from an

10  economic perspective.

11  Q.   Now, Professor Pfleiderer also provides some opinions

12  about the accounting gain and how that should be considered by

13  the Court in determining whether that's economic gain to

14  Barclays or not.  And have you reviewed that opinion and have

15  you -- do you have a response or a conclusion with respect to

16  that?

17  A.   Yes.  Professor Pfleiderer states that -- and if you go to

18  the next slide on 58, there's just a quote, so I don't misquote

19  him.  At the top it says -- this is Professor Pfleiderer's

20  report: "The fact that Barclays reported an accounting gain on

21  the acquisition does not indicate that Barclays received a

22  secret or unfair discount on the repo collateral, nor does it

23  imply that Barclays earned an unexpected or unreasonable profit

24  from the transaction."

25      Again, that's irrelevant.  There's two parts to this

Page 101

1    calculation:  what value did Barclays get from the transaction;

2    and what value was approved.  And this is completely irrelevant

3    to that calculation.

4    Q.   Now, as part of the work that you have done in reviewing

5    the materials, reviewing Professor Pfleiderer's report, have

6    you also prepared a calculation that sets forth, using

7    Barclays' own numbers -- using Barclays' own analysis -- what

8    are the components off the gain that was reported by Barclays?

9    A.   Yes.  Just based on testimony of others, I calculated the

10   value of -- not calculated the value -- I explained the

11   economic gain of Barclays as of the closing of the transaction.

12   Q.   And is that the analysis that is then set forth in slides

13   59, 60 and 61?  The mathematical breakdown off --

14   A.   It's really slide 60.

15   Q.   -- okay.  And so slide 60, then -- could you describe what

16   slide 60 sets forth?

17   A.   Yes.  If you look at the lower right-hand corner number,

18   this is the 4.2 billion dollar economic gain reported by

19   Barclays on its acquisition balance sheet, indicating that

20   there was an immediate gain to Barclays of that amount as of

21   the close of the transaction.  And in the lines above it, I

22   just illustrate -- document what the different components of

23   that gain are, as discussed by Professor Pfleiderer, Mr. Romain

24   and others.  So it's not -- it's just taking their testimony or

25   his report -- Professor Pfleiderer's report and documenting it.

Page 102

1      So the components of the 4.2 billion, the first component

2   is that the repo collateral, according to Barclays, was worth

3   about one half of a billion or 546 million dollars more than

4   the repo liabilities.  So immediately upon the closing of the

5   transaction, the collateral had a value of 45.5 billion, the

6   liabilities had a value of 45 billion.  There was an immediate

7   gain to Barclays just from that collateral.

8      There are other financial assets that I list there.  They

9   had a value of 4.6 billion.  The real estate, if you recall, it

10  was a wash, meaning that appraised value was going to be paid.

11  So that's a wash.  There's a zero effect there.  There are

12  intangible assets that had a value of 1.6 billion; other assets

13  that had a value of roughly 400 million.  And then there were

14  reductions for three factors: one 250 million dollar in cash

15  payment; liabilities assumed, compensation and cure liabilities

16  of 2.2 billion; and then there were transaction cost and

17  deferred taxes of 600 million.

18      So you take the repo collateral immediate gain, add the

19  financial assets, the intangible assets, the other assets, and

20  subtract what was paid in the assumption, and you get 4.2

21  billion dollars.  So that's a breakdown of the 4.2 billion

22  dollars.

23  Q.   Okay.  And in closing, just to bring it all together in

24  terms of the various opinions that you have set forth and

25  explained to the Court, at the end of the day, when you value

Page 103

1   the financial assets properly and make the necessary

2   adjustments for other items of value and liabilities, what is

3   your opinion as to the overall amount of the Barclays windfall

4   that's calculated by you?

5   A.   As I showed earlier, the 4.2 billion is after adjustments,

6   by the movants' experts, is equal to 11.2 billion.  And the

7   Barclays windfall is 13 billion dollars, again, based on the

8   placeholder that I'm using from the movants of 1.85 billion.

9          MR. TAMBE:  Your Honor, let me just consult with my

10  colleagues.  I think we'll be done with the direct examination

11  shortly.

12         THE COURT:  Sure.

13         MR. TAMBE:  No further questions on direct, Your

14  Honor.  Thank you, Professor Zmijewski.

15         THE COURT:  All right.

16         You're going to start cross-examination fairly close

17  to lunch time.  But I think we might as well use the time.

18         MR. THOMAS:  Yes, Your Honor.

19         THE COURT:  At the lunch break, we can try to make it

20  work again.

21  ??CROSS-EXAMINATION

22  BY MR. THOMAS:

23  Q.   Good afternoon, Professor Zmijewski.

24  A.   Hello.

25  Q.   Professor Zmijewski, in any valuation of the assets that

Page 104

1    Barclays received from Lehman, that valuation necessarily

2    involves estimates of value, correct?

3    A.    Not for all the assets.  Some are observed transaction

4    prices.  So I wouldn't call those estimates.  But some are

5    calculations, and I would call those estimates.

6    Q.    Were you performing estimates in your work in the

7    calculation of value for the assets that you valued?

8    A.    In the assets that I valued, some of those, for the

9    equities, for example, are factual.  And even for the JPM

10   inventory, some of those are, again, based on actual

11   transaction prices.  So those would be factual.  And others are

12   based on estimates, and so they would be estimates.

13   Q.    And do you agree with the statement that there's no exact,

14   objectively correct value that can be identified when it comes

15   to putting estimates on prices for securities?

16   A.    No.  Again, it depends.  If you have the price it's a

17   fact.  If you're calculating the value -- I'm not sure if I

18   understand your question.  I'll answer it and see if I

19   understand it.  If you have an observed price it's a fact; it's

20   a price.  If you have to calculate the value without having an

21   observed price, well, the calculation has certain inputs to it,

22   and there's a methodology that one uses.  And therefore it's an

23   estimate of a price.

24   Q.    Well, in your valuation of the equities, in your work, you

25   made estimates of their value, correct?  It wasn't simply

Page 105

1    observing their value.  You had to come up with a price and

2    then you had to make liquidity adjustments to them, correct?

3    A.    So the -- correct.  The price is a fact.  And then the

4    liquidity adjustment is based on an analysis of all the bid-ask

5    spreads.  And that is an estimate for the securities for which

6    you don't have an actual bid-ask spread.  That's correct.

7    Q.    And when you say --

8    A.    And just to be clear.  So there are -- for the equities,

9    for example -- a set of the equities you have observed bid-ask

10   spreads.  So -- because they're observable, so you have those.

11   Those are facts.  But there's a subset of securities for which

12   you do not have bid-ask spreads.  And you know, I used the

13   average for that purpose.  So that's an estimate.

14   Q.    You didn't just value equities, correct?

15   A.    Correct.  I also, as I explained earlier, valued the JPM

16   inventory using the JPM price marks.

17   Q.    Okay.  And you have to make judgments about which price

18   sources to use, correct, in your valuations?

19   A.    Of course.  I used the JPM custodial price marks.

20   Q.    And throughout your analysis, there were points in time

21   where you had to make various judgments, correct?

22   A.    I had to make estimates based on certain calculations, of

23   course.

24   Q.    And --

25   A.    And I explained those.

Page 106

```
 1    Q.    -- and in making those estimates, they required judgment,

 2    correct?

 3    A.    Yes.

 4    Q.    Okay.  And you coordinated your valuation numbers with

 5    your colleagues at Chicago Partners, correct?

 6    A.    I'm not sure how you're using the word "coordination".  I

 7    can describe how we calculated the values.

 8    Q.    Well --

 9    A.    It's probably useful to do that.  You know, I -- no one

10    talked to me about how to value equities or how to value the

11    JPM inventory.  I did that on my own.  We did have early

12    conversations when we started this process.  Mr. Olvany, Mr.

13    Slattery, and I and others at Chicago Partners had

14    conversations about what type of software to use, where to get

15    databases, software for valuation programs, where data should

16    be collected from.  So we had conversations like that.  But

17    then afterwards, every valuation expert did their work

18    independently.  So I'm not sure, is that coordination or not?

19    Others can judge that.

20    Q.    Well, you had calls with them to make sure there was

21    consistency in approach in the same analysis and the same views

22    on methodologies, correct?

23    A.    I would just change what you said, and then I'll say

24    "correct".  And that's not views; consensus on appropriate

25    methodologies to use, software programs to use.
```

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 107 of 233

Page 107

```
 1    Q.   And you saw their calculations before you issued your

 2    report, correct?

 3    A.   I never saw their calculations.  I only saw their results

 4    of their calculations.  I never looked at anyone's

 5    calculations.

 6    Q.   Well, when you say you never saw the calculations, you saw

 7    the numbers that were coming out of the calculations, correct?

 8    A.   I saw the final number of their undervaluation.  I've

 9    never -- I never looked at their individual CUSIP by CUSIP

10    calculation.  I never looked at those.

11    Q.   Right.  You didn't test those calculations yourself?

12    A.   That's correct.

13    Q.   But in discussion with your colleagues, your collaborative

14    work on this, you knew what their ultimate numbers were coming

15    out in terms of the -- what you describe as an undervaluation,

16    correct?

17    A.   At the aggregate level, that's correct.  At the CUSIP

18    level, I did not look at any other calculations at the CUSIP

19    level.

20    Q.   Right.  Indeed, you had their calculations mentioned

21    throughout your report, so you clearly had their calculations

22    before you finalized your report, correct?

23    A.   I just want to make sure we're on the same page on -- you

24    say "calculations"; I would say the result of their

25    calculations.  Maybe that's a subtle difference.  But
```

1    "calculations" to me means I have all their spreadsheets and

2    all their software on a CUSIP level, know -- you know, reviewed

3    what they did.  I didn't do that.  But I did have the result of

4    their calculations.  I knew their valuation and I compared it

5    to Barclays' valuation.  So I knew the difference.  But that's

6    what I knew.

7    Q.   Okay.  And you knew about movants' five billion dollar

8    discount claim before doing your calculations, correct?

9    A.   Yes, it's made in several places in various documents.

10   Q.   And your initial assignment last fall was to become

11   familiar with the issues in the matter and the parties'

12   positions, correct?

13   A.   Of course.

14   Q.   Okay.  And the first thing you did was review movants'

15   Rule 60(b) motion, correct?

16   A.   I'm not sure if that's the first thing I did, but it's

17   near -- it's one of the first things I did.  I might have

18   looked at your motion first.  I'm not sure which motion I

19   looked at first.

20   Q.   Okay.  And you understood before you submitted your report

21   with your calculations that Barclays' acquisition balance sheet

22   was inconsistent with movants' claim that the repo assets were

23   worth approximately five billion dollars more than the forty-

24   five billion dollars in cash that Barclays put forth in

25   connection with the repo?

Page 109

1    A.    I'm not sure if I heard all of that.  But I was aware that

2    the movants were claiming that there was an undervaluation of

3    five billion dollars.

4    Q.    Okay.

5    A.    I think that's the answer.  I was aware of that, if that

6    was your question.

7    Q.    Okay.  And you were aware of that claim that there was an

8    undervaluation of five billion dollars by Barclays, and that

9    that undervaluation had to be reflected in the Barclays

10   acquisition balance sheet, correct?

11   A.    You know, I'd have to think about -- I'm nut s -- it might

12   be -- they're certainly related.  I don't know.  You know, the

13   claims about the five billion discount negotiated at inception

14   and so forth, that was made early on on a different set of

15   numbers.  Does that feed directly into the acquisition balance

16   sheet?  Maybe it does.  But I'm not sure about that.

17   Q.    You understood that in order to support movants' claims,

18   you had to find a five billion dollar undervaluation in

19   Barclays' acquisition balance sheet, correct?

20   A.    Well, I'm not sure what you mean "support".  That was

21   their claim, and I was asked to quantify the calculation.  And

22   the undervaluation on the balance sheet that I calculated,

23   based on my work and the work of others, is seven billion

24   dollars.

25   Q.    But the seven billion dollars relates not just to the repo

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 110

1   collateral, correct?

2   A.   That's correct.

3   Q.   The seven million (sic) dollars also includes assets other

4   than the securities, right?

5   A.   It includes other securities other than the repo.

6   Clearance box assets as well as other assets, and unrecorded

7   assets; all the assets that I showed earlier.

8   Q.   And you knew from reading their claims that the five

9   billion dollar discount that we hear about in their papers

10  related not to those other assets, but to the valuation of the

11  securities -- the financials -- correct?

12  A.   You know, I don't recall if it was just on the repo assets

13  or if it was all the financial assets.  I just don't recall.

14  It was a five billion dollar claim.  I'm not sure if the five

15  billion dollar assertion on the part of the movants was only

16  for the repo assets or if it was beyond that.  I don't recall.

17  Q.   You don't recall what the five billion dollar claim

18  related to?

19  A.   I don't know if it was all the financial assets or if it

20  was related strictly to the repo assets.  But it was related to

21  the financial assets.

22  Q.   In any event, having read movants' claims and

23  understanding that they were alleging that undervaluation, and

24  understanding, having read about movants' five billion dollar

25  discount claim, you then concluded that Barclays had

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 111

1    undervalued its acquisition balance sheet by five billion

2    dollars.  Is that right?

3    A.    Seven billion dollars.

4    Q.    Okay.  But with respect to the financials and the

5    securities it's 5.1 billion dollars, correct?

6    A.    With respect to the financial assets, it was 5.1 billion

7    dollars, correct.

8    Q.    And Mr. Slattery and Mr. Schwaba, Mr. Olvany, all work

9    with you at Chicago Partners?

10   A.    Yes.

11   Q.    And they're all paid by Chicago Partners?

12   A.    Correct.

13   Q.    Okay.  And you founded Chicago Partners?

14   A.    I did.

15   Q.    Now, have you ever worked --

16   A.    And just to be clear, Chicago Partners is now owned by

17   Navigant Consulting, so I'm no longer an owner of Chicago

18   Partners.

19   Q.    Okay.  You all still work together at Chicago Partners?

20   A.    Yes.

21   Q.    Have you ever worked on a trading desk?

22   A.    I have not.

23   Q.    Have you ever been employed by a broker-dealer?

24   A.    I have not.

25   Q.    Have you ever worked at a CPA firm and had responsibility

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 112

1   for testing or auditing a broker-dealer's valuation of its

2   inventory or trading assets?

3   A.    I have not.  I'm not a certified public accountant and nor

4   have I ever been an auditor.

5   Q.    Okay.  And I believe you said the reason why there were

6   other experts doing other parts of the work was because you did

7   not have experience -- hands-on experience in the field, or

8   words to that effect.  Is that right?

9   A.    For some of these more complex securities, yes.

10  Q.    Do you agree that prices of most kinds of securities were

11  unusually volatile in September of 2008?

12  A.    Yes.

13  Q.    Do you agree that this was especially so in the second

14  half of September 2008, after the bankruptcy of Lehman Brothers

15  Holdings?

16  A.    You know, if you show me a volatility chart, I'll tell you

17  the answer.  But I don't remember the data that much.  That's

18  entirely possible.  I just don't remember.  But clearly 2008,

19  beginning of 2009, it's been a volatile time.

20  Q.    Do you believe that volatility created uncertainty and

21  higher risk for Barclays in closing this transaction?

22  A.    Of course.

23  Q.    Do you have an understanding of the concept of the

24  liquidity of a financial market?

25  A.    Yes.

Page 113

1    Q.    And what is your understanding?

2    A.    It's how easily one could trade a security --

3    Q.    Do --

4    A.    -- and what impact that might have on -- I'm sorry.  And

5    what impact that might have on price.

6    Q.    -- do you agree that many of the financial markets were

7    far less liquid than usual in September 2008?

8    A.    Did you say some of the -- I'm sorry, did you say some of

9    the markets?

10   Q.    Many -- all of them.

11   A.    I don't --

12   Q.    Let me take out the qualifier.  Do you agree that the

13   financial markets were far less liquid than usual in September

14   2008?

15   A.    Some of them were extremely illiquid, but some of them

16   were not.  Stock market, for example, I don't -- I don't know

17   that the liquidity changed.  I haven't read anything about

18   liquidity changing in the stock markets during this period.

19   Q.    Do you agree --

20   A.    It might have.  I just haven't read anything.

21   Q.    -- do you agree that in many financial markets, trading

22   was far less active in September than -- September 2008 than

23   usual?

24   A.    Same answer as before.  I think for some of them much

25   less.  And I'm not sure if that was true in the stock market or

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 114

1   not.

2   Q.   Do you agree that to the extent there were bid quotes and

3   ask quotes available in a given market in the second half of

4   September 2008, the spread between those two was unusually

5   large in that month?

6   A.   Just for -- I -- they should be.  The increased volatility

7   would have increased the -- and changed liquidity would have

8   increased the bid-ask spread.  Is September 2008 larger than

9   November, October, August?  I don't know the answer to that.

10  Q.   You haven't analyzed that issue?

11  A.   Correct.

12  Q.   You would agree that it's going to be larger in September

13  2008 than usual?

14  A.   If we -- than it has been historically.  We might have had

15  an intervention where looking forward things are changing in a

16  very different way.  So looking forward, it's not clear.  But

17  looking historically?  Absolutely.

18  Q.   Would you agree that in many financial markets, the depth

19  of quotes, if they were available at all, was far less than

20  usual?

21  A.   I don't know that answer to that.

22          MR. THOMAS:  Your Honor, this would be a good point to

23  break for lunch.

24          THE COURT:  Fine.  Let's break for lunch.  We'll

25  resume at 2 p.m.

Page 115

1      (Recess from 12:33 p.m. to 2:05 p.m.)

2           THE COURT:  Please be seated.

3           And please proceed.

4           MR. THOMAS:  Your Honor, we distributed a binder.

5           THE COURT:  I have it.  Thank you.

6           MR. THOMAS:  Okay.

7    RESUMED CROSS-EXAMINATION

8    BY MR. THOMAS:

9    Q.   Professor Zmijewski, I'd like to go ahead and pull up a

10   slide on the screen, if I could.  It's summarizing some

11   testimony in this case.  And you're familiar with Mr. Wachtell,

12   Mr. Landerman and Mr. Teague, is that right?

13   A.   Yes.

14   Q.   Okay.  They were three of the principal valuation

15   witnesses -- excuse me, three of the principal valuation

16   personnel for Barclays with respect to valuing the assets

17   received by Lehman?

18   A.   Correct.

19   Q.   Okay.  And you recall that they were deposed at length in

20   this case?

21   A.   I recall that each of them was deposed, yes.

22   Q.   Okay.

23   A.   I read their depositions.

24   Q.   Okay.

25   A.   Sometime I read their depositions.

Page 116

1    Q.   Okay.  And do you recall that each of them testified under

2    oath that their objective was at all times to state the fair

3    value of the assets under applicable accounting rules?

4    A.   I don't remember that specific testimony.

5    Q.   Do you recall that they each testified that their

6    instructions were to value assets at fair value?

7    A.   Again, I don't recall the specific words they used.

8    Q.   Do you recall that each testified under oath that no one

9    ever suggested to them that they should understate the value of

10   the assets in any way or do anything other than estimate the

11   fair value as accurately as possible?

12   A.   Again, I don't recall the specific words they used.

13   Q.   Okay.  Do you recall -- you read their depositions,

14   though?

15   A.   I did.

16   Q.   Okay.  Do you recall that each has testified under oath

17   that they believed that their ultimate valuation reflected fair

18   value?

19   A.   I do recall that, yes.

20   Q.   And do you -- are you aware that Mr. Romain has similarly

21   testified in this hearing and at deposition that Barclays

22   valued the assets at fair market value as defined in accounting

23   rules?

24   A.   I do.

25   Q.   Okay.  For purposes of your opinion, do you credit or

Page 117

1   reject such testimony, or is it not relevant to you?

