Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

4    - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS, INC., et al.

8                    Debtors.

9    - - - - - - - - - - - - - - - - - - - - - -x

10   In the Matter of:

11

12   LEHMAN BROTHERS INC.

13                    Debtor.

14   - - - - - - - - - - - - - - - - - - - - - -x

15                    United States Bankruptcy Court

16                    One Bowling Green

17                    New York, New York

18

19                    September 30, 2010

20                    9:35 AM

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25

Page 2

1

2    HEARING re 60(b) Motions.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:    Penina Wolicki

Page 3

```
 1
 2   A P P E A R A N C E S :
 3   JONES DAY
 4        Attorneys for LBHI, Movant
 5        222 East 41st Street
 6        New York, NY 10017
 7
 8   BY:   JAYANT W. TAMBE, ESQ.
 9        ROBERT W. GAFFEY, ESQ.
10
11   HUGHES, HUBBARD & REED, LLP
12        Attorneys for Movant, James W. Giddens, SIPC Trustee
13        One Battery Park Plaza
14        New York, NY 10004
15
16   BY:   WILLIAM MAGUIRE, ESQ.
17
18   QUINN EMMANUEL, URQUHART & SULLIVAN, LLP
19        Attorneys for Movant, Official Committee of Unsecured
20         Creditors
21        51 Madison Avenue
22        22nd Floor
23        New York, NY 10010
24
25   BY:   ROBERT K. DAKIS, ESQ.
```

Page 4

1

2   BOIES, SCHILLER & FLEXNER LLP

3        Attorneys for Barclays Capital, Inc.

4        333 Main Street

5        Armonk, NY 10504

6

7   BY:   JONATHAN D. SCHILLER, ESQ.

8

9   BOIES, SCHILLER & FLEXNER LLP

10        Attorneys for Barclays Capital, Inc.

11        5301 Wisconsin Ave NW

12        Suite 800

13        Washington, DC 20015

14

15   BY:   HAMISH HUME, ESQ.

16

17

18   ALSO PRESENT: (TELEPHONICALLY)

19        ANTHONY ARNOLD, Stutman, Treister & Glatt

20        WHITMAN L. HOLT, Stutman, Treister & Glatt

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2           THE COURT:  Be seated, please.  Good morning.

3           MR. TAMBE:  Good morning.

4           THE COURT:  Let's proceed.

5           MR. TAMBE:  Good morning, Your Honor.  Jay Tambe from

6    Jones Day for Lehman Brothers Holdings, Inc.  The movants call

7    their next witness, Mark Slattery.

8           THE COURT:  Mr. Slattery, please come to the witness

9    stand.

10        (Witness sworn)

11          THE COURT:  Be seated, please.

12          MR. TAMBE:  Your Honor, may I approach with some

13   binders?

14          THE COURT:  Yes.  Thank you.

15          THE WITNESS:  Thank you.

16        (Pause)

17   DIRECT EXAMINATION

18   BY MR. TAMBE:

19   Q.   Good morning, Mr. Slattery.

20   A.   Good morning.

21   Q.   Could you please describe to the Court your educational

22   background?

23   A.   I graduated from Northwestern University in June of 1986,

24   earning a bachelor of arts degree.  During my time there I

25   majored in economics.  In June of 1992, I graduated from the

Page 6

1    Kellogg Graduate School of Management, again Northwestern

2    University.  My areas of concentration were accounting and

3    finance.

4    Q.   Other than these degrees, do you hold any professional

5    certification, sir?

6    A.   Yes.  I'm a chartered financial analyst or CFA.  I earned

7    that designation also in 1992, on the heels of successfully

8    passing three successive exams.

9    Q.   If you could turn in the binder before you to tab 1A,

10   that's Movants' 155A.  And could you describe for the Court

11   what that document is?

12   A.   My CV, my resume.

13   Q.   And using your CV as a guide, could you briefly describe,

14   first, an overview of your professional experience?  And we'll

15   go through some of your specific employments.

16   A.   Sure.  I've been a fixed-income professional involved in

17   areas of risk management, portfolio management, security

18   analysis, security valuation, asset liability management, in a

19   variety of capacities over the course of those twenty-four

20   years.

21   Q.   Over the course of those twenty-four years that you've

22   been in the business, have you applied valuation techniques and

23   approaches similar to the ones that you applied in this case to

24   value the fixed-income securities at issue here?

25   A.   Yes.

Page 7

 1    Q.    Taking a look at your resume, does the resume set out

 2    accurately your employment, sir?

 3    A.    Yes.

 4    Q.    And your education and certification?

 5    A.    Yes.

 6          MR. TAMBE:  Your Honor, we offer Movants' Trial

 7    Exhibit 155A in evidence.

 8          THE COURT:  Any objection?

 9          MR. HUME:  No objection.

10          THE COURT:  It's admitted.

11    (CV of Mark Slattery was hereby received in evidence as

12    Movants' Exhibit 155A, as of this date.)

13    Q.    Working chronologically, Mr. Slattery, starting with, I

14    guess, your first job out of college in the industry, if you

15    could walk us through the various positions you have held, and

16    focus on the types of work you did that's relevant to the work

17    you were asked to do here?

18    A.    Sure.  Starting with the Federal Home Loan Bank of

19    Chicago, I spent six years there out of undergrad.  I split my

20    time, three years as a thrift regulator.  I was a capital

21    market specialist during my time as a regulator.  What that

22    meant was that I examined banks' capital markets activities, in

23    other words, investment security portfolios.  I validated,

24    examined, revalued instruments such as U.S. agency debt

25    securities, U.S. Treasury debt securities and U.S. agency

Page 8

1    residential mortgage-backed securities, or agency RMBS.

2        Also during that time, for the last three years at the

3    Federal Home Loan Bank of Chicago, I joined the bank side and I

4    was charged specifically with the responsibility to help the

5    bank manage, analyze on an ongoing basis, their agency

6    mortgage-backed security portfolios.

7    Q.   And when you talk -- when you speak about managing and

8    analyzing, are those valuation-related tasks that you were

9    involved in, sir.

10   A.   Yes.

11   Q.   Where did you work next?

12   A.   After Federal Home Loan Bank of Chicago and then

13   graduating from Kellogg, I joined Coopers & Lybrand.

14   Q.   And what did you do at Coopers & Lybrand?

15   A.   I was in a group known as the financial advisory services

16   group.  It included time spent in a specialty area known as

17   loan restructuring, which meant that I was engaged in looking

18   at typically commercial loans and more troubled or work-out

19   situations.  So again, loan analysis.

20   Q.   After your time at Coopers & Lybrand, where did you work

21   next?

22   A.   I then joined Quantitative Risk Management in Chicago.  I

23   spent approximately eight years there.  I was part of a

24   subject-matter consultants team.  QRM as an entity, is defined

25   by three business lines.  And those business lines are defined

Page 9

1   by software applications.  The one that I was most intimately

2   familiar with and I was part of, again, the consultancy team,

3   dealt with enterprise risk management.  This software is used

4   by banks to analyze all aspects of their on- and off-balance-

5   sheet activity.  In other words, I would help these

6   institutions around the globe determine methods and means to

7   integrate their balance sheet into the system for meaningful,

8   accurate results from a market value standpoint as well as an

9   income simulation standpoint.

10      The securities that I looked at during my time there

11  ranged from, once again, U.S. Treasury securities, U.S. agency

12  debt securities, agency RMBS.  Also during that time, I was

13  involved in the evaluation of collateralized mortgage

14  obligations.

15  Q.   If you could take a moment to describe what are CMOs that

16  they feature in your work here?

17  A.   Sure.  CMOs are a little bit more involved in terms of the

18  structure.  Typically, they're now referred to as structured

19  deals, structured fixed-income deals.  They are backed, at

20  their core, from an underlying collateral standpoint,

21  mortgages.  Those mortgages are then securitized in the

22  structure.  And then the individual investors have security

23  interests in varying positions with respect to the cash flows

24  emanating from those mortgages.

25  Q.   And I interrupted you.  You were talking about during your

Page 10

1    time at QRM you did work involving CMOs.  Just taking a step

2    back on QRM, you said it creates software -- it provides

3    software to financial institutions?

4    A.    Yes.

5    Q.    Could we delve into that a little bit more?  What types of

6    software and for what purposes is that software used?

7    A.    Again, their software, the enterprise risk management

8    system, is used to value these securities, also used to value

9    unsecuritized assets as well as analyze and value their

10   liabilities, also their off-balance-sheet activities -- in

11   other words, their hedging activities.

12        So this software is the valuation engine, if you will, to

13   the process.  Integrated along with the software there are

14   other tools or applications that could be joined with the QRM

15   system in order to analyze specific instruments.

16   Q.    Can you give us any examples of the types of institutions

17   that would have used QRM for enterprise risk management.

18   A.    Sure.  Again, domestically -- here, again, I'm dating

19   myself a little bit -- but institutions such as Nations Bank,

20   which is now Bank of America; Citigroup; large institutions.

21   Some institutions are no longer with us.  But Washington Mutual

22   would be an example.  Countrywide also used their system.  And

23   also institutions around the globe.  So there were

24   installations in Europe as well as installations in Australia.

25   Q.    Now, you mentioned that there were other types of software

Page 11

1    and models that can get hooked into QRM or work alongside QRM.

2    Could you take a moment just to describe, in terms of the work

3    that you have done, the use of models generally in this area,

4    in valuing fixed-income securities?

5    A.   Sure.  Let's take the mortgage-backed security market

6    specifically.  The QRM system, similar to the valuation engine

7    system that I used during this engagement, allows the user to

8    integrate what's considered a prepaying model.  So you can

9    integrate a prepayment model library that specifically

10   addresses the contingent cash flow nature of the mortgage.

11        In other words, you and I, as people that are granted

12   mortgages have the ability to prepay.  We have an economic

13   incentive if rates drop relative to our mortgage rate.  The way

14   in which to analyze said dynamic, the market evolved and there

15   were certain specific entities that specialized in prepayment

16   model and prepayment model libraries.  So the QRM system

17   enabled the user to integrate such systems --

18   Q.   Okay, so --

19   A.   -- such pieces of software.

20   Q.   -- and if I understand that explanation, the prepayment

21   models are used with mortgage-backed fixed-income securities to

22   model, basically, prepayment assumptions; what's the

23   likelihood, what are the scenarios under which mortgages are

24   going to be prepaid.  Is that --

25   A.   Correct.

Page 12

1   Q.    -- simplifying it, or --

2   A.    Correct, yes.  It's -- correct.

3   Q.    Okay.  Let's go back to your resume.  So you spent some

4   time at QRM working with software, working with financial

5   institutions.  Where did you go next?

6   A.    One other point, if you don't mind --

7   Q.    Sure.

8   A.    -- before leaving -- as part of the CMO world or state of

9   the world at the time, I was involved in what they call reverse

10  engineering collateralized mortgage obligations, which means

11  simply to translate the key investor document, in that case the

12  prospectus, to actionable quantitative information.  So in

13  other words, take the prospectus, translate that information

14  into the QRM system, and allow an analyst or a portfolio

15  manager to effectively analyze that position.

16        That practice gave way, again, as the system evolved, such

17  that there were entities that emerged that were specifically

18  tailoring their business models to reverse engineer and provide

19  structured deal libraries to people and systems like QRM.

20  Q.    And so is Intex an example of that kind of a deal library?

21  A.    Intex is the deal library, yes.

22  Q.    And while we're on the topic, let me just make sure we've

23  sort of broken down the pieces.  Structure deals are comprised

24  of lots of subparts.  Is that right?

25  A.    Yes.

Page 13

1    Q.    Okay.  So lots of sub-securities that roll up into the

2    structure that you're valuing, correct?

3    A.    Correct.

4    Q.    And all of that structure is governed by a governing

5    document, like a prospectus.  Is that right?

6    A.    Yes.

7    Q.    And the governing document tells you what the legal

8    standards are, but you have to translate that into cash flows.

9    Is that right?

10   A.    Correct.  I would just position it as the allocation of

11   payment rules as opposed to legal standards, but, yes.

12   Q.    And that's what you mean by sort of reverse engineering a

13   structure from the deal documents to valuation?

14   A.    Correct.  I mean, it's viewed as rather archaic and

15   antiquated at this point, given the emergence and dominance of

16   Intex.

17   Q.    And so when Intex came along, Intex was basically doing

18   that work for valuators -- evaluators like yourself?

19   A.    Correct.  On a grand scale.

20   Q.    Okay.  So if there was a structured security out there,

21   Intex has already broken that down into its component parts,

22   established the payment allocation issues and the like.  Is

23   that right?

24   A.    Yes.

25   Q.    Okay.  All right.  Let's go back to your resume, then.

Page 14

1   Where did you go to work next after QRM?

2   A.   When I left QRM I worked on my own.  I worked on behalf of

3   AIG Capital here in New York.  I was asked to help them

4   install -- implement, if you will -- an enterprise risk

5   management system.  At the time they were looking to

6   consolidate several hundred subsidiaries.  The subsidiaries had

7   different business focus -- focuses, if you will, foci.  So the

8   enterprise risk management system was warranted or needed to

9   help the AIG Capital CFO and senior management analyze and

10  understand that balance sheet as it was consolidated.

11  Q.   And that engagement lasted --

12  A.   Just about a year.

13  Q.   -- just about a year.  And so you were done with that in

14  January 2003.  Is that right?

15  A.   Yes, sir.

16  Q.   Okay.  Where'd you go to work next?

17  A.   I went to LaSalle Bank Corporation.  LaSalle was a North

18  American subsidiary of ABN AMRO, a Dutch parent.

19  Q.   And what did you do at LaSalle?

20  A.   I had specific responsibilities to ensure that the bank's

21  mortgage analytics were consistent throughout departments and

22  divisions.  In other words, the chairman and the senior

23  executives, again, at the bank, did not want to sustain any

24  risk as it related to model inconsistencies.  So I was charged

25  with co-heading what they called the mortgage advisory council.

Page 15

1    So we had weekly meetings with traders, other departments,

2    divisions, to ensure that, again, that we were installing,

3    implementing, on an ongoing basis, consistent models of

4    practices related to mortgage analytics.  And that ranged from

5    the mortgage origination business, which is considered by many

6    the primary mortgage market level, all the way through

7    securitized mortgage instruments, again, agency mortgage-backed

8    securities.

9    Q.   And again, just so I can understand some of the

10   terminology you're using, the mortgage origination group might

11   use a model for valuation purposes.  Another group within the

12   bank that maybe has a securitized mortgage, may use another

13   model for valuing that securitized security.  And if there's a

14   CDO or something that further securitizes that, there may be

15   another model that values that.  And you'd try and reconcile

16   all of those models?

17   A.   Correct.  The model that we used specifically in our group

18   was actually the QRM model.

19        Other responsibilities during my time was -- LaSalle was a

20   little bit late in terms of market history in terms of

21   originating subprime or Alt-A mortgages.  So I was asked, as

22   co-chair of the mortgage advisory council, to provide internal

23   consultation to the Dutch parent should LaSalle start to

24   originate or engage in that business or not.  Before we were

25   able to make a formal recommendation, ABN AMRO decided to sell

Page 16

1    LaSalle.

2    Q.   All right.  And in the course of your work at QRM, at

3    Slattery Enterprises, at LaSalle Bank Corporation, again, in

4    terms of the scope or the breadth of the fixed-income

5    securities that you were valuing, can you just give us a sense

6    of what types of securities those were?

7    A.   Sure.  Again, it ranged from U.S. Treasury notes, bonds,

8    U.S. agency debt securities, collateralized mortgage

9    obligations, agency RMBS, I started to explore the non -- what

10   they call the non-agency space in the mortgage market during

11   that time, toward the end of my tenure at LaSalle.  Also,

12   because of the depth and breadth of the balance sheet, I also

13   provided internal ongoing consultation as related to other

14   assets and liabilities that were part of the QRM system and the

15   modeling efforts related therein.

16   Q.   After LaSalle Bank, where'd you go to work next?

17   A.   I joined JMN Consulting -- JMN Financial.  It's a small

18   boutique investment firm out of California.

19   Q.   And what did you do for JMN Consulting?

20   A.   Twofold with respect to JMN.  I was part of two

21   nondiscretionary mortgage funds.  What I mean by that is, JMN

22   worked with investors -- two separate investor groups, that

23   actually, at the end of the day, made the decisions relative to

24   buy or sell within the portfolios that we were managing.  The

25   portfolios were specifically non-agency residential mortgage-

Page 17

1   backed securities.  So again, this is a focus on non-agency

2   RMBS.

3   Q.   And again, in terms of the time periods involved, you were

4   at JMN doing this work till what time period?

5   A.   From the fall of 2006 through the fall of 2008.

6   Q.   Okay.  So through the time of the Lehman bankruptcy, for

7   example, you were involved in valuing and evaluating non-agency

8   RMBS positions?

9   Q.   Yes.  And then also, during the period of the summer,

10  especially the late summer of 2008, JMN was engaged by an

11  investment syndicate here in New York to analyze a CDO -- a

12  massive CDO portfolio involving hundreds of CDOs.

13  Q.   And just --

14  A.   Collateralized debt obligations.

15  Q.   -- and when you talk about CDOs, these are CDOs with what

16  underlying securities, what types of assets?

17  A.   We're dealing with separate debt in this case.  It was

18  going to be the non-agency type mortgage securities.  So at the

19  end of the day, with respect to collateralized mortgage

20  obligations or collateralized debt obligations or

21  collateralized loan obligations, what you're looking at -- the

22  distinction, really, ultimately becomes the underlying

23  collateral as well as, obviously, anything specifically related

24  to the structure.

25  Q.   And when you say specifically related to the structure,

Page 18

1    you mean governed by the structure documents --

2    A.   Correct yes.

3    Q.   Where did you go to work next after JMN Consulting?

4    A.   I joined Flagstar Bank.  It's a regional bank based in

5    Troy, Michigan.  My responsibilities there were specific to the

6    bank's mortgage servicing rights portfolio, similar to the work

7    that I did at LaSalle, albeit I was focusing on one particular

8    asset, and again, in this case, the mortgage servicing rights

9    portfolio.

10        What that represents, relative or correlated to the work

11   that I've done in this engagement, mortgage servicing rights

12   represent the -- a portion of the interest-only segment of the

13   cash flows.  So when I compare the mortgage servicing rights

14   analytics to, say, interest-only securities, they are very,

15   very similar.  Mortgage servicing rights are actually a little

16   bit more complicated due to ancillary cost and revenue items

17   that are part of the MSR holding.

18   Q.   Now, in terms of models and tools that you used during

19   your work at JMN and at Flagstar, could you describe some of

20   those models that you used, to the extent they have any

21   relevance to what you did here?

22   A.   Sure.  At JMN, a colleague and myself, we extensively used

23   Intex.  At Flagstar I was using PolyPaths, which is again,

24   similar to QRM in that it is a valuation engine or calculator

25   that allows you to integrate these prepayment models and these

Page 19

 1   structured deal libraries.  At Flagstar I used PolyPaths along

 2   with the Andrew Davidson & Co. prepayment model.

 3   Q.   Okay.  So what is the Andrew Davison & Co. prepayment

 4   model?

 5   A.   It is one of the models that I spoke to earlier, in that

 6   it allows the analyst to incorporate algorithms that deal

 7   specifically with the underlying mortgagee's ability or right

 8   to prepay.

 9   Q.   Is it a widely used model in the industry, sir?

10   A.   Extensively used, yes.

11   Q.   And after you left Flagstar Bank, you've been employed by

12   Navigant Economics.  Is that correct?

13   A.   Yes, sir.

14   Q.   We've talked about models, we've talked about some of the

15   work you've done.  To what extent, through the course of your

16   career, have you relied on academic publications and treatises

17   to inform any of the valuation work that you have done?

18   A.   Those have been part of my career throughout, especially

19   starting probably, most accurately, in the late 80s, sort of at

20   the transition that I made from regulator to analyst at the

21   Federal Home Loan Bank.  And then through my work at QRM, I

22   actually became involved in a project that culminated in a

23   chapter that was submitted and published by a widely recognized

24   professional in this industry, a prolific author and editor of

25   such books.

Page 20

 1    Q.    And who was that?

 2    A.    Frank Fabozzi.

 3    Q.    And is Mr. Fabozzi's work some work that you have used and

 4    relied on for purposes of your analysis here?

 5    A.    Yes.  And the book that I was a contributing colleague for

 6    on was "The Handbook of Asset Liability Management".  So I went

 7    through the whole process in terms of the analytics that

 8    supported the chapter and its subsequent publication.

 9    Q.    And in terms of Mr. Fabozzi's recognition and reliance on

10    him by members of the industry, what is your understanding of

11    that?

12    A.    He became a gateway to sharing information and knowledge

13    specific to valuation approaches, methods, processes and the

14    like.  I believe he is -- his name, just his surname, is

15    extremely well-known.  It's commonplace in and amongst the

16    areas such as the ones that I've worked for twenty-four years.

17    Q.    Now, in the course of your work, your valuation work,

18    whether you're using models, treatises, academic articles,

19    various tools that you're using, do you, from time to time,

20    have to make adjustments for what's called liquidity or mid-to-

21    bid?

22    A.    Yes.

23    Q.    Okay.  And again, can you describe your use of mid-to-bid

24    liquidity adjustments in the course of your career, with a

25    specific emphasis on the extent it applies to what you did

Page 21

1   here?

2   A.   Sure.  As per my time at LaSalle, we used to run what they

3   would call liquidity fire drills.  Actually, it was dealing

4   specifically with LaSalle's ability to handle an event -- a

5   tumultuous event, out of the ordinary, that would put extreme

6   pressure on the bank's ability to maintain and acquire

7   liquidity.  So during that process, the ABN AMRO Dutch parent

8   asked that we put the -- again, we, as in the colleagues at

9   LaSalle at the time -- put in context the liquidity risk

10  element in a framework that they wanted integrated, which was

11  known as economic capital.  So it's a little bit theoretical,

12  but it was part and parcel of an economic capital project at

13  LaSalle.

14          MR. TAMBE:  Your Honor, we tender Mr. Mark Slattery as

15  an expert in the valuation of fixed-income securities.

16          MR. HUME:  No objection, Your Honor.

17          THE COURT:  He's accepted an expert in that area.

18          MR. TAMBE:  Thank you, Your Honor.

19  Q.   Mr. Slattery, if you could turn in the binder before you

20  to tab 1B as in boy.  It's Movants' Trial Exhibit 155B.  And

21  could you describe for the Court what that document is, please?

22  A.   This appears to represent the corrected version of my

23  expert report that I originally submitted in March of this

24  year.

25  Q.   And what is the nature of the correction that you have

Page 22

1   made to the report you submitted on March 15th?

2   A.   I believe it addresses a footnote error on my part.   I

3   ascribed a -- or I used a citation to another expert's report.

4   Specific pages were highlighted, but that was an error on my

5   part.

6   Q.   So you had cited to the wrong page in a footnote of your

7   original report.   You corrected that?

8   A.   I believe I did, yes.

9   Q.   Other than that correction, do you believe this -- your

10  expert report to be accurate and accurately state your opinions

11  in this matter as of today?

12  A.   Yes, sir.

13  Q.   And would you adopt this report, your observations, your

14  conclusions, your opinions, as your testimony in this case?

15  A.   Yes, sir.

16       MR. TAMBE:   Your Honor, we move Movants' Trial Exhibit

17  115B in evidence.

18       MR. HUME:   No objection.

19       THE COURT:   It's admitted.

20  (Mr. Slattery's corrected expert report was hereby received in

21  evidence as Movants' Exhibit 155B, as of this date.)

22  Q.   If you could turn, please, Mr. Slattery, to tab 2 of your

23  binder.   And could you describe -- it's Movants' Trial Exhibit

24  824.   If you could please describe to the Court what that

25  document is?

1   A.   This document appears to be my -- the declaration that I

2   submitted in July of this year.

3   Q.   And why did you prepare that declaration?

4   A.   The declaration addresses specific criticisms, I guess,

5   put forth by Barclays.

6   Q.   Does it change your opinions in any way -- the opinions

7   that were set forth in your March 15th expert report?

8   A.   No, it does not.

9        MR. TAMBE:  Your Honor, we offer Movants' --

10  Q.   Would you adopt the statements in your declaration as your

11  testimony here today?

12  A.   Yes, I do.

13       MR. TAMBE:  Your Honor, we offer Movants' Trial

14  Exhibit 824 in evidence.

15       MR. HUME:  No objection.

16       THE COURT:  It's admitted.

17  (Declaration by Mr. Slattery was hereby received in evidence as

18  Movants' Exhibit 824, as of this date.)

19  Q.   Now, Mr. Slattery, in preparation for your testimony here,

20  did you prepare some presentation materials to describe your

21  methodology and the conclusions that you have reached?

22  A.   Yes, I have.

23       MR. TAMBE:  Your Honor, may I approach?

24       THE COURT:  Yes.  Thank you.

25       THE WITNESS:  Thank you.

Page 24

1        (Pause)

2    Q.   As we get into the valuation you conducted, again, at a

3    high level, could you just summarize what it is that you were

4    asked to value, what you valued and what conclusions you

5    reached?  Again, at a high level, and we'll break it down.

6    A.   Sure.  At a high level, it was a portfolio of fixed-income

7    securities ranging, again, from U.S. Treasury instruments, debt

8    obligations, all the way through collateralized loan

9    obligations.

