Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555 (JMP)

5   Case No. 08-01420 (JMP) (SIPA)

6   - - - - - - - - - - - - - - - - - - - - - - - -x

7   In the Matter of:

8   LEHMAN BROTHERS HOLDINGS INC., et al.,

9               Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - -x

11  In the Matter of:

12  LEHMAN BROTHERS INC.,

13               Debtor.

14  - - - - - - - - - - - - - - - - - - - - - - - -x

15

16              U.S. Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              October 4, 2010

21              9:34 AM

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2    CONTINUED EVIDENTIARY HEARING re Rule 60(b) and Related Motions

3    (Case No. 08-13555-jmp and Adv. Proc. No. 08-01420-jmp)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed By:  Clara Rubin and Hana Copperman

25

Page 3

```
 1    A P P E A R A N C E S:

 2    JONES DAY

 3           Attorneys for Movant LBHI

 4           222 East 41st Street

 5           New York, NY 10017

 6

 7    BY:   JAYANT W. TAMBE, ESQ.

 8           ROBERT W. GAFFEY, ESQ.

 9

10    BOIES, SCHILLER & FLEXNER LLP

11           Attorneys for Barclays Capital, Inc.

12           575 Lexington Avenue

13           7th Floor

14           New York, NY 10022

15

16    BY:   JONATHAN D. SCHILLER, ESQ.

17

18    BOIES, SCHILLER & FLEXNER LLP

19           Attorneys for Barclays Capital, Inc.

20           401 East Las Olas Boulevard

21           Suite 1200

22           Fort Lauderdale, FL 33301

23

24    BY:   TODD THOMAS, ESQ.

25
```

Page 4

```
 1

 2    HUGHES HUBBARD & REED LLP

 3          Attorneys for Movant, James W. Giddens, Trustee for the

 4           SIPA Liquidation of Lehman Brothers Inc.

 5          One Battery Park Plaza

 6          New York, NY 10004

 7

 8    BY:   WILLIAM R. MAGUIRE, ESQ.

 9          NEIL J. OXFORD, ESQ.

10

11

12    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

13          Attorneys for Movant, the Official Committee of Unsecured

14           Creditors

15          51 Madison Avenue

16          22nd Floor

17          New York, NY 10010

18

19    BY:   JAMES C. TECCE, ESQ.

20          ERIC M. KAY, ESQ.

21

22

23

24

25
```

Page 5

1                  P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Be seated, please.  Good morning.

4          UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

5          MR. TAMBE:  Good morning, Your Honor.  Jayant Tambe

6   from Jones Day, for Lehman Brothers Holdings Inc.  The movants

7   will call John Olvany as their next witness.

8          THE COURT:  Okay.

9          Mr. Olvany?  Good morning.  Please raise your right

10  hand.

11      (Witness sworn)

12          THE COURT:  Be seated, please.

13          MR. TAMBE:  Your Honor, may I approach with some

14  binders?

15          THE COURT:  Yes.

16      (Pause)

17  VOIR DIRE EXAMINATION

18  BY MR. TAMBE:

19  Q.   Good morning, Mr. Olvany.

20  A.   Good morning.

21  Q.   Could you please describe for the Court your educational

22  background?

23  A.   Certainly.  I graduated from Williams College with a

24  degree in political science in 1982.

25  Q.   And could you briefly describe your career in the

Page 6

1   financial industry after graduation?

2   A.   Sure.  Ov -- after graduation from Williams, I spent over

3   twenty-odd years in the financial services business in a

4   variety of roles in trading, sales and sales management,

5   particularly in the fixed-income markets.  And for the last

6   sixteen years of my career, my specialization was in the

7   corporate-bond market and derivatives of the corporate-bond

8   market.

9   Q.   If you could turn, in the binder I handed you, to tab 1A,

10  please.

11          MR. TAMBE:  And that's Movants' Trial Exhibit 152A.

12  Q.   And could you describe for the Court what that document

13  is?

14  A.   This is a copy of my CV.

15  Q.   And does this set out your professional experience and

16  your education?

17  A.   Yes, it does.

18  Q.   And does it also identify the registrations you have held?

19  A.   Yes, it does.

20          MR. TAMBE:  Your Honor, we move Movants' Trial Exhibit

21  152A into evidence.

22          MR. THOMAS:  No objection.

23          THE COURT:  It's admitted.

24  (CV of John Olvany was hereby received into evidence as

25  Movants' Trial Exhibit 152A, as of this date.)

Page 7

1    Q.    I guess, starting chronologically from back in time with

2    your first job in the financial industry, if you could walk

3    through your positions and describe what you did insofar as

4    your experience relates to the opinions that you're offering in

5    this matter here?

6    A.    Certainly.  My initial job in the sales and trading aspect

7    of the financial markets was with S.G. Warburg, which became

8    part of UBS.  And for S.G. Warburg, I was the representative in

9    the Tokyo office.  I was responsible for making markets, which

10   is providing bids and offers to clients in the Asian time hours

11   for U.S. Treasury securities.

12   Q.    Where did you work next?

13   A.    And then after I left S.G. Warburg, I joined Continental

14   Illinois in Chicago, which eventually became Bank of America.

15   My role there was more specialized.  I was responsible

16   exclusively for making markets, i.e., providing bids and offers

17   to clients for intermediate treasury and agency securities,

18   that meaning securities between five years and ten years.

19   Q.    Where did you work next?

20   A.    Upon leaving Continental, I joined Morgan Stanley in 1991.

21   And when I first joined Morgan Stanley in 1991, I was a

22   salesperson in the Chicago office.  And in the context of being

23   a salesperson, at that time your responsibilities were rather

24   broad within the fixed-income world.  So during that time

25   period, I executed trades, which would be buying and selling

Page 8

1   securities across the gamut, really, of fixed-income

2   instruments, everything at the time that was actively traded,

3   which would have been corporate bonds, mortgage-backed

4   securities, asset-backed securities, CMOs, commercial

5   mortgages, et cetera.

6   Q.   Okay, and in the course of that -- you've described CMOs

7   and the various types of asset-backed securities.  Did that

8   expose you to the world of structured finance and structured

9   securitized products?

10  A.   Yes, it did.  In the early '90s, there was a fair amount

11  of development in a variety of different types of structured

12  products.  We at Morgan Stanley started to underwrite and sell

13  project-finance securities, which also incorporated, you know,

14  some of the structured-finance techniques.  And in the context

15  of my responsibilities at Morgan Stanley, I was also

16  responsible for valuing bonds on a regular basis, for clients

17  on a periodic basis, and those securities were -- I would value

18  bonds both in the daily course of my activities every day, in

19  addition to providing periodic marks on securities in

20  conjunction with my trading groups in New York.

21  Q.   Where did you work next after this stint at Morgan Stanley

22  from '91 through '96?

23  A.   I joined Credit Suisse First Boston in Chicago in a

24  similar capacity.  The difference primarily was that my client

25  base was a larger group of clients with a larger group of

Page 9

1   assets under management.  And once again, my responsibilities

2   were more or less across the whole spectrum of fixed-income

3   securities.  But during my time period at Credit Suisse First

4   Boston, that's when I began to specialize specifically in the

5   corporate-bond markets, but I also did have some experience and

6   responsibilities for asset-backed and collateralized mortgage

7   bonds as well.  And once again, in that capacity, on a daily

8   basis I would be discussing value of securities with clients

9   and with traders in New York in trying to come to agreement in

10  order to do transactions.  And then also I, once again,

11  provided periodic valuations in conjunction with my trading

12  desk for clients as well.

13  Q.   And when you refer to clients both at your work at Morgan

14  Stanley and then at Credit Suisse, could you describe generally

15  sort of the client base that you were serving?

16  A.    Certainly.  Broadly speaking, it would be referred to as

17  an institutional client base.  My clients across my career were

18  hedge funds, insurance companies, banks, trust departments of

19  banks, asset managers, some foreign ent -- some sovereign

20  entities as well, foreign central banks.  So, generally

21  speaking, we're talking about a very sophisticated client base

22  that had a substantial asset -- substantial amount of assets

23  under management.

24  Q.   Now, after your work at Credit Suisse, you returned to

25  Morgan Stanley, correct?

Page 10

1    A.    That's correct.

2    Q.    And you worked at Morgan Stanley then from 2000 through

3    2008?

4    A.    Right.  I rejoined Morgan Stanley in 2000, and my initial

5    responsibilities at Morgan Stanley was to be the senior member

6    of the corporate sales group in Chicago.  And then I eventually

7    was named the head of the office -- the head of the

8    institutional fixed-income office in Chicago, and promoted to

9    managing director in 2003.  I became the head of the office in

10   2002.  During that time period, I continued to have

11   responsibility for covering, as we call it, clients and, you

12   know, throughout my entire, you know, career at Morgan Stanley.

13   And then I also took on the responsibilities of being sales

14   manager, which included overseeing the entire process, for our

15   office, of providing valuations to clients on a regular basis.

16   So I had to sign off on everything that went out as far as a

17   price for any of our clients.

18   Q.    Now, after you stopped working at Morgan Stanley, where

19   have you been working since you left Morgan Stanley?

20   A.    I left Morgan Stanley in July of 2008, and I started

21   working with Navigant in September of 2008.  My first

22   assignment -- or the first matter I was involved in -- I began

23   in September 2008 and I'd been working with Navigant and

24   subsequently the Chicago Partners, or Navigant Economics Group,

25   since that period of time.

Page 11

1    Q.    And on pages 2 and 3 of your CV, Movants' Trial Exhibit

2    152A, does that identify some of the testimonial and consulting

3    experience you had while with Navigant and Chicago Partners?

4    A.    Yes, it does.  It lays out a number of the matters that

5    I've been involved in.

6    Q.    Now, over the course of your career in the financial

7    industry, did you become familiar with different types of

8    corporate financing and corporate debt?

9    A.    Yes, absolutely.  During, obviously, over a period of

10   twenty-plus years in the markets, there was a lot of innovation

11   that took place, and I was exposed to a variety of different

12   securities.  And I began working in the markets, you know, when

13   it was a rather -- you know, rather simple business.  Over the

14   course of time, I was exposed to a variety of number of

15   securities.

16        My experience specifically with the corporation auction-

17   rate securities, really similar to the securities that I valued

18   in this matter, became -- really kind of came to fruition in

19   the early part of 2008.  That was a time period where there

20   were some dislocations in the auction-rate securities market,

21   and Morgan Stanley and others were looking to try to develop a

22   different client base, a different type of -- different client

23   base in order to make some of these securities more actively

24   traded in the markets.  And some of my clients were very

25   interested in taking advantage of buying highly-rated assets at

1    attractive coupon rates that were potentially available at that

2    period of time.

3    Q.   You brought up the issue of auction-rate securities.

4    Could you describe how auction-rate securities fit into the

5    broader world of corporate financing or corporate debt?

6    A.   Certainly.  I mean, it's just one of many different ways

7    that a company can finance itself.  Companies can finance

8    themselves with, you know, fixed-rate fixed-term debt.  They

9    can finance themselves with a variable term debt.  It's just

10   one of a continuum of different types of securities that

11   corporations can issue in order to finance their operations.

12   It's -- and it -- the unique characteristic is the auction-

13   setting process, but other than that, it is still, once again,

14   a corporate security; that is, the inherent issue that one

15   needs to look at is the underlying creditworthiness of the

16   corporation that's involved in offering the securities.

17   Q.   Now, when you are doing a valuation, whether it be of

18   auction-rate securities or of other types of corporate bonds,

19   again, generally over the course of your career, what types of

20   techniques or approaches have you used, again, as it relates to

21   the work you did in this matter?

22   A.   Certainly.  I think the first -- you know, throughout the

23   twenty-odd years that I spent in the markets, the first place

24   that anyone would look for valuations was observable

25   transactions that would take place in either the exact security

Page 13

1    or CUSIP that you were being asked to value or similar

2    securities that you were being asked to value.  In absence of

3    that, then one would go about looking to value the securities

4    using different types of models that more or less utilized

5    discounted cash flow analysis.  And those models changed

6    over -- you know, over the course of my career, and some of

7    those models are -- would be mentioned rather frequently:

8    Bloomberg, Pi-Path (ph.), Fincat (ph.) and others.

9    Q.    Have you used those in the course of your career, sir?

10   A.    Yes.

11   Q.    Have you used them with respect to this assignment?

12   A.    Yes.

13   Q.    For complex securities and structured securities, which we

14   discussed, would your review include review of the transaction

15   documents, the indenture or the offering circular, documents

16   like that?

17   A.    Yes.  I'd say that for the more complex securities that

18   one would look to value, you would definitely need to take a

19   very long hard look at whatever was publicly available

20   information, whether it be offering documents, rating-agency

21   reports, trustee reports if the security was of that nature, or

22   any material that would be available in the public domain,

23   whether it be research from your own firm or other firms as

24   well.

25   Q.    And you used all of these various techniques to value the

1   securities that you valued in this case, sir?

2   A.   Yes, I did.  I used both observable prices that were

3   available to me, as well as discounted cash flow analysis, in

4   order to reach the valuations that I reached in this matter.

5   Q.   And did you also consult offering documents and other

6   types of transaction documents to arrive at your opinions?

7   A.   Yeah, absolutely.  That's the first place that one needs

8   to look for almost any of the securities in the corporate-bond

9   market, because there's such -- there are so many unique

10  different securities within the corporate-bond market that you

11  really need to understand exactly what the CUSIP is before you

12  can really go about valuing the security, because there's so

13  much intricacy and nuance to one security versus another.

14          MR. TAMBE:  Your Honor, we tender Mr. Olvany as an

15  expert in the valuation of corporate securities.

16          MR. THOMAS:  No objection.

17          THE COURT:  He's accepted as an expert in that area.

18          MR. TAMBE:  Thank you, Your Honor.

19  DIRECT EXAMINATION

20  BY MR. TAMBE:

21  Q.   Mr. Olvany, if you could turn in your binder to tab 1.

22          MR. TAMBE:  That's Movants' Trial Exhibit 152.

23  Q.   And could you describe for the Court what that document

24  is?

25  A.   This is the expert report that I filed in this matter.

Page 15

1    Q.   And have you reviewed this expert report before testifying

2    here today?

3    A.   Yes, I have.

4    Q.   And is it accurate in all material respects, sir?

5    A.   Yes, it is.

6    Q.   And would you adopt as your testimony on the stand your

7    analysis and conclusions that you set out in this expert

8    report?

9    A.   Yes, I would.

10        MR. TAMBE:  Your Honor, we tender Movants' Trial

11   Exhibit 152 in evidence.

12        MR. THOMAS:  No objection.

13        THE COURT:  It's admitted.

14   (Expert report prepared by John Olvany was hereby received into

15   evidence as Movants' Trial Exhibit 152, as of this date.)

16   Q.   If you could turn, Mr. Olvany, to tab 2 of your binder,

17   which is Movants' Trial Exhibit 823.  And could you describe

18   for the Court what that document is?

19   A.   Yes.  This is a doc -- this is a declaration that I

20   submitted in this matter -- yeah, in --

21   Q.   For what purpose?

22   A.   -- July.

23   Q.   For what purpose?

24   A.   In order to respond to some comments by counsel -- I'm

25   sorry, by Barclays with regard to my initial report.

LBH, et al; LBI

Page 16

1    Q.   Did this declaration change any of the opinions in your

2    expert report, sir?

3    A.   No, it did not.

4    Q.   And have you reviewed this declaration before testifying

5    here today?

6    A.   Yes, I did.

7    Q.   And would you adopt as your testimony the statements set

8    out in your declaration, Movants' Trial Exhibit 823?

9    A.   Yes, I would.

10         MR. TAMBE:  Your Honor, we offer Movants' Trial

11   Exhibit 823 in evidence.

12         MR. THOMAS:  No objection.

13         THE COURT:  It's admitted.

14   (Declaration of John Olvany was hereby received into evidence

15   as Movants' Trial Exhibit 823, as of this date.)

16   Q.   Now, moving into the heart of your analysis, Mr. Olvany,

17   if you could briefly describe the section of securities, the

18   number of securities, that you valued as part of your analysis?

19   A.   Certainly.  I prepared some slides today for

20   demonstratives today.  But --

21         MR. TAMBE:  Your Honor, may I approach and hand these

22   out?

23         THE COURT:  Yes.

24       (Pause)

25   A.   If --

Page 17

1    Q.    And if you can just start on slide 3 and orient the Court

2    in terms of what slide 3 is, and then we can go into your

3    analysis.

4    A.    Certainly.  Slide 3 is a table that you see has come from

5    Dr. Zmijewski's report and, in it, it lays out the number of

6    securities that I valued in this matter, which was twenty-two

7    distinct CUSIPs, and it indicates the -- that the

8    undervaluation that I considered in this matter was about 380

9    million dollars.

10   Q.    And did you do some analysis to split out the 381, how

11   that's distributed across those 22 securities?

12   A.    Yes.  There's another slide -- on slide 5 of the deck,

13   there -- this is a table that comes from my report.  There's

14   three different groups of securities that I looked at from my

15   perspective:  the Giants Stadium LLC; project revenue bonds,

16   where I saw a valuation differential of roughly 350 million

17   dollars; there was a group of corporate securities, corporate

18   bonds, excluding Giants Stadium bonds, which I calculated to be

19   an undervaluation of approximately 29 million dollars; and then

20   a distinct universe within the corporate-bond market, which I

21   refer to as covered bonds, and that specific type of security I

22   viewed as being undervalued by approximately 3 million dollars.

23   Q.    Now, before we go into the analysis of these different

24   categories or subcategories of bonds that you valued, let's

25   take a step back.  How did you select these particular twenty-

Page 18

1   two?  How did it come about that you were valuing these twenty-

2   two and not some other population of bonds?

3   A.   As you can see from the previous slide, there -- a group

4   of Navigant experts sorted the purchase portfolio and looked

5   for securities where there was a differential in value between

6   Barclays' value and Bank of New York's value of a million

7   dollars, whether it would be a positive or a negative

8   differential.  Within that universe of securities, then I was

9   responsible for valuing what I considered to be a corporate

10  bond within that universe, and by "a corporate bond" what I

11  mean specifically is that bonds that are the source of cash

12  flow for those bonds are coming from a specific corporation or

13  supranational entity.  And within that sort, I specifically

14  valued eighteen bonds that fell into that category.

15       There -- you know, as you can see on the slide, there was

16  another twenty-seven of the bonds that would have come out of

17  that sort that I did not value because the criteria that I was

18  looking to use was not -- or the market inputs that I was

19  looking to use to do my type of valuation was not available to

20  me.  So those securities were valued by Mr. Slattery, using

21  third-party prices.

22       And then, lastly, there are four securities issued by the

23  Giants Stadium LLC that I valued.  Those securities, as we'll

24  see later, were valued at the same price -- or same valuation

25  by both Barclays and Bank of New York.  I elected to discuss

Page 19

1   them in my report and value those securities because Professor

2   Pfleiderer discussed them in his expert report.

3   Q.   Now, for the twenty-seven that you said were valued by Mr.

4   Slattery, do you know whether requests were made of Barclays to

5   get the underlying detailed information about these securities,

6   such as trustee reports, offering documents, other kinds of

7   information?

8   A.   My understanding is that when Navigant's experts came up

9   with a group of CUSIPs that met the sort of criteria that all

10   of the offering documents, trustee reports, rating-agency

11   reports and the like were requested of Barclays, we did not

12   receive an adequate amount of information for me to go about

13   the analysis that I would have had to do in order to value

14   those securities in a manner that I wanted to value those

15   securities.

16   Q.   Let's go into the Giants Stadium bond valuation.  And

17   before we go down that path, if you could provide an overview

18   of what these bonds are, the bonds that you were valuing, the

19   four Giants Stadium bonds?

20   A.   Certainly.  It would probably be helpful to move to slide

21   6.  As I mentioned before, there are four what I refer to as

22   Giants Stadium bonds in the portfolio that I was asked to look

23   at.  These bonds were issued by a special-purpose entity,

24   Giants Stadium LLC, to finance the new stadium in New Jersey at

25   the Meadowlands.  These were corporate auction-rate securities

Page 20

1    and they were part of an overall seven-tranche transaction that

2    was underwritten by Lehman Brothers and Goldman Sachs for a

3    total financing of 650 million dollars.  These corporate

4    auction-rate securities had a maximum coupon rate that would

5    come into effect, in the event of a fail of the auction, of

6    twenty-two percent.

7        And I mention the auction right now, the rate, and I

8    mentioned that previously as well.  One of the characteristics

9    of these particular auction-rate securities is that the rate

10   for the securities was determined, you know, at each auction,

11   which is every twenty-eight days.  And those auctions,

12   initially when the bonds were issued, were conducted by Goldman

13   Sachs and Lehman Brothers, who were the underwriters of the

14   overall transaction.  Lehman Brothers was an underwriter and

15   the broker-dealer conducting the auction on four tranches, or

16   four bonds, of the deal.  And Goldman Sachs, at the time of the

17   offering and at the time of the filing of bankruptcy, they were

18   the auction agent for three securities.

19   Q.   Now, in terms of the valuation of these bonds, if you

20   could give an overview of what conclusions you reached in terms

21   of the value of these bonds, and then we can back into the

22   bases for your opinions?

23   A.   Certainly.  The total face value of these four securities

24   was about a little over 400 million dollars.  The screen shows

25   408 million dollars.  I valued these securities at 100 percent

Page 21

1    of face value; hence, 408 million dollars as well.  Barclays

2    valued these -- three of these bonds at the time of the sale

3    transaction -- or for balance-sheet purposes, at 10 percent

4    of -- approximately ten percent of face value, and a fourth one

5    at approximately 44 percent of face value.  There -- and,

6    hence, the difference in valuation that I mentioned previously,

7    which was roughly 350 million dollars.

8    Q.   And the slide 8 basically set out CUSIP by CUSIP the

9    valuation differences?  The three bonds that are valued at ten

10   percent by Barclays are the first three lines, and then the

11   fourth line is the bond that was valued at about forty-four

12   percent, is that right?

13   A.   Yes, that's correct.  These are the actual CUSIP numbers

14   of each one of the individual securities.

15   Q.   Now, in terms of your approach to valuing these

16   securities, what factors did you consider; how did you arrive

17   at your valuation of par for these bonds?

18   A.   Well, let's -- what I -- first thing I did was to get the

19   offering documentation on these securities, looked for the

20   publicly available information on the securities, which

21   included the rating-agency reports, and also take a look at --

22   in the context of looking at the offering documents, there was

23   a swap that was put in place between Lehman Brothers and the

24   Giants Stadium LLC, which -- the details of which are on -- or

25   some of the highlights of which are on slide 9.  And that was a

Page 22

1    fixed-for-floating swap that the Giants entered into where

2    the -- where Lehman would pay the floating rate, that was set

3    by the auction, to the Giants, and then the Giants would pay

4    that out to the investors, or the holders of the securities,

5    and the Giants would pay to Lehman Brothers a fixed rate of

6    6.1855 percent.  Clearly this swap fixed the Giants' interest

7    payments for the life of the transaction and provided them

8    interest-rate protection.

9        On -- one of the key features of this is that the Giants

10   terminated the swap on September 18th and, as a holder of the

11   securities, Barclays did not assume the -- Lehman's former

12   position in the swap.  And -- but they -- but the Giants were

13   still required to pay the coupon rates set by the security over

14   time.

15   Q.   If I can just talk about sort of the pre- and post-

16   bankruptcy aspects of what you've just described.  Pre-

17   bankruptcy you have the bonds, the auction-rate bonds; they

18   have an interest rate that is set by an auction process, is

19   that right?

