Hearing Date and Time: October 27, 2010 at 10:00 a.m.
Objection Deadline: October 13, 2010 at 4:00 p.m.

**BAKER & McKENZIE LLP**
**1114 Avenue of the Americas**
**New York, New York  10036**
**Telephone:  (212) 626-4100**
**Ira A. Reid (IR-0113)**

**Attorneys for Lincore Limited**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 08-13555 (JMP) |
| | (Jointly Administered) |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | |
| | Chapter 11 |
| Debtors. | |
| | Judge James M. Peck |

**RESPONSE BY LINCORE LIMITED TO DEBTOR'S THIRTY-FIFTH**
**OMNIBUS OBJECTION TO CLAIMS (VALUED DERIVATIVE CLAIMS)**

Lincore Limited ("Lincore"), by and through its undersigned counsel, hereby objects to

the Debtors' Thirty-Fifth Omnibus Objection to Claims (the "Claim Objection") as it relates to

Lincore, and states as follows:

**Preliminary Statement**

1.        Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively,

the "Debtors") seek to reduce the amount of Lincore's two filed proofs of claim, numbered

17559 and 17560 (the "Lincore Claims"), from the filed amounts of $18,824,851.23, to a

modified amount of $3,014,998.00 per claim, purportedly on the grounds that the Lincore

Claims, as filed, are overvalued.  The Claim Objection does not provide any reason for the

proposed modification other than the conclusory statement that "a fair, accurate, and reasonable

valuation of the Valued Derivative Claim is less than that reflected on the proof of claim submitted by claimant". This allegation is unsupported by any factual or legal analysis. The Lincore Claims, however, were timely filed, including all responses and documentation required by the Derivative and Guarantee Questionnaires, all of which was fully compliant and in accordance with this Court's Bar Date Order (defined below) and the Federal Rules of Bankruptcy Procedure. Thus, Lincore Claims are *prima facie* valid, and the Debtors have failed to satisfy their burden of presenting evidence to overcome their *prima facie* validity, as required under Federal Rule of Bankruptcy Procedure 3001(f) and applicable case law discussed below.

2.    In addition, although the Claim Objection itself is silent as to why the Debtors assert that the Lincore Claims are overvalued, Lincore believes, based upon discussions and valuation materials received from Lamco, that the Claim Objection is premised, at least in part, upon a flawed analysis. Upon information and belief, the Debtors value the Lincore Claims as of November 30, 2008 (the maturity date of a credit default swap transaction governed by the terms of the Lincore ISDA (defined below)). The Lincore ISDA, however, was never terminated by either Lincore or Lehman Brothers Special Financing ("LBSFI"), as counterparties, and both parties continue to have outstanding performance rights and obligations under that agreement which, but for these chapter 11 caes, the parties would be expected to perform. Moreover, the Lincore ISDA was never rejected by the Debtors under section 365(a) of the Bankruptcy Code. As a result, the Lincore ISDA remains an open executory contract, for which damages are properly calculated upon rejection, at some as yet undetermined date, in accordance with section 562(a) of the Bankruptcy Code.

3.    The date on which the Lincore Claims are valued is critical because the Lincore Claims are premised primarily on the return value of collateral posted by Lincore, in favor of

2

LBSFI, in the form of $18 million notional amount structured notes issued by Lehman Brothers Treasury Co. BV.[1]  Lincore contends that the value of this note collateral is significantly higher now than it was in November 2008.  As a result, Lincore believes, based upon current market values, that a reasonable current valuation of its claims is at least equal to the amounts set forth in its proofs of claim.

4.       In the event that the Court were to rule that the Licore ISDA is not an executory contract,  Lincore reserves the right to demonstrate, at the Merits Hearing or pursuant to the ADR Procedures, that the value of the Lincore Claims, as of November 30, 2008, exceeds the amounts set forth by the Debtors as proposed modified claim amounts  in the Claim Objection

5.       Thus, the Claim Objection, as it relates to Lincore, should be denied or, in the alternative, scheduled for a Merits Hearing and/or ADR Procedures, as defined by, and in accordance with, this Court's April 19, 2010 Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390, Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims against Debtors (the "Procedures Order").  In addition, the Temporary Litigation Injunction established by the Procedures Order should be modified to permit the parties to conduct discovery relating to valuation issues and evidence to be presented  in connection with the ADR Procedures and/or the Merits Hearing.

---

[1]  While the Lincore Claims include that the Note Collateral was transferred to LBSFI under the Lincore ISDA, Lincore has not been able to confirm that its letters of intruction to LBIE (acting as Lincore's broker/custodian) directing that LBIE transfer the collateral from Lincore's safe custody account with LBIE to a pledge account on behalf of LBSFI, was in fact honored by LBIE.  Moreover, the LBIE insolvency administrators have advised Lincore that LBIE is holding the collateral in trust for Lincore.  Thus, unless LBSFI can produce evidence that the Note Collateral was in fact transferred to it, Lincore may still own the Note Collateral, free of any interest of LBSFI. If that is indeed the case, Lincore should be deemed authorized to direct LBIE to return the Note Collateral directly to Lincore.  Lincore's claims against LBSFI, as counterparty, and LBHI, as guarantor, could then be deemed amended and reduced, in each case, by $18,328,248.75 (the amount of the Note Collateral plus the unpaid coupon amounts).

**Relevant Background**

6.        The Lincore Claims arise out of an ISDA Master Agreement dated June 9, 2005, by and between Lincore and LBSFI, as counterparties, as supplemented, amended and modified by the related Schedule, Credit Support Annex, Confirmation, and other documents (collectively, the "Lincore ISDA").  The sole transaction under the Lincore ISDA involved the sale of a credit default swap by Lincore to LBSFI.  LBHI guaranteed the obligations of LBSFI pursuant to a guarantee executed as credit support provider for LBSFI under the Lincore ISDA (the "LBHI Guarantee").  The Lincore ISDA and LBHI Guarantee are annexed as Exhibit A and B respectively.

7.        As credit support for the Lincore ISDA, Lincore posted (or authorized to be posted) collateral to LBSFI in the form of $18 million notional amount Lehman Brothers Treasury Co. BV credit linked notes (ISIN Nos. XS0342945002 and XSO357288058, which were merged by Lehman under ISIN Nos. XS0342945002) (the "Note Collateral") and cash in the principal amount of $392,960 (the "Cash Collateral").[2]

8.        Under paragraph 6 (Early Termination) of the Lincore ISDA, Lincore had the right to notify LBSFI of an "Early Termination Date", including upon the occurrence of an Insolvency Event (as defined in the Lincore ISDA) of either LBSFI or LBHI as the credit support provider under the Credit Support Annex.  Lincore, however, did not exercise its right of early termination.  Moreover, neither Lincore nor LBSFI ever terminated the Lincore ISDA for any other reason set forth in paragraphs  5 (Events of Default and Termination Events) or 6 of the Lincore ISDA.  Instead, the credit default swap, governed by the terms of the the the Lincore ISDA,

---

[2]  Please see footnote 1, which is incorporated herein by reference.

matured in accordance with its terms, on November 30, 2008, while the Lincore ISDA continues
as an open executory contract.

9.      On September 18, 2009, Lincore filed the Lincore Claims against LBSFI, as
counterparty, and LBHI, as guarantor, each in the amount of $18,824,851.23, in accordance with
this Court's July 2, 2009 order establishing a claims bar date (the "Bar Date Order").  The
$18,824,851.23 Lincore Claims are comprised of the following components: (a) an "unpaid
amount" in favor of Lincore equal to $78,125.00; (b) the Note Collateral in the notional amount
of $18 million; (c) coupon amounts on the Note Collateral equal to $328,248.75; (d) Cash
Collateral in the amount of $394,564.98; and (e) out-of-pocket expenses (including legal fees
and expenses) in the amount of $23,913.00.

10.     On October 14, 2009, Lincore electronically uploaded its derivative and guarantee
questionnaire responses, as well as documentation in support of the Lincore Claims (including
copies of the Lincore ISDA, the LBHI Guarantee and other supporting documentation), as
required under the Bar Date Order.

11.     On  September 10, 2010, the Debtors filed the Claim Objection.

## Argument

### The Debtors have failed to Satisfy their Burden of Overcoming
### the Prima Facie Validity of the Lincore Claims

12.     The Lincore Claims were timely filed, including all responses and documentation
required by the Derivative and Guarantee Questionnaires, all of which was done in compliance
and in accordance with this Court's Bar Date Order and the Federal Rules of Bankruptcy
Procedure.  The Claim Objection, however, does not provide any reason or basis for the
proposed modification other than the conclusory statement that "a fair, accurate, and reasonable
valuation of the Valued Derivative Claim is less than that reflected on the proof of claim

submitted by claimant". This naked allegation is not supported by any factual or or legal

analysis concerning the Lincore Claims.

