ALSTON & BIRD LLP
Michael E. Johnson, Esq.
90 Park Avenue
New York, New York 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

- and -

John C. Weitnauer, Esq.
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Bank of America, National Association successor by merger to LaSalle Bank National Association, in its capacity as the Libra Trustee*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | |
|---|---|
| In re | : Chapter 11 Case No. |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : 08-13555 (JMP) |
| | : |
| Debtors. | : (Jointly Administered) |

---------------------------------------------------------------x

**LIMITED OBJECTION OF BANK OF AMERICA, NATIONAL ASSOCIATION, SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, IN ITS CAPACITY AS LIBRA TRUSTEE, TO DEBTORS' MOTION FOR APPROVAL OF A SETTLEMENT AGREEMENT AMONG LBSF, LBHI, AND SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH (DOCKET NO. 11488)**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

  Bank of America, National Association, successor by merger to LaSalle Bank National Association, in its capacity as Libra Trustee and on behalf of Libra (collectively, "BANA"), files this limited objection to Debtors' Motion, Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rule 9019, for Approval of a Settlement Agreement Among

1

LBSF, LBHI, and Société Générale, New York Branch and Certain Related Relief, dated September 20, 2010 (the "Motion"),[1] and respectfully shows this Court as follows:

## I. Preliminary Statement

1. BANA does not dispute the right of LBSF, LBHI[2] and SG to arrange, *as between themselves, their respective obligations to each other* regardless of, or depending on, the ultimate disposition of one or more of the claims and demands asserted (or that may be asserted) in the Libra Adversary Proceedings; but BANA does object to the extent that the Settlement Agreement or any order of this Court approving the Settlement Agreement (i) makes or purports to make certain changes to the terms and conditions of the Libra CDSA, Libra Indenture, the Libra Senior Swap or any other documents that are part of the Libra Transaction (the "Libra Transaction Documents"), or (ii) affects or determines, or purports to affect or determine, the validity of the Libra Early Termination.

## II. Background

2. As noted in the Settlement Agreement, LBHI is LBSF's "credit support provider" under the Libra CDSA, which is a credit default swap between LBSF and Libra. Under the Libra CDSA, LBHI's chapter 11 filing constituted an "event of default" as to which LBSF is the "defaulting party." In connection with (i) LBHI's chapter 11 filing and (ii) the failure by LBSF to pay the "Fixed Payments" due to be paid by LBSF to Libra under the Libra CDSA on October 2, 2008, the Libra Trustee designated October 10, 2008 as the "early termination date" in respect of all outstanding transactions under the Libra CDSA.

---

[1] Capitalized terms not otherwise defined herein have the meanings given in the Motion.
[2] Subject of course, to Bankruptcy Court approval, in the case of the Debtors.

2

3. In the Libra Adversary Proceedings, the Debtors requested, among other things, a declaratory judgment that the Libra Early Termination was null and void, and SG, Libra and the Libra Trustee requested, among other things, a declaratory judgment that the Libra Early Termination was valid. On June 19, 2009, the Debtors filed a motion for summary judgment. On June 26, 2009, the Libra parties and SG filed a cross-motion for summary judgment. This Court has not ruled on either motion.

### III. The Motion and the Settlement Agreement – Payment and Receipt of $445 Million

4. The Motion explains that:

> Effective upon a Final Order approving the Settlement Agreement, LBSF is to receive a payment of $370 million from SG and a guaranty from SG that LBSF will recover an additional $75 million from Libra and Vela. *The payment and receipt of the $445 million* is conditioned only on the approval of the Settlement Agreement in a Final Order and *is not conditioned on the effectiveness of the Assignment Agreements*.

Motion, at ¶ 23 (emphasis added). More specifically, the Settlement Agreement provides that, on the Payment Date, SG shall pay LBSF $370 million and shall guarantee to LBSF a recovery of up to $75 million from the Libra and Vela Transactions as set forth in Section 10 of the Settlement Agreement. (Settlement Agreement §§ 7.1 & 7.2.) The Payment Date is the fifth Business Day after the Settlement Effective Date (*id.* § 1.76), and the Settlement Effective Date is, essentially, the date the Settlement Approval Order is a final order no longer subject to appeal (*id.* § 1.88). Thus, the key to Lehman's receipt of the $445 million is obtaining the Settlement Approval Order.

