Page 1

1

2     UNITED STATES BANKRUPTCY COURT

3     SOUTHERN DISTRICT OF NEW YORK

4     Case No. 08-13555 (JMP)

5     - - - - - - - - - - - - - - - - - - - - -x

6     In the Matter of:

7

8     LEHMAN BROTHERS HOLDINGS INC., et al.,

9

10                    Debtors.

11

12    - - - - - - - - - - - - - - - - - - - - -x

13

14                    U.S. Bankruptcy Court

15                    One Bowling Green

16                    New York, New York

17

18                    October 5, 2010

19                    9:36 AM

20

21

22    B E F O R E:

23    HON. JAMES M. PECK

24    U.S. BANKRUPTCY JUDGE

25

Page 2

1

2    CONTINUED EVIDENTIARY HEARING re Rule 60(b)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    Transcribed By:   Clara Rubin and Sharona Shapiro

24

25

Page 3

```
 1   A P P E A R A N C E S:

 2   BOIES, SCHILLER & FLEXNER LLP

 3        Attorneys for Barclays Capital, Inc.

 4        10 North Pearl Street

 5        Albany, NY 12207

 6

 7   BY:   TRICIA J. BLOOMER, ESQ.

 8

 9   BOIES, SCHILLER & FLEXNER LLP

10        Attorneys for Barclays Capital, Inc.

11        575 Lexington Avenue

12        7th Floor

13        New York, NY 10022

14

15   BY:   JONATHAN D. SCHILLER, ESQ.

16        RICHARD J. BETTAN, ESQ.

17

18   HUGHES HUBBARD & REED LLP

19        Attorneys for Movant, James W. Giddens, Trustee for the

20         SIPA Liquidation of Lehman Brothers Inc.

21        One Battery Park Plaza

22        New York, NY 10004

23

24   BY:   WILLIAM R. MAGUIRE, ESQ.

25        NEIL J. OXFORD, ESQ.
```

Page 4

1

2   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

3        Attorneys for Movant, the Official Committee of Unsecured

4         Creditors

5        51 Madison Avenue

6        22nd Floor

7        New York, NY 10010

8

9   BY:   JAMES C. TECCE, ESQ.

10        ERIC M. KAY, ESQ.

11

12

13   STUTMAN TREISTER & GLATT LLP

14        Attorneys for Elliott Management

15        1901 Avenue of the Stars

16        12th Floor

17        Los Angeles, CA 90067

18

19   BY:   WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)

20        REBECCA S. REVICH, ESQ. (TELEPHONICALLY)

21

22

23

24

25

Page 5

```
 1                    P R O C E E D I N G S

 2          THE COURT:  Be seated, please.  Good morning.

 3          UNIDENTIFIED SPEAKER:  Good morning.

 4          MS. BLOOMER:  Good morning, Your Honor.  Barclays'

 5   witness today is its expert witness on the issue of exchange-

 6   traded derivatives.  We call Anthony Leitner to the stand.

 7          THE COURT:  Please raise your right hand, Mr. Leitner.

 8       (Witness sworn)

 9          THE COURT:  Be seated, please.

10          MS. BLOOMER:  For the record, Your Honor, Tricia

11   Bloomer from Boies Schiller, for Barclays.

12   VOIR DIRE EXAMINATION

13   BY MS. BLOOMER:

14   Q.   Good morning, Mr. Leitner.

15   A.   Good morning.

16   Q.   Could you please begin by giving an overview of your

17   educational background?

18   A.   I have a bachelor or arts degree from Columbia College,

19   1965.  I spent a year reading economics at Trinity College in

20   Cambridge, Cambridge University, and have a juris doctor from

21   Northwestern University School of Law.

22   Q.   And could you give an overview of your career after

23   graduating law school?

24   A.   I spent ten years in private practice at Curtis, Mallet-

25   Prevost, Colt & Mosle here in New York.  It was a corporate
```

Page 6

1    practice; some litigation and international work.  And in

2    October of 1979, I joined the legal department of Goldman

3    Sachs.

4    Q.    And how long did you work for Goldman Sachs?

5    A.    Until I retired in November 197 -- 19 -- 2003.

6    Q.    And what have you done since then?

7    A.    I've continued to stay active in the -- as a consultant in

8    the equity regulatory and derivative regulatory sphere.  I

9    currently am consulting with NYSE Euronext, the stock exchange,

10   on their market-structure issues and some of the new ventures

11   that they have in the futures area and futures clearing area.

12   Q.    Mr. Leitner, could you please move your microphone a

13   little bit closer?

14   A.    (Witness complies).

15   Q.    Thank you.

16         Please describe generally your career at Goldman Sachs.

17   A.    Well, I was the third lawyer hired at Goldman, and I was

18   asked to basically take on regulatory counseling of all the new

19   businesses that they were getting into at the time, one of

20   which was the futures services business.  And they were also

21   increasingly involved in the fixed-income business.  And over

22   the course of the 1980s, I helped the fixed-income business

23   develop their first over-the-counter derivative products,

24   basically options on government securities, and continued to

25   counsel the futures services area.  I was also involved in

Page 7

1   the -- as counsel initially to the J. Aron & Company, which was

2   a commodities trading firm that we bought -- Goldman bought in

3   1980 or '81.  And then over the course of time I became -- as

4   the firm expanded its business in over-the-counter derivative

5   swaps and things like that, and the legal department itself

6   grew, we decided to combine the lawyers who were counseling the

7   fixed-income area and the equities area and working on

8   derivatives into a derivatives practice group, and I headed

9   that group.  And in 1999, I was asked to become general counsel

10  of the equities division of the firm, which was the position I

11  held when I retired.  At that point, I was actually co-general

12  counsel, because they'd asked some -- another colleague of mine

13  to work with me for a while and get familiar and then

14  ultimately take over that responsibility.

15  Q.   Could you describe generally Goldman Sachs' derivatives

16  business as you were involved in it?

17  A.   There were several parts to it.  First it was a futures

18  commission merchant, an FCM, so it did brokerage business for

19  firms.  But it also had a clearing business.  It was a clearing

20  member of all of the U.S. and foreign exchanges, so it cleared

21  transactions in futures products, both for clients and for

22  itself.

23       The -- over time, Goldman expanded its business in -- as I

24  said, in fixed-income securities, and also equity securities,

25  and became increasingly interested in the market-making aspects

Page 8

1    of that business.  And as a result, it increased its presence

2    as an option trading firm on the floor of the options

3    exchanges, and was of course a clearing member in the Options

4    Clearing Corporation.  And --

5    Q.   And, Mr. Leitner, were you involved in any acquisitions of

6    exchange-traded derivatives businesses while you were working

7    for Goldman?

8    A.   Well, essentially two.  I mentioned J. Aron & Company,

9    which was basically a commodities trading firm that the firm

10   bought in about 1980, and they had -- they were extensive

11   traders in what we call physical commodities -- gold, silver,

12   oil -- as well as in the -- Goldman Sachs itself was more

13   involved in the financial futures products, like equity options

14   and futures on the S&P index.

15        The second acquisition was Spear, Leeds & Kellogg, which

16   Goldman acquired, I believe, in 2000.  And that firm had

17   basically three businesses:  It was a market-maker in over-the-

18   counter traded securities; it was a specialist on the floor of

19   the New York Stock Exchange; and it had a business called First

20   Options Corp., which was a clearing business for professional

21   option traders on the floor of the exchange and provided

22   essentially financing for the folks who are in that business,

23   as well as providing clearing services for other broker-

24   dealers, which was a business that Goldman was not in before

25   they bought the firm.

Page 9

1    Q.   How long did it take to structure and close the

2    acquisition of the Spear, Leeds & Kellogg business?

3    A.   A couple of months.  I think the deal was struck on a --

4    over the Labor Day Weekend, and it was closed at the end of

5    October or early November.

6    Q.   Were you involved in the due diligence that was conducted

7    in relation to that transaction?

8    A.   Yes, specifically in connection with the clearing

9    businesses that involved listed derivative products.

10        And I'm going to use this term very often instead of

11   "exchange-traded derivatives" because that's the way we talk

12   about it in the business.  We distinguish between products that

13   are listed on options, like exchange-traded options and

14   futures, from swaps and other OTC-type derivatives.  So I may

15   use the term "listed" a lot when I mean those products.

16   Q.   In connection with the due diligence that was performed on

17   that acquisition, were you involved in the assessment of the

18   risks associated with that business?

19   A.   The firm was interested to know two things:  how --

20   whether their operations were sound, and what systems they were

21   using and also what mechanisms they were using to manage the

22   risk of those clients for whom they were essentially extending

23   their -- extending credit. I also was involved in the, sort of,

24   legal due diligence to make sure that they were compliant with

25   laws and regulations to look at their disciplinary history and

Page 10

1    any problems relat -- associated with that business.  You

2    obviously want to find out, you know, where the hidden traps

3    are that you might have to deal with going forward, and also to

4    make sure the business is well-run.

5        I'd always been interested in the operations side of the

6    business.  So -- and that was especially important in the

7    futures area, where I was tutored by some very excellent folks

8    from the -- what happened on the floor of the exchange through

9    the clearance and settlement process, and I wanted to know how

10   that business, which we were not then doing, was run.  So I

11   made a couple trips to Chicago and spent a lot of time looking

12   into it.

13   Q.   You mention in your report various industry associations

14   that you were a member of.  Can you describe generally for the

15   Court those associations and your involvement?

16   A.   Well, on the industry side, I've always been a member,

17   since almost the time I joined the firm, in the Future Industry

18   Association's Law & Compliance division, and the Securities

19   Industry Law and Compliance Division.  There was also an

20   industry association called the Bond Market Association; so I

21   was very involved there as well.  Eventually they merged and

22   became something called SIFMA; so that's now the umbrella

23   securities-related organization.  So I've been on committees

24   that worked on issues of common interest.

25       For purposes of this case, I guess the one most closely

1    associated -- I was ten years as co-head of something called

2    the Ad Hoc Reg (sic) T Committee, which was moving to get

3    regulatory reform in the area of margin regulations, and we

4    accomplished several major regulations and rule-makings, which

5    I've, frankly, been involved in ever since.

6    Q.    Did you also do work on committees for regulatory

7    agencies?

8    A.    Yes.  I was -- I had at least two engagements that I can

9    remember; one was the Market Transactions Advisory Committee,

10   which was an SEC formal advisory committee that was set up

11   by -- at the urging of Congress to determine whether or not

12   there should be a uniform national law for -- regarding

13   interests in securities, how the securities system was held.

14   That's Article 8 of the Uniform Commercial Code.  And the

15   second industry committee I worked on was the -- I also was a

16   member of the CFTC Technology Advisory Committee.  And for the

17   Industry Association, I worked during the time when there

18   was -- when Congress had passed legislation in 1999 permitting

19   the trading of securities futures products, and the goal there

20   was for the two trade associations to work with the staffs of

21   the SEC and the CFTC to figure out what those rules should look

22   like.  So I was the head of the legal regulatory subcommittee

23   of that trade association to work with the staffs.

24   Q.    And could you describe generally the types of risks in

25   relation to exchange-traded derivatives businesses that you

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 12

1   have focused on in the course of your career?

2   A.   I think I've focused on all of the risks associated with

3   this business at various points in time.  Very often these

4   risks arose because something happened in the marketplace or

5   something happened to the firm, but fortunately in many cases

6   they happened to somebody else but we learned from it.  One

7   significant event was the market break in 1987 when the markets

8   virtually crashed in a very short period of time, both the

9   futures markets and the securities markets, and there were

10  delays in the settlement system, particularly in the option

11  marketplace.

12      The -- clearance and settlement, which is a big issue in

13  this case, depends upon things happening on time.  And there is

14  zero tolerance when payments or margin requirements are not

15  made when they're supposed to be made.  And there were delays

16  in payments over the course of that incidence.  The firm asked

17  me to work with a risk group to assess what our risks were to

18  these clearinghouses:  what happens if they default; can they

19  call on us for more money; under what circumstances can they

20  call us for more money; were there -- in other words, we were

21  trying to rate the financial solvency of the clearinghouses

22  that we dealt with.  So that was kind of the first time I took

23  an in-depth look at all of the rules, how they worked, and

24  indeed to eventually move with other industry members to effect

25  changes, not only in the clearing system but also in the legal

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 13

1   regime, and here I worked with the Federal Reserve, Bank of New

2   York and a group of other lawyers in getting amendments to

3   FDICIA, the Federal Deposit Insurance Corporation (sic) Act, to

4   clarify the rights of clearinghouses to net obligations owed by

5   clearing members and to settle those obligations on a net

6   basis.  So there was a lot going on as a result of, you know,

7   that market break.

8        Similar events:  There was the Long-Term Capital incident.

9   Long-Term Capital Management was a big firm that went under.

10  They were heavily involved in the derivatives area.  And,

11  again, it was an opportunity to assess essentially counterparty

12  risks, different kinds of risk.  But essentially it's the

13  credit risks and market risks associated when people have

14  concentrated positions in the marketplace and there's a lack of

15  liquidity in the marketplace, positions -- how can you exit the

16  market, how can you protect yourself.

17       So there were industry groups that I worked on.  In fact,

18  Lehman and other firms were also involved with their counsel

19  to -- it eventually resulted in the writing of a report called

20  "The Counterparty Risk Management Group" that tried to assess

21  those risks.

22            MS. BLOOMER:  Your Honor, we offer Mr. Leitner as an

23  expert in the exchange-traded derivatives industry.  And we

24  understand from opposing counsel that they have no objection to

25  his qualifications.

Page 14

1           MR. MAGUIRE:  No objection, Your Honor.

2           THE COURT:  Mr. Leitner is accepted as an expert in

3      that area.

4           MS. BLOOMER:  Thank you.

5      DIRECT EXAMINATION

6      BY MS. BLOOMER:

7      Q.   Mr. Leitner, please describe generally your review of the

8      facts of this case in the course of preparing your expert

9      opinions.

10     A.   I began by looking at all the documents that were relevant

11     to the case:  the asset purchase agreement, the clarification

12     letter, the documents relating to the transfer of the listed

13     positions; that would be the assignment, and transfer and

14     assumption agreement, and the collateral agreement.  I also

15     looked at the Court's order, the sale order in this case.  Then

16     I also obviously talked to a lot of people.  I was particularly

17     interested in finding out what the Barclays people knew at the

18     time, what information they had when they got it.  So -- and I

19     also talked to the operations people.  I always find that their

20     view of what's going on is very critical to understanding

21     the -- you know, what was happening at the time.

22          I read depositions, participated and reviewed declarations

23     of various parties and, you know, tried to -- and looked at,

24     you know, hundreds of documents and business records.

25     Q.   Did you speak with lawyers for Barclays who were involved

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 15

1    in the transaction and who have testified in these proceedings?

2    A.   Yes.

3    Q.   Do you recall who you spoke with?

4    A.   Ed Rosen.

5    Q.   And do you know Ed Rosen professionally?

6    A.   Yes.

7    Q.   In what context?

8    A.   Ed Rosen has been counsel to several of the committees

9    that I worked with for the trade associations.  He and his firm

10   Clearly Gottlieb, his colleague Robert Cook, who's now director

11   of trading and markets at the SEC, were counsel that I worked

12   with very often.  So we've had a twenty-five year professional

13   relationship.

14   Q.   Could you please summarize for the Court the opinions that

15   you have formed in connection with your work on this case?

16   A.   Simply put, I concluded that the only rational way that

17   Barclays could have entered into this transaction was by being

18   assured that the collateral securing the listed positions that

19   it was going to be responsible for at the closing were part of

20   the deal and that, secondly, that the -- from Lehman's point of

21   view, that was also a rational decision to make given that the

22   failure to accomplish the transaction and transfer those risks

23   to Barclays would have left them with the possibility of losses

24   exceeding the value of whatever collateral they had.

25   Q.   Could you turn, in your --

1        MS. BLOOMER:  Your Honor, we've distributed a binder.

2   I believe --

3        THE COURT:  I have it.  Thank you.

4        MS. BLOOMER:  -- you have a copy.

5   Q.   Mr. Leitner, could you turn, in your binder, to tab 2,

6   which is BCI Exhibit 340?  Is this the report that you

7   submitted in these proceedings?

8   A.   Yes.

9   Q.   And does this report accurately reflect the opinions that

10  you have formed in the course of your work on this case?

11  A.   Yes.

12  Q.   Have you reviewed documents and information about these

13  proceedings since the time of this report?

14  A.   Yes.

15  Q.   And have those -- has that review caused you to change any

16  of the opinions in this report?

17  A.   No.  On the contrary, they have reinforced the conclusions

18  that I've reached.

19  Q.   Could you turn to page 54 of your report, please?  And we

20  can put that up on the screen for you as well.

21       Can you describe what this last page of your report

22  reflects?

23  A.   Well, I tried to summarize the basis for, and also to

24  summarize, the conclusions and opinions I reached in this

25  matter.

Page 17

1    Q.    And they accurately reflect the bases for your opinions?

2    A.    Yes.

3            MS. BLOOMER:   Your Honor, we offer BCI Exhibit 340

4    into evidence.

5            MR. MAGUIRE:   No objection, Your Honor.

6            THE COURT:   It's admitted.

7    (Report prepared by Anthony Leitner was hereby received into

8    evidence as BCI Exhibit 340, as of this date.)

9            MS. BLOOMER:   And, Your Honor, we prepared a slide of

10   this page of Mr. Leitner's report, and then a separate slide

11   showing each one of those individual conclusions.

12           Could you please put the first one of those up on the

13   board?

14   Q.    This -- so this is the first of the conclusions from page

15   54 of your report, Mr. Leitner?

16   A.    Yes.

17   Q.    Now, here you say "Being unsure of the scope of the market

18   risks it was assuming in the ETD accounts, how much potential

19   funding exposure it faced in taking on these positions, and

20   unknown potential losses due to default by LBI affiliates for

21   whose positions Barclays was now responsible, and being acutely

22   aware of the market volatility at the relevant time, Barclays

23   would not have been willing to take on this business without

24   receiving all of the posted collateral, including any clearing-

25   fund deposits."

1      Could you first explain why you say that LBI's exchange-

2    traded derivatives accounts carried market risk?

3    A.   Yes.  I mean, the -- all of the listed derivatives,

4    whether they were options or futures, were based upon the value

5    of an underlying asset, a stock, or an index of stocks, or some

6    other component.  And it was also based on the future

7    performance of that underlying security.  Therefore, the value

8    of the derivatives themselves are going to move -- their price

9    or value was going to move with the value of the underlying

10   commodity.  The more volatility there is in the product, the

11   more they will move.

12      There is also market risk in several other sense (sic):

13   There is the risk that there will be no market; there will be

14   the risk that there will be expenses in trading in the market.

15   So there are a variety of components to the concept of market

16   risk.  But, you know, essentially, and particularly in futures,

17   the amount of loss is -- could be significant.  Similarly with

18   regard to the selling of options, the losses could be

19   considerable depending on where the market moves and whether or

20   not you're hedged.

21   Q.   Okay.  Now, do the margin requirements on an exchange-

22   traded derivatives account inform an understanding of the

23   amount of exposure to market risk?

24   A.   Yes.  In both the futures markets and the stock markets,

25   the clearinghouses and the rules of the securities regulators

Page 19

1    require that short positions be covered by some form of

2    collateral to assure the future performance of that obligation.

3    In the case of the clearinghouses for options, the Options

4    Clearing Corporation, what they use for Barclays' proprietary

5    accounts, the ones that they were directly responsible for,

6    they basically took all of the positions, whether they were

7    positions that Barclays had bought and paid a premium for, as

8    well as those they had sold short, and they put them together,

9    applied a formula to determine the outside exposure or risk of

10   loss were there to be a liquidation of that portfolio.  So the

11   amount of margin reflected the clearinghouse's goal of

12   protecting itself.

13   Q.   Mr. Leitner, you said a few times today "Barclays" where I

14   think you meant to say "Lehman".  So I just ask that --

15   A.   It would be --

16   Q.   I'll try to clarify when you --

17   A.   This is a generic consequence.  The general point is that

18   that's the way that you define the risk, whoever has the

19   positions.

20   Q.   If you could turn to tab 9 in your binder, which is BCI

21   Exhibit 646?  And we can put that up on the screen.

22        Are you familiar with this chart, Mr. Leitner?

23   A.   Yes.

24   Q.   In general terms, what information does this chart

25   reflect?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 20

1   A.   Well, this is the Lehman Brothers positions in the various

2   accounts for which they were responsible at the Options

3   Clearing Corporation.  And when I say "various accounts", I

4   mean they as a clearing member had responsibility for all the

5   positions they had, but the Options Clearing Corporation

6   allowed you to have -- allowed a member to divide their

7   positions into different categories.  So some of these

8   represent positions for the firm itself, for the firm's market-

9   making activities and, separately, for customers.

10  Q.   And each one of those accounts are set forth across the

11  top of each of these pages --

12  A.   Yes, each of --

13  Q.   -- is that right?

14  A.   -- each of the accounts.  So O74C is the customer account,

15  and O74F and M are the proprietary accounts.

16  Q.   Okay.

17  A.   And what this chart also shows is the daily requirement

18  computed by the OCC in the morning, based upon the previous

19  night's closing values, and applying the formula for all the

20  positions held in the account.  It also shows the composition

21  of the margin held there.

22  Q.   And what is the source of the information on this chart,

23  to your understanding?

24  A.   They are reports generated, in the ordinary course of

25  business, by the OCC, that are provided to the clearing member.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 21

1    Q.   And did you verify the accuracy of the data on this chart

2    by reference to those reports?

3    A.   Yes.  I was given a -- copies of all the reports for all

4    the relevant dates described here and I compared them to the

5    numbers that are shown in the chart, and I compared every one

6    for the week from the 15th to the 19th and then a couple of

7    days into the following week, and then I spot-checked them for

8    other dates in the period through the end of October --

9    Q.   So this --

10   A.   -- and they were accurate.

11   Q.   -- table shows the data from September 15th through

12   October 31st --

13   A.   Yes.

14   Q.   -- in reverse chronological order --

15   A.   Correct.

16   Q.   -- is that right?

17        MS. BLOOMER:  Okay, could we go to the last page,

18   please?

