**Hearing Date: November 17, 2010, at 10:00 a.m.**
**Objection Deadline: November 10. 2010, at 4:00 p.m.**

Howard J. Weg (Cal. State Bar No. 091057)
    Admitted Pro Hac Vice
David B. Shemano (DS 1224)
PEITZMAN, WEG & KEMPINSKY LLP
10100 Santa Monica Boulevard, Suite 1450
Los Angeles, CA 90067
Telephone: (310) 552-3100
Facsimile: (310) 552-3101

Attorneys for Cascade Investment, L.L.C.

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------x
                                    :
In re:                              :        Chapter 11 Case
                                    :
LEHMAN BROTHERS HOLDINGS INC.,      :
et al.,                             :        Case No. 08-13555 (JMP)
                                    :
                                    :        (Jointly Administered)
                       Debtors      :
-----------------------------------------------------------x
```

## NOTICE OF MOTION OF CASCADE INVESTMENT, L.L.C. FOR LEAVE TO CONDUCT DISCOVERY OF (1) THE DEBTORS, AND (2) JPMORGAN CHASE BANK, N.A. PURSUANT TO  FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

**PLEASE TAKE NOTICE** that, on **November 17, 2010, at 10:00 a.m.**, or as soon

thereafter as the matter may be heard, before the Honorable James M. Peck, United States

Bankruptcy Judge, in Courtroom 601 of the United States Bankruptcy Court, Southern District of

New York, 1 Bowling Green, New York, New York, 10004, Cascade Investment, L.L.C.

("Cascade"), will move for entry of an order granting Cascade leave to conduct discovery of (1)

Lehman Brothers Holding, Inc. and Lehman Brothers Special Finance, Inc. (collectively, the

"Debtors"), and (2) JPMorgan Chase Bank, N.A., pursuant to Federal Rule Of Bankruptcy

Procedure 2004 (the "Motion").

      **PLEASE TAKE FURTHER NOTICE** that any objection or response to the Motion

must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local

Rules for the United States Bankruptcy Court for the Southern District of New York, and (i)

shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242

(General Order M-242 and the User's Manual for the Electronic Case Filing System can be

found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court), by

registered users of the Bankruptcy Court's case filing system and, by all other parties in interest,

on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other

Windows-based word processing format and (ii) a hardcopy of such objection or response shall

be served in accordance with General Order M-242, upon (A) the chambers of the Honorable

James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (B) Weil

Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, (Attn: Richard P.

Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and Jacqueline Marcus, Esq.),

attorneys for the Debtors; (C) the Office of the United States Trustee for the Southern District of

New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Andy Velez-

Rivera, Paul Schwartzberg, Brian Masumoto, Linda Riffkin, and Tracy Hope Davis); (D)

Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York

10005, (Attn: Dennis F. Dune, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq.), attorneys

for the official committee of unsecured creditors appointed in these cases; (E) the attorneys for

any other official committee(s) appointed in these cases, and (F) Peitzman, Weg & Kempinsky

LLP, 10100 Santa Monica Blvd., Suite 1450, Los Angeles, California 90067 (Attn: Howard J.

Weg, Esq., and David B. Shemano, Esq.), attorneys for Cascade, so as to be actually filed and received no later than November 10, 2010 at 4:00 p.m. (Eastern Time) (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  Los Angeles, California
      October 18, 2010          PEITZMAN, WEG & KEMPINSKY LLP


          By:   /s/ David B. Shemano
              David B. Shemano
              10100 Santa Monica Blvd., Ste. 1450
              Los Angeles, CA 90067
              (310) 552-3100

          Attorneys for Cascade Investment, L.L.C.

**Hearing Date:  November 17, 2010, at 10:00 a.m.**
**Objection Deadline: November 10. 2010, at 4:00 p.m.**

Howard J. Weg (Cal. State Bar No. 091057)
   Admitted Pro Hac Vice
David B. Shemano (DS 1224)
PEITZMAN, WEG & KEMPINSKY LLP
10100 Santa Monica Boulevard, Suite 1450
Los Angeles, CA 90067
Telephone: (310) 552-3100
Facsimile: (310) 552-3101

Attorneys for Cascade Investment, L.L.C.

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------x
                                         :
In re:                                   :        Chapter 11 Case
                                         :
LEHMAN BROTHERS HOLDINGS INC.,           :
et al.,                                  :        Case No. 08-13555 (JMP)
                                         :
                                         :        (Jointly Administered)
                  Debtors                :
-----------------------------------------------------------x
```

## MOTION OF CASCADE INVESTMENT, L.L.C. FOR LEAVE TO CONDUCT DISCOVERY OF (1) THE DEBTORS, AND (2) JPMORGAN CHASE BANK, N.A. PURSUANT TO  FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

Cascade Investment, L.L.C. ("Cascade"), hereby moves this Court for an order pursuant to Federal Rule of Bankruptcy Procedure 2004 directing that (1) Lehman Brothers Holding, Inc. and Lehman Brothers Special Finance, Inc. (collectively, the "Debtors"), and (2) JPMorgan Chase Bank, N.A. ("JPMorgan"), respond to the document requests contained in Schedule 1 attached hereto, and provide for examination of the Debtors' and JPMorgan's persons most knowledgeable about the matters set forth herein (the "Motion").

## **INTRODUCTION**

1.      Pursuant to a prepetition contract dated December 9, 2002, between Lehman Brothers Special Finance, Inc. ("LBSF") and Cascade (the "Contract"), LBSF took possession of and was granted a security interest in a $6.3 million United States Treasury Bill (the "Treasury Bill") owned by Cascade to secure Cascade's obligations to LBSF under the contract.  By the terms of the Contract, Cascade was entitled to return of the Treasury Bill prior to LBSF's bankruptcy filing.  The contract was properly terminated by Cascade shortly after the commencement of LBSF's bankruptcy case and LBSF was contractually required to return the Treasury Bill to Cascade.

2.      Despite its obligation to return the Treasury Bill, LBSF not only failed to return the Treasury Bill, but failed to provide any meaningful information to Cascade concerning the location and status of the Treasury Bill despite repeated inquiry by Cascade.  In July 2009, the Debtors advised Cascade that the Treasury Bill had been rehypothcated, but refused to provide any further detail or written evidence of the rehypothecation.  Finally, several months ago, Cascade was informed that the Treasury Bill is in the possession of JPMorgan, but JPMorgan in turn has not responded to Cascade's numerous requests for information relating to the Treasury Bill other than to claim that the Treasury Bill was rehypothecated by the Debtors to JPMorgan in accordance with the standard terms of an ISDA Master Agreement.

3.      On May 26, 2010, Debtor Lehman Brothers Holding, Inc. ("LBHI") filed a complaint against JPMorgan alleging that JPMorgan improperly extracted collateral from LBHI shortly before the commencement of these cases in September 2008 (the "JPMorgan Complaint").  Pursuant to the Complaint, LBHI seeks the avoidance and recovery of billions of dollars in collateral transfers.  While the Treasury Bill is not specifically identified in the JPMorgan Complaint, Cascade suspects that the transfer of the Treasury Bill to JPMorgan is one of the collateral transfers that LBHI is now alleging was improper and should be avoided and recovered.

4.      This case is now almost two years old and Cascade has been very patient and understands that these cases are complicated.  However, Cascade is now entitled to meaningful

information concerning its $6.3 million Treasury Bill.  Therefore, pursuant to Rule 2004,

Cascade request that the Court enter an order granting Cascade leave to take discovery of the

Debtors and JPMorgan concerning the Treasury Bill.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper

in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief

requested in this Motion is Rule 2004 of the Federal Rules of Bankruptcy Procedure.

## FACTUAL BACKGROUND

Procedural History

6.      On September 15, 2008 (the "Petition Date"), LBHI filed a voluntary petition for

relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On

October 3, 2008, LBSF also filed a voluntary chapter 11 petition under the Bankruptcy Code.

7.      The Debtors' chapter 11 cases are being jointly administered pursuant to

Bankruptcy Rule 1015(b) and this Court's order dated and entered on October 16, 2008.

JPMorgan Freezes Lehman Brothers' Assets

8.      Prior to the Petition Date, the Debtors, along with various other subsidiaries and

affiliates of the Debtors (collectively "Lehman Brothers"), were the fourth largest investment

bank in the United States.  Lehman Brothers offered a wide range of financial services, including

sales of debt and equities, trading and research, and investment banking, among other business

lines.

9.      Pertinently, LBSF was in the business of entering into derivative contracts with

various counterparties.  In the course of entering into these derivative contracts, LBSF would,

from time to time, require its counterparty to post collateral to secure such counterparty's

obligations.  The collateral could be in many forms, including United States Treasury Bills and

cash, and would be held in a LBSF account.

