Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

4    - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS, INC., et al.

8                    Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - -x

10   In the Matter of:

11

12   LEHMAN BROTHERS, INC.

13                    Debtor.

14   - - - - - - - - - - - - - - - - - - - - - - -x

15                    United States Bankruptcy Court

16                    One Bowling Green

17                    New York, New York

18

19                    October 8, 2010

20                    10:08 AM

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25

Page 2

1

2    HEARING re 60(b) Motions.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Penina Wolicki

Page 3

1

2      A P P E A R A N C E S :

3      JONES DAY

4            Attorneys for LBHI, Movant

5            222 East 41st Street

6            New York, NY 10017

7

8      BY:   JAYANT W. TAMBE, ESQ.

9            ROBERT W. GAFFEY, ESQ.

10

11     HUGHES, HUBBARD & REED, LLP

12            Attorneys for Movant, James W. Giddens, SIPA Trustee

13            One Battery Park Plaza

14            New York, NY 10004

15

16     BY:   WILLIAM MAGUIRE, ESQ.

17

18

19     BOIES, SCHILLER & FLEXNER LLP

20            Attorneys for Barclays Capital, Inc.

21            575 Lexington Avenue

22            New York, NY 10022

23

24     BY:   JONATHAN D. SCHILLER, ESQ.

25

Page 4

1

2   BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays Capital, Inc.

4         5301 Wisconsin Ave NW

5         Suite 800

6         Washington, DC 20015

7

8   BY:   HAMISH HUME, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                       P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. SCHILLER:  Good morning, Your Honor.  Jonathan

5       Schiller for Barclays.

6              Just to describe what the parties have agreed for Your

7       Honor this morning.  We have the PwC argument to resume, as

8       Your Honor scheduled.  I had mentioned and perhaps others had

9       mentioned that we have other exhibit issues.  But we continue

10      to discuss those, and would like, if necessary, to reserve an

11      hour on the 18th, if that's convenient for the Court.  And

12      we'll advise if we need it next week.  It may be that we won't.

13             THE COURT:  Okay.

14             MR. SCHILLER:  There's no longer a rebuttal case

15      issue.  They've withdrawn their request over that one witness,

16      so we do not need the 18th for a witness.  I thought I should

17      tell the Court that.

18             And finally, the parties would like a brief chambers

19      conference with Your Honor to discuss the closing schedule.

20             THE COURT:  Fine.

21             MR. SCHILLER:  The parties are in agreement, but we

22      need Your Honor's guidance.

23             THE COURT:  And do you want to do that today?

24             MR. SCHILLER:  Yes, if that's convenient for the

25      Court?

Page 6

1              THE COURT:  That would be fine.

2              MR. SCHILLER:  Thank you.  Mr. Hume will resume oral

3    argument on our motion.

4              THE COURT:  Okay.

5              MR. HUME:  Good morning, Your Honor.

6              THE COURT:  Good morning.

7              MR. HUME:  For the record, Hamish Hume, Boies,

8    Schiller, for Barclays.

9              Obviously, Your Honor, we've submitted our letter

10   brief.  The movants have submitted theirs.  It's given us all a

11   chance to look a little more closely at the issue raised by Mr.

12   Gaffey about this paper expert issue.

13             I think what I would like to do, Your Honor, is begin

14   by summarizing exactly what our position is in terms of what

15   we're asking for in the admission of these documents, and then

16   address the law, and then just briefly show some of the

17   documents again and discuss what they are.

18             We do submit that all of the PwC documents that are at

19   issue here are business records, and therefore exempt from the

20   hearsay rule, and can be admitted for all purposes.  That is

21   our first argument.  And we will be addressing the 702

22   objection to that argument in a moment.

23             I do want to make clear, because it was addressed in

24   Mr. Gaffey's response letter, what our alternative or fallback

25   argument is, for the limited purpose of admission.  I take the

Page 7

1    point that the limited purpose of admission to show the

2    thoroughness of the audit.  Mr. Gaffey says it doesn't really

3    make a difference; it's the same thing.  I don't think that's

4    quite right, and I'd like to try to refine in two respects the

5    limited purpose of admission argument.  There may be two

6    somewhat related aspects to it.

7          The first is, the movants do have an expert, Mr.

8    Garvey, whose report, if I could, I'd like to pull up briefly.

9    And perhaps if I could be given a pointer, it might help also.

10   Mr. Garvey --

11         THE COURT:  You really like that pointer, don't you.

12         MR. HUME:  I've become dependent on it, yes.

13         THE COURT:  I can see that.

14         MR. HUME:  Thank you.  So Mr. Garvey was the movants'

15   accounting expert.  And while he did, I think, admit in trial

16   testimony and deposition that he wasn't opining on the -- I

17   can't remember his precise words -- he did caveat that he

18   wasn't giving an opinion to some degree on PwC's audit or

19   whether they did this or that.  He does give these opinions in

20   his report which is now in evidence, "While PwC performed

21   certain procedures, it is not clear whether an extensive

22   investigation and testing was performed."  And he goes on to

23   list a series of bullet points of what he considered an

24   extensive investigation and testing.  And this is taken as a

25   rebuttal -- he is critiquing Paul Pfleiderer's reliance on the

Page 8

1   PwC documents here and saying you can't say they did an

2   extensive investigation and testing.  So he's giving expert

3   opinion on that issue.

4        And paragraph 83 -- if we could go to that next

5   paragraph -- has the following opinion:  "Based on my review of

6   the PwC procedures performed on Barclays' exit price marks, PwC

7   most likely did not perform an extensive investigation and

8   testing in light of the following deficiencies in the

9   valuations on the acquisition balance sheet."

10       Now, this does get confusing, because Mr. Garvey also

11   testifies that he's not giving an opinion on the acquisition

12   balance sheet and not giving an opinion if the acquisition

13   balance sheet undervalues the assets.  But on the other hand,

14   he critiques those values, as do all of movants' experts.

15       The simple point I'm making, Your Honor, is in these

16   two paragraphs, their expert does offer opinion on whether or

17   not PwC did or did not conduct a thorough investigation --

18   perform investigation and testing.  So one limited purpose, if

19   the Court rejects our argument that they're business records,

20   which we strongly submit they are, would be to rebut movants'

21   assertion that PwC did not perform extensive testing.  We think

22   our documents evidence that.  In fact, we think the ten boxes

23   of documents produced show that.  But we're not going to ask to

24   admit all of them, although we'd be happy to admit all of them.

25       THE COURT:  I don't want them.

1        MR. HUME:  There is a second broader concept for which

2   this limited purpose admission would be relevant.  And it kind

3   of goes somewhat to either an insinuation or a premise of the

4   movants' case, which is that beginning September 15th and 16th

5   of 2008, there was a pattern of conduct that -- this is my word

6   not theirs, but interpreting their allegations, is that there

7   is essentially some form of conspiracy here to hide five

8   billion dollars of value:  first to hide it from the Court by

9   saying seventy billion when it was really seventy five.  And

10  then that agreement to secretly hide value continued through

11  the end of the week to mark things down five billion, to hide

12  value.

13        And then it continued through the product control

14  group valuations, all the way through October, November,

15  December, January, February, and that it must have involved a

16  huge number of people who were either duped or part of this

17  agreement to mark down and hide value.  It must have extended

18  even to the auditors, who must have been either duped or

19  involved in this agreement to hide value.

20        And even if the PwC documents do not come in for the

21  truth of the assertions they make:  the findings of this

22  methodology was reasonable and that methodology was reasonable;

23  they should at least come in for the limited purpose of showing

24  there was extensive involvement of many people that have to be

25  found to either have been duped or been in on this secret

Page 10

1    agreement/conspiracy that movants assert/insinuate in their

2    case.

3           So I just wanted at the outset, even though we

4    strongly do ask the Court to accept these documents for all

5    purposes as business records, that there is a robust and

6    conceptually distinct limited purpose in two different

7    respects, for which they can be admitted.

8           Now, with respect to the legal issue raised by Mr.

9    Gaffey the other day, whether or not a business record should

10   be barred as expert opinion.  I hesitate to call it

11   interesting, because it may credit the issue, but it is

12   interesting.  And I'd like to look at the rules, beginning with

13   Rule 803(6), the business record rule.  If we could blow that

14   up?

15          And here's what the rule says.  This is the business

16   record rule exception to the hearsay law.  It says that the

17   following things are not hearsay:  "A memorandum, report,

18   record, or data compilation, in any form, of acts, events,

19   conditions, opinions," can you please highlight "opinions". "A

20   memorandum, report, record, of opinions made at or near the

21   time by, or from information transmitted by, a person with

22   knowledge, if kept in the course of a regularly conducted

23   business activity, and if it was the regular practice of that

24   business activity to make the memorandum, report, record or

25   data compilation, all as shown by the testimony of the

1    custodian or other qualified witness, or by certification."

2         And then it goes on to say, "unless the source of

3    information or the method or circumstances of preparation

4    indicate lack of trustworthiness."  That hasn't been alleged

5    here, but I'll come back to that.  And then it says something

6    else that I think is very important.  It says, "The term

7    'business'", in terms of business record, "The term 'business'

8    as used in this paragraph includes," what I'd really like you

9    to do is highlight "profession", it includes, "association,

10   profession, occupation, and calling of every kind."

