Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 08-13555 (JMP)

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  LEHMAN BROTHERS HOLDINGS INC., et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - -x

13

14              U.S. Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              October 6, 2010

19              9:37 AM

20

21

22  B E F O R E:

23  HON. JAMES M. PECK

24  U.S. BANKRUPTCY JUDGE

25

1

2   CONTINUED EVIDENTIARY HEARING re Rule 60(b)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed By:  Zipporah Geralnik

25

Page 3

1

2  A P P E A R A N C E S:

3  BOIES, SCHILLER & FLEXNER LLP

4        Attorneys for Barclays Capital, Inc.

5        575 Lexington Avenue

6        7th Floor

7        New York, NY 10022

8

9  BY:   HAMISH HUME, ESQ.

10       JONATHAN D. SCHILLER, ESQ.

11

12  JONES DAY

13       Attorneys for the Movant, LBHI

14       222 East 41st Street

15       New York, NY  10017

16

17  BY:   ROBERT W. GAFFEY, ESQ.

18       JAYANT W. TAMBE, ESQ.

19

20

21

22

23

24

25

Page 4

1

2   STUTMAN TREISTER & GLATT LLP

3          Attorneys for Elliott Management

4          1901 Avenue of the Stars

5          12th Floor

6          Los Angeles, CA 90067

7

8   BY:   ANTHONY ARNOLD, ESQ. (TELEPHONICALLY)

9          MICHAEL NEUMEISTER, ESQ. (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE COURT:  Be seated, please.  Good morning.

3         MR. HUME:  For the record Hamish Hume of Boies

4    Schiller for Barclays.  And Barclays calls its next witness,

5    Professor Paul Pfleiderer.

6         MR. TAMBE:  Your Honor, just one housekeeping matter.

7         THE COURT:  I think you can still come up here,

8    Professor.

9         MR. TAMBE:  Just one housekeeping matter before we

10   start with Professor Pfleiderer's examination.

11        Last night around 10:30 we received 30 additional

12   exhibits, including spreadsheets, including analysis of

13   hundreds of CUSIPs, we're in the process of reviewing those

14   documents.  We certainly reserve our rights to the extent any

15   of that work is beyond the scope of the expert report and the

16   opinions comes very late in the day.

17        Just looking at the documents it looks like it

18   addresses issues that Barclays has known about for several

19   months.  We are reviewing it.

20        It may be that at the end of today we may need a

21   continuance till tomorrow morning so we can complete our review

22   and do a proper cross-examination of Professor Pfleiderer on

23   those documents.

24        So we just want to reserve our objection to the use of

25   those documents in the course of today, and the ability to

Page 6

1    examine those documents and cross-examine Professor Pfleiderer.

2            THE COURT:  I understand your reservation.  I prefer

3    not to get into a major flack over these documents if it turns

4    out that it's a non-issue.  If it is an issue in the meantime

5    to adequately prepare for cross-examination we'll have to

6    accommodate you, but I don't know that that's an issue yet.

7            MR. TAMBE:  Thank you, Your Honor.

8            THE COURT:  Now, Professor Pfleiderer, in light of

9    that what'll -- aside I haven't sworn you in, so please stand

10   up and raise your right hand.

11      PROFESSOR PETER PFLEIDERER, BARCLAY'S WITNESS, SWORN

12           THE COURT:  Be seated, please.

13                       DIRECT EXAMINATION

14   BY MR. HUME:

15   Q    Good morning, Professor Pfleiderer.

16   A    Good morning.

17   Q    Professor Pfleiderer, could you begin by briefly stating

18   your current employment and your educational background for the

19   Court?

20   A    I'm employed by Stanford Graduate School of Business where

21   I am a professor of finance, and that has been my employment

22   for the last almost thirty years.

23   Q    And what are your educational qualifications?  Could you

24   briefly summarize those?

25   A    Yes.  I received both a BA and a Ph.D. in economics from

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 7 of 221

Page 7

 1    Yale University.

 2    Q    And at Stanford could you review generally what it is that

 3    you teach at the business school?

 4    A    I primarily or almost exclusively teach courses in finance

 5    on the MBA level for graduate students in the MBA program as

 6    well as in the past in the Ph.D. level, and I'm also teaching

 7    actually currently this quarter in the Stanford Law School

 8    teaching a course on corporate finance there.

 9    Q    Do you teach any classes that bear on issues of the

10    pricing valuation of financial assets?

11    A    Yes, indeed.  Almost all of the finance courses that I

12    teach are primarily devoted to valuation.  In fact when I

13    introduced the course that I'm now teaching to the MBAs I

14    explain that most of finance is about valuation of cash flow

15    streams, how you calculate adjustments for risk and so on and

16    so forth.

17    Q    Do you teach courses that bear on issues of what can be

18    called sometimes market microstructure?

19    A    Yes, that was the subject of my Ph.D. dissertation.

20    Market microstructure is the study of how prices are formed on

21    a trade by trade basis, how Bid-Ask Spreads are determined, and

22    I taught courses on that -- on the Ph.D. level.

23          MR. HUME:  Your Honor, perhaps I should have done this

24    first, but we did hand out for efficiency sake before the

25    examination began an examination binder with probably many

Page 8

1   more documents than we'll refer to, but at the beginning of it

2   is Professor Pfleiderer's report, and at tab 1A is his CV.  And

3   perhaps if we could put that up on the screen.

4              THE COURT:  I have the book.

5              MR. HUME:  Thank you.

6   BY MR. HUME:

7   Q    And Professor Pfleiderer let me just continue.  You've

8   reviewed already where you teach, your educational background,

9   what you teach.

10       Do you have any other professional affiliations besides

11  your academic post at Stanford?

12  A    Yes, I do.  I am a founder of a company called Quantal

13  International that was founded back in early 1990s, and this

14  company that I started with a professor at Berkley across the

15  bay, we basically do risk modeling for equities and fixed

16  income instruments and portfolio optimization providing a

17  platform for various high-end institutional investors to manage

18  risk.

19  Q    And what is your specific role with respect to that

20  company?

21  A    My official title there is director of research, and I'm

22  involved in writing some of the algorisms that are used, as

23  well as doing some of the statistical analysis that goes into

24  the risk modeling.

25  Q    And over the course of your career, Professor Pfleiderer

Page 9

1    have you written and published articles relating to the pricing

2    and valuation of financial assets?

3    A    Yes, I have.  I have a number of articles about

4    microstructure which relate to bid-ask spreads as I explained

5    before, and then there are other articles that relate to what's

6    called asset pricing determination of risk premia, and all of

7    this has been done on the theoretical level, so my papers are

8    theoretical in nature, but they address those issues.

9    Q    And in addition to publishing those articles do you stay

10   abreast of that research as part of your teaching career?

11   A    I do indeed, it's very important to do that both for

12   teaching and for research.

13   Q    And Professor Pfleiderer have you been -- have you served

14   as an expert witness in other litigations before this one?

15   A    Yes, I have.

16   Q    And have any of those dealt with valuation issues?

17   A    I sat in this chair a few years ago.  I can't remember now

18   whether it's two or three, maybe it's even more.  Basically

19   opining on valuation issues in the Iridium case and I've done

20   similar work in some other cases, or at least work that relates

21   to valuation.

22   Q    And could you briefly recount what those other cases

23   involve?

24   A    A recent case -- I didn't testify at trial, I did at

25   deposition -- related to the -- I think it was basically called

Page 10

1    the IPO cases where it was looked issues of pricing around IPOs

2    in the aftermarket and valuation there and price behavior.  My

3    initial cases, at least my first experience, were in so-called

4    Windstar cases where they're issues relating to the valuation

5    of capital supervisory goodwill on a bank's balance sheet, and

6    that was probably the first case that I was involved in dealing

7    with issues in valuation.

8    Q    Have you also testified or been retained as an expert

9    witness in 10(b)(5) securities cases?

10   A    Yes, I have.  I never testified at trial, but I have

11   testified in deposition in a number of those cases.

12   Q    And Professor Pfleiderer what are the issues that you've

13   been asked to give expert opinions on in this case?

14   A    A number of issues.  The main issues that I will be

15   testifying about relate to one, the issue of whether the wrong

16   positions that were mentioned in the APA as having a value of

17   70 billion somehow unfairly stated the true value of the loan

18   positions on Lehman Brothers' books or LBI's books, so whether

19   that was a misstatement of the book value.

20        I also will testify on issues relating to the value of the

21   repo collateral that was actually received in the transaction

22   in the end, and the value as measured by what I'll call P times

23   Q, which is the accounting value in some ways, and then testify

24   as to the economic value of that when someone is acquiring it

25   as a total portfolio.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 11

1       So those would be two of the issues that I would be

2   addressing today.

3   Q   And I'm sure we'll get into more details on those and

4   other opinions.

5           MR. HUME:  But, Your Honor, Barclays proffers

6   Professor Pfleiderer as an expert in financial economics and

7   valuation.

8           MR. TAMBE:  Your Honor, if we may have an opportunity

9   to voir dire Professor Pfleiderer on some aspects of his

10  opinions gauging from the opinions expressed in his report, as

11  well as several supplemental declarations.  We believe he is

12  not qualified to opine on certain of the matters that he has

13  written about.  If we could have an opportunity to voir dire

14  him, please.

15          THE COURT:  You can have that opportunity now.  I

16  don't think there's any reasonable dispute concerning Professor

17  Pfleiderer's qualifications to express expert opinions in the

18  broad areas stated by Mr. Hume.  It's not clear to me whether

19  this is preemptive cross-examination, and if it is I don't like

20  it.  If it's legitimate voir dire as to aspects of his opinion

21  that go to his expertise to express the opinion, I don't know

22  at whether he would in fact -- that's what he's going to

23  testify to.

24          So I'm frankly uncomfortable about what appears to me

25  to be a slight ambush tactic and would prefer that it wouldn't

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 12 of 221

Page 12

1    occur, particularly since we had dabbled in issues going to

2    what I suspect are more of the same issues which I overruled.

3          So my inclination is to say sit down, but I'm also

4    concerned about making sure that at the threshold we have real

5    issues concerning direct testimony.

6          So I'm going to let you do this if you really press

7    it, but I'm not happy about the tactic.

8          MR. TAMBE:  Let me explain why I believe I need to

9    press this, Your Honor.

10         We know there have been discussions in this case about

11   the role played by PWC.  There are statements that Professor

12   Pfleiderer makes in his expert report, and in his most recent

13   declaration submitted on September 1, in which he is making

14   judgments that we believe pass an opinion on the quality of

15   PWC's audit.  We don't believe he's qualified to do so.

16         If he sticks to the two areas on which he has been

17   offered and doesn't venture into all the other areas on which

18   he has mused in his expert report, in his declaration, and in

19   his deposition, we will deal with it on direct, Your Honor, but

20   my concern is that he has espoused a number of views not all of

21   which are captured by the two statements that he has made and

22   the areas -- the narrow areas we believe on which he's being

23   offered as an expert witness.

24         THE COURT:  I don't think that's proper voir dire, I

25   think that's cross-examination at most, and to the extent that

Page 13

1    there issues as to opinions expressed that go to, I'll call it

2    a validation of the quality of PricewaterhouseCoopers' work as

3    auditor where he is simply stating opinions as to which he has

4    no or may be shown to have no expertise, I simply won't give

5    weight to those opinions.  But I don't think it's proper voir

6    dire based upon your explanation you've just given.

7           If you want to press it I'll let you press it, but I

8    think you can do it just as easily and probably better in

9    cross-examination.

10          MR. TAMBE:  That's fine, Your Honor, I will not press

11   it with the understanding that he's not going to stray beyond

12   what he is being offered as an expert on, otherwise it puts me

13   in a catch-22 situation.  He comes in as an expert on these two

14   issues and then on direct proceeds into many different areas.

15          THE COURT:  Well, to the extent that in the course of

16   expressing an opinion within his area of expertise he makes

17   certain comments which fit within the general zone of opinion

18   evidence that are based upon his independent review of

19   PricewaterhouseCoopers' materials, and to the extent that in

20   the course of his work he regularly and routinely examines such

21   materials, I believe that as an expert he's probably capable of

22   relying upon such materials.  That doesn't mean that he

23   validates the quality of the work being performed by others.

24          But to the extent that the public is relying upon the

25   quality of PricewaterhouseCoopers' audit of Barclays' books and

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 14 of 221

Page 14

1    records, it seems to me that this witness is in the zone of the

2    public and can certainly comment upon what he is relying on.

3         You can cross-examine the quality of his opinions in

4    that area as much as you wish, and I think that's probably the

5    best way to address this subject.

6         MR. TAMBE:  Very well, thank you.

7         THE COURT:  Okay.

8         MR. HUME:  Thank you.

9    BY MR. HUME:

10   Q    Professor Pfleiderer, before you is a somewhat large

11   binder with a lot of documents.  At tab 1, I think you'll see

12   your expert report in this case.

13   A    Yes, I do.

14        THE COURT:  May I just make a comment also about

15   volume.  I think that it would be terrific since there are

16   people in the courtroom who are interested in the testimony,

17   both questions and answers, if everybody would please speak up.

18        MR. HUME:  Volume of voice rather than documents.

19        THE COURT:  Volume of voice rather than documents,

20   particularly the witness's voice.

21        MR. HUME:  Your Honor, I'm reminded by Jon Schiller,

22   in light of the long colloquy that we had, I don't know if the

23   Court has accepted the proffer of Professor Pfleiderer as an

24   expert in financial economics and valuation.

25        THE COURT:  I accept Professor Pfleiderer as an expert

Page 15

1    in that area.

2            MR. HUME:   Thank you, Your Honor.

3    BY MR. HUME:

4    Q    Professor Pfleiderer, can you simply identify and confirm

5    that tab 1 of the binder before you, which is marked as BCI

6    Exhibit 341 is your expert report in this case.

7    A    That is correct.

8    Q    And do you affirm and stand by the opinions expressed in

9    that report?

10   A    I do.

11           MR. HUME:   And Your Honor, we offer BCI Exhibit 341

12   into evidence.

13           MR. TAMBE:   No objection, Your Honor.

14           THE COURT:   It's admitted.

15   (Barclays Exhibit 341, Professor Pfleiderer's Expert Report,

16   was hereby received into evidence as of this date.)

17   BY MR. HUME:

18   Q    Professor Pfleiderer, tab 2 of the binder is a

19   declaration, can you identify tab 2 as a declaration you

20   submitted in this case and signed as of January 21, 2010

21   confirming and producing your analysis to the movants on the

22   nature of the assets in the repo collateral?

23   A    Yes, that is correct.

24   Q    And do you stand by and affirm the opinion expressed in

25   that declaration?

Page 16

1   A    I do with this as well, yes.

2        MR. HUME:  And that's BCI Exhibit 346, Your Honor, we

3   move that into evidence.

4        MR. TAMBE:  No objection, Your Honor.

5        THE COURT:  It's admitted.

6   (Barclays Exhibit 346, Professor Pfleiderer's Declaration, was

7   hereby received into evidence as of this date.)

8   Q    Professor Pfleiderer, can you confirm for the Court that

9   tab 3 of the binder is a declaration signed by you on

10  April 19th, 2010 responding to certain criticsms made of your

11  work by the movant's experts and giving your reaction to those?

12  A    Yes, that is correct.

13  Q    And do you stand by the opinions set forth in this

14  document?

15  A    I do.

16       MR. HUME:  Your Honor, this is marked as BCI Exhibit

17  1100, and we move this into evidence.

18       MR. TAMBE:  No objection, Your Honor.

19       THE COURT:  It's admitted.

20  (Barclays Exhibit 1100, Professor Pfleiderer's Declaration, was

21  hereby received into evidence as of this date.)

22       MR. HUME:  And Your Honor, I apologize for the number

23  of these, there are only a couple more.  I may note, the reason

24  we had a few declarations from Professor Pfleiderer is that as

25  he performed ongoing analysis of the data, and there was

Page 17

1    obviously a lot of data in this case, he had the regular

2    practice of producing that analysis to movants even though it

3    was data that had been long before produced if he did a new

4    analysis of it running a new, you know, something to show if

5    you analyze it this was way or that way, he produced it even

6    though they had the data and were capable of performing the

7    analysis.

8         I just note that for the record, because when the

9    movant's experts were presented we saw new analysis of data on

10   the day, and we took that to mean that if there was new

11   analysis done from that time going forward of data they already

12   had, it could be presented at trial.

13        I note that now for the demonstratives that will be

14   coming shortly and to explain why there are a couple more of

15   these to move in.

16   BY MR. HUME:

17   Q    Professor Pfleiderer, tab 4, can you confirm is BCI

18   Exhibit 779, a short declaration you signed on April 23rd, 2010

19   providing the movants with some additional analysis you had

20   done under the GFS data that had been gathered and produced to

21   the movants?

22   A    That's correct as well.

23   Q    And do you stand by the analysis in this declaration?

24   A    I do.

25        MR. HUME:  Your Honor, we move into evidence BCI

Page 18

1    Exhibit 779.

2            MR. TAMBE:  No objection, Your Honor.

3            THE COURT:  It's admitted.

4    (Barclays Exhibit 779, Professor Pfleiderer's Declaration, was

5    hereby received into evidence as of this date.)

6    BY MR. HUME:

7    Q    Lastly, Professor Pfleiderer, tab 5 of the binder marked

8    BCI Exhibit 1101, can you confirm for the Court that that is a

9    declaration signed by you on September 1st, 2010 providing some

10   additional information and analysis that you had done of the

11   data to the movants and providing a slight errata to one of the

12   analyses you had done previously?

13   A    Yes, it is that.

14   Q    And do you stand by the analysis set forth in this

15   declaration?

16   A    I do.

17           MR. HUME:  Your Honor, we move into evidence BCI

18   Exhibit 1101.

19           MR. TAMBE:  No objection, Your Honor.

20           THE COURT:  It's admitted.

21   (Barclays Exhibit 1101, Professor Pfleiderer's Declaration, was

22   hereby received into evidence as of this date.)

23   BY MR. HUME:

24   Q    Now, Professor Pfleiderer, have you had some

25   demonstratives prepared and gathered to present your testimony

Page 19

1    today?

2    A    Yes, I have.

3         MR. HUME:  And I would like to hand those out now if

4    we could.

5         THE WITNESS:  Thank you.

6    Q    Professor Pfleiderer, we've reviewed your background at

7    demonstrative exhibit 1.

8         I'd like to direct the Court's attention to your

9    demonstrative exhibit 2, slide 2, and does this in slide 3 set

10   forth a summary of your main opinions in this case?

11   A    It does, yes.

12   Q    And could you briefly -- obviously we're going to get into

13   the detail of each of these -- but briefly provide an overview

14   for the Court of what those opinions are.

15   A    Yes, as I mentioned a few minutes ago, one of the issues

16   that I'm going to address is the issue of whether the APA asset

17   purchase agreement understated the book value by any

18   significant amount or in particular by five billion, and I find

19   that all the financial data that I have available basically

20   refutes that.

21   Q    And what does the second opinion relate to?

22   A    And then as I said, I was looking at the repo collateral

23   and the valuations that were put on that, and in particular

24   looking to see if that was undervalued by five billion dollars

25   or a significant amount, and I find that it was reasonably

Page 20

1    valued based at my understanding of how it should be valued

2    under the accounting rules.

3    Q    And how does your opinion number 3 relate to that?

4    A    So my opinion in number 3 is looking at what would be

5    called the accounting value of these assets that were

6    delivered, which is basically done on a CUSIP by CUSIP basis,

7    but rather thinking as an economist about the total value of

8    the portfolio or I'm going to call the economic value when

9    someone is buying a whole portfolio of securities as opposed to

10   breaking it up piece by piece and valuing it as the economy

11   rules have you value.

12        And it's my opinion, my very strong opinion that the

13   economic value of that is less than the value that was put on

14   it on this CUSIP by CUSIP basis.

15   Q    And can you summarize what your opinion is that's listed

16   as opinion 4?

17   A    So one of the most important issues here that I think will

18   become readily apparent as we get into the details is that

19   many, if not most of the assets that were brought across -- not

20   all, but many, as I said not most -- were extremely difficult

21   to value and very difficult to value, and that would be true in

22   normal considerations and certainly was true in this very

23   hectic time that we're talking about, the latter part of

24   September in 2008.

25   Q    Going to the next slide, can you explain what you were

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 21

1    talking about in opinion number 5?

2    A    So it's my belief based upon the work that I saw and had

3    analyzed that basically a complete accounting that gives some

4    understanding of the sales transactions is basically being put

5    forward by Barclays, and I looked at this in a lot of different

6    ways.  As you see my opinion 5A is that there is really no

7    material difference between the list of CUSIPs that were

8    provided when the transaction was occurring -- before the sale

9    closed I should say -- and the CUSIPs that were actually

10   transferred.  So that's one of the ways that I analyzed this

11   and came to this conclusion.

12   Q    And I think it's clear, but just for the record, when you

13   use the word accounting in opinion 5 here, you're not giving an

14   opinion about the actual accounting judgments under the

15   accounting rules are you?

16   A    No, I am -- I'll just make it clear at the start, although

17   I think it's clear -- I'm not a CPA and I'm not in any way

18   going to testify as to whether the accounting rules were

19   followed.  My perspective here is more as a consumer of

20   accounting as someone who is looking at the accounting that's

21   been done and trying to understand what it means.  And

22   accountants obviously are producing these numbers not for

23   themselves but for someone on the outside without a CPA to

24   understand what is being done.  And so it's from that

25   perspective that I'm looking at it.

Page 22

1    Q    In opinion 5 are you using the term accounting to relate

2    to the fact that whether or not sufficient information has been

3    provided for movants to understand assets and liabilities that

4    have been transferred?

5    A    That is the perspective I was taking, yes.

6    Q    And finally Professor Pfleiderer can you briefly review

7    your opinion 6?

8    A    So my final opinion is basically looking at this as an

9    economist, and looking at a transaction and asking whether it

10   was an economically rational transaction, meaning that both

11   sides benefited from the transaction.  As we economists would

12   say gains to trade occurred here that made both sides better

13   off, and as I review everything and think about what actually

14   transpired here, I'm very confident that this was an

15   economically rational transaction for both sides.

16   Q    Professor Pfleiderer, before we move to the substance of

17   your first opinion and some of the work that you've done, let

18   me ask you, is it your opinion that the overall context of the

19   financial crisis and the events of September 2008 are relevant

20   to your analysis and your opinion in this case?

21   A    They're extremely relevant.  I think it's quite obvious

22   that these were not normal times by any stretch of the

23   imagination, and because of that -- because they were very

24   abnormal times -- a lot of market turmoil, a lot happening in

25   the market, to understand the valuations and understand most of

Page 23

1    these issues you have to look at it in the context in which all

2    of this was occurring, which was a very turbulent market caused

3    initially by problems in valuation of real estate securities

4    and particularly mortgages, which is what triggered the crisis.

5        So as we look later on at the mortgages and mortgage-

6    backed securities are going to be very important in this

7    assessment, because those were ones that were obviously quite

8    effected by the turmoil that was occurring.

9    Q    Have you and your staff gathered any materials to

10   summarize as a sample crisis?

11   A    Yes, we have.  Just to put all this in perspective there

12   are a number of materials that's useful to at least quickly

13   review to understand -- to remember what the situation was.

14       MR. HUME:  Your Honor, with the Court's permission we

15   have another smaller binder which we would like to have

16   Professor Pfleiderer review and explain both of these -- if we

17   may hand them back.  We're actually going to look at it,

18   probably be in that big one.

19       THE COURT:  Well, feel free to hand it out.

20       MR. HUME:  Thank you.

21       THE WITNESS:  Thank you.

22       THE COURT:  Thank you.

23   BY MR. HUME:

24   Q    Now, Professor Pfleiderer, you gave an answer a moment ago

25   explaining why the context of the events of 2008 were relevant

Page 24

1   to your opinion.  Can you explain briefly for the Court what

2   has been gathered in this binder and how it relates to some of

3   the opinions you're giving in this case?

4   A    Well, the documents that appear first in this binder are

5   giving a timeline of what led up to and was occurring

6   contemporaneously with the sales transaction and the events

7   immediately prior to that.  And the first one that you see here

8   on the screen is what happened in the earlier part of 2008 when

9   Bear Stearns was rescued, I guess is one to put it, in a

10  distress held situation in a transaction with JPMorgan, and

11  that wasn't necessarily the first event that occurred, but that

12  was certainly a major event that was a precursor to what

13  happened later.

14  Q    And was that event related to the crisis involving

15  mortgage-backed securities?

16  A    It was very much related to that because Bear Stearns was

17  exposed to the pricing of mortgage-backed securities and to the

18  diminution in value that was occurring at that time in those

19  securities.

20  Q    Can I ask you, Professor Pfleiderer, simply to review what

21  else is in the binder on how it relates to bring the events up

22  to the events of the sale transaction?

23  A    Well, there are a number of things here, and I don't know

24  if it's important to go through all of them, but just to give a

25  quick review.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 25

1      After the Bear Stearns incident there are a number of

2   other bad outcomes, if you will, related to this mortgage

3   crisis or the housing and real estate crisis.  IndyMac was I

4   think maybe the largest or one of the largest cases where FDIC

5   had to take over a bank.

6      And later on we have in September -- early September, I

7   think it was the 7th -- we have Fannie and Freddie being put

8   into conservatorship.

9      And then we come to the major part of the crisis which

10  occurred over the weekend leading up to the 15th where Merrill

11  Lynch was acquired by Bank of America and LBHI declared

12  bankruptcy on the 15th.

13     And also very important at the time were two other

14  instances.  AIG, which was a very important player in the

15  market, was basically propped up by the U.S. government by you

16  and me and the taxpayers actually.

17     And also in the weekend I believe of the transaction -- I

18  may be not quite right there -- but the two remaining

19  investment banks, Goldman Sachs and Morgan Stanley, became bank

20  holding companies to take advantage, maybe that's not quite the

21  way to put it, but to benefit from some of the government

22  financing that would come through that.

23  Q   Now after this first set of news articles that summarize

24  and chronicle some of these events, there's another section of

25  the binder that I think begins on tab 19 or so.  What are those

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 26 of 221

Page 26

1    documents and why did you have those gathered?

2    A    Well, many of these documents are observations that are

3    being made contemporaneously or a little bit after the fact

4    about what is happening and why it's happening, and perhaps

5    some of the most important relate to issues about how hard it

6    is to value many of the things that we'll ultimately be talking

7    about here later, and the mortgage-backed securities being a

8    good example and problems with rating agencies not giving

9    ratings that were really informative of what the underlying

10   situation was.  A number of issues related to that are

11   highlighted in these documents.

12   Q    When you refer to mortgage-backed securities, Professor

13   Pfleiderer, does that relate to the broader practice that had

14   increased over the decade prior to the crisis of

15   securitization?

16   A    Indeed it does.  So it used to be that mortgages back in

17   the '50s and '60s were originated by banks and they were held

18   on the bank's balance sheet and over time these ended up being

19   securitized, meaning that they originated and then put into

20   bundles that sometimes had very complex structures and sold to

21   other bundles that had very complex structures.  So the level

22   of complexity increased many fold.

23   Q    What is this document BCI Exhibit 988?

24   A    So this is -- I think it's the opening statement of Henry

25   Waxman talking about things that were -- happened or had

Page 27

1   happened.  It was made in October 2008, so a few weeks after

2   the incidents that we're talking about later.  And he is

3   mentioning a number of things that are at issue in terms of the

4   difficulty of valuation.

5       So what's up on the screen he's talking about CDOs,

6   collateralized debt obligations and around here these are new

7   financial inventions and they're extremely complex so that

8   virtually no one really understood them, and I think that

9   that's a factually correct statement.  No one's, specifically

10  lay people, but many of the people that were making decisions

11  -- investment decisions had trouble understanding these.

12  Q    Does Mr. Waxman then go on to comment about the ratings

13  agencies and the roles they played in this?

14  A    Yes.  Yes, he does.  These securitized products were

15  oftentimes packaged so that a substantial part of what was then

16  offered could get a triple A rating from the rating agencies,

17  and certainly with the benefit of hindsight, but I think even

18  without the benefit of hindsight, it's quite clear that these

19  triple A ratings were not really representative of the risk

20  that was there.

21  Q    Your tab 22, Professor Pfleiderer is a Bloomberg article

22  that discusses at the bottom of it this concept of

23  securitizations.  Was securitization limited only to mortgages

24  or was it broader than that?

25  A    No, there were many things that were securitized, so --

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 28 of 221

Page 28

1    for instance, almost any type of debt.  I should be careful and

2    not say every type of debt, but almost any type of debt

3    obligations could be put into once of these bundles and

4    securitized.

5        So we had collateralized loan obligations where you had

6    leveraged loans that were securitized put into a bundle and

7    then traunched, which is creating more complex structure.  So

8    there are many things besides just plain vanilla mortgages that

9    were packaged in this way.

10   Q    There's a quote on the next page of this article from Joe

11   Stiglitz.  Do you know who he is?

12   A    Yes, I do.

13   Q    All right.  Was he a former chairman of the President's

14   Council of Economic Advisors?

15   A    Yes, he is.  Or yes, he was I should say.

16   Q    And what is this comment on securitization that he makes

17   here, that securitization was based on the premise that a fool

18   is born every minute?  And he goes on to say, globalization

19   meant that there was a global landscape on which they could

20   search for those fools, and they found them everywhere.

21       Does that comment have any significance to you in the

22   context of your opinions in this case?

23   A    So I might not have stated it quite as strongly as this,

24   but I certainly agree with what he's saying, that there was a

25   definite attempt to package things to be able to sell them at

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 29 of 221

Page 29

1   high prices based upon high ratings, triple A ratings, for

2   example, that really misrepresented the risk, and to the extent

3   that people were buying those and not paying attention I guess

4   you could call them fools, or at least people that didn't quite

5   do the due diligence of because of the complexity couldn't

6   understand the product.

7   Q    And the next document, tab 23 of the binder, is another

8   Bloomberg article also quoting Mr. Stiglitz where he says, I

9   view the rating agencies as one of the key culprits.  And he

10  says, they were the party to perform that alchemy by converting

11  the security from F rated to A rated.  The banks could not have

12  done what they did without the complicity of the rating

13  agencies.

14       Can you explain your understanding of that?

15  A    Yes.  Again, this refers back to this notion that there

16  was a decided attempted on the part of the people doing the

17  securitization, banks and others, to take as much as they could

18  and put in into a structure to get out of it something that

19  could be triple A rated and sell at a high price.

20       So there was allegedly, and I think there's evidence that

21  this did happen, the securitized product creator worked with

22  the ratings agency to make sure that the product that was going

23  to be sold as triple A just eeked over the line to meet that

24  requirement, and the ratings agencies in retrospect weren't, I

25  think, always doing what they should in this particular case at

Page 30

1    this time.

2    Q    And as of the middle of September 2008, Professor

3    Pfleiderer, do you believe people were already beginning to

4    question those ratings?  This article is dated September 24th,

5    2008.

6    A    I believe they were, especially of course given the

7    turmoil and the problems in the residential real estate

8    markets.

9    Q    The next document, tab 24, very briefly is a policy

10   statement on financial markets developments by the President's

11   Working Group on Financial Markets dated March 2008. Are you

12   familiar with this document?

13   A    Yes, I am.

14   Q    On page 1 of this document it provides what it calls a

15   diagnosis and summary of recommendations.

16        Do you see that?

17   A    Yes, I do.

18   Q    And it lists out a number of underlying causes of turmoil

19   in the financial markets.  I draw you attention to the second

20   and third bullet points.  Have you reviewed those?

21   A    I have.

22   Q    It refers to significant erosion of market discipline by

23   those involved in the securitization process.  Do you see that?

24   A    I do.

25   Q    And then it refers at the next bullet point to flaws in

Page 31

1  credit rating agency's assessment of subprime residential

2  mortgage-backed securities, RMBS.  Do you see that?

