**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
In re                                                            :     **Chapter 11 Case No.**
                                                                 :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*    :     **08-13555 (JMP)**
                                                                 :
                                   **Debtors.**    :     **(Jointly Administered)**
--------------------------------------------------------------------x

## ORDER APPROVING SETTLEMENT AGREEMENT AMONG LEHMAN BROTHERS SPECIAL FINANCING INC., LEHMAN BROTHERS HOLDINGS INC., AND SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH, RELATING TO CERTAIN SWAP TRANSACTIONS WITH MKP VELA CBO, LTD. AND LIBRA CDO LIMITED AND GRANTING RELATED RELIEF

Upon the motion, dated September 20, 2010 (the "Motion"),[1] of Lehman Brothers

Special Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI"), as debtors and

debtors-in-possession (together, the "Debtors), pursuant to sections 105(a), 363 and 365 of

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004,

6006 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for (i)

approval of a settlement agreement (the "Settlement Agreement") among LBSF, LBHI, and

Société Générale, New York Branch ("SG") relating to certain swap transactions with MKP Vela

CBO, Ltd. ("Vela") and Libra CDO Limited ("Libra"), (ii) the assumption, assignment, and sale

of LBSF's interest in that certain Credit Default Swap Agreement, dated October 17, 2006,

consisting of an ISDA Master Agreement, a Schedule, and Confirmations (collectively, the

"Libra CDSA") to SG on the terms and conditions set forth in the Settlement Agreement and in

the Form of Libra CDSA Assignment Agreement attached as Exhibit 2 to the Settlement

Agreement (the "Libra CDSA Assignment Agreement"), (iii) the assumption, assignment, and

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Settlement
Agreement, a copy of which is annexed hereto as Exhibit A.

sale of LBSF's interest in that certain Credit Default Swap Agreement, consisting of an ISDA

Master Agreement, dated November 16, 2006, and an amended and restated schedule, a credit

support annex, and amended and restated confirmations, dated April 23, 2008 (collectively, the

"Vela CDSA"), to SG on the terms and conditions set forth in the Settlement Agreement and in

the Form of Vela CDSA Assignment Agreement attached as Exhibit 3 to the Settlement

Agreement (the "Vela CDSA Assignment Agreement"), and (iv) other related relief, all as more

fully described in the Motion; and a hearing having been held to consider the Motion; and upon

the Court's consideration of the Motion and the record of the hearing to consider the relief

requested in the Motion; and the Court having found and determined that the relief sought in the

Motion is in the best interests of the Debtors and their estates and that the legal and factual bases

set forth in the Motion establish just cause for the relief granted by the Order; and after due

deliberation and sufficient cause appearing therefor, it is

ADJUDGED, FOUND AND DETERMINED:

A.  **Jurisdiction and Venue**.  The Court has jurisdiction to consider this

Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.  **Statutory and Rule Predicates**.  The statutory predicates for the relief

sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy

Rules 2002, 6004, 6006 and 9019.

C.  **Notice**.  As set forth in the Motion and evidenced by the affidavits of

service filed with the Court, due, proper, timely, adequate and sufficient notice of the Motion, the

Settlement Agreement, the Libra CDSA Assignment Agreement and the Vela CDSA Assignment

Agreement has been provided in accordance with Bankruptcy Rule 2002(a), (l) and (m) and the

procedures set forth in the order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) SG; (vii) Libra; (viii) the Libra Trustee; (ix) the Libra Noteholders; (x) the Libra Collateral Manager; (xi) Libra CDO, LLC; (xii) Vela; (xiii) the Vela Trustee, (xiv) the Vela Noteholders; (xv) the Vela Collateral Manager, (xvi) MKP Vela CBO, LLC, and (xvii) all parties who have requested notice in these chapter 11 cases. No other or further notice is required.

D. **Opportunity to Object**. A reasonable opportunity to object and to be heard as to the Motion and the relief requested has been given as required by the Bankruptcy Code and Bankruptcy Rules to all persons entitled to notice.

E. **Best Interests and Reasonableness**. Good and sufficient reasons for approval of the Settlement Agreement and the transactions contemplated by such Agreement, including the Libra CDSA Assignment Agreement and the Vela CDSA Assignment Agreement, have been demonstrated, and the Debtors' entry into the Settlement Agreement, the Libra CDSA Assignment Agreement and the Vela CDSA Assignment Agreement is each (i) a decision within the sound exercise of the Debtors' business judgment; (ii) in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and (iii) reasonable and appropriate under the circumstances. The Settlement Agreement falls within the range of reasonableness and satisfies the standard for approval under Bankruptcy Rule 9019.

F. **Arm's-Length Transactions**. The Settlement Agreement, the Libra CDSA Assignment Agreement and the Vela CDSA Assignment Agreement were each

negotiated extensively, proposed and entered into (or, in the case of the Libra CDSA Assignment Agreement and the Vela CDSA Assignment Agreement, may be entered into in accordance with the Settlement Agreement) by the Debtors and SG, without collusion, after good faith, arm's-length bargaining and negotiations.  SG is not an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code.  Neither the Debtors nor SG have engaged in any conduct that would cause or permit the Libra CDSA Assignment Agreement or the Vela CDSA Assignment Agreement to be avoided under section 363(n) of the Bankruptcy Code.

G.    **Good Faith Purchaser**.  SG is a good faith purchaser of LBSF's rights, title and interest in the Libra CDSA and the Vela CDSA within the meaning of section 363(m) of the Bankruptcy Code.

H.    **Free and Clear**.  LBSF's rights, obligations and interests in the Libra CDSA and the Vela CDSA constitute property of its estate.  Pursuant to section 363(f) of the Bankruptcy Code, LBSF may sell its interests under the Libra CDSA and the Vela CDSA to SG free and clear of any claims or interests.  The assumption, assignment and sale of LBSF's rights and obligations under the Libra CDSA and the Vela CDSA to SG pursuant to the Libra CDSA Assignment Agreement and the Vela CDSA Assignment Agreement, respectively, will be a legal, valid, and effective transfer of such rights and obligations, and will vest SG with all right, title, and interest of LBSF under the Libra CDSA and the Vela CDSA, as applicable, free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code) (including, without limitation, successor liability claims), encumbrances, obligations, liabilities, contractual commitments, rights of first refusal or interests of any kind or nature whatsoever (collectively, the "Interests").

I.	**Cure/Adequate Assurance**.  Upon the Libra Assignment Closing Date (if it occurs) and compliance with paragraph 6 and the provisions of paragraph 14 applicable to the Libra CDSA Assignment Agreement and the Vela Assignment Closing Date (if it occurs) and compliance with paragraph 7 and the provisions of paragraph 14 applicable to the Vela CDSA Assignment Agreement, respectively, LBSF shall have: (i) cured or provided adequate assurance of cure of all defaults existing on the Libra Assignment Closing Date with respect to the Libra CDSA and the Vela Assignment Closing Date with respect to the Vela CDSA, in each case within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the Libra Assignment Closing Date with respect to the Libra CDSA and Vela Assignment Closing Date with respect to the Vela CDSA, in each case within the meaning of sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code, and (iii) provided adequate assurance of future performance by the assignee, SG, from and after the Libra Assignment Closing Date and the Vela Assignment Closing Date, respectively, in each case within the meaning of section 365(f)(2)(B) of the Bankruptcy Code.

J.	**Section 365(f) of the Bankruptcy Code**.  The transactions contemplated in and evidenced under the Libra CDSA Assignment Agreement and the Vela CDSA Assignment Agreement are not prohibited under the terms of the Libra CDSA or the Libra Indenture or the Vela CDSA or the Vela Indenture, as applicable, and any such terms that purport to prohibit, restrict or condition the assignment of LBSF's interest in the Libra CDSA or the Vela CDSA, are unenforceable pursuant section 365(f) of the Bankruptcy Code.

NOW, THEREFORE, IT IS ORDERED:

1.        **Motion Granted**.  The Motion and the relief requested therein is GRANTED and APPROVED to the extent provided in this Order.

2.        **Objections Overruled**.  Objections, if any, to the Motion and entry of this Order, including to the Settlement Agreement, the Libra CDSA Assignment Agreement and the Vela CDSA Assignment Agreement, that have not been withdrawn, waived, settled, or otherwise resolved pursuant to the terms hereof are denied and overruled on the merits in their entirety with prejudice.

3.        **Settlement Agreement Approved**.  Pursuant to Bankruptcy Rule 9019, the Settlement Agreement, inclusive of all of the terms and conditions thereto, is approved and shall be binding on the Debtors and SG, and each of their predecessors and successors and assigns.  The Debtors are authorized to enter into and perform their respective obligations under the Settlement Agreement and to execute all further documents and take such further actions as may be required, necessary or appropriate, including, without limitation, the posting and/or use of cash as provided in the Settlement Agreement, to implement the transactions contemplated by the Settlement Agreement, in each case, consistent with this Order.

4.        **The SG Payment and the SG Guarantee**.  On the 5th business day after this Order becomes a "Final Order" (the "Payment Date"), SG shall, subject to the terms and conditions of the Settlement Agreement, (i) pay LBSF $370,000,000 (the "SG Payment") and (ii) guarantee to LBSF a recovery of up to $75,000,000 from the Libra and Vela Transactions (the "SG Guarantee").  The SG Guarantee shall be satisfied by SG in accordance with, and subject to, the terms and conditions of the Settlement Agreement.   Notwithstanding anything to the contrary, after this Order becomes a "Final Order," the Parties' obligations under Section 7 of the

Settlement Agreement, including SG's obligation to make the SG Payment and to perform the SG Guarantee, shall not be conditioned or dependent upon the effectiveness of the Libra CDSA Assignment Agreement or the Vela CDSA Assignment Agreement.  As used in this paragraph, a "Final Order" means a Settlement Approval Order, as defined in the Settlement Agreement, that (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the order and the time for any further appeals has expired.

5.       **Deferral of Payment Due Date under Libra CDSA and Vela CDSA Approved**.  From and after the Libra Assignment Closing Date and the Vela Assignment Closing Date, respectively, the Debtors are permitted to unilaterally defer the payment due date in respect of any payment payable to them under the Libra CDSA and the Vela CDSA, respectively, and the deferral contemplated in Sections 7.4 and 7.5 of the Settlement Agreement shall be binding on the Other Libra Parties and the Other Vela Parties, as applicable, and is hereby authorized and approved.

6.       **Assumption, Assignment and Sale of Libra CDSA Approved**. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to paragraph 8 below, (i) the Libra CDSA Assignment Agreement, and all of the terms and conditions thereto, is approved and shall be binding on LBSF and SG, and each of their successors and assigns and (ii) LBSF's assumption, assignment and sale of its interests, rights and obligations under the Libra CDSA to SG pursuant to the Libra CDSA Assignment Agreement is approved.  LBSF is authorized to enter into and perform its obligations under the Libra CDSA Assignment Agreement, and to execute all further documents and take such further actions as may be

necessary and appropriate to implement the transactions contemplated by the Libra CDSA Assignment Agreement. On the Libra Assignment Closing Date, the current defaults of LBSF and LBHI under the Libra CDSA shall be cured (and any dispute as to the amount or nature of the then-current defaults will be submitted to this Court for determination), and any provision in such agreement, or any other agreement, that (i) purports to prohibit or condition the assignment (including, without limitation, any purported prerequisites that the Libra Rating Condition be satisfied) of the Libra CDSA, (ii) requires the consent of Libra or any other person in order for the assignment of LBSF's interest to be valid, or (iii) allows Libra, or any other third party, to terminate, recapture, impose any penalty or condition on renewal or extension, or modify any term or condition in respect of the Libra CDSA, the Libra CDS Transactions, the Libra Indenture or any other agreement upon or as a result of such assignment are void, of no force and effect and shall not be enforceable against SG.

7. **Assumption, Assignment and Sale of Vela CDSA Approved**.

Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to paragraph 8 below, (i) the Vela CDSA Assignment Agreement, and all of the terms and conditions thereto, is approved and shall be binding on LBSF and SG, and each of their successors and assigns and (ii) LBSF's assumption, assignment and sale of its interests, rights and obligations under the Vela CDSA to SG pursuant to the Vela CDSA Assignment Agreement is approved. LBSF is authorized to enter into and perform its obligations under the Vela CDSA Assignment Agreement, and to execute all further documents and take such further actions as may be necessary and appropriate to implement the transactions contemplated by the Vela CDSA Assignment Agreement. On the Vela Assignment Closing Date, the current defaults of LBSF and LBHI under the Vela CDSA shall be cured (and any dispute as to the amount or nature of the

then-current defaults will be submitted to this Court for determination), and any provision in such agreement, or any other agreement, that (i) purports to prohibit or condition the assignment (including, without limitation, any purported prerequisites that the Vela Rating Condition be satisfied) of the Vela CDSA, (ii) requires the consent of Vela or any other person in order for the assignment of LBSF's interest to be valid, or (iii) allows Vela, or any other third party, to terminate, recapture, impose any penalty or condition on renewal or extension, or modify any term or condition in respect of the Vela CDSA, the Vela CDS Transactions, the Vela Indenture or any other agreement upon or as a result of such assignment are void, of no force and effect and shall not be enforceable against SG.

8. **Effective Date of Assumption and Assignment**.  The assumption, assignment, and sale of the Libra CDSA by LBSF to SG shall be effective automatically and without any additional Court order or action on the Libra Assignment Closing Date.  The assumption, assignment, and sale of the Vela CDSA by LBSF to SG shall be effective automatically and without any additional Court order or action on the Vela Assignment Closing Date.  Within seven business days of the satisfaction of the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, LBSF shall file and serve on Libra and the Libra Trustee or Vela and the Vela Trustee, as applicable, notice of such event.  LBSF may assume the Libra CDSA only pursuant to the Libra CDSA Assignment Agreement, and LBSF may not assign and/or sell its interest in the Libra CDSA to any party other than SG.  LBSF may assume the Vela CDSA only pursuant to the Vela CDSA Assignment Agreement, and LBSF may not assign and/or sell its interest in the Vela CDSA to any party other than SG.

9. **Libra Floating Amounts and Credit Events**.  Effective as of the Libra Assignment Closing Date:

i.      the maximum aggregate amount of all Libra Credit Protection Payments and Libra CDS Termination Payments payable by Libra from time to time under the Libra CDSA shall be reduced to an amount equal to the aggregate funds available to Libra for making such payments without causing a draw on the Libra Senior Swap Agreement, with the effect that draws on the Libra Senior Swap Agreement are forever foreclosed; provided that, without limiting the foregoing, in no event shall Libra be required to pay any Libra Credit Protection Payment or Libra CDS Termination Payment that would leave Libra with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the Libra Indenture), the amounts required to be paid by Libra on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Libra Indenture;

ii.     SG, as successor credit protection buyer, is permitted to trigger any and all Libra Floating Amount Events and Libra Credit Events that occurred during the period beginning on October 10, 2008 and ending on the Libra Assignment Closing Date, regardless of the passage of time from the date on which any such Libra Floating Amount Event or Libra Credit Event has occurred;

iii.   the rating requirement set forth in clause (ii)(A) of the definition of "Rating Requirement" in each of the Libra CDSA Confirmations shall be satisfied with respect to a "buyer" whose long term debt obligations, or the long term debt obligations of its "credit support provider," are rated "A+" by Standard & Poor's if the Libra Rating Condition with respect to Standard & Poor's has been obtained;

iv.     (a) SG shall have full discretion as to when and if to deliver to Libra notices of Libra Floating Amounts due with respect to outstanding Libra Floating Amount Events under the Libra CDSA and full discretion to seek an amount equal to or less than the Libra Floating Amount due to the "buyer" under the Libra CDSA in respect of any outstanding Libra Floating Amount Events; provided that in no event shall SG seek an amount that would leave Libra with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the Libra Indenture), the amounts required to be paid by Libra on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Libra Indenture; (b) the exercise of such discretion is deemed to satisfy any applicable requirements under the Libra CDSA; and (c) in the event draws are made on the Libra Senior Swap Agreement, all such funds may be retained by the Libra Senior Swap Counterparty, as irrevocable assignee of the "buyer" under the Libra CDSA and party rightfully entitled to such funds; and

v.      any determination of the portion of the Libra Floating Payments made prior to the Debtors' bankruptcy filings that remains subject to reimbursement under the Libra CDSA shall not disregard the period from the purported designation of an early termination date under the Libra CDSA through the date of the Libra Judgment.

