Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555 (JMP)

5   Case No. 08-01420 (JMP) (SIPA)

6   Adv. Case No. 09-01728

7   - - - - - - - - - - - - - - - - - - - -x

8   In the Matter of:

9   LEHMAN BROTHERS HOLDINGS INC., et al.,

10                  Debtors.

11  - - - - - - - - - - - - - - - - - - - -x

12  In the Matter of:

13  LEHMAN BROTHERS INC.,

14                  Debtor.

15  - - - - - - - - - - - - - - - - - - - -x

16  MICHIGAN STATE HOUSING DEVELOPMENT

17  AUTHORITY,

18                  Plaintiff,

19      -against-

20  LB DERIVATIVE PRODUCTS INC., et al.,

21                  Defendants.

22  - - - - - - - - - - - - - - - - - - - -x

23

24  (cont'd. on next page)

25

Page 2

1              U.S. Bankruptcy Court

2              One Bowling Green

3              New York, New York

4

5              September 22, 2010

6              10:02 AM

7

8    B E F O R E:

9    HON. JAMES M. PECK

10   U.S. BANKRUPTCY JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2      STATUS CONFERENCE

3

4      HEARING re Motion for Authorization to Reject Certain Executory

5      Contracts [Docket No. 11201]

6

7      HEARING re Motion of Taipei Fubon Commercial Bank Co., Ltd.

8      Seeking Authority to Assign its Interests as Lender in a

9      Promissory Note Issued by Lehman Brothers Holdings Inc. [Docket

10     No. 11051]

11

12     HEARING re Debtors' Motion for Approval of (I) A Settlement

13     Agreement between the Debtors and Aurora Bank FSB Regarding the

14     Master Forward Agreement and Other Matters and (II) Certain

15     Other Related Relief, Including Authorization of (A) Certain

16     Debtors to Make Capital Transfers, (B) LBHI to Enter into a

17     Capital Maintenance Agreement, and (C) LBHI to Extend the

18     Duration of the Amended Repurchase Agreement and Financing

19     Facility [Docket No. 11141]

20

21     HEARING re Debtors' Motion for Approval of (I) a Settlement

22     Agreement between the Debtors and Woodlands Commercial Bank and

23     (II) Certain Related Relief, including Authorization of (A)

24     Certain Debtors to Make Capital Transfers and (B) LBHI to Enter

25     Into a Capital Maintenance Agreement [Docket No. 11142]

Page 4

1

2   HEARING re Motion of Lehman Commercial Paper Inc. for Approval

3   of that Certain Amended and Restated Compromise by and Among

4   Lehman Commercial Paper Inc., Alfred H. Siegel, as Chapter 11

5   Trustee for the SunCal Debtors, and the Official Committee of

6   Unsecured Creditors in the SunCal Bankruptcy Cases [Docket No.

7   11153]

8

9   HEARING re Motion of the Chapter 11 Trustee of the SunCal

10  Master Debtors for Relief from the Automatic Stay [Docket No.

11  9642]

12

13  HEARING re Michigan State Housing Development Authority v. LB

14  Derivative Products Inc., et al. [Adv. Case No. 09-01728]

15

16

17

18

19

20

21

22

23

24  Transcribed By:  Clara Rubin and Sharona Shapiro

25

Page 5

1    A P P E A R A N C E S:

2    WEIL, GOTSHAL & MANGES LLP

3         Attorneys for the Debtors and Debtors-in-Possession

4         767 Fifth Avenue

5         New York, NY 10153

6

7    BY:   HARVEY R. MILLER, ESQ.

8          EVERT J. CHRISTENSEN, JR., ESQ.

9          ANTHONY J. ALBANESE, ESQ.

10

11   WEIL, GOTSHAL & MANGES LLP

12        Attorneys for the Debtors and Debtors-in-Possession

13        700 Louisiana

14        Suite 1600

15        Houston, TX 77002

16

17   BY:   ALFREDO R. PEREZ, ESQ.

18

19   KING & SPALDING

20        Attorneys for Lehman Commercial Paper Inc.

21        1185 Avenue of the Americas

22        New York, NY 10036

23

24   BY:   ARTHUR J. STEINBERG, ESQ.

25         SCOTT DAVIDSON, ESQ.

Page 6

```
 1

 2   ARNOLD & PORTER LLP

 3         Attorneys for Woodlands, FHFA

 4         399 Park Avenue

 5         New York, NY 10022

 6

 7   BY:   MICHAEL J. CANNING, ESQ.

 8

 9

10   DAY PITNEY LLP

11         Attorneys for Fidelity National Title Insurance Co.

12         One Audubon Street

13         New Haven, CT 06511

14

15   BY:   JOSHUA W. COHEN, ESQ.

16

17

18   GOODWIN PROCTER LLP

19         Attorneys for Clayton Services, Inc.

20         The New York Times Building

21         620 Eighth Avenue

22         New York, NY 10018

23

24   BY:   BRIAN W. HARVEY, ESQ.

25
```

Page 7

1

2    HUGHES HUBBARD & REED LLP

3          Attorneys for James W. Giddens, Trustee for the SIPA

4           Liquidation of Lehman Brothers Inc.

5          One Battery Park Plaza

6          New York, NY 10004

7

8    BY:   JEFFREY S. MARGOLIN, ESQ.

9          JAMES B. KOBAK, JR., ESQ. (TELEPHONICALLY)

10

11   KIRKLAND & ELLIS LLP

12          Attorneys for CapStar Secaucus LLC

13          601 Lexington Avenue

14          New York, NY 10022

15

16   BY:   PAUL BASTA, ESQ.

17

18   LANDMAN CORSI BALLAINE & FORD P.C.

19          Attorneys for Freddie Mac

20          120 Broadway

21          27th Floor

22          New York, NY 10271

23

24   BY:   SOPHIA REE, ESQ.

25

Page 8

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3        Attorneys for the Official Committee of Unsecured

4        Creditors

5        One Chase Manhattan Plaza

6        New York, NY 10005

7

8    BY:   EVAN R. FLECK, ESQ.

9        DENNIS C. O'DONNELL, ESQ.

10       DENNIS F. DUNNE, ESQ.

11

12

13   MICHIGAN DEPARTMENT OF ATTORNEY GENERAL

14       Attorneys for Michigan State Housing Development

15       Authority

16       State Operations Division

17       P.O. Box 30754

18       Lansing, MI 48909

19

20   BY:   MICHAEL F. MURPHY, AAG

21

22

23

24

25

Page 9

1

2    MORRISON & FOERSTER LLP

3         Attorneys for Taipei Fubon Commercial Bank Co., Ltd.

4         1290 Avenue of the Americas

5         New York, NY 10104

6

7    BY:   STACY L. MOLISON, ESQ.

8

9

10   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP & AFFILIATES

11        Attorneys for Gramercy Warehouse Funding I, LLC

12        300 South Grand Avenue

13        Los Angeles, CA 90071

14

15   BY:   VAN C. DURRER II, ESQ.

16

17

18   WHITE & CASE LLP

19        Attorneys for the Official Committee of Unsecured

20         Creditors

21        1155 Avenue of the Americas

22        New York, NY 10036

23

24   BY:   J. CHRISTOPHER SHORE, ESQ.

25

Page 10

1

2  U.S. DEPARTMENT OF JUSTICE - U.S. ATTORNEY'S OFFICE

3       Attorneys for Ginnie Mae

4       86 Chambers Street

5       3rd Floor

6       New York, NY 10007

7

8  BY:   JOSEPH N. CORDARO, AUSA

9

10

11  WILLIAM KUNTZ, III, PRO SE

12       Objector

13       India Street

14       Nantucket Island, MA 02554

15

16

17  ALSTON & BIRD LLP

18       Attorneys for Plaintiff, Bank of America

19       One Atlantic Center

20       1201 West Peachtree Street

21       Atlanta, GA 30309

22

23  BY:   JOHN C. WEITNAUER, ESQ. (TELEPHONICALLY)

24

25

Page 11

```
 1
 2    BROWN RUDNICK LLP
 3         Creditor
 4         Seven Times Square
 5         New York, NY 10036
 6
 7    BY:   GORDON Z. NOVOD, ESQ. (TELEPHONICALLY)
 8
 9
10    BROWN RUDNICK LLP
11         Creditor
12         One Financial Center
13         Boston, MA 02111
14
15    BY:   TIMOTHY J. DURKEN, ESQ. (TELEPHONICALLY)
16
17
18    CHAPMAN AND CUTLER LLP
19         Attorneys for U.S. Bank National Association, as Trustee
20         111 West Monroe Street
21         Chicago, IL 60603
22
23    BY:   FRANKLIN H. TOP III, ESQ. (TELEPHONICALLY)
24         JAMES HEISER, ESQ. (TELEPHONICALLY)
25
```

Page 12

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3          Attorneys for Creditors, Goldman Sachs Bank, USA and

4           Goldman Sachs International

5          2000 Pennsylvania Avenue, NW

6          Washington, DC 20006

7

8    BY:   BENJAMIN MEEKS, ESQ. (TELEPHONICALLY)

9

10   EZRA BRUTZKUS GUBNER LLP

11         Attorneys for Creditor, City of Long Beach

12         21650 Oxnard Street

13         Suite 500

14         Woodland Hills, CA 91367

15

16   BY:   COREY R. WEBER, ESQ. (TELEPHONICALLY)

17

18   FELDERSTEIN FITZGERALD WILLOUGHBY & PASCUZZI LLP

19         Attorneys for Creditor, CALPERS

20         The Wells Fargo Center

21         400 Capitol Mall

22         Suite 1450

23         Sacramento, CA 95814

24

25   BY:   HOLLY A. ESTIOKO, ESQ. (TELEPHONICALLY)

Page 13

1

2    HAYNES AND BOONE, LLP

3         Attorneys for Creditor, Highland Capital

4         2323 Victory Avenue

5         Suite 700

6         Dallas, TX 75219

7

8    BY:   AUTUMN D. HIGHSMITH, ESQ. (TELEPHONICALLY)

9

10

11   HENNIGAN, BENNETT & DORMAN LLP

12        Attorneys for the Bondholders

13        865 South Figueroa Street

14        Suite 2900

15        Los Angeles, CA 90017

16

17   BY:   MONIKA S. WIENER, ESQ. (TELEPHONICALLY)

18

19

20   LEVENE, NEALE, BENDER, YOO & BRILL LLP

21        10250 Constellation Boulevard

22        Suite 1700

23        Los Angeles, CA 90067

24

25   BY:   DANIEL H. REISS, ESQ. (TELEPHONICALLY)

Page 14

1

2    MCCARTER & ENGLISH, LLP

3          Attorneys for Creditor, Occidental Energy Marketing, Inc.

4          Renaissance Centre

5          405 N. King Street

6          8th Floor

7          Wilmington, DE 19801

8

9    BY:   KATHARINE L. MAYER, ESQ. (TELEPHONICALLY)

10

11   MILLER STARR REGALIA P.C.

12          Attorneys for Creditor, Fidelity National Title Insurance

13          1331 N. California Boulevard

14          Fifth Floor

15          Walnut Creek, CA 94596

16

17   BY:   TARA CASTRO NARAYANAN, ESQ. (TELEPHONICALLY)

18

19   PAUL, HASTINGS, JANOFSKY & WALKER LLP

20          Creditor

21          Park Avenue Tower

22          75 E. 55th Street, First Floor

23          New York, NY 10022

24

25   BY:   BRYAN R. KAPLAN, ESQ.

Page 15

```
 1

 2   REED SMITH LLP

 3        Attorneys for Creditor, Bank of New York

 4        599 Lexington Avenue

 5        22nd Floor

 6        New York, NY 10022

 7

 8   BY:   ERIC A. SCHAFFER, ESQ. (TELEPHONICALLY)

 9

10   SONNENSCHEIN NATH & ROSENTHAL LLP

11        Attorneys for Creditor, Bankhaus

12        233 South Wacker Drive

13        Suite 7800

14        Chicago, IL  60606

15

16   BY:   PATRICK C. MAXCY, ESQ. (TELEPHONICALLY)

17

18   STUTMAN TREISTER & GLATT

19        Attorneys for Interested Party, Elliott Management

20        1901 Avenue of the Stars

21        12th Floor

22        Los Angeles, CA 90067

23

24   BY:   JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

25        WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)
```

Page 16

1

2    STUTMAN TREISTER & GLATT

3         Attorneys for Creditor, Perry Capital

4         1901 Avenue of the Stars

5         12th Floor

6         Los Angeles, CA 90067

7

8    BY:   MARINA FINEMAN, ESQ. (TELEPHONICALLY)

9

10

11   WEILAND, GOLDEN, SMILEY, WANG EKVALL & STROK, LLP

12        Attorneys for Alfred H. Siegel, the SunCal Trustee

13        650 Town Center Drive

14        Suite 950

15        Costa Mesa, CA 92626

16

17   BY:   EVAN D. SMILEY, ESQ. (TELEPHONICALLY)

18

19

20   ALVAREZ & MARSAL

21        Administrators to the Debtors

22   BY:   BRYAN MARSAL

23

24

25

Page 17

1

2   AURELIUS CAPITAL MANAGEMENT

3          Interested Party

4   BY:   DAVID TIOMKIN (TELEPHONICALLY)

5

6   CARVAL INVESTORS

7          Interested Party

8   BY:   ANDREA ZAMBELLI (TELEPHONICALLY)

9

10  CERBERUS CALIFORNIA

11         Interested Party

12  BY:   ERIK WRIGHT (TELEPHONICALLY)

13

14  CITI ALTERNATIVE INVESTMENTS

15         Creditor

16  BY:   DAVID HOLMES (TELEPHONICALLY)

17

18  CITIGROUP

19         For Lehman Brothers

20  BY:   ARIEL BARZIDEH (TELEPHONICALLY)

21

22  CREDIT SUISSE FIRST BOSTON

23         Creditor

24  BY:   ANDREW REBAK (TELEPHONICALLY)

25

Page 18

1

2   FARALLON CAPITAL MANAGEMENT

3        Creditor

4   BY:   ANATOLY BUSHLER (TELEPHONICALLY)

5

6   LATIGO PARTNERS

7        Interested Party

8   BY:   SCOTT T. MCCABE (TELEPHONICALLY)

9

10  LONGACRE MANAGEMENT FUND

11        Creditor

12  BY:   VLADIMIR JELISAVCIC (TELEPHONICALLY)

13

14  MONARCH ALTERNATIVE CAPITAL LP

15        Creditor

16  BY:   ADAM SKLAR (TELEPHONICALLY)

17

18  RBS SECURITIES, INC.

19        Creditor

20  BY:   JEFFREY FARKAS (TELEPHONICALLY)

21

22  SILVER POINT CAPITAL

23        Interested Party

24  BY:   JEFF FORLIZZI (TELEPHONICALLY)

25

Page 19

1

2   STONE LION CAPITAL

3       Creditor

4   BY:   MITCHELL E. SUSSMAN (TELEPHONICALLY)

5

6   STONEHILL INSTITUTIONAL PARTNERS, L.P.

7   BY:   TOM VARKEY (TELEPHONICALLY)

8

9   THE BAUPOST GROUP

10      Interested Party

11  BY:   MEGHAN S. SHERWOOD (TELEPHONICALLY)

12

13  TPG OPPORTUNITIES PARTNERS

14      Creditor

15  BY:   MATTHEW B. DILLARD (TELEPHONICALLY)

16

17  TEJAS SECURITIES GROUP

18      Interested Party

19  BY:   ROB HALDER (TELEPHONICALLY)

20

21  VARDE PARTNERS

22      Creditor

23  BY:   SCOTT HARTMAN (TELEPHONICALLY)

24

25

Page 20

1

2    WESTERN ASSET

3           Interested Party

4    BY:   CHRISTOPHER JACOBS (TELEPHONICALLY)

5

6    ALAN LEAVITT, IN PRO PER/PRO SE

7           Interested Party

8

9    ROBERT TAKACS, IN PRO PER/PRO SE (TELEPHONICALLY)

10          Interested Party

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 21

1                    P R O C E E D I N G S

2              THE COURT:  Be seated, please.

3              Good morning, Mr. Miller.

4              MR. MILLER:  Good morning, Your Honor.  There's --

5              THE COURT:  Before you start, let me just make an

6    announcement for those people who are standing in the aisles.

7    We really do have adequate overflow capacity upstairs, and I

8    don't think if you're going to be sitting there you're going to

9    miss anything.  You'll certainly be able to hear and see what's

10   on video.  If you were actually planning to participate in the

11   substance of the hearing later, I'm going to take maybe a

12   five-minute break after the State of the Estate report to allow

13   people to reassemble.  So anybody's who's on the seventh floor

14   who needs to participate or wants to observe in person the

15   later proceedings will have an opportunity to come back.  I'm

16   just, frankly, concerned about the comfort of the crowd and

17   encourage you to move, but I'm not going to force you to move.

18   It'd be great if somebody actually follows that suggestion.

19              Thank you, the one person who left.

20              MR. MILLER:  There is a rumor, Your Honor, this is

21   being streamed into Times Square.

22              THE COURT:  That's a completely false rumor, as far as

23   I know.

24              MR. MILLER:  Good morning, Your Honor.  Harvey Miller,

25   Weil, Gotshal & Manges, on behalf of the debtors.

Page 22

1        Your Honor, we have on the agenda for this morning as

2    the first matter a status conference, which has been entitled

3    "State of the Estate Presentation".  And before we get to it,

4    Your Honor, I'd like to make a few introductory remarks.

5        It has been a little over two years since the

6    commencement of these huge totally unplanned Chapter 11 cases

7    that have affected the lives of so many persons and threatened

8    the viability of the financial system, the global financial

9    system, cases that have spawned over eighty foreign insolvency

10   proceedings and have accentuated the need for a global system

11   to deal with interconnected insolvency cases.  The primary

12   case, Lehman Brothers Holdings Inc., started with little

13   appreciation of how the assets of the Lehman enterprise and its

14   broker-dealer subsidiary Lehman Brothers Inc. would be salvaged

15   and values preserved.

16       The Court aptly described Lehman as having been

17   overcome by a tsunami of the most gigantic proportions.

18   Whatever else may be stated, I believe it is beyond dispute

19   that Lehman was the spark that ignited the financial collapse

20   that almost brought down Morgan Stanley & Co. and even the

21   mighty Goldman Sachs, and did cause the AIG bailout and the

22   merger of Washington Mutual Savings into Wachovia.  It was a

23   major precipitating factor in the enactment of the Dodd-Frank

24   Financial Reform Act of 2010.

25       Lehman has made the phrase "too big to fail" a part of

Page 23

1    the lexicon -- everyday lexicon of the United States Congress,

2    the Internet and the media.  The debate over the demise of the

3    Lehman enterprise was the result of egregious miscalculation on

4    the part of the Federal Reserve Bank, the United States

5    Treasury and others.  That debate continues unabated.

6         The Financial Crisis Inquiry Commission was appointed

7    during 2009 to undertake an investigation into the causes of

8    the financial crisis of 2008.  That commission's report is

9    scheduled to be filed in December of this year.  In testimony

10   before that commission two or three weeks ago, Chairman

11   Bernanke testified that the Federal Reserve Bank seriously

12   miscalculated the consequences of Lehman's collapse.  He also

13   defended the decision to strictly construe Section 13(3) of the

14   Federal Reserve Act as having presented an absolute bar to any

15   federal assistance to soften the effects of Lehman's bankruptcy

16   on the world financial system.

17        By my count, there are at least twenty-five books that

18   have been published since January 2009, setting forth the

19   alleged facts and hypotheses as to the circumstances and

20   reasons why Lehman collapsed in the manner in which it did.

21   Much has been written, particularly by the participants in the

22   decision-making process in the fall of 2008; constitutes

23   revisionist history.  It reminds one of the debate Winston

24   Churchill was having with an adversary in the House of Commons,

25   in response to criticisms of actions he was taking as prime

Page 24

1    minister of the United Kingdom.  Churchill loudly explained

2    'History will prove I am right.  I know that, for I will write

3    the history.'  So much for former Secretary Paulson's book "On

4    the Brink".

5            There have been at least three extensive TV

6    documentaries centered on the financial collapse of the Lehman

7    enterprise.  On October 1st of this year, the New York Film

8    Festival will present a documentary entitled "Inside Job" which

9    covers the planting of the seeds of the financial disaster, the

10   insatiable greed that led to more and more risk-taking and the

11   eventual bursting of the bubble.  A good portion of the film

12   deals with Lehman's contribution to a market built on excessive

13   debt, short-term credit and deregulation that betrayed public

14   trust.

15           In that context, the past two years have been crammed

16   with intensive dedication on the part of many, many persons to

17   retrieve, preserve and enhance the value of the Lehman

18   enterprise so that a fair Chapter 11 plan may be proposed that

19   will equitably distribute the asset values that had been

20   created by the dedication of the persons who have been

21   administering these cases.

22           The docket sets forth the numerous proceedings that

23   have been brought in this court, proceedings that have taken

24   hours and hours of dedicated time of persons involved, and of

25   the Court.  Yet those proceedings are but the tip of the

1    iceberg and do not adequately describe the day-to-day

2    activities that go on at the Lehman offices and in the offices

3    of the professionals engaged by Lehman and others in the search

4    for assets values and protection of the debtors' interest and,

5    therefore, creditor interests.

6         These are the most complex and difficult cases to ever

7    enter the bankruptcy stream.  They are spiced with esoteric

8    financial transactions and securities, global considerations,

9    intercreditor disputes and issues, conflicts of laws, and

10   almost every problem that one might conceive.  Nonetheless,

11   significant progress has been made, albeit at substantial cost

12   of administration, which the media is so happy to point out and

13   elaborate.

14        I take comfort in the words of Professor Douglas Baird

15   who responded to media inquiries as to fees by essentially

16   asking that there be a realistic analysis of the aggregate fees

17   in the context of the value of the assets administered and

18   ultimately the success of the administration.

19        Two years is a relatively short period of time in the

20   perspective of the cases of the magnitude and complexity of

21   these cases.  The provisions of the Bankruptcy Code, when

22   adopted, did not contemplate such cases.  It has been almost

23   unanimously agreed that the eighteen-month limitation on the

24   proposal of a Chapter 11 plan doesn't really fit these cases.

25   And the same might very well apply to the statute of

Page 26

1    limitations for avoidance actions that are set forth in Section

2    546 of the Bankruptcy Code.

3         Indeed it took the examiner over fourteen months to

4    complete and file his report in March of this year, at a cost

5    of almost 105 million dollars.  As I am sure the Court has

6    noted, September 15, 2010, just seven days ago, a large -- I'm

7    sorry, just seven days ago, a large number of adversary

8    proceedings, based upon the avoidance powers under the

9    Bankruptcy Code, were initiated in this court.  In addition,

10   the debtors-in-possession have entered into a large number of

11   agreements with potential adversaries to toll the otherwise

12   applicable statutes of limitations for the commencement of

13   recovery actions.

14        Undoubtedly there will be significant litigation

15   augmenting the substantial litigation that has already been

16   commenced and is pending before the Court.  However, the

17   objective is that economic compromise should be the basic

18   guideline to the resolution of issues and the formulation of an

19   amended Chapter 11 plan that will fairly deal with the claims

20   of all constituencies and avoid the excessive costs of

21   litigation and the time that may be consumed by such

22   litigation.

23        As has been the practice for the past two years, and

24   in response to the Court's request, the debtors'

25   administrators, led by Mr. Bryan Marsal and Mr. John Suckow,

Page 27

1    will present today what has been characterized as "The State of

2    the Estate".  (It's interesting that it's on the same day that

3    President Obama is doing something of that character.)  It is a

4    continuation of prior similar reports that were made to the

5    Court over the past two years.

6            Unless the Court has questions, I would propose to

7    turn the lectern over to Mr. Marsal to commence the report.

8            THE COURT:  Thank you, Mr. Miller.

9            Mr. Marsal, the floor is yours.

10           MR. MARSAL:  Good morning, Your Honor.

11           THE COURT:  Good morning, Mr. Marsal.

12           MR. MARSAL:  Your Honor, I just want to make sure the

13   audience and you understand that, beginning with the

14   commencement of this presentation, the company is

15   simultaneously filing a Form 8-K with the SEC and is also

16   making this entire presentation available on its Web site.  So

17   as of right now, everything that's going to be shown is

18   available to the public.

19           THE COURT:  But no streaming video of you?

20           MR. MARSAL:  No.  No, sir.  No streaming video, I

21   hope.  I hope.

22           What we'd like to cover with you today, Your Honor, is

23   really a summary of what we've been doing the last two years,

24   covering the assets -- the asset recovery efforts, the claims

25   resolution efforts and, finally, the plan of reorganization,

Page 28

1    which I believe I promised you about a week ago.  So we will

2    see where we are in that entire process.

3            Going to the executive summary, this case, as Mr.

4    Miller points out, is a highly complex case which I think has

5    advanced significantly over the last -- since the last State of

6    the Estate.  The market for the various assets of the

7    company -- liquidity has improved, refinancings has improved,

8    and we've been employing, along with the improvement in the

9    market, an aggressive asset recovery strategy, reinvesting in

10   assets, completing assets that were either work-in-process or

11   identifying control positions, trying to obtain those positions

12   we think has proven to be a very effective strategy in

13   maximizing the recovery value.

14           By the final bar date in November, we received 1.2

15   trillion dollars of claims filed.  Significant progress has

16   been made, as you'll see later in the presentation, on that 1.2

17   trillion.  Today at the holdings level, we are down to in the

18   neighborhood of 260 to 360 million dollars' worth of --

19   billion, excuse me, worth of claims.  That's still a large

20   number, and much work to be done, but you'll see, I think, that

21   significant progress has been made.

22           We filed the plan, a directional plan, on the -- in

23   March, followed by a disclosure statement in April.  And we

24   believe that creditor differences have been significantly

25   narrowed over the course of time since that -- since coming out

Page 29

1   with that original plan.

