**LexisNexis®** *Total Research System*
Switch Client | Preferences | Sign Out | ? Help

My Lexis™ | Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector | Dossier | History | ↺

FOCUS™ Terms [                    ] Search Within [Original Results (1 - 1)] ⬛ Go → Advanced...

Service: Get by LEXSEE®
Citation: 450 F.3d 996

*450 F.3d 996, \*; 2006 U.S. App. LEXIS 14690, \*\*;
Bankr. L. Rep. (CCH) P80,626; 46 Bankr. Ct. Dec. 179*

⬦ View Available Briefs and Other Documents Related to this Case

In re: ZILOG, INC.; In re: ZILOG MOD III, INC., Debtors, ZILOG, INC., Plaintiff-Appellee, v. ROSE MARIE CORNING; SELENA ROBERT; MARGIE CLEVERDON, Defendants-Appellants. In re: ZILOG, INC.; In re: ZILOG MOD III, INC., Debtors, ZILOG, INC., Plaintiff-Appellee, v. ROSE MARIE CORNING; SELENA ROBERT; MARGIE CLEVERDON, Defendants-Appellants.

No. 04-15787, No. 04-15794

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

450 F.3d 996; 2006 U.S. App. LEXIS 14690; Bankr. L. Rep. (CCH) P80,626; 46 Bankr. Ct. Dec. 179; 24 I.E.R. Cas. (BNA) 1121

December 7, 2005, Argued and Submitted, San Francisco, California
June 15, 2006, Filed

**PRIOR HISTORY:** [\*\*1] Appeal from the United States District Court for the Northern District of California. D.C. Nos. CV-03-02704-JF, 02-51144-MM, D.C. Nos. CV-03-02705-JF, 02-5286. Jeremy Fogel, District Judge, Presiding.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendants, female employees who failed to file timely proofs of claims of sex discrimination in a Chapter 11 bankruptcy case, sought review of a judgment from the United States District Court for the Northern District of California affirming the bankruptcy court's summary judgment in favor of plaintiff debtor, the employer, in plaintiff's adversary action seeking a declaration that the claims were barred by the bankruptcy confirmation order.

**OVERVIEW:** Defendants claimed sex discrimination in the payment of retention bonuses. Notwithstanding the 11 U.S.C.S. § 524 (a)(2) discharge injunction, defendants filed a state court action based on plaintiff's failure to pay promised bonuses. After plaintiff filed the adversary proceeding, the parties stipulated to a stay of the state action. The bankruptcy court denied defendants' request to enter the discrimination claims into the bankruptcy proceedings, finding no excusable neglect for the late filing, and it awarded plaintiff attorney fees after holding defendants in contempt under 11 U.S.C.S. § 105(a) for willfully violating the discharge injunction. The court held that the bankruptcy court abused its discretion in discharging the discrimination claims and in declining to excuse defendants' failure to file timely proofs. The record showed a substantial possibility that the claims were not within defendants' fair contemplation until after the confirmation order and that notices sent to defendants by plaintiff's counsel were affirmatively misleading. The bankruptcy court also erred in failing to hold an evidentiary hearing to determine whether defendants had knowledge of the injunction.

**OUTCOME:** The court reversed the bankruptcy court's grant of summary judgment to plaintiff on defendants' sex discrimination claims, the excusable neglect determination, and the award of sanctions. The court remanded to the bankruptcy court to determine when the discrimination claims came within defendants' fair contemplation and to determine whether defendants were aware of the discharge injunction and its applicability to their claims.

**CORE TERMS:** injunction, notice, proofs of claims, confirmation, contempt, bonuses, discrimination claims, email, summary judgment, retention, automatic stay, discharged, pre-petition, excusable neglect, contemplation, bankruptcy code, sex, administrative expense, deadline, reimbursements, reorganization, holders, male, owed, bankruptcy proceedings, willful, claims arising, commencement, disparate, general counsel

**LEXISNEXIS® HEADNOTES**                                                         ⊟ Hide

Bankruptcy Law > Claims > General Overview 🔧
Bankruptcy Law > Claims > Types > General Overview 🔧
*HN1*⬦ The appellate court looks to federal law to determine when a claim arises under the bankruptcy code. In Jensen, the United States Court of Appeals for the Ninth Circuit held that an environmental claim arises under the bankruptcy code once it is within the claimant's "fair contemplation." Jensen has been applied to a range of non-environmental claims. Although the Ninth Circuit has not had occasion to consider whether Jensen's "fair contemplation" test extends to claims of discrimination, it sees no reason why these claims should not be analyzed under Jensen's framework. Therefore, claims of sex discrimination accrue under the bankruptcy code once they are within the claimant's "fair contemplation." More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > Judgments & Remedies 🔧
Civil Procedure > Summary Judgment > Evidence 🔧
*HN2*⬦ In a motion for summary judgment, the court is required to resolve disputed issues of fact in favor of the non-moving party. Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Claims > General Overview 🔧

Bankruptcy Law > Claims > Proof > Effects & Procedures 🔖

*HN3* The determination of whether neglect in the failure to file a timely proof of claim is "excusable" is an equitable one, taking account of all relevant circumstances surrounding the party's omission. Such circumstances include the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, and whether the movant acted in good faith. This list is not exhaustive. More Like This Headnote

Bankruptcy Law > Claims > Proof > Effects & Procedures 🔖

*HN4* Fed. R. Bankr. P. 9006(b)(1) provides that when an act is required or allowed to be done at or within a specified period by the bankruptcy rules, the court for cause shown may at any time in its discretion, on motion made after the expiration of the specified period, permit the act to be done where the failure to act was the result of excusable neglect. More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Remedies > Contempt 🔖
Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection 🔖
Evidence > Procedural Considerations > Burdens of Proof > Allocation 🔖
Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof 🔖

