Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

4   - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS, INC., et al.

8                 Debtors.

9   - - - - - - - - - - - - - - - - - - - - - -x

10  In the Matter of:

11

12  LEHMAN BROTHERS, INC.

13                Debtor.

14  - - - - - - - - - - - - - - - - - - - - - -x

15                United States Bankruptcy Court

16                One Bowling Green

17                New York, New York

18

19                October 18, 2010

20                2:04 PM

21

22  B E F O R E:

23  HON. JAMES M. PECK

24  U.S. BANKRUPTCY JUDGE

25

Page 2

1

2   HEARING re 60(b) Motions.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Penina Wolicki

Page 3

1

2     A P P E A R A N C E S :

3     JONES DAY

4           Attorneys for LBHI, Movant

5           222 East 41st Street

6           New York, NY 10017

7

8     BY:   TRACY V. SCHAFFER, ESQ.

9

10    HUGHES, HUBBARD & REED, LLP

11          Attorneys for Movant, James W. Giddens, SIPA Trustee

12          One Battery Park Plaza

13          New York, NY 10004

14

15    BY:   NEIL J. OXFORD, ESQ.

16

17

18    BOIES, SCHILLER & FLEXNER LLP

19          Attorneys for Barclays Capital, Inc.

20          575 Lexington Avenue

21          New York, NY 10022

22

23    BY:   JONATHAN D. SCHILLER, ESQ.

24

25

Page 4

1

2    BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays Capital, Inc.

4         5301 Wisconsin Ave NW

5         Suite 800

6         Washington, DC 20015

7

8    BY:   HAMISH HUME, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Be seated, please.  Good afternoon.

3              MR. SCHILLER:  Good afternoon, Your Honor.

4              THE COURT:  So what's happening?

5              MR. SCHILLER:  The parties have resolved most of the

6       issues between them with respect to disputes over deposition

7       designations or exhibits we want admitted into evidence.  There

8       are a few exhibits that remain to be discussed with Your Honor,

9       literally a few.

10             In addition to that, I would like to have a brief

11      bench conference or chambers conference to just address one

12      issue that came up in our last chambers conference, five

13      minutes on a contested issue, just something to raise with Your

14      Honor.

15             THE COURT:  Okay.

16             MR. HUME:  Good afternoon, Your Honor.  For the

17      record, Hamish Hume with Boies Schiller for Barclays.

18             As Mr. Schiller said, we have indeed resolved

19      virtually all of our admissibility issues, and we have two

20      different stipulations to hand up.  I think I'm right in saying

21      the reason there are two is simply a matter of chronology,

22      although I think one of them deals mostly with things admitted

23      for limited purposes.

24             And so I think the proposal is that we hand in the

25      stipulation that resolves our problems -- it's been signed --

Page 6

1    and that we hope to have, as a matter of good order and

2    process, a single stipulation put together on all exhibits that

3    we will provide the Court along with DBD with all exhibits that

4    have been admitted --

5              THE COURT:  Okay.  Fine.

6              MR. HUME:  -- once we're able to do so.

7              THE COURT:  That'll be a cumulative review of

8    everything that has been admitted?

9              MR. HUME:  Exactly.

10             THE COURT:  Either by stipulation or by order?

11             MR. HUME:  Exactly.

12             THE COURT:  Okay.

13             MR. HUME:  So may I hand these up to the Court?

14             THE COURT:  You may.  Okay, thank you.

15             MR. HUME:  We've also reached agreement on how to

16   approach designated deposition testimony and objections to that

17   testimony.  The agreement is, no more objections are going to

18   be pressed on any deposition testimony from either side.  That

19   is, I think, without prejudice to either side arguing for

20   specific testimony, what weight it should be given based on

21   lack of personal knowledge or foundation.  But it's all

22   admitted.

23             THE COURT:  All right.

24             MR. HUME:  I think that brings me -- subject to any

25   comments from the movants, to the three categories of documents

Page 7

1    not yet admitted that we'd wish to move into -- offer into

2    evidence.  The first of which -- I say three categories.

