**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., ET AL, | * | CASE NO. 08-13555 (JMP) |
| | * | |
| Reorganized Debtors. | * | Jointly Administered |
| | * | |
| | * | |

<u>RESPONSE TO DEBTORS' FORTY-SIXTH OMNIBUS OBJECTION
TO CLAIMS (NO DEBTOR CLAIMS)</u>

ACTIV Financial Systems, Inc. ("ACTIV") submits the following response to Debtors' Forty-Sixth Omnibus Objection to Claims ("Motion") pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure, and this Court's order approving procedures for the filing of omnibus objections to proofs of claim filed in these chapter 11 cases (the "Procedures Order") [Docket No. 6664], seeking entry of an order disallowing and expunging the claims of ACTIV.  ACTIV asserts its claim, #6085 ("ACTIV's Claim") is valid based on the following statements:

1.       ACTIV is an Illinois corporation with a principal place of business in Wheaton, IL.  ACTIV provides market data content and technologies to financial institutions.

2.       In a Letter of Intent between ACTIV and Lehman Brothers Inc. dated December 7, 2007 ("LOI"), ACTIV entered into an interim agreement with the Debtor, Lehman Brothers Inc., to grant the Debtor the right to access ACTIV's software and services beginning on December 17, 2007 through December 31, 2007 ("Interim Period").  The Letter of Intent was amended in an Amendment to the Letter of Intent dated December 27, 2007 ("Amendment") to extend the Interim Period to January 1, 2008. The Amendment included a fee due to ACTIV of $14,000 per month for the interim license.  The LOI and the Amendment are attached as <u>Exhibit 1</u>

3.       The parties entered into a Software License Agreement effective January 31, 2008 ("SLA"), attached as <u>Exhibit 2</u>.  Subsequently, the LOA and the Amendment terminated, per the terms set forth therein. The SLA included amount due to ACTIV for $14,000 for the Software and $2,500 for the data content. The term of the SLA was 12 months. See attached Purchase Orders generated pursuant to the SLA, attached as <u>Exhibit 3</u>

4.       The parties also entered into a Trial Agreement June 18, 2008 for a term of two (2) months. The Trial Agreement and subsequent cancellation letter are attached as <u>Exhibit 4</u>.

5.       ACTIV received notice on September 18, 2008 that the Debtor had filed for bankruptcy. See <u>Exhibit 5</u>.

6.      Debtor did not pay the amounts due from the September 2008 Invoice #8399, October 2008 Invoice #8687 and the November 2008 Invoice #8986, totaling $46,023.25. See Exhibit 6.

7.      ACTIV timely filed its claim (Claim Number 6085) against Debtor on July 24, 2009, for thirty thousand eight hundred and fifty dollars and eighty-seven cents ($30,850.87). Please see Acknowledgement of Receipt of Proof of Claim, attached as Exhibit 7.

8.      Rule 3007(e)(6) of the Federal Rules of Bankruptcy Procedure requires that an omnibus objection "shall contain objections to no more than 100 claims."  The No Debtor Claims in Exhibit A of the Motion exceeds 100 claims. Therefore, the Debtor's objection is improper and this Motion should be dismissed.

9.      The Court should reconsider ACTIV's Claim as is it presented with supporting attachments.

10.     The Court should not expunge or disallow ACTIV's Claim.

WHEREFORE, ACTIV hereby respectfully requests that this Court enter an order (i) overruling the Debtor's Forty-Sixth Omnibus Objection to Claims pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure, and this Court's order approving procedures for the filing of omnibus objections to proofs of claim filed in these chapter 11 cases (the "Procedures Order") [Docket No. 6664] as they relate to Claim No. 6085 for the reasons stated herein and (ii) granting such other and further relief as is just and proper.

Respectfully submitted,

/s/ *Ly S. Chhay*

Ly S. Chhay, Esq. (#6281166)

General Counsel

ACTIV FINANCIAL SYSTEMS, INC.

120 East Liberty Drive, Suite 200

Wheaton, IL 60187

Phone: (630) 682-5700

Fax: (630) 682-3338

Email: ly.chhay@activfinancial.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., ET AL, | * | CASE NO. 08-13555 (JMP) |
| | * | |
| Reorganized Debtors. | * | Jointly Administered |
| | * | |
| | * | |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of October, 2010, I caused to be served a true and correct copy of

the Response To Debtors' Forty-Sixth Omnibus Objection To Claims (No Debtor Claims) upon the

following parties as indicated:

<u>U.S. First Class Mail</u>

The Honorable James M. Peck
One Bowling Green,
New York, New York 10004
Courtroom 601;

Attorneys for the Debtors:
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Shai Waisman, Esq.

The Office of the United States Trustee for the Southern District of New York
33 Whitehall Street, 21st Floor
New York, New York 10004
Attn: Andy Velez-Rivera, Esq.,
Paul Schwartzberg, Esq.,
Brian Masumoto, Esq.,
Linda Riffkin, Esq., and
Tracy Hope Davis, Esq.

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Attn: Dennis F. Dunne, Esq.
Dennis O'Donnell, Esq.
Evan Fleck, Esq.

/s/  Ly S. Chhay

Ly S. Chhay, Esq.

**EXHIBIT 1**

**LETTER OF INTENT AND AMENDMENT**

December 7, 2007

Mr. David Garrison
ACTIV Financial Systems, Inc.
40 Rector Street, 11th Floor
New York, NY 10006

Re:  Letter of Intent to Acquire ACTIV Software and Services

Dear David:

The purpose of this letter is to confirm the intent of Lehman Brothers Inc. ("Lehman") and ACTIV Financial Systems, Inc. ("Activ") to enter into an interim agreement governing the provision of certain Activ software and services to Lehman to support Lehman's operation of its NYSE Specialist business.  Pursuant to this letter, Activ agrees to grant Lehman the rights to use and access the software and services listed in *Schedule 1* to support the operation of Lehman's NYSE Specialist business for a period beginning on December 17, 2007 and ending on the earlier of either (i) the date upon which both parties execute a definitive agreement regarding the subject matter hereof, and (ii) December 31, 2007 ("Interim License Period"), unless otherwise mutually agreed by the parties in writing.  The parties agree that at the end of the Interim License Period, Activ may invoice Lehman for an amount mutually agreed to by the parties with respect to the software and services listed in *Schedule 1*, with an effective date as of December 17, 2007.

Upon execution of this letter by both parties, Lehman and Activ will commence good faith negotiations during the Interim License Period with the goal of entering into a definitive agreement governing the provision of the software and services listed in *Schedule 1* to support the operation of Lehman's NYSE Specialist business.  Both parties agree to keep the discussions, negotiations and any information, documents or materials disclosed prior to or as a result of such discussions or negotiations between them strictly confidential in accordance with the terms of the Nondisclosure Agreement executed by the parties as of June 15, 2007.  In addition, no press releases or public announcements relative to this letter or the definitive agreement will be made unless jointly prepared by and mutually acceptable to the parties.

Please indicate your agreement with the terms of this letter by signing and returning an executed copy of this letter via facsimile to Mindy Dolgin at (212) 320-4391, whereupon this letter will constitute our agreement with respect to the subject matter hereof.

Sincerely,

Lehman Brothers Inc.

By:
Name:  Erik Stighm
Title:  VP

Acknowledged and Agreed:

ACTIV Financial Systems, Inc.

By:
Name:  SUJATA PARIKH
Title:  cFO

## Schedule 1
## Software and Services

(i)    ActivFeed is a consolidated market data feed consisting of ACTIV's software combined with information obtained, selected and consolidated ("Content") under the authority of various sources listed in Exhibit B hereto, ("ActivFeed Sources") ActivFeed data includes exchange pricing data, market news and fundamental data.

(ii)    ActivMiddleware comprises the following set of ACTIV proprietary components and base services used by Content Platform components. An ActivMiddleware license is limited for use to the extent necessary for correct functioning of those components.

     (a)    Content Gateway ("CG") is the server component that provides fault-tolerant load-balanced access to the Downstream Content Server, Time Series Server and News Server databases. Multiple API connections are handled by the CG as well as user authentication permissioning and entitlements.

     (b)    Content Gateway API provides a set of methods which can be used to connect to a CG to access the content delivered by the ActivFeed subject to entitlement restrictions. The API is delivered as a set of C++ header / library / binary files and JAVA API.

     (c)    Content Server is the server component of the Software that maintains a last-value cache for all data or records received from the Content Gateway API. Record updates are sent by the Content Server on to CGs installed as part of the Content Platform. The Content Server also appropriately responds to database requests made by the CGs, providing to them the requested data. Content Platform is a collection of server software applications.

     (d)    Publishing Gateway receives data from the API applications. This data is then published into the Content Server

### FEE SCHEDULE

| | Non-Recurring | Monthly Recurring |
|---|---|---|
| | | |
| I.  Software License Fees | | |
| ActivFeed data license (i), (ii) | | $ 2,500.00 |
| ActivMiddleware license (iv) | | $14,000.00 |
| | | |
| **Total Monthly Recurring Fees** | | **$16,500.00** |
| | | |

December 27, 2007

Mr. David Garrison
ACTIV Financial Systems, Inc.
40 Rector Street, 11th Floor
New York, NY 10006

Re:   Amendment to Letter of Intent to Acquire ACTIV Software and Services

Dear David:

The purpose of this letter is to amend the letter of intent dated December 7, 2007 between Lehman Brothers Inc. ("Lehman") and ACTIV Financial Systems, Inc. ("Activ"), in such that the parties agree to extend the expiration date of the Interim License Period until January 31, 2008 (the "Amendment").

The parties further agree that:

- Effective as of January 1, 2008, Activ may invoice Lehman for use of ActivMiddleware Software on a month to month basis, at the rate of $14,000/month. Payment terms are net thirty (30) days from Lehman's receipt of a valid invoice.

- As of the date of this Amendment, no content data is being provided to Lehman via ActivFeed. At such time the parties agree that content data is required, Activ may invoice Lehman for use of ActivFeed Software on a month to month basis, at a rate of $2,500/month, commencing as of the date the content data is made available to Lehman.   Payment terms will be net thirty (30) days from Lehman's receipt of a valid invoice.

- In the event a definitive agreement is not executed between the parties by the end of the Interim License Period, Lehman will have the right to cancel use of the applicable Software on notice to Activ, without further financial obligation.

Please indicate your agreement with the terms of this letter by signing and returning a scanned copy of this letter via email to my attention at mindy.dolgin@lehman.com, whereupon this letter will constitute our agreement with respect to the subject matter hereof.

Sincerely,

Lehman Brothers Inc.

By: _Mindy Dolgin_

Name: _Mindy Dolgin_

Title: _Vice President_

Acknowledged and Agreed:
ACTIV Financial Systems, Inc.

By: _Sujata Parekh_

Name: _Sujata Parekh_

Title: _CFO_

**EXHIBIT 2**

**SOFTWARE LICENSE AGREEMENT**

Lehman Brothers Inc
Confidential



## ACTIV Financial Systems, Inc
## SOFTWARE LICENSE AGREEMENT

This Software License Agreement (the "Agreement") is made and entered into as of this 31st day of January, 2008, ("Effective Date") by and between ACTIV Financial Systems, Inc., an Illinois corporation ("ACTIV"), and **Lehman Brothers Inc.**, a Delaware corporation ("Licensee").

### I.        GRANT OF LICENSE

ACTIV hereby grants to Licensee, and Licensee hereby accepts, a non-exclusive, non-transferable (except as permitted under this Agreement), limited license (the "License") to use ACTIV software products as described in Schedule I and as selected by Licensee, including any subsequent revision, update, improvement, modification, enhancement, correction or new release thereto ("Updates") and all related documentation and other materials ("Documentation") (collectively, the "Software") pursuant to the terms and conditions hereinafter set forth in this Agreement.

I.1        Unless expressly permitted in Schedule I, any use of the Software by Licensee including redistribution thereof, is prohibited.

I.2        The term of this Agreement shall take effect as of the Effective Date, and shall remain in effect for a term of twelve (12) months ("Initial Term"), beyond the Acceptance Date as set forth in Section III.2 of this Agreement.  After expiration of the Initial Term, this Agreement shall thereafter renew automatically for successive one (1) month terms ("Renewal Term") unless: (i) written notice to terminate is delivered by either party to the other at least thirty (30) days prior to the expiration of the Initial Term or any subsequent Renewal Term, or (ii) this agreement is terminated pursuant to Section VIII or IX hereof. Initial Term and Renewal Term are collectively referred to as Term.

### II.       PAYMENT

II.1        Licensee shall pay the amounts set forth in the fee schedule, attached as Exhibit A hereto (the "Fee Schedule") for the use of the Software ("License Fee").

II.2        The License Fee shall commence accruing on the Acceptance Date, and ACTIV shall invoice Licensee for a monthly License Fee each subsequent month thereafter during the term of this Agreement, payable thirty (30) days following Licensee receipt of a correct invoice.  Any invoice submitted by ACTIV, shall be deemed correct unless Licensee advises ACTIV in writing within thirty (30) days of the date of the invoice that it disagrees with the invoice and specifies the nature of the disagreement ("Disputed Amounts").

II.3        The Licensee Fee applicable to any continuation of use during a Renewal Term, to be calculated not more than once in a period of twelve (12) months, will be the lesser of: (a) the License Fee plus the percentage change over the prior year's U.S. Consumer Price Index for Urban Consumers, All U.S. Cities Average, published by the Bureau of Labor Statistics of the Department of Labor, or (b) five percent (5%).

Lehman Brothers Inc
Confidential

II.4     In addition to the fees set out in the Fee Schedule, if applicable, ACTIV shall invoice Licensee from the Delivery date and for each calendar month thereafter, fees for the data source selected by Licensee in Exhibit B and as required by such source. Such fees shall not be prorated.

II.5     The fees set out in the Fee Schedule are exclusive of any federal, state or local sales, use, property or other taxes, any duties or any similar assessments imposed on any transactions hereunder, all of which are the sole liability of, and shall be paid solely by, Licensee, except taxes on the income of ACTIV.

