Hearing Date and Time: November 17, 2010 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time: November 10, 2010 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                            :
In re                                       :    **Chapter 11 Case No.**
                                            :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,    :    **08-13555 (JMP)**
                                            :
                        **Debtors.**            :    **(Jointly Administered)**
                                            :
---------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION, PURSUANT TO**
**SECTION 362 OF THE BANKRUPTCY CODE, FOR AN ORDER**
**MODIFYING THE AUTOMATIC STAY TO ALLOW SETTLEMENT**
**PAYMENT UNDER DIRECTORS AND OFFICERS INSURANCE POLICY**

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for relief from the automatic stay, to the extent applicable, to

permit the Debtors' third-party insurers to make payments in connection with a certain

settlement agreement, all as more fully described in the Motion, will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy

Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court"), on **November 17, 2010 at 10:00 a.m. (Prevailing**

**Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn:  Richard P. Krasnow, Esq., attorneys for the Debtors; (iii) the Office of the United

States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York,

New York 10004, Attn:  Tracy Hope Davis, Esq., Andy Velez-Rivera, Esq., Paul Schwartzberg,

Esq., Brian Masumoto, Esq., and Linda Riffkin, Esq.; (iv) Milbank, Tweed, Hadley & McCloy

LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq.,

Evan Fleck, Esq. and Dennis O'Donnell, Esq., attorneys for the official committee of unsecured

creditors appointed in these cases; and (v) Mendes & Mount, LLP, 750 Seventh Ave., New York,

New York 10019-6829, Attn: Arthur Washington, Esq. and Pamela M. Passarello, attorneys for

Certain Underwriters at Lloyd's, London, so as to be so filed and received by no later than

**November 10, 2010 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  October 27, 2010
        New York, New York

                              /s/ Richard P. Krasnow
                              Richard P. Krasnow

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              Attorneys for Debtors
                              and Debtors in Possession

**Hearing Date and Time: November 17, 2010 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: November 10, 2010 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                                   :
In re                                                              :    **Chapter 11 Case No.**
                                                                   :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*                       :    **08-13555 (JMP)**
                                                                   :
                                    **Debtors.**                   :    **(Jointly Administered)**
                                                                   :
-------------------------------------------------------------------x

**DEBTORS' MOTION, PURSUANT TO**
**SECTION 362 OF THE BANKRUPTCY CODE, FOR AN ORDER**
**MODIFYING THE AUTOMATIC STAY TO ALLOW SETTLEMENT**
**PAYMENT UNDER DIRECTORS AND OFFICERS INSURANCE POLICY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

   Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), file this motion and respectfully

represent:

**Preliminary Statement**

   1.  On four prior occasions, the Court has modified the automatic stay

provided for under section 362(a) of title 11 of the United States Code (the "Bankruptcy Code"),

to the extent applicable, to remove any impediments to payment by certain of the Debtors'

insurers of directors and officers coverage of settlement amounts or defense costs or fees that

current or former directors, officers, and employees of the Debtors incurred or were incurring as

defendants in ongoing lawsuits, arbitration proceedings, regulatory and other investigations.[1]  By

this Motion, the Debtors seek identical relief to assure Certain Underwriters at Lloyd's London

and London Market Company subscribing to policy number QA0160907 ("Lloyd's"), the

Debtors' third level excess insurers under the Debtors' 2007-2008 directors and officers liability

insurance program (the "Lloyd's Policy"),[2] that it is authorized to make a settlement payment in

the amount of $10 million (the "Settlement Amount") in connection with a settlement agreement

between Alex E. Booth, Jr. ("Booth"), the Booth Foundation, Inc. (the "Booth Foundation") and

Richard S. Fuld, Jr. ("Fuld"), LBHI's former chief executive officer, without concern that, if the

automatic stay is otherwise applicable, it is violating the automatic stay.

   2.  For Claims[3] made against individual Insureds during the period from May

16, 2007 to May 16, 2008 (the "Policy Period"), the Debtors purchased a primary policy from

XL Specialty Insurance Company ("XL," and said policy the "2007-2008 Primary D&O Policy")

plus additional excess coverage for this period from a number of other carriers of up to $250

---

[1] *See* Orders dated March 25, 2009 [Docket No. 3220] (modifying automatic stay to allow advancement
of defense costs with respect to XL Specialty Insurance); November 23, 2009 [Docket No. 5906]
(modifying the automatic stay to allow advancement of defense costs with respect to Federal Insurance
Company); December 17, 2009 [Docket No. 6297] (modifying the automatic stay to allow payment of
settlement amounts by XL Specialty Insurance Company and Federal Insurance Company); and August
20, 2010 [Docket No. 10945] (modifying the automatic stay to allow advancement of defense costs with
respect to Continental Casualty Company, Lloyds, and U.S. Specialty Insurance Company (HCC))
(collectively, the "Prior Stay Orders").  Concurrently herewith, the Debtors are filing a motion, pursuant
to section 362 of the Bankruptcy Code for relief from the automatic stay, to the extent applicable, to
permit certain of their insurers to make payment of covered defense costs, advancement of covered
defense costs, or both, incurred by the Debtors' current and former officers, directors, and employees that
have been named as defendants in various legal proceedings.

[2] A copy of the 2007-2008 primary D&O policy together with the Lloyd's excess policy for such period is
attached hereto as Exhibit A.

[3] Capitalized terms that are used but not otherwise defined herein shall have the meanings ascribed to
them in the Lloyd's Policy.

million in the aggregate.  The excess policies, including the Lloyd's Policy, are all "follow form"

policies subject to additional independent terms and conditions.  That is, the terms and conditions

of the excess coverage are governed by the 2007-2008 Primary D&O Policy, but each excess

insurer's obligations are subject to certain additional terms, such as limits of liability, and attach

only after all Loss within the respective Limits of Liability of the underlying policies has been

paid.  As the third excess insurer for the Policy Period, Lloyd's provides coverage of $10 million

in excess of $45 million.

3.    Confirming Lloyd's' ability to make the proposed settlement payments is

in the best interests of the Debtors' estates and creditors because, *inter alia*, the interests of the

Debtors' estates, if any, in the proceeds of the Lloyd's Policy are expressly subordinate to the

interest of the individual Insureds.  Specifically, the Lloyd's Policy provides that the Debtors

have a right to the insurance proceeds only after the individual Insureds are fully reimbursed for

any "Loss," including defense costs and settlement payments.  As such, granting the relief

requested by this Motion is unlikely to have any adverse effect on the Debtors' estates and

creditors.  Moreover, validating that Lloyd's is authorized to fund certain settlement payments

without violating the automatic stay will also eliminate or reduce potential indemnification

claims that may be asserted against the Debtors.  Accordingly, granting the relief requested

herein is in the best interest of the Debtors' estates and creditors.

### Background

4.    Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced

voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The

Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being

jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

6.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA is administering LBI's estate.

7.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner. The Examiner issued a report on his investigation pursuant to section 1106 of the Bankruptcy Code on March 11, 2010 [Docket No. 7531].

8.      On April 14, 2010, the Debtors filed their amended joint chapter 11 plan [Docket No. 8330] and their proposed disclosure statement pursuant to section 1125 of the Bankruptcy Code [Docket No. 8332].

### Jurisdiction

9.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Lehman's Business

10.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,
filed on September 15, 2008 [Docket No. 2].

**Relief Requested**

11.      The Debtors seek the entry of an order granting relief from the automatic
stay provided for in section 362(a) of the Bankruptcy Code, to the extent that it applies, to allow
Lloyd's to make a payment of the Settlement Amount solely from the available proceeds of the
Lloyd's Policy in accordance with the terms of a settlement agreement (the "Settlement
Agreement") among Booth, the Booth Foundation and Fuld (together, the "Parties"), subject to
the terms of the Lloyd's Policy.  The Debtors further request that the Court waive the
requirements of Bankruptcy Rule 4001(a)(3) and direct that the order granting the requested
relief be effective immediately.

**The Debtors' Directors and Officers Liability Insurance Policies**

12.      Pursuant to their advancement and indemnification obligations expressed
in their by-laws and certificate of incorporation, the Debtors purchased primary and excess
directors and officers liability ("D&O") insurance, which provides coverage for the Debtors'
current and former officers, directors, and employees in connection with civil, criminal,
regulatory and other actions and investigations.

13.      Subject to the terms, conditions, limitations and exclusions of the Lloyd's
Policy, Lloyd's covers Loss (i.e., Defense Expenses, settlements and judgments, among other
things) of $10 million in excess of $45 million incurred as a result of Claims made during the
Policy Period for Wrongful Acts allegedly committed by individual Insureds in their capacity as
directors, officers, and / or employees of LBHI and certain of its subsidiaries.  Coverage under
the Side A provision of the Lloyd's Policy is immediately available to Insured Persons for any

Loss resulting from Claims made under the Lloyd's Policy that is not otherwise advanced or indemnified by the Debtors by reason of their financial insolvency.

14.    Furthermore, the Lloyd's Policy contains a "Priority of Payments" provision, which provides that when competing claims for coverage under both Insuring Agreement (A) for non-indemnifiable loss, as described above, and Insuring Agreement (B) are made under the Lloyd's Policy, "the Insurer shall pay that Loss, if any, which the Insurer may be liable to pay on behalf of the Insured Persons under Insuring Agreement (A)... ."  Thus, the Lloyd's Policy, by virtue of Insuring Agreement A and the Priority of Payments provision, provides for the immediate payment of the Settlement Amount on behalf of the individual Insureds ahead of any payment that may be made to the Debtors.

## The Action

15.    Both prior to and after the collapse of the Lehman enterprise in September 2008, various securities actions were commenced against certain current and former officers and directors of Lehman in both federal and state courts as well as before Financial Industry Regulatory Authority ("FINRA").  The Settlement Agreement relates to two actions, *Booth Foundation, Inc. v. Martin D. Shafiroff et al.*, (Case No. 09-01844) pending before FINRA (the "FINRA Action") and *Booth Foundation, Inc. v. Richard S. Fuld, Jr.* (Case No. 10-2521) pending in the United States Court of Appeals for the Second Circuit (the "Second Circuit Action," and together with the FINRA Action, the "Actions").  The Actions allege unsuitability and failure to supervise claims arising out of alleged activities of certain Lehman brokers in connection with the sale to the Booth Foundation of LBHI-issued notes.

16.    Neither LBHI nor any of the other Debtors is named as a defendant in the Actions and none of the Debtors are parties to the Settlement Agreement.  Wilmington Trust Company, as indenture trustee on behalf of certain noteholders, including the Booth Foundation,

has asserted an unrelated claim against LBHI (Claim No. 10082) for certain unsecured debt

obligations (the "Claim").  The Claim is not being settled by the Settlement Agreement.  Nothing

contained herein shall be construed as an acknowledgement by LBHI of the validity or

enforceability of the Claim, and LBHI reserves all of its rights to contest the amount or validity

of the Claim.

### The Settlement Agreement

17.    Booth, the Booth Foundation, and Fuld have agreed to settle all disputes

outstanding between them under the terms and conditions set forth in the Settlement Agreement.

The relevant terms of the Settlement Agreement are as follows:[4]

- The effectiveness of the Settlement Agreement is subject to entry of an order in the Chapter 11 Cases granting relief from the automatic stay, to the extent applicable, to permit Lloyd's to pay the Settlement Amount to the Booth Foundation as provided in the Settlement Agreement;

- within 10 business days after entry of a final order by this Court, Lloyd's shall pay the Settlement Amount to the Booth Foundation from the proceeds of the Lloyd's Policy; and

- within three business days after receipt of the Settlement Amount, the Booth Foundation shall dismiss the Actions with prejudice.

### Cause Exists to Grant the Relief Requested

18.    Pursuant to the Prior Stay Orders, this Court has granted relief that is

identical to the relief sought in this Motion, based on rights and obligations *vis-à-vis* the Debtors

and Individual Defendants that are governed by the same terms and conditions as the as the

Lloyd's Policy.  Accordingly, because cause to modify the automatic stay was found to exist

under the Prior Stay Orders, *a fortiori*, such cause exists here as well.  If, however, the Debtors

---

[4] To the extent there is an inconsistency between this summary and the Settlement Agreement, the terms of the Settlement Agreement shall control.  A copy of the Settlement Agreement has not been attached to this Motion because none of the Debtors are parties thereto and the only provisions thereof that are relevant to the Debtors are those described in paragraph 17 hereof with respect to the payment of the Settlement Amount from the proceeds of the Lloyd's Policy.

must independently demonstrate that such cause exists to allow Lloyd's to pay the Settlement

Amount, as described below, it is beyond peradventure that such a modification of the automatic

stay is warranted.

A.      The Proceeds Are Not Property of the Estate

           19.      Section 362(a)(3) of the Bankruptcy Code provides for an automatic stay

of any action seeking to obtain possession or exercise control over property of the bankruptcy

estate.  It is well settled that insurance policies are property of the estate and covered by the

automatic stay provisions of the Bankruptcy Code.  *See MacArthur Co. v. Johns-Manville Corp.*,

837 F.2d 89 (2d Cir 1988).  However, courts have distinguished between ownership of a *policy*

and ownership of the *proceeds* of a policy.  While courts have not been uniform in their analysis,

where a policy provides for payment only to a third party – such as payments to officers and

directors under an executive insurance policy – or where the debtor has a right of coverage or

indemnification, but such right is hypothetical or speculative, courts have held that the proceeds

of such policy are not property of the bankruptcy estate.  *See, e.g.*, *In re Adelphia Commc'ns

Corp.*, 298 B.R. 49, 53 (S.D.N.Y. 2003) (holding that insurance proceeds were not property of

the estate where it had not been suggested that debtors had made any payment for which they

may be entitled to indemnification under policy or that any such payments were then

contemplated); *In re Allied Digital Techs., Corp.*, 306 B.R. 505, 510 (Bankr. D. Del. 2004)

(holding that proceeds of D&O insurance policy were not property of the estate where debtor's

indemnification right under the policy was speculative and direct coverage of debtor under

policy was hypothetical); *In re La World Exposition, Inc.*, 832 F.2d 1391, 1401 (5th Cir. 1987)

(holding that proceeds of a D&O policy belonged only to the officers and directors and,

therefore, were not property of the estate); *In re World Health Alternatives, Inc.*, 369 B.R. 805,

809 (Bankr. D. Del. 2007) (when proceeds of a policy are payable to the directors and officers and not the estate, the proceeds are not property of the estate); *See In re First Cent. Fin. Corp.*, 238 B.R. 9, 18 (Bankr. E.D.N.Y. 1999) (holding that circumstances that may give rise to entity coverage were highly remote and therefore proceeds were not property of estate).

20.    In determining whether proceeds are property of the estate, courts review the "language and scope of the policy at issue." *Allied Digital*, 306 B.R. at 509. *See also In re CyberMedica, Inc.*, 280 B.R. 12, 16 (Bankr. D. Mass. 2002); *In re Jones*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) (respective rights of debtors and non-debtors to insurance proceeds "must be ascertained by reference to the parties' contractual rights pursuant to the interpretation of the pertinent contractual provisions under applicable state law").

21.    The Lloyd's Policy contains an unambiguous priority of payments endorsement that expressly subordinates any potential rights of the Debtors to proceeds payable under the Lloyd's Policy to the rights of the individual Insureds.  The priority of payment endorsements is an enforceable contractual provision and should be upheld for the benefit of the individual Insureds as intended. *See In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. Apr. 11, 2002) [Docket No. 3278] (holding that priority of payment provision was an enforceable contractual right).[5]

22.    Consistent with the purpose of such policies, the Debtors purchased the Lloyd's Policy primarily to provide insurance coverage to their officers and directors, including Fuld. *See In re First Cent. Fin. Corp.*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999) ("In essence and at its core, a D&O Policy remains a safeguard of officer and director interests and not a vehicle for corporate protection.").  The Debtors' speculative rights to any residual proceeds, which

---

[5] A copy of the Court's bench ruling in *Enron* is attached hereto at <u>Exhibit B</u>.

would be payable only in the event that the Debtors indemnified the individual Insureds and

which are subject to an express contractual subordination provision, should not alter the

conclusion that the proceeds should not constitute property of the Debtors' estates.

B.    Cause Exists to Modify the Automatic Stay, to the Extent
      That it Applies, to Allow Payment of the Settlement Amount.

23.    Even if the proceeds from the Lloyd's Policy are determined to be

property of the estate, "cause" exists under section 362(d)(1) of the Bankruptcy Code to modify

the automatic stay to allow for the payment of the Settlement Amount as required under the

Lloyd's Policy.  It is not uncommon for courts to grant stay relief to allow payment of settlement

costs to directors and officers, especially when there is no evidence that direct coverage of the

debtor will be necessary.  *See Allied Digital*, 306 B.R. at 513.

24.    Allowing Lloyd's to pay the Settlement Amount will, in fact, benefit the

Debtors' estates.  The Debtors believe that they have an obligation under their by-laws to

advance the settlement costs incurred by the individual Insureds, including Fuld.  If Lloyd's is

barred from advancing the Settlement Amount due to the enforcement of the automatic stay,

Fuld may assert indemnification claims against the Debtors for such amounts.[6]  Consequently,

payment of the Settlement Amount under the Lloyd's Policy will reduce or eliminate the claims

that Fuld could assert against the Debtors.

25.    Modifying the automatic stay will not harm the Debtors' estates.  As

explained above, any rights the Debtors have to the proceeds are contractually subordinated to

the rights of the individual insureds pursuant to the priority of payments clause.

