**Hearing Date and Time: November 17, 2010 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: November 10, 2010 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    08-13555 (JMP)
                                          :
                        Debtors.          :    (Jointly Administered)
                                          :
                                          :
-----------------------------------------------------------------x
```

## NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO IMPLEMENT THE 2011 DERIVATIVES EMPLOYEE INCENTIVE PROGRAM

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for authorization to implement a 2011 derivatives employee

incentive plan, all as more fully described in the Motion, will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court,

Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New

York 10004 (the "Bankruptcy Court"), on **November 17, 2010 at 10:00 a.m. (Prevailing**

**Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn:  Richard P. Krasnow, Esq. and Sunny Singh, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Tracy Hope Davis, Esq., Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., and Linda Riffkin, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Evan Fleck, Esq., Dennis O'Donnell, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **November 10, 2010 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: October 27, 2010
     New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                                  :
**In re**                                                          :          **Chapter 11 Case No.**
                                                                  :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :          **08-13555 (JMP)**
                                                                  :
                                       **Debtors.**             :          **(Jointly Administered)**
                                                                  :
                                                                  :
------------------------------------------------------------------x

## DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO IMPLEMENT THE 2011 DERIVATIVES EMPLOYEE INCENTIVE PROGRAM

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

## Preliminary Statement

1.     As contemplated by the Debtors' motion requesting authorization to implement a derivatives employee incentive plan for 2010 (the "2010 Incentive Plan"), which was approved by this Court on December 17, 2009 [Docket No. 6298], the Debtors request

authorization to implement a derivatives employee incentive plan for 2011 (the "2011 Incentive Plan").  The 2011 Incentive Plan is constructed on the same principles as the 2010 Incentive Plan and will allow the Debtors to maintain the momentum and success the Debtors have realized in the ongoing wind down of the Debtors' derivatives businesses.  Like the 2010 Incentive Plan, the 2011 Incentive Plan is designed to maximize the value of the Debtors' derivatives assets and to ensure that the Debtors are able to continue to expeditiously review derivatives claims filed against their estates.

2.    Under the 2010 Incentive Plan, the Debtors were permitted to offer a performance based incentive pool of up to $50 million in the aggregate to derivatives employees with payments to be made upon the achievement of certain specified criteria.  The Debtors estimate that approximately $35 million in the aggregate will be accrued for eligible employees for value created or preserved in 2010 under the 2010 Incentive Plan.  The excess amount remaining under the 2010 Incentive Plan, currently estimated to be approximately $15 million, will accrue to eligible employees that continue their employment with the Debtors or the LAMCO Entities (as defined below) in 2011 pursuant to the terms of the 2010 Incentive Plan.[1] By the 2011 Incentive Plan, the Debtors request authority to offer a performance based incentive pool of up to $15 million in additional funds to derivatives employees for value created or preserved during 2011.

3.    In 2010, the Debtors employed approximately 230 full-time employees (the "Derivatives Workforce") who were devoted solely to the task of reconciling and

---

[1] Specifically, as set forth in the Motion seeking authorization to implement the 2010 Incentive Plan, if a derivatives employee accepts an offer for extension of employment beyond December 31, 2010, "the employee's 2011 Contractual Bonus will be at least equal to his or her 2010 Contractual Bonus and his or her 2011 Incentive will not be less than 50% of his or her 2010 Incentive (in each case pro rated based upon the employee's period of extension)."  *See* Motion for Authorization to Implement 2010 Incentive Plan ¶ 22 [Docket No. 5952].

maximizing the value of Lehman's massive derivatives portfolio consisting of over 10,000

derivative contracts (the "Derivative Contracts") with an excess 1,700,000 transactions.

Pursuant to the authority granted by the Court to establish the LAMCO Entities, the members of

the Derivatives Workforce were transferred to the LAMCO Entities on or about May 1, 2010.

Such individuals continue to provide the same services and perform the same functions for the

Debtors as they did prior to such transfer. The Debtors are required to obtain Court approval for

payments proposed to be made to such LAMCO employees under the 2011 Incentive Plan

because the Debtors will be funding payments under the 2011 Incentive Plan.

> 4. Through the efforts of the Derivatives Workforce, as of August 31, 2010,

the Debtors have recovered approximately $2.5 billion in cash in 2010, bringing the total amount

of cash recovered by the Debtors on account of their derivatives assets since September 15, 2008

to more than $11 billion. In addition, more than 95% of the Derivative Contracts have now been

fully reconciled and the Debtors' valuation has been completed with respect to more than 85% of

the Derivative Contracts. Notwithstanding the tremendous efforts and achievements of the

Derivatives Workforce, much remains to be done. Only 43% of the Derivatives Contracts are

considered to be "final settled" and the Debtors are continuing to pursue their strategies on

collection of receivables and resolution of claims at fair value to maximize recoveries for

creditors. The Derivatives Workforce has also been focused on reviewing and reconciling more

than 8,000 derivatives and derivatives guarantee claims that have been filed against the Debtors

asserting more than $75 billion in amounts due from the Debtors. Reviewing and reconciling

derivatives claims filed against the Debtors and monetizing the value of the Debtors' "in the

money" Derivatives Contracts will continue to require substantial efforts of the Derivatives

Workforce through 2011. The Debtors estimate that approximately 150 full term employees and

approximately 25 part term employees will be required in 2011 to assist the Debtors wind down their derivatives businesses.

