09 cv 10317

JUDGE DANIELS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

FIRSTBANK PUERTO RICO,  :  Civil Action No.

        Plaintiff,  :

  -against-  :  **COMPLAINT**

BARCLAYS CAPITAL, INC.,  :  (Jury Trial Demanded)

        Defendant.  :

------------------------------------------------------------ X

RECEIVED DEC 21 2009 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiff FirstBank Puerto Rico ("FirstBank"), by its attorneys Gibbons P.C., for its Complaint against defendant alleges as follows:

1. FirstBank is a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, with its principal place of business located at 1519 Ponce de Leon Avenue, San Juan, Puerto Rico.

2. Upon information and belief, defendant Barclays Capital, Inc. ("BCI") is a Connecticut corporation with its principal place of business located at 200 Park Avenue, New York, New York.

## JURISDICTION

3. This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1332(a) as there is complete diversity between the parties and the matter in controversy exceeds $75,000.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

#1456100 v9
109459-67363

## FACTS RELEVANT TO THIS ACTION

A.  **Background**

5.  FirstBank is a Puerto Rico-chartered commercial bank with operations in Puerto Rico, the United States and the U.S. and British Virgin Islands.

6.  In connection with its business activities, on or about January 16, 1997, FirstBank entered into an International Swap Dealers Association ("ISDA") Master Agreement with Lehman Brothers Special Financing, Inc. ("LBSF") (the "Swaps Agreement").

7.  Pursuant to the Swaps Agreement, FirstBank engaged in swap transactions with LBSF in which interest rate risk was shifted or hedged.

8.  In order to secure FirstBank's obligations under various swap transactions, the Swaps Agreement required FirstBank to post collateral with LBSF.

9.  As the required collateral, FirstBank delivered to LBSF government issued mortgage backed securities of the Government National Mortgage Association ("Ginnie Mae") and Federal National Mortgage Association ("Fannie Mae") (the "Collateral").

10. The Collateral had a par value of approximately $62-million at the end of September 2008.

11. At all times relevant hereto, FirstBank held title to the Collateral.

12. Since title to the Collateral was held by FirstBank, LBSF, as custodian, was required by Paragraph 6(d) of the Credit Support Annex of the Schedule to the Swaps Agreement (the "Annex") to deliver to FirstBank all accrued interest paid by the issuer of each security that comprised the Collateral.

13. In addition, Paragraph 6(a) of the Annex required LBSF to assure the safe custody of the Collateral for FirstBank, and in that regard, provided as follows:

#1456100 v9
109459-67363

> [T]he Secured Party (LBSF) will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law....

14. On or about September 15, 2008, LBSF defaulted in its obligation under the Swaps Agreement to timely pay to FirstBank the scheduled net cash settlement due by that date.

15. On or about September 24, 2008, FirstBank delivered to LBSF a notice of termination of the Swaps Agreement pursuant to paragraph 6(a) thereto (the "Notice of Termination"), and made demand upon LBSF for return of the Collateral.

16. Upon termination of the Swaps Agreement in the manner set forth above, paragraph 8(b) of the Annex entitled FirstBank to the immediate return of all of the Collateral. That paragraph provided as follows:

> If at any time an Early Termination Date has occurred or been designated as a result of an Event of Default [...], then [...] the Secured Party (LBSF) will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor (FirstBank)....

17. On or about October 3, 2008, LBSF filed for protection under Chapter 11 of the United States Bankruptcy Code (the "LBSF Bankruptcy").

18. Prior to filing the LBSF Bankruptcy, LBSF failed and refused to return to FirstBank the Collateral, as required by the Swaps Agreement.

B. **Lehman Brothers, Inc. as Custodian of the Collateral**

19. On information and belief, at all times relevant hereto, LBSF was a wholly owned subsidiary of Lehman Brothers Holdings, Inc. ("LBHI"), and an affiliate of Lehman Brothers, Inc. ("LBI"), which itself was also a wholly owned subsidiary of LBHI.

