**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FIRSTBANK PUERTO RICO,<br><br>                    Plaintiff,<br><br>          -against-<br><br>BARCLAYS CAPITAL, INC.,<br><br>                    Defendant. | Civil Action No. 09 Civ. 10317 (GBD) |

---

## MEMORANDUM OF LAW OF FIRSTBANK PUERTO RICO IN
## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, New York 10019-3701
(212) 613-2000
*Attorneys for FirstBank Puerto Rico*

Of Counsel:

Jeffrey A. Mitchell, Esq.
Daniel S. Weinberger, Esq.

#1503671 v1
109459-67363

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL AND PROCEDURAL HISTORY ............................................................ 4

    A.    Background ................................................................................. 4

    B.    Special Financing Appoints LBI as Custodian to Hold the
        Collateral................................................................................... 4

    C.    Special Financing Defaults on its Obligations Under the ISDA
        Agreement ................................................................................. 5

    D.    The Lehman Bankruptcy ........................................................... 6

    E.    The Asset Purchase Agreement ................................................ 6

    F.    The Bankruptcy Court's Sale Order ......................................... 8

    G.    Transfer of the Collateral to Barclays ..................................... 9

LEGAL STANDARDS ............................................................................................... 10

ARGUMENT ............................................................................................................... 11

    POINT I    BARCLAYS NEVER PURCHASED THE COLLATERAL AT
               ISSUE IN THIS ACTION ........................................................ 11

    POINT II    BECAUSE THE COLLATERAL WAS NOT A "PURCHASED
              ASSET" UNDER THE APA, IT WAS NOT COVERED BY THE
              BANKRUPTCY COURT'S SALE ORDER ............................. 15

    A.    On its Face, the Sale Order Does Not Apply to Assets That Were
        Not Included in the APA............................................................ 15

    B.    To Now Hold That the Sale Order Applies to the Collateral
        Notwithstanding the Terms of the APA Would Violate FirstBank's
        Due Process Rights ................................................................... 18

    POINT III    FIRSTBANK'S TORT AND EQUITABLE CLAIMS ARE NOT
               BARRED BY THE U.C.C. ........................................................ 20

    POINT IV    FIRSTBANK'S BREACH OF CONTRACT CLAIM, PLED IN
               THE ALTERNATIVE, SURVIVES IF BARCLAYS OBTAINED
               ANY INTEREST IN THE COLLATERAL ............................. 23

CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) .................................................................................................. 11

*Bay Harbour Mgmt., L.C. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings, Inc.),*
415 B.R. 77 (S.D.N.Y. 2009) .................................................................................. 1, 6, 19

*Bell Atl. Corp v. Twombly,*
550 U.S. 544 (2007) ...................................................................................................... 11

*Blue Cross of Cent. N.Y., Inc. v. Wheeler,*
93 A.D.2d 995, 461 N.Y.S.2d 624 (App. Div. 1983) ..................................................... 22

*Chambers v. Time Warner, Inc.,*
282 F.3d 147 (2d Cir. 2002) ......................................................................................... 10

*Clarendon Nat'l Ins. Co. v. Health Plan Adm'rs,*
No. 08-cv-6279, 2009 U.S. Dist. LEXIS 88135 (S.D.N.Y. Sept. 24, 2009) ................. 10

*In re the Appraisal of the Estate Robert R. Willets,*
119 A.D. 119 (N.Y. App. Div. 1907) ............................................................................. 21

*Johnson v. Shearson Loeb Rhoades, Inc.,*
No. 83 Civ. 3937, 1984 U.S. Dist. LEXIS 22683 (S.D.N.Y. Oct. 18, 1984) ................. 23

*Jonathan Bailey Assocs. v. HLM Design, Inc.,*
No. 3:06-CV-270-W, 2007 U.S. Dist. LEXIS 15520 (W.D.N.C. Mar. 5, 2007) ............ 24

*Krumme v. WestPoint Stevens Inc.,*
238 F.3d 133 (2d Cir. 2000) ......................................................................................... 12

*Licensing by Paoli, Inc. v. Sinatra (In re Gucci),*
126 F.3d 380 (2d Cir. 1997) ......................................................................................... 18

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci),*
105 F.3d 837 (2d Cir. 1997) ......................................................................................... 18

*Mullane v. Cent. Hanover Bank & Trust Co.,*
339 U.S. 306 (1950) ...................................................................................................... 18

*Peral-Phil GMT (Far East) Ltd. v. Caldor Corp.,*
266 B.R. 575 (S.D.N.Y. 2001) ...................................................................................... 19

#1503671 v1
109459-67363

*Playboy Enters., Inc. v. Sage Realty Corp.*,
  No. 79 Civ. 2236, 1980 U.S. Dist. LEXIS 10939 (S.D.N.Y. Apr. 10, 1980) .......................... 22

*SEC v. Credit Bancorp, Ltd.*,
  279 F. Supp. 2d 247 (S.D.N.Y. 2003) ...................................................................................... 21

*Shaw Group Inc. v. Triplefine Int'l Corp.*,
  322 F.3d 115 (2d Cir. 2003) ..................................................................................................... 12

*Sweet v. Sheahan*,
  235 F.3d 80 (2d Cir. 2000) ....................................................................................................... 11

*Taylor v. Vt. Dep't of Educ.*,
  313 F.3d 768 (2d Cir. 2002) ..................................................................................................... 10

## **STATUTES**

11 U.S.C. § 105(a) ........................................................................................................................ 8

11 U.S.C. § 363 ............................................................................................................................. 8

11 U.S.C. § 365 ............................................................................................................................. 8

N.Y. U.C.C. § 1-201(32) ............................................................................................................. 21

N.Y. U.C.C. § 1-201(33) ............................................................................................................. 21

N.Y. U.C.C. § 1-201(44) ....................................................................................................... 22, 23

N.Y. U.C.C. § 8-102 .............................................................................................................. 13, 20

N.Y. U.C.C. § 8-503 .............................................................................................................. 13, 21

N.Y. U.C.C. § 8-510 .............................................................................................................. 20, 21

N.Y. U.C.C. § 9-314(a) ............................................................................................................... 13

## **RULES**

F.R.B.P. 2002 ............................................................................................................................... 8

F.R.B.P. 6004 ............................................................................................................................... 8

F.R.B.P. 6006 ............................................................................................................................... 8

#1503671 v1
109459-67363

Plaintiff FirstBank Puerto Rico ("FirstBank") submits this memorandum of law in

opposition to the Motion of Barclays Capital Inc. ("Barclays") pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure to dismiss the Complaint.

## PRELIMINARY STATEMENT

At the heart of Barclays' motion is a blatant misstatement of the claims brought by

FirstBank. Barclays says:

> This action concerns certain Securities that Barclays allegedly acquired, in good
> faith, as part of a portfolio of securities from LBI in September 2008, when LBI
> and related entities "crumbled during a period of extraordinary distress in the U.S.
> financial markets" and ultimately declared bankruptcy under chapter 11.

