# EXHIBIT E

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. |
| | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| | |
| In re | |
| | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| | |
| Debtor. | |

**REPLY MEMORANDUM OF BARCLAYS CAPITAL INC. IN FURTHER SUPPORT OF MOTION OF BARCLAYS CAPITAL INC. TO ENFORCE THE SALE ORDER AND SECURE DELIVERY OF ALL UNDELIVERED ASSETS**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

April 5, 2010

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

I.    BARCLAYS IS ENTITLED TO THE CLEARANCE BOX ASSETS. ......................... 6

      A.    The Plain Language Of The Parties' Contract Entitles Barclays To The
            Clearance Box Assets In All LBI Clearance Boxes, Including Those At
            The DTCC. ........................................................................................................ 6

      B.    The Trustee Cannot Evade The Plain Language Of The Purchase
            Agreement By Proffering Inadmissible Extrinsic Evidence. ............................ 14

            1.    The Trustee's Extrinsic Evidence Is Inadmissible Because The
                  Plain Text Of The Clarification Letter Is Unambiguous. ...................... 15

            2.    The Trustee's Extrinsic Evidence Does Not Support His
                  Argument. ............................................................................................... 16

            3.    The Extrinsic Evidence And Post-Closing Conduct
                  Overwhelmingly Supports Barclays' Claim. .......................................... 19

            4.    The Trustee's Argument Illogically Asserts That Barclays
                  Relinquished Assets To The *Trustee* In Order To Address *DTCC's*
                  Concerns. ................................................................................................ 22

II.   BARCLAYS IS ENTITLED TO ALL PROPERTY HELD TO SECURE THE
      ETD OBLIGATIONS IT ASSUMED FROM LBI. ...................................................... 24

      A.    The Plain Language of the Purchase Agreement Makes Clear That the
            ETD Margin is a Purchased Asset. ................................................................. 25

            1.    The Clarification Letter Expressly Provides That the Purchased
                  Assets Include "Any Property That May Be Held To Secure" the
                  Assumed ETD Obligations. .................................................................... 25

            2.    ETD Margin Is Not An Excluded Asset Under the APA. ...................... 27

      B.    The Extrinsic Evidence Refutes the Trustee's Professed Lack of
            Understanding That the Deal Included ETD Margin. ...................................... 29

      C.    The Drafting History Of The Clarification Letter Does Not Support Any
            Of The Trustee's Arguments. ......................................................................... 35

      D.    Barclays Would Not Have Agreed To Take Over the ETD Business
            Absent the Posted Margin, and the Trustee Had No Viable Alternative
            That Would Have Permitted It To Keep the ETD Margin. ............................... 38

i

1.      Barclays Needed the ETD Margin As Protection Against the
        Substantial Risks Associated With Assuming the ETD-related
        Obligations. ........................................................................................... 38

2.      The Trustee Had No Viable Alternative To the Deal He Approved. ....... 41

III.    BARCLAYS IS ENTITLED TO $769 MILLION IN SECURITIES OF THE
        TYPE HELD IN LBI'S CUSTOMER RESERVE ACCOUNT. ................................... 42

        A.      The Plain Text Of The Purchase Agreement Provides That Barclays Is
                Entitled To $769 Million In Securities Of The Same Nature And Value As
                Those Kept In LBI's 15c3-3 Reserve Account. ................................................. 43

                1.      The Trustee Has Not Identified Any "Applicable Law" That
                        Imposes The "Conditions" Asserted By The Trustee. ............................. 45

                a.      "Applicable Law" Authorized The Trustee To Transfer Some Or
                        All Of The Reserve Account To Barclays — Whether Or Not
                        There Was An "Excess" In That Account ................................................. 46

                b.      "Applicable Law" Allows The Transfer Of Any Excess Amount
                        From The Reserve Account Without Approval From The SEC. ............. 48

                c.      "Applicable Law" Does Not Require The Trustee To Delay
                        Transfer Of The $769 Million In Securities Until The SIPA
                        Liquidation Of LBI Is Complete. ............................................................ 50

                2.      The Court Should Reject The Trustee's Interpretation Of The "Or"
                        Clause, And Should Enforce That Clause To Require Delivery Of
                        The Promised Securities ........................................................................... 52

        B.      If The Court Determines That The Purchase Agreement Is Ambiguous,
                The Extrinsic Evidence Demonstrates That Barclays Is Entitled To The
                $769 Million In Securities Promised In Section 8 Of The Clarification
                Letter ........................................................................................................................ 54

        C.      The Rules of Contractual Interpretation Relied Upon By The Trustee Do
                Not Support His Argument. ................................................................................... 59

        D.      Rule 15c3-3 Does Not Prohibit The Transfer Of Any Of LBI's ETD
                Margin At The OCC ................................................................................................ 60

CONCLUSION ................................................................................................................ 63

# TABLE OF CONTENTS

## Cases

*Ballard v. Parkstone Energy, LLC,*
  522 F. Supp. 2d 695 (S.D.N.Y. 2007) ................................................................. 45

*Bero Contracting & Dev. Corp. v. Vierhile,*
  19 A.D.3d 1160 (N.Y. App. Div. 2005) .............................................................. 16

*Bonner v Guerrieri,*
  2009 NY Slip Op. 52666U (N.Y. Sup. Ct. 2009).................................................. 45

*Caloric Stove Corp. v. Chem. Bank & Trust Co.,*
  205 F.2d 492 (2d Cir. 1953)................................................................................ 11

*Christian Mut. Life Ins. Co. v. Penn Mut. Life Ins. Co.,*
  163 F. Supp. 2d 260 (S.D.N.Y. 2001) ................................................................. 45

*Croce v. Kurnit,*
  737 F.2d 229 (2d Cir. 1984)................................................................................... 8

*Cummins, Inc. v. Atlantic Mut. Ins. Co.,*
  56 A.D.3d 288 (N.Y. App. Div. 2008) ................................................................ 37

*DaPuzzo v. Globalvest Mgmt. Co., L.P.,*
  263 F. Supp. 2d 714 (S.D.N.Y. 2003) ................................................................. 37

*Faulkner v. Nat'l Geographic Soc'y,*
  452 F. Supp. 2d 369 (S.D.N.Y. 2006) ................................................................. 54

*Galli v. Metz,*
  973 F.2d 145 (2d Cir. 1992)................................................................................ 11

*Goodheart Clothing Co. v. Laura Goodman Enters., Inc.,*
  962 F.2d 268 (2d Cir. 1992)................................................................................ 11

*Hangzhou Silk Import & Export Corp. v. P.C.B. Int'l Indus., Inc.,*
  No. 00 Civ. 6344, 2002 WL 2031591 (S.D.N.Y. Sept. 5, 2002) .................................. 11, 32

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.,*
  889 F.2d. 1274 (2d Cir. 1989)............................................................................. 26

*In re Actrade Fin. Techs., Ltd.,*
  2009 WL 5219033 (Bankr. S.D.N.Y. Dec. 31, 2009) .......................................... 55

*In re Allegiance Telecom, Inc.*,
356 B.R. 93 (Bankr. S.D.N.Y. 2006)............................................................................ 16, 54

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*,
67 B.R. 557 (D.N.J. 1986) ..................................................................................................... 13

*In re Donald Sheldon & Co.*,
148 B.R. 385 (Bankr. S.D.N.Y. 1992)................................................................................... 51

*In re Manhattan Inv. Fund Ltd.*,
397 B.R. 1 (S.D.N.Y. 2007)................................................................................................... 14

*In re MJK Clearing Inc.*,
286 B.R. 109 (Bankr. D. Minn. 2002) ................................................................................... 51

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
595 F.3d, 458 (2d Cir. 2010)................................................................................................. 26

*Metropolitan West Asset Management, LLC v. Magnus Funding, Ltd.*,
No. 03 Civ. 5539(NRB), 2004 WL 1444868, (S.D.N.Y., June 25, 2004)............................ 45

*New Moon Shipping Co. v. MAN B & W Diesel AG*,
121 F.3d 24 (2d Cir. 1997).................................................................................................... 11

*NLRB v. Local 32B-32J Serv. Employees Int'l Union*,
353 F.3d 197 (2d Cir. 2003)................................................................................................... 59

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*,
505 F.2d 989 (2d Cir. 1974)................................................................................................... 54

*Paneccasio v. Unisource Worldwide, Inc.*,
532 F.3d 101 (2d Cir. 2008).................................................................................................... 8

*Pimpinello v. Swift & Co.*,
253 N.Y. 159 (1930).............................................................................................................. 12

*Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*,
No. 08-cv-7069, 2009 WL 1154094 (S.D.N.Y. Mar. 19, 2009) ........................................... 37

*Shadlich v. Rogrant Assocs., LLC*,
66 A.D.3d 759 (N.Y. App. Div. 2009) .................................................................................. 37

*Terry Oilfield Supply Co. v. American Sec. Bank, N.A.*,
195 B.R. 66 (S.D. Tex. 1996)................................................................................................. 11

*The Options Clearing Corp. v. Barclays Capital Inc., et al.*,
Case  No. 08-01759 (S.D.N.Y. Bankr.) ................................................................................. 33

*This is Me, Inc. v. Taylor*,
   157 F.3d 139 (2d Cir. 1998)........................................................................ 11

*Venizelos, S.A. v. Chase Manhattan Bank*,
   425 F.2d 461 (2d Cir. 1970)........................................................................ 59

*Ward v. Nat'l Geographic Soc'y*,
   284 Fed. Appx. 822 (2d Cir. 2008)............................................................ 55

## **Statutes**

11 U.S.C. § 748 ........................................................................................ 46

15 U.S.C. § 78fff-1 .................................................................................... 46

15 U.S.C. § 78fff-2(f) ..........................................................................47, 48, 59

15 U.S.C. § 78*lll*(4) ............................................................................. 52, 61

15 U.S.C. §§ 78fff-1(a)......................................................................... 48, 59

## PRELIMINARY STATEMENT

1.      In September 2008, Lehman had imploded and the entire financial system was in crisis.  There were virtually no buyers for distressed assets, and there were few institutions with available capital.  There were even fewer prepared to invest that capital at a time of great uncertainty.  Institutions that both had capital and were prepared to invest it had many opportunities to make substantial returns if — and it was a big if — the financial system recovered.

2.      As a result, Barclays was the only bidder for Lehman's assets.  The alternative to accepting Barclays' bid, as everyone acknowledged at the time, and as the Examiner recently confirmed, was a disaster for Lehman's customers and creditors, and chaos for the American financial system.  Barclays had no need, nor any incentive, to accept any deal that would impair its regulatory capital position, or that would otherwise fail to give it maximum downside protection and substantial upside potential.  At the time of the sale, no representative of Lehman proposed any of the conditions, interpretations, or assumptions that the Trustee now asks this Court to impose after the fact.  They did not do so for one simple reason:  Barclays would never have agreed and they knew it.

3.      The Trustee argues that the Court should reject any interpretation of the Purchase Agreement that would lead to a potential "shortfall" of assets for remaining customers.  He asserts that if the Court concludes that the plain text of the Purchase Agreement entitles Barclays to the Disputed Assets (as it clearly does), then that outcome must be rejected as "perverse," "unintended," or "the result of a mistake" — and hence must lead to reformation of the Sale Order and the Purchase Agreement.  Trustee Reply Br. at ¶ 9.

4.      Even a SIPA Trustee may not dictate such a "heads-I-win, tails-you-lose" approach to a contractual dispute.  As the Trustee's representative admitted in deposition, the

1

Barclays-Lehman sale was negotiated by Lehman executives and by Weil Gotshal, not by the

Trustee.[1]  The Trustee chose to *approve* that Sale because it was in the "best interest of

customers" and because it would provide "comfort on a national scale."  BCI Ex. 49 [Sept. 19,

2008 Hearing Tr.] at 73:20-74:1, 75:5-10.[2]  The Trustee approved the Sale *despite* his

acknowledgement of the uncertainty regarding the value of the assets that would remain with the

estate, and the amount of claims that would have to be satisfied (which remains uncertain to this

day):

> So we have many challenges and much work ahead of us.  There's no indication
> we'll have a small amount of money, cash.  The liabilities as best I can determine
> them, are in the billions.  And there are *potential assets* which are also valued
> highly *on the balance sheet*.  As to what those assets will be, many of which
> appear to be — have decreased, because of market conditions, substantially in
> value just in a matter of days, *I really cannot tell*.

*Id.* at 76:22-77:3, 78:9-16 (emphases added).

5.     The Trustee made the right decision.  By approving the sale, the Trustee

"assist[ed] in the stabilization of the financial markets" and avoided a liquidation that "could

[have] prove[d] to be truly disastrous," triggering losses and contagious panic that were correctly

thought to be "incalculable."  *Id.* at 250:13-21.  Having made that decision, however, the Trustee

cannot now (after market conditions have radically improved) disavow the terms of the deal that

made survival possible.  The undisputed evidence establishes that (a) Barclays *would not have*

*done the deal* if it had not been promised the Clearance Box Assets and the 15c3-3 assets,[3]  (b)

---

[1] BCI Ex. 80 [Kobak Dep. Tr.] at 22:3-6.

[2] The "BCI Exhibit" numbers referenced herein refer to the consolidated appendix of materials Barclays filed with
Court on January 29, 2010 (Vols. I – VIII, BCI Exhibits 1 – 380) and a supplemental appendix filed on April 5,
2010 (Vols. IX-X, BCI Exhibits 381 – 647).  Note that the exhibit numbers of Volume IX are not consecutive
because this volume comprises selected documents from Barclays' Trial Exhibit List, which was provided to
Movants' counsel on April 1, 2010.

[3]  BCI Ex. 91 [Ricci Dep. Tr.] 140:14-141:10, 157:13-159:4, 160:5-16; BCI Ex. 79 [Klein Dep. Tr.] at 97:10-98:5;
BCI Ex. 78 [Kirk Dep. Tr.] at 100:10-104:9, 112:4-113:7; *see also* BCI Ex. 638 [Excerpts of Movants' Statement of

Barclays *told this to the Lehman negotiators*,[4] (c) Barclays *always* understood it was obtaining

the ETD Margin (since it would have been madness not to do so) and *communicated that to*

*Lehman* by ensuring that specific language was included in the Clarification Letter so as to leave

no room for doubt.[5] For these reasons, Barclays made sure the plain text of the Purchase

Agreement — and in particular the Clarification Letter — was unambiguous, and provided

Barclays with the assets it needed to close the Sale.

6.    By contrast, the Trustee admits that he made no effort to negotiate, modify,

clarify, or otherwise revise any aspect of the Purchase Agreement.[6] Nevertheless, he now asks

this Court to override the plain text of the Clarification Letter based upon his undisclosed,

subjective "understanding" of — not the *terms* — but the supposed *results* of the Sale. The

Trustee argues that he "Did Not Know That Barclays Was Acquiring Assets Worth Materially

More Than $47.4 Billion." Trustee Reply Br. at p. 79. But the Trustee has also asserted that

"the revised deal called for Barclays to acquire the Business (as defined in the APA), certain real

---

Undisputed Material Facts] at ¶¶ 475-505; LBHI Reply Br. at ¶¶ 33, 39 n.20, 54, 77, 164; Committee Reply Br. at ¶ 49 n.66, 154, 199.

[4] BCI Ex. 78 [Kirk Dep. Tr.] at 112:4-9.

[5] *See* BCI Ex. 635 [Rosen Dep. Tr.] at 44:18-47:11, 47:25-48:16; BCI 233 [Sept. 20, 2008 12:45 pm email from J. McDaniel to R. Berkovich, *et al.*]; BCI Ex. 235 [Sept. 20, 2008 1:09 pm email from E. Rosen to J. McDaniel]; BCI Ex. 236 [Sept. 20, 2008 1:15 pm email from J. McDaniel to E. Rosen, *et al.*]; BCI Ex. 242 [Sept. 20, 2008 3:52 pm email from J. McDaniel to E. Rosen, *et al.*]; BCI Ex. 262 [Sept. 21, 2008 4:03 pm email from J. McDaniel to E. Rosen, *et al.*]; BCI Ex. 267 [Sept. 21, 2008 4:37 pm email from J. McDaniel to S. Harbeck, *et al.*]. *See also* Trustee Reply Br. at ¶ 93 (noting that Barclays' counsel drafted the parenthetical regarding ETD margin).

[6] BCI Ex. 80 [Kobak Dep. Tr.] at 22:24-23:15; Sept. 15, 2009 Kobak Decl. at ¶¶ 8-10. The Trustee makes this admission, which is not disputed by Barclays, despite the fact that 13 lawyers at the Trustee's firm billed over $150,000 between September 19 and September 22 for work described as "review of continuing revisions to APA, Clarification Letter and numerous rounds of negotiations with Weil, Cleary, and other professionals re changing terms to sale and timetable for closing and consultations with HHR, SIPC and SEC teams re same," "round-the-clock negotiations with Lehman, Barclays, SIPC and regulators on sale issues with review of Clarification Letter and accompanying sale documents," work to "monitor and participate in sale discussions and review of final sale documents," and the like. BCI Ex. 40 [HHR First Application for Interim Compensation — Sept. 2008 Time Entries] at pp. 26-27, 30, 34.

estate properties and $47.4 billion of additional assets."[7]  By his own admission, the Trustee

made no effort to learn what assets comprised the $47.4 billion estimate, what other assets were

being transferred as part of "the Business," or the estimated values of *any* of the various

Purchased Assets identified in the Purchase Agreement.[8]  If he had done so, he would have

learned that Barclays was acquiring assets of *exceptionally uncertain value*, which by no means

were guaranteed to be less — or more — than a specified amount.[9]

7.    Moreover, the Trustee's 30(b)(6) representative admitted that the Trustee never

communicated to anyone —  Barclays or anyone else — his alleged belief that Barclays was not

entitled to receive more than $47.4 billion in financial assets.[10]  To the contrary, in December

2008, three months after the Sale closed, the Trustee told this Court that when Barclays replaced

the New York Fed's lending position immediately prior to the Sale, "***LBI was to provide***

***Barclays with $49.7 billion in securities in exchange for $45 billion in cash***."  BCI Ex. 29

[Trustee's Motion for Entry of Order Approving Settlement Agreement] at ¶ 10.  The Trustee

told the Court that the Clarification Letter provided that this $49.7 billion of "Repo Collateral"

was "'deemed to constitute *part* of the Purchased Assets' under the Purchase Agreement."  *Id.* at

¶ 16.  Because $7 billion of this Repo Collateral had not been delivered to Barclays, the Trustee

asked this Court to approve a settlement in order to make up for that shortfall, emphasizing that

---

[7]  *See* Trustee Rule 60 Brief at ¶ 3; *see also* BCI Ex. 80 [Kobak Dep. Tr.] at 90:6-17 (admitting that over and above the $47.4 billion, Barclays was acquiring "any assets in the business").

