**Form 210B (12/09)**

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

In re **Lehman Brothers Holdings Inc.**                    **Case No. 08-13555**

## NOTICE OF TRANSFER OF CLAIM
## OTHER THAN FOR SECURITY

Claim No. **63862** was filed or deemed filed under 11 U.S.C. § 1111(a) in this case by the alleged transferor. As evidence of the transfer of that claim, the transferee filed a Transfer of Claim Other than for Security in the clerk's office of this court on .................., 2010.

**LANSFORSAKRING KRONOBERG**                    **ILLIQUIDX LTD**
Name of Alleged Transferor                       Name of Transferee

Address of Alleged Transferor:                    Address of Transferee:

**Kronobergsgatan 10**                            **Illiquidx Ltd**
**Box 1503**                                      **107-111 Fleet Street**
**35115 Vaxjo**                                   **London EC4A 2AB**
**Sweden**                                        **United Kingdom**

~~DEADLINE TO OBJECT TO TRANSFER~~

The alleged transferor of the claim is hereby notified that objections must be filed with the court within twenty-one (21) days of the mailing of this notice. If no objection is timely received by the court, the transferee will be substituted as the original claimant without further order of the court.

Date:_____                    _____
                                  CLERK OF THE COURT

B 210A (Form 210A) (12/09)

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

In re **Lehman Brothers Holdings Inc.**                    Case No. **08-13555**

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**ILLIQUIDX LTD**                              **LANSFORSAKRING KRONOBERG**
Name of Transferee                             Name of Transferor

Name and Address where notices to transferee          Court Claim # (if known):  **63862**
should be sent:                                       Total Amount of Claim Filed:
                                                      USD $ 1,483,680.00
                                                      Amount of Claim Transferred:
                                                      $ 1,483,680.00 (equivalent to Swedish Kronor
                                                      (SEK) 10,000,000)
**Celestino Amore**                                   ISIN/CUSIP: XS0272574889
**Managing Director**                                 Date Claim Filed: November 2, 2009
**Illiquidx Ltd**
**107-111 Fleet Street**
**London EC4A 2AB, UK**
**Phone: +44 207 936 9309**                            Phone: +46 470 72 0055
**Email: amore@illiquidx.com**                         Last four Digits of Acct #:

Name and Address where transferee payments
should be sent (if different from above):

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____          Date:  November 1, 2010
      Transferee/Transferee's Agent

*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

<u>AGREEMENT AND EVIDENCE OF TRANSFER OF CLAIM</u>
<u>LEHMAN PROGRAM SECURITY</u>

**TO:     THE DEBTOR AND THE BANKRUPTCY COURT**

1.      For value received, the adequacy and sufficiency of which are hereby acknowledged, **Lansforsakring Kronoberg** ("Seller") hereby unconditionally and irrevocably sells, transfers and assigns to **Illiquidx Ltd.** (the "Purchaser"), and Purchaser hereby agrees to purchase, as of the date hereof, (a) an undivided interest, equal to the percentage specified in Schedule 1 attached hereto (the "Purchased Claim"), in Seller's right, title and interest in and to Proof of Claim Number 63862 filed by or on behalf of Seller (the "Proof of Claim") against Lehman Brothers Holdings Inc. (the "Debtor"), debtor in proceedings for reorganization (the "Proceedings") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), administered under Case No. 08-13555 (JMP) (b) all rights and benefits of Seller relating to the Purchased Claim, including without limitation (i) any right to receive cash, securities, instruments, interest, damages, penalties, fees or other property, which may be paid or distributed with respect to the Purchased Claim or with respect to any of the documents, agreements, bills and/or other documents (whether now existing or hereafter arising) which evidence, create and/or give rise to or affect in any material way the Purchased Claim, whether under a plan or reorganization or liquidation, pursuant to a liquidation, or otherwise, (ii) any actions, claims (including, without limitation, "claims" as defined in Section 101(5) of Title 11 of the United States Code (the "Bankruptcy Code")), rights or lawsuits of any nature whatsoever, whether against the Debtor or any other party, arising out of or in connection with the Purchased Claim, (iii) any rights and benefits arising out of or in connection with any exhibit, attachment and/or supporting documentation relating to the Purchased Claim, and (iv) any and all of Seller's right, title and interest in, to and under the transfer agreements, if any, under which Seller or any prior seller acquired the rights and obligations underlying or constituting a part of the Purchased Claim and any and all of Seller's right, title and interest in, to and under any right or remedy of Seller or any prior seller against any prior seller in respect of the Purchased Claim, but only to the extent related to the Purchased Claim, (c) any and all proceeds of any of the foregoing (collectively, as described in clauses (a), (b), and (c), the "Transferred Claim"), and (d) the security or securities (any such security, a "Purchased Security") underlying or relating to the Purchased Claim and specified in Schedule 1 (as "Lehman Programs Securities to which Transfer Relates") attached hereto.

