WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                                   :
**In re**                                          :   **Chapter 11 Case No.**
                                                                   :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :   **08-13555 (JMP)**
                                                                   :
                              **Debtors.**        :   **(Jointly Administered)**
                                                                   :
                                                                   :
-------------------------------------------------------------------x

**DECLARATION OF DANIEL EHRMANN IN SUPPORT OF DEBTORS'**
**MOTION FOR AUTHORIZATION TO ASSUME AND ASSIGN INTEREST**
**RATE SWAP AGREEMENTS WITH CERTAIN TRUST COUNTERPARTIES,**
**INCLUDING DEUTSCHE BANK NATIONAL TRUST COMPANY, AS INDENTURE**
**TRUSTEE, AND TO ENTER INTO NEW INTEREST RATE SWAP AGREEMENTS**

Pursuant to 28 U.S.C. § 1746, I, Daniel Ehrmann, declare:

1.      I am over the age of 18 years and make these statements of my own

personal knowledge, following my review of the business records of Lehman Brothers Holdings

Inc. ("LBHI") and its affiliates debtors in the above-referenced chapter 11 cases (collectively,

with LBHI, the "Debtors"), including specifically, Lehman Brothers Special Financing Inc.

("LBSF") and Lehman Brothers Financial Products Inc. ("LBFP"), and/or my consultation with

employees of the Debtors.  If called to testify, I could testify to the truth of the matters set forth

herein.

2.        I submit this Declaration in support of the *Debtors' Motion for Authorization to Assume and Assign Interest Rate Swap Agreements with Certain Trusts and to Enter into New Interest Rate Swap Agreements* (the "Motion").[1]

3.        I am Managing Director with Alvarez & Marsal North America, LLC.  I was assigned to the Lehman matter in September 2008.  I am a co-head of the derivatives group for the Debtors.  In that capacity, I am responsible for and manage all derivates-related matters of the Debtors.

4.        I am familiar with LBSF's and LBFP's interests in the certain interest rate swap agreements and cap agreements (the "Swap Agreements") set forth on Exhibit A annexed to the proposed order (the "Proposed Order"), with the certain trusts, issuers, or special purpose vehicles (collectively, the "Trusts") or other parties acting on behalf of each of the respective Trusts (the "Trust Counterparties") set forth on Exhibit B annexed to the Proposed Order.

5.        The Motion accurately reflects the terms of the Swap Agreements and the Proposed Transactions.  After consultation with various employees of the Debtors and counsel, I believe that the transactions presented in the Motion (the "Proposed Transactions") are in the best interests of the Debtors, their estates and creditors.

6.        Since September 15, 2008, the date on which LBHI commenced its chapter 11 case, the Debtors have sought to unwind their derivative contracts, collect amounts owed to them, and crystallize amounts payable by the Debtors.  With respect to the derivative contracts as to which the Debtors are "in the money", the Debtors have attempted to assume, assign and sell such derivative contracts in accordance with the authority granted by the *Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the*

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

*Settlement or Assumption and Assignments of Prepetition Derivative Contracts*, entered on

December 16, 2008 [Docket No. 2257].  In most cases, however, market participants have not

been willing to purchase the Debtors' derivative contracts for amounts that the Debtors believe

are appropriate and fair prices.  For a variety of reasons, market participants have applied

discounts to the value of the Debtors' derivative contracts.  The Debtors have determined that in

many cases, rather than selling such contracts at a discount, retaining derivative contracts for

which they are owed money, and expect to be collecting receivables in the future, maximizes the

value of such contracts for the Debtors' estates.

7.      However, simply retaining the Swap Agreements means that the Debtors

would also retain certain risks associated with such agreements.  First, the Trust Counterparties

could seek to terminate the Swap Agreements and argue that the Debtors chapter 11 filings

constitute an event of default by the Debtors under the Swap Agreements and, pursuant to certain

provisions of the Swap Agreements, the Debtors may not be entitled to any payments due under

the Swap Agreement.  Second, the Trust Counterparties could assert that, as a result of the

existence of an event of default under the Swap Agreements by the Debtors, if a Trust

Counterparty terminates a Swap Agreement, the Debtors' rights to payment of amounts owed

under such Swap Agreement are modified.  Third, since the Debtors payment obligations under

the Swap Agreements are tied to One Month LIBOR and/or Three Month LIBOR, if such rates

dramatically increase, the Debtors could become net obligors under such agreements.

