# EXHIBIT "A"

08-13555-mg    Doc 12715-1    Filed 11/12/10    Entered 11/12/10 16:04:41    Exhibit A -
Supporting Documentation    Pg 2 of 12



COPY

# LIMITED PARTNERSHIP AGREEMENT

## OF

## PETROLEUM REALTY INVESTMENT PARTNERS, L. P.

a Delaware limited partnership

Dated as of April 20, 1999

NY_DOCS\320045.20

Supporting Documentation    Pg 3 of 12

intention of the Partners that the rights of the parties hereto and their successors-in-interest to Partnership property, as among themselves, shall be governed by the terms of this Agreement, and that the rights of the Partners and their successors-in-interest shall be subject to the limitations and restrictions as set forth in this Agreement.

### Section 14.13. Waiver of Trial by Jury

THE PARTIES HERETO WAIVE THE RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY FOREIGN, FEDERAL, STATE OR LOCAL INVESTIGATION, ACTION, CLAIM, SUIT OR PROCEEDING SEEKING ENFORCEMENT OF ANY OF THE PARTIES' RIGHTS UNDER THIS AGREEMENT.

### Section 14.14. Confidentiality

This Agreement and its terms shall be confidential and shall not be disclosed in any manner whatsoever in whole or in part to any Person except as may be required by law. If required by law, the party obligated to make such disclosure shall seek a protective order or other appropriate remedy and shall disclose only that portion of the Agreement and its terms it is legally compelled to disclose in the opinion of its counsel.

[signature page to follow]

NY_DOCS\320045.20

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the date first written above.

**GENERAL PARTNER:**

PETROLEUM REALTY CORPORATION,
a Delaware corporation

By: _____
Name:
Title:

Address:
88 West Main Street
Columbus, Ohio  43215


**LIMITED PARTNER:**

PETRO L CORPORATION,
a Delaware corporation

By: _____
Name: Jonathan Epstein
Title: *Authorized Signatory*

Address:
Three World Financial Center
200 Vesey Street
New York, New York  10285

S-1

# LOAN AGREEMENT

Dated as of April 20, 1999

by and among

**PETROLEUM REALTY INVESTMENT PARTNERS, L.P.**
and any **PROPERTY-OWNING SUBSIDIARY**
collectively as Borrower,

**LEHMAN COMMERCIAL PAPER INC.**
as Agent

and

Each Lender Signatory hereto

Section 9.9. <u>Agency Fee</u>. Each Lender will pay to Agent an agency fee as may be agreed upon between such Lender and Agent. Borrower shall not be liable for the payment of such fee.

Section 9.10. <u>Consents under Loan Documents</u>. Agent may consent to any modification, supplement or waiver under any of the Loan Documents, provided that, without the prior consent of each Lender, Agent shall not release any Collateral or otherwise terminate any Lien under any Loan Document providing for collateral security, or agree to additional obligations being secured by such collateral security (unless the Lien for such additional obligations shall be junior to the Lien in favor of the Indebtedness), except that no such consent shall be required, and Agent is hereby authorized, to release any Lien covering Collateral that is the subject of a disposition permitted hereunder.

Section 9.11. <u>Notices, Reports and Other Communications</u>. Agent shall provide, at its expense, copies of each notice, report, document, correspondence or other written communication delivered to Agent by Borrower or any Affiliate of Borrower pursuant to any Loan Document, to each Lender identified in such notice, report, document, correspondence or other written communication or reasonably determined by Agent to be entitled thereto or affected thereby, as soon as practicable after Agent's receipt thereof.

99

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**AGENT AND INITIAL LENDER:**

LEHMAN COMMERCIAL PAPER INC., a New York corporation

By: _____
    Name:  Jonathan Epstein
    Title:  Authorized Signatory

**BORROWER:**

PETROLEUM REALTY INVESTMENT PARTNERS, L.P., a Delaware limited partnership

By:  Petroleum Realty Corporation, a Delaware corporation, its general partner

By: _____
    Name:  David Glimcher
    Title:  Chief Executive Officer

**PETROLEUM
REALTY**
Investment Partners L.P.

November 14, 2006

Thomas A. Russo
Chief Legal Officer, Chief Executive Officer and Chairman of Exec. Committeer
Lehman Brothers
745 7th Avenue, 31st Floor
New York, NY 10019

**Re: Lehman Brothers partnership and loan relationship with Petroleum Realty**

Gentleman:

