**Hearing Date and Time: December 1, 2010 at 10:00 a.m.**

Douglas P. Bartner (DB-2301)
Susan A. Fennessey (SF-6950)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Telephone:  (212) 848-4000
Facsimile:  (212) 646-8283

*Attorneys for BG Energy Merchants LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
                                    :
                                    :
In re:                              :        Chapter 11
                                    :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    Case No. 08 – 13555 (JMP)
                                    :
                   Debtors.         :        (Jointly Administered)
                                    :
                                    :
-----------------------------------------------------------x
```

### RESPONSE OF BG ENERGY MERCHANTS LLC TO THE DEBTORS'
### SIXTY-THIRD OMNIBUS OBJECTION TO CLAIMS
### (VALUED DERIVATIVE CLAIMS)

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

   BG Energy Merchants LLC ("**BGEM**") hereby submits this response to the

Debtors' Sixty-Third Omnibus Objection to Claims (Valued Derivative Claims) [Docket No.

11978] (the "**Claims Objection**"), and in support thereof, respectfully represents as follows:

#### Preliminary Statement

   1.  BGEM, which was party to numerous trades with the debtors in the above-

captioned cases (the "**Debtors**"), terminated its trades on September 15, 2008 and replaced the

trades as soon as reasonably practicable, covering all of its positions on September 16, 2008.

BGEM calculated its loss pursuant to the terms of the Master Agreement (as defined below) as of the first day on which it was reasonably practicable to do so.  BGEM timely filed a proof of claim and completed the required derivative questionnaire and guarantee questionnaire, including all required supporting documentation.

2.      By their Claims Objection, the Debtors seek to reduce the claim filed by BGEM because the amount listed on BGEM's claim is "greater than the fair, accurate, and reasonable values determined by the Debtors after a review of [BGEM's] supporting documentation and the Debtors' books and records," but have not provided a specific basis or any evidence for their apparent allegation that BGEM's claim amount is unreasonable.  Each of BGEM's actions in terminating its positions with the Debtors, calculating its loss and filing its claim was reasonable and fully in accordance with the terms of the relevant agreement or law.  BGEM therefore respectfully submits that its claim should be allowed in full in the amount of $19,768,852.01.

### Background

3.      Prior to the Debtors' bankruptcy proceedings, BGEM and Lehman Brothers Commodity Services Inc. ("**LBCS**") entered into that certain ISDA Master Agreement dated October 18, 2007 (as amended, supplemented or modified, and together with all schedules, annexes and exhibits thereto and all confirmations exchanged pursuant to transactions entered into in connection therewith, the "**Master Agreement**").[1]

4.      On October 4, 2007, Lehman Brothers Holdings Inc. ("**LBHI**") unconditionally guaranteed to BGEM the due and punctual payment of all amounts payable by LBCS under the Master Agreement when such amounts become due and payable (the "**Guarantee**").

---

[1]      Capitalized terms used but not defined herein shall have the meanings set forth in the Master Agreement.

2

5.      The transactions between BGEM and LBCS entered into under the Master Agreement were Henry Hub based natural gas contracts and swap transactions based upon the Japan Customs-Cleared Crude oil index.  The Japan Customs-Cleared Crude index, also known as Japan Crude Cocktail ("**JCC**"), is the average price of crude oil imports into Japan, and is the commonly used index for oil contracts in Japan and other parts of Asia.

6.      On September 15, 2008, LBHI commenced before this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

7.      LBHI's bankruptcy filing constituted an Event of Default, as that term is defined in section 5(a) of the Master Agreement, and on September 15, 2008, BGEM delivered a Notice of Early Termination to LBCS.

8.      On October 3, 2008, LBCS commenced before this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

9.      On October 7, 2008, BGEM delivered a demand for payment under the Guarantee to LBHI.

10.     On July 2, 2009, this Court entered the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form [Docket No. 4271] (the "**Bar Date Order**") establishing September 22, 2009 as the deadline for filing proofs of claim against the Debtors.

