## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

JEROLD SOLOVY, not individually )
but solely as the co-executor of the Estate of )
Edwin Jacobson )
            )
      Plaintiff, )
            )
      vs. )    No. _____
            )
LEHMAN BROTHERS HOLDINGS, )
INC., COWEN & COMPANY, )
WAVELAND PARTNERS, L.P., )
GEM VALUE FUND, L.P., and all )
UNKNOWN OWNERS )
            )
      Defendants. )

DOROTHY BROWN — CLERK

**08CH33956**

### COMPLAINT

Plaintiff Jerold Solovy, not individually but solely as the co-executor of the Estate of

Edwin Jacobson ("Solovy"), through his attorneys, Edward T. Joyce & Associates, P.C.,

complains of defendants Lehman Brothers Holdings, Inc., Cowen & Company, Waveland

Partners, L.P., and Gem Value Fund, L.P., and certain unknown owners of Heartland Partners,

L.P. Class A partnership units as follows:

**I.    NATURE OF THE ACTION**

1. ·This case arises out of Heartland Partners L.P.'s ("Heartland's") distribution of over

$7,000,000 to its unitholders (the "2003 distributions") in violation of the Illinois Uniform

Fraudulent Transfer Act.

2. At the time of the distribution, Edwin Jacobson ("Jacobson") had a claim against

Heartland's operating company, CMC Heartland Partners ("CMC"), arising out of CMC's

breach of Jacobson's employment agreement. That claim is pending in the Law Division of the

Circuit Court of Cook County and is scheduled for trial from October 20, 2008 to October 24, 2008 (the "breach of contract case").

3. On April 28, 2006, Heartland and CMC filed voluntary petitions for bankruptcy relief under Chapter 11 of the bankruptcy code (the "Bankruptcy Proceeding").

4. On July 17, 2007, the judge presiding over the Bankruptcy Proceeding granted Jacobson standing to pursue state law fraudulent transfer claims on his own behalf.

5. Defendants in this case are certain Heartland unitholders who received their pro rata share of the 2003 distributions. Through this action Solovy, on behalf of Jacobson's probate estate, is seeking to recover the amounts fraudulently distributed by Heartland to defendants.

## II.    **PARTIES**

6. Between 1990 and February 2002, Jacobson was the president and chief executive officer of CMC pursuant to a written employment agreement. On August 19, 2002, Jacobson filed a lawsuit against CMC for breaching his employment agreement. On September 12, 2007, with the breach of contract case still pending, Jacobson died. A few months later, Solovy was substituted into the breach of contract case as the co-executor of Jacobson's probate estate. Solovy is bringing this lawsuit on behalf of Jacobson's probate estate, which is a creditor of Heartland as a result of its breach of contract claim. At the time of the 2003 distributions, Jacobson owned Heartland Class A units. Thus, he received his pro rata share of the 2003 distributions. Accordingly, Solovy's claim is offset by the amount that Jacobson received from the 2003 distributions.

7. As of March 28, 2003 Defendant Lehman Brothers Holdings, Inc. ("Lehman Brothers") beneficially owned 187,400 Heartland units, which represented 9.0% of all issued and outstanding units.

8.  As of March 28, 2003, Defendant Cowen & Company ("Cowen") was the beneficial owner of 183,100 Heartland units, which represented 8.8% of all issued and outstanding units.

9.  As of March 28, 2003, Defendant Waveland Partners, L.P. ("Waveland") beneficially owned 305,438 Heartland units, which represented 14.6% of all issued and outstanding units.

10. As of March 28, 2003 Defendant GEM Value Fund, L.P. ("Gem") beneficially owned 123,045 Heartland units, which represented 5.9% of all issued and outstanding units.  On May 15, 2003, Gem sold 24,000 of its Heartland units.  Thus, as of May 15, 2003, Gem beneficially owned 99,045 units.

## III.  FACTS

### A.  Heartland's Ownership Structure and Business

11. Heartland was in the business of owning, purchasing, developing, leasing, marketing, constructing and selling real estate properties.

