UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
:
In re:                                                              : Chapter 11 Case No.
:
LEHMAN BROTHERS HOLDINGS INC., et al.,  :          08-13555 (JMP)-ja
:
Debtors.  :
-----------------------------------------------------------x

RECEIVED
NOV 16 2010
U.S. BANKRUPTCY COURT, SDNY

### NOTICE OF MOTION AND MOTION FOR LIMITED STAY

SIR/MADAM:

PLEASE TAKE NOTICE, THAT THE UNDERSIGNED, WILL MOVE FOR AN ORDER FOR A LIMITED STAY WITH RESPECT TO A CERTAIN MEMO-DECISION AND ORDER GRANTING APPELLANT A LIMITED STAY OF SAID ORDER. PLEASE TAKE NOTICE THAT THE COURT MAY RULE WITH OR WITHOUT PAPERS IN OPPOSITION AND WITH OR WITHOUT A HEARING.

### MOTION

AS THE COURT IS WELL AWARE, UPON A HEARING AND FOLLOWING MEMO-DECISION ORDER OF THE 10TH OF NOV AND SUBSQUENT FILING OF A NOTICE OF APPEAL, CLAIMANT IS EFFECTIVELY BANISHED FROM THE BANKRUPTCY COURT IN THIS MATTER UNLESS AND UNTIL THERE IS A REMAND FOR THE EVIDENCE HEARING[1] THE COURT DENIED. TO BE CANDID, THIS IS A GREAT RELIEF[2] TO CLAIMANT-APPELLANT AS

---

[1] I find it interesting that the Court's view of my calling Mr. Buffet as vexing fairly obtuse. While we can read about Mr. Buffett riding trains in China playing bridge with Mr. Gates or being on TV in shows with Oprah? http://abcnews.go.com/Business/story?id=7628545&page=1 and while Mr. Buffett's public persona of an all shucks, cornpone, cherry coke guy may mollify the Court, it does not do anything to examine his stewardship of Salomon Brothers back when the Grand Union Company, Capital and Holdings Public Venture was unleashed upon investors by a public underwriting by Goldman Sachs.
<As attached>

[2] For example, Claimant will no longer have to consider the purchase of a newer suit, to replace his thread-bare Bill Blass sports coat from West Palm Beach, nor run the Fung Wa Bus gauntlet for $15.

HE NO LONGER HAS TO TRY TO KEEP UP ON THE NEFARIOUS SCHEMES[3] THAT PRESENT THEMSELVES AS THE ONGOING 'BUSINESS-JUDGMENTS' OF THE DEBTOR, LEHMAN BROTHERS AND THE SIDEKICK CASE WITH THE ALMOST USELESS[4] APPENDAGE OF THE FEDERAL GOVT, THE SIPC.

THERE ARE TWO <2> MATTERS WHICH ARE BEFORE THE COURT, BUT WHICH HAVE NOT BEEN NOTICED FOR HEARING, IE THE LAZARD/SUN-MOON CONCERNS AND THE ASIA-ART EXCHANGE.

WHILE CLAIMANT, NOW APPELLANT WOULD BE HAPPY TO COME BEFORE THE COURT ON THESE TWO MATTERS IN LIGHT OF THE DECISION AND ORDER OF THE 10TH IT SEEMS AKWARD. A REQUEST WAS MADE TO WEIL, GOTSHAL TO NOTICE THESE FOR THE 17TH OF NOV, 2010 BUT TO DATE NOTHING HAS BEEN HEARD BACK WITH RESPECT TO THIS AS IT WOULD FALL WITHIN THE 10 DAYS OF THE ORDER IN CONCEPT.

PERHAPS THE COURT MIGHT WISH TO RULE WITHOUT HEARING FURTHER FROM WEIL, GOTSHAL, THUS, IN EFFECT, RENDING THIS MOOT.