2   A.   I'm not sure what you mean by "credit".  Did I consider?

3   If I can use the word "consider" for "credit", of course I

4   considered all the testimony.

5   Q.   Okay.  Did you accept that as -- that testimony as true

6   for purposes of your report?

7   A.   Yes.

8   Q.   Okay.  So you're not offering any opinion that Barclays

9   intentionally understated the value of assets that it received

10  from Lehman?

11  A.   I'm offering no such opinion.

12  Q.   And as for the calculations done by your colleagues at

13  Chicago Partner, as I understand it, you did not review those

14  calculations themselves, correct?

15  A.   That is correct.

16  Q.   Okay.  And you didn't check any of their work?

17  A.   That is correct.

18  Q.   Okay.  And if their valuations are unreliable, then your

19  ultimate valuation conclusions here would be unreliable also,

20  correct?

21  A.   Well, it depends on the nature of the issue.  It might be

22  that my numbers need to be adjusted; that's entirely possible.

23  So it depends on the nature -- what you mean by "unreliable".

24  Q.   But, necessarily, if their numbers are wrong, your numbers

25  are wrong, correct?  Because you're adding up their numbers?

Page 118

 1   A.   If -- well, the partic -- the specific numbers that I gave

 2   would have to be adjusted, of course.  So, for example, let's

 3   assume that you -- someone told me that Mr. Schwaba's numbers

 4   could not be used or Mr. Schwaba's numbers are in correct; I'll

 5   use that for an example.  Then what I would do is either not

 6   use it at all, so the number there would be zero, and all the

 7   other numbers would be fine.  So you could adjust the numbers.

 8   Q.   Okay.  Of the 5 billion dollar undervaluation that Chicago

 9   Partners alleges/asserts, over 1.6 billion of that comes from

10   your calculation of the value of the December settlement

11   proceeds, correct?

12   A.   That is correct.

13   Q.   Okay.  You don't contest Barclays' valuation of the

14   settlement proceeds as of the date they received them, December

15   22nd, correct?

16   A.   I -- correct.  I did not examine that issue.

17   Q.   Okay.  You didn't do any analysis of the value of the

18   settlement proceeds as of December 22nd?

19   A.   That is correct.

20   Q.   Okay.  What you did was come up with your valuation, which

21   was 1.6 billion dollars higher, which calculated a value for

22   the settlement securities as of September 19th, correct?

23   A.   That is correct.

24   Q.   Okay.  Now, Barclays never actually received those

25   securities or the 1.2 billion dollars in cash in September

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 119 of 233

Page 119

```
 1    2008, correct?

 2    A.    Correct.  Barclays had claims that it was pursuing.

 3    Q.    Okay.  And your rationale for nonetheless calculating what

 4    the December settlement proceeds would have been in September

 5    was to measure the value of Barclays' claim, is that correct?

 6    A.    Correct.

 7    Q.    Okay.  And your valuation is based on your assumption that

 8    Barclays had a claim on the specific securities that ended up

 9    in Annex A to the settlement agreement, correct?

10    A.    That's incorrect.

11    Q.    Okay.  Have you changed your opinion since your

12    deposition?

13    A.    No.

14    Q.    Okay.  May I ask you to turn to tab 1 of your binder,

15    please?

16    A.    And just as a point of clarification, if you recall the

17    numbers that I put up on my testimony today, there were two

18    columns with respect to this issue:  One column used a 7

19    billion dollar valuation for the claim, minus the 5 billion,

20    that's 2 billion; and then the other column was the 1.67

21    billion dollar claim minus the 5 billion -- I'm sorry, the 5 --

22    I'd have to look at the number, but the other claim --

23    calculation of the claim was 1.67.  So I had two calculations

24    there:  The first one does not make the assumption that you

25    just stated; the second one does.
```

Page 120

1    Q.    Okay.  I did notice that, and that's a new calculation,

2    correct?  The seven billion wasn't in your first report as an

3    alternative calculation?

4    A.    The 7 -- I'd have to go back -- it's not -- I used the

5    1.657 in my report; I use it here.  But I believe I also talked

6    about the 7 billion dollar claim in my report, or in my

7    declaration, or both.

8    Q.    Okay.  Your recollection is that somewhere in your report

9    there's an alternative calculation of seven billion dollars?

10   A.    It's not a calculation.  It's just a statement of fact

11   that there was a claim for seven billion dollars and a

12   discussion that there was a seven billion dollar claim --

13   Q.    Okay.

14   A.    -- and which that was the amount.

15   Q.    Okay.  So it would surprise you if that's not in your

16   report?

17   A.    That I didn't discuss the seven billion dollar claim in

18   any way?  It would surprise me, yes.

19   Q.    That you did not offer an alternative calculation of the

20   claim amount for seven billion dollars and, instead, only did a

21   valuation based upon the value of the settlement proceeds as of

22   December 19.

23   A.    In the numbers that I showed today, the only number that I

24   used in my calculation was the 1.657 billion dollar number, but

25   I also showed a benchmark for that calculation of the 7 billion

Page 121

1   minus the 5, and I believe I discussed that same 7 billion in

2   my report.  However, like I testified today, in my report I

3   don't use that number in the calculation of the 5.1 billion

4   dollar undervaluation.

5   Q.   Okay.  But as of today, it's not your position that your

6   calculation is based on the assumption that Barclays had a

7   claim on specific securities that ended up in Annex A?

8   A.   I just didn't catch all of that.  Could you repeat it?

9   Q.   Yeah, let me ask you to turn -- with respect to your prior

10  answer to this question, turn to page 101, line 18 of your

11  deposition, please.  Question -- sorry, I'll wait for you to

12  get there.

13  A.   Okay.

14  Q.   You there?

15  "Q.   Is it your understanding that they would have a claim on

16  those particular securities, or would they have a claim on

17  securities in a certain amount, or would they have a claim for

18  a certain amount of money?

19  "A.   My assumption is that -- what I am assuming here is it's a

20  claim on a set of securities in the JPM inventory.  That is my

21  assumption in this calculation.  It's not an amount.  It's a

22  specific claim on those securities."

23  Q.   Was your testimony truthful and accurate at the time you

24  gave it?

25  A.   Yes, and it's consistent with what I've said today.

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 122 of 233

Page 122

1    Q.    Did you not just say today that you didn't base your

2    opinions on there being a claim for specific securities?

3    A.    That's correct, and I explained -- I thought, clearly, but

4    I'll try again -- there were two columns of numbers in that

5    calculation that I showed:  The first column of numbers, the

6    seven billion minus the five, doesn't -- does not depend on

7    this assumption; the second one does.  And in my deposition and

8    in my report, you focused on the second calculation, and the

9    statement's true for that.

10           MR. TAMBE:  Your Honor, for the sake of completeness,

11   could we just have the rest of the --

12           THE COURT:  I'm sorry?

13           MR. TAMBE:  For the sake of completeness -- there was

14   a question and answer immediately following that on that very

15   topic, which might be, for the sake of completeness, read into

16   the record.

17           THE COURT:  Well, we've moved beyond that subject, and

18   you can bring it up in redirect.

19   Q.    Sorry, are you finished with your answer?

20   A.    Well, I'll continue.  Later I also provide the answer,

21   just a few lines later, "Well, alternatively there was a --

22   Professor Pfleiderer talked about a seven billion dollar

23   cash -- supposed cash payment that might have occurred and

24   didn't occur, but securities were given instead.  If someone

25   said the claim was as you just described, a potential claim for

Page 123

1    seven billion, and that was the expected value of the claim,

2    seven billion, independent of the securities, none of this

3    would be relevant.  I would have put seven billion dollars down

4    for the value of this claim," which is what I did today.  So

5    this deposition testimony fits with --

6    Q.   Exactly, but you did --

7    A.   -- exactly what I did today.

8    Q.   -- you didn't do it in your report.  You didn't put it

9    down in your report.  You calculated something based upon the

10   value of specific securities, which you assumed in your report

11   Barclays had a claim for those specific securities, and that

12   was your basis for valuing the securities as of September 19th,

13   because they had a claim for those securities, right?  I'm not

14   talking about the alternative possibility of just taking seven

15   billion.  I'm talking about the calculation you use in your

16   report.

17   A.   The calculation in my report is the same calculation here

18   for the 1. -- 5.1 billion dollars, and that calculation uses

19   the 1.657 billion dollar claim, which depends on the

20   securities.  However, I believe, right here in my deposition,

21   as well as in the report, I also discussed the seven billion

22   dollar cash claim.

23   Q.   Yeah, okay.  The number you used in your five billion

24   dollar undervaluation number, that's not the seven billion

25   dollar cash one, right?

Page 124

1    A.    That's correct.  I showed it on the screen today.

2    Q.    Okay.  And for your statement that you were assuming that

3    Barclays had a set -- a claim in specific securities, what was

4    the basis of that assumption?

5    A.    That, as I explained earlier today, Fed repo securities

6    were not transferred over, as what I assumed was supposed to

7    happen, and seven billion dollars was held out, and eventually

8    those Fed repo securities were transferred over, some of them

9    that weren't sold or didn't mature.

10   Q.    The issue of how Barclays should value a claim on its

11   acquisition balance sheet is an accounting issue, correct?

12   A.    It is an accounting issue.  It's also for this purpose an

13   economic issue.  So the calculation here -- just to be clear,

14   the calculation here at 12:01 a.m. on December 22nd, from my

15   perspective that's an economic issue; it's not an accounting

16   issue.

17   Q.    Okay.  And if Barclays had received the settlement

18   securities on September 22nd, would they have sold them in

19   September?

20   A.    I don't know.

21   Q.    Would they have hedged them?

22   A.    I don't know what their hedging policies are.

23   Q.    Were they -- did they hedge them?

24   A.    I don't know the answer to that.  The hedging

25   information -- I read Mr. Romain's testimony, Professor

Page 125

1    Pfleiderer talks about hedging, and certainly Barclays was

2    hedging -- the way it was described is the hedges weren't on

3    specific securities, they were on groups of securities or asset

4    classes, and it was difficult to hedge, and the hedges were

5    incomplete.  So --

6    Q.   My question is --

7    A.   -- nothing was --

8    Q.   -- simply if you know if they hedged them or not.

9    A.   May I finish?

10   Q.   Well, if you could give me an answer to my question and

11   then we can have an explanation if you need.

12   A.   I didn't finish the answer to my previous question.

13   Q.   Okay.  Well, again, my question is whether you know if

14   they hedged them or not.

15   A.   I still haven't finished the answer to my previous

16   question.  May I finish?

17   Q.   Is it possible to answer that "yes" or "no"?

18   A.   As soon as I finish the answer to my question.  I don't

19   understand.

20   Q.   Are you nearly finished?

21   A.   Now I lost my train of thought.  I guess I'm finished.  I

22   lost it, I'm sorry.

23   Q.   You agree there's a difference between having a claim for

24   certain securities and actually having those securities, right?

25   A.   Yes, of course.

Page 126

1    Q.    Having a claim for them is less valuable, even if there's

2    a high chance of sometime receiving them, correct?

3    A.    Of course it depends on the probability of receiving them.

4    If the probability's one, then it's not different.  If the

5    probability's less than one, then it's different.

6    Q.    Well, isn't it different even if the probability is one?

7    I mean, you can't sell them.  You can't -- you don't know

8    whether to hedge them or not.  So isn't it less value --

9    valuable to have a claim for securities, even if there's a

10   hundred percent chance of getting them down the road, than it

11   is to actually have the securities and control them, be able to

12   sell them in a falling market?

13   A.    Generally I'd answer that question "no".  If the proba --

14   you said the probability's one; so that means I can't sell

15   those securities.  Can I short those securities so I can

16   guarantee my position, hedge them?  If I can, well, then I

17   don't see the difference.

18   Q.    Okay.  Well, is the probability of Barclays obtaining

19   those securities as of September 22nd one hundred percent, in

20   your view?

21   A.    I don't know the answer to that question.

22   Q.    Okay.

23   A.    I don't have a view.

24   Q.    You don't -- did you -- in valuing the claim that Barclays

25   had on September 22nd, did you make any judgments or assess the

Page 127

1    likelihood of recovery?

2    A.    Recovery of the claim?  Yes.

3    Q.    Okay.  What was your --

4    A.    You know, I read the --

5    Q.    -- assessment of the --

6    A.    -- I read the settlement agreement, and in the settlement

7    agreement -- I don't know if the settlement agreement is in

8    these documents that you pulled up, but my recollection of the

9    settlement agreement is that the claim that was satisfied in

10   December was for the economic situation that was in September,

11   which was a seven billion dollar claim.

12   Q.    Right --

13   A.    That's my recollect -- if you have the settlement

14   agreement, I'll look at it, but that's my recollection of the

15   settlement agreement.

16   Q.    To value a claim, you would calculate the expected value

17   by making an assessment of what the cash flows would be and

18   what the risk of those cash flows would be and the timing of

19   those cash flows, and discount it back to the point in time you

20   value it, right?

21   A.    I think I heard everything you said.  Yeah, I think I

22   agree with that.  If you -- if I could write it down

23   mathematically, I could tell you if I agree with it or not.  I

24   didn't underst -- I --

25   Q.    Did --

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 128

1    A.    But I think that's correct.

2    Q.    Did you do that here?

3    A.    I did not, because my understanding of the settlement

4    agreement is that the settlement agreement states that those

5    securities satisfied the claim that was on September 22nd.  So

6    it's satisfied, so I used the value as of September 22nd of

7    those securities.  And I also used the seven billion dollar

8    number, and valuing those securities results in a lower number.

9    Q.    So you didn't --

10   A.    It's conservative relative to using the seven billion

11   dollar number.

12   Q.    So you didn't value the claims the way you would normally

13   value a claim, because you believed Barclays had a claim on

14   those specific securities and ultimately received those

15   securities, is that right?

16   A.    Based on the settlement agreement, yes.

17   Q.    Okay.  And, again --

18   A.    And it's the -- I don't know if the settlement agreement's

19   here or not.

20   Q.    I'm just -- we don't need to get into the settlement

21   agreement.

22   A.    Okay.

23   Q.    I'm asking what was the basis of your understanding that

24   Barclays had a claim on those particular securities as opposed

25   to a claim for securities in a certain amount?

Page 129

1    A.    I don't know the answer to that question.

2    Q.    Okay.  If you add in the cash proceeds, what is the value

3    you attribute -- total value you attribute to Barclays' claim

4    as of September 22nd?

5         (Pause)

6    A.    I'm just going to look.

7    Q.    Please.

8         (Pause)

9    A.    So if you'd like to look, the number's on slide 41 that I

10   showed earlier.  The value, including the cash, is either 7

11   billion dollars or 6.647 billion dollars.

12   Q.    Okay.  One of those two.  So you're taking -- for the

13   purpose of your value of the claim, you're using bid prices,

14   not mid prices?

15   A.    I just didn't hear you.

16   Q.    Your valuation of the claim would be 1. --

17   A.    Was it bid, not -- I don't know if you said "bid not bid"

18   or "bid not" --

19   Q.    Bid, not mid.

20   A.    Oh.

21   Q.    Are you using bid or mid prices in valuing the claim?

22   A.    Bid.

23   Q.    Okay.  And so you're -- the risk factor for Barclays and

24   the time flow of the cashflow factor for Barclays was very

25   close to zero, in your viewpoint?

Page 130

1    A.    Could you repeat that?  I just didn't understand it.

2    Q.    Sure.  The risk factor for the value of Barclays' claims

3    and the timeflow factor of not having these funds at the time

4    but having -- getting them three months later, you would put at

5    very close to zero?

6    A.    No, that's not what I did.

7    Q.    Okay.  Well, you're very close to seven billion dollars in

8    your claim, right -- or valuation of your claim?

9    A.    Correct, and that's the value of those securities plus the

10   cash as of September 19th.

11   Q.    Okay.  So the value of the claim, as you calculated it, is

12   6.6 billion dollars.  Barclays valued the claim on its

13   acquisition balance sheet at just under 5 billion dollars.  And

14   the actual proceeds of the claim were 5 billion dollars, right?

15   A.    No.  I don't -- I'm not sure what you mean by "proceeds".

16   Q.    Well, when the secur -- when they got the securities and

17   the cash, it added up to just under 5 billion dollars, right?

18   A.    According to Barclays, it adds up to 5 billion, yes,

19   correct.

20   Q.    Right, and you have no basis for contesting that?

21   A.    I didn't look at that issue, correct.

22   Q.    Now, the starting point of your calculation of the value

23   of the settlement securities was JPM -- JPMorgan's September

24   17th collateral values for those securities, right?

25   A.    That was the starting point, correct.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 131

1    Q.   Okay.

2         MR. THOMAS:  And if I could ask that we go ahead and

3    pull up Movants' Exhibit 640, please.

4    A.   Excuse me, is that in the notebook here?  I can't read it

5    on the screen.

6    Q.   I'm sorry, that's tab 25 --

7    A.   Thank you.

8    Q.   -- of the Barclays binder.  And do you see this October

9    31st e-mail from JPMorgan to counsel concerning the settlement

10   securities?

11   A.   This isn't at tab 25.  I'm sorry.

12   Q.   Tab 27, excuse me.

13   A.   Okay.  I see that.

14   Q.   Okay.  And this is a document that you did not review

15   prior to your opinion, correct?

16   A.   Correct.  First time I saw this was when you gave it to me

17   at my deposition.

18   Q.   Okay.  And the first sentence says, from JPMorgan's

19   counsel, "I have attached the spreadsheet with collateral value

20   as of September 17th, which was the last evening on which the

21   Fed provided financing.  I understand that these collateral

22   values were furnished principally by third-party pricing

23   sources, and we caution against using those values as reliable

24   indicators of realizable value."  Do you see that?

25   A.   I do.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 132

1   Q.   Okay.  And they're talking about the same securities that

2   you value in your calculation, correct?

3   A.   That's correct, yes.

4   Q.   Okay.  And let me go ahead and ask you to turn to tab 28,

5   please.  This is another --

6   A.   Was I supposed to answer a question about this e-mail?

7   Q.   I'm going to ask you a question about the next e-mail;

8   then I'm going to address both of those.

9   A.   Okay, sorry.

10  Q.   Okay.  At tab 28 --

11  A.   Yes.

12  Q.   -- do you see an e-mail, again from JPMorgan's counsel,

13  and again in the second paragraph it's cautioned against using

14  the collateral values because they were obtained from third-

15  party pricing sources, and JPMorgan cautions the collateral

16  value, "may not be a reliable indicator of realizable value"?

17  A.   I see that.

18  Q.   Okay.  And in the paragraph above, do you see that what

19  JPMorgan does in connection with the settlement is, in addition

20  to providing the collateral values from September 17th, they

21  provide an estimate of market value as of November 3rd, using

22  the term "market value"?  Do you see that?  It's in the first

23  paragraph.

24  A.   Yes.

25  Q.   Okay.  And so JPMorgan here is cautioning against using

Page 133

1    the exact collateral values that is the starting point for your

2    calculation, correct?

3    A.   Well, that's correct, and the question is to what end, for

4    what purpose and at what date.  These -- both of these e-mails

5    are not -- neither of these e-mails is dated as of September

6    22nd, nor does it, at least based on my reading -- and you

7    showed these to me at my deposition and I read them afterwards,

8    of course, more.  Again, neither of these e-mails state that

9    these values weren't appropriate for September 22nd -- or,

10   excuse me, September 17th.  They -- it doesn't state what the

11   date is.  It also doesn't state what net realizable value is.

12   Q.   In both cases, it doesn't say they're not reliable because

13   the collateral values haven't been updated; it says they're not

14   reliable because the sources for those values were third-party

15   pricing sources, isn't that right?  Both times they give that

16   warning?