10   Q.   And in the slide deck that I have handed you, sir, which

11   is marked as Movants' Trial Exhibit 920, first -- the first

12   couple of pages, do those just summarize your qualifications

13   and experience, sir?

14   A.   Yes.

15   Q.   Turning to slide 4, could you just describe for the Court

16   what that slide represents or shows?

17   A.   It appears to be a table that breaks out the individual

18   experts' results as it relates to the undervaluation, or the

19   identification of a difference between Barclays' acquisition

20   value and those of the respective experts, including myself.

21   Q.   Okay.  And there are two line items associated with your

22   name that are highlighted there on slide 4.  Again, briefly,

23   could you describe what those two line items are?

24   A.   Sure.

25   Q.   We'll deal with each one in detail.

Page 25

1    A.   Sure.  The line item that's identified with the number

2    632, those are 632 securities that I analyzed from the ground

3    floor up.  In other words, I started with an assessment of

4    underlying collateral and -- if that was applicable, and then

5    related structure information, again, if that was applicable,

6    and used either discounted cash flow or what I would label as a

7    supercharged discounted cash flow.

8         The second line, the 6,035 securities, represent a block

9    of securities that was predominantly ascribed prices

10   accumulated or prices that were a function of third-party

11   prices and/or custodial price.  The third-party valuations

12   line, again, predominantly represents a difference in what we

13   as collaborative experts used in terms of a threshold.

14        So the 632 fundamentally represented a difference between

15   Barclays' adjusted values and the custodial BoNY values of a

16   million dollars, plus or minus.

17   Q.   So that if there was a million dollar delta, those

18   securities -- plus or minus a million dollar delta --

19   A.   Correct.

20   Q.   -- those securities were subject to the ground-up

21   analysis?

22   A.   Correct.

23   Q.   And how about the 6,035?

24   A.   Again, in the predominant case, I believe there's

25   approximately three dozen that pierced the million dollar

Page 26

1    threshold, but for specific reasons such as inability to secure

2    requisite information in order to appropriately and accurately

3    analyze those positions.  Those fell into the 6,035.  But

4    again, a significant predominant majority of those were below

5    the million dollar threshold.

6    Q.   Okay.  Now, do you know what efforts, if any, were made to

7    secure information to value those 6,035?  You said there were

8    about three dozen which crossed the million dollar threshold,

9    but were included in that 6,000 bucket, because there wasn't

10   enough deal-oriented information to value them.

11   A.   Correct.

12   Q.   Do you know what efforts were made to get information

13   about those deals?

14   A.   I believe requests were made.  I believe it was specific

15   to the CUSIP level, which is the security identification level.

16   Q.   Okay.  If you could turn in your binder to tab 3, which is

17   Movants' Trial Exhibit 250.  And sir, are you -- take a moment

18   to look at that e-mail chain.  Are you familiar with that

19   e-mail chain and the attachments referenced in that e-mail

20   chain?

21   A.   I am, somewhat, yes.

22   Q.   Okay.  And is it your understanding that the attachments

23   referenced in this e-mail chain gave you the detailed deal-

24   level information that had been requested from Barclays on a

25   CUSIP-by-CUSIP level?

Page 27

1   A.    I believe it is.

2   Q.    And did the information that was provided by Barclays in

3   response to discovery requests give you all of the inputs, the

4   Intex modeling, the various model assumptions used by Barclays

5   to value some of these securities?

6   A.    Some of the securities?  No.

7   Q.    Let me ask the question differently.  Did you get

8   information regarding all of the securities that you had

9   questions about?

10  A.    No.

11  Q.    Okay.  If you could turn to tab 4, which is Movants' Trial

12  Exhibit 249.  Are you familiar with that letter and the

13  documents referenced in that letter?

14  A.    Yes, I believe I am.

15  Q.    And is it your unders -- do you have an understanding as

16  to whether those documents were able to answer all of your

17  questions about the various inputs and model assumptions used

18  by Barclays for its valuation?

19  A.    All of the questions?  No.

20  Q.    So it answered some of the questions but not all of the

21  questions?

22  A.    Yes.

23  Q.    Okay.  Let's go back, then, to your analysis.  And we're

24  starting with the 632 CUSIPs, and we'll work our way down some

25  of the analysis that you did.  Now, did you break out the 632

Page 28

1    into different types of securities, sir?

2    A.   Yes, I did.

3    Q.   And if we turn to page 5 of your presentation, was that

4    the breakout?

5    A.   Yes, it is.

6    Q.   And again --

7    A.   What this --

8    Q.   -- go ahead.

9    A.   -- I'm sorry.  What this breakout represents is an

10   extraction of the Table 2 that I submitted as part of my expert

11   report.  It, again, segregates the securities along, as you

12   indicated, certain security silo lines.

13   Q.   All right.  And so items A through F total up to 632.  Is

14   that right?

15   A.   They should.

16   Q.   Okay.  And line item G is the 6,035 other securities?

17   A.   Yes.

18   Q.   The first item, item A, "U.S. Treasury and agency debt

19   securities", Barclays has those valued at 12.7 billion; you

20   have them valued at 13.2 billion, with a valuation difference

21   of about 424 million dollars.  What are these securities?

22   A.   These are either direct obligations of the government or

23   obligations of what they called government-sponsored

24   enterprises.  The direct obligations are backed by the explicit

25   full faith and credit of the government; the agency debt

Page 29

1    securities, by implication, especially by actions taken in and

2    around the time frame that we're looking at; market

3    participants; recognizing an implicit guaranty for the

4    government-sponsored enterprise debt.  These are typically AAA,

5    typical fixed rates of interest.

6    Q.    Okay.

7    A.    And extremely liquid markets.

8    Q.    When you say extremely liquid, can you give us some sense

9    of how liquid or deep these markets are for U.S. Treasury and

10   agency debt securities?

11   A.    In terms of the total debt outstanding, I believe it's in

12   the trillions.  In terms of daily trading volume, I believe

13   it's in the hundreds of billions -- I believe.

14   Q.    Now, what -- is there a simple explanation for why there

15   is this 424 million dollar difference on what is a liquid AAA

16   rated bucket of securities?

17   A.    I believe there is.

18   Q.    And what is that explanation, sir?

19   A.    During the course of my work analyzing my results and

20   comparing those to Barclays', I identified a difference -- a

21   disparity between the liquidity adjustment that I applied to

22   specifically the agency debt securities segment within the 125

23   CUSIPs versus the discount that Barclays applied.

24   Q.    So let's go to that analysis.  Do you break that out in

25   your presentation, sir?

Page 30

1    A.    Yes, I do.

2    Q.    Can you describe for the Court what slide 7 is in your

3    presentation?

4    A.    This creates a more granular view of the first category.

5    As indicated, the U.S. Treasury securities in total represented

6    12 CUSIPs of the 125.   The price difference in millions

7    relative to the face amount of these securities -- and the face

8    amount is not indicated on the table -- but I believe we are

9    looking at approximately four billion dollars plus of a

10   position.   So the price difference on a relative scale basis is

11   arguably somewhat de minimis.   And the liquidity adjustment

12   difference in the far right-hand column, for Treasury

13   securities, is only 430,000.   So we're pretty consistent in the

14   application of the various adjustments and discounts.

15   Q.    And how about the rest of the 125, the 113 that show up on

16   the second line?

17   A.    Those are specifically the U.S. agency debt securities.

18   And again, these would be obligations issued by such entities

19   as Fannie Mae, Freddie Mac, Federal Home Loan Bank system,

20   Federal Farm Credit Banks, and other like enterprises.

21   Q.    And what is that breakout that you have shown on the

22   second line indicate, the 33 million versus the 376 million?

23   A.    Again, relative to face, this portfolio, I think, in

24   aggregate, was approximately 9 billion dollars plus.   So the

25   price difference relative to that face amount of 34 million is

1   not necessarily a huge percentage.  However, the liquidity

2   adjustment difference column of 377 million dollars is directly

3   tied back to the difference in the adjustment that I applied

4   for these securities versus the discount that was applied by

5   Barclays.

6   Q.   Okay.  And what discount did Barclays apply as a liquidity

7   adjustment for U.S. agency debt securities?

8   A.   They used approximately a five percent discount -- 500

9   basis points.

10   Q.   500 basis points.  And what discount or adjustment did you

11   apply when you adjusted prices from mid to bid?

12   A.   On average, I used 82 basis points.

13   Q.   Did you have any understanding as to how Barclays arrived

14   at a 500 basis point discount for U.S. agency debt securities,

15   sir?

16   A.   No, I do not.

17   Q.   Just turning to slide 8, is that basically an explanation

18   of what we -- what you just covered in terms of the different

19   liquidity discounts applied, sir?

20   A.   Correct.  The only subtlety with respect to this slide --

21   since we're dealing with mid-to-bid adjustments, so mid prices

22   to the bid prices, taking for example the five percent

23   discount, equating that to a bid-ask spread, you're looking at

24   about a ten percent or 1,000 basis point bid-ask spread.

25        Based on follow-up analysis that I conducted, one of the

Page 32

1    main originators of U.S. agency debt securities indicated in an

2    investor paper that a representative bid-ask spread, even

3    through what they, I believe, coin as "tumultuous period", the

4    late summer of 2008, they indicated that their bid-ask spread

5    did not widen to more than 4 basis points.

6    Q.   Okay.  So they said that the bid-ask spread during the

7    tumultuous times was 4 basis points.  The bid-ask spread

8    applied by Barclays is 1,000 basis points.  Is that right?

9    A.   Yes.

10   Q.   If you can turn to slide 9, sir, is that a comparison of

11   the different bid-ask spreads applied, one by Barclays, then by

12   movants and then the one that you just referenced, for the

13   relevant time period, sir?

14   A.   Yes.  And then -- so just in terms of -- let's suggest

15   converting the information contained therein, my 82 basis

16   points, as far as a mid-to-bid adjustment, represents about a

17   40 factor relative to indications from specifically Fannie Mae.

18   As indicated, Barclays' number approaches a factor of about 250

19   times.

20   Q.   In your experience sir, when you were in the market in the

21   summer and fall of 2008, did you ever see spreads -- actually

22   traded spreads that justify a 1,000 basis point bid-ask spread

23   for U.S. agency debt securities?

24   A.   In this segment, I was not aware of it, no.

25   Q.   Did you do any calculations, sir to see what the

Page 33

1    implications were of applying such a large bid-ask spread that

2    Barclays did to the implied yields for some of these U.S.

3    securities?

4    A.    I did.

5    Q.    Okay.  And what did that analysis show?

6    A.    This is -- will depend on the maturity of the instrument.

7    So if I apply the 5 percent or 4.87 percent discount, if the

8    instrument is going to mature within, let's say, the course of

9    the next calendar year or the year that follows September 2008,

10   the yield premium that would be implied would be arguably

11   exaggerated.  And then that effect starts to wane over the

12   entire term structure of maturities embedded in this portfolio.

13         However, in my opinion, the premium is sustained even as

14   far out as the thirty-year instrument.  There's one security in

15   this portfolio that I believe matures in August of 2038.  And

16   it appeared to me that there was still a prevailing premium in

17   terms of market yield relative to market.

18   Q.    And when you're saying there's a prevailing premium, as a

19   result of the application of this large bid-ask spread?

20   A.    Yes.

21   Q.    Again, given your experience in the markets in 2008, what

22   would an implied yield -- a typical implied yield for, say, a

23   one- or two-year obligation be, and again, as compared to

24   similar obligations, but going out to thirty years?

25   A.    Using the Treasury rate curve or Treasury yield curve as

Page 34

1    an indication or a basis for comparison, shorter-term maturity

2    instruments such as these, the expectation, probably in the

3    area of a one- to two-percent yield.

4    Q.    How about the longer-dated ones?

5    A.    It looked to me as though the yield expectation from

6    investors across a mix of such offerings, was about five

7    percent.

8    Q.    If we can turn to the results of your analysis, where you

9    saw what happened to implied yields as a result of Barclays'

10   application of this 1,000 basis point bid-ask spread, is that

11   what's set out on slides 10 and 11, sir?

12   A.    Yes.

13   Q.    And could you just, using maybe a couple of examples,

14   describe to the Court this phenomenon that you were talking

15   about, what -- the result of using this outsized bid-ask spread

16   on U.S. government securities?

17   A.    Sure.  Just as far as an overview, again, these securities

18   from both slides 10 and 11 represent those that will mature

19   within approximately six months, I believe, of September 2008.

20   So I think we -- I can double check really quickly.  No,

21   actually, about nine months, I think.  So eight or nine months,

22   out to May of 2009.

23        But these instruments are discount notes.  What that means

24   is that they bear a zero rate of interest, but the investor is

25   provided their face amount at maturity.  So, for example, the

Page 35

1    first security, the maturity date that I identified in the

2    appropriate files, was effectively Monday following the Friday.

3    So 9/19/2008 would be the Friday; September 22, 2008, the

4    Monday.  By applying the 5 percent discount for such security,

5    the implied yield exceeded 640 percent.

6    Q.    Had you ever seen implied yields for U.S. government and

7    agency debt securities anywhere near that number, sir?

8    A.    No.

9    Q.    Let's move to the next subset of securities, again, within

10    the 630-plus that you valued.  These are the agency RMBS.

11    Again, if you could just briefly describe what is this type of

12    security?

13    A.    The agency RMBS represent those mortgage-backed securities

14    issued, if you will, by three entities:  Ginnie Mae, Fannie Mae

15    and Freddie Mac.  There is a limited credit risk in this area,

16    if not outright no credit risk.  And these are, again, highly

17    liquid.

18    Q.    Okay.  And there's a valuation difference of -- within

19    this subset of securities, between your valuation and Barclays'

20    of about 728 million.  Do you see that, sir?

21    A.    Yes.

22    Q.    And again, in broad terms, what is driving this

23    differential in valuation?

24    A.    You have to dig a little bit deeper.  If you don't mind,

25    again, similar to the A group, I stratified the information

Page 36

1    contained and represented in the 308 CUSIPs.  So there's a --

2    Q.   Is that slide 14, sir?

3    A.   Yes, sir.

4    Q.   So go ahead and explain what that stratification is.

5    A.   The first row represents twenty-four securities known as

6    agency trust, or MBS strips.  What this represents, if you

7    will, would be interest-only securities or principal-only

8    securities.  What the market created several years prior was,

9    as investor preferences started to get more sophisticated and a

10   plain vanilla mortgage-backed security was not enough, various

11   firms were able to strip the mortgage-backed security into its

12   two component pieces or cash-flow component pieces:  the

13   interest-only portion versus the principal-only portion.  So

14   again, within this twenty-four there's a mix of IO and PO

15   securities.

16   Q.   And if I'm reading that first line correctly, sir, most of

17   the price differential for those types of securities is the

18   liquidity adjustment, not so much the price difference.  Is

19   that right?

20   A.   Yes.

21   Q.   And when you say price difference that's your midpoint

22   versus Barclays' midpoint?

23   A.   Correct, mid-to-mid.

24   Q.   And you have stated there on slide 14 that Barclays'

25   average discount was 10 percent, whereas yours was about 1.6

Page 37

1   percent?

2   A.   Correct.

3   Q.   Again, can you discuss for the Court and describe for the

4   Court what's driving the ten percent number that Barclays uses

5   across these securities?

6   A.   In this area, I have information, I believe, that suggests

7   a support for the ten percent.  If -- do we -- the ten percent

8   represents two methods.  There are two methodologies that were

9   explained in the supporting document.  The method 2, which

10  seems to be a more detailed method, causes me some concern as

11  it relates to the result, and that result being a ten-percent

12  discount that was then applied to the broad universe of agency

13  mortgage securities, including the agency trust RMBS.

14  Q.   And just so I understand your answer, you have seen an

15  explanation for how the ten percent was derived, correct?

16  A.   Yes, sir.

17  Q.   But I take it, you don't agree with the application of

18  that ten percent the way Barclays applied it?

19  A.   I don't agree with the derivation or the application.

20  Q.   Let's go, if you can, to tab 14 in your binder, which is

21  Movants' Trial Exhibit 252, please?  And is that the document

22  you're alluding to which describes the ten percent methodology

23  used by Barclays?

24  A.   Yes.

25  Q.   And you said you don't agree with the derivation and you

Page 38

1    don't agree with the application.  Could you briefly describe

2    what your disagreements are on those two points?

3    A.    Sure.  Just method 1 appears to indicate various sources

4    and measurements that allowed the, I believe, the conclusion to

5    be ten percent.  I'm not sure I ever saw detailed information

6    about the specific sources.

7         Method 2 that's highlighted in the first page of this

8    document is actually supported by the information on the back

9    of the page.  So if you don't mind, I'd like to turn to the

10   back, the second page.

11        This is a collection, I believe, of thirty-nine

12   instruments, agency mortgage-backed securities of varying

13   types.  Twenty of the thirty-nine, I believe, are interest-

14   only -- inverse interest-only securities.  Inverse IOs

15   represent one of the most complicated agency RMBS securities

16   that we looked at -- that I looked at.  The other nineteen are

17   a cross-section of plan amortization classes from structured

18   collateral classes, a little bit less demanding analytically

19   and sophistication-wise.

20        If I could just guide your attention to the far right-hand

21   column, the indicated B/O percentage, which I took to mean the

22   bid-offer percentage.  Based on reverse engineering this

23   particular series of data points, I believe the 10.5 at the

24   bottom, the so-called "average bid-offer spread for agency

25   CMOs", was arrived at by using the indicated face amount.  So

Page 39

1    what was done, I believe they weighted the face amount times

2    the individual observations, and then came up with the

3    conclusion of 10.5 percent.

4        A couple things as it relates to the fundamentals of that

5    analysis.  The adjustments that I made throughout my analysis

6    were mid-to-bid adjustments.  So I believe, fundamentally, this

7    10.5 percent number should have been divided by 2.  So just in

8    terms of a quick reduction, it would be about 5 and a quarter

9    percent.

10       The other issue is that the weighting technique, if I

11   change the way in which I approach the conclusion at the bottom

12   and use market value of the securities -- and in the IO market,

13   I believe, based on what I've seen over the course of my

14   career, that most participants are used to using the market

15   value.  Because an interest-only security will typically trade

16   on a level somewhere in the area -- and again, it depends on

17   sophistication and structure and all the other elements.

18       But let's just say, for the sake of the description, a

19   five to twenty dollars price out of a hundred.  So the face

20   amount overextends or if not magnifies the result analytically

21   of such a weighting.  They -- my reaction is the weighting

22   should have been done by market value.  If you weight it by

23   market value, I believe that 10.5 percent number falls below 3

24   percent.  And then I would subject it to a divide by 2

25   approach.

Page 40

1    Q.   And that comes very close to the number that you actually

2    used, the 1.6?

3    A.   For trust IOs and POs, correct.  If you do a simple

4    average of the far right-hand column, again, your conclusion

5    would be below ten percent.  I think it would be about eight

6    percent.  Because it looks as though it's bid-offer, I would

7    then subject it to a division by two, yielding a four percent.

8    Q.   All right.  I'm going to try and --

9    A.   Sure.

10   Q.   -- sort of raise it up above the weeds just a little bit.

11   Did -- following this analysis, did Barclays then simply apply

12   that ten percent bid-ask spread across all of these types of

13   securities?

14   A.   Correct.

15   Q.   So regardless of whether they were in the first category

16   or the second category, they were at 10.5 percent mid-to-bid

17   adjustment?

18   A.   Correct.  And from indications, my reaction is that there

19   are no trust agency RMBS strips represented in this universe at

20   all.

21   Q.   Okay.  So it's not a good sample, either, for what you're

22   valuing?

23   A.   No, not specifically.

24   Q.   Now, when you applied your bid-ask spread, did you simply

25   apply 1.6 across all these securities, or did you do something

Page 41

1   different?

2   A.   No, the 1.6 actually represents a granular application.

3   Even including allocating an adjustment -- a different

4   adjustment for trust IOs versus trust POs.  And then within the

5   bigger universe of securities within this dataset, which I have

6   yet to discuss, there was a -- again, a granular approach in

7   terms of the allocation of my liquidity adjustment.

8   Q.   And so you applied the applicable liquidity percentage to

9   the type of security that you were actually valuing as opposed

10  to some kind of an average across all of them?

11  A.   I believe I did.  And just, again, for the sake of one

12  final point, if you don't mind.  I know there's a lot of

13  numbers.  My conclusion as far as the inverse IO instrument, I

14  concluded that the appropriate mid-to-bid adjustment would be

15  16.7 percent.  In other words, my conclusion as on the bid-ask

16  was approximately what's indicated here.  But because I took

17  the bid-ask and divided by two, I ironically enough, or

18  coincidentally enough, arrived at a similar number in terms of

19  the adjustment.

20  Q.   And again, so if I can understand what you're saying,

21  where applicable, for certain complex securities, you used a

22  very wide bid-ask spread?

23  A.   Correct.

24  Q.   Okay.  And when it was not applicable, you used the

25  applicable narrower bid-ask spread.  Is that correct?

Page 42

1   A.   That is correct.

2   Q.   Let's go back to your presentation.  We had started

3   talking about the fact that there's this liquidity adjustment

4   that seems to drive the differential on the first line.  On the

5   second line, agency CMOs, what drives the differential there,

6   sir?

7   A.   I believe it's price.

8   Q.   Okay.  And do you have an understanding as to how Barclays

9   derived its prices for these securities?

10  A.   I have an understanding.  I'm not sure I would be an

11  expert in terms of the actual details of their approach.  But I

12  believe the difference in their approach versus the approach

13  that I use would be encapsulated in a single facet of the

14  valuation approach, that being the risk premium assigned or

15  ascribed to the individual instruments.

16  Q.   So they assigned a higher risk premium than you did to

17  these instruments, sir?

18  A.   Correct.  In this category we're looking at a process that

19  I alluded to earlier known as what I would describe as a

20  supercharged discounted cash flow approach.  So what is

21  included in that supercharged DCFS is a risk premium or an

22  adjustment to the underlying interest rate.  And I believe,

23  compared to my number or numbers -- because it's a broad mix --

24  that they used fundamentally a higher risk premium.

25  Q.   And did you see any explanation in the documents produced

Page 43

1    by Barclays or PWC to justify that higher risk premium used by

2    Barclays?

3    A.    I found one spreadsheet that seemed to indicate a

4    segregation of the types of securities inside this agency CMO

5    silo.  And it looked as though that there was some indications

6    of spreads and yields according to the subdivisions of this

7    silo.  And then it was information that also contained prices

8    relative to third parties.  But that would be the extent of my

9    knowledge.

10   Q.    And in terms of any deposition testimony or evidence from

11   any Barclays witnesses, have you heard any explanation for

12   those risk premiums?

13   A.    No, not that I've seen.

14   Q.    Okay.  Now, again, as you did with the U.S. Treasuries,

15   did you test what effect Barclays' pricing and risk premiums

16   would have on implied yields for this group of securities?

17   A.    For a limited set.  Unfortunately, implied yield is a

18   little bit more difficult because of the type of process that

19   one undertakes to calculate the numbers.  But the bottom sub-

20   bullet on the slide that's up --

21   Q.    Slide 16?

22   A.    -- yes -- that was actually taken from the information

23   that I alluded to earlier.  This was not a calculation that I

24   did.  It was -- appeared to be a number that was in a file that

25   seemed to, I guess, support the pricing of these securities.

Page 44

1    Q.    So this was a file offered by Barclays as support for its

2    calculation?

3    A.    I believe so, yes.

4    Q.    Let's move on to the next subcategory, again, within

5    agency RMBS.  There's, again, a price differential here.  And I

6    think if we go back to your summary page for this particular

7    category -- this is on slide 14 -- this is the third category,

8    forty-seven CUSIPs, largely price-driven, not so much

9    liquidity-driven, correct?

10   A.    Correct.

11   Q.    And again, what's the explanation for the price

12   differential for this subcategory of securities?

13   A.    My only conclusion would be that it has to do with the

14   risk premium, once again.

15   Q.    Similar to the category we just looked at?

16   A.    Yes, sir.

17   Q.    Let's move on, then, to the next item in your overall

18   calculation.  So back to the summary page.  We discussed A and

19   B.  Let's talk about non-agency RMBS.  And again, let's start

20   with a discussion of what are these securities?

21   A.    Sure.  Non-agency RMBS would be securitized mortgage

22   product that has been originated by, again, the -- or

23   securitized through channels that are not Fannie Mae, Freddie

24   Mac or Ginnie Mae.  Probably the most -- or the best example

25   might be, Countrywide would be viewed as a private non-agency

Page 45

1    securitized or a mortgage institute.

2    Q.    So Countrywide originates or buys mortgages, bundles them

3    into an RMBS offering and then offers that RMBS offering?

4    A.    Yes.

5    Q.    And did you analyze what's driving the differential here?

6    You have a 387 million dollar differential between your

7    valuation and Barclays' valuation.  Is this price?  Is this

8    liquidity?  What is it?

9    A.    This is exclusively price.  And similar to the previous

10   two categories, there is a segregation of the 162, as based on

11   the slide that you just brought up.

12   Q.    Which is slide 19?

13   A.    Yes, sir.  The non-agency CMO strips, I analyzed in a

14   similar way to the previous grouping of securities, the 308

15   agency RMBS.  So I analyzed them using the same tools.  I

16   actually applied a liquidity adjustment that was a little bit

17   more conservative than Barclays' that produces the negative

18   number in the far right-hand column.  But as you can tell, net-

19   net it's exclusively price if not more than exclusively price,

20   with respect to these.