20   A.   That's correct, yes.

21   Q.   And that could be a fluctuating floating rate?

22   A.   Yeah, I would -- I wouldn't use the word "floating rate",

23   but a good change from -- it would change from period to period

24   potentially.  So the auction process that takes place every

25   twenty-eight days sets the coupon rate of the security.  The

Page 23

1    security does not have a contractually binding rate that was

2    set, except in the event of a fail or some of the other

3    characteristics of it.

4    Q.   Okay, so pre-bankruptcy you have this auction process that

5    determines what the interest rate's going to be.  There's also

6    a swap between the Giants Stadium LLC and Lehman Brothers,

7    correct?

8    A.   That's correct, yes.

9    Q.   And basically the combination of the auction bonds and the

10   swap means, at the end of the day, pre-bankruptcy, the Giants

11   are paying a fixed rate of interest on these bonds, is that

12   right?

13   A.   That's correct.  I mean, by virtue of this swap that was

14   in place, the Giants had entered into a fixed financing for the

15   full term of the securities at 6.1855 percent for the life of

16   the swap and the life of the bonds.

17   Q.   And, now, post-bankruptcy, post the filing of Lehman

18   Brothers Holdings Inc., the Giants terminated the swap

19   agreement, is that right?

20   A.   Yes, the Giants terminated the swap agreement.  There was

21   a -- on September 18th, in -- at that point in time the Giants

22   no longer were -- you know, had the benefit of the swap,

23   because they terminated it, and hence the Giants were exposed

24   to whatever the interest rate that was set at the auction at

25   that point in time.

```
1    Q.   And the swap -- are you aware of any similar swap being

2    entered into by Barclays and the Giants after Barclays

3    purchased these auction-rate securities?

4    A.   No, I'm not.

5    Q.   And was the analysis of the swap and the fact that the

6    swap was terminated, was that -- did that feature in your

7    opinions and your view that these bonds should be valued at par

8    as of 12:01 a.m. on the 22nd of September?

9    A.   Yes, I (sic) did, because in my opinion the absence of

10   that swap exposed the Giants to rates of -- higher rates of

11   interest than they had previously been exposed to.  So at that

12   point in time, it was a much different type of financing from

13   the Giant's perspective.  And the Giants could potentially

14   redeem the securities, which was available to them as the

15   issuer of the securities at each -- at the end of each auction

16   period, and refinance those securities at whatever, you know,

17   their current alternative financing rates would be, which was a

18   significant feature in looking at these securities, from my

19   perspective.

20   Q.   Now, you described earlier, again, pre-bankruptcy, that

21   there are these seven tranches of bonds; you got four of these

22   where Lehman is serving as the broker-dealer or the auction

23   agent, and there's another three where Goldman Sachs is serving

24   as the auction agent, is that right?

25   A.   That's correct, yes.
```

Page 25

1    Q.   And they're all part of the same 650 million dollar

2    offering?

3    A.   Yes.  There was a -- yeah, there was a 650 million dollar

4    offering, and Goldman was the broker-dealer conducting the

5    auction for a group of the securities, and Lehman was the

6    broker-dealer.  And my understanding from reading the offering

7    documents is that similar -- there was a similar swap in place

8    with Goldman Sachs as well.

9    Q.   Now, focusing on the role of the broker-dealer or the

10   auction agent, once Lehman had declared bankruptcy, was it able

11   to continue serving as an auction agent or a broker-dealer for

12   the transaction for the four bonds?

13   A.   No, they were not.

14   Q.   How did you take into account, in your analysis, the

15   impact that would have that there was no longer a functioning

16   or a viable auction agent for these bonds?

17   A.   Well, I read the documentation rather clearly, and the

18   documentation made it quite clear that the Giants could appoint

19   a new auction agent, you know, upon the absence of Lehman as

20   the prior auct -- I'm sorry, the prior broker-dealer.  And

21   because Goldman Sachs was already involved in the transaction,

22   I thought that that was a very likely scenario, highly likely

23   scenario, that, you know, Goldman or some other broker-dealer

24   that had presence in the auction-rate market would take on that

25   position.  And there also was a rate-setting mechanism in place

Page 26

1    for -- to set the rate in the absence of an auction as well.

2    Q.   Okay, so if an auction didn't happen and there was no

3    auction agent, what did the documents provide in terms of what

4    rate would apply going forward?

5    A.   Until the appointment of a new auction agent, the rate

6    that was set would have been 100 percent -- 110 percent, I

7    believe, of one month LIBOR, which was the rate that was set

8    prior -- between the September 22nd and the first auction after

9    the appointment of Goldman Sachs on November 14th.

10   Q.   And if that persisted and if no auction agent ever got

11   appointed, what would happen?

12   A.   I observed in the offering documents that there was a

13   mechanism put in place where, if over a period of time there

14   wasn't a new auction agent put in place, that this maximum

15   coupon rate of twenty-two percent would become a viable coupon

16   rate going forward.

17   Q.   If you could turn, in your binder, to tab 7, which is

18   Movants' Trial Exhibit 930.

19   A.   (Witness complies).

20   Q.   And could you describe for the Court what appears behind

21   tab 7, what is Movants' Trial Exhibit 930?

22   A.   This is the offering circular that was the key document

23   that I looked at in the course of valuing the Giants Stadium

24   LLC bonds.  And, you know, I would add also that an offering

25   circular or offering memorandum or prospectus would be, you

1    know, a document that, for any type of complex security, that

2    anybody that is looking to value those securities with any

3    great level of detail would consider this the first document

4    that they really should spend some time looking at.

5    Q.    And does it identify at the bottom of the page the

6    underwriters for the offering?

7    A.    Yes, it does.  It identifies Goldman on the left side and

8    Lehman Brothers on the right side.

9    Q.    Now, you can confirm for me, but the document that is

10   marked as Movants' Trial Exhibit 930, that's just an excerpt of

11   the offering circular and its various appendices, is that

12   right?

13   A.    Yeah, I believe this is the cover page and some other

14   excerpts of it.  It's a rather lengthy document.

15   Q.    Any idea how large a document that is?

16   A.    It was pretty large.

17   Q.    If you could turn to the appendix that is excerpted there

18   behind the cover page, Appendix A.  Could you describe for the

19   Court the relevance of that appendix?

20   A.    This appendix is referred to as Auction Procedures, and

21   this provides a lot of the defined terms, you know, for the

22   specific transaction.  And it, you know, defines a lot of the

23   very important aspects of this particular deal that one needs

24   to look at.

25   Q.    Okay.  If we could turn to page K-13, which is Section

Page 28

1    2.04.  Again, could you describe for the Court what that

2    section is generally?  And we can talk about some specific

3    aspects of it.

4    A.   Yeah, on K-13, under section 2.04, Determination of an

5    Auction Rate, this lays out the method by which the rate is

6    determined, and it also lays out some of the information that

7    would be relevant in the event that there wasn't an auction

8    agent in place.

9    Q.   And in particular, if you could turn to page K-14.

10   A.   Yes, K-14 -- essentially the end of K-13 through to the

11   middle of K-14, almost to the end of section 2.04, you know, in

12   my reading of this document, it lays out the procedures that

13   would be in place if there was no auction agent.

14        MR. TAMBE:  Your Honor, we move Movants' Trial Exhibit

15   930 in evidence.

16        MR. THOMAS:  Your Honor, we note that it's not a

17   complete document, but with that note we have no objection.

18        THE COURT:  It's admitted, and I note that it's not a

19   complete document too.

20   (Excerpt of offering circular used in Mr. Olvany's valuation of

21   the Giants Stadium LLC bonds was hereby received as Movants'

22   Exhibit 930, as of this date.)

23        MR. TAMBE:  Thank you, Your Honor.

24   Q.   How did Barclays value the Giants Stadium bonds?

25   A.   Barclays adopted -- you know, they didn't value these

Page 29

1    securities in their normal course of business, because there is

2    deposition testimony out there that demonstrates that Barclays

3    at the time was not a participant in the auction-rate

4    securities market.  They didn't have a desk, according to some

5    of the deposition testimony that I read, and so they did not

6    value these securities in the context of their normal course of

7    business.

8        They -- what Barclays did was they didn't -- they adopted

9    the Bank of New York pricing for these securities and,

10   according to the deposition testimony that I read of Mr.

11   Teague, they did what he described as a cursory analysis of

12   these securities before adopting the Bank of New York pricing.

13        MR. TAMBE:  If we could just pull up Mr. Teague's

14   testimony, pages Bates 65?  And if you could focus on line 15

15   to the bottom?

16   Q.   And the question was asked of Mr. Teague:

17   "Q.   That's what I'm trying to figure out.  Was your analysis

18   detailed or cursory when you ascribed a value to the Giants

19   Stadium bonds for purposes of the acquisition balance sheet?"

20   Q.   There's an objection.  Looks like the transcript may be a

21   little garbled there.

22   "Q.   Your word 'cursory' -- what do you mean by 'cursory'?

23   "A.   The overall view of the book was that if we didn't have a

24   price, then we would ascribe the price provided by Bank of New

25   York."

 1          MR. TAMBE:  And can you go on to page 66, please?  And

 2     highlight -- I guess it's the -- from 2 down to 23.

 3     "A.  I have not performed a large amount of auction-rate note

 4     analysis in the past because we as a firm did not have an

 5     auction-rate desk like Lehman had.  We were not bringing

 6     positions to market.  At that point in time, there was the

 7     issue of breaking the dollar, as they stated, where some firms

 8     were having issues, specifically money market funds, because

 9     their assets had been worth less than a dollar, so there was no

10     auction-rate market.  Looking at it from that perspective, and

11     here's an asset that hadn't traded for six months, we put

12     our -- you know, our understanding was, well, if BoNY was able

13     to ascribe a price to this, they, you know, must have

14     additional detailed information; so let's work with the BoNY

15     price, because we have no other market data out there.  There's

16     no -- again, for an asset that hasn't traded in six months,

17     you're not going to have additional market data to ascribe to

18     it directly from the marketplace."

19     Q.  And is that some of the testimony that you were referring

20     to in your earlier answer, sir?

21     A.  Yes, it was, and I believe that this testimony -- that I

22     cited it in my declaration as well.

23          MR. TAMBE:  If you'd actually continue and finish the

24     line of questioning.  There's a question that begins at the end

25     of page 66, over onto page 67.

Page 31

```
 1    "Q.  Just so I understand your answer, you guessed that BoNY

 2    may have had some additional --"

 3              MR. TAMBE:  And if you could highlight the top down to

 4    20.

 5    "Q.  -- information about the securities, and that's why you

 6    felt comfortable taking the BoNY price, is that right?"

 7    Q.    There's an objection.

 8    "A.  I can't speak to how BoNY performed any of their

 9    valuations.

10    "Q.  You have no idea, right?  You have no idea whether they

11    had any special insights into the security versus any of the

12    others?

13    "A.  No, I would not have known how specific -- any of the

14    specifics of any of the BoNY valuation.

15    "Q.  And in general, you thought that their valuations were

16    riddled with stale information, improper third-party marks, all

17    sorts of problems?

18    "A.  Which is why we used them as the last -- this was our last

19    resort in the hierarchy."

20    Q.    And did you consider that testimony in arriving at your --

21    in your declaration when you addressed some of the challenges

22    that have been made by Barclays to your opinion?

23    A.    Yes.

24    Q.    Now, this testimony and the value ascribed by Barclays --

25    was the value ascribed by Barclays sometime in February 2009
```

Page 32

1   for acquisition balance-sheet purposes?  Correct?

2   A.   Yes, that's my understanding.

3   Q.   However -- and acquisition balance-sheet purposes --

4   Barclays was valuing this as of September 22nd, 2008?

5          MR. THOMAS:  Objection, Your Honor.  Leading.

6          THE COURT:  Okay, I'll sustain it, although I would

7   note that all the examinations, particularly of the experts,

8   have included a lot of leading questions.  But it's sustained.

9   Q.   As of what date, Mr. Olvany, was Barclays valuing the

10  Giants Stadium bonds for acquisition balance-sheet purposes?

11  A.   At 12:01 on September 22nd is the as-of date.

12  Q.   Now, between the 22nd of September and February 2009, are

13  you aware of what Barclays had done with respect to their

14  valuation of the Giants Stadium bonds?

15  A.   Yes, I'm aware of that.  There's a couple of different

16  slides in my presentation.  But first of all, by December 31st

17  of 2008, Barclays had marked up the securities to a hundred

18  percent of face value, which was the same face -- which was the

19  same valuation that I arrived in my analysis.  And in addition

20  to that, Barclays had marked up the securities on October 31st

21  to seventy-five percent of face value for three of them, and

22  about eighty percent of face value for the fourth value.  And I

23  think that's extremely relevant, that date especially, because

24  that was also prior to Goldman Sachs being named as the auction

25  agent in the security, which is one of the criticisms that's

Page 33

1   been mention with regard to my analysis.

2   Q.   So on two occasions between September and December,

3   Barclays marked up the value of the Giant Stadium bonds, is

4   that what you're saying, sir?

5   A.   Yes.  It's -- yes, that's correct.

6   Q.   And if we could turn to slides 12 and 13.  Is that where

7   you set out the analysis?  In particular, on 13, what does that

8   demonstrative show, sir?

9   A.   This demonstrates that the value of the securities was

10  marked up -- or the value of the four securities was marked up

11  from the original pricing as of September 22nd, by both Bank of

12  New York and Barclays, of approximately 59 million dollars up

13  to the full face value of 408.  So as you could see at the

14  bottom, you know, there was a substantial gain of about 250

15  million dollars for -- within thirty-nine days of the valuation

16  date, which, as I mentioned prior, was not -- was before the --

17  before Goldman Sachs was appointed the auction agent in the

18  securities.

19       So it should be noted that the auctions between October

20  31st and the Sept -- the November 14th date were not conducted

21  and, as a result, the interest rate was set at 110 percent of

22  LIBOR.

23  Q.   Now, you've seen some documentation in this case about

24  various rationales given by Barclays for marking up the value

25  of the Giants Stadium bonds post-acquisition date but before

Page 34

1   year end, correct?

2   A.   Yes, I have.

3   Q.   And have you studied those rationales or reasons given by

4   Barclays?

5   A.   Yes, I have, and I've highlighted those -- or I cited

6   those in my reports.  There were a few examp -- or statements

7   made.  I'd say that slide 14 probably is a pretty good synopsis

8   of what some of those reasons are.  First of all, I'd like to

9   point out that in my opinion every one of these points that has

10  been mentioned by Barclays on the memo, which I believe is a

11  November 21st, 2008 document, all of these points that are

12  mentioned by Mr. Teague are -- were known and knowable at that

13  point in time.

14       So first of all, the rate-setting mechanism.  They cite a

15  newfound understanding of the rate-setting mechanism resulting

16  from a failed auction.  And I think that, you know, any market

17  participant that had spent the time to look at the offering

18  document that I did would understand what the rate-setting

19  mechanism was for the security.

20  Q.   And your understanding, sir, is that between the time of

21  acquisition and the time that the financial statements were

22  released in February 2009 that Barclays had five months to

23  study all of these securities?

24  A.   Yes.  Yeah, absolutely.  They had, you know, ample time to

25  get the offering document, which would have been available to

Page 35

1   them as a holder of the security, and, you know, understand the

2   offering document.

3   Q.   If you can continue down the list?

4   A.   There is a second point that's mentioned, which is the

5   risk posed by the monoline wrapper.  That, I believe -- you

6   know, the point there is that, in looking at my analysis of the

7   Giants Stadium LLC from a credit perspective, I relied on the

8   Moody's report that was dated on September 17th, I believe.

9   And Moody's published that rating of Baa3 with a stable outlook

10  at that point in time.  The reason why they granted the rating

11  at that time was because the -- excuse me, the monoline

12  wrapper, which I believe was FGIC, had been downgraded below

13  investment grade.  And as you can see in my declaration and in

14  the Moody's report, they very clearly set out -- and this is my

15  experience as well, they clearly set out that a rating on a

16  security that is wrapped will either be rated by the underlying

17  rating of the security or the wrapper's rating, whichever is

18  higher.  And at this point in time, as a result of the Moody's

19  analysis that was published on September 17th, the Giants

20  Stadium LLC was rated investment grade in the specific

21  categories Baa3, which was higher than the underlying monoline

22  wrapper.  So that's -- that was something that -- the fact that

23  the monoline wrapper was a risk, I don't view that as being an

24  issue whatsoever.

25       We already discussed a little bit previously the fact that

Page 36

1    there wasn't a broker-dealer in place to conduct the auctions

2    as of the closing date.  And as I mentioned, you know, I

3    believe that it was, you know, highly knowable that as of the

4    closing date that an auction agent would have been put in

5    place.  And as I pointed out already, the auction agent was --

6    I'm sorry, the broker-dealer of Goldman Sachs was appointed on

7    September -- I'm sorry, November 14th, and the bonds had

8    already been written up, you know, substantially by prior to

9    that date.  Once again, it was also knowable that the Giants

10   had the ability to redeem the securities as of the closing

11   date, if one had looked at the offering documents.

12        And then lastly, you know, market conditions in the

13   auction-rate securities market I don't believe were any

14   different between September 22nd as of 12:01 and, you know,

15   later periods of time.  You know, in fact if you look at the

16   overall corporate-bond market indices, the overall corporate-

17   bond market dropped by approximately, like, six percent or so

18   in terms of price valuation.

19   Q.   Moving now to the other part of the analysis.  You've

20   described your Giants Stadium analysis; you've described your

21   view of Barclays' calculation of the Giants Stadium bonds.

22   Let's turn to the other aspect, the other eighteen bonds that

23   were included in your analysis.  Can you give us a high-level

24   description of how you went about valuing those bonds?

25   A.   Yes.  What I did for these securities, as I mentioned

Page 37

1    before, the -- I looked for observable market pricing data in

2    the market; specifically, there is a pricing source of actual

3    transactions, referred to as TRACE, which is, I believe,

4    regulated by the SEC and operated by FINRA.  And I found -- I

5    looked at the overall trading activity for September 19th of

6    the entire universe of corporate bonds, and then I specifically

7    looked for the CUSIPs that I was requested to value and where I

8    saw valuation -- where I saw trades of institutional size for

9    those particular CUSIPs.  Then I utilized those observable

10   prices in my analysis.

11        In -- you know, in addition, with the exception of those

12   four securities that I valued in that fashion, the other

13   fourteen basically used a simple discounted cash flow

14   methodology, and I utilized different models depending on the

15   specifics of that security.  And the inputs for those models

16   that I utilized were, you know, various inputs that any market

17   participant would use, including interest rates, maturities,

18   frequency of payments.  But the key -- one of the key factors

19   is that in a discounted cash flow analysis for a corporate

20   bond, one needs to look at the credit risk of that corporate

21   bond relative to the risk-free rates of interest.

22        And then lastly, what I attempted to do was, in order to

23   limit the areas of disagreement, I utilized the same liquidity

24   adjustment that Barclays used for all these eighteen corporate

25   bonds.  So as a result, for twelve of the securities, I didn't

Page 38

1   make a liquidity adjustment, because those liquidity

2   adjustment -- I'm sorry, because the bid price was incorporated

3   in the -- in my analysis.  And then for the balance of the

4   securities, I took a conservative approach, I thought, of

5   utilizing the same liquidity discounts or adjustments that

6   (sic) you will as Barclays did.  So that would have been up to

7   ten percent on what I would consider a structured note.

8   Q.   Now, what was Barclays' approach, if you could discern it,

9   in terms of how they went about determining values for the

10   corporate bonds?

11   A.   Barclays -- it appears to me, from reading the

12   documentation, that they went to third-party market providers

13   for sources of prices, and when they were able to get third-

14   party prices they utilized the lowest of those third-party

15   prices.  And by reading through the documentation, it appears

16   that if there was no third-party price available, then Barclays

17   would use the PCG price of 9/19 -- of September 19th, I should

18   say.  And if there was no September 19th price available to

19   Barclays -- from Barclays, then they would use the Bank of New

20   York pricing.

21        But there's -- you know, I'd say that looks to be as the

22   general methodology, but there's one, you know, stark example,

23   which is slide 17, which I think is probably worth mentioning

24   here.  In this particular security, the issuer's Intelsat

25   (Bermuda).  This security -- there were no third-party prices

Page 39

```
1    available to Barclays, according to the spreadsheets that I

2    looked at.  Barclays did have a Bank of New York price of

3    eighty-eight and a half; that was available to them.  They did

4    not have their own September 19th price.  They valued the

5    security, in the documents that I looked at, at zero; or the

6    position, which is a fifteen million dollar position.

7         And, you know, I'd also point out that they did mark up

8    the security to a price of fifty-six from zero in a declining

9    market.  And this -- you know, I'd really call it a mistake.

10   You know, if you will, it was a ten million dollar mistake.

11   And of the thirty-two million dollars of undervaluation for

12   these other securities of eighteen bonds, this particular

13   situation, you know, accounts for ten million of that thirty-

14   two million.

15   Q.   And I take it your specific valuations for the other bond,

16   putting aside the Intelsat bond, those are set forth in your

17   expert repot?

18   A.   Yes.  Yeah, the methodology is set forth in the report,

19   and it's consistent, you know, throughout the entire -- all the

20   securities.

21   Q.   And you used a discounted cash flow analysis to value this

22   particular bond?

23   A.   Yes, I did.

24        MR. TAMBE:  If I may consult for a moment?  I think

25   I'm almost done.
```

Page 40

1          THE COURT:  Sure.

2      (Pause)

3          MR. TAMBE:  No further questions on direct.  Thank

4  you.

5          Thank you, Mr. Olvany.

6          THE COURT:  All right, thank you.

7          Cross-examine?

8      (Pause)

9          THE COURT:  Please proceed.

10  CROSS-EXAMINATION

11  BY MR. THOMAS:

12  Q.   Good morning, Mr. Olvany.  My name is Todd Thomas.  I'm

13  with the law firm of Boies, Schiller & Flexner and I represent

14  Barclays in this matter.

15  A.   Good morning.

16  Q.   You work in the same office as Mr. Slattery and Mr. Garvey

17  of Chicago Partners, is that right?

18  A.   Yes.  When I'm in the office, yes.

19  Q.   Okay.  And -- so you've been with Chicago Partners since

20  approximately December 2008?

21  A.   Yeah, I am -- I work with Chicago Partners.  I'm an

22  independent consultant to Chicago Partners.

23  Q.   Okay.  And in your prior employment history with Credit

24  Suisse and Barclays -- and, excuse me, Morgan Stanley, when you

25  say you were responsible for valuing securities in your former

L Bal, et al; LB1

Page 41

```
 1     jobs, you mean that as a salesperson you would discuss the

 2     value of securities with clients and traders and you would

 3     sometimes give your opinion on the value of the securities

 4     along with the opinions of your clients and traders, correct?

 5     A.   I would do independent analysis, you know, as well, and

 6     come to conclusions on valuations of securities by doing

 7     independent analysis by myself as -- in addition to some of the

 8     points that you mentioned.

 9     Q.   Okay.  But the traders would actually do the initial

10     evaluations, and then you might comment on them in the course

11     of discussions with clients, correct?

12     A.   I don't think that that's an inaccurate assessment.  I

13     mean, it depends on the circumstances of -- you know, when

14     you're valuing securities, you're doing it on an everyday

15     basis, and oftentimes a client will come to you and say, you

16     know, 'I'm interested in buying' or 'selling X security', and

17     you will come to -- you know, you will do some analysis even

18     prior to discussing it with the trading desk.

19     Q.   But it was the traders who were putting the initial mark

20     on the security, correct?

21     A.   Well, you're distinguishing two -- potentially two things

22     when you say "mark".  I don't know what -- exactly what you

23     mean by "mark", but valuation takes place every single day.  As

24     a salesperson, you're -- you know, you spend all of your time

25     discussing with clients, you know, what the value is of
```

Page 42

1    securities every single day.

2    Q.   It wasn't your responsibility to come up with a valuation

3    for that security?  It was the trader who had done that,

4    correct?