13.    Federal Rule of Bankruptcy Procedure 3001(f) and applicable case law provide

that a properly filed proof of claim is *prima facie* valid. *See* Fed. R. Bankr. P. 3001(f) (proof of

claim executed and filed in accordance with the rules constitutes *prima facie* evidence of the

validity and amount of the claim); e.g., *In re DJK Residential LLC*, 416 B.R. 100, 104 (Bankr.

S.D.N.Y. 2009) ("filing of a proof of claim constitutes 'prima facie evidence of the validity and

amount of a claim'") (citations omitted); *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y.

2009) ("proof of claim is prima facie evidence of the validity and amount of the claim, and the

objector bears the initial burden of persuasion" which then shifts back to the claimant "if the

objector produces 'evidence equal in force to the prima facie case'").

14.    Thus, the Debtors unsupported assertion that the Lincore Claims are overvalued

does not satisfy their burden of presenting evidence sufficient to overcome the *prima facie*

validity and amount of the Lincore Claims, as required under Federal Rule of Bankruptcy

Procedure 3001(f) and applicable case law. Accordingly, the Claim Objection should be denied

on that basis.

### The Debtors' Presumed Claim Valuation is Flawed

15.    In addition, while the Claim Objection itself is silent as to why the Debtors

contend that the Lincore Claims are overvalued, Lincore believes, based upon discussions and

valuation materials received from Lamco, that the Claim Objection is premised, at least in part,

upon a flawed analysis. Upon information and belief, the Debtors value the Lincore Claims as of

November 30, 2008, notwithstanding that the Lincore ISDA is an unterminated executory

contract under section 365 of the Bankruptcy Code which, once rejected, will be subject to the

damage calculation provisions of section 562(a) of the Bankruptcy Code.

16.     Section 562(a) of the Bankruptcy Code provides that damages arising upon

rejection of agreements, such as the Lincore ISDA, are measured as of the earlier of the rejection

date or the termination date.  *See* 11 U.S.C. § 562(a).  While the credit default swap transaction

which is governed by the terms of the Lincore ISDA matured on November 30, 2008, the

Lincore ISDA itself did not terminate on November 30, 2008 or thereafter, nor has it been

terminated by the parties or rejected by the Debtors under section 365(a) of the Bankruptcy

Code.

17.     Executory contracts have long been defined as including those in which

performance remains due to some extent on both sides.  *See e.g.* 3 *Collier on Bankruptcy*, 3-

365.02[a] (2010); *In re Penn Traffic Co.*, 524 F.3d 373, 379 (2d Cir. 2008).  The Lincore ISDA

remains an executory contract, subject to assumption or rejection under section 365(a) of the

Bankruptcy Code, because notwithstanding maturity of the credit default swap on November 30,

2008, the rights and obligations of Lincore and LBSFI under the Lincore ISDA remain

outstanding.

18.     For example, the provisions of the Lincore ISDA governing valuation and return

of collateral continue to be executory, unperformed obligations of the parties.  Specifically,

paragraph 2(b) of the Lincore ISDA Credit Support Annex (the "CSA") provides  that "upon a

demand made by the Transferor [defined by the CSA as Lincore] on or promptly following a

Valuation Date (defined as any local business day), if the Return Amount for that Valuation Date

equals or exceeds the Transferee's Minimum Transfer Amount, then the Transferee [LBSFI] will

transfer to the Transferor Equivalent Credit Support specified by the Transferor in that demand

having a Value as of the date of transfer as close as practicable to the applicable Return Amount." [3]  While the parties dispute valuation, upon information and belief, there is no dispute that LBSFI is contractually obligated to return Equivalent Credit Support to Lincore, as of the Valuation Date, or that Lincore is contractually entitled to demand return of the Equivalent Credit Support subject to the terms and conditions set forth in the Lincore ISDA.  These obligations, as well as all of the rights and obligations of the parties arising out of the Lincore ISDA, govern the relationship between Lincore and LBSFI both prior to and after maturity of the credit default swap transaction.

19.     As a result, it is inappropriate to use November 30, 2008 as the valuation date for purposes of fixing damages under the Lincore Claims.  Instead, the Debtors must first seek and obtain Court authorization to reject the Lincore ISDA in the same manner that the Debtors previously did with respect to Lincore's affiliate, E-Capital Profits Limited.  Upon entry of a Court order authorizing rejection, the Lincore Claims can and should be valued as of the rejection date pursuant to section 562(a) of the Bankruptcy Code.

20.     Once the Lincore ISDA has been rejected under section 365 of the Bankruptcy Code, Lincore will be in a position to demonstrate, at the Merits Hearing or pursuant to the Court's ADR Procedure, that the current value of the Lincore Claims is at least equal to the amount set forth in the Lincore proofs of claim.

---

[3]  Paragraph 2(b) of the CSA defines "Return Amount" as the amount by which "(i) the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount … exceeds (ii) the Credit Support Amount."  Paragraph 10 of the CSA defines "Equivalent Credit Support" as meaning "in relation to any Eligible Credit Support comprised in the Credit Support Balance, Eligible Credit Support of the same type, nominal value, description and amount as that Elibible Credit Support."  "Eligible Credit Support" is defined as "the items, if any, specified as such for that party in Paragraph 11(b)(ii) including, in relation to any securities, if applicable, the proceeds of any redemption in whole or in part of such securities by the relevant issuer."  "Credit Support Balance" is defined as including "with respect to a Transferor on a Valuation Date, the aggregate of all Eligible Credit Support that has been transferred to or received by the Transferee under this Annex, together with any Distributions and all proceeds of any such Eligible Credit Support or Distributions."

8

21.     Notwithstanding the foregoing, in the event that the Court determines that November 30, 2008 is the appropriate valuation date for fixing damages with respect to the Lincore Claims, Lincore reserves the right to demonstrate, at the Merits Hearing or pursuant to the ADR Procedures, that the value of the Lincore Claims, as of November 30, 2008, exceeds the amounts set forth by the Debtors as proposed modified claim amounts  in the Claim Objection.

## Conclusion

For all the reasons set forth above, the Claim Objection should be denied as to Lincore or, in the alternative, scheduled for a Merits Hearing or ADR Procedures and the Temporary Litigation Injuction modified to permit the parties to conduct discovery.

Dated:  New York, New York
      October 13, 2010

**BAKER & McKENZIE LLP**

By:___/s/ Ira A. Reid_____

    Ira A. Reid (IR-0113)
    1114 Avenue of the Americas
    New York, New York 10036
    Telephone:  (212) 626-4100

    Attorneys for Lincore Limited

**EXHIBIT A**

(Multicurrency–Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of June 9, 2005

**LEHMAN BROTHERS**                    and                    LINCORE LIMITED
**SPECIAL FINANCING INC.**

have entered and/or anticipate entering into one or more transactions (each a Transaction) that are or will be
governed by this Master Agreement, which includes the schedule (the Schedule), and the documents and other
confirming evidence (each a Confirmation) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for
the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other
provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the
provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for
the purposes of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all
Confirmations form a single agreement between the parties (collectively referred to as this Agreement), and the parties
would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to
the other provisions of this Agreement.

(ii)   Payments under this Agreement will be made on the due date for value on that date in the place of the
account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable
funds and in the manner customary for payments in the required currency. Where settlement is by delivery
(that is, other than by payment), such delivery will be made for receipt on the due date in the manner
customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in
this Agreement.

(iii)   Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event
of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the
condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been
effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease, to apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2                                          ISDA® 1992

(ii)    *Liability.* If: —

    (1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

    (2)   X does not so deduct or withhold; and

    (3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations.*

    (i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)   any other documents specified in the Schedule or any Confirmation; and

(iii)  upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.      **Events of Default and Termination Events**

(a)      *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

> (i)      *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

> (ii)      *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

> (iii)      *Credit Support Default.*

>> (1)      Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

>> (2)      the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

>> (3)      the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

> (iv)      *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

> (v)      *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

> (vi)      *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                              ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

> (i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —
>
>> (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or
>>
>> (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;
>
> (ii) *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));
>
> (iii) *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);
>
> (iv) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or
>
> (v) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

7

ISDA® 1992

6.    Early Termination

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8                                                          ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1)    *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events.* If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

9.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

     (i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

     (ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    Offices; Multibranch Parties.

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

12.    Notices

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15                                                              ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

                                                                    ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

17                                                                          ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| LEHMAN BROTHERS SPECIAL FINANCING INC. | LINCORE LIMITED |
|---|---|
| *(Name of Party)* | *(Name of Party)* |

By: _Scott E. Willoughby_

Name: Scott Willoughby

Title: SVP

Date: 3/3/06

By: _[signature]_

Name: Ip Tak Chuen, Edmond

Title: Director

Date: 11th November, 2005

18

(Multicurrency–Cross Border)

**SCHEDULE**

to the

Master Agreement

dated as of June 9, 2005

between

**LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A"),**

a corporation organized under the laws of

the State of Delaware

and

**LINCORE LIMITED ("Party B"),**

a corporation organized under the laws of

the British Virgin Islands

**Part 1: Termination Provisions**

In this Agreement:

(a)      "**Specified Entity**" means:

in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)      "**Specified Transaction**" will have the meaning specified in Section 14 of this Agreement.