5. The Settlement Approval Order is an order of this Court that approves all of the terms of the Settlement Agreement and that includes the Settlement Approval Determinations. (*Id.* § 1.86.)

3

6. The Settlement Approval Determinations (as they relate to Libra) are the following findings and holdings: (a) notice of the Settlement Agreement was adequate; (b) the Settlement Approval Order and Settlement Agreement are binding on Debtors and SG; (c) the execution and delivery of the Settlement Agreement is approved; (d) the compromises in the Settlement Agreement are fair and reasonable to, and are in the best interest of, the Debtors; (e) the releases contained in the Settlement Agreement are effective on the Payment Date, *provided that* LBSF shall be permitted to pursue the Libra Termination Claim and the Libra Priority Claim as against the Other Libra Parties (but in the case of the Libra Termination Claim, *only if* the Libra Termination Claim Preconditions have been satisfied). (Settlement Agreement § 1.86(a)-(e)(i).) In addition, the Settlement Approval Determination (as they relate to Libra) include the following findings and holdings – which can be waived by SG: (f) prosecution of Debtors' claims in the Libra Adversary Proceedings, as against Libra and the Libra Trustee, shall be stayed, and the Debtors shall not prosecute or in any litigation take a position regarding the Libra Termination Claim, as against the Other Libra Parties, in each case, unless and until LBSF and SG shall have entered into the Libra CDSA Assignment; and (h) the Libra CDSA shall only be assumed by LBSF as part of the Libra CDSA Assignment and no party other than SG may become LBSF's assignee under the Libra CDSA. (*Id.* § 1.86 (f) & (h).) Notably, the Settlement Approval Determinations do not include findings that the Libra CDSA Assignment Agreement is proper or that the Debtors and SG have validly entered into the agreement.

7. BANA has no objection to this Court's approval of a payment and receipt of the $445 million that is *not* conditioned on the effectiveness of the Libra CDSA Assignment

4

Agreement, and that does not alter or vary the terms of the Libra CDSA and any of the other related transaction documents.

8. For the reasons explained below, however, BANA does make a limited objection to the broad relief requested by the Debtors.

**IV. The Motion and the Settlement Agreement – Assignment of the Libra CDSA**

9. BANA's Limited Objection to the Settlement Agreement arises from the Debtors' decision to include in their Motion a request that the Court approve an assignment of the Libra CDSA from LBSF to SG. As explained in Point A below, the Court should refrain from ruling on the Libra CDSA Assignment Agreement, because the Debtors are improperly seeking an advisory opinion. If the Court were required to address the Libra CDSA Assignment Agreement, which it is not, it would have to reject the Agreement in its current form, as set forth in Points B through E below.

*A. The Debtors Seek an Improper Advisory Opinion as to the Libra CDSA Assignment Agreement*

10. The Motion explains that:

> SG is unwilling to make any settlement payment to the Debtors ... if there were a possibility that, after the settlement became effective, SG might still be required to make advances under the Senior Swap Agreements. That funding requirement *could result if the [Libra] Termination Claim were to succeed* and the Senior Swap Agreements were drawn upon ....

Motion at ¶ 6 (emphasis added).

11. In effect, the Debtors ask the Court to render an impermissible advisory opinion based upon an event that is speculative and conjectural in nature. Due to the contingent nature of the Libra CDSA Assignment Agreement, addressing the issue at this time is improper as the Debtors have not demonstrated a sufficient "case or controversy" to satisfy the jurisdictional requirements of Article III. U.S. CONST. art. 3, § 2, cl. 1 ("Article III"). Pursuant to Article

5

III, federal courts have jurisdiction over only those disputes that are capable of redress through the judicial process. *Whitmore v. Arkansas*, 495 U.S. 149, 154-55 (1990). To establish the existence of a "case or controversy" a litigant must demonstrate that he has suffered an "injury in fact" that is both concrete in a qualitative and temporal sense. *Id.* at 155. In short, the alleged injury must be "actual or imminent" and cannot be "conjectural" or "hypothetical." *Id. (citing Los Angeles v. Lyons*, 461 U.S. 95-101-02 (1983)).