19   Q.   So the bottom table on this chart shows the information

20   about the accounts on September 15th, the morning of Monday,

21   September the 15th?

22   A.   Yes.

23   Q.   And you mentioned OCC's margin requirements and your

24   ability to understand market exposure and risk based on the

25   size of those requirements.  Where is that information

Page 22

1   reflected on this chart, and why is it significant?

2   A.   Well, it's reflected in the top line for each date, for

3   each account.  And then on the far right, there's the total

4   requirement, which was essentially Lehman's requirement, which

5   on Monday was 789.6 million dollars.

6   Q.   And why -- is that figure, if at all, significant to your

7   conclusions?

8   A.   Yes.  I mean, it's a -- it's significant because that

9   number wouldn't be a requirement if there wasn't risk in the

10  position and risk of loss in any account which had a

11  requirement.  So it reflects a computation by the OCC that says

12  'You've got risk.  You have short positions.  They're not

13  offset by any long positions you have, and therefore you need

14  to put up collateral to secure me,' the clearinghouse.

15  Q.   Mr. Leitner, why would a broker-dealer carry these

16  positions that, as you say, represent risk?

17  A.   Well, for -- there are a number of reasons.  Lehman

18  Brothers was in businesses that were very familiar to me, and

19  one of the purposes of my investigation was to see whether I

20  could understand whether what Lehman Brothers was doing was

21  familiar to what I knew Goldman Sachs did, so I could kind of

22  compare these issues.  And Gerry Donini was the head of the

23  equities area or -- in -- or one of the senior executives in

24  the equity area of Lehman Brothers and we had a chat, and I was

25  convinced that their businesses were very similar.

Page 23

1     So, essentially the firm would take on proprietary option

2     positions for several reasons; number one, they had a

3     securities trading business.  They were also active in the

4     options markets, so -- as participants in that marketplace, so

5     they would be expected to have an inventory of options,

6     including what we call client facilitation.  If an institution

7     came and said 'We want to trade.  We want to have a position in

8     options of', let's say, '1,000 contracts' or '10,000 contracts,

9     representing 100' -- 'up to a million shares,' that's very

10    difficult to execute on the floor of the exchange.  So a firm

11    like Lehman or Goldman would say 'Okay, I will take the other

12    side of that position and eventually trade out of it.  So I

13    will do essentially a block trade in options.'  So some of

14    those positions would be done as a result of positions that

15    happened to exist at the time, as a result of client

16    facilitation.

17    Q.   Now, are you saying there, Mr. Leitner, that they would --

18    that Lehman would use exchange-traded derivatives to hedge

19    exposures that it took on in the over-the-counter --

20    A.   Well, in that case it wasn't hedging anything; it was

21    taking on pure risk.  It might have a hedge-on in the equity

22    markets.  So say that the client wanted to buy calls.  Lehman

23    would sell calls.  If Lehman sold calls, it was then at the

24    risk that if the underlying value of that stock went up, it

25    would be exercised.  They'd have to deliver the stock and, if

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 24

1    they had to trade out of it, they lose money.

2        So what Lehman would do would be to apply a model to say

3    'Okay, how many shares of the underlying stock do I need to own

4    to protect myself against the possibility that that option will

5    be exercised?'  So Lehman would have gone in the marketplace

6    and bought stock to hedge itself against that option position.

7        The significant issue here was that, although the parties

8    may have thought that 'Well, gee, you know, that's great.  I'll

9    take that over,' the fact of the matter is that in the event --

10   that stock wasn't there because it had been -- it was gone by

11   the time -- or close to the time this transaction was done.  So

12   you -- so Lehman Brothers winds up only with this short call

13   option position for which it has risk and no protection on the

14   other side.

15       But the other businesses that they did were, you know, in

16   connection with providing solutions to customers' desires to

17   hedge their own positions.  Again, it's like facilitation.

18   Customer says 'I have this position; I want to protect it.

19   And' -- 'But I want to protect it for three years.'  Well,

20   there's really a very illiquid market for a three-year option.

21   So Lehman might take that position as an over-the-counter

22   position, that is, a private negotiated contract, and then turn

23   to the marketplace to hedge that risk, both in options and in

24   the underlying security.  That's exactly the kind of business

25   it did -- that Goldman did and that Mr. Donini assured me that

Page 25

1    Lehman did as well.

2    Q.    And what significance does it have to your opinions, if

3    any, that there were over-the-counter positions that were

4    related to some of the exchange-traded positions that Lehman --

5    A.    Well, it would just be -- have been a part of a book of

6    business that a going concern would have.  But the -- these

7    over-the-counter derivatives were excluded from this deal.

8    They were not part of it right from the beginning.  One can

9    understand that because, you know, under, as I understand, the

10   rules relating to them, most of these transactions provide for

11   the ability to close them out, and you would either -- so the

12   ability to transfer them would be subject to the client's

13   potential desire to just get rid of them and exercise their

14   rights to close them out, or they would require that each and

15   every contract be novated by agreement.  You have to sit down

16   with the other side and take them on.

17        One of the reasons that Congress is discussing a common

18   clearinghouse for these kinds of products is precisely because

19   it's very difficult.  I had been involved in that when --

20   another event in the marketplace, when Drexel Burnham collapsed

21   and Goldman stepped in to buy their book of forward contracts

22   in the Ginnie Mae market.  They fortunately only settled once a

23   month, and so we had two weeks to novate, you know, eighteen

24   billion dollars of contracts.  But, you know, no way you could

25   do that under these circumstances with this book, so it wasn't

Page 26

1    included; made a lot of sense.

2    Q.   Now, if we could turn back to slide 4, which is -- or tab

3    4, I'm sorry.  You say here --

4         MS. BLOOMER:  The prior one, please.

5    Q.   You say here that Barclays was unsure of the scope of the

6    market risks it was assuming in the ETD accounts.  Based on the

7    facts that you have reviewed, do you believe Barclays could

8    have quantified the risk position of the exchange-traded

9    derivatives that it was acquiring?

10   A.   In this period of time, no.

11   Q.   Why not?

12   A.   It didn't have -- number one, it was very late getting the

13   information that it could have used to assess the risks, but it

14   also didn't have all of the information it needed.  For

15   example, there was testimony that they didn't know until well

16   after the closing where all of these -- where all of the

17   foreign futures accounts were held, what clearinghouses, what

18   the positions were, what the clearing banks were, and so forth.

19        With regard to the U.S. market and the equity derivatives

20   market and the Options Clearing Corp. positions, what they got

21   was, you know, huge lists of all the option contracts.  They

22   later -- they were -- they found out, in the course of

23   assessing that, that some of these included the OTC

24   contracts -- OTC options they weren't getting, and they also

25   did not have the capability of taking this file and loading

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 27

1    that into their own system so that they could assess the risk.

2    Q.    Do you have an understanding of the --

3    A.    By -- that operational issue, by the way, was, you know, a

4    separate set of issues and risks for Barclays right from the

5    beginning.

6    Q.    Do you have an understanding of the number of positions

7    that were in that equity options portfolio that you were just

8    discussing?

9    A.    My understanding is it was, like, 80,000.

10   Q.    Incidentally, do you recall how long it took after the

11   closing for Barclays to form a full picture of the open

12   positions that it had acquired?

13   A.    I believe it took about two weeks for them to be able to

14   migrate those positions onto their own books and records, even

15   though for clearing purposes some of the bridge accounts were

16   still in place, but just so that they could in fact see the

17   entire book and start to work out of the positions or hedge

18   them in a way that made sense.

19   Q.    And what about the futures positions that you said it took

20   time for Barclays to even learn about?  Do you know how long

21   that took?

22   A.    You know, I don't recall, but in some cases I think it

23   was, you know, well over a week or more.

24   Q.    Now, are you familiar with what's called a VIX position?

25   A.    Yes.

08-13555-mg   Doc 12027   Filed 10/07/10   Entered 10/15/10 11:40:55   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 28 of 151

Page 28

1    Q.   Can you describe generally your understanding of that type

2    of position is?

3    A.   It's a Chicago Board Option (sic) Exchange product that

4    is -- where the underlier -- all these transactions, all these

5    contracts have some underlier, the underlier is volatility.

6    Volatility is a measure of market moves.  And so it is also a

7    component in pricing options.  So the VIX is -- was a comp --

8    VIX was based on the underlying movements in the S&P index.

9        And Barclays discovered, after the transaction -- or while

10   the transaction was closing over that weekend, that there was a

11   position in VIX futures, which apparently represented thirty

12   percent of the open interest, that they hadn't known about at

13   all and for which Lehman had been, and Barclays was going to

14   be, now fully exposed.

15   Q.   And why would they be exposed on the VIX position?  Did it

16   have something to do with the market circumstances at the time?

17   A.   Well, I mean, as I indicated, in -- among the market and

18   trading risks are the difficulty in exiting a concentrated

19   position.  Your ability to execute it at a fair price depends

20   on how much liquidity there is in the marketplace.  If you own,

21   you know, a position of 10,000 of whatever and it only trades,

22   you know, 500 a day, it's going to take you a while, if you put

23   that block of 10,000 whatever onto the marketplace -- well,

24   let's put it this way:  People will take advantage of you.  And

25   so a forced liquidation or a liquidation where you have to show

Page 29

1    your hand, and it would have, I think, become pretty obvious

2    that -- you know, who owned what in the market, that that

3    represented a significant risk, in addition to the fact that it

4    could potentially further deteriorate just as a result of

5    continuing moves in the marketplace.  So if they're short, the

6    VIX -- and I understand it they were making a bet that the VIX

7    would go down.  Well, it went up.  So as it goes up, they're

8    losing money.

9    Q.   Can you please turn to tab 5 in your binder, which is BCI

10   Exhibit 290?

11   A.   Yes.

12   Q.   This is an e-mail dated Monday, September 22nd at 19:38

13   GMT time, which I'll represent to you is 3:38 p.m. Eastern Time

14   on the afternoon of the closing.  And this is an e-mail from

15   Stephen King to various individuals within Barclays.

16        Stephen King writes in this e-mail on Monday afternoon,

17   after the closing, "It is clear that LB has absolutely no idea

18   what its OCC risk position is.  We know it is between two

19   billion short and four billion long.  They do not know what has

20   been booked to what entity.  We cannot see.  We are now four

21   days into making zero progress on this with them."  You see

22   that?

23   A.   Yes.

24   Q.   Did you review this in forming your opinions in this --

25   A.   Yes.

Page 30

1    Q.   -- case?  And can you describe what significance, if any,

2    this communication had for your opinions?

3    A.   Well, again, what had happened -- we haven't discussed

4    this yet, but what Barclays found over the weekend was that it

5    had no hedges against this -- these positions -- these option

6    positions.  So they represented pure naked risk to them.  Point

7    one.

8         Point two:  Because the -- there's evidence that the

9    positions that they had -- that Barc -- that Lehman had at the

10   Chicago Mercantile Exchange had been liquidated on Wednesday,

11   they also would have had no S&P futures, one way or the other,

12   to potentially modulate whatever risk was here.

13        So what Barclays found on Monday -- what they didn't know

14   was whether this portfolio of exposures was sensitive to the

15   market going up or down.  So in order to put a macro hedge on

16   that position, which is all they could do as soon as the

17   closing happened, they would need to know what the sensitivity

18   of that book was, even without knowing all the other issues

19   related to the book.

20        So this just demonstrates that, you know, a senior

21   executive at Barclays, who was in fact responsible for trying

22   to hedge the book, didn't know whether he should be going long

23   or short on Monday.

24             MS. BLOOMER:  If we could put the slide at tab 4 back

25   up on the screen.

08-13555-mg   Doc 12027   Filed 10/07/10   Entered 10/15/10 11:40:55   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 31 of 151

Page 31

1   Q.   You next say that Barclays -- that there was unknown

2   potential funding exposure that Barclays faced in taking on

3   these positions.  What do you mean by "potential funding

4   exposure"?

5   A.   Well, on -- we discussed that there was a requirement

6   imposed by a clearinghouse for listed derivatives to protect

7   itself against exposure.  And we saw -- I looked at the chart

8   with you before that indicated the composition of the various

9   margin that was held.  What Barclays would need to know is

10  whether or not on Monday, when it took responsibility for the

11  positions, whether it would have to provide additional

12  collateral, because basically the OCC says 'Well, based on

13  market moves and other factors, you know, you had a billion

14  dollars there on Friday but we need two billion today' or 'a

15  billion-five, so put it up.'  So that's a -- that would be a

16  risk, even if all the margin's coming over.  But if no margin's

17  coming over, then they have to know what their potential

18  exposure -- they would have to totally fund these accounts on

19  day one, and they would have to have been engaged in figuring

20  out what that would be.

21      So the point is that, absent a deal to make sure that

22  these -- the collateral came over, they would have had to

23  arrange for the provision, and it made no -- they took no steps

24  to do that.  So from their point of view, they didn't have to.

25  Well, I shouldn't say they didn't have to.  They might have had

Page 32

1   to, because, as I said before, the collateral coming over might

2   not have been enough, but that would have been something

3   potentially they could have dealt with.  But this is aside from

4   the fact that the clearinghouse itself would have taken steps

5   to assure itself that that collateral was fully funded, which

6   OCC of course in this case didn't do since they were

7   transferring the whole account.

8   Q.   Now, turning back to tab 4 and the slide, you next say

9   that Barclays was facing unknown potential losses due to

10  default by LBI affiliates, for whose positions Barclays was now

11  responsible.  What were you referring to there?

12  A.   Well, Barclays' clearing business, and, you know, this is

13  a -- this is something that my former firm does too, it clears

14  positions for all of -- for the entire business, wherever it is

15  in the world.  So you do business in foreign countries through

16  affiliates.  They had big -- a huge business in London.  So

17  those London affiliates were doing a lot of the same things for

18  foreign clients that the U.S. firm is doing for U.S. clients.

19       So to the extent that it required listed derivative

20  positions, it was using Lehman to clear those positions.  It

21  was doing it in -- as the -- my understanding of the record

22  shows, in discussions with the operations people, those

23  positions were carried in some cases in the firm accounts, and

24  in some cases in the customer accounts.

25       So what you had was Barclays' willingness in this deal to

08-13555-mg    Doc 12027    Filed 10/07/10    Entered 10/15/10 11:40:55    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 33 of 151

Page 33

1    take over all of the clearing requirements for those positions

2    without knowing exactly what they were, because they were all

3    mixed up at the time; it took them a while to figure out, you

4    know, as someone said, you know, Barclays' -- 'Lehman's books

5    are screwed up.'  I don't know whether that's true, but that

6    was the perception on the part of the operations people at the

7    time.  They couldn't figure out what the positions were.

8        So whatever they were, they had -- any losses that would

9    result from them -- so even though they weren't taking on those

10   affiliate accounts as customers, they still had the clearing

11   responsibility for them.  And if there were losses, they would

12   have to turn back to make a claim against somebody.  But those

13   affiliates were already, you know, filing for bankruptcy at the

14   same time that Lehman was.  They were all insolvent.

15   Q.   And the fact that they were insolvent, how does that --

16   how is that significant to the risk that Barclays was assuming?

17   A.   It means you're unlikely to collect whatever losses you

18   incur as a result of getting out of the positions.

19   Q.   Would Barclays, upon taking clearing responsibility for

20   LBI's exchange-traded derivatives accounts, also be exposed to

21   credit risk in relation to nonaffiliate customers?

22   A.   Yes.  I mean, customers -- they were clearing for

23   customers who had, you know, positions that created risk.  The

24   theory is that all those customers are required to post margin

25   themselves and to have sufficient assets to cover the

Page 34

1   positions.  But you are at the risk that customers, in the

2   event -- as a result of a major market move or something like

3   that, will not be able to meet their obligations, and you will

4   have to liquidate those customer positions and risk loss.  So

5   if you don't get the margin along with the client accounts -- I

6   mean, that's some mitigation against that possibility, but that

7   was the risk they incurred.

8        So I don't think that it was a risk that should be

9   ignored, and they didn't -- but they were willing to take, you

10  know, a whole group of the customer accounts.  There was credit

11  risk on the derivative positions.

12  Q.   Did the market conditions during the time of this

13  transaction, in your view, have an effect on the extent of that

14  credit risk?

15  A.   Obviously it would depend on, you know, the position of

16  each of the clients, but as -- in a general context, yes.  The

17  market was very volatile at the time, and so, depending on

18  whether the clients' positions were sensitive to the market

19  going up or down, particularly if they were sensitive to the

20  market going down, you could have a serious call on the client

21  that they wouldn't be able to meet.

22       I mean, look, the majority of firms in this business,

23  particularly in the futures business, that have gone under have

24  been brought under as a result of client defaults and their

25  inability to meet margin requirements.  So it's not, you know,

Page 35

1    an insignificant risk.

2    Q.   Now, if we go back to tab 4, which is the slide -- next

3    thing you mention is the market volatility at the relevant

4    time.  And can you please turn, in this regard, to tab 9 of

5    your binder again, which is the margin chart that we were

6    looking at earlier, BCI Exhibit 646?

7    A.   Yes.

8    Q.   Can you explain to the Court the ways, if any, in which

9    the market volatility are reflected on this chart?

10   A.   Well --

11   Q.   And please turn to the last two pages -- last page.

12   A.   Yeah, we're talking about pages 7 and 8.  And starting

13   with page 8 and working backwards, or up the chart, the

14   volatility is reflected by the degree to which the margin

15   requirements go up or down in a given day.  And we can see that

16   the margin requirement goes from 789.6 million, in the

17   aggregate, to 1.36 billion, in round numbers, on the Tuesday,

18   based on Monday night's close.  So -- and I say in my report

19   the market dropped from Monday to Tuesday.  So that would

20   indicate a sensitivity to the market going down.

21        Then the next day there's a slight increase in the margin

22   requirement.  But between Monday and Tuesday we have an almost

23   500 million dollar change in the margin requirement; it's,

24   like, you know -- I didn't figure the percentage, but it's a

25   significant percentage change.

Page 36

1      And then it goes on the following day from 1.4 -- this is

2  from the 17th and flip over the page to the Thursday morning --

3  it goes to 2 billion, from 1.4 to 2, which is another 500

4  million.

5      And then based on Thursday night's close, the margin

6  requirement on Friday morning has gone down again by another

7  500 million.

8      So you have a fluctuation.  If you're just thinking of the

9  volatility of the margin requirement, you see it going up by

10  twenty-five to thirty percent, in round numbers, from one day

11  to the next.  That's a pretty huge variation.

12  Q.   And what significance does that market volatility in these

13  particular accounts have, if any, in relation to your opinions

14  concerning the risks that Barclays was undertaking in acquiring

15  these accounts?

16  A.   Well, let me start by emphasizing that, during this period

17  of time, this is Lehman's risk.  And, you know, we can't lose

18  sight of the fact that if this transaction closed, this would

19  have been all Lehman's risk.  So what Barclays was doing, you

20  know, for, frankly, from my point of view, the marketplace as

21  well as for the transaction in this case was a willingness to

22  take on all of this exposure at whatever volatility this meant,

23  without having a lot of facts, and its only mitigant was its

24  ability to take the margin along with it.

25      So what this chart tells me is that -- and what, actually,

Page 37

1     the record developed over the weekend shows, is that nobody

2     knew what that margin requirement was going to be on Monday

3     morning.  In fact, there was some indication by the OCC that

4     they might, you know, have a very significant deficit.

5          The other -- by the way, the other set of risks that we

6     haven't even discussed is the fact that on the Friday, that was

7     an option exercise date.  That means all these options that

8     were short, that were expiring on that date, that were in the

9     money, were going to get exercised.  There was a settlement

10    obligation that someone had to perform; that settlement

11    obligation -- that's to make delivery on all these contracts --

12    that settlement obligation was assumed by Barclays over time.

13    If this deal hadn't closed, then Lehman, the estate, and the

14    OCC would have been in charge of figuring out how to settle all

15    those bargains and make the payments.

16    Q.   Mr. Leitner --

17    A.   So this was a pretty critical period for lots of reasons,

18    but that was one of them.

19    Q.   You mentioned the possibility of a deficit.  Could you

20    describe for the Court what you mean by that?

21    A.   Well, we're talking about deficit here in terms of what

22    the -- only what the margin requirement is that OCC is

23    computing.  OCC is using its models; it's saying, you know,

24    'Our view of the risk of loss is X.'  And so a deficit would

25    mean that, under the rules of the Clearing Corp., you would

08-13555-mg    Doc 12027    Filed 10/07/10    Entered 10/15/10 11:40:55    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 38 of 151

Page 38

1    have to meet that deficit within a certain period of time on

2    the next business day.

3        I told you earlier that this market is very dependent on

4    things happening when they're supposed to happen.  There is a

5    low tolerance for being late in making payments and

6    settlements.  And so, you know, if there had been a deficit,

7    that would have been Barclays' requirement on money.

8        Look, you can -- just to take a look at the chart again,

9    if you look up to the 30th of September, the margin requirement

10   had gone up to two billion dollars.  And, again, you know, the

11   volatility of that margin requirement in the prior week had

12   been 500 million dollars, more or less, from potentially one

13   day to the next.

14   Q.   Now, Mr. Leitner, while we're still on this chart, let's

15   pause for a second to talk about the composition of the margin

16   in these accounts.  Is that composition in the margin reflected

17   in these charts as well?

18   A.   Yes.  You could -- just take a look at the 15th, for

19   example.  The 15th shows that the margin requirement of 789

20   million had been met by nine hundred and almost forty million

21   dollars of treasuries, and 330 million of what are described as

22   LCs, which are letters of credit.

23   Q.   Okay.  And in the course of your work on this case, did

24   you come to learn about LBI's practices for how it funded its

25   exchange-traded derivatives margin requirements?

08-13555-mg   Doc 12027   Filed 10/07/10   Entered 10/15/10 11:40:55   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 39 of 151

Page 39

1    A.   Their practices were very similar to the ones that I was

2    familiar with, which is that you used letters of credit and

3    treasuries generally as the cheapest way of meeting your margin

4    requirements, because if you reverse in treasuries, the carry

5    cost could be less than using cash.  Cash is expensive, so you

6    try not to use it.

7    Q.   Now, if you look at this chart, although there's zero cash

8    in the accounts on September 15th, by the end of the week, on

9    September 22nd --

10        MS. BLOOMER:  If you could turn to the next page, the

11   22nd.