6

10.     To facilitate its business operations, Lehman Brothers contracted with JPMorgan to provide, among other things, (i) cash advances to LBHI to fund overnight repurchase agreements, and (ii) clearing services to LBHI and certain of its subsidiaries.  The Lehman Brothers entities' obligations were guaranteed to JPMorgan under various guarantee agreements between JPMorgan and LBHI.  Additionally, LBHI's guarantee to JPMorgan was secured by collateral pledged to JPMorgan, estimated to be in an amount as high as $17 billion.

11.     According to published reports, on September 12, 2008, three days prior to the Petition Date, JPMorgan refused to allow LBHI access to its collateral and froze LBHI's accounts.

Cascade Seeks to Recover The Treasury Bill

12.     As of September, 2008, Cascade was the counterparty under three derivative, or "swap," transactions with LBSF (the "Swaps"). A true and correct copy of an account statement detailing the Swaps is attached hereto as Exhibit A.  The Swaps had an aggregate notional amount of approximately $122 million and were governed by an ISDA Master Agreement (the "ISDA Master"), dated December 9, 2002, between LBSF and Cascade.  A true and correct copy of the ISDA Master is attached hereto as Exhibit B.  LBSF's obligations under the ISDA Master were guaranteed by LBHI pursuant to that certain Guarantee Of Lehman Brothers Holdings Inc. (the "Guarantee"), dated December 9, 2002.  A true and correct copy of the Guarantee is attached hereto as Exhibit C.

13.     To secure Cascade's obligations under the ISDA Master, Cascade posted collateral with LBSF, in the form of a United States Treasury Bill, CUISP No. 912795H95, (together with any proceeds thereof, the "Treasury Bill"), with a market value, as of September 2008, estimated to be in excess of $6.2 million.  As of the Petition Date (and in the months preceding the Petition Date), the Swaps were "in the money" and, therefore, Cascade was not required to post collateral under the ISDA Master and was entitled to the return of the Treasury Bill.

14.     LBHI's bankruptcy filing was an event of default under the ISDA Master.  On September 15, 2008, Cascade sent a letter to LBSF (i) notifying LBSF that LBHI's bankruptcy

filing constituted an event of default under the ISDA Master, and (ii) designating September 15, 2008, as an early termination date for all of the transactions governed by the ISDA Master (the "Notice Letter").  A true and correct copy of the Notice Letter is attached hereto as Exhibit D.

15.    Two days later, on September 17, 2008, Cascade sent a second letter to LBSF notifying LBSF that as a consequence of LBSF's default under the ISDA Master, $11,708,287.49 (the "Termination Amount") was due to Cascade from LBSF (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as Exhibit E.  In addition, due to its default, LBSF was obligated to return the Treasury Bill to Cascade.  The Treasury Bill has not been returned.  The Treasury Bill matured on December 4, 2008.

16.    Over the ensuing months, Cascade attempted repeatedly by email and telephone to obtain information regarding the Treasury Bill from LBSF and JPMorgan.  For nearly a year, these efforts yielded no results.  On July 22, 2009, counsel to Cascade received a telephone call from Vinay Gupta ("Gupta") of Lehman Brothers.  Counsel was informed that JPMorgan took possession of the Treasury Bill when JPMorgan froze the Lehman Brothers accounts around the time of the Petition Date.  Subsequently, in connection with efforts to reconcile Cascade's claims against the Debtors, the Debtors have taken the position that Cascade's claims are entirely unsecured and not collateralized by the Treasury Bill, but the Debtors have expressly refused to provide any additional information concerning the status of the Treasury Bill.

17.    Based upon the information provided by Lehman Brothers, Cascade then sought further information about the Treasury Bill from JPMorgan.  After multiple informal inquiries were ignored, Cascade delivered a demand letter to JPMorgan on February 1, 2010.  In response, counsel to Cascade received a telephone call from counsel to JPMorgan.  JP Morgan's counsel confirmed that the Treasury Bill had been delivered to JPMorgan, but provided no meaningful information other than to restate JPMorgan's position that the Treasury Bill had been properly rehypothecated in accordance with the ISDA Master.

18.    On May 26, 2010, LBHI filed the JPMorgan Complaint alleging that JPMorgan improperly extracted collateral from LBHI shortly before the commencement of these cases in September 2008.  Pursuant to the JPMorgan Complaint, LBHI seeks the avoidance and recovery

of billions of dollars in collateral transfers.  While the Treasury Bill is not specifically identified

in the JPMorgan Complaint, Cascade suspects that the transfer of the Treasury Bill to JPMorgan

is one of the collateral transfers that LBHI is now alleging was improper and should be avoided

and recovered.

## RELIEF REQUESTED

19.     Cascade requests the entry of an order pursuant to Rule 2004 authorizing and

directing (i) the production of documents by the Debtors and JPMorgan in response to the

document requests attached hereto as Schedule 1, (ii) the deposition of a representative of each

of the Debtors and JPMorgan who is most knowledgeable about the matters set forth in this

Motion, (iii) the issuance of one or more subpoenas compelling such document production and

attendance at such deposition in the manner provided in Federal Rule of Bankruptcy Procedures

9016, and (iv) granting such other and further relief as the Court deems just and proper.

## ARGUMENT

20.     Rule 2004 provides that "[o]n motion of any party in interest, the court may order

the examination of any entity."  Fed. R. Bankr. P. 2004(a).  A Rule 2004 examination is not

limited to the debtor.  Any entity with knowledge of the debtor's acts, property, liabilities, and

financial affairs is subject to the rule.  *See, In re Ionosphere Clubs, Inc.,* 156 B.R. 414, 432

(S.D.N.Y. 1993) ("any third party who can be shown to have a relationship with the debtor can

be made subject to a Rule 2004 investigation").

21.     The scope of discovery under Rule 2004 is broad, relating to "the acts, conduct, or

property or to the liabilities and financial condition of the debtor, or to any matter which may

affect the administration of the debtor's estate, or to the debtor's right to a discharge."  Fed. R.

Bankr. P. 2004(b); *In re Ecam Publications, Inc.,* 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991)

("the scope of a Rule 2004 examination is so broad that it can be in the nature of a 'fishing

expedition'") *(quoting In re Coffee Cupboard, Inc.,* 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991));

*In re Drexel Burnham Lambert Group, Inc.,* 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) ("the

scope of a Rule 2004 examination is very broad"); *In re Corso*, 328 B.R. 375, 383 (Bankr. E.D.N.Y. 2005) (scope of Rule 2004 examination "is broader than discovery permitted under the Federal Rules of Civil Procedure"). Under Rule 2004, a moving party is entitled to both the examination of a witness and the production of requested documents. Fed. R. Bankr. P. 2004(c).

22.    By this Motion, Cascade is seeking information from the Debtors and JPMorgan relating to the Treasury Bill (or the proceeds therefrom), which was held in one of the Debtors' accounts and then apparently seized by JPMorgan on or about the time of the Debtors' bankruptcy filing. Cascade requires the information at this time for two important reasons. First, as Cascade and the Debtors are currently in the process of reconciling Cascade's claims against the Debtors, Cascade requires definitive information to determine whether its claims against the Debtors are secured or unsecured. The Debtors have expressly and repeatedly refused to cooperate in providing any explanation or evidence of the status of the Treasury Bill beyond a general statement that it was rehypothecated, going so far as to tell Cascade that the only way to learn the fate of the Treasury Bill is to seek formal discovery. Moreover, the Debtors have refused to fix or resolve any of Cascade's claims unless Cascade agrees to waive any right to return of the Treasury Bill or the proceeds therefrom.

23.    Second, as a consequence of the JPMorgan Complaint, there now appears a real possibility that, even if the Treasury Bill was rehypothecated to JPMorgan in accordance with the ISDA Master, which Cascade does not admit, the transfer will be avoided. Because of that, Cascade requires definitive information so that it can protect its rights and remedies relating to the consequences of the avoidance litigation.

24.    Because the status of the Treasury Bill relates to the property, liabilities, financial condition, and administration of the Debtors' estates, information concerning the status of the Treasury Bill is well within the scope of Rule 2004. The Treasury Bill was posted by Cascade in connection with the ISDA Master and now represents an obligation of LBSF to Cascade that will be administered through the Debtors' bankruptcy case. Further, the Debtors have represented, and JPMorgan has confirmed, that the Treasury Bill was in fact transferred to JPMorgan. Therefore, JPMorgan is also appropriately the subject of a Rule 2004 examination.

10

## NO PRIOR REQUEST

25.    No prior Motion for the relief requested herein has been made to this or any other court.

## WAIVER OF MEMORANDUM OF LAW

26.    As there are no novel issues of law relating to the Motion, Cascade requests that the Court waive the requirement that Cascade file a separate memorandum of law in support of the Motion.