11        I don't think I'm parsing this too finely to say that

12   the rule says that a memorandum or report with opinions from a

13   profession -- a professional opinion -- is a business record,

14   not subject to the hearsay rule.  That's what the rule on its

15   face says; a long-established rule applied in courts regularly,

16   for many, many years.

17        So you have one rule that says professional

18   opinions -- memoranda of professional opinions, if kept in the

19   regular course of business, and there's no indication of a lack

20   of trustworthiness, comes in.  It's not hearsay.

21        Now, let's look at 702.  702 says, "If scientific,

22   technical, or other specialized knowledge will assist the trier

23   of fact to understand the evidence, a witness qualified as an

24   expert," can testify.  And then it gives the qualifications

25   that are familiar to the Court and elaborated upon by the

08-13555-mg    Doc 12162    Filed 10/11/10    Entered 10/19/10 17:14:40    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 12 of 60

Page 12

1    Supreme Court's Daubert decision and its progeny.

2           Now, how do you reconcile these two rules?  If you

3    have one rule that says you have professional opinion is not

4    hearsay, it can come in; you have another rule that says if

5    scientific, technical or specialized knowledge will assist, it

6    can come in if these things are satisfied.  Your Honor, I

7    submit this.  There's -- first of all, there's not a lot of

8    case law that's addressed any perceived tension between these

9    two rules, but the cases that have addressed it have gone our

10   way, almost uniformly.  And I think the only circuit court to

11   address it have.  There are two cases identified by movants

12   that I'll address in a moment, that seem to support their

13   argument.  But I think the context shows why.

14           And that context is this.  If the report that's being

15   offered with the memorandum, the written document, with the

16   professional opinion is done by someone retained for purpose of

17   litigation, for the purpose of helping the litigation and the

18   litigants' cause in that litigation, then 702 comes into play.

19   If it's within the specter of litigation, I think some Courts

20   have said, look, then you've got an issue of whether this

21   person was retained as an expert in the case.  But otherwise,

22   if it's part of the regular activity, it comes in.

23           So, first of all, we have a number of cases that

24   simply allow auditor reports to come in as business records for

25   all purposes, with the issue of 702 not even arising.  And I

Page 13

1    think -- I hope we've listed those cases in our letter.  And I

2    can read them just briefly for the Court, because there're

3    Second Circuit cases allowing auditors' and accountants' notes

4    and work papers admitted as business records.  And this issue

5    of 702 does not even arise.  Phoenix Associates v. Stone, 60

6    F.3d 95 (2d Cir. 1995); United States v. Frazier, 53 F.3d 1105

7    (10th Cir. 1995); Hoselton v. Metz Baking, 48 F.3d 1056 (8th

8    Cir. 1995).  And there's a Third Circuit case, and then there's

9    a Southern District of New York case, Nasson Renders (ph.) v.

10   Aurash, with a Westlaw cite of 2005 WL 2875333 (S.D.N.Y. 2005).

11   I'm sorry to read those into the record.  I believe they're in

12   the letter, but if they're not, we can address that.

13         So those cases, it just comes in and the issue doesn't

14   arise.  There are, then, cases where people have raised the 702

15   argument, and the Courts have explicitly rejected it.  And I'd

16   like to just bring the Court's -- ask the Court's attention to

17   the two cases I'm sure we cited in our letter:  In re

18   Acceptance Insurance Companies case from the District of

19   Nebraska 2004.  That is directly on point.  And it, in fact,

20   happens to involve PwC documents.

21         It was a securities fraud case where the insurance

22   company had been alleged to not have been properly reserving

23   for certain kinds of claims that were coming against it that

24   were thought to be legitimate based on legal developments.  And

25   they wanted their auditors' reports in evidence for all

Page 14

```
 1   purposes to show that they were adequately reserving.  And the

 2   other side said, hey, wait a minute, that's a 702 problem.

 3   You're introducing this expert evidence.  And it was thoroughly

 4   analyzed by the Court that said your witnesses' expertise in a

 5   given field of study does not transform that witness into an

 6   expert witness under Rule 702.

 7             So we would say that case is directly on point and

 8   strongly supports our position.  And the same thing with

 9   respect to a Ninth Circuit case, the Licavoli case.  Our

10   colleagues at the movants say that case didn't address the

11   issue.  But it does address the issue.  The defendant, I think,

12   Licavoli, argued that although 803(6) authorized the admission,

13   it does not dispense with the general requirements of 702.

14   That argument was explicitly raised and the Ninth Circuit

15   rejected it.

16             So the balance of the case law -- there's also an

17   Eighth Circuit case, Shelton v. Consumer Products Safety

18   Commission, that addresses the issue and rejects it.  I must

19   have misspoke a moment ago, because I said all circuit court

20   cases went our way.  One of their cases is a Fifth Circuit

21   case.  And so let me address what I believe are the only cases

22   that have supported the movants' position on the relationship

23   of 803(6) and 702.

24             First, there's a Court of Claims case from 1979 that I

25   believe excluded an appraisal report because it was not
```

08-13555-mg   Doc 12162   Filed 10/11/10   Entered 10/19/10 17:14:40   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 15 of 60

Page 15

1    "incident to or part of factual reports of contemporaneous

2    events or transactions."  Again, I think it's drawing -- that

3    decision is drawing a distinction between:  is this

4    professional opinion and a contemporaneous fact that's happened

5    at the time as opposed to something that happened during

6    litigation or within the zone of the litigation, and it looks

7    like it may lack the trustworthiness of the contemporaneous

8    business record.

9          The other two cases they rely on, I think, implicitly

10   have that context.  But you have to really look closely to see

11   them.  They're both employment cases.  I think they're quite a

12   different context from auditor -- the auditing records we're

13   talking about here.  One of them is McCulley v. JTM Industries.

14   That's the Fifth Circuit case.  I would note that it's an

15   unpublished properian (sic) case.  I'm not certain what the

16   Fifth Circuit's rules were at the time about citing such cases.

17   But in any event, I think that bears on its weight.

18          And in that case you have an employee who had a long

19   history of disputes with his employer.  His father and

20   mother -- or father-in-law and mother-in-law were terminated by

21   the employer -- they had the same employer.  There was a

22   history of alleged bad behavior and bad attitudes.  He had some

23   form of counseling service or assessment service he was seeing.

24   And he tried to get their reports in to show that he was, I

25   think, you know -- he tried to bolster his case that he's been

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 16

1    wrongfully terminated in a retaliatory termination.

2           So you had at least something within the zone of

3    litigation that was prepared.  It looked like it might have

4    been influenced by the dispute, and therefore was excluded

5    under Rule 702.  I'm saying we think the decision is correct.

6    But I can see a clear distinction between that and this case.

7           The same is true for Martin v. Discount Smoke Shop,

8    their other case from the Central District of Illinois.  Again,

9    it's an employee case involving an employee who had learning

10   disabilities and had a long series of issues with her employer

11   of whether or not she was fit for the job.  And she had tried

12   to get in -- she was terminated, and after her termination date

13   she had a report issued by some, again, assessment center she

14   was seeing that was assessing her abilities and her learning

15   disabilities.  And she tried to get that into evidence to help

16   her employment discrimination case.

17          I note that most of the other business records from

18   that professional service were admitted, uncontested, but

19   admitted.  But it's the one that was done after her termination

20   that the defendant said you're just trying to get in expert

21   testimony, and the Court excluded it.

22          The point of all this, Your Honor, is when you read

23   the cases, it even looks like the dividing line for when 702 is

24   implicated is when you're in a litigation context or at least

25   potentially in a litigation context, and the party is trying to

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 17

1    use something -- a report, to get around the expert rules.

2    This is not what is happening in this case.

3         In this case we had months after the sale order was

4    issued in which Barclays was accounting for the transaction;

5    PwC was conducting a regular audit of the normal half-year

6    results.  The acquisition balance sheet became part of that.

7    It went on for months, and they published the acquisition

8    balance sheet.  At that time, there was no specter of

9    litigation, at least as far as Barclays knew.  Movants were

10   defending the sale order on appeal.  You've heard our merits

11   case on all of this.  But at least from Barclays' perspective,

12   there was no specter of litigation.  So these were regular

13   audit reports.  They come in squarely as professional opinion

14   under Rule 803(6), as a business record for all purposes.

15        Again, we have our limited purpose argument as an

16   alternative, but I think I've outlined what that is.

17        Finally, Your Honor, just to show you again what it is

18   we're disputing here.  I'll give just a few examples, if I may.

19   In the trial, I showed Barclays' accountant, Gary Romain, a

20   document.  And I'd just like to show briefly, if I could, the

21   testimony at page 63, line 15, 65/8.  This related to the issue

22   of the valuation date -- sorry, the trial transcript is

23   September 2nd.  Page 63, beginning line 15.

24        I asked him to turn to tab 17 which is BCI Exhibit

25   870A.  Right above here I asked him to look at 870A.  So that's

08-13555-mg    Doc 12162    Filed 10/11/10    Entered 10/19/10 17:14:40    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 18 of 60

Page 18

1    the BCI exhibit I'm asking him to look at.  And that remains

2    one that -- for dispute.  And I asked him to direct his

3    attention to the indented text, to read it.