3  A    I do.

4  Q    And other complex structured credit products, especially

5  collateralized debt obligations, CDOs that held RMBS, and other

6  asset backed securities CDOs of ABS.  Were there securities

7  like those CDOs, CLOs, RMBS, asset backed securities in the

8  inventory of assets acquired by Barclays?

9  A    Yes, a significant part of that inventory comes under

10  these categorizations.

11  Q    And on the next page, page 2 there's a reference to

12  serious weaknesses in risk management practices at several

13  large U.S. and European financial institutions, especially with

14  respect to the concentration of risks, the valuation of

15  illiquid instruments for the pricing of contingent liquidity

16  facilities in the management of liquidity risk.  Do those

17  findings by the President's Working Group have any impact or

18  relationship to your opinions in this case?

19  A    They do, and I would highlight especially -- I don't know

20  if it's the second or third point -- that the valuation of

21  illiquid instruments that is being questioned here, that turns

22  out to be one of the significant issues here, and that's not to

23  say that the others are not, but I would highlight that.

24  Q    And the next page has a summary of recommendations from

25  the President's Working Group which refers in the fourth bullet

Page 32

1    point that to insure that market participants -- in the first

2    sentence it says -- the recommendations include measures to be

3    implemented by government authorities or market participants.

4    market participants there would mean financial institutions and

5    banks, correct?

6    A    I believe that is what they're referring to, yes.

7    Q    And the fourth bullet point says, they should insure that

8    global financial institutions take appropriate steps to address

9    the weaknesses in risk management and reporting practices that

10   the market turmoil has exposed.  Do you see that?

11   A    I do.

12   Q    And that risk management reference refers back to a

13   previous page where risk management is discussed, including in

14   terms of the valuation of illiquid instruments?

15   A    That is correct.

16   Q    Very briefly, Professor Pfleiderer, the remaining

17   documents, you have three complaints listed here, the first of

18   which is a complaint against Barclays, BCI Exhibit 1092.  Why

19   is that in this binder?

20   A    Because the allegations that are being made here in this

21   complaint as I understand them are that Barclays didn't

22   undervalue assets, which isn't I believe the allegations that's

23   being made in the present context, but rather that they

24   overvalued various instruments in their inventory.

25   Q    Were those various instruments instruments as referenced

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 33 of 221

Page 33

 1    on page 1 of the complaint residential mortgage-backed

 2    securities, RNBS, and collateralized debt obligations, CDOs?

 3    A    Yes, those are precisely the ones that we're talking

 4    about, at least that the conversation before was referring to.

 5    Q    And were those typed of assets, RMBS and CDOs, included in

 6    the inventory of what was acquired by Barclays in the Lehman CL

 7    transaction?

 8    A    Yes, they were a significant part again.

 9    Q    And so in this complaint they're being sued for having

10    overvalued those assets between 2005 and 2008?

11    A    That's my understanding of the complaint, yes.

12    Q    And in this case they're being sued for undervaluing them?

13    A    That's certainly my understanding of the present case.

14    Q    Now, Professor Pfleiderer, there's one more article in

15    this binder from the Wall Street Journal talking about toxic

16    assets being hard to clean up.  What are the -- very briefly

17    what does this article mean when it refers to toxic assets?

18    A    I think that term as it came to be used, and it was used

19    quite frequently, is referring to the type of securities that

20    we've been talking about, securitized products in general, but

21    in particular products involving residential mortgages, but it

22    went even beyond that to general securitized private products

23    that were hard to value in which there was a lot of what I

24    would say opacity in terms of what their values were, and a lot

25    of concern that their values could be quite low relative to

Page 34

1   what they were carried on the books for or what people might

2   have thought at one time they were worth.

3   Q    So as far as references, collateralized mortgage

4   obligations, CMO, collateralized loan obligations, CLO,

5   collateralized debt obligations, CDO, were there CMOs, CLOs,

6   and CDOs in the inventory Barclays acquired in this sale

7   transaction?

8   A    Yes, all three were present.

9   Q    Finally, Professor Pfleiderer, you've gathered a series of

10  indices at the back of this binder.  Can you very briefly

11  review what those show and what relevance they have to your

12  opinion?

13  A    Yes.  It's important to understand what was happening in

14  markets at this time, and one way to get some sense as to what

15  was happening is to look at various indices that are routinely

16  put together.  This is the Dow Jones on the 15th which is the

17  day after midnight that day when -- around midnight when LBHI

18  declared bankruptcy.  So that would be the first thing to look

19  at.

20      Another is the second which looks at the treasury bill 90-

21  day yield index.  And that here is from the 18th through the

22  22nd, and it shows that over this time period the yields are

23  rising and it's really important when you look at the graph

24  showing yields to understand that when yields rise the prices

25  of the instruments are actually falling.  So treasury

Page 35

1    instruments, at least the 90-day bills here, are actually

2    falling over this period.

3         The next is agencies -- U.S. government agencies 15-year

4    yield, and again shows really two things.  Some turbulence

5    here, but in particular the first highlighted red point is

6    September 15th and the second is September 22nd, and you can

7    see once again that yields are rising so prices are falling

8    over this period.

9         And what I've done here in all of these is anything that's

10   after the 22nd I've put in a lighter color blue just to

11   indicate that that's after the timeframe that we're talking

12   about here.

13        And the third, many of these show the same story, we're

14   just looking at different asset classes.  The third looks at

15   the auction rate seven-day index.  These are for auction rate

16   securities, which I believe we'll discuss a bit later.  Again,

17   you see that yields are rising so prices are falling over this

18   time period.

19        The next is a leverage loan index, and we'll be talking

20   about leverage loans later as well.  And in this particular

21   case we're not looking at yields we're looking at prices, and

22   you can see that here up to September 22nd, 2008 prices are

23   falling, at least on this yield -- or excuse me -- this

24   established loan index.

25        And then this is -- the next one is an important

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 36

1    explanation for what's happening over this period as well.

2    This is the amount of U.S. commercial paper outstanding.  So

3    this is credit that's being given to various entities,

4    corporations, and others, and what you see is that this is

5    declining over this time period.

6         So this is indicative of the beginning of what was called

7    the market freeze up for credit and we're seeing it happening

8    before the 22nd, it's starting to happen.

9         And then tab 37 is a very important index to look at to

10   understand much of what we're going to be considering.  This is

11   the volatility index called the VIX, oftentimes it's called the

12   fear index, and what this measures is market participant's

13   expectations about volatility going forward.  In other words,

14   how uncertain is the market about values going forward?  So the

15   higher this index is the more uncertainty there is.  And what

16   you see is that uncertainty is going up from the beginning of

17   September to September the 22nd, this VIX index is increasing.

18   It's already starting out at a somewhat high level, but by the

19   time you get to September 22nd it's quite a bit higher.

20        Now the next page shows that that was just the beginning

21   and uncertainty really went through the roof, if you will, in

22   October and November of 2008 where the VIX got up to almost

23   eighty, I think it actually exceeded eighty, which is basically

24   unprecedented.  The normal level for this, if there is a normal

25   level, is around twenty or twelve to twenty.  So this is just

Page 37

1    showing how great uncertainty there was, and it shows in my

2    mind -- I don't want to look at what's shaded in the lighter

3    color -- but the September 22nd and September 12th points are

4    showing that the market was fearful of volatility, and in fact

5    that fear was well-founded at the time because volatility went

6    up much more.

7    Q    Thank you, Professor Pfleiderer.  We may refer back to

8    some of these later in the testimony.

9         MR. HUME:  And Your Honor, for the record Barclays

10   will want to move into evidence the documents in this binder,

11   but I -- unless there's no objection to all of them I would

12   rather deal with any objections at another time.

13        MR. TAMBE:  There will be objections, Your Honor.

14        THE COURT:  We will reserve to another time dealing

15   with the objections.

16        MR. HUME:  And could we go back to Professor

17   Pfleiderer's demonstratives, and we'll start -- we may come

18   back to this throughout as we go through your opinions.

19   BY MR. HUME:

20   Q    Your opinion 1 about the book value of the loan positions,

21   Professor Pfleiderer.  What did you do to assess and reach that

22   opinion?

23   A    So my understanding of what book value referred to of

24   these loan positions in the APA is the book value of what was

25   on Lehman's books at the time.

Page 38

1      So the movants, as I understand it, are claiming that the

2   transaction misrepresented what was pout in the -- I should say

3   what was put in the APA misrepresented the true book value that

4   was on Lehman's books, and so their financial records that are

5   available that show what that was on the books, and the most

6   obviously thing, at least what I thought was the most obvious

7   thing to do was to look back at those records and see how --

8   what was represented in the APA accorded or didn't accord with

9   what was on the books.

10  Q    And it's your understanding that the APA's reference to

11  book value was a reference to what was on Lehman's actual

12  books, your understanding of what the movants have been

13  asserting?

14  A    That's my understanding, yes.

15       MR. HUME:  And can we go to demonstrative 7.

16  Q    Professor Pfleiderer, can you explain to the Court what is

17  shown on this demonstrative?

18  A    So the APA it said in the asset purchase agreement that

19  there were long positions and that they had approximately a

20  value of seventy billion, and the long positions are the six --

21  the categories that you see on the right of this first part of

22  the slide here.  And so these are based upon Lehman

23  categorizations in its systems.

24       So I went back and basically looked at those categories

25  and looked at the values that the systems were showing at

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 39 of 221

Page 39

```
 1    various times and compared that to the seventy billion that's

 2    in the APA.

 3    Q    And by the way, would it be helpful to you, Professor

 4    Pfleiderer, to have a pointer in case you want to point out

 5    things on these charts?

 6    A    Yeah, that would --

 7    Q    At least potentially.

 8    A    Sure.

 9            MR. HUME:  May I approach, Your Honor?

10            THE COURT:  Yes, but just be careful with that

11    pointer.

12            THE WITNESS:  Okay.

13    BY MR. HUME:

14    Q    Professor Pfleiderer, in the middle of this chart refers

15    to collateralized short-term agreements at ten billion and then

16    it does a calculation showing five of the six long positions at

17    sixty billion.  Can you explain what that is?  Explain it.

18    A    So there's an entry that repeatedly comes up and we'll see

19    it often, collateralized short-term agreements, that are

20    carried throughout this time at ten billion.  So this is a

21    number that is basically not changing over the time period that

22    we're looking at.

23         So that was part of the long positions, but it wasn't

24    changing and it's rather convenient to just subtract that out

25    from the seventy billion and look at what remains and ask
```

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 40 of 221

Page 40

1    whether that is sixty billion or not.

2    Q    And to your knowledge, Professor Pfleiderer, goes the GFS

3    data that shows the gap asset summaries for LBI show anything

4    for collateralized short-term agreements?

5    A    I don't recall right now.

6    Q    And does the GFS data show summaries for the other five

7    asset classes, government securities, commercial paper,

8    corporate debt, corporate equity, and derivatives?

9    A    That it definitely does, yes.

10   Q    And before getting to the GFS data did you look originally

11   at the contemporary documents that were produced in this case

12   and used by participants in negotiations to show marks on

13   Lehman's books for these asset classes to find those long

14   positions?

15   A    Yes, I did, there was one spreadsheet summary that was

16   delivered I believe, if my memory is correct here, it was

17   delivered I think ultimately to Stephen King on Monday sometime

18   -- around two o'clock I think on Monday on the 15th, and what

19   that gave was -- it was labeled, here's the data from the -- it

20   wasn't data -- but here's something from the 12th.  So it was

21   representing what the assets were as they were valued on the

22   20th, which of course is the Friday before.

23        And I'll talk a little bit later about some of the

24   implications of the timing of when it was received on Monday,

25   because GFS updates in its normal course of operation, updates

Page 41

1    what's being basically put for Friday in a so-called T plus 1

2    process, so it didn't reflect the total that would ultimately

3    show because it was basically a preliminary version of the

4    balance sheet at that time.  But that was one thing that is

5    available as of around 2 o'clock I believe on Monday.

6    Q    Go to demonstrative 8.  Is this your analysis of that

7    document you just referred to?

8    A    Yes, it is.  So the highlighted part in yellow at the top,

9    which I guess is not quite readable, is -- because of its small

10   size -- but that is referring to the long positions, and that

11   was the summary in the spreadsheet.

12        So what you can see down below is for instance the net

13   long inventory for CDOs and money market instruments, the first

14   line was one billion rounded to the nearest tenth of a billion.

15   Q    And did this document -- the document shows 65.1 as the

16   total of what it's summarizing.

17   A    That's correct.

18   Q    And if you add 10 to that it's seventy-five.  Why does

19   that not show long positions as defined in the APA of greater

20   than seventy billion?

21   A    You might think that it would, but there's an important

22   thing to realize here, and it's very clear if you read the APA

23   that what was excluded from that calculation were what were

24   classified in the Lehman system as mortgages.  So the APA

25   referred to everything but the mortgages which were treated

Page 42

```
 1    separately and a value really wasn't put on those.

 2         So it's necessary because of that -- and we'll be doing

 3    this throughout -- to subtract off the mortgage book value

 4    which here is 6.5.  So right after that total of 65.1 you

 5    subtract off those mortgage-backed securities at book value and

 6    then you add these collateralized short-term agreements and you

 7    get 68.6 which is in this case obviously less than seventy

 8    billion, which is what was reported on the APA.

 9    Q    And just going back to those collateralized short-term

10    agreements, Professor Pfleiderer, what is your understanding of

11    what those are?

12    A    Those are part of what came to be referred to as the

13    matchbook, and they're called reverse repos.  Basically they're

14    loans that are outstanding that are due to Lehman Brothers or

15    LBI, and so they're valued here at ten.

16    Q    Are you aware of any testimony at all or any suggestion by

17    the movants that those were the subject of markdowns or would

18    it make sense for those to be the subject of markdowns?

19    A    I certainly haven't seen anything and I don't believe

20    those are in contention.

21    Q    Demonstrative exhibit 9 analyzes Movant's Trial Exhibit

22    15.  Are you familiar with that document?

23    A    Not by number, but by visual impression, yes.

24    Q    And have you analyzed whether the marks on that document

25    for the Lehman long positions show values greater than seventy
```

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 43 of 221

Page 43

 1   billion?

 2   A    Yes, this is a rather simple exercise, but it follows the

 3   same procedures.  We add up what was shown on debt and get a

 4   total of 65.2, but that includes as you can see the 6.5 in

 5   mortgages, which again were not part of the APA definition of

 6   long positions, so you subtract off that, add the ten in

 7   collateralized short-term agreements and this comes up with

 8   68.7, which again is less than seventy.

 9   Q    And the very next demonstrative performs a similar

10   analysis on what has been called the final version of this

11   Berkenfeld schedule that Steve Berkenfeld initialed?

12   A    Yes, the one that says final and then I think it's his

13   initials SB at the top, yes.

14   Q    And do you perform the same analysis with that document?

15   A    Yes, again and this is a fairly simple exercise of just

16   taking the numbers, adding them up, in this case you get 62.7,

17   but now you subtract off mortgages which are here shown as 2.7,

18   and there's one other additional subtraction that you have to

19   make included in the so-called Berkenfeld balance sheet as cash

20   of 700 million, and that was not part of the definition of long

21   positions in the APA.  So you subtract that off, add the ten

22   billion in collateralized short-term agreements and this comes

23   up to 69.3.

24   Q    Professor Pfleiderer, does this analysis show that the

25   final version of the Berkenfeld schedule actually shows a

Page 44

1    higher value for the long positions as defined in the APA than

2    the earlier version with Ian Lowett's handwritten notes?

3    A     Yes, it does.

4    Q     And just to go back again, this final one at 69.3 and to

5    go one slide earlier the final is 68.7 for the version with

6    Mr. Lowett's handwriting?

7    A     That's correct.

8    Q     Could we briefly pull out these two documents.  They are

9    Movant's 15, that is the one with Mr. Lowett's notes, and BCI

10   Exhibit 106A, the one with Mr. Berkenfeld's initials.

11        Now, Professor Pfleiderer, I'm going to use my pointer, if

12   I may.  The version Movant's 15 if we could highlight the total

13   number there it says 77.4.  Do you see that?

14   A     I do.  Excuse me, I do.

15   Q     In the final version here initialed by Berkenfeld says

16   77.65.  Do you see that?

17   A     72.65.

18   Q     Sorry, 72.65.

19   A     Yes.

20   Q     Now that does show approximately a five billion dollar

21   difference, doesn't it?

22   A     Between the two bottom lines, yes.

23   Q     And there's testimony that some of the marks here anyway

24   on Movant's 15 are Mr. Lowett's handwriting, there's also

25   written here words that appear to be markdown.  Do you see

1    that?

2    A    Yes, I do.

3    Q    So doesn't this show that there were markdowns to the

4    assets that led to a five billion dollar reduction from 77.4 to

5    72.65?

6    A    No, what you need to do is let's stay in the typed column

7    first, so the column on the left of the left balance sheet.

8    Q    Uh-huh.

9    A    And you'll notice first of all that we've got to subtract

10   off mortgages there, that's 6.5 is there and that needs to be

11   subtracted off.  And then you'll also notice that we still have

12   collateralized short-term agreements at ten, but there's some

13   other entries there, other assets, investment in consolidated

14   subs, those need to be subtracted off because those were not

15   part of the APA definition of the long positions, certainly as

16   I understand it.  And then there's one other entry which is

17   goodwill which is 250 million.

18       So what you need to do is subtract off from that 77.4 the

19   6.5 in mortgages, the 1.9 and .4 in other assets and

20   investments in consolidated subs, and also the .25 in goodwill,

21   and once you've done that you're less than seventy.

22   Q    So does the comparison of these two documents, Profession

23   Pfleiderer, indicate to you that there was or was not a five

24   billion dollar reduction in the marks on the long positions?

25   A    No, it doesn't.

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 46 of 221

Page 46

1   Q    Does it indicate to you that there may have been markdowns

2   or write downs on the mortgages?

3   A    There is a markdown on the mortgages from first of all 6.5

4   that you see there on the left to 2.7, and I believe that it's

5   appropriate to interpret in two ways.  One is that an

6   understanding in the asset purchase agreement that only half of

7   the mortgages were to be delivered to Barclays.  So if you take

8   half of 6.5 you get 3.25, and then I believe there was perhaps

9   a write down based upon assessed value of what those mortgages

10  were worth.  And again, it's important to emphasize this is

11  what all the turmoil was about in the market at the time, and

12  so that may have been marked down from 3.25 to 2.7, but

13  mortgages were not part of that seventy billion which was the

14  approximate value of the long positions on the asset purchase

15  agreement.

16  Q    Are you aware, Professor Pfleiderer, of whether there was

17  any public discussion by Barclays that it was writing down the

18  Lehman marks on the mortgages?

19  A    I believe that there was in -- if memory serves me

20  correctly -- in the conference call that was made, I believe it

21  was Wednesday -- I may be mistaken as to exact time -- that was

22  made with John Barley and others on the phone, and I believe

23  that they explicitly mentioned that they were writing down.  I

24  don't know if they used those words, but they were questioning

25  the valuation of the mortgages.

Page 47

```
 1    Q    Professor Pfleiderer, the corporate equity provision on

 2    Movant's 15 is listed at 9.3.  Do you see that?

 3    A    I do.

 4    Q    And the corporate equity category on the Berkenfeld

 5    initial version is 8.8.  Do you see that?

 6    A    Yes.

 7    Q    So there's a difference there of approximately 500

 8    million.  Do you see that?

 9    A    Yes, I do.

10    Q    Now if the corporate equities -- if the marks on the

11    Movant's 15 reflected September 12th marks would it be

12    appropriate in order to try to bring them up to date to

13    September 16th to reduce them?

14    A    As I understand book value that's carried on the books

15    it's supposed to be marked to fair value, and if the value of

16    those assets is changing then with a decrease in the value of

17    equities those should be marked down.  That's my understanding

18    of how the accounting is to be done.

19    Q    And did the stock market drop on September 15th?

20    A    It did as we saw I believe in one of the first diagrams

21    there -- one of the first indices we looked at.

22    Q    Did it drop somewhere in the region of five percent?

23    A    I believe it was.  I'd had to go back and look to verify

24    that precisely, but it was in that neighborhood.

25    Q    Now in addition to looking at the documents at the time
```

Page 48

1    did you also look at data extracted from the Lehman global

2    funding system, GFS?

3    A    Yes, I did.

4    Q    Can we go back to the demonstratives and to demonstrative

5    11.  What does this demonstrative show, Professor Pfleiderer?

6    A    So one can go back and access the GFS system to get the

7    valuations that were on Lehman's books at various times.  The

8    first column shows the 12th, and this was at the T plus 1 date

9    when that process was completed, and we may talk about that

10   later, but that shows a total value if you look at the bottom

11   line, the red line with 65.8, and not to make it -- belabor it,

12   but if you look at the values as you move across the sheet you

13   see that they're basically all under seventy and actually

14   declining for the most part.

15   Q    So on each date you subtract the mortgages, add ten

16   billion for collateralized short-term agreements?

17   A    That's correct, it's the same process for each of these.

18   Q    And the result on each date is less than seventy?

19   A    It's less than seventy, yes.

20   Q    Demonstrative 12, Professor Pfleiderer.  Does this simply

21   summarize your analysis of all of the data we've just reviewed?

22   A    Yes.  So this puts side-by-side the Berkenfeld balance

23   sheet, the one that Ian Lowett wrote upon, the schedule -- the

24   third one is the schedule that was given to Barclays that

25   represented what it was on the 12th, although that process

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 49 of 221

Page 49

1    wasn't complete in terms of the updating, and then we had the

2    actual GFS reports from the 12th and the 15th and the 16th.

3        And again, if you go to the bottom line here after

4    correcting for the mortgages, adding in the collateralized

5    short-term obligations you find that the value is always under

6    seventy billion.

7    Q    And so is it your professional opinion, Professor

8    Pfleiderer, that based on all of the actual documents and data

9    that the Lehman book value for the long positions as defined in

10   the APA was approximately seventy billion dollars or less?

11   A    It was always less, at least as we've seen, so -- but

12   approximately seventy billion or less is certainly a correct

13   way of putting it.

14   Q    And is it your professional expert opinion, Professor

15   Pfleiderer, that there is no actual financial data or

16   contemporaneous documents discussing and showing the Lehman

17   marks that would show marks as of September 16th for Lehman for

18   the long positions as defined in the APA of five billion

19   dollars more than seventy billion?

20   A    Absolutely not.  I didn't find any, and my staff and I did

21   an extensive search of all the records, a very careful search

22   of them.

23   Q    Now, Professor Pfleiderer, you're aware that there's been

24   a lot of testimony from movant's experts in this case and that

25   one of their experts, Professor Myefski (ph) has testified that

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 50 of 221

Page 50

1    there may be incompleteness or problems with the GFS statement.

2    Are you familiar with that?

3    A    Yes, I am.

4    Q    All right.  Can you go to demonstrative 13.  Are you

5    familiar that one of his criticisms was that Barclays used the

6    wrong data set -- sorry, excuse me -- that the data set was not

7    reliable because when he compared a 9/19 GFS data set with what

8    you had summarized in your April 23rd declaration they didn't

9    reconcile.  Are you familiar with that?

10   A    Yes, I am.

11   Q    And do you have an explanation for that?

12   A    Yes, I do, unfortunately it's a bit tedious, but it is an

13   explanation that shows precisely in my view what happened here.

14        And basically -- and I'm going to mispronounce his name

15   I'm afraid, but my name has been mispronounced too on occasion,

16   we both have difficulty pronounced names -- Professor Myefski

17   -- I hope I did that approximately correct -- was using the

18   wrong data set when he made this comparison.  And what happened

19   is that on April the 2nd of this year Barclays produced 9/91

20   GFS spreadsheet with the Bates number that you see there, and

21   then on the 23rd, a few weeks later, produced -- Barclays

22   produced another one of these, and this was basically an update

23   of the April 2nd -- the one that was produced on April 2nd,

24   because the original report -- because of a filter that was

25   inappropriately set, as I understand it, inadvertently omitted

Page 51

1    some of the CUSIPs or some of the entries in the GFS system.

2    So the April 23rd was the operative spreadsheet.

3        And what is quite apparent is that Professor Myefski

4    compares the one that was delivered on April the 2nd, the one

5    that should not have been used because it had been updated,

6    with the correct one -- or the updated one that was sent on the

7    23rd and find the difference, but that difference is easily

8    explained by the updating, and quite simply his analysis should

9    have been based on the spreadsheet that was sent on the 23rd.

10   Q    And Professor Pfleiderer, does either set show long

11   positions greater than seventy billion?

12   A    No.

13   Q    Demonstrative 14 addresses another criticism of Professor

14   Myefski.  He presented a demonstrative in this court saying

15   that approximately 10.5 percent of the CUSIPs acquired by

16   Barclays could not be found on GFS on September 12th, 15th, and

17   16th.  Did you and your staff analyze that assertion?

18   A    Yes, we did, and this unfortunately is ongoing work, we've

19   been able to do a fair amount here, but one of the problems

20   here -- the crux of one of the problems is that some of the

21   securities that were transferred to Barclays are listed on GFS,

22   but they're not identified by CUSIP identifiers, but rather by

23   something else.

24       So the problem is that indeed Professor Myefski makes this

25   clear, he's talking about 10.5 percent of the CUSIPs, so he's

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 52 of 221

Page 52

1    trying to make the matches with CUSIPs.  And what one can do is

2    go back and make further matches based not on CUSIPs, because a

3    CUSIP is not there in the GFS report, but on other identifiers,

4    and produce a match.

5        So there's an identifier called ISIN, for example, and I

6    knew what this meant a few days ago, and it's -- I should

7    speculate now.  I can't remember exactly what the acronym

8    means, but it's another identifier in the GFS system, and so

9    you can do further matches based upon other identifiers.

10       So this is extremely tedious to do, but in the intervening

11   time, my staff that's been working on this, has identified

12   another 133 that can be matched.  There was missing CUSIPs that

13   can be found not missing by basically matching on another basis

14   -- one of these other identifiers.

15   Q   So thus far of the approximately 1200 or so CUSIPs that

16   Professor Myefski says he thought were missing you and your

17   staff have thus far identified 133 that are not missing?

18   A   That's correct, and that's based -- again, it's a tedious

19   process so that's based upon what's been found to date.

20   Q   And does that -- when you say not missing does it mean the

21   security reference by the CUSIP is on GFS but without a CUSIP

22   identifier, just another identifier?

23   A   That's correct.  It's matched not by CUSIP but by another

24   identifier.

25   Q   We'll briefly look at this illustration on demonstrative

1    15 so that it's clear what we're talking about.

2    A    So this is an example of one of those 133.  And what you

3    see at the top is a -- basically an excerpt from the GFS

4    report, and what you see is a CUSIP that's given there.  I'm

5    sorry, I misspoke, I misspoke, I'm sorry.  What's given at the

6    top is from the acquisition balance sheet, and there we have a

7    CUSIP that is M22 so on and so forth, so that's from the

8    acquisition balance sheet from Barclays.

9        And if you look at the bottom of the page what you see is

10   an entry from the GFS report, and there is a column called real

11   world CUSIP, and on this particular -- for this particular

12   security that I'm going to identify here in a moment by another

13   means, there's no CUSIP that occurs.

14       And so when Professor Myefski looks at M22465104, that

15   CUSIP in the acquisition balance sheet and he tries to find it

16   in GFS he's not going to find it because there's no CUSIP in

17   GFS corresponding to that.  However, there is this other

18   identification -- again, if we look at the bottom, this is in

19   the GFS summary -- this ISIN number IL so on and so forth, and

20   that is another way to match things up.

21       What you see in the middle of this is a screen shot from

22   Bloomberg that gives the ISIN number at the bottom, and then if

23   you look at the right highlighted in pink it gives a CUSIP

24   number.  So this ISIN number matches with the CUSIP number M22.

25   So by using Bloomberg we can see the match between these two

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 54 of 221

Page 54

1    and then trace back the GFS security that's only listed by ISIN

2    number to the acquisition balance sheet that has the CUSIP

3    number.

4        So it's a tedious process to make these matches, but

5    there's indication, again, we found 133 that this is going on

6    when we look at these two systems, the acquisition balance

7    sheet and GFS.

8    Q    Are you aware, Professor Pfleiderer, whether the examiner

9    conducted any kind of similar analysis, the independent

10   examiner appointed in this case to determine whether GFS

11   captured the CUSIPs that were transferred to Barclays in the

12   sale?

13   A    Yes, I am.

14   Q    And I think it's demonstrative 17, just skipping ahead,

15   that shows -- are you familiar with this conclusion by the

16   examiner?

17   A    Yes, and the examiner must have had more time to do this

18   because he concludes that the difference in terms of CUSIPs

19   that can't be found is only .5 percent of the total par value

20   transferred to Barclays, so he was able -- he or staff working

21   for him I probably should say -- able to find quite a few

22   matches.

23   Q    Now the reference there is to value and that brings us to

24   another issue which is on the previous demonstrative 16.

25   Professor Myefski reported 10.5 percent missing CUSIPs.

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 55 of 221

Page 55

1   A    Yes.

2   Q    Was he talking about value or number of CUSIPs?

3   A    He's quite clearly, at least as I read it, talking about

4   CUSIP percentage of CUSIPs.

5   Q    And when you -- well first of all replace the CUSIP that

6   you and your staff have identified and then look at value

7   rather than CUSIPs what does it translate to?

8   A    So again, replacing the 133 that we were able to match to

9   date, what you find if you look at it at value is that the

10   missing CUSIPs that remain -- and I put that in quotation marks

11   because again, some of these may not be missing once you do

12   some further matches -- represent two percent of Barclays exit

13   marks.  So we're talking about 890 million or 1.4 percent of

14   the notional value which is a way of figuring out the scale of

15   the security.

16        So now we can go back and take that two percent number,

17   for example, and say well, let's assume that that is what

18   wasn't in GFS that somehow got transferred and basically

19   multiply by two percent the values that we've seen before and

20   see if that exceeds seventy billion.

21        So, for example, almost at the bottom of the page here if

22   you look at September the 16th the GFS marks were 62.57

23   billion, and if we say well two percent of that is missing, so

24   we take that and get 1.257 billion, so we gross the number up

25   by that amount we get 63.8, almost 64 billion, but a lot less

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 56 of 221

Page 56

1   than seventy billion.

2        And indeed there's nowhere near this value, but even if

3   you gross this up by ten percent to account for the so-called

4   missing CUSIPs you find that you only get up to 68.9

5   approximately, so still less than seventy billion.

6   Q    And jumping ahead now again to demonstrative 18.  In the

7   course of this analysis have you and your staff also identified

8   that some of what Professor Myefski has identified as so-called

9   missing CUSIPs show up on the Schedule B clearance box assets?

10  A    Yes.  So it's possible to take these ones that have been

11  identified and trace them back to various categories.  So 668

12  of the ones that Professor Myefski identified as missing CUSIPs

13  were actually on Schedule B which is a list of the clearance

14  box assets, and it's possible that these may not have been

15  because they were clearance box assets, may not have been in

16  GFS because they couldn't be traded or pledged, they were known

17  I guess as a box of hammers.  I've heard that expression used.

18  Or I shouldn't say heard, but I've seen that expression used.

19  So that's certainly a possibility.

20        And again, even if we add these -- and this just restates

21  the conclusion from before -- even if we add these to GFS we

22  still come out under seventy billion.

23        And the other interesting thing to observe is that if you

24  look at the remaining 3,173 CUSIPs that are on Schedule B all

25  but four of these are found on GFS, and those four are not in

Page 57

1   the backup to the acquisition balance sheet, and therefore

2   what's on Schedule B is part of the original estimate of the

3   long positions in the APA.

4   Q    There's been testimony --

5   A    This remaining part I should say.

6   Q    There's been a dispute in this case about whether the

7   clearance box assets were identified for Barclays at the end of

8   the week or added to the deal.  Does this analysis bear on that

9   dispute?

10  A    This strongly suggests based upon these numbers and

11  predominant number that's in GFS that they were part of the

12  long inventory, part of that approximately seven billion that

13  was referred to in the APA.

14  Q    You wouldn't know that unless you actually look at the

15  data though, correct?