10.     **Vela Floating Amounts and Credit Events**.  Effective as of the Vela Assignment Closing Date:

i.      the maximum aggregate amount of all Vela Credit Protection Payments, Vela CDS Termination Payments, Vela Premium Reserve payments and Vela Net Issuer Premium payments payable by Vela from time to time under the Vela

CDSA shall be reduced to an amount equal to the aggregate funds available to Vela for making such payments without causing a draw on the Vela Senior Swap Agreement, with the effect that draws on the Vela Senior Swap Agreement are forever foreclosed; provided that, without limiting the foregoing, in no event shall Vela be required to pay any Vela Credit Protection Payment, Vela CDS Termination Payment, Vela Premium Reserve payment or Vela Net Issuer Premium payment that would leave Vela with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the Vela Indenture), the amounts required to be paid by Vela on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Vela Indenture;

ii. SG, as successor credit protection buyer, is permitted to trigger any and all Vela Floating Amount Events and Vela Credit Events that occurred during the period beginning on September 30, 2008 and ending on the Vela Assignment Closing Date, regardless of the passage of time from the date on which any such Vela Floating Amount Event or Vela Credit Event has occurred;

iii. (a) SG shall have full discretion as to when and if to deliver to Vela notices of Vela Floating Amounts due with respect to outstanding Vela Floating Amount Events under the Vela CDSA and full discretion to seek an amount equal to or less than the Vela Floating Amount due to the "buyer" under the Vela CDSA in respect of any outstanding Vela Floating Amount Events; provided that in no event shall SG seek an amount that would leave Vela with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the

Vela Indenture), the amounts required to be paid by Vela on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Vela Indenture; (b) the exercise of such discretion is deemed to satisfy any applicable requirements under the Vela CDSA; and (c) in the event draws are made on the Vela Senior Swap Agreement, all such funds may be retained by the Vela Senior Swap Counterparty, as irrevocable assignee of the "buyer" under the Vela CDSA and party rightfully entitled to such funds; and

iv.    any determination of the portion of the Vela Floating Payments made prior to the Debtors' bankruptcy filings that remains subject to reimbursement under the Vela CDSA shall not disregard the period from the purported designation of an early termination date under the Vela CDSA through the date of the Vela Judgment.

11.    **Section 365(k) of the Bankruptcy Code**.  Immediately upon the Libra Assignment Closing Date and the Vela Assignment Closing Date, the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, of all further obligations under the Libra CDSA and the Vela CDSA, respectively.

12.    **Ipso Facto Clauses Ineffective**.  Upon the Libra Assignment Closing Date, no Event of Default or Termination Event affecting the "buyer" shall exist under the Libra CDSA, and no party shall be permitted to declare a default, terminate, cease payment, delivery or any other performance under the Libra CDSA, the Libra Indenture, or any agreement relating to either thereof, or otherwise modify any such agreement, assert any claim or right to termination payment, or impose any penalty or otherwise take action against SG under the Libra CDSA as a result of the Debtors' financial condition, bankruptcy or failure to perform any of their obligations under the Libra CDSA.  Upon the Vela Assignment Closing Date, no Event of

Default or Termination Event affecting the "buyer" shall exist under the Vela CDSA, and no party shall be permitted to declare a default, terminate, cease payment, delivery or any other performance under the Vela CDSA, the Vela Indenture, or any agreement relating to either thereof, or otherwise modify any such agreement, assert any claim or right to termination payment, or impose any penalty or otherwise take action against SG under the Vela CDSA as a result of the financial condition, bankruptcy or failure to perform any of obligations under the Vela CDSA of the Debtors.

13. **Free and Clear**. Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Libra Assignment Closing Date and the Vela Assignment Closing Date, SG shall take title to and possession of LBSF's interests in the Libra CDSA and the Vela CDSA, respectively, free and clear of all Interests.

14. **Cure and Adequate Assurance**. Upon (i) the Libra Assignment Closing Date, LBSF shall pay $17,520,316 to Libra in cure payments accrued as of the date of this Order, plus any cure amounts accrued and unpaid from the date of this Order until the Libra Assignment Closing Date (and any disputes regarding the existence and amount of any additional cure payments due shall be submitted to this Court for determination), and (ii) the Vela Assignment Closing Date, LBSF shall pay $15,304,759 to Vela in cure payments accrued as of the date of this Order, plus any cure amounts accrued and unpaid from the date of this Order until the Vela Assignment Closing Date (any disputes regarding the existence and amount of any additional cure payments due shall be submitted to this Court for determination), in each case as follows. Cure payments shall be deducted from payments due to LBSF from Libra or Vela under the Libra CDSA or the Vela CDSA, respectively, including payments not made to LBSF upon reliance of the purported termination of the Libra CDSA or the Vela CDSA. If

payments to LBSF are insufficient to cover the full cure payment due to Libra or Vela, then LBSF shall pay the difference of such amounts to Libra or Vela, as applicable, within 30 days of the Libra Assignment Closing Date or Vela Assignment Closing Date or such other time as may be agreed to by LBSF and the payee. No other or further cure payments shall be required of LBSF. LBSF has provided adequate assurance of future performance by the assignee, SG, within the meaning of section 365(f)(2)(B) of the Bankruptcy Code.

15. **Section 363(n) of the Bankruptcy Code**. The consideration provided by SG for LBSF's interest in the Libra CDSA and the Vela CDSA is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

16. **Good Faith**. SG is a good-faith purchaser of the LBSF's interests in the Libra CDSA and the Vela CDSA and shall be entitled to all the benefits and protections afforded in section 363(m) of the Bankruptcy Code.

17. **Stay of Debtors' Claims**. Prosecution of the Debtors' claims against SG in the Libra Adversary Proceedings is stayed until the Payment Date, at which time such claims against SG will be dismissed with prejudice without notice or further order of the Court. Prosecution of the Libra Termination Claim in the Libra Adversary Proceedings against Libra and the Libra Trustee is stayed and the Debtors shall not prosecute or in any litigation take a position regarding the Libra Termination Claim against the Other Libra Parties, in each case, until the date on which the Libra Termination Claim Preconditions shall have been satisfied. The Debtors shall not prosecute or in any litigation take a position regarding the Vela Termination Claim against SG until the Payment Date, at which time such claims against SG will be dismissed with prejudice without notice or further order of the Court. The Debtors shall not prosecute or in any litigation take a position regarding the Vela Termination Claim against the

Other Vela Parties until the date on which the Vela Termination Claim Preconditions shall have been satisfied.

18. **Releases Authorized**. The releases contained in the Settlement Agreement shall be effective as of the Payment Date and SG, LBSF and LBHI shall be deemed to have released and are each permanently enjoined from asserting, pursuing or prosecuting in any manner, and in any forum, any and all claims released pursuant to the Settlement Agreement; provided, however, that (i) the Debtors shall be permitted to pursue the Libra Termination Claim and the Libra Priority Claim against the Other Libra Parties or the Other Vela Parties (but in the case of the Libra Termination Claim, only if the Libra Termination Claim Preconditions have been satisfied) and (ii) the Debtors shall be permitted to pursue the Vela Termination Claim and the Vela Priority Claim as against the Other Vela Parties (but in the case of the Vela Termination Claim, only if the Vela Termination Claim Preconditions have been satisfied).

19. **Payment of Break-Up Fee**. Pursuant to the Court's order, dated June 1, 2009 [Docket No. 3709], approving a break-up fee payable to Deutsche Bank AG, London Branch ("DB") in connection with the Libra CDSA, LBSF is authorized to pay $20,000,000 to DB in accordance with and subject to the terms of the letter agreement, dated May 5, 2009, between the Debtors and DB regarding the same.

20. **No Modifications**. Nothing contained in any chapter 11 plan confirmed in any Debtor's bankruptcy case, any order confirming any such plan or any other order entered in these chapter 11 cases (including any order entered after any conversion of a chapter 11 case of any of the Debtors to a case under chapter 7 of the Bankruptcy Code) shall supersede, alter, amend or modify the provisions of the Settlement Agreement or this Order.

21. **Retention of Jurisdiction**.  The Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2),  to hear and determine all matters arising from or relating to the implementation of this Order.

22. **Reservation of Rights With Respect to Future Litigation**.  Nothing set forth in this Order shall impair or affect any rights, claims or defenses of the Other Libra Parties with respect to the Libra Termination Claim or the Libra Priority Claim, or any of the rights, claims or defenses of the Other Vela Parties with respect to the Vela Termination Claim or the Vela Priority Claim or any other rights, claims or defenses of the Other Libra Parties or the Other Vela Parties in any litigation that the Debtors or SG bring related to the distribution of the Remaining Libra Assets or the Remaining Vela Assets.

Dated: New York, New York
      October 21, 2010

                              *s/ James M. Peck*                     
                              HONORABLE JAMES M. PECK
                              UNITED STATES BANKRUPTCY JUDGE

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement Agreement"), dated as of September 20, 2010, is entered into by and among Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Holdings Inc. ("LBHI" and, together with LBSF, the "Debtors") and Société Générale, New York Branch ("SG" and, together with the Debtors, the "Parties").

WHEREAS, the Debtors filed for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on September 15, 2008 (in the case of LBHI) and October 3, 2008 (in the case of LBSF), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

WHEREAS, the Debtors' chapter 11 cases and the chapter 11 cases of certain other LBHI affiliates are being jointly administered as In re Lehman Brothers Holdings Inc., et al., Chapter 11 Case No. 08-13555 (JMP) (the "Bankruptcy Case"); and

WHEREAS, LBHI is LBSF's "credit support provider" under each of (i) that certain ISDA Master Agreement, dated as of October 17, 2006 (together with the Schedule and Confirmations thereto, each dated October 17, 2006, the "Libra CDSA"), between LBSF and Libra CDO Limited ("Libra"), and (ii) that certain ISDA Master Agreement, dated as of November 16, 2006 (together with the Amended and Restated Schedule, Credit Support Annex and Amended and Restated Confirmations thereto, each dated April 23, 2008, the "Vela CDSA"), between LBSF and MKP Vela CBO, Ltd. ("Vela"); and

WHEREAS, under each of the Libra CDSA and the Vela CDSA (collectively, the "CDSAs"), LBHI's chapter 11 filing constituted an "event of default" as to which LBSF is the "defaulting party"; and

WHEREAS, in connection with LBHI's chapter 11 filing, (i) The Bank of New York Mellon Trust Company, National Association, as Trustee on behalf of Vela (the "Vela Trustee"), designated September 30, 2008 as the "early termination date" in respect of all outstanding transactions under the Vela CDSA (the "Vela Early Termination") and (ii) Bank of America, N.A., as Trustee on behalf of Libra (the "Libra Trustee"), designated October 10, 2008 as the "early termination date" in respect of all outstanding transactions under the Libra CDSA (the "Libra Early Termination"); and

WHEREAS, the Debtors have challenged the validity and effectiveness of the Libra Early Termination and the Vela Early Termination; and

WHEREAS, on May 5, 2009, (i) the Debtors commenced Adversary Proceeding No. 09-01177 (the "Debtors' Libra Adversary Proceeding" and, the complaint filed by the Debtors in such proceeding, the "Debtors' Libra Complaint") requesting, among other things, a declaratory judgment that the Libra Early Termination was null and void, and (ii) SG, Libra and the Libra Trustee commenced Adversary Proceeding No. 09-01178 (the "Libra Parties' Adversary Proceeding" and, together with the Debtors' Libra Adversary Proceeding, the "Libra Adversary Proceedings") requesting, among other things, a declaratory judgment that the Libra Early Termination is valid; and

WHEREAS, by stipulation dated July 2, 2009, approved by the Bankruptcy Court on July 16, 2009 [Dkt. 17], the Official Committee of Unsecured Creditors of LBHI and its affiliated debtors and debtors in possession was authorized to intervene in the Libra Adversary Proceedings; and

WHEREAS, the Debtors will file a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Sections 363 and 365 of the Bankruptcy Code to seek, among other things, court approval of their entry into this Settlement Agreement;

NOW, THEREFORE, for and in sufficient consideration of the promises and the mutual covenants contained herein, and subject to Bankruptcy Court approval, the Parties hereby agree as follows:

1.      Definitions.  As used in this Settlement Agreement, the following terms have the respective meanings indicated in this Section 1.

1.1      "Advance" shall mean each Premium Advance, Legacy Reimbursement, SG Litigation Expense and Lehman Litigation Expense.

1.2      "Affiliate" shall mean, as to any specified Person, any other Person that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Person.  As used in this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of equity of that Person, by contract or otherwise).

1.3      "Aggregate Debtors Parties Indemnified Claims" shall have the meaning set forth in Section 8.2(b) hereof.

1.4      "Aggregate SG Parties Indemnified Claims" shall have the meaning set forth in Section 8.1(c) hereof.

1.5      "Assignments" shall mean, collectively, the Libra CDSA Assignment and the Vela CDSA Assignment.

1.6      "Bankruptcy Case" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.7      "Bankruptcy Code" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.8      "Bankruptcy Court" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.9      "Business Day" shall mean any day, other than a Saturday or Sunday, that is a day on which commercial banks are generally open for business in the City of New York.

1.10　"CDSAs" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.11　"Debtors" shall have the meaning set forth in the preamble hereof.

1.12　"Debtors Indemnification Cap" shall have the meaning set forth in Section 8.1(b) hereof.

1.13　"Debtors' Libra Adversary Proceeding" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.14　"Debtors' Libra Complaint" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.15　"Debtors Parties Indemnified Claims" shall have the meaning set forth in Section 8.2 hereof.

1.16　"Disbursable Recoveries" shall mean (x) with respect to the Libra Transaction, a portion of the aggregate Libra Funds standing to the credit of the Global Escrow Account at any time that is equal to the aggregate Advances made by SG *plus* the aggregate Advances made by the Debtors under the Libra CDSA that remain unreimbursed to SG and/or the Debtors (as applicable) from recoveries from Libra or the Libra Trustee at such time and (y) with respect to the Vela Transaction, a portion of the aggregate Vela Funds standing to the credit of the Global Escrow Account at any time that is equal to the aggregate Advances made by SG *plus* the aggregate Advances made by the Debtors under the Vela CDSA that remain unreimbursed to SG and/or the Debtors (as applicable) from recoveries from Vela or the Vela Trustee at such time.

1.17　"DTC" shall mean The Depository Trust Company.

1.18　"Entitlement Holder" shall have the meaning specified in Section 8-102(a)(7) of the UCC.

1.19　"Escrow Accounts" shall have the meaning set forth in Section 6.3 hereof.

1.20　"Final Libra Funds Settlement Distribution Date" shall mean the Business Day following the first date on which all Libra Funds standing to the credit of the Global Escrow Account are no longer subject to reimbursement under the Libra CDSA.

1.21　"Final Vela Funds Settlement Distribution Date" shall mean the Business Day following the first date on which all Vela Funds standing to the credit of the Global Escrow Account are no longer subject to reimbursement under the Vela CDSA.

1.22　"First Libra Funds Settlement Distribution Date" shall mean the Business Day following the first date on which all litigation in respect of the Libra Transaction is concluded with finality.

1.23    "First Vela Funds Settlement Distribution Date" shall mean the Business Day following the first date on which all litigation in respect of the Vela Transaction is concluded with finality.

1.24    "Global Escrow Account" shall have the meaning set forth in Section 9.1 hereof.

1.25    "ICA Recoveries" shall mean recoveries from Libra or the Libra Trustee of any amounts contained in the Libra Issuer Collateral Account that directly or indirectly relate to collateral posted by LBSF under the Libra CDSA.

1.26    "Indemnified Debtors Parties" shall have the meaning set forth in Section 8.2 hereof.

1.27    "Indemnified SG Parties" shall have the meaning set forth in Section 8.1 hereof.

1.28    "LBHI" shall have the meaning set forth in the preamble hereof.

1.29    "LBSF" shall have the meaning set forth in the preamble hereof.

1.30    "Legacy Reimbursement" shall mean any out-of-pocket reimbursement payment paid by SG or the Debtors to Libra or Vela under the Libra CDSA or the Vela CDSA, respectively, following the date of this Settlement Agreement with respect to Libra Credit Protection Payments or Vela Credit Protection Payments paid to LBSF under the Libra CDSA or the Vela CDSA, respectively, prior to September 15, 2008.

1.31    "Lehman Litigation Expense" shall mean all legal fees and expenses incurred by the Debtors in defense of any Debtors Parties Indemnified Claim.

1.32    "Libra" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.33    "Libra Adversary Proceedings" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.34    "Libra Assignment Closing Conditions" shall mean all of the following:

(a)    either:

(i)    the Libra Trustee has initiated an interpleader proceeding and named all Libra Noteholders as third-party defendants; or

(ii)    the Debtors have amended the Debtors' Libra Complaint to name the Libra Noteholders as defendants and have notified the Libra Noteholders through each of the following methods: (1) sending the Debtors' Libra Complaint to each Libra Noteholder care of the Libra Trustee, as the Libra Note Registrar, with instructions to the Libra Trustee to forward the Debtors' Libra Complaint to

the registered holder of each Libra Note, (2) sending the Debtors' Libra Complaint directly to the original holders of the Libra Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates), (3) publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days, and (4) any other method required by the court;

(b)    a judgment (the "Libra Judgment") is entered by the Bankruptcy Court in either of the foregoing proceedings declaring the Libra Early Termination to be invalid and without force and effect;

(c)    the Libra Judgment includes, among others, the following findings and holdings:

(i)    the manner in which notice of the Libra Termination Claim was provided to the Libra Noteholders and all other parties entitled to such notice effected proper service and is adequate, appropriate, reasonable and sufficient for all purposes and is approved; and

(ii)    the Libra Judgment is and shall be binding on the Other Libra Parties and each of their predecessors and successors; and

(d)    the Libra Judgment (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the Libra Judgment and the time for any further appeals has expired;

*provided that* SG shall have the right, in its sole and absolute discretion, to waive any of the foregoing Libra Assignment Closing Conditions *other than* the Libra Assignment Closing Conditions set forth in underlined clauses (b) or (d) above, with the effect that any Libra Assignment Closing Condition so waived shall be deemed to have been satisfied for purposes of this Settlement Agreement.