2        Moving on to specifics, every asset team -- and,

3   again, if you recall, we divide the estate into five assets

4   teams; each of those assets have updated their recovery

5   analysis from the April presentation, the April disclosure

6   statement.  Every one of those teams is coming in with higher

7   recovery values.  The markets continue to stabilize, and values

8   in pricing is improving.  Again, we would emphasize that our

9   liquidation strategy, which has been supported, most

10  importantly, by the unsecured creditors' committee, is focused

11  on the creation of value as opposed to the creation of

12  immediate cash, which is -- which I think will pay significant

13  dividends to the estate.

14       We've worked out a deal with the FDIC, which we

15  believe will optimize the liquidation recovery from the bank

16  platforms.  Where appropriate, and I'm sorry about this one

17  because I know you've got a lot on your docket, but we have --

18  we're pursuing significant lawsuits against some of the

19  clearing banks, against Barclays, and clearly there is a slew

20  of potential avoidance actions out there that we filed with the

21  Court or received tolling agreements on.

22       On the foreign administrative front, I'm happy to

23  report that that relationship has improved over the course of

24  two years.  We're really working together now.  I wish it had

25  been earlier, but it's working well now.  And I think that

Page 30

1    you're going to see, as you'll see later in our presentation,

2    improvement in recovery values because of that.

3          We have a good relationship with LBI, but I'm still

4    very much in the dark.  I'm very much in the dark what's going

5    on at LBI, and I wish -- you know, I wish Mr. Miller had added

6    that to the things that need to be addressed about the

7    bankruptcy process, because --

8          THE COURT:  Could you explain what you mean by --

9          MR. MARSAL:  I --

10         THE COURT:  -- by that?

11         MR. MARSAL:  I just don't feel I know what's going on

12   in that estate, Your Honor.  I don't understand how some of the

13   assets are being treated.  And we continue to feel -- we just

14   continue to feel a bit in the dark, and I don't know what I can

15   do about it, but --

16         THE COURT:  Well, only within the last month, I

17   believe, the LBI trustee filed a fairly extensive written

18   report, which I've had a chance to look at.  I'm sure you've

19   seen the report as well.  I'm frankly surprised at that

20   comment, both given the content of that report and given the

21   parallel fiduciary duties of the two estate administrators.

22   But we can talk some more about that another time.

23         MR. MARSAL:  Yeah, I will -- yeah, it's not a

24   complaint.  We have a good relationship, Your Honor, but

25   there's just lots of information lacking from our team -- from

Page 31

1   various teams' perspective on --

2           THE COURT:  Is that because the information is not

3   available or because the information is not being shared?

4           MR. MARSAL:  I don't know which.  There is

5   cooperation, Your Honor.  I don't know whether it's available,

6   but there is cooperation, but we just have -- after two years,

7   I wouldn't have expected to have some of the holes that we have

8   in our fact base --

9           THE COURT:  Okay.

10          MR. MARSAL:  -- that we have today.  But, again, I

11  think -- I don't want to harp on it, because I'm eighty percent

12  happy and twenty percent unhappy, if you would.

13          Last but not least, on the JPMorgan front, very

14  helpful in getting that out of the way.  We have -- that has

15  cleared up some of the -- cleared up our ability to dispose of

16  some of the assets as to the removal of the liens.  So that,

17  again, is helping the overall administration of the case.

18          Next item on the exec summary is claims management.

19  Originally 860 billion in claims were filed at LBHI, and 302

20  billion at the various subsidiaries.  After cleaning up errors

21  and dupes, we believe that the unsecured claims at LBHI are

22  closer to 250 to 350 billion.  Our target right now -- we

23  believe that the number will ultimately come out closer to 250

24  to 260 billion in claims, but we still have that kind of a

25  range to work on, which is with the additional analysis that's

LBH, et al, LBI

Page 32

1    needed.  We also are in a position -- because of getting the

2    claims more in order, we think we now are in a position to

3    really have a plan where we know who could vote on a plan as to

4    who has a legitimate claim, if you would.

5         The key priority of the last six months has been to

6    focus on the foreign receivers.  And, again, I think we've made

7    significant progress on that front.

8         In terms of case administration, Your Honor knows the

9    examiner's report was filed in March.  We have a slew of

10   requests from various governmental agencies that -- prior to

11   this report and post this report, asking for information and

12   continue to support that effort.  Full transparency in

13   communication with the UCC, U.S. Trustee, fee committee, that's

14   just ongoing.  Financial reporting is timely and current.

15   Given the size and complexity of the cases involved, again, I

16   would consider this overall administration to be timely and

17   efficient.

18        In terms of the plan process, the original timetable,

19   as I said, was to try and complete -- to get a plan of

20   reorganization approved by the second anniversary.  The biggest

21   obstacle to doing that is the foreign receivers.  We

22   miscalculated as to how long it was going to take us to first

23   of all educate them on the Chapter 11 process and our issues,

24   then have them go back to their various constituencies and

25   explain to them the issues, explain to their creditors the

1    issues, and then to come back to us with a counterproposal.

2    That process has been somewhat time-consuming and slow and,

3    particularly if you happen to be domestic creditor, you're a

4    little frustrated by this.  We've urged everyone to be patient

5    because it's a lot better than the alternative, which we think

6    is a litigation, which will get us nowhere and at least will

7    delay the process even further.

8              THE COURT:  I don't want to interrupt your flow --

9              MR. MARSAL:  Yes, sir.

10             THE COURT:  -- but can you tell me how the

11   multilateral protocol is functioning and whether or not that's

12   a meaningful contributor to improved relations?

13             MR. MARSAL:  It is, Your Honor, in that -- I mean, no

14   one is -- obviously, no one is going to jeopardize their

15   sovereign rights to apply whatever principles they have in

16   their country.  But even LBIE, despite not being a direct

17   participant in the protocol, is in fact operating as if it were

18   a participant in the protocol.  So I think it's been very

19   effective in terms of communication.

20             The first six months were rough.  The next six months

21   got better.  The last twelve months it's been pretty good; lots

22   of cooperation among the receivers.  And, in fact, later on

23   today we're going to announce that we reached our first

24   settlement with the largest -- with one of the largest

25   receivers, and we would hope to have that be the first of a

Page 34

```
 1   number of settlements which will be before the Court.  And,

 2   again, I don't want to jump ahead, but we'll talk about that

 3   later.   That's been the biggest handicap was the foreign

 4   receivers.

 5         We are anticipating that we're going to file a new

 6   disclosure statement by the -- sometime in the fourth quarter

 7   of this year, and we will be seeking a plan to be approved,

 8   hopefully plan confirmation, in the first quarter of 2011.

 9   Again, that's aggressive, and I've been cautioned by Mr. Miller

10   not to say that, but trying to drive an organization toward a

11   realistic date, and I think it's realistic subject to,

12   obviously, some of the other parties going along with it, but I

13   think there is momentum in the case to get the case resolved,

14   at least as a -- resolved as it relates to the claims.

15         Moving on to the specific assets, our cash position as

16   of the end of June -- well, this is significantly higher today,

17   but, again, to try and -- we have a June 30th cutoff date.  If

18   you look over to your right, Your Honor, you'll see 18 billion

19   in cash -- 18.9 billion in cash, with 2.2 billion in posted

20   pre-petition cash collateral; that's principally at Citibank.

21         THE COURT:  If you were to update that to today's

22   number or something around today's number, what would you be

23   talking about in terms of an order of magnitude of cash on

24   hand?

25         MR. MARSAL:  I would --
```

Page 35

1            MR. MILLER:  Another billion to billion and a half,

2    Your Honor.

3            MR. MARSAL:  Another billion to billion and a half,

4    Your Honor.

5            THE COURT:  So we're talking maybe twenty-two and a

6    half to twenty-three billion?

7            MR. MARSAL:  Yes.

8            THE COURT:  Okay.

9            MR. MARSAL:  Yes.  In terms of -- the next slide, this

10   is -- I wanted to identify what the sources of that cash flow

11   have been.  The total sources of cash, 25.9 billion dollars,

12   coming -- the biggest single source is derivatives.  There's

13   been uses of cash, operating expenses, 1.6 billion; again, that

14   would represent about eighteen months' worth of expenses, to

15   give you a run rate of how we are spending money today.  And

16   the -- you see the Bankhaus settlement of 1.28 billion dollars.

17   So in total our uses of cash are 7.9 billion, resulting in the

18   18 billion dollars on the previous page.

19            Okay.

20            In terms of the first category of key assets, loans,

21   we had a large portfolio.  We were simply a commercial lender.

22   The market continues to improve in this area.  Refinancings are

23   happening actually ahead of schedule.  While we're not seeing

24   more dollars, we're seeing an acceleration of the repayments,

25   which is the good news.  So from a

Page 36

1    present-value standpoint, this is improving.

2        Unfunded revolvers:  We have eliminated twenty-six

3    billion of unfunded revolvers at a minimal cost to the estate.

4    That's about eighty-five percent completed, and I would expect

5    that this will be -- at a timely filed plan, this will be a

6    nonissue, any unfunded responsibility or problem.

7        Our strategy in loans has been to continue to rely on

8    an improving liquidity position.  Again, with the support of

9    the unsecured committee, we've been pretty successful in

10   creating value there as opposed to blowing out positions today.

11       Next.

12       On the derivative front, we are increasing the

13   estimate of gross recovery proceeds by 850 million dollars.

14   And I'm cautiously optimistic that the next time we report on

15   this, this will in fact be better than the 850 million we're

16   talking about here.  But all the -- we expect to collect

17   fifteen billion from derivates from all the various receivables

18   being managed or being supervised by LAMCO.  LAMCO is actively

19   hedging some of the positions in order to lock up the contract

20   values.  I mean hedging the positions not to -- not for

21   purposes of making money; just to make sure that we have those

22   values locked up.

23       Big bank -- the big issue with derivatives is

24   resolution of the big-bank claims.  That remains a major

25   challenge in 2011.  It shouldn't get in the way of a plan, but

Page 37

1    it will take some time.  As I think I've said in the past, Your

2    Honor, this is a situation where very aggressive files (sic)

3    have been claimed and lots of homework has to be done to

4    support those claims.

5              The last shot there.  The derivative team has done a

6    terrific job.  They've surpassed all of our expectations and

7    have outperformed internal targets.

8              On the private equity front, again, much of this

9    private equity was created -- what Lehman would do is Lehman

10   would -- as they raised a fund for a private-equity firm, they

11   would always take a piece of the fund as an LP.  And so what

12   we're left with is many, many of these limited partnership

13   interests in various funds.  The guy putting the deal together

14   would get the bonus and we would be stuck with the long-term

15   play of this private equity investment, unfortunately.  That's

16   going to take a long time to wind down.

17             Having said that, though, market conditions are

18   better.  The disposition and pricing on those assets are

19   improving.  The portfolio's up about two percent since April.

20   And the team really has a pretty good understanding of the exit

21   strategy.  And, again, I'm pretty pleased with what's going on

22   from that team.

23             THE COURT:  Just a question on that.

24             MR. MARSAL:  Yes.

25             THE COURT:  Is the thought to endeavor to monetize

Page 38

1    those positions, or simply to hold onto them and hope for the

2    best?

3          MR. MARSAL:  Well, it varies, Your Honor.  In some

4    instances, the -- it depends on the age of the fund.  If the

5    fund has an exit with an eight-year strategy, we would probably

6    hang onto it if we're in the eighth -- seventh year, let's say.

7    If we're -- if it has an eight-year disposition strategy and

8    we're in the second year, we would be more prone to sell as

9    opposed to hold.  It depends on each -- it depends on the

10   circumstances associated with each investment.

11         THE COURT:  All right.

12         MR. MARSAL:  In terms of real estate, the real-estate

13   gross proceeds have actually improved, in terms of our

14   analysis, a hundred million dollars, but significantly more

15   than that in terms of repayments are being accelerated in terms

16   of timing.  And in the original proposal we made some mistakes

17   on the calculation of recovery value.  So this masks some of

18   the correction of the mistakes that were made.  So it's more

19   like about a half a billion dollars' worth of real-estate

20   improvement during this time period.

21         We are not calculating this go-round the unrecognized

22   upside in value.  We're taking a more conservative posture on

23   that.  And I believe that the LAMCO real-estate team has

24   finally moved from being originators of loans to loan workout

25   professionals, now to working the asset management

Page 39

1    professionals.  So there's been a -- you know, it's been a good

2    evolution.

3           You know, the -- again, I can't overstress, the

4    cooperation of the UCC has been vital in this process, because

5    we've done some unorthodox things on the real-estate front in

6    terms of reinvesting and trying to get control of a position so

7    that we can protect positions or to be able to take action.

8    And that's been very much appreciated.

9           On the bank platforms, which has, I know, been a real

10   thorn in the Court's side, us coming back continually on this,

11   finally got a deal with the FDIC.  We think we're going to

12   realize at least a billion-and-a-half-plus over the next

13   eighteen months out of this.  It also eliminates -- as Your

14   Honor will remember, there's a substantial priority claim by

15   the FDIC claimed if this thing were to go into liquidation, and

16   that becomes a nonissue.

17          On the foreign receivables side, there's an increase

18   of one billion dollars in gross recoveries that should be

19   anticipated.  And a combination of just not having the facts --

20   we're getting -- again, as we get more cooperation, we

21   understand the asset side of the subsidiaries and how they're

22   doing better, of the receivers, not under -- I mean of the

23   foreign receivers, I should say.

24          In terms of litigation activities -- you're more

25   familiar with this than I -- we have a slew of them.  The last

Page 40

1   item on the avoidance actions and tolling agreements, those

2   total -- they have a notional value of five billion dollars

3   that we are pursuing, in addition to the three major cases of

4   Bank of America, Barclays, JPMorgan.  This is not all the major

5   cases.  There are other potential major cases which are being

6   tolled.

7           In terms of what does that all mean to us, what it

8   means is that on the disclosure statement in April, we outlined

9   net proceeds of 55.3 billion.  Today the estate would say

10  that's it's more like 2.2 billion. And, again, that 55.3 was

11  probably overstated at that time, so the improvement is closer

12  to 3 billion dollars during the six-month period.  And -- but

13  we're now looking at net proceeds of 57.5 billion; this is

14  after reinvestment, by the way, Your Honor -- second to last

15  line -- of 1.8 billion.

16          In terms of the legal -- the same 57.5 billion by a

17  legal entity, which would be undoubtedly of interest to the

18  various claimants, you see the 57.5 broken out by various legal

19  entity.  Most of the reinvestment will be reinvestment in LBHI

20  assets.

21          Okay, the next slide covers headcount plan, how will

22  this -- how has this matter been executed.  What you've got,

23  Your Honor, are three categories of activities:  LAMCO, which

24  is really asset management; administration, which includes your

25  claims and your financials; and then litigation, which is all

```
 1    the various actions we've got going on, along with forensic

 2    activities.

 3           We attempted to cross the horizontal axis to identify

 4    three points in time, April '09, April '10 and April -- a

 5    projected April '11, to give you an idea of how the estate will

 6    be moving in terms of headcount.  I don't -- you know, I mean,

 7    the -- you've got -- what you see in the change between April

 8    '09 and April '10 really reflects, again, the activity on the

 9    claims side increasing, and the assets side decreasing, as it

10    relates to A&M, for example.

11           You see the derivative portfolio.  Much of LAMCO will

12    be coming down as derivatives wind down.  It's our objective,

13    Your Honor, that the 149 A&M employees that were on board April

14    10th -- excuse me, April of 2010, will be down to 66 by the

15    anniversary of that date, namely April 2011.

16           THE COURT:  Does that assume confirmation of a plan in

17    the first quarter, or that's just a projected date that's

18    unrelated to that contingency?

19           MR. MARSAL:  It's a projected date, Your Honor.  I

20    didn't get quite so -- I got the dates from the operating

21    people, and maybe it hasn't been exactly coordinated, but

22    that's a directional.  I mean, I would take it as directional.

23    There's one other problem you have here, and that is, as the

24    market improves, the people in legacy Lehman -- we run a risk

25    that those people are going to be leaving.  And, I mean, we see
```

Page 42

1    more and more people leaving the estate, and there is only one

2    failsafe and that's A&M filling the hole.  So this assumes that

3    we can keep the people and we can identify some business in

4    LAMCO, for example, and hopefully give a -- you know, give them

5    the interest to both retention and give them a career path.

6    And if we can't do that, this projection could be in jeopardy.

7             THE COURT:  Okay.

8             MR. MARSAL:  Claims resolution side, as I indicated,

9    was filed, was 1.162 trillion dollars of claims, consisting of

10   LBHI of 860 billion and 302 of the -- that are subsidiaries.

11   The first cutout at adjusted claims -- when we got the first

12   cutout, which was by April, we said 'Wait a minute, this is way

13   overstated.'  So the total claims, LBHI, was 605 and we felt

14   that the claims at the subsidiary level were about 135.  At

15   that point in time, when we came out with the disclosure

16   statement, we came out with a third column, which is your

17   likely allowed claims; that reflects the numbers in the

18   disclosure statement of 395 billion, of which 260 would be at

19   LBHI.

20            The fourth column is -- after scrubbing it further, we

21   believe that the 740 billion of claims is now 464 billion.  We

22   believe that LBHI, 605, is now down to 363.  And we believe

23   that the -- that subsidiary claims are, from 135, down to 101.

24            The last column is where we think this is all going to

25   end up, and that is we think that at the end of the day we're

Page 43

1    looking at something close to an LBHI claim of 264 and total

2    claims in the subsidiaries of 101 million, for a total of

3    365 -- I'm sorry -- million -- billion.  I keep saying

4    "million" when I mean "billion".  365 billion.  Any questions

5    on that, Your Honor?

6           THE COURT:  I'm not going to ask you --

7           MR. MARSAL:  Confusing?

8           THE COURT:  -- how you make that projection, because

9    I'm assuming you have some kind of proprietary information.

10           MR. MARSAL:  Yes, Your Honor.  That would be -- it

11   would be inappropriate in this forum to discuss that, but yes

12   we do.  Each of these have a -- we have a negotiation going on

13   is what I'm trying to say.

14           THE COURT:  Fine.  I accept this as your best estimate

15   of where --

16           MR. MARSAL:  Yes.

17           THE COURT:  -- this is going to end up.

18           MR. MARSAL:  Best estimate.

19           Summary highlights.  Although not adjudicated at this

20   point, substantial progress.  We've brought it from 1.2

21   trillion down to 464 billion.  The affiliate guaranty

22   outstanding claims are projected to decrease by 150 billion.

23   We think we have -- we're pretty close to getting agreement on

24   that from the various foreign subsidiary -- foreign

25   administrators.  The same thing is true of third-party guaranty

Page 44

1    claims.  The estimate of direct claims -- we've actually

2    increased a reserve of ten billion dollars; that's -- that

3    is -- that again is a contingent reserve.  As we get into the

4    negotiations with various parties, we believe some portion of

5    that ten billion will be needed, which is incorporated in our

6    estimate.

7            And then the intercompany claims.  We feel pretty

8    comfortable with the intercompany claims, with one exception,

9    and that is LBT, where we have an active negotiation going on.

10   But, again, this is a work in process and -- but forty-three

11   billion is -- we think, continues to be a reasonable estimate.

12           In terms of the plan, the plan -- I think the key

13   parts of this is that there's a lot of cooks in this kitchen.

14           Can we go to that?  Thank you.

15           There's a lot of cooks in the kitchen.  In addition to

16   the UCC and the LBHI ad hocs and the LBSF ad hocs and the LBT

17   ad hocs and a number of foreign protocol administrators and

18   foreign administrators, LBIE and LBI, and various other inputs,

19   we have a lot of cooks in the kitchen who were commenting about

20   the structure and the construct of the plan.  And we welcome

21   all the input and -- but clearly this just speaks to the size

22   of this case.

23           In terms of the key issues presented by the parties,

24   substantive consolidation versus nonsubstantive consolidation,

25   and we've done our review, we have -- you know, we see merit in

Page 45

1    both arguments.  The company, on the substantive consolidation

2    side, was operated as one company.  It was -- again, it was

3    managed -- it really was not managed on a legal-entity basis.

4    Many of the subsidiaries had absolutely no employees, they had

5    no addresses, they had no physical locations.  This was simply

6    an accounting entry.  Again, the -- at the same time, having

7    said that, there were separate subsidiary financial statements,

8    and in fact the company had thirty comptrollers going into

9    vigorous detail on constructing these financial statements; we

10   think, mostly for tax purposes, but they went into extensive

11   detail on keeping the books and records separate.  A vote in

12   favor of sub con.

13          There was a centralized cash management system and,

14   really, reliance -- there's no apparent -- as far as we can

15   see, there's no good argument made for a separate credit

16   analysis.  There was one entity that we saw from a financial

17   credit analysis standpoint that people were looking to.

18          At the same time, we've interviewed subsidiary

19   creditors who assert that a double-dip claim's appropriate

20   because two's better than one, irrespective of the reliance

21   factor.  They did rely on it, because it's better to get a

22   subsidiary guaranty than not to get a subsidiary guaranty, even

23   if they didn't have financials.

24          On the regulatory standpoint, it's pointed out by each

25   side that Lehman was subject to the CSE program, which means

Page 46

1      global supervision of both the holding company and of LBI by

2      the SEC.  And yet clearly -- you know, clearly, Lehman entities

3      were regulated by local law and by separate rules.  So there's

4      pros and cons on both sides, and what we tried to do, we

5      listened to everyone.

6              Yes?

7              MR. MILLER:  Your Honor, if I may interject.  Insofar

8      as this presentation is concerned, this is intended just for

9      informational purposes.  These are not intended to be binding

10     admissions against interests or anything of that kind, but just

11     for informational purposes in respect of this report.

12             MR. MARSAL:  Thank you.

13             THE COURT:  That cautionary note is understood and is

14     in the record, and I never assumed that this hot issue, which

15     is being highlighted at a very high level, is being resolved in

16     any manner or that there's any bias being shown in the chart,

17     either in favor of or in opposition to substantive

18     consolidation.  I simply take this as a listing of some of the

19     consideration's pro and con.

20             MR. MILLER:  Thank you, Your Honor.

21             MR. MARSAL:  Thank you.

22             And going to the next -- having said the pros and

23     cons, what we said was we think the best way to go here is an

24     economic compromise plan which respects the individual

25     subsidiaries and their legal status, and yet there are

Page 47

1    compromises that would be made to LBHI which would, again,

2    provide a basis for their waiving any claim to a substantive-

3    consolidation argument.  We think that this economic

4    compromise, as pointed out below, will reduce the time and

5    costs and need to litigate a very, very thorny issue given --

6    many, many thorny issues on this topic, and really to try and

7    avoid the issue of having to deal with whether or not sub con

8    or not applies here.  That is our objective is to come out with

9    an economic compromise which will make nobody happy but

10   everybody happy.

11           In terms of our priorities in the plan process, the

12   first group that we needed to attack was the international

13   affiliates.  And like I said, Your Honor, we made significant

14   progress on that as of yesterday.  We have an agreement in

15   principle with the German receiver, Bankhaus, which is an

16   important one -- it's the second largest of the receivers -- on

17   a settlement.  And that settlement, though, is subject to us

18   going to -- is them going back to their creditors -- the

19   receiver going back to their creditors and us going back to the

20   unsecured creditors' committee as well as -- and that's come

21   before the Court.

22           We would hope that on the LBIE front, which is the

23   largest, we're making significant headway with LBIE, and I'm

24   cautiously optimistic that we will soon have something to

25   report on the LBIE front as well.  So I think the foreign

Page 48

1    receivers are coming along, and I think our patience is paying

2    off.

3             The point number 2, our second objective is to -- is

4    really to attack the direct claims of LBHI.  That is underway,

5    how do we go from the 210 that are filed to our estimate of 112

6    billion.

7             The third priority is really to focus on the LBHI

8    direct creditors and the domestic creditors and the compromise

9    that would be made by the domestic creditors to the LBHI

10   estate.  And those negotiations and discussions are ongoing.

11            At the same time, the fourth point, if we cannot reach

12   agreement, then, as Mr. Miller points out, we may be back with

13   a different alternative.  But it's our hope that we can find a

14   compromise solution with the various parties.

15            Timetables:  We are -- we hope to complete the

16   bilateral negotiations with the foreign affiliates in the next

17   sixty days.  We will -- at the same time, we will be engaging

18   domestic stakeholders and trying to clean up the direct claims,

19   hopefully settling some of those -- some of the direct claim --

20   holdings direct claims, with an intention of filing a new

21   disclosure statement and having a plan confirmed by the end of

22   the first quarter.  Obviously the key there will no longer be

23   the foreign administrators; after sixty days it will be whether

24   or not the domestic subsidiary creditors and LBHI can get

25   together on this compromise.  And we are trying to be the

Page 49

1    Honest John in bringing about that compromise.

2             Any questions, Your Honor?

3             THE COURT:  I do have one question as it relates to

4    the last point you made concerning the potential time-consuming

5    problem of dealing domestically with the claims of creditors at

6    different subsidiary levels.  A few months ago, partly as a

7    result of an objection that was filed by counsel for the ad hoc

8    committee in the parent case, there was some discussion on the

9    record of a protocol or some means to facilitate communication

10   in a formal way.  I deferred action with respect to that and

11   left it to the debtors to propose something -- it doesn't need

12   to be publicly proposed -- that would satisfy some of the

13   concerns that had been expressed on the record at that time.

14   In fact, there were a number of lawyers who were coming forward

15   who wanted to reserve rights or to express themselves, and I

16   effectively said 'This isn't the time for that.'

17            To what extent is there, either in process, a

18   formalized means to share information that will facilitate

19   these discussions, or some other process that you can share

20   with me that will moderate some of the potential for discovery

21   judicial proceedings of one sort or another relating to the

22   process of getting information from one party to another and

23   having what amounts to a completely transparent system for

24   discussing these issues?

25            MR. MARSAL:  Well, the -- I can answer that in part,

Page 50

1    Your Honor, that certain of the constituencies are actually

2    hired professionals and those professionals to represent them.