*HN5* 11 U.S.C.S. § 524 provides that discharge operates as an injunction against the commencement or continuation of an action to collect, recover or offset any discharged debt as a personal liability of the debtor. 11 U.S.C.S. § 524(a)(2). A party who knowingly violates the discharge injunction can be held in contempt under 11 U.S.C.S. § 105(a). The party seeking contempt sanctions has the burden of proving, by clear and convincing evidence, that the sanctions are justified. The movant must prove that the creditor (1) knew the discharge injunction was applicable and (2) intended the actions which violated the injunction. More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection 🔖
Bankruptcy Law > Practice & Proceedings > Contested Matters 🔖
Civil Procedure > Remedies > Injunctions > Contempt 🔖
Evidence > Inferences & Presumptions > Inferences 🔖

*HN6* A trier of fact can infer knowledge of an automatic stay or discharge injunction from the fact that a creditor knew of the bankruptcy. Such an inference, however, would be a matter of fact, not a presumption implied in law. Knowledge of the injunction under 11 U.S.C.S. § 524, which is a prerequisite to its willful violation, cannot be imputed; it must be found. If the creditors dispute that they had such knowledge, a finding that they knew of the injunction, and thus willfully violated it, can only be made after an evidentiary hearing. More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection 🔖
Civil Procedure > Remedies > Injunctions > Contempt 🔖

*HN7* Only actual knowledge of the discharge injunction under 11 U.S.C.S. § 524 suffices for a finding of contempt. More Like This Headnote | *Shepardize:* Restrict By Headnote

## ⊤Available Briefs and Other Documents Related to this Case:

U.S. Circuit Court Brief(s)

**COUNSEL:** Eric S. Rossman, Rossman Law Group, PLLC, Boise, Idaho, and Ruth Elin Auerbach, Glassberg, Pollak & Associates, San Francisco, California, for the defendants-appellants.

Richard Levin and Kurt Ramlo, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, California, for the debtors/plaintiff-appellee.

**JUDGES:** Before: Alex Kozinski and Barry G. Silverman, Circuit Judges, and Roger T. Benitez,* District Judge.

* The Honorable Roger T. Benitez, United States District Judge for the Southern District of California, sitting by designation.

**OPINION BY:** KOZINSKI

### OPINION

[*997] KOZINSKI, Circuit Judge:

This case shows once again why it's important for lawyers representing a bankruptcy debtor to turn square corners.

**Facts**

In June 2001, ZiLOG, Inc. ▾ announced that it would close one of its Idaho plants, effective December 31, 2001. To retain employees through the plant closure, ZiLOG offered certain employees one-time retention bonuses. Rose Marie Corning, Selena Robert and Margie Cleverdon [**2] (collectively, "the women") were among the employees who accepted the offer.

In December 2001, ZiLOG notified the women that it had rescinded the retention bonus agreements because the women would not, after all, lose their jobs at the end of the year. In January 2002, Corning and Robert learned that three male engineers would receive retention bonuses. Corning and Robert claim, however, that [*998] not until "late April or early May, 2002," did they learn that those same three male employees had been paid bonuses even though they were not laid off. Cleverdon claims that she did not learn this until mid-June 2002.

Prior to this time, on February 28, 2002, ZiLOG and a related entity had filed for bankruptcy in the Northern District of California. ZiLOG employees received an email soon afterward from the company's general counsel explaining that they would receive proof of

claim forms from the bankruptcy court. The employees were instructed that "[y]ou need to fill out and return the Proof of Claim form only if you believe that, on February 28, 2002, ZiLOG owed you money other than the wages, benefits and expense reimbursements that you are entitled to as an employee. Otherwise, you do [**3] not need to take any action in connection with the notice that you have received."

Around this same time, the women received a notice from the bankruptcy court explaining that the deadline for filing proofs of claims that had accrued prior to the bankruptcy filing was April 19, 2002. The women did not file proofs of claim prior to the deadline.

The bankruptcy court confirmed ZiLOG's plan of reorganization on April 30 of that year, and the reorganization became effective on May 13. The bankruptcy court's April 30 confirmation order -- mirroring ZiLOG's reorganization plan -- provided that "[o]n the Effective Date, the Debtors shall be discharged of all liability for payment of any Claims incurred before the Effective Date, to the fullest extent provided by Bankruptcy Code § 1141, except that any liability imposed by or assumed under the Plan shall not be discharged." The confirmation order also provided that "July 1, 2002, is the deadline for filing a request for payment of an administrative expense arising from February 28, 2002 through April 30, 2002." The women received written notice of the plan's confirmation.

Pursuant to 11 U.S.C. § 524(a)(2) [**4] , confirmation of a plan "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor." Id.; see also id. § 1141(d)(1). Notwithstanding the discharge injunction, the women subsequently filed an action in Idaho state court (the "Idaho action") alleging contract, tort and statutory claims based on ZiLOG's failure to pay the promised retention bonuses. The complaint did not allege sex discrimination.

In response to this filing, ZiLOG initiated an adversary proceeding in the Northern District of California Bankruptcy Court, and sought to enjoin the Idaho action, arguing that those claims had been discharged in bankruptcy. Shortly after commencement of this adversary proceeding, the women and ZiLOG stipulated that the women would stay the Idaho action until the bankruptcy court entered a judgment in the adversary. The bankruptcy court approved this stipulation and it was entered into the record.

Subsequently, the women filed complaints with the Idaho Human Rights Commission and the United States Equal Employment Opportunity Commission. Each [**5] of the verified complaints contained identical statements of fact, alleging that

> [s]ometime after December 31, 2001, I learned that I would not be paid the promised retention bonus. That in late April or early May, 2002, I learned that male employees who had signed retention bonus agreements had been paid the retention bonuses and/or rehired within a period of time that Zilog represented [*999] such individuals would not be rehired.

Several months later, the women filed affidavits in the bankruptcy court further detailing their allegations of discrimination. Corning and Robert claimed (consistent with their verified complaints) that they did not learn until "late April or early May, 2002," that the three male engineers who had received retention bonuses would not be laid off. During this same period, Corning and Robert allegedly learned that three male maintenance workers who had been laid off in January 2002 might be returning to ZiLOG but would not have to repay their retention bonuses.