3    There's an JPM -- a JPMorgan e-mail relating to the Gifford

4    Fong valuation of Pine.  Secondly, there are a few exhibits --

5    two exhibits to a deposition that we wish to move into evidence

6    that have not yet been moved in.  And third, there are certain

7    excerpts from the examiner's report that we believe should be

8    moved into evidence, either for all purposes or at least for a

9    limited purpose of showing what the examiner reported.  And

10   that's subject to any counter-argument from movants or request

11   for completeness from them.

12         Before I go to those three categories, I guess I

13   should also note, when we were last before you, Your Honor,

14   counsel for the trustee asked if Barclays would be willing to

15   produce GFS data for earlier dates, September 11th and earlier

16   days in the preceding week.  We had initially said we thought

17   that request was out of time, too late, which it was.  But we

18   did go and get it and we have produced the summaries for that

19   data.

20         The request was literally for the summaries and an

21   exhibit showing September 11th.  I think we copied the Court on

22   a letter providing --

23         THE COURT:  I saw that last evening.

24         MR. HUME:  -- okay.  If the movants want the

25   underlying data, which I think they may, we'll be providing

Page 8

1    that to them later today.  And if the movants want to move that

2    into evidence, we're certainly happy for that to come into

3    evidence.

4           So with those overview points, I think we can go to

5    the first document, which is --

6           THE COURT:  Do you wish to be heard, ma'am?

7           MS. SCHAFFER:  Yes, just one comment.  Tracy Schaffer

8    from Jones Day for LBHI.

9           I can actually cut out one of the four arguments

10   you're going to make on the two deposition exhibits which we

11   just learned about two hours ago that they want to move in.

12   LBHI has no objection.

13          MR. HUME:  Thank you.

14          THE COURT:  Anybody else?

15          UNIDENTIFIED SPEAKER:  No objection from the

16   committee, Your Honor.

17          THE COURT:  Okay.  So they're admitted.

18   (Deposition exhibit was hereby received in evidence as BCI's

19   Exhibit BCI-1106, as of this date.)

20   (Deposition exhibit was hereby received in evidence as BCI's

21   Exhibit BCI-1107, as of this date.)

22          MR. HUME:  And that's BCI Exhibit 1106 and 1107.

23   We'll provide copies to the Court shortly.  Thank you.

24          THE COURT:  Just so I know what we're talking about,

25   what are those exhibits?

Page 9

1          MR. HUME:  Your Honor, we have copies -- do these

2    binders have all the documents that we're talking about?

3          UNIDENTIFIED SPEAKER:  They do have all the documents

4    we're talking about.

5          MR. HUME:  May we hand this out, Your Honor?

6          THE COURT:  Yes.

7          MR. HUME:  So, Your Honor, we're talking about the

8    documents at tab 11 and 12 of the binder.  Tab 11 is a

9    correspondence from counsel for the movants from Jones Day to

10   me, requesting GFS data in August of '09 during the 2004

11   discovery and providing the report path that they wanted us to

12   use to gather that data.  And at tab 12 -- and that's BCI

13   Exhibit 1106 -- tab 12 is BCI Exhibit 1107, which is an e-mail

14   recounting the request for a live environment by Alvarez &

15   Marsal to look at and make adjustments to GFS data for

16   September 12, 2008.

17         THE COURT:  All right.

18         MR. HUME:  And they were both used in the Uma Krishnan

19   deposition.

20         So with that, we can move to a document that we had a

21   brief argument over, Your Honor, during I believe Professor

22   Pfleiderer's examination, but it may have been on cross

23   examination of movants' expert, Mark Slattery, BCI Exhibit

24   1005, which is also in the binder, but we can bring it up.  And

25   Your Honor may recall, this is -- if we could just blow up the

08-13555-mg   Doc 12253   Filed 10/19/10   Entered 10/22/10 16:57:00   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 10 of 27

Page 10

1    e-mail header -- this is an internal e-mail at JPMorgan

2    produced by JPMorgan in this case pursuant to the subpoena,

3    that reports on the analysis of Lehman's collateral that

4    JPMorgan was holding as collateral for its lending facilities

5    to Lehman, and reporting that Gifford Fong -- it reported

6    specifically on the valuation from Gifford Fong.