II.6     All payments shall be in US currency unless stated otherwise.

## III.        DELIVERY AND ACCEPTANCE

III.1    ACTIV agrees to deliver and install the Software at the location set out in Exhibit C on a mutually agreeable date following execution of this Agreement by both parties hereto. For the purposes of this agreement, ("Delivery Date") shall mean the date on which the Software has been delivered such that a Licensee can access the Software using Licensee's installation.

III.2    If, within four (4) weeks from the installation of the Software, Licensee determines that the Software successfully meets the acceptance criteria, requirements, and or specifications, and terms of the Documentation (the "Acceptance Criteria"), Licensee shall notify ACTIV in writing of such acceptance of the Software ( "Acceptance"). If the Software does not pass such acceptance test, Licensee shall have the option of immediately terminating this Agreement, without obligation, liability or penalty of any kind and receiving a refund of all fees paid hereunder, or continuing the acceptance test; provided, however, that Licensee's termination option shall remain available to Licensee during any such continuation. If the Licensee does not notify ACTIV of its acceptance within four weeks from the Delivery Date, then it will be deemed accepted by the Licensee, unless otherwise agreed in writing thereto.

## IV.        LIMITED WARRANTY

IV.1    ACTIV warrants that (i) it has the right to authorize the use of the Software under this Agreement (ii) that ACTIV has and will have during the term of this Agreement the right to grant the licenses granted herein, (iii) that ACTIV is unaware of any claim that the Software licensed herein infringes the Intellectual Property rights of any third party. ACTIV warrants that it has used commercial best efforts to test the Software to detect, and if so detected, to eliminate, any computer code (sometimes referred to as "viruses" or "Trojan horse" or "backdoor" or "worms", etc.) designed to damage, disrupt, disable, harm, modify, delete or otherwise impede in any manner, the order operation of the Software or any other software, data files, firmware, hardware, computer system or network. ACTIV further represents and warrants that ACTIV shall use best commercial efforts to ensure that the Software (and all other software installed by ACTIV) shall not contain any computer code or any other procedures, routines or mechanisms designed by ACTIV to: (a) disrupt, disable, harm, modify, delete or impair in any way the orderly operation of the Software (or any other software) based upon the elapsing of a period of time, exceeding an authorized number of copies, advancement to a particular date or other numeral (sometimes referred to as "time bombs", "time locks", or "drop dead" devices; (b) cause the Software to damage or corrupt any of Licensee's data storage media, programs, equipment or communications or otherwise interfere with Licensee's operations.

IV. 2    Except as otherwise agreed by the Licensee and ActivFeed Source, (i) ACTIVFEED SOURCES (AS DEFINED IN SCHEDULE I) EXCLUDE ANY WARRANTY OR REPRESENTATION AS TO THE CONTENT, ACCURACY, OR TIMELINESS OF ANY DATA OR INFORMATION DISPLAYED OR RETRIEVED THROUGH USE OF THE SOFTWARE AND SPECIFICALLY

2

Lehman Brothers Inc
Confidential

EXCLUDES ANY OTHER WARRANTY OR REPRESENTATION REGARDING THE CONTENT AND USE OF SUCH DATA OR INFORMATION; and (ii) ActivFeed Sources shall not be responsible for any harm, costs or losses that may be suffered by Licensee due to failure of any computer system, software or communication links.

IV.3   The warranties in this Section IV will not apply if the Software has been modified by Licensee in any way, except to the extent that modifications are permitted or authorized by ACTIV or if Licensee uses the Software on hardware that fails to meet the minimum hardware specifications as set forth in Exhibit D of this Agreement and as applicable to Licensee's use.

IV.4   ACTIV's execution, delivery and performance of this Agreement are within ACTIV's corporate/partnership powers, have been duly authorized by all necessary corporate/partnership action, require no governmental, regulatory or other approvals and, when duly executed, this Agreement shall constitute a legal, valid and binding obligation of Licensee, enforceable in accordance with its terms.

IV.5   EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT OR IN A SCHEDULE OR EXHIBIT, THERE ARE NO OTHER WARRANTIES BY EITHER PARTY, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR USE AND FITNESS FOR A PARTICULAR PURPOSE.

## V.        SERVICE LEVEL AGREEMENT

Service Level Agreement is attached as Exhibit E to this Agreement.

## VI.       PROPRIETARY RIGHTS

VI.1   Except for the Content as defined in Schedule I, ACTIV owns the copyright in and to the Software. Licensee acknowledges that the Software contains trade secrets and proprietary data and that nothing in this Agreement shall be construed to convey any title or ownership rights to Licensee. This Section VI.1 shall survive the date of termination of this Agreement.

VI.2   Licensee agrees not to reverse engineer, decompile, or disassemble or otherwise seek to duplicate the performance characteristics of the Software or any part thereof, nor to sell, assign or distribute the Software or any part thereof (except as permitted under this Agreement), to any other person, firm, corporation or entity.

VI.3   Licensee agrees that, unless specifically authorized under this Agreement, it will not use, make or have made any more copies of the Software or any part thereof than are delivered by ACTIV for Licensee's use hereunder. At no additional cost to Licensee, Licensee may make one copy of the Software for archival and backup purposes, provided that such copy shall be subject to this Agreement  and bear ACTIV's trademarks, copyright notices and other proprietary notices contained in versions of the Software provided by ACTIV under this Agreement.

## VII.      REPRESENTATIONS OF LICENSEE

Licensee hereby represents and agrees as follows:

VII.1   Licensee's execution, delivery and performance of this Agreement are within Licensee's corporate/partnership powers, have been duly authorized by all necessary corporate/partnership action, require no governmental, regulatory or other approvals and, when duly executed, this Agreement shall constitute a legal, valid and binding obligation of Licensee, enforceable in accordance with its terms;

3

Lehman Brothers Inc
Confidential

VII.2   Licensee will not use or display the Software, nor will it allow the use or display of the Software within its internal organization or otherwise, for any purpose or in any manner contrary to the terms of this Agreement.

VII.3   Licensee shall be responsible for all costs and expense, all necessary installation alteration, including but not limited to, network installations, equipment communications links, site alterations and circuits that may be required to receive, process and display the Software licensed hereunder as set out in Exhibit D, as applicable for Licensee's use, at Licensee's location(s). Licensee acknowledges that increasing volume of market data or technological changes in data dissemination systems may necessitate an upgrade in Licensee's systems and that failure to do so may result in degradation of service. ACTIV will provide ample notification of any change in specifications from time to time to allow Licensee to upgrade it's environment. In such event Licensee is responsible for, and agrees to maintain its systems including but not limited to purchasing additional or new computer hardware or communications bandwidth as required such that it will not experience degradation in service. Failure to do so will void any service level warranty provided for by ACTIV hereunder.

## VIII.      TRANSFER AND ASSIGNMENT

VIII.1   This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective legal successors and permitted assigns.

VIII.2   Any assignment of this Agreement shall be void unless the assigning party has received the prior written consent of the other party, where such consent will not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Licensee may assign this Agreement without ACTIV's consent to an affiliate or as part of a corporate reorganization, consolidation or merger, to a purchaser of all or substantially all of its assets or of the assets of a business unit or division within the applicable party, or to a success in interest of the applicable party, provided that (i) Licensee shall provide ACTIV with written notice of any such assignment of by Licensee to a competitor of ACTIV ("Competitive Assignment") within thirty (30) business days after the consummation of such assignment and/or related transaction, (ii) ACTIV shall have the option to terminate the Agreement solely with respect to a Competitive Assignment by providing a written notice of termination to the Licensee within thirty (30) days from ACTIV's receipt of Licensee's notice of the Competitive Assignment , and (iii) if ACTIV opts to terminate this Agreement due to a Competitive Assignment, Licensee will have six (6) months or such other extended period as may be agreed to in writing by both parties from Licensee's receipt of ACTIV's notice of termination under this Section VIII.2 to migrate Licensee systems ("Transition Period') and therefore, all terms and conditions of this Agreement shall remain unchanged and in full force and effect during such Transition Period. ACTIV may assign this Agreement without Licensee's consent to an affiliate or as part of a corporate reorganization, consolidation or merger, to a purchaser of all or substantially all of its assets or of the assets of a business unit or division within the applicable party, or to a success in interest of the applicable party, provided that (a) ACTIV shall provide Licensee with written notice of any such assignment of by Licensee within thirty (30) business days after the consummation of such assignment and/or related transaction, (b) Licensee shall have the option to terminate the Agreement with respect to a any such assignment by providing a written notice of termination to the ACTIV within thirty (30) days from Licensee's receipt of ACTIV's notice of assignment, and (c) if Licensee opts to terminate this Agreement due to an assignment, Licensee will have a Transition Period of six (6) months or such other extended period as may be agreed to in writing by both parties from ACTIV's receipt of Licensee's notice of termination under this Section VIII.2 to migrate Licensee systems, and therefore, all terms and conditions of this Agreement shall remain unchanged and in full force and effect during such Transition Period.

4

Lehman Brothers Inc
Confidential

VIII.3   Any purported assignment in breach of this Agreement will be void.

## IX.         TERMINATION

IX.1    This Agreement may be terminated, at ACTIV's election, upon the occurrence of any one of the
following:

   (i)      Licensee fails to pay any invoice other than Disputed Amounts, when due and fails to
            fully remedy any such breach within thirty (30) business days after written notice thereof
            is provided by ACTIV to Licensee;
   (ii)     Licensee's material breach of any of the terms of this Agreement and Licensee fails to
            remedy such breach within thirty (30) days after a written notice thereof is provided by
            ACTIV to the Licensee.
   (iii)    Licensee files for bankruptcy or is adjudicated bankrupt or Licensee's interest under this
            Agreement is levied upon execution or seized by virtue of any writ of a court of
            competent jurisdiction.

   If this Agreement is terminated pursuant to this Section IX.1, ACTIV shall have the right to such
   other remedies as may be available to it, including, but not limited to, injunctive relief, it being
   acknowledged that legal remedies may be inadequate.

IX.2    This Agreement may be terminated at Licensee's election upon occurrence of any one of the
following:
   (i)      ACTIV's breach of any material term of this Agreement and ACTIV's failure to remedy
            such breach within thirty (30) days after notice thereof is provided by Licensee to
            ACTIV.
   (ii)     ACTIV's failure to meet service level requirements as set out in Schedule E.
   (iii)    ACTIV files for bankruptcy or is adjudicated bankrupt or ACTIV's interest under this
            Agreement is levied upon execution or seized by virtue of any writ of a court of
            competent jurisdiction whereby ACTIV is unable to meets its obligations under this
            Agreement.
   (iv)     For convenience by giving ACTIV at least thirty (30) days prior written notice specifying
            the termination date

   If this Agreement is terminated pursuant to this Section IX2, Licensee shall have the right to such
   other remedies as may be available to it, including, but not limited to, injunctive relief, it being
   acknowledged that legal remedies may be inadequate.

IX.3    Upon termination of this Agreement, Licensee shall promptly return to ACTIV any and all copies
of the Software in its possession and/or under its control.  Licensee shall additionally make prompt
payment in full for all amounts due and owing under this Agreement as of the effective date of
termination.

## X.         INDEMNIFICATION AND LIMITATION OF LIABILITY
X.1  Licensee agrees to indemnify, defend and hold harmless ACTIV, its officers, directors, stockholders,
employees, agents and representatives ("ACTIV Parties") from and against any and all third party actions,
suits, losses, costs, damages and expenses including, but not limited to, reasonable attorneys' fees and

Lehman Brothers Inc
Confidential

disbursements, which may at any time hereafter be sustained by ACTIV Parties, or any of them arising out of or in connection with Licensee's material failure to comply with the terms set forth in Section II and Section III of Schedule I to this Agreement.

X.2  ACTIV agrees to indemnify, defend and hold harmless Licensee, its officers, directors, stockholders, employees, agents and representatives ("Licensee Parties") from and against any and all third party actions, suits, losses, costs, damages and expenses including, but not limited to, reasonable attorneys' fees and disbursements, which may at any time hereafter be sustained by Licensee Parties, or any of them, by reason of or in consequence of infringement by ACTIV of any patent, copyright or similar intellectual property or proprietary right (including, but not limited to, misappropriation of trade secrets).

X.3      Licensee agrees to give ACTIV prompt written notice of any claim for which a Licensee Party seeks indemnification; provided, however, any failure by Licensee to provide such notice will not relieve ACTIV of its indemnification obligations under the Agreement except to the extent ACTIV can demonstrate actual prejudice as a result of such failure.  ACTIV will have the right to conduct the defense of the claim and, consistent with the rights of Licensee Parties hereunder, all negotiations for its settlement; *provided, however,* that (i) the Licensee Parties may participate in such defense or negotiations to protect its (or their) interests and (ii) any settlement will be for the payment of money by ACTIV and will not, without the prior written approval of Licensee, obligate or impose liability on Licensee or any Licensee Party in any way.

X.4  Except for liability for (i) a party's breach of confidentiality obligations under this Agreement or any applicable confidentiality agreements, (ii) ACTIV's indemnification obligations under the Agreement, and (iii) gross negligence or willful misconduct by a party, in no event will either party be liable to the other party for any lost profits or lost revenue or for any indirect, incidental, consequential, special, punitive, exemplary or consequential damages arising out of or in connection with this Agreement.  In addition, except for liability for a party's breach of confidentiality obligations under this Agreement or any of the applicable confidentiality agreements, (ii) ACTIV's indemnification obligations under the Agreement, and (iii) gross negligence or willful misconduct by a party, each party's total cumulative liability to the other party under the Agreement will not exceed an amount equal to the greater of (a) the total aggregate amounts paid under this Agreement and (b) $500,000.