---

[6] Fuld has filed a protective claim against LBHI for indemnification and advancement of defense costs (Proof of
Claim No. 16194).

26.     Alternatively, if this Court finds that the Debtors have some interest in the proceeds of the Lloyd's Policy, the Debtors submit that any such interest is nominal and in any event cannot be determined until Fuld's losses have been quantified and paid.  Advancing the Settlement Amount pursuant to the Lloyd's Policy, which represents approximately five percent (5%) of the Debtors' total outstanding coverage under its primary and excess 2007-2008 D&O Policies, is appropriate.  Accordingly, cause exists to modify the automatic stay pursuant to section 362(d) of the Bankruptcy Code, to the extent it applies, to allow Lloyd's to make payment of the Settlement Amount pursuant to the terms of the Settlement Agreement and subject to the terms of the Lloyd's Policy.

27.     In making this Motion, neither the Debtors, Fuld, nor Lloyd's are waiving any of their respective rights under the Lloyd's Policy or any other insurance policy.  In addition, the Debtors are not seeking a determination of Lloyd's' obligation to pay any settlement costs under the Lloyd's Policy.  Rather, the Debtors seek only the entry of an order modifying the automatic stay, to the extent applicable, to allow Lloyd's to make payment of the Settlement Amount.

## Notice

28.     No trustee has been appointed in these cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [Docket No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) all parties who have requested notice in these chapter 11 cases; and (vii) Lloyd's.  The Debtors submit that no other or further notice need be provided.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated: October 27, 2010
      New York, New York

                            /s/ Richard P. Krasnow
                            Richard P. Krasnow

                            WEIL, GOTSHAL & MANGES LLP
                            767 Fifth Avenue
                            New York, New York 10153
                            Telephone: (212) 310-8000
                            Facsimile: (212) 310-8007

                            Attorneys for Debtors
                            and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                      :
In re                                                 :    **Chapter 11 Case No.**
                                                      :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,          :    **08-13555 (JMP)**
                                                      :
                               **Debtors.**           :    **(Jointly Administered)**
                                                      :
-------------------------------------------------------------------x

### ORDER GRANTING DEBTORS' MOTION, PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE, FOR AN ORDER MODIFYING THE AUTOMATIC STAY TO ALLOW SETTLEMENT PAYMENT UNDER DIRECTORS AND OFFICERS INSURANCE POLICY

Upon the motion, dated October 27, 2010 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors"), pursuant to section 362(d) of

title 11 to the United States Code (the "Bankruptcy Code") and Rule 4001(a)(3) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order modifying the automatic

stay provided for in section 362(a) of the Bankruptcy Code, to the extent applicable, to allow

Certain Underwriters at Lloyd's London and London Market Company subscribing to policy

number QA0160907 ("Lloyd's") to make certain settlement payments in connection with the

terms of a settlement agreement (the "Settlement Agreement") relating to the cases of *Booth

Foundation, Inc. v. Martin D. Shafiroff, et al*. (FINRA Case No. 09-01844) and *Booth

Foundation, Inc. v. Richard S. Fuld, Jr.*, Docket No. 10-2521 (2d Cir.), all as more fully

described in the Motion; and the Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61

Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings

Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the

relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with the procedures set forth in the second

amended order entered on June 17, 2010, governing case management and administrative

procedures for these cases [Docket No. 9635] to (i) the United States Trustee for the Southern

District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii)

the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United

States Attorney for the Southern District of New York; (vi) all parties who have requested notice

in these chapter 11 cases; and (vii) Lloyd's, and it appearing that no other or further notice need

be provided; and a hearing having been held to consider the relief requested in the Motion; and

the Court having found and determined that the relief sought in the Motion is in the best interests

of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that pursuant to sections 105(a) and 362(d) of the Bankruptcy Code,

the automatic stay, to the extent applicable, is hereby modified to, and without further order of

this Court, allow Lloyd's to pay the Settlement Amount[1] provided for in the Settlement

Agreement on behalf of Fuld in accordance with the terms of the Lloyd's Policy; and it is further

ORDERED that the Debtors are authorized to execute all documentation

necessary to allow Lloyd's to fund the Settlement Amount on behalf of Fuld pursuant to the

Settlement Agreement; and it is further

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

ORDERED that nothing in this Order shall modify, alter or accelerate the rights and obligations of Lloyd's, the Debtors or Fuld provided for under the terms and conditions of the Lloyd's Policy; and it is further

ORDERED that all parties to the Lloyd's Policy reserve all rights and defenses with respect to the Lloyd's Policy that they would otherwise have; and it is further

ORDERED that nothing in this Order shall constitute a determination that the proceeds of the Lloyd's Policy are property of the Debtors' estates, and the rights of all parties in interest to assert that the proceeds of the Lloyd's Policy are, or are not, property of the Debtors' estates are hereby reserved; and it is further

ORDERED that stay provided by Bankruptcy Rule 4001(a)(3) is waived; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  November __, 2009
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**(LLOYD'S POLICY)**

| | | |
|---|---|---|
| **Policy Number:** ELU097792-07 | ☐ | **Greenwich Insurance Company** |
| **Renewal of Number** ELU092534-06 | ☒ | **XL Specialty Insurance Company** |

Members of the XL America Companies

---

**MANAGEMENT LIABILITY AND
COMPANY REIMBURSEMENT
INSURANCE POLICY DECLARATIONS**

Executive Offices
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

---

THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY PROVIDES FOR THE INSURER TO DEFEND ANY CLAIM MADE AGAINST AN INSURED EXCEPT UNDER THOSE CERTAIN SPECIFIED CIRCUMSTANCES WHERE THE INSURED CHOOSES TO PROVIDE ITS OWN DEFENSE. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

---

**Item 1.**    **Name and Mailing Address of Parent Company:**

Lehman Brothers Holdings Inc.
1301 Avenue of the Americas
New York, NY  10019

---

**Item 2.**    **Policy Period:**    **From:**    May 16, 2007    **To:**    May 16, 2008

At 12:01 A.M. Standard Time at your Mailing Address Shown Above

---

**Item 3.**    **Limit of Liability:**

$20,000,000  Aggregate each **Policy Period** (including Defense **Expenses**)

---

**Item 4.**    **Retentions:**

| | | |
|---|---|---|
| $0 | each **Insured Person** under INSURING AGREEMENT I (A) |
| $10,000,000 | each **Claim** under INSURING AGREEMENT I (B) |
| N/A | each **Claim** under INSURING AGREEMENT I (C) |

---

**Item 5.**    **Optional Extension Period:**

Length of Optional Extension Period:

(Either one year or two years after the end of the **Policy Period**, at the election of the **Parent Company**)

Premium for Optional Extension Period:    One Year:    $3,113,625.00

Two Years:    N/A

---

**Item 6.**    **Pending and Prior Litigation Date:**    March 31, 1989

---

**Item 7.**    **Notices required to be given to the Insurer must be addressed to:**

Executive Liability Underwriters
One Constitution Plaza, 16th Floor
Hartford, CT  06103
Toll Free Telephone: 877-953-2636

---

DO 70 00 11 01

## MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT POLICY DECLARATIONS

---

| Item 8. | **Premium:** | |
|---|---|---|
| | Taxes, Surcharges or Fees: | $0.00 |
| | Total Policy Premium: | $2,075,750.00 |

---

**Item 9.    Policy Forms and Endorsements Attached at Issuance:**

DO 71 00 09 99    XL 80 39 04 05    XL 80 24 03 03    DO 85 01 01 02    DO 85 02 02 00    DO 96 04 02 00
DO 96 02 02 00    DO 85 00 05 00    DO 80 142 10 01    DO 80 266 03 04    DO 80 122 06 01    DO 80 44 07 00
DO 80 48 07 00    DO 80 353 05 06    DO 83 33 08 01    XL 80 22 05 02    DO 80 286 08 04    DO 80 354 05 06
DO 80 02 03 00    DO 80 118 05 01    Manuscript 1236 08 04    Manuscript 1150 06 04
Manuscript 6189 05 06    Manuscript 1034 02 04    Manuscript 1151 06 04    Manuscript 6191 05 06
Manuscript 1102 05 04    Manuscript 6474 09 06    DO 83 134 01 07    Manuscript 6192 05 06
Manuscript 6193 05 06    Manuscript 87 01 01    Manuscript 6190 05 06    Manuscript 6473 09 06
Manuscript 7142 05 07    Manuscript 7141 05 07

Countersigned: _____    By: _____

Date                                              Authorized Representative

---

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

**In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations page, if required by law, by a duly authorized representative of the Insurer.**

*Nicholas M. Brown, Jr.*                          *Theresa M. Morgan*

Nicholas M. Brown, Jr.                            Theresa M. Morgan
President                                          Secretary

**Greenwich Insurance Company**

*Nicholas M. Brown, Jr.*                          *Theresa M. Morgan*

Nicholas M. Brown, Jr.                            Theresa M. Morgan
President                                          Secretary

**XL Specialty Insurance Company**

DO 70 00 11 01                                                                              Page 2 of 2

# POLICYHOLDER DISCLOSURE

## NOTICE OF TERRORISM
## INSURANCE COVERAGE

Coverage for acts of terrorism is already included in your current policy. You should know that, effective November 26, 2002, under your existing coverage, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived.  Any premium waiver is only valid for the current Policy Period.

However, the applicable federal law described above is set to expire on December 31, 2007 and it is unclear if such statutory provision will be extended past such date.  In the event such federal law expires without such extension, any losses caused by certified acts of terrorism would not be partially reimbursed by the United States.

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT OF 2002, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer:    **XL Specialty Insurance Company**
Policy Number:      **ELU097792-07**

# IN WITNESS ENDORSEMENT

XL SPECIALTY INSURANCE COMPANY

ADMINISTRATIVE OFFICE:  SEAVIEW HOUSE
70 SEAVIEW AVENUE
STAMFORD, CT 06902-6040

STATUTORY HOME OFFICE:  1201 NORTH MARKET STREET
SUITE 501
WILMINGTON, DE 19801

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

_____
John R. Glancy
President

_____
Kenneth P. Meagher
Secretary

IL MP 9104 0406 XLS

# NOTICE TO POLICYHOLDERS

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Policyholder Notice carefully.**

OFAC administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous

- Foreign agents
- Front organizations
- Terrorists
- Terrorist organizations
- Narcotics traffickers

as "Specially Designated Nationals and Blocked Persons". This list can be found on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance will be immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# PRIVACY POLICY

The XL America, Inc. insurance group ("We" or "Our Group"), respects the privacy of all personal information. Thus, the information We collect from our customers, or potential customers, is treated with the highest degree of privacy.

We have developed a Privacy Policy for Our Group that:
1) ensures the security of your information; and
2) complies with state and federal privacy laws.

The term "personal information" includes all information we obtain about a customer and maintain in our files. All persons with access to personal information are required to follow this policy.

## Our Privacy Promise

Your privacy rights are important to us. Analysis of your private information allows us to provide to you excellent service and products. Your trust in us depends upon the security and integrity of our records. Thus, We promise to:

1) Follow strict security standards. This will protect any information you share with us, or that we receive about you.
2) Verify and exchange data regarding your credit and financial status only for the purposes of: underwriting; policy administration; or risk management. We will obtain only reputable references and services.
3) Collect and use the least amount of information necessary to:
   a. advise you and deliver excellent service and products; and
   b. conduct our business.
4) Train our employees to securely handle private information. We will only permit authorized employees to have access to such information.
5) Not disclose data about you or your business to any organization outside Our Group or to third party providers unless:
   a. we disclose to you our intent to do so; or
   b. we are required to do so by law.
6) Not disclose medical information unless:
   a. you give us written consent to do so; or
   b. We disclose for any exception provided in the law.
7) Attempt to keep our records complete and exact.
8) Advise you how and where to access your account (unless prohibited by law).
9) Advise you how to correct errors or make changes to your account.
10) Inspect our procedures to ensure your privacy.

## Collection and Sources of Information

We collect only the personal information needed to:
1) determine suitability for a product or service;
2) manage the product or service; and
3) advise customers about our products and services.

The information we collect comes from the following sources:
- **Submission** – In the application, you provide: your name; address; phone number; e-mail address; and other types of private information.
- **Quotes** – We collect information to determine:
  1) your eligibility for an insurance product; and
  2) your coverage cost.

The data we collect will vary with the type of insurance you seek.
- **Transactions** – We maintain records of all transactions with Our Group and our third party providers. Our records include:

1)   your coverage choices;
2)   premiums; billing; and payment records,
3)   claims history; and
4)   other data related to your account.

- **Claims** – We maintain records on any claims that are made under your policies. The investigation of a claim involves collection of a broad range of information. It also involves many issues, some of which do not directly involve you. We will share with you facts that we collect about your claim; unless prohibited by law. The process of claim investigation also involves advice; opinions; and comments from many people. These may include attorneys and experts. This will help us determine how best to handle your claim. To protect the legal and privileged aspects of opinions and advice, we will not disclose this information to you.
- **Credit and Financial Reports** – We may receive your credit history. This is to support information you provided during the submission and quote processes. This history will help to underwrite your coverage.

## Retention and Correction of Personal Information

We retain personal information only as long as required by law; or as required by our business methods. If we become aware that any information may be incorrect, we will make reasonable effort to correct it.

## Storage of Personal Information

Safeguards are in place to protect data and paper files containing personal information.

## Sharing/Disclosing of Personal Information

We do not share personal information with a third party outside of Our Group for marketing purposes. This is true unless such sharing is permitted by law. Information may be shared with a third party for necessary servicing of the product. It may also be disclosed for other business reasons as permitted by law.

We do not share personal data outside of Our Group for servicing or joint marketing reasons. We will only disclose such data when a contract containing non-disclosure language has been signed by us and the third party.

Unless a consumer consents, we do not disclose "consumer credit report" type information outside of Our Group. "Consumer credit report type information" means such things as: net worth; credit worthiness; hobbies (piloting, boating, etc.); solvency; etc.

We also do not disclose outside of Our Group personal information for use in marketing. We may share information within Our Group regarding our experience and dealings with the customer.

We may disclose private information about a customer as allowed or otherwise required by law. The law allows us to share a customer's financial data within Our Group for marketing purposes. The law does not allow customers to limit or prevent such disclosures.

We may also disclose personal information about you or your business to:
- your independent agent or broker;
- an independent claim adjuster; investigator; attorney; or expert;
- persons or groups that conduct scientific studies. This includes actuaries and accountants;
- a medical care facility or professional to verify coverage for a covered person;
- an insurance support group;
- another insurer if to prevent fraud;
- another insurer to properly underwrite a risk;
- insurance regulators;
- governmental authorities pursuant to law;
- an authority in response to a valid administrative or judicial order. This includes a warrant or subpoena;
- a party for the following purposes regarding a book of business: sale; transfer; merger; or consolidation. This applies whether the transaction is proposed or complete;

- a professional peer review group.  This includes reviewing the service or conduct of medical care facilities or personnel;
- a covered person for providing the status of a transaction; or
- any of the following: a lienholder; mortgagee; assignee; lessor; or other person of record having a legal interest in the policy.

## Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer; unless consent is obtained from that customer.  However, such consent shall not be prohibited, limited or sought for certain insurance functions.  This includes, but is not limited to:
   a.   claims administration;
   b.   fraud prevention;
   c.   underwriting; policy placement or issuance; loss control or auditing.

## Access to Your Information

The following persons will have access to personal information we collect:
employees of Our Group and third party service providers.  Information will only be collected as is needed in transactions with you.

## Violation of the Privacy Policy

Any person violating this Policy will be subject to discipline. This may include termination.


For questions regarding this privacy statement, please contact your broker.

# MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT INSURANCE COVERAGE FORM

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to Executive Liability Underwriters, the Underwriting Manager for the Insurer identified in the Declarations (hereinafter the Insurer) including the Application and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:**

## I.   INSURING AGREEMENTS

(A)   The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act**, except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)   The Insurer shall pay on behalf of the **Company Loss** which the **Company** is required or permitted to pay as indemnification to any of the **Insured Persons** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act**.

(C)   The Insurer shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Company Wrongful Act**.

## II.   DEFINITIONS

(A)   **"Application"** means:

    (1)   the application attached to and forming part of this Policy; and

    (2)   any materials submitted therewith, which shall be retained on file by the Insurer and shall be deemed to be physically attached to this Policy.

(B)   **"Change In Control"** means:

    (1)   the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity;

    (2)   the acquisition by any person, entity or affiliated group of persons or entities of the right to vote, select or appoint more than fifty percent (50%) of the directors of the **Parent Company**; or

    (3)   the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the **Parent Company**.

(C)   **"Claim"** means:

    (1)   a written demand for monetary or non-monetary relief;

    (2)   any civil proceeding in a court of law or equity, or arbitration;

    (3)    any criminal proceeding which is commenced by the return of an indictment; and

    (4)    a formal civil, criminal, administrative regulatory proceeding or formal investigation of an **Insured Person** or the **Company** (but only with respect to the **Company** only for a **Company Wrongful Act**) which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying in writing such **Insured Person** or the **Company** as a person or entity against whom a proceeding as described in (C)(2) or (3) above may be commenced, including any proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body having jurisdiction over any **Employment Practices Wrongful Act**.

(D)    "**Company**" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to GENERAL CONDITIONS VI (D).