5.      Like the 2010 Incentive Plan, the 2011 Incentive Plan is designed to motivate and reward the Derivatives Workforce for their services that result in direct benefit to the Debtors through recovery on, or preservation of, the Debtors' derivatives assets and mitigation of derivatives claims against the Debtors.  No payments will be made unless the specified performance metrics are satisfied.  The 2011 Incentive Plan has been developed in close consulation with the Creditors' Committee's (defined below) advisors.  For these reasons, as set forth more fully below and in the Declaration of Robert Hershan filed in support of the Motion (the "Hershan Declaration"), the 2011 Incentive Plan is in the best interest of the Debtors' estates and their stakeholders and should, therefore, be approved.

## Background

6.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

8.      On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

9.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

10.      On April 14, 2010, the Debtors filed a revised joint chapter 11 plan (the

"Plan") and disclosure statement (the "Disclosure Statement") [Docket Nos. 8330 and 8332].

### Jurisdiction

11.      This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Lehman's Business

12.      Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman had been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.

13.      Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

### Relief Requested

14.      By this Motion, pursuant to sections 105(a), 363(b)(1), and 503(b)(1)(A)

of the Bankruptcy Code and Bankruptcy Rule 6004, the Debtors seek (i) authorization to adopt,

implement or otherwise take action consistent with the 2011 Incentive Plan, as described herein,

including making all payments thereunder, and (ii) approval of an administrative expense

priority of distribution entitlements under the 2011 Incentive Plan.  To successfully implement

the 2011 Incentive Plan, the Debtors also request that the Court waive Bankruptcy Rule 6004(h)

and direct that the order granting the relief requested herein be effective immediately upon entry.

### The Derivatives Workforce

15.     As the Court is aware, to maximize their limited resources, the Debtors

have established derivatives reconciliation and management teams based upon relevant industry,

counterparty and derivative product experience.  Generally, the members of the Derivatives

Workforce are assigned to a particular group, such as "Counterparty Teams" or

"Trading/Valuation," and then further assigned to a specific team that is led by a team leader.

Each team is charged with a specified task.  For example, the sole and dedicated purpose of the

members of the "Big Bank" team is to unwind derivative trades between the Debtors and thirty-

three of the largest financial institutions in the world.  The "SPV" team is tasked with the

objective of reconciling and winding down the Debtors' Derivatives Contracts with

counterparties that are special purpose entities.

16.     As set forth in the Hershan Declaration, on a day-to-day basis, among

other things, the Derivatives Workforce gathers and collates trade data, determines and

reconciles trade values, engages with counterparties to negotiate and recover payments or

collateral, and reconciles derivatives claims against the Debtors.  Given the unique nature of

Lehman's derivative unwind activities, the Derivatives Workforce is being asked to perform and

undertake tasks that are not normally performed in the derivatives marketplace.  Indeed, there is

no comparable entity in or out of bankruptcy that is engaged in the unwind of a derivatives

portfolio of the size and scale of the Debtors.  The Derivatives Workforce is subject to exceptional demands, complexities and pressures.

17.    To perform these extremely complex tasks in an efficient fashion, the Debtors require the expertise of highly qualified individuals with in-depth knowledge of Lehman's pre-petition business and counterparties.  Currently, approximately 60% of the Derivatives Workforce is made up of Lehman legacy employees and 80% of the workforce has been assisting the Debtors unwind their derivatives business for more than 12 months.  These individuals have significant institutional knowledge and Lehman process knowledge, which would make replacing them very difficult.  The loss of key individuals with knowledge of the Debtors' derivatives assets and developed counterparty relationships causes delay and frustrates the Debtors' goals and objectives of maximizing the value of their derivatives businesses.  The inefficiencies created by employee attrition and the delay associated with overcoming learning curves by replacement employees directly result in increased costs to the Debtors.

18.    Prior to the implementation of the 2010 Incentive Plan, 67 members of the Derivatives Workforce had voluntarily terminated their employment with the Debtors since the Commencement Date.  Since the inception of the 2010 Incentive Plan, only 23 members of the Derivatives Workforce have voluntarily terminated their employment.  The attrition rate for the Derivatives Workforce was reduced in 2010 to an average of 2.8 voluntary terminations per month from an average of 5.5 voluntary terminations per month in 2009.

19.    All of the Debtors' and the LAMCO Entities' employees, including the Derivatives Workforce, are currently compensated pursuant to the authority granted to the Debtors to implement the retention and recruitment program (the "<u>Retention and Recruitment Program</u>").  *See* Docket No. 1662 (order approving Retention and Recruitment Program).

Generally, under the Retention and Recruitment Program, employees are paid a base salary and are eligible to earn a performance based bonus (the "Contractual Bonus"), the metrics of which are set at the time of employment or extension by Alvarez and Marsal North America LLC ("A&M") with the review and consent of the Creditors' Committee. The amount of Contractual Bonus ultimately paid to an eligible employee is based upon a review of the employee's performance over the course of the employment or extension term by A&M and subject to the consent of the Creditors' Committee. The Derivatives Workforce is also compensated pursuant to amounts that are earned under the 2010 Incentive Plan.

20.     The Debtors are at a critical stage in their chapter 11 cases and seek to capitalize on the momentum that has been generated in the ongoing wind down of their derivatives business. It is anticipated that next year will continue to require a substantial commitment by the Derivatives Workforce to effectively wind down the Debtors' derivatives portfolio, particularly with respect to the review and reconciliation of derivatives claims filed against the Debtors' estates. The Debtors project that approximately 175 individuals (150 full term and 25 part term) will be required for the Derivatives Workforce in 2011. Without a qualified and motivated workforce, the Debtors will be operating at a serious disadvantage in their negotiations and litigation with counterparties and their efforts to maximize value for their stakeholders. Accordingly, the Debtors have developed a meaningful package to continue to motivate the Derivatives Workforce to excel at their highest and best levels in the unwind of the Debtors' derivatives businesses. The 2011 Incentive Plan will enable the Debtors and the LAMCO Entities to compete with the compensation and prospect of long-term employment offered by their competitors within the constraints of the Bankruptcy Code.