20. On information and belief, LBSF relied upon LBI to act as its custodial agent for the purpose of physically holding the Collateral.

21. Paragraph 6(b)(i) of the Annex provided that:

-3-

> The holding of Posted Collateral by a Custodian (LBI) will be deemed to be the holding of that Posted Collateral by the Secured Party (LBSF) for which the Custodian is acting.

22. In accordance with the Swaps Agreement, during the period that LBI acted as custodial agent for LBSF in the foregoing manner, title to the Collateral remained with FirstBank, and until LBSF's default, all accrued interest thereon was accounted for by LBSF and paid to FirstBank as owner of the Collateral.

23. On or about September 15, 2008, LBI filed for protection under Chapter 11 of the United States Bankruptcy Code (the "LBI Bankruptcy").

24. At the time of the LBI Bankruptcy filing, LBI was acting as custodial agent for LBSF in connection with the Collateral, and did not have any (i) ownership interest in or other right to claim title to the Collateral or (ii) security interest in the Collateral.

25. Upon information and belief, the books and records of LBSF and LBI, which included regular statements issued by each of them, reflected that the Collateral did not belong to LBI, and that it was not part of the LBI estate at the time of LBI's bankruptcy filing.

26. BCI knew or reasonably should have known, following an exercise of ordinary due diligence, that the Collateral in the possession of LBI as custodial agent at the time of its bankruptcy filing belonged to FirstBank, and was not an asset of LBSF or LBI.

C. **BCI Receives the Collateral from LBI Without Authorization**

27. Prior to the filing of the LBI Bankruptcy, LBI and its subsidiaries and affiliates (collectively, "Lehman") constituted one of the largest investment banking and financial services firms in the world.

28. There was a substantial concern expressed by experts and government officials at the time of the bankruptcy filing by LBHI and LBI that the Lehman failure generally would have a significant negative impact on world financial markets.

-4-

29. After the LBI Bankruptcy filing, along with that of parent LBHI, BCI pursued the acquisition of certain pieces of the former Lehman business from the bankruptcy estate, which pieces BCI has referred to in its own financial reports as the "Lehman Brothers North American business."

30. Because of the unprecedented magnitude of the Lehman bankruptcy, and the generally expressed concern that any delay might further erode the value of whatever portions of the former Lehman business a third party might be interested to acquire, BCI and others knew that time was of the essence.

31. As a result, BCI conducted due diligence into the underlying assets of LBI and its affiliates on an expedited basis.

32. The due diligence process was so expedited that, in fact, BCI made an agreement to acquire assets of LBI on September 16, 2008, literally one day after the LBI Bankruptcy was filed.

33. Pursuant to the Asset Purchase Agreement dated as of September 16, 2008 between the Lehman entities LBHI, LBI and LB 745 LLC, on the one hand, as "Seller", and BCI, on the other hand, as "Purchaser", as amended as of September 19, 2008 and September 20, 2008 (the "Purchase Agreement"), BCI expressly purchased the following assets:

> The "Purchased Assets" means (i) ***all of the assets of Seller*** used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) ***none of the assets of Subsidiaries of LBHI (other than assets of LBI)*** (emphasis added)

34. The Collateral was never an asset of or owned by any party defined as "Seller" under the Purchase Agreement.

#1456100 v9
109459-67363

35. In addition, the Collateral was delivered by FirstBank to LBSF, the counterparty to the Swaps Agreement, solely to secure certain obligations of FristBank under the Swaps Agreement.

36. Accordingly, LBSF was neither an owner of the Collateral, nor was it a "Seller" under the Purchase Agreement.

37. LBI, the party from which BCI obtained possession of the Collateral, only had possession of the Collateral itself as custodial agent for LBSF.

38. On September 19, 2008, the Bankruptcy Court (Hon. James M. Peck) issued a Sale Order approving the sale of certain LBI assets to BCI (the "Sale Order") pursuant to the Purchase Agreement.