Mem. of Law of Barclays in Supp. of Mot. to Dismiss ("Def.'s Mem.") at 1-2 (quoting *Bay*

*Harbour Mgmt., L.C. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings, Inc.),* 415

B.R. 77, 79 (S.D.N.Y. 2009)). This action does no such thing. In fact, FirstBank alleges

precisely the opposite – that the securities which underlie this case were expressly *excluded* from

those acquired by Barclays through its purchase agreement with Lehman Brothers Inc. ("LBI"),

and were "never a part of the assets" transferred in accordance with that agreement, yet Barclays

refuses to return them. *See* Compl. ¶ 43  Barclays goes on:

> In short, FirstBank argues that the Securities did not belong to LBI and should not
> have been sold to Barclays.

Def.'s Mem. at 2. That is also not true.

What the Complaint actually alleges is that LBI did not even purport to sell the securities

to Barclays, so Barclays *never* purchased them as part of the transaction at all. *See, e.g.,* Compl.

¶¶ 33-36, 39, 43, 50. And contrary to Barclays' characterization, FirstBank also does not

challenge the bankruptcy court's authority to issue a sale order. *See* Def.'s Mem. at 2-3. Rather,

it alleges that the subject assets were never included in the transaction, so the sale order could not

and did not confirm their transfer. *See, e.g.,* Compl. ¶ 39. Assuming *that* allegation to be true, as

the Court must on this motion, the entirety of Barclays' motion to dismiss must fail. If, as FirstBank alleges, the securities were never sold, then quite simply, issues of good faith purchase, lack of notice, or other similar defenses raised by Barclays fall because it cannot claim title to something it never bought in the first place. LBI did not sell the securities because it did not own them. It was nothing more than a custodian for an affiliate, which itself had nothing more than a security interest in them. That security interest was the only "asset" held by LBI's affiliate, so even if something had been transferred to Barclays, it could have been only that security interest, and not the underlying securities themselves.

As the Complaint alleges, the assets at issue here are mortgage-backed securities owned by FirstBank that are worth over $62 million. Compl. ¶ 10. Those securities were originally delivered by FirstBank to Lehman Brothers Special Financing, Inc. ("Special Financing") to be held as collateral for certain swaps transactions between the parties (the securities are hereinafter referred to as the "Collateral"). Somehow after Barclays' acquired certain assets of other Lehman Brothers ("Lehman") entities, that Collateral itself ended up in Barclays' possession. FirstBank filed this action to recover the Collateral or its value from Barclays.

In its motion, Barclays argues that it acquired the Collateral through a sale approved by the bankruptcy court, and should also be deemed a good faith purchaser for value under the Uniform Commercial Code. Those arguments are based upon the false premise that Barclays actually *purchased* the Collateral. It did not. The Complaint alleges – and indeed Barclays would have this Court ignore – that the Asset Purchase Agreement ("APA") made with Lehman excludes the Collateral. *See, e.g.*, Compl. ¶¶ 34, 43, 50. This allegation is buttressed by the

- 2 -

terms of various documents incorporated by reference into the Complaint, including the APA.[1]

When that allegation is taken as true, each of Barclays' arguments fails.

In particular, Barclays' claim that the bankruptcy court's sale order confirms the transfer of the Collateral ignores that the sale order (like this Court's order affirming it) only confirms transfers covered by the APA, which did not include the Collateral. Barclays' argument that U.C.C. Section 510 entitles it to keep the Collateral as a good faith purchaser for value also fails because it was never a "purchaser" of the Collateral, and did not "give value" for it. Barclays cannot have greater rights under the U.C.C. than the APA gave it by contract. Finally, Barclays' argument seeking dismissal of FirstBank's breach of contract claims fails because Barclays cannot have it both ways – if, as Barclays contends, it did not through the APA *assume* the contractual obligations attached to the Collateral, then Barclays cannot through that same APA be deemed to have purchased the Collateral itself, since the only "asset" held by Special Financing that even could be transferred was its security interest in the Collateral (as provided by the swaps contract).

For these reasons, and those set forth more fully below, Barclays' motion to dismiss should be denied.

---

[1] The Complaint incorporates several documents by reference which the Court may consider in ruling on Barclays' motion to dismiss pursuant to Rule 12(b)(6). FirstBank agrees with Barclays that the documents attached to the Declaration of Amy Chung, dated February 11, 2010 ("Chung Decl.") are incorporated by reference in the Complaint, *see* Def.'s Mem. at 1 n.1. The Chung Declaration does not, however, list all of the documents that are incorporated by reference in the Complaint, and some of the exhibits that are attached to the Chung Declaration are not complete copies of those documents. To avoid confusion, each of the incorporated documents referenced in this memorandum of law is attached as an exhibit to the Declaration of Daniel Weinberger, dated March 26, 2010 ("Weinberger Decl.") submitted herewith. *See infra* note 7 for a list of the incorporated documents referenced herein. Unless otherwise noted, all referenced exhibits are attached to the Weinberger Declaration.

#1503671 v1
109459-67363

# FACTUAL AND PROCEDURAL HISTORY

## A.    Background

FirstBank is a Puerto Rico-chartered commercial bank with operations in Puerto Rico, the

United States and the U.S. and British Virgin Islands.  Compl. ¶ 5.  On or about January 16,

1997, FirstBank entered into an International Swap Dealers Association Master Agreement (the

"ISDA Agreement") (Ex. A) with Special Financing, *id.* ¶ 6, a wholly owned subsidiary of

Lehman Brothers Holdings, Inc. ("LBHI"), *id.* ¶ 19.  Pursuant to the ISDA Agreement,

FirstBank engaged in swaps transactions with Special Financing in which interest rate risk was

shifted or hedged.  *Id.* ¶ 7.  In order to secure FirstBank's obligations to Special Financing under

various swaps, the Credit Support Annex to the ISDA Agreement (the "Credit Support Annex")

required FirstBank to post collateral with Special Financing.  *Id.* ¶ 8; Credit Support Annex

(Ex. B) ¶ 2.[2]  FirstBank therefore posted collateral with Special Financing in the form of

government issued mortgage backed securities of the Government National Mortgage

Association ("Ginnie Mae") and Federal National Mortgage Association ("Fannie Mae")

(defined *supra* page 2 as the "Collateral").  Compl. ¶ 9.  Special Financing never took title to the

Collateral, which remained in the name of FirstBank.  *Id.* ¶ 11.

## B.    Special Financing Appoints LBI as Custodian to Hold the Collateral

The Credit Support Annex required Special Financing to "exercise reasonable care to

assure the safe custody of all Posted Collateral [including the Collateral at issue] to the extent

required by law. . . ."  Compl. ¶ 13; Credit Support Annex ¶ 6(a) (Ex. B).  However, the

agreement permitted Special Financing to appoint a custodian on its behalf to hold the Collateral

to fulfill that obligation.  Credit Support Annex ¶ 6(b) (Ex. B).  Special Financing appointed its

---

[2] Ironically, FirstBank did not similarly receive collateral from Special Financing because at the time the Lehman
entities were thought to be financially strong and far too big to fail.