[8]  BCI Ex. 80 [Kobak Dep. Tr.] at 151:12-152:9.

[9]  Both the Trustee and the 30(b)(6) representative for LBHI admitted that they understood the $47.4 billion estimate given at the Sale Hearing to be an explanation for how the value of the assets in the APA's definition of "Long Positions" had fallen from the APA's initial approximation of $70 billion.  BCI Ex. 80 [Kobak Dep. Tr.] at 86:10-24; BCI Ex. 81 [Kruse Dep. Tr.] at 196:7-21.  By definition, therefore, the estimate did not include any of the other Purchased Assets, such as the approximately $3 billion in residential mortgages that the APA identified as a separate Purchased Asset from the Long Positions.  *Compare* BCI Ex. 1 [APA] at p. 6, subsection (d) (definition of Long Positions) *with id.* at § 1.1, p. 6, subsection (e) (identifying mortgage securities as a separate asset);  *see also* BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 49:8-53:8 (discussion of the mortgage securities that was distinct from discussion of Long Positions described 47:1-4).

[10]  *Id.* at 210:6-16.

4

"what this settlement really accomplishes is completing the very transaction contemplated in the purchase agreement as approved by this Court." BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 23:21-24. In seeking approval for that settlement, the Trustee did not tell the Court (or anyone else) that he believed that Barclays was entitled to receive no more than $47.4 billion in assets — in fact he told the Court just the opposite.[11]

8.    In deposition, the Trustee's representative admitted that when he asked the Court to approve the December Settlement, he thought the results of the settlement might *itself* cause the Repo Collateral acquired by Barclays — on its own, excluding all the other Purchased Assets — to be worth *more* than $47.4 billion. BCI Ex. 80 [Kobak Dep. Tr.] at 151:12-153:4. Thus, the Trustee's current story is that he asked the Court to do something in December 2008 that he (allegedly) *believed at the time was unauthorized* (because it might exceed $47.4 billion), and he signed a settlement and release with Barclays, even though *he believed at the time* he was entitled *to claw back the very assets he was agreeing to transfer*.

9.    The Trustee's professed "understanding" is nothing more than an *ex post* attempt to retrade a transaction that, at the time, the Trustee, the Debtor, the regulators, and major market participants urged the Court to approve to stave off disaster, but which would not have been concluded on the terms now proposed by the Trustee. The Trustee may be doing so out of a desire to maximize the recoveries of remaining customers, but that motive cannot override the plain text of the Purchase Agreement, the overwhelming extrinsic evidence confirming that plain text, or the established public policy of protecting bidders in bankruptcy sales by upholding the finality of their purchases.

---

[11] *See id.* at 19:12-20:10; BCI Ex. 80 [Kobak Dep. Tr.] at 147:3-10 BCI Ex. 29 [Trustee's Motion for Entry of Order Approving Settlement Agreement] at ¶¶ 10, 16.

10.     As the Trustee admits, he did not negotiate the disputed contractual terms.  He

therefore is in no position to argue that they mean something different from what Barclays and

the Debtor agree they mean (even as the Debtor's "special counsel" improperly asks the Court to

rewrite the contract under Rule 60(b)).[12]  Whether the Trustee understood its effects, he

indisputably signed the contract and is bound by it as a matter of law.  If the Trustee had wanted

a different contract — one that guaranteed a certain result for remaining customers or contained

a specific valuation cap — he could have asked for it.  He did not, and Barclays would not have

agreed had he done so.  Instead, he accepted the benefits of the Sale, which he has lauded as one

which was "instrumental in protecting customers and preserving customer value in uncertain

times," and which "provided immediate account access" to tens of thousands of PIM customers,

"avoided disruption of trading, preserved account value, and relieved the LBI Estate of the

administrative burden of handling the possible tens of thousands of claims."[13]  The Court should

now require the Trustee to honor *all* the terms of the Purchase Agreement — not merely those

advantageous to the Trustee — and deliver to Barclays the remaining Disputed Assets.

## I.    BARCLAYS IS ENTITLED TO THE CLEARANCE BOX ASSETS.

### A.    The Plain Language Of The Parties' Contract Entitles Barclays To The Clearance Box Assets In All LBI Clearance Boxes, Including Those At The DTCC.

11.     The Trustee does not dispute that the *plain text* of section 1(a)(ii)(B) of the

Clarification Letter entitles Barclays to receive *all* of LBI's Clearance Box Assets.  There is no

other way to read that plain text:  section 1(a)(ii)(B) of the Clarification Letter provides that the

---

[12]   After Barclays pointed out in its January 29, 2010 memorandum that the Debtor agreed with Barclays' contractual interpretations, the Debtor offered no argument in response:  it merely dropped a footnote in its reply brief endorsing the Trustee's contractual arguments (even while asking this Court to enter Rule 60(b) relief based on the premise that, absent such relief, the contract *does entitle* Barclays to the Disputed Assets).  *See* LBHI Reply Br. at n. 1.

[13]   BCI Ex. 42 [Trustee's First Interim Report] at ¶¶ 18, 20.

Purchased Assets being transferred to Barclays include the "securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing." This contractual language *does not exclude* the "securities and other assets held in LBI's 'clearance boxes'" at the DTCC — which were LBI's primary clearance boxes and held the vast majority of the $1.9 billion in Clearance Box Assets promised to Barclays to induce it to close on the transaction. To the contrary, although the Trustee ignores it, Schedule B to the Clarification Letter is a security-by-security list of the assets to be transferred — and more than 98% of the listed assets were in LBI's DTCC clearance boxes. BCI Ex. 521 [Apr. 1, 2010 Hraska Decl.] at ¶ 3. Thus, the Trustee's argument that LBI's assets in the DTCC clearance boxes were "excluded" from the deal directly contradicts the plain language of section 1(a)(ii)(B) and Schedule B of the Clarification Letter. It must therefore be rejected as a matter of law. The Trustee has no answer to this.

12.    Instead of addressing the contractual language in the Clarification Letter that actually governs the transfer of the Clearance Box Assets, the Trustee relies upon the language of the DTCC Letter, which he argues is the "more specific" of the two agreements. Trustee Reply Br. at ¶¶ 155-160. The Trustee has seized on a general reference in the DTCC Letter to the fact that LBI was retaining its "accounts" at the DTCC. The Trustee would have the Court believe that even though extensive evidence shows the Clearance Box Assets were critical to Barclays' decision to go ahead with the transaction, even though the parties had worked diligently over the weekend to identify and specify these assets, even though drafting work on the Clarification Letter describing the Clearance Box Assets was being done virtually up to the moment of Closing — indeed, even though the parties took actions to identify and transfer the Clearance Box Assets after the Closing — somehow, the DTCC Letter should be read as an agreement by Barclays to give the assets back to the Trustee. This argument fails as a matter of law.

7

13.     First, there is no conflict or inconsistency between the DTCC Letter and the

Clarification Letter, and therefore the doctrine that the "specific governs the general" does not

apply.  *See generally Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir.

2008) (holding there is "'no factual predicate for application of the principle that where a

specific contract provision conflicts with a more general provision, the specific provision

controls[,] ... [s]ince there is no inconsistency.'" ) (quoting *Croce v. Kurnit*, 737 F.2d 229, 237-

38 (2d Cir. 1984)) (ellipsis in original).  Here, the Clarification Letter identified specific

securities that would be included as Purchased Assets to be acquired by Barclays from LBI, and

the DTCC Letter provided that in receiving these securities Barclays would not assume LBI's

accounts where the securities were held; instead, the DTCC would have the benefit of a $250

million guaranty and certain other rights associated with winding down the LBI accounts.

*Compare* BCI Ex. 5 [Clarification Letter] *with* BCI Ex. 6 [DTCC Letter].  While the DTCC

Letter explains that Barclays was not acquiring *the LBI accounts themselves*, it did not purport in

any way to modify the Clarification Letter's definition of Purchased Assets, which on its face

included the LBI "securities and other assets" held in those accounts.

14.     But even if the "specific governs the general" doctrine were applied, the Trustee's

argument fails as a matter of law based upon the plain text of the agreements.  The Clarification

Letter provides that the Purchased Assets include "such securities and other assets held in LBI's

'clearance boxes' as of the time of Closing, *which at the close of business on September 21,*

*2008, were as specified on Schedule B previously delivered by the Seller and accepted by*

*Purchaser . . . .*"  BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(B) (emphasis added).  In contrast,

the DTCC Letter is entirely silent as to the disposition of any of the *specific assets* located within

LBI's clearance boxes at the DTCC, and is not "more specific" than the Clarification Letter.  The

"*most* specific" indication of the parties' intent is found on Schedule B to the Clarification Letter, which lists out, *CUSIP by CUSIP*,[14] the Clearance Box Assets that the Seller agreed Barclays was entitled to acquire.  BCI Ex. 359 [Jan. 27, 2010 Hraska Decl.] at ¶ 2, Ex. 1.  Over 98% of the securities listed on Schedule B *were located in the DTCC accounts*.  BCI Ex. 309 [Sept. 25, 2008 12:40 pm email from D. Murgio to V. Lewkow, *et al.*, with attachment] at p. 8; *see* BCI Ex. 521 [Apr. 1, 2010 Hraska Decl.] at ¶ 3.  Thus, the most specific indicator of the parties' contracting intent unambiguously confirms that the parties *never agreed* to remove the DTCC Clearance Box Assets from the Purchased Assets to be transferred to Barclays.

15.    The Trustee is mistaken in arguing that "[i]f Barclays' reading of the DTCC letter were correct, the effect would be to leave DTCC with control over various empty accounts after the assets had been transferred to Barclays."  Trustee Reply Br. at ¶ 152.  Barclays is not arguing that all assets in the LBI accounts must be transferred; rather, the Clarification Letter provides that all assets in the clearance boxes that were *owned by LBI* would be transferred.  After providing that the "securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing" are Purchased Assets, Section 1(a)(ii)(B) of the Clarification Letter confirms that "no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets."  BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(B).  In other words, the Clarification Letter provides that assets "held in LBI's 'clearance boxes'" are Purchased Assets, except that it makes clear that assets owned by LBHI, other Lehman affiliates, or customers are *not* Purchased Assets.  Thus, the Clarification Letter is very specific regarding the precise assets Barclays was acquiring.

---

[14]   A "CUSIP" is a unique alphanumeric designator for each type of security.

16.     Schedule B was available for inspection by the Trustee and by the Committee at the Closing, and on its face refuted the Trustee's current litigation position.  BCI Ex. 309 [Sept. 25, 2008 12:40 pm email from D. Murgio to V. Lewkow, *et al.*, with attachment] ("Attached is an electronic version of Schedule B that was on the closing table."); BCI Ex. 302 [Sept. 25, 2008 10:28 am email from H. Miller to L. Despins, *et al.*] ("You were invited *to stay* Monday AM as the schedules were reviewed and finalized.") (emphasis added); BCI Ex. 304 [Sept. 25, 2008 11:45 am email from R. Miller to L. Granfield, *et al.*] ("Schedule B was prepared by LBI *as to* what its records indicated as of Sunday, Sept. 21st as to what was in the unencumbered 'box' . . . .").  The summary page of the Schedule B that Weil Gotshal's emails describe as "on the closing table" *explicitly identifies* assets in the DTCC clearance boxes by name — listing assets from both the "DTC 074" and "DTC 636" boxes as having marks of more than $862.6 million and $300.9 million, respectively.[15]  The *summary of this same* Schedule B also lists a category denominated "Bony Tri Pledge," with marks of over $1 billion (approximately $777 million after reduction for worthless Lehman paper), which was composed *exclusively* of assets from the DTCC clearance boxes.  BCI Ex. 359 [Jan. 27, 2010 Hraska Decl.] at ¶ 3.  In fact, the only assets on Schedule B that were *not* in LBI's DTCC clearance boxes were assets marked at less than $37 million that were in LBI's *Canadian and Euroclear* boxes (less than 2% of the total).[16]  Thus, the *specific Schedule* attached to the Purchase Agreement that the Trustee signed *expressly provides that* nearly $2 billion of specifically identified securities in the DTCC clearance boxes were Purchased Assets *to be transferred* to Barclays.

17.     It is simply not meaningful to refer to LBI's "*Clearance Box Assets*" without including the assets in the DTCC clearance boxes.  Like all other U.S. broker-dealers, LBI held

---

[15] BCI Ex. 309 [Sept. 25, 2008 12:40 pm email from D. Murgio to V. Lewkow, *et al.*, with attachment] at p. 8.

[16] *Id.*

and traded securities *almost exclusively* through the various DTCC clearing corporations.  With

few exceptions, the LBI "clearance box assets" *are* the clearance box assets at the DTCC.  By

arguing that the DTCC clearance box assets were removed from the deal, the Trustee is arguing

that the plain language of section 1(a)(ii)(B) of the Clarification Letter — including Schedule B

— was nullified.  His argument must therefore be rejected as a matter of law.  *See, e.g.*, *Galli v.*

*Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract

that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred

and will be avoided if possible.") (internal quotation omitted) (ellipsis in original); *Goodheart*

*Clothing Co. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 272-73 (2d Cir. 1992) ("A court

should interpret a contract in a way that ascribes meaning, if possible, to all of its terms.")

(internal quotation omitted).

18.    The Trustee's only answer to Schedule B is that he "was not focused on its

filing."  Trustee Reply Br. at ¶ 163.  As a matter of law, that is not a basis for disregarding the

plain meaning of the contract, including its attached schedule.[17]  *See, e.g.*, *Hangzhou Silk Import*

*& Export Corp. v. P.C.B. Int'l Indus., Inc.*, No. 00 Civ. 6344, 2002 WL 2031591, at *6

(S.D.N.Y. Sept. 5, 2002) ("Ignorance of the terms and conditions of a contract is no defense for a

party that has already executed the contract."); *Terry Oilfield Supply Co. v. American Sec. Bank,*

*N.A.*, 195 B.R. 66, 73 (S.D. Tex. 1996) ("Bankruptcy is drastic and expensive enough without

allowing the debtor and court to approve a contract and later void it on the grounds that they

would not have approved if they had bothered to understand it."); *see generally Caloric Stove*

*Corp. v. Chem. Bank & Trust Co.*, 205 F.2d 492, 495 (2d Cir. 1953) (L. Hand, J.) ("the law of

---

[17] *See, e.g.*, *New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 30 (2d Cir. 1997) ("Under general principles of contract law, a contract may incorporate another document by making clear reference to it in such terms that its identity may be ascertained beyond doubt."); *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) (Under New York law, courts must read together "all writings which form part of a single transaction and are designed to effectuate the same purpose.").

New York in this regard is the same as the general law of contracts: i.e., if a party to a written

contract signs it, he is bound by its terms, whatever these may be," even if he has not read it);

*Pimpinello v. Swift & Co.*, 253 N.Y. 159, 162 (1930) ("the signer of a deed or other instrument . .

. is conclusively bound thereby. That his mind never gave assent to the terms expressed is not

material.  If the signer could read the instrument, not to have read it was gross negligence; if he

could not read it, not to procure it to be read was equally negligent; in either case the writing

binds him").

19.    Moreover, the Trustee did not need to "focus" on Schedule B at all to know that

Barclays was acquiring the Clearance Box Assets pursuant to section 1(a)(ii)(B) of the

Clarification Letter, and to know that those Clearance Box Assets are *virtually exclusively* held at

the DTCC.  The first fact was obvious from the face of the Clarification Letter the Trustee

signed, and the second was (and is) common knowledge to anyone familiar with how a broker-

dealer operates, which the Trustee surely is.[18]

20.    In any event, the Trustee had ample time to understand the meaning of the

Clarification Letter and to review Schedule B had he wanted to do so.  A draft of Schedule B was

"at the closing table," and the parties then spent a full week attempting to finalize that schedule,

working to address a series of technical issues relating to the precise identification of all of the

Clearance Box Assets.[19]  On September 29, 2008, the Debtor and Barclays filed a motion with

---

[18]  BCI Ex. 80 [Kobak Dep. Tr.] at 13:15-15:17; BCI Ex. 639 [http://www.hugheshubbard.com/James-W-Giddens/]
(James W. Giddens attorney webpage, listing Giddens as Co-Chair of Bankruptcy and Corporate Reorganization
Group, Hughes Hubbard & Reed LLP); BCI Ex. 640 [http://www.hugheshubbard.com/James-B-Kobak-Jr/] (James
B. Kobak, Jr. attorney webpage, listing SIPC liquidations as one of Kobak's areas of concentration).

[19]  *See e.g.,* BCI Ex. 359 [Jan. 27, 2010 Hraska Decl.] at ¶ 2.  It is for this reason that the filing of Schedule B
specifically provides that "Schedule B lists securities believed to be held in LBI's 'clearance boxes' as of the time of
the Closing (as defined in the Clarifying Letter) and is without prejudice to the right of Barclays to receive other
securities held in such clearance boxes but not listed on Schedule B or to return securities, in each case pursuant to
the terms of the Clarifying Letter." BCI Ex. 19 [Joint Motion] at p. 4 n.3 (emphasis added); BCI Ex. 359 [Jan. 27,
2010 Hraska Decl.] at ¶ 2, Ex. 1.  Because Schedule B was prepared on the basis of the imperfect information
available to the parties at the time, the parties recognized that it likely did not perfectly accomplish the goal of listing

the Court to file Schedules A and B under seal to protect competitively sensitive information
regarding the thinly traded assets included on those schedules.  BCI Ex. 19 [Joint Motion].  At
the same time, Weil Gotshal sent a copy to the Trustee and, in response to an informal request
from the Trustee's counsel, sent electronic copies to three Hughes Hubbard lawyers for their
review.  BCI Ex. 524 [Sept. 30, 2008 email from D. Harvey to D. Wiltenburg, *et al*] ("Here are
the filed schedules.  Search by CUSIP number.").  Again, as with the version on the closing
table, the *only* securities listed on Schedule B that were not held at the DTCC clearance boxes
were the approximately $37 million in securities in the Canadian and Euroclear clearance boxes.
BCI Ex. 521 [Apr. 1, 2010 Hraska Decl.] at ¶ 3.  The Trustee would not have needed to "focus"
for long to understand that Schedule B represented a substantial volume of assets in the DTCC
Clearance Boxes being transferred to Barclays — a proposition that is incompatible with the
Trustee's professed reading of the DTCC Letter, which would essentially have removed the
Clearance Box Assets from the deal.  Yet the Trustee never objected that a list of Purchased
Assets consisting almost entirely of assets in LBI's DTCC clearance boxes was inconsistent with
his understanding of the parties' agreement.