2.      Seller hereby represents and warrants to Purchaser that:  (a) the Proof of Claim was duly and timely filed on or before 5:00 p.m. (prevailing Eastern Time) on November 2, 2009 in accordance with the Court's order setting the deadline for filing proofs of claim in respect of "Lehman Programs Securities"; (b) the Proof of Claim relates to one or more securities expressly identified on the list designated "Lehman Programs Securities" available on http://www.lehman-docket.com as of July 17, 2009; (c) Seller owns and has good and marketable title to the Transferred Claim, free and clear of any and all liens, claims, set-off rights, security interests, participations, or encumbrances created or incurred by Seller or against Seller; (d) Seller is duly authorized and empowered to execute and perform its obligations under this Agreement and Evidence of Transfer; (e) the Proof of Claim includes the Purchased Claim specified in Schedule 1 attached hereto; and (f) Seller has not engaged in any acts, conduct or omissions, or had any relationship with the Debtor or its affiliates, that will result in Purchaser receiving in respect of the Transferred Claim proportionately less payments or distributions or less favorable treatment than other unsecured creditors of the Debtor that are nor entitled to priority under the Bankruptcy Code and are not subordinated.

3.      Seller hereby waives any objection to the transfer of the Transferred Claim to Purchaser on the books and records of the Debtor and the Court, and hereby waives to the fullest extent permitted by law any notice or right to receive notice of a hearing pursuant to Rule 3001(e) of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law, and consents to the substitution of Seller by Purchaser for all purposes in the case, including, without limitation, for voting and distribution purposes with respect to the Transferred Claim. Purchaser agrees to file a notice of transfer with the Court pursuant to Federal Rule of Bankruptcy Procedure 3001(e) including this Agreement and Evidence of Transfer of Claim. Seller acknowledges and understands, and hereby stipulates, that an order of the Court may be entered without further notice to Seller transferring to Purchaser the Transferred Claim, recognizing Purchaser as the sole owner and holder of the



Transferred Claim, and directing that all payments or distributions of money or property in respect of the Transferred Claim be delivered or made to Purchaser.

4.    All representations, warranties, covenants and indemnities shall survive the execution, delivery and performance of this Agreement and Evidence of Transfer of Claim and the transactions described herein. Purchaser shall be entitled to transfer its rights hereunder without any notice to or the consent of Seller. Seller hereby agrees to indemnify, defend and hold Purchaser, its successors and assigns and their representative officers, directors, employees, agents and controlling persons harmless from and against any and all losses, claims, damages, costs, expenses and liabilities, including, without limitation, reasonable attorneys' fees and expenses, which result from Seller's breach of its representations and warranties made herein.

5.    Seller shall promptly (but in any event no later than three (3) business days) remit any payments, distributions or proceeds received by Seller in respect of the Transferred Claim to Purchaser. Seller has transferred, or shall transfer as soon as practicable after the date hereof, to Purchaser each Purchased Security to such account, via Euroclear or Clearstream (or similar transfer method), as Purchaser may designate in writing to Seller. This Agreement and Evidence of Transfer supplements and does not supersede any confirmation, any other automatically generated documentation or any applicable rules of Euroclear or Clearstream (or similar transfer method) with respect to the purchase and sale of the Purchased Security.

6.    Each of Seller and Purchaser agrees to (a) execute and deliver, or cause to be executed and delivered, all such other and further agreements, documents and instruments and (b) take or cause to be taken all such other and further actions as the other party may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement and Evidence of Transfer, including, without limitation, cooperating to ensure the timely and accurate filing of any amendment to the Proof of Claim.

7.    This Agreement and Evidence of Transfer of Claim is subject to successful completion by the Purchaser on the date hereof of an on-sale by the Purchaser of the Transferred Claims and the Purchased Securities (the "Subsequent Sale") to be executed with a third party purchaser ("Subsequent Purchaser"). In the event that such Subsequent Purchase is not successfully completed on the date hereof (including receipt by the Purchaser from the Subsequent Purchaser of the full purchase price for such Subsequent Purchase for value on the date hereof), the Transferred Claims and the Purchased Securities shall be returned to the Seller and the purchase obligations of the Purchaser (including, without limitation, any obligation to pay purchase price) under this Agreement and Evidence of Transfer of Claim shall be cancelled accordingly.

8.    Seller's and Purchaser's rights and obligations hereunder shall be governed by and interpreted and determined in accordance with the laws of the State of New York (without regard to any conflicts of law provision that would require the application of the law of any other jurisdiction). Seller and Purchaser each submit to the jurisdiction of the courts located in the County of New York in the State of New York. Each party hereto consents to service of process by certified mail at its address listed on the signature page below.

IN WITNESS WHEREOF, this AGREEMENT AND EVIDENCE OF TRANSFER OF CLAIM is executed this 27th day of October 2010.

Lansforsakring Kronoberg

By: _____
Name: *Fredrik Daveby*
Title: *VD (MD)*

Kronobergsgatan 10
Box 1503
35115 Vaxjo
SWEDEN

Illiquidx Ltd.