8.      With respect to the first and second risks set forth above, based on a prior

decision of the Court, the Debtors do not believe that the Trust Counterparties still retain the

right to terminate the Swap Agreements at this time as a result of their chapter 11 filing.  In

addition, the Debtors have contested the enforceability of provisions in other derivative contracts

and other applicable agreements that modify the Debtors' rights to payment based on an event of default caused by the chapter 11 filing.  The Debtors would incur significant costs and expenses litigating these matters if the Trust Counterparties were to assert such positions.  I have additionally been informed that as a result of the uncertainty regarding the Court's decisions addressing the matters in relation to other derivative contracts, the Trust Counterparties have been unwilling to pay amounts to the Debtors under the Swap Agreements.

9.      In order to monetize the Swap Agreements and certain other of the Debtors' in the money derivative contracts, and mitigate certain of the above mentioned risks, the Debtors worked with Deutsche Bank AG, New York Branch ("Deutsche Bank AG") to structure transactions that alleviate the risks to the Debtors set forth in the preceding paragraph and would induce the Trust Counterparties to pay to the Debtors the amounts owed under the Swap Agreements.

10.      The Proposed Transactions described in the Motion, whereby LBSF and LBFP will assume and assign the Swap Agreements to 1271 SwapCo Ltd. ("1271 SwapCo") and then enter into New Swap Agreements with 1271 SwapCo and Deutsche Bank AG, will eliminate certain of the Debtors' existing risks under the Swap Agreements.  In addition, the Proposed Transactions will enable LBSF and LBFP to collect cash in the amount of $100,152,815.07 and $7,712,971.55, respectively, in net payments owed by the Trusts for the benefit of their creditors immediately upon the consummation of the Proposed Transactions.  The Proposed Transactions will also enable LBSF and LBFP to retain any future payments that may arise under the Swap Agreements.  The New Swap Agreements will have the effect of substantially replicating the economics for the Debtors extant under the current Swap Agreements.

11.    I am aware that the Proposed Transactions do not eliminate all of the risk to LBSF's and LBFP's estates of the Swap Agreements.  Pursuant to the terms of the New Swap Agreements, the Debtors will continue to be required to make payments based on One Month LIBOR or Three Month LIBOR rates.  If such rates dramatically increase, LBSF could be obligated to make net payments to the Trusts on the payment dates under the New Swap Agreements.   However, eliminating existing events of default under the Swap Agreements would remove the above mentioned risks to the Debtors and permit the Debtors to prudently and fully hedge their interest rate exposures under the Swap Agreements.

12.    Notwithstanding such risks, and taking into account the fact that any net payment obligations (to the extent they exist) could be entitled to priority status under section 503(b) of the Bankruptcy Code, in my business judgment, entering into the New Swap Agreements is in the best interest of LBSF's and LBFP's respective estates.  The benefit of collecting in excess of over $100 million in cash, in the aggregate, from the Trust Counterparties far outweighs the risk that LBSF or LBFP may have to make net payments under the New Swap Agreements in the future.

13.    In addition, entry into the New Swap Agreements is a necessary part of the Proposed Transactions, which, taken together, will (i) enable LBSF and LBFP to receive significant cash payments from each of the Trust Counterparties upon the entry of the Proposed Order, (ii) cure the defaults in existence under the Swap Agreements, (iii) provide the Trust Counterparties with a credit-worthy counterparty to their Swap Agreements, (iv) alleviate the risks that exist from the continued events of default under the Swap Agreements, which will enable the Debtors to prudently hedge their exposures, and (v) maximize the value of the Swap Agreements for the estates of LBSF and LBFP.

14.     The Proposed Transactions provide that LBSF and LBFP will pay Deutsche Bank a fee (the "Fee") at the market rate for such transactions.  The amount of the Fee will be approved by the Creditors' Committee.  Based on the fees that the Debtors have paid to other market participants for entering into similar transactions and negotiations with other market participants, I believe the Fee that will be paid to Deutsche Bank is reasonable and at market rates.  The Fee is necessary to compensate Deutsche Bank for entering into certain of the New Swap Agreements.  In my business judgment, the Fee paid to Deutsche Bank is small in comparison to the benefit that the Proposed Transactions confer upon LBSF's and LBFP's estates.

15.     In my business judgment the Proposed Transactions are in the best interest of the Debtors, their estates and their creditors.

16.     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 11th day of November 2010.

/s/ Daniel Ehrmann
Daniel Ehrmann