Early last week we forwarded to Lehman the standard lien release request, exactly as we have done on eleven prior sales of our partnership gas station sites. Once the original loan expired we agreed to have my company continue to manage the assets and liquidate the debt against the assets. As our partner and our lender, we all agreed that this was the best course of action for the venture. The assets at the time of the original loan expirations were worth less, far less, than your debt, but it was agreed that my company's skill and integrity were best able to salvage our business. We reached a working understanding in which the venture continued to pay libor plus three (3%) percent on your debt, as my company managed the portfolio of gas stations with compensation for this now fixed for six years. A program was undertaken to liquidate the assets and your debt in a controlled and mutually advantageous manner. As part of this understanding, since the assets have been repositioned and are increasing in value, the release price has been either the actual acquisition cost, or the net proceeds from the sale, if less than the acquisition cost. In the pending transaction, the releases were sent to your group for our acquisition cost to release the units to be sold from the blanket mortgage and facilitate the sale, as has been the practice of our dealings the past six years. Any proceeds in excess of the actual cost always have been paid at closing to the venture, and we used excess funds in our operating account to pay down our line of credit, retaining only the agreed upon $3 million necessary to prudently run the business. Pay downs from profitable operations and sales to date have reduced the borrowing line position from $102 million to $79 million, before the current sale, and your debt has now been reduced to $65 million after the sale. Pending transactions in the next few months should enable additional pay downs of nearly $8 million more.

The reduction in the debt from $102 million to $57 million in 6 years has been a remarkable achievement since the assets were admittedly not worth the debt six (6) years ago and since now the assets are worth anywhere from $20 million to $25 million

Page 1 of 5

more than the debt. Certainly we can agree that the decisions we made to leave my company in place to maximize the value for the venture have paid off for both us.

While our venture has always had the tension inherent between Lehman being both a partner and a lender to the venture, Lehman has now chosen by its actions to favor its position as lender against the interests of the venturers and the venture by requiring a release price of $13.5 million, which is in excess of the past agreed-to release prices by $5.5 million in cash or a percentage increase of almost 70%. This is despite Lehman's past agreement, the past pattern and practice of dealings between the parties, and contrary to express provisions of our agreement, which it is choosing to disregard. In breaching our understandings, Lehman is also now reaching into venture sale proceeds to pay down debt and in so doing, jeopardizing operations of our venture.

While recently trying to get us to buy Lehman out of the combined debt/equity position that Lehman has in the venture, for sums of $10 million to $15 million in excess of Lehman's investment cost, suddenly we are now told that Lehman is concerned about the value of the collateral when we both know that our company's efforts have produced a comfortable equity cushion for the venture with respect to your debt. We will be pleased to pay off the debt and end the relationship, or have Lehman buy us out, but Lehman cannot continue to take opposite positions whenever it suits it, some days asking for huge buyout profits, and other days threatening us with Lehman's workout group. What is most unfortunate is that since my company has produced an equity cushion, your company has taken aggressive positions that have damaged the venture. We hope you will reconsider your unlawful position and return to your prior agreements concerning our venture.

Your employee, Frank Prezioso, upon taking over management of Lehman's investment in our firm, attempted, on your behalf, to get a fee out of our venture to continue the debt portion of the relationship, although this had never been in any documents or part of the prior agreement. This is but one of many examples of his antagonistic approach that has been consistent in all of his dealings with us, and require him to be replaced in this role. Management of this position has been transferred many times already for Lehman.

As you are aware, Lehman has also lent money to the venture's tenant TRICO V and TRICO VII and, despite their payment default against Lehman and the venture, Lehman took no action to enforce the TRICO defaults. This can only be explained by the questionable attempts to make claims on certain TRICO V and TRICO VII units to the environmental insurer, A.I.G. All the while, your borrower and the venture's tenant used the assets encumbered by your loan in order to finance extensive legal action against the venture, delaying the venture's ability to marshal the collateral of our venture and further delaying an orderly and profitable liquidation of our venture's collateral against Lehman's debt. Lehman failed to foreclose on TRICO V and TRICO VII, so you could attempt to enforce your environmental claim against A.I.G. We wonder what A.I.G.

Page 2 of 5

knows about your actions. We were repeatedly told by your personnel that if you filed a foreclosure against the TRICO entities, you could not exercise your rights to your environmental claim against A.I.G. Our venture suffered, but your personnel received bonuses for their handling of TRICO V and TRICO VII. During this period, we were always complimented by you with respect to the results we achieved in our protracted multi-year, multi-million dollar litigation. While this litigation is still ongoing, it has already resulted in the eviction of TRICO V, TRICO VII and Boca Petroco from the venture's units, and a partial judgment being entered against those entities in excess of $14 million. Only now, after we have obtained these results on behalf of the venture, have you started any legal action whatsoever against TRICO V and TRICO VII. This being despite the cross-default provision required by Lehman in all of its documents, and our continued pressing for Lehman to act.