11.     In compliance with the Bar Date Order, on September 21, 2009, BGEM filed Claim No. 22098 against LBCS as the primary obligor under the Master Agreement

3

(the "**LBCS Claim**") and Claim No. 22099 against LBHI pursuant to the Guarantee (the "**LBHI Guarantee Claim**", and together with the LBCS Claim, the "**Claims**").

12.    On October 13, 2010, the Debtors filed the Claims Objection, seeking, among other things, to reduce the allowed amounts of the LBCS Claim and the LBHI Guarantee Claim by approximately $5 million each.

## Argument

13.    In their objection, the Debtors allege simply that the claim amount is greater than the amount that they have determined is reasonable, but do not provide any basis for their determination.  Based on limited telephone discussions between BGEM and Debtor representatives earlier this year, BGEM believes that the basis for the Debtors' objection is the timing of BGEM's replacement of its JCC-priced swap transactions — on September 16, 2008, the day after the Early Termination Date — under the Master Agreement.  Although Debtor representatives contacted BGEM to discuss the claims and the timing of BGEM's JCC swap transactions, the Debtors did not provide any support for their apparent position that BGEM should have calculated its loss as of September 15 or that its loss would have been lower if it had covered its JCC swap transactions on September 15, nor did the Debtors propose a settlement.[2]

14.    Pursuant to Rule 3001(f) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), "a proof of claim executed and filed in accordance with the [bankruptcy] rules shall constitute *prima facie* evidence of the validity and amount of the claim." F.R.B.P. 3001(f).  *See also In re DJK Residential LLC*, 416 B.R. 100, 104 (Bankr. S.D.N.Y. 2009); *In re Alper Holdings USA*, No. 07-12148, 2008 WL 160203, at *3 (Bankr. S.D.N.Y. 2008); *In re MarketXT Holdings Corp.*, No. 04-12078, 2007 WL 680763, at *4 (Bankr. S.D.N.Y.

---

[2]    The Debtors suggest in the Claims Objection that they have made a "Proposed Settlement" (as defined in the Claims Objection) to BGEM and reached an impasse in negotiating that Proposed Settlement.  No settlement has been proposed or negotiated between the parties to date.

2007).  In order to refute the validity or the amount of a properly filed proof of claim, the

objecting party must produce evidence sufficient to negate the *prima facie* validity of that claim.

*See In re Spiegel, Inc.*, Nos. 03-11540, 06-CV-13477, 2007 WL 2456626, at *15 (Bankr.

S.D.N.Y. Aug. 22, 2007) (citing *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992)).

The Claims Objection does not include evidence of any kind (it merely sets forth vague

allegations) to negate the *prima facie* validity of the Claims.  Therefore, the Claims remain

presumptively valid pursuant to section 502 of the Bankruptcy Code and Rule 3001(f) of the

Bankruptcy Rules.

   15. BGEM terminated the Transactions and calculated its claim in full

compliance with the terms of the Master Agreement, covered its trading position in a

commercially reasonable manner, and submits that its claim amount as filed is reasonable and

correct.

   16. BGEM was under no contractual obligation to terminate the Master

Agreement on September 15 or at any particular time on September 15.  The Master Agreement

allows a Non-defaulting party up to 20 days from the date of the Event of Default to deliver a

notice designating an Early Termination Date.  Master Agreement Section 6(a).  Nevertheless,

BGEM chose to terminate the outstanding Transactions on September 15.  BGEM ultimately

completed the necessary work, arranged for hand delivery of the termination and obtained

"Messenger – Proof of Delivery" at 4:05 p.m. Eastern time on September 15.  At that time, it was

too late in the trading day for BGEM to cover its positions with commercially reasonable

replacement JCC swap trades for the terminated Transactions.