12. At all relevant times, Heartland's principal executive offices were located in Chicago, Illinois.

13. CMC was a general partnership that was formed by Heartland and the Milwaukee Land Company, which is now known as Heartland Technology, Inc. ("Technology").  CMC was one of Heartland's operating companies that owned real estate for Heartland's benefit.  Heartland owned a 99.99% interest in CMC.

14. In addition to forming and owning CMC, Heartland formed and owned several other operating entities that owned real estate for Heartland's benefit.

### B.  Jacobson's Claim

15. Jacobson was CMC's president and chief executive officer pursuant to a written employment agreement from 1990 through February 26, 2002.

16. Jacobson was also a member of Technology's board of directors/managers (the "Board") until May 17, 2002. The Board managed both CMC and Heartland.

17. Under the terms of Jacobson's written employment agreement (as amended) CMC was obligated to pay Jacobson his salary and incentive compensation through May 30, 2005, unless CMC first terminated Jacobson's employment for "Cause" (a defined term). A termination for "Cause" is effective only upon the giving of a written "Notice of Termination" (also a defined term).

18. On February 21, 2002, without prior warning, discussion or statement of any reason, Ezrah Zilkha and John Torell (members of the Board) called Jacobson and demanded that he resign as president and CEO of CMC. Jacobson immediately notified CMC's general counsel, Lawrence Adelson, that proper corporate governance was not being followed and suggested that it was in the best interests of CMC and the other Heartland companies that he stay on for an orderly transition.

19. On February 26, 2002, CMC held a board meeting at which time the Board voted in favor of removing Jacobson as CMC's CEO and President. CMC purportedly "terminated" Jacobson's employment agreement, but did not do so for "Cause." CMC continued to pay Jacobson his salary until May 17, 2002.

20. On May 10, 2002, Adelson sent Jacobson a letter stating that the Board would be meeting to discuss whether Jacobson had violated federal securities laws and breached his fiduciary duty. The May 10, 2002 letter did not constitute "notice of termination" as that term is defined in the employment agreement. Moreover, even if the May 10, 2002 letter was a proper "notice of termination," none of the allegations contained therein constitute "Cause" as that term is defined in Jacobson's employment agreement.

4

21. On May 17, 2002, the Board held a special meeting to consider whether the conduct alleged in the May 10, 2002 letter constituted "grounds for Board Action."

22. At the conclusion of the May 17th meeting, CMC purportedly "terminated" Jacobson's employment agreement for "Cause," even though CMC had already terminated him without "Cause" three months earlier. CMC also removed Jacobson from the Board.

23. After May 17, 2002, CMC stopped paying Jacobson his salary, and has refused to pay him his incentive compensation.

24. On August 19, 2002, Jacobson filed a lawsuit against CMC in the Circuit Court of Cook County for breach of contract. Jacobson (now Solovy) is claiming approximately $8,500,000 in damages.

25. The breach of contract case is scheduled for trial from October 20, 2008 to October 24, 2008.

### C. Heartland Distributes Over $7,000,000 in Cash to its Unitholders Without Receiving a Reasonably Equivalent Value

26. On August 11, 2003, Heartland declared a cash distribution of $1.05 per unit.

27. On September 15, 2003, Heartland distributed approximately $2,231,000 in cash to its unitholders.

28. Heartland made the September 15, 2003 distribution without receiving a reasonably equivalent value in exchange for the transfer.

29. On November 14, 2003, Heartland declared another cash distribution of $2.30 per unit.

30. On December 9, 2003, Heartland distributed approximately $4,885,000 in cash to its unitholders.

31. Heartland made the December 9, 2003 distribution without receiving a reasonably equivalent value in exchange for the transfer.

5

32. The September 15 and December 9, 2003 distributions were the largest distributions that Heartland ever made.

33. On information and belief, the 2003 distributions were made from a bank account located in Chicago, Illinois.

**D. At the Time it Distributed $7,116,000 in Cash to its Unitholders, Heartland Had Incurred or Reasonably Should Have Expected to Incur Debts Beyond Its Ability to Pay as They Became Due**

34. The real estate business in which Heartland operated is "capital intensive." In other words, Heartland must generate significant cash flow to meet its operational needs. Heartland derived cash flow for its operating activities primarily from proceeds of property sales.