RESPECTFULLY,

WILLIAM KUNTZ, III

INDIA ST

PO BOX 1801

NANTUCKET, MA 02554-1801

508-435-5858

NOV 14, 2010

HOPKINTON, MASS

---

[3] At least 2 other Bankruptcy Judges have taken exception to this Court's imprimatur
[4] One could compare the SIPC to an ice machine salesman on the Titanic.

# Salomon Brothers

From Wikipedia, the free encyclopedia
Jump to: navigation, search

## Salomon Brothers

**Salomon Brothers**

| | |
|---|---|
| **Former type** | Acquired |
| **Industry** | Financial services |
| **Fate** | Acquired by Travelers Group in 1998 |
| **Successor** | Salomon Smith Barney (1998-2003), Citigroup (Since 2003) |
| **Founded** | 1910 |
| **Founder(s)** | Arthur Salomon, Herbert Salomon, Percy Salomon |
| **Defunct** | 2003 (name dropped by Citigroup) |
| **Headquarters** | New York, USA |
| **Products** | Investment banking |
| **Revenue** | ▲$4.018 billion (June 1997)[1] |
| **Net income** | ▲$443 million (June 1997)[1] |

| | |
|---|---|
| **Employees** | 7,100 (June 1997)[1] |

*This article deals with Salomon Brothers. For other uses of the name Salomon, see Salomon.*

**Salomon Brothers** was a bulge bracket, Wall Street investment bank. Founded in 1910 by three brothers (Arthur, Herbert and Percy) along with a clerk named Ben Levy, it remained a partnership until the early 1980s, when it was acquired by the commodity trading firm then known as Phibro Corporation.[2] This proved a "wag the dog" type merger as the parent company became first *Phibro-Salomon* and then *Salomon Inc.*[3]. Eventually Salomon (NYSE:SB) was acquired by Travelers Group in 1998, and following the latter's merger with Citicorp that same year, Salomon became part of Citigroup. Although the Salomon name carried on as Salomon Smith Barney, which were the investment banking operations of Citigroup, the name was ultimately abandoned in October 2003 after a series of financial scandals that tarnished the bank's reputation.[4]

# Treasury bond scandal

## SALOMON SMITH BARNEY
### A Member of TravelersGroup

Salomon Smith Barney logo from the late 1990s

In 1991, Salomon trader Paul Mozer was caught submitting false bids to the U.S. Treasury by Deputy Assistant Secretary Mike Basham, in an attempt to purchase more Treasury bonds than permitted by one buyer between December 1990 and May 1991. Salomon was fined $290 million, the largest fine ever levied on an investment bank at the time, weakening it and eventually leading to its acquisition by Travelers Group. CEO Gutfreund left the company in August 1991; a U.S. Securities and Exchange Commission (SEC) settlement resulted in a fine of $100,000 and his being barred from serving as a chief executive of a brokerage firm.[5] The scandal is covered extensively in the 1993 book *Nightmare on Wall Street*.

# John Gutfreund

From Wikipedia, the free encyclopedia
Jump to: navigation, search
*This article is about a banker. For other people, see Gutfreund.*

**John H. Gutfreund** (born September 1929[1]) is the former CEO of Salomon Brothers Inc, an investment bank that gained notoriety in the 1980s. Gutfreund turned Salomon Brothers from a private partnership into a publicly traded corporation [2] which started a trend in Wall Street for

investment companies to go public.[3] He became the icon for the excess that defined the 1980s culture in America. In 1985, *Business Week* gave him the nickname "King of Wall Street".

1. ^ TOO FAR, TOO FAST; Salomon Brothers' John Gutfreund, *The New York Times*, January 10, 1988

## Education and career

Gutfreund attended Oberlin College and majored in English Literature. He became managing partner of Salomon in 1978[4], later becoming its CEO (and the highest paid Wall Street executive at the time), and then left the company in 1991.