17   A.   It makes that statement but, again, it -- there's nothing

18   here that states that it's, as of September 7 -- you know,

19   first, as I said in my deposition, realizable value isn't

20   defined, okay, so it's not -- it doesn't say "fair value",

21   "realizable value".  And I recall reading the woman's testimony

22   from Deloitte & Touche about this issue and she didn't -- and

23   she's copied; so it would be Marlo Karp, I think, is the

24   individual from Deloitte & Touche.  And when I read her

25   testimony, her testimony didn't have an under -- she stated

Page 134

1  that she didn't have an understanding of realizable value nor

2  that these related to specific dates.  So I believe that was

3  her testimony, although we could look at it again.  And it

4  doesn't state the date.

5  Q.   So your testimony is that the term -- when I say

6  "realizable value", it may not mean value that you can realize

7  from it by selling it?

8  A.   It might mean that, but it might -- it might mean that; it

9  might mean that when you sell the whole block of securities,

10  or -- it just doesn't state what it is.  It -- it's not using a

11  term of art of fair value that is used both by Barclays and

12  used by the expert in this case with respect to the definition

13  of value.

14  Q.   Let me go and play an excerpt from Ms. Karp's deposition,

15  which is at lines -- page 102, lines 21, to page 103, line 7.

16       (Begin playing excerpt of video deposition of Mark

17  Zmijewski:)

18  Q.   Do you see in the second paragraph it says "Please note

19  the collateral value was attained from third-party pricing

20  sources, and JPMorgan cautions that collateral value may not be

21  a reliable indicator of realizable value"?  Do you see that

22  language?

23  A.   Yes.

24  Q.   So JPM is again cautioning against misusing the collateral

25  value as a reliable indicator of realizable value, correct?

Page 135

1   A.   That's what it says.

2   Q.   All right.

3        (End playing excerpt of video deposition of Mark

4   Zmijewski)

5   Q.   Okay.  So she's not questioning the fact that JPM's

6   cautioning against using it as reliable data for realizable

7   value, right?

8   A.   What I recall reading -- I didn't see the video before,

9   and what I just heard on the video is she agreed that those

10  were the words that it said.  And I believe I just said the

11  same thing when you asked me the question.

12  Q.   Okay.  And JPMorgan also noted in Movants' Exhibit 641

13  that "there are a number of securities for which JPMorgan did

14  not provide an estimate, because there was insufficient

15  information which conveys an estimate," do you see that?  The

16  last sentence of the first paragraph.

17  A.   I do.

18  Q.   Okay.  And if you would turn to the attachment.  There's

19  actually a chart that they provide and it shows -- first group

20  of numbers marked by JPM, and it shows that the collateral

21  value is at 5.4 billion?

22  A.   Correct.

23  Q.   Okay.  And then the JPM value on 11/3rd, November 3rd, for

24  that amount of marked collateral is 2.8 billion?

25  A.   My recollection is that's for a subset of the securities,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 136

1    not all the securities.

2    Q.   Well, it's a subset -- the 5.4 billion is the amount of

3    securities for which they could put prices on, correct?

4         (Pause)

5    Q.   There's a total value in Annex A of about 5.9 billion

6    dollars' worth of securities, 5.4 billion dollars of which

7    JPMorgan identifies as having -- marked by JPM, and the other

8    500 million are identified as unmarked because they weren't

9    able to even come up with an estimate for those, correct?

10   A.   Yes.   That's in November.

11   Q.   So JPM -- JPMorgan, who was longtime custodial agent for

12   Lehman, was not even able to estimate a market value for

13   securities of over half a billion dollars, correct?

14   A.   As of November, yes.

15   Q.   Okay.   And when they were estimating what they thought was

16   really market value, they didn't provide third-party pricing

17   for those securities, right?

18   A.   I'm sorry, I don't understand.

19   Q.   JPMorgan cautioned not to use the collateral values of the

20   Annex A securities; the Annex A securities had a collateral

21   value of 5.9 billion dollars as of September 17th.   Those are

22   the JPMorgan marks that is the starting point for your

23   recalculation of the value of the settlement proceeds --

24   A.   That's correct.

25   Q.   -- right?

Page 137

1    A.    Yes.

2    Q.    Right.  JPMorgan cautioned not to use those collateral

3    values as realizable value.  It then, as part of the settlement

4    process, provides a market value estimate as of November 3rd

5    for the 5.4 billion dollars that it can come up with some kind

6    of estimate for.  And then for 500 million dollars, it can't

7    even come up with an estimate.  So my question was isn't it

8    true that JPMorgan, in trying to value these things for the

9    half a billion dollars of securities, did not rely on third-

10   party pricing sources?

11   A.    In November, that is correct.

12   Q.    That's right.  And did you do any analysis of the types of

13   securities that JPMorgan couldn't come up with any value for?

14   A.    In November?

15   Q.    Yes.

16   A.    No.

17   Q.    Okay.  And if JPMorgan had been serving -- which had been

18   serving for (sic) the Lehman custodian for a long time, could

19   not even come up with estimates for these types of securities,

20   how do you think BoNY could have accurately estimated all of

21   these things when it had a much larger volume dumped on it on

22   the evening of September 18th?

23   A.    Other individuals will -- I understand, will testify on

24   that point.  So I don't belie -- I don't -- I'm not an expert

25   on the institutions of custodial values and these custodians.

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 138 of 233

Page 138

1    However, I believe other people will testify exactly on that

2    point.  What I do know is, from a document that I believe you

3    submitted as an exhibit, it's the testimony from Congress of a

4    gentleman from JPMorgan.  Mr. Zubrow?  I don't know if I'm

5    pronouncing his name correctly.  And that's a September 1st

6    testimony.  I just saw that over the last four days when I was

7    reviewing documents for today.  And in Mr. Zubrow's testimony,

8    he testified in front of Congress that a couple of -- what I

9    think are important considerations when you think about the JPM

10   marks.  Consideration number one is the custodian is at risk.

11   If they're -- if they don't mark these correctly, they're at

12   risk during the day if there's large swings in market prices or

13   some default on the part of the company, in this particular

14   case Lehman.

15        In addition, what he says in his testimony to Congress, he

16   states that he will -- or that JPMorgan did a -- I think the

17   word was "broad review" of the collateral in -- I think it's

18   the second week of September.  So he clearly states that

19   JPMorgan was carefully looking at the securities.

20        So in that document -- you know, it's not a BoNY document,

21   it's a JPMorgan document, but he describes in that document,

22   you know, they're in the business of doing this on a daily

23   basis, and they need to do it accurately because they're at

24   risk.

25   Q.   Professor Zmijewski, you understand my question was about

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 139

1    BoNY, right?

2    A.    I do, and I said I don't have institutional knowledge

3    about BoNY; others who will testify will.  But I have read over

4    the last four days the document that you provided as an exhibit

5    with respect to Mr. Zubrow.

6    Q.    Professor Zmijewski, we're going to come to that shortly,

7    but let me continue with this line of questions.

8         Do you accept that it was extremely difficult to place

9    values on many of the securities that went from Lehman to

10   Barclays?

11   A.    You use the word "extremely difficult".  You know, it was

12   difficult for sure.  Some of these securities were complex.  It

13   was difficult.

14   Q.    Are you familiar with the trustee's efforts to try to

15   value these?

16   A.    I'm not sure what document to which you're referring.

17   Q.    Let me go ahead and play an excerpt from Ms. Karp's

18   deposition, who was the 30(b)(6) witness for Deloitte on, among

19   other things, the value of the repo collateral, at page 67,

20   line 20, through 68, line 21.

21        (Begin playing excerpt of video deposition of Marlo Karp:)

22   Q.    We went through this, I think.  Just so I understand what

23   was done.  The CUSIPs for the securities -- you got a list of

24   CUSIPs of the securities that made up what was referred to as

25   the 42.3 billion, right?  Those transferred to Barclays?

Page 140

1    A.    Yes.

2    Q.    And you took a sample of those and tried to price them

3    and -- but it proved too difficult to price, so you gave up on

4    that effort, is that correct?

5    A.    We received a file from Barclays of what was transferred

6    to them under the repo transaction.  That file showed a

7    different market value than what JPMorgan showed on their file.

8    We were asked by the trustee to see if -- which -- whether or

9    not the price -- which prices were more accurate.  So we did a

10   sample and sent it out for just publicly available pricing

11   services.  We did that.  We got very -- we got a low hit rate

12   on those prices, so a number of them came back as not being

13   publicly available sources.  And at that point, we were told

14   not to move forward further into that.

15        (End playing excerpt of video deposition of Marlo Karp)

16   Q.    Did you consider Ms. Karp's testimony in your opinion?

17   A.    I read her deposition, yes, and what she said there was

18   they didn't attempt to value; what they attempted to do was

19   find publicly traded transaction prices is what I interpret her

20   to say, and they couldn't find publicly traded transaction

21   prices, so they stopped the exercise.  That's different -- and

22   we know not all of these securities had publicly available

23   prices.  You had to use other valuation techniques that were

24   used by all parties to value these securities.

25   Q.    And in any event, these JPMorgan e-mails cautioning

Page 141

1    against using the collateral value figures that you used in

2    your calculation as realizable indicators of value, you did not

3    review them in coming to your conclusion?

4    A.   Correct.

5    Q.   Okay.  And later in a declaration, you said that the JPM

6    pricing information discussed in the e-mails we just went

7    through -- in October and November -- was not available as of

8    your valuation measurement date of September 19th, so it didn't

9    change your opinion.  Do you recall saying that at paragraph 54

10   of your declaration, which should be tab 2 of the Barclays

11   binder -- or tab 3, excuse me?

12        MR. TAMBE:  I think it's tab 2.  I believe it's tab 2.

13   Was it -- oh, it's tab 3 of your binder.

14   Q.   Oh, it's on the screen, if you'd like to look at it.

15        (Pause)

16   Q.   And if you would -- actually, the --

17   A.   Could you read the question back, please?

18   Q.   -- part below it.

19   A.   Sorry.

20   Q.   And towards the end, one of these documents also includes

21   a spreadsheet attachment on collateral value as of September

22   17th, and JPMorgan's estimate of market value as of November

23   3rd.  "For reasons outlined in my report and deposition

24   testimony, the estimates of market value as of November 3rd

25   were not known or knowable at 12:01 a.m. on September 22nd and

Page 142

1    are not relevant to my opinions."  Do you recall that being

2    your opinion in your declaration?

3    A.    Yes.

4    Q.    Okay.  But is it -- would it be relevant if it calls into

5    question the reliability of the prices that you used for the

6    September 17th date?

7    A.    Of course.

8    Q.    Okay.  So using hindsight information is appropriate if

9    that information is shown to reflect the facts and

10   circumstances that existed as of the point in time the asset is

11   to be valued?

12   A.    Yes, and just to put some specificity on that statement,

13   information as of 12:01 a.m. on September 22nd, any information

14   that existed as of that date, should be considered.  And if you

15   can look later and find out some information and look

16   retrospectively this is information that was known or knowable

17   and about facts and circumstances that existed at that same

18   point in time, 12:01 a.m. September 22nd, then it would be

19   relevant.  But in this e-mail, for example, the prices that are

20   known on Septe -- November 3rd aren't relevant.

21   Q.    For the September 17th JPMorgan collateral value marks,

22   which is the starting-point basis for your calculation of the

23   settlement proceeds, if those were the collateral values as of

24   September 27th, what day's pricing would JPMorgan be using?

25   A.    What day's pricing?

Page 143

1    Q.   Yes.

2    A.   The 17th -- I have to think a moment on how this all

3    works.  I'd have to go back and check my notes.  It's either

4    the 16th or 17th, and I don't recall the difference.  I have to

5    go back and check my notes.

6    Q.   You don't recall -- you're not aware of -- do you know --

7    are you aware of what pricing sources JPMorgan uses?

8    A.   On one of the spreadsheets of third-party price, there

9    were some indicators of who the third-party pricing source was.

10   I don't recall who that -- it's on one of the spreadsheets.

11   Q.   You're unaware of whether custodians use pricing from the

12   prior day, is that right?

13   A.   As I just said, I have to check my notes.  It's either the

14   16th or the 17th.

15   Q.   Okay.  And finally one more question on the spreadsheet at

16   the back of 641, Movants' 641.  You'll see, for the half a

17   billion dollars of securities that even JPMorgan couldn't come

18   up with any kind of estimate on, they give -- it's different

19   potential valuations; they give it the unmarked amount at zero,

20   what would the total amount of the settlement securities be

21   worth, and then they give a value at ten percent of the half a

22   billion in unmarked securities and what the total amount of the

23   settlement securities would be, and then they give a value of

24   3.4 billion if you took the half a billion dollars in unmarked

25   securities at their collateral value.  And so they give a range

Page 144

1    from 2.8 billion to 3.4 billion as total market value for the

2    settlement securities.  And Barclays' valuation of these

3    securities on its acquisition balance sheet was actually over

4    3.7 billion, right?

5    A.   You know, I won't go back and check.  I'll take your word

6    for it.

7    Q.   Okay.

8         MR. THOMAS:  Let's go ahead and show BCI Exhibit 962.

9    Q.   And --

10   A.   Excuse me, what tab is that at?

11   Q.   This is tab 21.

12   A.   Thank you.

13   Q.   And bef -- (pause).  Are you aware that Barclays received

14   a list of securities on the morning of September 22nd that

15   JPMorgan wanted to transfer to Barclays and that Barclays was

16   concerned about the value of those securities?

17   A.   I don't recall that.

18   Q.   Okay.

19        MR. THOMAS:  If we could scroll down to the total on

20   the next page there.  And then blow up the grand total there.

21   Q.   You don't recall reviewing any testimony or facts

22   concerning -- about JPMorgan offering securities with a

23   JPMorgan collateral value mark of 8.5 billion dollars in order

24   to settle the -- what you referred to as Barclays' 7 billion

25   dollar claim?

Page 145

1    A.    I just don't recall that.

2    Q.    Do you recall there being testimony in this case about the

3    RACERS securities?

4    A.    I do.

5    Q.    Do you recall them being marked by JP -- these are Lehman

6    assets that were marked by JPMorgan at five billion dollars

7    that's in this list?

8    A.    I see that.

9    Q.    Do you recall there being testimony about various parties

10   indicating that those securities were worth nothing near that

11   amount?

12   A.    I just don't recall that.

13   Q.    Okay.  Do you think that JPMorgan was altruistically

14   offering Barclays securities that it thought were 1.5 billion

15   dollars more than the 7 billion dollars at issue?

16   A.    I certainly don't know what JPMorgan was doing, altruistic

17   or -- I don't know what their motives were.

18   Q.    And it would be unlikely for Barclays to irrationally

19   refuse 8.5 billion dollars in marked securities for a potential

20   7 billion dollar claim if Barclays really believed those

21   securities were worth that amount, correct?

22   A.    Well, that depends on what the alternative is.  You know,

23   if the alternative are -- is a different set of securities that

24   were worth more, if it's just a 7 billion dollar cash claim,

25   these are worth 8.5 billion, it would be economically

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 146

1   irrational to do that, yes.

2   Q.   Now, what you do, after taking the collateral val --

3   September 17 collateral value marks from JPMorgan, that's your

4   starting point for your calculation, and then you adjust that

5   using the observation of changes in the GFS system, which you

6   described earlier this morning?

7   A.   That's correct.

8   Q.   Okay.  And so if GFS was not being reliably updated, your

9   adjustment calculation would not be reliable, correct?

10   A.   If you constrain it to this set of securities, yes, that's

11   correct.

12   Q.   Okay.  And to the extent the values of assets --

13        MR. THOMAS:  Strike that.  Move on.

14   Q.   Are you familiar with testimony in this case concerning

15   that GFS may not have been accurately updated throughout the

16   week of bankruptcy?

17   A.   I am.  I'm familiar with testimony that it wasn't and

18   other testimony that it was.

19   Q.   Okay.  And let's go ahead and turn to tab 24, which is an

20   excerpt of the examiner's report.  Did you review the

21   examiner's report?

22   A.   I did.

23   Q.   Okay.  And at the last sentence on page 2006 --

24   A.   My document begins at 2008, if I'm looking correctly.

25   Q.   We're at tab 24, BCI Exhibit 997.

Page 147

1   A.   Yes, and --

2   Q.   Begins at 2008?  So let me ask you to look on the screen,

3   if you don't mind.  And --

4        THE COURT:  What's on the screen?

5        MR. THOMAS:  And on the screen should be the bottom of

6   page 2006.

7        And if we can now scroll up to the beginning of the

8   last sentence.

9   Q.   It says, "The examiner selected the September 12th, 2008

10  data set as opposed to the September 19th, 2008 data set, after

11  consultations with Lehman employees, Barclays personnel and

12  Alvarez & Marsal professionals, all of whom shared a common

13  concern that standard daily protocols were not consistently

14  followed during the week ending September 19th, 2008, as a

15  consequence of the atypical market conditions and the

16  extraordinary business disruption that occurred during that

17  week.  There was sufficient concern about the quality of the

18  September 19th data set to justify the selection of the

19  September 12th data set as the basis for the examiner's

20  analysis."

21       Did you consider that in the examiner's findings in

22  connection with your decision to rely on GFS updating to adjust

23  the September 17th collateral-value prices to September 19th?

24  A.    I did, and I also, as I stated earlier, checked those

25  numbers with -- using third-party prices for a subset, as well

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 148

1    as looking at different indices related to debt and asset-

2    backed securities, to gain a level of comfort that the decrease

3    in the GFS system, which was a negative 3.4 percent, was

4    reasonable to use.

5    Q.    If you would turn to tab 22 of the Barclays binder,

6    please.  And do you recognize this document?

7    A.    Yes.

8    Q.    Okay.  This was part of your backup or -- backup for your

9    calculations that you performed in calculating the 1.6 billion

10   dollar valuation difference?

11   A.    Correct.

12   Q.    Okay.  And if we could look at the columns that are the

13   JPM custodial price marks 9/17/08 and JPM calculated custodial

14   price marks 9/19/08.  And you say "Calculated custodial price

15   marks" because these aren't actually custodial price marks,

16   correct?

17   A.    As I -- correct.  As I explained before, that column is

18   equal to the September 17th column adjusted for the change in

19   the GFS prices between the 17th and the 19th.

20   Q.    And if we start looking down, so your September 17th value

21   that you're taking from the JPM collateral marks would be

22   220.477 for the first one?

23   A.    It's 220, comma, 477, yes.

24   Q.    Okay, comma, excuse me.  And the exact same value is found

25   in the next column.  Does that mean that there was no price

Page 149

1    adjustment between September 17th and September 19th for that

2    security?

3    A.    Yes.

4    Q.    Okay.  And so every time we go down these two columns and

5    those prices are the same, that means that there was no update

6    or change in the price of the security within GFS between

7    September 17th and September 19th?

8    A.    That's correct.

9    Q.    Okay.  And of the 900-or-so securities that you were able

10   to make this comparison for in GFS, about how many had actual

11   changes?  You have an idea?

12   A.    I don't.  I'm sorry, I do not.

13   Q.    Would you be surprised if close to eighty percent had no

14   change whatsoever?

15   A.    I don't have an expectation, so --

16   Q.    Okay.  So you didn't --

17   A.    -- I'm not surprised at any number you would tell me.  It

18   could be --

19   Q.    Okay.

20   A.    -- zero percent.

21   Q.    You made no analysis of --

22   A.    Correct.

23   Q.    -- how much the securities you were adjusting to September

24   9th actually had adjustments in GFS?

25   A.    I'm sorry, I just didn't hear the last part of your

Page 150

1    question.

2    Q.    You made no analysis of what percentage or how many values

3    that you were adjusting from 9/17 to 9/19 actually had changes

4    during that period of time?

5    A.    Correct.  I didn't look at the individual securities.  I

6    looked at the overall portfolio, which decreased by 3.4

7    percent.

8    Q.    Okay.  And you also said you attempted to apply a

9    liquidity adjustment to the -- after adjusting them, you took

10   the September 17th collateral-value marks that we saw in

11   e-mails; you then went to GFS to adjust them forward to an

12   adjusted 9/19 date; and then you took a liquidation adjustment

13   from those prices in order to bring them to mid, which is

14   market value under the accounting rules, correct?