21   Q.    Okay.  And what's driving the price differential here?  Do

22   you understand what's driving this price differential between

23   your valuation and Barclays'?

24   A.    No, I do not specifically.  I can only look to probably a

25   similar explanation, and that might be the risk premium.

Page 46

1    Q.    Just with respect to these prices where we're talking

2    about risk premiums and the differential, if you could, in I

3    think, fairly simple terms, describe your valuation process?

4    What are the major steps of your valuation process in ascribing

5    a price or a value to these types of securities?

6    A.    Sure.  I started with a broad universe of securities,

7    specifically in the agency trust RMBS universe.  I analyzed

8    those securities using the valuation configuration that I

9    deployed.  From that process, I gleaned spread information,

10   risk premium information and then allocated those accordingly

11   to the various buckets or instruments within the appropriate

12   categories.

13   Q.    Let's go back to the summary sheet for the next category

14   of documents.  Let's talk about the Pine (ph.) CLO, which is

15   item E.  Let's again start with a description of what that item

16   is.  That's a single CUSIP, correct?

17   A.    Yes, sir.

18   Q.    Okay.  And that's a 389 million dollar price differential

19   on that single CUSIP, correct?

20   A.    Yes sir.

21   Q.    Okay.  Let's start with an explanation, if you can, of

22   what is the Pine CLO and then get into how you value the Pine

23   CLO.

24   A.    The Pine CLO is a collateralized loan obligation backed by

25   fifty-five commercial credits, revolving credits.  In essence,

Page 47

1    it's an extremely large commercial credit card security.  The

2    individual underlying revolvers enable the individual borrowers

3    to borrow up to a certain limit.  It does not appear as though

4    anyone maxed out their individual credit cards but those

5    extensions of credit then provide cash that satisfies the

6    particular security in question, namely the A1 Pine security.

7    Q.   And so, you have a diagram that diagrams just in general

8    in a very simplistic way this complex structure, sir?

9    A.   Correct.  The relationship diagram.

10   Q.   Okay.  So, is it slide 21 of your presentation materials?

11   A.   Yes.

12   Q.   Okay.  And if you could just walk through this diagram and

13   describe to the Court what's reflected in this diagram.

14   A.   Sure.  On the left-hand side would, basically, be the

15   collateral.  The shaded boxes, the top, "eligible investments",

16   represents cash.  That cash is segregated into different

17   categories but it's cash collectively.

18        The "funded balances", the second sort of shaded gray box

19   of 864 million, that represents at the point of my analysis the

20   funded amount or extensions of credit; the credit that the

21   individual borrowers have pulled down with respect to their

22   outstanding limits.

23        The unfunded commitments would be the other portion.  That

24   is the -- the credit that would be extended in aggregate but is

25   yet to be pulled down by the various borrowers.

1      So, the two shaded areas represent, again, the collateral

2    that generate cash which would then be fed into the Pine

3    apparatus.

4      Pine is unique in that it is what I would label as an

5    "inverted structure".  Which means everything on the left hand

6    side in the gray would typically flow to the A1 to satisfy the

7    security interest or the bondholder of that security interest.

8    Q.   Okay.  And why do you use the phrase "inverted structure"?

9    I mean is it different from a noninverted structure?

10   A.   Correct.  A noninverted structure, there might be

11   additional, one would consider funding risks of the A1,

12   specifically involving the unfunded commitment amount.  But in

13   this case, the A1 is what would be described as a closed

14   security and that is not subject to additional funding calls.

15   Q.   Okay.  So, with respect to the unshaded portion on the

16   left, the unfunded commitments of 968, if requests were made by

17   these borrowers for further lending under that unshaded bucket,

18   the unfunded commitments, would any of that have to be paid by

19   the holder of the A1 note, sir?

20   A.   No.  It would then flow to the A2 and B and subnote.

21   Q.   And the security at issue here is the A1 note, correct?

22   A.   Correct.

23   Q.   Now, how did you value this structure?

24   A.   Once again, just as far as the description, there's an

25   underlying collateral pool of approximately fifty-five

Page 49

1    borrowers.  I analyze the, at the loan level, those fifty-five

2    borrowers.  And so --

3    Q.   How do you do that?

4    A.   I ascertain loan prices and then was able to convert that

5    loan information or loan price information to a yield and then

6    I was able to do a discounted cash flow analysis of the A1

7    security.  So, in effect, I started with, again, the fifty-five

8    commercial credits, identified price information where I could

9    for those credits and then work toward the A1 security in terms

10   of valuation.

11   Q.   Now, how did Barclays value this security?

12   A.   Based on my understanding of their approach, they

13   approached it from a, what one would describe as a net asset

14   value approach based on various scenarios.

15   Q.   And do you agree with that conclusion on their analysis?

16   A.   No, I did not.

17   Q.   Why not?

18   A.   One, I believe that they were assigning a price at the

19   loan level that was below the indications, at least, that I was

20   able to accumulate.  Also, I think they were not taking into

21   account the fact that the A1 was, in fact, an inverted

22   structure so it wasn't subject to additional funding risk.

23        When I attempted to replicate their net asset value again

24   that wasn't the driving approach that I took, but my

25   conclusions were that based on a reasonable expectation of

Page 50

1    default given the condition of Lehman, that the A1 piece was,

2    in fact, over-collateralized and the net asset value approach

3    would probably yield a price of par.

4    Q.   Now, that asset value is not the approach you used,

5    correct?

6    A.   No.

7    Q.   Okay.  For the approach that you used, what assumptions,

8    if any, did you make about the likelihood of an event of

9    default on and after the 19th of September?

10   A.   I did not use an event of default as a influence in the

11   valuation.

12   Q.   Okay.  So, it did not affect drive up or drive down your

13   evaluation in any way?

14   A.   No.  If I did, it would have driven it up.

15   Q.   Okay.  So, if you had considered the likelihood of an

16   event of default, your value would have been even higher?

17   A.   Yes.

18   Q.   Okay.  Is it your understanding that for purposes of the

19   acquisition balance sheet Barclays had a certain value for Pine

20   but that before the year was over, before December 31st, 2008,

21   the value was written up by Barclays?

22   A.   I believe the write-up was in the range of hundreds of

23   millions of dollars and that increase or write-up when compared

24   to the credit quality of the underlying credits, it appeared to

25   be that twelve credits were actually downgraded during the

Page 51

1  period from my analytical as of date to the apparent date of

2  their write-up.

3  Q.   Okay.  So, compared to the time when you valued these

4  securities as of September 19th, the credits you valued had

5  higher credit ratings than as of the end of December 2008 when

6  Barclays wrote up the value of this Pine CLO note.  Is that

7  right?

8  A.   As far as I could tell, yes.

9  Q.   Did you understand what the justification was offered

10 internally at Barclays for writing up by hundreds of millions

11 of dollars this single opposition?

12 A.   I recall a paragraph.  I'm not sure exactly where at this

13 point; I apologize.  But something with respect to the event of

14 default allayed a certain amount of fears and enabled the

15 write-up to occur or provided support for the write-up.

16 Q.   All right.  Let's move back to your summary sheet and the

17 categories of security to value.  And we had skipped over D but

18 go back to D.  These are collateralized loan obligations

19 excluding Pine.

20 A.   Yes, sir.

21 Q.   And again, briefly, this is not a big price differential,

22 about twelve million dollars, six CUSIPs, how did you value

23 these securities, sir?

24 A.   We valued them using Intex, so, the structure deal

25 library, and used market -- contemporaneous market information

Page 52

1  to quantify the appropriate discount rates.

2  Q.   And is Intex, the library Intex, that you refer to, is

3  that something that's used by Barclays as well, sir?

4  A.   I believe it is.

5  Q.   You have seen documents produced by Barclays showing that

6  they used Intex from time to time?

7  A.   I believe it looks as though screen shots are, yes,

8  extracts from Intex, yes.

9  Q.   Now, why the price differential if you're using same or

10 similar models and libraries?  Do you have any explanation for

11 why your value is different than Barclays'?

12 A.   I really don't.

13 Q.   Do you have any explanation for Barclays as to how they

14 arrived at their number?

15 A.   I recall seeing some information flows with respect to

16 model inputs but I really -- I don't know.

17 Q.   Could you reverse engineer, for example, their numbers?

18 A.   Not to fully conclude with a value, no.

19 Q.   Let's move to category F.  That's CDOs and CMBS.  It's

20 thirty CUSIPs.  Again, not a big price differential.  Briefly,

21 if you could describe how did you go about valuing these

22 securities?

23 A.   Similar to the category that we just left in that -- used

24 Intex.  So, started from the ground floor up and worked through

25 Intex ascribed in what I felt to be a contemporaneous market

Page 53

1    discount rate information and arrived at the conclusion that I

2    did.

3    Q.   Okay.   I skipped right over CDOs and CMBS.   CDOs are

4    collateralized debt obligations?

5    A.   Yes.

6    Q.   And CMBS is what?

7    A.   Commercial mortgage-backed securities.

8    Q.   So, its structured investments?

9    A.   Structures again, the point of departure would be the

10   underlying collateral.

11   Q.   And the reason you use Intex then is to get an

12   understanding of the deal structure?   What's in the particular

13   deal?

14   A.   Correct.

15   Q.   And again, here for this price differential, any

16   explanation from Barclays as to how they arrived at the numbers

17   that they arrived at?

18   A.   Again, I can recall seeing some information about

19   prepayment rates and the like, but not that I could use to

20   reverse engineer, as you suggest, no.

21   Q.   Now, let's move to the last category which is the 6,035

22   other CUSIPs.   Again, at a high level, if you could tell us,

23   basically, the steps you took to value this portfolio of

24   securities.

25   A.   The portfolio would -- the first step that I took was to

Page 54

1    try to identify available third-party price information from

2    sources such as Bloomberg, FactSet, Cap IQ, Interactive Data

3    Corp.

4    Q.   What are these?  I mean Bloomberg we've heard about.  How

5    about the others?  Are they --

6    A.   These are all reputable pricing sources.  So, where I did

7    have observations, prices available, at the CUSIP level from

8    those sources, I tried to use them as opposed to defaulting to

9    some other pricing mechanism.

10   Q.   And are these pricing sources that you had used in the

11   past as part of your career in your work?

12   A.   Yes.

13   Q.   And then, so it's step by step looking at the 6,000

14   CUSIPs, how did you go about applying this third-party data to

15   value this collateral?

16   A.   Okay.

17   Q.   Value these securities?

18   A.   Within the 6,000, approximately 4,600 or so allowed me to

19   identify an available third-party price.  Due to certain

20   adjustments, that particular segment of this universe was

21   reduced to 4515 CUSIPs.  So, about two-thirds of this portfolio

22   I priced using available information from Bloomberg, Cap IQ,

23   FactSet, Interactive Data as indicated.

24   Q.   And so, you would get -- you had prices for these

25   particular CUSIPs from those sources, one or more of those

Page 55

1    sources, is that right?

2    A.    Yes.

3    Q.    What if you had multiple prices from those sources?  What

4    did you do then?

5    A.    An average.

6    Q.    Okay.  Where there any third-party prices that you

7    discarded as part of your approach to using third-party

8    evaluations?

9    A.    Yes.  There were -- I believe there are sixty-two CUSIPs.

10   A statistical test was run throughout and that compared the

11   available third-party price information to the BoNY price and

12   the Barclays price based --

13   Q.    Why that comparison?  Why are you doing that comparison

14   between third-party prices and Barclays and BoNY?

15   A.    Wanted to make sure that -- approached it using a certain

16   amount of conservatism, make sure that it didn't introduce

17   something that was considerably different from the other

18   observations.

19   Q.    So, you're getting rid of the outliers?

20   A.    Correct.

21   Q.    Okay.  Putting those aside, then, you also used BoNY

22   prices for 1,520 CUSIPs.  So, why did you use BoNY prices?

23   A.    Again, a majority of this 1,500 would represent securities

24   for which I did not have an available third-party price.  And

25   then again about five dozen fell into this category where they

Page 56

1   failed the statistical test in comparison to comparability.

2   Q.   Okay.  So, you used BoNY when you don't have third-party

3   prices.  You also use BoNY when you have third-party data but

4   it's an outlier?

5   A.   Correct.

6   Q.   And once you have those prices, do you then apply

7   liquidity haircuts, sir?

8   A.   Yes.  If -- in certain instances, the data pulled from

9   Bloomberg was specifically a bid price so those were not

10  adjusted down further.

11       The other point to highlight would be that the sixty-two

12  that failed to meet the statistical test, if I did include the

13  third-party price observations for those and abandon this

14  approach that I took to identify outliers, the unevaluation

15  would have actually increased by approximately nineteen million

16  dollars.

17  Q.   Okay.  And for this collection, this overall collection of

18  6,000 CUSIPs, what was the average price differential between

19  your value and Barclays value?

20  A.   Sure.  On a per CUSIP basis, it's approximately 6,900

21  dollars.

22  Q.   Okay.  Now, did you do anything with respect to the

23  securities that you had priced from the ground up?  The 630 or

24  so to compare those ground up prices that you had derived

25  versus third-party quotes?

Page 57

1    A.    Yes.

2    Q.    What did that show?

3    A.    For comparison to the available third-party price

4    information again, I have 632 CUSIPs that I valued from the

5    ground floor up.  I did not have available price information

6    for all 632.  But for the ones that I did which exceeded 400-

7    450, the price differential was, I believe, 0.4 percent in

8    aggregate; mid-to-mid.

9    Q.    So, the prices that you arrived at through your ground

10   floor up approach, were very close if not identical to the

11   prices from these third-party sources?

12   A.    Correct.

13   Q.    For the ones that you had valued individually.

14   A.    Correct.  And then I also compared my universe, the

15   granular ground floor up universe, to the Bank of New York.

16   Q.    And what did that comparison show?

17   A.    Bank of New York was slightly higher but my price was

18   within 2.6 percent of the BoNY price, mid-to-mid, in aggregate.

19   Q.    Sir, you are aware that some of the values that you

20   ascribe for certain CUSIPs using BoNY prices are different than

21   the prices arrived at by Professor Zmijewski using the JPM

22   dataset?  Do you have any understanding or explanation for that

23   differential, sir?

24   A.    Well, one point to highlight is the one that you just

25   finished on and that is it's a discrete dataset.  It's separate

Page 58

1    and apart from the work that I did.  I also believe that Dean

2    Zmijewski was dealing with an as-of date issue.  So,

3    analytically, I believe, he was driven more toward a portfolio

4    approach and maybe less in the granular ground floor up

5    approach.

6    Q.   And using those at a portfolio level, the JPMorgan prices

7    or the Bank of New York prices, have you viewed as a -- on a

8    portfolio level, how those price sets or datasets compare?

9    A.   I did.

10   Q.   And what is that -- what have you concluded from that

11   review?

12   A.   They are comparable.

13            MR. TAMBE:  If I could have a moment, Your Honor?

14            THE COURT:  Sure.

15        (Pause)

16            MR. TAMBE:  Thank you, very much, Mr. Slattery.

17            THE COURT:  This is probably a suitable time to take a

18   morning break.  So, let's break till 11 a.m.

19        (Recess from 10:46 a.m. to 11:06 a.m.)

20            THE COURT:  Be seated please.

21            MR. HUME:  Good morning, Mr. Slattery.  My name is

22   Hamish Hume.  I represent Barclays.  We haven't met before.

23            THE WITNESS:  Good morning.

24            MR. HUME:  Nice to meet you.

25   CROSS-EXAMINATION

Page 59

BY MR. HUME:

Q.   Mr. Slattery, am I correct that your principal background

relates to devising computer models related to the valuation of

fixed income securities?

A.   No.

Q.   Am I correct that you spent eight years at Quantitative

Risk Management developing computer models, software models?

A.   That's not correct.

Q.   What did you do there?

A.   I was a subject-matter consultant.  The software and

development of the software was built, designed, by colleagues

at the firm.

Q.   Am I correct, sir, that you have never been a -- worked as

a trader?

A.   Correct.  I acted in the capacity of an assistant

portfolio manager during my time at JMN.

Q.   And I believe you testified this morning that you

currently work -- you currently are employed by Navigant, do

you remember that?

A.   Yes.

Q.   Am I correct, sir, that you're not employed by Navigant

but you were hired by them as a consultant in this case?

A.   That is correct.

Q.   And am I correct that at least as of the time of your

deposition in April of this year the only thing that you had

Page 60

1    worked on for Navigant was this case?

2    A.   As of that point, yes.  Subsequent to that time, no.

3    Q.   And am I correct that on this case you have used people

4    who work for you independently of Navigant?

5    A.   I'm sorry; could you --

6    Q.   Mr. Powell and the other gentleman, Mr. Dykstra, who

7    worked with you?

8    A.   Yes.  They were peers from prior employment, then I worked

9    with him on this engagement.

10   Q.   And I am correct, that neither of them are traders?

11   A.   Correct.

12   Q.   And you testified this morning that you worked for a

13   number of years as a consultant to AIG in developing their risk

14   management system?

15   A.   That's not correct

16   Q.   What -- did you work -- you testified something about

17   doing work for AIG's risk management system, correct?

18   A.   AIG Capital for approximately one year helping them

19   implement an enterprise risk management system, yes, but not --

20   Q.   And do you know whether they continue to use that system

21   through -- up through 2008?

22   A.   I don't know.  The name of the system is Oracle Risk

23   Manager.  I don't know.  I have not been in contact with them.

24   Q.   And you were a consultant for a group called JMN

25   Investing, is that right?

Page 61

1   A.   JMN Financial, JMN Consulting.

2   Q.   And did they manage two different funds?

3   A.   Yes.  In a nondiscretionary capacity.

4   Q.   And is the reason -- and you helped them in their

5   valuation modeling?

6   A.   Correct.

7   Q.   And is the reason you left JMN because one of the major

8   investors decided to pull out of one of the funds?

9   A.   The second investor decided to not pursue additional --

10   billed out the portfolio, correct, but there are other issues

11   that related to my departure from JMN.

12   Q.   Did it have to do with the underperformance of the funds

13   that were using your modeling?

14   A.   No, it did not.

15   Q.   Did it have to do with the fact -- did the investor's

16   departure have to do with the fact that one of the funds was

17   underperforming?

18   A.   No, it did not.

19   Q.   Do you know why that investor pulled out?

20   A.   I believe there was some, I guess, concern about the

21   performance of the fund as constructed throughout the course of

22   our time acting on the gentleman's behalf but I believe there

23   was another element of the relationship that caused for the

24   break.

25   Q.   And this was in November 2008?

Page 62

1    A.    Yes.

2    Q.    And between November 2008 and March of 2009, how were you

3    employed?

4    A.    I was not.

5    Q.    We have some examination binders we will hand out which

6    have some exhibits I'll refer to in the examination.

7         (Pause)

8            THE COURT:   Thank you.

9         (Pause)

10   Q.    Mr. Slattery, am I correct that when you were at JMN you

11   attempted to value collateralized debt obligations?

12   A.    Yes.

13   Q.    And is it correct that the portfolio you attempted to

14   value was over 100 billion dollars or is that not correct?

15   A.    At this point, I think the recollection was north of 100

16   billion.  It was several hundred CDO positions.

17   Q.    Do you have any records, Mr. Slattery, of how those

18   valuations performed after your departure?

19   A.    No.  That was not the crux of the engagement anyway.

20   Q.    Now, in this engagement, Mr. Slattery, am I correct that

21   you did not perform an analysis to determine what percentage of

22   the assets you value were characterized as either Level 2 or

23   Level 3 assets?

24   A.    For what purpose?

25   Q.    The question is did you do it?

Page 63

1  A.   No.

2  Q.   Do you know -- do you know what the characterizations

3  under the accounting rules of Level 1, Level 2, and Level 3

4  are?  Are you familiar with those?

5  A.   I have some familiarity, yes.

6  Q.   And would you agree with me that Level 2 and Level 3

7  assets by definition are assets which cannot be valued by a

8  daily transaction price in that particular asset?

9  A.   I believe that's the formal definition or --

10  Q.   And that, therefore, for Level 2 and Level 3 assets, you

11  have to use some kind of indicative pricing; either modeling or

12  matrix system of some kind, correct?

13  A.   Fair.

14  Q.   And you don't know what percentage of the alleged

15  undervaluation of 2.83 billion that you found relate to Level 2

16  and Level 3 assets?

17  A.   It's 2.38 billion.

18  Q.   I'm sorry.  Maybe I misspoke.  Sorry; I did.  So, let me

19  ask it again.

20      Am I correct that you don't know what percentage of the

21  2.38 billion alleged undervaluation that you are opining on in

22  this case relate to Level 2 or Level 3 assets?

23  A.   No.  I was not asked to perform such work, so, no; I don't

24  know the quantification of those particular categories.

25  Q.   Would it surprise you, based on your familiarity with the

Page 64

1    assets that you looked at, to learn that the alleged

2    undervaluation of 2.38 billion you're opining at only

3    approximately 12 percent of it relate to assets that Lehman

4    characterized as Level 1 assets?

5    A.    Would it surprise me?

6    Q.    Yes.  Would that surprise you or would that be in keeping

7    with your rough sense of the nature of the assets you were

8    looking at?

9    A.    It would probably coincide or reconcile to my rough sense

10   of what was embedded in -- or what was represented in the

11   portfolio I examined.

12   Q.    So, in other words, you would agree that the overwhelming

13   majority of the assets where you found an undervaluation were

14   assets that did not have a daily transaction price in those

15   assets that could be used to value the assets?

16   A.    I don't know specifically if they didn't.  It might be a

17   function of my limited success in finding one.  However, in

18   terms of the prices that I did find, I was able to use them in

19   consistent methods and market practices to value the other

20   securities.

21   Q.    Would you agree with me, Mr. Slattery, in principle, that

22   for Level 2 and Level 3 assets that don't have a reliable daily

23   transaction price, that there is some range of possible values

24   that could be reasonable to apply to those assets?

25   A.    There might be a range.  Again, it would be a function of

Page 65

1   the particular security.  You would have to get much more

2   granular in terms of exact -- exactly what that sort of general

3   depiction would represent.

4   Q.   My only -- my question is just very limited to a principle

5   here, which is for assets that are not liquid, that don't have

6   a ready daily active market that you can look at to see what

7   it's trading at.  In other words, for Level 2 or 3 assets,

8   would you agree that in valuing those, there's room for a

9   reasonable range of values that may be considered accurate?

10  A.   There might be a range.  However, in my comparison in

11  terms of results as I indicated in the previous testimony, that

12  my results were extremely consistent with available third-party

13  prices as well as custodial prices.  So, in my view, the

14  consistent outlier might have been the Barclays price.

15  Q.   Am I correct, sir, that you did not attempt to define a

16  range of reasonable values but instead attempted to define what

17  you believe to be accurate values?

18  A.   Correct.

19  Q.   And, sir, did you review the depositions of the Barclays'

20  product control group professionals, Sean Teague, Richard

21  Landerman and Mark Wachtell?

22  A.   I paid particular attention, I believe, to Mr. Landerman.

23  The other ones I reviewed.  But I wouldn't --

24  Q.   I'd just like to pull up a demonstrative, quickly, if I

25  may and ask if you are generally -- you're generally familiar

Page 66

1    with who these individuals are?

2    A.   Yes, sir.

3    Q.   And you understand that they had some managerial

4    responsibility for the valuation work that was done for most of

5    the assets that were valued by Barclays acquired by Lehman --

6    acquired from Lehman?

7    A.   Yes.

8    Q.   And are you generally familiar with the fact, Mr.

9    Slattery, that all three of those professionals swore under

10   oath that their objective was at all times to state the fair

11   value of the assets under applicable accounting rules?

12   A.   Are you asking me if I -- that's a specific quote or is

13   that a paraphrase?

14   Q.   Well, we have the deposition quotes and we can look at

15   each one if you wish.  But my question is --

16   A.   That's fair.

17   Q.   -- are you generally aware that they gave that testimony?

18   A.   Yes.

19   Q.   And are you generally aware that they testified under oath

20   that the instructions given to them and the instructions they

21   gave to their teams were to value the assets at fair value?

22   A.   Yes.  I just don't necessarily agree that instructions

23   given and intent are not in any way, shape or form undermining

24   the integrity of the gentlemen that are represented.  But I

25   know the course that I took and I'm comfortable and confident

Page 67

1    in the results that I generated.

2    Q.   And I understand that and I'm going to ask you about that

3    approach.  My only question here, sir, is you're not giving an

4    opinion, are you, that you believe Barclays intentionally tried

5    to understate the assets you valued?

6    A.   No.  I'm not offering an opinion as to their intent, no.

7    Q.   Am I correct, sir, that over ninety percent of the

8    CUSIPs -- let me move now to the different categories you

9    valued.  And I want to start with this group of 6,035 CUSIPs --

10   A.   Okay.

11   Q.   -- which represent approximately half of the CUSIPS

12   acquired by Barclays from Lehman, correct?

13   A.   I believe that's fair representation, yes.

14   Q.   And they represent approximately ninety percent of the

15   CUSIPs that you valued, correct?

16   A.   Yeah.  Ninety percent.

17   Q.   Ninety percent.  In other words, you valued 6,600 and

18   something and just over 6,000 of them you valued through this

19   third-party method?