5    A.   The eventual price that a transaction would take place in,

6    you know, would be determined by the traders.  Yes.

7    Q.   And ultimately, in quoting prices to your clients, you

8    would one hundred percent of the time end up just quoting your

9    traders' prices to your clients, correct?

10   A.   I don't think that that's an accurate assessment of --

11   when you say "quoting a price", you can give you opinion to

12   your client about a price.  The price that eventually is

13   transacted at is -- has to be agreed upon by your client as

14   well as the trader.  But salespeople are an integral part of

15   that process of developing a valuation assessment for

16   securities.

17   Q.   Do you recall being deposed in this matter?

18   A.   Yes.

19   Q.   In your binder, would you please turn to tab 1, which is a

20   copy of your deposition, and page 23, line 21?

21   A.   Just give me a minute, please, to get there.

22   Q.   Absolutely.

23   A.   Page 23 on the bottom or on the --

24   Q.   On the top corner.

25   A.   (Pause).  Okay, 23, line what?

Page 43

1    Q.    Line 21.

2    A.    Um-hum.

3    Q.    And do you see there you're asked:

4    "Q.   As I understand your testimony, you said the traders were

5    one source of prices that you would quote to clients --

6    "A.   Uh-huh.

7    "Q.   -- and that you also had your own -- you used your own

8    opinion on the prices?

9    "A.   Uh-huh.

10   "Q.   What I'm asking is generally what percentage of the time

11   did you end up just quoting the traders' price to your client?

12   "A.   As one hundred percent of the time."

13   Q.    Was that answer truthful and correct?

14   A.    Yes, I think that what you're -- what we're referring to

15   here is a slightly -- is a nuance within what we're talking

16   about.  There's -- specifically what I'm speaking about, I

17   believe, here is the process of, you know, providing periodic

18   pricing to clients, not the process of doing transactions in

19   the normal course of business.

20   Q.    You don't have any experience with repurchase agreements,

21   correct?

22   A.    Pardon?

23   Q.    You don't have any experience with repurchase agreements,

24   correct?

25   A.    I know of them, but -- and I've done some, but not very

Page 44

1    many.

2    Q.   You were not operating in the market for corporate bonds

3    as of September 19th, 2008, correct?

4    A.   That's correct.  I was working with Navigant at that point

5    in time.

6    Q.   And you do not have an accounting background, correct?

7    A.   No, I do not.

8    Q.   Okay.  And you're not certain of what the term "fair

9    value" means, right?

10   A.   From an accounting perspective, I don't know exactly what

11   fair value means.  What I've -- what I -- you know, I've had

12   discussions with some of my colleagues about it, about what

13   fair value means, but where I'm coming from is looking at a,

14   you know, market valuation.

15             MR. THOMAS:  And if you could put up Exhibit 2 to his

16   report, which is at tab 2.

17   Q.   And this is a chart of the twenty-two securities that you

18   valued, correct?

19   A.   That's correct.

20   Q.   Now, of the 517 corporate bonds that went from Lehman to

21   Barclays, you valued 16, is that correct?

22   A.   There's 517 bonds that would have been included -- or

23   identified by Barclays as corporate bonds, but some of the

24   bonds that I valued in this matter did not come under that

25   category, by Barclays, of that 517.  So that's the first thing.

Page 45

1    And then -- but these 22 bonds are the 22 bonds that I valued

2    in this matter, and some of them were identified by Barclays

3    under slightly different categories.

4    Q.   But approximately 500 of the other corporate bonds that

5    went over to Barclays were valued by Mr. Slattery and Mr. --

6    Professor Zmijewski of Chicago Partners, using different

7    valuation methods, correct?

8    A.   That's correct.

9    Q.   And as I understood it, part of your selection criteria

10   for which bonds you valued using your different method was that

11   there was at least a million-dollar difference between the

12   Barclays valuation and the BoNY valuation, is that correct?

13   A.   That's correct, with the exception, as I mentioned before,

14   of the Giants Stadium LLC bonds where Barclays and Bank of New

15   York had the same price.

16   Q.   That's an exception.  So on the other ones, the corporate

17   bonds, the universe you valued were the ones where there's a

18   difference between Barclays and BoNY, correct?

19   A.   That was the original grouping of securities, and then, as

20   I mentioned in my previous testimony, there was a group of

21   securities that I didn't feel that I had adequate information

22   in order to value the securities using my methodology, which,

23   as a result of that, were valued by some of the other experts

24   in this matter.

25   Q.   Now, Professor Slattery -- I mean Mr. Slattery, when he

Page 46

1    would value his larger set of corporate bonds, if he didn't

2    find a third-party price, he would use the BoNY price, right?

3    A.    I'm not a hundred percent sure of that.

4    Q.    And if that was his method and he applied that to your

5    bonds, there would likely be less of a valuation difference

6    with the Barclays valuation and the Chicago Partners valuation,

7    correct?

8    A.    I didn't do any analysis like that, so I can't comment on

9    that.

10   Q.    So you didn't analyze whether applying Mr. Slattery or

11   Professor Zmijewski's approach to your group of sixteen bonds

12   would result in a lower valuation than the Barclays valuation?

13   A.    I didn't do any analysis like that.

14   Q.    Okay.  And who chose to cut up the bonds this way with

15   different people using different methods to value different

16   sets of bonds?

17   A.    As I mentioned, when we -- when the group of securities

18   were originally sorted out by that million-dollar differential,

19   with the exception of Giants Stadium, then there were certain

20   securities that were backed by corporate -- corporation cash

21   flows that I consider to be a corporate bond.  And so that's --

22   I elected to price those particular securities.

23   Q.    Did you look at all 517 corporate bonds that came over and

24   pick a certain amount of bonds you were going to value?

25   A.    No.  As I mentioned, we did this original sort; then there

Page 47

1    was a certain number of securities that came out of that.  And

2    then from that universe of securities, then we attempted to

3    provide valuations of those.

4    Q.   Who's making the call on this original sort that you refer

5    to?

6    A.   I be -- I'm not a hundred percent sure, but I believe Mr.

7    Slattery and, you know, in conjunction with some of the other

8    experts, you know, came up with the original sort, if you will.

9    Q.   And you have no understanding and you did no analysis of

10   how Chicago Partners' valuation would be different if the

11   sorting was done differently?

12   A.   No, I do not.

13   Q.   Okay.  Hypothetically, if Mr. Slattery, in valuing

14   corporate bonds, used -- would use third-party vendor prices

15   and where those were not available he would use the BoNY

16   prices, would you consider that a regional -- reasonable

17   approach to valuing corporate bonds?

18   A.   There's a lot of different methodologies that one could

19   use for valuing corporate bonds.  And, you know, Mr. Slattery's

20   methodology -- I wasn't asked to opine on that.  But there are

21   different meth -- different experts can have different

22   methodologies for valuing bonds.

23   Q.   Well, I'm asking you now if you could give me your opinion

24   on whether the methodology I just described of using third-

25   party prices and, when those aren't available, using BoNY

LBHI, et al; LB1

Page 48

```
 1    prices, would that be a reasonable approach to valuation?

 2    A.   Yeah, I think, hypothetically speaking, I think that's a

 3    reasonable approach, yes.

 4    Q.   And if Barclays did it, it would be reasonable for

 5    Barclays too, right?

 6    A.   Yeah, if another expert -- I'm sorry, if another

 7    valuation, you know, person did it, it would be reasonable.

 8    But I believe that my valuation of doing a ground-up analysis

 9    is more robust.  You know, I haven't used that term earlier,

10    but my valuation of looking at the individual securities would

11    be more robust when you can do that.

12    Q.   On the corporate bonds, you attempted to find transaction

13    prices, is that right --

14    A.   Yes.

15    Q.   -- for the actual bonds?  And for the ones you found

16    transaction prices in TRACE, you used the transaction price, is

17    that right?

18    A.   I used -- in one of the transaction prices, yes.

19    Q.   Okay.  And there were about four of the sixteen corporate

20    bonds that you found using TRACE?

21    A.   Yes.

22    Q.   Okay.  And for the others, did you use other reported

23    transaction prices for those bonds, or did you create a model

24    for valuing them?

25    A.   I used a method -- I used -- not prices for those
```

L-Bar, et al; LB1

Page 49

1    particular securities, but I used a combination of credit

2    default swaps and what's referred to as a corporate-bond basis,

3    in order to come up with market inputs, in addition to interest

4    rates, volatility and other aspects of it, in order to come up

5    with valuations.

6    Q.    If we could turn to tab 27, please.

7              MR. THOMAS:   And let's go ahead and put that on the

8    screen.

9    Q.    Now, this demonstrative is our attempt to try to show some

10   of the methods, assumptions and judgments that are involved in

11   your methodology as described in Appendix 3 to your report.

12   And I'm not going to go through all of these, but as an initial

13   matter, would you agree that the bonds that you valued, using

14   your methodology approach as opposed to market prices, involved

15   a lot of assumptions and judgments?

16   A.    It included looking at observable market data and using my

17   experience to know what I believe to be the appropriate market

18   data to look at.  So that would be a judgment, you know, in my

19   opinion.  And there, you know, were other -- there were other

20   factors as well that -- and the assumption of using -- you

21   know, which market data to use, I think, would be another

22   example of an assumption.

23   Q.    There were quite a few assumptions you had to make to put

24   into your model in order to come up with a figure, correct?

25   A.    I mean, which is consistent with what a market participant

Page 50

1    would do on any particular day or end of a reporting period as

2    far as valuing a corporate bond.  There is -- utilizing

3    observable market information in the form of some of the inputs

4    that I mentioned, and then using your judgments of exper --

5    with experience and market assumptions for things like default

6    rates -- I'm sorry, recovery rates, you know, would be another

7    thing.

8    Q.   Do you know if, in valuing the twenty-two CUSIPs you

9    valued, if you attempted to value them using September 22nd

10   pricing or market information, if that would affect your

11   valuation, as opposed to using September 19th market valu --

12   market information?

13   A.   The market -- yeah, prices, generally speaking, move from

14   day to day.  So I -- so exactly what was the question?

15   Q.   If you -- instead of using September 19th market

16   information as input into your valuation process, if you had

17   used September 22nd market information, would that have changed

18   your valuation?

19   A.   Depends on the security, but potentially yes.

20   Q.   Have you done an analysis of that?

21   A.   No.

22   Q.   Okay.  And on this chart here at tab 27, there's a big

23   blue box on the right referring to pricing mechanisms.  Is it

24   accurate that you used four different pricing mechanisms for

25   different bonds?

LBan, et al; LB1

Page 51

1    A.    Yes.

2    Q.    Okay.  And can you explain why you did four different

3    mechanisms for various bonds?

4    A.    Sure.  The -- first of all, TRACE, as I mentioned, is not

5    a -- it is observable pricing information, so that's why I used

6    that there.  And for each one of these securities, different

7    models have different limitations, and each security has

8    different characteristics to it.  So, depending on whether or

9    not the security has a fixed coupon, a floating coupon, has any

10   optionality to the bond, whether the coupon will switch from

11   fixed to floating, there's different models in pricing

12   mechanisms that I elected to use depending on the limitations

13   of those particular securit -- those particular models.

14   Q.    Did you do any analysis of how your valuation would be

15   different if you had used the same pricing mechanism across the

16   board or had used different pricing mechanisms with respect to

17   different bonds?

18   A.    No, I did not.

19   Q.    Okay.  If you would turn to tab 11 in your binder, please.

20         MR. THOMAS:  And if we could put this on the board.

21   Q.    And this is a chart where we tried to pull together the

22   valuations you come up with using your methods and some of the

23   other available prices and values in the market.  And so in

24   coming up with your valuations, am I right that you did not

25   consider or factor in third-party vendor prices?

LBHI, et al; LB1

Page 52

1    A.    That's correct.

2    Q.    Okay.  So that's true even when you had -- when you

3    couldn't find a trade price in TRACE, which was true of twelve

4    of the sixteen (you could find a trade price), for those you

5    did not go in with their market information and look at what

6    the bond was actually trading for at that date, correct?

7    A.    That's not an accurate statement.  I mean, a pricing

8    vendor is not a demonstration of where the bond is trading that

9    day; it's a -- you know, my understanding of a pricing vendor's

10   business, which I've never been in a pricing vendor, is simply

11   that:  It's a price that is full of assumptions and judgments

12   of whatever the methodology is.  So that -- those are not

13   accurately price, you know --

14   Q.    Okay, I'll --

15   A.    -- actually traded prices.

16   Q.    -- I'll change it from price to value.  Did you go and

17   factor in other values given for that bond on that day by

18   third-party pricing sources?

19   A.    I actually -- you know, I created my prices, I -- and I

20   had those prices in -- I had those prices calculated, and --

21   but I didn't use the third-party prices as part of the

22   analysis.  But I actually obtained some third-party prices of

23   securities where they were available, you know, whether it

24   would be in the Barclays data that was produced or not.

25          MR. THOMAS:  If we could pull up -- highlight the

Page 53

1   first few lines there and just take a look at a few of these.

2   Q.   So on the first CUSIP, just so we're reading this right,

3   your price -- your value given in the valuation you calculate

4   in your report would be the 33.7; and then for this particular

5   bond, the BoNY mark would be 10; and then a third-party price

6   from value from market would be 20; and then EIV (ph.), 20; and

7   then FTID, 16; and then market, 14.8; and EIV, 15 again; and BP

8   data LD2P (ph.), 14.9.  Do you have any explanation for, like,

9   for instance in this bond, why your value would be higher than

10  the range of values by other parties?

11  A.   Based solely on my recollection of what this CUSIP number

12  is, because it's hard to recollect exactly what the CUSIP

13  number is, my understanding is that that is a bond issued by

14  AIG.  And I'd say that -- and if my memory serves me correct on

15  this security, which it would probably be worthwhile to look at

16  the specifics of what the security is, it is a rather complex

17  security issued by AIG, if it's the one I'm thinking about.

18       So I think that my valuation of the security, you know,

19  took into consideration some of the very intricate aspects of

20  this security, using market inputs.  And -- but, yes, is my

21  price higher than the other prices?  Yes, that's correct.

22  Q.   Could those other valuations be reasonable for that

23  security?

24  A.   I can't comment on what those other valuations are.  I

25  don't know how they came up with those other valuations.  But,

Page 54

1    you know, the different -- different market participants can

2    have different reasons for having those secur -- you know,

3    coming up with that price.

4    Q.   Did you do -- let me ask you, do you think it will be

5    reasonable for a market participant valuing the security to

6    take into consideration the third-party pricing value

7    information available in the market on that security as of that

8    point in time?

9    A.   I'm sorry, what's the question?

10   Q.   Would it be reasonable for a valuer of these securities to

11   take into consideration this type of market information about

12   prices or values for that security?

13   A.   Yeah, it would be reasonable for somebody to do that.  You

14   know, my valuation of this security in -- is, you know, based

15   on my methodology.

16   Q.   Okay.  Did you do any systematic analysis of how your

17   values that you came up with through your modeling compared to

18   price transactions -- to values quoted by third parties in the

19   marketplace?

20   A.   No.

21   Q.   Did you do any analysis of how your price -- your value

22   for these bonds -- and you valued them as of September 19th,

23   2008, is that right?

24   A.   No, I valued them as of 12:01 on September 22nd, using the

25   data that was available to me, which was the end of day on the

Lear, et al; LBI

Page 55

1    19th of September.

2    Q.    So in attempting to value them at 12:01 on September 22nd,

3    you used as a proxy their value that you calculated as of

4    September 19th, using September 19th market information,

5    correct?

6    A.    Yes.

7    Q.    Okay.  Did you do any analysis of how your value for these

8    bonds compared to the values for that same bond on that same

9    day on September 19th in the Lehman GFS system?

10   A.    No, I didn't.

11   Q.    Why not just take the value in GFS and use that for your

12   valuation?

13   A.    Because I was -- what I was asked to do is value the

14   securities using my experience and expertise.  And by using my

15   experience and expertise, I wanted to use the most robust

16   valuation methodology that I could come up with on the

17   securities that I had information available to me.

18   Q.    Okay.  And if we could go back to Exhibit 2, which is --

19   to your report, which is tab 2.

20         MR. THOMAS:  And pull that back up.

21   Q.    Now, how -- on the corporate bonds -- on the sixteen

22   corporate bonds, how many of them was Lehman the issuer on?

23   A.    Was Lehman the issuer on?

24   Q.    Yes.

25   A.    In other word -- oh, okay.  The CUSIPs that all -- if my

Page 56

1    memory serves me correct, the CUSIPs that all start with 525.

2    So there's three.

3    Q.    Okay.  And those bonds eventually defaulted, right?

4    A.    Yes.

5    Q.    And when was the -- when did LBI go into liquidation?

6    A.    The -- when -- I'm sorry, what's the question?

7    Q.    When did LBI go into liquidation?

8    A.    The filing of the bankruptcy date -- I mean, these bonds

9    were trading in TRACE, you know, on that day, and these three

10   bonds were all valued using prices that were traded on that

11   partic -- on September 19th.  And there was observable market

12   information for all Lehman securities on that day, and there

13   was active trading in the bonds that day.

14   Q.    Do you know what day LBI went into liquidation?

15   A.    No, I don't.

16   Q.    Did you do anything to try to -- in your valuation of the

17   Lehman-issued bonds, did you do anything to try to account for

18   the LBI SIPC liquidation?

19   A.    As I said, the first place that I looked for, for the

20   securities that I looked at, was observable market prices; and

21   for Lehman's bonds, there was active -- active trading on that

22   particular date.  And if you look at my reliance material,

23   you'll see that for these particular securities, there was, you

24   know, many trades that took place on that day.  So my first

25   source of information was observable market data.

Page 57

1    Q.    So these securities, did you value based upon observed

2    trade prices or did you value using your methodology?

3    A.    Observed trade prices.

4    Q.    Okay.  And what would their value be if you had used the

5    valuation methodology you used for twelve of the sixteen?

6    A.    I don't have an answer to that question, because my first

7    source was actual trade information.

8    Q.    Okay.  And you would have had --

9    A.    And just for the -- just to point out, those, you know,

10   those four -- those three securities, you can see that my

11   valuation was actually lower than Barclays' valuation.

12   Q.    Right.  And why -- how did Barclays come up with its

13   valuation?

14   A.    The way it looked -- the way it looked from -- how did

15   Barclays come up with their valuation?  I don't recall

16   specifically --

17   Q.    Okay.

18   A.    -- on that bond -- on those bonds.

19   Q.    And in fact, if Barclays were following a process which

20   led to a higher valuation on those bonds, but the bonds ended

21   up being worthless -- strike that.

22        If you had done your valuation approach to valuing those

23   bonds, you would have had to take into account the credit risk

24   of the bonds, correct?

25   A.    There -- you would use observable market data for those

Page 58

1   particular bonds.

2   Q.   Well, because it's available.  I'm asking, if you had used

3   your valuation methodology, which you used on most of the

4   corporate bonds, you would have had to account for the credit

5   risk associated with the issuer, which is Lehman, right?

6   A.   You -- that's incorporated in the market inputs, you know,

7   the price -- the pricing input.

8   Q.   Exactly.  So by using TRACE on these three bonds, you

9   avoided that, correct?

10  A.   Well, as I said, the most reliable source of information,

11  you know, on pricing, in my opinion, would be observable market

12  prices for the securities that you can find observable market

13  prices.  And for, you know, these three CUSIPs within -- of

14  Barclays -- I'm sorry, of Lehman Brothers, you know, there was

15  a robust amount of information in the market place about where

16  those bonds were trading on that particular day.  And so for

17  each individual CUSIP I analyzed, you know, how much traded

18  that particular day.  And then, what I did was take the number

19  of observances that were out in the market, because believe it

20  or not -- believe it or not, these -- a couple of these Lehman

21  bonds traded at par that day.  And so I wanted -- and they

22  traded -- some of them traded from a range of 12 to par.  And

23  so in order to do a more accurate evaluation of those

24  particular securities, what I did was take the -- all the

25  observations and then take sixty percent of the observations

LBar, et al; LB1

Page 59

1    that were available and then take the low trade within those

2    sixty percent of observations.  And I thought that that was a

3    conservative utilization of the data.

4    Q.   On the 296 million dollar valuation you have for the

5    covered bonds, you did not make a liquidity adjustment to that

6    amount, did you?

7    A.   Yes, I did.

8    Q.   You did?

9    A.   Yeah.

10   Q.   And --

11   A.   I utilized the same -- I utilized the same liquidity

12   adjustment for those corporate bonds that -- I'm sorry -- for

13   those covered bonds that Lehman -- that Barclays did, which

14   was, as I said in my previous comments, was I believe, ninety-

15   five percent.

16   Q.   So, I'm sorry --

17   A.   Any -- sorry.

18   Q.   -- you're saying you took a five percent liquidity

19   adjustment for the corporate bonds?

20   A.   No, I didn't say that.  I said -- you asked me for that

21   specific security, the one that was 200-odd million --

22   Q.   Well --

23   A.   -- which is CUSIP number 057.

24   Q.   -- no, no.  I'm talking about the total for this -- for

25   the sixteen corporate bonds.  Excuse me, I said 296.  I should

Page 60

1   have said 298 million, going back up.  Corporate bonds -- the

2   sixteen corporate bonds that you valued at 298 million dollars

3   and that Barclays' valuation you cite there as 269 million

4   dollars.  Do you see that?

5   A.    Yes.

6   Q.    Now, for those sixteen bonds, you did not take a liquidity

7   discount or liquidity adjustment, correct?

8   A.    That's incorrect.

9   Q.    Okay.  What percentage --

10  A.    Let me just -- why don't we go back to my direct testimony

11  for a second, just to clear this up.  What I used --

12  Q.    Well, can you --

13  A.    -- as a liquidity adjustment --

14  Q.    -- sir, can you tell me without going back --

15  A.    I'm sorry.

16  Q.    -- to the materials that were presented and handed out

17  today what percentage liquidity adjustment did you take with

18  respect to the corporate bonds?

19  A.    I used -- I utilized the exact same -- for each CUSIP, I

20  used the exact same liquidity adjustment that Barclays used for

21  each one of those particular CUSIPs.

22  Q.    Okay.  And what do you understand Barclays' liquidity

23  adjustment to be for those CUSIPs -- for the --

24  A.    For some of them, it was ten percent -- or ninety percent.

25  For some of them it was ninety-five; some of them it was

Page 61

1    ninety-seven; and some of it was a hundred percent.

2    Q.   When you're saying ninety-seven, do you mean a ninety-

3    seven percent liquidity adjustment?

4    A.   No, the other way around; ninety percent of the value.  So

5    in other words -- in other words, a zero percent for some, a

6    three percent for others, a five percent for others, and a ten

7    percent for others.

8    Q.   Now, at the time of your deposition, you did not believe

9    that Barclays had made a liquidity adjustment for those

10   corporate bonds, correct?

11   A.   Well, I think that what we're getting into here is a

12   differential between what Barclays classified bonds as and what

13   I classified bonds as.  There are certain bonds within the

14   Bar -- within the Barclays universe that I classified as

15   corporate bonds.  Some of these bonds were identified by

16   Barclays as emerging market bonds; some of these bonds were

17   identified by Barclays as, you know, in what was called the

18   PMTG tab; and some of them were classified by Barclays under

19   the agency tab.  So each one -- what Barclays considered to be

20   a corporate bond and I considered to be a corporate bond,

21   that's where they didn't take a liquidity adjustment.

22   Q.   Okay.  Of your sixteen bonds that you list as corporate

23   bonds, how many of those are traded by Barclays as corporate

24   bonds?

25   A.   In my recollection is, it's twelve.

Page 62

1    Q.    Okay.  And which --

2    A.    Excluding the Giants Stadiums.

3    Q.    And of the twelve corporate bonds that you characterize as

4    corporate bonds and Barclays characterizes as corporate bonds,

5    did you take a liquidity adjustment on those bonds?