(c)      The "**Cross Default**" provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:

"**Specified Indebtedness**" will have the meaning specified in Section 14 of this Agreement.

"**Threshold Amount**" means the lesser of (i) USD 75 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency), and the lesser of (i) USD 75 million and (ii) two percent (2%) of the Stockholders' Equity of Party B's Credit Support Provider, in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency).

For purposes hereof, "**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)    The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"). In the event of a split rating, the lower rating shall be determinative.

(e)    The "Automatic Early Termination" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)    Payments on Early Termination. For the purpose of Section 6(e) of this Agreement, Loss and the Second Method will apply.

(g)    "Termination Currency" means United States Dollars ("USD").

(h)    Additional Termination Events will not apply.

**Part 2: Tax Representations**

(a)    Payer Tax Representations. For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

    It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)    Payee Tax Representations. For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a corporation duly organized and validly existing under the laws of the British Virgin Islands.

(c)    Tax Representations in Confirmations. For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

20

Part 3: Agreement to Deliver Documents

For the purpose of <u>Sections 4(a)(i)</u> and <u>(ii)</u> of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)   Party A and Party B will deliver forms and/or documents described in <u>Section 4(a)(iii)</u> of this Agreement upon reasonable demand by the other party.

(b)   Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report of its Credit Support Provider containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |
| Party A and Party B | A copy of a letter from a process agent in England and Wales acknowledging and confirming such agent's appointment as Process Agent. | Upon execution of this Agreement | Yes |

21

Part 4: Miscellaneous

(a)    Addresses for Notices. For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to **Party A**:

| | |
|---|---|
| Address: | Lehman Brothers Special Financing Inc. |
| | c/o Lehman Brothers Inc. |
| | Transaction Management Group |
| | Corporate Advisory Division |
| | 745 Seventh Avenue |
| | New York, NY 10019 |
| | |
| Attention: | Documentation Manager |
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |

For all purposes.

Address for notices or communications to **Party B**:

| | |
|---|---|
| Address: | Lincore Limited |
| | c/o 7th Floor, Cheung Kong Center |
| | 2 Queen's Road Central |
| | Hong Kong |
| | |
| Attention: | Mr Ip Tak Chuen, Edmond |
| Telephone No.: | (852) 2128 8888 |
| Facsimile No.: | (852) 2845 2057 |
| | |
| With a copy to: | Lincore Limited |
| | c/o 2 Dai Fu Street |
| | Tai Po Industrial Estate |
| | Hong Kong |
| | |
| Attention: | Mr Leon Lam / Ms Irene Cheng |
| Telephone No.: | (832) 2126 1222 / (852) 2126 1294 |
| Facsimile No.: | (852) 2126 1233 |

For all purposes.

(b)    Process Agent. For the purpose of <u>Section 13(c)</u> of this Agreement:

| | |
|---|---|
| Party A appoints as its Process Agent: | Lehman Brothers International (Europe) |
| | Attention: Head of Transaction Management Group, Europe |
| | 25 Bank Street |
| | London E14 5LE |
| | England |
| | |
| Party B appoints as its Process Agent: | Cheung Kong International Ltd. |
| | 18 Bentinck Street |
| | London W1U 2AR |
| | England |

(c)    Offices. The provisions of <u>Section 10(a)</u> will apply to this Agreement.

22

(d)    **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)    **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)    **Credit Support Document.** Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in this Agreement or such Confirmation:

In the case of Party A:

Guarantee of Party A's obligations hereunder by Party A's Credit Support Provider in the form annexed hereto as Exhibit A to this Schedule.

In the case of Party B:

Guarantee of Party B's obligations hereunder by Party B's Credit Support Provider in the form annexed hereto as Exhibit B to this Schedule.

(g)    **Credit Support Provider.**

Credit Support Provider means in relation to Party A:    Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B:    CK Life Sciences Int'l., (Holdings) Inc.

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of England and Wales.

(i)    **Netting of Payments.** <u>Subparagraph (ii)</u> of <u>Section 2(c)</u> of this Agreement will <u>not</u> apply to any Transactions.

(j)    "**Affiliate**" will have the meaning specified in <u>Section 14</u> of this Agreement, <u>provided, however,</u> that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

23

Part 5: Other Provisions

(a)    Representations.    Section 3 of this Agreement is hereby amended by adding the following additional subsections:

    (g)    *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

    (h)    *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

    (i)    *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

    (j)    *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

    (k)    *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)    Additional Representations of Party B. Party B represents to Party A in accordance with Section 3 of the Agreement (which representations will be deemed to be repeated by Party B at all times until termination of this Agreement) that:

    (i)    Complex Risks. It understands that the Transactions contemplated hereunder are subject to complex risks which may arise without warning, may at times be volatile, and that losses may occur quickly and in unanticipated magnitude.

    (ii)    Sophisticated Investor. It is a sophisticated investor able to evaluate the terms, conditions and risks of the Transactions contemplated hereunder and accepts such terms, conditions and risks.

    (iii)    Assumption of Risks. It is capable of assuming and assumes, all risks (financial and otherwise) associated with the Transactions contemplated hereunder.

    (iv)    Compliance with Laws. It is in all respects in compliance with all applicable laws, rules, regulations, interpretations, guidelines, procedures, and policies of applicable regulatory authorities affecting Party B's obligations under this Agreement and the Transactions, or the performance of Party B's obligations hereunder.

    (v)    No Restrictions. It is in compliance with all provisions of its internal management regulations or any other non-public documents (the "Investment Guidelines"). No provision of the Investment Guidelines fetters Party B's ability to execute, deliver and perform its obligations under this Agreement and each Transaction.

24

(c)    Set-off. Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

    (f)    *Set-off.*

    (i)    In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

    (ii)    For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

    (iii)    If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

    (iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(d)    Transfer. Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be otherwise identical to the guarantee then in effect of the obligations of the transferor.

(e)    Notices. For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(f)    Service of Process. The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(g)    Outstanding Specified Transactions. Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(h)    Waiver of Trial By Jury. Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(i)    Accuracy of Specified Information. Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(j)    Failure to Pay or Deliver. Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

(k)    **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(l)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(m)    **Recording of Conversations.** Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, and (ii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.

26

Part 6: Additional Terms for FX Transactions and Currency Options

(a)    Incorporation and Amendment of 1998 FX and Currency Option Definitions

(i)    Incorporation of 1998 FX and Currency Option Definitions. The 1998 FX and Currency Option Definitions, as amended from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

(ii)    Amendment of 1998 FX and Currency Option Definitions. The following amendments are made to the 1998 Definitions:

Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

Currency Obligation. "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)    Confirmations. Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)    Netting and Related Provisions. Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

(i)    Netting, Discharge and Termination of FX Transactions. The following provisions shall apply to FX Transactions:

Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

(ii)    Netting, Discharge and Termination with Respect to Currency Option Transactions. The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

27

(d)    **Inconsistencies.** In the event of any conflict between:

(i)    the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

(ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(iii)    the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)    **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.


The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

|  |  |
|---|---|
| **LEHMAN BROTHERS**<br>**SPECIAL FINANCING INC.**<br>*(Name of Party)* | **LINCORE LIMITED**<br><br>*(Name of Party)* |

By: _____

Name: Scott Enright

Title: SVP

Date: 3/3/0 L

By: _____

Name: Ip Tak Chuen, Edmond

Title: Director

Date: 11th November, 2005

# LEHMAN BROTHERS

### EXHIBIT A to Schedule

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and LINCORE LIMITED ("Party B") have entered into a Master Agreement dated as of June 9, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

1

# LEHMAN BROTHERS

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, NY 10022 USA (Facsimile No. (212) 526-0339) with a copy to Lehman Brothers Special Financing Inc., c/o Lehman Brothers Inc., Corporate Advisory Division, Attention: Transaction Management Group, 745 Seventh Avenue, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:
Date:

2

EXHIBIT B to Schedule

[LETTERHEAD OF CK LIFE SCIENCES INT'L (HOLDINGS) INC.]

DEED OF GUARANTEE OF CK LIFE SCIENCES INT'L. (HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and LINCORE LIMITED ("Party B") have entered into a Master Agreement dated as of [□] 2005, (the "Master Agreement"), pursuant to which Party A and Party B have entered into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party B by Party A under the Agreement, CK LIFE SCIENCES INT'L., (HOLDINGS) INC., a corporation organized and existing under the laws of the Cayman Islands ("Guarantor"), hereby agrees to the following:

(a)  Guarantor hereby unconditionally guarantees to Party A the due and punctual payment of all amounts payable by Party B under each Transaction when and as Party B's obligations thereunder shall become due and payable in accordance with the terms of the Agreement.  In case of the failure of Party B to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party A, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)  Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)  Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party B (other than as a result of the unenforceability thereof against Party A), the absence of any action to enforce Party B's obligations under the Agreement, any waiver or consent by Party A with respect to any provisions thereof, the entry by Party B and Party A into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defence of a guarantor (excluding the defence of payment or statute of limitations, neither of which is waived); provided, however, that Guarantor shall be entitled to exercise any right that Party B could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party A, but only to the extent such right is provided to Party B under the Agreement. The Guarantor acknowledges that Party B and Party A may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party B and Party A extend to all such Transactions without the taking of further action by the Guarantor.