12. Although, "imminence" is somewhat elastic, this Article III concept has bounds that do not include an injury that may occur at some indefinite future time. *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 343 (2d Cir. 2009). Thus, where a party has "within its control whether the future injury [will] actually occur" and failure by such party to act in a specific way [will] result in an absence of injury, the "hypothetical" injury is an "insufficient basis upon which to confer standing." *See id; see also Lujan v. Defenders of Wildlife*, 503 U.S. 555, 564 at n. 2 (1992) (*citing Whitmore*, 495 U.S. at 156-160).

13. In this instance, the "possibility" alluded to in paragraph 6 of the Motion may never occur, for more than one reason. The Settlement Agreement *expressly provides* that (i) *LBSF can elect not to pursue* the Libra Termination Claim, (ii) *LBSF can elect to abandon* the Libra Termination Claim, and (iii) *LBSF may lose* the Libra Termination Claim. (*See* Settlement Agreement § 3.3.) Notwithstanding that the Libra Termination Claim might not be pursued, might be abandoned (at the Debtors' election) or might be lost, the Debtors are asking this Court to spend its time, and issue a ruling *now,* on matters that are, at best, premature, and at worse, not part of any case or controversy today and might never become a case or controversy. Deciding whether and subject to what terms and conditions LBSF could assume the Libra CDSA, or assign it to SG or any other party, makes sense only if (i) LBSF

6

decides to pursue the Libra Termination Claim, (ii) this Court rules in LBSF's favor on the motions for summary judgment pending in the Libra Adversary Proceedings and (iii) such an order becomes a final order not subject to appeal. If LBSF abandons the Libra Termination Claim or this Court rules against LBSF on the pending motions, there will be nothing to assume or assign and nothing for this Court to decide about an assumption or assignment.

14. The Debtors and SG have *not* made consummation of the Settlement Agreement contingent on the Court's approval of the CDSA Assignment Agreement or the parties entering into the agreement. It is also clear that there are several scenarios under which the Court would *never* need to rule upon the CDSA Assignment Agreement. As the "injury" in this instance (the need for and proprietary of the CDSA Assignment Agreement) is conjectural at best and the Debtors control, at least in part, whether or not the injury will occur, the Court should decline the Debtors' invitation to render an advisory opinion on the propriety of the CDSA Assignment Agreement.[3]

15. In the alternative, even if the Debtors had presented a live "case or controversy", the Court may decline to entangle itself in the Debtors' hypothetical request pursuant to the doctrine of prudential ripeness, which permits courts to refrain from exercising jurisdiction over cases that can be better decided at a later date. *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003). The doctrine is designed to enhance the "accuracy of [courts'] decisions and to avoid [their] becoming embroiled in adjudications that may later turn out to be unnecessary." *Id.* Courts may decline to hear a case based upon prudential ripeness when

---

[3] The Court's approval of the assignment of the Libra CDSA will only be required if the Debtors obtain the Libra Judgment and determine to proceed with assigning the Libra CDSA to SG. If it should become necessary for LBSF

7

the issue is not currently fit for judicial adjudication because it is predicated upon future events that may never occur or because the court would be better positioned to decide the issue after further development of the facts, and the parties will not endure hardship if a decision is deferred. *Id.* at 359; *see also New York Civil Liberties Union v. Grandeau*, 528 F.3d 122, 132-34 (2d Cir. 2008).