12   Q.   -- you see cash of over a billion dollars --

13   A.   Yes.

14   Q.   -- do you see that?

15   A.   Yes.

16   Q.   Do you have an understanding of what factor or factors

17   contributed to the buildup of cash in this account over that

18   week?

19   A.   My understanding is that, you know, as a result of the

20   fact that Lehman was in distress, financial distress, that

21   their -- the banks that they dealt with that were essentially

22   funding their operations were beginning to pull back, and that

23   specifically they found it more difficult to reserve in

24   treasuries and they needed -- so they wound up having to use

25   cash, that they would otherwise have used for that purpose, to

Page 40

1    fund their margin requirement

2    Q.    And so is it your understanding that LBI had to deposit

3    over a billion dollars in cash in that one week in light of

4    that event?

5    A.    Well, that's -- that -- they met the requirement.  That --

6    the requirement was the requirement.  And to the extent they

7    couldn't use their normal strategy of reversing in treasuries,

8    they had to use cash.

9    Q.    Would an acquirer of an exchange-traded derivatives

10   business typically attribute significance to the allocation or

11   composition of margin in an account as between cash and

12   securities?

13   A.    No, not really, because all you're concerned about is the

14   fact that the margin was good enough for the clearinghouse.

15   It's good enough for the clearinghouse, it's fine.  The problem

16   would be whether some portion of that margin was being covered

17   by letters of credit.  They're acceptable to the clearinghouse,

18   but those are contracts with the prior clearing member, and so

19   you would have to find arrange -- make arrangements, if you

20   wanted to use letters of credit, to find your own banks to

21   provide them.

22   Q.    So to the extent that LBI was using letters of credit, and

23   here it shows they were using 252 million dollars' worth of

24   letters of credit to fund their margin requirements on

25   September 22nd, would Barclays be expected to receive benefit

Page 41

1   of value from that, or would they have to replace those letters

2   of credit?

3   A.   Well, theoretically they would have to meet the

4   requirement and they couldn't use the letters of credit that

5   were there, if I've understood your question correctly.

6   Q.   And what significance does that risk, if any, have to your

7   opinions?

8   A.   Well, that's part of the funding risk that I indicated

9   before, that is, the need to know whether you have to come up

10  with additional collateral, and then figuring out what's the

11  best way to do that.

12  Q.   And finally, Mr. Leitner, with respect to this chart, it

13  shows you that as of the morning of September 22nd, there were

14  926.8 million dollars' worth of treasuries --

15  A.   Right.

16  Q.   -- in this account.  That reflects to you that this was

17  not purely a cash margin account, is that right?

18  A.   No.  No, I mean, look, again, the practice is to try to

19  meet your margin requirement in the cheapest way possible, and

20  that generally is by reversing treasuries which have some

21  income component to it.  So if you're in the business, that's a

22  cheap way to do it.  So that's the way most firms do it.

23  That's what I assume Lehman was doing.

24      Cash is more expensive.  You can put cash to work in other

25  ways.  So you wouldn't do it as a matter of choice.  And indeed

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 42

1    the testimony from Mr. Jones, Craig Jones, who was running this

2    business, was, you know, they -- treasury -- their treasury

3    department was being forced to use cash.

4    Q.    Now, if you'd turn to tab 12 of your binder, which is your

5    next conclusion that we have put on a slide.  You say "Absent

6    Barclays' assumption of LBI's obligations with respect to the

7    exchange-traded derivatives, this business was in imminent

8    danger of being unraveled by the relevant exchanges in clearing

9    corporations through the medium of a forced liquidation of the

10   positions in LBI's ETD accounts."

11   A.    Yes.

12   Q.    What was your basis for this conclusion?

13   A.    Well, there were a couple:  The first one was that it had

14   happened already through the Chicago Mercantile Exchange's

15   exercise of its rights in auctioning off all of Lehman's

16   proprietary positions on the Wednesday, which the Court was

17   told about at the hearings; secondly, the OCC had made it clear

18   on Friday and throughout the weekend that if the deal didn't

19   close, that's exactly what they were going to do.

20       And let me make a general point that clearinghouses have

21   only one concern when a member goes into distress, and that is

22   protecting themselves and their members.  And they begin to

23   look at whatever happens to be sitting in those accounts as

24   theirs to deal with, and in fact they have the right to deal

25   with it as theirs.  So a forced liquidation means, just as in

Page 43

1    the CME case, is that the clearing member uses -- loses all

2    control over its ability to determine the outcome of whether

3    it's going to get any money back or wind up owing money.

4    Q.   Now, if we turn to tab 16, which is your next conclusion,

5    you say "There was a substantial risk that such a liquidation

6    could result in a loss of much, if not all, of the margin LBI

7    had posted with the OCC and the other exchanges and clearing

8    corporations, and could have resulted in losses beyond those

9    that the posted collateral, including the clearing-fund

10   deposits, would cover, and also result in losses to LBI's

11   customers."

12         Now, let's focus on the first part.  When you talk about a

13   substantial risk of "such a liquidation", you're talking about

14   the forced liquidation --

15   A.   Yes.

16   Q.   -- that you were referring to in your prior opinion?  Why

17   do you believe a forced liquidation could result in a loss of

18   much, if not all, of the posted margin?

19   A.   I think it was very important in my reaching that

20   conclusion about two factors:  One was the size and complexity

21   of the positions (this would have been the largest liquidation

22   of option positions ever in the United States); and secondly

23   that, at the time, there was a huge uncertainty in the

24   marketplace.  You had Harvey Miller telling the Court, and the

25   investment banker for Lehman telling the Court, that if the

Page 44

1    transaction hadn't closed, first of all, the -- I think Harvey

2    Miller's words were 'this administration is over'.  And the

3    banker's saying, you know, 'The capital markets, as we know it,

4    will be in chaos.'  I don't -- that might have been a bit of

5    hyperbole, that last statement, but I was at the stock exchange

6    at the time, helping consult with them on market issues, and I

7    can tell you that there was a huge amount of uncertainty in the

8    marketplace at that time.  And so I think it is absolutely

9    reasonable for me to conclude that the -- a forced liquidation

10   could have blown right through all the collateral they had.

11          And, again, Lehman has no power to manage the liquidation.

12   OCC said they were going to do it, and they would have done it.

13   And every other exchange that they cleared through, all these

14   foreign exchanges, they would have used self-help.  That's what

15   they're supposed to do.

16   Q.   And in the event --

17   A.   And they will do it to protect themselves.

18   Q.   I apologize for interrupting.

19          Did the event at the CME inform your conclusion that such

20   a liquidation could result in a loss of much, if not all, of

21   the margin?

22   A.   Yes.  I mean, they -- that liquidation, you know,

23   basically shredded their positions and, what, it cost them 1.6

24   billion.

25   Q.   Could LBI have mitigated its risk of this doomsday

Page 45

 1   scenario that you describe, by taking the margin out of its ETD

 2   accounts during that week?

 3   A.   I'm not sure I followed you.  I mean, first of all, they

 4   couldn't have taken the margin out.

 5   Q.   Well, that's my question, sir.  Why not?

 6   A.   Well, first of all, the -- they had to keep whatever the

 7   requirement was there during the day.  And the exchanges also,

 8   almost universally but certainly the U.S. exchanges, have the

 9   right to do what they call an intraday call.  In other words,

10   if they feel that a member is in financial difficulties or if

11   there's particular volatility in the marketplace, they will say

12   'Just put up more margin.'  That happens in the futures markets

13   all the time.  Get a call at, you know, 2 o'clock, saying 'We'd

14   like another billion dollars, and we'd like it in an hour.'

15   And they expect to get it in an hour.

16       Now, what happened here on the Friday was that the Lehman

17   folks, having been told that their margin requirement had gone

18   down between Thursday and Friday, did what they normally did

19   was just try to get the money back.  And OCC said 'Eh, we don't

20   think so.'  I'm being colloquial, but they exercised their

21   right to, effectively, refuse to return that margin, by

22   implementing an intraday call on Lehman.

23       So one of the reasons why there was a lot of margin was

24   because the OCC felt itself exposed.  And indeed what I think

25   they were doing is protecting against the possibility that the

Page 46

1    deal wouldn't close.

2    Q.   Now, did the other exchanges and clearing corporations

3    have similar rights and powers and incentives as those of the

4    OCC?

5    A.   Yes.

6    Q.   Can you turn back to slide 4, which is at tab 16 of your

7    binder?  You next say that a liquidation could have resulted in

8    losses beyond those that the posted collateral would cover.

9    A.   Yes.

10   Q.   Are you saying that, absent this deal, LBI could have lost

11   more than the margin that it had put up with the exchanges and

12   clearing corporations?

13   A.   Yes.

14   Q.   Why is that?

15   A.   Well, for the reasons I've stated before, that, number

16   one, they had no control of it.  You were perfectly at the

17   control over the liquidation processes -- the clearinghouse's

18   control.  So they have to figure out how to do this.  Now,

19   they're going to try to do it in an orderly way, but understand

20   that in this instance, in these circumstances, if the deal

21   hadn't closed, the -- how would the markets have reacted to

22   that?  The markets were expecting the deal to close.  If it

23   hadn't closed and the OCC was now going to exercise its rights

24   and other exchanges were going to exercise their rights, the

25   OCC -- the whole portfolio would have been at all the market

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 47

1   risks I just described before:  spreads would have widened;

2   liquidity might have dried up.  You just don't know what those

3   consequences were.

4        So I think it is completely reasonable to conclude that

5   most all or more than the amount of collateral that was held,

6   which was what the total as -- you know, whatever it was,

7   one-point-something billion dollars, would have been

8   insufficient to cover the complete liquidation of those

9   positions.  Do I know that for a certainty?  Of course not.

10  One has to speculate on what would have been the likely outcome

11  in the marketplace at that time, and that time was pretty

12  unique --

13  Q.   Does that opinion --

14  A.   -- fortunately.

15  Q.   -- hold true even though there was an excess in the OCC

16  accounts as of the Friday morning?

17  A.   Yes, because, look, what does an excess mean when the

18  margin requirement's moving 500 million dollars a day?  I mean,

19  the margin requirement on the -- let's look back at -- can I

20  look back the tab again?  What was the number?

21  Q.   Sure.

22        MS. BLOOMER:  Can you pull up --

23  Q.   I believe it's tab 9 of your binder.

24  A.   (Pause).  Sorry, I got it the wrong way around.

25        So the Friday requirement, the 19th, the morning

Page 48

1    requirement is 1.6 billion, and the requirement on Monday

2    morning is 1.5 billion.  And the requirement on Tuesday is 1.7

3    billion.  I mean, so, you know, it looks to me like the

4    aggregate margin requirement, you know, went up.

5    Q.   And did you investigate whether that trend continued after

6    the 23rd?

7    A.   Well, I mean, yeah, the chart will speak for itself in

8    terms of what those requirements were, but, you know, it

9    gravitated between, you know, just somewhere in the 1.5 billion

10   dollar range up to 2 billion by the 30th of September.

11   Q.   Now, what exactly would happen if an exchange-traded

12   derivatives account liquidation resulted in losses that

13   exceeded the posted margin, as you say was possible?

14   A.   Well, first of all, if they exceeded the posted margin,

15   the clearinghouse would go to its reserve fund, which is the --

16   sorry, it would first go to the clearing member's clearing fund

17   deposit, and it would use those assets.  Every clearing member

18   has to put up a deposit, which is like an overall equity, and

19   that deposit varies depending on how much business they do.

20        So -- by the way, that was another thing Barclays had to

21   worry about, because now they were going to have this big

22   position.  Their own clearing-fund deposit was going to have to

23   go back.  So it would be concerned that, you know, those were

24   part of the assets in the business too that it needed to be

25   able to support the positions.

Page 49

1        But just for the purpose of answering your question, it

2    would -- the clearinghouse would look to that clearing-fund

3    deposit.  If it wasn't enough, then they would assess the

4    clearing-fund deposits of all the other members.  To the extent

5    that they had to do that, then they would look back to the

6    estate to cover themselves against that differential.  So if

7    all of the assets that Lehman had were used up and the

8    clearinghouse had to look to the resources of other members or

9    itself to make up the difference, then Lehman Brothers remains

10   on the hook.

11        MS. BLOOMER:  Your Honor, I would pause to note that

12   we are at our typical morning break time.  I have about ten

13   minutes, I would say, left --

14        THE COURT:  Please proceed till you finish.

15        MS. BLOOMER:  Thank you.

16        THE COURT:  We'll break when you're --

17        MS. BLOOMER:  Okay.

18        THE COURT:  -- you finish your direct.

19        MS. BLOOMER:  Thanks.

20   Q.   Back to the slide that we were just looking at, at tab 16.

21   A.   Yes.

22   Q.   You mention at the end of this that there was a

23   substantial risk that the liquidation could -- would also

24   result in losses to LBI customers.  Can you explain that for

25   the Court?

Page 50

1    A.    (Pause).  If the customer positions hadn't been

2    transferred, the OCC had the right to liquidate the customer

3    positions.  They would not have wanted to do so, of course.

4    The whole object in any of these proceedings is protecting the

5    customers, which means moving them to other firms that are

6    solvent.  But the fact is that the -- it has happened before

7    that customer positions have been blown out; it happened in --

8    which, by the way, was one of the cases I worked on on the

9    Market Transactions Advisory Committee assignment had; it was

10   looking into the outcome of something called volume investors.

11   In that case, the Clearing Corporation had liquidated

12   everything, including the customer positions, because actually

13   that was one of those cases where a customer default had

14   brought the firm down.  And so in liquidating all the other

15   customer accounts, those customers lost money and, you know,

16   the Clearing Corporation was not responsible for them.  So

17   it's -- that's what happens if -- in a here-today-gone-tomorrow

18   scenario.

19   Q.    Could you turn to tab 15 of your binder, please, which is

20   BCI Exhibit 267?

21   A.    Yes.

22   Q.    This is an e-mail from Jim McDaniel to Stephen Harback of

23   SIPC, and various attorneys at Hughes Hubbard --

24   A.    Yes.

25   Q.    -- among others, dated Sunday, September 21st.  And it's

08-13555-mg   Doc 12027   Filed 10/07/10   Entered 10/15/10 11:40:55   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 51 of 151

Page 51

1    responding to an e-mail that Stephen Harback had written to Jim

2    McDaniel and Bill Navin earlier that day.

3         First of all, do you know Jim McDaniel and Bill Navin?

4    A.   Yeah, Jim McDaniel and I have known each other for years.

5    Jim is -- and I are co-authors of an article on cross-margining

6    that was published in the Capital Markets Law Journal.  And

7    Bill Navin I've also known for -- he's now the general counsel.

8    I knew him when he was still a lawyer at Sidley.

9    Q.   Now, Mr. Harback says in this e-mail, "I urge you in the

10   strongest possible terms not to take precipitous action."  And

11   this was in response to Jim McDaniel's e-mail from earlier that

12   afternoon, if you'd look at the next page, paragraph 3, where

13   he says, "If the transaction does not close tonight, OCC would

14   need to immediately liquidate and close out the LBI accounts

15   and is preparing to do so."

16        Now, in response to Mr. Harback's e-mail urging Mr.

17   McDaniel and Mr. Navin not to take precipitous action, Mr.

18   McDaniel responds, and in that response he says, in the middle

19   of that paragraph, "OCC cannot allow the positions to remain in

20   place if no transaction is concluded tonight, because OCC will

21   then be exposed to loss if the market moves against LBI's

22   positions."

23   A.   Right.

24   Q.   You see that?

25   A.   Yes.

Page 52

1   Q.   Did you review this e-mail when you were forming your

2   opinions in this case?

3   A.   Yes.

4   Q.   And what significance, if any, did this e-mail have to

5   your conclusions?

6   A.   Well, it's -- you know, as I said before, OCC was making

7   preparations and it, frankly, had indicated, I believe,

8   according to testimony, as early as Friday that if this wasn't

9   resolved with Barclays actually taking full responsibility for

10  those accounts, that it would exercise its self-help rights.

11  So this is just confirmation of -- along with other testimony,

12  of what was going on over that weekend.  They were getting very

13  nervous.

14  Q.   Now, if you'd turn to tab 18, which is your next slide.

15  You say "For all of these reasons, it was in LBI's best

16  interest to agree to transfer to Barclays the entirety of

17  exchange-traded derivatives business, including all posted

18  collateral and the clearing-fund deposits."  What is your basis

19  for this conclusion?

20  A.   Well, as I said before, the -- by the time of the -- on

21  the -- by the Friday, for sure, there was only risk in these

22  positions, that is to say that -- the risk of loss, so that --

23  particularly with regard to the proprietary positions.  So if

24  LBI -- there was -- there were no hedges for any of these

25  transactions.  There was nothing that offset the positions.  So

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 53

1    when you have nothing but naked exposure on all of these listed

2    derivative contracts, the margin is a proxy for how much you

3    can lose.  But it's not a limitation on how much you can lose.

4        So I think -- that's why I think it was absolutely in the

5    interest of the estate to assure that this derivatives

6    exposure, which, you know, I'm not sure that, you know,

7    everybody quite understood that at the hearing, but in my view

8    it's one of the largest exposures that the estate faced by that

9    Friday when these hearings were being held before you.

10       And so I think it was -- as I said, I also think it's in

11   the best interest of the markets, because I don't know how the

12   markets would have reacted if this deal hadn't closed and there

13   had been a liquidation.  But, you know, kind of based on my

14   experience walking around on the floor of the stock exchange,

15   it would not have been pretty.

16   Q.   Mr. Leitner, you say that you're not sure whether the

17   other people at the hearing understood the risks associated

18   with this type of a liquidation.

19   A.   No, no, I -- let me --

20   Q.   Could you please turn to --

21   A.   Sorry.

22   Q.   -- tab 13 --

23   A.   Okay.

24   Q.   -- of your binder, which is BCI Exhibit 49A, which is the

25   sale hearing transcript?

Page 54

1    A.    Yes.

2    Q.    Okay.  And if I could direct your attention to page 238 of

3    that transcript --

4    A.    Yes.

5    Q.    -- lines 17 through 21, and this is Mr. Miller addressing

6    the Court towards the end of the sale hearing.  And he says,

7    "Look what happened yesterday, Your Honor.  The CME closed us

8    out and we took a loss of 1,600,000,000 dollars."  And then he

9    says "This administration is finished if this transaction is

10   not completed, Your Honor."

11        Do you believe, Mr. Leitner, based on that statement, that

12   Mr. Miller understood the risks associated with the exposures

13   in these accounts?

14   A.    Yes.

15   Q.    Now, Mr. Leitner, have you reviewed the contemporaneous

16   evidence and transaction documents that were generated during

17   the time that this transaction was being completed?

18   A.    Yes.

19   Q.    And do you have a view of what the parties understood this

20   transaction to be, based on your understanding of industry

21   practice and the discussions and actions that those parties

22   were undertaking at that time?

23   A.    Are you talking to the last conclusion in my opinion?

24   Q.    Sure.

25        MS. BLOOMER:  Why don't we put that up on the screen.

Page 55

1    Q.    That's at tab 20 of your binder.  You say "The governing

2    agreements are entirely consistent from the vantage point of an

3    industry expert, with a view that the parties agreed to a

4    transfer of the entirety of LBI's exchange-traded derivatives

5    business, including all of the posted collateral and the

6    clearing-fund deposits."

7          What brought you to this conclusion?

8    A.    Well, again, it's the review of the entirety of the

9    agreements.  I was looking for, okay, what was the deal here?

10   When I was first engaged in this matter, I said, you know, kind

11   of, what's -- what is this fight about and why is there a fight

12   at all?  And I looked at the agreements and I said, okay, well,

13   they're transferring all these businesses and all the assets

14   necessary to operate the business, so why is there a fight

15   about the collateral, because that's a necessary part of

16   operating this portion of the businesses that were being

17   transferred, the equity -- sorry, the listed derivatives'

18   exposures.

19   Q.    Now, when you reference the documents that you looked at

20   that caused you to lead -- reach that conclusion, were you

21   including the APA in that?

22   A.    I was looking at the APA, the clarification letter, but

23   also all the documents that were created to implement what

24   seemed to be the intent of the parties.  Those included the

25   sale order that was presented to Judge Peck that reflected the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 56

1   fact that the parties had been talking to the OCC about getting

2   this -- getting these accounts transferred.  OCC was insisting

3   that its lien against all of the collateral of Lehman Brothers

4   that was going to be transferred to Barclays -- which they

5   assumed was a fact -- was that they maintained the lead in

6   that.  That order referred to all the margin, including cash,

7   that was being transferred, and the transfer and assumption

8   agreement, the collateral agreement, that actually implemented

9   that transfer.  All of those documents were consistent with an

10  understanding that the collateral's going to move.

11  Q.   And are you aware of a bulk transfer order that was issued

12  in this case by the CFTC?

13  A.   Thank you for reminding me.  Again, what did the parties

14  responsible and the lawyers responsible for accomplishing the

15  transaction do to make it happen?  One of the things they had

16  to do on the futures side of the business was to get the SEC

17  and CFTC to under -- to permit this bulk transfer.

18      The reason why it was necessary is because the CFTC and --

19  the rules look at any transfer of beneficial ownership as a

20  trade.  That trade can only happen on the floor of the exchange

21  or under the auspices of an exchange.  In a circumstance like

22  this, however -- special circumstances, where an entire

23  business is being transferred, you can get the permission to do

24  that change of beneficial ownership without it affecting the

25  marketplace.

Page 57

1         And so -- but you've got to get the CFTC to say it's okay.

2    So -- and the assumption by Mr. Raisler and all the parties

3    working on the futures side and the practice in the marketplace

4    was, that when you transfer futures accounts, you're

5    transferring the accounts with everything in it.  And that

6    includes all the collateral that happens to be securing the

7    futures positions in those accounts.  That's what the bulk

8    transfer order is designed to do, to make sure that that

9    happens.

10   Q.    And if you look at tab 11 of your binder, which is the

11   bulk transfer order that was issued in this case, BCI Exhibit

12   843, and you look at the last page of that --

13   A.    Yes.

14   Q.    -- it says, "Accordingly, pursuant to delegated authority,

15   the undersigned," and that would be a representative of CFTC,

16   "authorizes the transfer of the accounts as described above

17   from LBI to BCI."  Do you see that?