## CONCLUSION

**WHEREFORE**, for the reasons stated herein, Cascade respectfully requests that the Court enter an Order, pursuant to Rule 2004, in the form attached hereto as Exhibit F: (i) requiring the production of documents from the Debtors and JPMorgan responsive to the document requests; (ii) requiring the Debtors and JPMorgan to each produce its representative for examination who is most knowledgeable about the matters set forth in this Motion; (iii) authorizing the issuance of one or more subpoenas compelling such document production and appearance for examination; and (iv) granting such other and further relief as the Court deems just and proper.

Dated:  Los Angeles, California
      October 18, 2010    PEITZMAN, WEG & KEMPINSKY LLP


By:    /s/ David B. Shemano
     David B. Shemano
     10100 Santa Monica Blvd., Ste. 1450
     Los Angeles, CA 90067
     (310) 552-3100

Attorneys for Cascade Investment, L.L.C.

**SCHEDULE 1**

**REQUEST FOR PRODUCTION OF DOCUMENTS**

**DEFINITIONS**

A.      The term "CASCADE" as used herein shall mean and refer to Cascade

Investment, L.L.C.

B.      The term "COMMUNICATIONS" as used herein shall mean and refer to every

manner or method of disclosure or transfer or exchange of information, whether oral or written,

and whether in person, by telephone, mail, email, personal delivery or otherwise.

C.      The term "COMPUTER" as used herein includes, but is not limited to, all

mainframe computers, personal computers, microcomputers, desktop and portable, laptop or

notebook computers and personal digital assistants ("PDAs").

D.      The term "DEBTORS" as used herein shall mean and refer to Lehman Brothers

Holdings, Inc. and Lehman Brothers Special Finance, Inc. and any of their respective officers,

directors, employees, associates, consultants, attorneys, representatives, agents or other any

person working on its behalf, including its predecessors and successors in interest.

E.      The term "DOCUMENT" or "DOCUMENTS" as used herein shall mean and

refer to all written, printed, typed, recorded, or graphic matter of every type and description,

however and by whomever prepared, produced, reproduced, disseminated or made in any form,

including, but not limited to, letters, correspondence, statements, cancelled checks, agreements,

contracts, appraisals, plans, specifications, reports, evaluations, e-mails, telegrams, telexes,

memoranda, records, minutes, contracts, agreements, intra- and interoffice communications,

microfilm, bulletins, circulars, pamphlets, studies, reports, notices, diaries, calendar entries,

summaries, books, messages, instructions, work assignments, notes, writeups, notebooks, drafts,

data sheets, data compilations, computer data compilation and computer runs, worksheets, statistics, speeches, tapes, tape recordings, press releases, public statements and public announcements, public and governmental filings, financial statements, opinions and other writings and other magnetic, photographic, electronic and sound recordings.

F.      The term "ELECTRONIC DATA" as used herein shall mean and refer to the original and any non-identical copies of any COMPUTER program, software, database, file, e-mail, source code or operating system, including ASCII files, word processing documents, spreadsheets, charts, and graphs, whether active, deleted or fragmented.

G.      The term "ELECTRONIC MEDIA" as used herein shall mean and refer to any magnetic or other storage device used to record, store or maintain ELECTRONIC DATA, including, but not limited to, any disk, minidisk, floppy disk, hard drive, disk drive, CD ROM, optical disk, memory card, personal computer, network, magnetic tape, microfiche, punch card, computer chip, back up or any other means of storing, recording or retaining information generated or input to or on a COMPUTER.

H.      The term "JPMORGAN" as used herein shall mean and refer to JPMorgan Chase Bank, N.A. , and any of its respective officers, directors, employees, associates, consultants, attorneys, representatives, agents or other any person working on its behalf, including its predecessors and successors in interest.

I.      The term "LBHI" as used herein shall mean and refer to Lehman Brothers Holdings, Inc., and any of its respective officers, directors, employees, associates, consultants, attorneys, representatives, agents or other any person working on its behalf, including its predecessors and successors in interest.

J.      The term "LBSF" as used herein shall mean and refer to Lehman Brothers Special

Finance, Inc. and any of its respective officers, directors, employees, associates, consultants,

attorneys, representatives, agents or other any person working on its behalf, including its

predecessors and successors in interest.

K.      The term "RELATE TO" or "REFER TO" or the like as used herein shall mean

and refer to all documents that in any manner or form are relevant in any way to or bear upon in

any way the subject matter in question, including, without limitation, all documents that contain,

record, reflect, summarize, evaluate, comment upon, transmit, refer to, or discuss that subject

matter or that  in any manner state the background of, the basis or bases for, or that record,

evaluate comment upon, or were referred to, relied upon, utilized, generated, transmitted, or

received in arriving at your conclusions, opinions, estimates, calculations, positions, beliefs,

assertions or allegations, undermine, contradict, or conflict with your conclusions, opinions,

calculations, estimates, positions, beliefs, assertions, or allegations, concerning the subject matter

in question.

L.      The term "TREASURY BILL" as used herein shall mean and refer to that certain

United States Treasury Bill, identified in Exhibit A of the Motion Of Cascade Investment, L.L.C.

For Leave To Conduct Discovery Of (1) The Debtors, And (2) JPMorgan Chase Bank, N.A.

Pursuant Federal Rule Of Bankruptcy Procedure 2004, with a maturity date of December 4,

2008, CUSIP No. 912795H95.  This definition shall expressly include any earning and proceeds

of such Treasury Bill.

M.      The terms "YOU" and "YOUR" as used herein shall mean, as applicable, (1) the

DEBTORS, and (2) JPMORGAN.

N.     For the purposes hereof, the reference to any entity shall include any and all

officers, directors, employees, associates, consultants, attorneys, representatives and agents or

any other person or entity representing such entity or acting on its behalf as well as any and all

affiliate entities, predecessors and successors in interest and their respective officers, directors,

employees, associates, consultants, attorneys, representatives and agents.

## **INSTRUCTIONS**

A.     In responding to these requests for production, YOU are requested to furnish all

DOCUMENTS that are in YOUR actual or constructive possession, custody, or control or in the

possession, custody or control of any of YOUR representatives, agents or attorneys.  In

responding to these requests for production, YOU may elect to produce the original or, if the

original is not available, a legible copy, of each requested document.

B.     In responding to these requests for production, YOU are requested to produce all

DOCUMENTS either as they are kept in the usual course of YOUR business affairs or they shall

be organized and labeled to correspond with the requests herein.  If a DOCUMENT is responsive

to more than one request, only one exemplar of the DOCUMENT needs to be produced.

Similarly, if YOU have more than one copy of the exact same DOCUMENT, the additional

copies need not be produced.  A version of a DOCUMENT that differs in any way from the

original of such DOCUMENT because it constitutes a prior draft or subsequent version, because

it contains any interlineations or marginalia, or because it differed in any other respect from the

original, is not an exact duplicate of such DOCUMENT.  Each different version of such

DOCUMENT is required to be produced.

C.     If YOU cannot respond to any of the following requests in full after exercising

reasonable diligence to secure the information requested therein, please so state and respond to

the extent possible, specifying the reasons for any inability to respond and stating whatever information YOU do have concerning such request.

D.       If a responsive DOCUMENT consists of ELECTRONIC DATA, is stored on ELECTRONIC MEDIA or a COMPUTER, or is otherwise unreadable in its ordinary state, the responding party shall take reasonable steps to produce and translate all such responsive items into a useable or readable form.

E.       If any privilege is claimed or if any objection is made regarding the production of any DOCUMENTS, with respect to each such DOCUMENT:  (1) identify the privilege or objection involved; (2) state the basis for claiming the privilege or making the objection; (3) describe the type of DOCUMENT and the date of its creation; (4) identify each person who (a) has knowledge of the DOCUMENT or the information that the DOCUMENT contains, (b) prepared or made the DOCUMENT, (c) signed the DOCUMENT, and (d) now possesses the DOCUMENT or a copy,  summary or digest thereof; and (5) identify each person to whom the DOCUMENT or a copy,  summary, or digest thereof was directed, circulated, or distributed.


## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1**:

All DOCUMENTS that RELATE TO the present location and status of the TREASURY BILL.

**REQUEST FOR PRODUCTION NO. 2**:

All DOCUMENTS that RELATE TO the transfer, assignment, negotiation, movement, conveyance, or the like, of the TREASURY BILL from any account of the DEBTORS to its present location.

**REQUEST FOR PRODUCTION NO. 3**:

All DOCUMENTS, including, without limitation, internal work papers, emails, memoranda that RELATE TO the TREASURY BILL.

**REQUEST FOR PRODUCTION NO. 4**:

All DOCUMENTS that RELATE TO COMMUNICATIONS between CASCADE, its counsel, or other representative, on the one hand, and JPMORGAN, on the other hand, RELATING TO the TREASURY BILL.