4            Let's go to the next page.  If we could go down to the

5    whole page.  Go ahead and highlight the whole page, just bring

6    it up.  This is where PwC says -- and I'm reading from the

7    document, "Given the turmoil in the markets, there was further

8    downward pressure on prices on the weekend, 9/20 and 9/21, and

9    therefore," I'm quoting the document, "we," that's PwC,

10    "suggested that this may be something that you would want to

11    capture.  Do you see that?

12    "A.  I do."

13            And I say, "In reading that, and looking more closely,

14    I realize I think I misdescribed the e-mail.  It was sent by

15    Robert MacGoey of PwC."  So I clear that up. And I then ask, in

16    the question -- can we go down to the next page, "Is this

17    consistent with your recollection and understanding that PwC

18    suggested that you use 9/22 prices rather than 9/19?

19    "A.  Yes, it is.

20    "Q.  And is that what you did?

21    "A.  Yes, it is.

22    "Q.  And did PwC agree with that as a reasonable approach?

23    "A.  Yes, they did."

24            So the point of all this, Your Honor, is simply to

25    remind the Court when I tried to show that document, tried to

Page 19

1    move it into evidence, I believe at that time.  And there was

2    as hearsay objection.  You did sustain that hearsay objection.

3    And I said we can come back to that.

4         But if I could show the document now, BCI Exhibit --

5    actually, what I'd like to show on that document is Movants'

6    Exhibit 813.  Your Honor, this is the same exact document,

7    perhaps in a slightly different form.  But it's -- can you blow

8    it up?  The language down here, just blow up all of it.  It

9    would be, "Given the turmoil in the markets and the further

10   downward pressures on prices" -- I think you need to blow up

11   the whole thing.  And it says, "And therefore we suggest that

12   this may be something you would want to capture."

13        So the point, Your Honor, is Movants' 813 is, in

14   substance, anyway -- there may be a slightly different way in

15   which it's produced -- the exact same e-mail memo from PwC's

16   Robert MccGoey, one of the lead auditors on the case, to Sean

17   Teague of Barclays.  It's the exact same information that was

18   BCI 870 -- or 870A, we created a more readable version.  Here

19   it is.  The exact same memo.

20        Now, movants have made it an exhibit.  It is has not

21   been admitted into evidence, but I'm sure we didn't object.  If

22   we did it would have been a clerical error.  We are not

23   objecting.  We want it into evidence.  They designated it.  We

24   designated it.  We believe it should come into evidence.  It is

25   clear black-letter law under the Second Circuit that e-mails

Page 20

1   conducted -- produced in the regular course of business are

2   business records.  I say under the Second Circuit -- I have at

3   least the Southern District of New York case, United States v.

4   Stein, 2007 WL 3009650 -- that holds that; that if the e-mail

5   otherwise satisfies the business record requirement of being

6   part of the regular course of business, reporting regularly-

7   conducted activity in which it's the practice to make a written

8   record, it's a business record.  And this is a memo.  This is

9   simply a memo to Sean Teague from PwC laying out the analysis

10  PwC had of this valuation date issue.

11         So part of the reason for showing that, Your Honor, is

12  to show you that an example of an important document we think

13  should come into evidence as a business record; also, to remind

14  the Court that there are numerous PwC documents that movants

15  have identified, most of which are already in evidence -- this

16  one isn't -- that are indistinguishable from the documents we

17  seek to get into evidence.  And as you heard me say the other

18  day, we think it is at least unfair for that to be the result,

19  and must indicate if they proffered it as admissible evidence,

20  that they believe these PwC documents are business records and

21  therefore not subject to hearsay and admissible.

22         Now, if I might, Your Honor, just show a few more

23  examples.  You did obviously hear the last few days from

24  Professor Pfleiderer who reviewed extensively the PwC work.

25  And if we could show demonstrative slide 47, this is an example

Page 21

 1   of when he presented his testimony, some of the PwC work he

 2   quoted.  And this related to this Pine asset that's been

 3   heavily disputed in terms of its valuation.

 4          And Professor Pfleiderer looked at all sorts of things

 5   with respect to Pine.  He looked at the Barclays internal

 6   analysis and valuation; he looked at PwC's analysis; he looked

 7   at the Gifford Fong valuation from JPMorgan, the examiner

 8   report, et cetera.  But here, he's citing to the fact that

 9   PwC's valuation included the Barclays discounts for

10   participation in funding risk were not unreasonable.  So there

11   you see Professor Pfleiderer, in the demonstrative, referencing

12   that as one of the relevant data points he relied upon.

13          Of course, he can rely on inadmissible evidence to

14   give an expert opinion.  That's clear from the rule itself.

15   702, I believe, says that.  But we also think it helps show the

16   relevance of this document and why it should be admitted.  If

17   we can have a look at BCI Exhibit 607, it's one of the

18   documents in dispute today.  And here it is.  It's clearly a

19   business record.  It's an internal memorandum to the BarCap

20   audit file.  I mean, this is, by definition, a memo for the

21   file, for the record:  PwC Financial Analytics and Valuation

22   Group.  It's from a formal group:  February 8, 2009 review of

23   Lehman CDO acquisition valuation; prepared at the time, in the

24   regular course of business, where it would be normal practice

25   to make such a memo to the file.  Of course, we offered to

08-13555-mg    Doc 12162    Filed 10/11/10    Entered 10/19/10 17:14:40    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 22 of 60

Page 22

1    bring a custodian if we have to to address that, but I don't

2    think that's really the issue.

3         This, then has an extensive review of the CDO

4    valuations.  If we can go to page 11, you see the significant

5    discussion of the Pine CLO that begins on that page.  And it

6    goes down for all of page 11, all of page 12, and they

7    review -- if we could just go back up to 11 for a moment --

8    they review first the front office valuation approach.  Those

9    are the traders.  The valuation approach that ultimately, I

10   think, determined what Barclays booked for Pine, because it was

11   a PMTG asset.  And they run down and summarize that approach.

12        And you go to page 12.  After reviewing that approach

13   they look at the PCG price.  There was analysis done by the

14   internal product control group.  PwC reviews that.  Then PwC

15   sets forth the FA&V assessment, which I believe, if we go back

16   to the first page, is the group that -- the PwC internal group,

17   the financial analytics and valuation group.  So they set

18   forth -- there we go -- financial analytics and valuation

19   group.  So they then set forth their analysis on page 12

20   through to page 13.

21        And if we could go to page 13, you'll see their

22   extensive analysis.  And then this concluding -- if we could

23   just blow up the conclusion paragraph?  Could we blow that up?

24   And it says, "While we," this is a PwC memo of course.  "While

25   we derive a lower starting price for the underlying collateral

Page 23

1    than was seen by the client, the twenty percent participation

2    risk discount, which partially accounts for the collateral and

3    the conservative approach in weighting the potential funding

4    obligations, drives the client price to a level that does not

5    appear unreasonable."  It goes on to further explain its

6    conclusions.

7           This is contemporaneous evidence of PwC's assessment

8    in a nonlitigation environment of the valuation work done by

9    Barclays.  It's clearly part of a regular business memo.  And

10   the balance of legal authority would say that should come in.

11          I have a few other examples, Your Honor, but I've gone

12   on for a while.  Why don't I just, if I could, briefly show you

13   again some of what movants have identified that is in evidence.

14   Movants' 255 is a similar memo to the one we just saw to the

15   Barclays Capital PC audit team from one of the people involved

16   in the audit.  Review of Barclays Capital price testing.  Same

17   kind of business memo.  We looked at this, I think the other

18   day.

19          This one appears to preempt what maybe I think is a

20   nonissue, but if you could look at the Bates number, this one

21   has WP.  Some of -- Mr. Gaffey noted the other day that some of

22   these documents are Bates numbered WP, some are not -- work

23   papers.  There's some internal distinction at PwC that I don't

24   fully understand -- I'll confess -- between work papers and

25   non-work papers.  I do not think it can be used as a proxy to

08-13555-mg    Doc 12162    Filed 10/11/10    Entered 10/19/10 17:14:40    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 24 of 60

Page 24

1    what is or is not a business record.

2          Some of what movants designated are WP, some of what

3    they designated does not have a WP in the Bates stamp.  Some of

4    what we designated has WP in the Bates stamp, some does not.

5    The point is, a memo like this clearly, on its face, is formed

6    in the regular course of business and it would be the regular

7    practice for it to be prepared.

8          Let's go to Movants' 332.  Another PwC -- this is now

9    an internal e-mail of PwC from one of the lead audit partners

10   John Holloway to Mr. Guarnuccio, Mr. MacGoey, other auditors,

11   addressing some issues involving the acquisition balance sheet:

12   "Can someone at your end please go through the agreement and

13   letter and understand whether the JPM assets are in any way

14   covered."  This is asking questions about the December

15   settlement inventory.  And this obviously, on its face, may

16   raise a little more of a question as to whether it's a business

17   record.  But it is an e-mail sent internally by PwC people in

18   their regular course of business.  And I don't think it's a

19   stretch for us all to say I'm sure in the regular course of

20   business they sent e-mails about what they're doing on the

21   audit.  So we didn't object.

22          They think it's helpful to them.  I don't think it is.

23   But it doesn't matter.  It is a business a record.  And let's

24   look at the Bates number.  There's no WP.  So there's no magic

25   to WP based on the movants' designations, and we don't think

08-13555-mg    Doc 12162    Filed 10/11/10    Entered 10/19/10 17:14:40    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 25 of 60

Page 25

1    there's any magic to it either.