16  A    That's right.  This is based upon tracing them back to

17  GFS.

18  Q    And has your staff confirmed what I think is undisputed

19  that not all of the CUSIPs on Schedule B have been transferred

20  to Barclays?

21  A    That's my understanding based upon just looking at

22  Schedule B and then looking at what appears in the acquisition

23  accounting.

24  Q    And finally, Professor Pfleiderer, and then we can perhaps

25  take a break if it makes sense.  On demonstrative 19 there have

Page 58

1    been accusations, quite serious accusations actually, in a

2    letter that attempted to keep GFS data out of this case, that

3    there had been manipulations, adjustments that may have

4    corrupted the data in some way.  Have you analyzed that issue?

5    A    Yes, in terms of what the differences that were created by

6    the special environments actually ended up being, I have.

7    Q    And what is it that you have found?

8    A    So by going through the change that occurred in this

9    special environment, because the important thing is that before

10   those changes were made the GFS balance -- I should say GFS

11   system data was archived so you can see what the changes are.

12   As a matter of fact I understand that each one of those changes

13   is a data entry itself that is kept track of.

14        So you can go back and look at the change.  And the change

15   that was made on September the 12th -- to September the 12th --

16   I misspoke -- the changes to the September 12th data that were

17   done by Alvarez & Marsal, because as I understand it they were

18   the ones that requested that -- that results in 100 million net

19   reduction in the total value which is really immaterial to my

20   opinions given that we've shown before -- or I've shown before

21   what we looked at that it's well less than seventy billion.

22        And if you look at the 19th, which as I understand it was

23   the other special environment day or any special environment

24   applied to the GFS was on that day or for that day, that is

25   even smaller.  Amounts to about sixteen million in changes.

Page 59

1    Q    Professor Pfleiderer, could you just briefly explain what

2    you mean by special environment?

3    A    So my understanding of it based upon meeting, I believe

4    her name is Ilna Krisner (ph) and just understanding the

5    context for this, is that Alvarez & Marsal requested the

6    ability to go back in and make changes to the GFS system -- or

7    to the GFS data for these two days, and those resulted in quite

8    a few entry changes, but some of those changes as I understand

9    them are not changes to values but rather just changes in some

10   cases to names I believe.

11        So in any event, as I said, you can look at what the delta

12   is in terms of value, it's 100 million for September the 12th

13   and it's about 16 million for September the 19th.

14   Q    What is your understanding, Professor Pfleiderer, of the

15   normal T plus 1 process you referenced earlier or adjustments

16   to the GFS data?

17   A    So my understanding of that process is that at the close

18   of trading let's say on Monday some of the GFS system starts to

19   get updated with some of the automatic feeds and various other

20   things, but throughout the next day what's called T plus 1

21   changes are made that are really just updating it given what

22   happened the day before, so that what gets produced represents

23   what was basically the situation at the end of the day before.

24        So you need to let that process play out, that T plus 1

25   process in which things are reconciled and brought up to date

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 60 of 221

Page 60

1    for the day before.  So you can never really look, as I

2    understand it, at an accurate measure of what GFS was recording

3    for Monday you can see that until that process plays out

4    through the course of the day on Tuesday and closes I believe

5    the practice was at six o'clock on the following day.

6    Q    And once it closes is it your understanding that further

7    adjustments can be made after the T plus 1 process is complete?

8    A    No, my understanding is at that time -- or at six o'clock

9    the system is closed and no further changes can be made.

10   Q    What about the special environment?

11   A    Well, there the word special is important.  These were

12   created at the request of Alvarez & Marsal to make changes.

13   Q    So after accessing all of Professor Myefski's criticisms

14   of GFS data and all of the allegations about adjustments,

15   special environments, et cetera, do you see any reason to alter

16   any of your opinions that the GFS data like the contemporary

17   documents all show long positions as defined in the APA of less

18   than seventy million dollars?

19   A    No, I do not.

20        MR. HUME:  Your Honor, I'm going to move to a new

21   topic so it may be a perfect time for a break.

22        THE COURT:  This is a good time for a morning break.

23   We'll go for fifteen minutes.

24        THE CLERK:  All rise.

25        (Recess at 11:07 a.m.; reconvened at 11:31 a.m.)

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 61 of 221

Page 61

1          THE COURT:  Please be seated.  I have one relatively

2    minor scheduling issue that effects me today.  I have a

3    conference call set for 1:30.  I have every expectation that I

4    will complete the call before the two o'clock start time, but

5    there's at least the potential that it might extend past two

6    o'clock.  Please plan to be here for a two o'clock start

7    anyway, but understand that if there's a slight delay there's

8    good reason for it.

9          MR. HUME:  Thank you, Your Honor, we'll plan

10   accordingly.

11   BY MR. HUME:

12   Q    Professor Pfleiderer, I think we were at the demonstrative

13   20, and you obviously have given testimony this morning about

14   this issue of a five billion dollar discount and the definition

15   of the long positions in the APA.

16        Professor Pfleiderer, generally have you made an effort to

17   review both the deposition testimony and the trial testimony in

18   this case?

19   A    Yes, I have.

20   Q    And are you familiar generally that there has been

21   testimony from various people who were at Lehman Brothers about

22   a five billion dollar difference or loss or delta of some kind?

23   A    Yes, I think terms of that sort of have been used and

24   usually associated with five billion.

25   Q    And have you reviewed that testimony?

Page 62

```
 1    A     I have.

 2    Q     And is that testimony inconsistent with the opinions

 3    you've given this morning about the seventy billion dollars

 4    definition of the long position in the APA?

 5    A     Well, when I read that testimony it's not precisely clear

 6    to me in reading it exactly what's being said, but if the claim

 7    is that the seventy billion was seventy billion less than what

 8    was on Lehman Brothers' books, LBI's books, then the evidence

 9    is very strongly against that as we showed.  Never looking at

10    the books never got about seventy billion.  So if that was what

11    people were meaning then I can only conclude that they were

12    probably mistaken about that.

13          But it may be that they were claiming something different

14    when they used that five billion difference, and there are

15    various ways to interpret the transaction and how it was being

16    carried out that would be consistent with the Barc's being at

17    seventy billion or less for Lehman Brothers, but nevertheless

18    give rise to a five billion delta in other ways.

19    Q     And just for the record in your answer I think you said if

20    what they were talking about is the seventy billion being

21    seventy billion less.  Did you mean --

22    A     I may have misspoke.  I mean five billion less.  I

23    misspoke.

24    Q     If we could look at the BCI Exhibit 110.  Are you familiar

25    with the document in which Barclays publicly announced the
```

1   sale?

2   A    Yes, I am.

3   Q    And are you familiar with the fact that on page 2 of the

4   document it describes the transaction as involving a taking on

5   -- excuse me -- we are acquiring trading estimates with a

6   current estimated value of seventy-two billion dollars and

7   trading liabilities with a current estimated value of sixty-

8   eight billion dollars?

9   A    Yes, that was the transcript -- or that was what was said

10  in the transcript of that call.

11  Q    And are you familiar with the fact that later on in the

12  call Mr. Raleigh (ph) I believe responds to a question about a

13  four billion dollar buffer?

14  A    Yes.

15  Q    And do you recall what he said in response to the

16  question?

17  A    He certainly said that it was important that they preserve

18  that buffer.

19  Q    And on page 5 of the transcript -- you know, this is what

20  we were just taking about -- do you recall there also being a

21  discussion in this transcript about the seventy-two number

22  being a net number because the mortgage paper had been written

23  down?  I think you may have referred to that earlier.

24  A    Yes.

25  Q    Have you analyzed what the numbers would look like if you

Page 64

1    used the Lehman marks on the mortgages and all the other

2    numbers together?

3    A    Yes, I did do that as one way to compute something that

4    might amount to a five billion dollar delta, but not in the

5    respect of the seventy billion that we looked at in the GFS

6    balance sheet.

7    Q    All right.  Is your analysis on demonstrative 21?

8    A    Yes, it is.

9    Q    And can you explain what this shows?

10   A    So the --

11           MR. TAMBE:  Your Honor, if I may object here.  This is

12   just sheer speculation.  There's no evidence in the record that

13   -- from people who were involved in the transaction that the

14   explanation that is set out on slide 21 or 22 has any

15   resemblance or connection to what actually happened.  It's pure

16   sheer speculation.

17           THE COURT:  Well, I don't know if it is or if it isn't

18   at this point, so I'll hear questions -- objections

19   appropriately lodged to questions, to the extent that there's

20   an objection to the use of the demonstrative or there's some

21   issue as to whether or not the evidence is competent after it's

22   been adduced we can deal with that, but I'm going to certainly

23   permit the question to proceed.

24           MR. HUME:  So -- and just in response to that, Your

25   Honor.

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 65 of 221

Page 65

1    Q    Professor Pfleiderer, are you reporting or attempting in

2    anything here to give an opinion about what you -- or give an

3    expert opinion about what people believed or thought at the

4    time?

5    A    No, that's not my expertise at all and that's not what I'm

6    trying to do here at all.

7    Q    Are you here trying to determine whether or not evidence

8    in this case, testimony is inconsistent with your expert

9    opinion about what the financial data and documents show?

10   A    I think that's an appropriate way to put it.  I'm

11   basically looking at what was said which was a claim that there

12   was a five billion dollar delta and you don't find that when

13   you look at GFS as we just went through.  So I'm simply asking

14   the question, given the numbers that are out there, is there a

15   way to construe those to give rise to a five billion delta?

16        So I'm not in any way saying that that was what was in the

17   minds of people that were writing that, but I'm simply saying

18   there's a way to interpret the transaction that relates to a

19   five billion delta, but not in the sense of the APA basically

20   giving a five billion dollar discount.

21   Q    And do you believe you're competent, Professor Pfleiderer,

22   as a financial economist to analyze numbers that were given for

23   trading assets and liabilities in this transaction to interpret

24   whether they may or may not be something that would give rise

25   to a loss versus Lehman marks?

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 66 of 221

Page 66

1    A    Yes, I believe that I'm certainly competent to do that.

2    Q    With that background could you explain what this

3    demonstrative is showing?

4    A    So all I'm doing here is observing first of all that the

5    APA said that the long positions -- and this excludes mortgages

6    -- were worth seventy billion at book value, and fifty percent

7    of the mortgages were to go to Barclays, and those were carried

8    on the books at 6.5 billion, so fifty percent of that would be

9    3.25 billion.

10    So I'm simply observing that if we use Lehman marks to

11    value the mortgages, and again, Barclays was writing these

12    down, but if we use Lehman marks to do that we would put in

13    3.25 to represent half of the mortgages at the Lehman marks.

14    And then there was 1.3 billion in retained cash.

15    So if you add all of that up you get 74.5, and if you

16    subtract off the trading liabilities that are stated in the APA

17    you get 5.5 billion, which could be rounded off to five

18    billion.  This is a way to get a delta of five billion.

19    I'm not in any way testifying this was going through any

20    particular person's mind, I'm simply saying there's a way to

21    interpret this that gives rise to a difference of five billion,

22    but not in the way that I believe the movants are alleging that

23    the books were marked down for the purposes of reporting values

24    in the APA.

25    MR. TAMBE:  Your Honor, we move strike that as

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 67 of 221

Page 67

1    speculative and not supported by any expertise.  It's just

2    conjecture.

3            THE COURT:  That motion is overruled.

4    BY MR. HUME:

5    Q    Professor Pfleiderer, you generally are familiar with the

6    APA in this transaction?

7    A    Yes, I read almost all of it, but some of it didn't seem

8    appropriate -- I shouldn't say appropriate, that was a -- it

9    was not related to the issues, so I wouldn't pass a test on all

10   the issues, but at least the financial issues I believe I would

11   pass that test.

12   Q    Are you generally familiar with the proposition that the

13   APA provided for assets beyond the long positions and mortgages

14   and liabilities beyond these trading liabilities?

15   A    That's correct.

16   Q    This is simply an attempt for you to analyze those

17   financial inventory positions?

18   A    That is correct, yes.

19   Q    Now the next slide.  Can you explain what the next

20   demonstrative is showing?

21   A    So the next simply looks at the accruals -- the comp and

22   cure that was accrued on the books of Lehman, to the extent

23   that I understand what the books were accruing -- and that

24   comes to 920 million, and you see that was on provisional

25   balance sheets that were sent to Weil Gotshal, as well as

Page 68

1   Alvarez & Marsal.  And if we subtract that off from that 5.5

2   billion number that we had on the previous slide as part of the

3   consideration that's being given then we get to 4.5, which

4   again is something like five billion.

5   Q    Now, Professor Pfleiderer, when you reference this comp

6   and cure accrual, do you understand that the Court was told

7   that the potential exposure for cure and comp was 1.5 and two

8   billion dollars respectively, or 3.5 billion of exposure, which

9   is different from this accrual?

10  A    That's correct, yes.

11  Q    And if Barclays -- do you understand generally whether

12  there were reasons why the estimate of what Barclays would have

13  to pay might differ from what's an accrual on a provisional LBI

14  balance sheet?

15  A    Yes, I do.  In fact much of this was just accrued through

16  the time and not through the end of the year.  Barclays would

17  be taking on liabilities for the rest of the year.  My

18  understanding also is that on comp Lehman did basically some of

19  the comp in cash and more in stock and Barclays would do more

20  in cash, and so there's a difference that arises from that as

21  well.

22  Q    Now, I'm not going to ask for a professional accounting

23  opinion, but as a financial economist do you understand

24  generally how a loss can be accrued on a financial statement

25  from a sale transaction like this?

Page 69

1    A    I understand the general principles, yes.

2    Q    And if Barclays paid a potential exposure amount or an

3    actual amount that was actually paid for cure and comp of three

4    and a half billion that was more than the accrual on the Lehman

5    books, would that impact the loss to Lehman?

6    A    My understanding is it would not.  That basically the

7    accountants would only recognize what was accrued.

8    Q    Now have you seen any documents in this case, Professor

9    Pfleiderer, that are consistent with this potential explanation

10   of the five billion dollar difference or loss that's been

11   eluded to?

12   A    I've seen various things that seem to comport with that,

13   yes.

14   Q    Can I please pull up exhibit -- Movant's Exhibit 14.  Now

15   have you reviewed these notes of Mr. Martin Kelly?

16   A    Yes, I have.

17   Q    And can I refer you to the third page of the note.  Have

18   you reviewed this page?

19   A    I have.

20   Q    And at the top here do you see this BV?

21   A    Yes, that I assume is meaning book value.

22   Q    And you see underneath it says, inventory 65?

23   A    Correct.

24   Q    And do you recall the first schedule that was sent to

25   Stephen King that you analyzed earlier this morning of what the

Page 70

1    total number was of the long positions plus the mortgages on

2    that schedule?

3    A    It was basically sixty-five.

4    Q    And did that number include 6.5 billion of mortgages?

5    A    That would include that 6.5 billion, yes.

6    Q    Then you see below that reverse repo ten.  Do you see

7    that?

8    A    Yes, that corresponds to the short-term agreements that we

9    talked about earlier.

10   Q    Then do you see a column here that's called proceeds?

11   A    Yes.

12   Q    And you see underneath that is the number 58.75?

13   A    Yes.

14   Q    And then another ten?

15   A    Yes.

16   Q    Adding up to 68.75?  Do you see that?

17   A    That's correct, yes.

18   Q    And then do you see another column loss gain?

19   A    Yes.

20   Q    And what does that show?

21   A    That shows here 6.25.

22   Q    As a loss or a gain?

23   A    As a loss.

24   Q    How would you compare this analysis here to the

25   demonstratives you just explained to the Court?  Is it similar

1   or dissimilar?

2   A    In my interpretation of this based upon reading it as book

3   value inventory and all the other things that we've just

4   discussed it comports fairly well with the type of analysis --

5   or I should hesitate to call it analysis -- but the type of

6   interpretation that I did on the last two slides.

7   Q    Moving on to a related but slightly distinct topic,

8   Professor Pfleiderer.  Do you recall reviewing parts of

9   Mr. Garvey's expert testimony in this case?

10  A    Yes, I do.

11  Q    You understand he's the expert accountant the movants

12  retained?

13  A    Yes.

14  Q    And I'd like to pull up -- have you reviewed his

15  demonstrative slides that he presented, some of them?

16  A    I certainly have seen some of them I believe, yes.

17  Q    I'd like to pull up Movant's 913, which is the

18  demonstratives of Mr. Garvey.  And slide 11 is his description

19  of fair value accounting principles.  And on this slide he

20  lists a series of bullet points summarizing what the rules --

21  the accounting rules require with respect to how assets should

22  be booked on a balance sheet.  Do you understand that?

23  A    I do.

24  Q    And have you reviewed this?

25  A    I have.

Page 72

1    Q    And I'm not asking you to give any kind of accounting

2    advise or opinion in this case, but as a financial economist

3    are you familiar and aware of the proposition that the value of

4    a portfolio of assets as a matter of economic and market

5    reality might be different from the value of that portfolio as

6    shown on the balance of a broker dealer?

7    A    Indeed that is certainly a possibility and quite a likely

8    possibility in certain circumstances.

9    Q    And Mr. Garvey showed this slide I think in a part of his

10   report where he was criticizing your use of the word book value

11   and your opinions on book value, and he was saying in his

12   expert opinion book value is a conservative, or he may have

13   even said most conservative way you can measure value of

14   financial assets if they are marked at a bid price, because

15   that's the low point.  Are you familiar generally with his

16   testimony on that?

17   A    I am.

18   Q    And is it true that marking financial assets at a bid

19   value on the financial statements of a broker dealer is the

20   lowest and most conservative way you can represent their value?

21   A    So CUSIP by CUSIP that may be the case, depending upon how

22   you do it, although even there from an economist's -- financial

23   economist's point of view the accountants as I understand it

24   don't allow one to make provisions for even the size of a

25   particular CUSIPs position.  But when we move from a CUSIP by

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 73 of 221

Page 73

1    CUSIP analysis to an analysis of what someone would pay for the

2    entire bundle, the portfolio as a whole, it is certainly not my

3    opinion that that gives the lowest value or a conservative

4    value.  Or perhaps a better way to put it is a reasonable

5    economic value.

6    Q    Mr. Garvey's opinion here included three bullet points I'd

7    like to draw your attention to, the last three on this slide.

8    The first one says, fair value does not contemplate a party's

9    personal ability to risk manage the asset.  Do you see that?

10   A    I do.

11   Q    As a matter of economic reality might it be the case in

12   your expert opinion, as a financial economist, that the value

13   of assets received by someone in a transaction or to be

14   acquired by someone in a transaction might be impacted by their

15   ability to risk manage those assets?

16   A    If I interpret fair value as an economist in the sense of

17   what someone would be willing to pay then indeed their ability

18   to risk manage the asset or the portfolio would factor into

19   that, in some cases in a very important way.

20        So this may be the accounting definition, but it doesn't

21   comport always with what would be an economist's definition of

22   what someone would reasonably be willing to pay.

23   Q    So if you -- or hypothetically if an entity acquired

24   thousands of CUSIPs in a chaotic transaction in which it was

25   going to take several days to get their arms around them all,

Page 74

1   if not weeks, to be able to risk manage them properly, hedge

2   them, start selling them, that might impact the economic value

3   even though it doesn't impact the accounting value?

4   A    That's right.

5   Q    Is that your testimony as a financial economist?

6   A    That's right.  My understanding is that the accountants

7   wouldn't allow you to reflect that, but that would definitely

8   be an important economic factor in a transaction of that sort.

9   Q    And the next bullet point says, market participants are

10  assumed to be knowledgeable and to have a reasonable

11  understanding about the assets based on all available

12  information, including information that might be obtained

13  through due diligence efforts that are usual and customary.  Do

14  you see that?

15  A    I do.

16  Q    And is it the case as a matter of economic reality a

17  person who has no understanding of an asset may value it less

18  than if they have a perfect understanding of it?

19  A    That is indeed the case.

20  Q    And so is this another example, as with the first bullet

21  point we reviewed, where the accounting value under the strict

22  accounting rules for portfolio financial assets might be higher

23  than those assets would have as a matter of economic reality?

24  A    Indeed.

25  Q    And the last bullet point says, a discount for block size

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 75 of 221

Page 75

1    is prohibited.  Do you have an understanding of what that

2    means?

3    A    I have an understanding of what's intended there, which is

4    that basically the accountants don't take into account the size

5    of the position of any buyer would certainly take that into

6    account, especially if it's in a liquid position.

7    Q    So you don't disagree with what Mr. Garvey is saying in

8    terms of his expert opinion as an accountant do you?

9    A    Oh no, not at all.

10   Q    Do you agree that the economic value of a portfolio

11   financial assets might be different, and in some circumstances

12   significantly lower, than the accounting value under these

13   strict accounting rules?

14   A    I do.

15   Q    And I'd like to briefly pull up -- have you reviewed the

16   testimony of Gary Romain, the accountant for Barclays?

17   A    Yes, I did.

18   Q    And have you spoken personally to Mr. Gary Romain as part

19   of your expert work in this case?

20   A    I did in December.

21   Q    From the trial transcript on September 2nd, if it's easy

22   to pull up, I'd like to pull up -- well, it's a number of pages

23   which I'm not sure is worth taking up everyone's time with.

24   But 6021, there's a question that I asked, now does that fair

25   market value under the accounting rules take into account all

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 76 of 221

Page 76

 1   possible economic and market realities that might impact what a

 2   willing buyer would pay to require the whole portfolio?  His

 3   answer, no.

 4   A    Yes.

 5   Q    Are you familiar with that testimony?

 6   A    I am.

 7   Q    Do you agree with it?

 8   A    I certainly do.

 9   Q    Now there's an objection, which I'm afraid we'll skip.

10   Line 12 on the next page, page 61 I say again, I am asking a

11   question about how the accounting rules work, which is does the

12   fair market value under the accounting rules take into account

13   all possible economic and market realities that might impact

14   what a willing buyer would pay to acquire the whole portfolio?

15       His answer, no, they don't.  They don't permit you to take

16   into account the fact that if you were to sell a large block of

17   assets you often wouldn't be able to realize the value that you

18   would get by adding up the bid prices of each individual

19   security in that portfolio, or the fact that if you were to

20   sell a large block of securities, especially into a illiquid or

21   volatile market, that very act would most likely depress the

22   price in that market making subsequent sales at the accounting

23   bid price unlikely.

24       Are you familiar with that testimony?

25   A    I am.

Page 77

1    Q    Do you agree with it?

2    A    Absolutely.

3    Q    Is it your expert opinion as a financial economist that

4    there is a difference between fair market value as defined as a

5    matter of economic and market reality and fair market value as

6    defined under the strict accounting rules?

7    A    Indeed there is.

8    Q    Are you familiar with the demonstratives I showed

9    Mr. Garvey when I cross-examined him in this trial?

10   A    Yes, I am.

11   Q    And did you decide that it might be useful to have those

12   as part of your examination?

13   A    Yes, I think that's a useful framework to talk about the

14   difference between the accountant's approach and basically

15   looking at the portfolio as a whole.

16   Q    You referenced earlier in your testimony Professor

17   Pfleiderer, P times Q, do you recall that?

18   A    I do.

19   Q    And what do you mean by P times Q?

20   A    I believe when I was saying that I was saying that the

21   accountants would take for each position the quantity of that

22   security, multiply it by a price that is determined by some

23   procedure accounting for illiquidity potentially for a normal

24   size lot, and then once you multiply quantity for each security

25   by the accountant's determined priced and you add it up you get

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 78 of 221

Page 78

1    the accountant's value of that portfolio.

2    Q    Did you invent the concept of P times Q or is it something

3    referenced in the accounting literature?

4    A    I believe it's referenced in the accounting literature.  I

5    certainly didn't invent it.

6    Q    Can I reference you briefly to -- you don't have to open

7    the big binder, but it is at tab 39 in the big binder, BCI

8    Exhibit 1002A, we'll put it up on the screen, and it's

9    statement of financial accounting standards number 157.  Do you

10    see that?

11    A    Yes, I do.

12    Q    From the financial accounting standards book.  Do you see

13    that, financial accounting standards book?

14    A    Yes.

15    Q    As a financial economist, Professor Pfleiderer, are you

16    generally familiar, and from time to time does your work

17    require you to look at and understand developments in the world

18    of accounting?

19    A    Yes, it does.

20    Q    I'd like to refer you to page, I believe it's 71, and

21    paragraph -- maybe we could put up C75 and C76.  And C75 begins

22    by saying, for broker dealers and certain investment companies,

23    investment companies other than registered funds subject to SEC

24    reporting requirements to use blockage factors, it says, the

25    AICPA audit and accounting guides for those industries allowed

Page 79

1    an exception to the requirement of other FASB pronouncements to

2    use P times Q to measure the fair value of a block,

3    specifically the guides permitted a fair value measurement

4    using a blockage factor where appropriate.  Do you see that?

5    A    Yes, I do.

6    Q    And do you understand this section of SFAS 157 to be a

7    discussion of whether it was appropriate under the accounting

8    rules for broker dealers to continue to be able to take

9    advantage of this exception to P times Q?

10   A    That was my understanding.

11   Q    And you've reviewed this document?

12   A    I have.

13   Q    And it refers in the second sentence of the next paragraph

14   to a blockage factor task force.  Do you see that?

15   A    Yes, I do.

16   Q    And that was formed in 2000.  Do you see that?

17   A    Correct.

18   Q    And if you skip down a little bit it says that this task

19   force affirmed that discounts involving large blocks exist

20   generally increasing as the size of the block to be traded

21   expressed as a percentage of the daily trading volume

22   increases, but that the methods for measuring the blockage

23   factors -- discounts -- vary among entities and are largely

24   subjective.  Do you see that?

25   A    I do.

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 80 of 221

Page 80

1    Q    Does that in your mind simply describe the economic

2    reality that when large institutions acquire large portfolios

3    of assets they may be only willing to pay less that P times Q

4    for that portfolio?

5    A    Less than P times Q as the accountants would calculate it

6    without having the so-called adjustment for a blockage factor.

7    Q    And if I could I'd just like to refer you to the next

8    couple of paragraphs.  I think in C77 there's an extensive

9    discussion of this P times Q, and it says in particular, if a

10   block is purchased at a discount to the quoted price a fair

11   value measurement using P times Q would give the appearance of

12   a gain upon buying the block followed by a reported loss on

13   subsequently selling the block.  Do you see that?

14   A    Yes, I do.

15   Q    And do you have an understanding of what that means?

16   A    So I believe that simply what they're saying is that the

17   accounting conventions will not reflect the actual trade prices

18   that one would expect when you're dealing with a large block.

19   So the accounting restriction is going to basically cause you

20   to deviate from the economic reality.

21   Q    And if we can just flip ahead quickly to the next two

22   paragraphs.  To move things along why don't we just go to C80,

23   and the end of this last paragraph of this section says, this

24   statement -- meaning SFAS 157 -- precludes the use of blockage

25   factors and eliminates the exception to P times Q.  Do you see

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 81 of 221

Page 81

1    that?

2    A     I do.

3    Q     And is that consistent with your understanding that at

4    present, under the accounting rules, no matter what the

5    economic reality is, no matter what the economic value of a

6    portfolio or the nature of the transaction, the accounting

7    rules require, just as Mr. Garvey said --

8    A     Right.

9    Q     -- that you use P times Q and that you are not allowed to

10   take a blockage factor into account?

11   A     That is my understanding, yes.

12   Q     Now, if we could go back to the demonstrative 23, I think

13   you've already described what this illustrates, perhaps we

14   could go to the other demonstrative 74 -- 24, I believe.

15         Now, Professor Pfleiderer, I asked Mr. Garvey if a

16   perfectly mark-to-market assets on a broker dealer's balance

17   sheet was seventy-two billion following the P times Q method,

18   strictly and accurately, but if the most that any willing buyer

19   would pay for that portfolio was sixty-eight, I said, would

20   that be above discount?  And I can show you his testimony, but

21   I would first like to ask you whether it's your opinion that

22   that might or might not be described by an accountant as a bulk

23   discount?

24   A     My understanding is that an accountant would probably use

25   that terminology, yes.

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 82 of 221

Page 82

1    Q    And would an accountant use that terminology, even if the

2    transaction was discussed in negotiating without any negotiator

3    using that terminology?

4    A    I believe they would, yes.

5    Q    Let me refer you to your next demonstrative, and have you,

6    if you would, explain to the Court what it is that you're

7    explaining in this demonstrative.

8    A    So the word discount has been used in various contexts in

9    the record, as I read it, and as a financial economist, I would

10   observe that discount is used in a number of contexts, and I

11   wanted to basically list three here that are very different,

12   but nevertheless, contexts in which discount might be used.

13        And the first one is very simple.  If you believe for

14   various reasons that mark or some quoted price is stale or

15   doesn't reflect fair market value, is above fair market value,

16   you might speak about discounting it to fair market value.  So

17   it's not a case that you're discounting from fair market value,

18   you're actually discounting something that's too high to fair

19   market value.  So that's one use of the word discount in a

20   certain context.  But it certainly doesn't result in an end

21   product, if you will, that is not equal to fair market value,

22   it's the way you get to fair market value.

23        And then the other -- another, I should say, use of the

24   word discount might be describing less than what we've just

25   talked about, P times Q as the accountants calculate it, for a

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 83 of 221

Page 83

1    large portfolio of assets, and accountants may talk about this

2    as a block discount, but the economics of this could be

3    completely justified, and in particular, if no other buyer is

4    willing to pay more, then this is the fair market value, as

5    would be used by an economist.

6         So the final way that it might be used, and I believe but

7    I am just speculating, this how the movants are attempting to

8    use the word discount, is that it's a discount that gives the

9    buyer a price lower than what someone else would've been

10   willing to pay for it.

11        And so that would be a true discount in economic sense.

12   Someone's getting to buy something lower than someone else

13   might have paid for it. But an economist would only use that

14   term if there was evidence that someone was in the market,

15   ready to pay more than what the buyer actually paid.

16   Q    Can we go back one demonstrative, please.  When we looked

17   earlier at the Barclays' public announcement, Professor

18   Pfleiderer, we talked about, trading assets of seventy-two and

19   liabilities of sixty-eight.

20   A    Yes, we did.

21   Q    Is it your understanding that was a public document?

22   A    I would consider it public.  It was on a conference call

23   that was certainly public in that sense, and then I believe

24   there were a number of newspaper articles that picked it up.

25   So I would certainly say that that was in the public domain.

Page 84

1    Q    And you're aware of newspaper articles that before the

2    sale was approved, described the deal very simply, whether

3    accurate or inaccurate, described it simply as a deal of

4    seventy-two billion trading assets and sixty-eight billion of

5    trading liabilities?

6    A    That's my recollection of what some of the articles said,

7    yes.

8    Q    And that was in the public domain?

9    A    I would certainly consider that in the public domain.

10   Q    And did you understand whether anyone in the financial

11   markets in the world that could read those articles, came

12   forward in reaction to that and said, we'll pay more?

13   A    My understanding is that did not occur.

14   Q    Is that relevant going forward one more slide to your

15   opinion as to whether or not there was a discount in the true

16   economic sense of the word in this case?

17   A    Just as what's highlighted in red, you wouldn't use that

18   term unless you could point to a buyer who was willing to pay

19   more.

20   Q    Based on all of your analysis and we're going to talk

21   about the repo collateral shortly, and the evaluation of it.

22   Based on all your analysis of the economics of this

23   transaction, do you believe that this transaction involved a

24   discount in that final truest, strictest sense of Barclays

25   getting a price that was less than what another buyer would be

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 85

1    willing to pay?

2    A    Absolutely not.  I certainly have seen nothing that would

3    indicate there was some other buyer that was willing to pay any

4    more.

5    Q    And do you include in that opinion another buyer for a

6    single transaction or a whole series of buyers in a mass

7    liquidation of LBI?  In other words, do you believe there's any

8    evidence that a liquidation of LBI would've yielded more value

9    to the estate?