1.35    "Libra Assignment Closing Date" shall mean the first date on which the Libra Assignment Closing Conditions shall have been satisfied.

1.36    "Libra Assignment Determinations" shall mean the following findings and holdings:

(a)    approval of the Libra CDSA Assignment, including but not limited to the closing conditions set forth therein in respect of (x) the assumption of the Libra CDSA by LBSF and (y) the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations as "buyer" and "calculation agent" under the Libra CDSA;

(b)    the Debtors are authorized to (x) enter into and perform each of their respective obligations under the Libra CDSA Assignment and all related agreements and (y) execute all further documents and take such further steps necessary and appropriate to effectuate the purposes of the Libra CDSA Assignment;

(c)     notice of the Libra CDSA Assignment (including, where applicable, notice through DTC), given in accordance with the methods set forth in subsections (i)-(iii) below, to the Libra Noteholders, all other parties in interest to the Libra CDSA and the Libra Indenture and to any other persons entitled to such notice in the Bankruptcy Case, constitutes sufficient notice of the Libra CDSA Assignment to such persons:

(i)     sending the Settlement Motion to each such person; *provided, that* in the case of the Libra Noteholders, the Settlement Motion shall be sent (1) to each Libra Noteholder care of the Libra Trustee, as the Libra Note Registrar, with instructions to the Libra Trustee to forward the Settlement Motion to the registered holder of each Libra Note and (2) directly to the original holders of the Libra Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates);

(ii)     publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days; and

(iii)     any other method required by the court;

(d)     any objections to the Libra CDSA Assignment, if not then withdrawn, are deemed to have been waived or are overruled;

(e)     the transactions contemplated in and evidenced by the Libra CDSA Assignment shall not be prohibited under the terms of the Libra CDSA, the Libra Indenture or any other agreement, or, alternatively, shall be deemed to be consistent with the terms of the Libra CDSA, the Libra Indenture and any other agreement;

(f)     any provisions in the Libra CDSA, the Libra Indenture or any other agreement (i) that prohibit, restrict, or condition the Libra CDSA Assignment or the transactions contemplated thereby (including, without limitation, any purported prerequisite that the Libra Rating Condition be satisfied), (ii) that require the consent of Libra or any other person in order for the Libra CDSA Assignment to be valid, or (iii) that allow Libra as a party thereto, or any other third parties, to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition in respect of the Libra CDSA, the Libra CDS Transactions, the Libra Indenture or any other agreement upon or as a result of the assignment of the Libra CDSA and the Libra CDS Transactions are deemed (as applicable) satisfied or void and of no force and effect as to the Libra CDSA Assignment;

(g)     the rights and obligations to be assigned to SG by the Libra CDSA Assignment are property of LBSF's estate that will be assigned free and clear of any adverse claims;

(h)     the Libra CDSA Assignment was negotiated extensively in good faith and at arms' length without any collusion by the Debtors and SG and entered into in good faith by the Debtors and SG;

(i)     the assumption of the Libra CDSA by LBSF and the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations under the Libra CDSA will each take effect, automatically and without any additional court order or action, upon satisfaction of the closing conditions set forth in the Libra CDSA Assignment;

(j)     with effect as of the Libra Assignment Closing Date, SG, as a successor credit protection buyer, would be permitted to trigger any and all Libra Floating Amount Events and Libra Credit Events that occurred during the period beginning on October 10, 2008 and ending on the Libra Assignment Closing Date, regardless of the passage of time from the date on which any such Libra Floating Amount Event or Libra Credit Event has occurred;

(k)     the Debtors are permitted to unilaterally defer the payment due date in respect of any payment payable to them under the Libra CDSA and the deferral contemplated in Section 7.4 of the Settlement Agreement shall be binding on the Other Libra Parties and is hereby authorized and approved;

(l)     the rating requirement set forth in clause (ii)(A) of the definition of "Rating Requirement" in each of the Libra CDSA Confirmations shall be satisfied with respect to a "buyer" whose long-term debt obligations, or the long-term debt obligations of its "credit support provider," are rated "A+" by Standard & Poor's if the Libra Rating Condition with respect to Standard & Poor's has been obtained; and

(m)     at least one of the following:

(i)     the maximum aggregate amount of all Libra Credit Protection Payments and Libra CDS Termination Payments payable by Libra from time to time under the Libra CDSA shall be reduced to an amount equal to the aggregate funds available to Libra for making Libra Credit Protection Payments and Libra CDS Termination Payments without implicating the Libra Senior Swap, with the effect that draws on the Libra Senior Swap are forever rendered impossible; *provided* that, without limiting the foregoing, in no event shall Libra be required to pay any Libra Credit Protection Payment or Libra CDS Termination Payment that would leave Libra with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the Libra Indenture), the amounts required to be paid by Libra on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Libra Indenture; or

(ii)     with effect as of the Libra Assignment Closing Date, (x) the "buyer" and the "calculation agent" under the Libra CDSA shall have full discretion as to when and if to deliver notices of Libra Floating Amounts due with respect to outstanding Libra Floating Amount Events under the Libra CDSA and full discretion to seek an amount equal to less than the Libra Floating Amount due to the "buyer" under the Libra CDSA in respect of any outstanding Libra Floating Amount Events; *provided* that in no event shall SG seek an amount that would leave Libra with insufficient funds to pay, on the immediately following Quarterly

Distribution Date (as defined in the Libra Indenture), the amounts required to be paid by Libra on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Libra Indenture; (y) the exercise of such discretion by the "calculation agent" or the "buyer" under the Libra CDSA shall be deemed to satisfy any applicable timing requirements under the Libra CDSA and, in the case of the "calculation agent," any applicable obligation under Section 1.14 of the 2003 ISDA Credit Derivatives Definitions; and (z) either (A) all funds drawn by Libra from the Libra Senior Swap must be paid directly by the Libra Senior Swap Counterparty to the "buyer" under the Libra CDSA as the party rightfully entitled to such funds or (B) all funds drawn by Libra from the Libra Senior Swap may be retained by the Libra Senior Swap Counterparty, as irrevocable assignee of the "buyer" under the Libra CDSA and party rightfully entitled to such funds;

*provided that* SG shall have the right, in its sole and absolute discretion, to waive the requirement that one or more of the foregoing findings and/or holdings be included in the Settlement Approval Order, in which case the "Libra Assignment Determinations" shall mean all of the foregoing findings and/or holdings other than those explicitly waived by SG.

1.37    "Libra CDSA" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.38    "Libra CDSA Assignment" shall mean an agreement, substantially in the form attached hereto as Exhibit 2, for the assumption, assignment and sale of the Libra CDSA. The Libra CDSA Assignment will provide that LBSF assumes the Libra CDSA and assigns to SG, and SG assumes, all of LBSF's rights, duties and obligations under the Libra CDSA, with effect, automatically and without any additional court order or action, from and including the Libra Assignment Closing Date.

1.39    "Libra CDS Termination Payment" shall mean a "CDS Termination Payment" as defined in the Libra Indenture.

1.40    "Libra CDS Transactions" shall mean the "CDS Agreement Transactions" as defined in the Libra Indenture.

1.41    "Libra Collateral Manager" shall mean the "Collateral Manager" as defined in the Libra Indenture.

1.42    "Libra Credit Event" shall mean a "Credit Event" as defined in the Libra CDSA.

1.43    "Libra Credit Protection Payment" shall mean "Credit Protection Payment" as defined in the Libra Indenture.

1.44    "Libra Credit Protection Premium" shall mean the amount specified as "Fixed Amount" in the Libra CDSA.

1.45    "Libra Early Termination" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.46 "Libra Floating Amount" shall mean a "Floating Amount" as defined in the Libra CDSA.

1.47 "Libra Floating Amount Event" shall mean a "Floating Amount Event" as defined in the Libra CDSA.

1.48 "Libra Funds" shall have the meaning set forth in Section 9.10(b) hereof.

1.49 "Libra Funds Advance Reimbursement Date" shall mean the Business Day following the Business Day on which any Libra Funds on deposit in the Global Escrow Account constituting Disbursable Recoveries are no longer subject to reimbursement under the Libra CDSA.

1.50 "Libra Funds Settlement Distribution Date" shall mean any Business Day following the First Libra Funds Settlement Distribution Date on which Libra Funds on deposit in the Global Escrow Account are no longer subject to reimbursement under the Libra CDSA.

1.51 "Libra Indenture" shall mean the Indenture, dated as of October 17, 2006, by and among Libra, as issuer, Libra CDO, LLC, as co-issuer, and the Libra Trustee, as amended, supplemented, waived or otherwise modified from time to time.

1.52 "Libra Interim Period" shall mean the time period beginning on the date of the Libra Judgment, up to and including the Libra Assignment Closing Date.

1.53 "Libra Issuer Collateral Account" shall mean the "Issuer Collateral Account" as defined in the Libra Indenture.

1.54 "Libra Judgment" shall have the meaning set forth in Section 1.34(b) hereof.

1.55 "Libra Note Registrar" shall mean the "Note Registrar" as defined in the Libra Indenture.

1.56 "Libra Noteholder" shall mean a "Noteholder" as defined in the Libra Indenture.

1.57 "Libra Notes" shall mean the "Notes" as defined in the Libra Indenture.

1.58 "Libra Parties' Adversary Proceeding" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.59 "Libra Physical Settlement Amount" shall mean a "Physical Settlement Amount" as defined in the Libra CDSA.

1.60 "Libra Principal Collection Account" shall mean the "Principal Collection Account" as defined in the Libra Indenture.

1.61 "Libra Priority Claim" shall mean LBSF's claims concerning the enforceability of contractual payment priority provisions with respect to the Remaining Libra Assets.

1.62 "Libra Rating Condition" shall mean the "Rating Condition" as defined in the Libra Indenture.

1.63 "Libra Reimbursement Escrow Account" shall have the meaning set forth in Section 9.8(a) hereof.

1.64 "Libra Reserve Account" shall mean the "Reserve Account" as defined in the Libra Indenture.

1.65 "Libra Senior Swap" shall mean, collectively, the ISDA Master Agreement, Schedule, Credit Support Annex and Confirmation, each dated as of October 17, 2006, between Libra and the Libra Senior Swap Counterparty.

1.66 "Libra Senior Swap Counterparty" shall mean SG.

1.67 "Libra Termination Claim" shall mean, collectively, all of LBSF's claims in respect of the validity and/or effectiveness of the Libra Early Termination.

1.68 "Libra Termination Claim Preconditions" shall have the meaning set forth in Section 3.2 hereof.

1.69 "Libra Transaction" shall mean the Libra CDO Limited transaction relating to, among others, the (i) Libra CDSA, (ii) Libra Senior Swap, and (iii) Libra Indenture.

1.70 "Libra Triggering Sequence" shall mean the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events in the following order: *first*, all Libra Credit Protection Payments for which the reimbursement period under the Libra CDSA has ended (without regard to any specific order) and, *second*, the remaining Libra Credit Protection Payments, starting with that Libra Credit Protection Payment for which the remaining reimbursement period under the Libra CDSA is the shortest followed by the Libra Credit Protection Payment for which the remaining reimbursement period is the second shortest and so forth until that Libra Credit Protection Payment for which the remaining reimbursement period is the longest.

1.71 "Libra Trustee" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.72 "Libra Uninvested Proceeds Account" shall mean the "Uninvested Proceeds Account" as defined in the Libra Indenture.

1.73 "Other Libra Parties" shall mean, collectively, Libra, the Libra Trustee, the Libra Collateral Manager and the Libra Noteholders.

1.74 "Other Vela Parties" shall mean, collectively, Vela, the Vela Trustee, the Vela Collateral Manager and the Vela Noteholders.

1.75 "Parties" shall have the meaning set forth in the preamble hereof.

1.76 "Payment Date" shall mean the 5th Business Day after the Settlement Effective Date.

1.77 "Permitted Investments" shall mean short-term highly-liquid investments to be agreed upon by the Parties prior to the Payment Date.

1.78 "Permitted Netting" shall mean (x) with respect to the Libra CDSA, a netting under the Libra CDSA of any Libra Credit Protection Premium and/or reimbursement payment in respect of any Libra Credit Protection Payment payable by SG and/or the Debtors to Libra on a specific date against an outstanding Libra Credit Protection Payment that is owed by Libra to SG and/or the Debtors on such date; *provided* that either (i) such Libra Credit Protection Payment is not subject to reimbursement under the Libra CDSA on such date or (ii) the Party effecting the netting remits to the Global Escrow Account on such date an amount equal to the Libra Credit Protection Payment against which the netting is effected, in which case the amount remitted to the Global Escrow Account shall constitute an Advance by the remitting Party and the reimbursement period applicable to the amount remitted to the Global Escrow Account shall be equal to the reimbursement period applicable to the Libra Credit Protection Payment against which the netting is effected; and *provided further* that the amount of any Permitted Netting that would result in Libra having insufficient funds to pay, on the Quarterly Distribution Date (as defined in the Libra Indenture) immediately following the date on which such Permitted Netting is effected, the amounts required to be paid by Libra on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Libra Indenture will be automatically reduced to such lesser amount that would not result in such deficiency, and (y) with respect to the Vela CDSA, a netting under the Vela CDSA of any Vela Credit Protection Premium and/or reimbursement payment in respect of any Vela Credit Protection Payment payable by SG and/or the Debtors to Vela on a specific date against an outstanding Vela Credit Protection Payment that is owed by Vela to SG and/or the Debtors on such date; *provided* that either (i) such Vela Credit Protection Payment is not subject to reimbursement under the Vela CDSA on such date or (ii) the Party effecting the netting remits to the Global Escrow Account on such date an amount equal to the Vela Credit Protection Payment against which the netting is effected, in which case the amount remitted to the Global Escrow Account shall constitute an Advance by the remitting Party and the reimbursement period applicable to the amount remitted to the Global Escrow Account shall be equal to the reimbursement period applicable to the Vela Credit Protection Payment against which the netting is effected; and *provided further* that the amount of any Permitted Netting that would result in Vela having insufficient funds to pay, on the Quarterly Distribution Date (as defined in the Vela Indenture) immediately following the date on which such Permitted Netting is effected, the amounts required to be paid by Vela on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Vela Indenture will be automatically reduced to such lesser amount that would not result in such deficiency.

1.79 "Person" shall mean any natural person, entity, estate, trust, union or employee organization or governmental authority.

1.80    "Plan" shall mean, collectively, the joint chapter 11 plans of liquidation for the Debtors and certain other affiliates of LBHI, filed on April 15, 2010, as subsequently amended in accordance with the provisions thereof and applicable bankruptcy law or any other chapter 11 plan in the Bankruptcy Case of which the Debtors are proponents.

1.81    "Premium Advance" shall mean any out-of-pocket Libra Credit Protection Premium or Vela Credit Protection Premium paid by SG or the Debtors under the Libra CDSA or the Vela CDSA, respectively, following the date of this Settlement Agreement.

1.82    "Remaining Libra Assets" shall mean the assets of Libra, other than its rights under the Libra CDSA and the Libra Senior Swap, which as of September 5, 2010 were comprised of (i) approximately $48,533,031 of cash assets and (ii) the ABS and CDO securities listed on Schedule B hereto.

1.83    "Remaining Vela Assets" shall mean the assets of Vela, other than its rights under the Vela CDSA and the Vela Senior Swap, which as of September 20, 2010 were comprised of approximately $144,755,641 of cash assets.

1.84    "Settlement Agreement" shall have the meaning set forth in the preamble hereof.

1.85    "Settlement Approval Determinations" shall have the meaning set forth in Section 1.86 hereof.