3    We have been meeting with those professionals periodically to

4    download information.  I mean, you've got one group which wants

5    to argue substantive consolidation, so they want all the facts

6    that might help them on a substantive-consolidation argument,

7    and you've got another group that's separate and they want the

8    information that will help reinforce their position.  We've

9    been working on that score, but that's pretty much the issue as

10   relates to today.  I mean, that's pretty much where the

11   advisors are honing in on.

12          As to a process, we are actively in discussions with

13   the subcommittees representing LBT, LBSF and LBHI.  And there's

14   no shortage of input, trust me on that score.  And -- but what

15   we've tried to do is, again, we've tried to meet with these

16   people and to share information, provided they will -- they're

17   not -- we're staying away from asset values because we don't

18   see this as anything other than a pot plan.  If you want to

19   know about asset values, then you could run amuck of maybe

20   you're trying to do something other than -- you know, there's

21   market implications to that, so as long as we stay away from

22   the assets side and focus on the claims side, we're pretty open

23   with people trying to explain to them where the negotiations

24   are.

25          Other than that, Your Honor, there's nothing more

Page 51

1    formal, I mean, other than being responsive.

2              THE COURT:  Mr. Miller, do --

3              MR. MILLER:  Your Honor --

4              THE COURT:  -- do you wish to comment?

5              MR. MILLER:  If I may inter -- responding specifically

6    to your question, which arose at another omnibus hearing, in

7    connection -- there is no formal process, but there have been

8    NDA agreements entered into with most of these ad hoc

9    alliances, committees or whatever they call themselves.

10             THE COURT:  Groups.

11             MR. MILLER:  Groups.  Anything to get away from 2019.

12             Part of the problem, Your Honor, is that most people

13   don't want to be restricted.  So the process -- the formal

14   process is that those groups can hire a financial advisor and

15   investment banker, and the investment banker or financial

16   advisor has access to the material.  And that process is going

17   forward.  There are regular meetings.  Information is being

18   distributed.  A data room has been created.  There is a

19   constant stream of information going into the data room, and

20   that's available to these groups that have entered into NDA

21   agreements.

22             So, responding to Your Honor's comments at the last

23   hearing, there have been tremendous efforts in that respect.

24   And so far, Your Honor, we basically have not heard any

25   complaints.

```
 1              THE COURT:  Good.  I'm sure if there are complaints,

 2    I'll hear about that.

 3              MR. MARSAL:  That's all I have, Your Honor.

 4              THE COURT:  Well --

 5              MR. MARSAL:  Do you have any questions?

 6              THE COURT:  -- that's quite a lot.

 7              I want to express my appreciation for a very

 8    comprehensive report which I find very helpful, and I hope

 9    other parties-in-interest find it as helpful as I have found

10    this.  I won't hold you to another one of these presentations

11    in terms of scheduling a date for one, but to the extent that

12    there are major developments in the case that in your judgment

13    you think should be reported in a public fashion, these omnibus

14    hearings represent a natural opportunity for public

15    information-sharing, and it's very obvious in the number of

16    people here that this is a subject of great public interest.

17    So, thank you very much.

18              MR. MARSAL:  Thank you.

19              THE COURT:  I think I'm going to take this occasion to

20    just give people who wish to go about their business elsewhere

21    and leave the bankruptcy court, either in the courtroom

22    upstairs or in this courtroom, and who have no need to stay or

23    no desire to stay to hear the remainder of this morning's

24    omnibus hearing, to leave.  And what we're going to do is take

25    about a five-minute recess to allow people to reposition
```

1   themselves, and we'll resume in about just five minutes.  So

2   we're adjourned for five.

3           MR. MILLER:  Thank you, Your Honor.

4       (Recess from 10:50 a.m. until 11:02 a.m.)

5           THE COURT:  Please be seated.

6           Mr. Miller.

7           MR. MILLER:  Good morning again, Your Honor.

8   Returning now, Your Honor, to the agenda for the omnibus

9   hearing scheduled for today, there are two uncontested matters

10  on the agenda, Your Honor:  One, number 2, is the debtors'

11  motion for authorization to reject certain executory contracts.

12  There are no objections to that motion, Your Honor.  It's on

13  the calendar because the form of order has been revised

14  slightly to add a provision that claims must be filed within

15  thirty days after the date of rejection, or in such agreed time

16  as the debtors may agree to.  That's the only change, Your

17  Honor.

18          THE COURT:  That's fine.  I took a look at the motion.

19  It seems --

20          MR. MILLER:  The second --

21          THE COURT:  -- routine.

22          MR. MILLER:  -- item on the uncontested motions, Your

23  Honor, is the motion of Taipei Fubon Commercial Bank, Ltd.  I

24  believe Morrison & Foerster represents the bank, Your Honor.

25          MS. MOLISON:  Good morning, Your Honor.  Stacy Molison

Page 54

1   from Morrison & Foerster, on behalf of Taipei Fubon.

2          Your Honor, this is a motion to remove a consent-to-

3   transfer provision from within a loan document.  There have

4   been no objections to the motion, and the relief requested is

5   similar to that that the Court granted to another lender in

6   April 2010.

7          THE COURT:  Is it really removing the provision, or

8   it's simply giving the ability to transfer notwithstanding the

9   provision?

10          MS. MOLISON:  The latter, Your Honor.

11          THE COURT:  Okay.  You can --

12          MS. MOLISON:  In March 2005, Taipei Fu --

13          THE COURT:  It's unopposed, and the relief is granted.

14          MS. MOLISON:  Okay.  Thank you, Your Honor.  I have a

15   form of order.

16          THE COURT:  Why don't you --

17          MS. MOLISON:  Can I hand it up?

18          THE COURT:  Why don't you collect it with the other

19   forms of order to be submitted today through debtors' counsel,

20   and it can be submitted at the end of the hearing.

21          MS. MOLISON:  Okay.  May I be excused?

22          THE COURT:  You may.

23          MS. MOLISON:  Thank you, Your Honor.

24          MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

25   on behalf of the debtors.

Page 55

1         Your Honor, the next two matters on the agenda are the

2    bank settlement motions, one with Aurora and one with

3    Woodlands.  We did receive several objections, comment, and

4    we've made some further modifications to the form of order.  We

5    only received one objection, Mr. Kuntz, who is here in the

6    courtroom.

7         But if I could go through the presentation.  We did

8    file a form of declaration for Mr. Lambert.

9         THE COURT:  I read that declaration.

10        MR. PEREZ:  Okay.  And so, Your Honor, if I could kind

11   of go through the motion, deal with the things that we've

12   agreed on, and then Mr. Kuntz will be the only remaining

13   objecting party.

14        In essence, Your Honor, by these two motions, we

15   finally get to the point where we're having a global settlement

16   with respect to the issues that have really plagued the case

17   since the very beginning, and that is the obligations that LBHI

18   and the Lehman debtors had with respect to these two banks; one

19   is a savings bank and the other one is what is called a loan

20   production bank, Woodlands Bank.

21        We were first here, Your Honor, in February of '09,

22   and since that time we have put in substantial funds, and

23   continue to put in substantial funds.  Attached to Mr.

24   Lambert's declaration was a list of all the contributions which

25   we either had made or which we had -- which we intend to make

Page 56

1    by means of this motion in order to support the banks to allow

2    them to, in essence, with respect to Aurora, continue to

3    operate in the ordinary course of business so it can be sold

4    and, with respect to Woodlands, also continue to operate so

5    that it can either be sold or liquidated.

6            Your Honor, the matters involving the banks and the

7    fact that they were so intertwined with all the Lehman debtors

8    is very complex.  We attached to the motion all of the various

9    proofs of claim that had been filed.  There are numerous,

10   numerous claims by various Lehman entities that had claims

11   against the banks.  And in addition to that, Your Honor, there

12   were the very substantial 2.2 billion dollar claims filed both

13   by the OTS and by Aurora against LBHI on account of their --

14   the master forward agreement, which the OTS takes the position

15   is in essence a capital maintenance guarantee, Your Honor.

16           Both of these banks -- both of these cases, Your

17   Honor, if you looked at the banks separately, they would

18   constitute among the largest bankruptcy cases in the country,

19   with assets almost totaling eight or nine billion dollars.  So

20   these are very substantial entities.  And this resolution has

21   taken a long time.  I think the last -- maybe not the last

22   time, but maybe two times ago when I was here, I thought we

23   were going to be here on this final resolution a lot sooner

24   than we have been.  But it's just taken a long time as a result

25   of this very, very extensive process to resolve all of these

Page 57

1    things.

2             Your Honor, both proposals have been submitted to the

3    appropriate regulatory agencies:  the OTS as it relates to

4    Aurora; the FDIC as it relates to Woodlands.  And obviously the

5    FDIC also has some input on Aurora because it is the insurance

6    company that would guarantee it.  And the applications were

7    submitted in December of last year.  To our knowledge, those

8    applications are -- we've done all the work that is needed in

9    order for them to approve the applications.  We've made

10   changes, at their request, to the applications and to the

11   business plans and how we would conduct the business for the

12   next eighteen months.

13            The -- based on our understanding, the Federal Home

14   Loan Bank has to determine -- I'm sorry, the Federal Reserve

15   has to determine whether these transactions constitute an

16   affiliate transaction under 13A.  They either will need to

17   grant a waiver or say that they're excluded from that.  And to

18   our knowledge, that seems to be the one issue that still needs

19   to be resolved so that the transactions can proceed.  But I

20   think having them approved by this Court will make that

21   determination go quicker.  But as far as our primary regulators

22   are concerned, to our knowledge there's nothing additional that

23   we need to do in order for the final approval to be granted.

24            THE COURT:  Do the regulators know about this hearing?

25   I mean, it's obviously very public.  Have they taken a position

Page 58

1   with respect to this hearing?  Do you have any knowledge

2   concerning their timetable?  Because part of what seems to be

3   going on here is a setting of the table so that they can have

4   no excuses for not acting.

5         MR. PEREZ:  Correct, Your Honor.  To our knowledge, as

6   it relates to our primary regulators, which are the OTS and the

7   FDIC, we do not believe that there's anything left for us to do

8   in order for them to act.  And we've addressed all their

9   concerns.  We've addressed -- we've made modifications to the

10  applications.  To our knowledge, we've done everything that we

11  need to do for them to act --

12        THE COURT:  But effectiveness is really not about what

13  I do; it's about what they ultimately approve.

14        MR. PEREZ:  Correct, Your Honor.

15        THE COURT:  Okay.

16        MR. PEREZ:  Correct, Your Honor.  Your Honor, there

17  are various intercreditor issues implicated by the banks.  And

18  during the last two weeks, we've spent a tremendous amount of

19  time with the ad hocs, with -- and with White & Case and their

20  financial advisor, as well as some of the ad hocs, going

21  through what are clearly interdebtor issues related to the

22  banks and the way that they operated.

23        We have amended the form of order to address really a

24  full reservation of rights not only as to each of the debtors,

25  whatever claims they may have, but also a full reservation of

Page 59

1    rights as to the allocation of the cost and the benefits that

2    are being derived from the settlement.  And at some point in

3    the future, obviously we either have to come to an agreement on

4    that or we're going to be back before the Court.  But vis-a-vis

5    the banks and vis-a-vis the regulators, this is a full and

6    final settlement.  It's really the -- only the intercreditor --

7    I'm sorry, the interdebtor issues that are being preserved, and

8    they're being fully preserved.

9         And I was chided the other day for perhaps being

10   imprecise at one of the hearings, talking about the fact that,

11   you know, a certain debtor was the only one that had a benefit

12   and entitlement to it.  As the Court is aware, most of the

13   motions that I've been bringing up in the last several months

14   have involved situations where there have been questions about

15   the various rights as between the various debtors.  So to the

16   extent that I might have said something at a hearing which is

17   not reflective of a full reservation of rights that you may

18   have in the orders, obviously the orders are what controls.

19   And I wasn't intending to affect or change the orders.  I told

20   them I'd put that on the record, but --

21        THE COURT:  Well, I can't tell you from memory which

22   one you're talking of.  Was this Sun and Moon?

23        MR. PEREZ:  It was Sun and Moon, yes, Your Honor.

24        THE COURT:  Okay.  Then I guess I can do it from

25   memory.

Page 60

1          MR. PEREZ:  Yeah, you do remember.

2          And there was -- and actually it was in that hearing;

3   it was both Sun and Moon and Innkeepers, Your Honor.  But the

4   orders do reflect a full reservation of rights.

5          With that, Your Honor, unless the Court has any

6   questions about the deal -- I think the deal's been in front of

7   the Court for a long time, and it was reflected in the plan of

8   reorganization that we filed that this -- that the amounts

9   would have been contributed.

10         With that, Your Honor, let me try to address the

11  objections, and then --

12         THE COURT:  Before you get to the objections, I assume

13  that you're relying on the declaration --

14         MR. PEREZ:  Absolutely, Your Honor.

15         THE COURT:  -- of Mr. Lambert?

16         MR. PEREZ:  We're relying on the declaration to put

17  forth the business reason for our entry into the --

18         THE COURT:  Is there any objection to my receipt of

19  that declaration as a proffer of what Mr. Lambert would say if

20  called as a witness in support of this?

21     (No response)

22         THE COURT:  There's no objection.  I accept the

23  declaration.

24  (Declaration of Douglas Lambert was hereby received into

25  evidence, in lieu of direct testimony, as a Debtors' exhibit,

Page 61

1    as of this date.)

2         THE COURT:  And I may have a question of Mr. Lambert,

3    in particular as it relates to Exhibit A.

4         MR. PEREZ:  Yes, Your Honor.

5         Your Honor, the first objection that we received was

6    from Clayton Services.  Clayton Services basically filed a

7    statement reserving their rights.  They are -- there is a

8    potential avoidance action against them, and the debtors, by

9    means of my statement, confirmed that nothing in the motion or

10   order affects the rights or defenses that Clayton may have with

11   respect to the avoidance action that could be commenced by the

12   debtor, including any rights or claims that Clayton may have

13   against Aurora in connection therewith, and that all of the

14   debtors' rights and defenses, Aurora's rights and defenses, and

15   Clayton's rights and defenses with respect to that -- any

16   potential action, are reserved.  So nothing in this motion and

17   order is intended to affect any situation with Clayton

18   Services.

19        Your Honor, secondly, we did receive a pleading from

20   Freddie Mac.  We have made some changes in the order, which I

21   will hand the Court.  But to reflect basically -- and I also

22   have a statement to read into the record.  But basically

23   Freddie Mac and Fannie Mae are government-sponsored entities.

24   Ginnie Mae is a government corporation as opposed to a

25   government-sponsored entity.  They all have contractual rights

Page 62

1    vis-a-vis approval of the transfer of the master servicing

2    rights.  And by means of this motion, as we stated in there,

3    we're going to seek their consent in order to do that.  And

4    they have -- as being, you know, government-sponsored or in the

5    sense of government corporation, they have those rights.

6         So by means of this motion, we're not affecting --

7    we're not trying to affect their rights, their consent rights,

8    and by means of this motion, likewise we're not affecting their

9    rights generally that they may have pursuant to their

10   contracts.  So, in essence, neither the motion nor the order

11   affect those rights.

12        So with respect to Freddie Mac, LBHI owns a portfolio

13   of mortgage servicing rights with respect to certain Freddie

14   Mac and Fannie Mae sponsored residential mortgages.  LBHI

15   appointed Aurora (sic) Services, LLC, or ALS, as a subservicer

16   of those loans, and the servicing is currently being provided

17   by ALS.  Pursuant to the settlement agreement, LBHI proposes to

18   transfer such mortgage servicing rights to FSB, subject to

19   Freddie Mac and Fannie Mae -- and Fannie Mae is in

20   conservatorship -- and their conservators' consent.

21        Now, LBHI agrees that it will not, without such

22   consent, transfer to Freddie Mac and Fannie Mae mortgage

23   servicing rights to Aurora or Aurora Loan Services or their

24   affiliates, or assign the income receivable or -- received or

25   receivable by LBHI that is attributable to or derived from such

Page 63

1    servicing to the FSB or Aurora Services or any such affiliate

2    entity for a period of 120 days or such period as may be

3    extended by the parties so that the parties can try to obtain

4    the consent of Freddie Mac, Fannie Mae and their conservator

5    for the transfer of such servicing rights to the FSB or Aurora

6    Services.  And the parties reserve all their rights with

7    respect to such transfer of the mortgage servicing rights or

8    any income in connection therewith, in the event that any

9    agreement in respect to such consent is not reached.  And

10   nothing herein constitutes a waiver of any of Freddie Mac's,

11   Fannie Mae's or their conservators' rights or claims regarding

12   the subject residential mortgage loans, or constitute a waiver

13   of any of the conservators' rights under the Federal Housing

14   Enterprises (sic) Safety and Soundness Act of 1992 as amended

15   by the Housing and Economic Recovery Act, Public Law 110-289.

16        Your Honor, I believe, with that statement in the

17   record as well as the change that we've made to the order, that

18   the concerns raised by Freddie Mac are obviated.

19        THE COURT:  Is there anyone here acting on behalf of

20   Freddie Mac who can confirm that the statements just read into

21   the record will be sufficient for these purposes?

22        MS. REE:  Good morning, Your Honor.  Sophia Ree from

23   Landman Corsi Ballaine & Ford, on behalf of Freddie Mac.

24        Based on what was read into the record, Freddie Mac

25   has no objections, Your Honor.

Page 64

```
 1          THE COURT:  Fine.  Thank you.

 2          MR. PEREZ:  And, Your Honor, I believe that Ginnie

 3   Mae, who's represented by the U.S. Attorney -- we have agreed

 4   to insert -- the way we had drafted the order, we talked about

 5   government-sponsored entities that had this full reservation.

 6   There is a concern about including Ginnie Mae as one of the

 7   government-sponsored entities.  So we've just flipped the

 8   order.  Unfortunately it's -- I have it handwritten, but we've

 9   just flipped the order.  So we put Ginnie Mae and the

10   government-sponsored entities Freddie Mac and Fannie Mae.  But

11   the same reservation and the same comments that I've made with

12   respect to Ginnie Mae and Freddie Mac also -- I'm sorry, Fannie

13   Mae and Freddie Mac, also apply to Ginnie Mac.  And I believe

14   counsel also has a statement, and I think, with that, that

15   resolves their concern.

16          MR. CORDARO:  Thank you, Mr. Perez.

17          Good morning, Your Honor.  Joseph Cordaro, Assistant

18   United States Attorney, on behalf of Ginnie Mae.  And, yes,

19   that -- there is an issue.  Ginnie Mae technically is not a

20   GSE.  It's a government corporation.  Hence, the change, that

21   Mr. Perez just mentioned to Your Honor, to the order.  And just

22   to confirm what I believe Mr. Perez told Your Honor, that

23   there's nothing in the motion, or the order granting the

24   motion, that modifies or restricts any rights of Ginnie Mae

25   under any agreement with either the debtors or Aurora Bank FSB.
```

Page 65

1    And we come to that agreement; I believe Mr. Perez articulated

2    it.  So --

3            THE COURT:  Understood.

4            MR. CORDARO:  Thank you, Your Honor.

5            MR. PEREZ:  Your Honor, next we come to the statement

6    filed by the ad hocs.  I think that I've addressed it.  The --

7    we have, at their request, gone back and done -- and are doing

8    basically further due diligence on some of the issues that

9    they're concerned -- that process is continuing and we will

10   finalize that process before the closing takes place; it's just

11   a matter of getting the documents.  The debtor and its counsel

12   who's handling this feel very comfortable that the issues --

13   first of all, that they've already looked at the issues raised,

14   and that is any potentially contingent liability that you might

15   be creating by the transfer of the servicing rights; feel that

16   that issue is -- doesn't exist, and they're going back again

17   and confirming to themselves that -- again, they confirmed that

18   the issue doesn't exist.

19           And we did make --

20           THE COURT:  I'm confused.  I'm sorry to break in, Mr.

21   Perez.  I'm confused by what you just said.  Is there a

22   condition subsequent that needs to be satisfied --

23           MR. PEREZ:  Your Honor --

24           THE COURT:  -- in order to make the objection of the

25   ad hoc committee go away?

Page 66

```
1           MR. PEREZ:  No, Your Honor, I don't believe that it's

2    a condition subsequent.  We are endeavoring and think that --

3    as a result of the fact that we're going to have a little bit

4    of time before we have final regulatory approval, to finish the

5    work that we started again last week.  But we've committed to

6    do that and report to them before we close or report to them

7    where we are when we're going to close.

8           THE COURT:  And this is the group represented by Mr.

9    Uzzi?

10          MR. PEREZ:  Excuse me?

11          THE COURT:  This is the group represented by Mr. Uzzi?

12          MR. PEREZ:  Yes.

13          THE COURT:  I'd like to hear from him.  Well, I'm

14   going to hear from his partner, from Mr. Shore.

15          I just want to understand the status of your objection

16   at this point.

17          MR. SHORE:  Sure.  And I can either address -- I had a

18   couple of statements to make on the record today with respect

19   to both the motions, and I can table them for now.  But with

20   respect to the specific question, there's no condition

21   subsequent.  We trust that the debtors, having done the due

22   diligence, if they find something in there that would require

23   them to reassess the motion or going forward with the

24   transaction, they're perfectly capable of pulling the plug on

25   that transaction, because they're only seeking authorization
```

Page 67

```
 1    and not a direction to do it.  But as long as we understand

 2    that they are going through that process, we have no objection.

 3            THE COURT:  Okay.  Thank you.

 4            MR. PEREZ:  So, Your Honor, I think that that

 5    addresses all of the objections, other than the one filed by

 6    Mr. Kuntz.

 7            THE COURT:  Mr. Kuntz, do you wish to speak?

 8            MR. KUNTZ:  Thank you, Your Honor.  First I'd like to

 9    clarify one thing.  I believe Mr. Miller spoke this morning

10    earlier and he referred to Washington Mutual in relationship to

11    Wachovia.  I believe Washington Mutual was acquired by

12    JPMorgan.  And Wachovia was acquired by Wells Fargo.  I know

13    this only because I was a -- I had my credit card with

14    Washington Mutual.

15            What concerns me here is the use of additional estate

16    funds versus estate assets.  And yesterday afternoon I filed,

17    in accordance with Your Honor's prior comment, a notice to call

18    the deponent to the stand, and I've already provided a punch

19    list of perhaps fifteen questions, because I really don't think

20    that they've done their homework, they've expanded all the

21    options that are available.  It's just simply the government

22    wants the money, here, we'll give them two billion to keep them

23    happy.  For instance, I put in 'What about the Park Avenue

24    mortgage?'  From my understanding, that Park Avenue mortgage

25    could be transferred to these banks.  They could then take that
```

Page 68

1    mortgage and go to the Federal Reserve, Federal Home Loan

2    Savings Bank, and get 6-, 7-, 8-, 900 hundred million dollars

3    in cash.

4            As I put in my prior papers, these are run-of-the-mill

5    institutions.  There's nothing special about them that requires

6    a billion more of cash put up to keep them in a situation in a

7    world where the business model of lending money doesn't really

8    exist anymore.  I mean, just yesterday I read that General

9    Motors Acceptance Corp. has suspended filing all foreclosures

10   in the entire country.  So what's going to happen to Woodlands

11   and what's going to happen to Aurora if all of a sudden there's

12   another billion, here's another billion?  Whoops, all your

13   mortgages now are suspended for two years.  If the

14   administration comes out and says 'We have a crisis.  Guess

15   what, guys?  Your mortgages are now suspended,' what's going to

16   happen to the cash flow?

17           THE COURT:  Is your objection, Mr. Kuntz, that you

18   question the business judgment of the debtors in proposing to

19   satisfy some of the regulatory problems impacting these two

20   institutions by investing capital into these assets for a

21   future sale or disposition?

22           MR. KUNTZ:  Cash.

23           THE COURT:  Is that -- did I --

24           MR. KUNTZ:  Not assets.

25           THE COURT:  Did I correctly summarize what is your

Page 69

1   objection?

2            MR. KUNTZ:  Cash, not assets.  And I have -- I'd like

3   to call the witness to the stand and ask him.  I said have

4   you -- I filed a notice, Your Honor, yesterday, as you

5   instructed previously that 'If you want to call the witness to

6   the stand, you have to file with the Local Rule,' which I did.

7            THE COURT:  Okay, so you want to examine Mr. Lambert,

8   is that right?

9            MR. KUNTZ:  Yes, sir.  Yes, Your Honor.

10           THE COURT:  Mr. Lambert is here.

11           MR. KUNTZ:  And I would like that the record reflect

12  that yesterday I went to mail copies of the time-stamped

13  documents, and the mailing standards from the Whitehall Post

14  Office wouldn't accept them.  So I have a copy for the debtors'

15  counsel --

16           THE COURT:  What is it you're handing to Mr. Miller?

17           MR. KUNTZ:  It's the time-stamped copy of the notice

18  to call the deponent to the stand.

19           THE COURT:  Okay.

20           Is there any objection to having Mr. Lambert appear as

21  a witness?

22           MR. MILLER:  No, Your Honor.

23           THE COURT:  Fine.

24           Mr. Lambert, why don't you come forward?  Yeah, come

25  to the stand.

Page 70

1        And before questions are asked by Mr. Kuntz, I had

2    some questions that I noted I wanted to ask Mr. Lambert, so I'm

3    going to ask those questions first.

4        MR. KUNTZ:  I understand, Your Honor, but I just --

5    can I provide a copy -- I have the questions here.  Could I

6    provide a copy of -- to Mr. Lambert, or counsel can also?

7        THE COURT:  Well, ordinarily you would just ask them.

8        MR. KUNTZ:  Well, I understand, but these are, like --

9    I didn't want to attack them by surprise.  And also one other

10   thing:  In the interest of judicial economy, as Your Honor is

11   aware, my standing has been challenged now finally, and there

12   were three minor matters which I withdrew my objections to.