Corning and Robert also claimed to have learned by late April or early May 2002 that a seventh male employee who had been paid a retention bonus was neither terminated nor was asked for a [**6] refund. (This was in contrast to a female employee who had apparently been retained, but was forced to return her bonus.) Finally, in "mid-June 2002," Corning and Robert allegedly learned that an eighth male employee had been rehired without being required to repay his retention bonus.

While Corning and Robert's affidavits to the bankruptcy court were consistent with their verified complaints to the Idaho Human Rights Commission and the EEOC, Cleverdon's was not. In her complaint to the Idaho Human Rights Commission, Cleverdon had alleged that she became aware of disparate treatment in late April or early May 2002. In her later affidavit to the bankruptcy court, however, Cleverdon claimed that she did not become aware of the disparate treatment until "approximately mid-June 2002," when she was informed of such by Corning and Robert.

Subsequently, the women moved to enter their untimely contract, tort and statutory claims into the bankruptcy proceedings under the equitable doctrine of excusable neglect. See Fed. R. Bankr. 9006(b)(1). They also requested payment of their sex discrimination claims as post-petition administrative expenses. 1

---

**FOOTNOTES**

1 Although not disputed by the parties, we note in passing that a literal reading of 11 U.S.C. § 503(b), governing administrative expenses, might suggest that "[t]o be deemed an administrative expense, the claim must have arisen from a *transaction* with the debtor in possession, and directly and substantially benefitted the estate." *Boeing N. Am., Inc. v. Ybarra (In re Ybarra), 424 F.3d 1018, 1025 (9th Cir. 2005)* (emphasis added) (footnote omitted). But the Supreme Court has "carved out an exception" by holding that "[i]n the interests of 'fairness to all persons having claims against the insolvent' . . . *tort claims* arising post-petition [are] 'actual and necessary expenses' of preserving the estate." *Id. at 1025 n.10* (emphasis added) (quoting *Reading Co. v. Brown, 391 U.S. 471, 477, 482, 88 S. Ct. 1759, 20 L. Ed. 2d 751 (1968)).* Thus, under *Reading* and its progeny, discrimination claims that arise post-petition but pre-confirmation can be filed as administrative expenses against the debtor's estate.

---

[**7] The bankruptcy court granted summary judgment to ZiLOG, and held all of the women's claims barred by the bankruptcy confirmation order. Applying *California Department of Health Services v. Jensen (In re Jensen), 995 F.2d 925 (9th Cir. 1993)* (per curiam), which held that a claim arises under the bankruptcy code once it is within the claimant's "fair contemplation," *id. at 930*, the bankruptcy court held that the women's sex discrimination claims "should have been within their fair contemplation as of the effective date of confirmation on May 13, 2002. As preconfirmation claims they are subject to the bankruptcy proceedings." 2 The bankruptcy court also found all of the women's other claims to be within their fair contemplation pre-petition, and thus barred because [*1000] no proofs of claim were filed by the April 19 deadline. The bankruptcy court found no excusable neglect for the late filing of these claims, and held the women in contempt for willfully violating the discharge injunction. ZiLOG was awarded $ 20,000 in attorneys'

fees.

---

**FOOTNOTES**

2 It's unclear why the bankruptcy court looked to May 13 rather than April 30 as the relevant date. *See* pp. 6604-6606 *infra.*

---

[**8]  The district court affirmed, holding that the bankruptcy court had made "explicit [factual] findings" that, by late April or early May 2002, Corning and Robert were aware that a number of male employees had received retention bonuses while remaining employed at ZiLOG. The district court held that the bankruptcy court's findings were not clearly erroneous, and that "the bankruptcy court did not err in finding that Corning's and Robert's gender discrimination claims were classified appropriately as *pre-petition* and thus barred by the *May 13, 2003* bankruptcy discharge." 3 (Emphasis added.)

---

**FOOTNOTES**

3 Setting aside the fact that the discharge became effective on May 13, 2002, not 2003, we do not understand why the district court described the claims as "pre-petition." The bankruptcy court had determined that the claims arose *pre-discharge*, not pre-petition. As we explain on pages 6604-6606, the bankruptcy court's use of the May 13 effective date, rather than the April 30 confirmation date, as the deadline for the discharge of administrative claims was inconsistent with other portions of its confirmation order. In any event, the district court's description as "pre-petition" of claims that the bankruptcy court had "found" to have arisen in late April or early May 2002 (i.e., at least one-and-a-half months *after* the filing of the bankruptcy petition) is contradicted by the record.

---

[**9]  The district court described the issue of when Cleverdon's sex discrimination claim arose as "closer." Citing the conflict between Cleverdon's complaint to the Idaho Human Rights Commission and her subsequent affidavit to the bankruptcy court, the district court affirmed the bankruptcy court's grant of summary judgment against Cleverdon: "In light of Cleverdon's *conflicting statements*, this Court cannot conclude that the bankruptcy court's factual determination that Cleverdon's claims were pre-petition [sic] and barred by the confirmation plan on May 13, 2003 [sic] constituted clear error." (Emphasis added.)

The district court also affirmed the sanctions award, holding that "[a]bsent any affirmative act by Defendants to stay or dismiss the Idaho litigation, the bankruptcy court's finding that the continuing Idaho state proceedings were a willful violation of the discharge order was reasonable." 4

---

**FOOTNOTES**

4 This statement is puzzling, given that the bankruptcy court approved a stipulation by the parties staying the Idaho action pending resolution of the adversary bankruptcy proceeding. *See* p. 6600 *supra* and pp. 6619-6620 *infra.*

---

[**10] Summary Judgment on the Discrimination Claims

*HN1* We look to federal law to determine when a claim arises under the bankruptcy code. *Cool Fuel, Inc. v. Bd. of Equalization (In re Cool Fuel, Inc.),* 210 F.3d 999, 1006 (9th Cir. 2000). In *Jensen,* we held that an environmental claim arises under the bankruptcy code once it is within the claimant's "fair contemplation." 995 F.2d at 930. *Jensen* has been applied to a range of non-environmental claims. *See, e.g., In re Cool Fuel, Inc.,* 210 F.3d at 1000 (tax claim); *Hassanally v. Republic Bank (In re Hassanally),* 208 B.R. 46, 53 (B.A.P. 9th Cir. 1997) (negligent construction claim); *Corman v. Morgan (In re Morgan),* 197 B.R. 892, 898 (N.D. Cal. 1996) (fraud claim).