7         And I think there's evidence in the record that's not

8    disputed, Gifford Fong was a independent valuation consultant

9    who was hired by JPMorgan to perform these valuations.  And

10   this e-mail memo simply reports, "Here is the analysis by

11   Gifford Fong, the executive summaries at Gifford Fong has the

12   three CDOs as 1.5 billion dollars lower than Lehman has it."

13   This is dated September 4, 2008, an e-mail memo within the

14   JPMorgan -- the subject header is "Gifford Fong pricing for

15   Lehman excess."

16        And attached to this e-mail is the spreadsheet with

17   the three CDOs valued by Gifford Fong as compared to their par

18   values.  So you have the CUSIPs there in column C, the total

19   position, the debt position, the market value.  And then the

20   next page of the spreadsheet -- can we go to the next page --

21   gives the Gifford Fong price, both in percentage terms and then

22   Gifford Fong collateral value.  And there in the first row of

23   three, 515 million is the valuation for Pine.

24        Now, we submit that this should be accepted into

25   evidence for all purposes as a business record of JPMorgan

1   and/or in the alternative, as a party admission by an agent of

2   Lehman in its efforts to value the collateral Lehman had

3   provided to JPMorgan.  On the business record front, there's

4   well-established case law in the Southern District that

5   internal e-mails reporting on business activity are business

6   records.  There are many such e-mails admitted in this case

7   already.  And this information attached to the e-mail is

8   summarized in the e-mail.  So I don't think there's any

9   analytical difference between the information attached to the

10   e-mail and the information in the e-mail.

11        The e-mail says these three CDO's are valued by

12   Gifford Fong at 1.5 billion less than Lehman, and this simply

13   shows the breakdown.  The e-mail itself could just have easily

14   have written this information.  It would have been exactly the

15   same analysis from a hearsay or business records perspective.

16        To the extent there is an argument that the Gifford

17   Fong valuation is embedded hearsay, we would argue that it is,

18   again, information that comes to JPMorgan in the form of a

19   business record.  It's Gifford Fong's valuation, and as the

20   actions of an agent, Lehman's agent, performing a valuation of

21   that collateral.  So again, we think under both party admission

22   rule and the business records rule, it comes in for all

23   purposes.

24        Now, we of course have the alternative or fallback

25   position that this should come in at least for a limited

1    purpose.  And the limited purpose -- there could be a couple of

2    limited purposes that it would come at.  I think the most

3    important one is this should at least come in for the limited

4    purpose of showing that for an asset like Pine, and

5    particularly for Pine, which has been discussed in this case,

6    there were ranges of valuations provided in September 2008,

7    given how illiquid it was and given how complex its structure

8    was.

9         So even if it does not come in for the truth of the

10   assertion that Pine was worth 515 million on September 4th, it

11   should at least come in for the limited purpose of showing that

12   JPMorgan received a valuation from Gifford Fong at 515 million.

13   That is at least evidence that there were range of different

14   values provided for that illiquid asset.

15        That's our argument on this e-mail.  And it may be

16   preferable for the Court if we argue this one at a time, so you

17   can hear from movants' counsel now.

18        THE COURT:  Yes, let's do it one at a time.  Thank

19   you.

20        MS. SCHAFFER:  Good afternoon, Your Honor.  Tracy

21   Schaffer from Jones Day for LBHI, for the record.

22        Movants believe that Exhibit 1005 should not be

23   admitted; that it's being admitted for the truth of the matter;

24   and that it's hearsay.  And then there's also an authentication

25   objection as well.  My partner, Mr. Tambe, raised the objection

08-13555-mg   Doc 12253   Filed 10/19/10   Entered 10/22/10 16:57:00   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 13 of 27

Page 13

1    in court last week when the exhibit was used.  He raised a

2    hearsay objection.  And as Your Honor noted, we don't really

3    know what that attachment is and what it exactly purports to

4    be.  And there hasn't been any testimony on the document or any

5    showing of what this third-party document is.  So we maintain

6    our objection to it.

7              THE COURT:  Okay.

8              MS. SCHAFFER:  We don't think Barclays has made a

9    sufficient showing under the business records exception.