X.5  If the Software, in whole or part, is, or in the opinion of ACTIV may become, the subject of any claim or suit for infringement of any intellectual property or proprietary right of a third party, ACTIV shall, at its own option and expense, do one of the following: (i) supply to Licensee revisions or modifications to the Software, or affected part thereof, that makes it non-infringing and that is qualitatively and functionally at least the equivalent of the affected Software or part thereof; or (ii) procure for the Licensee the right to continue using the Software, or the affected part thereof, as licensed herein; or, if neither (i) nor (ii) is, in ACTIV's sole reasonable discretion, reasonably commercially practical, then (iii) terminate the Agreement.  If the Agreement is terminated hereunder, pre-paid fees shall be refunded to the Licensee as appropriate.

## XI.        MISCELLANEOUS

XI.1      During each calendar year, upon 45 days notice, License will have the responsibility to provide a report based on current usage for the purpose of verifying Licensee's compliance with it's obligations.

6

Lehman Brothers Inc
Confidential

XI.2    This Agreement contains the entire understanding of the parties hereto with regard to the subject
        matter contained herein and supersedes all prior agreements and understandings between or
        among the parties hereto regarding the subject matter hereof. The parties hereto, by mutual
        agreement in writing, may amend, modify and supplement this Agreement.

XI.3    No party shall bear any responsibility or liability for any losses arising out of any delay or
        interruption of its performance of obligations under this Agreement due to circumstances beyond
        the reasonable control (force majeure event).

XI.4    If either party waives its rights with respect to any provision of this Agreement, such party shall
        not thereafter be construed to have waived its rights with respect to such provision or any other
        provision of this Agreement.

XI.5    The exchange of information hereunder will be governed by the Non-Disclosure Agreement dated
        June 15, 2007 between the parties, attached hereto as Schedule E.

XI.6    Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall
        be brought in the appropriate Federal or State court located in the County of New York, and the
        parties irrevocable consent to the exclusive jurisdiction of such court.

XI.7    This Agreement shall be construed in accordance with and governed by the laws of the State of
        New York.

XI.8    All notices, demands, requests or other communications which may be or are required to be given
        by any party hereto to the other party hereto shall be in writing, addressed as follows:

        If to ACTIV:
        ACTIV Financial Systems, Inc
        1607 East Taft Avenue, Suite 101
        Wheaton, IL 60187
        Attn.: Sujata Parekh


        If to Licensee:
        Lehman Brothers Inc.
        1301 Avenue of the Americas, 3rd Floor
        New York, NY 10019
        Attn: Mindy Dolgin, IT Contract & Vendor Management


XI.9    Any provision of this Agreement which is held invalid or unenforceable shall be ineffective to the
        extent of such invalidity or unenforceability without invalidating or rendering unenforceable the
        remaining provisions hereof.

XI.10   The section headings contained in this Agreement are intended solely for convenience of
        reference and shall be given no effect in the construction or interpretation of this Agreement.

Lehman Brothers Inc
Confidential

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**ACTIV:**
ACTIV Financial Systems, Inc

By: _____

Name: Sujata Parekh

Title: Vice President and Controller

Date: _January 31, 2008_

**LICENSEE: Lehman Brothers Inc.**

By: _____

Name: Erik Stigum

Title: SVP

Date: 1/31/2008

8

Lehman Brothers Inc
Confidential

## SCHEDULE I

Licensee, having entered into the foregoing License Agreement, agrees to the following products, service and terms:

### I.    Software Licensed:

(i)    ActivFeed is a consolidated market data feed consisting of ACTIV's software combined with information obtained, selected and consolidated ("Content") under the authority of various sources listed in Exhibit B hereto, ("ActivFeed Sources") ActivFeed data includes exchange pricing data, market news and fundamental data.

(ii)   ActivMiddleware comprises the following set of ACTIV proprietary components and base services used by Content Platform components. An ActivMiddleware license is limited for use to the extent necessary for correct functioning of those components.

   (a)    Content Gateway ("CG") is the server component that provides fault-tolerant load-balanced access to the Downstream Content Server, Time Series Server and News Server databases. Multiple API connections are handled by the CG as well as user authentication permissioning and entitlements.

   (b)    Content Gateway API provides a set of methods which can be used to connect to a CG to access the content delivered by the ActivFeed subject to entitlement restrictions. The API is delivered as a set of C++ header / library / binary files and JAVA API.

   (c)    Content Server is the server component of the Software that maintains a last-value cache for all data or records received from the Content Gateway API. Record updates are sent by the Content Server on to CGs installed as part of the Content Platform. The Content Server also appropriately responds to database requests made by the CGs, providing to them the requested data. Content Platform is a collection of server software applications.

   (d)    Publishing Gateway receives data from the API applications. This data is then published into the Content Server

### II.   License and Use:

The Software listed herein is licensed for use by Licensee on an unlimited number of production and non-production servers in connection with the operation of its NYSE Specialists business unit for NYSE Hybrid implementation.

(i) Licensee may use the software to:

   a.   to ingest various NYSE feeds including CT/CQ data, and the Specialist API using Licensee supplied and supported feed handlers;

   b.   to derive content through the Software within Licensee's applications only. For avoidance of doubt: the Licensee may interface with any NYSE feed currently existing or feeds that may be offered by NYSE in the future that is directly related to NYSE Hybrid Specialist activity; however, the Software may not be used to ingest or process data from other sources.

(ii)   Licensee may access ActivFeed data for Licensee's test and development environment by connecting via a Web interface to a shared infrastructure at ACTIV's data center in New York.

(iii)  The Software and ActivFeed licensed hereunder is not for distribution to or use by any third party without ACTIV's express written permission or as permitted in the Agreement. Licensee agrees not

Lehman Brothers Inc
Confidential

to use, transfer, dispose or distribute the Software or any part thereof in any manner that could compete with ACTIV's business.

(iv)   Any use outside the scope of this Agreement shall require ACTIV's prior written consent.

### III.   Terms:

*Licensee Controlled ActivFeed data for Internal distribution*:

(i)   Licensee shall, prior to commencing any use of ActivFeed submit an application to and obtain approval from each and every selected ActivFeed Source whose approval is required for receipt or use of information requested by Licensee to be received in ActivFeed. The use of the ActivFeed data by Licensee may be subject to separate agreements with the ActivFeed Sources and Licensee shall comply with any conditions restrictions, or limitation imposed by such ActivFeed Source in such agreements, including the payment of all such fees or charges as the ActivFeed Source may impose with respect thereto. Licensee agrees that ACTIV will withhold providing ActivFeed until it has received written notification from the respective ActivFeed Source. Licensee is expressly prohibited from any redistribution either internally or externally to third parities without the express written consent o f the appropriate ActivFeed Source and ACTIV.

(ii)   Licensee hereby acknowledges and agrees that Licensee's right to use ActivFeed must be approved by the ActivFeed Sources and ACTIV and both have the right to terminate provision of ActivFeed or portion thereof to Licensee with or without notice for any unauthorized use or breach of this Agreement. Licensee understands that ActivFeed Sources have the right unilaterally to terminate provision of portions of ActivFeed to ACTIV and Licensee with or without notice. Any such termination shall not be deemed to be a breach of this or any other agreement on the part of either ActivFeed Source or ACTIV.

(iii)   Licensee agrees that it shall use ActivMiddleware API only with ActivContent Gateway API and only on the devices accessing ActivFeed as followsUse of ActivMiddleware service location facilities for the purpose of locating Content Gateway Serverson Licensee's local network.

> (a) Use of ActivMiddleware functions required to connect to or disconnect from Content Gateway Servers and to receive information about the state of connections to these servers.
> (b) Use of ActivMiddleware classes which are specified as parameters to Content Gateway API methods, solely for the purpose of passing parameters to these methods.
> (c) Use of ActivMiddleware classes which are required to interpret the data returned by the Content Gateway API, solely for the purpose of interpreting such returned data. .
> (d) Use of the in-process or out-of-process ActivMiddleware Agent classes for the sole purpose of providing the required Agent functionality to the Content Gateway API.

(iv)   Licensee shall not edit, abridge, rewrite, translate or in any other way alter or modify Software or create any work derived from the Software that materially alters the meaning and/or interpretation of the Software except to the minimum extent necessarily incident to forming the look and feel of Licensee's products and services provided that such modification does not materially alter the Software.

(v)   If modification to ActivFeed is required in order to comply with exchange mandated or regulatory changes to accommodate increased data volume or for other reasons, then at ACTIV's sole discretion, ACTIV shall modify ActivFeed. Licensee shall update Licensee's software, hardware and/or communications infrastructure as notified by ACTIV to maintain correct functioning of

Lehman Brothers Inc
Confidential

ActivFeed. ACTIV shall not be responsible for the performance of any Licensee software due to any such changes.

(vi)     Licensee shall be solely responsible for the display, usage and entitlement of the data and information received through the ActivFeed hereunder.

11

Lehman Brothers Inc
Confidential

## EXHIBIT A

## FEE SCHEDULE

| Software License Fees | Non-Recurring | Monthly Recurring |
|---|---|---|
| | | |
| ActivFeed Data Software (i), (ii), (iii) | | $ 2,500.00 |
| ActivMiddleware Software (iv) | | $14,000.00 |

## SPECIAL TERMS:

(i) ActivFeed Data Software License Fees above include up to ten (10) users to access NYSE Level I Equities and Futures Exchange Data via shared internet access. For purposes of clarity, the use of the ActivFeed is limited to use in a test and development environment and any expanded production use will be subject to the terms of a separate schedule between the parties.

(ii) Licensee will provide network communications required to receive ActivFeed Data Software and hardware to process the Software.

(iii) Software License Fees stated here are exclusive of any applicable exchange fees that may be charged by the exchange directly or through ACTIV and which fees shall be identified and provided to Licensee reasonably in advance for Licensee's approval.

(iv) Notwithstanding anything to the contrary contained in the Agreement, Licensee acknowledges that the ActiveMiddleware Software has been accepted and that the License Fees for the ActivMiddleware Software stated herein shall commence upon the execution of this Agreement.

Lehman Brothers Holdings Inc
Confidential

## SCHEDULE B

## LIST OF ACTIVFEED SOURCES – EXCHANGES

ActivFeed Sources:
Exchange Fees, if applicable.

### I.   US Equities Exchange data:

| Real Time | Delayed | Exchange | Per User fees |
|---|---|---|---|
| | | NYSE – New York Stock Exchange Last Sale | Exchange billed |
| | | NYSE – New York Stock Exchange Bid/Ask | Exchange billed |
| | | AMEX – American Stock Exchange Last Sale | Exchange billed |
| | | AMEX – American Stock Exchange Bid/Ask | Exchange billed |
| | | NASDAQ – Level 1 | $21.00 |
| | | NASDAQ – Level 2 (NQDS) | $51.00 |
| | | NASDAQ – Real time index data | $10.00 |
| | NA | NASDAQ – Mutual Funds | $ 5.00 |
| | | Pink Sheets - Level 1 | $21.00 |
| | | Pink Sheets - Level 2 | $51.00 |

### II.  Options data:

| Real Time | Delayed | Exchange | Per User Fees |
|---|---|---|---|
| | | OPRA – Options Price Reporting Authority NBBO | Exchange billed |
| | NA | OPRA – Options Price Reporting Authority Regionals | Exchange billed |
| | NA | OPRA – Options Price Reporting Authority FCO | Exchange billed |

### III. US Futures data:

| Real Time | Delayed | Exchange | Per User fees |
|---|---|---|---|
| | | CBOT- Chicago Board of Trade (incl. e-CBOT market depth) | $56.00 |
| | | CBOT – Dow Jones Indices | $ 1.00 |
| | | CME – Chicago Mercantile Exchange | $56.00 |
| | | CME – Chicago Mercantile Exchange E-Mini | $26.00 |
| | | CME – Chicago Mercantile Exchange S&P 500 Index | $ 1.00 |
| | | CME – One Chicago single stock futures | $ 6.00 |
| | | CME – Chicago Mercantile Exchange Globex | $41.00 |
| | | CFE – Chicago Futures Exchange | $ 6.00 |
| | | KCBT – Kansas city Board of Trade | $21.00 |
| | | NYBOT – New York Board of Trade | $56.00 |
| | | NYMEX – New York Mercantile Exchange (through 1/31/08) | $51.00 |
| | | NYMEX – New York Mercantile Exchange (effective 2/1/08) | $55.00 |
| | | COMEX – Commodity exchange (through 1/31/08) | $51.00 |
| | | COMEX – Commodity exchange (effective 2/1/08) | $55.00 |
| | | PBOT – Philadelphia Board of Trade | $ 2.00 |

### IV.   Depth of Book data (Top 10 BBO)*:
(additional ACTIV fees apply)

| Real Time | Exchange | Per User fees |
|---|---|---|
| | NYSE - ARCA Book data | Exchange billed |
| | NYSE – Open Book data | Exchange billed |
| | NASDAQ – TotalView (incl. Openview) | $76.00 |
| | CME Depth data (incl. CME data) | $56.00 |

Lehman Brothers Holdings Inc
Confidential

\* Full depth of book data available through direct connection

**EXHIBIT B (cont)**

### V.   Canadian Data:

|  |  | | |
|---|---|---|---|
|  |  | TSX – Toronto Stock Exchange Level 1 | Exchange billed |
|  |  | TSX – Venture Level 1 | Exchange billed |
|  |  | Montreal – Level 1 | $41.00 |
|  |  | Montreal – Level 2 | $51.00 |

### VI.   News:

|  | Vendor | Per User fees |
|---|---|---|
|  | Dow Jones News Service | DJ billed |
|  | Comtex News | $40.00 per User |

Lehman Brothers Holdings Inc
Confidential

## **EXHIBIT C**

## SPECIFICATIONS FOR INITIAL INSTALLATION

### I) General Information

Name of Licensee:   Alex Getman

Installation address:   45 Broadway, 29th floor

New York, NY 10006

Principal telephone no.: 646-576-2951

Contact for installation: Manuel Caceres

E-mail address:   macacere@lehman.com

Telephone no.: (646 )   576-2949

Facsimile no.: ( 646)   576-2716

Minimum users (if applicable): _____

### II) Billing Information

Company Name:   Lehman Brothers, Inc.