(E)    "**Company Wrongful Act**" means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the **Company** in connection with a **Securities Claim**.

(F)    "**Defense Expenses**" means reasonable legal fees and expenses incurred in the defense of any **Claim** including the premium for an appeal bond, attachment bond or similar bond but will not include applying for or furnishing such bond. **Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers or employees.

(G)    "**Employment Practices Wrongful Act**" means any actual or alleged:

    (1)    wrongful termination of employment whether actual or constructive;

    (2)    employment discrimination of any kind including violation of any federal, state or local law involving employment or discrimination in employment which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee, because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status;

    (3)    sexual or other harassment in the workplace; or

    (4)    wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, or refusal to hire.

(H)    "**Employment Practices Claim**" means a **Claim** alleging an **Employment Practices Wrongful Act**.

(I)    "**Insured**" means the **Insured Persons** and the **Company**.

(J)    "**Insured Person**" means:

    (1)    any past, present or future director or officer, or member of the Board of Managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

    (2)    any past, present or future employee of the **Company** to the extent any **Claim** is a **Securities Claim**;

    (3)    an individual identified in (J)(1) above who, at the specific written request of the **Company**, is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**;

    (4)    any individual identified in (J)(1) above who, at the specific written request of the **Company** is serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

DO 71 00 09 99

MANAGEMENT LIABILITY
DO 71 00 09 99

(5)  the lawful spouse of any person set forth in the above provisions of this definition, but only to the extent the spouse is a party to any **Claim** solely in their capacity as a spouse of such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and spouse, or property transferred from any such person to the spouse.

In the event of the death, incapacity or bankruptcy of an individual identified in (J)(1), (2), (3), (4) or (5) above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** or **Employment Practices Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

(K)  "**Interrelated Wrongful Acts**" means any **Wrongful Act, Company Wrongful Act**, or **Employment Practices Wrongful Act** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events.

(L)  "**Joint Venture**" means any corporation, partnership, joint venture, association or other entity, other than a **Subsidiary**, during any time in which the **Parent Company**, either directly or through one or more **Subsidiary(s)**;

(1)  owns or controls at least thirty three percent (33%), but not more than fifty percent (50%), in the aggregate of the outstanding securities or other interests representing the right to vote for the election or appointment of those persons of such an entity occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

(2)  has the right, by contract, ownership of securities or otherwise, to elect, appoint or designate at least thirty three (33%) of those persons described in (L)(1) above.

(M)  "**Loss**" means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and **Defense Expenses** in excess of the Retention that the **Insured** is legally obligated to pay. **Loss** will not include:

(1)  the multiplied portion of any damage award;

(2)  fines, penalties or taxes imposed by law; or

(3)  matters which are uninsurable under the law pursuant to which this **Policy** is construed.

**NOTE:** With respect to judgments in which punitive damages are awarded, the coverage provided by this **Policy** shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the **Insured**, punitive damages are insurable under applicable law the **Insurer** will not dispute the written opinion of counsel for the **Insured**.

(N)  "**Non-Profit Entity**" means a corporation or organization other than the **Company**, which is exempt from taxation under Section 501(c)(3), (4) and (10) of the Internal Revenue Code as amended or any rule or regulation promulgated thereunder.

(O)  "**Parent Company**" means the entity named in ITEM 1 of the Declarations.

(P)  "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

(Q)    **"Securities Claim"** means a Claim made against an **Insured** for:

    (1)    any actual or alleged violation of the Securities Act of 1933 as amended, the Securities Exchange Act of 1934 as amended, any similar federal or state statute or any rules or regulations promulgated thereunder; or

    (2)    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty arising from or in connection with the purchase or sale of, or offer to purchase or sell any securities issued by the **Company**, whether such purchase, sale or offer involves a transaction with the **Company** or occurs in the open market.

(R)    **"Subsidiary"** means any entity during any time in which the **Parent Company** owns, directly or through one or more **Subsidiary(s)**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

(S)    **"Wrongful Act"** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by any **Insured Person** while acting in his or her capacity as an:

    (1)    **Insured Person** of the **Company** or a person serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary**;

    (2)    **Insured Person** of the **Company** who at the specific written request of the **Company** is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**; or

    (3)    **Insured Person** of the **Company**, who at the specific written request of the **Company** is serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**.

## III.    EXCLUSIONS

The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured Person**, or with respect to INSURING AGREEMENT (C), the **Company**:

(A)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this EXCLUSION (A) will not apply to any allegations of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of an **Employment Practices Claim** for an **Employment Practices Wrongful Act**;

(B)    for any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste.  With respect to a **Claim** made under INSURING AGREEMENT (A) only, this EXCLUSION (B) will not apply to a **Claim** unless a court of competent jurisdiction specifically determines the **Company** is not permitted to indemnify the **Insured Person**;

    **NOTE:**  EXCLUSIONS (A) and (B) above will not apply with respect to a **Securities Claim** brought by a security holder of the **Company**, or a derivative action brought by or on behalf of, or in the name or right of, the **Company**, and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, an **Insured**.

(C)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation;

(D)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to the Pending and Prior Litigation Date set forth in **ITEM 6** of the Declarations;

(E)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

(F)      brought about or contributed to in fact by any:

     (1)      intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

     (2)      profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

     as determined by a final adjudication in the underlying action or in a separate action or proceeding;

(G)      by, on behalf of, or at the direction of the **Company**, except and to the extent such **Claim**:

     (1)      is brought derivatively by a security holder of the **Company** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of an **Insured Person** or the **Company**; or

     (2)      is brought by the Bankruptcy Trustee or Examiner of the **Company** or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company**;

(H)      by, on behalf of, at the direction of or in the name or right of any **Non-Profit Entity** or **Joint Venture** against an **Insured Person** for a **Wrongful Act** or **Employment Practices Wrongful Act** while acting in his or her capacity as a director, officer, trustee, regent or governor of such, or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated; or

(I)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an **Insured Person** acting in their capacity as a **Insured Person** of any entity other than the **Company**, **Non-Profit Entity** or **Joint Venture**.

No conduct of any **Insured Person** will be imputed to any other **Insured** to determine the application of any of the above EXCLUSIONS.

## IV.      LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS

(A)      The Insurer shall pay the amount of **Loss** in excess of the applicable Retention(s) set forth in **ITEM 4** of the Declarations up to the Limit of Liability set forth in **ITEM 3** of the Declarations.

(B)      The amount set forth in **ITEM 3** of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy. Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(C)     With respect to the **Company's** indemnification of its **Insured Persons**, the certificate of incorporation, charter, by-laws, articles of association, or other organizational documents of the **Parent Company**, each **Subsidiary** and each **Non-Profit Entity** or **Joint Venture**, will be deemed to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

(D)     The Retention applicable to INSURING AGREEMENT (B) shall apply to any **Loss** as to which indemnification by the **Company**, **Non-Profit Entity** or **Joint Venture** is legally permissible, whether or not actual indemnification is made unless such indemnification is not made by the **Company**, **Non-Profit Entity** or **Joint Venture** solely by reason of its financial insolvency. In the event of financial insolvency, the Retention(s) applicable to INSURING AGREEMENT (A) shall apply.

(E)     If different retentions are applicable to different parts of any **Loss**, the applicable Retention(s) will be applied separately to each part of such **Loss**, and the sum of such Retention(s) will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

(F)     Notwithstanding the foregoing, solely with respect to a **Securities Claim**, no Retention shall apply to such **Claim** and the Insurer will reimburse those **Defense Expenses** incurred by the **Insured** if:

(1)     the **Securities Claim** is dismissed, or there is a stipulation to dismiss the **Securities Claim**, with or without prejudice and without the payment of any monetary consideration by the **Insured**;

(2)     there is a final judgment of no liability obtained prior to or during trial, in favor of the **Insured**, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or

(3)     there is a final judgment of no liability obtained after trial, in favor of the **Insured**, after the exhaustion of all appeals.

Any reimbursement in the case of (F)(1), (2), or (3) above will only occur if ninety (90) days after the date of dismissal, stipulation, final judgment of no liability is obtained and only if:

(a)     the same **Securities Claim** (or a **Securities Claim** containing **Interrelated Wrongful Acts**) is not brought again within that time; and

(b)     the **Insured** provides the Insurer with an Undertaking in a form acceptable to the Insurer that such reimbursement of the applicable Retention(s) will be paid back to the Insurer in the event the **Securities Claim** (or a **Securities Claim** containing **Interrelated Wrongful Acts**) is brought after the ninety (90) day period.

V.     DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS

(A)     It shall be the duty of the **Insured** and not the duty of the Insurer to defend any **Claim** under this Policy.

(B)     No Insured may incur any Defense Expenses or admit liability for, make any settlement offer with respect to, or settle any Claim without the Insurer's consent, such consent not to be unreasonably withheld.

(C)     Upon the written request of an **Insured**, the Insurer will advance **Defense Expenses** on a current basis in excess of the applicable Retention, if any, before the disposition of the **Claim** for which this policy provides coverage. As a condition of the advancement of **Defense Expenses**, the Insurer may require a written undertaking, in a form satisfactory to the Insurer, which will guarantee the repayment of any **Loss** including **Defense Expenses** paid to or on behalf of the **Insured** if it is finally determined that the **Loss** incurred is not covered under this Policy.

(D)     If both Loss covered by this Policy and Loss not covered by this Policy are incurred, either because a **Claim** made against the **Insured** contains both covered and uncovered matters, or because a **Claim** is made against both the **Insured** and others (including the **Company** for **Claims** other than **Securities Claims**) not insured

under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of **Loss** that is not covered under this Policy. Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by, the **Insured** and others.

(E)   In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in (D) above, then the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.   GENERAL CONDITIONS

### (A)   NOTICE

(1)   As a condition precedent to any right to payment under this Policy with respect to any **Claim**, the **Insured** shall give written notice to the Insurer of any **Claim** as soon as practicable after it is first made.

(2)   If, during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** and if, during the **Policy Period**, the **Insured**:

(a)   provides the Insurer with written notice of the specific **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, the circumstances by which the **Insured** first became aware of such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**; and

(b)   requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**;

then any **Claim** subsequently made arising out of such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** will be treated as if it had been first made during the **Policy Period**.

(3)   All notices under GENERAL CONDITIONS (A)(1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 7 of the Declarations; Attention: Claim Department.

### (B)   INTERRELATED CLAIMS

All **Claims** arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the time at which the earliest such **Claim** is made or deemed to have been made pursuant to GENERAL CONDITIONS (A)(1) above or GENERAL CONDITIONS (A)(2), if applicable.

### (C)   OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES

(1)   All **Loss** payable under this Policy will be specifically excess of and will not contribute with any other insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy. This Policy will not be subject to the terms of any other insurance policy.

(2)    All coverage under this Policy for **Loss** from **Claims** made against the **Insured Persons** while acting in their capacity as a director, officer, trustee, regent or governor of a **Non-Profit Entity** or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the **Insured Persons** of the Company, regardless of the name or title by which such position is designated, of a **Joint Venture** will be specifically excess of and will not contribute with, any other insurance or indemnification available to such **Insured Person** from such **Non-Profit Entity** or **Joint Venture** by reason of their service as such.

(D)    **MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)**

(1)    If during the **Policy Period**, the **Company** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage shall be provided for any **Loss** involving a **Claim** for a **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** occurring after the consummation of the transaction.

(2)    If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the entity, assets, **Subsidiary** or liabilities so acquired or so assumed, exceed thirty five percent (35%) of the total assets or liabilities of the **Company**, as represented in the **Company's** most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days for any **Loss** involving a **Claim** for a **Wrongful Act, Company Wrongful Act,** or **Employment Practices Wrongful Act** that occurred after the transaction has been consummated. Coverage beyond the ninety (90) day period will be provided only if:

    (a)    the Insurer receives written notice containing full details of the transaction(s); and

    (b)    the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

(3)    With respect to the acquisition, assumption, merger, consolidation or otherwise of any entity, asset, **Subsidiary** or liability as described in (D)(1) and (2) above, there will be no coverage available under this Policy for **Claims** made against the acquired, assumed, merged, or consolidated entity, asset, **Subsidiary**, liability, or **Insured Person** for a **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** committed any time during which such entity, asset, liability or **Subsidiary** is not an **Insured**.

(4)    If during the **Policy Period** any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who, because of their service with such **Subsidiary**, were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the Company.

(5)    If, during the **Policy Period**, there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** against an **Insured** for a **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** committed or allegedly committed up to the time of the **Change In Control**; and

    (a)    coverage will cease with respect to any **Claim** for a **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** committed subsequent to the **Change In Control**; and

    (b)    the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control**.

(E)    **CANCELLATION AND RENEWAL OF COVERAGE**

(1)    Except for the nonpayment of premium, as set forth in (E)(2) below, the **Parent Company** has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)    The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation will be sent to the **Parent Company** and the agent of record for the **Insured**, if applicable.

(3)    The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Parent Company** written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

(F)    **OPTIONAL EXTENSION PERIOD**

(1)    If either the **Parent Company** or the Insurer does not renew this Policy, the **Parent Company** shall have the right, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to an extension of the coverage provided by this Policy with respect only to any **Claim** first made during the period of time set forth in ITEM 5 of the Declarations after the Policy Expiration Date, but only with respect to a **Wrongful Act, Company Wrongful Act, or Employment Practices Wrongful Act,** occurring prior to the Policy Expiration Date.

(2)    As a condition precedent to the right to purchase the Optional Extension Period the total premium for this Policy must have been paid in full. The right of the **Parent Company** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)    If the **Parent Company** elects to purchase the Optional Extension Period as set forth in (F)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(4)    The purchase of the Optional Extension Period will not in any way increase the Limit Of Liability set forth in ITEM 3 of the Declarations, and the Limit of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to the Limit of Liability for all **Claims** made during the **Policy Period**.

(G)    **ASSISTANCE, COOPERATION AND SUBROGATION**

(1)    The **Insured** agrees to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request, and further agree that they will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery.

(2)    In the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the **Insured**. The **Insured** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in their name, and will provide all other assistance and cooperation which the Insurer may reasonably require.

(H)    **EXHAUSTION**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss**, the premium as set forth in ITEM 8 of the Declarations will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

(I)    **REPRESENTATION CLAUSE**

The **Insured** represents that the statements and particulars contained in the Application as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are material to the risk assumed and form the basis of this Policy. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person(s) who signed the **Application**. In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

(J)    **ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

(1)    No action may be taken against the Insurer unless, as a condition precedent thereto:

(a)    there has been full compliance with all of the terms and conditions of this Policy; and

(b)    the amount of the obligation of the **Insured** has been finally determined either by judgment against the Insured after actual trial, or by written agreement of the Insured, the claimant and the Insurer.

(2)    Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the Insurer to determine their liability, nor may the Insured implead the Insurer in any **Claim.**

(3)    Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

(4)    Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations may only be waived or changed by written endorsement.

(K)    **AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Parent Company** will act on behalf of the Company and the **Insured Persons** with respect to:

(1)    the payment of the premiums;

(2)    the receiving of any return premiums that may become due under this Policy;

(3)    the giving of all notices to the Insurer as provided herein; and

(4)    the receiving of all notices from the Insurer.

(L)    ENTIRE AGREEMENT

The **Insured** agrees that the Declarations, Policy, including the endorsements, attachments and the **Application** shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.

| | |
|---|---|
| **Endorsement No.: 1** | **Effective: May 16, 2007** |
| **Named Insured: Lehman Brothers Holdings Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU097792-07** | **Insurer: XL Specialty Insurance Company** |

# CHANGE OF ADDRESS OF INSURER ENDORSEMENT

In consideration of the premium charged, as of the effective date of this Endorsement:

Notices required to be given to the Insurer must be addressed to:

|  |  |
|---|---|
| Notice to Claim Dept: | All other Notices: |
| XL Professional<br>One Hundred Constitution Plaza, 18th Floor<br>Hartford, CT 06103<br>Attn: Claim Dept | XL Professional<br>One Hundred Constitution Plaza, 17th Floor<br>Hartford, CT 06103<br>Attn: Underwriting |

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 2**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# TERRORISM PREMIUM ENDORSEMENT

Please note: The portion of your annual premium set forth in Item 8. of the Declarations that is attributable to coverage for acts of terrorism is: $ waived.

All other terms, conditions and limitations of this Policy shall remain unchanged.

XL 80 24 03 03                                                                                                    Page 1 of 1

| | |
|---|---|
| Endorsement No.: 3 | DO 85 01 01 02 |
| Named Insured: Lehman Brothers Holdings Inc. | Effective: May 16, 2007 |
| Policy No.: ELU097792-07 | 12:01 A.M. Standard Time |
| | Insurer: XL Specialty Insurance Company |

## NEW YORK ADDENDUM TO DECLARATIONS

1.  The Declarations to the Management Liability and Company Reimbursement Insurance Policy is amended by the addition of the following:

THIS IS A CLAIMS MADE POLICY, EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD, THE AUTOMATIC EXTENSION PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD. NO COVERAGE EXISTS FOR CLAIMS MADE AFTER THE END OF THE POLICY PERIOD OR THE AUTOMATIC EXTENSION PERIOD UNLESS, AND TO THE EXTENT, THE OPTIONAL EXTENSION PERIOD APPLIES. UPON TERMINATION OF COVERAGE FOR ANY REASON, A 60-DAY AUTOMATIC EXTENSION PERIOD WILL APPLY. FOR AN ADDITIONAL PREMIUM AN OPTIONAL EXTENSION PERIOD OF AT LEAST ONE YEAR CAN BE PURCHASED AS INDICATED IN ITEM 5 OF THE DECLARATIONS. NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE AUTOMATIC EXTENSION PERIOD OR, IF PURCHASED, THE OPTIONAL EXTENSION PERIOD, WHICH MAY RESULT IN A POTENTIAL COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT SUBSEQUENTLY PROVIDED BY ANOTHER INSURER. DURING THE FIRST SEVERAL YEARS OF A CLAIMS-MADE RELATIONSHIP, CLAIMS-MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED CAN EXPECT SUBSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE INCREASES, UNTIL THE CLAIMS-MADE RELATIONSHIP REACHES MATURITY.