## The 2011 Incentive Plan

21.     The Debtors have designed an incentive pool to be calculated based upon

the total value recovered or preserved by the Derivatives Workforce as well as for claims

mitigated through December 31, 2011 (the "Trigger Date") capped at $15 million in the

aggregate (the "Incentive Pool").  This amount excludes the excess or carryover payments that

were authorized to be made to derivatives employees under the 2010 Incentive Plan.

Contributions to the Incentive Pool will be based upon percentages of (i) cash collections; (ii)

realizable asset value of live trades; (iii) counterparty settlement offers; and (iv) mitigation of

claims, including claims settlement offers.  The Debtors have carefully selected the benchmarks

set by the 2011 Incentive Plan, which have been reviewed by the Creditors' Committee and its

professionals, and believe that they are reasonably calculated to achieve the desired result of

maximizing value for creditors.  The Debtors have set the benchmarks based upon their

experience in these cases, the progress made to date, a review of their derivatives portfolio,

including counterparties and risks associated with litigation, and an assessment of the size,

qualification and performance to date of the Derivatives Workforce.

Eligibility and Payout

22.     None of the employees that are eligible for participation in the 2011

Incentive Plan are officers, directors or persons in control of the Debtors.  At the time the Court

approved the 2010 Incentive Plan, there were four individuals, including one of the co-heads of

the derivatives group (the "Derivatives Co-Heads"),[2] who were nominally "officers" of certain

Debtors.  In connection with the transfer of the Derivatives Workforce to the LAMCO Entities,

---

[2] The Derivatives Co-Heads include an A&M employee and a Lehman legacy employee.  The Lehman
legacy Derivatives Co-Head will be eligible to participate in the 2011 Incentive Plan.  However, all
decisions made with respect to such individual's maximum and actual payout under the 2011 Incentive
Plan have been or will be made by A&M, with the consent of the Creditors' Committee.

however, such individuals are no longer "officers" of the Debtors.  These four individuals, who

have generally the same responsibilities as they did at the time the Court approved their

participation in the 2010 Incentive Plan, will be eligible for participation in the 2011 Incentive

Plan. The Creditors' Committee has been apprised of, and has no objection to, these four

individuals being eligible to participate in the 2011 Incentive Plan.

23.    Approximately twenty-five (25) members of the Derivatives Workforce

are being extended on a part term basis for a period of 3 or 6 months.  These individuals will not

be eligible to participate in the 2011 Incentive Plan.  As compensation for 2011, these part term

individuals will receive: (i) a base salary; (ii) an amount equal to at least their earned 2010

Contractual Bonus (pro rated); and (iii) an amount equal to 50% of their total earned

compensation under the 2010 Incentive Plan (pro rated).

24.    Approximately one hundred-fifty (150) members of the Derivatives

Workforce are being extended for a full term of 12 months.  As compensation for 2011, such

individuals will: (i) receive a base salary; (ii) receive an amount equal to at least their earned

2010 Contractual Bonus; (iii) receive an amount equal to 50% of such individual's earned

compensation under the 2010 Incentive Plan; and (iv) be eligible to earn up to an additional

maximum incentive for 2011 determined on a case by case basis by the Derivatives Co-Heads

(such incentive payment for 2011, in the case of each employee, the "2011 Incentive Payment").

25.    To be eligible for the 2011 Incentive Plan, a derivatives employee must be

employed by the Debtors or the LAMCO Entities from January 1, 2011 through the Trigger

Date.  Employees hired after January 1, 2011, but on or prior to September 30, 2011 (either to fill

new or replacement positions) and who are employed through the Trigger Date may also be

eligible to earn a 2011 Incentive Payment, as determined by the Derivatives Co-Heads subject to

the consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

Employees who are dedicating a portion of their time to the unwind of the Debtors' derivatives

businesses may also be eligible to earn a 2011 Incentive Payment at the discretion of the

Derivatives Co-Heads subject to the consent of the Creditors' Committee, which consent shall

not be unreasonably withheld.  At the time a derivatives employee is extended an offer of

employment for 2011, or at the time a new or replacement employee is hired and the Derivatives

Co-Heads determine to allow such new or replacement employee to participate in the 2011

Incentive Plan, such individual will be allotted a maximum 2011 Incentive Payment on a

discretionary basis by the Derivatives Co-Heads.  The maximum 2011 Incentive Payment will be

determined based upon each employee's performance, function, seniority, and historical

compensation.  Additionally, the Debtors may use the maximum incentive payment previously

allocated to terminated employees to compensate replacement employees.

26.    The actual 2011 Incentive Payment that is payable to each member of the

Derivatives Workforce will be determined at the end of 2011 by the Derivatives Co-Heads based

upon an individual's performance and other criteria established through internal guidelines.  The

maximum 2011 Incentive Payment that may be paid to each employee, including any

reallocation of a maximum 2011 Incentive Payment of a terminated employee to a replacement

employee, and the actual 2011 Incentive Payment that is paid to each employee is subject to the

consent of the Creditors' Committee, which consent shall not be unreasonably withheld.  Subject

to the individual caps and as described below, at least 75% of the Incentive Pool must be

distributed to eligible members of the Derivatives Workforce.