39. Since the Collateral was never an asset of "Seller" as defined in the Purchase Agreement, the Sale Order did not nor could it have properly covered or authorized the transfer of the Collateral to BCI, and any consideration paid by BCI could not have been for the Collateral.

40. The BCI sale was conducted on such an expedited basis, and was so unprecedented, that Judge Peck said the following before issuing the Sale Order after a seven hour hearing:

> I have to approve this transaction because it is the only available transaction. Lehman Brothers became a victim, in effect the only true icon to fall in a tsunami that has befallen the credit markets. This is the most momentous bankruptcy hearing I've ever sat through. It can never be deemed precedent for future cases. It's hard for me to imagine a similar emergency.

41. BCI knew or reasonably should have known that because of (i) the expedited nature of the underlying transaction, (ii) the fact that many people on the LBHI/LBI side of the transaction were themselves traumatized and in shock over the loss of their livelihoods, and (iii) other unprecedented circumstances attendant to this extraordinary transaction, once assets were

-6-

#1456100 v9
109459-67363

finally delivered to BCI, BCI needed to inspect what it received to assure that assets not transferred pursuant to the Sale Agreement were not included – mistakenly or otherwise – in the assets delivered to BCI.

42. Indeed, BCI owed a duty to FirstBank and other similarly situated counterparties on swaps agreements with LBSF to assure that collateral in the possession of LBI solely as custodial agent for LBSF was not taken by BCI.

43. The Collateral was never a part of the assets of "Seller" under the Purchase Agreement, and therefore could not properly have been part of the assets acquired by BCI pursuant to the Sale Order.

44. BCI had an obligation to account for all assets transferred after entry of the Sale Order, and to immediately return to the rightful owner all assets that were not "assets of the Seller" as defined in the Purchase Agreement, but had nevertheless been delivered to BCI after entry of the Sale Order, by mistake or otherwise.

45. Since LBI did not hold title to the Collateral, and instead was only acting as custodial agent for LBSF at the time of the Sale Order, BCI had a duty to return the Collateral to FirstBank once it discovered that the Collateral had been included in the assets delivered to BCI.

46. The Purchase Agreement further provided that unless BCI was accepting an underlying account in its entirety, which included all obligations that went along with that account, the assets of the affected customer were "excluded" from the assets being transferred to LBI. The Purchase Agreement, as amended, provides:

> "Excluded Assets" shall not include any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business.

47. BCI denied any obligations to FirstBank under or in connection with the Swaps Agreement or otherwise.

#1456100 v9
109459-67363

48. Since BCI claimed that it did not assume the Swaps Agreement, BCI similarly did not claim that FirstBank had any "obligations" to BCI under the Swaps Agreement.

49. Since BCI did not claim that FirstBank had any obligations to it under the Swaps Agreement or otherwise, there was also no need for BCI to hold the Collateral as security.

50. Accordingly, the Collateral was an "Excluded Asset" under the Purchase Agreement.

51. Since the Collateral was not a purchased asset pursuant to the Sale Order, title to it was not nor could it have properly been transferred to BCI by LBI or LBSF.

**D.** **FirstBank Attempts to Locate and Obtain a Return of the Collateral**

52. On or about September 22, 2008, BCI misled FirstBank and other similarly situated swaps agreement counterparties to believe that it had or was about to take over the obligations of LBSF under the Swaps Agreement.

53. BCI posted on the *LehmanLive* website, a site through which FirstBank had historically accessed information about its swaps transactions, the following statement:

> On September 20, 2008, Barclays Capital, Inc. acquired Lehman Brothers North American investment banking, capital markets, and private investment management businesses.
>
> During the transition period, you will continue to have access to your account and other information. Please be aware that certain information you are accessing has been prepared, and is made available to you, by Barclays Capital, Inc. and its affiliates, while other account data may be made available to you through Neuberger Berman, LLC.
>
> Click below to acknowledge.