#1503671 v1
109459-67363

affiliate Lehman Brothers Inc. (defined *supra* page 1 as "LBI"), a wholly owned subsidiary of LBHI, to act as "custodial agent" for the Collateral. Compl. ¶¶ 19-20. LBI did not have any ownership, security interest or other claim of title to the Collateral. *Id.* ¶ 24.[3] In accordance with the ISDA Agreement, during the period that LBI acted as custodian, title to the Collateral remained with FirstBank, and all accrued interest paid on the Collateral was accounted for by Special Financing and paid to FirstBank as owner. *Id.* ¶ 22. Moreover, the Complaint alleges that the books and records of Special Financing and LBI, which included regular statements issued by each of them, reflected that the Collateral belonged to FirstBank. *Id.* ¶ 25.

## C.   Special Financing Defaults on its Obligations Under the ISDA Agreement

On or about September 15, 2008, Special Financing defaulted on its obligation under the ISDA Agreement to make a payment due to FirstBank. Compl. ¶ 14. Therefore, on September 24, 2008, FirstBank delivered to Special Financing a notice of termination of the ISDA Agreement pursuant to paragraph 6(a) thereof. *Id.* ¶ 15; *see also* ISDA Agreement ¶ 6(a) (Ex. A). Paragraph 8(b) of the Credit Support Annex provides:

> If at any time an Early Termination Date has occurred or been designated as a result of an Event of Default . . . then . . . the Secured Party [Special Financing] will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor [FirstBank]. . . .

Credit Support Annex (Ex. B). FirstBank demanded that Special Financing return all of the Collateral by Sept. 26, 2008. Compl. ¶ 16; Letter from Víctor Barreras to Adriana León/Allyson Carine (Sept. 24, 2008) (Ex. C). Special Financing failed to do so. Compl. ¶ 18.

---

[3] Paragraph 6(b)(i) of the Credit Support Annex provides that "[t]he holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting." Credit Support Annex (Ex. B).

#1503671 v1
109459-67363

**D.** **The Lehman Bankruptcy**

On or about September 15, 2008, LBHI – but *not* Special Financing – filed for bankruptcy protection (the "Lehman Bankruptcy"). *See Bay Harbour Mgmt.*, 415 B.R. at 79.[4] Four days later, LBI, a subsidiary of LBHI and a member of the Securities Investor Protection Corporation ("SIPC"), was placed into liquidation by SIPC. *See id.* at 77 n.1. Prior to the Lehman Bankruptcy, Lehman was one of the largest investment banking and financial services firms in the world, and experts and government officials expressed concern that the Lehman collapse would impair world financial markets. Compl. ¶¶ 26, 28. Because of the unprecedented magnitude of the Lehman Bankruptcy, and the desire to keep certain business units intact to preserve their value, Barclays expedited its pursuit of Lehman assets. *Id.* ¶¶ 29-30. In fact, the acquisition process was so expedited that Barclays actually entered into the original APA on September 16, 2008, literally one day after the Lehman Bankruptcy was filed. *Id.* ¶ 32. *See also Bay Harbour*, 415 B.R. at 78 (noting that Barclays "purchased certain divisions of Lehman Brothers within days of Lehman Brothers declaring bankruptcy on September 15, 2008"). The transaction by which Barclays purchased those assets was memorialized by the APA (Ex. D), which includes an amendment dated September 19, 2008 (Ex. E).

**E.** **The Asset Purchase Agreement**

The APA provides that:

Purchaser [Barclays] shall purchase, acquire and accept from the Seller . . . and Seller . . . shall sell, transfer, assign, convey and deliver . . . to Purchaser, all of Seller's and its applicable Subsidiaries' right, title and interest in, to and under the Purchased Assets free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code.

---

[4] The Complaint states that "[o]n or about September 15, 2008, LBI filed for protection under Chapter 11 of the Untied States Bankruptcy Code." Compl. ¶ 23. FirstBank concurs with Barclays that the Court may take judicial notice that the entity that filed for bankruptcy on September 15, 2008 was LBHI, not LBI. *See Bay Harbour*, 415 B.R. at 79; *see also* Def.'s Mem. at 4 n.5.

#1503671 v1
109459-67363

APA § 2.1 (Ex. D). The "Seller[s]" of the "Purchased Assets" were defined by the APA as

LBHI and LBI, and not Special Financing. *See* APA Recitals.

The APA was subsequently "clarifie[d]" by a letter agreement dated as of September 20,

2008 (the "Clarification Letter Agreement"). Clarification Letter Agmt. at 1 (Ex. F). Section

1(a) of the Clarification Letter Agreement states as follows:

> [t]he Purchased Assets means (i) all of the assets of Seller used primarily in the
> Business or necessary for the operation of the Business (in each case excluding
> the Excluded Assets) and (ii) *none of the assets of Subsidiaries of LBHI (other
> than assets of LBI) except as otherwise specifically provided in the Agreement
> or this Letter*.

*Id* (emphasis added).[5] The Clarification Letter Agreement also limited the customer accounts

being transferred to Barclays as part of the Purchased Assets: "[a]ll customer accounts *of LBI*

*(other than customer [sic] who are Affiliates of LBI*) shall be transferred to Purchaser." *Id.* § 8

(emphasis added).[6] The Collateral was held by LBI as custodian for Special Financing, an

affiliate of LBI.

In Section 5.2 of the APA, LBI represented and warranted that it "ha[d] all requisite

power, authority and legal capacity" to enter into the transaction. *Id.* LBI further represented

and warranted that:

> [o]ther than the real property subject to the Transferred Real Property Leases,
> intellectual property licensed to [LBI] and the personal property subject to
> personal property leases, [LBI] owns (directly or indirectly) each of the Purchased
> Assets, and [Barclays] will be vested with good and exclusive title to such

---

[5] Under the APA, "Subsidiary" means "any Person of which a majority of the outstanding voting securities or other
voting equity interests are owned, directly or indirectly, by Seller [LBHI or LBI]." APA § 1.1 (Ex. D). Prior to its
amendment in the Clarification Letter Agreement, the APA had purported to generally include among "Purchased
Assets" assets owned by Subsidiaries but used by the Sellers in their operations. *See* APA § 1.1 at 6 (Ex. D). It did
not in either version purport to include assets that were not owned by either the Sellers or Subsidiaries.

[6] Under the APA, "'Affiliate' means, with respect to any Person, any other Person that, directly or indirectly through
one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term
'control' (including the terms 'controlled by' and 'under common control with') means possession, directly or
indirectly, of the power to direct or cause the direction of management and policies of such person, whether through
ownership of voting securities, by contract or otherwise." APA § 1.1 (Ex. D).

- 7 -

#1503671 v1
109459-67363

Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to
the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

*Id.* § 5.4. As LBI only had possession of the Collateral in its capacity as a custodial agent for

Special Financing as pledgee, the Collateral was never a "Purchased Asset" or an asset owned by

LBI, so despite Barclays' claims to the contrary, the Collateral was not covered by that

representation. Compl. ¶ 34. Moreover, Special Financing was neither a "Seller" under the APA

nor an owner of the Collateral, but rather itself held only a security interest in it. *Id.* ¶ 36.

**F.    The Bankruptcy Court's Sale Order**

On September 19, 2008, the Honorable James M. Peck of the United States Bankruptcy

Court for the Southern District of New York (the "Bankruptcy Court") issued a sale order

approving the sale of the Purchased Assets, as that term was defined in the APA, to Barclays.