21.    Finally, in addition to being irreconcilable with the plain meaning of the
Clarification Letter and Schedule B, the Trustee's argument ignores the fundamental distinction
between ownership of a clearing agency account, and beneficial ownership of the assets within
that account.  That distinction lies at the heart of the system by which securities are held and
transferred in a modern financial system.[20]  Absent such a distinction, every owner of a security

---

the unencumbered assets in LBI's clearance boxes.  Barclays seeks neither more nor less than the parties intended it
to receive, and has prepared revised lists of the undelivered Clearance Box Assets that more accurately reflect the
parties' contracting intent.  *See* BCI Ex. 359 [Jan. 27, 2010 Hraska Decl.] at ¶¶ 5-8, Exs. 3, 4, 5.  The Trustee's brief
does not indicate that he takes issue with the accuracy of those updated lists.

[20]  *See generally* Barclays Opp. Brief at ¶¶ 357-359 (citing U.C.C. Art. 8 (rev. 1994)); *In re Bevill, Bresler &
Schulman Asset Mgmt. Corp.*, 67 B.R. 557, 572-74, 610-12 (D.N.J. 1986) (describing rights and obligations relating

would need to be a clearing member of a clearing corporation.  BCI Ex. 635 [Rosen Dep. Tr.] at

59:13-61:15.  LBI's "clearance box" accounts at the DTCC were used to hold and trade

securities on behalf of thousands of entities — both Lehman affiliates and customers.  The

account itself is a custody arrangement which gave LBI a set of rights and liabilities vis-à-vis

DTCC, in connection with LBI's holding and transferring securities through DTCC, completely

distinct from LBI's rights vis-à-vis the counterparties with whom it engaged in securities

transactions.  The Trustee obviously could (and did) transfer beneficial ownership over specified

assets in LBI's accounts without transferring the accounts themselves.   Likewise, by refusing to

acquire the *accounts*, Barclays did not in any way relinquish its agreement to acquire certain

*assets located within* those accounts.[21]

> **B.**    **The Trustee Cannot Evade The Plain Language Of The Purchase Agreement By Proffering Inadmissible Extrinsic Evidence.**

22.    The Trustee devotes most of his discussion of the Clearance Box Assets to

extrinsic evidence relating to the "DTCC's concerns about its potential exposure for LBI's open

trades."  Trustee Reply Br. at ¶ 140.  According to the Trustee, the DTCC's concerns were

resolved only because Barclays agreed "that the DTCC Clearance Box Assets would stay with

the Trustee, and thereby remain a potential source of securities that DTCC could use in winding

---

to a clearing account); *see also In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 9 (S.D.N.Y. 2007) (ownership of margin account was distinct from control of contents in the account).

[21]  This distinction was obviously recognized in the discussions between Barclays and the DTCC — which related solely to ownership of the LBI accounts themselves, and did not impact ownership of the assets within the accounts. The Trustee unwittingly acknowledges this when he explains that "[on] September 17, DTCC informed LBI and Barclays that Barclays 'would be required to assume the liabilities associated with the accounts maintained by LBI at the DTCC and its subsidiaries . . . in their entirety and *irrespective of whether the assets or liabilities in a particular account were the subject of the Purchase Agreement or were owned by LBI or an affiliate of LBI*.'" Trustee Reply Br. at ¶ 142.  This was precisely what the DTCC discussions were about — whether BCI would, would not, or the extent to which BCI would, assume the liabilities associated with the DTCC accounts "irrespective of whether the assets or liabilities in a particular account were the subject of the Purchase Agreement or were owned by LBI or an affiliate of LBI."  *Id.*

down LBI's open trades." *Id.* The Trustee bases this assertion on the vague and self-contradictory testimony of an in-house lawyer from the DTCC. *Id.* at ¶ 147.

23.    The Court should reject this attempt to use extrinsic evidence to disavow the Trustee's obligations under the Purchase Agreement.   First, as a matter of law, extrinsic evidence may not be admitted to contradict the plain terms of the Purchase Agreement.  Second, the extrinsic evidence cited by the Trustee does not support his position.  Third, an abundance of relevant extrinsic evidence and post-Closing course of performance by the parties overwhelmingly supports Barclays' reading of the contract,

24.    Moreover, the Trustee proffers this thin extrinsic evidence in the service of an argument which makes no sense.  Even under the Trustee's construct, Barclays would have had no reason to relinquish assets *to the Trustee* in order to address the *DTCC's* concerns.  At most, although it did not in fact do so, DTCC might have insisted on some lien or a restriction on the immediate removal of assets from the accounts to protect itself from losses beyond the $250 million guaranty (a guaranty which the DTCC has admitted proved more than sufficient).  But Barclays would have had no reason to agree to give back *to the Trustee* assets that the contract specifically promised, and whose identification had been so critical to Barclays' willingness to close the deal, merely to protect *the DTCC* against potential losses, when such a less expensive alternative was available to Barclays.[22]

> 1.    The Trustee's Extrinsic Evidence Is Inadmissible Because The Plain Text Of The Clarification Letter Is Unambiguous.

25.    Under black-letter New York law, "if a contract is unambiguous on its face, its proper construction is a question of law.  A court should not look beyond the confines of the

---

[22] The exact manner in which the terms of the DTCC Letter should be construed to protect DTCC's interests as a creditor of LBI is not before the Court; what is clear, however, is that the DTCC Letter did nothing to change the deal between Barclays and the Trustee.

contract to extrinsic evidence if its relevant provisions are plain and unambiguous." *In re Allegiance Telecom, Inc.,* 356 B.R. 93, 98 (Bankr. S.D.N.Y. 2006) (citations omitted); *see also Bero Contracting & Dev. Corp. v. Vierhile*, 19 A.D.3d 1160, 1161 (N.Y. App. Div. 2005) (since language in agreement was clear and unambiguous and included a merger clause, parties could not introduce "parol evidence, including evidence of prior negotiations between the parties").

26.     As explained above, the Trustee's argument is refuted by the unambiguous text of the Clarification Letter.  The extrinsic evidence proffered by the Trustee is therefore inadmissible and may not be relied on to contradict section 1(a)(ii)(B) and Schedule B of the Clarification Letter.

2.     The Trustee's Extrinsic Evidence Does Not Support His Argument.

27.     Even if extrinsic evidence were examined, it does not support the Trustee's argument.  The Trustee relies upon the testimony of a DTCC lawyer, Isaac Montal, who stated that he "believe[s]" and "think[s]" that during the negotiations over the DTCC Letter, someone from Barclays (he does not remember whom), said something like "We're not going to take anything." BCI Ex. 633 [Montal Dep. Tr.] at 100:6-12.  This vague testimony does not demonstrate anything about how the Purchase Agreement should be read.  If anything, that vaguely recalled statement (of which Barclays has no recollection) should be interpreted in a manner consistent with the plain language of the agreement.  Any alleged statement that Barclays was "not going to take anything" likely would have referred to the fact that Barclays had in the same series of phone calls confirmed it was not taking any DTCC *accounts*, because of their associated liabilities; it could also have referred to not taking securities on a particular settlement day, as opposed to over time; it could also have been aimed at any one of a number of possible other concerns of the DTCC without affecting the rights of Barclays to receive the promised Clearance Box Assets from the Trustee.   Mr. Montal's recollection must be

16

understood in the context that, as Mr. Montal makes clear elsewhere, the DTCC was concerned

only about the DTCC's rights; it was not concerned with what assets were being sold by the

Trustee to the Barclays.  BCI Ex. 633 [Montal Dep. Tr.] at 48:18-49:7, 51:23-52:7, 79:10-20,

91:21-93:17, 117:8-118:20.

28.     Nothing in Mr. Montal's testimony provides any reason to believe that Barclays

agreed to abandon the Clearance Box Assets.  Those assets were identified as a Purchased Asset

and promised to Barclays on Friday, September 19, before the Sale Hearing — and they were

critical to Barclays' agreement to go forward with the Sale.[23]  Mr. Montal admitted that "It was

not DTCC's issue" which assets the Clarification Letter identified as being transferred to

Barclays in the Sale — that issue was solely between Barclays and Lehman.  BCI Ex. 633

[Montal Dep. Tr] at 88:6-21.  After being shown the paragraph in the Clarification Letter

requiring the transfer of all LBI Clearance Box Assets to Barclays, Mr. Montal was asked

whether the DTCC ever objected to that provision, and answered as follows:

> DTCC is not a party to this agreement.  It has no basis to object one way or
> another with respect to the provisions in the agreement.
>
> Both Barclays and Lehman were represented by counsel in connection with this
> transaction.  And it is not DTCC's place one way or another to comment or object
> to the provisions in this agreement, and it did not do so.

*Id.* at 90:13-21.

29.     The documents likewise confirm that the DTCC's outside counsel received the

Clarification Letter containing the provision requiring transfer of all Clearance Box Assets to

Barclays, and never objected.  *See* BCI Ex. 283 [Email chain including Sept. 22, 2008 6:02 am

---

[23] BCI Ex. 78 [Kirk Dep. Tr.] at 100:10-104:9, 104:24-109:3, 112:4-113:7; *see also* BCI Ex. 91 [Ricci Dep. Tr.] at
140:14-141:10, 160:5-16, 164:16-165:17; BCI Ex. 79 [Klein Dep. Tr.] at 97:10-98:5.

email from M. Mazzuchi to I. Montal, *et al.*, with attachment]. Had the details of which assets

were being sold or not sold been important to the DTCC, he surely would have done so.

30.    Indeed, the DTCC's outside counsel wrote an email in March of 2009 that was

consistent with Barclays' understanding of the DTCC Letter — *i.e.*, (a) Barclays was not taking

LBI's accounts at the DTCC and the associated clearing liabilities, (b) Barclays was providing

the DTCC with a limited guaranty in the form of the $250 million payment, (c) Barclays was not

providing any other guaranty or conveying any other assets to the DTCC, and (d) the DTCC

Letter in no way impacted Lehman's obligation to convey the Clearance Box Assets to

Barclays.[24]    In the email drafted by the DTCC's outside counsel, Sheldon Hirshon at Proskauer,

the deal was described as follows:

> DTCC monitors its risk daily. In a b/d failure the DTCC standard procedure is for
> DTCC to "cease to act." It turns off the failing b/d's access to the market so that
> DTCC's risk is limited to the trades already in the pipeline. In the Lehman deal
> the regulators prevailed on DTCC to hold off on its usual procedures in order to
> facilitate the transfer of LBI's b/d business to Barclays by keeping LBI alive
> instead of shutting it down. The idea, as expressed at the hearing, was to deliver
> the b/d business intact and as a going business. ***The $250mm Barclays guarantee
> and the resi's were to be provided to protect DTCC from any losses it would
> incur as a result of not ceasing to act for LBI. As I said, the resi's were pulled
> from the deal leaving <u>only</u> the Barclays guarantee and, after an internal review
> of the situation, <u>DTCC accepted the revised deal.</u>***

BCI Ex. 376 [March 31, 2009 10:03 pm email from S. Hirshon to E. Kay, *et al.*]

(emphasis added).

31.    As the DTCC's 30(b)(6) representative admitted at his deposition, the $250

million guaranty proved more than enough to cover the losses that the DTCC actually incurred as

a result of LBI's failure (which were essentially limited to legal fees). BCI Ex. 633 [Montal

Dep. Tr.] at 64:9-65:19. Thus, the Trustee's entire argument is based on a false factual premise:

---

[24] Barclays Opp. Br. at ¶¶162, 238, 345-379; *see also* BCI Ex. 635 [Rosen Dep. Tr.] at 151:7-153-14, 156:2-160:25,
168:11-169:14.

the DTCC did *not* need more than the $250 million guaranty that was provided in the DTCC

Letter.  It did not need the assets in the days immediately following the Closing, and it does not

need them now.

        3.     <u>The Extrinsic Evidence And Post-Closing Conduct Overwhelmingly
Support Barclays' Claim.</u>

32.      In contrast to the vague and self-contradictory extrinsic evidence proffered by the

Trustee, the drafting history of the Clarification Letter and the parties' post-Closing conduct

*conclusively demonstrates* that the parties *did not believe* the DTCC Letter impacted Lehman's

promise to transfer the Clearance Box Assets to Barclays.

33.      The Trustee has *no answer* to the fact that the drafting history of the Clarification

Letter overwhelmingly refutes his *ex post* interpretation.  First, the basic terms of the DTCC

Letter were orally agreed at approximately 11:00 pm Sunday, September 21, 2008.[25]  Over four

hours later, Weil Gotshal circulated, to the Trustee among others, a revised draft of the

Clarification Letter that specifically provided *new language* making clear that Barclays was to

acquire "such securities and other assets held in LBI's '074 clearance box' at DTC."  BCI Ex.

505 [Sept. 22, 2008 4:36 am email from Weil Gotshal to Hughes Hubbard, *et al.*] (attaching a

draft of the Clarification Letter).  That language was replaced in a later draft with the broader

statement that Barclays was acquiring "such securities and other assets held in LBI's 'clearance

boxes' at DTC."  BCI Ex. 642 [Sept. 22, 2008 5:22 am email from R. Messineo to M. Ford with

attachment].  It obviously would have made no sense to *add* specific references to the LBI assets

held in the DTCC clearance boxes if the parties had agreed hours earlier to *exclude* those assets

from the deal.  Moreover, as the Trustee acknowledges, this draft language was then "replaced

---

[25] *See* BCI Ex. 475 [Sept. 21, 2008 11:39 pm email from M. Mazzuchi to S. Hirshon, *et al.*]; BCI Ex. 476 [Sept. 22, 2008 3:43 am email from I. Montal to E. Rosen, *et al.*, ]; BCI Ex. 633 [Montal Dep. Tr.] at 56:25-57:15; BCI Ex. 635 [Rosen Dep. Tr.] at 153:24-154:13, 156:11-17.

with a *broader* reference" to *all* of "LBI's 'clearance boxes,'" which was the final language incorporated into the executed Clarification Letter.  BCI Ex. 5 [Clarification Letter].  The Trustee never explains how this admittedly "broader" reference to *all* Clearance Box Assets can possibly be squared with his assertion that 98% of all Clearance Box Assets (those at the DTCC) had been removed from the deal.

34.    The Trustee also has *no answer* to the fact that while the parties were *broadening* the description of the Clearance Box Assets being acquired by Barclays, they were simultaneously revising the Clarification Letter to reflect the agreement set forth in the DTCC Letter.  *Compare* BCI Opp. Br. at ¶¶ 349-351 *with* Trustee Reply Br. at ¶ 159.  In the very same draft Clarification Letter that specifically added a provision stating that Barclays was acquiring the assets in the "'074 clearance box' at DTC," Weil Gotshal also *added* Section 1(d) of the Clarification Letter, that *specifically referenced* the agreement set forth in the DTCC Letter, and implemented that agreement by nullifying certain provisions of the First Amendment to the APA.  BCI Ex. 5 [Clarification Letter] at § 1(d).  This demonstrates that the parties consciously revised the Clarification Letter to reflect what was agreed in the DTCC Letter, and in so doing they did *not* narrow or remove the language granting Barclays all Clearance Box Assets — instead, they *reiterated and broadened it*.

35.    After the Closing, the parties further confirmed their understanding that Barclays was entitled to the Clearance Box Assets in LBI's accounts at the DTCC.  As the Trustee admits in his Reply Brief, "***For a period of time following the Closing, Weil Gotshal and Alvarez & Marsal acted as if the DTCC Clearance Box Assets had been acquired by Barclays under the Clarification Letter***."  Trustee Reply Br. at ¶ 162 (emphasis added).  The Trustee attempts to explain this away by saying "that was only because ***they were unaware that the DTCC Letter***

*had removed those assets from the deal*." *Id.* (emphasis added). But that simply confirms that

Barclays is right: the reason the law firm advising the Debtor and drafting the Clarification

Letter was "unaware" that the Clearance Box Assets were removed from the deal is that ***the***

***Clearance Box Assets were not removed from the deal.*** The Trustee admits he did not negotiate

the Clarification Letter but merely relied upon Weil Gotshal, *see* BCI Ex. 80 [Kobak Dep. Tr.] at

22:24-23:18: he cannot now argue that Weil Gotshal did not know the material terms of the

contract it negotiated and drafted.

36.    The Trustee also tries to distance himself from the actions of his own law firm

and representatives. He claims that when his representatives expressly authorized the DTCC to

transfer Clearance Box Assets with marks of more than $400 million to Barclays on September

29 and 30, 2008, they were "mistaken" because they "believed, based on assurances from

Barclays employees, that they were transferring customer property." Trustee Reply Br. at ¶ 164.

37.    The Trustee's claims are demonstrably false, and improperly call into question the

integrity of Barclays operations personnel who had no reason to mislead the Trustee, and did not

do so. The two Barclays employees who communicated with the Trustee's representatives

concerning those transfers, Neal Ullman and Laura Vecchio, *flatly deny* that they ever

represented to the Trustee's representatives that the assets to be transferred were customer assets,

or that the Trustee's representatives told them that only customer assets were to be transferred.

BCI Ex. 522 [Ullman Decl.] at ¶¶ 4-6; BCI Ex. 523 [Vecchio Decl.] at ¶¶ 4-5.