By: _____
Name: Celestino Amore
Title: *Managing Director*

107-111 Fleet Street
London EC4A 2AB

Emails: amore@illiquidx.com;

**Schedule 1**

**Transferred Claim**

**Purchased Claim**

With respect to Proof of Claim 63862, 100% of U.S. $1,483,680 (the outstanding amount of XS0272574889as described in the Proof of Claim dated as of 27th October, 2010) equivalent to U.S. **$1,483,680**

**Lehman Programs Securities to which Transfer Relates**

| Description of Security | ISIN | Issuer | Guarantor | Notional Amount being Transferred to Purchaser | Coupon | Maturity | U.S. $ Amount claimed in Proof of Claim with respect to Lehman Programs Securities to which Transfer relates |
|---|---|---|---|---|---|---|---|
| Lehman Brothers Treasury Co. BV Program Securities Bonds | XS0272574889 | Lehman Brothers Treasury CO. BV | Lehman Brothers Holdings Inc. | Swedish Kronor (SEK) 10,000,000 | Not Applicable | 31st of October 2011 | U.S. $1,483,680 |



**United States Bankruptcy Court/Southern District of New York**

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al., | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

Note: This form may not be used to file claims other than those
based on Lehman Programs Securities as listed on
http://www.lehman-docket.com as of July 17, 2009

# LEHMAN SECURITIES PROGRAMS PROOF OF CLAIM

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000063862

0000063862

---

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Tommy Danielsson
Länsförsäkring Kronoberg
Box 1503
35115 Växjö, Sweden
Phone: +46 470 72 0055

with a copy to:  Richard C. Pedone, Esq.
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110
Phone: 617-345-1000

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
(If known)

Filed on: _____

Telephone number: _____   Email Address: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

Telephone number: _____   Email Address: _____

---

**1.** Provide the total amount of your claim based on Lehman Programs Securities. Your claim amount must be the amount owed under your Lehman Programs Securities as of September 15, 2008, whether you owned the Lehman Programs Securities on September 15, 2008 or acquired them thereafter, and whether such claim matured or became fixed or liquidated before or after September 15, 2008. The claim amount must be stated in United States dollars, using the exchange rate as applicable on September 15, 2008. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the claim amounts for each Lehman Programs Security to which this claim relates.

**Amount of Claim:** $  $1,483,680.00 (10,000,000 SEK)*  **(Required)**   *This amount does not include interest or other charges, fees and expenses which continue to accrue in connection with this claim. See attachment for full amount of claim.

☐  Check this box if the amount of claim includes interest or other charges in addition to the principal amount due on the Lehman Programs Securities.

**2.** Provide the International Securities Identification Number (ISIN) for each Lehman Programs Security to which this claim relates. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the ISINs for the Lehman Programs Securities to which this claim relates.

**International Securities Identification Number (ISIN):** XS0272574889   **(Required)**

**3.** Provide the Clearstream Bank Blocking Number, a Euroclear Bank Electronic Reference Number, or other depository blocking reference number, as appropriate (each, a "Blocking Number") for each Lehman Programs Security for which you are filing a claim. You must acquire a Blocking Number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the Blocking Numbers for each Lehman Programs Security to which this claim relates.

**Clearstream Bank Blocking Number, Euroclear Bank Electronic Instruction Reference Number and or other depository blocking reference number:**

01-003 654 429

**(Required)**

**4.** Provide the Clearstream Bank, Euroclear Bank or other depository participant account number related to your Lehman Programs Securities for which you are filing this claim. You must acquire the relevant Clearstream Bank, Euroclear Bank or other depository participant account number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). Beneficial holders should not provide their personal account numbers.

**Accountholders Euroclear Bank, Clearstream Bank or Other Depository Participant Account Number:**

6037005

**(Required)**

**5. Consent to Euroclear Bank, Clearstream Bank or Other Depository:** By filing this claim, you consent to, and are deemed to have authorized, Euroclear Bank, Clearstream Bank or other depository to disclose your identity and holdings of Lehman Programs Securities to the Debtors for the purpose of reconciling claims and distributions.

**FOR COURT USE ONLY**

**FILED / RECEIVED**

NOV 0 2 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date. | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|
| 10/27/2009 | Fredrik Daveby, VD |

*Penalty for presenting fraudulent claim:*  Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., et al. | 08-13555 (JMP) |
| | (Jointly Administered) |
| Debtors. | |

## ADDENDUM TO PROOF OF CLAIM

**Name of Debtor Against Which Claim is Asserted:**

   Lehman Brothers Holdings Inc. (the "Debtor").

**Case Number of Debtor Against Which Claim is Asserted:**

   08-13555 (JMP).

**Name of Creditor:**

   Länsförsäkring Kronoberg (the "Creditor").

**Name and address where notices should be sent:**

   Tommy Danielsson, Redovisningschef
   Länsförsäkring Kronoberg
   Box 1503
   35115 Växjö, Sweden
   Telephone: +46 470 72 0055
   e-mail: tommy.danielsson@LFkronoberg.se

   With a copy to:

   Richard C. Pedone, Esq.
   Nixon Peabody LLP
   100 Summer Street
   Boston, MA 02110
   Telephone: (617) 345-1000
   e-mail: rpedone@nixonpeabody.com

12757487.2

## I.    SUMMARY OF CLAIM

Reference is made to the Final Terms dated October 31, 2006 (the "Final Terms")

relating to Lehman Brothers Teasury Co. B.V. (the "Obligor") Issue of SEK 10,000 Index-

Linked Notes (the "Notes") due October 31, 2011 relating to the OMX Stockholm 30 Index

guaranteed by Lehman Brothers Holdings Inc. under the U.S. $60,000,000,000 Euro Medium-

Term Note Retail Program.  A copy of the Final Terms is attached hereto as Exhibit A.  Pursuant

to the terms and conditions of the Final Terms and the Base Prospectus dated as of August 9,

2006 (the "Base Prospectus") and any related documents, the Debtor guaranteed the obligations

of the Obligor under the Notes.  The Notes were assigned ISIN Code XS0272574889.