In addition, at the beginning of the venture, Lehman hindered our ability to be profitable, by setting up an internal group within Lehman, with no notice to us whatsoever, to compete with the venture on debt origination in connection with liquidating the assets of the venture and then sharing the venture's new business pipeline with them to make it ever harder for the venture. Fortunately your firm shut this group down after incurring several million dollars in losses and untold conflicts of interest. This competition necessarily hurt the venture in liquidating your debt. As you should be aware, we were all ready and documented to enter into a hedge agreement to protect against future rises in interest rates, Mr. Prezioso asked if Lehman could do it for us to get credit for a fee. Lehman could not get it done, rates moved and the opportunity was forever lost, costing us huge excess in interest payments, and hurting our ability to liquidate our venture's debt to Lehman.

Last month, at Lehman's urging and request, we entered into a binding contract to sell eight sites to a public company, at a significant profit, but also at a significant loss of rental income. This placed our venture in a more challenging position to meet the libor plus three (3%) interest rate on the balance of your debt. We preferred to sell the non-earning sites first and keep the revenue producing units until the end, to be certain that our venture would always meet its debt obligations, and so advised the Lehman team. Lehman's team pleaded for the venture to do this deal for the sake of certain employees' positions in your firm, insisting it was necessary for their bonus compensation and future. We behaved like a good partner and got it done and did not even ask for the operating balance cushion of $3 million to be increased, although it may be needed.

Now on the very eve of the closing, Lehman breaches our agreement, first demanding all of the proceeds, and then last Thursday morning changing the position to allow us to retain $1.15 million for operations and not the $2.2 million necessary to refill our operating account. The $3 million operating reserve for the venture has been agreed to and maintained with Lehman's full knowledge and consent since January, 2002, although last week we were told that Lehman never agreed to the operating reserve for

Page 3 of 5

our venture. As you would imagine, this unprofessional response was most disappointing given my company's performance on behalf of the venture under very difficult circumstances during the past six, almost seven years.

We have done the right thing and closed the transaction, paid down the $13.5 million in debt, and subjected our venture to additional short-term risks on account of Lehman's actions. Now it is time for you to do the right thing.

When we questioned how Lehman came up with your proposed pay down number and asked if it could be put in writing so we could understand your reasoning, we were told there would be no writing. We were then advised that Lehman was concerned that we would avail ourselves of the provision in the partnership agreement that your firm promulgated and we accepted as is, which provided for distributions for tax payments. We were also told that we had a defaulted loan and that this overrides the partnership agreement, despite the terms the venture has been operating and performing under, as described in this letter.

It has been the position of all members of the venture for at least the past three years, that there was significant value in excess of the debt to Lehman. We know you can appreciate why we believe that your sudden position of concern of the value of the collateral of our venture to liquidate your debt seems to us to be manufactured. It seems contrary to our past understanding that you wish to place the venture in operating peril to benefit your debt position which will necessarily hurt the long term profitability of the venture. I am sure you would agree that if you wish to change our prior agreement, we would need to negotiate a new understanding that would be mutually acceptable. Our company has remained diligent in protecting the assets of the venture, despite the constant revolving door at Lehman for the group responsible for our venture and the historical actions taken by Lehman adverse to the venture. Perhaps it is because of this constant revolving door that there is no institutional memory with respect to our venture. Mr. Chris Epes has been the only constant, and a remarkable voice of reason to balance Mr. Prezioso's inflammatory role. Before precipitous action is taken, it would aid our relationship for you to verify the facts we have set forth in this letter concerning the venture.

We have worked long and hard to protect the capital of the venture as we transitioned from an acquiring growing company to our present condition. We made every hard call, closing offices, terminating the employment of all but a few, including partners, to properly manage cash. We have both stuck to our agreement until now. I can only assume it is because you wish to take the entire profit from our venture after our hard work has produced an extraordinary result. Please let me know if my assumption is incorrect. Please reverse your position which places our venture in jeopardy, in breach of our understandings for the short term benefit of your debt being liquidated.

Page 4 of 5

We look forward to hearing from you in order to put our venture back on the track that I am sure we both mutually desire to see it take.

Sincerely,

Stephen H. Bittel
President of Petroleum Realty Corporation

SHB:en


cc: Mr. Richard S. Fuld Jr., Chairman, Chief Exec. Officer and Chairman of
    Exec. Committeer
    Frank Prezioso, Managing Director
    Chris Epes, Senior Vice President


487388-1