   17. The Master Agreement provides that the amount due if an Early

Termination Date results from an Event of Default — as it did in this case — will be calculated

pursuant to "Second Method and Loss," which requires payment of an amount equal to the Non-

defaulting Party's Loss in respect of the Agreement.  In calculating Loss, the Non-defaulting

Party under the Master Agreement may, but is not required to, enter into replacement trades for

the terminated Transactions under the Master Agreement.  If the Non-defaulting Party enters into

replacement trades, the cost of those trades is appropriately used for calculating Loss.  "Loss" is

defined in the Master Agreement in relevant part as

> an amount that [a] party reasonably determines in good faith to be
> its total losses and costs (or gain, in which case expressed as a
> negative number) in connection with [the] Agreement or that
> Terminated Transaction or group of Terminated Transactions, as
> the case may be, including any loss of bargain, cost of funding or,
> at the election of such party but without duplication, loss or cost
> incurred as a result of its terminating, liquidating, obtaining or
> reestablishing any hedge or related trading position (or any gain
> resulting from any of them).  . . .  A party will determine its Loss
> as of the relevant Early Termination Date, or, if that is not
> reasonably practicable, as of the earliest date thereafter as is
> reasonably practicable.  A party may (but need not) determine its
> Loss by reference to quotations of relevant rates or prices from one
> or more leading dealers in the relevant markets.

Although BGEM was not required to replace its Transactions, it determined that it was in its best

interest to do so and replaced the Transactions as soon as reasonably practicable.

     18.     It was not reasonably practicable for BGEM to replace its Transactions on

the Early Termination Date.  JCC-priced swap contracts are generally relatively illiquid and are

not traded on an exchange.  JCC swap trades are all bilateral contracts for which much of the

trading occurs during the Japanese trading day and for which counterparties often rely on other

oil markets as proxies for pricing.  Counterparties most commonly rely on the Brent market in

London, which has the practical effect of limiting the prime trading day for JCC swap contracts

in Texas to the morning hours of the trading day.  The market for JCC swap contracts that

BGEM can access in the afternoon in the U.S. is very limited:  the cost of transacting is

significantly higher and the limited volume of available trades would not have been sufficient for BGEM to cover the large volume of JCC swap contracts that it had terminated on the Early Termination Date.  BGEM does not have trading capabilities in Asia to trade JCC swap contracts during the night in the U.S.

19.    Although it was not contractually obligated to do to, on September 15, BGEM took immediate action to prepare to terminate its Transactions with LBCS in response to the commencement of LBHI's chapter 11 case.  Even if BGEM had been operating as it typically does on the morning of September 15, instead of in the wake of the significant damage caused by Hurricane Ike, it would not have been commercially reasonable for BGEM to enter into replacement trades by the time it was able to terminate the Transactions.  As described above, by the time BGEM was able to terminate the Transactions, the prime JCC swaps trading day had ended and it was not commercially reasonable for BGEM to begin covering its JCC swap transactions.  Therefore, in accordance with its trading practice and as soon as commercially reasonably practicable, BGEM covered its JCC swap transactions during the day on September 16.

20.    Because it was not able to replace its Transactions on the Early Termination Date, BGEM was not able to calculate its loss as of that date.  Instead, BGEM calculated its loss based on the earliest date thereafter that was reasonably practicable:  the very next day, when it replaced its Transactions in a commercially reasonable manner.  In its valuation statement and the questionnaires submitted in support of the Claims, BGEM provided detailed information and confirmations for all of its replacement trades.

21.    Based on the foregoing, BGEM respectfully maintains that its calculation of Loss under the Master Agreement on which the Claims are based was in accordance with the

7

terms of the Master Agreement and commercially reasonable, and that the Claims should be

allowed for the full and actual amount of its loss.

### Conclusion

WHEREFORE, BGEM respectfully requests that the Court deny the Claims

Objection with respect to the LBCS Claim and the LBHI Guarantee Claim, deem the Claims to

be timely filed, and grant such other and further relief as this Court deems just and equitable.

Dated:    New York, New York
          November 15, 2010

SHEARMAN & STERLING LLP

By:    */s/ Douglas P. Bartner*_____
       Douglas P. Bartner
       Susan A. Fennessey
       599 Lexington Avenue
       New York, New York 10022
       Telephone:  (212) 848-4000
       Facsimile:  (212) 848-7179

       *Attorneys for BG Energy Merchants LLC*

8