35. Heartland's net cash derived from operating activities for 2003 was $19,138,000 compared to $2,291,000 of net cash used in operations in 2002. Thus, cash provided by operating activities increased by $21,429,000 in 2003. This difference was due primarily to property sales.

36. At the end of 2003, Heartland had just $3,926,000 remaining in cash because. It also recorded $13,065,000 in non-cash assets, consisting mostly of accounts receivable and land held for sale. Thus, at the end of 2003, Heartland recorded total assets of $16,991,000.

37. At the end of 2003, Heartland recorded total liabilities of $7,500,000. But, that figure failed to properly account for the possibility of significant contingent liabilities, such as environmental claims and Jacobson's lawsuit.

38. With respect to environmental claims, Heartland disclosed in its year 2003 Form 10-K that:

    a. The EPA was considering a cleanup of arsenic soils in a residential area in Minneapolis, Minnesota that was near property impacted by arsenic and lead that

was owned by CMC and that the EPA may seek to recover the cost of that cleanup from CMC. Heartland did not provide an estimate of the cost of that liability in its 10-K.

b. Heartland "has known environmental liabilities associated with certain of its properties arising out of the activities of its predecessor or certain of its predecessor's lessees and may have further material environmental liabilities as yet unknown. The majority of [Heartland's] known environmental liabilities stem from the use of petroleum products, such as motor oil and diesel fuel, in the operation of a railroad or in operations conducted by its predecessor's lessees." Heartland did not provide an estimate of the cost of these liabilities in its 10-K.

c. "The Montana Department of Environmental Quality has asserted that [Heartland] is liable for some or all of the investigation and remediation of certain properties in Montana..." Heartland did not provide an estimate of the cost of this liability in its 10-K.

d. Hearland provides an allowance with regard to potential environmental liabilities when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. If the amount of the liability cannot be reasonably estimated, but Heartland's management is able to determine that the amount of the liability is likely to fall within a range, then an allowance in the minimum amount of the range is established.

39. In addition to the foregoing environmental liabilities, Heartland was facing the possibility of paying Jacobson over $9,000,000 in damages and litigation costs, such as attorneys' fees. Heartland acknowledged the existence of this potential liability in its 2003 10-K, but it did not

make any provision for the liability; i.e., it did not set-up any cash reserve to account for the liability.

40. Despite the existence of the foregoing potential claims and liabilities, Heartland's total allowance for claims and liabilities in 2003 was just $3,970,000.

### E. Heartland Failed to Retain Sufficient Property to Pay Its Obligations

41. In 2004, the year after Heartland distributed $7,116,000 in cash to its unitholders, Heartland began disclosing concerns about the uncertainty of its ability to meet its obligations as they became due and to continue as a going concern.

42. With respect to its environmental liabilities, Heartland disclosed (in its 2004 Form 10-K) that it estimates the upper range of its environmental claims and liabilities to be approximately $10,841,000. It also disclosed that its reserve for environmental claims and liabilities as of December 31, 2004 was just $4,228,000. Heartland acknowledged that if it were to use a different approach for establishing the reserve amount (*see* ¶ 38(d) *supra* for an explanation of the approach that Heartland uses), the amount of the reserve would be "materially higher." Heartland further acknowledged that it "believes that it is likely that the actual amount of the Company's [Heartland's] environmental claims and liabilities, when fully resolved or provided for, will be higher than the reserve amount because it is unlikely that, as a whole, such claims and liabilities will be less expensive to resolve than the amount of the low end of such range."

43. With respect to Jacobson's lawsuit, Heartland acknowledged (in its 2004 Form 10-K) that the lawsuit may not be resolved in its favor and that it may incur "significant costs" associated with the lawsuit.

44. With respect to its financial condition, Heartland disclosed (in its 2004 Form 10-K) that its recurring losses for the years ended December 31, 2002 through 2004 and the uncertainty

surrounding environmental liabilities and other claims, particularly Jacobson's lawsuit, created

uncertainties about Heartland's ability to meet existing and future liabilities as they became due.

Heartland stated that it had taken "certain steps, including the reduction of fixed overhead and

conservation of cash, in light of these uncertainties."