Gutfreund was featured prominently in the 1989 book *Liar's Poker* by Michael Lewis, a former employee of Salomon Brothers. Gutfreund would later tell Lewis that "Your fucking book destroyed my career, and it made yours."[2]

## Controversy

When Gutfreund was CEO of Salomon Brothers, a major scandal took place regarding the way Treasury bond trading was done by Salomon Brothers. Paul Mozer, a rogue trader, was submitting bids in excess of what was allowed by the Treasury rules. When this was discovered and brought to the attention of Gutfreund, he did not immediately suspend the rogue trader.[5] This, however, did not sit well with Warren Buffett who had just acquired a stock position in Salomon Brothers for Berkshire Hathaway, and Gutfreund resigned.[1]

## Mr. Buffett

In 1987, Berkshire Hathaway purchased 12% stake in Salomon Inc., making it the largest shareholder and Buffett the director. In 1990, a scandal involving John Gutfreund (former CEO of Salomon Brothers) surfaced. A rogue trader, Paul Mozer, was submitting bids in excess of what was allowed by the Treasury rules. When this was discovered and brought to the attention of Gutfreund, he did not immediately suspend the rogue trader. Gutfreund left the company in August 1991.[27] Buffett became Chairman of Salomon until the crisis passed; on September 4, 1991, he testified before Congress

The New York Times

This copy is for your personal, noncommercial use only.



August 19, 1994

# Ex-Salomon Chief's Costly Battle

By FLOYD NORRIS

John H. Gutfreund, once one of the most powerful men on Wall Street, has lost more than $5 million of his own money, and probably will lose a lot more before he is done dealing with the aftermath of the Treasury bond bidding scandal that cost him his job as chairman and chief executive of Salomon Inc.

In sharp contrast to the normal fate of ousted chief executives, Mr. Gutfreund got almost nothing from Salomon after he left three years ago. Although the company announced that he resigned -- which he insists was the case -- it now maintains he was fired and adds that he should have been fired for cause. As a result, Salomon even decided to seize the stock options and restricted stock he had received in prior years.

Mr. Gutfreund, who will be 65 next month, has spent millions of dollars in legal fees trying to get Salomon to pay him what he is convinced he is owed. He was shocked when a New York Stock Exchange arbitration panel upheld Salomon's contention that he deserved no payment from the firm.

Last week, he went to New York State Supreme Court in an effort to overturn the arbitration decision, calling it a baffling decision that ignored clear contracts between him and Salomon. Unless it is overturned, the decision makes it much more likely that Mr. Gutfreund will eventually be forced to pay a substantial amount to Salomon shareholders.

In the investigations that followed the Salomon scandal, it became clear that Mr. Gutfreund did not approve of the illegal activities. But he did not disclose to regulators the first transgression -- which he and other officials took to be an aberration by an otherwise good employee -- and that fact hurt Salomon immensely in the public view. It also appears to have convinced Salomon officials who succeeded him that Mr. Gutfreund should pay a penalty.

Now, as a result of a failure to settle when he could have, and of a vigorous legal assault by Salomon when he sought money he believed he had earned, Mr. Gutfreund is suffering a financial penalty that Salomon officials say is far greater than they ever imagined would be imposed. But those officials, speaking privately, add that it is too late for them to do anything about it, a view Mr. Gutfreund disputes.

"No one I know understands why Salomon is continuing with this vendetta," Mr. Gutfreund said in an interview this week. "Salomon has shown no caring for me in any way." All he wants to do now, he said, is to get the issue behind him and get on with his life.

But walking away now is not easy to do. Mr. Gutfreund, along with two other former senior Salomon executives, faces a $300 million suit filed by private lawyers on behalf of Salomon shareholders over the bidding scandal, and the official position at Salomon is that Mr. Gutfreund will have to settle that case on his own.

Efforts to cut a deal between Mr. Gutfreund and the firm he once led continued up to the filing of his suit last week, with Laurence A. Tisch, the chairman of CBS and of the Loews Corporation, trying to mediate between him and Warren E. Buffett, the Salomon director who served as chief executive in the aftermath of the bidding scandal and who picked the current chairman, Robert E. Denham.