15   A.    No.  You didn't state that correctly.  If you don't mind

16   if I state it correctly.

17   Q.    Please do.

18   A.    I used the liquidity adjustment that Barclays used and --

19   to adjust those prices to the bid price, or exit price.  I

20   thought I heard you say "mid" price.  So it's the bid price.

21   Q.    Right, I'll speak more clearly.

22        The -- if we could look back at tab 22 again.

23   A.    Yes.

24   Q.    And on the far right-hand column you have Barclays'

25   liquidity adjustment factor?

Page 151

1    A.    Correct.

2    Q.    Okay.  And so you would take the -- your adjusted

3    calculated 9/19 price and multiply that times this factor in

4    order to account for the liquidity discount and bring it down

5    to bid, correct?

6    A.    Correct.

7    Q.    Okay.  And every time we see "1" in this column, that

8    means that you did not take any liquidity adjustment, correct?

9    A.    That's correct, and it means that because, for the asset

10   class Barclays used didn't have a liquidity adjustment for that

11   particular type of asset.  These are Barclays' numbers, not my

12   numbers.

13   Q.    So the reason you didn't make a liquidity adjustment for

14   those securities in those classes is because Barclays didn't do

15   it?

16   A.    Well, I did make a liquidity adjustment using Barclays'

17   liquidity adjustment, which happened to be zero percent for

18   those securities.

19   Q.    Okay.  If Barclays had made a liquidity adjustment beyond

20   a multiplier of 1, which there's no adjustment, if Barclays had

21   made an adjustment, you would have also?

22   A.    Yes.

23   Q.    Okay.  Did you do any analysis of the nature of these

24   particular type of securities that are showing up as 1s in your

25   column, and an analysis of the securities in the market

Page 152

1  conditions, to independently determine whether some type of a

2  liquidity adjustment was appropriate?

3  A.   I did not.  I used Barclays' liquidity adjustment that it

4  used for its acquisition balance sheet, under the assumption

5  that there wouldn't be a disagreement about using those.  But

6  maybe I was wrong.

7  Q.   Did you do anything else to address the fact that you were

8  dealing with JPMorgan mid prices on those securities?

9  A.   I did not.

10 Q.   Okay.  So in these securities you simply took JPMorgan's

11 mid prices?

12 A.   Could you say that again?

13 Q.   On these securities, you simply took JPMorgan's mid prices

14 and brought them forward to 9/19?

15 A.   And then adjusted them for the liquidity discount --

16 Q.   Okay --

17 A.   -- that Barclays --

18 Q.   -- but on the securities with number 1, right, there's no

19 adjustment made to the value?

20 A.   The column that's titled "JPM Custodial Price Marks 9/17"

21 represent JPM's price marks on 9/17, their mid price marks.

22 Q.   Right, they're mids, right.  So I'm just confirming you

23 didn't do it.  You took mids -- JPMorgan's collateral-value

24 mids and you didn't make a liquidity adjustment for those where

25 see "1" in the right-hand column, and you've explained why you

Page 153

```
 1    didn't, right?

 2    A.   You want me to explain why I didn't?

 3    Q.   Let -- no.  Well, you've already explained it.

 4    A.   Okay, good.

 5    Q.   I'm just confirming you didn't do anything else to try to

 6    account -- or create a liquidity adjustment.

 7    A.   Correct.  The only thing I did for the liquidity

 8    adjustment is use Barclays' percentage liquidity adjustments

 9    for those asset classes.

10    Q.   But Barclays did do something to account for the liquidity

11    issue, didn't it?

12    A.   I'm sorry, I don't -- the an -- I don't know.  Not to the

13    best of my knowledge.

14    Q.   Okay.  Can we turn to tab 26, please?  This is BCI Exhibit

15    999.  Do you recognize this document?

16    A.   I do.

17    Q.   Is this the source document for your liquidity adjustments

18    that you applied?

19    A.   It looks like that, yes.

20    Q.   All right.  So these are liquidity adjustment factors that

21    you took and applied to your securities?

22    A.   Correct.

23    Q.   Okay, right.

24         MR. THOMAS:  And if you would scroll down.  And if we

25    could look where we see some of the 1s.
```

Page 154

1    Q.   Do you see where it says "The lower third-party price

2    utilized in place of bid offer"?

3    A.   I see that.

4    Q.   Is that news to you that what Barclays did was, instead of

5    doing a liquidity adjustment on those docs, to account for the

6    liquidity issue by taking a range of different prices and then

7    using the lowest price?  Were you aware of that?

8    A.   I don't recall reading those statements before.  I might

9    have; I just don't recall it.

10   Q.   Okay.  And are you aware that Barclays did something

11   that -- to that effect similar with the muni classes also?

12   A.   It's possible.  It's not stated on this document.  It

13   might be on another document.

14   Q.   Okay.  Let's go ahead and turn to tab 44, please, and this

15   is Movants' Trial Exhibit 143.  And under "Liquid Assets", up

16   at the top "Lehman Opening Balance Sheet; Barclays Capital

17   Valuation Methodology".  And I'm -- I'm sorry, I'm on the

18   second page.  And under "Liquid Assets", do you see the bullet

19   point "BO exception, corporates.  As per discussion with PwC,

20   new methodology for corps, BO", bid offer, "is to use a minimum

21   of available third-party data, much of it trace"?  You see

22   that?

23   A.   I do.

24   Q.   Were you aware of that?

25   A.   I don't recall it.

Page 155

1    Q.    Okay.  The next line down, "Munis.  Maintain the 9/19

2    values with embedded haircut, already disclosed and discussed

3    with PwC, methodology consistent with original file as this

4    asset class was extremely illiquid at the time, and little

5    transparency on a daily movement."  Do you recall considering

6    that?

7    A.    I don't recall.

8    Q.    Okay.  Do you realize -- do you have understanding of how

9    much value the securities that you did not take a liquidity

10   adjustment on add up to?

11   A.    I do not.

12   Q.    Would it surprise you if it were in the billions of

13   dollars?

14       (Pause)

15   A.    It'd be a long -- I don't have an expectation, I'm sorry.

16   It would take me quite a long time to start going through

17   the --

18   Q.    You did no analysis of how big an impact that has on your

19   numbers, correct?

20   A.    That's correct.

21   Q.    Okay.  And in your calculations in your charts, where you

22   referred to BoNY-adjusted 9/19 marks, you apply the same source

23   liquidity -- Barclays' liquidity adjustment list, correct?

24   A.    Yes.

25   Q.    Okay.  So the same issue applies to those values as well,

Page 156

1    right?

2    A.    To the extent there's an issue, yes.

3    Q.    Okay.  Other than adjusting the date forward to September

4    19th and applying a liquidity discount to adjust some of the

5    securities to bid prices, did you make any other adjustments to

6    JPMorgan's September 17th collateral-value marks that was your

7    starting point?

8    A.    I did not.

9    Q.    Okay.  Now, elsewhere in your report, you mentioned making

10   adjustments to go from dirty prices to clean prices.  Can you

11   explain what that means?

12   A.    It's to take out the accrued interest on debt securities.

13   Q.    Okay.  And it's appropriate to use clean prices in

14   estimating fair market value under the accounting rules,

15   correct?

16   A.    Well, the accounting rules require that you separate the

17   two, so the value of the security will have a value without the

18   accrued interest, and then there will be a separate value for

19   the accrued interest.  The total value of the security,

20   although it's separated, is with accrued interest of course.

21   Q.    But valuing the security itself, you have to have a clean

22   price, right?

23   A.    That's correct.  You have two assets.  If you have an

24   asset of this sort, one part of the asset would be shown as an

25   investment and a bond, for example; the other part of the asset

Page 157

1    would be interest receivable, accrued interest receivable.

2    Those two parts represent the sum of the value of the asset

3    plus the accrued interest, but accountants will separate those

4    two, that's correct.

5    Q.    Well, when you were placing values on securities for

6    purposes of your calculation, were those clean or dirty

7    prices --

8    A.    Which --

9    Q.    -- clean or dirty values?

10   A.    Which are -- which calculations?  For JPM?

11   Q.    Yes.

12   A.    I'd have to go back and check my notes.

13   Q.    Which would be appropriate?  Clean or dirty?

14   A.    For JPM, you'd want with accrued interest.

15   Q.    Why is that?

16   A.    Because, to the best of my knowledge, they're -- that

17   would be the total value of those securities.  You would -- if

18   you were an accountant and putting this in a financial

19   statement, you would separate that total value out.  Accrued

20   interest is a right to certain interest, and you have the value

21   of the asset, but the total value with -- related to that

22   security is with accrued interest.

23   Q.    Well, when you gave your values of the equities in the

24   initial inventory and the value of the settlement securities,

25   are you separating it out or are you giving the values as dirty

Page 158

1    prices?

2    A.    This issue isn't relevant to the equity.  This issue's

3    relevant to bonds that pay interest.  Equity's -- this isn't

4    relevant to the equity securities.

5    Q.    Okay.  With respect to the bonds that you -- when you

6    state your value of the settlement proceeds and include bonds,

7    does your -- does that lead to the 1.6 billion dollar valuation

8    difference?  Are those clean or dirty values?

9    A.    I just need you to restate question so I can hear it

10   again.  That's --

11   Q.    Sure.  Just -- it's --

12   A.    They can read it back, if you want.  I just didn't hear

13   everything.

14   Q.    When you state the value of the settlement securities, are

15   you stating -- with respect to bonds, are you stating them as

16   clean or dirty values?

17   A.    With accrued interest.

18   Q.    So, dirty?

19   A.    Yes.

20   Q.    You're giving dirty numbers?

21   A.    I believe so.

22   Q.    And your calculation of your -- the settlement securities,

23   the 1.6 billion is also predicated on your judgment that

24   September 19th prices are the best proxy for what you say is

25   the point in time at which closing occurred on September 22nd,

Page 159

1    is that right?

2    A.   Yes, that's correct.

3    Q.   Okay.  We'll come back to that.

4        If we could turn back to tab 22, please.  And this, again,

5    is your papers for your calculation of the settlement

6    securities, which led to the 1.6 billion.  And this was

7    produced to us very recently and we were trying to figure out

8    what prices you used for the settlement securities.  And this

9    document doesn't actually state prices but, to calculate the

10   price for the securities, I want to make sure we're doing it

11   right.

12       You would calculate the price for the securities by just

13   dividing the value by the par or notional amount, is that

14   correct?  And I think we have a pop-up here just to -- so we

15   don't have to get too embedded in the math.  And since this is

16   your document, I just wanted to confirm that this is the way we

17   try to discover what your prices are on your securities.

18       (Pause)

19   A.   That's a correct calculation, yes.

20   Q.   That's correct?

21   A.   Yes.

22   Q.   Okay.  Thanks.  So we've pulled that up.  And so the price

23   on this security, for example, would be -- the mid price would

24   be 76.78, correct?  Assuming our math is correct.

25   A.   I'll trust your arithmetic.

Page 160

1    Q.   Assuming our arithmetic is correct.  We're doing it the

2    right way.  Okay.

3         Let me ask that we now go ahead and turn to BCI Exhibit

4    992, which I believe is tab 23 of our binder.

5         (Pause)

6    Q.   This is a document produced in connection with Mr.

7    Slattery's work; it's entitled "Details of Valuation

8    Differences, Using Third-Party Prices".  And I'd like to turn

9    to page 186 of the document, which we're going to pull up; it's

10   a lot easier.  And what I'd like to do is highlight the same

11   CUSIP we just looked at on tab 22, which was your calculation.

12   I want to look at the same CUSIP, which is the tenth entry down

13   on the page, which is CUSIP 058521AH8.  And do you see there on

14   the right Mr. Slattery identifies what source for his pricing

15   he's using?  And he uses a price of $14.70?  Do you see that?

16   A.   He does.  That's a BoNY price, yes.

17   Q.   Okay.  Okay, that's right.  And let's put these two

18   numbers side by side, if we could.  So for the same CUSIP on

19   the same day, in your calculations you have a price for the

20   security of 76.78, and your colleague Mr. Slattery has a price

21   of 14.70.  Have you given any consideration to how much

22   conflict there is between your pricing and Mr. Slattery's

23   pricing?

24   A.   You state that it says Mr. Slattery's pricing, but for

25   these particular securities, Mr. Slattery used BoNY, Bank of

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 161

1    New York, another custodian, on September 19.  So, you know,

2    you're stating as if he's calculated a price.  He didn't

3    calculate this price.  This is a BoNY price.

4         And I did -- so, the question.  I'm going to change your

5    question, and if I change it inappropriately tell me.  But so

6    the question isn't about Mr. Slattery.  The question is did I

7    consider the difference between JPMorgan's prices and BoNY's

8    prices.

9    Q.   Sir, if you wouldn't mind, please answer my question.  Did

10   you consider the universe of securities for which you and your

11   colleague were at the same time putting different values for

12   purposes of your calculation?

13   A.   I did.

14   Q.   Okay.  And --

15   A.   And those universes are the BoNY prices and the JPMorgan

16   prices.  Those are the two prices of universe of securities.

17   Q.   Were you aware that there are many instances in which you

18   have prices quite different from your colleagues, on the same

19   security as of the same day, for purposes of your calculation?

20   A.   I am.

21   Q.   Are you aware of what the total -- are you aware of

22   whether that -- those differences add up to hundreds of

23   millions of dollars?

24   A.   I don't remember the exact number.

25   Q.   Okay, but that's something you looked at?

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 162 of 233

Page 162

1    A.   It is something I looked at.  As a matter of fact, I

2    addressed that issue in my declaration, which is in tab -- I

3    guess it's tab 3, and the last exhibit, X-1, which is the last

4    page of the declaration.  If you look at the last page of the

5    declaration, what I do is, for this reason, you know, for the

6    reason of how well are BoNY -- how well do BoNY prices map to

7    JPM prices.  Naturally, there could be differences at a

8    particular security level.  I asked the question for this

9    purpose "How do those two prices look against each other at a

10   large level?"

11        So I have, for the overlap betw -- for the 11,938

12   securities, the overlap between BoNY and JPM for those

13   securities is 8,047.  And if you look at the value in BoNY for

14   those 8,047 securities that are overlapping with JPM, the value

15   in BoNY is, on September 19th, 38.85 billion.  And for JPM, two

16   days earlier, because it's September 17th, it's 39.4 billion,

17   which is a difference of 1.28 percent.  So I specifically

18   looked at this issue, and it's in my declaration.

19   Q.   You specifically looked at the issue, the fact that you

20   had different prices for the same securities as Mr. Slattery

21   did on the same day?

22   A.   I specifically looked at the issue of using BoNY versus

23   JPM.

24   Q.   Okay.  That's a much broader issue.  I'm asking very

25   specifically the fact that you have a list of securities for

Page 163

1    which your prices are quite different than the prices from your

2    colleague; were you aware of that?

3    A.    I'm aware of that.

4    Q.    Okay.  And you thought there was no problem with, in your

5    calculation, your five billion dollar valuation adjustment

6    calculation, your calculating a price of seventy-six dollars

7    for the security; your colleagues calculating a price of

8    fourteen dollars for the security; you're off by roughly eighty

9    percent?  Does that mean that one of those two prices was

10   unreasonable?

11   A.    It means that they're different.  And is one of them more

12   accurate than the other?  Yes, it does (sic).  And what I --

13   and how do you go about using a custodial mark, many of them,

14   for a large portfolio of securities?  The question is do you

15   start cherry-picking one group versus another, or do you use

16   the entire set?  What we have done is use the entire set.  Mr.

17   Mr. Slattery, he used BoNY because those are -- BoNY is the

18   available price marks on September 19th for all these

19   securities.  JPM wasn't available on September 19th for all

20   these securities.  And I used JPM for September 17th for the

21   JPM inventory because BoNY wasn't available for those

22   securities, and what I did was to check that to make sure that

23   it was reasonable to do.  I compared at the portfolio level,

24   which is what you want to do with the entire portfolio, 8,000

25   CUSIPs.  They're within one percent of each other.  JPM's

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 164

1    higher than BoNY, but that makes sense because it's two days

2    later and we know that these securities dropped in price a

3    little bit.  I use a 3.4 percent reduction from GPS (sic).  So

4    that makes sense.  And you check it at the portfolio level.

5         I agree, cherry-picking and observation like this, there's

6    a difference and it looks strange, but there's no way to do

7    your analysis in a consistent way security by security.  You

8    look at what custodial marks you're going to use and see if at

9    the portfolio level they're reasonable or not.  And I did that.

10   Q.   You think it's just cherry-picking?  Are you aware that it

11   adds up to hundreds of millions of dollars in difference?

12   A.   For these securities.  But if you go across -- as I said

13   before, go across the entire portfolio -- I have it in my

14   declaration -- it's within one percent.

15   Q.   Let me come back to my specific question.  Do you believe

16   both of these prices for that security on that day could be

17   reasonable?

18   A.   Uh --

19   Q.   Without -- please, sir -- without a discussion of the

20   overall opinion.

21   A.   For that one security, both prices, of course, one's not

22   correct relative to the other.  One is more accurate than the

23   other.  Of course.

24   Q.   One is more accurate?  I'm asking could they both be

25   reasonable?

Page 165

1    A.   I don't think they're both reasonable at -- for this one

2    security.

3    Q.   So you understand that your calculation of five billion

4    dollars is using unreasonable price calculations?

5    A.   Again, you're cherry-picking individual securities rather

6    than looking at the entire portfolio.  At the entire portfolio,

7    these are absolutely reasonable to use.

8    Q.   And a couple hundred million dollars is, to you, cherry-

9    picking?

10   A.   You're isolating specific securities.  If you -- you know,

11   I'll look at a different set of securities, I'd give you a

12   different answer.  And on average, will it work out to be the

13   same?  And the answer is yes.  Take a look at the data.

14   Q.   Do you know which one is unreasonable?

15   A.   I haven't looked at the individual securities, so I don't

16   have an opinion.

17   Q.   Okay.  When you've had these conflicts, have you tried to

18   look and see which one is unreasonable and understand why it's

19   unreasonable and do any analysis with respect to that -- those

20   securities?

21   A.   Well, very early on, many months ago, we asked for

22   detailed information about the CUSIPs, contractual information,

23   so that we could look at the valuation of individual

24   securities, and it's my understanding Barclays refused to give

25   that detailed information.  So we don't have all the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 166

1   contractual information underpinning all of these CUSIPs.

2   Q.   So just -- you did not do any analysis of why they're

3   getting such a big difference in these valuations?

4   A.   Correct.  For these securities, we didn't have the

5   information from Barclays to do that.

6   Q.   Now, I'm going to pivot to the -- away from the settlement

7   proceeds to the 541 million dollar revaluation you do of the

8   equities that Barclays actually received in September 2008,

9   okay?  And there's two factors there; that's the -- your change

10  of the date from September 22nd to September 19th, and then a

11  different approach to the liquidity adjustment, correct?

12  A.   Yes.

13  Q.   Okay.  Now, do you agree that the question of which

14  measurement date to use, September 19th or September 22nd, is a

15  matter of judgment?

16  A.   Informed judgment, but a judgment of course.

17  Q.   Okay.  And do you agree that we will never know what the

18  actual value of the securities were at 12:01 a.m. on September

19  22nd?

20  A.   We -- it's clear that we know that -- we won't know the

21  actual trading prices that would have occurred, because the

22  markets weren't open.

23  Q.   Okay.  And therefore you agree that we have to use

24  something else other than actual trading prices?

25  A.   Well, we have to use adjusted trading prices.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 167

1    Q.   Did you make the judgment that September 19th was the best

2    measurement date to use?