20   A.   Yes.

21   Q.   And am I correct that of those 6,035 that you valued

22   through the third-party method, that your valuation was more of

23   a data mining exercise than a ground-up valuation effort?

24   A.   It was an accumulation of available information as opposed

25   to specific detailed look on a security basis, yes.

Page 68

1   Q.   Would you agree that it's fair to characterize it as more

2   a data mining exercise than a valuation effort?

3   A.   No.  I think that actually undermines it based on that

4   description.  I wouldn't intend to agree with that, no.

5   Q.   Well, sir.  Can you turn, please, to tab 3 of your binder

6   which is your deposition transcript and to page 210, lines 11

7   to 16, and the question there was,

8   "Q.  Was the work on the 6,000 primarily done by your staff?

9   "A.  It was done with predominately with my staff and myself

10  and, basically, it was a data mining exercise more so than a

11  ground-up valuation effort."

12       Do you see that?

13  A.   Yes, sir.

14  Q.   And was that truthful testimony at the time you gave it?

15  A.   Yes, it was.

16  Q.   Does it remain truthful and accurate today?

17  A.   I think I probably would seek to amend that comment, but

18  yes, it's -- obviously, I said it in deposition.

19  Q.   And, sir, they were -- would you agree with me that there

20  were a lot of different types of assets in this group of 6,035

21  securities?

22  A.   Yes.

23  Q.   And we have a demonstrative that would show all of those

24  different assets based upon your materials and the PwC

25  materials, would you agree with me, sir, that that 6,035 CUSIPs

Page 69

1    included as listed here, corporate bonds, emerging market

2    securities, auction rate preferreds, commercial paper,

3    mortgage-backed securities, municipal bonds, sovereign debt,

4    and a wide variety of asset-backed securities including those

5    relating to life insurance, auto loans, credit card loans, FHA,

6    floor plan, whatever that is, litigation fees, franchise,

7    student loan, unguaranteed portions of SBA loans and other ADS

8    including aircraft.  Does that sound familiar?

9    A.    Yes.  Is there a relative value assigned in terms of the

10   weight?  I believe the mortgage-backed securities represented a

11   majority of them.

12   Q.    Right.  Would you agree with me, sir, that you're not a

13   specialized expert in valuing all of those kinds of securities?

14   A.    I'm not a specific specialized expert, no, but I'm

15   comfortable and confident that based upon exploration given a

16   ground floor up analysis charge I would be able to value the

17   respective item.

18   Q.    And am I -- would it be correct to characterize your

19   effort with respect to the 6,035 CUSIPs, Mr. Slattery, as an

20   effort to provide a reasonable sense of their value without

21   performing your own independent valuation?

22   A.    Yes.

23   Q.    And that would include an effort to do that with respect

24   to assets that you may not have great familiarity with but that

25   you understand the basic concept of how to value?

Page 70

1    A.    Fair.

2    Q.    And am I correct that you have not analyzed with respect

3    to the valuation difference you find on those 6,035 securities,

4    which is I think 419 million dollars?

5    A.    Correct, approximately 69,000 dollars of security.

6    Q.    Right.  You haven't attempted with respect to that 419

7    million dollars to determine how much of that valuation

8    difference relates to Level 2 and 3 assets?

9    A.    Correct.

10   Q.    Would it surprise you to learn that, again, less than ten

11   percent of the assets for relating to the valuation difference

12   you found on these 6,035 securities were Level 1 assets?

13   A.    No.

14   Q.    You gave testimony earlier this morning, and I believe

15   it's a slide in your demonstratives, page 28.

16          MR. HUME:  I don't know, do we have the ability to

17   pull this up yet?  We have to switch over here?  Could we pull

18   up page 28?  Thank you.  Thank you.

19   Q.    Am I understanding both your testimony in this chart

20   correctly, Mr. Slattery, that you're saying that for

21   approximately two-thirds of the 6,035 CUSIPs, you found third-

22   party data from more than one source?

23   A.    No, I don't know exactly in terms of how many I had

24   multiple sources.  Those just indicate the type of sources that

25   I had.  I don't know -- I don't know the segregation that I

Page 71

1    think you're asking about.

2    Q.    Have you attempted to analyze, sir, how much of the 419

3    million dollar valuation difference that you found with respect

4    to these 6,035 CUSIPs is attributable to CUSIPs for which you

5    only had one third-party source?

6    A.    As I sit here, no, I don't know the answer to that.

7    Q.    Would you agree with me, sir, that if there is only one

8    third-party source, the pricing information you have is less

9    reliable than when you have multiple third-party sources?

10   A.    Not necessarily.  Again, there was a statistical check on

11   every third-party price accumulated, for reasonableness and

12   comparability, so I don't know if I would tend to agree with

13   that.

14   Q.    Did you analyze, sir, how different, if at all, your

15   midpoint prices were for these 6,035 CUSIPs and those provided

16   by the Bank of New York?

17   A.    Are you asking on a mid-to-mid basis, 6,035 versus --

18   Q.    Mid-to-mid for the 6,035, yes.

19   A.    Well, again, 1,520 resulted in the utilization of the BoNY

20   price.  So the other 4,515 by, again, statistical definition

21   would be comparable to the BoNY price.

22   Q.    Let me move on now to the agency rate securities that you

23   valued.  You testified earlier this morning, sir, that the

24   agency rates were part of the larger rates portfolio; including

25   both treasuries and government agencies, correct?

Page 72

1   A.   Are we talking the agency debt securities?

2   Q.   Well, yeah, I'm going to focus on them.  But you

3   characterized them first as both Treasuries and agency rates

4   together?

5   A.   Yes.

6   Q.   And there is a difference between U.S. Treasuries and

7   government agency bonds, correct?

8   A.   Correct.

9   Q.   And you describe the difference, I think, as the

10   Treasuries have the explicit government guarantee and the

11   government agencies were viewed to have an implicit guarantee,

12   correct?

13   A.   Correct.

14   Q.   Were you aware, sir, that in September 2008 there was

15   doubt about the extent of that implicit guarantee?

16   A.   I think when the government put 200 billion dollars out to

17   backstop Fannie and Freddie in September 7th, I think that

18   allayed those fears or those doubts.

19   Q.   So you don't believe there was any concern amongst

20   bondholders after the government takeover of Fannie and Freddie

21   on September 7th, that as to what kind of guarantee, what the

22   conservatorship would mean for bondholders?

23   A.   Am I -- can you repeat the question?

24   Q.   Is it your testimony, sir, that after the government took

25   over Fannie and Freddie and placed them into conservatorship on

Page 73

1    September 7th, 2008 there was no doubt or concern amongst the

2    bondholders of Fannie and Freddie as to what would happen to

3    the value of their bonds?

4    A.   I would probably be remiss to suggest that there was no

5    doubt.  However, in terms of performance, I looked at a cross-

6    section of agency bonds:  Fannie, Freddie, Federal Farm Credit,

7    Federal Home Loan Bank, and TVA.  And based on spreads, yield

8    levels there was widening and tightening in the marketplace

9    post-September 7th.

10   Q.   Are you aware of what happened to preferred shareholders

11   in Fannie and Freddie?

12   A.   I have loose familiarity with those, yes.

13   Q.   Would you agree with me that their investments were

14   completely wiped out by the government conservatorship?

15   A.   I believe that was the effect, yes.

16   Q.   And have you ever looked at the Fannie and Freddie balance

17   sheets at the time the conservatorship was put into effect on

18   September 7th?

19   A.   As of September 7th, no.  But I spent time with Fannie and

20   Freddie as it relates to my LaSalle time.  I actually met with

21   the risk managers of both enterprises for an extensive period

22   to understand the approaches they would take as it relates to

23   risk management.  Because ABN AMRO at the time wanted to make

24   sure that there was explicit understanding of Fannie and

25   Freddie risk management practices.

Page 74

1    Q.    Would you agree with me, sir, that the time they were

2    placed into conservatorship, their balance sheet, based on

3    their valuations of all the mortgage-backed securities they

4    held, showed sufficient regulatory capital to meet the

5    regulatory capital standards?

6    A.    I'm sorry, again, please repeat that one.

7    Q.    Do you know whether Fannie and Freddie's valuations on

8    the -- of the assets on their balance sheet, would have shown

9    that they were actually adequately capitalized at the time they

10   were put into conservatorship?

11   A.    I don't have any specific recollection of --

12   Q.    Would it surprise you to learn that when the government

13   made the decision to take them over the government's decision

14   was necessarily based on a view that Fannie and Freddie had not

15   marked all those assets properly down to market?

16   A.    That's fair.

17   Q.    Now, in your testimony on agency rates you testified that

18   you believe Barclays calculated a ten percent bid-ask spread

19   for the agency rates, correct?

20   A.    Just for clarification, when you're saying agency rates,

21   which specific asset class?  Relative to my -- are we talking

22   agency RMBS, or agency debt securities?

23   Q.    No, no.  Let's make sure we have our terminology right.

24   A.    Okay.

25   Q.    We're talking about bonds issued by government agencies:

Page 75

1    Fannie, Freddie, Federal Home Loan Bank, do you know all the

2    other ones that were in the pool that was acquired?

3    A.    Yes.   The agency debt securities, I guess in terms of --

4    Q.    I'll call them agency debt securities.

5    A.    That's fine.

6    Q.    Do you know all the agencies that had issued those agency

7    debt securities acquired by Barclays?

8    A.    In the 113 securities that I analyzed, do I know the

9    composition of the portfolio?

10    Q.    Yes.

11    A.    I believe I do.

12    Q.    And what is it?

13    A.    I believe there was a cross-section, again, of government

14    sponsored enterprise:   Freddie Mac, Fannie Mae, Federal Home

15    Loan Bank debt, Federal Firm Credit debt, TVA.   There might

16    have been some RFC debt in there.   But I think it was heavily

17    weighted toward Freddie and Fannie, if I'm not mistaken.

18    Q.    And you testified earlier that you believe those were very

19    liquid, correct?

20    A.    Yes.

21    Q.    Did you analyze the percentage by either value or CUSIP

22    number of what you're calling the agency debt securities that

23    were characterized by Lehman as Level 2?

24    A.    No.

25    Q.    Did you analyze those that were characterized as Level 3?

Page 76

1   A.   No.

2   Q.   Would it surprise you to learn that almost half were

3   characterized as either Level 2 or 3?

4   A.   Within that universe of securities?

5   Q.   Yes.

6   A.   It would surprise me.

7   Q.   Within that universe of securities did you come to the

8   conclusion, as I think is shown on page 8 of your

9   demonstratives, that Barclays applied the equivalent of a ten

10   percent bid-ask spread?

11   A.   Yes.

12   Q.   It's on page 8 of your demonstratives, I believe.

13         UNIDENTIFIED SPEAKER:  You'd like me to turn to that?

14         MR. HUME:  If you could, I'd be grateful.  Thank you.

15   Q.   This is in the third bullet point up from the top.

16         You said applied a five percent liquidity adjustment which

17   you say is equivalent to about a ten percent bid-ask spread, do

18   you see that?

19   A.   Yes.

20   Q.   Now, sir, am I correct that implicit in that opinion is

21   the assumption that the starting point of value to which

22   Barclays applied the adjustment to bid was a mid-price as

23   opposed to an ask-price?

24   A.   Yes.

25   Q.   And would you agree with me, sir, that in a falling market

Page 77

1    when assets are falling in price rapidly, the pricing

2    information that you receive could be more accurately deemed to

3    be an ask-price than a mid-price?

4    A.   It's fair.

5    Q.   Okay.  And did you analyze at all, sir, what was happening

6    in the government agency -- excuse me, agency debt security

7    market for those agency debt securities that were trading at

8    this time?

9    A.   I have reviewed a data set known as ICAP that I believe is

10   supported by 120,000 securities that were traded.  And I found

11   that that data set for September 2008 indicated an average bid-

12   ask spread of 3.4 basis points for these securities.

13   Q.   My question was a little bit different from that.  I

14   understand you're testifying about bid-ask spreads, I'm going

15   to come back to that.

16       But in terms of the pricing for the agency debt

17   securities, did you analyze whether they were rising or falling

18   during the week of September 15th, 2008?

19   A.   I did.

20   Q.   And were the prices rising or falling for most of these

21   agency debt securities?

22   A.   From Monday to Friday I believe that they were falling.

23   Q.   And let me see if I could show a demonstrative that's

24   consistent with that.  Let me look first at BCI Exhibit 940.

25       This is a demonstrative created from data that's been

Page 78

1   produced I think a couple of months ago.  And the

2   demonstrative's been produced as well, showing the yield on an

3   index for government agency securities with a fifteen-year

4   maturity.  Do you see that?

5   A.    Yes.

6   Q.    And it shows the yield going from just over 4.4 percent on

7   September 15th, 2008 all the way up to just over five percent

8   on September 22nd, 2008.  Do you see that?

9   A.    Yes.

10  Q.    And would you agree with me, sir, that when yield goes up

11  that means price is going down?

12  A.    Yes.

13  Q.    And so would you agree with me that while the line is

14  going up on this chart, what that means is the price for the

15  securities tracked by this U.S. government agency index was

16  falling throughout the week of September 15th, 2008?

17  A.    Again, I guess this is an index on -- to assume that this

18  is replete with a cross-section of different GSEs; government

19  sponsored enterprises.  Is that accurate?

20  Q.    Unfortunately, I'm not here to answer questions, and I'm

21  not sure I can tell you the exact composition of the index.

22      But are you familiar, generally, with indexes -- indices

23  that track U.S. government agency securities?

24  A.    I am.  However, in the work that I did which, again, I

25  took five examples trying to take one representative bond from

Page 79

1   each one of the GSEs that I just previously highlighted.  And

2   the movement from Friday to Monday showed that the prices were

3   going up again.  So I'm not sure exactly.  In terms of being

4   able to completely reconcile, I guess I would like to know more

5   information about this index.  But I have seen indices before

6   and what they represent, yes.

7   Q.   All I wanted to ask you, and all I did ask is, would you

8   agree that this index, based on the information on this

9   demonstrative, shows prices falling for the securities tracked

10  by this index, during the week of September 15th, 2008?

11  A.   Yes.

12  Q.   And let me show you BCI Exhibit 942.  This is an index for

13  government agency securities with a three-month yield.  And it

14  shows that the rates at the beginning of the week of September

15  15th, 2008, the yields went down.  That means prices were going

16  up at first, correct?

17  A.   Consistent with what I've seen, yes.

18  Q.   But then from about September 17th, 2008 through to what

19  looks like the end of that week, the yields shot up quite

20  dramatically, which means prices went down quite dramatically,

21  correct?

22  A.   Right.  But, I guess if we're exploring the same type of

23  information, in this one it would show that, if I'm assuming

24  that I'm understanding the axises correctly, that the price

25  went up from the 19th to the 22nd.  And, again, I would

Page 80

1    probably need to explore exactly what's represented in the

2    specific indices.  And I don't know if this is exactly

3    representative of the types of securities I looked at,

4    especially on the short end of the maturity spectrum.

5    Q.   Well, sir, would you agree with me that there was no index

6    that was precisely representative of the portfolio of agency

7    debt securities that Barclays acquired in the Lehman

8    transaction?

9    A.   None that I'm aware.

10   Q.   Would you agree with me that the indices reflect the

11   pricing information for agency debt securities that are

12   actually trading, and by definition cannot reflect the price

13   changes of agency securities that are not trading?

14   A.   I don't know if I agree with that last assertion.

15   Q.   Well, it may be relevant to the price movements of agency

16   debt securities that are not trading, but it doesn't actually

17   track the price movements of agency debt securities that are

18   not trading?

19   A.   I fundamentally am not aware that, again, what's imbedded

20   in these indices are exactly specifically represented or not

21   represented in correlation to the securities that I examined.

22   Q.   Let's go back then, sir, to the bid-offer adjustments that

23   you took.  As I think you testified, your main difference, the

24   principal source of the valuation difference between you and

25   Barclays on the agency debt securities, is in the bid-offer

Page 81

1    adjustment, correct?

2    A.   Yes.

3    Q.   Not in the starting price, which is relatively close,

4    correct?

5    A.   Correct.

6    Q.   Let me refer you, if I could, to tab 11 of your binder,

7    which is BCI Exhibit 1027.  This is a worksheet of yours

8    produced to us.  Do you recognize it?

9    A.   Yes.

10   Q.   And does this show, sir, the calculation of the bid-ask

11   spreads that you used in making your bid-offer adjustments to

12   the agency debt securities?

13   A.   Yes.

14   Q.   And am I correct, sir, that at the top of this document

15   you have excerpted information from a book from 1997, the

16   Fabozzi book?

17   A.   Yes.

18   Q.   And you then apply -- and that book has a column with

19   normal bid-ask spreads and distressed bid-ask spreads and then

20   the multiple, the relationship between the two, correct?

21   A.   I'm not sure if his box shows the multiple.  But, yeah, I

22   believe the normal and distressed are shown.

23   Q.   Okay.  In any event, the multiple reflects the

24   relationship of the normal to distressed?

25   A.   Yes.

Page 82

1    Q.   And then you used that multiple, you applied it to a

2    starting point, correct?

3    A.   Correct.

4    Q.   A starting point for normal bid-ask spreads for the

5    securities you were valuing?

6    A.   For a specifically off-the-run Treasuries, which is in the

7    normal column toward the bottom.

8    Q.   So your starting point is in the normal column on the

9    second part of -- second bottom-half of this page, correct?

10   A.   Correct.

11   Q.   And that starting point, sir, is taken from what you call

12   off-the-run Treasuries from January 1992 to December 2002,

13   correct?

14   A.   Correct.

15   Q.   And you used that to reflect the normal bid-ask spread for

16   agency debt securities?

17   A.   I use that information as a starting point to derive my

18   distressed level.

19   Q.   Right.  But it's your -- these are the bid-ask spreads you

20   used for the agency debt securities, correct?

21   A.   Ultimately, those that are indicated in the distressed

22   column, yes.

23   Q.   And the normal starting point you took for agency debt

24   securities, was a bid-ask spread from Treasuries, not from

25   agency debt securities, correct?

Page 83

1    A.    Correct.

2    Q.    And then you multiplied -- and that normal spread came

3    from the decade, from 1992 to December 2002, correct?

4    A.    Correct.

5    Q.    And you then multiplied that by this ratio that you

6    derived from the Fabozzi book?

7    A.    Correct.

8    Q.    Now, the Fabozzi book, you referenced him in your direct

9    testimony as an esteemed person in this area, correct?

10   A.    Yes.

11   Q.    Am I correct that -- you would agree with me, sir, that

12   the information you have here, that you sourced to Fabozzi, is

13   not actually from anything that Fabozzi wrote?

14   A.    It's a Fabozzi publication.  I believe the author was a

15   gentleman by the name of Gerber.

16   Q.    Okay.  But the author was not Mr. Fabozzi?

17   A.    Correct.  It's a publication from Frank Fabozzi.

18   Q.    And can you turn to tab 14 of your binder, which is BCI

19   Exhibit 1033.  Or if it's easier, sir, you can always just look

20   at the screen, because we'll put everything up there.  This is

21   the title of that Fabozzi book you're referencing, correct?

22   A.    Yes.

23   Q.    And on the second page it shows that it was published in

24   1997, correct?

25   A.    Yes.

1   Q.   And we've excerpted the chapter by Mr. Gerber, which I

2   believe is Chapter 16, do you see that?

3   A.   Yes.

4   Q.   Chapter 16 on the second page is written by Robert Gerber,

5   not by Mr. Fabozzi, correct?

6   A.   Correct.

7   Q.   And if you turn to the page that's numbered 279, that has

8   the table from which you take this relationship of normal to

9   distressed, correct?

10   A.   Correct.

11   Q.   And the table -- you don't take all of these ratios,

12   correct, you take just some of them?

13   A.   Correct.

14   Q.   Do you remember which ones you took?

15   A.   The information underneath the mortgage backed securities

16   block, and also the on-the-run notes and bonds, off-the-run

17   notes and bonds, and then the corporate finance rows.

18   Q.   You took corporate finance, which had a ratio of typical

19   to distressed of 0.12 to 0.5, do you see that?

20   A.   Yes.

21   Q.   You did not take corporate industrials which had a ratio

22   of 0.5 to 5?

23   A.   Correct.

24   Q.   And you used corporates finance as the multiple that you

25   applied to what?  To the agency debt securities, generally?

Page 85

1    A.    No.  I took a approximate midpoint between the multiplier

2    provided by the finance row and the off-the-run notes and

3    bonds.

4    Q.    Now, sir, this table gives a source:  Solomon Brothers,

5    Lehman Brothers and Sanford Bernstein, do you see that?

6    A.    Yes.

7    Q.    You've never seen any data that actually underlies this

8    table, have you?

9    A.    No.

10   Q.    And the book was published in 1997, correct?

11   A.    Correct.

12   Q.    So do you know for a fact what period of time the

13   distressed numbers come from?

14   A.    I'm not exactly sure, no.

15   Q.    Okay.  There's a reference I believe in your declaration

16   to something about the distressed might be around the time of

17   the 1994 Orange County bankruptcy.  Do you remember that?

18   A.    Yes.  In terms of the mortgage information that is

19   correct, yes.

20   Q.    How do you know that?

21   A.    I believe that -- I believe that information was in this

22   document.  But --

23   Q.    In the chapter; in the Gerber chapter?

24        (Pause)

25   A.    I thought it was, yes.

Page 86

1    Q.    Okay.  Was it at all relevant to your analysis, Mr.

2    Slattery, that all of this information comes from 1997 or

3    before?

4    A.    In terms of the mortgage securities, no.  Because in terms

5    of the securities crash of '94 the stress in that environment

6    was similar to the one occurring in 2008.  The difference would

7    be the size of the market.  But in 1994 the securities crash in

8    the mortgage market led to the collapse of Kidder Peabody,

9    which is similar to what happened in 2008 as it relates to a

10   household name entity in this field.

11   Q.    Okay.  Let me make sure I understand that.  And I think

12   you refer to this in your declaration.

13         Is it your testimony, sir, that the mortgage crisis of

14   1994 was comparable to the mortgage crisis of September 2008?

15   A.    Similar.

16   Q.    Was it of the same magnitude, in your opinion?

17   A.    No.  The market was -- the size was different.  I believe

18   the mortgage market at that time was about forty to forty-five

19   percent of the size of the mortgage market in 2008.

20   Q.    Do you believe the major stress events in the mid-1990s

21   generally were equivalent to those experienced in September

22   2008?

23   A.    I believe there was a difference in terms of a component

24   in the 2008 as opposed to the 1994.  But, again, the

25   similarities with respect to liquidity as well as impact on

Page 87

1   profitability and performance, they were similar.

2   Q.   Let me refer you to some statements made on the page

3   earlier than this in the Gerber chapter.  He has a section

4   called market conditions, do you see that?

5   A.   Uh-huh, yes.

6   Q.   And in the third paragraph he writes, "Illiquid markets

7   pose somewhat different challenges."  Do you see that?

8   A.   Yes.

9   Q.   And then he writes, "Acquiring reliable information

10  becomes much more difficult because securities are typically

11  less homogenous and are infrequently traded."  Do you see that?

12  A.   Yes.

13  Q.   And do you agree with those statements?

14  A.   Yes.

15  Q.   It then says, "Moreover, the cost of ignorance can be

16  great, as the notion of a market clearing price is not well

17  defined."  And then he writes, "Executing a transaction might

18  take days rather than seconds, and can resemble the mating

19  ritual of a praying mantis."  Do you see that?

20  A.   Yes, sir.

21  Q.   And do you agree with that statement?

22  A.   I'm not sure about the praying mantis mating ritual but --

23  Q.   He then goes on to say, "Under some circumstances enhanced

24  information and negotiating skill can add a few percentage

25  points to a transaction."  Do you agree, generally, with his

Page 88

1   description of illiquid markets?

2   A.    Yes.

3   Q.    At the end of the next paragraph he writes that Exhibit 1

4   provides indicators of market liquidity and goes on to explain

5   the bid-ask spreads for typical and distressed conditions.  And

6   then says, "For example, the bid-ask spreads on Fannie Mae

7   Trust interest-only strips have ranged from less than 0.5

8   percent to more than 5 percent."  Do you see that?

9   A.    Yes.

10   Q.    And he says, "In light of this variability, identifying

11   the determinants of liquidity becomes important."  Do you see

12   that?

13   A.    Yes.

14   Q.    And am I correct, sir, you did not use this information on

15   Fannie Mae Trust interest-only strips, 0.5 to 5 percent, you

16   didn't use that data in any of your calculations, correct?

17   A.    No.

18   Q.    All right.

19   A.    But if I convert the bid-ask that's implied on the higher

20   range there; the five percent, it would represent a two and a

21   half percent mid-to-bid adjustment.

22   Q.    That would be assuming the starting point was a mid-price

23   not an ask-price, correct?

24   A.    That would be, yes.

25   Q.    Okay.  And, sir, this is in a paragraph relating to

Page 89

1    Exhibit 1, and he talks about Fannie Mae Trust interest-only

2    strips, are they listed somewhere in Exhibit 1, do you know?

3    A.    At the bottom.

4    Q.    In the corporates industrials?

5    A.    No, I'm sorry, at the bottom of the mortgage backed

6    securities block.