6    A.    I -- as I said, I utilized the same -- my -- I utilized

7    the same liquidity adjustment that Barclays utilized.  Inherent

8    in my methodology was a bid side valuation, you know, of those

9    securities.  So I utilized -- I utilized their liquidity

10   adjustment across the board.  And so that would include, you

11   know, both the securities that had a liquidity adjustment, as

12   well as the securities that didn't have a liquidity adjustment.

13   And all of my valuations were done based on market information

14   that incorporated -- or market data that incorporated bid side

15   valuations.

16   Q.    At the time of your deposition, you did not believe that

17   Barclays had done a liquidity adjustment for those bonds,

18   correct?

19   A.    No, that's in -- for -- as I said, for the bonds that they

20   classified as corporate bonds, that's correct.

21   Q.    But for the twelve bonds that we're now talking about, you

22   understood, at the time of your deposition, that they had not

23   done a liquidity adjustment?

24   A.    That's correct.

25   Q.    Right.  At some point later in time, you realized that

LB-Bar, et al; LBI

Page 63

1    Barclays had accounted for liquidity by taking the lowest

2    available vendor price instead of subsequently making a

3    liquidity adjustment.  Is that correct?

4    A.   I was -- you know, I read that document, the BO, the sell

5    that we're referring to and, you know, had an understanding of

6    what that meant.  And that was the rationale that they used for

7    that.

8    Q.   You understood that after your deposition, right?

9    A.   I kind of understood it --

10   Q.   Yeah.

11   A.   -- you know, both times.

12   Q.   Right.  At the time when you made your report and your

13   calculations, you had the impression that Barclays did not make

14   a liquidity adjustment to those total bonds, correct?

15   A.   Well, they didn't make a liquidity adjustment aside from

16   their methodology, which was -- they believed, based on some of

17   the testimony that I've seen and some of the information, that

18   by utilizing the low bid of the third-party market providers.

19   And I'd point out that in the case of that bond that is up

20   there, where they have a zero valuation, you know, there

21   they're taking a -- they don't have any valuation at all and,

22   you know, they didn't take a market -- they didn't take a

23   liquidity adjustment on that.

24   Q.   Okay.  After you learned that Barclays actually had

25   adjusted for liquidity by using the lowest available price and

Page 64

1    treating that as a proxy for a liquidity adjustment, did you go

2    back and change your valuation in any way for those twelve

3    bonds?

4    A.    No.

5    Q.    And you did not apply the value that you ended up with in

6    your model, you did not discount that for liquidity purposes?

7    A.    For the twelve securities that we're talking about, the

8    liquidity was -- or the bid side valuation was incorporated in

9    the valuation technique.

10   Q.    Okay.  And what exactly does that mean, "the bid side"?

11   Did you go out and get a whole bunch of different prices like

12   Barclays did and took the lowest price?

13   A.    No.  In the market inputs that I used, right, which I

14   mentioned to you previously, which included the -- an

15   adjustment for the credit risk, you know, of the individual

16   securities, it was incorporated in that.

17   Q.    How was it incorporated in that?

18   A.    In the -- you know, in the valuation -- I'm sorry, in the

19   bid side of the default characteristics of the bond.

20   Q.    What does that mean, "incorporated in there"?  Were you

21   anticipating that Barclays was doing a liquidity adjustment so

22   I have to do that as well?

23   A.    No, I was using the market information that was available

24   to me that was a bid side valuation.  So it's incorporated in

25   the bond basis data -- I'm sorry, the corporate-bond basis

In re: Barclays, et al; LBI

Page 65

1   data.

2   Q.   Okay.  So we know what Barclays did.  Barclays observed

3   prices in the market and then took the lowest and treated that

4   as the mid-to-bid adjustment.  What you did, precisely, is

5   what?

6   A.   I took the -- using the market available information I

7   used bid side inputs into that in order to come up with my

8   valuations.

9   Q.   What does that mean "used bid side" -- could you give me

10  an example?

11  A.   Yeah.  As I mentioned before, it is incorporated in the

12  default characteristics, the corporate-bond basis trading

13  information is in there as well as the CES information.

14  Q.   So you adjusted some value to make it come up with a lower

15  value in order to adjust for liquidity issues in the market?

16  A.   I used the bid side that was available to me.

17  Q.   And using the bid side that's available to you, what

18  precise data did you use?

19  A.   The -- as I said the Morgan Stanley Corporate Basis Report

20  information.

21  Q.   Okay.  And so that means you're using -- how does that --

22  that impacts your model in what way?

23  A.   It changes the default probability of the security, which,

24  in a discounted cash flow analysis, what we mentioned before is

25  that you have to take the characteristic security, discount it

Page 66

1    for a risk-free rate, and then, you know, add to that discount

2    something for the credit risk.  And that impact was

3    incorporated in that discount for credit risk.

4    Q.    And it's your testimony that you did that with an eye

5    towards making this a proxy for a liquidity adjustment?

6    A.    For a proxy for the bid side of the market.

7    Q.    But was it a proxy for making a liquidity adjustment?

8    A.    I -- you know -- I mean, my valuation was to try to come

9    up with a bid side valuation.

10   Q.    Okay.  Again, was it with an eye towards accounting for a

11   liquidity adjustment that would need to be made in order to

12   value these bonds?

13   A.    It was -- you know, it's the bid that -- liquidity

14   adjustment would incorporate trying to value things on the bid

15   side of the market, in my opinion.

16   Q.    You would agree with me that the appropriate valuation,

17   when valuing these bonds, is the exit price that would take

18   into consideration liquidity issues, correct?

19   A.    Yeah -- or the bid side of the market, yes.

20          MR. THOMAS:  Your Honor, it's about 11 a.m.  I

21   think -- I don't know if this is a --

22          THE COURT:  It's actually a little past.  It's a

23   little past 11 a.m.

24          MR. THOMAS:  Sorry.

25          THE COURT:  It's a good time for a morning break.  But

LBHI, et al; LB1

Page 67

1  I'd be interested in your estimate of about how much more you

2  think you have?

3          MR. THOMAS:  I think --

4          THE COURT:  Not to hold you to it, but I'm just trying

5  to get a sense.

6          MR. THOMAS:  -- yes, Your Honor.  I think

7  approximately one hour.

8          THE COURT:  Okay.  Let's take a break till twenty

9  after 11.

10      (Recess from 11:07 a.m. until 11:29 a.m.)

11          THE CLERK:  All rise.

12          THE COURT:  Be seated, please.  And please proceed.

13  RESUMED CROSS-EXAMINATION

14  BY MR. THOMAS:

15  Q.  Mr. Olvany, we've been discussing whether you accounted

16  for liquidity conditions in the market with respect to the

17  twelve corporate bonds that we've been discussing.  And I'd

18  like to ask you to turn to page -- tab 2, paragraph 36 of your

19  report.

20          MR. THOMAS:  If we could pull that up, please?

21  A.  I have it.

22  Q.  If you see paragraph 36, you're talking about the large

23  group of sixteen corporate bonds that would include the twelve

24  bonds we've been discussing?

25  A.  Yes.

L-Bar, et al; LB1

Page 68

1   Q.   And do you see the last sentence?  It says, "Consistent

2   with Barclays' methodology described below, I did not reduce

3   the valuation of the corporate bonds to reflect liquidity

4   conditions in the market."  Is that a true statement?

5   A.   Yeah, I think that that's -- yes, I think it's a true

6   statement.

7   Q.   And at the time you wrote that, you did not realize that

8   instead of taking a liquidity adjustment Barclays had instead

9   assumed a lowest price as a proxy for liquidity adjustment,

10  correct?

11  A.   I was aware -- I was aware that that's what they did.  I

12  think it might be instructive for the Court to look at -- to

13  look at, you know, on the same part of the report in Table 2 on

14  page 14.  Table 2 on page 14 looks at the entire universe of

15  517 corporate bonds that Barclays classified as corporate

16  bonds, and you see that's got a total market valuation of about

17  1.1 billion dollars.  And in the instances where there's more

18  than two prices available, that the difference between the

19  average price, you know, and -- or average value and the

20  minimum value, which is what Barclays uses, is about 20 million

21  dollars on a portfolio of 1.1 billion dollars.  So it's 1.72

22  percent -- 1.71 percent.

23  Q.   Do you understand my question is whether you took a

24  liquidity adjustment in your valuation?  And the answer is no,

25  correct?

L-Bar, et al; LBI

Page 69

1    A.   Yeah, I used the same liquidity adjustments that Barclays

2    used.

3    Q.   To the extent -- you're saying that because you saw a

4    sheet that Barclays had where it showed the liquidity

5    adjustment rate of 1, right?

6    A.   Yes.

7    Q.   Okay.  But --

8    A.   For these bonds.

9    Q.   -- right.  But what Barclays did, instead of using a

10   liquidity adjustment, they used the lowest available price for

11   the bonds, and that was a proxy for the liquidity adjustment,

12   correct?

13   A.   And as I just stated, if you look in the report, you can

14   see what the impact is of the average value, you know, for

15   those prices and the low value for those prices.  And it's a

16   mere 1.72 percent.

17   Q.   Okay.  Didn't you --

18   A.   That's the impact that Barclays -- you know, it's a small

19   impact.

20   Q.   -- did you do an independent analysis of what the

21   appropriate liquidity adjustment for these bonds would be in

22   this market at that time?

23   A.   I did not, no.

24   Q.   Okay.  And if you would turn to tab 31, please, which I

25   believe are some of your work papers.

Page 70

1   A.    Um-hum.

2         MR. THOMAS:  And if we could pull that up -- could we

3   pull up --

4   Q.   Look at the last column, please.  And so you identified

5   your bond values that you used in your report as mid prices,

6   correct?

7   A.    Yeah.  This column, I wanted to use -- I wanted to, you

8   know, calculate, you know, their -- using Barclays'

9   methodology, their pri -- their liquidity adjustment, you know,

10  to adjust from mid to bid.  But each one of those, I'd

11  mentioned, that's probably the not right -- not the correct

12  terminology to put at the top of that -- top of that column.

13  Because it was incorporated, as I said before in my previous

14  testimony -- the bid valuation is incorporated in the

15  underlying price.

16       But then, again, on the securities where there was a

17  liquidity adjustment made by Barclays, I actually reduced it

18  again by their liquidity adjustments.

19  Q.   And this is BCI Exhibit 1091.  Now, isn't it true that

20  what happened was that you made your valuation not thinking

21  that Barclays had made a liquidity adjustment of any kind; you

22  made no liquidity adjustment.  That's why you identify it as

23  mid price.  It was pointed out to you at your deposition that

24  Barclays actually had made a liquidity adjustment, and now

25  you're saying that this was just a mistake?

Page 71

1    A.   It was pointed out that that was what their rationale for

2    using the low price was, that, you know, in lieu of the

3    liquidity adjustment.  But I don't believe that it changes my

4    opinion that all the prices that I put together were based on,

5    you know, mid -- I'm sorry, bid value adjustments, you know,

6    using this methodology.

7    Q.   So that was just -- when you said mid prices, that was

8    just error?

9    A.   Well, because it's -- it is -- I should have titled it

10   slightly differently in the work papers, yes.

11   Q.   Now, you mentioned using TRACE data when you had that

12   available.  And I think you referred to it as being real

13   transaction data.  Do you see some kind of distinction between

14   using TRACE data with respect to the value of securities and

15   using other third-party vendor data with respect to that value?

16   A.   Yes, I do.  I -- because TRACE is actually reported trades

17   that actually take place.  It has a -- it has time stamped on

18   it.  And it has the transaction price.  And I believe that

19   that's a -- that is real transaction data as opposed to pricing

20   sources.

21   Q.   When you say "real transaction data", do you mean that's

22   like live data that's showing actual transactions?

23   A.   It's reported within fifteen minutes, you know, in public

24   sources, from the time of the trade.  Or at least, that's what

25   the goal is.

Page 72

1    Q.    And you think using that real or live data may be more

2    reliable for obtaining market information than using historical

3    third-party prices?

4    A.    Yes, I do.

5    Q.    So if Barclays felt that way also, you wouldn't disagree

6    with that?

7    A.    No, I don't.

8    Q.    If we could go back -- on the covered bonds -- if we could

9    pull back Exhibit 3 to your report, please?  The covered bonds,

10   the difference there between your valuation and Barclays' was

11   only about one percent.  Is that right?

12   A.    Yes.

13   Q.    And Barclays based its valuation for these bonds based

14   upon prices or valuations observed in the marketplace, correct?

15   A.    I believe they used third-party prices on those as well.

16   Q.    Okay.  And you calculated your value using, among other

17   things, secondary market spreads for comparable securities

18   acquired from contemporaneous market research?

19   A.    That's correct.

20   Q.    And did you decide what were comparable securities?

21   A.    Yes.

22   Q.    Now, ninety percent of your valuation difference comes

23   from the Giants bonds, correct?

24   A.    That's correct.

25   Q.    And as of September 22, 2008 -- the valuation date here --

L-Bar, et al; LB1

Page 73

1    vendor pricing was not available for these securities, correct?

2    A.    Yes.   That's my understanding.

3    Q.    And the auction-rate securities market was not functioning

4    as it had historically, correct?

5    A.    That's correct.

6    Q.    And Barclays did not have an auction-rate securities desk

7    as of that time, correct?

8    A.    That's correct.

9    Q.    And the Giants bonds were not part of the fed repo.   Is

10   that right?

11   A.    I don't know.

12   Q.    Do you know if Barclays was expecting to receive these

13   bonds?

14   A.    I don't know.

15   Q.    Now, you used a model to value the Giants bonds, correct?

16   A.    Well, I used -- I used a model to elaborate on my pricing

17   of these securities.   But I developed my view of a hundred

18   percent of face value as the price for these bonds.   And then

19   what I did was I tested that price using a couple of different

20   methodologies that essentially are discounted cash flow

21   methodologies using a set of assumptions that was, I thought,

22   reasonable.   So my valuation was not based on the model

23   outputs.

24   Q.    Well, can we look at your methodology report, please,

25   which is Appendix 3 to your report, which is at tab 2.

Page 74

```
 1              MR. THOMAS:  And if we could pull that up, please?

 2    And if we could pull up paragraph 1, please?

 3    A.   Sorry, what page are we on?

 4    Q.   This is Appendix 3 -- it's the methodology section of your

 5    expert report.

 6    A.   Right.  So where -- oh, okay.  Sorry.  Um-hum.

 7    Q.   And paragraph 1 says, "Due to the lack of a pricing model

 8    for securities with coupon rates set by an auction process, and

 9    uncertainty of expected future cash flows, based on the

10    willingness and ability of Giants to fully redeem the

11    securities at face value or extend the securities each period,

12    I constructed a model to value the securities with the

13    assistance of my staff, working at my direction."

14         And did you do that?  Did you construct a model?

15    A.   Like I said, with the assistance of my staff, yes.

16    Q.   Okay.  This is a model that was created just for the

17    purposes of valuing these four bonds?

18    A.   Yes.

19    Q.   Now, in your prior positions --

20    A.   For testing -- excuse me.  For testing -- if I can add --

21    for testing the price valuation.  Because actually, if you look

22    in the reliance materials, you'll see that the model would

23    produce a price, you know, above par, at different points in

24    time.

25    Q.   So actually, the model you created would actually produce
```

Page 75

1    a price for the security above par?

2    A.   Yes.

3    Q.   And in the middle of a frozen auction market, you believed

4    it's reasonable to value it above par?

5    A.   No, I didn't -- that's why I didn't value it above par, I

6    valued it at par.  But the inputs to the model, which is a

7    standard, you know, discounted cash flow analysis with a

8    default probability, you know, and an assumed coupon rate, the

9    assumed coupon rate, because of the failed -- because the fail

10   process, you know, in the auctions, and because of what rates

11   would be charged given the difficulties of the auction-rate

12   securities market at the time, you'd discount back those cash

13   flows depending on how long they're going to be outstanding.

14   And the model will tell you that the price should be above par.

15   But I didn't think that that was a reasonable assessment of

16   what this price should be.

17   Q.   So you agree, your model that you developed to value this

18   product, produced an unreasonable price?

19   A.   I produced a -- yeah, I think that that's -- I think it

20   produced a price that was above par, and I didn't think that

21   that was a reasonable price in the market.  But you can adjust

22   different aspects of the model to -- but I didn't utilize that

23   price.

24   Q.   So your actual price that you did utilize was not a

25   product of observed prices in the market or a product -- or

L Bai, et al; LB1

Page 76

1    custodian price, or a product of your model, but rather, it was

2    your opinion?

3    A.    Yes, it's my opinion.

4    Q.    Okay.  And in your provision -- your prior positions with

5    Morgan Stanley and other companies you mentioned, you had not

6    been responsible for developing models or have any role in

7    developing models for valuation of securities, correct?

8    A.    That's correct.

9    Q.    If we could turn to tab 26, please?  And again, this is

10   our effort to try to chart some of the variables described in

11   your model.  I'm not going to go through them, but I did want

12   to confirm, again, that your model has a lot of assumptions and

13   judgments that required to be made?

14   A.    Yes.

15   Q.    And one of the assumptions I do want to ask you about is

16   this coupon rate of sixteen percent that you assume.  Is that

17   an important variable in your analysis?

18   A.    Yes, it is.

19   Q.    Okay.  And is it -- how did you come up on sixteen percent

20   as the coupon rate?

21   A.    I basically just thought of what a reasonable market

22   participant, you know, may be interested in bidding in this

23   auction in order to own these securities.  And at that time,

24   there was significant disruptions.  And because of the coupon-

25   setting mechanism, my experience with clients when I was

LB1, et al; LB1

Page 77

1    transacting in these securities in February, March time period

2    of 2008, the rates that were being set were substantially above

3    LIBOR rates.  And so there was an assumption built into that

4    level based on my prior experience and based on what the fail

5    rate was of twenty-two percent on the securities.

6    Q.   Just so I understand your testimony, you're saying that in

7    calculating what you thought was a likely coupon rate as of

8    September 22nd at 12:01 a.m., you independently came up with

9    the idea that a likely rate would be sixteen percent.  Is that

10   right?

11   A.   Yeah.  You could vary it to a great degree, and it

12   wouldn't impact the valuation very much.

13   Q.   Okay.  Did you -- so it's just coincidence that once they

14   actually hired Goldman Sachs and had an auction for the first

15   time since March 2008 -- they had an auction in November 2008,

16   that the rate set at the auction was sixteen percent?

17   A.   I think that the rates were vary -- you know, they

18   changed.  I believe they were between fifteen, sixteen,

19   et cetera.  But I could use any rate below twenty-two percent

20   in order to make that calculation.

21   Q.   I understand --

22   A.   So the answer -- the answer to your question is, it is,

23   that didn't enter my analysis, you know, what the rate set by

24   the -- by Barclays later on.

25   Q.   Okay.  So you understand, though, in November there was an

Page 78

1    actual successful auction that set the rate at sixteen percent?

2    A.   Yeah.  I believe that that's what I remember.

3    Q.   But it's your testimony that in the year prior to that,

4    between March of 2008 and November of 2008, the rates had been

5    much lower in the two to five percent range.  Is that right?

6    A.   Yeah, they were in the two to five percent range, you

7    know, more than likely because Lehman Brothers owned a

8    substantial amount of those securities and because they were

9    paying that side of the swap.  It was my assumption that, you

10   know, a market rate like that would be something that Lehman

11   would be willing to hold the securities at, as long as it was

12   above their cost of financing.

13   Q.   Okay.  And it's your testimony that in coming up with the

14   coupon rate as of September 19th or September 22nd, 2008, even

15   though it had been at lower rates, that you independently came

16   up with a sixteen percent coupon rate, and it's just coin --

17   and you did that without taking into consideration what

18   happened in November, which was an auction which happened to

19   set the coupon rate at exactly sixteen percent?  Is that your

20   testimony?

21   A.   Yes.

22   Q.   Because it would be improper, from your view, from a

23   valuation standpoint, to be using data that people just learned

24   in November from events that occurred in November, in valuing a

25   security as of September 22nd.  Is that right?

Page 79

1   A.   Yes, that's correct.  I mean, I think the valuation, once

2   again, you have to consider the historical market conditions.

3   And one of the major, major, major contributors to this is that

4   Barclays now owned the security.  Okay?  And so Barclays had an

5   incentive to set the coupon at as high a level as they could

6   possibly set it at, as the holder of that security as opposed

7   to -- because they didn't have any relationship with the Giants

8   to speak of.  They didn't have the swap in place.

9        So it was Barclays' incentive to set the rate as high as

10  they possibly could, and in doing so, they could earn a higher

11  return on that particular investment, and secondly, they could

12  put potentially pressure, if you will, on the Giants Stadium

13  LLC to redeem the securities at a rate that they didn't

14  previously want to redeem the secur -- or at a rate that they

15  weren't looking for.

16       And, you know, as I point out in my report, the Giants had

17  previously redeemed over 100 million of these securities in

18  April of 2008 after, you know, some -- after one of the

19  auctions had previously failed.

20  Q.   It's your testimony you came up with the sixteen percent

21  without considering the fact that that's the exact amount that

22  was set at auction in November, right?

23  A.   Yes.

24  Q.   Could we turn back to tab 11, please?  And this is, again,

25  the price chart.

Page 80

1          MR. THOMAS:  And if we could pull up the Giants

2      Stadium portion of this chart.

3      Q.   So BoNY's valuations on these bonds in this time period,

4      one is ten for the three larger bonds and forty-three for the

5      smaller bond.  Is that right?

6      A.   I don't recall the CUSIP numbers off the top of my head,

7      so I don't know which is which.  But, yes, that's what the

8      prices on the screen show.

9      Q.   Okay.

10     A.   I don't know which is large and which is smaller.

11     Q.   Okay.  And the -- do you know which one has the higher

12     credit rating?

13     A.   Pardon me?

14     Q.   Do you know which bond up here has the highest credit

15     rating, or are they the same?

16     A.   I think they're the same.

17     Q.   You think all four bonds have the same credit rating?

18     A.   Yes.

19     Q.   Was that an important consideration for your opinion?

20     A.   The fact that the BW3 rating was in place was an important

21     consideration, yes.

22     Q.   And but you end up rejecting the BoNY valuations, correct?

23     A.   Yes, I did.

24     Q.   Okay.  And in fact, you didn't even consider the BoNY

25     marks at all, right?

LB Bar, et al; LBI

                                                                    Page 81

1    A.    Pardon?

2    Q.    You didn't even consider the BoNY marks at all, right?

3    A.    No, I did not.

4    Q.    Okay.  So is it your opinion that it's reasonable, in

5    doing a valuation, to reject the value of a custodial bank to

6    reach -- strike that.

7          Is it your opinion that it's reasonable to reject the

8    value that a custodial bank places on a security in doing a

9    valuation?

10   A.    I'm not -- I'm not opining on the value of custodial

11   marks.  But what I did -- what I have opined on is that I

12   looked at these marks and I looked at the security and I looked

13   at Professor Pfleiderer's report, and I thought that these

14   prices were, you know -- were unreasonable.  And so I disagree

15   with their prices.  But I don't disagree with the overall

16   methodology of custodial marks.

17   Q.    Okay.  Now, in this case, BoNY was more than a custodian

18   bank, right?

19   A.    I don't know what you mean by that.

20   Q.    Do you know what role BoNY played with respect to these

21   Giants Stadium bonds?

22   A.    I believe that they were what was termed the auction

23   agent.

24   Q.    Okay.  Any other role?

25   A.    I don't recall.

Page 82

1   Q.   Did you analyze what role they may have involved (sic) in

2   these particular bonds?

3   A.   No.  I analyzed the role -- you know, I analyzed what the

4   market participant would look at.