(d)  This Guarantee shall remain in full force and effect until such time as Party A shall receive written notice of termination.  Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)  Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party A upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party B or Guarantor.

(f)  Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party A exhaust any right to take any action against Party B or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of England, without reference to choice of law doctrine. The Guarantor hereby submits to the jurisdiction of the English courts and waives any objection it may have to the bringing of proceedings in relation to the Agreement or this Guarantee in such court. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Cheung Kong International Limited of 18 Bentinck Street, London W1U 2AR, United Kingdom.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed as a deed as of the date of the Agreement.

EXECUTED AS A DEED BY
CK LIFE SCIENCES INT'L., (HOLDINGS) INC.

_____    )

Name:

Title:

Date:



# CK Life Sciences Int'l. (Holdings) Inc.

長 江 生 命 科 技 集 團 有 限 公 司

(Incorporated in the Cayman Islands with limited liability)
(於開曼群島註冊成立的有限公司)

## DEED OF GUARANTEE OF CK LIFE SCIENCES INT'L., (HOLDINGS) INC.

**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A") and **LINCORE LIMITED** ("Party B") have entered into a Master Agreement dated as of 9 June 2005, (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party B by Party A under the Agreement, **CK LIFE SCIENCES INT'L., (HOLDINGS) INC.**, a corporation organized and existing under the laws of the Cayman Islands ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party A the due and punctual payment of all amounts payable by Party B under each Transaction when and as Party B's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party B to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party A, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party B (other than as a result of the unenforceability thereof against Party A), the absence of any action to enforce Party B's obligations under the Agreement, any waiver or consent by Party A with respect to any provisions thereof, the entry by Party B and Party A into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defence of a guarantor (excluding the defence of payment or statute of limitations, neither of which is waived); provided, however, that Guarantor shall be entitled to exercise any right that Party B could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party A, but only to the extent such right is provided to Party B under the Agreement. The Guarantor acknowledges that Party B and Party A may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party B and Party A extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party A shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party A upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party B or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party A exhaust any right to take any action against Party B or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

...../2

**Principal Place of Business**
7th Floor, Cheung Kong Center, 2 Queen's Road Central, Hong Kong
香港皇后大道中2號長江集團中心7樓

Tel (852) 2128 8888 / (852) 2526 6911    Fax (852) 2845 2940

**Head Office**
2 Dai Fu Street, Tai Po Industrial Estate, Hong Kong
香港大埔工業邨大富街2號

Tel (852) 2126 1212    Fax (852) 2126 1211

**CHEUNG KONG INTERNATIONAL LIMITED**
18 Bentinck Street
London W1U 2AR
United Kingdom

As of 9th June, 2005

Lincore Limited
c/o 7th Floor
Cheung Kong Center
2 Queen's Road Central
Hong Kong

Dear Sirs,

**ISDA Master Agreement between Lehman Brothers Special Financing Inc. and
Lincore Limited**

We, the undersigned, hereby accept our appointment to receive on your behalf the
service of process issued out of the courts of England and Wales in respect of any
legal action or proceedings arising out of, or in connection with, the ISDA Master
Agreement dated as of 9 June 2005 between Lehman Brothers Special Financing Inc.
and Lincore Limited.

Yours faithfully

.......................................
For and on behalf of
Cheung Kong International Limited

*Else/a(91)/ISDA(6)/Lehman - Lincore*

Lincore Limited
As per Resolutions in Writing of the Board of Directors
dated 11th November, 2005
Authorised Signatories List



Name                                                    Specimen Signature

### Group A

Yu Ying Choi, Alan Abel
D121392(0)

Pang Shiu Fun
A600496(5)

Lam Hing Chau, Leon
D383946(0)

Chu Kee Hung
E145190(5)

### Group B

Li Tzar Kuoi, Victor
D457843(1)



Kam Hing Lam
A682897(6)

Ip Tak Chuen, Edmond
E440617(A)

Signing Instructions
(i)    any two of Group A or Group B jointly for an amount up to HK$100,000; and
(ii)   any two but at least one from Group B jointly for an amount of more than HK$100,000.

Signlist-choi/erica

Certified True Copy

*Director/Secretary*

## CK LIFE SCIENCES INT'L., (HOLDINGS) INC.
(Incorporated in the Cayman Islands with limited liability)

RESOLUTIONS IN WRITING OF THE BOARD OF DIRECTORS OF THE COMPANY PASSED PURSUANT TO ARTICLE 133 OF THE COMPANY'S ARTICLES OF ASSOCIATION

GUARANTEE IN FAVOUR OF LEHMAN BROTHERS SPECIAL FINANCING INC. – ISDA MASTER AGREEMENT

Annexed hereto are the following documents:

(a)    an ISDA Master Agreement (the "Agreement") dated as of 9th June, 2005 to be entered into between Lehman Brothers Special Financing Inc. ("LBSF") and Lincore Limited ("Lincore") for transactions entered and/or anticipated entering into as from 9th June, 2005 (the "Transactions") as therein provided including swap and option transactions upon and subject to the terms and conditions thereof; and

(b)    a deed of guarantee (the "Guarantee") effective as of 9th June, 2005 to be executed by the Company in favour of LBSF to guarantee the performance of Lincore under the Agreement limited to the obligations of Lincore under the Transactions of the Agreement.

Noted that:

(i)     the Company indirectly holds a 100% equity interest in Lincore and it is a condition of the Agreement that the Company shall provide the Guarantee; and

(ii)    each of the Directors of the Company has declared his/her interest, if any, in relation to the transactions contemplated by the above documents and no Director of the Company has any material interest in the matters to be transacted except by virtue of certain Directors being also directors of Lincore, and the Directors confirmed that it is bona fide in the commercial interests of the Company to provide the Guarantee.

RESOLVED THAT the Guarantee effective as of 9th June, 2005 be approved, ratified and confirmed upon and subject to the terms and conditions set out therein and THAT any two Directors of the Company be and are hereby authorised for and on behalf of the Company to sign and, where required, to affix the common seal of the Company to, the same subject to such necessary amendments as such Directors may approve and their signatures on the same shall be conclusive evidence of their approval.

Dated as of  11th November, 2005

Li Tzar Kuoi, Victor                          Kam Hing Lam



*Healthy* Strides

Sustained *Growth*

**CK Life Sciences Int'l. (Holdings) Inc.**
長 江 生 命 科 技 集 團 有 限 公 司
(Incorporated in the Cayman Islands with limited liability)

Annual Report 2004

**LINCORE LIMITED**
(Incorporated in the British Virgin Islands)

RESOLUTIONS IN WRITING OF THE BOARD OF DIRECTORS OF THE COMPANY
PASSED PURSUANT TO SECTION 51 OF THE INTERNATIONAL BUSINESS COMPANIES
ACT (CAP. 291) AS OF 11TH NOVEMBER, 2005

---

## LEHMAN BROTHERS SPECIAL FINANCING INC. - ISDA MASTER AGREEMENT AND CREDIT SUPPORT ANNEX

Annexed hereto are the following documents:

(a) an ISDA Master Agreement ("ISDA Master Agreement") dated as of 9th June, 2005 to be entered into between Lehman Brothers Special Financing Inc. ("LBSF") and the Company for transactions entered and/or anticipated entering into as from 9th June, 2005 ("Transactions") as therein provided including swap and option transactions upon and subject to the terms and conditions thereof;

(b) a Credit Support Annex to the Schedule to the ISDA Master Agreement ("Credit Support Annex") dated as of 9th June, 2005 to be entered into between LBSF and the Company; and

(c) A deed of guarantee ("Guarantee") effective as of 9th June, 2005 to be executed by CK Life Sciences Int'l., (Holdings) Inc. ("CKLS") in favour of LBSF to guarantee the performance of the Company under the ISDA Master Agreement limited to the obligations of the Company under the Transactions of the ISDA Master Agreement.

Noted that:

(i) each of the Directors has declared his/her interest, if any, in relation to the transactions contemplated by the above documents; and

(ii) CKLS, which holds a 100% interest in the Company, has agreed to provide the Guarantee in favour of LBSF.