16. As explained above, a decision on the Libra CDSA Assignment Agreement at this juncture would be premature. The Court will be better positioned to consider issues presented by the CDSA Assignment Agreement, such as the amount of LBSF's "cure" (discussed in Point D below), if and when it is determined that the CDSA was not properly terminated. Further, because "[t]he mere possibility of future injury…does not constitute hardship," the parties (the Debtors and SG) will not be prejudiced by delaying a decision on the merits of the Libra CDSA Assignment Agreement until after a decision on the Libra Termination Claim is rendered. By exercising its discretion to consider the Libra CDSA Assignment Agreement only if it later becomes necessary to do so, the Court will avoid unnecessary waste of its time and ensure that all relevant issues are addressed in light of actual events and circumstances.

17. Even if the Court were prepared to render an advisory opinion, the complicated assumption and assignment set forth in the Libra CDSA Assignment Agreement and Settlement Approval Order include several terms and conditions that are not permitted under applicable provisions of the Bankruptcy Code, as set forth below.

---

to assign the Libra CDSA to SG, LBSF and SG can draft and move the court for approval of an appropriate agreement.

*B. Only Executory Contracts Can Be Assumed and Assigned*

18. Even though the transactions under the Libra CDSA have been terminated, and even though the Debtors have not yet secured a Libra Judgment invalidating the termination, the Settlement Approval Order treats the Libra CDSA as an "executory contract" capable of assumption and assignment pursuant to 11 U.S.C. § 365. As explained above, this puts the cart before the horse and is not permitted.

*C. The "Sale" Free and Clear of the Interests of the Libra Trustee is Not Permitted Without Compliance with 11 U.S.C. § 363(f)*

19. Paragraph 13 of the Settlement Agreement Motion provides, in pertinent part, that:

> Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Libra Assignment Closing Date ..., SG shall take title to and possession of LBSF's interests in the Libra CDSA ... free and clear of all Interests.

The Motion states that:

> The Debtors are not aware of any parties that have any liens, claims, encumbrances, or interests in the Libra CDSA.... To the extent that any party asserts a lien, claim, encumbrance or other interest in the Libra CDSA ..., subject to any claims and defenses the Debtors may possess with respect thereto, such party's interests will be adequately protected because LBSF will be able to satisfy one or more of the conditions set forth in section 363(f).

Pursuant to the Indenture, the Libra Trustee has a lien in the Libra CDSA. The Libra Trustee does not consent to a "sale" of the Libra CDSA free and clear of its lien, and the Debtors have not otherwise satisfied, or even attempted to satisfy, the requirements of 11 U.S.C. § 363(f).

*D. The Settlement Approval Order Improperly Determines "Cure" Amounts as of an Arbitrary Date*

20. Paragraph 14 of the Settlement Approval Order provides that "[u]pon (i) the Libra Assignment Closing Date, LBSF shall pay $17,520,316 to Libra in cure payments ...." The Libra Assignment Closing Date might not occur for many months or even years, if at all, since the "primary" Libra Assignment Closing Condition is a judicial finding that the Early Termination

9

was invalid. (*See* Settlement Agreement § 1.34.) The cure payment can only be determined if and when the Debtors secure a Libra Judgment.

21. Paragraph 6 of the Settlement Approval Order provides in relevant part that, on "the Libra Assignment Closing Date," a date that could be years in the future if ever, "the current defaults of LBSF and LBHI under the Libra CDSA shall be deemed cured." This provision is also premature in that no one knows if or when there will be a Libra Assignment Closing Date, and if so, what amount will need to be paid or whether such amount will actually be paid.

> E. *The Terms and Conditions of the Libra CDSA Assignment Agreement Impermissibly Vary the Terms and Conditions of the Libra CDSA.*