18   A.    Right.

19   Q.    And is that, to your understanding, an authorization by

20   the CFTC of the transfer of the accounts that housed the

21   futures positions that Barclays was acquiring with everything

22   that was in them?

23   A.    Precisely.

24   Q.    Would you --

25            MS. BLOOMER:  Okay.  I apologize, Your Honor.  That's

Page 58

1   in your binder at tab number 11, but we weren't able to put it

2   on the screen.

3           THE COURT:  I have the letter.

4           MS. BLOOMER:  Thank you.

5   Q.   Now, Mr. Leitner, the last thing I'd like to ask you about

6   is whether you have reviewed the communications between the

7   parties in this case, and whether you have formed a view about

8   what those communications signify in terms of the understanding

9   of the parties to this transaction?

10  A.   I've reviewed the communications of the parties, and

11  obviously, I've reviewed the testimony of many of the witnesses

12  in their depositions and in their testimony before the Court.

13  Q.   And based on your knowledge of this industry and industry

14  practice, what do you understand the parties to have been

15  agreeing to in this transfer, based on what you saw in their

16  communications?

17  A.   That they intended to include the listed derivatives

18  clearing business as part of the businesses to be transferred

19  along with the FCM, capital markets and related businesses, all

20  the assets used in that business, and that would include all

21  the collateral, including clearing fund deposits that were part

22  of that business.  That was my conclusion.  And that seems to

23  be the roadmap that was provided for the folks who had to

24  execute the transaction and make it happen and was consistent

25  with all the actions that the parties took and was reflected in

Page 59

1    the documents, particularly those at OCC that, you know,

2    essentially effected the transfer.  And --

3    Q.    Lastly, Mr. Leitner --

4    A.    Excuse me.  Can I --

5    Q.    -- are there things --

6    A.    -- go ahead.

7    Q.    -- that you would have expected to see happen that you did

8    not see evidence of, if you believed the parties did not

9    believe the transfer was being -- the margin was being

10   transferred?

11   A.    Well, put it another way.  I did not see any action that

12   wasn't consistent with that view for any other alternative to

13   have been accomplished, i.e., oh, you're not getting the

14   margin; or you're not getting all the margin; or we're keeping

15   some of the margin.

16        You would have had to have a lot of things put in place to

17   effect the transfer -- that is the funding requirement would

18   have had to have been in place at the time, which clearly the

19   parties -- Barclays didn't do.  You would have had the parties

20   having some methodology for computing well, how much do you get

21   back; when do you get it back; why should we get it back.  I

22   mean, there would have had -- there was no evidence that any of

23   those issues, which would have had to have been accomplished if

24   there was any other deal or understanding, I see no evidence

25   that there was any such discussion by any of the lawyers

Page 60

1    involved or by any of the businesspeople involved.

2         MS. BLOOMER:  Thank you, Mr. Leitner.

3         Your Honor, I have no further questions.

4         THE COURT:  We'll take a break before cross-

5    examination and return at 11:15.

6         (Recess from 10:58 a.m. until 11:19 a.m.)

7         THE COURT:  Be seated, please.

8         And I see I have another book.

9         MR. MAGUIRE:  If it please the Court, Bill Maguire for

10   the SIPA trustee.

11        THE COURT:  Please proceed, Mr. Maguire.

12   CROSS-EXAMINATION

13   BY MR. MAGUIRE:

14   Q.   Mr. Leitner, is it fair to say that you have never had any

15   experience involving the sale of a broker-dealer business that

16   was structured as an asset purchase?

17   A.   Correct.

18   Q.   And in fact, you'd agree that it's obviously a much more

19   complicated structure to sell an exchange-traded derivatives

20   business as an asset purchase, than a sale of a company?

21   A.   Yes.

22   Q.   In the sale of a company, there's simply a sale of stock,

23   and all of the assets and all of the liabilities of the

24   exchange-traded derivatives business, all go with the company,

25   right?

Page 61

1    A.    Yes.

2    Q.    When you have an asset purchase agreement, then the buyer

3    and the seller have to go down through all of the assets and

4    the liabilities and figure out which ones stay and which ones

5    go to the buyer?

6    A.    Generally speaking, yes.  Although it's ver -- it would be

7    unusual, except in my experience in the sale of an FCM

8    business, for a -- the closest thing you have is a -- to this

9    case, is the sale of an organization involved in a clearing

10   business.  So the -- this sale involved several businesses

11   together that were linked in regard to the equities or the

12   listed derivative business that happened to be included within

13   it.

14        So although it can be discussed as a separate business, it

15   was also an adjunct of all the other businesses:  the trading,

16   marketing, capital markets businesses that were already being

17   transferred -- that were also being transferred.  But I

18   absolutely agree with you that it's very complicated to do this

19   in the form of an asset transaction as opposed to the sale of

20   the entire company.  Completely agree.

21   Q.    And you'll accept that in negotiating an asset purchase

22   agreement, a buyer and a seller may agree that some or all of

23   the seller's cash will go with the business?

24   A.    In a theoretical sense, is it possible?  Yes.  Was it

25   possible here?  I don't think so.

Page 62

1    Q.    Yes, of course, the parties can all agree that the cash

2    will not go with the business.  Isn't that right?

3    A.    Are we using cash here as a kind of an accounting term?

4    What are we talking about in terms of cash?

5    Q.    As a general matter, the parties can decide to do whatever

6    they want in terms of picking and choosing which assets are

7    going to be sold and which assets are not --

8    A.    Yes --

9    Q.    -- going to be sold?

10   A.    -- correct.

11   Q.    And in a normal transaction, you would expect a buyer and

12   a seller to agree whether or not margin is in the deal or not

13   in the deal?

14   A.    Two solvent parties engaging in an arm's-length

15   discussion.  That would be absolutely possible.

16   Q.    Now, here you say that no rational purchaser would buy

17   Lehman's exchange-traded derivatives business without all the

18   margin, right?

19   A.    In September -- my opinion was based on the context.  So

20   I'm talking about the period between September 15th and 22nd,

21   2008.

22   Q.    And that was because of all of the risks that you

23   described on direct:  the market risks and the funding risks

24   and the clearing risks, right?

25   A.    Also because it was effectively the -- a forced sale and

08-13555-mg    Doc 12027    Filed 10/07/10    Entered 10/15/10 11:40:55    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 63 of 151

Page 63

1   the only transaction available.  So, you know, for all of the

2   reasons that, you know, I described, the transaction was

3   unique, and I mean unique in every sense and hope it never

4   happens again.

5   Q.   Let me just ask you a little bit about the clearing risks

6   that you testified about --

7   A.   Yes.

8   Q.   -- earlier.  With respect to customers, a broker-dealer

9   manages that risk by getting collateral, margin, from the

10   customers.  Isn't that right?

11   A.   Among other things, yes.

12   Q.   And they keep that in what are called segregated or seg

13   and secured accounts, right?

14   A.   It's important here to distinguish whether we're talking

15   about futures accounts or accounts in the broker-dealer, the

16   equity accounts.  So the -- but -- because segregation is the

17   norm and the requirement in the futures business but not in the

18   broker-dealer business.

19   Q.   In either case, though, the broker-dealer will get margin

20   from the customer.  They'll either put it off exchange in a

21   money market fund or whatever, or they'll put it on the

22   exchange, right?

23   A.   Yes.

24   Q.   And you're not aware of any actual loss that Lehman --

25   that Barclays suffered here as a result of the transfer of the

Page 64

1    PIM customers, are you?

2    A.   One of the risks I didn't get into in discussing this was

3    operational risk.  And my understanding is that they, in fact,

4    incurred losses as a result of two factors.  One was that the

5    Lehman folks were carrying some of the futures accounts for

6    customers in U.S. dollars.  But the actual customers had

7    supplied the margin in foreign currency.  So the obligation

8    back to the customer was in the foreign currency, which

9    Barclays was not aware of.  And so there was a loss in the

10   sense of the conversion of the dollars back to the foreign

11   currency.

12       The second issue apparently was the -- that some customer

13   positions of Lehman customers that were carried in foreign

14   accounts of affiliates, had been booked in a firm account range

15   and not in a customer range.  And so there were -- Barclays had

16   to wind up making up the loss.

17       But if you ask whether customers themselves suffered

18   losses, I'm not aware -- or sorry, that Barclays incurred

19   losses as a result of any customer defaults, I'm not aware that

20   they did.

21   Q.   You're not aware of any customer defaults?

22   A.   Right.

23   Q.   Now, you mentioned the clearing risks with respect to

24   affiliates, and that's affiliates of Lehman, right?

25   A.   Affiliates of Lehman, yes.

Page 65

1   Q.   And the risk there was Lehman affiliates would be bankrupt

2   or wouldn't be good for any margin calls --

3   A.   Right.

4   Q.   -- and that Barclays, in stepping in and taking over

5   clearing responsibility, would get stuck with their losses,

6   right?

7   A.   Yes.

8   Q.   And the clearing risk, you understood, was Lehman's

9   problem in terms of clearing trades for the affiliates.  But

10  that would then become Barclays' problem once Barclays took

11  responsibility for the Lehman accounts?

12  A.   That's right.

13  Q.   Now, Lehman had relationships with various clearing

14  organizations, did it not?

15  A.   Yes.

16  Q.   I believe in your report, at page 10 --

17       MR. MAGUIRE:  Maybe we can put it up.

18  Q.   -- you list the various exchanges and clearing

19  organizations.  You should find it in the binder that I just

20  left for you, sir, in tab 1, a copy of your report, marked

21  Barclays' Exhibit 340.  And if you turn to page 10, you'll see

22  that you list there the -- at the very top of the page, that

23  LBI was a clearing member of several clearing organizations,

24  including the Options Clearing Corporation?

25  A.   Yes.

Page 66

1    Q.    The CME; the National Securities Clearing Corporation, or

2    NSCC; and the Depository Trust Clearing Corporation, the DTCC.

3    Do you see that?

4    A.    Yes.

5    Q.    And you have at the end of that sentence a footnote that

6    refers to various other exchanges.  And that's at the bottom of

7    the page.

8         MR. MAGUIRE:  And maybe we can put that footnote up.

9    That's footnote 1.

10   Q.    And you note there that "The exchanges in which LBI traded

11   exchange-traded derivatives included," and you've a long list

12   there that goes all the way from Osaka to the Kansas City

13   Border Trade, right?

14   A.    Yes.

15   Q.    And Lehman was responsible for all of the liabilities

16   associated with its accounts of the exchanges, right?

17   A.    That's my understanding, yes.

18   Q.    And it's your understanding that when Barclays entered

19   into this transaction, then Barclays was assuming and taking on

20   all of Lehman's responsibility for all of the accounts at the

21   exchanges?

22   A.    Yes.

23   Q.    And in doing so, Barclays was taking on not just the risk

24   of proprietary and ordinary customer positions, but also the

25   clearing risk for all of the Lehman affiliates?

Page 67

1    A.    In those cases where those positions were being booked for

2    the affiliates.  That's my understanding.  So that in the case

3    of OCC, those affiliate positions were part of the accounts for

4    which Lehman was directly responsible.  I have not parsed

5    through whether, for example, a London Lehman affiliate traded

6    its futures positions in its own name through a foreign

7    exchange or through Lehman.  But to the extent that they did,

8    then it would be an example of something that was similar to

9    the situation at OCC, that is to say, that Lehman Brothers Inc.

10   in the U.S. would be responsible for that affiliate's position,

11   yes.

12   Q.    And it's your understanding that since Barclays was taking

13   responsibility for the Lehman accounts at the exchanges,

14   Barclays would get the margin at the exchanges?

15   A.    Yes.

16   Q.    But if Barclays did not take responsibility for the Lehman

17   accounts at the exchanges, then Barclays would not be entitled

18   to the Lehman margin at the exchanges?

19   A.    Right.

20   Q.    Bottom line, Barclays wouldn't be entitled to the margin

21   unless it took responsibility for the Lehman accounts?

22   A.    Right.

23   Q.    At the exchanges?

24   A.    Well, keep in mind, I think my report makes clear that

25   although they might be members of the exchanges or were members

Page 68

1    through affiliates, their obligation was with whatever party

2    was, in fact, carrying the positions.  In some cases those were

3    not the exchanges themselves or the clearinghouses themselves,

4    but they dealt through local brokers or affiliates.

5        But the same issue would apply.  So that in Korea, for

6    example, if Lehman's futures positions for itself and customers

7    were done through a local Korean FCM counter -- you know,

8    whatever is the equivalent of an FCM in Korea, then the margin

9    would be posted at that local Korean affiliate and the

10   obligations, however, would be otherwise the same.  In other

11   words, the Korean company would itself have rights that are

12   very similar to the rights of an exchange to exercise self help

13   under the local rules in the event of a default by, in this

14   case, the customer.

15   Q.   Okay.  So let's just be clear.  Where Lehman was doing

16   business on a foreign exchange through a broker -- a foreign

17   broker, it dealt with that broker just like it would deal with

18   an exchange?  It would post margin, it would have an account

19   with that broker, and that broker would then deal with the

20   exchange?

21   A.   Yes.

22   Q.   And it's your understanding that in that case, as long as

23   Barclays stepped in and took over complete responsibility for

24   Lehman's accounts with that broker, then Barclays would be

25   entitled to the margin that Lehman had at that broker?

Page 69

1    A.    In those accounts, yes.

2    Q.    And where was Lehman was dealing with exchanges, then

3    whatever margin Lehman had at those exchanges, Barclays would

4    get as long as it took on responsibility for the Lehman

5    accounts at those exchanges?

6    A.    That's my understanding.

7    Q.    Now, are you aware, sir, that under the asset purchase

8    agreement in this case, Barclays did not take on any

9    responsibility for any Lehman accounts at any exchanges?  Are

10   you aware of that, sir?

11   A.    My understanding was that in -- that the entire deal

12   involved the taking on of all of the positions, so that is not

13   my understanding.

14   Q.    Did anyone tell you that your understanding was not

15   correct?

16   A.    No.

17   Q.    Did anyone tell you that when Barclays signed the asset

18   purchase agreement, it did not take on responsibility for any

19   Lehman accounts at any exchange or at any foreign broker?

20   A.    Whether or not the -- my understanding was that the

21   professionals who ran the futures business for Barclays were

22   attempting to in fact -- and to my -- I thought that they in

23   fact had taken over or attempted to take over responsibility

24   for those positions and those accounts.

25   Q.    So I take it nobody told you that when Barclays signed the

Page 70

1   asset purchase agreement, it did not take on responsibility for

2   any Lehman account at any exchange or foreign broker.  No one

3   has told you that?

4   A.   No.

5   Q.   Has anyone told you that when Barclays signed the asset

6   purchase agreement, it insisted on an express term that gave it

7   the right to reject any contract that Lehman had, including any

8   contract with any exchange?

9   A.   That's not my understanding, no.

10  Q.   Are you aware that Barclays declined to take

11  responsibility for the Lehman accounts at the Depository Trust

12  Clearing Corporation?

13  A.   Yes.

14  Q.   Are you aware that Barclays refused to take responsibility

15  for any customer accounts that were in the name of Lehman

16  affiliates?

17  A.   I'm not aware of which customers -- of all of the

18  customers.  I'm generally aware that there were certain

19  customers that they did not take responsibility for.  But I am

20  certainly not surprised to hear you say that if there was a

21  customer of a foreign affiliate, it would be, particularly in

22  London, difficult to take "responsibility" for those customers.

23  So --

24  Q.   Well, has anyone told you, sir, that the deal documents

25  that you testified about earlier, providing for the transfer of

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 71

1   customer accounts to Barclays, that in those deal documents,

2   Barclays specifically insisted on an exception for all Lehman

3   affiliates?

4   A.   I'm -- I didn't look at those documents, so I'm not aware

5   of that.  But I'm not surprised.

6   Q.   Sir, I want to ask you some questions about the general

7   history of this transaction.  Are you familiar with the

8   terminology "Lehman I", "Lehman II" and "Lehman III"?

9   A.   No.

10   Q.   Now, did you review the deposition or trial testimony of

11   John Varley?

12   A.   John Varley?

13   Q.   Yes.

14   A.   No.

15   Q.   How about Bob Diamond?

16   A.   Yes.

17   Q.   I'll represent to you, sir, that what I'm talking about

18   when I say "Lehman III", is the actual transaction that closed

19   on Monday, September 22, 2008, the transaction that brings us

20   here today.

21   A.   Yes.

22   Q.   That's what we are referring to as Lehman III, okay?

23   A.   Okay.

24   Q.   And we'll get to that. But first I want to ask you about

25   two transactions prior to that, Lehman I and Lehman II.  And

Page 72

1  Lehman I, sir, is a transaction that was originally

2  contemplated the weekend prior to September 15, when Lehman

3  filed bankruptcy, in which Barclays contemplated acquiring the

4  global Lehman business, including the parent company, Lehman

5  Brothers Holdings Inc.  Okay?  That's what we're going to refer

6  to as "Lehman I".  Is that okay?

7  A.   Okay.

8  Q.   Now, sir, did you do any analysis of that transaction,

9  Lehman I?

10  A.   No.

11  Q.   So you've no basis for any opinion with respect to Lehman

12  I?

13  A.   No.

14  Q.   Okay.  Lehman II, sir, is the transaction that the parties

15  entered into in signing the asset purchase agreement which is

16  dated as of Tuesday, September 16, 2008.  And it contemplated

17  the acquisition by Barclays of Lehman's North American

18  brokerage business, including the investment banking business

19  and all the capital markets businesses.  Okay?  That's what I'm

20  going to refer to as "Lehman II", okay?

21  A.   Okay.

22  Q.   And that's the transaction that included some seventy

23  billion dollars of long trading assets and some sixty-nine

24  billion dollars of short trading liabilities.  Okay?

25  A.   Okay.

Page 73

1  Q.   Sir, have you -- you can't give us any opinion with

2  respect to that overall transaction that we refer to as Lehman

3  II, right?

4  A.   Other than that -- I've always considered that asset

5  purchase agreement as part of the transaction that ultimately

6  resulted here.  But if you want to divide it to some -- I'm

7  anxious to hear how you describe Lehman III.

8  Q.   Well, just pausing on Lehman II for a second.  You do, in

9  your report, address the acquisitions of the exchange-traded

10  derivatives business, right?

11  A.   Yes.

12  Q.   And that was a piece of Lehman II, right?  The asset

13  purchase agreement --

14  A.   Yes.

15  Q.   -- dealt with the acquisition of the exchange-traded

16  derivatives business, right?

17  A.   Yes.

18  Q.   But your report does not deal at all with the equities

19  business that was purchased as part of Lehman II?

20  A.   Um --

21  Q.   You have no opinions in your report addressing the

22  acquisition of the equities business?

23  A.   Not directly.  I mean, except insofar, I believe, as I

24  discussed in my report the fact that with regard to the

25  derivatives listed in the U.S. markets that reflected positions

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 74

1    in equities securities, that some of those positions existed

2    because they were engaged in by the various elements of

3    Lehman's equities and market-making businesses.

4    Q.   And you've no opinions on Lehman II other than that

5    reference?

6    A.   I -- my opinions are contained in the report.  So you'd

7    have to be more specific.  Opinion about what?

8    Q.   You haven't done any analysis on the equities ac -- the

9    long trading assets, the equities positions, that part of the

10   seventy billion dollars in trading assets that were acquired by

11   Barclays in the APA?

12   A.   Only to the extent that I was trying to form an

13   understanding that at that time, in connection with that

14   transaction, it was intended that the whole book of long and

15   short positions would somehow move over to Barclays.  I have my

16   own view about whether, even on that Tuesday or Wednesday, that

17   was possible.  But it wasn't necessary for and I didn't express

18   it in my formal opinion.

19   Q.   But beyond that, you haven't done any analysis of the

20   risks or opportunities in that acquisition of that equities

21   business?

22   A.   In the broadest possible sense of opportunities?  What do

23   you mean by that?  I'm just not following.

24   Q.   You haven't done any analysis in your report or elsewhere

25   about the risks or opportunities that Barclays contemplated,

Page 75

1    specifically with respect to the equities piece of Lehman II?

2    A.   No, I haven't -- the only commercial aspect of this

3    transaction that I have rendered an opinion about is that which

4    relates to the assets and liabilities associated with the

5    equities derivatives.  To the extent that they included equity

6    securities or intended to include equity securities as part of

7    that business, my conclusion was that in the event, those

8    offsets that might have reduced the risk weren't in place.

9    Q.   And that's my point, sir.  Beyond your focus on the

10   exchange-traded derivatives piece of Lehman II, you didn't

11   investigate or do any analysis of any other pieces such as the

12   compensation liabilities or the cure liabilities or the

13   purchase price or the asset-backed securities or the other long

14   equity positions or the corporate debt or any of the other

15   pieces of the Lehman II transaction?

16   A.   An analysis?  No.

17   Q.   And you have no basis for any opinion with respect to that

18   overall transaction of Lehman II, right?

19   A.   No.

20   Q.   Now, let's talk about Lehman III.  And as I say, that's

21   the actual transaction that closed on the Monday morning.

22   Again, you focused on the exchange-traded derivatives piece of

23   the transaction, right?

24   A.   Yes, primarily.

25   Q.   And again, you didn't do any analysis of the forty-seven

Page 76

1    billion dollars of long positions that were acquired by

2    Barclays in connection with that transaction?

3    A.    No.

4    Q.    And again, you didn't do any analysis of the purchase

5    price or the compensation liabilities or the contract cure

6    liabilities, that were other pieces of that overall

7    transaction?

8    A.    That's right.

9    Q.    And you have -- you were asked to focus on the exchange-

10   traded derivatives piece of the transaction, right?

11   A.    Yes.

12   Q.    And you've limited your opinions to the exchange-traded

13   piece of the transaction, right?

14   A.    Yes.

15   Q.    But in fact, sir, that wasn't the deal.  This was not the

16   sale of a standalone exchange-traded derivatives business, was

17   it?

18   A.    I agree.

19   Q.    As you pointed out earlier, this exchange-traded

20   derivatives business was an integral part of the inventory and

21   the business -- the other businesses that Barclays was

22   acquiring?

23   A.    Yes.

24   Q.    Isn't that right?

25   A.    Yes.

1    Q.    In fact, you can't think of any reason why Barclays would

2    want to buy the exchange-traded derivatives business, other

3    than the fact that it was not only ancillary, but it was

4    integral to the other businesses that Barclays was acquiring?