**REQUEST FOR PRODUCTION NO. 5**:

All DOCUMENTS that RELATE TO COMMUNICATIONS between CASCADE, its counsel, or other representative, on the one hand, and the DEBTORS, their counsel or other representative, on the other hand, RELATING TO the TREASURY BILL.

**REQUEST FOR PRODUCTION NO. 6**:

All DOCUMENTS that RELATE TO COMMUNICATIONS between JPMORGAN, its counsel, or other representative, on the one hand, and the DEBTORS, their counsel or other representative on the other hand, RELATING TO the TREASURY BILL.

**REQUEST FOR PRODUCTION NO. 7**:

All DOCUMENTS that RELATE TO the names and contact information of any individual that knows, should know, or may know the location or status of the TREASURY BILL from January 1, 2008, to the date of the response to this Request.

# EXHIBIT A

# LEHMAN BROTHERS

## DERIVATIVES - MTM STATEMENT

| TO: | CASCADE INVESTMENT, LLC |
|---|---|
| A/C # : | 12002CASC |
| | OPERATIONS GROUP |
| PHONE: | 425-889-7944 |
| FAX: | 425-822-7649 |
| EMAIL: | confirms@bgi-group.com;keitht@bgi-group.com; |

| DATE: | 01-Sep-2008 |
|---|---|
| COB VALUATION DATE: | 29-Aug-2008 |
| REPORTING CCY: | USD |

| FROM: | LEHMAN BROTHERS SPECIAL FINANCING INC. |
|---|---|
| PHONE: | 212-526-2170    TRACY AGARD |
| FAX: | 917-522-0252 |
| EMAIL: | cvg@lehman.com |

*POSITIVE NUMBERS = DUE TO LEHMAN/COLLATERAL HELD BY LEHMAN*
*NEGATIVE NUMBERS = DUE TO YOU/COLLATERAL HELD BY YOU*

The below estimated value(s) are as of the date indicated and do not represent actual bids or offers by Lehman Brothers. There can be no assurance that actual trades could be completed at such value(s). Unless otherwise specified, the below valuations represent mid-market valuations. Mid-market values attempt to approximate the current economic value of a given position using prices and rates at the average of the bid and offer for the respective underlying asset(s) or reference rate(s). Discussions of trade values in general, and indicative or firm price quotations and actual trade prices in particular, may vary significantly from these written estimated values as a result of various factors, which may include (but are not limited to) prevailing credit spreads, market liquidity, position size, transaction and financing costs, hedging costs and risks and use of capital and profit.

These estimates may not be representative of any theoretical or actual internal valuations employed by us for our own purposes, may vary during the course of any particular day and may vary significantly from the estimates or quotations that would be given by another dealer. You should consult with your own accounting or other advisors as to the adequacy of this information for your purposes. As a condition for providing these estimates, you agree that Lehman Brothers makes no representation and shall have no liability in any way arising there from to you or any other entity for any loss or damage, direct or indirect, arising from the use of this information.

| MTM Summary | | Independent Requirement Summary | |
|---|---|---|---|
| Default Swaps Total: | (194,416) | Portfolio Independent Requirement | 20,422 |
| Structured Total: | 361,342 | Deal Specific Independent Requirement | |
| TOTAL: | 166,926 | TOTAL: | 20,422 |

## Default Swaps

| GID | RMS ID | Product Type | Ticker | Trade Date | Maturity Date | Buy / Sell | CCY | Notional Amount CCY | Indicative Spread | MTM (USD) |
|---|---|---|---|---|---|---|---|---|---|---|
| 20237459 | 20237459 | DEFAULTS | CDX_HVOL_0613 | 13-May-2008 | 20-Jun-2013 | S | USD | 100,000,000 | 0.0358 | 380,909 |
| 2961133 | 2961133 | DEFAULTS | TITIM | 26-Mar-2007 | 20-Dec-2013 | S | USD | 20,000,000 | 0.0151 | (794,498) |
| 3694469 | 3694469 | DEFAULTS | ABX_HE_AAA061 | 27-Feb-2008 | 25-Jul-2045 | B | USD | 2,042,154 | | 219,173 |

**DEFAULT SWAPS TOTAL:** (194,416)

## Structured

| GID | RMS ID | Trade Date | Effective Date | Maturity Date | Structured Notional CCY | Notional Amount CCY | MTM (USD) | Independent Requirement (USD) |
|---|---|---|---|---|---|---|---|---|
| 3733471 | 186460SL | 25-Mar-2008 | 29-Feb-2008 | 01-Sep-2008 | USD | 14,900,000 | 361,342 | |

**STRUCTURED TOTAL:** 361,342

## Deal - Specific Breakdown (Scheduled)

| GID | RMS ID | Trade Date | Effective Date | Maturity Date | Notional CCY | Notional Amount CCY | Independent Requirement Percent | Independent Requirement (USD) |
|---|---|---|---|---|---|---|---|---|
| 3694469 | 3694469 | 27-Feb-2008 | 27-Feb-2008 | 25-Jul-2045 | USD | 2,042,154 | 1.00 | 20,422 |

**DEAL-SPECIFIC BREAKDOWN TOTAL:** 20,422

| Deal ID | Coll Type | Security ID | Security Description | Collateral Data | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Maturity Date | CCY | Dirty Price | | Quantity | Market Value (USD) |
| VAR | 912795H95 | U S TREASURY BILL | 04-Dec-2008 | | USD | 99.57 | 6,300,000 | 6,272,658 |
| IND | USD | UNITED STATES DOLLARS | | USD | 0.00 | 20,903 | 20,903 |
| VAR | USD | UNITED STATES DOLLARS | | USD | 0.00 | (20,903) | (20,903) |
| COLLATERAL DATA TOTAL: | | | | | | | | | 6,272,658 |

# EXHIBIT B

(Multicurrency — Cross Border)



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ......................................... **December 9, 2002**

LEHMAN BROTHERS
SPECIAL FINANCING INC. ................................. and ................ CASCADE INVESTMENT, L.L.C. ..............

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.    Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)   *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)   *Netting.* If on any date amounts would otherwise be payable:—

    (i)   in the same currency; and

    (ii)  in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)   *Deduction or Withholding for Tax.*

    (i)   *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)   promptly notify the other party ("Y") of such requirement;

        (2)   pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)   promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)   if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)   the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)   the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA® 1992**

(ii)  *Liability.* If: —

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)  *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)  *Basic Representations.*

(i)  *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)  *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)  *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)  *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                                    ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)   *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)   *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)   *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)   *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)   *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)   *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event*.

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate*. If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

                                                            ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) *Effect of Designation.*

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations.*

(i) *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i) *Events of Default.* If the Early Termination Date results from an Event of Default: ---

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events.* If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

7.    **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

**9.    Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

12                                    ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.   Notices**

(a)   *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)   if in writing and delivered in person or by courier, on the date it is delivered;

(ii)   if sent by telex, on the date the recipient's answerback is received;

(iii)   if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)   *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.   Governing Law and Jurisdiction**

(a)   *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)   *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)   submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)   *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14                                      ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15                                                      ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS
SPECIAL FINANCING INC.**

........................................................
(Name of Party)

By: ........................................................
Name:
Title:          ZDENKA S. GRISWOLD
Date:           Authorized Signatory

**CASCADE INVESTMENT, L.L.C.**

........................................................
(Name of Party)

By: ........................................................
Name: *Michael Larson*          MEB
Title: *Business Manager*
Date:

18                                              ISDA® 1992

(Multicurrency - Cross Border)

# ISDA

## SCHEDULE

## to the

## Master Agreement

dated as of December 9, 2002

between

**Lehman Brothers Special Financing Inc.**, a corporation organized under the laws of the State of Delaware ("Lehman"),

and

**Cascade Investment, L.L.C.**, a limited liability company organized under the laws of the State of Washington ("Cascade").

**Part 1. Termination Provisions.**

(a)     "***Specified Entity***" means in relation to Lehman for the purpose of:

| | |
|---|---|
| Section 5(a)(v)  (Default under Specified Transactions), | Specified Affiliates |
| Section 5(a)(vi) (Cross Default), | Specified Affiliates |
| Section 5(a)(vii) (Bankruptcy), | Specified Affiliates |
| Section 5(b)(iv)  (Credit Event Upon Merger), | Not Applicable |

and in relation to Cascade for the purpose of:

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transactions), | Affiliates |
| Section 5(a)(vi) (Cross Default), | Affiliates |
| Section 5(a)(vii) (Bankruptcy), | Affiliates |
| Section 5(b)(iv)  (Credit Event Upon Merger), | Affiliates |

"Specified Affiliates" with respect to Lehman, as used above, means Lehman Brothers Inc., Lehman Brothers Finance S.A., and Lehman Brothers Commercial Corporation.