2            Again, I have a couple of other examples, but I don't

3    want to go on too long.  I would note for the record -- we

4    could pull this up, but I don't think it's necessary -- that we

5    have had extensive discussion about these PwC documents for

6    many, many weeks.  And we did have, about a month ago,

7    essentially a deal in which there were three e-mails that the

8    movants wanted in that related to Mr. Guarnuccio's

9    interpretation of whether the two billion dollar estimate for

10   comp covered only bonuses or bonus and salaries.  You've heard

11   testimony from Mr. Exall on that issue.  We did resist those at

12   first.  And we were then engaged in discussion with movants:

13   if we agreed to those three, would they agree to, I think it

14   was five or six PwC documents that we wanted in.

15           And I think we had an in-principle agreement on that

16   until we then said, well actually we want more -- we want more

17   PwC documents.  And then they said well, no, no deal.  I'm not

18   accusing anyone of bad faith for them saying -- yanking the

19   deal.  The deal did change.  But my point is, I don't think

20   what's really happening here, Your Honor, is an argument that

21   what they wanted in was admissible, what we wanted in is not

22   admissible.  I think the argument is, they just want to keep

23   out a lot of evidence that they think is unhelpful to them.

24           They've raised the 702 argument for the first time --

25   I believe for the first time -- last week.  That's fine.

Page 26

1    That's when the issue was joined.  But it didn't come up for

2    the many weeks and months when they were designating some of

3    them and we were designating some of them.

4         Your Honor, I think unless you have any questions, I

5    think that we'll allow the movants to respond.

6         THE COURT:  Okay.  Thank you.

7         MR. GAFFEY:  Good morning, Your Honor.

8         THE COURT:  Good morning.

9         MR. GAFFEY:  For the record, Robert Gaffey from Jones

10   Day for the debtors.  Let me deal first with a couple of things

11   that Mr. Hume raised at the end of his argument, one of which

12   goes to the overall questions.

13        It is a fact that, as I said when we discussed this

14   last time, that from time to time we have done what litigators

15   do and said all right, if you'll let that document in, I'll let

16   this document in.  That really is not the issue here today.

17   The issue here today is whether or not Barclays should be

18   permitted to put in a raft of PwC documents which taken all

19   together, I believe, is a substitute for expert testimony.

20        And I'll give you an example of the narrow versus the

21   broad here.  Exhibit 870, that's Barclays' Exhibit 870 on which

22   Mr. Hume spent a little time here, which he described at M-815,

23   and makes the argument well, we put the same document in.  He's

24   absolutely right.  That's why I have no objection to it.  On

25   the list of objections that we have attached to our letter, we

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 27

1    have no objection to Barclays Exhibit 870, which is identical

2    to 813 (sic).  So I agree with him.  You know, we put it in;

3    we're certainly not going to take a position that if they want

4    to give it another number too, that's fine with us.

5            The fact of the matter, though, is the documents that

6    come in from our side of the aisle often could be -- most of

7    them come in with no objection.  Had there been an objection,

8    the argument would have been to I think all of them, there are

9    admissions in those documents.  That's not a hearsay issue.

10   And that's what brings us here.

11           With regard to the suggestion that it ought to be a

12   simple formula of if the movants put into evidence a document

13   from PwC then all bets are off and all PwC documents should go

14   in, then that would simply swallow the rules of evidence.  I

15   mean, if that were so, then -- and if the end result were,

16   well, because there are some documents that emanated from PwC

17   in the record at the behest of movants, all PwC documents have

18   to come in, then we would want the ones that we still haven't

19   managed to make an agreement about, including the famous Mr.

20   Guarnuccio e-mail about the two billion dollars in the comp

21   piece.  But that's really not what's at issue here.

22           What's at issue here -- and I think it does go

23   directly to the heart of the interplay between the hearsay rule

24   and Rule 701 and 702 -- is taken as a whole, I think it's

25   evident, and I think it's more evident now than it was when we

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 28

1    last addressed this, given the fact that Professor Pfleiderer

2    has now testified, that this is an effort by Barclays to

3    construct from a hearsay document what amounts to a second

4    expert who actually will address the depth and extent and

5    nature and expertise required to explain whatever it was that

6    PwC did in the context of its overall audit of Barclays that

7    addressed the values at issues here.

8          And just to frame it that way, I think, demonstrates

9    the point.  Your Honor heard Professor Pfleiderer say multiple

10   times, he's not an accountant.  We know he's not an accountant.

11   That really wasn't a matter in any dispute.  His testimony

12   repeatedly refers to -- there's an add-on at the end -- and PwC

13   reviewed this; and PwC reviewed this.  And to him, he suggested

14   that the fact of the PwC review, the PwC audit, which he

15   occasionally mis-described as the PwC valuation, enhances his

16   opinion -- which is also not a valuation -- but his opinion

17   that the activities of the PCG group and the others within

18   Barclays who conducted internal valuations, was reasonable.

19         Now, his opinion is what it is, and it has the weight

20   that it has or it doesn't have.  And we'll address that in the

21   longer term.  But to say that because a document was generated

22   by an accountant in or out of a litigation context, and the

23   accountant has expertise, and the accountant expresses an

24   opinion, and the accountant prepares that type of document in

25   the normal course of business; and to say that those factors

08-13555-mg   Doc 12162   Filed 10/11/10   Entered 10/19/10 17:14:40   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 29 of 60

Page 29

1     standing alone are enough to justify its admission into

2     evidence, is to take Rule 803 and use it to make Rule 702

3     disappear.

4          Now, the cases that have addressed this tension

5     between the two -- and one that we cite in our litter is the

6     Applin decision, which is a good discussion -- demonstrate that

7     the hearsay rule is not a cure-all -- the business records

8     exception to the hearsay rule is not a cure-all to the 702

9     problem that opinion evidence creates.  Applin suggests and

10    looks a bit at the history of the rule and explains that the

11    reason for the inclusion of opinions in the business records

12    rule is really something that's directed to something much more

13    mundane than this.  That's getting medical records in in

14    personal injury cases.  The doctor examined and the doctor

15    found this injury.

16         Now, that's something that might have independent

17    weight, and therefore can come in.  That's just not true of the

18    body of documents that we have here.  They are replete with

19    PricewaterhouseCoopers' conclusions or opinions as to the

20    nature of the values or as to the nature of the work that

21    Barclays did.  I won't belabor this, because I said most of

22    what I had to say about the topic when we last addressed this.

23         I think that our letter adds case law that supports

24    our position here, the so-called paper expert position.  How --

25         THE COURT:  Can I break in and ask a question that's

08-13555-mg   Doc 12162   Filed 10/11/10   Entered 10/19/10 17:14:40   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 30 of 60

Page 30

 1    bothering me?  I don't mean to intrude on the flow of your

 2    words.  But Rule 702 is entitled "Testimony by experts" and

 3    Rule 803(6) is entitled "Records of regularly conducted

 4    activity."  So I have a very simplistic issue of conflation.

 5            How do we meld, for purposes of your argument, a rule

 6    of evidence which is about testimony with a rule of evidence

 7    which is about documents, records, without the imagery of the

 8    paper expert, which is your metaphor, but there's no metaphor

 9    in the rules; there's only a metaphor in your argument?

10            MR. GAFFEY:  I think the answer to that, Your Honor,

11    is twofold.  One, evidence is evidence.  It's an issue of

12    weight.  A document comes into evidence as a document.

13    Testimony comes in as testimony.  But evidence is evidence.

14    That's the first piece.

15            The second piece is, what's the purpose -- the best

16    analogy -- not to use a metaphor -- but the best analogy under

17    Rule 803 is the double hearsay issue which is familiar to

18    everybody in this courtroom.  A business record in writing will

19    contain -- contains some -- let me start again.  A business

20    record in writing can contain double hearsay.  The rules

21    expressly address that by saying in Rule 805, each level of the

22    chain of hearsay needs to be addressed.

23            The analysis on the question Your Honor presents is no

24    different.  Rule 803 -- the business records exception gets you

25    past the first evidentiary obstacle to the proponent of the

08-13555-mg    Doc 12162    Filed 10/11/10    Entered 10/19/10 17:14:40    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 31 of 60

Page 31

1    document:  this is hearsay; we'll agree it's hearsay.  The

2    proponent is able to say this was prepared in the normal course

3    of business and it was the normal course of business to prepare

4    such a document.  That gets you past the hearsay issue as to

5    the document as a whole.

6         But within the document -- and now go back to my

7    analogy -- whether it's a second level hearsay problem or Rule

8    702 opinion problem, the proponent of the document still has to

9    overcome that second hurdle.  And that goes back to:  evidence

10   is evidence.

11        The statements of the absent declarant that constitute

12   the hearsay in the analogy, or the statements that are the

13   expert opinion, to put it right at the foot of Rule 702,

14   whether they come in from the stand or come in from the

15   document, are evidence.  The reason 702 and the reason the

16   paper expert issue is here, goes to what the rules do require

17   of expert testimony.   Expert testimony is entitled to be

18   cross-examined.  Expert evidence, whether it be testimony or

19   whether it be a report or whether it be the documents upon

20   which the expert relied, are required to be produced.  Now,

21   that issue has been a bit lost in the shuffle here.

22        The PwC issue has arisen very recently in the life of

23   this case.  It didn't arise during the discovery period.