10   A    So as I understand it, there were basically two

11   alternatives.  One was whether -- there were three

12   alternatives; complete the transaction, sell it someone else

13   for a higher price, no one stood up and said that they were

14   willing to pay more, and the third alternative was not to

15   complete the sale and basically go into a liquidation or

16   whatever would ensue if a sale didn't occur.  So those were the

17   three.

18        The one with the higher buyer was not relevant because the

19   higher buyer or a buyer willing to pay a higher price was not

20   there.  So that basically leads you to the other two, either

21   sell it or go into a liquidation, and then the only question

22   remaining is whether selling it is better than a liquidation.

23   And I think there's substantial reason to think that it was

24   very reasonable that selling it was much better than the

25   liquidation scenario.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 86

1    Q    So taking all of that into account, is there any evidence,

2    again in your professional opinion as a financial economist,

3    that Barclays received a discount in this transaction in the

4    strict economic sense of receiving a price less than what

5    someone else would pay, whether in a single transaction or in

6    multiple transactions in a liquidation?

7    A    Absolutely not.  There's no evidence of that that I've

8    seen.

9    Q    Let's move then to the topic of the repo collateral.  I

10   believe your demonstrative 26 begins with that.  Do you recall

11   that you were retained in this case after the movants filed

12   their Rule 60(b) motions?

13   A    That's my understanding, yes.

14   Q    And do you recall what they asserted in their motions

15   about the value of the assets Barclays had received?

16   A    My understanding is that their claim was, at that time,

17   that there was a five billion discount in the collateral that

18   was delivered, the repo collateral that was delivered to

19   Barclays, that the repo collateral was actually worth five

20   billion dollars more than the 45 billion that was paid on the

21   other side.

22   Q    And did they support that assertion, Professor Pfleiderer,

23   with expert opinions that challenged the valuations on the

24   Barclays' acquisition balance sheet and showed that the assets

25   were worth more than Barclays had valued them at on the

Page 87

1    acquisition balance sheet?

2    A    I don't believe at the time they had any expert opinion

3    that was -- were saying that, no.

4    Q    Did they make extensive assertions in their Rule 60(b)

5    briefs about an allegation that Barclays' acquisition balance

6    sheet was wrong and undervalued the assets by something on the

7    order of five billion dollars?

8    A    I don't believe that they did.  I'd have to go back and

9    look at it real carefully, but I don't believe that they did.

10   Q    Did you look closely to see what Barclays did value the

11   repo collateral at on its acquisition balance sheet?

12   A    Yes, I did.

13   Q    And what did that show?

14   A    That showed that the value of what they received in

15   September was about 40.5 billion, and then five billion came in

16   in value in the December settlement with JPMorgan, which as I

17   sit here on this side, it's my understanding that the movants

18   are not disputing that value, at least as it's valued in

19   December 2008.

20        So the total value of what came in, if we add those two

21   together was about 45.5.

22   Q    And in your effort, there's some reference today that they

23   made suggestions there may have been undervaluations or

24   adjustments.  Did you, in your initial expert work, make an

25   effort to assess whether this 45.5 billion dollar number listed

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 88

1    here was a reasonable valuation?

2    A    Yes.  That was, quite a bit of my work was directed,

3    excuse me, to that.

4    Q    And can you explain what you did to make that assessment,

5    and can you move to demonstrative 27, please?

6    A    So this exercise basically is the P times Q exercise that

7    we talked about before, in terms of figuring it out in the

8    spirit of what the accountants would calculate.  And to do

9    that, you need to first of all figure out what Q is.  Q is the

10   quantities of the various assets that were delivered.  So that

11   entails identifying what CUSIPs, CUSIPs identifying the

12   security, what CUSIPs were acquired, and obviously what was the

13   nature of the securities that were delivered.

14        So that's part of that.  That's the Q part.  That turns

15   out to be not a trivial undertaking, but then there's the P

16   part, determining the prices. And unfortunately, this would be

17   simpler if publicly available transaction prices were

18   available, but they're not for many, if not most of these

19   securities.

20        So that creates, obviously some difficulty in doing this

21   as a simple exercise.  In fact, it's not at all a simple

22   exercise.  So there are other sources than publicly available

23   prices, there are the prices that Barclays actually gave,

24   audited by PricewaterhouseCoopers, there are BoNY  marks, there

25   are Lehman marks, the marks that Lehman actually carried these

Page 89

1    assets on their books.  And there's a third possibility, and

2    that was that I or someone else would sit down and do a de novo

3    after the fact valuation, and as I've said before in a

4    litigation context, and I strongly believed that that would not

5    be helpful in determining whether this was reasonable.  Partly

6    because it's in a litigation environment, which I think always

7    makes it a little bit suspect in terms of what's being done in

8    that environment.  But also, and perhaps even more importantly,

9    problems in getting some of the information.

10       As I mentioned here, missing -- they'd ask information

11   about appropriate liquidity adjustments, illiquid assets that

12   really require that you have a good understanding of what the

13   market was at that time.  And there's a potential here as you

14   do it later and later in the process for some hindsight bias to

15   creep in.

16       Obviously, Barclays was doing this after the fact as well,

17   but closer to the fact than what I or someone else would be

18   doing it a couple of years later.

19   Q    Professor Pfleiderer, are you familiar with the fact that

20   in seeking to exclude your testimony, Lehman's have said you

21   essentially just rubber-stamped the Barclays' valuations?

22   A    I did nothing of the sort, in the sense of as I understand

23   rubberstamp means simply takes a rubberstamp and stamp it

24   without really looking at it.  I looked at it extremely

25   carefully, and tried to determine whether it was reasonable or

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 90 of 221

Page 90

1    not from principles of basic financial economics.

2    Q    Did you review the actual back-up data, with the

3    assistance of your staff, that underlay all the valuations?

4    A    Yes.  I personally reviewed all of the back-up -- no, I

5    shouldn't say that.  I personally reviewed the summary

6    acquisition balance sheet, acquisition detail, which included

7    CUSIP-by-CUSIP listings, and a lot of the support documents for

8    that, and spent quite a bit of time doing that.  And the staff

9    that was working at my direction spent untold hours reviewing

10   documents, those documents and other spreadsheets that went

11   into that.  So very much effort was put into it.

12   Q    Did you and staff working at your direction meet with or

13   interview over the phone the members of Barclays' product

14   control group who were involved in these valuation efforts?

15   A    Yes, we did.  I was involved in several calls with people

16   at Barclays in December, and my staff has been in continual --

17   well, continuous -- a little bit of an exaggeration, contact

18   with them in terms of sending e-mails and getting information

19   and conversations with them.

20   Q    And have you had regular contact with your staff where

21   you've directed their work and been informed of their work in

22   analyzing all of the different valuation methodology issues

23   that have been brought into dispute in this case?

24   A    Absolutely, yes.

25   Q    Now, have you and your staff attempted, in addition to

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 91

1   reviewing the valuation methodologies, assessing their

2   reasonableness, looking at PWC's work, you attempted

3   independently to look at the nature of the assets and the

4   difficulty in valuing it?

5   A    Yes, we have.  That was a very important part of getting

6   an understanding of what this transaction entailed, and the

7   challenges of coming up with a reasonable valuation.

8        MR. HUME:  And will you put up demonstrative 28,

9   please.

10  Q    Professor Pfleiderer, can you explain to the Court what

11  this demonstrative is showing?

12  A    So the accounting rules as I understand them require that

13  assets be categorized in one of three categories, and the

14  actual wording from the accounting definitions are given there

15  to the right, level one are for securities or assets where

16  there are quoted prices available in active markets, that one

17  can look to.

18       And a good example for that would be IBM shares, a hundred

19  shares of IBM stock, we could go out and get prices on that

20  without too much difficulty.  So that would -- IBM stock would

21  be put in level one.

22       Level two are assets or securities where there are inputs

23  that are other than quoted prices, and that aren't readily

24  available in the way that number one inputs are available.  But

25  the inputs are observable.  So you may be using a model, but

Page 92

1    the model is based upon observable inputs that could someone

2    could go out and find.

3        Level three, which I had colored here at the darkest

4    level, because it's sometimes these assets are a little bit of

5    a black box are inputs -- level three securities require inputs

6    that are unobservable, basically involving a fair amount of

7    judgment on the part of the person doing the valuation.

8        So a better way to view it, I think is not with level one,

9    level two, and level three as very demarcated classifications,

10   but rather the spectrum that I have at the bottom, where on the

11   one side, to the left, you have assets that can be valued quite

12   quickly, almost in a mechanical way.  There's very little

13   judgment involved.  You, in some cases, could just delegate it

14   to a computer.

15       And as you move across this sector, more and more judgment

16   has to be made.  There's a human being that's having to make

17   some judgments.  And as we'll see, much of this inventory is

18   towards the interior or the right end of this spectrum, where a

19   lot of judgment is involved.

20   Q    And just so it's clear, for assets that are not level one,

21   either level two or three, is there any daily transaction price

22   that can be relied upon to value those assets?

23   A    Given the definitions, generally no.

24   Q    And if there is a daily transaction price in a very thinly

25   traded asset, say there's just one municipal bond that's traded

Page 93

1    that day, is that a reliable indication of value?

2    A    Generally, it would not be taken as a reliable indication

3    if it's a very thinly traded market and prices are very

4    sporadic.

5    Q    And if there are no trades whatsoever in that asset, and

6    you can't look to what that asset is trading at, you have to

7    look at some indirect information to try to model or get an

8    indication of what the value might be?

9    A    That is correct.

10   Q    So is there necessarily more uncertainty in valuing level

11   two and three assets?

12   A    I would certainly characterize it as more uncertainty and

13   more judgment and some level of subjectivity.

14   Q    Can you explain to the Court what the next demonstrative

15   shows?

16   A    So what this comes from, I should explain, is that in the

17   Lehman GFS system, Lehman had to categorize these assets that

18   were on its books according to these three levels of

19   classification, level one, level two, and level three.

20       And so I'm using here the Lehman classifications for the

21   trading portfolio, and I'm including here all the assets that

22   were delivered to Barclays in the initial or in the December

23   inventory.

24       And what you see is a simple pie chart that shows that

25   about forty percent of these are level one, and about fifty-

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 94 of 221

Page 94

```
 1   six, fifty-seven percent is level two, and 2.1 percent level

 2   three, and then there's some that can't be categorized, they're

 3   unavailable, they don't have, for instance, a level

 4   classification in the GFS system.

 5   Q    Is this information on this demonstrative, Professor

 6   Pfleiderer, significant in any way to your opinions in this

 7   case?

 8   A    It's extremely significant, because if we were looking at

 9   a pie chart that was all green, then it would be perhaps

10   possible to do a pure mechanical valuation of this.  Although I

11   should point out that even within the level of green, there's a

12   spectrum, and so it may not even be possible then.

13        But we're looking at a pie chart where the majority is

14   red, and so we're already into the interior part of that

15   spectrum where it's not a mechanical procedure.  Some judgment

16   is involved, and the process of getting a price is not a

17   straightforward one, it's mechanical.

18   Q    And is that relevant to your opinion about the risks and

19   uncertainties that faced Barclays when they acquired these

20   assets?

21   A    It is indeed.  The risk and uncertainty of these assets

22   that are colored red is generally going to be greater, at least

23   in terms of knowing what the value is, than what the risk of

24   not knowing the value of what's in green, because there, you

25   can go out and observe with some degree of ease traded prices.
```

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 95 of 221

Page 95

1    Q    Is the information shown on this demonstrative 29

2    significant or relevant to your opinions about the valuation of

3    the repo collateral?

4    A    It is.  Again, for basically the reasons that I'm stating,

5    that the red and the black are much harder to value assets than

6    what the green is.

7    Q    Now, moving -- this demonstrative shows the percentage of

8    the assets that Barclays acquired in both the initial and

9    December inventory, by its level one, two and three

10   classification.

11   A    That's correct.

12   Q    What does the next demonstrative show?

13   A    So the next shows where the disagreement is between --

14   I'll characterize it between the movants and Barclays, and

15   basically divides that disagreement between two

16   classifications.

17        The green, which as I've represented, are in many ways,

18   somewhat easier to value, although even in that inventory

19   they're not all extremely simple.  And the red, which are these

20   assets, and I've combined here levels two and three in the red,

21   those are assets that are more difficult to value, and involve

22   some judgment.  And as you can see, almost all -- well, I

23   shouldn't say all, almost all, but at least eighty-four percent

24   of the disagreement here is in the red zone.

25        In other words, not surprisingly, in those assets where

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 96 of 221

Page 96

1   judgment is involved, and difficult to value.

2   Q    And is this significant to your opinions in this case?

3   A    I think it's very significant, because in the red zone

4   reasonable people can disagree about valuation.  So one can

5   expect to find differences, and the red zone gives one some

6   latitude to make different assumptions, and get values higher

7   or lower, based upon the fact that some additional assumptions

8   have to be put in and some judgments made to come up with

9   values.

10  Q    Now, in the green zone here, there is a valuation

11  difference of 808 million.  Can you explain at least

12  conceptually, why there is still a valuation difference between

13  Barclays and movants, even in the category of level one, where

14  there's less judgment involved?

15  A    Yes, I can.  Much of that difference is due to two

16  different factors.  One is just a dispute about the valuation

17  date, difference between September the 19th and September the

18  22nd.  And then some of it is due to differences in how one

19  accounts for the illiquidity of those assets and how one marks

20  those assets to a bid price or an exit level.

21  Q    Does the next demonstrative present the same information

22  in a different form?

23  A    Yes, it does.  This breaks it down into the three levels.

24  So in each case, the blue on the left is the Barclays' exit

25  value, and the orange or yellow is the movant's exit value, and

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 97 of 221

Page 97

1    we've classified these by the three different levels, and

2    there's one category off there to the right that is either

3    something that's not classified as a level or the level's not

4    available.

5    Q    Did you also look in assessing the nature of the assets

6    required by Barclays at what percentage of the CUSIPs, measured

7    by value could not even be located on a Bloomberg or Capital IQ

8    terminal?

9    A    Yes, I did, and that's on the next slide.

10   Q    And you reported on this in your initial report, correct?

11   A    That's right.

12   Q    Have you revised that to use BoNY values rather than

13   Barclays' values?

14   A    I believe that's what this represents, yes.

15   Q    So it says the Bloomberg and Capital IQ had no information

16   for approximately twenty-six percent of the initial trading

17   inventory Barclays acquired, measured by a percentage of BoNY

18   marks.

19        And is that a reference to the inventory that Barclays

20   actually acquired in September?

21   A    That's correct.

22   Q    And what does it mean for a CUSIP to not even be found on

23   a Bloomberg or Capital IQ terminal?

24   A    Well, in some cases it would mean that there wasn't a

25   match that you would put a CUSIP in and the Bloomberg and

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 98

1    Capital IQ wouldn't find it.

2        In other cases, it would come up, but there'd be very

3    limited information that it wasn't useful, certainly not giving

4    you price information that you could use  --

5    Q    Would the Bloomberg and Capital IQ give information on

6    some level two and three assets?

7    A    I believe they did, yes.

8    Q    But if an asset is not only level two or three, but

9    obscure, is that a reason why it might not show up on Bloomberg

10   and Capital IQ?

11   A    It is, yes.

12   Q    Does it make it more difficult to value the assets, if

13   they cannot be found on Bloomberg or Capital IQ at all?

14   A    I would say it does, yes.

15   Q    You then have a couple of demonstratives that further

16   analyze these assets.  Can you briefly explain what the next

17   two show and why they're significant?

18   A    So at the very beginning of my testimony this morning, I

19   mentioned that some of the severe problems in the markets were

20   related to securitized products that were difficult to value.

21   So what this shows is first of all, how much of the inventory

22   was security, securitized products, based upon a division on --

23   excuse me, the division between securitized and non-securities

24   -- securitized products, based on the Barclays' exit values.

25       And what you see here is that thirty-seven percent are the

Page 99

```
 1    securitized products that tend to be much more difficult to

 2    value.  And then at the bottom again we're showing the -- I'm

 3    showing the valuation difference between the movants and

 4    Barclays, based upon whether it's in the securitized products,

 5    or in the non-securitized.  And you see that even though the

 6    securitized products are only thirty-seven percent of the

 7    inventory, basically sixty-five percent of the valuation

 8    difference is located in the securitized products, which are

 9    more difficult to value.

10    Q    Is a similar phenomenon shown in the next demonstrative

11    relating to mortgaged backed securities?

12    A    This does the division a slightly different way.  Instead

13    of looking at securitized and non-securitized, I'm looking at

14    mortgage-backed and non-mortgage-backed securities, and we find

15    that thirty-three percent are mortgage-backed, and sixty-seven

16    percent don't fall into that category.  But when we look down

17    to see where the valuation differences are, we see that there's

18    greater valuation difference in the mortgage-backed securities

19    than what the percentage is of that in the original inventory.

20    Q    Now, this slide talks about RMBS, and is that residential

21    mortgage-backed securities?

22    A    That would be, yes, RMBS.

23    Q    The earlier analyses we were looking at talked about

24    mortgages of the total mortgage portfolio at the beginning of

25    the week at 6.5 billion.  Do you recall that?
```

Page 100

1    A      That's correct.

2    Q      And here it says that Barclays acquired 14.6 billion.  Do

3    you see that?

4    A      Yes.

5    Q      Do you understand what the disconnect is there?

6    A      Yes, I do.  It all depends upon how you define mortgage-

7    backed or securities that are related to mortgages.

8           What Lehman did -- Lehman Brothers, Inc. did is they

9    classified only those so-called private label mortgage-backed

10   securities as mortgage-backed securities, and did not classify

11   in that classification that led to 6.5, other mortgaged-backed

12   securities that weren't so-called private label.

13          Now, the private label ones are the most difficult to

14   value, and I believe that's why Barclays was wanting to

15   separate those and took a valuation difference there, wanted to

16   write them down, if you will, to 2.7 because of severe concern

17   about those values.

18          But the difference here is basically definitional, what do

19   you consider a mortgage-backed security.

20          MR. HUME:  Could you just briefly show the next

21   demonstrative, please?

22   Q    I think this just captures what you said.  So the agency

23   residential mortgage-backed securities are shown in GFS as

24   something other than mortgages?

25   A      That's correct.

Page 101

1    Q    They are shown, it says, in the government and agency

2    securities?

3    A    That's right, they --

4    Q    In that top line on the Berkenfeld schedule?

5    A    In that category, yes.

6    Q    And are those assets, do they still represent risky assets

7    that are normally thinly traded and difficult to value?

8    A    They certainly can be thinly traded, and they are

9    representative of assets that are based upon mortgages, and

10   prepayment risk and various other things associated with

11   mortgages.

12   Q    Did Fannie and Freddie have a lot of those on their

13   balance sheets?

14   A    Yes, they did.

15   Q    And did the government -- when the government took Fannie

16   and Freddie over, was it implicit in their takeover, that they

17   didn't think they were marked accurately on the Fannie and

18   Freddie balance sheet?

19   A    That would be my interpretation.

20   Q    Let me skip ahead, if I might, I want to come back to the

21   demonstrative on 536.  But let me first ask you if all the

22   analysis you have done on the nature of this collateral is

23   relevant to whether or not you believe the mark that Bank of

24   New York put on the repo collateral, where something was

25   sufficiently reliable that Barclays could assume that those

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 102

1  would be basically what would match the values they would have

2  on their balance sheet?

3  A    No.  I think that there were multiple reasons to question

4  the reasonableness of those marks, at least the reasonableness

5  for what Barclays needed to do in coming up with an acquisition

6  balance sheet.

7          MR. HUME:  Could we have demonstrative 37, please?

8  Q    And can you review briefly your analysis of this issue?

9  A    So here are some of the main reasons why just using the

10 BoNY marks would not have been appropriate for what Barclays

11 was having to do in coming up with a value for what they

12 acquired.

13         One of it has to do with time, the BoNY marks were

14 basically placed on the inventory, placed upon the repo

15 collateral, on the night of September the 18th, and did not

16 certainly, in some cases, reflect any of the market activity or

17 the information that was occurring on September the 18th.  And

18 a good example is what you call Lehman paper, various

19 instruments or securities that were subject to the credit risk

20 of Lehman, that had just declared bankruptcy a few days before.

21         So there's a timing issue.  Another important issue is

22 that BoNY marks to a mid-point, not to an exit value or bid.

23 And the accounting rules, as I understand them, and I haven't

24 seen anyone asserting otherwise, requires Barclays to mark --

25 excuse me, I misspoke, a bid value or an exit price, so

Page 103

1    adjustments would've had to be made to the BoNY marks to do

2    that, certainly.

3        And then approximately thirty percent of the repo

4    collateral was what one could characterize as non-standard repo

5    collateral, at least as it's defined by, I believe, the

6    bankruptcy rules.

7        So it's a reasonable presumption that the repo custodian

8    faced with what may be for that repo custodian, the repo

9    collateral would have trouble in doing the valuation in a short

10   period of time.

11       And another consideration, which I think is important in

12   making assessments, is that the BoNY marks weren't audited by

13   an outside independent accounting firm.  So that is also a

14   consideration that is important, I believe.

15   Q    Is demonstrative slide 38 an example of one of the points

16   you just made, in terms of the valuation of Lehman affiliated

17   paper by BoNY?

18   A    Yes, it is.  So these are all, as you said, Lehman

19   affiliated collateral that was transferred to Barclays.  And

20   what you see is the pink values are the values given by BoNY,

21   and the purple is the value given by the movants, and Barclays'

22   exit value is given in blue.  And perhaps the most compelling

23   example is not given by what jumps out here, which is the left-

24   hand side, but the right-hand side, where Barclays was putting

25   -- excuse me, I misspoke, BoNY was putting 202 million dollars

Page 104

1    on some of the Lehman related securities that were classified

2    as equities.  And both the movants and Barclays basically

3    valued those at near zero.

4    Q    Would those essentially be things that were tied to the

5    value of stock in Lehman Brothers, which had filed bankruptcy

6    that week?

7    A    Either tied to the value of stock, but also just tied to

8    like, I believe, there are warrants in that where the ability

9    to collect on the warrant was based upon the ability of Lehman

10   Brothers to actually fulfill its obligation.

11           THE COURT:  Given my schedule, we need to break for

12   lunch very promptly, but I'd like to do it at a time when you

13   reach a logical breaking point.  When you're done with BoNY,

14   let's stop.

15           MR. HUME:  I was very conscious of that.  I was going

16   to try to do -- go a few more documents on it, but in light of

17   that, I think maybe --

18           THE COURT:  I'm just pressed for time because of my

19   schedule.

20           MR. HUME:  I know.

21           THE COURT:  I want you -- but I want this to be a

22   logical breaking point.

23           MR. HUME:  It is very close.

24           THE COURT:  If you can break in the next five minutes,

25   that'll be helpful.

Page 105

```
 1            MR. HUME:  I can break in five minutes -- four

 2     minutes.

 3            THE COURT:  It's like Name That Tune.

 4            MR. HUME:  May I have Movant's Exhibit 200, please.

 5     BY MR. HUME:

 6     Q    Professor Pfleiderer, are you familiar with this document?

 7     A    I am, yes.

 8     Q    And it shows Barclays receiving assets with marks from

 9     BoNY at 52.19.  Do you see that?

10     A    Yes, I do.

11     Q    And are you familiar with the fact that there's some

12     testimony in this case that Barclays did not believe it could

13     accept or rely completely on those BoNY marks, and believed

14     that the actual values was going to be considerably less?

15     A    I'm aware of that, yes.

16     Q    And is that testimony consistent with your understanding,

17     having the benefit of hindsight of analyzing the inventory and

18     the way BoNY marked that inventory, that Barclays had good

19     reason at the time to have those concerns?

20     A    Yes.  Based upon my analysis and looking at the BoNY marks

21     for a number of the securities that were in the inventory, that

22     concern was well founded.

23            MR. HUME:  Your Honor, I think we can break now.

24            THE COURT:  Okay.  Let's take a break until 2:00

25     o'clock.
```

Page 106

1      (Recessed at 12:39 p.m.; reconvened at 2:10 p.m.)

2          THE COURT:  Please be seated.

3          MR. HUME:  Good afternoon, Judge Peck.

4          THE COURT:  Please proceed, Mr. Hume.

5          MR. HUME:  Thank you.

6  BY MR. HUME:

7  Q    Professor Pfleiderer, before the break, you had given some

8  testimony about the BoNY marks, if I could just very briefly

9  ask you some questions about the Lehman mark, as of the week of

10  September 15, 2008.

11      Can I begin by asking you to pull up BCI Exhibit 736.

12  This is an e-mail sent over the weekend before the closing,

13  it's forwarding an e-mail from Paulo Tanechi (ph) saying this

14  is what our ops team delivered.  Do you see that, Professor

15  Pfleiderer?

16  A    Yes, I do.

17  Q    And you're familiar with the fact that Paul Tanechi is the

18  treasurer -- was the treasurer of Lehman at the time?

19  A    Yes.

20  Q    Now, attached to this, and he's sending this to Weil

21  Gotshal, these lawyers who sent it on to other lawyers at Weil

22  Gotshal, do you see that, Weil Gotshal?

23  A    Yes, I do.

24  Q    All right.  Now, attached to this is a summary of the

25  schedule here.

Page 107

1          MR. HUME:  Can we blow that up?

2     Q    And you see here, there's an entry of seven billion in

3     cash, the placeholder, you're familiar with what that is?

4     A    Yes, I am.

5     Q    And that the rest of the marks, or all of the marks,

6     including that seven billion entry are 49.9 billion.  Do you

7     see that?

8     A    Yes, I do.

9     Q    And so do you understand these to be the Lehman marks on

10    the repo collateral delivered to Barclays, plus this seven

11    billion dollar entry which became a disputed item?

12    A    That is my understanding, yes.

13    Q    Now, have you and your team analyzed the reliability or

14    staleness of the Lehman marks during the week of September

15    15th, 2008?

16    A    Yes.  We did an extensive analysis on that subject.

17    Q    And can -- this is your demonstrative 39.  Can you explain

18    what your analysis shows?

19    A    Yes.  This and the next basically give a high level

20    overview of the results of that analysis.  And so what we did

21    is we looked at positions that were greater than 20 million

22    dollars in value on the Lehman system, as marked by Lehman, and

23    looked to see how often those marks changed over the course of

24    the week.

25         And there were thirty-four positions in level three assets

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 108 of 221

Page 108

1    that were valued by Lehman above twenty million, and the Lehman

2    marks for thirty-one of these positions changed no more than

3    once after September the 12th.

4         And further on down, it gives a breakdown, fifty-two

5    percent of these, it made no change in the marks, and the total

6    value of those was around 800 million.  Thirty-five percent,

7    the mark changed on September 15th, but not at all thereafter.

8    And remember, that's the date of the bankruptcy filing.  And

9    seven percent were updated once, but not on September 15th.

10        So the next slide, which you see to your right, does the

11   same analysis, reports the same analysis for level two.  And

12   the important thing is when we sum up the values that just fall

13   into this category above the twenty million dollars, we find

14   that there are about 3.5 million dollars according to the

15   Lehman marks, for which there was no change or one change

16   during the week in level two assets, and about 1.4 million in

17   level three assets that did not change but once or not at all

18   over the week.

19        So the total is about -- almost five million dollars in --

20   I misspoke.  I misspoke.  Multiply that by a thousand, five

21   billion dollars in assets that did not change at all over the

22   week or only changed once in value.

23   Q    I think my colleagues would agree with you that -- with

24   me, that you won't be the first person to say million instead

25   of billion in this case.

1      This does speak in terms of billions in this number?

2   A    It does indeed.  Actually it's thousands of millions, so

3   that's billions.

4   Q    And just again for clarity, this analysis is only looking

5   at assets that were marked greater than twenty million dollars?

6   A    That is correct.  So the total would actually be larger

7   than this.  So this understates the amount of value that is not

8   being marked at all over the week or at most, once.

9           MR. HUME:  Okay.  If we could go to the next

10   demonstrative 41.

11   Q    In addition to your stickiness analysis, is there any

12   other reason for you to conclude that that 49.9 schedule would

13   be considered, at least in part, stale, as of the time of the

14   closing?

15   A    Yes.  There's another issue which I believe I talked a

16   little about this morning, and this is the T plus one marking

17   system, which basically means that the accounting in the GFS

18   system for a particular date is not completed until 6:00 p.m.

19   the day after.

20      A lot of updates and changes can be made during the next

21   day to bring it up to date, but that means that if you're

22   looking at say, September the 18th, you're either looking at

23   something that hasn't been completely updated, or if you want

24   something that is completely updated, you have to look for the

25   prior day.

Page 110

1    Q    I'd now like to move on to a discussion of the specific

2    classes of assets acquired by Barclays in the transaction, and

3    the valuations placed on those assets in the dispute with the

4    movants' experts over those valuations.

5         Demonstrative 42, could you just very briefly explain what

6    this shows?

7    A    So there were several different, I guess I can use the

8    word buckets or classifications that Barclays, when they

9    received the assets put these securities into.  You can see

10   them there at the bottom, corporates, emerging markets,

11   equities, the PMTG group, which I believe is Principal Mortgage

12   Trading Group, rates and RMBS, residential mortgaged-backed

13   securities.  There's one other category there that is principal

14   and this is just principal repayments, that's basically cash.

15        So it's really the first six that are the categories.  And

16   what this shows is a number of things.  First of all, the

17   height of the bar shows the value that is in each one of these

18   categories, but the color coding shows how much in each

19   category is at the various levels that we talked about.  And as

20   I explained this morning, the green levels, level one, are

21   fairly easy to price, not necessarily at a mechanical level,

22   but fairly easy to price.

23        The red and the black, that's where the pricing gets very

24   difficult, because you don't have mechanical ways to price it,

25   and some judgment has to be used.  So this gives a snapshot, a

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 111

1   summary of what went where, and what was difficult to price,

2   and what was perhaps a little bit easier to price, those green

3   bars.  Although I should add, that even those can pose

4   problems.

5   Q    Now, this morning when you were going through some of the

6   background of the financial classes, you mentioned -- you

7   explained some of the securitized products, collateralized loan

8   obligations, collateralized debt obligations.  Were some of

9   those assets included both in the RMBS category and in the PMTG

10  category?

11  A    Yes.  Quite a substantial part of both of those would be

12  assets that would have those characteristics.

13  Q    And is one example of those assets the CDO or CLO that's

14  called Pine?

15  A    That would be a good example.  That was in the PMTG group.

16  Q    That was in PMTG?

17  A    That's correct.

18  Q    All right.  And there's a graphic showing the different

19  valuations of Pine.  And the next demonstrative, 44, is this an

20  attempt to illustrate the structure of Pine?

21  A    Yeah.  I had a little bit different diagram, but I saw

22  that this one is used in its -- it actually explains quite well

23  the overall structure of this.  And what you see at the bottom

24  is that Lehman Commercial Paper, Incorporated which ends up, of

25  course, in bankruptcy, had basically made leverage loans, or

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 112 of 221

Page 112

1    had possession of leverage loans to a group of 50 borrowers.

2    And most importantly, this was fairly highly concentrated.

3    Twenty percent was to Archstone, which Lehman had acquired.

4        So these, in some sense, revolving credit loans that can

5    be drawn down, and about 700 million had been borrowed.

6        Now, the Pine structure itself was one where there was in

7    the structure a varying amount of its called eligible

8    investments, which is cash or short-term investments that can

9    be used for funding.  And the picture here shows about 370

10   million.

11       And then at the top, we have ownership in this structure

12   called Pine, and Barclays owns the senior tranche, and then

13   there are others that own the junior tranche.  So what is

14   supposed to happen here is as the borrowers repay, the money

15   filters up to Pine, and then is distributed according to

16   various rules to the senior and junior tranches; however, when

17   the borrowers need to basically call down a loan, then money

18   has to come out of Pine to fund those loans, and that would

19   come out of eligible investments in perhaps in other ways as

20   well.