1.86    "Settlement Approval Order" shall mean an order entered by the Bankruptcy Court, in form and substance satisfactory to the Parties, approving all of the terms of the Settlement Agreement that includes, but is not limited to, in substance, the findings and holdings listed below (the "Settlement Approval Determinations"), and, if the court so holds, that may also include the Libra Assignment Determinations and/or the Vela Assignment Determinations:

(a)    The manner in which notice of the Settlement Motion was provided to all parties entitled to such notice is adequate, appropriate, reasonable and sufficient for all purposes and is approved;

(b)    The Settlement Approval Order and the Settlement Agreement are and shall be binding on the Debtors, SG and each of their predecessors and successors;

(c)    The execution and delivery of the Settlement Agreement by the Parties and the settlement and compromises set forth therein are approved;

(d)    The compromises and settlement set forth in the Settlement Agreement are fair and reasonable to, and are in the best interest of, the Debtors, and, in entering into the Settlement Agreement, the Debtors have exercised sound business judgment and the Debtors' entry into the Settlement Agreement is reasonable under the circumstances;

(e)    The releases contained in the Settlement Agreement shall be effective as of the Payment Date, and each Party shall be deemed to have released and is permanently

enjoined from asserting, pursuing or prosecuting in any manner and in any forum any and all claims released pursuant to the Settlement Agreement; *provided that* LBSF shall be permitted to (i) pursue the Libra Termination Claim and the Libra Priority Claim as against the Other Libra Parties (but in the case of the Libra Termination Claim, only if the Libra Termination Claim Preconditions have been satisfied) and (ii) pursue the Vela Termination Claim and Vela Priority Claim as against the Other Vela Parties (but in the case of the Vela Termination Claim, only if the Vela Termination Claim Preconditions have been satisfied);

(f)    Prosecution of Debtors' claims in the Libra Adversary Proceedings, as against SG, shall be stayed pending the Payment Date and satisfaction of the SG Payment, at which time they will be dismissed with prejudice.  Prosecution of Debtors' claims in the Libra Adversary Proceedings, as against Libra and the Libra Trustee, shall be stayed, and the Debtors shall not prosecute or in any litigation take a position regarding the Libra Termination Claim, as against the Other Libra Parties, in each case, unless and until LBSF and SG shall have entered into the Libra CDSA Assignment;

(g)    The Debtors shall not prosecute or in any litigation take a position regarding the Vela Termination Claim, as against the Other Vela Parties, unless and until LBSF and SG shall have entered into the Vela CDSA Assignment;

(h)    The Libra CDSA shall only be assumed by LBSF as part of the Libra CDSA Assignment and no party other than SG may become LBSF's assignee under the Libra CDSA;

(i)    The Vela CDSA shall only be assumed by LBSF as part of the Vela CDSA Assignment and no party other than SG may become LBSF's assignee under the Vela CDSA; and

(j)    The terms of this Settlement Agreement and/or the Settlement Approval Order shall not be modified, altered or amended by any Plan or any order confirming a Plan in the Bankruptcy Case;

*provided that* SG shall have the right, in its sole and absolute discretion, to waive the requirement that one or more of the foregoing findings and/or holdings described in clauses (f) through (j) above be included in the Settlement Approval Order, in which case the "Settlement Approval Determinations" shall mean all of the foregoing findings and/or holdings other than those explicitly waived by SG.

1.87    "Settlement Date" shall mean September 20, 2010.

1.88    "Settlement Effective Date" shall mean the first date on which all of the following shall have occurred:

(a)    The Settlement Approval Order has been entered by the Bankruptcy Court;

(b)     The Settlement Approval Order has not been stayed and the time for any motion to stay has expired; and

(c)     The Settlement Approval Order (i) has not been appealed and the time for any appeals has expired, or (ii) was appealed and all appeals have been dismissed or have resulted in the affirmance of the Settlement Approval Order, and the time for any further appeals has expired.

1.89    "Settlement Motion" shall mean a motion, substantially in the form attached hereto as Exhibit 1, that would be filed by the Debtors with the Bankruptcy Court in accordance with this Settlement Agreement, and would seek, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Sections 363 and 365 of the Bankruptcy Code, court approval of (i) this Settlement Agreement, (ii) the Libra CDSA Assignment and (iii) the Vela CDSA Assignment.

1.90    "Settlement Motion is Denied with Finality" shall mean that the Settlement Motion has been denied and such denial (1) has not been appealed and the time for any appeals has expired or (2) was appealed and all appeals have been dismissed or have resulted in the affirmance of the denial of the Settlement Motion, and the time for any further appeals has expired.

1.91    "SG" shall have the meaning set forth in the preamble hereof.

1.92    "SG Escrow Agent" shall have the meaning set forth in Section 6.3(a) hereof.

1.93    "SG Guarantee" shall have the meaning set forth in Section 7.2 hereof.

1.94    "SG Guarantee Payment Date" shall have the meaning set forth in Section 10.1 hereof.

1.95    "SG Indemnification Cap" shall have the meaning set forth in Section 8.2(a) hereof.

1.96    "SG Litigation Expense" shall mean all legal fees and expenses incurred by SG in defense of any SG Parties Indemnified Claim.

1.97    "SG Parties Indemnified Claims" shall have the meaning set forth in Section 8.1 hereof.

1.98    "SG Payment" shall have the meaning set forth in Section 7.1 hereof.

1.99    "SSA Recoveries" shall mean (x) in the case of the Libra Transaction, any recovery from Libra or the Libra Trustee that directly or indirectly relates to a funding under the Libra Senior Swap and (y) in the case of the Vela Transaction, any recovery from Vela or the Vela Trustee that directly or indirectly relates to a funding under the Vela Senior Swap.

1.100 "UCC" shall mean the Uniform Commercial Code as in effect in the State of New York.

1.101 "Vela" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.102 "Vela Assignment Closing Conditions" shall mean all of the following:

(a) either:

(i) the Vela Trustee has initiated an interpleader proceeding and named all Vela Noteholders as defendants; or

(ii) the Debtors have filed an adversary proceeding asserting the Vela Termination Claim (the "Vela Complaint"), naming the Vela Noteholders as defendants, and have notified the Vela Noteholders through each of the following methods: (1) sending the Vela Complaint to each Vela Noteholder care of the Vela Trustee, as the Vela Note Registrar, with instructions to the Vela Trustee to forward the Vela Complaint to the registered holder of each Vela Note, (2) sending the Vela Complaint directly to the original holders of the Vela Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates), (3) publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days and (4) any other method required by the court;

(b) a judgment (the "Vela Judgment") is entered by the Bankruptcy Court in either of the foregoing proceedings declaring the Vela Early Termination to be invalid and without force and effect;

(c) the Vela Judgment includes, among others, the following findings and holdings:

(i) the manner in which notice of the Vela Termination Claim was provided to the Vela Noteholders and all other parties entitled to such notice effected proper service and is adequate, appropriate, reasonable and sufficient for all purposes and is approved; and

(ii) the Vela Judgment is and shall be binding on the Other Vela Parties and each of their predecessors and successors; and

(d) the Vela Judgment (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the Vela Judgment and the time for any further appeals has expired;

*provided that* SG shall have the right, in its sole and absolute discretion, to waive any of the foregoing Vela Assignment Closing Conditions *other than* the Vela Assignment Closing Conditions set forth in clauses (b) or (d) above, with the effect that any Vela Assignment

Closing Condition so waived shall be deemed to have been satisfied for purposes of this Settlement Agreement.

1.103 "Vela Assignment Closing Date" shall mean the first date on which the Vela Assignment Closing Conditions shall have been satisfied.

1.104 "Vela Assignment Determinations" shall mean the following findings and holdings:

(a) approval of the Vela CDSA Assignment, including but not limited to the closing conditions set forth therein in respect of (x) the assumption of the Vela CDSA by LBSF and (y) the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations as "buyer" and "calculation agent" under the Vela CDSA;

(b) the Debtors are authorized to (x) enter into and perform each of their respective obligations under the Vela CDSA Assignment and all related agreements and (y) execute all further documents and take such further steps necessary and appropriate to effectuate the purposes of the Vela CDSA Assignment;

(c) notice of the Vela CDSA Assignment (including, where applicable, notice through DTC), given in accordance with all of the methods set forth in subsections (i)-(iii) below, to the Vela Noteholders, all other parties in interest to the Vela CDSA and the Vela Indenture and to any other persons entitled to such notice in the Bankruptcy Case, constitutes sufficient notice of the Vela CDSA Assignment to such persons:

(i) sending the Settlement Motion to each such person; *provided, that* in the case of the Vela Noteholders, the Settlement Motion shall be sent (1) to each Vela Noteholder care of the Vela Trustee, as the Vela Note Registrar, with instructions to the Vela Trustee to forward the Settlement Motion to the registered holder of each Vela Note and (2) directly to the original holders of the Vela Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates);

(ii) publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days; and

(iii) any other method required by the court;

(d) any objections to the Vela CDSA Assignment, if not then withdrawn, are deemed to have been waived or are overruled;

(e) the transactions contemplated in and evidenced by the Vela CDSA Assignment shall not be prohibited under the terms of the Vela CDSA, the Vela Indenture or any other agreement, or, alternatively, shall be deemed to be consistent with the terms of the Vela CDSA, the Vela Indenture and any other agreement;

(f)     any provisions in the Vela CDSA, the Vela Indenture or any other agreement (i) that prohibit, restrict, or condition the Vela CDSA Assignment or the transactions contemplated thereby (including, without limitation, any purported prerequisite that the Vela Rating Condition be satisfied), (ii) that require the consent of Vela or any other person in order for the Vela CDSA Assignment to be valid, or (iii) that allow Vela as a party thereto, or any other third parties, to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition in respect of the Vela CDSA, the Vela CDS Transactions, the Vela Indenture or any other agreement upon or as a result of the assignment of the Vela CDSA and the Vela CDS Transactions are deemed (as applicable) satisfied or void and of no force and effect as to the Vela CDSA Assignment;

(g)     the rights and obligations to be assigned to SG by the Vela CDSA Assignment are property of LBSF's estates that will be assigned free and clear of any adverse claims;

(h)     the Vela CDSA Assignment was negotiated extensively in good faith and at arms' length without any collusion by the Debtors and SG and entered into in good faith by the Debtors and SG;

(i)     the assumption of the Vela CDSA by LBSF and the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations under the Vela CDSA will each take effect, automatically and without any additional court order or action, upon satisfaction of the closing conditions set forth in the Vela CDSA Assignment;

(j)     with effect as of the Vela Assignment Closing Date, SG, as a successor credit protection buyer, would be permitted to trigger any and all Vela Floating Amount Events and Vela Credit Events that occurred during the period beginning on September 30, 2008 and ending on the Vela Assignment Closing Date, regardless of the passage of time from the date on which any such Vela Floating Amount Event or Vela Credit Event has occurred;

(k)     the Debtors are permitted to unilaterally defer the payment due date in respect of any payment payable to them under the Vela CDSA and the deferral contemplated in Section 7.5 of the Settlement Agreement shall be binding on the Other Vela Parties and is hereby authorized and approved; and

(l)     at least one of the following:

(i)     the maximum aggregate amount of all Vela Credit Protection Payments, Vela CDS Termination Payments, Vela Premium Reserve payments and Vela Net Issuer Premium payments payable by Vela from time to time under the Vela CDSA shall be reduced to an amount equal to the aggregate funds available to Vela for making Vela Credit Protection Payments, Vela CDS Termination Payments, Vela Premium Reserve payments and Vela Net Issuer Premium payments without implicating the Vela Senior Swap, with the effect that

draws on the Vela Senior Swap are forever rendered impossible; *provided* that, without limiting the foregoing, in no event shall Vela be required to pay any Vela Credit Protection Payment, Vela CDS Termination Payment, Vela Premium Reserve payment or Vela Net Issuer Premium payment that would leave Vela with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the Vela Indenture), the amounts required to be paid by Vela on such Distribution Date under <u>Sections 11.1(i)(A)</u>, <u>(B)</u>, <u>(C)</u>, <u>(D)</u> and <u>(E)</u> and <u>11.1(ii)(A)</u> of the Vela Indenture; or

(ii)    with effect as of the Vela Assignment Closing Date, (x) the "buyer" and the "calculation agent" under the Vela CDSA shall have full discretion as to when and if to deliver notices of Vela Floating Amounts due with respect to Vela Floating Amount Events under the Vela CDSA and full discretion to seek an amount equal to less than the Vela Floating Amount due to the "buyer" under the Vela CDSA in respect of such Vela Floating Amount Events; *provided* that in no event shall SG seek an amount that would leave Vela with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the Vela Indenture), the amounts required to be paid by Vela on such Distribution Date under <u>Sections 11.1(i)(A)</u>, <u>(B)</u>, <u>(C)</u>, <u>(D)</u> and <u>(E)</u> and <u>11.1(ii)(A)</u> of the Vela Indenture; (y) the exercise of such discretion by the "calculation agent" or the "buyer" under the Vela CDSA shall be deemed to satisfy any applicable timing requirements under the Vela CDSA and, in the case of the "calculation agent," any applicable obligation under Section 1.14 of the 2003 ISDA Credit Derivatives Definitions; and (z) either (A) all funds drawn by Vela from the Vela Senior Swap must be paid directly by the Vela Senior Swap Counterparty to the "buyer" under the Vela CDSA as the party rightfully entitled to such funds or (B) all funds drawn by Vela from the Vela Senior Swap may be retained by the Vela Senior Swap Counterparty, as irrevocable assignee of the "buyer" under the Vela CDSA and party rightfully entitled to such funds;

*provided that* SG shall have the right, in its sole and absolute discretion, to waive the requirement that one or more of the foregoing findings and/or holdings be included in the Settlement Approval Order, in which case the "Vela Assignment Determinations" shall mean all of the foregoing findings and/or holdings other than those explicitly waived by SG.

1.105  "<u>Vela CDS Termination Payment</u>" shall mean an "Issuer CDS Termination Payment" as defined in the Vela Indenture.

1.106  "<u>Vela CDS Transaction</u>" shall mean a "CDS Agreement Transaction" as defined in the Vela Indenture.

1.107  "<u>Vela CDSA</u>" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.108  "<u>Vela CDSA Assignment</u>" shall mean an agreement, substantially in the form attached hereto as <u>Exhibit 3</u>, for the assumption, assignment and sale of the Vela CDSA. The Vela CDSA Assignment will provide that LBSF assumes the Vela CDSA and assigns to SG,

and SG assumes, all of LBSF's rights, duties and obligations as "buyer" and "calculation agent" under the Vela CDSA, with effect, automatically and without any additional court order or action, from and including the Vela Assignment Closing Date.

1.109 "<u>Vela Collateral Manager</u>" shall mean the "Collateral Manager" as defined in the Vela Indenture.

1.110 "<u>Vela Complaint</u>" shall have the meaning set forth in <u>Section 1.102(a)(ii)</u>.

1.111 "<u>Vela Credit Event</u>" shall mean a "Credit Event" as defined in the Vela CDSA.

1.112 "<u>Vela Credit Protection Payment</u>" shall mean a "Floating Payment" as defined in the Vela Indenture.

1.113 "<u>Vela Credit Protection Premium</u>" shall mean the amount specified as "Fixed Amount" in the Vela CDSA.

1.114 "<u>Vela Early Termination</u>" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.115 "<u>Vela Floating Amount</u>" shall mean a "Floating Amount" as defined in the Vela CDSA.

1.116 "<u>Vela Floating Amount Event</u>" shall mean a "Floating Amount Event" as defined in the Vela CDSA.

1.117 "<u>Vela Funds</u>" shall have the meaning set forth in <u>Section 9.10(c)</u> hereof.

1.118 "<u>Vela Funds Advance Reimbursement Date</u>" shall mean the Business Day following the Business Day on which any Vela Funds on deposit in the Global Escrow Account constituting Disbursable Recoveries are no longer subject to reimbursement under the Vela CDSA.

1.119 "<u>Vela Funds Settlement Distribution Date</u>" shall mean any Business Day following the First Vela Funds Settlement Distribution Date on which Vela Funds on deposit in the Global Escrow Account are no longer subject to reimbursement under the Vela CDSA.

1.120 "<u>Vela Indenture</u>" shall mean the Indenture, dated as of November 16, 2006, by and among Vela, as issuer, MKP Vela CBO, LLC, as co-issuer, and the Vela Trustee, as amended, supplemented, waived or otherwise modified from time to time.

1.121 "<u>Vela Interim Period</u>" shall mean the time period beginning on the date of the Vela Judgment, up to and including the Vela Assignment Closing Date.

1.122 "<u>Vela Judgment</u>" shall have the meaning set forth in <u>Section 1.102(b)</u> hereof.

1.123 "<u>Vela Net Issuer Premium</u>" shall mean a "Net Issuer Premium" as defined in the Vela Indenture.

1.124 "<u>Vela Note Registrar</u>" shall mean the "Note Registrar" as defined in the Vela Indenture.

1.125 "<u>Vela Noteholders</u>" shall mean the "Noteholders" as defined in the Vela Indenture.

1.126 "<u>Vela Notes</u>" shall mean the "Notes" as defined in the Vela Indenture.

1.127 "<u>Vela Physical Settlement Amount</u>" shall mean a "Physical Settlement Amount" as defined in the Vela CDSA.

1.128 "<u>Vela Premium Reserve</u>" shall mean a "Premium Reserve" as defined in the Vela Indenture.

1.129 "<u>Vela Principal Collection Account</u>" shall mean the "Principal Collection Account" as defined in the Vela Indenture.

1.130 "<u>Vela Priority Claim</u>" shall mean LBSF's claims concerning the enforceability of contractual payment priority provisions with respect to the Remaining Vela Assets.

1.131 "<u>Vela Rating Condition</u>" shall mean the "Rating Condition" as defined in the Vela Indenture.

1.132 "<u>Vela Reimbursement Escrow Account</u>" shall have the meaning set forth in <u>Section 9.9(a)</u> hereof.

1.133 "<u>Vela Reserve Account</u>" shall mean the "Reserve Account" as defined in the Vela Indenture.

1.134 "<u>Vela Senior Swap</u>" shall mean, collectively, the ISDA Master Agreement, Schedule, Credit Support Annex and Confirmation, each dated November 16, 2006, between Vela and the Vela Senior Swap Counterparty.

1.135 "<u>Vela Senior Swap Counterparty</u>" shall mean SG.