13   But this is such a large number, I felt that I should at least

14   make my objection known.  I mean, a billion dollars --

15       THE COURT:  Well, why don't you --

16       MR. KUNTZ:  -- in fees --

17       THE COURT:  -- why don't you --

18       MR. KUNTZ:  -- have been paid --

19       THE COURT:  -- sit down for a moment --

20       MR. KUNTZ:  Thank you, Your Honor.

21       THE COURT:  -- and I'm just going to ask Mr. Lambert a

22   couple of questions that I had.

23       But, first, since you're here -- you've spoken to the

24   Court before from the podium.  I'm going to swear you as a

25   witness.  Please stand up and raise your right hand.

Page 71

1          (Witness sworn)

2          THE COURT:  Be seated please.  Mr. Lambert, I took a

3    look at your declaration, which is now in evidence, and I just

4    am interested in the cost benefit analysis that's attached to

5    your declaration in particular.  And I'm looking for -- in

6    effect, more detail --

7          THE WITNESS:  Sure.

8          THE COURT:  -- if you can provide it.

9          THE WITNESS:  I'll try.

10         THE COURT:  My best recollection from what I saw is

11   that you estimate approximately a three billion dollar overall

12   advantage to the estate by virtue of these transactions, and

13   I'd like to understand, since it's a very spare cost benefit

14   analysis, what assumptions were made in order to reach that

15   conclusion --

16         THE WITNESS:  Sure.

17         THE COURT:  -- and to understand something more about

18   your analysis.

19         THE WITNESS:  As you know, back in probably fourth

20   quarter of '08 and the early days of the first quarter of '09,

21   we had many discussions with Debtors' counsel, counsel to the

22   UCC, regulatory counsel, and expressed to the Court, I think,

23   in a presentation that Mr. Marsal made in February of '09, the

24   risk to the estate of the regulators bringing a 365(o) claim

25   against the estate.  And at that time, I believe we estimated

Page 72

1    that potential exposure to be approximately 2.7 billion, I

2    think, at the time.

3           We -- and that obviously had weighed on many of the

4    decisions that we've made since the commencement of this case.

5    Again, while I think we've always felt -- or the debtor, as

6    well as the banks, have felt that there were adequate defenses

7    against that claim, certainly there was a concern that, if

8    brought by the federal government, they could be successful,

9    and the detriment to the estate would be significant.

10          The analysis that I attached to my declaration assumes

11   today that we will be -- the estate and/or various debtors of

12   the estate will be receiving back various pledged collateral

13   that was pledged to both banks.  And, again, we look at the

14   assumed current value of that collateral coming back.  Further,

15   as I think we've presented in the plan of reorganization and

16   disclosure statement, we believe that, in the case of

17   Woodlands, it is most likely that we will liquidate that

18   institution in place and ultimately surrender the charter for

19   that industrial lending corp. -- bank.  And with respect to

20   Aurora Bank, we believe that it is most likely that that

21   institution will be sold to a third party in order to maximize

22   value and recovery to the estate.

23          So when taking together either the liquidation through

24   liquidation in place or sale proceeds of the two institutions,

25   together with the value of the collateral coming back, I think

Page 73

1    we reasonably expect that value to be approximately two billion

2    dollars today; and, you know, potentially some further upside

3    to those numbers.

4         We look at, again, the avoidance of the loss to the

5    estate of approximately -- 2.7 billion, I believe, is the

6    number; I don't have the schedule right in front of me -- which

7    suggests a value and/or claims avoided, aggregating 4.7

8    billion.  Assuming that the motions that are before the Court

9    today are approved and the estates go forward with making the

10   final contributions, we believe, in the aggregate on a gross

11   basis, we will have contributed cash, other assets, as well as

12   the cancellation of indebtedness, to the tune of 1.6 billion to

13   both institutions, which suggests to us -- and we believe

14   that -- you know, it was a conclusion that we had in early '09

15   and it's the same conclusion that we draw today that we will

16   have saved or preserved value to the estate of approximately,

17   you know, 3.1 billion dollars by the actions that have been

18   taken to date as well as if we take action pursuant to the

19   motions before the Court, if that answers your question.

20        THE COURT:  Yeah, so the essence of this is that

21   there's an avoided substantial claim of 2.7 billion dollars and

22   a realization as a result of disposition --

23        THE WITNESS:  Correct.

24        THE COURT:  -- of underlying assets that, on a net

25   basis, you estimate is about 3.1 billion dollars to the benefit

LBJI, et al, LBI

Page 74

1   of the estate?

2           THE WITNESS:  That is correct.

3           THE COURT:  Okay.  Thank you.

4           THE WITNESS:  You're welcome.

5           THE COURT:  Mr. Kuntz, if you have questions, this is

6   the time.

7           MR. KUNTZ:  Thank you, Your Honor.

8   CROSS-EXAMINATION

9   BY MR. KUNTZ:

10  Q.   Good morning, Mr. Lambert.

11  A.   Good morning.

12  Q.   Have you worked for a bank?

13  A.   I have.

14  Q.   Which bank?

15  A.   National Bank of North America.

16  Q.   Are you an officer of either Aurora or Woodlands?

17  A.   No, I'm not.

18  Q.   Are you a director of either Aurora or Woodlands?

19  A.   I'm a director of both institutions.

20  Q.   When the settlement was proposed with JPMorgan, was any

21  part of the Woodlands or Aurora alleged equity considered as

22  part of or in place of the 500 million in cash paid to

23  JPMorgan?

24  A.   I'm not sure I understand your question or the

25  connectivity between the CDA with JPMorgan and the banks.

Page 75

```
 1    Q.    There was a settlement previously approved by this Court.

 2    As part of that settlement, the debtor gave JPMorgan 500

 3    million in cash.

 4    A.    Correct.

 5    Q.    Was it ever considered to give part of the Woodlands or

 6    Aurora equity to JPMorgan in place of the cash?

 7    A.    I was not involved with those negotiations, but I would

 8    suspect that JPMorgan was looking for liquid assets, cash, in

 9    connection with that transaction.  So I'm not sure that anybody

10    considered turning over equity value of either institution to

11    JPMorgan.

12    Q.    Has a spinoff of Aurora or Woodlands to Lehman creditors

13    been considered?

14    A.    That is a potential option in the disposition of one or

15    both banks.

16    Q.    What effect would the transfer of the Park Avenue

17    mortgages have on the Aurora or Woodlands balance sheet?

18            MR. PEREZ:  Objection, Your Honor.  Irrelevant.

19            THE COURT:  I don't understand the question either.

20            MR. KUNTZ:  Thank you.

21    Q.    The debtor has, it's my understanding, almost a billion

22    dollars in mortgages on the, I think, 237 Park Avenue building.

23            THE COURT:  Well --

24    Q.    If --

25            THE COURT:  -- I sustain the objection.  It's not --
```

Page 76

1    it's conflating one asset with the need to cure some regulatory

2    problems affecting other assets.  And it's really an

3    inappropriate question, so I sustain the objection.

4          MR. KUNTZ:  Then I'll skip to the next three.

5    Q.   Was there ever any consideration of transferring the

6    junior mortgage on the Hancock Center to Aurora or Woodlands?

7          MR. PEREZ:  Same objection, Your Honor.

8          THE COURT:  Same ruling, and --

9          MR. KUNTZ:  Thank you, Your Honor.

10         THE COURT:  -- the objection is sustained.

11   Q.   Has there ever been a consideration of transferring the

12   empty building in Stamford, Connecticut to Woodlands or Aurora

13   to bolster the balance sheet?

14         MR. PEREZ:  Same objection, Your Honor.

15         THE COURT:  And same ruling.

16         I mean, Mr. Kuntz, I understand what you're getting

17   at, but --

18         MR. KUNTZ:  Your Honor, I take the objection.  I'll

19   just simply finish my questions and I'll be done.  Thank you.

20         THE COURT:  Okay.

21   Q.   How much ground rent is being paid to General Re, if you

22   know?

23   A.   I do not know.

24   Q.   Are you aware that the allowed claims in the Stamford,

25   Connecticut building have been acquired by Barclays?

Page 77

```
 1          MR. PEREZ:  Same -- could I just have a running
 2    objection on relevancy, Your Honor, so I don't have --
 3          MR. KUNTZ:  I believe this goes to the
 4    business-judgment rule, Your Honor.  If --
 5          THE COURT:  Well, without limiting your ability to ask
 6    questions, the questions do need to relate to the substance of
 7    the motion that's before the Court.  And the motion that's
 8    before the Court is very specific; it's a series of settlements
 9    that are designed to cure certain regulatory problems that have
10    plagued Woodlands and Aurora from the very beginning of these
11    bankruptcy cases.
12          MR. KUNTZ:  I understand, Your Honor, and --
13          THE COURT:  And you're talking about a series of
14    other assets and transactions.
15          MR. KUNTZ:  Mr. Lambert is a senior member of the
16    debtors' management, and they continue to roll out this
17    business-judgment rule, and I'm simply asking questions.  For
18    instance, it seems to me that if the Court approved and allowed
19    claims to Bank of America, a/k/a Security Pacific, and then
20    Barclays acquired that claim and now Barclays is being sued
21    by -- for I don't know how much money, that this would be
22    something senior management would be aware of.  I was shocked
23    when I read that.
24          THE COURT:  Well, your questions for today need to
25    relate to the subject matter of the motion that's before the
```

Page 78

1    Court.

2           MR. KUNTZ:  Well, then I'll -- let me skip down.

3    BY MR. KUNTZ:

4    Q.   Has there ever been a consideration of transferring the

5    Sun and Moon property to Woodlands or Aurora to bolster the

6    balance sheet?

7    A.   Well --

8           MR. KUNTZ:  Same objection?

9    Q.   Has the concept of investing one billion dollars in

10   Citibank stock, together with a transfer of Aurora or Woodlands

11   to Citi, ever been considered?

12   A.   Are you -- could you restate the question?  I'm sorry, I'm

13   not sure I understand.

14   Q.   Has the concept of investing the one-billion-dollars-plus

15   that's proposed to be put into Woodlands or Aurora -- has a

16   consideration been made of buying Citibank stock and then, in

17   essence, transferring the Woodlands/Aurora problems to

18   Citibank?

19   A.    I'm not sure I understand how buying stock of another

20   regulated institution would in turn transfer

21   liability/obligation to Citibank.

22   Q.   If Citibank acquired these two institutions, then the big

23   bad government claim would go away, as I understand it.

24          MR. PEREZ:  Your Honor, I'm going to object again.

25   Relevancy.

Page 79

```
 1              THE COURT:  Well, I think you could also object to the

 2      fact that it's not a question.  It was just a statement of Mr.

 3      Kuntz.  It's sustained.

 4              MR. KUNTZ:  Well, at this point, Your Honor, I can see

 5      that, you know, the Court really doesn't want to hear what's

 6      really going on in the debtors' minds, and --

 7              THE COURT:  No, what I want to hear, and I'm giving

 8      you the opportunity to do it, are questions that relate to the

 9      motion.

10              MR. KUNTZ:  Yes, and the questions relate to the

11      business-judgment rule behind putting another billion

12      dollars --

13              THE COURT:  That would mean --

14              MR. KUNTZ:  -- of cash --

15              THE COURT:  That would mean that you would have to ask

16      questions about these institutions, about their capital

17      adequacy --

18              MR. KUNTZ:  Yes, that's why --

19              THE COURT:  -- about the kinds of claims that the

20      government might make under 365(o), whether or not those claims

21      are in fact hundred-cent-dollar claims.

22              MR. KUNTZ:  I'm not --

23              THE COURT:  Those would be real relevant questions.

24      You haven't asked those questions.

25              MR. KUNTZ:  The question, Your Honor, as I understand
```

Page 80

1   it, is the inadequacy of the balance sheet of the subject

2   banks.  And if a billion-dollar mortgage was transferred, not

3   cash, mortgage was transferred to these banks, and the banks

4   could go to the Federal Reserve or whoever and borrow against

5   that collateral, then it seems to me that that would solve the

6   accounting question that the government has.

7           And by the way, we are here because the federal

8   government, as Mr. Miller said, left Lehman out in the cold.

9   Right?  At this point, Your Honor, I'll just leave it at that.

10  I don't have any more to say.

11          THE COURT:  Okay.

12          Is there any --

13          MR. PEREZ:  I have nothing further, Your Honor.

14          THE COURT:  -- any examination of the witness?

15          MR. PEREZ:  I don't have any questions for Mr.

16  Lambert.

17          THE COURT:  Okay.

18          Mr. Lambert, thank you.

19          THE WITNESS:  Thank you.

20          THE COURT:  You're excused.

21      (Witness excused)

22          MR. PEREZ:  Your Honor, by way of argument, I wanted

23  to highlight a couple of things.  Number one, we did start this

24  process back in February of '09, trying to address -- at the

25  time, you know, there was a very material chance that these

Page 81

1    banks would be seized.  And we have put in substantial amounts

2    of money, culminating in the 477 million dollars that we

3    propose to put in by means of this motion.

4         I do want to highlight the fact that, as against

5    Aurora, the -- I'm sorry, by Aurora, on account of Aurora,

6    there is a 2.2 billion dollar claim asserted by the bank.

7    There's a 2.2 billion dollar claim -- there are two 2.2 billion

8    dollar claims asserted by the OTS.  Those claims, one of which

9    is on account of 365(o), which would result -- if that claim

10   was found to be valid, would result in a 507(a)(9) priority.

11   So those would be one-hundred-cent dollars that would have to

12   be paid, same as if it were a fully secured claim.  In

13   addition, Your Honor, there is a 23(a) claim as a result of a

14   concern about an affiliate transaction.

15        We did attach to the motion all the various claims

16   that were filed against the entities, against Woodlands, which

17   total in excess of a billion dollars.  And after you reduce

18   them for duplicates, it's something less than that.  But they

19   are very significant.

20        This is a very difficult situation.  This was not a

21   situation that -- this has been one of the more difficult

22   situations that the bank has faced -- I'm sorry, that Lehman

23   has faced, for two reasons.  First of all, we've had a very

24   volatile environment.  And these banks, when they were char --

25   when they were purchased by Lehman, went on mark-to-market

Page 82

1   accounting, which was the way Lehman accounted.  And generally

2   banks don't do mark-to-market accounting because when you've

3   got a loan that's paying interest and you realize on it,

4   there's no need to mark to market as you would a securities

5   firm that has volatile securities.

6           So we had a situation where, although the assets were

7   performing as a result of the accounting principles, the fair-

8   value accounting, you ended up marking it and there was a real

9   chance that they were going to be taken, coupled with the

10  potential priority claims, coupled with the fact that, under --

11  because LBHI was a bank holding company, the FDIC, if it

12  stepped in and took one bank, was authorized by statute to take

13  the other bank.  So it could have been a situation where not

14  only would we not have had any assets left because of a fire

15  sale liquidation, but there would also have been a very, very

16  significant claim that would have had priority.

17          After many, many months of trying to negotiate this,

18  Your Honor, we've come before the Court, presenting this

19  proposal which we think is the way to really maximize value and

20  avoid significant potential priority claims.

21          That's all, Your Honor.

22          THE COURT:  Okay.  I'd like to hear from the

23  creditors' committee because I know the committee supports the

24  transaction; I'd like to know why.

25          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

Page 83

1    Tweed, Hadley & McCloy, on behalf of the official committee of

2    unsecured creditors.

3            Your Honor, as you rightly point out, we've been here

4    every time the debtors have been here for the past year and a

5    half, supporting the previous infusions and currently support

6    this final resolution.  It hasn't been an easy task for the

7    committee.  I mean, the committee did not start out thinking

8    that this was necessarily a good idea, and convincing the

9    committee took time and effort, working with them, working on

10   the legal issues in terms of the priority claims, and

11   working -- having our financial advisors vet everything the

12   debtors were doing in terms of the potential values here.  But

13   we got there.  We got there sometime ago and we've been side by

14   side with the debtors throughout this process, convinced that

15   doing what we need to do here to get over the regulatory

16   hurdles will result in value to be reaped from this investment.

17           We -- I would -- in the context -- I mean, as I say,

18   we -- it hasn't been an easy process.  We know that this is a

19   lot of money.  We know that this is a substantial investment,

20   has been and continues to be.  We acknowledge some concerns in

21   terms of using the estates' assets with respect to an

22   investment that is not guaranteed, but there are no guaranteed

23   investments here.  We believe that the debtors' business

24   judgment here in making this investment is the best viable

25   option at this point and should yield to substantial value in

Page 84

1    the long term.

2            Commenting as well on Mr. Kuntz's potential

3    substitution, and I think what he was -- his questions were

4    going to were, were other -- whether -- did the estate -- did

5    the committee consider the use of other assets here instead of

6    cash for the other consideration that's being used, and the

7    answer's yes, all options were considered.  I think the answer

8    with respect to the assets you were referring to, the

9    real-estate ones, is that the government did want those types

10   of assets.  What they're getting -- I mean, what we ultimately

11   settled on was the type of assets, the type of contributions

12   that would be acceptable to the government.  And we are where

13   we are.  We have a settlement before you, and that's the issue

14   for the Court.

15           One further -- in terms of the fact that the

16   regulators have not yet approved this, that is a concern, but

17   not a great concern.  We believe that there is enough momentum

18   with the regulators for this to get done in short order.

19   There's one minor hurdle, we believe, to get order, and that

20   will be done.  And nothing will happen with the settlement

21   until that happens.  We take comfort that this is a package

22   deal and, if it's going to get done, it's going to get done as

23   written with full approval by the regulators.  And the money

24   will not get invested without that approval.

25           And finally, Your Honor, on the allocation issues,

Page 85

1    which we think have been resolved, or clarified at least, I

2    think there was always an understanding that the proposed

3    allocations of the benefits and burdens in the motion were

4    subject to a reservation of rights.  The order as modified does

5    in fact make it very clear that they are subject to being

6    revisited if need be.  We think the allocations as proposed

7    make some sense but, with the reservation of rights, everyone

8    will have the opportunity to confirm that in the future.

9             And that's all I have to --

10            THE COURT:  All right, thank you.

11            Does anyone else wish to be heard on this?

12            MR. SHORE:  Chris Shore from White & Case, for the ad

13   hoc group.  I've got two things I'd like to focus on, and I'll

14   try to be brief.

15            We look at the Aurora and Woodland settlement as

16   having two pieces:  First there's a bank settlement piece,

17   which is the interface between the enterprise and the banks;

18   and then there's a debtor settlement, which is the interface

19   between each of the individual debtor estates and what's being

20   resolved in the motion.

21            With respect to the bank motion -- or the bank

22   settlement, that is, the interface between the debtor estates

23   and the banks, we started out very concerned about the

24   investment strategy, which is essentially a doubling-down and

25   putting in a billion dollars of new equity in order to save old

Page 86

1    equity.  And it's not just a 365(o) issue.  Obviously that has

2    always been a concern, but be clear by this motion the debtors

3    are accepting 365(o) liability, because they've entered into

4    what is indisputably a capital maintenance agreement, which

5    is -- so if anything bad goes on from now, that issue seems to

6    be resolved.

7            It's also an issue of this is going in as equity.  And

8    the issues we had and the issues the debtors are working on and

9    the questions we've been asking are what are the risks to that

10   equity investment going into the banks, versus just leaving

11   things as they are now and resolving the 365(o) liability as

12   best we can as it exists.  And we've worked with the debtors

13   all last week.  We had a number of calls over the weekend.  The

14   process is ongoing.  But I think we've gotten ourselves to a

15   fragile approval of the motion where the questions have been

16   answered or are being answered, such that the nature of a very

17   large equity investment to save old equity is something we can

18   agree with.

19           With respect to the debtors' settlements, we

20   appreciate that the statements are being made now that it

21   wasn't intended to be a final allocation.  We did have concerns

22   with respect to two aspects of the motion:  first, the manner

23   in which the allocation of the costs were going to be done, in

24   particular, for example, on the Woodlands side, the allocation

25   of cost based upon bank-filed claims; and also there are going

Page 87

1   to be a number of interdebtor asset transfers going on.

2          Again, we've had a lot of discussions with the

3   debtors.  They've given us comfort that it's not their intent

4   to resolve those finally.  And I think Mr. Miller's comments

5   before are telling.  He's standing up.  Look, they recognize

6   the issue.  We see the issue.  We're trying to reserve rights

7   now.

8          So let me give you an example.  There's an agreement

9   in principle disclosed in the Aurora motion that LCPI is going

10  to be purchasing Archstone loans at ninety percent of fair

11  market value.  Well, that settlement really was one individual

12  acting on behalf of LBHI and LCPI, saying what is fair in this

13  context for going back and forth, and ninety percent of fair

14  market value -- our question's why not ninety-five percent --

15  I'm sure somebody else has a question why not eighty-five

16  percent -- and more importantly, what is fair market value.  I

17  think if we've seen anything in this case, a lot of very

18  sophisticated people can disagree as to how to make marks on an

19  asset.

20         They may have come to the right settlement; they may

21  have not.  We weren't in a position, in the time given, to come

22  up with a definitive view as to what the right allocations are.

23  But we -- so we've agreed to a reservation of rights that lets

24  the debtors proceed with a bank settlement and getting that

25  done -- again, that's an important piece of this -- and that

Page 88

```
 1    allows the debtors to close their books provisionally.  They

 2    have to do something with the accounting for the transaction

 3    that allows it to do it, but allows any party-in-interest, as

 4    part of some process at some point, to look at the bona fides

 5    of this and come up with an approval.

 6              I suspect, just as far as keeping the Court apprised,

 7    that if the debtors go forward and transfer assets from LBHI to

 8    LCPI at this ninety percent of fair market value as they're

 9    calculating, we may have to come back to the Court on that.  I

10    just don't think that there's an agreement, just looking at it

11    from an LBHI perspective, that that transfer at that price

12    makes sense, and we're talking about hundreds of millions of

13    dollars here.

14              I recognize, again, on behalf of the group, that these

15    kind of reservations are cumbersome from a judicial economy

16    standpoint.  We'd like to wrap up all resolutions with respect

17    to one subject matter at the same time.  But at this time, we

18    don't have anybody to negotiate.  If the debtors recognize they

19    can't come to a final settlement and there's nobody there for

20    LCPI, there's really no way to resolve that issue without

21    coming to the Court.  And we apologize for, again, the

22    reservations of rights and the need maybe to come back on that,

23    but we don't have a structure.

24              I don't want to sound like a broken record, but there

25    needs to be something in place.  This is coming up consistently
```

Page 89

1    and it's going to have to come up over time as this gets done,

2    because I'm going to clarify two things from the State of the

3    Estate address:  This isn't a pot plan, per se, absent an

4    agreed settlement.  When we talk about assets and liabilities,

5    distributions are going to be made out of estates, based on the

6    assets and liabilities.  If there are disputes as to who owns

7    the asset or where the liability resides, or what price an

8    asset was transferred, that's all going to have to be resolved

9    at some point, and it's going to have to be resolved pursuant

10   to some process.

11          The only other thing I'd like to add as far as the

12   process as it exists today, I don't necessarily -- I guess I

13   can agree that there are no disputes that have been brought

14   before the Court on that.  I don't think it's fair to say that

15   there aren't disputes.  We've been asking for documents since

16   June.  There has been a database set up.  There are five

17   hundred and, I think, seventy as of last count, documents in

18   that database, substantially -- more than half of which are

19   public documents.

20          So I don't think -- I think we have information

21   bottlenecks now.  There were issues with respect to signatures

22   of NDAs and getting people engaged.  The process is started.

23   But from a disclosure standpoint, I think if that bottleneck

24   doesn't open up and that there's more population with

25   documentation, we may have to be back before the Court.

Page 90

1          THE COURT:  My door's always open.  But to be clear,

2     Mr. Shore, because you used this occasion, and that's fine, to

3     in effect respond to some of the things that came up during the

4     State of the Estate section of this morning's hearing, but as

5     it relates to the motion that's currently before me and your

6     reservation of rights with respect particularly to allocation

7     issues, those rights having been reserved, your group having

8     examined this transaction with the perspective of -- actually

9     the same perspective as Mr. Kuntz; and not wanting to throw

10    good money after bad to preserve equity, old equity especially,

11    you're satisfied -- well, at least your group is satisfied,

12    that this is a reasonable transaction in respect of protecting

13    these banking assets?

14          MR. SHORE:  Yes, we do (sic), Your Honor.

15          THE COURT:  Okay.  I wanted to confirm that.

16          MR. PEREZ:  Your Honor, I'm not sure I have any real

17    response to Mr. Shore's comments, because they largely didn't

18    have to do with the motion, but there is one thing that I would

19    want to respond to, and that is that there was some indication

20    that there was one person who was making all of these

21    decisions.  I mean, all of these decisions are made by groups

22    of professionals, the committees involved.  I mean, this is not

23    something that some person dreams up by himself and wearing all

24    kinds of hats.  I mean, this is -- it's done very thoughtfully,

25    with a lot of input by professionals who do this, or who are

Page 91

1   trying to get to the right decision.

2           And with that, Your Honor, I don't have anything

3   further.

4           THE COURT:  All right.

5           Is there anything more?

6       (No response)

7           THE COURT:  This has been a problem that has been

8   presented on a number of prior occasions, namely the need to

9   provide infusions of equity to support Aurora and Woodlands and

10  to bring these institutions properly within regulatory

11  compliance.  One of the problems, from the Court's perspective

12  during each one of those prior occasions, and today is no

13  exception, is that the role of the regulators has been somewhat

14  obscure.  We know they're there.  We know that they need to

15  take some kind of action to say yes to these various attempts

16  to bring the institutions within regulatory compliance.  But

17  even today I'm being asked to approve very significant

18  transactions without knowing that the approval will lead,

19  within some demonstrated period of time, to approval by the

20  regulators themselves.  In effect, as I said earlier during

21  colloquy, I'm being asked to set in motion a process such that

22  the regulators should have no reason to say no and shouldn't be

23  in a position to say 'Well, wait a minute, you don't have

24  bankruptcy court approval.'  That approval will have been

25  obtained as a result of today's hearing and so, presumably,

Page 92

1    that will create some momentum toward bringing this to a final

2    resolution.