Although we have not had occasion to consider whether *Jensen*'s "fair contemplation" test extends to claims of discrimination, we see no reason why these [*1001] claims should not be analyzed under *Jensen's* framework. We therefore agree with the courts below that the women's claims of sex discrimination accrued under the bankruptcy code once they were within the [**11] women's "fair contemplation."

The bankruptcy court granted summary judgment to ZiLOG and held that the sex discrimination claims arose pre-discharge. The plan was confirmed on April 30, 2002, and became effective on May 13. The bankruptcy court held that claims arising prior to May 13 were discharged under the plan, even though the April 30 confirmation order only permitted claims arising "from February 28, 2002 through April 30, 2002" to be filed as administrative expenses. Under the bankruptcy court's confirmation order, claims arising from May 1 to May 12 were discharged, even though no provision was made for their presentation and payment.

The issue of which date should be used to bar claims for administrative expenses was raised before the bankruptcy court at the hearing on motions for summary judgment. Counsel for the women objected that, because the July 1 bar date only related to administrative claims that had arisen on or before April 30, the discharge injunction should likewise only bar claims that had accrued through April 30, rather than May 13. As counsel for the women explained: "The problem with using the effective date is that the debtor is trying to vacate any right [**12] to payment for claims that it didn't even know existed at the time that one would vote on confirmation of the plan." For reasons not apparent from the record, the bankruptcy court overruled the objection.

Assuming that the bankruptcy court even has the authority to discharge post-confirmation debts, 5 we cannot see how, in this case, the bankruptcy court could have discharged claims arising between the plan's confirmation and effective dates without first allowing for the presentation of such claims. Given the manifest injustice of discharging claims that could not have been filed under the bankruptcy court's April 30 confirmation order, we [*1002] hold that only claims against ZiLOG arising on or before April 30 were discharged.

---

**FOOTNOTES**

5 Both the reorganization plan and the bankruptcy court's confirmation order -- in identical language -- discharged ZiLOG "of all

---

liability for payment of any Claims incurred before the Effective Date, to the fullest extent provided by [11 U.S.C. § 1141]." Section 1141 of the bankruptcy code provides that "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A) (emphasis added).

We are uncertain whether post-confirmation debts can in fact be discharged in bankruptcy. The "[e]xcept as otherwise provided" clause in section 1141 can be read in either of two ways. One way would be to read the clause as modifying the words "any debt." Under that reading, all pre-confirmation debts are dischargeable, except as limited by the plan or the code. Alternatively, one could read the "[e]xcept as otherwise provided" clause as modifying the phrase "before the date of such confirmation." Under that reading, even post-confirmation debts could be discharged if that were provided for in the reorganization plan.

We have not located a case addressing which reading is correct. Nor have we found an answer in the statute's legislative history. See H. Rept. No. 95-595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977), at 418. Although we find the first alternative more plausible, we need not decide the matter here. Under either reading, the bankruptcy court's confirmation order failed to provide for the presentation and adjudication of claims arising between April 30 and May 13. Because it would be manifestly unjust to discharge claims that could not have been filed as either pre-petition claims or administrative expenses, we hold that even if the bankruptcy court had the power to discharge post-confirmation claims, the court abused its discretion in discharging the women's discrimination claims here.

[**13] Even if the bankruptcy court meant to say that the women's discrimination claims arose prior to the April 30 confirmation order, summary judgment was still unwarranted. Corning and Robert claimed that they became aware by late April or early May 2002 that female ZiLOG employees were subjected to disparate and allegedly discriminatory treatment. HN2 As this was a motion for summary judgment, the court was required to resolve disputed issues of fact in favor of the women, as the non-moving parties. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); see also Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56.

Accepting that Corning and Robert's sex discrimination claims arose in late April or early May 2002, there is a substantial possibility that those claims were not within the women's fair contemplation until after the April 30 confirmation order, and thus were outside the bankruptcy process. The bankruptcy court therefore erred in granting summary judgment and finding those claims discharged.

The bankruptcy court's grant of summary judgment to [**14] ZiLOG on Cleverdon's sex discrimination claim is even more problematic. Cleverdon claimed in her complaint to the Idaho Human Rights Commission and the EEOC that she learned of the allegedly disparate treatment by late April or early May 2002. Even if this were true, the bankruptcy court's grant of summary judgment must be reversed for the reasons discussed above.

Cleverdon, however, claimed in her subsequent affidavit to the bankruptcy court that she did not learn of the allegedly disparate treatment until mid-June 2002. The date by which Cleverdon's allegedly disparate treatment was within her fair contemplation was therefore in dispute. Taking the facts in the light most favorable to Cleverdon, her discrimination claim did not come within her fair contemplation until one-and-a-half months after confirmation of the plan. 6 The bankruptcy court therefore erred in granting summary judgment to ZiLOG on Cleverdon's sex discrimination claim.

## FOOTNOTES

6 The district court appeared to believe that, because Cleverdon had indicated in her administrative complaint that she learned the facts underlying the discrimination complaint in late April or early May, it was entitled to ignore her declaration in the bankruptcy court that she only learned of these facts in mid-June. But the fact that Cleverdon presented a sworn statement in another proceeding that appears to contradict her sworn statement in this proceeding does not vitiate her sworn statement here. At most, the conflicting statement may be used to impeach her testimony at trial. Confronted with that inconsistency, Cleverdon may be able to reconcile the two statements or otherwise explain away the inconsistency. Or, the trier of fact may resolve the inconsistency in favor of the later statement. These are matters to be resolved at trial, not on summary judgment.

[**15] The district court then compounded these mistakes by deferring under the clearly erroneous standard of review to the bankruptcy court's "explicit [factual] findings" -- "findings" that the bankruptcy court had no authority to make on a motion for summary judgment. The district court's affirmance of the bankruptcy court's grant of summary judgment was therefore erroneous.