10              THE COURT:  Well, I'm going to admit the document for

11    the limited purposes described by Mr. Hume in his argument.  I

12    think that there are reasonable questions as to whether or not

13    Gifford Fong is an agent of Lehman for purposes of admission,

14    since there's nothing in the record that I'm aware of that

15    demonstrates that agency relationship.

16              Additionally, for the reasons that I mentioned when

17    this came up the first time, it's unclear that the schedule

18    attached constitutes a business record, although I have no

19    doubt that the e-mail itself, which is internal to JPMorgan

20    Chase is a business record of JPMorgan Chase and that it has

21    been used to distribute internally the Excel spreadsheet.

22              To the extent that the information being distributed

23    represents an indication of value as to the CUSIPs listed

24    there, I'm not accepting it for the truth of the market values

25    as listed.  But I am accepting it as an indication of what at

Page 14

1    least JPMorgan was sharing internally.  And I believe that it

2    does demonstrate something of relevance as to the value of

3    these assets.  And for that reason, I'm accepting it for the

4    limited purpose described by Mr. Hume.

5    (Internal JPMorgan e-mail and attachment were hereby received

6    in evidence for limited purpose as BCI's Exhibit BCI-1005, as

7    of this date.)

8         MS. SCHAFFER:  Thank you.

9         MR. HUME:  Your Honor, that leaves six exhibits that

10   we've marked that are excerpts from the examiner's report in

11   this case.  They relate to things that you've heard about in

12   trial testimony such as the use of the GFS system and its

13   reliability on September 12th; whether it contained all the

14   securities transferred to Barclays; some of the negotiations

15   and the examiner's discussion of the negotiations of the sale

16   transaction.

17        We note, of course, that the examiner was very clear

18   to say that he was making no findings on the matters in dispute

19   in this case.  We don't submit the examiner's report excerpts

20   as findings of fact relating to matters in dispute, but simply

21   for the limited purpose of showing what the examiner reported

22   to the Court on some of the subsidiary fact issues that have

23   come up in the case.

24        There are six exhibits that we've identified

25   previously.  I think there may be some other limited excerpts

1    we have used from time to time, at least two, one relating to

2    the valuation of Pine, and another relating to the discussion

3    of Archstone which was a borrower of Pine.  We haven't

4    identified those as exhibits yet, so we may be too late to do

5    so.  But depending on movants' counsel's reaction to the

6    limited purpose of admission, we would ask that those be

7    considered as well.

8            I think that's all we have to say about the examiner's

9    report.  And maybe we can allow movants' counsel to respond.

10           MS. SCHAFFER:  Again, for the record, Tracy Schaffer.

11           Movants believe that all of the examiner's reports

12   excerpts, including the ones -- the two additional ones just

13   mentioned, are classic hearsay.  With all due respect to the

14   examiner, the report was based on interviews conducted --

15   interview memos drafted, none of which had been made available.

16   The witnesses who were interviewed were not deposed.  The

17   interviews were not conducted under oath.  And many of the

18   individuals were not deposed in this matter, and we think that

19   it's hearsay and that the case law is very clear on this point.

20           And I actually have a stack of manageable size

21   cases -- about four cases that hold that an examiner's report

22   is hearsay and not evidence.  We're happy to give that to Your

23   Honor.  We can put it in a short letter brief as well.

24           THE COURT:  I have no doubt that it's hearsay.  I

25   agree with you.  The question is whether or not it can be

08-13555-mg    Doc 12253    Filed 10/19/10    Entered 10/22/10 16:57:00    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 16 of 27

Page 16

1    admitted for a limited purpose.  And maybe I need to better

2    understand what we're talking about in terms of these excerpts

3    and the purpose for which the offer is being made and what

4    evidentiary value these excerpts have for purposes of matters

5    under dispute here.

6            Can I have a little bit more from Mr. Hume on this?  I

7    agree that it's hearsay.  The question is whether or not I can

8    consider the excerpts for a limited purpose.

9            MR. HUME:  It may be useful first for me to say that

10    while it's hearsay in the sense that it's a document in a

11    report, the examiner was reporting pursuant a statutory

12    authority and was under a duty to make this report.