Address: 1301 6th Ave., 3rd floor

Contact:   Erik Stigum

E-mail address: estigum@lehman.com

Telephone no.: 212-320-6112

Facsimile no.:   646-834-8080

15

Lehman Brothers Holdings Inc
Confidential

## EXHIBIT D
## MINIMUM HARDWARE AND COMMUNICATIONS SPECIFICATION

| App | Feed | Date | CPU Cores | RAM | DISKS | LAN | OS |
|---|---|---|---|---|---|---|---|
| FH/T | ARCA / TotalVie w | Now | 12 | 8GB | (1) 70+ GB (1) 200+ GB | 4 x 1 Gbps Ethernet | Win32 |
| | OPRA | Now | 12 | | | | |
| | | Mar 08 | 16 | | | | |
| | Other | Now | 8 | | | | |
| DCS and/or Contrib ution Server | AF_NA | Now | 4 | 8GB | (2) 140+ GB | 4 x 1 Gbps Ethernet | Win32, or Win64, or Linux |
| | | Mar 08 | 8 | | | | |
| | AF_OPR A_FULL | Now | 12 | | | | |
| | | Mar 08 | 16 | | | | |
| | AF_OPR A_NBBO | Now | 4 | | | | |
| | | Mar 08 | 8 | | | | |
| CG | | Now | 8 | 8 | (2) 70+ GB | 4 x 1 Gbps Ethernet | Win32, or Win64, or Linux |
| TSS | | Now | 8 | 8GB | (1) 70+ GB (1) 140+ GB 15000 RPM Ultra 320 SCSI | 4 x 1 Gbps Ethernet | Win32 |
| NS | | Now | 8 | 8GB | (1) 70+ GB (1) 140+ GB 15000 RPM Ultra 320 SCSI | 4 x 1 Gbps Ethernet | Win64 |

Notes:

1.  The "Now" recommendation is good for current OPRA capacity of 701,000 messages per second (MPS). Hardware may need upgrade when the message rates increase.
2.  DVD/ROM drive in all servers is required
3.  As shown above each ActivFeed stream (AF_NA, AF_OPRA_FULL and AF_OPRA_NBBO) needs its own DCS server(s). The exception to this rule is AF_NEWS as the demands of this feed are quite low, this can be run on a DCS that is also receiving AF_NA.
4.  For redundancy purposes, Licensee should have twice the number of servers listed.
5.  It is recommended that the fastest, lowest-latency DDR RAM available for all machines such as Corsair XMS3200LL-PT 512MB ECC/Registered DDR-400 Module (CAS 2-3-2-6) be used.
6.  If choosing Opteron CPUs, also choose a Dedicated Memory Bus Opteron Platform (rather than Shared Memory Bus Opteron Platform) such as Tyan Thunder K8W.
7.  For new purchases its is recommended to have either 1 free PCI Express slot or 1 free HTX slot, to enable room for an Infiniband HCA card (which ACTIV will begin supporting soon).
8.  A hardware-based compression capability in the Content Gateway is offered. If Licensee wishes to choose this option, 1 free PCI-X slot will be required.
9.  Disks should ideally run Hardware or Software RAID1 (or RAID5).

Lehman Brothers Holdings Inc
Confidential

10.    When "Win32" is referred to above, it means 32-bit Windows versions for x86 CPUs i.e.:
       Windows XP Professional,
       Windows Server 2003x64 Edition
11     When "Win64" is referred to above, it means 64-bit Windows versions for x86-64 (e.g. AMD64,
       Opteron and Intel EM64T) CPUs i.e.:
       Windows XP Professional x64 Edition
       Windows Server 2003 x64 Edition
12.    It is not recommended to run 32-bit Windows binaries on a Windows x64 system.
13.    When "Linux" is referred to above, it means 2.6 kernels with NPTL and Glibc 2.3.2 or later. 64-bit
       kernels preferred
14.    Where there is an OS choice for low latency and performance, Linux is preferred over Windows

### (b) *Minimum Communications requirement:

ActivFeed currently consists of 4 UDP multicast streams:

AF_NA                  This "North American" stream contains equities, futures, fundamental, forex and
                       administration data. All ActivFeed subscribers must receive this component.
AF_OPRA_NBBO           This optional stream contains the NBBO data from OPRA.
AF_OPRA_FULL           This optional stream contains the full OPRA data including NBBO.
AF_NEWS                This optional stream contains news.

The feeds are projected to use the following peak bandwidths:

| Date   | AF_NA    | AF_OPRA_NBBO | AF_OPRA_FULL | AF_NEWS   |
|--------|----------|--------------|--------------|-----------|
| Now    | 14 Mbps  | 13 Mbps      | 60 Mbps      | 0.25 Mbps |
| 3/4/08 | 14 Mbps  | 30 Mbps      | 70 Mbps      | 0.25 Mbps |
| 7/8/08 | >14 Mbps | 40 Mbps      | 96 Mbps      | 0.25 Mbps |

For more information please go to https://support.activfinancial.com

**\*ACTIV is not responsible for communication failures. For resiliency, it is recommended a back up
communication circuit be maintained.**

Lehman Brothers Holdings Inc.
Confidential

## **EXHIBIT E**
## **NDA (ATTACHED)**

## NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement
("Agreement") is made, as of June 15, 2007,
by and between Lehman Brothers Holdings
Inc., with an office at 745 Seventh Avenue,
New York, NY 10019 (together with its
affiliated or subsidiary companies, "Lehman")
and **ACTIV Financial Systems, Inc.** with an
office at the address indicated on the
Company signature block below ("Company").
The parties acknowledge and agree that they
have been exchanging information since May
31, 2007, and further acknowledge and agree
that all information exchanged since that date
shall be deemed "Confidential Information"
governed by this Agreement.

WHEREAS Lehman and Company would like
to exchange certain information in connection
with certain products and services offered by
Company, Lehman's business and any
related project or work effort (the "Purpose")
(for purposes of this Agreement, the word
"exchange" shall be construed to include,
without limitation, furnishing information,
providing access or availability to information
or the obtaining of information from any
source and by any means, as a result of this
Agreement); and

WHEREAS. in connection with such
exchange each party may obtain, or be in a
position to obtain Confidential Information (as
defined); and

WHEREAS, each party wishes to ensure the
protection of its Confidential Information;

NOW, THEREFORE, IN CONSIDERATION
OF the mutual covenants contained herein
and the agreement to exchange information
as contemplated hereunder, the parties agree
as follows:

NDAB
v.07.05

1.      **Definition.** "Confidential Information"
of each party includes all information
exchanged hereunder specifically relating to
the Purpose (as defined above) including: (a)
information relating to the past, present and
future business activities (including, without
limitation, agreements and other business
arrangements) of each party, its affiliates and
each of their respective employees,
customers or third-party contractors, (b)
information relating to strategic and other
plans, pricing, methods, methodologies,
processes, financial data, lists, inventions,
customers, suppliers, apparatus, statistics,
programs, research, development,
technology, network designs, and/or usage
data of each party, its affiliates and each of
their respective employees, customers or
third-party contractors, and (c) the terms and
existence of this Agreement or related
information.

2.      **Carve-Outs.** Both parties
acknowledge and agree that information shall
not be considered "Confidential Information"
only to the extent that such information is: (a)
currently in the public domain and/or
previously known to the receiving party, and
in either case, free from any confidentiality
obligation; (b) publicly disclosed by or on
behalf of the disclosing party either prior to or
subsequent to receipt by the receiving party
of such information; (c) independently
developed by the receiving party without
access to or use of the Confidential
Information of the disclosing party; or (d)
rightfully obtained by the receiving party from
a third party lawfully in possession of the
Confidential Information who is not bound by
confidentiality obligations to the disclosing
party. The receiving party may disclose

1

Confidential Information of the disclosing party if the receiving party is required to do so under applicable law, rule or order; provided that the receiving party, where reasonably practicable and to the extent legally permissible, provides the disclosing party with prior written notice of the required disclosure so that the disclosing party may seek a protective order or other appropriate remedy; and provided further that the receiving party discloses no more Confidential Information than is reasonably necessary in order to respond to the required disclosure.

3.     **Obligations.** Each party agrees to regard and preserve as confidential, all Confidential Information which may be exchanged as a result of this Agreement. In maintaining the confidentiality of Confidential Information hereunder, each party agrees that (a) it shall not, without first obtaining the written consent of the other, disclose or make available to any person, firm or enterprise, reproduce or transmit, or use for its own benefit or the benefit of others, any such Confidential Information, and (b) it shall prevent disclosure to any competitor of the other party (known to be such after reasonable inquiry). Neither party shall, without obtaining the prior written consent of the other party, use such other party's Confidential Information for any purpose other than for evaluation, discussions between the parties, internal planning, the protection of its rights and performance of its duties and obligations under this Agreement, and the provision of other services to the other party. Each party agrees that its own use and/or distribution of the other party's Confidential Information shall be limited to its own employees on a "need to know" basis; provided, however, that Lehman, in addition to its own employees, may, for the avoidance of doubt, also disclose Company's

Confidential Information to employees of its parent, subsidiaries and affiliated companies, and to consultants or other persons retained by Lehman for purposes specifically related to Lehman's use or evaluation of such Confidential Information. Each party shall, in advance, require each of its personnel and/or representatives who obtains or is in a position to obtain any Confidential Information of the other party to execute a confidentiality agreement with confidentiality provisions no less restrictive than those contained in this Agreement. While onsite at the other party's premises, each party shall comply with all policies and procedures of the other party.

4.     **Lehman Sensitive Data.** Company hereby acknowledges that Lehman is subject to certain privacy and information security laws and regulations, pursuant to which Lehman is required to ensure that Company appropriately safeguards personal or financial information regarding Lehman's former, current or prospective clients or employees ("Lehman Sensitive Data"). To the extent that Company receives any Lehman Sensitive Data as a result of any exchange of information under this Agreement, and notwithstanding anything to the contrary contained in this Agreement, Company agrees that it shall (a) not disclose or use any Lehman Sensitive Data except to the extent necessary to carry out its obligations under this Agreement and for no other purpose, (b) not disclose Lehman Sensitive Data to any third party, including, without limitation, its third party service providers without the prior written consent of Lehman and subject to the further requirements of this Section, (c) employ administrative, technical and physical safeguards to prevent unauthorized use or disclosure of Lehman Sensitive Data, (d) promptly provide such information regarding its privacy and information security systems,

2

NDAB
v.07.05

policies and procedures as Lehman may request relating to its due diligence and oversight obligations under applicable laws and regulations, (e) in the event of any actual or apparent theft, unauthorized use or disclosure of any Lehman Sensitive Data, immediately commence all reasonable efforts to investigate and correct the causes and remediate the results thereof, and (f) as soon as practicable following discovery of any event described in clause (e) hereof, provide Lehman notice thereof, and such further information and assistance as may be reasonably requested. With respect to any third party provided access to Lehman Sensitive Data pursuant to subsection (b) of this Section, Company shall enter into a written agreement with such third party requiring safeguarding of Lehman Sensitive Data in a manner no less restrictive than Company's obligations under this Agreement, and including those affirmative obligations described in this Section.

5.    **Independent Parties.** Neither party shall be required to exchange with the other any particular information, and the exchange of any information by either party is entirely voluntary and is not intended to and shall not create or modify any contractual, fiduciary or other relationship or obligation of any kind beyond the terms of this Agreement. Nothing contained in this Agreement, nor any exchange of information hereunder, shall grant or confer upon any party any right, license or authority in or to the information exchanged or otherwise. Correspondingly, except as expressly provided herein, neither party shall be liable to the other in any manner whatsoever for any decisions, obligations, costs or expenses incurred, changes in business practices, plans, organization, products, services, or otherwise

of the other party, as a result of this Agreement or any exchange of information.

6.    **Return of Information.** At any time at the request and option of the disclosing party, the receiving party agrees to promptly: (a) return to the disclosing party the Confidential Information and/or Lehman Sensitive Data, as applicable; or (b) destroy or permanently erase (on all forms of recordation) the Confidential Information and/or Lehman Sensitive Data, as applicable and, if requested by the disclosing party, acknowledge in writing that all such Confidential Information and/or Lehman Sensitive Data, as applicable, has been destroyed or permanently erased. Notwithstanding the foregoing, each party may retain copies of the Confidential Information and/or Lehman Sensitive Data, as applicable, to the extent required to comply with applicable legal and regulatory requirements, provided, however, that such Confidential Information and/or Lehman Sensitive Data, as applicable, shall remain subject to the terms and conditions herein.

7.    **Injunctive Relief.** Notwithstanding anything to the contrary contained herein, in the event of a breach or threatened breach by the receiving party of the provisions of this Agreement, the disclosing party may have no adequate remedy in money or damages and, accordingly, may seek injunctive relief, provided, however, that no specification in this Agreement of a specific legal or equitable remedy shall be construed as a waiver or prohibition against any other legal or equitable remedies in the event of a breach of a provision of this Agreement.

8.    **Title.** The parties acknowledge and agree that any disclosure of Confidential Information, and in the case of Lehman,

3

NDAB
v.07.05  *EP*

Lehman Sensitive Data, under this Agreement shall in no way be construed to be an assignment, transfer, or conveyance of title to or ownership rights in such Confidential Information or Lehman Sensitive Data.

9.    **Assignment.** Neither this Agreement nor any rights and/or obligations hereunder may be assigned (whether by operation of law or otherwise) by either party without the other party's prior written consent, and any such assignment shall be void. Notwithstanding the foregoing, Lehman may assign this Agreement and any of its rights and/or obligations hereunder upon written notice to Company, to any of its affiliated companies or to an entity with or into which it is merged or consolidated or to which it sells all or substantially all its capital stock or assets associated with the operations related to this Agreement, without the consent of Company. This Agreement shall benefit and be binding upon the parties hereto and their respective successors and assigns. Each receiving party shall be responsible for acts and omissions of its permitted assigns and disclosees.