2.  Item 5. is deleted in its entirety and amended to read as follows:

**Item 5.    Optional Extension Period and Premium (if purchased at the election of the Parent Company):**

| Length of Optional Extension Period | Optional Extension Premium |
|---|---|
| 1 year | 90% of policy premium |
| 2 years | 180% of policy premium |
| 3 years | 205% of policy premium |

3.  Item 7. is amended by the addition of the following:

Notwithstanding the foregoing, notice given by or on behalf of the Insured or written notice by or on behalf of the injured person or any other claimant, to any licensed agent of the Insurer in this state shall be deemed notice to the Insurer.

**Endorsement No.: 4**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# NEW YORK COINSURANCE ENDORSEMENT

Solely for the purpose of the coverage provided under Insuring Agreement I.A., in accordance with New York State Laws BCL section 726(a)(3):

1.    the **Insured Persons** are liable to coinsure 0.5% of **Loss** in excess of the applicable Retention for the first $1,000,000 of coverage; and

2.    the retention (under Insuring Agreement I.A.) shall be $5,000 each **Insured Person**, not to exceed $50,000 in the aggregate.

The **Insured Persons** shall not be liable to coinsure any **Loss** in excess of the first $1,000,000 of **Loss** in excess of the applicable retention.

**Endorsement No.: 5**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# NEW YORK DEFENSE EXPENSES DISCLOSURE

Defense Expenses reduce and may completely exhaust the Limit of Liability. To the extent the Limit of Liability is exceeded, the Insurer shall not be liability for Defense Expenses or for the amount of any judgment or settlement. Defense Expenses are also applied to the Retention.

This form shall be attached to and made part of the Policy.

The below Officer of the Parent Company, on behalf of the Insureds, acknowledges that he/she read this form and understands the above provisions.

DO 96 02 02 00

**Endorsement No.: 6**                              **Effective: May 16, 2007**
**Named Insured: Lehman Brothers Holdings Inc.**    **12:01 A.M. Standard Time**
**Policy No.: ELU097792-07**                        **Insurer: XL Specialty Insurance Company**

# NEW YORK DISCLOSURE STATEMENT

This Policy is a claims-made policy.

Coverage under this Policy or any subsequent renewal of this Policy, subject to the terms of the applicable policy, applies only to any "Claim" (as defined herein) made against the Insureds, or specific Wrongful Act, Employment Practices Wrongful Act or Company Wrongful Act reported during the Policy Period of this Policy or the applicable renewal policy.  All coverage under this Policy ceases upon Termination of Coverage, except for the Automatic Extension Period unless the Optional Extension Period is purchased.

The below officer of the Parent Company, on behalf of the Insureds, acknowledges that he/she has received information from the Insurer or its agent explaining the limitations and potential gaps in coverage of a claims-made policy and that he/she understands these limitations and potential gaps in coverage.

This Policy includes a 60-day automatic extended reporting period, referred to as the Automatic Extension Period.

This Policy provides the Insured with the option to purchase for an additional premium at least a one-year Optional Extension Period from the termination of this Policy.  The premium for the Optional Extension Period is indicated in Item 5. of the Policy's Declarations.

During the first several years of a claims-made relationship between the Insureds and the Insurer, claims-made rates are relatively lower than occurrence rates, and the Insured can expect substantial annual premium increases independent of overall rate level increases, until the claims-made relationships reaches maturity.

Endorsement No.: 7
Named Insured: Lehman Brothers Holdings Inc.
Policy No.: ELU097792-07

Effective: May 16, 2007
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# NEW YORK AMENDATORY ENDORSEMENT

1.    Clause II. DEFINITIONS (G)(2) is deleted and replaced by the following:

(2)    vicarious liability for employment discrimination of any kind including violation of any federal, state or local law involving employment or discrimination in employment which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status; or disparate impact discrimination in employment.

2.    Clause II. DEFINITIONS (G)(3) is deleted and replaced by the following:

(3)    vicarious liability for sexual or other harassment in the workplace: or

3.    Clause II. DEFINITIONS (M) is deleted and replaced by the following:

(M)    "Loss" means damages, judgments, settlements or other amounts and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay.  Loss will not include:

(1) punitive damages or exemplary damages or the multiplied portion of any damage award:

(2) fines, penalties or taxes imposed by law; or

(3) matters which are uninsurable under the law pursuant to which this Policy is construed.

4.    Clause II. DEFINITIONS is amended by addition of the following:

"(T)    'Termination of Coverage' means (1) the Policy expiration date set forth in Item 2., of the Declarations, or its earlier cancellation date, or (2) a decrease in limits, a reduction in coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the Insured."

5.    Clause III. EXCLUSIONS (F) is deleted and replaced by the following:

"(F)    brought about or contributed to by any:

(1)    intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

(2) profit or remuneration gained by any Insured to which such Insured is not legally entitled; "

6.    Notwithstanding anything to the contrary in the Declarations and Clause VI. GENERAL CONDITIONS (A), notice of any Claim may also be provided to any authorized agent of the Insurer located within the state of New York".

7.    Clause VI. GENERAL CONDITIONS (C) OTHER INSURANCE AND SERVICE IN CONNECTION WITH  NON-PROFIT ENTITIES AND JOINT VENTURES (1) is deleted and replaced by the following:

"(1)    "If any Loss resulting from any Claim is insured under any other policy(ies), this Policy shall apply only to the extent Loss exceeds the amount paid under such other valid and collectible insurance whether such other insurance is stated to be primary, contributory,

excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over this Policy."

8.    Clause VI. GENERAL CONDITIONS (E) CANCELLATION AND RENEWAL OF COVERAGE (3) is deleted and replaced by the following:

"(3)    The Insurer is under no obligation to renew this Policy upon its expiration.  Once the Insurer chooses to non-renew this Policy or conditions its renewal upon a change in the Limit of Liability, change in type of coverage, reduction of coverage, increased retention, the addition of any exclusion or an increase in premium in excess of 10%, then the Insurer shall mail or deliver written notice of the refusal to renew or the conditional renewal to the Parent Company at the mailing address shown on the Policy and to the Insureds' authorized agent at least sixty (60) days but not more than one hundred and twenty (120) days in advance of the expiration date of the Policy.  Such notice shall contain the specific reasons for the refusal to renew or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

If the Insurer does not provide notice of nonrenewal or conditional renewal as provided in Clause VI.(E)(3), coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the Parent Company, during this 60-day period, has replaced the coverage or elects to cancel.

If the Insurer provides notice of nonrenewal or conditional renewal on or after the expiration date of this Policy, coverage will remain in effect at the same terms and conditions of this Policy for another Policy Period, at the lower of the current rates or the prior period's rates, unless the Parent Company, during the additional Policy Period, has replaced the coverage or elects to cancel.

The Insurer will not send the Insureds notice of nonrenewal or conditional renewal if the Insureds, their authorized agent or another insurer of the Insureds mail or deliver notice that the Policy has been replaced or is no longer desired.

If the Insureds elect to accept the terms, conditions and rates of the conditional renewal notice pursuant to Clause VI.(E)(3), a new aggregate Limit of Liability shall become effective as of the inception date of renewal, subject to regulations promulgated by the Superintendent of Insurance."

9.    Clause VI. GENERAL CONDITIONS (F) OPTIONAL EXTENSION PERIOD is deleted and replaced by the following:

"(1)    If either the Parent Company or the Insurer cancels or does not renew this Policy, or if the Parent Company or Insurer offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, an increase in premium in excess of 10% over the current Policy's premium, or any change in coverage less favorable to the Insured, then, without any additional premium being required, there shall be an automatic extension of the coverage granted by this Policy with respect to any Claim first made during a period of sixty (60) days immediately following the Termination of Coverage, but only with respect to a Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act committed before the Termination of Coverage, provided such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act is otherwise covered by this Policy.  This 60-days period shall be referred to as the 'Automatic Extension Period'  The granting of such Automatic Extension Period shall not serve to increase the Limit of Liability set forth in Item 3., of the Declarations applicable to the Policy Period and Automatic Optional Extension Period.

(2)    If either the Parent Company or the Insurer cancels or does not renew this Policy, or if the Parent Company or Insurer offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, an

increase in premium in excess of 10% over the current Policy's premium, or any change in coverage less favorable to the Insured, then the Parent Company shall have the right, upon payment of an additional premium set forth in Item 5 of the Declarations, to an extension of the coverage provided by this Policy with respect only to any Claim first made during the period of time set forth in Item 5 of the Declarations after the date upon which the Automatic Extension Period ends.  However, the extension of coverage applies only to a Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act committed before the Termination of Coverage provided such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act is otherwise covered by this Policy.  This additional period of coverage shall be referred to as the 'Optional Extension Period'  Except in the Declarations to the Policy and this Clause VI., the Automatic Extension Period may also be referred to as the Optional Extension Period.

(3)     The Limit of Liability applicable to the Optional Extension Period, if any, shall be at least equal to the amount of coverage remaining in the Policy's Limit of Liability set forth in Item 3. of the Declarations.

(4)     The Insurer shall provide written notice to the Parent Company of the Automatic Optional Extension Period and the availability of, the premium for, and the importance of purchasing, the Additional Optional Extension Period within thirty (30) days after the Termination of Coverage.

(5)     The right to purchase the Optional Extension Period shall terminate unless written notice is given to the Insurer within sixty (60) days from the Termination of Coverage, or within thirty (30) days after the mailing or delivery of the notice provided by the Insurer under Clause VI.(4), above, which ever is greater, together with full payment of the premium for the Additional Optional Extension Period.  If such notice and premium payment are not so given to the Insurer, the Parent Company will not be able to exercise the right to purchase the Additional Optional Extension Period.

(6)     If the Optional Extension Period is purchased, the entire premium shall be deemed earned at its commencement and if the Parent Company terminates the Optional Extension Period before its term, the Insurer shall not be liable to return any portion of the premium paid for the Additional Optional Extension Period.  The premium charged for the Additional Optional Extension Period shall be based upon the rates in effect on the date this Policy was issued or last renewed.

(7)     In the event the Parent Company is in liquidation or bankruptcy, or permanently ceases operation, and if the Parent Company or its designated trustee, although entitled to, does not purchase the Optional Extension Period, any Directors and Officers insured under this Policy who request the Optional Extension Period within 120 days of the Termination of Coverage may purchase the Optional Extension Period, as provided in Clause VI.(2), above.

(8)     A person employed or otherwise affiliated with the Insured and covered by this Policy during such affiliation shall continue to be covered under this Policy and any Optional Extension Period after such affiliation has ceased for such person's covered acts or omissions during such affiliation.

(9)     Upon Termination of Coverage, any return premium due the Insured shall be applied to the premium for the Optional Extension Period if the Insured elects to purchase such coverage. Where the premium is due to the Insurer, any payment received by the Insurer from the Insured as payment for the Optional Extension Period shall be first applied to any premium due for the Policy.

(10)    In the event similar insurance to that provided by this Policy is in force during the Optional Extension Period, the coverage afforded during the Optional Extension Period shall be excess over any such valid and collectible insurance."

10.    Clause VI. GENERAL CONDITIONS (I) REPRESENTATION CLAUSE is amended by the addition of the following:

"However, no misrepresentation shall be deemed material unless knowledge by the Insured of the facts misrepresented would have led to a refusal by the Insurer to issue the Policy."

11.    Clause VI. GENERAL CONDITIONS (J) ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY (4) is deleted and replaced by the following:

"Notice given by or on behalf of the Insured or written notice by or on behalf of the injured person or any other claimant, to any licensed agent to the Insurer in this state shall be deemed notice to the Insurer."

12.    Clause VI. GENERAL CONDITIONS (J) ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY (1) is amended by addition of the following:

"(c)    If the Insurer does not pay any judgment covered by the terms of this Policy within thirty (30) days from the service of notice of the judgment upon the Insured or its attorney and the Insurer, then an action may be brought against the Insurer under the terms of the Policy for the amount of judgment not exceeding the amount of the applicable Limit of Liability under the Policy, except during a stay or limited stay of execution against the Insured on such judgment."

13.    This Policy is amended by the addition of the following:

"The insolvency or bankruptcy of the Insureds, or the insolvency of their estates, shall not release the Insurer from the payment of Loss not otherwise excluded under this Policy."

**Endorsement No.: 8**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND SECTION IV ENDORSEMENT

In consideration of the premium charged, Section IV Limit of Liability, Indemnification and Retentions (F) of the Policy is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 80 142 10 01

Page 1 of 1

Endorsement No.: 9                                          Effective: May 16, 2007
Named Insured: Lehman Brothers Holdings Inc.                12:01 A.M. Standard Time
Policy No.: ELU097792-07                                    Insurer: XL Specialty Insurance Company

# DELETE INSURING AGREEMENT (C) ENDORSEMENT

In consideration of the premium charged:

(1)    Section I Insuring Agreement (C) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (C) are deleted.

(2)    The term "Company Wrongful Act," as defined in Section II Definitions (E) of the Policy, is deleted in its entirety and all references in the Policy to "Company Wrongful Act" are deleted.

(3)    Section II Definitions (Q) is deleted in its entirety and replaced by the following:

(Q)    "Securities Claim" means a Claim made against an Insured Person for:

(1)    any actual or alleged violation of the Securities Act of 1933 as amended, the Securities Exchange Act of 1934 as amended, any similar federal or state statute or any rules or regulations promulgated thereunder; or

(2)    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty arising from or in connection with the purchase or sale of, or offer to purchase or sell any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market;

(3)    any actual or alleged violation of any federal, state or local law (whether statutory or common law), rule or regulation in connection with the purchase or sale of, or offer to purchase or sell any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market."

(4)    Item 4. of the Declarations Page is deleted and replaced by the following:

Item 4    Retentions:

$0  each Insured Person under INSURING AGREEMENT I(A)
$10,000,000 each Claim under INSURING AGREEMENT I(B)"

(5)    Solely with respect to Securities Claims made against any of the Insured Persons, Item 4 of the Declarations is amended to read as follows:

Item 4    Retentions:

$0  each Insured Person under INSURING AGREEMENT I(A)
$10,000,000 each Claim under INSURING AGREEMENT I(B)"

With respect to all other Claims, Item 4 of the Declarations shall remain unchanged.

(6)    Solely in the event of a Securities Claim made against an Insured Person(s) and the Company, if both Loss covered by this Policy and loss not covered by this Policy are incurred because such Securities Claim is made against both the Insured Person and the Company (which is not insured under this Policy), the portion of Loss allocated to Insured Persons under this Policy shall in no event be less than one hundred percent (100%).

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 80 122 06 01

**Endorsement No.: 10**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND MERGERS & ACQUISITIONS ENDORSEMENT

In consideration of the premium charged, Section VI General Conditions (D)(2) of the Policy is amended to read in its entirety as follows:

    (2)    If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the entity, assets, Subsidiary or liabilities so acquired or so assumed, exceed twenty percent (20%) of the total assets or liabilities of the Company, as represented in the Company's most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days for any Loss involving a Claim for a Wrongful Act, Company Wrongful Act, or Employment Practices Wrongful Act that occurred after the transaction has been consummated.  Coverage beyond the ninety (90) day period will be provided only if:

        (a)    the Insurer receives written notice containing full details of the transaction(s); and

        (b)    the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate."

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 11

Named Insured: Lehman Brothers Holdings Inc.

Policy No.: ELU097792-07

DO 80 44 07 00

Effective: May 16, 2007

12:01 A.M. Standard Time

Insurer: XL Specialty Insurance Company

# AMEND NOTICE OF CLAIM

In consideration of the premium charged, for purposes of Section VI (A) Notice, the Insured will be deemed to have given the Insurer notice of a Claim as soon as practicable after such Claim is first made if the Risk Manager gives the Insurer written notice of such Claim as soon as practicable after first becoming aware thereof.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 12                                     DO 80 48 07 00
Named Insured: Lehman Brothers Holdings Inc.            Effective: May 16, 2007
Policy No.: ELU097792-07                                12:01 A.M. Standard Time
                                                        Insurer: XL Specialty Insurance Company

# AMEND DEFINITION OF COMPANY

In consideration of the premium charged, Section II (D), Definition of "Company," is amended to include:

> Any Non Profit foundation that is under the management control of the Company

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 80 48 07 00                                                    Page 1 of 1

**Endorsement No.: 13**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND NON-PROFIT ENTITY ENDORSEMENT

In consideration of the premium charged, the term "Non-Profit Entity," as defined in Section II Definitions (N) of the Policy, is amended to read in its entirety as follows:

(N)      'Non-Profit Entity' means any not-for-profit entity or not-for-profit organization.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 14
Named Insured: Lehman Brothers Holdings Inc.
Policy No.: ELU097792-07

Effective: May 16, 2007
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND EXCLUSION (F) ENDORSEMENT

In consideration of the premium charged, Section III Exclusions (F) of the Policy is amended to read in its entirety as follows:

(F)    brought about or contributed to in fact by any:

    (1)    intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

    (2)    profit or remuneration gained by any Insured to which such Insured is not legally entitled;

    as determined by a final adjudication."