27.    If an employee is terminated without cause prior to September 30, 2011 or

if an employee is terminated with cause at anytime, such employee will not be entitled to a 2011

Incentive Payment.  If an employee is terminated without cause in 2011, such employee will, however, still receive their earned base salary through the departure date (plus any severance entitlement that such employee may have), such employee's earned Contractual Bonus (pro rated through the date of departure) and 50% of such employee's earned incentive payment under the 2010 Incentive Plan.  If an employee is terminated without cause after September 30, 2011, but prior to the Trigger Date, then such employee will not be entitled to a 2011 Incentive Payment unless the maximum amount distributed to eligible employees is less than the mandatory 75% Incentive Pool distribution.  In that event, employees terminated without cause after September 30, 2011 but prior to the Trigger Date will be permitted to share pro rata and subject to their individual caps in the difference between the mandatory 75% Incentive Pool distribution and the actual aggregate 2011 Incentive Payments distributed to the Derivatives Workforce.  For example, if the total Incentive Pool is $10 million, at least $7.5 million must be distributed to eligible members of the Derivatives Workforce.  If the aggregate 2011 Incentive Payment distributed to the Derivatives Workforce through the Trigger Date is $6 million, then derivatives employees terminated after September 30, 2011 but prior to the Trigger Date will receive a pro rata share of $1.5 million subject to their individual 2011 Incentive Payment caps.  While the remaining $2.5 million in the Incentive Pool is not required to be distributed, it may be distributed at the discretion of the Derivatives Co-Heads.

Extension Option

28.    The Debtors and the LAMCO Entities retain the option to offer to extend employee contracts upon 30 days' notice.  If an employee accepts an extension offer, such individual's 2012 base salary will be at least equal to his or her 2011 earned base salary and such individual's 2012 Contractual Bonus will be at least equal to his or her earned 2011 Contractual

Bonus, both pro rata for the period of such extension.  In addition, if an employee is offered an extension of employment beyond December 31, 2011, the Debtors will hold back an amount equal to 25% of the total incentive payments earned by such individual in 2011, *i.e.,* 50% of such individual's earned compensation under the 2010 Incentive Plan plus such individual's 2011 Incentive Payment.  The holdback does not apply to employees earning a total base salary and Contractual Bonus of less than $150,000 in 2011.  Except as described below, the 2011 Incentive Payment holdback will be paid at the earlier of (a) January 31, 2013 or (b) within 30 days of the end of the extension period if the extension is for less than 12 months.

29.     If an employee is terminated without cause during the 2012 extension period, the employee will be paid the full amount of his or her 2011 Incentive Payment holdback and a pro rata share of his or her 2012 Contractual Bonus.  If, however, an employee declines an extension offer, is terminated with cause during the extension period or should resign prior to the completion of the extension period, such employee shall not be entitled to his or her 2012 Contractual Bonus and shall forfeit his or her 2011 Incentive Payment holdback.

Calculation of the Incentive Pool

30.     The amounts contributed to the Incentive Pool will be calculated, as of the Trigger Date, based upon an "Asset Recovery" component and a "Claims Mitigation" component and shall be subject to the consent of the Creditors' Committee, which consent shall not be unreasonably withheld, as explained below.  Contributions to the Incentive Pool under the Asset Recovery component are calculated based upon total recovery through cash collections, value of live trades (referred to as "Realizable Asset Value") and counterparty settlement offers without duplication (collectively, "Recovery Value").  Recovery Value is based upon collections realized or value preserved since September 15, 2008.  There shall be no incremental

contribution to the Incentive Pool under the 2011 Incentive Plan for amounts credited to the

Derivatives Workforce under the 2010 Incentive Plan.

31.    The criteria for contributions to the Incentive Pool under the 2011

Incentive Plan are largely the same as the criteria for the 2010 Incentive Plan, with certain

modifications to reflect the evolution of these cases.  For example, the Debtors recognize that the

focus of the Derivatives Workforce in 2011 on reviewing and reconciling derivatives claims is

expected to increase.  Accordingly, the contribution to the Incentive Pool for claims mitigation

has been increased from 20 basis points for claims mitigated to 30 basis points for claims

mitigated in excess of $10 billion to further motivate the Derivatives Workforce.  The

adjustments in contributions to the Incentive Pool recognize the Debtors' shift in focus and are

also intended to simplify the mechanics of the 2011 Incentive Plan.[3]

**Asset Recovery**

32.    Contributions to the Incentive Pool will be calculated based upon total

Recovery Value in excess of the greater of $15 billion and the total Recovery Value determined

for the 2010 Incentive Plan as of December 31, 2010 and will be made as follows: 100 basis

points of Recovery Value in excess of such floor will be contributed to the Incentive Pool.  For

example, if total Recovery Value is $16 billion as of the Trigger Date and Recovery Value

determined for the 2010 Incentive Plan as of December 31, 2010 is $15.5 billion, then there will

be a contribution to the Incentive Pool of 100 basis points of $500 million (difference between

$16 billion and $15.5 billion), or $5 million.

---

[3] A chart identifying the material differences between the 2010 Incentive Plan and 2011 Incentive Plan is
annexed hereto as Exhibit A.