54. On or about September 23, 2008, FirstBank contacted LBSF and inquired whether, as a result foregoing message posted on *LehmanLive*, BCI had accepted and assumed all obligations under the Swaps Agreement when it acquired assets pursuant to the Sale Order.

55. LBSF failed and refused to respond to that inquiry.

56. Since LBSF was at the time in default of its obligation to timely pay to FirstBank the scheduled net cash settlement due pursuant to the Swaps Agreement, and since LBSF had not responded to FirstBank's inquiry, FirstBank served on LBSF the Notice of Termination.

57. Nine days later, LBSF filed the LBSF Bankrupcty.

58. At the time of the LBSF Bankruptcy, FirstBank presumed the Collateral remained in the possession of LBSF and/or LBI as its custodial agent, and that the Swaps Agreement had had not been transferred to and assumed by BCI and the Collateral transferred to BCI as a result thereof.

59. FirstBank thereupon tried through counsel, without success, to determine the status of the Swaps Agreement, and confirm the location of the Collateral.

60. LBSF and the SIPA Trustee were unable or unwilling to advise FirstBank about the status of the Swaps Agreement or the Collateral.

61. FirstBank's efforts to obtain further information about the status of the Collateral were further delayed by the automatic stay in place on account of the LBSF Bankruptcy, and the need after bankruptcy filing had been made for those responsible to gather facts in order to accurately report information.

62. After engaging in discussions for several months though counsel, FirstBank was finally asked by LBSF to provide more details about the Collateral, which it did on March 31, 2009.

63. In or about June 15, 2009, LBSF filed an amended Schedule G of Assets and Liabilities (Executory Contracts and Unexpired Leases), which listed on page 121 the Swaps

#1456100 v9
109459-67363

Agreement, implying that the Swaps Agreement and the underlying Collateral were still in the possession of the LBSF estate.

64. In or about July or August, 2009, LBSF advised FirstBank for the first time that the Collateral had apparently been transferred.

65. On or about September 17, 2009, FirstBank wrote to BCI and inquired whether and in what capacity BCI was holding the Collateral.

66. On or about September 25, 2009, BCI confirmed that it had, in fact, received the Collateral from LBI, but claimed, *inter alia*, that it had purchased the Collateral out of bankruptcy pursuant to the Purchase Agreement and Sale Order, and therefore held it as sole owner to the exclusion of FirstBank's rights, even though the Collateral never belonged to LBI in the first place.

67. Since the Collateral was never the property of the LBSF or LBI estates, the Sale Order could not properly have authorized the transfer of the Collateral from LBI to BCI.

68. In addition, since the books and records of LBSF and LBI showed that the Collateral belonged to and was an asset of FirstBank, BCI knew or should have known that LBSF and LBI did not have the authority to transfer the Collateral pursuant to the Purchase Agreement and/or Sale Order since it was not property of the estate, and that the Bankruptcy Court lacked jurisdiction to authorize a transfer of the Collateral, most especially without first affording FirstBank due process, and in particular, the right to appear and be heard in opposition.

69. FirstBank also listed the Collateral as an asset on its own books and records, and has never participated in any transaction by which a transfer of the Collateral to BCI was authorized or approved.

-10-

## FOR A FIRST CLAIM FOR RELIEF
(unjust enrichment)

70. FirstBank repeats and realleges the allegations made in paragraphs "1" through "69" above, as if set forth at length herein.

71. BCI knew or should have known upon receipt of the Collateral that the Collateral was not and should not have been included in the assets delivered pursuant to the Sale Order because the Collateral was not the property of the bankrupt estate, but rather, belonged to FirstBank.

72. BCI nevertheless retained possession of the Collateral, including, but not limited to, all income paid or derived therefrom.

73. BCI has been unjustly enriched by the receipt and retention of the Collateral, as well as the income paid or derived therefrom.

74. In equity and good conscience, BCI should not be permitted to retain the Collateral, as well as the income paid or derived therefrom, since it was not and never has been property of the estate of LBI and/or LBSF, but rather, at all times material hereto was the property of FirstBank.