Compl. ¶ 38; *see also* Order under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of

Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of

Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and

Assignment of Executory Contracts and Unexpired Leases (the "Sale Order"). The Sale Order

provides, in relevant part, that

> [t]he [APA] represents a fair and reasonable offer to purchase the Purchased
> Assets under the circumstances of these chapter 11 cases. . . . Approval of the
> [Sale] Motion and the [APA] and the consummation of the transactions
> contemplated thereby is in the best interests of the Debtors, their creditors and all
> other parties in interest.

Sale Order ¶ M (Ex. G). Accordingly, the Bankruptcy Court only approved the transfer of

"Purchased Assets" as defined by the APA, and nothing more. *See id.* ¶¶ 1, 3 ("The [APA] and

all of the terms and conditions thereto are hereby approved. . . . The Debtors [LBHI and LBI] are

hereby authorized and directed to consummate the Sale in accordance with the terms and

conditions of the [APA]. . . . ").

- 8 -

#1503671 v1
109459-67363

## G.    Transfer of the Collateral to Barclays

Special Financing did not file for protection under Chapter 11 of the United States Bankruptcy Code (the "Special Financing Bankruptcy") until October 3, 2008, Compl. ¶ 17, nearly two weeks after Barclays closed on its purchase pursuant to the APA, and more than one week after FirstBank terminated the ISDA Agreement. At the time of the Special Financing Bankruptcy, FirstBank had no reason to suspect that the Collateral had been disposed of, or was anywhere other than in the possession of Special Financing or, perhaps, LBI as its custodial agent. *Id.* There had also not been any indication that the obligations under the ISDA Agreement had been transferred to and assumed by Barclays. *Id.* ¶ 58. Indeed, in 2009, after FirstBank made numerous unsuccessful attempts to ensure that the Collateral remained in the possession and control of Special Financing, Special Financing filed an amended Schedule G of Assets and Liabilities (Executory Contracts and Unexpired Leases) ("Schedule G"), which listed on page 121 the ISDA Agreement, thus implying that the ISDA Agreement and the underlying Collateral were still in the possession of the Special Financing estate. Compl. ¶ 63; *see* Schedule G at 121 (Ex. I). In or about July or August, 2009, Special Financing advised FirstBank for the first time that the Collateral had apparently been delivered to Barclays. Compl. ¶ 64. FirstBank wrote to Barclays on September 17, 2009, to inquire whether and in what capacity Barclays purported to hold the Collateral. *Id.* ¶ 65; *see also* Letter from Lawrence Odell to General Counsel's Office of Barclays (Sept. 17, 2009) (Ex. J). Barclays did not deny that it had received the Collateral from LBI, but claimed, *inter alia*, that it had purchased it pursuant to the APA and the Sale Order, and therefore was now owner of the assets free and clear, even though the Collateral never belonged to LBI in the first place. Compl. ¶ 66; *see also* Letter from Boaz S. Morag to Lawrence Odell (Sept. 25, 2009) (Ex. K).

- 9 -

On December 21, 2009, FirstBank filed this diversity action against Barclays seeking return of the Collateral or monetary damages equivalent to its value – approximately $62 million. The Complaint alleges six claims under state law:  unjust enrichment, *id.* ¶¶ 70-75; constructive trust/accounting, *id.* ¶¶ 76-82; negligence, *id.* ¶ 83-91; breach of contract/duty to return, *id.* ¶¶ 92-99; conversion *id.* ¶¶ 100-05; and breach of contract/failure to perform, *id.* ¶¶ 106-11. Barclays filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on February 11, 2010. [*See* Dkt. # 10].

Barclays has no legitimate claim to the Collateral or its value.

## LEGAL STANDARDS

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must construe a complaint liberally, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Clarendon Nat'l Ins. Co. v. Health Plan Adm'rs*, No. 08-cv-6279, 2009 U.S. Dist. LEXIS 88135, at *4 (S.D.N.Y. Sept. 24, 2009) (Daniels, J.).  In addition to the facts alleged in the complaint, a court may also consider documents attached to the pleading as exhibits or incorporated into the complaint by reference. *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002); *Chambers*, 282 F.3d at 152-53.[7]  A court also may consider matters as to which

---

[7] Documents that are incorporated by reference in the Complaint include:
- the ISDA Agreement (Compl. ¶¶ 6-7) (Ex. A);
- the Credit Support Annex (Compl. ¶¶ 12-13) (Ex. B);
- the Letter from Víctor Barreras to Adriana León/Allyson Carine (Sept. 24, 2008) (Compl. ¶ 15) (Ex. C);
- the APA (Compl. ¶¶ 33, 46) (Ex. D);
- First Amendment to Asset Purchase Agreement (Ex. E);
- the Clarification Letter Agreement (Compl. ¶ 33) (Ex. F);
- the Sale Order (Compl. ¶ 38) (Ex. G);

#1503671 v1
109459-67363

judicial notice may be taken, including the court's own records. *See Taylor*, 313 F.3d at 776;

*Chambers*, 282 F.3d at 153. Dismissal of a complaint pursuant to Rule 12(b)(6) "is

inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which

would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

To survive a motion to dismiss, the plaintiff must plead only "enough facts to state a

claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570

(2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). "A claim has facial plausibility

when the pleaded factual content allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Cit. at 1949. Application of these

standards requires denial of Barclays' motion to dismiss.

## ARGUMENT

### POINT I

### BARCLAYS NEVER PURCHASED THE COLLATERAL AT ISSUE IN THIS ACTION

The plain language of the underlying agreements establishes that until now Barclays

never even purported to purchase the Collateral. As the Complaint alleges, the plain terms of the

APA, as amended by the Clarification Letter Agreement, unambiguously excluded from the sale

assets owned by Special Financing, and certainly never purported to include assets that were

only pledged to Special Financing as collateral. When interpreting a contract, the "words and

phrases used by the parties must . . . be given their plain meaning." *Krumme v. WestPoint*

---

- the Order Approving, And Incorporating By Reference For the Purposes Of This Proceeding, An Order Authorizing The Sale of Purchased Assets and Other Relief in The Lehman Brothers Holdings, Inc. Chapter 11, Proceeding (Sept. 19, 2008) (H);

- Schedule G of Assets and Liabilities (Executory Contracts and Unexpired Leases) (Compl. ¶ 63) (Ex. I);

- Letter from Lawrence Odell to General Counsel's Office of Barclays (Sept. 17, 2009) (Compl. ¶ 65) (Ex. J); and

- Letter from Boaz S. Morag to Lawrence Odell (Sept. 25, 2009) (Compl. ¶ 66) (Ex. K).

- 11 -

*Stevens Inc.*, 238 F.3d 133, 140 (2d Cir. 2000) (internal quotation marks and citation omitted);

*see also Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124 (2d Cir. 2003) (noting that

"we are not free to alter the plain terms of an agreement or to strain language beyond its

reasonable and ordinary meaning").

As cited above, Section 1(a) of the Clarification Letter Agreement states:

> [t]he Purchased Assets means (i) all of the assets of Seller [LBHI and LBI] used
> primarily in the Business or necessary for operation of the Business . . . and
> (ii) **none of the assets of Subsidiaries of LBHI (other than the assets of LBI)**
> except as otherwise specifically provided in the Agreement or this Letter.