38.    Moreover, the contemporaneous documentary evidence and the deposition

testimony of the Trustee's representative establishes that the *Trustee knew* — or certainly *should*

*have known* — that the transfers in question involved non-customer assets purchased by

Barclays. The testimony of the Trustee's representative shows that when customer assets were

21

to be transferred, Barclays was required to confirm expressly in writing that the assets were *customer* assets.  BCI Ex. 630 [Frelinghuysen Dep. Tr.] at 53:4-24, 59:15-22.  By contrast, the Trustee authorized the transfers of Clearance Box Assets after a discussion concerning Barclays' request that the Trustee authorize the DTCC to transfer "*non-customer assets*" to Barclays.  *Id.* at 68:14-22.[26]  These Clearance Box Assets were transferred after the Trustee's lawyer requested and received confirmation from Barclays that the requested assets were "**assets of Lehman Brothers, Inc. which were sold to Barclays Capital, Inc.**, pursuant to the asset purchase agreement dated as of September 16, 2008 . . . ."  *Id.* at 73:20-74:19 (emphasis added); BCI Ex. 514 [Sept. 25, 2008 5:40 pm email from A. Frelinghuysen to A. Blackwell, *et al.*, with attachment].

39.     In sum, the Trustee cannot escape the fact that the parties' collective conduct before and after the Closing uniformly confirms that the Clearance Box Assets were understood to be Purchased Assets and that the DTCC Letter did not alter that agreement.

4.     The Trustee's Argument Illogically Asserts That Barclays Relinquished Assets To The *Trustee* In Order To Address *DTCC's* Concerns.

40.     The Trustee bases his entire argument on his assessment of the *DTCC's concern* over its exposure to LBI's settlement obligations.  Trustee Reply Br. at ¶¶ 139-160.

41.     The Trustee never explains why Barclays would seek to address the DTCC's concern by relinquishing assets *to the Trustee*.[27]

[26] *See also* BCI Ex. 641[Sept. 25, 2008 2:16 pm email from A. Blackwell to M. Forrest, *et al.*] ("I have spoken to SIPC (Anson Frelinghuysen from Hughes Hubbard).  He is prepared and will have his organization work through this.  Can you send Paolo the file when you are ready so he can check the asset?"); BCI Ex. 643 [Sept. 25, 2008 3:35 pm email from M. Forrest to P. Tonucci, *et al.*] ("Paolo – this is an updated list of the unencumbered collateral in DTC.").

[27] It is as if this case were a dispute about how much of an automobile dealer's inventory had been sold, and the Trustee would have it turn not on the specific list of the cars being sold that was prepared by the dealer and the buyer, but instead on a side agreement with the parking garage where those were housed.  The Court should not look aside from the text of the Purchase Agreement, and the wealth of evidence of contractual intent as to the sale of the Clearance Box assets to Barclays, to entertain the Trustee's strained account.

42.    The Clearance Box Assets were identified to Barclays as a source of potentially
critical value to ensure that Barclays could cover the estimated liabilities in the deal, and
hopefully retain some "buffer" in the deal in order to protect its regulatory capital position.[28]  If it
had been required to do so, the most Barclays logically would have agreed to do would have
been to address DTCC's concerns through a lien on the assets Barclays was acquiring (or some
similar arrangement).  It obviously was not necessary for Barclays to agree to cede back *to the
Trustee* approximately $2 billion of securities merely to protect *DTCC* against potential liability.
No rational contracting party would make such an expensive change to the transaction when the
same end could be achieved with far less.[29]

43.    DTCC's concerns were only those of a custodian who had exposure to LBI
associated with LBI's account.   It cared solely about its own exposure, not about what assets
were being sold by the Trustee to Barclays. BCI Ex. 633 [Montal Dep. Tr.] at 48:18-49:7, 51:23;
52:7, 79:10-20, 91:21-93:17, 117:8-118:20.  It therefore defies common sense to think that
DTCC, in drafting a letter addressing its rights as custodian, would also take upon itself the task
of changing the terms of the deal between Lehman and Barclays.[30]

44.    The Trustee's implausible account of events is not necessary to give meaning to
the DTCC Letter.  It is perfectly understandable that in the context of Barclays' acquisition of

---

[28] *See generally* BCI Ex. 78 [Kirk Dep. Tr.] at 100:10-104:9, 104:24-109:3, 112:4-113:7; *see also* BCI Ex. 91 [Ricci Dep. Tr.] at 140:14-141:10, 157:13-159:4, 160:5-16, 164:16-165:25; BCI Ex. 79 [Klein Dep. Tr.] at 97:10-98:5.

[29] Indeed, the parties structured the actual guaranty that the DTCC accepted by agreeing that the $250 million that otherwise would have flowed directly to the Trustee would instead be available first to the DTCC, which in turn would pay the unused portion out to the Trustee.  Likewise, if any assets going to Barclays in the Sale were to be used to bolster the guaranty, they too would have been available first to the DTCC, and then transferred to Barclays to the extent not used.

[30] If one entertains the notion that the DTCC Letter really did contemplate that LBI would keep not only the accounts but all the LBI assets in them, it becomes impossible to believe that would not have been plainly expressed. the DTCC and Barclays had lengthy discussions regarding whether Barclays would assume the accounts or take only certain assets.  If the end result were somehow that LBI were keeping not only the accounts but all LBI assets in them, it is unthinkable that the parties would not have made that point explicitly in both the DTCC Letter and the Clarification Letter.

LBI's securities business generally, DTCC would want a simple written statement as to who

owned LBI's accounts with DTCC:  who had the right to use the DTCC accounts to effect

transactions, and who was answerable for liabilities on the accounts.  Conceivably, if the DTCC

had incurred losses in excess of the $250 million guaranty (which it did not), it might have

argued that they had rights over some of the Clearance Box Assets promised to Barclays (based

on Mr. Montal's testimony); a dispute between Barclays and the DTCC might then have arisen.

But that never happened because the DTCC's interests were adequately protected by the $250

million guaranty. Therefore, such hypothetical disputes are beside the point.  More than one year

later, it is obvious the Clearance Box Assets were not needed, and are not needed, to protect the

DTCC in the satisfaction of LBI's settlement obligations.[31]  The Trustee should not be permitted

to use the DTCC's hypothetical arguments under the DTCC Letter as an excuse to avoid the

Trustee's obligations under the plain text of the Purchase Agreement.

## II.    BARCLAYS IS ENTITLED TO ALL PROPERTY HELD TO SECURE THE ETD OBLIGATIONS IT ASSUMED FROM LBI.

45.    In his reply, the Trustee raises two new contractual arguments relating to the ETD

Margin, neither of which were raised in his opening brief or in the six months of correspondence

relating to this dispute.  First, he argues that while the definition of Purchased Assets includes

"any property that may be held to secure obligations under such [exchange-traded] derivatives,"

that provision applies only to *customer property in the possession of* LBI, and not to any

proprietary assets owned by LBI and posted as margin to secure the ETD obligations Barclays

---

[31] BCI Ex. 633 [Montal Dep. Tr.] at 64:9-65:19; BCI Ex. 627 [excerpts of DTCC Annual Report 2008] (cover story); BCI Ex. 628 [DTCC Consolidated Financial Statements for the years ended December 31, 2008 and 2007] at p. 22.

assumed.  Second, he argues that a separate provision in the APA excludes *all* assets "relating

to" the ETDs — including *all* margin — from the definition of Purchased Assets.[32]

46.    These two new arguments should be rejected as a matter of law.  They contradict

the plain text of the contract.  They are irreconcilable ***with one another***.  They contradict the

Trustee's own deposition testimony from just two months ago.  And they conflict with the

contemporaneous extrinsic evidence.  Finally, they would have the effect of converting what the

contract defines as a "Purchased Asset" into a *liability* in excess of a billion dollars — a liability

that no one ever discussed or contemplated during the negotiation of this transaction, and that an

industry expert has sworn "no rational purchaser" would ever have agreed to.

## A.    The Plain Language of the Purchase Agreement Makes Clear That the ETD Margin is a Purchased Asset.

### 1.    The Clarification Letter Expressly Provides That the Purchased Assets Include "Any Property That May Be Held To Secure" the Assumed ETD Obligations.

47.    The Clarification Letter provides that the "Purchased Assets" include "exchange

traded derivatives (and any property that may be held to secure such derivatives)."  BCI Ex. 5

[Clarification Letter] at § 1(a)(ii)(C).  According to the Trustee's new argument, the language

"any property" should be construed to mean "any ***customer*** property," and does not include any

LBI property.  *See* Trustee Reply Br. at ¶¶ 101-06.  Likewise, the Trustee argues that the

language "property that may be held" means only "property that may be held ***by LBI***," and

---

[32] The notion that margin is an Excluded Asset in the APA is absent from the Trustee's opening arguments.  *See* Trustee Br. at ¶¶ 32-34 (transfer of any cash, including cash margin is improper); *id.* at ¶¶ 67-71, 77 (that the parties never discussed the transfer of ETD margin); *id.* at ¶¶ 75-76 (that the transfer would be a "material change" and prejudice compliance with Rule 15c3-3); *id.* at ¶¶ 85-86 (that references to "any collateral" do not include margin); *id.* at ¶¶ 97-98 (protection of customers precludes transfer of margin to Barclays); *id.* at ¶¶ 99-101 (assets in the deal are strictly limited to $47.4 billion); *id.* at 102-105 (Trustee's ignorance of the terms he willingly agreed to absolves of the obligation to live up to them).  *See also* BCI Exs. 156-179 [correspondence relating to Disputed Assets] (never raising the issues in Trustee's Reply Brief).

therefore does not include LBI property that may be held as security by an exchange, clearing corporation or clearing broker. *Id.*

48.    The Court should reject the Trustee's attempt to limit the plain language of the contract. It is the "reasonable and ordinary meaning" of an agreement's "plain" language that controls, *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d. 1274, 1277 (2d Cir. 1989), and "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d, 458, 468 (2d Cir. 2010) (citation omitted).[33]

49.    Moreover, the ETD parenthetical is part of the definition of the "Purchased Assets," which are the assets Barclays was acquiring *for its own account*. It cannot logically be read to apply — at all, let alone *solely* — to *customer* property. The Trustee's interpretation is illogical, and inconsistent with the distinction between Purchased Assets and customer property.

50.    Similarly, the Trustee's interpretation of the parenthetical would render redundant section 8(i) of the Clarification Letter, which provides that "Purchaser shall receive (i) for the account of the customer, any and all property ***of any customer***, ***including any held by*** or on behalf of ***LBI to secure the obligations of any customer***, whose account(s) are being transferred to Purchaser as part of the Business". BCI Ex. 5 [Clarification Letter] at § 8(i). Since section 8(i) already provided for "any and all property of any customer" to be transferred to Barclays, it

---

[33] The Trustee also argues that the APA did not include ETD Margin because it failed to include the specific term "margin" or anything "similar" to it. Trustee Reply Br. at ¶¶ 83-90. The Court must reject that argument based upon the plain text of the APA. First, the APA defines the Purchased Assets as "***all*** of the assets" used in connection with the Business *unless specifically excluded*, and therefore the absence of a specific mention of an asset means that it is *included*, not *excluded*. BCI Ex. 1 [APA] at §§ 1.1 (at p. 6, definition of Purchased Assets), 1.2 (definition of the term "including"). Second, the APA explicitly defines Purchased Assets as including both ETDs and "all deposits" associated with the Business, "including without limitation" both "customer deposits" and "required capital deposits." *Id.* at § 1.1 (at p. 6). On its face, that language includes the ETD Margin within the definition of "all of the assets" of the Business being transferred to Barclays.

would be both illogical and redundant for the parties to add language to the definition of
Purchased Assets to accomplish the same result.

51.    The Trustee rests his illogical argument on the contention that "[t]he distinction
between 'held' and 'posted' is an important one," because property "held" by LBI does not
include property "posted" by LBI to a clearing corporation or exchange.  Trustee Reply Br. at ¶
101.  That is not correct.  First, as explained above, the plain language of the provision is not
limited to property "held by LBI," but rather covers "any property held to secure obligations"
under the ETDs — regardless of what entity holds the property.  BCI Ex. 5 [Clarification Letter]
at § 1(a)(ii)(C).  Second, the Trustee admits that the customer ETD margin that he agrees was to
be transferred to Barclays was *both* "held by LBI" *and* posted at an exchange.  *See, e.g.,* Trustee
Reply Br. at ¶ 70 ("The disputed Margin Assets do not include customer property that customers
deposited with LBI and that LBI *held* on behalf of its customers *at an exchange* or with other
custodians.") (emphasis added).[34]

2.    ETD Margin Is Not An Excluded Asset Under the APA.

52.    The Trustee raises another new argument in his reply:  that all of the ETD Margin
is excluded from the definition of Purchased Assets by virtue of subparagraph (n) of the
definition of Excluded Assets, which refers to "all assets primarily related to the IMD Business
and derivatives contracts."  Trustee Reply Br. at ¶¶ 77-82; BCI Ex. 1 [APA] at p. 4 (definition of
Excluded Assets (n)).  This subparagraph does not apply to "exchange-traded derivatives," which
are publicly-traded futures and stock options, but instead applies solely to "derivatives contracts"

---

[34] The same logical inconsistency applies to the Trustee's argument (again, never before made) that Section 1(b) of
the Clarification Letter excludes certain of the disputed ETD Margin.  Trustee Reply Br. at ¶ 82.  Section 1(b) of the
Clarification Letter carves out of the acquired "Purchased Assets" any "government securities . . . *held by [LBI]*
. . . ." BCI Ex. 5 [Clarification Letter] at § 1(b) (emphasis added).  But this language is qualified with the phrase
"except as otherwise specified herein or in the Agreement."  *Id.*  The government securities posted as ETD Margin
are "otherwise specified" by Section 1(a)(ii)(C), stating that Barclays was acquiring "any property held to secure
obligations" under the ETDs (just as similar securities were "otherwise specified" by their inclusion in the Repo
collateral covered by Section 1(a)(ii)(B) of the Clarification Letter).

that are entered into over the counter through bilateral transactions.  This is clear from the plain language of the contract and from its logical structure and the actions of the parties after September 22, 2008.

53.     The Trustee's interpretation of subsection (n) of the Excluded Assets definition would make it directly inconsistent with the Trustee's own narrow reading of Section 1(a)(ii)(C).  Subsection (n) excludes "all assets primarily related to . . . derivatives contracts."  If the Trustee's interpretation were accepted, such that "derivatives contracts" means ETDs (which it does not), then subsection (n) would necessarily exclude the *customer margin* associated with those ETDs, because those assets are "primarily related" to the ETDs.  Thus, the Trustee's reading of subsection (n) of Excluded Assets would nullify even the Trustee's (unduly narrow) reading of the ETD parenthetical.[35]

54.     In each instance in which the parties intended to refer to *exchange-traded derivatives*, they used the words "exchange-traded derivatives."  *See, e.g.*, BCI Ex. 1 [APA] at § 1.1 (at p. 6, definition of Purchased Assets (d)); BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(C).  By contrast, where the parties intended to refer to other kinds of derivatives, they referred to "derivatives contracts."  BCI Ex. 1 [APA] at § 1.1 (at p. 3, definition of Excluded Assets (l) ("derivatives contracts by Lehman Brothers Derivatives Products Inc.") and (n) ("IMD Business and derivatives contracts")).[36]  It is not surprising, therefore, that the Trustee cannot point to a

---

[35] Moreover, the Trustee's interpretation of subsection (n) would make it directly inconsistent with any possible reading of the Section 1(a)(ii)(C).  Subsection (n) excludes "all assets primarily related to . . . derivatives contracts."  That language necessarily includes the *"derivatives contracts" themselves*.  Thus, the Trustee's reading of subsection (n) would exclude the "exchange-traded derivative" *positions* themselves, which even the Trustee admits *are* to be included in the definition of Purchased Assets, as provided in paragraph 1(a)(ii)(C) of the Clarification Letter.

[36] *Compare* BCI Ex. 1 [APA] at § 1.1 definition of Purchased Assets at (d) ("exchange traded derivatives" are Purchased Assets) *with id.* at § 1.1, definition of Excluded Assets at (l) and (n) (the only two places in the entire Purchase Agreement where the simple term "derivatives contracts" appears); BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(C); BCI Ex. 320 [Sept. 27, 2008 12:53 pm email from G. West to J. McCarthy, *et al.*, with attachments]

28

single piece of evidence that *anyone* involved *on either side* of this transaction intended

subsection (n) of the definition of Excluded Assets to relate to exchange-traded derivatives.[37]  By

contrast, the extrinsic evidence confirms that the parties intended for over-the-counter

"derivatives contracts" — such as credit default swaps and other types of bilateral derivatives

contracts — to be *excluded entirely* from the definition of Purchased Assets.[38]  Thus, paragraph

(n) of the Excluded Assets definition has nothing to do with exchange-traded derivatives or the

margin associated with them.

> **B.     The Extrinsic Evidence Refutes the Trustee's Professed Lack of
> Understanding That the Deal Included ETD Margin.**

55.     The Trustee contends that "there was no business discussion" or "agreement" to

transfer the ETD Margin to Barclays, nor any "agreements, communications, or testimony"

reflecting the parties' "common understanding" that Barclays would be receiving these assets.

Trustee Reply Br. at ¶¶ 72-73.  This argument ignores the myriad *written agreements* and

communications that show precisely what "discussions" were taking place and what the parties'

"common understanding" was.  In particular, the Trustee has no answer (other than a professed

lack of understanding at the time) to the following pieces of contemporaneous evidence, which

directly refute his current argument:

- At the Sale Hearing, the Trustee's representative signed a Collateral Account Agreement
  that provided in pertinent part that "LBI has assigned to Barclays *all rights in securities,
  cash, and other property* ('Collateral') **pledged by LBI** to The Options Clearing
  Corporation ('OCC') and **held for OCC's benefit** at J.P. Morgan Chase."  BCI Ex. 231

---

(listing "OTC Derivatives (all underlyings)" as "OUT" while "Exchange Traded Derivatives (all underlyings)" and
"Any property that may be held in order to secure obligations under Exchange Traded Derivatives" are "IN").

[37] The only fact witness testimony concerning this provision confirms that it was intended to document the parties'
agreement that *over-the-counter* derivatives were excluded from the deal.  BCI Ex. 635 [Rosen Dep. Tr.] at 198:20-
201:5.

[38] BCI Ex. 469 [Sept. 16 2008 10:27 am email from M. Kelly to A. Nagpal] (Lehman negotiator clarifying:  "No
OTC" in the deal); BCI Ex. 636 [Mar. 3, 2010 Seery Dep. Tr.] at 316:19-317:15; BCI Ex. 58 [Burian Dep. Tr.] at
210:17-211:6.