The Creditor currently holds Notes in the principal amount of 10,000,000 SEK.  This

amount has been converted to $1,483,680.00 using an exchange rate of 6.74 SEK/USD, the

applicable exchange rate in effect as of September 15, 2008, the date that the Debtor commenced

its voluntary case under chapter 11 of the Bankruptcy Code.  The amount of the claim set forth

on the attached Form B-10 does not include additional amounts that the Debtor is liable for

including: interest, fees and expenses (including without limitation, attorneys' fees and expenses)

incurred in connection with the filing of this proof of claim and the prosecution and protection of

the Creditor's rights in these cases.

Pursuant to the Unanimous Written Consent of the Executive Committee of the Board of

Directors of the Debtor, dated June 9, 2005 (the "Guarantee"), the Debtor guaranteed the

payment of all liabilities, obligations and commitments of the Obligor.  A copy of the Guarantee

is attached hereto as Exhibit B.  The Creditor thus asserts its claims with respect to the securities

issued by Obligor against the Debtor on the basis of the Guarantee and any other guarantees,

contractual or otherwise, by the Debtor for the benefit of the Obligor.

2

The Creditor reserves the right to amend any and all amounts set forth above as necessary. Claims asserted herein are asserted to the fullest extent permitted under the Final Terms, the Base Prospectus and applicable law.

## II.     **RESERVATION OF RIGHTS**

The Creditor reserves the right to (a) amend and/or supplement this proof of claim at any time, including after any bar date, and in any manner; and (b) to file additional proofs of claim for any additional claim against the Debtor which may be based on the same or additional documents or grounds of liability. This proof of claim is not a waiver of any claim by the Creditor.

The filing of this proof of claim is not and shall not be deemed or construed as: (a) a waiver or release by the Creditor of any rights against any person, entity or property; (b) a consent by the Creditor to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving the Creditor; (c) a waiver or release of the Creditor's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as core proceedings pursuant to 28 U.S.C. § 157, and whether such jury trial right is pursuant to the statute or the United States Constitution; (d) a consent by the Creditor to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. § 157 or otherwise; (e) a waiver or release of the Creditor's right to have any and all final orders in any and all non-core matters or proceedings entered on after *de novo* review by a judge of the United States District Court; (f) a waiver of the right to move to withdraw the

3

reference with respect to the subject matter of this proof of claim, any objection thereto or other

proceeding which may be commenced in this case or otherwise involving the Creditor; (g) an

election of remedies; or (h) a waiver of any rights, claim, actions or defenses, setoffs,

recoupments or other matters to which the Creditor is entitled under any agreements, at law, in

equity or under the United States Constitution.

# EXHIBIT A

EXECUTION COPY

FINAL TERMS dated 31 October 2006

**LEHMAN BROTHERS TREASURY CO. B.V.**
Issue of SEK 10,000,000 Index-Linked Notes due 31 October 2011
relating to the OMX Stockholm 30 Index
guaranteed by Lehman Brothers Holdings Inc.
under the U.S.$60,000,000,000
Euro Medium-Term Note Retail Program

*Carnegie Sverige*
*Lehman 2006/2011*

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated 9 August 2006 as supplemented up to the date of this document. This document constitutes the Final Terms of the Notes described herein and must be read in conjunction with such Base Prospectus as so supplemented. Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus, as so supplemented.

## PART A – RISK FACTORS

Prospective investors of Notes should carefully consider the following information in conjunction with other information contained in these Final Terms and the Base Prospectus before purchasing the Notes. The attention of prospective investors is drawn to pages 14 to 25 of the Base Prospectus, headed "Risk Factors".

These Final Terms however cannot disclose all of the risks and other significant aspects of the Notes and investment decisions should not be made solely on the basis of these risk factors since the information contained herein cannot serve as a substitute for independent individual advice which is tailored to the requirements, investment objectives, experience, knowledge and circumstances of a prospective investor.

Each prospective investor of Notes should consider carefully whether the Notes are suitable for it in the light of its circumstances and financial position and in view of the complexity and risks inherent in the Notes. Prospective investors of Notes should be experienced with respect to derivatives, particularly options and options transactions. Furthermore, prospective investors of Notes should understand the risks of transactions involving the Notes and should reach an investment decision only after careful consideration of the suitability of the Notes in light of their particular financial circumstances and after consultation with their own legal, tax, accountancy and other professional advisers. No person should deal in the Notes unless that person understands fully the nature of the relevant transaction. Such transaction is suitable only for, and should be made only by, an investor who has no need for liquidity and understands and can afford the financial and other risks of this transaction.

*Issue Price*

The Issue Price in respect of the Notes may not be an accurate reflection of the market value of such Notes as at the Issue Date. The price at which the Notes may be sold in secondary market transactions may be lower than the Issue Price. In particular, the Issue Price in respect of the Notes may take into account the distribution fee payable to any appointed distributor of the Notes with respect to the offer and sale of the Notes.

*Factors Affecting the Index*

Prospective investors of Notes should be familiar with investments in global capital markets and with indices generally. The level of an index is based on the value of the assets comprised in such index although prospective investors should note that the level of the Index at any time will not include the reinvestment of the yield on the assets comprised in the Index. Prospective investors should understand that global economic, financial and political developments, among other things, may have a material effect on the value of the assets comprising the Index and/or the performance of the Index.