45. In April 2005, Heartland's independent auditors, PriceWaterhouseCoopers, LLP

("PWC"), audited Heartland's 2004 financial statements and issued a "going concern" opinion.

46. Specifically, PWC stated:

> [Heartland] has experienced recurring operating losses. [Heartland's] management has indicated it intends to sell the remaining assets of [Heartland] and dissolve. [Heartland] is working to resolve their remaining liabilities, which primarily consist of environmental and other claims against [Heartland]. The actual costs to resolve these liabilities may differ from current estimates in an amount that exceed [sic] the value of [Heartland's] assets and prevent [sic] [Heartland] to meet their existing and future obligations as they become due. Such uncertainties raise substantial doubt about their ability to continue as a going concern.

47. All of the "uncertainties" that gave rise to Heartland's and PWC's substantial doubts

about Heartland's ability to pay its obligations as they became due were known or, at least

should have been known, to Heartland at the time it distributed $7,116,000 in cash to its

unitholders in 2003.

48. On April 28, 2006, Heartland (and its operating entities) filed voluntary petitions for

bankruptcy relief under chapter 11 of the bankruptcy code.

### COUNT I – Lehman Brothers
### (Violation of 740 ILCS 160/5(a)(2))

49. Plaintiff incorporates paragraphs 1-48 as through fully set forth herein.

50. Count I is brought against defendant Lehman Brothers.

51. On September 15, 2003 and December 9, 2003, Lehman Brothers owned 187,400

Heartland units.

9

52. Thus, Lehman received approximately $627,790 from Heartland as a result of Heartland's 2003 distributions.

53. At the time Heartland made these cash distributions, it had incurred and/or reasonably should have believed it was going to incur debts beyond its ability to pay as they became due.

54. After Heartland made these cash distributions, it was unable to meet its other obligations.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

    a. ˙ Judgment in favor of plaintiff;

    b. An attachment or other provisional remedy against the asset transferred in accordance with 740 ILCS 160/8(a)(2);

    c. An order granting plaintiff the right to levy execution of his judgment against CMC, once it is obtained, on the asset transferred or its proceeds pursuant to 740 ILCS 160/8(b);

    d. The costs of this action; and

    e. Any other relief the circumstances may require pursuant to 740 ILCS 160/8(a)(3)(C).

### COUNT II – Cowen & Company
### (Violation of 740 ILCS 160/5(a)(2))

55. Plaintiff incorporates paragraphs 1-54 as through fully set forth herein.

56. Count II is brought against defendant Cowen & Company.

57. On September 15, 2003 and December 9, 2003, Cowen owned 183,100 Heartland units.

58. Thus, Cowen received approximately $613,385 from Heartland as a result of Heartland's 2003 distributions.

59. At the time Heartland made these cash distributions, it had incurred and/or reasonably should have believed it was going to incur debts beyond its ability to pay as they became due.

10

60. After Heartland made these cash distributions, it was unable to meet its other obligations.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

    a. Judgment in favor of plaintiff;

    b. An attachment or other provisional remedy against the asset transferred in accordance with 740 ILCS 160/8(a)(2);

    c. An order granting plaintiff the right to levy execution of his judgment against CMC, once it is obtained, on the asset transferred or its proceeds pursuant to 740 ILCS 160/8(b);

    d. The costs of this action; and

    e. Any other relief the circumstances may require pursuant to 740 ILCS 160/8(a)(3)(C).

**COUNT III – Waveland**
**(Violation of 740 ILCS 160/5(a)(2))**

61. Plaintiff incorporates paragraphs 1-60 as through fully set forth herein.

62. Count III is brought against defendant Waveland.

63. On September 15, 2003 and December 9, 2003, Waveland owned 305,438 Heartland units.

64. Thus, Waveland received approximately $1,023,217 from Heartland as a result of Heartland's 2003 distributions.

65. At the time Heartland made these cash distributions, it had incurred and/or reasonably should have believed it was going to incur debts beyond its ability to pay as they became due.

66. After Heartland made these cash distributions, it was unable to meet its other obligations.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

    a. Judgment in favor of plaintiff;

11

b. An attachment or other provisional remedy against the asset transferred in accordance with 740 ILCS 160/8(a)(2);

c. An order granting plaintiff the right to levy execution of his judgment against CMC, once it is obtained, on the asset transferred or its proceeds pursuant to 740 ILCS 160/8(b);

d. The costs of this action; and

e. Any other relief the circumstances may require pursuant to 740 ILCS 160/8(a)(3)(C).