"John built up Salomon Brothers, did a great job, built up a tremendous firm, and look what happened to him, out of the blue, almost," Mr. Tisch said in an interview yesterday.

Salomon executives and lawyers declined to be quoted, but privately they blamed Mr. Gutfreund for his own plight, saying he turned down a Salomon settlement offer of $8.6 million in late 1992. To Mr. Gutfreund, that was less than half the amount he was clearly owed by Salomon, through its retirement and option plans, at the time of his retirement. "I said, as a matter of principle, that is not right," he said.

The other top executives who left Salomon at the same time reached settlements with the firm, in each case getting less than they felt they were owed. Bond-Bidding Scandal

For Mr. Gutfreund, once proclaimed the King of Wall Street by Business Week -- "I hated that title," he said this week -- the downfall began in April 1991, when he was told by subordinates that Paul W. Mozer, then the head of government bond trading at Salomon, had admitted to making a false bid in the name of a customer in a February bond auction. It was agreed that Government officials should be told of the action.

But Mr. Gutfreund did not act. "I had no sense of urgency," he said. The false bid "looked to me to be a stupid act," he recalled, adding, "He said he had never done it before and would never do it again."

But Mr. Mozer did do it again. And when the scandal broke in August, Mr. Gutfreund's failure to notify the Treasury or the Federal Reserve began to appear like a huge error.

There was a firestorm of Congressional and public criticism, and talk of criminal behavior. But in the end no charges were brought against Mr. Gutfreund and the investigation by the Securities and Exchange Commission ended with a settlement in which Mr. Gutfreund paid $100,000 and was barred from serving as a chief executive of a brokerage firm.

But he was not banned from the industry, and the S.E.C. penalty was for failure to supervise Mr. Mozer, not for any act he committed. Mr. Gutfreund felt vindicated. Arbitration Became a Trial

But Salomon was not willing to pay him all the money he felt he was owed, and he took the matter to arbitration. He evidently expected a fairly quick proceeding, focusing on the language of the Salomon stock option and other plans.

Instead, Salomon turned the arbitration proceeding into a trial on Mr. Gutfreund's conduct. The company contended that Salomon almost perished as a result of his actions, that he had deceived the Salomon board, and that the board, had it known at the time what had really happened, would have fired him for cause.

One action that became a heavily debated part of the arbitration was Mr. Gutfreund's handling of a letter sent from the Federal Reserve Bank of New York to Salomon on Aug. 13, 1991, as the scandal was building. Salomon officials characterized that letter as a clear demand that senior management step down -- although on the face of it that is far from clear -- and blamed Mr. Gutfreund for not notifying the Salomon board.

Mr. Gutfreund said he gave the letter to the firm's lawyers when he received it, and noted that it demanded an answer within 10 days, well after he left Salomon on Aug. 18. He says

some board members knew of the letter, "but everybody forgot, and chose to point the finger at me."

The letter, from Peter D. Sternlight, then the executive vice president of the New York Fed, expressed anger at Salomon for having previously given incorrect information to the Fed. "The occurence of these events, their belated discovery and the failure to report them promptly to us call into question the soundness of Salomon's management and controls," he wrote.

In September 1991, Gerald Corrigan, then the president of the New York Fed, told a Congressional committee that he believed that letter had helped to lead to the departure of Mr. Gutfreund and other senior Salomon executives. Yesterday, Mr. Sternlight, now retired, said he had not viewed the letter as an effort to force management changes.

Just why the arbitrators chose to give Mr. Gutfreund nothing is not clear because securities industry arbitration panels do not state reasons for their decisions. Mr. Gutfreund said that one reason for filing his suit was to try to force the arbitrators to explain why they ignored what he deemed to be clear contractual provisions. No Settlement Talks

Salomon insiders say that it appears to be clear that the arbitrators accepted the contention that Mr. Gutfreund's actions had brought on Salomon's problems. And they say that now they cannot even consider settling with him, for that would invite a suit against them from Melvyn Weiss, the New York lawyer whose shareholder suit against Mr. Gutfreund and other former senior executives, who did settle with Salomon, is pending.