3    A.   Yes.  I explained that earlier.  I can explain it again.

4    Q.   Well, in fact weren't you told by Movants' lawyers to use

5    September 19th?

6    A.   Movants' lawyers said that they believe the closing

7    occurred, effectively, on September 19th, yes.

8    Q.   Okay.

9    A.   I think it was based on Mr. Romain's testimony.

10   Q.   So in your report, you say that you chose September 19th

11   because Movants' lawyers told you to do it, right?

12   A.   I can go look at the -- that is --

13   Q.   Let's pull it out.

14   A.   That is there, and I don't remember the exact words I

15   used, but --

16   Q.   Okay.

17   A.   I don't know if those are the exact words, but I agree

18   with you, yes.

19   Q.   Well, do you recall whether you chose September 19th

20   because that was your judgment or because the lawyers told you

21   to use that date?

22   A.   The lawyers said that was the closing date.  I believe

23   that's what they told me and what's in my report.

24   Q.   Okay.  And, again, you did not analyze the value of the

25   equities delivered on September 22nd, using September 22nd

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 168 of 233

Page 168

1    prices, correct?

2    A.   I'm sorry, I don't understand the question.

3    Q.   You didn't analyze the value of the equities delivered on

4    September 22nd, using September 22nd prices?  You didn't do

5    some other analysis of prices of the value of those securities

6    using September 22nd prices, correct?

7    A.   That's incorrect.  I looked at Bloomberg prices on the

8    22nd and bid-ask spreads on the 22nd.  I explained some of that

9    analysis.

10   Q.   You calculated a value, for the 22nd, of the equities?

11   A.   I compared Bloomberg prices on the 22nd to the Barclays

12   prices, and I didn't make any adjustments.  I didn't have to do

13   a calculation, because I was using September 19th.

14   Q.   Okay.  So you --- right --

15   A.   And on September 19th, I used Barclays' prices as well

16   but, again, I also checked it with Bloomberg.

17   Q.   Simple question; just try to speed it up.  You didn't make

18   a valuation calculation, using September 22nd prices, of the

19   total value of the equities received by Barclays, correct?

20   A.   That's correct, although that's the number that Barclays

21   calculated.

22   Q.   Correct.  You emphasized that the valuation should be made

23   as of a specific point in time, at 12:01 a.m. on September

24   22nd, correct?

25   A.   Yes.

Page 169

1   Q.   But the assets were not actually conveyed to Barclays

2   then, right?

3   A.   I think different assets transferred at different times.

4   Q.   Okay, were any assets conveyed to Barclays as of 12:01

5   a.m. on September 22nd?

6   A.   At that point in time, yeah, I just don't recall.

7   Q.   Okay.  What if the parties had said that the assets should

8   be deemed conveyed as of August 1st, 2008?  Would that be --

9   that then be the appropriate valuation date, even if they

10  closed on September 22nd?

11  A.   Let me just make sure I understand.  You said October --

12  or what date did you give?

13  Q.   If the contract -- you understand, your basis for

14  calculating valuation date exactly at 12:01 a.m. on September

15  22nd was because there's a provision in the contract talking

16  about that being deemed the closing time, right?

17  A.   Well, it's not just the closing time; it's when -- these

18  are my words, not the exact words used there -- it's when the

19  risk and rewards of ownership transfer.  I forgot what the

20  legal terms are, but it's when the risk and rewards of

21  ownership transferred.  They transferred at 12:01 a.m. on

22  September 22nd.

23  Q.   But it didn't really transfer then, right?  You know, at

24  12:02, nothing had transferred?  So this is kind of a fiction

25  that comes from the contract?

Page 170

1    A.    Well, no, I disagree with that.

2    Q.    So you think Barclays had ownership and control of those

3    assets at 12:02 a.m. and --

4    A.    Well, it's one thing --

5    Q.    -- could do whatever they want with them?

6    A.    Sorry.  It's one thing to have physical control.  It's

7    another thing to have the rights of -- and the risk and the

8    rewards of ownership.  Those are two different concepts.  For

9    example, let's say -- let's assume that the securities

10   quadrupled in value at 12:02 a.m. on September 22nd.  I don't

11   think Barclays was going to pay back Lehman on that day.  So

12   the risk and rewards changed as of 12:01.  That's when

13   everything changed.

14   Q.    And what if the parties never closed?  What if the deal

15   never closed?  It wouldn't have adjusted, right?

16   A.    You threw me there with -- I'm sorry.

17   Q.    Okay, let me go back to my question.  If the parties had

18   said in a contract, Closing shall be deemed to occur August

19   1st, 2008, and it closed on September 22nd, would your

20   valuation date then be August 1st?

21   A.    In that effective closing was title transfer, so the risk

22   and rewards of ownership transferred, so that any change in

23   value was at that point going to transfer to Barclays' versus

24   Lehman's.  If the answer to that question's yes, then the

25   answer's yes.

Page 171

1   Q.   Assume the exact same language that you're citing to

2   and --

3   A.   Then the answer's yes.

4   Q.   Okay.  So what the parties say in their contract about

5   when the assets are deemed transferred trump reality for

6   accounting purposes, is that your opinion?

7   A.   Reality.  I'm using the word "reality".  The economics are

8   that at 12:01 a.m. the risk and rewards of ownership changed;

9   that's when you would value the asset.  The accounting rules

10  are what they are, and they can allow flexibility and do what

11  they do.  And I know Mr. Garvey is coming to talk about that

12  issue and the difference between the economics and the

13  accounting.  But from an economic perspective, 12:01 a.m. is

14  when everything happened.

15  Q.   Using September 19th prices fails to account for any

16  changes affecting the market between 4 p.m. on September 19th

17  and September 22nd, correct?

18  A.   To the extent there was a change in the value of those

19  securities between the close on Friday and 12:01 a.m., by using

20  September 19th closing prices, then you omit that factor.

21  Q.   Okay.

22  A.   However, as I showed earlier, the stock market wasn't

23  moving over the weekend.

24       MR. THOMAS:  Could we, please, pull up BCI Exhibit

25  993?

Page 172

1    Q.    Which is tab 43 in your binder.

2         (Pause)

3    Q.    And so the measurement date that you chose to value

4    securities was September 19th, which is that peak date up at

5    the top there?  This is a one-year run of the Dow Jones.

6    A.    Yes.  I see that.

7    Q.    Okay.  And is it true that changes in the market that were

8    affecting the market after 4 p.m. on September 19th would be --

9    would tend to be reflected in U.S. equity indices, like the Dow

10   Jones, in the early time of trading the following Monday

11   morning?

12   A.    No.  There would be show-up in the opening price of the

13   Dow.  The Dow is a very liquid index.  It would show up in the

14   opening price of the Dow.

15   Q.    You -- let's go ahead and go to tab 36, please, BCI

16   Exhibit 994.  And we can see the Friday, start of Friday, with

17   the Dow down below 11.50, and then it shoots way up on Friday.

18   And the difference between the close on Friday and the open is

19   very minimal.  And is it your understanding that any changes

20   that show up over the weekend in the Dow open price are

21   reflective of changes in the market or trading, or is it just

22   technical adjustments made after the close on Friday?

23   A.    It's calculated by the opening prices of those underlying

24   securities.  So it's -- it reflects the changes in the prices

25   of the underlying securities at the opening.

Page 173

1   Q.   Okay, let's say there's a big market movement, something

2   catastrophic happens in the market over the weekend or that

3   would affect the market over the weekend, and let's say the

4   market -- the Dow closes at 11,000 on Friday.  Do you think the

5   Dow will open -- the opening of the Dow will be at, you know,

6   say, 500 points less, or do you think the Dow will open at

7   about 11,000 and then immediately drop down after the opening

8   bell?

9   A.   Well, depends on your definition of "immediately".  What

10  has to happen is there has to be trades on the stocks

11  underlying the Dow for the Dow to drop.  So you won't see that

12  until you have an opening price or first trade price on all

13  these underlying securities.  The Dow's an index of specific

14  securities.

15  Q.   Exactly.  I'm talking about the opening price.  The

16  opening price would be essentially the same as the close on

17  Friday, correct?

18  A.   Not if there were trades on all the underlying stocks and

19  they dropped.

20  Q.   Right, that would be the first trade price, but the

21  opening price is about the same?

22  A.   No, I don't think that's correct.

23  Q.   Okay.  And can you see on this chart that almost half the

24  drop in the Dow on Monday, a drop in equity markets which

25  you've referred to in your reports, comes in approximately the

Page 174

1    first forty minutes?  Were you aware that a large part --

2    disproportionate part of the drop on Monday occurred in the

3    first forty minutes?

4    A.   I see that.  I've looked at this chart before.  The --

5    seems like most of the drop's happening at the end of the day.

6    I saw this before, yes.

7    Q.   Okay.  Doesn't that reflect -- that early drop right after

8    the opening reflect mark -- downward market pressure that

9    occurred after 4 p.m. on Friday?

10   A.   It depends when the individual stocks started trading on

11   the Dow stocks.  I'm assuming they traded very quickly, right

12   as opening prices -- if the opening prices for these individual

13   stocks would -- they should have reflected the change if there

14   was a big change on that day -- over the weekend, rather.

15   Q.   In any event, to the extent there was downward pressure

16   over the weekend, your using September 19th prices would not

17   capture that movement, correct?

18   A.   That is correct.

19   Q.   Okay.  So at your deposition -- I recall asking you if,

20   since you're saying your cutoff time is 12:01 a.m., whether it

21   would be -- if there was a trade in a security at 12:05 a.m.,

22   would that trade be something that you would consider.  And I

23   want to make sure your answer's still the same.  What is it

24   now?

25   A.   Of course not.  You wouldn't consider that, because it's

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 175

1   going to reflect new information and you don't want to use new

2   information.  Now, if you're telling me that the price was the

3   same or didn't -- or reflected the same information, well, then

4   you'd use it.  But if it reflects new information, of course

5   not; you wouldn't use it.

6   Q.   So within a liquid security that hasn't traded in weeks,

7   if that security trades at 12:05 a.m., according to your rule,

8   people valuing that security would not consider that 12:05 a.m.

9   trade, is that right?

10  A.   That's correct, assuming that there was new information

11  released between 12:01 and 12:05 that moved the price.

12  Q.   Even if that new information is reflective of facts and

13  circumstances that existed at 12:01 a.m., even then you can't

14  use the information?

15  A.   Well, let me restate it and answer your question.  Assume

16  there was a price at 12:05 a.m., or it could be, you know,

17  hours later, and all the information reflected in that price

18  existed as of 12:01 a.m.  If that's your question, then the

19  answer is Well, of course you could use it.

20  Q.   Okay.  In a liquid --

21  A.   But that's -- but you'd have -- but that's -- you have to

22  verify that.  And we know -- take a look here.  We know what

23  happened during the day:  Prices dropped during the day; you

24  show it yourself.

25  Q.   Isn't a close-in-time trade after a measurement date a

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 176 of 233

Page 176

1    good indicator of what's going on at the prior time?

2    A.   Conditional on no new information being released, of

3    course it is.

4    Q.   Okay, so in a liquid security that's valued at 1,000 on

5    September 1st, at 12:05 it trades for 200, you would still

6    value at 1,000 because the closing, in your view, occurred at

7    12:01 a.m.?

8    A.   No, I would look at what happened at 12:04, 12:03, 12:02,

9    and look at the information and what happened.  The -- did

10   something dramatic happen in -- before -- you know, with new

11   information between 12:01 and 12:05 that moved the price?

12   Q.   You don't consider the trade itself new information?

13   A.   Sure -- well, there could be -- some trades have new

14   information, some trades don't.  But, you know, you look at

15   what drove that price change.  You know, you just created an

16   example where the price dropped by eighty percent.

17   Q.   Okay.  Were you aware that PwC had actually suggested that

18   Barclays use September 22nd prices?

19   A.   It's not clear from reading the documents that they

20   suggested that.

21   Q.   Okay.  Let me ask you to turn to tab 19, which is BCI

22   Exhibit 870A.

23           THE COURT:  Before we address that document, I just

24   wanted to inquire as to your best estimate of how much time you

25   think you're going to be with the witness.  Without limiting

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 177 of 233

Page 177

 1    you, I just want to get a sense for purposes of taking a break.

 2            MR. THOMAS:  Your Honor, my best guess at this point

 3    would be about an hour and forty-five minutes.

 4            THE COURT:  About an hour and forty-five minutes?

 5            MR. THOMAS:  Yes, Your Honor.

 6            THE COURT:  Let's -- we need to stop today at 5:30,

 7    unless I change reporters, and I'm assuming there may be some

 8    redirect.  Is there a reasonable ability to complete the

 9    witness today?

10            MR. TAMBE:  My sense is there will be a reasonable

11    amount of redirect; at least an hour of redirect, if not more.

12            THE COURT:  In that case, I think it unlikely, with

13    two and three-quarter hours as our estimate, and with a need

14    for a break, that we're going to comfortably finish the witness

15    this evening.  So I'm going to suggest that we take a fifteen-

16    minute break now and then reserve redirect for tomorrow

17    morning, unless the timing changes between now and the end of

18    the day.

19            MR. THOMAS:  I'll work on that, Your Honor.

20            THE COURT:  Okay.

21            We'll take a fifteen-minute break.

22        (Recess from 3:40 p.m. until 4:02 p.m.)

23            THE COURT:  Be seated, please.

24    RESUMED CROSS-EXAMINATION

25    BY MR. THOMAS:

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 178

1   Q.   Professor Zmijewski, I believe we were at tab 19.  And I

2   believe you said you were not aware that PwC had suggested to

3   Barclays using the 9/22 date.  And I just wanted to direct your

4   attention to BCI Exhibit 870A from Mr. MacGoey at PwC, and he

5   writes -- a few lines down he writes "However, given the

6   turmoil in the markets, there was further downward pressure on

7   prices on the weekend, 9/20 and 9/21, and therefore we

8   suggested that this may be something that you would want to

9   capture."  Did you consider this comment by PwC?

10  A.   I did, and I don't know if what I said before was that I

11  didn't know.  I thought I said that I don't believe they did

12  suggest it.

13  Q.   You don't believe that they did?

14  A.   No.  What I'm reading here in this document is PwC first

15  says that there's turmoil in the markets, downward pressure on

16  prices on the weekend.  And keep in mind -- we should just read

17  the whole thing.  This is not about equities, right?  This is

18  about all the entire portfolio.  So, "given the turmoil in the

19  markets, there was further downward pressure on prices on the

20  weekend, 20 and 21, and therefore we suggested that maybe this

21  would be something you want to capture."  Antecedent of this, I

22  believe, is September 20th and 21.

23       Next paragraph, John Holloway spoke with Marcus, and I

24  forgot Marcus' last name, but I believe he's a P -- a Barclays

25  person:  "And our understanding was that you", you being

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 179 of 233

Page 179

1    Barclays I believe, "were going to use 9/22 closing prices, on

2    the basis that you can capture intraday prices and the S&P

3    opening is a poor proxy for much of", not all, "much of the

4    BarCap purchased.  We believe this is a reasonable approach.

5    However, it's important for management to document the

6    rationale."

7         So my reading of this is that PwC talked about the

8    weekend, and it was Barclays that decided to use the closing

9    price on 9/22. I don't see that PwC suggested they use the

10   closing price on 9/22.  And I've read this document before.

11   Q.   And this includes the equities, correct?  This is

12   referring to the equities too?

13   A.   It includes the equities but, first, you can't get

14   intraday numbers; you can for certain equities.  Some of these

15   stocks were publicly traded on the New York Stock Exchange.

16   You can -- NASDAQ, American stock exchange, you can get

17   intraday prices. So this is -- and it's saying much of -- for

18   much of what BarCap purchased, not all, and the equities is

19   something that you could make an adjustment for.

20   Q.   Now, the only way to capture the downward pressure on

21   prices on the weekend of 9/20-9/21 is to use September 22nd

22   prices, correct?

23   A.   Well, September 22nd is a day and it begins and it ends.

24   It doesn't mean you use the closing price.  The chart that you

25   showed for the intraday trading of the Dow shows a big decrease

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 180 of 233

Page 180

```
 1   right at the end of the day.  So that's captured, and that

 2   would bias the results that Barc -- the calculations that

 3   Barclays used, just using your own chart that you showed

 4   before.  So you'd have to back that off.  And although -- you

 5   know, what this says here is "the S&P opening is a poor proxy

 6   for much of", but it's not a poor proxy for equities.  It is

 7   equities.

 8   Q.   Okay.  Was it your understanding, in forming your opinions

 9   and conclusions, that there were -- Barclays could have somehow

10   used opening-day prices for September 22nd?

11   A.   Actually, for some of the securities it could have used

12   opening-day prices.  That's possible; not for all of them.  But

13   it certainly could back off from closing prices, what happened

14   during the day, by using indices.  It certainly could have done

15   that.

16   Q.   You cite Mr. Wachtell's deposition in your declaration, at

17   paragraph Sixteenth, as support for the proposition that

18   Barc -- for the proposition of not considering anything that

19   happens after the closing time.  And let's just look at that

20   briefly -- it's tab 3, at least in my binder, it may be tab 2

21   in yours -- your declaration, which is at paragraph 16.

22        (Pause)

23        MR. THOMAS:  And it's at paragraph 16.  If we could

24   maybe pull that up and bring the rest of the quote underneath

25   it so we can read it.
```

Page 181

1    Q.    You're quoting Mr. Wachtell.  The question to him that

2    you're quoting at length here is:

3    "Q.  If a willing buyer or seller does not have availability to

4    information at the time, is it fair to say that that would not

5    be information that they would be taking into consideration in

6    connection with the transaction?

7    "A.  Yes.  I think you've said the same thing.  The parties

8    have access to information that is available at a point in

9    time.  They don't have access to information that's available

10   or for something that's going to happen in two hours' time."

11   Q.    But isn't Mr. Wachtell here merely confirming the

12   linearity of time?  And you don't cite to his deposition

13   transcript where he explains this in a little more detail; so I

14   want to show you that part, which is --

15   A.    But you asked me a question.  You asked me a question.

16   Q.    Okay, embedded.  Yeah, isn't Mr. Wash -- okay, isn't Mr.

17   Wachtell simply saying that of course two people transacting a

18   transaction at a point in time will not know information that

19   doesn't exist at that time?

20   A.    Yes, and you need to understand the context of this

21   section of my declaration, the context and -- I won't take the

22   time to read paragraphs 12 through 20, but the context has a

23   variety of points to it; one of the points is, in real time --

24   so one of the points I make here is in real time there's no --

25   you don't have the ability to use information that doesn't

Page 182

1    exist.  And Mr. Wachtell's statement is consistent with that

2    part of this discussion in my report -- in my declaration.

3    Q.    Right --

4    A.    But then I also talk about what it means to use ex post

5    information and I cite to different valuation associations and

6    I cite to some accounting standards.  And, you know, so you

7    need to read all those paragraphs from 12 to --

8    Q.    So you accept now that --

9    A.    -- from 12 to 20.

10   Q.    So you accept that post -- ex post information can be

11   appropriate to use in a valuation process, such as the one at

12   hand where we're trying to value assets that came over, and

13   we're doing that valuation at a later point in time?

14   A.    I think I've said before, and those paragraphs are very

15   clear, you can always use information as long as that

16   information reflects the information that existed as of the

17   valuation point in time, which is 12:01 a.m. September 22nd.

18   Q.    Okay.

19   A.    I believe that this -- that whole section talks about that

20   issue.

21   Q.    Now, Mr. Wachtell did go on in his deposition to explain

22   that it is consistent with Barclays' practice and quite

23   reasonable to use ex post information if it helps inform a

24   valuation judgment, correct?

25   A.    You know, I just don't remember that specific testimony.

Page 183

1    I'm not -- believe me, I'm not saying he didn't say it.  He

2    said -- certainly made statements consistent with that, but it

3    was in a broader context.  I don't know if he was talking about

4    valuing things at 12:01 a.m.