7    Q.    But that was not information -- that's the IO strip.    I

8    see what you're saying.    And that was not used in your

9    calculations, correct?

10   A.    For my mortgage-backed securities it was.

11   Q.    Not for the agency debt securities?

12   A.    This is a different security class.

13   Q.    And am I correct, sir, that what he's saying here, is that

14   the variability of the liquidity of the instrument can

15   determine the variability of the bid-ask spread?

16   A.    I believe that's what he's saying.

17   Q.    And would you agree with that?

18   A.    Yes.

19   Q.    So, in other words, the less liquid a financial asset, the

20   wider potentially its bid-ask spread is.    Would you agree with

21   that?

22   A.    Yes.

23   Q.    Now, let me move on to agency RMBS assets.    Just so the

24   record is clear, I think you direct most of your discussion on

25   this category to the ten percent bid-offer adjustment that

Page 90

1    Barclays took, is that correct?

2    A.    Yes.

3    Q.    Am I correct, sir, that you understand that out of all the

4    CUSIPs in the agency RMBS category, the majority of them

5    actually had a one percent bid-ask adjustment from Barclays,

6    not a ten percent bid-ask adjustment?

7    A.    I don't know that.

8    Q.    Do you know how many CUSIPs there were in the agency RMBS

9    population?

10   A.    In aggregate I believe it's in the thousands.

11   Q.    But you analyzed 308, correct, independently.  The rest

12   went into your third-party valuation?

13   A.    Correct.  Because the -- as far as the million dollar

14   threshold of the difference that we collaboratively used that

15   created that particular 308 CUSIP data set.

16   Q.    So you didn't analyze the bid-ask adjustment Barclays took

17   on any of the agency RMBS that were not in the 308 you looked

18   at specifically, correct?

19   A.    I analyzed them to the extent that where I had specific

20   liquidity adjustments, I tried to stay consistent in the

21   application when they leave in the third-party data set.

22   Q.    My only question, sir, is when you say in your report that

23   Barclays took an unjustified across the board ten percent bid-

24   ask adjustment on agency RMBS, am I correct in saying that you

25   don't know one way or the other whether Barclays actually took

Page 91

1   only a one percent bid-ask adjustment on over 3,000 of the

2   CUSIPs within the agency RMBS category?

3   A.    I don't know the quantification of that, no.

4   Q.    Now, in calculating the bid-offer adjustments on agency

5   RMBS you again used data from the 1997 book, correct?

6   A.    Yes.

7   Q.    And in this instance you applied it to a starting point

8   that came from a colleague of yours who worked at Bank of

9   America, correct?

10  A.    Correct.

11  Q.    And in other words for the agency debt securities you used

12  treasury off the runs from 1992 to 2002 as your starting point,

13  correct?

14  A.    Yes.

15  Q.    And for agency RMBS you used a starting point for bid-ask

16  spreads that came from a colleague of yours, Mr. Powell, who

17  had the information from Bank of America in 2001?

18  A.    Correct.

19  Q.    And so the information reflects what Mr. Powell said the

20  bid-ask spreads were, on these kinds of agency RMBS assets

21  based on his experience with Bank of America on 2001?

22  A.    Correct.  He had information about the granular cash flow

23  type securities for which I was analyzing.  The 2001 time

24  frame, again, represents a less liquid time frame in 2008 in

25  terms of depth and breadth of the market.

Page 92

1    Q.   You're saying that the market for agency residential

2    mortgage-backed securities was less liquid in 2001 than in

3    2008?

4    A.   In terms -- if you're defining it in terms of size and

5    data trading volumes, yes.

6    Q.   Well, let's just explore whether that's a fair way to

7    define it.  The market for securitized mortgage products

8    exploded in size between 2001 and 2008, would you agree with

9    that?

10   A.   Yes.

11   Q.   So by definition the volume of assets being traded is

12   larger in 2008 than in 2001, correct?

13   A.   Yes.

14   Q.   But would you agree that to really assess the liquidity of

15   those assets you should compare the volume of daily trading

16   with the total volume held outstanding in that category of

17   securities?

18   A.   If that information was readily available.  But based on

19   my assessment of the information that I did have available to

20   me, I do feel that the results were comparable and accurate in

21   terms of the mid-to-bid adjustment that I needed to include.

22   Q.   My understanding is you don't have the information and

23   haven't analyzed whether as a relative matter comparing daily

24   volume turnover to total amount outstanding the liquidity was

25   greater in 2008 than 2001 for these securities, do you?

Page 93

1    A.    No, I don't.

2    Q.    Can we just look briefly at BCI Exhibit 1031 which is at

3    tab 12?  Just so we're totally clear what we're talking about,

4    again you have bid-ask spreads taken from the Gerber article in

5    the Fabozzi 1997 book at the top, correct?

6    A.    Correct.

7    Q.    And then you have a starting bid-ask normal range for

8    various categories of agency RMBS, correct?

9    A.    Correct.

10   Q.    And this column I'm pointing to, which is at the bottom

11   half of the page BCI Exhibit 1031, the left-hand column bid-ask

12   normal, that column comes from Bank of America 2001, correct?

13   A.    Correct.

14   Q.    And it comes from your colleague, Mr. Powell, who worked

15   at Bank of America in 2001, correct?

16   A.    Correct.

17   Q.    How did Mr. Powell have that information?

18   A.    I believe he was in the enterprise risk management group

19   so he interacted daily, I believe, with traders and traders in

20   these instruments.

21   Q.    My question, sir, is did he just remember it?

22   A.    No, I don't believe it was just a recollection.  No.

23   Q.    So he wrote it down somewhere?

24   A.    I believe.

25   Q.    You believe he did?

Page 94

1   A.   Yes.

2   Q.   Is the place that it was written down, is it your

3   understanding that that's been produced to us?

4   A.   I believe in this form it has been, yes.

5   Q.   In this form, yes.  This form -- this is your work paper,

6   correct?

7   A.   Yes.

8   Q.   My question, sir, is these numbers that Mr. Powell wrote

9   down somehow in 2001 when he was working at Bank of America,

10   has the document or spreadsheet in which he recorded those

11   numbers, to your knowledge, been produced to us?

12   A.   Not that I'm aware.

13   Q.   Have you seen that document or spreadsheet?

14   A.   No, I have not.

15   Q.   Have you discussed it with Mr. Powell?

16   A.   Yes.  His findings I have.

17   Q.   So Mr. Powell just said these are the numbers from Bank of

18   America 2001?

19   A.   Yes.

20        MR. HUME:  Your Honor, I haven't been very good at

21   doing this.  This is one of Mr. Slattery's work papers, we've

22   marked it as BCI Exhibit 1031, we'd like to move it into

23   evidence.

24        MR. TAMBE:  No objection, Your Honor.

25        THE COURT:  It's admitted.

Page 95

```
 1    (Work Papers of Mr. Slattery were hereby received in evidence

 2    as BCI's Exhibit 1031, as of this date.)

 3            MR. HUME:  And just for the record, previous tab BCI

 4    Exhibit 1027, which was the similar calculation for the agency

 5    debt security spreads, we'd like to move that into evidence

 6    too.

 7            MR. TAMBE:  No objection, Your Honor.

 8            THE COURT:  That's admitted as well.

 9    (Calculation for Agency Debt Security Spreads was hereby

10    received in evidence as BCI's Exhibit 1027, as of this date.)

11            MR. HUME:  And tab 14, BCI Exhibit 1033 which is the

12    excerpt of the Gerber chapter on which Mr. Slattery relied,

13    we'd like to move that into evidence.

14            MR. TAMBE:  No objection.

15            THE COURT:  That is admitted.

16    (Excerpt of Gerber Chapter was hereby received in evidence as

17    BCI's Exhibit 1033, as of this date.)

18    BY MR. HUME:

19    Q.   Now Mr. Slattery, you've testified that most of the

20    difference for agency RMBS came from the difference between

21    your adjustment from mid prices to bid prices versus Barclays'

22    adjustment from mid prices to bid prices, correct?

23    A.   For the 308, no.

24    Q.   No, for the agency RMBS.

25    A.   Well there's agency RMBS trust, the trust strips I would
```

Page 96

1    concede that that is the point I'm trying to make, yes.

2    Q.   In any event, sir, you explained this morning and in your

3    declaration that you calculated -- what we're talking about

4    with these liquidity discounts is an adjustment from, in your

5    case, a mid price to a bid price, correct?

6    A.   Correct.

7    Q.   And a mid price is the mid point between a bid and ask,

8    correct?

9    A.   Yes.

10   Q.   And a bid is what a buyer would bid, which is lower than

11   the ask which is what a seller would ask, correct?

12   A.   Yes.

13   Q.   And what you did is determine midpoint values between the

14   bid and the ask and then adjust that by what you thought was an

15   appropriate bid-ask adjustment to the bid price, correct?

16   A.   Once I arrived at the mid I needed to ascribe a mid-to-bid

17   adjustment.

18   Q.   Right.  A mid-to-bid adjustment?

19   A.   Right.

20   Q.   First you determine the mid and then you determine a

21   percentage by which you should adjust that to arrive at a bid

22   price, correct?

23   A.   Correct.  Generally speaking, yes.

24   Q.   And then that's what the phrase liquidity discount refers

25   to in this context, correct?

Page 97

1   A.   Yes.

2   Q.   So you don't object to the concept of taking that

3   liquidity discount, you just disagree with the amount of such

4   bid adjustment that Barclays told you, correct?

5   A.   Correct.

6   Q.   I'd like to show you one of your other work papers which

7   underlies, I think, a lot of the agency RMBS, maybe all of the

8   agency RMBS values.   It's tab 20 of the binder which is BCI

9   Exhibit 1028.   And I think, for this purpose, it's going to be

10  easier to look at the screen because it's obviously a long

11  spreadsheet with multiple tabs at the bottom.   Do you recognize

12  this spreadsheet, sir?

13  A.   Yes.

14  Q.   And there's lots of different numbers to refer to these

15  different spreadsheets so just to avoid confusion at the top it

16  says, "Lehman Navigant 26180" do you see that?

17  A.   On this screen I can't.

18  Q.   On the top of the spreadsheet here?

19  A.   Yes, I can see it.

20  Q.   All right.   And that refers to the whole spreadsheet that

21  contains your summary backup for the agency RMBS valuations,

22  correct?

23  A.   Yes.

24  Q.   And does it also include the summary backup for at least

25  some of your non-agency RMBS valuations?

Page 98

1    A.    I believe it does.

2    Q.    And it has different tabs for different categories at the

3    bottom, correct?

4    A.    Correct.

5    Q.    So it has trust agency, agency trust IOs, POs, structured

6    agency IOs POs, structured private label IOs POs and then other

7    RMBS, do you see that?

8    A.    Yes.

9    Q.    Right now the spreadsheet is clicked on the third tab

10   called structured agency IOs POs, do you see that?

11   A.    Yes.

12   Q.    And at the top there's a list of CUSIPs down column B, do

13   you see that?

14   A.    Yes.

15   Q.    And then across the row, if you look at that first CUSIP

16   3128CVXJ8, it provides a mid price, a liquidity factor and a

17   bid price, do you see that?

18   A.    Yes.

19   Q.    And it then has a column called price spread map and it

20   just says spread for most of them, do you see that?

21   A.    Yes.

22   Q.    And then it lists two spreadsheets in column G and H, do

23   you see that?

24   A.    Yes.

25   Q.    Okay.  Let's go back and looking at this CUSIP, just to

1    understand the mechanics of it, if we click on cell E2 it

2    clearly shows that the bid price is determined by taking the

3    mid price, as you just said, and multiplying it by the

4    liquidity factor which is the mid-to-bid adjustment, correct?

5    A.    Right.  In this case it looks like it's about 5.2 percent.

6    Q.    Right.  So for this CUSIP it's about a 5.2 percent

7    adjustment from the mid price to the bid price, correct?

8    A.    Yes.

9    Q.    And what the calculation shows is that you start -- just

10   as you just testified, you start with a mid price and multiply

11   it with the mid-to-bid factor to get to the bid price, correct?

12   A.    Correct.

13   Q.    And do you remember being shown this in your deposition?

14   A.    I don't recall at this point.

15   Q.    All right.  Do you remember being asked questions in your

16   deposition about how you calculated the mid price?

17   A.    I have some recollection of it, yes.

18   Q.    Do you recall, sir, that your deposition was in April of

19   this year?

20   A.    Yes.

21   Q.    And do you recall that originally these proceedings were

22   scheduled for a trial that was intended to be two weeks at the

23   end of April, early May, correct?

24   A.    I wasn't aware of that schedule.

25   Q.    Do you remember that at one point you were going to

Page 100

1    testify at that period of time?

2    A.    No.

3    Q.    In July we were given a letter, BCI Exhibit 1025, it is in

4    the binder if you'd bear with me.

5         (Pause)

6    Q.    It's in the binder but it's now on the screen, it's tab 27

7    in the binder.  This is BCI Exhibit 1025 and this letter

8    produced to us a series of backup materials related to your

9    work papers.  Do you recall generally providing more work

10   papers to be produced to us in and around July?

11   A.    Generally, yes.

12   Q.    At the bottom of the page, paragraph 4, it says, "In

13   response to your request for spreadsheets or PolyPath software

14   outputs that were used to support Mr. Slattery's analysis of

15   liquidity factor discounts," and then it says where that

16   information's found and it lists some spreadsheets.  Do you see

17   that?

18   A.    Yes.

19   Q.    Then on the next page, three lines down, it says,

20   "Although somewhat redundant of what has already been produced,

21   enclosed find additional files that roll into LEH Navigant

22   026180," do you see that?

23   A.    Yes.

24   Q.    And then it lists five spreadsheets.  Do you recognize

25   those spreadsheets?

Page 101

1    A.    Yes.

2    Q.    Okay.  And do you recognize that this says that those five

3    roll into 26180, which is the spreadsheet we were just looking

4    at?

5    A.    Yes.

6    Q.    Your summary spreadsheet that summarizes the values for

7    all of the agency RMBS, correct?

8    A.    Yes.

9    Q.    Okay.  Now one of these five spreadsheets I'd like to look

10   at in conjunction with looking at 26180.  So can I pull up both

11   the spreadsheet at tab 23, which is the 26433, and let me make

12   sure I identify this clearly.  Well we're there in the letter,

13   26433 -- thank you.  Here is the first spreadsheet listed

14   26443, do you see that?  I want to look at this spreadsheet

15   together with this one, 26180, okay.  Do you understand, Mr.

16   Slattery, the two I'm looking at?

17   A.    Yes.

18   Q.    So in other words, up top here we have 26443 which is

19   identified in the letter as one of the spreadsheets that feeds

20   up into 26180, correct?

21   A.    Yes.

22   Q.    Okay.  And 26180 is the spreadsheet that summarizes your

23   valuations for agency RMBS and many of the non-agency RMBS,

24   correct?

25   A.    Correct.

Page 102

1   Q.   Okay.  If we go to, first, spreadsheet 26180 which is BCI

2   Exhibit 1028, the first row relates to this CUSIP 3128CVXJ8, do

3   you see that?

4   A.   Yes.

5   Q.   And do you see that the first row in the backup

6   spreadsheet is also for CUSIP 3128CVXJ8?

7   A.   Yes.

8   Q.   Now, in this backup spreadsheet there's a lot of

9   information provided:  the deal name, the tranche name, INT

10  type, issue date, coupon maturity, price is column H and then a

11  whole series of columns after H, OAS, OA spread, prepayment, a

12  lot of information.  Do you see that?

13  A.   Yes.

14  Q.   And all that information is relevant to calculating the

15  price you've calculated, correct?

16  A.   The information to the right of the price, no.

17  Q.   No?  Okay.

18  A.   Well, OAS would be included in I.

19  Q.   All right.

20  A.   And I believe that's on the spreadsheet at the bottom.

21  Q.   Okay.

22  A.   In this backup spreadsheet, 26443 which is BCI Exhibit

23  1041, the price for the CUSIP that ends CVXJ8 is listed at

24  78.110677, correct?

25  A.   Yes.

Page 103

1    Q.    And if we look at your summary spreadsheet for the very

2    same CUSIP, the bid price is listed at exactly that same price,

3    correct?

4    A.    Yes.

5    Q.    So the backup spreadsheet is not calculating a mid price,

6    is it, it's calculating a bid price, correct?

7    A.    No, the bid price was entered into this PolyPath engine

8    and the OAS came up.  So this was a bid price based exercise.

9    Q.    All right.  So let me make sure I understand.  Your backup

10   spreadsheet calculates a price of 78.11, correct?  Let's just

11   take it one step at a time.

12   A.    No.  The bid price is calculated in the lower spreadsheet.

13   The analytics associated in what you're reviewing in the top

14   spreadsheet are a function of the bid price of 78.11.

15   Q.    Okay.  So you're saying that this bid price here, on the

16   lower spreadsheet --

17   A.    Yes.

18   Q.    -- is calculated from the mid price multiplied by the

19   liquidity factor, correct?

20   A.    Correct.

21   Q.    You're saying it's not calculated by this backup

22   spreadsheet?

23   A.    No.

24   Q.    So you deny that what you calculated through your models

25   was a price that was bid and that you then reverse engineered

Page 104

1   it up to a mid and adjusted it back down to a bid, you did not

2   do that?

3   A.   In this example no I did not.  What we --

4   Q.   Did you do it in other examples?

5   A.   I'd have to go through each example.  But if I can explain

6   what I did?

7   Q.   I would like you to explain this question.

8   A.   Okay.

9   Q.   How did you calculate the mid price?

10  A.   That's where I was going with that.

11  Q.   Good.  Because we've looked at your backup spreadsheets --

12  A.   Okay.

13  Q.   -- and all we find is calculations of a price that show up

14  here as a bid.  We see no calculations that show how your mid

15  price was calculated.

16  A.   Okay.

17  Q.   So how did you calculate the mid price?

18  A.   The mid price was calculated based on the methodology that

19  I identified in the expert report known as break even

20  prepayment methodology.  I believe you have the spreadsheets in

21  columns G and H of the lower spreadsheet, which would give you

22  a blow-by-blow description of the spreads associated with the

23  securities in order to calculate a mid.  If you had put

24  together the same analytical configuration that I did, you

25  would be able to take that spread, the mid-based option

Page 105

1    adjusted spread, and calculate the mid price of eighty-two.

2        The top spreadsheet, again, is just looking at the

3    analytics bid price analysis.

4    Q.   Sir --

5    A.   Because I'm interested in looking at the OAS and the

6    performance metrics to the right of column I.  That's how I

7    gain comfort with my analysis.  So this is not, in any way,

8    shape or form, trying to reverse back to a mid in this example.

9    Q.   In this example.  Let me see if I can understand what you

10   said.  We were told in the letter, which we can look at again,

11   that this top spreadsheet rolled up into your summary

12   spreadsheet 26180.

13   A.   That is correct on a bid price basis.

14   Q.   Does the information from the spreadsheet listed as BCI

15   Exhibit 1041, 26443, does it or does it not roll up into BCI

16   Exhibit 1028, which is 226180?

17   A.   It does -- it does if you're comparing bid price to bid

18   price.

19   Q.   What information, with respect to this first CUSIP, CVXJ8,

20   rolls up from this top spreadsheet into this bottom

21   spreadsheet?

22   A.   The price, again, column E bid, which I believe is cell

23   E2, would obviously match to H2.

24   Q.   The H2 information of 78.11 rolls up into cell E2 on the

25   summary spreadsheet?

Page 106

1   A.   Correct.  And I believe if you go to the right in the

2   bottom spreadsheet --

3   Q.   But sir, if that's true, if what you're saying is that the

4   information in H2 from spreadsheet 26443 rolls up into cell E2

5   on spreadsheet 26180, then why does spreadsheet 26180 show that

6   that bid is being calculated in a completely different way

7   based on a mid price that's not shown anywhere?

8        MR. TAMBE:  Your Honor, could I run over a technical

9   area.  If he could just let the witness, please, answer his

10  question.  He was explaining that line.  This is technical

11  enough as it gets.  He can give a full explanation of each of

12  these spreadsheets; he's intimately familiar with them.

13       THE COURT:  I have no trouble with the questions that

14  are being asked and I don't think the witness is having any

15  trouble either.  So please proceed, Mr. Hume.

16       THE WITNESS:  Would it help, again, if I give an

17  overview of the process.

18       THE COURT:  I think you should just answer the

19  question that's been asked.

20       THE WITNESS:  Okay.

21  BY MR. HUME:

22  Q.   The specific question I have right now, Mr. Slattery, is

23  just so it's clear, one step at a time, does the information in

24  cell H2 on spreadsheet, this top spreadsheet, roll up into the

25  information in cell E2 on your summary spreadsheet?

Page 107

1   A.   Yes.

2   Q.   Now, you mentioned before that the mid price here, 82.35,

3   is calculated and can be shown and found from these two

4   spreadsheets in column G and H, correct?

5   A.   Correct.

6   Q.   And we asked you that in your deposition and that's what

7   you referred us to, do you recall that?

8   A.   I believe so.

9         MR. HUME:  Can I have those two spreadsheets, please,

10   pulled up.  They are at tabs 21 and 22 of your binder, BCI

11   Exhibits 1046 and 1030.

12       (Pause)

13   Q.   We'll just show those two at the bottom there is the 26180

14   but we now have these two spreadsheets that are referenced in

15   your summary spreadsheet.  Now they don't list the CUSIPs in

16   the same order but can you now tell us, sir, how these two

17   spreadsheets calculate a mid price?

18   A.   Okay.  The bottom spreadsheet is an accumulation of spread

19   information that I calculate and derive based on a methodology

20   known as break even.  The spreads are allocated to the

21   securities based on a cross section of collateral weighted

22   average maturity and collateral weighted average coupon.  So it

23   is a two-tiered intersection.

24       The spread is applied, again, at that collateral level.

25   The spread is then associated with that CUSIP in question and

Page 108

1    PolyPaths given that spread would calculate a price.  That

2    price, to me, would be identified as a mid price.  Because of

3    the analytics of these instruments you can go from spread to

4    price or price to spread.  I needed to build up to a bid price.

5    Q.   Can you show me, on these two spreadsheets, sir, a mid

6    price for any of the CUSIPs you value?

7    A.   I would need an example.

8    Q.   Well, you can take any example you want, any CUSIP.  Can

9    you just show me the mid price you calculated on these two

10   spreadsheets?

11   A.   Okay.  If we can just take the cursor and put it up to the

12   top spreadsheet and then just -- so the OAS in cell, I believe,

13   I3 is 57.9, okay.  If you can just scroll to the right, please?

14   Okay.  The WAC and the WAM, which is the weighted average

15   coupon of the underlying mortgage set and the WAM is the

16   weighted average maturity, again, of the underlying collateral

17   data set are 5.361 and 317 respectively.  So if we can go to

18   the second spreadsheet and now that 57.9 is the PO.

19        So if you could, please, at the bottom go to the breakeven

20   PO OAS tab, it's the third tab in from the left, thank you.  Go

21   to cell H5, okay.  There's the four and a half percent trust PO

22   with a WAC of 5.361, a WAM of 317.  A principal-only break even

23   OAS of 57.9.  That number in H5, in this tab, ties directly to

24   I3 on the top spreadsheet.

25        The engine then calculates the seventy-three and fourteen

Page 109

1    ticks.   That's the mid.

2    Q.    Where is the mid, sir, 7314?

3    A.    Yes.

4    Q.    For which CUSIP?

5    A.    Please go back to the top.   I believe it's -- yeah,

6    3128HVGN3.

7    Q.    Okay.   So 7314 is the mid value for that CUSIP, it that

8    your testimony?

9    A.    Yes.

10   Q.    And is it your testimony that we should have been able to

11   figure this all out on our own?   Do you have any answer to

12   that?

13   A.    I don't have an answer to that.   No.

14   Q.    Okay.   May I refer you to BCI Exhibit 10298, which is tab

15   19 of the binder?   And I'd like this to be shown in conjunction

16   with BCI Exhibit 1028, the summary spreadsheet.

17        Now on the summary spreadsheet on top I need to go to the

18   second tab now, agency trust IOs and POs.   Do you see that Mr.

19   Slattery?

20   A.    Yes, sir.

21   Q.    And am I correct, sir, that the spreadsheet I've called

22   BCI Exhibit 1029, which is at the bottom, is the backup

23   calculations for the spreadsheet on the top for the agency

24   trust IOs and POs?

25   A.    Correct.

Page 110

1   Q.   And the first CUSIP listed at the top is 31282YBR7, do you

2   see that?

3   A.   Yes, sir.

4   Q.   And that is also the first CUSIP listed in the analysis in

5   the bottom spreadsheet, correct?

6   A.   Yes, sir.

7   Q.   And the bottom spreadsheet has a lot of information and

8   scrolls out to the right, column N, which is listed price

9   9/19/2008, do you see that?

10  A.   Yes.

11  Q.   And that price is 21.5898, correct?

12  A.   Yes.

13  Q.   And that price is shown in your summary spreadsheet as a

14  bid price, correct?

15  A.   Correct.

16  Q.   So that is a bid price that you calculated, correct?

17  A.   No, that's a bid price that I arrived at based on the

18  accumulation of indicative prices from Wall Street firms.

19  Q.   You're just quibbling with my phrase you calculated?  You

20  arrived at it from all this other data but --

21  A.   Correct.

22  Q.   -- that is a bid price?

23  A.   Correct.

24  Q.   And that bid price is shown in your summary spreadsheet as

25  being calculated from a mid price reduced by a mid-to-bid

Page 111

1    liquidity factor adjustment, correct?