5   Q.   Were you aware that they were the trustee on the bonds?

6   A.   I don't believe that I was aware of that, no.

7   Q.   So you didn't take that into consideration in rejecting

8   BoNY's marks?

9   A.   No, I did not.

10  Q.   Now, the first time you began to do any work in the

11  auction-rate securities market, was in early 2008.  Is that

12  right?

13  A.   That's correct, yes.

14  Q.   And that was at Morgan Stanley?

15  A.   Yes, that's correct.

16  Q.   And the involvement with valuations of auction-rate

17  securities would have been along the lines we discussed earlier

18  in discussing marks with traders and clients.  Is that correct?

19  A.   No.  Mine was much more hands-on.  It was, as I mentioned,

20  after the market had -- after the market had undergone its

21  disruptions, I had some clients that were interested in

22  entering the market.  And so frankly, we would -- we did

23  exactly what I did in this matter, which is, that we would look

24  at what the different auctions were that Morgan Stanley was

25  conducting on any given day, and we would look at what the fail

Page 83

1   rates were on those particular auctions.  We would look at the

2   credit rating and understand the credit characteristics of the

3   companies that were auctioning on that particular day.  And

4   then in consultation with my clients, what we would do is

5   submit bids in the auction process in order to -- for my

6   clients to buy the securities, which we did.

7   Q.   Okay.  After you began your first work ever in early

8   September 2008, and then after -- in auction-rate securities --

9   and then after the spring of 2008, you only spent ten percent

10  of your time valuing any securities at all, right?

11  A.   Yes.  I believe that that's the testimony that I gave at

12  my deposition.

13  Q.   And was that true and accurate?

14  A.   Yes.

15  Q.   And after the spring of 2008, any time you spent valuing

16  auction rate securities would have been less than five percent

17  of the time, right?

18  A.   I don't know how you come up with that figure.  But I

19  spent a -- you know, not a large percentage of my time doing

20  transactions in auction-rate securities, no.

21  Q.   Well, if you could please turn to tab 1 of your binder,

22  your deposition, page 21, lines 13 to 16?  And actually it

23  starts up above it, line 17:

24  "Q.  And after the spring, did you devote any time to valuing

25  auction-rate securities while you were at Morgan Stanley?

Page 84

1    "A.   Yes.

2    "Q.   What percentage of your time would that have been?

3    "A.   Less than five percent."

4    Q.   Do you recall that testimony?

5    A.   I don't recall that, but you know, I think that, as I

6    mentioned before, that's probably an accurate statement.

7    Q.   Okay.  So you started in early 2008.  And then after

8    spring of 2008, it's less than five percent, correct?

9    A.   Yeah, because when I was involved in this market, it was

10   right -- you know, in a time period that was very similar to

11   the -- you know, it was after this market was in disruption and

12   it was in a period where investors, you know, were looking to

13   take advantage of potentially high rates of -- high rates that

14   they could achieve and high returns for highly rated

15   securities.  So it wasn't a substantial amount of my time that

16   was spent on this.

17   Q.   And then you left Morgan Stanley in July of 2008.  Is that

18   correct?

19   A.   That's correct.

20   Q.   And that's why you say you were not in the market as of

21   September 2008, right?

22   A.   That's correct.

23   Q.   And after leaving Morgan Stanley, you formed Chilton

24   Partners in September 2008?

25   A.   Yes.  It was -- yes.

L-Bai, et al; LBi

Page 85

1   Q.   And Chilton Partners doesn't really have any partners.

2   You're the sole employee, correct?

3   A.   That's correct.

4   Q.   Okay.  And Chilton Partners was primarily focused on

5   litigation support?

6   A.   Chilton Partners is just my company that I just utilize in

7   order to -- in order to do this type of expert witness and

8   litigation consulting work.  But a hundred percent of my

9   engagements up to now have been through Navigant.

10  Q.   And Chilton Partners was primarily focused on litigation

11  support, correct?

12  A.   Yes.

13  Q.   And you spent less than ten percent of your time with

14  Chilton valuing any type of securities, right?

15  A.   That's -- I -- one of the different roles that I do is in

16  valuation, you know, of securities.  So the different matters

17  that I've been involved in, some of them are valuation, some of

18  them are not valuation.

19  Q.   Okay.  It would be less than ten percent of your time,

20  right?  That's what you testified at your deposition?

21  A.   That's probably correct.

22  Q.   Okay.  And in March of 2008, you were involved in the

23  marketing of auction-rate securities for Morgan Stanley?

24  A.   I don't recall the specific dates.  But that would be

25  after February, so March sounds about right.

Page 86

1    Q.   Okay.  And if we could turn to tab 21, please?  And this

2    is a Market Watch article about Morgan Stanley being sued over

3    auction-rate securities marketing.  Were you aware of that

4    litigation?

5    A.   I was -- at my deposition it was brought up, and I believe

6    that that's the first time I knew about this.

7    Q.   That's the first time you knew, at your deposition?

8    A.   I believe so, yes.

9    Q.   And would you also look at tab 30, please?  And this is a

10   release by the New York Attorney General's Office.  Were you

11   aware of the State Attorney General investigations of the same

12   matter with respect to --

13   A.   I was not aware of those, no.

14   Q.   Did you ever become aware of them?

15   A.   At my deposition testimony, I believe they -- I was asked

16   this question.

17   Q.   Are you aware, as you sit here today, that these lawsuits

18   and investigations involve the failure to account for the

19   illiquidity of auction-rate securities?

20   A.   I'm sorry?

21   Q.   Are you aware, as you sit here today, that this lawsuit

22   and the Attorney General investigations revolved around the

23   failure by Morgan Stanley and others to account for the

24   illiquidity of auction-rate securities?

25   A.   I'm not aware of that.  I haven't read the re -- I haven't

1    read the -- I have not read the claim or the settlement

2    document.

3    Q.   Okay.  In your valuation of the Giants bonds, you don't

4    make a liquidity adjustment, correct?

5    A.   That's correct, because of the mechanism -- because of the

6    mechanism by which I believe that these securities are traded

7    in the marketplace or change hands in the marketplace, through

8    the auction process.

9    Q.   Okay.  Now, at tab 3, which is your declaration, paragraph

10   20 --

11           MR. THOMAS:  If we could pull up the first part of

12   that, there?

13   Q.   -- you say, "As a" --

14   A.   One second, please.

15   Q.   Sorry.

16   A.   Okay.  Thank you.

17   Q.   You say, "As a former market participant, my conclusion as

18   to the valuation of the Giants Stadium's bonds wasn't as

19   reliable."  But you were not a market participant as of

20   September 2008, correct?

21   A.   No, I was basing it on my experience over twenty years in

22   the markets.

23   Q.   Right.  But with auction-rate securities, it was several

24   months?

25   A.   I think that it's very -- very, very, very important to

Page 88

1    consider that the market changed rather dramatically as far as

2    these securities are concerned.  And when I entered the market

3    and started to become involved in the auction-rate securities,

4    it was in a time period, you know, when -- which is much more

5    relevant to the time period that we're talking about here.  And

6    you're also looking at a client or a holder of these securities

7    in Barclays that had similar incentives to the types of clients

8    that I was trading auction-rate securities with as well.

9    Q.   If we could turn --

10   A.   I don't think it's a question of time, I think it's a

11   question of, you know, related experience.

12   Q.   -- if we could turn to tab 29, please?

13   A.   29?

14   Q.   Yes, please.  Are you familiar with municipal securities

15   rule-making boards?

16   A.   Not re -- generally.  But that's all.

17   Q.   You don't know what it is?

18   A.   I generally know what it is.

19   Q.   Okay.

20   A.   These are -- I'd point out that the Giants Stadium bonds

21   are not municipal bonds, they're corporate auction-rate

22   securities.  They're not municipal auction-rate securities.

23   Q.   Okay.  And do you think that -- well, let me ask you to

24   turn to page 2, please.

25        MR. THOMAS:  And if we could pull up the -- that part

Page 89

1    right there.

2    Q.    Look at the third sentence, where it reads, "Shortly after

3    the broader financial crisis that began in the second half of

4    2007, the ARS market experienced widespread failed auctions and

5    effectively collapsed in early 2008, resulting in no new ARS

6    issuance at December 2007."

7        Do you agree with that assessment?

8    A.    Yes.  That's when I started getting involved in the

9    market.

10   Q.    Um --

11   A.    I mean, just because the market had widespread auction

12   failures, it doesn't mean that new participants would not be

13   willing to take advantage of those changes in the market.

14   Q.    Did you analyze the level of activity in the market as of

15   September of 2008?

16   A.    No, I did not.

17   Q.    Okay.  And the Giants bonds had -- one Giants bond that

18   had been put up for auction in March of 2008 failed at auction,

19   correct?

20   A.    Based on the -- based on the coupon setting of twenty-two

21   percent that I observe in the Bloomberg data, my assumption is

22   that the auction failed, yes.

23   Q.    Okay.  And as of September 22nd, there had been no

24   successful auctions of these bonds -- any of the four bonds,

25   since March 2008, correct?

L Bar, et al; LB1

Page 90

1    A.    That's the testimony of one of the other ex -- I'm

2    sorry -- of Mr. Teague.  I don't have any reason to believe

3    that that was true or untrue.

4    Q.    Did you consider that in your opinion, whether it was

5    true or untrue?

6    A.    Did -- what's the question?

7    Q.    Did you consider whether there had been any successful

8    auctions since March of 2008?

9    A.    Well, all of the -- none of the auctions actually, you

10   know, had twenty-two percent as a fail rate, so there could

11   have been other things going on.  But my analysis was based on

12   the market conditions, you know, overall of an environment of

13   failed auctions.

14   Q.    But had there been any successful auctions of these bonds

15   in 2008 as of September 22, 2008?

16   A.    I'm sorry, what's the question?

17   Q.    Had there been any successful auctions of any of the

18   Giants bonds between March 2008 and September 22, 2008?

19   A.    Based on some of my analysis of the coupon setting rates,

20   I think the answer to that is probably yes.

21   Q.    And did you do any independent analysis of that?

22   A.    No.

23   Q.    Okay.  And when you say your analysis of the coupon-

24   setting rates, are you referring to the fact that rates were

25   changing?

Page 91

```
 1    A.   In -- no, I looked at all the different securities, and

 2    you can see that some of the securities that warrant the Lehman

 3    bonds that were issued by the Giants, those rates were set, you

 4    know, at eight-plus percent or so.

 5    Q.   So --

 6    A.   So that would indicate to me that there were -- those were

 7    auctions, you know, that were set.

 8    Q.   And did you consider whether there was a provision in the

 9    agreement that would allow for different rate setting other

10    than through auctions?

11    A.   Yes.

12    Q.   Okay.  And is there?

13    A.   Yeah, there is what they call an all-hold rate.

14    Q.   Okay.  And --

15    A.   And also the rate, as I mentioned earlier, that if there

16    wasn't an auction taking place, then it would reset at 110

17    percent of LIBOR.

18    Q.   Okay.  And did you do an analysis to see whether the rates

19    you were observing were, in fact, consistent with that

20    alternative rate setting?

21    A.   No, I did not.

22    Q.   And --

23    A.   I looked at -- you know, subsequent to -- subsequent, I

24    looked at what the rates that were set -- that were set between

25    the failure -- the bankruptcy filing until this setting -- I'm
```

Page 92

1   sorry, until the appointment of Goldman Sachs.  And I analyzed

2   the fact that all of those rates were 110 percent of LIBOR for

3   the four securities that I analyzed.

4   Q.   Can you state where there has been any -- was there any

5   successful auction of the Giants bonds between March 2008 and

6   November 2008?

7   A.   I'm sorry, what's the question?

8   Q.   Can you state whether there were any successful auctions

9   of the Giants bonds between March 2008 and November 2008?

10  A.   Not with any degree of certainty, no.

11  Q.   Okay.

12  A.   I had to assume it based on what I saw the coupon rates --

13  Q.   So part of your conclusion is based on the assumption that

14  there were successful auctions during that period of time,

15  correct?

16  A.   No, not at all.  I mean, my valuation is based on there's

17  a new holder of the securities.  The new holder of the

18  securities has the opportunity to either put their securities

19  up for renewal or redemption.  And if they put their securities

20  up for redemption and they don't get redeemed and nobody bids

21  in the auction, then you reset the coupon at the fail rate.  If

22  you are the holder of the security, you can set the rate that

23  you want to set.

24       And my testimony is that the Giants, in my opin -- I'm

25  sorry -- that Barclays, in my opinion, were incentivized to set

Page 93

1   the rate as high as they possibly could.  So whether or not

2   there was a failed auction or not previously, you know, to me,

3   gave indication of what's the potential coupon rate that could

4   be set.

5   Q.   So you said you assumed -- your word -- you assumed that

6   there were successful auctions, but that was irrelevant to your

7   evaluation?

8   A.   Yes.

9   Q.   And you ended up valuing the bonds at par, right?

10  A.   That's correct, a hundred percent of face.

11  Q.   And you're aware of Mr. Schwaba, in his report, stated

12  that failed ARS would trade below par and may be subject to

13  restrictive liquidity?  Are you aware that's what's stated in

14  his report?

15  A.   I'm aware that he stated that in his report.  And I'm also

16  aware that you need to, as I said in my deposition testimony

17  and I believe in my declaration as well, that you have to look

18  at the specifics of each particular security.  And, you know,

19  the particulars of this security had a fixed-rate fail rate.

20  And the generalization of the auction-rate securities market,

21  you know, does not necessarily have those same characteristics.

22      So what I did was a robust analysis of this particular

23  security in order to say whether or not the rate -- you know,

24  what the fail rate would have been.

25  Q.   Did you -- were you aware, before you gave your opinion,

LBar, et al; LBI

Page 94

1    that Mr. Schwaba's opinion included the statement that, "failed

2    ARS would trade below par and may be subject to restricted

3    liquidity"?

4    A.    I didn't read his report prior to doing my report.

5    Q.    You became aware of that later, right?

6    A.    Yes.

7    Q.    And did you raise with movants that that's a problem for

8    your report?

9    A.    Pardon me?

10   Q.    Did you raise with movants that that's inconsistent with

11   your analysis?

12   A.    No, I didn't.

13   Q.    If you would turn to tab 30, please?  And this is back to

14   the Attorney General release.  And if we could look at the

15   third paragraph.  The second sentence in there, starting with

16   "Firms" says, "Firms will also pay damages to investors who

17   sold securities for a loss."  Do you understand selling

18   securities for a loss -- the auction-rate securities for a loss

19   means they're selling below par?

20   A.    I'm sorry?

21   Q.    Do you understand that when someone sells an auction-rate

22   security for a loss they're selling it below par?

23   A.    It could be they bought it above par, they could sell it

24   at a different price, and that would be below -- that would be

25   a loss.

Page 95

1    Q.   Did you do any analysis of the losses incurred by holders

2    of auction-rate securities during 2008?

3    A.   No.

4    Q.   And do you believe that the rating for an investment grade

5    bond, whether it is Aaa or Baaa impacts the value of the bond?

6    A.   Yes, I do.

7    Q.   A higher rated bond results in a higher value of the bond?

8    A.   Not necessarily.  It all depends on the coupon rate, you

9    know, and what the price is -- I mean, what the coupon rate is

10   on the bond and what the characteristics are on the bond -- I

11   mean, what the value would be to that bond.  So it's not

12   necessarily, you know, that just the higher credit rating, you

13   know, means that it's a higher value.

14   Q.   Is it an important consideration what the credit rating

15   is, in your view?

16   A.   In what?

17   Q.   In coming up with a valuation for a bond?

18   A.   Yes, it is.

19   Q.   Okay.  In 2007, Moody's ratings on these bonds was Aaa,

20   right?

21   A.   Yes, that's -- as I mentioned before, that the original

22   ratings on the bonds were based on -- were based on the

23   monoline wrap rating of Aaa.  And, you know, as you can see --

24   as you can see from the Moody's report, which is included in

25   these -- in the documents that you provided to me, you'll see

Page 96

1    they very clearly state -- it's behind tab 10 -- they very

2    clearly state in the second paragraph that Moody's assigned a

3    Aaa rating in August and that Moody's -- and I'll quote here,

4    "Moody's ratings on securities that are guaranteed or 'wrapped'

5    by a financial guarantor are generally maintained at a level

6    equal to the higher of:  a) the rating of the guarantor," which

7    in this case was FGIC, and it was B1; "or b) the published

8    underlying rating.  Accordingly, the Company has requested that

9    Moody's publish an underlying rating of its senior debt

10   securities.  And the investment grade underlying rating

11   reflects the credit considerations, including the following."

12        So that's -- that's why the bonds were rated Baa3 at that

13   point in time, because the wrapper previously was downgraded,

14   and the rating of these particular securities was now rated at

15   the underlying rating of the company.

16   Q.   Well, in fact, the -- well, let's go ahead and turn to tab

17   13.  It might be easier to discuss this with the chart.  In

18   fact, the bonds themselves had been rated Aaa in 2007, correct?

19   A.   Yes.

20   Q.   Okay.  And what you're saying is that Moody's would rate

21   it based upon generally the higher of the bonds or the wrapper

22   or fin -- which is also the financial guarantor or insurer of

23   the bonds, correct?

24   A.   That's correct.

25   Q.   And the reason why the financial guarantor was relevant is

Page 97

1   because if the bonds failed, an investor in the bond would look

2   to the financial guarantor, the insurer, or as you call it, the

3   wrapper, to recover, right?

4   A.   That's my understanding, yes.

5   Q.   Okay.  And at this -- on this chart we're looking at, it

6   shows that the ratings on the bonds themselves were Aaa in

7   2007, but had sunk to Baa3, right?

8   A.   That's correct.

9   Q.   Okay.  And --

10  A.   Because of the downgrade of FGIC -- F-G-I-C.

11  Q.   Okay.  Well, that's -- the downgrading of -- that's not

12  accurate, is it?  Why they pointed that out was because Giants

13  had asked Moody's, in fact, to go ahead and publish the rating

14  based upon the underlying bonds, given the junk status of the

15  financial guarantor, correct?

16  A.   That's what the release says, yes.

17  Q.   Okay.  And if you would turn, please, to tab 25 -- and

18  we'll come back to this chart -- but turning to tab 25 briefly,

19  it's Moody's rating symbols and definitions.  And page 10 --

20       MR. THOMAS:  The bottom of page 10, if we could just

21  pull that chart up?

22  Q.   So the Baa3 rating that was on the bonds as of September

23  2008, was the very lowest investment grade rating there was,

24  correct?

25  A.   That's correct.

Page 98

1    Q.   So they had previously been at Aaa, and by September 2008,

2    they were down to Baa3, correct?

3    A.   That's correct.

4    Q.   Okay.  Now, you mentioned the wrapper -- the insurer.  If

5    we go back to tab 13, the insurer, FGIC, for these four bonds,

6    in fact, was Aa2 rated in 2007, correct?

7    A.   I don't -- I don't know that for a fact, but it's -- yeah,

8    that's probably correct.  I think that might be in the Moody's

9    report.

10   Q.   Okay.

11   A.   I'm not sure exactly what the monoline rating was at that

12   time.

13   Q.   And did you consider what the credit rating was of the

14   insurer or the financial guarantor?

15   A.   No.

16   Q.   Okay.  The --

17   A.   Because it was irrelevant.  I mean, we're not -- the date

18   that I was looking at these -- valuing these securities was as

19   of the close of business on the 19th.  And at that point in

20   time, the rating of the securities was Baa3.  And so my

21   assessment of the credit rating of the Giants, which is

22   basically the ability for the Giants to pay a high coupon or

23   potentially redeem the bonds, was based on the investment grade

24   status of this company, the Giants Stadium LLC.  It did not

25   have anything to do with the monoline wrapper rating.

Page 99

1    Q.   And you didn't consider the monoline wrapper rating?

2    A.   No, I did not.

3    Q.   But the monoline wrapper rating, the financial guarantor

4    of the bonds, by September of 2008, had fallen all the way from

5    Aa2 down into junk status, correct?

6    A.   Yes.

7    Q.   Okay.  And if after the sale to Barclays, a different

8    company with a higher credit rating became the wrapper of the

9    bonds, that would impact your analysis, right?

10   A.   It potentially could.

11   Q.   Okay.  And that's, in fact, exactly what happened, right?

12   In November of 2008, Goldman Sachs stepped in and became the

13   marketing agent, and FCA was appointed the financial guarantor,

14   and FCA had A rated creditworthiness?

15   A.   I'm sorry, what's the question?

16   Q.   Isn't that what happened?

17   A.   The underlying rating of the Giants bonds was Baa3 all the

18   way, you know, until now.

19   Q.   You understand, I'm asking about the financial guarantor.

20   At September 2008, the financial guarantor of this bonds was

21   junk status, and then in November the financial guarantor

22   changed to an Aa-rated company in connection with Goldman Sachs

23   becoming the marketing agent?  Is that right?

24   A.   I was not aware of that.

25   Q.   So you didn't take that into consideration?

Page 100

```
 1    A.    No.  I took into consideration the underlying rating of

 2    the bonds itself.

 3    Q.    Okay.  Do you understand that Barclays heavily considered

 4    the upgrade of the financial guarantor in its decision to write

 5    up, as you say, the value of these bonds at later points in

 6    time?

 7    A.    I'm sorry, what's the question?

 8    Q.    Do you understand that Barclays considered heavily the

 9    fact that a new financial guarantor with a Aaa rating had taken

10    over these bonds in deciding to later write up the value of

11    these bonds?

12    A.    I'm not aware that that's the case, because the bonds were

13    actually ra -- the bonds themselves were rated Baa3, which is

14    exactly what, you know, what they were rated on the date that I

15    valued them.  And that's the value -- based on what I -- the

16    publicly available information on these bonds.  Right?  These

17    bonds still had a rating of Baa3 and it never changed.

18    Q.    So you think going from a financial guarantor with junk

19    bond status to a financial guarantor of Aaa credit rating,

20    doesn't affect the valuation of the bonds?

21    A.    Yes, because the valuation of the bonds is based on the

22    coupon as well as the creditworthiness of the bonds.  And you

23    have to take that into consideration, which I did take into

24    consideration, the coupon-setting mechanism, the underlying

25    credit characteristics of a Baa3 assurer.  Right.  And that was
```

Page 101

1    all taken into consideration, you know, by me.

2    Q.   If you would turn to tab --

3    A.   I didn't see any documentation of the change of a -- you

4    know, change of the monoline wrapper.

5    Q.   -- if you would turn to tab 9, please?

6    A.   This is an e-mail discussion of the Giants bond and how

7    and why Barclays valued it the way it did at later points in

8    time.  Did you review this document?

9    A.   Yes, I did.

10   Q.   Does it mention the issue of how the bonds were wrapped?

11   A.   Yes, it does.

12   Q.   Okay.  And if these developments occurred in November of

13   2008, would it be -- you're not saying that Barclays should

14   have factors these developments into its September 22nd

15   valuation, are you?

16   A.   I'm sorry, I don't understand the question.

17   Q.   If these developments --

18   A.   What developments are we referring to?

19   Q.   -- the replacement of a junk financial guarantor with a

20   Aaa financial guarantor and the joining of Goldman Sachs as the

21   marketing agent.  You're not suggesting that Barclays should

22   have taken those things into consideration in a September 22nd

23   valuation of these bonds, are you?

24   A.   No.  I mean, if -- I haven't seen any public information

25   that says that the financial guarantor was changed.  All I saw

Page 102

1    was the rating of the securities was the same throughout.

2    Q.   So you haven't analyzed whether the financial guarantor's

3    ratings were changed?

4    A.   No.  I analyzed the bonds themselves.  And the bonds

5    themselves had that same rating.

6    Q.   Okay.  I mean, it's an easy thing to do to see the rating

7    of the financial guarantor, FCA, correct?