RESOLVED THAT:

1. the ISDA Master Agreement and the Credit Support Annex and the transactions thereby contemplated be approved, ratified and confirmed as effective from 9th June, 2005;

2. any one Director of the Company be and is hereby authorised for and on behalf of the Company to sign and where required, to affix the common seal of the Company to the ISDA Master Agreement and the Credit Support Annex and any and all other documents incidental thereto with such amendments, alterations or additions thereto, if any, as he/she may in his/her absolute discretion think fit, whose signature thereto shall be conclusive evidence of his/her approval to such amendments, alterations or additions;

.../2

Lincore Limited
Board Resolutions dated as of 11th November, 2005
*- Lehman Brothers - ISDA Master Agreement and Credit Support Annex*



- 2 -

3.  any one Director of the Company be and is hereby authorised for and on behalf of the Company to do any acts and things deemed by him/her to be necessary or expedient in order to facilitate the signing of and/or to give effect to the ISDA Master Agreement and the Credit Support Annex and the transactions thereby contemplated and to sign all other documents necessary for completion of the same by the Company; and

4.  (a)  the following persons be hereby appointed and authorised to give any verbal instructions to place orders with LBSF in relation to the ISDA Master Agreement in the following manner:-

   (i)  By either Mr. Ip Tak Chuen, Edmond or Ms. Pau Yee Wan, Ezra solely; or

   (ii)  In their absence, by Mr. Li Tzar Kuoi, Victor solely.

   (b)  the following persons be hereby appointed and authorised for and on behalf of the Company to sign any documents, instruments, agreements or other documents incidental thereto which may be necessary pursuant to the ISDA Master Agreement in the following manner:

   <u>Authorised Signatories</u>
   <u>Group A</u>
   Mr. Yu Ying Choi, Alan Abel
   Professor Pang Shiu Fun
   Mr. Lam Hing Chau, Leon
   Dr. Chu Kee Hung

   <u>Group B</u>
   Mr. Li Tzar Kuoi, Victor
   Mr. Kam Hing Lam
   Mr. Ip Tak Chuen, Edmond

   <u>Signing Instructions</u>
   (i)  any two of Group A or Group B jointly for an amount up to HK$100,000; and
   (ii)  any two but at least one from Group B jointly for an amount of more than HK$100,000.

Dated as of 11th November, 2005

_____
Kam Hing Lam

_____
Ip Tak Chuen, Edmond

...../3

Lincore Limited
Board Resolutions dated as of 11th November, 2005
*- Lehman Brothers - ISDA Master Agreement and Credit Support Annex*

- 3 -


_____                    _____
Lau Chin Sung, John                          Neil Douglas McGee


_____                    _____
Yeo May Ann, Annie                           Wang Qi, James

Lincore Limited
Board Resolutions dated as of 11th November, 2005
- *Lehman Brothers - ISDA Master Agreement and Credit Support Annex*

- 3 -

_____
Lau Chin Sung, John

_____
Neil Douglas McGee

_____
Yeo May Ann, Annie

_____
Wang Qi, James

Lincore Limited
Board Resolutions dated as of 11th November, 2005
- *Lehman Brothers - ISDA Master Agreement and Credit Support Annex*

- 3 -

_____
Lau Chin Sung, John

_____
Neil Douglas McGee

_____
Yeo May Ann, Annie

_____
Wang Qi, James



Lincore Limited
Board Resolutions dated as of 11th November, 2005
*- Lehman Brothers - ISDA Master Agreement and Credit Support Annex*

- 3 -

_____
Lau Chin Sung, John

_____
Neil Douglas McGee

_____
Yeo May Ann, Annie

_____
Wang Qi, James

AlV/Lincore/2005/Res_LBSP_ISDA

CERTIFIED TRUE COPY

**LINCORE LIMITED**
(Incorporated in the British Virgin Islands)

*IRENE YEUNG*
*Solicitor*
*Hong Kong SAR*

RESOLUTIONS IN WRITING OF THE BOARD OF DIRECTORS OF THE COMPANY
PASSED PURSUANT TO SECTION 51 OF THE INTERNATIONAL BUSINESS COMPANIES
ACT (CAP. 291) AS OF 11TH NOVEMBER, 2005

---

## LEHMAN BROTHERS SPECIAL FINANCING INC. - ISDA MASTER AGREEMENT AND CREDIT SUPPORT ANNEX

Annexed hereto are the following documents:

(a)    an ISDA Master Agreement ("ISDA Master Agreement") dated as of 9th June, 2005 to be entered into between Lehman Brothers Special Financing Inc. ("LBSF") and the Company for transactions entered and/or anticipated entering into as from 9th June, 2005 ("Transactions") as therein provided including swap and option transactions upon and subject to the terms and conditions thereof;

(b)    a Credit Support Annex to the Schedule to the ISDA Master Agreement ("Credit Support Annex") dated as of 9th June, 2005 to be entered into between LBSF and the Company; and

(c)    A deed of guarantee ("Guarantee") effective as of 9th June, 2005 to be executed by CK Life Sciences Int'l., (Holdings) Inc. ("CKLS") in favour of LBSF to guarantee the performance of the Company under the ISDA Master Agreement limited to the obligations of the Company under the Transactions of the ISDA Master Agreement.

Noted that:

(i)    each of the Directors has declared his/her interest, if any, in relation to the transactions contemplated by the above documents; and

(ii)    CKLS, which holds a 100% interest in the Company, has agreed to provide the Guarantee in favour of LBSF.

RESOLVED THAT:

1.    the ISDA Master Agreement and the Credit Support Annex and the transactions thereby contemplated be approved, ratified and confirmed as effective from 9th June, 2005;

2.    any one Director of the Company be and is hereby authorised for and on behalf of the Company to sign and where required, to affix the common seal of the Company to the ISDA Master Agreement and the Credit Support Annex and any and all other documents incidental thereto with such amendments, alterations or additions thereto, if any, as he/she may in his/her absolute discretion think fit, whose signature thereto shall be conclusive evidence of his/her approval to such amendments, alterations or additions;

.../2

(Bilateral Form – Transfer)[1]     (ISDA Agreements Subject to English Law)[2]



## ISDA®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

## ISDA Master Agreement

dated as of June 9, 2005

between

**LEHMAN BROTHERS SPECIAL**          **LINCORE LIMITED**
**FINANCING INC.**          and
("Party A")          ("Party B")

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above and is part of its Schedule. For the purposes of this Agreement, including, without limitation, Sections 1(c), 2(a), 5 and 6, the credit support arrangements set out in this Annex constitute a Transaction (for which this Annex constitutes the Confirmation).

### Paragraph 1.  Interpretation

Capitalised terms not otherwise defined in this Annex or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 10, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 11 and the other

---

[1] This document is not intended to create a charge or other security interest over the assets transferred under its terms. Persons intending to establish a collateral arrangement based on the creation of a charge or other security interest should consider using the ISDA Credit Support Deed (English law) or the ISDA Credit Support Annex (New York law), as appropriate.

[2] This Credit Support Annex has been prepared for use with ISDA Master Agreements subject to English law. Users should consult their legal advisers as to the proper use and effect of this form and the arrangements it contemplates. In particular, users should consult their legal advisers if they wish to have the Credit Support Annex made subject to a governing law other than English law or to have the Credit Support Annex subject to a different governing law than that governing the rest of the ISDA Master Agreement (e.g., English law for the Credit Support Annex and New York law   for the rest of the ISDA Master Agreement).

Copyright © 1995 by International Swaps and Derivatives Association, Inc.

provisions of this Annex, Paragraph 11 will prevail. For the avoidance of doubt, references to "transfer" in this Annex mean, in relation to cash, payment and, in relation to other assets, delivery.

## Paragraph 2. Credit Support Obligations

(a)    *Delivery Amount.* Subject to Paragraphs 3 and 4, upon a demand made by the Transferee on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Transferor's Minimum Transfer Amount, then the Transferor will transfer to the Transferee Eligible Credit Support having a Value as of the date of transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 11(b)(iii)(D)). Unless otherwise specified in Paragraph 11(b), the "Delivery Amount" applicable to the Transferor for any Valuation Date will equal the amount by which:

(i)    the Credit Support Amount

exceeds

(ii)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date).

(b)    *Return Amount.*    Subject to Paragraphs 3 and 4, upon a demand made by the Transferor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Transferee's Minimum Transfer Amount, then the Transferee will transfer to the Transferor Equivalent Credit Support specified by the Transferor in that demand having a Value as of the date of transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 11(b)(iii)(D)) and the Credit Support Balance will, upon such transfer, be reduced accordingly. Unless otherwise specified in Paragraph 11(b), the "Return Amount" applicable to the Transferee for any Valuation Date will equal the amount by which:

(i)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date)

exceeds

(ii)    the Credit Support Amount.

## Paragraph 3. Transfers, Calculations and Exchanges

(a)    *Transfers.*    All transfers under this Annex of any Eligible Credit Support, Equivalent Credit Support, Interest Amount or Equivalent Distributions shall be made in accordance with the instructions of the Transferee or Transferor, as applicable, and shall be made:

(i)    in the case of cash, by transfer into one or more bank accounts specified by the recipient;

(ii)    in the case of certificated securities which cannot or which the parties have agreed will not be delivered by book-entry, by delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, transfer tax stamps and any other documents necessary to constitute a legally valid transfer of the transferring party's legal and beneficial title to the recipient; and

(iii)    in the case of securities which the parties have agreed will be delivered by book-entry, by the giving of written instructions (including, for the avoidance of doubt, instructions given by telex, facsimile transmission or electronic messaging system) to the relevant depository institution or other entity specified by the recipient, together with a written copy of the instructions to the recipient, sufficient, if complied with, to result in a legally effective transfer of the transferring party's legal and beneficial title to the recipient.