22. Section 365(a) of the Bankruptcy Code permits a debtor to assume or reject its executory contracts or unexpired leases, but if an executory contract or unexpired lease is assumed, it must be assumed *cum onere*, in its entirety with all the corresponding benefits and burdens. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984). The debtor cannot assume parts of a contract while rejecting others. *See, e.g., COR Route 4 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co)*, 524 F.3d 373, 383 (2d Cir. 2008) (the Bankruptcy Code provisions permitting a debtor to assume or reject an executory contract "do not alter the parties' contractual rights"); *Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 24 (2d Cir. 1996); *Texaco, Inc. v. Bd. of Comms. (In re Texaco)*, 254 B.R. 536, 551 (Bankr. S.D.N.Y. 2000) (the debtor takes the executory contract or unexpired lease without any "diminution in its obligations or impairment of the rights of the lessor"); *Pieco, Inc. v. Atlantic Computer Sys., Inc. (In re Atlantic Computer Sys., Inc.)*, 173 B.R. 844, 849 (Bankr. S.D.N.Y. 1994); *The Leslie Fay Cos., Inc. v. Corp. Prop. Assocs. (In re The Leslie Fay Cos., Inc.)*, 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994). Once an executory contract has been assumed, the debtor cannot later reject provisions found in the assumed executory contract. *Rockland Ctr. Assocs. v. TSW Stores (In re*

10

08-13555-mg    Doc 11967    Filed 10/13/10    Entered 10/13/10 16:07:13    Main Document
Pg 11 of 17

*TSW Stores)*, 34 B.R. 299, 304-05 (Bankr. S.D.N.Y. 1983) (*citing* In re City Stores Co., 21 B.R. 809, 812 (Bkrtcy.S.D.N.Y.1982) (debtor could not reject damage provisions in an assumed contract)). Similarly, the debtor can only assign to a third-party what he assumes, and the assignee cannot unilaterally impose burdens that make performance more or less onerous. *In re Best Payphones, Inc.*, No. 01-B-15472 (SMB), 2007 WL 1388103 (Bankr. S.D.N.Y. May 8, 2007). The Settlement Approval Order impermissibly rewrites portions of the Libra CDSA to the detriment of Libra.

23. The Libra CDSA consists of four primary documents: an ISDA Master Agreement (the "Master Agreement"), the Schedule thereto, a Confirmation for CMBS/RMBS Securities and a Confirmation for CDO Securities, all of which were dated as of October 17, 2006.[4]

24. The Confirmation prescribes certain procedures for the making of Libra Credit Protection Payments, including the timing of such payments.[5] Pursuant to Section 3 of the Confirmation, Libra is required to make each "Floating Payment" (*i.e.*, Libra Credit Protection Payment) on the appropriate "Floating Rate Payer Payment Date."[6] (Confirmation § 3.) The Floating Rate Payer Payment Date is defined as the first "Fixed Rate Payer Payment Date," falling at least two days after the Calculation Agent's or LBSF's delivery of a notice that a "Floating Amount" is owed. (*Id.*) Under the Confirmation, the Fixed Rate Payer Payment Date is generally five days after the Reference Obligation Payment Date. (*Id.* § 2.) The Libra CDSA does not permit the parties to postpone or otherwise alter the Floating Rate Payer Payment Date.

---

[4] Copies of the Libra CDSA documents are annexed as Exhibit C to the Motion.

[5] The operative terms of the two Confirmations are essentially identical. Accordingly, no distinction is made between the two Confirmations in this Limited Objection, and a reference to a particular term or section in the "Confirmation" is intended to refer to the corresponding terms and sections in both documents.

[6] The terminology used in the Libra CDSA is not identical to the terminology used in the Indenture. For example, the Indenture defines the term the "Credit Protection Payment" as the "Floating Amount" in the CDSA.

25. The Libra CDSA sets forth the circumstances under which payments owed by LBSF to Libra are permitted to be netted against payments owed by Libra to LBSF. Section 2(c) of the Master Agreement, which is entitled "Netting," provides in relevant part that:

*If on any date amounts would otherwise be payable*: --

  (i) in the same currency; and

  *(ii) in respect of the same Transaction*,

by each party to the other, then, on such date, such party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay the excess of the larger aggregate amount over the smaller aggregate amount.