5    A.    I generally agree with that statement.  That in -- and as

6    I testified before when we were talking about an asset transfer

7    agreement involving an exchange-traded derivatives business, I

8    said I thought that would be quite unusual if we were -- unless

9    we were talking about an FCM business.  So I agree with you

10   that the transaction makes sense assuming that you are

11   acquiring all of the businesses that are ancillary to that.

12   Although there is an aspect of that business which is self-

13   generating for profits; that's the brokerage piece of it.  The

14   FCM customer side of the businesses can be kind of separated

15   out.  You incur a P&L.  It has a separate P&L and so forth.

16       So there's two pieces of the -- generally two pieces of

17   the -- in this case, three pieces of the equities -- of the

18   exchange-traded derivatives business:  the business you were

19   doing for customers as a broker; the business that you were

20   doing kind of in the capital markets area, facilitating

21   customer business, and being willing to take on risk in a

22   market-making capacity; and finally, accommodating the

23   proprietary trading and clearing of those positions for

24   whatever the businesses are.

25       And so, I mean, that would be my -- the way I looked at

Page 78

1   this overall transaction.  And I think that's what I testified

2   to.

3   Q.   In fact, to be an intermediary in the capital markets

4   business, Barclays had to have -- it needed the exchange-traded

5   derivatives business?

6   A.   Yes.  Well, and so did Lehman.  I mean, Lehman needed it.

7   And Barclays was, to some extent, already in that business, but

8   not as heavily in the -- there was evidence that they weren't

9   as heavily in the equities market and they were looking to get

10  into that market.

11  Q.   So I'm not going to ask you any questions today, sir, on

12  the subject of any acquisition of a standalone exchange-traded

13  derivatives business.  All of my questions are going to relate

14  to the overall transaction, and specifically to the overall

15  transaction that I've referred to as Lehman II, which is the

16  asset purchase agreement that's dated as of the Tuesday,

17  September 16, 2008.

18  A.   Oh, I was anxious to hear you describe Lehman III.  Are

19  you going to keep me in suspense?

20  Q.   Well, I thought I had described Lehman III as the

21  transaction that actually closed on September 22.

22  A.   Okay, thank you.

23  Q.   Did you follow that?

24  A.   I do now.

25  Q.   Okay.  And focusing now, sir, on the asset purchase

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 79

1  agreement, which you understand was earlier in the week, okay?

2  That was on the -- that's as of the Tuesday, right?  You

3  understand Lehman III is the transaction that closed on the

4  Monday, but the asset purchase agreement that we're talking

5  about now, Lehman II, is the agreement that the parties

6  initially entered into on the Tuesday, right?

7  A.   Yes.

8  Q.   Okay.  Just as a general matter, you refer to hedging

9  quite a bit in your direct testimony.  And when you spoke about

10  hedging, you were talking about hedging as covering risk,

11  right?

12  A.   Yes.

13  Q.   And exchange-traded derivatives can be used to hedge, can

14  they not?

15  A.   Yes.

16  Q.   So exchange-traded derivatives can be very risky things,

17  but they can actually be used in the right hands to manage

18  risk, to decrease risk, right?

19  A.   Yes.  The converse is also true.  So for example, I

20  believe I described the -- that one of the businesses that

21  Lehman was engaged in was actually market making in options.

22  And if you were facilitating option transactions, what you

23  would do is you would engage in hedging the option risk by

24  going long or short in the equity market or futures.  So there

25  would be different ways to hedge that risk.

Page 80

1        But it works both ways.  You have positions in the cash

2    market you can hedge with options.  You have positions in

3    options you can cash in the cash market.

4    Q.    As a general matter, sir, it's true, is it not, that

5    Lehman engaged in various hedging strategies using exchange-

6    traded derivatives?

7    A.    Yes.

8    Q.    Did so for years?

9    A.    Yes.

10   Q.    And at the time of Lehman II, of the asset purchase

11   agreement, you don't know to what extent Lehman was using its

12   exchange-traded derivatives as hedges?

13   A.    To the extent to which it did?  No.

14   Q.    But it is fair to say that to the extent that Lehman was

15   using exchange-traded derivatives to hedge other positions in

16   its inventory, Barclays needed those hedges, right?

17   A.    Having those hedges would reduce its risk in the overall

18   portfolio of businesses that it was taking on.  But the -- it

19   wouldn't eliminate the risk.  And in this case, it would be,

20   you know, very difficult to quantify that risk.  But the

21   essential point is that the risk profile of the business would

22   be different if you were looking at the entire book of

23   business, and you could assure or have reasonable assurance

24   that, in fact, you could wind up transferring that business.

25        My point was that any reasonable party under -- you would

08-13555-mg    Doc 12027    Filed 10/07/10    Entered 10/15/10 11:40:55    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 81 of 151

Page 81

 1    have to have, I think, been highly optimistic to the point of

 2    irrationality to think that there would be -- that it would be

 3    possible in that week, under those circumstances, with the

 4    rapidity with which this deal had to be closed, that you could

 5    effect the transaction as it was contemplated of seventy

 6    billion of long positions and seventy billion of short

 7    positions moving over.

 8         I alluded to this in my testimony.  But it was -- just for

 9    the benefit for the Court, a short position in an equity

10    security is covered by borrowing the stock in the open market

11    and delivering that stock to the buyer.  You get cash for that

12    and you use that as collateral for your short position.  So a

13    short position is a series of obligations with numerous --

14    potentially hundreds of counterparties from whom you're

15    borrowing the stock.  To transfer the liabilities on the short

16    positions, somehow would -- I mean, it's just inconceivable

17    that that could have been done in connection with this

18    transaction that was contemplated by the parties; because

19    everyone would have had to accept Barclays as the counterparty

20    to that stock loan.  And they weren't even in the business in

21    that big a deal.

22         Very cumbersome to do.  As I said before, you know, it

23    took us weeks to get it done in novation of the forward

24    contracts in the -- in the bankruptcy of Drexel.  So, you know,

25    I know what -- I read the agreement.  I know what it says.  I

08-13555-mg    Doc 12027    Filed 10/07/10    Entered 10/15/10 11:40:55    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 82 of 151

Page 82

1   do have a view about what any reasonable -- what a reasonable

2   person familiar with how this business actually worked, how

3   much of that could be accomplished as the parties were hoping

4   to accomplish it within one week's time.

5          MR. MAGUIRE:  Move to strike the witness' answer as

6   nonresponsive.

7          THE COURT:  I'm not going to strike it, but I'm going

8   to disregard it.

9   Q.   Sir, my question is simply, to the extent that Lehman's

10  exchange-traded derivatives hedged other positions in Lehman's

11  inventory, and Barclays didn't want to go naked or speculative

12  with respect to those positions, it needed those hedges, it

13  needed to acquire those exchange-traded derivatives?

14  A.   It would help, yes.

15  Q.   And if it didn't get those exchange-traded derivatives,

16  and it wanted a hedge, then Barclays would have had to go out

17  and replace those exchange-traded derivatives, right, with

18  another hedge?

19  A.   If it got all of the cash positions?

20  Q.   If Barclays took Lehman's inventory without the hedging

21  exchange-traded derivatives, then Barclays would have to

22  replace those exchange-traded derivatives by going out and

23  getting other hedges?

24  A.   I disagree with that statement.

25  Q.   Well, if --

Page 83

1    A.   I absolutely disagree with that statement.  If Barc --

2    because if I understand you correctly, what you're positing for

3    me is that they're going to, in fact, take the book of equity

4    positions, long and short, and they're going to look at that

5    set of exposures, and they're going to conclude that the entire

6    portfolio of equity exchange-traded derivatives that they would

7    be taking on would hedge that book.  That's just factually

8    in --

9    Q.   No.  Let me clear up the question.  I'm asking you, to the

10   extent that Barclays is taking an inventory position, and to

11   the extent that position is hedged by an exchange-traded

12   derivative, and assuming Barclays doesn't want to go unhedged,

13   then Barclays needs to take the hedging exchange-traded

14   derivative, right?

15   A.   If, if, if.  Yes.

16   Q.   And if it doesn't take the exchange-traded derivative, it

17   would have to replace it or else go unhedged?

18   A.   Correct.

19   Q.   So with or without any margin, Barclays needed the

20   exchange-traded derivatives that hedged other positions in

21   Lehman's book.  Isn't that correct?

22   A.   No.  Look, they didn't need them.  It was a risk mitigant

23   to a portion of their book, potentially, if they had them.

24   However, my experience in the manner in which equity

25   portfolios -- equity trading portfolios are hedged, is that you

Page 84

1    first look to the long and short positions of the portfolio

2    itself to net out what is the overall equity risk, and then you

3    may try futures contracts to mitigate that risk.

4        The futures contracts would be those traded on the Chicago

5    Mercantile Exchange, S&P futures, and similar index-related

6    futures.  Those positions, if they ever had them, had been

7    liquidated by the CME on Wednesday.  So the -- in a way, the

8    overall profile of risk, at least on the Wednesday, had been

9    changed, to the extent that any S&P positions -- futures

10   positions had been wiped out.

11       So I don't accept as a premise that there is somehow a

12   one-to-one relationship between their entire equity book and

13   options, because I don't accept that in each and every case,

14   that options were either the only or even the preferred method

15   of hedging the equity book.

16   Q.    And do you understand, I'm not asking you about a one-to-

17   one, and I'm not asking you about the entire book.  I'm asking

18   you very specifically about the exchange-traded derivatives

19   that were hedging other positions in Lehman's inventory.  Those

20   exchange-traded derivatives.  Do you understand --

21   A.    Yes.

22   Q.    -- that's what I'm asking you about?

23   A.    Okay.

24   Q.    And to the extent that Barclays did not want to go

25   unhedged -- did not want to take a speculative flier on

08-13555-mg    Doc 12027    Filed 10/07/10    Entered 10/15/10 11:40:55    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 85 of 151

Page 85

 1   billions of dollars in other positions in their book, to the

 2   extent that those exchange-traded derivatives hedged other

 3   positions in Lehman's book, Barclays needed those derivatives.

 4   You accept that, do you not?

 5   A.   It would help to mitigate their risk, yes, to the extent.

 6   Q.   Now, you have done no analysis of the extent to which

 7   Lehman's exchange-traded derivatives hedged other positions in

 8   the Lehman inventory.  Isn't that right?

 9   A.   I have not.  And to my understanding, neither was Barclays

10   able to engage in such an exercise.

11   Q.   You do admit, sir, that Lehman's portfolio of equity

12   securities included many positions that were hedged by Lehman's

13   exchange-traded derivatives?

14   A.   I accept as a -- I have not looked to specific correlated

15   transactions between a hypothetical equity book and the

16   particular options, because that information was not made

17   available to me.  It would have been that information which was

18   available to the parties on the Monday or Tuesday.  Because by

19   Friday, everything had changed.

20   Q.   Now, sir, in tab 1 of your book, if you'd go to your

21   report at page 27, and look, sir, at paragraph 63.

22        MR. MAGUIRE:  Maybe we can put it up?

23   Q.   There you note, sir, that, "Subsequent to the signing of

24   the APA the exchange-traded derivatives assets and liabilities

25   of LBI were constantly changing, as was the portfolio of equity

08-13555-mg    Doc 12027    Filed 10/07/10    Entered 10/15/10 11:40:55    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 86 of 151

Page 86

```
 1    securities that Barclays had originally intended to acquire,

 2    many of which hedged or were hedged by the exchange-traded

 3    derivatives."

 4         You did say that in your report, did you not, sir?

 5    A.   Yes.  Right.

 6    Q.   You don't deny that today, do you?

 7    A.   No.

 8    Q.   And you agree, sir, that where exchange-traded derivatives

 9    are coming with a broker-dealer's inventory, a buyer may not

10    insist on acquiring margin, and may be willing to use the

11    buyer's own resources.  Isn't that a fact, sir?

12    A.   I explained that in the context of a transaction between

13    two solvent parties where the parties had the ability to engage

14    in a complete assessment of what was intended to be exchanged

15    and plenty of time to do due diligence, that that might be an

16    aspect of the negotiation.  You're absolutely right.

17    Q.   And that's at page 45 of your report, right, sir?  At

18    paragraph 94?  That's where you have the first sentence, I

19    think we talked a little bit about before, with respect to

20    posted collateral, "Under normal circumstances a buyer and a

21    seller would have reached an agreement about whether the

22    transfer of exchange-traded derivatives would come with or

23    without the related collateral."

24    A.   Correct.

25    Q.   And you go on to say, "The outcome would depend in part on
```

Page 87

```
 1    how the margin requirements were met.  For example, cash

 2    collateral versus letters of credit."  Then you say, "This

 3    determination would be made in the context of accurate

 4    information about the related inventory positions being

 5    acquired, and to some extent, would depend on the motivations

 6    of the parties with respect to the market in which the

 7    exchange-traded derivatives traded."  Right?  And you

 8    specifically emphasize the motivations of the parties, right?

 9    A.   Yes.

10    Q.   Then you go on to say, "For example, if exchange-traded

11    derivatives positions in a particular market were coming

12    together with inventory to be actively managed by the buyer,

13    the buyer might be less insistent upon acquiring the collateral

14    posted and would be more willing to use its own resources."

15    Right, sir?

16    A.   Yes.

17    Q.   And here, you do agree, do you not, sir, that the

18    exchange-traded derivatives, that whole business and the

19    derivatives themselves, as of the date of the asset purchase

20    agreement, that we have been referring to as Lehman II, that

21    was integral to the overall inventory of Lehman?

22    A.   I expressed my opinion that, you know, the document says

23    what it says.  I've indicated to you what I thought any

24    reasonable party would have assumed would be in fact possible

25    or likely to be accomplished, even on the Tuesday.
```

08-13555-mg   Doc 12027   Filed 10/07/10   Entered 10/15/10 11:40:55   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 88 of 151

Page 88

1    Q.   Now, sir, after the Tuesday, after the Wednesday -- the

2    Wednesday and later, circumstances changed, did they not?

3    A.   They did.

4    Q.   And you point that out in your report.  You point out the

5    changes that happened after the parties had executed the asset

6    purchase agreement, right?

7    A.   Yes.

8    Q.   And you do that at page 48 in paragraph 100 of your

9    report.  There you say, in paragraph 100, "In short, the

10   circumstances as they existed by the end of the week of

11   September 15, made it not just reasonable, but imperative that

12   Barclays acquire all of the collateral held in respect of

13   Lehman's various exchange-traded derivative accounts," right?

14   A.   Yes.

15   Q.   And you were very specific there that what you're

16   referring to are the circumstances as they existed by the end

17   of the week?

18   A.   Yes.

19   Q.   And the circumstances that made this imperative, not just

20   reasonable, but imperative for Barclays, are all circumstances

21   that happened by the end of the week and that you survey in

22   paragraph 98 and 99 of your report, right?

23   A.   Right.

24   Q.   Right, sir?

25   A.   Yes.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 89

1    Q.   In paragraph 98 you say that, "The facts on the ground

2    changed as the week of September 15 progressed," right?

3    A.   Yes.

4    Q.   And those facts, those changes, made the whole acquisition

5    of the exchange-traded derivatives piece, as you understood it,

6    to be much riskier than it was at the beginning of the week.

7    A.   Yes.  And made it riskier in two senses.  It made it much

8    riskier for the estate and it certainly made it -- it certainly

9    changed the characteristic, to some extent, for Barclays.

10   However, in my view, as I was telling you before, I don't think

11   that it changed what would have been Barclays' expectation, and

12   let me step back, because I think I said this on my direct, is

13   that the general expectation of the parties would be that

14   collateral would move in the circumstances where you were

15   transferring a business of the sort that was described in the

16   APA.  That would be the first, so that you would have -- have

17   to -- so, my opinion, as having been in this business for, I

18   hate to say it, coming up to almost thirty years now, is that

19   that would be the expectation and that you would have to take

20   special care to change that expectation and to carve it out,

21   and under the circumstances of this transaction it would have

22   been very difficult.  That's my opinion.

23        So, yes, the facts changed, so whatever, and let me make

24   it clear.  They changed the risk profile, although not

25   necessarily the motivations of the parties to get this deal

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 90

1   done, but it changed the risk profile and it changed it more

2   for the estate than it did for Barclays.  It did change it,

3   made it worse for Barclays, but it made it really critical for

4   the estate.

5   Q.   And the specific facts changed that made this imperative

6   and not just reasonable by the end of the week.  Those specific

7   facts you point to in paragraph 99 as the self-help seizures

8   that occurred later in the week.

9   A.   One of the factors, yes.

10  Q.   Now, you'd agree with me that the critical moment that we

11  need to focus on here in looking at the motivations of the

12  parties is what they knew at the time that they made the

13  decision, at the time that Barclays made the decision to

14  acquire the exchange-traded derivatives, right?  It's the

15  moment of decision.  That's when we want to focus what was

16  known, right?  Not what happened two days or ten days or months

17  later?

18  A.   Well, I believe the parties certainly have the, you know,

19  ability, based on changes in circumstances, to decide that the

20  initial transaction as conceived will be closed with a

21  different mechanism, which is what I assume you were getting to

22  in deciding on Lehman 3.  But, in general, yes, it is my

23  understanding that the deal was articulated in the APA.  I

24  understand the APA was amended, but, essentially, in the APA,

25  for purposes of the discussion we're having, and, as I

08-13555-mg   Doc 12027   Filed 10/07/10   Entered 10/15/10 11:40:55   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 91 of 151

Page 91

1    understand it, that essential business deal didn't change.

2    That these businesses would be transferred, I suppose, was a

3    generally accepted caveat that everybody had, to the extent

4    they could be, at the closing to Barclays and that a bunch of

5    assets would hopefully go over, and to the extent that there

6    were risks associated in the listed derivatives book those

7    would go over too.

8    Q.    My only point is that when we look to see what had made

9    sense for Barclays to do on Tuesday we have to look at the

10   facts on the ground on Tuesday, right?

11   A.    As would be -- as they would be interpreted by, in my

12   view, a rational purchaser and seller, yes.

13   Q.    And the parties made the decision that Barclays would

14   acquire the exchange-traded derivatives' position in the asset

15   purchase agreement earlier in the week.

16   A.    Yes.

17   Q.    Isn't that right?

18   A.    Correct.

19   Q.    And that was before the facts on the ground changed,

20   right?  That was before the self-help seizures that you

21   referred to in paragraph 99 of your report.

22   A.    Just before, but under circumstances where, in my view,

23   they could be expected, because even on the Tuesday, as I

24   recall the record, there had already been discussions by the

25   CME that if looking for protection, and, in fact, Barclays had

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 92

1   sent people over to look at the acquisition of taking over or

2   guaranteeing some portion of Lehman's exposures on the Sunday,

3   so the -- I don't think that we can look at Tuesday.  The

4   bankruptcy had already been filed.  Lehman was in distress.  A

5   bunch of lawyers are given the task of articulating what they

6   are told is, quote, "the deal", and they do their best to

7   accomplish that in a very short period of time.  I think they

8   did the best they could under the circumstances, and I think

9   that although it's a lot of fun to look in 20/20 hindsight

10  about what could have happened, I think we need to be aware, as

11  the parties in this room are more aware than I, of the facts

12  and circumstances as they were on the ground on Monday and

13  Tuesday, which were bad enough.

14  Q.   Now, sir, you said the essential business deal did not

15  change.  Let me just ask you to clarify one or two points on

16  that.  Obviously the deal changed in a very drastic way, and

17  you acknowledge it in your report, from the Tuesday to the

18  Friday.  I mean, for example, seventy billion dollars of

19  trading assets became forty-seven billion dollars of trading

20  assets.  That's a pretty dramatic change, is it not?

21  A.   Yes.

22  Q.   So when you said the essential business deal did not

23  change what you were referring to was the fact that Barclays

24  was acquiring the exchange-traded derivatives business.  That

25  did not change.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 93

1    A.   Well, no, I meant more than that.  I meant that the intent

2    of the parties to transfer the, all of the essential elements

3    of Lehman's U.S. broker-dealer and capital markets business and

4    FCM business and have Barclays come in and take over, that

5    meant the people, that meant the, all of the other things that

6    were included in the deal.  We're focusing here on the ETD

7    portion of the business, but when I say that the deal, as a

8    transfer of the business and all of the assets necessary to

9    conduct that business, I'm not aware that that essential part

10   of the deal changed.

11   Q.   Well, let me ask you specifically with respect to the

12   exchange-traded derivatives.  The decision, Barclays' decision

13   to acquire the exchange-traded derivatives, that was made early

14   in the week in the APA, right?

15   A.   Yes.

16   Q.   And that was not revisited.  That never came up again

17   after that.

18   A.   Correct.

19   Q.   Now, you're aware that Lehman representatives, Lehman

20   executives, believed that there was no margin in this deal.

21   A.   I believe that -- I've read testimony of two Lehman folks

22   on this subject.  One was Bart McDade, who testified, I think,

23   fairly recently that he didn't think margin was included in the

24   deal, and I read the testimony of another executive named

25   Seery, who thought that it was.  So --

Page 94

1    Q.   When you say you read the testimony recently you're

2    referring to the trial testimony of Mr. McDade?

3    A.   Yes.

4    Q.   Why don't we ask you to turn to tab 3 of your binder, and

5    we'll show you there the testimony for Mr. McDade on April 26th

6    here at page 234 of the transcript, starting at line 20.

7    A.   Okay.

8    Q.   And that's where Mr. McDade was asked:

9    "Q.   Can you please tell the Court whether Lehman's margin

10   assets were included in the sale?

11   "A.   They were not intended to be included in the transaction.

12   "Q.   Did you ever authorize any agreement with anyone at

13   Barclays to include any Lehman cash margin in the sale?

14   "A.   No, I do not."

15   Q.   Is that the testimony that you are referring to, sir?

16   A.   Yes.

17   Q.   And that testimony did not affect your opinion in any way.

18   Is that right, sir?

19   A.   Insofar as it -- my understanding was that Mr. McDade

20   wasn't -- was responsible at the highest level of Lehman for

21   getting this deal done and that others were involved in the

22   actual negotiation with both parties.  So I do not, obviously,

23   know what other indications or instructions may have been

24   communicated down to actually reflect the agreement on the

25   ground.  When there is testimony of other people saying that

Page 95

1    they understood that the collateral was to move in the deal,

2    and that, certainly, that was the view on the Barclays side of

3    the transaction, both at senior levels and at the levels of the

4    lawyers who were instructed to carry this out.