(b)     "***Specified Transaction***" will have the meaning specified in Section 14.

(c)     The "***Cross Default***" provisions of Section 5(a)(vi) will apply to Lehman and to Cascade.

"***Specified Indebtedness***" will have the meaning specified in Section 14.

19

"***Threshold Amount***" means in the case of Lehman and Lehman Brothers Holdings Inc. ("Holdings"), the lesser of (i) USD 40 million or (ii) two percent (2%) of the Stockholders' Equity of Holdings, and in the case of Cascade, USD 10 million, or in each case its equivalent in any currency.

As used herein, "Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus, and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The "***Credit Event Upon Merger***" provisions of Section 5(b)(iv) will apply to Lehman and to Cascade; provided, however, that the term "materially weaker" means, with respect to Lehman, that Holdings or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services ("S&P"). In the event of a split rating, the lower rating shall be determinative.

(e)     The "***Automatic Early Termination***" provisions of Section 6(a) will not apply to Lehman or to Cascade.

(f)     ***Payments on Early Termination.*** For the purpose of Section 6(e) of this Agreement:

(i)     Market Quotation will apply.
(ii)    Second Method will apply.

(g)     "***Termination Currency***" means United States Dollars.

(h)     "***Additional Termination Event***" will not apply.


## Part 2. Tax Representations.

(a)     ***Payer Representations.*** For the purpose of Section 3(e), Lehman will make the following representation and Cascade will make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on: (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this

Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)   ***Payee Representations.*** For the purpose of Section 3(f) of this Agreement, Lehman and Cascade make the following payee representations:

(i)      Lehman represents that it is a corporation organized under the laws of the State of Delaware and that its United States taxpayer identification number is 11-2751029. Lehman represents that it is a US person for US federal income tax purposes.

(ii)     Cascade represents that it is a limited liability company organized under the laws of the State of Washington and that its United States taxpayer identification number is 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.


**Part 3.  Agreement to Deliver Documents.**

For the purpose of Section 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)   Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| Lehman | IRS Form W-9 | At execution and thereafter upon request. |
| Cascade | IRS Form W-9 | At execution and thereafter upon request. |
| Lehman and Cascade | Forms and/or documents described in Section 4(a)(iii) of this Agreement. | Upon reasonable demand by the other party. |

(b)   Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Lehman | Guarantee of Holdings in the form of Exhibit A attached. | At execution | No |

21

| Lehman | Legal opinion of counsel to Lehman and the Guarantor as to capacity and due authorization of Lehman and the Guarantor, substantially in the form of Exhibit B. | At execution. | No |
|--------|--------|--------|--------|
| Lehman | A copy of the annual report of its Credit Support Provider containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting practices consistently applied. | Upon request, promptly upon becoming available. | Yes, as amended in Part 5(c) |
| Lehman | A copy of the unaudited financial statements of its Credit Support Provider for its most recent fiscal quarter and prepared in accordance with generally accepted accounting practices consistently applied | Upon request, promptly upon becoming available. | Yes, as amended in Part 5(c) |
| Lehman | Incumbency Certificate of the Corporate Secretary or Assistant Corporate Secretary of Lehman as to the authority and genuineness of signature of the individual executing this Agreement on behalf of Lehman. | At execution. | Yes |
| Lehman | A copy of the resolutions (the "Authorizing Resolution") of the board of directors of Lehman, pursuant to which Lehman is authorized to enter into this Agreement and each Transaction entered into hereunder. | At execution. | Yes |
| Cascade | Certificate of the General Counsel or the Manager of Cascade that the net worth of Cascade is not less than US $500 million, such certificate to be substantially in the form of Exhibit C. | At execution and thereafter annually on or before August 31, and quarterly upon request. | Yes |

| Cascade | Certificate of the General Counsel to Cascade as to (i) the authority of Cascade to enter into Transactions and (ii) the authority and genuineness of signature of the individual executing this Agreement on behalf of Cascade, substantially in the form of Exhibit D hereto. | At execution. | Yes |
|---|---|---|---|
| Cascade | Legal opinion of the General Counsel of Cascade substantially in the form of Exhibit E. | At execution. | No |
| Cascade | Certificate of the General Counsel of Cascade as to the authority of one or more named investment advisors to enter into Transactions and otherwise act hereunder on behalf of Cascade, substantially in the form of Exhibit F hereto. | At execution and from time to time thereafter as Cascade may elect or promptly upon request. | Yes |
| Cascade | As to Transactions entered into by an investment advisor on behalf of Cascade, (1) a Certificate of the Corporate Secretary or Assistant Corporate Secretary of the investment advisor as to the authority and genuineness of signature of the individual executing documents relating to such a Transaction on behalf of Cascade, and (2) a copy of relevant portion of the Investment Advisory Agreement between Cascade and the Investment Advisor authorizing the Investment Advisor to act on behalf of Cascade. | At execution and from time to time thereafter as Cascade may elect or promptly upon request. | Yes |

## Part 4.  Miscellaneous

(a)    *Addresses for Notices.*  For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to Lehman: —

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management
745 Seventh Avenue, 28th Floor

23

New York, New York 10019
Attention: Documentation Manager

Telephone No.:  (212) 526-7187
Facsimile No.:  (212) 526-7672

Address for notices or communications to Cascade: —

Cascade Investment, L.L.C.
2365 Carillon Point
Kirkland, WA 98033
Attention: Mr. Michael Larson

Telephone No. (425) 803-0720
Facsimile No. (425) 889-0288
Electronic Messaging System Details:  None until mutually agreed otherwise.

(b)     **Process Agent.** For the purpose of Section 13(c) of this Agreement:  Not applicable.

(c)     **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(d)     **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:

Lehman is not a Multibranch Party.
Cascade is not a Multibranch Party.

(e)     **Calculation Agent.** The Calculation Agent is Lehman, unless otherwise specified in a Confirmation in relation to the relevant Transaction or unless an Event of Default with respect to Lehman has occurred or is continuing; provided, however, that in the event that a calculation or determination is disputed by Cascade, the parties shall first pay any undisputed amount and endeavor to resolve such dispute.  If they are unable to do so within a commercially reasonable time (but in no event more than two Local Business Days), they shall mutually select a dealer which would qualify as a Reference Market-maker in the applicable market to act as Calculation Agent with respect to the amount in dispute.

(f)     **Credit Support Document.**  Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation (unless provided otherwise in a Confirmation), as if set forth in full in this Agreement or such Confirmation:

In the case of Lehman, a guarantee of Lehman's obligations hereunder in the form annexed hereto as Exhibit A and the Credit Support Annex annexed hereto.

In the case of Cascade, the Credit Support Annex annexed hereto.

24

(g)   ***Credit Support Provider.*** Credit Support Provider means in relation to Lehman, Holdings, and means, in relation to Cascade, Not Applicable.

(h)   ***Governing Law.*** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)   ***Netting of Payments.*** Subparagraph (ii) of Section 2(c) of this Agreement will apply to all Transactions.

(j)   "***Affiliate***" will have the meaning specified in Section 14 of this Agreement except that, with respect to Cascade, "Affiliate" will not include Microsoft Corporation, the Bill & Melinda Gates Foundation, or any entities the majority of the voting power of which is owned, directly or indirectly, by Microsoft Corporation or the Bill & Melinda Gates Foundation.

## Part 5. Other Provisions.

(a)   ***Scope of Agreement -- Incorporation of Existing Transactions.*** Upon the effectiveness of this Agreement, unless specifically agreed to the contrary in writing by the parties as to a specific transaction, each and every Specified Transaction currently existing and outstanding between Lehman and Cascade is hereby incorporated herein and is subject to, governed by and construed in accordance with the terms of this Agreement.

(b)   ***ISDA Definitions.*** Unless otherwise expressly specified in a Confirmation, this Agreement, each Confirmation and each Transaction incorporates, and is subject to and governed by, the 2000 ISDA Definitions and the 1998 FX and Currency Option Definitions published by the International Swaps and Derivatives Association, Inc., as amended, supplemented, updated, restated, and superseded from time to time (collectively, the "Definitions"). Subject to Section 1(b), in the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail. Also, subject to Section 1(b), in the event of any inconsistency between the provisions of any Confirmation and this Agreement, either of these Definitions, and a Confirmation, the Confirmation will prevail.

(c)   ***Representations – Financial Information.*** Section 3(d) of this Agreement is amended by (a) inserting after the word "information" in the first line the words "other than financial information," and (b) adding before the period at the end of the Section the words "and, in the case of each item of financial information, presents fairly the financial condition or performance that the item of financial information purports to present as of the date or for the periods for which that item of financial information is stated to refer and, in the case of interim financial information is subject to year-end adjustments".