24   PricewaterhouseCoopers was never identified as an expert.

25   PricewaterhouseCoopers was never put on Barclays' witness list.

08-13555-mg   Doc 12162   Filed 10/11/10   Entered 10/19/10 17:14:40   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 32 of 60

Page 32

1   My own view is that's a strategic decision.  They're entitled

2   to make it, but I think that's what it is.  And then at the end

3   of the trial to say, well, let's put this in to bolster the

4   testimony of the expert who is there on the stand but can't be

5   cross examined about the substance of the

6   PricewaterhouseCoopers issue, demonstrates the real -- one of

7   the real problems with the tensions here.

8          One of the cases that we cite addresses this issue,

9   and that's the Martin Smoke case, which talks about not only

10  the 702 issue, but addresses expressly that the proponent of

11  the document there, as Barclays I think is doing here, offered

12  it at a point where the author of the ultimately inadmissible

13  statement was clearly for opinion purposes, had never been

14  cross examined, and it was an evasion of the Rule 26

15  requirements regarding expert disclosures.

16         Now, those Rule 26 requirements applied in this case.

17  As Your Honor knows, there was a lot of back-and-forth about

18  how to manage the expert case:  when they were going to be

19  identified; when the reports were going to be produced.

20  There's an inherent unfairness in simply because -- it's almost

21  circular to say well, we're not putting the expert on the stand

22  so it's okay to put their opinions in by another mechanism;

23  evidence is evidence.

24         And what the Rule 26 requirements, what the expert

25  disclosure requirements obtain to is the fairness that's -- the

Page 33

```
 1    necessary elements of being able to examine the basis for the

 2    expert's opinion, depose the expert, put up a rebuttal report.

 3    We had none of those opportunities here.  If those documents

 4    come into evidence now, under the guise of they're a business

 5    record and because an accountant wrote them down as they

 6    normally do -- and that's all I hear Mr. Hume really said about

 7    why they're admissible -- then an essentially expert opinion

 8    will have been put into the record of the case without an

 9    opportunity to cross examine, by whatever mechanism they choose

10    to introduce it, be it by documents or be it by testimony.

11            THE COURT:  Is it an expert opinion or is it an

12    inference that a finder of fact can make as a result of

13    reviewing the business records?

14            MR. GAFFEY:  If I understand Your Honor --

15            THE COURT:  Because what is the opinion that you're

16    complaining about?

17            MR. GAFFEY:  I'll give you an example by reference to

18    one of the documents.  Let's take -- Steve could you put BCI

19    Exhibit 607 up on the screen, please?

20            Now, this document is a memorandum, as Mr. Hume notes

21    when he talks about it.  It's not denominated by Barclays as --

22    by PricewaterhouseCoopers as work papers.  And again, that's

23    the distinction -- I spent all the time on that I want to

24    spend.  It's a memo -- PricewaterhouseCoopers'.  I understand

25    that.
```

08-13555-mg    Doc 12162    Filed 10/11/10    Entered 10/19/10 17:14:40    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 34 of 60

Page 34

1      But if Your Honor would take a look, for example, at

2    page 2 of that document -- and I'll highlight this piece -- and

3    this is an example of something I think all of these documents

4    are replete with -- take paragraph 1(a) the reasonableness of

5    using 9/30 marks as of 9/22/08.  Well, as Your Honor knows,

6    that's -- when an expert is on the stand, they talk about this

7    issue and they're able to be cross examined about it.  And the

8    PwC document recounts what they've done to address this issue,

9    or at least adverse to it, and among other things, refers to,

10   "Based on discussions with market participants and observations

11   of deals."  That's the hearsay problem.

12      And then go to the last paragraph -- the last

13   sentence, "Therefore the September month-end mark should fall

14   within a reasonable range of the acquisition date's fair value,

15   especially considering the wide bid-ask range for CDOs."

16   That's what would come out of the mouth of an expert witness if

17   an expert took the stand.  That is the type of testimony that

18   Professor Pfleiderer was put on the stand to give.  What was

19   the reasonableness of this approach; what was the

20   reasonableness of that approach?  Was the methodology used such

21   that X conclusion or Y conclusion is reasonable?  That's an

22   opinion.

23      Now, the difference is, as Mr. Hume says, this is not

24   an opinion expressed in the context of an expert report.  It's

25   not an opinion elicited for the purpose of litigation.

08-13555-mg   Doc 12162   Filed 10/11/10   Entered 10/19/10 17:14:40   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 35 of 60

Page 35

1          Now, I heard Professor Pfleiderer testify yesterday,

2    when he gave his view, ironically from the witness stand, that

3    litigation experts' testimony should be given less weight

4    than -- my term -- real time experts.  And that was prob -- I

5    suspect that's a precursor to the argument that we're hearing

6    today, which is, well, this was done at a different time and at

7    a different place.  It doesn't make it any less of an expert

8    opinion that's entitled to be cross examined, that's entitled

9    to be probed for what its basis is.

10          If this document comes in, it will come in only with

11   what Pricewaterhouse chose to record in a memorandum that

12   summarizes its activities and the conclusion that it makes.

13   That type of format continues throughout these documents.

14          I'll give the Court another example.  There's a

15   particular format I want to find, Your Honor.  Excuse me one

16   moment.

17       (Pause)

18          MR. GAFFEY:  Well, I won't take the time with it, Your

19   Honor.  I think even within 607 -- let me turn to another page

20   of that-- take a look at page 5 of that.  Steve, would you put

21   that on the screen, please?

22          Regarding certain bid-ask adjustments.  The document

23   recites at the top, in hearsay, that the client -- you don't

24   know who within the client -- "The client has applied an on-top

25   bid-ask adjustment to all the Lehman CDO desk acquisition

Page 36

1    prices.  Based on discussions with the front office," we're not

2    sure who the front office is, the author of this document

3    continues to talk about this bid-ask adjustment.  And then

4    concludes, beginning "Therefore", "Therefore we recommend that

5    the new bid-ask adjustment be taken on the 9/22 acquisition

6    prices for the CDO assets acquired from Lehman."

7              Now, that is an opinion.  This is distinct, Your

8    Honor, from the smaller fact that this documents might prove.

9    The smaller fact that these documents might prove is

10   Pricewaterhouse was asked to review some things here.  It did.

11   Now, Professor Pfleiderer's opinion essentially relies on the

12   fact of PwC review.  If the Court were to take these for that

13   limited purpose, okay.  But if what Barclays wants to do is to

14   put these documents in so that these opinions stated by the

15   absent declarant, PwC, have any weight as to the correctness of

16   what it is they say, then that's where the rubber hits the road

17   on the 702 and the hearsay problem; that's where it becomes the

18   so-called paper expert.  And I can't cross examine that

19   document.  I can't cross examine the author of it; was not

20   given an opportunity to do that during discovery.

21             I'm not sure if that addresses Your Honor's question.

22   I think it does, or at least --

23             THE COURT:  Well, it's certain responsive

24   thematically.  But it doesn't -- it doesn't entirely deal with

25   what to me is a fundamental problem in your argument.  And I

Page 37

1    understand what you're trying to accomplish here.  And it's a

2    fascinating issue.  Even Mr. Hume suggested it was an

3    interesting argument.

4           What I'm troubled by is trying to marry, for purposes

5    of this particular case, rules of evidence in a manner that

6    produces the fairest possible record for both parties and

7    enables the Court to fairly assess trustworthy evidence in the

8    case.  And the fundamental premise of the Federal Rules of

9    Evidence, particularly the hearsay rule and the exceptions to

10   that rule, involve fairness.

11          Rule 102 -- and we're all familiar with Rule 102 -- is

12   like Section 105 for purposes of bankruptcy practitioners.

13   It's a catchall.  "These rules shall be construed to secure

14   fairness in administration, elimination of unjustifiable

15   expense and delay, and promotion of growth and development of

16   the law of evidence to the end that the truth may be

17   ascertained and proceedings justly determined."

18          With those high aspirations in mind, I largely do not

19   have a problem with seeing all these documents.  And the only

20   real issue in my mind is whether or not my seeing these

21   documents and considering these documents exposes the movants

22   to demonstrable prejudice.

23          Your argument is that you can't cross examine the

24   opinion statements that are embedded in many of these

25   documents.  But these opinion statements are statements that

Page 38

1    were made not for purposes of this litigation, but for purposes

2    of PwC's audit, which as we know from the evidence presented so

3    far in the case, was conducted not solely for purposes of

4    testing the reasonableness of the acquisition balance sheet,

5    but for purposes of auditing the financial statements of

6    Barclays in all respects.  This was obviously an important

7    feature of that exercise.

8         I don't view any of these embedded opinions -- and

9    using this document which is on the screen as an example of

10   that -- as going to an ultimate issue in dispute in this

11   litigation.  Rather I view those little micro-opinions as

12   indicia of the work that was done by those people who had

13   undertaken the audit function for PwC at the time that these

14   documents were being prepared; and to that extent, goes to the

15   nature of their activities and the kinds of mental impressions

16   they formed during the course of their work.

17        And so one of my fundamental questions here is how

18   this hurts you.  Because to the extent that prejudice is one of

19   the things I'm concerned about in weighing this nuance question

20   of evidence, I don't see how you're hurt, because I've already,

21   by virtue of the argument, seen the opinions.