21   Q    Can you use this chart, Professor Pfleiderer, to briefly

22   explain the different kinds of risks that have to be taken into

23   account in valuing the senior tranche interest owned by

24   Barclays, or acquired by Barclays in the sale?

25   A    Yes.  There are multiple risks here, and if you start at

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 113 of 221

Page 113

1    the bottom, there's the risk that those borrowers may not

2    repay, may default, so those aren't loans to the U.S.

3    government, they're loans to borrowers who have default risks,

4    so there's a question as to whether the money will even come

5    into LCPI.

6        Then there's a question of whether if the money comes in

7    to LCPI, it will actually filter up to Pine, given now

8    especially at the time we're looking at this, LCPI is part of a

9    bankrupt entity.  So that was called participation risk.

10       But then there's some other risks that Barclays was

11   worried about and aware of, and one of the risks is that the

12   cash that's in Pine, I'll call it cash, it's the money held in

13   eligible investments is very secure if it remains as cash or

14   eligible investments, but when it goes to fund leveraged loans,

15   in other words, goes downstreams to borrowers, then it's much

16   riskier.  So that's a funding risk.

17       And there's other risk that is associated with maybe some

18   legal risk that the borrowers can perhaps basically have their

19   calls fulfilled by a judge perhaps in a bankruptcy proceeding

20   requiring -- or it may be not in a bankruptcy proceeding, but

21   in some legal proceeding requiring that Barclays put money in,

22   which wouldn't necessarily be the way that you would read the

23   contract, but I understand that Barclays was worried about that

24   risk as well.

25       And there's yet one more risk, and I think it's safe to

Page 114

1    call it a risk.  And that is, Barclays standing near at the

2    top, is concerned about the money filtering up from the bottom,

3    and at the bottom, we have the borrowers, and their financial

4    stability may be impaired if they aren't able to borrow.  And

5    so it may be important for money to go to the borrowers to

6    preserve the credit risk or to enhance the credit risk.  So

7    Barclays might need to put in more money to maintain those

8    loans.

9        So there's a lot of loose risk built into the structure at

10   various levels, all of them not easy to quantify.  It's not a

11   matter where you can go out and simply look this up on a

12   Bloomberg terminal, for instance, and to be able to make a

13   simple judgment as to how to value or how to account for those

14   risks.

15   Q    Were you aware, Professor Pfleiderer, that the indenture

16   agreement that creates Pine has what's called an inverted

17   structure?

18   A    Yes, I am.

19   Q    And do you have an understanding of what that means?

20   A    The inverted structure, as I understand it, means that

21   Barclays as the senior comptroller has no legal funding risk to

22   put more money in, at least according to the legal structure

23   that exists here.

24   Q    And do you understand that the Movant's expert has

25   criticized Barclays for believing that there was a funding

Page 115

1    risk, given that there's an inverted structure?

2    A    That's my understanding.

3    Q    And do you agree with that criticism?

4    A    No.  There's -- as I explained, there's lots of risks

5    inherent here, including funding risk that's associated with

6    that 367 million or however much it is in eligible investments

7    not staying in a secure form, but instead being used to fund

8    the unfunded obligation.  I would call that a funding risk.

9    Q    And have you read Jasen Yang's memo from Barclays from the

10   Barclays PMTG group?

11   A    Yes.

12   Q    Explaining his analysis of these different risks?

13   A    I have.

14   Q    And do you believe it to be a reasonable analysis of those

15   different funding risks?

16   A    From my understanding of this structure, and the type of

17   credits that were at the bottom and everything else, I thought

18   it was a very reasonable characterization of the various risks

19   that were involved.

20   Q    Did you -- I believe you've explained before, I don't know

21   if you did it just here, is there a funding risk or is there a

22   way to understand the funding risk that has to do with the

23   money here at the bottom held by the borrowers, the 697 million

24   when that is their risk, that when that gets repaid, it has to

25   come back?

Page 116

1    A    Yes.  I should've mentioned that, if I didn't, I don't

2    recall whether I did or not, but that is yet -- if I didn't

3    mention it, that's yet another risk that Barclays was

4    contemplating, and in fact, very worried about, that money that

5    gets repaid and goes through LCPI and ends up into Pine can

6    still be drawn back to fund some of the unfunded obligations.

7    So that accentuates the risk here.

8    Q    Professor Pfleiderer, have you in studying Pine and in

9    analyzing the different valuations that have been put forward

10   on Pine, have you reviewed portions of the Examiner report that

11   discuss Pine?

12   A    Yes.  The Examiner report contains numerous mentions of

13   Pine, and if you search each one of the volumes for the word

14   Pine, you'll find that it comes up quite frequently.

15       The Examiner's report indicates that this was created to

16   basically help Lehman Brothers in its funding.  It was never

17   intended to be something that was sold to anyone outside.  It

18   was simply to be used as a funding vehicle.

19       And as it says up here, it was posted as collateral with

20   JP Morgan, which was the clearing bank for Lehman Brothers, and

21   that occurred on July 19th, and was marked at par.  But in

22   August of the same year, 2008, JP Morgan actually gets a

23   prospectus that describes the structure and realizes how bad

24   the collateral is, the underlying loans; and as I say here, it

25   was characterized as borderline insulting that Lehman Brothers

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 117 of 221

Page 117

 1   had posted this as collateral with JP Morgan and indicated that

 2   it should be marked at par.

 3        So just to continue the story, this is all from the

 4   Examiner's report, on the 12th of September, which is, of

 5   course, before the bankruptcy, JP Morgan valued it at seventy

 6   cents on the dollar, and then at the same time, there was an

 7   independent valuation which -- by Gifford Fong & Associates

 8   that does work along these lines, and they reached an even

 9   lower value of about 50 cents on the dollar for Pine.

10        MR. HUME:  Can we just briefly pull up the section of

11   the Examiner report cited here at page 1105?  And going under

12   this section about JP Morgan concern over Lehman collateral,

13   could you just highlight this sentence here, by August 9 --

14   sorry, yeah, this sentence.

15   Q    By early August 2008, JP Morgan had learned that Lehman

16   had pledged self-priced CDOs as collateral over the course of

17   the summer.  Do you see that?

18   A    Yes, I do.

19   Q    And on the next page, it discusses JP Morgan expressing

20   concern as to the quality of the assets that Lehman had

21   pledged, and that consequently Lehman offered to review its

22   valuations.  Do you see that?

23   A    I do.

24   Q    And is this portion of the Examiner report that you

25   believe you reviewed?

Page 118

1    A    That's one of the portions.  Again, it occurs in the

2    Examiner's report many times.

3    Q    In the footnote that's cited there, 4039 --

4         MR. HUME:  If you'd just pull that up.

5    Q    -- where they say that Lehman renewed its valuations on

6    the CDOs, it refers to Pine.  Do you see that?

7    A    Yes, I do.

8    Q    Okay.  If you go back to the report.

9         MR. HUME:  Can we go back to the text of the report,

10   of the --

11   Q    And it says, although JP Morgan remained concerned that

12   the CDOs were not acceptable collateral, Lehman informed JP

13   Morgan that it had no other collateral to pledge.  Do you see

14   that?

15   A    Yes, I do.

16   Q    And just very briefly on the next page, 1107.

17        MR. HUME:  If you could just blow up the paragraph and

18   highlight this sentence.

19   Q    At the time the market for CDOs was illiquid generally,

20   rendering them less than desirable as collateral.  Do you see

21   that?

22   A    I do.

23   Q    And below that, if you could just pull this down,

24   Weisbrod, who is a JP Morgan employee says -- questioned

25   Lehman's intentions.  This strikes me as borderline insulting

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 119 of 221

Page 119

1  to think we could accept Lehman's self-structured and self-

2  priced CDOs to meet our margin requirements.  Do you see that?

3  A    I do.

4  Q    This is the portion of the Examiner report you're citing

5  to?

6  A    This is the portion that I had in mind, yes.

7  Q    And it goes on to discuss the different prices given both

8  by JP Morgan and Gifford Fong for Pine in particular.  You have

9  them referenced in your demonstrative, but I'd just like to

10  show the exhibit if I could, BCI Exhibit 1005, and this is

11  David Weisbrod of JP Morgan sending his analysis of the access

12  box and on the next page, it has the valuation for a CUSIP of

13  Pine.  This is Pine's par value.

14      And the next page has it valued at 515 dollars.  Have you

15  seen that?

16  A    I have, yes.

17  Q    And are you aware of what movant's expert are valuing Pine

18  at in this case?

19  A    I believe it's either 700 or 800 million dollars.

20  Q    I'll represent to you, I think it's 817 million.

21  A    817 million, that's correct.

22  Q    At the time that Gifford Fong was doing its analysis,

23  which was, I think that e-mail was September 4th, was the risk

24  of LCPI's bankruptcy greater or less than on September 22nd?

25  A    On September 22nd, it was known and the risk was certainly

Page 120

1   less before.

2   Q    And so would it be your expert opinion that in valuing

3   Pine, given all the risks, in terms of the participation risks

4   of LCPI not distributing money, did that risk go up after

5   Lehman Brothers Holdings filed bankruptcy on September 15?

6   A    I wouldn't say that there's a huge increase in that risk

7   after the bankruptcy.

8   Q    If we could go now to demonstrative Exhibit 47, and I

9   think you've explained you've reviewed the Barclays' valuation

10  analysis, correct?

11  A    That's correct.

12  Q    And is that what this demonstrative outlines?

13  A    This gives the basic considerations, or some of the most

14  important considerations, that Barclays had and how they dealt

15  with them.

16  Q    And did PricewaterhouseCoopers review and analyze the

17  Barclays' valuation work for Pine?

18  A    Yes, they did quite extensively, because this was a

19  sizeable part of the overall acquisition, the portfolio that

20  was acquired.

21  Q    And is it significant to you as a financial economist

22  analyzing the valuation disputes over Pine in this case, that

23  PWC reviewed and analyzed the valuation at the time?

24  A    It is, because this is an independent entity that has the

25  responsibility to make sure that appropriate marks are placed

Page 121

1   on various assets by doing its due diligence and basically

2   reviewing the process that went into achieving or arriving at a

3   price.

4   Q   And you -- do you list a conclusion here in this bottom

5   bullet point?

6   A   Yes.  They basically were very concerned about the various

7   risks that were addressed, and they conclude that the discounts

8   that Barclays had taken for the participation and funding risks

9   were not unreasonable.

10           MR. HUME:  Can we go to demonstrative 48, please?

11  Q   I asked you a moment ago about the difference between the

12  timing of when Gifford Fong valued Pine and when Barclays did,

13  but before I do that, can I ask you, do you know who Gifford

14  Fong is?

15  A   Yes.  Actually I know him quite well.  My firm did some

16  limited collaborative work with his firm some years ago, and he

17  lives not terribly far from me across the Bay, and in my

18  opinion, does very high quality work.

19  Q   What kind of work does he do?

20  A   Basically valuation of complex fixed income instruments is

21  the major expertise that his firm has, and I think -- I'm

22  pretty sure that's what they primarily do.  At least I know

23  they do a lot of that work.

24  Q   Is it significant to your opinions in this case that

25  Gifford Fong in early September 2008 valued Pine at 515 million

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 122 of 221

Page 122

1    dollars?

2    A    I would consider that a very important data point, if you

3    will, because this is a valuation that's being put on it by a

4    professional before the bankruptcy.  And there's every reason

5    to believe that the value of this has in all likelihood has

6    deteriorated after that, and hasn't been enhanced by the events

7    that occurred after that and before -- after Gifford Fong's

8    evaluation and before September the 22nd.

9    Q    Now, you understand that by the end of the year Barclays

10   had increased its marked value of Pine?

11   A    Yes.  Yes, I did.

12   Q    And do you understand the reasons for that?

13   A    My understanding is that in between the time that it first

14   valued it and the time that it valued it again, there was a so-

15   called event of default that resulted because the trustee found

16   that the value of the underlying assets had dropped below the

17   aggregate amount, as it says up here of the outstanding Class A

18   notes, which is the Barclays' position.

19        And so according to the technical definitions that were

20   set forth, that creates a default and gives Barclays the right

21   to accelerate the note, which it interpreted as meaning that no

22   cash, especially from the eligible investments, as well as cash

23   that would come in, could be reinvested, that it could eke out

24   of the structure.

25        So that would enhance the valuation to the extent that it

Page 123

1   mitigates some of those risks that we were talking about

2   earlier.

3   Q    Now, you understand that's based in part upon a legal

4   judgment Barclays made after the event of default?

5   A    I believe that would be a legal judgment, yes.

6   Q    And it depends in part upon Barclays' decision in the

7   second bullet point to elect to accelerate the note.  Do you

8   see that?

9   A    I believe that that is the case, yes.

10  Q    Now, have you reviewed PricewaterhouseCoopers' analysis of

11  Barclays' year-end valuation of Pine?

12  A    I have.

13  Q    And what information was there, if any, that was relevant

14  to your opinions?

15  A    Well, they were a little bit worried about -- I don't

16  think they rejected it, but they were a little bit worried

17  about the mark-up as being -- and I think they used the words

18  that you see here, most optimistic approach, and they thought

19  that valuations, as it says here between 520 million and 612

20  million would be more reasonable than what Barclays marked it

21  up to at 705 million.

22  Q    And is that significant, even though we're talking here

23  about the valuations at the end of the year, given that movants

24  have relied in part on Barclays marking it up at the end of the

25  year, do you believe this is relevant to your analysis, a

1   reasonable valuation of Pine, as of September 22nd, 2008?

2   A    I think it's relevant for a couple of reasons.  First of

3   all, it shows something that I think permeates through much of

4   what we're talking about, that reasonable people can disagree

5   about what the valuations are; and you see a disagreement here,

6   because again, we're way to the right of that spectrum, where

7   judgments have to be made.  But also, what we see is that PWC

8   is still worried about those risks, participation risks and

9   some of the other things that I discussed, and thinks that

10  those are still operative or salient at this point, and so

11  given they think that now, at the time they're making this

12  judgment, they certainly are thinking about that when it was

13  first valued in the September period that was before the event

14  of default.

15       So for both of those reasons, I think there's some

16  significance in this, great significance in it.

17            MR. HUME:  Your Honor, a moment ago, I put a slide up,

18  BCI Exhibit 1005, which is tab six of the binder.  It's that e-

19  mail showing the Gifford Fong valuation.  We have not yet moved

20  it into evidence, and I believe there is no objection, so we

21  move it in now.

22            MR. TAMBE:  There's an objection, Your Honor, the

23  document, it's hearsay, not coming in for the truth of the

24  matter.

25            THE COURT:  So, Mr. Hume, I believe there is an

Page 125

1    objection, but --

2           MR. HUME:  I received a note today, Your Honor, and in

3    the event, there is an objection.

4           THE COURT:  The objection is hearsay?

5           MR. TAMBE:  It's hearsay, Your Honor.

6           THE COURT:  Okay.  It seems to be hearsay.

7           MR. HUME:  Your Honor, this would classify as a

8    business record sent by JPMorgan internally, reporting on the

9    analysis of the valuation work they've done, of collateral

10   pledged to secure their exposure to Lehman, in which I'm sure

11   it is the regular course of business for them to record that in

12   writing, so that there is knowledge of what they have valued,

13   or what their independent consultants have valued this

14   collateral at, from which they have great exposure.

15          So we would submit it as a business record that should

16   come in for all purposes.

17          THE COURT:  Well, there's no question that the

18   document is internal to JPMorgan Chase, and purports to be

19   attaching the spreadsheet.  I don't know that the spreadsheet

20   is a business record, though.  It may simply have been prepared

21   to illustrate the comparison which includes the reference to

22   executive summary of the Gifford Fong values, so I don't know

23   that it's a business record.  It might be.  If it's important

24   to get it in, there's no need to be, more shown than has been

25   shown so far.

Page 126

1              MR. HUME:  All right.  Your Honor, that's fine.  Since

2     I didn't know there was an objection, I haven't prepared

3     anything beyond that and I will continue and maybe try to

4     revisit when we talk about other exhibits on Friday.

5              THE COURT:  That's fine.  Friday sounds like a messy

6     day.

7     BY MR. HUME:

8     Q    Professor Pfleiderer, in your analysis earlier of Pine,

9     you referenced one of the borrowers named Archstone.  Do you

10    recall that?

11    A    Yes, I did.

12    Q    And you've mentioned generally that there was risk with

13    respect to borrowers repaying debt in the bottom of the chart

14    up to LCPI.  Do you recall that?

15    A    Yes, I do.

16    Q    I'd like to refer you if I could, and we'll pull it up on

17    the screen, because it may be easier, to the end of the binder,

18    Movant's Trial Exhibit 307, which is on the cover, an e-mail

19    from Sean Teague at Barclays Capital.  Do you know who he is?

20    A    Yes, I do.

21    Q    And it is sending, forwarding to a variety of people at

22    PWC a trustee report for Pine, attached to it.  Do you see

23    that?

24    A    Yes, I do.

25    Q    And if you scroll down that trustee report, I believe we

Page 127

1    provided you with a number of these.  This is one example.

2    There is a rating of some of the borrowers.  If we go to, for

3    example, the page that's Bates stamped 7230, Moody's weighted

4    average recovery rate test.  We have a list of some of the

5    borrowers on Pine, and their Moody's rating down that middle

6    column.

7          MR. HUME:  If you could -- yes, please highlight or

8    box that.

9    Q    Do you see that?

10   A    Yes, I do.

11   Q    And there's a DP rating here, and you see B1, B1, a couple

12   of no entries, BA1, a couple of C, or CAA, and then Moody's

13   recovery rate number.  Do you see that?

14   A    I do.

15   Q    Is this the kind of information from the ratings agencies

16   relevant to assessing the risks inherent in Pine?

17   A    Yes, it is.  It's information that would be used to

18   determine, or at least to shed some light on the underlying

19   risk of each of the individual borrowers.

20   Q    Is it significant to you, in your opinion, that the nature

21   of the borrowers were not all triple A rated?

22   A    Oh, indeed it is.  These were called leverage loans, and

23   that term is generally applied to riskier loans, loans where

24   the borrower already has a lot of leverage in its balance

25   sheet, and is taking on additional debt.

Page 128

1    Q    Now, one of those borrowers who had a disproportionate

2    amount of the debt was Archstone.

3    A    That is correct.

4    Q    Can you -- what do you recall about what Archstone was?

5    A    Archstone was basically a real estate, commercial real

6    estate in apartments, and various other types of real estate

7    investment trust that was acquired in a very large transaction,

8    and it was exposed to real estate risks and mortgage risks, in

9    a sense, given the type of properties that it held.

10   Q    Could I show you a section of the Examiner's report on

11   page 356, please?  Now, this describes -- this section of the

12   report addresses Lehman's valuations of its Archstone

13   positions.  Do you see that?

14   A    Yes, I do.

15   Q    And were you -- are you familiar with the fact that Lehman

16   had been a part of a leveraged buy-out of Archstone in 2007?

17   A    Yes.  I believe that was one of the biggest transactions

18   that Lehman did over this period.

19   Q    And are you aware of the fact that the Examiner has an

20   extensive analysis of whether Lehman was properly valuing its

21   equity interests in Archstone?

22   A    Yes.  There was quite a bit of attention given to that in

23   the Examiner's report.

24   Q    And did the Examiner conclude, to your knowledge, that

25   Lehman did not reasonably value its equity interest in

Page 129

1    Archstone?

2    A    It's my recollection that that's his -- I don't know if I

3    can characterize it as final conclusion, but that I believe was

4    his conclusion.

5    Q    Could you quickly go to page 358, and this first sentence,

6    Archstone was a highly leveraged company with seventy-six

7    percent loan to enterprise value as of the closing date?  Do

8    you see that?

9    A    Yes, I do.

10   Q    Is that significant to your analysis of the reasonableness

11   of Barclays' valuation of Pine?

12   A    A seventy-six percent loan to enterprise value means that

13   this was highly levered.  It didn't have a lot of equity to

14   basically provide a cushion, and so there would be a fair

15   amount of concern just based upon that.

16        And then additional concern is its ability to service any

17   debt that it has, given that its revenue streams are from

18   mortgage -- I shouldn't say mortgage, but real estate entities,

19   and at this time, we're in September, and the economy's looking

20   somewhat shaky, to say the least.

21        So given the high leverage and loan obligations, there's a

22   fair amount of risk here.

23             MR. HUME:  Could we look now at page 359 of the

24   Examiner report?

25   Q    Second paragraph, report's on a January 2008 Barron's

Page 130

1    article, suggested Archstone had no equity value.  Do you see

2    that?

3    A    Yes, I do.

4    Q    And the next sentence says, the lenders including Lehman,

5    were unable to syndicate any of their Archstone positions

6    during the first quarter of 2008, when Archstone faced a

7    tightening liquidity situation due to, among other things, its

8    inability to execute its plan to sell properties, which would

9    reduce the acquisition debt.  Do you see that?

10   A    I do.

11   Q    Is that your significant to your analysis of the

12   reasonableness of the valuation of Pine?

13   A    Indeed.  So the statement that there's no equity value

14   means that if you take that somewhat seriously, that this is

15   close to being insolvent, that would give one serious concern.

16   And then again, we need to put this in the context of the

17   evolving problem in the economy, which is certainly starting to

18   manifest itself in some ways in the first quarter of 2008.  But

19   by the time we get to the third quarter, the economy is

20   certainly challenged, and real estate investments are not

21   exactly considered safe bets at that point.

22   Q    This goes on at length, and to speed things along, let me

23   just jump ahead to page 361.  First, this sentence, however

24   there's sufficient evidence to support a finding that Lehman's

25   valuations or its Archstone equity positions were unreasonable,

Page 131

1    beginning as of the end of the first quarter of 2008, and

2    continuing through the end of the third quarter 2008.  Do you

3    see that?

4    A    Yes, I do.

5    Q    Now, that's talking about Archstone equity positions, not

6    depositions.

7    A    That's correct.

8    Q    Does it still have significance to you in terms of your

9    analysis of the risks Archstone posed and the valuations of

10   Pine?

11   A    Yes, it does.  Because if the equity is compromised, and

12   equity is lower, then debt will have lower value too, because

13   equity is basically the cushion that protects the lenders

14   against adverse effects.  And if there's less of a cushion,

15   there's more risk.

16   Q    Now, do you recall what assumption Barclays' PMTG Group

17   made in -- with respect to the risk of repayment from all of

18   those borrowers at the bottom of the Pine structure?

19   A    Yes.  I believe that they basically valued that at twenty0

20   percent, eighty cents on the dollar risk.

21   Q    Do you believe an eighty percent, and does that translate

22   to an eighty percent likelihood of repayment from those

23   borrowers?

24   A    Roughly speaking it could be interpreted that way.

25   Q    Do you believe, focusing solely on Archstone, given its

Page 132

1   financial condition in September 2008, would it be your

2   professional opinion as a financial economist, that Archstone

3   was eighty percent likely to repay its debt?

4   A     No.  From all the information that was available at that

5   time, it would appear to me, based upon my knowledge, that

6   eighty percent would be optimistic and it was probably lower

7   than that.  I can't quantify exactly how much lower, but I

8   would be quite comfortable in saying that eighty percent would

9   be a high valuation.

10  Q     Have you, Professor Pfleiderer, reviewed the work or

11  opinion of movant's expert, Mark Slattery with respect to Pine?

12  A     I have.

13           MR. HUME:  Can we go back to where we did your

14  demonstrative 50.

15  Q     And there it shows that he values Pine at 817 million

16  before the event of default.  Do you see that?

17  A     That is correct.

18  Q     And what is your analysis of that valuation?

19  A     Well, I find it difficult to understand how he came up

20  with 817 million, especially when you calibrate it with

21  everything else that we've been speaking about, and especially

22  in light of all these other valuations that we've been talking

23  about, 817 million is far above these other valuations.

24        So given all these risks, I think it's very difficult to

25  justify something that high.

Page 133

1    Q    And are you aware of the fact, Professor Pfleiderer, that

2    some time in the spring of 2009, after the event of default,

3    which at least Barclays and Mark Slattery interpreted as

4    increasing the value of Pine, Alvarez and Marsal, the

5    administrator of the debtor who hired Mr. Slattery, believed

6    that they should be able to buy Pine back from Barclays for

7    approximately 600 million dollars?

8             MR. TAMBE:  Objection, Your Honor to the question, the

9    same reason stated last week.  This was the subject of

10   confidentiality agreements between Barclays and Alvarez and

11   Marsal.  No mention was to be made of this in the litigation.

12   We reserve our rights.

13            MR. HUME:  May I respond?

14            THE COURT:  Sure, respond.

15            MR. HUME:  We have spoken to our client, as I

16   mentioned during Mr. Slattery's examination.  We contacted all

17   the people on that PMTG desk that had any involvement at the

18   time, including the names movants gave us, people who may have

19   had involvement, discussions with Alvarez and Marsal.  None of

20   them have any recollection of any agreement to keep it

21   confidential.

22            If there is an agreement, we haven't seen anything in

23   writing.  We've asked.  There may be a misunderstanding, I'm

24   not accusing anyone of bad faith, but we don't have any

25   evidence or knowledge of it, and I would note this, which may

Page 134

1    have different kinds of significance, the e-mail in which I

2    offered into evidence, and I show the witness now, that makes

3    the 600 million dollar offer, was from April 2009.

4           At that point, technically, the sale order was still

5    on appeal, being defended by the debtor.  It had been confirmed

6    by the district court, but there was still pending appeal of

7    the Second Circuit, it hadn't been dismissed.  We knew nothing

8    about the request for 2004 discovery.  We knew nothing about

9    Jones Day being hired to investigate us.  There was no

10   liquidation to exclude it from.  I don't understand this

11   supposed agreement.

12          MR. TAMBE:  Your Honor, just as Mr. Hume has, we have

13   also checked with Upline.  The folks who were doing this

14   business-to-business negotiation in our very firm, have a

15   recollection that they made it a term of the discussions that

16   they would be confidential discussions, and not to be used by

17   anyone for any purpose.  When the litigation commenced and

18   those discussions continued, we stressed once we got involved,

19   that no use was to be made of this by either side in the

20   litigation.

21          THE COURT:  Well, it's unclear to me whether or not

22   there is an enforceable confidentiality restriction that

23   governs the use of this, this invader (ph).  There appears to

24   be no dispute that, in fact, such an offer was made.  The only

25   dispute is whether or not it's something which can properly be

Page 135

1    the subject of questioning in this trial.

2              The current record, I'm not able to make a ruling one

3    way or the other, because it's frankly filled with ambiguity.

4    I have no reason to question the representations that have been

5    made by counsel, both for the movants, and for Barclays, and

6    there's no way for me to make a ruling at this point.  But I am

7    inclined to permit the question, unless and until it can be

8    shown that, in fact, it violates a confidentiality restriction,

9    I'm going to permit it.

10             If it does violate a confidentiality restriction, we

11   can strike it from the record later.

12   BY MR. HUME:

13   Q    Have you seen an e-mail between Alvarez and Marsal,

14   Professor Pfleiderer, and the Barclays' PMTG Group discussing

15   an offer to acquire Pine by Alvarez for approximately 600

16   million?

17   A    That's my recollection.

18   Q    And is that relevant to your expert analysis of the

19   valuation of Pine?

20   A    It would be, because this was after the event of default,

21   and in -- as I understand it, in the spring.  I'm not quite

22   sure of the timing, so notably after the event of default, and

23   it's very much less than what the movant's expert is valuing it

24   at.  So I think that we've got now several prices for Pine, all

25   in the 400 to 600 million range, and the 817 is, given that, a

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 136 of 221

Page 136

```
 1   bit of an outlier that I find hard to understand how you would

 2   come up with that valuation, given again, all of the risks that

 3   are involved here.

 4   Q    Can you think of any reason that could make Mr. Slattery's

 5   valuation of 817 million consistent with what I will call his

 6   client's offer, if that's not taking too much of a liberty, of

 7   600 million in April 2009?

 8   A    No, not as I sit here.

 9   Q    And are you aware of the fact, Professor Pfleiderer, that

10   Mr. Slattery does not take any discount in his evaluation -- in

11   his valuation of Pine for the -- what you call the

12   participation risk, the risk of LCPI not making distributions

13   up to Pine?

14   A    That is my understanding, that that calculation does not

15   take into account that risk, or implicitly assess that risk at

16   zero.

17   Q    And are you aware, generally, of the fact that Alvarez and

18   Marsal, as administrator for the estate, has taken the position

19   that no such distributions should be made to Pine, and that

20   prior distributions should potentially be called back?

21   A    That's my understanding of --

22   Q    Can you think of any reason or justification that could

23   make reasonable Mr. Slattery's decision not to take any

24   discount for the participation risk imposed by LCPI's

25   bankruptcy in valuing Pine?
```

Page 137

1    A    Well, I'm not an expert on the bankruptcy law, and there

2    are certainly people in this room that are, but my

3    understanding is that there's considerable risk when an entity

4    becomes bankrupt, has various creditors, and limited means to

5    pay, and if you're a creditor, be it Pine or any other entity,

6    there's some risk, which I think is definitely material.

7    That's my understanding as a financial economist, but certainly

8    not as a lawyer.

9    Q    Now, based on all of your review of all of these analyses

10   and different valuations for Pine, you haven't attempted to

11   find a definitive single number for Pine, correct?

12   A    No.

13   Q    But you have -- do you have a professional opinion as a

14   financial economist of whether the Barclays' valuation for

15   Pine, as of September 22nd, 2008, was a reasonable valuation?

16   A    Given the risk, the multiple risks that were involved

17   here, especially given that this was being valued, before this

18   event of default, which may have mitigated some of the risks,

19   it seems to me in my professional opinion to be reasonable.

20   Q    Let me move on then, Professor Pfleiderer, to the rest of

21   the so-called PMTG Group, Principal Mortgage Trading Group that

22   held Pine, and also held other assets.

23        Are you -- I guess demonstrative 51 summarizes the

24   different valuation for those assets.

25   A    Yes.  And what you can see here again, the color coding is

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 138 of 221

Page 138

1    red is level two, and black is level three.  You can see here

2    that there's very little of this level one.  It's just a small

3    little green line at the bottom, almost all of its level two or

4    level three.  Again, this is the difficult stuff to value, and

5    in fact, some people would characterize much of this or at

6    least a good portion of this, as the toxic assets that people

7    were talking about in this time period and afterward.

8    Q    By the way, before we left Pine, I should've asked you one

9    last question, which is, what was your understanding the bar

10   chart illustrated, by color, what is your understanding of how

11   Pine was categorized on the Lehman system?

12   A    So Pine rather, I would assert rather remarkably, was

13   categorized as a level two asset.  My understanding is that

14   Barclays categorizes it as a level three; and given what I

15   understand about Pine, and the complexities involved, and all

16   of the uncertainty, it appears to me that it's better

17   categorized as level three than level two.

18        Again, I make the qualification that I'm not an

19   accountant, so that's not an accounting judgment, but given my

20   understanding of what the accountants are trying to represent

21   by those classifications, I would say that Pine is better

22   classified at level three than level two.

23   Q    One other question I failed to ask you is, when roughly

24   speaking, what is your understanding of when the concept of

25   level one, two, and three classifications was introduced?

Page 139

1   A    This is, as I understand it, a rather new innovation in

2   accounting practice.  I believe, I may be incorrect here, but I

3   believe that it started to be used as a rule in 2007.  So it's

4   only a few years old.

5   Q    Does -- is it your understanding as a financial economist

6   that the implementation of the level one, two, and three

7   classification system has some relationship to the explosion of

8   securitization as a practice by financial firms around the

9   world over the decade or two leading up to the financial crisis

10  in 2008?

11  A    I would interpret it as a definite outcome of that.  There

12  were proliferation of assets that came to be on the books of

13  broker dealers and banks and others that were these very

14  complex securitizations that were much more difficult to value

15  than what the accountants were valuing before.

16       So I believe that this classification was a response, at

17  least in part, a response to that.

18  Q    And is the reason there was a response, was that it was an

19  attempt to make more transparent to outsiders, looking at a

20  portfolio of assets, which assets were easy to value, had

21  reliable values and which were harder to value and had less

22  reliable values?