1.136 "<u>Vela Termination Claim</u>" shall mean, collectively, all of LBSF's claims in respect of the validity and/or effectiveness of the Vela Early Termination.

1.137 "<u>Vela Termination Claim Preconditions</u>" shall have meaning set forth in <u>Section 4.2</u> hereof.

1.138 "<u>Vela Transaction</u>" shall mean the MKP Vela CBO, Ltd. transaction relating to, among others, the (i) Vela CDSA, (ii) Vela Senior Swap, and (iii) Vela Indenture.

1.139 "Vela Triggering Sequence" shall mean the triggering of Vela Credit Protection Payments in respect of outstanding Vela Floating Amount Events in the following order: *first*, all Vela Credit Protection Payments for which the reimbursement period under the Vela CDSA has ended (without regard to any specific order) and, *second*, the remaining Vela Credit Protection Payments, starting with that Vela Credit Protection Payment for which the remaining reimbursement period under the Vela CDSA is the shortest followed by the Vela Credit Protection Payment for which the remaining reimbursement period is the second shortest and so forth until that Vela Credit Protection Payment for which the remaining reimbursement period is the longest.

1.140 "Vela Trustee" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.141 "Vela Uninvested Proceeds Account" shall mean the "Uninvested Proceeds Account" as defined in the Vela Indenture.

2.    Suspension of Parties' Claims in respect of the Libra Early Termination and the Vela Early Termination.  The Parties agree that, as of the Settlement Date, their respective claims in respect of the Libra Early Termination and the Vela Early Termination shall be stayed and suspended, as follows:

2.1    Prosecution of (i) Debtors' claims in the Libra Adversary Proceedings, as against SG, and (ii) SG's claims in the Libra Adversary Proceedings, as against the Debtors, shall, in each case, be stayed until either (x) the Payment Date, at which time they will be dismissed with prejudice, or (y) the Settlement Motion is Denied with Finality.

2.2    Prosecution of the Libra Termination Claim in the Libra Adversary Proceedings, as against Libra and the Libra Trustee, shall be stayed, and the Debtors shall not prosecute or in any litigation take a position regarding the Libra Termination Claim, as against the Other Libra Parties, in each case, until either (i) the date on which the Libra Termination Claim Preconditions shall have been satisfied or (ii) the Settlement Motion is Denied with Finality.

2.3    The Debtors shall not prosecute or in any litigation take a position regarding the Vela Termination Claim, (i) as against SG, until either (x) the Payment Date, at which time SG will be released from the Vela Termination Claim, or (y) the Settlement Motion is Denied with Finality, and (ii) as against the Other Vela Parties until either (x) the date on which the Vela Termination Claim Preconditions shall have been satisfied or (y) the Settlement Motion is Denied with Finality.

2.4    SG shall not prosecute or in any litigation take a position regarding any claims in respect of the Vela Transaction, as against the Debtors, until either (i) the Payment Date, at which time the Debtors will be released from such claims, or (ii) the Settlement Motion is Denied with Finality.

3. **Execution and Delivery of the Libra CDSA Assignment; Pursuit of the Libra Termination Claim and/or the Libra Priority Claim**.

3.1     If, on the Settlement Effective Date, the Settlement Approval Order includes the Libra Assignment Determinations, LBSF and SG shall execute and deliver the Libra CDSA Assignment as soon as reasonably practicable and no later than the Payment Date, it being understood and agreed that:

(a)     the assumption of the Libra CDSA by LBSF and the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations under the Libra CDSA will each take effect, automatically and without any additional court order or action, on the Libra Assignment Closing Date;

(b)     notwithstanding Debtors' entry into the Libra CDSA Assignment, at any time prior to the entry by the Bankruptcy Court of the Libra Judgment, LBSF may elect to pursue the Libra Priority Claim in lieu of the Libra Termination Claim; and

(c)     for the avoidance of doubt, the Parties' Payment Date obligations and releases under Section 7 of this Settlement Agreement are not conditioned upon inclusion in the Settlement Approval Order of the Libra Assignment Determinations or the occurrence of the Libra Assignment Closing Date.

3.2     If (w) the Settlement Approval Order, as in effect on the Settlement Effective Date, approves the Libra CDSA Assignment, and expressly includes the Libra Assignment Determinations, (x) all terms and conditions necessary for the Libra CDSA Assignment to be valid have been satisfied or are deemed to be satisfied by the terms of the Settlement Approval Order (as in effect on the Settlement Effective Date) and the Libra Rating Condition with respect to SG's current long-term rating by Standard & Poor's has been obtained or is deemed to have been obtained by the terms of the Settlement Approval Order (as in effect on the Settlement Effective Date), (y) LBSF has delivered to Libra, the Libra Trustee and the Libra Collateral Manager the deferral notice required to be delivered pursuant to Section 7.4 hereof and (z) LBSF and SG have entered into the Libra CDSA Assignment (the conditions set forth in clauses (w), (x), (y) and (z), collectively, the "Libra Termination Claim Preconditions"), LBSF shall be permitted to prosecute or in any litigation take a position regarding the Libra Termination Claim against the Other Libra Parties. For the avoidance of doubt, LBSF shall also be permitted to allege facts to support the Libra Priority Claim in any such proceeding.

3.3     If (w) on the Payment Date the Libra Termination Claim Preconditions have not been satisfied, (x) the Libra Termination Claim Preconditions have been satisfied on or prior to the Payment Date but LBSF elects not to pursue the Libra Termination Claim, (y) LBSF pursues the Libra Termination Claim and prior to the entry by the Bankruptcy Court of the Libra Judgment LBSF elects to abandon the Libra Termination Claim, or (z) LBSF loses the Libra Termination Claim, then, in each case, so long as Libra still has assets with a fair market value in excess of $5,000,000, LBSF shall pursue the Libra Priority Claim against the Other Libra Parties with respect to the Remaining Libra Assets.

4.    Execution and Delivery of the Vela CDSA Assignment; Pursuit of the Vela Termination Claim and/or the Vela Priority Claim.

4.1    If, on the Settlement Effective Date, the Settlement Approval Order includes the Vela Assignment Determinations, LBSF and SG shall execute and deliver the Vela CDSA Assignment as soon as reasonably practicable and no later than the Payment Date, it being understood and agreed that:

(a)    the assumption of the Vela CDSA by LBSF and the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations under the Vela CDSA will each take effect, automatically and without any additional court order or action, on the Vela Assignment Closing Date;

(b)    notwithstanding Debtors' entry into the Vela CDSA Assignment, at any time prior to the entry by the Bankruptcy Court of the Vela Judgment, LBSF may elect to pursue the Vela Priority Claim in lieu of the Vela Termination Claim; and

(c)    for the avoidance of doubt, the Parties' Payment Date obligations and releases under Section 7 of this Settlement Agreement are not conditioned upon inclusion in the Settlement Approval Order of the Vela Assignment Determinations or the occurrence of the Vela Assignment Closing Date.

4.2    If (w) the Settlement Approval Order, as in effect on the Settlement Effective Date, approves the Vela CDSA Assignment, and expressly includes the Vela Assignment Determinations, (x) all terms and conditions necessary for the Vela CDSA Assignment to be valid have been satisfied or are deemed to be satisfied by the terms of the Settlement Approval Order (as in effect on the Settlement Effective Date), (y) LBSF has delivered to Vela, the Vela Trustee and the Vela Collateral Manager the deferral notice required to be delivered pursuant to Section 7.5 hereof and (z) LBSF and SG have entered into the Vela CDSA Assignment (the conditions set forth in clauses (w), (x), (y) and (z), collectively, the "Vela Termination Claim Preconditions"), LBSF shall be permitted to prosecute or in any litigation take a position regarding the Vela Termination Claim against the Other Vela Parties. For the avoidance of doubt, LBSF shall also be permitted to allege facts to support the Vela Priority Claim in any such proceeding.

4.3    If (w) on the Payment Date the Vela Termination Claim Preconditions have not been satisfied, (x) the Vela Termination Claim Preconditions have been satisfied on or prior to the Payment Date but LBSF elects not to pursue the Vela Termination Claim, (y) LBSF pursues the Vela Termination Claim and prior to the entry by the Bankruptcy Court of the Vela Judgment LBSF elects to abandon the Vela Termination Claim, or (z) LBSF loses the Vela Termination Claim, then, in each case, so long as Vela still has assets with a fair market value in excess of $5,000,000, LBSF shall pursue the Vela Priority Claim against the Other Vela Parties with respect to the Remaining Vela Assets.

5.     Restrictions on the Assumption and Assignment of the CDSAs.  The Debtors hereby agree, that, unless the Settlement Motion is Denied with Finality, LBSF shall not do any of the following:

5.1     assume the Libra CDSA other than as part of the Libra CDSA Assignment;

5.2     assume the Vela CDSA other than as part of the Vela CDSA Assignment;

5.3     assign the Libra CDSA or any of its rights and/or obligations thereunder to any party other than SG; and

5.4     assign the Vela CDSA or any of its rights and/or obligations thereunder to any party other than SG.

6.     The Settlement Motion; Establishment of Escrow Accounts.

6.1     The Debtors shall file the Settlement Motion with the Bankruptcy Court no later than September 20, 2010 and do all things necessary and proper to (i) seek approval of the Settlement Motion, (ii) seek entry of the Settlement Approval Order, and (iii) prosecute and defend any motions to stay and any appeals relating to the Settlement Approval Order.

6.2     Promptly following the filing of the Settlement Motion, the Debtors shall effect service of the Settlement Motion on the Libra Noteholders and the Vela Noteholders through each of the following methods:

(a)     sending the Settlement Motion to each Libra Noteholder care of the Libra Trustee, as the Libra Note Registrar, with instructions to the Libra Trustee to forward the Settlement Motion to the registered holder of each Libra Note;

(b)     sending the Settlement Motion directly to the original holders of the Libra Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates);

(c)     sending the Settlement Motion to each Vela Noteholder care of the Vela Trustee, as the Vela Note Registrar, with instructions to the Vela Trustee to forward the Settlement Motion to the registered holder of each Vela Note;

(d)     sending the Settlement Motion directly to the original holders of the Vela Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates);

(e)     publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days; and

(f)     any other method required by the Bankruptcy Court.

6.3    As described in <u>Section 9</u>, SG shall cause the Global Escrow Account, the Libra Reimbursement Escrow Account and the Vela Reimbursement Escrow Account (collectively, the "<u>Escrow Accounts</u>") to be established upon mutually agreeable terms, which terms shall include the following:

(a)    each Escrow Account shall be maintained within the State of New York at Société Générale, New York Branch or at an affiliated broker-dealer organized under the laws of a jurisdiction within the United States and registered as a broker or dealer with the Securities Exchange Commission (as applicable and in such capacity, the "<u>SG Escrow Agent</u>");

(b)    each Escrow Account shall be governed by an agreement under New York law that expressly provides for purposes of Sections 8-110 and 9-304 of the UCC that the jurisdiction of the SG Escrow Agent is the State of New York;

(c)    each Escrow Account shall be held in the name of "Société Générale, New York Branch, as Customer and Entitlement Holder in trust for the benefit of Société Générale, New York Branch, Lehman Brothers Special Financing Inc. and Lehman Brothers Holdings Inc.";

(d)    the SG Escrow Agent shall at all times maintain the Escrow Accounts as separate segregated accounts and shall not commingle the Permitted Investments or other credits to the Escrow Accounts with the assets of SG or any other Person;

(e)    SG shall agree that it shall not create or agree to create or permit to exist any assignment by way of security, charge, right of set-off, any other security interest or any other agreement or arrangement having the commercial effect of conferring security over all or any part of the Escrow Accounts or sell, transfer, assign, factor or otherwise deal with or dispose of all or any part of the Escrow Accounts;

(f)    the SG Escrow Agent shall grant a valid, perfected and enforceable security interest over its right, title and interest in and to the Escrow Accounts to Société Générale, New York Branch, Lehman Brothers Special Financing Inc. and Lehman Brothers Holdings Inc. to secure the performance of its obligations under the Settlement Agreement and shall take all reasonable actions to recognize and perfect that security interest under the UCC;

(g)    remittances into the Escrow Accounts shall promptly be invested and, upon maturity, be re-invested solely in Permitted Investments; and

(h)    all interest and other income from such Permitted Investments shall be deposited in the applicable Escrow Account, and any gain realized from such Permitted Investments shall be credited to the applicable Escrow Account.

6.4    SG and LBSF shall remit into the Global Escrow Account certain recoveries from the Libra and Vela Transactions as described in <u>Section 9</u>.  The Debtors shall pay into the Libra Reimbursement Escrow Account and the Vela Reimbursement Escrow Account the amounts set forth in <u>Sections 9.8(a)</u> and <u>9.9(a)</u>.

7.    Parties' Payment Date Obligations; Releases.    On the Payment Date, the Parties shall do all of the following:

7.1    SG shall pay LBSF $370,000,000 (the "SG Payment");

7.2    In addition to the SG Payment, SG shall guarantee to LBSF a recovery of up to $75,000,000 from the Libra and Vela Transactions as set forth in Section 10 hereof (the "SG Guarantee"), it being understood that receipt by LBSF of any ICA Recoveries shall not affect their rights with respect to the SG Guarantee;

7.3    The Parties, their respective affiliates and, where applicable, their respective estates, will fully and forever release one another, their respective affiliates and, where applicable, their respective estates from any and all claims that arise, in whole or in part, from or relate to the Libra and Vela Transactions, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, foreseeable or unforeseeable, in law, equity or otherwise, which as of such date shall be fully and forever discharged, waived, released and settled; *provided that* such release shall not reduce or otherwise limit the Parties' obligations to one another under this Settlement Agreement and, if applicable, the Assignments. Without limiting the generality of the foregoing, the Parties' claims in the Libra Adversary Proceedings as against each other will be dismissed with prejudice;

7.4    LBSF shall deliver written notice to Libra, the Libra Trustee and the Libra Collateral Manager, substantially in the form attached hereto as Exhibit 4, advising that notwithstanding anything to the contrary in the Libra CDSA, LBSF, in its capacity as "credit protection buyer" under the Libra CDSA and as the sole third party beneficiary under the Libra Senior Swap, irrevocably agrees that to the extent any portion of any Libra Credit Protection Payment and any Libra CDS Termination Payment payable to it under the Libra CDSA would cause the Libra Collateral Manager or the Libra Trustee to request a funding under the Libra Senior Swap, the due date for payment of such portion shall be deferred, and Libra shall be released from its obligations to make such payment, in each case, until such time (if any) that Libra is able to make such payment (i) without causing the Libra Collateral Manager or the Libra Trustee to request a funding under the Libra Senior Swap and (ii) without leaving Libra with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the Libra Indenture) the amounts required to be paid by Libra on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Libra Indenture, with the effect that in respect of any Libra Credit Protection Payment and any Libra CDS Termination Payment payable to LBSF under the Libra CDSA, any portion of any such payment that Libra is unable to make without causing the Libra Collateral Manager or the Libra Trustee to request a funding under the Libra Senior Swap shall not become due, and the obligation of Libra to pay such portion shall not arise, until such time (if any) that Libra is able to make such payment from amounts on deposit in the Libra Uninvested Proceeds Account, the Libra Principal Collection Account and the Libra Reserve Account (x) without causing the Libra Collateral Manager or the Libra Trustee to request a funding under the Libra Senior Swap and (y) without leaving Libra with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the Libra Indenture) the amounts required to be paid by Libra on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Libra Indenture; and

7.5 LBSF shall deliver written notice to Vela, the Vela Trustee and the Vela Collateral Manager, substantially in the form attached hereto as <u>Exhibit 5</u>, advising that notwithstanding anything to the contrary in the Vela CDSA, LBSF, in its capacity as "credit protection buyer" under the Vela CDSA and as the sole third party beneficiary under the Vela Senior Swap, irrevocably agrees that to the extent any portion of any Vela Credit Protection Payment, any Vela CDS Termination Payment, any Vela Premium Reserve payment and any Vela Net Issuer Premium payment payable to or for the benefit of LBSF under the Vela CDSA would cause the Vela Collateral Manager or the Vela Trustee to request a funding under the Vela Senior Swap, the due date for payment of such portion shall be deferred and Vela shall be released from its obligations to make such payment, in each case, until such time (if any) that Vela is able to make payment thereof (i) without causing the Vela Collateral Manager or the Vela Trustee to request a funding under the Vela Senior Swap and (ii) without leaving Vela with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the Vela Indenture) the amounts required to be paid by Vela on such Distribution Date under <u>Sections 11.1(i)(A)</u>, <u>(B)</u>, <u>(C)</u>, <u>(D)</u> and <u>(E)</u> and <u>11.1(ii)(A)</u> of the Vela Indenture, with the effect that in respect of any Vela Credit Protection Payment, any Vela CDS Termination Payment, any Vela Premium Reserve payment and any Vela Net Issuer Premium payment payable to or for the benefit of LBSF under the Vela CDSA, any portion of any such payment that Vela is unable to make without causing the Vela Collateral Manager or the Vela Trustee to request a funding under the Vela Senior Swap shall not become due, and the obligation of Vela to pay such portion shall not arise, until such time (if any) that Vela is able to make such payment from amounts on deposit in the Vela Uninvested Proceeds Account, the Vela Principal Collection Account and the Vela Reserve Account (x) without causing the Vela Collateral Manager or the Vela Trustee to request a funding under the Vela Senior Swap and (y) without leaving Vela with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the Vela Indenture) the amounts required to be paid by Vela on such Distribution Date under <u>Sections 11.1(i)(A)</u>, <u>(B)</u>, <u>(C)</u>, <u>(D)</u> and <u>(E)</u> and <u>11.1(ii)(A)</u> of the Vela Indenture.