3            I understand what's going on.  I also understand some

4    of Mr. Kuntz's concerns as an observer.  But I am satisfied

5    that the debtors are exercising well-informed business judgment

6    in an area that is not free from doubt.  The fact that the

7    creditors' committee has been closely associated with this

8    process for the last eighteen months and has presumably,

9    through one of its subcommittees, been monitoring this and

10   exercising independent judgment as a watchdog, and also

11   considering the business judgment that's being proposed by the

12   debtor, is a source of comfort to me.

13           Additionally, Mr. Shore's clients represent entities

14   that have significant economic stakes in these proceedings,

15   presumably through acquired claims but that doesn't matter, and

16   they have an interest in maximizing value and preserving

17   rights.  In effect, these natural economic forces that are

18   operating within the case provide some additional comfort in

19   assessing the reasonableness of the business judgment that is

20   being exercised by the debtors.

21           The only real live objection at this point is Mr.

22   Kuntz's objection, which is an objection more to the use of

23   cash as opposed to other kinds of consideration or collateral

24   or assets that might be offered up to make the regulators

25   happy.  With respect to that position, I believe that the

Page 93

1    debtors, the creditors' committee and those who are closely

2    monitoring this process for the banks themselves have done all

3    that they can reasonably do to try to satisfy a difficult

4    situation.  Everybody involved has recognized that this is

5    difficult in part because we're dealing with regulators who are

6    not here in court, and I find that a little troublesome but I

7    can't force them to appear.  It would be much more comforting

8    to me if I were being asked to approve something and I knew

9    that at the time of approval that a deal was going to be inked

10   and executed promptly thereafter.  Instead, this is a little

11   bit of a black box.  And it is really that aspect, as opposed

12   to Mr. Kuntz's objections, that I find most troublesome.

13          Notwithstanding that, I accept the business judgment

14   of the debtors as validated by the creditor constituencies that

15   have been monitoring this, and I approve the motion as

16   presented, both as to Aurora and Woodlands.

17          MR. PEREZ:  Thank you, Your Honor.  We are going to

18   need to change one of the orders to reflect the comments from

19   the U.S. Trustee.  So we will submit that order later on today

20   after we get back to the office.

21          THE COURT:  That's fine.

22          If there are parties who wish to be excused who were

23   involved in the Aurora and Woodlands matters, they can be

24   excused.  But we now have the SunCal matter.

25          (Pause)

Page 94

1           MR. PEREZ:  I meant U.S. Attorney, not U.S. Trustee.

2    I misspoke.

3           THE COURT:  Fine.

4        (Pause)

5           MR. PEREZ:  Your Honor, the next two matters on the

6    morning docket are the motion to settle with the SunCal

7    trustee, and then the last matter is just the motion for relief

8    from stay that has been continued, obviously to the extent,

9    depending on the Court's ruling, that motion will be moot, and

10   there was no counsel for SunCal.  Mr. Smiley, who was here in

11   the courtroom last time, is actually on the phone today.  So

12   there was no intent ever to go forward with that motion, but it

13   was just carried along.

14           Mr. Steinberg is going to take the lead for the

15   debtors with respect to the approval of the 9019 motion.

16           THE COURT:  Okay.

17           MR. STEINBERG:  Good afternoon, Your Honor.  Arthur

18   Steinberg from King & Spalding, on behalf of Lehman Commercial

19   Paper Inc. in its individual capacity and as the agent for the

20   first lien lenders in the SunCal bankruptcy cases.

21           Your Honor, we're here today to -- for approval of a

22   settlement, which has been embodied in an amended term sheet

23   between the SunCal trustee and LCPI as the agent for the first

24   lien lenders and on behalf of itself.  Your Honor had signed an

25   order to show cause scheduling this hearing for today.  The

L-Bar, et al; LB1

Page 95

1    order to show cause was filed and served in accordance with the

2    service list required.

3           The motion has engendered four responsive pleadings:

4    one responsive pleading filed by Fidelity National; the second

5    by Gramercy Warehouse, which is the agent for the second lien;

6    the third is LBREP Lakeside SC Master I, LLC, which was the

7    equity owner of the SunCal entity that received a dividend in

8    connection with a 2006 financing; and the last pleading was a

9    pleading filed by the creditors' committee, in support of the

10   approval of the motion.

11          We filed a reply to the responsive pleadings on

12   September 20th, which included the declaration of Robert

13   Brusco, and we also amended the proposed order to try to deal

14   with some of the objections, and we filed two such amendments,

15   the first filed in conjunction with the reply, the second filed

16   last night when we had gotten a comment from the SunCal trustee

17   who said, based on the timing of when he will get his order

18   approving him entering into the settlement, that it'll probably

19   span beyond the two-year statute of limitations for the SunCal

20   trustee to bring avoiding-power claims, and asked to have this

21   order include a provision that allows LCPI to toll the statute

22   of limitations with respect to any action so that he wouldn't

23   be forced to deal with that issue as to how to preserve his

24   claims until the settlement is approved by both this Court and

25   the bankruptcy court.

Page 96

1          Your Honor, yesterday the SunCal trustee, who had been

2      struggling trying to get a hearing date from his judge, filed

3      the motion to approve the settlement.  The hearing date has

4      been scheduled for December 21.  And he was also able to obtain

5      a hearing date of December 2nd for approval of the disclosure

6      statement, so that he is subject to Your Honor approving the

7      New York aspect of this settlement.  He is going to try not to

8      lose too much time, prepare a disclosure statement over the

9      month of October so that the adequacy of that disclosure

10      statement can be heard by the judge on December 2nd.  Hopefully

11      the judge will approve the settlement at the end of December,

12      confirmation will take place in the early parts of 2011, and we

13      will be able to move forward on the plan.

14          Your Honor, I think -- in assessing the settlement, I

15      think there are four basic tenets that, once accepted, the

16      approval of the settlement will flow directly from that.  The

17      first is that there's no bona fide creditor of LCPI that has

18      objected to the settlement.  Two, even the responding parties

19      do not contend that the settlement is unfair from LCPI's

20      perspective.  Third, the settlement does not seek to adversely

21      modify any rights except the signatories to the term sheet.  In

22      other words, this is a settlement between the SunCal trustee on

23      behalf of the SunCal estate, and LCPI on behalf of itself and

24      the first lien lenders.  Fourth, that this settlement was

25      approached with the interest of the LCPI estate.  That was the

Page 97

1    basis upon which LCPI went forward and entered into the

2    settlement.

3          With those four tenets accepted, the two general

4    questions that arise in the context of a settlement:  Is this

5    settlement in the best interest of the LCPI estate?  And are

6    there any third-party rights that are being adversely modified

7    by the settlement?  I think the answers flow to those questions

8    from those four basic tenets.

9          The reason why LCPI decided that this was a critical

10   juncture in this case and it was important to try to settle as

11   compared to further litigate these matters is viewed -- when

12   looked at, the pending litigations that already have been

13   involved for the almost two years that the SunCal cases have

14   been going on.  Your Honor was the recipient of the motion to

15   lift the stay that was filed by the SunCal trustee, that was

16   filed earlier this year, asking for permission to sell the

17   properties which is the subject of LCPI's collateral and the

18   first lien lenders' collateral.  Companion with that was the

19   motion filed in the SunCal case to retain a broker, which LCPI

20   did not feel was the appropriate broker.  Companion with that

21   was a contract that he had entered into for the sale of the

22   properties for forty-one million dollars, which was embedded

23   with a breakup fee of a million dollars, which LCPI didn't

24   agree with.  Embedded in that was the request to strip the

25   first lien lenders of their rights to credit-bid, which LCPI

Page 98

```
 1   wasn't in favor of.  And embedded with that was an attached

 2   draft equitable subordination fraudulent transfer complaint,

 3   which they wanted to be able to bring for purposes of

 4   determining liability.  So that was one critical juncture that

 5   we had to decide whether we will face the litigation head-on,

 6   whether we would use this opportunity to try to settle.

 7           The second thing is that in the SunCal cases there

 8   have been pending disputes that have lasted over the 2010 year

 9   with regard to use of cash collateral.  Since the filing of the

10   SunCal cases, there's been approximately 4.8 million dollars of

11   cash collateral that is being used for purposes of preserving

12   the properties.  It seemed like that, if we didn't do

13   something, that that cash collateral, which would otherwise be

14   the first lien lenders' collateral, would be dissipated further

15   and further.  The case started with about a little over

16   eighteen million dollars of cash collateral and now it's been

17   reduced to somewhere between thirteen and fourteen million

18   dollars.  So there was a desire to preserve the cash collateral

19   and to sell the properties or to put it into an appropriate

20   position to sell to preserve as much of the cash collateral.

21           The first lien lenders, in 2008, had filed a motion in

22   the SunCal case to lift the automatic stay.  That was basically

23   taken -- put in suspense while the settlement negotiations were

24   going on.  But if this case was not going to settle, that

25   motion would be resumed.  That motion subsumed lifting --
```

1    modifying the stay on two grounds:  One ground was lack of

2    adequate protection, but the second ground was that the debtor

3    had no equity in the properties, which I think has been

4    admitted, and that the properties are not necessary for an

5    effective reorganization.  No doubt that the pursuit of that

6    automatic-stay litigation would lead to competing plans and

7    further litigation expense.  And this case has become more

8    complicated, because it's not all concentrated before one

9    bankruptcy court; it spans two bankruptcy courts, with both

10   bankruptcy courts represented by -- with fiduciaries in both

11   bankruptcy courts trying to advocate the positions on behalf of

12   the estates that they're to represent.

13        So this was a critical juncture in this case, and we

14   are approaching the two-year anniversary for purposes of

15   bringing avoiding-power claims in the SunCal case.  And if we

16   hadn't agreed to toll -- tolling is just a Band-Aid.

17   Ultimately you have to address the merits of the claims or not.

18        From the beginning of the case, or very shortly after

19   the beginning, the decision had been made by LCPI to try to get

20   a settlement.  And I think Your Honor is familiar with the fact

21   that there was an extensive period of time that had been

22   engaged in to try to negotiate what our papers call the

23   original term sheet.  After the trustee -- the SunCal trustee

24   had filed a motion in the California court, it had engendered

25   some objections.  The SunCal trustee reviewed his -- the

Page 100

1    original term sheet; was concerned as to the ramifications if

2    there were senior liens that were not otherwise covered by

3    title insurance that were greater than a million and a half

4    dollars; did not like necessarily what those ramifications are.

5    He said there was an ambiguity; case got off track; and that

6    precipitated the SunCal trustee motion, the hearing before Your

7    Honor, where Your Honor urged the parties to settle, which

8    brings us to here today.

9          From LCPI's perspective, the benefits of a settlement

10   are clear.  With a settlement, there's a obviously a reduction

11   of the expenses that have been incurred on behalf of the first

12   lien lenders in the case, because you're resolving a

13   significant amount of the litigation that I've outlined before,

14   and you are exchanging general releases.  You are avoiding the

15   litigation risk that's involved in any type of case that's

16   before.

17         And just as significantly, this litigation has created

18   a stalemate in the disposition of not just the cash collateral

19   account but the real-estate property itself because until some

20   of these issues are resolved the property just sits.  The

21   property then subsumes a further negative connotation in the

22   market.  And most importantly, if there was a realization

23   opportunity, a favorable realization opportunity for the

24   properties, you could potentially lose it as you engage in

25   further protracted litigation as both parties try to gain the

Page 101

1    system, leverage each other in order to try to drive to a

2    resolution that they otherwise would have.

3           So the settlement that has been entered into basically

4    gives two bundles of rights to the LCPI estate in two different

5    time periods:  one is the settlement effective date and the

6    second is in conjunction with a plan of reorganization.  On the

7    settlement effective date, which is when Your Honor will have

8    approved, if Your Honor approves the settlement, and the SunCal

9    trustee bankruptcy court approves the settlement, at that time

10   the cash collateral account will effectively been allocated in

11   accordance with the term sheet where leases will have been

12   exchanged and litigation will have stopped.  Those things will

13   have been put in place.  The claims of LCPI in the SunCal case

14   will have been recognized and the claim that the SunCal trustee

15   filed in the LCPI case will have been withdrawn.  All of those

16   things take place as of the settlement effective date.  Then

17   under the plan of reorganization the properties will be sold,

18   and the trustee is contractually obligated to proffer a plan

19   which will provide for the sale of the properties for the other

20   assets of this estate to essentially be divided fifty percent

21   to the first-lien lenders, which includes LCPI, and fifty

22   percent to, in effect, the trade creditors.  That contemplates

23   the enforcement of the intercreditor subordination agreement

24   between the first-lien lenders and the second and third-lien

25   lenders.

Page 102

1    In this case the first-lien debt is about 235 million

2    dollars; the second-lien debt is 85 million dollars; the third-

3    lien debt is 75 million dollars.  The total lien debt in this

4    case is 395 million dollars.  The overall claims in this case

5    is about another 60 million or 455 million dollars.  The lender

6    group is the predominant class in the SunCal case.  A give-up

7    of what otherwise would be given to the first-lien lenders by

8    enforcement of the subordination to get to the fifty-fifty

9    level is a give-up.

10    The settlement also contemplates what might happen if

11    we could not enforce the intercreditor agreement, if the

12    second-lien lenders or the third-lien lenders could effectively

13    make an argument.  They will have that opportunity to make that

14    argument in the context of the SunCal plan of reorganization.

15    If that happens, the settlement provides that LCPI, who is a --

16    about a twelve million dollar holder in the second-lien debt

17    and almost fifty million dollars in the third-lien debt, and

18    the first-lien lenders who hold 235 million dollars, will

19    dedicate their claims back to the trustee in order to

20    effectuate the same fifty-fifty split.  Those issues will be

21    resolved as part of the SunCal plan.  But either way you work

22    it, because of the mathematics and the size of the first-lien

23    debt and the LCPI positions in the second and the third-lien

24    debt we'll be able to effectuate the fifty-fifty split that's

25    contemplated by the other recoveries.

Page 103

1          So Your Honor, just to highlight the benefits of the

2     settlement -- and I know I've said it before but I just want to

3     emphasize again -- it's the ability to realize the full value

4     of the properties, when we think it should be sold, with the

5     broker that we think it should be sold.

6          We've agreed to be the stalking-horse bidder, at a

7     minimum, or to say that if the SunCal trustee needs us we will

8     be the stalking-horse bidder at forty-five million dollars

9     which is four million dollars than the bid that he otherwise

10    had before.  We agreed to an allocation of the monies that are

11    being used for cash collateral.  That allocation is essentially

12    to give the SunCal trustee three and a half million dollars.

13         Plus agree we're no longer fighting about cash

14    collateral.  You have a dedicated fund of another two million

15    dollars to take you through the set -- from the settlement

16    effective date to the disposition of the real estate.  If

17    there's any money left over that flows back to the first-lien

18    lenders.  The burn rate of cash collateral in this case has

19    been a little over two million dollars a year.  It's

20    anticipated that we will not have another year gap for the sale

21    so there will be some money flowing back.

22         The three and a half million dollars which is being

23    given to the SunCal trustee is necessary because we're selling

24    the real estate through a plan.  The reason why we're selling

25    the real estate through a plan instead of a 363 sale is that

Page 104

1    the SunCal case is in the Ninth Circuit.  The Clear Channel

2    decision has created some difficulties with buyers looking at

3    whether they can get something free and clear, and the decision

4    was made that in order to have the best type of result for

5    marketing the property we do it through a plan.

6         One of the byproducts of doing it through the plan is

7    that the SunCal trustee needs enough money to pay

8    administrative expenses.  As a practical matter, he has not

9    really gotten very -- he hasn't really gotten paid.  Creditors'

10   committee counsel really hasn't gotten paid in the two years of

11   this case.  There's a loan that Gramercy made, which is the

12   second-lien agent, at the beginning of this case which would

13   have to be paid.  There's plan disclosure statements, sale

14   expenses, objections to claims expenses, assisting us on the

15   resolution of the senior lien issue; all of those are

16   administrative expenses.

17        I don't think there's a lot of fat left over for

18   anything, but it was necessary to give that sum of money, and

19   that sum of money is a half a million dollars more than the

20   original term sheet.  It was deemed, because he may have to

21   deal with the broker who won't have the same deal that he

22   thought he had, that he may have to deal with the contractual

23   bidder that has never been approved, that he may have to deal

24   with something like that.  We gave him the money so that he

25   could administer the case and confirm a plan pursuant to which

Page 105

1    the real estate, which is the primary collateral, would be

2    sold.

3         Those are our benefits.  The detriments that we gave

4    up are we gave up some of our cash collateral.  But we have

5    been fighting cash collateral for two years already in this

6    case.  We've already had a 4.8 million dollar dissipation of

7    cash collateral.  We gave up 3.5 percent of the net proceeds

8    that we would get under the real estate.

9         Now, we said we would be a stalking-horse bidder for

10   forty-five million dollars.  There are potentially senior

11   mechanics' liens which would be ahead of us.  To do simple

12   math, if the net purchase price would be fifty million dollars

13   because we were able to get a deal that reflected that amount

14   of money net to us, net of the brokerage fee and everything

15   else, 3.5 percent would be 1.75 million dollars to the SunCal

16   estate and 48.25 million dollars for the benefit of the first-

17   lien lenders.  In the context of a compromise that was deemed

18   to be sufficient from LCPI's perspective.  And I think no one

19   is challenging that LCPI is having at least a fair deal in the

20   matter.

21        There are the three responsive pleadings, other than

22   the committee that is supportive of the transaction.  One was

23   filed by Fidelity, and I think that's probably the easiest to

24   deal with because Fidelity perceived an ambiguity which we,

25   frankly, didn't think existed.  But for purposes of clarifying

Page 106

1    the record, and we put it in our reply, that when we said that

2    the SunCal trustee was going to cooperate in trying to deal

3    with the senior lien issue that was not meant to say that the

4    first-lien lenders, who in effect purchased the title policy,

5    would not live within its contractual commitments for

6    cooperation.  The bargained-for rights for the SunCal trustee

7    was additive.  So it was not only that the first-lien lenders

8    will do something but if it didn't cost an extreme amount of

9    money the SunCal trustee would also cooperate to allow us to

10   resolve the mechanics' lien issues which are the creditors of

11   the SunCal estate.

12          So we clarified that.  I make the statement on the

13   record.  With that statement, I think, we've spoken to them

14   before, I think they're here today, everything else they said

15   in their pleading was a reservation of rights, the same type of

16   reservations of rights that they sent to the first-lien lenders

17   over a year ago, to the counsel that was handling mechanics'

18   liens issues saying that there are some potential defenses we

19   have, we'll defend you, we'll stand -- we'll continue to defend

20   you now, but we're reserving our rights because we haven't

21   crossed the bridge on that yet.

22          And they said please, Your Honor, although we're

23   saying to you, sir, as we're reserving our rights, we're not

24   asking you to rule on any of those reservations of rights in

25   connection with the settlement agreement.  And generally we are

Page 107

1    supportive of the settlement, it cleans up most of the

2    objections, and subject to cleaning up the ambiguity that I

3    referred to before we're generally supportive of the settlement

4    agreement.

5           So I was careful to call them responsive pleadings

6    instead of an objection because I didn't want to overstate what

7    Fidelity had.  They, like a lot of title insurance companies,

8    they put their marker down saying I'm still holding on to my

9    bundle of rights, rights which we totally disagree with and we

10   think at the end of the day we will win, but there's no reason

11   to deal with that in the context of this motion because they're

12   not asking you to, I don't think we have to, and it's not an

13   impediment to the settlement.

14          THE COURT:  Let me stop you for a second.  You've been

15   talking for quite awhile, Mr. Steinberg.  Is the Fidelity

16   objection a live objection at this point?

17          MR. COHEN:  Good afternoon --

18          THE COURT:  If you say no that'd be great.

19          MR. COHEN:  Good afternoon, Your Honor.  Joshua Cohen

20   from Day Pitney, on behalf of Fidelity.

21          With respect to the issue of the duty to cooperate,

22   Mr. Steinberg's representations on the record and the

23   statements that were made in the reply do address those issues

24   and address the objection that was asserted with respect to

25   that.  So with respect to that issue, Your Honor, the answer is

Page 108

1   no.

2        We do have reservations of rights that we would like

3   to address on the record, whether Your Honor wishes to do it

4   now or following the rest of the presentations --

5        THE COURT:  Well, we've been going for a long time and

6   we're kind of at a point where we're either going to get this

7   done before I break for lunch, because I have a 2 o'clock

8   calendar, or we're going to carry this to the afternoon

9   calendar.  And so I need to get some sense as we go, objection

10  by objection, whether or not I'm going to have what amounts to

11  lengthy argument with respect to the objections or whether or

12  not these are just going to be statements, reservation of

13  rights type objections.

14       I suspect the fact that both Mr. McKane and Mr. Basta

15  are in court today indicates either they don't have that much

16  to do right now or they're going to be pressing their

17  objections on behalf of LBREP vigorously which suggests to me

18  that I may be taking a lunch break, it's just a question of

19  when.  Unless -- there's somebody standing in the gallery --

20       MR. DURRER:  I apologize for rising, Your Honor.  I

21  have a suggestion that I think will address Your Honor's direct

22  question about schedule.

23       THE COURT:  What, about lunch?

24       MR. DURRER:  No, Your Honor.  It'll actually allow the

25  conclusion of these proceedings instantly.

Page 109

1           THE COURT:  Okay, let's hear what that might be.

2           MR. DURRER:  Thank you, Your Honor, I appreciate that.

3     Van Durrer, Skadden Arps Slate Meagher & Flom on behalf of

4     Gramercy Warehouse Funding I, LLC, the second-lien agent, as

5     Mr. Steinberg mentioned.

6           Your Honor, I know that the debtors had filed on

7     Monday a declaration of Mr. Brusco.  We have reviewed it.  I've

8     cobbled together a cross-examination of Mr. Brusco which I'm

9     prepared to go forward with today.  But my understanding under

10    Local Rules is that this would not be an evidentiary hearing.

11    Given that the SunCal matter in California is set for hearing

12    on December 21st, it doesn't seem to me that there is any rush,

13    nothing's going to happen for several months in any event, so

14    that if we could schedule an evidentiary hearing so that

15    discovery can be taken, if appropriate, and we can brief any

16    issues that Your Honor identifies or that the parties think

17    would be appropriate --

18          THE COURT:  That doesn't sound like an instant

19    resolution at all.  That sounds like stretching this out to the

20    detriment of the parties, and I appreciate your stepping up at

21    12:30 to make that proposal, but you can sit down.

22          MR. DURRER:  Thank you, Your Honor.

23          THE COURT:  We're not doing that.  We're going forward

24    and we're taking a lunch break.  But I want to take a lunch

25    break at an appropriate time which would be after Mr. Steinberg

Page 110

```
 1   has completed his recitation as to the current status of things

 2   and parties who are represented who are objectors with live

 3   objections can at least state what their intentions are or

 4   whether or not they agree with what's been said.  And we're

 5   then going to resume at 2 o'clock immediately after the

 6   2 o'clock status conference which involves one of the adversary

 7   proceedings and shouldn't take terribly long.  So I have time

 8   this afternoon to hear you.

 9           MR. STEINBERG:  Thank you, Your Honor.  With respect

10   to Fidelity, they did, in addition to their reservation of

11   rights, say that there were two ambiguities.  And one related

12   to if we do a sale free and clear of liens except for permitted

13   liens, as contrasted to senior liens, permitted liens being the

14   kind of things like easements, et cetera, they said that that

15   word is kind of used loosely and we accept their comment and

16   when the sale motion is filed or is embedded in part of the

17   plan we will be careful of how the permitted liens are defined

18   so we don't have a circular type definition.

19           As far as their saying that they haven't committed to

20   give title insurance to any potential buyer for the property we

21   accept that notion that they haven't committed to give title

22   insurance.

23           With regard to the objection filed by Gramercy, the

24   second-lien agent, they raised three objections, two of which

25   we've resolved pursuant to the proposed order.  One related to
```

Page 111

1    the clause in the proposed order that said that there was a

2    retention of jurisdiction to this court.  They were concerned

3    that that type of what I thought a plain vanilla clause could

4    potentially undermine the jurisdiction of the California court.

5    And they asked us to include language that says that nothing is

6    intended to undermine and affect the exclusive jurisdiction of

7    the California court and whatever those issues are or to

8    predetermine any concurrent jurisdiction issues.  And we were

9    prepared to live with that language.  Obviously, it's Your

10   Honor's order, but we would find that acceptable.

11        The second was they looked at a page in the amended

12   term sheet, they flipped seven pages later, they said 'Ah-hah,

13   I think there may be another ambiguity.  Can you potentially

14   clear it up?'  They suggested some language.  We accepted that

15   language.  The language specifically said that, in essence,

16   that nothing in this term sheet is intended to, in effect,

17   adversely modify the rights of any party who wasn't settling.

18   So we weren't trying to predetermine any rights that the first-

19   lien lenders had as against the second-lien lenders.  We were

20   simply settling our disputes between the SunCal estate and the

21   SunCal trustee and LCPI.  So we accepted their language and

22   they're fine with that.

23        So then the third thing is really not an objection,

24   and they really do not have standing for anything in this case.