Taking the facts in the light most favorable to the women, there is a substantial possibility with respect to Corning and Robert, and a certainty with respect to Cleverdon, that their discrimination claims arose post-confirmation. We reverse the bankruptcy court's grant of summary judgment on the women's discrimination claims and remand to the bankruptcy court to determine when those claims came within the women's fair contemplation. [*1003] See Renwick v. Bennett (In re Bennett), 298 F.3d 1059, 1072 (9th Cir. 2002).

### Excusable Neglect

We next consider whether the bankruptcy court abused its discretion in declining to excuse the women's failure to file timely proofs of claim regarding their retention bonuses. HN3 The determination of whether neglect is "excusable" is "an equitable one, taking [**16] account of all relevant circumstances surrounding the party's omission." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993). Such circumstances include "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay . . . and whether the movant acted in good faith." Id. This list is not exhaustive. See id.

On March 11, 2002, the women received the following email from ZiLOG's general counsel:

| Sent: | Monday, March 11, 2002 7:40 PM |
|---|---|
| | |
| To: | Austin Users; Field Sales Americas; |

| | Fort Worth Users; Tampa Users; San |
| | Jose Users |
| | |
| Cc: | 'rlevin@skadden.com'; |
| | 'pclapp@skadden.com'; |
| | 'tivey@skadden.com'; |
| | 'slubben@skadden.com' |
| | |
| Subject: | Proof of Claim |
| | |
| Importance: | High |

As you know, we commenced our chapter 11 case on February 28, 2002. *The case will affect only the holders of the company's public debt securities and the current holders of our common and preferred shares.* We expect to conclude the case and emerge from chapter 11 by early May. In the interim, the bankruptcy court [**17] has granted the company's motion for permission to pay all amounts owed to employees for salary, wages, expense reimbursements, and vacation, medical, and other benefits as they become due. *We expect that the chapter 11 case will have no effect on you or on our business operations.*

The Federal bankruptcy rules requires [sic]that we provide the broadest possible notice of the case's commencement. For that reason, you will likely all receive in the mail a written notice, together with a Proof of Claim form, from . . . the company's noticing agent. You may receive additional notices about the progress of the case.

*This is nothing to be concerned about.* You need to fill out and return the Proof of Claim form *only if you believe that, on February 28, 2002, ZiLOG owed you money other than the wages, benefits and expense reimbursements that you are entitled to as an employee. Otherwise, you do not need to take any action in connection with the notice that you have received.*

I am out of the office until Monday. In my absence, if you have any particular questions, please call Stephen Lubben of Skadden, Arps (213-687-5000).

Cheers,

dmj

Daniel M. Jochnowitz

Vice [**18] President and General Counsel

532 Race Street

San Jose, CA 95126

(t) 408-558-8485 (Emphasis added.)

The email was not calculated to inform the women that they needed to file their wage claims with the bankruptcy court. More likely, it would have led them to believe exactly the opposite.

The second sentence of the email states: "The [bankruptcy] case will affect only the holders of the company's public debt securities and the current holders of our common and preferred shares." [7] The clear [*1004] import of this language, especially when read by employees who were not lawyers and had no expertise in bankruptcy law, is that the bankruptcy would not affect their rights. The author of the email reinforced this view by concluding the first paragraph with a sentence expressing the company's expectation that "the chapter 11 case *will have no effect on you* or on our business operations." (Emphasis added.)

---

**FOOTNOTES**

[7] This statement was plainly incorrect. The bankruptcy affected virtually all pre-petition creditors, in that they were required to file proofs of claim in order to preserve their rights to payment. Presumably, what the company meant to say was that, under the terms of the reorganization plan, all valid general unsecured pre-petition claims would receive 100 on the dollar, assuming proofs of claim were filed with the bankruptcy court. It was only public debt and equity holders whose claims would be impaired.

---

[**19] The third paragraph reinforces the idea that the employees need not file claims with the bankruptcy court. Having explained in the second paragraph that the notice was sent only because "[t]he Federal bankruptcy rules requires [sic] that we provide the broadest possible notice of the case's commencement," the third paragraph begins by assuring employees that "[t]his is nothing to be concerned about." *Cf. The Wizard of Oz* (Metro-Goldwyn-Mayer 1939) ("Pay no attention to that man behind the curtain."). Then follows -- buried in the middle of the third paragraph -- the only sentence that gives any hint that some employees may need to file proofs of claim after all: "You need to fill out and return the Proof of Claim form only if you believe that, on February 28, 2002, ZiLOG owed you money other than the wages, benefits and expense reimbursements that you are entitled to as an employee."

Assuming diligent employees made their way past the assurances that they needn't worry about all the legal mumbo-jumbo, it is far from clear that they would have understood they were required to file proofs of claim for monies they believed they were owed as retention bonuses. The bonuses [**20] ZiLOG had promised the women were supposed to compensate them for services they had rendered or would be rendering to the company. As such, the bonuses could easily be understood to be "wages, benefits and expense reimbursements that you are entitled to as an employee" -- the type of claims for which no proof of claim needed to be filed. We also

note that the "you need to do X only if Y" construction of the sentence -- giving information by way of negative inference rather than affirmative assertion -- appears designed to deflect attention from, rather than underscore the necessity of, filing proofs of claim. [8]

**FOOTNOTES**

[8] The bankruptcy judge, in her oral ruling, concluded that the March 11 email gave the women fair notice because the email "referred to employees' wages, expense reimbursements, vacation, medical, and other benefits *as they become due*." (Emphasis added.) In the bankruptcy court's view, "[t]hat language clearly projects into the future," whereas "[t]he retention bonuses, if payable to the claimants, were due January 4th, 2002 more than a month before the petition date."