13            THE COURT:  Absolutely.  And I've read the report and

14    I consider the report to be extremely well done, to be a very

15    professional piece of work; perhaps the finest example I've

16    ever seen of an examiner's report.  And I believe that the

17    information in the report is extremely useful and also

18    reliable.

19            MR. HUME:  As --

20            THE COURT:  But that doesn't mean that it isn't

21    hearsay.

22            MR. HUME:  -- well, it may mean, under 803(8) that

23    it's a public -- an official document pursuant to a statutory

24    duty.

25            THE COURT:  I don't think it's like a mortgage.  I

08-13555-mg    Doc 12253    Filed 10/19/10    Entered 10/22/10 16:57:00    Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 17 of 27

Page 17

1    think it probably doesn't fit that, although I'm going to give

2    you the ability to argue.

3            MR. HUME:  What I would like to do, Your Honor, if we

4    could look at 803(8), we have that.  And then could I have

5    those two excerpts up?

6            Your Honor, 803(8) provides that the hearsay rule does

7    not apply to reports -- would you highlight "reports" please?

8    I don't have my pointer today -- reports, in any form, of

9    public offices or agencies, setting forth ... (B)" -- if you

10   could -- "(B) matters observed pursuant to duty imposed by law

11   as to which matters there was a duty to report."  I don't think

12   you need the next part.  And similarly, (C) in civil actions,

13   factual findings resulting from an investigation made pursuant

14   to authority granted by law.

15           I would submit, Your Honor, that the highlighted

16   portions of 803(8) on the screen provide support for a finding

17   that the examiner's report falls under that exception.

18           I suppose there's a question of whether the examiner

19   is a public office or agency.  The argument we would make is

20   that by being appointed by the Court as an independent party

21   and an officer of the Court, not representing any private

22   interest, only representing the public interest, the examiner

23   should be considered akin to a public office or agency for

24   purposes of this rule.

25           Now, in terms of the limited purpose and evidentiary

1    value of what is in the examiner's report, I'd like to first

2    start with BCI Exhibit 976, which is at tab 5 of the binder,

3    which is a lengthy excerpt, but explains -- if we go to the

4    second page on 2117, how on September 14th -- in the second

5    paragraph -- Federal Reserve Bank of New York expanded the

6    categories of collateral accepted through its primary dealer

7    credit facility, and that previously, it had only accepted

8    investment-grade securities, on September 15th it announced it

9    would accept any collateral.

10        This is relevant to the issue of the nature of the

11   collateral that had become acceptable in these repos as the

12   financial prices worsened, and the Fed's recognition that to

13   keep the system afloat, it was going to take illiquid security.

14   And of course, as Professor Pfleiderer explained, over half the

15   securities that came over to Barclays in the Fed replacement

16   transaction were illiquid.

17        So we would think this is simply limited-purpose

18   evidence that can help support the complete picture and context

19   of the facts relevant to this case.  This doesn't go to an

20   ultimate issue directly.  But it does help thaw out interditial

21   (ph.) facts that are relevant to understanding the case.

22        If we could look at BCI Exhibit 997 at tab 6 of the

23   binder, there is a discussion in that excerpt, beginning on

24   2006, of the examiner's use of GFS.  The first sentence there:

25   "The examiner's financial advisors used GFS as their primary

Page 19

1    source for information," here it's talking about the LBHI

2    affiliate entities' securities, but that includes LBI.  And I

3    think the discussion goes on to explain in detail, if you go

4    down the paragraph, a little bit, to the sentence, "The

5    examiner used the September 12, 2008 dataset to perform the

6    securities analyses presented herein," and that he selected the

7    September 12 dataset after all of these extensive interviews

8    with Lehman, Barclays and Alvarez employees.

9              So he goes on, in this discussion to discuss his

10   assessment of GFS, his analysis of whether the securities

11   transferred to Barclays were in GFS, whether any of them

12   belonged to Lehman affiliates.  And as Your Honor knows, he

13   concluded that none of them did, they all belonged to LBI, I

14   believe is his finding.