10.    **No Publicity.** Neither party shall use the other party's name or marks, refer to, or identify the other party or any of its respective affiliate in publicity releases, promotional or marketing materials, announcements, customer listings, testimonials, or advertising.

11.    **Severability.** If any information exchanged under this Agreement is held by any court with jurisdiction over the subject matter of this Agreement not to be Confidential Information and/or Lehman Sensitive Data, as applicable, any remaining information that the parties have exchanged and that would otherwise be deemed

Confidential Information and/or Lehman Sensitive Data, as applicable, within the meaning of this Agreement will be unimpaired and will continue to be protected as Confidential Information and/or Lehman Sensitive Data, as applicable, in accordance with the terms of this Agreement. In addition, if any of the provisions of this Agreement are held invalid, illegal or unenforceable, the remaining provisions shall be unimpaired.

12.    **Governing Law.** In all respects this Agreement shall be governed by the substantive laws of the State of New York without regard to conflict of law principles. Any claim or action brought by one of the parties hereto in connection with this Agreement shall be brought in the appropriate Federal or State court located in the County of New York, and the parties hereto irrevocably consent to the exclusive jurisdiction of such court.

13.    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original, but which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile. Any facsimile signatures shall have the same legal effect as manual signatures.

14.    **Entire Agreement; Amendment; Waiver.** This Agreement, which constitutes the entire agreement between the parties as to the subject hereof, shall be construed and interpreted fairly, in accordance with the plain meaning of its terms, and there shall be no presumption or inference against the party drafting this Agreement in construing or interpreting the provisions hereof. No modification or amendment of, or supplement to, this Agreement will be binding upon the parties unless made in writing and signed by

4

NDAB
v.07.05

a duly authorized representative of both parties. At no time will any failure or delay on the part of any party in exercising any right or remedy provided in the Agreement operate as a waiver thereof, nor will any single or partial exercise of or failure to exercise any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy provided herein or available at

law or in equity.

15.   **Other Agreements.** The termination of any other agreement or business relationship between, or involving both parties, shall not relieve either party of its obligations with respect to the information exchanged pursuant to the terms hereof.

IN WITNESS WHEREOF, the parties hereto have had their duly authorized representatives execute this Agreement as of the date first written above.

**and ACTIV Financial Systems, Inc.**

By: Frank M. Piasecki

Name: FRANK PIASECKI
(Type, Print or Stamp)

Title: President

Address:
40 Rector St.
11TH Floor
NY. NY  10006

**Lehman Brothers Holdings Inc.**

By: _____

Name: _____
(Type, Print or Stamp)

Title:  Authorized Signatory

(Signature Page to Non-Disclosure Agreement)

NDAB
v.07.05

5

Lehman Brothers Holdings Inc
Confidential

## EXHIBIT F
### Service Level Agreement

This Service Level Agreement ('SLA") defines the performance criteria for which ACTIV will be held accountable. This SLA will become effective as of the Delivery Date.

### I. SOFTWARE AVAILABILITY

ACTIV will endeavor to provide 99.7% up time for the Software, excluding Excluded Time ("Service Threshold"). Compliance with the Service Threshold and calculation of Outages (as defined below) will be measured on a calendar month basis. The Service Threshold percentage will be calculated for each calendar month by dividing the total number of minutes in which there were no Outages during an applicable month (excluding Excluded Time) by the total number of Available Minutes in such month (also excluding Excluded Time), and then subtracting the resulting number from 1 and multiplying that amount by 100; i.e., a calculation using the following formula: 1- (total Outage minutes in a month/total Available Minutes in said month less scheduled maintenance times) x 100. If Licensee notifies ACTIV of a Level Error, an "Outage" corresponding to such incident will be measured from either the time of Licensee's initial notice to ACTIV, or the time of ACTIV first becoming aware of an incident, whichever is earlier, until the incident is fully resolved and all Services are fully restored. "Available Minutes" is defined as the minutes in the month during which ActivFeed Sources are open for trading.

Outage Credit

If the number of Outages in any calendar month exceeds 3 in addition to any other remedies available to Licensee under this Agreement or by law or in equity, Licensee will be entitled to liquidated damages in the form of a credit equivalent to one day's fees for each hour that component of Software that failed not to exceed the monthly Fees for that Software.

Termination

If (i) the Service Threshold is not met for three consecutive months; or (ii) during any thirty day period, there are more than four Outages; then, Licensee may, at its option, terminate this Agreement, for cause by written notice to ACTIV without any further opportunity for cure.

For purpose of this Agreement, "Excluded Time" is defined as follow:

The scope of this SLA does not include the following:
- Scheduled maintenance for which Licensee is provided at least 72 hours prior written notice;
- Time taken to run refresh cycle or such other process to restore data;
- Failures related to equipment, facilities, applications, systems or services not furnished by or on behalf of ACTIV;
- External connectivity to ActivFeed sources, communication carriers and third-party connections except where prevention of such failure is within ACTIV's reasonable control;
- System outages resulting from design issues required or specified by Licensee;
- Licensee's network or other Licensee requirements;
- The acts or omissions of Licensee, its employees, contractors, agents or Licensee's end users;
- Circumstances or causes beyond the control of ACTIV.

### II. SOFTWARE SUPPORT SERVICES

Lehman Brothers Holdings Inc
Confidential

ACTIV will provide Licensee Support Services for the Software. Support Services will be provided in English. Support Services will be delivered without additional charge beyond the Fees.

a)      "Support Services" include:

     i)      ACTIV delivering to Licensee all Updates and revisions for the Software;

     ii)     Licensee having access to ACTIV's customer support telephone service for reasonable assistance in identifying and resolving problems associated with the use of the Software; and

     iii)    ACTIV responding to Licensee's report of an Error in accordance with the Severity Level and Response and Resolution Schedule defined below.

b)      All Support Services will be on all US exchange trading days during trading hours as standard; 24/7/365 service will be available on an "on call" basis;.

c)      ACTIV shall provide to Licensee all updates and revisions that are made available to ACTIV's customers ("Updates"). No amount in addition to the Support Service prices shall be charged in respect of such Updates. All Updates of the Software to which Licensee may become entitled shall be treated as part of the Software hereunder. ACTIV will provide Support Services for at least the current Update and the immediately previous Update of the Software provided that ACTIV shall not be obligated to support any version of the Software for more than one year after ACTIV makes available an Update that is intended to replace the current version of the Software and meets the Applicable Specifications without any material loss of functionality.

d)      ACTIV shall provide to Licensee written notice as reasonably far in advance as practicable of each Update release to enable Licensee to determine by the time of the release the desirability of the Update. ACTIV shall provide with such notice (i) reasonable documentation, descriptions and specifications for the Update to enable Licensee to assess the differences in functionality and features that will result therefrom; and (ii) a written description of any and all incompatibilities and other problems that might occur as a result of an Update as determined based upon ACTIV's reasonable inquiry in light of the Software. All Updates of the Software shall (1) be compatible with the previous version and its associated data and with any software interfacing with such Software prior to the Update, and (2) not eliminate any of the material functions, features or performance of the previous version.

e)      ACTIV will insure the migration path for all Updates incorporates a process that will allow Licensee to regress from the new Update if problems develop that Licensee perceives to be attributable to said new Update. The process methodology shall be documented and tested by ACTIV prior to the new Update delivery. In all cases, changes will be reversible so they can be backed out if necessary.

## III.  APPLICATION ERROR CORRECTION:

    a.      ACTIV will correct all Severity 1 Errors, Severity 2 Errors, Severity 3 Errors and Severity 4 Errors ("Errors") reported by Licensee, or by ACTIV itself. ACTIV is required to address and resolve Errors in a timely manner as specified below. Without limiting the foregoing, ACTIV will provide the following Services in connection with such Error resolution obligations:

            1.  problem reporting, tracing and monitoring by electronic mail;

            2.  ACTIV shall respond to Licensee's request for assistance as quickly as reasonably possible to diagnose the situation and at which time the Error(s) will be categorized by ACTIV in accordance with the Severity Level definitions of this Schedule;

            3.  for Severity One Error 24x7 telephone support for problem determination, verification and Resolution (or instruction as to Workaround, as

Lehman Brothers Holdings Inc
Confidential

applicable); ACTIV shall respond promptly (in no event shall such response exceed one (1) hour following ACTIV's receipt of Licensee's initial request for assistance). and

4.   diagnose and resolve Errors.

b.   The Severity Levels of Error will have the meanings ascribed to them below:

1.   "Severity 1 Error" shall mean that the Software is non-operational, resulting in a critical condition or a critical impact on Licensee's business requiring immediate resolution or that a bug or Error has been identified which could result in a Severity 1 Error as defined herein. Severity 1 Errors that can not be resolved by ACTIV's Level 1 customer support will be escalated to ACTIV's Level 2 customer support within thirty (30) minutes. Support personnel will continuously work to resolve the problem(s) and will apprise Licensee of the status at reasonable time and frequency.. ACTIV will assign a crisis manager who shall be responsible for and manage the Resolution of the problem to its completion.

2.   "Severity 2 Error" shall mean that the Software is operational but a significant feature or function is not operating properly and there is an immediate impact on Licensee's business. Severity Level 2 Errors that cannot be resolved by ACTIV's Level 1 customer support will be escalated to ACTIV's Level 2 customer support within two (2) hours. Support personnel will continuously work to resolve the problem(s) and will apprise Licensee, at Licensee's request, of progress toward a Resolution.

3.   "Severity 3 Error" shall mean the Software is operational with functional limitations or restrictions that are not critical to the overall operation of the Software or the operation of Licensee's business. Severity Level 3 Errors will be resolved as expeditiously as possible within the constraints of other technical support priorities.

4.   "Severity 4 Error" shall mean the Software is operational with problems or errors which have little or no impact on system operations, the overall operation of the Software or the operation of Licensee's business. Severity Level 4 Errors will be addressed and resolved in a future Update of the Software.

c.   ACTIV will respond to Licensee and will correct or eliminate Errors within the timeframes set forth in the following table (including timely updates to Licensee as to the progress of such efforts):

**Response and Resolution Schedule**

| Severity Level | Initial Call Back | Temporary Fix | Permanent Resolution |
|---|---|---|---|
| Severity 1 | 1 hour | Work begins immediately and continues until a Workaround is produced | As soon as reasonably practicable |
| Severity 2 | As soon as reasonably possible | Work begins immediately and continues until a Workaround is produced . | As soon as reasonably practicable |
| Severity 3 | As soon as reasonably possible | Workaround provided . | Within the next scheduled Update. |
| Severity 4 | As soon as reasonably possible | Mutually agreed upon schedule | Within the next scheduled Update. |

Lehman Brothers Holdings Inc.
Confidential

"Resolution" means the correction or elimination of an Error.

"Workaround" means a temporary solution to an Error which results in the return of the Software to functional or operational status and which permits Licensee to perform its critical business functions.

Support Services Credit

If ACTIV fails to correct any Errors within the time frames set forth above, in addition to any other remedies available to Licensee under this Agreement or by law or in equity, Licensee will be entitled to a credit equivalent to one thirtieth (1/30) of the monthly fees for that part of the Software that failed for each full or partial twenty-four (24) hour period of such failure.

If ACTIV determines that no such Error(s) exists, or if the error was caused by coding or logic embedded in the Software by Licensee or by any cause outside of ACTIV's reasonable control, Licensee shall pay ACTIV for its services at mutually agreed to consulting rates and shall reimburse ACTIV for reasonable out of pocket expenses, including travel expenses incurred by ACTIV in rendering such services.

## 5)   CONTACT INFORMATION
Licensee may contact the following for support:

- Network Support:    Operations@activfianancial.com
                      Dave O'Connor at dave.oconnor@activfinancial.com
                      Bob Brzezinski at Bob@activfinancial.com
                      Phone: 212-964-2600
                      Fax:    212-964-2601

- Product Support:    Ken Lea at ken.lea@activfinancial.com
                      Phone: 312-578-9800
                      Fax:    312-578-9805

- Development Support:  development@activfinancial.com

**EXHIBIT 3**

**PURCHASE ORDERS**

# Purchase Order

## Lehman Brothers - Americas
70 Hudson Street
Jersey City NJ 07302-4585
United States

**Dispatch via E-Mail**

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| LBUSA-0000058318 | Feb-05-2008 | | 1 |

| Payment Terms | Freight Terms | | Ship Via |
|---|---|---|---|
| Net 30 | Destination, PPD | | Common |

| Buyer | | Phone | Currency |
|---|---|---|---|
| Nuzzela,Danielle | | 1 201 499 2721 | USD |

**Vendor:**  1000003032
ACTIV FINANCIAL
1607 East Taft Avenue
Suite 101
Wheaton IL 60187

**Ship To:**     70HXXVSOFT
70 Hudson Street
Jersey City NJ 07302-4585
United States

**Bill To:**     P.O. Box 2339
Secaucus NJ 07096-2339
United States

Tax Exempt? N     Tax Exempt ID:          Replenishment Option: Standard

| Line-Sch | Item/Description | Mfg ID | Quantity UOM | PO Price | Extended Amt | Due Date |
|---|---|---|---|---|---|---|
| 1- 1 | N/A | ACTIV FINA | 12.00MON | 16,500.00 | 198,000.00 | Feb-19-2008 |
| | ACTIVE FEED & MIDDLEWARE LICENSE | | | | | |
| | FEES-OTHER-LICENSE & MAINT | | | | | |
| | 00000000090007446 | | | | | |

|  |  |
|---|---|
| Schedule Total | 198,000.00 |
| Item Total | 198,000.00 |
| Total PO Amount | 198,000.00 |

### PURCHASE ORDER TERMS AND CONDITIONS

ACCEPTANCE; TERM; TERMINATION -- These terms and conditions (the "T&Cs") constitute Customer's acceptance of Supplier's offer (the "Offer," together with the T&Cs, the "Order") to sell and/or license products and/or services, as applicable, to the Customer identified in this Order.  Customer's acceptance of this Order is expressly subject to the terms and conditions contained herein, unless otherwise expressly agreed to in a writing signed by Customer pursuant to the Section titled "Miscellaneous" below. If ongoing services are to be provided pursuant to this Order, the term of such services shall be one year unless otherwise specified in the T&Cs or in a writing signed by the parties. Customer may renew services under the same T&Cs at any time by providing written notice to Supplier for subsequent one-year terms unless Supplier provides notice of non-renewal to Customer no later than sixty days prior to the end of the then-current term. If neither party gives notice of renewal or non-renewal, upon the expiration of the term, this Order shall continue month-to-month under these T&Cs.