All other terms, conditions and limitations of this Policy shall remain unchanged.

XL 80 22 05 02

**Endorsement No.: 15**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# DEBTOR IN POSSESSION ENDORSEMENT

In consideration of the premium charged, the term "Insured" shall include the Company as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code.

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 80 286 08 04

**Endorsement No.: 16**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# DOMESTIC PARTNER ENDORSEMENT

In consideration of the premium charged, Section II Definition (J)(5) of the Policy shall include the domestic partner of any person set forth in Section II Definition (J)(1) – (J)(4), but only to the extent the domestic partner is a party to any Claim solely in their capacity as a domestic partner to such persons and only for the purposes of any Claim seeking damages recoverable from community property, property jointly held by any such person and domestic partner, or property transferred from any such person to the domestic partner.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 17                                    Effective: May 16, 2007
Named Insured: Lehman Brothers Holdings Inc.           12:01 A.M. Standard Time
Policy No.: ELU097792-07                               Insurer: XL Specialty Insurance Company

# SPECIFIED OTHER INSURANCE ENDORSEMENT

In consideration of the premium charged:

(1)    Solely with respect to any Employment Practices Claim, it is understood and agreed that the coverage provided under this Policy will be specifically excess of, and will not contribute with, Policy Number BM00022400EP06A issued by XL Insurance (Bermuda) Ltd. and any other policy or policies excess thereof issued to the Insured, and no coverage will be available under this Policy for Claims as to which such other insurance applies unless and until the limit or limits of liability of such other insurance shall have been completely exhausted by the payment of loss thereunder.  Nothing herein shall be construed to limit, restrict or otherwise affect coverage under this Policy for Loss, including Defense Expenses, not covered under such other insurance.

(2)    Nothing in this endorsement is intended, nor shall it be construed, to make this Policy subject to any terms of any other insurance policy.

(3)    Section VI General Conditions (C) of the Policy shall be deemed to have been amended as necessary to effect the purpose and intent of this endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 18                          Effective: May 16, 2007
Named Insured: Lehman Brothers Holdings Inc.  12:01 A.M. Standard Time
Policy No.: ELU097792-07                     Insurer: XL Specialty Insurance Company

# AMEND DEFINITION OF INSURED PERSON

In consideration of the premium charged, the term "Insured Person" shall include those individuals holding the following positions for the Company:

    Position(s)

    De Facto Directors

All other terms, conditions and limitations of this policy shall remain unchanged.

**Endorsement No.: 19**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND GENERAL CONDITIONS (A)(2) ENDORSEMENT

In consideration of the premium charged, Section VI General Conditions (A)(2) of the Policy is amended to read in its entirety as follows:

(2)     If, during the Policy Period, or if applicable the Optional Extension Period, the Insured first becomes aware of a specific Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act and if, during the Policy Period, or if applicable the Optional Extension Period, the Insured:

(a)     provides the Insurer with written notice of the specific Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, the circumstances by which the Insured first became aware of such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act; and

(b)     requests coverage under this Policy for any subsequently resulting Claim for such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act;

then any Claim subsequently made arising out of such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act will be treated as if it had been first made during the Policy Period.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 1236 08 04

| | |
|---|---|
| Endorsement No.: 20 | Effective: May 16, 2007 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU097792-07 | Insurer: XL Specialty Insurance Company |

# AMEND DEFINITION OF LOSS ENDORSEMENT

In consideration of the premium charged, Section II Definitions (M) of the Policy is amended to read in its entirety as follows:

"(M)  'Loss' means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law and any prejudgment and post-judgment interest awarded on any judgment) and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay. Loss will not include:

(1)    the multiplied portion of any damage award;

(2)    fines, penalties or taxes imposed by law;

(3)    taxes or wages; or

(4)    matters which are uninsurable under the law pursuant to which this Policy is construed.

NOTE:  With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law.  If, based on the written opinion of counsel for the Insured, punitive damages are insurable under applicable law, the Insurer will not dispute the written opinion of the counsel for the Insured."

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 1236 08 04                                                                                          Page 1 of 1

Manuscript 1150 06 04

| | |
|---|---|
| **Endorsement No.: 21** | **Effective: May 16, 2007** |
| **Named Insured: Lehman Brothers Holdings Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU097792-07** | **Insurer: XL Specialty Insurance Company** |

# GENERAL E&O ENDORSEMENT
# (WITH MANAGEMENT CARVE-BACK)

In consideration of the premium charged:

(1)    No coverage will be available under this Policy for Claims for any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services for others or for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this Policy; provided that this exclusion will not apply solely with respect to a Claim to which Insuring Agreement (A) applies.

(2)    Paragraph (1) above is not intended, however, nor shall it be construed, to apply to a Claim against an Insured to the extent that such Claim is for a Wrongful Act by such Insured in connection with the management or supervision of any division, Subsidiary or group of the Parent Company offering any of the aforementioned services.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 6189 05 06

| | |
|---|---|
| Endorsement No.: 22 | Effective: May 16, 2007 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU097792-07 | Insurer: XL Specialty Insurance Company |

# PRIORITY OF PAYMENTS ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that if Loss, including Defense Expenses, shall be payable under more than one of the INSURING AGREEMENTS, then the Insurer shall, at the request of the chief financial officer of the Parent Company, to the maximum extent practicable and subject at all times to the Insurer's maximum aggregate Limit of Liability as set forth in ITEM 3 of the Declarations, pay such Loss as follows:

(1)    first, the Insurer shall pay that Loss, if any, which the Insurer may be liable to pay on behalf of the Insured Persons under INSURING AGREEMENT (A);

(2)    second, the Insurer shall pay that Loss, if any, which the Insurer may be liable to pay on behalf of the Company under INSURING AGREEMENT (B); and

(3)    third, the Insurer shall make such other payments which the Insurer may be liable to make under INSURING AGREEMENT (C) or otherwise.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 1034 02 04

Endorsement No.: 23
Named Insured: Lehman Brothers Holdings Inc.
Policy No.: ELU097792-07

Effective: May 16, 2007
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# INSURING AGREEMENT (A) ENDORSEMENT

In consideration of the premium charged, solely with respect to Claims made under Section I Insuring Agreements (A) of the Policy, the Insurer may not void and/or rescind this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

| | |
|---|---|
| **Endorsement No.: 24** | **Effective: May 16, 2007** |
| **Named Insured: Lehman Brothers Holdings Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU097792-07** | **Insurer: XL Specialty Insurance Company** |

# AMEND DEFINITION OF INSURED PERSON

In consideration of the premium charged, the term "Insured Person" shall include those individuals holding the following positions for the Company; provided that the Company indemnifies such individuals with respect to such position(s):

Position(s)

Trustees
Consultants
Officials or Advisors to the Company's Board of Directors

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 6191 05 06

**Endorsement No.: 25**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# LIMITED LIABILITY COMPANY ENDORSEMENT

In consideration of the premium charged:

(1)    The term "Subsidiary", as defined in Section II Definitions (R) of the Policy, is amended to include any limited liability company organized under the laws of any state, during any time in which the Company and/or the Insured Persons own(s), directly or indirectly, the right to elect, appoint or designate fifty percent (50%) or more of the members of such company's Board of Managers provided that the Company has "management control" of such entity and has an obligation to indemnify such entity's Insured Persons.

(2)    The term "Change In Control," as defined in Section II Definitions (B) of the Policy, is amended to read in its entirety as follows:

"(B)    'Change In Control' means:

(1)    the acquisition of the Parent Company by another entity, or the merger of the Parent Company into another entity such that the Parent Company is not the surviving entity, or the consolidation of the Parent Company with another entity, or the acquisition of substantially all of the assets of the Parent Company by another entity; or

(2)    the acquisition at any time or over a period of time during the Policy Period of record or beneficial ownership or control by any person, entity or affiliated group of persons or entities of fifty percent (50%) or more of the outstanding securities representing the present right to vote for the election of directors or member of the Board of Managers, as the case may be, of the Parent Company."

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 6191 05 06

Page 1 of 1

Endorsement No.: 26                          Effective: May 16, 2007
Named Insured: Lehman Brothers Holdings Inc.  12:01 A.M. Standard Time
Policy No.: ELU097792-07                      Insurer: XL Specialty Insurance Company

# CLARIFICATION ENDORSEMENT

In consideration of the premium charged, in the event that there is an inconsistency between a state amendatory attached to this Policy and any term or condition of this Policy, then it is understood and agreed that, where permitted by law, the Insurer shall apply those terms and conditions of either the state amendatory or the Policy which are more favorable to the Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 6474 05 07

| | |
|---|---|
| Endorsement No.: 27 | Effective: May 16, 2007 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU097792-07 | Insurer: XL Specialty Insurance Company |

# AMEND INSURED PERSON ENDORSEMENT

In consideration of the premium charged:

I.    The definition of "Insured Person," as set forth in Section II Definition (J) of the Policy, is amended to include the following:

"(6)    an individual identified in (J)(1) above who, at the request of the Company, is, was or will be serving as a director, officer, regent or governor of an Outside Entity;

(7)    the following individuals, in their capacity as a director or officer of the entities set forth below:

Henry Lentz – Peabody Energy Corp.
James Peet – SevenSpace, Inc.
James Peet – OpenReach, Inc.
James Peet – Network Telephone Corporation
James Peet – EpicRealm, Inc.
John Cecil – CP Kelco
Peter Cohen – First Capital Holdings
Richard Descherer – First Capital Holdings
William Mack – First Capital Holdings
Hingge Hsu - Aerovance
Hingge Hsu – Fluidigm
Hingge Hsu – Peak Surgical
Keith Greengrove – Grande Asset Development Public Co. Ltd.
Erik Van Kuelen – Grande Asset Development Public Co. Ltd.
Jason Dunn – Grande Asset Development Public Co. Ltd.
Xie Bingwu – Grande Asset Development Public Co. Ltd.
Mark Newman – Grande Asset Development Public Co. Ltd.
Kenneth Burd – Grande Asset Development Public Co. Ltd.
Jerome Calvet – SOFCO
Glenn McKenzie – Lehman Brothers Private Equity Advisers LLC and its portfolio companies
Nick Hill – Carpeta Center Comercio Internacional e Servicos Lda
Nick Hill – Lusotel – Industria Hoteleira Lda
Nick Hill – Sociedade Hoteleira Sao Lourenco Lda
Nick Hill – Sociedade Turistica da Penina SA
Richard E. Wenz – Hunter Fan Company
Richard E. Wenz – Hunter Fan Holdings, Inc.
Emilio Novela – Patentes Talgo
Jack Pope – Patentes Talgo
David Williams – European Seafood 1 Sarl, Heinz Seafood Luxemborg
David Williams – MW Brands SAS, Heinz Seafood France
Jose Arozamena - European Seafood 1 Sarl, Heinz Seafood Luxemborg
Jose Arozamena - MW Brands SAS, Heinz Seafood France
Michael Castleman – Touchstone Health Partnership Inc.
Michael Castleman – FuelQuest, Inc.

(8)     an individual identified in (J)(1) above who, at the request of the company is, was or will be serving as a director, officer, trustee, regent or governor of any entity as described in Section III of this endorsement, other than a Shadow Director Entity;

(9)     William Wesp in his capacity as a director, officer, trustee, regent or governor of Conseco Inc.;

(10)    an individual identified in (J)(1) above who is, was or will be serving as a Shadow Director of any Shadow Company (other than a Company or Joint Venture) that is incorporated or domiciled in the United Kingdom, as defined in Section 741 of the Companies Act 1985 (such entity, "Shadow Director Entity");

(11)    the lawful spouse or domestic partner of any person set forth in subparagraph (6)-(10) above, but only to the extent the spouse is a party to any Claim solely in their capacity as a spouse or domestic partner of such persons, and only for the purposes of any Claim seeking damages recoverable from marital community property, property jointly held by any such person and spouse or domestic partner, or property transferred from such person to the spouse.

In the event of the death, incapacity or bankruptcy of an individual identified in J(1)-(10) above, any Claim against the estate, heirs, legal representatives or assigns of such individual for a Wrongful Act or Employment Practices Wrongful Act of such individual will be deemed to a Claim against such individual."

II.    For purposes of this endorsement, the following terms shall have the meanings set forth below:

(1)    "Outside Entity" means any Non-Profit Entity (regardless if private or public) or any non-public for-profit entity, other than any Company or Joint Venture.

(2)    "New Public Outside Entity" means any public, for-profit entity, other than any Company, Joint Venture, Specified Entity, as described in Section III of this Endorsement, or Shadow Director Entity.

(3)    "Specified Entity" means:

    (a)    the entities set forth in Section I paragraph (J)(7) of this Endorsement; and

    (b)    the following entities:

        Peabody Energy Corp
        Seven Space, Inc.
        Open Reach, Inc.
        Network Telephone Corporation
        Epic Realm, Inc.
        CP Kelco APS
        First Capital Holdings
        St. Mary's NHS Trust
        RSI Holding Corporation
        Newcastle Investment Holdings Corp.
        Weatherford International Ltd.
        Gulfmark Offshore, Inc.
        Link Energy, LLC
        Walter Industries, Inc.
        Interstate Hotels Corp./Interstate Hotels & Resorts Inc.
        Blount International, Inc.
        R.G. Barry Corp.
        Automatic Data Processing

Delta – Galil Industries Ltd.
L-3 Communications Corporation
Imperial Sugar Company
Mahogany Capital Limited
Antero Resources Corporation
Pacific Energy Management LLC
Gulfmark International
Pemstar, Inc.
Regeneration Technologies, Inc.

(4)    "Directorship Entity" means any Outside Entity, New Public Outside Entity, Specified Entity, Non-Profit Entity, or Shadow Director Entity.

III.    New Positions

If, during the Policy Period, an individual identified in Section II Definition (J)(1) of the Policy provides service as a director, officer, trustee, regent or governor of a New Public Outside Entity upon the request of the Company, it shall be the Company's responsibility to report such position to the Insurer within 30 days of Company's risk management group's knowledge of such position.  Upon receiving such notice from the Company, the Insurer will then have 30 days, from its date of notice, to underwrite the risk and advise the Company if it will: (1) provide coverage for such Insured Person's service with the New Public Outside Entity pursuant to Section IV(1) of this Endorsement for no additional premium; (2) provide coverage for such Insured Person's service with the New Public Outside Entity pursuant to Section IV(1) of this Endorsement for an additional premium; or (3) provide coverage for such Insured Person's service with the New Public Outside Entity specifically excess of and without contributing to any other insurance or indemnification available to such Insured Person from any source, including from such New Public Outside Entity or the Company pursuant to Section IV(2) of this Endorsement.  If the Insurer does not provide the Company with its determination within 30 days, coverage for such New Public Outside Entity position will apply pursuant to Section IV.(1) of this Endorsement.

IV.

(1)    All coverage under this Policy for Loss from Claims made against the Insured Persons while acting their capacity as a director, officer, trustee, regent or governor of an Outside Entity, Specified Entity, New Public Outside Entity or Shadow Director Entity (if applicable), will be specifically excess of and will not contribute with any other insurance or indemnification available to such Insured Person from such Outside Entity, Specified Entity, New Public Outside Entity or Shadow Director Entity.

(2)    All coverage under this Policy for Loss from Claims made against the Insured Persons while acting in their capacity as a director, officer, regent or governor of any New Public Outside Entity so designated by the Insurer pursuant to Section III of this Endorsement will be specifically excess of and will not contribute with any other insurance or indemnification available to such Insured Person from any source, including from such New Public Outside Entity or the Company.  Accordingly, coverage is only available under this Policy in connection with Loss arising under Insuring Agreement (A) of the Policy.

(3)    All coverage under this Policy for Loss from Claims made against William Wesp in his capacity as a director, officer, trustee, regent or governor of Conseco Inc., as set forth in Section II Definition (J)(9), as amended above, will be specifically excess of and will not contribute with any other insurance or indemnification available to such Insured Person from any source, including from Conseco Inc. or the Company.  Accordingly, coverage is only available under this Policy in connection with Loss arising under Insuring Agreement (A) of the Policy.

(4)    With respect to any Directorship Entity's indemnification of its Insured Persons, the certificate of incorporation, charter, partnership agreement or other organizational and operational documents of such Directorship Entity, including bylaws and resolutions, shall be deemed to provide indemnification to the Insured Person for his or her service with respect to such Directorship Entity to the fullest extent permitted by law.


V.  Wrongful Act

The definition of "Wrongful Act," as set forth in Section II Definition (S)(2) of the Policy, is amended to read in its entirety as follows:

"(2)    Insured Person of the Company who, at the request of the Company is serving as a director, officer, trustee, regent or governor of a Directorship Entity."