**Cash Collections and Realizable Asset Value**

33.      Cash collections is the amount of cash realized on a Derivatives Contract (including Derivatives Contracts with affiliates) and other derivatives-related assets included in the 2011 Incentive Plan through a settlement, liquidation, transfer or assignment to a third party. Realizable Asset Value relates to the benefit to the estate from preservation of value of open live contracts and is the liquidation value of the live portfolio as of, or reasonably close to, the Trigger Date.  In many cases, due to current market conditions, preservation or management of a portfolio of derivatives assets, as opposed to immediate sale or liquidation, may be in the best interests of the Debtors.  Because it evidences a value enhancement, to encourage the preservation of such value and to attract individuals with unique management skills to remain with or join the Debtors, the Debtors believe that offering an incentive on Realizable Asset Value in addition to cash collections is appropriate.

34.      The Realizable Asset Value will initially be determined by the derivatives team charged with managing that portfolio of contracts.  The derivatives team has the greatest understanding of the portfolio and will be in the best position to determine the intrinsic value of the contracts.  To ensure an objective assessment of value, the assigned Realizable Asset Value is subject to review and approval by A&M and the consent of the Creditors' Committee, which consent shall not be unreasonably withheld.  There shall be no incremental contribution to the Incentive Pool under the 2011 Incentive Plan for Realizable Asset Value credited to the Derivatives Workforce under the 2010 Incentive Plan.

**Settlement Offer Value**

35.    Lastly, the Asset Recovery component includes the settlement value offered by a counterparty, but rejected by the Debtors.  To reward the Derivatives Workforce for the time and effort expended in negotiating a settlement and to encourage favorable settlements, the Debtors believe it is appropriate to calculate the contribution to the Incentive Pool based upon the last settlement offer negotiated by the Derivatives Workforce that remains outstanding as of the Trigger Date, even if such offer is not accepted.  To ensure an objective assessment of the settlement offer value, including verification that the settlement offer is a true offer and not subject to further negotiation, the proposed settlement value will be subject to review and approval by A&M and the consent of the Creditors' Committee, which consent shall not be unreasonably withheld.  In addition, there shall be no incremental contribution to the Incentive Pool for settlement offers that were credited to the Derivatives Workforce under the 2010 Incentive Plan but for which final agreement was not reached until 2011 (except for any excess value obtained in 2011 that is over the amount that was credited to the Derivatives Workforce under the 2010 Incentive Plan).

**Claims Mitigation**

36.    In addition to the Asset Recovery Component, the Incentive Pool will be calculated based upon "Claims Mitigation."  For every dollar mitigated on a derivatives claim as a result of the efforts of the Derivatives Workforce, *i.e.*, the difference between either the valuation statement submitted by a creditor or the claim filed by that creditor (each after reductions for trades that are determined to be inappropriately included in the trade population due to maturation, termination or novation prior to the Early Termination Date or duplicate and frivolous claims) and the amount of the claim as ultimately allowed by agreement or order of the

Court, 30 basis points will be contributed to the Incentive Pool for total amounts mitigated in

excess of $10 billion (since September 15, 2008).  For the same reasons that the Debtors have

determined it is appropriate to include settlement offer value for calculation of the Asset

Recovery component of the Incentive Pool, the Claims Mitigation component also includes the

settlement value offered by a counterparty on a claim, but rejected by the Debtors.  There will be

no contribution to the Incentive Pool for (i) duplicate or frivolous claims mitigation, (ii)

settlement offers that are retracted by a counterparty, or (iii) settlement offers that were credited

to the Derivatives Workforce under the 2010 Incentive Plan but for which final agreement or

determination on a claim was not reached until 2011 (except for any excess value obtained in

2011 that is over the amount that was credited to the Derivatives Workforce under the 2010

Incentive Plan).  To ensure an objective assessment of value, prior to a claim being processed by

the derivatives team, the initial amount of the claim will be subject to review and approval by

A&M and the consent of the Creditors' Committee, such consent not to be unreasonably

withheld.

   37.  The following is a summary of the material terms of the 2011 Incentive

Plan as described above:

| Criteria | Asset Recovery Component | Claims Mitigation |
|---|---|---|
|  | ▪ Cash Collections<br>▪ Realizable Asset Value (value preservation)<br>▪ Settlement Offer Value | ▪ Claims mitigation (after adjustment for duplicates and frivolous claims)<br>▪ Claims Mitigation Settlement Offers |
| **Incentive Pool** | 100 basis points for Asset Recovery exceeding greater of $15 billion and total Recovery Value determined for the 2010 Incentive Plan as of December 31, 2010 | 30 basis points for Claims Mitigation exceeding $10 billion |

| Individual Payouts | <ul><li>Maximum 2011 Incentive Payment determined on a discretionary basis by the Derivatives Co-Heads (date of extension or hire)</li><li>Actual 2011 Incentive Payment determined on discretionary basis by Derivatives Co-Heads based upon actual performance</li><li>Both maximum and actual payouts subject to Creditors' Committee consent, such consent not to be unreasonably withheld</li></ul> |
|---|---|
| **Aggregate Cap** | **$15 million** |

LAMCO and Cost Allocation Among Debtors

38.     By order dated April 15, 2010, the Court approved the Debtors' transfer to LAMCO Holdings LLC and its subsidiaries (collectively, the "LAMCO Entities") of a majority of LBHI's asset management employees and certain infrastructure (the "LAMCO Order") [Docket No. 8372].  As a result, the members of the Derivatives Workforce are now employed directly by the LAMCO Entities, but will be providing the same services to the Debtors as they performed prior to the establishment of the LAMCO Entities.  As noted above, the Debtors are seeking Court approval of the 2011 Incentive Plan because they will be funding all payments thereunder.