75. FirstBank is entitled to recover from BCI the value of the Collateral as of the date it was wrongfully delivered to BCI, plus all interest, income or other benefits paid to BCI or otherwise derived by BCI therefrom, which amount is not less than $62-million.

## FOR A SECOND CLAIM FOR RELIEF
(constructive trust/accounting)

76. FirstBank repeats and realleges the allegations made in paragraphs "1" through "69" above, as if set forth at length herein.

77. The Collateral properly belongs to FirstBank.

#1456100 v9
109459-67363

78.   Upon learning that the Collateral had been transferred to BCI, FirstBank made prompt demand upon BCI for immediate return of the Collateral.

79.   BCI failed and refused to return the Collateral, and wrongfully retained possession of it.

80.   BCI knew or reasonably should have known at the time it acquired possession of the Collateral that the Collateral belonged to FirstBank because, upon information and belief, the books and records of LBI showed that it was only holding the Collateral in the limited capacity of custodial agent for LBSF.

81.   FirstBank is entitled to the imposition of a constructive trust on the Collateral, and all interest, income or other benefits paid to BCI or otherwise derived by BCI therefrom.

82.   FirstBank is entitled to an accounting from BCI, and in particular, of the Collateral, and all income paid or derived therefrom.

## FOR A THIRD CLAIM FOR RELIEF
(negligence)

83.   FirstBank repeats and realleges the allegations made in paragraphs "1" through "69" above, as if set forth at length herein.

84.   BCI knew or reasonably should have known in light of the circumstances surrounding the transaction with LBI, including the unprecedented rush to complete this huge transaction and the fact that employees at LBI were themselves traumatized and distracted by the events that led to Lehman's demise because of the prospect of their own unemployment and uncertain futures, that assets not intended for transfer to BCI pursuant to the Sale Order may nevertheless have been delivered to BCI, by mistake or otherwise.

85.   Upon information and belief, the books and records of LBI and LBSF showed that the Collateral was not property of the estate of LBI, or later after LBSF filed for bankruptcy,

-12-

of the estate of LBSF, and that the Bankruptcy Court therefore did not have nor could it have had the authority to affirm a transfer of the Collateral to BCI.

86. BCI also knew or reasonably should have known based upon its own due diligence conducted prior to entry of the Sale Order that the Collateral was not property of the bankrupt estate.

87. BCI owed a duty to FirstBank and other similarly situated counterparties on swaps agreements with LBSF to inspect all assets delivered purportedly pursuant to the Sales Order to assure that no assets belonging to others were included within the assets delivered, mistakenly or otherwise, and to then return all such assets to their rightful owners.

88. BCI breached the duty it owed to FirstBank when it failed to properly and adequately inspect the assets delivered to BCI after entry of the Sale Order, and thereafter to return the Collateral to FirstBank.

89. BCI was negligent in the manner in which it received assets after entry of the Sale Order, and in failing to return to the rightful owner property delivered to it in error, including, but not limited to, the Collateral.

90. As a direct and proximate result of the foregoing negligence, FirstBank suffered damages in an amount not less than $62-million.

91. FirstBank is entitled to recover from BCI all monetary damages caused by the negligence of BCI set forth above, which amount is not less than $62-million.

### FOR A FOURTH CLAIM FOR RELIEF
(breach of contract/duty to return)

92. FirstBank repeats and realleges the allegations made in paragraphs "1" through "69" above, as if set forth at length herein.

93. The Swaps Agreement was timely and properly terminated by FirstBank.

#1456100 v9
109459-67363

94. FirstBank made timely demand under the Swaps Agreement for the return of the Collateral.

95. Pursuant to the terms of the Swaps Agreement, the Collateral should have been returned to FirstBank.

96. Since the Collateral was delivered to LBSF pursuant to the terms of the Swaps Agreement to be held as security for the performance of FirstBank's obligations to LBSF under the Swaps Agreement, BCI could not properly take possession of the Collateral without also explicitly or implicitly assenting to the terms and obligations of the Swaps Agreement, and in particular the obligation to return the Collateral to FirstBank following termination of the Swaps Agreement.