Clarification Letter Agmt. § 1(a) (Ex. F) (emphasis added). The Clarification Letter Agreement

could not be more clear that the Purchased Assets under the APA did not include the assets of

any subsidiaries of LBHI other than assets of LBI.[8] The Collateral at issue here was never an

asset of LBI.

Pursuant to the ISDA Agreement, FirstBank posted the Collateral with Special Financing

in order to secure its obligations under the various swaps transactions. Compl. ¶ 8. The Credit

Support Annex provides that: "the Pledgor [FirstBank], hereby pledges to . . . the Secured Party

[Special Financing], *as security* for its Obligations, and grants to the Secured Party [Special

Financing] a first priority continuing *security interest* in, lien on and right of Set-off against all

Posted Collateral Transferred to or received by the Secured Party hereunder." Credit Support

Annex ¶ 2 (Ex. B) (emphasis added). Thus, the Credit Support Annex clearly states that Special

Financing did not own the Collateral, but rather held only a "first priority continuing security

interest in" it,[9] which security interest in any event dissipated when the ISDA Agreement was

terminated by FirstBank.

---

[8] *See supra* note 5 for the definition of "Subsidiary" under the APA.

[9] The Credit Support Annex required FirstBank to deliver the Collateral to the possession of Special Financing primarily for the purpose of granting Special Financing "control" over the Collateral, which would have been

- 12 -

As permitted by the Credit Support Annex, Special Financing appointed LBI to act as its custodial agent only to hold the Collateral and ensure its safe custody. *Id.* ¶ 6(b). Special Financing did not and could not transfer the Collateral itself to LBI, unencumbered by the ISDA Agreement, as Special Financing never held title to it. Consequently, LBI had no interest in the Collateral itself. Rather, as custodian, it merely served as a securities intermediary for Special Financing, and ultimately for FirstBank, the titleholder of the securities comprising the Collateral. *See* N.Y. U.C.C. § 8-102 cmt. 14 ("A 'securities intermediary' is a person that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity. The most common examples of securities intermediaries would be . . . banks acting as securities custodians, and brokers holding securities on behalf of their customers."); *see also* N.Y. U.C.C. § 8-503(a) ("all interests in [a] financial asset held by the securities intermediary are held by securities intermediary for the entitlement holders, are not property of the securities intermediary, and are not subject to claims of creditors of the securities intermediary. . . ."). LBI never held title to, or even had so much as a security interest in, the Collateral.

The APA nowhere purported to sell even Special Financing's limited security interest in the Collateral to Barclays.[10] At all relevant times, including the date of the APA and the closing of Barclays' transaction with LBHI and LBI, Special Financing was a wholly owned subsidiary of LBHI. Compl. ¶ 19. As an asset of a subsidiary of LBHI *other* than LBI, Special Financing's security interest in the Collateral was not a "Purchased Asset" under the APA, unless "otherwise

---

necessary for Special Financing to perfect its security interest in the Collateral in the event that FirstBank defaulted on its obligations. *See* N.Y. U.C.C. § 9-314(a).

[10] Barclays appears to argue in footnote 8 of its brief that Special Financing had the right to dispose of the Collateral even though it did not own or even have any interest in it. However, whether that is what, in fact, happened or properly even could have happened on the facts of *this* case is a question of fact that is inappropriate for consideration or disposition on a motion to dismiss, and must await the conclusion of discovery and, presumably, trial. Indeed, Barclays refused to even acknowledge possession of the Collateral in its letter to FirstBank dated September 25, 2009 (Ex. K), so what Barclays in fact has, and how and when it got it, is the ultimate issue of fact.

#1503671 v1
109459-67363

08-13555-mg    Doc 12435-44    Filed 10/28/10    Entered 10/28/10 18:51:06    doc 16
Pg 18 of 29

specifically provided." Clarification Letter Agmt. § 1(a) (Ex. F). Nothing in the APA or the

Clarification Letter Agreement "otherwise specifically provided" that the Collateral was to be

included in the transaction.[11]  Accordingly, the Collateral was not purchased by Barclays.

Additionally, the Clarification Letter Agreement provided that "[a]ll customer accounts

of LBI (*other than customer [sic] who are Affiliates of LBI*) shall be transferred to Purchaser."

*Id.* § 8 (emphasis added). Thus, the customer accounts of "Affiliates" of LBI were not among

the customer accounts that were to be transferred to Barclays pursuant to the APA. *See id.*  Since

both Special Financing and LBI were wholly owned subsidiaries of LBHI, Special Financing

was an "Affiliate" of LBI. *See supra* note 6. Furthermore, because Special Financing relied on

LBI to act as custodian for the Collateral, the Collateral presumably was at most held by LBI in

an account of Special Financing for the benefit of FirstBank.[12]  As Special Financing was an

affiliate of LBI, the Special Financing customer account which held the Collateral was therefore

expressly not included among those transferred to Barclays pursuant to the APA.[13]

---

[11] The Clarification Letter Agreement further provides that "no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets." Clarification Letter Agmt. § 1(a)(ii) (Ex. F). Thus, even if Special Financing *owned* the securities comprising the Collateral, which it did not, the Collateral still would not have constituted part of the Purchased Assets under the APA because Special Financing was a subsidiary of LBHI.

[12] The customer account holding the Collateral either did or should have listed FirstBank as the titleholder and owner of the Collateral. In the event that customer account was in the sole name of FirstBank, and not in the name of Special Financing, Section 8 provides that "Purchaser shall receive (i) *for the account of the customer,* any and all property of any customer . . . whose accounts are being transferred to Purchaser as part of the Business." Clarification Letter Agmt. § 8 (emphasis added) (Ex. F). Thus, if the customer account containing the Collateral was in the name of FirstBank, the Collateral should have been received by Barclays "for the account of the customer [FirstBank]," and not for Barclays' own account or its own personal benefit.

[13] The Clarification Letter Agreement further provided that "'Excluded Assets' shall not include any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business." Clarification Letter Agmt. § 1(c) (Ex. F). Because section 8 explicitly stated that customer accounts of affiliates of LBI were not to be transferred to Barclays, section 1(c) does not apply to the Collateral, which was being held with LBI in a customer account belonging to Special Financing. Accordingly, everything in the Special Financing account, including the Collateral, was an "Excluded Asset" under the APA.

- 14 -

109459-67363

Barclays repeatedly asserts in its brief that LBI represented in the APA that it had exclusive title to each of the assets it transferred to Barclays, implying that the Collateral was among those assets. In fact, LBI represented in the APA only that it had exclusive title to the "Purchased Assets," which by definition did not include the Collateral. *See* APA § 2.1 (Ex. D). For example, Barclays points to Section 5.2 of the APA in which LBI represented and warranted that: "[LBI] owns (directly or indirectly) *each of the Purchased Assets*, and [Barclays] will be vested with good and exclusive *title to such Purchased Assets*, free and clear of all Liens . . . to the fullest extent permissible under Section 363(f) of the Bankruptcy Code." *Id.* § 5.2 (emphasis added); *see also* Def.'s Mem. at 5 (citing APA § 5.2). As Section 5.2 explicitly states, these representations only apply to Purchased Assets, which, under the plain terms of the APA, did not include the Collateral. Thus, Barclays did not purchase the Collateral.