[Sept. 20, 2008 2:32 am email from A. Rovira to J. Kobak, *et al.* with attachments] at HHR 00006078 (emphasis added).

- The Sale Order entered by the Court contemplated that "*securities, cash, collateral, and other property*" in LBI's OCC accounts would be "***transferred to accounts of [Barclays]***" and provided that Barclays would take that collateral "subject to all rights of OCC therein". BCI Ex. 16 [Sale Order] at ¶ N (emphasis added).

- The Trustee, Barclays, and the OCC executed the Transfer and Assumption Agreement ("TAA"), which expressly provides that "***Lehman hereby sells***, assigns, transfers, and sets over to Barclays . . . all of Lehman's rights, title, interests, powers, privileges, remedies, obligations, and duties in, to, under, and in respect of the Account . . . including … ***all margin deposits held by OCC*** with respect to the Account." BCI Ex. 3 [TAA] at § 1(a) (emphasis added).

- The Trustee, Mr. Kobak, Mr. Caputo of SIPC, and lawyers from Weil Gotshal representing the Debtors all received email correspondence from the OCC's counsel at Sidley & Austin on Saturday morning, September 20, in which the OCC confirmed its understanding "that the LBI accounts and all *positions, **cash and securities collateral that are held by OCC*** in respect of those accounts ***are intended to be transferred to Barclays***". BCI Ex. 233 [Sept. 20, 2008 12:45 pm email from J. McDaniel to R. Berkovich, *et al.*] (emphasis added).

- The OCC subsequently emailed the Trustee, Mr. Kobak, and Mr. Harbeck of SIPC and indicated that, "*[h]aving heard nothing further from you with respect to cash **held by OCC** in respect of the LBI accounts*, and in accordance with the terms of the Transfer and Purchase [sic] Agreement, *all such cash in the accounts will be transferred to Barclays . . .*." BCI Ex. 262 [Sept. 21, 2008 4:03 pm email from J. McDaniel to E. Rosen, *et al.* with attachment] (emphasis added). Again, this prompted no objection from any of the Movants.

- The Trustee then proceeded to execute the Clarification Letter, which provided that among the Purchased Assets were "exchange-traded derivatives (and ***any property*** that may be ***held*** to secure obligations under such derivatives)." BCI Ex. 5 [Clarification Letter] at § l(a)(ii)(C) (emphasis added).

56.    In his reply, the Trustee attempts to explain away the TAA and the Collateral

Account Agreement by claiming that he did not understand them to do anything but "effect[]

[sic] the transfer of customer property to Barclays for the account of customers." Trustee Reply

Br. at ¶ 54. But there is nothing ambiguous or confusing about either one of these agreements,

and neither one references "customer property" or property "held by LBI." To the contrary, they

say in plain language that LBI is transferring to Barclays "***all***" property "***pledged by LBI*** *and*

30

"**held for OCC's benefit**" and "**all**" margin deposits "**held by OCC**".  BCI Ex. 231 [Sept. 20,

2008 2:32 am email from A. Rovira to J. Kobak, *et al.* with attachments] at HHR 00006078

(emphasis added); BCI Ex. 3 [TAA] at § 1(a) (all emphases added).[39]

57.     The Trustee then claims that the Sale Order "provides only that, **to the extent** that

LBI assets at the OCC are transferred, Barclays will assume LBI's obligations to the OCC in

connection therewith."  Trustee Reply Br. at ¶ 128 (emphasis added).  However, what the Sale

Order in fact states is that Barclays was assuming "all of [LBI's] obligations" to the OCC, and

obtaining the collateral at the OCC subject to those obligations.  BCI Ex. 16 [Sale Order] at ¶ N.

It would have made no sense to reference the transfer of LBI assets at the OCC to Barclays if

that were not, in fact, what the parties were contemplating at the time.

58.     The Trustee's attempts to minimize the significance of the "few email exchanges

with the OCC" are equally unpersuasive.  Although the Trustee contends that none of these

emails "indicated to the Trustee that there were significant Margin Assets at the OCC," Trustee

Reply Br. at ¶ 127, he admits, as he must, that one of those emails expressly states that the "OCC

is holding nearly $1 billion in cash."  BCI Ex. 233 [Sept. 20, 2008 12:45 pm email from J.

McDaniel to R. Berkovich, *et al.*].  And although the Trustee contends that this email "does not

indicate that this was margin held in respect of LBI positions," Trustee Reply Br. at ¶ 127, that

same email expressly stated that this $1 billion in cash was held "for the accounts of LBI" and

that "*all positions, cash and securities collateral that are held by OCC in respect of those

accounts*" were being transferred to Barclays.  BCI Ex. 233 [Sept. 20, 2008 12:45 pm email from

J. McDaniel to R. Berkovich, *et al.*]  Were that not clear enough, the Trustee was told again the

---

[39] The Trustee's contention that the TAA was not approved by the Court is incorrect.   Paragraph 3 of the Sale Order
explicitly approved "any additional instruments or documents that may be reasonably necessary or appropriate to
implement the Purchase Agreement", of which the TAA is a perfect example.  BCI Ex. 16 [Sale Order] at ¶ 3.  The
TAA is both an approved and enforceable contract and a piece of extrinsic evidence that directly refutes the
Trustee's interpretation of the Clarification Letter.

next day that there was "*cash **held by OCC** in respect of the LBI accounts*," and that "*all such cash in the accounts will be transferred to Barclays*".  BCI Ex. 262 [Sept. 21, 2008 4:03 pm email from J. McDaniel to E. Rosen, *et al.* with attachment] (emphasis added).[40]

59.    The Trustee's own post-Closing conduct further undermines the arguments he now makes.  On October 3, 2008, the Trustee's representative indicated "we are OK" with the OCC's report that it was transferring ETD Margin to Barclays "without consent from the Trustee" because "there was no need for [such] consent."[41]  On October 2, 2008, the Trustee expressly authorized the release of additional ETD Margin to Barclays.[42]  On November 14, 2008, the Trustee's representative sent a letter to Barclays stating that the Trustee would "gladly" authorize the transfer of all remaining ETD margin to Barclays once certain outstanding customer issues were resolved.[43]

---

[40] While Barclays attempted to gather information regarding the nature and value of the ETD assets prior to the Closing, *see e.g.*, BCI Ex. 457 [Sept. 19, 2008 1:08 am email from P. Tonucci to S. King, et al.], and even included the Trustee on its inquiries, *see e.g.*, BCI Ex. 235 [email from E. Rosen to McDaniel, Giddens, *et al.* (Sept. 20, 2008 1:09 pm)] ("Jim – can you tell me more about the $1bn - is it excess margin"), the Trustee, having remained silent about his purported understanding of the deal, BCI Ex. 80 [Kobak Dep. Tr.] at 284:4-13, and having not asked any questions about margin, excess or otherwise, *id.* at 314:8-21, was content merely to sit back and wait for "somebody" to provide him information.  *Id.* at 288:6-21.  Well-settled law bars the Trustee from now using to his advantage the ignorance born of his own inaction.  *Hangzhou Silk*, 2002 WL 2031591, at *6 ("Ignorance of the terms and conditions of a contract is no defense for a party that has already executed the contract.").

[41] *See* BCI Ex. 470 [Oct. 3, 2008 9:06 am email chain from C. Kiplok to C. Levine and L. Vecchio] (containing Oct. 2, 2008 1:28 pm email from J. McDaniel to C. Kiplok, W. Navin, and J. Cawley).

[42] Specifically, on October 2, 2008, "the Trustee affirmatively asked JPMC to transfer to BCI approximately $19 million, representing the proceeds of matured Government securities that had also been deposited with OCC as collateral by LBI through the use of an OCC Depository Receipt."  BCI Ex. 335 [Nov. 9, 2008 email from J. McDaniel to J. Giddens, *et. al* with attachment] at HHR_00001145; *see also* BCI Ex. 334 [Email chain including Oct. 21, 2008 4:50 pm email from W. Navin to K. Raisler with attachment].  Although the Trustee argues in his reply that he believed he was only thereby authorizing the release of customer property encompassed by the parenthetical, Trustee Reply Br. at ¶ 119, the authorization says nothing about customer *property*.  It merely says that the transfer is being authorized as part of the transfer of customer *accounts*.  Moreover, the Trustee does not even attempt to explain why he would have viewed this as appropriate given his current contention that the ETD parenthetical allowed Barclays to acquire only property **held by LBI**, and not property of the kind he released to Barclays in October 2008 — which was plainly **posted** by LBI and **held by JPMorgan** for the benefit of the OCC.

[43] BCI Ex. 156 [Nov. 14, 2008 Letter from J. Kobak to J. McDaniel] ("[T]he Trustee will gladly consent" to the release of collateral to Barclays "if Barclays will . . . assume the obligations involved for all customers").

60.    Similarly, in March 2009, the Trustee filed a pleading in this Court that confirmed his understanding that funds which were "deposited in LBI's … margin account at the OCC" were "Purchased Assets" under the Clarification Letter and the TAA.  In the OCC Interpleader action, filed in December 2008, there is a dispute over $80 million of letter of credit proceeds that were moved by the OCC from LBI's account into a suspense account at around the time of the Sale.  In his Answer to that Complaint, the Trustee argued that he may be entitled to the funds, rather than Barclays, "*to the extent that* the LC Proceeds were held by the OCC in a suspense account and *never deposited in LBI's (or Barclays') margin account at the OCC*, *and accordingly do not constitute 'Purchased Assets' within the meaning of the Purchase Agreement or 'margin deposits'* (or are not otherwise part of LBI's 'Account') *within the meaning of the TAA*."[44]  This argument implicitly acknowledges that assets *that were* "deposited in LBI's . . . margin account at the OCC' *were acquired* by Barclays — it would have made no sense for the Trustee to plead this argument if he truly believed that Barclays was not entitled to *any* property deposited in LBI's margin account at the OCC.

61.    The Trustee was told before the Closing, and was reminded on October 3, 2008, that immediately as of the Closing, Barclays received *$1.3 billion in cash margin from LBI's account at the OCC.*  It is implausible for the Trustee now to claim that he did not believe Barclays was acquiring *any* ETD Margin — if so, he would not have waited a full year to complain about the $1.3 billion of ETD Margin Barclays received as of the Closing.[45]

---

[44] *See The Options Clearing Corp. v. Barclays Capital Inc., et al.*, Case No. 08-01759 (S.D.N.Y. Bankr.) (the "Interpleader Action") at Dkt. No. 12 Trustee's Answer and Statement of Claim (Feb. 6, 2009) at ¶ 51.

[45] Moreover, the Trustee's 30(b)(6) representative gave sworn testimony that also directly contradicted the Trustee's current argument that Barclays was not entitled to any ETD Margin:  he testified that the Trustee understood at the time of the Sale that Barclays was acquiring ETD Margin, including cash margin, but tried to argue that Barclays was not entitled to any margin that was in "excess" of the liabilities or margin requirements (what this precise limitation was, or how it was to be determined, was never explained).  BCI Ex. 80 [Kobak Dep. Tr.] at 282:14-283:21.  As shown above, this attempt to impose an artificial limitation on the amount of ETD Margin is illogical, unsupportable, and contrary to the language of the contract.

62.     Thus, the Trustee cannot sustain any of his various theories for why Barclays was not entitled to receive *any* of LBI's ETD margin.  Recognizing this, the Trustee continues to advance his fallback argument that Barclays was entitled to receive ETD Margin, but *only* up to the amount "needed to cover the liabilities."  BCI Ex. 80 [Kobar Dep. Tr.] at 283; Trustee Reply Br. at ¶ 106.[46]  That limitation, however, is not found anywhere in the contract.  The Trustee tries to squeeze that limitation into the phrase "any property that may be held to secure such obligations," *id.*, but the plain reading of this language shows that it covers not merely property that was "required" to "cover" ETD "liabilities," but rather "any property" that "may be held to secure" the ETD "obligations."  BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(C).  Similarly, the TAA plainly states that LBI was transferring to Barclays "***all margin deposits held by OCC*** with respect to the Account."  BCI Ex. 3 [TAA] (emphasis added).

63.     Had the parties intended to transfer only the amounts required to cover ETD liabilities or specific margin requirements, numerous other provisions would have been necessary to implement that agreement.  The parties would have had to agree upon how to define what amount of margin was "required" — whether based upon the exchange's margin requirement (and if so, as of what time on what date), or the precise mark-to-market liabilities of the traded positions (and if so, as of what time on what date), or based upon losses actually incurred over some period of time (and if so, over what period of time).  They likewise would have needed a "true-up" mechanism to implement the transfer of any "excess margin" back to Lehman.  There are, of course, no such provisions in any of the contractual documents, because

---

[46] In support of this argument, the Trustee asserts that "Margin Assets that exceeded LBI's collateral requirements . . . can be withdrawn at any time."  Trustee Reply Br. at ¶ 106.  This assertion is refuted by undisputed record facts, including the fact that the OCC refused to permit LBI to withdraw any of the margin that exceeded the OCC's margin requirements on Friday, September 19, 2008, precisely because the OCC had "insecurities" and was "very concerned" about the "substantial volatility in the market, particularly around equity and equity options trading" and about the ramifications of this in the event the OCC would have to "either auction or liquidate positions."  BCI Ex. 634 [Raisler Dep. Tr.] at 54:11-55:8, 189:15-24.

that was not the agreed deal.[47]   Rather, Barclays was to acquire "any property" held to secure the

ETD obligations — just as it was acquiring "all assets" used in the Business.

### C.   The Drafting History Of The Clarification Letter Does Not Support Any Of The Trustee's Arguments.

64.   The Trustee continues to rely upon a misleading account of the drafting history of

the Clarification Letter in an attempt to show that Lehman's attorneys rejected a proposal by

Barclays to insert language covering the ETD Margin.   The full account of this drafting history

shows otherwise.   On the evening of Saturday, September 20, Barclays proposed the following

language for two different provisions of the Clarification Letter:

> **"Excluded Assets" shall not include** . . . (ii) cash, cash equivalents, bank deposits or similar cash items maintained **(A) by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise, or by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing pursuant to the requirements of any such clearing agency or clearing organization.**

BCI Ex. 249 [Sept. 20, 2008 11:13 pm email from D. Leinwand to A. Keller, *et al.,*with

attachment] at §§ 1(d), 8 (bold font reflects Barclays' proposed insertions).

65.   Barclays proposed adding the same language cited in the preceding paragraph to a

new provision, at Section 8, addressing the customer property and 15c3-3 assets Barclays was to

acquire.   *Compare id.* at § 1(d) *with id.* at § 8.   The proposed language was intended to address a

number of issues at once — to clarify and confirm that customer cash was being transferred to

Barclays, that certain 15c3-3 cash assets were at that point in time being transferred to Barclays,

---

[47] Nor would Barclays have agreed to such a limitation had it been proposed.   Among other things, and as explained in detail in Barclays' opposition, the margin required on any given day could never reasonably have been assumed to approximate the exposure on the underlying positions even one day later where, as here, margin requirements were fluctuating by hundreds of millions of dollars each day.   BCI Ex. 354 [Jones Decl.] at Ex. 1; *see generally* Barclays Opp. Br. at ¶ 403.

and that margin was being transferred to Barclays.  The proposed late-night redline from Barclays' lawyers attempted to address these various issues, but did so in language that was incompletely (or at least confusingly) drafted — there is no subsection (B) to correspond to the subsection (A) in the draft language and the word "or" is missing.  *Id*.  In any event, in response to this proposed language, Weil Gotshal never indicated any disagreement with the specific point that ETD Margin was included in the deal.  To the contrary, on the evening of September 21, more than 20 hours *after* receiving this proposed language, Weil Gotshal circulated a draft "Responding to [Cleary Gottlieb's] comments of September 20, 2008" that *retained* all of Barclays' proposed language and indicated that "apart from a few possible incidental points (involving wording changes in response to Barclays' comments), Weil Gotshal did "not expect the letter to change".  BCI Ex. 270 [Sept. 21, 2008 7:54 pm email from R. Messineo to A. Frelinghuysen, *et al.*, with attachment].

66.    After midnight on September 21, Weil Gotshal, representatives of the Creditors' Committee, and Barclays representatives held a discussion to address the 15c3-3 assets.  In that discussion, it was agreed that Barclays would acquire $769 million of securities from the 15c3-3 account (or the equivalent from elsewhere), but not the cash that was also held pursuant to Rule 15c3-3.  BCI Ex. 364 [Lewkow Decl.] at ¶ 20.  It was only *after* this oral agreement was reached, at 4:36 am on September 22, that Weil Gotshal circulated a new draft of the Clarification Letter which removed all of the proposed language Barclays had circulated Saturday night.  BCI Ex. 468 [Sept. 22, 2008 4:36 am email from R. Messineo to A. Frelinghuysen, *et al.*].

67.    In other words, when Weil Gotshal deleted the proposed language to reflect the 15c3-3 discussion, the language pertaining to the ETD Margin came out as well.  As soon as Barclays' attorneys realized this, they presented the Weil Gotshal attorneys with a hand-written

36

mark-up containing the proposed ETD parenthetical, in order to confirm and clarify that all ETD margin was still included.  BCI Ex. 635 [Rosen Dep. Tr.] at 25:24-29:15.  Weil Gotshal accepted the proposed language, which, as explained above, was consistent with everyone's understanding throughout the week.  Thus, it was ***Weil Gotshal*** — not Barclays — that actually typed in the ETD parenthetical language into the final version of the Clarification Letter.  *Id*. at 25:24-27:8.