Prospective investors should also note that dividends paid to holders of the assets comprised in the Index will not be paid to the Issuer or to the Noteholders. The return on the Notes will thus not reflect any dividends which would be paid to investors that have made a direct investment in the assets comprised in the Index. Consequently, the return on the Notes may be less than the return from a direct investment in the assets comprised in the Index.

*Investing in the Notes is not the same as investing in a Component Security*

Prospective investors should be aware that the market value of the Notes may not have a direct relationship with the prevailing level of the Index or price of component securities comprised in the Index (each, a **"Component Security"**), in that changes in the prevailing level of the Index or price of the Component Securities will not necessarily result in a comparable change in the market value of the Notes.

*Secondary market and liquidity for the Notes*

There can be no assurance as to how any Notes will trade in the secondary market, whether there will be a secondary market or, if a secondary market exists, whether such market will be sustainable or liquid or illiquid.

The liquidity of the Notes may also be affected by restrictions, if any, on offers and sales of the Notes in some jurisdictions. In any case, due to the relative complexity and lower liquidity of the Notes if compared to more conventional financial instruments such as shares, comparatively larger spreads between bid and ask quotes should be expected.

*The Notes may be redeemed prior to maturity*

In the event that the Issuer or the Guarantor would be obliged to increase the amounts payable in respect of any Notes due to any withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or on behalf of The Netherlands or the USA, as the case may

- 2 -

be, or any political subdivision thereof or any authority therein or thereof having power to tax, the Issuer may redeem all outstanding Notes in accordance with the Terms and Conditions.

*Early Redemption Amount*

In the event of an early redemption for taxation reasons or in an event of default (as described in Item 23 of the Terms and Conditions of the Notes) as determined by the Calculation Agent (as described in the Annex), the Issuer may cancel the Notes and, if permitted by applicable law, pay the holder of each Note the Early Redemption Amount. The amount payable will be calculated by reference to the fair market value of the Notes as determined by the Calculation Agent in its sole and absolute discretion and may be reduced by an amount referable to the cost to the Issuer of unwinding any related hedging arrangements as determined by the Calculation Agent. Investors of Notes should understand that such Early Redemption Amount may be less than the Issue Price of the Notes or the amount the investor has paid for the Notes and may even be nil.

*Potential conflicts of interest*

The Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may, from time to time, engage in purchase, sale or other transactions involving the Index or a Component Security or related derivatives for their proprietary accounts and/or for accounts under their management and/or for clients. Such transactions may have a positive or negative effect on the level of the Index and consequently on the value of the Notes. In addition, the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may, from time to time, act in other capacities with regard to the Notes (such as in an agency capacity and/or as the calculation agent) and may issue or participate in the issue of other competing financial instruments in respect of the Index or Component Securities and the introduction of such competing financial instruments may affect the value of the Notes. The Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries owe no duty or responsibility to any Noteholder (or any other party) to avoid such conflicts.

In connection with the offering of the Notes, the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may enter into one or more hedging transactions with respect to the Index or Component Securities or related derivatives. In connection with such hedging or with respect to proprietary or other trading activities by the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries, the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may enter into transactions in relation to the Index, Component Securities or related derivatives which may affect the market price, liquidity or value of the Notes and which could be deemed to be adverse to the interests of the relevant Noteholders.

Such transactions could present certain conflicts of interest with the interest of Noteholders and may affect the value of the Notes. The Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries owe no duty or responsibility to any Noteholder (or any other party) to avoid such conflicts.

*Risk-excluding or risk-limiting transactions*

- 3 -

## PART C – OTHER INFORMATION

1. **LISTING**

   (i) Listing:                    None

   (ii) Admission to trading:      Not Applicable

2. **RATINGS**

   Not Applicable

3. **NOTIFICATION**

   Not Applicable

4. **INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE ISSUE/OFFER**

   Save as discussed in the section headed "Subscription and Sale" on pages 132 - 140 of the Base Prospectus, so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer.

5. **REASONS FOR THE OFFER, ESTIMATED NET PROCEEDS AND TOTAL EXPENSES**

   Not Applicable

6. **YIELD (Fixed Rate Notes Only)**

   Not Applicable

7. **HISTORIC INTEREST RATES**

   Not Applicable

8. **PERFORMANCE OF INDEX/FORMULA/other variable, EXPLANATION OF EFFECT ON VALUE OF INVESTMENT AND ASSOCIATED RISKS and other information concerning the underlying (INDEX-LINKED OR OTHER VARIABLE -LINKED NOTES ONLY)**

   See the Annex.

   Details on historical levels of the Index can be found on www.se.omxgroup.com.

   The Issuer does not intend to provide post issuance information regarding the Index.

   THESE NOTES ARE NOT IN ANY WAY SPONSORED, ENDORSED, SOLD OR PROMOTED BY OMX AB (PUBL) ("OMX") AND OMX MAKES NO WARRANTY OR REPRESENTATION WHATSOEVER, EXPRESS OR IMPLIED, EITHER AS TO THE RESULTS TO BE OBTAINED FROM THE USE OF THE OMXS30™ INDEX AND/OR THE FIGURE AT WHICH THE

SAID OMXS30™ INDEX STANDS AT ANY PARTICULAR TIME ON ANY
PARTICULAR DAY OR OTHERWISE. THE OMXS30™ INDEX IS COMPILED
AND CALCULATED SOLELY BY STOCKHOLM STOCK EXCHANGE LTD.
HOWEVER, STOCKHOLM STOCK EXCHANGE SHALL NOT BE LIABLE
(WHETHER IN NEGLIGENCE OR OTHERWISE) TO ANY PERSON FOR ANY
ERROR IN THE OMXS30™ INDEX AND THE EXCHANGE SHALL NOT BE
UNDER ANY OBLIGATION TO ADVISE ANY PERSON OF ANY ERROR
THEREIN.