## COUNT IV – Gem
### (Violation of 740 ILCS 160/5(a)(2))

67. Plaintiff incorporates paragraphs 1-66 as through fully set forth herein.

68. Count IV is brought against defendant Gem.

69. On September 15, 2003 and December 9, 2003, Gem owned 99,045 Heartland units.

70. Thus, Gem received approximately $331,795 from Heartland as a result of Heartland's 2003 distributions.

71. At the time Heartland made these cash distributions, it had incurred and/or reasonably should have believed it was going to incur debts beyond its ability to pay as they became due.

72. After Heartland made these cash distributions, it was unable to meet its other obligations.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

a. Judgment in favor of plaintiff;

b. An attachment or other provisional remedy against the asset transferred in accordance with 740 ILCS 160/8(a)(2);

12

c.   An order granting plaintiff the right to levy execution of his judgment against

CMC, once it is obtained, on the asset transferred or its proceeds pursuant to 740

ILCS 160/8(b);

d.   The costs of this action; and

e.   Any other relief the circumstances may require pursuant to 740 ILCS

160/8(a)(3)(C).

### COUNT V – Unknown Owners
### (Violation of 740 ILCS 160/5(a)(2))

73. Plaintiff incorporates paragraphs 1-76 as through fully set forth herein.

74. Count V is brought pursuant to 735 ILCS 5/2-413 against all unknown owners of the

Heartland units that were owned by Lehman, Cowen, Waveland and Gem as of September 14,

2003 and December 9, 2003.

75. This Count is brought in the alternative to Counts I through IV.

76. In its 10-K for the year 2002, which was filed on March 28, 2003, Heartland identified

Lehman, Cowen, Waveland and Gem as the beneficial owners of the Heartland units.

77. If Heartland's 10-K disclosure is incorrect and Lehman, Cowen, Waveland and Gem are

not the beneficial owners of the Heartland units listed in that 10-K, then Plaintiff asserts this

Count against all unknown beneficial owners of those units.  (See Exhibit A hereto.)

**WHEREFORE**, Plaintiff respectfully requests the following relief:

a.   Judgment in favor of plaintiff;

b.   An attachment or other provisional remedy against the asset transferred in

accordance with 740 ILCS 160/8(a)(2);

c.  An order granting plaintiff the right to levy execution of his judgment against

CMC, once it is obtained, on the asset transferred or its proceeds pursuant to 740

ILCS 160/8(b);

d.  The costs of this action; and

78. Any other relief the circumstances may require pursuant to 740 ILCS 160/8(a)(3)(C).

Respectfully submitted,
JEROLD SOLOVY, not individually, but
solely as the co-executor of the Estate of
Edwin Jacobson

By: _____
One of his attorneys

Edward T. Joyce
Robert D. Carroll
Edward T. Joyce & Associates, P.C.
11 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
(312) 641-2600
Attorney Code 32513

# EXHIBIT A

Complaint - Solovy v. Lehman
Brothers Holdings, Inc. et. al.

State of Illinois        )
                         ) ss
County of Cook           )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| JEROLD SOLOVY, not individually but solely as the co-executor of the Estate of Edwin Jacobson | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. _____ |
| LEHMAN BROTHERS HOLDINGS, INC., COWEN & COMPANY, WAVELAND PARTNERS, L.P., GEM VALUE FUND, L.P., and all UNKNOWN OWNERS | ) ) ) ) ) | |
| Defendants. | ) ) | |

### AFFIDAVIT OF JEROLD SOLOVY PURSUANT TO 735 ILCS 5/2-413

Jerold Solovy, being duly sworn, deposes and states as follows:

1.     I am the Plaintiff in the above captioned cause, not individually, but solely as the co-executor of the Estate of Edwin Jacobson, am over the age of eighteen, and am otherwise competent to make this affidavit. I have personal knowledge of the facts set forth herein below, and if sworn as a witness can competently testify to same.