Had Mr. Gutfreund been willing to settle on Salomon's terms prior to the arbitration ruling, they say, it might have been possible to settle the shareholder suit as well, at minimal cost.

Mr. Weiss said yesterday that there were no serious settlement talks going on, and added that he was planning to amend the suit to seek more than $300 million in damages.

If Salomon really thinks it cannot now cut a deal with Mr. Gutfreund, then his only hope would seem to be cutting one to pay money to settle the suit brought by Mr. Weiss, or winning the New York suit. But that will not happen without considerable additional cost to him, and without the possibility for a lot more embarrassing publicity for a very proud man.

In the last three years. Mr. Gutfreund has done some consulting work, including advising other Wall Street chief executives. "There was always a mystique about Salomon," he said, "and they felt maybe they could learn something from me."

But most of his effort has been in fighting for what he views as justice. So far, he has been defeated more soundly than anyone imagined possible when the battle began.

Photo: "Salomon has shown no caring for me in any way," said John H. Gutfreund, who was forced out as head of Salomon Inc. after a Treasury bond bidding scandal and has lost millions of dollars in compensation. (Fred R. Conrad/The New York Times)

- Copyright 2010 The New York Times Company



# THE SUNDAY TIMES

March 21, 2010

# Liars Poker II

**Two decades ago, a former bond trader wrote a darkly comic exposé of Wall Street lies and excess. Now he traces the roots of the biggest financial crisis in history back to the decision of one man – and finds the few who made billions betting on the collapse**

Michael Lewis

The willingness of a Wall Street investment bank to pay me hundreds of thousands of dollars to dispense investment advice to grown-ups remains a mystery to me to this day. I was 24 with no experience of, or particular interest in, guessing which stocks and bonds would rise and which would fall. Believe me, I

hadn't the first clue. I'd never taken an accounting course, never run a business, never even had savings of my own to manage.

I stumbled into a job at Salomon Brothers in 1985 and stumbled out, richer, in 1988. I figured the situation was unsustainable. Sooner rather than later, someone was going to identify me, along with a lot of people more or less like me, as a fraud. Sooner rather than later would come a Great Reckoning, when Wall Street would wake up and hundreds, if not thousands, of young people like me, who had no business making huge bets with other people's money or persuading other people to make those bets, would be expelled from finance.

When I sat down to write my account of the experience in a book called Liar's Poker, I thought I was recording a period piece about the 1980s in America, when a great nation lost its financial mind. I expected readers of the future would be appalled that back in 1986 the CEO of Salomon Brothers, John Gutfreund, was paid millions as he ran the business into the ground. I expected them to gape in wonder at the story of the mortgage bond trader who had lost $250m and to be shocked that once upon a time on Wall Street the CEOs had only the vaguest idea of the complicated risks their bond traders were running.

Not for a moment did I suspect that the financial 1980s would last for two full decades longer. That a single bond trader might be paid $47m a year and feel cheated. That the mortgage bond market, invented on the Salomon Brothers trading floor, would lead to the most purely financial economic disaster in history.

In the two decades after I left I waited for the end of Wall Street as I had known it. Over and over again the financial system was discredited in some narrow way: the outrageous bonuses, the endless parade of rogue traders, the scandal that destroyed Gutfreund and finished off Salomon Brothers, the crisis following the collapse of the Long-Term Capital Management hedge fund (run by another old boss, John Meriwether), the internet bubble.

Yet the big Wall Street banks at the centre of it just kept on growing, along with the sums of money they doled out to 24-year-olds to perform tasks of no obvious social utility.

At some point I gave up waiting. There was no scandal or reversal, I assumed, sufficiently great to sink the system. Then came the events of 2008. In mid-September that year, as the investment banking system collapsed, I sat in a restaurant on Manhattan's East Side waiting for Gutfreund to arrive for lunch.