5    Q.   Let me ask you to turn to tab 7, please.  And this is page

6    217, line 11 of Mr. Wachtell's declaration.  And we don't have

7    video, so I'm just going to read a couple questions and

8    answers:

9    "Q.  Does the fact that a market participant transacting

10   something cannot take into account future events which it

11   doesn't know -- does it necessarily follow that in estimating

12   the fair value of securities at a particular point in time, you

13   should ignore or exclude all information about market

14   conditions immediately after that point in time?

15   "A.  No, it does not follow.  I would say on the contrary.  I

16   was just mentioning and assessing fair value as of a point in

17   time.  We would generally consider all information that we have

18   both on a particular day but also in the time period leading up

19   to that day and the time period after that day.  So if we were

20   assessing as part of our monthly processing process, for

21   example, the valuations as of September 30th, we would consider

22   market information, market trades and quotes that are available

23   on the 1st, 2nd and 3rd of October, then, yes.  So we would, as

24   part of our normal practice."

25   Q.   And then he goes on to confirm that's his normal practice.

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 184 of 233

Page 184

1   And then at line 7 he's asked:

2   "Q.  So your auditors and regulators are aware of that approach

3   and take no exception to it?

4   "A.  That's correct."

5   Q.  Do you think Barclays' approach to valuation, as described

6   here by Mr. Wachtell, is incorrect?

7   A.  The way it's described correctly here -- or directly here,

8   it is incorrect.  There's no doubt in my mind it's incorrect.

9   Q.  Okay.  And you believe it's incorrect because you would

10  not take into account a trade two minutes after the measurement

11  date?

12  A.  Again, it has to do with -- you know, conditional on what

13  information?  You know, September 30th we're setting a price,

14  and I'm going to look three days later.  If nothing happened in

15  the marketplace, it was thinly traded security and there was no

16  new information since September 30th, well, there's nothing

17  wrong in doing that.  That's not what he's saying here.  He's

18  saying under any circumstances, no matter what happens, if it's

19  back in October 1987 and the market went down middle of the day

20  by twenty percent, you would still use that information,

21  ignoring the fact that the market went down after the date

22  you're trying to value it.  That's what he's saying here, and

23  that's incorrect.  Now, maybe he wasn't complete when he was

24  describing it and he would say, Well, you have to back off the

25  effect of subsequent information.  And so maybe he wasn't

Page 185

```
 1   complete but, as the words are written right here, this is

 2   incorrect.

 3   Q.    So as this description of Barclays' practice -- you

 4   disagree with their practice?

 5   A.    I -- this particular description?  I believe it's

 6   incorrect.

 7   Q.    And it's -- again, it's incorrect because he -- what he's

 8   saying is you can take into consideration information after a

 9   valuation date.  You know, do you disagree with that principle?

10   A.    No, but he didn't condition that on -- but excluding the

11   new information that arose after the valuation date, that's

12   what you need to do.  You have to do that.

13   Q.    Would you agree -- when you say "new information",

14   obviously anything that arise -- or about new information, even

15   if that information relates back to the valuation date, for

16   example, if the JPM e-mails say that the September 17th

17   collateral-value marks were unreliable, even though that new

18   information becomes available later, is that still information

19   that you would consider in valuing assets?

20   A.    I must not be explaining what I mean.  The new information

21   I mean is new information about setting security prices after

22   the valuation date.  So there's something that happened in the

23   marketplace after the valuation date.  You're constructing

24   information that is known after the valuation date but pertains

25   back to the valuation date.  That's fine.  But what's written
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 186

1   here is you use all information.  And it's just incorrect to

2   use information that became new information after the valuation

3   date.

4   Q.   So --

5   A.   It's just incorrect.

6   Q.   So you -- or the distinction I think you're trying to draw

7   is that it's okay to use information after the valuation date

8   if it relates back and informs circumstances as of the time of

9   the valuation date, but it's not okay to use it if it relates

10   to a subsequent development or event after the valuation date?

11   A.   Yeah, that's a fair statement.

12   Q.   Now, I'm afraid I have to dive into the liquidity

13   adjustment issue here.

14   A.   I can bring my charts back up if you like.

15   Q.   Well, we may have some different charts.

16       Now, again, everyone's in agreement you have to -- in

17   valuing the securities, you have to adjust down to bid prices

18   under the accounting rules to state fair market value, right?

19   A.   That's correct.

20   Q.   Okay.  And so you don't take issue with Barclays doing

21   that; it's just that you have a different way of calculating

22   that adjustment?

23   A.   Well, Barclays had a -- this isn't their general approach,

24   right?  This is an approach Barclays used -- so do -- if the

25   question is do I disagree generally with what Barclays does,

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 187 of 233

Page 187

1    the answer's no.  It's about the backdating process that they

2    use for this particular valuation.

3    Q.   Now, you used the word "backdating" several times here.

4    And do you recall Mr. Wachtell being asked about this

5    backdating issue and whether this is backdating?

6    A.   I'm sorry, I don't.

7    Q.   But you cite Mr. Wachtell's deposition when you talk about

8    Barclays backdating.  And do you recall Mr. Wachtell in fact

9    explaining at length that this was not backdating; this was

10   simply trying to use available reasonable information to come

11   up with an accurate valuation, something they've talked through

12   with the regulators and their auditors, and that's what they

13   do; he actually rejected the notion that it was backdating?  Do

14   you recall that portion of his deposition testimony?  Because

15   it wasn't cited in your report.

16   A.   I don't recall it specifically, but let me define

17   backdating for you.  And with my definition, backdating's

18   appropriate.  Backdating, using the definition I had in mind,

19   means you use information subsequent to the date, which was

20   December 18th -- date of that happened on December 18th of

21   2008, and you use that information to backdate -- going back to

22   a previous point in time, September 22nd.  That's what Barclays

23   did and that process I call backdating:  using subsequent

24   information and taking it back.  I call it backdating.

25   Q.   They're not --

Page 188

1    A.    Maybe that's -- you know, so --

2    Q.    They're not taking a --

3    A.    So let me just -- let me retract the word and just say

4    what Barclays did was use data on December 18th, roughly three

5    months later after the transaction closed, and they used that

6    information to calculate a liquidity adjustment on September

7    22nd.  If you don't like the word "backdating", doesn't matter.

8    I mean, that's what they did.  And I just tried to describe

9    that in one word.

10    Q.    Right, they didn't take a later value and just plug it in;

11    they used later values information to try to calculate as of

12    the valuation date, right?

13    A.    They didn't take later values.  They took later bid-ask

14    spreads.

15    Q.    Okay.  And Mr. Wachtell explained at length why they did

16    their procedure, right, why they went and took later bid-ask

17    spreads?

18    A.    Yes, I read that.

19    Q.    And that has to do with live data being better than the

20    nonlive historical data that you used, correct?

21    A.    I read his explanation and it just, you know, didn't all

22    hold.  I called and, you know, we called Reuters to really

23    understand what the live database is versus the historical

24    database.  And, you know, based on what was given in that

25    document for the December 18th calculation of the bid-ask

Page 189

1    spread, there's one bid-ask spread per security for that day.

2    Mr. Wachtell described looking during the course of the day and

3    looking for bid-ask spreads.  So I just couldn't map what he

4    said to the actual document that I received.  So there's more

5    information that we just don't have access to.

6    Q.   When you have live bid-ask spreads, which is what Barclays

7    used, you're able to ensure that the bid and the ask are

8    actually at the same time or come together in a transaction,

9    correct?

10   A.   I don't know that you can assure that it comes -- you can

11   assure that a bid-ask spread is at the same time -- you know,

12   maybe there's a transaction, maybe there's not, but you can

13   have contemporaneous bid-ask spreads --

14   Q.   Now, when you --

15   A.   -- which is what's relevant.

16   Q.   -- when you use historical information, like you did,

17   using Bloomberg prices or so forth, you can't ensure that the

18   bid and the ask you were looking at occur at the same time or

19   were part of the transaction, isn't that true?

20   A.   That's true.  It's the closing, the last bid, the last ask

21   and the last price is what's quoted, and that's what's quoted

22   in the historical Reuters, that's what's quoted in historical

23   Bloomberg, and that's what Barclays used for the 459 securities

24   on September -- I'm sorry, Septe -- yeah, September 22nd.

25   Q.   And --

Page 190

1    A.    That sample was historical.

2    Q.    And so if you have a security which has trading generally

3    in a bid-ask spread of about 1, say, a bid of 9 and the ask of

4    10, and then later in the day a bid comes in at 9.50 but

5    there's no corresponding ask and the bid changed because of the

6    markets moving, which you'll see is a last bid and ask of 9.50

7    and 10, and mistakenly conclude that that's the bid-ask

8    spread -- using your analysis, right?

9    A.    That's -- it's correct; that's what happens at the end of

10   the day.  You use the last bid and the last ask.  And it's

11   possible that they are not contemporaneous.  Absolutely, that's

12   possible.

13   Q.    Okay.  And do you know if in fact the pricing services you

14   use will report the inner spread when there are multiple bid-

15   ask spreads?

16   A.    I don't know.  No, I don't recall that.  I'd have to go

17   back and look it up.

18   Q.    You don't know one way or another as you sit here?

19   A.    I just don't remember.  Yes, I don't remember.

20   Q.    Okay.  And if they use the inner spreads, that would make

21   the process of using historical data inherently downward-

22   biased, correct?

23   A.    I'd have to think about that.  That's not clear to me on

24   the face of it.

25   Q.    Okay.  Now, in your data, you -- when you were calculating

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 191

1   your bid-ask spread, Barclays went back and looked at live data

2   and then tried to figure out how to adjust the live bid-ask

3   spreads they were looking at in December, back to the market in

4   September, right?

5   A.   That's correct, although the data they had for September

6   were historical bid-ask spreads, not live.

7   Q.   Right.  And what they did was they tried to get a sense of

8   looking at the -- for the securities they could find bid-ask

9   spreads for, they tried to compare for those securities which

10  were -- were they higher or lower and by what factor as

11  compared to December, right?

12  A.   I'm sorry, I just didn't understand --

13  Q.   Sure.

14  A.   -- what you said.

15  Q.   You've got December live bid-ask spreads, what they

16  consider good data; you've got what they need to adjust it to

17  September, because if markets were less liquid, more volatile,

18  in the second half of September, around September 22nd, the

19  bid-ask spreads would be larger.  So they have to adjust it for

20  the September time period, and they do that by looking at some

21  bid-ask spreads for securities they can find, and comparing

22  those securities' bid-ask spreads to their bid-ask spreads in

23  December, right?

24  A.   That's true.  In a very broad sense, that's true.

25  Q.   Okay.  And that's what you're trying to do.  Then you're

Page 192

1    looking at the factor, like if the spreads are basically half

2    as big in December; they then apply a factor to extrapolate

3    that to the larger population, and that's how they get the

4    factor which increases the liquidity adjustment of the observed

5    bid-ask spread in December, right?

6    A.    That's correct, except the bids weren't two times.  The

7    bids were less than one.

8          MR. THOMAS:  Can we actually look at --

9    Q.    First of all, before -- so you're not really challenging

10   the theory behind what Barclays was doing; rather, you're

11   challenging how the math was calculated, correct?

12   A.    No, that's incorrect.

13   Q.    Well, the execution --

14   A.    The arithmetic is correct.

15   Q.    But the concept --

16   A.    I checked that they're -- but it's the methodology that's

17   incorrect.

18   Q.    Okay, you're -- right.  The concept of trying to take --

19   accurately measure bid-ask spreads for September, you're in

20   agreement with that?

21   A.    No, what -- you know, you can do that.  I already

22   described that it's possible from Reuters, their own organi --

23   you know, their own supplier, their own vendor of data.  They

24   could have collected -- not for 459 observations -- for almost

25   all the securities that they have in December, they could have

Page 193

1    collected a very big sample of securities.  And so, you know, I

2    don't think that methodology was appropriate to use, because

3    they were ignoring data that existed.  But I was -- I

4    demonstrated, even using their methodology, that specific

5    methodology is flawed.  But, you know, I don't think that's the

6    way they should have done it.  As a matter of fact, if you

7    think about it, if you think about their exercise, instead of

8    using live -- if you wanted to understand, well, how do you

9    convert this, you'd use all the data on September 22nd; you

10   wouldn't use -- or September -- yeah, September 22nd.  You

11   wouldn't use some of the data.

12   Q.   Okay, there was no live data available on September 22nd,

13   right?

14   A.   Correct, but Barclays used historical data for 459

15   securities.  Barclays could have used historical data for 2,100

16   securities.

17   Q.   Right, and there's no -- when you say they could have, how

18   do you -- do you know how Barclays ended up at the little under

19   500 securities as a sample set?

20   A.   I don't.  I have a guess, but I don't know factually how

21   they did --

22   Q.   Okay --

23   A.   -- did it.  However, they -- I know -- what I do know is

24   they could have called Reuters up, and Reuters would have given

25   them the historical bid-ask spreads for 2,100 securities --

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 194

1    Q.    For --

2    A.    -- because that's what we did.

3    Q.    For 2,000 securities, is 450 a sufficient sample size?

4    A.    Well, it depends what you're trying to do.  You know, why

5    would you not get all the data when it's available?

6    Q.    If this --

7    A.    It costs 5,000 dollars or some price like that.

8    Q.    Now, the -- if these securities were the ones available,

9    do you agree that they are likely to be the more liquid

10   securities?

11   A.    You mean the 2,100?

12   Q.    No, the 450 that Barclays was -- obtained information for.

13   A.    I -- you know, I -- as I said, I could guess on why they

14   only had 459, but I --

15   Q.    Now, the question is --

16   A.    -- don't know.

17   Q.    -- the question is -- we've seen several times today, when

18   it's hard to go out and get pricing data for a lot of these

19   securities, the pricing data that you can get tends to be for

20   the more liquid securities, correct?

21   A.    That's correct, but maybe I'm not being clear.  On -- for

22   September 22nd, Barclays could have called Reuters up and said

23   Here's all of our CUSIPs, give me the data for all the CUSIPs,

24   and Reuters would have given it to them because they did that

25   for us.

Page 195

1    Q.   You have no understanding or knowledge about what Barclays

2    did and why in coming up with the 450 CUSIPs, and whether they

3    could have obtained more, isn't that correct?

4    A.   Well, the first part is correct.  The second part's

5    incorrect.  I know, since I did it, they could have called up

6    Reuters and collected that data.

7    Q.   And what exactly did you do?  Call up Reuters and just ask

8    them for -- what exactly?

9    A.   What we did for the data that was in my declaration:

10   called up Reuters and said Here's the CUSIPs, we'd like the

11   bid-ask spreads for September 22nd, 2008.  And they gave us all

12   the data that they have for September 22nd, 2008 and it

13   represented, if I recall correctly, ninety percent in value of

14   that entire portfolio.  And what Barclays used on December 18th

15   was -- I think it was eighty-six percent of the entire

16   portfolio.

17   Q.   Do you agree that the securities that are easier to attain

18   pricing information for tend to be the more liquid securities?

19   A.   I believe I said yes to that question.

20   Q.   Okay.  And the more liquid securities will have lower bid-

21   ask spreads, correct?

22   A.   That's correct.

23   Q.   So if Barclays took a sample and was only able to obtain,

24   for whatever unknown reason, at this point, whatever reason,

25   they took -- got a sample back of 450 securities, isn't it

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 196

1    likely that those will be more liquid securities, therefore,

2    being a skewed population, towards lower bid-ask?

3    A.    That's correct.  If you recall, I showed that for the 459

4    the bid-ask spread was .67 on average for the -- that 459 on

5    September 22nd.  That was the average on that day, which is

6    lower than, you know, the average for that whole portfolio of

7    1.93 three months later, but it's low.

8    Q.    Right.  So the big bid-ask spreads will tend to be the

9    illiquid securities that you can't get prices for, right?

10   A.    Yes, but let's be clear:  It's only ten percent of the

11   value of that portfolio.  It's not 459 and everybody else you

12   can't prices for or bid-ask spreads for.  You can get bid-ask

13   spreads and prices for ninety percent of the portfolio.

14   Q.    Would you agree that there is more volatility in the bid-

15   ask-spread ratios for illiquid stocks than liquid stocks?

16   A.    Bid-ask -- so the bid-ask spreads you're talking -- the

17   percentage bid-ask spreads --

18   Q.    Yes.

19   A.    -- is that what you mean?

20   Q.    Yes.

21   A.    Yeah, well, as we said before, the less liquid a security,

22   the larger the bid-ask spread --

23   Q.    In --

24   A.    -- defined in percentage terms.

25   Q.    In addition -- but I'm actually talking about the

Page 197

1    volatility of the bid-ask spread.  So, in addition, would you

2    see greater percentages -- declines in the increases with bid-

3    ask spreads with respect to illiquid securities than liquid

4    securities?

5    A.   Again -- it's an interesting question.  It's not something

6    I've ever looked at.  I don't know the answer to that.

7    Q.   Okay.

8    A.   If I understand what you're saying, it's really how does

9    the bid-ask spread move from one day to another, and more

10   liquid securities have more larger changes from day to day in

11   the bid-ask spreads than more liquid securities?

12   Q.   That's the question.

13   A.   I just don't know the an -- it's an interesting empirical

14   question, but I don't know the answer to it.

15   Q.   We're going to get to the math in just a minute.  But do

16   you agree that the selection -- Barclays selecting a smaller

17   sample size, to the extent that smaller sample size is

18   reflective of easier-to-get prices for more liquid securities,

19   that their choosing that smaller sample actually results, in

20   their methodology, in a smaller bid-ask-spread calculation than

21   it would if it chose a larger sample size?

22   A.   And I just want to be clear; when you say "bid-ask-spread

23   calculation", that's just the bid minus the ask under

24   percentage terms?  That's what you mean?

25   Q.   Yes.

Page 198

```
 1    A.    Yes.  Then the answer's yes.

 2    Q.    Okay.

 3    A.    It's not the ratio of two bid-ask spreads.

 4    Q.    Okay.

 5    A.    I would -- I wouldn't say yes if you mean the ratio of

 6    those two bid-ask spreads.  That I wouldn't say yes to.  But if

 7    it's just the rat -- the bid-ask spread, yes.

 8    Q.    Okay.  So aside from the math, the basis is, when you

 9    choose a smaller sample size that has the more liquid stuff,

10    you're going to be understating the bid-ask spread for the

11    larger population?

12    A.    "Understating the" -- yeah, well, it's -- yes, it's --

13    yes, that's correct.

14    Q.    Okay.  Now --

15    A.    And that's consistent with what I showed on the bar

16    charts.

17    Q.    Well --

18    A.    That's exactly what I showed.

19    Q.    Let's a look at this bar chart, tab 31, please, if we

20    could.  It's, I'm sorry, tab 31 of Movants' set of sixty-three

21    demonstratives.