2    A.    Correct.

3    Q.    Am I correct, sir, that there's nothing that calculates

4    the 22.017971 mid value shown in your summary spreadsheet?

5    A.    No.  I mean, to be consistent it probably should have been

6    C divided -- E divided by D for C2.

7    Q.    Well, just so I understand, in other words you arrived at

8    the values shown in the summary spreadsheet listed as mid

9    values, you arrived at those by taking bid values and grossing

10   them up by the mid-to-bid adjustment factor, correct?

11   A.    Because I felt that I had started with indicative prices

12   or bids.

13   Q.    Just yes or no, sir.

14   A.    Yes.

15   Q.    Is that what you did?

16   A.    For this particular section -- request.

17   Q.    For these securities you started with bid prices and

18   grossed them up to mid prices, correct?

19   A.    Yes.

20   Q.    And yet this summary spreadsheet that was produced to us,

21   shows that you started with mid prices and reduced them to bid

22   prices, correct?  That's what the formula shows in the bid,

23   please put the cell on E2.  Doesn't this show a formula that

24   starts with mid and is reduced to bid?

25   A.    Yes.

Page 112

1   Q.   But that's not what you did, you did the opposite.   You

2   started with bid and grossed up to mid, correct?

3   A.   Correct.

4   Q.   And is that true also for other securities in this agency

5   RMBS backup spreadsheet?

6   A.   These are the only prices that I was actually able to

7   accumulate from Wall Street firms.

8   Q.   When you accumulated them from Wall Street firms you

9   treated them as bid?

10  A.   Yes.

11         MR. HUME:  Your Honor, I'm going to move to another

12  topic.  I was hoping I might finish before the lunch break but

13  I'm not sure I can.  Would now be an appropriate time or would

14  you like me to just keep going?

15         THE COURT:  Why don't we break for lunch, and given

16  the rain, we'll return at 2 o'clock.

17         MR. HUME:  Thank you, Your Honor.

18      (Recess from 12:22 p.m. to 2:11 p.m.)

19         THE COURT:  Be seated, please.  And please proceed,

20  Mr. Hume.

21         MR. HUME:  Thank you.

22  BY MR. HUME:

23  Q.   Mr. Slattery, good afternoon.

24  A.   Good afternoon.

25  Q.   Before I move on to a couple of other topics, I just want

Page 113

1    to come back to one of the things we were talking about before

2    we broke.

3              MR. HUME:  And could I have on the screen BCI Exhibit

4    1030, which is one of your backup spreadsheets.

5    Q.   I believe this is the spreadsheet you were looking at when

6    I was asking you to identify a mid price for one of the CUSIPs

7    you valued.  Do you remember that?

8    A.   Yes, sir.

9    Q.   And I believe you identified -- was it the cell H3 or I3

10   as the mid price?

11   A.   H3.

12   Q.   H3, 73.14?

13   A.   Yes, sir.

14   Q.   And that's the mid price for CUSIP 3128HVGN3, correct?

15   A.   I believe that's the case.

16   Q.   And Mr. Slattery, is that the mid price for a CUSIP that

17   Barclays actually acquired from Lehman?

18   A.   I believe it was part of the universe, yes.

19   Q.   So that was in the inventory that you were valuing,

20   correct?

21   A.   Yes.

22   Q.   It was not a comparable?

23   A.   No.

24   Q.   And so if we go back to BCI Exhibit 1028, which was your

25   spreadsheet -- your summary spreadsheet 26180, is it your

Page 114

1    testimony, Mr. Slattery, that we should, somewhere in your work

2    papers, be able to find the prices listed in column C for mid

3    prices?

4    A.   I believe so, yes.

5    Q.   So for example, for the first CUSIP -- can you just click

6    on -- we should be able to find the price as 82.359375 as an

7    output from some formula somewhere in your work papers,

8    correct?

9    A.   I believe so, yes.

10   Q.   And that's true for the other CUSIPs listed on the

11   spreadsheet?

12   A.   Yes.

13   Q.   And do you know which spreadsheet or spreadsheets we would

14   look to?  Would it be the ones that are listed here in columns

15   G and H?

16   A.   Could you please go back to the previous one that was up?

17   Q.   Sure.

18   A.   I don't recall the names.

19   Q.   We can go back.  The previous one was one of those two,

20   which is spreadsheet 26178, which we've identified as BCI

21   Exhibit 1030.

22   A.   Right.  I'm trying to gain a sense -- I believe that the

23   agency RMBS securities that populated the second box that I had

24   in my presentation materials, summed to a total number of

25   CUSIPs of 237.  I believe there are two sheets that sum to 237

Page 115

1   CUSIPs.  I don't know if this is one of two.  I guess I'd have

2   to see how far the CUSIP rows go down, if that's possible?

3   Q.   Sure, we can just --

4   A.   It might go down to like 120.

5   Q.   -- control-shift to the bottom.

6   A.   I'm assuming 121 or -- oh.

7   Q.   This is many more than that.

8        MR. HUME:  Can you jump to the bottom?  Do control-

9   down-arrow, and you will go to the bottom.  558 -- just go one

10  more down so we can see that's the bottom.

11  Q.   So this goes down to 558.

12  A.   Well, this is -- this is part of the entire available

13  price universe that I did have at my disposal.  Again, if we

14  need to find the one CUSIP that was highlighted in the other

15  spreadsheet, I'm sure we could find it.

16  Q.   Okay.

17       MR. HUME:  Can we go back to the top?

18  Q.   And just looking at this CUSIP, 3128HVGN3, it's actually

19  entered twice, both in rows 3 and 4.  Do you see that?

20  A.   Yes.

21  Q.   And if we go over to column H, it lists price for both.

22  And then next to that it has OAS for both.  Do you see that?

23  A.   Correct.

24  Q.   And the OAS on the top row is from a Goldman Sachs source

25  of some kind --

Page 116

1   A.   Correct.

2   Q.   -- at 57.9, correct?

3   A.   Correct.

4   Q.   And then below that is one from Lehman at 39.8, correct?

5   A.   Correct.  What happens there is the price implies the

6   spread.  So this might be the comparable file.  I may have

7   misspoke.  But I'd have to search for the actual 3128 CUSIP to

8   see if it's in the universe.

9   Q.   Okay.  So let's take it one step at a time.  First of all,

10  are you now changing your testimony and saying that the price

11  in H3 for CUSIP 3128HVGN3 is a price for a comparable not for a

12  CUSIP acquired by Barclays in the transaction?

13  A.   Again, I apologize for not memorizing these CUSIPs, but

14  I'd have to double check.  I mean, this file, upon second look,

15  appears to be the entire universe of available prices.  And I

16  distinguish by indicative price source.  So as you highlighted

17  earlier, row 3 would be the Goldman Sachs price for this

18  particular PO on 9/19, and the row 4 would be the Lehman price

19  for the same security.  The price is entered, and the OAS or

20  the spread is generated.

21  Q.   Okay.  So, are you now -- I'm not asking you, by the way,

22  to memorize CUSIPs, so you don't have to apologize for that.

23  I'm just trying to find out how to get to a mid price for any

24  CUSIP that you valued that's shown on that the summary

25  spreadsheet.

Page 117

1    A.   Okay.

2    Q.   Now --

3    A.   I --

4    Q.   -- before -- just let me -- I'm just explaining what I'm

5    trying to learn.

6    A.   Right.

7    Q.   Let me ask a couple of questions here.  Is it now your

8    testimony that you believe these CUSIPs on this spreadsheet

9    26178 are comparables, not CUSIPs acquired by Barclays in the

10   transaction, or are you not sure?

11   A.   I'm not sure.

12   Q.   Okay.

13   A.   I mean this is a spreadsheet that I set in motion to house

14   the comparables, if you will.  But as your tab 19, there are

15   twenty-four instruments -- such securities that did fall into

16   the universe of instruments acquired by Barclays.

17   Q.   Okay.  Let me move on just to a different question about

18   the information shown in these two rows.

19   A.   Um-hum.

20   Q.   On the OAS, if we can focus on column I --

21   A.   Um-hum.

22   Q.   -- you have 57.9 and 39.8, correct?

23   A.   Yes.

24   Q.   And am I correct that the higher the OAS the lower the

25   price?

Page 118

1    A.   Correct.

2    Q.   And would you agree with me that there's -- I don't

3    know -- there's a thirty or forty percent difference between

4    39.8 and 57.9?  Without giving me the exact percentage, would

5    you agree there's a bigger percentage between the OASs and the

6    two prices that are shown?

7    A.   Yes.

8    Q.   Let me go now to BCI Exhibit 1046, which is spreadsheet

9    26177, which has information for this same CUSIP, which also

10   has this identifier FHLS234.  And you have there the same -- I

11   think the same numbers:  Goldman Sachs 57.4; Lehman 39.4.  Do

12   you see that?

13   A.   Um-hum.  Yes, sir.

14   Q.   And on this spreadsheet, you then work an average between

15   those two OASs of 48.4, correct?

16   A.   Correct.

17   Q.   And you're averaging these two inputs to try to come up

18   with an average that will be the best use of all the

19   information about the OAS and the price, correct?

20   A.   Correct.

21   Q.   So for that CUSIP with those two inputs, you would then

22   use the average to calculate the price?

23   A.   Correct.  And mathematically, the price would fall between

24   73.14 and 73.15.

25   Q.   Okay.

Page 119

1            MR. HUME:  And can I look at the second tab on the

2     spreadsheet please?

3     Q.    Now, for FHLS234, that same entry, this spreadsheet does

4     not use the average, it uses 39.4.  Do you see that?

5     A.    Yes.

6     Q.    Shouldn't this spreadsheet be using the average and not

7     just the lowest entry?

8     A.    Um --

9     Q.    The lowest yield entry which will yield the highest price?

10    A.    -- yes, but I -- this is based on collateral.  So the one

11    example for the four and a half percent coupon, I would have to

12    contrast that with the next coupon, which is a series of five

13    percent instruments.  So there's actually two processes at work

14    here.  One is based on just straight price conversion to an

15    average spread, and the other one is based on collateral.

16    Q.    Okay.  But the calculation here, at least conceptually, is

17    that the first spreadsheet calculates an average OAS, and that

18    feeds to the second spreadsheet, which uses that in other

19    calculations, correct?

20    A.    Correct.

21    Q.    And the first spreadsheet for FHLS 234 shows an average of

22    48.4, but you do not use 48.4, you used 39.4, correct?

23    A.    Apparently, yes.

24    Q.    At least for that entry, would you agree that that's an

25    error and that you should have used the average, 48.4?

Page 120

1   A.   Not necessarily.  Again, if I opt to use the lower spread,

2   that would produce a more conservative price.

3   Q.   Well, a lower spread will produce a higher price, correct?

4   A.   Correct.

5   Q.   Correct?

6   A.   Correct, yes.

7   Q.   And so you view a higher price to be more conservative?

8   A.   In terms of the way in which this break-even prepayment

9   methodology works.  You deploy a spread to determine the price.

10   Q.   Okay.

11        MR. HUME:  And let me just go back to the first tab.

12   Q.   You have a list of averages there.  Do you believe you

13   used those averages in the second tab or do you believe you

14   discarded the averages in every instance?  Or do you not

15   remember?

16   A.   I'd have to check another example.  So the next example in

17   terms --

18   Q.   The next example is FHLS225.

19   A.   Okay.

20   Q.   The number used in the second tab is 43.8.

21   A.   Okay.

22   Q.   If we go back to the first tab, it shows 43.8 is simply

23   the second entry, and the average of 49.65 is not used.  Do you

24   see that?

25   A.   Yes.

Page 121

1    Q.   And in that instance, again, you chose the lower yield,

2    correct?

3    A.   Lower spread.

4    Q.   Lower spread.

5    A.   Correct.

6    Q.   Okay.  And let's go to the next example.  Now -- the next

7    example is FNMSO340.  The number used in the second tab is

8    35.9.  If we go back to the first tab, 35.9 is the last entry

9    of five entries.  And the average was 34.8.  So in this

10   instance you actually used a higher OAS than the average,

11   correct?

12   A.   It appears so, yes.

13   Q.   And so does it appear the you simply used the last --

14   whatever happened to be the last entry of all of these sources,

15   not the average, not the lowest and not the highest?

16   A.   It appears as so.

17   Q.   Would you agree that that is an error?

18   A.   Not necessarily, no.

19   Q.   In what sense would using the last entry and disregarding

20   all the others and disregarding the average, not be an error?

21   A.   If -- can I go to the second tab?

22   Q.   Sure.

23   A.   Okay.  And then could you just highlight G7, the cell?

24   Q.   G7 is 35.9.

25   A.   Okay.  And if you could just go down the range, please?

Page 122

1        (Pause)

2   A.   Okay.  And then just go back to the first tab, and then

3   just scroll to your right, please.  It looks as though there

4   may have been an inconsistency, yes.

5   Q.   And so there may just have been a glitch in the linking

6   between tab 1 and tab 2 here?

7   A.   Possibly, yes.

8   Q.   Let me ask you now to go to BCI -- back to BCI Exhibit

9   1028, which is the summary spreadsheet 26180.  And I apologize.

10  I think I may have already asked you this.  But just so it's

11  clear, Mr. Slattery, your testimony is that we should be able,

12  if we look through all of your work papers, to find the mid

13  price for the CUSIP listed there, the first example being a mid

14  price of 82.359375 for CUSIP 3128CVXJ8 in your work papers.

15  A.   Yes.

16  Q.   Correct?  There's something that actually computes that,

17  correct?

18  A.   Correct.  I believe we saw it before lunch, if I'm not

19  mistaken.

20  Q.   I don't believe so.  But we'll certainly check the

21  transcript carefully.

22  A.   Um-hum.

23  Q.   And that computation will be something other than just a

24  gross-up from a bid price using the liquidity adjustment?

25  A.   Correct.

1   Q.   All right.  Now, I'd like to ask you a few questions about

2   Pine.  Let's go to your worksheet for Pine which is tab 53 of

3   your binder.  And it's been marked as BCI Exhibit 1040.  We'll

4   pull it up on the screen in native format.

5        (Pause)

6   Q.   This is worksheet 26183.  Do you identify that as your

7   worksheet underlying your valuation of Pine?

8   A.   Yes.

9   Q.   Okay.  And one thing I want to do to begin with is just

10  highlight the CUSIP number.  That's Pine's CUSIP number,

11  722490AA7, correct?

12  A.   I believe it is.

13  Q.   And if you scroll down to row 10, CP price is at 88.8.  Is

14  that your price for Pine stated in terms of a percentage of

15  notional?

16  A.   I believe it is.  I think it may have been truncated.  I

17  think it might be 88.84.

18  Q.   Okay.  But if we multiply that to the notional amount

19  listed there, we get to your valuation of 817 million, correct?

20  A.   Correct.

21  Q.   Now, were you aware at the time that you were valuing

22  Pine, Mr. Slattery, that before Lehman filed bankruptcy, Lehman

23  had hired -- or sorry, JPMorgan had hired people to attempt to

24  value Pine, since it was being used as collateral for loans

25  that Lehman had from JPMorgan?

Page 124

1    A.    Was I aware?

2    Q.    Yes.

3    A.    I believe I was, yes.

4    Q.    Did you study those valuations at all?

5    A.    No.

6    Q.    Can I refer you to tab 49 of the binder, which is an

7    excerpt from the examiner's report in the Lehman Brothers

8    bankruptcy case?  And it's an excerpt that discusses the

9    valuation of Pine.  So this is volume 4 of the report of Anton

10   Valukas, examiner appointed in this case.  And at page 1165 it

11   states, "As discussed above, on September 11, 2008, Craig

12   Delaney, a managing director at JPMorgan's investment bank, had

13   been asked to review the valuation of Lehman's securities."  Do

14   you see that?

15   A.    Yes.

16   Q.    And then on the next page, page 1166 at the bottom, the

17   paragraph begins, "At the same time, Delaney valued the other

18   collateral posted by Lehman in the LCE account, namely the

19   Pine, Spruce and Verano CDOs."  Do you see that?

20   A.    Yes.

21   Q.    And do you see it says -- and please highlight this, "He

22   priced Pine at seventy percent face value."  Do you see that?

23   A.    Yes.

24   Q.    And you priced Pine at 88.8 percent face value, correct?

25   A.    Yes, yes.

Page 125

1    Q.   And did you consider this information in reaching your

2    valuation?

3    A.   No, I did not.

4    Q.   And would you agree with me, sir, that if anything, the

5    bankruptcy of Lehman Brothers on September 15, 2008, would have

6    diminished the value of Pine?

7    A.   Not necessarily.  No.

8    Q.   Okay.

9    A.   I think the event of default, actually, would increase the

10   net asset value, I believe.

11   Q.   All right.  You see then, the next sentence says --

12   there's a reference to GFA.  Do you know who GFA is?

13   A.   No, I do not.

14   Q.   Have you heard of Gifford Fong Associates?

15   A.   Yes, I do -- yes, I have.

16   Q.   Are they an independent valuation firm?

17   A.   To the best of my knowledge, they are, yes.

18   Q.   It says, "Although GFA had priced Verano similarly, it

19   priced Pine and Spruce at a lower value than Delaney had."  Do

20   you see that?

21   A.   Yes, sir.

22   Q.   Did you review the Gifford Fong valuation in doing your

23   valuation of Pine?

24   A.   No, I did not.

25   Q.   It cites to a footnote 4331.

Page 126

1          MR. HUME:  Can we show that?  Scroll down the page.

2     Q.   4331 -- highlight this, please -- is an e-mail from Edward

3     Corral of JPMorgan to David Weisbrod of JPMorgan, dated

4     September 4, 2008.  Do you see that?

5     A.   Yes.

6     Q.   And do you believe you've seen that e-mail before?

7     A.   I don't recall that I have, no.

8     Q.   Well, it's the next tab in your binder, tab 50, BCI

9     Exhibit 1005.  E-mail from Ed Corral, JPMorgan, to David

10    Weisbrod of JPMorgan.

11         MR. HUME:  Please highlight the names and the date.

12    Q.   And this is on September 4, 2008.  Do you see that?

13    A.   Yes, sir.

14    Q.   And it says, "David, here's the analysis of the Lehman

15    excess box with Lehman's price and the value compared to

16    Gifford Fong's.  Executive summary is that GF," meaning Gifford

17    Fong, "has the three CDOs priced 1.5 billion dollars lower than

18    Lehman has them."  Do you see that?

19    A.   Yes.

20    Q.   And seeing it, do you recall reviewing this e-mail or not?

21    A.   I actually have flipped to the second page in --

22    Q.   Okay.

23    A.   -- this tab.  And I've seen this depiction of the

24    valuation.

25    Q.   Okay, let's move to the second -- first, the first page of

Page 127

1   the spreadsheet, if we could, which shows -- it's not that easy

2   to see, so we'll blow it up -- in line -- let's just make sure

3   I get this right -- row 3 is a CUSIP 722490A7.  I promise I

4   wasn't testing you on CUSIPs, but can we agree that that's the

5   Pine CDO?

6   A.   I don't know the nine-digit sequence off the top of my

7   head.  I know it starts with 722.

8   Q.   Well, we can go back to your valuation spreadsheet if you

9   want.  You're not sure that that's Pine?

10  A.   I'll accept for the sake of this discussion, that's Pine.

11  Q.   Okay.  The next sheet -- and it gives the market value and

12  the depth position at 1.025.  I don't know if that's Lehman's

13  value or face value.  But the next page gives Gifford Fong's

14  value.  Again, this was row 3 -- Gifford Fong valued it at

15  515.9 million.  Do you see that?

16  A.   Yes.

17  Q.   And so when you say you remember looking at this, did you

18  look at that because that was a valuation of Pine before Lehman

19  Brothers declared bankruptcy?

20  A.   I looked at it because I was aware that it was a Pine

21  valuation.  It wasn't necessarily in my head to look at it

22  based on a chronological significance.

23  Q.   But you did not incorporate that valuation in any way in

24  your valuation, correct?

25  A.   No.  I know of the reputation of Gifford Fong, but I don't

Page 128

1    know what went into this valuation as opposed to what went into

2    mine.

3    Q.   Would you agree with me, sir, they have a very good

4    reputation as an excellent valuation firm?

5    A.   Yes.

6    Q.   Now, you had a chart in which you showed the structure of

7    Pine.  And I'd like to pull that up.  I think it's your slide

8    21, which we can now do -- in black and white, unfortunately.

9    This was your demonstrative for your understanding of Pine,

10   correct?

11   A.   Correct.

12   Q.   Now, am I correct, sir, that Pine's principal assets are

13   participations in loans held through an entity called LCPI?

14   A.   That is my understanding, yes.

15   Q.   And LCPI is Lehman Commercial Paper Inc., correct?

16   A.   Yes.

17   Q.   Can we -- you do not show on your chart any involvement of

18   LCPI, correct?

19   A.   No.

20   Q.   In other words, you have a straight arrow from what's been

21   borrowed by borrowers, straight back to the tranche holders:

22   Barclays for the senior tranche; Lehman entities for the junior

23   tranches?

24   A.   Inclusive of the cash.  So --

25   Q.   Inclusive of the cash.

Page 129

1    A.    -- well, the eligible investments.

2    Q.   This chart does not reflect in any way, does it, a risk

3    that LCPI will not pass on any amounts repaid from the

4    borrowers?

5    A.    As far as the flow-through?

6    Q.    Correct?

7    A.    Risk?  No, it does not.

8            MR. HUME:  Can we put up my demonstrative slide on

9    Pine?

10   Q.    Now, you may disagree with some of the numbers, and I'm

11   not certain of the numbers exactly, but conceptually, would you

12   agree that this is the structure of Pine?  Let me just explain

13   what I mean by that.

14       At the bottom of this chart is the entity, LCPI, which

15   owns leveraged loans with over fifty different borrowers,

16   correct?

17   A.    I believe --

18   Q.    Is that your understanding?

19   A.    -- yes, fifty-five in total.

20   Q.    Okay.  And what Pine owns is a participation interest in

21   all of those leveraged loans, correct?

22   A.    Correct.

23   Q.    Pine is not the direct borrower, correct?  Excuse me.

24   Pine is not the direct lender to the borrowers, correct?

25   A.    I would say no.

Page 130

1    Q.   Okay.  And then Pine itself has a senior tranche or

2    tranches owned by Barclays and junior tranches owned by Lehman

3    affiliates, correct?

4    A.   Well, I would just say, it's senior tranche.

5    Q.   Okay.  That's fine.

6    A.   It's just one senior note.

7    Q.   One senior note held by Barclays and then a junior tranche

8    or tranches held by Lehman affiliates, correct?

9    A.   Right.  Correct.  And as you indicated, the numbers are a

10   little bit different.

11   Q.   Right.  I think you have smaller numbers up here held in

12   eligible investments.

13   A.   Correct.  But in aggregate, I think if the funded or the

14   already-borrowed, on your slide, plus the eligible investments,

15   versus my eligible investments and funded balances, I think we

16   arrive close to the same -- a similar number.  Close.

17   Q.   Okay.  The question is, sir, in your valuation of Pine, am

18   I correct that you did not discount the value in any way based

19   on any risk that payments that the borrowers made to LCPI might

20   not be passed on by LCPI to Pine?

21   A.   Correct.

22   Q.   You did not take that into account?

23   A.   Viewed it, and then did not take it into account.

24   Q.   Okay.  And would you agree with me, sir, that there is in

25   fact a risk that LCPI will not pass on payments it receives

Page 131

1    from borrowers directly up to Pine?

2    A.    Again, there is the potential for that risk, but I did not

3    include it or weight it in my valuation.

4    Q.    Are you aware, sir, of the fact that LCPI filed

5    bankruptcy?

6    A.    Yes.

7    Q.    And is it your understanding that LCPI owns nothing other

8    than these leveraged loans?

9    A.    I don't know the extent of LCPI's ownership --

10   Q.    Do you have any understanding -- excuse me.  I'm sorry.

11   Do you have any understanding of whether LCPI has any other

12   creditors other than Pine?

13   A.    I'm not aware, no.

14          MR. HUME:  Can we hand out, please, BCI Exhibit 1050?

15   This is not in your binder.

16      (Pause)

17   Q.    Mr. Slattery, do you have a copy of BCI Exhibit 1050?

18   A.    Yes.

19   Q.    It is an amended schedule of assets and liabilities for

20   Lehman Commercial Paper Inc.  Do you see that on the first

21   page?

22   A.    Yes, I do.

23   Q.    And if you -- if we jump to page 26, we will see Schedule

24   D of this filing is creditors holding secured claims in LCPI.

25   Do you see that?

Page 132

1    A.   Yes.  My -- yes.

2    Q.   Okay.  It goes on for a number of pages until page 54,

3    where it references Pine.  Do you see that?  Do you see Pine

4    here on page 54 referenced twice?

5    A.   Yes.

6    Q.   And do you see that that's after 28 some pages of other

7    creditors being listed?

8    A.   If I understand the schedule correctly, yes.

9    Q.   And did you take into account, sir -- if we go, I think,

10   to the end of the secured creditor claims, it goes all the way

11   to page 116.  Do you see that?