8    A.   But it's also an easy thing to do looking at the bonds

9    themselves.  And that's what I was valuing.

10   Q.   My questioning was just regarding the financial guarantor.

11   Did you -- it's easy to look up on Moody's as to what the

12   financial rating is for FCA --

13   A.   Right.

14   Q.   -- when they became financial guarantor, right?

15   A.   It wasn't -- as I said, I'm not aware that they became the

16   financial guarantor.

17   Q.   Okay.  You did not investigate or consider whether or not

18   Lehman had difficulty selling its positions in the Giants

19   Stadium's bonds, leading up to the Barclays transaction,

20   correct?

21   A.   No, I did not.

22   Q.   Okay.  You did not investigate or consider whether or not

23   there was an auction agent in place as of September 22nd,

24   correct?

25   A.   No, I did not.  But subsequent to my deposition I, you

Page 103

1   know, reviewed the documentation -- reviewed the documentation

2   to understand exactly what would happen in the event of no

3   auction -- what the coupon-setting mechanism would be.

4   Q.   You didn't consider the auction-rate history prior to

5   February 2008, did you?

6   A.   Yes, I did.  I considered it from the perspective of

7   looking at the failed auction, you know, on some of the other

8   securities.  But yes, I looked at that.

9   Q.   Is that subsequent to your deposition?

10  A.   I believe I -- you know, I looked at it beforehand --

11  before the deposition.

12  Q.   Well, do you recall -- okay, could you please turn to page

13  117 of your deposition?  And at lines 6 to 14 you were asked:

14  "Q.  Did you consider the auction-rate history prior to

15  February of 2008 to be irrelevant for your conduction?

16  "A.  No, I didn't consider it to be irrelevant, I just didn't

17  consider it.  I didn't consider it in this paragraph."

18  Q.   Are you saying you considered it somewhere else or --

19  A.   No, I -- what you're -- maybe I didn't understand your

20  full question before.  But this says "before February 2008".

21  Q.   Right.

22  A.   I'm not sure whether or not you said that before or not.

23  Q.   That was the question.  Did you consider the auction-rate

24  history prior to February 2008?

25  A.   No, I didn't.  Sorry.

Page 104

1    Q.   Do you know whether there were any actual sales conducted

2    at any of the rates you listed in your report?

3    A.   Excuse me?

4    Q.   You list a number of rates in your report, correct?   Do

5    you know if there were any sales actually conducted at those

6    rates?

7    A.   You -- because these -- you don't know whether or not the

8    bonds actually changed hands, right, at those particular rates,

9    because as we talked about before, if a holder of the

10   securities wants to hold a security from one auction to the

11   next, then there's no changing hands.   So you only know what

12   the rate is of those securities.

13   Q.   Were you aware that the Giants themselves attempted to get

14   the -- get major market players to provide a value on their

15   swap agreement with Lehman relating to the Giants bonds, and

16   that B of A, JPMorgan and Goldman Sachs all declined, in part,

17   because of conditions in the ARS market?

18   A.   No, I didn't consider that.

19   Q.   Would you take a brief look at tab 8, please?   And it's

20   going to be page -- this is a filing with the bankruptcy court.

21   And it's excerpts of a filing, because it's couple hundred

22   pages, I believe.   But I wanted to ask you to briefly look at

23   what I have as page 88 of the PDF.   And it's --

24   A.   Page 88.

25   Q.   -- and it's under a section entitled "Inability to use

Page 105

1    market quotations to determine settlement amount."  And it's

2    relating, I believe, to the valuation of the swap transaction,

3    not the bonds per se.  But there's comments in the third

4    paragraph that I want to look at.

5        It says, "The defaulting party has contracted three

6    leading dealers in New York:  Bank of America, JPMorgan and

7    Goldman Sachs, that meeting the ratings requirements providing

8    market quotations in Section 6 of the confirmation issued under

9    the agreement.  All three dealers have informed us that they

10   are unwilling to provide a quotation pursuant to Section 6 and

11   do not believe that it would be practicable to do so.  The

12   primary reasons that were cited by the dealers were", and

13   there's a list of five.

14       The second one is "the absence of liquidity and

15   unpredictability of pricing in the market for auction rate

16   securities".

17       The first question is just, do you agree with that

18   assessment of the marketplace as of this time?

19   A.   The absence of liquidity and unpredictability of pricing

20   of auction-rate securities market.  Of the overall auction-rate

21   securities market, yes.  I do agree with that statement.

22   Q.   Okay.  And the next reason they cite is the downgrade of

23   and other developments at FGIC.  FGIC was the wrapper of the

24   Giants bonds as of September 2008 until they were replaced in

25   November 2008, correct?

Page 106

```
 1    A.    Yes.

 2    Q.    Okay.  And it goes on to say "The uncertainty about the

 3    creditworthiness of any traditional bond issuer in the long

 4    term."  Do you agree that the creditworthiness of a traditional

 5    bond issuer is an important factor in valuing these bonds?

 6    A.    No.  As I said, I didn't consider that.  I only looked at

 7    the creditworthiness of the Giants, because that's the only

 8    thing that was known and knowable on September 19th.

 9    Q.    Now, do you know if the corporate bonds that you value --

10          MR. THOMAS:  Strike that.

11    Q.    Do you know generally, if corporate bonds were being less

12    frequently traded on September 19th than on other dates in

13    2008?

14    A.    I don't know that.

15    Q.    You didn't look at that?

16    A.    No, I didn't.

17    Q.    Do you know if bid-offer spreads on corporate bonds were

18    becoming narrower or broader in September 2008?

19    A.    I don't know.

20    Q.    Now, you don't have an opinion on what a willing buyer

21    would have paid for these four Giants Stadium bonds as of 12:01

22    a.m. on September 22, 2008, do you?

23    A.    No, I don't have an opinion on what, you know, a willing

24    buyer would pay on that date.  I have an opinion on what the

25    value is of these securities as of that time period, but not
```

LBH, et al; LBI

Page 107

1  what a willing buyer, you know, and frankly willing seller, you

2  know, would pay on that particular date.

3  Q.   Okay.  So --

4  A.   And time.

5  Q.   -- when you say -- you're not trying to calculate fair-

6  market value of these securities, you're rather calculating

7  what you think is the intrinsic value of the security?

8  A.   Yeah, I'm basing it on the -- I'm basing my value on a

9  not -- on an orderly liquidation of the securities, you know,

10 over a period of time, not I'm basing my valuation on, you

11 know, what a single market participant would pay on the last --

12 you know, at that time.

13 Q.   You're not basing your valuation on what any market

14 participant would pay for these bonds, right?

15 A.   I'm sorry?

16 Q.   You're not valuating these bonds based upon what any

17 market participant would pay, right?

18 A.   Yes, I am.  I'm basing it -- I think a market participant

19 would be willing to pay, you know, what these bonds are worth,

20 which, in my opinion, for the holder of these securities, for a

21 creditworthiness of Baa3 and the ability to set a coupon as

22 high as twenty-two percent, you know, for a security that you

23 can own, that's investment grade, that's what I based my

24 opinion on.

25 Q.   Well, I thought we had established, and maybe you're

Page 108

1    changing this -- I thought we had established that you did not

2    have an opinion on what a willing buyer would have paid for

3    these four Giants Stadiums bonds as of 12:01 a.m. on September

4    22nd.  Is that right?

5    A.    Yes, that's what I said in my deposition, yeah.  I don't

6    know what a willing buyer would have paid on that -- I don't

7    know who the -- you know, I don't know what a willing buyer

8    would have paid on that date.  I was analyzing the overall

9    value of the securities.

10   Q.    And if you were asked to make that valuation, what a

11   willing buyer would pay for these securities as of 12:01 a.m.

12   on September 22nd, you might change your methodology, right?

13   A.    Yes.

14   Q.    And if you were asked to do that, you would have to apply

15   a liquidity discount, correct?

16   A.    I think you'd have to look at the liquidity conditions in

17   the marketplace and make a determination of liquidity

18   characteristics of the security at that point in time, yes.

19   Q.    And then apply a liquidity discount, correct?

20   A.    Well, I think that's what I said.  In the context of that.

21   Q.    Okay.  But you didn't do any of that?

22   A.    No.  Because I wasn't looking at a liquidation valuation;

23   I was looking at the value of the securities in an orderly

24   liquidation, which is what Professor Pfleiderer talked about.

25   Q.    And when you say a liquidation valuation, you mean what a

Page 109

1   willing buyer would pay for the securities if they were sold?

2   A.   Yes.

3   Q.   In your evaluation, you did not attempt to take into

4   consideration the size of Barclays' position and what effect

5   that would have on how much Barclays could actually sell the

6   positions for.  Is that right?

7   A.   That's correct.  Because I was -- you know, my

8   understanding -- the way that I, over the course of my career,

9   valued securities, was not based on the entire position, it was

10  based on what a transaction would take place at, you know,

11  whether it would be for five million or fifty million of that

12  particular bond, which is consistent with what most market

13  participants would consider.

14  Q.   Now, you say in your report that Barclays should have been

15  aware of Giants' willingness to redeem the bonds.  And as

16  support for that, you cite some other redemptions that were

17  done by Giants.  Is that right?

18  A.   That's correct.  In April -- in April of 2008.  And then I

19  also indicate that they did redeem the securities, you know,

20  after the valuation date.

21  Q.   Okay.  So --

22  A.   But they did redeem the securities in April -- I believe

23  it was April 15, 2008, which is significantly before.  So I did

24  take that into consideration, yes.

25  Q.   Okay.  So there's three redemptions you're talking about.

1   You're talking about April 15, 2008 and you're talking about

2   April and May of 2009 redemptions, correct?

3   A.    That's right.

4   Q.    Okay.  And of the April 15th redemption, did you consider

5   whether market condition affecting those bonds were different

6   in April of 2008 than they were in September 2008?

7   A.    No.  I considered the willingness and ability of the

8   Giants to redeem the bonds on that particular date, not the

9   market conditions.  It's a --

10  Q.    Okay.  And the bond that was redeemed, do you know which

11  one that was?

12  A.    I do not.

13  Q.    You're not aware of the fact that the one that was

14  redeemed was the one that retained a higher credit risk and was

15  valued higher by BoNY?

16  A.    No, I did -- I would -- I did not.  And, you know, because

17  basically you're talking about the financial wherewithal of the

18  Giants, you know.  And it's not one particular -- it was a bond

19  within the 650 million dollar financing.  Or I don't know if

20  it's one particular security, but it's 100 million or so of

21  that financing.  And what the -- you know, what the Giants are

22  going to do -- what the rating is of that particular bond is

23  not relevant to the fact that the Giants actually redeemed the

24  securities.  It's what you're -- what you're looking at there

25  is their financial ability and willingness to redeem the

Page 111

1   securities.

2   Q.   Now, you recall BoNY had -- BoNY and Barclays valued three

3   of the bonds at ten and the other one at forty-three.  Did you

4   assess whether the bond that was valued higher had a different

5   credit rating than the other three bonds?

6   A.   No.

7   Q.   So it would be a surprise to you if that bond that was

8   valued higher actually had a higher rating than the Baa3?

9   A.   It would -- I mean, yeah, it would be a surprise to me.

10  But I also think that, you know my valuation was based on a

11  Baa3 rating.

12         MR. THOMAS:  Your Honor, I probably have about fifteen

13  minutes, but this would be an appropriate time for a lunch

14  break, if Your Honor would like.

15         THE COURT:  Let me inquire as to the extent of the

16  redirect, if any?

17         MR. TAMBE:  I think it will be very short; five

18  minutes at most.

19         THE COURT:  Is there a witness for this afternoon?

20         MR. SCHILLER:  No, Your Honor.

21         THE COURT:  What I'd be inclined to do is to just

22  complete the witness, if we can complete the witness in the

23  next twenty minutes.  If you think it's going to be longer than

24  that or if your estimate is off, we can take a break.

25         It's just that we end up extending an hour and a half

Page 112

1   of the trial day for the sake of lunch.  My inclination is to

2   go ahead.

3           MR. SCHILLER:  Your Honor, we had an argument planned

4   for later this afternoon, but not a witness.

5           THE COURT:  What do you have this afternoon?

6           MR. SCHILLER:  An argument with Your Honor concerning

7   document admissions, which we discussed briefly last week

8   during a break.

9           THE COURT:  I'm wondering whether or not that makes me

10  want to take lunch break now.  I think it does.  Let's take a

11  lunch break.

12          MR. SCHILLER:  Thank you.

13      (Recess from 12:30 p.m. until 2:02 p.m.)

14          THE CLERK:  All rise.

15          THE COURT:  Be seated, please.

16          And please proceed with your examination.

17  RESUMED CROSS-EXAMINATION

18  BY MR. THOMAS:

19  Q.   Mr. Olvany, in your report you also cite two redemptions

20  by Giants in April and May of 2009.  Do you recall that?

21  A.   Yes.

22  Q.   And did you rely on those developments when reaching your

23  valuation opinions?

24  A.   Not as of the date that I value the securities, but I rely

25  on that as an indication of the fact that they had previously

Page 113

1   redeemed securities and that there is a likelihood that they

2   would in the future.

3   Q.   Well, you did rely, in reaching your conclusions in your

4   report you did rely on the fact that those redemptions had

5   occurred in April and May of 2009, correct?

6   A.   No.  I relied solely on the fact that they were redeemed

7   prior to that point in time.  That's just an indication that it

8   did and -- did and could happen again.

9   Q.   Would you please turn to tab 1, page 151 of your

10  deposition, please?  And line 24, continuing to page 152, line

11  7.  Okay?  And the question is:

12  "Q.  Did you rely in any way in creating your valuation on the

13  fact that the Giants redeemed securities in April and May of

14  2009?

15  "A.  I relied on the fact that they redeemed securities at that

16  time as a further indication that their previous bad 2:08

17  behavior could be expected to take place in the future, and

18  that's impacted in the valuation."

19  Q.   Was that testimony truthful and accurate at the time?

20  A.   Yes.

21  Q.   Is it still truthful and accurate that you relied on those

22  redemptions in this way?

23  A.   Yes.

24  Q.   Now, did you consider whether market conditions had

25  improved between September, 2008 and April and May, 2009 for

Page 114

1    the auction-rate securities market?

2    A.   No.

3    Q.   You're not suggesting that Barclays, in valuing the bonds

4    as of September 22nd, should have considered those later

5    redemptions in 2009, right?

6    A.   No.

7    Q.   If we could turn to tab 12, please?  And this is BCI

8    Exhibit Demonstrative 1059, and we've set out here

9    circumstances as of September 22, 2008, and I just want to see

10   if you agree that these are the circumstances Barclays was

11   facing as of September 22, 2008?  First, three of the four

12   Giants Stadium's bonds were downgraded to the lowest investment

13   grade rating.  Do you agree with that?

14   A.   Yes, I do.  That's what we discussed earlier --

15   Q.   And --

16   A.   -- the underlying rating.

17   Q.   And the insurer or financial guarantor had been downgraded

18   to junk status?

19   A.   Correct.

20   Q.   And the ARS markets were frozen?

21   A.   That's a fair characterization of the ARS markets.

22   Q.   And after the Giants bond failed at auction in 2008 there

23   were no further auctions of these bonds as of September 22,

24   2008?

25   A.   I'll take Mr. Teague's testimony to that regard.  I don't

Page 115

1    know that to be a fact.  I didn't research that on my own, as

2    we talked about earlier.

3    Q.    You also agree that Barclays had no presence in the ARS

4    markets as of September 22nd.

5    A.    Yes.

6    Q.    And do you agree that BoNY, the trustee in the bonds and

7    the custodian, had deeply discounted their value?

8    A.    Yes.

9    Q.    And you agree that there are no vendor prices available to

10   Barclays for these bonds?

11   A.    Yes.

12   Q.    So those are the circumstances that Barclays was looking

13   at as of September 22nd, correct?

14   A.    Those are the circumstances I -- while I can't speak on

15   what Barclays was thinking about completely, you know, in

16   coming to that evaluation, but those are the circumstances, you

17   know, at least these bullet points are accurate.

18   Q.    If you would please turn to tab 28.  Tab 28, a Wall Street

19   Journal article listing -- it's referring to companies that

20   have taken large impairment charges on their auction-rate

21   securities.  And I just wanted to ask.  Are you aware whether

22   companies in this time frame of 2008 were, in fact, taking

23   large impairment charges on their holding of auction-rate

24   securities?

25   A.    No.

Page 116

1    Q.   Is that something you analyzed?

2    A.   No.

3    Q.   You didn't consider it one way or the other?

4    A.   No.

5    Q.   And if we could turn to tab 22 of your report, and

6    paragraph 26, please.

7    A.   Where are we going?

8    Q.   Paragraph 26 of your expert report, which should be tab 2

9    of your binder.  And the first sentence says "It is plausible

10   that market conditions" --

11   A.   Hold on one second.  Where -- okay.

12   Q.   "It is plausible that market conditions for ARS could be

13   expected to change and that other potential buyers would be

14   willing to bid for the Giants Stadium bonds."

15       Is it your opinion that Barclays, as of September 22nd,

16   should have valued these assets based on the possibility of

17   market conditions for ARS changing at some point in the future?

18   A.   No.

19   Q.   And we may have touched on this earlier, but do you agree

20   that reasonable market participants can come up with different

21   valuations for the same security as of the same point in time?

22   A.   Yes.

23   Q.   And both valuations could be reasonable?

24   A.   It's plausible that both can be reasonable, yes.

25   Q.   When you have valued securities in the past in your

Page 117

1   profession have you provided ranges of values?

2   A.   No.   It's always been -- I've always provided a price.

3   Q.   Do you recall at your deposition testimony testifying that

4   you didn't know if you had provided ranges in the past?

5   A.   I don't know if that's exactly the way I said it, but when

6   we, you know, when -- when you provide a price to clients then

7   you, you know, you usually provide them a price, you know, in

8   the context of -- in the context of trading securities, in

9   which I also include valuing those securities, you know,

10  they're -- at that point in time you could discuss ranges of

11  potential prices.  So I don't know the specific, you know,

12  quote, you know, in the deposition.

13  Q.   Okay.  So you're not sure in the past whether providing

14  prices, discussing prices, you discussed them in terms of

15  ranges?

16  A.   As I said, when you're in the process of buying and

17  selling securities you could talk about, you know, the bonds

18  could trade here or they could trade there.

19  Q.   Can more than one valuation methodology be used to lead to

20  reasonable valuations for corporate bonds?

21  A.   Yeah, there are multiple valuation methodologies available

22  to people, yes.

23            MR. THOMAS:  Thank you.  I have nothing further.

24            THE COURT:  Redirect?

25  REDIRECT EXAMINATION

Page 118

```
 1    BY MR. TAMBE:

 2    Q.   Just a few questions, Mr. Olvany.  If we could put up, if

 3    you don't mind, Exhibit 1059, which is tab 12 in the Barclays

 4    binder.  I'm not sure we have that on our system yet.  You were

 5    asked questions about circumstances as of September 22, 2008.

 6    Do you recall that?

 7    Q.   Yes.

 8    A.   There was a lot of other information available about these

 9    Giant Stadium bonds on September 22, 2008, correct.

10    Q.   Yes, and all that information I took into consideration,

11    yes.

12         MR. TAMBE:  You can take that down.  Thank you.

13    Q.   You were asked some questions about whether following

14    September, 2008, whether there had been a change in the

15    monoline insurer for some of these bonds, some of these four

16    bonds.  Do you recall those questions?

17    A.   Yes.

18    Q.   And I believe you were asked to take a look at the

19    document that's behind tab 9 of the Barclays binder.  If you

20    could just turn to that, please?  I believe that's Movants'

21    Trial Exhibit 339.  In that document, sir, do you see anywhere

22    any statement that says that the monoline insurer for the bonds

23    has, in fact, been changed from FGIC to some other monoline

24    insurer?

25    A.   No, I didn't, and I believe I said that in my testimony
```

Page 119

1    earlier that I did not see any documentation anywhere about a

2    change in the monoline.

3    Q.   Is it your understanding that with respect to certain

4    other of the Giants Stadium bonds there was another monoline

5    that are always been the monoline wrapper for those bonds?

6    A.   Yes.

7    Q.   And that's FSA?

8    A.   That's correct.  It's FSA.

9    Q.   If you can turn the Barclays binder again to tab 16, which

10   is BCI Exhibit 1063, and if I could just call in the Barclays

11   folks to pull that up, because I don't think we have that in

12   our system.  Do you recognize what this document is, sir?

13   A.   Yes, I do.

14   Q.   What is it?

15   A.   This is what we refer to as the description page of a bond

16   on Bloomberg.

17   Q.   I want to draw your attention to the bottom right-hand

18   corner.  There's a date that appears there, 20 March, 2010.  Do

19   you see that?

20   A.   Yes, I see that.

21   Q.   What does that date signify?

22   A.   I believe that the way it works when you do a screenshot

23   on Bloomberg is that's the date that you -- that's the date

24   that you took the picture of that screen.

25   Q.   And what's the rating shown for the Giants Stadium bond as

Page 120

1    of that date?

2    A.    Baa3.

3    Q.    Okay.  So unchanged from the Baa3 as of September, 2008?

4    A.    That's correct.

5    Q.    Okay.

6    A.    And, then, just for a point of clarify, on the bottom

7    you'll also notice that it says that this bond is insured by

8    FGIC, so there's -- so that is one of the bonds that you're

9    referring to.

10   Q.    Changing topics, you were asked some questions about your

11   involvement while at Morgan Stanley in the auction-rate

12   securities markets.  Do you recall that?

13   A.    Yes, I do.

14   Q.    But the clients on behalf of who you were reviewing trades

15   and recommending trades, these were people who were seeking to

16   invest in the auction-rate securities market because of the

17   turmoil in that market, correct?

18   A.    Absolutely.

19   Q.    They were seeing opportunities in the high max rates and

20   the fail rates in the auction-rate securities markets.

21   A.    My clients took the opinion that they could participate in

22   the auction, set the rates that they would get for the auction,

23   and that if they weren't able to redeem their securities in the

24   next auction and no other market participant took place in the

25   auction, then they would receive that maximum or failed coupon

Page 121

1    rate, which they thought was also an attractive investment.

2    Q.   You were asked some questions about --

3    A.   Could I just add to that one?

4    Q.   Sure.

5    A.   A quick second.  And, then, if that didn't take place, and

6    they presented their securities, once again, at the auction,

7    and another market participant did bid lower than their bid,

8    then, or lower in yield or higher in price, then they would

9    redeem their securities.  So they thought that that was a good

10   opportunity.

11   Q.   And when securities, auction-rate securities are redeemed

12   in that fashion in an auction, did the holder get back par?

13   A.   The holder does get back par, yes.

14   Q.   You were shown a couple of diagrams.  One was tab 27 from

15   the Barclays binder, which is BCI Exhibit 1089.  And I'm sure

16   counsel was trying to be as helpful up there as possible, but

17   does that diagram, as helpful as it is, show all of the market

18   data that you inputted into your models to arrive at prices?

19   A.   No, it doesn't.

20   Q.   Okay.  What else did you include in your price valuations?

21   A.   It doesn't -- I haven't looked at every box here, but I

22   don't believe it demonstrates the exact characteristics of the

23   bonds that you have to put into the model, whether it's a fixed

24   rate bond or floating rate bond and what the maturity is of the

25   bond, what the call provisions are of the bond.  These

Page 122

1   individual characteristics of the bond, I think, are not on

2   this page anywhere.

3   Q.   Yes.  So in addition to all the work that's reflected

4   there you did even more work?

5   A.   Absolutely.

6          MR. TAMBE:  That's all the questions I have.  Thank

7   you.