Subject to Paragraph 4 and unless otherwise specified, if a demand for the transfer of Eligible Credit Support or Equivalent Credit Support is received by the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the date such demand is received; if a demand is received after the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the day after the date such demand is received.

(b)    *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 2 and 4(a) will be made by the relevant Valuation Agent as of the relevant Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or, in the case of Paragraph 4(a), following the date of calculation).

(c)    *Exchanges.*

(i)    Unless otherwise specified in Paragraph 11, the Transferor may on any Local Business Day by notice inform the Transferee that it wishes to transfer to the Transferee Eligible Credit Support specified in that notice (the "New Credit Support") in exchange for certain Eligible Credit Support (the "Original Credit Support") specified in that notice comprised in the Transferor's Credit Support Balance.

(ii)    If the Transferee notifies the Transferor that it has consented to the proposed exchange, (A) the Transferor will be obliged to transfer the New Credit Support to the Transferee on the first Settlement Day following the date on which it receives notice (which may be oral telephonic notice) from the Transferee of its consent and (B) the Transferee will be obliged to transfer to the Transferor Equivalent Credit Support in respect of the Original Credit Support not later than the Settlement Day following the date on which the Transferee receives the New Credit Support, unless otherwise specified in Paragraph 11(d) (the "Exchange Date"); *provided* that the Transferee will only be obliged to transfer Equivalent Credit Support with a Value as of the date of transfer as close as practicable to, but in any event not more than, the Value of the New Credit Support as of that date.

ISDA® 1995

**Paragraph 4. Dispute Resolution**

(a)     *Disputed Calculations or Valuations.* If a party (a "Disputing Party") reasonably disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, then:

>    (1)     the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following, in the case of (I) above, the date that the demand is received under Paragraph 2 or, in the case of (II) above, the date of transfer;

>    (2)     in the case of (I) above, the appropriate party will transfer the undisputed amount to the other party not later than the close of business on the Settlement Day following the date that the demand is received under Paragraph 2;

>    (3)     the parties will consult with each other in an attempt to resolve the dispute; and

>    (4)     if they fail to resolve the dispute by the Resolution Time, then:

>>    (i)     in the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 11(c), the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

>>>    (A)     utilising any calculations of that part of the Exposure attributable to the Transactions that the parties have agreed are not in dispute;

>>>    (B)     calculating that part of the Exposure attributable to the Transactions in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction, then fewer than four quotations may be used for that Transaction, and if no quotations are available for a particular Transaction, then the Valuation Agent's original calculations will be used for the Transaction; and

>>>    (C)     utilising the procedures specified in Paragraph 11(e)(ii) for calculating the Value, if disputed, of the outstanding Credit Support Balance;

>>    (ii)    in the case of a dispute involving the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, the Valuation Agent will recalculate the Value as of the date of transfer pursuant to Paragraph 11(e)(ii).

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) as soon as possible but in any event not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following such notice given by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraph 3(a), make the appropriate transfer.

ISDA® 1995

(b)    *No Event of Default.*  The failure by a party to make a transfer of any amount which is the subject of a dispute to which Paragraph 4(a) applies will not constitute an Event of Default for as long as the procedures set out in this Paragraph 4 are being carried out. For the avoidance of doubt, upon completion of those procedures, Section 5(a)(i) of this Agreement will apply to any failure by a party to make a transfer required under the final sentence of Paragraph 4(a) on the relevant due date.

**Paragraph 5. Transfer of Title, No Security Interest, Distributions and Interest Amount**

(a)    *Transfer of Title.*  Each party agrees that all right, title and interest in and to any Eligible Credit Support, Equivalent Credit Support, Equivalent Distributions or Interest Amount which it transfers to the other party under the terms of this Annex shall vest in the recipient free and clear of any liens, claims, charges or encumbrances or any other interest of the transferring party or of any third person (other than a lien routinely imposed on all securities in a relevant clearance system).

(b)    *No Security Interest.*  Nothing in this Annex is intended to create or does create in favour of either party any mortgage, charge, lien, pledge, encumbrance or other security interest in any cash or other property transferred by one party to the other party under the terms of this Annex.

(c)    *Distributions and Interest Amount.*

(i)    *Distributions.*  The Transferee will transfer to the Transferor not later than the Settlement Day following each Distributions Date cash, securities or other property of the same type, nominal value, description and amount as the relevant Distributions ("Equivalent Distributions") to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

(ii)    *Interest Amount.*  Unless otherwise specified in Paragraph 11(f)(iii), the Transferee will transfer to the Transferor at the times specified in Paragraph 11(f)(ii) the relevant Interest Amount to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

**Paragraph 6. Default**

If an Early Termination Date is designated or deemed to occur as a result of an Event of Default in relation to a party, an amount equal to the Value of the Credit Support Balance, determined as though the Early Termination Date were a Valuation Date, will be deemed to be an Unpaid Amount due to the Transferor (which may or may not be the Defaulting Party) for purposes of Section 6(e). For the avoidance of doubt, if Market Quotation is the applicable payment measure for purposes of Section 6(e), then the Market Quotation determined under Section 6(e) in relation to the Transaction constituted by this Annex will be deemed to be zero, and, if Loss is the applicable payment measure for purposes of Section 6(e), then the Loss determined under Section 6(e) in relation to the Transaction will be limited to the Unpaid Amount representing the Value of the Credit Support Balance.

ISDA® 1995

**Paragraph 7. Representation**

Each party represents to the other party (which representation will be deemed to be repeated as of each date on which it transfers Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions) that it is the sole owner of or otherwise has the right to transfer all Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions it transfers to the other party under this Annex, free and clear of any security interest, lien, encumbrance or other restriction (other than a lien routinely imposed on all securities in a relevant clearance system).

**Paragraph 8. Expenses**

Each party will pay its own costs and expenses (including any stamp, transfer or similar transaction tax or duty payable on any transfer it is required to make under this Annex) in connection with performing its obligations under this Annex, and neither party will be liable for any such costs and expenses incurred by the other party.

**Paragraph 9. Miscellaneous**

(a)    *Default Interest.*    Other than in the case of an amount which is the subject of a dispute under Paragraph 4(a), if a Transferee fails to make, when due, any transfer of Equivalent Credit Support, Equivalent Distributions or the Interest Amount, it will be obliged to pay the Transferor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value on the relevant Valuation Date of the items of property that were required to be transferred, from (and including) the date that the Equivalent Credit Support, Equivalent Distributions or Interest Amount were required to be transferred to (but excluding) the date of transfer of the Equivalent Credit Support, Equivalent Distributions or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Good Faith and Commercially Reasonable Manner.*    Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(c)    *Demands and Notices.*    All demands and notices given by a party under this Annex will be given as specified in Section 12 of this Agreement.

(d)    *Specifications of Certain Matters.*    Anything referred to in this Annex as being specified in Paragraph 11 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 10. Definitions**

As used in this Annex:

*"Base Currency"* means the currency specified as such in Paragraph 11(a)(i).

ISDA® 1995

*"Base Currency Equivalent"* means, with respect to an amount on a Valuation Date, in the case of an amount denominated in the Base Currency, such Base Currency amount and, in the case of an amount denominated in a currency other than the Base Currency (the "Other Currency"), the amount of Base Currency required to purchase such amount of the Other Currency at the spot exchange rate determined by the Valuation Agent for value on such Valuation Date.

*"Credit Support Amount"* means, with respect to a Transferor on a Valuation Date, (i) the Transferee's Exposure plus (ii) all Independent Amounts applicable to the Transferor, if any, minus (iii) all Independent Amounts applicable to the Transferee, if any, minus (iv) the Transferor's Threshold; *provided, however*, that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

*"Credit Support Balance"* means, with respect to a Transferor on a Valuation Date, the aggregate of all Eligible Credit Support that has been transferred to or received by the Transferee under this Annex, together with any Distributions and all proceeds of any such Eligible Credit Support or Distributions, as reduced pursuant to Paragraph 2(b), 3(c)(ii) or 6. Any Equivalent Distributions or Interest Amount (or portion of either) not transferred pursuant to Paragraph 5(c)(i) or (ii) will form part of the Credit Support Balance.

*"Delivery Amount"* has the meaning specified in Paragraph 2(a).

*"Disputing Party"* has the meaning specified in Paragraph 4.

*"Distributions"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance consisting of securities, all principal, interest and other payments and distributions of cash or other property to which a holder of securities of the same type, nominal value, description and amount as such Eligible Credit Support would be entitled from time to time.