Master Agreement § 2(c) (emphasis added.) The Libra CDSA thus contemplates that, on a single date when amounts are ordinarily payable both by LBSF to Libra and by Libra to LBSF in respect of a single Transaction, the payments can be netted against each other, such that a single payment of the net amount is made by the party owing the greater amount.[7]

26. The language of Section 2(c)(ii) quoted above makes clear that netting is permitted only in respect of payments that are owed by the two parties on a *single* date in respect of a *single* Transaction.[8] The Master Agreement does permit the parties to opt out of the single-

---

[7] Thus, for example, if on a given date for a particular Transaction, Libra is obligated to make a Libra Credit Protection Payment to LBSF and LBSF is simultaneously obligated to pay a CDSA "Fixed Amount" (*i.e.*, a Libra Credit Protection Premium) in a lesser amount to Libra, the two payments can be netted such that a single payment of the difference in the two amounts is paid by Libra to LBSF. Conversely, if on a given date for a particular Transaction, Libra is obligated to make a Libra Credit Protection Payment to LBSF and LBSF is obligated to pay a Libra Credit Protection Premium in a *greater* amount to Libra, the two payments can be netted such that a single payment of the difference in the two amounts is paid by LBSF to Libra.

[8] The Confirmation reinforces the Transaction-by-Transaction approach to netting, providing that "each Transaction (i) constitutes a separate and independent Transaction between [LBSF and Libra] . . . in respect of each Reference Obligation, (ii) shall not be affected by any other Transaction and (iii) shall operate independently of each other Transaction evidenced hereby." (Confirmation at 1.)

12

Transaction limitation of subsection (ii), *but only* if such an election has been made in the Schedule or Confirmation.  Section 2(c) provides in relevant part:

> The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transaction from such date).

In the Schedule, LBSF and Libra elected *not* to permit netting between Transactions.  Part 5(j) of the Schedule provides that "[s]ubparagraph (ii) of Section 2(c) of this Agreement will apply to all Transactions."  The Schedule thus makes clear that payments between LBSF and Libra can only be netted in respect of a single transaction.

27. The Settlement Agreement and Settlement Approval Order alter the terms of the Libra CDSA, including the above-described terms pertaining to the timing and netting of payments, without Libra's consent.  Specifically, Section 7.4 of the Settlement Agreement provides for LBSF to deliver a notice to Libra and others that, to the "extent that any portion of any Libra Credit Protection Payment and any Libra CDS Termination Payment payable to it" would necessitate a draw on the Libra Senior Swap Agreement, "the due date for payment of such portion shall be deferred" until such time as Libra is able to make such payment without causing a draw on the Libra Senior Swap Agreement.  If LBSF were permitted, pursuant to Section 7.4, to defer a portion of Libra Credit Protection Payment to a later period, that portion could be netted against a Libra Credit Protection Premium that would otherwise be paid to Libra or could require payment of funds from Libra's Principal Collection Account, which funds would otherwise be available for other Libra payment obligations.  (*See* Libra Indenture § 7.18(a).)

13

28. Section 9.8 of the Settlement Agreement contemplates additional manipulation of the timing and netting provisions of the Libra CDSA, which could further harm Libra and its investors. Section 9.8(b) provides that, if permitted by the Court, SG will "cause Libra Credit Protection Payments to be payable to it on such dates as will allow it to exercise a Permitted Netting in respect of any outstanding Libra Credit Protection Premiums or Legacy Reimbursement payments." "Permitted Netting" is defined as a netting of "any Libra Credit Protection Premium and/or reimbursement payment . . . payable by SG and/or the Debtors to Libra on a specific date against an outstanding Libra Credit Protection Payment that is owed by Libra to SG and/or the Debtors." (Settlement Agreement § 1.78.) Section 9.8(b) thus would permit SG to defer the date for Libra to make any Libra Credit Protection Payments to a date when SG otherwise would be obligated to pay Libra Credit Protection Premiums, and then net out Libra Credit Protection Premiums that would otherwise be payable to Libra on the date on which the Libra Credit Protection Payment is made. The effect of Section 9.8(b)'s deferral and netting provisions could be to cut off the flow of Libra Credit Protection Premiums to Libra. Deferral of Libra Credit Protection Payments could also result in amounts being paid from Libra's Principal Collection Account to LBSF or SG, which amounts would otherwise be available for other Libra payment obligations.