5    Q.    Did you consider Mr. McDade's testimony to be inconsistent

6    with your opinion?

7    A.    Yes.

8    Q.    Did you review the testimony that Barclays presented of an

9    executive by the name of Mr. Shapiro?

10   A.    I don't recall that testimony.

11   Q.    If you turn, sir, to tab 4 of your binder you'll see the

12   trial transcript from August 23 here, and if you turn to page

13   25 you'll see where Mr. Shapiro is asked by, I believe,

14   Barclays' counsel, starting at line 21:

15   "Q.   Now, who were the lead negotiators for Lehman in this

16   process?

17   "A.   Bart McDade, our president, was the guy who really led the

18   overall negotiations.  No decision got made without basically

19   Bart being involved in that decision."

20   Q.    Did you consider, sir, or do you consider that testimony,

21   presented by Barclays to this Court, to be inconsistent with

22   your opinion?

23   A.    You know, I'd be careful of -- I don't like the word

24   inconsistent.  I mean the testimony stands for itself, and I

25   don't know the context of what the witness here, who I don't

Page 96

1   know who he is or what his position is and what aspects of the

2   transaction he happened to be working on, but it is -- let's

3   put it this way.  It is inconsistent with the manner in which

4   all of both the Lehman, the trustees, and, certainly, the

5   Barclays' lawyers and business people down the ranks were

6   acting in order to both articulate and close the transaction.

7   It is inconsistent with what, in fact, happened.  If Mr. McDade

8   was emphatic about the collateral not moving then there would

9   have been an expected set of actions to have occurred to make

10  sure that that did not happen.  And it is completely

11  inconsistent with authorizing representatives of Lehman to

12  execute agreements that were totally inconsistent with the idea

13  that the collateral is not being transferred.  So I don't know

14  how to explain it other than in the event nobody acted as

15  though this were the deal that the parties had, in fact, agreed

16  to.

17  Q.   Did you check that?  Did you do anything to see if Lehman

18  informed Barclays that there was no margin in this deal?

19  A.   Checked?  I've read trial testimony by Mr. Seery, who, as

20  I understand it, was a Lehman executive who said that he

21  thought that the collateral was to be included in the

22  transaction, and, as I said, I was focusing on also what

23  happened at the hearing before Judge Peck and the documents

24  that were executed immediately thereafter to accomplish the

25  transaction, all of which were consistent with including, you

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 97

1    know, going to the CFTC.  This was not done in a vacuum.  My

2    understanding is that the team negotiating for Lehman was fully

3    informed of these actions, and that no one at any time, to my

4    knowledge, had said why are you doing that.  We need to make

5    sure that, you know, we don't transfer the margin.  What are

6    they doing to make sure that they're collateralizing these

7    accounts?  How are -- we can't less this happen.  I was not

8    aware of any such communication.  If you bring it to my

9    attention, fine, but I am not aware of any such communication.

10   Q.   Would it affect your opinion, sir, if Lehman had provided

11   Barclays with information showing that there was no margin

12   being transferred here?

13   A.   There would have had to have been a reaction to that.

14   That is, the lawyers themselves would have had to do something

15   consistent with that instruction, because, after all, the

16   lawyers are the agents of the parties when you're engaging in

17   a, you know, a transaction of this sort, you know, the

18   documentation and execution of the deal has to, you know, carry

19   out what people feel was intended in the transaction document.

20   Q.   We'll get to the lawyers, but how about the principals,

21   the decision makers?  Would it affect your opinion if the

22   decision makers at Lehman provided Barclays with information

23   showing that there was no margin in the deal?  Would that

24   affect your opinion?

25   A.   That would depend on what the -- well, look, my opinion is

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 98

1   what rational, what I believe that Barclays is, as a party,

2   would have rationally done here, and that it was in the best

3   interests of Lehman to do exactly what happened.  That's my

4   opinion.  So if -- why don't you show me something, because

5   I -- it's just an abstract hypothetical question right now.

6   Would it affect my opinion?  The answer is I don't know.

7   Q.   Happy to do that, sir.  You'd agree with me that cash is a

8   financial asset, is it not?

9   A.   Yes.

10  Q.   And cash equivalents are financial assets, are they not?

11  A.   Yes.

12  Q.   Margin is a financial asset, is it not?

13  A.   Margin is an encumbered asset.  I -- you're asking -- I

14  don't know whether you're asking me in the sense of an

15  accounting term or whatever, but I would look at collateral as

16  a, in a different category than I would cash that you have in a

17  bank account that you can draw on freely.  Once you put

18  collateral up at the clearinghouse you cannot use it.  It's

19  there for one purpose only, and that's --

20  Q.   Whether you can use it or whether you can't use it, you

21  own it.  It's an asset, is it not?

22  A.   Well, the practice -- it's interesting.  The practice in

23  the industry is that a lot of the assets that are actually

24  deployed in margin accounts are used with part of the treasury

25  operation in financing the business overall.  So whether it's

Page 99

1    cash in the sense -- whether the actual assets used have been

2    traced to, you know, sort of, free funds on the -- on a balance

3    sheet or traced to some borrowing, since most treasury

4    securities are not taken out of the inventory -- that are used

5    in margin are not necessarily taken out of the inventory of the

6    firm as collateral but are usually reversed in as part of the

7    treasury operation, are they, quote, "theirs" at the time?

8    Well, yeah, but they're also theirs in the sense that there's

9    an obligation, potentially, to give them back.  So the

10   composition of treasuries that may be used to provide

11   collateral can be -- could be constantly changing because of

12   the rates in the repo market.  So --

13   Q.   When you were at Goldman, sir?

14   A.   Yes.

15   Q.   Did you consider that Goldman owned the margin assets that

16   it had at the exchanges?

17   A.   I considered the manner of funding just the way I

18   described it, that the -- that those assets which we -- that we

19   claimed on the balance sheet as assets were paired off against

20   liabilities, and, so, the difference would be, you know, the

21   equity in the business and --

22   Q.   That's what a balance sheet is.

23   A.   That's what a balance sheet is.

24   Q.   That's where you put the assets on one side and the

25   liabilities on the other, right?

Page 100

```
 1    A.    Okay.

 2    Q.    And margin is an asset, right?

 3    A.    To the extent that -- well, look, the margin here consists

 4    of a letter of credit.  I wouldn't consider that an asset.

 5    Q.    The cash --

 6    A.    To the extent that you --

 7    Q.    -- them to the asset.

 8    A.    -- cash or margin you may be booking that as an asset on

 9    your balance sheet.

10    Q.    Maybe you can look, sir, at tab 5.  That's a balance sheet

11    that Lehman provided.  It's Movants' Exhibit 2.

12          MS. BLOOMER:  Your Honor, I object to Mr. Maguire's

13    characterization of this as a Lehman balance sheet.  I don't

14    think there's any evidence in the record to support that that's

15    what this document actually is.

16          THE COURT:  Well, it's -- the objection is overruled.

17    It's a list of assets and liabilities.  We've seen this

18    document countless times in the case.  To the extent there's a

19    characterization in the question that's overly broad, the

20    witness is an expert and can certainly deal with the question.

21    It's simply presenting a document, and I'm accepting it for

22    what it is, which is Movants' Trial Exhibit 2, initialed in the

23    upper right-hand corner.

24    Q.    Sir, I'll ask you for your characterization.  You

25    understand that this is a balance sheet.  Isn't that right?
```

Page 101

1   That Lehman provided to Barclays.

2   A.   Well, look, I'm, obviously, I will accept your

3   characterization of the document.  It is what it is.  It's a

4   list of assets and liabilities.  I have no reason to believe

5   that it -- to know anything about its accuracy or anything

6   else, but I -- it is what it is.

7   Q.   Sir, if you turn to your transcript, which, I believe, is

8   in the back of your binder, your deposition transcript, and you

9   turn to page 63.  You'll see at line 14 you were asked the

10  following --

11  A.   What page?

12  Q.   I'm sorry.  Page 63.

13  A.   Yeah, but what page of the --

14  Q.   Of the deposition transcript?

15  A.   Yeah, I'm on page 3 of that exhibit, and then there are

16  pages 246, 47.  So which --

17  Q.   I'm sorry.  This should be the tab all the way at the

18  back.  You should have a full copy of your deposition

19  transcript there now.

20  A.   I see it.

21  Q.   And do you have page 63?

22  A.   I do.

23  Q.   Is that included there?

24  A.   And this is divided into four quadrants.

25  Q.   Yes.  You went to the upper right-hand quadrant.

Page 102

1   A.   Okay.  What you -- what is listed as page 247.  Okay.  And

2   line --

3   Q.   And starting at line 14.  You can also see it on the

4   screen if that's easier.  And there you're asked the question:

5   "Q.  Mr. Leitner, I'm handing you what" --

6   A.   Sorry.  I'm -- where --

7           THE COURT:  It's page 17 on the bottom and it's --

8           THE WITNESS:  Page 17 on the bottom.  Thank you,

9   Judge.  Okay.  Thank you.  Now, I got it.

10   Q.   Okay.  Are you on line 14?

11   A.   Yes.

12   "Q.  Mr. Leitner, I'm handing you what has previously been

13   marked as Exhibit 19 of these depositions."

14   Q.   I'll represent to you, sir, that that is Movants' Exhibit

15   2.

16   "Q.  You've seen that document before, haven't you, sir?

17   "A.  It looks familiar.

18   "Q.  In fact, you include it in the list of documents that you

19   reviewed to prepare for your report, correct?

20   "A.  Yes.

21   "Q.  Can you tell me what you understand that to be?

22   "A.  It's one of the balance sheet snapshots that the parties

23   were dealing with.  I believe it was prepared by Lehman for

24   Barclays."

25   Q.   You were asked those questions, and you gave those

Page 103

1    answers, right, sir?

2    A.    Yes.

3    Q.    Now, you're aware, sir, that there is, if we go back to

4    Movants' Exhibit 2, there's no margin in that balance sheet.

5    A.    It -- there's no line saying margin, correct.

6    Q.    No margin anywhere there.

7    A.    There's --

8    Q.    Let me put it this way, sir.  Have you done anything to

9    find out whether there's any margin, any of the margin assets

10   at any of the exchanges or with any of the foreign brokers is

11   reflected on that balance sheet?

12   A.    Well, we --

13   Q.    Did you do anything to check that fact?

14   A.    Now, with all due respect, you're asking a question which

15   is completely in opposite to, which -- I would have thought the

16   correct question is do you know where those assets are?  And to

17   the extent I accept your proposition that margin consists of

18   assets, then the question is where are the assets being

19   deployed?  The assets happen to be -- being deployed as

20   collateral to support the equity -- sorry, the exchange-traded

21   derivative business, and they are, therefore, assets that are,

22   in fact, used in that business, and there are assets intended

23   to be transferred as part of the overall business that Barclays

24   is acquiring.  So, yes, this is a balance sheet of assets.  It

25   doesn't tell me where they are, what they're being used for, or

Page 104

1   anything else.  And, so, of course there's no line for margin,

2   because some of the assets are being deployed to support that

3   part of the business, just as part of the liabilities are

4   supporting the long equity positions.  Somewhere in there is a

5   repo.

6   Q.   So if I understand you, sir, if there's no margin anywhere

7   on this balance sheet, and if Barclays understood there's no

8   margin anywhere on this balance sheet that would not affect

9   your opinion in this matter?

10  A.   Right, because it doesn't tell me where the -- that's

11  correct.  It doesn't --

12  Q.   And you did not ask Barclays to explain what they

13  understood this balance sheet meant.

14  A.   No, I did not.

15  Q.   And if Lehman gave Barclays a balance sheet as of the

16  signing of the asset purchase agreement, and that balance sheet

17  did not contain any margin, would you consider that to be

18  consistent with Mr. McDade's testimony that there was no margin

19  in this deal?  Would you consider that to be consistent?

20  A.   Margin is not a category of an asset.  Margin is a term of

21  art to describe collateral that is assets of the party posting

22  that collateral but happens to be put in a particular case.

23  It's a location issue not a balance sheet issue.  So of course

24  there's no margin on the balance sheet, because it would be a

25  portion of cash, government securities or whatever other assets

Page 105

1   the particular clearinghouse would accept.

2   Q.   And, so, that would not, the fact that there's no margin

3   on the Lehman balance sheet would not affect your opinion?

4   A.   Correct.

5   Q.   And the fact that Barclays did not find out where any of

6   this margin was prior to signing the asset purchase agreement

7   does not affect your opinion?

8   A.   My opinion is that whatever margin was there was -- were

9   assets used to support the businesses that were being

10  transferred.  Barclays would have expected to get them and that

11  the parties acted consistently with that expectation.

12  Q.   Now, you do agree, sir, it would have been prudent for

13  Barclays to get a report of all of the exchange-traded

14  derivatives that it was taking on here prior to signing the

15  asset purchase agreement.

16  A.   Look, I think the -- in any transaction, any acquisition

17  transaction, as anyone knows who's been involved in it, you try

18  to do as much due diligence as possible before you enter into

19  an agreement and in a major transaction.  As an element of that

20  due diligence it would have been great if the parties had had

21  the opportunity to look at and study all of the aspects of the

22  businesses being acquired.  My understanding is that Barclays

23  had, indeed, done some preliminary analysis of Lehman even

24  prior to that week, and, certainly, over the weekend had

25  attempted to do some investigation with regard to helping

08-13555-mg   Doc 12027   Filed 10/07/10   Entered 10/15/10 11:40:55   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 106 of 151

Page 106

1   support the futures part of the business.  But, so would it

2   have been appropriate in a normal transaction to have done that

3   thing?  Absolutely.  But this was not a normal transaction, and

4   I think the parties were entering into this transaction in good

5   faith to take -- take Lehman out of -- take Lehman out of it

6   and put Barclays in the position for the benefit of the

7   marketplace and for the commercial interests of the parties.

8   Q.   OCC can give you a report right away on what the positions

9   are, right?  They've got systems.  They keep track of that, not

10  only at the end of the day but intraday.  Isn't that right.

11  A.   Yes.

12  Q.   They watch this stuff very carefully.  You want to know

13  what the positions are at the OCC, they can give it to you,

14  right?

15  A.   Well, they'll give it to the clearing member, yes.

16  Q.   And with all of the risks you told us about, clearing

17  risks, the market risks, the funding risks, you still don't

18  think it was necessary for Barclays to get that report and see

19  what positions it was taking over.  You don't think that was

20  necessary.

21  A.   As I understand it, I -- was it necessary?  No, it wasn't

22  necessary.  Would it have been helpful for the parties to do

23  that?  Yes.  But, you know, my understanding is that the

24  deployment of personnel at Barclays to begin the detailed

25  investigation of what was involved in the transaction, unlike a

Page 107

1   normal transaction, occurred after the signing of this document

2   and not before and depended largely on this global information

3   being provided by Lehman to Barclays.  That's my understanding,

4   but I haven't done a complete investigation of all of the, you

5   know, the elements leading up to it.

6   Q.   And the reason it wasn't necessary -- the reason it wasn't

7   necessary for Barclays to actually get a report of all these

8   risky exchange-traded derivatives' positions that it was

9   taking, the reason that wasn't necessary is because Barclays

10  wanted to do the deal.  Isn't that right?

11  A.   It was -- it wanted to do the deal where it was assuring

12  itself that it was going to have a risk mitigant against the

13  exposures it was taking.

14  Q.   Barclays could go into this sight unseen, without looking

15  at the exchange-traded derivatives, and you think it wasn't

16  necessary for them to get a report showing those positions,

17  because Barclays was motivated to do the entire transaction.

18  Isn't that right, sir?

19  A.   You're -- I'm sorry.  I missed -- your question you're

20  asking me, is it was it necessary?

21  Q.   You say it wasn't necessary for Barclays to see the

22  exchange-traded derivatives' positions it was taking up.

23  Notwithstanding all the risks it wasn't necessary.  And the

24  reason it wasn't necessary is because Barclays was motivated to

25  do the entire transaction.  Isn't that right?

Page 108

1   A.   That's a reasonable conclusion.  It's not a conclusion

2   that I've reached in any independent way, but it's, I would

3   concur that it's reasonable.

4   Q.   So the bottom line here is that Barclays was willing to

5   take on whatever was in the Lehman portfolio, sight unseen,

6   because it wanted to do the entire transaction.  Isn't that

7   right?

8   A.   Yes.

9        MR. MAGUIRE:  If this would be a good time to stop for

10  lunch, Your Honor?

11       THE COURT:  I think it would be.  Just a general

12  inquiry as to how much more you expect in terms of time.

13       MR. MAGUIRE:  I would try to do it within about half

14  an hour or so, Your Honor.

15       THE COURT:  Okay.  We'll resume at 2 o'clock.

16   (Recess from 12:34 p.m. until 2:07 p.m.)

17       THE COURT:  Be seated, please.  And, Mr. Maguire,

18  please proceed.

19  RESUMED CROSS-EXAMINATION

20  BY MR. MAGUIRE:

21  Q.   Sir, in any part of your testimony this morning did you

22  mean to suggest that Lehman was unable to generate a report

23  from its systems that excluded the over-the-counter

24  derivatives?

25  A.   That's my recollection of the testimony that some of the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 109

1    operations people gave, yes.

2    Q.   Did you check that with the people that you talked to?

3    A.   I actually met with Liz James in connection with, you

4    know, while I was preparing my report and also with some folks

5    who were at Lehman and now at Barclays, and my recollection is

6    that among that group of people were folks who were charged

7    with obtaining this data from our senior people, and that's

8    what they told me.

9    Q.   One of the folks that you met with who was at Lehman and

10   was at Barclays at the time that you met with him was Daniel

11   Dziemian, right?

12   A.   Yes.

13   Q.   Did you check with Mr. Dziemian whether that was, in fact,

14   the case?

15   A.   I would -- I don't recall a specific conversation with him

16   on that.

17   Q.   If you could turn, sir, to tab 7 in your binder.  You'll

18   see there is an excerpt from the deposition testimony of Mr.

19   Dziemian.  And if I could ask you, sir, to turn to page -- it's

20   page 28 at the very bottom.  It should be the last page in that

21   tab.  And if you look at the top right quadrant you'll see page

22   107 of his deposition transcript.  And they're starting at line

23   14.  This is from page 107 of Mr. Dziemian's deposition

24   transcript.  He's asked the following question:

25   "Q.  Would you have any problem in creating an ADP report and

Page 110

1   excluding from that report over-the-counter derivatives?

2        "UNIDENTIFIED SPEAKER:  Objection.

3   "A.  Yes, and the way we would do that is by using an ADP

4   options trade day stock record report, which OTC derivatives

5   would not be included on."

6   Q.   And, then, after a little colloquy, the question starting

7   at the top of page 108 is

8   "Q.  Mr. Dziemian, did you mean to say that you would have a

9   problem in excluding the OTC derivatives or you would not have

10  a problem?

11  "A.  Would not."

12  Q.   Do you see that testimony?

13  A.   Yes, sir.

14  Q.   And you say you did not raise that subject when you spoke

15  with Mr. Dziemian?

16  A.   Well, it was relevant to know what Lehman had and what

17  they thought, and, so, my conversations on this point were

18  mostly with Ms. James, who worked for Barclays.

19  Q.   Did you understand that Mr. Dziemian was, in fact, the

20  person responsible for generating reports concerning the

21  exchange-traded derivatives?

22  A.   He was one of the people who could do that, yes.

23  Q.   All right, sir.  Now, you had told us this morning about

24  how facts on the ground changed during the Lehman week.

25  Remember that?

Page 111

1    A.    I think we were having a colloquy about what my report

2    said, yes.

3    Q.    Are you familiar with what has been referred to in these

4    proceedings as "the Friday asset scramble"?  Let me put it more

5    generally for you, sir.  Are you aware that on the Thursday

6    night and the Friday morning of the Lehman week, that's

7    Thursday the 18th, that night, and Friday morning, Friday the

8    19th, Barclays was concerned to find additional assets for this

9    deal?

10   A.    I have seen testimony describing what you've just

11   described.

12   Q.    And are you aware, sir, that one of the top Barclays

13   executives involved in this deal was Stephen King?

14   A.    Yes.

15   Q.    Are you aware, sir, that Mr. King sent an e-mail to

16   Barclays' chief financial officer on Thursday night proposing

17   adding margin in the deal?

18   A.    I don't recall seeing that e-mail.

19   Q.    If you turn, sir, to tab 8 of your binder you'll see

20   Movants' Trial Exhibit 620.  Are you with me?

21   A.    I'm sorry.  Tab 9?

22   Q.    It should be tab 8.

23   A.    Eight, okay.

24   Q.    And at the bottom right-hand corner you should see a

25   sticker with Movants' Trial Exhibit 620.

Page 112

1    A.    Yes, I have it.

2    Q.    And if you look at the bottom of that e-mail string you'll

3    see it starts chronologically with Stephen King sending an e-

4    mail to Patrick Clackson on the night of Thursday, September

5    18.  Do you see that?

6    A.    Yes.

7    Q.    And what he says is why don't we add the initial margin on

8    the repos.  Do you see that?

9    A.    Yes.

10   Q.    And then he follows up with a correcting e-mail a little

11   bit later in which he says sorry, I meant exchanges and

12   clearinghouses.  Do you see that, sir?

13   A.    Yes.

14   Q.    Now, would you agree, sir, that there would be no reason

15   for Barclays to add margin to the deal on Thursday or Friday if

16   it was already in the deal at the beginning of the week?

17   A.    There would be no such reason, and, by the way, I have no

18   information that I recall anywhere about the context of this

19   document or this particular exchange, so --

20   Q.    Did you ask Mr. King about this document when you spoke

21   with him?

22   A.    My understanding from Mr. King was that he understood that

23   the margin for the OTC derivative positions was involved in the

24   deal.

25   Q.    Did you ask Mr. King about this document when you spoke

Page 113

1    with him?

2    A.   I didn't personally ask him, no.

3    Q.   Now, sir, I'd like you to assume -- I'd like you to make

4    an assumption -- I'd like you to assume that Barclays agreed to

5    exclude all assets that were related to exchange-traded

6    derivatives in this transaction?  Do you understand that

7    assumption?