(d)   ***Additional Representations.*** Section 3 is amended by adding the following at the end of that Section:

25

(g)     ***Relationship Between Parties***. Each party represents to the other party that (i) as to each FX Transaction entered into prior to, on or after the date it executes this Master Agreement and Schedule, and (ii) as to each Transaction, other than an FX Transaction, entered into prior to or on the date it executes this Master Agreement and Schedule:

(i) ***Non-Reliance***. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) ***Assessment and Understanding***. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, condition and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) ***Status of Parties***. The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

The parties anticipate (but do not now hereby agree) that this relationship, as set out in paragraphs (i), (ii) and (iii), above, will continue and be applicable to Transactions (whether or not an FX Transaction) after the date of execution of this Master Agreement and Schedule in which case the relevant Confirmation may (but need not) repeat verbatim the language in paragraphs (i), (ii) and (iii), above, as applicable to that Transaction. The parties further anticipate that if such language is inserted into a Confirmation, the issue will have been discussed and the substance of the language acknowledged and agreed to at or before the time of the relevant oral trade call being confirmed by the Confirmation.

(h)     ***Eligible Contract Participant***. Lehman and Cascade each represents that it is an "eligible contract participant" as defined in Section 1a(12) of the Commodity Exchange Act, as amended by the Commodity Futures Modernization Act of 2000.

(e)   ***Recording of Telephone Conversations***. Each party (i) consents to the recording of the telephone conversations of its trading and marketing personnel by the other party in connection with this Agreement and any potential Transaction and (ii) waives any

26

objection based on the absence of consent (but does not waive any other available objection) to the admission into evidence of audiotapes of such recording in any Proceeding (as defined in Section 13(b) of this Agreement). Upon written request, each party will promptly make available to the other party the original (or an equally audible copy) of any tape recording in its possession relating to any Transaction previously entered into or purported to have been entered into by the parties.

(f)     *Set-off*. Section 6 is hereby amended by adding the following additional clause:

"(f)     **Set-off.** Any amount (the "Early Termination Amount") payable to one party by the other party under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(iv) or Section 5(b)(v) as occurred, will, at the option of the party ("X") other than the Defaulting Party or the Affected Party ("Y") (and without prior notice to the Y), be reduced by its set-off against any amount(s) (the "Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by Y to X or an Affiliate of X (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between Y and X or an Affiliate of X or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). The parties consent to any assignment required to effect such set-off. X will give notice, which need not be prior, to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

(g)     *Conditions to Certain Payments*. Notwithstanding the provisions of Section 6(e)(i)(3) and (4) as applicable (and notwithstanding the provisions of Section 6(e)(ii)(1) in circumstances where there is one Affected Party and a Termination Event under Section 5(b)(iv) has occurred in which case for the purposes of this paragraph and the succeeding two subparagraphs the Affected Party shall be deemed the Defaulting Party and the party that is not the Affected Party shall be deemed the Non-defaulting Party), if the amount

27

referred to therein is a positive number, the Defaulting Party will pay such amount to the Non-defaulting Party, and if the amount referred to therein is a negative number, the Non-defaulting Party shall have no obligation to pay any amount thereunder to the Defaulting Party unless and until the conditions set forth in (i) and (ii) below have been satisfied at which time there shall arise an obligation of the Non-defaulting Party to pay to the Defaulting Party an amount equal to the absolute value of such negative number less any and all amounts which the Defaulting Party may be obligated to pay under Section 11:

(i) the Non-defaulting Party shall have received confirmation satisfactory to it in its sole discretion (which may include an unqualified opinion of its counsel) that (x) no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of Terminated Transactions will be required to be made in accordance with Section 6(e)(ii) and (y) each Specified Transaction shall have terminated pursuant to its specified termination date or through the exercise by a party of a right to terminate and all obligations owing under each such Specified Transaction shall have been fully and finally performed; and

(ii) all obligations (contingent or absolute, matured or unmatured) of the Defaulting Party to make any payment or delivery to the Non-defaulting Party or any Affiliate of the Non-defaulting Party shall have been fully and finally performed.

(h) **Service of Process.** With respect to the provisions of Section 13(c) of the Agreement, the reference therein to Section 12 to the contrary notwithstanding, no consent is given by either party to service of process by telex, facsimile transmission or electronic messaging system. In addition, the penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(i) **Authority to Enter Into Transactions.** (i) Cascade may, from time to time, authorize an investment advisor (each such investment advisor an "Investment Advisor") to enter into one or more Transactions on behalf of Cascade and execute and deliver a Confirmation and other documentation as may be required with respect thereto, such authority to be evidenced by a certificate substantially in the form of Exhibit F from the General Counsel to the sole trustee of Cascade and a copy of the relevant portion of the investment advisory agreement between Cascade and the Investment Advisor.

(ii)   Cascade represents and warrants that Lehman is entitled to rely upon any request, instruction, certificate, representation or other document furnished to Lehman or action taken, by any employee or agent of an Investment Advisor in connection with any Transaction thereunder entered into by such Investment Advisor, as though the same had been given or made by Cascade until such time as Cascade gives written notice to Lehman affirmatively revoking, terminating, or modifying such authorization.

(iii)   Cascade represents and warrants that any execution, delivery, or action by an Investment Advisor on behalf of Cascade does not conflict with any law or regulation applicable to Cascade, any provision of the constituent documents of Cascade, any order

28

or judgment of any court or agency of government applicable to Cascade or any of the assets of Cascade or any contractual restriction binding on or affecting Cascade.

(j)  *Compliance with Authorizations and Regulations.* Cascade represents and warrants that as of the date hereof, each time that it enters into a Transaction with Lehman, either directly or through an Investment Advisor, and at all times until the termination of this Agreement, such Transaction is consistent with (i) any policies, guidelines, restrictions or limitations imposed on Transactions by the constituent documents or management of Cascade, and (ii) any rules, regulations, laws, restrictions or limitations imposed on Transactions by any commission, regulatory body or other agency of government applicable to it or any of its assets.

(k)  *Payments to Cascade.* Notwithstanding any provision in any Confirmation to the contrary, all payments under this Agreement due and payable to Cascade shall be made to the custodian account of Cascade maintained at Mellon Bank by wire transfer to Federal Reserve Bank Boston ABA : 011 001 234 for further credit to the sub-account name and number specified in the relevant Confirmation.

(l)  *Additional Representations and Warranties.*

   (i)  Cascade acknowledges and agrees that Lehman is not acting as a fiduciary in respect of Cascade and has no responsibility pursuant to the standards governing the conduct of fiduciaries, investment advisors, or investment managers, and any advice given by Lehman under or in connection with this Agreement is merely incidental to the provision of Lehman's services hereunder and will not serve as a primary basis for any investment decision by Cascade.

   (ii)  Each party covenants and agrees that it will not take any action during the term of this Agreement that would reasonably be expected to render any of the representations and warranties of such party in this Agreement (including this Schedule) untrue, incorrect or incomplete, and if any event or condition should occur that would reasonably be expected to render any of such representations and warranties untrue, incorrect, or incomplete, such party will immediately give written notice thereof to the other party.

   (iii)  Each party will provide the other, promptly upon becoming aware of the same, with written notice of any proposed action, change, or modification to any charter document of such party or any other action to be voted on with respect to such party, if such action, change, modification, or vote would be reasonably expected to cause a Termination Event or Event of Default by that party.

The representations and agreements in this Schedule will be deemed to be representations and agreements for all purposes of this Agreement, including without limitation Sections 3(d), 4, 5(a)(ii), and 5(a)(iv).

29

(m)   ***Certain Tax Representations.***  For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

(n)   ***Notices.***  For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(o)   ***Waiver of Jury Trial.***  Each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction.

(p)   ***Exclusive Jurisdiction—Washington Courts.***  In return for the waiver herein requested by Lehman of the right to trial by jury, the parties agree that, notwithstanding any other provision in this Agreement, any act, suit or proceeding relating to this Agreement shall be brought exclusively in the courts of the State of Washington or the United States District Court located in Seattle, Washington.

(q)   ***Transfer.***  Notwithstanding the provisions of Section 7, Lehman may, with the prior written consent of Cascade which Cascade agrees will not be unreasonably withheld, assign and delegate all (but not less than all) its rights and obligations under this Agreement to any direct or indirect wholly-owned subsidiary of Holdings in form and substance satisfactory to Cascade, provided that Lehman delivers to Cascade an executed guarantee of Holdings of the assignee's obligations under this Agreement, substantially in the form of Exhibit A hereto.