22        MR. GAFFEY:  And on exactly that note, Your Honor, let

23   me make a small concession and let me respond to the rest of

24   that.  Here's the small concession.  This is a bench trial.

25   Were this a jury trial, I'd be fighting a lot harder about

08-13555-mg   Doc 12162   Filed 10/11/10   Entered 10/19/10 17:14:40   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 39 of 60

Page 39

1    these documents for exactly that reason.  We'd be doing the

2    usual:  get if off the screen, they can't see it till it's in.

3    And there would be no issue with regard to whether the Court

4    saw it, because it's only going to make an evidentiary issue.

5         I know the Court sees it.  I also know that if it

6    comes in, a Court is able to make some distinctions, at least

7    from a weight perspective, between hearsay and nonhearsay.  So

8    that's the small concession, with regard to what's the

9    prejudice.  We have less prejudice here than we would have in a

10   jury trial for all the reasons everybody in this courtroom

11   knows.

12        On the fairness issue, though -- on the fairness

13   issue, I think we do have a legitimate gripe.  I think the

14   fairness issue does arise from the timing.  Now, I said, when

15   we spoke about this the other day, that's not the core of our

16   argument.  Our argument is based on the Rule of Evidence and

17   what's admissible and what's not.

18        This comes up at the end.  No hint of this during

19   discovery; no identification of PwC's -- the use of PwC

20   document for opinion purposes.  And I'm phrasing it that way so

21   I'm not going to characterize it as expert evidence.  Except,

22   that's exactly what it is.  That's where the unfairness is.

23   Whatever weight the Court gives it or doesn't give it, in a

24   much more educated way that a juror could, I still didn't get a

25   shot during discovery at PwC qua expert.  I never got a report

08-13555-mg   Doc 12162   Filed 10/11/10   Entered 10/19/10 17:14:40   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 40 of 60

Page 40

1    from PwC qua expert.

2         Your Honor mentioned little micro-opinions.  There's a

3    lot of them.  And they're by a variety of PwC people.  And when

4    you put them all together, here it comes again, it's the paper

5    expert.  It's the sum total of the collection of the documents.

6    And I think to put them in in-whole, for what they now purport

7    to be, the opinions of PricewaterhouseCoopers, coupled with the

8    timing, the failure to identify them, no report and therefore

9    no follow-up expert discovery, does create prejudice for the

10   movants.

11        I take Your Honor's point about less prejudice than if

12   we had a jury trial.  But there is prejudice nonetheless.

13        THE COURT:  Okay.

14        MR. GAFFEY:  Thank you, Your Honor.

15        MR. HUME:  May I very briefly respond, Your Honor?

16        THE COURT:  Sure.

17        MR. HUME:  I think the first part I'd like to do is

18   address this prejudice argument, something I meant to say at

19   the beginning.

20        Your Honor may recall that after the Rule 60 motions

21   were filed on September 15, 2009, Mr. Schiller sent a letter to

22   the Court relating to scheduling, that we didn't know exactly

23   how to posture this entire proceeding.  But in the course of

24   that letter, Your Honor may also recall, we set forth some

25   initial reactions to what the movants were saying.

08-13555-mg    Doc 12162    Filed 10/11/10    Entered 10/19/10 17:14:40    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 41 of 60

Page 41

1        And in the course of doing so, when we addressed the

2   repo collateral -- actually could you go up to the text so we

3   can see the context of this -- it's in the paragraph -- no, no,

4   no.  You should be on page 3, last paragraph.  And addressed

5   this assertion it was the discounted repo collateral that it

6   must have been five billion more, then at forty-five.  And we

7   explain that the nominal value of the securities were somewhere

8   in the region of that.  That was in the Leventhal declaration

9   that was in the December settlement, where we say that the

10  actual value was potentially far less.  And then we footnote

11  down -- footnote 3 now to the valuation -- and we then said,

12  "Our doubts about the value at the time were justified.

13  Applying a standard valuation policy, it took Barclays months

14  to determine the correct value of what it received.  Based upon

15  that process, which was done in the ordinary course and was

16  subject to review by independent auditors, it was not for any

17  litigation purposes."  And we go on to say what we concluded:

18  It was worth billions of dollars less than the Lehman and BoNY

19  mark.

20        September 24, 2009 we raised the issue of our

21  independent auditors.  It was raised again in Professor

22  Pfleiderer's report of January 8, 2010.  He relied extensively

23  on PwC.  Movants subpoenaed PwC -- I don't know the exact date,

24  but they subpoenaed them during discovery.  That's the reason

25  the documents were produced.  And, Your Honor, as the Court

Page 42

1    said the other day, the Court will form its own impressions of

2    various judgments that have been made.  But I cannot let stand

3    the suggestion by Mr. Gaffey that it's our strategic choice not

4    to bring PwC.

5            At least to our way of thinking, Your Honor, when

6    somebody accuses a public company that files a public financial

7    statement with the SEC and the FSA on this multibillion dollar

8    transaction -- accuses us of understating the values by five

9    billion, isn't it up to them to prove it?  They chose not to

10   depose PwC.  Now they want to keep the PwC documents out, and

11   they claim it's new -- not new.  They're the ones who raised

12   the issue.  Your valuations are all wrong.  And you were

13   audited.  Here are the documents.  They don't want to depose

14   them?  They didn't want to call those valuation professionals

15   from the PCG group.  So respectfully, Your Honor, we submit the

16   strategy here, the tactical judgments are on this side of the

17   courtroom, not this side.

18           Finally, Your Honor, just two brief things.  Your

19   Honor's question about testimony -- the word "testimony" in

20   Rule 702, versus "records" in 803(6).  It occurred to me and I

21   think this is exactly the point I was trying to make in a

22   better, more acute or precise way, that 702 is talking about

23   what happens in a litigation.  One party says, I need an

24   expert.  He's going to come and testify.  When it's in a

25   context of litigation, those rules of 702 and the Daubert

Page 43

1     standards apply.  If it's not, if it's before litigation, and

2     someone makes a record, that's just a fact.  It's just a fact.

3            In fact, if PwC had been called, it would never have

4     occurred to me to say that they're being qualified as an

5     expert.  They would have been a fact witness:  What did you do?

6     What did you find?  What procedures did you follow?

7            If they had called PwC, we wouldn't have said, that's

8     an expert.  We just said, it.  They did have PwC people on

9     their fact witness list.  Then they struck them.  I never

10    thought that they were expert witnesses.  None of this ever

11    occurred to us until we raised it the other day.

12           So they are fact witnesses.  It is a fact what

13    happened.  They made records of what happened.  It should come

14    in as factual record evidence.  That's it.

15           803(6) -- the drafters of the Federal Rules of

16    Evidence know how to make one rule subject to another.  They

17    know how to say "subject to the provisions of 702".  They did

18    not write it that way.  There is a strong inference on the

19    plain text therefore.  It is not read that way.  And it's never

20    been read that way.

21           Auditor records come in as business records in case

22    after case after case.  It would be extremely unusual in a case

23    of this magnitude for the rule to be different.

24           And finally, Your Honor, back to your citation to Rule

25    102, I would just note for the record that the Second Circuit,

Page 44

```
 1    in interpreting 803(6), says that it "favors the admission of

 2    evidence rather than its exclusion, if it has any probative

 3    value at all."  That's United States v. Williams, 205 F.3d 23,

 4    34, a Second Circuit decision from 2000.  I think, in other

 5    words, a close call, in light of what the Second Circuit has

 6    said about 803(6), what Rule 102 says, any close call favors

 7    admission.

 8         With respect to hearsay within hearsay, Your Honor, we

 9    asked them a couple of weeks ago to identify with specificity

10    which ones they meant.  They didn't.  We said -- we gave a few

11    examples.  We didn't -- they now say, well, we don't identify

12    with specificity which ones should come in.  Well, it's up to

13    them to say what the hearsay within the hearsay problem is.

14    They've had several weeks to do so, and they haven't.

15         So again, we submit these should come in as business

16    records.  And Your Honor has heard our alternative limited

17    purpose argument, so I don't think I need to repeat that.

18    Thank you.

19         THE COURT:  Okay.  I'm going to take a ten minute --

20    do you want to respond, Mr. Gaffey?

21         MR. GAFFEY:  You know, there's something I meant to

22    clarify, Your Honor, that if you don't mind, I think makes some

23    sense for me to raise before Your Honor deliberates on this.

24         The 702 -- I just want to be clear that the 702 aspect

25    of our objections does not apply to every one of the documents.
```

08-13555-mg   Doc 12162   Filed 10/11/10   Entered 10/19/10 17:14:40   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 45 of 60

Page 45

1    There are some -- and I can identify for the record -- but

2    they're on the list attached to our letter -- there are some

3    where our objection is only hearsay.  So I just wanted to be

4    clear about that so I'm not thought be overstating my case.

5    Most of them do have the 702 issue.  But some do not.

6         THE COURT:  Okay.  I appreciate that clarification.

7    We're going to take a ten-minute break.  I'd like to think

8    about this a little.

9         THE CLERK:  All rise.

10   (Recess from 11:16 a.m. to 11:31 a.m.0

11        THE COURT:  Please be seated.

12        I've given some additional thought to the issue of the

13   PricewaterhouseCoopers exhibits that are all collected in a

14   binder.  This issue really first surfaced and was argued in a

15   preliminary way before the submission of letter briefs.  I have

16   a letter brief from Boies Schiller dated October 4, and a

17   responsive letter brief from Jones Day dated October 6.