23  A    That is correct.  And one of the things that an investor

24  would presumably look at in evaluating any financial statements

25  is how many of the assets or how much of the asset value was at

Page 140

1    these various levels, because that gives some indication about

2    the uncertainties associated with those values.

3    Q    Now, going back to the rest of the PMTG Group that held

4    Pine and also held other assets.  Are you familiar with -- you

5    understand the PMTG Group are essentially front office traders?

6    A    That's correct.  That's my understanding.

7    Q    And you understand that for the other assets acquired from

8    Lehman, the Product Control Group determined the final values

9    that went on the acquisition balance sheet?

10   A    That basically is the case, yes.

11   Q    And with the PMTG assets, do you have an understanding of

12   whether there were valuation testing done, both by Product

13   Control Group and valuations put on by the PMTG traders?

14   A    That's correct.  The Product Control Group, which is in a

15   sense the independent valuation activity within Barclays, put

16   marks on these assets, I believe, as of the 19th.  They were

17   preliminary marks, and then the PMTG Group, which would be in

18   some sense the front office, valued those and it was determined

19   and Price Waterhouse reviewed this -- PricewaterhouseCoopers

20   reviewed this, that the PMTG marks were more accurate, was more

21   reasonable to use those than the Product Control Group marks

22   that had been put on earlier.

23   Q    Now, Professor Pfleiderer, are you familiar from your

24   review of the papers and transcripts in this case with the

25   assertion and insinuation made by the movants that the traders

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 141 of 221

Page 141

1    had clear incentive to mark down all of the assets below their

2    fair market value, so that later on, they could sell them at a

3    higher price and make an artificial profit?  Are you familiar

4    with that assertion or allegation?

5    A    I believe that allegation has been made, or at least

6    asserted in some of my -- yes.

7    Q    And have you analyzed the data to determine whether the

8    data is consistent with that allegation?

9    A    Yes, I did, in the sense of looking at a comparison

10   between the marks that were put on by the -- the initial marks

11   that were put on by the Product Control Group and what was

12   later established by the PMTG Group.

13   Q    And can you explain generally your understanding of the

14   two different ways in which PMTG established values for the

15   category of assets in the PMTG Group?

16   A    There are two slides here that relate to this.  The one in

17   the left is marks that were obtained through sales, internal

18   sales within the PMTG Group.  And the right is basically exit

19   marks that were put on by PMTG that were not sales.  So this is

20   two distinct set of assets.

21        And if we look at the left, the first row of the left is

22   looking at those situations where the PMTG sales were greater

23   than the Product Control Group marks.  And you can see here

24   that we have the cases where this occurs, the value that the

25   PMT sales occurred were 640 million and the PCG mid-marks were

Page 142

396.

Now, I should point out something right away.  The PCG

mid-marks don't include the exit price valuation.  So they

would tend to be higher, everything else being equal, than the

PMTG sales marks, which are going to be representative of an

exit valuation.

So here we see that it goes the opposite way.  That the

traders, who were buying these, were actually paying prices

that were higher than what PCG marked them at mid-point.  So

that's the first row.

There's an interior row, a middle row, in which it turned

out to be the same.  And then there's a bottom row where it

goes in reverse.

So what you take away from this, is that it wasn't a case

that the traders were simply marking everything down to low

levels.  In many cases, they marked them up; in many cases, the

process was one of marking down.

Overall, more was marked down than was marked up, but

that's not terribly surprising, given that these are being

marked to an exit price from a mid-price, you would expect it

to go in that direction.

And relatively the same story is told on the right-hand

side, where the PMTG prices are not determined by sales, but

rather by their exit marks.  And again, in the first row, you

see in a number of cases the exit prices that are being

Page 143

1    determined by the front office, 146.8 are higher than what

2    those assets were valued by the Product Control Group.

3         And in the bottom row, you see it going the other way.

4    INET (ph), of course, it moves in a negative direction.  But

5    again, that's not surprising, given that we're marking from a

6    mid-point to an exit price.

7    Q    And you mentioned earlier that PWC had reviewed the PMTG

8    valuations, do you recall that?

9    A    That's correct.

10   Q    And slides 54 and 55 summarize some of that, right?

11   A    Yes.  These are quotations taken from various working

12   papers that were produced by PWC, and these relate to the

13   valuation of securities or assets in the PMTG Group.  And I

14   highlighted or had highlighted some of the important statements

15   here in red, and basically, if we want to go quickly, the

16   bottom line of this is that the valuation of PCG -- I'm sorry,

17   the valuation of PricewaterhouseCoopers is that the company's

18   process, using their models and marketed favorable data points,

19   provides a reasonable basis for their determination of fair

20   value.  But up above, you can see a number of other things that

21   they checked, and basically found to be reasonable.

22   Q    And is it significant to you in your opinion as an expert

23   financial economist, that PWC did this level of work, and

24   review, and testing of the PMTG valuations?

25   A    Yes, it is.  They're looking at the processes that were

Page 144

1    followed, assumptions that are being made, inputs into the

2    models, and evaluating whether they're likely to produce

3    reasonable values.

4        So that's an outside process that's being done to check

5    and make sure that the outcome of this is going to be within

6    the bounds of what's reasonable.

7    Q    I note at the bottom bullet point of the second slide,

8    that PWC notes that Barclays should take no bid-ask adjustment

9    on CBO assets valued at desk levels, an impact of 12.3 million.

10   PWC notes that the liquidity adjustment is appropriate for

11   Pine.

12       Do you recall that discussion, and does it have

13   significance to you?

14   A    Yes, it does.  What happens here, and I can point to some

15   other things here as well, is that PWC takes exception to some

16   of the practices that Barclays was doing.  And actually before

17   we get to the bottom, it might be interesting just to look at

18   bullet point three.  It looks at PWC, compares a pricing matrix

19   for 9/30, this is in September, to what it calls a legacy

20   matrix, which is a matrix that's being used to price Barclays'

21   assets that weren't acquired, and discovers that there are some

22   differences.

23       And so the first thing that PWC does, is it takes a sample

24   of the securities, and sees whether this is going to result in

25   a material difference, and it actually determines that Barclays

Page 145

1    is pricing after the -- off of the wrong index.  And then PWC

2    directs the Pricing Control Group to stress test the portfolio

3    to address the impact, and decides that it's an immature

4    effect, but finally, it notes that when the portfolio was re-

5    marked on the 30th, the appropriate matrices were applied.

6         So this is an example of where this is really an ongoing

7    process where PWC is involved in assumptions that are being

8    made reviewing those.  And when it sees something that isn't

9    acceptable or doesn't seem to be reasonable, I think is a

10   better way of putting it, it determines whether it's material

11   and calls it to Barclays' attention, or at least looks and sees

12   that in the end, Barclays is using the right matrix.

13   Q    And does PWC have an incentive to make sure the valuations

14   are done accurately?

15             MR. TAMBE:  Objection, foundation.

16             THE COURT:  What's the foundation objection?  What --

17             MR. TAMBE:  Does PWC have an incentive?  He's not an

18   employee of PWC, he'd be speculating as to what incentives PWC

19   had.  He doesn't know the nature of their relationship with

20   Barclays, how extensive it is, what other matters it covers.

21             THE COURT:  Well, it sounds like it's a very long list

22   of items in the question, you can start over.  Let's ask a

23   different question.

24             MR. HUME:  I'd just suggest if we can have an off-the-

25   record discussion about whether Mr. Tambe will withdraw his

Page 146

1    accusations of the incentives of the Barclays' traders, since

2    he and his colleagues don't work for Barclays.  But with that

3    perhaps inappropriate remark, I will try to ask a different

4    question.

5            THE COURT:  It's okay.  It's a little snarky, but you

6    can get away with it this time.

7            MR. HUME:  I'll try not to do so in the future.

8    BY MR. HUME:

9    Q    Professor Pfleiderer, as a financial economist, do you

10   understand generally the role of independent auditing firms,

11   and their relationship with publicly traded companies that they

12   audit?

13   A    I understand that as a financial economist, that they

14   have, what I would call reputation risks as well as litigation

15   risks, and that if they basically -- let's see how to put this,

16   accept things that are unreasonable in one direction or

17   another, they expose themselves both to some litigation risk

18   and some reputation risk.

19        I don't know anything about incentive contracts within, so

20   I can't speak to that, but for the role that they play and the

21   reputations that they have and litigation risk, I would

22   understand that that would create incentives to make sure that

23   when they say that something is reasonable, they have

24   reasonable grounds to do it.  And that would be probably the

25   extent of my understanding, but that's enough to give me

Page 147

1    comfort that the process here is a constructive one that --

2    Q    Based on your review of that process, based on your review

3    of the Barclays' valuation work papers, and your assessment of

4    the movant's criticisms of those, do you have a professional

5    opinion as a financial economist, of whether the Barclays'

6    valuations of the PMTG assets was reasonable?

7    A    I believe I do, yes.

8    Q    And what is your opinion?

9    A    That it is reasonable, based upon their assessment.  I'm

10   not sure I fully understood your question, so I want to make

11   sure that I'm answering the question that you asked.

12   Q    Simply whether you have an expert opinion on the

13   reasonableness of the Barclays' valuations of the assets in the

14   PMTG Group?

15   A    Oh, I'm sorry.  I thought you were referring to

16   PricewaterhouseCoopers.  Yes, it appears to me given the

17   decisions that were made, that it is within the realm of

18   reasonableness, yes.

19   Q    Could we now move on to a different -- quite different

20   category of assets, the equities?  Demonstrative 56 begins a

21   discussion of the equities.  Can you briefly explain what this

22   shows and your understanding of how Barclays valued the

23   equities?

24   A    So as it says at the top, there were 4,028 CUSIPs of

25   equities in the initial inventory, which is what I'm looking at

Page 148

1    here.  Most of these were classified by Lehman, and again these

2    are all Lehman classifications at level one.  Some are

3    classified at level two, and there are some that don't have

4    available classifications.

5        And what these bars show are the various valuations that

6    were made by Barclays, BoNY, and the movants at mid-point marks

7    and then at exit marks.  And you can see that there's some

8    differences here among the various ones that we're looking at,

9    and much of this, as I explained before, at least a good

10   portion of this, in terms of the difference between Barclays

11   and the movants, in particular, is due to the so-called

12   measurement date.

13   Q    With respect to that, very briefly, you're not offering an

14   opinion as an accountant on what the accounting rules required,

15   in terms of a valuation date?

16   A    No, absolutely not.

17   Q    Do you have any opinion as a financial economist of

18   whether September 22nd closing prices was a reasonable way to

19   measure the value of what Barclays actually received in the

20   transaction?

21   A    Well, it strikes me as reasonable.  Again, thinking about

22   the economics of this transaction, Barclays did not have the

23   ability to trade these until after certainly the open of the

24   markets on this day.  And so the 19th was quite some time away

25   from that, and the ability to go back and trade something in

Page 149

1    past history, when you didn't have possession of it, is

2    something I don't quite understand, in particular, and I just

3    may not understand the legal niceties of this, but as I would

4    understand it, the possession actually would occur at the close

5    of the transaction, and not before, and I don't recall

6    particularly exactly the time, but I think that was more 8:00

7    o'clock in the morning or so.

8         So from an economic point of view, I would think that you

9    couldn't start trading these securities until then.  Now, I may

10   have the legal niceties there wrong, given how things are

11   stated in the contract and if I understood that better, I might

12   change my economic opinion, but my understanding would be that

13   they couldn't actually start trading things until the

14   transaction had closed.

15   Q    Based on your understanding, the fact that the contract

16   says that Barclays takes possession 12:01 -- title and interest

17   at 12:01 a.m. on the date of the closing.  If the closing

18   doesn't happen until 8:00 or 9:00 a.m., that's really the

19   relevant time from an economic matter?

20   A    I, again, unless I misunderstand something, that would

21   seem to be the appropriate economic point of view, which looks

22   at what you could actually do, which I would think would not be

23   to trade anything until you'd actually closed and taken

24   possession.

25   Q    Now, Professor Zchemiasky (ph) has stated that the close

Page 150

1   of business on the 19th would be the best proxy for the value

2   of the assets, as of the open of business on the 22nd.  Because

3   he doesn't think prices changed over the weekend.  Are you

4   familiar with that?

5   A    Yes, I am.

6   Q    And have you analyzed, in any way, whether that is a

7   reasonable assessment to make?

8   A    I have looked at opens and closes, and intra-day pricing,

9   and come to a different conclusion.  I don't think it's nearly

10  as clear-cut as what Professor Zchemiasky would have us believe

11  by what he wrote.

12  Q    What -- can you just explain what demonstrative 57 is

13  showing?

14  A    Well, this is showing, as it says, intra-day trading in

15  ten-minute increments of the S&P 500, which is an index that is

16  a proxy for at least part of the equity portfolio here, that's

17  toward the very liquid large market cap end of the spectrum.

18       And what this shows is that if you literally look at the

19  closer price and then the open again, you don't see much or any

20  movement, but that tends to be rather typical of many days.

21  And the explanation for this is that information is actually

22  processed in the trading process itself.

23       So we talk about price discovery in which the actual

24  trading activity that occurs in a marketplace helps establish

25  the price.  So what you see, and this is fairly frequent, you

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 151

1    see that in the first few minutes of trading, or in a

2    relatively short period of time, the market is getting a sense

3    of where it should open, and how to process the information

4    from either the night before, or in this case, from the

5    weekend.

6         So if you look at this diagram, you see that within the

7    first few minutes of the day, first ten or forty minutes of the

8    day, the price is actually adjusting downward quite

9    significantly, and it is my opinion that this is quite likely

10   processing information that has occurred over the weekend,

11   rather than information that's coming out in those first ten

12   minutes.

13        So I think that the literal open to close or close to open

14   type of analysis is not appropriate here, given that it takes

15   the market typically some time to process information through

16   the price discovery process.

17   Q    Now, in addition to valuation date, Professor Pfleiderer,

18   do you understand that Professor Zchemiasky has a different

19   method for calculating adjustments to bid or exit prices than

20   Barclays did?

21   A    Yes.  Yes, I do.

22   Q    And have you analyzed closely his method versus Barclays'

23   method?

24   A    I have.  First of all, I should explain if we go to slide

25   58, I think it's the next one.  The problem here is the great

Page 152

1    unknowns that we see here, and those are the question marks.

2    So there's limited information to figure out what the bid-ask

3    spread should be.

4         The information that Barclays had its disposal when it was

5    doing this, is the following information.  It had some

6    historical information about bid-ask spreads for 469 CUSIPs.

7    Now, historical is information that's basically collected at

8    the end of the day that relates to bid-ask spreads.  But

9    there's reason to be concerned with its reliability.  In fact,

10   you oftentimes or sometimes, and it's fairly frequent, come up

11   with negative spreads or very small spreads, and this has to do

12   with some of the staleness that can be involved in the pricing.

13        So Barclays and this is Mr. Washdel (ph) made the decision

14   to put more weight on live information, where you actually get

15   a simultaneous bid and offer in the market.

16        So what we would like to have based upon Mr. Washdel's

17   concerns, and of course, trying to figure out what the

18   valuation of the bid-ask adjustment should be on September 22nd

19   is live spreads covering all the CUSIPs, in other words, that

20   top row.  But none of that information is available.

21        So you're left with the problem of taking the information

22   that you have and trying to infer from that what you would

23   conclude if you had the live information on the September 22nd

24   date.

25        And what Washdel -- Mr. Washdel did at Barclays, was he

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 153

1    took live information, compared it with historical, and made an

2    adjustment based upon that.  And Professor Zchemiasky disagrees

3    with that and comes up with another method.  But the problem

4    here is that anyone trying to do this is confronted with the

5    fact that we just don't have the information that we need to do

6    it with complete reliability.  So some judgment has to be

7    involved in this exercise.

8    Q    Professor Zchemiasky also had a series of demonstratives.

9    Have you reviewed his demonstratives?

10   A    Yes, I have.

11   Q    And did you recall seeing demonstratives that showed an

12   average bid-ask spread gathered in December that was actually

13   higher than what had been gathered in September, and yet

14   Barclays came up with a scaling factor that was positive.  Do

15   you recall that?

16   A    I do.  And, in fact, on slide 59, I reproduce his example,

17   and I believe this is exactly the same example as he used, so

18   we've got two securities on the 22nd, that have the spreads

19   that you see there, .4 percent and 1.6 percent.  And then

20   Professor Zchemiasky's example has values for the 28th --

21   excuse me, the 18th, looks at the ratios, looks at the

22   averages, and basically concludes that Barclays' method using

23   the ratio is going to reach too high a spread.

24        So there's nothing wrong with his example.  The numbers

25   are exactly what they are, and the phenomenon he's addressing

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 154

1    is something that can occur.

2    Q    Let me make sure I understand the phenomenon and your

3    opinion on it, and then maybe if we can get through it, we can

4    take a break after the equities.

5         First of all, mathematically, does his example show and is

6    it possible that the averages of two dates can have one

7    relationship, but the ratios will have another relationship?

8    A    Yes, indeed.

9    Q    In other words, the ratio of the averages can show a

10   positive relationship from December to September, but the

11   average of the ratios shows that you would need to increase

12   from December to get to September?

13   A    That is correct.

14   Q    So mathematically, that's possible?

15   A    It is indeed.

16   Q    But in his example, it would lead to incorrect results,

17   that's what he's trying to show?

18   A    That's what he's trying to show, and in his example, if

19   this were a perfect representation of what the problem was,

20   which it's not, then it would show that this would come up with

21   potentially too high of an example.  If this were the

22   situation, this would create a problem.

23   Q    Why is this not a fair representation of --

24   A    Well, if we go back to the slide before, the problem here

25   is that there is a lot that's unknown.  And in particular, the

Page 155

1   main problem is what in economics and other places, we call

2   selection bias.

3       So the difficulty is the following.  You've got lots of

4   securities out there, some that trade in liquid markets, and

5   some that don't.  If I go out and observe some information for

6   securities, I'm much more likely to observe the information for

7   liquid securities, things that trade a lot, than things that

8   don't.

9       So it's sort of the same problem that you encounter when,

10  in the old days, Gallup would try to do a poll, and they would

11  call people on the phone, and of course, people that were too

12  poor to have phones were excluded from that.  That's no longer

13  true today, but that was a problem in selection.

14      So here it's the same sort of problem.  You're trying to

15  get information, but you're more likely to get information for

16  things that are more liquid, and have lower spreads.  So that's

17  a huge problem potentially here, it's a significant problem,

18  and it's represented by these question marks.

19      As I go over toward the right-hand side, I'm looking,

20  generally speaking, at less liquid assets.  I don't get

21  information about those.  So if we go ahead to, I believe it's

22  slide 60, what I've done is simply taken Professor Zchemiasky's

23  example and added another dimension of the problem to it,

24  because there is this important other dimension.  There's

25  several other dimensions to it that are not considered or

Page 156

1    contemplated by his example.

2        And the addition is to put an unobserved security C in,

3    and that's the third row here at the top.  In other words, this

4    is something that is illiquid, and because it's illiquid and

5    not trading very frequently, we just don't see it.  It's, to go

6    back to my analogy, it's the security without the telephone and

7    we can't really call it up.

8        So that has, in this example, and this is a purely

9    hypothetical example, but it illustrates the problem.  In this

10   example, it has a historical and I'm reading in the September

11   22nd historical column versus Security C, 14 percent.

12       Now, Mr. Washdel was concerned about the use of

13   historical, because historical results in some compression, due

14   to some staleness, and was concerned to get live, but we don't

15   get to see live.  But I put in red at the left the putative

16   live spreads that we don't see, but we would like to see.  And

17   they're a little bit larger than the historical.

18       So then we actually look at, if we go over to the far

19   right-hand, and I can actually use my pointer here, we'll go

20   over to the far right-hand side here, I look at the actual

21   based upon the true numbers here, the actual bid offer

22   adjustment -- I should say adjustment to bid correction that we

23   need to make.  And for the size of these holdings, it should be

24   575 dollars.  Yeah, that's 575 dollars, just measuring it in

25   the units that I am.

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 157 of 221

Page 157

1          So now we put Professor Zchemiasky's method, and his

2     method is just to observe what we can.  We don't get to observe

3     Security C, and this is exactly what he had before.  He got one

4     percent, and so he would have an adjustment of 130.  Barclays'

5     method was to look at these ratios, adjust to September, and

6     get 4.12 percent, which gives us 536, which is closer to 575.

7          Now, I'm not going to sit here and say that this is fully

8     representative of what's going on, because we don't know.

9     That's the problem, we just don't get to see a lot of this

10    information.  But the whole question here is whether what

11    Barclays did was reasonable, given what could be observed, and

12    given the problems that Mr. Washdel considered to be important

13    in the difference between historical and live.  And given this

14    type of issue, it certainly can be reasonable, as a way to

15    capture some of the other issues that Mr. -- excuse me, I

16    misspoke, Professor Zchemiasky is not capturing in his example.

17    Q    This problem of the unknown live bid-ask information, do

18    you have an understanding of how traders at broker dealers who

19    mark assets to market every day, do they have to deal with that

20    problem?

21    A    In a live environment, no.

22    Q    Because they have live bid-asking price?

23    A    That would be correct, yes.

24    Q    So is it a problem that may be not unique, but at least

25    was sort of special to a situation where you have a large

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 158

1   portfolio that you have to then, after you figure out what it

2   is, go back in time to value?

3   A   There were some special challenges that Barclays faced,

4   given the nature of this portfolio acquisition.  It used

5   whatever it could in standard procedures, but here was a

6   situation where it had to determine what was an appropriate

7   adjustment on a past date where it didn't have it in the

8   inventory before that, and it didn't have access to these live

9   quotes.

10  Q   And did PWC perform a thorough review of all of these

11  valuation methods in the bid-ask methods that you've been

12  describing?

13  A   Yes, it did, very thorough, and I challenged this because

14  it was something that was going to be important in terms of the

15  overall acquisition accounting, given that there were a fairly

16  substantial number of equities here.

17      So is -- I won't read all of these, but it did audit

18  sampling, tested 43.6 percent of the equities, based upon total

19  asset value, that's the third point.  Performed other audit

20  procedures, and in fact, if we look down at the bottom of the

21  first page, perhaps that's one of the more important

22  conclusions, it reads that it performed additional audit

23  procedures on the bid-offer adjustment, which is what we're

24  talking about here, and actually considered further scenarios

25  to adjust for illiquid positions.  And that's sort of the issue

Page 159

1    that I've been talking about here.

2        And then they go on to say this produces a range of

3    estimates for the bid-offer provision from 373 million to 453

4    million, and in this case, Barclays used 300, maybe 2, which is

5    closer to their low point than to their high point.

6        So on the next page, which is on the right-hand side of

7    the screen, they basically in the bottom line, they deemed that

8    the approach is reasonable.

9    Q    Do they also note at the top there that they agreed that

10   September spreads should be wider?

11   A    Yes.  Yes.  So this is an important issue obviously that

12   is being confronted here, and they agree with what was -- the

13   concern at Barclays that Mr. Washdel had about the spreads,

14   especially given the illiquidity of some of the securities.

15           MR. HUME:  Your Honor, I'm going to move on to a new

16   topic from the equities, if now is an appropriate time for a

17   break.  Seems like the natural --

18           THE COURT:  This would be a fine time to break.  I

19   just wanted to get a sense of likely overall duration of the

20   direct.  I know that Professor Pfleiderer has to return to

21   California at the end of the day tomorrow.  I just want to be

22   sure that we get him all in, so one of my questions is, whether

23   we stay a little bit late tonight, or whether we stay a little

24   bit late tomorrow, or whether we need to do sitting late on

25   either day.

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 160 of 221

Page 160

1          So I just want to get a sense as to what we're talking

2     about, in terms of perceived duration of the direct and cross.

3          MR. HUME:  I appreciate that.  I'm certainly sensitive

4     to that timing issue.  My goal had been to finish everything by

5     4:30, to allow cross to begin.  I'm probably running a little

6     short of that goal, depending on how long the break is, but I'm

7     going to try to move things along, maybe skip some of these

8     topics.

9          THE COURT:  I am in no way suggesting that you need to

10    skip anything that you consider important.  I just want to get

11    a sense as to whether this is a day that we're going to stay a

12    little bit late, or tomorrow's the day that we're going to stay

13    a little bit late, or whether we're likely to finish --

14         MR. HUME:  Yeah.  I think our --

15         THE COURT:  -- on time in both days.

16         MR. HUME:  -- preference -- given the witness'

17    constraint tomorrow evening, our preference would be for cross

18    to begin today.  I know the movants anticipate extensive cross,

19    and so if they could begin today, and then have, obviously, the

20    lion's share tomorrow, but at least a little time for our

21    redirect, that would be our preference, and we will try to

22    finish before 5:00 today, if we could stay till 6:00, would

23    give them an hour, if the Court -- if that's permissible for

24    the Court.

25         THE COURT:  That's fine.  And is there a time tomorrow

Page 161

1    that the witness needs to leave?

2           MR. HUME:  Yes, my understanding at present, is if the

3    witness is on a flight, that would require him to leave court

4    around 5:00 or 5:15.  I stand to be corrected, maybe 5:30.

5           THE COURT:  Okay.  Well, we can make adjustments in

6    the schedule tomorrow, including shortening lunch if necessary

7    to get everything in.

8           Mr. Tambe, about how long do you think you're going to

9    be on cross?

10          MR. TAMBE:  My sense, and let me consult a little bit

11   over the break, but my sense is, if direct is done by 5:00

12   o'clock today, if I start at 9:30 tomorrow morning with my

13   cross, I don't think I'm going to be going much past lunch.  I

14   would anticipate finishing the cross around 3:00 or 3:30, at

15   the latest.

16          THE COURT:  So you're saying we don't need to stay

17   late tonight?

18          MR. TAMBE:  I don't think we need to stay late

19   tonight, and frankly, given all this material, I would like the

20   opportunity overnight to prepare for his cross, there's a lot

21   of new stuff in here.

22          THE COURT:  All right.  Well, we can take a break now

23   in any event, and we'll either stay a little bit late tonight

24   or not.  My inclination is if we don't need to, that there's no

25   need to at all.  But why don't you talk a little bit during the

Page 162

1   break also about logistics.  We're going to finish the witness

2   for sure before 5:15 tomorrow.  It's really just a question of

3   how we allocate the remaining time to reach that goal.  And if

4   Mr. Tambe is clear that he's not going to go past 3:30 or so,

5   even if he starts tomorrow at 9:30 without starting today, that

6   accomplishes the goal, and there's no need to stay late.  Okay.

7          (Recessed at 3:39 p.m.; reconvened at 4:01 p.m.)

8              THE COURT:  Be seated, please.  Please proceed, Mr.

9   Hume.

10             MR. HUME:  Thank you.

11  BY MR. HUME:

12  Q    Professor Pfleiderer, in the interest of time, I think

13  we'll skip treasuries.  Did you generally review Barclays'

14  valuation of treasuries?

15  A    Yes, I did.

16  Q    And just for the record, is it your understanding that the

17  only real difference between Barclays and movants is the

18  valuation date there?

19  A    I believe that is the entire difference.

20  Q    Did you also review Barclays' valuation of what are called

21  agency debt securities or agency rates?

22  A    I did.

23  Q    And what are those securities?

24             MR. HUME:  And could we have demonstrative 66, please?

25  A    So these are securities that are issued by various

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 163

1    government agencies, government-sponsored enterprises.  This

2    would, of course, include Fannie and Freddie, but it also

3    includes the Tennessee Valley Authority and various other

4    entities that are lumped into this group.

5         An important point to note on this slide is actually if we

6    go back, let me actually take us back to the treasuries just

7    for one second, if we can go back to treasuries, there was no

8    real valuation difference, as we just remarked.  But you notice

9    that almost the entire inventory here is green, and this is

10   what can be marked with almost a mechanical process.  There's

11   not much variation because there's not much judgment involved

12   here.

13        But when you come to the agencies, what you see, and this

14   is again with Lehman's marks or Lehman's, I should say

15   classification, I misspoke.  Lehman's classification as to

16   level one and level two, a significant proportion of these is

17   level two, which are the more difficult to value range of

18   securities.

19        So there are differences here, and the differences are

20   explained by in part, valuations and in part, the process of

21   marking to an exit price.

22   Q    And does demonstrative 67 sets forth your understanding of

23   how Barclays valued these securities?

24   A    Yes.  Very quickly, they used outside pricing sources,

25   Bloomberg and FTIT -- FTID, excuse me, which is the Financial

Page 164

1    Times Interactive Data, I believe, prices from September the

2    22nd.  And Barclays applied a five percent liquidity adjustment

3    to the whole portfolio, which includes both level one, which

4    are more liquid, and level two, which are more illiquid, as I

5    remarked before.

6        And the -- one of the important points here is the

7    government takeover of Fannie and Freddie on the 7th of

8    September in 2010 -- I'm sorry, that's a mistake, should be

9    2008, I believe.

10   Q    Yes.

11   A    And so that's a typo, I take responsibility for that.  In

12   any event, it was on September 7th, 2008, and this created some

13   uncertainty over the value of Fannie and Freddie bonds.

14       Now, there are two real effects that are happening at this

15   time in the market.  On the one hand, the government is taking

16   it over and people remark that this may be indicative of the

17   government standing by, some implicit guarantee.  So that's the

18   good news.  But the bad news is that they had to be taken over,

19   and there's considerable uncertainty about the value of their

20   assets, because these are basically mortgage-based assets, and

21   so it's unclear exactly how this cuts, but I think one thing

22   that's very clear, is that this creates a fair amount of

23   uncertainty going forward as to what the value of these bonds

24   is going to be.

25       Now, PWC, PricewaterhouseCoopers again approved the

Page 165

1    liquidity adjustment that they applied across this portfolio,

2    and the movant's expert, Mr. Slattery, basically comes up with

3    an alternative liquidity adjustment, which he applies to this

4    inventory, but it is basically based upon what I would call a

5    fairly unreliable method.

6         What he does, is he starts from treasury spread from 1992

7    to 2002, which of course, is a period that's somewhat distant

8    in time, and he adjusts these using a table from a 1997 book

9    that was edited by Mr. Fabozzi that is basically comparing what

10   are the other spreads in normal and distressed markets.  And he

11   applies this factor to the 1990s data to basically bring it up

12   to 2008.  But the question is whether any distressed period in

13   the 1990s is really comparable to 2008.

14        So he's trying to get information from the past, which

15   isn't necessarily a bad thing to try to do, but what he's doing

16   is taking information from distressed periods from some time

17   ago, that I would at least assert are not as distressed as what

18   this major event that we're talking about in September was,

19   because this was almost unprecedented.  The only time I think

20   that you can find a similar period is perhaps even going back

21   to the Great Depression.

22        MR. HUME:  Can we have BCI Exhibit 1027A, please?

23   Q    Professor Pfleiderer, do you recognize this document?

24   A    Yes.  That is sort of my work papers, I don't know if you

25   call it work papers, but that's my scribbling there on the

Page 166

1    right, and I was just trying to get some understanding as to

2    how he was making this adjustment.

3         Now the information from the top is from this Fabozzi

4    book, it's not actually written by Fabozzi, the article itself,

5    it's written by a man by the name of Gerber, and he's looking

6    at what he calls normal time spreads and distress spreads, and

7    then taking a multiple between the two.  But again, this is

8    distress based upon some period that presumably happened

9    sometime in the 1990s, and it's unclear that that has any real

10   relevance in terms of the magnitude to what we saw in 2008.

11   Q    So, Professor Pfleiderer, am I correct that this is your

12   handwriting here?

13   A    Yes, I'm afraid it is.

14        MR. HUME:  I'm going to highlight this, please.

15   Q    And so am I correct, Professor Pfleiderer, that you

16   reviewed Mark Slattery's back-up work paper here that showed

17   how he calculated a bid-ask adjustment using these multiples

18   and tried to see if it was -- if you could reverse engineer,

19   figure out what multiple he was really using?