If the Settlement Approval Order (as in effect on the Settlement Effective Date) includes the Libra Assignment Determinations and/or the Vela Assignment Determinations, it is a condition to SG's obligations under <u>Sections 7.1</u> and <u>7.2</u> above and the releases by SG under <u>Section 7.3</u> above that LBSF and LBHI shall have executed and delivered to SG the Libra CDS Assignment and/or the Vela CDSA Assignment, as applicable.

8. <u>Indemnification</u>.

8.1 The Debtors shall jointly and severally indemnify SG, its affiliates and SG's and its affiliates' respective officers and directors, employees, agents and attorneys (collectively, the "<u>Indemnified SG Parties</u>"), against any and all claims and actions against any such Indemnified SG Parties brought by or on behalf of an Other Libra Party or Other Vela Party, or an affiliate, successor, assign or agent thereof, and shall hold SG and the Indemnified SG Parties harmless against any loss, liability or expense incurred (including, without limitation, attorneys fees and interest), that, in each case, arise out of or in connection with SG's entering into, complying with, or enforcing the Settlement Agreement and the Assignments (any such claim or actions, "<u>SG Parties Indemnified Claims</u>"); *provided that* no loss, liability, or expense shall be deemed to arise out of or in connection with the Settlement Agreement or the Assignments solely because the claim it relates to was asserted in litigation brought by the

Debtors to pursue the Libra Termination Claim, Libra Priority Claim, Vela Termination Claim or Vela Priority Claim; and *provided further that* the indemnification under this <u>Section 8.1</u> (i) shall not in the aggregate exceed the Debtors Indemnification Cap, (ii) shall be payable, *first*, by application of funds on deposit in the Global Escrow Account in accordance with <u>Section 9.10(d)(ii)</u> herein, and *second*, to the extent such indemnification is not paid in full in accordance with clause first, by the Debtors, (iii) shall not apply to (x) any cost or expense incurred in connection with the review, negotiation or documentation of the Settlement Agreement, the Assignments and the documents entered into in connection therewith or with SG's internal, routine or periodic compliance activities, (y) any loss, liability or expense incurred solely as a result of the gross negligence or willful misconduct of SG or any Indemnified SG Party, or (z) any loss, liability or expense incurred by SG or any Indemnified SG Party resulting solely from SG's capacity as Senior Swap Counterparty or Controlling Class or out of actions taken or not taken by SG in either such capacity, in each case in this clause (z) other than actions taken or not taken by SG in order to enter into, enforce and/or comply with the Settlement Agreement and, if applicable, the Assignments, and (iv) shall apply only so long as the net value of LBSF's estate and/or LBHI's estate (or, in each case, one or more successor liquidating trusts) is greater than $1,000,000,000 and $1,000,000,000, respectively, and only to SG Parties Indemnified Claims of which the Debtors are notified in writing on or prior to the sixth anniversary of the latter of the Final Libra Funds Settlement Distribution Date and the Final Vela Funds Settlement Distribution Date.

(a)     Any indemnification payable by the Debtors to SG or any Indemnified SG Party under the Settlement Agreement shall be treated as priority administrative expense claims under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

(b)     The "<u>Debtors Indemnification Cap</u>" shall mean an amount equal to (i) the total amount actually paid to SG from the Global Escrow Account pursuant to <u>clauses (iii)</u> and <u>(iv)</u> of <u>Section 9.10(d)</u> hereof, *minus* (ii) the amount that SG would have been paid from the Global Escrow Account pursuant to <u>clauses (iii)</u> and <u>(iv)</u> of <u>Section 9.10(d)</u> hereof if the total amount paid to the Parties from the Global Escrow Account pursuant to <u>clauses (iii)</u> and <u>(iv)</u> of <u>Section 9.10(d)</u> hereof were equal to the <u>excess</u> of (A) the total amount actually paid to the Parties from the Global Escrow Account pursuant to <u>clauses (iii)</u> and <u>(iv)</u> of <u>Section 9.10(d)</u> hereof *over* (B) the Aggregate SG Parties Indemnified Claims, *minus* (iii) all SG Parties Indemnified Claims previously paid by the Debtors under the Settlement Agreement, *plus* (iv) all Debtors Parties Indemnified Claims previously paid by SG under the Settlement Agreement; *provided that*, if the amount calculated pursuant to the preceding <u>clauses (i)-(iv)</u> is less than zero, the "Debtors Indemnification Cap" shall be zero; and *provided further that*, if the amount calculated pursuant to the preceding <u>clauses (i)-(iv)</u> is greater than $71,644,336, the "Debtors Indemnification Cap" shall be $71,644,336.

(c)     "<u>Aggregate SG Parties Indemnified Claims</u>" shall mean, at any time of determination, the sum of all previously asserted SG Parties Indemnified Claims *plus* all presently asserted SG Parties Indemnified Claims, in each case (i) payable by the Debtors to SG under this Settlement Agreement and (ii) determined without regard to the Debtors Indemnification Cap.

(d)    The Debtors shall be entitled to participate in and, upon notice to the Indemnified SG Party, assume the defense of any action or proceeding in respect of any SG Parties Indemnified Claim in reasonable cooperation with, and with the reasonable cooperation of, the Indemnified SG Party; *provided that* the Debtors shall not settle any such action or proceeding without the prior written consent of SG, which consent shall not be unreasonably withheld, conditioned or delayed.  The Indemnified SG Party shall have the right to employ separate counsel in any such action or proceeding and to participate in the defense thereof at the expense of the Indemnified SG Party; *provided*, *however*, that the fees and expenses of such separate counsel shall be at the expense of the Debtors if (i) the Debtors have agreed to pay such fees and expenses, (ii) the Debtors shall have failed to assume the defense of such action or proceeding and employ counsel satisfactory to the Indemnified SG Party in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified SG Party and either or both of the Debtors, and the Indemnified SG Party shall have been advised by counsel that: (A) there may be one or more legal defenses available to it that are different from or additional to those available to the Debtors and (B) the representation of the Debtors and the Indemnified SG Party by the same counsel would be inappropriate or contrary to prudent practice, in which case, if the Indemnified SG Party notifies the Debtors in writing that it elects to employ separate counsel at the expense of the Debtors, the Debtors shall not have the right to assume the defense of such action or proceeding on behalf of such Indemnified SG Party; *it being understood, however*, that the Debtors shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one firm of attorneys in any jurisdiction at any time for all Indemnified SG Parties, which firm shall be designated in writing by SG.  The Debtors shall not be liable for any settlement of any such action or proceeding effected without their written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with their written consent, the Debtors agree to indemnify and hold the Indemnified SG Party harmless from and against any loss or liability by reason of such settlement.  Any Lehman Litigation Expense shall be reimbursable to the Debtors from Disbursable Recoveries as provided herein.

8.2    SG shall indemnify the Debtors and their respective officers and directors, employees, agents and attorneys (collectively, the "Indemnified Debtors Parties"), against any and all claims and actions against any such Indemnified Debtors Parties brought by or on behalf of an Other Libra Party or Other Vela Party, or an affiliate, successor, assign or agent thereof, and shall hold the Debtors and the Indemnified Debtors Parties harmless against any loss, liability or expense incurred (including, without limitation, attorneys fees and interest), that, in each case, arise out of or in connection with the Debtors' entering into, complying with, or enforcing the Settlement Agreement and the Assignments (any such claim or actions, "Debtors Parties Indemnified Claims"); *provided that* no loss, liability, or expense shall be deemed to arise out of or in connection with the Settlement Agreement or the Assignments solely because the claim it relates to was asserted in litigation brought by the Debtors to pursue the Libra Termination Claim, Libra Priority Claim, Vela Termination Claim or Vela Priority Claim; and *provided further that* the indemnification under this Section 8.2 (i) shall not in the aggregate

exceed the SG Indemnification Cap, (ii) shall be payable, *first*, by application of funds on deposit in the Global Escrow Account in accordance with Section 9.10(d)(ii) herein, and *second*, to the extent such indemnification is not paid in full in accordance with clause first, by SG, (iii) shall not apply to (x) any cost or expense incurred in connection with the review, negotiation or documentation of the Settlement Agreement, the Assignments and the documents entered into in connection therewith or with the Debtors' internal, routine or periodic compliance activities, (y) any loss, liability or expense incurred solely as a result of the gross negligence or willful misconduct of any of the Debtors or any Indemnified Debtors Party, or (z) any loss, liability or expense incurred by any of the Debtors or any Indemnified Debtors Party resulting solely from LBSF's capacity as "credit default swap counterparty" and "calculation agent" and LBHI's capacity as LBSF's "credit support provider" under the Libra CDSA or the Vela CDSA or out of actions taken or not taken by the Debtors in such capacities, in each case in this clause (z) other than actions taken or not taken by the Debtors in order to enter into, enforce and/or comply with the Settlement Agreement and, if applicable, the Assignments, and (iv) shall apply only so long as the net value of LBSF's estate and/or LBHI's estate (or, in each case, one or more successor liquidating trusts) is greater than $1,000,000,000 and $1,000,000,000, respectively, and only to Debtors Parties Indemnified Claims of which SG is notified in writing on or prior to the sixth anniversary of the latter of the Final Libra Funds Settlement Distribution Date and the Final Vela Funds Settlement Distribution Date.

(a)     The "SG Indemnification Cap" shall mean an amount equal to (i) the total amount actually paid to the Debtors (1) from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof and (2) if applicable, from the SG Guarantee pursuant to Section 10 hereof, *minus* (ii) the amount that the Debtors would have been paid (1) from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof and (2) if applicable, from the SG Guarantee pursuant to Section 10 hereof if the total amount paid to the Parties from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof were equal to the excess of (A) the total amount actually paid to the Parties from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof *over* (B) the Aggregate Debtors Parties Indemnified Claims, *minus* (iii) all Debtors Parties Indemnified Claims previously paid by SG under the Settlement Agreement, *plus* (iv) all SG Parties Indemnified Claims previously paid by the Debtors under the Settlement Agreement; *provided that*, if the amount calculated pursuant to the preceding clauses (i)-(iv) is less than zero, the "SG Indemnification Cap" shall be zero; and *provided further that*, if the amount calculated pursuant to the preceding clauses (i)-(iv) is greater than $121,644,336, the "SG Indemnification Cap" shall be $121,644,336.

(b)     "Aggregate Debtors Parties Indemnified Claims" shall mean, at any time of determination, the sum of all previously asserted Debtors Parties Indemnified Claims *plus* all presently asserted Debtors Parties Indemnified Claims, in each case (i) payable by SG to the Debtors under this Settlement Agreement and (ii) determined without regard to the SG Indemnification Cap.

(c)     SG shall be entitled to participate in and, upon notice to the Indemnified Debtors Party, assume the defense of any action or proceeding in respect of any Debtors Parties Indemnified Claim in reasonable cooperation with, and with the reasonable

cooperation of, the Indemnified Debtors Party; provided that SG shall not settle any such action or proceeding without the prior written consent of Debtors, which consent shall not be unreasonably withheld, conditioned or delayed.  The Indemnified Debtors Party shall have the right to employ separate counsel in any such action or proceeding and to participate in the defense thereof at the expense of the Indemnified Debtors Party; provided, however, that the fees and expenses of such separate counsel shall be at the expense of SG if (i) SG has agreed to pay such fees and expenses, (ii) SG shall have failed to assume the defense of such action or proceeding and employ counsel satisfactory to the Indemnified Debtors Party in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified Debtors Party and SG, and the Indemnified Debtors Party shall have been advised by counsel that: (A) there may be one or more legal defenses available to it that are different from or additional to those available to SG and (B) the representation of SG and the Indemnified Debtors Party by the same counsel would be inappropriate or contrary to prudent practice, in which case, if the Indemnified Debtors Party notifies SG in writing that it elects to employ separate counsel at the expense of SG, SG shall not have the right to assume the defense of such action or proceeding on behalf of such Indemnified Debtors Party; *it being understood, however*, that SG shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one firm of attorneys in any jurisdiction at any time for all Indemnified Debtors Parties, which firm shall be designated in writing by the Debtors.  SG shall not be liable for any settlement of any such action or proceeding effected without their written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with their written consent, SG agrees to indemnify and hold the Indemnified Debtors Party harmless from and against any loss or liability by reason of such settlement.  Any SG Litigation Expense shall be reimbursable to SG from Disbursable Recoveries as provided herein.

9.      <u>Recoveries from the Libra and Vela Transactions</u>.

9.1     All recoveries from the Libra and Vela Transactions (exclusive of, (x) in the case of the Libra Transaction, ICA Recoveries and (y) in respect of the Libra Transaction and the Vela Transaction, SSA Recoveries), whether by LBSF or by SG, shall be deposited into a segregated escrow account that SG shall cause to be established promptly following the Settlement Effective Date in accordance with <u>Section 6.3</u> hereof, entitled the "Libra and Vela Global Escrow Account" (the "<u>Global Escrow Account</u>") and will be released therefrom as set forth in <u>Section 9.10</u> hereof.

(a)     Following the Settlement Effective Date, the SG Escrow Agent shall notify the Parties in writing of the account number of the Global Escrow Account and shall thereafter give the Parties written notice of any change of the location or account number of the Global Escrow Account on or prior to the date of such change.

(b)     Prior to the release of funds from the Global Escrow Account as set forth in <u>Section 9.10</u> hereof, the SG Escrow Agent shall furnish, on a monthly basis, to the Parties a statement setting forth in reasonable detail the total Libra Funds and Vela Funds

standing to the credit of the Global Escrow Account and, separately with respect to such Libra Funds and Vela Funds, the portion thereof that is not subject to reimbursement under the applicable CDSA.

9.2     Any SSA Recoveries will be for the sole benefit of SG, and the Debtors shall have no right or claim whatsoever with respect to such funds. Without limiting the generality of the foregoing:

(a)     any SSA Recoveries from the Libra and Vela Transactions by SG, will remain with SG; and

(b)     any SSA Recoveries from the Libra and Vela Transactions by LBSF will be immediately paid through by LBSF to SG and, while held by LBSF, will be deemed to be held in trust for SG.

9.3     Any ICA Recoveries will be for the sole benefit of LBSF, and SG shall have no right or claim whatsoever with respect to such funds. Without limiting the generality of the foregoing:

(a)     any ICA Recoveries from Libra or the Libra Trustee by LBSF, will remain with LBSF; and

(b)     any ICA Recoveries that are recovered from Libra or the Libra Trustee by SG will be immediately paid through by SG to LBSF and, while held by SG, will be deemed to be held in trust for LBSF.

9.4     To the extent SG and/or the Debtors have paid any Advances, such Advances shall be repaid to SG and/or the Debtors, as applicable, from Disbursable Recoveries to the extent permitted by and as set forth in Section 9.10.

9.5     If LBSF is paid any amount by Libra or the Libra Trustee in respect of the Libra CDSA (whether upon prevailing on the Libra Priority Claim or otherwise), LBSF shall promptly remit such payment to the Global Escrow Account except to the extent such amount constitutes SSA Recoveries (in which case it will be handled in accordance with Section 9.2 above) or ICA Recoveries (in which case it will be handled in accordance with Section 9.3 above).

9.6     If LBSF is paid any amount by Vela or the Vela Trustee in respect of the Vela CDSA (whether upon prevailing on the Vela Priority Claim or otherwise), LBSF shall promptly remit such payment to the Global Escrow Account except to the extent such amount constitutes SSA Recoveries (in which case it will be handled in accordance with Section 9.2 above).

9.7     (a)     If the Libra Judgment has been entered by the Bankruptcy Court, then, if during the Libra Interim Period (x) the Debtors are required to pay under the Libra CDSA any Libra Credit Protection Premiums and/or reimbursements in respect of any Libra Credit Protection Payments and (y) the Debtors are unable to exercise a Permitted Netting under the Libra CDSA with respect to the foregoing payments, the Debtors shall pay the related

Premium Advances and/or Legacy Reimbursements to Libra in a timely manner; *provided that* during the Libra Interim Period the Debtors shall not fail to make, when due, any payment under the Libra CDSA required to be made by them, after giving effect to any notice or grace period under the Libra CDSA, that, if not made, would entitle Libra to designate an early termination date in respect of all outstanding transactions under the Libra CDSA.

(b)     If the Vela Judgment has been entered by the Bankruptcy Court, then, if during the Vela Interim Period (x) the Debtors are required to pay under the Vela CDSA any Vela Credit Protection Premiums and/or reimbursements in respect of any Vela Credit Protection Payments and (y) the Debtors are unable to exercise a Permitted Netting under the Vela CDSA with respect to the foregoing payments, the Debtors shall pay the related Premium Advances and/or Legacy Reimbursements to Vela in a timely manner; *provided that* during the Vela Interim Period the Debtors shall not fail to make, when due, any payment under the Vela CDSA required to be made by them, after giving effect to any notice or grace period under the Vela CDSA, that, if not made, would entitle Vela to designate an early termination date in respect of all outstanding transactions under the Vela CDSA.