25   They are not a creditor of LCPI.  They are a creditor of the

Page 112

```
 1    SunCal estate which is a disputed creditor of the LCPI estate.

 2    Their argument -- and it's not even an objection because they

 3    say basically, 'Judge, we're trying to be helpful here' -- sort

 4    of like the same kind of help that they had about the

 5    adjournment -- 'We're trying to be helpful here.  What we think

 6    is that the SunCal trustee hasn't done his job.  He hasn't done

 7    his diligence.  Man, if he did more diligence he'd be able to

 8    find bigger claims against the LCPI estate.  He'll never win in

 9    the SunCal court, so let's assume he's not going to win and

10    let's deal with that issue automatically right now.  Let's lift

11    the stay, let the SunCal trustee take more discovery on the

12    claims that he's otherwise settling or let's appoint another

13    examiner in this case.  Let's have the LCPI estate bear greater

14    administrative expenses as a helpful suggestion by a

15    noncreditor of the LCPI estate, all for the purpose of

16    establishing larger claims against LCPI and undermining the

17    settlement.'

18          Well, I think that argument is probably a very good

19    argument in support of the settlement because he's essentially

20    conceded, without being a party-in-interest in this case, that

21    this is a good settlement for LCPI.  And that is what we're

22    asking Your Honor to evaluate.  But certainly I don't think he

23    has standing to object.  Once we said that there's nothing in

24    this case that's affecting his rights then we don't think that

25    he has standing to say anything in this case at all.
```

Page 113

1       And I think, just to put it on the table, he's being

2    helpful because he is a party, his client is a party to an

3    intercreditor agreement that says that "The second-lien agent

4    will not contest or support any person in contesting in any

5    proceeding the priority, validity or enforceability of a lien

6    held by the first-lien lender claim holders in their first-lien

7    collateral."  So he's skating very close to it, and so as a

8    nonparty to this action he's coming forward with this type of

9    helpful suggestion.

10       With regard to LBREP Lakeside, they are not asserting

11   that this settlement is unfair to the creditors of LCPI.  They

12   are not criticizing LCPI's decision to settle claims asserted

13   by the SunCal trustee.  In reality, their only complaint is

14   that they're not getting a settlement as well too; they want a

15   settlement.  It would be nice if they settled but there is no

16   settlement on the table right now.  They value their claim at

17   zero.  The SunCal trustee values their claim as something more

18   than zero.  They haven't been able to bridge the gap.

19       But there's nothing in this settlement that prevents

20   LBREP from settling with the SunCal trustee.  There's nothing

21   at all that affects their rights.  They could do it tomorrow.

22   They could do it next week.  They could do it before December.

23   We can't force the SunCal trustee to settle with LBREP.

24   Certainly we can't force it to settle it at a zero number.  And

25   there's nothing in the amended term sheet that is preventing

Page 114

1    them from settling.

2          They've conjured up a whole bunch of arguments, none

3    of which are grounded in any type of law.  Since we say that

4    there's nothing in this settlement that's affecting any of

5    LBREP's rights they still somehow say that based on some law

6    which isn't apposite that we are profiting from our wrongdoing

7    because we're settling on the loans that we made while they're

8    still exposed on the dividend recap.  The cases that they cite

9    all relate to one party directly suing another party.

10         THE COURT:  I read the footnote that included some of

11   the very interesting cases that were cited --

12         MR. STEINBERG:  Okay, so --

13         THE COURT:  -- involving photographs and real contests

14   and the like.

15         MR. STEINBERG:  So the general obligation law citation

16   which is really just a bootstrap of the same argument that you

17   shouldn't be able to profit from the other:  (a) we don't have

18   a litigation; (b) we're not asserting contribution claims; and

19   (c) even if we had -- if we were joint tortfeasors and we were

20   asserting contribution claims they get the benefit of the

21   reduction of their liability under New York general obligations

22   law.

23         THE COURT:  Okay.

24         MR. STEINBERG:  You heard that part.  All right, so

25   then I'll leave with the last two arguments that they have.

Page 115

1          THE COURT:  I actually read the papers.

2          MR. STEINBERG:  Okay.  So then I'll just -- Your

3     Honor, just the last two things, and maybe I'll just flag them

4     and if Your Honor has any questions, because I think our papers

5     adequately dealt with them.  One was if we settle, after having

6     staked out all of our position in the SunCal estate, if we

7     settle and say that we never believed that this litigation had

8     any merit but we suddenly change our position because we are a

9     potential recipient of the other recoveries, will we perjure

10    ourselves, violate the federal rules based on this concern.

11    And I think that is clearly a nonmeritorious objection, and our

12    papers recite why we would uphold the oath, the ability to tell

13    the truth, et cetera, et cetera.

14          And the last thing that they say is that there's a

15    conflict of interest.  And really the biggest example of why

16    there's no conflict of interest is they're in court today.

17    Right?  They're objecting to the settlement.  We're not

18    controlling them.  We didn't undermine any aspect of their

19    settlement.  We didn't try to affect their ability to settle at

20    all.  They are -- you know, the LBREP or the Lehman estate

21    entity is a minority economic interest in LBREP.  It's -- the

22    majority or the clear majority is held by third parties.  In

23    the LCPI, for the first-lien lenders the LCPI estate is only

24    thirty percent of the first-lien lender debt.  There are all

25    these outside third parties that are making sure that their

Page 116

1    individual parochial rights are being protected.  There is

2    nothing in here as a bottom line that's prejudice.  And we said

3    it at the beginning and the basic tenet is that we approach

4    this settlement from the perspective of LCPI.  We didn't

5    approach it from the perspective of LBREP.  We did it on behalf

6    of LCPI who is the individual lender and is acting as an agent

7    for the first-lien lenders.

8            Your Honor, our papers do recite the general standards

9    that I know you're familiar with about lowest range of

10   reasonableness, canvassing of the issues, et cetera, and we

11   think we've clearly met that burden in this case.

12           THE COURT:  Okay, thank you.

13           I want to hear, before I hear from LBREP Lakeside,

14   from Mr. Smiley if he's on the line.

15           Mr. Smiley, are you there?

16           MR. SMILEY:  Yes, I am, Your Honor.  Good afternoon.

17   Your Honor, I don't have much to add on behalf of the SunCal

18   Chapter 11 Trustee.  I just would point out that this

19   settlement is supported by both the Chapter 11 Trustee of the

20   SunCal estates, by the creditors' committee in our estates,

21   obviously by the debtor in your estates and the creditors'

22   committee in your estates.  And --

23           THE COURT:  That's helpful.  Let me ask you one

24   question because counsel for Gramercy made another one of his

25   helpful suggestions in proposing that maybe we could just end

LBHI, et al; LB1

1   this whole thing, go to lunch, and do this another day.  And I

2   told him that I thought that wasn't a good idea and I proposed

3   that he take his seat again. I see him smiling, at least, in

4   the courtroom right now.

5          One of the reasons that I made that judgment -- I want

6   to verify this with you -- is that my conclusion from what Mr.

7   Steinberg said about the scheduling of this in California is

8   that things need to move forward on the assumption that you

9   have a settlement that's at least approved here, and that in

10  order for you to be undertaking the work necessary for plan

11  disclosure statement purposes you really need to have that

12  certainty, and that delay here would lead to delay in

13  California.  I want to confirm that that assumption on my part

14  is correct.

15         MR. SMILEY:  Your Honor, your assumption is correct.

16  Although we have a December 21 date before Judge Smith and we

17  did try to get an earlier date, we went ahead and filed our

18  compromise motion almost ninety days early so that if there's

19  discovery, if there's issues that need to be addressed that

20  they can be addressed in our estate.  And in addition to that,

21  given that there is a drop dead date of February 28th to

22  confirm a plan, we do need to proceed right away with filing

23  the plan of reorganization, and we anticipate having that filed

24  by probably mid to late October.  So timing is an issue.

25         Another important note is we have a potential

Page 118

1    stalking-horse bidder that was proffered in connection with our

2    original motion.  They are still there.  There are other

3    bidders and they are all -- they all call almost every day.

4    And we need to give them answers about whether we're going down

5    this process or not.  A lot of them have put a lot of time and

6    effort into reviewing these trial briefs.

7             THE COURT:  Okay.

8             MR. SMILEY:  So it is important that we move

9    expeditiously and that we have certainty on both coasts in both

10   cases.

11            THE COURT:  All right, thank you for that.  Is there

12   anything more you wish to add?

13            MR. SMILEY:  No, Your Honor.

14            THE COURT:  Okay.  Now before we take a lunch break,

15   unless it's possible to resolve this in the next ten minutes, I

16   want to just find out from counsel for LBREP Lakeside -- is

17   there some easy way to say that?  How about just Lakeside?

18            MR. BASTA:  Or just LBREP -- or Lakeside's fine.  Your

19   Honor, I have about fifteen or twenty minutes of argument.

20   There's no evidence.  If they don't go beyond the scope of the

21   declaration there won't be any evidence; fifteen to twenty

22   minutes of argument.

23            THE COURT:  Okay.  And let me find out from Gramercy

24   what Gramercy really wants to do at this point.

25            MR. DURRER:  Your Honor, Van Durrer for Gramercy.

Page 119

1    Well, as I mentioned, Your Honor, we are prepared to go

2    forward.  We will have argument.  We will have cross-

3    examination of the witness.

4            THE COURT:  You're perfectly permitted, in my view,

5    given the circumstances, to call the declarant.  I assume the

6    declarant is in court?

7            UNIDENTIFIED SPEAKER:  Yes, he is.

8            THE COURT:  So his declaration, which I have read,

9    would be his direct testimony and you can ask questions on

10   cross-examination.  That suggests that we should take a lunch

11   break and I'll see you back at 2 o'clock.  We're adjourned till

12   then.

13       (Recess from 12:42 p.m. until 2:24 p.m.)

14           THE COURT:  Be seated, please.  We'll start with the

15   pre-trial.  Do we have counsel for Michigan State Housing?

16           UNIDENTIFIED SPEAKER:  Your Honor, they're just

17   conferring in the hallway so my colleague just went to ask them

18   to come in.

19           THE COURT:  Okay.

20       (Pause)

21           MR. ALBANESE:  Good afternoon, Your Honor.

22           THE COURT:  Good afternoon.

23           MR. ALBANESE:  Anthony Albanese on behalf of the

24   debtors in connection with the Michigan State matter.

25           We're here for a conference with the Court.  Your

LBHI, et al, LB1

Page 120

```
 1    Honor, the matter -- this adversary proceeding has been stayed

 2    a number of times pending the parties' attempt to mediate the

 3    dispute.  Most recently the stay was in fact up until July

 4    15th.  Our adversary, Michigan State, who I'll turn it over to

 5    in a moment, had not agreed to extend the stay at that point in

 6    time because they wanted to see more movement on the mediation

 7    front.  The parties had conferred several times in an

 8    attempt -- without a formal mediator in an attempt to move the

 9    ball forward.

10            THE COURT:  This is a mediation without a mediator?

11            MR. ALBANESE:  Correct.  We were --

12            THE COURT:  That's not mediation.

13            MR. ALBANESE:  Well, we now have a mediator.  My next

14    point, Your Honor, is that we now have a mediator.  They've

15    been appointed.  We've been waiting for one to be appointed but

16    we're trying to move the ball forward in the interim.  A

17    mediator has now been appointed; we just learned yesterday who

18    the mediator would be.  And the mediator has proposed three

19    dates in the end of October and the beginning of November.  The

20    debtor is available on all three dates.  Michigan is

21    determining which of those dates they're available on.

22            So the debtors request that the matter, the adversary

23    proceeding, be stayed at least pending the mediation which

24    should occur within thirty days.  And Michigan State has not

25    yet agreed to consent to that stay, but I'll turn the floor
```

Page 121

1    over to them.  But at this point it does not seem to make sense

2    for the debtors to spend any time and money engaging in

3    discovery the next thirty days in the adversary proceeding not

4    that we do in fact have a mediator and have three proposed

5    dates which the debtors have agreed to all three dates.

6         THE COURT:  Okay.  Where's Michigan State?  Please

7    identify yourself for the record.

8         MR. MURPHY:  Good afternoon, Your Honor.  Michael

9    Murphy appearing on behalf of the Michigan State Housing

10   Development Authority.

11        We just got -- I think it was just last night that

12   some e-mail came through with so-called dates for the

13   mediation.  One of our concerns has been, consistently all

14   through this process, is that to mediate this meaningfully to

15   hopefully get a resolution out of mediation we need certain

16   information to be able to have an effective mediation.  We've

17   never been able to get that.  We've had a couple of informal

18   conferences over the phone.  We've had various agreements that

19   have fallen apart over this period of time about exchanging

20   certain information.  We did submit significant information to

21   Lehman Brothers based upon how we calculated our termination

22   payments.  They said they would simultaneously give us their

23   information.  We got two pages from them of just nothing that

24   we could work with or figure out.

25        So we had another phone conference subsequent to that.

Page 122

1    We did make some headway narrowing the issues.  But the problem

2    is, is I know the Court wants to, and we've agreed to, and I

3    think it's a very good idea to try to mediate the dispute.  But

4    if you can't get information to be able to effectively mediate

5    it then we're wasting everyone's time.  So we were trying to

6    get some discovery to get this information and we've conducted

7    most of the criteria in Rule 26 which allows -- you know, we've

8    done certain things as far as exchanging and swapping

9    information.  We've prepared a discovery plan.  We have

10   submitted it to them.  We're waiting for comments.  To stay the

11   matter thirty days and then go to mediation without information

12   that we think we need to effectively mediate it means we're

13   going to spend a whole day at the mediation and not be able to

14   accomplish much.  So that's why we haven't agreed to the stay.

15         THE COURT:  Well, whether you agree to it or not,

16   there isn't going to be a lot of activity in the litigation

17   unrelated to preparing for the mediation if you're both

18   agreeing to mediate.  So I think it's largely an academic

19   issue.

20         Also, I looked at the pleadings here, and if I

21   understand correctly what's going on, you're seeking to recover

22   a 2.4 million dollar, more or less, payment that was made to

23   Lehman allegedly by your trustee that shouldn't have been made.

24   But your trustee isn't a defendant.  Why is that?

25         MR. MURPHY:  There's been some discussion with our

Page 123

1   clients as regarding their relationship with the trustee and

2   the bonding thing and they don't feel that the trustee should

3   be brought in at this time as a defendant, and so I've honored

4   their wishes.

5           THE COURT:  I consider that curious, to say the least.

6   If the payment was allegedly made improperly by the trustee you

7   may not have all the parties before the Court or before the

8   mediation who may have potential financial responsibility.

9           Also, I see that there is a counter-claim, although

10  it's unclear to me from the counter-claim what the damages

11  might be based upon your calculation of termination payments.

12  And I would hope that at least the parties would exchange that

13  much information so you know what your exposure is in this case

14  just in case you might be on the wrong end of it.

15          Do you know what your exposure is in this case?

16          MR. MURPHY:  Yes, we do, based upon the ADR submittals

17  that Lehman Brothers have already made.

18          THE COURT:  Then you probably know what you need to

19  know.

20          MR. MURPHY:  Yes, at least we have a pretty good idea.

21          THE COURT:  Okay.  What do the parties want from me at

22  this conference?

23          MR. ALBANESE:  Your Honor, I would suggest that we set

24  a conference for after the mediation which will occur about

25  November 5th.  And hopefully we'll resolve it, we'll continue

Page 124

1   our discussions before and during the mediation, and if not

2   then we'll come before Your Honor with a discovery schedule.

3            THE COURT:  Fine, that makes sense.

4            MR. ALBANESE:  Thank you, Your Honor.

5            THE COURT:  And to the extent that there is a need for

6   some informal information in order to make the mediation

7   productive, I assume that the parties will cooperate with one

8   another in providing the information necessary to make the

9   mediation a productive experience for all parties.

10           MR. ALBANESE:  We will, Your Honor.  And our last

11  call, I think we agreed was our most productive, so we'll

12  continue in that -- down that path.

13           THE COURT:  Good.  You're moving in the right

14  direction.  Okay.

15           MR. ALBANESE:  Thank you, Your Honor.

16           MR. MURPHY:  Thank you.

17           THE COURT:  Now we'll pick up with LBREP.

18       (Pause)

19           THE COURT:  Was any progress made during the lunch

20  break?

21           MR. STEINBERG:  Your Honor, I think at this point in

22  time you had indicated you wanted to hear from the objectors.

23  With regard to the second-lien agent, Gramercy, we had

24  indicated that we had questioned whether they had any standing

25  to -- at this point in time.  Even if Your Honor was prepared

Page 125

```
 1    to hear them out for the completeness of a record, I'm not sure
 2    what is left of their objection because if Your Honor -- and I
 3    think at the morning hearing didn't accept their helpful
 4    suggestions then I think we resolved those aspects that they
 5    objected to and I don't think they have anything left in their
 6    objection that they've filed that they're objecting to the
 7    settlement, and they are the only person asking to examine a
 8    witness.  So before we hear from the objectors it would be
 9    helpful to figure out what is it that the second-lien agent is
10    objecting to at this point in time.
11            THE COURT:  Okay.  I'm prepared to hear from them what
12    it is that they're objecting to --
13            MR. STEINBERG:  Thank you.
14            THE COURT:  -- at this time and also to hear on what
15    basis they claim to have standing to object in the first
16    instance.
17            MR. STEINBERG:  Thank you, Judge.
18            MR. DURRER:  Good afternoon, Your Honor.  Van Durrer,
19    Skadden Arps Slate Meagher & Flom, on behalf of Gramercy
20    Warehouse Funding I, LLC.
21            With regard to our standing, Your Honor, I think that
22    the answer is pretty simple.  Mr. Steinberg has already
23    mentioned, and it's not disputed, that Gramercy as second-lien
24    agent and LCPI as first-lien agent, among others, are parties
25    to an intercreditor agreement that was entered into early in
```

Page 126

1    2007 that governs the rights and obligations and duties among

2    the parties.

3            THE COURT:  Do you have any claims in the LCPI case?

4            MR. DURRER:  We do, Your Honor.

5            THE COURT:  What are they?

6            MR. DURRER:  The claims would be for breach of that

7    agreement and/or for breach of the duty of good faith and fair

8    dealing that arises under that agreement under New York law and

9    also California law by entering into the settlement.

10           THE COURT:  Did you file a protective proof of claim

11   to cover those claims?

12           MR. DURRER:  We did not file a protective proof of

13   claim, Your Honor, because under the Ninth Circuit law those

14   actions, because they arise -- well, first of all, we didn't

15   file one under the intercreditor agreement because this issue

16   hadn't arisen.  With regard to the underlying actions, which

17   is --

18           THE COURT:  Do you claim that this settlement

19   agreement violates the intercreditor agreement?

20           MR. DURRER:  I may, Your Honor.

21           THE COURT:  Well, but -- well, you may; do you?

22           MR. DURRER:  I've not yet had an opportunity to

23   examine the witness or depose the witness.  I just got the

24   declaration for the first time a couple of days ago and there

25   are issues that arise in that declaration that give me pause

Page 127

1    regarding the good faith nature of this negotiation and the

2    entering into the settlement by LCPI.

3           The other claims that we have, independent from the

4    intercreditor agreement, are the same claims that are being

5    released by the settlement.  The reason why we didn't file a

6    proof of claim with respect to those, Your Honor, is that under

7    Ninth Circuit law when the order for relief was entered and the

8    trustee was appointed we were divested of those claims, they

9    were taken over by the SunCal trustee, and it would have been a

10   stay violation for me -- in that case for me to file a proof of

11   claim in this case and assert dominion and control over those

12   causes of action.

13          THE COURT:  It sounds to me that you don't have any

14   claims.  You've just said that those claims were divested and

15   became claims of the trustee under Ninth Circuit law, so

16   haven't you just said you don't have standing?

17          MR. DURRER:  No, Your Honor, because we still have --

18   first of all, standing is broader than having a claim, in the

19   first instance.  Standing as a creditor is also broader than

20   having filed a proof of claim.  The settlement, I believe,

21   based upon what I've heard so far, and I want to test it by

22   asking the witness some questions, I believe may negatively

23   impact our rights under the intercreditor agreement.

24          And I mean, there's no doubt that we are a party to an

25   agreement with this debtor.  I think that under 1109, if not as

Page 128

1    a claim today, that clearly gives us standing to ask questions

2    about a settlement that hinges upon the operation of the

3    intercreditor agreement itself.

4         And the fifty-fifty split, Your Honor, that is a

5    component of the settlement, it requires that LCPI and the

6    SunCal trustee win an argument against me that I'm not entitled

7    to proceeds of certain recoveries by virtue of that agreement.

8    And I believe that entering into that agreement without even

9    consulting with us at all as a party-in-interest potentially

10   violated their duty of good faith and fair dealing.  I think

11   that that --

12        THE COURT:  Which bankruptcy court would be the right

13   court to decide whether or not you have a claim?

14        MR. DURRER:  Apparently, Your Honor, I think it's a

15   question of concurrent jurisdiction.  I think that either court

16   may have jurisdiction to hear that.  Honestly I haven't

17   explored it in depth and research.  But this is the problem

18   that we're here for, as a matter of fact, if I can address that

19   for a moment.

20        Mr. Steinberg actually used a very appropriate

21   metaphor earlier; he called this a stalemate, and it is.  The

22   problem is Judge Smith in California has not let LCPI exercise

23   its remedies against its collateral because of the allegations

24   that have been made in the California court.  However, this

25   Court has not permitted anyone to take discovery -- and I'm not

LBHI, et al, LB1

Page 129

1    saying that Your Honor personally took an interest or invoked

2    some sort of control, but rather the debtor has invoked the

3    automatic-stay protection of this Court to prevent any party-

4    in-interest from taking any discovery, not even in their motion

5    for stay relief.  They go into California court and they say

6    'I'd like stay relief.  I would like relief from this court,

7    yet you cannot ask me any questions, you cannot depose my

8    people, you cannot see my documents.'  That creates the

9    stalemate.

10         So we -- and I must admit that when Mr. Steinberg

11   describes my suggestions they don't sound as helpful as I

12   thought they were, but out of my own mouth, I mean, we thought

13   that let's raise our hand now and say to Your Honor, you know,

14   we have a couple of suggestions as to how to break that

15   stalemate and let this thing move forward.  One suggestion was

16   lifting the automatic stay just for discovery, just for

17   discovery purposes.  And we can certainly work with the other

18   side to delineate how that process goes.  Perhaps we can engage

19   in it informally.  So far we've been completely rebut --

20         THE COURT:  What's your objection to the settlement

21   agreement, apart from these suggestions of what you want to do

22   or what relief you're seeking unrelated to the settlement

23   agreement?  What is Gramercy's objection to the settlement

24   agreement that hasn't already been covered by adjustments made

25   in the order?

Page 130

```
 1              MR. DURRER:  The objection we have to the settlement
 2     at this point, Your Honor, based on the declaration filed a
 3     couple of days ago, is that the settlement is not fair, even to
 4     this estate, because it may expose the estate to substantial
 5     administrative liabilities, and that it is not --
 6              THE COURT:  When you say "this estate", you're talking
 7     about the estate of LCPI?
 8              MR. DURRER:  Correct, Your Honor.  And that is --
 9              THE COURT:  So you're here as a friend of the LCPI
10     creditors?
11              MR. DURRER:  No, I would rather not have to pursue
12     litigation to recover a forty million dollar administrative
13     claim in this estate.  I'd rather not be here, Your Honor,
14     candidly, but for the fact that it's very close to California
15     weather here today, I would rather not, you know, dart in your
16     doorway.  But our objection to the settlement is that, and that
17     the settlement has not been entered into in good faith.
18              THE COURT:  All right.  I'll hear what you have to
19     say, why it's time for you to examine the witness, if you
20     choose to do that.
21              MR. DURRER:  Thank you, Your Honor.
22              THE COURT:  Now, is there any question as to your
23     standing, Mr. Basta?
24              MR. BASTA:  Your Honor, there is none.  We filed proof
25     of claim 28846 in the LCPI case as a --
```

Page 131

1            THE COURT:  Well, welcome to our court.

2            MR. BASTA:  Okay, thank you.  It's been a year since

3       I've been here and I'm glad to be back.

4            THE COURT:  Has it been that long?  It hardly seems

5       that long.

6            MR. BASTA:  Yes.  We filed a proof of claim and that's

7       going to be the heart of my argument today because the proof of

8       claim is a protective proof of claim for contribution from LCPI

9       if it turns out that our client, LBREP Lakeside, is liable on a

10      fraudulent conveyance action.  We filed a protective proof of

11      claim to make sure that the comparable recoveries are smoothed

12      out.

13           Let me just start out, Your Honor -- we have a lot of

14      respect for the folks on the other side.  In fact, we work with

15      them all the time.  And the reason we work with them all the

16      time is that we are a partnership.  And our general partner is

17      controlled by the Lehman estate.  And the Lehman estate is our

18      largest constituent.  And when the dividend came out, it's the

19      Lehman entities that got the largest share of that dividend.

20      And when we want to make a major decision, we call up to one of

21      Alfredo's partners, we say, hey, look, we've got to make this

22      major decision.  And he says, okay, we'll go, we'll speak to

23      the people in the Lehman estate.  And the Lehman estate sort of

24      says, you can do this and you can do that.  And we work it out.

25      So everything goes pretty smoothly.  Sometimes.

Page 132

1          Here, we've been trying to get in the door on the

2    settlement discussions.  We're not naïve.  I'm not here saying

3    that LCPI has a duty to bring me in to the settlement.  They

4    can settle whatever they want.  I've been on the other side.

5    I've been in multi-debtor cases.  I'm not saying that the

6    interest of LCPI and the interest of LBREP cannot be adverse to

7    one another.  That's not the position I'm taking.  And it's not

8    the position that I'm taking that this is a bad settlement for

9    LCPI.  I haven't looked at it from that perspective.  I've

10   looked at it under Drexel and a RICO which is, does the

11   settlement adversely affect our client which is LBREP.  That's

12   the focus of our objection.  And our position is that based on

13   the structure of the settlement, our contribution claims

14   against LPCI (sic) are being eliminated under state law while

15   they are preserving under their settlement through the

16   structure their contribution claims against us.

17          And let me walk the Court through why this problem

18   exists.  And before I do that, you know what the settlement is,

19   Your Honor.  Mr. Steinberg laid it out.  There's a fifty-fifty

20   split on -- they get fifty percent of the proceeds from the

21   litigation against my client, LBREP Lakeside, on the dividend

22   recap.  They get fifty percent direct interest.  So if the

23   trustee wins in the fraudulent conveyance claim against us,

24   LCPI and the other lenders, these -- LCPI structured the deal,

25   sized the debt, syndicated the loan, sold the loan with the

Page 133

1    purpose of it being a dividend.  They get fifty percent of the

2    recovery against us.