The problem with the bankruptcy court's analysis is twofold. First, it ignores the other parts of the email that speak directly to the necessity of filing a proof of claim. Specifically, the email told employees they need not file claims for wages or other benefits owed to them on February 28, 2002. Contrary to what the bankruptcy court believed, this refers to claims for past services, rather than "project[ing] into the future." Second, the language on which the bankruptcy court relied says nothing about the filing of proofs of claim; rather, it advises employees that "the bankruptcy court has granted the company's motion for permission to pay all amounts owed to employees for salary, wages, expense reimbursements, and vacation, medical, and other benefits as they become due." To someone versed in bankruptcy law, saying that the debtor is authorized by the court to pay certain claims suggests that no proofs need be filed for those claims. But the employees to whom the email was addressed can't be presumed to have understood that connection. A fair reading of the email, using the eyes of an ordinary non-lawyer employee, does not convey the idea that proofs of claim had to be filed for *all* pre-petition claims for employee compensation.

[**21] [*1005] Read in its entirety, the email from the general counsel hardly gives fair notice to the women, or to others in their position, that they were required to file proofs of claim to preserve their rights. Rather, the email seems designed to lull the employees into a false sense of security about the need to file claims, and to dissuade them from paying very close attention to any notices sent out by the bankruptcy court. [9]

**FOOTNOTES**

[9] It's not as if fair and accurate notice would have been impossible to give. Rather than minimizing the notice from the bankruptcy court as an irrelevant technicality, the general counsel could have encouraged employees to examine it closely and make sure that they had no need to file timely proofs of claim. He could also have encouraged employees who did not understand the notice to seek independent legal advice. The email could also have laid out in plain terms who was required to file proofs of claim using language such as this: "You must file a proof of claim to preserve your rights, unless you are seeking payment only of ordinary salaries, wages, employee benefits and expense reimbursements. If you have any doubt as to whether your claim falls into this excepted category, you should file a proof of claim to preserve your rights or contact a lawyer for guidance." The plainly defective notice was cc'd to *four* of ZiLOG's outside counsel, none of whom sent a corrected notice.

[**22] The written notice from the bankruptcy court muddied the waters further. That notice stated:

> The Bankruptcy Court has set *April 19, 2002*, as the deadline for filing proofs of claim (the "Bar Date"). . . . *If you have a prebankruptcy claim against either Debtor that is not based on the delivery of goods or services to the Debtors in the ordinary course of business, you must file a proof of claim . . . so that it is received no later than the Bar Date. If you fail to do so, your claim will be discharged.*

> . . . .

> The Plan alters the rights of the holders of ZiLOG's Senior Notes and its equity securities but does not alter the rights of holders of any other class of claims. If the Court confirms the Plan, it will be binding on all holders of claims against and interests in the Debtors.

> . . . .

> Confirmation of the Plan will result in a discharge of claims against the Debtors, which may include all or part of your claim. A discharge means that you may never try to collect the claim from the Debtors, except as provided in the Plan. (First emphasis in original.)

Part of the problem, of course, is that -- having been assured by the general counsel's [**23] email that "[t]his is nothing to be concerned about" -- many employees may not have read the bankruptcy court's notice very carefully, or at all. Assuming, however, that employees did read the notice, they would have learned that no proof of claim had to be filed for any "pre-bankruptcy claim . . . based on the delivery of . . . services to the Debtors in the ordinary course of business." The phrase "in the ordinary course of business" is most readily understood as modifying "delivery of . . . services to the Debtors," which immediately precedes it. The women's one-time retention bonuses *were* based on their performing services for ZiLOG, and the services were rendered in the ordinary course of ZiLOG's business. ZiLOG does not claim that the women were required to perform extraordinary services to earn the bonuses; as best the record reveals, the bonuses were to be paid if the women kept their jobs through the end of the year. Given that the services they rendered to earn the bonuses were exactly the same ones they had been rendering to ZiLOG all along, we can easily see how the women, even had they read [*1006] the notice from the bankruptcy court closely, would have believed there was [**24] no need to file proofs of claim to preserve their right to recover the promised bonuses. [10] Moreover, given the misleading statements in the March 11 email that "the chapter 11 case will have no effect on you" and "[t]his is nothing to be concerned about," we can readily understand why the women may not have parsed the notice from the bankruptcy court more closely or consulted an attorney at that time.

**FOOTNOTES**

10 Once again, careful drafting could have avoided the problem. Rather than speaking of compensation for services in the ordinary course of business, the notice might have said something like this: "If you are an employee, you need not file proofs of claim if you believe ZiLOG owes you money only for ordinary wages, salaries and expense reimbursements. If you are in doubt as to whether the monies you claim are owed to you fall into this narrow category, you must file a proof of claim to preserve your rights."

In *Pioneer* -- which, as it happens, was also a bankruptcy case involving a late proof of claim **[\*\*25]** -- a creditor represented by "an experienced bankruptcy attorney" missed the deadline for filing pre-petition claims because his lawyer overlooked the filing date in the bankruptcy court's notice. 507 U.S. at 384. The bankruptcy court refused to find excusable neglect for the creditor's late filing, and the district court affirmed. *See id. at 384-86.*

The Sixth Circuit reversed the bankruptcy court's refusal to accept the late-filed proofs of claim, and the Supreme Court affirmed. *Id. at 386-87.* In holding that the bankruptcy court abused its discretion, the Supreme Court explained that the standard for excusable neglect

> is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission[, including] . . . . the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id. at 395.*

In *Pincay v. Andrews,* 389 F.3d 853 (9th Cir. 2004) (en banc), we applied **[\*\*26]** *Pioneer* to hold that the district court did not abuse its discretion by finding excusable neglect when a sophisticated law firm missed a filing deadline because of a paralegal's error. *See id. at 860.* Although we did not hold that the district court was *required* to find excusable neglect under those circumstances, we upheld a finding of excusable neglect because we found the evidence *sufficient* to support it. *See id.*

In *Pioneer* and *Pincay,* sophisticated attorneys were let off the hook after missing filing deadlines. In fact, the Supreme Court in *Pioneer* went so far as to hold that it was an abuse of discretion *not* to find excusable neglect where a versed bankruptcy practitioner missed the bankruptcy court's notice and failed to file a timely proof of claim. By contrast, Corning, Robert and Cleverdon were unrepresented by counsel, and the notices sent out by debtor's counsel and the bankruptcy court were, at the very least, ambiguous, and more likely affirmatively misleading. It would be very strange indeed to find the neglect in our case inexcusable, when the neglect in *Pioneer* and *Pincay* was found excusable.