15             So again, there's been some disputes about what GFS

16   does and doesn't contain.  I believe there's an excerpt

17   somewhere in here, in one of our excerpts, saying that the

18   examiner carefully performed a lot of analyses to determine

19   what was there.  Sometimes they're listed by CUSIP, sometimes

20   by ISIN number.  And after that analysis, he concluded that all

21   but 0.5 percent of the value of Schedule A and B was found on

22   GFS.

23             Again, I'm saying that from memory.  But I showed that

24   excerpt to Professor Pfleiderer during his examination.  And so

25   again, it's an example of a subsidiary fact that is relevant to

Page 20

1    show context, relevant to some of the facts in dispute.

2          So we offer -- and there may be a completeness

3    objection.  And we have excerpts -- to be honest, Your Honor,

4    as I look through the first four tabs, that seem even

5    incomplete as excerpts.  I'm not quite sure whether they are

6    complete excerpts we made.  But if there's a completeness

7    objection, we would not object to the examiner report coming in

8    as a whole for a limited purpose of showing what was reported,

9    to the extent that it is relevant to any factual findings that

10   the Court's being asked to resolve.  We're not asking the Court

11   to adopt it as findings.  There are things in there that I

12   think both parties likely disagree with in terms of the

13   examiner's report, for the reasons mentioned by Lehman's

14   counsel.  But it does have some relevant information provided

15   from his extensive work.

16          THE COURT:  Okay.

17          MS. SCHAFFER:  First, just to respond to Mr. Hume's

18   argument that the examiner excerpts somehow fall into the

19   hearsay objection (sic), I've got a case which I'll just read

20   one paragraph from that's particularly responsive to that

21   point.  And it is in the case of Monus v. Antonucci, it's in

22   the Northern District of Ohio, and the cite is 1995 WL 469694.

23   And in that case one of the parties sought to admit an

24   examiner's report.

25          And the Court noted that the examiner's -- excluding

08-13555-mg   Doc 12253   Filed 10/19/10   Entered 10/22/10 16:57:00   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 21 of 27

Page 21

1    the examiner's report, held it was not evidence, and noted

2    that, "The examiner's report consists of 1,000 pages relying on

3    sworn and unsworn testimony and statements by individuals, some

4    of whose identities are not revealed, and a variety of

5    documents, the authenticity of which may be subject to

6    challenge under the Federal Rules of Evidence.  It is doubtful

7    that the examiner's report is one of those public records or

8    reports which the drafters of the Federal Rules of Evidence had

9    in mind in creating the Rule 803(8), which is the public

10   records exception to hearsay."  And the examiner's report was

11   excluded.

12        In terms of the particular -- and I think there's

13   about eight to ten excerpts that Barclays wants admitted.  Mr.

14   Hume just gave us two examples.  He didn't go through all of

15   them.  I'm not sure what the limited purposes are for the other

16   ones.  Those have not been disclosed to us.  But in terms of

17   the two exhibits that he did speak about, I think they're still

18   seeking to admit them for the truth of the matter.

19        THE COURT:  They're still what?

20        MS. SCHAFFER:  Seeking to admit them for the truth of

21   the matter, and I think that they're hearsay.  He may have

22   narrowed it down to the particular paragraph within the

23   excerpt, but they're still for the truth of the matter, and

24   they should be excluded as hearsay.  Unless Your Honor has

25   questions --

08-13555-mg   Doc 12253   Filed 10/19/10   Entered 10/22/10 16:57:00   Main Document
LEHMAN BROTHERS HOLDINGS, INC., ET AL.
Pg 22 of 27

Page 22

1          THE COURT:  Mr. Hume, just so I'm clear on the offer,

2     is the offer for a limited purpose as it relates to all

3     excerpts?

4          MR. HUME:  Yes, Your Honor.

5          THE COURT:  I'm not suggesting that we need to burden

6     today's hearing with a review of each of the other excerpts,

7     but are the other excerpts of the same sort as we've seen or

8     are they of a different type?

9          MR. HUME:  No, I think they're the same sort.  I mean,

10    I've tried to recall what I think has been most important that

11    we've shown from the examiner's report:  what he said about the

12    GFS system, what he said about JPMorgan's valuations of

13    collateral, including Pine, and the doubts about that

14    collateral; and to a limited extent, some of his discussions of

15    the Barclays-Lehman sale negotiations being conducted in good

16    faith, at least as far as he found.