FEES -- Invoices shall be sent to Customer's address set forth in this Order.  Undisputed invoices shall be payable within sixty (60) days of receipt.  Supplier shall not invoice any products or services provided hereunder at a price higher than that shown on this Order, which price includes all applicable federal, state and local taxes.  If the price is omitted on the Order, the price will be the lowest prevailing market price for such products or services.  Customer shall not be responsible for any charges for delivery, installation, transportation or packaging.  Supplier will not be entitled to reimbursement from Customer for any expenses it incurs in connection with fulfilling this Order.

DELIVERY AND ACCEPTANCE; RISK OF LOSS; CUSTOMER'S PROPERTY -- Title and risk of loss shall remain with Supplier until products purchased under this Order have been delivered to  Customer at the location specified in the Order and have been accepted by Customer. If Supplier does not comply with Customer's delivery schedule, Customer may either approve a revised schedule or terminate the Order without liability. Upon delivery, Customer may inspect all products and services purchased hereunder to determine if they meet all applicable requirements, and are otherwise in good condition, suitable for their intended business use. IF, IN THE REASONABLE JUDGMENT OF CUSTOMER, THE PRODUCTS OR SERVICES ARE UNSATISFACTORY, CUSTOMER MAY REJECT SUCH PRODUCTS OR SERVICES. Customer shall return rejected products to Supplier at Supplier's expense.  Except for Software licensed to Customer hereunder, all products and services provided to Customer under this Order shall be and remain the personal property of Customer.  Any developed works or other intellectual property or materials created by Supplier under this Order shall be owned exclusively by Customer.

SOFTWARE -- This Section will apply to the extent that this Order includes Software (embedded or stand-alone). Unless otherwise specified in the T&Cs or in another applicable agreement between the parties, Supplier grants to Customer a worldwide, perpetual, royalty-free license to use, display and perform the Software identified in this Order in the ordinary course of Customer's business operations and for its own business purposes, including, but not limited to, processing its own information and that of its affiliates and clients as part of its business.  Use includes use by or on behalf of Customer or Customer's affiliates, and use by third parties under contract to provide

**Signature not required on emailed Pos**

# Purchase Order

## Lehman Brothers - Americas
70 Hudson Street
Jersey City NJ 07302-4585
United States

**Dispatch via E-Mail**

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| LBUSA-0000058318 | Feb-05-2008 | | 2 |

| Payment Terms | Freight Terms | | Ship Via |
|---|---|---|---|
| Net 30 | Destination, PPD | | Common |

| Buyer | | Phone | Currency |
|---|---|---|---|
| Nuzzela,Danielle | | 1 201 499 2721 | USD |

**Vendor:** 1000003032
ACTIV FINANCIAL
1607 East Taft Avenue
Suite 101
Wheaton IL 60187

**Ship To:** 70HXXVSOFT
70 Hudson Street
Jersey City NJ 07302-4585
United States

**Bill To:** P.O. Box 2339
Secaucus NJ 07096-2339
United States

**Tax Exempt?** N    **Tax Exempt ID:**          **Replenishment Option:** Standard

| Line-Sch | Item/Description | Mfg ID | Quantity UOM | PO Price | Extended Amt | Due Date |
|---|---|---|---|---|---|---|

services to Customer or its affiliates, on any number of PCs and in any number of instances, subject
to the restrictions set forth herein. If applicable, Use also includes the right of Customer to
freely use and distribute, internally within Customer, among Customer's affiliates, and with
Customer's clients, data produced by the Software, including data in any proprietary formats used by
the Software. Customer may make a reasonable number of copies of the Software solely for backup,
training, archiving, testing and disaster recovery. "Software" means the software programs listed in
this Order and any upgrades, updates, enhancements, modifications, alterations, improvements,
revisions, releases, and new versions. Customer may transfer the Software from one hardware platform
or operating system to another (or both) for which the Software is or becomes generally available, at
no additional charge. Customer will not modify, reverse assemble, or reverse compile any part of the
Software, except as permitted by applicable law. Customer may make copies of and incorporate any
documentation for the Software in other works prepared for Customer's business, so long as all
intellectual property notices of Supplier are included as they appear on or in the documentation.

COMPLIANCE WITH LAWS -- In connection with the products provided and/or services performed hereunder,
Supplier shall at Supplier's sole cost, comply with, and shall require all Suppliers, subcontractors
and/or consultants retained by Supplier to comply with (i) all requirements of applicable laws,
orders, rules and regulations of governmental authorities, and (ii) all policies, rules and
regulations of Customer (including, without limitation, Customer's policies regarding security and
testing for controlled substances) and of the building in which the products are provided and/or the
services are to be performed. Supplier shall not file any mechanic's or materialman's lien or claim
against Customer's property nor against the buildings in which the products are provided and/or the
services are performed, nor shall Supplier suffer or permit any such lien to be filed by any of its
subcontractors and/or consultants.

CONFIDENTIALITY -- Supplier shall preserve as confidential all information related to the business
activities of Customer and its affiliates, clients, and entities with whom Customer does business
that may be obtained by Supplier from any source (such information, together with the existence and
terms of this Order, constituting the "Confidential Information"). Supplier shall hold Confidential
Information in trust and confidence for Customer and shall not disclose Confidential Information to
any person, firm or enterprise, or use any Confidential Information for its own benefit or the
benefit of any other party, unless specifically authorized by Customer in writing, and to limit
access and disclosure of such Confidential Information to Supplier's personnel on a "need to know"
basis only. Confidential Information does not include any particular information that the Supplier
can demonstrate (i) is currently in the public domain, (ii) was previously known to Supplier free
from any obligation to keep it confidential, (iii) was or is publicly disclosed by or on behalf of
the Customer either prior to or subsequent to the receipt of such information by Supplier, (iv) is
independently developed by the Supplier without any access to or use of Confidential Information of
Customer, or (v) is rightfully obtained by Supplier from a third party lawfully in possession of the
Confidential Information and who is not bound by confidentiality obligations to Customer. Supplier
may disclose Confidential Information of Customer if required to do so under applicable law, rule or
order provided that Supplier, where reasonably practicable and to the extent legally permissible,
provides Customer with prior written notice of the required disclosure so that Customer may seek a
protective order or other appropriate remedy, and provided further that Supplier discloses no more
Confidential Information of the Customer than is reasonably necessary in order to respond to the
required disclosure. At any time at the request and option of the Customer and in the event of
termination or expiration of the Order (or any part thereof), Supplier agrees to promptly: (i)
return to Customer the Confidential Information; or (ii) destroy or permanently erase (on all forms
of recordation) the Confidential Information and, if requested by Customer, acknowledge in writing
that all such Confidential Information has been destroyed or permanently erased. In addition,
Supplier acknowledges and agrees that any disclosure of Confidential Information will in no way be
construed to be an assignment, transfer, or conveyance of title to or ownership rights in such
Confidential Information.

WARRANTY -- Supplier warrants that all products sold under this Order are free from defects in
material, workmanship and design, and that all services provided under this Order shall be performed
in a high-quality, professional and workmanlike manner by qualified personnel.

**Signature not required on emailed Pos**

# Purchase Order

## Lehman Brothers - Americas

70 Hudson Street
Jersey City NJ 07302-4585
United States

**Dispatch via E-Mail**

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| LBUSA-0000058318 | Feb-05-2008 | | 3 |

| Payment Terms | Freight Terms | | Ship Via |
|---|---|---|---|
| Net 30 | Destination, PPD | | Common |

| Buyer | Phone | | Currency |
|---|---|---|---|
| Nuzzela,Danielle | 1 201 499 2721 | | USD |

**Vendor:** 1000003032
ACTIV FINANCIAL
1607 East Taft Avenue
Suite 101
Wheaton IL 60187

**Ship To:** 70HXXVSOFT
70 Hudson Street
Jersey City NJ 07302-4585
United States

**Bill To:** P.O. Box 2339
Secacus NJ 07096-2339
United States

Tax Exempt? N    Tax Exempt ID:    Replenishment Option: Standard

| Line-Sch | Item/Description | Mfg ID | Quantity UOM | PO Price | Extended Amt | Due Date |
|---|---|---|---|---|---|---|

PUBLICITY – Supplier will not use the name or marks of, refer to, or identify Customer (or any related entity) in publicity releases, interviews, promotional or marketing materials, public announcements, customer listings, testimonials or advertising without the prior written consent of Customer in each such instance.

INSURANCE -- Supplier at its sole cost and expense, shall maintain with insurance companies having a Best's rating of A or better, (i) comprehensive general liability insurance in an amount not less than $2,000,000 and (ii) automobile liability insurance in an amount not less than $1,000,000 and (iii) worker's compensation insurance as required by law. Such policies shall include an endorsement naming Customer and any other entities designated by the Customer as additional insureds and shall include a waiver by the insurance carrier of any subrogation rights. Within ten (10) days after the date hereof., Supplier shall deliver to Customer binders or certificates of insurance showing that each policy of insurance which Supplier is required to maintain hereunder is in full force and effect and that the premium therefore has been paid in full and providing that such policies may not be canceled, supplemented, amended or modified before the expiration date thereof without issuing company giving at least thirty (30) days prior written notice to Customer.

INDEMNIFICATION -- Supplier shall, at its own expense, indemnify, defend and hold harmless Customer, Customer's parent, subsidiaries and affiliates and any additional indemnified parties that may be designated by Customer, together with the respective partners, agents, officers, directors and employees of all of the foregoing, from and against any loss, cost, expense, claim, injury or damage (including, without limitation, reasonable attorneys' fees and expenses), whether incurred due to third party claims or otherwise, arising or resulting from or caused by (i) any act or omission or willful misconduct of Supplier or any consultant, engineer or other party retained by Supplier or any of its or their partners, directors, officers, employees, agents or subcontractors; (ii) any breach or default by Supplier in the performance of any of its obligations under this Order, or (iii) any claim that any product and/or services furnished by or on behalf of Supplier, or the use thereof by Customer, constitutes an infringement, misappropriation or unlawful use or disclosure of any intellectual property rights of a third party.

LIMITATION OF LIABILITY -- IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR LOST PROFITS OR LOST REVENUE, OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS ORDER; PROVIDED, HOWEVER, THAT THE FOREGOING LIMITATION OF LIABILITY WILL NOT APPLY TO ANY OF THE FOLLOWING: (A) SUPPLIER'S INDEMNIFICATION OBLIGATIONS HEREUNDER; (B) SUPPLIER'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER THIS ORDER; OR (C) ANY UNLAWFUL OR WILLFUL MISCONDUCT BY SUPPLIER.

RECORD RETENTION AND INSPECTION -- During the term of this Order and for a period of at least three (3) years after the date of the final payment under this Order, Supplier will maintain complete and accurate accounting records in connection with products provided and Services performed under this Order, in accordance with generally accepted accounting principles applied on a consistent basis, to substantiate its charges hereunder. Such records will include, without limitation, payroll records, attendance cards, time tracking sheets and job summaries. Supplier will provide Customer or its designees access to such records for audit purposes during the term of this Order and for three (3) years after the date of the final payment under this Order.

BREACH/REMEDIES – In the event of any breach of this Order by Supplier, Customer may (reserving cumulatively all other remedies and rights under this Order, at law and in equity) terminate this Order, in whole or in part, by giving Supplier thirty (30) days' prior written notice of termination thereof; provided, however, that such termination will not be effective if Supplier has cured the breach of which it has been notified prior to the expiration of such thirty (30) day notice period. Additionally, Customer may terminate this Order for convenience by giving Supplier written notice specifying the termination date. In such event, Customer will be obliged to pay Supplier at the agreed upon rates for all products and services accepted by Customer up to the effective date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

**Signature not required on emailed Pos**

# Purchase Order

## Lehman Brothers - Americas
70 Hudson Street
Jersey City NJ 07302-4585
United States

**Dispatch via E-Mail**

| Purchase Order | | Date | Revision | Page |
|---|---|---|---|---|
| LBUSA-0000058318 | | Feb-05-2008 | | 4 |
| **Payment Terms** | **Freight Terms** | | | **Ship Via** |
| Net 30 | Destination, PPD | | | Common |
| **Buyer** | | **Phone** | | **Currency** |
| Nuzzela,Danielle | | 1 201 499 2721 | | USD |

**Vendor:** 1000003032
ACTIV FINANCIAL
1607 East Taft Avenue
Suite 101
Wheaton IL 60187

**Ship To:**    70HXXVSOFT
70 Hudson Street
Jersey City NJ 07302-4585
United States

**Bill To:**    P.O. Box 2339
Secaucus NJ 07096-2339
United States

**Tax Exempt?** N      **Tax Exempt ID:**          **Replenishment Option:** Standard

| Line-Sch  Item/Description | Mfg ID | Quantity UOM | PO Price | Extended Amt  Due Date |
|---|---|---|---|---|

MISCELLANEOUS -- Except to the extent the parties have entered into an agreement covering the
products and/or services provided hereunder (in which case such other agreement's terms shall apply),
(a) this Order constitutes the entire agreement between the Customer and the Supplier and voids all
prior agreements concerning the subject matter hereof; and (b) no modification, amendment, supplement
to, or waiver of this Order or any of its provisions shall be binding upon the parties unless made in
a writing duly signed by both parties, and specifically referencing these T&Cs, and stating that such
modification, amendment, or supplement is made to modify, amend or supplement these T&Cs.   No
amendment or modification to these T&Cs may be executed via electronic signatures unless the parties
first agree in a writing that is not an electronic communication to be bound by electronic
signatures.  Any purchase order printed on a form provided by Supplier may be used for convenience
only, but these T&Cs shall solely control the terms of this Order, and any such terms contained on
any form(s) received from Supplier shall be of no force and effect.  Failure or delay on the part of
Customer to exercise any right hereunder shall not operate as a waiver thereof.  Any services
performed by Supplier will be performed as an independent contractor, and Supplier will be solely
responsible for any applicable payroll or income taxes.  This Order shall be governed under the laws
of the State of New York, excluding its conflicts of laws rules.  If any term, provision or part of
these T&Cs is to any extent held invalid, void or unenforceable by a court of competent jurisdiction,
the remainder of these T&Cs will not be impaired or affected thereby, and each term, provision and
part will continue in full force and effect, and will be valid and enforceable to the fullest extent
permitted by law.  Supplier may not assign this Order or delegate any of its responsibilities
hereunder without the prior written consent of the Customer, and any such purported assignment or
delegation shall be null and void.  Customer may freely assign this order to any affiliate, or to any
entity acquiring all or substantially all of its assets or which is a successor by merger to
Customer, or to any party acquiring that portion of Customer's business to which the products and/or
services purchased or licensed under this Order pertain.  Any provision of this Order that
contemplates performance or observance subsequent to termination or expiration of the Order
(including confidentiality, limitation of liability, indemnification provisions and perpetual
licenses) will survive termination or expiration of this Order and continue in full force and effect
thereafter.