VI.    Exclusions

(1)    Section III Exclusions is amended to include the following paragraphs:

"(J)    by, on behalf of, at the direction or in the name or right of any Directorship Entity (including any parent company, holding company, controlling entity of any kind or subsidiary thereof, of any Directorship Entity) or past, present or future director or officer thereof, except and to the extent that such Claim:

(1)    is brought derivatively by a security holder of the Directorship Entity (including any subsidiary thereof) who, when such Claim is made and maintained is acting independently of, and without the active solicitation, assistance, participation or intervention of an Insured Person, a Directorship Entity (including any subsidiary thereof) or any director or officer of the Directorship Entity (including any subsidiary thereof), (other than any solicitation, assistance or participation for which Section 806 of the Sarbanes-Oxley Act of 2002, or any similar "whistleblower" protection provision of any applicable federal, state, local or foreign securities law, affords protection to such Insured Person or director or officer of the Directorship Entity) ;

(2)    alleges an Employment Practices Wrongful Act by a director, officer, trustee, governor or regent of the Directorship Entity (including any subsidiary thereof);

(3)    is brought and maintained by a director, officer, trustee, governor or regent, or those persons serving in a functionally equivalent role, of any Directorship Entity (including any subsidiary thereof) and brought and maintained in a jurisdiction outside the United States of America, including its territories and possessions;

(4)    is brought in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an Insured Person which is part of or results directly from a Claim which is not otherwise excluded by the terms of this policy;

(5)    is brought by the Bankruptcy Trustee or Examiner of the Directorship Entity (including any subsidiary thereof) or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator or Liquidator or comparable authority of the Directorship Entity (including any subsidiary thereof);

(6)    is brought and maintained by a director or officer of any Directorship Entity (including any subsidiary thereof):

(a)    who has not served as a director, officer, or employee of such Directorship Entity (including any subsidiary thereof) for at least four years prior to the date such Claim is first made; and

(b)    who is acting independently of, and without the active solicitation, assistance, participation or intervention of an Insured Person, a Directorship Entity (including ay subsidiary thereof) or any director or officer of the Directorship Entity (including any subsidiary thereof);"

(2)    Section III Exclusion (I) of the Policy is amended to read in its entirety as follows:

"(I)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an Insured Person acting in their capacity as an Insured Person of any entity other than the Company, Joint Venture or Directorship Entity.

VII.    Miscellaneous

(a)    If any Claim made against any Insured Person gives rise to coverage under both this Policy and under any other policy or policies of management liability and company reimbursement, directors and officers liability or other similar insurance issued by the Insurer to any Directorship Entity, the Insurer's maximum aggregate limit of liability under all such policies for all Loss, including Defense Expenses, in respect of such Claim shall not exceed $35,000,000. It is understood and agreed that to the extent that there are any excess insurers that follow form to the terms and conditions of this policy and this Section (VII)(a) of this Endorsement is pertinent with respect to coverage hereunder, such excess insurers shall treat such event as exhaustion of this policy as though the Insurer paid such Loss under this Policy.

(b)    In the event loss resulting from a Claim is covered in part under this Policy and in part under any other policy or policies of management liability and company reimbursement, directors and officers liability or other similar insurance issued by the Insurer to any Directorship Entity, the applicable retention or deductible, as the case may be, set forth in the Declarations of each such policy, and the sum of the retentions or deductibles, as the case may be so, shall constitute the Retention applicable to all Loss resulting from such Claim; provided, however, that the total Retention as finally determined shall in no event exceed the largest single retention or deductible, as the case may be, set forth in the Declarations of either policy.

(c)    Nothing in this endorsement is intended, nor shall it be construed, to obligate or require the Insurer to pay Loss, including Defense Expenses, under the Policy in respect of such Claim in any amount exceeding the available Limit of Liability under this Policy. Nothing in this endorsement is intended, nor shall it be construed, to obligate or require the Insurer to pay loss, including all costs and expenses of defense, under any other policy in respect to any such Claim in any amount exceeding the available limit of liability under such other policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 83 134 01 07

Endorsement No.: 28                                          Effective: May 16, 2007
Named Insured: Lehman Brothers Holdings Inc.                 12:01 A.M. Standard Time
Policy No.: ELU097792-07                                     Insurer: XL Specialty Insurance Company

# AMEND INSURED v. INSURED EXCLUSION

In consideration of the premium charged: Section III Exclusions (G) of the Policy is amended to read in its entirety as follows:

"(G)    by, on behalf of, or in the name or right of, the Company or any Insured Person, except and to the extent such Claim:

      (1)    is brought derivatively by a security holder of the Company who, when such Claim is made and maintained is acting independently of, and without the active solicitation, assistance, participation or intervention of an Insured Person or the Company (other than any solicitation, assistance or participation for which Section 806 of the Sarbanes-Oxley Act of 2002, or any similar "whistleblower" protection provision of an applicable federal, state, local or foreign securities law, affords protection to such Insured);

      (2)    is in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an Insured Person which is part of or results directly from a Claim which is not otherwise excluded by the terms of this Policy;

      (3)    is brought by an Insured Person and brought and maintained in a jurisdiction outside the United States of America, including its territories and possessions;

      (4)    is brought and maintained by an Insured Person:

            (a)    who has not served as a director, officer, member of the Board of Managers, or employee of the Company for at least four (4) years prior to the date such Claim is first made; and

            (b)    who is acting independently of, and without the solicitation, assistance, participation or intervention of an Insured Person or the Company;

      (5)    is an Employment Practices Claim; or

      (6)    is brought by the Bankruptcy Trustee or Examiner of the Company of any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company."

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 6192 05 06

| | |
|---|---|
| Endorsement No.: 29 | Effective: May 16, 2007 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU097792-07 | Insurer: XL Specialty Insurance Company |

# AMEND ERISA EXCLUSION

In consideration of the premium charged, Section III Exclusions (C) of the Policy is amended to read in its entirety as follows:

"(C)    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation; provided that this EXCLUSION (C):

    (1)    will not apply to a Securities Claim brought by a security holder of the Company other than an Insured Person;

    (2)    will only apply to any pension, employee benefit or welfare plan sponsored by the Company; and

    (3)    will not apply to Claims made under Section I Insuring Agreement (A) of the Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 6193 05 06

Endorsement No.: 30
Named Insured: Lehman Brothers Holdings Inc.
Policy No.: ELU097792-07

Effective: May 16, 2007
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# FOREIGN JURISDICTION ENDORSEMENT

In consideration of the premium charged:

(1)    Where legally permissible, this Policy shall apply to any Claim made against an Insured Person anywhere in the world.

(2)    With respect to any Claim brought and maintained solely in a Foreign Jurisdiction, as defined below, against an Insured Person of a Foreign Company, as defined below, for a Wrongful Act committed or allegedly committed in such Foreign Jurisdiction, the Insurer shall apply those terms and conditions (and related provisions) of the Foreign Policy, as defined below, registered with the appropriate regulatory body in such Foreign Jurisdiction that are more favorable to the Insured Person than the terms and conditions of this Policy; provided, however, this paragraph (2) shall only apply to the following sections of the Policy and the comparable provisions of the Foreign Policy:

Sections I, II, III, VI (D), VI (E), VI (F), VI (G), VI (I), VI (J) and VI (K)

In addition, this paragraph shall not apply to the non-renewal or claims made and reported provisions of any policy.

(3)    Solely for the purposes of this endorsement, the following terms shall have the meanings set forth below:

(a)    "Foreign Company" means any Company formed and operating in any Foreign Jurisdiction.

(b)    "Foreign Jurisdiction" means any jurisdiction, other than the United States of America or any of its territories or possessions.

(c)    "Foreign Policy" means the Insurer's or an affiliated company of the Insurer's (collectively "XL"), management liability policy (including all mandatory endorsements, if any) approved by XL to be sold within the Foreign Jurisdiction that provides coverage substantially similar to the coverage afforded under this Policy. If more than one such policy exists, then "Foreign Policy" means the standard policy most recently registered in the local language of the Foreign Jurisdiction, or if no such policy has been registered, then the policy most recently registered in that Foreign Jurisdiction. The term "Foreign Policy" shall not include any partnership managerial, pension trust or professional liability coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 87 01 01

**Endorsement No.: 31**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND REPRESENTATION CLAUSE ENDORSEMENT

In consideration of the premium charged, Section VI General Conditions (I) of the Policy is amended to read in its entirety as follows:

"(I)    REPRESENTATION CLAUSE

The Insured represents that the statements and particulars contained in the Application as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are material to the risk assumed and form the basis of this Policy. No knowledge or information possessed by any Insured will be imputed to any other Insured. In the event that any of the particulars or statements in the Application are untrue, this Policy will be void with respect to any Insured who knew of such untruth."

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 6190 05 06

**Endorsement No.: 32**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# LOCAL TAX ENDORSEMENT

In consideration of the premium charged, in the event the Insurer is unable to pay any Loss in the country where such Loss is incurred because of local law or otherwise, to the degree allowable, such Loss shall be paid in the United States of America.  In the event of the payment of such Loss by the Insurer, the Insurer shall also pay the Insured an additional amount required to offset any tax(es) on income as a result of local tax(es) on income payable by the Insured in the country of payment, that accrues because of such payment, which amount is part of, and not in addition to, the maximum aggregate Limit of Liability for all Loss from all Claims under this Policy as set forth in Item 3 of the Declarations.  Any such additional amount shall be reduced to the extent of any reduction in tax(es) on income as a result of local tax treatment of the loss in the country where the loss occurred.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Manuscript 6473 09 06**

**Endorsement No.: 33**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU097792-07**

**Effective: May 16, 2007**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND SUBSIDIARY DEFINITION ENDORSEMENT

In consideration of the premium charged, Section II Definition (R) of the Policy is amended to read in its entirety as follows:

"(R)    'Subsidiary' means any entity during any time in which the Parent Company owns, directly or through one or more Subsidiary(s), fifty percent (50%) or greater of the outstanding securities representing the right to vote for the election of such entity's directors provided that, only in the case where the Parent Company owns, directly or through one or more Subsidiary(ies), fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors, the Company has "management control" of such entity and has an obligation to indemnify such entity's Insured Persons."

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 7142 05 07

| | |
|---|---|
| Endorsement No.: 34 | Effective: May 16, 2007 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU097792-07 | Insurer: XL Specialty Insurance Company |

# EMPLOYED LAWYERS ENDORSEMENT

In consideration of the premium charged:

(1)     The coverage afforded under this Policy will, subject to all of its terms, conditions, limitations and exclusions, be extended to apply to Loss resulting from a Claim made against any Employed Lawyer of the Company (an "Employed Lawyer Claim").

(2)     The term "Employed Lawyer" means any employee of the Company if and to the extent such employee is or, during the course of such person's employment was,"

    (a)     admitted to the practice of law; and

    (b)     employed within the Company for the purpose of providing legal services to or for the benefit of the Company.

(3)     The term "Insured Person" also includes any Employed Lawyer.

(4)     The term "Wrongful Act" also includes any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an Employed Lawyer, but only in connection with an Employed Lawyer's performance of, or actual or alleged failure to perform, legal services to or for the benefit of the Company within the scope of his or her employment.

(5)     No coverage will be available under this endorsement for Loss, including Defense Expenses, from any Claim against an Employed Lawyer based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    (a)     the service by any such person in any capacity, whether or not with the Company, other than those explicitly set forth in this endorsement; or

    (b)     an Employed Lawyer's performance of, or actual or alleged failure to perform, any legal services other than legal services to or for the benefit of the Company within the scope of the Employed Lawyer's employment.

(6)     It is understood and agreed that Endorsement No. 21 shall not apply to the coverage afforded by this Endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Manuscript 7141 05 07**

| | |
|---|---|
| **Endorsement No.: 35** | **Effective: May 16, 2007** |
| **Named Insured: Lehman Brothers Holdings Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU097792-07** | **Insurer: XL Specialty Insurance Company** |

# AUSTRALIAN CLAIM ENDORSEMENT

In consideration of the premium charged, solely with respect to Defense Expenses, Section III Exclusion (G) will not apply to the extent a Claim is brought and maintained in Australia.

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 80 218 04 03

| | |
|---|---|
| **Endorsement No.: 36** | **Effective: May 16, 2007** |
| **Named Insured: Lehman Brothers Holdings Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU097792-07** | **Insurer: XL Specialty Insurance Company** |

# AMEND DEFINITION OF CHANGE IN CONTROL ENDORSEMENT

In consideration of the premium charged, Section II Definitions (B)(3) of the Policy is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.



THE INSURED IS REQUESTED TO **READ THIS POLICY.** IF IT IS INCORRECT, PLEASE RETURN IT

## DECLARATIONS
## EXCESS LIABILITY POLICY

SUBJECT TO ITS TERMS, THIS POLICY APPLIES ONLY TO ANY CLAIM MADE AGAINST
THE ASSUREDS DURING THE POLICY PERIOD.  THE LIMIT OF LIABILITY AVAILABLE
TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED
BY AMOUNTS INCURRED AS REASONABLE AND NECESSARY LEGAL FEES AND
EXPENSES IN DEFENDING THE ASSUREDS.  THIS POLICY DOES NOT PROVIDE FOR ANY
DUTY BY UNDERWRITERS TO DEFEND THE ASSUREDS.

These Declarations along with the completed and signed Application, and the Policy with
endorsements shall constitute the contract between the Assureds and Underwriters.


**Policy Number:** 509/QA016907


**Item A.**    **Named Insured:**

Lehman Brothers Holdings, Inc.

**Principal Address:**

1301 Avenue of the Americas
New York
NY 10019
USA


**Item B.**    **Policy Period:**

From:   16th May, 2007
To:       16th May, 2008
Both days at 12:01 a.m. local standard time at the Principal Address stated in Item A.


**Item C.**    **Limit of Liability:**

USD 10,000,000 in the aggregate for the Policy Period.


**Item D.**    **Premium:**

USD 527,199 including TRIA, hereon 85.7142% thereof

**Item E.**   **Notification to Underwriters pursuant to Clause V. shall be given via:**

      Arthur Washington
      Mendes & Mount, LLP
      750 Seventh Avenue
      New York
      NY 10036-6829
      USA

**Item F.**   **Primary Policy:**

| | |
|---|---|
| Primary Carrier: | XL Specialty Insurance Company |
| Policy Number: | ELU097792-07 or renewal thereof |
| Limit: | USD 20,000,000 |
| Retention: | USD 10,000,000 |
| Period: | 12 months from 16th May, 2007 at 12:01 a.m. local standard time |

**Item G.**   **Underlying Excess Policies:**

| | |
|---|---|
| 1st Excess Carrier: | Chubb |
| Policy Number: | 7043-0876 or renewal thereof |
| Limit: | USD 15,000,000 |
| Retention: | As per Primary |
| Period: | 12 months from 16th May, 2007 at 12:01 a.m. local standard time |

| | |
|---|---|
| 2nd Excess Carrier: | CNA |
| Policy Number: | 267996454 or renewal thereof |
| Limit: | USD 10,000,000 |
| Retention: | As per Primary |
| Period: | 12 months from 16th May, 2007 at 12:01 a.m. local standard time |

**Item H.**   **Service of process in any suit pursuant to Clause VI. shall be made upon:**

      Mendes & Mount, LLP
      750 Seventh Avenue
      New York
      NY 10036-6829
      USA

**Dated in London:** 15th May 2007

## EXCESS LIABILITY POLICY

In consideration of the payment of the premium, in reliance upon the statements in the Application and subject to the provisions of this Policy, Underwriters and the Assureds agree as follows:

## I.    CONFORMANCE WITH UNDERLYING POLICIES

Except as regards:

A.    the premium, and

B.    the amount and Limit of Liability, and

C.    the subject matter of Clauses II, III, IV, V, VI, VII and VIII, and

D.    as otherwise may be provided herein,

this Policy is subject to the same insuring clauses, definitions, terms, conditions, exclusions and other provisions as those set forth in the Underlying Policies as described in the materials submitted to Underwriters in connection with the Application for this Policy.  No changes to the Underlying Policies as so described shall be binding upon Underwriters under this Policy unless specifically agreed in writing by Underwriters hereon.

## II.    DEFINITIONS

The following terms whenever used in this Policy shall have the meanings indicated.

A.    "Assureds" shall mean all persons or entities insured under the Primary Policy.

B.    "Primary Policy" shall mean the policy identified in Item F. of the Declarations.

C.    "Underlying Limits of Liability" shall mean the combined limits of liability of the Underlying Policies as set forth in Items F and G of the Declarations, less any reduction or exhaustion of said limits of liability due to payment of loss under said policies.

D.    "Underlying Policies" shall mean the policies identified in Items F and G of the Declarations.

III.    **MAINTENANCE OF UNDERLYING POLICIES**

This Policy provides excess coverage only.  It is a condition precedent to the coverage afforded under this Policy that the Assureds maintain the Underlying Policies with retentions/deductibles, and limits of liability (subject to reduction or exhaustion as a result of loss payments), as set forth in Items F and G of the Declarations.  This Policy does not provide coverage for any loss not covered by the Underlying Policies except and to the extent that such loss is not paid under the Underlying Policies solely by reason of the reduction or exhaustion of the Underlying Limits of Liability through payments of loss thereunder.  In the event the insurer under one or more of the Underlying Policies fails to pay loss in connection with any claim under Insuring Agreements (B) and (C) of the Primary Policy as a result of the insolvency, bankruptcy or liquidation of said insurer, then the Assureds shall be deemed self-insured for the amount of the limit of liability of said insurer which is not paid as a result of such insolvency, bankruptcy or liquidation.