39.     The cost to the LAMCO Entities to employ the Derivatives Workforce are paid by the Debtors in the form of a "management fee."   Such costs are paid initially by LBHI, but the cost of every employee is then reallocated to the particular Debtor for whom an employee performs its services.  The payments made under the 2011 Incentive Plan will be allocated among the Debtors in the same manner as currently applied for the Debtors' payroll expenses.

**The 2011 Incentive Plan is Supported**
**By Sound Business Judgment And Should Be Approved By The Court**

40.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  When considering a transaction outside

the ordinary course of business, courts in the Second Circuit, and others, require that such

transaction be based upon the sound business judgment of the debtor. *Comm. of Equity Sec.*

*Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re*

*Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir.

1996) (citing *Fulton State Bank v. Schipper* (*In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991));

*Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*),

780 F.2d 1223, 1226 (5th Cir. 1986).

41.    It is generally understood that "[w]here the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville*

*Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is

a strong presumption that "'the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company.'" *In*

*re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488

A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

*Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

42.    For all of the reasons that the Court approved the 2010 Incentive Plan, the

2011 Incentive Plan, which is designed for the same purpose of motivating the Derivatives

Workforce to continue to excel at their highest and best levels to maximize recoveries to

creditors, should be approved. The resolution of the Debtors' derivatives assets will have a

significant impact on recoveries to creditors. The 2011 Incentive Plan will enable the Debtors to

maintain the momentum generated by the 2010 Incentive Plan and promotes the expeditious

resolution of the Debtors' derivatives businesses by motivating the Derivatives Workforce to continue to efficiently pursue the Debtors' objectives.  The total cost of the 2011 Incentive Plan – no more than $15 million – is *de minimis* in comparison to the total value of the Debtors' derivatives portfolio –  estimated to be in excess of $15 billion – that can be achieved for the benefit of creditors.

43.    The 2011 Incentive Plan also encourages the Derivatives Workforce to continue their commitment to the Debtors through these challenging chapter 11 cases.  To be successful in achieving their goals, the Debtors must be represented by highly qualified individuals.  Not only does the unprecedented complexity of the Derivatives Contracts demand the expertise of individuals with extensive experience in the derivatives industry generally, but the Derivatives Workforce also possesses intimate knowledge of Lehman's derivatives business and counterparties.  The distractions and time that must be expended to continuously search for replacements could have a detrimental impact on recoveries for creditors and are far more costly than the costs associated with the 2011 Incentive Plan.  Accordingly, the 2011 Incentive Plan should be approved as a sound exercise of the Debtors' business judgment.

### The Requirements of Section 503(c)(1) of the Bankruptcy Code Are Not Applicable to the 2011 Incentive Plan

44.    Section 503(c)(1) of the Bankruptcy Code imposes heightened evidentiary burdens on the approval of a "transfer or payment made to, or an obligation incurred for the benefit of, an *insider* of the debtor *for the purpose of inducing such person to remain with the debtor's business*…" 11 U.S.C. § 503(c) (emphasis added).  Section 101(31) of the Bankruptcy Code defines the term "insider" to include an officer, director or person in control of the debtor if the debtor is a corporation.  *See* 11 U.S.C. § 101(31)(B).  As noted above and set forth in the Hershan Declaration, no officer, director or person in control of the Debtors will participate in

the 2011 Incentive Plan.  Accordingly, by its terms, section 503(c)(1) of the Bankruptcy Code is

inapplicable to the 2011 Incentive Plan.  *See In re Nellson Nutraceutical Inc.*, 369 B.R. 787, 801

(Bankr. D. Del. 2007) (holding that section 503(c)(1) is inapplicable to non-insiders).

45.    Moreover, none of the employees that are eligible for participation in the

2011 Incentive Plan have extensive control over the Debtors or the LAMCO Entities that would

afford them the opportunity for self-dealing.  *See In re 455 CPW Assoc's. v. The Greater New*

*York Savings Bank (In re 455 CPW Assoc's.)*, 2000 U.S. App. LEXIS 23470, at *17-20 (2d Cir.

Sept. 14, 2000) (holding that "courts have required evidence of *extensive* control before finding

insider status" and that individual was not an insider because the evidence did not demonstrate

that such person "executed actual management of the Debtor's affairs that afforded him an

opportunity to self-deal.") (emphasis added).  As described in the Hershan Declaration, none of

the individuals that are eligible for participation in the 2011 Incentive Plan exercise control over

the Debtors or the LAMCO Entities or made any decisions with respect to their maximum 2011

Incentive Payment and have no ability to control or influence their actual 2011 Incentive

Payment.

46.    Additionally section 503(c)(1) does not apply because the 2011 Incentive

Plan is not a retention plan.  "[M]erely because a [compensation] plan has some retentive effect

does not mean that the plan, overall, is retentive rather than incentivizing in nature."  *In re Dana*

*Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006) (concluding that "incentivizing plans with

*some* components that arguably have a retentive effect do not necessarily violate section 503(c)"

(emphasis in original)); *see also In re Nellson Nutraceutical Inc.*, 369 B.R. at 802 (noting that

"[a]ny payment to an employee, including regular wages, has at least a partial purpose of

retaining the employee. . . if the Court did not apply a materiality standard, all payments to

insiders would be subject to 503(c)(1), which would be an absurd result.  At the same time,

applying a 'sole purpose' standard goes too far.").  Courts have therefore read section 503(c)(1)

"to mean 'a transfer made to . . . an insider for the *[primary]* purpose of inducing such person to

remain with the debtor's business."  *Id.* at 802 (quoting 11 U.S.C. § 503(c)(1)) (emphasis in

original); *see also In re Global Home Products, LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007)

(holding that "[t]he entire analysis changes if a bonus plan is not *primarily* motivated to retain

personnel…") (emphasis added).