97. FirstBank made demand upon BCI for a return of the Collateral.

98. In breach of the obligations of the Swaps Agreement, BCI failed and refused to return the Collateral.

99. FirstBank has been damaged on account of the foregoing breach in an amount not less than $62-million.

## FOR A FIFTH CLAIM FOR RELIEF
(conversion)

100. FirstBank repeats and realleges the allegations made in paragraphs "1" through "69" above, as if set forth at length herein.

101. On or about September 17, 2009, FirstBank made demand upon BCI to return the Collateral.

102. On or about September 25, 2009, BCI failed and refused to return the Collateral and wrongfully exercised dominion and control over the Collateral for its own benefit, and to the exclusion of FirstBank, despite BCI having no legal or contractual right to do so.

#1456100 v9
109459-67363

103. BCI converted the Collateral to its own use.

104. BCI is liable to FirstBank for conversion of the Collateral.

105. BCI has suffered damages on account of the foregoing conversion of the Collateral in an amount not less than $62-million.

### FOR A SIXTH CLAIM FOR RELIEF
(breach of contract/failure to perform)

106. FirstBank repeats and realleges the allegations made in paragraphs "1" through "69" above, as if set forth at length herein.

107. Pursuant to the terms of the Purchase Agreement, unless BCI accepted the Swaps Agreement, including all obligations thereunder, the Collateral was an "Excluded Asset" under the Purchase Agreement.

108. BCI, by the conduct described above, either expressly or by implication, accepted the Swaps Agreement, including all obligations thereunder, when it obtained and maintained possession of the Collateral and failed to return it to FirstBank.

109. BCI breached the terms of the Swaps Agreement by failing to perform its obligations thereunder.

110. On account of the foregoing breach of contract, FirstBank has suffered damages in an amount not less than $62-million.

111. BCI is liable to FirstBank for the foregoing damages on account of its breach of contract.

WHEREFORE, FirstBank respectfully requests that the Court enter judgment in its favor and against BCI as follows:

#1456100 v9
109459-67363

### ON THE FIRST CLAIM FOR RELIEF

a.  In an amount equal to the value of the Collateral as of the date it was wrongfully delivered to BCI, plus all interest, income or other benefits paid to BCI or otherwise derived by BCI therefrom, which amount is not less than $62-million.

### ON THE SECOND CLAIM FOR RELIEF

b.  Imposing a constructive trust on the Collateral, and all interest, income or other benefits paid to BCI or otherwise derived by BCI therefrom, and compelling an accounting from BCI, and in particular, of the Collateral, and all income paid or derived therefrom.

### ON THE THIRD CLAIM FOR RELIEF

c.  For monetary damages in an amount not less than $62-million.

### ON THE FOURTH CLAIM FOR RELIEF

d.  For monetary damages in an amount not less than $62-million.

### ON THE FIFTH CLAIM FOR RELIEF

e.  For monetary damages in an amount not less than $62-million.

### ON THE SIXTH CLAIM FOR RELIEF

f.  For monetary damages in an amount not less than $62-million.

### ON ALL CLAIMS FOR RELIEF

g.  For such other further and different relief as the Court deems proper.

#1456100 v9
109459-67363

## **DEMAND FOR TRIAL BY JURY**

FirstBank hereby demands trial by jury of all issues so triable.

Dated: New York, New York
December 21, 2009

                                      GIBBONS P.C.

                                      By: _____
                                          Jeffrey A. Mitchell (JM5323)
                                         *Attorneys for Plaintiff*
                                         *FirstBank Puerto Rico*
                                         One Pennsylvania Plaza, 37th Floor
                                         New York, New York 10119-3701
                                         (212) 613-2009
                                         (212) 554-9696 (fax)

#1456100 v9
109459-67363