## POINT II

### BECAUSE THE COLLATERAL WAS NOT A "PURCHASED ASSET" UNDER THE APA, IT WAS NOT COVERED BY THE BANKRUPTCY COURT'S SALE ORDER

Barclays' allegation that the Bankruptcy Court's Sale Order bars FirstBank's claim is predicated on the erroneous assumption that the Sale Order approved the transfer of the Collateral to Barclays. It does no such thing. The Court need not interpret the Bankruptcy Court's Sale Order to reach that conclusion since the Sale Order did nothing more than approve the sale of the Purchased Assets as defined by the APA, which did not include the Collateral.

**A.    On its Face, the Sale Order Does Not Apply to Assets That Were Not Included in the APA**

Barclays argues that the Sale Order precludes FirstBank's claims because "Barclays purchased the [Collateral] free and clear of all claims under the Sale Order, which approved the APA as clarified by the Clarification Letter Agreement." Def.'s Mem. at 10 (emphasis omitted).

- 15 -

#1503671 v1
109459-67363

To say that, Barclays misleadingly ignores the provisions of the APA, which are clearly spelled out in the Complaint. *See* Compl. ¶¶ 33-34, 39, 43, 46. Those provisions state that the Collateral is not among the Purchased Assets under the APA. *See supra* Point I. Consequently, the Sale Order is irrelevant to FirstBank's claims and Barclays' defenses.

Whether the Collateral was transferred to Barclays by mistake, accident or impropriety, it was not transferred pursuant to the APA or the Bankruptcy Court's Sale Order. The Bankruptcy Court approved only the sale of the "Purchased Assets" to Barclays, as that term was defined in the APA. *See* Sale Order ¶ 3 (Ex. G). The Sale Order did not purport to cover any assets other than the Purchased Assets listed in the APA. *See id.* ("The Debtors [LBHI and LBI] are hereby authorized and directed to "consummate the Sale in accordance with the terms and conditions of the Purchase Agreement [APA]. . . ."). And, as noted in Section I above, the Purchased Assets under the APA did not include the Collateral. Hence, the Bankruptcy Court never even purported to approve the sale of the Collateral to Barclays.

Once the Court accepts that the Collateral was not a Purchased Asset, Barclays' arguments regarding the Sale Order each fall. Barclays cites first to Section N of the Sale Order, which states:

> [T]he Debtors and LBI are the sole and lawful owners of the Purchased Assets. The transfer of the Purchased Assets to the Purchaser under the [Asset] Purchase Agreement will be a legal, valid and effective transfer of the Purchased Assets, and vests or will vest the Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all Liens, claims . . . or interests of any kind or nature whatsoever.

*Id.* ¶ N (Ex. G).[14] However, the Collateral was not among the "Purchased Assets [transferred] to the Purchaser under the [Asset] Purchase Agreement," *id.*, because of the plain language of the

---

[14] The Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings, Inc. Chapter 11 Proceeding, dated

#1503671 v1
109459-67363

APA. Barclays cannot claim title to assets not transferred by the "terms and conditions" of the APA, *id.* ¶ 3, which are the only transfers approved by the Sale Order.

Similarly, Barclays asserts that "[i]n approving the Sale, this Court and the bankruptcy court specifically found that Barclays was a good faith purchaser and purchased all the Purchased Assets (including the [Collateral] if they were among the securities conveyed in the Repo) free and clear of all claims – including the claims asserted here by FirstBank." Def.'s Mem. at 11 (citing Sale Order ¶ K). Paragraph K of the Sale Order, however, actually states: "[t]he Purchaser is a good faith Purchaser *of the Purchased Assets* within the meaning of Bankruptcy Code section 363(m) and is, therefore, entitled to all of the protections afforded thereby. . . ." Sale Order ¶ K (emphasis added) (Ex. G). Paragraph K states nothing about the Collateral or the securities comprising the Collateral if they are not "Purchased Assets" under the APA, nor does it state that the good faith purchaser protection applies to securities that do not qualify as "Purchased Assets" as defined by the APA.

Barclays alleges that "[t]he Sale Order enjoined any party claiming an interest in the Purchased Assets (including the [Collateral]) from asserting, prosecuting or otherwise pursuing claims against Barclays," *see* Def.'s Mem. at 12 (citing Sale Order ¶ 7 (Ex. G)), as if that is what FirstBank is doing here. It is not. Paragraph 7 of the Sale Order states: "Following the Closing Date, no holder of an Interest in or Claim against the Debtors shall interfere with Purchaser's title to or use and enjoyment of the Debtors' [LBHI and LBI] *interests in the Purchased Assets* based on or related to such Interests or Claims. . . ." Sale Order (emphasis added) (Ex. G). However, since the Collateral was not part of the Purchased Assets, Paragraph 7, like all of the other provisions of the Sale Order, does not apply to the Collateral.

September 19, 2008 (Ex. H), states that "LBI shall be deemed to be included in the definition of the Debtors" in the Sale Order.

- 17 -

#1503671 v1
109459-67363

The cases upon which Barclays relies in support of its claim that it was a good faith purchaser are inapposite because those cases relate to assets that *were* in fact purchased in connection with a judicially-authorized sale. *See Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 105 F.3d 837, 840 (2d Cir. 1997); *Licensing by Paoli, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997). The Complaint alleges, and the APA and Sale Order confirm, that neither the Bankruptcy Court nor this Court ever authorized the sale of the Collateral to Barclays. *See* Compl. ¶¶ 38-39, 41, 43. The Sale Order authorized only the sale of the Purchased Assets, which, under the terms of the APA, do not include the Collateral.

**B.    To Now Hold That the Sale Order Applies to the Collateral Notwithstanding the Terms of the APA Would Violate FirstBank's Due Process Rights**

If a court were to hold that the Sale Order confirmed the transfer of the Collateral to Barclays notwithstanding the plain language of the APA, FirstBank's due process rights would be violated. Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Barclays argues that because the Sale Order explicitly addresses the notice requirement, FirstBank's due process rights would not be violated by "enforcement of the sale." Def.'s Mem. at 12-13. FirstBank takes no issue with the findings of the Bankruptcy Court, which held that "(i) in light of the exigent circumstances of these cases and the wasting nature of the Sellers' assets, due, proper, timely, adequate and sufficient notice of the Motion, the sale Hearing and the transactions set forth in the Purchase Agreement . . . has been provided. . . ." Sale Order ¶ C (Ex. G). Rather, FirstBank alleges in the Complaint that the Sale Order, and the findings contained in it, pertain only to Purchased Assets. What would violate FirstBank's due process rights would be for a Court to hold that the Sale Order encompassed an asset, such as the

#1503671 v1
109459-67363

Collateral, that was not a "Purchased Asset" under the APA, and therefore not among the assets for which notice was provided.