68.    The Trustee misleadingly quotes the testimony of Barclays lawyer Edward Rosen, who explained the process by which the parenthetical was proposed.  The Trustee quotes Mr. Rosen as saying that he wanted to avoid "extensive negotiations," but they fail to quote his testimony that he believed the parenthetical captured the parties' agreement "as simply and clearly as possible."  Trustee Reply Br. at ¶¶ 93, 138; BCI Ex. 635 [Rosen Dep. Tr.] at 114:16-115:7.  There is ***no evidence*** to support the Trustee's insinuation that Weil Gotshal and the Debtor did not understand this language to encompass ETD Margin, and the Debtor's counsel at Simpson Thacher has confirmed that they plainly ***did*** understand the parenthetical — and understood it to refer to all ETD Margin, including cash margin.  BCI Ex. 74 [Keller Dep. Tr.] at 78:12-79:17; *see also* BCI Ex. 80 [Kobak Dep. Tr.] at 278:15-280:8, 282:14-283:21.[48]

---

[48] The Trustee's reliance on the principle that in certain circumstances a contract may be construed against the party that drafted it is wrong as a matter of law.  First, the doctrine, which is simply a method of ascertaining the parties' intention, is inapplicable because the parties expressly agreed that it would not apply.  BCI Ex. 1 [APA] at § 1.2 ("The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.").  *See e.g.*, *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, No. 08-cv-7069, 2009 WL 1154094, at *6 n.9 (S.D.N.Y. Mar. 19, 2009).  Moreover, the doctrine is inapplicable where, as here, the provision at issue was negotiated by sophisticated parties that had an opportunity to clarify any ambiguity.  *See e.g.*, *Shadlich v. Rogrant Assocs., LLC*, 66 A.D.3d 759, 760 (N.Y. App. Div. 2009) (doctrine generally not available in the instance of an agreement between sophisticated parties); *Cummins, Inc. v. Atlantic Mut. Ins. Co.*, 56 A.D.3d 288, 290 (N.Y. App. Div. 2008) (same); *see also e.g.*, *DaPuzzo v. Globalvest Mgmt. Co., L.P.*, 263 F. Supp. 2d 714, 729 (S.D.N.Y. 2003) (the Second Circuit has noted that New York law has become increasingly reluctant, except "as a matter of last resort," to apply the doctrine") (citations omitted).

**D.    Barclays Would Not Have Agreed To Take Over the ETD Business Absent the Posted Margin, and the Trustee Had No Viable Alternative That Would Have Permitted It To Keep the ETD Margin.**

69.    Unable to assert any viable contractual claim to the ETD margin, the Trustee resorts to the argument that Barclays is not entitled to the ETD Margin because Barclays did not *need* it, and because the Trustee never would have knowingly approved a deal that included it. Neither claim withstands scrutiny.

1.    Barclays Needed the ETD Margin As Protection Against the Substantial Risks Associated With Assuming the ETD-related Obligations.

70.    First, the Trustee suggests (incorrectly) that Barclays simply did not need the ETD Margin.  Trustee Reply Br. at ¶¶ 107-116.  The Trustee overlooks the fact that, absent the transfer of the ETD Margin, in order to avoid an immediate liquidation of the acquired ETD positions, Barclays would have had to arrange for the posting of approximately $1.6 billion worth of collateral — which was never discussed or contemplated, in order to cover obligations at the OCC alone.[49]  That initial collateral posted would then have increased as the ETD positions fell in value during the ongoing market turmoil.

71.    In other words, the Trustee's interpretation of the contract converts what was identified as a "Purchased Asset" into a massive *liability* for Barclays.  As confirmed by Barclays' ETD expert, it would have been irrational, in these circumstances, for Barclays to proceed without the ETD Margin.  BCI Ex. 340 [Leitner Rpt.] at § V.C.4.[50]

---

[49] BCI Ex. 354 [Jones Decl.] at Ex. 1 (OCC margin requirement as of Sept. 19, 2008 was $1.693 billion); *see also* BCI Ex. 646 [Chart of OCC accounts from Sept. 15, 2008 through Oct. 31, 2008] (OCC margin requirement as of Sept. 22, 2008 was $1.571 billion).  This would have taken extensive pre-arranging, for Barclays would have had to post billions of dollars worth of assets with a multitude of different clearing organizations and clearing brokers by Friday, September 19 in order for it to be available to those organizations by the open of business on Monday, September 22.

[50] The Trustee argues that both experts agree that "ordinarily" the parties would have negotiated separately as to whether the agreement would include the margin.  Trustee Reply Br. at ¶ 88.  As explained above, the parties *did* reach agreement on this point — and, as the Trustee knows, they did so under circumstances that were far from "ordinary."  In his report, Barclays expert Tony Leitner (who has spent decades working in the ETD industry)

72.    The Trustee claims that the proprietary options positions represented a "market opportunity" and that Barclays faced "little risk" because it could "hedge" against losses on those positions.  Trustee Reply Br. at ¶ 113, n.19.  Neither is an accurate statement.  In fact, the proprietary options carried a negative value of approximately $1.1 billion on the day of the Closing — an immediate **liability**.  Moreover, given the random assortment of trading assets that were ultimately available for transfer to Barclays, any hope that these options were part of a sensible "portfolio of financial instruments," Trustee Reply Br. at ¶ 113, was shattered; what they comprised was a substantial portfolio of risk positions.  BCI Ex. 340 [Leitner Report.] at §§ V.C.2, V.C.4.  Given the unprecedented market volatility at the time, and Barclays' knowledge that it would not, for some unknown period of time, be in a position to hedge effectively against future losses on these positions, Barclays faced exposure for losses well in excess of $1.1 billion.[51]  Without the margin, this was *not* "a market opportunity."

73.    It is equally inaccurate for the Trustee to suggest that Barclays assumed "little risk" in acquiring LBI's proprietary futures.  Trustee Br. at ¶¶ 114-115.  A director in Barclays' futures business testified in great detail concerning the "mess" of LBI's books and records at the relevant time, which made it virtually impossible for Barclays to come to any clear understanding of LBI's proprietary futures book prior to the Closing.  BCI Ex. 71 [James Dep. Tr.] at 77:4-78:11.  Indeed, although Barclays knew it was taking responsibility for everything

---

considers the actual circumstances the parties were presented with, and concludes that under these circumstances, the *only* rational solution for Barclays was to acquire whatever ETD Margin was there.  Ex. 340 [Leitner Rpt.] at §§ V.C.2, V.C.4.  By contrast, the Trustee's expert Mr. McIsaac (who has no experience working in the ETD field), does not even acknowledge the extraordinary circumstances or the effect they would have on the economic rationality of his conclusion.   Thus, his opinion is wholly unreliable and should be disregarded.

[51] The Trustee half-heartedly contends that Barclays was able to manage the risk associated with these proprietary positions by hedging them after the closing.  Trustee Reply Br. at ¶ 113.  But the Trustee then concedes (albeit in a footnote) that while Barclays lost "$800 million on the exchange-traded derivatives post-Closing" in the first two weeks after the Closing, only "$280 million of this loss was offset by gains on hedges that Barclays executed."  Trustee Reply Br. at ¶ 113, n.19.

on the futures side, it had no concept of what that "everything" consisted of until *after the Closing*.[52]  And although the Trustee characterizes the risk on the proprietary futures positions as "ordinary day-to-day market risk" since they are "marked to market daily," Trustee Reply Br. at ¶ 115, there was nothing ordinary about the level of market volatility Barclays was facing at the time, and Barclays could neither assess the magnitude of this risk nor manage it until Barclays learned of its existence *after the Closing*.  Thus, there is nothing "little" about the risk Barclays undertook with regard to the proprietary futures.

74.    As to the customer and affiliate positions, the Trustee claims that there was no market risk, that credit risk was minimal, and that Barclays was "spared" from any risk whatsoever associated with affiliate positions in particular.  Trustee Reply Br. at ¶¶ 111-112, 114, 116.  Again, this ignores the fact that the market volatility at the time was at a record high and the country was in the midst of a deep recession.  *E.g.*, BCI Ex. 80 [Kobak Dep. Tr.] at 39:23-40:5 ("obviously this deal was related to a severe financial crisis").  Credit risk (which is inherently tied to market risk under these circumstances) was significant, even for customers that could ordinarily have been presumed to be solvent.  *E.g.*, BCI Ex. 644 [Leitner Dep. Tr.] at 37:2-10, 112:10-12.  As for the Lehman affiliates, they were already known to be financially distressed, and therefore would have been presumed *unable* to compensate Barclays for losses it incurred on their positions:  that was not just a risk; it was a virtual *certainty*.  The Trustee is simply wrong to suggest that the Clarification Letter "spared Barclays the risk associated with affiliate positions" or that Barclays "charged LBI for the cost of closing out these positions." Trustee Reply Br. at ¶ 112.  The undisputable facts are that Barclays took over settlement

---

[52] Perhaps the best two examples of this are that (1) other than a single VIX position, Barclays did not learn for certain until after the Closing that LBI even had any proprietary futures positions, BCI Ex. 71 [James Dep. Tr.] at 79:8-80:1, and (2) Barclays only learned of the VIX position — a position that carried hundreds of millions of dollars of exposure — on Saturday, September 20.  BCI Ex. 634 [Raisler Dep. Tr.] at 78:9-15.  For all Barclays knew, LBI could have had countless other proprietary futures positions that gave rise to still further exposure.

responsibility for all ETD positions, including those held on behalf of affiliates, and incurred a

cost of over $100 million in closing out the affiliate positions.  BCI Ex. 95 [Jan. 13, 2010

Romain Dep. Tr.] at 119:12-21; BCI Ex. 352 [Dziemian Decl.] at ¶ 14; BCI Ex. 353 [James

Decl.] at ¶¶ 10, 12; BCI Ex. 649 [Barclays' Second Supplemental Responses to the Trustee's 2nd

30(b)(6) Notice].  Barclays neither filed a claim with the LBI estate nor recovered any of these

losses from the LBI estate or from any LBI affiliate, and it has since ***written off the entirety of***

***that loss***.  BCI Ex. 95 [Jan. 13, 2010 Romain Dep. Tr.] at 16:20-17:9; BCI Ex. 472 [Mar. 1, 2010

Barclays' Supplemental Responses to the Trustee's 2nd 30(b)(6) Notice] at Ex. 2.  The only

protection Barclays received against this loss was the collateral that the Trustee now seeks to

take away from Barclays.

> ### 2.     The Trustee Had No Viable Alternative To the Deal He Approved.

75.       Not only is it clear why Barclays was demanding the ETD Margin, but it is

equally apparent why the Trustee agreed to a deal that included it.  As explained in Barclays

opposition brief, the Trustee's alternative to the proposed deal with Barclays was an immediate

liquidation of the entirety of the positions in the OCC accounts (and likely all others) on Monday

morning, September 22.  BCI Ex. 267 [Sept. 21, 2008 4:37 pm email from J. McDaniel to S.

Harbeck, *et al.*].  When the CME took similar self-protective actions just days before, the cost to

LBI was $1.6 billion.  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 239:16-21.  The Trustee was

present in the courtroom on the evening of September 19 when this fact was shared with the

Court as an illustration of the turmoil that surrounded the transaction and that made it crucial that

the Court approve, and that the parties consummate, the Sale.  BCI Ex. 80 [Kobak Dep. Tr.] at

21:16-19.

76.    Mr. McDade, Lehman's lead negotiator, was also aware at the time of what had happened at the CME, and of the substantial risk that an OCC liquidation could similarly consume the margin LBI had posted there:

> Q.    Did you understand that, in addition to the long positions and the short positions that Lehman had at OCC, it also had additional cash and assets that were deposited as margin and also clearing funds deposited at the OCC?
>
> A.    Yes, I did, but keep in mind the context that we had had assets like that, for example, at the CME, and they lost those assets over the course of the week. So we had no confidence that those were potentially our assets given what had been transpiring.

BCI Ex. 85 [McDade Dep. Tr.] at 275:3-13.[53]

77.    Thus, everyone involved was aware that the posted ETD Margin was unlikely to inure to the benefit of the estate either way. But what the Trustee could ensure — by approving the deal with Barclays — was that (1) customers' options and futures positions would be preserved, and (2) the estate's exposure on the proprietary and affiliate options and futures positions (which at the time was open-ended — and substantial, given the extreme market volatility) would be eliminated. It was these benefits that the Trustee saw at the time, and the Trustee was more than rational in concluding that a deal that carried these benefits was preferable to the impending liquidation of these ETD accounts, with all its associated risks. BCI Ex. 340 [Leitner Report.] at §§ V.C.4, V.C.6.

## III.    BARCLAYS IS ENTITLED TO $769 MILLION IN SECURITIES OF THE TYPE HELD IN LBI'S CUSTOMER RESERVE ACCOUNT.

78.    The Trustee argues that "[t]he Clarification Letter provides Barclays with a conditional right to $769 million in securities from LBI's Special Reserve Bank Accounts for the Exclusive Benefit of Customers." Trustee Reply Br. at ¶ 13. According to the Trustee, Barclays

---

[53] Even the Trustee admits that "LBI could not have withdrawn the minimum Margin Assets required by the OCC to secure LBI's Assets required by the OCC to secure LBI's open positions." Trustee Reply Br. at ¶ 136.

is entitled to these assets only if the following "conditions" are satisfied: "(i) there is a sufficient

excess in the Customer Reserve Accounts above the amount that SEC Rule 15c3-3 requires to be

reserved for customer claims, (ii) the SEC approves the release of the excess securities from the

Customer Reserve Accounts, and (iii) all of the customer claims in the SIPA proceeding are

satisfied." *Id.*

79.    As a matter of law, the Trustee is wrong.  The contract does not contain *any* of

these "conditions."  It provides that "to the extent permitted by applicable law," Barclays shall

receive the $769 million in securities from LBI's Rule 15c3-3 account.  BCI Ex. 5 [Clarification

Letter] at § 8(ii).  None of the conditions insisted upon by the Trustee are required by "applicable

law."  To the contrary, the SIPA statute unambiguously authorized the Trustee to transfer any

property — LBI property or customer property — to Barclays as part of the overall Sale.  The

Trustee agreed to make such a transfer.  Moreover, the contract further provides that if there are

any conceivable regulatory obstacles to such transfer (and there are not), then the Seller shall

provide the equivalent value from another source.

80.    The "applicable law," the plain text of the contract, and the extrinsic evidence all

support Barclays' right to the $769 million in securities it was promised.  That right was

important to Barclays' willingness to close the Sale, and should not be nullified now simply

because the Trustee wishes he had not agreed to it.

**A.    The Plain Text Of The Purchase Agreement Provides That Barclays Is
Entitled To $769 Million In Securities Of The Same Nature And Value As
Those Kept In LBI's 15c3-3 Reserve Account.**

81.    The Trustee's discussion of the 15c3-3 issue never addresses the fact that the

Purchase Agreement provides that Barclays shall acquire "all of the assets of Seller used

primarily in the Business or necessary for the operation of the Business (in each case, excluding

the Excluded Assets)."  BCI Ex. 5 [Clarification Letter] at § 1(a); *see also* BCI Ex. 1 [APA] at

43

§ 1.1, p. 6 (definition of "Purchased Assets").  The Business was "the U.S. and Canadian

investment banking and capital markets businesses of Seller including the fixed income and

equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking

operations and LBI's business as a futures commission merchant."  *Id.* at p. 2 (definition of

"Business").  As part of its acquisition of this Business, Barclays took on over 72,000 "Private

Investment Management" ("PIM") customer accounts, containing assets in excess of $40 billion.

As the Trustee explains, the securities in the Rule 15c3-3 account (the "Reserve Account") were

an integral part of the Business Barclays acquired, because they are required to be held in reserve

for the customers whose accounts are part of that Business.  Thus, the Reserve Account

securities were "assets primarily used in the Business" within the meaning of the Purchase

Agreement.[54]

82.    Section 8 of the Clarification Letter confirms this.  It is titled "Transfer of

Customer Accounts" and provides that:

> Purchaser *shall receive . . .* (ii) to *the extent permitted by applicable law,* and *as
> soon as practicable after the Closing,* $769 million of securities, as held by or on
> behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities
> Exchange Act of 1934, as amended, *or securities of substantially the same nature
> and value.*"

BCI Ex. 5 [Clarification Letter] at § 8 (emphasis added).

83.    The plain meaning of this provision is that, if there is a legal prohibition against

transferring the $769 million in securities from *inside* the Customer Reserve Account (and there

---

[54] The Trustee never argues that these assets were "Excluded Assets," and they clearly never were so identified. *See*
Barclays' Opp. Br. at ¶¶ 142, 215 (and sources cited therein).  The Trustee does obliquely refer to the $769 million
in securities as an "additional asset" that purportedly was "added" to the transaction on September 19, Trustee Reply
Br. at ¶ 24, implying that the Trustee does not consider the assets identified in the Clarification Letter to have been
included as Purchased Assets in the APA.  This tacit argument is contrary to the clear language of the APA, which
provided that Barclays would receive the *entirety* of the assets used in Lehman's business, other than the Excluded
Assets, and did not identify the Customer Reserve Account as an Excluded Asset.  As the Examiner reported, "The
APA thus provided that Barclays would purchase *all* of LBI's long securities positions – with the exception of 505
of each position in RMBS – and assume all short positions relating to those long positions."  Examiner Report at
2139-2140 (emphasis added).

is not, as explained below), then Barclays "shall receive" "securities of substantially the same nature and value" from *outside* the account. There is no "applicable law" that prevents this plain meaning, and therefore Barclays is entitled to the $769 million in securities it was promised.

        1.    <u>The Trustee Has Not Identified Any "Applicable Law" That Imposes The "Conditions" Asserted By The Trustee.</u>

84.    The Trustee argues that the phrase "to the extent permitted by applicable law" imposes three "conditions" — the need for an "excess" in the Reserve Account, the need for SEC approval, and the need to satisfy all remaining customer claims. Trustee Reply Br. at ¶ 13. Despite his extensive discussion of SIPA and Rule 15c3-3, the Trustee has failed to demonstrate that the phrase "applicable law" imposes *any* of these three conditions.

85.    The law generally disfavors the imposition of a condition precedent that is not plainly stated in the contract.[55] Here, the conditions asserted by the Trustee are not plainly stated, and are not encompassed within the phrase "to the extent permitted by applicable law." Moreover, the alleged conditions do not logically apply to the contract's requirement that even if a regulatory issue arose with respect to the assets within the Rule 15c3-3 account, "securities of substantially the same nature and value" must be transferred to Barclays.[56]

---

[55] Conditions precedent are strongly disfavored under New York law, and "where a contract term is ambiguous, the creation of a condition precedent is disfavored." *Metropolitan West Asset Management, LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539(NRB), 2004 WL 1444868, at *6 (S.D.N.Y. June 25, 2004) (internal citations and quotations omitted). Moreover, section 10.2 of the APA expressly sets forth the "Conditions Precedent to the Obligations of the Seller" but contains no reference to any of the conditions sought by the Trustee. *See Ballard v. Parkstone Energy, LLC*, 522 F. Supp. 2d 695, 711 (S.D.N.Y. 2007) (condition precedent found not to exist where parties failed to include it in the condition precedent clause of the purchase agreement); *see also Christian Mut. Life Ins. Co. v. Penn Mut. Life Ins. Co.*, 163 F. Supp. 2d 260, 263 (S.D.N.Y. 2001).