ALL RIGHTS TO THE TRADEMARKS OMX™, OMXS30™ AND OMXS30
INDEX™ ARE VESTED IN OMX AND ARE USED UNDER LICENCE FROM
OMX OR ANY SUBSIDIARY TO OMX.

9.     PERFORMANCE OF RATES OF EXCHANGE AND EXPLANATION OF
EFFECT ON VALUE OF INVESTMENT (DUAL CURRENCY NOTES ONLY)

     Not Applicable

10.    OPERATIONAL INFORMATION

| | |
|---|---|
| ISIN Code: | XS0272574889 |
| Common Code: | 027257488 |
| Any clearing system(s) other than Euroclear Bank S.A./N.V. and Clearstream Banking Societe Anonyme and the relevant identification number(s): | Valoren - 2757094 |
| Delivery: | Delivery against payment |
| The Aggregate Nominal Amount of Notes issued has been translated into U.S. Dollars at the rate of USD 1.00 = SEK 7.3683 producing a sum of: | USD 1,357,165.1 |
| Names and addresses of Additional Paying Agent(s) (if any): | Not Applicable |

**ANNEX**

1.    **Final Redemption Amount of each Note**

Unless previously redeemed or purchased and cancelled, and subject to the terms herein, each Note shall be redeemed on the Maturity Date at a Final Redemption Amount ("**FRA**") in the Specified Currency determined by the Calculation Agent in accordance with the following:

(A.)    If the Final Closing Level is greater than the Initial Closing Level:

$$SD \times 185\% \times \left( \frac{\text{Final Closing Level}}{\text{Initial Closing Level}} \right)$$

(B.)    If the Final Closing Level is less than the Initial Closing Level:

$$SD \times \left( \frac{\text{Final Closing Level}}{\text{Initial Closing Level}} \right)$$

Where:

"**Final Closing Level**" means the arithmetic mean of the Index Levels on each Observation Date;

"**Index Level**" means, in relation to any Scheduled Trading Day, the official closing level of the Index, as calculated and announced by the Index Sponsor at the Valuation Time on such day;

"**Initial Closing Level**" means 1091.28;

"**Observation Date**" means, subject as provided in section 3 below, the 18th of each month from and including 18 April 2011, up to and including, 18 October 2011 (the "**Final Observation Date**") provided, however, that if any such day is not a Scheduled Trading Day then the relevant Observation Date shall be the first succeeding day which is a Scheduled Trading Day; and

"**SD**" means the Specified Denomination of each Note.

2.    **Definitions**

In these Final Terms (including this Annex), the following expressions have the following meanings:

"**Calculation Agent**" means Lehman Brothers International (Europe), 25 Bank Street, London E14 5LE;

- 10 -

**"Disrupted Day"** means any Scheduled Trading Day on which the Exchange or Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred;

**"Early Closure"** means the closure on any Exchange Business Day of the Exchange relating to the securities thereof that comprise 20 per cent. or more of the level of the Index or the Related Exchange prior to its Scheduled Closing Time unless such earlier closing time is announced by such Exchange or Related Exchange at least one hour prior to the earlier of (i) the actual closing time for the regular trading session on such Exchange or Related Exchange on such Exchange Business Day and (ii) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution at the Valuation Time on such Exchange Business Day;

**"Exchange"** means the Stockholm Stock Exchange or any successor to such exchange or quotation system;

**"Exchange Business Day"** means any Scheduled Trading Day on which the Exchange and the Related Exchange are open for trading during their respective regular trading sessions, notwithstanding any such Exchange or Related Exchange closing prior to its Scheduled Closing Time;

**"Exchange Disruption"** means any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general (i) to effect transactions on the Exchange in securities thereof that comprise 20 per cent. or more of the level of the Index, or (ii) to effect transactions in, or obtain market values for, futures or options contracts relating to the Index on the Related Exchange;

**"Index"** means the OMX Stockholm 30 Index (Bloomberg: OMX Index), a stock index that is composed of 30 stocks which is currently compiled and calculated by the Index Sponsor;

**"Index Sponsor"** means the Stockholm Stock Exchange and/or, as the context requires or permits, any successor sponsor accepted by the Calculation Agent pursuant to section 4 below;

**"Market Disruption Event"** means the occurrence or existence, in respect of any security comprised in the Index of (i) a Trading Disruption, (ii) an Exchange Disruption, which in either case the Calculation Agent determines is material and, where the level of the Index is to be determined at the Valuation Time, which occurs at any time during the one hour period that ends at the relevant Valuation Time, or (iii) an Early Closure;

For the purposes of determining whether a Market Disruption Event exists in respect of the Index at any time, if a Market Disruption Event occurs in respect of a security thereof at that time, then the relevant percentage contribution of that security to the level of the Index shall be based on a comparison of (x) the portion of the level of the Index attributable to that security to (y) the overall level of the Index, in each case immediately before the occurrence of such Market Disruption Event;

"**Related Exchange**" means any exchange on which futures contracts and/or options contracts on the Index are traded, as determined by the Calculation Agent;

"**Scheduled Closing Time**" means, in respect of an Exchange or a Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours;

"**Scheduled Trading Day**" means any day on which the Exchange and the Related Exchange are scheduled to be open for trading for their respective regular trading sessions;

"**Trading Disruption**" means any suspension of or limitation imposed on trading by the Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the Exchange or Related Exchange or otherwise (i) on the Exchange relating to securities that comprise 20 per cent. or more of the level of the Index, or (ii) in futures or options contracts relating to the Index on the Related Exchange;

"**Valuation Time**" means the official close of trading on the Exchange.