2.     Heartland Partners L.P.'s ("Heartland's") Form 10-K for the year 2002 discloses that Lehman Brothers Holdings, Inc., Cowen & Company, Waveland Partners, L.P., and Gem Value Fund, L.P. were the beneficial owners of 187,400, 183,100, 305,438 and 123,045 Heartland Class A units, respectively, as of March 28, 2003. (See Exhibit 1 hereto.)

3.     I have no reason to believe that the disclosure described in paragraph 2 above is incorrect. However, to the extent that Heartland's year 2002 10-K is incorrect with respect to the disclosure described in paragraph 2 above, I do not know the names of the real beneficial owners of the units described in that paragraph.

The Affiant says nothing further.

_____
Jerold Solovy

Subscribed and sworn to before me
this 12th day of December, 2008.
September,

_____          (Seal)
Notary Public

OFFICIAL SEAL
LINDA J. HOLMES
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10-24-2010

2

# TAB 1

Affidavit of Jerold Solovy Pursuant to
735 ILCS 5/2-413

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf6DSgAwRwJAW2zNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaMSD3tdczXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 QOMfO6am+jHHZpAYaUeBtIncmVw/Wdw2bcfNOt2UaRlw5fDLPD//3ZAlyv/WgbDA
 LUy2ypN6YhFb7oJkZJ4eGw==

<SEC-DOCUMENT>0000843964-03-000001.txt : 20030328
<SEC-HEADER>0000843964-03-000001.hdr.sgml : 20030328
<ACCEPTANCE-DATETIME>20030328140419
ACCESSION NUMBER:       0000843964-03-000001
CONFORMED SUBMISSION TYPE: 10-K
PUBLIC DOCUMENT COUNT:  4
CONFORMED PERIOD OF REPORT: 20021231
FILED AS OF DATE:       20030328

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:      HEARTLAND PARTNERS L P
                CENTRAL INDEX KEY:           0000843964
                STANDARD INDUSTRIAL CLASSIFICATION: LAND SUBDIVIDERS & DEVELOPERS (NO CEMETERIES) [6552]
                IRS NUMBER:                  363606475
                STATE OF INCORPORATION:      DE
                FISCAL YEAR END:             1231

        FILING VALUES:
                FORM TYPE:           10-K
                SEC ACT:             1934 Act
                SEC FILE NUMBER:     001-10520
                FILM NUMBER:         03624279

        BUSINESS ADDRESS:
                STREET 1:            330 N JEFFERSON CT.
                STREET 2:            SUITE 305
                CITY:                CHICAGO
                STATE:               IL
                ZIP:                 60661
                BUSINESS PHONE:      3125750400

        MAIL ADDRESS:
                STREET 1:            330 N JEFFERSON CT.
                STREET 2:            SUITE 305
                CITY:                CHICAGO
                STATE:               IL
                ZIP:                 60661
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>hp10k_2002.txt
<DESCRIPTION>HEARTLAND PARTNERS, L.P. 2002 10-K
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
FORM 10-K

(Mark One)

[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
      ACT OF 1934

For the fiscal year ended December 31, 2002
or

[_]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
      EXCHANGE ACT OF 1934

For the transition period from to

Commission File Number 1-10520

HEARTLAND PARTNERS, L.P.
(Exact name of registrant as specified in its charter)

Delaware                                36-3606475
.(State or other jurisdiction of        (IRS Employer
incorporation or organization)          Identification no.)

330 North Jefferson Court, Chicago, Illinois       60661
(Address of principal executive offices)          (Zip Code)

Registrant's telephone number, including area code:   312/575-0400

Securities registered pursuant to Section 12(b) of the Act:

        Title of each class            Name of each exchange on which registered
Class A Limited Partnership Units            American Stock Exchange

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark whether the Registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the Registrant was

2000, CMC made matching contributions of 25% of each participant's contribution
to the plan. Participating 1998 employees were fully vested with respect to
salary reduction and CMC's contributions. For all future participants, they are
fully vested with respect to salary reduction immediately, but the matching
contribution vests at 20% per year. Benefits are normally distributed upon
retirement (on or after age 65), death or termination of employment, but may be
distributed prior to termination of employment upon a showing of financial
hardship.