I had not seen my old boss since I quit Wall Street. I'd met him, nervously, a couple of times on the trading floor. A few months before I'd quit, I had tried to explain to him what at the time seemed exotic trades in derivatives that I had done with a European hedge fund. He claimed not to be smart enough to understand and I assumed that was how a Wall Street CEO showed he was the boss, by rising above the details. There was no reason for him to remember and when my book became a public-relations nuisance to him he told reporters that we had never met.

I knew that after he'd been forced to resign in 1991 he had fallen on harder times. I heard that he had sat on a panel about Wall Street at the Columbia Business School. When his turn came to speak, he advised the students to find some more meaningful thing to do with their lives than go to work on Wall Street. As he began to describe his career, he had broken down and wept.

When I had emailed Gutfreund to invite him to lunch, he could not have been more polite or more gracious. That attitude persisted as he was escorted to the table, made chitchat with the owner and ordered his food. He was more deliberate in his movements but was completely recognisable. The same veneer of courtliness masked the same animal impulse to see the world as it is rather than as it should be.

We spent 20 minutes or so determining that our presence at the same lunch table was not going to cause the Earth to explode. We discovered a mutual friend. We agreed that the Wall Street CEO had no real ability to keep track of the frantic innovation occurring inside his firm. ("I didn't understand all the product lines and they don't either.") We agreed, further, that the CEO of the Wall Street investment bank had shockingly little control over his subordinates. ("They're buttering you up and then doing whatever the f*** they want to do.") He thought the cause of the financial crisis was simple: "Greed on both sides — greed of investors and the greed of the bankers." I thought it was more complicated. Greed on Wall Street was a given, almost an obligation. The problem was the system of incentives that channelled the greed.

The line between gambling and investing is artificial and thin, and the outcome should be the same: for every winner there is a loser. Pretty much all the important people on both sides of the gamble that shattered Wall Street in 2008 left the table rich, however.

A few shrewd investors "shorted" the sub-prime mortgage bond market. Realising that the odds were in their favour, they gambled on the inevitable collapse of the multi-trillion-dollar bond market built on mortgages taken out by poor Americans. They reaped millions, even billions. The people on the other side —the entire financial system, essentially — failed to realise they were betting with the odds against them. The CEOs of every major Wall Street firm either ran their public corporations into bankruptcy or were saved from bankruptcy by the US government. Yet they all got rich, too.

What are the odds that people will make smart decisions about money if they don't need to make smart decisions — if they can get rich making dumb decisions? The incentives on Wall Street were all wrong; they're still all wrong.

But I didn't argue with Gutfreund. Just as you revert to being about nine years old when you go home to visit your parents, you revert to total subordination when you are in the presence of your former CEO. He spoke in declarative statements; I spoke in questions. But as he spoke, my eyes kept drifting to his hands. His alarmingly thick and meaty hands. They were not the hands of a soft Wall Street banker but of a boxer. I looked up.

The boxer was smiling — though it was less a smile than a placeholder expression. And he was saying, very deliberately, "Your . . . f****** . . . book."

I smiled back, though it wasn't quite a smile.

"Why did you ask me to lunch?" he asked, though pleasantly. He was genuinely curious.

You can't really tell someone that you asked him to lunch to let him know that you didn't think of him as evil. Nor can you tell him you asked him to lunch because you thought you could trace the biggest financial crisis in the history of the world back to a decision he had made.

Gutfreund did violence to the Wall Street social order — and got himself dubbed the King of Wall Street — when in 1981 he turned Salomon Brothers from a private partnership into Wall Street's first public corporation, a decision that can now be seen as the first pebble kicked off a cliff that triggered the avalanche that has engulfed Wall Street.

At the time it was more a question of decorum. Gutfreund lifted a giant middle finger in the direction of the moral disapproval of his fellow Wall Street CEOs and ignored the outrage of Salomon's retired partners. ("I was disgusted by his materialism," William Salomon, the son of one of the firm's founders, who had made Gutfreund CEO only after he had promised never to sell it, told me.) Gutfreund seized the day. He and the other partners not only made a quick killing; they also transferred the ultimate financial risk from themselves to their shareholders.