22          UNIDENTIFIED SPEAKER:  If you want, I can put it up.

23    You want 31?

24          MR. THOMAS:  Sure.  Please.  Thank you.

25    Q.    Now -- acknowledge I'm trying to do complicated math on
```

Page 199

1    the fly here, but this -- your calculation of that 1.16 number

2    is a different mathematical approach than the one Barclays

3    took, correct?  Your methodology for calculating ratios versus

4    averages was different?

5    A.    The 1 -- the 1.16 percent?  No, it's just the same

6    calculation that Barclays does.

7    Q.    Well, didn't you count the --

8    A.    Just to be clear what it is, for the 459 securities on

9    December 18th, the same 459 securities that Barclays used on

10   September 22nd, for that 459 the average bid-ask spread is 1.16

11   percent.  It's just a fact.

12   Q.    I'm sorry, 1.16 percent is, you're saying, the average?

13   A.    It's the average bid-ask spread for those 459 securities

14   on December 18th, using Barclays' information.  This is right

15   off of Barclays' spreadsheet.

16   Q.    Okay, and is this the calculation you did or a number that

17   you took off Barclays' documents?

18   A.    There's a spreadsheet that calculates the Barclays bid-ask

19   spread, and I just, for the 459 on December 18th, calculated

20   the average of those.

21   Q.    Okay.  Let me go ahead ask that we put up a chart that we

22   just put together here.  This is a hypothetical involving ten

23   CUSIPs, and there's a September bid offer percentage column and

24   a December bid offer percentage column, and you see that nine

25   of the ten CUSIPs -- for nine of the ten, September is three

Page 200

1    times higher than December.  You see that?

2    A.    I see that.

3    Q.    Okay.  And the tenth one is 1.5 and then the December one

4    is much larger.  Do you see that?

5    A.    Yes.

6    Q.    Okay.  Now, if you just do an average of the September bid

7    offer spreads and an average of the December bid offer spreads,

8    you get an average bid offer spread for December of 1.18, much

9    larger than the average for September.  Do you see that?  You

10   follow the calculation?

11   A.    I do.

12   Q.    Okay.  So even though -- by taking that approach, even

13   though nine out of the ten securities are three times -- have

14   three times larger bid offer spreads, that you still end up

15   with a calculation that shows a higher bid offer spread in

16   December, correct?

17   A.    That's correct.

18   Q.    Now, if you take a different approach and average the

19   ratios, the 3, the 3 -- the nine 3s, and then the .15 down at

20   the bottom, it looks much different, right?  It's a 2.715.  It

21   actually looks a completely different calculation, right?

22   A.    That's correct.

23   Q.    Which approach did you do when you made your chart?

24   A.    When I made my chart or --

25   Q.    Yeah, your 1.16.

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 201 of 233

Page 201

1    A.    -- or when I did my calculation --

2    Q.    When you did your calculation.

3    A.    -- on the bid-ask spread?  My bid-ask-spread calculation?

4    Q.    Yeah.

5    A.    I didn't do any of these.  I didn't use Barclays' bid-ask

6    spread methodology at all.  It's unrelated to this.

7    Q.    Okay.

8    A.    If you go back to my -- so there are two parts to my

9    presentation on the bid-ask spread:  one that I calculated the

10   value using my methodology, and then I demonstrated in a

11   separate section, independent, that Barclays' methodology was

12   inappropriate.  And what I did to calculate my bid-ask spread

13   is I calculated the bid-ask spread for every security from

14   which I could get data on Bloomberg, and I calculated the

15   average and I applied that average of 1.48 percent.

16   Q.    Okay, now, I'm actually referring to the 1.16 number that

17   you had in your chart, not the numbers that actually appear in

18   your reports.

19   A.    The calculation of the 1. --

20   Q.    1.16.

21   A.    Yeah, well, here's the problem that you have:  You have

22   two sets of data here that both have ten observations.  You

23   know, you don't have the 459 analogy.  The 1.16 that I

24   calculated is -- it's a fact; it's the average of the 459 bid-

25   ask spreads in Barclays' spreadsheet for December 18th.  It's

Page 202

```
 1    just a calculation.  It's a fact.  There's no one else.  It's

 2    just a fact.

 3    Q.    It's a particular type of calculation.  So I'm just

 4    confirming the way you calculated it was -- was it one of these

 5    two methods?

 6    A.    It had nothing to do with what you're showing here.

 7    Q.    Okay, but the way you calculated it, was it taking a

 8    simple average?

 9    A.    It would be -- yeah, well, the simple average.  So it

10    would be either the .69 or the 1.18.  Those are two simple

11    averages.  But it would be analogous to that calculation,

12    except it was for that 459 securities on December 18th.

13    Q.    Okay.  Now, when -- for the purposes of your calculation

14    you actually did with respect to the valuation difference, in

15    your data set that you came up using Bloomberg historical

16    quotes, you had a number of negative bid-ask spreads, correct?

17    A.    Yes.  I can look up the number if you'd like me to.  It

18    was a small number, yes.

19    Q.    Okay.  And you excluded them from your sample set because

20    a negative bid-ask spread is nonsensical, correct?

21    A.    Yeah, that's correct.

22    Q.    Okay.  And one explanation for why you would see negative

23    bid-ask spreads is because you're using historical data; you

24    run into the problem of when a bid and ask are not occurring at

25    the same time, you can have market moves and very little traded
```

Page 203

1    securities; you may see historically reported an ask that is

2    far different in time from a bid, correct?

3    A.    You know, it's still on the same day, and so it depends on

4    what you define as far.  But they're not contemporaneous,

5    that's correct.

6    Q.    Okay.  And --

7    A.    That's right.  And that's the cause of those negative bid-

8    ask spreads, yeah.

9    Q.    And that's precisely the reason -- that problem you ran

10   into with negative bid-ask spreads, that's precisely the reason

11   that Barclays thought, in consultation with PwC, that it was

12   more appropriate to use live bid-ask spreads and try to adjust

13   that for September, correct?  Whether you agree with that or

14   not, that was their reasoning?

15   A.    It may be their reason.  There's nothing in the documents

16   that says that that was the reason, although Mr. Wachtell did

17   testify to that, keeping in mind that that's true for December

18   18th.  However, for September -- for September 22nd, they used

19   historical data.

20   Q.    In trying to calculate an adjustment factor to bring back

21   the live data --

22   A.    Right --

23   Q.    -- that's what you're saying?

24   A.    I call that backdating.  You don't like the word

25   "backdating", fine, but I -- yes.  To take it from December --

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 204 of 233

Page 204

1    Q.    Okay.

2    A.    -- back to September.

3    Q.    So the sample set, after excluding the negative bid-ask

4    spreads that you ended up on your calculation, you would agree

5    or tended to be -- over 1,500, you couldn't find any pricing

6    information for, right, of the -- you tried to look up

7    approximately -- well, do you recall how many CUSIPs you did?

8    A.    Oh --

9    Q.    Oh, I got it.    37 -- about 3,700 CUSIPs.    And for about

10   1,500 you couldn't find any pricing information for, does that

11   sound right?

12   A.    One second.    I need to look at my --

13   Q.    Okay.    It's page 12, footnote 35 of your report.

14   A.    I'm looking for -- well, it's in my -- in my declaration.

15   Since you asked me some questions in my deposition, I provided

16   that, you know, exact calculation of the sample, and that's in

17   Exhibit III-1 in my declaration.    And the equities are 3,731,

18   for which there were, at the end, 2,106 prices.    So of that

19   portfolio, of the total portfolio from -- on September 19th of

20   the total portfolio of 3,731, I could identify -- not prices --

21   bid-ask spreads and prices.    So you could have many more

22   prices, but you don't always get bid-ask spreads.    So you'd

23   have to get a bid and an ask and a price, and for that I have

24   2,106.

25   Q.    Okay.    So --

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 205

1   A.   And just to put that in context, that represents eighty-

2   eight percent of the total value.  And Barclays, on December

3   18th, on its calculation, used 2,103 and that value was eighty-

4   six percent.  So I had a slightly bigger sample than they did,

5   with a slightly bigger valuation percentage than they did.

6   Q.   I'm trying not to solicit long answers, so I'll try to be

7   more precise in my questions.

8       Question is were there about 1,500 securities for which

9   you couldn't obtain bid-ask spreads?

10  A.   I couldn't obtain bid-ask spreads and prices, correct.

11  Q.   Okay.  For about 1,500, give or take?

12  A.   About 1,500, which is the same number Barclays couldn't

13  have bid-ask spreads for on December 18th.

14  Q.   Okay.  And you agree that the ones that you couldn't

15  attain that information for are likely to be the more illiquid

16  securities?

17  A.   I'm going to break that group up into two buckets, okay?

18  Bucket number 1, there's no transaction prices whatsoever; so

19  we don't have a bid, we don't have an ask and there aren't

20  prices.  So that's one group.  In that case, I would agree with

21  you there's not a price.  Another group is where there's no

22  bid, no ask, because they don't have the data, but you do have

23  a price; in there, I would disagree with you.

24  Q.   Okay.  The -- you would agree that your sample -- by

25  creating your sample from the universe of securities, for which

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 206 of 233

Page 206

1    you can obtain bid-ask information, skews it towards securities

2    with smaller bid-ask, correct?

3    A.   It's true for the sample of the eighty-eight percent.

4    Those bid-ask spreads for the eighty-eight percent -- or

5    Barclays' eighty-six percent, would be smaller than the group

6    for which there aren't any prices whatsoever.  Yeah, of course.

7    Q.   And you also excluded from your sample set the largest

8    bid-ask spreads, the largest observed bid-ask spreads; that is,

9    approximately 1,500 you couldn't find bid-ask spreads for?  And

10   then you also excluded about 147 of the largest observed bid-

11   ask spreads because you considered them outliers and above, I

12   think, 50 percent?

13   A.   That's incorrect.  What I did was -- you're correct from

14   the per -- you look surprised.  It is correct that 147 had bid-

15   ask spreads greater than 50 percent, and I did not use those,

16   but it's not because that was my assessment that they were

17   large.  Barclays has a rule, and I cite to the document -- I

18   can look for it in -- I think I cited it again in my

19   declaration, but it's Bar -- that was Barclays' approach.  That

20   wasn't my approach.  I'll see if I can find it.

21   Q.   In any event --

22   A.   It's on page 19 of my declaration.  What Barclays did was,

23   you know, not include an average -- a bid-ask spread greater

24   than fifty percent.

25   Q.   Okay.  In any event, you excluded the largest observed

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 207 of 233

Page 207

1   bid-ask spreads, correct?  Putting aside what Barclays did.

2   A.   I followed Barclays' approach on this, yes.

3   Q.   Okay.

4   A.   I followed their same approach.

5   Q.   So you both excluded the largest --

6   A.   Yes.

7   Q.   -- bid-ask spreads --

8   A.   Correct.

9   Q.   -- correct?  And that had the effect of reducing the bid-

10  ask-spread calculation and therefore increasing the valuation

11  of the securities, correct?

12  A.   That's correct, yes.

13  Q.   Okay.  So you have a sample size which is skewed towards

14  smaller bid-offer spreads, and you have the practice of

15  excluding the largest observed bid offer spreads, and both of

16  them result -- those two factors result in higher valuations

17  for the securities, correct?

18  A.   Correct, and that -- and as you said before, that's what I

19  did.  I did that because of Barclays, so I followed that

20  approach that Barclays was --

21  Q.   You followed Barclays when they were doing something that

22  resulted in a higher valuation for the securities?

23  A.   No, I followed Barclays when it made sense and -- or I

24  found it to not be completely incorrect.  And with the scaling

25  factor for backdating, it's just wrong.

Page 208

1    Q.    You didn't follow Barclays when they, for example, took

2    bid-offer adjustments to things like munis, and you used the

3    factor of 1 instead that we discussed earlier today?

4    A.    What we discussed earlier today?  Correct.  That's

5    correct, yes.

6    Q.    Yeah.  Okay.  A liquidity discount is a discount that you

7    would apply to the price of a security to account for the

8    illiquid nature of the security, right?

9    A.    Well, that sort of -- you know, the conclusion there is

10   that every security's illiquid.  It's not.  You know, you can

11   apply a liquidity discount to a very liquid security.  Barclays

12   applies for New York Stock Exchange-traded securities; they

13   apply a liquidity discount to take it from the mid price to the

14   bid price.  That doesn't mean it's not liquid.  You know, it's

15   an adjustment to go from the mid price to the bid price.

16   Q.    Okay.  And you would do that when you're valuing a

17   security, correct?

18   A.    That's the common practice, yes, it is.

19   Q.    Okay.  And including that liquidity discount in the

20   valuation, adjust the value to fair market value under the

21   accounting rules, right?

22   A.    I'm sorry, I just missed the first part of what you said.

23   Q.    Sure.  And including that liquidity discount in the

24   valuation, adjust the value to the -- to fair market value

25   under the accounting rules, right?

1   A.   That's right, fair value in the accounting rules is a bid

2   or exit price, which means you need to adjust the mid prices to

3   the bid prices.

4   Q.   Okay.  Now, applying a liquidity to adjust to an exit

5   price or bid price does not involve taking a block discount,

6   right?

7   A.   That's correct.

8   Q.   Okay.  So that does not take into account any impact that

9   the size of the position someone is trying to sell is likely to

10  have on the average price attained in selling the position?

11  A.   Well, that assumes they're selling the entire position in

12  a block rather than selling the security over -- in the normal

13  course of business in small transactions.  So there needs to be

14  some type of liquidity -- or liquidation pressure on them to do

15  that.

16  Q.   There's a different concept; when you're doing the

17  discount -- the liquidity discount, you're not taking into

18  account the size of the positions you're selling, right?

19  A.   No.  You're assuming that it's a small amount of volume.

20  So you are taking -- and consider the size.  Right, you do?

21  You're assuming that there's a small amount of volume, that

22  it's not a big block.  So you take it into account that way.

23  Q.   Okay.  And do you agree there can be an impact on price

24  when a large position is sold off even in an orderly manner?

25  A.   Well, I agree with everything you said until you said

Page 210

1    "even in an orderly manner", because I don't think selling a

2    big block is the ordinary manner.  I think -- you know, because

3    of -- it is an empirical fact, you sell a big block of

4    securities, you get a lower price because that big-block sale

5    has at least a temporary effect on price.  So you get that

6    automatically.  So my view of the ordinary course would be you

7    don't do that; you sell it in smaller blocks so you don't have

8    to pay that cost.

9    Q.   So the market value -- what the market value might be

10   could be dependent upon the volume of assets you are selling,

11   correct?

12   A.   I don't disa -- I don't agree with the way you stated

13   that.

14          MR. THOMAS:  Okay.  Strike that.

15   Q.   Let me try a different -- the amount of money that you're

16   actually going to realize on a sale may be less than market

17   value under the accounting rules if you're selling a large

18   position?

19   A.   Well stated.

20   Q.   Okay.  So accounting exit prices, the accounting notion of

21   fair market value, do not necessarily reflect what Barclays

22   could have actually realized in the marketplace if it were to

23   sell some of these Lehman assets that it acquired in the

24   transaction?

25   A.   I don't agree with that.  It's an incomplete statement.

Page 211

1    Q.    Have you studied it?

2    A.    Well, I mean, if they were selling one-off securities -- I

3    think you're conditioning on some state -- I think you're

4    thinking about having some big block in your statement; maybe

5    not.

6    Q.    What I -- what the question was, could it actually.

7    Might -- depending on Barclays, might actually realize less

8    than what the accounting rules say is market value if it were

9    to sell some of the assets that it received from Lehman, if

10   they were selling them in large positions?

11   A.    If they sell in a large position, there would be a block

12   effect and it would be below -- it would generally on average

13   be below the fair market value, yes.  That's an empirical fact.

14   Q.    Okay.  Do you think any buyer in September of 2008 would

15   have paid the accounting market value for all of the Lehman

16   assets that transferred to Barclays?

17   A.    In September of 2008?

18   Q.    Yes.

19   A.    On --

20   Q.    September -- the week of September 15th.

21   A.    The week of September 15th?  Based on my understanding --

22   that means selling the company essentially, right?  It's all

23   one transaction.  You wouldn't just sell those securities

24   without a combined transaction.  And I'm not aware of any other

25   bidders at that point in time.

Page 212

1    Q.    The term -- in your field, the term "discount" has many

2    different meanings?

3    A.    Yes.

4    Q.    Okay.  And to understand what the term "discount" means,

5    you have to have more descriptors; you have to have a

6    description of discount from what to what, right?

7    A.    Correct.

8    Q.    Okay.  Now, when you estimate prices, there is a

9    distribution of prices, correct?

10   A.    For a security?

11   Q.    For a security.  For example, when you're -- in your

12   valuation that you come up with in your expert report, when

13   you're estimating a price as of 12:01 a.m., right, you're not

14   looking at an actual transacted price at 12:01 a.m. on

15   September 22nd; you're making an estimate, right?

16   A.    That's correct.

17   Q.    When you're doing those kind of estimates, there is a

18   distribution of prices, correct?

19   A.    That's correct.

20   Q.    Okay.

21   A.    And distribution -- you know, probability distribution of

22   different prices.  Any time there's an estimate, it has a

23   probability distribution associated with it, yes, it does.

24   Q.    And did this distribution of prices widen greatly in

25   September 2008 because of the much more volatile market?

Page 213

```
 1    A.    Interesting question.  So let's take a -- how liquid is
 2    the security?  Let's take a New York Stock Exchange equity
 3    that's in that portfolio; no, I don't think so.  Let's take a
 4    privately held or a very thinly traded or rarely traded equity,
 5    then I would say yes.
 6    Q.    So I guess your answer is, for some securities,
 7    particularly less-traded securities, you would agree that the
 8    distribution on prices widen greatly in September 2008?
 9    A.    Again, we have to get a definition of "greatly", but it
10    definitely widened, yes.
11    Q.    Okay.  And have you done anything to quantify the degree
12    of uncertainty surrounding any of the marks you estimate in
13    this case?
14    A.    I have not.
15    Q.    Have you estimated a confidence interval?
16    A.    I have not.
17    Q.    Okay.  Do you believe the confidence interval would have
18    widened during the period of September 2008, confidence
19    interval for price estimates?
20    A.    Maybe we're not on the same page, because when you say
21    "the distribution" and now you're saying "confidence interval",
22    to me they mean -- that's -- I was talking about the same
23    thing.  So this is the same question you asked before, and I'm
24    not sure if you -- maybe you don't mean the same question.
25    Q.    Does -- well, let me ask you, does confidence interval to
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 214

1   you mean the same thing as distribution probability?

2   A.   Well, as I said, it's a probability distribution of

3   securities from -- that's where you get the confidence interval

4   from, yes.

5   Q.   Okay.

6   A.   So they're one in the same thing, to me.

7   Q.   Okay.  And can you quantify a ninety-five percent

8   confidence interval around your value estimates?

9   A.   I did not.

10  Q.   Now, you -- in part of your windfall calculation, I think

11  you call it, you made a 103 million dollar adjustment to

12  Barclays' OCC trading liabilities by moving the date from

13  September 22nd to September 19th, is that right?

14  A.   Yes.

15  Q.   Okay.  And you didn't make any corresponding adjustment on

16  the asset side that related -- you know, margin, because you

17  believed that those -- the asset numbers were already from

18  September 19th, is that correct?

19  A.   That's my understanding, correct.

20  Q.   Okay.  And certainly you wouldn't have done that if you

21  believed the asset numbers were actually from September 22nd,

22  right?  That would be wrong?

23  A.   It had -- if the assets were also with September 22nd,

24  then I would have adjusted the assets as well on September

25  22nd.

Page 215

1    Q.    You got to keep them on the same date, right?  You can't

2    measure trading liabilities on the 19th and assets on the 22nd

3    just because that leads to a particular result, right?

4    A.    You could do that.  I wouldn't do it, but --

5    Q.    Okay.

6    A.    -- you could do that, absolutely, yes.

7    Q.    Okay.  And you concluded that, based on looking at an

8    e-mail that you cite in footnote 44 of your report, at page 15,

9    and I'd like for you -- you're welcome to come back to your

10   report, but I'd for you to look at tab 14, which is BCI Exhibit

11   263.

12        (Pause)

13   Q.    And is this the -- document tab 14, is this the e-mail

14   that was the basis of your conclusion that Barclays valued

15   their trading liabilities -- OCC trading liabilities as of

16   September 22nd, but the related assets as of September 19th?

17        (Pause)

18   A.    I apologize.  I was reading and I did -- I just didn't

19   hear your question.

20   Q.    Is this the document that your based your understanding --

21   gained your understanding that Barclays had valued the

22   trading -- OCC trading liabilities as of September 22nd, but

23   the assets as of September 19th?