12   A.   Referring to the Schedule D?

13   Q.   Yes.

14   A.   Yes, it looks so.  Yes.

15   Q.   Okay, sir.  So, LCPI -- going back to the charts, if we

16   could -- LCPI is not simply a funnel through which these

17   borrower loans will automatically and necessarily be

18   distributed up to Pine, is it?

19   A.   I don't know, again, if I could necessarily conclude.  It

20   looks like there's a tremendous list of creditors holding

21   claims.  But I don't know if that necessarily is automatically

22   going to mean the LCPI entity would not pass on --

23   Q.   Are you aware of -- excuse me.  Are you aware of the fact,

24   sir, that in this -- that in the LCPI case, the estate has

25   taken the position that any payments received by Pine may be

Page 133

1  preference claims that could be avoided?  Are you aware of

2  that?

3  A.   No, I'm not.

4        MR. HUME:  I would like to -- excuse me, Your Honor.

5  I think it is tab -- Your Honor, I apologize, but I have -- we

6  have a slight dispute about the use of certain documents that

7  have been objected to by the other side.  And if I could take a

8  two-minute break, I'd like to try to address that.  It relates

9  to offers that the estate has made with respect to Pine to

10  Barclays that they say are to be excluded from this litigation.

11  We think it's relevant.

12        May I ask for a five-minute break to try to address

13  that?

14        THE COURT:  But let me understand what you're asking

15  for.  Are you asking to take a break in the examination of the

16  witness to --

17        MR. HUME:  Yes.

18        THE COURT:  -- present what amounts to a freestanding

19  argument about this issue?

20        MR. HUME:  I'd like to try to resolve it first with

21  opposing counsel, and then if I cannot --

22        THE COURT:  So we'll take a break --

23        MR. HUME:  -- yes.

24        THE COURT:  -- in the sense of I'll get up and leave.

25  That kind of break?

Page 134

1            MR. HUME:  Yeah, I would actually like a two-minute

2     break to go and consult with my client for two minutes.

3            THE COURT:  Why don't we take more than a two-minute

4     break.  Let's break until five to 3, which is fifteen minutes.

5            MR. HUME:  Thank you.

6         (Recess from 2:41 p.m. to 3:00 p.m.)

7            THE COURT:  Be seated, please.

8            MR. HUME:  Thank you, Your Honor.

9            THE COURT:  Anything --

10           MR. HUME:  The break allowed us to --

11           THE COURT:  -- resolved?

12           MR. HUME:  -- I think a practical resolution was

13    achieved.  There are two documents in our examination binder

14    that are e-mails between Alvarez & Marsal and Barclays

15    businesspeople, that counsel for the movants told us during the

16    lunch break, they had understood there was an agreement where

17    that wouldn't come up or be used in the litigation.

18           We've consulted with our clients and have -- none of

19    them that we've reached so far, which is many of them, have any

20    knowledge of that agreement.  We're not going to resolve

21    whether there is or isn't an agreement now.  Movants' counsel

22    have graciously allowed us to present the documents, which

23    we'll do quickly, and ask questions about them, move on.  And

24    they reserve their rights to move to strike them from the

25    record.

Page 135

1           Is that a fair summary?

2           MR. TAMBE:  Based on information that we have, there

3    was such an understanding that any communications that are

4    covered by these two documents would not be used for purposes

5    of this litigation.  For purposes of today's examination, we

6    simply want to reserve our objection.  Mr. Hume can go ahead

7    and do his examination.  We'll reserve the right to seek to

8    have that testimony and those documents stricken, if we can

9    confirm that --

10          THE COURT:  I take it, they're not being offered into

11   evidence, they're just being used in examining the witness.  Or

12   were you planning to offer them into evidence as well?

13          MR. HUME:  We do want to offer them into evidence, but

14   we can either do so subject to the reserved objection, or we

15   can do so later after they -- after we try to resolve it over

16   the next few days.

17          THE COURT:  All right.  Why don't you proceed.  And

18   frankly, this is all a little obscure to me, because I don't

19   know about the class of documents in which these particular

20   items may fall or why there was such an agreement.  But I'm not

21   going to dwell on it.  Let's just proceed with the

22   understanding being that everybody's rights are reserved:  your

23   rights to have them in the record and the movants' rights to

24   strike them from the record.

25          MR. TAMBE:  Thank you, Your Honor.

Page 136

1        MR. HUME:  Thank you, Your Honor.  And I'll try to be

2   brief with them.

3   BY MR. HUME:

4   Q.   Mr. Slattery, tab 41 of the binder -- excuse me, let me go

5   to tab 42 first, because I was asking you about whether you

6   were aware of a tolling agreement.  Tab 42, which has been

7   marked BCI Exhibit 1007 is an e-mail from David Walsh to

8   someone named Jake Scrivens.  Do you see that?

9   A.   Yes.

10  Q.   And do you know who David Walsh is?

11  A.   No, I do not.

12  Q.   You've never heard his name in connection with LCPI or the

13  Pine CCS?

14  A.   I have not personally, no.

15  Q.   He is forwarding to Jake -- Jake Scrivens, I'll represent

16  to you, I believe, is someone -- a businessperson at Barclays.

17  And this e-mail, as the prior e-mail in the chain indicates, is

18  a form of tolling agreement.  Do you see that?

19  A.   Yes.

20  Q.   And on the second page of the tolling agreement, there are

21  a series of "whereas" clauses.  The third and final "whereas"

22  clause on this page says, "Whereas the parties agree to toll

23  any applicable statute of limitations, statutes of repose, or

24  other time-related defense that might exist in regards to any

25  avoidance action."  Do you see that?

Page 137

1    A.    Yes.

2    Q.    Did it ever come to your attention, Mr. Slattery, in your

3    work on Pine, that LCPI was considering potential avoidance

4    actions to recover monies that it had paid to Pine?

5    A.    No.

6    Q.    Let me ask you to turn now to tab 41, which is BCI Exhibit

7    1006, which is an e-mail from April 23, 2009 -- an e-mail chain

8    between David Walsh, again, from Alvarez & Marsal, and Jasen

9    Yang.  Do you see that?

10   A.    Yes.

11   Q.    Do you know who Jasen Yang is?

12   A.    I do not.

13   Q.    I'll represent to you that at the time he worked for

14   Barclays Capital, and that he was involved in the valuation of

15   Pine and that he -- the e-mail chain, if you go to the second

16   page, to the e-mail that is halfway down the page, it says,

17   "From David Walsh to Jasen Yang," and it says, "I have

18   discussed internally a fallback.  What about 53.2 million

19   dollars plus 600 million, subject to court approval."  Do you

20   see that?

21   A.    Yes.

22   Q.    Did it ever come to your attention, Mr. Slattery, that in

23   April of 2009, Alvarez & Marsal was making an offer to Barclays

24   to purchase Pine for 600 million dollars plus the distributions

25   made to-date?

Page 138

1    A.    Was I aware was the question?

2    Q.    Correct, were you aware of it?

3    A.    No.

4    Q.    Did you ever discuss the evaluation of Pine with anyone at

5    Alvarez & Marsal?

6    A.    Personally?  No.

7    Q.    You agreed, Mr. Slattery, that the event of default would

8    likely increase the value of Pine, correct?

9    A.    That is my view, yes.

10   Q.    And is it your understanding the event of default occurred

11   on or around October 20, 2008?

12   A.    That is my understanding.

13   Q.    And is that why you didn't take it into account in valuing

14   Pine as of September 22nd or September 19th, 2008?

15   A.    No.  My analysis was a granular valuation of the

16   underlying credits.  So it was not necessarily a fundamental

17   component of my valuation, so I did not include it.

18   Q.    Mr. Slattery, do you recall, at your deposition,

19   testifying that you did not know for what purpose Lehman had

20   created the Pine CLO?

21   A.    It sounds familiar, yes.

22   Q.    Am I correct that you do not know why it was created by

23   Lehman?

24   A.    I do know why it was created.  But I believe that was a

25   truthful answer at the time.

Page 139

1    Q.   But subsequently you've learned why?

2    A.   Yes.

3    Q.   You've learned that they created it for financing

4    purposes?

5    A.   I believe they securitized organically-originated loans,

6    yes.

7    Q.   Is it your understanding, sir, that the underlying

8    leveraged loans for Pine were those which they were not able to

9    sell off independently?

10   A.   That I do not know.

11   Q.   Am I correct, sir, you were not involved in the market for

12   CLOs in September 2008?

13   A.   I was extensively analyzing and viewing the CDO market at

14   the time, but not --

15   Q.   But not the CLO market?

16   A.   -- correct.

17   Q.   And am I correct that your valuation opinion for Pine is

18   not intended to be an opinion on what any specific -- let me

19   strike that.

20        Am I correct that your valuation opinion on Pine is not an

21   opinion on what a market participant would be willing to pay

22   for Pine in September 2008?

23   A.   I wouldn't necessarily agree with that depiction, no.

24   Q.   Can I refer you to tab 3 of your deposition, page 234?

25   And, sir, at the bottom of that page, you were asked a

Page 140

1   question:  "And my question" -- this is going to go straight

2   over to 235 -- "my question, just so we're clear is, in your

3   mind, is there a difference between the value of the A1 tranche

4   of Pine CLO and what a willing buyer would pay for it on that

5   date?

6   "A.  I would be willing to concede that is possible."

7        Do you see that?

8   A.   Yes.

9   Q.   So do you concede that it's possible that your valuation

10  for Pine is different from and greater than what any willing

11  market participant would be willing to pay for it on September

12  19, 2008?

13  A.   I wouldn't include "any" I would say "a market

14  participant", because I don't know the entire universe of

15  possible would-be buyers.

16  Q.   Am I correct, sir, that in valuing Pine, you did not apply

17  any mid-to-bid adjustment?

18  A.   No, there -- that 88.8 reflects a bid.

19  Q.   You did not calculate a mid, you simply calculated a price

20  and concluded that that was a bid, correct?

21  A.   Yes.

22  Q.   And even though it was -- would you agree that it was an

23  illiquid asset?

24  A.   I would concede that the market was defined by a certain

25  degree of illiquidity.  In this case, my view of Pine was that

Page 141

1    it was a security that was fairly valued at 88.85 or -84.

2    Q.   Would you -- given that it was illiquid, what would the

3    range be, in your judgment, of the bid and ask spread?

4    A.   Again, given that the market exhibited a certain degree of

5    illiquidity, I'm not ascribing that to this particular

6    transaction.

7    Q.   But my question is, if you think the bid is 88.8

8    percent --

9    A.   Yes.

10   Q.   -- of notional amount, what is the ask?  Is the ask just

11   the notional amount?

12   A.   No, I'd have to quantify the ask.  But it would be north

13   of the 88.8.

14   Q.   And you didn't attempt to calculate either an ask or a mid

15   price for Pine, correct?

16   A.   No, just an ask -- a bid.

17   Q.   Mr. Slattery, am I correct that you do not know whether

18   the Barclays valuations on the acquisition balance sheet were

19   audited by an independent auditing firm?

20   A.   Can you please repeat that question?

21   Q.   Am I correct that you are not aware one way or the other,

22   whether the Barclays valuations for the assets on its

23   acquisition balance sheet were audited by an independent

24   auditor?

25   A.   That is correct.

Page 142

1    Q.    You were asked in testimony earlier today by Mr. Tambe

2    about some valuation differences between your values and

3    Professor Zmijewski -- I'm probably mispronouncing his name.

4    Do you remember that?

5    A.    Yes, sir.

6    Q.    And I believe your testimony was that at the portfolio

7    level, you believe your values and Professor Zmijewski's values

8    were comparable?

9    A.    That is my understanding, yes.

10   Q.    Have you analyzed -- performed any calculations of the

11   full extent of the differences?

12   A.    I have not, no.

13   Q.    And what is the basis, then, for your saying that you

14   believe, on a portfolio level, your values and his values are

15   comparable?

16   A.    I have an understanding of the portfolio level, again, for

17   comparability.  But in terms of granular assessment, I did not

18   do that.

19   Q.    You are aware that there are some significant differences

20   on specific CUSIPs that both you valued and Professor Zmijewski

21   valued, correct?

22   A.    I understand that there are CUSIPs that reflect different

23   prices, yes.

24   Q.    And in your report, you said that you thought that any

25   difference in value between Barclays and BoNY that was greater

Page 143

1   than a million dollars should have triggered scrutiny.  Do you

2   remember that?

3   A.   Yes.

4   Q.   Did you look to see how many CUSIPs you and Professor

5   Zmijewski valued that had a difference in value of a million

6   dollars or more?

7   A.   I did with respect to my dataset.  I don't know what Dean

8   Zmijewski with respect to his.

9   Q.   And I mean no disrespect by calling him Professor not

10  Dean.  I didn't --

11  A.   Sorry.

12  Q.   -- know he was a dean.  We have a demonstrative to hand

13  out that has calculated the differences, and we'll put it up on

14  the screen -- it's rather hard to see -- showing differences in

15  valuations on CUSIPs that both Dean Zmijewski valued.

16       (Pause)

17  Q.   Do you recall roughly how many CUSIPs both you and Dean

18  Zmijewski valued?

19  A.   Common CUSIPs?

20  Q.   Correct.

21  A.   I understand -- I believe it's approximately four dozen.

22  Q.   Correct.  This spreadsheet shows first the nominal values

23  you each had for each CUSIP, which I think, in a way, gives us

24  a sense of how large the position was in that CUSIP.  And in

25  aggregate, the positions Dean Zmijewski valued were larger in

Page 144

1    aggregate than yours.  His had a nominal value of 578 million,

2    yours of 123 million.  Do you see that?

3    A.   I see it at the bottom of the hard copy, yes.

4    Q.   I believe that's simply comparing how large the positions

5    were that you each valued.  Now, if you then have the list of

6    prices you each have, for example, on the first CUSIP, Dean

7    Zmijewski has a price of 91.39 and you have a price of 24.34.

8    Do you see that?

9    A.   Yes.

10   Q.   And would you consider that a significant difference in

11   price?

12   A.   I would have to know the context.  I'm not sure exactly

13   what Dean Zmijewski's price represents.

14   Q.   When you say it depends upon the context, would you agree

15   that for some assets that were very illiquid, there would be a

16   range of reasonable values, and that both your values and Dean

17   Zmijewski's values might be reasonable?

18   A.   It's possible.

19   Q.   You can scroll down and see the other differences.  But if

20   you go further to the right on this spreadsheet, you can see

21   the original Zmijewski column has the total value he has for

22   each CUSIP.  Do you see that column?

23   A.   Yes.

24   Q.   It's column AA on the screen.  You can see it fourth from

25   the right or fifth from the right here --

Page 145

1   A.    I see it.

2   Q.    And his original valuation for all of these CUSIPs was 515

3   million.  Do you see that?

4   A.    I see that, yes.

5   Q.    And then we have a column that is implied Zmijewski price

6   using your prices.  Do you see that?

7   A.    Yes, I do.

8   Q.    And that is 299 million.  Do you see that?

9   A.    Yes, I do.

10  Q.    With a difference of 215 million.  Do you see that?

11  A.    Yes.

12  Q.    Do you believe that that is comparable across these

13  population of CUSIPs that you both valued?

14  A.    Again, based on the exercise, I would concede that no,

15  it's not comparable.  However, again, I don't know the context

16  of Dean Z's price in terms of day and so forth and collection

17  efforts, versus mine.

18  Q.    I assume you still believe your valuations were

19  reasonable?

20  A.    Yes.

21  Q.    But you don't know necessarily whether Dean Zmijewski's

22  values were unreasonable?

23  A.    Correct.

24  Q.    And so there may be a range of reasonable values for these

25  CUSIPs, correct?

Page 146

1    A.    Again --

2    Q.    It's possible?

3    A.    -- it's possible, but the most appropriate way to answer

4    that question would be to do a granular assessment on a CUSIP-

5    by-CUSIP basis.

6    Q.    If these numbers are correct, would you agree that Dean

7    Zmijewski is asking this Court to conclude that Barclays should

8    pay back 215 million dollars of value that you don't believe

9    was there?

10   A.    Again, it's -- within a context, I would need a little bit

11   more clarification in terms of what I'm exactly comparing to

12   here in terms of Dean Z's price column.

13   Q.    Can you turn briefly, Mr. Slattery, to tab 54 of your

14   binder, which is Movants' Exhibit 242.  Do you see that

15   document?

16   A.    Yes.

17   Q.    Have you seen it before?

18   A.    Yes.

19   Q.    Have you made any effort, in your opinions in this case,

20   Mr. Slattery, to analyze whether the Barclays information on

21   its post-closing gains and losses in all of the asset classes

22   you valued, are consistent or inconsistent with your opinions

23   about the fair market value of those assets on or around the

24   time of acquisition?

25   A.    Are you asking -- just a clarification.  Are you asking if

Page 147

1   I've compared my results to those of Barclays?

2   Q.   No, I'm asking whether -- you say you've seen this

3   document before.

4   A.   Correct.

5   Q.   You understand this document is reporting, to the best of

6   its ability, Barclays' information on gains and losses it

7   incurred on the various asset classes that it acquired in the

8   Lehman transaction.  Do you understand that?

9   A.   Yes.

10  Q.   And all I'm really asking is, using this information or

11  any other information provided with it, have you attempted to

12  perform any analysis of the consistency or inconsistency of the

13  information here, on post-closing gains and losses in these

14  asset classes, with your determination of fair market value?

15  A.   No.

16         MR. HUME:  Your Honor, if I may just have one minute?

17         THE COURT:  Sure.

18         MR. HUME:  I may be done.

19         I'm reminded, Your Honor, as I frequently do, and I

20  apologize, I didn't move into evidence all the exhibits I would

21  have liked to.  And there were a number of work papers specific

22  to this witness.  So it might just be appropriate to take one

23  minute and move into evidence -- I can do it one at a time or

24  all at once.

25         MR. TAMBE:  If you can do it one at a time --

Page 148

1          MR. HUME:  Okay.  BCI Exhibit 1029 is tab 19, which is

2     a work paper we discussed.

3          MR. TAMBE:  No objection.

4          THE COURT:  It's admitted.

5     (Work paper of Mark Slattery was hereby received in evidence as

6     BCI's Exhibit 1029, as of this date.)

7          MR. HUME:  BCI 1028 is at tab 20 and is a Slattery

8     work paper.

9          MR. TAMBE:  No objection.

10         THE COURT:  Admitted.

11    (Work paper of Mark Slattery was hereby received in evidence as

12    BCI's Exhibit 1028, as of this date.)

13         MR. HUME:  BCI 1046 is at tab 21, and is also another

14    Slattery work paper we looked at.

15         MR. TAMBE:  No objection.

16         THE COURT:  It's admitted.

17    (Work paper of Mark Slattery was hereby received in evidence as

18    BCI's Exhibit 1046, as of this date.)

19         MR. HUME:  BCI 1030, that's at tab 22.  Another

20    Slattery work paper.

21         MR. TAMBE:  No objection.

22         THE COURT:  Admitted.

23    (Work paper of Mark Slattery was hereby received in evidence as

24    BCI's Exhibit 1030, as of this date.)

25         MR. HUME:  BCI 1041 is at tab 23.  Another work paper

Page 149

1    of Mr. Slattery's.

2         MR. TAMBE:  No objection.

3         THE COURT:  Admitted.

4    (Work paper of Mark Slattery was hereby received in evidence as

5    BCI's Exhibit 1041, as of this date.)

6         MR. HUME:  BCI 1042 is at tab 24.  We may not have

7    used this one, but we would move it into evidence.  It is also,

8    I believe, a work paper of Mr. Slattery's.

9         MR. TAMBE:  No objection.

10        THE COURT:  It's admitted.  But if you haven't used it

11   during the course of examination, it will be meaningless to me.

12   (Work paper of Mark Slattery was hereby received in evidence as

13   BCI's Exhibit 1042, as of this date.)

14        MR. HUME:  It's conceivable that one of our experts

15   will want to talk about it, but he wouldn't be able to get it

16   into evidence.

17        THE COURT:  Fine.  Got it.

18        MR. HUME:  I'm not expecting the Court to review it

19   necessarily.

20        MR. HUME:  BCI Exhibit --

21        THE COURT:  Even if the type were bigger, I wouldn't

22   get it.

23        MR. HUME:  -- BCI Exhibit 1043 falls into the same

24   category, at tab 25.

25        MR. TAMBE:  No objection.

Page 150

1          THE COURT:  It's admitted.

2    (Work paper of Mark Slattery was hereby received in evidence as

3    BCI's Exhibit 1043, as of this date.)

4          MR. HUME:  BCI Exhibit 1044 is at tab 26.  And we

5    would move that into evidence.  It's also a Slattery work

6    paper.

7          MR. TAMBE:  26 -- tab 26?

8          MR. HUME:  I'm sorry, tab 26, yes.

9          MR. TAMBE:  Yes, no objection.

10          THE COURT:  Admitted.

11    (Work paper of Mark Slattery was hereby received in evidence as

12    BCI's Exhibit 1044, as of this date.)

13          MR. HUME:  And just three more.  This is now a

14    slightly different category.  Tab 27 is the Jones Day letter

15    that actually came up the other day.  I assume no objection to

16    having it in evidence.

17          MR. TAMBE:  No objection.  Only there are attachments

18    referenced in it which are not -- there are attachments to this

19    letter which are not in fact part of the exhibit.

20          MR. HUME:  That's fine.  We should add them.  We can

21    add them.

22          THE COURT:  So you're supplementing the exhibit?

23          MR. HUME:  I will -- we will supplement the exhibit.

24    We can deal with that.  And then --

25          THE COURT:  Okay.  If there's no objection, it's

Page 151

1    admitted.

2    (Jones Day letter was hereby received in evidence as BCI's

3    Exhibit 1025, as of this date.)

4          MR. HUME:  Exhibit 1040 is at tab 53, which is Mr.

5    Slattery's work paper on Pine.

6          MR. TAMBE:  No objection.

7          THE COURT:  Admitted.

8    (Work paper of Mark Slattery on Pine was hereby received in

9    evidence as BCI's Exhibit 1040, as of this date.)

10          MR. HUME:  And finally, we created a demonstrative

11    which the witness testified about, Exhibit 1051.

12          MR. TAMBE:  Your Honor, if this is a demonstrative

13    coming in as a demonstrative exhibit, we have no objection.

14          THE COURT:  You have no objection to its coming in as

15    a demonstrative.

16          MR. TAMBE:  As a demonstrative.  But I'm not sure who

17    prepared it or anything beyond that.

18          MR. HUME:  Since it's referenced in the examination,

19    Your Honor, I just think it should be in evidence so it can be

20    seen.

21          THE COURT:  It's admitted as a demonstrative.

22    (BCI Demonstrative was hereby received in evidence as BCI's

23    Exhibit 1051, as of this date.)

24          MR. HUME:  Thank you, Your Honor.  Thank you, Mr.

25    Slattery.

Page 152

1          THE COURT:  Redirect?

2          MR. TAMBE:  Yes, Your Honor.  If I could just have a

3  moment?

4          THE COURT:  Sure.

5      (Pause)

6  REDIRECT EXAMINATION

7  BY MR. TAMBE:

8  Q.   Good afternoon, Mr. Slattery.

9  A.   Good afternoon.

10  Q.   If you could turn in the Barclays binder, please, to tab

11  12, which is BCI 1031.

12          MR. TAMBE:  Is that on our system, Steve?

13  Q.   And I'm going to ask another document to be pulled up,

14  which is tab 14 in the binder that I gave you, which was

15  Movants' Trial Exhibit 252.  And if we could turn to the second

16  page of that, and maybe it's easiest on the screen with some

17  enlargement.

18      The document on the left, BCI Exhibit 1031, has a range of

19  mid-to-bid distressed spreads, third column, bottom half.  Do

20  you see that, sir?

21  A.   Yes.

22  Q.   Okay.  How, if at all, did you apply those mid-to-bid

23  distressed spreads for the valuation of the securities that you

24  valued?

25  A.   I applied them at the specific cash flow type or

Page 153

1    instrument that's noted to the far left.  So, for example, the

2    inverse IO agency mortgage-backed securities, I applied a 16.67

3    percent mid-to-bid adjustment.

4    Q.   Okay.  And that mid-to-bid adjustment would translate to a

5    bid-ask spread of how much, with respect to the inverse IO?

6    A.   33.33.

7    Q.   And how does that actual mid-to-bid adjustment and bid-ask

8    spread that you actually applied relate to the data that was

9    used as a starting point by Barclays for their liquidity

10   adjustment calculations for similar securities?

11   A.   Well, taking into account that the bid-offer that's

12   indicated on the right-hand document, the far right-hand

13   column --

14   Q.   Movants' 252.

15   A.   -- is a bid-offer spread.  In other words, in my opinion,

16   that number should be divided by two.  But suspending that

17   particular convention for a moment, my inverse IO mid-to-bid or

18   bid -- mid-to-bid adjustment of 16.7 percent reconciles to the

19   apparent tight range in the inverse IO selection set that

20   Barclays used to determine the bid-offer spread across the wide

21   range of agency mortgage-backed securities.

22   Q.   Okay.  So the methodology, first of all, that you used to

23   derive the appropriate mid-to-bid spread for distressed

24   situations, coincides with the market data that's reflected in

25   Barclays' analysis, correct?

Page 154

1    A.    Again, assuming for the moment that the bid-offer on the

2    right-hand side represents a mid-to-bid as opposed to a bid-

3    offer.