8          THE COURT:  Is there any more?

9          MR. THOMAS:  Nothing, Your Honor.

10          THE COURT:  You're excused.

11          THE WITNESS:  Yes.

12          MR. TAMBE:  Your Honor, just one second.

13          THE COURT:  But you're not excused.

14          MR. TAMBE:  I don't think -- I don't believe I have

15   moved into evidence the demonstrative deck that Mr. Olvany

16   relied on when he was testifying.  And I'd offer that into

17   evidence as a demonstrative and as Movants' Trial Exhibit

18   number 958.

19          THE COURT:  Are we talking about this booklet?

20          MR. TAMBE:  That booklet.  Yes, Your Honor.

21          MR. THOMAS:  Your Honor, we do have an objection.  I

22   don't think all of these boards, the pages on here were

23   addressed by the witness, and there's some assertions in there

24   that we may object to, whether it be accepted as a

25   demonstrative, I guess we --

Page 123

1          THE COURT:  I'm not going to accept it as evidence,

2     but I will accept it as a demonstrative which illustrates

3     aspects of his testimony and which will make it easier in

4     reviewing the record of today's testimony to understand the

5     testimony.

6          MR. TAMBE:  May we offer it as a demonstrative?

7          THE COURT:  It's accepted for that purpose.

8     (Deck prepared by Mr. Olvany was hereby received for

9     demonstrative purposes as Movants' Exhibit 958, as of this

10    date.)

11         MR. TAMBE:  Thank you.

12         THE COURT:  And you are excused now.

13        (Witness excused)

14         THE WITNESS:  Thank you, sir.

15         MR. TAMBE:  And, along the same lines, if I haven't

16    already done so, for the other demonstratives I used with the

17    other experts, again, we offer them as demonstratives to aid

18    the Court as it's reading the record.

19         THE COURT:  They're all in on the same basis.

20         MR. TAMBE:  Thank you, Your Honor.  If I could just

21    read in the exhibit numbers.  For Professor Zmijewski it's

22    exhibit --

23         THE COURT:  It looks as if there's an objection, or at

24    least a comment about to be made from Barclays' counsel.

25         MR. THOMAS:  Your Honor, I think we're in the same

Page 124

1    boat with some demonstratives, and we were going to just meet

2    and confer on whether there was any objection to ours, but I

3    just wanted to note that we would be moving some in also.

4            THE COURT:  You'll be treated equally.

5            MR. THOMAS:  Okay.  Thanks.

6            MR. TAMBE:  And if I could just state for the reason,

7    then, the demonstratives I'm referring to.

8            THE COURT:  Fine.

9            MR. TAMBE:  For Professor Zmijewski it's Movants'

10   Exhibit 910.  For Mr. Garvey it's Movants' Exhibit 913.  For

11   Mr. Schwaba, Movants' Exhibit 917, and for Mr. Slattery,

12   Movants' Exhibit 920, and we'd offer all of these as

13   demonstrative exhibits.

14           THE COURT:  Fine.  They're accepted as demonstratives

15   only.

16   (Demonstrative prepared by Professor Zmijewski was hereby

17   received for demonstrative purposes as Movants' Exhibit 910, as

18   of this date.)

19   (Demonstrative prepared by Mr. Garvey was hereby received for

20   demonstrative purposes as Movants' Exhibit 913, as of this

21   date.)

22   (Demonstrative prepared by Mr. Schwaba was hereby received for

23   demonstrative purposes as Movants' Exhibit 917, as of this

24   date.)

25   (Demonstrative prepared by Mr. Slattery was hereby received for

Page 125

1    demonstrative purposes as Movants' Exhibit 920, as of this

2    date.)

3              MR. TAMBE:  Thank you, Your Honor.

4              THE COURT:  Now we have some evidentiary issues to

5    address.

6              MR. SCHILLER:  Jonathan Schiller for Barclays.

7              First, I wanted to hand up to the Court a stipulation,

8    an order between the trustee and Barclays concerning the 15c3

9    issues that Mr. Maguire raised with you the other day.

10             THE COURT:  Does this relate to Mr. McIsaac?

11             MR. SCHILLER:  No.  That has to do with the exchange-

12    traded derivatives.  That remains.  This only has to do with

13    15c3, and it does eliminate Mr. McIsaac in that regard.

14             THE COURT:  Okay.

15             MR. SCHILLER:  Your Honor, I'm also going to provide

16    the Court with a stipulation to the admission of certain

17    Barclays' documents that have been agreed to between movants

18    and Barclays.

19             THE COURT:  Okay.  Thank you.

20             MR. SCHILLER:  What remains for us today is to move

21    the admission of certain PwC exhibits, which we raised with

22    Your Honor eight or nine days ago and to which certain

23    objections have been made.  But Mr. Hume will move their

24    admission and explain our position here.

25             MR. HUME:  Good afternoon, Your Honor.

Page 126

1            THE COURT:  Good afternoon.

2            MR. HUME:  For the record, Hamish Hume for Barclays.

3            Your Honor, we move the admission of, I believe it's

4    twenty-five PwC work papers, and we do have a binder containing

5    those.  We're happy to go through each one or simply to explain

6    generally.  We believe they are all --

7            THE COURT:  Am I going to take the binder now?

8            MR. HUME:  Well, why don't we hand it out.  I think we

9    may only have a couple of copies, but one for the Court and one

10   for movants' counsel.  We've obviously identified these in

11   advance for movants' counsel, and, Your Honor, these are work

12   papers that with one or two -- there may be one exception in

13   this binder that is a Barclays's document.  I'll ask my

14   colleague to identify that if that's true.  But otherwise these

15   are PwC work papers prepared in the course of PwC's regular

16   business activity, and it was the regular practice of them to

17   make such work papers.

18           We would be prepared to have PwC custodian state that

19   if that's the issue.  It's not clear that that is the main

20   issue.  We've asked movants to state what their objections are

21   with as much specificity as possible to make this as efficient

22   as possible.  We have heard back, generally, that they have an

23   objection that under Rule 701 and 702 that this is either

24   improper lay opinion or opinion of experts who have not been

25   qualified.  We don't offer them as expert opinion, and there

Page 127

1    are many cases we have saying that work papers of auditors are

2    not inadmissible under 702 or 701 just because they're offered

3    to show the work of the auditors.

4         We have prepared a short letter brief.  Three pages.

5    It may just spill over to the fourth page, which we'd like to

6    submit to the Court.  Obviously give the estate an opportunity

7    to respond, but the case law we've seen all supports the

8    admission of these documents.  We think that it would easily

9    satisfy the hearsay exception under the business records rule.

10        There has been a suggestion that there's hearsay

11   within hearsay in the documents.  We would want to know exactly

12   what hearsay within hearsay movants are objecting to, and we've

13   asked and haven't yet heard specifically what it is, but much

14   of the hearsay within hearsay that we've tried to identify

15   would also satisfy the hearsay exception.  For example, there

16   are references to PwC gathering pricing information from third-

17   party vendors, which would be attached to a document.  That

18   comes in under, I think it's 803(17) or (16) for compilations

19   of publicly available pricing sources.  Or, maybe, a reference

20   to a memo done by Barclays for how it valued a particular

21   asset, which, we would submit, would also satisfy the business

22   record exception as a record that was clearly done in the

23   regular course of business in which it was the regular practice

24   to create such a memo for the auditors.

25        So, Your Honor, I would also just point out that

Page 128

1   movants have, themselves, identified, I believe it's twenty-

2   seven PwC documents to be admitted into evidence, and twenty-

3   four of them have already been admitted, and we would stipulate

4   to the admission of the other three.  They are of the same

5   kind.  Some of them are e-mails.  That's formal, so, perhaps,

6   slightly more debatable, but we had agreed that they were

7   admissible as business records.

8           And, if I could, I might just briefly like to show an

9   example.  Let's pull up Movants' Trials Exhibit 255, which is

10  exactly the same kind of document of the kind we have in our

11  binder, a PwC memo prepared in the course of the audit, to the

12  Barclays Capital PwC Audit Team from members of that PwC

13  Structured Finance Group, one of the specialist groups that was

14  brought in to review some of the particular kinds of assets

15  acquired by Barclays in the sale and setting forth their

16  analysis in this case of price testing methodology with respect

17  to particular kinds of assets.  This is exactly the kind of

18  document that we're trying to get into evidence.  When they

19  identified it we agreed it's a business record.  Since they

20  identified it as evidence they must believe it was admissible

21  as a business record.  So there's no hearsay objection.  We

22  think it would be unprincipled for them to say it's only

23  admissible when they identify it.

24          In terms of hearsay within hearsay, I would just go

25  down to the last paragraph of this letter, and it says to

1    benchmark market prices obtained by PCG, that's the Barclays

2    group, SFG, that's a PwC group, the specialist group, obtained

3    observable trades for the municipal bonds from

4    investinginbonds.com, an online source of bond price and market

5    information.  So that information, which, I believe, may be

6    attached to this memo, could be objected to as hearsay within

7    hearsay, but would fall within an independent hearsay

8    exception.

9         So, again, we didn't take objection to that, but we do

10   take objection to only having selected PwC documents admitted

11   into evidence.  We believe the documents should come in, both

12   the ones they want and the ones we want.  They will assist the

13   Court to see the extent and thoroughness of the PwC audit of

14   the valuations that are at issue in this case and we believe

15   are relevant and helpful to the Court.

16        There is one other example.  We have another movants'

17   document.  Movants' Trial Exhibit 803 is an example of an email

18   within PwC.  I can see how e-mails amongst PwC auditors could

19   be more debatable as to whether they're business records, but

20   this contains -- and this contains in the e-mail a memo from

21   Sean Teague, one of the Barclays members.  Now, they would say

22   that's a party admission, when it's hearsay within hearsay.  We

23   would say it's a business record.  But the e-mail above it from

24   PwC they must be saying is a business record, and we agreed.

25   When e-mails are written as part of the regular course of

Page 130

```
 1    activity in an audit, and it's the regular practice to make

 2    that kind of record, we have no problem accepting that as

 3    admissible.  There were a few they identified we objected to

 4    early on in the case.  We're now willing to stipulate to those.

 5              Just last week Mr. Tambe, examining his expert

 6    witness, Mr. Slattery, showed him a PwC document discussing the

 7    valuation of Pine.  I got up and recrossed Mr. Slattery on that

 8    document.  I forgot to move it into evidence, but that would

 9    have been a good time to do so since he had just used it.  But

10    that's one of the ones in our binder.

11              I think, unless the Court wishes for me to go through

12    each one, I think that's, essentially, our position.  We could

13    offer up this, I hope, sufficiently concise letter brief and --

14              THE COURT:  I'll obviously take a look at the letter

15    brief, which -- is that part of what's been handed to me or do

16    you have it --

17              MR. HUME:  Not yet, Your Honor.  It's just being

18    finalized and put on a letterhead, and I'm going to have it

19    ready in, I think, a few minutes.

20              THE COURT:  Okay.  I have a question.  I'm going to

21    give movants' counsel an opportunity to respond on this.  Just

22    so I understand what's in the binder.

23              MR. HUME:  Yes.

24              THE COURT:  You have argued that, in a sense, the

25    documents that are in the binder are logically within the same
```

Page 131

1    basket as other PwC documents that have already been admitted

2    into evidence.

3            MR. HUME:  Yes.

4            THE COURT:  And I'll certainly want to hear argument

5    as to why these are different.  But just for my baseline

6    information, is it true that all of the PwC documents that

7    we're talking about are, for all practical purposes,

8    indistinguishable from one another, that is, they are all

9    papers generated during the course of PwC's work in auditing

10   the Barclays's portfolio?

11           MR. HUME:  All of the ones -- that's my understanding.

12   You may remember I showed the ten boxes to Mr. Garvey that had

13   been produced.

14           THE COURT:  It was a very vivid demonstration of

15   volume.

16           MR. HUME:  And I haven't reviewed all of them, but my

17   understanding is the production of those relevant to the

18   auditing of the acquisition balance sheet, some spill that came

19   up in the midyear audit and then spilled over to the annual

20   audit.  But it was only produced if it was relevant to auditing

21   the sale transaction.  So in that sense they're all the same,

22   and, certainly, those that have been identified for production,

23   I think, fall within that same category.  There's no separate

24   category of PwC documents that I'm aware of.  I stand to be

25   corrected, but that's certainly my understanding.

Page 132

1          THE COURT:  Okay.  I just wanted to understand what

2     was in the binder.  Basically, a selection from the huge set of

3     documents previously shown to me in court.

4          MR. HUME:  Yes.

5          THE COURT:  Okay.

6          MR. HUME:  And I did neglect to make one last point,

7     Your Honor, that I think the movants have objected that this is

8     after our fact case is closed.  First of all, we've been

9     careful not to close our fact case without making sure we get

10    our exhibits into evidence.  And, second of all, the trustee's

11    lawyer did the same thing at the end of their fact case.  They

12    said we're closed, except for making sure we get the exhibits

13    in, and there's ample precedent that Courts will allow exhibits

14    to come in after fact witnesses have been completed.  In fact,

15    during expert testimony, as it happened today, documents can be

16    put into evidence.  So we don't really understand the nature of

17    that objection.

18          THE COURT:  Well, I do have a basic question.  Not

19    having looked at these documents the question is simply one

20    that occurs to me as we're engaged in this debate, but it's not

21    a bottoms up question.  It's a general question.  Are you

22    anxious to get this information in because you believe that the

23    documents support a valuation determination made by Barclays?

24    In other words, do you view this as corroborative of the

25    judgments made by Barclays in connection with its acquisition

Page 133

1    balance sheet?  And, to that extent, are you seeking to produce

2    this information as part of the record in order to strengthen

3    your argument that Barclays made fair valuation judgments with

4    respect to its acquisition balance sheet?

5             MR. HUME:  Yes.  We would also say they are relevant

6    to showing the thoroughness of PwC's audit, generally, and,

7    specifically, of the types of issues raised by movants'

8    experts.  So we think it is relevant to support the

9    reasonableness of our valuations.

10            THE COURT:  All right.  I understand.

11            MR. HUME:  It's relevant directly and indirectly.

12            THE COURT:  Okay.  So the two basic reasons that we're

13   having a discussion about this now include corroboration that

14   PricewaterhouseCoopers did a thorough job and a professional

15   job, and, also, that they did a job that verified decisions

16   made by Barclays when it prepared its acquisition balance

17   sheet.  Correct?

18            MR. HUME:  Correct.

19            THE COURT:  Okay.  Thank you.

20            MR. GAFFEY:  Good afternoon, Your Honor.  For the

21   record, Robert Gaffey from Jones Day for the debtor.

22            Just taking things slightly in reverse order, Your

23   Honor.  Our principal argument is not that this is coming up

24   late in the case, except that what's really happening with this

25   offer of twenty-five some-odd PwC documents is an attempt to

LBH, et al; LB1

Page 134

1    construct a paper expert.  They are, in document after document

2    they read as if they were expert reports.  PwC reviewed the

3    following hearsay, comes to the following conclusion and offers

4    an opinion that the valuation conducted by Barclays as to this

5    particular issue or that particular issue was reasonable.  PwC

6    does not conduct its own valuation.

7         The hearsay within hearsay that's contained within

8    these documents is -- I take Mr. Hume's point about third-party

9    pricing materials, but, more importantly, there are statements

10   attributed and unattributed from within Barclays.  Barclays own

11   statements.  I can offer those in a PwC document because, as

12   Mr. Hume correctly notes, those are admissions.  That's not a

13   hearsay issue.  That's basic.  If it's an admission we don't

14   have a hearsay question.  They have a hearsay question.  And

15   they have a hearsay issue because when they put in statements

16   from, unattributed statements to no particular person in

17   Barclays PCG Group, that's standard hearsay, which is

18   inadmissible.

19        The business records rule doesn't solve that problem

20   because it's second level hearsay, and under Rule 805, of

21   course, the hearsay has to be addressed at every level in the

22   chain.

23        The 701 and 702 piece, that is the opinion piece, also

24   doesn't cover this.  And it doesn't cover it because although

25   Rule 803(6), that is the business records rule, allows for the

Page 135

1    introduction of data and facts and opinions it doesn't allow

2    for the admission of inadmissible opinions.  The point being

3    the business records rule doesn't solve a freestanding problem

4    with respect to the opinion that's offered.

5            So we look to 701 and 702.  701, of course, deals with

6    lay opinions and expressly excludes the type of scientific or

7    technical opinions that require expertise that are addressed by

8    Rule 702.  So 701 doesn't get them where they want to be,

9    because this is an effort to put in this raft of

10    PricewaterhouseCoopers' documents as if PricewaterhouseCoopers

11    was an expert.  Now, of course, a firm, no matter what its

12    reputation, can never be an expert.  Experts are individuals.

13    They are witnesses.  PwC was never put on a witness list.  PwC

14    was never identified as an expert.  We never had expert

15    discovery from PwC, and, it's self-evident, we've never had an

16    expert report from PwC.  So when Mr. Hume says it's

17    unprincipled for us to take the position that we should resist

18    these documents, it's, actually, a very principled position.

19    It is if they had an expert and they wanted to put PwC on to

20    say we conducted a valuation, which, by the way, none of the

21    documents say, but if it said we conducted a valuation and in

22    our opinion the assets were worth x, y and z.  They should have

23    qualified them.  They should have called somebody from PwC, and

24    they should have put them on.

25            THE COURT:  Can I break in and just ask a very basic

Page 136

1    question?  Did the movants take any depositions of PwC

2    employees with respect to their work?

3            MR. GAFFEY:  No.  Nobody did.  Neither we nor Barclays

4    took depositions of the PwC witnesses.

5            THE COURT:  So regardless of whether they're

6    classified as experts or lay, nobody chose to examine any of

7    the people who were involved in the audit function.

8            MR. GAFFEY:  That's correct, Your Honor, but nor did

9    they ever appear on anybody's witness list.  Now, as Your Honor

10   knows, we went through the 2004 discovery through the summer,

11   culminating in the filing of the claim.  That was the bulk of

12   the discovery that we took, the investigatory discovery, as it

13   were.  And then we had a stipulation that allowed us to take,

14   and I forget the number, I think it was ten more depositions.

15   So we had to be careful about what we did ask for.

16           Then, when witness lists were exchanged between the

17   parties, Your Honor may recall that if a new name popped up on

18   a witness list we all agreed we would take a deposition.  No

19   Pricewaterhouse witness.  Today's the day that the Court's

20   being told, through paper, Pricewaterhouse is, essentially,

21   being asked to be a witness with regard to the valuation.

22           Now, it's been established.  Several witness have

23   talked about, Barclays' witnesses have talked about the fact

24   that Pricewaterhouse made the pronouncement, gave the

25   conclusion, offered the opinion that the valuations conducted

LBH, et al; LB1

Page 137

1    by Barclays as to particular aspects of the securities appeared

2    reasonable.  Professor Pfleiderer, who you'll hear from this

3    week, will tell you that.  He'll tell you that that's, in part,

4    one of the things that he's relying on in offering the opinion

5    that they want him to be able to offer.

6           But this is an effort, actually, to fill a hole in

7    that expert case, because, as Your Honor knows from the

8    in-limine motion argument, Professor Pfleiderer did not conduct

9    a valuation.  He didn't conduct a valuation of his own.  And

10   even in the supplemental declaration that he put in he says --

11   he doesn't say he spoke to PwC.  He says he spoke to people who

12   spoke to PwC.  This is an attempt to bolster the expert case.

13   That's what's really going on here.  And that's why the hearsay

14   issue and the opinion issues are important.  This is not a

15   document by document litigator's fight over whether somebody

16   can keep a particular document out of evidence.  Mr. Hume tells

17   you that both parties have put in some PwC documents.  And he's

18   right about that.  It's not about 803, which, by the way, is

19   not in evidence.  But we have had stipulations.  But not all

20   the time.

21          Your Honor may recall we ultimately ended a week in

22   the movants' factual phase of the case with a stipulation read

23   into the record as to what Michael Guarnuccio -- he works for

24   PwC -- would say if called to the stand.  That was the result

25   of a weeklong struggle over Barclays objections about it being

Page 138

1    hearsay and not authentic, to get one PwC document into

2    evidence.

3            So we've stipulated sometimes.  We haven't stipulated

4    others.  But we have never stipulated that PwC comes in in

5    full, which is what this is an effort to do.

6            Now, I could show you examples of the document -- if

7    we could put up, say, 607, I'll give you an example of what I'm

8    talking about, why I think these things are really ersatz

9    expert reports and not proper documents.  Now, first of all, I

10   should note this is one of the documents in the binder Mr. Hume

11   handed out.  The PwC production differentiates by its Bates

12   number between work papers and non work papers.  This

13   particular Bates number in the lower right-hand corner does not

14   have the annotation WP, which Pricewaterhouse used when it

15   produced actual work papers.  This is just a memo.  Now, it

16   goes to the audit file, but it doesn't rise to the level of an

17   accountant's work paper.  And let me just take my copy of that

18   out.  If we could start with just scope and background, and

19   I'll show Your Honor a couple of examples of this.  Just in

20   that top paragraph, Steve, scope and background, if you could

21   highlight that.  This is what Pricewaterhouse says it did as

22   requested by the BarCap audit engagement team, et cetera, et

23   cetera, et cetera.  PwC advisory reviewed the reasonableness of

24   the September 22, 2008 acquisition price of CDO transactions

25   for Lehman's portfolio and assessed the reasonableness of the

Page 139

```
 1   bid-ask spread adjustment applied to the acquisition markets.

 2   Now, that's what this document says is the PwC test there.

 3           And let's just turn to page 2, and I'll show you where

 4   that goes, and there's several examples of this in the

 5   document.  One, a reasonableness of using 9/30 marks as of

 6   9/22/08.  Now, Your Honor knows that's an issue that is at the

 7   heart of the expert case here, what the appropriate date was

 8   for valuing the assets that were transferred in the sale

 9   transaction.  And PricewaterhouseCoopers offers about halfway,

10   fourth line down, starting at the last word, based, "Based on

11   discussions we have had with market participants and

12   observations of deals that hit triggers due to the failure of

13   Lehman, any major impact", et cetera, et cetera, et cetera, and

14   it ends at the bottom.  "Therefore, the September month end

15   mark should fall within a reasonable range of the acquisition

16   dates fair value, especially considering the wide bid-ask range

17   for CDOs."

18           That's an expert opinion.  That's what it's being

19   offered for.  It's being offered as opinion evidence.  It's not

20   being offered for the truth of the matter asserted.  That's the

21   reality of it.  Now, to say that it should come in through

22   803(6) on a hearsay exception to offer the truth of the matter

23   asserted is a misuse of the rule.  That's what's happening

24   here.

25           Now, the hearsay problem proper, within the documents,
```

Page 140

1    is also exemplified here.  Take a look, Steve, at page 3.

2    Positions where PMGT (sic) desk price is less than PCG mark.

3    And just highlight the top paragraph.  All right.  There you

4    go.  Starting five lines from the bottom at the end, the word

5    through.  And can you highlight that through the end, please,

6    Steve?

7             "Through discussions with market participants and

8    research."  Well, again, I take Mr. Hume's point about access

9    to commonly used publications in a particular industry, but

10   through discussions with market participants and research?  How

11   do we cross-examine that document?  How is that within the

12   limits of the business record exception, which offers something

13   for the truth?  We don't know who they are.  We don't know what

14   they had to say.  This is the type of thing, if an expert took

15   the stand and said that, that expert could be cross-examined.

16   When Professor Pfleiderer takes the stand he will be cross-

17   examined about statements like that.  Not that one, but like

18   that that he will make.