*"Distributions Date"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance other than cash, each date on which a holder of such Eligible Credit Support is entitled to receive Distributions or, if that date is not a Local Business Day, the next following Local Business Day.

*"Eligible Credit Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 11(b)(ii) including, in relation to any securities, if applicable, the proceeds of any redemption in whole or in part of such securities by the relevant issuer.

*"Eligible Currency"* means each currency specified as such in Paragraph 11(a)(ii), if such currency is freely available.

*"Equivalent Credit Support"* means, in relation to any Eligible Credit Support comprised in the Credit Support Balance, Eligible Credit Support of the same type, nominal value, description and amount as that Eligible Credit Support.

*"Equivalent Distributions"* has the meaning specified in Paragraph 5(c)(i).

*"Exchange Date"* has the meaning specified in Paragraph 11(d).

7                                                    ISDA® 1995

*"Exposure"* means, with respect to a party on a Valuation Date and subject to Paragraph 4 in the case of a dispute, the amount, if any, that would be payable to that party by the other party (expressed as a positive number) or by that party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(1) of this Agreement if all Transactions (other than the Transaction constituted by this Annex) were being terminated as of the relevant Valuation Time, on the basis that (i) that party is not the Affected Party and (ii) the Base Currency is the Termination Currency; *provided* that Market Quotations will be determined by the Valuation Agent on behalf of that party using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11 (b)(iii)(A); if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the Base Currency Equivalents of the amounts of interest determined for each relevant currency and calculated for each day in that Interest Period on the principal amount of the portion of the Credit Support Balance comprised of cash in such currency, determined by the Valuation Agent for each such day as follows:

    (x)    the amount of cash in such currency on that day; multiplied by

    (y)    the relevant Interest Rate in effect for that day; divided by

    (z)    360 (or, in the case of pounds sterling, 365).

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Local Business Day on which Eligible Credit Support or Equivalent Credit Support in the form of cash was transferred to or received by the Transferee) to (but excluding) the Local Business Day on which the current Interest Amount is transferred.

*"Interest Rate"* means, with respect to an Eligible Currency, the rate specified in Paragraph 11(f)(i) for that currency.

*"Local Business Day"*, unless otherwise specified in Paragraph 11(h), means:

    (i)    in relation to a transfer of cash or other property (other than securities) under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment;

    (ii)    in relation to a transfer of securities under this Annex, a day on which the clearance system agreed between the parties for delivery of the securities is open for the acceptance and execution of settlement instructions or, if delivery of the securities is contemplated by other means, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place(s) agreed between the parties for this purpose;

ISDA® 1995

(iii)   in relation to a valuation under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place of location of the Valuation Agent and in the place(s) agreed between the parties for this purpose; and

(iv)   in relation to any notice or other communication under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place specified in the address for notice most recently provided by the recipient.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 11(b)(iii)(C); if no amount is specified, zero.

*"New Credit Support"* has the meaning specified in Paragraph 3(c)(i).

*"Notification Time"* has the meaning specified in Paragraph 11(c)(iv).

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 4; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 2 prior to the resolution of the dispute, then the *"Recalculation Date"* means the most recent Valuation Date under Paragraph 2.

*"Resolution Time"* has the meaning specified in Paragraph 11(c)(i).

*"Return Amount"* has the meaning specified in Paragraph 2(b).

*"Settlement Day"* means, in relation to a date, (i) with respect to a transfer of cash or other property (other than securities), the next Local Business Day and (ii) with respect to a transfer of securities, the first Local Business Day after such date on which settlement of a trade in the relevant securities, if effected on such date, would have been settled in accordance with customary practice when settling through the clearance system agreed between the parties for delivery of such securities or, otherwise, on the market in which such securities are principally traded (or, in either case, if there is no such customary practice, on the first Local Business Day after such date on which it is reasonably practicable to deliver such securities).

*"Threshold"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11(b)(iii)(B); if no amount is specified, zero.

*"Transferee"* means, in relation to each Valuation Date, the party in respect of which Exposure is a positive number and, in relation to a Credit Support Balance, the party which, subject to this Annex, owes such Credit Support Balance or, as the case may be, the Value of such Credit Support Balance to the other party.

*"Transferor"* means, in relation to a Transferee, the other party.

*"Valuation Agent"* has the meaning specified in Paragraph 11(c)(i).

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 11(c)(ii).

9                                    ISDA® 1995

*"Valuation Percentage"* means, for any item of Eligible Credit Support, the percentage specified in Paragraph 11(b)(ii).

*"Valuation Time"* has the meaning specified in Paragraph 11(c)(iii).

*"Value"* means, for any Valuation Date or other date for which Value is calculated, and subject to Paragraph 4 in the case of a dispute, with respect to:

    (i)    Eligible Credit Support comprised in a Credit Support Balance that is:

        (A)    an amount of cash, the Base Currency Equivalent of such amount multiplied by the applicable Valuation Percentage, if any; and

        (B)    a security, the Base Currency Equivalent of the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any; and

    (ii)    items that are comprised in a Credit Support Balance and are not Eligible Credit Support, zero.

ISDA®1995

(Bilateral Form – Transfer)[1]                    (ISDA Agreements Subject to English Law)[2]

# CREDIT SUPPORT ANNEX
Elections and Variables
dated as of June 9, 2005
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.**
(hereinafter referred to as either "Party A" or "Transferee")
and
**LINCORE LIMITED**
(hereinafter referred to as either "Party B" or "Transferor")

## PARAGRAPH 11. ELECTIONS AND VARIABLES

(a)     **Base Currency and Eligible Currency.**

    (i)     "Base Currency" means United States Dollars.

    (ii)     "Eligible Currency" means the Base Currency.

(b)     **Credit Support Obligations.**

    (i)     Delivery Amount, Return Amount and Credit Support Amount

        (1)     "Delivery Amount" has the meaning specified in Paragraph 2(a).

        (2)     "Return Amount" has the meaning specified in Paragraph 2(b).

        (3)     "Credit Support Amount" has the meaning specified in Paragraph 10, *provided*, however, that in the event that the sum of the Independent Amount applicable to the Transferor exceed zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Transferor.

    (ii)     Eligible Credit Support.  The following items will qualify as "Eligible Credit Support" for the party specified:

| | Collateral Type | Party B | Valuation Percentage |
|---|---|---|---|
| (1) | Cash in an Eligible Currency. | Yes | 100% |
| (2) | Negotiable debt obligations issued by the Government of the United States of America having a maturity at issuance of not more than one year. | Yes | 99% |
| (3) | Negotiable debt obligations issued by the Government of the United States of America having a maturity at issuance of more than one but not more than 5 years. | Yes | 98% |
| (4) | Negotiable debt obligations issued by the Government the United States of America having a maturity at issuance of more than 5 years but not more than 10 years. | Yes | 97% |
| (5) | Negotiable debt obligations issued by the Government the United States of America having a maturity at issuance of more than 10 years. | Yes | 95% |
| (6) | Such other Eligible Credit Support as may be agreed between the parties | Yes | As determined by Party A |

11

    (iii)    **Thresholds.**

        (1)    "Independent Amount" shall mean an amount, if any, as set forth in a Confirmation with respect to Party B.

        (2)    "Threshold" means, with respect to Party B, zero.

        (3)    "Minimum Transfer Amount" means, with respect to a party, USD15,000; provided that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that, if an Event of Default, Credit Event Upon Merger, or Additional Termination Event has occurred and is continuing, then the Minimum Transfer Amount with respect to such party shall be zero.

        (4)    Rounding.   The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of USD 1,000.

(c)    **Valuation and Timing.**

    (i)    "Valuation Agent" means Party A.

    (ii)    "Valuation Date" means any Local Business Day.

    (iii)    "Valuation Time" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

    (iv)    "Notification Time" means by 5:00 p.m., Tokyo time, on a Local Business Day.

(d)    "Exchange Date" has the meaning specified in Paragraph 3(c)(ii).

(e)    **Dispute Resolution.**

    (i)    "Resolution Time" means 1:00 p.m., Tokyo time on the Local Business Day following the time at which notice is given that gives rise to a dispute under Paragraph 4.

    (ii)    Value. For the purpose of Paragraphs 4(a)(4)(i)(C) and 4(a)(4)(ii), the Value of the outstanding Credit Support Balance or of Eligible Credit Support or Equivalent Credit Support other than cash, as the case may be, will be calculated as follows:

        With respect to any Eligible Credit Support in the form of securities listed in Paragraph 11(b)(ii) (referred to herein as "Collateral Obligations") the sum of (1) (x) the bid price quoted on such date by a mutually acceptable principal market maker for such Collateral Obligations, or (y) if no such quotation is available from a principal market maker for such date, such bid price as of the day, next preceding such date, on which such quotation was available, in either case multiplied by the applicable Valuation Percentage, plus (2) the accrued interest on such Collateral Obligations (except to the extent Transferred to a party pursuant to any applicable section of this Agreement or included in the applicable price referred to in (1) of this clause) as of such date.