29. Not only is the manipulation of the dates for making Libra Credit Protection Payments ("Floating Rate Payer Payment Dates" under the CDSA) inconsistent with the terms of the Libra CDSA, it is not clear whether the definition of Permitted Netting contemplates netting of a Libra Credit Protection Premium payable to Libra in respect of *one* Transaction against a Libra Credit Protection Payment payable to SG in respect of *another* Transaction, in direct contravention of Section 2(c)(ii) of the Libra CDSA Master Agreement.

14

30. The Settlement Approval Order includes terms designed to facilitate the Settlement Agreement's deferral and netting provisions. In particular, Paragraph 5 of the Settlement Approval Order grants LBSF the authority to defer payments otherwise due from Libra under the Libra CDSA and specifically provides that "the deferral contemplated in Sections 7.4 and 7.5 of the Settlement Agreement shall be binding on the Other Libra Parties," which include Libra, the Libra Trustee and the Libra Collateral Manager. (*See* Settlement Agreement § 1.73.)

31. Paragraph 9.iv(a) of the Settlement Approval Order would grant SG "full discretion as to when and if to deliver to Libra notices of Libra Floating Amounts due with respect to outstanding Libra Floating Amount Events under the Libra CDSA and full discretion to seek an amount equal to or less than the Libra Floating Amount due to the 'buyer' under the Libra CDSA in respect of any outstanding Libra Floating Amount Events."

32. More broadly, the Settlement Approval Order sweepingly provides that the Settlement Agreement, "inclusive of all of the terms and conditions thereto, is approved." (Proposed Order ¶ 3.)

33. If approved by the Court, the Settlement Agreement and Settlement Approval Order would modify the terms of the Libra CDSA without the consent of the Libra Trustee, Libra and all "Other Libra Parties" in a manner that could detrimentally affect their pecuniary interests. More specifically, LBSF and SG could use the Settlement Agreement's deferral and netting provisions to cut off the flow of Libra Credit Protection Premiums to Libra by shifting each date when a Libra Credit Protection Payment would normally be due to a later date when a Libra Credit Protection Premium otherwise payable to Libra can be netted against the deferred Libra Credit Protection Payment, even if the Libra Credit Protection Premium and the deferred Credit Protection Payment pertain to different Transactions. If LBSF and SG are allowed to wipe out

15

any further obligation to pay Libra Credit Protection Premiums to Libra, Libra will be deprived of funds to which it would otherwise be entitled. Libra will also be deprived of funds that could be used for other purposes if LBSF or SG are permitted to defer Libra Credit Protection Payments to dates when payments from the Principal Collection Account would otherwise not be required.

## V. Conclusion

34. This Court should not approve the Settlement Agreement, and should not enter the Settlement Approval Order, unless the Court's approval is strictly limited to the approval of the payment by SG and receipt by LBSF of the $445 million settlement consideration, which the parties have already agreed is *not* conditioned on the effectiveness of the Libra CDSA Assignment Agreement. This Court should not approve the assumption or assignment of the Libra CDSA pursuant to the Libra CDSA Assignment Agreement or otherwise, unless and until the pending motions for summary judgment have been determined in the Debtors' favor, and such rulings have become final and are no longer subject to appeal. Only in that event, if LBSF thereafter seeks to assume and assign the Libra CDSA, should this Court consider such a request, and in any event, should not approve any such assumption or assignment that alters or varies the terms of the Libra CDSA or any of the other related transaction documents.

Dated: New York, New York
      October 13, 2010

                                      ALSTON & BIRD LLP

                                      /s/ Michael E. Johnson
                                      Michael E. Johnson, Esq.
                                      90 Park Avenue
                                      New York, N.Y. 10016
                                      Telephone: (212) 210-9400
                                      Facsimile: (212) 210-9444

                                      - and -

John C. Weitnauer, Esq.
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Bank of America, National Association, successor by merger with LaSalle Bank National Association, as Libra Trustee*