8    A.   Okay.

9    Q.   Now, if Barclays agreed to exclude all assets that were

10   related to exchange-traded derivatives that would be consistent

11   with a deal that did not include margin.  Isn't that right?

12   A.   It would be consistent with a deal other than the one that

13   was here, yes.

14   Q.   You'd agree, sir, that margin is an asset that is related

15   to exchange-traded derivatives?

16   A.   Margin, to the extent that it includes cash or securities,

17   would constitute assets of the clearing entity or of their

18   customers.  It would not necessarily be the only margin in the

19   account and would be assets of the -- could be assets of the

20   clearing member.  We already discussed that, yes.

21   Q.   So cash and cash equivalents are assets that are related

22   to exchange-traded derivatives.

23   A.   These are assets that are in the account.  I'm only

24   quibbling -- I don't mean to quibble with your use of the word

25   related.  They are -- I would certainly say that, and I have

Page 114

1    said, in my report, that these are -- that all the collateral

2    were associated with the business.  You used the word related

3    to.  I think the documents used the term associated with, and I

4    would certainly classify that as associated with the doings in

5    the business.

6    Q.   Are you aware, sir, that the deal documents here contain a

7    term excluding all of Lehman's cash and cash equivalents?

8    A.   I believe there is a clause to that effect in the

9    agreement.  I can't remember exactly which one.

10   Q.   And are you aware, sir, that over the closing weekend

11   Barclays proposed making an exception to that cash exclusion?

12   A.   I think the issue of cash, from all I've seen in the

13   record, both in the document and in the reference to cash in

14   the -- during the testimony before the judge, Judge Peck,

15   leading to the signing of his order and in the so-called

16   clarification letter, was, to me, very confusing, because, for

17   one thing, it was inconsistent with the view that encumbered

18   collateral, whether it consisted of cash and cash equivalents,

19   was included in the deal, so I'm not sure exactly what portion

20   of cash was being excluded and where it was.

21   Q.   Did you come to learn in the course of your work on this

22   that Barclays proposed a carve-out, an exception, from the

23   exclusion for all cash and cash equivalents?  Did anyone tell

24   you that?

25   A.   I don't know what you're referring to.  Are you making a

Page 115

1    general statement about drafting of a document?

2    Q.   Yes.  Did you either see a document or did anyone tell you

3    that over the course of the Lehman weekend Barclays proposed

4    the proposed language that would have created an exception to

5    the cash exclusion and that that exception specifically

6    addressed Lehman's margin?

7    A.   What I did see was various drafts of a clarification

8    letter.  It wasn't always clear to me from the record that I

9    saw who proposed what amendments to that document at various

10   points in time, but at one point there was a paragraph dealing

11   with excluded assets in which there was an exception to the

12   exception to excluded assets, which, frankly, I find very

13   confusing, so if that's the paragraph you're referring to I

14   believe that was an exception to that portion of that very

15   complicated paragraph that dealt with an exclusion to cash.  So

16   if that's what you're talking about that's what I saw.

17   Q.   That's exactly what I'm talking about.  Very good.  Did

18   you ever get to the bottom of all that confusion?

19   A.   Yes.  And I believe the attorneys got to the bottom of it

20   too, because, as I understand from the testimony of Mr. Rosen,

21   he had what I would consider an elegant solution about taking

22   that confusing syntax and putting it in a way in that

23   clarification letter that made sense to him and also made sense

24   to me and actually would up using fewer words, which is unusual

25   in these transactions.

Page 116

1   Q.   Let's leave aside Mr. Rosen's elegant solution for a

2   moment.  Let me ask you, sir, did it come to your attention

3   that Lehman's lawyers at Weil, Gotshal -- Lehman's lawyers at

4   Weil, Gotshal -- that they had deleted all of the language that

5   Barclays had proposed addressing margin?

6   A.   I don't recall the backing-and-forthing (sic) of who was

7   doing what with regard to the draft.  I -- whoever signed the

8   final version.

9   Q.   Would you agree with me, sir, that if one side, the buyer,

10  proposes putting margin in the deal, and the other side, the

11  seller, rejects that proposal, would you agree that that raises

12  a real question whether margin is in the deal or is not in the

13  deal?

14  A.   It would, except that here there was also testimony that

15  when Cleary Gottlieb went back to Weil, Gotshal and said why

16  did you take that out or words to that effect, I think Mr.

17  Rosenfeld testified to this, maybe others as well, that they

18  said okay, that's a mistake.  Let's fix it.  And that's why he

19  fixed it in the final draft that was ultimately signed.

20  Q.   I'm not going to get into who said what to whom, sir.  I'm

21  asking you a fundamental question.  When that happens, one side

22  proposes adding margin, the other side rejects it, you'd agree

23  the buyer and the seller have to go talk to each other to

24  figure out whether it's in the deal or not and work it out,

25  right?

08-13555-mg   Doc 12027   Filed 10/07/10   Entered 10/15/10 11:40:55   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 117 of 151

Page 117

1    A.    That's a hypothetical but not necessarily a statement of

2    what actually happened here, because I don't know whether it

3    was a fact that Weil, Gotshal took that paragraph out because

4    they disagreed with the proposition that margin was included or

5    simply because they didn't like where it was in that

6    complicated paragraph.  So --

7    Q.    But they had to talk to them, right?

8    A.    I assume they were talking, and it led to the final

9    version of that agreement that reinserted in a different place

10   exactly the concept that had been in that complicated

11   paragraph.

12   Q.    If Barclays believed margin was in you have to assume that

13   they went and talked to Weil.  Isn't that right?  You have to

14   assume they went and talked about it.  If margin was so

15   important to Barclays, and they saw that language deleted, you

16   would naturally expect Barclays to go and talk to Weil,

17   Gotshal, right?

18   A.    My understanding is the lawyers were talking to each

19   other, you know, all the time during this very compressed

20   period trying to get the deal done.

21   Q.    So you would expect a rational purchaser to go talk to the

22   seller.

23   A.    But I don't know that they didn't.  I mean, somebody had a

24   conversation that led to the -- a final version of the

25   clarification letter as it came out, and in that letter, which

Page 118

1   was signed off by all the relevant parties, the issue of

2   collateral in respect of the derivative transactions was put

3   back in.  So if there was a -- if one law firm was objecting to

4   the characterization in one draft of the letter there were

5   discussions that led to the final version.  There has been

6   testimony, which I can't cite off the top of my head, about

7   that process of going back and forth.

8   Q.   It's not a memory test, sir.  I'm not asking you to recall

9   testimony.  I'm just asking about your expectation.  Your

10  expectation is that a rational purchaser would go and talk to

11  Weil, Gotshal and find out what the reason was why the language

12  was deleted, right?

13  A.   Yes.

14  Q.   And if there was a problem then the principals would be

15  brought in and they would work out whatever the problem was,

16  right?

17  A.   Yes.

18  Q.   And where you have a rational purchaser they'll explain

19  why they need the margin, right?  You've told us why Barclays

20  needed the margin, to protect itself, right?

21  A.   That's not the only thing they would say.  They would say

22  margins been in the deal from the beginning.  Why did you take

23  this out?

24  Q.   I'm sure they would.  My only point is you don't say

25  anywhere in your report that Barclays needed this margin to

Page 119

1    fatten its profits.  Your report simply talks about how

2    Barclays needed this margin to protect itself, right?

3    A.    I say that, but I also say that in the transaction

4    involving the sale of this business it would be, in my view,

5    normal for the margin to be considered part of the assets

6    necessary to operate the business.  And, so, whatever was there

7    that the -- that the transferor had chosen to, whatever assets

8    they had chosen to use would move to the acquirer, that that

9    was the essential transaction and remains so throughout.  The

10   other issues that I cite in my report were why under the

11   unusual circumstances of this transaction and the -- that no

12   rational purchaser would have done otherwise.

13   Q.    People use margin to protect against downside risk, the

14   risk of loss.  Isn't that right?

15   A.    That is its purpose, yes.

16   Q.    It protects market participants like exchanges and broker-

17   dealers against the risk of loss, right?

18   A.    Yes.

19   Q.    And if the market moves against you then the dealer or the

20   exchange, whoever is holding the margin, is able to use that

21   margin to protect themselves, right?

22   A.    Correct.

23   Q.    Of course when they use the margin to protect themselves

24   any margin that's left over remains the property of the

25   counterparty, right?

Page 120

1    A.    Yes.

2    Q.    So if you're a broker-dealer and you post four billion

3    dollars with an exchange and then you close out your position

4    and the market has moved in your favor and there's no loss, you

5    get your full four billion dollars back, right?

6    A.    That's right.

7    Q.    Now, if the market moves against you and you lose a bundle

8    of money, like a billion dollars, then that billion dollars is

9    gone, right?

10   A.    Correct.

11   Q.    And when your positions are closed out the exchange keeps

12   that billion dollars, right?

13   A.    No, it goes back to the clearing member.

14   Q.    And the clearing member uses that billion dollars to

15   protect itself.

16   A.    Yes.

17   Q.    But the clearing member can't keep the other three billion

18   dollars, right?

19   A.    You lost me.

20   Q.    You had four billion dollars at the exchange.  You lost

21   one.  The exchange closes you out but keeps the billion.  The

22   billion is gone.  You never get that back, right?

23   A.    Right.

24   Q.    But you get the other three back.

25   A.    You get the other three back, yes.

Page 121

1    Q.   The exchange can't keep the other three billion.

2    A.   Correct.

3    Q.   There's no rule of the exchange that allows the exchange

4    to hold onto margin after it's fully protected itself.

5    A.   Absolutely right.

6    Q.   No rational participant in this exchange-traded

7    derivatives market would think that margin could be used by an

8    exchange to fatten its own profits or to go straight to its

9    bottom line as opposed to simply covering itself against a

10   downside risk.

11   A.   Right.

12   Q.   It's generally true, is it not, sir, that when market

13   participants post margin, when they give margin to another

14   market participant, they do so by way of posting it and giving

15   the other participant, the exchange or the broker-dealer, a

16   security interest in the margin, right?

17   A.   Yes.

18   Q.   They don't transfer the margin outright to the other side,

19   right?

20   A.   To the party carrying the exposure, no.  They transfer a

21   security interest to cover the party who has the potential risk

22   that they won't perform and -- as you just described

23   accurately.

24   Q.   So if all Barclays needed was protection against all the

25   downside risks that you've described:  the market risk and the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 122

1   clearing risk and so on, all it needed was a reserve or a

2   security interest in margin; they didn't need an outright

3   transfer of margin that it would keep even if it wasn't

4   necessary.

5   A.   That's incorrect.

6   Q.   Sir, if the market moved in favor of all of the Lehman

7   positions and none of the margin was necessary to protect

8   Barclays, right?  Right?

9   A.   Is there a question?

10  Q.   Are you with me so far?

11  A.   Yes.

12  Q.   You're saying Barclays got to keep all of the margin.

13  A.   Look, this is why this -- this is why this is a -- this is

14  why this area is complicated or you're making it complicated.

15  There's a very simple concept.  There are accounts.  All of

16  these positions are in an account.  Clearing member has the

17  responsibility to perform.  Assets constitute a margin.  The

18  clearinghouse has a lien over those assets, and in order for an

19  acquirer to acquire the positions in this case the OCC and the

20  parties agreed that the interest in whatever margin was there

21  would also go with the positions.

22       Now, it was very important to OCC because they didn't want

23  to lose control over that margin.  So they had a separate

24  reason for wanting the transaction restructured the way it was.

25  But Barclays, simply because it understood that the transaction

08-13555-mg    Doc 12027    Filed 10/07/10    Entered 10/15/10 11:40:55    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 123 of 151

Page 123

1   was that if they were going to take those risks they also

2   wanted to take the only mitigant that they could, which was the

3   margin in the account -- certainly the only mitigant at the

4   time.  It's possible that if the deal had closed as originally

5   contemplated there would have been other mitigants like all the

6   positions you described.  That's also true.

7        Nevertheless, at the very least, even if all those

8   positions had come over, Barclays would have still had the risk

9   of an additional funding requirement because you don't know on

10  day one exactly what the clearinghouse margin requirement is

11  going to be and how much of what comes to you is in a form that

12  can be transferred.  As I discussed, the letters of credit

13  could not be.

14  Q.   So are you aware that Barclays considered asking Lehman

15  for a security interest in margin?

16  A.   It's -- I'm not aware that they did.

17  Q.   Are you aware that Mr. Rosen considered asking for such a

18  security interest?

19  A.   I'm aware that there was a consideration that's obliquely

20  referred to -- I don't recall Mr. Rosen's testimony on this

21  point if he gave any -- but that with respect to the VIX

22  positions that -- as I testified earlier, the record seems to

23  reflect that that was a surprise to Barclays that that position

24  was there and that Barclays was looking for additional

25  protection over and above the amount of the collateral for that

Page 124

1    position.

2        Now, in my view that was logical because the -- one of the

3    ways that you would protect yourself against movements and

4    volatility, which would be essentially reflective of moves in

5    the market as a whole, and since the VIX underlier was the S&P,

6    would be to have all the short positions in the futures

7    contract.  On the weekend they didn't have any futures

8    contracts, they'd been blown out by the CME; those contracts

9    trade at the CME.  So there were no risk mitigants against that

10   VIX position other than the margin.  And given that you've got

11   thirty percent of the open interest in the contract I would

12   think it was completely logical for Barclays to consider and

13   for Ed Rosen to disclose that 'Well, we're looking for more

14   protection than what we're getting.'

15   Q.   Can you please turn to tab 12 of your binder?  And there

16   you should see a sticker in the bottom right-hand corner of

17   Movants' Trial Exhibit 736.  Do you see that?

18   A.   Yes, I do.

19   Q.   And you'll see this is an e-mail that Mr. Rosen sent to a

20   person at the SEC on September 20.  You'll see there's an

21   e-mail exchange back and forth there.

22   A.   Yes.

23   Q.   And in Mr. Rosen's e-mail, which is right in the middle of

24   the page, he addresses this person at the SEC and he says,

25   "Bob, tracked it down, just a junior associate and outside

Page 125

1   counsel to the OCC that did not understand the conversation he

2   was listening to.  There are VIX futures positions in an

3   account at OCC that are not part of the deal but that as a

4   practical matter we may -- we have to take with the LBI OCC

5   accounts.  We see a lot of potential downside exposure in the

6   position and we are trying to figure out how, away from OCC, we

7   can protect B, such as with collateral or a reserve from Lehman

8   to meet the potential liquidation exposure," then it goes on.

9   So you see that in this e-mail Mr. Rosen was concerned about

10  positions that were not part of the deal.  You see that?

11  A.    He described it was not part of the deal.  I don't have

12  any knowledge whether that was an accurate statement or not.

13  Q.    And he's specifically concerned here, he's talking about

14  the VIX positions at the OCC?

15  A.    Yes.

16  Q.    And he's concerned about downside exposure?

17  A.    Yes, because as he describes it, whether they were, quote,

18  "in the deal or not", by acquiring Lehman's obligations as a

19  clearing member of the clearinghouse those contracts were not

20  excluded from their exposure.

21  Q.    Now what he's looking for is some way to protect B, which

22  is obviously Barclays, right?

23  A.    Correct, and I think he's very clear by the phrase "away

24  from OCC" that he means more protection, as I described before,

25  more protection when the margin was there, for the reasons I

08-13555-mg   Doc 12027   Filed 10/07/10   Entered 10/15/10 11:40:55   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 126 of 151

Page 126

1    described.

2    Q.   And the protection he describes is a reserve or

3    collateral, right?

4    A.   Yes.

5    Q.   And you understand that reserve or collateral means if the

6    downside exposure comes to pass then the market participant

7    takes the collateral or invades the reserve.  But if there is

8    no loss then they don't keep the collateral and it goes back to

9    the person who posted it, right?

10   A.   Theoretically yes.

11   Q.   Now, do you know how Mr. Rosen figured this out?

12   A.   No.

13   Q.   You didn't discuss this with him?

14   A.   No, I didn't.  And by the way, I'm not sure I know what

15   you mean by "figured it out", but --

16   Q.   I think he referred to figuring something out.  You don't

17   know what ultimately happened with his consideration of seeking

18   collateral or a reserve?

19   A.   I don't know.

20   Q.   Okay.  Now, sir, if it were true that Barclays and Lehman

21   agreed to transfer all margin to Barclays, you would expect the

22   parties to have disclosed that to the Court and to the

23   creditors and to the public, isn't that right?

24   A.   I'm -- yes, we would expect that there would be a

25   disclosure of the transaction and it would up to the parties to

Page 127

1    determine whether or not any particular aspects of the

2    transaction were relevant to be separately mentioned or

3    disclosed.

4    Q.    And the transfer of margin is not a difficult thing to

5    disclose?  Exchanges keep track of margin on a daily basis, is

6    that right?

7    A.    It's not difficult to disclose.

8    Q.    Margin is not a difficult asset to value, right?

9    A.    Correct.

10    Q.    Exchanges keep very close track on exactly what cash and

11    cash equivalents a market participant has in their account at

12    the exchange at all points, isn't that right?

13    A.    The exchange does, yes.

14    Q.    Yeah.  So if the parties decided that they needed to

15    disclose the amount of margin that Lehman had that would not

16    have been a difficult thing for them to disclose, isn't that

17    right?

18    A.    The exact amount of margin?

19    Q.    Right.

20    A.    It would in this case because I think there was testimony

21    that Lehman's systems did not in fact have the information or

22    at least have the information to supply to Barclays as to what

23    the full quantity of margin at every potential venue where

24    these positions were going to be assumed was.  OCC,

25    theoretically, might have been in and of itself easy but even

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 128

1    there what were you going to look at and when were you going to

2    look at it?  Were you going to look at it in the morning?  Were

3    you going to look at it at the close of business?  Those were

4    two different time frames.  So if your question is what

5    quantity would they disclose, I'm not sure that would have been

6    in fact possible on that Friday.

7    Q.   If there were a couple of billion dollars at the OCC it

8    wouldn't have been terribly difficult to find that out?

9    A.   Right, but there -- as I read the hearing record, there

10   also wasn't a disclosure of the amount or value of the

11   liabilities that were being assumed either.  So there were

12   aspects of this transaction that were described to the Court;

13   the Court knows better than I what he was told.  But the

14   failure to talk about margin doesn't seem to me to be any more

15   surprising that there was a failure to discuss the greater

16   details of the equities division -- equities derivative

17   business that was being transferred and the benefit, except in

18   a very general way, to the estate of getting rid of that

19   business and exposure.

20        Now, I think that Harvey Miller did talk about that either

21   directly or obliquely, that Lehman was being able to transfer

22   potentially billions of dollars of exposure.  As I testified

23   this morning, I didn't think it was possible to quantify what

24   that risk and exposure was in view of the fact that in a

25   liquidation context the losses could well exceed the margin

Page 129

1    that was being posted.

2    Q.   Not my question.  My question is simply as to margin; not

3    difficult to find out what the margin is at the OCC, correct?

4    A.   If someone in this courtroom had called up the OCC and

5    asked them what the margin was I don't think they -- it would

6    have been that easy to find out.  It took the parties a day to

7    understand exactly what that margin was.

8    Q.   Do you know that the OCC was here?

9    A.   Yes, I believe there was a representative of the OCC here.

10   Q.   If the OCC and Barclays and Lehman all say 'I just want to

11   know how much cash there is in Lehman's account at the OCC,' if

12   somebody did an e-mail or a call, the OCC would be able to look

13   in the account, the margin account, and say exactly how much

14   cash there was in that account, isn't that right?

15   A.   I believe that's possible, yes.

16   Q.   And as far as the other margin, the Treasury bills, the

17   cash equivalents --

18   A.   I --

19   Q.   -- they could look in the account and see exactly what was

20   in the margin account, isn't that right, sir?

21   A.   I don't mean to sound equivocating here, but the problem

22   with Friday was that among the other things that were happening

23   to determine the amount of cash was that they drew down some

24   letters of credit.  So the composition -- we talked about the

25   composition of the assets in the account, so they actually

Page 130

1    changed during the day.  So I'm not trying to be evasive but it

2    depends on -- you know, if you called at 9 o'clock in the

3    morning you would get one answer; if you called at 2 o'clock in

4    the afternoon you would get a different answer.  So would it

5    have been possible to find out at a specific point in time?

6    Certainly OCC would have told you what their records showed at

7    that point in time but there would be different -- potentially

8    different answers in the course of the day.

9    Q.    But you would expect them to be responsive --

10   A.    Yes.

11   Q.    -- and to tell you the information they have?

12   A.    Yes.

13   Q.    And the same for Osaka or Tokyo or the Kansas City Board

14   of Trade, any of the other exchanges that you listed in your

15   report, they all keep track of the amount of cash and cash

16   equivalents that the participant has left with them, isn't that

17   right?  Isn't that what an exchange has to do?

18   A.    As I think the record shows and certainly what my report

19   reflects is that a lot of the foreign positions were not held

20   at clearinghouses or exchanges, they were held at foreign

21   brokers.  And at the time in question it's unlikely that they

22   were open since it's already Saturday in the far east.

23   Q.    If they hadn't gone to sleep or somebody had called them

24   the day before, they'd have the number at their fingertips,

25   right?  Any market participant in this business, as you've told

08-13555-mg    Doc 12027    Filed 10/07/10    Entered 10/15/10 11:40:55    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 131 of 151

Page 131

1    us many times, needs to be able to act instantaneously;

2    information they have to have at their fingertips --

3    A.    Yes.

4    Q.    -- isn't that right?

5    A.    Yes.

6    Q.    And that one of the most important pieces of information

7    is how much cash and cash equivalents does this counterparty

8    have with me right now, isn't that right?

9    A.    Yes.

10   Q.    And that whole week everybody was watching Lehman because

11   everybody was worried about Lehman, isn't that right?

12   A.    Yes.

13   Q.    So every single counterparty, every single Lehman

14   counterparty that had Lehman cash and Lehman cash equivalents,

15   you believe knew exactly how much cash and exactly how much

16   cash equivalents they had, isn't that right, sir?

17   A.    Yes.

18   Q.    Now, sir, if I could ask you to look at the -- I believe

19   it's tab 16 of your binder.  This is with respect to other

20   separate contracts with the Options Clearing Corporation which

21   you alluded to earlier in your testimony, the transfer and

22   assumption agreement.