**Part 6. FX Transactions and Currency Options.**

(a)   ***Incorporation of 1998 FX and Currency Option Definitions.***  This Agreement incorporates, and is subject to and governed by, the 1998 FX and Currency Option Definitions, including Annex A thereto and, to the extent Annex A is hereafter revised, such revisions to the extent the parties expressly agree to the same in writing, (the "FX and Currency Option Definitions") published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and the Foreign Exchange Committee.

(b)   ***Scope.***  This Agreement, as modified by this Part 6, shall apply to each FX Transaction and Currency Option Transaction entered into before, on or after the date hereof between Cascade and Lehman, each of which shall constitute a Transaction for purposes of and be subject to this Agreement. Any FX Transaction and Currency Option Transaction currently existing between the parties hereto shall henceforth be subject to this Agreement only.

(c)   ***Inconsistency.***  Notwithstanding Section 1(b) of this Agreement, in the event of any inconsistency between the terms of this Master Agreement (including the Schedule) and

30

the terms of a Confirmation of an FX Transaction or of a Currency Option Transaction, the Master Agreement (including the Schedule) will prevail for purposes of the relevant Transaction if the Confirmation is by means of an electronic messaging system that the parties have elected to use.

In the event of any inconsistency between the provisions of the 2000 ISDA Definitions and the FX and Currency Option Definitions in the case of a Transaction which is an FX Transaction or a Currency Option Transaction, the FX and Currency Option Definitions will prevail.

(d)   *Electronic FX Transaction and Currency Option Confirmations.* An FX Transaction and a Currency Option Transaction may be confirmed in accordance with this subpart, notwithstanding anything to the contrary herein. Where an FX Transaction or Currency Option Transaction is confirmed by means of an electronic messaging system that the parties have elected to use to confirm such Transaction,
(i) such confirmation will constitute a 'Confirmation' as referred to in this Agreement even when not so specified in the Confirmation,
(ii) such Confirmation will supplement, form part of, and be subject to this Agreement and all provisions in this Agreement will govern the Confirmation except as modified therein, and
(iii) the FX and Currency Option Definitions, as amended herein, will be incorporated into the Confirmation if the Transaction is an FX Transaction or Currency Option Transaction.

Without limitation of the foregoing, where an FX Transaction or Currency Option Transaction is confirmed by means of exchange of electronic messages on an electronic messaging system or by means of facsimile or telex (whether manually or automatically generated) or other document or confirming evidence exchanged between the parties confirming such Transaction, such messages, facsimile transmission, document, or evidence shall constitute a Confirmation for the purposes of this Agreement even where not so specified therein. FX Transactions and Currency Option transactions shall be promptly confirmed by the parties by Confirmations exchanged by mail, telex, facsimile, or other electronic means.

(e)   *Amendments to the FX and Currency Option Definitions.* The FX and Currency Option Definitions as applicable to Transactions under this Master Agreement are amended as follows:

(1) *Failure to Pay Premium.*
Section 3.4 of the FX and Currency Option Definitions is amended by adding a new subsection (c) as follows:

"(c) If any Premium is not received on or before the Premium Payment Date, the Seller may elect: (i) to accept a late payment of such Premium; (ii) to give written notice of such non-payment and, if such payment shall not be received within two

31

(2) Local Business Days of such notice, treat the related Currency Option Transaction as void; or (iii) to give written notice of such non-payment and, if such payment shall not be received within two (2) Local Business Days of such notice, treat such non-payment as an Event of Default under Section 5(a)(i). If the Seller elects to act under either clause(i) or (ii) of the preceding sentence, the Buyer shall pay all out-of-pocket costs and actual damages incurred in connection with such unpaid or late Premium or void Currency Option Transaction, including, without limitation, interest on such Premium in the same currency as such Premium at the then prevailing market rate and any other costs or expenses reasonably incurred by the Seller in covering its obligations (including, without limitation, a delta hedge) with respect to such Currency Option Transaction."

(2) *Partial Exercise of Options.*

Section 3.6(a) of the FX and Currency Option Definitions is hereby amended by deleting in its entirety the final sentence thereof and adding at the end thereof the following:

"The right or rights granted pursuant to a Currency Option Transaction may be exercised in whole or in part unless otherwise specified in the applicable Confirmation. If the right or rights granted pursuant to a Currency Option Transaction are exercised in part, the unexercised portion of such rights shall not be extinguished thereby but shall survive to the extent of such unexercised portion until the earlier of (A) the expiration of the Currency Option Transaction or (B) an exercise of the remaining right or rights granted pursuant to such Currency Option Transaction that leaves no remaining unexercised portion thereof."

(3) *Conversion to a Non-Deliverable Currency Option Transaction.*

Section 3.7(a) of the FX and Currency Option Definitions is hereby amended by adding at the end thereof the following sentence:

"Notwithstanding the foregoing, if an Event of Default or a Potential Event of Default has occurred and is continuing and an Early Termination Date has not been designated by the Non-defaulting Party, the Non-defaulting Party may, by written notice, specify that any or all Deliverable Currency Option Transactions being settled while such an Event of Default or Potential Event of Default is continuing shall be settled in accordance with section 3.7(b) unless and until the Event of Default or Potential Event of Default is no longer continuing."

(4) *Netting, Novation and Discharge.*

(A) "Currency Obligation" means the undertaking of a party hereunder to deliver an amount of currency under an FX Transaction, an exercised Currency Option Transaction, or a Novated Currency Obligation (as defined below).

(B) Section 1.24 of the FX and Currency Option Definitions is amended for the purposes of this Agreement to read in its entirety as follows:

32

**Section 1.24 Settlement Date.** "Settlement Date" means, subject to adjustment in accordance with the Following Business Day Convention unless another Business Day Convention is specified to be applicable to that Settlement Date, (a) in respect of a Transaction, the date (i) specified as the Settlement Date or the Payment Date, as the case may be, or otherwise determined as provided in the related Confirmation, or (ii) determined in accordance with Section 5.2(c)(x)(A) or Section 5.2(c)(xi), and (b) in respect of a Novated Currency Obligation, the date (i) determined pursuant to the provisions of Part 6(e)(4)(C) and (D) or (ii) the date determined in accordance with Section 5.2(c)(x)(A) or Section 5.2(c)(xi).

(C) Whenever a Currency Obligation is created by a pair of Offices entering into an FX Transaction or by a Currency Option Transaction between a pair of Offices being exercised and such Currency Obligation is in the same currency and for the same Settlement Date as an existing Currency Obligation between such Offices, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation (a "Novated Currency Obligation") which shall have the same Settlement Date and which shall be determined as follows: (i) if the canceled Currency Obligations evidenced an undertaking by the same party to deliver the underlying currency, the Novated Currency Obligation shall equal the aggregate of the canceled Currency Obligations, and (ii) if the canceled Currency Obligations evidenced undertakings by each party to deliver the underlying currency, the amount of the underlying currency to be delivered by each party under the canceled Currency Obligations shall be compared, and the Novated Currency Obligation shall equal the amount by which the Currency Obligation of the party having the greater obligation with respect to such currency exceeded the Currency Obligation of the party having the lesser obligation with respect to such currency.

(D) The provisions in the immediately preceding subpart (C) shall apply notwithstanding that either party (i) may fail to send out a Confirmation, (ii) may not on its books treat the Currency Obligations as canceled and simultaneously replaced by a new Currency Obligation as provided herein, or (iii) may send out a Confirmation that incorrectly states any term of a Currency Obligation.

**(5) Termination and Discharge of Offsetting Currency Option Transactions.**
Any Call or any Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, written by the other party, such termination and discharge to occur automatically upon the payment in full of the last Premium payable in respect of such options; *provided that* such termination and discharge may only occur in respect of a Currency Option Transaction:

(A)  each being with respect to the same Put Currency and the same Call Currency;
(B)  each having the same Expiration Date and Expiration Time;
(C)  each being of the same style, i.e. either both being American Style Currency Option Transactions or both being European Style Currency Option Transactions;
(D)  each having the same Strike Price;

33

(E)    neither of which shall have been exercised by delivery of a Notice of Exercise; and

(F)    each of which has been transacted by the same pair of Offices of the parties; and, upon the occurrence of such termination and discharge, neither party shall have any further obligation to the other party in respect of the relevant Currency Option Transaction or, as the case may be, parts thereof so terminated and discharged. In the case of a partial termination and discharge, (i.e., where the relevant Currency Option Transactions are for different amounts of the Currency Pair), the remaining portion of that Currency Option Transaction which is partially discharged and terminated shall continue to be a Currency Option Transaction for all purposes of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Schedule as of the date specified on the first page hereof.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:

Name:
Title:    ZDENKA S. GRISWOLD
          Authorized Signatory

CASCADE INVESTMENT, L.L.C.