18   Additionally, we had a very interesting and specific argument

19   this morning which included references to sample documents and

20   the contents of those documents.

21        The question presented is an interesting one.  And I

22   think that the colloquy probably highlights my thinking on the

23   point.  I don't believe that the documents that are the subject

24   of this motion by Barclays to admit into evidence certain

25   documents from PricewaterhouseCoopers, actually implicates Rule

1    702 at all.  I understand the concern expressed by Mr. Gaffey

2    and the reference made by him to the so-called paper expert.

3    But I actually believe that the documents, taken as a whole, do

4    not constitute expert opinion evidence at all.  There are

5    multiple reasons for that conclusion on my part.

6         First, I believe that the documents, fairly read,

7    constitute work papers that PricewaterhouseCoopers prepared in

8    the course of their audit of Barclays' financial statements,

9    and in particular, provide information concerning judgments

10   made by the auditors as to the proper way to account for assets

11   acquired from Lehman Brothers that are referenced in the so-

12   called acquisition balance sheet of Barclays.

13        To the extent that there are what I characterized as

14   micro-opinions of PwC employees that are embedded in these

15   documents, these are simply ordinary-course judgments made by

16   professionals in the course of their work.  And I do not view

17   these opinions as going to the fundamental question before the

18   Court.  None of these opinions, either individually or

19   collectively, express an opinion as to the fair value, really,

20   of the acquired assets.  I view these documents as going to the

21   process and procedure, rather than to the ultimate question

22   which is in dispute in the case.

23        Also I take Mr. Hume's point that at least for

24   purposes of trial preparation, Barclays always assumed, I think

25   correctly, that any witness that might be presented from PwC

Page 47

```
 1    would be a fact witness and not an expert witness, a witness

 2    who would be questioned if called to testify as to the work

 3    that was performed.  And necessarily, an auditor's work

 4    includes the exercise of judgment.  And the exercise of

 5    judgment necessarily involves forming certain opinions.

 6           I also agree that Rule 702, by virtue of its title,

 7    deals with testimony by experts and in particular parties who

 8    are engaged to provide expert testimony at a trial.

 9           The hearsay issue presented by Jones Day is a

10    different story, however.  I agree with Mr. Gaffey that to the

11    extent that there are hearsay problems embedded in these

12    business records, the hearsay within hearsay rule, Rule 805,

13    applies.  And for purposes of judicial review of these

14    documents, I will not give any weight whatsoever or treat as

15    competent evidence statements recorded within these documents

16    that constitute hearsay and that do not otherwise correspond

17    with a recognized exception to the hearsay rule.

18           That leads to the question of what am I going to do

19    with these documents and what's the real purpose of their being

20    admitted.  And I am going to admit them.  And in a sense, this

21    is a halfway house between admitting the documents for all

22    purposes and admitting the documents for the special purposes

23    proposed by Boies Schiller in its fall-back position in its

24    letter brief.

25           My view of these documents is that they do not
```

Page 48

```
 1    constitute a paper trail that can be fairly read as an opinion

 2    as to the value of the portfolio of financial assets acquired

 3    by Barclays from Lehman Brothers, but that they do reflect

 4    contemporaneous evidence of the process undertaken by

 5    professionals to test the reasonableness of judgments made by

 6    Barclays' personnel in their best effort undertaken to value

 7    these assets.  The valuation is a Barclays valuation which has

 8    been tested, at least as to process and procedure, by

 9    PricewaterhouseCoopers during the ordinary course of its audit.

10         That does not mean that Pricewaterhouse has provided a

11    valuation opinion.  But I do accept the fact that because an

12    audit was conducted, that the judgments made by Barclays

13    internally had at least been scrutinized.  And to that extent,

14    there may be greater reliability than if they hadn't been

15    scrutinized.  It's in effect a statement by the Court that's

16    somewhat consistent with what Professor Pfleiderer said for two

17    days.

18         So the documents are admitted for the purposes of

19    demonstrating that an audit was conducted, and that the audit

20    included some review and testing of judgments made by Barclays

21    personnel of the Barclays valuation.  To the extent that there

22    is hearsay within hearsay, I will disregard such hearsay

23    statements.  Now we need to have a chambers conference.

24         MR. GAFFEY:  Your Honor, before we do that, I think I

25    have an agreement -- in anticipating of Your Honor's decision,
```

08-13555-mg    Doc 12162    Filed 10/11/10    Entered 10/19/10 17:14:40    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 49 of 60

Page 49

1    there were two PricewaterhouseCoopers documents that movants

2    wanted in to which Barclays had objected.  And I think we have

3    an agreement now that they're waiving their objection.  And I'd

4    offer them into evidence now.  And they are --

5            THE COURT:  So that's the good part of this ruling for

6    you.

7            MR. GAFFEY:  There's always a little sunlight at the

8    end of the day, Your Honor.

9            THE COURT:  I'm glad you can find it.

10            MR. GAFFEY:  The other point I want to raise might not

11    be so agreeable.  Those are Exhibits M-150 and Exhibit M-335.

12    I'm happy to describe them for the record, Your Honor, but I

13    think they were already described in the pertinent portions of

14    the transcript.

15            THE COURT:  All right.  They're admitted.

16    (PwC Document was hereby received in evidence as Movants'

17    Exhibit M-150, as of this date.)

18    (PwC Document was hereby received in evidence as Movants'

19    Exhibit M-335, as of this date.)

20            MR. GAFFEY:  Thank you, Your Honor.

21            Another admission issue, Your Honor, has to do with --

22    we did put off the document issue.  And if I can raise an issue

23    about one document now, I think it will help us to be much more

24    successful in reaching agreements as to many, many others.

25            I appeared to have picked up Mr. Hume's bad habit

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 50

1    about not being entirely explicit about offering documents in

2    evidence, and in particular --

3            THE COURT:  Which you're chosen to blame him for.

4            MR. GAFFEY:  Well, I'm not blaming him.  Maybe he

5    learned it from me.  I don't know.

6            During the testimony of Mr. Ainslie, the very first

7    witness in the case, I offered Exhibit M-142.  It's an

8    e-mail -- exchange of e-mail correspondence between Mr.

9    Lubowitz and others at Weil Gotshal concerning a set of draft

10   board minutes.  Your Honor may remember -- and I have the

11   transcript cite if we need it -- that Mr. Boies reacted to the

12   document by saying I had waived privilege.  And we had a small

13   colloquy then about what the waiver had been before Mr. Boies

14   came to try the case and what the scope of it was.  And in the

15   course of that, I did not offer the document.

16           And I would like to offer it now.  I would like to

17   offer it for the reasons I stated its relevance at the time,

18   and also under Federal Rule of Evidence 102.  And the reason I

19   would like to do that is because during that same examination

20   Mr. Boies put in several other sets of drafts.  So for the sake

21   of completeness, I would like to offer 142 now, and I'm

22   prepared to show that to the Court to remind Your Honor of what

23   the document is.

24           THE COURT:  I think I remember the document.  But if

25   you have it and would like to show it so that I can be sure I

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 51

1    do remember it, that's fine.

2         MR. GAFFEY:  If I may approach, Your Honor?

3         Just for the record, Your Honor, it's top line is --

4    it's an e-mail from Michael Lubowitz of Weil Gotshal to Rob

5    Miller of Weil Gotshal.  It's dated September 16th, '08, board

6    meeting -- its entitled "8/9/16 board meeting minutes."

7         THE COURT:  Is there any objection to the document?

8         MR. HUME:  There is, Your Honor.  I'd like to make two

9    points with my objection.  First, the document itself.  This is

10   Weil Gotshal e-mail, internal.  It's being offered for the

11   truth of Mr. Lubowitz's assertion, "I don't recall the

12   reference to the sixty-four and seventy billion."  This is him

13   passing on, "Here are a few nits."  I think this is outside the

14   business record rule.  This is not a substantive memo in his

15   e-mail.  It's not a -- it's just forwarding on his nits.

16   Movants control Weil Gotshal.  Weil Gotshal is the lawyer for

17   the debtor.  They could have brought Mr. Lubowitz.

18        My second comment, Your Honor, is I had a discussion

19   with movants' counsel.  We have a number of documents we'd like

20   to offer today which we told them.  We decided to defer these

21   issues until the 18th.  If we're going to allow Mr. Gaffey to

22   offer this, I'd at least like the chance to offer two or three

23   of my own so we could get the Court's feedback on it.

24        MR. GAFFEY:  We can defer, Your Honor.  The reason I'm

25   raising it now is this -- twofold.  First let me respond

Page 52

1   substantively and then to the issue of why now.

2        We are offering it to demonstrate that when Mr.

3   Lubowitz and Mr. Miller were at the board meeting, they get

4   this set of drafts.  There's a reference in there to a wash.

5   I'm not offering it for the truth of Mr. Lubowitz's statement

6   about what he recalls or doesn't recall.  I'm offering it for

7   the more limited purpose that the document shows that when it

8   was sent to Mr. Lubowitz who attended the board meeting, he,

9   while making changes in the same paragraph, did not remove the

10  reference to "wash".  That's its limited purpose.  It's not for

11  the truth of his assertion about what he remembers or what he

12  doesn't.