20   A    That is correct.

21   Q    And what relationship -- is this your question mark here?

22   A    Yes, it is.

23   Q    And you've -- does this word say actual?

24   A    What I meant there was the actual multiple that he used

25   for each one of those tranches, or each one of those maturity

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 167 of 221

Page 167

1    tranches.

2    Q    So, in other words, you calculated the relationship

3    between normal to distress that Mr. Slattery had here in his

4    work paper and wrote it over here in this column?

5    A    That's correct; 2.33 is simply 0.14 divided by 0.06.

6    Q    Okay.  And did you do that in an effort to see how it

7    would match up with the multiples that Mr. Slattery has up here

8    in the top half of his work paper?

9    A    Yes.  I was just attempting to understand what he did and

10   what the basis for it was.  And there are obviously factors

11   here that range from 2.3 to I guess 2.51, but how he got those

12   from the numbers above isn't quite clear to me, and he may have

13   had something in mind, but I don't know what it is.  I can't

14   reverse engineer it from what I see here.

15   Q    And I think you said this already, but is it your opinion

16   as a financial economist that the distress in the markets in

17   the mid-1990s, I think there's a reference to the 1994 Orange

18   County bankruptcy, was not comparable to the distress in 2008?

19   A    Yes, that would certainly be my opinion.  The Orange

20   County bankruptcy, for example, was not an insignificant event,

21   but it certainly doesn't rise to the magnitude of what we saw

22   in 2008, especially of course, the latter part of 2008.

23   Q    Now, Mr. Slattery also has a table in his report, and he

24   presented it as a demonstrative when he came to trial,

25   calculating the implied yields on some of the agency debt

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 168 of 221

Page 168

1   securities that Barclays had in the portfolio.

2   A    Yes.

3   Q    Are you familiar with that?

4   A    Yes, I am.

5   Q    And are you familiar with the fact that he showed 16 such

6   categories with a range of maturity dates from the day of the

7   closings, September 22nd, to sometime in May of 2009?

8   A    Yes.

9   Q    Have you attempted to analyze whether that's a fair

10  representation of the maturities of the securities acquired in

11  the agency debt securities portfolio?

12  A    Well, even before I begin to talk about that, let me just

13  make the observation that looking at an individual CUSIP in

14  calculating the yield and getting a high number, doesn't in any

15  way impugn what Barclays was doing, because basically, they

16  were doing it on a portfolio-wide basis, and if they were doing

17  it for a particular CUSIP, it would've given you a result that

18  would not have been the one that you wanted to use.  But I'm

19  applying it across the whole portfolio, and so you might want

20  to look at individual yields on individual issues.

21       So that's the first point that I would emphasize about

22  that exercise.  But the slide 68, which shows the distribution

23  of --

24  Q    I think it's slide 69.

25  A    I'm sorry, I'm on the wrong one, thank you.  Slide 69

Page 169

1   shows the distribution of the term to maturity, and it shows

2   that most of it is certainly over a year and stretches out to

3   much longer.

4   Q    And as those maturities stretch out, the implied yields

5   from Mr. Slattery's calculation would go down?

6   A    Oh, indeed, yes, quite dramatically.

7   Q    You've mentioned the Fannie and Freddie takeover.  Is --

8   do you have an understanding of what happened to preferred

9   stockholders in Fannie and Freddie?

10  A    My understanding is that they were to use a technical

11  term, wiped out, in the conservatorship or the takeover of

12  those two entities.

13  Q    Are preferred shareholders, in some sense, in a middle

14  position between equity holders and debt holders?

15  A    Yes.  Preferred is sort of a hybrid in some ways, a

16  halfway point between a debt-like instrument that has specified

17  payments, and equity, which is a residual claim holder

18  position.

19  Q    And so let's move on, if you would, to the municipal

20  securities, demonstrative 71.  And can you explain, there's

21  actually two demonstratives for municipals, 71 and 72, and you

22  might put them side-by-side.  Could you explain what each of

23  them show?

24  A    Yes.  This is an interesting part of the inventory.  The

25  first thing to note is on the left-hand side, we're using the

Page 170

1   same color coding to indicate level, and basically all of this

2   for all intents and purposes is level two, or classification

3   that's unavailable.

4        So again, this is the Lehman classification of what class,

5   what level the securities are in, and you see basically no

6   green.  What that means is that this is not a mechanical

7   exercise to price it.  But then the municipal inventory is

8   composed of two types of securities.  There are auction rate

9   securities, and then there are basically non-auction rate, and

10  that's what you see on the right-hand side.

11       So the other municipal bonds are at the top, the purple

12  color, those are not auction rate securities.

13            MR. HUME:  Let me have demonstrative 73, please.

14  Q    And what was happening in the auction rate market at this

15  time?

16  A    So the auction rate market basically became, for all

17  intents and purposes, frozen or close to being frozen in

18  February of that year, starting in February of 2008.  And what

19  happened is that these were supposed to be very liquid

20  securities that one could easily sell or basically redeem

21  through an auction process, but that assumed that the auctions

22  could be held and would not fail.

23       And what happened is starting in February or starting a

24  little bit before, but certainly accelerating in February of

25  2008, there were a tremendous number of auction failures.  So

Page 171

1    people were trying to sell and it is basically a case where the

2    market didn't clear, and people couldn't sell, investors

3    couldn't sell.

4        So that was a real problem that has to be factored into

5    valuing these securities, because there's very little liquidity

6    now, at least, that you can get to through the auction process.

7    Q    Are you aware, Professor Pfleiderer, that one of movant's

8    experts, Mr. Schwaba has testified that there were auction rate

9    securities that were treated at par on September 19th, 2008?

10   A    Yes, I am.  And almost certainly, I won't say in every

11   case, but in most of those cases when you saw an auction rate

12   security trading at par, it wasn't the typical transaction.  It

13   was rather the issuer redeeming at par, because of these fail

14   rate auctions.  And so because of the failed rate auctions, you

15   had a different market type of transaction where there were

16   issuers who were redeeming the securities.

17       And so the conclusions that you can draw from those trades

18   is very limited, or somewhat limited because of that.

19   Q    So do you believe in evaluating an auction rate security,

20   you would have to take into account the fact that those trades

21   at par would likely reflect these forced buy-back programs?

22   A    I would think that you would definitely need to factor

23   that in and make sure that the ones that you were observing

24   were not subject to that.

25   Q    And on slide 73, it says Barclays applied a twenty percent

Page 172

1    liquidity adjustment for these auction rate securities.

2    A    Uh-huh.

3    Q    Does that mean that they basically valued them at eighty

4    percent of par?

5    A    That would be correct, yes.

6    Q    And for an auction rate security for which there was no

7    market, and which had failed at auction, do you believe valuing

8    it at eighty percent of par is a reasonable valuation?

9    A    I do, because what we're trying to determine is what is a

10   reasonable estimate of the price that you could exit at.  When

11   there's no auction process that allows you to exit the

12   liquidity in these securities is, for all intents and purposes,

13   gone.

14   Q    Did PWC review Barclays' valuation of municipal bonds?

15   A    Yes, they did.  And on slide 74, I have some of the text

16   from their work product in terms of their audit of the

17   municipal bonds.  And it basically supports what was done, and

18   I don't know what to read here, but basically if we go to the

19   second-to-the-last paragraph, any auction rate security was

20   marked 80 percent to reflect the illiquidity of that asset

21   class or market conditions, given the lack of liquidity in the

22   auction rate market, which is what I've been talking about.

23        In addition, market disruption at the time of the Lehman

24   acquisition, PCG's process provides a reasonable basis for

25   determining fair value, excuse me, I misspoke.

Page 173

1    Q    Let me move from auction rate securities generally that

2    are municipal bonds to a specific auction rate security that's

3    attracted some attention in this case, the so-called Giants

4    Stadium bonds.

5        These are not municipal bonds, are they?

6    A    That is correct.

7    Q    And have you reviewed and studied what these are and how

8    they were valued?

9    A    So as you said, these are not municipal rate bonds.  They

10   were actually, if I recall correctly in the corporate

11   inventory, not where the municipal bonds were.  And as I think

12   is probably well known at this point, given that it's come up

13   before in this hearing, the bonds were to finance the

14   Giants/Jets Stadium two miles from where we're sitting, and of

15   course, at this time it was, as I understand, not yet

16   completed, and the Giants basically issued, I think, the total

17   was about 650 million in these auction rate instruments to

18   finance their portion of that stadium.

19       And Lehman had seven series of this in its inventory,

20   which ended up going to Barclays.  And there were a lot of

21   issues here related to the financial security, the monoline

22   issuer, which was in great doubt at this time, and the monoline

23   insurer -- did I say issuer, I meant to say insurer, the

24   monoline insurer is a credit enhancer that makes the bonds

25   safer, but when the credit of that monoline insurer is

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 174

1    deteriorating, that enhancement deteriorates as well.  And just

2    like other auction rate securities at the time, there was a

3    failed auction on this, one of the Giants' bonds, and so we

4    have to seriously question, as in the other cases, the

5    liquidity.

6        There were no vendor prices available.  There's just no

7    information about this at all, and so Barclays, in this

8    situation, when there was no information basically used the

9    marks from BoNY to value this.

10   Q    And is it your understanding that it would've been

11   difficult to sell these bonds at the time?

12   A    I would say difficult, if not impossible.  Impossible is

13   too strong a word, but certainly very, very difficult.

14   Q    And so Barclays is engaged in an effort to determine an

15   exit price, which is defined as a price at which you can sell

16   the asset, and the asset almost certainly can't be sold.  How

17   does that problem get solved in terms of trying to value this

18   asset?

19   A    Well, I -- in some sense, would conclude that you almost

20   come up with some philosophical problems here if you're trying

21   to value what the exit price would be when something is not

22   being traded.  It's a difficult thing to do, and so Barclays

23   basically took the BoNY marks as representative of what that

24   exit price would be.

25   Q    And do you understand that later in the year, that Goldman

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 175

1    Sachs sponsored a new auction, not only for the bonds that it

2    had issued, but also for the Lehman, the bonds that Lehman had

3    issued?

4    A    Yes, that's my understanding.

5    Q    And is it your understanding that that impacted the value

6    of the Giants' bonds that Barclays held?

7    A    Well, it certainly made them more liquid, so the

8    possibility of exiting once you've got another entity basically

9    standing in here to conduct auctions, that changes the

10   liquidity of the situation from what it was before.

11   Q    And is it your opinion, Professor Pfleiderer, that if you

12   have a change from being very illiquid, to the prospect of

13   having a liquid asset and a market to sell it in, that that can

14   have a significant positive impact on the value of the asset?

15   A    In terms of its liquidity exit price, yes.

16   Q    And so the ability of having the Goldman auction would

17   increase the value of the Giants' bonds?

18   A    That would be my opinion, yes.

19   Q    Now, have you looked at what the movant's experts have

20   done in their -- specifically their expert, Mr. Olvany, in his

21   effort to value the Giants' bonds?

22   A    Yes, I did.

23   Q    And are you aware that he testified earlier this week in

24   court?

25   A    Yes, I did see that transcript.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 176

1   Q    Okay.  And does demonstrative 76 provide an excerpt from

2   his testimony?

3   A    It does.

4   Q    And why is this excerpt significant to you in forming your

5   opinions?

6   A    Well, it's my opinion that Mr. Olvany doesn't have a

7   reasonable basis, given the liquidity of these to mark these

8   bonds at par, at least the explanations that he gives don't

9   convince me that this would be reasonable in the circumstances.

10  Q    Are you aware of the fact that Mr. Olvany constructed an

11  elaborate model in an effort to value the Giants' bonds?

12  A    I am.

13  Q    And are you aware that he admitted in trial that the value

14  produced by that model was something he deemed to be

15  unreasonable because it was over par?

16  A    That's what I understand he said, yes.  He got a value

17  from that model that was over par, an over par value, and then

18  concluded that that was not reasonable.

19  Q    Do you understand then how it is he came to the conclusion

20  that this illiquid asset should be valued at par?

21  A    I think what it says up there that that was his opinion,

22  so he was offering an opinion that it should be settled at par.

23  Q    Would you have valued an auction rate security that had

24  failed at auction, and that had no ready market of any kind,

25  and no vendor prices available, would you value such a security

1   at par?

2   A    No, I don't think that I could justify doing that.  I

3   think that that would be unreasonable, especially at this time,

4   and especially given that you're asked by the accounting rules

5   to evaluate at an exit price.

6   Q    Now, you asked for an analysis the other day that is on

7   demonstrative 77.  What does this show?

8   A    Well, the interesting thing that occurred to me is that

9   the movants have several experts who have different approaches

10  to basically doing various types of valuations, and so Mr.

11  Olvany marked it at par in the end.  However, Mr. Slattery, as

12  I understand it, basically when there wasn't any prices

13  available for a security, resorted to the BoNY marks, which is

14  what Barclays did in this case, because it couldn't find any

15  information.

16      So if Mr. Slattery were valuing this, as opposed to Mr.

17  Olvany, he would have valued it not at par, but at the BoNY

18  prices that Barclays did.

19      And Mr. Zchemiasky -- excuse me, I misspoke, Professor

20  Zchemiasky didn't independently value any of the corporate

21  bonds, but if he did, his basic approach was to use custodial

22  marks, so that custodial marks in this case again when there

23  wasn't information, at least that was what I understood his

24  basic approach to be, custodial marks in this case would've

25  been BoNY marks.

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 178 of 221

Page 178

1        So each of the three experts here are following slightly

2    different procedures that would've resulted in very different

3    valuations for their client.

4    Q    And do you understand, Professor Pfleiderer, that Mr.

5    Olvany was assigned the task of valuing corporate bonds, where

6    there was a difference in value between Barclays and BoNY of at

7    least a million dollars?

8    A    I believe that was his general selection criteria,

9    although that wouldn't have applied to BoNY -- excuse me, I

10   misspoke.  That would not have applied to Giants, because in

11   that case, there was no difference.

12   Q    So Giants was an exception to the method of what was

13   assigned to him.  Do you understand that Mr. Slattery only

14   performed an independent valuation when there was a greater

15   than a million dollar difference between Barclays and BoNY's?

16   A    That's also correct.

17   Q    And otherwise, he put the rest of the 6,000 CUSIPs he

18   looked at into an analysis that relied on either BoNY marks or

19   other third party prices?

20   A    That is my understanding of his procedure, yes.

21   Q    And Professor Zchemiasky only valued equities and

22   otherwise used custodial prices?

23   A    That again is my characterization of what he did.  I

24   believe that is a proper characterization.

25   Q    And do you understand or can you make sense of what Mr.

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 179 of 221

Page 179

1    Schwaba, one of movant's other experts, has said about the

2    impact of failed auction rate securities, on whether they were

3    traded at par?

4    A    Well, my understand is -- my understanding is that in his

5    report, he said that a failed auction rate security, which is

6    of course what the Giants' bond is, would trade below par and

7    would be subject to restricted liquidity.

8         But then he said in a subsequent declaration, as you see

9    up here on the screen, that this incorrectly characterizes his

10   opinions regarding the failed auction rate securities and that

11   they could trade below par, but not necessarily.

12        But what seems to be emoric (ph) here, is the fact that

13   any failed auction rate securities trading at par in September

14   would very likely be forced buy-back programs, these

15   redemptions by the issuers.

16   Q    Do you find any of these methods that could be applied to

17   Giants any more reasonable than what Barclays did?

18   A    No.  I think that this indicates that this is not in that

19   mechanical green zone, but definitely in the red or the black

20   zone of being difficult to value, and basically having to make

21   some assumptions and come up with some reasonable valuations.

22        I do think it is not reasonable to value it at par when

23   there's basically no market.  And, in fact, as I thought about

24   this, there's something very interesting that you think about

25   when you think about the claim that you could sell this Giants'

Page 180

1    bond at par.

2       Let's go back to before the Lehman bankruptcy, say go back

3    to the 10th of December.  Lehman --

4    Q    Did you mean to say September?

5    A    Did I say September?  I meant to say September, 10th of

6    September.  So before the bankruptcy, some time before the

7    bankruptcy, Lehman Brothers is in fairly desperate need of

8    cash, it's got a liquidity crisis, among other things.

9       So if it could've sold the Giants' bonds at par, and this

10   of course was before the market turmoil, you would think that

11   it would have even a better prospect of selling them before

12   than as things developed, then there's an interesting question

13   why it didn't.  Because this would've solved, at least to some

14   extent, its liquidity problems by being able to sell these for

15   their full value.  And the fact that they didn't, I think

16   additionally calls into question this proposition that they

17   could be sold at par.

18   Q    Let's move on, if we could, Mr. -- Professor Pfleiderer,

19   to very briefly look at the Barclays' valuation of the

20   corporates, meaning the corporate debt securities, excluding

21   Giants, slide 78 and 79.  Can you explain briefly what they say

22   and how they are relevant to your opinion?

23   A    So the procedure here, again, we should look and see that

24   almost all of these are either level two, or some are level

25   three, some are basically not classified, but you don't see any

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 181 of 221

Page 181

1    green here at all.  So these are difficult to value securities.

2        And what Barclays did, was they took vendor prices, and

3    they got them from up to five sources, I list them here,

4    Bloomberg, Financial Times Interactive Data, so on and so

5    forth, and what Barclays did is they used the minimum price of

6    these as a proxy for the exit price, and then they did not take

7    any further adjustment, based upon that.

8        And again, as in all of these cases, on decisions of this

9    sort, the PWC, PricewaterhouseCoopers reviewed this and tested

10   it and concluded that the vendor prices used were appropriate.

11   Q    Moving on to the next category of assets, which I think is

12   the last, the RMBS assets.  We started the day talking about

13   these and their role in the overall financial crisis.

14       Can you just again explain what types of assets are

15   included in the RMBS portfolio?

16   A    So these are residential mortgage-backed securities and

17   some of these are very complex instruments that are subject to

18   prepayment risk and various types of risk associated with how

19   fast people back their mortgages, and they're difficult to

20   analyze, in some cases quite difficult to analyze.

21       You'll notice that they're all colored red here, because

22   they're all classified by Lehman as level two.  And so these

23   are not again simple mechanically valuated.  And Barclays

24   basically, as you see on the next page, valued these using a

25   prepayment model that helps analyze the various underlying

Page 182

1    risks associated with these and determinates the value.  And

2    they took an average distribution model, we saw to determine

3    their liquidity adjustment.

4         And the important thing to stress here, is that they did

5    not take uniform liquidity adjustment of cost out of these,

6    rather they separated them into two categories.  Agency pools

7    and pastures are the simpler type of securities to analyze.

8    They're not as complicated, and they took a one percent

9    adjustment for those.

10        Agency CMOs contain some of the much more complex

11   instruments, and they took a ten percent adjustment there.

12   PWC, PricewaterhouseCoopers, again looked at these, looked at

13   the methods that they used, and basically found them

14   reasonable.

15   Q    Now, have you reviewed -- you have a couple of slides

16   summarizing the work done by PWC, that I'd like to direct your

17   attention to demonstrative 84, and the work done by movant's

18   expert, Mr. Slattery.

19        Did you -- have you looked at the work done in the report

20   filed by Mr. Slattery in this case?

21   A    Yes.  We -- very carefully.  We, myself and the staff

22   working with me, looked at the work that Mr. Slattery had done,

23   and became quite perplexed about some of what he had done,

24   because he lists mid values and then appears to adjust those

25   down to a bid based upon liquidity adjustment.

Page 183

1      But when you look behind this for many of these, not all,

2   but many of these, you find that there's no work paper in his

3   files that shows how he got the mid value.  In fact, when you

4   look at the supporting documents, you find that the values that

5   he calculated were treated as bids.

6      So I'm not going to say that he did this, because I'm not

7   absolutely sure, but the work product certainly strongly

8   suggest it, that he calculated bids from his models and then

9   grossed them up to mid marks, where the standard procedure

10  would be to calculate mids according to the model, and then

11  adjust it down.

12     And the potential effect with that is to overvalue what

13  the securities would be worth, if that's actually what he did.

14  Q   Would you briefly explain why the potential effect would

15  be to overvalue the securities?

16  A   Because you have calculated the mid-point, called it a

17  bid, and then you grossed it up to a mid, and then bring it

18  down to a bid again.  I probably should use numbers.  So you

19  calculate, say, a value of ten, and you have calculated a mid.

20  What you should be doing is taking it down to nine.  But

21  instead, you treat that as a bid, gross it up to eleven, and

22  then take it down to ten again.  So you end up at ten, when you

23  should've ended up with nine.

24  Q   Did you review Mr. Slattery's trial testimony?

25  A   Yes, I did, I read it.

Page 184

1    Q    Could I show you an exhibit from his work papers that I

2    showed him.  I'm going to call it up by the Navigant worksheet,

3    even though it has a BCI exhibit number, 26180.

4         26180, and have you looked at this document?

5    A    Yes, I have, yes.

6    Q    And this is one of -- this is the summary spreadsheet

7    backing up Mr. Slattery's valuations of all of his agency RMBS,

8    and at least some of his non-agency RMBS valuations.  And you

9    see he has both mid and bid columns.  Do you see that?

10   A    Yes, I do.

11   Q    And do you recall, using this first CUSIP as an example, I

12   show that the formula is clearly showing that the bid is

13   calculated as a reduction from the mid.  Do you see that?

14   A    Yes.  It looks like he's reduced the bid by about five

15   percent or so.

16   Q    Now, if his model produced the price that is a bid, 78.11,

17   and not the price that's a mid.

18   A    That's correct, at least it -- I should say that if you

19   look at all of his work papers, and you look at the price

20   that's produced by his model, it's 78.1, not 82.3.

21   Q    All right.  If -- let's assume for a moment that that's

22   true.

23   A    That's right.  That's what I can infer from looking at his

24   work papers.

25   Q    Then would it make any sense at all to have that bid value

Page 185

1    calculated here as a reduction from the mid?  Either -- would

2    that make sense?

3    A    No.  What should have happened, if that's the proper

4    interpretation, and I'm somewhat confident that it is, but I'm

5    not going to assert with all confidence that that's the case.

6    What should have happened is that number 78.1 should've been in

7    column C.  It was actually a mid price.  And then the liquidity

8    factor should've been applied to that to get a lower number in

9    the bid column than what is actually appearing there.  It

10   would've been something like perhaps 76.

11   Q    And if his judgment was that his model, for whatever

12   reason produced a bid, not a mid, and the model was producing

13   the 78.1 number, then there would be no reason for him to

14   increase it to a mid?

15   A    I wouldn't see that there would be any reason to do it,

16   because he would already have what he needs.

17   Q    And you certainly wouldn't increase it and then show it on

18   the model as being calculated as a reduction from the mid?

19   A    That would be, let me just say it, a little bit mildly

20   misleading.

21   Q    Now, have you had your staff do everything they possibly

22   can to review his data, OCR his data, search his data, for

23   every single mid in this back-up spreadsheet to see if you

24   could find it anywhere?

25   A    Yes, they did.  They worked, I'm not sure how many hours,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 186

1    but an incredible number of hours to try to match things up and

2    find a mid price, that 82.3 as a result of one of his models or

3    in any of his work papers.

4    Q    And were they able to find the mid values on these back-up

5    spreadsheets?

6    A    I asked them this morning, as they were doing continual

7    work on it, and the answer this morning as of about 8:00

8    o'clock was no.

9    Q    And have they produced to you everything that they have

10   found -- that every bid value -- every mid value on this

11   spreadsheet that they have been unable to find.  Is that listed

12   here behind this spreadsheet?

13   A    I believe it is, yes.

14   Q    There is -- I'd just direct your attention behind

15   demonstrative 84 is BCI Exhibit 1099.  Do you see that?

16   A    Yes.

17   Q    And was this prepared by your staff within your direction?

18   A    Yes, it was.

19   Q    Was this an effort by them to look throughout all of Mr.

20   Slattery's work papers to see if there was anywhere that they

21   could find the mid values shown in his summary spreadsheet?

22   A    There was that effort, yes.

23   Q    And does this list every one of the mid values that are in

24   his records that they have been unable to identify in his other

25   work papers?

Page 187

1    A    As of the time they compiled this, yes.

2    Q    Now, when you say as of the time, Professor Pfleiderer, is

3    it your understanding that they have worked on this

4    exhaustively since before Mr. Slattery appeared for trial

5    testimony?

6    A    Oh, yes.  This was started quite some time ago, yes.

7    Q    And have they done everything that they can, in terms of

8    reviewing the data, and OCR'ing the data, and searching the

9    data to look for these mids?

10   A    I'm quite confident they did.  I'm certain that they

11   worked very diligently to do that.

12   Q    Now, in trial, do you remember reading Mr. Slattery's

13   testimony where I asked him if he could identify one of these

14   mid values, and he told me he could?

15   A    Yes, I remember reading that.

16            MR. HUME:  And can we pull up Slattery worksheet

17   26178?

18   Q    And I believe the record will reflect that Mr. Slattery

19   after walking me through some very complicated formulas in a

20   number of spreadsheets directed me to cell H3 in this

21   spreadsheet 26178.  All right.  I'll just state for the record,

22   I don't have the transcript in front of me, so I'm not a

23   hundred percent sure it's that one, but I'm 99 percent sure.

24   And I know there was only one.

25            And do you recall after lunch when I asked him questions

Page 188

1   about what he had identified as a mid, what he told me?

2   A    I believe, again, it's my recollection of reading the

3   transcript, I wasn't here, but my recollection of reading the

4   transcript, is that he indicated that this was a mid price, I

5   believe, that he'd calculated.

6   Q    And he told me it was a mid price for a CUSIP acquired by

7   Barclays.  After I questioned him, do you remember that he then

8   admitted, after a number of questions, that it's actually a

9   price for a comparable security, a comp, not a security

10   acquired by Barclays?

11  A    Yes, indeed.  If you look at the price, it's actually not

12  what you would expect to be calculated out of a model, because

13  it's actually put in terms of 16ths or 32nds I believe here.

14  16ths -- no 32nds, down this row, and that's the way prices are

15  quoted, but not the way they would come out of a model.

16       So it's a very fair presumption that these are quoted

17  prices, not calculated prices.

18  Q    And do you recall seeing anywhere else in the trial

19  testimony where Mr. Slattery was able to identify for me a

20  calculation that produced a mid value for one of his agency arm

21  BS valuations shown in his summary spreadsheet 26180?

22  A    Not from my reading of the transcript.

23  Q    And just again for the record, BCI Exhibit 1099, that is

24  behind your demonstrative 84, represents the work papers of

25  your staff working at your direction?

Page 189

1    A    Oh, that's correct, yes.

2    Q    And they are doing a data analysis of all of Mr.

3    Slattery's work papers, and that's what's summarized in this

4    document?

5    A    That is -- yeah, summarized in these pages, yes.

6    Q    And do you have confidence in the competent abilities of

7    your staff to analyze that data?

8    A    Oh, yes.  They worked on it very hard, and basically used

9    every way they could to try to match to what was reported as a

10   mid price and didn't find any.

11            MR. HUME:  Your Honor, I move BCI Exhibit 1099 into

12   evidence.

13            MR. TAMBE:  Your Honor, this is one of the documents

14   that was produced late last night.  We would just like to

15   reserve our objection to the admission of this document.  We're

16   analyzing what this is as well, that has been produced by their

17   work staff.

18            THE COURT:  So is that a request that I defer a ruling

19   on the offering till tomorrow?

20            MR. TAMBE:  Yes, Your Honor, that's what it is.

21            THE COURT:  I'll defer until tomorrow.

22   BY MR. HUME:

23   Q    Now moving on, Professor Pfleiderer, there is one other

24   valuation exercise that we referred to earlier that Mr.

25   Slattery does of this, what amounts to approximately half the

Page 190

1    CUSIPs, by CUSIP number, not by value transferred to Barclays.

2    Are you familiar with that?

3    A    Yes, I am.

4    Q    Now, what is the analysis that you asked your staff to

5    perform on this, and I direct you to demonstrative 85?

6    A    So just at the top we are looking at the valuation of the

7    6,035 CUSIPs by various methods, Barclays' exit price, the BoNY

8    mid price, Slattery's mid price and Slattery's exit price, I

9    should say Mr. Slattery's mid price and Mr. Slattery's exit

10   price, and the total alleged undervaluation that Mr. Slattery

11   finds.

12        But what's interesting, and I think very important to look

13   at, is this is based on this exercise of simply taking these

14   6,035 and going out and finding prices without basically any

15   judgment used in any way to determine how to use those prices,

16   because many of these again are not level one, or level two, or

17   perhaps even level three securities.

18        So if I look, and I had my staff do this, look at what Mr.

19   Slattery is relying on in doing this evaluation, there are

20   2,809 CUSIPs where it is based upon a single third party or a

21   BoNY mark.  So the undervaluation now associated with that is

22   331 million or seventy-nine percent of his undervaluation.

23        There are 1,520 where it relies just on the single BoNY

24   mark.  There's no other information.  And that results in an

25   undervaluation of 241 million, and that's fifty-eight percent

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 191

1   of his undervaluation  And then, of course, let's go back to

2   the red and the green and the black.  The green is where you

3   could perhaps reasonably just get a price from the market, and

4   mechanically go through this type of exercise, but if I look at

5   fair value levels, I find out that the level two, that's the

6   red, forty-nine percent of his undervaluation is based upon

7   this simple data mining exercise, and at the level three, there

8   are 364 CUSIPs, which results in 108 million in undervaluation

9   of twenty-six percent.

10       So in some sense, I would suggest that what Mr. Slattery

11   has done, is he's trying to turn the exercise of valuing level

12   two and level three, which is difficult, into a mechanical

13   exercise that's just using limited information, and comes up

14   with an undervaluation that's based upon that.

15   Q   And, Professor Pfleiderer, did you also ask your staff to

16   perform an analysis or a couple of different refined analyses

17   on the forty-eight CUSIPs which both Mr. Slattery and Professor

18   Zchemiasky valued?

19   A   Yes, I did.

20   Q   And what was that analysis designed to show?

21       MR. HUME:  I direct the Court's attention to

22   demonstrative 87.

23   A   Okay.  The first thing I should emphasize is this is the

24   total of what was the overlap.  So they were forty-eight CUSIPs

25   that were overlapped, so this is not a chosen selection from

Page 192

1    it.  It's the total universe of the overlap.  And what we find

2    is that there are, in some cases, tremendous differences

3    between the price that Mr. Slattery is using, and the price

4    that Mr. Zchemiasky is using to price the same security.

5        And one of the exercises that one can do is simply to take

6    either the lowest value assigned by either and compare that to

7    the highest value assigned by either, and see what range of

8    difference you would get by exploiting, if you will, the

9    difference, the tremendous difference in their valuations in

10   some of these cases.

11       And the difference is about 263 million dollars, or it

12   turns out to be about forty-one percent, forty-two percent of

13   the maximum valuation that they collectively assign.  So this

14   is just one way to quantify the great magnitude of difference

15   between these.

16       But what's probably better than just expressing it that

17   way, is to look -- I think we have the spreadsheet itself.

18   Q    Uh-huh.  It's BCI Exhibit 1098 and it's behind the blue

19   sheet behind demonstrative 86.  It's a little hard to get it

20   all on the screen, but it's there, and you can direct the

21   graphics control to --

22   A    So I think what's probably most useful is to look at the

23   Zchemiasky price and the Slattery price, which --

24   Q    EMC under bid?

25   A    Yes.  Just here, maybe in just the first row.  I don't

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 193

1    know if that can be made bigger.

2         So just the first CUSIP that appears here, the Zchemiasky

3    price, Dean Zchemiasky is 9048, so that's ninety cents on the

4    dollars, and Mr. Slattery's price is twenty-four cents on the

5    dollar.  The next one, ninety-one, twenty-four, and as you

6    scroll down, you see that there are substantial differences

7    between these.  And again, this is the entire universe.  This

8    hasn't been, shall we say, cherry picked to show the

9    differences.  It's everything that was valued in common between

10   the two of them, and you see fairly substantial differences,

11   which shows that at least at the very least, that when you

12   assign someone to value something, and put that person in one

13   room, and assign someone else to value something, and you put

14   that person in another room, they come up with very, very

15   different results.