9.8     If the Libra Assignment Closing Date shall have occurred, then:

(a)     No later than 5 Business Days following the Libra Assignment Closing Date, the Debtors will pay into a segregated escrow account that SG shall cause to be established promptly following the Libra Assignment Closing Date in accordance with Section 6.3 hereof (the "Libra Reimbursement Escrow Account"), an amount equal to 25% of an amount equal to the portion of all Libra Credit Protection Payments listed on Schedule A-1 hereto that remain subject to reimbursement under the Libra CDSA on such date; *it being understood* that unless the Libra Judgment (as in effect on the Libra Assignment Closing Date) includes an express determination that the reimbursement period in respect of each of the foregoing Libra Credit Protection Payments continued to run during the period from the designation of early termination date under the Libra CDSA through the date of the Libra Judgment, such period shall be disregarded for purposes of determining  the portion of all Libra Credit Protection Payments listed on Schedule A-1 hereto that remain subject to reimbursement under the Libra CDSA. Amounts standing to the credit of the Libra Reimbursement Escrow Account shall be used as follows:

(i)     all reimbursement payments required to be made by the "credit protection buyer" under the Libra CDSA in respect of Libra Credit Protection Payments listed on Schedule A-1 will be paid by the SG Escrow Agent from funds on deposit in the Libra Reimbursement Escrow Account and shall be deemed Legacy Reimbursement payments made by the Debtors; and

(ii)     at any time a Libra Credit Protection Payment for which there are funds on deposit in the Libra Reimbursement Escrow Account is no longer subject to reimbursement under the Libra CDSA, the SG Escrow Agent shall return the funds related to such Libra Credit Protection Payment (representing, for

the avoidance of doubt, 25% of such Libra Credit Protection Payment) to the Debtors.

(b)     Following the Libra Assignment Closing Date, SG will pay Libra Credit Protection Premiums to Libra from its own funds subject to Section 10.2 hereof and receive Libra Credit Protection Payments and Libra Physical Settlement Amounts from Libra in respect of Libra Floating Amount Events and Libra Credit Events, respectively. In addition, the SG Escrow Agent will pay Legacy Reimbursements to Libra from the Libra Reimbursement Escrow Account; *provided that* after all funds standing to the credit of the Libra Reimbursement Escrow Account have been exhausted, SG shall pay Legacy Reimbursements to Libra from its own funds subject to Section 10.2 hereof. Without limiting the foregoing, to the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG can control the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events, SG will exercise reasonable efforts to cause Libra Credit Protection Payments to be payable to it on such dates as will allow it to exercise a Permitted Netting in respect of any outstanding Libra Credit Protection Premiums or Legacy Reimbursement payments; *provided that* if at any time SG is unable to accomplish a Permitted Netting, (x) SG shall pay the requisite Premium Advance(s) in respect of such Libra Credit Protection Premium(s) from its own funds subject to Section 10.2 hereof or (y) the SG Escrow Agent shall pay the requisite Legacy Reimbursement payment(s) from the Libra Reimbursement Escrow Account or, if there are no funds standing to the credit of such account, SG shall pay such Legacy Reimbursement payments from its own funds subject to Section 10.2 hereof.

(c)     To the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG can control the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events, SG will exercise reasonable efforts to periodically trigger Libra Credit Protection Payments under the Libra CDSA in accordance with the Libra Triggering Sequence that would yield (after giving effect to the netting described in clause (b) above) an aggregate payout of Libra Credit Protection Payments by Libra in an amount at least equal to the funds then available to Libra for making such payments without implicating a funding under the Libra Senior Swap and without leaving Libra with insufficient funds to pay, on the immediately following Quarterly Distribution Date (as defined in the Libra Indenture) the amounts required to be paid by Libra on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Libra Indenture and, except to the extent such aggregate paid out funds constitute SSA Recoveries or ICA Recoveries, promptly following receipt of such aggregate paid out funds will deposit them in the Global Escrow Account. In furtherance of the foregoing, to the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG is free to control the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events (both in its capacity as credit protection buyer and in its capacity as calculation agent), SG shall exercise reasonable efforts to periodically trigger Libra Credit Protection Payments in accordance with the Libra Triggering Sequence and demand Libra Floating Amounts in an amount sufficient to recover funds building up in the Libra Reserve Account from Libra Credit Protection Premiums, Legacy Reimbursements and from the proceeds of the assets of Libra and, except to the extent

such recovered funds constitute SSA Recoveries or ICA Recoveries, remit such recovered funds to the Global Escrow Account.

(d)     To the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG can control the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events, the triggering of any Libra Credit Protection Payments under the Libra CDSA in addition to those set forth in clauses (b) and (c) above would be in SG's sole discretion (and to the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG would be permitted to specify a Libra Floating Amount equal to less than the Libra Floating Amount payable in respect of any such Libra Floating Amount Event, SG shall have sole discretion to do so) and, except to the extent such funds constitute SSA Recoveries or ICA Recoveries, all amounts received in respect of such Libra Credit Protection Payments will be remitted to the Global Escrow Account.

(e)     To the extent SG cannot control and/or delay the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events as they occur, all payments from Libra in respect of Libra Floating Amount Events (or Libra Credit Events) that constitute SSA Recoveries will remain with SG and the Debtors will not have any right or claim with respect to such funds, and all other such payments (unless constituting ICA Recoveries) will be deposited into the Global Escrow Account.

(f)     SG acknowledges that LBSF advised it that following the Settlement Effective Date it intends to effect a release by the Libra Trustee of all of LBSF's funds currently held in the Libra Issuer Collateral Account.  SG shall exercise reasonable efforts to assist LBSF to release such funds, including such efforts as may involve dealing with the Libra Trustee or any rating agency whose consent may be required in connection with such release, and SG agrees that, to the extent any such funds are paid by the Libra Trustee to SG, SG shall promptly transfer all amounts so received to LBSF; *provided that* prior to the Libra Assignment Closing Date SG shall not be required to post any collateral in connection with the foregoing, and *provided further that* reasonable efforts of SG as used herein expressly exclude any offer of indemnity by SG to the Libra Trustee in connection with the release of the foregoing funds.

9.9     If the Vela Assignment Closing Date shall have occurred, then:

(a)     No later than 5 Business Days following the Vela Assignment Closing Date, the Debtors will pay into a segregated escrow account that SG shall cause to be established promptly following the Vela Assignment Closing Date in accordance with Section 6.3 hereof (the "Vela Reimbursement Escrow Account"), an amount equal to 25% of an amount equal to the portion of all Vela Credit Protection Payments listed on Schedule A-2 hereto that remain subject to reimbursement under the Vela CDSA on such date; *it being understood* that unless the Vela Judgment (as in effect on the Vela Assignment Closing Date) includes an express determination that the reimbursement period in respect of each of the foregoing Vela Credit Protection Payments continued to run during the period from the designation of early termination date under the Vela CDSA through the date of the Vela Judgment, such period shall be disregarded for

purposes of determining the portion of all Vela Credit Protection Payments listed on Schedule A-2 hereto that remain subject to reimbursement under the Vela CDSA. Amounts standing to the credit of the Vela Reimbursement Escrow Account shall be used as follows:

      (i)      all reimbursement payments required to be made by the "credit protection buyer" under the Vela CDSA in respect of Vela Credit Protection Payments listed on Schedule A-2 hereto will be paid by the SG Escrow Agent from funds on deposit in the Vela Reimbursement Escrow Account and shall be deemed Legacy Reimbursement payments made by the Debtors; and

      (ii)      at any time a Vela Credit Protection Payment for which there are funds on deposit in the Vela Reimbursement Escrow Account is no longer subject to reimbursement under the Vela CDSA, the SG Escrow Agent shall return the funds related to such Vela Credit Protection Payment (representing, for the avoidance of doubt, 25% of such Vela Credit Protection Payment) to the Debtors.

      (b)      Following the Vela Assignment Closing Date, SG will pay Vela Credit Protection Premiums to Vela from its own funds subject to Section 10.2 hereof and receive Vela Credit Protection Payments and Vela Physical Settlement Amounts from Vela in respect of Vela Floating Amount Events and Vela Credit Events, respectively. In addition, the SG Escrow Agent will pay Legacy Reimbursements to Vela from the Vela Reimbursement Escrow Account; *provided* that after all funds standing to the credit of the Vela Reimbursement Escrow Account have been exhausted, SG shall pay Legacy Reimbursements to Vela from its own funds subject to Section 10.2 hereof. Without limiting the foregoing, to the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG can control the triggering of Vela Credit Protection Payments in respect of outstanding Vela Floating Amount Events, SG will exercise reasonable efforts to cause Vela Credit Protection Payments to be payable to it on such dates as will allow it to exercise a Permitted Netting in respect of any outstanding Vela Credit Protection Premiums or Legacy Reimbursement payments; *provided that* if at any time SG is unable to accomplish a Permitted Netting, (x) SG shall pay the requisite Premium Advance(s) in respect of such Vela Credit Protection Premium(s) from its own funds subject to Section 10.2 hereof or (y) the SG Escrow Agent shall pay the requisite Legacy Reimbursement payment(s) from the Vela Reimbursement Escrow Account or, if there are no funds standing to the credit of such account, SG shall pay such Legacy Reimbursement payments from its own funds subject to Section 10.2 hereof.

      (c)      To the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG can control the triggering of Vela Credit Protection Payments in respect of outstanding Vela Floating Amount Events, SG will exercise reasonable efforts to periodically trigger Vela Credit Protection Payments under the Vela CDSA in accordance with the Vela Triggering Sequence that would yield (after giving effect to the netting described in clause (b) above) an aggregate payout of Vela Credit Protection Payments by Vela in an amount at least equal to the funds then available to Vela for making such payments without implicating a funding under the Vela Senior Swap and without leaving Vela with insufficient funds to pay, on the immediately

following Quarterly Distribution Date (as defined in the Vela Indenture) the amounts required to be paid by Vela on such Distribution Date under Sections 11.1(i)(A), (B), (C), (D) and (E) and 11.1(ii)(A) of the Vela Indenture and, except to the extent such aggregate paid out funds constitute SSA Recoveries, promptly following receipt of such aggregate paid out funds will deposit them in the Global Escrow Account. In furtherance of the foregoing, to the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG is free to delay the triggering of Vela Credit Protection Payments in respect of outstanding Vela Floating Amount Events (both in its capacity as credit protection buyer and in its capacity as calculation agent), SG shall exercise reasonable efforts to periodically trigger Vela Credit Protection Payments in accordance with the Vela Triggering Sequence and demand Vela Floating Amounts in an amount sufficient to recover funds building up in the Vela Reserve Account from Vela Credit Protection Premiums, Legacy Reimbursements and from the proceeds of the assets of Vela and, except to the extent such recovered funds constitute SSA Recoveries, remit such recovered funds to the Global Escrow Account.

(d)     To the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG can control the triggering of Vela Credit Protection Payments in respect of outstanding Vela Floating Amount Events, the triggering of any Vela Credit Protection Payments under the Vela CDSA in addition to those set forth in clauses (b) and (c) above would be in SG's sole discretion (and to the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG would be permitted to specify a Vela Floating Amount equal to less than the Vela Floating Amount payable in respect of any such Vela Floating Amount Event, SG shall have sole discretion to do so) and, except to the extent such funds constitutes SSA Recoveries, all amounts received in respect of such further Vela Credit Protection Payments will be remitted to the Global Escrow Account.

(e)     To the extent SG cannot control and/or delay the triggering of Vela Credit Protection Payments in respect of outstanding Vela Floating Amount Events as they occur, all payments from Vela in respect of Vela Floating Amount Events (or Vela Credit Events) that constitute SSA Recoveries will remain with SG and the Debtors will not have any right or claim with respect to such funds, and all other such payments will be deposited into the Global Escrow Account.

9.10     Payments from the Global Escrow Account.

(a)     If at any time following the Settlement Effective Date LBSF or SG is required to (x) make a reimbursement payment under the Libra CDSA or the Vela CDSA in respect of a Libra Credit Protection Payment or a Vela Credit Protection Payment that had been paid to SG or LBSF by Libra or Vela, as applicable, after the Settlement Effective Date, or (y) without duplication with amounts covered under clause (x), pay back to Libra or Vela, pursuant to a judicial determination or otherwise, any payment paid to SG or the Debtors by Libra or Vela under the Libra CDSA or the Vela CDSA, after the Settlement Effective Date, the SG Escrow Agent shall, in each such case, make such payment from Libra Funds or Vela Funds (as applicable) on deposit in the Global Escrow Account on the applicable payment date.

(b)     Recoveries from the Libra Transaction standing to the credit of the Global Escrow Account (all such recoveries, collectively, the "<u>Libra Funds</u>"), if any, shall be distributed to the Parties as follows:

(i)     On any Libra Funds Advance Reimbursement Date, the SG Escrow Agent shall release from the Global Escrow Account an amount equal to the lesser of (A) the excess of (x) the Libra Funds standing to the credit of the Global Escrow Account on such Libra Funds Advance Reimbursement Date *over* (y) the aggregate amount of Libra Funds standing to the credit of the Global Escrow Account on such Libra Funds Advance Reimbursement Date that, as of such date, remain subject to reimbursement under the Libra CDSA, and (B) the aggregate amount of unreimbursed Advances paid with respect to the Libra CDSA; and apply such amount in the order of priority set forth in <u>clause (d)</u> below.

(ii)     On the First Libra Funds Settlement Distribution Date, the SG Escrow Agent shall release from the Global Escrow Account an amount equal to the excess of (x) the Libra Funds standing to the credit of the Global Escrow Account on the First Libra Funds Settlement Distribution Date *over* (y) the aggregate amount of Libra Funds standing to the credit of the Global Escrow Account on the First Libra Funds Settlement Distribution Date that, as of such date, remain subject to reimbursement under the Libra CDSA, and apply such amount in the order of priority set forth in <u>clause (d)</u> below.

(iii)     On each Libra Funds Settlement Distribution Date and on the Final Libra Funds Settlement Distribution Date, the SG Escrow Agent shall apply all Libra Funds standing to the credit of the Global Escrow Account that are not subject to reimbursement under the Libra CDSA on such date in accordance with the order of priority set forth in <u>clause (d)</u> below.

(c)     Recoveries from the Vela Transaction standing to the credit of the Global Escrow Account (all such recoveries, collectively, the "<u>Vela Funds</u>"), if any, shall be distributed to the Parties as follows:

(i)     On any Vela Funds Advance Reimbursement Date, the SG Escrow Agent shall release from the Global Escrow Account an amount equal to the lesser of (A) the excess of (x) the Vela Funds standing to the credit of the Global Escrow Account on such Vela Funds Advance Reimbursement Date *over* (y) the aggregate amount of Vela Funds standing to the credit of the Global Escrow Account on such Vela Funds Advance Reimbursement Date that, as of such date, remain subject to reimbursement under the Vela CDSA, and (B) the aggregate amount of unreimbursed Advances paid with respect to the Vela CDSA; and apply such amount in the order of priority set forth in <u>clause (d)</u> below.

(ii)     On the First Vela Funds Settlement Distribution Date, the SG Escrow Agent shall release from the Global Escrow Account an amount equal to the excess of (x) the Vela Funds standing to the credit of the Global Escrow

Account on the First Vela Funds Settlement Distribution Date *over* (y) the aggregate amount of Vela Funds standing to the credit of the Global Escrow Account on the First Vela Funds Settlement Distribution Date that, as of such date, remain subject to reimbursement under the Vela CDSA, and apply such amount in the order of priority set forth in <u>clause (d)</u> below.

(iii)　　On each Vela Funds Settlement Distribution Date and on the Final Vela Funds Settlement Distribution Date, the SG Escrow Agent shall apply all Vela Funds standing to the credit of the Global Escrow Account that are not subject to reimbursement under the Vela CDSA on such date in accordance with the order of priority set forth in <u>clause (d)</u> below.