3            The term sheet says they get a fifty percent recovery

4    in other recoveries.  It's misleading, Your Honor.  There's two

5    assets of this estate.  There's the real estate which is being

6    sold and they've reduced their secured claim to forty-five

7    million dollars so that they can get somebody to come in and

8    bid.  And there's a lawsuit against us.  And it's not in -- of

9    the recovery because it's not a different lawsuit.  It's not a

10   different set of facts.  There's one set of facts.  There's a

11   dividend recap.  They sued LCPI and they sued the lenders.  And

12   they've threatened to sue us and they haven't done it yet but

13   they've shown us the draft of the complaint.  It's the same

14   allegations.  It's the cause of action.  It's just -- there's

15   nothing different about it.  They're just getting released.

16   They're taking a fifty percent interest in the lawsuit against

17   us.

18           Now, I know Your Honor made the comment about those

19   cases that we cited.  But what I would like to do --

20           THE COURT:  I was particularly interested in the case

21   involving the photographs.

22           MR. BASTA:  Oh okay.  Your Honor, what I would like to

23   do, because this is basically, I think, one statute is sort of

24   the sum of my argument -- a few additional tweaks.

25           THE COURT:  I don't mind hearing about the case, in

Page 134

1    particular, but it just caught my eye.

2            MR. BASTA:  Okay.  And I'm not going to talk about

3    that case.

4            THE COURT:  Good.

5            MR. BASTA:  If I could hand up a copy of New York law

6    for a second?

7            THE COURT:  Sure.

8        (Pause)

9            MR. BASTA:  So this is a New York statute on joint

10   tortfeasor, what happens if somebody gets released.  And I

11   don't think anyone can argue that Lehman isn't subject to

12   applicable nonbankruptcy law.  Now what this says is what is

13   the effect of a release of a tort type claim against LCPI.  And

14   so the first question is, is this really a tort.  Are we under

15   this statute -- am I looking in the right place.  And we've

16   cited cases, both Morgenthau  and a California case, Ryan, for

17   the proposition that a fraudulent conveyance action is a tort

18   claim.

19            And there's three sections.  So Section A says that if

20   they settle with the SunCal trustee, our liability is reduced

21   by the amount of their settlement.  And Mr. Steinberg

22   referenced that in his opening remarks.  And I'm sure the

23   SunCal trustee and LBREP at the appropriate time are going to

24   have a rigmarole about how much our liability is reduced by the

25   fact that a joint defendant settled.

Page 135

```
 1              Now look at Section B.  This is absolutely critical.

 2    If Your Honor approves this settlement, our proof of claim for

 3    contribution against LCPI is barred by B because a settlement I

 4    am prohibited from seeking contribution against LCPI if the

 5    settlement is approved.  Done.  My proof of claim is gone.  And

 6    then there is what is known as the quid pro quo.

 7              THE COURT:  Your proof of claim isn't gone.  It's just

 8    that there's an affirmative defense to that claim that

 9    presented --

10              MR. BASTA:  There's affirmative -- well, yes.  Your

11    Honor --

12              THE COURT:  -- that presented a result in an objection

13    to the claim which is contingent anyway.

14              MR. BASTA:  Yes.  But, Your Honor, the key there is

15    that in order for them --

16              THE COURT:  Because we disallowed his contingent in

17    any event.

18              MR. BASTA:  Your Honor -- well, it depends what the

19    facts are at the time -- just because it's contingent it would

20    have to --

21              THE COURT:  I'm not challenging the argument that

22    you're making.

23              MR. BASTA:  Yes.

24              THE COURT:  It's just that you -- I think you may have

25    stated --
```

Page 136

```
 1              MR. BASTA:  I short-circuited --

 2              THE COURT:  -- a little more strongly than was

 3    necessary.

 4              MR. BASTA:  That's a fair statement.  I apologize for

 5    doing that.  It's not that --

 6              THE COURT:  It doesn't -- your claim doesn't just

 7    disappear.

 8              MR. BASTA:  It doesn't disappear.  But, Your Honor,

 9    it's subject to them coming in -- when we can addressed in the

10    proof of claim process, it's subject to them coming in and

11    relying on 15-108(b) and saying that no matter what happens,

12    we're not entitled to prosecute that claim against the estate.

13              And the quid pro quo for this section is subsection

14    (c) because if I'm prohibited from seeking contribution against

15    them, they're prohibited from seeking contribution against us.

16    And that is the heart of it which is that what they are

17    doing -- this is one lawsuit, one cause of action -- maybe

18    multiple causes of action but the same set of facts.  They are

19    entering into a settlement.  They are borrowing LBREP's

20    rights -- they could borrow LBREP's rights to pursue them for

21    contribution if they're taking the fifty percent interest in

22    the lawsuit against us.  And this rule is not unique to New

23    York.  This is the rule in twenty-five states and in

24    California, this is also the rule.  It's -- I can get Your

25    Honor the citation but it's the same rule in California.
```

Page 137

1           THE COURT:  Well, let me ask you this.

2           MR. BASTA:  Yeah.

3           THE COURT:  I don't want to get into what the rule is

4    in California.  But is it your position that New York general

5    obligations law applies to a litigation which has not yet been

6    commenced in California with respect to real property to be

7    developed in California and loans that were entered into in

8    connection with that real property in California?

9           MR. BASTA:  Your Honor, there is a choice of law

10   question.  I think that our proof of claim which it has an

11   effect on is obviously subject to New York law.  I think you

12   could apply California law, candidly, because -- you could

13   apply California because the property is located in California.

14   But the citation if I could get -- I'll get the citation, Your

15   Honor.  I can present to the Court that the rule barring

16   contribution, our contribution claim against the estate once

17   they have settled, that rule is identical in both New York and

18   in California.

19           And, Your Honor, the -- to answer your question,

20   there's a case, and it's cited in our papers, that says that

21   the prohibition on contribution -- these rules come into effect

22   even with respect to lawsuits that have not yet been filed.

23   Meaning that, once they settle, that's a prohibition on

24   contribution.  There's no requirement that a lawsuit be filed

25   in order to trigger that.  And the definition of

Page 138

1   contribution -- we cited these state law cases.  And one of the

2   reasons we cited these state law cases is that the definition

3   of contribution is very broad because what I think the statute

4   is trying to do is they want settlements, they want LCPI and

5   SunCal to settle so we don't have to hear about this anymore.

6   But -- so you should foster that.  But it's not really --

7   unless you get to the quid pro quo in (b) and (c), it's not

8   really getting rid of the litigation, because what it's going

9   to shift is that instead of them being sued by the SunCal

10  trustee, if there's ultimately a judgment, they're going to end

11  up being sued by us on behalf of figuring out who is more

12  responsible for the underlying claim.

13          There is an easier way to settle the lawsuit.  The way

14  to settle the lawsuit is they compromise their claims with the

15  SunCal trustee and not create an economic interest in the

16  lawsuit against us.  And this rule -- you know, we cited a lot

17  of Justice Cardozo, don't profit from your own wrongdoing.  The

18  rule is, I think, a basically common sense rule.  You can't

19  take advantage of the statute to get a settlement and prohibit

20  us from going against them.  You can't take that benefit.

21  Okay?

22          THE COURT:  Well, they cite a whole bunch of cases,

23  too, and say that this has nothing to do with profiting from

24  wrongdoing which is how we get into the photographs and the

25  Will (ph.) case --

Page 139

```
 1              MR. BASTA:  Right.

 2              THE COURT:  -- which were cited in that footnote.

 3      And -- I mean, it seems to me -- and I don't mean to make this

 4      overly simplistic -- that what you really want is not so much

 5      to defeat the settlement as to be benefited by the settlement.

 6      You want -- the affidavit or declaration that was filed by one

 7      of your colleagues makes clear in paragraph after paragraph

 8      attempts to knock on the door and get into the settlement

 9      discussion.

10              MR. BASTA:  Let me explain why that's relevant or not

11      relevant.  Mr. Steinberg discussed sort of, like, oh, we can't

12      settle.  There's a bid in the ask.  There's never been a bid in

13      the ask.  But let me -- this is the conflict point.  It's not

14      really -- I'm not really alleging a conflict of interest.  I'm

15      not.  This is what I'm saying.  If you -- we have a bunch of

16      limited partner investors.  And let's look at how they view the

17      world.  They view the world -- is that LBREP isn't really

18      different than LCPI.  We're both subsidiaries of Lehman

19      Brothers.  Lehman Brothers is our general partner.  Lehman

20      Brothers controls LCPI.  And they both owe duties to their

21      constituencies for which they are the controlling party.  And

22      on the LCPI side, they're being very vigilant in protecting

23      themselves.  They're protecting their economic interest.

24      They're worried about their stakeholders.  They enforce the

25      automatic stay when the SunCal trustee came to this Court and
```

Page 140

```
 1   said no, no.  The automatic stay applies.  You can't come in

 2   and you can't affect this entity that we're in control of.  But

 3   they call us up and they say, wait a minute.  They owe those

 4   same duties to us.  How come -- where is it that they're

 5   fighting and saying Lehman has an economic interest in this

 6   fund.  Lehman has an economic interest in making sure that this

 7   lawsuit doesn't deprive the creditors of the Lehman estate with

 8   a recovery from this.  So we are here.  We are the -- we feel

 9   like the neglected sibling.  We are the sibling that has not

10   been protected by the Lehman estate.

11           So it's not a conflict.  LCPI can do what it wants.

12   They have done a good job.  They can settle with their

13   creditors.  But what they're doing is something worse than

14   settling with their creditors.  They're facilitating a lawsuit,

15   really, that's not meritorious against us and we are under the

16   same common control.

17           We -- they say something very interesting.  And I

18   talked to Mr. Perez about this.  They say they don't think

19   SunCal was insolvent at the time of the dividend.  Great.  That

20   was a great statement.  We don't think it was insolvent either,

21   the fact that they raised the debt.  But it's a single issue,

22   solvency.  So why are they taking a fifty percent interest in a

23   lawsuit against an entity that they control that they don't

24   think has any merit because SunCal was solvent at the time?

25   There's only two reasons why that they could be pursuing that.
```

Page 141

1    They're either working with the trustee to try to shake us down

2    for some recovery even though meritoriously they don't think --

3    because they've said that the company is solvent.  They don't

4    think it has any merit.  But they want to take a fifty percent

5    cause of action in a lawsuit that they don't think has any

6    merit.  We don't think that lives up to 9019.  Or, second, and

7    this is really what we think happened, this idea was the SunCal

8    trustee's idea because he said if I can get the lenders in LCPI

9    who orchestrated the transactions on the sideline with an

10   economic interest in the lawsuit, that's going to make my

11   lawsuit against LBREP Lakeside easier.  And that's also not a

12   good reason to settle.

13        So our position is that the settlement agreement is

14   structurally flawed.  The provision -- they should go forward

15   with the settlement.  God bless them.  They should cut out the

16   financial incentive that both prohibits all ability to seek

17   contribution and that results in all of the key evidence being

18   presented by people who have an economic incentive for there to

19   be a finding of a fraudulent conveyance.

20        Your Honor, there's two other points I'd like to make

21   as I forgot --

22        THE COURT:  Mr. Steinberg was ready to pounce.

23        MR. BASTA:  Just two other points.  At the end of

24   the -- Your Honor, the provision of the California code is

25   California Civil Procedure Code 877.6.  It has the same

LBHI, et al, LBI

Page 142

1    provision.

2          Mr. Perez --

3          THE COURT:  It's just a joint tortfeasor's release

4    provision.

5          MR. BASTA:  Yeah.  Mr. Perez' papers at the end make a

6    point about how they offered to us taking the LCPI recovery and

7    putting it into an escrow to accommodate what our concern is.

8    And the papers sort of suggest that we rejected it.  We didn't

9    reject it.  We don't understand it because, one, what about --

10   we're not just focusing on LCPI.  We think all the lenders were

11   participants in this transaction.  So just putting into the

12   escrow the LCPI piece doesn't really help us.  We don't know

13   what standard is being suggested for the release of the funds

14   from the escrow.  So we don't know how that would work.  And it

15   seemed to us that what Mr. Perez was suggesting is almost like

16   we're getting a financial interest in a lawsuit against us

17   which we just couldn't figure out.  So it's not that we're not

18   open to suggestions on how to structurally address the

19   settlement.  We just don't know how that one works in

20   particular.

21         We also don't think Moore v. Bay is relevant to

22   anything.  It's been codified as 544.  Moore v. Bay just says

23   it's the trustee who brings the lawsuit.  It doesn't say that

24   when the -- a particular creditor who is a joint tortfeasor

25   takes a direct financial pass-through from the trustee that it

Page 143

1    gets you out of this joint tortfeasor statute.  And there

2    hasn't been any presentation by the debtor as to how any of

3    this works.  They don't say -- they don't make a case that this

4    statute is preempted.  They don't make a case that the statute

5    doesn't apply.  They don't make any case as to what's the

6    impact of our proof of claim.  I mean, even if Your Honor's

7    inclined to rule against us, which we hope Your Honor won't, I

8    mean, this is -- what are our rights going forward.  Is our

9    ability to go after them for contribution, is that still going

10   to be preserved?  We think this whole area and how this whole

11   thing works really needs some clarification to go forward.

12   Thank you, Your Honor.

13          THE COURT:  Okay.

14          MR. STEINBERG:  Your Honor, I do have a lot of

15   familiarity with 15-108, having litigated the issue.  So I

16   think the first element of clarity --

17          THE COURT:  What issue did you litigate?

18          MR. STEINBERG:  The New York General Obligations Law

19   in other matters.  So I'm very familiar with this section.  And

20   I know that Mr. Basta just now didn't properly cite the

21   section.  And you have to go back to understand that the

22   purpose of 15-108 is to promote settlements.  And it does say

23   that if one of joint tort -- one of a number of joint

24   tortfeasors that that joint tortfeasor's contribution claims

25   has against others are dismissed and the contribution claims

Page 144

1    that they could otherwise assert against the settling party is

2    dismissed.  What Mr. Basta didn't read is that the other

3    protection in 15-108 is that the reduction of the nonsettling

4    parties is reduced by the greater of the consideration paid by

5    the settling party or the proportionate share of fault that the

6    other party had in the transaction, whichever is greater,

7    translated to this situation.  If this section applies, which I

8    do not think it applies, and we cited the AMT Mobile case, a

9    Judge Shannon decision, 404 B.R. 118, which specifically said

10   that joint tortfeasor liability doesn't apply in a fraudulent

11   transfer case.  And I don't think any of their cases are

12   fraudulent transfer cases.  But if this section applied then if

13   LCPI was deemed to be a joint tortfeasor with LBREP and LCPI

14   was fifty percent at fault, and even though they're paying

15   something less than the fifty percent exposure, LBREP's

16   exposure to the SunCal trustee has been reduced by fifty

17   percent because it gets reduced by the greater of the dollars

18   or the equitable share.

19          THE COURT:  So you're saying the settlement benefits

20   them.

21          MR. STEINBERG:  Absolutely benefits them.  And the

22   thing that he spent ten minutes railing about is because he

23   didn't fully read the section.  The section says you get the

24   benefit of the proportionate fault.  That's why the

25   contribution claims go away under this section if this section

Page 145

```
 1    applied.  But it doesn't apply because we're not asserting a

 2    contribution claim against them.  We're asserting a deficiency

 3    claim against the SunCal estate.  We made a loan on the first

 4    lien basis for 235 million dollars.  Our collateral would be

 5    worth less than a hundred million dollars.  We have a

 6    deficiency claim for over 200 million dollars.  And we're

 7    filing it in the case for whatever it comes out to be.  And

 8    we're actually reducing what our share otherwise would be as an

 9    additional benefit to the SunCal trustee to promote the

10    settlement.

11              So this -- you could try to squeeze as much as you can

12    the square peg into the round hole.  But there's no litigation.

13    We haven't asserted any direct claims against them and we're

14    not.  We're asserting a claim for a deficiency on a 235 million

15    dollar loan that's filed against them.  And let's just put it

16    on the table.  The fifty-fifty split, the LCPI share of the

17    fifty-fifty split is fifteen percent, right, with thirty

18    percent of the first lien debt.  Our share is fifteen percent.

19    If Gramercy is correct that it doesn't apply to the other

20    recoveries then our share is even going to go down much further

21    than that because the second lienholders and the third

22    lienholders are going to participate in the settlement and

23    we're going to have to contribute more of what the other

24    recoveries are in order to effectuate the fifty-fifty split

25    which is part of this transaction.
```

LBHI, et al, LB1

Page 146

1          So no one is profiting.  They're giving up.  And the

2     question asked, why are we giving up -- why are we asking for

3     other recoveries which we think has merit -- well, we agree.

4     We don't think the lawsuit had merit.  So at the end of the

5     day, there will be nothing paid by LBREP.  They'll win.

6     They'll vindicate itself.  We think they will.  And we won't

7     get anything on the other recoveries.  And so be it.  That's

8     the element of the deal that we captured.  And all of this

9     fifty-fifty split is something that's embedded in the plan.

10     Ultimately, it will have to be approved by the SunCal

11     bankruptcy court in connection with the SunCal plan of

12     reorganization.

13          THE COURT:  Let me ask you a question that's very,

14     very basic and follows on your last comment.  My approval of

15     this settlement doesn't really effectuate the settlement.  It

16     simply is the first step in a process that we discussed on the

17     phone earlier with Mr. Smiley that may lead to a settlement

18     which is a confirmed plan of reorganization which is built on

19     the settlement.  Do I understand that correctly?

20          MR. STEINBERG:  Yes and no, Your Honor.  There are --

21     if you approve the settlement and the California bankruptcy

22     court approves the settlement, then we will have a settlement

23     effective date and certain rights will flow from the settlement

24     effective date.  Then there's a contractual obligation by the

25     trustee under the settlement which has been approved --

Page 147

1          THE COURT:  To prosecute the plan.

2          MR. STEINBERG:  -- to proffer a plan which will have

3     the elements about selling the property and provide for the

4     fifty-fifty recoveries -- fifty-fifty sharing in other

5     recoveries.  That's embedded in the plan.  The term sheet also

6     provides that if the trustee can't consummate that plan within

7     a certain period of time, it specifies what the recoveries --

8     what happens as a result of that.  We can then move forward on

9     a foreclosure and they're not going to contest it which will

10    allow us to be able to sell the properties.  And the issue

11    about the other recoveries will be left open in the SunCal

12    court to try to figure out.

13         THE COURT:  Okay.

14         MR. STEINBERG:  So, Your Honor, the purpose of 108 is

15    to facilitate settlements.  It's to allow this type of

16    circumstance.  It provides that they will get a benefit of the

17    equitable share.

18         I will just say briefly on the second lien agent.

19    They asked for specific language in the order that said

20    notwithstanding anything in the contrary in the amended term

21    sheet in this order, nothing in the amended term sheet is

22    intended to affect the rights of any -- of any person including

23    the second lien lenders.  So what is it that he thinks he's

24    still objecting to?  He got the provision that says we're not

25    trying to interfere by this approval order of anything relating

Page 148

```
 1    to the intercreditor agreement.  I will also say that if you

 2    read his objection, you'll never find this argument.  He

 3    doesn't talk about that there may be a potential violation of

 4    the intercreditor agreement.  And reading the declaration of

 5    Robert Brusco, which is basically -- encapsulates the moving

 6    brief, that's nothing illuminating for purposes of him making

 7    this argument.  Whatever was on the table with regard to other

 8    recoveries was on the table when we filed this motion and all

 9    along.

10         So, I think what you got here was a shuffle by a

11    lawyer when he had nothing to say.  There was nothing in his

12    objection.  He always had notice of it.  There's nothing about

13    that he's arguing about a violation of the intercreditor

14    agreement.  He couldn't articulate what it was.  And he

15    bargained for a provision that says we're not trying to affect

16    the intercreditor agreement.  Frankly, I think what he does, as

17    I said before, there are general provisions in the

18    intercreditor agreement which talk about what the second lien

19    lender can do or can't do vis-a-vis the first lien lender.  And

20    I think he's probably coming fairly close once he abandoned the

21    helpful suggestions and is now trying to make a more direct

22    claim.

23         So, Your Honor, I think that's my response to the

24    remaining responses.

25              THE COURT:  Okay.  Mr. Basta, I'm going to give you an
```

Page 149

```
 1    opportunity.  I just have a procedural question.  Mr.

 2    Steinberg, you mentioned the declaration which is going to be

 3    presumably the subject of some further examination.  Do you

 4    wish, in connection with affirmative case, to put your

 5    declarant on the stand or do you simply want to expose him to

 6    cross-examination?

 7            MR. STEINBERG:  I think, Your Honor, expose him to

 8    cross-examination.

 9            THE COURT:  Okay.  Mr. Basta?

10            MR. BASTA:  I just have one point to respond to

11    because I checked my reading skills because I read the statute

12    again.  And the statute doesn't say that if we get the benefit

13    of a reduction that we have to -- the statute doesn't say that

14    we have to choose between (a) and (c).  The statute says, we

15    get (a) and the statute says we get (c).  They're

16    comprehensive.  It's (a), (b) and (c).  It's a package.  I

17    understand we get the benefit of (a).  We get the benefit of

18    (a).  Now the benefit of (a) isn't going to reduce litigation.

19    It's going to increase litigation because we're going to be

20    sitting here at some point in time potentially arguing over

21    relative contribution.  But that -- just because there's a

22    reduction in the greater of the settlement amount and the

23    equitable share of damages doesn't right out (b) and (c) which

24    all the case law says embodies a quid pro quo arrangement.  And

25    that quid pro quo arrangement -- they haven't said anything to
```

Page 150

1    suggest that the statute doesn't apply.  Judge Shannon never

2    said in AMT case that the statute doesn't apply.  All Judge

3    Shannon said is that in a fraudulent conveyance action where

4    the only cause of action is a rescission and return, he

5    wondered whether or not there was really contribution in that

6    context.  The complaint that the trustee has been threatening

7    with us has all sorts of causes of action, you know, brief of

8    fiduciary duty, the same stuff that they threw at these guys.

9    And so, to suggest that we're not going to be in a position

10   where this contribution principle is coming down the pike, I

11   just don't think they made a case that to show that we're not

12   going to be harmed by the structure of this settlement.

13           THE COURT:  But to be clear, Mr. Basta, the reason

14   that you're objecting to the settlement is not that the

15   settlement fails to deliver everything that LCPI should want in

16   a settlement.

17           MR. BASTA:  Right.

18           THE COURT:  But rather that the settlement carries

19   with it what you view as the negative collateral damage

20   potentially to your client.  Is that right?

21           MR. BASTA:  I think that we read Drexel and a RICO

22   that says when approving a settlement, the Court should

23   consider the impact on nonsettling defendants.  And in my

24   view -- in our view -- not my view; in our view, a settlement

25   that ignores the impact of state law on how the contribution

Page 151

1    claims work, a settlement that does not follow that state law,

2    I don't know how that settlement can satisfy 9019.  So I don't

3    think it's a situation --

4          THE COURT:  But you're one step removed from that.

5    Very frequently, a 9019 settlement is settling litigation --

6          MR. BASTA:  Right.

7          THE COURT:  -- or settling potential litigation --

8          MR. BASTA:  Right.

9          THE COURT:  -- which is litigation that would be

10   pursued within the bankruptcy court that is approving the

11   settlement.  Here, you're complaining about potential

12   collateral damage impact to your client in California of a

13   litigation that hasn't been brought but it has been threatened.

14   And it's being settled as it relates to LCPI.  And your

15   objection is that if that litigation is never pursued, there

16   may be a negative impact to the extent that California law

17   follows 5108's provisions although we haven't been cited to and

18   I don't have a copy of the California statute that undoubtedly

19   would be the statute that Judge Smith will be looking at.  So

20   we've been making an argument about New York law that probably

21   doesn't apply --

22         MR. BASTA:  Right.

23         THE COURT:  -- in California bankruptcy court.

24         MR. BASTA:  Your Honor --

25         THE COURT:  Do I have that right?

LBHI, et al; LB1

Page 152

1            MR. BASTA:  Look, I think you have the following

2    right.

3            THE COURT:  Did I summarize the position correctly?

4            MR. BASTA:  No.  I don't believe you summarized --

5    with all due respect, I just don't think you summarized the

6    position correctly.  I think we're here to approve a

7    settlement.

8            THE COURT:  You're here to block a settlement because

9    you think it's advantageous to your client to break the play

10   and be in the room so that you can get into a comprehensive

11   settlement that benefits your limited partners, isn't that

12   right?

13           MR. BASTA:  Yes.  And it's also right that Lehman is

14   the general partner.  But I am suggesting, Your Honor, that the

15   settlement structure itself doesn't comply with state law.

16   Now, Your Honor can say, Mr. Basta, go take that to California.

17           THE COURT:  I could say that.

18           MR. BASTA:  Yes.  You could stay that.  And we'll go

19   to California if Your Honor says that.  I don't know why I have

20   to go here and I have to go to California.  If I have to go to

21   California, I will.  My client is, I think, entitled to take

22   actions that it thinks will benefit -- in fact, has a duty to

23   its limited partners to do so.  And here, I don't think this is

24   a question of there's a statute.  And the statute says how it

25   works.  And the statute says that they can't take an interest

Page 153

1   in the claim against us relating to their own conduct that

2   they're settling.  And so we're here to bring that statute to

3   the Court's attention and say go and structure the settlement

4   in a manner that does not eliminate our contribution claim

5   against them and does not incent the lenders and LCPI who

6   bought their debt with a view to solvency to have a financial

7   interest in -- they have a financial interest in their own

8   conduct.

9           THE COURT:  Okay.

10          MR. BASTA:  Thank you, Your Honor.

11          THE COURT:  Now are we going to pursue the Gramercy

12   objections?

13          MR. DURRER:  We're ready, Your Honor.

14          THE COURT:  Let's call your witness.

15          MR. DURRER:  Your Honor, we would -- Mr. Brusco's

16   here.