ZiLOG argues that **[\*\*27]** permitting the late-filing of the women's claims could create a "Material Adverse Change," which could interfere with the effectiveness of the reorganization. Even if this were a "theoretical possibility," as ZiLOG puts it, the bankruptcy court made no finding that **[\*1007]** ZiLOG would suffer any prejudice if the claims were filed late. Based on the record before us, we cannot say that ZiLOG would be prejudiced by the late-filing of the women's claims. *See Pioneer, 507 U.S. at 389.* In any event, to the extent that ZiLOG is prejudiced as a result of its own deficient lawyering, the burden of such errors or malfeasance must be borne by those who caused it, rather than by innocent creditors who were misled thereby.

After *Pioneer* and *Pincay,* we have little difficulty in concluding that the bankruptcy court here abused its discretion in failing to find excusable neglect. *See* **HN4**Fed. R. Bankr. 9006(b)(1) ("[W]hen an act is required or allowed to be done at or within a specified period by these rules . . . the court for cause shown may at any time in its discretion. . . on motion made after the expiration of the specified period permit **[\*\*28]** the act to be done where the failure to act was the result of excusable neglect."). We remand to the bankruptcy court to permit the women to file their pre-petition claims in the bankruptcy proceedings as timely. Similarly, in the event that the bankruptcy court determines that the women's discrimination claims came within their fair contemplation after the filing of the bankruptcy petition but before its April 30 confirmation order, the bankruptcy court shall permit those claims to be filed as timely administrative expenses. (Of course, if the discrimination claims are found to have accrued after April 30, 2002, the women may pursue those claims outside of the bankruptcy proceedings.)

**Sanctions Award**

**HN5**Section 524 of the bankruptcy code provides that discharge "operates as an injunction against the commencement or continuation of an action . . . to collect, recover or offset any [discharged] debt as a personal liability of the debtor." 11 U.S.C. § 524 (a)(2). A party who knowingly violates the discharge injunction can be held in contempt under section 105(a) of the bankruptcy code. *See In re Bennett,* 298 F.3d at 1069; *Walls v. Wells Fargo Bank, N.A.,* 276 F.3d 502, 507 (9th Cir. 2002) **[\*\*29]** (holding that civil contempt is an appropriate remedy for a willful violation of section 524's discharge injunction). In *Bennett,* we noted that the party seeking contempt sanctions has the burden of proving, by clear and convincing evidence, that the sanctions are justified. We cited with approval the standard adopted by the Eleventh Circuit for violation of the discharge injunction: "[T]he movant must prove that the creditor (1) knew the discharge injunction was applicable and (2) intended the actions which violated the injunction." *Bennett,* 298 F.3d at 1069 (citing *Hardy v. United States (In re Hardy),* 97 F.3d 1384, 1390 (11th Cir. 1996)).

It is clear from our cases, and should have been clear to the bankruptcy court, that knowledge of the injunction is a question of fact that can normally be resolved only after an evidentiary hearing. [11] The bankruptcy court, however, decided the contempt motion on a paper record. The court did so after expressing its views about the applicable law in its oral ruling, such as "contempt need not be willful to justify an award of damages," and "[c]ontempt may be established even if the failure **[\*\*30]** to comply with the Court order was unintentional." The bankruptcy court also seemed to be under the misimpression that knowledge, for purposes of contempt, could be presumed: "While a party can't **[\*1008]** be held in contempt absent knowledge of the injunction, knowledge may be presumed in a case where the defendants received notice of bankruptcy and of confirmation of the debtor's plan of reorganization." The court went on to conclude that "[b]ased on the evidence, it appears that the defendants knew about the bankruptcy case, knew that the plan had been confirmed. That is sufficient for a presumed knowledge of the discharge injunction."

**FOOTNOTES**

11 Of course, where the facts are not in dispute, no hearing need be held. *See, e.g., Knupfer v. Lindblade (In re Dyer),* 322 F.3d

1178, 1191-92 (9th Cir.2003) (contempt sanctions upheld where creditor admitted having notice of the automatic bankruptcy stay, yet took no steps to remedy his violation of the stay).

It is certainly true that *HN6⇥*a trier of fact [**31] could infer knowledge of an automatic stay or discharge injunction from the fact that a creditor knew of the bankruptcy. Such an inference, however, would be a matter of fact, not a presumption implied in law. Knowledge of the injunction, which is a prerequisite to its willful violation, cannot be imputed; it must be found. If, as here, the creditors dispute that they had such knowledge, a finding that they knew of the injunction, and thus willfully violated it, can only be made after an evidentiary hearing.

We made this point clear, if it was not before, in a case decided after the bankruptcy court entered its contempt order (but before it denied the women's motion to reconsider its finding of contempt). In _Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178 (9th Cir. 2003),_ we dealt with contempt sanctions for violation of the automatic bankruptcy stay by a creditor, represented by counsel, who filed a lien on property of the estate after commencement of the bankruptcy proceedings. See _Id. at 1183-84._ In considering whether to uphold the sanctions, we noted that the creditor and his lawyer both knew of the bankruptcy but "may not have been [**32] familiar with that particular Code provision [section 362(a) of the bankruptcy code, which imposes an automatic stay]."_Id. at 1191._ While acknowledging that "a party with knowledge of bankruptcy proceedings is charged with knowledge of the automatic stay" for purposes of awarding damages under section 362(h) of the bankruptcy code, "we hesitate[d] to extend that principle to the contempt context. Generally, a party cannot be held in contempt for violating an injunction absent knowledge of that injunction." _Id. at 1191-92_ (citing _Bennett, 298 F.3d at 1069,_ and _Jove Eng'g, Inc. v. IRS, 92 F.3d 1539, 1555 (11th Cir. 1996))._