17         THE COURT:  Okay.  I'm going to exclude all of the

18    excerpts from the examiner's report as evidence for all

19    purposes.  My reasoning is as follows.

20         I've already read the examiner's report.  And it's

21    voluminous, and I can't say that I have total recall of the

22    excerpts that you're most concerned with.  But I viewed the

23    examiner's report as a guide to the Court and to parties-in-

24    interest as to events that are circumscribed by an order that I

25    issued directing the appointment of the examiner and providing

Page 23

1    for the scope of the examiner's work.

2         To that extent, I believe that Rule 803(8) does not,

3    by its literal reading, apply to this report.  And I don't mean

4    to be overly constrained in my reading of the rule, nor do I

5    mean by this ruling to limit my ability to consider the

6    application of this rule in other settings that may be

7    comparable.  But I don't believe that the examiner was

8    appointed pursuant to any duty imposed by law, as much as he

9    was appointed pursuant to a carefully negotiated order that was

10   drafted by parties-in-interest, for my approval.  And I think

11   as a result, that his work does not neatly fit within the

12   public records and reports exception to the hearsay rule.

13        Additionally, I know from my review of the report,

14   which I consider a reliable report, that it was based to a very

15   large extent upon a series of interviews with third parties,

16   many of whom were identified.  There are extensive footnotes in

17   the report, and it's very well-documented, but it's not

18   entirely clear to the reader that every conclusion reached in

19   the report is traceable to particular statements made by these

20   third parties.  And even if they were traceable to such

21   statements, the statements would be hearsay.

22        More to the point, Mr. Valukas was very deliberate in

23   his efforts not to in any way intrude upon the fact-finding

24   process that the Court is currently engaged in, in respect of

25   the present 60(b) dispute.  And I think it unwise for me to

Page 24

1    admit the excerpts for any purpose, in part for that reason,

2    but also because I doubt that there is any meaningful probative

3    value that I can derive from these excerpts, since I rather

4    expect that in the course of the months of hearings that we've

5    had in this Court, that I have been exposed to more direct and

6    unvarnished evidence than Mr. Valukas could possibly have

7    encountered during the course of his work.

8           So for these reasons, I believe that I have ample

9    evidence in the record to make my own conclusions concerning

10   the reliability of the GFS system and any other matters that he

11   may be describing in his report.  I don't need these excerpts.

12   I recognize that they may be valuable extras, but I view this

13   as gilding the lily at this point.  So I'm excluding those

14   excerpts.

15          MR. SCHILLER:  Your Honor, that concludes what we have

16   for Your Honor today, other than our request for a brief

17   conference with Your Honor.

18          THE COURT:  All right.  Let's do the following,  I

19   know that there are some people in court who shouldn't be

20   present for a chambers conference.  And we have, I think, a

21   small enough group gathered here today that we can comfortably

22   do this in Room 608, assuming that room is available to us, and

23   I expect it is.

24          So, I'm going to have my courtroom deputy check on the

25   availability of that room.  If that room is available, we'll

Page 25

1    meet there in about five or ten minutes.  If for some reason

2    that room is not available, we'll meet here in the courtroom,

3    having first cleared the courtroom of those people who

4    shouldn't be present for the chambers conference.

5              And we're adjourned until Thursday morning.

6         (Whereupon these proceedings were concluded at 2:39 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 26

1

2                              I N D E X

3

4                            E X H I B I T S

5    OTHER'S              DESCRIPTION           PAGE

6    BCI-1106             Deposition exhibit  8

7    BCI-1107             Deposition exhibit  8

8    BCI-1005             Internal JPMorgan   14 (limited purpose)

9                         e-mail and

10                        attachment

11

12                              RULINGS

13                          Page    Line

14   All excerpts of the      22      17

15   examiner's report will

16   be excluded as evidence

17

18

19

20

21

22

23

24

25

Page 27

1

2                    C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8    _____

9    PENINA WOLICKI

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  October 19, 2010

17

18

19

20

21

22

23

24

25