**Signature not required on emailed Pos**

**EXHIBIT 4**

**TRIAL AGREEMENT AND CANCELLATION LETTER**

*Lehman  Contract #  Con 080A000 28525*

## TRIAL AGREEMENT

Licensor (Name and Address):                    Effective Date: June 16, 2008

ACTIV Financial Systems Inc.
1607 E. Taft Ave.
Suite 101
Wheaton, IL 60187

This Agreement is entered into as of the Effective Date specified above between Lehman Brothers Inc. ("Customer") and the Licensor specified above.

## W I T N E S S E T H

That, for and in consideration of the mutual promises and covenants hereinafter contained, the parties hereto agree as follows:

## ARTICLE 1: PROVISION OF PROGRAMS

1.1     Licensor agrees to furnish to Customer, as more specifically set forth hereinafter, a trial license to use Licensor's proprietary computer programs ("Products") which are listed on the Schedule or Schedules in the form attached hereto as Exhibit A and made a part hereof.

## ARTICLE 2: TERMS OF AGREEMENT

2.1     This Agreement shall commence as of the date first above written and shall continue in effect hereinafter unless and until the terminated in accordance with the provisions of this Agreement.

2.2     Customer will acquire the Product for a trial period ("Trial Period") as set forth in the applicable Schedule with no obligations.  During the Trial period, Customer

understands that the market data information shall be received via the Internet. However, if there are any Exchange or communications fees charged to Licensor for receipt of such data, Customer agrees to reimburse Licensor for such fees. Customer further agrees to comply with any and all Exchange requirements.

2.3     Customer's parent company, and its subsidiaries and affiliated companies may execute Schedules under this Agreement and for purposes of any such Schedule shall be considered the "Customer" as that term is used herein.

## ARTICLE 3: RISK OF LOSS

3.1     Licensor will be responsible for all risk of loss or damage to the media and documentation prior to delivery and subject to licensor's obligations hereunder Customer shall bear the same subsequent to delivery.

## ARTICLE 4: DELIVERY; INSTALLATION

4.1     Licensor agrees to deliver each Product on or before the applicable Scheduled Delivery Date to the Installation Site.

4.2     If "Customer Installed" is specified, Customer agrees to install the Products on Customer's CPU (which shall include local area networks) at the Installation Site in accordance with Licensor's installation instructions, a copy of which shall be provided to Customer upon delivery of the Product. If Customer has difficulties in installing the Product, Licensor shall provide a qualified technician to install, or assist in installation, at no charge.

## ARTICLE 5: DOCUMENTATION

5.1     A copy of Licensor's standard operational instructions, program documentation, Products' User's Guide, written specifications ("Specifications") and complete operating information, installation procedures, and any other documentation

sufficient to enable Customer personnel to use and to fully understand the use and operation
of the Product as provided by Licensor to its other customers shall be furnished with the
delivery of the Product to allow Customer to install, test, operate and evaluate the Product.

## ARTICLE 6: SCOPE OF LICENSE

6.1     Licensor retains title to the Products provided hereunder and does not convey
any proprietary interest therein to Customer.

6.2     Customer acknowledges that Licensor considers its Products to be confidential
and trade secrets of Licensor; and Customer agrees that unless Customer has obtained
licensor's prior written consent, Customer shall keep the Products confidential and prevent
their disclosure to any person other than employees or representatives of Customer, its parent
company, subsidiaries and affiliated companies, employees or other persons on Customer's
premises for purposes specifically related to Customer's permitted use of the Products. In no
event will Customer be required to take any steps to keep confidential and prevent disclosure
of any Products other than those Customer normally takes to protect its own similar
information. This Agreement shall be subject to certain Non-disclosure/Confidentiality
Agreement dated June 15, 2007 between the parties hereto.

6.3     Licensor shall regard and preserve as confidential all information related to the
business of Customer, its parent company and its subsidiaries and affiliated companies and its
or their clients and suppliers that may be obtained by Licensor from any source as a result of
this Agreement except publicly available information. Licensor shall not, without first
obtaining Customer's prior written consent, disclose to any person, firm or enterprise, or use
for its benefit, any information relating to affiliated companies or its clients concerning past,
present or future business activities of said entities.

ARTICLE 7: WARRANTIES

7.1     Licensor warrants to Customer that (i) Licensor has the right to furnish to
Customer the Products and other materials covered hereunder free of all liens, claims,
encumbrances and other restrictions; (ii) the Products, Specifications, documentation and
other materials furnished hereunder do not infringe the rights of any third party; (iii)
Customer shall quietly and peacefully possess the Products and other materials furnished
hereunder subject to and in accordance with the provisions of this Agreement; and (iv)
Customer's use and possession of the Products and other materials will not be interrupted or
otherwise disturbed by any entity asserting a claim under or through Licensor.

7.2     EXCEPT AS PROVIDED IN THIS AGREEMENT, THERE ARE NO
OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO
ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A
PARTICULAR PURPOSE.

7.3     Customer represents that it will not use or display the Products herein in a
manner contrary to this Agreement and the Schedules hereto, nor will it allow the use or
display of the Products within its organization on any terminals by any users in a manner
contrary to this Agreement and the Schedules hereto. Customer further agrees that it will
comply with all third party requirements of which Customer has been given notice, including
paying exchange, vendor or communication fees that may be incurred during the trial of the
Products as contemplated hereunder.

ARTICLE 8: TERMINATION

8.1     This Agreement shall commence as of the Effective Date specified above and
shall continue in effect thereafter for the Trial Period, unless and until the Agreement is
earlier terminated hereunder.

8.2     At the end of the Trial Period Customer shall notify Licensor in writing of
acceptance or rejection of the Products.

8.3     Customer may immediately terminate any Schedule and/or this Agreement at any time upon written notice to Licensor, without financial liability, obligation or penalty of any kind to Customer except for any amounts due as of the date of such notice of termination. Any purchase, sale, lease or license or a Product or a Service shall be subject to a separate, mutually agreed written agreement between the Parties.

8.4     At the end of the applicable Trial Period for a specific Schedule, and/or upon notice by Customer, the Trial Period shall terminate if not extended in writing by both parties. Upon termination of the Trial Period as stated hereinabove, Customer will make arrangements to have the Product removed promptly from Customer's site, and Customer shall cease the use of the product immediately thereof pursuant to this Section. Customer shall not be liable for any fees or charges to Licensor upon termination of the Trial Period.

## ARTICLE 9: INTELLECTUAL PROPERTY INFRINGEMENT

9.1     Licensor agrees to defend and/or handle at its own expense, any claim or action against Customer, its parent company and its subsidiaries and affiliated companies, for actual or alleged infringement of any trademark, patent, copyright or similar property right (including, but not limited to, misappropriation of trade secrets) based upon the Products or any other materials or services furnished hereunder by Licensor or based on Customer's use thereof provided Customer's use of the Products are in compliance with the terms and conditions of this Agreement. Licensor further agrees to indemnify and hold Customer, its parent company and its subsidiaries and affiliated companies, harmless from and against any and all liabilities, losses, costs, damages and expenses (including reasonable attorneys fees) associated with any such claim or action incurred by Customer, its parent company and its subsidiaries or affiliated companies hereunder. Licensor shall have the sole right to conduct the defense of any such claim or action and all negotiations for its settlement or compromise, unless otherwise mutually agreed to in writing between the parties hereto. Should any Product become, or in Licensor's opinion be likely to become, the subject of any such claim or action, Licensor may at its option and expense either: (i) procure for Customer the right to continue using the Product as contemplated hereunder; (ii) modify the Product to make it non-infringing (provided such modification does not adversely affect Customer's intended use

of the Product as contemplated hereunder); or (iii) replace the Product with an equally suitable, functionally equivalent, compatible, non-infringing product.

9.2     Customer agrees to defend and hold harmless Licensor, its officers and assigns against any and all third party claims, liabilities, losses, costs, damages and expenses (including reasonable attorneys' fees) brought against the Licensor due Customer's use of Products in contravention to the terms of this Agreement or Licensor's authorization or instruction.

## ARTICLE 10: GENERAL

LIABILITY:   Licensor shall be liable for and shall indemnify and hold Customer harmless from any loss or damage arising from the fault or negligence of Licensor, its officers, employees, agents and representatives.  In no event shall either party be liable for consequential damages arising out of or in connection with this Agreement.

ADVERTISING OR PUBLICITY:   Neither party shall use the name, proprietary marks of or otherwise refer to or identify the other party in advertising without securing the prior written consent of such party.

SEVERABILITY:   In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired, and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable provision, which being valid, legal and enforceable, comes closest to the intent of the parties underlying the invalid, illegal or unenforceable provision.

HEADINGS:   The headings in this Agreement are for purposes of reference only and shall not in any way limit or affect the meaning or interpretation of any of the terms hereof.

ENTIRE AGREEMENT:   The terms and conditions of any and all Exhibits and attachments to this Agreement are incorporated herein by this reference and shall constitute part of this Agreement as if fully set forth herein.  Except for the Non-disclosure Agreement stated above, this Agreement, together with attachments hereto, constitutes the entire agreement between the parties and supersedes any prior or inconsistent agreements, promises, proposals, negotiations, representations, understandings, written or oral. No modification to this agreement or any failure or delay in enforcing any term, exercising any option or requiring performance will be binding or construed as a waiver of such term unless agreed to in writing by Customer.

GOVERNING LAW:   This Agreement and the documents attached hereto shall be governed by the laws of the State of New York without giving effect to the conflicts of law principles thereof.  The parties agree to submit to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan, New York, New York, and the appellate courts from any thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day, month and year first above written.

ACTIV FINANCIAL SYSTEMS, INC.          LEHMAN BROTHERS, INC.

By: _Sujata Parekh_                    By: _Ken Hop_

Name: Sujata Parekh                    Name: _Kevin Hopkins_

                                       (type or print)
Title: Chief Financial Officer         Title: _Vice President_

Date: _JUNE 16, 2008_                  Date: _June 12, 2008_

## EXHIBIT A:

### Schedule Number: I

This Schedule is issued pursuant to the Trial Agreement (the "Agreement") between Lehman Brothers Inc. and the Licensor specified below, which was entered into as of the 16th day of June, 2008

Installation Site:

Scheduled Delivery Date:  June 16, 2008

Products:

| | |
|---|---|
| Hosted ActivFeed Direct data feed: | $0.00 |
| Activ API: | $0.00 |
| Server Access: | $1,000.00 |

*Product Notes:*

    (a) Fee for Server Access includes Customer's access to up to four (4) shared Licensor servers.
    (b) Data licensed herein shall be U.S. Equities, Future and Options data as selected by Customer from the attached Schedule.
    (c) Fees are exclusive of taxes and exchange fees that may be charged by ActivFeed Sources directly or through Licensor.
    (d) Licensor will host Customer's equipment as required to receive the data at Licensor's datacenter in New York.