IV.    **LIMIT OF LIABILITY**

A.    Underwriters shall be liable to pay loss which is in excess of:

1.    the Underlying Limits of Liability plus

2.    the applicable retention or deductible under the Primary Policy

up to the Limit of Liability as shown under Item C of the Declarations resulting from each claim made against the Assureds.

B.    The amount shown in Item C of the Declarations shall be the maximum aggregate Limit of Liability of Underwriters under this Policy.

C.    Underwriters shall be liable only after the insurers under each of the Underlying Policies have paid or have been held liable to pay the full amount of the Underlying Limits of Liability.

D.    In the event of the reduction or exhaustion of the Underlying Limits of Liability by reason of payment of loss, or under Insuring Agreement (A) of the Primary Policy, by reason of failure to pay loss as a result of a claim due to insolvency, bankruptcy or liquidation of an insurer under one or more of the Underlying policies this Policy shall:

1.    in the event of reduction, pay excess of the reduced limits, and

2.    in the event of exhaustion, continue in force as primary insurance; provided, however that in the case of exhaustion this Policy shall only pay excess of the retention or deductible applicable to the Primary Policy as set forth in Item F of the Declarations, which shall be applied to any subsequent loss in the same manner as specified in the Primary Policy.

**V.     NOTIFICATION**

Notice to Underwriters of any claims shall be given to the firm shown under Item E of the Declarations.

**VI.     WARRANTY CLAUSE**

It is warranted that the particulars and statements contained in the Application, a copy of which is attached hereto, are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy.

By acceptance of this Policy, the Assureds agree:

A.     that the statements in the Application are their representations, that they shall be deemed material to the acceptance of the risk or the hazard assumed by Underwriters under this Policy and that this Policy is issued in reliance upon the truth of such representations;

B.     that in the event that the Application contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by Underwriters under this Policy, this Policy shall be void and of no effect whatsoever with respect to those Assureds who made or had knowledge of such misrepresentations; and

C.     that, except as provided in Clause VI.B, this Policy shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individual contracts of insurance with each of the Assureds.

**VII.     CHOICE OF LAW AND JURISDICTION**

It is agreed that in the event of Policy disputes between the Assured and the Underwriter, this insurance shall be governed by the laws of New York but subject always to the provisions of NMA1998 below.

**SERVICE OF SUIT**

It is agreed that in the event of the failure of Underwriters to pay any amount claimed to be due hereunder, Underwriters, at the request of any person or entity insured hereunder will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon the firm shown under Item H of the Declarations, and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The firm shown under Item H of the Declarations is authorised and directed to accept service
of process on behalf of Underwriters in any such suit and/or upon the request of any person or
entity insured hereunder to give a written undertaking to such person or entity that they will
enter a general appearance upon Underwriters' behalf in the event such a suit shall be
instituted.

Further, pursuant to the statute of any state, territory or district of the United States which
makes provision therefor, Underwriters hereon hereby designate the Superintendent,
Commissioner or Director of Insurance or other officers specified for that purpose in the
statute, or any of their successors in office, as their true and lawful attorney upon whom may
be served any lawful process in any action, suit or proceeding instituted by or on behalf of
any person or entity insured hereunder or any beneficiary hereunder arising out of this Policy,
and hereby designate the firm shown under Item H of the Declarations as the firm to whom
the said officer is authorised to mail such process or a true copy thereof.

24/4/86
NMA1998 (amended)

## VIII.   OUTSIDE DIRECTORSHIP PROVISIONS

If any loss arising from any claim made against any of the Assureds, as covered by XL
Specialty Insurance Company Primary Policy No. ELU097792-07 or renewal thereof,
Endorsement No. 12 (Outside Directorship Liability Endorsement) is insured under any other
valid policy(ies) issued by Underwriters, then the total amount Underwriters shall pay under
all such policies for all covered loss on account of such claim shall not exceed the combined
Aggregate Limit of Liability of USD 25,000,000.

Further, and solely with respect to an Outside Directorship Liability claim, this Policy shall
recognise any payment made by Lehman Brothers Holdings, Inc. in excess of payments paid
by XL Specialty Insurance Company for loss arising from a claim made against any of the
Assureds which is covered by XL Specialty Insurance Company (or any other member of the
XL Capital Family) under an outside entity policy and the Primary Policy for Lehman
Brothers Holdings, Inc., as being part of the Primary Policy Limit of Liability with respect to
an Outside Directorship Liability Claim.

IT IS HEREBY UNDERSTOOD AND AGREED THAT NO CHANGES TO THE
UNDERLYING POLICIES AS SO DESCRIBED SHALL BE BINDING UPON
UNDERWRITERS UNDER THIS INSURANCE UNLESS AGREED IN WRITING BY
UNDERWRITERS HEREON.

LSW1045 (amended)

### NEW SHORT RATE CANCELLATION TABLE ENDORSEMENT (U.S.A.)

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this insurance is written it is agreed that in the event of cancellation thereof by the Assured the earned premium shall be computed as follows:

A.    For Insurance written for one year:

| Days Insurance in Force | | Percent of One Year Premium | Days Insurance in Force | | Percent of One Year Premium |
|---|---|---|---|---|---|
| 1 | | 5 | 154-156 | | 53 |
| 2 | | 6 | 157-160 | | 54 |
| 3-4 | | 7 | 161-164 | | 55 |
| 5-6 | | 8 | 165-167 | | 56 |
| 7-8 | | 9 | 168-171 | | 57 |
| 9-10 | | 10 | 172-175 | | 58 |
| 11-12 | | 11 | 176-178 | | 59 |
| 13-14 | | 12 | 179-182 | (6 months) | 60 |
| 15-16 | | 13 | 183-187 | | 61 |
| 17-18 | | 14 | 188-191 | | 62 |
| 19-20 | | 15 | 192-196 | | 63 |
| 21-22 | | 16 | 197-200 | | 64 |
| 23-25 | | 17 | 201-205 | | 65 |
| 26-29 | | 18 | 206-209 | | 66 |
| 30-32 | (1 month) | 19 | 210-214 | (7 months) | 67 |
| 33-36 | | 20 | 215-218 | | 68 |
| 37-40 | | 21 | 219-223 | | 69 |
| 41-43 | | 22 | 224-229 | | 70 |
| 44-47 | | 23 | 230-232 | | 71 |
| 48-51 | | 24 | 233-237 | | 72 |
| 52-54 | | 25 | 238-241 | | 73 |
| 55-58 | | 26 | 242-246 | (8 months) | 74 |
| 59-62 | (2 months) | 27 | 247-250 | | 75 |
| 63-65 | | 28 | 251-255 | | 76 |
| 66-69 | | 29 | 256-260 | | 77 |
| 70-73 | | 30 | 261-264 | | 78 |
| 74-76 | | 31 | 265-269 | | 79 |
| 77-80 | | 32 | 270-273 | (9 months) | 80 |
| 81-83 | | 33 | 274-278 | | 81 |
| 84-87 | | 34 | 279-282 | | 82 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 88-91 | (3 months)......................... | 35 | 283-287 | ........................................ | 83 |
| 92-94 | ........................................ | 36 | 288-291 | ........................................ | 84 |
| 95-98 | ........................................ | 37 | 292-296 | ........................................ | 85 |
| 99-102 | ........................................ | 38 | 297-301 | ........................................ | 86 |
| 103-105 | ........................................ | 39 | 302-305 | (10 months)...................... | 87 |
| 106-109 | ........................................ | 40 | 306-310 | ........................................ | 88 |
| 110-113 | ........................................ | 41 | 311-314 | ........................................ | 89 |
| 114-116 | ........................................ | 42 | 315-319 | ........................................ | 90 |
| 117-120 | ........................................ | 43 | 320-323 | ........................................ | 91 |
| 121-124 | (4 months)......................... | 44 | 324-328 | ........................................ | 92 |
| 125-127 | ........................................ | 45 | 329-332 | ........................................ | 93 |
| 128-131 | ........................................ | 46 | 333-337 | (11 months)...................... | 94 |
| 132-135 | ........................................ | 47 | 338-342 | ........................................ | 95 |
| 136-138 | ........................................ | 48 | 343-346 | ........................................ | 96 |
| 139-142 | ........................................ | 49 | 347-351 | ........................................ | 97 |
| 143-146 | ........................................ | 50 | 352-355 | ........................................ | 98 |
| 147-149 | ........................................ | 51 | 356-360 | ........................................ | 99 |
| 150-153 | (5 months)......................... | 52 | 361-365 | (12 months)...................... | 100 |

B.    For Insurances written for more or less than one year:

    1.    If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

    2.    If insurance has been in force for more than 12 months;

        a.    Determine full annual premium as for an insurance written for a term of one year.

        b.    Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata earned premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written

        c.    Add premium produced in accordance with items (a) and (b) to obtain earned premium during full period insurance has been in force.

09/02/58
NMA45

**NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)**

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

> Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.   Under any Liability Coverage, to injury, sickness, disease, death or destruction:

    (a)   with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b)   resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.  Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

    (a)   the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

    (b)   the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c)     the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.     As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a)     any nuclear reactor,

(b)     any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)     any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.
17/3/60
NMA1256

## RADIOACTIVE CONTAMINATION EXCLUSION
## CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1.      war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.      any act of terrorism.

        For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918

## SPECIAL CANCELLATION CLAUSE

In the event that an Underwriter:

(a)     ceases underwriting; or

(b)     is the subject of an order or resolution for winding up or formally proposes a scheme of
        arrangement; or

(c)     has its authority to carry on insurance business withdrawn,

the Assured may terminate that Underwriter's participation on this risk forthwith by giving notice and
the premium payable to that Underwriter shall be pro rata to the time on risk. In the event there are
any notified, reserved or paid losses or circumstances, premium shall be deemed fully earned. Any
return of premium shall also be subject to a written full release of liability from the Assured.

30/05/03
NMA2975

## U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
## NEW & RENEWAL BUSINESS ENDORSEMENT

This Endorsement is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.

In consideration of an additional premium of USD5,272 paid, it is hereby noted and agreed with effect from inception that the Terrorism exclusion to which this Insurance is subject, shall not apply to any "insured loss" directly resulting from any "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002" as amended ("TRIA").

The coverage afforded by this Endorsement is only in respect of any "insured loss" of the type insured by this Insurance directly resulting from an "act of terrorism" as defined in TRIA. The coverage provided by this Endorsement shall expire at 12:00 midnight December 31st, 2007, the date on which the TRIA Program is scheduled to terminate or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates. The Terrorism exclusion, to which this Insurance is subject, applies in full force and effect to any other losses and any act or events that are not included in said definition of "act of terrorism".

This Endorsement only affects the Terrorism exclusion to which this Insurance is subject. All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

Furthermore the Underwriter(s) will not be liable for any amounts for which they are not responsible under the terms of TRIA (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on the Underwriter's liability for payment for terrorism losses.

22/12/05
LMA5052

## EXCESS PRIOR AND PENDING LITIGATION

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Underwriters shall not be liable to make any payment for loss in connection with any claim made against the Assureds based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

1.      any prior and/or pending litigation as of 12:01 a.m. Local Standard Time on
        31st March, 1989, or

2.      any fact, circumstance, situation, transaction or event underlying or alleged in such litigation,

regardless of the legal theory upon which such claim is predicated.


06/01
LSW888A


## WAIVER OF APPLICATION (EXCESS)

In consideration of the payment of the premium charged for the Policy, it is hereby understood and agreed as follows:

1.      The first paragraph of the Policy is deleted and the following is substituted therefor:

        "In consideration of the payment of the premium, in reliance upon the statements in any
        Application for previous policies issued providing continuous coverage until the inception
        date of this Policy, and subject to the provisions of this Policy, Underwriters and the Assureds
        agree as follows:"

2.      The first paragraph of Clause VI. Warranty Clause is deleted and the following is substituted
        therefor:

        "It is warranted that the particulars and statements contained in any Application for this
        Policy or contained in any Application for any policy issued by Underwriters of which this
        Policy is a renewal thereof and any material submitted therewith are the basis of this Policy
        and are to be considered as incorporated into and constituting a part of this Policy."


02/97
LSW957 (amended)

## PREMIUM PAYMENT WARRANTY

The Premium must be paid to and received by Underwriters on or before 24.00hrs on 30th June, 2007.
If this warranty is not complied with, then this Insurance shall be cancelled ab initio.

## ADDENDUM NUMBER 1

It is agreed that Underwriters hereon follow:

(a)    the terms of the "Outside Directorship Liability Non Accumulation Endorsement";

(b)    the terms "Amend Insuring Clause and Apply Coinsurance Endorsement";

(c)    the terms of the "Follow Form Endorsement";

(d)    the addition of de facto directors to the definition of Insured Person;

(e)    the addition of pre/post judgement interest to the definition of Loss;

(f)    defence costs exception to the Insured versus Insured Exclusion, specific to Australia;

(g)    the amendment to the Extended Reporting Period to allow for Notice of Circumstances;

(h)    the provision that Outside Entity versus Insured exceptions applicable to the Outside
       Directorship Liability coverage will be the same as those provided for under the Insured
       versus Insured clause;

all as stated in the Underlying Chubb Policy, and

(g)    the "Employed Lawyers" endorsement as stated in the Primary XL Insurance Policy and
       Underlying Chubb Policy.

## ADDENDUM NUMBER 2

It is hereby understood and agreed that wherever the words "Insured" and "Insurers" appear in this
Policy same shall be deemed to read "Assured" and "Underwriters" respectively.

## ADDENDUM NUMBER 3

It is hereby understood and agreed that the Underwriters hereon follow the "Employed Lawyers"
endorsement, per Primary XL Insurance Policy and Underlying Chubb Policy.

## ADDENDUM NUMBER 4

It is understood and agreed that no account taken hereunder of Robert L. Garber or Doris Staehr actions.

## LINES CLAUSE

This Insurance, being signed for 85.7142%, insures only that proportion of any loss, whether total or partial, including but not limited to that proportion of associated expenses, if any, to the extent and in the manner provided in this Insurance.

The percentages signed in the Table are percentages of 100% of the amount(s) of Insurance stated herein.

## SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing Insurer who for any reason does not satisfy all or part of its obligations.

LSW 1001 (Insurance)

## Endorsement No. 1

Attaching to Lloyd's Policy Number 509/QA016907

In the name of  Lehman Brothers Holdings, Inc.

---

It is agreed that, effective from16th May 2007 both days at 12.01 a.m. local standard time, the following amendments are made:

1.  Clause VIII. Outside Directorship Provisions, is amended to read as follows:

    If any loss arising from a claim made against any of the Assureds under endorsement #38 to XL Specialty Insurance Company's Primary Policy No. ELU097792-07 or renewal thereof, AMEND INSURED PERSON ENDORSEMENT, including any revisions or amendments made to endorsement #38, (hereinafter "ODL Claim"), is covered under any other valid and collectible policy(ies) issued by Underwriters, then the total amount the Insurer shall pay under all such policies for all covered loss an account of such claim shall not exceed the combined aggregate Limit of liability of $25,000,000.

    Further, and solely with respect to an ODL Claim, the Underlying Limits of Liability shall be deemed to be depleted or exhausted as a result of the issuers of the Underlying Insurance or any of the members of the issuers of the Underlying Insurance, and/or the Assureds, paying loss covered under the Underlying Insurance.

2.  The Excess Prior and Pending Litigation Clause is amended by deleting the word "Assureds" and replacing it with the words "directors and officers".

3.  Addendum Number 1 attached to the policy is amended to read as follows:

### "ADDENDUM NUMBER 1

It is agreed that Underwriters hereon follow:

1.  the terms "Amend Insuring Clause and Depletion of Underlying Limits Section Endorsement"

2.  the terms of the "Follow Form Endorsement"

All as stated in the Underlying Chubb Policy.

21/11/07

4.    Addendum Number 3 is deleted in its entirety and replaced as follows:

## ADDENDUM NUMBER 3

It is hereby understood and agreed that Drop Down/Difference in Conditions provision solely applicable to Insuring Clause I(A) (non-indemnifiable) of the Primary, if and to the extent that the insurer(s) of the Underlying Insurance is financially unable to indemnify any Assureds for loss as defined in such Underlying Insurance.

All other terms and conditions remain unchanged.

Dated: London, 19th November 2007



21/11/07 .



The Table of Syndicates referred to on the face of this Policy follows:

**BUREAU REFERENCE**     61146 15/06/07          **BROKER NUMBER**     0509

| PROPORTION % | SYNDICATE | UNDERWRITER'S REFERENCE |
|---|---|---|
| 47.6190 | 2987 | TF587K07A000 |
| 19.0476 | 2000 | 715Y00118450 |
| 19.0476 | 2488 | AKD567YF0619 |

**TOTAL LINE**        **No. OF SYNDICATES**
85.7142                          3

THE LIST OF UNDERWRITING MEMBERS
OF LLOYDS IS IN RESPECT OF 2007
YEAR OF ACCOUNT

BUREAU USE ONLY
USL1  57    7475

# Companies
# Insurance Policy

We, the Insurers, hereby severally agree, in consideration of the payment to us, or the promise of payment to us, by the Insured of the premium specified in the Schedule, to insure against loss, damage, liability or expense in the proportions and manner hereinafter provided. Each Insurer shall be liable only for its own respective proportion.

In witness whereof the name of the Managing Director of Ins-sure Services Limited is subscribed on behalf of each of the Insurers in accordance with the provisions of the Services Agreement that each of the Insurers has with London Processing Centre Limited (a wholly owned subsidiary of the Ins-sure Services Limited).