> 47.    As was the case with the 2010 Incentive Plan that was approved by the

Court, the 2011 Incentive Plan is not a prohibited retention plan under section 503(c)(1) of the

Bankruptcy Code because the primary purpose of the 2011 Incentive Plan is to maximize

recoveries to creditors, not to retain insiders.  The 2011 Incentive Plan is a performance based

reward to the Derivatives Workforce for benefits created for the Debtors and their stakeholders.

The total amounts payable are directly tied to the value created or preserved by the members of

the Derivatives Workforce.  If the threshold metrics are not satisfied, no payments will be made.

### The Requirements of Section 503(c)(3), to the Extent Applicable, Are Satisfied

> 48.    Section 503(c)(3) of the Bankruptcy Code prohibits "other transfers or

obligations that are outside the ordinary course of business and not justified by the facts and

circumstances of the case, including transfers made to, or obligations incurred for the benefit of,

officers, managers or consultants hired after the date of the filing of the petition."  11 U.S.C. §

503(c)(3).  Some courts have held that the business judgment standard is the relevant test under

503(c)(3).  *See In re Dana Corp.*, 358 B.R. at 576 (holding that the "test in section 503(c)(3)

appears to be no more stringent a test than the one courts must apply in approving any

administrative expense under section 503(b)(1)(A).  Any expense must be an actual, necessary

cost or expense of preserving the estate" (citation omitted)).  Other courts "have held that section

503(c)(3) sets a higher bar than the simple business judgment test."  *In re Pilgrim's Pride Corp.*,

401 B.R. 229, 236 (Bankr. N.D. Tex. 2009) (reading the "justified by the facts and circumstances

of the case" requirement to mean that the "court must make its own determination that the

transaction will serve the interests of creditors and the debtor's estate"); *see also In re CEP

Holdings, LLC*, 2006 WL 3422665, *3 (Bankr. N.D. Ohio 2006) (holding that 'facts and

circumstances' that must be considered before determining that the transaction is justified

include "whether the potential plan recipient had significant input into the negotiation of the plan

(including the amount of additional compensation that the employee would receive under the

plan)").

   49.  Under either standard, the 2011 Incentive Plan is more than justified by

the "facts and circumstances" of these cases.  It is widely recognized that derivatives contracts

are extremely complex and require expertise and extensive experience to manage and liquidate.

In addition to their complexity, the Debtors' Derivatives Contracts are massive in number.  There

is a limited pool of professionals that possess the necessary skills to perform the functions of

these individuals who also possess the intimate knowledge of Lehman's derivatives business.

Indeed, as the Court found in approving the 2010 Incentive Plan, "in this instance providing

reasonable incentives for these very qualified and absolutely critical employees is an essential

ingredient to the success of the Lehman liquidation, at least as it relates to the derivatives book.

And so I approve it."  *See* Tr. of Dec. 16, 2009 Hr'g at 54:12-16.

   50.  The Debtors submit that the factors set forth by the Court in *Dana*, 358

B.R. at 576, are irrelevant here because of the unique circumstances of the Debtors.  There are no

market comparables because there are no other companies that are engaged in the business of

unwinding a derivatives business of such massive size and complexity.  Moreover, the Debtors'

derivatives assets are the most significant assets of their estates.  Indeed, the efforts of the

Derivatives Workforce have resulted in the recovery of over $11 billion in cash and the

preservation of significant additional value for the benefit of creditors.  As such, comparison to

other employees of the Debtors or the LAMCO Entities charged with the task of administering

other assets of the estates is irrelevant.

      51.      Nevertheless, to the extent any of the *Dana* factors are helpful to the

Court's analysis, as explained in the Hershan Declaration, the metrics of the 2011 Incentive Plan,

which have been reviewed by the Creditors' Committee, have been carefully selected and

tailored by the Debtors to achieve the desired outcome of maximizing recoveries to creditors.

The criteria has been established based upon the Debtors' experience in these cases, the progress

made to date, a review of the derivatives portfolio, an assessment of the size, qualification and

performance to date of the Derivatives Workforce, and relevant market information (recognizing

that the Debtors are constrained by the Bankruptcy Code in ways that the market is not).

### Payments Pursuant to the 2011 Incentive Plan Are Administrative Expenses

      52.      Because the wind-down of the Debtors' derivatives business would be less

efficient and more costly without the 2011 Incentive Plan, the payment rights of the employees

under the 2011 Incentive Plan will be actual, necessary costs and expenses of preserving the

Debtors' estates, and, therefore, should be accorded administrative expense priority under section

503(b)(1)(a) of the Bankruptcy Code.

### Notice

      53.      No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the amended

order entered on June 17, 2010 governing case management and administrative procedures for

these cases [Docket No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; and (vi) all parties who have

requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice

need be provided.