Barclays further argues that because this Court has held that the Bankruptcy Court "appropriately considered and resolved due process interests throughout the sale process," *Bay Harbour*, 415 B.R. at 85 n.7, FirstBank "has no due process objection to the enforcement of the Sale Order." Def.'s Mem. at 13. Barclays' argument misses the mark. In *Bay Harbour*, the appellant asked the court to "revise the terms of the sale by reversing the Bankruptcy Court's good faith purchaser finding, which would mean that Barclays did not take *LBI's assets* free and clear of all interests." 415 B.R. at 83 (emphasis added). The court declined to do that. *Id.* at 85 n.7. Here, FirstBank does not ask that the terms of the Sale Order be revised, nor does it look to have the Bankruptcy Court's finding that Barclays was a good faith purchaser of the Purchased Assets reversed. FirstBank simply alleges, with the benefit of unambiguous documentary support, that the Collateral was not among the assets of LBI which Barclays acquired pursuant to the APA, as confirmed by the Sale Order. *See* Compl. ¶¶ 33, 38-39, 43.

Moreover, FirstBank was not a creditor of Special Financing with respect to the Collateral, as Barclays suggests. *See* Def.'s Mem. at 12 (arguing that "FirstBank, like all other creditors, had the opportunity to appear at the sale hearing"). Special Financing was, until the ISDA Agreement was terminated, a secured party itself. In that relationship, Special Financing was a secured creditor of FirstBank, not *vice versa. See* Credit Support Annex ¶ 2 (Ex. B). The cases on which Barclays relies, therefore, are of no moment because they stand for the proposition that a *creditor* is bound by a bankruptcy order limiting the value of its claims where the creditor did not have actual notice of the sale proceedings but where the notice provided was reasonable under the circumstances. *See Peral-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 583 (S.D.N.Y. 2001). A creditor of a bankrupt estate undoubtedly would have an

- 19 -

interest in the sale of the estate's assets. Here, even if FirstBank received actual notice of the

contemplated transaction, FirstBank could not have known that its interests in the Collateral were

at issue because the transaction documents did not purport to authorize a transfer of the

Collateral to Barclays. To permit Barclays to now hide behind a Sale Order that, on its face, did

not approve the sale of the Collateral, would violate FirstBank's due process rights.

**POINT III**

**FIRSTBANK'S   TORT   AND   EQUITABLE
CLAIMS ARE NOT BARRED BY THE U.C.C.**

Barclays' contention that FirstBank's claims to the Collateral are barred by the U.C.C.

fails for similar reasons. Under Article 8 of the U.C.C., an "adverse claim" is "a claim that a

claimant has a property interest in a financial asset and that it is in violation of the rights of the

claimant for another person to hold, transfer, or deal with the financial asset." N.Y. U.C.C. § 8-

102(a)(1). Barclays argues that all of FirstBank's claims sounding in tort and equity are

precluded by N.Y. U.C.C. § 8-510. That section offers protection against adverse claims to "a

purchaser of an interest in a security entitlement if the purchaser gives value, obtains control, and

does not have notice of the adverse claim." *Id.* § 8-510 cmt. 2. Section 8-510 provides:

> [A]n action based on an adverse claim to a financial asset or security entitlement
> whether framed in conversion, replevin, constructive trust, equitable lien, or other
> theory, may not be asserted against a person who purchases a security entitlement,
> or an interest therein, from an entitlement holder if the purchaser gives value,
> does not have notice of the adverse claim, and obtains control.

*Id.* § 510(a). Because the Collateral was not a "Purchased Asset," Barclays does not qualify as a

"purchaser" and likewise did not "give value" for the Collateral.[15]

---

[15] Barclays is mistaken to rely upon Section 8-510 in the first place. Barclays did not obtain the securities
comprising the Collateral from an "entitlement holder," but rather from a "securities intermediary" — LBI. *See
supra* page 13; N.Y. U.C.C. § 8-102(a)(7); *see also* N.Y. U.C.C. § 8-102 cmt. 14. As alleged in the Complaint, the
entitlement holder of the securities comprising the Collateral was FirstBank. *See* Compl. ¶ 11. Moreover, the
comments to Section 8-510 explain that "[t]he primary purpose of this rule is to give adverse claim protection to
persons who take *security interests* in security entitlements and obtain control, but do not themselves become

- 20 -

Under the U.C.C., a "Purchaser" means "a person that takes by purchase." *Id.* § 1-201(33). "'Purchase' means taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in the property.'" *Id.* § 1-201(32). As discussed above, the Collateral was not a "Purchased Asset" under the APA. *See, e.g.,* Compl. ¶ 39. Moreover, on June 15, 2009, approximately nine months after the closing of the APA, Special Financing filed an amended Schedule G of Assets and Liabilities (Executory Contracts and Unexpired Leases), which listed on page 121 the ISDA Agreement as one of its assets, further refuting Barclay's claim of ownership. *See* Compl. ¶ 63; Schedule G at 121 (Ex. I). The Collateral could not have been purchased by Barclays from LBI nine months earlier if it remained listed as an asset of Special Financing. Accordingly, Barclays did not take the Collateral by "sale." *See* N.Y. U.C.C. § 1-201(32).

In addition, the Collateral was not transferred by any other "voluntary transaction creating an interest in the property," but rather was transferred, apparently, by mistake, accident or impropriety. *See, e.g.,* Compl. ¶¶ 64-66. Whether the Collateral was accidentally swept into the portfolio of securities that Barclays purchased from LBI, or was included in the portfolio on the mistaken belief that it was among the securities that LBI owned and purported to sell pursuant to the APA, the transfer of the Collateral was effected under a mistake of fact. *See In re the Appraisal of the Estate Robert R. Willets*, 119 A.D. 119, 123 (N.Y. App. Div. 1907) ("It is true that the item . . . was included in the estate . . . through an erroneous legal construction of

entitlement holders." N.Y. U.C.C. § 8-510 cmt. 2 (emphasis added); *see SEC v. Credit Bancorp, Ltd.*, 279 F. Supp. 2d 247, 262 (S.D.N.Y. 2003). Barclays has not asserted a security interest in a security entitlement, but rather claims that it has outright ownership of the securities comprising the Collateral. Because Barclays obtained the securities comprising the Collateral from a securities intermediary – LBI – which had no authority to transfer the Collateral, any protection Barclays could obtain through the U.C.C. would have to be under Section 8-503(d) and (e). *See* N.Y. U.C.C. § 8-503 cmt. 2 (explaining that Section 503, which protects purchasers of a financial asset from a securities intermediary against adverse claims by the intermediary's entitlement holders, "takes precedence" over Sections 8-502 and 8-510). As a practical matter, however, Barclay's error is not material to this motion because Section 503(e), like Section 510(a), only provides protection to a transferee of a financial asset if, *inter alia*, the transferee is a "purchaser" who "gives value" for the financial asset. *See id.* § 503(e).

- 21 -

the will . . . , but the error was one of fact in including in that estate property which the testator did not own. The ownership of property is a fact and a mistake in that respect is one of fact."). As such, the transfer of the Collateral to Barclays was not a voluntary transaction. *C.f., e.g.,* *Playboy Enters., Inc. v. Sage Realty Corp.*, No. 79 Civ. 2236, 1980 U.S. Dist. LEXIS 10939, at *2-3 (S.D.N.Y. Apr. 10, 1980) (explaining that "under New York law a payment is not voluntary in the absence of full knowledge of all the material facts"); *Blue Cross of Cent. N.Y., Inc. v. Wheeler*, 93 A.D.2d 995, 996, 461 N.Y.S.2d 624, 626 (App. Div. 1983) (explaining that "[t]he law permitting a person to recover for moneys paid by mistake is based upon the principle of unjust enrichment, and that "[a] person may be unjustly enriched . . . where he receives money *or property. . . .*") (emphasis added).  Barclays therefore was not a "purchaser," as defined by the N.Y. U.C.C.

> Barclays also did not give "value" for the Collateral.  Under the U.C.C.:
>
> a person gives "value" for rights if he acquires them
>
> (a) in return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection; or
>
> (b) as security for or in total or partial satisfaction of a pre-existing claim; or
>
> (c) by accepting delivery pursuant to a pre-existing contract for purchase; or
>
> (d) generally, in return for any consideration sufficient to support a simple contract.

N.Y. U.C.C. § 1-201(44).[16]  Barclays asserts, without regard to the terms of the APA or the allegations in the Complaint, that "[b]y virtue of the Repo and the Sale Order, Barclays plainly 'gave value' for the Purchased Assets." Def.'s Mem. at 15.  However, the terms of the APA

---

[16] Subsections (a) and (b) are irrelevant to the present dispute because this case does not involve an extension of credit or the granting of a security interest in the Collateral to Barclays.  Only subsections (c) and (d) are pertinent to the issue of whether Barclays gave "value" for the Collateral through the APA.

#1503671 v1
109459-67363

confirm to the contrary, as the Collateral was not part of the Purchased Assets. *See, e.g., supra* Point I. Therefore, Barclays did not "accept delivery" of the Collateral "pursuant to a pre-existing contract for purchase." N.Y. U.C.C. § 1-201(44)(c). Moreover, the Complaint alleges that "[s]ince the Collateral was never an asset of 'Seller' as defined in the [APA], . . . any consideration paid by [Barclays] could not have been for the Collateral." Compl. ¶ 39. While Barclays may have paid billions of dollars for Purchased Assets under the APA, it did not pay a penny for the Collateral. *See* APA § 3.1 (Ex. D) (providing that "[t]he aggregate consideration *for the Purchased Assets* shall be" a certain cash amount and the assumption of certain liabilities by Barclays) (emphasis added). Because Barclays neither accepted delivery pursuant to a pre-existing contract for purchase nor provided any consideration for assets not purchased, Barclays did not "give value" for the Collateral. *See Johnson v. Shearson Loeb Rhoades, Inc.*, No. 83 Civ. 3937, 1984 U.S. Dist. LEXIS 22683, at *20-21 (S.D.N.Y. Oct. 18, 1984) (holding that a gratuitous transfer or a transfer in exchange for no services or consideration "does not qualify as a transfer for value"). Accordingly, Barclays is not entitled to protection from adverse claims by any section of the U.C.C., and FirstBank's tort and conversion claims should not be dismissed.

### POINT IV

### FIRSTBANK'S BREACH OF CONTRACT CLAIM, PLED IN THE ALTERNATIVE, SURVIVES IF BARCLAYS OBTAINED ANY INTEREST IN THE COLLATERAL

Even if one were to assume, *arguendo*, that the Collateral was transferred to Barclays, Barclays could not obtain a different interest in the Collateral than the transferor had itself. Since Special Financing held the Collateral as pledged security for certain obligations under the ISDA Agreement, if Barclays now holds the Collateral as of right, then it must also be treated as having assumed the ISDA Agreement, because there is no basis to split the asset itself (a security

- 23 -

interest in certain pledged collateral) from the agreement which sets out the terms of possession.

Barclays presumes the "asset" consists of the securities that comprise the Collateral alone. In

fact, the only "asset" Special Financing held was a security interest, which cannot exist separate

and apart from the ISDA Agreement pursuant to which FirstBank's obligations to Special

Financing were created. *See* Compl. ¶¶ 107-08; *see also Jonathan Bailey Assocs. v. HLM*

*Design, Inc.*, No. 3:06-CV-270-W, 2007 U.S. Dist. LEXIS 15520, at *7-8 (W.D.N.C. Mar. 5,

2007) ("[A]ny liens or other security interests tied to the account receivable were intended to be

. . . assigned part-and-parcel. Because a lien is security for a debt, there can be no lien in the

absence of an underlying debt."). Since neither Special Financing nor LBI ever foreclosed upon

or otherwise "owned" the underlying securities, Barclays could not possibly hold them now

without also having assumed the limitations on possession spelled out in the ISDA Agreement.

Although Barclays' brief omits any reference to the provisions of the Clarification Letter

Agreement which provide that assets of subsidiaries of LBHI (other than LBI) were not included

in the definition of Purchased Assets, *see* Clarification Letter Agmt. § 1(a) (Ex. F), Barclays

nevertheless relies upon the terms of the Clarification Letter Agreement to argue that the ISDA

Agreement was an "Excluded Contract" under the APA. *See* Def.'s Mem at 21; Clarification

Letter Agmt. § 21 (Ex. F) ("the term 'Excluded Contract' shall include any ISDA Master

Agreement and any master swap agreement"). Barclays claims that this provision was intended

to establish that "Barclays would not assume any liabilities arising out of 'Excluded Contracts.'"

Def.'s Mem. at 21 (citing APA §§ 2.4(a), 1.1(a) (Ex. D), which provides that the term "Excluded

Liabilities" includes liabilities "arising out of Excluded Assets, including" Excluded Contracts).

However, Barclays fails to mention that under the APA, "Excluded Contracts" are also

"Excluded Assets," and "Excluded Assets" are not "Purchased Assets." *See* APA § 1.1(a)

(Ex. D). Thus, if Barclays did not assume the ISDA Agreement, it did not purchase the assets

- 24 -

inextricably tied to it, including Special Financing's security interest in the Collateral. That security interest is the only asset that could, in any event, have been transferred, and such a transfer would by necessity include the obligations of the ISDA Agreement.

Accordingly, if Barclays does not purport to assume the ISDA Agreement as part of the purchase it claims to have made, then it could not have purchased the Collateral because the two are tied to each other.[17] If, however, Barclays is allowed to maintain that it rightfully acquired the Collateral pursuant to the APA and the Clarification Letter Agreement, then those documents must also impose upon Barclays the obligations set forth in the ISDA Agreement. As the Complaint alleges, Barclays has breached those obligations. Compl. ¶ 109. Since Barclays insists that it purchased the Collateral, the claims for breach of the ISDA Agreement to which the Collateral is linked properly state a claim.

## CONCLUSION

For the foregoing reasons, Barclays' Motion to Dismiss should be denied.

Dated: New York, New York
       March 26, 2010

Respectfully submitted,

GIBBONS P.C.

By: /s/ Jeffrey A. Mitchell
       Jeffrey A. Mitchell
       Daniel S. Weinberger
       *Attorneys for FirstBank Puerto Rico*
       One Pennsylvania Plaza, 37th Floor
       New York, New York 10119
       Tel.: (212) 613-2000
       Fax: (212) 554-9696

---

[17] If Barclays accepts the obligations under the ISDA Agreement and the Credit Support Annex, then FirstBank has no objection to Barclays holding a security interest in the Collateral.

#1503671 v1
109459-67363