[56] The case law holds that where a contract has "disjunctive" provisions (such as provisions separated by an "or" clause), the law should be especially reluctant to impose a condition precedent on *both* of those disjunctive provisions. *See generally Bonner v Guerrieri*, 2009 NY Slip Op. 52666U, 4 (N.Y. Sup. Ct. 2009) (rejecting interpretation of a condition precedent that ignored disjunctive nature of the provision and provided multiple avenues for satisfying the condition). Here, the disjunctive nature of section 8(ii) allows for more than one method of satisfying "applicable law," including a transfer of assets from *outside* of the account.

a.    "Applicable Law" Authorized The Trustee To Transfer Some Or All Of
The Reserve Account To Barclays — Whether Or Not There Was An
"Excess" In That Account.

86.    The Trustee has cited no statute, regulation, or case that prohibits a SIPA Trustee

from transferring some or all of the Reserve Account as part of an overall sale of the broker-

dealer business in a liquidation.  There is no such statute, regulation, or case.  To the contrary,

the Trustee *was expressly authorized* by "applicable law" to transfer a portion of the Reserve

Account to Barclays as part of this sale.

87.    The Trustee does not, and cannot, dispute that he was authorized to approve the

sale of "all of the assets of [LBI] used primarily in the Business or necessary for the operation of

the Business."  SIPA expressly provides that a trustee has the "same powers and title with

respect to the debtor and property of the debtor . . . as a trustee in a case under Title 11."  15

U.S.C. § 78fff-1(a).  Thus, pursuant to Section 363 of the Bankruptcy Code, the Trustee was

authorized to sell "all of the assets" used in LBI's broker-dealer business to Barclays —

including a portion of the Reserve Account.  That is precisely what he agreed to do.

88.    Indeed, as Weil Gotshal was advised at the time, the property held in the Reserve

Account is required to be *broker-dealer property*, not customer property.  BCI Ex. 248 [Sept. 20,

2008 11:12 pm email from D. Murgio to R. Miller, *et al.*] (including Sept. 20, 2008 9:29 pm

email from R. Messineo to R. Miller, *et al.*).  It is required to be locked up to protect customers,

but it is nonetheless property of the broker-dealer.  It can therefore be transferred pursuant to the

Trustee's general power to transfer broker-dealer property in a Section 363 sale.

89.    Indeed, SIPA explicitly contemplates that a Trustee may sell customer property.

Section 748 of the Bankruptcy Code requires the Trustee for a broker-dealer that is not subject to

SIPA promptly to liquidate all customer securities.  11 U.S.C. § 748.  Section 7(a) of SIPA gives

46

the SIPA Trustee all the powers and duties of a Trustee under the Bankruptcy Code, except that it provides that the Trustee "may, but is not required to" liquidate customer securities.  15 U.S.C. § 78fff-1.

90.     Moreover, SIPA specifically gives a Trustee the power to "sell or otherwise transfer to another member of SIPC, without consent of any customer, all or any part of the account of a customer of the debtor."  15 U.S.C. § 78fff-2(f).  The Trustee is authorized to make such a sale or transfer "pursuant to terms satisfactory to him and subject to prior approval of SIPC" in order to "facilitate the prompt satisfaction of customer claims and the orderly liquidation of the debtor."  *Id.*  Accordingly, whether the assets in the Reserve Account are considered LBI property or customer property, the Trustee was authorized to transfer that property to Barclays as part of his overall sale of the Business to Barclays.  That is what he agreed to do.

91.     The Trustee never addresses these clear statutory provisions that authorized him to agree to the transfer of a portion of the Reserve Account as part of the overall sale of the Business to Barclays.  Instead, he invokes the broad purposes of SIPA and the specific requirements of Rule 15c3-3.  Trustee Reply Br. at ¶¶ 16-23.  But none of the law he invokes in any way limits the right of the Trustee to transfer property as part of a sale of assets — both customer assets and proprietary assets — in a SIPC liquidation.

92.     The Trustee relies upon Rule 15c3-3(g), which prohibits a broker-dealer from making a withdrawal from its Reserve Account if the withdrawal would lead to a deficit in the Reserve Account.  Trustee Reply Br. at ¶ 19.  That requirement, however, applies to operating broker-dealers, and generally has not been applied to a broker-dealer that is already in a SIPA liquidation.  A liquidation typically involves distributing the assets of the estate to customers,

and it is not an obstacle to such a distribution that the Reserve Account does not satisfy the reserve requirement that would apply if the debtor were still an operating broker-dealer.  Once in a liquidation, the broker-dealer no longer calculates a Rule 15c3-3 requirement — instead, its SIPA Trustee *liquidates*, according to whatever process the trustee decides is best (with SIPC and/or Court approval).[57]  Again, this is consistent with the overarching point that in a liquidation, the Trustee is expressly authorized to "sell or otherwise transfer" *any* property, including customer property, in order to best protect customers.  *See* 15 U.S.C. § 78fff-2(f); *see also* 15 U.S.C. §§ 78fff-1(a).  Here, in the largest SIPA liquidation in history, the Trustee made the correct judgment that the best way to protect the maximum number of customers would be to sell the Business to Barclays in order to provide an *immediate* and *solvent* broker-dealer for 72,000 PIM customers — a transfer he admits was "instrumental in protecting customers and preserving customer value in uncertain times."[58]

93.    There is therefore no "applicable law" that prohibits the transfer of some or all the Reserve Account to Barclays — whether or not there was an excess in that account.  Nor does the contract refer in any way to a requirement that there be an "excess" in the Reserve Account before Barclays could receive the $769 million in securities it was promised.  The Court should enforce the plain text of the contract and order delivery of those securities.

b.    "Applicable Law" Allows The Transfer Of Any Excess Amount From The Reserve Account Without Approval From The SEC.

94.    Even if the Court accepts the Trustee's argument that Rule 15c3-3(g) applies in a SIPA liquidation (and thereby prohibits the Trustee from transferring any amount needed to

---

[57] Indeed, the Trustee and his expert have admitted that LBI has not attempted to recalculate its Rule 15c3-3 requirement as of September 19, 2008.  McIsaac Rebuttal Report at ¶¶ 29-33.

[58] *See* BCI Ex. 42 [Trustee First Interim Report] at ¶¶ 18-20.

satisfy the putative Reserve Account requirement), it should still reject the Trustee's argument
that SEC approval would be required to transfer any *excess* in the Reserve Account.

95.      By necessary implication, Rule 15c3-3(g) provides that an operating broker-dealer
*may* transfer amounts held in excess of the Reserve Account.  No other interpretation makes any
sense.  As the Trustee admits, the rule prohibits only those withdrawals that would lead to a
*deficit* in the Reserve Account.  Trustee Reply Br. at ¶ 19.  Thus, a withdrawal of an amount that
is in *excess* of the requirement, and that will *not* create a deficit in the account, is permitted.
There is no statute, regulation or case requiring SEC approval for such a withdrawal.  On a
regular basis, operating broker-dealers calculate their Rule 15c3-3 reserve requirement,
determine that it has decreased, and withdraw the excess amount over that requirement — and
the Trustee cites no rule indicating that such activity requires SEC approval.

96.      The Trustee agrees that at the time of the Sale, Lehman executives represented to
Barclays that there *was* an excess in the LBI Reserve Account that "might be as much as $1.7
billion."  Trustee Reply Br. at ¶ 24.  Despite his expert's changing assessments of what the
"correct" calculation might show, the Trustee has failed to demonstrate that there was no excess
in the Reserve Account.[59]  Given that the law permits the transfer of any excess without SEC
approval, Barclays is entitled to any such excess (up to $769 million), without the need for SEC
approval.[60]

---

[59] Despite assertions to the contrary by the Trustee's expert, only the Trustee — and not Barclays — has had access
to the materials necessary to re-run the reserve calculation to account for the alleged discrepancies now identified by
the Trustee's expert.  BCI Ex. 647 [Martini Decl.] at ¶¶ 5-7.

[60]   As explained above, Barclays is entitled to the full amount of the $769 million in securities it was promised
*irrespective* of whether there was an excess in the Reserve Account — first because "applicable law" authorized the
transfer of the Reserve Account to Barclays whether or not there was an excess, and second because the "or" clause
entitled Barclays to the equivalent value from outside the Reserve Account, in the event of any regulatory obstacle.

c.    "Applicable Law" Does Not Require The Trustee To Delay Transfer Of
The $769 Million In Securities Until The SIPA Liquidation Of LBI Is
Complete.

97.    The Trustee cites no statute, regulation, or case holding that he is prohibited from

transferring *any* property to Barclays until he has completed the SIPA liquidation, and satisfied

all remaining customer claims.  That sweeping assertion has no basis in law, and has already

been contradicted by the Trustee's own actions.

98.    At the time he agreed to the Sale, the Trustee *knew* there was uncertainty over

whether the assets that would remain with the LBI estate would be sufficient to cover all

remaining customer claims.  He told the Court at the Sale Hearing that thousands of customers

would remain, and that the value of the assets left behind was uncertain — in describing what

those values might be, he told the Court "I really cannot tell."  BCI Ex. 49 [Sept. 19, 2008

Hearing Tr.] at 76:22-77:3, 78:9-16.

99.    Moreover, the Trustee has already fully embraced the fact that the Barclays Sale

may result in certain LBI customers receiving better treatment than others.  In December 2009,

after the Rule 60(b) litigation had commenced, and after the Trustee had proffered the analysis of

Daniel McIsaac regarding a possible shortfall in the Reserve Account, the Trustee asked this

Court to approve a settlement that would result in the transfer to Barclays of the remaining

amounts of customer property allocable to the PIM customers.[61]  The settlement was designed to

ensure that the PIM customers who were transferred to Barclays received *all* of their customer

property.  BCI Ex. 504 [Nov. 20, 2009 Motion for an Order Approving Trustee's Implementation

of Transfer of PIM Accounts to Barclays].  The Trustee asked for this Court's approval over the

objection of remaining customers (or creditors who claim to be "customers"), who argued that

---

[61] *See* BCI Ex. 504 [Nov. 20, 2009 Motion for an Order Approving Trustee's Implementation of Transfer of PIM
Accounts to Barclays] at Ex. C.

the transfer may well result in remaining customers receiving less than a full recovery. *Id.*; BCI Ex. 648 [Dec. 10, 2009 Hearing Tr.] at 12:9-15:2. These objectors argued that SIPA required a "pro rata" distribution among all customers. BCI Ex. 648 [Dec. 10, 2009 Hearing Tr.] at 16:18-20:2. The Trustee correctly persuaded the Court to reject that argument, and to fulfill the provisions of the Barclays Sale: in other words, the Trustee accepted the proposition that because it provided the maximum protection to the maximum number of customers, the Barclays Sale was in the best interests of all customers, *even if* it might lead to different recoveries between the customers that were transferred to Barclays, and those who remained with the estate.[62]

100.    Thus, all of the Trustee's arguments about the need to allocate "general estate" property to remedy any "shortfall" of customer property are simply inapposite. Trustee Reply Br. at ¶¶ 16-23.[63] The assets sold to Barclays are *not in general estate property*, because they have been *sold*. None of the legal authorities cited by the Trustee in support of his assertion have anything to do with the Trustee's ability to "sell or transfer" any property as part of an authorized sale that he believes is in the best interests of customers overall. That is what he did in this case, and he cannot now unilaterally modify the transaction after the fact because he is unhappy with its results.

101.    For the same reason, the Court should reject the arguments submitted by SIPC in its "Statement" filed April 5, 2008. *See* Statement of the Securities Investor Protection Corporation in Support of Trustee's Motion for Relief Pursuant to the Sale Orders Or,

---

[62] As explained in his First Interim Report, the Neuberger Berman "Private Asset Management" ("PAM") customers were transferred to Ridge Securities, and also received essentially 100% of their customer property. BCI Ex. 42 [Trustee's First Interim Report] at ¶¶ 3-4.

[63] For example, the cases the Trustee cites do not address Section 363 sales or other transfers of customer property at all. *See generally* Trustee Reply Br. at ¶ 22 (citing *In re Donald Sheldon & Co.*, 148 B.R. 385, 388 (Bankr. S.D.N.Y. 1992) and *In re MJK Clearing Inc.*, 286 B.R. 109 (Bankr. D. Minn. 2002)).

Alternatively, For Certain Limited Relief Under Rule 60.[64]  SIPC argues that Barclays is not

entitled to *any* Purchased Assets unless and until it is finally determined that all remaining LBI

customers are satisfied in full.  *Id.* at pp. 12-18.  The statutory authority SIPC cites, however,

provides that in the event of a shortfall in customer property, "any other property *of the debtor*"

should be made available first for customers.  *Id.* at p. 17 (citing 15 U.S.C. § 78*lll*(4)); *see also*

*id.* at 13 (discussing "the requirement that the Trustee look to any other assets *of the debtor* to

remedy a shortfall).  Again, that authority is inapposite because the property in question in this

case was *sold to Barclays*.  By contrast, SIPC cites *no authority* that allows a court (or a Trustee)

to remedy a putative shortfall in customer property by clawing back assets that were *sold by the*

*debtor to a third party*.  It would violate contract law and the Constitution to retroactively

override the sale of assets to a third party in order to remedy a subsequently discovered (or

feared) shortfall in customer property.[65]  It would also be terrible public policy:  no one would

ever buy assets again from a SIPC Trustee, since any such purchase would carry the risk of a

clawback if the SIPC Trustee subsequently concluded there *might* be a shortfall in customer

property.[66]

      2.     <u>The Court Should Reject The Trustee's Interpretation Of The "Or" Clause,
And Should Enforce That Clause To Require Delivery Of The Promised
Securities.</u>

     102.    The plain language of Section 8(ii) of the Clarification Letter provides that if

"applicable law" does create a regulatory obstacle to transferring securities from the Reserve

Account (which as explained above, it does not), then Barclays would be entitled to "securities

---

[64]  As SIPC's submission was received just hours before Barclays filed this reply brief, Barclays reserves its right to file a lengthier response if appropriate and helpful to the Court.

[65]  *See* Barclays Opp. Br. at ¶¶435-38, 686-87.

[66]  Neither the Trustee nor SIPC have submitted any evidence to demonstrate that their fears of a potential shortfall are valid.  The most significant remaining claims are from LBIE and LBHI, and neither SIPC nor the Trustee address the status of attempting to evaluate the magnitude of those claims.

of substantially the same nature and value." BCI Ex. 5 [Clarification Letter] at § 8(ii). Thus, the

Court need not resolve any of the legal disputes between Barclays and the Trustee relating to the

interpretation of SIPA and Rule 15c3-3, but instead may simply enforce the plain language of the

contract which requires delivery of the securities to Barclays from outside the Reserve Account

(*even if* there is a regulatory problem in transferring them from inside the account).

103.    Indeed, because the "Seller" is defined to include LBHI, LBHI is jointly and

severally liable to fulfill the obligation to transfer the $769 million of Rule 15c3-3 type securities

to Barclays. *See* Barclays Opposition Br., at ¶¶ 439-441. Neither the Debtor nor the Trustee

dispute this joint and several liability. Thus, the Court can order LBHI to transfer the securities

without even addressing the (fallacious) arguments by SIPC and the Trustee relating to

"customer property."

104.    After filing its initial brief, the Trustee argued for the first time that the phrase "or

securities of substantially similar nature and value" merely contemplated that if securities within

the Reserve Account matured, they would be replaced with similar securities. *See, e.g.,* BCI Ex.

80 [Kobak Dep. Tr.] at 269:23-272:23; Trustee Reply Br. at ¶¶ 36-40. On the face of the

contract, this explanation makes no sense. Unlike other sections of the Clarification Letter (for

example, with respect to Schedules A and B, referring to the Repo Collateral and Clearance Box

Assets, respectively), there is no reference in Section 8(ii) to *specific CUSIPs* that were to be

transferred to Barclays. *Compare* BCI Ex. 5 [Clarification Letter] at §§ 1(a)(ii)(A) & (B) *with*

*id.* at § 8(ii). Rather, Section 8(ii) simply provides the value of the securities to be transferred. If

the "or" clause were omitted, the provision would still unambiguously require the transfer of

$769 million in securities — *any* securities — held in the Rule 15c3-3 account. The fact that

some of those securities might mature and be replaced by others would in no way create any

ambiguity that would have to be resolved through the addition of the "or" clause. Thus, the "or" was completely unnecessary to deal with the "maturation" point argued by the Trustee. The Trustee is therefore adopting an interpretation that renders the "or" clause redundant.[67]

105.    By contrast, the "or" clause was needed, and insisted upon, to ensure that Barclays would be entitled to $769 million of securities of the type held in a Reserve Account *whether or not* there might be some regulatory issue with transferring them from the account itself.

**B.    If The Court Determines That The Purchase Agreement Is Ambiguous, The Extrinsic Evidence Demonstrates That Barclays Is Entitled To The $769 Million In Securities Promised In Section 8 Of The Clarification Letter.**

106.    The Trustee relies upon extrinsic evidence in an attempt to vary the plain meaning of Section 8(ii) of the Clarification Letter. The Court should reject that evidence and enforce the unambiguous terms of the contract as written. *In re Allegiance Telecom, Inc.*, 356 B.R. at 98. However, even if the Court concludes that the contract is ambiguous, the extrinsic evidence supports Barclays, not the Trustee.

107.    It is black-letter New York law that, if an ambiguity in a contract requires consideration of extrinsic evidence, the court cannot consider a party's un-communicated, subjective intent. *See Pan American World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1003 (2d Cir. 1974) ("Even if the all [sic] risk insurers intended to distinguish between 'warlike' and 'non-warlike' hijackings at the time the policies were written, their subjective or hidden intent is not competent to determine the meaning of the words they employed."); *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 277-78 (S.D.N.Y. 2006) ("[a]lthough the purpose of contract interpretation is to determine the intentions of the parties, only objective

---

[67]  It is of course well-established that courts should not interpret contractual language in a manner that renders certain provisions redundant. *See generally Law Debenture Trust Co. of New York*, 595 F.3d at 468.

manifestations of intent are relevant under New York law."), *aff'd sub nom.*, *Ward v. Nat'l Geographic Soc'y*, 284 Fed. Appx. 822 (2d Cir. 2008); *In re Actrade Fin. Techs., Ltd.*, -- B.R.--, 2009 WL 5219033, *12 (Bankr. S.D.N.Y. Dec. 31, 2009) (Gropper, J.) ("Their unstated goal does little to demonstrate the parties' *mutual* intent, as there is no indication of this intent in the [settlements] other than the Release clause itself. The unexpressed subjective intent of one party is immaterial in construing the terms of a contract.").

108.     The Trustee has presented the Court with the affidavit of a Weil Gotshal attorney, Robert Messineo, who declares that *he* understood the phrase "or securities of substantially the same nature and value" to reflect the "potential for there to be a change in the specific securities held in the Customer Reserve Accounts between September 22 and the date when it became permissible to withdraw securities from the Customer Account." BCI Ex. 645 [Messineo Decl.] at ¶ 8.

109.     Mr. Messineo admitted in deposition, however, that he did not communicate this understanding to anyone at Barclays. BCI Ex. 632 [Messineo Dep. Tr.] at 21:19-22:18, 26:23-27:11. As a matter of law, therefore, his testimony about his "understanding" is irrelevant to the Court's interpretation of the "or" clause.

110.     Indeed, it does not appear that Mr. Messineo even informed his colleague, Harvey Miller, regarding his subjective understanding of the meaning of the phrase "or securities of substantially similar nature and value":

Q.     Was it your understanding that if the [sic] LBI or the estate was no longer in a position of transferring the specific security because it had matured, it would have the ability to transfer an alternative similar security of the same value?

A.     I don't think that was contemplated at the time that this was drafted.

BCI Ex. 87 [Miller Dep. Tr.] at 94:9:17 (objection omitted); *see also* BCI Ex. 632 [Messineo Dep. Tr.] at 22:19-23:5.[68]

111.    The Trustee also relies upon testimony relating to a "hallway discussion" that occurred after midnight on Sunday, September 21 (in the early morning hours of September 22). Trustee Reply Br. at ¶¶ 27-32.  But the only evidence relating to what was *actually communicated* in that discussion demonstrates an agreement to provide Barclays with the promised securities without any of the "conditions precedent" now asserted by the Trustee.

112.    During the hallway discussion, Mr. Miller of Weil Gotshal apparently raised the concern about whether there may be regulatory obstacles to transferring the promised securities from the Reserve Account.  BCI Ex. 635 [Rosen Dep. Tr.] at 103:23-105:24.  In response, Barclays counsel Ed Rosen (from Cleary Gottlieb), who is a specialist in SEC regulations, told Mr. Miller that he did not believe there were any such regulatory issues.  *Id.*  Nevertheless, given the late hour and the need to close promptly, Mr. Rosen suggested that they insert the words "to the extent permitted by applicable law" to obviate Mr. Miller's concern.  *Id.*  At the same time, however, Barclays also communicated that additional language should be included, to ensure that Barclays would receive the equivalent value from outside the account, just in case (contrary to Mr. Rosen's expert view) a regulatory obstacle did arise.  *Id.*; *see also* BCI Ex. 631 [Lewkow Dep. Tr.] at 202:16-20.

113.    In deposition, Mr. Rosen summarized the conversation as follows:

I guess some predecessor language to this was being reviewed, and Harvey Miller, as I said, raised the question whether there might be limits under applicable law, and I said that I wasn't aware of any, but to the extent that they exist, and it would address your concern, we can provide that the transfer be to the

---

[68]  The Trustee argues that "no one from Cleary Gottlieb approached Weil Gotshal to ask what the phrase meant." Trustee Reply Br. at ¶ 34.  But this does not make Mr. Messineo's subjective and undisclosed "understanding" any more admissible or relevant.

extent permitted by applicable law. *But if there was such a constraint, that that basically 769 million dollars in securities would come from somewhere else.* And can I remember exactly what was said, whether it was a grunt or a nod or a smile, I don't remember, but I remember coming away from the conversation feeling that we had sort of resolved the point.

BCI Ex. 635 [Rosen Dep. Tr.] at 105:4-24.

114.    The lead Barclays transactional lawyer, Vic Lewkow, was also present during the conversation, and he had the same recollection. He explained that he specifically recalled Barclays' financial advisor Michael Klein *telling Weil Gotshal* that Barclays should receive the assets *even if* (contrary to Mr. Rosen's view) there were a regulatory issue with respect to the Reserve Account itself:

> During that hallway conversation, Mr. Miller or one of his partners raised a concern about whether the transfer of the Rule 15c3-3 account might be subject to legal or regulatory constraints and that time would likely be necessary to resolve such concerns. To address that issue, I recall that my partner Ed Rosen suggested that the pertinent provision of the Clarification Letter include a phrase such as "to the extent permitted by applicable law." It is also my recollection that, *as part of the same conversation*, Mr. Klein said, in substance, that if the legal constraints prevented transfer of the Rule 15c3-3 account assets, *Barclays should receive substitute assets.* This was agreed to by representatives of Lehman as reflected in the final version of the Clarification Letter, as executed by all the parties thereto. In particular, the phrase 'or securities of substantially the same nature and value' was added to make clear that to the extent the transfer of $769 million in securities from the 15c3-3 account was not possible due to any legal or regulatory constraint, *Lehman would be obligated to deliver to Barclays securities of the same nature and value from some other source (outside of the 15c3-3 reserve account).*

BCI Ex. 364 [Lewkow Decl.] at ¶ 20 (emphasis added).

115.    Mr. Lewkow further testified in deposition that "Lehman's counsel agreed" that "if there were legal constraints preventing transfer of the rule 15c3-3 account assets, Barclays would receive substitute assets." BCI Ex. 631 [Lewkow Dep. Tr.] at 202:16-20.

116.    Whatever Weil Gotshal lawyers or other Lehman or Trustee representatives may have subjectively understood, unlike Barclays' communication of its intent to Lehman, there is

no evidence that anyone ever *communicated to Barclays* that its right to the securities was
conditional, was dependent upon there being an excess, was subject to the completion of the
SIPA proceeding, or was otherwise contingent or uncertain.  To the contrary, the
contemporaneous evidence shows that Weil Gotshal described the transfer of the securities as
definite, and not in any way contingent.  The morning of the closing, Harvey Miller exchanged
emails with Luc Despins and Saul Burian, advisers for the Creditors' Committee, confirming that
"Barclays took the portion of the reserves that were in securities," and stating that of the
"regulated capital," Barclays "gets securities $763m Figures approx."  BCI Ex. 287 [Sept. 22,
2008 8:18 am email from H. Miller to L. Despins].

117.    Likewise, on October 18, 2008, Mr. Miller gave a "state of the estate" report to
the Court, in which he explained:

> And all during that week, Your Honor — and that was a terrible week, the market
> was going down, values were disappearing.  And when we go to the closing, there
> was no billion three hundred million dollars.  The only money at LBI, and the
> SIPA trustee can tell us that also, was in the 15c3-3 account which was the
> reserve account for protection of customers.  And in that account, there was a
> billion dollars in cash and there was 700 odd million dollars in securities for
> customers. . . .  ***And as part of the Barclays closing, because Barclays was
> taking the customer accounts, they got the 700 odd million dollars in securities.***

BCI Ex. 485 [Oct. 16, 2008 Hearing Tr.] at 58:1-13 (emphasis added).

118.    In describing this to the Court, Mr. Miller did not state that the transfer of the
"700 odd million dollars in securities" was contingent, or uncertain, or dependent upon there
being an "excess" or any other condition.  That contemporaneous evidence confirms the
testimony of Barclays representatives and the plain reading of Section 8(ii) of the Clarification
Letter.

119.    The Trustee cites to the fact that, after the closing, certain Barclays' employees
who were *not* involved in the negotiation of the deal indicated an understanding that SEC

approval might be relevant to obtaining the $769 million of securities.  *See* Trustee Reply Br. at

¶¶ 45-46.[69]  The extrinsic evidence from employees who were far removed from the discussions

over the Reserve Account is not relevant to determining the meaning of the contract.[70]

### C.    The Rules of Contractual Interpretation Relied Upon By The Trustee Do Not Support His Argument.

120.    The Trustee invokes the principle that contracts should be construed to avoid

violating statutes and regulations.  Trustee Reply Br. at ¶¶ 53.  As explained above, there are no

statutes or regulations that prohibit transfer of the $769 million of securities promised to

Barclays in Section 8(ii) of the Clarification Letter.  To the contrary, the law expressly

authorized the Trustee to transfer *any* property as part of the overall sale to Barclays.  *See* 15

U.S.C. § 78 fff-1(a); 15 U.S.C. § 78 fff-2(f).[71]

121.    The Trustee also argues that contracts should be interpreted to give meaning to all

the terms, and that the Barclays' reading effectively eliminates the phrase "to the extent

---

[69]  For example, the Trustee relies upon the fact that Alastair Blackwell, former head of operations at Lehman who was not a negotiator of the deal, testified that he met with the SEC in an attempt to obtain permission to release the funds.  Trustee Reply Br. at ¶ 45 (citing BCI Ex. 56 [Blackwell Dep. Tr.] 206:21-208:21).  Mr. Blackwell was not a negotiator, and is not a lawyer.  His views of what may have been required are not relevant.  Moreover, he specifically testified that he believed alternative equivalent value needed to be found and transferred if the assets could not be transferred from the 15c3-3 account.  *Id.* at 214:19-215:2 ("The request was on the basis that if Mike felt there was an excess, then we could discuss having the $769 million worth of securities.  If there isn't an excess, then I'm not expecting him to release the securities.  But then alternative value would need to be found away from the C3.")

[70]  The Trustee also relies upon notations on draft balance sheets generated by Barclays accountant Gary Romain, but ignores his testimony that he had only "*a limited understanding of the 15c3 item*" at the time he created those drafts.  BCI Ex. 95 [Jan. 13, 2010 Romain Dep. Tr.] at 65:4-66:3 (emphasis added).

[71]  The two cases cited by the Trustee are inapposite.  In *NLRB v. Local 32B-32J Serv. Employees Int'l Union*, 353 F.3d 197 (2d Cir. 2003), the Court noted that the rule of construction at issue is "merely a presumption;  if there is evidence to suggest that the parties intended the clause to be read more broadly, it would be appropriate to consider that evidence when construing the clause."  *Id.* at 202.  Here, as discussed above, the relevant extrinsic evidence shows that the parties intended for Barclays to receive the $769 million in securities.  The decision in *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461 (2d Cir. 1970) does not address a contract in which a clause was alleged to be illegal, but instead stands only for the unremarkable proposition that if contract provision "is fairly susceptible of two constructions," the court should adopt the more reasonable one.  *Id.* at 466 (citations omitted).  Given the risks Barclays took, the benefits the Barclays' sale provided to customers and the public interest, and the fact that it was told there was at least $769 million of value to be transferred from the Reserve Account, Barclays has the more reasonable position.

permitted by applicable law." Trustee Reply Br. at ¶¶ 57-60. The Trustee is incorrect. As explained above, the phrase "to the extent permitted by applicable law" was added to obviate Weil Gotshal's uncertainty over the Trustee's authority; as also explained above, there is no uncertainty, and the Trustee did have the authority to transfer securities from the Reserve Account (and certainly had authority to agree to transfer securities from outside the account, if a regulatory issue arose with respect to the account).

**D.    Rule 15c3-3 Does Not Prohibit The Transfer Of Any Of LBI's ETD Margin At The OCC.**

122.    The Trustee argues that he also cannot transfer $507 million of LBI's proprietary margin deposits at the OCC because those deposits were treated as a "debit item" in the Reserve Account calculation as of September 19, 2008. Trustee's Reply Br. at ¶¶ 62-66. The Trustee argues that if these amounts were transferred to Barclays (as they plainly were), that would have increased the deficit that the Trustee now believes existed in the Reserve Account at that time. For that reason, the Trustee argues, those amounts must be deemed *not* to have been transferred. *Id*.

123.    The Trustee is mistaken. There is no legal prohibition that prevents the transfer of property simply because the transfer may impact the *calculation* of the Rule 15c3-3 requirement. That happens as a matter of course: if a transfer of property causes the requirement to go up when the reserve requirement is next calculated (usually on the next Friday), then the broker-dealer must address that by locating other property to deposit into the Reserve Account by 10:00 am on the second business day after the date of the calculation (assuming the Rule 15c3-3 Reserve Requirement is still applicable, which it is not in a liquidation). *See* 17 CFR 240.15c3-3(e)(3).

124.    At the time of the Sale, Lehman (and the Trustee) agreed to transfer to Barclays all ETD Margin.  *See* Section II, above.  The Trustee cannot alter the terms of that sale now because, in retrospect, he now believes it would create (or increase) a deficit that he has subsequently "discovered" (without yet proving) in the Reserve Account.

125.    Moreover, the Trustee is wrong in asserting that he is able to treat the $507 million in LBI margin deposit at the OCC as "customer property."  Trustee Reply Br. at ¶ 65. As an initial matter, the Trustee misquotes the initial portion of the SIPA definition of customer property, which in fact defines "customer property" generally as "cash and securities . . . received, acquired, or held by or for *the account* of [LBI] from or for the securities accounts of a customer. . . ."  *Id.* (quoting 15 U.S.C. § 78lll(4)) (emphasis added)).  The securities held at the OCC were not held for the accounts of LBI customers, but rather to secure LBI's own obligations to the OCC.  As the Trustee himself has insisted, the LBI margin deposits at the OCC were *LBI assets*.  Trustee Reply Br. at ¶62.  Thus, the statute does not itself provide any basis for treating any portion of LBI's margin deposits at the OCC as "customer property."

126.    In addition, the OCC Margin is not "customer property" because it is significantly different from the types of assets that are generally treated as customer property.  Unlike Reserve Account deposits and securities held in "good control locations," a broker-dealer does not have an unfettered right to the prompt return of OCC margin without the payment of money; the OCC margin is collateral for positions in the broker-dealer's account at the OCC.

127.    Furthermore, the alternative here to transferring the accounts and related margin to Barclays was *not* the return of the margin to the LBI estate, but *liquidation* of the positions in the accounts and the application of the margin to any amounts due upon such liquidation.  On the afternoon of Sunday, September 21, 2008, the OCC warned it might have to liquidate all LBI

61

accounts in order to protect itself and its members.[72]  The SIPA Trustee cannot now argue that he would have preferred the liquidation to the Sale to Barclays.

128.    The Trustee had the legal authority to determine, as he correctly did, that in light of the chaos and volatility in the market that weekend, Barclays' acquisition of the OCC accounts and margin as part of a larger integrated transaction was in the best interests of customers.  He cannot now second-guess that judgment because he believes (without any concrete evidence) that customer property may be inadequate for remaining customers.

129.    As misunderstood by the Trustee, Rule 15c3-3 and SIPA's requirements concerning the allocation of customer property would have severe adverse consequences for SIPA proceedings involving substantial broker-dealers, paralyzing efforts to manage the estate prudently for the benefit of customers and creditors generally.  As the Trustee recognized at the Sale Hearing, it is impossible to be certain at the beginning of a substantial SIPA proceeding whether customer property will be sufficient to satisfy customer claims, and that uncertainty is likely to continue not only until the bar date but thereafter until most customer claims have been determined.  Yet, if the Trustee's arguments concerning the securities held in the Reserve Account and at the OCC were correct, then so long as the adequacy of customer property to satisfy customer claims remained uncertain, a SIPA Trustee could *never* transfer any customer accounts to another broker-dealer (potentially creating an unequal distribution of customer property), and could *never* sell *any* property of the estate, notwithstanding that the property of a broker-dealer's estate typically consists of assets with highly volatile values (like LBI's OCC accounts), so that retaining such property may be highly imprudent.

---

[72] BCI Ex. 484 [Sept. 21, 2008 4:04 pm email from J. McDaniel to J. Giddens, et al.] ("If the transaction does not close tonight, OCC would need to immediately liquidate and close out the LBI accounts and is preparing to do so."). SIPC implored the OCC not to liquidate.  BCI Ex. 265 [Sept. 21, 2008 4:15 pm email from S. Harbeck to J. McDaniel, *et al.*] ("Jim [McDaniel] and Bill [Navin], I urge you in the strongest possible terms not to take precipitous action.").

130.    In fact, Congress considered the possibility of transferring customer accounts to
another broker dealer to be an essential benefit of SIPA.[73]  The statute clearly authorizes the
Trustee to sell any property with court approval, both by incorporating Section 363 of the
Bankruptcy Code and by explicitly authorizing the liquidation of customer securities.  The
Trustee should not be permitted, in his eagerness to maximize the estate and limit the SIPC
insurance fund's losses in *this case*, to establish new and unintended restrictions on the powers of
SIPC trustees and bankruptcy courts to manage future SIPA liquidations for the benefit of
customers.

## CONCLUSION

For the reasons set forth above and as set forth in Barclays' January 29, 2010
submissions, this Court should deny the Trustee's motion and should order the Debtor and the
Trustee to deliver to Barclays all Undelivered Assets.

Dated: New York, New York
        As of April 5, 2010

                                        Respectfully submitted,

                                        BOIES, SCHILLER & FLEXNER LLP

                                        By:    /s/  Jonathan D. Schiller_____
                                               Jack G. Stern
                                               575 Lexington Avenue
                                               New York, New York 10022
                                               Tel: (212) 446-2300
                                               Fax: (212) 446-2350
                                               Email: JSchiller@bsfllp.com
                                                      JStern@bsfllp.com

---

[73] S. REP. NO. 95-763, at 765-66 (1978) (noting that the amendment to SIPA enabling "the trustee, subject to prior approval by SIPC, to transfer customers' accounts in bulk to another broker-dealer," would address the issue of "substantial unnecessary delays to the detriment of customers" and make "SIPA far more responsive to the needs of customers.").

63

Hamish P. M. Hume
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Tel: (202) 237-2727
Fax: (202) 237-6131
Email: HHume@bsfllp.com

Attorneys for Barclays Capital Inc.