3.    **Disrupted Days**

If any Observation Date is a Disrupted Day, then the relevant Observation Date, as the case may, shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day, unless there is a Disrupted Day on each of the eight Scheduled Trading Days immediately following the date that, but for the failure to open for trading during its regular trading session or the Market Disruption Event, would have been such Observation Date. In that case:

(a)   the earlier of (i) that eighth following Scheduled Trading Day and (ii) the day which is the third weekday (meaning a day other than a Saturday or Sunday) prior to the Maturity Date, shall be deemed to be the Final Observation Date notwithstanding it is a Disrupted Day (the "**Deemed Valuation Date**"); and

(b)   the Calculation Agent shall determine its good faith estimate of the level of the Index that would have prevailed but for that Disrupted Day as of the Valuation Time on that Deemed Valuation Date.

4.    **Adjustments to Index**

4.1   *Successor Index*:  If the Index is (i) not calculated and announced by the Index Sponsor but is calculated and announced by a successor sponsor acceptable to the Calculation Agent, or (ii) replaced by a successor index using, in the determination of the Calculation Agent, the same or a substantially similar formula for and method of calculation as used in the calculation of that Index, then in each case that index (the "Successor Index") will be deemed to be the Index.

4.2   *Index Adjustment Event*:  If (i) on or prior to the Final Observation Date, the Index Sponsor announces that it will make a material change in the formula for or the method

of calculating the Index or in any other way materially modifies the Index (other than a modification prescribed in that formula or method to maintain the Index in the event of changes in constituent stock and capitalization and other routine events) (an "**Index Modification**") or permanently cancels the Index and no Successor Index exists (an "**Index Cancellation**") or (ii) on any Observation Date, the Index Sponsor fails to calculate and announce the Index Level (an "**Index Disruption**" and together with an Index Modification and an Index Cancellation, each an "**Index Adjustment Event**"), then the Calculation Agent shall determine if such Index Adjustment Event has a material effect on the Notes and, if so, shall make its determination for the purposes of calculating the Early Redemption Amount or the Final Redemption Amount, as the case may be, using, in lieu of a published level for the Index, the level for the Index as at the relevant Observation Date, as determined by the Calculation Agent in accordance with the formula for and method of calculating the Index last in effect prior to the change, failure or cancellation, but using only those securities that comprised the Index immediately prior to that Index Adjustment Event.

5.    **Correction of Index**

In the event that any price or level published on the Exchange or by the Index Sponsor and which is utilized for any calculation or determination made under the provisions of these Final Terms or the Terms and Conditions of the Notes is subsequently corrected and the correction is published by the Exchange or the Index Sponsor within one Settlement Cycle after the original publication, the Calculation Agent will determine the amount that is payable or deliverable as a result of that correction, and, to the extent necessary, will adjust the provisions of these Final Terms or the Conditions to account for such correction, provided that any correction effected and published after the third weekday (meaning any day of the week except Saturday and Sunday) before the Maturity Date shall be ignored.

For the purposes of this section 5 the following terms shall have the following respective meanings:

"**Clearance System**" means, in respect of the Index at any time, the domestic clearance system customarily used for settling trades in shares underlying the Index at that time;

"**Clearance System Business Day**" means, in respect of a Clearance System, any day on which such Clearance System is (or but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions;

"**Settlement Cycle**" means, in respect of the Index, the period of Clearance System Business Days following a trade in the shares underlying the Index on the Exchange in which settlement will customarily occur according to the rules of such Exchange (or if there are multiple Exchanges in respect of an Index, the longest such period); and

"**Settlement Disruption Event**" means, in respect of the Index, an event beyond the control of the Issuer as a result of which the relevant Clearing System cannot clear the transfer of shares underlying the Index.

6.    **Notification of Early Redemption Amount, Final Redemption Amount and Disrupted Days**

6.1    *Notice to Issuer:*  As soon as reasonably practicable after calculating or otherwise determining the Early Redemption Amount or the Final Redemption Amount, as the case may be, the Calculation Agent shall give notice of the relevant amount to the Issuer.

6.2    *Notice of Disrupted Day:*  The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the existence or occurrence of a Disrupted Day on the day which but for such Disrupted Day would have been the Final Observation Date.

6.3    *Notice to Noteholders:*  Adjustments in accordance with the foregoing sections shall be calculated by the Calculation Agent, shall be notified to the Noteholders in accordance with Condition 15 (*Notices*) and shall be (in the absence of manifest error) binding on all parties concerned. However, Noteholders should be aware that there may be, necessarily, some delay between the time at which any of the above events occur and the time at which it is reported to Noteholders.

7.    **The Calculation Agent**

The Calculation Agent shall have no responsibility to Noteholders for good faith errors or omissions in its calculations and determinations as provided in the Terms and Conditions except such as may result from its own wilful default, gross negligence or bad faith.  The calculations and determinations of the Calculation Agent shall be made in accordance with the Terms and Conditions (having regard in each case to the criteria stipulated herein and where relevant on the basis of information provided to or obtained by employees or officers of the Calculation Agent responsible for making the relevant calculation or determination) and shall, in the absence of manifest error, be final, conclusive and binding on the Noteholders.  Noteholders shall not be entitled to make any claim against the Calculation Agent, the Issuer or the Guarantor in the case where the Index Sponsor shall have made any error, omission or other incorrect statement in connection with the calculation and public announcement of the Index.

Nothing contained herein shall prevent the Calculation Agent from dealing in these Notes or from entering into any related transactions, including without limitation any swap or hedging transactions, with the Issuer (or any of its affiliates) or any holder of Notes (or any of its affiliates).

# EXHIBIT B

# UNANIMOUS WRITTEN CONSENT OF THE

## EXECUTIVE COMMITTEE OF THE

## BOARD OF DIRECTORS OF

## LEHMAN BROTHERS HOLDINGS INC.

The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware:

WHEREAS, the Corporation has previously authorized by specific resolution, which authority has not been revoked (the "Outstanding Guarantee Resolutions"), the guarantee of all or specified obligations and liabilities of certain direct and indirect subsidiaries of the Corporation, each of which is a "Guaranteed Subsidiary" as such term is used in the Corporation's Code of Authorities as currently in effect (the "Code"),

WHEREAS, certain of the Guaranteed Subsidiaries presently enjoy full guarantees while others have only partial guarantees, and the Corporation now wishes to expand such partial guarantees to full guarantees,

WHEREAS, due to the passage of time the names of certain of the Guaranteed Subsidiaries have changed, rendering the Outstanding Guarantee Resolutions out of date to that extent,

WHEREAS, the Corporation wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,

WHEREAS, Management wishes to establish additional Guaranteed Subsidiaries,

WHEREAS, Management wishes to specify that to the extent lawful and allowable, guarantees issued by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, so as to secure certain tax and accounting benefits, and

WHEREAS, Management believes that it would facilitate the conduct of the business of the Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their entirety with this single document,

NOW THEREFORE BE IT,

**RESOLVED,** that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the Code;

**RESOLVED,** that the Outstanding Guarantee Resolutions are hereby superseded and replaced in their entirety with this single document, provided that any guarantees provided pursuant to the Outstanding Guarantee Resolutions and outstanding on the date hereof, whether in the form of a separately executed individual guarantee or otherwise, shall remain issued, outstanding and valid for all purposes;

**RESOLVED,** that guarantees provided by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, to the extent lawful and allowable, as specified on Schedule A hereto;

**RESOLVED,** that each of the persons listed in the Code (as it may be amended from time to time) as being authorized to approve individual guarantees issued by the Corporation with respect to Guaranteed Subsidiaries, or any proper delegee thereof (collectively, "Authorized Persons"), are hereby authorized, in the name and on behalf of the Corporation, to execute such guarantees in such form as is approved by an attorney of the Corporation and such Authorized Person, subject to any limitations specified herein, his or her execution of each such guarantee to be conclusive evidence of approval thereof; and to do such other acts and things as may be advisable or necessary in order to effect the purposes and intent of these resolutions; and

**FURTHER RESOLVED,** that any and all actions contemplated by the foregoing resolutions and taken by such Authorized Persons prior to the date hereof are hereby ratified, confirmed and approved in all respects.

Dated: June 9, 2005

Richard S. Fuld, Jr.                                    John D. Macomber

2

**Schedule A**
**to LBHI Unanimous Written Consent**
**dated June 9 , 2005**

| | Name of Subsidiary | Issue Corporation guarantee from branch located in London, England, to the extent lawful and allowable? |
|---|---|---|
| 1. | Lehman Brothers Asia Holdings Limited | No |
| 2. | Lehman Brothers Bankhaus A.G. | Yes (London branch of such subsidiary only) |
| 3. | Lehman Brothers Commercial Bank | No |
| 4. | Lehman Brothers Commercial Corporation | No |
| 5. | Lehman Brothers Commercial Corporation Asia Limited | No |
| 6. | Lehman Brothers Equity Finance (Cayman) Limited | No |
| 7. | Lehman Brothers Finance S.A. | No |
| 8. | Lehman Brothers Holdings Plc | Yes |
| 9. | Lehman Brothers International (Europe) | Yes |
| 10. | Lehman Brothers Japan Inc. | No |
| 11. | Lehman Brothers (Luxembourg) Equity Finance S.A. | No |
| 12. | Lehman Brothers (Luxembourg) S.A. | No |
| 13. | Lehman Brothers OTC Derivatives Inc. | No |
| 14. | Lehman Brothers Securities Asia Limited | No |
| 15. | Lehman Brothers Securities N.V. | No |
| 16. | Lehman Brothers Special Financing Inc. | No |
| 17. | Lehman Brothers Treasury Co. B.V. | No |
| 18. | Lehman Re Limited | No |

3

H
A
N
D

D
E
L
I
V
E
R
Y

FILED / RECEIVED

NOV 0 2 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

NK
_____
RECEIVED BY:

_____
DATE

11:02
_____
TIME