Effective January 1, 2000, the Company approved the CMC Heartland Partners
Incentive Plan ("CMC Plan") and the Sales Incentive Plan ("Sales Plan") to
provide incentives to attract, retain or motivate highly competent employees of
the Company. The aggregate benefits payable under the CMC Plan were computed by
multiplying the following percentages (3% for the year 2001, 2% for the year
2002 and 1% for the year 2003) by the net proceeds from the sale of certain land
parcels during those years. Effective December 31, 2001, the CMC Plan was
amended to vest benefits earned under the CMC Plan as of December 31, 2001 and
provides that earned benefits shall be paid at the time of a cash distribution
to the Unitholders. The CMC Plan was then terminated effective December 31,
2001. The aggregate benefits payable under the Sales Plan were computed by
multiplying 3% for the year 2001 by the net proceeds from the sale of certain
real estate during that year. As of December 31, 2002, $973,000 had been accrued
as compensation expense under the plans of which $335,000 has been paid to the
officers by the Company.

Effective January 1, 2002, the CMC Heartland Partners 2002 Incentive Plan ("2002
CMC Plan") was approved by the Company. The aggregate benefits payable under the
2002 CMC Plan shall be computed by multiplying 2% by the net proceeds from the
sale of certain land parcels for the period January 1, 2002 to December 31,
2004. Three officers of the Company are eligible for benefits under the 2002 CMC
Plan. As of December 31, 2002, $39,000 has been accrued as compensation expense
under the 2002 CMC Plan of which $22,000 has been paid to one of the three
officers. Also, the 2002 CMC Plan granted three officers the economic (but not
tax) equivalent of ownership of 10,000 (non-voting) Heartland Class A
Partnership Units payable at the time of any distributions to the Unitholders.
The phantom Units awarded under the CMC Plan is accounted for in accordance with
Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to
Employees" and related Interpretations. No compensation expense related to these
phantom Units has been recognized in the consolidated statements of operations
for the year ended December 31, 2002. Compensation expense will be recognized
when the amount of the underlying distribution is probable and estimable.

<PAGE>                          70

Item 12. Security Ownership of Certain Beneficial Owners and Management.

Security Ownership of Certain Beneficial Owners

Set forth below is certain information concerning persons who are known by
Heartland to be beneficial owners of more than 5% of Heartland's outstanding
Units at March 28, 2003:

| Name and Address of Beneficial Owner (i) | Number of Units Owned | Percent |
| --- | --- | --- |
| Lehman Brothers Holdings, Inc. (ii) American Express Tower 3 World Financial Center New York, New York 10285................... | 187,400 | 9.0% |
| Cowen & Company (iii) Financial Square New York, New York 10005-3597............. | 183,100 | 8.8% |
| Waveland Partners, L.P. (iv) 227 West Monroe, Suite 4800 Chicago, IL 60606....................... | 305,438 | 14.6% |
| GEM Value Fund, L.P. (v) 900 North Michigan Avenue, Suite 1900 Chicago, IL 60611....................... | 123,045 | 5.9% |

(i) Nature of ownership is direct, except as otherwise indicated herein.

(ii) Based on Amendment No. 3 to Schedule 13G, filed on February 3, 1995, Lehman
     Brothers Holdings Inc., through its subsidiary, Lehman Brothers Inc., a
     registered broker/dealer, has sole voting and dispositive power with respect
     to such Units.

(iii) Based on Amendment No. 2 to Schedule 13G, filed on February 12, 1998,
      Cowen & Company, a registered broker/dealer and investment adviser, Cowen
      Incorporated and Joseph Cohen have shared voting power of 132,900 Units, and
      shared dispositive power of 183,100 Units.

(iv) Based on Form 4 filed on September 16, 2002, Waveland Partners, L.P.,

Waveland Capital Management, L.P., Waveland Capital Management, L.L.C.,
Waveland Partners, Ltd. and Waveland International, Ltd. share voting and
dispositive power with respect to such Units.

(v) Based on Amendment No. 1 to Schedule 13D, filed on October 26, 2001, GEM
    Value Fund, L.P. a private investment partnership, and GEM Value Partners
    LLC, its General Partner, have shared voting and dispositive power with
    respect to such units

71

<PAGE>

Security Ownership of Management

Set forth below is certain information concerning the beneficial ownership of
Units by each current director of HTI, each manager of HTI Interest, LLC, by
each named executive officer of CMC and by all directors and executive officers
of HTI and all executive officers of CMC as a group, as of March 28, 2003:

| Name of Beneficial Owner and Number of Persons in Group (i) | Number of Units Owned | Percent |
|---|---|---|
| Lawrence S. Adelson | 15,000 | .7% |
| Richard P. Brandstatter | --- | ---% |
| Robert S. Davis | --- | ---% |
| Charles Harrison | --- | ---% |
| Edwin Jacobson (ii) | 36,400 | 1.7% |
| Susan Tjarksen Rousseo | --- | ---% |
| John R. Torell III | --- | ---% |
| Ezra K. Zilkha (iii) | 80,500 | 3.9% |
| All directors and executive officers as a group (8 persons) | 131,900 | 6.3% |

(i) Nature of ownership is direct, except as otherwise indicated herein. Unless
    shown, ownership is less than 1% of class.

(ii) Included in the table are 9,400 units held by Mr. Jacobson's wife as to
     which Mr. Jacobson shares voting and dispositive power.

(iii) Included in the table are 24,500 Units owned by Zilkha & Sons, Inc., with
      respect to which Mr. Zilkha may be deemed to be the beneficial owner.

Item 13.    Certain Relationships and Related Transactions

CMC had a management agreement with HTI, pursuant to which CMC was required to
pay HTI an annual management fee in the amount of $425,000. On October 19, 2000,
this management agreement was extended from June 26, 2000 to June 27, 2005. The
management fees for the years 2000 and 2001 of $425,000 each were credited
against amounts owed Heartland and CMC by HTI. On January 7, 2002, this
management agreement was assigned to HTII, the new General Partner. The
management fee for the year 2002 is $413,000. The management fee for the first
five months of 2002 of $172,000 has been offset against the amounts owed
Heartland and CMC by HTI. The Company paid the June to December, 2002 management
fee of $241,000. As of December 31, 2002, the Company has prepaid $58,000 of the
year 2003 management fee of $413,000.

Under a management services agreement, HTI reimburses Heartland for reasonable
and necessary costs and expenses for services. These totaled $179,000, $837,000
and $410,000 for the years ended December 31, 2002, 2001 and 2000, respectively.
Heartland and CMC also made loans to HTI. HTI owes Heartland and CMC in the
aggregate $8,464,000, $8,186,000 and $4,581,000 as of December 31, 2002, 2001
and 2000, respectively, related to these expenses and loans. Effective April 1,
2002, CMC stopped the accrual of interest on the outstanding note receivable
balance and the reimbursement of management services. If these amounts had been
accrued for the period April 1, 2002 to December 31, 2002 (nine months), they
would have been approximately $871,000 in interest and approximately $121,000
for reasonable and necessary costs and expenses for services. Heartland stopped
this accrual on April 1, 2002 because of the uncertainty related to the
competing interests in the Collateral (see Note 1 to the Consolidated Financial
Statements and the next paragraph) and the uncertainty concerning the continued
existence of HTI as a going concern. Included in this amount owed Heartland and
CMC is $271,000, $882,000 and $294,000 of interest accrued on outstanding
amounts owed during the years 2002, 2001 and 2000, respectively. Interest was
computed using the prime rate plus 2 1/4% (11.75% at December 29, 2000) until
December 31, 2000 when the interest rate was changed to 13%. As collateral for
the amount owed Heartland and CMC, HTI Class B, LLC pledged, on December 14,
2000, to Heartland and CMC a senior lien and a senior security interest in the
Heartland Class B Interest owned by HTI Class B, LLC. On December 29, 2000, HTI
executed a line of credit promissory note that is due on demand, payable to
Heartland and CMC in the amount of $6,000,000. At that time, HTI granted the
Company a Series C Warrant that entitles the Company to purchase 120,000 shares
at an exercise price of $1.00. The warrant is exercisable on or before February
16, 2006. HTI's stock is now trading in the over-the-counter market (due to