The shareholders, who financed the risk-taking by bond traders, had no real understanding of what the risk-takers were doing. As the risk-taking grew ever more complex, their understanding diminished. All that was clear was that the profits to be had from smart people making complicated bets overwhelmed anything that could be had from servicing customers or allocating capital to productive enterprise. The customers became beside the point.

In the late 1980s and early 1990s Salomon Brothers had entire years — great years! — in which five proprietary traders generated more than the firm's annual profits. Which is to say that the 10,000 or so other employees, as a group, lost money.

The moment Salomon Brothers demonstrated the potential gains to be had from turning an investment bank into a public corporation, the psychological foundations of Wall Street shifted from trust to blind faith. I doubt that any partnership would have leapt into bed with loan sharks, or even allowed mezzanine CDOs (let's just call them a very risky sub-prime investment) to be sold to its customers.

Yet by early 2005 all the big Wall Street investment banks were deep into a game involving bonds based on sub-prime loans made by dubious mortgage lenders, who urged homeowners with bad credit and no proof of income to accept apparently cheap mortgages — no money down and low initial interest, followed by a sudden hike that they would not be able to afford.

In California a Mexican strawberry picker with an income of $14,000 and no English was lent every penny needed to buy a house for $724,000. In New York nannies and housekeepers were offered mortgages to buy expensive townhouses. Their sudden ability to obtain loans was no accident: it followed from the defects of the models used to evaluate sub-prime mortgage bonds by the two big ratings agencies, Moody's and Standard & Poor's.

The inner workings of these models were, officially, a secret: Moody's and S&P claimed they were impossible to game. But everyone on Wall Street knew that the people who ran the models were ripe for exploitation. They were dismissed as brain-dead. "Guys who can't get a job on Wall Street get a job at Moody's," as one Goldman Sachs trader turned hedge fund manager put it.

Wall Street bond trading desks, staffed by people making seven figures a year, set out to coax from the brain-dead guys making high five figures the highest possible ratings for the worst possible loans. Performing the task with Ivy League thoroughness and efficiency, they quickly figured out that the people at Moody's and S&P didn't actually evaluate the individual home loans or even so much as look at them.

The top concern of those betting that the knock-on effects of mortgage defaults would soon overwhelm Wall Street was that the powers-that-be might step in to prevent the strawberry pickers and nannies from failing. The powers-that-be never did so. Instead, in 2008 they stepped in to prevent the failure of the big Wall Street firms that had contrived to bankrupt themselves by making their dumb bets on sub-prime borrowers.

A few Wall Street CEOs were fired for their roles in the sub-prime mortgage catastrophe, but most remained in their jobs and they, of all people, became important characters operating behind closed doors, trying to figure out what to do next. With them were a handful of government officials — the same government officials who should have known a lot more about what Wall Street firms were doing, back when they were doing it.

Hank Paulson, the Treasury secretary, persuaded Congress that he needed $700 billion to buy sub-prime mortgage assets from banks. Thus was born Tarp, the Troubled Asset Relief Program. Once handed the money, Paulson abandoned his promised strategy and instead essentially began giving away billions of dollars in fantastic handouts to Citigroup, Morgan Stanley, Goldman Sachs and a few others unnaturally selected for survival.

The $13 billion that AIG, the rescued insurance giant, owed to Goldman Sachs as a result of its bet on sub-prime mortgage loans was paid off in full by the US government: 100 cents on the dollar.

Just weeks after receiving $25 billion, Citigroup returned to the Treasury to confess that — lo! — the markets still didn't trust Citigroup to survive. In response, the Treasury granted another $20 billion from Tarp and simply guaranteed $306 billion of Citigroup's assets. This guarantee — equal to 2% of US gross domestic product, or roughly the combined budgets of the US Departments of Agriculture, Education, Energy, Homeland Security, Housing and Urban Development and Transportation — was presented undisguised as a gift.

By then it was clear that Tarp's $700 billion was insufficient to grapple with the troubled assets acquired over the previous few years by Wall Street bond traders. That's when the US Federal Reserve took the unprecedented step of buying bad sub-prime mortgage bonds directly from the banks. Soon the risks and losses associated with more than a trillion dollars' worth of bad investments had been transferred from big Wall Street firms to the US taxpayer.

The events on Wall Street in 2008 were reframed — not just by Wall Street leaders but also by the US Treasury and the Federal Reserve — as a "crisis in confidence": an old-fashioned financial panic triggered by the failure of Lehman Brothers, the one firm allowed to go bankrupt.

But there's a difference between an old-fashioned financial panic and what happened in 2008. In an old-fashioned panic, someone shouts, "Fire!" in a crowded theatre and members of the audience crush each other to death in the rush for the exits. On Wall Street in 2008 a crowded theatre burnt down with a lot of people still in their seats. Every big firm on Wall Street was either bankrupt or fatally intertwined with a bankrupt system.

The new regime — free money for capitalists, free markets for everyone else — plus the more or less instant rewriting of financial history vexed Steve Eisman, one of the key players who had bet against sub-prime.

The world's most powerful and most highly paid financiers had been entirely discredited; without government intervention every single one of them would have lost his job; and yet those same financiers were now using the government to enrich themselves.

"I can understand why Goldman Sachs would want to be included in the conversation about what to do about Wall Street," Eisman told me. "What I can't understand is why anyone would listen to them."

In Eisman's view, the unwillingness of the US government to allow the bankers to fail was a symptom of a still deeply dysfunctional financial system. The problem wasn't that the banks were, in themselves, critical to the economy. The problem, he felt certain, was that some gargantuan, unknown dollar amount of credit default swaps — essentially, bets on the banks' inability to pay their debts — had been bought and sold on every one of them.

The failure of, say, Citigroup might be economically tolerable but it would also trigger the payoff of a massive bet of unknown dimensions from people who had sold credit default swaps on Citigroup to those who had bought them.

"There's no limit to the risk in the market," he said. "A bank with a market capitalisation of $1 billion might have $1 trillion-worth of credit default swaps outstanding. No one knows how many there are. And no one knows where they are."

This was yet another consequence of turning Wall Street partnerships into public corporations: it turned them into objects of speculation. It was no longer the social and economic relevance of a bank that rendered it too big to fail, but the number of side bets that had been made upon it.

I couldn't resist asking Gutfreund about his biggest and most fateful act: turning Salomon Brothers into a corporation. "Yes," he said. "They — the heads of the other Wall Street firms — said what an awful thing it was to go public and how could you do such a thing. But when the temptation rose they all gave in to it."

He agreed that the main effect of turning a partnership into a corporation was to transfer the financial risk to the shareholders, but when the corporation was a Wall Street investment bank and it screwed up badly enough, its risks became the problem of the US government.

"It's laissez-faire until you get in deep shit," he said, with a half-chuckle. He was out of the game. It was now all someone else's fault.

He watched me curiously as I scribbled down his words. "What's this for?" he asked.

I told him that I thought it might be worth revisiting the world I'd described in Liar's Poker, now that it was finally dying. Maybe bring out a 20th anniversary edition.

"That's nauseating," he said.

Hard though it was for him to enjoy my company, it was harder for me not to enjoy his. He was still tough, straight and blunt as a butcher. He'd helped to create a monster, but he still had in him a lot of the old Wall Street where people said things like "a man's word is his bond".

On that Wall Street people didn't walk out of their firms and cause trouble for their former bosses by writing a book about them. "No," he said, "I think we can agree about this: your f****** book destroyed my career and it made yours."

© *Michael Lewis 2010 Extracted from The Big Short by Michael Lewis, published by Penguin at £25. Copies can be ordered for £22.50, including postage, from The Sunday Times Bookshop on 0845 271 2135 Wall Street prophet, John Arlidge reviews The Big Short, Books, Culture, pages 39-40*