24   A.    I'm trying to match up Bates numbers, and if you look at

25   my footnote 44 it's -- the Bates numbers, the last three digits

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 216 of 233

Page 216

1    are 233, 238, and this seems like it's 277, which is the second

2    cite.  But the first cite for the liabilities, I think, is 233

3    to 238.  It's been a while since I've looked at that level of

4    detail in my report, but I'm just --

5    Q.   I see a cite to BCI Exhibit 263, at the last line of your

6    footnote 44 of your report.  And it is tab 14 of your binder,

7    footnote -- BCI Exhibit 263.

8    A.   Yes, and that refers to that sentence.  I determined that

9    they reflect the balance on 9/19 by reviewing an e-mail 9/21,

10   but there's a previous memorandum that's in the first line of

11   that footnote, and I believe that memorandum is relevant.

12   Q.   True.  My question to you, though, is about the

13   determination that the balance on -- that the OCC assets on

14   Barclays' acquisition balance sheet reflected the balance on

15   9/19 as opposed to 9/22, and what you cite for that is 263.  So

16   I'm just asking you is the 263 the document from which you came

17   to conclude that Barclays used assets for September 19th?

18   A.   It's a long time since I read this footnote.  Based on my

19   reading of the footnote right now, I believe it's the first

20   document, not the second document.

21   Q.   Okay.  Do you recall -- you see in your footnote that the

22   basis for your concluding that in the last sentence of your

23   footnote, attaching the OCC statement, detailing cash of 1.82

24   billion, letters of credit of 252 billion, and treasuries with

25   a market of -- I guess, revised, it's now 967 billion, for a

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 217

1    total of 9 -- for a total 9/19 balance of just over 2.3

2    billion?  And let me just understand what -- you're saying 2.3

3    billion in OCC assets on the acquisition balance sheet.  You're

4    then looking at these documents -- this document and seeing

5    amounts of 1.082 billion and 252 million and over 900 million;

6    you're adding them and you're saying that that's close to the

7    2.3 billion on Barclays' acquisition balance sheet, so you

8    assume that they're using the 9/19 values for their acquisition

9    balance sheet, is that right?

10   A.   You know, that discussion is about the assets.  I think

11   it's -- my recollection, and, again, it's -- there are many

12   months since I wrote this; my recollection is the first

13   document, that memo that details this, with the date, it's --

14   I'm sorry, what tab, again, is this?  14, you said?  Is that

15   correct?

16   Q.   Yeah, tab 14.  And if you want to look through tab 14, you

17   can find the numbers, you know, the 1.082 billion letters of

18   credit.  But let me just focus on -- let me try to move this

19   along.  The -- let me just -- the concept was no one told you,

20   from Barclays, what date they used?  You inferred that from

21   adding up some numbers and thinking that's about the 2.3 on the

22   balance sheet, right?  I mean, that's what you describe in your

23   footnote?

24   A.   No, I believe that's wrong.  I believe -- it's stated

25   specifically in that first document.  If you have the first

08-13555-mg   Doc 11862   Filed 09/22/10   Entered 10/07/10 15:50:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 218 of 233

Page 218

1   document, I'll take a look at it, see if I can find it quickly.

2   Q.   You know, your counsel will be able to provide that for

3   you if you think that document explains this.

4   A.   Well, my answer to your question is I bel -- I would

5   answer no, that's not what I did.  I believe the first document

6   spells out the dates on which they calculated those two

7   numbers.

8   Q.   Then why in your last sentence do you say -- and the last

9   two sentences are "I also reviewed the 2.3 billion of OCC-

10  related assets as presented in a Barclays opening balance

11  sheet.  I determined they reflect the balance on 9/19 by

12  reviewing an e-mail dated 9/21 attaching a 9/19 OCC statement

13  detailing the cash", on and on, and then you cite BCI Exhibit

14  263.  And lo and behold, that's an e-mail with those OCC

15  attachments and with those numbers.

16  A.   And I agree with that, and I'm -- I agree that you read it

17  properly, correctly, and I also believe -- I've reviewed the

18  memorandum regarding the valuation of OCC trading liabilities.

19  And I believe, in that memorandum, if my recollection is

20  correct, it spells out specific dates when the assets were

21  valued and the liabilities were valued, and the liabilities

22  were valued on 9/22 and the assets were valued on 9/19.  That's

23  my recollection of a document.

24  Q.   Let me ask you to turn to page -- tab 15, please.  And,

25  now, do -- whether it's spelled out or not, do you agree that

Page 219

1   you thought that the numbers in your last sentence added up to

2   the 2.3 billion under Barclays' acquisition balance sheet?

3   A.   Yes.

4   Q.   Okay, so we got that concept down.  Now, if we can --

5   let's see if we can find those numbers on tab 15.  And they're

6   close.  On the date for September 22nd -- and do you

7   understand, by the way, that the -- on these kind of sheets

8   with the September 22nd actually reflects the 9/19 values?

9   A.   I apolog -- what page are you on on this document?  I'm

10   trying to find it and I --

11   Q.   It's page -- at the bottom, it's page 7.

12       (Pause)

13   Q.   Let me try to shortcut this for the -- did you review Mr.

14   Romain's deposition testimony?

15   A.   Yeah, I have.

16   Q.   Okay.  And if you could turn to tab 9, please, and page

17   107, lines 6 to 15.

18       (Pause)

19   Q.   And do you see Mr. Romain testifying here that Barclays

20   did not recognize the letters of credit for accounting

21   purposes?

22   A.   What pa -- did you want me to look at -- I'll read the

23   whole thing?  Okay.

24   Q.   Yeah:

25   "Q.   Okay.  And if you could state for the record what the

Page 220

1   other items are, the other two items?

2   "A.  The other two items are principal and interest on the

3   unencumbered assets, which are summarized in cell C11 of

4   Exhibit 377A.  And also -- and also the collateral against

5   customer positions, which held in the form of letters of

6   credit, were not recognized for accounting purposes."

7   Q.   Were you aware that Barclays did not include the letter of

8   credit on their acquisition balance sheet?

9   A.   I'd have to go back and look at my notes again, yeah.

10  It's a very detailed question.

11  Q.   Okay.  If you take out the letters of credit, the 252

12  million, from your calculation to 2.3 billion, it no longer

13  adds up to 2.3 billion, right?

14  A.   I'll agree with that.

15  Q.   Okay.  Did you look at the asset values on September 22nd

16  to see if they added up to 2.3 billion, the number on the

17  acquisition balance sheet?

18  A.   I just don't recall.

19  Q.   Okay.  Let me ask you to turn, then, to BCI Exhibit 1000,

20  which is tab 45.

21  A.   Did you say 4-5?

22  Q.   No -- 45, yes.

23       (Pause)

24  Q.   And this is a PwC memo discussing the OCC issue.  And

25  we've made a clear copy as BCI Exhibit 1000A, which replicates

Page 221

1    the chart in 1000, which is not very clear.  And the 2.3

2    billion dollars on the acquisition balance sheet was actually

3    2.29 billion; do you recall that?

4        (Pause)

5    A.    I see that, yes.

6    Q.    Okay.  And do you see that this is adding up to the 2.29

7    billion without the letter of credit but with amounts that are

8    different from the amounts you cite in your footnote?

9    A.    I see that they're different.  What's the source of this

10   document again?

11   Q.    This is a PwC work paper explaining how the acquisition

12   balance amount was calculated for the OCC --

13   A.    Is there --

14   Q.    -- the trading liabilities and assets.

15   A.    Is there a Bates number on it, so I could look in my

16   document?

17   Q.    Well, there is a Bates number, but I don't want to take

18   the time to look in the document.  Do you recall seeing this?

19   A.    I just don't recall.

20   Q.    You don't recall?  Now, can we go -- do you see the

21   numbers there that add up, the 1.375 and the 926?  You see

22   those two numbers?

23   A.    Yes.

24   Q.    Okay.  First one's cash; second one's treasuries?

25   A.    Correct.

Page 222

1    Q.    Do you know if those numbers are in fact the numbers for

2    September 22nd?

3    A.    Not as I sit here right now.  I'd have to go back to the

4    database and look.

5    Q.    Okay.  Do you see that those numbers add up approximately

6    to the 2.3 billion without the letter of credit that Mr. Romain

7    testified was not included?

8    A.    I see that.

9    Q.    Let me -- and the last point here, on tab 15, if you go

10   back to page 7, do you see under September 23rd --

11   A.    What page is that?

12   Q.    Page 7, tab 15.  And under September 23rd, which is

13   reflecting September 22nd values, you see the 1,375 and 926?

14   A.    I'm sorry, I don't -- you know, these are all Bates

15   numbers that I have.  There isn't a 7 on it.

16   Q.    There's no 7 on the lower bottom?  Okay, 567.

17   A.    Oh, 56 --

18   Q.    Same page we looked at.

19   A.    Thanks very much.  576.  Yeah, I'm missing something,

20   because -- I think I'm on the right page, 576.

21   Q.    Do you see the numbers highlighted on the screen?  Does

22   that help?

23   A.    I see the numbers highlighted on the screen.

24   Q.    Okay.  And those are the numbers from the acquisition

25   balance sheet document we were just looking at, the PwC

08-13555-mg    Doc 11862    Filed 09/22/10    Entered 10/07/10 15:50:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 223 of 233

Page 223

1    document?

2    A.    Yes.

3    Q.    Okay.  Now, if you were to accept that, on the acquisition

4    balance sheet, Barclays actually used both liabilities and

5    assets for September 22nd, you adjusted liabilities back to the

6    19th, you didn't make any adjustment to the assets, your

7    adjustment of liabilities back to the 19th result in a lower

8    liability number, and that led to your charging Barclays with

9    103 million dollars and -- on your windfall calculation,

10    correct?

11    A.    I wouldn't characterize it as charging but, yeah, there

12    was a 103 million dollar adjustment, yes.

13    Q.    Okay.  And would you agree that you would also want to

14    take the assets for September 19th if you're going to use the

15    liabilities for September 19th?

16    A.    Absolutely.

17    Q.    Okay.  And if it's correct that those are in fact -- that

18    1,375 and the 926 are the assets on Barclays' balance sheet,

19    and if you add up those two, and -- did you do this

20    calculation, by the way?

21    A.    Maybe I have, but I certainly haven't done it recently.

22    We were really down in the weeds, and I'd have to go back to

23    some detailed spreadsheets and try to recreate my analogy based

24    on this.  So I'm going along with you, but I don't have very

25    good recollection of all of these issues.

Page 224

1    Q.   Okay.  And have you -- if by adding up the correct -- if

2    the assets are really on -- assets using acquisition balance

3    sheet are really the 22nd and you adjust them to the 19th,

4    right, and that results in a 261 million dollar decrease in

5    assets, you would have to factor that into your equation as

6    well, right?

7    A.   Yes, if the assets were not at September 19th but in fact

8    at December -- or September 22nd, then I had -- and then I

9    would have revalued the assets to September 19th, and had the

10   revaluation resulted in, I think you said, 261 million dollars

11   of an adjustment, of a change, then I would of course -- using

12   your language on charge, I would credit Barclays in that way,

13   of course I would, yes.

14   Q.   Right.  So you have the 1,375 in cash and 926 in

15   treasuries on what is the 22nd, and you have the lower numbers

16   of 1,081 and 926 on the 19th.  So you would have to -- if you

17   had moved that back to the 19th, you would actually have to

18   reduce your valuation adjustment calculation by approximately

19   260 million, right?

20   A.   Again, just -- let me just assume everything you said is

21   correct.  I don't know that it's correct.  It's very deep in

22   the woods -- in the weeds here.  So I'll just assume for the

23   moment it's correct.  And if what you're saying is correct,

24   then I would have to make that adjustment, absolutely.

25   Q.   Okay.  And let me ask you to turn to -- pull up Exhibit

Page 225

1    D-1 of your report, which is at tab 2 at the back.  D-1.

2         (Pause)

3    Q.   And this is an analysis you did of the resis in connection

4    with your report --

5    A.   Yes.

6    Q.   -- is that right?

7    A.   Correct.

8    Q.   And you showed a similar report; I think it was tab 47 of

9    a Movants' exhibit today, except you dropped off the piece

10   about Barclays' opening balance sheet at exit mark prices of

11   the acquired mortgages.  And just looking at this, it appears

12   that the -- about 1.8 billion dollars of the valuation

13   difference that you discuss between the Barclays valuation and

14   the custodian marks relate to resis, is that correct?

15        (Pause)

16   A.   Could you just restate it again?

17   Q.   Sure.  That you have two different valuations of the

18   resis.  You're tracking -- you're looking at the resis, you're

19   saying how much came over up top as a percentage of the marks,

20   and you say the custodial calculated valuation at exit price

21   marks of acquired mortgages as of 9/19 is 4.034 billion,

22   correct?

23   A.   That's based on the custodial marks, yes.

24   Q.   Right.  And the actual Lehman marks were close but

25   slightly higher than that?

Page 226

1   A.   Yes.   Two lines above, the Lehman marks were at 4.2

2   billion.

3   Q.   Okay.   And the 4.2 billion -- what you did there is you

4   just looked at the Lehman marks on the resis, which totaled

5   approximately six billion dollars, and then you calculated the

6   amount of the resis, using the Lehman marks at first that came

7   over to Barclays, is that right?

8   A.   Correct.

9   Q.   Okay.   And then you also put -- calculated the amount of

10  those resis as calculated by the custodian marks --

11  A.   That's correct.

12  Q.   -- correct?

13  A.   Yes, that's --

14  Q.   Okay.

15  A.   -- that's correct.

16  Q.   Okay.   So is it true that about 1.8 billion dollars of

17  this valuation difference with respect to the securities of

18  about 5 billion dollars relates to -- comes from the resis --

19  A.   No, you --

20  Q.   -- comes from different valuations of the resis?

21  A.   No, that's incorrect.   This calculation -- your arithmetic

22  is roughly correct.   The custodial marks valued are at 4 --

23  4.03, and the Barclays marks are 2.27.   So that's

24  1.7-something, and that's the difference.   But that's the

25  difference between the custodial difference and that -- and the

Page 227

1    Barclays marks.  That is not -- the custodial marks were not

2    used to value all the residential mortgages.

3         If you look at the slides that I prepared today, Mr.

4    Olvany and Mr. Slattery valued those mortgages themselves.  So

5    the custodial marks were not used directly for those mortgages.

6    Q.    Right.  You do mention -- you do have some comparisons of

7    custodial valuations versus Barclays' in your report, right?

8    A.    Yes.

9    Q.    Okay.  So when you're making those comparisons and

10   observing valuation difference, approximately 1.8 billion

11   dollars of the valuation difference comes from valuation

12   differences on the resis, correct?

13   A.    To be clear, so not related to the 5.1 billion.  So when

14   you -- we compare the custodial valuation to the Barclays

15   valuation, and there's a difference, and I forgot what the

16   number is but if you want me to look it up I can look it up,

17   but of that difference, about 1.7 billion of the difference

18   comes from residential mortgages.  Yeah, that's a fact.

19   Q.    Did you analyze how much the difference of the five

20   billion dollars' valuation difference that you cite in your

21   report, in your totaling, how much of that comes from different

22   valuations between Barclays and the movants on the resis?

23   A.    I did not do that, no.

24   Q.    Okay.  Would you be surprised if it were over 1.5 billion

25   dollars?

1    A.    I don't have an expectation, so --

2    Q.    Would it -- if you had a --

3    A.    -- I'm not surprised.

4    Q.    If you had a group of assets having a disproportionate

5    impact on the valuation difference, would it be important for

6    you to understand why that was?

7    A.    We laid out -- well, I laid out my methodologies.  Others

8    who will follow me, I understand, will discuss their

9    methodologies.  And the methodologies are what they are.

10   Q.    So if a disproportionate amount of the difference was

11   coming from one particular group, the resis, that doesn't

12   warrant analysis, in your view?

13   A.    Well, it depends on what someone was doing in the -- using

14   the methodol -- what methodology they were doing.  It depends

15   on the methodology.

16   Q.    Let me go ahead and ask that we play a clip I want to ask

17   you about from the Kobak deposition transcript.  Mr. Kobak, I

18   believe, was the trustee's 30(b)(6) on, among other things, the

19   value of -- such as the resis.  And I want to play lines (sic)

20   36, 4 to 23.

21         (Begin playing excerpt of video deposition of James

22   Kobak:)

23   Q.    Are you aware of whether there was a total valuation given

24   for all of the purchased assets set forth in the asset purchase

25   agreement?

1    A.    No.   There might have been some definition of what amount

2    of repayment cash was subsequently -- except for 250 million

3    dollars, there wasn't really any repayment cash.   Oh, I'm

4    sorry, this isn't the part -- no, I mean, there may have been

5    some -- and I don't remember what it was -- some estimate of

6    the cash.   I think there was some estimate that the residential

7    real estate mortgages were worth -- 'worth' probably isn't the

8    right word, but had some kind of value of six billion dollars.

9    So fifty percent of that would be three billion dollars, but I

10   don't think anyone thought that they were actually worth

11   anything near that.   And I don't think any numbers were

12   associated with any of the other items listed.

13       (End playing excerpt of video deposition of James Kobak)

14   Q.    Were you aware that the trustee had testified that he

15   thought -- didn't think anyone thought the resis were worth

16   anything near what they were marked at?

17   A.    I read that deposition testimony, yes.

18   Q.    You're aware of that?

19   A.    Yes.

20   Q.    Okay.   And yet the custodial marks that you cite are

21   coming in right around the Lehman marks under resis?

22   A.    That's correct.

23   Q.    Okay.   And you didn't do any analysis of whether those

24   marks under resis were correct or problematic for some reason?

25   A.    I did not, but Mr. Slattery and Mr. Olvany did.

Page 230

1   Q.   Okay.  Now, there are no custodian marks out there for the

2   collat -- the assets that Lehm -- Barclays received as of

3   September 22nd, is that right?  There's no custodial values out

4   there valuing the assets that Barclays received on September

5   22nd?  Those custodial values are earlier in the week?

6   A.   Yes.  We have -- on the 17th, we have JPMorgan, and we

7   have BoNY on the 19th.  Yes.

8   Q.   And the -- the BoNY on the 19th, did you look to see when

9   that source file was created?

10  A.   I did not.

11  Q.   Do you have any understanding of what day's prices that

12  reflects?

13  A.   I don't recall.

14  Q.   Okay.  Might it have been prices from earlier in the week,

15  like when they received -- first received the assets on the

16  18th?

17  A.   I don't know.

18  Q.   Okay.  Let me --

19          MR. THOMAS:  Your Honor, I apologize for not being

20  able to move this on more quickly, but I just wanted to raise

21  with the Court whether we should proceed in --

22          THE COURT:  How much more time do you have with the

23  witness?  Best estimate.

24          MR. THOMAS:  Best estimate would probably be cutting a

25  little -- maybe forty minutes.

Page 231

1          THE COURT:  I think it would be sensible, if this is a

2    logical break time, for us to break and for us to resume at

3    9:30 tomorrow, assuming it works for all counsel and the

4    witness.  So I'll see you at 9:30 tomorrow.

5          (Whereupon this hearing was concluded at 5:24 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 232

1

2                          I N D E X

3

4                      T E S T I M O N Y

5

6    WITNESS                   EXAM BY                PAGE    LINE

7    Mark Zmijewski            Mr. Tambe                7      20

8

9

10                     E X H I B I T S

11   MOVANTS'    DESCRIPTION                        ID.     EVID.

12   156A        Professor Zmijewski's resume               15

13   156B        Professor Zmijewski's expert report        19

14   821         Declaration of Professor Zmijewski         20

15               Dated 7/15/10

16

17

18

19

20

21

22

23

24

25

Page 233

1

2                         C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9       AAERT Certified Electronic Transcriber (CET**D-486)

10

11      Also transcribed by:    Clara Rubin (CET**D-491)

12

13      Veritext

14      200 Old Country Road

15      Suite 580

16      Mineola, NY 11501

17

18      Date:  September 22, 2010

19

20

21

22

23

24

25