4    Q.    Okay.  And you actually applied that 16.67 percent mid-to-

5    bid adjustment when you were valuing inverse IOs in the

6    population that you valued?

7    A.    Yes.  As indicated, there were at least three interest-

8    only structured agency RMBS for which I applied a mid-to-bid

9    adjustment of more than ten percent.

10   Q.    Were there situations in which you applied a wider bid-ask

11   spread to make a liquidity adjustment than Barclays did?

12   A.    Yes.

13   Q.    And were there situations where you applied a lower bid-

14   ask spread?

15   A.    Yes.

16   Q.    And is that because you applied specific bid-ask spreads

17   by subcategory, to these securities?

18   A.    Yes.  The trust IOs and POs, again, the weighting within

19   that grouping yields the 1.6 percent adjustment that I made.

20   Q.    If you could turn in the binder that I gave you to tab 5,

21   which is Movants' Trial Exhibit 921, please?  If you could turn

22   to the second page of that document, please?

23   A.    Sorry I --

24   Q.    It's tab 5 in the binder I gave you.

25   A.    Yes, I'm there.

Page 155

1   Q.   And what is shown on page 2 of Movants' Trial Exhibit 921?

2   A.   The top represents the range of liquidity discounts that I

3   applied based on specific asset subcategories.  In other words,

4   the cash flow type of the particular agency mortgage under

5   consideration.  It's not ordered along the lines of smallest to

6   greatest or greatest to smallest.  But, for example, again, the

7   inverse IO, which would be the fourth row down from the top,

8   the discount that I applied for a mid-to-bid adjustment is

9   consistent with the previous or one of the previous sheets that

10  was up on the screen.

11      The bottom grouping represents the liquidity discounts --

12  liquidity adjustments that I applied across the range of agency

13  debt securities based on a stratification along maturity lines

14  or remaining maturity lines.  So, for example, the longer

15  instruments, those that have the greatest remaining maturity,

16  receive the largest discount.

17  Q.   And Movants' Trial Exhibit 921, that's one of your

18  worksheets.  Is that right?

19  A.   I'm sorry, which one?

20  Q.   The document we're looking at, tab 5?

21  A.   Yes.

22  Q.   Movants' Trial Exhibit 921.  It's one of your worksheets?

23  A.   Yes.

24      MR. TAMBE:  We'd move that into evidence, Your Honor.

25      MR. HUME:  No objection.

Page 156

1          THE COURT:  It's admitted.

2     (Work paper of Mark Slattery was hereby received in evidence as

3     Movants' Exhibit 921, as of this date.)

4     Q.   There were a couple of demonstratives that were shown to

5     you.  And again, I'm not sure whether we can pull these up, but

6     BCI 940.  I think there was a discussion about price and yield

7     and this particular demonstrative that was shown to you by

8     Barclays.

9          The yields that are shown on the -- I guess, fifteen-year

10    yields that are shown on this document, which range from a

11    little over 4.4 percent to a little under 5.2 percent, how do

12    those compare to the implied yields that you calculated using

13    Barclays' liquidity discounts for similar instruments?

14    A.   Integrating their discount?

15    Q.   Yes.

16    A.   These numbers would be less than the implied yields.

17    Q.   Well, would their numbers -- their implied yield numbers,

18    show anywhere on this chart, sir?

19    A.   Not with the range that's indicated on the vertical axis,

20    no.

21    Q.   So they'd be off the charts?

22    A.   Correct.

23    Q.   There was discussion, I think, at various times, about

24    Level 2 and Level 3 assets.  And I understand from your

25    testimony that you did not classify these CUSIPs that you were

Page 157

1    valuing and say well, these are Level 2s and these are Level

2    3s.  In terms of valuing Level 2 and Level 3 assets, do you

3    have any less confidence in your ability to value Level 2

4    assets versus Level 3 or Level 1 assets, sir?

5    A.    No.

6    Q.    Did you apply market standard practices for valuing these

7    securities?

8    A.    Yes.

9    Q.    Do financial institutions every single day and every week

10   and every month value Level 2 and Level 3 assets?

11   A.    Absolutely.

12   Q.    In the summary sheet for your analysis, which is slide 4

13   of the presentation materials, I believe Mr. Hume showed you

14   6,035 and said, well that's about fifty percent of the CUSIPs.

15   Do you recall that?

16   A.    I think he mentioned eighty, and then I said ninety, in

17   terms of number of CUSIPs.

18   Q.    Number of CUSIPs.  The value attributed to those 6,000

19   CUSIPs as compared to the overall securities that were

20   transferred over, was that about what, twenty-five percent or

21   so by value?

22   A.    Based on the collective experts' valuation, it looks as

23   though it's about twenty-two percent.

24   Q.    And in terms of the overall delta, the undervaluation

25   delta that's attributable to those 6,000 securities, that's

Page 158

1    about 400 million over a total delta of about 5.11 billion.

2    What's that in percentage terms?

3    A.    Less than ten percent.

4    Q.    There were some questions, I think in the Treasury space.

5    And maybe -- I believe it was in the Treasury space.   And

6    correct me if I'm misremembering this -- where there was a

7    discussion about certain situations where you calculated a mid

8    price and then derived a bid price, and situations where you

9    calculated a bid price to begin with.   Do you recall that, sir?

10   A.    Yes.

11   Q.    What were the situations in which you calculated a bid

12   price, and why?

13   A.    Calculated a bid price was when I was working from the mid

14   to the bid in a reverse order.   If I had bids, then I took

15   those bids and incorporated them, again, recognizing that I

16   would apply a liquidity discount at the security level, I could

17   work backward to a mid.

18   Q.    And where you had data that gave you mid prices, did you

19   then make the adjustment from mid to bid?

20   A.    Yes.

21   Q.    And again, I want to make sure I've got the right

22   securities.   Are the ones that you applied the bid prices to --

23   so you started with bid prices, you applied bid prices -- are

24   they within the agency RMBS portfolio or are they within the

25   U.S. Treasuries and agencies?

Page 159

1   A.   I had prices for instruments or securities within both

2   datasets.  The slide that's up, the prices that I had were for

3   the twenty-four CUSIPs indicated in the top row.

4   Q.   So for those twenty-four securities, the prices you would

5   have used would, in fact, have been -- you had bid prices and

6   you used bid prices?

7   A.   I had indicative prices that I used as bids from four

8   different firms.  Some CUSIPs I believe I had less than four

9   observations.  Some CUSIPs I had actually four observations.

10  And the prices, based on that distribution, would show a much

11  tighter indicative price than five percent.  The proximity of

12  the prices I collected from the four different firms as of 9/19

13  were much tighter.

14          MR. TAMBE:  Your Honor, may I approach?

15          THE COURT:  Sure.  Thank you.

16          THE WITNESS:  Thanks.

17      (Pause)

18  Q.   Sir, I've handed up to you a document marked as BCI

19  Exhibit 996.  And I want to turn your attention to the second

20  page of this exhibit.  And it's the paragraph under "Legal

21  concerns".

22  A.   Yes.

23  Q.   And about six lines down there's a sentence that begins --

24  well, let's start four lines down, "As of 12/31/08."

25          MR. TAMBE:  If you could just highlight that and the

Page 160

1    next sentence please up until the word "cash".

2    Q.   It states in this document, "As of 12/31/08, there's 100

3    million dollars in cash flows from the underlying borrowers

4    that have been paid since Bar Cap acquired Pine.  Bar Cap's

5    attorneys allege that a senior noteholder is following the UOD

6    and acceleration of the deal.  Barclays is fully entitled to

7    these cash flows.  The desk claims of this cash has been

8    allowed to sit with LCPI, as a sign of good faith as they

9    prepare to sell the deal back to Lehman, but that they are

10   fully entitled to the cash."

11        Do you see that?

12   A.   Yes, sir.

13   Q.   And were you -- had you reviewed this document in

14   preparing to testify here today?

15   A.   Yes.

16   Q.   In coming up with the valuation for Pine, you were asked a

17   question about whether you made an adjustment from mid to bid

18   or whether the price you had was a bid price.  And you said --

19   I believe you said you did not make a mid-to-bid adjustment

20   once you had your price.  Is that right?

21   A.   Yes.

22   Q.   Why didn't you make an adjustment -- mid-to-bid

23   adjustment?

24   A.   I approached it using a fundamental analysis by pricing

25   the underlying credits first and then working up to an implied

Page 161

1    yield based on those credits and the prices that I accumulated

2    from reliable sources, including Lomax (ph.).  And then

3    converted that yield to discount the cash flows associated with

4    the A1 security.  So in essence, I had built into the process a

5    repayment risk, i.e., a credit risk.  And I felt confident with

6    the price that I arrived at in terms of expressing a bid.

7    Q.   In your Pine valuation, you told us you did this ground-up

8    valuation, but that you also did a net asset value calculation

9    as a backup calculation.  Is that right?

10   A.   Yes.

11   Q.   Okay.  And in the net asset value calculation, did you

12   conclude that there was more than enough collateral to satisfy

13   the obligations to the A1 note?

14   A.   Yes.

15   Q.   And do you know by how much there was excess collateral?

16   A.   I looked at three scenarios, one that would convert the

17   cash that was part of the eligible investments to loans, so 300

18   million dollars, generally speaking, would be converted to

19   loans.  I looked at a scenario where all the underlying credits

20   were called or drawn down, so the entire deal would be funded.

21   And I also looked at a third scenario which would call for an

22   event of default.  So the 300 million in cash would reside and

23   stay as cash, in other words, it wouldn't be converted to

24   loans.  All three scenarios provide a net asset value greater

25   than 100 percent relative to the A1 position in Pine.

Page 162

1   Q.   And do you have any recollection of how much in excess of

2   the 100 percent, sir?

3   A.   Depending on scenario, but I believe it was, at a minimum,

4   about 116 percent in terms of overcollateralization.

5          MR. TAMBE:   No further questions, Your Honor.

6          MR. HUME:   Your Honor, if I may, I just have two or

7   three questions in response to the redirect?

8          THE COURT:   All right.

9   RECROSS-EXAMINATION

10  BY MR. HUME:

11  Q.   Mr. Slattery, you were asked just now by Mr. Tambe about

12  the implied yields from the Barclays valuations of the agency

13  debt securities as compared to the yields in the index.  Am I

14  correct, sir, that you don't know whether the securities -- I

15  think you testified earlier -- that Barclays acquired, were the

16  same as the securities in the index?

17  A.   Yes.

18  Q.   And am I correct, sir, that in your calculation of implied

19  yields, where you show that certain very short-term maturities

20  would have high yields, did you calculate implied yields for

21  all of the agency debt securities Barclays had?

22  A.   Yes.

23  Q.   Including ones that had maturities of more than ten years?

24  A.   Yes.

25  Q.   More than twenty years?

Page 163

1   A.   All the way out to the last bond which was approximately a

2   thirty-year instrument, maturing in August of 2038.

3   Q.   And did you produce that information to us?

4   A.   No, it was just follow-up analysis by myself.  It wasn't

5   reliance materials, as far as I understand it.

6   Q.   So you performed the analysis, but you chose not to rely

7   on it?

8   A.   It just confirmed an understanding that I had with respect

9   to the securities in the --

10  Q.   If you relied on it sir, we were supposed to get it.  So

11  did you rely on it or not?

12  A.   No, I did not.

13  Q.   You were asked a moment ago about this document, BCI

14  Exhibit 996.

15           MR. HUME:  Could we pull that up on the screen,

16  please?

17  Q.   And you were asked about a paragraph, "Legal concerns".

18  You were not shown the last sentence in that paragraph, which

19  says, "Nonetheless, the cash has still not been passed through

20  to Barclays from LCPI, as would normally be performed under the

21  terms of the master participation agreement."

22       Do you see that?

23  A.   Yes.

24  Q.   And so did you understand PWC to be noting the Barclays

25  legal position here as of the end of 2008, but also noting that

Page 164

1   it was a potential concern?  Did you understand that to be the

2   case?

3   A.   Yes.

4   Q.   And did you understand that in this same document that you

5   considered in forming your opinion, PWC expressed some concern

6   about the price to which Barclays had marked up Pine, that it

7   might be too high?

8   A.   I did not use this document to form my opinion.

9   Q.   I thought you testified that you did review this document?

10  A.   I did review it.  But in forming my opinion about Pine, I

11  did not use it.

12  Q.   All right.  Let me just see if you reviewed -- on page --

13  the two pages later from this one, so I suppose the third page

14  of the document, at the bottom there's a paragraph that says,

15  "As there is significant uncertainty around the amount and

16  timing of the cash that will ultimately be passed on to Bar Cap

17  and no relevant benchmarks to compare with, we are unable to

18  determine the appropriate amount to include in determining the

19  year-end market value of Pine.  Do you see that?

20  A.   Yes.

21  Q.   Did you find that at all relevant in your attempt to value

22  Pine?

23  A.   No.  I think -- again, chronologically, I think this was

24  done toward year end.  I was valuing the instrument as of

25  September 2008.

Page 165

1    Q.    And just so I'm clear on something you testified to Mr.

2    Tambe, that you have as much confidence valuing an asset like

3    Pine as you would valuing the most liquid traded S&P 500 stock,

4    let's say shares of Microsoft on a particular day.  You are

5    just as confident valuing Pine as you are valuing Microsoft on

6    September 19, 2008.  Is that correct?

7    A.    In my abilities?  Yes.

8    Q.    You're just as confident in the price you reach, correct?

9    A.    I stand by the prices I reach, yes.

10   Q.    Okay.  The next page -- I'll move on quickly here and I'll

11   finish up -- there's a series of points under "Pine

12   conclusions" by PWC.  Do you see that?

13   A.    Yes.

14         MR. HUME:  And actually, let's highlight the box too,

15   please, where PWC runs a number of scenarios.

16   Q.    Do you remember reviewing this?

17   A.    Yes.

18   Q.    And in the paragraph they have a bunch of scenarios here

19   with probability weightings:  FA VG Scenario 1, Scenario 2,

20   Scenario 3, Scenario 4.  Do you see that?

21   A.    Yes.

22   Q.    And total market value of A1 tranche varies under those

23   scenarios from the current client view, which they had marked

24   it up to 705 at the year end after the event of default, and

25   then there's four other scenarios with values ranging from 420

Page 166

1    all the way up to 705.  Do you see that?

2    A.   Yes.

3    Q.   And so the highest of all the scenarios that PWC could

4    come up with was the client value.  Do you see that?  The 705.

5    A.   Yes.

6    Q.   Okay.  And under "Cash valuation", paragraph 3, they say,

7    "We are unable to assess the appropriate amount of cash that

8    should be in the deal.  However, based on our scenario analysis

9    above, the client appears to be taking the most optimistic

10   approach."

11        Do you see that?

12   A.   Yes.

13   Q.   And the last sentence of that paragraph says, "As such,

14   the prices that result from scenario 2 or 3 appear to be more

15   reasonable than the client's value."

16        Do you see that?

17   A.   Yes.

18   Q.   And so do you recall generally that PWC expressed some

19   skepticism about the amount by which Barclays marked up its

20   valuation of Pine after the event of default?

21   A.   Yes.

22   Q.   But Barclays' mark-up, sir, is still over 100 million

23   dollars less than your valuation, correct?

24   A.   I believe that's the case, yes.

25        MR. HUME:  No more questions, Your Honor.

Page 167

1          THE COURT:  Anything more?

2          MR. TAMBE:  Nothing further, Your Honor.

3          THE COURT:  You're excused.  Thank you, Mr. Slattery.

4          We are done for the day and for the week.  I note that

5     Monday the 4th lists John Olvany --

6          MR. TAMBE:  It's John Olvany, yes.

7          THE COURT:  -- Olvany.  And he will be the witness?

8          MR. TAMBE:  He will be the witness.

9          THE COURT:  What's happening with Mr. McIsaac on

10    Tuesday?  Is he appearing or not?

11         MR. MAGUIRE:  I believe we have an agreement to which

12    we decided as a result of that agreement, we will not be

13    presenting Mr. McIsaac.  And the issue for which we were going

14    to present him, which was whether there is an excess in the c3

15    account as of a particular date, is one that the parties have

16    agreed will be deferred and dealt with if necessary, based on

17    the Court's ruling on the matters that are presented as a

18    result of this trial, Your Honor.

19         So there's no need to present him or for the Court to

20    hear him at this stage.

21         THE COURT:  All right.  Does that mean that Barclays'

22    expert case may begin as early as Tuesday?

23         MR. SCHILLER:  Yes, Your Honor.

24         THE COURT:  Fine.

25         MR. SCHILLER:  We'll be presenting a stipulation

Page 168

1   reflecting what Mr. Maguire just told the Court.

2        THE COURT:  Okay.  Is there anything more for today?

3        MR. SCHILLER:  Not from Barclays, Your Honor.

4        MR. GAFFEY:  One question I had for the Court, Your

5   Honor, which falls under the heading of housekeeping.  For the

6   record, Bob Gaffey from Jones Day.

7        It has to do with the trial transcripts.  We are --

8   and I'm sure my friends at Boies Schiller are, and I'm sure the

9   Court is -- working quite hard on what's gone on so far.  We

10  had tried with Barclays' counsel to -- there was some issues

11  with the accuracy of the Veritext transcript.  It's the nature

12  of a tape recording transcript.  And we had taken a look at

13  some of the transcripts through the April and May portions of

14  the hearings and tried to agree on a set of proposed changes.

15       THE COURT:  Agreed changes to the transcripts?

16       MR. GAFFEY:  Yes.  And that was, I should say, Your

17  Honor, always with the proviso that we weren't going to do

18  anything without the Court's approval with regard to this.  I'm

19  a little concerned that we're this far down the road and not

20  far enough in that project that, among other things, Your Honor

21  and the Court's staff may have spent a lot of time on page

22  numbers and the like, which would change if we make the

23  accuracy changes.

24       The proposal -- what I wanted to do now is get the

25  Court -- get some guidance from the Court as to whether this is

Page 169

1    worth doing at all, or whether we're far enough down the road,

2    we ought to live with the Veritext that we've got, put sic and

3    quotes up when we need to, and maybe deal with another

4    transcript.

5            THE COURT:  Well, the quality of the transcript is an

6    issue that concerns everybody.  And I think that it's an issue

7    that you should deal with as it relates to the testimony that

8    matters for your proposed findings of fact, which I understand

9    will be coming in, sometime in November.

10           MR. GAFFEY:  Well, they will.  But we'll also have,

11   Your Honor, closings --

12           THE COURT:  Sure.

13           MR. GAFFEY:  -- and I expect that -- I know, and I

14   expect that my friends at Boies Schiller are going to throw

15   some testimony up there too.  And we'll be -- at this stage, my

16   plan is to refer to the transcript as is, because I don't think

17   we've made enough progress trying to reach a corrected one.

18   And what --

19           THE COURT:  Good.

20           MR. GAFFEY:  -- I don't want to do is disturb the

21   Court's workflow on whatever it is --

22           THE COURT:  No, no.  That's not going to affect us at

23   all.  I noted this, I think it was yesterday, when we had an

24   argument about some testimony and whether or not -- I think it

25   was Mr. Fogarty's deposition testimony -- was going to be

Page 170

1   included.  And we had blue text and we had yellow text up on

2   the screen.  And I spotted what I thought was -- maybe it was

3   exactly what was said, but it seemed to me to be a

4   typographical error that everybody probably recognized as such,

5   and it didn't affect our ability to understand what he was

6   saying.

7          I think some transcription error is an inevitable part

8   of what we all do in litigation.  And it usually results in

9   somebody putting in brackets [sic] after something that's

10  obviously wrong.  I have not studied the transcript with a view

11  toward determining the quality in the sense of determining

12  mistakes that are really meaningful to the interpretation of

13  the record.

14         Have you spotted errors that you believe are

15  meaningful?

16         MR. GAFFEY:  This is where I have to confess, I've not

17  been on the front lines on this.  I'm told that there are a

18  number of errors.  I don't think there's anything where a

19  witness is totally off the reservation as to what he or she

20  actually said.

21         THE COURT:  We don't have "yeses" coming out "no", do

22  we?

23         MR. GAFFEY:  Exactly.  We've got --

24         THE COURT:  Good .

25         MR. GAFFEY:  -- names mispronounced.  Mine as often as

Page 171

1   anybody's.  Zmijewski was a challenge for everybody.  And there

2   are --

3            THE COURT:  I recognize, every time I look at a

4   transcript, that they get me wrong.

5            MR. GAFFEY:  What I wanted -- the reason I wanted to

6   raise it, and I know it sounds like a small point, but as I

7   said, there's a lot of work going into this now, and here's

8   where I fear we are.  We're halfway through a project -- we're

9   only through the May hearings.  We've got June; we've got

10  September.  What I propose is for now, we should just deal with

11  the transcript as it is, and if we can come up for a better one

12  for a full record, we should do that in the fullness of time.

13  But I just wanted to be consistent.

14           THE COURT:  Well, as to this housekeeping item, absent

15  some comment from Mr. Schiller, who seems ready to stand to say

16  something, which is fine, I'm happy to hear what he has to say,

17  the most convenient thing probably is to deal with the

18  transcript as-is.  And to the extent that there are some

19  meaningful mistakes as to witnesses or portions of testimony

20  that are actually critical, I suspect it would be of use to the

21  parties and to the Court for there to be some stipulated

22  adjustment to mistakes that are quite obvious.  But as a

23  general matter, I think that we can use the transcript as is.

24           MR. HUME:  Your Honor, just so I'm clear.  I think the

25  process was described correctly.  But we have been sending --

Page 172

1    using the audio tape, where there have been meaningful errors,

2    we've tried to have the audio checked and have the -- I think

3    Veritext, correct them.  And then we were going to work with

4    Jones Day to propose it.  If we're able to get the audio

5    checked that it is correct, and it is meaningful, why can't we

6    use that at closing?

7            MR. GAFFEY:  Because as recently as the 27th of

8    September, Your Honor, with respect to transcripts as far back

9    as April and May, my friends at Boies Schiller are still

10   proposing changes.  My point is, we're not going to get this

11   done in time to make the transcripts usable for closings.  So I

12   want to go ahead and use the transcript as it is.

13           MR. HUME:  I didn't realize this was contentious.  I

14   thought it was housekeeping.

15           MR. GAFEEY:  I thought it was too.

16           MR. HUME:  I'm simply telling you that I think my

17   colleagues are finding meaningful errors that would be

18   important to change, because otherwise testimony that's

19   important will not be usable.

20           THE COURT:  I think it may be sensible for us to have

21   a chambers conference now.  We'll clear the courtroom.  We have

22   a little bit of time for the balance of the day.  And my

23   suggestion is that we'll use the courtroom for a chambers

24   conference on this issue, rather than have this all on a record

25   which we're then going to have to proof later.

Page 173

1          MR. GAFFEY:  I'm going to be misunderstood.

2          THE COURT:  So if we can just have our own flawed

3    memories of what we say off the record.  My suggestion is that

4    we clear the courtroom and have a chambers conference in here

5    at about ten past 4.

6          MR. GAFFEY:  Thank you, Your Honor.

7          THE COURT:  We're adjourned till then.

8       (Whereupon these proceedings were concluded at 3:52 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 174

1

2                          I N D E X

3                      T E S T I M O N Y

4

5    WITNESS              EXAMINATION BY      PAGE

6    Mr. Slattery         Mr. Tambe           5/152

7    Mr. Slattery         Mr. Hume            60/162

8

9                        E X H I B I T S

10   MOVANTS'             DESCRIPTION         PAGE

11   155A                 CV of Mark          7

12                        Slattery

13   155B                 Mr. Slattery's      22

14                        corrected expert

15                        report

16   824                  Declaration by Mr.  23

17                        Slattery

18   921                  Work paper of Mark  156

19                        Slattery

20   BCI'S

21   1031                 Work Papers of Mr.  95

22                        Slattery

23   1027                 Calculation for     95

24                        Agency Debt

25                        Security Spreads

Page 175

| | BCI'S | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | 1033 | Excerpt of Gerber Chapter | 95 |
| 4 | 1029 | Work paper of Mark Slattery | 148 |
| 6 | 1028 | Work paper of Mark Slattery | 148 |
| 8 | 1046 | Work paper of Mark Slattery | 148 |
| 10 | 1030 | Work paper of Mark Slattery | 148 |
| 12 | 1041 | Work paper of Mark Slattery | 149 |
| 14 | 1042 | Work paper of Mark Slattery | 149 |
| 16 | 1043 | Work paper of Mark Slattery | 150 |
| 18 | 1044 | Work paper of Mark Slattery | 150 |
| 20 | 1025 | Jones Day letter | 151 |
| 21 | 1040 | Work paper of Mark Slattery on Pine | 151 |
| 23 | 1051 | BCI Demonstrative | 151 |

Page 176

| | | | Page | Line |
|---|---|---|---|---|
| 1 | | RULINGS | | |
| 2 | | | Page | Line |
| 3 | Mr. Slattery is accepted | | 21 | 17 |
| 4 | as an expert in | | | |
| 5 | fixed-income securities | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

Page 177

1

2                    C E R T I F I C A T I O N

3

4      I, Penina Wolicki, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7

8      _____

9      PENINA WOLICKI

10

11     Veritext

12     200 Old Country Road

13     Suite 580

14     Mineola, NY 11501

15

16     Date:  October 4, 2010

17

18

19

20

21

22

23

24

25