19             It's our view, Your Honor, that's in an improper use

20   of the business records exception, especially in light of 701

21   and 702, to, essentially, put in an expert report that hasn't

22   been vetted through discovery, that was never revealed before

23   the deadline, and that is where the timing of this all does

24   come into play.  It's not the main part of our objection.  We

25   understand that in a case that's up to, I think we're on trial

Page 141

1    date 29, we understand that there will be documents people want

2    to offer.  I forgot this.  I want to add these three.  That's

3    going on.  We're not doing that before the Court, but that goes

4    on -- I get an e-mail every morning from Mr. Green (ph.), who,

5    I think, does not sleep, with a couple of exhibits saying we

6    want to offer these or add these.  That's not what this is

7    about.  This is about calling PwC exhibits separate exhibits as

8    if each is just a separate hearsay problem when, in fact, it's

9    an effort to skew the record with an uncross-examinable expert.

10   And that's the reason that we're opposing this.

11          If they want to submit a letter brief I'm happy to

12   respond to it.  But I don't think that the hearsay, and this is

13   just one example.  I could do this with each one of the

14   documents.  I'm not sure Your Honor is inclined to have me do

15   that here and now.

16          THE COURT:  Well, not here and now, but if it comes to

17   it we may --

18          MR. GAFFEY:  But it --

19          THE COURT:  -- reserve the right to do that at some

20   point in the future.

21          MR. GAFFEY:  But I think it also is telling.  Your

22   Honor's questions about whether these are meant to show that

23   Pricewaterhouse conducted the work.  I'm paraphrasing the

24   Court, obviously, but whether it made a judgment as to what it

25   was Barclays did, but then Your Honor asked if it also

Page 142

1   corroborated the valuation that Barclays did.  Again, let's

2   look at the sequence of what the proof will be if those come

3   into the record.  This is a question of fairness.

4           Mr. Tambe noted, when we argued the in limine motions

5   with regard to experts, and so far he's been right.  Your Honor

6   will not see one Barclays' valuation witness take that stand.

7   You won't see Mr. Teague.  You won't see Mr. Landerman (ph.).

8   You won't see Mr. Wachtell (ph.).  You won't see the witnesses

9   upon whose statements Professor Pfleiderer relies.  You won't

10  see PricewaterhouseCoopers.  You'll just see their documents.

11          In the interest of fairness these will skew the

12  record, because they will appear to have weight.  But they

13  don't.  They can't have weight, because they can't be cross-

14  examined, because there never was a PwC expert.  If that's the

15  expert they wanted to use they should have done it.  They

16  shouldn't be allowed to use these documents to fill a hole in

17  the experts' testimony that you're going to see on Wednesday.

18  And unless Your Honor has questions, that's the shape of our

19  position.

20          THE COURT:  I think this has been a useful preview of

21  what will, no doubt, be an argument we're going to have another

22  day, although it's been very effective without the benefit of

23  papers.  I don't have the letter brief from Barclays.  You

24  haven't had a chance to look at it and respond to it, but,

25  obviously, from your presentation, Mr. Gaffey, you're very

Page 143

1   familiar with the subject and view this as a very important

2   issue in the case.

3            Because it's important I think I need the benefit of

4   the submissions of the parties in writing, including references

5   to the cases that have been alluded to by Mr. Hume in his

6   presentation as to the use of documents prepared by auditors.

7   One of the things that makes this a somewhat curious event in

8   the case at this juncture, from my perspective, is that I have

9   been very conscious of the role of PwC throughout the case, in

10  part because PwC documents have been used, but, also, because

11  in the examination and cross-examination of witnesses I have

12  been aware for some time that Barclays takes the position that

13  there is a meaningful difference between audited financial

14  results and the issues in this case and that the movants also

15  recognize a difference between audited financial results and

16  the issues in this case.

17           Nonetheless, I believe that Barclays is endeavoring,

18  and has been fairly straightforward about this, to suggest that

19  that inconsistency proved something, that you can't effectively

20  not challenge the credibility of an audit and at the same time

21  prove that the underlying valuation judgments that are included

22  in the audited numbers should be set aside in this trial.  So

23  the stress, and it's been basic for weeks, if not months, is

24  that to the extent that we are involved in shadowboxing with

25  the acquisition balance sheet and its credibility, that

Page 144

```
1    shadowboxing is happening on both sides of the case.  There's a

2    finesse going on, and what you said is true.

3           I have known about the Product Control Group since, I

4    suppose, the first day of this trial.  But I haven't seen any

5    witnesses from the Product Control Group and Barclays' case has

6    closed.  Do I consider that a curiosity?  You bet.  Do I

7    consider it a choice that they made?  Obviously.  But I can

8    only make judgments with respect to the record that's presented

9    to me, and I see experts on both sides, I mean the lawyers, who

10   have made strategic judgments as to what I am to see.

11          If parties chose not to examine

12   PricewaterhouseCoopers, a well respected international

13   accounting and auditing firm, but a firm whose involvement in

14   the case has been apparent at the outset, that's a choice both

15   sides made.  And the fact that you didn't examine them doesn't

16   necessarily mean that you've been sandbagged here.  I think

17   what it means is that judgments were made.  Do you feel that

18   you were sandbagged?

19          MR. GAFFEY:  That would be -- that's why I began by

20   saying we're not centering our argument on the timing, as you

21   know.  I don't think I've been sandbagged.  I do think it's a

22   strategic choice --

23          THE COURT:  Absolutely.  That's what I just said.

24          MR. GAFFEY:  -- to have waited till now to say I tell

25   you what.
```

Page 145

1          THE COURT:  Both sides have made strategic choices

2     here.

3          MR. GAFFEY:  Well, except, Your Honor, they put on

4     Gary Romain, their accountant, who talked about this, and we

5     were able to cross-examine him.  Their choice as to how they

6     wanted to prove the accounting treatment.  They put on Gary

7     Romain.  We cross-examined him.  We leave it to the Court to

8     decide how that one came out.  But with regard to whether I

9     feel sandbagged, no.  I mean, the existence of

10    PricewaterhouseCoopers is not a secret.  I agree with you.  But

11    what amounts to a golem of an expert is a surprise.  The idea

12    that it wasn't just Pfleiderer, it was actually going to be

13    Pfleiderer and a very tall paper friend of his, were all these

14    PricewaterhouseCoopers' documents.  That, I think, is the

15    essence of our problem with the manner in which his proof is

16    being put out.  It's not a question of getting the custodian up

17    to say yes, it's a true copy.  True and correct copy of a

18    memorandum that someone at Pricewaterhouse prepared.  I don't

19    want to take the Court's time with that.  That would be a mess.

20         THE COURT:  And that doesn't avoid the issue, does it,

21    because this really isn't a question as to whether or not these

22    are authentic copies of authentic documents that were prepared

23    by PwC in the course of the work that they undertook at

24    Barclays request.

25         MR. GAFFEY:  And that's absolutely right.  And, in

Page 146

1   fact, when this issue was raised by Mr. Schiller we made

2   some -- a little bit of progress over the weekend, and one of

3   them was I withdrew our, you know, what authenticity objections

4   had been there.  That would be a silly fight.  They are what

5   they purport to be.

6          THE COURT:  They are what they purport to be.  The

7   question is whether they should come into this record.

8          MR. GAFFEY:  I think it's a multiple part question,

9   Your Honor.  I think it's whether they should come into the

10  record at all.

11         THE COURT:  That's what I just said.

12         MR. GAFFEY:  And if they do, do they come in for the

13  truth, and which part, and what weight gets accorded to them?

14  Those are the multiple parts.  I think, on a straight 803(6)

15  analysis, I don't think these opinions come in.  But if the

16  Court were to take them in, to allow them in, they would have

17  to, I believe, in fairness, come in only -- not for the truth

18  of the matter asserted, because they're not a fact.  They're an

19  opinion.  And it was their choice how to put on their

20  accounting case.  They chose to put on Romain and no one else.

21  We cross-examined their accountant.  We put on our experts who

22  did valuations.  I won't -- you'll hear from -- the Court will

23  hear from Pfleiderer, and that issue will be joined to, and

24  we'll see who did what with respect to what's a valuation of

25  the assets here and what's not.  But I don't think this is a

Page 147

1    substitute.

2         THE COURT:  Well, here's what I think we should do

3    with this.  I assume a letter brief, which is three and a

4    quarter pages long, single spaced, will be completed this

5    afternoon, and I'll receive it, and you'll get a copy of it,

6    and you'll have an opportunity to respond to it.  And sometime

7    this week we should revisit this issue.

8         MR. GAFFEY:  What I'd suggest, as a matter of timing,

9    Your Honor, is if I can -- I can get a response in by first

10   thing Thursday morning I think we'll be -- it's conceivable

11   we'll be close to done with all proof by then unless Professor

12   Pfleiderer goes even longer than I think he might on cross.  We

13   still have Friday open if you need it to deal with it, and that

14   would give us a chance to address whatever cases they cite.

15   Mr. Hume says they have a lot of them.  I've only seen one of

16   their cases so far.  So I'd like a chance to spend tomorrow

17   researching it and finalizing --

18        THE COURT:  It's an important issue.  You should have

19   as much time as you think is needed to address it --

20        MR. GAFFEY:  Thank you, Your Honor.

21        THE COURT: -- in a manner consistent with your

22   professional obligations to the movants, and I also need the

23   time to review the materials that you're going to be collecting

24   and that Barclays is submitting.  But I have a question about

25   what happens Tuesday, Wednesday, Thursday.  Our witness

Page 148

1    tomorrow is who?

2          MR. SCHILLER:  Tony Leitner, Your Honor.  Mr. Leitner.

3          THE COURT:  And that will be a full day?

4          MR. SCHILLER:  We don't expect it to.  Two-thirds of a

5    day.

6          THE COURT:  So it'll take part of the day?

7          MR. SCHILLER:  Yes.

8          THE COURT:  A good part of the day.  And then

9    Professor Pfleiderer is coming in on Wednesday?

10          MR. SCHILLER:  Yes.

11          THE COURT:  And that's the last Barclays identified

12    expert?

13          MR. SCHILLER:  Yes.

14          THE COURT:  And he'll either be concluded on Wednesday

15    or, if necessary, on Thursday?

16          MR. SCHILLER:  That's what we expect, Your Honor, yes.

17          THE COURT:  And that means --

18          MR. SCHILLER:  He's teaching on Friday, so he expects

19    to go back Thursday night.

20          THE COURT:  I'm sorry?

21          MR. SCHILLER:  He's teaching on Friday, and expects to

22    return Thursday night.

23          THE COURT:  Okay.  It seems to me that one --

24          MR. SCHILLER:  He would like to address --

25          THE COURT:   It seems to me that one witness should

Page 149

```
 1    be, even an important one, should be finished in two full days,

 2    which means that Friday is open.  So why don't we simply

 3    reserve Friday morning at 10 a.m., since we don't have

 4    witnesses --

 5            MR. GAFFEY:  Thank you, Your Honor.

 6            THE COURT:  -- for purposes of the

 7    PricewaterhouseCoopers argument, part two.

 8            MR. GAFFEY:  If I might, Your Honor, under the heading

 9    of no surprises we have a small dispute brewing about witness

10    order that you may -- Your Honor may recall the name Uma

11    Krishnan raised in connection with the famous GFS reports.

12            THE COURT:  Yes.

13            MR. GAFFEY:  I've asked Barclays to make her available

14    as a very short, but as a rebuttal witness, depending on the

15    testimony we hear from Mr. Pfleiderer, and I'm told if I don't

16    take her tomorrow they won't produce her.  I can subpoena her,

17    but I was hoping to resolve it.  I'm going to talk to them to

18    see if we can resolve this, but we've taken Your Honor's point

19    before about not surprising you with last minute disputes, and

20    this one's about half an hour old.  So I hope you have a

21    resolution.

22            THE COURT:  Well, I consider that seasonable notice.

23    That's fine.

24            MR. SCHILLER:  Your Honor, not to interrupt Mr. Hume's

25    (sic) argument, but I want to clarify one thing for Your Honor
```

Page 150

1    and get Your Honor's direction in this with respect to

2    Pricewaterhouse.  The three valuation people, we submitted

3    their testimony.  They were on videotape by movants.  We

4    submitted their deposition designations long ago.  They have

5    them.  They're in your record.  They're going to be going

6    before Your Honor.  They were relied on by Gary Romain.

7    They'll be relied on by our expert.

8             They didn't examine him at trial.  We felt that was

9    sufficient.  You have that evidence.  We didn't not give you

10   that evidence.  We gave it to you from all three individuals.

11            THE COURT:  I understand.

12            MR. SCHILLER:  And if Your Honor wants us to, if Your

13   Honor wants to see them we'll call them.

14            THE COURT:  No, it's fine.  I mean, the --

15            MR. SCHILLER:  Live.

16            THE COURT:  The point I was making, it's a fairly

17   obvious point.  I was speaking at a program at Georgetown Law

18   School on Friday, and one of the things that I was talking

19   about was judicial perception in a completely different

20   setting.  It was about how bankruptcy courts recognize whether

21   or not a particular dispute is core, noncore, whether it's

22   arising in or arising under, when is a matter properly to be

23   remanded to the state court or kept as an adversary proceeding

24   in the bankruptcy court.  I'm certainly not going to repeat

25   what I said there, except for this one reference point, which

Page 151

1    is that like everyone judges are just people, and we know what

2    we know because of perceptions that we make, hopefully correct

3    ones.  But not always.  And the perception of something is

4    sometimes at least as important, if not more important, than

5    the reality.

6           For that reason, for jurisdictional purposes sometimes

7    it's very difficult to make a judgment early in a bankruptcy

8    case when you don't know all the facts, you don't have a good

9    feel for what's going on.  This is a different situation.  This

10   is a very significant, very high level, very skillfully tried

11   dispute, which has been going on for, apparently, twenty-nine

12   days of trial, if I take Mr. Gaffey's count as an accurate

13   count.  It feels longer.  But however long it has actually

14   been, it's a process in which we have, collectively, been

15   engaged in an extremely important process of uncovering the

16   truth in respect of extraordinarily complex matters that are in

17   dispute.  And in the process of uncovering the truth various

18   impressions come across the bench.  And we had this dialogue in

19   a different context when we were talking about the videotaped

20   depositions of certain witnesses.  And I said, and I meant it,

21   that I weight testimony based upon the interpersonal nature of

22   the storytelling.  You are all involved in a process of telling

23   me a story, both through your live witnesses, what you tell me

24   from the podium or from counsel table and the documents that

25   you offer into evidence or use in the examination of witnesses.

Page 152

1   And that narrative is embellished in this trial more so than in

2   many, because of the amount in controversy, with the screens

3   and the highlighting and the blowing up of certain provisions

4   of documents so that I am well aware, as a result of having sat

5   here for as long as I have and paying attention to the

6   narrative as it has been told to me, as to what the parties

7   consider important and what the key issues are in the case.

8   Even before we get to closing arguments I think I have a pretty

9   good idea as to the strengths and weaknesses on both sides.

10          But it's also true that even though the record

11   includes designated deposition testimony, and that is material

12   that I am certainly free to consider in reaching ultimate

13   conclusions here, it's very different when someone who is

14   saying the same thing is telling it to me in person.  For one

15   thing, it demonstrates that this is a matter of significance to

16   the parties, important enough to fly witnesses in from London,

17   important enough to create the best possible impression for the

18   Court, important enough to be worthy of live trial time, a very

19   expensive, and, ultimately, inefficient process, but one that

20   is extraordinarily important as we look to find the truth.  So

21   if Mr. Diamond is here and Mr. Varley is here, that's telling

22   me something.  That's telling me Barclays cares about this at

23   the highest level.

24          MR. SCHILLER:  Yes, sir.

25          THE COURT:  You could have --

Page 153

1           MR. SCHILLER:  Patrick Clackson was here.

2           THE COURT:  You could have designated testimony, but

3     you brought in the senior officers of Barclays to tell me their

4     story and to expose themselves to cross-examination.

5           MR. SCHILLER:  Right.  Just to remind the Court, we

6     brought in the CFO, Patrick Clackson, responsible for the

7     accountant, and the Chief Technical Accountant, Gary Romain, to

8     do just that --

9           THE COURT:  I understand.  I'm not --

10          MR. SCHILLER: -- on quantification and valuation --

11          THE COURT:  I'm not debating your trial strategy here

12    at all.

13          MR. SCHILLER: -- from London.

14          THE COURT:  All I'm saying is it is a matter of

15    interest to me, that I am a little bit like the classic Greek

16    philosopher, I think it was Plato, who sits in a cave and looks

17    at the shadows on the cave wall from the fire in the cave.

18    Much of what I see is indirect.  And for that reason you need

19    to recognize that the fact that nobody from the Product Control

20    Group showed up live, I view as interesting.  Whether it's

21    important, whether it changes anything, I have not any idea at

22    this point.

23          But that, coupled with the fact that nobody from

24    Pricewaterhouse has testified, I also view as interesting.

25    Because the key information concerning the ultimate valuation

Page 154

```
 1    judgments made within Barclays after the acquisition remains

 2    somewhat guarded.  Just because something is in an acquisition

 3    balance sheet or in native format on some kind of computer

 4    screen that I get to see every once in a while, that doesn't

 5    tell me exactly how individuals charged with the responsibility

 6    of valuing positions did that.  In fact, Gary Romain didn't

 7    know that.  So, and, obviously, we had Stephen King.  We had

 8    all kinds of witnesses, and I remember them, and I'm not, for a

 9    moment, suggesting that anybody else should show up.  I'm

10    simply saying that as it relates to the Pricewaterhouse

11    documents we're dealing with something that is very important,

12    and we're going to deal with it after it's briefed.  The case

13    is in.  Is there anything more for this afternoon?

14            MR. GAFFEY:  No housekeeping from us, Your Honor,

15    unless you want to hear about the case baby who was born over

16    the weekend, so --

17            THE COURT:  Who's --

18            MR. GAFFEY:  One of our associates had the first baby

19    of the Rule 60 motions.

20            THE COURT:  Oh, that's terrific.

21            MR. GAFFEY:  Yes.

22            THE COURT:  Was it a boy or a girl?

23            MR. GAFFEY:  It's a girl, and her name is Amelia Kenny

24    (ph.), and I promised her mother I'd get her on the record.

25    Thank you, Your Honor.
```

Page 155

```
1              THE COURT:  Okay.  Yes, that's on the record.

2              MR. SCHILLER:  Your Honor, there is one other issue.

3              THE COURT:  Order that page.

4              MR. SCHILLER:  We were told by Mr. Gaffey today that

5      he wants to call another witness.  We said no to him over

6      lunch.  This is the woman responsible, who knows about GFS

7      data.  This is Ms. Krishnan, who was introduced to Your Honor

8      by name several weeks ago, and you said if you want to call her

9      talk to Barb (ph.), please.  Decide when to call her.  And I

10     asked him last week you're done.  Are you done?  He said I am

11     done.  Then I told Your Honor then we would be calling

12     Professor Pfleiderer.  No more facts.  Here's our wrap-up

13     expert.  Now, this morning he says well, we may want to call

14     her about GFS.  That's a new issue.  It just happened at lunch

15     break.  The case may not be closed in that respect.  We've

16     objected to his request.  I don't know whether he wants to

17     argue it or not.  She is available.  We spoke with her at lunch

18     when we got his e-mail or whatever it was.  She's available

19     tomorrow.  She's not available after that.  Professor

20     Pfleiderer is testifying Wednesday and Thursday.  We don't want

21     to have fact witnesses after the expert case.  That's not

22     traditional.  It's not been ordered by Your Honor.  It's not

23     been agreed by the parties, and that is what we're now faced

24     with today at lunch.

25             MR. GAFFEY:  She's a rebuttal witness, Your Honor.
```

Page 156

1   Professor Pfleiderer is going to testify, I expect, with regard

2   to the GFS data.  Your Honor knows the GFS issue.  I won't

3   rehash it.

4            THE COURT:  Right.

5            MR. GAFFEY:  We're going to cross-examine Professor

6   Pfleiderer, and we're going to ask him about GFS, and depending

7   on what he says or doesn't say we may need brief rebuttal from

8   Ms. Krishnan, who is a Barclays' employee.  So it's rebuttal.

9   It's not reopening our fact case.  We'll make the decision

10  after Professor Pfleiderer as to whether we need to call her.

11  If we call her it's going to be an hour, but I certainly didn't

12  want to wait until the case was over, the expert case was over,

13  and say okay, now, let's talk about rebuttal witnesses.

14           What I don't want to do is call her tomorrow.  I don't

15  want to surface the issue.  I want to see what Professor

16  Pfleiderer has to say, and if I need to rebut what I think he

17  might say we'll need Uma Krishnan for that for about one hour.

18           THE COURT:  Okay.  Do you wish to comment on that, Mr.

19  Schiller?

20           MR. SCHILLER:  Well, Your Honor, we've been with you

21  for a number of months now.  There's been no discussion, no

22  consideration, no planning of a rebuttal case.  We believed

23  there was no provision for a rebuttal case by the parties or at

24  Your Honor's initiative.

25           THE COURT:  Well, here's what we'll do with this one

Page 157

1    hour witness.  We have an expert case that we're in the midst

2    of right now.  Mr. Gaffey has indicated no desire to take this

3    witness out of order or to ask questions of her prior to the

4    completion of Professor Pfleiderer's examination, and he has

5    identified her as a rebuttal witness.  Whether or not there

6    will be rebuttal witnesses is a question that I can address at

7    the conclusion of the expert testimony.  If there is a need for

8    a rebuttal witness, and if I conclude that there should be a

9    rebuttal portion of the case, we have a trial day reserved

10   already on the 18th of October, which we can use for that

11   purpose, if necessary, and in noting that that's an available

12   day I, by no means, wish to suggest that I think that we need

13   to have a rebuttal witness.  I have an open mind on that

14   question.  We can argue that, along with the PwC issues, on

15   Friday at 10.

16        MR. SCHILLER:  Just to respond to the Court. We will

17   consider that, Your Honor, in terms of our own rebuttal case

18   for the motion we've opposed by the trustees.  Take that into

19   consideration as well.

20        THE COURT:  Okay.

21        MR. SCHILLER:  Thank you, Judge.

22        THE COURT:  Everybody's rights are reserved.  We're

23   adjourned till tomorrow.

24        (Whereupon these proceedings were concluded at 3:07 PM)

25

```
                                                         Page 158

 1

 2                            I N D E X

 3

 4                        T E S T I M O N Y

 5    WITNESS                  EXAM BY            PAGE      LINE

 6    John Olvany (voir dire)  Mr. Tambe            5        19

 7    John Olvany              Mr. Tambe           14        21

 8    John Olvany              Mr. Thomas          40        12

 9    John Olvany              Mr. Tambe          118         2

10

11

12                        E X H I B I T S

13    PARTY    NO   DESCRIPTION              ID.      EVID.

14    Movants  152  Expert report prepared by          15

15                  John Olvany

16    Movants  152A CV of John Olvany                    6

17    Movants  823  Declaration of John Olvany          16

18    Movants  910  Demonstrative prepared by          124

19                  Professor Zmijewski

20    Movants  913  Demonstrative prepared by          124

21                  Mr. Garvey

22    Movants  917  Demonstrative prepared by          124

23                  Mr. Schwaba

24    Movants  920  Demonstrative prepared by          124

25                  Mr. Slattery
```

Page 159

```
 1

 2                    E X H I B I T S (cont'd.)

 3   PARTY    NO    DESCRIPTION                    ID.      EVID.

 4   Movants   930   Excerpt of offering circular            28

 5                    used in Mr. Olvany's valuation

 6                    of the Giants Stadium LLC bonds

 7   Movants   958   Deck prepared by Mr. Olvany             123

 8

 9

10                        R U L I N G S

11   DESCRIPTION                               PAGE      LINE

12   John Olvany accepted as an expert in the    14        17

13   valuation of corporate securities

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 160

1

2                         C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    _____

8    Clara Rubin

9    AAERT Certified Electronic Transcriber (CET**D-491)

10   Also transcribed by:    Hana Copperman (CET**D-487)

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date: October 5, 2010

18

19

20

21

22

23

24

25