    (iii)    Alternative. Paragraph 4 will apply.

(f)    Distributions and Interest Amount.

      Interest Rates

      With respect to:

      (i)      USD Cash.  The Interest Rate will be the Federal Funds Rate.  "Federal Funds Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Transferee, as reported in Federal Reserve Publication H.15-519.

      (ii)     Transfer of Interest Amount.  The transfer of the Interest Amount will be made on the fifth Local Business Day of each calendar month.

      (iii)    Alternative to Interest Amount.  Paragraph 5(c)(ii) will apply.

(g)    Addresses for Transfers.

      Party A:    To be advised.

      Party B:    To be advised.

13

(h)     Other Provisions.

 (i)  Paragraph 6. For the purposes of determining the Credit Support Balance pursuant to Paragraph 6, the definition of Value in Paragraph 10 shall be amended by deleting the words "multiplied by the applicable Valuation Percentage, if any" from subsection (i)(A) and (B).

 (ii)  Agreement as to Single Transferee and Transferor. Party A and Party B agree that, notwithstanding anything to the contrary in the recital to this Annex, or definitions in Paragraph 10, (1) the term "Transferee" as used in this Annex means only Party A and (2) the term "Transferor" as used in this Annex means only Party B.

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

LEHMAN BROTHERS SPECIAL FINANCING
INC.
*Party A*

LINCORE LIMITED

*Party B*

By: _____

Name: Scott Willoughby

Title: SVP

Date: 3/3/06

By: _____

Name: Ip Tak Chuen, Edmond

Title: Director

Date: 11th November, 2005

14

CKLS

(7)

# LEHMAN BROTHERS

### Transaction

*New*

*Tom*

Date:        29 January, 2007

To:          Lincore Limited
Attention:   Documentation Unit

From:        Lehman Brothers Special Financing Inc.
             Transaction Management Group
             Facsimile:   (+1) 646-885-9556 (United States of America)
             Telephone:   (+1) 212-526-7000 (United States of America)     *(p - 2779173*

Effort Id:   1153216
Global Id:   2779173                                                        *Trade date : 1/15/2006*

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Lincore Limited ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency–Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions (the "Credit Derivatives Definitions") as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation shall govern.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Transaction: | Credit Derivative Transaction |
| Trade Date: | 1 December, 2006 |
| Effective Date: | 1 December, 2006 |
| Scheduled Termination Date: | 30 November, 2008 |
| Floating Rate Payer: | Party B (the "Seller") |
| Fixed Rate Payer: | Party A (the "Buyer") |
| Calculation Agent: | The Buyer |
| Calculation Agent City: | New York |
| Business Day: | London and New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | TOM Holdings Limited |
| Reference Obligation(s): | In respect of the Reference Entity, an obligation as determined by the Calculation Agent in its sole and absolute discretion on or prior to the Valuation Date, that meets the following criteria: |

| Category: | Characteristics: |
|---|---|
| Bond or Loan | Not Subordinated |
| | Standard Specified Currencies + HKD |
| | Not Sovereign Lender |
| | Not Contingent |
| | Assignable Loan |
| | Transferable |
| | Not Bearer |
| | Maximum Maturity: 30 years |

| | |
|---|---|
| All Guarantees: | Applicable |
| Reference Price: | 100% |

**Fixed Payments:**

Risk ID: 516878V Effort ID: 1153216 / Global Deal ID: 2779173

Page 2 of 6

| | |
|---|---|
| Fixed Rate Payer Calculation Amount: | USD25,000,000.00 |
| Fixed Rate: | 1.25% |
| Fixed Rate Day Count Fraction: | Actual/360 |
| Fixed Rate Payer Payment Dates: | 28 February, 2007, and thereafter the last day of each February, May, August, and November of each year to and including the Termination Date |

**Floating Payments:**

| | |
|---|---|
| Floating Rate Payer Calculation Amount: | USD25,000,000.00 |
| Conditions to Settlement: | Credit Event Notice |
| |     Notifying Party:       Buyer or Seller |
| | Notice of Publicly Available Information: Applicable |
| | Notice of Physical Settlement |
| Credit Event(s): | The following Credit Event(s) shall apply to this Transaction: |
| | Bankruptcy<br>Failure to Pay<br>   Grace Period Extension:   Applicable<br>   Payment Requirement: USD1,000,000.00, or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay |
| | Restructuring |
| Default Requirement: | USD10,000,000.00, or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. |

**Obligation(s):**

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristic(s): | Obligation Characteristic(s) shall mean all of the following:<br>Not Domestic Issuance<br>Not Domestic Law<br>Not Sovereign Lender<br>Not Subordinated<br>Specified Currency: Standard Specified Currencies and HKD |

**Settlement Terms:**

| | |
|---|---|
| Settlement Method: | Cash Settlement |
| Terms Relating to Cash Settlement: | |

Risk ID: 5168787 / Effort ID: 1153216 / Global Deal ID: 2779173

1/29/2007 2:34 AM    PAGE    5/007    Fax Server

| | |
|---|---|
| Valuation Date: | Single Valuation Date: 5 Business Days after satisfaction of Conditions to Settlement |
| Quotation Method: | Bid |
| Cash Settlement Date: | 3 Business Days |
| Quotations: | Exclude Accrued Interest |

In obtaining Quotations in respect of any Reference Obligation which is a Convertible Obligation or an Exchangeable Obligation, the Calculation Agent shall require each Dealer to provide its firm bid quotation excluding any amount that may be payable under the terms of such Reference Obligation in respect of the value of the Equity Securities for which such Reference Obligation is convertible or exchangeable, as if such Reference Obligation were straight bonds. Terms used above shall, where appropriate, have the meanings as used in the Credit Derivatives Definitions.

**Valuation Method:** Highest

**Collateral:** Party A and Party B agree that this provision will apply with respect to this Transaction and all other Transactions entered into between them until such time as they execute an ISDA Credit Support Annex to the Agreement.

Paragraphs one through ten of the standard form ISDA Credit Support Annex (English law) (the "CSA") are incorporated by reference herein subject to the elections and modifications set out below. Terms defined in the CSA have this same meaning herein.

**Elections and variables for the purposes of Paragraph 11 of the CSA:** "Threshold" means unlimited with respect to Party B.

**Independent Amount:** "Independent Amount" means, USD46,200,000 Lehman Brothers Treasury Co., B.V. issued 8 year linked Daily Accrual Principal Guaranteed Note due 15 June, 2012. Party B shall deliver the Independent Amount to Party A immediately upon Party A's request. Notwithstanding any provision to the contrary contained in the CSA or the Credit Support Annex (when executed), Party A shall have no obligation to return the Independent Amount to Party B until this Transaction is fully and finally terminated.

| | |
|---|---|
| Early Termination: | Party A has the right to terminate the Transaction on each Fixed Rate Payer Payment Date from and including 31 May 2007, upon no less than 10 Business Days prior written notification. Following such notification, Part A and Party B will no further obligations related to this Transaction other than the payment of the Fixed Amount to be settled on the immediately following Fixed Rate Payer Payment Date. |

**Miscellaneous:**

| | |
|---|---|
| Escrow: | Applicable |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party. |
| Transfer: | Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the full unconditional guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Governing Law: | English law; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |

**Notice and Account Details:**

Telephone, Telex and/or Facsimile Numbers and Contact Details for Notices:

| | |
|---|---|
| Buyer: | Paul Penkett<br>Telephone: +852-2252-6655<br>Facsimile: +81 3 4582 2802 |
| Cc: | Transaction Management<br>Facsimile: 646-885-9556 (United States of America) |
| Seller: | Please advise |

**Account Details:**

| | |
|---|---|
| Account Details of Buyer: | JP Morgan Chase Bank, New York<br>ABA No: 021000021 |

Risk ID: 516878 / Effort ID: 1153216 / Global Deal ID: 2779173

1/29/2007 2:34 AM    PAGE    7/007    Fax Server

Account Number: 066-143543
Account of: Lehman Brothers Special Financing Inc.
Please advise

Account Details of Seller:

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number 646-885-9556 (United States of America), Attention: Documentation.

Yours sincerely,                                    Accepted and agreed to:

Lehman Brothers Special Financing Inc.        Lincore Limited

By:  _Anatoly Kozlov_                          By:  _____
Name:  Anatoly Kozlov                          Name:   Edmond Ip
Title:  Authorized Signatory                   Title:  Director

Execution time will be furnished upon Counterparty's written request.

Risk ID: 516878 / Effort ID: 1153216 / Global Deal ID: 2779173

Page 6 of 6



# EXHIBIT B

NYCDMS/1166809.2

# LEHMAN BROTHERS

<u>GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.</u>

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and LINCORE LIMITED ("Party B") have entered into a Master Agreement dated as of June 9, 2005, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in <u>Section 5(a)(vii)</u> of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

1

# LEHMAN BROTHERS

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

JAMES J. KILLERLANE, VICE PRESIDENT

2