23   A.    Yes.

24   Q.    You see that this is Barclays's Exhibit number 286 and

25   it's a transmitted e-mail from a Barclays -- from a Barclays'

Page 132

1   outside lawyer to the OCC in which he says, "Sorry for the

2   delay on this.  The executed agreement is attached."  And that

3   is the transfer and assumption agreement.  Do you see that,

4   sir?

5   A.   Yes.

6   Q.   If you look, sir, at the attachment, and specifically to

7   section 2, "Representations and Warranties", and if you look in

8   there at section 2(c)(i).

9   A.   Yes.

10  Q.   I'm sorry, I misspoke -- 2(c).  It says "Barclays hereby:"

11  and little (i) goes "represents and warrants that it has

12  received such documents and other information as it has deemed

13  appropriate to make its own credit analysis and decision to

14  enter into this agreement".  Do you see that, sir?

15  A.   Yes.

16  Q.   Do you know who did that credit analysis?

17  A.   No.

18  Q.   Do you know what they did?

19  A.   No.

20  Q.   Do you know whether Barclays figured out over the weekend

21  that it would get 2.3 billion dollars in cash and cash

22  equivalents if it signed this contract?

23  A.   I'm sorry, would you repeat the question?

24  Q.   Do you know whether Barclays figured out over the Lehman

25  weekend that it would get 2.3 billion dollars of Lehman cash

Page 133

1    and cash and cash equivalents if it signed that contract?

2    A.   It was certainly aware that it would get whatever was in

3    the account.  I'm not sure that they had all the records that

4    indicated the exact amount or composition of what was in the

5    account.

6    Q.   So you don't know either way whether Barclays figured that

7    out?

8    A.   Whether they -- whether they precisely knew the number

9    that they were getting.

10   Q.   Do you know whether Barclays checked over the Lehman

11   weekend and figured out that if they signed this contract they

12   would be taking responsibility for certain affiliates'

13   positions that could cost them 800 million dollars?

14   A.   I don't believe they knew the amount but I think they knew

15   that they were taking responsibility for affiliate positions.

16   Q.   Do you know, one way or the other, whether Barclays did an

17   analysis that basically amounted to subtracting 800 million

18   dollars from 2.3 billion dollars and concluding that if it

19   signed this contract it would get 1.5 billion dollars net in

20   cash and cash equivalents.

21   A.   No.

22   Q.   All you know, sir, is that Barclays represented that it

23   had received such documents and other information as it deemed

24   appropriate to make its own credit analysis and decision to

25   enter into this contract?

Page 134

1    A.   A standard rep and warranty, probably any deal lawyer

2    who's seen this in any document that gets signed that has a

3    similar purpose.

4    Q.   And you would agree, sir, that Barclays somehow concluded

5    that signing this contract was in its economic interest,

6    notwithstanding all the risks that you -- the clearing risks

7    that you described earlier?

8    A.   Right.

9    Q.   You mentioned something about the composition of margin,

10   and I believe you told us generally it could be cash, it could

11   be cash equivalents or it could be letters of credit, right?

12   A.   Yeah, that's not the only assets that -- or transactions

13   that constitute margin, but that was bulk -- the bulk of the

14   cover in this account.

15   Q.   And in this case there were in fact hundreds of millions

16   of dollars of letters of credit, right?

17   A.   Yes.

18   Q.   And they had to be replaced?

19   A.   Yes.

20   Q.   And if those letters of credit had been in the billions of

21   dollars they would have to have been replaced --

22   A.   Correct

23   Q.   -- as well?  And replaced by Barclays.

24   A.   Correct.

25   Q.   If Lehman had all of its margin by way of letter of

Page 135

1    credit, Barclays would have had to replace all of those letters

2    of credit?

3    A.   Yes.

4    Q.   Now sir, I believe you referred earlier to your experience

5    on the ad hoc committee for Reg T?

6    A.   Yes.

7    Q.   And when you said Reg T you're referring to a regulation,

8    a federal law --

9    A.   Yes.

10   Q.   -- isn't that right?  And that regulation is -- concerns

11   banks and banking, and specifically credit by brokers and

12   dealers, isn't that right?

13   A.   Yes.

14   Q.   And that is known popularly as Reg T?

15   A.   Yes.

16   Q.   That's a regulation that was promulgated for notice and

17   comment, the industry had an opportunity to discuss and build a

18   consensus on, and then it was adopted as a federal regulation.

19   A.   I'm not sure that the process used by the Federal Reserve

20   Board is exactly that, but certainly the rules of the

21   securities regulatory associations that implement Regulation T

22   under Section 7 of the Securities Exchange Act of 1934 would be

23   published for comment.

24   Q.   And you participated in the ad hoc committee in connection

25   with that Reg T, right?

Page 136

1    A.    Yes.

2    Q.    I'd like you to take a look at an excerpt from that

3    regulation which deals specifically with definitions, and the

4    definition I'm interested in is the definition of cash

5    equivalent, do you see that?

6    A.    Yes.

7    Q.    So this is Reg T specifically credited by brokers and

8    dealers.  And the definition is "cash equivalent means

9    securities issued or guaranteed by the United States or its

10   agencies, negotiable bank certificates of deposit, banker's

11   acceptances issued by banking institutions in the United States

12   and payable in the United States or money market mutual funds."

13   And that's generally understood by market participants in the

14   industry as cash equivalents, isn't that right, sir?

15   A.    I wouldn't say that.  I would say that the definition here

16   is very specific to defining the types of assets that would be

17   considered permissible for a broker-dealer to accept in

18   margining equity securities under the regulation.

19   Q.    And the reason for this is that cash can be held in the

20   form simply of cash or you have these things called cash

21   equivalents which are so liquid that they can be readily

22   changed into cash, right?

23   A.    Yes, although I'm aware of other contexts in which the

24   definition of securities of the same type are more narrowly

25   defined to apply only to securities whose maturity is within

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 137

1   six months.  What the -- so this particular rule for this

2   particular purpose is defining it more broadly.  So my only

3   quibble is with the fact that universally within the industry

4   and for every purpose cash equivalent means that.  It means

5   that in this regulation for this purpose.

6   Q.   And exchanges allow participants in the exchange-traded

7   derivatives business to post margin in the form of cash

8   equivalents instead of cash, isn't that right?

9   A.    And in other forms.  The -- I outlined in my report the

10  types of collateral that are permissible.  And in some cases

11  corporate obligations and other obligations that are -- could

12  be acceptable to the OCC.  So they chose to use these

13  particular instruments and it was much more common in practice

14  to use them.

15  Q.   So if the OCC tells me I have to put a billion of margin

16  at the OCC I can put a billion dollars of cash at the OCC or I

17  can go out and buy some T-bills, put them at the OCC, and get a

18  tiny little bit of interest on my margin deposit, right?

19  A.   Correct.  But I can do other things, but that would be the

20  common business practice, yes.

21  Q.   Thank you, sir.

22        MR. MAGUIRE:  I have no further questions.

23        THE COURT:  Thank you.

24        Redirect?

25        MS. BLOOMER:  Thank you, Your Honor.

Page 138

1    REDIRECT EXAMINATION

2    BY MS. BLOOMER:

3    Q.    Good afternoon, Mr. Leitner.

4    A.    Good afternoon, Ms. Bloomer.

5    Q.    Mr. Maguire asked you some questions about whether your

6    opinions assumed that Barclays was in fact taking

7    responsibility for all the positions in Lehman's exchange-

8    traded derivatives accounts.  Is it your understanding, based

9    on your view of the evidence, that Barclays was in fact taking

10   responsibility, settlement and clearance responsibility, for

11   all of the exchange-traded derivatives positions in Lehman's

12   account?

13   A.    Yes.

14   Q.    Mr. Maguire asked you about the facts on the ground on

15   September 16th, at the time the APA was entered into.  I'd like

16   to consider some of those facts with you.  On September 16th

17   were the over-the-counter derivatives positions part of the

18   transaction?

19   A.    I don't believe they were.

20   Q.    On September 16th were there exchange-traded derivatives

21   positions in Lehman's accounts that were held on behalf of

22   Lehman affiliates for which there were no related underlying

23   securities in Lehman's equity portfolio?

24   A.    Correct.

25   Q.    At the time the parties entered into the APA on September

Page 139

1    16th, was Lehman, the parent company, bankrupt?

2    A.    Yes.

3    Q.    Did you consider, when you formed your opinions in this

4    case, whether it would have been rational for Barclays on

5    September 16th, based on what it knew then, to take on LBI's

6    exchange-traded derivatives positions, under the context of

7    that deal that was being contemplated, without the margin?

8    A.    It would not have been rational.

9    Q.    Is it your opinion, as an expert in this industry who has

10   studied the facts of this case, that a broker-dealer in

11   Barclays' position would have been very concerned on Tuesday,

12   September 16th, that the exchange-traded derivatives positions

13   it was taking responsibility for contained negative exposures?

14   A.    Yes.

15   Q.    Was it possible, in your view, on September 16th, for

16   Barclays to sort through LBI's trading book and its exchange-

17   traded derivatives portfolio and identify the positions that

18   bore no relation to the exchange-traded -- to the securities

19   that Barclays was acquiring separate from the exchange-traded

20   derivatives and to leave those exchange-traded derivatives

21   positions behind in the deal?

22   A.    No.

23   Q.    Now, there were changes that occurred throughout the week

24   that you discuss in your report, correct?

25   A.    Yes.

08-13555-mg    Doc 12027    Filed 10/07/10    Entered 10/15/10 11:40:55    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 140 of 151

Page 140

1    Q.    Did those changes make the prospect of taking over the

2    exchange-traded derivatives even riskier than it otherwise

3    would have been?

4    A.    Yes.

5    Q.    And is that what you were saying in your report in the

6    sections that Mr. Maguire referred you to?

7    A.    That's right.

8    Q.    You were shown an e-mail in Mr. Maguire's binder -- and

9    it's at tab 8 of that binder, Lehman's Exhibit 620.

10    A.    Yes.

11    Q.    And this was an e-mail -- two e-mails from Stephen King to

12    Patrick Clackson.  Do you know who Patrick Clackson is?

13    A.    My understanding, he is a Barclays executive.

14    Q.    And do you know what department Patrick Clackson worked in

15    at Barclays?

16    A.    I think -- I think he was in the finance division, what we

17    would consider the treasury operation of my former firm.

18    Q.    And Mr. King says in these e-mails to Patrick Clackson,

19    "Why don't we add the initial margin on the repos -- sorry, I

20    meant exchanges and clearinghouses."  Do you know one way or

21    the other whether Mr. King was suggesting that they add margin

22    to the deal or whether they add margin to the draft acquisition

23    balance sheet that they were working on putting together at

24    that point?

25    A.    I certainly can't tell from this document, and I don't

Page 141

1    recall the -- Mr. King's testimony on this point.

2    Q.    Mr. Maguire asked you some questions about Mr. McDade's

3    testimony in this trial.  Could you please pull up the April

4    27th official transcript, pages 45 to 46?  And Mr. Maguire

5    showed you testimony in which Mr. McDade suggested that he did

6    not believe there was an intent to transfer margin for the

7    exchange-traded derivatives, do you recall that?

8    A.    Yes.

9    Q.    If you could look at the lines that are up on the screen,

10   lines 19 on page 45 through line 4 on page 46, Mr. McDade is

11   asked:

12   "Q.  You don't personally -- you were not personally involved

13   in and you do not personally recall one way or the other what

14   the deal was with respect to exchange-traded derivatives and

15   their collateral."

16   Q.    And he answers:

17   "A.  To the specifics, yes, that's correct."

18   Q.    And then he's asked:

19   "Q.  And that's because you were not personally involved in

20   those negotiations, correct?"

21   Q.    And he says:

22   "A.  That's correct."

23   Q.    And then he's asked:

24   "Q.  Who was involved in the negotiations with respect to

25   exchange-traded derivatives and their collateral?"

Page 142

1    Q.   And his response, Mr. McDade's response:

2    "A.  I don't have a specific answer or knowledge of that."

3    Q.   Did you review that testimony in connection with your work

4    on this case prior to today?

5    A.   Yes, I did.

6    Q.   And do you understand this testimony to mean that Mr.

7    McDade was not involved in the discussions about the exchange-

8    traded derivatives business and what the transfer of that

9    business would entail?

10   A.   That's the way I read it.

11   Q.   Now, if you could turn -- if you could pull up the sale

12   hearing transcript, BCI Exhibit 49A.  And if you go to page 112

13   in that sale hearing transcript.  This is at tab 13 in  your

14   binder if it's more convenient for you to follow along, but you

15   can feel free to use the screen.

16       Mr. McDade here starts on page 112 at line 15 and this

17   testimony goes over a couple of pages, and we'll show you those

18   pages.  Why don't we flip through them?  This is a list --

19   first of all, the question that was put to Mr. McDade at the

20   sale hearing was:

21   "Q.  And I want to confirm some information given there.

22   Pursuant to the proposed asset purchase agreement here, the

23   businesses that are being -- the Lehman businesses being

24   transferred to Barclays are as follows:  Tell me if I'm

25   incorrect, I'll read one at a time."

08-13555-mg   Doc 12027   Filed 10/07/10   Entered 10/15/10 11:40:55   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 143 of 151

Page 143

1   Q.   And then he proceeds to read a list of businesses and this

2   proceeds for another page and a half.  Will you please look

3   through that list and tell me whether you see businesses in

4   that list that would include exchange-traded derivatives

5   businesses?

6   A.   Well, there are several references to derivatives which in

7   the context of this transaction I would look at as -- would

8   interpret as exchange-traded derivatives.  On line 10, line 14,

9   line 18.

10  Q.   Then that would be cash equities, long and short

11  proprietary trading --

12  A.   Yeah, but going on to the next page I was -- first of all,

13  on page 113 --

14  Q.   Oh, I'm sorry.

15  A.   -- then on page 114 --

16  Q.   Um-hum.

17  A.   -- the cash equities; convertible bonds -- options are

18  often used to hedge convertible bonds; and long and short

19  proprietary trading; options and futures --

20  Q.   And --

21  A.   -- customer options and futures.

22  Q.   Thank you.  And I'm sorry, on the prior page then, lines

23  10, 14, and 18, I believe, you suggested were --

24  A.   And you could say 6 too, commodities, because in

25  connection with commodities, you know, as I know from the J&M

Page 144

1   (ph.) business futures are, you know, part of their commodities

2   business.

3   Q.   So taking -- based on your understanding of the businesses

4   that Lehman was involved in, do you understand what McDade was

5   telling the Court at the sale hearing that among the businesses

6   being transferred were the exchange-traded derivatives

7   businesses?

8   A.   He was describing all these businesses in a very general

9   high-level way.

10  Q.   Now, the asset purchase agreement is at tab 21 of the

11  binder that I gave you.  If you can turn to page 6 --

12  A.   Sorry, it's in the office; I only have their binder.  But

13  go ahead.

14  Q.   Oh, I'm sorry.  Actually, why don't we look at their

15  binder; I believe it's in there.  (Pause)  Perhaps it's not.

16  We have it up on the screen, sir.

17  A.   Okay.

18  Q.   I apologize for that.  There's a definition of purchased

19  assets but in that definition it says  purchased assets means

20  all of the assets of the seller and its subsidiaries used in

21  connection with the business excluding the excluded assets.

22  And then it has the word "including" which I represent to you

23  is defined as including without limitation.  And then they go

24  on to list a number of specific assets.

25  A.   Right.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 145

1    Q.    Now, this definition, "all of the assets of the seller and

2    its subsidiaries used in connection with the business", does

3    that include, in your opinion, based on your understanding in

4    this industry, margin, assuming it's not an excluded asset?

5    A.    Yes.

6    Q.    And Mr. Maguire showed you Mr. Shapiro's testimony

7    suggesting that Mr. McDade approved every aspect of this

8    transaction.  Do you believe, based on that testimony, that Mr.

9    McDade approved this definition of purchased assets?

10   A.    Yes.

11   Q.    Now, Mr. Maguire asked you about whether Barclays could

12   have gotten a list of the positions that it was taking on in

13   this business prior to the closing.  Did in fact Barclays

14   obtain a list of those positions prior to the closing?

15   A.    No.

16   Q.    Did it at least obtain a list of certain positions before

17   the closing?

18   A.    Yes, it -- sorry, I think I testified before that it got,

19   you know, sort of reams of position reports.  So it did get, I

20   think, on the Friday -- it got some information on Thursday,

21   some information on Friday, but basically lists of collateral.

22   It also got huge lists of the fixed income collateral that was

23   included in the repo.  So they were getting -- they were

24   getting a lot of information, yes.

25   Q.    First of all, were these lists complete, to your

Page 146

1    understanding, in terms of showing the universe of all of

2    Lehman's open exchange-traded derivatives positions including

3    options and futures?

4    A.    No.

5    Q.    Okay.  And second of all, for the ones as to which it was

6    complete, could Barclays, based on what you understand under

7    the circumstances of this deal, have determined the risk

8    position of those positions based on the list that it was

9    given?

10   A.    No.

11   Q.    And you saw earlier when we were talking during my direct

12   examination and e-mail from Stephen King in which he said on

13   the night of the closing that he was unable to determine the

14   risk position four days into it, is that correct?  Do you

15   remember that?

16   A.    Right.

17   Q.    And he was suggesting in that e-mail, if you recall, that

18   Lehman couldn't tell them what the risk position was either, is

19   that right?  Do you remember that testimony?

20   A.    Yes.

21   Q.    Was that significant to your conclusions?

22   A.    Yes.  And just to be clear, the positions they got that I

23   recall looking at, of all the option positions, had one, you

24   know, set of, you know -- very many pages of all the long

25   positions and another set of very many pages of all the short

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 147

1    positions.  But what they didn't do was to allocate them as to

2    all the puts and all the calls, so you couldn't tell in the

3    aggregate whether the short positions, which is really where

4    the risk is, were more sensitive to the market going down or

5    the market going up, which is what they were concerned about in

6    terms of figuring out, you know, where the hedges were, again,

7    because they had no S&P futures against that that might have

8    mitigated some of the risk, so they were clueless.

9    Q.   Mr. Maguire asked you some questions about whether the

10   margin would all come back to Barclays if the market didn't

11   move after the closing.  Do you recall that line of

12   questioning?

13   A.   Yes.

14   Q.   Okay.  Let me ask you a specific question, a hypothetical

15   question.  If there was a billion dollars in margin that was

16   required at the OCC on the day of the closing in the options

17   accounts --

18   A.   Right.

19   Q.   -- and the market didn't move for the next month and then

20   those options were exercised, would Barclays get back the

21   billion dollars in margin or would that margin be used to

22   settle the responsibility to perform the obligations that

23   created that margin requirement?

24   A.   Well, sorry, I can't answer that with a yes or no because

25   the fact of the matter, it depends first of all on what

Page 148

1   happens.  And let's just divide these risks.  I talked a little

2   bit about them before.  Over the weekend involved here there

3   were settlement risks, so one of the things that would have

4   affected the margin -- and in fact this is the practice of the

5   OCC -- they would take into account all of these settlements

6   and whether or not there was a net gain or loss in the account.

7   And then they would either deduct from the account's cash what

8   it was owed or they would add to the amount.  These are called

9   net pay settle.  So there was that portion in -- actually in

10  that document that shows that net pay collect.  Now that

11  happens every day because options can be settled every day.

12  So number one, you have the risk that options will be exercised

13  and they have to be covered.  That would be the obligation of

14  the clearing member to do that.

15       So your hypothetical, while it's a good one, really only

16  applies in the case of a forced liquidation.  So you know, it's

17  up to the clearinghouse to figure out how to cover itself

18  because it exercises its rights to do so and then it closes all

19  the positions out and it uses whatever collateral is left.  In

20  the normal course, and what happened here was that Barclays

21  attempted to manage the positions over time to mitigate the

22  risk and possibly even, if lucky, make a profit.

23  Q.   Now, Mr. Leitner, in your expert opinion, based on

24  everything you know about this transaction, do you believe

25  there was even a reasonable possibility that Barclays would

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 149

1   have agreed at any point during the week of September 15, 2008,

2   to take over LBI's exchange-traded derivatives accounts if it

3   believed it was not going to get the margin in those accounts?

4   A.   No.

5   Q.   And in your expert opinion, based on everything you know

6   about this transaction, do you believe it was commercially

7   reasonable for LBI to conclude that it was in the estate's best

8   interest to transfer the entirety of those accounts to Barclays

9   including the margin?

10   A.   Absolutely.

11   Q.   Thank you, sir.

12        MS. BLOOMER:  No further questions, Your Honor.

13        MR. MAGUIRE:  Nothing further, Your Honor.

14        THE COURT:  You're excused.  Thank you very much.

15   (Witness excused)

16        THE WITNESS:  Thank you, Your Honor.

17        THE COURT:  Is there anything more for today?

18        MR. SCHILLER:  No, Your Honor, not on my part.

19        THE COURT:  We're adjourned till tomorrow at 9:30.

20        Professor Pfleiderer is coming in then, is that right?

21        MR. SCHILLER:  Yes, Your Honor, he'll be here.

22        THE COURT:  Fine.  See you tomorrow.

23   (Whereupon these proceedings were concluded at 3:07 p.m.)

24

25

Page 150

1

2                        I N D E X

3

4                    T E S T I M O N Y

5   WITNESS                EXAM BY              PAGE        LINE

6   Anthony Leitner        Ms. Bloomer           5          14

7    (voir dire)

8   Anthony Leitner        Ms. Bloomer          14           7

9   Anthony Leitner        Mr. Maguire          60          14

10   Anthony Leitner        Ms. Bloomer         138           3

11

12

13                    E X H I B I T S

14   PARTY    NO   DESCRIPTION                  ID.       EVID.

15   BCI      340   Report prepared by Anthony            17

16                    Leitner

17

18

19                    R U L I N G S

20   DESCRIPTION                                PAGE        LINE

21   Anthony Leitner is accepted in the area of   14          2

22   the exchange-traded derivatives industry.

23

24

25

Page 151

1

2                        C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    _____

8    Clara Rubin

9    AAERT Certified Electronic Transcriber (CET**D-491)

10   Also transcribed by:    Sharona Shapiro (CET**D-492)

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date: October 7, 2010

18

19

20

21

22

23

24

25