Michael Larson
Business Manager

34

# EXHIBIT C

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and BILL & MELINDA GATES FOUNDATION ("Party B") have entered into a Master Agreement dated as of December 9, 2002, (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d) This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)  Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)  Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine.  All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein.  All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, New York 10022 USA (Facsimile No. 212-520-0176) with a copy to Lehman Brothers Special Financing Inc., Attention: Transaction Management, 745 Seventh Avenue, 28th Floor, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

Name:        Oliver Budde

Title:        Vice President

Date:        12/19/2002

# EXHIBIT D



CASCADE INVESTMENT LLC

September 15, 2008

**Via Personal Delivery**

To:    Lehman Brothers Special Financing Inc.
       c/o Lehman Brothers Inc.
       Transaction Management
       745 Seventh Avenue, 28th Floor
       New York, NY 10019
       Attention:  Documentation Manager

Please take notice that, pursuant to Section 6(a) of that ISDA Master Agreement
between Lehman Brothers Special Financing Inc. ("LBSF") and Cascade Investment,
L.L.C., dated as of December 9, 2002, as amended (the "Master Agreement'), Cascade
Investment, L.L.C. hereby specifies that the filing of a Voluntary Petition in the United
States Bankruptcy Court, Southern District of New York, on or before September 15,
2008 by Lehman Brothers Holdings Inc., a Credit Support Provider under the Master
Agreement with respect to LBSF, constituted an Event of Default with respect to LBSF
under Section 5(a)(vii) of the Master Agreement.

Cascade Investment, L.L.C. hereby designates September 15, 2008 as the Early
Termination Date in respect of all outstanding transactions under the Master
Agreement.

Very truly yours,

CASCADE INVESTMENT, L.L.C.

Laurie Smiley
General Counsel

RECEIPT ACKNOWLEDGED.

NAME Kirsy Acosta
Admin. Asst.

DATE 9/15/08

# EXHIBIT E



# CASCADE INVESTMENT L.L.C

### NOTICE OF AMOUNT PAYABLE WITH RESPECT TO EARLY TERMINATION

September 17, 2008

**Via Personal Delivery**

To:    Lehman Brothers Special Financing Inc.
      c/o Lehman Brothers Inc.
      Transaction Management
      745 Seventh Avenue, 28th Floor
      New York, New York 10019
      Attention: Documentation Manager

Further to our Notice Designating Early Termination Date, dated September 15, 2008, with respect to that ISDA Master Agreement between Lehman Brothers Special Financing Inc. ("LBSF") and Cascade Investment, L.L.C., dated as of December 9, 2002, as amended (the "Master Agreement"), Cascade Investment, L.L.C. has calculated pursuant to Section 6 of the Master Agreement that the amount due Cascade Investment, L.L.C. in respect of the Early Termination Date is $11,708,287.49. A statement showing in reasonable detail such calculations (including all relevant quotations) is attached.

This amount is due upon date of receipt of this notice. Payment is to be made by wire transfer to:

      Northern Chgo/Trust
      ABA# 071000152
      Credit Wire Account# 5186041000
      Account Name: Cascade Bonds
      Account Number: C38511

*Receipt Acknowledged !*
*Name C.FERNANdez*
*Date: 9-17-08*
*Time : 8:23*

Very truly yours,

CASCADE INVESTMENT, L.L.C.

Laurie Smiley
General Counsel

Attachment

2365 CARILLON POINT

KIRKLAND, WASHINGTON 98033

T 425.889.7900  F 425.893.8758

LEHMAN BROTHERS SPECIAL FINANCING / CASCADE INVESTMENT, LLC
Schedule of Amounts Due

September 19, 2008

**Exposure**

| Product | Trade Date | Maturity | Notional | Purchase Price | Quotation Source 9/19/08 | GMM Quotation 9/19/08 | Amount Due to Cascade | Amount Due to Lehman |
|---|---|---|---|---|---|---|---|---|
| CDS: CDX.NVOL.10 | 5/13/08 | 6/20/13 | ($100,000,000.00) | 228 | Average per ISDA | | $3,951,845.00 | $12,794.35 |
| | | | | | Deutsche Bank | 480 | | |
| | | | | | JP Morgan | 480 | | |
| | | | | | Credit Suisse | 475 | | |
| | | | | | Barclays | 495 | | |
| | | | | | | 480 | | |
| CDS: (TITM) 6.375% 1/22/H3 SWAP | 3/26/07 | 12/22/13 | ($320,000,000.00) | 70 | Average per ISDA | | $1,446,193.84 | |
| | | | | | Deutsche Bank | 241 | | |
| | | | | | JP Morgan | 243 | | |
| | | | | | Bank of America | 239 | | |
| | | | | | Barclays | 243 | | |
| | | | | | | 238 | | |
| ABX.HE_AAA 06-1 | 2/27/08 | 7/25/45 | $2,100,000.00 | 90.75 | Average per ISDA | 90.13 | | |
| | | | | | Deutsche Bank | 88.75 | | |
| | | | | | Credit Suisse | 90.00 | | |
| | | | | | Morgan Stanley | 90.00 | | |
| | | | | | JP Morgan | 90.50 | | |
| | | | | | Merrill Lynch | 90.00 | | |
| | | | | | Goldman Sachs | 91.00 | | |
| Total | | | | | | | $5,428,043.84 | $12,794.35 |

**Collateral Pledged to Lehman and not returned to Cascade**

| Product | Trade Date | Maturity | Notional | Purchase Price | Quotation Source 9/19/08 | GMM Quotation 9/19/08 | Amount Due to Cascade | Amount Due to Lehman |
|---|---|---|---|---|---|---|---|---|
| 912796H95    TREASURY BILL | 8/8/08 | 12/24/08 | $6,000,000.00 | 99.8895 | | | $6,293,038.50 | $0.00 |
| Total | | | | | | | $6,293,038.50 | $0.00 |

| Amount Due to Cascade Investment, LLC | | | | | | | $11,708,287.49 | |

Notes:
- Average per ISDA determined by arithmetic average of market quotations, excluding the highest and lowest prices

# EXHIBIT F

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
                                    :
In re:                              :            Chapter 11 Case
                                    :
LEHMAN BROTHERS HOLDINGS INC.,      :
et al.,                             :            Case No. 08-13555 (JMP)
                                    :
                                    :            (Jointly Administered)
                 Debtors            :
-----------------------------------------------------------x
```

### ORDER ON MOTION OF CASCADE INVESTMENT, L.L.C. FOR LEAVE TO CONDUCT DISCOVERY OF (1) THE DEBTORS, AND (2) JPMORGAN CHASE BANK, N.A., PURSUANT FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

Upon the motion (the "Motion")[1] of Cascade Investment, L.L.C. ("Cascade") for the

entry of an order pursuant Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule

2004") authorizing and directing (i) the production of documents by Lehman Brothers Holdings,

Inc. and Lehman Brothers Special Finance, Inc. (collectively, the "Debtors") and JPMorgan

Chase Bank, N.A. ("JPMorgan") in response to the document requests attached as Schedule 1 to

the Motion, (ii) the deposition of a representative of each of the Debtors and JPMorgan who is

most knowledgeable about the matters set forth in the Motion, and (iii) the issuance of one or

more subpoenas compelling such document production and attendance at such deposition; and

this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B); and upon

consideration of the Motion; and due and appropriate notice of the Motion having been given, it

is hereby **ORDERED** that:

1.       The Motion is GRANTED.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2.      Cascade is authorized to serve upon the Debtors and JPMorgan document requests, substantially in the form of Schedule 1 to the Motion.  Each of the Debtors and JPMorgan shall produce such requested documents so that such documents are received at the offices of Hahn & Hessen LLP, located at 488 Madison Avenue, 14th Floor, New York  NY 10022, on or before _____, 2010, or at such other date, time, or place as Cascade may agree.

3.      The Debtors shall make its representative most knowledgeable with regard to the matters set forth in the Motion available for a deposition by Cascade on _____, 2010, commencing at 10:00 a.m. (New York time), at the offices of Hahn & Hessen LLP, located at 488 Madison Avenue, 14th Floor, New York  NY 10022, or at such other date, time, or place as Cascade may agree.

4.      JPMorgan shall make its representative most knowledgeable with regard to the matters set forth in the Motion available for a deposition by Cascade on _____, 2010, commencing at 10:00 a.m. (New York time), at the offices of Hahn & Hessen LLP, located at 488 Madison Avenue, 14th Floor, New York  NY 10022, or at such other date, time, or place as Cascade may agree.

5.      Cascade is authorized to issue subpoenas, pursuant to Federal Rule of Bankruptcy Procedure 9016, as necessary for the above-ordered document production and deposition.

Dated:  _____ __, 2010
        New York, New York          _____
                                    THE HONORABLE JAMES M. PECK
                                    UNITED STATES BANKRUPTCY JUDGE