13       The reason I am raising it now and the reason I said

14  it would make our negotiations go a bit more easily, is we have

15  been having discussions about a lot of documents.  And the deal

16  I offered last night was, in return for agreement to this one

17  document, which I think is evidence anyway -- and I'm being

18  clear here -- I'd be just the most agreeable guy you ever saw

19  about about fifty documents that they offer.  If this is

20  admissible regardless of their agreement, I think it will make

21  the way much easier for an agreement as to what comes in and

22  what doesn't come in, on a pure negotiation basis.  That's why

23  I'm standing to offer it now, to take it off the table.

24       MR. HUME:  Well, it sounds like, in other words, that

25  way he doesn't have to agree to the fifty.  One versus fifty

Page 53

1    does sound like a good deal, Your Honor.

2         MR. GAFFEY:  I'll agree to the same ones I put the

3    e-mail to Mr. Green last night, number by number.

4         MR. HUME:  Okay.  Thank you.  One versus fifty does

5    sound like a good deal.  If the fifty are plainly admissible

6    and the one is not, it may not be a good deal.

7         THE COURT:  Let me suggest the following.  I was not

8    aware we were really going to need the 18th as a date, and

9    apparently do, for purposes of hearing some of these ongoing

10   issues of admissibility.  We have properly noticed for today an

11   argument which resulted in a ruling in respect of the PwC

12   documents.  And that was really the principal business of

13   today.  And like I said, we can have chambers conference, and

14   that's fine.

15        If we're really going to use the 18th as a holding

16   date for purposes of admitting the documents, and if there is

17   an ongoing process of communication, of communication between

18   counsel that may result in agreements regarding documents that

19   can be offered into evidence without objection, I think I'd

20   like to defer ruling on the Lubowitz document so as not to --

21   even though I know it would potentially facilitate ongoing

22   conversations, I'm also not inclined to change the dynamics of

23   those negotiations by making any ruling today on this document.

24        I remember these board minutes and I remember the

25   evolution of the board minutes during the examination so many

Page 54

1    months ago of Mr. Ainslie.  In effect, whether this document in

2    its form, Exhibit 142 is admitted or not admitted, probably

3    doesn't make a whole lot of difference to the Court in terms of

4    evaluating the overall evidence of the case.  And I would hope

5    that the parties would recognize, as Mr. Gaffey generously did

6    during his presentation earlier, that this is a bench trial;

7    that I will apply the rules of evidence; but that I've already

8    seen all the evidence.

9            And with that, I suggest that you, consistent with the

10   philosophy of the Federal Rule of Evidence, endeavor to reach

11   agreement that will, as Mr. Hume said, allow for the

12   introduction of most documents such that I can weigh all

13   trustworthy evidence in the case.  I have no doubt that

14   Movants' Trial Exhibit 142 is a trustworthy document.  And to

15   fence over whether or not it should come in or not come in is

16   probably not a useful exercise for any of us.

17           MR. SCHILLER:  Your Honor?  I'm sorry.

18           THE COURT:  Who would like to add?

19           MR. SCHILLER:  I just want to confirm our

20   understanding, subject to your ruling on these exhibits and our

21   putting in the deposition designations from our case, that the

22   record's closed to evidence?

23           THE COURT:  The evidence is closed, as far as I'm

24   concerned, subject to that.

25           MR. SCHILLER:  Thank you.

08-13555-mg    Doc 12162    Filed 10/11/10    Entered 10/19/10 17:14:40    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 55 of 60

Page 55

1            MR. MAGUIRE:  May I be heard on one thing, Your Honor?

2            THE COURT:  Absolutely.  And maybe the evidence is not

3     closed.

4            MR. MAGUIRE:  It should actually be a couple of

5     things, Your Honor.  One is, we do have a stipulation -- in

6     fact, three stipulations regarding the admissibility of

7     movants' exhibits.  So if I could just hand up those

8     stipulations.  They're a stipulation as to admission of

9     movants' exhibits dated April 30.  I share the general

10    affliction here in not moving exhibits in in a timely way.  Our

11    second stipulation is dated August 30.  And the last one is

12    dated September 29.  But all of these are stipulated to, Your

13    Honor.

14            THE COURT:  Okay.  Thank you.

15            MR. MAGUIRE:  A second matter, in terms of the record,

16    Your Honor, is that while we've set aside the 18th to deal with

17    exhibits, I believe there's also a stipulation that the parties

18    have concerning deposition designations.  And that provides

19    that the parties are supposed to confer, work out objections,

20    and subject to the objections, those designations will come in

21    evidence.  We still need to confer, resolve whatever objections

22    there are, and in the case of any disagreement, bring that

23    before the Court.  So we may need some time on the 18th if

24    there is any problem there.

25            THE COURT:  Okay.

Page 56

```
 1          MR. MAGUIRE:  And one additional matter.  Mr. Schiller

 2     is right in terms of there being no rebuttal witness and the

 3     record being closed.  There's just one asterisk I would like to

 4     put on that.  And that arises from Mr. Pfleiderer's testimony

 5     the last couple of days.

 6          You may recall that he put on the screen a

 7     demonstrative showing Lehman's book values from the GFS system

 8     over various dates from September 12 through the Lehman week.

 9     The problem is, he testified, as I understand it, that the GFS

10     system was subject to a T+1 method.  And that meant that the

11     books as of Friday, September 12, were finalized at 6 p.m. on

12     Monday the 15th.  So to the extent the Court wants to have a

13     complete record of what Lehman's books were before Barclays

14     appeared on the scene, before the due diligence was done,

15     before the parties negotiated about values.

16          The Friday, September 12 information, that data, was,

17     as I understand it, finalized at 6 p.m. on Monday, after all of

18     the negotiations of the weekend.  Dr. Pfleiderer did not do the

19     previous day before Barclays appeared on the scene or that

20     week.  So what I've suggested to our colleagues at Barclays is

21     if they can provide us with a similar exhibit that just shows

22     that prior week, and specifically September 11.  Because if the

23     T+1 principle -- if I understand it correctly, that would show

24     the information that was on Lehman's books and was finalized at

25     6 p.m. on Friday the 12th.
```

1          So that and the earlier dates, I think, would then

2     give us a complete picture of what the books were before and

3     after Barclays appeared on the scene.  I'm hoping that's not

4     controversial.  I've asked our colleagues to consider it.

5     They're conferring with their client.  But I did want to

6     highlight that as one asterisk.  It seems to me that's an

7     important piece of a factual record that the Court would want

8     to have in the record before we close everything completely.

9          THE COURT:  If the parties agree on it.  The problem

10    is if the parties don't agree, I'm not sure what you can do

11    about it.

12          MR. MAGUIRE:  If we don't have an agreement, then I

13    think we may ask -- we'll obviously consider our position and

14    consider whether we come to the Court and ask for any relief on

15    that.  Obviously, there'll be objections, and assuming that,

16    we'll have to argue the point.

17          THE COURT:  Thank you for teeing up the issue.

18    Hopefully, it's resolved.  If it's not resolved, we'll deal

19    with it on the 18th.

20          MR. MAGUIRE:  Thank you, Your Honor.

21          THE COURT:  Now, speaking about the 18th, how much

22    time do you propose for that day?  And since it's more in the

23    nature of colloquy, are we talking about 10 a.m., are we

24    talking about 2 p.m., or what other time?

25          MR. SCHILLER:  I think we're talking about one hour of

LEHMAN BROTHERS HOLDINGS, INC., ET AL.

Page 58

1    your time when it's convenient for Your Honor.

2            MR. GAFFEY:  I think that's about right, Your Honor.

3    I think we're closer than it might sound from the carping going

4    here on documents.  And we've heard what Your Honor has to say.

5    We just need to, I think, bring you up to date, for an hour or

6    an hour and a half.

7            THE COURT:  Well, my only inquiry is whether if you

8    only need a limited period of time, would it be helpful for you

9    to be in the afternoon session as opposed to a morning session,

10   because that might give you some additional time to work out

11   any difficulties.  It's a lot of time in the future, but I see

12   no reason why we need to show up early.

13           MR. GAFFEY:  I think the afternoon makes more sense.

14   I think --

15           MR. SCHILLER:  We agree.

16           THE COURT:  Okay.  Let's make it 2 o'clock on the

17   18th.  And let me find out if I can get access to room 608,

18   which is down the hall.  And that might be a more comfortable

19   way for us to have our chambers conference.  If I can get

20   access to that, I'll let you know and we'll meet there in about

21   ten or fifteen minutes.  If I can't get access to it, we'll use

22   the courtroom, and those people who are not to remain for the

23   conference will be excused.  But my chambers staff will let you

24   know where we're meeting.  Okay?

25           (Whereupon these proceedings were concluded at 11:56 a.m.)

Page 59

1

2                                    I N D E X

3

4                                E X H I B I T S

5      MOVANTS'              DESCRIPTION                    PAGE

6      M-150                 PwC Document                   49

7      M-335                 PwC Document                   49

8

9                                    RULINGS

10                                   Page      Line

11     PwC documents are            48        18

12     admitted for the

13     purposes of

14     demonstrating that an

15     audit was conducted, and

16     that the audit included

17     some review and testing

18     of judgments made by

19     Barclays personnel of

20     the Barclays valuation

21

22

23

24

25

Page 60

1

2                        C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8    _____

9    PENINA WOLICKI

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  October 11, 2010

17

18

19

20

21

22

23

24

25