16        And one thing that is useful for us to have an outside

17   auditor like PWC to come in and test to see whether there are

18   reasonable results that are being produced by the process.  But

19   this accentuates in my mind and provides evidence for the

20   difficulty in valuing these and using mechanical processes to

21   come up with values.

22   Q    Professor Pfleiderer, may I direct your attention to

23   demonstrative exhibit 87, which relates to one final point on

24   valuation that Professor Zchemiasky makes in his report and in

25   his declaration and trial testimony.  This relates to the

Page 194

1    valuation of the exchange traded option.

2        Now, do you have an understanding generally, this is not

3    something that you have special expertise in, with respect to

4    exchange traded derivatives.  But do you have a general

5    understanding that there were exchange traded derivatives

6    acquired by Barclays in the deal?

7    A    Yes, I do.

8    Q    And do you have an understanding of what Professor

9    Zchemiasky is saying about Barclays' valuation of those

10   exchanged traded options and its use of the September 19th

11   date, allegedly?

12   A    So my understanding is he is asserting that Barclays

13   basically understated the value of its OCC accounts by choosing

14   to value one thing on September 22nd, and another thing on the

15   19th.

16       So the liability valuation date he asserts, was the 22nd,

17   but the margin valuation date was the 19th.  An the first thing

18   to observe is that there's no document that actually says that

19   that was what Barclays did, and yet if you read what Professor

20   Zchemiasky is saying, he said that he determined that what

21   Barclays reported reflected the balance on the 19th by -- and

22   he determined that by reviewing an e-mail dated on the 21st of

23   2008, attaching the 19th OCC statement, which showed cash of

24   about one billion dollars and letters of credit, and I have

25   that highlighted in red for a reason here, of about a quarter

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 195

1    of a billion dollars in treasuries with a market value of about

2    a billion.

3        But the important thing is that that 252 million dollar

4    letter of credit was not acquired by Barclays; and my

5    understanding is that it couldn't have been acquired by

6    Barclays.  So you've got to take that out, and that can't be

7    counted as part of the calculation.

8        So the margin values for September 22nd, without the

9    letter of credit, do add up to the 229 billion on the

10   acquisition balance sheet.  So as far as I can tell, the

11   mistake here was that Mr. Zchemiasky didn't take out the letter

12   of credit of that 220 -- excuse me, 252 million dollars.

13           MR. HUME:  Could we have BCI Exhibit 646, to see if it

14   helps illustrate this problem?  And could we go to the last

15   page of the document, the second to last page.

16   Q    And Professor Zchemiasky is saying that Barclays should

17   value it using September 19th values, which include in this

18   line item of letters of credit is 333 here, or actually

19   September 19th values I think are reflective at the start of

20   day on the 22nd?

21   A    That's my understanding.  It's a day --

22   Q    Sorry for the confusion.  So he has the letters of credit

23   of 252 showing on this line item, he is counting as something

24   that was in the Barclays' valuation, and -- is that your

25   understanding?

Page 196

1   A    That's my understanding as far as I can infer from the

2   numbers and what Professor Zchemiasky is saying.

3   Q    And if Barclays had truly valued the options using values

4   as of September 19th, then it would not have attributed any

5   value to that 252 million, and the total value on the

6   acquisition balance sheet would've been less as a result?

7   A    That's correct, at least according to calculations, I

8   believe that is correct.

9   Q    Let me then move you on to one other issue, which I don't

10  think there's a demonstrative on, to ask your reaction on.  Are

11  you aware of the fact that Professor Zchemiasky has one major

12  area of valuation difference with Barclays relating to these

13  securities transferred to Barclays in the December 22, 2008

14  settlement?

15  A    The December 22, 2008, yes, I'm aware of that.

16  Q    And are you aware that neither he, nor any of the other

17  movants disagree with Barclays' valuation of those assets, as

18  of December 22nd, 2008?

19  A    That's my understanding, yes.

20  Q    And so what is your understanding of Professor

21  Zchemiasky's valuation difference with respect to those

22  securities, and does it make sense to you as a financial

23  economist?

24  A    My understanding is that he and I believe other movants as

25  well, but he is asserting that they should be valued as of the

Page 197

1    19th of September, several months before.  And usually I don't

2    state things as strongly as I'm going to state this:  That, I

3    have to confess, makes absolutely no sense to me as an

4    economist whatsoever, and gives rise to all kinds of really

5    perverse outcomes that make no economic sense to me.

6        So that's a rather strongly worded statement, but I just

7    can't make sense of that as an economist, that that would make

8    sense as a way to value a claim that was delivered at a point,

9    because it then -- it makes a great deal of difference as to

10   what was delivered at the time and Barclays, if you do that

11   type of accounting, would have taken, say, two million dollars

12   in securities worth on December 22nd, if those two million had

13   been worth fourteen million in September, because then it

14   would've had a bigger gain.  And, of course, that's absurd.

15   Because it's not going to take two million when it can take

16   five million.

17       And so you can come up with all kinds of absurd results

18   with the type of calculation on that basis.  So it doesn't make

19   any sense to me as an economist.  And, in fact, I would just to

20   maybe strengthen my statement, I would love to live in that

21   world where you could do that type of trading, because that

22   would almost create an arbitrage like a money machine.  It just

23   doesn't make any sense.

24   Q    Professor Pfleiderer, just a few more questions.  The last

25   two demonstratives -- we haven't been going back to your

Page 198

```
 1   opinions each time, but now relate to what you had an opinion

 2   at the beginning about whether Barclays has given a full

 3   accounting, whether it is possible to see what Barclays

 4   acquired or not.

 5       Have you had your staff analyze and compare the data in

 6   the acquisition back-up spreadsheets from Barclays, containing

 7   the CUSIPs they acquired, with the lists of schedules

 8   circulated to the creditor's committee and to Weil Gotshal

 9   before the sale closed?

10   A   Yes.  I did instruct them to carry out an exercise, the

11   results of which are up on the right-hand side of the screen

12   here.

13   Q   And is -- what is the upshot of those results?

14   A   Well, it gets somewhat confusing if you look at dollar

15   values, because then prices and the type of pricing that's done

16   carries into the analysis.

17   Q   I'd like you to explain the first demonstrative actually,

18   if we could.

19   A   I'm sorry?

20   Q   And then the second.

21   A   So this is just to set up the setting for what the

22   analysis is, at least as I understand it.  So before this

23   transaction actually closed, Paulo Tanechi sent Weil Gotshal a

24   schedule of CUSIPs that were being transferred to Barclays in

25   the repo collateral.  And I understand that this was then sent
```

Page 199

1   to the creditor's committee as well.

2       And there was another schedule that was I guess came to be

3   called Schedule B that was a schedule of clearance box assets

4   that was also filed with this Court.  And out of -- first of

5   all, out of more than 11,000 CUSIPs that were transferred to

6   Barclays in the sale, all but twenty-seven are found on the

7   repo collateral schedule that was circulated by Mr. Tanechi, or

8   on Schedule B.  So we're only talking about twenty-seven CUSIPs

9   that can't be found.

10      And another data item is out of more than 11,000 CUSIPs on

11  Schedule A and Schedule B, fifty-nine in Schedule A were not

12  transferred to Barclays, did not make it into the acquisition

13  accounting.  And 773 on Schedule B have not been delivered to

14  Barclays.  So that's just looking at CUSIPs, number of CUSIPs.

15  Q   Putting aside the 773 on Schedule B that have not been

16  delivered, which relates to a contractual dispute between

17  trustee and the Barclays, are the other missing CUSIPs of

18  fifteen and twenty-seven within the range of what your staff

19  would expect to see in analyzing data of this magnitude, where

20  there are perhaps data glitches, such as those you explained

21  earlier?

22  A   Actually, quite frankly I was surprised that it wasn't a

23  little bit greater than that.  It's a very small number

24  relative to the total number of CUSIPs.

25  Q   Now, can you explain why you did or had your staff do

Page 200

1    additional analysis that's summarized in demonstrative 89 and

2    what it is that that shows?

3    A    Well, another question that might come up in analyzing

4    this, is perhaps CUSIPs transferred, but the quantities were

5    different.  So the CUSIPs just identified the securities, but

6    what they don't identify is the amount that was transferred.

7         And the best way to do that, as far as I'm concerned, that

8    gets around issues of pricing, to put it in dollar terms, is to

9    measure what's called the notional amount, which is just sort

10   of the scale of what's been transferred.

11        And so we see some very large numbers here, but that's

12   just because the way the notionals are calculated.  But the

13   important thing to look at is how close are these numbers,

14   because that gives a notion if basically the quantity that was

15   transferred, and was the quantity equivalent.

16        And so this is obviously a lot of numbers, but if you go

17   to the first subtotal, which includes the fed wire transfers

18   and the DTC transfers for the repo collateral, and you see the

19   total that's given on the -- I guess what's become what we call

20   the Tanechi schedule, that's 90.643 million or billion, again,

21   I misspoke.  And on the Barclays' acquisition detail, you find

22   that it's 90.543, just a little bit less, but very, very, very

23   close.

24        And the Friday transfers are approximately equivalent and

25   the total per these two schedules is basically very close.  And

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 201 of 221

Page 201

1   then in the third column, you see the filed schedules, A and B,

2   and you see that that also is very, very close.

3       So then there's some other entries here.  There are

4   clearance boxes that are transferred, and you see some

5   discrepancies there, based upon the allocation to these boxes

6   on the 29th and the 30th, between what the filed schedules were

7   and the Tanechi's and Barclays' acquisition detail, which

8   actually the outliers, the Tanechi schedule, not the -- either

9   ended up at Barclays or the filed schedules.

10      And if you scroll down to the very end and basically look

11  at the total at the end, you see that they're extremely close

12  in terms of the quantity.  So whether we look at CUSIPs or

13  whether we look at quantities, it's extremely close.  And

14  again, to emphasize the great size of this, the fact that it

15  comes out so close, is in some ways rather surprising, but

16  reassuring as well, I would think.

17  Q   And again, just for the record, when you see these large

18  numbers, these are notional values that reflect principal

19  amounts that have been paid down, so that they don't bear any

20  necessary relationship to market value?

21  A   That's correct.

22  Q   And so based on your analysis of the CUSIPs and of the

23  notional values, is it your professional opinion as a financial

24  economist, Professor Pfleiderer, that the lists provided to

25  Weil Gotshal and the creditor's committee at the time of the

Page 202

1    sale, before the closing, gave them the information they needed

2    to know what CUSIPs, what securities were being transferred to

3    Barclays?

4    A    Both the CUSIPs and the quantities, yes, that is my

5    opinion.

6    Q    And you've now spent a lot of time working on this case

7    with your staff, responding to movant's assertions about

8    valuation.  Was there any other information besides the list of

9    CUSIPs that movant's experts have used that isn't publicly

10   available, that was needed for them to do all the valuation

11   work and modeling that they've done?

12   A    I can't think of any.

13   Q    Other than, of course, getting the Barclays' data of their

14   back-up and criticizing Barclays?

15   A    That date certainly needed to file their reports, but in

16   terms of doing a valuation of it, they have basically what was

17   delivered and what quantities.  And so one could start from

18   there and do the valuation without any more information.

19   Q    So --

20   A    Or having the same information that Barclays had,

21   basically when it started this process.

22   Q    So other than getting the information they need to

23   criticize Barclays and getting BoNY marks to rely on, in terms

24   of doing an independent valuation of what these CUSIPs were

25   worth, the movants and their experts could've done this work or

Page 203

1   tried to do this work at the time of the sale.

2   A    I believe they would've been in the same position as

3   Barclays was in, having the same information at the starting

4   gate, if you will.

5   Q    There was one piece of analysis you did that we skipped

6   over that I'd like to touch upon very briefly.

7        Are you -- I know -- are you aware, Professor Pfleiderer,

8   of the testimony and evidence in this case about the fed repo

9   and the operational problems that happened when Barclays

10  stepped in to replace the fed's position?

11  A    I read much of the testimony about that.  I can't claim

12  that I understand all of the nuances, but I understand what I

13  believe is a fair amount about it.

14  Q    You understand that there are a list of CUSIPs that were

15  pledged to the fed as of the night of September 17th, that were

16  shown to Barclays as the repo collateral that would be

17  transferred to them if they replaced the fed?

18  A    That was my understanding, yes.

19  Q    And you understand that in the process of Barclays

20  replacing the fed, some of those CUSIPs made it over, but for

21  operational reasons, a significant portion of them were sucked

22  out into other clearing transactions, and lost effectively, not

23  able to be transferred to Barclays?

24  A    That is my understanding, yes.

25  Q    And are you aware of the fact that some Barclays'

Page 204

1    executives have testified that that created significant

2    uncertainty, risk about what it is they were getting, and that

3    some of what they saw coming over as substitute collateral,

4    they thought was of poor quality and potentially mismarked?

5    A    That was seen in a number of testimony -- I should say, a

6    number of e-mails that I saw and I think deposition testimony

7    as well.

8    Q    Now, are you also aware that Professor Zchemiasky

9    performed a data analysis that purported to show that if you

10   looked at all of the collateral and compared the substantive --

11   what he calls, or we could call the substitute collateral, what

12   was not in the fed repo, but was transferred to Barclays, to

13   the original fed repo collateral that was transferred to

14   Barclays, the valuation difference between Barclays and movants

15   with respect to those, is essentially the same, or very

16   proportionate?  Are you familiar with that analysis?

17   A    I believe I am, yes.  Yes, I do recall that.

18   Q    Have you had your team do an analysis to compare the

19   valuation differences between the Barclays' marks and the BoNY

20   marks of the repo collateral broken down by what's called

21   substitute collateral or versus overlapping collateral with the

22   fed repo?

23   A    Yes, I did.

24   Q    And is that analysis at demonstrative 36?

25   A    I think we did skip over it.  Yes.

Page 205

```
 1   Q    Now, there are actually two slides at demonstrative 36,

 2   and let's look first, if we could, at the second slide, which

 3   is 36B.  And is it your understanding that this slide was made

 4   simply by taking Professor Zchemiasky's numbers and reducing

 5   them by extracting the December inventory that was transferred

 6   in the December settlement?

 7   A    That's correct.

 8   Q    And what does this analysis show?

 9   A    Well, this shows the percentage that was in the fed repo,

10   and the percentage that was what we'll call substitute

11   collateral.  The percentage that was in the fed repo is in

12   orange, and the substitute collateral that was not in the fed

13   repo is in blue.  And if we look at those at Barclays' marks,

14   we see the eighty-one percent was in the fed repo, but nineteen

15   percent was not.  It was this substitute collateral.

16        But then when we look at the valuation difference, we see

17   that a disproportionate part of the valuation difference is in

18   this substitute collateral.  We go from nineteen percent to

19   twenty-five percent.  And so that indicates -- is one way of

20   indicating that what came over as substitute collateral results

21   in a greater valuation difference and could be more difficult

22   to value.

23   Q    So is the analysis in this chart consistent with the

24   assertion by Barclays that they had great concern about the

25   quality and the marks on the substitute collateral?
```

1    A    I believe it's strongly suggestive that that was well-

2    founded, yes.

3    Q    Now, the first page of this analysis -- and by the way,

4    while I'm on this, even if the proportions were the same as

5    Professor Zchemiasky's analysis shows by including the December

6    inventory --

7    A    Right.

8    Q    -- does that mean that the actual quality of the

9    collateral is any better in the blue than in the orange?  Or

10   does it just talk about the relationship of the Barclays' marks

11   to the BoNY -- to the movant's marks?

12   A    It would be just the latter.  It wouldn't say necessarily

13   anything about the quality.

14   Q    Now, let me show you demonstrative Exhibit 36, which has a

15   typo in the heading, I should note.  It should say eighteen not

16   nineteen percent at the top.

17        Does this analysis reflect what your staff came up with

18   when they did this independently rather than just taking

19   Professor Zchemiasky's numbers?

20   A    Yes, it does.

21   Q    And does it show a slightly more dramatic difference in

22   the relationship in percentage of portfolio versus percentage

23   or undervaluation?

24   A    Yes, it does.  Because in this case, we're comparing the

25   Barclays' with the BoNY marks and not with the movants.  And so

1    here we see that there's even a graded disproportionate effect

2    here.  Over thirty percent of that valuation difference is

3    associated with this replacement capital.

4    Q    So based --

5    A    Replacement collateral, I misspoke.

6    Q    So based on these numbers, which suggest that assuming

7    Barclays' marks are accurate, the BoNY marks were

8    disproportionately overvalued for the substitute collateral

9    than for the original fed repo collateral?

10   A    That would be a reasonable interpretation of this looking

11   at the difference between the BoNY marks and what Barclays

12   ended up valuing it at.

13   Q    Now, has your staff been able to reconcile why their

14   numbers come out with something different from Professor

15   Zchemiasky's numbers?

16   A    I'm not sure that they have exactly.

17   Q    Are they continuing to work on that?

18   A    I believe they are, yes.

19   Q    Finally, Professor Pfleiderer, let me take you back to

20   slide two, demonstrative two in your opinion, and perhaps

21   demonstrative three, your last opinion.

22        You give an opinion about the sale being economically

23   rational for both parties, and you discuss this in your report,

24   which is in evidence.  I don't want to take too much time, but

25   I do want to ask.

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 208 of 221

Page 208

1        The movants have asserted that if the mark-to-market

2   values on the Barclays' balance sheet is greater than the

3   liabilities on the balance sheet plus the consideration as

4   defined by the accounting rules on the balance sheet, then that

5   -- what meant assets left the estate and went to Barclays,

6   rather than coming from Barclays and going to the estate.

7        Do you believe that is an economically rational way to

8   analyze this transaction?

9   A    No, I do not.  And if that were actually imposed as the

10  criterion for transactions of this sort, which I would hope

11  wouldn't happen too often, because they happen in distressed

12  circumstances.  But if that were imposed, we wouldn't have a

13  transaction and Lehman would've been left with a liquidation,

14  because Barclays would not take a transaction that would've

15  basically resulted in a transfer from it to Lehman.

16       Basically, we have here a simple situation where there

17  were gains to both parties in the transaction, which is what

18  economists are always looking at, when they look for gains to

19  trade.  Lehman Brothers did better than what it would have done

20  if it would've had a liquidation.  There's no doubt in my mind

21  that that's the case with very, very strong probability.

22       And Lehman Brothers couldn't have done better, the estate

23  could not have done better by selling it to another bidder for

24  more, because there wasn't another bidder.

25       Barclays took a risk with the prospect of a gain, but a

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 209 of 221

Page 209

1    risk, and it potentially was going to gain in the transaction.

2    It wouldn't have taken it if it wasn't.  That wouldn't have

3    been a good business situation, but there are a lot of

4    transactions that occur every day where both parties gain.

5    That's the essence of trade.

6         And so it was an economically rational transaction, the

7    right decision was made, and if you were to impose what I

8    believe the movants are trying to impose, which is that

9    Barclays should've given a lot more to Lehman, Barclays

10   wouldn't have done that transaction, wouldn't have entered into

11   it, as far as I can assess, given the tremendous risk, if those

12   had been the terms.

13        So that is the conclusion that I came to fairly early when

14   I understood the broad terms of this, and everything that I've

15   read and analyzed later, and all the analysis that I've done

16   have confirmed that.

17   Q    If there was -- the movants have also suggested that if

18   Barclays paid 1.5 billion dollars in cash for the buildings and

19   the business and assumed liabilities, but received for that,

20   included with the business, a financial inventory with trading

21   assets greater than trading liabilities, by let's say more than

22   1.5 billion dollars.  Does that mean that assets are actually

23   net -- leaving the estate rather than coming to the estate?

24   A    No, it doesn't.  And part of this relates back to the

25   early discussion of P times Q and the simple question is would

08-13555-mg   Doc 12176   Filed 10/08/10   Entered 10/20/10 11:02:00   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 210 of 221

Page 210

1    the estate have done better in the liquidation, the answer is

2    no.  And would the estate have done better if there had been

3    another bidder that would pay more, the answer is yes, but

4    there wasn't another bidder that would pay more.

5         So I can only come back to that way of analyzing it, which

6    is the appropriate economic analysis and the state got fair

7    market value in a transaction that benefited both sides.

8    Q    The estate has said that the Court was told that the

9    transaction would yield the cash amount for the buildings, plus

10   the 250 million dollars.  The cash amount for the buildings was

11   originally 1.5, plus the two estimated, the appraisal then

12   changed.  Plus the 250 was 1.7.  The movants have said the

13   Court was told that the transaction would yield 1.7, and they

14   say it has not yielded that amount.  That 1.7 became 1.5 when

15   the final appraisals came in.

16   A    Uh-huh.

17   Q    As you understand this transaction, did the transaction

18   yield 1.5 billion dollars to the estate?

19   A    There certainly was that money transferred into the

20   estate, and so it yielded that.  Their assets that were

21   transferred -- again, the only way I can think about it is

22   there were again three opportunities.  One was to sell to a

23   higher bidder, there was no higher bidder.  The second was to

24   sell to Lehman -- excuse me, I misspoke, sell to Barclays, and

25   the third one was a liquidation.

Page 211

1        In those cases, when you don't have option one, and you

2   only have option two and three, option two was better than

3   option three.  It was an economically reasonable transaction.

4   I'm not sure if that answers your question but that's the only

5   way I can think of it as an economist.

6   Q    And before the lunch break, Professor Pfleiderer, I showed

7   you an e-mail showing marks at fifty-two.  Do you recall that?

8   A    Yes, I believe so.

9   Q    And do you recall you'd given testimony about why Barclays

10  had several reasons not to simply accept the BoNY marks as what

11  these assets would be worth on its balance sheet?

12  A    That's correct.

13  Q    In your review of the record in this case, and your

14  attempt to determine whether this was a financially -- sorry,

15  excuse me.  In your attempt to determine whether this was an

16  economically rational deal for both sides, it would be relevant

17  to you, wouldn't it, if you saw evidence that there was a

18  secret transfer of several billion dollars that no one knew

19  anything about?

20  A    Yes, it would.  Because that would've potentially

21  indicated that someone else would've come in to make a higher

22  bid.

23  Q    But when the transaction was publicly announced as having

24  a four billion dollar buffer, assets four billion dollars

25  higher than liabilities, did any other buyer come in?

Page 212

1    A    Not to my knowledge.  I think if one had, we would be

2    maybe sitting here but in a different context.

3    Q    And in determining whether Barclays believed that fifty-

4    two billion dollar number in the e-mail was really

5    representative of what it was going to get, would you have

6    expected to see evidence that that's what they thought they

7    were getting, as opposed to evidence showing they thought they

8    were getting less?

9    A    The e-mails that I looked at showed great concern that

10   this was going to be a transaction that was actually going to

11   work out.  So I read it, those e-mails as showing great concern

12   about whether the value was there, and whether they were going

13   to be able to preserve the buffer that made it an economically

14   reasonable transaction.  At least that's how I read those e-

15   mails.

16   Q    And that buffer is the buffer that had been publicly

17   announced to the market and reported to the board?

18   A    That was what I was referring to, yes.

19        MR. HUME:  And may I see BCI or movant's, excuse me,

20   Movant's Exhibit 580?  And can we start at the bottom of this

21   chain, please?

22   Q    This is an e-mail, Professor Pfleiderer, it's very hard to

23   read the first part, Gary Romain.  You know who he is?

24   A    Yes, I do.

25   Q    And it's dated September 22nd, the day of the closing at

1    7:56 p.m.  Do you see that?

2    A    Yes, I do.

3    Q    And he sends it to Rich Ricci, Chief Operating Officer for

4    Barclays, and one of the lead negotiators for Barclays; Patrick

5    Clackson, CFO for Barclays, involved in the negotiations; and

6    James Walker, another colleague in finance.

7         He sends them the latest acquisition balance sheet, a

8    negative good will calculation.  Do you see that?

9    A    Yes, I do.

10   Q    And was it your understanding that Barclays had publicly

11   announced to the investing public and to its board, that this

12   transaction should result in negative good will?

13   A    That is basically what they announced, yes.

14   Q    And is it your understanding that that was of critical

15   importance to Barclays, because if it did the transaction, and

16   the transaction had the impact of negatively impacting its

17   regulatory capital, that could place at a grave risk, at a time

18   of great market turmoil.

19   A    That would certainly be a concern to any bank during this

20   time.

21   Q    Mr. Romain lists out a variety of moving parts, including

22   a bullet point that the initial valuation adjustment from the

23   BoNY marks of 2.83 billion as Stephen King's first cut only.

24   Do you see that?

25   A    Yes, I do.

Page 214

1   Q    And let's go up one e-mail.  Patrick Clackson forwards

2   this on or responds to Rich Ricci, forwards it on to Rich

3   Ricci, Chief Operating Officer, Clackson says, so some things

4   we have to keep working on to squeeze out what we can.  Does

5   that sound to you like the statement of someone who thinks he

6   just got a guaranteed five billion dollar windfall because the

7   fifty-two billion is an accurate number?

8   A    I wouldn't necessarily interpret it that way, no.  I would

9   interpret that there's some concern here.

10  Q    He says, it looks like -- more like three to three and a

11  half rather than four.  Do you see that?

12  A    Yes, I do.

13  Q    Do you understand that four to be the same as the four

14  that had been publicly announced on September 17th?

15  A    That would be what I would interpret it as, yes.

16  Q    Rich Ricci responds, what have we told group.  Do you

17  understand group to be the holding company, the parent company

18  that controls Barclays?

19  A    That would be a reasonable interpretation of that, yes, I

20  believe so.

21  Q    If we go up the e-mail chain, please, to the end of it,

22  later that day, still the date of closing, Rich Ricci writes

23  back to Clackson, I am worried.  Do you see that?

24  A    Yes.

25  Q    Does that look like evidence that he believed he had a

Page 215

1   guaranteed five billion dollar gain, because the fifty-two was

2   a real number?

3   A    No, I think they -- the interpretation that I would place

4   on this in the context, is that they're concerned about what

5   these values are going to actually be.

6   Q    Above that, Patrick Clackson writes back, 1.9 billion, do

7   you understand that to be a reference to the clearing box

8   assets?

9   A    Yes.  That would be -- yes, that's the clearance box, I

10  believe.

11  Q    He says, 1.9 billion was in, but Stephen has valued at

12  nil, so maybe up side.  Do you see that?

13  A    Yes.

14  Q    Does that represent to you evidence that Stephen King had

15  valued the clearance box assets at nil, in order to hide value

16  from the Court or the creditors, or do you think it's because

17  he was worried about whether it had any value?

18  A    I obviously can't interpret this, other than just in this

19  context here, but I think it's obviously the context, the only

20  way to interpret it, is that there's great worry about what the

21  value of this is going to be.  And again, in the context of the

22  markets and given the quality of this collateral, I would say

23  that that really was well founded potentially.

24  Q    Finally, let me show you BCI Exhibit 292.  On the very day

25  of the closing, earlier in that e-mail chain, or maybe it's

Page 216

1    around the same time, Monday, September the 22nd, 8:02 p.m.

2    Ricci to Clackson, scared to death.

3        Professor Pfleiderer, do you believe Barclays had good

4    reason to be concerned about the risks that they had taken in

5    acquiring all of these illiquid assets in the middle of the

6    worst financial crisis since the Great Depression?

7    A   I certainly did.  I think there are two major risks here.

8    One was the risk of just knowing what these values were, and

9    that was compounded by the risk of the very turbulent market.

10   So those two things taken together, certainly compounded to

11   substantial risk, yes.

12       MR. HUME:  Your Honor, thank you for allowing us

13   additional time.  I know I went longer than I said.  I have no

14   further questions.  I don't know if Mr. Tambe wants to revisit

15   or we did chat during the break, I think his preference is to

16   begin tomorrow.

17       MR. TAMBE:  That is my preference, more so now than

18   before.

19       THE COURT:  It's the Court's preference as well.

20       MR. HUME:  All right.  Is -- the only concern I have,

21   Your Honor, is completing cross with some time for redirect.

22   Not a lot, but hopefully some.

23       THE COURT:  Well, based upon the estimate from

24   earlier, it does seem it would be complete tomorrow, but

25   perhaps 3:30 with cross, giving you some time for redirect if

08-13555-mg    Doc 12176    Filed 10/08/10    Entered 10/20/10 11:02:00    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 217 of 221

Page 217

1    necessary.  I recognize that estimates are just that,

2    estimates.  But under the circumstances, everybody will be in

3    effect dealing with a timed trial tomorrow because the witness

4    has get to his airplane and get back to California.

5            The question becomes whether we need to or should

6    start a little earlier than 9:30 to accommodate the scheduling,

7    or whether or not everybody on the movant's side is prepared to

8    take the risk, in effect.  There will be less time for cross-

9    examination if we start at 9:30, but that seems to be the

10   civilized time to start.  I'll leave it to Mr. Tambe to make

11   that judgment.

12           MR. TAMBE:  Your Honor, we had a brief discussion

13   about this without impinging in the norms of the civilized

14   world, we could start at 9:00, it might be helpful.  It would

15   give us some more breathing room, and less of a time pressure.

16           THE COURT:  Then we'll start at 9:00 a.m.

17           MR. TAMBE:  Thank you, Your Honor.

18           THE COURT:  Now, I -- okay.  I see Mr. Gaffey ready to

19   say a few words.  He has some papers in his hand.

20           MR. HUME:  Before we finish with the witness, and I

21   apologize for this, as I often fail to do, there was an errata

22   report from January 8th that should've been in the binder for

23   completeness.  I would just like to move into evidence, Exhibit

24   1102.

25           MR. TAMBE:  No objection.

Page 218

1          THE COURT:  It's in.  I don't have it, but it's in.

2     (BCI's Exhibit No. 1102, Errata Report dated 1/8/10, was hereby

3     received into evidence as of this date.)

4          MR. HUME:  And may I approach?

5          THE COURT:  You can give it to me.  Thank you.  Mr.

6     Gaffey, do you want to say something?

7          MR. GAFFEY:  I'm just happy that we're actually ahead

8     of schedule on something, Your Honor.  We have our letter on

9     the PWC issue, which was due tomorrow, but we've computed it,

10    and they're going to hand it up now.

11         THE COURT:  That's fine.  Or if you want to hold it

12    till tomorrow, that's fine too.

13         MR. GAFFEY:  Thank you.  If we could hand it up and

14    get it off the plate, we can just get straight to the witness

15    tomorrow then.

16         THE COURT:  Fine.  Okay.  Thank you.

17         With that, if there's nothing more, we're adjourned

18    for the day, and we will resume at 9:00 o'clock tomorrow

19    morning.

20    (Whereupon these proceedings were concluded at 5:30 p.m.)

21

22

23

24

25

Page 219

```
 1

 2                        I N D E X

 3

 4                     T E S T I M O N Y

 5    WITNESS              EXAM BY          PAGE     LINE

 6    Paul Pfleiderer      Mr. Hume           6       13

 7

 8

 9

10                     E X H I B I T S

11    PARTY    NO   DESCRIPTION              ID.     EVID.

12    BCI     341   Expert Report of Professor

13                  Pfleiderer                         15

14    BCI     346   Declaration of Professor

15                  Pfleiderer - 1/21/10               16

16    BCI    1100   Declaration of Professor

17                  Pfleiderer - 4/19/10               16

18    BCI     799   Declaration of Professor

19                  Pfleiderer - 4/23/10               18

20    BCI    1101   Declaration of Professor

21                  Pfleiderer - 9/1/10                18

22    BCI    1102   Errata Report - 1/8/10            218

23

24

25
```

Page 220

1

2                           R U L I N G S

3    DESCRIPTION                                  PAGE       LINE

4    Paul Pfleiderer is accepted in the

5    area of financial economics and valuation     14         25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 221

1

2                    C E R T I F I C A T I O N

3

4    I, Zipporah Geralnik, certify that the foregoing transcript is

5    a true and accurate record of the proceedings.

6

7    _____

8    ZIPPORAH GERALNIK (CET**D-489)

9    AAERT Certified Electronic Transcriber

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date: October 8, 2010

17

18

19

20

21

22

23

24

25