(d)　　On each Libra Funds Advance Reimbursement Date, the First Libra Funds Settlement Distribution Date, the Final Libra Funds Settlement Distribution Date and any other Libra Funds Settlement Distribution Date and on each Vela Funds Advance Reimbursement Date, the First Vela Funds Settlement Distribution Date, the Final Vela Funds Settlement Distribution Date and any other Vela Funds Settlement Distribution Date, the SG Escrow Agent will apply, as applicable, all Libra Funds available for distribution under <u>clause (b)</u> above or all Vela Funds available for distribution under <u>clause (c)</u> above, in each case in accordance with the following order of priority:

(i)　　*first*, (x) in respect of Libra Funds, in the following order: (1) to the payment to SG of all Legacy Reimbursement payments paid by SG in respect of the Libra Transaction not yet reimbursed to SG until such Legacy Reimbursements are reimbursed in full to SG, (2) then to the payment to the Debtors of all Legacy Reimbursement payments paid (or deemed pursuant to <u>Section 9.8(a)(i)</u> to have been paid) by the Debtors in respect of the Libra Transaction not yet reimbursed to the Debtors until such Legacy Reimbursements are reimbursed in full to the Debtors, (3) then to the payment to SG and the Debtors, *pro rata*, of any Premium Advances in respect of the Libra Transaction not yet reimbursed to SG and/or the Debtors, as applicable, until such Premium Advances are reimbursed in full, and (4) then to the payment to SG and the Debtors, *pro rata*, of any SG Litigation Expense pertaining to the Libra Transaction or Lehman Litigation Expense pertaining to the Libra Transaction, as applicable, not yet reimbursed to SG and/or the Debtors, as applicable, until such expenses are reimbursed in full; and (y) in respect of Vela Funds, in the following order: (1) to the payment to SG of all Legacy Reimbursement payments paid by SG in respect of the Vela Transaction not yet reimbursed to SG until such Legacy Reimbursements are reimbursed in full to SG, (2) then to the payment to the Debtors of all Legacy Reimbursement payments paid (or deemed pursuant to <u>Section 9.9(a)(i)</u> to have been paid) by the Debtors in respect of the Vela Transaction not yet reimbursed to the Debtors until such Legacy Reimbursements are reimbursed in full to the Debtors, (3) then to the payment to SG and the Debtors, *pro rata*, of any Premium Advances in respect of the Vela Transaction not yet reimbursed to SG and/or the Debtors, as applicable, until such Premium Advances are reimbursed in full, and (4) then to the payment to SG and the Debtors, *pro rata*, of any SG Litigation Expense pertaining to the Vela

Transaction or Lehman Litigation Expense pertaining to the Vela Transactions, as applicable, not yet reimbursed to SG and/or the Debtors, as applicable, until such expenses are reimbursed in full;

(ii)     *second*, to the payment, *pro rata*, (a) to SG of all unreimbursed SG Parties Indemnified Claims incurred by SG that are payable by the Debtors under the Settlement Agreement and (b) to the Debtors of all unreimbursed Debtors Parties Indemnified Claims incurred by the Debtors that are payable by SG and not yet reimbursed to the Debtors;

(iii)     *third*, to the payment to LBSF until the aggregate amount received by LBSF under this subsection (iii) on all previous Libra Funds Settlement Distribution Dates and Vela Funds Settlement Distribution Dates, and, if applicable, the current Libra Funds Settlement Distribution Date and/or Vela Funds Settlement Distribution Date is equal to $100,000,000; and

(iv)     *fourth*, to the payment to LBSF on the one hand and SG on the other of all remaining amounts, split evenly on a 50:50 basis;

*provided that*, references above to "*pro rata*" means payments in proportion to the respective amount to which each of SG on the one hand and the Debtors (or, where applicable, LBSF) on the other is entitled.

10.     <u>Recourse to the SG Guarantee</u>.

10.1     If (x) on both the First Libra Funds Settlement Distribution Date and the First Vela Funds Settlement Distribution Date there are no funds standing to the credit of the Global Escrow Account or (y) following the later to occur of the Final Libra Funds Settlement Distribution Date and the Final Vela Funds Settlement Distribution Date the aggregate amount of distributions made to LBSF in accordance with <u>Section 9.10(d)(iii)</u> above is less than $75,000,000, then LBSF shall be entitled to recourse from the SG Guarantee on, in the case of clause (x) above, the later to occur of the First Libra Funds Settlement Distribution Date and the First Vela Funds Settlement Distribution Date, and in the case of clause (y) above, the later to occur of the Final Libra Funds Settlement Distribution Date and the Final Vela Funds Settlement Distribution Date (in each case, the "<u>SG Guarantee Payment Date</u>"), in an amount equal to the SG Top-up Amount set forth in <u>Section 10.2</u> below.

10.2     The SG Top-up Amount shall mean, as of the SG Guarantee Payment Date, an amount equal to the greater of (x) zero and (y) the excess of (i) $75,000,000 *over* (ii) an amount equal to (A) the aggregate amount of distributions made to LBSF in accordance with <u>Section 9.10(d)(iii)</u> above *plus* (B) all Advances paid by SG under the Libra CDSA and under the Vela CDSA (other than Legacy Reimbursements paid from funds on deposit in the Libra Reimbursement Escrow Account and/or the Vela Reimbursement Escrow Account) that have not been reimbursed to SG as of such date.

11. <u>Post Petition Claim</u>.

11.1    SG shall have a post-petition administrative expense claim under Sections 503(b) and 507(a)(2) of the Bankruptcy Code against the Debtors to the extent of any Advances paid or to be paid by SG under the Libra CDSA (other than Legacy Reimbursements paid from funds on deposit in the Libra Reimbursement Escrow Account) that have not been either reimbursed to SG from Disbursable Recoveries or resulted in a reduction of the SG Top-up Amount.

11.2    SG shall have a post-petition administrative expense claim under Sections 503(b) and 507(a)(2) of the Bankruptcy Code against the Debtors to the extent of any Advances paid or to be paid by SG under the Vela CDSA (other than Legacy Reimbursements paid from funds on deposit in the Vela Reimbursement Escrow Account) that have not been either reimbursed to SG from Disbursable Recoveries or resulted in a reduction of the SG Top-up Amount.

11.3    Upon confirmation of a Plan for the Debtors, the Debtors shall establish a cash reserve to secure payment of the contingent claims set forth in <u>Sections 11.1</u> and <u>11.2</u> above in an amount equal to 25% of Advances outstanding at such time.

12. <u>Representations and Warranties</u>.

12.1    Each of LBSF and LBHI represents and warrants to SG (which representations and warranties shall be deemed to be repeated by LBSF and LBHI on the date they execute and deliver the Libra CDSA Assignment and on the date they execute and deliver the Vela CDSA Assignment, and shall be subject in all cases to entry and effectiveness of all terms of the Settlement Approval Order) that:

(a)     it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(b)     subject to Bankruptcy Court Approval, it has the power to execute this Settlement Agreement and any other documentation relating to this Settlement Agreement to which it is a party, to deliver this Settlement Agreement and any other documentation relating to this Settlement Agreement that it is required by this Settlement Agreement to deliver and to perform its obligations under this Settlement Agreement and has taken all necessary action to authorize such execution, delivery and performance;

(c)     such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(d)     all governmental and other consents that are required to have been obtained by it with respect to this Settlement Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(e)     subject to Bankruptcy Court Approval, its obligations under this Settlement Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)); and

(f)     there is not pending or, to its knowledge, threatened against it or any of its affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Settlement Agreement or its ability to perform its obligations under this Settlement Agreement (other than any appeal of the Settlement Approval Order).

12.2     SG represents and warrants to LBSF and LBHI (which representations and warranties shall be deemed to be repeated by SG on the date it executes and delivers the Libra CDSA Assignment and on the date it executes and delivers the Vela CDSA Assignment, and shall be subject in all cases to entry and effectiveness of all terms of the Settlement Approval Order) that:

(a)     it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(b)     it has the power to execute this Settlement Agreement and any other documentation relating to this Settlement Agreement to which it is a party, to deliver this Settlement Agreement and any other documentation relating to this Settlement Agreement that it is required by this Settlement Agreement to deliver and to perform its obligations under this Settlement Agreement and has taken all necessary action to authorize such execution, delivery and performance;

(c)     such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(d)     all governmental and other consents that are required to have been obtained by it with respect to this Settlement Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(e)     its obligations under this Settlement Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)); and

(f)     there is not pending or, to its knowledge, threatened against it or any of its affiliates any action, suit or proceeding at law or in equity or before any court, tribunal,

governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Settlement Agreement or its ability to perform its obligations under this Settlement Agreement (other than any appeal of the Settlement Approval Order).

12.3    If the Libra Assignment Closing Date shall have occurred, SG shall not (i) fail to make, when due, any payment under the Libra CDSA required to be made by it, after giving effect to any notice or grace period under the Libra CDSA, that, if not made, would entitle Libra to designate an early termination date in respect of all outstanding transactions under the Libra CDSA and (ii) fail to timely take actions required to be taken by it under the Libra CDSA in connection with a change to its credit ratings that, if not taken, would result in the occurrence of an "additional termination event" that would allow Libra to designate an early termination date in respect of all outstanding transactions under the Libra CDSA.

12.4    If the Vela Assignment Closing Date shall have occurred, SG shall not (i) fail to make, when due, any payment under the Vela CDSA required to be made by it, after giving effect to any notice or grace period under the Vela CDSA, that, if not made, would entitle Vela to designate an early termination date in respect of all outstanding transactions under the Vela CDSA and (ii) fail to timely take actions required to be taken by it under the Vela CDSA in connection with a change to its credit ratings that, if not taken, would result in the occurrence of an "additional termination event" that would allow Vela to designate an early termination date in respect of all outstanding transactions under the Vela CDSA.

13.    <u>Incorporation into the Assignments</u>.

13.1    By executing the Libra CDSA Assignment, LBSF and SG agree that the terms of this Settlement Agreement applicable to the Libra CDSA shall be deemed to have been incorporated by reference into the Libra CDSA Assignment and form an integral part thereof.

13.2    By executing the Vela CDSA Assignment, LBSF and SG agree that the terms of this Settlement Agreement applicable to the Vela CDSA shall be deemed to have been incorporated by reference into the Vela CDSA Assignment and form an integral part thereof.

14.    <u>Notices</u>.

14.1    All notices, requests and demands to or upon the respective Parties to be effective shall be in writing (including by email, unless a non-delivery response has been received by the sender) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made (a) in the case of delivery by hand, when delivered, (b) in the case of delivery by mail, three (3) Business Days after being deposited in the mails, properly addressed and postage prepaid or (c) in the case of delivery by email, when sent, addressed as follows or to such other address as may be hereafter notified by the respective parties hereto:

(a)    <u>LBSF</u>:

Lehman Brothers Special Financing Inc.
1271 Sixth Avenue, 40th Floor
New York, New York 10020
Att: General Counsel

(b)    LBHI:

Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 40th Floor
New York, New York 10020
Att: General Counsel

(c)    SG:

Société Générale, New York Branch
1221 Avenue of the Americas
New York, NY 10020
Attention: Dansby White
Telephone: (212) 278-6085
Email: dansby.white@sgcib.com

with a copy to:

Mayer Brown LLP
1675 Broadway
New York, NY 10019
Attention: Paul A. Jorissen, Esq.
Telephone: (212) 506-2555
Email: pjorissen@mayerbrown.com.

15.    Miscellaneous.

15.1    The Parties agree that SG's total cost of settlement of the Libra and Vela Transactions (including any liability or expenditure related thereto except for (x) SG's legal fees and expenses, and (y) all amounts excluded from the indemnification set forth in Section 8.1) shall in no event exceed $445,000,000. No provision of this Settlement Agreement or the Assignments shall be construed to require a different result.

15.2    Each of the Debtors on the one hand and SG on the other will bear its own costs and expenses (including legal fees and expenditures) incurred in connection with the review, negotiation or documentation of this Settlement Agreement, the Assignments and the documents entered into in connection therewith as well as the costs and expenses (including legal fees and expenditures) incurred in connection with the review, preparation, filing and prosecution of the Settlement Motion.

15.3    All amounts payable or to be remitted pursuant to this Settlement Agreement shall be paid or remitted or caused to be paid or remitted in U.S. Dollars by wire

transfer of immediately available funds to an account specified in writing by the recipient thereof.

15.4    This Settlement Agreement may be executed in several counterparts (including by facsimile transmission or electronic transmission of a PDF file), each of which when so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Settlement Agreement.

15.5    This Settlement Agreement shall be binding on the Parties, their successors, assigns, transferees and any other Persons who have asserted or seek to assert claims on behalf of the Debtors' estates.

15.6    The descriptive headings of the various sections of this Settlement Agreement are inserted for convenience of reference only and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

15.7    Whenever the context and construction so require, all words used in the singular number herein shall be deemed to have been used in the plural, and vice versa, and the masculine gender shall include the feminine and neuter and the neuter shall include the masculine and feminine.

15.8    This Settlement Agreement sets forth the entire understanding and agreement between the Parties as to the matters covered herein and supersedes and replaces any prior understanding, agreement or statement of intent, in each case, written or oral. No supplement, modification, amendment, waiver or termination of this Settlement Agreement shall be binding unless executed in writing by each of the Parties (or their successors and assigns) to be bound thereby, or by their authorized counsel.   This Settlement Agreement is executed without reliance on any representations by any person or entity concerning the nature, cause or extent of injuries, or legal liability therefor, or any other representations of any type or nature except as set forth herein.   No contrary or supplementary oral agreement shall be admissible in a court to contradict, alter, supplement, or otherwise change the meaning of this Settlement Agreement.   This Settlement Agreement has been negotiated by the Parties adequately represented by counsel, none of whom shall be deemed the "drafter" of the agreement, and no provision of this Settlement Agreement shall be applied or interpreted by reference to any rule construing provisions against the drafter.

15.9    The Debtors' obligations under this Settlement Agreement shall be joint and several.

15.10   This Settlement Agreement shall be governed by and shall be construed in accordance with, in all respects, the laws of the State of New York, without giving effect to principles of conflicts of law.   During the pendency of the Debtors' bankruptcy cases, any litigation arising out of or in connection in any way with this Settlement Agreement shall be brought in the Bankruptcy Court and each of LBSF, LBHI and SG submits itself to the exclusive jurisdiction of the Bankruptcy Court and waives any defense of lack of jurisdiction, improper venue or inconvenient forum that may be available to any action brought in such court.   Upon the closing of the Debtors' bankruptcy cases, any litigation arising out of or in connection in any

way with this Settlement Agreement shall be brought in a state or federal court of competent jurisdiction in New York County, State of New York, and each of LBSF, LBHI and SG submits to the exclusive jurisdiction of such courts and waives any defense of lack of jurisdiction, improper venue or inconvenient forum that may be available to any action brought in such courts.

15.11   LBSF, LBHI AND SG HEREBY IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS SETTLEMENT AGREEMENT.

15.12   Nothing in this Settlement Agreement shall be construed as an admission of liability or fault by any Party, which liability and fault are expressly denied.

15.13   The provisions of this Settlement Agreement shall be breached and a cause of action accrued thereon immediately on any Party's commencement of any claim or action prohibited by this Settlement Agreement, and in any such action this Settlement Agreement may be asserted both as a defense and as a counterclaim or cross-claim.

15.14   The Parties acknowledge and agree that a breach of the provisions of this Settlement Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage.   Therefore, the obligations of the Parties set forth in this Settlement Agreement shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith.   Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Settlement Agreement or otherwise.

15.15   No failure or delay by any party in exercising any right or remedy provided by law under or pursuant to this Settlement Agreement shall impair such right or remedy or be construed as a waiver or variation of it or preclude its exercise at any subsequent time, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have duly executed this Settlement Agreement as of the day and year first above written.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:_____
    Name:
    Title:

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____
    Name:
    Title:

**SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH**


By:_____
     Name:
     Title:

SCHEDULE A-1

LIST OF LIBRA LEGACY CREDIT PROTECTION PAYMENTS
SUBJECT TO REIMBURSEMENT UNDER THE LIBRA CDSA

[ATTACHED]

SCHEDULE A-2

LIST OF VELA LEGACY CREDIT PROTECTION PAYMENTS
SUBJECT TO REIMBURSEMENT UNDER THE VELA CDSA

[ATTACHED]

SCHEDULE B

LIST OF ABS AND CDO SECURITIES OWNED BY LIBRA
AS OF SEPTEMBER 5, 2010

[ATTACHED]

EXHIBIT 1

FORM OF SETTLEMENT MOTION

[ATTACHED]

EXHIBIT 2

FORM OF LIBRA CDSA ASSIGNMENT

[ATTACHED]

EXHIBIT 3

FORM OF VELA CDSA ASSIGNMENT

[ATTACHED]

EXHIBIT 4

FORM OF LBSF LIBRA NOTICE

[ATTACHED]

EXHIBIT 5

FORM OF LBSF VELA NOTICE

[ATTACHED]

# TABLE OF CONTENTS

**Page**

1.  Definitions ........................................................................................................... 2
2.  Suspension of Parties' Claims in respect of the Libra Early Termination and the Vela Early Termination ........................................................................ 20
3.  Execution and Delivery of the Libra CDSA Assignment; Pursuit of the Libra Termination Claim and/or the Libra Priority Claim ....................................... 21
4.  Execution and Delivery of the Vela CDSA Assignment; Pursuit of the Vela Termination Claim and/or the Vela Priority Claim ........................................ 22
5.  Restrictions on the Assumption and Assignment of the CDSAs ..................................... 23
6.  The Settlement Motion; Establishment of Escrow Accounts ......................................... 23
7.  Parties' Payment Date Obligations; Releases ............................................................. 25
8.  Indemnification ................................................................................................... 26
9.  Recoveries from the Libra and Vela Transactions ...................................................... 30
10. Recourse to the SG Guarantee ................................................................................ 39
11. Post Petition Claim .............................................................................................. 39
12. Representations and Warranties .............................................................................. 40
13. Incorporation into the Assignments ........................................................................ 42
14. Notices .............................................................................................................. 42
15. Miscellaneous .................................................................................................... 43

17653612