17      (Pause)

18          THE COURT:  Please raise your right hand.

19      (Witness sworn)

20          THE COURT:  Be seated, please.

21          MR. DURRER:  Good afternoon again, Your Honor.  Van

22   Durrer, Skadden, Arps, Slate, Meagher & Flom, on behalf of

23   Gramercy Warehouse Funding I LLC.

24   CROSS-EXAMINATION

25   BY MR. DURRER:

Page 154

1   Q.   Good afternoon, Mr. Brusco.

2   A.   Good afternoon.

3   Q.   Are you familiar with the declaration that you -- that was

4   submitted as signed by you in connection with this contested

5   matter?

6   A.   Yes, I am.

7   Q.   Have you read your declaration fully?

8   A.   Yes, I have.

9   Q.   Do you have a copy of your declaration with you?

10  A.   Not here but --

11  Q.   I have extra copies --

12  A.   -- I'm sure there's plenty of copies in the courtroom.

13  Q.   Yeah.  I just --

14          MR. DURRER:  It might be convenient, Your Honor --

15          THE COURT:  You may approach and give him a copy of

16  his declaration.

17          MR. DURRER:  Thank you, Your Honor.

18          THE WITNESS:  Thank you.

19          MR. DURRER:  Would you like an extra copy of it?

20          THE COURT:  Sure.

21      (Pause)

22          THE COURT:  Thanks.

23      (Pause)

24  Q.   Mr. Brusco, in your -- actually, let me ask you a few

25  background questions first.  Do you hold any professional

Page 155

1    licenses?

2    A.   Yes.  I hold a law license.

3    Q.   For which state?

4    A.   New York and New Jersey.

5    Q.   And are you a practicing attorney?

6    A.   I am not.

7    Q.   When were you admitted to the bar in New York and New

8    Jersey, sir?

9    A.   90 -- 1992.

10   Q.   What is your position with LAMCO?

11   A.   I am senior vice president.

12   Q.   Okay.  And your declaration states that you're the person

13   primarily responsible for the direct management of SunCal

14   loans.  I want to ask you specifically, does that include

15   directing and consulting with counsel for LCPI in connection

16   with the SunCal bankruptcy cases in California?

17   A.   Which SunCal bankruptcy cases?  There are a number of

18   them.

19   Q.   The SunCal bankruptcy cases that are the subject of this

20   settlement.

21   A.   Yes.

22   Q.   Does it also include the SunCal cases that are not the

23   subject of this settlement?

24   A.   Yes.

25   Q.   Okay.  And is it also within your responsibilities to

Page 156

```
 1    consult and direct King & Spalding in connection with the

 2    motion that is before the Court today in these bankruptcy cases

 3    in New York?

 4    A.   Yes.  But I would add that I do that in consultation with

 5    our internal committee as well as Alvarez & Marsal who is our

 6    restructuring officer.

 7    Q.   And who are the members of the internal committee you just

 8    referred to?

 9    A.   The --

10         MR. PEREZ:  Your Honor, I'm going to let him go a

11    little bit of background.  But this has nothing to do with any

12    of his objections and I don't believe is relevant.

13         THE COURT:  I totally agree.  I'm finding this pretty

14    far afield.  And this isn't a deposition.  This is the pursuit

15    of focused questioning in support of whatever are your

16    remaining objections.  So no latitude.  Go to the points.

17         MR. DURRER:  For purposes of the record, Your Honor,

18    may I make a proffer of where I'm heading with this?

19         THE COURT:  Sure.

20         MR. DURRER:  Thank you, Your Honor.  Your Honor, as we

21    mentioned during the earlier comments, we have concerns that

22    the settlement is not fair and is not entered into in good

23    faith.  The process by which the witness who is in control of

24    that process went about that process is directly relevant to

25    that inquiry.
```

Page 157

1          THE COURT:  Yes.  But the only basis that gives you a

2    reason to stand at the podium is your strained allegation that

3    there's something about this settlement that may result in a

4    breach of an intercreditor agreement.  You don't have a

5    generalized fishing expedition to pursue unsubstantiated

6    allegations of lack of good faith.  And this is not going to

7    happen this afternoon.  It's 3 o'clock.  I've been on the bench

8    since 10 o'clock this morning.  You're going to get an

9    opportunity to ask focused questions only.

10          MR. DURRER:  I appreciate that, Your Honor.  May --

11          THE COURT:  Go ahead.

12          MR. DURRER:  May I finish with my proffer?

13          THE COURT:  Ask your questions.

14          MR. DURRER:  Your Honor, respectfully --

15          THE COURT:  Respectfully, you're on thin ice.

16          MR. DURRER:  I understand, Your Honor.

17          THE COURT:  You have barely standing to be here.  Ask

18    your questions.

19    BY MR. DURRER:

20    Q.   Mr. Brusco, how did you value the various components of

21    the settlement?  And by components of the settlement, I mean

22    the consideration that is being offered and obtained by LCPI in

23    connection with the settlement?

24          MR. PEREZ:  Your Honor, I'm going to object.  It goes

25    beyond the scope of his objection.  I mean, he objected on

Page 158

1    three grounds, two of which were addressed.  We think we

2    addressed the third.  The third was the helpful suggestion --

3    if you look at what his objections are, valuing the components

4    of the settlement had absolutely nothing to do with anything

5    that he raised nor touched neither topside nor bottom.

6              THE COURT:  Sustained.

7              MR. DURRER:  Your Honor, the relief we seek --

8              THE COURT:  You don't seek relief.  You're objecting

9    to a settlement.

10             MR. DURRER:  We're objecting to the settlement unless

11   it is approved on the condition that there be a fair process.

12   That is exactly consistent with the comments I made about this

13   settlement not being fair and not being entered into in good

14   faith.  If I --

15             THE COURT:  You didn't raise an objection to the

16   settlement that it wasn't entered into in good faith.

17             MR. DURRER:  We didn't have Mr. Brusco's declaration

18   which refers to his internal approval.

19             THE COURT:  Mr. Brusco's declaration tracks the

20   motion.

21             MR. DURRER:  Mr. Brusco's declaration refers to

22   internal approvals.  And that process, we believe, ends with

23   two people, Mr. Huesen (ph.) and Mr. Walsh.  It ends with the

24   same people for both sides of this controversy --

25             MR. PEREZ:  Well --

Page 159

1              MR. DURRER:   -- for the LBREP side and for their side.

2     I won't have the opportunity in California to explore that

3     because when I seek to depose Mr. Brusco, when I object to the

4     settlement there that was just filed yesterday, these gentlemen

5     and Mr. Troop, who I don't know if he's still here for

6     Cadwalader, will object and say you can't discovery because of

7     the automatic stay.  The relief that we -- the condition that

8     we suggested would be appropriate for approval of the

9     settlement today was to either give us the opportunity to take

10    that discovery and we're happy to discuss how it be limited, or

11    alternatively, pick a third party impartial, subject to Your

12    Honor's jurisdiction, and we will live with it.  If the person

13    says the deal's good, there's no lawsuit, we will live with

14    that.  As to the expense issue, we're happy to have the expense

15    shared by the two estates.  We thought Your Honor would prefer

16    to have control of that person.  That I'm trying -- and I

17    appreciate the Court's indulgence in allowing me to explain how

18    this is related to the settlement not being in good faith and

19    fair if we don't have that opportunity.  If Your Honor enters

20    the form of order that we proffered, either option, then we

21    have no further objection to the settlement in this court.  But

22    we feel that if it goes forward with one -- both arms tied

23    behind my back in California, that is unfair.  It does affect

24    my rights and it's not in good faith.

25              THE COURT:  Look, you're making an argument in the

Page 160

1    middle of examining a witness.  You wanted to examine the

2    witness.  You can ask proper questions of the witness.  There's

3    been an objection to the question which I sustained.  You can

4    ask proper questions.  No speeches.

5            MR. DURRER:  I appreciate that, Your Honor.

6            THE COURT:  No speeches now.

7            MR. DURRER:  Thank you, Your Honor.

8    BY MR. DURRER:

9    Q.   In connection with entering into the settlement, there

10   were no discussions, consultations, negotiations with Gramercy

11   on the LCPI side, is that correct?

12   A.   In connection with the settlement at issue, the answer is

13   yes.  There were no discussions with Gramercy.

14   Q.   Or any discussions with any of the third lien lenders

15   other than LCPI itself?

16   A.   There were not.

17   Q.   Your declaration refers to your experience and opinions.

18   And your opinions -- in your opinion, would it be beneficial,

19   in general, to have consensus in connection with a settlement

20   like this?

21           MR. PEREZ:  Objection, Your Honor.  I'm not sure that

22   I understand the question.  So I would object to it as being

23   vague.

24           THE COURT:  Why don't you rephrase the question?

25           MR. DURRER:  Thank you, Your Honor.

Page 161

1    Q.   In general, do you think it would be helpful and

2    beneficial to have universal consensus in connection with the

3    settlement when entering into a settlement?

4            MR. PEREZ:  Same objection, Your Honor.

5            THE COURT:  Sustained.  It's not tethered to

6    particular facts.  Of course it's always best if you have

7    universal consensus and everybody sings Kumbaya.  That's not

8    required, however.

9            MR. DURRER:  Certainly not, Your Honor.  I agree.

10   Q.   In connection with this settlement, would it be beneficial

11   to have universal consensus?

12   A.   Well, I don't think I can say it more adequately than the

13   judge just said it.  But yes, in a perfect world, I think it's

14   nice to have consensus by all parties.  I don't think that's

15   necessary required in this case.  I think we've structured a

16   settlement that will get us to where at least LCPI and the

17   trustee need to get to in order to effectuate the settlement we

18   bargained for.

19   Q.   In fact, wasn't it a substantial factor weighing in favor

20   of your determination to enter into the settlement that it

21   would avoid future litigation?

22           MR. PEREZ:  Your Honor, I don't think that's -- I

23   think we say that in our pleading.  This is not an area that is

24   of any contention.  I don't know that this is intended to

25   impeach the witness.  The matter is just repetitive.  And it

Page 162

```
1    doesn't go to any issue that is contested in this matter.

2          THE COURT:  I agree.  I think it would be useful to

3    focus on whatever it is you want to focus on in support of your

4    remaining objection.

5    Q.   In assessing your business judgment to approve this

6    settlement, did you take into account the potential for

7    liability on an administrative basis for breach of the

8    intercreditor agreement?

9    A.   Can you repeat that?

10   Q.   Yes.  Are you --

11         MR. DURRER:  I'll rephrase the question, Your Honor.

12   Q.   Are you familiar with the intercreditor agreement entered

13   into in 2007 among the lenders in connection with the SunCal

14   loans that are the subject of the settlement?

15   A.   I am familiar that an intercreditor agreement exists, yes.

16   Q.   Okay.  In considering whether to enter into this

17   settlement, did you consider potential exposure under that

18   intercreditor agreement?

19   A.   Yes.  There were discussions with counsel.

20   Q.   How did you evaluate your potential exposure on the

21   intercreditor agreement?

22         MR. PEREZ:  Two objections, Your Honor.  First, I

23   mean, I think he indicated that there were discussions with

24   counsel.  So I would object based on attorney/client privilege.

25   But more fundamentally, there's nothing in his papers about a
```

Page 163

1   violation of the intercreditor agreement or any such thing so

2   it really is beyond the scope of his objection.

3           THE COURT:  Sustained on both grounds.

4           MR. DURRER:  Your Honor, with respect to the counsel

5   argument, the declaration specifically states that it is based

6   on discussions with counsel.

7           THE COURT:  It's not a waiver.  This isn't an at-issue

8   waiver.

9   Q.   In paragraph 25 of your declaration, you state that you

10  believe that LCPI has valid defenses to the claims and the

11  SunCal trustee. What are those valid defenses as you understand

12  them?

13          MR. PEREZ:  Your Honor, again, not -- it wasn't

14  included in any of his pleadings.  In our reply, we go to great

15  lengths in a footnote to cite exactly what we had said in the

16  California case indicating all of the reasons why we thought it

17  was there.  Again, I don't think that there's any issue, hasn't

18  been raised by him.  And it's not something that is in dispute

19  in this case.  Yes.  They -- counsel did file -- or his

20  predecessor counsel did file a fraudulent conveyance claim.

21  And the position that LCPI has taken has been consistent since

22  November of 2008.

23          THE COURT:  I'll sustain the objection and consider

24  that the examination is running so far afield of any cognizable

25  objection that this is beginning to look like a fishing

Page 164

1   expedition.  Please, if you have a valid objection to the

2   settlement, ask questions about that that go to this man's

3   business judgment.

4          MR. DURRER:  I believe I inquired into the exercise of

5   his business judgment and that calculus and how he evaluated

6   the various components to the settlement.  And I believe that

7   Your Honor sustained an objection to that.

8          THE COURT:  What I'm telling you is that this man is

9   being called as a witness in connection with his declaration.

10  You can ask him questions that fit within cross-examination of

11  that declaration in connection with his role as a witness in

12  support of a 9019 settlement which is being proffered by virtue

13  of the debtors' business judgment that this is in the best

14  interest of the LCPI estate.  If you have objections to that,

15  you can raise such objections.  Or, if you have objections that

16  this somehow prejudices your client, you can raise such

17  objections but only to the extent that it's within the scope of

18  the declaration, because that's his direct testimony.

19         MR. DURRER:  Okay.

20  BY MR. VAN DURRER:

21  Q.   The settlement calls for the SunCal trustee to receive 3.5

22  percent of net proceeds from the sale of the collateral, is

23  that correct?

24  A.   That is correct.

25  Q.   How do you value that consideration to the trustee?

Page 165

1   A.   Are you asking me how is that monetized?

2   Q.   What do you think it's worth?

3   A.   Well, I can give you an example.  I mean, the appraised

4   values of the properties was sixty-two million.  Okay?  I mean,

5   I can do the math for you if you'd like.

6   Q.   Is it your testimony that you believe that that's worth

7   sixty-two million times .035?

8   A.   Well, it's supposed to be a net -- it's supposed to be

9   three and a half of net proceeds.  So it would be whatever the

10  sale proceeds are.  I think in this case you have to calculate

11  deductions of senior liens in order to satisfy the senior

12  liens, you know, broker costs, all that stuff.  You net that

13  out and then the trustee would take home three and a half

14  percent of that net number.

15  Q.   And in connection with your evaluation of the settlement,

16  did you do that calculation?

17  A.   At one point in time, yes, we did.

18  Q.   Okay.  And what was the result of that calculation?

19          MR. PEREZ:  Your Honor, I think that calls for the

20  witness do disclose what he thinks the value of the property

21  is.  There's three pieces of testimony in the record indicating

22  value.  There's the forty-one million dollar offer that was

23  made that Mr. Smiley referred to.  There's a forty-five million

24  dollar credit bid which we're doing.  And then there's the

25  appraised value which was indicated in what was filed in the

```
1    California cases.  For Mr. Brusco to talk about where he thinks

2    it's going to end up, first of all, doesn't go to any issue in

3    the case.  It doesn't go to any issue raised by Gramercy in the

4    case and would just divulge confidential and proprietary

5    information as to what Lehman thinks or LCPI thinks is the

6    value of the case.

7              Furthermore, Your Honor, nobody is saying -- I haven't

8    heard anybody say you're either getting too much or you're not

9    getting enough.  This is strictly a fishing expedition.

10             THE COURT:  I'll sustain the objection.  I have yet to

11   hear a question that goes to the heart of any objection.  And

12   it really seems to be something that amounts to a deposition

13   and I can't tell if it's being used for purposes of this

14   bankruptcy or if it's being used for purposes of the other

15   bankruptcy where you claim that you can't take discovery

16   because of the impact of the automatic stay.  If that's your

17   objective here, this is really a misappropriation of the

18   Court's time.

19             MR. DURRER:  Well, I certainly don't want to do that,

20   Your Honor.  I have two questions, very specific questions.

21   BY MR. DURRER:

22   Q.  Have you permitted your counsel in the SunCal bankruptcy

23   case that is the subject of this settlement to engage in any

24   discovery where they offer documents respond to discovery?

25   A.   By any party?
```

Page 167

1    Q.   By any party.

2    A.   I believe the answer is yes.  We've actually -- I believe

3    we've actually given discovery to the SunCal trustee.

4    Q.   In response to discovery requests in litigation?

5    A.   I'd have to defer to counsel on that.  I just don't recall

6    whether it was in direct response to discovery demands that

7    were made or it was more in a cooperative nature.  I just don't

8    recall.

9    Q.   And why have you not engaged in conversations, discussions

10   or negotiations with Gramercy in connection with this

11   settlement?

12          MR. PEREZ:  Objection, Your Honor.  Irrelevant.

13          THE COURT:  Sustained.

14          MR. DURRER:  Your Honor, that question goes directly

15   to our allegation of bad faith.

16          THE COURT:  Well, it may also go to whether or not

17   Gramercy filed a motion for relief from stay with focused

18   discovery for particular purposes either in this court or in

19   the California court.  I know from my experience that no such

20   requests for stay relief were made here.  It may be that the

21   answer to the question is because nobody asked the questions

22   the right way.  I don't think that you are doing anything that

23   helps your objections.  And I am increasingly convinced by your

24   questions that you're pursuing another agenda here unrelated to

25   any objection to the settlement.  And I'm not real happy about

Page 168

1   that.

2           MR. DURRER:  Your Honor, there is no other agenda.

3   Candidly, we just want the opportunity to explore the

4   settlement on its merits in the California court.  We believe

5   we're going to be prevented from doing so.

6           THE COURT:  Well, I think you'll have that opportunity

7   if you make a proper request to Judge Smith.

8           MR. DURRER:  Thank you, Your Honor.  I don't have any

9   other further questions.

10          THE COURT:  Okay.  Does anybody else wish to question

11  the witness?

12          MR. PEREZ:  I have nothing, Your Honor.

13          THE COURT:  You're excused, Mr. Brusco.

14      (Witness excused)

15          THE WITNESS:  Thank you, Your Honor.

16          THE COURT:  Is there anything more on this?

17          MR. BASTA:  Not from our end, Your Honor.

18          MR. COHEN:  Your Honor, just to put the -- Fidelity's

19  reservation of rights that we've deferred from earlier onto the

20  record, there is -- as has been discussed, part of the

21  settlement has the disbursement of the development account

22  funds.  And as we articulate in our limited objection, Your

23  Honor, the disbursement of those funds may negatively impact

24  the availability of coverage under Fidelity's title insurance

25  policies.  We've made LCPI aware of that not just in

Page 169

1    conjunction with this particular proceeding but in prior

2    proceedings.  And we assume that as part of the calculus in

3    going to the business judgment to consider the settlement.  And

4    we just reserve our rights with respect to any impact that the

5    proposed settlement has on availability of coverage under the

6    policies.  And we'll defer that issue to a later date.

7              THE COURT:  Okay.

8              MR. COHEN:  Thank you, Your Honor.

9              MR. PEREZ:  Your Honor, we did file -- I'm sorry -- a

10   revised proposed form of order.  I don't know whether the Court

11   was able to see that.  But I can say I have copies to hand up

12   to the Court.

13             THE COURT:  Why don't you hand that up?  Thank you.

14             MR. PEREZ:  In particular, Your Honor, that does

15   include both -- I think it's on the third page.  The first one

16   is the marked -- on the third page of the order, it does have

17   the reservation of rights and the statement that nothing herein

18   affects -- that nothing herein is intended to affect the rights

19   of any third person including the second lienholders and that

20   only the parties to the term sheet's rights are affected.  And

21   secondly, Your Honor, the other major paragraph is the tolling

22   of the statute of limitations.  And then the third item was

23   also in response to Mr. Durrer's comments about concurrent

24   jurisdiction of both bankruptcy courts.

25             THE COURT:  Okay.  The SunCal bankruptcy cases, for

Page 170

1    some reason, have become a major distraction on here.  And

2    that's not just in this afternoon's argument but, frankly,

3    throughout these proceedings including a matter in an unrelated

4    case which is already on appeal to the Second Circuit.

5          The settlement which is currently before the Court is

6    actually the direct result of certain statements that I made

7    from the bench in the context of a motion brought by the SunCal

8    Chapter 11 trustee for relief from the automatic stay in order

9    to pursue litigation claims against LCPI in California and to

10   sell certain property in California while depriving LCPI of its

11   right to credit bid.

12         During the course of the argument that I believe took

13   place in July of this year with respect to that motion for

14   relief from the stay, I noted that a term sheet had been

15   developed many months prior to the date of that hearing which

16   provided for, among other things, the development of a plan of

17   reorganization with the support of LCPI that would have

18   provided for a sale of the property under a confirmed plan of

19   reorganization.  In effect, the current term sheet builds on

20   that prior document and with some modifications including those

21   that have been identified by Mr. Steinberg in his remarks.

22   This is a result that has been long in the making.

23         It comes as something of a surprise to me that third

24   parties who appear not to be directly impacted by the

25   settlement have raised objections some creatively going into

Page 171

1    the question of whether or not joint tortfeasor law is somehow

2    implicated in a negative way by the settlement.  I recognize,

3    and I think I said this during my conversations with Mr. Basta,

4    that the motivation here may be to derail the settlement so

5    that settlement discussions can take place with more parties

6    embraced by the settlement in a more comprehensive settlement.

7    Moving counsel for Gramercy, when asking questions of Mr.

8    Brusco, made a general reference to the fact that it would be

9    more favorable if the settlement embraced more parties.  And I

10   recognize that as true.  It probably would be more favorable if

11   the settlement embraced more parties.  But the settlement in

12   the form that it has been presented is nonetheless one that

13   LCPI, through counsel and through Mr. Brusco, has urged that

14   the Court approve because it benefits the estate.

15         The creditors' committee filed papers in support of

16   the settlement although counsel for the committee has not

17   spoken in connection with today's contested hearing.  I have

18   reviewed the committee's papers and recognize that the

19   committee is, in effect, a strong supporter of approval of the

20   settlement.

21         I'm prepared to approve it.  And I'm sure that comes

22   as no surprise to the objectors.  But I am concerned about some

23   of the arguments that had been made in respect of the joint

24   tortfeasor problem in particular.  And I'm simply going to

25   reserve the time for entry of the order so that I can more

Page 172

1    fully examine the cases that have been cited both by LBREP and

2    by LCPI on the subject of the applicability of these various

3    cases and also the standards applicable to third parties

4    claiming potential damage on account of a settlement.

5           I don't see a clear connection between this settlement

6    and the damage alleged by LBREP, but I want to give it some

7    more thought.  It also occurs to me that the proper form for

8    raising many of these issues is the bankruptcy court in Santa

9    Anna, California when the settlement will be presented to Judge

10   Smith and when there will also be a plan process that will

11   allow parties who can legitimately demonstrate that they are

12   adversely affected by this to have their day in court.  So I'm

13   going to give this some more thought.  But the clear indication

14   that you should take away from this is that the objections are

15   going to be, in all likelihood, overruled, that the settlement,

16   in all likelihood, be approved and that I'll take appropriate

17   action in connection with the proposed form of order as

18   promptly as I can do that.

19          To the extent that any party may wish to submit

20   anything in addition to what has already been presented today

21   in the form of a letter brief, my suggestion is that that be

22   done by no later than September 27 which is next Monday.  I'm

23   not encouraging that that be done.  I'm simply noting that if

24   you feel that there is something more than needs to be brought

25   to my attention while I'm thinking about this that that will be

LBH, et al; LBI

Page 173

1        your last and best opportunity to do that.

2                We're adjourned.

3           (Whereupon these proceedings were concluded at 3:25 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 174

1                          I N D E X

2

3                      T E S T I M O N Y

4    WITNESS                EXAM BY            PAGE      LINE

5    Douglas Lambert        Mr. Kuntz          74        10

6    Robert Brusco          Mr. Van Durrer     155        1

7

8

9                      E X H I B I T S

10   PARTY    NO   DESCRIPTION              ID.     EVID.

11   Debtors       Declaration of Douglas            61

12                 Lambert

13

14

15                      R U L I N G S

16   DESCRIPTION                            PAGE      LINE

17   Debtors' Motion for Authorization to Reject   53        18

18   Certain Executory Contracts, granted.

19

20   Motion of Taipei Fubon Commercial Bank Co.,   54        13

21   Ltd. Seeking Authority to Assign its

22   Interests as Lender in a Promissory Note

23   Issued by Lehman Brothers Holdings Inc.,

24   Granted.

25

```
                                                    Page 175

 1

 2                    R U L I N G S  (cont'd.)

 3    DESCRIPTION                              PAGE      LINE

 4    Debtors' Motion for Approval of (I) A      93       15

 5    Settlement Agreement between the Debtors

 6    and Aurora Bank FSB Regarding the Master

 7    Forward Agreement and Other Matters and

 8    (II) Certain Other Related Relief, granted.

 9

10    Debtors' Motion for Approval of (I) a      93       15

11    Settlement Agreement between the Debtors

12    and Woodlands Commercial Bank and (II)

13    Certain Related Relief, granted.

14

15    Motion of Lehman Commercial Paper Inc. for  171      21

16    Approval of that Certain Amended and

17    Restated Compromise by and Among Lehman

18    Commercial Paper Inc., Alfred H. Siegel,

19    as Chapter 11 Trustee for the SunCal

20    Debtors, and the Official Committee of

21    Unsecured Creditors in the SunCal

22    Bankruptcy Cases, granted.

23

24

25
```

Page 176

1

2                        C E R T I F I C A T I O N

3

4       I, Clara Rubin, certify that the foregoing transcript is a true

5       and accurate record of the proceedings.

6

7       _____

8       Clara Rubin

9       AAERT Certified Electronic Transcriber (CET**D-491)

10      Also transcribed by:    Sharona Shapiro (CET**D-492)

11

12      Veritext

13      200 Old Country Road

14      Suite 580

15      Mineola, NY 11501

16

17      Date: September 24, 2010

18

19

20

21

22

23

24

25