As noted, the women here dispute knowing of the discharge injunction. That a competent lawyer should have known about the injunction after diligent inquiry is not dispositive. The creditor's lawyer in _Dyer_ no doubt *should* have known about the existence of the automatic stay, which he could easily have discovered by doing elementary legal research. Nevertheless, we declined to affirm the contempt sanctions on this basis because the lawyer "may not have been familiar with that particular [**33] Code provision." There is nothing remarkable or surprising about this aspect of _Dyer;_ it simply reiterates the well-established proposition that *HN7⇥*only actual knowledge of the discharge injunction suffices for a finding of contempt. 12

**FOOTNOTES**

12 Although _Dyer_ involved the automatic stay, rather than the discharge injunction, it relied on discharge injunction cases such as _Bennett_ and _Hardy,_ and, indeed, we see no material difference between the discharge injunction and the automatic stay for these purposes. A contempt order entered for violation of either is governed by the same standards, namely those applicable to all civil contempt proceedings. See _Dyer, 322 F.3d at 1191-92_ (citing Fed. R. Civ. P. 65(d) for the proposition that an "injunction [is] not binding unless [a] party has actual knowledge of it").

By the time _ZiLOG_ was appealed to the district court, _Dyer_ had been decided and the district court, in fact, relied on it. [**34] Perhaps aware that _Dyer_ undercut the bankruptcy court's rationale for imposition of contempt sanctions, the district court [*1009] relied on an alternative theory for affirming the contempt order. In _Dyer,_ we ultimately upheld the contempt sanctions on the ground that, though the creditor may not have known about the automatic stay initially, he became aware of it when he was notified by the trustee, and this created "an affirmative duty to remedy [the] automatic stay violation" by "undo[ing] the recordation process." _Dyer, 322 F.3d at 1192._ Because the failure to cure the violation after notice was undisputed in _Dyer,_ we agreed that the violation was willful and upheld the contempt sanctions.

The district court relied on this aspect of _Dyer_ in upholding the bankruptcy court:

> Defendants were charged with knowledge of the stay [sic] 13 no later than August 21, 2002, when ZiLOG served a complaint on Defendants seeking injunctive relief to stop the Idaho state actions. See _In re Dyer, 322 F.3d at 1191._ Defendants' failure to take affirmative action to undo an arguably innocent violation of the automatic stay [sic13] constituted [**35] a willful violation. *Absent any affirmative act by Defendants to stay* or dismiss the Idaho litigation, the bankruptcy court's finding that the continuing Idaho state proceedings were a willful violation of the discharge order was reasonable. . . . There is nothing in the record to suggest that the bankruptcy court abused its discretion. (Emphasis added.) (Internal citation omitted.)

But the record, in fact, clearly undercuts the district court's conclusion. Specifically, the record contains a stipulation, approved by the bankruptcy court, staying the Idaho state court proceedings.

**FOOTNOTES**

13 We don't understand why the district court discussed the automatic stay. By August 21, 2002, the automatic stay had long since disappeared; it was only the discharge injunction that was relevant. See 11 U.S.C. § 362(c)(2)(C) ("[The automatic stay] continues until . . . the time a discharge is granted or denied.").

There remains the question of whether the women and their counsel were, [**36] in fact, unaware of the discharge injunction and its potential applicability to their claims. _Dyer_ relied on the fact that the automatic stay is imposed by statute, rather than court order, and counsel may not have been aware of the statute. See _322 F.3d at 1191-92._ The same is true here; the discharge injunction is imposed by section 524(a) of the bankruptcy code, and we have found no place where it is also embedded in the bankruptcy court's confirmation order. This raises the possibility, as in _Dyer,_ that counsel for the women "may not have been familiar with that particular Code provision." _Id. at 1191._

To say that counsel may not have known of section 524 is not the same as saying that he did not know. _Dyer_ had no reason to resolve this uncertainty because it affirmed on another ground. Here, the uncertainty is crucial because there is no evidentiary basis on which to dispose of the contempt claim. On remand, the bankruptcy court shall determine whether the women were aware of the discharge injunction and its applicability to their claims. See _Bennett, 298 F.3d at 1069_ (in order to justify sanctions, "the movant

must [**37] prove that the creditor (1) knew the discharge injunction was applicable and (2) intended the actions which violated the injunction"). [14] We vacate the bankruptcy [*1010] court's contempt finding and remand for a determination of willfulness.

---

**FOOTNOTES**

[14] The willfulness question is clouded to some extent by the deficiencies in the March 11 email and the notice sent out by the bankruptcy court, discussed at length above. *See* pp. 6608-6614 *supra*. To be held in contempt, the women must not only have been aware of the discharge injunction, but must also have been aware that the injunction applied to their claims. To the extent that the deficient notices led the women to believe, even unreasonably, that the discharge injunction did not apply to their claims because they were not affected by the bankruptcy, this would preclude a finding of willfulness.

---

We **REVERSE** (1) the bankruptcy court's grant of summary judgment to ZiLOG on the women's sex discrimination claims; (2) the bankruptcy court's discharge of the women's [**38] statutory, contract and tort claims; (3) the bankruptcy court's permanent injunction against the women's pursuit of those claims; (4) the bankruptcy court's determination that the women failed to show excusable neglect for not filing those claims on time; and (5) the bankruptcy court's award of sanctions.

We **REMAND** to the bankruptcy court to conduct proceedings in close conformity with the views expressed in this opinion. On remand, the bankruptcy court should consider whether any fees it may have approved for debtor's counsel should be adjusted in light of our observations. The bankruptcy court should also consider whether costs and attorneys' fees incurred by the women in defending this adversary proceeding, and the appeal there from, should in equity and good conscience, be shifted to ZiLOG and its lawyers.

**REVERSED and REMANDED.**

Service:  Get by LEXSEE®
Citation:  450 F.3d 996
View:  Full
Date/Time:  Monday, October 18, 2010 - 9:05 AM EDT

* Signal Legend:
🔴 - Warning: Negative treatment is indicated
🟡 - Questioned: Validity questioned by citing refs
⚠️ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

LexisNexis®  About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2010 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.