CPU (if applicable):

Number of copies:

Number of authorized users:  Four (4)

Trial Period:   Two (2) months

Licensor:                                          Customer:

ACTIV FINANCIAL SYSTEMS, INC                       LEHMAN BROTHERS, INC

By: _Sujata Parekh_                                By: _____

Name: Sujata Parekh                                Name: _Kevin Hopkins_

                                                   (type or print)
Title: Chief Financial Officer                     Title: _Vice President_

## SCHEDULE NUMBER: 1 (CONTINUED)

ActivFeed Sources: (Select all required permissioning)

### I. US Equities Exchange data:

| Real Time | Delayed | Exchange |
|---|---|---|
| X | | NYSE – New York Stock Exchange Last Sale |
| X | | NYSE – New York Stock Exchange Bid/Ask |
| X | | AMEX American Stock Exchange Last Sale |
| X | | AMEX – American Stock Exchange Bid/Ask |
| X | | NASDAQ – Level 1 |
| | | NASDAQ – Level 2 (NQDS) |
| X | | NASDAQ Real time index data |
| | NA | NASDAQ – Mutual Funds |
| | | Pink Sheets - Level 1 |
| | | Pink Sheets - Level 2 |

### II. Options data:

| Real Time | Delayed | Exchange |
|---|---|---|
| X | | OPRA – Options Price Reporting Authority NBBO |
| | NA | OPRA – Options Price Reporting Authority Regionals |

### III. US Futures data:

| Real Time | Delayed | Exchange |
|---|---|---|
| | | CBOT- Chicago Board of Trade (incl. e-CBOT market depth) |
| | | CBOT – Dow Jones Indices |
| | | CME Chicago Mercantile Exchange |
| | | CME – Chicago Mercantile Exchange E-Mini |
| | | CME – Chicago Mercantile Exchange S&P 500 Index |
| | | CME – One Chicago single stock futures |
| | | CME – Chicago Mercantile Exchange Globex |
| X | | CFE Chicago Futures Exchange |
| | | KCBT – Kansas city Board of Trade |
| | | NYBOT – New York Board of Trade |
| | | NYMEX – New York Mercantile Exchange (effective 2/1/08) |
| | | COMEX – Commodity exchange (through 1/31/08) |
| | | PBOT – Philadelphia Board of Trade |

### IV.

| Real Time | Delayed | Exchange |
|---|---|---|
| | | TSX – Toronto Level 1 |
| | | TSX – Venture Level 1 |
| | | Montreal – Level 1 |
| | | Montreal – Level 2 |

### V. Depth of Book data (Top 10 BBO)*:

| Real Time | Exchange |
|---|---|
| | NYSE - ARCA Book data |
| | NYSE – Open Book data |
| | NASDAQ TotalView (incl. Openview) |
| | CME Depth data (incl. CME data) |

# LEHMAN BROTHERS

KEVIN HOPKINS
VICE PRESIDENT
IT CONTRACT & VENDOR MANAGEMENT
1301 AVENUE OF AMERICAS- 5TH FLOOR
NEW YORK, NY 10019

August 18, 2008

Ms. Sujata Parekh
Sujata.Parekh@activfinancial.com
Activ Financial Systems
1607 East Taft Avenue
Wheaton, Il 60187

Dear Sujata,

In accordance with the Trial Agreement between Activ Financial Systems Inc. and Lehman Brothers Inc. dated June, 2008, section 8 termination, please accept this notice to terminate our agreement upon completion of the Trial Agreement. We will not require the service beyond the two month trial period.

We would like to thank Activ for their support and cooperation during the trial period.

Sincerely,

Kevin Hopkins
Vice President
Lehman Brothers

**EXHIBIT 5**

**NOTICE OF DEBTOR'S BANKRUPTCY FILING**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------x
                       :

**In re**                            :        **Chapter 11 Case No.**
                       :

**LEHMAN BROTHERS HOLDINGS INC.,**   :        **08-13555 (JMP)**
                       :

        **Debtor.**              :
                       :
                       :

--------------------------------------------------------------------x

### NOTICE OF ASSUMPTION AND ASSIGNMENT OF, AND AMOUNTS NECESSARY TO CURE DEFAULTS UNDER CONTRACTS AND LEASES TO BE ASSUMED AND ASSIGNED TO SUCCESSFUL PURCHASER

        **PLEASE TAKE NOTICE** that Lehman Brothers Holdings Inc. ("LBHI") and LB 745 LLC (together with LBHI, the "Debtors") filed petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on September 15, 2008, and September 17, 2008, respectively.

        **PLEASE TAKE FURTHER NOTICE** that on September 17, 2008, the Debtors filed a motion (the "Sale Motion") with the Bankruptcy Court seeking, among other things, an order (the "Sale Order") approving a sale of certain designated assets relating to LBHI's wholly-owned subsidiary Lehman Brothers Inc. ("LBI"), including assets which are owned by LBI and related assets which are owned by LBHI. The assets will be sold in accordance with an Asset Purchase Agreement (the "Purchase Agreement") by and among Barclays Capital Inc. (the "Purchaser"), the Debtors, and LBI, free and clear of all liens, claims, encumbrances, and other interests.

        **PLEASE TAKE FURTHER NOTICE** that on September 17, 2008, the Bankruptcy Court entered an Order: (A) Authorizing a Break-Up Fee and Expense Reimbursement, (B) Approving Certain Matters Relating to Competing Bids, if any, as Set Forth in the Purchase Agreement, (C) Approving the Form and Manner of Sale Notices, and (D) Fixing a Date for the Sale Hearing (such order, the "Break-Up Fee and Competing Bid Order").

#### Notice to Contract Parties

        Pursuant to the Break-Up Fee and Competing Bid Order, parties to executory contracts and unexpired leases (the "Contracts") may determine whether their contract is proposed for assumption and assignment to Purchaser under the Purchase Agreement at the closing of transactions (a "Closing Date Contract") by visiting http://chapter11.epiqsystems.com/lehman (the "Website"). The Debtors will compute the appropriate cure amount (the "Cure Amount") for each Closing Date Contract and will list such Cure Amounts on the Website (the "List") prior to the hearing (the "Sale Hearing") to authorize the Debtors and LBI to enter into the Purchase Agreement. The Sale Hearing is scheduled for September 19, 2008 at 4:00 pm. If the Contract is one that the Purchaser

designates for assumption and assignment within the 60 days after the Closing (a "Designated Contract"), the Debtors will file a motion for approval of procedures with respect to Designated Contracts at a later date.

Any non-Debtor party to a Closing Date Contract shall either (A) at any time prior to the Sale Hearing, file with the Court and serve on the Debtors in writing or (B) raise at the Sale Hearing, any objections to (i) the proposed assumption and assignment to the Purchaser (and must state in its objection, with specificity, the legal and factual basis of its objection) and (ii) if applicable, the proposed Cure Amount (and must state in its objection, with specificity, what Cure Amount is required with appropriate documentation in support thereof), no later than the Sale Hearing. If no such objection is timely received or raised at the Sale Hearing, (x) the non-Debtor party to the Closing Date Contract shall be deemed to have consented to the assumption and assignment of the Closing Date Contract to the Purchaser and shall be forever barred from asserting any objection with regard to such assumption and assignment, and (y) any Cure Amount identified pursuant to the Assumption, Assignment and Cure Notice shall be controlling, notwithstanding anything to the contrary in any Closing Date Contract, or any other document, and the non-Debtor party to a Closing Date Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Closing Date Contract against the Debtors or the Purchaser, or the property of any of them.

The failure of any Contract to appear on the List does not necessarily indicate that such Contract will not be assumed by the Debtors and assigned to the Purchaser, as Section 2.5 of the Purchase Agreement provides that the Purchaser shall have until 60 days after the Closing to designate contracts for assignment.

A copy of the Sale Motion, Break-Up Fee and Competing Bid Order and further information relating to the sale transaction may be found at http://chapter11.epiqsystems.com/lehman. Questions may be directed to counsel to the above-captioned debtor or to EPIQ at lehman@epiqsystems.com.

Dated: September 18, 2008
New York, New York

_Jacqueline Marcus_

Harvey R. Miller, Esq.
Richard P. Krasnow, Esq.
Lori R. Fife, Esq.
Shai Y. Waisman, Esq.
Jacqueline Marcus, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor
and Debtor in Possession

**EXHIBIT 6**

**UNPAID INVOICES**

ACTIV Financial Systems, Inc.
1607 East Taft Avenue, Suite 101
Wheaton, IL 60189

# Statement

| Date |
| --- |

12/1/2008

Image Processing Systems
C/O Lehman Brothers Accounts Payable Depa
PO# 0000058318
P.O. Box 2339
Secaucus, NJ 07096

| Amount Due |
| --- |
| $46,023.25 |

| Date | Transaction | Amount |
| --- | --- | --- |
| 09/01/2008 | INV #8399. Due 09/30/2008. Orig. Amount $15,678.25. | 15,678.25 |
| 10/01/2008 | INV #8687. Due 10/31/2008. Orig. Amount $15,172.50. | 15,172.50 |
| 11/01/2008 | INV #8986. Due 11/30/2008. Orig. Amount $15,172.50. | 15,172.50 |

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
| --- | --- | --- | --- | --- | --- |
| 0.00 | 15,172.50 | 15,172.50 | 15,678.25 | 0.00 | $46,023.25 |

Make Checks Payable to:
ACTIV Financial Systems, Inc.
1607 East Taft Avenue, Suite 101
Wheaton, IL 60189
Billing Inquiries: (630) 682-5700

Wire To:
ACTIV Financial Systems, Inc
Account # 901523500
Routing: 071923310
MB Financial Bank
1400 Sixteenth Street
Oak Brook, IL 60523

Payments received after the
25th of the month will be
reflected on the next
statement.

ACTIV Financial Systems Inc.
1607 East Taft Avenue, Suite 101
Wheaton, IL 60189

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/1/2008 | 8399 |

**Bill To**

Image Processing Systems
C/O Lehman Brothers Accounts Payable Depa
PO# 0000058318
P.O. Box 2339
Secaucus, NJ 07096

**Site:**

LEHM 1000
Lehman Brothers
Erik Stigum
11 Wall Street
New York, NY 10005

| Due Date | Account # |
|----------|-----------|
| 9/30/2008 | LEHM 1000 |

| Description | Period | Quantity | Rate | Amount |
|-------------|--------|----------|------|--------|
| ActivMiddleware License | 9/1-9/30/08 | 1 | 14,000.00 | 14,000.00T |
| Server access for 2 month trial of ActivFeed. Trial began 7/14/08 and ends 9/14/08 | 9/1-9/14/08 | 1 | 466.67 | 466.67T |
| NY State Sales Tax - NY City | | | 8.375% | 1,211.58 |

| Phone # | Fax # |
|---------|-------|
| (630) 682-5700 | (630) 682-5800 |

Wire To:
ACTIV Financial Systems, Inc
Account # 901523500
Routing: 071923310
MB Financial Bank
1400 Sixteenth Street
Oak Brook, IL 60523

| **Total** | $15,678.25 |
|-----------|------------|

ACTIV Financial Systems Inc.
1607 East Taft Avenue, Suite 101
Wheaton, IL 60189

# Invoice

| Date | Invoice # |
|------|-----------|
| 10/1/2008 | 8687 |

| Bill To |
|---------|
| Image Processing Systems<br>C/O Lehman Brothers Accounts Payable Depa<br>PO# 0000058318<br>P.O. Box 2339<br>Secaucus, NJ 07096 |

| Site: |
|-------|
| LEHM 1000<br>Lehman Brothers<br>Erik Stigum<br>11 Wall Street<br>New York, NY 10005 |

| Due Date | Account # |
|----------|-----------|
| 10/31/2008 | LEHM 1000 |

| Description | Period | Quantity | Rate | Amount |
|-------------|--------|----------|------|--------|
| ActivMiddleware License<br>NY State Sales Tax - NY City | 10/1-10/31/08 | 1 | 14,000.00<br>8.375% | 14,000.00T<br>1,172.50 |

| **Total** | | | | $15,172.50 |

| Phone # | Fax # |
|---------|-------|
| (630) 682-5700 | (630) 682-5800 |

Wire To:
ACTIV Financial Systems, Inc
Account # 901523500
Routing: 071923310
MB Financial Bank
1400 Sixteenth Street
Oak Brook, IL 60523

ACTIV Financial Systems Inc.
1607 East Taft Avenue, Suite 101
Wheaton, IL 60189

# Invoice

| Date | Invoice # |
|------|-----------|
| 11/1/2008 | 8986 |

| Bill To |
|---------|
| Image Processing Systems<br>C/O Lehman Brothers Accounts Payable Depa<br>PO# 0000058318<br>P.O. Box 2339<br>Secaucus, NJ 07096 |

| Site: |
|-------|
| LEHM 1000<br>Lehman Brothers<br>Erik Stigum<br>11 Wall Street<br>New York, NY 10005 |

| Due Date | Account # |
|----------|-----------|
| 11/30/2008 | LEHM 1000 |

| Description | Period | Quantity | Rate | Amount |
|-------------|--------|----------|------|--------|
| ActivMiddleware License<br>NY State Sales Tax - NY City | 11/1-11/30/08 | 1 | 14,000.00<br>8.375% | 14,000.00T<br>1,172.50 |

| Phone # | Fax # |
|---------|-------|
| (630) 682-5700 | (630) 682-5800 |

| Wire To: |
|----------|
| ACTIV Financial Systems, Inc<br>Account # 901523500<br>Routing: 071923310<br>MB Financial Bank<br>1400 Sixteenth Street<br>Oak Brook, IL 60523 |

| **Total** | $15,172.50 |
|-----------|------------|

**EXHIBIT 7**

**ACKNOWLEDGEMENT OF RECEIPT OF PROOF OF CLAIM**



P 646 282 2500  F 646 282 2501
757 THIRD AVENUE, NEW YORK, NY 10017
WWW.EPIQSYSTEMS.COM

**** LBH CLMLTR (MERGE2,TXNUM2) 4000052757 ****
ACTIV FINANCIAL SYSTEMS, INC.*
125 SOUTH WACKER DRIVE, SUITE 2325
CHICAGO, IL 60606

September 16, 2009

## ACKNOWLEDGEMENT OF RECEIPT OF PROOF OF CLAIM

This letter serves as acknowledgement that the claim identified below has been recorded
by Epiq Bankruptcy Solutions, LLC, the court-approved claims agent, on the claims
register in the LEHMAN BROTHERS HOLDINGS INC. case.   To ensure that your
claim has been recorded correctly, please review the following information:

| | |
|---|---|
| Debtor: | NO DEBTOR ASSERTED BY CREDITOR |
| Case Number: | NO CASEZ99 |
| Creditor: | ACTIV FINANCIAL SYSTEMS, INC.* |
| Date Received: | 07/24/2009 |
| Claim Number: | 6085 |

*Please note that nothing in this Acknowledgement should be construed to mean or imply
that your claim is being allowed.  The Debtor may elect to object to the identified claim
on various grounds.*

We also strongly encourage you to review your proof of claim on our website at
http://chapter11.epiqsystems.com/LBH.  To find your imaged claim, click on the "Filed
Claims & Schedules" icon at the top of the page, type in your claim number in the
"Claim #" field, and click "Search".  Additionally, you may search for your claim by
typing in your name in the appropriate search field.

If you have any questions, please contact us at 646-282-2400 or via our contact form on
our website at http://www.epiq11.com/contact.aspx.  Please be sure to specify the client
name about which you are inquiring.

EPIQ BANKRUPTCY SOLUTIONS, LLC