**Managing Director**

This policy is not valid unless it bears the signature of the Managing Director of Ins-sure Services Limited.

| | |
|---|---|
| **Policy Number** | 509/QA016907 |
| **Insured** | Lehman Brothers Holdings, Inc. |
| **Period of Insurance** | From 16th May 2007 To 16th May 2008<br>Both days as expressed in the Co-Insuring Policy and for<br>such further period or periods as may be mutually agreed<br>upon. |
| **Type of Insurance** | Third Excess Directors and Officers Liability and Company<br>Reimbursement Insurance as more fully set forth in the Co-<br>Insuring Policy. |
| **Premium** | USD 527,199 for the period. |
| **Hereon** | 14.2858% of the Premium and Limit of Liability as more<br>fully set forth in the Co-Insuring Policy. |

**Co-Insurance Clause**

*This Policy is subject to the same terms, conditions, limitations and exclusions as more fully
defined in Policy Number 509/QA016907 issued by Lloyd's Policy Signing Office on the
identical subject matter and risk.*

## Several Liability

The subscribing Insurers' obligations under this contract are several and not joint and are limited solely to the extent of their individual signed subscriptions. The subscribing Insurers are not responsible for the subscription of any co-subscribing Insurer who for any reason does not satisfy all or part of its obligations.

## Insurers' Proportions

BUREAU REFERENCE                0706150000513



| BUREAU REFERENCE PROPORTION % | CODE | 0706150001024 MEMBER COMPANY AND REFERENCE |
|---|---|---|
| 14.2858000 | W3206 | WUERTTEMBERGISCHE VERSICHERUNG A.G. 201336400007 |

14.2858000 %    TOTAL

## Exhibit B

**(TRANSCRIPT FROM BENCH RULING IN *ENRON*)**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

In the Matter of:

ENRON CORP., ET AL.,

          Case No.

          01-16034

     Debtor.

------------------------------------------x


      April 11, 2002

      2:00 p.m.

      United States Custom House

      One Bowling Green

      New York, New York


B E F O R E:

    HON. ARTHUR J. GONZALEZ, U.S. BANKRUPTCY JUDGE


Ruling in reference to:  One, the schedules; two,
exclusivity; and three, the D&O insurance issue


Reported by:

Linda D. Noto, RPR, CSR

2

                    ENRON CORP., ET AL.,

A p p e a r a n c e s:

            WEIL, GOTSHAL & MANGES, LLP
                Attorneys for Debtors
                767 Fifth Avenue
                New York, New York 10153-0119

        BY:   MARTIN J. BIENENSTOCK, ESQ.
                    - and -
              RICHARD L. LEVINE, ESQ.
                    - and -
              HANS S. HWANG, ESQ.

            WEIL, GOTSHAL & MANGES, LLP
                Attorneys for Debtors
                1501 K Street, N.W., Suite 100
                Washington, D.C. 20005
        BY:   DAVID R. BERZ, ESQ.

            WEIL, GOTSHAL & MANGES, LLP
                Attorneys for Debtors
                700 Louisiana, Suite 1600
                Houston, Texas 77002
        BY:   STEPHEN T. LODEN, ESQ.

            OFFICE OF THE ATTORNEY GENERAL - STATE OF TEXAS
                JOHN CORNYN
                Post Office Box 12548
                Austin, Texas 78711-2548
        BY:   JEFF BOYD, DEPUTY ATTORNEY
              GENERAL FOR LITIGATION
                    - and -
              HAL F. MORRIS, ASSISTANT ATTORNEY
              GENERAL - SENIOR ATTORNEY
              BANKRUPTCY & COLLECTIONS DIVISION

2ace9960-508a-11d6-bfa1-0050da59f9be

3

ENRON CORP., ET AL.,

A p p e a r a n c e s:   (Continued)

THOMPSON & KNIGHT LLP
        Attorneys for Dunhill Group
        1700 Pacific Avenue, Suite 3300
        Dallas, Texas 75201
BY:   DAVID M. BENNETT, ESQ.

CARRINGTON COLEMAN SLOMAN & BLUMENTHAL L.L.P.
        Attorneys for Kenneth Lay
        200 Crescent Court, Suite 1500
        Dallas, Texas 75201-1848
BY:   RUSSELL F. NELMS, ESQ.

CADWALADER, WICKERSHAM & TAFT
        Attorneys for PG&E
        100 Maiden Lane
        New York, New York 10038
BY:   EDWARD A. SMITH, ESQ.

2ace9960-508a-11d6-bfa1-0050da59f9be

4

ENRON CORP., ET AL.,

A p p e a r a n c e s:  (Continued)

CLIFFORD CHANCE ROGERS & WELLS LLP
        Attorneys for PE&E, GTN
        200 Park Avenue
        New York, New York 10166-0153
BY:   WENDY ROSENTHAL, ESQ.


REED SMITH LLP
        Attorneys for The Wiser Oil Company
        375 Park Avenue, 17th Floor
        New York, New York 10152
BY:   DEBORAH A. REPEROWITZ, ESQ.


McCLAIN & SIEGEL, P.C.
        Attorneys for The Employment
        Related Issues Committee
        909 Fannin, Suite 4050
        Houston, Texas 77010


BY:   DAVID McCLAIN, ESQ.

5

ENRON CORP., ET AL.,

A p p e a r a n c e s:   (Continued)

KRONISH LIEB WEINER & HELLMAN, LLP
        Attorneys for The Employee
        Related Issues Committee
        1114 Avenue of the Americas
        New York, New York 10036-7798

BY:   RONALD R. SUSSMAN, ESQ.

BARRY A. BROWN, ESQ.
        Attorney for Upstream Energy Services
        as agent for the gas producers
        The Arena Tower, Suite 1100
        7322 Southwest Freeway
        Houston, Texas 77074

ARTER & HADDEN, LLP
        Attorneys for AEGIS Insurance
        101 West Broad Street, Suite 2100
        Columbus, Ohio  43215-3422

BY:   DAN A. BAILEY, ESQ.

6

ENRON CORP., ET AL.,

A p p e a r a n c e s:   (Continued)

PHILLIPS NIZER, LLP
         Attorneys for AEGIS
         600 Old Country Road
         Garden City, New York  11530-2011
BY:   LOUIS A. SCARCELLA, ESQ.

TOGUT, SEGAL & SEGAL LLP
         Attorneys for Enron et al
         One Penn Plaza
         New York, New York  10119
BY:   FRANK A. OSWALD, ESQ.
            -and-
         SCOTT RATNER, ESQ.

NICKENS, LAWLESS & FLACK, L.L.P.
         Attorneys for Officers Regarding
         Insurance Carriers
         1000 Louisiana Street, Suite 5360
         Houston, Texas 77002

BY:   JACK C. NICKENS, ESQ.

ENRON CORP., ET AL.,
A p p e a r a n c e s:  (Continued)

KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
        Attorneys for Appaloosa Management L.P.,
        Oaktree Capital Management, LLC,
        Angelo Gordon & Co., L.P.,
        Elliott Associates, L.P.
        1633 Broadway
        New York, New York  10019-6799

BY:   RICHARD F. CASHER, ESQ.

GOLUB & GOLUB, LLP
        Attorneys for Rio Piedras
        225 Broadway, Suite 1515
        New York, New York  10007

BY:   CHRISTOPHER P. BRUNDAGE, ESQ.
              - and -
        FRANK JAKLITSCH, ESQ.

MILBANK, TWEED, HADLEY & MCCLOY LLP
        Attorneys for Official Comm. of the
        Unsecured Creditors Committee
        1 Chase Manhattan Plaza
        New York, New York  10005-1413
BY:   LUC A. DESPINS, ESQ.
              - and -
        MATTHEW BARR, ESQ.

8

ENRON CORP., ET AL.,

A p p e a r a n c e s:  (Continued)

DALTON GOTTO SAMSON & KILGARD
        Attorneys for Tittle
        Suite 900, National Bank Plaza
        3101 N. Central Avenue
        Phoenix, Arizona   85012

BY:    GARY A. GOTTO, ESQ.

ENTWISTLE & CAPPUCCI LLP
        Attorneys for Florida State Board
        of Administration
        200 Park Avenue
        New York, New York   10171-1499
BY:    ANDREW J. ENTWISTLE, ESQ.

GIBBS & BRUNS, L.L.P.
        Attorneys for Enron Outside Directors
        1100 Louisiana, Suite 5300
        Houston, Texas   77002
BY:    ROBERT MADDEN, ESQ.

9

                    ENRON CORP., ET AL.,
A p p e a r a n c e s:  (Continued)


        GENOVESE JOBLOVE & BATTISTA, P.A.
                Attorneys for Class Claimants
                in Houston Action
                Bank of America Tower
                100 Southeast Second Street, 36th Floor
                Miami, Florida  33131
        BY:   CRAIG P. RIEDERS, ESQ.
                    - and -
                JOHN GENOVESE, ESQ.


        TONKON TORP LLP
                Attorneys for Ken L. Harrison
                1600 Pioneer Tower
                888 SW Fifth Avenue
                Portland, Oregon  97204

        BY:   ZACHARY W.L. WRIGHT, ESQ.


        SHEARMAN & STERLING
                Attorneys for Citigroup
                599 Lexington Avenue
                New York, New York  10022-6069

        BY:   FREDRIC SOSNICK, ESQ.

10

ENRON CORP., ET AL.,
A p p e a r a n c e s:   (Continued)

DAVIS POLK & WARDWELL
        Attorneys for JP Morgan Chase Bank
        450 Lexington Avenue
        New York, New York  10017
BY:    MARSHALL SCOTT HUEBNER, ESQ.

ROPES & GRAY
        Attorneys for Present and Former
        Outside Directors
        One International Place
        Boston, Massachusetts  02110-2624

BY:    WILLIAM F. MCCARTHY, ESQ.

APPEARING TELEPHONICALLY
        NEBENZAHL KOHN DAVIS & LEFF LLP
            ALBERT DAVIES, ESQ.
            MERTON RANDEL DAVIES, ESQ.
        WOLLMUTH, MAHER & DEUTSCH LLP
            KIRSTIN PETERSON, ESQ.

        VORYS, SATER, SEYMOUR & PEASE
            JONATHAN AIREY, ESQ.
        WEIL, GOTSHAL & MANGES LLP
            MARGARITA COALE, ESQ.

        ROPES, GRAY
            GREG KADEN, ESQ.

1                    ENRON CORP., ET AL.,

2                    THE COURT:  Please be seated.

3                    All right.  My recollection, if I

4       left something out I'll have to go back in and get

5       some more papers, but my recollection is that

6       there are three decisions I have to read into the

7       record:  One, the schedules; two, exclusivity; and

8       three, the D&O insurance issue.

9                    Was there anything else that I

10      reserved on this morning?

11                   All right.  I'll deal first with

12      exclusivity and then I'll read a decision with

13      respect to the D&O.  And when I deal with

14      exclusivity, I'll deal as well with the schedules.

15                   Cause exists to extend the Debtors

16      exclusive periods as to all the Debtors.

17                   With respect to ENA, the Court will

18      do the following:  One, extend ENA's exclusive

19      period to August 31st, 2002; two, sua sponte

20      expand the ENA Examiner's role to that of the

21      facilitator of a plan in the ENA case and direct

22      him to file a report regarding the status of those

23      efforts including a recommendation as to any

24      further extension of ENA's exclusivity; three,

25      such report shall be filed on or before July 26,

12

1                     ENRON CORP., ET AL.,

2    2002.

3                     With respect to the other Enron

4    Debtors, the exclusive period is extended as

5    requested by the Debtor and the Committee for the

6    six-month period sought.

7                     With respect to the schedules, the

8    Court grants the Debtors' request for the

9    additional 60 days and the related relief sought.

10   And the Debtor is to serve an order with respect

11   to both of those issues, and obviously settle it

12   upon the ENA Examiner with respect to the

13   exclusivity issue.

14                    Regarding the AEGIS motion and the

15   outside directors.  Concerning the motions filed

16   by AEGIS and the outside directors to lift the

17   automatic stay to allow AEGIS to pay amounts under

18   the AEGIS D&O Policy and the AEGIS Fiduciary and

19   Employee Benefit Liability Policy, first, as set

20   forth by the Movants, their motion to lift the

21   stay is the procedurally correct method to have

22   this matter presented to the Court.

23                    Therefore, currently at issue is

24   the payment of the defense costs incurred by the

25   officers and directors.

1                    ENRON CORP., ET AL.,

2                    The D&O Policy provides for

3     coverage of the directors and officers,

4     indemnification coverage for the Debtor, and

5     entity coverage for the Debtor.

6                    Pursuant to the terms of the D&O

7     Policy, the directors have a right to advancement

8     of defense costs under a priority of payments

9     endorsement.

10                   The Debtors' entity coverage and

11    its indemnification coverage are expressly

12    subordinated to the rights of the directors and

13    officers under the AEGIS D&O policy.

14                   As the Debtors' property rights are

15    defined by state law, it is that law that governs

16    the contractual obligation; thus, any directors

17    and officers currently due defense costs covered

18    by the policy must be paid from the proceeds of

19    the policy first.  The Debtors are then entitled

20    to have their own claims for defense costs paid.

21                   The Debtors note the importance of

22    providing the officers and directors with this

23    type of coverage.  The Debtors assert that the

24    Debtor, itself, is entitled to currently-due

25    defense costs and will seek payment once the

1                    ENRON CORP., ET AL.,

2    directors and officers receive payments for the

3    amounts currently due them.

4                    With respect to the payment of

5    officers and directors' defense costs, to the

6    extent that any such payments would negatively

7    impact the Debtors' interest in the proceeds of

8    the D&O policy, that result is dictated by the

9    negotiated terms of the policy.

10                   As certain officers and directors

11   may have present rights to payment of defense

12   costs, the fact that certain parties may in the

13   future assert claims and potentially become

14   entitled to payment from the insurance policies

15   does not preclude those who are currently entitled

16   to payment from receiving it.

17                   In any case, the parties are bound

18   by the contractual provisions of the policy.  The

19   Debtors' interest in the policy is limited by its

20   contractual provisions including a priority

21   advancement and payment obligations contained in

22   those policies.  The Court cannot rewrite the

23   provisions of the contract.

24                   The Objectants acknowledge the

25   terms of the contract.  Some of the Objectants

1                    ENRON CORP., ET AL.,

2    argue that because AEGIS and the outside directors

3    are seeking to invoke this Court's jurisdiction

4    concerning the lifting of the stay, that gives

5    this Court leeway to set conditions upon which the

6    stay would be lifted.  However, in this case, any

7    such action would result in changing the terms of

8    the contract.

9                    The Court finds that, while

10   exercising jurisdiction concerning the issue of

11   lifting the stay, it should not exercise

12   jurisdiction over the terms of the contract and

13   will not interfere with those terms.

14                    Under the AEGIS Fiduciary Policy,

15   the coverage afforded the relevant Debtors is

16   co-extensive with the coverage afforded the

17   individual insureds.  However, that policy

18   provides a special $10 million fund earmarked for

19   defense costs.

20                    Payment from that fund will protect

21   the coverage that is available for payment of

22   settlements and judgements.  Moreover, payment

23   from the special funds requires written approval

24   from the Debtor.  These two aspects protect the

25   Debtors' interest.

1                         ENRON CORP., ET AL.,

2                   In addition, the Debtors have

3    referenced the estates' interest in having

4    individual defendants vigorously defend themselves

5    in light of the potential for vicarious liability.

6                   The Debtors also have asserted that

7    the payment of the individual claimants' defense

8    cost from the special $10 million fund should not

9    limit the availability of proceeds that may be

10   required by the Debtor.

11                  Based upon the pleadings filed and

12   the record of this hearing, the Court finds that

13   because of the entity coverage, the stay is

14   implicated.  However, the Debtors' interest appear

15   minimal.

16                  Moreover, the Debtors' interest

17   should not be expanded by this Court.  They should

18   receive no greater protection than their contract

19   rights afford them.

20                  The Court finds cause to lift the

21   stay and grant the motion to permit the parties to

22   exercise their contractual rights under the D&O

23   Policy.

24                  In addition, the Court grants the

25   motion to lift the automatic stay to the extent

1                           ENRON CORP., ET AL.,

2    that the individual insureds and the Debtors may

3    exercise their contractual rights against the

4    $10 million special fund portion of the Fiduciary

5    Policy.

6                       The Movants shall settle an order

7    upon the appropriate parties.

8                       We will begin again, I think, at

9    2:30.  Thank you.

10

11                      (Time noted:  2:05 p.m.)

12                               oOo

13

14

15

16

17

18

19

20

21

22

23

24

25

18

# C E R T I F I C A T E

STATE OF NEW YORK     )

                      ) SS.:

COUNTY OF NEW YORK    )


          I, LINDA D. NOTO, a Certified

Shorthand Reporter, Registered

Professional Reporter and Notary Public

within and for the State of New York, do

hereby certify:

          I reported the proceedings in the

within entitled matter, and that the

within transcript is a true record of

such proceedings.

          I further certify that I am not

related, by blood or marriage, to any of

the parties in this matter and that I am

in no way interested in the outcome of

this matter.

          IN WITNESS WHEREOF, I have hereunto

set my hand this 11th day of April, 2002.


                    LINDA D. NOTO, C.S.R., R.P.R.

                    License Number XI 01887 - N.J.

                    License Number 001002 - N.Y.