        54.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

        WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  October 27, 2010
      New York, New York

                /s/ Richard P. Krasnow
                Richard P. Krasnow

                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York 10153
                Telephone: (212) 310-8000
                Facsimile: (212) 310-8007

                Attorneys for Debtors
                and Debtors in Possession

## Exhibit A

**(2010 Incentive Plan v 2011 Incentive Plan)**

## 2010 Incentive Plan v 2011 Incentive Plan

| | **2010 Incentive Plan** | **2011 Incentive Plan** |
|---|---|---|
| *Eligible Employees* | ▪ Employees that started before July 1, 2010 and remaining through December 31, 2010 | ▪ Employees that start before October 1, 2011 and remaining through December 31, 2011.<br><br>▪ Employees working partially on derivatives project also eligible (in discretion of Derivatives Co-Heads) |
| *Claims Mitigation Definition* | ▪ Claims actually mitigated | ▪ Claims actually mitigated plus claims mitigation settlement offers |
| *Contributions to Incentive Pool* | ▪ 50 bps for Asset Recovery between $10-$11 billion<br><br>▪ 100 bps for Asset Recovery exceeding $11 billion<br><br>▪ 20 bps for claims mitigated | ▪ 100 bps for Asset Recovery exceeding greater of $15 billion and total Recovery Value determined for the 2010 Incentive Plan as of December 31, 2010<br><br>▪ 30 bps for claims mitigated or claims settlement offers exceeding $10 billion |
| *Special Thresholds* | ▪ SPVs – If overall recovery exceeds $11 billion, contributions based on SPV recovery limited to 25 bps in excess of $3 billion<br><br>▪ Big Banks Claims – 20 bps for claims mitigated up to $5 billion; 5 bps for claims mitigated over $5 billion | ▪ Incorporated into overall thresholds for Asset Recovery and Claims Mitigation. |
| *Individual Payout Maximum Calculations* | ▪ Maximum payout equal to (i) attributable share of 85% of aggregate incentive pool (predetermined based performance, function, seniority, historical compensation, etc.), plus (ii) attributable share of 15% of aggregate incentive pool (reserved discretionary for Derivatives Co-Heads);<br><br>▪ Actual payout of 85% based upon satisfaction of aggregate thresholds and 15% based upon discretion of Derivatives Co-Heads;<br><br>▪ Maximum and actual payout subject to Creditors' Committee Consent, such consent not to be unreasonably withheld | ▪ 100% of maximum and actual payout determined in discretion of Derivatives Co-Heads (based on performance, function, seniority, historical compensation, etc.)<br><br>▪ Maximum and actual payout subject to Creditors' Committee Consent, such consent not to be unreasonably withheld |

| Extension / Holdback | ▪ If extension for 2011 is offered, estate has option to hold back 25% of 2010 incentive payout (only for employees earning greater than $150,000)<br><br>▪ If extension is accepted, employee's (i) 2011 base salary will be equal to at least earned 2010 base salary, (ii) 2011 Contractual Bonus will be equal to at least 2010 earned Contractual Bonus, and (iii) 2011 incentive will be equal to at least 50% of 2010 incentive | ▪ If extension for 2012 is offered, estate has option to hold back 25% of total 2011 incentive payment, i.e., 50% of earned 2010 incentive payment plus 2011 earned incentive payment (only for employees earning greater than $150,000)<br><br>▪ If an employee accepts an extension offer, such individual's (i) 2012 base salary will be at least equal to his or her 2011 earned base salary and (ii) 2012 Contractual Bonus will be at least equal to his or her earned 2011 Contractual Bonus |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                    :
In re                                               :          **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*        :          **08-13555 (JMP)**
                                                    :
                            **Debtors.**            :          **(Jointly Administered)**
                                                    :
                                                    :
----------------------------------------------------------------x

**ORDER GRANTING DEBTORS' MOTION PURSUANT TO**
**SECTIONS 105(a) AND 363(b)(1) OF THE BANKRUPTCY CODE AND**
**BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO IMPLEMENT**
**THE 2011 DERIVATIVES EMPLOYEE INCENTIVE PROGRAM**

Upon the motion, dated October __, 2010 (the "<u>Motion</u>"), of Lehman Brothers

Holdings Inc. ("<u>LBHI</u>") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "<u>Debtors</u>" and, together with their non-

debtor affiliates, "<u>Lehman</u>"), pursuant to sections 105(a) and 363 of title 11 of the United States

Code (the "<u>Bankruptcy Code</u>") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the

"<u>Bankruptcy Rules</u>") for authorization and approval of, among other things, (i) the

implementation of a 2011 derivatives employee incentive plan (the "<u>2011 Incentive Plan</u>") and

(ii) approval of an administrative expense priority of payment rights under the 2011 Incentive

Plan, all as more fully described in the Motion; and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided in accordance with the

procedures set forth in the amended order entered June 17, 2010 governing case management

and administrative procedures [Docket No. 9635] to (i) the United States Trustee for the

Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured

Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; and (vi) all parties who have

requested notice in these chapter 11 cases, and it appearing that no other or further notice need be

provided; and a hearing having been held to consider the relief requested in the Motion; and the

Court having found and determined that the relief sought in the Motion is in the best interests of

the Debtors, their estates and creditors, and all parties in interest and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtors are authorized, pursuant to sections 105(a) and

363(b)(1), and, to the extent applicable, section 503(c) of the Bankruptcy Code, to take all

necessary action to adopt, implement or otherwise take actions consistent with the 2011

Incentive Plan on the terms and conditions set forth in the Motion, including making all

payments thereunder; and it is further

ORDERED that distribution entitlements under the 2011 Incentive Plan are

entitled to administrative expense status and priority under sections 503(b)(1)(A) and 507(a)(2);

and it is further

ORDERED that the 14-day stay imposed by Bankruptcy Rule 6004(h) is waived

and this Order shall be effective immediately upon entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the 2011 Incentive Plan.

Dated:  November __, 2010
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE