JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
William J. Hine
Tracy V. Schaffer

Attorneys for Debtors
And Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., et al., | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| In re | SIPA Proceeding Case No. |
| LEHMAN BROTHERS, INC., | 08-01420 (JMP) |
| Debtor. | |

## LBHI'S POST-TRIAL MEMORANDUM AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................... 1

POST-TRIAL MEMORANDUM ................................................................... 1

    A.    The Misrepresentations To The Court ............................................ 2

    B.    The Never-Approved Clarification Letter Materially
        Altered The Transaction ................................................................. 5

    C.    Because The Clasification Letter Was Never Approved,
        LBHI's Claims Under Counts III, IV, V And IX Of The
        Adversary Complaint Were Proven ............................................... 7

    D.    Rule 60(b) Relief Is Warranted Because The Principles Of
        Disclosure Governing Section 363 Sales Were Violated ............. 8

    E.    Rule 60(b) Cannot Be Avoided By A Retrospective View
        Of What The Result At The Sale Hearing Could Have Been
        If The Truth Had Been Told At The Time .................................. 11

    F.    The Evidence At Trial Precludes A Finding That The Court
        Could Have Approved The Deal If The Truth Had Been
        Told ............................................................................................. 13

    G.    Rule 60(b) Does Not Accommodate A Reconstruction Of
        What Could Have Happened If The Truth Had Been Told ......... 17

PROPOSED FINDINGS OF FACT ............................................................ 30

   I.    INTRODUCTION .................................................................... 30

   II.    THE LEHMAN ONE TRANSACTION ................................. 32

    A.    In Response To The Difficult Economic Situation In 2008,
        U.S. Regulators Sought To Encourage An Acquisition Of
        Lehman ....................................................................................... 32

    B.    Barclays Viewed The Economic Troubles In The U.S.
        Banking Sector As A Strategic Opportunity ............................... 34

    C.    Barclays Insisted It Would Only Buy Lehman Assets At A
        Distressed Price .......................................................................... 35

    D.    After Conducting Due Diligence And Almost Reaching A
        Deal With Lehman, Barclays Backed Out Of The Lehman
        One Transaction ......................................................................... 37

    E.    LBHI Was Forced, With A Strong Push From U.S.
        Regulators, To File For Bankruptcy Protection .......................... 39

   III.    THE LEHMAN TWO TRANSACTION ................................. 42

i

# TABLE OF CONTENTS

**Page**

A.  Negotiations Of A New Transaction With Barclays
    Resumed Right After LBHI Filed For Bankruptcy ...................... 42

B.  The Principal Negotiators ............................................................ 45

C.  Barclays' Insistence On A First Day Gain, Capital
    Accretion, And A "Delta" Or "Buffer" Or Asset/Liability
    Mismatch In Its Favor As A Condition Of The Deal ................... 48

D.  The Undisclosed $5 Billion Discount, Or "Difference,"
    Between Lehman's Book Value And The Negotiated Price ....... 54

    1.  The negotiated values for Lehman's assets were
        agreed to by Lehman executives moving on to jobs
        at Barclays ....................................................................... 54

    2.  Movants proved the existence of the discount with
        sworn testimony and documentary evidence ................... 59

    3.  Barclays' efforts to explain away the $5 billion
        discount are internally inconsistent and unavailing ......... 65

        (i)   Embracing the discount, Barclays argued it
              was justified by Lehman's "stale" marks ............. 65

        (ii)  Alternatively rejecting the discount,
              Barclays also argued the discount was not
              "plausible" ........................................................... 72

E.  The Lehman Boards' Approval Of The Sale Transaction
    Was Based Upon Being Told The Deal Was To Be A
    "Wash" And Barclays Was Paying More Than Liquidation
    Value ......................................................................................... 75

F.  Unlike The Lehman Boards, The Barclays Board Was Told
    The Sale Transaction Would Yield An Immediate Gain For
    Barclays Of About $3 Billion ..................................................... 82

G.  The Sale Transaction Was Supposed To Be Based On The
    9/16/08 Financial Schedule ...................................................... 85

    1.  The 9/16/08 Financial Schedule reflected a
        balanced, or "wash," transaction ..................................... 85

    2.  Lehman's lawyers, drafting the Asset Purchase
        Agreement, did not prepare and were unaware of
        the basis for the 9/16/08 Financial Schedule .................. 87

    3.  The 9/16/08 Financial Schedule incorporated
        discounted, negotiated values, not Lehman's "book
        values" ............................................................................. 89

# TABLE OF CONTENTS

**Page**

H.    The Asset Purchase Agreement Set Forth The Terms Of The Sale Transaction For The Court, The Lehman Boards And Creditors ............................................................................ 91

I.    The Asset Purchase Agreement And 9/16/08 Financial Schedule Reflected Inflated Bonus And Cure Liabilities ............ 96

    1.    The $2 billion amount listed for bonus liabilities was purposefully overstated from the start ...................... 96

    2.    The amount of cure liabilities Barclays was supposed to assume was also inflated ............................ 101

J.    Lehman Lawyers And Others Who Appeared In Court Were Not Told About The Undisclosed Discount Or Inflated Liabilities ...................................................................... 105

    1.    Weil Gotshal was unaware of the discount or inflated liability estimates ................................................ 106

    2.    Steven Berkenfeld was not told of the discount or inflated liability estimates ................................................ 109

    3.    McDade did not focus on the term "book value" and did not know that the comp and cure liabilities were inflated .............................................................................. 112

    4.    The Lehman employees who knew about the discount and inflated liabilities were not involved in making disclosures to the Court ...................................... 114

K.    The September 17 Hearing And Sale Approval Motion ............ 117

L.    Disclosures Concerning The "Buffer," Valuations And Risks Made To Analysts And Institutional Investors Were Not Made To The Court And Did Not Accurately Depict The Deal .................................................................................... 121

M.    Unbeknownst To Weil Gotshal And The Court, Barclays Had Further De-Risked The Sale Transaction Through A "Take-Out" Agreement With The FRBNY ................................ 127

IV.    THE LEHMAN THREE TRANSACTION ............................................ 135

A.    Without Disclosure To The Court, Barclays Materially Changed The Deal After It Replaced The FRBNY In Providing Interim Financing To Lehman ................................... 135

B.    The September 18 Repurchase Agreement ................................ 140

C.    The Use Of The September 18 Repurchase Agreement To Deliver The Discount ................................................................ 143

# TABLE OF CONTENTS

**Page**

D.    Barclays Marked Down The Repo Securities To Liquidation Value And Then Complained It Had Not Received Adequate Collateral ..................................................... 148

E.    The Friday "Scramble" For Additional Assets .......................... 158

    1.    Barclays threatened not to close the Sale Transaction if Lehman did not come forward with additional assets ............................................................ 158

    2.    The scramble for assets to satisfy Barclays' demand .... 161

F.    Those Making Disclosures To The Court Knew Nothing About The Real Role Of The September 18 Repurchase Agreement, And They Were Unaware The Collateral Had Been Marked To Liquidation Value .......................................... 165

G.    The September 19 Sale Hearing, And The Court's Approval Of The Sale Transaction And Issuance Of The Sale Order .................................................................................. 168

    1.    Weil Gotshal described recent changes to the deal ........ 168

    2.    The Court was told about, but not shown, the Clarification Letter ......................................................... 173

    3.    McDade testified at the Sale Hearing, but only about aspects of the transaction about which he was aware .................................................................................. 175

    4.    Ridings testified based only on his limited knowledge of the deal ..................................................... 178

    5.    The Court approved the Sale Transaction and issued the Sale Order based only on the record before it .......... 180

H.    Over The Weekend After The Sale Hearing Material Changes Were Made To The Sale Transaction Through The Clarification Letter .................................................................. 181

    1.    The parties' difficult and harried negotiations continued over the weekend ........................................... 181

    2.    When the Creditors Committee was excluded from the negotiations, its representatives tried to gather information and were misled about the revised terms of the deal ............................................................. 185

    3.    Material changes to the deal were incorporated into the Post-Sale Hearing Clarification Letter .................... 189

# TABLE OF CONTENTS

**Page**

4.      The Clarification Letter was also used to evade the Section 559 problems created by Barclays' termination of the September 18 Repurchase Agreement ................................................................... 192

5.      The Clarification Letter was finalized and signed in the early morning hours of September 22, 2008 ........... 195

I.      The Decision Not To Bring The Clarification Letter Back To The Court For Its Review And Approval ............................ 197

V.      BARCLAYS' MISCONDUCT CONTINUED AFTER CLOSING ..... 199

A.      Barclays Failed To Pay The Full Amount In Bonus And Cure Liabilities .......................................................................... 199

1.      Barclays failed to pay the full amount of $2.0 billion in bonuses required under Paragraph 9.1(c) of the APA .................................................................... 199

(i)      Barclays identified its "$650 million problem" before Closing ................................... 200

(ii)     All along, Barclays planned on paying, at most, only $1.3-1.5 billion in bonuses ............... 203

(iii)    In the end, Barclays paid only $1.5 billion in bonuses to transferred Lehman employees ........ 210

2.      Barclays paid only a tiny fraction of the $1.5 billion in cure liabilities the Court was told it would pay ......... 214

B.      Barclays' Internal Opening Balance Sheet Confirmed Its Efforts To Disguise From The Court Its Expected Gain On Acquisition .............................................................................. 217

1.      McDade did not know that, even before the Closing, Kelly was helping Barclays calculate an enormous gain on acquisition ......................................................... 217

2.      Even before Closing, Barclays was counting on earning a large day-one gain, or negative goodwill, from the Sale Transaction ............................................. 219

3.      Post-Closing, Barclays manipulated the Acquisition Balance Sheet to maximize asset markdowns while preserving the minimum requisite negative goodwill.... 224

4.      Even though the Acquisition Balance Sheet showed a large gain, it never reflected an accounting reduction from the actual gain ....................................... 232

# TABLE OF CONTENTS

**Page**

5. When PwC audited Barclays' Acquisition Balance Sheet, it did not independently value the assets or liabilities in question ...................................................... 233

C. LBHI Was Excluded From Discussions Concerning The Dispute Between Barclays And JPM Over $7 Billion In Collateral, The Resolution Of Which Was Also Not Properly Disclosed .................................................... 234

1. Almost immediately after the Closing, a nasty dispute erupted between Barclays and JPM ................... 234

2. The FRBNY played a not-so-impartial role in effecting a settlement between these two banks ............ 241

3. Barclays, JPM and LBI signed the December 5, 2008 Settlement Agreement and presented it to the Court for approval .......................................................... 251

D. From The Outset, Those Administering The LBHI Estate Were Kept In The Dark About Important Aspects Of The Sale Transaction And Eventually Were Forced To Seek Rule 2004 Discovery To Learn The Truth ................................. 255

1. Alvarez & Marsal was retained to administer the LBHI Estate ................................................................. 255

2. Barclays' lack of cooperation in providing information to the Estate ............................................... 257

3. LBHI could not comprehensively study the Sale Transaction in late 2008 ................................................ 260

4. The December 2008 Settlement provided no new information to LBHI ...................................................... 264

5. The Bay Harbour Appeal involved unrelated claims ..... 265

6. Alvarez & Marsal began noticing discrepancies in LBHI's books ................................................................. 268

7. Barclays' February 2009 disclosure of its "gain" on the Sale Transaction ..................................................... 269

8. In light of Barclays' recalcitrance, A&M and LBHI began focusing on the terms of the Sale Transaction .... 271

9. LBHI retained special counsel, who were forced to seek Rule 2004 discovery and expeditiously to move under Rule 60 ....................................................... 273

THE VALUATION EVIDENCE ................................................................. 275

# TABLE OF CONTENTS

**Page**

I.    BARCLAYS RECEIVED A WINDFALL OF
      APPROXIMATELY $13 BILLION BEYOND WHAT WAS
      DISCLOSED TO THE COURT ............................................................ 275

    A.    The Value Of The Transaction That Was Disclosed To The
            Court .................................................................................... 275

    B.    The Valuation Of The Transaction That Actually Closed ......... 277

        1.    Movants presented detailed valuation opinions by
                  experts with experience in the relevant financial
                  markets ............................................................................ 277

        2.    All other valuations for the Repo Collateral were
                  very close to Movants' valuation ................................... 281

            (i)    Other valuations before the Court ...................... 281

            (ii)    Movants' Expert John Schneider offered
                        unrebutted testimony on the customs,
                        practices and reliability of the custodial
                        marking process ................................................ 283

            (iii)    The custodial valuations are very close to
                        each other and to Movants' valuation;
                        Barclays' valuation is the outlier ...................... 285

            (iv)    There is significant overlap between the
                        Repo Collateral and the Fed Repo ..................... 286

    C.    Barclays' Valuation Mirrors The Undisclosed Liquidation
            Value Analysis Conducted On The Morning Of September
            19, 2008 .................................................................................. 287

    D.    Barclays' Acquisition Balance Sheet Does Not Reflect The
            Fair Value Of The Securities As Of The Closing Date ............. 290

        1.    Barclays' Acquisition Balance Sheet value is the
                  outlier among all available valuations ........................... 290

        2.    The valuation dates Barclays used are flawed ............... 292

        3.    The liquidity adjustments Barclays used do not
                  reflect the fair value ....................................................... 294

        4.    PwC's audit of Barclays' financial statements was
                  not an independent valuation ......................................... 295

    E.    Barclays Had An Incentive To Undervalue The Securities ....... 297

# TABLE OF CONTENTS

**Page**

II.  BARCLAYS RECEIVED FAR MORE IN ASSETS AND PAID FAR LESS CONSIDERATION THAN WAS DISCLOSED TO THE COURT ...................................................................... 300

  A.  The Financial Assets That Barclays Received Had A Far Greater Value Than Disclosed To The Court ........................... 300

      1.  Equities and JPM Inventory (Professor Mark Zmijewski ) ...................................................... 302

          (i)  Equities ............................................... 303

          (ii)  JPM Inventory .................................... 308

      2.  Municipal Bonds (Joseph Schwaba) ............................ 310

      3.  Treasuries, Agencies, MBS and CLOs (Mark Slattery) ........................................................ 311

          (i)  U.S. Treasuries and Agencies ............................ 312

          (ii)  Agency RMBS .................................... 314

          (iii)  Non-Agency RMBS ............................... 318

          (iv)  Pine ................................................. 319

          (v)  CLOs ................................................. 322

          (vi)  CDOs and CLOs ................................. 322

          (vii)  Third Party Valuations ....................... 323

      4.  Corporate Bonds (John Olvany) ................................... 326

          (i)  Giant Stadium Bonds ........................................ 327

          (ii)  Other Corporate Bonds ..................................... 331

  B.  Barclays Added Undisclosed Assets To The Deal Through The Weekend Asset Scramble ................................................... 333

  C.  Barclays Incurred Far Less In Liabilities Than Was Disclosed To The Court ............................................................. 334

III.  PROFESSOR PFLEIDERER'S TESTIMONY DID NOT REBUT MOVANTS' EXPERTS' INDEPENDENT VALUATIONS OR THEIR CALCULATION OF THE BARCLAYS' WINDFALL .......... 336

  A.  Professor Pfleiderer Did No Independent Valuation And Did Not Provide Any Empirical Data In Support Of Barclays' Valuation .................................................................. 337

# TABLE OF CONTENTS

**Page**

B. Barclays Has Turned Professor Pfleiderer Into A Rebuttal Expert On Valuation Topics For Which He Has Provided No Affirmative Opinion About Barclays' Valuation ................ 341

    1. Rebuttal to Professor Zmijewski ................................... 342

        (i) Equities ............................................. 342

        (ii) JPM Inventory .................................... 343

    2. Rebuttal to Mr. Schwaba ............................................. 344

    3. Rebuttal to Mr. Slattery ............................................... 345

        (i) Mid-to-Bid ........................................ 345

        (ii) Pine .................................................. 347

    4. Rebuttal to Mr. Olvany ................................................. 348

PROPOSED CONCLUSIONS OF LAW .................................................... 350

I. LBHI IS ENTITLED TO RECOVER UNDER BANKRUPTCY CODE §§ 549 AND 550 AND TO A DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201 AND 2202 ......................... 350

    A. The Court Did Not Approve The Transfer Of Extra Assets Memorialized Over The Weekend In The Clarification Letter ...................................................................... 350

    B. Barclays' Strained Linguistic Analysis Is No Defense To These Claims ................................................................ 353

    C. Barclays' Misreading Of The "No Material Change" Provisions Of The Sale Order Is Unsupportable ....................... 358

    D. Barclays' Other Arguments On This Issue Are Disingenuous ............................................................. 362

    E. LBHI Is Entitled To A Declaratory Judgment Defining Movants' Rights And Barclays' Obligation To Return Assets, The Transfer Of Which Was Not Approved By The Court ...................................................................... 364

II. MOVANTS DEMONSTRATED AT TRIAL THAT THEY ARE ENTITLED TO RELIEF UNDER RULE 60(b) .................................. 366

    A. LBHI Is Entitled To Relief Under Rule 60(b)(1) Due To Multiple Mistakes Of Fact By Various Entities ....................... 368

    B. Separately, LBHI Is Entitled To Relief Under Rule 60(b)(2) Based On Newly Discovered Evidence ..................... 382

# TABLE OF CONTENTS

**Page**

1.  The newly discovered evidence relates to facts in existence at the time of the Sale Hearing and the closing of the Sale Transaction ...................................... 382

2.  LBHI was "justifiably ignorant" of this new evidence until recently, and without Rule 2004 discovery it would not have been found ........................ 384

3.  Barclays' other factual and legal defenses are misplaced ..................................................... 385

C.  Separately, LBHI Is Entitled To Relief Under Rule 60(b)(3) And 60(b)(6) Based On Innocent Or Intentional Misrepresentations Made To The Court .................................... 392

D.  Separately, LBHI Is Entitled To Relief Under Rules 60(b)(3), 60(b)(6) And 60(d) For Fraud By Certain Individuals Or Entities Or Fraud On The Court ........................ 394

E.  The Relief LBHI Seeks Is Authorized Under Rule 60, The Appropriate Vehicle For Addressing These Concerns .............. 396

1.  The relief Movants seek is consistent with Rule 60 ...... 396

2.  Courts need not find bad faith to grant Rule 60(b) relief ............................................................... 397

III.  BARCLAYS' PRECLUSION DEFENSES ARE WITHOUT MERIT .......................................................................... 398

A.  LBHI's Rule 60(b) Motion Was Timely Filed ......................... 398

B.  The Mandate Rule Does Not Bar LBHI's Claims ..................... 404

C.  Barclays' Estoppel Defenses Are Baseless And Inapplicable ................................................................ 407

D.  Barclays' Release Arguments Are Unavailing .......................... 409

CONCLUSION ............................................................................. 413

# TABLE OF AUTHORITIES

**Page**

CASES

*Alpern v. UtiliCorp United, Inc.*,
  84 F.3d 1525 (8th Cir. 1996) ............................................................385

*Anderson v. Cryovac, Inc.*,
  862 F.2d 910 (1st Cir. 1988)................................................. 18-19 n.7, 393

*Avedis v. Herman*,
  192 F.R.D. 477 (S.D.N.Y. 2000) ........................................................25

*Bettis v. Kelly*,
  No. 02 Civ. 104 (MBM), 2004 WL 1774252 (S.D.N.Y. Aug. 9, 2004)........................... 25-26

*Bousa Inc. v. United States of America* (*In re Bulk Oil (USA) Inc.*),
  No. 89-B-13380, 2007 WL 1121739 (S.D.N.Y. Apr. 11, 2007) ...........................................25

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*,
  117 F.3d 655 (2d Cir. 1997)........................................................23

*Casse v. Key Bank Nat'l Ass'n (In re Casse)*,
  198 F.3d 327 (2d Cir. 1999).........................................................357

*Catskill Dev., LLC v. Park Place Entm't Corp.*,
  286 F. Supp. 2d 309 (S.D.N.Y. 2003)....................................... 18-19 n.7

*Cedar Island Builders, Inc. v. South Cnty. Sand & Gravel, Inc.*,
  151 B.R. 298 (D.R.I. 1993)..........................................................22

*Center v. Hampton Affiliates, Inc.*,
  66 N.Y.2d 782 (1985) ...................................................386, 386 n.201, 392 n.204

*Christy v. Alexander & Alexander of New York Inc. (In re Finley, Kumble,*
  *Wagner, Heine, Underberg, Manley, Myerson & Casey)*,
  130 F.3d 52 (2d Cir. 1997)...................................................... 350-351

*Cobos v. Adelphi University*,
  179 F.R.D. 381 (E.D.N.Y. 1998) ...................................................24 n.8

*Colonial Auto Center v. Tomlin (In re Tomlin)*,
  105 F.3d 933 (4th Cir. 1997) .......................................................356

*Crocker v. Piedmont Aviation, Inc.*,
  49 F.3d 735 (D.C. Cir. 1995) ................................................... 405-406

*Devan v. Phoenix Am. Life Ins. Co. (In re Merry-Go-Round Enters., Inc.)*,
    400 F.3d 219 (4th Cir. 2005) ..................................................................... 355-356

*DeWeerth v. Baldinger*,
    38 F.3d 1266 (2d Cir. 1994)...................................................................... 404-405

*Edwards v. Golden Guernsey Dairy Co-op (In re Edwards)*,
    962 F.2d 641 (7th Cir. 1992) ............................................................ 397- 398 n.207

*Fetik v. New York Law Sch.*,
    No. 97 CIV. 7746 (DLC), 1999 WL 459805 (S.D.N.Y. June 29, 1999) ................................25

*Fitzgerald v. Field*,
    175 F.3d 1007, 1999 WL 177278 (2d Cir. 1999) ..........................................................24 n.8

*Freedom, N.Y., Inc. v. United States*,
    438 F. Supp. 2d 457 (S.D.N.Y. 2006)......................................................................26 n.9

*GMAC Mortgage Corp. v. Salisbury (In re Loloee)*,
    241 B.R. 655 (B.A.P. 9th Cir. 1999)........................................................................28

*Golfland Entm't Ctrs., Inc. v. Peak Inv., Inc. (In re BCD Corp.)*,
    119 F.3d 852 (10th Cir. 1997) .................................................................... 19-22, 27

*In re Alan Gable Oil Dev. Co.*,
    No. 91-1526, 1992 WL 329419 (4th Cir. Nov. 12, 1992) .................................... 397-398 n.207

*In re Au Natural Restaurant, Inc.*
    63 B.R. 575 (Bankr. S.D.N.Y. 1986)........................................................................9

*In re Aztec Supply Corp.*,
    399 B.R. 480 (Bankr. N.D. Ill. 2009) .................................................................10

*In re CBI Holdings, Inc.*,
    529 F.3d 432 (2d Cir. 2008)........................................................386, 388, 389 n.202

*In re Chung King, Inc.*,
    753 F.2d 547 (7th Cir. 1985) .............................................................................23, 27

*In re Computer Learning Ctrs., Inc.*
    268 B.R. 468 (Bankr. E.D. Va. 2001)....................................................................27

*In re Crystal Apparel, Inc.*,
    220 B.R. 816 (S.D.N.Y. 1998)..............................................................................357

*In re Ctr. Wholesale, Inc.*,
    759 F.2d 1440 (9th Cir. 1985) ...........................................................................28

*In re Emergency Beacon Corp.,*
    666 F.2d 754 (2d Cir. 1981)..................................................10, 28, 367, 380

*In re Int'l Fibercom, Inc.,*
    503 F.3d 933, 945 (9th Cir. 2007) ..................................................403

*In re Gucci,*
    126 F. 3d 380 (2d Cir. 1997)..................................................398, 398 n.208

*In re Intermagnetics Am. Inc.,*
    926 F.2d 912 (9th Cir. 1991) ..................................................10, 352

*In re Jack Kline Co.,*
    ___ B.R. ___, No. 09-36569-H4-7, 2010 WL 3909445
    (Bankr. S.D. Tex. Sept. 30, 2010)..................................................22

*In re Lundy,*
    110 B.R. 300 (N.D. Ohio 1990)..................................................29

*In re Maxwell Newspapers, Inc.,*
    170 B.R. 549 (S.D.N.Y. 1994)..................................................10

*In re McKenzie,*
    No. 08-16378, 2010 WL 3386012 (Bankr. E.D. Tenn. Aug. 25, 2010) ..................................................22

*In re Med. Software Solutions,*
    286 B.R. 431 (Bankr. D. Utah 2002) ..................................................9

*In re Metzger,*
    346 B.R. 806 (Bankr. N.D. Cal. 2006) ..................................................28-29

*In re New York Trap Rock Corp.,*
    42 F.3d 747 (2d Cir. 1994)..................................................9

*In re Rickel & Assocs., Inc.,*
    272 B.R. 74 (Bankr. S.D.N.Y. 2002)..................................................10

*In re Santec Corp.,*
    49 B.R. 59 (Bankr. D. N.H. 1985) ..................................................9

*In re Stephen's 350 E. 116th St.,*
    313 B.R. 161 (S.D.N.Y. 2004)..................................................26 n.9

*In re Summit Ventures, Inc.,*
    161 B.R. 9 (D. Vt. 1992)..................................................398

*In re Wilde Horse Enters., Inc.,*
    136 B.R. 830 (Bankr. C.D. Ca. 1991)..................................................9

*In re WPRV-TV, Inc.*,
   983 F.2d 336 (1st Cir. 1993) ............................................................................18, 22

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
   235 F.3d 588 (D.C. Cir. 2001) ............................................................................405

*Jones v. Aero/Chem Corp.*,
   921 F.2d 875 (9th Cir. 1990) ................................................................ 18-19 n.7

*K & B Capital, LLC v. Official Unsecured Creditor's Comm. of LWD, Inc.*
   *(In re LWD, Inc.)*,
   No. 5:05-CV-108, 2007 WL 2668512 (W.D. Ky. Sept. 6, 2007) .........................351

*K & B Capital, LLC v. Official Unsecured Creditor's Comm. of LWD, Inc.*
   *(In re LWD, Inc.)*,
   No. 5:06-CV-00206-TBR, 2009 WL 5198060 (W.D. Ky. Dec. 23, 2009) .............9

*Kirschenbaum v. Nassau Cnty. Dist. Attorney* (*In re Vitta*),
   409 B.R. 6 (E.D.N.Y. 2009) .................................................................................25

*Kirschner v. KPMG LLP*,
   __ N.E.2d __, 2010 WL 4116609, 2010 N.Y. Slip Op. 07415
   (Oct. 21, 2010) ...............................................................387-388, 390-391

*Kirschner v. KPMG LLP*,
   No. 09-2020-CV(L), 09-2027-CV (CON), 2010 WL 4644062
   (2d Cir. Nov. 18, 2010) ......................................................................................387

*Langdon v. Proper*,
   No. 89-CV-1400, 1991 WL 263554 (N.D.N.Y. Dec. 9, 1991) ........................26 n.9

*Lasky v. Cont'l Prods. Corp.*,
   804 F.2d 250 (3d Cir. 1986) .................................................................. 27-28, 368

*Lawrence v. Wink* (*In re Lawrence*),
   293 F.3d 615 (2d Cir. 2002) .................................................................9-10, 366-367

*Leber-Krebs, Inc. v. Capitol Records*,
   779 F.2d 895 (2d Cir. 1985) .................................................................................28

*Lonsdorf v. Seefeldt*,
   47 F.3d 893 (7th Cir. 1995) ........................................................... 18-19 n.7, 3932

*Marshall v. Monroe & Sons, Inc.*,
   615 F.2d 1156 (6th Cir. 1980) .......................................................................28, 368

*Matura v. United States*,
   189 F.R.D. 86 (S.D.N.Y. 1999) ..................................................................... 24-25

*Motorola Credit Corp. v. Uzan*,
    561 F.3d 123 (2d Cir. 2009).............................................................................23

*Musso v. Brooklyn Navy Yard Dev. Corp.*
    (*In re Westchester Tank Fabricators, Ltd.*),
    207 B.R. 391 (Bankr. E.D.N.Y. 1997)..........................................................8, 351

*Myers v. Martin* (*In re Martin*),
    91 F.3d 389 (3d Cir. 1996)............................................................................. 8-9

*Nemaizer v. Baker*,
    793 F.2d 58 (2d Cir. 1986).............................................................................23

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)...............................................................................358 n.195

*Official Unsecured Creditors Comm. of LWD, Inc. v. K & B Capital, LLC*
    (*In re LWD, Inc.*),
    332 B.R. 543 (Bankr. W.D. Ky. 2005) ............................................................10

*Paddington Partners v. Bouchard*,
    34 F.3d 1132 (2d Cir. 1994)....................................................................... 23-24

*Philips Lighting Co. v. Schneider*,
    No. 09-4144-cv(L), 2010 WL 3959820 (2d Cir. Oct. 12, 2010) ...........................23

*Polycel Structural Foam, Inc. v. Pool Builders Supply of the Carolinas, Inc.*
    (*In re Polycel Liquidation, Inc.*),
    No. 06-2183, 2007 WL 77336 (D.N.J. Jan. 8, 2007)....................................... 22-23

*Pratt v. Philbrook*,
    109 F.3d 18 (1st Cir. 1997).............................................................................404

*Rajala v. Langer* (*In re Lodge America, Inc.*),
    239 B.R. 580 (D. Kan. 1999) ..........................................................................357

*Remcor, Inc. v. Allegheny Int'l, Inc.* (*In re Allegheny Int'l, Inc.*),
    158 B.R. 343 (Bankr. W.D. Pa. 1992) ..........................................................8, 352

*Ross v. Kirschenbaum* (*In re Beck Indus., Inc.*),
    605 F.2d 624 (2d Cir. 1979)...................................................................... 17-18

*Rozier v. Ford Motor Co.*,
    573 F.3d 1332 (5th Cir. 1978) ............................................................... 18-19 n.7

*S. Motor Co. of Dade Cnty. v. Carter-Pritchett-Hodges, Inc.*
    (*In re MMH Auto. Grp., LLC*),
    385 B.R. 347 (Bankr. S.D. Fla. 2008) ........................................................ 10-11

*Sapir v. C.P.Q. Colorchrome Corp. (In re Photo Promotion Assocs., Inc.)*,
  881 F.2d 6 (2d Cir. 1989) ...................................................................... 7-8, 351

*Schultz v. Butcher*,
  24 F.3d 626 (4th Cir. 1994) ................................................................ 18-19 n.7

*Seidel v. Houston Casualty Co.*,
  375 F. Supp. 2d 211 (S.D.N.Y. 2005)............................................................365

*Sewell v. The 1199 Nat'l Benefit Fund for Health & Human Servs.*,
  187 Fed. Appx. 36 (2d Cir. 2006)........................................................358 n.195

*Sims v. Aalfs (In re Straightline Invs., Inc.)*,
  Nos. 99-1249, 97-13375, 2002 WL 31863838 (Bankr. N.D. Cal. Apr. 4, 2002) .......... 351-352

*Stefanopoulous v. City of New York*,
  No. 07-cv-1045, 2008 WL 4820558 (2d Cir. Nov. 5, 2008) ................................380

*U.S. v. Baus*,
  834 F.2d 1114 (1st Cir. 1987) ...............................................................403

*U.S. v. Int'l Bhd. of Teamsters*,
  247 F.3d 370 (2d Cir. 2001)..................................................................382

*U.S. v. One (1) Douglas A-26B Aircraft*,
  662 F.2d 1372 (11th Cir. 1981) .............................................................393

*U.S. v. Salerno*,
  932 F.2d 117 (2d Cir. 1991)............................................................398 n.208

*W. Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus, Inc.)*,
  43 F.3d 714 (1st Cir. 1994).................................................................357

*W. Helicopter Servs., Inc. v. Rogerson Aircraft Corp.*,
  777 F. Supp. 1543 (D. Or. 1991) ......................................................385-386

*Wedtech Corp. v. Federal Ins. Co.*,
  740 F. Supp. 214 (S.D.N.Y. 1990)...........................................................365

*Whitaker v. Associated Credit Servs., Inc.*,
  946 F.2d 1222 (6th Cir. 1991) .........................................................28, 368

## STATUTES

11 U.S.C. § 105..........................................................................10, 366-367

11 U.S.C. § 363 .............................................................................*passim*

11 U.S.C. § 363(f).............................................................................44

11 U.S.C. § 363(m) ........................................................................................397 n.207

11 U.S.C. § 542 ........................................................................................................7

11 U.S.C. § 549 ................................................................................................ *passim*

11 U.S.C. § 550 .................................................................... 7, 350-351, 3521 n.195

11 U.S.C. § 550(a) .......................................................................................... 350-351

11 U.S.C. § 559 ................................................................................................ *passim*

28 U.S.C. § 2201 ....................................................................350, 364, 413, 414

28 U.S.C. § 2202 .................................................................................. 350, 364-365

## OTHER AUTHORITIES

Fed. R. Bankr. P. 2004 ...................................................................................... *passim*

Fed. R. Bankr. P. 9024 ...................................................................... 397-398 n.207

Fed. R. Civ. P. 30(b)(6) ...................................................................................203

Fed. R. Civ. P. 60 .............................................................................................. *passim*

Fed. R. Civ. P. 60(b) ........................................................................................ *passim*

Fed. R. Civ. P. 60(b)(1).............................................. 24 n.8, 25, 367, 368, 379-380

Fed. R. Civ. P. 60(b)(2)......................................................................367, 382, 386

Fed. R. Civ. P. 60(b)(3)....................................................... 10, 18 n.8, 22, 367, 393-394

Fed. R. Civ. P. 60(b)(6)...........................................24 n.8, 28, 366, 393, 393 n.206, 394 n.207, 393

Fed. R. Civ. P. 60(c)(1)...................................................................................275

Fed. R. Civ. P. 60(d) ...............................................................................23, 367, 394

Moore's Federal Practice § 60.24[1] (2009)...........................................................367

Moore's Federal Practice § 60.41[3] (2009).........................................................368

## PRELIMINARY STATEMENT

Lehman Brothers Holdings, Inc. ("LBHI" or "Debtor"), respectfully submits this Post-Trial Memorandum, Proposed Findings of Fact and Conclusions of Law in support of (i) the claims in its adversary complaint that were tried, by stipulation, in conjunction with its motion pursuant to Fed. R. Civ. P. 60(b) and (ii) its Rule 60(b) motion concerning the Sale Order.  This submission is divided into three parts.  First, it sets out a summary of the facts and the law with regard to certain discrete aspects of Rule 60 that were addressed at the trial and, in particular, at the closings.  Second, it sets out detailed proposed findings of fact based on the full record adduced at the trial, which took place in intermittent segments between April 26, 2010 and October 21, 2010.  Third, it sets out proposed conclusions of law supporting the relief that LBHI requests.

## POST-TRIAL MEMORANDUM

To avoid repetition in what is another lengthy submission in this complex case, LBHI incorporates by reference, and in full, all of the arguments set forth in its moving papers (served September 15, 2009) and in its reply papers (served March 18, 2010) filed in support of its Rule 60 motion.  We will not repeat in this section of LBHI's submission much of what has been said in those papers and the proposed findings of fact and conclusions of law below.  Instead, we will summarize as to certain salient issues, including the relief LBHI seeks under the claims in its Adversary Complaint which were tried before this Court, and, with respect to Rule 60, the question the Court raised during

the closing arguments concerning whether Rule 60(b) permits or requires the Court to

consider the facts it learned at trial as if they had been disclosed at the Sale Hearing.[1]

### A.    The Misrepresentations To The Court

This case, of course, arises from the transfer to Barclays, purportedly under the

auspices of the Sale Transaction, of billions of dollars in Debtor assets that were never

authorized by, or disclosed to, the Court.  The ultimate mechanism for this transfer was

the so-called Clarification Letter, an amendment of material terms of the Asset Purchase

Agreement that was never approved by the Court.

Indeed, as the evidence at trial showed, misrepresentations and failures to disclose

did not just arise at the end of the deal with the Clarification Letter.  The Sale Transaction

that was disclosed to the Court was based upon false premises from the very outset.  In

essence, one deal was disclosed to the Court while a very different deal was closed.  In

the end, the transaction that closed on September 22, 2008 was not the deal that had been

described to the Court.

The evidence at trial proved the following material aspects of the Sale Transaction,

among others, were either misrepresented to the Court, or, worse, never disclosed at all:

- The deal that was disclosed to the Court was a balanced transaction, in
  which there was to be an exchange of roughly equivalent assets and
  liabilities.  This was not true.  In fact, there was a first day gain embedded

---

[1] Capitalized terms used in the Post-Trial Memorandum are later defined inthe Findings of Fact.
Unless otherwise noted, all exhibits referenced herein (cited as either "M. __" or "BCI __") have been
admitted into evidence at trial except for demonstrative exhibits.  Citations to demonstrative exhibits are for
the Court's convenience and are not in evidence.  Citations to the trial transcript of the evidentiary hearings
held in connection with Movants' Adversary Complaint and Rule 60 motions, and Barclays' Motions are
presented here as "Date of testimony [Witness] page:lines" (*e.g.,* 4/26/10 [Ainslie] ___.).  All designated
deposition testimony has been admitted as BCI 1108. Designated deposition transcripts are cited as
"[Deponent] Dep. Tr. page:lines" (*e.g.,* Tonucci Dep. Tr. __.).  Citations to the Stipulations of Fact agreed
to by the parties in April 2010 are referenced as "Stip. ¶ __."

in the deal, resulting in a windfall for Barclays of approximately $13 billion immediately upon closing.

- The Court was told, in the Asset Purchase Agreement, that the "Long Positions" of securities being transferred to Barclays had a "book value" as of September 16, 2008 of approximately $70 billion. That was not true. It was a negotiated value, $5 billion lower than Lehman book value.

- The Court was told that, as part of the consideration it would pay the sellers, LBHI and LBI, Barclays would assume $1.5 billion in liability for contract cures. The balanced nature of the Sale Transaction depended on this assertion, and according to Bart McDade, a drop in the cure number meant a drop in the consideration Barclays was giving Lehman. The cure number was inflated. Barclays never intended to pay anything close to $1.5 billion, and it knew this as of the Sale Hearing on September 19. Barclays planned to pay something in the neighborhood of $200 million.

- The Court was told that, as part of the consideration it would pay the sellers, LBI and LBHI, Barclays would pay an agreed amount of $2 billion in bonuses to transferred Lehman employees. Again, the balanced nature of the Sale Transaction depended on this assertion as well. But it also was not true. In fact, although it had expressly agreed it would, Barclays never intended to pay more than $1.5 billion in bonuses.

- By September 18, the day before the Sale Hearing, the Asset Purchase Agreement had essentially been abandoned and, instead, the Lehman/Barclays repurchase agreement had become the focal point of the transaction. The Court was told virtually nothing about the repurchase agreement, or Barclays' Take-Out Agreement with the New York Federal Reserve Bank, much less that those agreements had become central to the transaction.

- The Court was told at the Sale Hearing that the value of the assets to be transferred had been reduced to a specific figure of $47.4 billion owing to a drop in "market" value. That was not true. In fact, the assets at issue were primarily the assets in the repo and they had been deliberately priced at *liquidation* values, which was never disclosed to the Court.

- On the morning of September 19, the day of the Sale Hearing, Barclays demanded that more assets be added to the deal and threatened not to close unless its demands were met. This was followed by the Friday asset "scramble," in which billions of dollars in assets were added, including 15c-3 assets worth (at this point) $1.7 billion, and "clearance box" assets worth $1.9 billion. Not one word was uttered at the Sale Hearing about any of this.

- At the Sale Hearing, the Court was told, in connection with some relatively insignificant changes, that a "clarification letter" was being prepared. This Clarification Letter, in fact, made material changes and additions to the deal and, by the time it was done, was the mechanism by which (i) the undisclosed discount on Lehman's assets was delivered to Barclays, and (ii) the fruits of the undisclosed Friday asset scramble were purportedly added to the deal. The Court was not shown – and never approved – the Clarification Letter.

Each one of these misrepresentations, omissions and failures to disclose rendered the Sale Transaction *materially* different from the transaction the Court was asked to approve.[2] The "bonus" issue, alone, made a half billion dollar difference between the consideration the Court was told the sellers, LBHI and LBI, would receive, and the amount Barclays in fact planned to pay. Similarly, the "cure" estimate of $1.5 billion overstated by $1.3 billion the amount Barclays was really going to give in consideration to LBHI and LBI. And, most certainly, the $5 billion discount on the value of the financial assets, embedded in the deal from the beginning and delivered through undisclosed use of the repo at the end of the week, reflected a material difference between what the Court was told and what actually happened. Indeed, the failure to utter a single *substantive* word about the role of the repo – and the use of liquidation values in connection with it – was by itself a failure to disclose a critical, material facet of the transaction.

---

[2] At closing arguments, the Court observed that it could not have had a thirty-plus day Sale Hearing on the Sale Motion itself to explore every facet of what was going on the week of September 15. LBHI does not contend that a thirty day Sale Hearing would have been necessary to make full disclosure to the Court. It took months of discovery and thirty days of trial to wrestle from many, often hostile, Barclays witnesses facts they knew in September 2008 but, had the lawyers known all of these same facts, it would have taken only minutes to utter the above disclosures to the Court at the time (*e.g.*, that prices were based on liquidation values or that Barclays never intended to pay more than $200 million in cure payments).

**B.    The Never-Approved Clarification Letter Materially Altered The Transaction**

The failure even to show the Court the misnamed "Clarification Letter," in which numerous critical amendments were made to the Sale Transaction, was also a material non-disclosure.  It changed the definition of "Purchased Assets" in the Asset Purchase Agreement and added billions in additional assets, purportedly to make up for the phony "shortfall" Barclays claimed existed based on the liquidation values applied to the repo assets.

Barclays suggested throughout the trial that the Clarification Letter was merely ministerial, adding nothing to the deal that was not already in the deal.  But Barclays' effort to make the transfer of billions in additional assets (or purported rights to assets) disappear was belied not only by the evidence at trial (including the testimony of its General Counsel Jonathan Hughes) but also the terms of the letter itself, which expressly said it "amends" the Asset Purchase Agreement.  It is also contrary to Barclays' written admissions to the Court, made in May 2009, before it adopted a strategy to mischaracterize the Clarification Letter as merely "identifying" value that was already in the deal.  In Barclays' own words:

> It [] has been repeatedly disclosed that Barclays was entitled to receive *additional categories of securities* and other assets set forth in the Clarification Letter, which *amended the APA.*

(M.259 [Barclays Rule 2004 Obj.] ¶ 52 (emphasis added)); and

> Accordingly, as reflected in the Clarification Letter, there was a concerted effort to identify *additional assets* to transfer to Barclays as *alternatives* to those assets that could not be delivered as contracted for in the original APA.

(*Id.* (emphasis added); s*ee also* Barclays Opposition to Rule 60 Motion ("Barclays Opp.")

¶ 141 ("As a result of these concerns, the Barclays negotiators informed the Lehman

negotiators that Barclays would not be willing to close the deal unless it could be assured

that other LBI assets would be transferred to make up for the shortfall.").)[3]

In apparent recognition of the reality that billions were added to Barclays' take

through the Clarification Letter, and the Court was never told about them, Barclays has

also offered a more audacious argument.  It claims that, although the Court never *saw* the

Clarification Letter at the Sale Hearing, the Court nonetheless *approved* it, simply

because its existence was mentioned at the Sale Hearing and in the Sale Order.  (10/21/10

[Closing] 133:1-136:21).  The Court, of course, has already rejected this assertion both at

the beginning of the trial (4/9/10 [Opening] 133:15-17) and after all the proof was in

(10/21/10 [Closing] 136:22-137:12) ("Let me be clear about something . . . .  I never

approved the clarification letter.  You're making a circular argument about what the sale

order says").

A simple chronology of events shows that the amendments and transfers effected

by the Clarification Letter were never approved by the Court.  At the Sale Hearing, Ms.

Fife told the Court there was "a clarification letter which we're hoping to finalize and

actually present to Your Honor whenever it comes down here."  (M.261 [9/19/08 Tr.]

48:5-17.)  No Clarification Letter was shown to the Court though.  (M.261 [9/19/08 Tr.]

133:21-136:5 (offering APA and First Amendment).)  The Sale Hearing concluded

shortly after midnight on Saturday, September 20.  And the parties continued to negotiate

---

[3] In fact, Barclays' mischaracterization of the Clarification Letter collapses under the weight of common sense.  First, if it was not to amend the Asset Purchase Agreement, there would have  been no need to add the term "amends" to it.  Second, if the assets it addressed were already in the deal, there would have been no need to change the definition of "Purchased Assets," which it purported to do.

-- and make major changes in -- the Clarification Letter over the weekend.  (*See, e.g.*,

M.53, M.138.)  The Court had expressly said it was available on the weekend.  But on the

morning of Monday, September 22 -- without ever telling the Court about the

Clarification Letter terms -- the deal closed and unauthorized assets were purportedly

added pursuant to the Clarification Letter including (i) $769 million in 15c3-3 assets;

(ii) $1.9 billion in "clearance box" assets; and (iii) the excess collateral in the repo plus

cash worth, by Barclays' own contemporaneous calculation, $7 billion ($52 billion in

cash and securities minus the $45 billion advanced under the repo).

> **C.**     **Because The Clarification Letter Was Never Approved, LBHI's Claims Under Counts III, IV, V And IX Of The Adversary Complaint Were Proven**

If the Court were to stop right there, the foregoing facts warrant findings in

LBHI's favor on the causes of action in its Adversary Complaint that, by stipulation with

Barclays,[4] were tried along with the Rule 60 evidentiary hearing.  In particular, for

transfers effected through the never-authorized Clarification Letter, or otherwise beyond

the scope of the Sale Transaction the Court actually approved, Barclays is liable under

(i) Count III, for unauthorized post-petition transfers under Bankruptcy Code § 549;

(ii) Count IV, for recovery of unauthorized assets under Bankruptcy Code § 550;

(iii) Count V, for recovery of the excess collateral in the repo under Bankruptcy Code §§

542 and 559; and (iv) Count IX, for a declaratory judgment that "[t]o the extent the

Clarification Letter, or other undisclosed modifications in the Sale Transaction, purported

to authorize the transfer of assets to Barclays over and above the transfer of assets

---

[4] Stipulation and Order Between Debtors, Trustee, Committee and Barclays Capital Inc. Concerning Certain Claims Made in Adversary Complaints Filed by LBHI, SIPA Trustee and Creditor's Committee, So Ordered on Jan. 13, 2010.

authorized by the Court, those transfers were void and unauthorized." *See e.g., Sapir v. C.P.Q. Colorchrome Corp.* (*In re Photo Promotion Assocs., Inc.*), 881 F.2d 6, 8-11 (2d Cir. 1989) (recovery of property transferred beyond the scope of court's approval order); *Musso v. Brooklyn Navy Yard Dev. Corp.* (*In re Westchester Tank Fabricators, Ltd.*), 207 B.R. 391, 401-03 (Bankr. E.D.N.Y. 1997) (recovery of rent payments when court had not approved the transfer*); Remcor, Inc. v. Allegheny Int'l, Inc.* (*In re Allegheny Int'l, Inc.*), 158 B.R. 343 (Bankr. W.D. Pa. 1992) (Section 549 allowed recovery of payments that exceeded estimates given to the court when it approved contract at issue); *see also infra* ¶¶ 713-747.)

> **D.     Rule 60(b) Relief Is Warranted Because The Principles Of Disclosure Governing Section 363 Sales Were Violated**

If Barclays were to persist in its assertions that (i) the Clarification Letter was authorized, sight unseen, by the Court, (ii) the Clarification Letter did not amend the deal, or (iii) that the Sale Transaction was anything other than a balanced transaction, then relief under Rule 60(b) is well warranted to modify the Sale Order to ensure it achieved only what it was *intended* to achieve: the approval of the Sale Transaction that was actually described to the Court; not the material changes to the transaction about which the Court was never told.

Any other result would convert the Sale Order into a license to make any deal, at all, regardless of whether the deal closed was consistent with the deal that was disclosed and actually approved. Such a result would be utterly inconsistent with the fundamental principles of disclosure that support Section 363 of the Code, which gives buyers finality but only when proper disclosure is made. Complete and accurate disclosure is the foundation upon which Section 363 sales are built. *See, e.g., Myers v. Martin* (*In re*

*Martin*), 91 F.3d 389, 395 (3d Cir. 1996) (363 sale is subject to "a trustee's actions to

complete disclosure and review by the creditors of the estate and by the bankruptcy

court"); *In re New York Trap Rock Corp.*, 42 F.3d 747, 752 (2d Cir. 1994) (discussing

policies against undisclosed agreements in section 363 sales); *K & B Capital, LLC v.*

*Official Unsecured Creditor's Comm. of LWD, Inc. (In re LWD, Inc.),* No. 5:06-CV-

00206-TBR, 2009 WL 5198060, at *5 (W.D. Ky. Dec. 23, 2009) (affirming denial of

motion to compel performance under a sale order because, *inter alia,* "rather than

following the Term Sheet . . . Debtors improperly transferred assets to [purchaser] and

failed to disclose a major asset that was ultimately purchased … for insufficient

consideration at the 363 Sale"); *see also In re Wilde Horse Enters., Inc.*, 136 B.R. 830,

841 (Bankr. C.D. Ca. 1991) ("Of course, the court and the creditors can only make an

'articulated business' judgment regarding the prudence of the sale where there has been a

full disclosure of the details of the proposed sale by its proponent"); *In re Med. Software*

*Solutions,* 286 B.R. 431, 439-40 (Bankr. D. Utah 2002) (requiring "full disclosure of the

sale terms" as requirement for approval of Section 363 sale).  For this reason, disclosure

of imprecise or incomplete terms is insufficient to support a Section 363 sale.  *In re Au*

*Natural Restaurant, Inc.*,  63 B.R. 575, 580 (Bankr. S.D.N.Y. 1986) ("unclear and

inconsistent terms contained in the transaction" were grounds to disapprove sale).  And

presenting a sale transaction to a Court that is not actually finalized as to its real terms, as

happened here, is also a basis to refuse approval.  *In re Santec Corp.*, 49 B.R. 59, 60

(Bankr. D. N.H. 1985) (denying approval where sale terms were not yet finalized).

  After a sale has been approved, Rule 60(b) empowers the Court to address the

affects of material non-disclosure or misrepresentation.  To suggest, as Barclays has both

before and throughout the trial, that the relief Movants seek is somehow extraordinary or unprecedented is simply not true.  It is well settled that, in the context of Section 363 sales, where there has been a failure to disclose, or misrepresentation as to deal terms, these "are precisely the types of facts under which Rule 60(b)(3) [or Sections 105 and 549] relief is appropriate."  *Lawrence v. Wink* (*In re Lawrence*), 293 F.3d 615, 625 (2d Cir. 2002).  And bankruptcy courts have readily employed Rule 60(b) to modify or vacate sale orders that were predicated on misstated or undisclosed terms.  *In re Emergency Beacon Corp.,* 666 F.2d 754, 757 (2d Cir. 1981) (affirming bankruptcy court's amendment of order to eliminate provision that had been procured without full disclosure); *In re Intermagnetics Am. Inc.*, 926 F.2d 912, 917-18 (9th Cir. 1991) (sale order set aside under Rule 60(b) where false declaration submitted to the Court); *In re Rickel & Assocs., Inc.*, 272 B.R. 74, 88-90 (Bankr. S.D.N.Y. 2002) (Rule 60(b) motion successfully raised factual issues where purchaser failed to disclose a warrant provision, thus understating to the Court the value of assets being sold); *In re Maxwell Newspapers, Inc.*, 170 B.R. 549, 550 (S.D.N.Y. 1994) (affirming decision to vacate settlement under Rule 60(b) because motion for approval had material omissions); *Official Unsecured Creditors Comm. of LWD, Inc. v. K & B Capital, LLC (In re LWD, Inc.)*, 332 B.R. 543, 551-56 (Bankr. W.D. Ky. 2005) (debtor and purchaser failed to disclose valuable asset and inadequate consideration; requiring purchaser to compensate estate for the asset); *In re Aztec Supply Corp.*, 399 B.R. 480, 489-92 (Bankr. N.D. Ill. 2009) (vacating under Rule 60(b) one paragraph of Court's order because matter approved in the court had been obtained through misrepresentations as to notice and consent); *S. Motor Co. of Dade Cnty. v. Carter-Pritchett-Hodges, Inc. (In re MMH Auto. Grp., LLC)*,  385 B.R. 347, 360-73

(Bankr. S.D. Fla. 2008) (modifying Section 363 sale order to eliminate "free and clear"

provision to the extent the Rule 60 movant, who had a leasehold interest, had received no

notice of sale proceeding (*citing In re Polycel Liquidation, Inc.*, No. 00-62780, 2006 WL

4452982 at *10-11 (Bankr. D. N.J. Apr. 18, 2006).)[5]

> **E.    Rule 60(b) Cannot Be Avoided By A Retrospective View Of What The Result At The Sale Hearing Could Have Been If The Truth Had Been Told At The Time**

Barclays has tried to sidestep all of this settled law and the vital importance of full

disclosure in Section 363 sales by proclaiming that all of the material non-disclosures and

misrepresentations proven at trial did not really matter, because, Barclays has suggested,

if all had been disclosed, the Court would have had no choice but to approve the deal

anyway.  This notion would turn the Court into a rubber stamp, rendering the Sale

Hearing a meaningless exercise and forcing the Court to ignore material

misrepresentations made to it.  Apart from the obvious assault it would wage on the

substance and integrity of the proceedings that took place before the Court, the assertion

also is based on a fallacious premise.

Specifically, Barclays' formulation relies on the faulty ground that, if (i) the

discount, (ii) the inflated cure estimate, (iii) the inflated bonus amount, (iv) the central

role of the repo, (v) the use of liquidation values to measure the repo collateral, (vi) the

misuse of the artificially low repo values to justify the Friday asset grab, and (vii) the

misuse of the repo to deliver $7 billion in excess "haircut" collateral to Barclays without

---

[5] What is extraordinary is that billions of dollars are at issue.  However, the magnitude of what is at stake most certainly does not diminish disclosure requirements under bankruptcy law.  Indeed, witnesses for Barclays conceded that the disclosure requirements in these proceedings were not relaxed (for any reason).  (*See, e.g.*, 8/31/10 [Lewkow] 135:25-136:4; 8/23/10 [Shapiro] 62:6-18; 9/7/10 [Leventhal] 33:5-34:5.)

consideration had been revealed, then *all else* that took place during the week of

September 15 would nonetheless have remained the same.

The premise is impossible. There can never be a record based upon a hypothesis

with some -- but not all -- historical facts changed. Thus, if the Court were to

hypothesize about what it would have done if it knew now what it was not told then, it

would *also* have to hypothesize about *everything else* that would have happened as a

consequence if the truth had been told in September 2008. For example, the Court would

have to speculate about how creditors and other interested parties would have reacted to

the same revelations. It would also have to determine (by supposition because there is

obviously no record of what never happened) what motions, objections, appeals or stay

applications creditors would have made, and how they all would have fared. Similarly,

the Court would have to assume that -- despite a *revealed* $13 billion gain -- there still

would have been no other bidders for all or part of the assets. The Court would also have

to assume that the government still would have supported the deal. It would have to

incorrectly find that the Lehman Boards would have approved the deal to begin with.

Similarly, the Court would have to guess that the testimony given in support of the deal

would have been exactly the same, although the testimony no doubt would be very

different indeed. It would have to surmise that a finding of arms-length negotiations was

still viable, even though it now has been revealed that conflicted Lehman officers,

including a CFO already under a multimillion dollar contract to Barclays, contingent on

the deal closing, were in the thick of the project to add undisclosed billions to the deal.

The list could go on and on, but even these examples demonstrate that it simply is not

possible to discern retroactively what would actually have happened if the past had been

different and the truth had been told to the Court when it should have been told, *i.e.,*

before or at the Sale Hearing.

### F.    The Evidence At Trial Precludes A Finding That The Court Could Have Approved The Deal If The Truth Had Been Told

The premise that the record can be retroactively amended, but only in part, is also

not supported by the evidence at trial.  To the contrary, the evidence underscores the

impossibility of engaging in such revisionist history:

- Board member Michael Ainslie testified, without rebuttal, that the Boards of LBHI and LBI approved the deal *because* it was a "wash"; a basically equivalent exchange of assets and liabilities.  Ainslie specifically recalled this balanced deal structure because the Lehman Boards "had been briefed already that we were now working for the creditors as the Board of Lehman, the Lehman estate" and "this deal structure seemed to eliminate the possibility of a loss to Lehman or claims that would more than offset the value of the assets being transferred."  (4/26/10 [Ainslie] 85:17-86:4.)

- The Boards also understood that the price Barclays was going to be paying was greater than liquidation value, because that is what they were told at the meeting when they were asked to approve the deal.  There is no basis in the trial record to assume the transaction would have ever made it out of the boardroom, let alone to the Court, if a lopsided deal, with a loss to Lehman and its creditors and billions in Barclays' favor, priced at liquidation prices, had been the disclosed deal on the table.

- Bart McDade, Lehman's chief negotiator, testified unequivocally that the deal he negotiated was a wash, it was supposed to remain so throughout the week, and that is what he intended to represent to the Court when he testified.  There is no basis in the trial record to assume he would have agreed to the completely different deal Barclays now asks the Court to retroactively approve.  For example, upon being shown Barclays' opening balance sheet at trial which included an equity position for Barclays of $3.38 billion, McDade testified that if there had been such an equity component in the deal on the opening day, the deal would not have been in balance and thus would be inconsistent with the actual deal he made with Barclays.  (4/26/10 [McDade] 213:21-214:12.)  McDade testified that if the assumed liabilities were inflated, the assets should be reduced to maintain the balanced transaction.  (*See* 4/27/10 [McDade] 75:15-19.)

- The Sale Transaction described to the Court expressly contemplated the possibility of other bidders and an auction.  Hence a break-up fee was approved.  There is no basis in the record at all to assume that, had the $13

billion "buffer" or the use of liquidation prices been revealed, other
bidders would not have emerged for all or part of the assets up for sale,
offering something better to Lehman than the sweetheart deal Barclays
had.  Put bluntly, there may have been no other takers for the equivalent
exchange that was disclosed, but it is fair to conclude there most likely
would have been other takers willing to bid on an immediate first day gain
of billions of dollars if the true economics of the deal had been disclosed.

- Barry Ridings told the Lehman Boards that the standard the deal had to
meet was "a price greater than liquidation value." (M.9 at 4.)  At trial, by
deposition, he testified repeatedly that he was able to testify favorably at
the Sale Hearing because the deal was "better than liquidation" (Ridings
Dep. Tr. 12:18-22, 34:18-35:6, 43:4-18, 65:4-15, 66:21-25.)  Even
Michael Klein, Barclays' ten-million dollar man, conceded that Lehman
needed to make sure the transaction was better than liquidation.  (8/27/10
[Klein] 89:11-22.)  If the truth had been revealed at the time that the deal
was at liquidation values, Ridings could not have made these
representations to the Boards or to the Court.

- There is no basis in the record to assume the creditors would have acted,
or reacted, in exactly the same way had the truth been revealed.  Creditors
at the Sale Hearing registered their objections, or consents, and made
decisions about appeals, stay applications, and the exercise of other rights,
all based on the Sale Hearing as it actually played out and based on what
was actually disclosed.  Had they been told there was a multi-billion
benefit to Barclays, derived from undervalued assets and overstated
consideration, they certainly would have made different, and more
aggressive, decisions about their rights.  If the creditors did not care if the
estates lost billions and would not have objected, sought a stay or
otherwise exercised their rights, they would not have continued, as the
proof showed they did, to try to verify (over Barclays' resistance and
refusal) what assets were transferred to Barclays, and the value of those
assets, for months after the Sale Transaction.  For example, in December
2008, as the creditors continued to press for information concerning the
securities transferred to Barclays, Houlihan Lokey wrote that the "primary
issue" that it was "trying to get to the bottom of" was whether "the
securities that were transferred to [B]arcap were worth $5 billion more"
than the creditors were told, and whether "the [L]ehman guys -- in cahoots
with their soon to be bosses/partners at barcap -- negotiated a sweetheart
deal that [camouflaged] the amount/value of securities that were to be
transferred." (BCI 814.)   Clearly, and obviously, value was important to
the creditors who had been misleadingly told by Michael Klein that the
Sale Transaction provided a $2 billion benefit to the Estate and not a gain
of billions to Barclays.  (5/6/10 [Burian] 107:3-12.)

- Barclays did not inform the Court, the creditors or other interested parties
that it had any difficulty valuing the securities at issue, that the values

14

could have a wide range, or that the cure and comp estimates were illusory. Rather the Court was given a specific value of $47.4 billion for assets and specific estimates for comp and cure. There is no evidence in the record that demonstrates that had these alleged valuation difficulties been disclosed, nothing else would have changed. To take but one example, when Mr. Qureshi cross-examined McDade about the absence of a balance sheet and was told there had been a "line item detail" evaluation, he moved on to another topic. (M.261 [9/19/08 Tr.] 109:5-110:6.) Had he been told no such evaluation had, in fact, ever been conducted, that liquidation values had been put together that morning in under an hour, and that there was a swing of billions of dollars in the potential values at issue, he would no doubt have conducted a very different, and certainly less docile, cross of McDade.

There is also no sound basis in the record to determine that the Court would have acted the same way if the truth had been told. If Barclays' invitation to speculate about what the outcome would have been were accepted, the Court -- which itself expressed specific questions about the overall value of the transaction, and whether material amounts even in the $500 million range were being adequately addressed -- would have been in a position then to take steps to adjust the multimillion-dollar windfall Barclays was getting, none of which is possible now. For example:

- If the Court had been told of the possibility that Barclays would make a huge windfall on the deal, or that the values ascribed to the securities were unreliable or unknowable, the Court could have imposed a "true up"or similar requirement of its own to ensure Barclays was protected but at the same time did not make off with a huge windfall at the expense of innocent creditors.

- Had the Court known that those valuing the assets on the Lehman side were subject to an obvious conflict of interest, the Court could have put a neutral in place to oversee the process or insisted on an after-the-fact appraisal of the assets by a disinterested third party to ensure a fair valuation had been performed.

- Had the Court known that the estimate for cure liabilities was inflated, or simply unreliable, or that Barclays did not intend to pay $2 billion in bonuses, the Court could have approved the deal subject to Barclays reimbursing LBHI and LBI with additional consideration to reflect the amount it actually paid compared to the estimate the Court was given.

- Had the Court known that the Creditors Committee was being kept in the dark about key financial information, the Court might well have insisted that immediate and complete disclosure be made prior to the Sale Hearing.

- If the Court had been advised of the Section 559 issue associated with the excess repo collateral, it likely would have wanted to consider this issue before approving the proposed by-pass of that provision engineered by Barclays' counsel and never revealed to the Court.

The overarching point here is that the Court, the Debtors counsel, the Creditors Committee, other third parties (whether potential bidders or objectors), the Federal Reserve Bank of New York ("FRBNY"), the U.S. government, all had options available to them at the time, but the exercise of those options was necessarily dependent upon what they were told at the time about the facts and the terms of the deal. They certainly cannot exercise them now, because the terms of the deal were not revealed as part of the process of approving the Sale Transaction.[6]

In sum, the record does not permit a speculative assumption that all else would – or could – have gone as it did if the truth had been revealed at the Sale Hearing. The Debtors, their creditors, potential bidders, Barclays, and the Court all likely would have acted and interacted very differently in the hypothetical world posited by Barclays, in which the material terms of the Sale Transaction were actually disclosed as part of the process of approving the Section 363 sale. But there is no way to reconstruct that

---

[6] Moreover, it is just not good enough for Barclays to assert now that it relied on all aspects of the deal, disclosed or otherwise, and Barclays would have walked away from any other deal. The fact is Barclays was anxious to do this deal; it was the key to Barclays implementing its strategic vision of becoming a major player in the North American broker-dealer market. (8/27/10 [Klein] 8:24-9:12; 4/30/10 [Hughes] 121:11-122:4.) Barclays' CFO Clackson wrote that it was the "deal of the century." (BCI 292.) Indeed, the record is replete with examples of Barclays agreeing to modify the transaction to get the deal done. For example, over the weekend, rather than wait until Monday morning, September 22, to review the transcript from the Sale Hearing for what was represented to the Court concerning cash in the transaction, Barclays dropped a demand for a billion dollars cash in connection with the 15c-3 assets. There is nothing in the record proving, or even suggesting, that had the Court insisted on protections or modifications such as those noted above, Barclays actually would have refused to close. That is just an easy story for Barclays to tell now.

complex alternative world now.  The misrepresentations made at the time corrupted the

record as a whole, and thus disabled the Court from doing now what Barclays invites it to

do, *i.e.,* assume what the record would have been – and how it would have developed –

had the truth been told.

### G.    Rule 60(b) Does Not Accommodate A Reconstruction Of What Could Have Happened If The Truth Had Been Told

In a context similar to a Rule 60(b) motion, the Second Circuit has recognized the

affront to the Court's processes Barclays' invitation to retroactively ignore material

misrepresentations would present.  Thus, in *Ross v. Kirschenbaum* (*In re Beck Indus.,*

*Inc.*), 605 F.2d 624 (2d Cir. 1979), the court addressed a bankruptcy auction in which a

senior debtor employee had a right of first refusal that allowed him to match the best

offer.  He secretly entered into a joint venture agreement with one potential bidder, Butler,

to preclude its competitor, Edison, from acquiring the business.  The employee used his

right of first refusal and undisclosed joint venture agreement to chill the bidding and keep

the price down.  Once Edison bid (and Butler purposefully stayed out of the auction), the

employee moved for an order closing the bidding and seeking to exercise his right of first

refusal on Edison's opening bid price, never disclosing to the trustee or the court that

Butler was financing his offer or that he had an agreement to later sell Butler the part of

the business it wanted.  Having seen no other bids, the bankruptcy court approved the

sale to the employee.  Later, when the undisclosed joint venture was revealed, the trustee

appealed the confirmation of the sale.  In affirming the district court's reversal of that sale

order, the Second Circuit addressed the argument that the undisclosed joint venture did

not impact the low price at which the company sold and specifically noted the

impossibility of such a hypothetical inquiry in the context of a sale order:  "It is simply

impossible to say that the price to be received by the estate is what it would have been if [the employee] had not entered into the [joint venture agreement] and concealed Butler's role. Courts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same." (*Id.* at 636.)

Nor does Rule 60(b) itself accommodate the type of revisionist history that Barclays urges. To rule otherwise would threaten the integrity of the Court's processes and undermine the public's confidence in those processes. It would bestow a windfall on a party that participated in misrepresentations, while those who might have objected and those who might have bid on such a lucrative deal never had a chance to do so on a properly informed basis and a transparent record, and can never have a chance to do so now. For this reason, in the specific context of deciding whether to exercise discretion to vacate or modify an order confirming a sale in bankruptcy, courts focus on whether there are "compelling equities" to order such relief in light of all the circumstances and are especially vigilant to protect the integrity of the bankruptcy process. The overriding inquiry is to determine whether "there was fraud, unfairness, or mistake in the *conduct of the sale," In re WPRV-TV, Inc.,* 983 F.2d 336, 340 (1st Cir. 1993) (emphasis added) (internal quotation marks omitted), and courts do not need to engage in such retrospective inquiry to determine whether the mistake, newly discovered evidence, misrepresentation (innocent or intentional) or fraud would have changed the *outcome* of the process.[7]

---

[7] In particular, a party seeking relief pursuant to Rule 60(b)(3) for fraud, misrepresentation or misconduct need demonstrate only that it "foreclosed full and fair preparation or presentation of its case." *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 924 (1st Cir. 1988). The purpose of this provision is to protect "the fairness of the proceedings, not necessarily the correctness of the verdict." *Lonsdorf v. Seefeldt,* 47 F.3d 893, 897 (7th Cir. 1995). Thus, a movant "need not show that the outcome would have been different

Thus, where there is "fraud, accident, mistake, or some other cause for which equity would avoid a like sale between private parties, [a court is] warrant[ed] . . . in avoiding the confirmation of the sale." *Golfland Entm't Ctrs., Inc. v. Peak Inv., Inc.* (*In re BCD Corp.*), 119 F.3d 852, 859-60 (10th Cir. 1997) (internal quotation marks omitted). Under this principle, a bankruptcy court should modify a sale order pursuant to Rule 60(b) when "the confirmation had been granted through a mistake as to the terms of the sale." *Id.* at 860. For example, where "the terms that the parties thought they were bargaining and bidding on turn out not to be the terms of the sale which is ultimately proposed to the court," Rule 60(b) has warranted vacatur or modification of a sale order on the ground of a "mistake." *See id.* at 860-61 (bankruptcy court did not clearly err in finding that "confusion as to the terms of the sale" warranted vacatur of sale order).

*Golfland Entertainment* is particularly instructive. There, the bankruptcy court vacated a sale order because the parties had not properly disclosed the terms of their deal to the court. The proposed purchaser, Golfland Entertainment Centers, Inc., had submitted a winning bid at auction, and the bankruptcy court approved the sale to Golfland. The next highest (and losing) bidder moved to vacate the sale confirmation order, on the ground that Golfland had changed the terms of its bid after confirmation by

---

(continued…)

absent [the respondent's] misconduct." *Catskill Dev., LLC v. Park Place Entm't Corp.,* 286 F. Supp. 2d 309, 316 (S.D.N.Y. 2003); *see also Anderson,* 862 F.2d at 924 ("[M]isconduct need not be result-altering in order to merit Rule 60(b)(3) redress."); *Schultz v. Butcher,* 24 F.3d 626, 631 (4th Cir. 1994) ("[N]ew evidence does not have to be result altering to warrant a new trial on a Rule 60(b)(3) motion."); *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir. 1978) (citations omitted) ("Although Rule 60(b)(3) applies to misconduct in withholding information called for by discovery, it does not require that the information withheld be of such nature as to alter the result in the case."); *Lonsdorf,* 47 F.3d at 897 (In light of the purpose of Rule 60(b)(3), "[a] determination of whether the alleged misrepresentation altered the result of the case is unnecessary."); *Jones v. Aero/Chem Corp.,* 921 F.2d 875, 879 (9th Cir. 1990) ("[W]hen the case involves the withholding of information called for by discovery, the party need not establish that the result in the case would be altered.").

demanding to be reimbursed by the debtors for certain environmental clean-up costs.  On

that motion, the bankruptcy court found that, at the auction, all parties had "believed that

the risk of environmental problems on the property being purchased . . . shifted to the

buyer."  *Golfland*, 119 F.3d at 855.  Golfland and the debtor, however, had made a side

agreement that the debtor would bear the cost of environmental liabilities and a bond.

That side agreement was never shown to the bankruptcy court.  Instead, in the proposed

sale order, counsel for the debtors "just referred to the offer made at the sale," without

revealing the terms of the side agreement.  *See id.* at 855.

Even accounting for the undisclosed terms of the side agreement, Golfland still

would have been the highest bidder.  Nonetheless, the bankruptcy court vacated the sale,

not on the ground that the court would have approved a competing bid, but because

(i) the material terms of the sale that the parties had actually consummated had not been

disclosed to the bankruptcy court, and therefore (ii) the bankruptcy court had not

approved the sale.  In doing so, the Court demonstrated that the protection of the rights of

interested parties through transparency trumped any notion of "harmless error" because

violating essential principles of transparency and eliminating the protection of the Court's

processes is not harmless.  As the bankruptcy court explained, in language that is

especially pertinent here:

> In this case the terms were not disclosed to the court.  The
> terms that the parties thought they were bargaining on and
> bidding on turn out not to be the terms of the sale which is
> ultimately proposed to the court.  *The court didn't have the
> opportunity to give that vital protection because the court
> didn't have the information that it needed.  The parties
> didn't have the information they needed to make
> appropriate objections and arguments*.  That part of the
> notice and hearing requirement for the sale of property
> simply was not met.

*Id.* at 855 (emphasis added).  The bankruptcy court thus vacated the sale order on the

ground that "[t]he sale to Golfland is not a sale which has been approved by the Court,

and that sale is, therefore, not authorized."  *Id.* at 855.

The bankruptcy court in *Golfland* further underscored that it could not

retroactively approve a deal on the basis of important, but undisclosed, sale terms

because the parties' failure to disclose those terms deprived the court and potential

objectors of an opportunity to make a reasoned decision as to whether the proposed sale

should have been approved:

> The major changes in the terms of the sale did not give the
> bidders a fair opportunity to bid at the sale and the notice
> and further proceedings did not give the Court an
> opportunity to make a reasoned decision about whether or
> not to approve the sale and other parties an opportunity to
> properly object.

*Id.* at 855.  The district court affirmed the bankruptcy court's order, "concluding that the

bankruptcy court's finding of a mistake in the sale was supported by the record and was

legally sufficient to set aside the sale."  *Id.*  And, on further appeal, the Tenth Circuit held

that "the bankruptcy court's decision to set aside the confirmed sale on the ground that it

had been entered under a mistake as to the terms of the agreement was not an abuse of

discretion."  *Id.* at 861-862.

Neither the bankruptcy court, the district court, nor the Tenth Circuit even paused

to consider whether, as a hypothetical matter, the bankruptcy court would have

nevertheless approved the sale to Golfland even if the full terms of the transaction had

been properly disclosed to the bankruptcy court.  The controlling factor in all three courts

was that the sale order had been obtained through a distorted process in which the deal

had been misrepresented, and therefore neither the bankruptcy court nor potential

objectors had an adequate opportunity to consider whether the sale should have been approved in the first place.

This same concern for the integrity of the process leading up to confirmation of a sale is reflected in other decisions addressing motions to vacate or modify sale orders pursuant to Rule 60(b).  *See, e.g.*, *WPRV-TV*, 983 F.2d at 341 (vacating sale order on the basis of "compelling equities" of case where proposed purchaser misstated identity of its principals and their financial capacity in connection with obtaining confirmation of sale); *In re Jack Kline Co.*, ___ B.R. ___, No. 09-36569-H4-7, 2010 WL 3909445, at *12 (Bankr. S.D. Tex. Sept. 30, 2010) (modifying sale order entered on undisclosed facts concerning certain distributions that would be made from sale proceeds; "misconduct" under Rule 60(b)(3) includes "accidental omissions" and "Rule 60(b)(3) does not require that the information withheld be such that it can alter the outcome of the case"); *In re McKenzie*, No. 08-16378, 2010 WL 3386012, at *10 (Bankr. E.D. Tenn. Aug. 25, 2010) (modifying sale order pursuant to Rule 60(b) where "the court does find that there was a mistake with respect to what the Sale Order says and what the parties were buying and selling and on what terms"); *Cedar Island Builders, Inc. v. South Cnty. Sand & Gravel, Inc.*, 151 B.R. 298, 302-303 (D.R.I. 1993) (vacating sale order where debtor failed to give proper notice, notwithstanding opponent's argument that the movant's "proposed purchase price is at best only slightly higher than [the prevailing bidder's].  It makes no difference," because "[a] lack of proper notice corrupts the judicial sale process at its very roots"); *Polycel Structural Foam, Inc. v. Pool Builders Supply of the Carolinas, Inc.* (*In re Polycel Liquidation, Inc.*), No. 06-2183, 2007 WL 77336, at *8-9 (D.N.J. Jan. 8, 2007) (affirming order vacating portion of sale order as void because it was entered in

violation of third-party's due process rights to notice of the proposed sale).  The

overriding principle that guides the court's exercise of its discretion in ruling upon a Rule

60(b) motion is not whether the mistake, fraud, misrepresentation or new evidence would

have led to a different outcome, but "that the existence of undiscovered errors or

infirmities may prevent the bankruptcy judge from making a fair and proper confirmation

decision based on accurate knowledge of all relevant factors."  *In re Chung King, Inc.*,

753 F.2d 547, 552 (7th Cir. 1985).

In this case, Barclays casts aside this bedrock principle of full and adequate

disclosure in connection with the Sale Order and argues that the Court does not have the

discretion to modify the Sale Order because, in a hypothetical world where the full terms

of the deal had actually been disclosed, the Court might still have approved the Sale

Order.  Rule 60(b) does not, of course, impose any such constraint on the Court's

discretion, as a matter of law.

The Second Circuit certainly has not restricted a court's discretion in the manner

that Barclays suggests.  The Court has held that a Rule 60(b) motion for relief from a

final order "should be broadly construed to do 'substantial justice,'" *Nemaizer v. Baker*,

793 F.2d 58, 61 (2d Cir. 1986) and also that "[t]he discretionary relief available under

Rule 60(b) is equitable" in nature.  *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 127 (2d

Cir. 2009); *see also Philips Lighting Co. v. Schneider,* No. 09-4144-cv(L), 2010 WL

3959820, at *1 (2d Cir. Oct. 12, 2010) ("Relief under Rule 60(b) and Rule 60(d) is

equitable in nature."); *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655,

661-62 (2d Cir. 1997); *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1142 (2d Cir.

1994).

Barclays has relied in its motion papers on district court decisions that, according to Barclays, impose a rule that a court must find that a mistake, fraud, or newly discovered evidence would have changed the outcome of the prior proceeding before the court may order relief pursuant to Rule 60(b).  (*See* Barclays Opp. ¶ 559.)  But none of the cases on which Barclays relies addresses a bankruptcy court's approval of a sale of assets, and the paramount concern in bankruptcy for full disclosure and the integrity of the process in connection with such a proceeding.  Moreover, Rule 60(b) does not, on its face, impose the limits that Barclays would impose on the Court.  And, although some district court cases may invoke this consideration, none has suggested that it is elevated to the status of a rigid rule that governs all motions arising under Rule 60(b) and constrains the court's discretion in deciding such a motion.

In any event, read in their proper context, most of the decisions that Barclays has cited stand for the unremarkable proposition that a Rule 60(b) movant must show that the mistakes, new evidence, misrepresentations or fraud on which it relies are *material* because immaterial mistakes are just that, immaterial.[8]  For example, in *Matura v. United States*, 189 F.R.D. 86, 89 (S.D.N.Y. 1999), the district court noted that the court clerk's mistake in failing to notify the *pro se* movant that his prior habeas petition had been

---

[8] Barclays' other cases are completely inapposite since under their unique facts, Rule 60(b) relief was denied because, even assuming the elements of the rule were met, the movant had no claim as a matter of law for other reasons.  In *Fitzgerald v. Field*, 175 F.3d 1007, 1999 WL 177278 (2d Cir. 1999), the court denied Rule 60(b) relief because the underlying decision against the movant was issued on summary judgment, *i.e.*, all facts were assumed in Fitzgerald's favor and the motion was decided as a matter of law, and therefore movant's bringing new facts to light could not have had any affect on the court's analysis of that summary judgment motion.  *Id.* at *2.  In *Cobos v. Adelphi University*, 179 F.R.D. 381, 389-90 (E.D.N.Y. 1998), relief was denied because even if movant satisfied the criteria under Rule 60(b)(1) or (6), he had no meritorious claim because it was barred either by the statute of limitations or sovereign immunity.  Barclays' contentions that Movants' claims fail as a matter of law are meritless and are addressed elsewhere in Movants' submissions.  For present purposes, however, these cases provide no support for Barclays' contention that the Court would have approved the Sale Transaction anyway had known then all it knows now.

denied was not material to his Rule 60(b) motion seeking reversal of that denial because
the mistake occurred after the petition was denied.  Although the court remarked that
"Rule 60(b)(1) affords a party relief from a material mistake that changed the outcome of
the court's judgment," *id.*, it did not hold in denying this *pro se* application that Rule 60(b)
may be invoked *only* where a material mistake could *also* be deemed outcome-
determinative.  *Id.  See also Bousa Inc. v. United States of America* (*In re Bulk Oil (USA)
Inc.*), No. 89-B-13380, 2007 WL 1121739, at *9-10 (S.D.N.Y. Apr. 11, 2007) (citing in
*dicta* the materiality language of *Matura*, but denying Rule 60(b) motion as premature);
*Avedis v. Herman*, 192 F.R.D. 477, 478 (S.D.N.Y. 2000) (quoting materiality test of
*Matura* and denying relief because two of movants claims had already been raised and
decided in prior proceedings, and third ground for relief was "immaterial");
*Kirschenbaum v. Nassau Cnty. Dist. Attorney* (*In re Vitta*), 409 B.R. 6, 12 (E.D.N.Y.
2009) (citing and applying materiality test of *Matura*).

Similarly, in *Fetik v. New York Law Sch.*, No. 97 CIV. 7746 (DLC), 1999 WL
459805 (S.D.N.Y. June 29, 1999), Rule 60(b) relief was denied because the *pro se*
movant could not identify "any *material* issue of fact or law overlooked by the Court"
because none of the evidence was even "relevant to the merits of the litigation," which is
obviously not the case here. (*Id.* at *4-5 (emphasis added);  So, too, in *Bettis v. Kelly*, No.
02 Civ. 104 (MBM), 2004 WL 1774252 (S.D.N.Y. Aug. 9, 2004), Rule 60(b) relief was
denied because, even if true, the new evidence presented "could not have changed the
overwhelming statistical evidence" on which the underlying opinion was based, *i.e.*, it

was immaterial when considered in light of the weight of the evidence. *Id.* at *2.[9]  In

short, the materiality of the circumstances giving rise to the Rule 60(b) motion was the

dispositive concern in the courts' exercise of their discretion in these cases.

Here, in stark contrast to the cases on which Barclays relies, the undisclosed sale

terms were *clearly material* to the transaction and, in turn, to whether the transaction

should have been approved by the Court.  The undisclosed terms resulted in an

undisclosed $13 billion windfall to Barclays.  The undisclosed discount alone was $5

billion, as was the value of the excess repo collateral about which the Court was not told,

mistakenly or otherwise.  The unpaid bonus and cure liabilities, about $500 million and

$1.3 billion, respectively, were each obviously material to the deal.  In fact, the Court

stated explicitly at the Sale Hearing that it considered $500 million to be material, even in

a transaction of this size.  (M.261 [9/19/08 Tr.] 54:21-22.)  In essence, by asking the

Court to approve the transaction despite material misrepresentations and omissions,

Barclays dares the Court to now deem material matters to be immaterial because,

implicitly under Barclays argument, it has no other choice. Respectfully, LBHI suggests

that exactly the opposite is true.  If the matters at issue were material at the time, they

cannot be deemed immaterial now, while remaining faithful to a consistent record and

proceeding.

---

[9]  *See also In re Stephen's 350 E. 116th St.*, 313 B.R. 161, 173 (S.D.N.Y. 2004) (newly discovered evidence related only to one of many factors that went into court's conclusion, and therefore "would not have produced a different result" if it came to light at the time); *Langdon v. Proper*, No. 89-CV-1400, 1991 WL 263554, at *2 (N.D.N.Y. Dec. 9, 1991) (denying Rule 60(b) relief because "vague and conclusory assertions" were not sufficient to vacate prior judgment); *Freedom, N.Y., Inc. v. United States*, 438 F. Supp. 2d 457, 463-64 (S.D.N.Y. 2006) (Rule 60(b) relief denied because movant could not show how new evidence would have affected the three of the four factors favoring dismissal of claims).

Here, the undisclosed, and plainly material, facts irreparably "prevent[ed] the bankruptcy judge from making a fair and proper confirmation decision based on accurate knowledge of all relevant factors," *In re Chung King*, 753 F.2d at 552, and show that "confirmation had been granted through a mistake as to the terms of the sale." *Golfland Entm't Ctrs., Inc.*, 119 F.3d at 860. The appropriate remedy is not, as Barclays urges, to ignore this fact or to deny Movants any relief because Barclays would somehow be prejudiced, having relied on a sale order that was issued on a false record for which Barclays is in large part to blame. *See In re Computer Learning Ctrs., Inc.* 268 B.R. 468, 475-76 (Bankr. E.D. Va. 2001) (granting Rule 60(b) motion to correct amount trustee must pay to cure lease payment, on ground of "mistake," and rejecting trustee's argument that it would be unfairly prejudiced by correction of the error, which required an increased cure payment after consummation of a Court-approved asset sale: "denial of a windfall is not prejudice").

The only equitable response is to fashion a remedy that enforces the deal that was actually disclosed, because that is the record that actually exists, upon which *all* interested parties, and the public, relied. Contrary to Barclays' argument, the Court has ample discretion pursuant to Rule 60(b) -- and should exercise its discretion here -- to rule that the Sale Order should be modified to accord with the terms of the deal as they were actually disclosed to the Court, whether the material misrepresentations or omissions to the terms disclosed to the Court are deemed a "mistake," "newly discovered evidence," innocent misrepresentation, or a fraud on the Court.

The Court, of course, has broad powers to consider equitable principles in fashioning relief. *See, e.g., Lasky v. Cont'l Prods. Corp.,* 804 F.2d 250, 256 (3d Cir.

1986); *Marshall v. Monroe & Sons, Inc.,* 615 F.2d 1156, 1160 (6th Cir. 1980); *Whitaker v.*

*Associated Credit Servs., Inc.,* 946 F.2d 1222, 1224 (6th Cir. 1991); *see also Leber-Krebs,*

*Inc. v. Capitol Records,* 779 F.2d 895, 900 (2d Cir. 1985) ("In tracing the development of

a court's equity power to combat fraud in the enforcement of judgments, the Supreme

Court [has] recognized that the relief devised may [take] several forms:  [including]

setting aside a judgment to permit a new trial, altering the terms of a judgment, or

restraining the beneficiaries of a judgment from taking any benefit whatever from it.")

        The flexibility provided by Rule 60 is particularly germane here, giving the Court

the power to enforce the Sale Transaction that was actually disclosed and approved,

which is all that LBHI requests.  Such relief would give Barclays the full benefit of the

disclosed deal, but eliminate the ill-gotten gains to Barclays traceable to the undisclosed,

never-approved facets of the deal that actually closed and impose a narrowly tailored

remedy modifying the particular portions of a Sale Order, or the transaction effected

pursuant to the Sale Order, that arise from mistake, inadvertence, misrepresentation or

fraud.  The Court's power to fashion such focused relief is well settled.  *See, e.g., In re*

*Emergency Beacon Corp.,* 666 F.2d 754, 761 (2d Cir. 1981) (vacating a portion of order

under Rule 60(b)(6)); *GMAC Mortgage Corp. v. Salisbury* (*In re Loloee*)*,* 241 B.R. 655,

663 (B.A.P. 9th Cir. 1999) (where sale itself was not subject to reversal, suggesting

damages award to compensate movant); *In re Ctr. Wholesale, Inc.*, 759 F.2d 1440, 1451

(9th Cir. 1985) (voiding bankruptcy court's order did not require movant "be placed in

the precise position it would have occupied" had the court never approved the order, and

suggesting that bankruptcy court grant movant superpriority interest as an alternate

remedy); *In re Metzger*, 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006) (voiding offending

portion of sale order and stating "[t]he Court has some flexibility in creating a remedy here and need not and will not find the entire sale void on these facts"); *In re Lundy,* 110 B.R. 300, 304 (N.D. Ohio 1990) (granting relief under Rule 60 from selected portions of bankruptcy court's order).

Barclays' challenge to the Court – to simply approve the undisclosed deal despite material misrepresentations – thus rests on yet another flawed assumption.  It assumes that the Court has a choice between only two options: approve or deny the transaction exactly as closed or disapprove it in its entirety.  This assumes away the Court's well-settled power to craft an appropriate order to address the misrepresentations made to it in September 2008.  The facts proven at trial well support such relief, *i.e.,* (i) ordering Barclays to return to the estates all value received over and above a wash, the equal exchange of assets and liabilities upon which the issuance of the Sale Order was premised; (ii) ordering Barclays to return to the estates the value of all assets received through the amendments effected by the unauthorized Clarification Letter.[10]  Such an order would leave with Barclays the benefit of the deal actually *disclosed* to the Court while also protecting the integrity of the Court's processes, and the interests of creditors by refusing to countenance the notion that disclosure obligations at the Sale Hearing were meaningless.

---

[10] At this stage it is not necessary for the Court to allocate any recovery as between LBHI and LBI, both of which are the "Seller" under the Asset Purchase Agreement.  (M.1 at 1) (defining LBI "together with LBHI" as "the Seller").  Any such allocation should be the product of further proceedings.  (*See* M.257 [Sale Order] ¶ 30 ("Allocation").

## <u>PROPOSED FINDINGS OF FACT</u>

**I.    INTRODUCTION**

1.      LBHI's adversary complaint and Rule 60 motion and Barclays' Motions

arise out of a Section 363 sale transaction between Barclays, LBHI, LBI and LB 745

LLC (the "Sale Transaction"), memorialized in an Asset Purchase Agreement, dated as of

September 16, 2008 ("Asset Purchase Agreement" or "APA" (M.1)). The Asset Purchase

Agreement was amended pursuant to the First Amendment to Asset Purchase Agreement,

dated as of September 19, 2008 (the "First Amendment" (M.357)).  In addition to this

disclosed First Amendment, the parties also executed a letter agreement, dated as of

September 20, 2008, but actually signed on September 22, purporting to "amend" the

APA (the "Clarification Letter") (M.3 at 1).  That Clarification Letter was never

submitted to the Court for approval, and, as stated by the court at the beginning and end

of these proceedings, never approved by the Court.

2.      The parties executed the Asset Purchase Agreement the day after LBHI

and certain other Lehman entities filed for bankruptcy protection on Monday,

September 15, 2008 (the "LBHI Bankruptcy").  (LBHI Docket No. 1.)  LBI, a U.S.

broker-dealer subsidiary of LBHI, did not declare bankruptcy until the morning of the

following Friday, September 19, 2008 (the "LBI Bankruptcy").  (LBI Docket No. 1.)

3.      On September 17, 2008, LBHI filed a motion with the Court seeking,

among other things, approval of the Sale Transaction and procedures related thereto (the

"Sale Motion" (M.118.)).  A copy of the Asset Purchase Agreement was included within

the Sale Motion.  (*See* M.118.)  Later that day, September 17, 2008, the Court held a

hearing (the "September 17 Hearing") in which, *inter alia*, counsel for Lehman from

Weil Gotshal & Manges LLP described the proposed Sale Transaction.  (M.260 [9/17/08

Tr.].)  Two days later, on September 19, 2008 (and lasting until shortly after midnight on

September 20), the Court held a second hearing to consider the pending Sale Motion (the

"Sale Hearing").  (M.261 [9/19/08 Tr.].)  No copy or draft of the Clarification Letter was

presented to the Court at those hearings.  (*See, e.g.,* M.260 [9/17/08 Tr.]; M.261 [9/19/08

Tr.] 48:5-13.)  Barclays was represented in these proceedings by Cleary, Gottlieb, Steen

& Hamilton ("Cleary Gottlieb").

4.      At the Sale Hearing, the Court issued the Sale Order approving the Sale

Transaction based on the record that had been developed at the Sale Hearing.  (M.257;

*see* M.261 [9/19/08 Tr.] 247:14-253:25.)  Over the following weekend, however, the

parties continued to negotiate terms concerning the Sale Transaction.  These new terms

were incorporated into the Clarification Letter.  The final version of the Clarification

Letter was signed by the parties early on Monday morning, September 22, but it was

dated "[a]s of September 20, 2008."  (M.3 at 1.)  The Sale Transaction closed on

Monday, September 22, 2008 (the "Closing").  (4/28/10 [Miller] 24:3-10; 5/7/10 [Ricci]

177:20-25.)

5.      For purposes of this litigation, it is sometimes helpful to use nomenclature

adopted by Barclays' Group Chief Executive, John Varley and others at Barclays.  Varley

and others at Barclays testified that they viewed the Sale Transaction as a progression

through three different actual or potential transactions denominated as Lehman One, Two

and Three.  (6/22/10 [Varley] 78:20-79:2; 4/29/10 [Clackson] 200:25-201:19; 6/22/10

[Cox] 219:3-12.)  Lehman One involved discussions that took place between executives

from Barclays and Lehman during the days immediately preceding the LBHI bankruptcy

filing (*i.e.*, from September 11-14, 2008) concerning Barclays possibly acquiring the

whole global enterprise of Lehman, minus "some carve-outs" ("Lehman One").  (6/22/10 [Varley] 78:25-79:18.)  For reasons noted herein, the Lehman One transaction was not consummated.

6.    The Lehman Two transaction was the deal to which the parties actually agreed on September 15-16, 2008, memorialized in the Asset Purchase Agreement, and described to the Court in the Sale Motion and at the September 17 Hearing ("Lehman Two").  (6/22/10 [Varley] 83:8-16.)  Lehman Two is also the transaction that was publicly announced by Lehman on September 16 (M.120) and by Barclays executives in a conference call with analysts and investors held the next day.  (M.16.)

7.    The Lehman Three transaction was the Sale Transaction that actually was consummated by the parties at the Closing on September 22, 2008 ("Lehman Three").  (M.1; M.357; M.3; 6/22/10 [Cox] 219:10-12.)  As described below and as Barclays' Group Chief Executive testified at the trial, Lehman Three was "different from" Lehman Two in numerous key respects.  (6/22/10 [Varley] 83:17-22.)  As demonstrated by Movants, the parties disclosed Lehman Two to the Court but closed a different deal in Lehman Three.

## II.    THE LEHMAN ONE TRANSACTION

### A.    In Response To The Difficult Economic Situation In 2008, U.S. Regulators Sought To Encourage An Acquisition Of Lehman

8.    The U.S. economy experienced great difficulties during most of 2008. The Court can take judicial notice of the fact that the financial and banking sectors of the U.S. economy, in particular, were in a distressed state.  Determining the causes of these problems is beyond the scope of this litigation.  But these difficulties provide the background for the Sale Transaction and related proceedings.

9.       After the near failure of Bear Stearns in March 2008, U.S. regulators, including the FRBNY, the Treasury Department and the SEC became increasingly concerned with Lehman's strained economic situation, which they monitored closely. (M.883 at 3-5.)  As the situation at Lehman worsened, the regulators began taking an active role in trying to find a solution.  (M.883 at 5-7.)  They pursued two potential options: (1) find a suitable merger partner that could acquire Lehman in its entirety, or (2) provide interim financing to Lehman's broker-dealer subsidiary (LBI) so it could effect an orderly wind-down of its customer accounts prior to its filing for bankruptcy.  (9/7/10 [Leventhal] 7:19-8:23, 38:3-39:24, 44:22-45:6, 46:14-47:7 (adopting Baxter's statements to FCIC in M.883 as her own); M.883 at 6-11.)  To facilitate the second option, the FRBNY expanded the type of securities it would accept as collateral in its PDCF program, although it increased the haircuts (*i.e.*, the amount of excess collateral necessary to obtain financing) it would insist upon for such collateral to better protect the FRBNY. (9/7/10 [Leventhal] 50:22-52:21; M.863 (FRBNY's revised terms for PDCF collateral with increased haircuts).)

10.       In that regard, the Treasury Department, working in conjunction with the FRBNY and the SEC, convened a meeting of the CEOs of major financial institutions on Friday, September 12, 2008, principally to discuss Lehman.  (M.883 at 6.)  They discussed forming a consortium of banks to provide financing for certain of Lehman's illiquid assets to make the company more attractive to a potential acquirer.  (M.833 at 6-7 (by Sunday, September 14th, the consortium had agreed to finance approximately $30 billion of Lehman's illiquid assets); 9/7/10 [Leventhal] 39:20-40:24.)  They also

discussed developing contingency plans in the event the hoped-for acquisition did not

take place.  (M.883 at 10-11.)

11.     At the time of these weekend meetings, there were two known suitors

exploring a possible acquisition of Lehman:  Bank of America and Barclays.  (4/26/10

[Ainslie] 79:1-11; 4/26/10 [McDade] 145:10-146:7; M.883 at 7.)

**B.     Barclays Viewed The Economic Troubles In The U.S. Banking Sector
As A Strategic Opportunity**

12.     Barclays viewed these difficult times, and the financial problems of some

of its competitors, as a strategic opportunity for Barclays to move into the North

American market as well as into several new business areas.  (8/27/10 [Klein] 8:24-10:3,

13:2-14:10; 4/30/10 [Hughes] 121:6-122:4.)  Within Barclays, "there had been

discussions […] since August or September of 2007, that the situation in the financial

markets could create an opportunity for [Barclays] to grow [its] business." (6/21/10

[Diamond] 112:18-113:4; 6/22/10 [Varley] 77:19-78:1 (prior to September 2008, Varley

and others on Barclays' Executive Committee believed that the credit crunch might

provide an opportunity for Barclays).)

13.     One of the strategic opportunities Barclays considered at the end of the

summer of 2008 was an acquisition of Lehman Brothers.  (6/21/10 [Diamond] 113:18-

113:21; 6/22/10 [Varley] 78:2-5.)  Indeed, even before entering into the discussions that

ultimately led to the Sale Transaction, Barclays had been researching and evaluating the

possibility of acquiring some or all of Lehman's assets.  (*See, e.g.*, M.16 at 1 ("I should

say that we thought some months back that it was possible that this opportunity might

arise, but we were clear that we would only be interested in pursuing it at the right

price"); M.16 at 2 ("We knew from that work over the summer that there was a

significant value opportunity in the business…").)  In the end, Barclays entered into the

Sale Transaction with Lehman out of its desire to become a "major player" in the North

American marketplace.  (8/31/10 [Lewkow] 100:22-101:22 ("They were doing this to

become a major player in the U.S. markets as a broker-dealer."); 8/27/10 [Klein] 8:24-

10:21 (this was a "very big opportunity for them").)

> ### C.     Barclays Insisted It Would Only Buy Lehman Assets At A Distressed
> ### Price

14.     Barclays' interest in acquiring Lehman and the U.S. government's role in

trying to effect such a deal dated back several months before September 2008.  Sometime

in mid-2008, Robert Diamond, Barclays' President, received a telephone call from Bob

Steel, a U.S. Undersecretary of the Treasury, asking whether Barclays would want to be

called if Lehman became available.  (6/21/10 [Diamond] 113:18-114:21.)  Diamond

discussed this with his superior, Varley, and others at Barclays.  (6/21/10 [Diamond]

115:7-119:12 (after being impeached with his deposition testimony that for him and

Varley it was "always a given" that if Barclays was going to do a deal it would be "at a

distressed price as opposed to a book value or premium price," Diamond testified "the

single most important thing, was to do the right value of the deal that would be capital-

accretive").)

15.     Although he had admitted to it at his deposition, at the trial, Diamond was

evasive about whether Barclays expected to buy Lehman assets only if it could obtain a

distressed price.  In his trial testimony, Diamond claimed numerous times that he needed

to further explain or "walk through" the context and posited rhetorical questions about his

own prior testimony, such as "[t]he question is what you mean by 'premium'" (a word he

himself had used in the deposition) and questioning whether "is it possible to determine

book value in any time." (6/21/10 [Diamond] 117:22-120:14.)[11]  Varley's trial testimony

on this topic, however, was unequivocal: "You asked me whether our view was that we

would only transact that at a distressed price.  My answer to that was an unambiguous

yes." (6/22/10 [Varley] 88:12-19; *see also* 6/22/10 [Varley] 85:19-86:17 (agreeing that

one of the key aspects of Lehman One was that Lehman would be available at a

distressed price); *see* M.12 (Varley's hand file) at 00166335 ("we were clear that we

would only be interested in pursuing the opportunity at the right price"); M.223 at 3

(Barclays discussion materials noting that "[Lehman] has become available at a

distressed price").)

16.     Notwithstanding his efforts to disclaim his deposition testimony, even

Diamond eventually agreed that Barclays intended all along only to pay a distressed price

for Lehman's assets.  For example, on Friday, September 12, 2008, Diamond discussed

with Richard Fuld, Lehman's chief executive, the possibility of Barclays entering into

discussions concerning a potential transaction with Lehman.  Diamond conceded that he

relayed to Fuld that Barclays "had an interest if this is a rescue situation, meaning it's a

very, very distressed price." (6/21/10 [Diamond] 122:25-123:6.)  Diamond also admitted

that at around this time, he had conversations with Timothy Geithner, the then-President

of the FRBNY, in which Diamond said that the only way an acquisition of Lehman

---

[11]     At his deposition, Diamond's answers were much less equivocal.  At that time, Diamond
conceded that "it was always a given" that "if [Barclays] were going to do a deal with anybody it would be
at a distressed price." (6/21/10 [Diamond] 117:22-119:12 (citing Diamond Dep. Tr. 17:16-20).)  As
Diamond explained it at his deposition, Barclays considered the possibility of purchasing Lehman assets in
light of the price at which they might be offered: "I think the new information that was coming in the wake
of Bear Stearns – or actually through Bear Stearns and in the wake of Bear Stearns is, if in fact it happens at
a distressed price as opposed to a premium or a book-value price, does that change the opportunity?"
(6/21/10 [Diamond] 117:3-21 (citing Diamond Dep. Tr. 12:16-13:25).)

would work for Barclays, if at all, would be if it was at "a distressed price." (6/21/10

[Diamond] 123:7-13.)

### D.    After Conducting Due Diligence And Almost Reaching A Deal With Lehman, Barclays Backed Out Of The Lehman One Transaction

17.    Either late Thursday, September 11, or early Friday, September 12,

Barclays and Lehman began negotiations about a potential global acquisition, and those

talks continued into the weekend. (4/26/10 [McDade] 145:22-146:7, 145:10-21.) At

about the same time Lehman was having similar discussions with Bank of America.

(4/29/10 [Lowitt] 18:21-19:2.) Barclays began due diligence of Lehman that "picked up

in earnest" on Friday, September 12, and extended into Saturday, September 13.

(6/21/10 [Diamond] 134:20-25, 135:18-20; Stip. ¶ 75) Bart McDade was "very

involved" in the negotiations concerning Lehman One (4/26/10 [McDade] 146:18-20),

while Martin Kelly (Lehman's financial controller)[12] and Paolo Tonucci (Lehman's

treasurer)[13] were involved in the due diligence process. (*See* Stip. ¶ 75; 4/28/10 [Kelly]

136:25-137:11.)

18.    Kelly helped Barclays' personnel in their due diligence efforts in

connection with this possible transaction. (4/28/10 [Kelly] 136:25-137:11; *see also*

---

[12] Martin Kelly was employed by Lehman from August 2000 through September 2008 (except for the period from May 2005 through January 2006). (4/28/10 [Kelly] 131:18-132:1; Stip. ¶ 28.) At the time of Lehman's bankruptcy, Kelly was its Global Financial Controller and he reported directly to Ian Lowitt, Lehman's Chief Financial Officer. (4/28/10 [Kelly] 132:9-20; Stip. ¶¶ 29-30.) At the time of trial, in April 2010, Kelly worked as Barclays' Americas CFO and Head of Finance for Structured Capital Markets and reported to Clackson. (4/28/10 [Kelly] 130:21-131:12; Stip. ¶ 34; *see also* 4/28/10 [Kelly] 130:21-131:12 (he previously was Barclays Capital's Financial Controller and American Head of Financial Decision Support).)

[13] At the time of the Sale Transaction, Tonucci was Lehman's Global Treasurer (Stip. ¶ 73), reporting directly to Lowitt. (Stip. ¶ 74.) Tonucci's deposition testimony confirming a $5 billion discount was duplicative of the deposition and trial testimony of other witnesses, including that of Kelly and Lowitt, and Barclays did not call Mr. Tonucci as a witness to refute his deposition testimony. Tonucci initially joined Barclays as its U.S. Treasurer. (Stip. ¶ 80; BCI 356 ¶ 24.) In February 2009, Tonucci assumed the position of Head of Group Balance Sheet at Barclays. (Stip. ¶ 81; BCI 356 ¶ 24.)

4/28/10 [Kelly] 147:7-148:3.)  Kelly received "a whole range of requests for financial

information" from the Barclays team.  The Barclays team included Romain,[14] Keegan,

and possibly Clackson,[15] as well as James Walker, Chris Weidler, John Mahon, T.J.

Gavenda, and Matt Hughey, along with representatives from Pricewaterhouse Coopers

("PwC") brought in to assist Barclays.  (4/28/10 [Kelly] 147:7-148:3.)

19.    On Sunday, September 14, the LBHI Board of Directors was called to

New York for meetings regarding a possible sale of all or part of the company.  (4/26/10

[Ainslie] 78:8-21.)[16]  The LBHI Board had been told that two firms were interested in

purchasing Lehman: Bank of America and Barclays.  (4/26/10 [Ainslie] 79:1-11; *see also*

4/26/10 [McDade] 145:22-146:7 ("Lehman had been approaching a number of suitors

toward the end of its operational existence" and the two real possibilities were Bank of

America and Barclays).)  But on Saturday, September 13, Bank of America withdrew,

because it had reached an agreement to acquire Merrill Lynch instead.  (M.883 at 7;

9/7/10 [Leventhal] 40:25-41:20; 4/29/10 [Lowitt] 19:3-16.)

20.    Discussions between Barclays and Lehman about Lehman One continued

for a while but, in the end, failed.  (Stip. ¶ 106; 8/27/10 [Klein] 11:10-12:3; 4/26/10

[McDade] 145:22-146:7; 6/22/10 [Varley] 79:19-25; M.883 at 7-8.)  The reason cited by

U.S. regulators for this failure was Barclays' unwillingness or inability to provide a

---

[14] Gary Romain is the Head of Technical Accounting and Private Equity Finance for Barclays Capital.  (9/2/10 [Romain] 12:16-19; 4/29/10 [Clackson] 208:15-19; Stip. ¶ 97.)

[15] Patrick Clackson is Barclays' Chief Financial Officer.  (4/29/10 [Clackson] 185:4-25.) Clackson played a role in ensuring the structure of the Sale Transaction was effective from Barclays' perspective, and later he was involved in accounting for the transaction.  (4/29/10 [Clackson] 187:2-14, 204:21-205:6.)

[16] Michael Ainslie has been a member of the LBHI Board of Directors since 1996, and he currently is Chairman of the LBHI Board.  (4/26/10 [Ainslie] 77:13-20.)

guarantee of Lehman's trading obligations for the period between the signing of the

merger agreement and its closing.  (M.883 at 7-8.)  The FRBNY was told that (i) under

U.K. law such a guarantee would require a shareholder vote, and (ii) the U.K.

government or Barclays' regulators apparently were unwilling to waive that requirement.

(M.883 at 7-8. 9/7/10 [Leventhal] 41:21-42:21.)

21.    On Sunday afternoon, September 14, Barclays informed Lehman of its

"inability to consummate" the Lehman One transaction.  (4/26/10 [McDade] 146:21-

147:1; *see also* 6/21/10 [Diamond] 137:7-12 (talks ended on Sunday, September 14);

6/22/10 [Varley] 81:9-11 (same).)  The LBHI Board was told that a transaction with

Barclays was a "dead issue and was not going to happen."  (4/26/10 [Ainslie] 79:12-24.)

Lehman Board members were told the negotiations failed because of U.K. regulatory

issues and because a shareholder vote would create an unacceptable time delay. (4/26/10

[Ainslie] 79:1-11.)

### E.    LBHI Was Forced, With A Strong Push From U.S. Regulators, To File For Bankruptcy Protection

22.    During the Lehman Board meetings on Sunday, September 14, the

Lehman Boards had "a very lively debate" about whether filing for bankruptcy would be

required or whether the firm should attempt to go forward despite its financial problems.

(4/26/10 [Ainslie] 80:4-13.)  Ian Lowitt, Lehman's CFO, told the Lehman Boards that

there would be great difficulty in continuing to fund the firm if it chose not to file for

bankruptcy protection.  (4/26/10 [Ainslie] 80:4-9; 4/29/10 [Lowitt] 20:20-21:19 (he told

Board that Lehman's liquidity position was "extremely stressed").)[17]

---

[17] Ian Lowitt was the Chief Financial Officer at LBHI at the time of the Sale Transaction.
(4/29/10 [Lowitt] 11:1-12:20; Stip. ¶ 39.)  Lowitt also served at the time as the Chief Financial Officer,

23.     In the middle of this debate, the LBHI Board was interrupted by a phone call from FRBNY General Counsel Thomas Baxter and SEC Chairman Christopher Cox. Cox and Baxter asked about Lehman's plans and relayed that they thought Lehman would have to file for bankruptcy.  (*See* 4/26/10 [Ainslie] 80:4-81:24; 9/7/10 [Leventhal] 42:22-43:7, 47:8-11, 48:24-50:4.)  Among other things, Lehman Board members asked Cox and Baxter whether the Federal Government was directing Lehman to file for bankruptcy.  (4/26/10 [Ainslie] 80:4-81:15.)  Cox and Baxter denied that they were actually ordering a filing, but they made sure to tell the Boards that their management "knows what our opinion is on this."  (4/26/10 [Ainslie] 81:1-7); 9/7/10 [Leventhal] 47:18-48:23, 48:24-50:4 (unable to dispute Miller's account of the call since she was not on it).)[18]

24.     Lehman Board members also asked if the FRBNY would refuse to continue funding Lehman's broker-dealer (LBI) the next day if LBHI did not declare

─────────────────────

(continued…)

Controller, and Executive Vice President of LBHI.  (Stip. ¶ 39.)  Martin Kelly, Gerard Reilly and Paolo Tonucci all reported directly to Lowitt.  (4/29/10 [Lowitt] 12:14-16.)  Soon after the Closing, Lowitt became Barclays' Managing Director, Infrastructure Management.  (4/29/10 [Lowitt] 13:3-11, 47:11-48:12; Stip. ¶ 44.)  In April 2009, he became the Chief Operating Officer of Barclays Wealth, Americas, his current position.  (Stip. ¶ 45; 4/29/10 [Lowitt] 12:21-13:2, 48:6-8.)

[18]  At trial, Shari Leventhal, FRBNY's Assistant General Counsel, was shown Harvey Miller's written testimony to the FCIC, in which he relayed that "[i]n substance, Messrs. Cox and Baxter stated that it was in the best interests of the financial system and the United States economy for Lehman's Board of Directors to pass a resolution approving the commencement of a bankruptcy case prior to 12:00 midnight of that day.  Several Directors asked Messrs. Cox and Baxter whether they, on behalf of the FRBNY and the SEC, were directing the Board of Directors to adopt a bankruptcy resolution.  In response, Mr. Cox hesitated, and Mr. Baxter suggested they hold an offline caucus.  After five or ten minutes, Messrs. Cox and Baxter rejoined the conference call with the Directors."  Miller continued, "Mr. Cox stated that he and Mr. Baxter were not issuing a direction to the Lehman Board of Directors to pass a resolution. … [T]he decision was for Lehman's Directors to make."  (9/7/10 [Leventhal] 47:18-48:23, 48:24-50:4; M.882 at 9-11 (shown to Leventhal but not moved into evidence.)

bankruptcy.  After "some hesitation," Chairman Cox eventually answered no, he was not saying that.  (4/26/10 [Ainslie] 80:21-81:12.)

25.     After that call from federal regulators, the Lehman Boards continued to discuss their options.  After lengthy debate, late in the evening of September 14, 2008, the LBHI Board voted to file for bankruptcy.  (4/26/10 [Ainslie] 81:12-24.)  At approximately 2 a.m. on September 15, 2008, LBHI filed a Chapter 11 petition with this Court.  (4/28/10 [Miller] 11:12-18; LBHI Docket No. 1; 4/26/10 [Ainslie] 81:22-24.)

26.     While the FRBNY may dispute that the message to seek bankruptcy protection was delivered as a directive from the U.S. government (9/7/10 [Leventhal] 47:12-15; M.883 at 11), Lehman Board Members and representatives apparently understood it as such.  (4/26/10 [Ainslie] 80:4-81:24; 9/7/10 [Leventhal] 48:24-50:4 (unable to dispute Miller's account of the regulators' call as she was not on the call).)  At the very least, U.S. regulators strongly pushed LBHI to file, and that encouragement was made plain by the government's willingness to provide interim financing to Lehman's broker-dealer subsidiary (LBI) but not to the parent (LBHI).  (9/7/10 [Leventhal] 43:12-44:18.)

27.     In short, with no buyer on the horizon at that moment, the regulators' "Plan B," which contemplated an orderly winding down of Lehman's customer accounts, entailed the FRBNY and JPMorgan Chase ("JPM") providing interim financing to Lehman's broker-dealer subsidiary (LBI) to keep it in business after the parent entity (LBHI) had filed for bankruptcy.  (9/7/10 [Leventhal] 7:9-8:23, 38:3-39:24, 44:22-45:6, 46:14-47:7; M.883 at 10-11.)  This would provide a period of time for LBI to liquidate, transfer or otherwise wind down its customer accounts before it also filed for bankruptcy.

The plan was for the FRBNY to provide overnight financing to LBI, and for JPM (one of

Lehman's principal clearing banks) to provide intra-day financing in support of LBI's

operations.  (9/7/10 [Leventhal] 7:17-8:23, 38:3-39:24, 44:22-45:6, 46:14-47:7; M.883 at

10-11.)  While this plan was discussed by U.S. regulators and the banking consortium

over the September 13-14 weekend (9/7/10 [Leventhal] 7:17-8:23, 38:3-39:24, 44:22-

45:6, 46:14-47:7; M.883 at 10-11), Lehman had little to do with this planning process,

since it was not invited to all the weekend meetings sponsored by the Treasury

Department.  (M.883 at 5-11.)

## III.   THE LEHMAN TWO TRANSACTION

### A.   Negotiations Of A New Transaction With Barclays Resumed Right After LBHI Filed For Bankruptcy

28.     After the conclusion of discussions concerning Lehman One, and after the

Lehman Boards had decided to file for bankruptcy, sometime in the evening of

September 14, 2008, McDade called Diamond to inquire about continuing a dialogue

between Lehman and Barclays about a potential transaction after the Lehman bankruptcy

filing, which was to be made in a matter of hours.  (4/26/10 [McDade] 146:21-147:3;

Stip. ¶ 107.)  Diamond discussed this with other Barclays executives and called McDade

back shortly after their initial conversation.  They agreed that the parties could meet the

following morning.  (6/21/10 [Diamond] 138:9-139:5.)

29.     Discussions between representatives from Barclays and Lehman

concerning a potential Lehman Two transaction resumed at 7:00 a.m. on Monday,

September 15, 2008 at Lehman's offices at 745 Seventh Avenue.  (Stip. ¶ 108; 4/26/10

[McDade] 146:21-147:3, 148:1-18; *see also* 4/28/10 [Miller] 11:12-21.)  Large groups of

executives from both Lehman and Barclays set up temporary computers, phones, and

work spaces on the 32nd floor, a location conducive to hosting "lots of different meetings that needed to go on."  (4/26/10 [McDade] 148:1-18.)

30.    From all accounts at trial, the compressed timeframe for the parties' complex negotiations gave rise to a chaotic situation, one rife with the possibility, indeed the likelihood, that mistakes would be made.  Miller, who arrived at Lehman's offices at approximately 9 a.m., described a "sense of frenzy, distress" and a "scene of organized chaos" in which "hundreds of people [were] milling about" as negotiations took place.  (4/28/10 [Miller] 11:25-12:21; *see also* 4/29/10 [Lowitt] 15:18-18:11 (shown his declaration swearing that people were "distraught" and it was "difficult to get employees to focus on the firm").)  Others testified about the rushed and often confused conduct of the negotiations and the haphazard division of labor among those involved.  (*See* 8/31/10 [Lewkow] 13:7-15:5 (compressed timeframe meant that "[i]t was all being done very quickly" and "[t]hings that would have taken weeks got done in forty-eight hours" with an impromptu division of labor); 8/27/10 [Klein] 22:15-18 ("there was really a large number of people – most people I didn't know then and I don't know now – in various different rooms"), 40:25-41:16.)

31.    The participants attempted to segregate themselves into various groups.  In one office were attorneys for both parties drafting the Asset Purchase Agreement.  (4/27/10 [Berkenfeld] 122:13-20; 8/31/10 [Lewkow] 13:7-24, 35:1-5.)  In another area, business people and attorneys worked on compensation issues.  (8/23/10 [Shapiro][19]

---

[19]Mark Shapiro is trained as a bankruptcy lawyer.  At the time of the Sale Transaction, he was a Managing Director and Head of Restructuring within Lehman's Investment Banking Division.  (8/23/10 [Shapiro] 7:9-24; Stip. ¶ 62.)  Shapiro is now a Managing Director and Head of Restructuring and Finance at Barclays.  (8/23/10 [Shapiro] 7:25-8:5; Stip. ¶ 72.)  His annual compensation from Barclays includes a base salary of $200,000 and guaranteed cash bonus of $1,447,500.  (M.115.)

89:3-14; Brown Dep. Tr. 10:2-12.)  There also was a group assigned to addressing

contract cure liabilities.  (4/28/10 [Kelly] 283:13-284:7; 8/23/10 [Shapiro] 95:2-20.)

Much of the process centered around those assigned to negotiate values for the assets

being transferred to Barclays.  Teams of people from the Lehman and Barclays finance

departments assembled and analyzed data concerning the myriad of securities at issue.

(*See, e.g.,* 8/31/10 [Lewkow] 34:20-35:13; 8/27/10 [Klein] 38:24-39:17.)  Miller thought

he recalled Barclays and Lehman personnel reviewing "huge computer runs going CUSIP

number by CUSIP number to try to get to what the market value was."  (4/28/10 [Miller]

36:2-19.)

32.    All witnesses agreed that the emphasis was on speed.  (8/27/10 [Klein]

23:20-25:14; 4/29/10 [Clackson] 231:25-232:16 ("we needed to do the deal very

quickly").)  For example, according to Miller, once SIPC agreed to a coordinated Chapter

11 for LBHI and SIPA proceeding for LBI:

> *[T]he question was how fast can this transaction be
> accomplished.  The Barclays team was very anxious that
> the transaction be completed before the end of Friday,
> September 19.  …  And the Barclays team also was very
> adamant that it would have to be a judicial sale*.  Barclays
> didn't have any desire to be involved in a transaction which
> would ultimately or possibly lead to a post-transaction
> claim that it was a fraudulent transfer or fraudulent
> conveyance.  So it had to be a judicial sale with a provision
> that it was free and clear in accordance with Section 363(f)
> of the Bankruptcy Code.

(4/28/10 [Miller] 15:6-16 (emphasis added).)

33.    The harried negotiations continued all day Monday, September 15, and

into the early morning hours of September 16.  (4/26/10 [McDade] 150:14-24; 4/28/10

[Kelly] 150:17-151:15; 4/29/10 [Lowitt] 63:2-6, 77:12-17; 4/27/10 [Berkenfeld] 105:12-

106:22; 4/28/10 [Miller] 13:4.)  There were "lots of flash fires" and "[p]eople were going

in and out of the room as these different flash fires occurred." (4/28/10 [Miller] 13:4-10.)

There were different meetings going on in rooms all through the 32nd floor at Lehman's

offices. (4/28/10 [Miller] 13:4-10; 4/28/10 [Kelly] 278:18-279:2.) The parties finally

reached agreement on the terms of the Lehman Two deal on September 16, 2008, and the

Asset Purchase Agreement was signed on, and dated "as of" that date. (4/28/10 [Kelly]

150:17-151:15; 4/27/10 [Berkenfeld] 105:12-106:22; Stip. ¶ 109; M.1 at 1.)

### B.    The Principal Negotiators

34.    The senior principals from Lehman involved in these negotiations were

Bart McDade, Skip McGee and Mark Shafir. (4/26/10 [McDade] 148:19-22); *see also*

Stip. ¶ 47.) However, there were at least fifty or sixty Lehman representatives "involved

in a senior way" in activities related to the negotiations. (4/26/10 [McDade] 149:4-9.)

Among those were: (i) Martin Kelly, Lehman's Global Financial Controller (*see* 4/26/10

[McDade] 149:17-150:1; Stip. ¶¶ 29-33); (ii) Ian Lowitt, Lehman's CFO (*see* 4/29/10

[Lowitt] 51:7-52:11, 94:6-22 ("We were tracking what was emerging from the

discussions between the respective traders per asset class within – for Barclays and for

Lehman"), 94:23-95:21 (Lowitt involved in developing 9/16/08 Financial Schedule);

Stip. ¶ 40; 8/23/10 [Shapiro] 69:10-19); and (iii) Paolo Tonucci, Lehman's Treasurer

(4/29/10 [Lowitt] 60:10-16, 56:18-23).

35.    Richard Ricci,[20] Archibald Cox,[21] and Michael Klein[22] were the senior

participants from the Barclays side, with Ricci taking the lead role.  (4/26/10 [McDade]

148:19-24; 4/27/10 [Berkenfeld] 109:18-21; 4/29/10 [Lowitt] 30:20-22; Stip. ¶¶ 84, 88.)

Ricci testified that he was appointed by Diamond to be "head of the whole transaction."

(5/7/10 [Ricci] 125:15-126:16.)  Cox agreed that he was "one of the structurers of the

transaction." (6/22/10 [Cox] 216:9-12.)  Despite Barclays' attempt to make Klein a

central witness, Klein was primarily involved in matters largely tangential to this

proceeding: "discussions on the elements of the building and elements of the cash paid

for the rights to operate the business."  (Klein Dep. Tr. 48:22-49:2; 8/27/10 [Klein]

22:15-23:1, 25:15-27:24 (Barclays agreed to pay $250 million for the value of the

ongoing business), 29:16-19.)  Klein said he was not involved in the pricing of specific

assets or in preparing, drafting or even reviewing the Asset Purchase Agreement.

(8/27/10 [Klein] 38:24-39:17, 77:9-78:19, 81:15-83:16 (impeached with Klein Dep. Tr.

57:13-58:18 ("I don't recall that I have ever reviewed this agreement")), 107:4-108:6 (no

role in drafting the Asset Purchase Agreement or valuing securities), 108:24-111:15 (no

role in evaluating balance sheets or other financial analyses), 114:19-115:14, 128:1-

130:19 (no knowledge of value of repo collateral).)  Nevertheless, Klein claimed to have

played a role in "how the transaction changed in the later part of the week and, in

---

[20] Richard Ricci was Barclays' Chief Operating Officer of the Investment Banking and Investment
Management Division.  (Stip. ¶ 85.)  Ricci is currently Co-Chief Executive of Corporate and Investment
Banking. (Stip. ¶ 86.)

[21] Archibald Cox, Jr. is Chairman of Barclays America.  (6/22/10 [Cox] 204:10-13.)

[22] Michael Klein was a consultant to Barclays in connection with the Sale Transaction.  (8/27/10
[Klein] 7:16-21; Stip. ¶ 101.)  Klein was paid $10 million for his short stint as a consultant to Barclays, and
under his contract with Barclays his receipt of that sum was contingent on the Sale Transaction closing.
(8/27/10 [Klein] 95:18-102:18.)

addition to those changes, the then resulting shifts of assets and the, what I'll call the weekend of the JPMorgan-related issues." (Stip. ¶ 103.) But he conceded that he could not recall reviewing the Asset Purchase Agreement and never reviewed the Clarification Letter. (8/27/10 [Klein] 139:19-140:4.)[23]

36.     Varley, Barclays' Group Chief Executive, was not directly involved in the negotiations, but he received reports from Diamond, his "man on the ground." (6/22/10 [Varley] 81:19-82:5.) Varley said he focused on strategy and the implementation of a transaction consistent with the authority he was given by the Barclays Board, and Diamond was responsible for negotiating a transaction within those parameters. (6/22/10 [Varley] 82:11-18.) Diamond, however, testified that "Rich [Ricci] ran the deal. [Diamond] didn't run it." (6/21/10 [Diamond] 140:7-8.) Diamond said he "asked Rich [Ricci] to take full responsibility for negotiating the agreement within the authority that we were given from the board." (Stip. ¶ 89; *see also* 6/22/10 [Diamond] 41:23-42:1 (Diamond delegated negotiating duties to Ricci).) Diamond described his role as involving "discussions with the Barclays group, our CEO, the executive committee and the board to keep them abreast. And there were many internal meetings to review the results of different valuations." (Stip. ¶ 89.)

---

[23] Klein testified that he primarily dealt with Shafir, who then left Lehman in the middle of the week. (8/27/10 [Klein] 23:2-19, 112:23-113:20.) Thus, it is not clear how familiar Klein really was with the terms of the deal (which materially changed after his counterparty left), let alone the valuation of assets. (*See* 8/27/10 [Klein] 32:18-33:3 (he had little exposure to McDade early in the week, he only dealt with McDade towards the end of the week and during the weekend), 38:24-39:17 (not involved in valuing assets), 112:23-114:8.)

C.    **Barclays' Insistence On A First Day Gain, Capital Accretion, And A "Delta" Or "Buffer" Or Asset/Liability Mismatch In Its Favor As A Condition Of The Deal**

37.    Barclays only intended to do the deal if it yielded an immediate gain to Barclays.  (4/30/10 [Hughes] 121:6-10, 122:21-123:7.)  This is of particular significance because this remained its position as the transaction changed later in the week.  (6/22/10 [Varley] 131:23-133:6 (Varley was "preoccupied" with ensuring that the buffer between trading assets and liabilities remained in Lehman III and "the business strategy between Lehman Two and Lehman Three was unchanged"), 142:16-23 (Varley wanted to make sure that the buffer that had existed in Lehman Two was maintained into Lehman Three); 5/7/10 [Ricci] 221:24-222:14 (Ricci did everything humanly possible through the week to make sure that there was a disparity between assets and liabilities).)

38.    Barclays' General Counsel Jonathan Hughes admitted that Barclays considered it a ***"precondition"*** of the transaction that it yield a ***first-day*** gain for Barclays.  (4/30/10 [Hughes] 122:21-123:8 (emphasis added), 140:10-143:1 (impeached with his deposition testimony that it was "a pre-condition for Barclays"; an immediate gain "was of huge importance to Barclays").)

39.    Ricci, who had overall charge of the deal for Barclays, also acknowledged that there was a first-day economic gain built into the deal for Barclays, agreeing that this first-day economic gain was "derived from the excess of the assets purchased over the liabilities assumed and the cash paid."  (5/7/10 [Ricci] 147:12-20, 167:12-15.)  Ricci admitted Barclays was "looking for buffers across the whole transaction phase." (5/7/10 [Ricci] 161:23-162:11.)

40.    According to Varley, the deal needed to have a "delta between asset valuation and liability valuation."  (Stip. ¶ 112; *see also* 6/22/10 [Varley] 103:18-24;

5/7/10 [Ricci] 167:12-15 (Barclays needed "more assets than liabilities" to get its desired

"cushion").)  Varley said he was not prepared to go to his board of directors with a

transaction that did not protect Barclays' capital ratios.  (6/22/10 [Varley] 91:14-24); *see*

*also* 5/7/10 [Ricci] 143:4-10, 144:18-145:2 (Ricci understood that the Barclays Board

intended that the Sale Transaction be capital accretive and Diamond was "pretty

emphatic" that that be the case); 6/21/10 [Diamond] 140:21-141:3 (capital accretion was

"certainly a priority").)

41.     This "delta" was "a condition precedent" to the deal, and without it

Barclays witnesses testified they would have walked away from the proposed transaction.

(6/22/10 [Varley] 110:12-111:1; 4/30/10 [Hughes] 141:22-142:10, 122:21-123.)

42.     Ricci, Diamond and Barclays' other negotiators had no authority to do a

deal unless there was an immediate gain for Barclays embedded in an "asset/liability

mismatch."  As Diamond testified in his deposition:

> The regulators that we are responsible to, the Financial
> Services Authority in the UK, holds us to specific capital
> standards, so for example, core equity, tier 1 equity, and it
> was becoming increasingly clear during this time that they
> were focusing more on core equity than tier 1 equity, and
> they were thinking the banks would potentially have to
> hold higher core equity.  ***So when I say capital accretive,***
> ***accretive to the capital ratios, which means that the asset***
> ***liability mismatch had to have a mismatch in favor of a***
> ***positive capital accretion or we weren't authorized to do a***
> ***deal***.

(Stip. ¶ 117 (emphasis added); *see also* 4/30/10 [Hughes] 144:6-24 (conceding that

Diamond likely said this at his deposition), 205:11-206:8 (conceding that Diamond did

not have authority from the Board to do the deal without an asset/liability mismatch).)

43.     Barclays' regulatory capital requirements were directly affected by the

negative goodwill or capital accretion generated by the proposed Sale Transaction.  To

the extent the transaction was itself capital accretive, and therefore generated negative

goodwill, that would reduce Barclays' regulatory capital requirements, meaning Barclays

would not have to raise additional capital to purchase the Lehman assets.  (4/29/10

[Clackson] 205:18-206:13 ("So negative goodwill would give you an accounting gain

which would go into your earnings, which would give you a bigger capital base, which

would help you to support a higher regulatory capital charge on the assets").)

Conversely, if the deal generated little or no negative goodwill (*i.e.*, if it was not capital

accretive on its face), that would increase Barclays' regulatory capital requirements,

thereby forcing Barclays to raise additional capital.  (4/29/10 [Clackson] 206:14-207:24.)

In effect, by insisting that the deal had to be immediately capital accretive by taking in

more assets than liabilities, Barclays' plan was to use Lehman's own assets to satisfy

Barclays' capital requirements attendant to the deal.  A "buffer" in Barclays' favor was

therefore crucial to this plan.

44.    At trial, Varley, Diamond and other witnesses employed by Barclays

seemed to want to make a point of saying that the "buffer," "delta" or "gap" Barclays

insisted upon was only between trading assets and trading liabilities.  (*See, e.g.*, 6/22/10

[Varley] 91:25-92:10, 103:18-24; *see also* 8/31/10 [Lewkow] 34:3-7.)  They did so

evidently because Barclays now argues this buffer was discussed in a press release and

analyst call on September 17 and therefore could have been found if one had looked in

the public record.  (*See infra* ¶¶ 183-194.)

45.    However, this admitted or disclosed "buffer" discussed in the analyst call

was only one of the two discounts or buffers at issue in the Rule 60 Motions.  Even

before trading assets were matched against trading liabilities, the parties had already

agreed to a $5 billion discount on the value of Lehman's assets.  (*See infra* ¶¶ 52-73; *see also* 6/22/10 [Varley] 115:25-116:10 (Varley was "fixated" on two buffers, the first involving marking Lehman's securities to what was, in Barclays' opinion, a lower "realistic" value, and the second was a buffer between trading assets and liabilities), 132:16-133:6 (similar); 5/7/10 [Ricci] 162:7-11 (Barclays was "looking for buffers across the whole transaction").)

46.    Varley conceded that the first "buffer," *i.e.*, the reduction of values below Lehman's actual book value, was achieved through a negotiated marking process to achieve the $72 billion in assets (in the Financial Schedule, M.2, upon which the deal was based), and the $70 billion in so-called "Long" Positions described in the Asset Purchase Agreement.  (6/22/10 [Varley] 131:19-16; *see also* 6/22/10 [Varley] 130:19-131:2 ($72 billion of assets in press release was arrived at through the marking down process between traders).)  As the deal changed over the course of the week, this "buffer" took different forms, but it always remained embedded in the deal.  (*See infra* ¶¶ 206-250; 4/30/10 [Hughes] 121:6-15 (the concept of Barclays deriving a gain on the transaction never changed from September 15 through the closing); 6/21/10 [Diamond] 154:6-155:1 (the imperative for capital accretion did not change over the course of the negotiations).)  In the end, after the negotiations were over and the deal agreed to, Diamond felt comfortable, notwithstanding the risky economic climate, telling the Barclays Board that the deal was capital accretive.  (6/21/10 [Diamond] 151:16-21.)

47.    Notably, no one at Barclays ever mentioned to anyone at Lehman that it was a precondition to the transaction that Barclays make such a day-one gain.  (4/26/10 [McDade] 184:18-185:6 (at no point in any of his dealings with Barclays was McDade

ever told that it was imperative that the deal incorporate a first-day gain for Barclays, and

he did not understand the Asset Purchase Agreement to contemplate a first-day gain for

Barclays); 4/30/10 [Hughes] 123:9-125:7, 138:7-139:6 (Barclays never told Weil Gotshal

or anyone outside Barclays), 145:17-147:20 (not sure this imperative for a day-one gain

"would've been known to others").)[24]

48.     Nor did anyone advise the Court about this precondition.  (4/30/10

[Hughes] 126:3-127:16, 139:20-140:2 (nobody at Barclays felt this needed to be

disclosed), 143:22-25 (similar); 5/7/10 [Ricci] 164:5-166:10 (Ricci took no steps to

ensure the Court was informed of "any notion of a cushion or a buffer for Barclays").)

49.     Hughes testified that Barclays did not think it was necessary to disclose

the asset/liability mismatch and expected first-day gain to the Court.  (4/30/10 [Hughes]

143:2-25, 145:5-16 ("I don't think that that was a necessary disclosure to the Court.  And

certainly nobody ever advised Barclays that it was, either.").)  Demonstrating Barclays'

cavalier approach to disclosure to the Court, Hughes testified that this "feature" of a first-

day gain could be "deduced" from "pieces of information."  (4/30/10 [Hughes] 126:13-

127:1, 136:19-138:11, 167:8-17; *see also* 4/30/10 [Hughes] 138:12-140:5, 145:17-147:20

(also conceding that Weil Gotshal was not in a position to disclose this imperative to the

Court, but conceding that those representing Barclays were in such a position).)

50.     Barclays' General Counsel, Hughes, said he believed that no additional

disclosures were required as to these issues.  (4/30/10 [Hughes] 143:2-25, 145:5-16 (with

respect to it being a "precondition" that there be an "asset/liability mismatch" or a "first

---

[24] Leventhal confirmed that the FRBNY also was never told that the Sale Transaction was
structured to ensure Barclays received a gain on the very first day.  (9/8/10 [Leventhal] 50:2-22.)

day gain," Hughes said: "I don't think that that was a necessary disclosure to the

Court.").)  Indeed, Hughes said that whether Barclays earned a "windfall profit" on the

Sale Transaction was not "relevant" to the Court.  (4/30/10 [Hughes] 147:21-149:22

(shown and acknowledged his prior deposition testimony).)[25]

51.    In fact, there is no evidence that shows that either Lehman or its counsel

was ever told that Barclays viewed capital accretion, an asset/liability mismatch in

Barclays' favor, or a day-one gain as a precondition or imperative of the deal.  (*See*

4/30/10 [Hughes] 138:12-139:6 (Barclays had not told anyone outside Barclays that it

was imperative that there be a first-day gain for Barclays, and agreeing unless they had

been able to "deduce" it that it would have been impossible for Weil Gotshal to tell the

Court); 4/26/10 [McDade] 184:18-186:7 (McDade was never told nor did he understand

that there was an embedded or first-day gain for Barclays in the deal), 216:6-217:5 (the

approximate $4.2 billion gain disclosed in February 2009 Barclays' Results

Announcement was not contemplated by the deal McDade made); 6/21 [Diamond] 158:4-

21 (Diamond did not know whether the Lehman team was told that the deal needed to be

capital accretive to Barclays).)

---

[25]  At trial, Hughes could not explain how Barclays' position that it had not agreed to a deal
premised on a "reasonably equivalent value" (4/30/10 [Hughes] 206:17-19), could be reconciled with it
seeking an order from the Court approving the transaction based on a finding that it involved "reasonably
equivalent value" under the Bankruptcy Code, especially in light of, among other things, the additional
assets added to the deal pursuant to the Clarification Letter.  (4/30/10 [Hughes] 206:11-211:17, 215:9-18,
221:25-222:25; *see also* M.441 [Sale Order] at 6.)

D.      **The Undisclosed $5 Billion Discount, Or "Difference," Between Lehman's Book Value And The Negotiated Price**

1.      **The negotiated values for Lehman's assets were agreed to by Lehman executives moving on to jobs at Barclays**

52.      The deal reached on the morning of September 16, 2008 actually included an agreement, which was never revealed to the Court until these Motions, to value Lehman's assets to be transferred to Barclays at values lower than the Lehman "book value" that the Asset Purchase Agreement described to the Court.  (*See* 4/26/10 [McDade] 152:4-15.)  Over the course of the parties' meetings on September 15 and 16, traders from Lehman and Barclays had, in fact, negotiated a price for Lehman's assets *below* Lehman's marks.  (4/29/10 [Lowitt] 59:7-60:8, 92:20-93:18; 4/28/10 [Kelly] 154:22-155:1; 4/29/10 [Clackson] 190:18-193:13 (describing negotiations and involvement of Barclays' traders, including Stephen King[26]); M.7.)[27]

53.      Several, but not all, of Lehman's executives were involved in these discussions about "asset values."  (Stip. ¶ 111; 4/27/10 [Berkenfeld] 112:25-113:7 (Felder); 4/27/10 [McDade] 21:18-23 (Gelband); 4/28/10 [Kelly] 279:9-15 (describing Felder negotiating with King); 4/29/10 [Lowitt] 157:18-158:1 (Gelband and Felder); M.188; M.159 (on the morning of September 19, Lowitt writes to Donini, Felder, and others, cc-ing King, that "Barclays teams are on their way to meet with us on our positions and marks; obviously critical").)  But these executives were hardly disinterested negotiators; they all were offered and accepted lucrative employment arrangements with

---

[26] Stephen King currently is employed by C12 Capital Management, a special purpose company, formed by 40 Barclays employees, which manages assets acquired mostly from Barclays.  (8/25/10 [King] 6:25-7:4; 92:19-98:19.)

[27] As Clackson explained, if Barclays was going to err, it was going to err on the side of undervaluing assets it was taking onto its books.  (4/29/10 [Clackson] 190:3-191:7.)

Barclays at about the same time they were engaged in supposed arms-length, multi-billion dollar negotiations with their presumptive future employer.  (Stip. ¶¶ 18-19, 23-25, 27.)  For example, on the morning of September 16, while he was negotiating with Barclays over asset values, Felder met with Diamond and Jerry del Missier, both senior Barclays executives, to discuss Felder's future role and compensation at Barclays.  (Stip. ¶ 23; Felder Dep. Tr. 31:9-32:10, 36:25-43:11.)  On September 21, 2008, Felder signed an employment agreement with Barclays.  (Stip. ¶ 24.)  Shortly after closing, Donini also signed lucrative employment contracts with Barclays.  (M.112 (Donini was entitled to receive compensation in excess of $50 million over two years).)  Barclays also employed Gelband after the closing, but Gelband left Barclays in October 2008.  (Stip. ¶ 27.)  No final employment contract for Gelband was produced.  (*See* M.109 (includes an unsigned employment agreement for Gelband).)

54.      Lowitt, Lehman's CFO, and his Finance Department were heavily involved in collecting information concerning asset values and tracking the series of agreements being made between the traders during these negotiations.  (4/29/10 [Lowitt] 56:11-57:9, 58:23-63:3.)  Lowitt's direct reports Kelly, Tonucci and Reilly[28] "were involved in providing a lot of the information to the traders."  (4/29/10 [Lowitt] 56:18-21, 60:12-16; 4/27/10 [Berkenfeld] 113:22-114:10 (Kelly and Tonucci were a "conduit" for "getting information about the security positions that were being transferred over"); 8/23/10 [Shapiro] 69:10-19.)  Lowitt also negotiated -- and signed -- a lucrative

---

[28] At the time of the Sale Transaction, Gerard Reilly was the Capital Markets and Investment Banking Chief Financial Officer of Lehman (Stip. ¶ 57), reporting directly to Lowitt.  (Stip. ¶ 58.)  Reilly died in December 2008 and never testified.  (Stip. ¶ 59.)

employment agreement with Barclays while these valuation negotiations were ongoing. (4/29/10 [Lowitt] 22:11-18, 30:10-38:25, 39:6-40:7; M.108.)  Many others acting on Lehman's behalf, including Kelly and Tonucci, fully expected to be offered employment by Barclays after the closing of the Sale Transaction.  (*See, e.g.,* 4/28/10 [Kelly] 140:5-144:16 (it's possible Lowitt told him as early as September 19 that he would have a spot at Barclays); Tonucci Dep. Tr. 65:12-66:19 (Lowitt told Tonucci on September 19 that he would receive an employment offer from Barclays); M.212 (David Petrie of Barclays wrote over the weekend of September 14 that "[t]he treasurer (paolo tonucci) seemed very eager to give me whatever I needed"); M.50 (9/19/08 J. Palchynsky (Lehman) e-mail to Tonucci, Alastair Blackwell and numerous others stating "see you all at Barcap").)

55.    While the Lehman Boards were advised generally that certain senior executives would be negotiating employment contracts with Barclays it was never adequately explained to the Boards that at the same time those same executives would be negotiating on Lehman's behalf to set a price below Lehman's book value that Barclays would pay for Lehman's assets.  (M.9 at 3; *see also* 4/29/10 [Lowitt] 37:4-38:25.) Indeed, the disclosures made to the Lehman Boards on this score were incomplete at best. The minutes of the September 16 meeting reflect that the Lehman Boards were told the following:

> Mr. Roberts resumed by describing that it is a condition to the transaction that eight specific Firm employees enter into employment agreement with Barclays.  He stated that Mr. McGee was one of those employees, so interested Firm employees were involved in the transaction negotiations on behalf of the Firm.  Mr. Roberts reported that Mr. McDade was subsequently advised by Barclays that his agreement to continued employment was a condition precedent to the

transaction. Mr. Roberts reported that both Weil, Gotshal
& Manges and Simpson Thacher & Bartlett then told
Barclays there were to be no more discussions concerning
Mr. McDade's employment until all terms of the Firm
transaction were completed. Mr. Roberts reported that the
discussions regarding Mr. McDade's employment were
suspended to protect Mr. McDade's independence.

(M.9 at 3.) In response to a question, the Lehman Boards were also told that Felder,

Donini, Lowitt, Gelband and Lee were among the eight employees whose agreement to

continue employment Barclays considered a condition to the transaction. (M.9 at 5.) The

Lehman Boards were not told about the numerous other interested employees involved in

the negotiations, including Kelly, Tonucci, Seery[29] and Kirk.[30] (*Id.*) Nor were the Board

members advised just how intimately involved these individuals were in setting the

bargain price of the Lehman assets being sold to Barclays. (*Id.*)

56.    By September 16, and before the Asset Purchase Agreement was signed,

Lehman and Barclays traders agreed to a negotiated price approximately $5 billion below

Lehman's book value for the securities going to Barclays. (4/29/10 [Lowitt] 92:20-

---

[29] James Seery was Managing Director for Fixed Income Loans at Lehman prior to the Closing of
the Sale Transaction. He reported directly to Alex Kirk. (5/3/10 [Seery] 112:14-113:11.) After the
Closing, Seery went to work for Barclays as a Managing Director, although he ultimately had no defined
role or reporting relationship within Barclays. (5/3/10 [Seery] 115:4-23, 116:7-11.) Even so, he received
bonus and "retention payment[s]" of "several million dollars." (5/3/10 [Seery] 116:12-117:7.)

[30] Alex Kirk was Global Head of Principal Businesses at Lehman from July 2008 until September
2008. (Stip. ¶ 35.) Kirk worked for Barclays from after the Closing in September 2008 until November
2008. (Stip. ¶ 38.) Although he left Barclays after only about a month, Kirk received a severance package
valued at approximately $15 million. (BCI 356 ¶ 10 (Exall Declaration [regarding compensation Barclays
paid to certain transferred Lehman employees].) Kirk testified at his deposition that he first became
involved in the Sale Transaction late on September 18 or early on September 19 (Kirk Dep. Tr. 23:24-24:9,
43:17-45:10; Stip. ¶ 36), when McDade asked him to help close the transaction after Mark Shafir, one of
Lehman's negotiators, suddenly left the company. (Kirk Dep. Tr. 43:17-45:10.) Kirk's principal
involvement (along with Lowitt, Tonucci and Kelly) was in responding to Barclays' demands, made just
before the Sale Hearing, that billions more had to be added to the deal or Barclays would refuse to close.
(*See* Kirk Dep. Tr. 103:25-108:16, 112:10-24.)

93:18; 4/28/10 [Kelly] 155:12-18, 170:16-20; M.7; M.8; 4/26/10 [McDade] 155:10-22.)[31]

This difference between what was on Lehman's books and what emerged through the

negotiation process was agreed as a fixed number rather than as a percentage. (4/29/10

[Lowitt] 93:19-25.) And that fixed number did not change even as the value of Lehman

assets purportedly declined later in the week. (*See infra* ¶¶ 206-250.) This discount was

never disclosed to the Lehman Boards. (M.9; 4/26/10 [Ainslie] 139:12-20, 84:3-17; *see*

*also* 85:17-86:4, 122:18-25.)

57.     Whatever nomenclature one uses – delta, discount, buffer or difference – it

was not revealed in the Asset Purchase Agreement signed by the parties and submitted to

the Court as part of the Sale Motion. To the contrary, the Asset Purchase Agreement

stated that the pool of securities being transferred to Barclays had a "*book value* as of the

date hereof [September 16, 2008] of approximately $70 billion (collectively, 'Long

Positions')." (M.1 at 6 (emphasis added).) The term "book value" was purposefully

added to the agreement. It was handwritten into the version of the Asset Purchase

Agreement attached to the Sale Motion. (M.118 at 7.) In fact, Lewkow, Barclays'

counsel, testified he believed he was the author of this term. (8/31/10 [Lewkow] 39:3-

40:15.) Lewkow is an experienced professional in the industry, and he would know what

it meant and would connote in the minds of readers. (8/31/10 [Lewkow] 129:5-130:12.)

Indeed, Lewkow conceded that he intended this term to be understood as reflecting

Lehman's book value. (8/13/10 [Lewkow] 130:3-12.) Barclays presented no evidence

to suggest otherwise.

---

[31]    Varley testified: "If on the other hand you acquire assets of 10 for a valuation of five, then
there would be negative goodwill of five because of the discount at which you are buying the assets. So
negative goodwill is a term of science describing in a scientific way what most people would refer to as a
discount." (Stip. ¶ 115.)

## 2.    Movants proved the existence of the discount with sworn testimony and documentary evidence

58.    The existence of an agreed upon, but undisclosed, $5 billion discount was confirmed by contemporaneous documents and sworn testimony.  For example, upon learning that an agreement between Lehman and Barclays had been reached after overnight negotiations, at 5:10 a.m. on September 16, 2008, Martin Kelly sent an e-mail to his superior, Ian Lowitt, and to Paolo Tonucci informing them of the economic terms of the deal.  (4/28/10 [Kelly] 152:13-153:17; M.7; M.8.)  Kelly wrote:

> Well it took all night and lots of back and forth but the deal is done and ready for the Board.  ***Final price did not change meaningfully - approx a $5b all in economic loss versus our marks*** and $3.6b of resi assets left behind. Assume we can fund this after everything else winds down but Paolo [Tonucci] you need to review this.  Also, an extra $1b of comp beyond our accrual and assumption of all trade payables in LBI and LBHI.  Took 745 [real estate asset] for $1b and several data centers for $400mm.  Bart [McDade] reviewed all of it before final agreement. ...."

(M.7 (emphasis added); M.8; 4/28/10 [Kelly] 154:22-155:1; 4/29/10 [Lowitt] 88:25-90:1 (claimed no recollection, but agreed he received this e-mail).)

59.    By "$5b all in economic loss versus our marks," Kelly admitted he meant that "the transaction included an approximately $5 billion dollar difference between the values that had been negotiated for the assets that were moving, and their most recent book values on the books of Lehman."  (4/28/10 [Kelly] 155:12-18; *see also* 4/28/10 [Kelly] 156:14-19 ("there was an approximately five billion dollar difference between the negotiated value and the most recent book value as to Lehman"), 170:16-20 ("At the time I understood that the value negotiated for the assets were lower than the preexisting book values"); 187:4-6 (negotiated values were in the aggregate $5 billion less than the book value); 4/27/10 [McDade] 84:9-17 (conceding a five billion all-in loss versus Lehman's

marks).)  Kelly's contemporaneous handwritten notes contain his calculations of "a loss

to Lehman of approximately $5.25 billion," which was "primarily a function of the

difference between the book value of the inventory and the value negotiated."  (4/28/10

[Kelly] 240:18-243:1; *see* M.14 at 00115169.)  This $5 billion difference between the

book and agreed values was the result of a series of discussions conducted at the portfolio

level (4/28/10 [Kelly] 168:7-10), and not on an line-by-line, or CUSIP-by-CUSIP,

level.[32]

60.    At his deposition, Paolo Tonucci, Lehman's Treasurer and one of the two

recipients of Kelly's 5:10 a.m. e-mail, conceded the existence of the $5 billion discount.

> Q:    . . . You understood the 5 billion dollars all in
> economic loss versus our marks to be a reference to a
> discount off the marks, correct?
>
> A:    Yes.

(Tonucci Dep. Tr. 29:22-30:2.)  Although Movants put Tonucci's testimony in the record

in their direct case, Barclays chose not to call Tonucci as a witness and offered no

evidence to rebut this admission.  (*See* 6/14/10 Tr. 5:10-6:1, 10:4-11:17.)

61.    Lowitt, Lehman's CFO, learned on Tuesday morning, September 16,

2008, that "Barclays was going to purchase a ***substantial block of assets for less than the***

***amount that we had on our books*** to reflect a sort of bid offer that reflected both the size

of the purchase, as well as the inherent volatility in the market, which was significant that

week."  (4/29/10 [Lowitt] 77:19-82:2 (emphasis added); *see also* 82:3-84:8 ("They

valued those assets at a level that was less than was on our books"), 84:9-88:23, 92:19-

---

[32]  McDade testified at the Sale Hearing that a valuation exercise was done on an line-by-line
basis.  (M.261 [9/19/08 Tr.] 126:21-127:1.)  This was just wrong.  McDade himself was not personally
involved in this exercise.  (4/27/10 [McDade] 68:21-24.)

94:22 ("my understanding was that the traders were meeting with their counterparties and

agreeing what was the appropriate value for those securities given the nature of the

environment and the market they were dealing with").)  Lowitt testified:

> There was certainly an agreement between the parties to
> value a block of assets and that that was a process
> involving the Lehman traders and the Barclays traders.
> They came up to some value that reflected what, in their
> view, reflected the appropriate values given the market
> environment ***and it was what Barclays was willing to value
> those securities at.  And that was different to our book
> value*** as of Friday.

(4/29/10 [Lowitt] 85:2-86:5.)

62.      Lowitt, the other recipient of Kelly's 5:10 a.m. e-mail describing the $5

billion economic loss versus Lehman's marks, responded to Kelly with an e-mail of his

own, saying "You are a hero. Well done. Ian."  (M.7; M.8; 4/29/10 [Lowitt] 88:25-90:11,

*see also* 93:3-18 ("I understood that there was a difference between what was on our

books and what was the outcome of that [negotiating] process … [and] that that was

around five billion dollars"); 4/26/10 [McDade] 151:22-152:11 (describing negotiations

over valuing Lehman's assets), 155:10-22 (the difference between book value and the

agreed price was $5 billion), 165:22-166:10 (similar).)[33]

63.      Gerard Reilly, Lehman's Head Global Product Controller, also

acknowledged there would be a "fixed discount" on Lehman's assets, writing in an e-mail

to Martin Kelly on September 16, 2008:

---

[33]   At trial, Lowitt tried to explain this away by saying he was merely recognizing Kelly for his
work and that his response was "just a reflection that Martin had been working extremely hard through this
period and had supported the process very successfully."  (4/29/10 [Lowitt] 90:2-11.)  Given Lowitt's lack
of credibility on other major issues (*see, e.g., infra* ¶ 78), this testimony appeared self-serving and
disingenuous.

> My understanding of the deal is that they will purchase our
> assets that remain in LBI on the closing date which will not
> be the same as the assets on the 12th. ***That purchase will
> be at a fixed discount on the assets that remain*** to reflect
> the bulk size of the purchase."

(M.21 (emphasis added).)

64.    Contemporaneous Barclays documents also confirm the existence of this

negotiated $5 billion discount off the book value of Lehman's assets.  (*See, e.g.,* M.12 at

00166340 (document from Varley's "hand file" showing "negotiated discount -[$]5");

6/22/10 [Varley] 109:13-111:1, 115:19-24; M.31 at 3 (9/18/08 Montaudy e-mail referring

to "the 'discount' between the value of the assets acquired and the purchase price").)

Even Barclays' brief in opposition to the Rule 60 Motions concedes the existence of the

discount.  (*See* Barclays' Opp. ¶ 21 (arguing the "discount" in issue was to adjust

Lehman's marks to fair market value).)  Similarly, Barclays' September 16, 2008 Board

minutes reflect that it was receiving $75 billion in Lehman assets, instead of the $70

billion "book value" shown in the Asset Purchase Agreement.  (M.144 ¶ 3 ("The balance

sheet acquired consisted of $45 billion of liquid assets and $30 billion of less liquid

assets").)

65.    This negotiated valuation could not truthfully be described as Lehman's

"book value."  Of course, Lehman had never before determined the book value of its own

assets through negotiations with a third-party, single bulk purchaser.  (4/27/10 [McDade]

62:22-63:12; 4/29/10 [Lowitt] 86:15-87:2 ("I'm not aware of a comparable situation to

this one"), 88:12-22 (this was not Lehman's normal process for marking its books).)

66.    The evidence also showed that the parties intended to mark Lehman's

books down to reflect this discount.  Kelly said that after the $5 billion loss on Lehman's

marks was agreed upon, "there was a plan to reflect the transaction on Lehman's books"

(4/28/10 [Kelly] 169:20-170:20), and "portions of the books would have to be written down to reflect the negotiated price in the transaction." (4/28/10 [Kelly] 186:22-187:6; *see also* 4/29/10 [Lowitt] 84:2-8).

67.    Kelly's contemporaneous handwritten notes reflect that the number one "key issue" was "marking book down." (M.235 at 00115152.)  At the hearing, Kelly attempted to claim that his handwriting said "matched" rather than "marking." (4/28/10 [Kelly] 176:12-187:6.)  He was impeached, however, not only with his admissions on the stand about his handwriting, but also with prior deposition testimony in which he agreed his note read "marking book down" and, in fact, gave lengthy explanations that the phrase referred to "reflect[ing] the transaction on the books of Lehman" to "reflect the negotiated sales price." (4/28/10 [Kelly] 176:9-185:1.)  In the end, Kelly's attempt to explain away his own handwritten notes was simply not credible.

68.    Lowitt, the CFO, also understood "that there was going to be an exercise to mark down the books to reflect the agreements between Barclays and Lehman." (4/29/10 [Lowitt] 84:2-8.)  In fact, on an early draft of the 9/16/08 Financial Schedule (which showed $72.65 billion in assets), Lowitt himself placed the handwritten notation "mark down" under the "Adjusted Total Asset" entry of $77.4 billion. (M.15; *see also* 4/29/10 [Lowitt] 96:19-100:7.)

69.    The plan to mark down Lehman's books also was to involve participation from Barclays' personnel before the deal closed.  In a September 17, 2008 e-mail, Lowitt wrote to Reilly, "Are we set up to do the marking of the positions," and followed up with another e-mail saying, "What I meant was for barcap to mark the positions further." (M.25.)  Lowitt testified at trial that what he meant when he wrote this was that "we

needed to engage the Barclays traders who had met with the Lehman traders to make sure

that what they had agreed to with regard to the appropriate valuation of the assets was

one that we could reflect."  (4/29/10 [Lowitt] 102:4-102:25, 105:6-16; *see also id.*

103:16-22 ("what we wanted to do was make sure that we, in finance, or Gerry [Reilly]

knew -- had the understanding of what had emerged in those discussions between

Barclays and Lehman traders").)

70.    In response to Lowitt's September 17 e-mail, Reilly explained how he

planned to accomplish the mark down with Barclays personnel: "We are going to send

last nights assets and marks over so they can see the mix and marks."  (M.25; 4/29/10

[Lowitt] 100:11-101:22 (agreeing that marking down Lehman's books needed to involve

Barclays traders to make sure both sides agreed to the new marks).)

71.    Aside from this marking down of the books, the September 17 e-mail

chain between Lowitt and Reilly also confirmed the existence of the negotiated block

discount on Lehman's assets, a fact never mentioned in the Asset Purchase Agreement or

in any proceeding before the Court.  Later in the same e-mail chain, Reilly wrote to

Lowitt:

>    I went through all docs and did not see reference to the
>    price haircut.  If we want conservative marks to reflect
>    block nature, we need to know how much and then can
>    allocate to most logical assets.

(M.25.)

72.    Lowitt understood Reilly to be communicating that he had reviewed the

Asset Purchase Agreement and did not see a reference to a price haircut, and that Reilly

"had an understanding of the transaction that suggested there was a block nature to it."

(4/29/10 [Lowitt] 107:7-24.)  In response, Lowitt said he did not ask what Reilly meant

by his reference to a block discount.  However, undercutting the credibility of that

assertion, Lowitt wrote, "Since it's not in the contract it's hard to see what to d[o], Ian."

(M.25; 4/29/10 [Lowitt] 108:7-18, 108:19-22 (testifying he never questioned Reilly as to

what discount he was discussing).)  Nonetheless, Lowitt conceded that he understood that

"the size of the transaction might have been a factor as the traders were agreeing [to] their

pricing," and "Gerry seem[ed] to have a similar understanding that the size of the

transaction could have been a factor in how the traders determined what was the

appropriate mark."  (4/29/10 [Lowitt] 108:23-109:15.)

73.    Lowitt never mentioned the block discount or the effort to write down

Lehman's books to anyone involved in drafting the Asset Purchase Agreement.  (4/29/10

[Lowitt] 110:3-113:2 (disclaiming any knowledge of Asset Purchase Agreement, which

he claims he never saw).)  And no one ever mentioned it to the Court.

### 3.    Barclays' efforts to explain away the $5 billion discount are internally inconsistent and unavailing

74.    At trial, Barclays offered two opposing and irreconcilable arguments to

deflect the sworn testimony and contemporaneous documents proving the existence of

the undisclosed $5 billion discount in the Lehman Two transaction.  On the one hand,

Barclays embraced the discount and argued that it was necessary in light of Lehman's

"stale" marks.  On the other hand, Barclays sought to deny the discount; Professor

Pfleiderer deemed it not "plausible."

### (i)    Embracing the discount, Barclays argued it was justified by Lehman's "stale" marks

75.    Barclays appeared to contend that, to arrive at Lehman's "book value" as

of September 16, the parties had to negotiate a discount from Lehman's supposedly stale

and inaccurate September 12 marks because Lehman purportedly had not updated its

books since that date.  Tellingly, this rationalization accepts that Lehman's book values were discounted or marked down through negotiations, and not through the normal valuation process Lehman followed to mark its books.  (*See* 4/27/10 [McDade] 62:22-63:12; 4/29/10 [Lowitt] 92:20-93:18.)  However, this abnormal process was never disclosed to the Court, the Lehman Boards, or the creditors.  (*See, e.g.,* 8/25/10 [King] 116:4-120:3 (describing process whereby values of securities were negotiated between the parties).)

76.     The purported evidence Barclays offered for this contention was unpersuasive.  Kelly and Lowitt's efforts to amend their prior sworn testimony were not credible.  As discussed below, in overly-scripted and self-serving trial testimony, Kelly and Lowitt tried to suggest that the negotiated discount about which they had clearly testified in their depositions was merely the parties' effort to correct Lehman's marks from September 12.  This was an explanation that neither of them had offered in their depositions, when it would have been obvious and appropriate for them to do so.  As executives in its Finance Department, both had great familiarity with Lehman's books and with this issue in particular as participants in the negotiations concerning the Sale Transaction.  In the end, Barclays' revisionism only served to call into question the credibility of Kelly and Lowitt.

77.     At his deposition, Kelly testified unequivocally that the marks at which Lehman carried its assets on its books reflected their actual value as of the date the Asset Purchase Agreement was signed.  (Kelly Dep. Tr. 65:19-22.)  By trial, however, this testimony had changed.  Kelly testified "as [he had] spent more time thinking about it recently" and talking to his lawyers over the prior six months in preparing for trial he

came to the "realization" that the book value used in the negotiations must have been from the close of business on Friday, September 12, 2008. (4/28/10 [Kelly] 156:14-161:4.) This post-deposition epiphany about the date on which Lehman's books supposedly were last marked was just not credible. At the very least, Kelly has no first hand knowledge on which to base his "realization." Indeed, when pressed on cross-examination, Kelly conceded that in the early morning hours of September 16 (when he wrote his e-mail) he had no reason to believe that the marks at which Lehman carried its assets on its books were inaccurate as of that date. (4/28/10 [Kelly] 188:7-20, 189:19-21.)

78. Like Kelly, at trial, Lowitt also changed his story. On the witness stand, Lowitt sought to "clarify" his prior deposition testimony by adding "an additional detail," *i.e.*, that he meant in his earlier testimony that there was a discount from the marks on Lehman's books as of September 12, as opposed to the date of the Asset Purchase Agreement, September 16. (4/29/10 [Lowitt] 77:13-81:23 (impeached with Lowitt 42:6-43:11), 96:21-100:10 (trying same tactic to explain away his "mark down" notation on M.15, but getting caught in a baseless "assumption").) Again, this was evidently scripted and incredible testimony. Lowitt had offered no such qualification at his deposition, when he was asked about this very issue. (4/29/10 [Lowitt] 78:7-81:23 (reading Lowitt his deposition testimony where he did not add any qualification about September 12).) And as noted below, this new "clarification" by other parts of his deposition testimony where he confirmed that Lehman's books were accurate as of September 16, 2008. (4/29/10 [Lowitt] 69:4-9.)

79.     In any event, regardless of whether Lehman's marks from September 12, 15 or 16, 2008 were used in the negotiations, Lowitt conceded that the negotiated price was around $5 billion less than the amount shown on Lehman's books as of September 16, 2008, which was what the Asset Purchase Agreement plainly represented.  (4/29/10 [Lowitt] 93:3-18; 81:24-82:2.)  He also conceded that it was unprecedented for a registered broker-dealer to establish its "book value" with input from a third party bulk purchaser like Barclays.  (4/29/10 [Lowitt] 84:9-88:24; 4/27/10 [McDade] 62:22-64:12.)[34]

80.     Several Barclays witnesses parroted the suggestion that Lehman's books may not have been marked since Friday, September 12, 2008, due to chaos that day, departing Lehman employees, or other reasons.  For example, Berkenfeld (who signed the Asset Purchase Agreement)[35] speculated at trial that he understood that Friday, September 12 was the last official marking of Lehman's books.  (4/27/10 [Berkenfeld] 143:18-22.)  When questioned further, Berkenfeld conceded that he did not actually know whether Lehman was going through its marking process on Monday, September 15.

---

[34] Although Lewkow tried to assert that Lehman's marks were not "appropriate" (8/31/10 [Lewkow] 104:1-15), under cross examination he conceded that he had no knowledge about how Lehman's marks had been calculated or whether the parties changed Lehman's books to reflect a negotiated price for the securities Barclays was acquiring.  (8/31/10 [Lewkow] 102:18-106:24.)  He also acknowledged that as Lehman and Barclays traders met to negotiate the marks for Lehman assets, Barclays would not do a deal unless Lehman took a fresh look at its marks, and that in the end "Lehman acknowledged that we were going to use a lower number for purposes of the deal because they understood where we [Barclays] were coming from.  And they got comfortable that using a lower number was appropriate and I believe they said they were going to take the [Barclays] marks."  (8/31/10 [Lewkow] 104:21-106:24 (he did not know whether Lehman's book value was changed).)

[35] Steven Berkenfeld is a lawyer who worked at Lehman from January 1987 to September 2008.  (Stip. ¶ 4.)  In September 2008, Berkenfeld was, among other things, Lehman's Head of the Legal, Compliance and Audit Division.  (Stip. ¶¶ 5-6.)  After the Sale Transaction closed, Steven Berkenfeld also took up employment at Barclays.  Berkenfeld's current title at Barclays is Managing Director and his area of responsibility is "in the Investment Banking Division."  (Stip. ¶ 12.)

(4/27/10 [Berkenfeld] 144:20-145:1.)  Indeed, based on his position as in-house counsel

and other testimony, it is clear that Berkenfeld was not in a position to know one way or

the other when or how Lehman marked its books that week.  On cross examination,

Berkenfeld admitted that the only basis for his speculation that Lehman's books had not

been marked since September 12 was "just the chaos that was going on at the time."

(4/27/10 [Berkenfeld] 146:11-14.)  He had no first hand knowledge.  (4/27/10

[Berkenfeld] 143:18-147:11.)

      81.     In an effort to show that the marks on Lehman's books were stale or

otherwise inaccurate, Barclays also enlisted Professor Pfleiderer, who said he analyzed

whether marks in Lehman's Global Finance System ("GFS") were updated during the

week of September 15.  His analysis purported to show nothing more than that the marks

for $5 billion of the over $50 billion in assets in GFS "did not change at all over the week

or only changed once in value."  (10/6/10 [Pfleiderer] 107:10-109:5; BCI 341 [Pfleiderer

Report] Exs. 4-5 at 125-129; BCI 1101 [9/1/10 Decl.] Exs. 4-5 revised at 9-14.)  Barclays

failed to demonstrate how that conclusion -- commenting on less than 10% of the

securities (by value) in GFS -- supports any conclusion that Lehman's marks on the

remaining 90% of the securities were "stale."

      82.     Barclays' contention that Lehman's marks were "stale" is also belied by

other, more persuasive evidence.  In contrast to Professor Pfleiderer, who reviewed only a

sample of GFS data that he then whittled down further, Professor Zmijewski, Movants'

expert, examined how prices for each security in GFS changed over the week of

September 15.  (9/20/10 [Zmijewski] 82:7-85:3; M.156B [Zmijewski Report] ¶¶ 59-63,

Ex. E-3; *see also* M.910 [Zmijewski Dem.] 49-50.)  Professor Zmijewski concluded that

the marks for a significant proportion of the securities changed during the week of September 15. Indeed, 64% of the securities (by value) and 52% (by CUSIP) changed values on each of the 5 trading days -- they were updated daily. (9/20/10 [Zmijewski] 83:19-85:3; M.156B [Zmijewski Report] ¶ 62, Ex. E-3; *see also* M.910 [Zmijewski Dem.] 50.) The percentages for the number of securities that had values updated 2 to 4 days of that week is even higher -- approximately 77%. (M.156B [Zmijewski Report] ¶¶ 62, Ex. E-3; *see also* M.910 [Zmijewski Dem.] 50.)

83. Finally, the mere fact that a value in GFS did not change day-to-day does not make the GFS price stale. As McDade confirmed at trial, Lehman would not have assigned a new mark to every security on a daily basis in the ordinary course of its business. (4/27/10 [McDade] 83:1-11.)

84. It is undisputed that Lehman kept its books in accordance with valuation policies and under U.S. GAAP. (*See* 4/28/10 [Kelly] 189:22-25.) Several witnesses agreed that if one wanted to know the state of Lehman's books at any given point in time, Lowitt was the person to ask. (4/26/10 [McDade] 157:10-15; 4/27/10 [McDade] 90:24-91:5; 4/28/10 [Kelly] 165:10-166:6; 4/27/10 [Berkenfeld] 177:4-9.) As CFO, Lowitt was "responsible for making sure that the finance organization was effective in maintaining the books and records." (4/29/10 [Lowitt] 14:9-14.) And as CFO, Lowitt attested to the accuracy of Lehman's public filings regarding its financials, by signing the 10-Q for second quarter 2008. (4/29/10 [Lowitt] 15:1-5.)

85. Although Lowitt tried to walk away from his prior testimony that Lehman's books fairly reflected the value of Lehman's assets on September 15 and 16, Lowitt ultimately confirmed his admission at trial. (4/29/10 [Lowitt] 69:4-9.) Before

negotiations with Barclays began, Lehman's method of determining the market value of its securities involved accessing public data, models and the internal views of Lehman employees.  (4/29/10 [Lowitt] 104:16-19; *see also id.* 104:20-25 ("Lehman people were responsible for maintaining Lehman's books").)  Certain securities, including liquid securities like government and corporate securities, were marked automatically without human intervention, and "it's easy enough to just pull marks off of trading information and trading systems."  (4/27/10 [Berkenfeld] 144:2-145:8; 4/29/10 [Lowitt] 66:3-12, 69:10-17.)

86.    And Lowitt unequivocally testified that on September 15, 2008, Lehman's books carried accurate marks for the securities recorded therein.  (4/29/10 [Lowitt] 64:16-21; *see also id.* 67:3-5 ("Again, its just worth clarifying that books and records of a particular day reflect the activity of that particular day…"); 4/26/10 [Ainslie] 124:5-9 ("Marks were done on a regular, you know, very current basis.").)  To the best of Lowitt's knowledge, when the Asset Purchase Agreement was submitted to the Court, the amount shown on Lehman's books reflected the market value of those securities as of that particular day.  (4/29/10 [Lowitt] 82:3-7.)[36]

87.    In the normal course, the books and records for September 15, 2008 would be made generally available on the morning of September 16, 2008.  (4/29/10 [Lowitt] 64:16-21, 67:3-5, 67:21-25.)  The marks for any particular day were available in the finance systems the next day.  (4/29/10 [Lowitt] 70:16-71:12.)  Thus, Lowitt agreed that Lehman's marks for September 16, 2008 (which he swore were accurate as of that date),

---

[36] Lehman kept its book on a mark-to-market basis, which did not contemplate the sale of securities in bulk or moving the entire book of securities the next day.  (4/26/10 [McDade] 157:22-158:9.) When Lehman marked its books to market, it already took illiquidity into account.  (4/26/10 [McDade] 168:10-12.)

would in the normal course be made available to everyone at Lehman on the morning of

September 17, 2008, but such information was available within the finance systems at the

end of the day on September 16, 2008.  (4/29/10 [Lowitt] 64:16-21, 67:3-5, 70:16-71:22,

82:13-83:1; 4/26/10 [Ainslie] 124:5-9 ("Marks were done on a regular, you know, very

current basis").)

88.    Lowitt testified that this "process was continuing" throughout the week of

September 15, 2008.  (4/29/10 [Lowitt] 70:16-71:22.)  Indeed, Lowitt said Lehman had to

continue to mark its books during the week of September 15, 2008, in part because the

Court had not approved any transaction yet and Barclays had not acquired any of

Lehman's assets.  (4/29/10 [Lowitt] 103:1-11.)  The import of this explanation is that the

marks assigned to assets held on Lehman's books for September 16, 2008 (the "as of"

date of the Asset Purchase Agreement) were, according to Lehman's CFO at the time,

available within the Lehman system by that night and were generally accessible by the

next day.

### (ii)    Alternatively rejecting the discount, Barclays also argued the discount was not "plausible"

89.    Even as Barclays embraced the discount and attempted to justify why the

"stale" Lehman marks necessitated the $5 billion discount, it presented a completely

different story, offering alternative evidence that was directly to the contrary.  In

particular, Barclays proffered Professor Pfleiderer's purported analysis that there was no

mark down of the assets on Lehman's book.  (BCI 341 [Pfleiderer Report] Table 4 at 48;

M.2; M.253; BCI 865; BCI 779-781 [4/23/10 Decl.]; 10/6/10 [Pfleiderer] 41:9-49:16.)

90.    Professor Pfleiderer's analysis ignored documentary evidence and sworn testimony attesting to the negotiated discount off of Lehman's marks.[37]  Instead, he claimed to have studied GFS data for September 12 through September 19 and concluded that no discount was "plausible."  (BCI 341 [Pfleiderer Report] Table 4 at 48; M.2; M.253; BCI 865; BCI 779-781 [4/23/10 Decl.] ¶¶ 2-4; 10/6/10 [Pfleiderer] 41:9-49:16.)[38] That analysis did nothing to aid Barclays' case.  It showed that simply adding up the GFS data resulted in a total that was far less than the amounts shown in the Asset Purchase Agreement or the 9/16/08 Financial Schedule.  (10/7/10 [Pfleiderer] 31:8-33:20.)  All that proves is that the GFS data is incomplete and did not include all of the assets that were included in the relevant sale documents -- the Asset Purchase Agreement and the 9/16/08 Financial Schedule.  The only other conclusion that could be drawn from Professor Pfleiderer's mathematical exercise is that the values on Lehman's books -- the GFS system -- were actually marked *up* by Barclays for purposes of the Asset Purchase Agreement and the 9/16/08 Financial Schedule.  That conclusion is absurd and flatly refuted by the sworn testimony of multiple fact witnesses.

---

[37] In addition to ignoring the sworn testimony of Lowitt, Kelly, and Tonucci, among others, Professor Pfeiderer also ignored that of Barclays' legacy employees including Barclays' lead negotiator, Ricci, who when asked if there was a discount to Lehman's book value testified that Lehman's marks were stale, and that: "Yes, I would have assumed [there] would have been." (5/7/10 [Ricci] 169:16-22*; see also* Keegan Dep. Tr. 100:15-101:10 (On the Monday night transaction, "[w]e did go through and identify haircuts is the term I would use as opposed to discounts . . . to account for the fact that we were buying inventory in bulk, to account for the fact that we were not being able to close on the inventory until Friday at the earliest, to account for the fact that the markets were melting down," and that Barclays believed Lehman was aggressive on their valuations).)

[38] Nor did Professor Pfleiderer analyze the short positions at all to assess if the negotiated discount, admitted to by numerous individuals involved in the negotiation of that discount, was effectuated through a write up of any of the short positions described as a $69 billion "Short Position" in the Asset Purchase Agreement.  (10/7/10 [Pfleiderer] 35:11-36:13; M.1 [APA] ¶ 2.3(i).)

91.     The use of the term "book value" in the APA thus falsely described the

basis upon which the assets actually had been valued, *i.e.*, by a negotiation between

Lehman, the seller, and Barclays, the purchaser.  To refer to the values arrived at by the

parties, through negotiations by their traders as Lehman's "book value," is inaccurate and

a mistake, at best.  It is affirmatively misleading, at worst.  Witnesses agreed that it is

simply not the normal course of business for the asset values carried on the books of a

registered broker-dealer to be determined through negotiations with a third party, let

alone through negotiations with a single, third party purchaser of all those assets.  (*see*

*e.g.*, 4/27/10 [McDade] 62:22-63:8.)[39]  Indeed, McDade could not give a single example

in his twenty-five years of experience where Lehman's book values were determined

through a negotiation process involving Lehman and one single purchaser.  (4/27/10

[McDade] 67:3-14.)  Thus, whatever it was, the value appearing in the Asset Purchase

Agreement and the 9/16/08 Financial Schedule was not "book value" as the Asset

Purchase Agreement described it.  (4/27/10 [McDade] 63:3-12, 66:20-67:2.)[40]

92.     Barclays' trial counsel also suggested that, in light of the difficult

economic circumstances in September 2008, no one reading the Asset Purchase

Agreement could have understood the term "book value" to really mean "book value."

But Barclays' transaction counsel, Victor Lewkow, testified that is exactly how he meant

---

[39] Lowitt also admitted that marking down the books of a broker-dealer to reflect an agreed price with one purchaser was something he had never seen before.  (4/29/10 [Lowitt] 84:9-19, 86:15-22; *see also id.* 88:12-22 ("I would not have thought that going to one outside party and saying what do you think these assets are like would be the normal process of how we would establish our books and records for marking"), 105:1-5 (answering that he was not aware of a time when a potential buyer of assets was invited to participate in the marking process).)

[40] Berkenfeld conceded though that if what is referred as "book value" in the Asset Purchase Agreement was actually a negotiated value between Lehman and Barclays, it would have been a simple matter to put in a couple of words in the Asset Purchase Agreement to say so accurately.  (*See infra* ¶¶ 118-122; *see also* 4/27/10 [Berkenfeld] 135:7-12.)

it to be understood when he wrote the phrase into the Asset Purchase Agreement.

(8/31/10 [Lewkow] 130:3-12.)

93.    In any event, the extraordinary process employed by the parties to reach

agreement on Lehman's purported "book value" was never explained to the Court, either

at the hearing on September 17, 2008, when the Sale Motion was first heard, or on

September 19, 2008, at the Sale Hearing, or in the Sale Motion papers submitted to the

Court.  (4/27/10 [McDade] 64:3-9.)

### E.    The Lehman Boards' Approval Of The Sale Transaction Was Based Upon Being Told The Deal Was To Be A "Wash" And Barclays Was Paying More Than Liquidation Value

94.    At approximately 6:00 a.m. on September 16, 2008, the proposed Sale

Transaction was presented for approval at a meeting of the combined Lehman Boards.

(M.9 at 1; 4/26/10 [Ainslie] 82:5-14; Stip. ¶ 121.)  Michael Ainslie attended the meeting,

as did Thomas Russo (LBHI's General Counsel), Ian Lowitt (Lehman's CFO), Thomas

Roberts and Michael Lubowitz (both from Weil Gotshal), and Barry Ridings (from

Lazard).  (M.9 at 1; 4/26/10 [Ainslie] 83:5-23.)  Bart McDade and Skip McGee, among

others, attended for parts of the meeting.  (M.9 at 1; 4/26/10 [Ainslie] 87:1-5.)  Miller,

who later described the transaction to the Court, did not attend.  (M.9; 4/28/10 [Miller]

28:18-19.)  And Miller testified he was not given any details about the meeting; he was

told only that the Boards had approved the transaction.  (4/28/10 [Miller] 28:20-29:7.)

95.    At that meeting, Roberts outlined the structure of the transaction, which

the Lehman Boards understood to be a balanced transaction whereby the assets and

liabilities being transferred were roughly equivalent.  (4/26/10 [Ainslie] 84:3-17; 122:18-

123:20; M.9.)  Ainslie's testimony and the Board Minutes confirm that the transaction

was described as a wash as to LBI.  (M.9 at 4 ("[f]or LBI . . . a wash – with Barclays

assuming liabilities, including employee liabilities and contract cure amounts, basically

equivalent to the assets"); 4/26/10 [Ainslie] 84:3-17.)  Ainslie was not sure who used the

word "wash," but he was certain the term was used during the meeting and also he was

"quite certain that the concept of assets and liabilities equating was described by Tom

Roberts."  (4/26/10 [Ainslie] 84:18-85:1, *see also id.* 83:24-84:17 ("[I]t was actually

quite simple, and it was basically a transaction whereby the assets and the liabilities were

equal"), 85:17-86:4 ("It was a very simple deal in reality, assets equal liabilities, and that

sticks with me very clearly"), 122:18-25 (similar).)

96.     Ainslie specifically recalled this balanced deal structure because the

Lehman Boards "had been briefed already that we were now working for the creditors as

the Board of Lehman, the Lehman estate" and "this deal structure seemed to eliminate the

possibility of a loss to Lehman or claims that would more than offset the value of the

assets being transferred."  (4/26/10 [Ainslie] 85:17-86:4.)

97.     Ainslie's recollection of the Lehman directors summarizing the transaction

was consistent with what is described in the Board Minutes:

> The Directors summarized the consideration as follows:
> approximately $1 billion to the Corporation for 745
> Seventh Avenue, $250 million to LBI for the Lehman
> Brothers name, and approximately $450 million to the
> Corporation for the data centers.  For LBI, the transaction
> was described as a wash – with Barclays assuming
> liabilities, including employee liabilities and contract cure
> amounts, basically equivalent to the assets.

(M.9 at 4; *see* 4/26/10 [Ainslie] 89:7-89:10.)[41]

---

[41]   Roberts and Lubowitz reviewed draft board minutes and neither changed the reference to a
"wash."  At trial, counsel for Barclays showed Ainslie draft minutes (none of which he had ever seen
before) and attempted to suggest that a reference to 64 and 70 billion asset/liability numbers demonstrates
that the Board did not understand or was not told the transaction was a wash.  (4/26/10 [Ainslie] 104:16-

98.     The Lehman Board Minutes reflect, and Ainslie's testimony confirmed, that Lowitt attended the September 16 meeting of the Lehman Boards (M.9; 4/26/10 [Ainslie] 92:21-93:1), although Lowitt claimed he could not recall whether he attended this pivotal meeting (4/29/10 [Lowitt] 37:17-20; 71:23-72:4).  Lowitt did not disclose to the Lehman Boards that -- just hours before the meeting -- he had been offered a $6 million compensation package from Barclays.  (M.9; 4/29/10 [Lowitt] 38:17-25; M.108 (signed on September 18).)  And Lowitt did not disclose to the Lehman Boards that, less than an hour before the meeting began, he had received an e-mail stating that Lehman and Barclays had agreed to a deal which included a "$5b all in economic loss versus [Lehman's] marks" and "$1b of comp beyond our accrual."  (M.9; M.7.)  In short, Lowitt did not disclose to the Lehman Boards that the price Barclays was to pay for Lehman assets was a negotiated price $5 billion below Lehman's book value.  (*see, e.g.*, M.9; 4/26/10 [Ainslie] 139:14-22; 4/29/10 [Lowitt] 88:25-90:11, 93:3-94:5 ("I understood that there was a difference between what was on our books and what was the outcome of the

_____

(continued…)

106:13; BCI 771; *but see* BCI 769 at 017675 (handwritten notes from September 16 Lehman Board meeting including the following description of the transaction: "Mark Shafir describes asset transfer: b/s of $70B of assets & $70B of total liabilities, + building + goodwill of $250 million. . . . " (emphasis added).)  However, in a subsequent e-mail dated October 28, 2008, Michael Lubowitz of Weil Gotshal, who attended the meeting, was sent a set of draft minutes "[f]or comments."  (M.142.)  The following day, he noted "a few nits," stated that he didn't recall the reference to "the 64 and 70 billion asset/liability numbers," and, notably, did not change the reference to "wash" in the minutes.  (M.142.)

A year and a half later, on March 24, 2010, one month before the start of this hearing, Richard Davis of Weil Gotshal wrote to Robert Byman of Jenner & Block (counsel for the Examiner) concerning the statement in the Examiner's Report that Thomas Roberts described Barclays' acquisition of assets and liabilities as a wash.  Davis conceded the transaction had been described that way, but argued that the Examiner left out "significant qualifiers."  (BCI 419.)  Mr. Byman replied that the Examiner's Report had accurately recounted Mr. Robert's statements, and that the Examiner disagreed with Weil's assertion that there was anything misleading about Mr. Robert's statements in the Examiner's Report.  (BCI 420.)

[negotiating] process . . . my understanding was that that was around five billion dollars").)

99.      Instead, the minutes reflect that Lowitt -- who on the morning of September 16 already had his job offer from Barclays -- only told the Lehman Boards that, if the transaction was not approved that day, LBI would not be able to fund itself going forward and it too would have to file for bankruptcy immediately.  (M.9 at 4; 4/26/10 [Ainslie] 93:2-6.)  While Ainslie believed that Lowitt was probably right that the firm could not rely on traditional sources of funding, he "was not at all sure, given what Commissioner Cox had said Sunday night, that there might not be government funding to keep LBI functioning for a short period of time."  (4/26/10 [Ainslie] 93:7-17.)[42]

100.      McDade was present for part of the September 16 meeting of the Lehman Boards (4/26/10 [Ainslie] 87:1-5), but was "not one of the main presenters."  (4/26/10 [Ainslie] 99:3-9.)  McDade understood that he and his team did not have permission to proceed without authorization from the Lehman Boards.  (4/26/10 [McDade] 184:10-13.)  McDade concurred with the overall structure of the transaction -- an equivalent exchange of assets and liabilities -- that Roberts outlined and others reinforced later.  (4/26/10 [Ainslie] 99:10-24.)  And McDade confirmed at trial that he understood the Sale Transaction to be an exchange of approximately equivalent assets and liabilities, or a wash, "including all of the value of what was contemplated."  (4/26/10 [McDade] 184:4-9 (he viewed it as approximately a "wash" transaction when it was signed on September 16), *see also id.* 185:22-186:5 (he continued to hold the view on September 17

---

[42] Lowitt, Lehman's CFO, testified that the FRBNY was "interested in seeing . . . the orderly wind-down of LBI" and expanded its list of PDCF eligible collateral to assist in funding Lehman.  (4/29/10 [Lowitt] 134:21-135:7.)

that the transaction was an approximate equivalent exchange of assets and liabilities),

203:25-204:5 (and also through the Sale Hearing), 204:23-205:5, 205:21-206:4, 213:21-

214:7, 217:14-218:4; *but see* 4/30/10 [Hughes] 206:9-25 (confirming that Barclays did

not agree to a deal on this basis).)[43]  McDade was never told of any condition that

Barclays had to have a first-day gain on the deal.  (4/26/10 [McDade] 184:18-185:7,

205:12-20 (such a first-day gain would have been inconsistent with the deal he made with

Barclays).)

101.    Barry Ridings (Lehman's advisor from Lazard) also attended the

September 16 meeting of the Lehman Boards.  (M.9 at 1; 4/26/10 [Ainslie] 83:22-23;

95:16-96:6.)  Ridings advised the Lehman Boards that the applicable standard for the

approval of the sale (under Section 363 of the Bankruptcy Code) was to obtain the

highest and best price and a price greater than liquidation value.  (M.9 at 4; 4/26/10

[Ainslie] 95:16-96:6.)  With this test in mind, Ainslie understood the Lehman Board's

approval of the Sale Transaction to be appropriate because, as they understood it, the

price Barclays was paying was going to be more than liquidation value.  (4/26/10

[Ainslie] 96:13-17.)[44]

---

[43]  Miller testified that his client, McDade, did not tell him that in his view the deal was to be an equivalent exchange of assets and liabilities.  (4/28/10 [Miller] 126:14-18; 127:4-8.)  But unlike McDade, Miller did not attend the September 16 meeting of the Lehman Boards.  Miller was only told that the Lehman Boards had approved the transaction and he was not given the description of the deal provided to the Lehman Boards at the meeting.  (4/28/10 [Miller] 28:20-29:7.)

[44]  Notably, Barclays did not call Ridings as a witness at trial, but merely relied on playing selected excerpts from his deposition, and even those contained Ridings' repeated assertions that the Sale Transaction was "better than liquidation."  (Ridings Dep. Tr. 12:18-22, 34:18-35:6, 43:4-18, 65:4-15, 66:21-25.)  At Ridings' deposition, Barclays' counsel studiously avoided asking Ridings about the September 16 Lehman Board meeting and whether the deal was described as a "wash" at the meeting.  Barclays' counsel never even asked Ridings whether he thought the deal was supposed to be a roughly equivalent exchange of assets and liabilities or balanced in any way.  Instead, Barclays' counsel asked carefully constructed question whether Ridings understood the transaction to be a "*precise* exchange of equivalent assets and liabilities" or a "*precise* wash."  (Ridings Dep. Tr. 13:21-14:7, 17:5-10 (emphasis

102.     The Lehman Boards were not shown the Asset Purchase Agreement at the

September 16 meeting because the document was still being drafted at the time.  (4/26/10

[Ainslie] 87:1-8; 115:21-116:8; 4/27/10 [Berkenfeld] 111:3-7 (APA not finalized until

the afternoon of September 16).)  The Lehman Boards did not have any knowledge or

involvement in the valuing of assets being sold to Barclays, a task delegated to

management.  (4/26/10 [Ainslie] 90:11-14; *see id.* at 90:15-20 (that is "what management

is there for").)  Nor were the Lehman Boards made aware that, as of September 16, there

were any disagreements between Barclays and Lehman as to how to value the assets

being sold to Barclays.  (4/26/10 [Ainslie] 132:6-10.)[45]

103.     The Lehman Boards were not told at the September 16 meeting about an

immediate day-one gain, or any gain, to Barclays upon the Closing of the Sale

Transaction.  (4/26/10 [Ainslie] 86:5-18.)  Nor were the Lehman Boards told that such a

gain was a condition of the transaction from Barclays' perspective.  (4/26/10 [Ainslie]

86:9-12; *see also id.* 86:13-15 (an immediate day-one gain for Barclays would have been

inconsistent with what the Board was told at the meeting).)  And the Lehman Boards

---

(continued…)

added); *see also* 22:23-23:7 (Ridings precisely defines wash as "everything sold equals everything
purchased").)  Counsel's questions were obviously designed to elicit denials as no one could agree that any
complex deal of this magnitude, especially one during these troubled economic times, could ever be
designed as a "precise" exchange of anything.

[45]  Ainslie did not recall any discussion of specific numbers or values for the assets being
transferred to Barclays or liabilities being assumed by Barclays, despite Barclays' use on cross-examination
of a set of draft board minutes (which Ainslie had not seen at the time or anytime thereafter) referring to
trading liabilities of $64 billion and trading assets of $70 billion.  (4/26/10 [Ainslie] 105:13-20; 85:17-86:4.)
Michael Lubowitz, a Weil Gotshal lawyer who also attended the board meetings also "[did]n't recall the
reference to the 64 and 70 billion asset/liability numbers" when he reviewed the same draft Board Minutes.
(M.142.)

were not told that it was imperative that there be an asset-liability mismatch in Barclays'

favor for Barclays to go through with the transaction.  (4/26/10 [Ainslie] 88:1-5.)

104.    Based upon these presentations describing the deal as an equivalent

exchange of assets and liabilities, the Lehman Boards approved the execution, delivery

and performance of an agreement "substantially in accordance with the material terms

described to the Board of Directors by its legal counsel."  (M.9 at 6-7; 4/26/10 [Ainslie]

90:2-10; 115:10-16; *see also id.* at 87:18-25 ("We passed a resolution that basically said

that the outline of the transaction as we had had it presented was approved and

management was directed to implement it."); Stip. ¶ 123 ("At their September 16, 2008

meeting, the Lehman Boards approved the deal between Lehman and Barclays as

described to them and authorized the preparation of the documents necessary to effect the

Sale Transaction.").)[46]

105.    The Lehman Boards' view that the transaction should be approved derived

from the description of the "wash" structure of the deal presented at the meeting.

(4/26/10 [Ainslie] 94:5-9.)  Ainslie expressly said he voted to approve the transaction

because he "felt the break-even, the assets-equal-liabilities structure of the deal

minimized downside exposure."  (4/26/10 [Ainslie] 93:18-94:4.)  Among other things,

Ainslie "feared that there could be enormous claims from the tens of thousands of

customers who held accounts with LBI."  (4/26/10 [Ainslie] 93:18-94:4.)  At no time did

the Lehman Boards approve a transaction with an asset/liability mismatch in Barclays'

---

[46] It is undisputed that as the deal changed over the course of the week from Lehman Two to
Lehman Three, the Lehman Boards were not reconvened or ever asked to approve the revised "very
different" transaction.  (4/26/10 [Ainslie] 116:9-117:18; 4/29/10 [Lowitt] 120:8-14.)

favor.  (4/26/10 [Ainslie] 88:1-5 ("[T]he assets and liabilities, including assumed

obligations, were supposed to match").)

   **F.    Unlike The Lehman Boards, The Barclays Board Was Told The Sale
          Transaction Would Yield An Immediate Gain For Barclays Of About
          $3 Billion**

   106.    At or around the same time the Lehman Boards were being told the

transaction was to be an equivalent exchange of assets and liabilities, roughly a wash,

Varley was telling the Barclays Board of Directors a very different story.  Also on the

morning of September 16, Varley told the Barclays Board that Barclays was purchasing

assets with a value of "$75 [billion]" (*i.e.*, $5 billion more in value than the Asset

Purchase Agreement later disclosed) in a deal expected to yield a pre-tax "negative

goodwill" of about $3 billion.  (M.12 at 00166320 ("Executive Summary"); *see* 6/22/10

[Varley] 95:23-98:14, 98:24-99:2; M.12 at 00166340 (document from Varley's hand file

reflecting $5 billion "negotiated discount"); 4/29/10 [Clackson] 220:16-225:15.)  As

Varley himself acknowledged, negative goodwill is what arises where there is a discount

to net asset value.  (6/22/10 [Varley] 99:3-6.)  He admitted that it is a term describing in a

scientific way what most people would refer to as a "discount."  (6/22/10 [Varley] 99:7-

101:7, 101:16-19.)

   107.    Despite the basis on which the Lehman Boards approved it, Barclays

never viewed the deal as a wash.  Capital accretion, *i.e.*, an asset/liability mismatch

yielding an immediate gain, was very important to Barclays Board.  (6/21/10 [Diamond]

140:12-141:3 ("It was certainly a priority"), 144:8-15.)  Diamond testified that "capital

accretion was incredibly important" to the Board and it was "absolutely" a condition to

the deal: "If you mean by 'condition' I was using every wit of my analysis, working with

the team, working with the other side, that we had a deal that was capital accretive, you

are absolutely right." (6/21/10 [Diamond] 143:9-144:5.)  If the deal was not to be capital

accretive, Barclays was not authorized by its board of directors to do the deal.  At trial,

Diamond tried to revise his earlier sworn testimony to that effect by arguing that he

"probably misused the phrase 'authorized'" in this connection (6/21/10 [Diamond]

144:22-148:25), and by adding a "couple caveats" to his prior testimony (6/21/10

[Diamond] 147:22-148:3).  But this was fruitless evasion: Barclays has stipulated to

Diamond's testimony "that the asset liability mismatch had to have a mismatch in favor

of a positive capital accretion or we weren't authorized to do a deal." (Stip. ¶ 117.)

108.    A set of materials provided to the Barclays Board for its September 16

meeting gave more details about the proposed Sale Transaction (at the time, termed

"Project Long Island" by Barclays).  (M.6.)  The Executive Summary confirmed that

Barclays was to "acquire $75bn of assets and liabilities." (M.at page 6 ("Executive

Summary"); *see also* 4/29/10 [Clackson] 220:16-222:10.)  In exchange, Barclays "would

offer $250m to acquire the business and we are buying $1.5bn worth of company-related

property (HQ and data centres)." (M.6 at 2 ("Executive Summary").)  The Barclays

Board package showed an immediate gain -- it relayed that "[t]he recognition of negative

goodwill amounts to $3.0bn pre tax ($2bn post tax)." (*Id.*)  It further explained that the

deal structure would mitigate risks by, among other things, "extract[ing] 'clean' assets

and contracts out of Long Island." (*Id.*)

109.    In a supporting chart, the Barclays Board materials provided a breakdown

of the $75.3 billion in assets Barclays was acquiring from Lehman.  (M.6 at page 5

("Total Assets in New Transaction are $75bn"); *see also* M.10 (e-mail referring to $75.3

billion in the board deck and outlining basis for $3 billion in negative goodwill); 4/29/10

[Clackson] 241:2-244:13; M.254 at 00213936 ($75.2 billion, also on 9/16/08); 4/29/10

[Clackson] 234:16-238:1, 241:2-247:4 (discussing M.130 and M.254, which contained

numbers generated from the negotiations between Lehman and Barclays traders).)  In a

projected income statement, the Barclays Board was shown, among other things, an

estimate of compensation to be paid for the newly acquired business, with 2008 bonus

payments projected at $1.1 billion, well below the $2 billion for bonuses that had been

agreed that very morning.  (M.6 at 6 ("Income statement of the business we are

acquiring"); *see also* M.10 (bonus accrual projected at $1.3 billion).)

110.    While the Barclays Board discussed raising some equity, the presentation

assured the Board members that "the negative goodwill arising from the transaction will

still improve Barclays['] equity ratio (by a minimum of 16bps if zero capital is raised)"

(M.6 at 10 ("Remaining issues").)  The Barclays Board materials made no mention of any

value being ascribed to intangible assets Barclays was acquiring from Lehman, contrary

to the position Barclays would later take in this lawsuit.

111.    In the end, Diamond admitted that he had been, as he had testified at his

deposition, "highly confident, notwithstanding the environment [they] were in, that [he]

could hold [his] head up to the board and say, yes, it is capital accretive," and in

recommending the deal to the board as being capital accretive he took into consideration

Barclays' assumption of compensation and cure liabilities.  (6/21/10 [Diamond] 149:1-

153:18, 155:2-4 ("There was a gain on acquisition."); M.12 at 00166338 (from the files

of John Varley) ("We expect it to be immediately economic profit positive"); 6/21/10

[Diamond] 179:5-180:2 (agreeing with statement made by Varley concerning Barclays'

expectation that the transaction would be immediately economic profit positive).)  The

Barclays Board approved the transaction described to it, *i.e.*, the deal with an immediate -
- but never disclosed -- multibillion dollar gain for Barclays.  (*See* 4/29/10 [Clackson]
233:5-234:15.)

### G.    The Sale Transaction Was Supposed To Be Based On The 9/16/08 Financial Schedule

112.    To guide the documentation of the Sale Transaction, the parties prepared a
balance sheet showing the value of certain assets that were to be transferred to Barclays
and the liabilities it would assume (the "9/16/08 Financial Schedule").  (M.2; 4/27/10
[Berkenfeld] 115:2-10, 118:12-16, 123:19-124:22; *see also* 8/31/10 [Lewkow] 36:9-23
(describing Berkenfeld signing BCI 106 (same document as M.2)); 8/23/10 [Shapiro]
69:10-70:22.)  McDade testified that the 9/16/08 Financial Schedule "was the guiding
document that all of the participants, including advisors and lawyers, were using."
(4/26/10 [McDade] 174:6-19; *see also id.* 164:9-20.)  Berkenfeld concurred in this
understanding.  (4/27/10 [Berkenfeld] 123:19-124:22 (the "significance of [the 9/16/08
Financial Schedule] was that it gave guidance"); *see also* 6/21/10 [Marsal] 57:1-10
(Berkenfeld gave the Financial Schedule to Marsal when A&M was retained); 8/23/10
[Shapiro] 71:14-72:7 (the Financial Schedule "served as a basis to try to identify which
specific pools of assets were being included in the deal").)  Archie Cox of Barclays
testified that the schedule was "handed out" to participants in the deal negotiations no
later than Tuesday, September 16.  (6/22/10 [Cox] 224:5-8.)

### 1.    The 9/16/08 Financial Schedule reflected a balanced, or "wash," transaction

113.    As McDade explained, the 9/16/08 Financial Schedule served as "the
guidance document used for the first hearing" on September 17, 2008, and it contained
"the numbers on which the deal was based on the 16th."  (4/26/10 [McDade] 165:8-17;

*see also* 4/27/10 [McDade] 32:15-18.)  The 9/16/08 Financial Schedule contained the

following balanced summary of assets and liabilities going to Barclays:

| ASSETS | | | LIABILITIES | |
|---|---|---|---|---|
| Gov & Ag | $40.0 | | ST Borrowings | $0.0 |
| Commercial Paper | 1.1 | | Gov & Ag | 21.0 |
| Mortgages | 2.7 | | Commercial Paper | 0.0 |
| Total Corp Debt | 4.9 | | Mortgages | 0.0 |
| Corp Equity | 8.8 | | Corp Debt | 2.1 |
| Derivatives | 4.5 | | Corp Equities | 6.3 |
| Cash | 0.7 | | Derivatives | 4.5 |
| | | | | |
| Total | $62.7 | | Total | $33.9 |
| | | | | |
| Collateralized ST Agr | 10.0 | | Collateralized ST Fund | 34.5 |
| Receivables | 0.0 | | Payables | 0.0 |
| Other Assets | 0.0 | | Deposits | 0.0 |
| Inv in Con Subs | 0.0 | | Due to Subs | 0.0 |
| Due From Subs | 0.0 | | Sub Notes | 0.0 |
| | | | | |
| Total | 10.0 | | Total | 34.5 |
| | | | | |
| | | | Total | 68.4 |
| | | | | |
| | | | Cure pmt | 2.25 |
| | | | Comp | 2.0 |
| | | | | |
| Adj. Total Assets | $72.65 | | Total | 72.65 |

(M.2.)[47]

114.     According to Berkenfeld, the "point" of the 9/16/08 Financial Schedule

was "to provide some guidance around what was meant by the purchase agreement when

there was a number for long positions and a number for short positions."  (4/27/10

[Berkenfeld] 124:19-22.)  As to liabilities, Berkenfeld testified it was the understanding

of the parties at the time "that Barclays would assume liabilities that were at the time

estimated roughly to be in [the amounts]" on the 9/16/08 Financial Schedule.  (4/27/10

[Berkenfeld] 168:3-14.)  On its face, the 9/16/08 Financial Schedule reflected a balanced

---

[47]   As much as Barclays would like to explain away higher valuations on earlier iterations of the
9/16/08 Financial Schedule on the basis of the "resis" or "mortgages," because other line items changed in
value throughout the negotiation process, the drop in value by the final version cannot be ascribed solely to
removal of 50% of the mortgages nor was this the explanation given by those who admitted to the $5
billion negotiated discount.

transaction, with the value of assets Barclays was acquiring roughly equaling the liabilities it was to assume.[48]

### 2. Lehman's lawyers, drafting the Asset Purchase Agreement, did not prepare and were unaware of the basis for the 9/16/08 Financial Schedule

115.    Kelly, Lowitt, Reilly and Tonucci were involved in preparing the 9/16/08 Financial Schedule.  (4/28/10 [Kelly] 196:23-197:17; *see also* Stip. ¶ 124 ("Kelly worked on the preparation of the 9/16/08 Financial Schedule"); 4/27/10 [Berkenfeld] 115:2-10 (The schedule was put together by the finance department), 116:4-6 ("The schedule was being transmitted to us by Martin Kelly and Paolo Tonucci.  I think primarily Martin"); 6/22/10 [Cox] 223:23-225:15 ("The estimates came from Martin Kelly"); 8/23/10 [Shapiro] 72:8-13 (as far as he knew, Kelly had a role in collecting data and supplying it to the negotiators).)  The finance department, including Kelly and Tonucci, were the source of the numbers set forth in that schedule.  (4/27/10 [Berkenfeld] 123:1-9.)  Lowitt himself "was involved in some of the [iterative] steps" that led to the 9/16/08 Financial Schedule.  (4/29/10 [Lowitt] 94:23-95:15; *see also id.* 94:6-17 (on Monday night, September 15, 2008, into Tuesday morning, September 16, 2008, Lowitt was "tracking what was emerging from the discussions between the respective traders per asset class within -- for Barclays and for Lehman," and the "specific liabilities from a Lehman perspective that [he] understood Barclays would be assuming").)

---

[48]    While Barclays' witnesses were prepared to argue that the Sale Transaction was not a "balance sheet deal" (8/27/10 [Klein] 16:24-19:21; 8/23/10 [Shapiro] 35:24-25; 6/22/10 [Varley] 83:23-84:4 ("business transaction was acquiring a going concern"); Barclays Opp. ¶¶ 56-62, 493-501), none of them denied that this balance sheet (the 9/16/08 Financial Schedule) served as guidance for the deal.  (8/23/10 [Shapiro] 71:14-72:7 (schedule was a list of what assets were on the balance sheet that were available to be sold to Barclays, served as guidance and "served as a basis to try to identify which specific pools of assets were being included in the deal"); *see also* 6/22/10 [Cox] 223:23-224:8 (Financial Schedule handed out to negotiators).)

116.    Lehman lawyers involved in documenting the Sale Transaction, however, had no involvement in preparing the 9/16/08 Financial Schedule.  (4/28/10 [Miller] 31:25-32:2 (Miller would be "shocked" if Weil Gotshal had any role in preparing M.2); 8/31/10 [Lewkow] 37:24-38:16 (those who negotiated the transaction "[had not] really audited or reviewed" the schedule).)  Rather, Berkenfeld and lawyers from Weil Gotshal and Simpson Thacher "were relying on [Kelly and Tonucci] to put together the list of assets that were estimated at the time would be transferred over to Barclays."  (4/27/10 [Berkenfeld] 115:25-118:3; *see also* 4/26/10 [McDade] 174:6-19, 164:9-20.)  Miller said he "probably" saw the 9/16/08 Financial Schedule on Tuesday or Wednesday in preparing for the hearings.  (4/28/10 [Miller] 30:21-31:6.)

117.    Kelly and Tonucci provided the 9/16/08 Financial Schedule to the lawyers.  (Stip. ¶ 125; 4/27/10 [Berkenfeld] 116:4-6.)  Berkenfeld remembered Kelly delivering the 9/16/08 Financial Schedule when he was sitting in a room of lawyers working on drafting the Asset Purchase Agreement.  (4/27/10 [Berkenfeld] 122:13-25.)  Berkenfeld initialed the 9/16/08 Financial Schedule, and marked it as "final."  (M.2; 4/27/10 [Berkenfeld] 118:12-23, 119:10-13, 120:6-9; Stip. ¶¶ 11, 126.)[49]  The time stamp on the final version of the 9/16/08 Financial Schedule is 11:18 a.m.  (M.2.)

---

[49]  In fact, Berkenfeld initialed two versions of the 9/16/08 Financial Schedule, but marked only one of those as "final," and that is the version the parties relied on thereafter.  (M.2; 4/27/10 [Berkenfeld] 119:10-120:9.)  In that regard, the Court should discount suggestions made by Barclays for the first time at trial that somehow the 9/16/08 Financial Schedule is inoperative or void because no Barclays officer initialed the final version.  (*See, e.g.,* 8/23/10 [Shapiro] 119:13-120:11; 8/24/10 [Exall] 18:10-19:4.)  There is no evidence that any of the participants in the events of September 2008 (or even those involved in subsequent events prior to this lawsuit) ever took this position.  Indeed, the evidence is all to the contrary.  Everyone who had cause to refer to this version of this schedule, treated it as final, operative and applicable to the parties' deal.  *See, e.g.,* 8/24/10 [Exall] 38:12-43:17 (When asked by PWC for a copy of "the schedule that shows the $2bn bonus liability to Lehman folks," Exall provided PWC with a copy of M.2); M.801 ("I think Patrick has the original schedule").)

### 3.      The 9/16/08 Financial Schedule incorporated discounted, negotiated values, not Lehman's "book values"

118.    As is apparent on its face, the Adjusted Total Assets and Liabilities listed on the 9/16/08 Financial Schedule were shown to be basically equivalent, or as the Lehman Boards had been told a few hours before, a wash.  The 9/16/08 Financial Schedule listed (i) asset-side cash and securities, including governments and agencies, commercial paper, mortgages, corporate debt, corporate equity, and derivatives, totaling $62.7 billion, (ii) an asset-side line item for "Collateralized ST Agr" in the amount of $10 billion, and (iii) "Adj. Total Assets" as $72.65 billion.  (M.2.)  The 9/16/08 Financial Schedule listed "Total" liabilities also at $72.65 billion.  (*Id.*)

119.    Berkenfeld thought that the 9/16/08 Financial Schedule reflected the $70 billion "Long Positions" described in the Asset Purchase Agreement as "book value as of" September 16, 2008, when adjusted for residential mortgage assets.  (M.1 at 6; M.2; 4/27/10 [Berkenfeld] 123:19-124:22; 134:22-25.)  At his deposition, Berkenfeld testified the 9/16/08 Financial Schedule reflected asset values based on Lehman's marks.  (4/27/10 [Berkenfeld] 130:3-21.)  In what again can only be viewed as revisionist testimony, at trial, Berkenfeld (now employed by Barclays) changed his prior understanding and claimed that he meant the "marks that started as of Friday and then were revised to reflect what the mark should have been as of Monday and Tuesday."  (4/27/10 [Berkenfeld] 130:22-132:14.)  But, as even Berkenfeld conceded, however, he had no first hand knowledge on which to base such testimony.  (4/27/10 [Berkenfeld] 129:1-14 (no knowledge of how Kelly and Tonucci got the numbers on the 9/16/08 Financial Schedule).)

120.    Those with such knowledge, however, confirmed that the 9/16/08 Financial Schedule did not reflect the actual "book value" of Lehman's assets as of September 12, 15, 16 or any other date.  (4/28/10 [Kelly] 197:18-25; 4/27/10 [McDade] 33:2-10.)  Rather, the 9/16/08 Financial Schedule contained the marked-down, negotiated value of Lehman's assets.  Kelly admitted the asset value of $72.65 billion on the 9/16/08 Financial Schedule represented the negotiated value $5 billion below Lehman's book value.  (4/28/10 [Kelly] 197:18-198:3; *see also* 4/26/10 [McDade] 116:1-10; 4/27/10 [McDade] 33:2-10.)

121.    Lowitt also admitted the asset value of $72.65 billion on the 9/16/08 Financial Schedule was $5 billion lower than the original position on Lehman's books.  (4/29/10 [Lowitt] 95:4-96:18, 174:10-15.)  In addition, Barclays' own documents reflect a negotiated reduction from an original value considerably higher than $72.65 billion.  (*See* M.144 ¶ 3 (Barclays Board minutes reflecting purchase of "$45 billion of liquid assets and $30 billion of less liquid assets"); M.12 at 00166340 (document from Varley's hand file reflecting $5 billion "negotiated discount"); 6/22/10 [Varley] 101:24-103:17 (Varley described the reduction in value as a two-step process.  First, "an assessment of realistic valuation" followed by "seeking to ensure that there was a buffer between assets and liabilities") .)  Indeed, Lowitt testified about one such earlier version in which the "Total Adj. Assets is $77.4 billion."  (M.15; 4/29/10 [Lowitt] 96:19-100:10.)  Lowitt handwrote on that document, just below the $77.4 billion figure,  "MARK DOWN."  He testified that this was an instruction to reflect the valuation negotiation and revised values

to which the Lehman and Barclays traders had agreed.  (4/29/10 [Lowitt] 97:11-13;

99:20-25.)[50]

122.    When asked whether the values for assets on the final version of the

9/16/08 Financial Schedule were the agreed numbers or numbers taken from Lehman's

books, McDade testified that they were agreed numbers that reflected a $5 billion delta

from Lehman's books.  (4/26/10 [McDade] 165:22-166:10.)  The agreed valuation on the

9/16/08 Financial Schedule "reflected the ability to find a price to transact," and McDade

agreed that the "price to transact" was ***not*** Lehman's book value as September 16, 2008.

(4/26/10 [McDade] 167:19-168:6.)

> ### H.    The Asset Purchase Agreement Set Forth The Terms Of The Sale Transaction For The Court, The Lehman Boards And Creditors

123.    The Asset Purchase Agreement was finalized on September 16, 2008.

(4/27/10 [Berkenfeld] 111:3-7.)  It was signed by Berkenfeld, on behalf of LBHI and

LBI, and Gerard LaRocca,[51] on behalf of Barclays.  (M.1; Stip. ¶¶ 10, 157-158.)  When

he signed it, Berkenfeld, Head of Lehman's Legal, Compliance and Audit Division,

understood that the Asset Purchase Agreement would be submitted to the Court for

---

[50]  Lowitt attempted to testify that the schedule listing assets at $77.4 billion was based on Lehman's marks from Friday, September 12, 2008, but when pressed, admitted that "I don't know it's the marks of the Friday."  (4/29/10 [Lowitt] 99:20-100:7; *see also id.* 100:8-10 ("But, you're right, I don't know that that's the Friday marks.").)  In the end, Lowitt did not even know how the 9/16 Financial Schedule related to terms of the Asset Purchase Agreement.  (4/29/10 [Lowitt] 143:10-12.)

[51]  Gerard LaRocca is a Managing Director and Chief Administrative Officer, Americas at Barclays.  He is also the Chief Executive Officer of Barclays U.S. broker-dealer and the New York Branch Manager for Barclays Bank PLC.  (Stip. ¶ 90.)  LaRocca reports directly to Ricci.  (Stip. ¶ 92.)  Despite initially appearing as a witness on Barclays' witness list, LaRocca ultimately did not appear as a witness at trial.  LaRocca signed the Asset Purchase Agreement, the Transfer and Assumption Agreement ("TAA"), and the Clarification Letter for Barclays.  (*See* Stip. ¶¶ 93, 94, 95.)  LaRocca confirmed in deposition testimony that he was unaware of the $5 billion discount when he signed the Asset Purchase Agreement. (LaRocca Dep. Tr. 121:22-122:15.)  He knew, however, that under the September 18 Repurchase Agreement, Barclays later forwarded to LBI approximately $45 billion in cash and LBI was to post collateral valued at approximately $50 billion in securities with Barclays.  (LaRocca Dep. Tr. 40:2-41:17.)

approval and that the agreement itself was a means by which the Sale Transaction was to be disclosed to the Court.  (4/27/10 [Berkenfeld] 141:23-143:1.)

124.    Paragraph 1.1 of the Asset Purchase Agreement (M.1 at 6) defined the "Purchased Assets" to include securities in various classes "with a book value on the date hereof of approximately $70 billion," collectively defined as "Long Positions."  (M.118 (Sale Motion), *attaching* Asset Purchase Agreement, at 7 (with "book value" added as a handwritten insert).)  This language was expressly added to the Asset Purchase Agreement just before it was filed as part of the Sale Motion.  Moreover, according to Barclays' lead outside counsel, Victor Lewkow, he was the one who likely chose the term "book value."  (8/31/10 [Lewkow] 39:3-40:15 (recalling that the words "book value" were purposefully inserted in lieu of the word "marks" which "isn't a very technical term," and recalling that at the time someone involved in the negotiations said: "Don't we mean book value?"), 129:5-15 ("it struck me at the time, I think it was me, that we should use the term 'book value.'"); 4/30/10 [Hughes] 171:5-14 (conceding that Barclays agreed to use "book value" in the agreement, but no knowledge as to who proposed it).)[52] And as Lewkow testified, he intended when he chose the term "book value" that it was to be understood as Lehman's book value.  (8/31/10 [Lewkow] 130:3-12.)

125.    In fact, the $70 billion figure in the Asset Purchase Agreement was not Lehman's book value; it was a negotiated price.  It was not Lehman's book value at the time nor as of September 16, 2008.  (*See, e.g.,* 8/25/10 [King] 116:12-120:3 (describing process whereby values of securities were negotiated between the parties), 123:16-21 (he

---

[52] *See also* 4/27/10 [Berkenfeld] 157:25-158:6 (Berkenfeld did not even have an understanding of how the term "book value" came to be added to the Asset Purchase Agreement); 155:20; 157:7-18 (he did not zero in on the use of the word "book value").)

knew negotiated valuations were factored into the Asset Purchase Agreement), 133:4-134:15; 4/30/10 [Hughes] 171:13-174:19 ("Barclays was satisfied that a good discussion had been had … between the parties to arrive at the appropriate values"); 4/26/10 [McDade] 183:22-184:3 (conceding that "book value" of Long Positions was really a negotiated value), 167:19-168:6 (similar); 4/27/10 [McDade] 84:9-17 (this Long Position figure reflected a $5 billion "all-in loss versus Lehman's marks"), 155:20-156:16 (McDade was not thinking in terms of book value at the time).)

126.    The negotiated price was *less* than Lehman's book values.  As Kelly testified:  "It was an amount that was less than the amount that we had in our books which reflected a bid offer that was consistent with the size of the purchase as well as the volatility of the marketplace."  (4/29/10 [Kelly] 80:1-21; *see also* 81:20-82:2 (conceding that "book value" in the Asset Purchase Agreement was a price lower than that on Lehman's books).  CFO Lowitt concurred.  (4/29/10 [Lowitt] 93:3-18 (there was a difference of "around five billion dollars" between the agreed price and "what was on [Lehman's] books").)  So did Treasure Paolo Tonucci.  (Tonucci Dep. Tr. 29:2-30:17 (there was a five billion dollar discount off Lehman's marks at the time embedded in the transaction).)

127.    This was never disclosed to the Court at the September 17 Hearing, the Sale Hearing, or at any other time.  (*See* M.260; M.261.)  According to Hughes, Barclays viewed the expressly-chosen term "book value" as "[not] of great consequence."  (4/30/10 [Hughes] 171:18-24, *see also* 171:5-9.)

128.    Paragraph 2.3 of the Asset Purchase Agreement (M.1 at 11-12), described the liabilities Barclays was to assume.  The "Assumed Liabilities" were to include, *inter*

*alia*, "(b) all Liabilities of Seller [Lehman] under the Purchased Contracts arising after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code," "(c) all Liabilities assumed under Article IX" (*i.e.,* the provisions concerning compensation to Transferred Employees), and (i) approximately $69 billion in "Short Positions", *i.e.,* the liabilities associated with the Long Positions.  Again, language defining the "Short Positions" in terms of their "book value" and as "including repos" was expressly added to the Asset Purchase Agreement through handwritten edits made to the agreement just before it was filed as part of the Sale Motion.  (8/31/10 [Lewkow] 39:3-40:15; M.118 [Sale Motion] *attaching* Asset Purchase Agreement, at 12.)

129.    With regard to the Assumed Liabilities "under Article IX," entitled "Employees and Employee Benefits" (M.1 at 34-35), Barclays assumed, among other things, an obligation to pay transferred Lehman employees in a specified aggregate amount, *i.e.,* $2 billion in bonuses for their 2008 services to Lehman.  The obligation was specific and mandatory.  Paragraph 9.1(c) of the Asset Purchase Agreement provided that the Purchaser "shall" pay to each Transferred Employee an annual bonus for the 2008 Fiscal Year that, in the aggregate, was equal to the amount reflected on the 9/16/08 Financial Schedule.[53]  Under Paragraph 9.1(c), such bonuses were required to be awarded on or before March 15, 2009, so that the aggregate amount awarded equaled the "Accrued 08 FY Liability" referred to in the Asset Purchase Agreement.  Barclays executives admitted that the "financial schedule" referred to in this Paragraph 9.1(c) was

---

[53]  Barclays also assumed certain obligations for severance, but these were covered in a separate provision (¶ 9.1(b)) that was not linked to the 9/16/08 Financial Schedule.  (*See* M.1 at 34.)

the 9/16/08 Financial Schedule initialed by Berkenfeld.  (M.2; 8/23/10 [Shapiro] 91:11-

92:4; 8/24/10 [Exall] 17:18-18:16; *see also* 4/29/10 [Clackson] 218:19-219:12, 256:16-

257:6-259:1; M.24.)

130.    The Asset Purchase Agreement included the various assumed liabilities

within the consideration Barclays was to pay Lehman under the Sale Transaction.

Paragraph 3.1 stated:  "The aggregate consideration for the Purchased Assets shall be

(a) the Cash Amount and (b) the assumption of the Assumed Liabilities by Purchaser."

(M.1 at 14.)  The Cash Amount was defined as "an amount in cash equal to the sum of

(i) $250 million, [and (ii – iv) the appraised value of the real estate assets in question, less

reasonable market commission payable on Closing]."  (M.1 at 14.)  This paragraph

concluded, "[f]or illustrative purposes only, the parties note that as of the date hereof they

expect that the Cash Amount will be approximately $1.7 billion (less the aforementioned

assumed commissions)."  (M.1 at 14.)

131.    Witnesses from both sides confirmed that the assumption of compensation

and cure liabilities was part of the consideration Barclays agreed to pay under the Asset

Purchase Agreement in exchange for assets.  McDade testified that the compensation and

cure liabilities were "part of the price in the transaction."  (4/26/10 [McDade] 168:13-

169:10; *see also* 4/28/10 [Miller] 80:7-23 (comp and cure liabilities were "part of the

transaction"); 5/7/10 [Ricci] 148:5-16 (consideration paid by Barclays included comp and

cure liabilities); 8/31/10 [Lewkow] 18:6-19:2 (comp and cure liabilities were

fundamental terms of the transaction and part of the consideration Barclays was paying);

8/27/10 [Klein] 20:2-21:2 ("It's my understanding that there were assumptions of specific

liabilities as part of the overall consideration."), 30:20-31:10, 44:5-12.).)

132.    If the assumed liabilities for compensation and cure had been real (not

inflated) and were taken into account, the Sale Transaction could not have resulted in an

immediate gain on acquisition for Barclays.  Those liabilities, if accurately stated, would

have exceeded the balanced exchange, to Barclays' detriment, between $3.45 and $4.25

billion.

I.    **The Asset Purchase Agreement And 9/16/08 Financial Schedule
Reflected Inflated Bonus And Cure Liabilities**

1.    **The $2 billion amount listed for bonus liabilities was
purposefully overstated from the start**

133.    Paragraph 9.1(c) of the Asset Purchase Agreement, concerning Barclays'

obligation to pay 2008 bonuses to former Lehman employees who transferred to

Barclays, expressly referenced the 9/16/08 Financial Schedule.  (M.1 ¶ 9.1(c); M.2;

4/26/10 [McDade] 177:17-180:23; 8/23/10 [Shapiro] 89:15-92:4; 8/31/10 [Lewkow]

97:2-9; 8/24/10 [Exall] 27:16-25;  4/29/10 [Clackson] 218:19-219:12, 257:6-260:16;

M.24; Brown Dep. Tr. 20:2-21:2.)  The aggregate amount of such 2008 bonus payments

(defined in Paragraph 9.1(c) as the "Accrued 08 FY Liability") was then established by

the $2 billion figure set forth on the 9/16/08 Financial Schedule.  (*See* M.2; 4/26/10

[McDade] 168:13-169:4, 177:17-180:23; 8/24/10 [Exall] 27:16-28:4.)  This was, by the

plain terms of the Asset Purchase Agreement, only for bonuses.  This amount did not

apply to severance.  There was no reference to the 9/16/08 Financial Schedule in

Paragraph 9.1(b) of the Assets Purchase Agreement, which separately defined Barclays'

obligation to make severance payments to qualified former Lehman employees who

transferred to Barclays but were later laid off.  (*See* 8/24/10 [Exall] 28:5-19; 8/23/10

[Shapiro] 92:5-94:22 (he reviewed Asset Purchase Agreement to ensure it accurately

reflected the deal, and Subparagraph 9.1(b) does not refer to the 9/16/08 Financial

Schedule); Brown Dep. Tr. 20:15-22 ("$2 billion really related to subsection C") .)

      134.    McDade testified that this $2 billion for bonuses to former Lehman

employees was an "agreed number" (4/26/10 [McDade] 164:6-8), and reflected a "full

requirement for Barclays to pay," (4/26/10 [McDade] 215:13-18).

      135.    Contemporaneous documents and statements by Barclays' employees and

their auditors also confirm their understanding of this $2 billion obligation to be related

only to bonuses.  When Clackson reviewed Paragraph 9.1(c) of the Asset Purchase

Agreement to figure out how much to pay transferring Lehman employees, he understood

that Barclays had committed itself to pay the full $2 billion in bonuses only, exclusive of

its severance obligations.  In an e-mail to Ricci, he termed this a "$650 million problem."

(M.24; 4/29/10 [Clackson] 257:6-260:16; *see infra* ¶¶ 348-352.)  When Paul Exall[54] was

brought in by Barclays to monitor payments to former Lehman employees, he came to

the same conclusion.  He shared that conclusion with Barclays' auditors at PwC.  (M.150

("We [PwC] discussed this with HR (Paul Exall) back in September and it was confirmed

to us then that the $2 billion was only for bonus and the severance amounts to be paid

were separate").)  Indeed, Barclays stipulated to this conversation.  (6/25/10 Tr. 5:13-21

(If called to testify, Michael Guarnuccio of PwC would testify that he "recalls that at

some time in September 2008, after the Barclays/Lehman transaction closed, he spoke

with Paul Exall.  And Mr. Exall stated that he believed the two billion dollar estimate was

---

[54] Paul Exall is Barclays' Head of Compensation Analytics for Barclays Capital, Barclays
Corporate and Barclays World.  (8/23/10 [Exall] 185:6-22.)  After the Closing, Exall was asked to track
how much Barclays actually paid to former Lehman employees who transferred to Barclays in bonuses,
severance (for later terminated employees), and other forms of compensation.  (8/23/10 [Exall] 189:2-
194:8.)

for bonus payments only not for severance pay"); 8/24/10 [Exall] 36:12-24 (Exall's

conversation with Guarnuccio remains unrefuted as Exall testified that he did not have a

recollection one way or the other of this conversation with Guarnuccio); *see also* M.335

(Guarnuccio: "As I understand it, they are required to pay legacy Lehman people $2bn in

bonus per APA. This is separate from the requirement (per APA) to pay people they

terminate a severance payment in line with the Lehman severance policy. The $2bn

bonus amount can not be used to pay severance (which was agreed with the client months

ago)").)

136.    There was nothing optional or discretionary about Barclays' obligation to

pay $2 billion in bonuses under Section 9.1(c) of the Asset Purchase Agreement. (*See,

e.g.*, 8/24/10 [Exall] 28:20-29:12.) Indeed, there appears to be no real dispute on this

issue (notwithstanding an earlier litigation position taken by Barclays to the contrary),[55]

except that Barclays now contends that it could satisfy this obligation by including in the

total payments of severance, taxes and other forms of compensation. (*See infra* ¶¶ 365-

371.)

137.    In any event, the 9/16/08 Financial Schedule reflects that the $2 billion

bonus liability was "part of the price in the transaction." (4/26/10 [McDade]

168:13-169:4; *see also* 164:6-8.) It was important to have an accurate number for this

bonus liability because it was "an important component of the deal." (4/26/10 [McDade]

170:2-21; 4/29/10 [Clackson] 194:14-196:5 (understood they were trying to be accurate

with this figure).) The $2 billion figure was intended to be a good faith estimate of the

---

[55]    *See* M.259 [Barclays Opp.] ¶ 24 ("But Barclays did not assume an obligation to pay $2 billion
in bonus payments"; *id.* ¶ 28 ("neither Section 9.1(c) nor the financial schedule delivered to Barclays
specifies a minimum dollar amount of total 2008 bonuses that Barclays was required to pay to Transferred
Employees").)

amount owed in bonuses to those expected to move to Barclays, and if it turned out that

was not the case, McDade said that would not have been consistent with the deal he

made.  (4/26/10 [McDade] 169:11-19.)  Further, McDade testified that to the extent the

number came down, it should consequently have reduced the number of assets to be

transferred in order for the deal to remain in balance.  (4/26/10 [McDade] 215:9-18;

4/27/10 [McDade] 73:12-16 (Barclays' payment of $2 billion for bonuses was a "full

requirement" for Barclays to pay and a reduction in the comp figure should reduce the

number of assets that are transferred to Barclays for the deal to stay in balance).)

138.    It was Kelly's job to monitor the accrual for compensation maintained on

Lehman's books.  (4/28/10 [Kelly] 171:22-24.)  Lehman provided data to Barclays

concerning that accrual, but Barclays was the "ultimate determiner" of the figure used in

the parties' agreement.  (4/26/10 [McDade] 162:12-163:7.)  McDade never saw any

calculations concerning compensation from Barclays' "model."  (Stip. ¶ 127.)  In the end,

Barclays agreed to the inclusion of $2 billion in the 9/16/08 Financial Schedule and to its

reference in Section 9.1(c) of the Asset Purchase Agreement.

139.    As Kelly revealed in his September 16, 2008, 5:10 a.m. e-mail to Lowitt

and Tonucci, however, the terms of the deal were based on an inflation of this assumed

liability by "an extra $1 b[illion] of comp beyond our accrual[.]"  (M.7; M.8; *see also*

4/28/10 [Kelly] 200:10-16 ("My understanding was that it was approximately a billion

dollars over -- over Lehman's accrual for the year to that point in time"); 4/29/10

[Lowitt] 121:15-23 (agreeing that bonus liability amount was not derived from Lehman's

accruals, but rather was a negotiated number).)[56]  Barclays has tried to explain this away

by saying Lehman had not yet accrued on its books all of its compensation liabilities

beyond the third quarter of 2008.  (Barclays Opp. ¶¶ 282-283.)  McDade agreed,

however, that the billion dollar difference noted in Kelly's e-mail, a 100% increase over

Lehman's accruals, could not be accounted for by annualizing.  (4/27/10 [McDade]

70:13-19.)  In other words, even if Lehman had not yet fully accrued its bonus liabilities

for the last quarter, that could not account for an additional $1 billion in liabilities.

140.    No matter how the figure was derived, it is undisputed that $2 billion for

bonus liabilities was a negotiated and agreed number, and this number was then included

on the 9/16/08 Financial Schedule, which in turn was expressly referenced in Section

9.1(c) of the Asset Purchase Agreement.  (*See*, *e.g.*, 4/28/10 [Kelly] 200:3-16; 4/26/10

[McDade] 164:6-8, 168:13-169:10, 178:14-180:18, 215:13-18; 4/29/10 [Lowitt] 121:15-

23; 8/23/10 [Shapiro] 89:15-92:4.)

141.    The overstatement of bonus liabilities Barclays was to assume is relevant

to whether the disclosures made to the Court about the Sale Transaction were accurate

and complete.  Along with the evidence indicating the $2 billion figure was inflated

beyond Lehman's accruals, the evidence also showed that Barclays never, in fact,

intended to pay $2 billion in bonuses.  (*See infra* ¶¶ 353-364.)  For example, even during

the week of September 15, before the Sale Hearing on September 19, Kelly created, or

had created for him, documents that show the increase of both the compensation and

contract cure liabilities as "transaction adjustments."  (See *e.g*., M.32; M.34; M.17 at

---

[56]  Incredibly, Lowitt, Lehman's CFO, claimed to have never seen the Asset Purchase Agreement
and disclaimed any knowledge of its contents.  (4/29/10 [Lowitt] 110:3-113:2.)

00115127-31.)  These were not matter-of-course business adjustments.  They were alterations to Lehman's books to make them agree with the negotiated terms of the Asset Purchase Agreement.  (4/28/10 [Kelly] 212:5-11.)  In other words, these adjustments were just plug numbers used to show a balance between assets and liabilities that did not really exist.

142.    A balance sheet dated September 17, 2008 containing Kelly's handwritten notes shows a "transaction adjustment" writing up the estimate for "bonus payable" from $1.5 billion to $2 billion.  (M.17 at 00115129; 4/28/10 [Kelly] 212:24-213:16.)  On September 18, 2008, Brian Young sent Kelly a balance sheet showing a $1 billion "transaction adjustment" for "compensation payable."  (M.32 at 3; 4/28/10 [Kelly] 209:1-212:11 (Kelly conceded transaction adjustments were "to reflect the terms of the purchase agreement" and part of an exercise at different points in time to determine the Sale Transaction's impact on Lehman's books).)  Later that same day, Rose Hanzenberg sent to Kelly balance sheets showing a $1.5 billion "transaction adjustment" for "bonus payable."  (M.34.)

### 2.    The amount of cure liabilities Barclays was supposed to assume was also inflated

143.    The 9/16/08 Financial Schedule also included a liability-side line item for "Cure pmt" in the amount of $2.25 billion.  (M.2.)  Liabilities for cure amounts were meant to include any contractual or trade liabilities Barclays was to assume in continuing to operate Lehman's North American broker-dealer assets.  Such cure liabilities could include anything from, for example, information service agreements to a coffee supply agreement.  (4/29/10 [Lowitt] 91:13-22.)

144.    Kelly was responsible for estimating the amount of cure liabilities that Barclays would pay.  (4/27/10 [McDade] 52:13-18; 4/29/10 [Lowitt] 90:17-92:19, 121:24-122:17; 8/23/10 [Shapiro] 94:23-95:20 (this estimate was prepared to answer an inquiry by Cox from Barclays); 6/22/10 [Cox] 224:18-225:11 (the "estimates" came from Martin Kelly).)  The task was not to identify the maximum amount Barclays could pay.  It was to come up with the best estimate of what Barclays would *actually* have to pay.  (4/29/10 [Lowitt] 92:6-19.)  At no point was Kelly told to estimate a range or how high the number conceivably could be.  He was told to make an accurate estimate.  (4/27/10 [McDade] 76:16-20.)  Lowitt asked Kelly to come up with "the best estimate of the amount that Barclays would likely have to pay to step into the shoes and run the business by way of assumed contracts."  (4/29/10 [Lowitt] 91:8-12, 122:24-122:17; *see also* 8/23/10 [Shapiro] 96:16-97:9 (task was to get the "best estimate we could under the circumstances"); 4/29/10 [Clackson] 196:14-22.)

145.    McDade met with Kelly and Lowitt "to make sure that we had accurate information to deliver to Barclays."  (4/26/10 [McDade] 169:20-170:1; *see also* 4/29/10 [Lowitt] 122:5-123:21; 5/7/10 [Ricci] 150:1-6.)  McDade knew that the cure liability number was being given to the Court in describing the consideration Barclays was paying and that his proffered testimony to the Court was an attempt "to come as close as [he] could to telling Judge Peck what the cure number was actually going to be."  (4/27/10 [McDade] 75:6-15, 76:7-11, 77:15-21.)[57]  According to McDade, it was important to have an accurate estimate of the actual cure liability because it related to the value

---

[57] While Hughes acknowledged that the parties had an obligation to provide a "good faith" estimate of this liability to the Court (4/30/10 [Hughes] 152:17-153:21), he, in an evident effort to sculpt his testimony to fit Barclays' trial story, refused to agree that this estimate had to "bear some relation to what actually would be spent … by Barclays."  (4/30/10 [Hughes] 153:22-154:14.)

Lehman was going to receive from Barclays in the transaction, and was "an important component of the deal." (4/26/10 [McDade] 170:2-18.) McDade also testified that, in the deal as he understood it, a drop in the cure amount Barclays would actually assume would mean that the consideration Barclays was giving would decline as well. (4/26/10 [McDade] 172:2-5; *see also* 4/27/10 [McDade] 75:2-10 (McDade implored Lowitt and Kelly to get the cure number to be as accurate as possible because it was consideration Lehman was receiving in the transaction), 76:12-15 (same).) The cure number also was important to the Court's evaluation of the break-up fee requested by Barclays, which it considered in light of the overall "value" of the deal. (*See* M.260 [9/17/08 Tr.] 23:5-24:25; 8/23/10 [Shapiro] 102:10-106:18; 8/31/10 [Lewkow] 80:23-81:16.)

146.    As of September 16, 2008, Kelly came up with an estimate for cure of $2.25 billion. (4/26/10 [McDade] 161:11-19, 163:8-12.) This is the number in the 9/16/08 Financial Schedule. (M.2; 4/26/10 [McDade] 168:13-169:10.) By the time of the September 17 Hearing before the Court, however, the cure liability estimate had declined to $1.5 billion and that number was given to the Court. (*See* M.118 ¶ 14; 4/26/10 [McDade] 161:20-23.) The Sale Motion stated "[t]he *parties estimate* that the cure costs associated with such assumptions and assignments will be approximately $1.5 billion." (M.118 ¶ 14 (emphasis added).) In his presentation about the Sale Motion on September 17, Miller said, "in connection with the assumption and assignment of contracts, the cure amounts and other payments in connection with the contracts are estimated to be a billion five hundred million dollars." (M.260 [9/17/08 Tr.] 24:1-5; *see also* 6/22/10 [Cox] 230:8-24 (Cox testified that he understood Lehman to be making a "good faith estimate").)

147.    Kelly testified at trial that, on either September 16 or 17, 2008, he and

Lowitt were reviewing versions of the 9/16/08 Financial Schedule and discovered that the

amount for cure was overstated by a billion dollars.  (4/28/10 [Kelly] 204:17-207:14,

207:4-10 (they observed that "the cure looked high relative to the funds-expense run-

rate").)  Kelly alleges that he brought this overestimate for contract cure liabilities to

McDade's attention during the week of September 16, 2008, and claims McDade

commented that "we just left $1 billion dollars on the table."  (4/28/10 [Kelly] 206:4-8.)

At trial, McDade could think of no rational reason to increase the amount of cure

liabilities over the amount shown on Lehman's books.  (4/26/10 [McDade] 172:6-9,

173:2-6.)  McDade agreed that if the cure liabilities had been inflated it would be

inconsistent with the Sale Transaction as documented and disclosed to the Court.  (*See*

4/26/10 [McDade] 169:11-170:21, 172:2-9, 205:3-6, 76:21-77:21.)[58]

148.    Barclays knew $1.5 billion was not a good faith estimate, and it never had

any intention of paying anything close to that amount.  (*See infra* ¶¶ 372-377; M.11; *see*

*also* M.140 at 5.)  During the week of September 16, 2008, notes made by Cox,

Chairman of Barclays America and self-described "lead structurer" of the deal (6/22/10

[Cox] 204:14-17), on the 9/16/08 Financial Schedule refer to "$200 [million]" as an

estimate for contracts that would be "mission critical," *i.e.*, necessary to run the business.

(M.11; 6/22/10 [Cox] 225:20-226:7.)  Cox received this information from Martin Kelly,

who still ostensibly worked for Lehman at the time.  (M.11 (notation citing "Martin Kelly

– LEH"); 6/22/10 [Cox] 226:17-227:15 (Cox testified that only "some" of the $200

---

[58]    While Kelly claimed not to recall any other estimates for cure liability other than the drop from
$2.25 billion (4/28/10 [Kelly] 211:1-14), contemporaneous e-mails show otherwise, *i.e.*, the e-mails
showing Kelly's "transaction adjustments" designed to fit the Sale Transaction.  (4/28/10 [Kelly] 212:5-11;
*see* M.32 at 3; M.33 at 3; M.34 at 3; 4/28/10 [Kelly] 209:1-212:11.)

million mission critical contracts would be necessary to the operation of the business post-acquisition).)

149.    Other Barclays' documents in evidence showed that Barclays was always planning on paying only around $200 million for cure liabilities.  (M.130 (9/16/08 Bill Castell e-mail, calculating "$3bn of negative goodwill" based *inter alia* on $200 million in "External funding," *i.e.*, cure payments); M.104 at 00109156 (Barclays spreadsheet reflecting "cure payments" of $220 million); M.41 (9/22/08 James Trevelyn e-mail: "We understand broadly that the negative goodwill arises because the 2.25 cure payment and 2.0 comp provision won't be valued at that amount but instead at c.1.3, the difference (2.95) giving rise to net assets for which we pay .25, leading to negative goodwill of 2.7.").)  In fact, apparently gearing up to explain away Barclays' intention not to pay the full amounts disclosed to the Court, if it ever became necessary, Clackson internally proposed Barclays' "official line," *i.e.*, "Cure payments are optional and though some will be incurred, most will be covered by our ongoing supplier relationships and fall into monthly expenses."  (M.41; 4/30/10 [Clackson] 16:3-12.)  No one ever shared this "official line" with the Court until these motions were filed.

150.    Consistent with its undisclosed internal planning, after taking over Lehman's broker-dealer operations, Barclays paid only $238,200,978 in cure liabilities through July 14, 2009.  (Stip. ¶¶ 128.)

**J.    Lehman Lawyers And Others Who Appeared In Court Were Not Told About The Undisclosed Discount Or Inflated Liabilities**

151.    The evidence presented at trial confirmed that the lawyers charged with presenting the Sale Transaction to the Court were not informed about the $5 billion

discount from Lehman's book value or the inflation of the assumed liability estimates

given to the Court.

### 1. Weil Gotshal was unaware of the discount or inflated liability estimates

152.    Although Weil Gotshal helped draft the Asset Purchase Agreement and

"answer[ed] legal issues" that arose during the drafting process (4/28/10 [Miller] 25:22-

26:5; 37:24-38:4; *see also* 4/27/10 [Berkenfeld] 105:9-11),[59] lawyers from Weil Gotshal

just "document[ed] what was being told to them by the business people."  (4/27/10

[Berkenfeld] 111:25-112:8.)  Weil Gotshal did not negotiate the economic terms of the

Sale Transaction.  Business people for Lehman and Barclays did.  (4/28/10 [Miller]

25:14-21, 65:12-16 ("the economic terms of the transaction were negotiated between

Lehman personnel and Barclays personnel").)  Weil Gotshal did not conduct any

independent assessment or play any role whatsoever in valuing the assets being

transferred to Barclays.  (4/28/10 [Miller] 26:6-13.)  Weil Gotshal was not qualified to do

such an evaluation.  (4/28/10 [Miller] 26:6-10.)  Again, that was "left to the business

people."  (4/28/10 [Miller] 27:24-28:2.)

153.    There is no evidence to suggest that Weil Gotshal knew about the $5

billion discount from Lehman's book value.  (4/28/10 [Miller] 36:20-37:4; Miller Dep.

Tr. 79:5-9.)  Kelly communicated about that discount only with Lowitt, Tonucci, Reilly

and McDade.  (4/28/10 [Kelly] 190:9-191:5.)  Kelly never revealed the plan to mark

down Lehman's books to reflect a negotiated sales price with anyone from Weil Gotshal.

---

[59]  Thomas Roberts and Michael Lubowitz were the primary drafters from Weil Gotshal.  Miller
was not so engaged as he was only in the room some of the time because he "kept getting called out for
these flash fires."  (4/28/10 [Miller] 25:22-26:5, 37:24-38:4.)

(4/28/10 [Kelly] 187:11-23.)  Miller had never even met Kelly.  (4/28/10 [Miller] 33:3-6.)

Lowitt, who was also in on the discount and the plan to mark down the books, testified he

never communicated with any of the lawyers involved in drafting the Asset Purchase

Agreement.  (4/29/10 [Lowitt] 112:9-18.)

154.    To Berkenfeld's knowledge, none of the lawyers involved in the drafting

process were aware of any loss on Lehman's assets (Stip. ¶ 120) and none of the lawyers

responsible for making disclosures to the Court were told there would be a bulk discount

given to Barclays.  (4/27/10 [Berkenfeld] 184:19-25.)[60]

155.    Miller recalled hearing only "discussions about -- or arguments about the

marks that Lehman had marked too aggressively, that the values were declining so

rapidly that there were questions about the value of the deal."  (4/28/10 [Miller] 35:11-

17; 112:5-10.)  But he recalled no discussions about Lehman's book value.  (4/28/10

[Miller] 35:18-20.)  Miller does not know (i) who asked that the term "book value" be

added in the Asset Purchase Agreement; (ii) when it was added, or (iii) if there was any

discussion of the term.  (4/28/10 [Miller] 39:9-24.)  Miller was not aware of any

discussions Weil Gotshal had with Lehman or Barclays business people about whether

the book value of the Lehman securities actually was $70 billion as of September 16,

2008 as represented in the Asset Purchase Agreement.  (4/28/10 [Miller] 40:16-23.)  No

one at Weil Gotshal could independently assess Lehman's book value, and Weil Gotshal

was never asked, nor did it attempt, to do so.  (4/28/10 [Miller] 39:25-40:15.)  In short,

---

[60]    In addition, Miller testified that he was under "the impression" that the Lehman team and
Barclays team had engaged in a CUSIP number by CUSIP number discussion to arrive at the appropriate
marks for Lehman's securities.  (4/28/10 [Miller] 95:22-96:8.)  But unbeknownst to Miller, that type of
analysis never took place.  (5/4/10 Tr. [Seery] 26:8-15 (there was not "a line-by-line debate about each of
these securities")) 119:25-120:11 (I knew that [$47.4 billion] was a negotiated number by that point.  And
that that was the number that was agreed upon.  So it would not have reflected a line by line valuation").)

Miller and Weil Gotshal had no reason to suspect that the $70 billion "book value as of September 16" described in the Asset Purchase Agreement was inaccurate, thus disabling them from making accurate disclosures to the Court.

156.    Weil Gotshal also had no knowledge of the inflation of comp and cure liabilities, and thus was prevented from disclosing that fact, too.  Weil Gotshal had no role in preparing the 9/16/08 Financial Schedule or the liability numbers it contained. (4/28/10 [Miller] 31:25-32:2; 4/26/10 [McDade] 174:20-175:1.)  At both the September 17 Hearing and the Sale Hearing, Weil Gotshal used comp and cure figures provided by the business people and did not ever know how those figures were calculated.  (4/28/10 [Miller] 66:2-10.)  In preparing for the hearing, including preparing McDade to testify, Weil Gotshal never had any conversations with McDade about the basis for the comp or cure figures.  (4/26/10 [McDade] 175:2-19.)[61]

157.    With respect to the $2 billion bonus liability, Miller said he never knew who came up with that number (4/28/10 [Miller] 32:25-33:2), and he never spoke about it with Kelly, who knew the figure was inflated.  (4/28/10 [Miller] 33:3-6.)  Miller even was under the mistaken impression that the $2 billion compensation figure included both

---

[61]    Kelly claimed that Lori Fife from Weil Gotshal called him on Friday September 19, 2008 and they spoke about "the fact that the [cure] estimate had changed throughout the course of the week." (4/28/10 [Kelly] 208:4-17; 270:17-271:5.)  Kelly said he told Fife the new cure estimate was $1.0 billion. (4/28/10 [Kelly] 286:15-21.)  Whether Kelly's testimony at trial is true or not (and Barclays offered no document to support Kelly's late-breaking, and self-serving assertions), no one from Weil Gotshal told the Court that the cure estimate was really $1.0 billion.  Rather, the Court was told on September 17, and again on September 19, that Barclays was going to assume a liability of approximately $1.5 billion for contract cures.  (M.260 [9/17/08 Tr.] 23:5-24:5; M.261 [9/19/08 Tr.] 100:1-4.)  Similarly, Barclays asserted that a copy of one of Kelly's "transaction adjustments" was found in Weil Gotshal's files and A&M's files, but Barclays offered no proof whatsoever that anyone had ever explained to either Weil Gotshal or A&M how the document reflected inflated liabilities.  (*See* Fogarty Dep. Tr. 141:2-25) (Fogarty testified he was not aware of any transaction adjustments nor did he even know what a transaction adjustment meant, and did not recall that anyone at A&M was aware of any transaction adjustments).)

bonuses and severance.  (4/28/10 [Miller] 32:20-24.)  But the lawyers from Simpson

Thacher who actually drafted this section of the Asset Purchase Agreement and Barclays

understood that it was bonus only.  (Brown Dep. Tr. 20:2-21:13, 25:13-21.)

158.    As to the $1.5 billion cure liability, Weil Gotshal did not participate in

deriving this figure.  It was just a number supplied to Weil Gotshal.  (4/28/10 [Miller]

45:11-14; 46:9-11.)  Miller could "only assume…that somebody within Lehman did a

calculation."  (4/28/10 [Miller] 45:18-23.)  Miller and Weil Gotshal had no knowledge

about what Barclays thought it would actually wind up paying in comp and cure

liabilities.  (4/28/10 [Miller] 34:10-35:1.)

### 2.    Steven Berkenfeld was not told of the discount or inflated liability estimates

159.    Berkenfeld, the senior in-house lawyer for Lehman who signed the Asset

Purchase Agreement (and now a Barclays employee), was involved in "lawyering" the

Asset Purchase Agreement.  (4/27/10 [Berkenfeld] 104:25-105:8.)  At trial, Berkenfeld

first tried to deny that this meant he was involved in the drafting and preparation of the

Asset Purchase Agreement, instead referring to himself as merely an "air traffic

controller."  (4/27/10 [Berkenfeld] 105:21-106:22.)  However, when confronted with his

prior deposition testimony on that topic, Berkenfeld admitted he was indeed "involved in

the drafting and preparation of the Asset Purchase Agreement."  (4/27/10 [Berkenfeld]

106:23-109:1.)

160.    Even so, Berkenfeld was not involved in negotiating the business, or

economic, terms of the Asset Purchase Agreement.  (4/27/10 [Berkenfeld] 104:15-22,

104:25-105:8; *see also* Stip. ¶ 8 ("Berkenfeld testified that he was not involved in

negotiating the 'business deal' embodied in the Sale Transaction").)  Berkenfeld said that

when he joined an existing drafting session between Lehman's and Barclays' attorneys on Tuesday, he was "playing catch-up in trying to understand what the business terms were." (Stip. ¶ 9; 4/27/10 [Berkenfeld] 111:15-18.) Berkenfeld did not join the discussions until Tuesday, September 16, and then he tried to review the Asset Purchase Agreement and evaluate whether he thought it represented the transaction as it was described to him "mostly" by Weil Gotshal. (4/27/10 [Berkenfeld] 106:16-22; *see also id.* 109:5-13.)

161.    When he signed the Asset Purchase Agreement, Berkenfeld "did not know for sure" whether Lehman's book value for the long position "as of" September 16 was $70 billion. (4/27/10 [Berkenfeld] 134:22-135:6.) Berkenfeld did not even have an understanding of how the term "book value" came to be added to the Asset Purchase Agreement. (4/27/10 [Berkenfeld] 158:4-6, 155:20-156:4, 157:12-18 (he did not recall "zeroing in" on the use of the word "book value").)

162.    Berkenfeld conceded, however, that if what is referred to as "book value" in the Asset Purchase Agreement "was actually a negotiated price between Lehman and Barclays, it would have been a simple matter to put in a couple of words in the Asset Purchase Agreement to say so." (4/27/10 [Berkenfeld] 135:7-12.) Berkenfeld suggested that "current market value at the time might have been a better way to describe it." (4/27/10 [Berkenfeld] 156:17-157:2.)

163.    At the time he signed the Asset Purchase Agreement, Berkenfeld was never informed of a $5 billion loss to Lehman versus its marks. (4/27/10 [Berkenfeld]

153:13-19.)[62]  At his deposition, Berkenfeld said he was "not aware of any discount off

the marks."  (4/27/10 [Berkenfeld] 183:7-12.)  But, purportedly to be more "precise" at

trial, Berkenfeld (an employee under Barclays' control) added new, evidently prepared,

phraseology to his answer, saying that he was not aware of any discount, bulk or

otherwise, off the "then current marks" or "marks at the then current fair market value."

(4/27/10 [Berkenfeld] 151:20-152:7.)  This attempt to obscure the issue for the benefit of

his current employer was pointless.  Regardless, because Berkenfeld did not know

whether $70 billion was an accurate description of Lehman's book value as of September

16, 2008, he could not have known at the time whether the $70 billion included any kind

of discount, bulk or otherwise, off Lehman's assets.  (4/27/10 [Berkenfeld] 134:22-

135:6.)

164.    Berkenfeld also had no knowledge of Lehman marking down its books to

give Barclays a discount.  (*See, e.g.,* 4/27/10 [Berkenfeld] 182:9-21.)  The people who

knew about the discount did not tell Berkenfeld.  Lowitt knew that Berkenfeld was

providing legal advice in connection with the Sale Transaction (4/29/10 [Lowitt] 57:10-

12), but Lowitt never told Berkenfeld about the discount or that the $70 billion figure was

not Lehman's book value.  (4/29/10 [Lowitt] 112:4-113:2.)  And Berkenfeld had no

discussions with Lowitt about the Asset Purchase Agreement.  (4/29/10 [Lowitt] 112:4-

8.)

---

[62]  Berkenfeld volunteered, notwithstanding the fiduciary duties he owed to Lehman shareholders
at the time, that he did not think a loss to Lehman "was really all that relevant" and that instead he believed
saving jobs was the main concern.  (4/27/10 [Berkenfeld] 153:13-154:12 ("We weren't thinking about it in
terms of a loss of book value").)  After being asked whether he was also concerned with preserving value
for the creditors of Lehman, Berkenfeld changed his testimony and said that he was.  (4/27/10 [Berkenfeld]
154:13-15.)

165.    At the time he signed the Asset Purchase Agreement, Berkenfeld had no

information as to what Barclays actually planned to pay in compensation, and it never

came to his attention that the comp number was a billion dollars in excess of what was

recorded on Lehman's books.  (4/27/10 [Berkenfeld] 176:18-177:3.)  Berkenfeld believed

the $2 billion figure in the 9/16/08 Financial Schedule was a good faith estimate of what

Barclays might end up paying.  (4/27/10 [Berkenfeld] 165:18-21, 167:23-168:14, 175:14-

176:25.)

166.    Nor did Berkenfeld have any information as to Barclays' plan for how

much it would actually pay in cure costs.  (4/27/10 [Berkenfeld] 176:13-17.)

Berkenfeld's "impression" was the $1.5 billion relayed to the Court was the best good

faith estimate at the time.  (4/27/10 [Berkenfeld] 176:5-10.)

### 3.    McDade did not focus on the term "book value" and did not know that the comp and cure liabilities were inflated

167.    Kelly had told McDade that the difference between the agreed price and

Lehman's book value was $5 billion.  (4/26/10 [McDade] 155:10-22.)  McDade believed

that the reason for this difference was that Lehman's books had not been marked since

September 12, 2008 because of "personnel problems," and this was "simply marking a

moment in that process."  (4/26/10 [McDade] 152:16-153:2, 156:8-20; 4/27/10 [McDade]

90:17-91:9.)  However, McDade had no personal knowledge of whether Lehman's books

were marked after September 12, 2008.  (4/27/10 [McDade] 90:17-23.)  McDade had not

spoken to anyone who said Lehman had been unable to mark it books on September 16,

he did not know whether Lehman's books had been marked on either September 15 or

September 16, and he did not have specific knowledge of Lehman's stated book value on

September 16, 2008.  (4/26/10 [McDade] 158:18-159:5, 157:6-9.)  McDade did not know

whether Lehman's books were ever marked to reflect the agreed valuation of Lehman's assets, and he said Lowitt and Kelly would be the persons to ask about that. (4/26/10 [McDade] 166:11-19.)

168.    McDade reviewed the Asset Purchase Agreement at the time Berkenfeld signed it and concluded that, in his view, it accurately reflected the terms that had been agreed between Lehman and Barclays. (4/26/10 [McDade] 175:23-176:16.) However, he admitted that he did not focus on the term "book value" in the description of the "Long Positions." (4/26/10 [McDade] 182:18-21.) McDade did not know who was the proponent of the phrase "book value" in the Asset Purchase Agreement. He never spoke to Kelly, Lowitt, Berkenfeld, Weil Gotshal, or anyone else about the description of the Long Positions as having a book value of $70 billion as of September 16, 2008. (4/26/10 [McDade] 182:22-183:21.) Contrary to the terms represented to the Court, McDade mistakenly believed that the Long Positions being described in the Asset Purchase Agreement were being conveyed at "the market value that the Lehman and Barclays traders came up with," not book value. (4/26/10 [McDade] 183:22-184:3.)

169.    During the course of the week of September 15, 2008, McDade testified he did not have any significant discussions with anyone concerning the comp liability that Barclays had agreed to assume. (4/27/10 [McDade] 69:25-70:5.) Nor did McDade participate in estimating the cure liability Barclays had agreed to assume. (4/27/10 [McDade] 69:25-70:5.) Further, he did not speak to Kelly about the process by which the cure liability was estimated, and never saw any of the work product generated by Kelly, or anyone that worked for Kelly, in connection with estimating the cure liability. (4/26/10 [McDade] 173:10-20.) McDade had no knowledge of whether Kelly made

transaction adjustments writing up the number for the cure liability.  (4/26/10 [McDade] 163:13-19.)

170.    McDade testified that he could not think of any reason that would justify increasing of the amount of cure liabilities over the amount shown on Lehman's books. (4/26/10 [McDade] 172:6-9, 173:2-6.)  He testified that if the liability for contract cures had been inflated it would be inconsistent with the Sale Transaction as documented and disclosed.  (*See* 4/26/10 [McDade] 170:2-18, 172:2-9, 163:8-24; *see also* 4/27/10 [McDade] 76:21-77:21.)

171.    Further, McDade testified that if the assumed liabilities were inflated, this meant Barclays was paying less in consideration and the assets should be reduced (or Barclays should have to pay more to Lehman in other consideration as part of the Sale Transaction, including greater cash consideration).  (*See* 4/27/10 [McDade] 73:15-19, 76:21-77:21; 4/26/10 [McDade] 72:2:5, 204:23-205:6.)

### 4.    The Lehman employees who knew about the discount and inflated liabilities were not involved in making disclosures to the Court

172.    Compounding the disability of the lawyers and McDade to accurately describe the deal to the Court, many of the individuals from both Lehman and Barclays who were intimately involved in the negotiations did not attend the Court hearings and some of those who did claimed they did not hear what was described to the Court.  Many also had not read the Asset Purchase Agreement and other transaction documents.[63]

---

[63]    According to Berkenfeld, although he understood all along that in determining whether to approve the Sale Transaction the Court would rely on the descriptions of the deal presented at the approval hearings, other senior executives involved in the negotiating process did not necessarily have this understanding.  (4/27/10 [Berkenfeld] 149:11-21.)  "They wouldn't have thought through that the process

173.    For example, during the period from September 15-22, 2008, Lowitt claimed he did not at any point see the Asset Purchase Agreement. (4/29/10 [Lowitt] 110:12-14.) He was not briefed by any lawyer about the specific terms of the Asset Purchase Agreement. Nor was he given an explanation of what was in the agreement. (4/29/10 [Lowitt] 138:11-23.) He never met with Miller or other lawyers designated for making disclosures to the Court, and so he never discussed with them the discount, the planned marking down of Lehman's books, its book value, or other key aspects of the proposed Sale Transaction. (4/29/10 [Lowitt] 112:4-113:2.)

174.    Kelly and Tonucci, both of whom knew about the discount and plan to write down Lehman's books, did not attend the Court hearings. (*See* Tonucci Dep. Tr. 204:20-22.) Miller had never even met Kelly. (4/28/10 [Miller] 33:3-6.)

175.    The principal Lehman negotiators as to the value of Lehman's assets, *e.g.*, Felder, Gelband, Donini, and others, did not discuss their valuation of the securities with Miller, Berkenfeld or others presenting the deal to the Court. (*See* 4/28/10 [Miller] 26:6-15, 27:24-28:2, 36:20-37:4; 4/27/10 [Berkenfeld] 112:9-113:7; *see also* Ridings Dep. Tr. 29:9-23 (neither he nor anyone on the Lazard team were "in any meetings where people were talking about specific securities and what the marks should be"); Felder Dep. Tr. 80:11-17, 81:13-23.) Barry Ridings, Lehman's outside adviser, attended the hearings, but he was too ill-informed about the terms of the deal to have recognized that misstatements had been made. He knew nothing about the discount, the marking down of Lehman's books or other key aspects of the deal, and he had not participated in valuing assets or in

---

(continued…)

they were going through was going to end up in a motion in front of the bankruptcy court." (4/27/10 [Berkenfeld] 149:11-21.)

drafting or reviewing the deal documents.  (*See* Ridings Dep. Tr. 29:9-23, 31:10-16, 32:2-

12, 46:21-47:11, 58:23-59:8, 61:9-20.)

176.    From the Barclays side, Varley and Diamond did not attend the Court

hearings, although Barclays' legal team, including representatives from Cleary Gottlieb

and Sullivan and Cromwell, and other key negotiators, like Archie Cox, did.  (6/21/10

[Diamond] 161:17-24; 6/22/10 [Diamond] 46:1-4; 6/22/10 [Varley] 153:3-9; 4/30/10

[Hughes] 119:14-120:18; 6/22/10 [Cox] 204:22-205:3.)   Klein attended the hearings, but

he denied knowledge as to the specifics of the disclosures being made to the Court.  (*See*

8/27/10 [Klein] 56:16-57:2, 204:13-206:24.)  Although he was one of Barclays' principal

negotiators, Klein also testified that he did not review the Asset Purchase Agreement

since he "didn't view the [APA] as being [his] document or in [his], if you will,

portfolio."  (Stip. ¶ 104.)

177.    At one point in this litigation, Barclays took the position that it was

contractually precluded from speaking up at the hearings, under Paragraph 7.2 of the

Asset Purchase Agreement.[64]  However, as the Court pointed out during Barclays'

opening statement, "Barclays was not just silent; Barclays was an active participant in the

hearing."  (4/9/10 [Opening] 187:22-188:13.)  And at the trial, Barclays conceded that it

did, in fact, have an obligation to correct the record if any misstatements or omissions

were made in the approval hearings before the Court.  (4/30/10 [Hughes] 128:17-135:7

(agreeing that Barclays' counsel attended and spoke at the September 17 Hearing and

Sale Hearing, notwithstanding purported limitation imposed by Paragraph 7.2 of the

---

[64]    (Barclays Opp.  ¶¶163, 601; *see* 6/21/10 [Diamond] 161:11-13 (Lehman, not Barclays, had to
get the Court's approval for the transaction).)

Asset Purchase Agreement, and acknowledging that it would have been "a fairly easy

thing" for Barclays to seek consent thereunder if it wanted to speak at hearings), 135:8-25

(agreeing on behalf of Barclays that its counsel "absolutely" had a "full and complete

duty of truthful and accurate disclosure" and an obligation to correct material

misstatements and omissions).)[65]  But Barclays' participants at the hearings never made

any effort to do so, despite the fact that several of those attending appear to have been in

the know as to the discount, the marking down of Lehman's books and other undisclosed

aspects of the deal.  (*See*, *e.g.*, 4/30/10 [Hughes] 136:6-18 (Barclays lawyers knew it was

important for Barclays to secure an immediate "gain" from the transaction).)

### K.    The September 17 Hearing And Sale Approval Motion

178.    On September 17, 2008, LBHI and LB 745 LLC filed a motion seeking

Court approval for the sale (the "Sale Motion").  The Sale Motion described the Sale

Transaction and the Purchased Assets and stated that the sale was to be consummated on

the terms and conditions set forth in the Asset Purchase Agreement.  (*See* M.118 ¶ 5.)

The Sale Motion disclosed neither the discounted price nor the inflated assumed

liabilities.  A final version of the Asset Purchase Agreement was attached to the Sale

Motion, which included the $70 billion, book value, definition of "Long Positions."

(M.118 ¶ 5; 8/31/10 [Lewkow] 128:20-134:19 (admitting that there were no disclosures

---

[65]  (8/31/10 [Lewkow] 107:11-111:12 (if there was a misstatement to the Court Lewkow had an
obligation to speak up and correct it); 5/7/10 [Ricci] 168:18-24, 213:21-25 (counsel for Barclays assured
Ricci that full and fair disclosures were being made to the Court).)  Lewkow at first appeared to be arguing
that statements made to the Court were not "representations," but then ultimately conceded that the
September 17 Hearing, the Sale Motion (including the Asset Purchase Agreement) were "means and
mechanisms" of disclosure to the Court.  (8/31/10 [Lewkow] 107:11-111:12.)  Barclays' counsel also
conceded that these disclosure obligations were not relaxed or diminished in any way merely because no
other potential buyer for Lehman assets had been identified.  (8/31/10 [Lewkow] 135:25-136:10, 183:2-
184:3 (he understood that creditors would be relying on this "book value" number and he agreed the parties
had to have a "good faith belief" in the veracity of this book value figure); 8/23/10 [Shapiro] 61:10-64:12.)

to Court to the effect that "book value" might mean something other than book value).)

The moving papers also described that Barclays was to assume liabilities of $2.5 billion

for bonuses and $1.5 billion for cure payments. (*Id.* ¶¶ 10, 14, 20.)[66]

179.    At the September 17 Hearing, the overall value of the proposed Sale

Transaction was described to the Court in connection with its being asked to approve a

break up fee based on the full value of the deal. (M.118 ¶¶ 15-18; M.260 at 22:4-7; *see*

8/31/10 [Lewkow] 80:23-81:21 (the value of the deal, for purposes of evaluating the

break up fee, included the bonus and cure liabilities).)[67] The discussion about the value,

in response to a direct question from the Court, was as follows:

> MR. MILLER:  Now, Your Honor, we are talking about a
> transaction that has, as I said, many parts.  But looking at it
> from the net of this transaction, there will be approximately
> 1,700,000,000 yielded out of this transaction…. And in the
> negotiations, quite properly, with all of the efforts that they
> have put into it, there was a request…, almost a demand,
> for a breakup fee.…

---

[66] Documents in evidence show that, while it failed to correct misstatements made to the Court, Barclays gave high level attention to *how* this consideration was portrayed to the Court, with an emphasis on making the price appear as high as possible.  On September 17, 2008, Diamond wrote to Chris Lucas, Varley and Ricci that "[i]t is very important to the bankruptcy court to see the larger number.  It is not credible and very harmful I think!! [t]o be seen trying to show lower." (M.19; 6/21/10 [Diamond] 169:14-170:5 (Diamond thought "the smaller number wasn't the credible disclosure").)

[67] When confronted with Barclays' assertion that Sale Transaction was agreed to "irrespective" of the value of the deal (Barclays' Opp. ¶¶ 40, 182, 193, 497, 591, 629, 656), Lewkow could not explain why the Court asked about values and real estate appraisals and could not recall why McDade's proffered testimony discussed values if the value of the transaction had not been an important consideration. (*See* 8/31/10 [Lewkow] 116:11-122:19.)  Lewkow did testify, however, that one of the things that needed to be demonstrated was fair consideration to the debtors and that he understood "that the Court needed to understand the deal, what was being transferred, what [] liabilities were being assumed…. All of that needed to be disclosed to the Court…" (8/31/10 [Lewkow] 121:14-122:4.)  In the end, Lewkow conceded that at the time he knew very little about the valuations assigned to the assets being transferred to Barclays. (8/31/10 [Lewkow] 123:16-125:21.)  Klein also could not agree that the deal was to be done without regard to what the assets were worth. (8/27/10 [Klein] 89:25-90:16 ("[N]o one can undertake a transaction, when they initially undertook it, without having whatever their own understanding was of the magnitude and quantum…. There was a magnitude or a quantum that I understood both sides defined").)  McDade also expressly rejected Barclays' litigation position that the deal was agreed and done irrespective of value. (4/26/10 [McDade] 217:19-218:4.)

THE COURT:  May I ask a question … about how to equate that breakup fee and expense reimbursement with the purchase price?  And I've attempted to assess the notional value of the transaction because in addition to the 1.7 billion dollars, there's a reference to 1.5 billion dollars in cure amounts and possibly as much as 2.5 billion dollars in certain employee related … severance expenses which may or may not be triggered …. *How should I view the fair value of the overall transaction?*

MR. MILLER:  I think, Your Honor, if you start with the billion seven hundred million dollars [the amount paid for real estate assets], which is the cash component, … there will be an exposure for 2.5 billion in connection with the retention of these 10 to 12,000 employees.  In addition to that, Your Honor, in connection with the assumption and assignment of contracts, the cure amounts and other payments in connection with the contracts, are estimated to be a billion five hundred million dollars.  So we have four billion dollars right there, Your Honor.  In addition, Your Honor, the purchaser is paying 250 million dollars for the goodwill of LBI.  So there you have 4,250,000,000 dollars in that respect, Your Honor.

And then, Your Honor, in the interim, LBI has entered into an arrangement with the prospective purchaser where there's a repo agreement in which they are backing up and allowing these repos to be settled and to be financed.  In addition, if this goes forward, there will be a support agreement for this interim period of two or three days where Barclays Capital will be on the premises, will be offering oversight and in the sole discretion, may be willing to advance some monies in the interim period.

(M.260 [9/17/08 Tr.] 22:8-24:17 (emphasis added).)

180.    Miller testified that he described the value of these securities to "give the Court a guide as to what was involved in the transaction."  (4/28/10 [Miller] 67:5-10.) When asked why he referred the Court to comp and cure liabilities, Miller testified that they were "potential assumed liabilities that go to the cost of the deal" and they were the "easiest items to refer to."  (4/28/10 [Miller] 50:16-51:15.)  Berkenfeld agreed that the estimates for comp and cure were being given to the Court "as part of a package of

materials submitted to seek the Court's approval of [the] transaction," and he thought they were "the best good faith… estimates at the time" of what Barclays might be paying, not ceilings.  (4/27/10 [Berkenfeld] 175:14-176:12.)[68]

181.    When Miller informed the Court on September 17 that "looking at it from the net of this transaction, there will be approximately 1,700,000,000 dollars yielded for Lehman out of this transaction" (M.260 [9/17/08 Tr.] 22:8-11), this indicated that, net of the real estate value, the deal was a wash, just as the Lehman Boards had been told and the Asset Purchase Agreement reflected.  McDade attended the September 17 Hearing, and at that time he understood the deal to reflect "an approximate equivalent of assets and liabilities."  (4/26/10 [McDade] 185:22-186:5.)  Nothing was said to the Court at the September 17 Hearing that was inconsistent with that understanding.  (4/26/10 [McDade] 186:6-10, *see also id.* 217:9-218:1.)

182.    Also attending the hearing was Shari Leventhal, Assistant General Counsel of the FRBNY.  (M.260 [9/17/08 Tr.] at 8 (appearances recorded).)  The FRBNY had already made a contractual commitment in a "Take-Out Agreement" to support the proposed sale in return for Barclays' agreement to take out certain FRBNY financing of Lehman.  (*See infra* ¶¶ 195-205).  As the contract required, Leventhal voiced the FRBNY's support for the Sale Transaction.  (M.260 [9/17/08 Tr.] 64:12-65:12.)  She

---

[68]    For the first time at trial, Barclays took a stab at suggesting that part of the consideration Lehman received in the Sale Transaction was that Barclays would be taking over the costs associated with running the broker-dealer business *after* Closing.  (8/31/10 [Lewkow] 22:17-23:15; 8/27/10 [Klein] 93:16-94:15.)  The fallacy of this position was pointed out on cross examination, when Lewkow admitted that once the deal closed Barclays enjoyed all the rewards associated with the assets it acquired, Barclays incurred both the costs and profits of running the business going forward.  (8/31/10 [Lewkow] 84:21-85:6.)  And in any event, such an additional component of value was never disclosed or explained to the Court at any hearing prior to issuance of the Sale Order (or for that matter, at any point before trial).  (M.261 [9/19/08 Tr.] 46:19-49:17; 8/31/10 [Lewkow] 86:2-6.)

also expressed the FRBNY's concern that the transaction be approved quickly, ostensibly

because there were only one or two possible bidders for the Lehman assets. (M.260

[9/17/08 Tr.] 64:12-65:12)  But she made absolutely no mention of the Take-Out

Agreement between Barclays and the FRBNY, the financial inducements the FRBNY

had provided to Barclays, or the inducements Barclays had given to the FRBNY in return

for its support of the deal. (*See infra* ¶¶ 195-205.)

> **L.    Disclosures Concerning The "Buffer," Valuations And Risks Made To
> Analysts And Institutional Investors Were Not Made To The Court
> And Did Not Accurately Depict The Deal**

183.    On September 16, Lehman issued a press release in which it announced

and described the proposed Sale Transaction (the "Lehman Press Release").  The release

said Barclays had signed an agreement to acquire the Lehman assets "for consideration

consisting of assumed liabilities, $250 million in cash and certain contingent

considerations." (M.120 at 2.)  The announcement said Barclays had also entered into a

definitive agreement to acquire the Lehman headquarters and other real estate assets "for

an aggregate of approximately $1.45 billion," subject to an appraisal. (*Id.*)  The release

announced that Barclays' executives Varley and Diamond would host a conference call

for analysts and institutional investors the following day. (*Id.* at 5.)

184.    Very early the next day, Barclays issued a press release of its own (the

"Barclays Press Release"). (M.133.)  Barclays announced that it would be acquiring

"trading assets with a current estimated value of £40bn (US$72bn) and trading liabilities

with a current estimated value of £38bn (US$68bn) for a cash consideration of £0.14bn

(US$0.25bn)." (M.133 at 2, 4; 9/2/10 [Romain] 124:6-126:15 (tracing these figures back,

through his schedule (M.135 at 2), to data supplied by Clackson, which were the same as

the figures on the 9/16/08 Financial Schedule (M.2)).)

185.    The Barclays Press Release did not reveal that the $72 billion asset figure *already* reflected a cut from Lehman's book value, *i.e.* the first buffer.  (*See supra* ¶¶ 44-46; 6/22/10 [Varley] 130:19-131:11.)  Nor did it purport to describe all of the contract terms.  In particular, it made no mention of Barclays assuming bonus and cure liabilities. Nor did it contain any reference to intangible assets.  (*See* M.133.)[69]  The Barclays Press Release noted, however, that "[t]he Board of Barclays expects these discussions to lead to a subscription of at least £0.6bn (US$1bn) of additional equity.  The proposed transaction with Lehman Brothers and the additional equity would result in an enhancement of Barclays earnings and capital ratios."  (M.133 at 2.)

186.    On September 17, 2008 (the day of the Court hearing), Barclays held a conference call to discuss the Barclays/Lehman transaction (the "Analysts Call").  (Stip. ¶ 162.)  The parties agreed that the transcript of that Analysts Call (M.16 or BCI 110) accurately reflects what was said on the call.  (Stip. ¶ 163.)  Participating on the call from Barclays were, among others, Varley, Diamond, Ricci, and Chris Lucas.  (M.16.)

187.    For his own use, Varley prepared a set of talking points for the Analysts Call in which he noted the "capital accretive" nature of the Sale Transaction as well as the expected "negative goodwill."  (Stip. ¶ 113.)  In Varley's talking points, he noted:

> ▪ The transaction is capital ratio accretive without additional equity issuance.

---

[69]    Although Barclays' litigation position now involves the notion that the intangible assets had great value to Barclays, but not to Lehman, a position its witnesses were uniformly prepared to espouse (*see, e.g.,* Barclays Opp. ¶¶ 44, 72, 303-319; 8/27/10 [Klein] 58:16-59:20 ("So as I understood it, the substantive business was clearly valuable …")), Klein admitted that at the time of the negotiations he placed no value on the "ongoing business" Barclays was acquiring.  (8/27/10 [Klein] 25:15-26:10 ("I did not believe that there was an ongoing business -- I did not believe that there was, as a result, an ongoing business value that could be attributed to this."), 111:16-112:7.)  Indeed, Barclays agreed to pay only $250 million for the entirety of these "intangibles" at the time**.**  (M.1 at ¶ 31; 8/27/10 [Klein] 26:11-27:24.)

> - The source of that accretion is the negative goodwill from the transaction, which amounts to some US $2 billion, post tax.
>
>                        * * *
>
> - The transaction meets our financial tests with significant margin for error.
> - We expect it to be immediately economic profit positive.

(M.12 at 00166333-339; Stip. ¶ 114.)

188.    During the Analysts Call, in his opening remarks, Varley relayed that Barclays was "acquiring trading assets with a current estimated value of 72 billion dollars and trading liabilities with a current estimated value of 68 billion dollars for a cash consideration of 250 million dollars."  (M.16 at 2; *see also* M.133 at 2, 4; 8/25/10 [King] 125:23-127:4 (Varley "presumably" was comfortable with the numbers he was relaying).)  Again, Varley made no mention of the "first" buffer built into the $72 billion figure, *i.e.*, the fact that it already contained the negotiated discount.  Nor did he mention the liabilities for bonuses and contract cures that Barclays was supposed to be assuming.  (M.16; 4/30/10 [Clackson] 108:3-17.)  Nor did he mention acquiring a valuable trove of intangible assets.  He noted, however, that "the transaction is capital ratio accretive without additional equity issuance.  And the source of that accretion is the negative goodwill from the transaction, which amounts to about 2 billion US dollars post tax."  (M.16 at 2.)  "We expect it to be immediately economic profit positive.  We expect it to be accretive to earnings on an ongoing basis in the first year, including the impact of equity raising."  (M.16 at 2; *see also* 4/30/10 [Clackson] 108:18-109:12 (undisclosed is that the $2 billion is the post-tax figure derived from only accounting for having to pay for the $1.35 billion in comp liability).)

189.    Varley touted the extensive due diligence the Barclays team had performed over the previous several days:

> We knew from that work over the summer that there was a
> significant value opportunity in the business and we knew
> that there might be a good economic opportunity available
> to us.  Furthermore we satisfied ourselves in the due
> diligence process which took place at the back end of last
> week and over the weekend, that the franchise of much of
> Lehman's and in particular the US broker/dealer business,
> remains strong and healthy.

(M.16 at 2; *see* 8/25/10 [King] 132:15-133:22 (quibbling with Diamond's assurances

provided on the call as to the quality of Barclays' due diligence).)

190.    When asked about risks associated with the assets Barclays had agreed to

buy, Chris Lucas, from Barclays, explained the marking down process in which the

Barclays and Lehman traders had engaged:

> I should say that out of the 72.7 which is a net number, the
> vast majority of those assets are quoted equity Government
> and Agency paper, CP money market instruments and
> derivatives and a relatively sizeable cash and matched book.
> There is a small amount of mortgage paper *which has been
> heavily written down and included in those numbers.  So
> we have been through a process where we took the original
> marks, reviewed them and then took some further write
> downs*, but that is against the very small portion, less than
> 5% of that book.

(M.16 at 3 (emphasis added).)

191.    Diamond elaborated on this explanation:

> First and foremost, as Chris said, we got to choose which
> inventory came with the deal. …. I think the second thing
> that is important is we had just completed 72 hours of due
> diligence on every position.  So when it came time to make
> the decision on what came, we personally had been doing
> due diligence and were able to establish the marks.

(M.16 at 4; 6/21/10 [Diamond] 183:14-25 (confirming accuracy of his statement that

Barclays had been doing due diligence and was able to "establish the marks").)  On the

call, Diamond made no mention of being unable to determine the value of the securities

due to chaos in the market, illiquid assets, or any other exigent circumstances, although

that is a theme Barclays later pursued vigorously at trial.

192.    Indeed, in the Analysts Call (held before litigation governed how he

framed the issue) Varley described how Barclays had "de-risked" the transaction "by

excluding the overwhelming majority of Lehman risk assets." (M.16 at 2; M.12 at

00166337.)  In other words, Barclays de-risked the deal by agreeing to acquire only

"tradable" assets:

> What we have taken is a portfolio of trading assets and
> liabilities that are first of all de-risked and secondly those
> that need to support the ongoing parts of the business that
> we have acquired.  And therefore they are predominantly
> market making assets and liabilities and are very tradable.

(M.16 at 7, *see also id.* 9 (Ricci describing the assets acquired as "more liquid …

Government agency types" and "ongoing trading positions").  Strategically, at trial some

Barclays witnesses attempted to dilute Varley's clean admission.  (4/30/10 [Clackson]

106:14-107:10 (testifying he would not have said this "so strongly"); 4/30/10 [Hughes]

164:11-19 (testifying would not have used the word "de-risked" to describe the Sale

Transaction).)  But before litigation guided Barclays' phrasing, Varley conceded that

another aspect of this de-risking effort involved the "buffer" noted above.  When asked

about that "buffer," Varley remarked: "[w]e absolutely expect to preserve that buffer and

in the way that Chris has described we have marked, and the capital derived from the

negative goodwill that arises from the transaction is actually more than is needed to

support the 15 billion dollars of risk weighted assets."  (M.16 at 5.)[70]

---

[70]  Somewhat inconsistent with this was Varley's response when asked about the seemingly balanced nature of the deal.  When one of the questioners asked whether "it [was] just coincidence that you are acquiring assets that are roughly, a similar kind of size to the client receivables on the Lehman book,"

193.    Barclays misleadingly argued on these Motions that the September 17 Analysts Call and the Barclays Press Release disclosed for all to see the "buffer," "delta," "mismatch," or "discount" at issue in this case.  Setting aside the fact that an analyst call or press release does not constitute disclosure to the Court (and Barclays' concessions on that issue),[71] nothing in the Barclays Press Release or Analysts Call appeared inconsistent with what those who were familiar with the deal understood it to be.  In particular, there was no mention at all of the bonus and cure liabilities that Barclays was assuming.  Indeed, McDade testified that the description of the transaction in the Analysts Call as including "trading assets of $72 billion and liabilities of $68 billion" (*i.e.*, the second buffer, without regard to discounts and understated liabilities) was consistent with his understanding of the state of negotiations as of September 17.  (4/27/10 [McDade] 61:9-15.)[72]

---

(continued…)

Varley quipped "there is no coincidence in this transaction, if you see what I mean. … The transaction is structured as we wanted it to be.  It is of course subject to Court approval and we are respectful of the Court.  But we have been very deliberate in our choices here."  (M.16 at 6-7.)

[71]    On cross examination, Lewkow readily conceded that the Barclays Press Release and the Analysts Call were not intended and did not represent disclosures to the Court as to the terms of the Sale Transaction.  (8/31/10 [Lewkow] 109:9-112:5 (acknowledging that there were only three mechanisms used for providing disclosure to the Court, the Sale Motion and the hearings on September 17 and 19); *see also* 4/30/10 [Hughes] 164:1-3, 166:1-8 (the first time Hughes read the transcript from the Analysts Call was in preparation for his deposition, Barclays did not submit the Barclays Press Release to the Court, and Hughes testified that he "certainly didn't invite" the Court to join the Analysts Call).)  And Barclays witnesses conceded that no further Press Release or Analysts Call was held later in the week to describe the revised deal (Lehman Three) once the deal substantially changed on September 18-19.  (8/31/10 [Lewkow] 115:18-24 (no recollection of any corrective press release being issued).)

[72]    Barclays also points to numerous articles in the press in arguing that the terms of the transaction, including the buffer between assets and liabilities, were disclosed.  (Barclays' Opp. ¶ 70 fn. 48, 59; 4/26/10 [Opening] 175:24-176:9 (citing to BCI 111, 113, 114, 115, 381); *see also* BCI 382, 796, 797, 798 (it should be noted that BCI 798 actually does say that the $72/68 billion does *not* include $2.5 billion in employee liabilities).)  However, Barclays did not establish that any witness saw any of these articles, and the witnesses Barclays did ask had not seen any of the press articles, or in the case of its own General Counsel, Mr. Hughes, had not even read the Analysts Call until preparing for his deposition in this case. (*see, e.g.*, 5/3/10 [Hughes] 64:25-65:9.); 6/21/10 [Marsal] 37:24-38:10 (Marsal had no knowledge of any

194.     Whatever the weight or accuracy of their content, it is undisputed that no one ever provided the Court with copies of either the transcript from the Analysts Call or the parties' Press Releases.  (4/30/10 [Hughes] 165:23-166:8 (quipping that he "certainly didn't invite" the Court to the Analysts Call), 167:8-170:1 (unable to explain how one could deduce the existence of a first day gain when neither Press Release nor Analysts Call disclosed anything about cure and comp liabilities); 5/7/10 [Ricci] 167:4-11.)  Moreover, Barclays never disclosed to the Court that the "buffer" between trading assets and liabilities or its expectation of $2 billion in negative goodwill or first-day gain as described in the Analysts Call.  (4/30/10 [Hughes] 138:12-139:6 (imperative for first-day gain not disclosed outside Barclays).)  And in any event, the "disclosed" buffer at issue in the Analysts Call is not the same as the undisclosed discount off the value of Lehman's assets to which Lehman and Barclays traders agreed and which is at issue in this case.  The $72 billion in assets referenced in the Press Release and Analysts Call already incorporated that reduction at issue.

### M.     Unbeknownst To Weil Gotshal And The Court, Barclays Had Further De-Risked The Sale Transaction Through A "Take-Out" Agreement With The FRBNY

195.     Even before the Asset Purchase Agreement was signed and the Sale Transaction was brought to this Court, Barclays had been dealing with representatives of the U.S. government and the FRBNY in connection with Barclays' efforts to acquire Lehman or its assets.  Over the weekend of September 13-14, federal regulators

---

(continued…)

press reports at the time that Barclays was expecting to make a gain on the transaction).)  In any event, the press articles do not reference assumed liabilities or address the hidden aspects of the deal, such as the undisclosed discount or Barclays' plan to underpay the assumed liabilities.

sponsored meetings with major financial institutions, including Barclays, to try to address the problems at Lehman.  (9/7/10 [Leventhal] 38:3-39:24, 44:22-45:6; M.119 ¶2; M.883 at 6-11.)  At the time, Barclays and Bank of America were in talks with Lehman, and federal regulators sought to organize a consortium of banks that could, in conjunction with the FRBNY, provide interim financing or other assistance for an acquisition, if needed.  (9/7/10 [Leventhal] 38:3-39:24; M.883 at 6-11)

196.    When Lehman's discussions with Barclays and Bank of America ended in failure over that weekend, federal regulators became involved in planning and advising Lehman as to how to wind down its customer accounts in the context of an LBHI bankruptcy.  (9/7/10 [Leventhal] 7:9-8:14; M.119A [Leventhal Decl.] ¶¶ 3-5.)  Federal regulators supported (indeed, affirmatively promoted) a plan whereby the parent entity, LBHI, would file bankruptcy on Monday, September 15, while its broker-dealer subsidiary, LBI, would be kept out of bankruptcy to allow it time to effect an orderly winding down of its customer accounts.  To assist in implementing this plan, the FRBNY agreed it would provide interim overnight financing to LBI, while JPM, LBI's clearing bank, would provide intra-day financing to allow LBI to keep its doors open while it sold off or transferred its customer accounts.  (9/7/10 [Leventhal] 7:17-8:14, 44:22-45:6; M.883 at 6-11.)

197.    Accordingly, starting on Sunday night, September 14, and continuing through the early part of the week, the FRBNY entered into a series of repurchase agreements with LBI, under various financing programs sponsored by the FRBNY, pursuant to which LBI was provided overnight financing.  (M.119A [Leventhal Decl.] ¶ 6.).  The amount of such financing increased each night, from September 14 through 17.

But as the week progressed, the FRBNY started to become concerned about the risks it

was bearing in providing this financing to Lehman, especially when Barclays was

seeking court approval to acquire the bulk of the securities held by LBI and it was

capable of providing this overnight financing on its own. (9/7/10 [Leventhal] 7:19-8:23

("[O]nce there was an acquisition, it became the purchaser's obligation to ensure that the

value of the assets were maintained, pending closing").)

198.    As early as September 15, representatives from FRBNY and Barclays had

already had discussions about Barclays replacing the FRBNY in this overnight financing

role. (4/30/10 [Hughes] 175:11-21 ("And [the] New York Fed asked Barclays, first of

all, on Monday the 15th, but then more definitely on Tuesday the 16th to take that

financing which was then in the form of a repo. Barclays agreed to do that").) Ostensibly

towards that end, on September 17, 2008, Barclays and FRBNY entered into an

agreement, pursuant to which Barclays provided protection to the FRBNY (the "Take-

Out Agreement"). (BCI 4.) While that agreement was ultimately signed on September

17, it was being negotiated on September 16. (M.874; 9/7/10 [Leventhal] 71:20-72:8.)

199.    Under the Take-Out Agreement, Barclays agreed that, if at any time prior

to the Closing of the Sale Transaction the value of the collateral supporting the FRBNY's

overnight financing of LBI declined below the amount required in the FRBNY's

repurchase agreements with LBI, Barclays would immediately (i) contribute additional

collateral to LBI and (ii) cause LBI to post that additional collateral to its repurchase

agreements with the FRBNY. (BCI 4 ¶ 1; *see* 9/7/10 [Leventhal] 86:25-87:25 (This was

to protect the FRBNY against the risk of a decline in the value of collateral.).)

200.    In addition, Barclays agreed that, "[b]y not later than the opening of

business on Monday, September 22, 2008" (or a later date, if the Court extended Sale

Hearing date), Barclays would "take-out" the FRBNY's financing role by (i) purchasing

the entirety of the FRBNY's position for a payment only of the amount owed to the

FRBNY under all of its repurchase agreements with LBI (*i.e.,* not the full market value of

***all*** the collateral including the excess "haircut" collateral), and (ii) causing the release or

termination of the FRBNY's obligations thereunder.  (BCI 4 ¶ 2.)  Upon delivery of that

purchase price and release, the FRBNY agreed it "shall" deliver to Barclays all the LBI

collateral it was holding under its existing repurchase agreements with LBI.  (*Id.*)

Alternatively, at Barclays option, it could execute a novation "to substitute Barclays (or

one of its affiliates) in place of the FRBNY" under all those repurchase agreements.  (*Id.*)

In sum, these contractual protections allowed the FRBNY to avoid the counterparty risks

associated with doing business with LBI, as it effectively would be replacing LBI with

Barclays as its counterparty.  (9/7/10 [Leventhal] 54:4-55:8 (explaining risks in Fed

Repo), 88:1-96:5.)

201.    Paragraph 2 of the Take-Out Agreement also effectively gave Barclays an

option to buy collateral at below market value.  It provided that "[i]t is expressly agreed

that Barclays shall have no obligation under this paragraph 2 if it is not the Successful

Bidder" for Lehman's assets.  (BCI 4 ¶ 2.)  Notably, however, this provision did not say

that Barclays would have no rights if it is not the Successful Bidder.  In fact, even if

Barclays were not the Successful Bidder for Lehman's assets, it could still deliver to the

FRBNY only the amount outstanding under the Fed Repo and then the FRBNY would be

obligated to deliver to Barclays ***all*** the LBI collateral in its possession, including the

excess "haircut" collateral.  (9/7/10 [Leventhal] 89:23-95:6 (agreeing with this reading of the contract).)  This provision effectively granted Barclays an option, at a bargain price, on all the LBI collateral (including the excess collateral or "haircut" posted to the FRBNY), which Barclays could use to thwart or dissuade competing bidders seeking to buy Lehman's assets out from under its nose.  (9/7/10 [Leventhal] 89:23-95:6.)[73]  The provision locked in for Barclays the right to take the collateral by delivering only the "Take-Out" Agreement purchase price to the FRBNY and to pay nothing for the excess or "haircut" collateral).  (9/7/10 [Leventhal] 79:14-80:4.)

202.    In exchange, the FRBNY also  agreed that "[a]t the hearing before the Court on the [Sale] Motion, the FRBNY shall support this Motion."  (BCI 4 ¶ 5.)  At first, Leventhal, said the FRBNY never had any agreement with Barclays to support the Sale Motion.  (9/7/10 [Leventhal] 64:20-65:8.)  When confronted with this provision of the Take-Out Agreement, she claimed she had not remembered it.  (9/7/10 [Leventhal] 65:11-66:20.)  Then, despite the clear language of the provision, Leventhal disputed that this provision was a *quid pro quo*.  (9/7/10 [Leventhal] 79:14-86:8.)  However,  Barclays' General Counsel Hughes testified at his deposition that Thomas Baxter, General Counsel

---

[73]    Barclays' counsel skirted this issue in his carefully worded questions to Lewkow, from Clearly Gottlieb, who testified before Leventhal took the stand.  (8/31/10 [Lewkow] 9:7-11:21.)  While Lewkow correctly agreed that "the United States government did not guaranty any loss for Barclays from the liabilities it acquired" (8/31/10 [Lewkow] 10:8-12), and the government bore no risk "if the business of Lehman that Barclays acquired upon closing fail[ed]" (8/31/10 [Lewkow] 10:13-11:3), and after closing the risk of a financial collapse remained with Barclays (8/31/10 [Lewkow] 11:4-19), it is instructive what Barclays' counsel did not ask Lewkow.  He did not ask him if Barclays received any benefits or *quid pro quo* from its contract with the FRBNY or arrangements with other government agencies.  He did not ask if the FRBNY had helped reduce Barclays' risk under the September 18 Repurchase Agreement.  Even when Barclays' counsel revisited this issue, he only asked whether, absent the FRBNY's offer to refinance the repo collateral, Barclays was still obligated to pay the FRBNY in full in taking it out of the Fed Repo.  (8/31/10 [Lewkow] 49:4-50:17.)  And Barclays' counsel did not ask if Barclays' dealings with the government gave Barclays a leg-up on, or in any way dissuaded, other potential bidders for Lehman  assets.  And in any event, Lewkow admitted that his firm was not involved in documenting the repo transactions, valuing the securities associated with them, or advising Barclays on such issues.  (8/31/10 [Lewkow] 75:25-78:12.)

for the FRBNY, said to Hughes "in essence … that if Barclays was going to take over

assets of LBI and was going to conclude a transaction, the Fed would want Barclays to

replace the Fed in that repo, and that its support of the transaction would likely be

conditional upon our approving of that." (9/7/10 [Leventhal] 96:9-97:19.) When shown

this testimony from Hughes, Leventhal said she was surprised by it, but could not dispute

it since she was not involved in the conversation between Hughes and her boss, Baxter.

(9/7/10 [Leventhal] 97:20-98:12.)

203. Leventhal's quibbling aside, the terms of the Take-Out Agreement clearly

show a *quid pro* exchange between Barclays and FRBNY. And, demonstrating

FRBNY's lack of concern for the Court's processes, FRBNY agreed to this *quid pro quo*

before it ever saw a copy of the Sale Motion, before that motion was even filed, and

before the FRBNY saw a copy of the Asset Purchase Agreement. (9/7/10 [Leventhal]

68:15-20, 66:21-68:8, 69:17-70:5 (Q. "The Fed was happy to agree to support the motion

before it was made or seen?" A.. "Yes. …"), 70:13-73:11 (draft Take-Out Agreement

contained this provision as early as September 16), 76:23-77:7, 129:25-131:8 (the terms

of the Clarification Letter were not a concern of the FRBNY); M.874.) Also

demonstrating FRBNY's lack of concern for the debtor's entitlement to maximize values,

the FRBNY agreed to this provision knowing full well that the Sale Motion contemplated

the possibility of other bidders for Lehman's assets. (9/7/10 [Leventhal] 79:14-80:4.) In

short, the FRBNY sold its support for an unseen motion and purchase agreement to

Barclays to protect its own flanks, no matter what the motion papers said or the proffer at the Sale Hearing showed.[74]

204.    The net effect of this Take-Out Agreement was to provide substantial risk abatement to Barclays.[75]  Pursuant to this agreement, Barclays purchased for itself U.S. federal regulator support for the Sale Motion and the Asset Purchase Agreement.[76]  And if all went wrong in Barclays efforts to buy Lehman assets, Barclays had secured for itself the right to acquire from the FRBNY virtually all of the Lehman securities directly from the FRBNY, if it so desired, at a bargain price, *i.e.*, it would get all the collateral -- including the excess, "haircut" collateral -- by paying the FRBNY only what it was owed by LBI, not the full value of all the collateral.  Not only was this a powerful defensive

---

[74] The cozy relationship between Barclays and the FRBNY exhibited in this Take-Out Agreement as well as in effecting the December 2008 Settlement (*see infra* ¶¶ 420-436), is also reflected in the close relationship between their respective counsel.  (9/7/10 [Leventhal] 61:4-63:6, 73:12-74:11, 75:19-76:8 (no knowledge of how Chinese wall within Cleary, which represented both FRBNY and Barclays, was enforced).)

[75] Barclays has attempted throughout this case to portray its purported "stepping into the shoes" of the FRBNY as something that was forced upon Barclays by the FRBNY.  (Barclays Opp. ¶¶ 117, 121 ("*Under pressure*, Barclays *reluctantly* agreed to replace the FRBNY's lending position") (emphasis added); 5/4/10 [Seery] 57:17-24 (the FRBNY "required that as part of the transaction, and Barclays didn't have a real option to walk away from that part of the deal); 9/7/10 [Leventhal] 8:24-9:5 (agreeing with Barclays' counsel's suggestion that the FRBNY "required" Barclays to assume the obligation to finance LBI).)  Leventhal confirmed however, upon direct questioning from the Court, that the FRBNY did not pressure Barclays into assuming the Fed Repo prior to Closing; this was something Barclays wanted to do as part of its acquisition of Lehman assets.  (9/8/10 [Leventhal] 75:15-78:25.)  Concerning Barclays' risk, Diamond also testified that it would be "overstating" Barclays' downside risk to say that Barclays was stuck with all of the downside of the financing if the transaction did not close because it "did this transaction hand-in-hand" with the FRBNY, "certainly had the partnership" of the FRBNY if that happened, and the financing could have been reversed.  (6/21/10 [Diamond] 241:16-22, 243:4-22.)

[76] In testifying on direct about her appearances in Court on behalf to voice the FRBNY's support for the Sale Transaction, Leventhal made no mention of the FRBNY's contractual obligation to do so.  (9/7/10 [Leventhal] 16:1-19:13.)  She did concede, surprisingly, that whether Barclays made a large gain on acquisition was "irrelevant" to the FRBNY and its support of the Sale Transaction (*id.* at 34:16-22), which was based primarily on its public policy concern for the transferring of customer accounts.  (*Id.* at 19:14-20:25; *see also id.* at 22:3-15.)  She showed no concern on the part of the FRBNY for understanding the terms of the Asset Purchase Agreement or ensuring that they accurately described the deal to the Court.  (*Id.* at 76:23-77:16.)  And she even conceded that the interests of Lehman's creditors were "irrelevant" to the FRBNY.  (*Id.* at 86:5-9.)

weapon to wield against would-be competing bidders, it was also a valuable insurance

policy for Barclays, which could buy virtually the same assets directly from the FRBNY

-- and still get the haircut collateral -- no matter what happened in the Court approval

process.[77]

205.    This Take-Out Agreement and its important ramifications were never

disclosed to the Court, although Leventhal professed to be under the impression that it

had been brought to the Court's attention.  (9/7/10 [Leventhal] 98:23-99:18, 116:25-

118:11 (The FRBNY did nothing to ensure agreement was filed with the Court).)[78]  Nor

were they disclosed to Lehman or its counsel.  (*see, e.g.,* 9/7/10 [Leventhal] 76:9-22,

98:13-22; M.876, M.874.)  The FRBNY's own collateral agent, JPM, was not even told

about the agreement until it came time to actually move the repo collateral.  (9/7/10

[Leventhal] 115:23-116:24.)[79]

---

[77]    In this important respect, Leventhal's assertion on direct examination that "other than the letter of the 17[th]" the FRBNY reached no understanding or agreement that would protect Barclays against the risk of loss on the Sale Transaction (9/7/10 [Leventhal] 14:15-15:5 ("Absolutely not"), was misleading and incomplete.  She nowhere explained (until pressed on cross examination) the key protections the Take-Out Agreement afforded Barclays throughout the course of the week of September 15.

[78]    This Take-Out Agreement was never disclosed to the Court even though on the very day it was signed the Court was considering and ultimately issued an Order concerning the qualification of competing bidders for the Lehman assets.  (*See, e.g.*, LBHI Docket No. 88; 9/7/10 [Leventhal] 9:6-10:10 (the FRBNY was aware of that order at the time).)

[79]    And when Barclays' consultant, Klein, testified about the risks associated with the September 18 Repurchase Agreement – a transaction in which he had no involvement – he apparently was unaware of or had not been prepared to testify about the Take-Out Agreement and its effect in limiting Barclays' risks.  (*See, e.g.,* 8/27/10 [Klein] 45:3-47:15.)  If he did know about this agreement, then his testimony on this score was disingenuous at best.

## IV.    THE LEHMAN THREE TRANSACTION

### A.    Without Disclosure To The Court, Barclays Materially Changed The Deal After It Replaced The FRBNY In Providing Interim Financing To Lehman

206.    By the time the deal was approved by the Court on September 19, 2008 (or the early hours of September 20), "it was a completely different deal than the deal that had been worked through on Monday night into Tuesday morning."  (4/29/10 [Lowitt] 113:3-115:7 (agreeing that "ultimately the REPO became the deal"), 127:2-130:23 (the Friday transaction was a "very different deal" from that on Monday and Tuesday because of the repo and the addition of 15c3-3 and clearance box assets); *see* 4/29/10 [Clackson] 201:20-204:8; 5/3/10 [Seery] 133:11-18, 135:9-11 (by Friday, the deal was "to essentially turn the REPO into an asset sale").)  Barclays has contended repeatedly that the deal was changed because on Wednesday, September 17, 2008, the FRBNY insisted that Barclays take the FRBNY out of its financing role with LBI.  (4/29/10 [Lowitt] 113:15-19; Barclays Opp. ¶ 118.)  According to Lowitt, "the repo was the big factor that was different in the transaction."  (4/29/10 [Lowitt] 120:8-14.)

207.    The testimony of Shari Leventhal, however, confirmed that this was not, as Barclays contends, a change forced on Barclays at the last minute.  This had been the plan all along under the Take-Out Agreement.  (9/8/10 [Leventhal] 75:16-78:25 ("in the course of negotiations [concerning the Take-Out Agreement] … Barclays … goal was to essentially take over financing LBI as quickly as possible, once it was clear that they were … likely to succeed in their bid").)  Indeed, this is confirmed by the very existence of the Take-Out Agreement (which was never disclosed to the Court) as well as meetings and correspondence between Barclays, the FRBNY and others at the time.  (BCI 4; M.874 (e-mail attaching a draft of the Take-Out Agreement dated 9/16 – the same day the

APA was signed); M.844 (e-mail referencing a 9/17 meeting in which Barclays was

making plans to take out the FRBNY less than 24 hours later); M.23 (Lowitt attended

9/17 meeting with Barclays and FRBNY and stating "plan is to early terminate . . [a]nd

then all the collateral to Barclays so no on-going fed financing of Lehman.  Assume

everyone is ok with this.  Not a lot of choice.").)

208.    As noted above, even before the Asset Purchase Agreement was finally

negotiated, signed and presented to the Court for approval, the FRBNY had already

agreed to provide financial support to LBI under a repurchase agreement (the "Fed

Repo").  (Stip. ¶ 130; *see also* Stip. ¶ 165.)  The Fed Repo effectively was comprised of

loans made to LBI through the following FRBNY programs:  the Primary Dealer Credit

Facility ("PDCF"); the Term Securities Lending Facility ("TSLF"); and Open Market

Operations ("OMO").  (Stip. ¶ 166.)  As part of the Fed Repo, LBI had to post collateral

to the FRBNY.  (Stip. ¶ 131.)  As in repo transactions generally, the FRBNY required

LBI to post as collateral, securities valued in excess of the principal amount the FRBNY

advanced.  (Stip. ¶ 132.)  The amount by which the value of securities transferred exceeds

the amount paid for them is referred to as a "haircut."  (Stip. ¶ 133.)  The "haircut" is

measured at market value.  (9/7/10 [Leventhal] 52:22-53:19.)

209.    By the night of Wednesday, September 17, LBI had posted collateral

valued at approximately $50.62 billion in exchange for FRBNY financing approximately

$46.22 billion.  (M.119A [Leventhal Decl.] ¶ 9.)  This "haircut" reflected excess

collateral of $4.4 billion.  (*See* Tonucci Dep. Tr. 17:5-15.)

210.    Sometime early that week, when the FRBNY learned that Barclays was to

buy Lehman's broker-dealer assets, the FRBNY began insisting that it be relieved of its

short-term financing role for LBI and that Barclays instead provide such financing to

LBI.  (Stip. ¶ 134; *see also* 4/29/10 [Lowitt] 113:15-19; M.119A [Leventhal Decl. ¶ 7] ;

9/7/10 [Leventhal] 7:9-8:23, 23:5-24:8.)  As noted above, by September 16, Barclays had

already negotiated the terms of the Take-Out Agreement (M.874), which was then signed

on September 17, 2008.  (BCI 4.)

211.    Barclays' undisclosed Take-Out Agreement with the FRBNY significantly

reduced Barclays' risk in the deal, because it knew it would have immediate FRBNY

financing for all repo collateral.  An FRBNY e-mail, dated September 17, 2008 (M.844),

summarizes key aspects of those discussions between Barclays, the FRBNY and the

Bank of New York Mellon ("BoNY," or, referred to here as BNYM).  (M.844; 9/7/10

[Leventhal] 99:19-103:2.)  Lowitt was the only Lehman representative at the September

17 meeting.  (4/29/10 [Lowitt] 113:20-114:2.)[80]  As the e-mail relayed:

> We (see cc list) just met with BCI, LBI and BNYM folks
> (names at bottom of e-mail) to go through [the] transactions
> that they will execute tomorrow that will permit Barclays to
> take possession of Lehman's collateral and extinguish
> Lehman's PDCF ($20 billion), OMO ($7 billion) and TSLF
> ($20 billion) activity with us.  Barclays plans to bring all
> [of] the collateral to the PDCF tomorrow for a PDCF loan
> ($47 billion).  They expect to be able to finance all this
> collateral in the market within 2 weeks.  (They need this
> time to get all the cusips into their systems and find
> counterparties.  They expect the loan amount to decline
> each day as they get up to speed.)

(M.844; *see* 9/7/10 [Leventhal] 103:3-105:5.)

212.    Thus, to assist Barclays in replacing the FRBNY as LBI's overnight

financier, the plan was for the FRBNY to lend Barclays $47 billion under the PDCF

---

[80]   Lowitt later was involved in monitoring the movement of collateral and cash as the Fed Repo
was unwound and the September 18, 2008 Repurchase Agreement was put into place.  (4/29/10 [Lowitt]
114:3-9.)

program.  (M.844; 9/7/10 [Leventhal] 104:14-25.)[81]  The collateral for that loan was to be

the same collateral LBI had been posting to secure its own overnight financing under the

three FRBNY programs.  (9/7/10 [Leventhal] 10:20-14:14.)[82]  The FRBNY was therefore

not concerned with the quality or risk associated with that collateral, but rather it was

concerned with the risk of having Lehman as a counterparty, as explained by the fact that

it required Lehman to post more collateral for the Fed Repo than peer investment banks.

(9/7/10 [Leventhal] 107:16-22 (affirming that "[t]he haircuts (as listed on M.863) were

specific to Lehman.  Recognizing…the account party credit risk that Lehman

presented.").)  The FRBNY wanted to replace LBI with Barclays to reduce that

counterparty risk.  (9/7/10 [Leventhal] 10:20-14:14.)  Thus, when the transaction was

consummated, Barclays did not really "step into the shoes of the Fed" as it contends;

rather, it stepped into the shoes of Lehman.

213.    The internal FRBNY e-mail continued, explaining some of the mechanics

of the new financing:

> The transaction will also require Barclays <u>Bank</u> to overdraft
> its account with us for the $47 billion early in the day
> tomorrow (they have an intraday cap of $56 billion at the
> window -- Andrew just told me that they only have about
> $7 billion pledged to the window, most of this is pledged to
> TAF).  Barclays Bank will lend this amount intraday to
> BCI to pay down its overdraft at JPMC that results from the

---

[81]    In his direct examination of Leventhal, Barclays' counsel tried to suggest that this aspect of the
FRBNY's dealings with Barclays was properly disclosed to the Court in Ridings' proffer.  (9/7/10
[Leventhal] 15:6-25 (reading portion of Ridings' testimony that does not, in fact, address the FRBNY's
commitment to provide PDCF financing to Barclays on the very same pool of collateral that had supported
the Fed Repo).)  Ridings, of course, had no knowledge of the FRBNY's arrangements with Barclays.

[82]    In the end, when Barclays completed taking the FRBNY out of its repo and Barclays entered
into the September 18 Repurchase Agreement, this plan was in fact implemented as Barclays financed the
entirety of the collateral it received from Lehman with the FRBNY under its PDCF program.  (*See* BCI 969
(Barclays interrogatory response showing its usage of the PDCF facility on and after September 18, 2008);
9/7/10 [Leventhal] 105:6-109:19.)

> unwind of triparty repo tomorrow.  This will permit LBI to
> deliver the securities free of payment to BCI.  BCI will
> pledge them to the PDCF.  The cash proceeds will pay back
> Barclays Bank's intraday overdraft.

(M.844 (emphasis in original).)  Thus, not only was the FRBNY backstopping Barclays

by offering to provide financing on the collateral Barclays was acquiring from LBI, the

FRBNY also was willing to advance cash (in the form of a Barclays Bank overdraft) to

Barclays to allow it to make this purchase.  This substantially reduced the risks, and

capital outlays, Barclays was undertaking in this transaction.  Indeed, Leventhal

acknowledged that the FRBNY, not Barclays, was taking on the risk associated with a

decline in the value of the collateral under this scheme.  (9/7/10 [Leventhal] 108:4-

109:19.)

214.    Barclays has presented no evidence that any of this was disclosed to

LBHI, its lawyers at Weil Gotshal, or the Court.  (*See also* 9/7/10 [Leventhal] 109:25-

110:19 (no knowledge of the topics discussed in M.884 being shared with Weil, Cleary or

the Court).) [83]

---

[83]  The key risk about which the FRBNY was worried was not the value of the collateral, but rather JPM and its role in the transaction:

> A key risk factor is that JPMC will try to use the $47 billion in cash
> paid from Barclay's to pay down other Lehman Bros. obligations and
> refuses to release the collateral.  This would be a disaster.  BNYM and
> Barclays folks have been in contact with JPMC.  I wonder if we should
> reach out to Barry Zubrow [from JPMC] (or higher?) to make sure they
> behave tomorrow … what do you think?  There's an awful lot at stake
> on many dimensions …

(M.844 ; *see* 9/7/10 [Leventhal] 110:20-113:7 (noting concern that JPM would "engage in self help").) This concern would later prove prescient as problems arose involving the transfer of collateral by JPM. (*See infra* ¶¶ 305-306, 409-419.)

B.        **The September 18 Repurchase Agreement**

215.        With this considerable help from the FRBNY (in the form of financing

and a cash advance), Barclays relieved the FRBNY of its short-term financing role.  This

was accomplished through a Repurchase Agreement, dated September 18, 2008, between

LBI and Barclays (the "September 18 Repurchase Agreement").  (*See e.g.* M.119A

[Leventhal Decl.] ¶ 12; M.256 ¶¶ A-B; Stip. ¶ 135.)

216.        On the morning of September 18, steps were initiated to effect the

transition from the Fed Repo to the September 18 Repurchase Agreement.  This involved

first unwinding the Fed Repo, with LBI returning to the FRBNY assets it had transferred

to LBI and the FRBNY returning to LBI the securities LBI had pledged as collateral.

Later that day, pursuant to the September 18 Repurchase Agreement, Barclays forwarded

to LBI approximately $45 billion in cash (its advance from the FRBNY) and LBI was to

post collateral valued at approximately $50 billion in securities, reflecting an approximate

$5 billion discount, or "haircut," in the value of LBI's collateral.  (*See* M.119A

[Leventhal Decl.] ¶¶ 10-12; 9/7/10 [Leventhal] 118:17-120:14 (confirming paragraph 9

of her declaration (M.119A)), 121:3-24 (Barclays advanced $45 billion in cash), 121:25-

122:3 (Barclays was supposed to receive $49.7 billion in collateral); 5/3/10 [Seery]

135:24-136:7 ("Lehman's marks for the Fed facility were 50.6"), 136:12-17 (he had

confidence in Lehman's marking process); 4/29/10 [Lowitt] 114:24-115:24; *see also*

4/29/10 [Clackson] 264:9-265:5 (generally explaining the concept of a "haircut");

LaRocca Dep. Tr. 40:2-41:17; Hraska I Dep. Tr. 58:14-22, 60:15-61:4; Petrie Dep. Tr.

77:12-78:6; M.19; M.45 (Haircut Summary); Stip. ¶ 136.).  When asked to review the

pool of collateral Barclays was to take over from the FRBNY, King concluded that

Barclays would be sufficiently collateralized in loaning $45 billion against this pool of securities.  (8/25/10 [King] 49:19-53:2, 55:2-10; King Dep. Tr. 75:6-77:20.)

217.    Due to operational problems, by the close of business on September 18, LBI had not transferred all of the intended collateral to Barclays.  Instead of approximately $50 billion in collateral, LBI transferred, according to some witnesses, at least $42.9 billion in collateral under the September 18 Repurchase Agreement. (M.119A [Leventhal Decl.] ¶ 14; 4/30/10 [Hughes] 183:18-184:7; 4/29/10 [Clackson] 272:4-24; Hraska I Dep. Tr. 56:22-57:7; M.55.)[84]   To make up the difference, LBI took a so-called "box loan" of $7 billion, provided by JPM and secured by an equivalent amount of securities held in JPM's "clearance boxes."  (Hraska I Dep. Tr. 52:16-54:13, 57:2-4; M.36; M.50; M.66; M.42; (9/7/10 [Leventhal] 122:21-123:17 (not sure where cash came from, but Barclays received $7 billion in cash to make up shortfall); 4/30/10 [Hughes] 183:18-184:7.)  The full cash proceeds of this loan, *i.e.*, $7 billion, were given to Barclays as a replacement for the portion of collateral that could not be transferred on September 18.  (Hraska I Dep. Tr. 50:8-22; *see generally* 9/7/10 [Leventhal] 24:9-28:2 (her recollections on this issue); 4/30/10 [Hughes] 183:18-184:7.)

218.    So, in the end Barclays received at least $49.7 billion in collateral and cash to secure LBI's obligations for the $45 billion advanced to it under the September 18 Repurchase Agreement.  (9/7/10 [Leventhal] 123:18-124:7.)  JPM, Lehman's collateral agent (4/29/10 [Lowitt] 114:10-13; 6/22/10 [Varley] 159:11-16), and BoNY,

---

[84] BoNY, as Barclays' collateral agent, valued it even higher, at $45 billion.  (*See infra* ¶¶ 219, 281, 385, 390, 499.)

Barclays' collateral agent (4/29/10 [Lowitt] 114:14-16), each recorded the value of the securities posted as collateral by LBI.  (*See* 4/30/10 [Hughes] 185:3-16.)

219.    There is compelling evidence, however, Barclays actually received total collateral and cash in the range of $52 billion.  BoNY, as Barclays' agent, valued the collateral that actually transferred (*i.e.,* not including the $7 billion transferred to make up the difference) at approximately $45.037 billion.  (M.102; 8/25/10 [King] 157:17-158:3.) BoNY marked the Lehman collateral as it came into Barclays account under the September 18 Repurchase Agreement.  (8/25/10 [King] 63:14-64:7.)  And Barclays relied on the BoNY marks, when initially Barclays itself reflected the BoNY marks on its own books.  (M.800; *see also* 8/25/10 [King] 67:16-68:1.)[85]

220.    Barclays personnel also valued the collateral in the $52 billion range at that time.  In an e-mail dated September 19, 2008 (12:04 p.m.) from Marty Malloy (a trader in Barclays stock loan area (LaRocca Dep. Tr. 65:4-8)) to Gerard LaRocca (Chief Administrative Officer of Barclays), Malloy described the "Repo Cash Amount" as "45.00" billion, and the total "Securities/Cash" Barclays received as collateral as "52.19" billion.  (M.47; M.200.)  Malloy described the "7.19" billion difference between these two as "Excess Collateral," constituting a "Margin" of "14%."  (M.47; M.200; 8/25/10 [King] 171:11-173:10 (confirming that this $52.19 billion figure reflected the BoNY marks as of 9/19/08).)

---

[85] JPM, acting as collateral agent for the FRBNY, valued the Fed Repo collateral at approximately $50.62 billion and the collateral Barclays was to receive under the September 18 Repurchase Agreement at $49.7 billion.  (9/7/10 [Leventhal] 119:20-24; M.119A [Leventhal Decl.] ¶¶ 9,12.)  The FRBNY understood this at the time to represent the "market value" that JPM ascribed to that collateral.  (*See* 9/7/10 [Leventhal] 120:15-121:2; M.705.)  These figures did not reflect liquidation values.  (9/7/10 [Leventhal] 122:8-13.)

221.    Other contemporaneous Barclays documents are consistent with valuations of $52 billion for the securities and cash Barclays received.  In fact, at the outset, Barclays consistently valued its total take in the $52 billion range.  (*See* M.45 (Barclays' Haircut Summary indicating excess collateral of $7.17 billion); M.60 (opening balance sheet circulated to Barclays executives, valuing September 18 Repurchase Agreement assets at $44.8 billion (securities) plus $7 billion (cash)); 4/29/10 [Clackson] 272:25-274:4 (confirming this information was incorporated into Barclays' acquisition balance sheet); M.63 (same); M.72 (same); M.362 (Ricci 9/21/08 e-mail valuing repo collateral at $52 billion:  "Pretty convinced resis not in 52 after talking to a few people.").)

### C.    The Use Of The September 18 Repurchase Agreement To Deliver The Discount

222.    Although the Lehman/Barclays repo in fact became the centerpiece of the Sale Transaction by mid-week, the Court was told virtually nothing about it.  Lehman's repurchase agreements were described only in passing to the Court during the September 17 Hearing and only as a means to continue short term financing so LBI could get through the week, not as a mechanism by which billions of dollars in assets would be transferred to Barclays, much less that the repo would be used to transfer billions for no consideration.  (M.260 [9/17/08 Tr.] 24:9-17 ("And then, Your Honor, in the interim, LBI has entered into an arrangement with the prospective purchaser where there's a repo agreement in which they are backing up and allowing these repos to be settled and to be financed...").)  At the Sale Hearing, Miller said nothing more to the Court other than, "Barclays basically stepped into the shoes of the Federal Reserve in connection with the Primary Broker Dealer Credit Facility as to the 45.5 billion dollars Lehman borrowed last

Monday and received the collateral that Lehman posted in connection therewith."

(M.261 [9/19/08 Tr.] 63:16-22.)

223.    One thing never changed, however.  Barclays insisted that it still get its
pre-agreed multi-billion dollar "buffer" as had been agreed upon, but not disclosed, in the
beginning of the week.  (6/22/10 [Varley] 131:23-133:6 (Varley was "preoccupied" with
ensuring that the buffer between trading assets and liabilities remained in Lehman III and
"the business strategy between Lehman Two and Lehman Three was unchanged"),
142:16-23 (in writing "Query buffer 3-4 billion" in his notes (M.12 at 00166277) Varley
was looking to make sure that the buffer that had existed in Lehman II was maintained
into Lehman III), 110:12-111:1 (Barclays "wouldn't have proceeded" without the
"appropriate delta" or buffer).)  The only difference was the mechanism for doing so.
Now the September 18 Repurchase Agreement was to be used as a conduit to deliver the
$5 billion discount, by using it to give Barclays $50 billion in collateral assets in return
for only a $45 billion funding advance.

224.    By the time of the Sale Hearing, however, the central role the September
18 Repurchase Agreement was to play in the Sale Transaction had become apparent to all
in the know.  As Lowitt testified, the September 18 Repurchase Agreement effectively
became the central aspect of the Sale Transaction because it was understood that Barclays
was to keep all the collateral, including the excess collateral, that LBI had posted under
that repurchase contract.  (4/29/10 [Lowitt] 115:4-7, 17-24 ("an exchange of fifty billion
in collateral for forty-five billion in cash," if that was actually the amount of collateral
and cash that was moved, was how it would "sit out"). )  Among other things, there was
no mention to the Court of Barclays keeping the excess collateral in the repo.

225.    This idea appears to have had its genesis in an e-mail Reilly wrote on September 18, at 6:03 a.m.  Reilly wrote to Lowitt, Gelband, Tonucci and Kelly, suggesting that the repo agreement presented the best mechanism to deliver the "discount" to Barclays:

> I need some help resolving these issues today …
>
> 3)  Not clear on the amount of block discount or how we make it happen.  ***Defaulting on repo could be the best as discount could be taken from haircut.***  If not that then we need to give business an allocation of block discount so they can mark down the books tonight.  Does that create a problem as it could tip the broker early?  Would we rather have that be in the sale price tomorrow?

(M.188 (emphasis added).)

226.    Lowitt understood Reilly to mean that the September 18 Repurchase Agreement could be a way in which the parties could effect the transaction.  (4/29/10 [Lowitt] 116:9-121:8 (but disclaiming recollection as to whether last line referred to Sale Hearing scheduled for the next day, September 19); s*ee* 4/28/10 [Kelly] 225:22-227:23 (confronting Kelly with his deposition testimony: "I understand that that was the mechanism, defaulting on the repo was the mechanism" used to settle the contract between Barclays and Lehman); Tonucci Dep. Tr. 32:4-34:18("the actual transfer of securities and cash was through the repo agreements, and essentially the termination of those repo agreements.).)

227.    Stephen King (a Barclays managing director involved in risk management) testified at his deposition that he understood even before the September 18 Repurchase Agreement was executed that there was going to be a default under that agreement and he was planning even then for Barclays' receipt of the collateral and how to manage the risk associated with these securities once Barclays received them.  (King

Dep. Tr. 78:22-80:11; *see also* 8/25/10 [King] 106:14-107:12 (testifying at trial

concerning how his group began thinking about risk-managing the September 18

Repurchase Agreement assets beginning on Friday, September 12).)

228.   The undisclosed decision to use the September 18 Repurchase Agreement

to deliver the discount conveniently solved a problem people at Lehman were having in

trying to fit the discount retroactively into the Asset Purchase Agreement.  As discussed

above, the original plan had been for Lehman to mark down its books to fit the negotiated

price.  (*See supra* ¶¶ 66-70, 73.)  But Reilly had spotted a problem with this plan:  the

Asset Purchase Agreement did not mention any discount from book value:

> I went thru all docs and did not see reference to the price
> haircut.  If we want conservative marks to reflect block
> nature we need to know how much and then can allocate to
> most logical assets.

(M.25.)

229.   In response, Lowitt commiserated: "Since not in contract [it is] hard to see

what to d[o]." (M.25.)  Reilly's suggestion that "[d]efaulting on [the] repo could be the

best as [the] discount could be taken from [the] haircut" solved the problem that the Asset

Purchase Agreement did not provide for marking down Lehman's books.  (M.188.)

230.   In this regard, Tonucci testified at his deposition as follows:

> Q:     Would it also be fair to say, therefore, that the
> discount was embedded in the haircut on the repo
> transaction?
>
>              *       *       *
>
> A:     In a repo transaction there is a haircut, a difference
> between the market value and the cash value received.  You
> could view that as a discount.  ***I think in this case it is fair
> to say that that was the settlement mechanics and
> therefore the way that the difference between market***

> *value and cash paid was accomplished.  There was in that*
> *sense a discount.*

(Tonucci Dep. Tr. 33:7-34:18 (emphasis added).)[86]

231.   None of this was told to the Court at or before the Sale Hearing.[87]  But by then, events appear to have overtaken even this plan.  Among other things, Barclays claimed it was "worried" about the value of the securities posted as collateral for the September 18 Repurchase Agreement, and Barclays threatened not to close if Lehman did not come up with more assets.  (*See infra* ¶¶ 251-260.)

232.   In the midst of all this, on September 19, 2008, LBI was placed in liquidation, which constituted a defined event of default under the September 18 Repurchase Agreement.  (M.4 (Master Repurchase Agreement) ¶¶ 2(a), 11; M.38 (Notice of Termination).)  This could not have surprised Barclays.  The Asset Purchase Agreement itself required that LBI file for bankruptcy as a condition precedent to the obligations of Barclays and Lehman to close the Sale Transaction.  (M.1 ¶ 10.3(d).)  As a result of this filing by LBI, Barclays immediately issued a Notice of Termination under the September 18 Repurchase Agreement.  (M.38.)

233.   Barclays now claims that the issuance of this Notice of Termination was inadvertent or a mistake.  (8/31/10 [Lewkow] 64:23-65:8; Lewkow Dep. Tr. 67:19-69:14.)  Regardless, this issue was addressed by the parties when they continued their negotiations over the weekend of September 20-22.   (*See infra* ¶¶ 330-334.)  And as a result of those negotiations, the original plan to use a default under the September 18

---

[86] Barclays did not call Tonucci as a witness; this testimony is unrefuted.

[87] Weil Gotshal was not privy to any discussions about defaulting on that agreement as a means of delivering a block discount to Barclays.  (4/28/10 [Miller] 53:1-6.)

Repurchase Agreement to provide the discount to Barclays was replaced with another means for doing so.  (*See infra* ¶¶ 330-334.)

> ### D.    Barclays Marked Down The Repo Securities To Liquidation Value And Then Complained It Had Not Received Adequate Collateral

234.    After Barclays received the repo securities, traders at Barclays purportedly began questioning their value.  (*See, e.g*., 8/25/10 [King] 57:23-58:17, 64:11-65:25; 9/2/10 [Romain] 111:13-22, 116:16-117:7.)

235.    Those traders, who would eventually be responsible for managing these securities within Barclays' portfolio, had every personal incentive to try to understate the value of the securities.  To the extent they were successful in understating the value of the securities within their portfolios at the outset, the Barclays traders would ensure future trading profits as they either sold off the positions or continued to hold them down the road at a greater price than was ascribed to them at acquisition.  (8/25/10 [King] 102:15-104:6.)  It is with that backdrop that the debate involving the value of Fed Repo collateral transferred to Barclays should be considered.  (*See also* 4/29/10 [Clackson] 261:1-263:13 (to the extent the collateral was insufficient that would also affect the amount of goodwill Barclays could recognize in the transaction).)

236.    Lehman's marks for the Fed Repo collateral showed an aggregate value of $50.6 billion.  (5/3/10 [Seery] 135:24-136:11; M.119A [Leventhal Decl.] ¶ 9).)  James Seery, who testified that Lehman had marked this collateral at $50.6 billion on its books, was familiar with, and had confidence in, the process Lehman used to mark its securities in September 2008.  (5/3/10 [Seery] 136:12-17.)[88]  Seery testified that he was

---

[88]  Despite testifying, without qualification, at his deposition that he had confidence in the process that Lehman was using to mark its liquid securities in September 2008, Seery attempted to qualify this at

"comfortable with" the marks.  (5/3/10 [Seery] 136:18-22, 137:14-22.)  It was Lehman's

position that its marks of $50.6 billion for the Fed Repo collateral were accurate.  (5/3/10

[Seery] 138:16-23.)  Therefore, the "haircut," *i.e.*, the difference between that marked

book value and the amount LBI had been advanced under the Fed Repo, conveniently,

was approximately $5 billion.  (5/3/10 [Seery] 138:24-139:6.)

237.    Despite Lehman's position that its marks for the Fed Repo collateral were

accurate, Seery ultimately accommodated Barclays "challenge to Lehman's marks."

(5/3/10 [Seery] 139:7-140:10.)  Barclays raised these concerns with Alex Kirk, Lehman's

global head of Principal Business,  on Friday morning, September 19, and Kirk called

Seery "to discuss issues with respect to the repo."  (5/4/10 [Seery] 10:22-11:12.)  Seery

later met with Barclays' Michael Keegan, who expressed Barclays' purported "concerns"

about various securities in the September 18 Repurchase Agreement.  (5/4/10 [Seery]

10:22-13:13.)  Keegan said that Barclays thought that Lehman's marks for those

securities were too high.  (5/4/10 [Seery] 16:3-14.)[89]

238.    In the meantime, to arm Keegan for these discussions, a Barclays team in

London, consisting of Clackson, Stephen King, Jasen Yang and others, had created a so-

called "Haircut Summary," in which Barclays claimed that a $6.04 billion value

reduction should be applied to the securities in the Fed Repo, to which (consistent with

the FRBNY valuation) Lehman had assigned a market value of $50.64.  (M.45; M.45N;

*see also* M.159 (on the morning of September 19, Lowitt writes Donini, Felder, and

---

(continued…)

trial by saying there was difficulty not only in valuing illiquid assets, but also liquid assets.  Seery was
impeached on this topic with his prior contrary deposition testimony.  (5/3/10 [Seery] 136:18-138:15.)

[89]  Barclays did not call either Kirk or Keegan to testify at trial.

others, cc-ing King, that "Barclays teams are on their way to meet with us on our

positions and marks; obviously critical").)  Barclays Haircut Summary was created by

Yang at 4:13 a.m. on September 19, 2008 (M.45M; 4/30/10 [Clackson] 19:23-20:12).

Ricci testified that he received the "Haircut Summary" from Clackson, who received it

from Yang on the morning of September 19.  It was then sent on to Keegan for use in his

discussions with Lehman about what assets Barclays demanded, purportedly to make up

for an inadequacy in the value of the repo collateral.  (5/7/10 [Ricci] 205:17-209:2; *see*

4/29/10 [Clackson] 265:6-270:12 (received this summary from Yang after learning of

concerns with the amount of collateral that had come to Barclays from Lehman, and this

prompted Barclays to seek more assets for the deal).[90]  King conceded at trial that his

team at Barclays had prepared this Haircut Summary.  (8/25/10 [King] 51:17-53:2

(describing the Haircut Summary as "some estimates that [he] worked on with Jasen

[Yang] of what sort of reduction that we would have expected to crystallize or lose if

[Barclays] were to undertake…[a] controlled risk management process").)[91]

239.    Based on this Haircut Summary, Ricci, Keegan, and "at least briefly"

Diamond, contacted Lehman to discuss Barclays' professed concern over the value of the

repo collateral.  (5/3/10 [Seery] 141:2-5.)  Seery,  Kirk, Shapiro and McDade from

Lehman all became involved, to some degree, in these discussions.  (5/3/10 [Seery]

140:17-141:1.)  And although Seery claimed he "[didn't] know exactly" how he came to

have a copy of the Haircut Summary (5/3/10 [Seery] 197:17-20), the evidence shows it

---

[90]  Barclays did not call Yang to testify, so the record on this point remains unrebutted.

[91]  The fact that Barclays prepared this analysis also is confirmed by the document itself, which refers to pre-write down values as "Lehman MV," a term Lehman would not have used to describe its own market value.  If someone from Lehman had created the document, they would simply have written "MV" or "market value" when referencing the market value Lehman itself ascribed to the securities.

was given to him by Keegan that morning. [92]  The Barclays Haircut Summary suggests a value reduction of $6.04 billion to the securities marked by Lehman at $50.64 billion, or $44.64 billion.  (M.45.)  Seery perceived that "it was [Keegan's] responsibility to make sure that Barclays didn't lose money on that repo, and he was nervous about it."  (5/4/10 [Seery] 16:3-14.)[93]

240.    Seery, another Lehman executive on his way to a job at Barclays, then made the necessary arrangements to cave in to Barclays eleventh-hour demand for more value based on its Haircut Summary.  After meeting with Barclays on Friday morning, September 19, Seery assembled a group of ten to twenty Lehman traders in a third floor conference room at Lehman.  (5/3/10 [Seery] 141:6-8, 142:10-25.)[94]  At his deposition, Seery had testified the meeting was called "[i]n response to Barclays' queries with respect to or challenges with respect to the marks and the value."  (5/3/10 [Seery] 148:12-149:10) (referring to Seery II Dep. Tr. 257:12-258:25).)  Also at his deposition, Seery had testified that he, Kirk and Ridings "went directly to traders in the High Grade and the High Yield universe as well as the Treasury and Interest Rate Groups to figure out what

---

[92]  Seery retained in his files a copy of the Haircut Summary on which he wrote notes.  (M.147, discussed herein).  Seery was asked if, when he met with Barclays' lawyers, they told him the document "was actually created at Barclays early in the morning of the 19?"  He answered, "I heard them mention it. I have disagreement with that.  It just doesn't seem consistent. No one from Barclays gave it to me.  I don't know how it would have gotten in my notes if that was the case."  (5/3/10 [Seery] 196:21-197:9.)  Seery's answer is a *non sequitur*.  If Barclays sent it to Lehman, as Ricci testified, then Seery would have written his handwritten notes on a copy of it.  The fact that Seery wrote notes on the document does nothing to refute the evidence that the document, and its calculation of a $6.04 reduction on the Repo collateral, originated at Barclays.

[93]  McDade was not in the room when Seery and Keegan met, and Seery did not remember anyone from Weil being in the room.  (5/4/10 [Seery] 11:13-20, 12:3-7.)  Seery says Ridings was "in and out of those meetings."  (5/4/10 [Seery] 12:3-7.)

[94]  The traders were selected by a Lehman employee named Peter Hornick who "[l]iterally ran around the floor and grabbed guys off their desk and said, come with me."  (5/3/10 [Seery] 146:5-14.)  It "wasn't a formal meeting," but rather "it was guys standing up and saying this is what we need and we need it fast."  (5/3/10 [Seery] 145:18-146:4.)

the appropriate liquidation bid would be with respect to this collateral."  (5/3/10 [Seery]

148:12-149:10) (referring to Seery II Dep. Tr. 257:12-258:25).)

241.    Seery gave the assembled traders the following instruction:

> And it was not -- it had to be done very fast, and I mean
> like a half an hour or less, and it was, in the market today,
> **if you had to liquidate this collateral quickly**, and I can't
> tell you it's an hour, two hours, five hours or -- **but very
> quickly, within a couple days, what would you expect to
> get,** and that was, you know, subjective, but borne of
> experienced -- borne from experienced traders and their
> view as to the volatility in the market, the quality of the
> assets' liquidity in the market and the lack of it, and **what
> would happen if 50 billion in securities hit the market in
> rapid succession**.

(5/3/10 [Seery] 148:12-149:10 (emphasis added) (referring to Seery II Dep. Tr. 257:12-

258:25), 147:2-12.)

242.    Seery told the traders to discount Lehman's market values by using

liquidation prices.  He gave these instructions to the traders:

> Got the senior traders all in a room and said, here's what
> we need, here's the category of assets that you're
> responsible for, we're going to come back and circulate,
> and come back to each of you, and we need a view as to
> where, **what kind of discount you would be forced to take
> if you were to liquidate these assets in a relatively short
> period of time**.

(5/3/10 [Seery] 151:25-152:14 (emphasis added) (impeached with Seery II Dep. Tr.

259:5-15), 154:11-155:4 (he told traders to assume the sale of the "full size" of the

portfolio)(impeached with Seery II Dep. Tr. 263:6-18).)  Seery confirmed at trial that this

was consistent with the instructions he gave the traders.  (5/3/10 [Seery] 152:10-14.)

Seery knew at the time there was no legitimate reason to apply liquidation values.  He

admitted he knew that Barclays would not be going out into the market and selling all the

securities all at once or very quickly.  (5/3/10 [Seery] 161:17-162:1, 160:12-16, 161:1-16 ("They wouldn't do that.")(impeached with Seery II Dep. Tr. 266:10-19).)[95]

243.    Although Seery testified at trial that he would "stand by this testimony," and that the testimony was "consistent with the instruction [he] gave the traders," he nonetheless attempted to chisel away at his prior deposition admissions.  (5/3/10 [Seery] 149:4-10, 152:10-14.)  For example, at the trial, Seery continually quibbled with the words "liquidation bid" that he had used several times in his deposition.  (*See, e.g.*, 5/3/10 [Seery] 149:4-20, 152:15-25.)[96]  For example, Seery tried claiming that "liquidating" just meant selling, that "his term liquidation bid is selling your assets," that "the liquidation bid he was receiving was coextensive with the market value of the assets," and that the market value and liquidation value were "probably pretty darn close."  (5/3/10 [Seery] 152:15-154:6.)

244.    However, Seery ultimately conceded that he gave truthful testimony when he said at his deposition that he had instructed the traders to come back with a liquidation bid, the "kind of discount you would be forced to take if you were to liquidate these

---

[95]    McDade, who later testified at the Sale Hearing, said he was unaware of this project. He had no recollection of any project where anyone suggested that fire sale liquidation prices be calculated, and he had no discussions with anyone about whether his Sale Hearing testimony should address fire sale prices for the securities being transferred to Barclays. (4/26/10 [McDade] 226:20-227:5, 227:12-228:13.) McDade knew that Lehman's book values did not reflect fire sale prices, and he understood that Barclays could not sell off this large pool of securities in bulk, or all at once, nor did Barclays ever communicate to Lehman that it was planning to do so. (4/26/10 [McDade] 158:3-17.)

[96]    Though professing to be neutral, Seery submitted an affidavit on Barclays' behalf in its Rule 60 opposition papers and, later, met several times with Barclays counsel to prepare his testimony at trial. Indeed, Seery admitted to discussing this very issue with counsel for Barclays. Furthermore, Seery even changed certain substantive deposition testimony after speaking with counsel for Barclays, preparing an "errata sheet" with them shortly before he testified at trial. Seery claimed the deposition changes were attributable to a court reporter error when she wrote the word "marked" when he meant to say "market" no fewer than six times. But he admitted he did not review the tape of his testimony to confirm what he actually said at his deposition, and made the changes based only on the "context" of the testimony. He claimed not to remember whether it was he or Barclays counsel who first noticed this purported "error" when they met. (5/3/10 [Seery] 123:8-24, 125:3-13, 126:12-18.)

assets in a relatively short period of time," and "what would happen if 50 billion in securities hit the market in rapid succession." (5/3/10 [Seery] 150:9-152:14.) Seery also admitted that he may have used the words "liquidation bid" in his instructions to the traders, and, whether he did or not, the description of his instructions that he testified to in his deposition is what he told the traders. (5/3/10 [Seery] 149:11-20.)

245.    Seery also tried to chisel away at his testimony by claiming that the "primary purpose" for meeting with the traders was to gather information for Ridings' testimony at the Sale Hearing. (5/3/10 [Seery] 141:24-142:9, *see also* 143:1-143:21, 144:16-145:9.) Seery said "[Ridings] was going to testify that the sale was fair and reasonable. And in order to do that, he had to consider what the alternative sales of Lehman Brothers would look like." (5/3/10 [Seery] 143:17-21; *see also* 8/23/10 [Shapiro] 114:25-115:16 (agreeing that the purpose of Ridings' testimony was to present liquidation prices as a "lower worse alternative to the deal that was on the table for approval").) Ridings was going to testify that the Sale Transaction was better for Lehman than just getting liquidation values. (5/3/10 [Seery] 155:21-156:1, 156:10-14, 158:7-11; 8/23/10 [Shapiro] 115:17-116:3 (one of the goals of the 363 sale was to do better than liquidation values).)

246.    But this actually undercut Seery's claim that by "liquidation bid" he just meant selling assets at market value. If the meeting was to gather information for Ridings' testimony that the asset values achieved through the sale were *better* than a liquidation and to "contrast the deal that was on the table to liquidation values," then the traders had to have been seeking to establish that "contrast" – *i.e.*, the liquidation price. (5/3/10 [Seery] 155:17-156:14.) Regardless of the specific words used, Seery's

instructions were clearly to get liquidation prices.  And the evidence made clear that regardless of their original "primary purpose," liquidation values were in fact obtained and used to surrender to Barclays' demand that more assets be added to the deal.

247.    After being told to come back with a liquidation bid, the "kind of discount you would be forced to take if you were to liquidate these assets in a relatively short period of time" and "what would happen if 50 billion in securities hit the market in rapid succession," the traders reported back "[v]ery swiftly," which Seery described as meaning "some five minutes, some two minutes, some an hour."  (5/3/10 [Seery] 164:8-15.)  The traders opined on various categories of assets, but not specific assets which would have involved reviewing a list of assets a couple hundred pages long.  (5/3/10 [Seery] 178:13-21.)  Seery got the result of the traders' analysis from Peter Hornick, who was gathering the information, and Seery agreed that the traders "came back with exactly what I asked for."  (5/3/10 [Seery] 164:23-165:13, 166:7-11.)

248.    The traders came back with a liquidation value of $45.5 billion for the repo collateral.  This is reflected on a copy of the Barclays Haircut Summary containing Seery's handwritten notes, in which Seery crossed out "$50.64" billion and inserted "$45.5" billion.  (M.147 at 000070; 5/3/10 [Seery] 167:8-170:1) (conceding the numbers 45.5 and 1.9 and the cross-out of the 50.6 are his writing), 176:5-177:11 (confirming that the "Lehman MV" column reflected the marks on Lehman's books at the time).)[97]  At his deposition Seery testified that the information on the document, in fact, related to the

---

[97]    The term "Lehman MV" on M.147 (and M.45) stands for Lehman market value (5/3/10 [Seery] 176:5-177:11), and that column originally totaled at $50.64 billion.  (5/3/10 [Seery] 183:4-6.)

answer he received from the Lehman traders.[98]  At trial, Seery confirmed that his

handwritten notations were "consistent" or "roughly consistent" with the answer he

received from the Lehman traders.  (5/3/10 [Seery] 187:6-19 (impeached with Seery II

Dep. Tr. 282:15-21 ("here's the numbers they're reporting back if we had to do a fast

liquidation").)  He said he "liked these figures, I'll stand by them."  (5/3/10 [Seery]

172:13-175:1, 177:24-178:6.)[99]

249.    In the end, Seery agreed that the $45.5 billion figure resulting from this

analysis was, in fact, not used to prepare Ridings to contrast the deal price with

liquidation values, *i.e.,* to contrast to the sale price as a worst alternative.  It was used for

exactly the opposite reason: to reach a "negotiated settlement amount" -- at liquidation

values -- agreed to by Lehman and Barclays executives on Friday.  (5/4/10 [Seery] 94:21-

95:4.)  This figure was, conveniently, approximately $5 billion dollars below the figure

that would have resulted from any line-by-line valuation of Lehman's marks.  (*See* 5/4/10

[Seery] 119:20-120:11.)  As explained in greater detail below, this $45.5 discounted

valuation was the major component in the number that was later relayed as "market

value" to the Court by Ms. Fife at the Sale Hearing and to the Creditors Committee over

the weekend of September 20-22.[100]  Seery claimed he was not involved in deciding

---

[98]   In particular, Seery testified that he agreed with his deposition testimony that the number on M.147 was the one Lehman traders came back to him with after hearing his instruction that he wanted the view as to a liquidation bid as to the assets if you sold them full size and what discount would one give the buyer.  (5/3/10 [Seery] 180:7-181:9.)

[99]   The Haircut Summary containing Seery's notes on the last page (M.147 at 000070) was a document that Seery discussed with Barclays' counsel just the day before in preparing for his testimony at trial.  (5/3/10 [Seery] 175:2-11.)

[100]   This $45.5 billion is also -- by what cannot have been a coincidence -- the same figure Barclays ascribed to the Repo collateral on its acquisition balance sheet, five months later.  Incredibly, however, Barclays had Romain testify that this was "sheer coincidence."  (9/2/10 [Romain] 129:16-17 ("Q. Sheer coincidence?  A. Absolutely."); *see* Barclays' Reply Motion to Exclude Experts at 44-45 n.40

whether to share this figure with the Court.  (*See* 5/4/10 [Seery] 121:24-122:7.)  Klein,

who met with the Creditors Committee over the weekend, could not refute that the  $45.5

billion figure that emerged from Seery's liquidation analysis was the basis for figures he

provided to the Creditors Committee.  (8/27/10 [Klein] 173:12-176:14.)

250.    No one could dispute, however, that no one ever told the Court that the

numbers presented to the Court were based on liquidation prices or a "negotiated

settlement amount." Incredibly, Seery, trained and experienced as a bankruptcy lawyer,

said it never occurred to him to bring to the Court's attention that "the $45.5 billion dollar

number was a negotiated settlement value."  (5/4/10 [Seery] 121:8-13, 121:24-122:7.)[101]

---

(continued…)

(referring to this as a "numerical coincidence").)  But Romain had no first hand knowledge on which to
base that statement.  Not only had he never met Seery, he had no knowledge of the provenance of the
numbers Seery used. (9/2/10 [Romain] 129:18-130:13.)  And Romain admitted that the valuation figures
he used in his acquisition balance sheet came from other sources, PCG and traders in PMTG (including
King and Yang, who had prepared Barclays' "Haircut Summary").  (9/2/10 [Romain] 31:18-23, 106:23-
107:8, 128:4-23.)  Romain also said he had no idea that the "Haircut Summary" used in his analysis, had
itself been prepared by Barclays.  (9/2/10 [Romain] 130:15-131:19 (agreeing that the figures on M.147
match those on M.45 (Yang's haircut summary)).)  That this could not possibly be a "sheer coincidence" is
also shown by Varley's statements made during the Analysts Call (in connection with the assets Barclays
was acquiring in the transaction) that "there is no coincidence in this transaction, if you see what I mean. …
The transaction is structured as we wanted it to be.  It is of course subject to Court approval and we are
respectful of the Court.  But we have been very deliberate in our choices here." (M.16 at 6-7.)

[101] Despite Seery's clear admissions that liquidation prices were used, Barclays during closing
arguments appeared to be attempting to suggest that the $45.5 was a market value by misrepresenting an e-
mail communication between Kirk and Seery at 5:55 p.m. while the Sale Hearing was taking place.
Barclays put up a slide (36) and stated that Kirk emailed Seery at 5:55 p.m. on September 19 saying, "I
believe the value is 45.5."  (10/21/10 [Closing] 175:18-176:5.)  Barclays then referenced Kirk's deposition
testimony concerning volatility of the markets, thereby suggesting that $45.5 billion was a market value.
(*See id.*)  Barclays misrepresented both the e-mail (BCI 679) and Kirk's deposition testimony.  The $45.5
billion is the market value of what was *posted to the DTC which did not include the $7 billion cash*.  Kirk
writes, "I believe the value is 45.5" in response to Seery's question concerning what was the value of
collateral that Barclays *posted to the DTC*.  (BCI 679; Kirk Dep. Tr. 142:14-143:12.)  Kirk also testified
that he probably mis-typed and meant to write "market" not "marked."  143:13-25.)

### E.    The Friday "Scramble" For Additional Assets

#### 1.    Barclays threatened not to close the Sale Ttransaction if Lehman did not come forward with additional assets

251.    While Seery was having the traders calculate this undisclosed liquidation pricing, Barclays demanded additional assets be added to the Sale Transaction, under an eleventh hour threat not to close, based on its professed concerns over the value of the collateral it did receive from Lehman. (5/7/10 [Ricci] 210:1-6, 11-14; 6/21/10 [Diamond] 192:15-193:2; 4/30/10 [Hughes] 186:17-187:6, 188:23-189:11; 4/29/10 [Clackson] 268:23-271:12 (recalled conference call to that effect with Lowitt and Tonucci from the Lehman side); 8/27/10 [Klein] 131:23-134:9 (confronting him with his deposition testimony: "I made it known to the parties that were involved that there needed to be more assets, because if there weren't more assets, the transaction couldn't take place").)

252.    On the morning of September 19, Ricci, Klein and Keegan met with McDade, Lowitt and Kirk about Barclays' demand for more assets.  (4/26/10 [McDade] 189:8-18; 5/7/10 [Ricci] 208:20-209:2, 209:12-17.)  Ricci had a conversation with McDade [and Lowitt] concerning whether Barclays was receiving enough value in the deal, and a "project" followed to gather more value so that Barclays could close. (4/29/10 [Lowitt] 40:11-24, 45:21-46:3).)[102]  Ricci conceded that Barclays' demand for more assets was premised on the Haircut Summary prepared by Yang (M.45).  (*See* 5/7/10 [Ricci] 217:4-16.)

---

[102] Although McDade clearly recollected that the Friday morning meeting concerning finding additional assets included Ricci, Lowitt in his testimony continually tried to exclude Ricci, now his boss at Barclays.  (*See e.g.*, 4/29/10 [Lowitt] 40:11-24, 45:21-46:3 )  Ricci was not so anxious to be taken out of the room.  He remembered the conversation with McDade and testified, "Mr. Lowitt may have been in the room."  (5/7/10 [Ricci] 209:21-25.)

253.    Keegan told McDade that Barclays had done a valuation of the collateral, and conveyed that Barclays was "uncomfortable" with the value of the assets it had received under the September 18 Repurchase Agreement.  (4/26/10 [McDade] 189:8-190:2; BCI 638 ¶ 480 ("McDade testified that Barclays demanded additional assets on September 19, 2008 because it was 'uncomfortable with the new aspect of what they now had . . . agreed upon'").)  Barclays did not even bother to share its valuation methods with McDade or even quantify the amount it wanted; it simply said there was an unquantified shortfall and demanded it be filled to Barclays' satisfaction.  (4/26/10 [McDade] 191:17-24.)  Keegan spoke only "generally" about how he was "finding it difficult to find information" concerning values.  (4/26/10 [McDade] 190:3-16, 191:20-24, 196:18-20.)

254.    However, although Barclays put no dollar limit or target on its demand, McDade testified that Barclays "asked very specifically in terms of a need for finding more assets in order to close the transaction."  (4/26/10 [McDade] 189:19-190:2; *see also* 199:3-8; 4/29/10 [Lowitt] 24:4-11 (he understood the search for additional value was "important" to the transaction).)  McDade also specifically recalled that both Ricci and Klein said Barclays "would not close" unless more value was added to the deal.  (4/26/10 [McDade] 191:25-193:3.)

255.    Ricci claimed he did not recall his exact words to McDade. (5/7/10 [Ricci] 210:15-211:3.)  However, Ricci conceded that Barclays was "looking to identify additional assets" and that Keegan used the Haircut Summary (M.45) to engage in a discussion with his counterparts at Lehman concerning what needed to be added to make

up for a purported inadequacy in the value of the repo collateral.  (5/7/10 [Ricci] 207:19-24; 212:8-10 (more assets were needed to be added to the deal).)

256.    Although Klein, one of the Barclays negotiators sent in to demand more, tried to portray it as less of a threat than Lehman understood at the time, his deposition testimony on this issue was clear.  (8/27/10 [Klein] 132:9-134:9 (impeaching with Klein Dep. Tr. 94:3-95:9 ("I made it known to the parties that were involved that there needed to be more assets, because if there weren't more assets, the transaction couldn't take place.")).)  In any event, Barclays has admitted to threatening not to close in its motion papers.  (*See* Barclays Opp. ¶ 141 (conceding the threat not to close).)[103]

257.    No one from Barclays gave McDade (or anyone from Lehman) a specific number for this required additional value.  Barclays just said it was a "[l]arge enough gap not to close the transaction."  (4/26/10 [McDade] 190:21-191:4; *see* 191:25-192:4, 193:4-11; 8/27/10 [Klein] 134:24-135:22 (agreeing that "no specific number ever was put forward"); 5/7/10 [Ricci] 214:8-13 ("I don't recall giving a specific number"), 214:17-23.)  Ricci, however, knew that internally, Barclays' "number" was three to four billion.  (5/7/10 [Ricci] 212:3-10; *see also* 6/21/10 [Diamond] 195:10-13 (Diamond agreed that it was possible that $3 billion was in the range of the target); 4/29/10 [Lowitt] 75:17-76:17 ("My recollection is we were looking for between three and four billion dollars."), 126:11-127:1; M.600 "I heard from Paolo [Tonucci] that you are expecting $3.1 billion").)

---

[103]    This is yet another fact about which the lawyers were not told.  Miller testified he was never told that Barclays had said it would not close if more assets or value was not identified and added to the deal.  (4/28/10 [Miller] 69:1-5.)

258.    These were assets over and above those already in the repo collateral.

(Stip. ¶ 138; 5/7/10 [Ricci] 210:1-6, 213:1-12, 214:14-16; 4/29/10 [Lowitt] 126:6-10.)

Ricci "wanted to make sure that [Barclays] had enough cushion."  (5/7/10 [Ricci] 215:8-

15.)  Accordingly, Ricci sent Klein, Barclays' advisor, to meet with Lehman armed with

the instruction "to go in and get more assets."  (5/7/10 [Ricci] 210:7-10; *see also* Klein

Dep. Tr. 94:3-18 (Klein was instructed  "to go in and express that we needed more

assets").)

259.    Other than the meeting early Friday morning, McDade did not have any

further conversations with Barclays about its demand for more value.  (4/26/10 [McDade]

194:16-21.)  McDade charged Kirk and Lowitt with finding additional assets to satisfy

Barclays, while he went off to Weil Gotshal's offices that afternoon to prepare for his

testimony at the Sale Hearing.  (4/26/10 [McDade] 194:16-25, 199:9-17.)

260.    None of this changed McDade's view about the balanced nature of the

deal he had made.  It was McDade's understanding that if there was a gap between the

value Barclays was expecting to receive and the liabilities it was going to assume, the gap

needed to be filled only as necessary to return the deal to a rough equivalent exchange of

assets and liabilities not to provide a gain for Barclays.  (4/26/10 [McDade] 193:16-

194:2, 194:12-15.)

### 2.    The scramble for assets to satisfy Barclays' demand

261.    After Barclays demanded more, "[Lehman] certainly scrambled around to

ensure that we closed."  (5/7/10 [Ricci] 212:6-15; BCI 638 ¶ 485 ("Lowitt worked on

finding additional assets that potentially could be transferred to Barclays on the Friday,

September 19, 2008, and through the weekend of September 20-21, 2008").)  According

to Diamond, "there was a scramble, a chaotic scramble, to find replacements" for

collateral purportedly not delivered to Barclays.  (6/21/10 [Diamond] 192:20-193:2

(emphasis added).) According to Ricci, Kirk "was very worried that we weren't go to

close the deal," and "they felt a lot of pressure from their people."  (5/7/10 [Ricci]

215:22-216:6.)

262.    Lowitt and his team (including Kelly and Tonucci) searched in the so-

called "clearance boxes" maintained for Lehman's benefit by JPM and other entities,

including the Depository Trust Corporation ("DTC").  (*See* 4/29/10 [Lowitt] 124:3-

126:10; BCI 638 ¶ 487 (Kirk worked with Lowitt, Tonucci and Kelly).)  Lehman

executives performed detailed "depot analysis" and database reviews to try to locate

additional assets that could be sent to Barclays.  (M.68 (Lehman's 9/21/08 "depot

analysis"); Hraska I Dep.Tr. 48:9-12, 107:18-108:5, 212:5-215:23.)  Lowitt and his

colleagues, including Kelly, also located assets in a so-called "15c3 lock up," a regulatory

requirement that brokerages keep on hand assets sufficient to cover a specified

percentage of their customer portfolio.  (4/29/10 [Lowitt] 125:17-126:5, 128:10-130:5;

4/28/10 [Kelly] 244:17-21 (Kelly involved in 15c3 reserve).)

263.    Lowitt kept McDade abreast of his progress in the hunt for extra value.

(*See* M.48 ("CLS money all snarfed up by Citi.  The 15c3 lock up looks ok at $1.3 bn.

Good faith not.  So we are short $1.7 bn.  The TBA and FX settlement did not work.  We

did find $5 bn. of exchange listed options which we are investigating"); Tonucci Dep. Tr.

54:24-56:20.)  And Kelly kept Barclays "updated on what the [15c3] calculation was

showing in terms of what the reserve requirement was and what the cash lock-up was."

(4/28/10 [Kelly] 247:25-248:21; M.236.)

264.    The assets that were added to the deal as a result of the scramble included (1) unencumbered collateral located in LBI's "clearance boxes" that was marked by Lehman at approximately $1.9 billion; and (2) 15c3 assets valued (ultimately) at $769 million.  (5/7/10 [Ricci] 213:1-12; 4/26/10 [McDade] 195:1-15; 4/29/10 [Lowitt] 42:13-20 (his team identified around $3 billion of value); M.3 ¶8; M.62; M.65; M.37; M.97; M.88.)[104]

265.    The scramble concluded just before the start of the Sale Hearing that same day.  (5/7/10 [Ricci] 216:12-19.)  At that time, Kirk told Ricci that Lehman employees had located all the assets they were ever going to find.  (5/7/10 [Ricci] 215:19-216:6.)  Ricci replied, "We won't be pigs, fine, you know, let's get on with it."  (5/7/10 [Ricci] 215:19-216:6.)  Kirk relayed this conversation to McDade twenty minutes before the Sale Hearing was set to begin, e-mailing McDade that Ricci "just told me he won't blow up this trade by being a pig."  (M.51)

266.    Although McDade was not present for this scramble for additional assets, just as he arrived at the courthouse he received an e-mail from Kirk about the 15c3 and unencumbered box assets.  (4/26/10 [McDade] 202:1-17; *see also* 195:1-15, 199:24-200:9; M.51.)  For McDade (and Miller) these 15c3 assets were "questionable, given it needed regulatory authority to be able to be transferred over."  (4/26/10 [McDade] 197:25-195:8.)  In any event, upon receiving Kirk's e-mail, McDade understood "the asset addition project" to be "finished."  (4/26/10 [McDade] 202:24-203:6.)  McDade, who testified at the Sale Hearing later that afternoon, never saw a calculation of the total effect of adding the 15c3 assets and the unencumbered box assets to the deal.  (4/26/10

---

[104] Some listings of the unencumbered "clearance box" assets prepared over the weekend of September 19-21, 2008 showed Lehman's marks for these assets as high as $2.3 billion.  (Stip. ¶ 142.)

[McDade] 195:16-19.)  And he never once mentioned the asset scramble in his Sale Hearing proffer or testimony later that day.

267.    Lowitt was particularly motivated to find additional assets to send to Barclays.  The day before the asset scramble, he had signed an employment contract with Barclays, which was contingent on the Sale Transaction closing, so he stood to earn millions of dollars in compensation, including a retention bonus from Barclays, but only if Barclays got what it wanted.  (4/29/10 [Lowitt] 22:7-18, 33:17-34:11, 34:24-35:4; M.56; M.108.)  At the time, Lowitt never mentioned to McDade or anyone else, however, that he was already under contract with Barclays.  (4/29/10 [Lowitt] 54:9-55:9.)  But he did write to Tonucci and Berkenfeld on September 20 to thank them for their help in "getting us over the goal line."  (M.56.)  Lowitt noted in his e-mail that "[w]hile it would be great to just relax and enjoy the victory, think we need to launch an effort as soon as possible to ensure we get the 15c3 lockup money and also transfer the unencumbered box."  (M.56.)  Consequently, he urged Tonucci (who, like Lowitt, would move to Barclays but only if the deal closed) "[y]ou need to be close to it," to ensure the assets made their way to their future employer, Barclays.  Lowitt's e-mail to Tonucci demonstrated the degree to which they elevated their personal interests over Lehman's interests.  He wrote: "[I]f we don't succeed *you and I are toast* despite our heroics." (M.56 (emphasis added); *see also* M.65 (Lowitt to his team: "Good luck getting additional collateral.  But good accurate presentation of the collateral is also critical as we will append to the agreement.").)

268.    As it turned out, Lowitt and Tonucci were not "toast."  The Friday Asset Scramble had successfully added billions more in value for Barclays.  As Klein crowed in

an e-mail to Diamond sent in the early morning of September 20, shortly after the Sale

Hearing ended:

> Great day.
>
> **We clawed back 3B more of value in the transaction** and
> cut the building prices by 160 mm.

(M.52 (emphasis added).)[105]

F.  **Those Making Disclosures To The Court Knew Nothing About The Real Role Of The September 18 Repurchase Agreement, And They Were Unaware The Collateral Had Been Marked To Liquidation Value**

269.    As with the originally agreed $5 billion discount, the lawyers charged with

describing the Sale Transaction to the Court (including the changes made to the original

deal) were kept in the dark.  They had no knowledge about the role of the September 18

Repurchase Agreement, the crucial role it had come to play in Sale Transaction, or the

liquidation pricing that had been used to value the collateral being transferred to Barclays

thereunder or the Friday asset scramble that had added billions more to fill up a phony

shortfall.  In short, the lawyers presenting evidence at the Sale Hearing were completely

disabled from making accurate and complete disclosures to the Court, about any of this.

270.    Miller was not even on the Lehman premises for most, if not all, of

September 18 and 19.  On Thursday, September 18, when Barclays agreed to "step into

---

[105] Barclays tried to have Klein and others testify, consistent with its litigation strategy, that these were not really additional assets added to the deal, but rather "newly identified" assets that had been in the deal all along that Barclays did not know about.  (8/27/10 [Klein] 55:8-56:15, 137:12-139:15; 4/30/10 [Hughes] 188:23-189:23, 196:22-197:13.)  No Barclays witness could explain, however, why if this were true the parties had to amend, through the Clarification Letter, the definition of "Purchased Assets" in the Asset Purchase Agreement to reflect the inclusion of these assets if they had been in the deal all along. (*See e.g.*, 4/30/10 [Hughes] 193:14-197:13; 8/31/10 [Lewkow] 162:25-164:12; *see also* M.65 (Lowitt: "Good luck getting additional collateral.  But good accurate presentation of the collateral is also critical as we will append to the agreement.").)  On cross examination, Klein professed not to remember sending his "clawed back" e-mail.  (8/27/10 [Klein] 144:16-145:19.)

the shoes" of the FRBNY in connection with the Fed Repo and negotiations of the

Lehman Three transaction continued, and into the early morning hours and the day of

Friday, September 19, when Barclays negotiated the value of the assets in the September

18 Repurchase Agreement and demanded additional value, Miller was part of a wholly

different "work stream" as he was preparing for the Sale Hearing back at Weil Gotshal's

offices. (4/28/10 [Miller] 19:17-23.) As Miller described it, he spent Thursday night and

Friday with McDade and Ridings at Weil Gotshal's offices where they could "have some

quiet" to prepare their proffered testimony. (4/28/10 [Miller] 19:17-20:14.)

271. Weil Gotshal also was not privy to any discussions during the week of

September 15 through 22, 2008 about defaulting on a repo as a means of delivering a

block discount to Barclays. (4/28/10 [Miller] 53:1-6.) Weil Gotshal had no role in

determining the value of the repo collateral. (4/28/10 [Miller] 61:19-62:4, 62:12-19

(Miller: "We're not in the valuation business" and "we're not valuation experts"), 27:22-

28:2 (valuations were "left to the business people"), 63:3-7 ("we were not running the

business of Lehman").) Miller had no knowledge of who valued the repo collateral

(4/28/10 [Miller] 62:16-19; 79:14-17) or even about the composition of the assets that

comprised that collateral. (4/28/10 [Miller] 63:8-18.)[106] Miller did not know that BoNY

was Barclays' collateral agent in connection with the September 18 Repurchase

Agreement, and he did not see BoNY's marks for the repo collateral. (4/28/10 [Miller]

---

[106] Miller's lack of familiarity with valuation issues is further confirmed by his being under the mistaken impression that "there were computer runs that were very extensive," and he testified, "I think they were going through it, as I recall, CUSIP number by CUSIP number." (4/28/10 [Miller] 79:18-25.) Other testimony confirmed that he was plainly mistaken in this regard. (5/4/2010 [Seery] 69:16-70:4 (Seery had no "line by line reevaluation of the book" to provide to the Creditors' Committee, because "[f]rankly, everything was rushed"), 87:5-11 (Seery would not have offered "to do a security by security breakout, completely remark this entire book by the next morning," because "[t]he deal was closing").)

80:1-6.)  And Miller was never even told that Barclays had threatened not to close the

Sale Transaction if more assets were not added to the deal.  (4/28/10 [Miller] 69:1-5.)

272.    Berkenfeld was no better informed on these issues.  Berkenfeld was not

involved in the repo financing, did "not really" have any knowledge about how the

September 18 Repurchase Agreement came to play a role in the Sale Transaction as it

ultimately was concluded, and had no involvement in or knowledge of the manner in

which repo collateral was valued.  (4/27/10 [Berkenfeld] 181:13-19.)  Cleary Gottlieb

also had no involvement in the September 18 Repurchase Agreement.  (8/31/10

[Lewkow] 76:12-23, 122:20-123:7, 124:22-125:16.)

273.    And while McDade knew a little more about these issues than his counsel,

McDade himself was under the mistaken impression that the collateral in the September

18 Repurchase Agreement was marked at fair market value, and not liquidation value.

(4/26/10 [McDade] 196:18-197:24.)  And Shapiro, the purported architect of the deal,

knew nothing about Seery's liquidation analysis.  (8/23/10 [Shapiro] 113:15-118:24.)

274.    In the end, because the lawyers making disclosures to the Court knew

virtually nothing about the September 18 Repurchase Agreement, nothing was disclosed

to the Court about any of these issues.  (*See* M.260 [9/17/08 Tr.] 71:2-4, 24:9-12 (two

passing references to a "repo" without any detail); M.261 [9/19/08 Tr.] 63:16-22 (brief

mention of $45 billion advanced to Lehman with no mention at all of the value in

collateral or existence of excess collateral or "haircut").)

**G.    The September 19 Sale Hearing, And The Court's Approval Of The Sale Transaction And Issuance Of The Sale Order**

275.    The Sale Hearing started on September 19, 2008 at 4:36 p.m. (Stip. ¶ 167) and lasted until slightly after midnight on September 20, 2008.  (4/28/10 [Miller] 21:12-13.)[107]

**1.    Weil Gotshal described recent changes to the deal**

276.    Before the hearing began, Fife told the Court that there were "some major changes in the transaction" that Weil Gotshal had been told "weren't finalized until about a half hour ago."  (4/28/10 [Miller] 58:1-16.)[108]  Fife asked the Court for time to explain to those in attendance "the changes in the deal that had occurred since the filing of the Sale Motion and the 9/17 Hearing."  (4/28/10 [Miller] 56:17-22.)  The Court granted this request and took a short recess.  An off-the-record explanation to those in attendance took about thirty minutes to an hour.  (4/28/10 [Miller] 21:3-8; 59:4-18.)[109]  All witnesses agree that nothing was said during this conference that was inconsistent with or not covered in the on-the-record hearing before the Court that followed, or inconsistent with how the transaction had been described to them.  (4/28/10 [Miller] 59:22-60:2; 5/6/10 [Burian] 121:4-17, 123:20-124:1; 6/25/10 [Despins] 19:11-20:19.)[110]

---

[107]  Miller went directly to the Courthouse from Weil Gotshal's offices where he was preparing McDade and Ridings for their testimony for the better part of the day. (4/28/10 [Miller] 20:3-23.)  Fife arrived separately approximately half an hour to forty-five minutes later.  (4/28/10 [Miller] 55:11-17.)

[108]  Miller had no specific recollection of who told Weil Gotshal about the changes.  (4/28/10 [Miller] 58:20-23.)  Miller testified that he "generally" knew what the major changes were.  (4/28/10 [Miller] 58:24-59:1.)

[109]  The Court's transcripts shows that a "break" was taken at 4:43 p.m. and the Court went back on the record at 5:41 p.m.  (M.261 [9/19/08 Tr.] at 45:19; 4/28/10 [Miller] 59:4-18.)

[110]  It appears that Barclays' outside counsel, Victor Lewkow, learned about the changes to the deal for the first time in court on September 19, prior to the start of the hearing, while standing with Klein, Ms. Fife and others near the jury box.  (8/31/10 [Lewkow] 44:5-48:18 (relaying his recollections about being told of changes to the deal).)  Klein also had only limited familiarity with the September 18

277.    When the hearing resumed, Ms. Fife described the changes to the proposed Sale Transaction, and she described assets in terms of market value, not liquidation value.  Ms. Fife stated that, while the assets being sold originally had a value of $70 billion, because "the markets dropped," the Sellers would now be selling assets valued at only "$47.4 billion."  (M.261 [9/19/08 Tr.] at 46:19-47:4.)[111]  Ms. Fife said Barclays would be assuming $45.5 billion in liabilities in connection with those assets. (M.261 [9/19/08 Tr.] 47:5-7.)  At no time did Ms. Fife say anything about these figures no longer reflecting Lehman's "book value" as that term had been used in the Asset Purchase Agreement.  (M.261 [9/19/08 Tr.]; see 8/31/10 [Lewkow] 127:12-135:17 (admitting that there were no disclosures to the Court to the effect that "book value" in the Asset Purchase Agreement and Sale Motion might mean something other than that).) Ms. Fife also told the Court that Barclays still would assume the same cure amounts and employee compensation amounts as had previously been described.  (M.261 [9/19/08 Tr.] 47:11-15.)[112]

---

(continued…)

Repurchase Agreement and the role it had come to play in the Sale Transaction.  (8/27/10 [Klein] 45:3-46:1 ("I didn't have any direct conversations certainly at that time with the Fed, and I wasn't a participant in the creation of those repo transactions, and I wasn't really aware of those until – at the end of the week."), 47:20-48:4.)

[111] Despite hearing these figures from Ms. Fife, and knowing that Barclays had just received $49.7 billion in securities and cash under the September 18 Repurchase Agreement, Ms. Leventhal (also in attendance) said nothing to correct the numbers presented by Ms. Fife.  Ms. Leventhal tried to excuse this by saying her "understanding of the terms of the deal were not comprehensive enough to say that I understood that Ms. Fife was saying 47.4 and that referred to the repo."  (9/7/10 [Leventhal] 124:8-128:22.) And Ms. Leventhal had no knowledge of any exercise within Barclays or Lehman to assign liquidation values to this collateral.  (9/7/10 [Leventhal] 128:18-129:13.)

[112] At later points during the Sale Hearing, counsel indicated that the cure amount represented a potential exposure of $1.5 billion (M.261 [9/19/08 Tr.] 100:1-4), and that "Barclays will also assume exposure for the employees that accept offers of employment, which is estimated to have a value of approximately – an exposure of approximately two billion dollars."  (M.261 [9/19/08 Tr.] 99:22-25.)  The

278.    Ms. Fife described the changes to the transaction as follows:

> Let me try to summarize the changes that were made to the transaction.  In terms of the economic changes, they result largely because of the markets, unfortunately.  And from the time that the transaction was actually entered into till now, the markets dropped and the value of the securities dropped as well.
>
> So, originally, we were selling assets that had a value of seventy – approximately seventy billion dollars.  And today, Your Honor, we're only selling assets that have a value of 47.4 billion dollars.
>
> Barclays is assuming liabilities, however, of 45.5 billion dollars in connection with those assets.  So that has not changed from the original transaction.  There was an upside sharing in the original transaction.  There was going to be a true-up twelve months later on and that has been eliminated from this transaction.
>
> Barclays is still agreeing to pay the cure amounts on any leases that it assumes or that we assume and assign to it.  Barclays is also agreeing to the same employee compensation arrangements.  And it is also agreeing to pay the 250 million dollars of goodwill to LBI.

(M.261 [9/19/08 Tr.] at 46:20-47:15.)[113]

279.    The $47.4 billion figure Ms. Fife recited had been given by Lehman to

Weil Gotshal, and on the surface appeared to correlate to the $70 billion "book value" for

---

(continued…)

Court was further told that Barclays "is also agreeing to pay the $250 million dollars of goodwill to LBI." (M.261 [9/19/08 Tr.] 47:14-15.)

[113]    The deal as presented to the Court at the Sale Hearing was supposed to be more favorable to the Sellers than a "wash," by $1.85 billion.  (*See infra* ¶¶ 484-485, 490, 493.)  Leaving to one side the real estate, which was purchased at the assessed value of $1.29 billion -- $960 million for the Lehman building, which was the mid-point value of the two independent appraisals obtained by the parties, and $330 million for two data centers in New Jersey, based on the appraised value of those centers -- the Court was told that Barclays would purchase $47.4 billion in assets, for which it would pay $250 million for goodwill and assume liabilities of $45.5 billion plus cure and compensation liabilities of $1.5 and $2 billion, respectively. (*See* M.261 [9/19/08 Tr.] 47:1-49:17, 138:23-139:22, 100:1-4, 99:22-25, 47:14-15.)  Far from conveying an immediate gain for Barclays, the deal as disclosed to the Court involved Barclays paying or assuming liabilities that exceeded $49 billion, substantially in excess of the assets it was acquiring.

the Long Positions set forth in the Asset Purchase Agreement. (*See* 8/23/10 [Shapiro] 114:11-24; 4/28/10 [Miller] 63:19-64:12 (Miller was "pretty sure" it came from McDade).)[114]

280.    That, of course, was not true. Weil Gotshal had not been given *any* description of how the $47.4 billion figure was calculated. (4/28/10 [Miller] 64:13-16; 65:5-7.) So no one told the Court the values actually came directly from Seery's liquidation analysis, the Haircut Summary prepared by Barclays, the "negotiated settlement value" and the scramble for additional assets that had taken place just before the hearing. (*See supra* ¶¶ 234-268; 5/3/10 [Seery] 193:20-194:3.) Weil Gotshal also had no knowledge of who calculated the $45.5 billion in liabilities or the derivation of that number. (4/28/10 [Miller] 65:8-20.) Weil Gotshal still had the same comp and cure numbers from Lehman earlier in the week, and did not know how those numbers were calculated, either. (4/28/10 [Miller] 65:21-66:10.)[115]

281.    The record shows that at the time the $47.4 billion figure was given to the Court, both Lehman and Barclays, as well as their respective collateral agents (BoNY and JPM) *really* valued this collateral not at $45.5 billion, or even $47.4 billion, but in fact in the range of $50-52 billion. (*See* M.47 (Barclays valuing it at $52.19 billion); M.362 (9/21/08 Ricci e-mail, referring to the "52"); 5/7/10 [Ricci] 185:12-186:7, 186:21-187:9 (BoNY valued it at $45 billion plus $7 billion in cash = $52 billion), 195:12-20 (agreeing

---

[114] As discussed herein, McDade did not know this number was based on liquidation values. (*See infra* ¶ 282; 4/26/10 [McDade] 197:13-24.)

[115] Lewkow testified that Cleary Gottlieb was in no position to correct or confirm Ms. Fife's description of the revised transaction, because his firm also had no role in designing, negotiating or valuing the repo transactions, knew nothing of Seery's liquidation analysis, and had only a limited knowledge of the values of the additional assets added to the deal. (8/31/10 [Lewkow] 136:16-146:8.)

he was putting assets in the $52 billion range); M.236 (9/20/08 Kelly e-mail, listing $44.8

billion for the inventory plus $7 billion cash); M.74 (9/21/08 Kelly's opening balance

sheet: $52.88 billion); M.72 (Lehman 9/21/08 opening balance sheet: $52.88 billion);

M.234 (9/20/08 Barclays balance sheet: $52.19 billion); M.64 (9/20/08 Yang e-mail

showing collateral (not including $7 billion cash) at $45.078 billion); M.139 (9/21/08

Barclays' "consensus" valuing collateral (not including $7 billion cash) at about "45bn");

M.78 (9/21/08 King e-mail: "Current best estimate is the portfolio inc 7bn cash is 48.5 to

49bn.").)

282.    McDade attended the Sale Hearing on September 19, 2008.  (Stip. ¶ 119;

4/26/10 [McDade] 186:14-21.)  But he was not in a position to correct the numbers,

either.  McDade was not aware of any changes to the transaction other than those

described to Court by Lori Fife.  (4/26/10 [McDade] 188:15-25.)  He testified he thought

the numbers Ms. Fife disclosed to the Court were market values, not liquidation values.

(4/26/10 [McDade] 197:13-24.)

283.    Those who knew about the original $5 billion discount did not go to Court.

Kelly, who was aware of the "$5b all in economic loss versus [Lehman's] marks," or

"difference," was not involved in the court approval process and did not know whether

anyone told the Court about the $5 billion difference.  (4/28/10 [Kelly] 191:6-18.)  Lowitt

and Tonucci also did not attend the Sale Hearing.  (4/29/10 [Lowitt] 127:21-128:5;

Tonucci Dep. Tr. 204:11-22.)  Barclays knew otherwise and as Barclays lawyers and

executives who testified at trial readily admitted, Barclays had a duty to speak up and

inform the Court of any material omissions or misstatements.[116]  But Barclays took

absolutely no steps to ensure the Court was told the assets in question were actually being

valued at the time in the $52 billion range.  (5/7/10 [Ricci] 201:14-21, 202:17-203:1.)

### 2.    The Court was told about, but not shown, the Clarification Letter

284.    In addition, for the first time at the Sale Hearing, the Court learned about

-- but was not shown -- a purported "Clarification Letter" the parties were working on:

> [MS. FIFE:]   Some other changes that were made to the
> contracts affect what are called purchase assets and what
> are excluded assets.  There was some confusion as to which
> subsidiaries, if any, were being sold.  *And we've clarified
> in a clarification letter which we're hoping to finalize and
> actually present to Your Honor whenever it comes down
> here.*  But in that letter, we're going to clarify that the only
> subsidiaries that are being purchased by Barclays are
> Lehman Brothers Canada Inc., Lehman Brothers
> Sudamerica SA and Lehman Brothers Uruguay SA.  The
> latter two subsidiaries that I just referred to relate to a
> business that is called PIM, or Private Investment
> Management Business, which is a business that was not
> part of the original deal but is now being purchased by
> Barclays.

(M.261 [9/19/08 Tr.] at 48:5-17 (emphasis added).)

285.    However, the Clarification Letter was not, in fact, finalized during the

course of the Sale Hearing, and was not shown to the Court.  (4/28/10 [Miller] 20:11-

21:3; 70:1-8 (there was "a draft being worked on" during the Sale Hearing); *see*, *e.g.*,

M.137 (5:15 p.m., September 19); BCI 466 (9:39 a.m., September 20); M.53 (2:39 p.m.,

---

116  (*See*  4/30/10 [Hughes] 135:13-136:5 (agreeing that Barclays' lawyers had "a full and
complete duty of truth and accurate disclosure" and were obligated to bring the Court's attention any
material omissions); 8/31/10 [Lewkow] 108:1-5 (Barclays' counsel was obligated to speak up and correct
any misstatements in court or tell Weil Gotshal a correction was needed); *see also* 6/21/10 [Diamond]
163:21-164:2 (Barclays "absolutely" was obligated to ensure that the Court received a "substantive,
complete" presentation of the Sale Transaction's terms).)

September 20).)  Miller recalled that at one point during the Sale Hearing a draft of the

Clarification Letter arrived in the courtroom, but upon review it was determined that it

"wasn't consistent with the understanding of the parties."  (4/28/10 [Miller] 70:9-13.)

Miller did not know what was wrong with the draft Clarification Letter as he "personally

was not involved."  (4/28/10 [Miller] 72:5-14.)

286.    Notably, an earlier September 19 draft of the Clarification Letter had

stated that its purpose was merely to "clarif[y]" the Asset Purchase Agreement.  (BCI 460

at 00008458.)  But by the time of the Sale Hearing, the decision had already been made

to amend the Asset Purchase Agreement with the Clarification Letter.  Lewkow admitted

that during the early afternoon of September 19, shortly before the Sale Hearing had

commenced, the Clarification Letter was changed to reflect that its purpose now included

to "*amend*" the Asset Purchase Agreement.  (M.131 at 10279851, p. 1 (9/19/08, 12:34

p.m. version); 8/31/10 [Lewkow] 146:20-153:9 (acknowledging that no one disclosed to

the Court on September 19 that the Asset Purchase Agreement "was being amended"),

157:13-158:6, 164:13-165:1; *see* 4/30/10 [Hughes] 195:1-3 (conceding that Clarification

Letter amended the Asset Purchase Agreement), 195:4-196:1 (Clarification Letter

authorized Barclays to receive additional categories of securities); M.259 ¶ 52 (Barclays

Rule 2004 Opp. ("Barclays was entitled to receive **additional** categories of securities and

**other assets** set forth in the Clarification Letter, **which amended the APA**." (emphasis

added)).)

287.    Further demonstrating that the lawyers remained in the dark about what

was going on, even up until the conclusion of the Sale Hearing (and after), the attorneys

drafting the Clarification Letter were still defining the assets in terms of "book value,"

which was not true.  (*See, e.g.,* M.131 at 10279851 ¶3.3(b) at p. 10; M.137 at 10279864

¶1(a) at p. 1 (9/19/08, 5:15 p.m. version); BCI 466 at 00009528 ¶1(a) at p. 1 (9/19/08

midnight version); M.582 (9/20/08 10:33 a.m. version).)

288.    By the time the Sale Hearing ended, the Clarification Letter still had not

been finalized (Stip. ¶ 129), so it was not presented to the Court at that time.  (*See* M.261

[9/19/08 Tr.] 133:23-137:15 (Debtor's counsel offered only the Asset Purchase

Agreement and First Amendment into evidence); (Stip. ¶ 144 (the Court did not review

the Clarification Letter prior to or at the Sale Hearing on September 19, 2008).)

289.    In fact, and as described in more detail below, negotiations continued over

the weekend after the Sale Hearing and the Clarification Letter was not finalized until

three more days after the Sale Hearing.  When it was finished, the letter effected material

changes to the deal that were not disclosed to the Court, and purported to transfer to

Barclays billions of dollars in additional assets over and above those authorized by the

Court based on the evidence presented to it at the Sale Hearing.

### 3.    McDade testified at the Sale Hearing, but only about aspects of the transaction about which he was aware

290.    Also at the Sale Hearing, McDade testified and was cross examined about

the proposed Sale Transaction.  (Stip. ¶ 119; 4/26/10 [McDade] 186:14-21; M.261

[9/19/08 Tr.] 103:11-133:17 (McDade cross-examination).)  McDade understood that as a

witness for Lehman his role was to describe the transaction so the Court could understand

it and decide whether or not to approve it.  (4/27/10 [McDade] 79:6-21.)  McDade

believed the transaction to be a balanced deal, effectively a "wash," and he considered his

testimony to be a representation to the Court to that effect.  (4/27/10 [McDade] 79:10-13,

79:22-81:2; *see* 8/23/10 [Shapiro] 84:12-88:23 (no reason to disagree with McDade's

testimony on this issue).)  As the hearing progressed and concluded shortly after

midnight, McDade's view that the transaction was an equivalent exchange of assets and

liabilities never changed.  (4/26/10 [McDade] 203:25-204:5.)

291.    McDade's testimony at the Sale Hearing about the valuation of assets

being transferred was simply, and materially, wrong.  He was asked on cross-examination

during the Sale Hearing how, "in the absence of a closing balance sheet," Lehman had

"determined that fair value was being realized" in the proposed "sale of its assets."

(M.261 [9/19/08 Tr.] 109:5-10.)  McDade responded that a detailed "individual line item"

valuation of the Lehman assets being sold to Barclays had been conducted:

> The individual assets on the balance sheet, the trading
> inventory was bottoms up, meaning individual line item
> detail processed through all of our individual risk business
> units in coordination with the normal finance professionals
> who are incorporated into the valuation process.

(M.261 [9/19/08 Tr.] 109:11-15.)  When pressed further, McDade said "There are many

complex securities involved.  Many different models that we use to evaluate those

securities."  (M.261 [9/19/08 Tr.] 110:19-22.)  And when asked whether "a valuation was

conducted within Lehman of all of the assets that are being transferred to Barclays,"

McDade responded: "Portfolio moved during the week, but that was conducted all last

evening.  All through and up to the arrangement – the agreement today."  (M.261

[9/19/08 Tr.] 109:23-110:3; 4/26/10 [McDade] 196:18-197:3 (McDade believed the repo

collateral was valued at market value).)

292.    McDade's testimony was not correct.  As others knew, the values were

based on liquidation prices, determined only at a portfolio level, and were a "negotiated

settlement."  (*See supra* ¶¶ 234-250.)  The valuations had nothing to do with "individual

line item detail" on Lehman's usual valuation processes.  (5/4/10 [Seery] 119:20-24,

120:6-11, 120:19-25 (contrary to McDade's testimony, Seery did not believe the number

presented in Court was supported by a line-by-line valuation).)

293.    Other aspects of McDade's testimony at the Sale Hearing also were

inaccurate or incomplete.  For example, during his proffer of McDade's testimony, Miller

outlined the role of FRBNY financing and mentioned the PDCF lending program and

how it helped broker-dealers continue to operate in difficult times.  (M.261 [9/19/08 Tr.]

96:10-97:2, 98:3-9 (relaying that Barclays has no North American broker-dealer of its

own and therefore has no access to the PDCF "window").)  But neither Miller nor

McDade made any mention of the Take-Out Agreement between Barclays and the

FRBNY, the FRBNY's commitment to provide financing to Barclays on the repo

collateral once it was transferred to Barclays, or the FRBNY's commitment to advance

Barclays the cash it needed in the form of an overdraft to Barclays Bank.  (*See supra*

¶¶ 195-205.)  This is because Miller and McDade had no knowledge of these facts.

294.    The McDade proffer and McDade's testimony on cross at the Sale

Hearing also made no mention of the September 18 Repurchase Agreement, the central

role it had come to play in the Sale Transaction, or the liquidation analysis and Haircut

Summary prepared by Seery and Barclays, respectively.  Once again, while Miller and

McDade did not know about all this, others at Lehman and Barclays clearly did.  Some of

those individuals (Seery, Klein and others) sat in Court at the Sale Hearing, but they did

absolutely nothing to bring these issues to the Court's attention.  (*See* 8/27/10 [Klein]

140:7-142:14; 5/4/10 [Seery] 121:24-122:7 ("If it had occurred to me, I would have

advised the Court" that the valuations on the securities were achieved with the

participation of Barclays rather than through Lehman's normal process).)

295.    Nor was any mention at all made by McDade in his testimony of Barclays'

threat not to close if more assets were not added, and the ensuing scramble to locate

billions in additional assets.  The addition of these assets made this a very "different" deal

from that agreed upon on September 15 and 16, memorialized in the Asset Purchase

Agreement, and previously described to the Court.  (4/29/10 [Lowitt] 124:3-14; BCI 638

¶ 482 ("Lowitt testified that these 'additional sources of value' that potentially could be

transferred to Barclays would be 'elements' of a different deal than the one that had been

reached on 'Monday and Tuesday.'").)  Even though McDade was aware of this change

to the deal (although not sufficiently aware of the ramifications as to additional value

because he thought it was simply to bring the deal back into balance), the Court was told

nothing about the $769 million in 15c3-3 and $1.9 billion in unencumbered box assets at

any time before it approved the Sale Transaction.  (BCI 638 ¶ 508 ("At the Sale Hearing

on September 19, 2008, the search for additional assets to transfer to Barclays in

connection with the proposed Sale Transaction was not disclosed to the Court").)  Nor

was the Court told about the margin assets now in dispute in the Rule 60 Motions.

### 4.    Ridings testified based only on his limited knowledge of the deal

296.    Also testifying at the Sale Hearing was Barry Ridings, Lehman's financial

adviser on the Sale Transaction.  Ridings gave neither a fairness opinion nor any

testimony about valuations.  Instead Ridings testified only that (i) the difficult economic

times had had a detrimental effect on Lehman's business, the value of its assets, and its

liquidity (M.261 [9/19/08 Tr.] 143:7-144:19), (ii) he had not received calls from other

potential buyers (M.261 [9/19/08 Tr.] 144:20-23), (iii) he personally had observed

nothing untoward in the negotiations between Lehman and Barclays, and the parties

worked very hard to get a deal done (M.261 [9/19/08 Tr.] 143:24-144:17)), (iv) Lehman's

assets would have greater value and jobs would be saved if the assets are sold as a going

concern (M.261 [9/19/08 Tr.] 144:18-145:4), and (v) he had identified no better offer for

these Lehman assets.  (M.261 [9/19/08 Tr.] 145:5-146:25.)  In the end, Ridings concluded

that the proposed sale to Barclays was the "highest and best offer for these assets."

(M.261 [9/19/08 Tr.] 145:24-25.)  Ridings' testimony -- while quite general and lacking

in specificity -- was consistent with the intended purpose of the Sale Motion, to convince

the Court that the proposed deal was better than a sale at liquidation prices.  (*See* Ridings

Dep. Tr. 35:19-36:20, 42:22-43:18, 65:4-15; 8/23/10 [Shapiro] 53:11-54:3 (proposed sale

would avoid a "near-term liquidation"); M.118 ¶ 11 (not approving the deal would cause

"material disruption of [] value".)

297.    Ridings, however, appears to have had very little involvement and

knowledge of the economic terms and negotiation of the transaction.  (*See, e.g.*, Ridings

Dep. Tr. 61:18-20 (Ridings did not know how the $47.4 billion figure given to the court

was derived), 29:9-23 ("I nor anyone on my team were in any meetings where people

were talking about specific securities and what the marks should be"), 42:22-43:18

(Ridings did not recall negotiations concerning a block bulk sale discount).)

298.    The proffer of Ridings' testimony also was incomplete when it came to the

role of the FRBNY and its dealings with Barclays throughout this week.  Perhaps because

Miller and Ridings were unaware of those dealings, the Ridings proffer stated that:

> Any prospective purchaser would need access to the
> Federal Reserve Funds to operate Lehman's business.  The
> list of firms authorized to trade directly with the Federal
> Reserve System and borrow from the so-called "window"
> is limited.  Each entity must meet stringent capital and
> regulatory requirements.

*        *        *

> [T]he universe of potentially qualified and capable
> purchase[r]s is extremely limited by the huge financial
> commitment that would have to be made and the ability to
> access federal funds.  At most, there are less than a half
> dozen possible entities that might qualify, and most of them
> have their own financial needs.

(M.261 [9/19/08 Tr.] 145:19-146:25.)

299.    While this may have been largely true, Ridings made no mention of the Take-Out Agreement, the FRBNY's commitment to finance the collateral Barclays was getting from Lehman and to advance it the cash to make that purchase.  Nor had Ridings considered that this willingness of the FRBNY to provide such generous financing and cash advances might well -- if it had been made public -- have expanded the pool of entities capable of undertaking a transaction of this size.  So Ridings' testimony was limited – and in critical respects wrong –  because no one had told him about key facts.

### 5.    The Court approved the Sale Transaction and issued the Sale Order based only on the record before it

300.    Based on representations made to the Court about the terms of the proposed Sale Transaction (both at the two hearings and in the Sale Motion), the Court orally approved the transaction at the conclusion of the Sale Hearing.  (M.261 [9/19/08 Tr.] 247:15-257:2.)  The parties spent an hour or so after the hearing, reviewing and making some changes to the Sale Order (BCI 16), which the Court signed between 1 a.m. and 2 a.m. on September 20, 2008.  (4/28/10 [Miller] 23:18-24:2.)  The Sale Order provided, among other things, in a section entitled "Consideration":

> The consideration constitutes reasonably equivalent value
> or fair consideration, as the case may be (as those terms are
> defined in each of the Uniform Fraudulent Transfer Act,
> Uniform Fraudulent Conveyance Act and section 548 of the
> Bankruptcy Code), and fair consideration under the

Bankruptcy Code and under the laws of the United States,
any state, territory, possession or the District of Columbia.

(M.441 [Sale Order] at 6.)

### H.  Over The Weekend After The Sale Hearing Material Changes Were Made To The Sale Transaction Through The Clarification Letter

301.   After the Court approved the Sale Transaction, Barclays and Lehman executives continued their negotiations over the following weekend and ultimately decided to materially alter the terms of the Sale Transaction that had been approved by the Court.

### 1.  The parties' difficult and harried negotiations continued over the weekend

302.   The closing of the transaction had been scheduled to begin early Saturday morning, September 20, 2008.  (4/28/10 [Miller] 24:3; *see also* 8/31/10 [Lewkow] 54:11-55:7.)  But in fact, the deal did not close until "just about two minutes before the market opened" on Monday, September 22.  (4/28/10 [Miller] 24:3-10.)

303.   All witnesses agree that the closing, which took place at the offices of Weil Gotshal over the entire weekend, was a confused and stressful affair.  Teams of Lehman and Barclays personnel, including their counsel and other advisers, along with representatives from the Creditors Committee, the Trustee, and any number of other entities, all crowded into a single floor at Weil Gotshal, splitting up into numerous separate meetings, conference calls, and hallway discussions.  (*See, e.g.*, 8/27/10 [Klein] 57:11-25; 5/6/10 [Burian] 126:4-130:15; 6/25/10 [Despins] 24:23-25:19; 4/28/10 [Miller] 24:11-17.)  The negotiations were often chaotic, disjointed, and at time contentious.  In short, the situation was ripe for mistakes, misunderstandings, and miscommunications.

304.    Among the primary reasons the closing became so difficult involved

actions and positions taken by the DTC and JPM, which both had roles in clearing the

transactions that had to be effected to consummate the entire Sale Transaction and allow

Barclays to continue operating Lehman's broker-dealer business.  For the most part, the

negotiations with DTC and JPM were undertaken by Barclays, and McDade and the

Lehman team were excluded, since they involved issues concerning Barclays ability to

continue operating the Lehman broker-dealer assets after the Closing.  Some Lehman

employees (with knowledge of the issues in dispute, and who were going to transfer to

Barclays anyway) did participate in these talks, but Barclays was in charge of  dealing

with these third party entities.

305.    Barclays spent many hours over the closing weekend negotiating with

JPM about the failure to transfer all of the repo collateral on the evening of September 18

and JPM's unwillingness to continue clearing Lehman trades.[117]  (8/31/10 [Lewkow]

66:1–67:21.)  At "some point in the middle of the night" between Sunday and Monday,

JPM agreed to continue clearing trades for Lehman.  JPM also agreed to provide Barclays

with the remaining repo collateral in exchange for the cash of approximately $7 billion

that LBI had provided in its stead.  (8/27/10 [Klein] 64:11–65:14; 8/31/10 [Lewkow]

67:22–69:13.)  But Barclays witnesses claimed that when Barclays reviewed a list of the

collateral that JPM would transfer they purportedly found that it included RACERs,

---

[117] Lewkow testified that "Barclays said well, we need to get the rest of the security for our loan
to Lehman.  And there was a dispute between JPMorgan and Barclays as to whether or not we were going
to get that."  (8/31/10 [Lewkow] 66:1-67:21.)  In contrast, Seery testified that "JPMorgan was insisting that
Barclays take all of the securities" – in particular, the $8.55 billion in RACERs – but Barclays "certainly
did not want the 8.55 in securities versus that cash."  (5/4/10 [Seery] 55:4-25.)

securities Barclays believed to have little value.  So Barclays told JPM it would not accept the collateral. (8/31/10 [Lewkow] 68:12–70:20, 245:14–246:12.) [118]

306.    After further discussions early on the morning of September 22, Barclays understood that JPM had agreed to make up for the shortfall in securities with cash. (8/31/10 [Lewkow] 68:12–70:20.)  But Barclays found out after the closing that JPM would not release the funds to Barclays because Barclays had not taken out all of Lehman's financing.  In particular, Barclays had refused to "roll" a $15.8 billion repo loan, secured by Lehman's RACERs, that Lehman had taken on September 18.  (9/7/10 [Leventhal] 133:23-134:23, 152:11-153:21; *see also* M.845 (9/18/08 e-mail from Wachtell, JPM's counsel, to Barclays, the SIPC Trustee and FRBNY, seeking clear instructions concerning transfer of operating accounts and assets to Barclays and related issues).)

307.    Barclays also spent much of the weekend in discussions with the DTCC, which was in a position to "shut Lehman down" if its concerns were not addressed. DTCC was concerned with Lehman's ability to meet its continuing obligations and DTCC's ability to protect its rights in the Lehman assets at DTCC, and it was considering whether it should "cease to act for Lehman on a going-forward basis." (4/26/10 [McDade] 232:13–233:5; 5/6/10 [Montal] 9:15-10:4, 11:24-12:10.)  During the week of September 15, DTCC had asked Barclays to assume all of Lehman's assets and liabilities at DTCC, but Barclays refused.  (5/6/10 [Montal] 15:5-16:4.)

---

[118]  Evidence adduced at trial shows that this allegation by Barclays was just not true.  The JPM portfolio included a grand total of just $321.00 in Racer securities, hardly enough to matter to anyone in a deal of this size.  (*See* M.103N; *see also*  9/2/10 [Romain] 187:3-21 (disclaiming any knowledge of this issue).)

308.    By the time of the Sale Hearing, Barclays and DTCC had agreed that

Barclays would provide DTCC with a $250 million guaranty of Lehman's obligations

and an estimated $3 billion in residential mortgage securities as additional collateral.

(5/6/10 [Montal] 19:5-20:4 (quoting M.261 [9/19/08 Tr.] 52:14-23); M.423; M.425.)  But

over the closing weekend, Barclays and DTCC continued to debate over the assets and

obligations Barclays would assume upon purchasing LBI.  (5/6/10 [Montal] 20:12-21:13

(describing Barclays' diligence at DTCC's offices and "numerous phone calls through

the afternoon and evening" on September 21).)  By Sunday evening, the residential

mortgage securities were no longer available to transfer to DTCC.  (5/6/10 [Montal] 18:5-

9; 5/3/10 [Hughes] 77:11-76:1.)  At roughly midnight, however, DTCC agreed to accept

Barclays' offer of a $250 million guaranty, based in part on Barclays' representation that

it was not taking any Lehman assets in which DTCC had rights.  (5/6/10 [Montal] 18:24-

20:5.)  Early on September 22, DTCC, Barclays, and the Trustee memorialized this

understanding in a letter agreement.  (BCI 476; M.633; 5/6/10 [Montal] 21:25-22:24.)

309.    In addition to these DTC and JPM clearing issues, the parties were trying

to finalize the list of securities and other assets being transferred to Barclays.  Traders and

others (virtually all of whom knew they were going to work for Barclays once the deal

closed) continued to review computer runs of CUSIPS in the repo collateral pool,

continued to evaluate Lehman's Rule 15c3-3 calculation and consult with the SEC on

whether it would release such assets to Barclays.  And they continued to try to locate

additional  value in the unencumbered box and other Lehman assets.  (*See supra* ¶¶ 261-

268.)

310.    This frenzied effort resulted in the parties trying to assemble schedules of securities, which schedules were referred to in the Clarification Letter and in other correspondence between the parties and other entities.  (*See generally*, Hraska I Dep. Tr. 311:20-315:7.)

### 2.    When the Creditors Committee was excluded from the negotiations, its representatives tried to gather information and were misled about the revised terms of the deal

311.    Saul Burian, from Houlihan Lokey, an advisor to the Creditors Committee, testified that the Creditors Committee was effectively excluded from the substantive discussions concerning the terms of the Sale Transaction and significant changes that were being made to the deal.  (5/6/10 [Burian] 124:6-125:2, 126:4-21 (Houlihan was "for the most part ignored and excluded from almost every single substantive conversation"), 131:3-23.)   He testified in detail about being kept in the dark about  changes being made to the deal that they had seen presented to the Court.

312.    At one point during the closing weekend, Burian was provided a schedule showing $49.9 billion in assets going to Barclays.  The Creditors Committee asked about the figure, but Seery told them that the identity and marks of the securities to be transferred were still unclear.  (M.381; 5/6/10 [Burian] 134:12-136:12, 138:22-139:5.)

313.    Burian told Miller that the Creditors Committee needed to be kept better informed as to the terms of the transaction.  Miller organized a hasty and short meeting between Burian and other Creditor Committee representatives and Michael Klein, representing Barclays.  The meeting took place early in the morning of September 22, in a conference room at Weil Gotshal.  The meeting lasted a matter of minutes.  (5/7/10

[Burian] 6:9-20; 8/27/10 [Klein] 156:1-10.)[119]  Klein did the talking.  Miller himself did not give this presentation to the Creditors Committee because he did not have enough knowledge about the financial aspects of the deal to do so.  (*See, e.g.,* 8/27/10 [Klein] 156:11-157:9.)

314.    Barclays attempted at trial to distance Klein from what he said at this meeting.  For example, Klein claimed that the meeting was not to discuss what was being transferred to Barclays, but rather he described only the "flow of funds" relating only to the September 18 Repurchase Agreement.  This was not credible.  Klein himself testified that his knowledge of the repo was severely limited.  (8/27/10 [Klein] 122:8-123:24 (no involvement in structuring, designing or negotiating the repurchase agreement, and no knowledge of economics of or documentation for the Repurchase Agreement), 124:11-14 (did not review any valuation analytics concerning the collateral in the repo).)  Moreover, he had no credible explanation for why a diagram he drew at the meeting included citations to the comp and cure liabilities, why it is set up in a balance sheet (with assets and liabilities set forth on either side), or how his citations to the $72 billion and $68 billion in the Lehman Two transaction related in any way to the "flow of funds" in the repo.  (8/27/10 [Klein] 147:14-154:2, 157:10-158:10.)  They very obviously related to the Sale Transaction itself.

---

[119]  On direct examination, Barclays' counsel tried to use BCI 144 (9/29/08 handwritten notes of Mary Korycki, from A&M) to question Klein about this meeting.  (8/27/10 [Klein] 65:15-67:25.)  As was shown on cross examination, however, those notes were from an altogether different meeting (a week later) which Klein did not attend in which an altogether different repo transaction was discussed.  (8/27/10 [Klein] 102:19-106:24.)  Klein's testimony concerning this exhibit and the numbers therein should be disregarded, except as it goes to his lack of credibility.

315.    At the meeting, Klein very roughly sketched the Sale Transaction on the back of a file folder.  (M.410)[120]  Klein told the Committee that Barclays would receive assets that earlier had been worth $49.4 billion ("pre-mark") but now had dropped in value to roughly $45 billion ("post-mark").  (5/6/10 [Burian] 150:24-153:4; 8/27/10 [Klein] 59:23-61:17 (conceding he was at meeting and prepared the manila folder chart), 62:4-65:8 (in his direct testimony avoiding the part of his presentation about the overall value of the deal to Lehman), 68:19-23 (conceding he spoke for Barclays at the meeting).)[121]  Klein said Barclays also would receive clearance box assets worth $1.9 billion and would assume contract cure and compensation liabilities totaling $4.25 billion.  (M.410; 5/6/07 [Burian] 150:24-153:4.)[122]  Klein told Burian that the Sale Transaction thus provided a $2 billion *benefit* to the LBHI Estate.  (5/6/10 [Burian] 152:12-24.)  At no time did Klein advise those present that these figures represented liquidation values for the assets being transferred to Barclays, not market values. (8/27/10 [Klein] 234:8-24.)

---

[120]  In another effort to distance himself from the facts, Klein disingenuously had refused to testify about most aspects of this document at his deposition, saying things like he was not sure it was his handwriting or an accurate copy of the chart.  (8/27/10 [Klein] 160:14-166:23 (impeached with Klein Dep. Tr. 166:12-20, 170:23-171:5).)  When Barclays' counsel used the exact same chart on his direct at trial, however, Klein evidently had no such problems and readily testified about the exhibit.  (8/27/10 [Klein] 59:20-65:8, 145:20-147:13, 159:12-160:11.)

[121]  Klein said at this meeting that the up-to-date value of the assets was between $44 billion and $45 billion, but Barclays had agreed to accept a valuation of $45 billion.  This explanation informed Burian's understanding of the references to "negotiated" or "agreed" values in various documents.  (BCI 131 (which is also M.712); 5/6/10 [Burian] 151:19-152:7, 156:19-25, 176:22-177:8, 178:8-19; BCI 813b; 5/7/10 [Burian] 96:24-97:17.)

[122]  At trial, Burian testified consistently that Houlihan understood the Sale Transaction to involve assets with a market value of roughly $45 billion (*i.e.*, approximately $5 billion lower than the $49.9 billion marked value shown on the schedules they received over the closing weekend).  Houlihan did not believe that Barclays received a negotiated $5 billion reduction off assets with an actual value of $49.9 billion.  (M.381; BCI 813b; 5/7/10 [Burian] 66:4-25, 70:24-71:7, 92:18-93:8, 96:24-97:25.)  Furthermore, Burian convincingly refuted the notion, suggested on cross-examination, that market value and liquidation value had nearly converged during that period, especially considering that "[t]here was a flight to quality" in the market at that time.  (5/6/10 [Burian] 115:16-116:25.)

316.    When the Creditors Committee questioned Klein's assertion that the market value of the securities being sold to Barclays had declined, Klein "sort of made a face, you know, as if we don't know what's going on the world," and did not answer the question.  (5/6/10 [Burian] 155:22-157:9.)  Klein said he had no recollection one way or the other about this part of the meeting, so Burian's testimony is unrebutted.  (8/27/10 [Klein] 235:12-237:14.)  Klein also claimed to have no memory of whether Committee representatives asked any follow-up questions.  (8/27/10 [Klein] 238:1-13.)

317.    In the end, Klein's description of the Sale Transaction reiterated the misleading story Seery had given Burian previously, disguising the fact that liquidation values were now being used.  (5/6/10 [Burian] 158:13-159:5, 160:4-7.)  Before Burian left Weil Gotshal's offices on  September 22, he told Miller that Houlihan had no choice but to rely on the information given to them, and would attempt to verify what they had been told once they received lists of the securities transferred.  (M.713 (Burian's next-day summary to the Committee of his meeting with Klein); 5/6/10 [Burian] 159:5-23, 167:19-168:5.)

318.    Houlihan did try to verify Klein's explanation of the Sale Transaction by following up after the closing, but was given incomplete and conflicting information and stymied by a lack of cooperation from Barclays.  (*See*, *e.g.*, 5/6/10 [Burian] 171:6-172:7, 177:9-178:1, 188:15-189:22; 5/7/10 [Burian] 47:1-18.)  The Creditors Committee, relying on the presumption that representations to the Court had been truthful, therefore did not immediately return to court "with their hair on fire," because Burian did not immediately conclude, and could not at that point prove, that critical numbers had been misrepresented to them.  (5/6/10 [Burian] 182:17-185:8, 190:22-191:16.)

319.    During the closing, Burian was never told that (i) liquidation values were being ascribed to the asset values in the Sale Transaction, (ii) a $5 billion "block" discount for Barclays was embedded in the deal, or (iii) Barclays would make a huge and immediate actual gain on closing, *i.e.,* that it was not an equivalent exchange. (5/6/10 [Burian] 112:15-114:18, 191:24-192:10.) While the Creditors Committee believed that the purchase of Lehman's broker-dealer assets for $250 million would give Barclays some kind of "economic gain," because Barclays was purchasing a solid operation, they always understood that Barclays would pay fair market value for the assets it acquired, and had no information at that point revealing that the gain was, in fact, gargantuan. (5/7/10 [Burian] 27:21–28:11, 30:11–31:2, 118:3-22.)

### 3.    Material changes to the deal were incorporated into the Post-Sale Hearing Clarification Letter

320.    At the conclusion of these post-Sale Hearing negotiations, on or about September 22, 2008, the parties executed the "Clarification Letter," and they dated it "as of September 20, 2008" apparently to fit it within the description of the letter in the Sale Order. (4/30/10 [Hughes] 194:21-25 (letter finalized and signed on September 22).) On its face, it now purported to "amend[]" the Asset Purchase Agreement. (M.3 at 1 (Clarification Letter "amends" the Asset Purchase Agreement).)

321.    The Clarification Letter was never presented to the Court for approval. It was simply filed, as an exhibit, without explanation, in the afternoon of September 22, along with the Asset Purchase Agreement and First Amendment that the Court had seen and approved at the hearing. (LBHI Docket No. 280.)

322.    A review of several of the numerous drafts of the Clarification Letter generated over that weekend provides a timeline as to what changes were made to the

deal and when.  One material change made after the Sale Hearing was a redefinition of

"Purchased Assets" (M.3 ¶1) in the Asset Purchase Agreement.  One of the reasons for

this change was to include the additional assets that had been added to the deal outside of

Court through the repo and the Friday Asset Scramble, about which the Court was never

told.  (*See* 8/31/10 [Lewkow] 58:2-59:13.)[123]

323.    Thus, on Saturday, September 20 all references to the "Long Positions" to

be sold under the Asset Purchase Agreement that had been presented to the Court the

previous day were completely erased, and along with that change the "book value"

representation in the original agreement was also erased.  (*See* M.53 at 00024253-

00024254 ¶1 (9/20/08, version circulated at 2:39 p.m.).)  Instead, the definition of

"Purchased Assets" was now completely changed to include "the securities owned by

LBI and pledged to [Barclays] or its Affiliates under the Barclays Repurchase Agreement

... as specified [on Schedule A] previously delivered by Seller to [Barclays] or its

Affiliates."  (M.53 ¶ 1(a)(ii).)  In other words, for the first time the agreement was to

revolve around the Repurchase Agreement and  include a schedule of assets (*i.e.*, a list of

securities by CUSIP number) being sold to Barclays.  No one made any effort to ensure

the Court knew of this material change.  (*See* 8/31/10 [Lewkow] 160:2-10 (no discussion

of bringing the change in the definition of "Purchased Assets" to the Court for its

approval).)

324.    The Clarification Letter also purported to add to the Sale Transaction the

additional assets that Lowitt, Kelly and others had scrambled to assemble on September

---

[123]    Miller said that after the Sale Hearing he saw drafts of the Clarification Letter, but he was not involved in the drafting process and he was "not a party to the negotiations with respect to the drafting." (4/28/10 [Miller] 71:6-15; 75:23-76:2.)  Miller had no knowledge about the circumstances under which the definition of "Purchased Assets" was changed in the Clarification Letter.  (4/28/10 [Miller] 74:7-76:2.)

19.  (*See* 8/31/10 [Lewkow] 59:4-13; M.259 [Barclays Rule 2004 Opp.] ¶ 52 (stating the

Clarification Letter "disclosed" that "Barclays was entitled to receive additional

categories of securities and other assets").)  These undisclosed additions made their way

into deal in different ways.

325.    The $1.9 billion in "unencumbered box" assets were added to the

definition of "Purchased Assets" with the phrase "(B) such securities and other assets

held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of

business on September 21, 2008 were as specified on Schedule B previously delivered by

Seller and accepted by [Barclays] . . ."  (M.3 ¶ 1(a)(ii).)[124]

326.    The Clarification Letter also added for the first time, again within the new

definition of "Purchased Assets," a reference to "exchange-traded derivatives (and any

property that may be held to secure obligations under such derivatives) and collateralized

short-term agreements."  (M.3 ¶ 1(a)(ii).)  Barclays now claims that this provision

allowed it to take all Lehman's margin (cash or otherwise) residing with the OCC and

other exchanges, totaling approximately $4 billion.  (Barclays Opp. ¶¶ 31 n.27, 155, 184,

228, 336, 380, 384, 386, 395, 491, 588.)  This change was never disclosed to the Court

either.

327.    In addition, to memorialize the conditional addition of the Rule 15c3-3

assets to the pot, the parties inserted a provision into the Clarification Letter, under the

heading "Transfer of Customer Accounts," stating in pertinent part:

> Purchaser shall receive … (ii) to the extent permitted by
> applicable law, and as soon as practicable after the Closing,

---

[124]  This change, too, did not exist in any draft of the Clarification Letter until the Saturday after
the Sale Order was issued.  (*See* M.44 ¶ 1(a).)

> $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value.

(M.3 ¶ 8.)

328.    In total, these post-Sale Hearing modifications, which were never revealed or explained to the Court, resulted in Barclays receiving or claiming entitlement to (i) at least $5 billion, and as much as $7 billion, in excess collateral from the September 18 Repurchase Agreement, plus (ii) approximately $2.7 billion in "additional value" in 15c3-3 and "unencumbered box" assets that Lowitt, Kelly, Tonucci and Reilly had located on September 19 to throw into the deal, plus (iii) a further $2.3 billion in securities and cash located in the OCC margin accounts.  (*See* Damages section below.)

329.    While these changes to the deal had all been privately agreed to before the Sale Hearing, none of them had been disclosed to the Court and none had even been incorporated into the draft of the Clarification Letter in existence at the time of the Sale Hearing.  (M.131 (draft Clarification Letter and blackline distributed by R. Messineo at 12:09 p.m. on September 19 (a few hours prior to start of hearing); M.137 (draft Clarification Letter and blackline distributed by D. Murgio at 5:15 pm on September 19) (during hearing).)  They were all added after the Sale Hearing ended.  (M.53 (distributed at 2:39 p.m. on Saturday September 20); M.138; 8/31/10 [Lewkow] 159:20-160:1.)

> ### 4.    The Clarification Letter was also used to evade the Section 559 problems created by Barclays' termination of the September 18 Repurchase Agreement

330.    Later in the weekend, the parties' discussions turned to what to do about the Notice of Termination that Barclays had issued concerning the September 18 Repurchase Agreement after LBI filed for bankruptcy.  (M.38.)  Barclays witnesses

suggested that this termination had been inadvertent, but Barclays presented no witness

with first hand knowledge of that issue.  (*See, e.g.,* 8/31/10 [Lewkow] 64:23-65:5

(Lewkow claims "being told at some point" that "some back office person"

unintentionally had sent a letter), 168:15-169:4; 8/27/10 [Klein] 122:8-124:4 (Klein was

not involved in negotiating or restructuring the repo and had no familiarity with the

Notice of Termination).)[125]  Nor did any other witness have any recollection of how or

why the termination came about.  (*See, e.g.,* 8/23/10 [Shapiro] 108:22-109:4 (no direct

involvement in repo); 4/28/10 [Miller] 69:10-22 (Miller not aware at any time that

Repurchase Agreement had been terminated); 5/4/10 [Seery] 148:22-149:3 (no

knowledge prior to reading Rule 60 motion that Clarification Letter purported to rescind

the Notice of Termination).)  Ultimately, why the termination was issued is irrelevant.

The issue is what the parties did about this termination and what effect that had on the

assets of the Lehman estates.

331.    In that regard, the Clarification Letter purported to rescind the earlier

termination and then terminate the Repurchase Transaction retroactively, all effective as

of the Closing.  Paragraph 13 of the letter thus provided:

> Barclays Repurchase Agreement.  Effective at Closing, (i)
> all securities and other assets held by Purchaser under the
> September 18, 2008 repurchase arrangement among
> Purchaser and/or its Affiliates and LBI and/or its Affiliates
> and Bank of New York as collateral agent (the "Barclays
> Repurchase Agreement") shall be deemed to constitute part
> of the Purchased Assets in accordance with Paragraph
> 1(a)(ii) above, (ii) Seller and Purchaser shall be deemed to
> have no further obligations to each other under the Barclays
> Repurchase Agreement (including, without limitation, any

---

[125]    Ms. Leventhal testified that, at the time, the FRBNY had no knowledge of the termination of
the September 18 Repurchase Agreement and it had no involvement in discussions concerning Paragraph
13 of the Clarification Letter.  (9/7/10 [Leventhal] 135:12-136:20.)

> payment or delivery obligations), and (iii) the Barclays
> Repurchase Agreement shall terminate.  Additionally, the
> Notice of Termination relating to the Barclays Repurchase
> Agreement dated September 19, 2008 is hereby deemed
> rescinded and void *ab initio* in all respects.

(M.3 ¶ 13.)

332.    This paragraph was solely a Barclays creation.  It was proposed late in the

weekend by Barclays' lawyers from Sullivan & Cromwell, and it was adopted word-for-

word with no discussion or negotiation that anyone could recall.  (*See* M.138 (9/21/08 e-

mail from Sullivan & Cromwell); 8/31/10 [Lewkow] 170:12-172:16.)  The insertion of

this paragraph was an effort to make the Repurchase Agreement disappear, because the

Clarification Letter now purported to give *all* the collateral in the Repurchase Agreement

-- including all the excess collateral or "haircut" that under §559 of the Bankruptcy Code

would have to be returned to the estate-- to Barclays.  Along with the change in the

definition of Purchased Assets, this effectively awarded to Barclays, at no additional cost,

approximately $5 billion excess collateral that had been posted in connection with the

Repurchase Agreement.

333.    When asked about it at trial, Miller did not recall language in the

Clarification Letter concerning the termination of the repo, but he did recall discussion

that the repo had "essentially" been cancelled and turned into "a credit against the

purchase price."  (4/28/10 [Miller] 76:9-17.)  Nonetheless, Lehman and its

representatives, including Weil Gotshal, had no discussions with Barclays and its

representatives Cleary Gottlieb about the implications of a default or termination of the

repo under Section 559 or any other provision of the Bankruptcy Code.  (4/28/10 [Miller]

77:19-25; 8/23/10 [Shapiro] 109:5-22 (no involvement in repo, and despite his experience with Section 559 he was never asked to look into this issue).)[126]

334.    When asked about this issue at trial, Lewkow claimed that Cleary was not involved in the negotiations concerning this issue.[127]  As far as Lewkow knew, "there was no conversation between Cleary and Barclays [on] that side of the table with Weil and Lehman [on the other] side of the table over the implication of the termination of the repo."  (8/31/10 [Lewkow] 169:5-170:6 (no recollection of knowing at the time that under the Bankruptcy Code when a repo is terminated the haircut needs to be paid back into the estate), 174:23-175:4 (no knowledge of whether Barclays did not want to bring this issue back to the Court so as to avoid having to disclose the existence of excess repo collateral).)  It is also undisputed that no one made any effort to bring the insertion of paragraph 13 into the Clarification Letter or its implications under Section 559 of the Bankruptcy Code to the Court's attention.  (8/31/10 [Lewkow] 172:17-173:13, 174:8-17.)

### 5.    The Clarification Letter was finalized and signed in the early morning hours of September 22, 2008

335.    The final Clarification Letter, now incorporating all of these post-Sale Hearing changes, was executed on September 22, 2008.  (M.3; Stip. ¶ 143.)  Berkenfeld signed it on behalf of Lehman, between 7:30 a.m. and 8:00 a.m. that morning.  (M.3 at

---

[126]  There is evidence, however, that Barclays, at least, was attuned to the section 559 issue. Barclays' counsel had been speaking with the SEC and FRBNY about Section 559 and other safe harbor provisions of the Bankruptcy Code, albeit with respect to other assets.  (M.136 (9/17/08 e-mail from Rosen to SEC, FRBNY and SIPC).)

[127]  Lewkow conceded, however, that his partner Ms. Granfield had made representations to the Court that the proposed Sale Transaction would have no effect on the safe harbor provisions of the Bankruptcy Code.  (8/31/10 [Lewkow] 167:21-168:7; M.261 [9/19/08 Tr.] 179:7-180:5.)  And his partner Mr. Rosen had communicated with the SEC concerning the safe harbor provisions of the Bankruptcy Code, including Section 559.  (8/31/10 [Lewkow] 168:8-14; M.136; M.383; Rosen Dep. Tr. 213:21-214:7, 215:19-216:10.)  He also admitted that he has since come to learn there are Bankruptcy Code implications of terminating a repo.  (8/31/10 [Lewkow] 180:11-14.)

11; 4/27/10 [Berkenfeld] 188:13-25; 8/31/10 [Lewkow] 70:21-25.)  He did so because he "got comfort from Weil that it was something that was appropriate to sign" and he was the only authorized Lehman signatory at Weil Gotshal's offices at that hour.  (4/27/10 [Berkenfeld] 191:21-192:7.)

336.    Berkenfeld had not been involved in drafting the Clarification Letter, but knew that it was effecting changes to the Asset Purchase Agreement.  (4/27/10 [Berkenfeld] 201:8-25.)  Berkenfeld agreed that it would be fair to characterize the Clarification Letter as "a different deal" than that which he signed on September 16, he agreed it was "an amended deal."  (4/27/10 [Berkenfeld] 190:8-17.)  Barclays' General Counsel Hughes also conceded that the Clarification Letter amended the Asset Purchase Agreement.  (4/30/10 [Hughes] 195:1-3.)

337.    Although he signed the Clarification Letter, Berkenfeld testified he did not know the reasons behind all of its terms.  (4/27/10 [Berkenfeld] 189:1-5.)  In particular, Berkenfeld was "less familiar" with the provisions concerning the repo financing. (4/27/10 [Berkenfeld] 189:6-18.)  And while Berkenfeld understood that the letter changed the definition of "Purchased Assets," his "general understanding" of this issue did not go beyond the language in the letter itself.  (4/27/10 [Berkenfeld] 193:2-23.) Berkenfeld had no knowledge about the value of the repo securities, or how they had been valued.  (4/27/10 [Berkenfeld] 193:24-194:5.)  He had no understanding about the clearance box assets being added to the deal, or how those assets were valued.  (4/27/10 [Berkenfeld] 192:18-22 (this was "beyond his area of expertise" and "area of focus"), 194:24-195:3.)  And Berkenfeld had had no discussions with anyone about the 15c3-3 assets referenced in the Clarification Letter.  (4/27/10 [Berkenfeld] 192:23-193:1.)

338.    McDade was involved in the Clarification Letter only from "a  conceptual level."  He was not involved in drafting the letter, including changes to the definition of "Purchased Assets." (4/26/10 [McDade] 206:12-25, 207:15-18, 207:22-208:21.)  McDade said "in concept it was meant to reflect on the changes that had happened from Friday and the lack of timeliness in terms of the ability to communicate [] the specific new document to the Court." (4/26/10 [McDade] 207:4-10.)  McDade agreed that "among its purposes was to include references to the unencumbered box and the 15c3 that had not been mentioned specifically in court." (4/26/10 [McDade] 207:11-14.)

339.    McDade did not learn until months after the Closing that Barclays had terminated the September 18 Repurchase Agreement, and he did not have any discussions with Lehman's lawyers, Barclays or anyone else concerning the need for Paragraph 13 of the Clarification Letter concerning the termination of the repo.  (4/26/10 [McDade] 208:22-210:16.)

**I.    The Decision Not To Bring The Clarification Letter Back To The Court For Its Review And Approval**

340.    Towards the conclusion of the Closing, the parties gave only fleeting consideration about seeking the Court's approval, and then went ahead and closed the deal without it.

341.    Lewkow, counsel for Barclays, testified that at one of the many meetings that weekend, Miller addressed those assembled and briefly inquired as to whether anyone there thought that the changes made to the transaction were such that they required further Court review.  No one, from either the Lehman or Barclays side, spoke up.  (*See* 8/31/10 [Lewkow] 72:14-73:17, 174:8-22.)  So no one made any further effort

to return to Court on that Monday morning for its approval of the final Clarification

Letter.  (*See* 8/31/10 [Lewkow] 72:14-73:17, 174:8-22.)

342.    McDade was not present on early Monday morning when this purported

discussion took place.  (*See* 4/26/10 [McDade] 211:1-2.)  Berkenfeld also had no

recollection of any such discussion.  (4/27/10 [Berkenfeld] 191:21-192:12.)  Even so, it is

not clear that they had enough knowledge about the changes made to the deal to

contribute to such discussion or to make that decision.

343.    While the parties have debated whether or not this decision was

appropriate under the circumstances, a few things are evident from the record.  In

particular, there is no good reason for failing to apprise the Court of the new changes.  In

unrebutted testimony, Mr. Rosen, counsel for Barclays, conceded that the Closing for the

Sale Transaction could have concluded on Tuesday, September 23, if need be.  (Rosen

Dep. Tr. 220:17-222:12.)  Lewkow also admitted that the Closing could have taken place

"a day or two later" than September 22 and that the parties could have returned to Court

on September 22.  (8/31/10 [Lewkow] 181:24-182:6.)  Ms. Leventhal confirmed that the

FRBNY had set no deadline for a Monday closing, it just wanted the deal closed as soon

as possible.  (9/7/10 [Leventhal] 150:3-151:3.)  And the Asset Purchase Agreement itself

contained no contractual obligation to close before the markets opened on Monday,

September 22.  (M.1 ¶ 4.4; 8/31/10 [Lewkow] 177:20-178:21 ("there was a very strong

desire" to close Monday but no drop-dead date of Monday in the Asset Purchase

Agreement).)  Indeed, the September 17 Barclays Press Release had previously disclosed

to the public that the closing would take place before September 24, that Wednesday.

(BCI 198; 8/31/10 [Lewkow] 181:16-182:6.)[128]

344.    It is also undisputed that at the conclusion of the September 19 Hearing,

the Court made plain to those present that it would be available over the weekend if

further consultation or action on the Sale Transaction were required.  (M.261 [9/19/08

Tr.] 217:19-218:3.)  The parties had taken note of the Court's weekend availability.  (*See*

8/31/10 [Lewkow] 160:11-18 (recalling the Court's comment to this effect).)

345.    In the end, however, the Sale Transaction was closed based on the

unapproved and undisclosed Clarification Letter.  A copy of the Clarification Letter was

electronically filed as an Exhibit with the Court on September 22, 2008, after the closing,

and without any comment about its importance.  (Docket No. 280 (Clarification Letter

filed as Exhibit C).)

## V.    BARCLAYS' MISCONDUCT CONTINUED AFTER CLOSING

### A.    Barclays Failed To Pay The Full Amount In Bonus And Cure Liabilities

#### 1.    Barclays failed to pay the full amount of $2.0 billion in bonuses required under Paragraph 9.1(c) of the APA

346.    In its opposition to the Rule 60 Motions, Barclays argued that "according

to a document prepared by Barclays' Paul Exall regarding compensation to former

Lehman employees for their pre-acquisition services (the 'Exall Spreadsheet'), Barclays

---

[128]    Indeed, Barclays' zeal to get the deal closed without going back to the Court was confirmed by Lewkow's recollection concerning a dispute that arose as to whether cash margin was to be included in the Rule 15c3-3 assets that were to be transferred to Barclays.  In a hallway discussion, the parties could not recall exactly what had been represented to the Court on this issue, and rather than contact the Court to try to get access to the transcript, Barclays simply agreed to waive its purported claim to an approximate $1 billion dollars it claimed it was entitled to receive.  (8/31/10 [Lewkow] 175:5-176:18 ("Q. So rather than wait till Monday and come back to court and get the transcript, Barclays gives a billion dollars?  A. I think yes, given the enormous desire to close before Monday morning, yes.").)

has paid or promised to pay for 2008 approximately $1.66 billion in bonuses, $265 million in severance payments, and approximately $21 million in taxes.  (Barclays Opp. ¶ 300.)  Barclays contends that "[t]hese liabilities total $1.946 billion, an amount fully consistent with the $2 billion estimate of the parties."  (Barclays Opp. ¶ 300; *see* 8/23/10 [Exall] 189:2-194:8 (discussing BCI 142A); 8/24/10 [Exall] 8:21-9:17 (confirming M.107 is same chart as BCI 142A), 61:11-62:22 ($5 million difference between Exall's chart M.107 ($1.951 billion) and Barclays' brief).)

347.    Evidence adduced at trial, however, (i) confirmed that Barclays did not pay the full $2 billion in bonuses required under Subparagraph 9.1(c) of the Asset Purchase Agreement, and (ii) showed that Barclays never planned on paying that full amount, despite representations to the Court that it would.

### (i)    Barclays identified its "$650 million problem" before Closing

348.    On September 17, 2008 at 7:07 p.m., Clackson wrote an e-mail to Ricci and Michael Evans, Barclays head of human resources, concerning what he termed a "$650m problem."  (M.24; 4/29/10 [Clackson] 257:6-260:25.)  Referring to and quoting in its entirety Subparagraph 9.1(c) of the Asset Purchase Agreement (but not Subparagraph 9.1(b)), Clackson wrote:

> This is a problem, they have $2bn in the agreement.  I was relying on you guys telling me I needed $1.35bn which gave me $650m of the goodwill but the para below [9.1(c)] says we have to pay it to them / can't use.  Archie says you have agreed to this.  Help …

(M.24; *see also* 8/24/10 [Exall] 31:10-33:11 (conceding the e-mail did not refer to Subparagraph 9.1(b) concerning severance).)

349.    Ricci conceded at trial that he understood Clackson to be telling him that the Asset Purchase Agreement "required the expenditure of the whole two billion on bonuses but that he'd only budgeted 1.35 billion … [h]ence the title 650 million dollar problem."  (5/7/10 [Ricci] 172:17-173:4 ("Yes.  I think Mr. Clackson's flagging that issue.").)  And Ricci understood that Clackson's reference to "goodwill" was to his efforts to calculate a gain for Barclays from the Sale Transaction.  (5/7/10 [Ricci] 173:5-8; *see* 4/29/10 [Clackson] 218:24-219:18 (conceding that this $650 million problem changed Barclays day-one negative goodwill calculation), 257:6-260:16.)  Ricci's admissions on this issue were clear:

> Q. … Isn't it a fact, sir, that the 650 million dollar problem that Mr. Clackson is identifying here is that he's figured out the contract requires Barclays to pay two billion but Barclays is only planning on spending 1.35 billion, yes or no?
>
> A. Yes.
>
>       *    *    *
>
> Q. Okay.  Regardless of what's best or desirable or fair, the problem that Mr. Clackson is surfacing to you here is the contract actually says Barclays was supposed to pay two billion dollars for bonuses, yes?
>
> A. We have an obligation to pay two billion, yes.

(5/7/10 [Ricci] 173:23-174:22; *see also* M.24.)  Indeed, the next day, September 18, 2008, Clackson forwarded to Ricci a copy of the 9/16/08 Financial Schedule, and wrote: "so it looks like we have to pay them $2bn min bonuses."  (M.35.)

350.    This interpretation of Barclays bonus liabilities under the Asset Purchase Agreement was confirmed by the deposition testimony of Alvin Brown, a Simpson Thacher partner specializing in compensation issues, who actually was involved in

drafting the provision.  (Brown Dep. Tr. 7:8-8:7, 11:10-12:3, 20:2-21:2, 27:18-32:18.)[129]

Brown testified unequivocally that the $2 billion "Comp" figure on the 9/16/08 Financial

Schedule "was the number for the accrued bonuses for the Lehman employees for that

year. It had been agreed to and put on the schedule."  (Brown Dep. Tr. 25:13-21.)

Further, he testified:

> Q. Is it your recollection that $2 billion number was
> someone's estimate of potential liability under Section 9.1?
>
> *        *        *
>
> A. Yes. But not with respect to the section that you just
> were referencing [*i.e.*, paragraph 9.1(b)].  The $2 billion
> number really related to subsection C [*i.e.*, the bonus
> provision].

(Brown Dep. Tr. 20:15-22.)

351.    When pressed on this issue by counsel for Barclays, Brown was again

very certain:

> Q. Okay.  So the $2 billion includes both bonus and
> severance?
>
> *        *        *
>
> A. No.
>
> Q. Can you explain?
>
> A. Yes.  The bonus -- in order to prevent people from being
> terminated and deprived of their bonus, the arrangement
> was that if they were terminated they would receive their
> accrued bonus and they would be paid severance under the
> severance arrangements so that the $2 billion -- if 90
> percent of the people were terminated and they represented

---

[129]  This testimony is unrebutted.  Barclays, who had deposed Brown, did not call Brown as a trial witness to try to cross examine him on his clear deposition testimony on this issue.  Nor did Barclays call as a witness Arthur Cohen, from Cleary Gottlieb, who Brown identified as having worked on drafting Article IX as well.  (Brown Dep. Tr. 27:18-28:7.)

> 90 percent of the bonus pool, they would be paid the 90
> percent of the bonus pool and to the extent they were
> covered under severance arrangements they would also be
> paid the severance arrangements that they were entitled to.
> If they were severed before 12/31/08.

(Brown Dep. Tr. 30:21-31:17; *see also* BCI 935 (Lehman's Severance Plan).)

352.    Barclays presented no witness to refute Brown's testimony about the

parties' intent in drafting and executing Subparagraph 9.1(c) of the Asset Purchase

Agreement.  (*See, e.g.,* 8/24/10 [Exall] 13:17-15:9 (admitting he had no first hand

knowledge about these issues and conceding that if he had a question about the

negotiations he would defer to someone who was personally involved in them).)[130]

### (ii)    All along, Barclays planned on paying, at most, only $1.3-1.5 billion in bonuses

353.    Paul Exall was the Barclays executive charged with monitoring the

compensation paid to former Lehman employees who transferred to Barclays, and he was

Barclays' Rule 30(b)(6) witness on that topic.  (8/24/10 [Exall] 10:5-11:15; Exall Dep.

Tr. 8:2-9:9; M.766 [Rule 30(b)(6) notice].)  Immediately after the Closing of the Sale

Transaction, Exall was told to plan on paying bonuses to former Lehman employees of

only approximately $1.4 billion, not the $2 billion the Asset Purchase Agreement

required.  (*See, e.g.,* M.91 at 2; 8/24/10 [Exall] 46:4-47:11 (Exall's team prepared twice-

daily reports tracking bonus payments, and Exall reviewed the reports before they were

---

[130]    Exall tried several times at trial to argue, for the first time, that non-compensation
professionals often use terms like "comp" and "bonus" and "severance" as mere colloquialisms or in an
imprecise manner.  (8/24/10 [Exall] 39:18-40:1, 89:8-22.)  That argument cannot apply to Mr. Brown,
however, as he has extensive experience in dealing with complex compensation issues.  (Brown Dep. Tr.
7:24-8:7.)  If anything, Exall's point suggests that the non-compensation professionals responsible for
inserting the word "comp" into the 9/16/08 Financial Schedule or McDade in interpreting it at trial (*see,
e.g.,* 8/24/10 [Exall] 86:6-20) were the ones being imprecise, rather than the compensation lawyers
negotiating and drafting the express language of Paragraph 9.1 of the Asset Purchase Agreement.

given to Barclays' Executive Committee); M.92 at 2; M.130 (9/16/08 e-mail reflecting

$1.3 billion "bonus accrual"); M.134 (9/17/08 Walker e-mail, showing $1.3 billion

"bonus accrual"); M.43 (9/18/08 e-mail to Ricci: "We have assumed only $1.5bn of

comp accrual is required rather than $2bn in completion balance sheet").)

354.    When Exall first looked into this issue, around September 22, 2008, he

reviewed Article IX of the Asset Purchase Agreement and the 9/16/08 Financial Schedule

and immediately concluded that Barclays had obligated itself to pay $2 billion in

bonuses, exclusive of its severance obligations.[131]    Exall relayed this conclusion to

Michael Guarnuccio, one of Barclays' auditors at PwC.  The parties have stipulated that:

"if called to testify at trial, Michael Guarnuccio of Price Waterhouse Coopers would

testify as follows:

> Michael Guarnuccio recalls that at some time in September
> 2008, after the Barclays/Lehman transaction closed, he
> spoke with Paul Exall.  And Mr. Exall stated that he
> believed the two billion dollar estimate was for bonus
> payments only not for severance pay.

---

[131]    When Exall was first asked to look at these compensation issues, he was given a copy of the
Asset Purchase Agreement (M.1) as well as the 9/16/08 Financial Schedule (M.2), which Clackson
represented to him as "being the schedule referred to in the APA."  (8/24/10 [Exall] 15:10-18:16
(impeaching him with Exall Dep. Tr. 37:22-38:4).)  And while Exall tried to squirm away from conceding
that he understood Exhibit M.2 to be the schedule referred to in Subparagraph 9.1(c) of the Asset Purchase
Agreement (including raising the implausible excuse that no one from Barclays had initialed it) (8/24/10
[Exall] 18:17-19:4), in the end he had to admit that he was given no other schedule and he performed his
work operating under the assumption that it was the schedule to which Subparagraph 9.1(c) referred.
(8/24/10 [Exall] 19:5-16; *see* 8/31/10 [Lewkow] 96:15-98:11 (conceding this point).)  Indeed, Exall's
efforts to disclaim any understanding of the operative provisions of the Asset Purchase Agreement
appeared coached and incredible, especially given his compensation-related position at Barclays and the
important role he played in tracking and monitoring what was paid to former Lehman employees.  (*See, e.g.,*
8/24/10 [Exall] 21:5-33:11 (repeatedly testifying that he had no understanding of compensation-related
obligations in the APA); 8/23/10 [Exall] 186:3-22 (disclaiming any responsibility for having to understand
the compensation provisions of the Asset Purchase Agreement).)  His denial of knowledge was also belied
by his own later testimony where he demonstrated that he, in fact, had such knowledge.  (*See, e.g.,* 8/24/10
[Exall] 41:3-42:14 (showing familiarity with Subparagraph 9.1(c), 42:15-43:17 (familiar with Asset
Purchase Agreement provision requiring financial schedule to be initialed by both parties), 43:18-44:18
(sufficiently familiar with issues to be on a conference call with PWC), 61:3-10 (he understood negative
goodwill considerations in Clackson' "$650 million problem" e-mail).)

(6/25/10 Tr. 5:17-21.)

355.    Exall was unable to deny this admission at trial.  (8/24/10 [Exall] 33:12-

36:24 (no recollection one way or the other as to accuracy of Guarnuccio's recollection of

the conversation); *see* 8/23/10 [Exall] 186:23-188:22 (even on direct unable to address

contents of conversation with Guarnuccio).)  And Guarnuccio's version of the

conversation is confirmed by PwC documents.  For example, a November 2008 e-mail

exchange among Exall, Romain and Walker, all from Barclays, and Guarnuccio from

PwC shows that they discussed this very issue.  On November 3, 2008, Walker wrote to

Exall, cc'ed to Romain, concerning a "PWC Request":

> Gary and I just had a conversation with Mike Guarnuccio
> (lead US partner covering Barclays at PwC), and as part of
> the sign-off of the Acquisition Balance Sheet, he is
> requesting a copy of the schedule that shows the $2bn
> bonus liability to LEH folks.  He is referring to an
> "Accrued FY08 Liability" schedule that is referenced in the
> Asset Purchase Agreement.  Is this something that you have
> and can share with PwC?

(M.801.)  Exall responded by attaching a copy of the 9/16/08 Financial Schedule, and

remarking, "[h]ere's a scanned copy; you will see that $2bn described as 'Comp.' I think

Patrick [Clackson] has the original schedule. Suggest you chat with him before you share

it with PwC (unless you have done so already.")  (M.801.)  Walker forwarded this

schedule to Guarnuccio.  (M.801.)  No one on this pre-litigation exchange made any

mention of the possibility that the $2 billion obligation also covered severance payments.

356.    When asked about this e-mail exchange at trial, Exall conceded that he

understood Mr. Walker's e-mail to concern bonus liabilities and not severance.  (8/24/10

[Exall] 37:3-40:9.)  Exall also conceded that (i) the term "Accrued FY08 Liability" which

Walker used in its e-mail is a defined term in Subparagraph 9.1(c), the Asset Purchase

Agreement section that relates only to bonus and not to severance, and (ii) Exall

understood Walker to be writing about that provision.  (8/24/10 [Exall] 40:10-41:1.)  And

when Exall forwarded a copy of the 9/16/08 Financial Schedule, no one from Barclays

stopped him or suggested that this was not the correct schedule, nor did anyone say that

the schedule covered both bonus and severance instead of just bonus liabilities.  (8/24/10

[Exall] 42:15-43:17.)

357.    In other e-mails from PwC, Barclays auditors raised questions about

Barclays' apparent efforts to use the $2 billion allocated for bonuses to also cover

separate severance obligations.  On January 23, 2009, Karen Hong wrote to Barclays:

> "I haven't received how this exactly ties into 12/31
> balances but from the schedule I have, it seems that a
> portion of the $2 bil was used for severance payments to
> the terminated employees.  However, it was my
> understanding that per the APA, the severance payments to
> the transferred employees were to be paid 'without limiting
> any additional rights that each Transferred Employee may
> have.'  I had interpreted this to mean that the $2 bil bonus
> provision should be used solely for bonus as any use of the
> $2 bil for the severance payment would be limiting the
> additional rights that each Transferred Employee has by
> reducing the pool of bonus to be paid out to those
> Transferred Employees."

(M.149 at 2)

358.    On January 26, 2009, in connection with PwC's audit of the Acquisition

Balance Sheet for the Sale Transaction, Guarnuccio wrote an e-mail to Martin Kelly and

James Walker, in which he summarized the differences between Subparagraphs 9.1(b)

and 9.1(c) of the Asset Purchase Agreement, and wrote:

> We discussed this with HR (Paul Exall) back in September
> and it was confirmed to us then that the $2 billion was only
> for bonus and the severance amounts to be paid were
> separate.

(M.150 at 00009520.)  Martin Kelly, by then a Barclays employee, responded: "Mike –

there is a call scheduled tomorrow at 8am between your team and Paul Exall in HR –

purpose to discuss what may be paid out of the $2bn – our view is that the $2bn may be

used to discharge severance payments."  (M.150 at 00009519; 8/24/10 [Exall] 43:18-

44:18 (Exall participated in that conference call).)  Guarnuccio forwarded this to his

colleague, Jim Holloway, at PwC, and asked for his input: "I don't agree there is any

leeway in the APA to get to their decision."  (M.150 at 00009519)  Holloway replied,

"Agreed. They have to pay 2bn unless there are leavers, and they have to pay sev based

on ex lehman terms."  (M.150 at 00009519)[132]

359.    Exall confirmed at trial that from September 2008 until the time of these

e-mails, PwC's position was that the entire $2 billion referenced in Subparagraph 9.1(c)

of the Asset Purchase Agreement had to be paid in 2008 bonuses, and not as part of

Barclays' severance obligations.  (*See, e.g.,* 8/24/10 [Exall] 38:9-45:4; M.801.)[133]

360.    Barclays' intention never to pay the contractually agreed $2 billion in

bonuses is also apparent from other contemporaneous documents.[134]  A report Exall

prepared, which his superior Evans forwarded to Diamond, Ricci and other senior

Barclays executives on September 23, 2008, the day after closing, presented his "update

of our present bonus and related spend."  (M.91 at 00027190, *see* 8/24/10 [Exall] 45:5-

47:11 (describing why reports were prepared).)  In an attached chart, Exall set forth the

---

[132]  By "leavers" Holloway was evidently referring to the provision in the latter section of
Paragraph 9.1(c) covering what happens to the bonus obligation if a large percentage of employees
voluntarily leave Barclays, something that never happened.  (*See* M.1 ¶ 9.1(c).)

[133]  For some reason, unknown to Exall and never presented by Barclays at trial (which called no
witnesses from PwC), PwC later changed that view when it agreed to sign off on Barclays' financials and
its Acquisition Balance Sheet.  (8/24/10 [Exall] 44:19-45:4; 8/23/10 [Exall] 188:18-189:1.)

[134]  *See also* M.10 (Barclays document showing a bonus accrual of $1.3 billion as of 9/16).)

amounts Barclay had spent or was planning on spending for some 402 guaranteed bonus

recipients ($862 million "actual"). (M.91 at 00027191; 8/24/10 [Exall] 52:15-52:17.)

The chart shows that at the time, Barclays was planning to lay off 3,300 of the transferred

Lehman employees as "planned redundancies," and they were to receive no bonuses.

(M.91 at 00027191; 8/24/10 [Exall] 53:7-54:16.) A footnote to the chart (n.1) showed

that Barclays was planning on paying about $100 million in severance for these

redundant employees, which was "not funded out of the 2008 bonus pool." (M.91 at

00027191; 8/24/10 [Exall] 54:17-56:22.)[135] Terminating these 3,300 employees was

expected to leave a "residual pool" of 6,792 employees who were not to get guaranteed

bonuses, but who Barclays expected to pay $538 million in discretionary bonuses. (M.91

at 00027191; 8/24/10 [Exall] 54:17-55:4.) The chart shows that this would bring

Barclays' expected total expenditure in bonuses to $1.4 billion, which Exall called "Total

Pool Funding Available." (M.91 at 00027191; *see also* M.92 at 00027259 (same bonus

pool target for September 24, 2008); 8/24/10 [Exall] 45:5-13 ("I was instructed to use in

the daily updates that I was preparing a reference point of 1.4 billion."), 54:17-55:9,

57:22-58:8 (Exall was given the $1.4 billion number less than a week after Sale

Hearing).)

361. The accompanying analysis, also prepared by Exall, explained that,

"[t]hree funding pressures currently exist that are putting pressure on the original bonus

pool estimate of $1.4bn." (M.91 at 00027191.) Among the listed "pressures," he noted:

"The original intention was to guarantee approximately 175 to 200 people; currently we

---

[135] Thus, even under Barclays' litigation-driven reading of Article IX of the Asset Purchase
Agreement (*See infra* ¶¶ 365-371.), at the time this chart was prepared (around September 23, 2008),
Barclays was still only planning to spend a total of $1.5 billion in bonuses plus severance ($1.4 billion plus
$100 million). (M.91 at 00027191; 8/24/10 [Exall] 56:23-57:8.)

are proposing to guarantee nearly 400 people, more than twice as many as anticipated."
(M.91 at 00027191.)  This $1.4 billion internal Barclays target for bonuses is further
confirmed in Attachment 3 to Exall's analysis, entitled "Analysis of Targeted Spend
against $1.4bn Funding."  (M.91 at 00027195.)  In his "observations," he noted: "After
deducting targeted spend to date and other guaranteed bonuses, there remains a residual
pool of $400m from the proposed $1.4bn funding."  (M.91 at 00027195; *see also* n. 1
(noting one column showed an "Illustrative allocation of $1.4bn pool").)

362.    Exall's chart thus confirms that, immediately after the Closing, Barclays
was planning on spending only $1.4 billion in 2008 bonuses to transferred Lehman
employees, in direct contravention of representations to the Court and the express
requirement of Subparagraph 9.1(c) of the Asset Purchase Agreement submitted to the
Court.  When questioned about this, Exall testified as follows:

> Q. Right.  So this chart maps an expectation of having to
> pay a total of 1.5 billion in severance and bonus, correct?
> If you add the one hundred to the 1.4 billion, I get to 1.5
> billion dollars, right?
>
> A. If you do the mental arithmetic, that's what this chart in
> isolation says.  However, I would say that as this document
> clearly identifies, at the time, we were very clear.  The 1.4
> billion reference point was going to be insufficient to the
> tune of 270 to 370 million dollars as modeled to deliver the
> kind of compensation that Barclays in fact wanted to do.
>
> Q. Wanted to do?
>
> A. Well, was planning to do in terms of the target as
> specified in this document.
>
> *          *          *
>
> Q. And the rest of this memo is to highlight [for] the
> executive committee, the fact that we might blow the 1.4
> pool, correct?

A. That's what this document is intended to demonstrate.

…

(8/24/10 [Exall] 56:23-57:19 (confirming $1.4 billion was Barclays' target).)

363.    On September 23, 2008, Exall wrote an e-mail to his superior, Michael

Evans, in which he discussed a "flight risk" problem Barclays was experiencing due to its

refusing to pay enough in bonuses.  (M.145 at 00228642-00228643; *see* 8/24/10 [Exall]

58:10-60:16 (explaining context).)

364.    To address this risk, Exall proposed a few options, the second being:

"Model and allocate specific GB pools to individual business areas to manage within the

overall $1.4 bn."  (M.145 at 00228643.)  In other words, under this proposal the decision

making as to bonuses would be decentralized, but the total amount of bonus payments

would be managed to ensure it did not exceed Barclays' internal limit of $1.4 billion.

(8/24/10 [Exall] 60:17-60:22.)  One of the risks Exall identified with this option was

"[s]pending more than $1.4 bn is dilutive to current negative goodwill calculation."

(M.145 at 00228644.)  When asked about this comment at trial, Exall conceded that he

understood "from the e-mail that Mr. Clackson sent to me that there was a [sic] he has

raised the issue around 1.35 billion and the 650 goodwill -- negative goodwill calculation.

And this is a reiteration of that understanding at the time from his e-mail.  I simply

rounded it to 1.4 billion."  (8/24/10 [Exall] 61:3-10.)

   **(iii)    In the end, Barclays paid only $1.5 billion in bonuses to
            transferred Lehman employees**

365.    Barclays produced in discovery a spreadsheet it claimed showed that, in

the aggregate, Barclays paid to transferred Lehman employees approximately

$1.951 billion in all forms of compensation.  (M.107; 8/24/10 [Exall] 8:21-9:17, 65:18-

66:2; *see also* 9/2/10 [Romain] 40:5-9 (Barclays' acquisition balance sheet accrued $2.0

billion for payments of bonuses and severance).)[136]  As explained below, Exall conceded

on cross examination that several entries on the spreadsheet (M.107) did not relate to

bonuses.  (*See, e.g.,* 8/24/10 [Exall] 66:3-83:11; Exall Dep. Tr. 78:22-84:3; 110:22-

115:18; 124:22-125:6; 128:8-137:7; 141:5-144:12, 151:15-23.)

366.    For example, Barclays paid or expected to pay a total of $265 million in

severance, which is the sum of two entries on Exall's chart.  (M.107; 8/24/10 [Exall]

72:10-74:17.)  These payments were or are to be made as part of two reduction in force

exercises at Barclays, one of which took place after the December 31, 2008 cutoff date

under Subparagraph 9.1(b) of the Asset Purchase Agreement.  (M.107; 8/24/10 [Exall]

72:10-74:17.)  And while Exall testified that he had no understanding of Barclays'

obligations under that subparagraph, *i.e.*, the severance provision of the Asset Purchase

Agreement or how it related to Subparagraph 9.1(c) (8/24/10 [Exall] 73:2-74:12), he

conceded that, unlike 9.1(c), Subparagraph 9.1(b) makes no mention of the 9/16/08

Financial Schedule which contains the $2.0 billion "Comp" number at issue in this case.

(8/24/10 [Exall] 28:5-19.)

367.    Exall's chart also refers to $53 million in payments Barclays made or

committed to make to a single trader, Mr. Hoffman, (and related tax payments), which

Exall admitted were in the nature of performance based retention payments.  (M.107;

---

[136]  This was presented to Movants only after Barclays first produced in discovery a spreadsheet
that showed Barclays remarkably paying a total of $1.999 billion out of the $2.0 billion called for under the
Asset Purchase Agreement.  (M.218.)  In testimony lacking in credibility, Exall, who prepared both
versions of the spreadsheet, maintained that he was never instructed to make the total reach $2.0 billion.
He offered no explanation for how, in these turbulent economic times, Barclays managed to come within
one-tenth of one percent of the $2.0 billion target and chalked it up, improbably, to pure happenstance.  He
conceded, however, that he had to replace the original version of the schedule because it double counted
and therefore overstated severance payments Barclays claims to have made.  (8/24/10 [Exall] 11:24-13:15,
62:23-66:2.)

8/24/10 [Exall] 75:8-81:1.)  Those payments were contingent on how well Hoffman

performed as a trader after he moved to Barclays, they were not in the nature of a bonus

for his 2008 performance at Lehman and so was not within the ambit of Subparagraph

9.1(c).  (8/24/10 [Exall] 80:16-81:1 (in addition to sums owed under this retention

agreement, Hoffman received a separate 2008 bonus for his work at Lehman).  Barclays

retained the ability to reduce those expected payments if either (i) Hoffman performed

poorly while at Barclays, or (ii) he leaves Barclays before February 2011.  (8/24/10

[Exall] 76:11-79:9 (impeached with Exall Dep. Tr. 136:9-24).)  Moreover, the payments

to Hoffman were made or will be made well past the March 15, 2009 cutoff date

provided for in subparagraph 9.1(c) of the Asset Purchase Agreement.  (M.1 ¶ 9.1(c);

9/24/10 [Exall] 75:23-76:10, 79:10-81:2.)

368.    Five million dollars of the $12 million Barclays paid as "Pre 9/22 payroll"

were in the nature of base salaries, and therefore, by definition, also not bonus payments.

(M.107; 8/24/10 [Exall] 66:16-67:3, 68:12-69:25 (conceding that the $5 million was

"principally" the employees' "base salary").)  Subparagraph 9.1(c) expressly excludes

"base salary" from the bonus payments it mandates.  (M.1 ¶ 9.1(c); 8/24/10 [Exall]

69:10-25.)[137]  The remaining $7 million within this entry were tax payments, which were

not paid directly to the individual Lehman employees in question, as required under

Subparagraph 9.1(c).  (8/24/10 [Exall] 67:1-68:10; M.1 ¶ 9.1(c).)

369.    Barclays' payment of approximately $56 million (and related taxes) in

"ISP Awards" (M.107), which were shares of stock dispensed to all Barclays employees

---

[137]  This $5 million may explain the difference between the $1.946 in Barclays' Brief and the
$1.951 in Exall's chart (M.107), but Exall was not sure.  (8/24/10 [Exall] 70:1-5.)

(both legacy Barclays and former Lehman employees) to compensate them for Barclays' failure to follow its own procedures in paying bonuses for 2008. (8/24/10 [Exall] 81:6-83:10.) In other words, whereas Barclays normally pays stock bonuses in March for the prior year, in 2009 Barclays failed to do so, and employees had to wait until May for their stock awards, which cost them money as the price of Barclays' stock changed in the interim period. (8/24/10 [Exall] 81:6-83:10.) The "ISP Award" to which the chart refers was an award to all Barclays employees (the chart reflects only the portion attributable to former Lehman employees) to make them whole for their losses during this interim period (*i.e.*, from March to May). (8/24/10 [Exall] 81:6-83:10; Exall Dep. Tr. 141:20-150:12, 151:4-153:22.) Barclays presented no evidence even suggesting that the risk that Barclays would fail to timely pay its employees was something Lehman contractually agreed to bear.

370.    Lastly, Exall's chart reflects Barclays' payments to various taxing authorities, in the total amount of approximately $71 million. (M.107.)[138] None of these taxes was paid to the individual employees, but rather to the applicable taxing authority. (8/24/10 [Exall] 67:4-68:9, 70:14-71:4, 71:16-72:5.) This includes some $50 million included in Exall's entry for "Bonus including social tax." (8/24/10 [Exall] 70:11-71:15.) As Exall admitted, Subparagraph 9.1(c) makes no mention of payments to tax authorities, nor does it allow for payments to any third parties made "on behalf of" the Lehman

---

[138] This includes the $21 million in taxes Barclays claims to have paid, plus the $50 million embedded in Exall's entry for "Bonus including social tax." (M.107.) This amount also includes the taxes purportedly paid on account of Mr. Hoffman's performance payments as well as taxes on the replacement stock awards Barclays had to pay to make up for its own mistake in connection with its untimely payment of such awards in the first place. As explained above, the taxes on those items should be excluded for the independent reasons relating to these types of payments.

employees who were meant to receive the bonuses.  (M.1 ¶ 9.1(c); 8/24/10 [Exall] 67:21-68:9.)

371.    In the end, subtracting out these non-bonus payments, Barclays paid approximately $1.5 billion in bonuses to former Lehman employees who transferred to Barclays (*i.e.*, $11m (Replacement RSUs) + ($1.271b - $50m (Bonus w/o social tax)) +$11m (IBD Grad programmes)).  (*See* Barclays Opp. ¶¶ 300, 301 (Barclays admits to paying or promising to pay only $1.66 bill in bonuses and still includes social tax, "equity, deferred equity, replacement awards [and] other future payable awards" within that figure); M.107.)

### 2.    Barclays paid only a tiny fraction of the $1.5 billion in cure liabilities the Court was told it would pay

372.    As noted above, the Court was told the parties estimated the cost of cure payments Barclays would assume at $1.5 billion.  (M.118 ¶14.)   No one ever explained to the Court that this estimate for $1.5 billion was anything other than a good faith estimate of what that actual liability would be.  It was never portrayed, as Barclays attempted to portray it at trial, as some kind of theoretical "cap."  It was presented to the Court as an actual estimate of the consideration Lehman would receive from Barclays.

373.    Internally, however, Barclays decided early on that only about $200 million worth of those contracts were "mission critical."  (M.11; 6/22/10 [Cox] 225:16-228:5 (confirming that his notes in M.11 read: "We need these contracts.  No one knows where the 800 mill came from.  The 200 mill is for more than 3,000 contracts mission critical," and testifying that Martin Kelly supplied these numbers).)[139]  This conclusion,

---

[139] Barclays' outside counsel, at Cleary Gottlieb, had no knowledge or involvement in determining what Barclays would actually end up paying in cure liabilities.  (8/31/10 [Lewkow] 86:7-20.)

which clearly related to the likelihood Barclays would actually assume all the potential

cure liabilities, was never relayed to the Court, to Lehman's counsel, to the Lehman

Boards or to creditors.  (6/22/10 [Cox] 227:12-229:15 (acknowledging that Barclays'

liability for mission-critical contracts had been estimated at $200 million and conceding

that there was a swing of roughly $1.3 billion of what was told to the Court), 205:2-3,

206:4-24 (Cox attended the Sale Hearing and was aware of the importance of full

disclosure to the Court but could not testify to any steps he took to inform the Court of

this $1.3 billion swing); 4/27/10 [McDade] 76:7-77:21 (believed cure figure presented at

Sale Hearing was intended to reflect actual cure payments as accurately as possible);

5/7/10 [Burian] 11:16-14:8 (Klein described to Burian cure and compensation liabilities

totaling roughly $4.25 billion); 4/28/10 [Miller] 33:19-34:17 (Miller was not "privy to

Barclays' thinking" regarding cure); *see* 4/26/10 [Ainslie] 113:15-20 (the Lehman Board

did not ask for Barclays' view of the transaction).)

374.    At trial, pervasive evidence was introduced showing Barclays never

intended to pay anything close to $1.5 billion for cure liabilities.  By Friday, September

19 (the date of the Court hearing), Barclays knew that Lehman's estimate for cure

liability exposure had dropped from $2.25 billion to $1.5 billion.  (4/30/10 [Clackson]

10:11-22.)  By that same date, Barclays had a list of contracts provided by Lehman

---

(continued…)

Mr. Lewkow claimed to have no knowledge, prior to Closing, of any document indicating Barclays
considered only $200 million of the Lehman contracts in issue to be "mission critical.  (8/31/10 [Lewkow]
87:15-88:19; *but see* 240:1-241:24 (general recollection of the concept of "mission critical" contracts being
discussed at the time))  He also professed not to have read the portion of the Sale Motion that said, "The
*parties* estimate that the cure cost associated with such assumption and assignment will be approximately
1.5 billion dollars."  (8/31/10 [Lewkow] 90:16-94:23 (referring to M.118 at 6 (emphasis added)).)  He had
no personal knowledge as to whether Barclays participated in developing that estimate presented to the
Court.  (8/31/10 [Lewkow] 91:8-93:12)

showing that a total potential exposure of approximately $800 million.  (4/30/10

[Clackson] 10:23-14:11 (agreeing that mission critical contracts was closer to $150

million than $200 million at the time, and conceding that this analysis was being done on

Thursday or Friday, September 18-19); M.95 (Romain 9/19/08 e-mail, re: cure amounts

for acquisition balance sheet:  "Believe the total list is something like $800m but would

imagine we'll end up rejecting a significant proportion of the underlying contracts;"

Westwood response: "I understood the critical piece was $158m when got it on Friday. . .

Range of $125m-$150m should work out okay").)  And the decision as to what was

considered a "mission critical" contract was solely that of Barclays, not Lehman.  (*See*

4/30/10 [Clackson] 16:3-19; M.11; M.130; M.104; M.41.)

375.    That Friday, in response to an e-mail concerning Barclays' negative

goodwill calculation – premised in part on Barclays assuming $2.25 billion in cure

liabilities (*see* M.41) – Clackson relayed to Ricci, Barclays' "official line" as to its

accounting for negative goodwill.  (4/30/10 [Clackson] 14:15-16:2.)  Part of his

explanation to Ricci reflected his understanding that "cure payments are optional."

(M.41; 4/30/10 [Clackson] 16:3-17:20 (conceding that he hoped at the time that Barclays

would not be assuming contracts with vendors with whom Barclays already had

dealings), 98:5-99:13.)  There is no mention in this or any other e-mails of having to

correct previous representations made to the Court as to the total expected cure liabilities

Barclays was to assume, in the neighborhood of $1.5 billion.

376.    In sum, the Court was never told at the September 19 Hearing, or even

after Closing, that Barclays was planning all along to assume only a tiny fraction of the

$1.5 billion that had been presented to the Court in explaining the "value" of the deal to

Lehman.[140]

377.    In the end, Barclays paid only $238,200,978 in contract cure liabilities

through July 14, 2009.  (Stip. ¶¶ 128, 152, 162; *see* BCI 133 at 00115845 line 41; 9/2/10

[Romain] 41:23-42:1, 47:2-25.)

**B.    Barclays' Internal Opening Balance Sheet Confirmed Its Efforts To Disguise From The Court Its Expected Gain On Acquisition**

**1.    McDade did not know that, even before the Closing, Kelly was helping Barclays calculate an enormous gain on acquisition**

378.    Unbeknownst to McDade or the Lehman Boards, a few Lehman

executives began working with Barclays, to prepare an acquisition balance sheet, even

before the Closing while they were still Lehman employees.  Among the Lehman

executives involved were Martin Kelly, Ian Lowitt, Gerard Reilly and Paolo Tonucci.

(*See, e.g.,* M.54, M.55 (e-mails dated September 20 among Kelly, Reilly, Tonucci and

others discussing the creation of an opening balance sheet as per James Walker's (of

Barclays) request); M.74 (e-mail dated September 21 from Azerad to Romain, Walker

and Gavenda of Barclays, copying Kelly, Reilly, Tonucci, Beldner and Lowitt, and

transmitting an opening balance sheet).)

379.    Incredibly, Kelly testified that he did not recall preparing the Opening

Balance Sheet for Barclays but "it's certainly possible" he did.  (4/28/10 [Kelly] 234:1-

---

[140]    Barclays' counsel's redirect of Clackson with respect to the cure liabilities again missed the
main point.  (4/30/10 [Clackson] 72:1-86:19.)  The point is not when Barclays definitively learned what it
would have to pay in cure amounts, but rather why no one said anything to the Court at the Sale Hearing
when Barclays clearly knew that the $1.5 billion figure previously provided to the Court nowhere near the
amount Barclays actually would pay.

3.)  Documents reveal that on September 20, James Walker (Barclays) called Martin Kelly and requested that he prepare an opening balance sheet for Barclays.  (M.55.)

380.    Over the course of the week of September 15, Kelly prepared several templates summarizing the terms of the Sale Transaction and the values of the assets and liabilities being transferred to Barclays.  (*See* M.235; M.576; 4/28/10 [Kelly] 172:2-13.) In his September 21, 2008 e-mail to Walker and Romain, of Barclays, Kelly relayed that "Right now the BS is a work in progress. Will probably take overnight to resolve. Will keep you posted. Here is what we know and don't know."  (M.576 at 1.)  Just two days after the Court has been told Barclays was taking $47.4 billion in assets, Kelly provided a breakdown of the assets Barclays was actually receiving, including $7 billion in cash, $44.8 billion in "inventory" and $1 billion in "15c3-3 receivable, all totaling $52.8 billion in value.  (M.576 at 1; M.235 at 00115145.)

381.    Kelly's work was translated into an acquisition balance sheet prepared by Robert Azerad, also from Lehman.  (M.74; 4/28/10 [Kelly] 234:4-235:16; 9/2/10 [Romain] 136:21-138:10, 141:16-142:14; M.576 (e-mail exchange involving Romain, Azerad and Kelly, re: over $50 billion in cash and inventory coming from Lehman).)  On Sunday, September 21, 2008 (before the Closing), Azerad forwarded to Romain, Kelly, Tonucci, Reilly and Lowitt, among others at Barclays, his "updated opening balance sheet."  (M.74.)  This document reflected a transaction in which Barclays acquired $52.88 billion in assets in exchange for (i) $45.25 billion in "Financing for Cash Received from Barclays ($45b for repo and $250m for purchase)" plus (ii) $2.0 billion in "Accrued Bonuses (Assumed to be all accrued)" and (iii) another $2.25 billion in "Cure Payments (Placeholder for actual accrual)."  (M.74 at 2.)  Subtracting even the full

original amounts for liabilities ($4.25 billion) from the real value of the assets transferred

provided an equity component for Barclays on the opening day of $3.38 billion. (M.74 at

2.) This "equity" component represented a day-one gain Barclays was expecting to

recognize once the deal closed. (9/2/10 [Romain] 140:7-141:22.)

382.    Kelly never informed McDade or the Lehman Boards that he was working

on an opening day balance sheet for Barclays (4/26/10 [McDade] 211:22-212:1, 214:13-

16), and McDade never saw any such Opening Balance Sheet for Barclays. (4/26/10

[McDade] 212:2-14; *see also id.* at 211:18-19, 212:20-24.) In fact, upon being shown

Barclays' opening balance sheet at trial, and in particular the equity position it showed

for Barclays at $3.38 billion, McDade testified that if there had been such an equity

component in the deal on the opening day, the deal would not have been in balance and

thus would be inconsistent with the actual deal he made with Barclays. (4/26/10

[McDade] 213:21-214:12; *see also* 205:21-206:4 (agreeing that if the deal had not been

in balance, McDade would want that disclosed to the Court).)

### 2.    Even before Closing, Barclays was counting on earning a large day-one gain, or negative goodwill, from the Sale Transaction

383.    Relying in part on Kelly's spreadsheets, Barclays began work on an

acquisition balance sheet to reflect the Sale Transaction. (*See, e.g.,* 9/2/10 [Romain]

13:8-14:6 (the process took many months).) The numerous versions of the balance sheet

demonstrate the tension between the desire of the Barclays traders (PCG and others) to

write down the assets (so they could more easily recognize trading profits or offset

trading losses on those securities later) and the desire of the senior executives to reveal at

least the negative goodwill they had promised to the Barclays Board. (*See supra* ¶¶ 106-

111, 235; *see also, e.g.,* 9/2/10 [Romain] 99:2-101:3 (agreeing that values listed in his

"initial inventory" spreadsheet were developed based on input from both PCG and

traders), 110:15-111:22 (aware traders were valuing assets at amounts lower than those

on Lehman's books), 117:19-119:1 (aware of process whereby traders assigned values to

Lehman assets), 112:15-114:9 (Romain was receiving valuation input from both traders

and PCG (*i.e.*, King and Yang), 128:4-23 (same), 144:3-147:1 (traders like Teague,

Landreman and Washtell were involved in valuing assets; not sure if Lehman traders

were involved); 8/25/10 [King] 179:12-181:13 (King played a role in "coordinated

approach" to bringing assets onto Barclays' balance sheet; to the extent his team lowered

the value of assets that would reduce negative goodwill), 193:12-200:16 (trading gain

results from difference between what assets are marked at on Barclays' books as of

acquisition date (including transaction adjustments) and price at which they are later

sold); 4/30/10 [Clackson] 21:5-23 (King was involved throughout the week in negotiating

prices for Lehman assets and he had input into acquisition balance sheet), 30:5-33:14

(valuation of the repo assets is being driven by King's analysis, and that is causing Ricci

concern with lower than expected negative goodwill calculation), 33:7-37:7 (describing

large jump in negative goodwill up to $4.47 billion, driven mainly by King's downward

change in his valuation adjustment); M.806 (Romain 9/29/08: "Patrick – PCG's valuation

numbers plus the loss of some of the 1.9 isn't helping the negative goodwill number").)

384.    Barclays' counsel's questions of Clackson on this issue -- designed to

show that higher asset valuation would lead to higher negative goodwill -- completely

missed the point.  (*See, e.g.*, 4/30/10 [Clackson] 70:16-71:25.)  Of course they do.  The

real point is that traders within Barclays (who were integrally involved in valuing the

securities) had an incentive to understate the value of assets they were later to manage so

as to leave themselves room to show trading profits later, while still recognizing the minimum accounting valuation necessary to meet the negative goodwill and regulatory capital concerns of the Board and senior management.  (*See infra* ¶¶ 547-551.)  It is this earnings management effort that skewed the valuation exercise at Barclays, leading to understated values being calculated after the closing.

385.    Even so, through all the back and forth over various versions of the opening balance sheet, a few facts became clear at the trial.  In sum, Barclays' calculations showed that (i) the $52 billion figure that disinterested third parties like Barclays' collateral agent, BoNY, assigned to the financial assets in question were considerably higher than the $45 billion figure Barclays now argues for in this litigation, even with the write downs it was taking for future earnings management purposes, (ii) Barclays knew before the Sale Hearing that it would be making a huge, undisclosed, profit (*i.e.*, negative goodwill), and (iii) Barclays ascribed little to no value to the intangible assets it received from Lehman until much later, when it decided it could plant an accounting gain in them, supplying part of the negative goodwill it wanted, while simultaneously undervaluing the securities it received.

386.    One of the earliest versions of this analysis is reflected in a September 16th spreadsheet prepared (before any of the Court hearings) under the direction of Clackson and his team, which calculated $2.75 billion in negative goodwill.  (M.135 at 3.)  The asset side of the balance sheet reflected $72.70 billion in financial assets plus $1.5 billion in real estate assets, for a total of $74.2 billion in assets.  These were offset in large part by $68.4 billion in financial liabilities, plus $1.3 billion in bonuses, for a total of $69.7 billion in Total Liabilities.  (*Id.*)  This left $4.5 billion in net assets, less $1.75 billion in

"Consideration," leaving $2.75 billion in negative goodwill.  (*Id.*)  The draft contained no reference to cure liabilities or the additional $700 million in bonuses about which the Court was advised.  (*Id*.)  Nor did it mention intangibles at all.

387.    After receiving this spreadsheet, Clackson forwarded it (again on Tuesday, September 16) to Bill Castell, in Barclays' Corporate Development, with his calculation based on the bonus and cure liability figures supplied by Lehman and reflected in the 9/16/08 Financial Schedule:

> Bill this is completion balance sheet from draft docks.  LI
> [*i.e.*, Lehman] side not Barcap, gives the final asset split –
> neg good will from this method is sum of 2.25 + 2 = 4.25 -
> 1.35 (a/cing liab) = 2.9

(M.135 at 1-2; *see* M.574 (same analysis attaching 9/16/08 Financial Schedule); M.575 (9/21/08 e-mail with Castell circulating figures from 9/16/08 Financial Schedule which he described as "latest balance sheet for the transaction").)  Romain later asked Clackson to explain his calculation, which apparently came from somewhere else within Barclays, and not his accounting department.  (*Id.* at 1; 9/2/10 [Romain] 121:17-126:15 (to the best of Romain's understanding, the information on his schedule (M.135) was supplied to him by Clackson, which is the same as the information on the 9/16/08 Financial Schedule (M.2), and this is analogous to the disclosures made on the Analysts Call); 4/30/10 [Clackson] 14:15-16:12 (discussing M.41 (same e-mail chain) and Barclays "official line" with respect to negative goodwill).)

388.    That same day, Romain (using Tom McClosker's e-mail account) circulated an acquisition summary raising the negative goodwill to $3.7 billion.  (M.227;

9/2/10 [Romain] 114:10-116:1; 4/29/10 [Clackson] 207:25-208:12.)[141]  His analysis

started with the type of frank admission found in internal documents not intended to see

the light of day, concerning "Inventory – net: $60.5bn (book value $64bn, Writedown

$3.5bn)."  (M.227; 9/2/10 [Romain] 116:2-119:1; 4/29/10 [Clackson] 211:6-212:5 ($3.5

billion inventory valuation adjustment was the product of negotiations between Barclays

and Lehman traders).)  It also relied on a bonus accrual of only $1.3 billion and it omitted

any cure liabilities.  (*Id.*)[142]  This $3.7 billion negative goodwill figure is the number that

was  reported to the Barclays Board a few hours later.  (4/29/10 [Clackson] 219:22-

220:15.)

389.    By Saturday, September 20, Romain's opening balance sheet, reflected

$3.89 billion in negative goodwill.  (M.234.)  This was based on $52.19 in financial

assets received by Barclays, adjusted downward by $2.5 billion.  (*Id.* at 2.)  To that

Romain added $1.3 billion in cash, $1.0 billion "assets in fed box (net of $0.9bn

writedown)" – *i.e.*, the $1.9 billion in assets added to the deal the day before -- and 50%

of the mortgage backed securities (MBS) valued at $1.4 billion, and the real estate.  (*Id.*)

From the total of $54.84 billion in assets, he subtracted $45 billion in repo liability, $2.25

billion in cure payments, and $2 billion for bonuses, leaving $5.59 billion in net assets.

(*Id.*)  After accounting for $1.7 billion in consideration, Barclays was left with negative

goodwill, or a day-one gain, of $3.89 billion.  (*Id.*; 4/29/10 [Clackson] 272:25-275:1

---

[141]    Negative goodwill figures in this range were shared with the Barclays Board at its September 16 meeting to consider "Project Long Island."  An illustration contained in the Board packet, shows an expected negative goodwill from the transaction of $3.5 billion.  (M.232 at 8.)

[142]    Later versions of the opening balance sheet seem to correct this bonus liability figure (*see, e.g.*, M.17 at 00115129; *see supra* ¶ 142; 4/29/10 [Clackson] 217:10-219:21, 257:6-260:25), but only after Barclays had concluded that it was contractually required to pay the full $2 billion in bonuses under Subparagraph 9.1(c) of the Asset Purchase Agreement (*see supra* ¶¶ 348-352).

(confirming these figures in this document were the same as those on M.47 (LaRocca e-mail regarding $7.19 billion in excess repo collateral).)

### 3. Post-Closing, Barclays manipulated the Acquisition Balance Sheet to maximize asset markdowns while preserving the minimum requisite negative goodwill

390.    Internal Barclays documents generated during the period heading up to closing confirm that Lehman, Barclays, and their collateral agents valued the assets in the range of $52 billion. (*See, e.g.,* M.47 (Barclays valuing it at $52.19 billion); M.362 (9/21/08 Ricci e-mail, referring to the "52"); 5/7/10 [Ricci] 185:12-187:9 (BoNY valued it at $45 billion plus $7 billion in cash = $52 billion), 195:12-20 (agreeing he was putting assets in the $52 billion range); M.236 (9/20/08 Kelly e-mail, listing $44.8 billion for the inventory plus $7 billion cash); M.74 (9/21/08 Kelly's opening balance sheet: $52.8 billion); M.72 (Lehman 9/21/08 opening balance sheet: $52.88 billion); M.234 (9/20/08 Barclays balance sheet: $52.9 billion); M.64 (9/20/08 Yang e-mail showing collateral (not including cash) at $45.078 billion); M.139 (9/21/08 Barclays' "consensus" valuing collateral (before addition of $7 billion cash) at about "45bn"); M.78 (9/21/08 King e-mail: "current best estimate is the portfolio inc. 7bn cash is 48.5 to 49bn"); M.55 (Azerad email to Kelly and others: "Repo with Barclays as of Thursday night ($49 billion - $42 billion of securities and $7 billion of cash"); M.55 (Reilly e-mail to Kelly, Tonucci, and others: "So they basically have 42b of assets and paid 38b of cash. Is that how they should think about it?" (excludes $7 billion in cash)).)

391.    Notwithstanding the numerous valuations of the financial assets at $50-52 billion at closing, post-closing, the traders at Barclays, who would benefit from future trading gains, immediately began to press for aggressive write downs to the assets for purposes of Barclays accounting for the transaction. Stephen King and his colleague

Jasen Yang were charged with bringing the block of assets "on-board" at Barclays and

assigning the securities to groups of traders.  (8/25/10 [King] 98:11-15, 106:18-107:12;

M.792.)  Profits that the traders would earn on those securities in the future were very

much driven by the value at which those assets were assigned to those securities by

Barclays for purposes of the acquisition.  (8/25/10 [King] 100:17-101:5 (substantial

amount of King's compensation dependent on maximizing P&L); 10/7/10 [Pfleiderer]

103:3-105:8 (traders involved in valuation process have personal financial incentive to

maximize P&L to maximize their own bonuses)).)  As King admitted at the hearing, he

was tasked with trading and risk-managing some of the most complex assets that were

acquired by Barclays — the mortgage-backed securities.  (8/25/10 [King] 7:7-16, 37:23-

25.)  But, King and Yang wore two hats throughout the Fall of 2008, as Barclays edited,

revised, and amended how it was going to value the assets acquired and how it was going

to account for those assets on its Acquisition Balance sheet.  King and Yang remained

involved in the valuation and accounting process, offering their input and judgments on

issues concerning the pricing of those securities and what liquidity discounts Barclays

would assign to the securities.  (9/2/10 [Romain] 163:2-6; Landreman Dep. Tr. 52:24-

53:6, 100:8-17.)  And all of this was done with the full benefit of hindsight.  As late as

January 2009, with full knowledge of the deep post-closing declines in equity and debt

markets in October through December 2008, Barclays was still refining and amending the

valuations it would retroactively assign to the securities as of September 22, 2008.

(9/2/10 [Romain] 14:2-6.)

        392.    Starting September 22nd, Romain started to refine his analysis, this time

arriving at a negative goodwill calculation of $2.98 billion.  (M.228 at 2; M.579 (same

analysis); *see also* BCI 264 at 4 (9/21/08 version showing $2.46 billion in negative

goodwill).)  In this iteration, Romain valued the inventory at $42.55 billion, after taking a

$2.83 billion write down at King's suggestion from $45.18 billion.  (M.228; M.579;

9/2/10 [Romain] 148:16-150:13 (this $2.83 billion adjustment was "S. King's first cut

only," confirming that King and PCG remained involved in the valuation/adjustment

process), 154:11-155:23 (describing write down of cure number, as shown in M.95

(9/19/08 e-mail)); 4/30/10 [Clackson] 20:13-24:7  (spreadsheet reflects valuation

adjustments to the prices Barclays initially booked according to BoNY marks).)[143]

393.    After adding to this written down number the 15c3-3 assets ($.77 billion)

and the $7 billion in cash Barclays received as part of the September 18 Repurchase

Agreement, Barclays should have had total financial assets of $50.32.  (M.228.)  Adding

in real estate and $280 million for intangibles, resulted in $52.02 billion in total assets,

matched against total liabilities of $47.50.  (*Id.*)  This left $4.52 billion in net assets, less

$1.54 billion consideration, for $2.98 in negative goodwill.  (*Id.*; *see* M.579 (same);

4/30/10 [Clackson] 24:8-25:23 (this analysis reflects where things stood as of the

Closing.)

394.    Clackson reviewed this analysis and was not satisfied with the amount of

negative goodwill, remarking: "So some things we have to keep working on to squeeze

out what we can, but looks more like $3-3.5 rather than $4+, basic issue is outside repo

not enough assets …."  (M.228; 9/2/10 [Romain] 155:24-156:19 (confirming Clackson is

---

[143]    To clarify, this was not the entire pool of repo collateral that Barclays ended up with after the
December 2008 Settlement with JPM.  Rather, this collateral did not include the $7 billion Barclays had
received in cash in order to close the September 18 Repurchase Agreement.  Adding that $7 billion to the
$45.18 (pre-adjusted figure) yields a value of $52.18 billion for the entire pool of collateral Barclays
received under the September 18 Repurchase Agreement.

talking about negative goodwill); *see also* 4/30/10 [Clackson] 20:17-25:23.)  Ricci

expressed his concern about "what have we told group?," meaning the leadership of

Barclays Group and the Barclays Board.  (M.228; 9/2/10 [Romain] 157:5-158:7; 4/30/10

[Clackson] 30:9-13 (recalling Board was told to expect about $3 billion in negative

goodwill).)  Later in the e-mail chain, Ricci remarked about the negative goodwill, "Need

to get to 4 or no writedown capacity," and later "I am worried."  (M.580; 4/30/10

[Clackson] 32:10-33:6 (Ricci "was trying to get to as large a number as possible"); 9/2/10

[Romain] 166:4-168:6 (claiming no memory of discussing writedown capacity issue).)

395.    To assuage him, Clackson replied, "$1.9bn was in but Stephen [King]

valued at nil so may be upside – he has his guys working on it, I am putting 50c value on

it for the moment."  (M.580 at 1; *see also* M.819 (King questioning value of $1.9 billion

in added assets).)  This demonstrates the tension between King and the other traders

seeking to assign lower values to the collateral, and the accountants and others wanting to

assign higher values to meet the negative goodwill commitments Barclays had made to

its Board.  (*Id.*; *see also* 9/2/10 [Romain] 158:17-163:18 (describing debate he had with

King about the proper dates on which assets should be valued), 164:23-169:7, 193:17-

194:9 ("different asset classes were looked at by people who specialized in those asset

classes"); M.660 (e-mail exchange from Romain to Yang and King).[144]

396.    The very next day, Romain forwarded to Clackson yet another version of

the opening balance sheet, this time showing $4.47 billion in negative goodwill (M.581 at

---

[144]    Romain later followed up with Yang and others on this issue, writing "Speaking with Patrick,
I believe the current view of valuation of Long Island acquired assets is $42.9b + $300m in repo margin
and that this corresponds to the $44.8b asset listing received from Lehman.  However, this valuation does
not yet attribute any value to the $1.9b that came across from the Lehman box rather than as repo collateral.
Is that all correct?"  (M.660 at 1.)  Later, he inquired, "Is there any early view on an approximate fair value
for the additional $1.9bn from the box …?"  (*Id.*)

3; M.229 at 3) – more than enough for the "writedown capacity" Ricci wanted.  (*See* 4/30/10 [Clackson] 33:7-37:7 (describing large jump in negative goodwill up to $4.47 billion, driven mainly by King's downward change in his valuation adjustment).)  To achieve this, Romain used "revised" valuations and adjustments he received from King, Yang, and others.  (*See* 9/2/10 [Romain] 168:11-169:7; s*ee also* M.664 native attachment (October 4, 2008 version of opening balance sheet showing $4.14 billion in negative goodwill and $51.13 billion in financial assets).)  Overnight, the adjustments to valuation had been reduced by about $1.5 billion, which provided the "4.1" billion of negative goodwill that Clackson sought.

397.    In the end, these versions of the opening balance sheet show that, at the time disclosures were being made to the Court in September 2008, Barclays (i) repeatedly valued the collateral it received in the $50-52 billion range; (ii) ascribed little to no value to the intangibles it received from Lehman (4/29/10 [Clackson] 215:7-9 (Barclays believed intangibles had *de minimus* value); and (iii) only later massaged the numbers to arrive at a day-one gain (negative goodwill) in the range of $3.5-4 billion while preserving the write downs its traders wanted).)[145]

398.    In the months after the Closing, Barclays continued to write down on its books the value of the assets it had acquired from Lehman.  In the main, these write downs were motivated by the desire of Barclays traders to post on their books low values for the collateral they now had to manage and trade, in order to provide room to show a

---

[145]  These figures comport with what Barclays was preparing at the time to share with the investing public.  At the time of the Closing, Barclays' Investor Relations group prepared a "Transaction Summary," which it ran past Clackson and others, stating that Barclays had acquired some $43 billion in financial assets, $7 billion in cash and $769 million in 15c3-3 assets in exchange for $45 billion in repo obligations.  (M.439 at 4.)

trading profit later.  (9/2/10 [Romain] 99:22-101:2 (Barclays traders were involved in valuation process until balance sheets were finalized in February 2009); 8/25/10 [King] 193:12-200:16 (trading gain results from difference between what assets are marked at on Barclays' books as of acquisition date (including transaction adjustments) and price at which they are later sold).)

399.    Barclays tax planners were also involved in the attempts to manage the valuations downward and still keep negative goodwill in the $4 billion range.  (M.31 at 3 (McKinnon e-mail: "I understand the negative goodwill could be as high as 4-5 million").)  Notwithstanding Barclays' desire to generate negative goodwill, it also wanted to avoid paying taxes on the discount it had received from Lehman while preserving its ability to manage its future earnings.  (*See id.*)  To that end, tax planning was a key concern for Barclays in structuring the Sale Transaction and in developing the Acquisition Balance Sheet.  As Beatrice Montaudy, involved in tax planning for Barclays, described the issue in a September 18, 2008 e-mail to Jasen Yang and others:

> … during the asset purchase price negotiations, ***it was essential to the valuation calculation that the "discount" between the value of the assets acquired and the purchase price NOT be subject to the 46% marginal US tax rate applicable to BCI.***  The purchase price negotiations assumed the assets would be purchased by BBPLC where all gains would be offset by BBPLC US tax losses and ONLY subject to the 28% UK tax.  This assumption was based on the repeated and repeatedly reconfirmed aversions of the business and PCG people present at 745 7th on Tuesday am that the "equities were de minimus" and all assets would be held for sale and liquidated quickly.

(M.31 at 3 (emphasis added).)

400.    When Romain was added to this e-mail chain later that day, he remarked that "[i]t's essential there is a coordinated approach to how assets are brought on to

barclays balance sheet (which entities acquire which assets, how/where negative goodwill recognized, how ringfenced for acquisition accounting, etc.)." (*Id.* at 1; 9/2/10 [Romain] 107:9-109:9)  Thus, the preparation of an opening balance sheet involved multiple tax planning and valuation considerations, and such considerations continued on into 2009. (*See* M.31 at 3; 9/2/10 [Romain] 104:7-106:13, 110:5-111:12 (aware of tax planning involved in acquisition balance sheet); M.105A at 2 (bulk of gain allocated to non-BCI entities); 8/25/10 [King] 178:14-19 (ultimately, when Barclays accounted for the transaction, the gain was not reported in BCI, it was reported in other entities).)

401.    Through the Fall of 2008, Barclays' internal accountants continued to amend valuations and re-assign assets amongst various subsidiaries to (a) maximize the write down on the securities and (b)  assign the securities to entities that would minimize the tax liability of Barclays Capital, the U.S.-registered broker-dealer.  Barclays marked down the securities by employing various unprecedented, ad hoc and unreliable methodologies, as described by Movants' various expert witnesses.  (*See infra* ¶¶ 561-673, 682.)  The tactics Barclays employed included:  (a) moving the date of valuation so as to convert what would have been a trading loss into a lower acquisition value; (b) imposing liquidity discounts that were 250-500 larger than prevailing bid-ask spreads; and (c) using post-closing sales wholly internal to Barclays to assign values to some of the most complex securities.

402.    Ultimately, by February 2009, through the use of all these posting-closing maneuvers, Barclays assigned an after-the-fact value of $40.69 billion to the initial inventory that, in September 2008 had been valued at over $45 billon by BoNY — a reduction of about $5 billion.  (M.102N; 5/7/10 [Ricci] 185:12-187:9; M.47)  As for the

so-called JPM Inventory, valued by JPM at $7.0 billion just prior to closing, Barclays

valued that collateral as of December 2008 -- three months later -- at $3.74 billion.

(M.103N.)

403.    The write downs of the securities valuations would have adversely

impacted Barclays negative goodwill, but Barclays had yet another "adjustment" to fix

that problem.  Barclays developed new, much larger, valuations for the "intangible"

assets, which it previously, at the time around the Sale Transaction, had valued at zero or

at negligible amounts.  (*See, e.g.,* M.668 at 1 (10/4/08 Romain e-mail about the opening

balance sheet, remarking "Intangibles – not expected to be material (and a full capital

deduction in any case"); 4/29/10 [Clackson] 214:15-18 ("We thought we were buying a

bankruptcy company.  We didn't think there was any value in – intangible assets would

include things like the Lehman name.  We didn't think there was any value in those assets

at the time we were buying it.").)  Indeed, Barclays retained Ernst & Young ("E&Y")

solely for that purpose, and in January 2009, E&Y came up with a figure of $1.407

billion to be assigned to the intangible assets Barclays had acquired for purposes of

Barclays' accounting for the transaction.  (M.299 at 3; *see also* M.663 at 1 (Romain

noting that E&Y will be coming up with a value for intangibles); 9/2/10 [Romain] 14:15-

18, 19:8-22:3.)  E&Y was careful to explain, however, that it had not independently

valued these assets and that it had based its valuation analysis on historical and

prospective information provided by Barclays and Lehman.  (M.299 at 3.)  Even so, these

valuation figures were incorporated into Barclays financial statements.  The addition of

these now much larger values attributed to intangibles allowed Barclays to maximize the

write down on the securities and still meet the negative goodwill commitment made to its

Board.

> ### 4. Even though the Acquisition Balance Sheet showed a large gain, it never reflected an accounting reduction from the actual gain

404.    In the end, the acquisition balance sheet sent to Barclays' auditors showed

a gain on the Sale Transaction of approximately $4.7 billion pre-tax.  (BCI 133; 9/2/10

[Romain] 16:24-17:5; BCI 134 (excerpt from Barclays' February 9, 2009 Form 6-K);

Stip. ¶ 116; *see also* M.814 (January 9, 2009 version of opening balance sheet showing

$3.58 billion in negative goodwill).)

405.    Gary Romain's testimony about Barclays' announced gain on acquisition

revealed that post-closing adjustments made by Barclays had the effect of reducing its

actual gain by over $6 billion.  (9/2/10 [Romain] 97:3-100:10, 111:13-22 (testifying

about write downs on assets after receipt and after Sale Transaction closed); *see* M.105A

("final version" of acquisition balance sheet showing $4.17 billion gain); M.102N

(Barclays' write down of assets received from Lehman, through BoNY, by $4.4 billion

from BoNY valuations); M.103N (Barclays write down of assets transferred through JPM

by $2 billion from September 2008 values); *see also* M.101 (July 31, 2009 cover letter

from Barclays' counsel describing the spreadsheets in M.102 and M.103 as "[t]wo

spreadsheets containing information that were provided to Barclays' auditors relating to

values that Barclays booked for the securities received from Lehman and JPM").)  Absent

these internal adjustments to third-party valuations, Barclays' announced gain on

acquisition would, in truth, have been billions of dollars more.

406.    Romain explained that by the time of the final acquisition balance sheet,

Barclays valued the entire pool of collateral it had received from Lehman, including the

assets received in the December 2008 Settlement, at only $45.5 billion, down from the

$50-52 billion marks placed on it by BoNY, JPM, FRBNY, Lehman, and even Barclays

at the time.  (9/2/10 [Romain] 17:3-24, 29:22-35:1; *see also id.* at 35:2-37:6 (attributing

$5 billion of the $45.5 billion repo collateral to the assets that came over in the December

2008 Settlement).)  And, when he added in all the other assets Barclays received or

claims entitlement to, he came to a total of $57.8 billion in assets acquired in the Sale

Transaction.  (*Id*.; *see* 8/25/10 [King] 182:23-183:21.)  Romain attributed Barclays' $4.7

billion gain on acquisition to $2 billion in intangible assets, in particular "customer lists,"

and $2.5 billion from the derivatives business.  (9/2/10 [Romain] 17:25-19:4; *see id.* at

19:5-21:25 (explaining accounting for intangibles), 22:1-24:4 (explaining accounting for

exchange traded derivatives).)

> **5.    When PwC audited Barclays' Acquisition Balance Sheet, it did
> not independently value the assets or liabilities in question**

407.    Towards the end of its case, Barclays put into the record several

documents produced by PwC relating to its work in auditing Barclays' acquisition

balance sheet.[146]  However, Barclays called no PwC witness to the stand.

408.    In the end, the PwC documents Barclays introduced demonstrate only that:

- PwC did not conduct any independent valuation of the assets Barclays
  received from Lehman.  (10/7/10 [Pfleiderer] 91:18-24; 9/21/10 [Garvey]
  47:7-12, 60:10-63:1, 71:6-75:10.)  Indeed, in signing off on Barclays'
  financial statement, PwC included the following disclaimer in its auditor
  letter:

> Our responsibility is to express an opinion on these
> financial statements based on our audits. We
> conducted our audits of these financial statements in
> accordance with the standards of the Public

---

[146] These documents were admitted into evidence only on a limited basis.  (*See infra* ¶¶ 544-546.)

> Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

(M.554 at 178.)

- When it reviewed the Asset Purchase Agreement and the 9/16/08 Financial Schedule, PwC concluded that Barclays owed $2 billion in bonuses, exclusive of its severance obligations, and PwC was later, for reasons never revealed, talked out of that position. (M.149 at 2; M.150.)

- The value Barclays now ascribed to the non-financial assets, including the intangible assets, it received from Lehman was an accountant-driven exercise, and not the result of Barclays itself placing $2 billion of value of these assets – a figure that, in any event, was never disclosed to the Court.[147] (M.299; 4/29/10 [Clackson] 215:7-9; M.668; M.663.)

**C.      LBHI Was Excluded From Discussions Concerning The Dispute Between Barclays And JPM Over $7 Billion In Collateral, The Resolution Of Which Was Also Not Properly Disclosed**

      **1.      Almost immediately after the Closing, a nasty dispute erupted between Barclays and JPM**

409.    As noted, there were operational problems in transferring to Barclays on the night of September 18 all $50 billion of the collateral Barclays expected to receive. (*See* M.119A [Leventhal Decl.] ¶¶ 13-14; *see generally* 9/7/10 [Leventhal] 25:3-28:2 (describing her limited recollections on the start of this dispute).) To correct this, in the

---

[147]    For example, to assist in PWC's audit, Barclays provided PWC with a November 2008 draft opening balance sheet for the Sale Transaction, which showed negative goodwill of $2.77 billion. (M.245 at 8-9.) In the liabilities section, this analysis reflected cure liabilities of only $0.15 billion (*id.*), and intangible assets were listed at only $0.06 billion. (*Id.*) The total financial assets are valued at $49.52 billion. (*Id.*)

early morning of September 19, 2008, it was agreed that LBI would pay Barclays $7

billion in cash to complete the transaction, which cash was provided by a JPM "box

loan."  But, as explained below, that $7 billion was transferred into Barclays' account and

then later removed from Barclays' account.  (*See generally* 4/30/10 [Hughes] 177:12-24;

6/21/10 [Diamond] 201:5-202:8.)  JPM claimed that this was the result of Barclays

failing to "roll" or renew a $15.8 billion repurchase agreement (separate and apart from

the September 18 Repurchase Agreement) secured by other Lehman assets which caused

LBI to have to borrow such funds from JPM.  (9/7/10 [Leventhal] 152:1-153:21.)

  410. In any event, Barclays claims it first realized that the $7 billion was not in

its account after it had closed the Sale Transaction on September 22 and after it had

signed the Clarification Letter.  (*See* M.119A [Leventhal Decl.] ¶¶ 19-21; M.119C

[LaRocca Decl.] ¶ 11 ("At the time the Clarification Letter was finalized, Barclays

believed its $7 billion – *i.e.*, the Subject Funds – was in its account at JPMorgan."); *see*

*also* 9/7/10 [Leventhal] 27:19-22 (agreeing that Barclays brought this to the FRBNY's

attention on September 23rd), 133:23-134:8; 6/21/10 [Diamond] 201:5-202:8.)[148]  After

discovering this problem, Barclays sought help from the FRBNY.  (*See* M.119A

[Leventhal Decl.] ¶ 21; 9/7/10 [Leventhal] 155:3-14 (dispute became heated and Barclays

asked the FRBNY to get involved).)

  411. In a September 26, 2008 e-mail from LaRocca to the FRBNY, he relayed

the situation and Barclays' insistence that it be resolved quickly, as well as his

---

[148]  Notably, the Clarification Letter never mentioned the parties' purported agreement to transfer
this $7 billion to Barclays.  (*See* M.3.)  One would expect a document purporting to "clarify" issues
associated with the Asset Purchase Agreement to at least mentioned an agreement of this magnitude.
Rather, the first mention of this agreement in Court filings was in the motion to approve the December
2008 Settlement.  (M.119 ¶ 13.)

expectation that the FRBNY would continue to support Barclays in this regard.  (M.856

("We need JPM Chase to return our funds this morning").)[149]  He also forwarded to the

FRBNY a copy of an e-mail Jonathan Hughes had sent to JPM' counsel saying:

> As you know there are a lot of people who can attest to the
> discussions we had a few days ago and to the fact that the
> funds in question are Barclays' funds.  I have had calls to
> this effect from others today, including our external
> lawyers who were at the relevant meetings.  The absence of
> a realistic explanation and your firm's continuing refusal to
> give back the money, together with these documents, make
> the whole thing start to look like fraud (in the inducement
> relating to the agreement we reached) and theft (given your
> firm's prior acknowledgements that the funds belong to
> Barclays and that the funds may have been removed from a
> Barclays account).

(M.856 at 1-2; (9/7/10 [Leventhal] 155:12-156:3 (FRBNY was aware of this e-mail).)

412.    JPM's perspective on this dispute between Barclays and JPM was

summarized in an October 11, 2008 letter sent by Jamie Dimon, JPM's chief executive,

to John Varley, Barclays Group CEO.  (M.360)  A copy of that letter was e-mailed to

Diamond and Hughes of Barclays.  (M.360 at 00059718.)[150]  This letter was never shared

with the Court, even when it was later asked to approve the parties' settlement of this

dispute.

413.    Dimon wrote to Varley to explain JPM's position as to why the $7 billion

Barclays thought it had received on September 19 instead remained in LBI's clearance

account.  (M.360.)  Dimon wrote that after LBHI declared bankruptcy, JPM voluntarily

---

[149]  (*See also* M.856 at 3 (9/25/08 e-mail from S. Heller from FRBNY to LaRocca and Hughes, cc'ed to Leventhal, saying "I truly believe that there was a good faith misunderstanding between Chase and Barclays during the negotiations this weekend.  There seems to have been two different transactions .... Unfortunately, both involved about $7 billion dollars.  There were signs of this disconnect that night ....").)

[150]  Over Barclays' objection, M.360 was admitted for the limited purpose of showing that Jamie Dimon made the statements in the letter to Barclays and showing notice to Barclays.  (6/21/10 [Diamond] 208:17-209:16.)

agreed to continue to act as clearing bank for LBI so it could wind down its positions.

(M.360 at 00059720-1.)  Dimon said that, throughout this period, Barclays assured JPM

that Barclays would fully repay JPM's advances by purchasing or refinancing the entire

LBI securities portfolio that JPM was financing.  (M.360 at 2 (expressing his view that

the publicly filed Asset Purchase Agreement, listing $70 billion in securities and $69

billion in liabilities, was consistent with that commitment by Barclays).)

414.     Dimon recounted the transition from the Fed Repo to the September 18

Repurchase Agreement and how that affected Barclays' commitment to JPM:

> During the course of that week, a significant amount of the
> borrowing LBI had been doing from the Fed was assumed
> by Barclays.… Indeed, much of the collateral financed by
> Barclays Capital on Wednesday night was the very
> collateral financed by the Fed on Monday and Tuesday
> nights.  (For a very significant amount of that collateral, the
> movement of which between the Fed collateral pool and the
> Barclays Capital collateral pool was undoubtedly deliberate,
> Barclays Capital assigned a loan value greater than the
> amount that had been assigned by the Fed.)

(M.360 at 00059721.)  On Thursday, Dimon stated, JPM "'unwound' these facilities by

advancing cash to repay the Fed and Barclays Capital.  Again, we did so with the clear

expectation that Barclays Capital would either purchase or finance all of the securities in

these facilities and that JPMorgan's intra-day funding would be fully repaid prior to the

commencement of LBI's SIPA proceeding."  (M.360 at 00059722.)

415.     In that regard, on Thursday evening,

> Bob Diamond spoke to Heidi Miller and several other of
> our senior executives and asked that we release our lien on
> additional securities so that Barclays Capital would receive
> an aggregate of $49.7 billion in securities in exchange for
> aggregate payments of $45 billion in cash.  (The Fed has
> apprized us that the loan amount on the Fed collateral pool
> was $46.1 billion and we and the Fed agree that the loan
> amount on $49.7 billion of collateral was $45.2 billion.

> Accordingly, we have difficulty understanding any claim
> that you were to receive the entire Fed collateral pool in
> exchange for $45 billion in cash.)

(M.360 at 00059722.)  JPM apparently viewed Barclays' request to release its lien on

these additional securities as an effort by Barclays to get more collateral than it was

entitled to for the loan it was making to LBI.  (M.360 at 00059722.)

416.    In addition, Dimon complained that in the "chaos" of that Thursday night,

Barclays ended up taking collateral from outside the pool of Fed Repo collateral,

including some securities that had not previously been financed by JPM at all.  (M.360 at

00059722-3.)  To facilitate these transfers, JPM agreed to advance $7 billion in cash to

LBI, and "[a]gain [JPM] understood that [it] would be fully repaid on the advances made

on Thursday morning" and that this would occur prior to LBI's bankruptcy filing.

(M.360 at 00059723.)  Later that night or early Friday morning, however, LBI informed

JPM that Barclays was "not purchasing or financing the securities that had been part of

the Barclays Capital tri-party financing."  (M.360 at 00059723.)  This prompted JPM to

credit the $7 billion back to LBI's clearing account, from which JPM had advanced the

funds in the first place.  (M.360 at 00059723.)  JPM did so because it believed Barclays

"had no intention of living by the assurances that [Barclays] had given [JPM] – or of even

completing the 'take-out' of the Fed collateral."  (M.360 at 00059723.)

417.    In this context, Dimon directly questioned the accuracy of the disclosures

that had been made to the Court in light of Barclays' position in their dispute and accused

Barclays of misleading the Court:

> On Friday night, for the first time as far as we know, the
> Bankruptcy Court was apprised of a different "deal"
> between Barclays Capital and Lehman Brothers – and that
> Barclays Capital was no longer purchasing $70 billion in
> assets and assuming $69 billion in related debt.  But the

> Court was *not* apprised of the purchase that Barclays
> Capital now says it agreed to make. Instead of the Court
> being told that Barclays Capital was purchasing
> approximately $49.7 billion in securities for $45 billion in
> cash, the Court was told that Barclays Capital was
> purchasing $47.4 billion in securities for $45.5 billion in
> cash. In addition, the Court was told that the reason for the
> change was a deterioration in market prices, an explanation
> we now know to be incorrect.

(M.360 at 00059724); *see also* 6/22/10 [Varley] 150:14-17, 151:5-12 (Varley agreed that

Dimon was accusing Barclays of misleading the Bankruptcy Court about the nature of the

transaction that was actually implemented and that this was a serious accusation); 6/21/10

[Diamond] 215:6-216:5 (similar).)[151]

418.    Dimon proposed that an accounting be performed to ensure Barclays did

not end up with assets to which it was not entitled. (M.360 at 00059725 ("[W]e believe

that a full accounting should be done.").) As he explained it:

> [T]he Bankruptcy Court was told that Barclays Capital was
> to receive $47.4 billion (not $49.7 billion) in securities and
> to pay $45.5 billion (not $45 or $45.2 billion) in cash. We
> are both duty-bound to ensure that LBI received the value it
> was supposed to receive in exchange for your $45 billion.
> We have offered several times to do this accounting with
> you (and, as appropriate, the Fed), and it is entirely possible
> that the SIPA Trustee and the Bankruptcy Court would
> want such an accounting, but [Barclays] personnel have
> declined, citing the amount of time and effort it would take.
> We should do this accounting and should do it now. We
> would be willing to discuss the concept of an escrow while
> such reconciliation was taking place.

(M.360 at 00059725).)

---

[151]    While Ms. Leventhal claimed she did not recall being shown a copy of this letter, she remembered that JPM had accused Barclays of misleading the Court. (9/7/10 [Leventhal] 172:6-173:25, 174:1-11 (later softening her testimony to say JPM raised concerns about the accuracy of disclosures to the Court).) Ms. Leventhal conceded the FRBNY made no efforts to investigate that question. (*Id.* at 175:14-176:2.)

419.    The Barclays/JPM dispute continued for many more weeks, but no accounting was ever performed.  Indeed, despite Dimon's serious accusations, no one at Barclays even made an effort to see that an accounting was done.  (6/21/10 [Diamond] 222:8-223:8 (no knowledge whether Barclays ever performed an accounting); 6/22/10 [Varley] 153:22-154:16, 158:18-22 (similar).) [152]  Nor was that suggestion ever raised with the Court, even in connection with the motion for approval, several months later, of the December Settlement with JPM.  Moreover, demonstrating Barclays disdain for disclosure, no one from Barclays showed any interest in investigating or looking into Dimon's allegations concerning the misleading nature of the disclosures that had been made to the Court about the terms of the Sale Transaction.  (6/22/10 [Varley] 157:7-158:17 (Varley assigned Diamond and counsel to handle issues arising from the letter but never asked Diamond whether Dimon's statements concerning asset values and disclosures to the Court were correct); 6/21/10 [Diamond] 211:11-18 (When asked whether he discussed with Varley the necessity of investigating the disclosures to the Court concerning the Sale Transaction, Diamond responded that until the $7 billion was returned to Barclays, he and Varley believed "it didn't make much sense to talk.").)  And Dimon's letter to Varley concerning this issue was never shown to the Court until this litigation, and even then over Barclays' objection.  (6/21/10 [Diamond] 208:17-209:16.)

---

[152]    The FRBNY was not an addressee on this letter from Dimon to Varley.  (M.360 at 00059718-9.) However, given the extensive role played by the FRBNY in trying to broker a resolution of this contentious dispute between Barclays and JPM (*see supra* ¶¶ 420-436), in which both sides accused the other of fraud or serious impropriety (M.856 (September 26 e-mail from Hughes to Stephanie Heller of FRBNY forwarding a September 25 e-mail from Hughes to Cutler (JPM) in which Hughes asserted that JPM's actions suggested "fraud" and "theft")), it is hard to imagine that the concept of performing an accounting to get to the bottom of things never came up, or even that JPM never expressed some of the sentiments contained in the Dimon letter to FRBNY representatives during these contentious negotiations.

### 2.    The FRBNY played a not-so-impartial role in effecting a settlement between these two banks

420.    Faced with a multi-billion dispute between two major banks it was charged with regulating, and realizing it had played a large role in bringing about the transaction giving rise to the dispute, Leventhal testified the FRBNY tried to "mediate" a resolution of the outstanding issues between Barclays and JPM.  (9/7/10 [Leventhal] 27:23-28:7, 135:2-6, 155:3-11.)  E-mail correspondence between the parties and the conduct of the negotiations, however, show that the FRBNY hardly played an impartial role; it basically did Barclays bidding throughout the negotiations.  (9/7/10 [Leventhal] 159:7-15.)  At the very least, the FRBNY was complicit in hiding the ball from LBHI, which was expressly excluded from the discussions until the last minute and, even then, misinformed about how the settlement related to the overall Sale Transaction.  (*See infra* ¶¶ 434-435, 439-440.)

421.    Initially, the FRBNY reviewed the banks' claims, and tried to reconcile which securities were sent to Barclays from the Fed Repo collateral, whether any other securities (not within the Fed Repo) were also transferred to Barclays, and whether any proffered securities were refused by Barclays.  (*See* M.403 (Sept 30 e-mail between FRBNY and JPM:  "Bottom line I think is that we have committed to going through the Sept 18 transaction to identify the degree to which the securities pledged to FRBNY under the three programs on the night of Sept 18 were sent (and retained) by Barclays and to identify which, if any, of those securities were sent by Lehman/Chase and DK'd back that night.").)

422.    Soon, however, FRBNY representatives became Barclays' advocate, trying to get Barclays the financial deal and agreement provisions it wanted.  Throughout

October of 2008, Shari Leventhal, from the FRBNY, was in close communication, and

essentially strategizing, with Hughes, Barclays' General Counsel, about Barclays'

negotiating position with respect to the financial terms of a possible settlement. (*See,

e.g.,* M.701, M.705, M.846; 4/30/10 [Hughes] 197:14-19, 200:15-201:6.) In one such e-

mail exchange, Hughes relayed to Leventhal an analysis prepared by King, from

Barclays, of what Barclays should be entitled to based on two different "principles."

(M.701 at 00097-8; M.846 at 00391-2.) The first such principle was that "the ratio of

collateral to cash [in the settlement] should be at least the ratio on the original facility."

(*Id.*) In his analyzing this "principle," King set forth his understanding, as of October 5,

2008, of the value of the collateral and loan amount under the Fed Repo -- $50.62 billion

in collateral securing a loan of $45 billion cash, for a haircut ratio of 1.12. (M.701 at

00097; M.846 at 00391; 9/7/10 [Leventhal] 166:25-169:4 (confirming that she

understood this analysis to reflect a discounting from market value).)[153] Under King's

second "principle," because the "quality" of the collateral Barclays received was

purportedly "worse" than that in the Fed Repo, Barclays was entitled to more collateral –

he figured it should be 20%. (M.701 at 00097; M.846 at 00391-2.)

423.    Leventhal responded to this analysis, relaying her own understanding, as

of October 6, 2008, of the terms of the Fed Repo: "The ratio appears to be different. We

actually loaned $46.1B against the $50.6[B], so the ratio is 1.10 not 1.12. That means the

$45B loan would have had a collateral target of $49.5B." (M.701 at 00093; *see* M.846

(Hughes suggesting to Leventhal that they confer further on this issue); 9/7/10

---

[153]  Contrast this $50.62 billion figure (which Barclays adopted in October 2008 when negotiating with JPM) with the position Barclays has taken in this case (when it has an incentive to understate values), where it claims this pool of securities was worth only about $45 billion.

[Leventhal] 169:7-170:20 (confirming that at this time the FRBNY still considered

$50.62 billion to be the market value of this pool of collateral).)[154]

424.    All of these numbers were different from those disclosed to the Court just

three weeks earlier at the September 19 Hearing.  Leventhal recognized this issue right

away but did nothing to bring the issue to the Court's attention, or to encourage Barclays

to do so.  In an e-mail she sent to Hughes on October 5, 2008, she remarked:  "[I]n

thinking about the ratio, I think we also need to be mindful of what was represented to the

bankruptcy court about the deal.  We can't really deviate from that representation in a

way that would be to the detriment of the estate if we hope to get approval for this from

the ct and the SIPC trustee."  (M.705 at 00772 (Leventhal e-mail seeking confirmation

and understanding of the $49.6 billion and $45 billion numbers and ratio "[i]f we are

looking to replicate the Fed trade…."); 9/7/10 [Leventhal] 163:11-166:7.)

425.    Barclays clearly wanted to keep the disclosure problem under wraps.  In a

telling reply, Hughes wrote: "I think we need to recognize that we should only be

considering dealings with the trustee if absolutely necessary and even then, the risk has to

lie with JPM – for the reasons mentioned yesterday."  (M.705 at 00772.)  Leventhal had

no problem with this approach, writing in reply:  "Agreed.  But we may not have a choice

so we need to make sure we don't change terms in a material way."  (M.705 at 00772.)

In the end, they agreed to speak further on this issue.  (M.705 at 00772.)  There is no trial

testimony concerning any such subsequent conversations.

---

[154]  There is no dispute that the Barclays and FRBNY participants on this e-mail exchange were
discussing the "market value" of the collateral in question.  In the opening e-mail of this exchange, Ms.
Leventhal forwarded to Hughes the definition of "market value" used in official publications concerning
the PDCF program.  (M.705 at 00773; 9/7/10 [Leventhal] 160:17-162:8.)

426.    Thereafter, Ms. Leventhal and the FRBNY helped convince the Trustee to file a motion seeking approval of the Barclays-JPM settlement.  On November 4, 2008, however, the Trustee wrote to the FRBNY representatives involved in the settlement, raising questions about the value of securities being transferred, representations that had been made to the Court, and the FRBNY's knowledge about Barclays' claimed rights under the Clarification Letter.  (M.642.)  After reciting its understanding of the proposed settlement, the Trustee asked for more information:

> The Trustee will, as you know, need to persuade the Bankruptcy Court and creditors that the Settlement Transaction is in the best interests of the LBI estate, and we know that you had some thoughts along those [lines] that we would like to hear, including whether you and the parties are of the view that BarCap has not received 100% of the consideration to which it is entitled under the APA, as clarified by the clarification letter.
>
> In particular, the Trustee would like to inquire as to (i) whether the [] Fed [is] aware of any understanding that BarCap would be entitled to keep outright the originally intended $5 billion of excess collateral under the BarCap repo (and how any such prior understanding was affected by the APA clarification letter), (ii) how much LBI collateral the Fed itself had when it was the party to the LBI repo and (iii) whether the Fed is aware of any understanding that BarCap, after the execution of the APA clarification letter, was to retain any right to pursue either (x) the approximately $7 billion of securities that originally was intended to be delivered, but was in fact not delivered, as collateral under the BarCap repo or (y) the $7 billion cash that LBI attempted to transfer to Barclays on September 19, 2008.  We also would like to understand how the $50 billion figure was reached since the description of the transaction to SIPC and the Trustee on September 19 and later in open Court referred to securities valued at $47.4 billion and liabilities of $45.5 billion.

(M.642 at 00028673-4.)

427.    Although FRBNY representatives agreed to meet with the Trustee to discuss these issues, (M.642 at 00028670-1)  LBHI was not included in those discussions. (9/7/10 [Leventhal] 28:20-29:3 (FRBNY did not have any direct discussions with LBHI concerning the settlement).)  And prior to that meeting, the FRBNY strategized with Barclays about how to address the Trustee's concerns about disclosures that had been made to the Court about the value of securities being transferred to Barclays.  (M.705; 9/7/10 [Leventhal] 163:15-165:1) (describing a conversation with Hughes about the quality of collateral and the appropriate haircut ratio, and that any argument concerning using a different haircut ratio "would have to be explained very well because the Court [according to Leventhal] was under the impression that there was a particular ratio which was the Fed's ratio and we needed to be consistent with that").)

428.    Later, at Barclays request, FRBNY representatives agreed to submit sworn declarations in support of the Settlement Motion.  (*See* declarations of Shari Leventhal (M.119A) and Jeffrey Moore (M.119B), both from the FRBNY.)  Barclays was allowed to edit those declarations before they were sent to JPM for review.  (*See, e.g.,* M.849 (Leventhal 11/25/08 e-mail to Hughes w/attachment: "Here's the current version of my declaration.  Please do not share it yet."); M.848 (Hughes reply, forwarding his mark-up of draft Leventhal Declaration); 9/8/10 [Leventhal] 15:3-16:19 (no recollection of whether Barclays got to review her declaration before JPM), 70:9-20 (no recollection of Hughes proposing edits to her declaration).)[155]  Ms. Leventhal adopted virtually all of the

---

[155]  Counsel for Barclays (Ms. Granfield and Mr. Schiller) also asked permission and planned on preparing Leventhal to testify in Court during the hearing on the Settlement Motion.  (*See, e.g.,* M.859; M.860; 9/8/10  [Leventhal] 40:2-41:23.)  There is no indication in the record that the FRBNY was willing to provide this level of access to counsel for JPM or any other party.  (*Id.*)  Nor, apparently, did the FRBNY consider it inappropriate to allow its personnel to be prepared by counsel for any party when the FRBNY

changes proposed by Mr. Hughes.  (*See* 9/8/10 [Leventhal] 23:20-25:19; M.885

(demonstrative showing changes suggested by Hughes and adopted by Leventhal).)  One

notable change proposed by Hughes and adopted by Ms. Leventhal in her final

declaration was to delete the reference to the specific ratio (1 to 1.1) of cash or cash

equivalents to collateral supporting the Fed Repo.  (*See* 9/8/10 [Leventhal] 19:12-21:8;

*compare* M.849 ¶ 9 with M.848 ¶ 9.)  And that change was not contained in the draft

declaration sent to JPM's counsel for his review.  (*See* 9/8/10 [Leventhal] 30:10-35:25

("Í'm not in a position to say one way or another" whether a draft was sent to JPM before

M.886); *but see* M.887; M.886.)

     429.    Under the rubric of the Settlement Motion, the Leventhal and Moore

Declarations relayed information to the Court that Barclays supplied to the FRBNY and

about which the FRBNY declarants had no personal knowledge.  For example, Ms.

Leventhal purported to testify in her declaration as to the value of collateral Barclays

received from Lehman on September 18 – "When, at 11PM, DTC had to close, Barclays

had received approximately $42.7 billion of the approximately $49.7 billion in securities

it was expecting under the terms of the September 18 Repo."  (M.119A [Leventhal Decl.]

¶ 14.)  Not only did she have no personal knowledge of what Barclays' expectations were

at the time, she had no way of knowing (nor did anyone at the FRBNY) the value of the

collateral Barclays actually received that night.  Indeed, she had no involvement in

_____

(continued…)

was purporting to act as a mediator of sorts in this dispute.  (*Id.*)  (*See also* M.860; 9/8/10 [Leventhal]
43:14-46:15 (e-mail exchange between Leventhal and Barclays counsel, but not JPM's counsel or LBHI, re:
Leventhal's expected testimony at hearing).)

valuing any of the collateral in the September 18 Repurchase Agreement or the Fed Repo.[156]

430.    Nor did Ms. Leventhal have any first hand knowledge on which to base the statements to which she attests in paragraphs 19-21 and 24 of her declaration, regarding the intent of the Clarification Letter as it related to Barclays' claim against JPM. (M.119A.)  As she testified at her deposition and at trial, Ms. Leventhal had absolutely no involvement in negotiating the Clarification Letter, nor did she have any recollection of discussing (during a conference call in which she was on the line for many hours) specific provisions of that letter or the parties' intent with respect to them.[157]  And given her lack of involvement in the negotiations of the Clarification Letter, Leventhal certainly had no basis to opine, as she did on behalf of the FRBNY in her declaration, that the proposed settlement between Barclays and JPM was "consistent with the intent of the Clarification Letter."  (M.119A [Leventhal Decl.] ¶ 24.)[158]

431.    Once the FRBNY declarations and the accompanying motion papers had been prepared, and vetted by Barclays, the last task on the agenda before filing the

---

[156]    (See 9/7/10 [Leventhal] 35:4-38:2 (conceding she has no knowledge of major terms of the Sale Transaction, the value of assets or liabilities involved in the deal, or whether executives acted in good faith), 56:19-57:25 (no knowledge of whether Sale Transaction was supposed to be a balanced deal), 58:21-59:22 (no knowledge of discount or use of liquidation values), 35:4-36:2 (Leventhal had no involvement in negotiating the Asset Purchase Agreement or in valuing any collateral that went to Barclays under any repurchase agreements or the Asset Purchase Agreement); 9/8/10 [Leventhal] 63:19-64:1 (she did not review in depth the collateral portfolios).)

[157]    (See 9/7/10 [Leventhal] 31:18-32:4 ("Other than the conference call on Sunday where there were points of the clarification letter that were addressed, no, I did not participate in discussions about the letter."), 131:18-133:22 (unable to recall anything about Clarification Letter discussed on conference call, on which she participated from her office and home).)

[158]    (See 9/8/10 [Leventhal] 24:15-25:13 (referring to demonstrative M.885 and confirming that Hughes proposed changing this sentence to remove a reference to what "Barclays intended to represent to the Court" in the Clarification Letter, but having no recollection of any conversations with Hughes as to why he wanted this reference to Barclays removed).)

Settlement Motion was to provide a cursory explanation of the deal to LBHI just before

the hearing.  (*See* M.850; 9/8/10 [Leventhal] 27:22-30:7 (she had no knowledge of when

LBHI learned of terms of the settlement ("I certainly did not [tell LBHI]" and refusing to

give any import  to Hughes seeking to meet with LBHI "just ahead of the filing")).)

432.    In a November 21 e-mail, Lindsee Granfield, from Cleary Gottlieb, wrote

to Hal Novikoff, from Wachtell, representing JPM, copying FRBNY and revealing just

how much Barclays wanted to keep LBHI away from its settlement with JPM:

> I have just heard something very disturbing.  James Kobak,
> counsel for the Trustee, said that at a meeting that he was
> having with representatives of LBHI today, that LBHI
> brought up whether there was some settlement in the offing
> with JPM and Barclays, saying that JPM had told them of a
> settlement (Kobak said that the Trustee did not reveal that a
> settlement was in the offing before LBHI asked the
> question.)  **When did JPM tell LBHI of a settlement, what
> was said and why was this done?  This could be quite
> explosive as to Barclays Capital.**

(M.851 at 00211; *see* 9/8/10 [Leventhal] 7:4-10:5 (conceding knowledge of e-mail, but

professing not to know why Granfield thought this was "explosive"), 13:20-14:9.)

433.    Novikoff explained what little had been revealed to LBHI:

> JPMorgan has been seeking information from LBHI as to
> the loans and other assets underlying some very large
> ABCP and ABS positions in the collateral pool.… In order
> to demonstrate the importance to LBHI on its guarantee
> liability that JPMorgan be in a position to favorably realize
> on those positions, we made a highly confidential
> presentation to Weil and A&M on November 6 as to the
> then current state of the collateral liquidations at LBI.
> Unfortunately, the fact that we have held aside approx $6
> billion collateral value of securities from the liquidation
> stuck out like a sore thumb.  We disclosed that they were
> being held for a proposed settlement, but did not give any
> of the terms or background information.

(M.851 at 00211.)  He later added, "just to be clear, none of the securities set aside were

identified."  (*Id.* at 00210.)[159]  When Messrs. Hughes and Schiller were forwarded a copy

of this exchange, Hughes wrote:  "Apart from the fact that this JPMorgan action looks

actively prejudicial to our interests, do you agree that it makes all the more crucial the

need to file the motion -- again, under seal if we can -- literally as soon as possible?"

(*Id.*; *see* 9/8/10 [Leventhal] 10:6-13 (Barclays' concern was disclosing lists of securities

to LBHI and others), 12:10-13:6, 13:7-19 (no recollection of Hughes wanting to file

motion quickly to keep LBHI from inquiring about the settlement).)

      434.    In that vein, by December 1, 2008, when the parties were just about ready

to file the Settlement Motion, the question of disclosure to LBHI finally had to be

addressed.  After reviewing Hughes' latest proposed changes to her declaration,

Leventhal accepted them all, as did Moore.  (M.850 at 00511; *see generally* M.119A

[Leventhal Decl.].)  Hughes, obviously anxious to get the Settlement Motion filed, raised

the issue of LBHI:

> On the assumption that the two Fed affidavits and our
> affidavit can be concluded today, do you think we can
> shoot for a filing on Wednesday?  We may need to have a
> meeting with LBHI just ahead of the filing but my hope is
> that all the parties might be able to do that tomorrow.
> Clearly, though, we are in your hands on this point if, as we
> had previously thought possible, the Fed might host such a
> meeting (I had in mind a repeat of the earlier meeting in
> which Tom took the Trustee through the proposed
> settlement, but this time doing that and explaining the plan
> for the motion for the benefit of LBHI).  Again, we would
> be hoping to expedite the hearing and keep under seal at

---

[159]  Leventhal could recall having no conversations with Novikoff about his meeting with LBHI
or his explanation about how LBHI came to find out about the settlement.  (9/8/10 [Leventhal] 10:25-
11:24.)  But she agreed that at the time of this e-mail, JPM valued the securities in issue at $6 billion.  (*Id.*
at 11:25-12:3.)

least those items we have previously agreed should be kept
under seal.

(M.850 at 00511.)  Leventhal agreed to host this meeting with LBHI and also to support

an application to seal the record on the motion.  (*Id.* at 00510.)[160]

435.    While the FRBNY agreed to host a meeting with LBHI to discuss the

proposed settlement at Barclays' request, at trial Leventhal could not recall whether the

meeting actually took place.  At most, Leventhal could only recall "a vague recollection

of speaking to [Miller] at some point" via telephone prior to the settlement hearing to

answer Miller's questions. [9/8/10 [Leventhal] 46:4-47:9; *see also* 9/7/10 [Leventhal]

29:10-19 (she had no discussions with LBHI about her declaration).)  She did not testify

that Miller was ever given a presentation on the proposed settlement (*Id.*), and could not

say on redirect examination whether Miller was given a full opportunity to review and

comment on the motion.  (9/8/10 [Leventhal] 70:20-71:4; *see, e.g.,* 9/7/10 [Leventhal]

28:20-29:19 (recalling on direct only that she thought the Trustee at some point explained

the settlement to LBHI;  she did not).)  In any event, regardless of any phone call or

possible meeting, important questions were raised that prompted LBHI to take the

position, when it came to Court on December 22, that while it would not formally oppose

the settlement it would not affirmatively support it and would reserve all of its rights in

that regard.[161]

---

[160]    The FRBNY also agreed to support Barclays' application to have the motion papers filed
under seal.  (*See* 9/8/10 [Leventhal] 36:19-37:1; M.850 at 00510.)  She relayed to Hughes the thoughts of
Thomas Baxter, the General Counsel of the FRBNY, on this issue:  "Tom does not think calling the Judge
about the notice schedule is a good idea."  (M.850 at 00510; 9/8/10 [Leventhal] 37:2-7 (unable to recall
why Baxter made this comment).)

[161]    M.859 (12/18/08 e-mail from Davis to Leventhal:  "Further to our call today, I understand
jonathan hughes sent you an e-mail w/r/t the cryptic voice mail message he received from Weil today
indicating that they will not be objecting to our settlement – I believe jonathan plans to speak to them

436.    The Creditors' Committee, too, was given only a cursory preview of the proposed settlement, which prompted it to file an objection.  (*See, e.g.,* M.852 (evincing that a draft of the proposed order was shared with the Committee's counsel, who raised concerns); M.860 (12/19/08 Davis e-mail to Leventhal: "looks like creditors committee at LBHI is putting in some sort of general objection about the entire Barclays deal and wanting more time to investigate whole deal.  They plan to file an objection this afternoon.").)

### 3.    Barclays, JPM and LBI signed the December 5, 2008 Settlement Agreement and presented it to the Court for approval

437.    A December 5, 2008 Settlement Agreement between Barclays, JPM and LBI, to which LBHI was not a party (the "Settlement Agreement"), reflects the resolution of the Barclays/JPM dispute.  Pursuant to that agreement, securities held by JPM (listed in Annex A to the Settlement Agreement),[162] plus $1.25 billion in cash, were transferred to Barclays, along with an additional $7.1 million in cash representing proceeds of securities that JPM had inadvertently liquidated.  (M.119; M.119A (Leventhal Decl.) ¶ 22; M.262 [12/22/08 Tr.] 41:21-43:4 (Court seeking and receiving assurances on this issue); *see also* M.105A (showing value of securities was $5.99 billion on 9/30/08; M.851 (Mr. Navikoff explaining JPM "held aside approx $6 billion collateral value of

---

(continued…)

directly to confirm later today."); 9/8/10 [Leventhal] 39:15-40:2 (no recollection of discussing this voice mail from Miller.).  M.262 [12/22/08 Tr.] 34:7-21 (Miller: LBHI does not object because "there is nothing in this that presents collateral estoppel with a binding effect in any future proceeding").

[162]    The value of these securities was not revealed in these proceedings.  (M.119 [LBI Docket No. 387] ¶ 19; *see also* M.262 [12/22/08 Tr.] 21:20-22:2.)

securities from the liquidations" as of 11/21/08.").)  This cash and securities came from

LBI's account at JPM.  And JPM agreed to release a lien it held on that account.[163]

438.    On December 5, 2008, the Trustee sought approval of the December 2008

Settlement (the "Settlement Motion"), attaching the Leventhal, Moore and LaRocca

declarations.  (M.119.)  And on December 19, 2008, the Creditors' Committee objected,

based on yet unexplained discrepancies between the facts reported in the Settlement

Motion and those recounted in Court concerning the Sale Transaction.  (*See* M.398 ¶ 18.)

The Committee objected because there now appeared to have been undisclosed changes

made to the deal over the weekend following the Court's approval.  (*See* M.262 [12/22/08

Tr.] 45:11-50:7.)[164]  The Committee noted that the limited information available at the

time raised questions about "what the values are or who ascribed the value, as of what

date" and whether "this is a fair deal or not a fair deal."  (*Id.* at 48:3-8.)  The Committee

---

[163] Among other things, the Settlement Agreement is not consistent with the Clarification Letter itself.  The Clarification Letter provided for the elimination of all obligations under the September 18 Repurchase Agreement:  "Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations)."  (M.3 ¶13.)  Notwithstanding this express disclaimer of any further obligations under the September 18 Repurchase Agreement, Barclays later sought (with the active help of the FRBNY) to enforce some of the terms of the "terminated" Repurchase Agreement.  Thus, a provision intended to insulate Barclays from future claims relating to this agreement (and which, under its terms, should also have provided protection to Lehman) was ignored once Barclays realized it needed to reopen this issue.

[164] (M.262 [12/22/08 Tr.] 46:7-10 (referring to the Leventhal Declaration, M.119A: "Your Honor yourself probably sees the numbers in the affidavit and went back and looked at your transcript and said that wasn't exactly the numbers that I remember being told on the Friday."), 46:14-16 ("If they're not footing with the numbers that were told to the creditors' committee during the weekend, why is that?  And what are the right numbers?"), 47:7-9 ("When we see declarations that have different numbers, different understandings than what people were told, we agree with the Court's comments that these aren't rounding errors."), 47:12-18 (noting need to reconcile numbers relating to the closed transaction with those presented by Ms. Fife at the Sale Hearing), 49:4-5 ("[T]here are major discrepancies between what we were told that weekend and what's being put forth here today.").)

argued for discovery to clear up these questions and noted that Barclays was in sole possession of the required information.  (*Id.* at 48:8-50:7.)[165]

439.    LBHI expressed similar concerns.  Based upon its limited access to pertinent information, at the hearing on the Settlement Motion, LBHI's counsel explained to the Court that, among other things, there were questions about assets transferred to Barclays and that discovery might be needed.  (M.262 [12/22/08 Tr.] 32:6-34:21, *see also* 45:11-49:18.)[166]  Miller, speaking for LBHI, said "we were very concerned that something would occur in this compromise and settlement which would preclude future discovery, future determination, that perhaps some assets were transferred to Barclays that [should] not have been transferred to Barclays ...."  (M.262 [12/22/08 Tr.] 33:18-22.) He noted that "there is still a great deal of work being done by the unsecured creditors' committee in looking to the transfer of assets from all of the Chapter 11 debtors and LBI

---

[165]    At the time, Barclays' planned to string the Committee along with respect to its requests for information.  This is confirmed by a December 21, 2008 e-mail from Lindsee Granfield to, among others, Jonathan Schiller, JPM and counsel for the Trustee, in which she suggested language for a covering e-mail to be sent to counsel for the Committee:  "As to the creditors committee, we think that the e-mail should go on to say that the settlement parties are not willing to agree to other demands of the creditors committee re an order requiring delivery by January 15 of a vast amount of information relating in general to the details of sale of assets to Barclays Capital Inc. in September (as that information is irrelevant to the settlement under consideration… and such requests were made for the first time to the settlement parties on the afternoon of Dec 19).   Nevertheless, the settlement parties are willing on an informal basis to discuss with the Creditors Committee after the first of the year reasonable requests for information concerning the sale that it has sought from LBHI and been unable to obtain from LBHI."  (M.852 at 00482; 9/8/10 [Leventhal] 48:16-50:1 (confirming that plan was to put off the Creditors' Committee's request for information).)

[166]    These questions were prompted in part by filings made by the parties to the December 2008 Settlement Agreement in support of their motion, including a declaration signed by Shari Leventhal.  In her declaration, Leventhal explained for the first time some of the negotiating history leading to the settlement, the terms of the settlement, and in that context represented, among other things, that LBI had provided approximately $49.7 billion in securities to Barclays under the September 18 Repurchase Agreement.  (BCI 30 [Leventhal Decl.] ¶¶ 11-12.)  At this time, LBHI still did not know that Barclays had never actually assumed the full $3.5-4.0 billion in liabilities for compensation and cure, as had been represented to the Court.  So at this time, the Leventhal Declaration was not a red flag for the Estate that indicated something was wrong with the Sale Transaction.  Rather, these figures just became part of the confusing mix of limited information available to LBHI in late 2008.

to Barclays." (M.262 [12/22/08 Tr.] 34:12-15.)[167]  Because the proposed order

confirming the settlement did not bar such future discovery or claims, LBHI did not

object to the settlement.  (M.262 [12/22/08 Tr.] 34:16-21.)[168]

440.   The Court agreed that additional factual inquiry was warranted about

assets transferred to Barclays.  (M.262 [12/22/08 Tr.] 45:11-49:18.)  Even Barclays'

counsel concurred.  Indeed, counsel for all the settling parties, including Barclays,

assured those present that such investigation would not be foreclosed:

> We confirm Your Honor's understanding that what is being
> done here is we are approving a settlement agreement.
> There will not be any collateral estoppel or other similar
> effects .... People would remain free to pursue claims if
> they feel there is something in the overall sales transaction
> which gives rise to a claim.

(M.262 [12/22/08 Tr.] 39:13-20, *see* 24:19-25:3, 34:7-21 (Miller: LBHI does not object

because "there is nothing in this that presents collateral estoppel with a binding effect in

any future proceeding"), 35:3-35:5 (Schiller: confirming Barclays' understanding of the

agreement is consistent with Mr. Miller's), 40:8-19 (Schiller: affirming above reservation

of rights), 41:7-12, 45:13-20; 4/28/10 [Miller] 120:1-4 (Miller recalled a complete

reservation of rights).)[169]

---

[167]   When asked at trial, Miller did not recall Shari Leventhal from the FRBNY describing the securities in the Fed Repo as having a value of $49.7 billion.  (4/28/10 [Miller] 119:16-120:5.)

[168]   The Trustee also expressed concern that its investigation into potential claims relating to the transfer of assets to Barclays would not be precluded by approval of the settlement.  (*See* M.262 [12/22/08 Tr.] 20:10-21, 24:15-25:3 ("the trustee himself intends to investigate some of these matters").)

[169]   (*See also* M.852 at 00482 (Granfield 12/21/08 e-mail to settlement parties confirming that cover e-mail to Creditors Committee transmitting revised proposed order (to be proffered to the Court) should state "that the revised order addresses any concern about facts being binding for any issues other than the approval of the settlement and the authorization for the transfer of the settlement consideration to Barlcays [sic].").)

441.    Based in part on this assurance, the Court approved the December 2008

Settlement.  (*See* M.119; M.262 [12/22/08 Tr.] 58:11-18 (Court's approval was "based on

the record and the representations that have been made including the comments

confirming that the settlement is not to have collateral estoppel impact that would

preclude further investigation of the circumstances surrounding the original sales

transaction between the estates and Barclays Capital approved by order entered

September 20th"); *see id.* at 60:6-9.)  The Court also noted that there remained

unanswered questions about the Sale Transaction, and it urged Barclays to supply

information to answer them:

> I consider it to be important for us to get to what I'll call
> closure with respect to the basics of the transaction that was
> approved by order entered September 20th.  And this
> motion with respect to the settlement agreement is a
> reasonable platform on which to address some of these
> issues because while this is not fairly to be characterized as
> a cleanup item, it's a very significant matter.  It does draw
> all of our attention back to what happened in September.
> And I think it important that there be reasonably prompt
> resolution of outstanding questions that the committee may
> have on the subject.  I would hope that it's not necessary
> for the committee to have to file 2004 requests in order to
> get the information that it seeks which seems reasonable
> and consistent with its mandate.

(M.262 [12/22/08 Tr.] 50:18-51:6.)  In any event, such cooperative disclosure was not

forthcoming and LBHI had to seek Rule 2004 discovery.  (*See infra* ¶¶ 445-452, 476-482.)

**D.    From The Outset, Those Administering The LBHI Estate Were Kept
In The Dark About Important Aspects Of The Sale Transaction And
Eventually Were  Forced To Seek Rule 2004 Discovery To Learn The
Truth**

**1.    Alvarez & Marsal was retained to administer the LBHI Estate**

442.    On or about September 19, 2008, a few days after LBHI's bankruptcy

filing, Bryan Marsal, a principal of Alvarez & Marsal ("A&M"), was retained by LBHI

to act as its Chief Restructuring Officer.  (6/21/10 [Marsal] 6:8-22.)  A&M had no role in negotiating the Sale Transaction, valuing the property that would be transferred to Barclays, or reviewing the documentation of the Sale Transaction.  (6/21/10 [Marsal] 9:16-10:1.)  In addition, A&M had "very limited" access to the members of the Lehman team who negotiated the transaction.  (6/21/10 [Marsal] 17:9-19 (McDade missed four meetings with Marsal the week of September 15 and did not finally meet with Marsal until after the closing, a meeting which according to Marsal, was "short and really not of much help").)  Marsal was instructed by Berkenfeld that the Sale Transaction was being addressed by the management teams at Lehman, and that Marsal was to focus instead on the restructuring issues facing LBHI and not to get involved in the Sale Transaction with Barclays.  (6/21/10 [Marsal] 8:6-9:15.)

443.    A&M's necessary main priority was to preserve data it could later use for the overall administration of this complex estate.  (6/21/10 [Marsal] 7:12-20 ("priority number one had to do with preserving the data, the information. With the data, with the information, we could always come back -- circle back and figure out what happened with the various transactions").)  Because virtually everyone knowledgeable about Lehman's operations had moved to Barclays, those left to administer the estate were faced with a monumental task just in understanding the business and preparing to administer what was left.[170]

444.    Marsal recounted the difficulties facing LBHI after the Sale Transaction and its forced dependence on Barclays for information:

---

[170]    (*See* Kruse Dep. Tr. 11:6-18; 6/21/10 [Marsal] 7:16-9:1, 15:13-16:7, 18:4-6; Fogarty Dep. Tr. 20:22-22:8, 23:3-14.)

> Well, let's start with chaos…People were walking out the
> door with boxes.  Not only did we not have information, we
> didn't have people, people that were transferred—within
> four or five days, you had 10,000 employees transferred.
> We were left with a small cadre of tax and compliance
> people which were of no use to us in terms of the task at
> hand or minimal use…We were trying to satisfy that chaos
> or that confusion, and trying to do it, like I said, without
> any employees.  So we were—we were very busy.

(6/21/10 [Marsal] 15:13-16:7.)

### 2.  Barclays' lack of cooperation in providing information to the Estate

445.  Because of these unique circumstances, a workable Transition Services

Agreement ("TSA") was a key priority for A&M.  (6/21/10 [Marsal] 8:6-9:15; Marsal

Dep. Tr. 10:3-11:13, 15:24-16:10, 37:12-38:11; Kruse Dep. Tr. 239:2-240:5 (A&M's

primary focus was "getting Barclays to execute under the TSA"); Fogarty Dep. Tr. 25:2-

9, 29:15-30:2.)  Marsal discussed this with Weil Gotshal: "I [] expressed to them that it

would be impossible to manage this case without the accounting systems and the pricing

systems.  And I expressed to them the importance of the TSA [Transition Services

Agreement]."  (6/21/10 [Marsal] 12:10-17.)[171]

446.  A TSA was agreed upon and Barclays was obliged, among other things, to

provide to LBHI "certain services, use of facilities and other assistance on a transitional

basis" (M.122 [TSA] at 1) to allow the LBHI estate to operate and wind down.  (*See

generally* M.122 [TSA] at 3-5.)  This was supposed to include access to historical data,

computerized systems, books and records, and former Lehman facilities and personnel,

who were required to provide "reasonable cooperation and assistance."  (M.122 [TSA] §

---

[171] These discussions were the only discussions Marsal had with Weil Gotshal the week of
September 15 related to the Sale Transaction.  (6/21/10 [Marsal] 12:10-17.)

3.04; *see also* §§ 2.01-03, 3.01, 3.05, 3.07-08, 3.12.)  As Marsal testified, Barclays'

cooperation was "critical" because Barclays "had the information systems and the

operational systems that were transferred to Barclays as part of the transaction.  So it was

essential that we gain their cooperation."  (6/21/10 [Marsal] 17:20-18:3.)  Further, the

Estate did not have people left who had not gone to Barclays and who were

knowledgeable about these systems.  (6/21/10 [Marsal] 18:4-6.)

447.    Notwithstanding LBHI's critical need for information and Barclays'

obligations to provide such information, Barclays withheld cooperation after closing the

Sale Transaction, which threatened the administration of the LBHI estate:

> There was a very difficult process we had for getting any
> information from Barclays.  I think I referred earlier in my
> testimony to extraordinarily difficult circumstances in
> getting Barclays to execute under the TSA. … We were at
> Barclays' mercy in terms of needing their employees, their
> systems, their information, their insight.  That was the
> focus, the immediate most important focus for us early on
> in the administration of the estate.  If we didn't get that
> right a lot of things were going to go wrong.  That was the
> priority.  We weren't focusing on the Barclays deal at that
> stage.  It would have been in my mind irresponsible to put
> an emphasis on that versus the higher priority of getting the
> information in hand that we needed to [ad]minister and run
> the estate.

(Kruse Dep.Tr. 239:2-240:5; *see also* 240:19-241:25; Fogarty Dep. Tr. 57:16-58:12,

88:22-91:21.)  Marsal confirmed this at trial.  (6/21/10 [Marsal] 18:25-19:2 ("Q. So were

you getting the information you needed in the first sixty days?  A. No, we were not.").)

448.    Barclays' refusal to cooperate got to the point in late 2008 that LBHI

prepared to sue Barclays for breach of the TSA.  (M.397; 6/21/10 [Marsal] 20:13-21:9

(Thomas Roberts of Weil Gotshal who now had business with Barclays tried to act as a

liaison)  As Phil Kruse, from A&M, described it:

> We weren't getting information openly from Barclays.
> Shortly after the time that we got the … CUSIP level detail
> of what came over, there were repeated problems in
> performance under the TSA.  It almost resulted in a lawsuit
> being filed.  I mean, … we had the lawsuit drafted and it
> was going to be served if we didn't get cooperation.  That's
> the degree to which the performance or the lack of
> performance under the TSA was a concern of ours. … the
> entire process was breaking down under which we needed
> to administer to the estate because of what we felt was the
> failure to perform under the TSA by Barclays. … To put an
> emphasis at that stage on looking back at a deal, again, that
> was not the focus at the time.  It evolved to be a focus.  But
> we weren't focusing on that in the first quarter.

(Kruse Dep. Tr. 240:19-241:25; *see also* 6/21/10 [Marsal] 19:13-23, 20:13-22; O'Donnell

Dep. Tr. 161:3-17 (describing disputes between Debtors and Barclays about access to

information).)  It was not until January 2009, under the threat of such a lawsuit, that

Barclays began to provide some information A&M needed.  (6/21/10 [Marsal] 19:24-

20:12.)

449.    While A&M was engaged in some early efforts to try to ascertain what

assets had been transferred to Barclays, it did not revisit the negotiations of the Sale

Transaction.  Rather, it attempted, based on very limited information, to understand what

remained in the estate.  (*See* Kruse Dep. Tr. 217:14-218:15, 219:15-23 ("our focus was

not on the [Sale Transaction] … itself.  It was on help[ing] us understand the assets and

liabilities we need to be focused on as we begin to administer the wind-down of this

estate."), 219:24-220:22, 200:3-21 ("our mission was to administer the wind-down of the

Lehman Brothers estate.  You've got to know what assets are yours in order to begin that

process.").)

450.    The problem remained, however, that no one was left at Lehman who had

been involved in negotiating the Sale Transaction or who had a grasp on its terms, let

alone details as to which securities had been transferred at what price.  Everyone with

that knowledge now worked for Barclays and they provided little useful information.

(*See, e.g.*, 6/21/10 [Marsal] 17:9-19, 18:4-6.)  In late 2008, the accounting systems at

Lehman were not even in place that would have allowed the Estate to try to value the

assets that had been transferred to Barclays.  (*See* 6/21/10 [Marsal] 7:12-8:5,48:6-15).)

451.    When asked about these early attempts to review schedules and lists of

securities associated with the Sale Transaction, Kruse testified:

> It was really from the perspective of capturing the data that
> we thought was going to be necessary for us to administer
> the estate and understanding what was estate assets, what
> was not estate assets.  I think there was some thought early
> on that we would try to do a reconciliation of the securities
> that were transferred, ensure that nothing was transferred
> that should not have been transferred under the deal.  That
> effort was not really feasible based on the information
> available to us in that first quarter of the administration of
> the estate.  But the context was ensuring we had the data in
> hand while it was fresh in everybody's mind as to what was
> transferred in the deal.

(Kruse Dep. Tr. 103:11-104:8; *see also* 138:15-139:3.)

452.    Marsal described the state of play with respect to his knowledge of the

terms of the Sale Transaction at the end of 2008 as "in the dark" and "pretty ignorant of

the transaction."  (6/21/10 [Marsal] 23:20-24:3.)

### 3.    LBHI could not comprehensively study the Sale Transaction in late 2008

453.    Given this struggle to collect data and understand what had happened in

this extraordinary bankruptcy, a comprehensive investigation of the Sale Transaction was

not possible even if the administrators of the LBHI estate had reason to conduct such an

investigation.  But at that point, the fourth quarter of 2008, A&M had no reason to

suspect that such an investigation was even warranted in light of the disclosures made to

the Court and the Lehman Boards about the Sale Transaction.  As Mr. Kruse testified:

> There was never a comprehensive attempt for us to fully
> evaluate the totality of the deal and the economics of the
> deal until we started a forensic focus on it in January 2009.
> So the idea that we knew, you know, or focused on this
> issue at some point prior to that, I think that's wrong.
> There were a lot of other priorities that we were dealing
> with and this just wasn't anywhere near the early priorities
> in that first quarter of the administration of the estate.  We
> were gathering facts early on just to lock it down what went
> over, what didn't go over.  We weren't in any way
> attempting to comprehensively evaluate the Barclays deal
> in the first quarter of the administration.

(Kruse Dep. Tr. 235:15-238:25; *see also* 6/21/10 [Marsal] 23:20-24:8 (Marsal did not

consider it part of his duties to investigate the Sale Transaction to determine whether it

was accurately described to the Court and "had too many other fires to put out").)

454.    Limited pieces of information began to dribble out of Barclays during late

2008, but estate administrators and creditors were not in a position to understand the

import of this information, and did not have a complete picture.  For example, during this

period A&M periodically reported to the Creditors' Committee and tried to keep it

apprised of developments.  In one such meeting, James Fogarty, from A&M, presented

some of the fragments of information A&M had obtained from various sources about the

Sale Transaction.  None of those sources, however, included a comprehensive debriefing

by Barclays or former Lehman executives about the terms of the transaction.  Thus,

A&M's reviews during this period were necessarily hampered by this lack of

information.  (*See* Fogarty Dep. Tr. 57:21-58:9, 88:22-91:21.)  Even so, Barclays now

points to Fogarty's inclusion on one October 2008 slide of the phrase "43.1 billion repo

assets, book value per Lehman stale marks, negotiated a $5 billion reduction" (BCI 131 at

28) as purported evidence that A&M fully understood the deal.  (Barclays Opp. ¶¶ 24, 274-75, 550-551.)

455.    In deposition testimony that Barclays itself chose to play at the trial, Fogarty recounted how he told those at the presentation, however, that he had no clear or complete understanding of what this entry meant, let alone an understanding of the entirety of the transaction.  (Fogarty Dep. Tr. 119:15-19, *see also* 125:9-126:19 (A&M continued to ask questions of Barclays and there came a point in time where they weren't being responsive).)  No one at A&M had been told at the time of the $5 billion discount on Lehman's assets, nor did they have any idea how this related to the September 18 Repurchase Agreement.  (6/21/10 [Marsal] 54:25-55:14 (Marsal was never told that Barclays had obtained a discount on the valuation of Lehman's assets.) [172]  No one at A&M had a complete understanding of the Sale Transaction at the time, and certainly no one at A&M could have interpreted this reference on Fogarty's slide as indicating a built in profit for Barclays.  (6/21/10 [Marsal] 30:10-31:15 (he thought it referred to market price declines during the week of September 15, and not the "discount" negotiated by Lehman executives and Barclays); Kruse Dep. Tr. 104:9-108:16 (he thought, but did not know, the slide reflected A&M receiving some information as to outdated marks being

---

[172]  When asked by counsel for Barclays at his deposition, Fogarty speculated that it was possible the "reduction" noted in his slide may have related to the haircut under the September 18 Repurchase Agreement and a dispute he understood the parties were having about the value of the Repo collateral. (Fogarty Dep. Tr. 119:15-121:6, 68:11-70:5 (recalling being given a description of a fight in which there was $50 billion and a $45 billion number, and "Barclays was at 45 and the Lehman folks, Alex [Kirk] and Paolo [Tonucci], were at – they were at 50.").)  But Fogarty testified repeatedly (and often in response to questions concerning select documents shown to him by counsel for Barclays) that he was having difficulty gaining any understanding of the Sale Transaction at this early date -- or even at any time thereafter. (Fogarty Dep. Tr. 20:22-22:8, 23:3-14, 27:20-28:5, 40:5-45:15, 48:4-11 ("I didn't fully understand the transaction, we were – I was never sure of anything in that transaction"), 49:21-53:17, 57:21-61:13 ("My understanding of things kept changing along the way."), 92:7-15, 94:2-15, 129:24-132:22.)

reduced); *see also* 6/21/10 [Marsal] 33:21-34:15 (Marsal also "didn't have a clue at that

point" what "1.9 billion dollars unencumbered box" referred to.)

456.    Through 2008 and into the first quarter of 2009, A&M and those few

Lehman employees left behind at LBHI had no reason to suspect the Sale Transaction

was anything other than what they and the Court and Lehman Boards had been told, *i.e.*,

a "wash" or balanced deal.  (6/21/10 [Marsal] 10:8-11:24 (Berkenfeld told Marsal asset

value would equal liabilities being assumed), 13:1-10 (Roberts described the deal to

Marsal as a "push" or a "wash"), 67:6-20 (similar), 13:11-14:3 (LBHI Board members

recollection of the deal was a "wash" with no gain to Barclays and all liabilities covered

by the market value of assets being exchanged); O'Donnell Dep. Tr. 109:9-17 (Milbank

had similar understanding at time of Closing); Keller Dep. Tr. 94:13-95:2 (Simpson

Thacher & Bartlett, Lehman's counsel, understood that "assets equal[ed] liabilities").)

Marsal's only exposure to the terms of the Sale Transaction prior to Closing was short

briefings from Berkenfeld and Roberts, of Weil Gotshal, both of whom told him it was an

exchange in which the assets transferred to Barclays were equal to the liabilities it was to

assume.  (6/21/10 [Marsal] 10:8-11:24, 13:1-10, 67:6-20.)

457.    Marsal testified specifically with respect to the Fogarty slide that his

assumption of the $43.1 billion and $1.9 billion was that these were the market values of

these assets at the time of the transaction which were "[o]ffset by [] an equal amount of

liabilities."  (6/21/10 [Marsal] 37:15-23 ("I had no reason to believe that the assets did

not equal the liabilities being assumed at this point in time").)   In other words, there was

nothing suspicious on its face about the limited information given to Fogarty.

### 4.    The December 2008 Settlement provided no new information to LBHI

458.    As noted, in December of 2008, a few months after the closing but still in the midst of the estate's struggle to gather data, the Trustee (on behalf of the LBI estate), JPM and Barclays entered into the Settlement Agreement.  LBHI was not a party to that agreement, nor was it involved in negotiating its terms.  (6/21/10 [Marsal] 28:21-29:21 (Marsal did not learn about the dispute between Barclays and JPM Morgan Chase until December 2008, and LBHI did not join the settlement and instructed Weil Gotshal to reserve all rights until LBHI "had a fact base").)

459.    On December 5, 2008, the Settlement Motion was filed and the Creditors Committee filed its objections.  (*See* M.119; BCI 37 [LBI Docket No. 453] ¶ 18.)  Based upon its limited access to pertinent information, at the hearing on the Settlement Motion, LBHI's counsel explained to the Court that, among other things, there were questions about assets transferred to Barclays and that discovery might be needed.  (BCI 50 [12/22/08 Tr.] 33:12-34:21; *see also* 45:11-49:18.)  The Court agreed that additional factual inquiry was warranted and Barclays' counsel concurred.  (BCI 50 [12/22/08 Tr.] 50:8-52:7.)  Counsel for all settling parties, including Barclays, assured those present that such investigation would not be foreclosed:

> We confirm Your Honor's understanding that what is being done here is we are approving a settlement agreement. There will not be any collateral estoppel or other similar effects .... People would remain free to pursue claims if they feel that there is something in the overall sales transaction which gives rise to a claim.

(BCI 50 [12/22/08 Tr.] 39:13-20; *see also*  24:15-25:3, 34:10-21 (Miller: LBHI does not object because "there is nothing in this that presents collateral estoppel with a binding effect in any future proceeding"), 34:24-35:5 (Schiller: confirming Barclays' agreement),

40:8-19 (Schiller: affirming above reservation of rights), 41:7-12, 45:13-20.)  Based in

part on this assurance, the Court approved the settlement.  (*See* M.119; BCI 50 [12/22/08

Tr.] 58:11-18, 60:6-9.)

460.    From the perspective of those administering the LBHI estate, the dispute

and assets in issue under the December 2008 Settlement were not the focus of their

efforts.  (*See* Kruse Dep. Tr. 231:20-232:22 ("[In December 2008,] we were learning

probably new things at that point about the 7 billion.  I think there was a fair amount of

confusion on our part about what really happened and there's still some confusion, I'm

not sure the record is completely clear on how and why JPM kept the 7 billion …").)

And in connection with the Court's approval of the settlement the LBHI estate relied on

Barclays' assurances, stated in open court including from its counsel Schiller, that the

approval would have no preclusive effect on LBHI's position regarding the Sale

Transaction or potential future claims.  (*See* BCI 50 [12/22/08 Tr.] 24:15-25:3, 34:10-21,

34:24-35:5, 40:8-19, 41:7-12, 45:13-20.)  LBHI also relied on the Court's admonition to

Barclays that "information be shared as promptly as it can be" regarding aspects of the

Sale Transaction about which there were outstanding questions.  (*See* BCI 50 [2/22/08

Tr.] 50:18-51:6.)

### 5.    The Bay Harbour Appeal involved unrelated claims

461.    Separately, on December 12, 2008, as the administrators of the LBHI

estate continued to gather information, one creditor ("Bay Harbour") appealed the denial

of its objection as to select aspects of the Court's Sale Orders.  The objections were

unrelated to the issues raised in the Rule 60 Motions.  Bay Harbour's appeal concerned

about $8 billion it claimed should have been transferred from LBI back to LBIE, a

Lehman subsidiary in separate U.K. insolvency proceedings.  (*See* M.123 [LBHI Docket

No.502] at 2 (appellant's statement of issues).)  Fearful these funds might go to Barclays,

Bay Harbour objected at the Sale Hearing.  (*See* M.121 [LBHI Docket No.175] ¶¶ 1-8;

*see also* M.261 [9/19/08 Tr.] 204:14-218:25.)  The Court denied the objection,

concluding the funds had no bearing on the Sale Transaction and Bay Harbour had

presented no evidence to support its claims.  (M.261 [9/19/08 Tr.] 204:14-218:25,

247:14-253:25.)

462.    Neither the terms of the Sale Transaction itself nor the issues raised by the

Rule 60 Motions was ever the subject of Bay Harbour's objections or its appeal.  Bay

Harbour challenged the Court's finding that Barclays was a good faith purchaser under

Section 363 of the Bankruptcy Code but, given the limited issue on appeal, only with

regard to the supposed misappropriation of the so-called "Defalcated Funds," the only

transfer at issue on the appeal.  Bay Harbour argued that its due process rights had been

violated by refusing to allow it to take discovery and conduct an investigation.

463.    Barclays took several positions in opposition to the appeal that are

inconsistent with arguments it now raises in response to the Rule 60 Motions.  For

example, in response to the appeal, Barclays relied on the disclosures made at the Sale

Hearing, arguing (contrary to its Rule 2004 opposition) that the transaction had not

changed significantly from that in the original Asset Purchase Agreement that Bay

Harbour had been shown two days earlier:

> The fundamental terms of the proposed Sale, i.e., the sale
> of assets related to LBHI's broker-dealer business and
> certain real estate assets, were unchanged.  The primary
> changes, noted on the record, included a purchase price
> decrease for the real estate assets based on appraisal results,
> and that cash was no longer being transferred to Barclays as
> the Debtors no longer held such cash.

(M.258 [Barclays' Bay Harbour Opp.] at 10.)

464.    Barclays also argued that the Court "heard evidence that Barclays assumed billions in liabilities and agreed to pay cure amounts on leases and contracts it assumed" and that "no cash was being transferred" in the deal (M.258 [Barclays' Bay Harbour Opp.] 15, 17, 19), representations it now appears to disavow.  Barclays relied on McDade's testimony as evidence of its good faith (M.258 [Barclays' Bay Harbour Opp.] 26, 29-30 & n.32 (arguing McDade's credibility went "unchallenged")), although Barclays now seeks to distance itself from McDade's understanding of the balanced nature of the deal.  (*See* Barclays Opp. ¶ 74.)  Barclays argued then that "the only reviewable issue" on Bay Harbour's appeal was "whether Barclays was a good faith purchaser" (M.258 [Barclays' Bay Harbour Opp.] at 20) and not the validity of the sale (M.258 [Barclays' Bay Harbour Opp.] at 20-24), although Barclays now suggests all aspects of the Sale Transaction were in issue on the appeal.  (*See, e.g.,* Barclays Opp. ¶¶ 442-480, 502-504, 616-617.)

465.    On December 12, 2008, LBHI also submitted a brief in opposition to the appeal in which it argued that it was not plain error for the Court to find good faith and that Bay Harbour's due process right had not been violated.  Unlike Barclays, however, LBHI's arguments were not inconsistent with its position here.  Barclays points to the fact that in its appellate papers LBHI stated that "[b]y the time the Sale Hearing was conducted, the value of the securities to be transferred to Barclays declined from $72 billion at the beginning of that week to $47.4 billion and the liabilities to be assumed by Barclays declined from $68 billion to $45.5 billion."  (M.405 [LBHI Bay Harbour Ans.]

at 12.)[173]  These numbers merely comported with the uninformed description Ms. Fife

gave on September 19, 2008 before discovery revealed there was much the lawyers had

not been told.

466.    And there is nothing untoward with LBHI having argued against Bay

Harbour's assertion that there was no record evidence that Barclays was a good faith

purchaser.  Bay Harbour had failed to present any such evidence.  (M.405 [LBHI Bay

Harbour Ans.] at 17-27.)  At that time, LBHI did not have access to the information

(being withheld by Barclays) that later showed certain Lehman officers had breached

duties they owed to Lehman and that Barclays aided and abetted those breaches.  At the

very least, LBHI took no position in the appeal inconsistent with its recently learning that

mistakes were made in the September 2008 disclosures to the Court.

### 6.    Alvarez & Marsal began noticing discrepancies in LBHI's books

467.    A&M first began taking a closer look at the Sale Transaction toward the

end of December 2008 when, as it worked on year end matters, it saw discrepancies

between the amounts of liabilities left with the LBHI estate and those it had expected,

based on disclosures made in Court, would remain.  (*See* Kruse Dep. Tr. 164:23-165:23;

6/21/10 [Marsal] 24:9-25:12, 52:18-53:2.)  At the end of December, the administration at

LBHI began "coming to some realization that the liabilities that were on the books for

comp and call it cure kind of liabilities appear[ed] to be much lower than the amounts

that were presumed to be the effective liabilities in the deal."  (Kruse Dep. Tr. 164:23-

165:21, *see also* 233:5-20 ("toward the end of December 2008 when our finance team

---

[173]  This was undoubtedly derived from Weil Gotshal's review of the transcript for the September
19 hearing where Ms. Fife described the proposed Sale Transaction in these terms.  (M.261 [9/19/08 Tr.]
46:19-47:15; *see also* LBHI Mot. ¶¶ 84-85.)

was finalizing the closing of the filing date books and records.  Issues started to bubble

up about the amount of the liabilities for comp and to some extent for cure as well."),

168:6-17; 6/21/10 [Marsal] 24:9-25:12.)

468.    Marsal recalled that in mid to late January, as A&M was trying to close

the books on September, "questions were coming up" and he "[did not] understand how

the assets equaled the liabilities," as he had been told was the case.  (6/21/10 [Marsal]

52:18-53:16, *see also* 24:9-25:12 (the estate's current CFO, Bill Fox, "said he did not

understand how the [cure and comp] estimates were put together by his predecessor [Ian

Lowitt] [a]nd that he raised the concern to me in . . .  late January which started—we

started to ask questions"), 47:16-48:17 (accounting records only became available to

A&M in January 2009 through a reopening of the accounting process by Barclays).)

469.    After noticing these discrepancies, upon direction from Marsal, A&M

formed a team in January 2009 to look into the Sale Transaction.  (Kruse Dep. Tr.

164:23-166:5, 68:3-8 (A&M did not "undertake a comprehensive review of the

transaction until January of 2009"); 6/21/10 [Marsal] 53:6-24 (first time A&M had any

concern whether the transaction was actually a wash and asked anyone to investigate was

in the first quarter of 2009); 50:20-51:6 (Marsal did not see any of the "Transaction

Adjustments").)

### 7.    Barclays' February 2009 disclosure of its "gain" on the Sale Transaction

470.    While the forensic team was starting its work, on February 9, 2009,

Barclays announced its results for the year ending December 31, 2008.  (M.100; Stip. ¶¶

154-155.)  In particular Barclays announced: "The excess of the fair value of net assets

acquired [from Lehman] over consideration paid [to Lehman] resulted in £2,262 m[illion]

[approximately $4.2 billion USD at the time] of gains 'on acquisition.'" (M.100 at 95; Stip. ¶ 118; *see also* Stip ¶ 154 ("In February 2009, Barclays announced that it had secured a £2.262 billion gain from its acquisition of Lehman's North American business.").) That same day, Barclays filed its Form 6-K with the SEC, which included Barclays' acquisition balance sheet for the Sale Transaction. (BCI 134; Stip. ¶ 211.)

471.    The existence of this massive gain "on acquisition" – *i.e.*, a day-one gain on the sale itself, not due to Barclays operating the broker-dealer business thereafter – came as a surprise to the Lehman Boards and to others involved in the transaction who had been told the deal was a balanced exchange.[174] A $4.2 billion gain derived from the excess of the fair value of net assets acquired over consideration paid was not contemplated by the deal McDade made with Barclays. (4/26/10 [McDade] 215:19-216:16.) During the week of September 15, no one suggested such a gain for Barclays. (4/26/10 [McDade] 216:17-217:3.)

472.    Berkenfeld testified that under his "understanding of the transaction, as reflected in the Asset Purchase Agreement, it was not intended that Barclays would have an immediate excess value in the assets that they were bringing over." (4/27/10 [Berkenfeld] 197:17-199:4, 199:19-200:1.)

---

[174]   In opposing Rule 2004 discovery in this case, Barclays misled the Court about this announcement and argued that this "gain" was due to that fact that "thus far the acquired businesses have performed well and have generated an accounting gain." (BCI 43 [Barclays' Rule 2004 Opp.] ¶ 56.) This statement was directly contrary to the clear language of Barclays' Results Announcement, which disclosed a "gain on acquisition" resulting from the "excess of the fair value of net assets acquired over consideration paid." (M.100 at 95.) Asked about this contradiction, Hughes at first disingenuously professed an inability to understand Barclays' own filings. (4/30/10 [Hughes] 156:5-160:18 ("I don't know the answer to that.").) Eventually, however, he conceded that Barclays' opposition papers appeared to refer to post-acquisition performance, not a day one gain. (4/30/10 [Hughes] 157:4-8.)

473.    The February 2009 announcement gave LBHI the first real indication that the Sale Transaction as closed may not have been the "wash" or "push" described to the Court, the Lehman Boards, the creditors, and A&M, but instead may have provided undisclosed benefits to Barclays.  As Marsal testified:

> [I]n early February -- I believe it was early February -- the quarterly results came out from Barclays.  And it indicated that there had been a substantial built-in gain from the transaction not from operations post the transaction but from the transaction itself which would suggest that the net assets received were greater than [] the liabilities assumed. And at that point we registered a -- we sent a letter out to -- again to Jonathan [Hughes] and asked him could he explain this 'cause we thought -- I mean our initial reaction was there must have been a mistake made here.  Again, in the chaos of the situation, there was a mistake made by the parties,  And, we asked him can you explain how this came about.

(6/21/10 [Marsal] 24:9-25:12.)  This release prompted A&M to begin examining the assets and liabilities transferred to Barclays.  (6/21/10 [Marsal] 52:18-53:2 (a week or two after information from accounting systems came in, Barclays' "quarterly results came out and that caused even greater questioning on our part"); 53:17-24 (shortly after Barclays' press release in February 2009 Marsal asked people to investigate whether or not the Barclays transaction was a wash).)

### 8.    In light of Barclays' recalcitrance, A&M and LBHI began focusing on the terms of the Sale Transaction

474.    Right after Barclays issued its Results Announcement, the LBHI estate asked Barclays for information.  Barclays stonewalled.  On February 19, 2009, LBHI wrote to Ricci and Hughes at Barclays, requesting information about its payments of the bonus and contract cure amounts (the "February 19 Letter").  (M.124A; *see also* Kruse Dep. Tr. 209:8-21, 233:5-234:5; 6/21/10 [Marsal] 24:9-25:12.)  The February 19 Letter

stated that LBHI had conducted "a preliminary review of the accrual for bonuses as of

August 31, 2008, and it appears that the consolidated global accrual on the books of

LBHI as of that date was only $1.3 billion."  (M.124A.)  The letter requested a meeting

with Barclays and supporting documentation to explain the amounts paid, or to be paid,

by Barclays.  (M.124A.)

476.    On February 23, 2009, Barclays responded, saying that it purportedly

wanted to avoid addressing queries on a piecemeal basis, but actually provided no

answers at all.  (M.124B.)  Barclays did not agree to meet with LBHI about the bonus and

cure liabilities.  (M.124B.)  Barclays did not provide LBHI any supporting

documentation or analysis.  (M.124B.)  As Marsal testified, Barclays' response was not

satisfactory and "did not explain the differences between what was [] reported as the deal

and what was actually going down in the case."  (6/21/10 [Marsal] 26:24-25:6; *see also*

Marsal Dep. Tr. 208:21-209:20 (Barclays' response was that what it spent on cure and

comp liabilities was "irrelevant").)  Marsal recognized "there was going to be a

significant disagreement between the Lehman estate [] and Barclays without an answer,"

and that this was only with respect to the accrued liabilities.   (6/21/10 [Marsal] 27:7-19.)

At that point, LBHI retained Jones Day as special counsel in March 2009.  (6/21/10

[Marsal] 27:7-25.) [175]  It also caused A&M to begin looking at the value of assets

transferred to Barclays, although that proved difficult given the paucity of information

---

[175]    Counsel for the Creditors' Committee had been discouraged from pursuing similar questions
by Weil Gotshal because, allegedly, there was nothing they could do about it.  (M.148 (e-mail from Ms.
Fife to Milbank:  "I really am at a loss to figure out why you and the other committee professionals are
spending so much time on the Barclays sale.  What could you or anyone for that matter do even if it turned
out that the assets turned out to be greater?  As you know, the sale has been consummated which
effectively moots out any relief you might be seeking."); O'Donnell Dep. Tr. 153:7-154:14.)

and institutional knowledge available to LBHI even then.  (Marsal Dep. Tr. 186:16-

187:24; 6/21/10 [Marsal] 15:13-16:7, 18:4-6, 7:12-8:5.)

> ### 9.    LBHI retained special counsel, who were forced to seek Rule 2004 discovery and expeditiously to move under Rule 60

476.    After an initial investigation of the limited available facts, on April 13,

2009, LBHI's counsel at Jones Day wrote to Barclays to follow up on the requests in

LBHI's February 19 Letter (the "April 13 Letter").  (M.124, Ex. C.)

477.    In response, Barclays again stonewalled, its counsel characterizing this as

"an unnecessarily burdensome and confrontational approach in these circumstances."

(M.124, Ex. D.)  Barclays stated the requests in the April 13 Letter addressed topics the

Examiner was investigating and asserted that a "simultaneous and duplicative

investigation by [LBHI] will interfere with [Barclays'] ability to respond to the Examiner

in a timely and complete manner."  (M.124, Ex. D.)  Again, no information was actually

provided.  Barclays did not agree to provide LBHI any materials or to make available any

former Lehman employees.  (M.124, Ex. D.)

478.    On April 24, 2009, LBHI's counsel requested copies of any documents

Barclays produced to the Examiner, and again requested the documents called for in the

April 13 Letter.  (M.124, Ex. E.)  Barclays did not provide, or agree to provide, any such

documents.  Instead, on May 13, 2009, Barclays said it would provide only some of the

requested discovery and some "aggregate" data, but it would neither commit to any

deadlines for doing so nor specify what it would produce.  (M.124 [LBHI Docket No.

3596] Rule 2004 Mot. ¶ 28.)

479.    Accordingly, on May 18, 2009, LBHI moved for an order authorizing

Rule 2004 discovery concerning the Sale Transaction.  (M.124 [LBHI Docket No. 3596]

Rule 2004 Mot.)  The Committee and Trustee joined in LBHI's Motion.  (LBHI Docket

No. 3778; LBHI Docket No. 4074.)  Barclays opposed the requested discovery.  (BCI 43

[LBHI Docket No. 3776] Barclays Rule 2004 Obj.)

      480.    In its opposition, Barclays asserted that LBHI's "potential claims have no

merit and the Estate already has access to any information it reasonably could need."

(BCI 43 [LBHI Docket No. 3776] Barclays Rule 2004 Obj. ¶ 2; *see also* ¶¶ 19, 35, 55.)

Barclays falsely asserted that A&M "participated directly" in negotiations from

September 15 through the Closing.  (BCI 43 [LBHI Docket No. 3776] Barclays Rule

2004 Obj. ¶¶ 19, 54.)  As to discrepancies concerning bonus and cure amounts, Barclays

argued it was not required to make such payments (BCI 43 [LBHI Docket No. 3776]

Barclays Rule 2004 Obj. ¶ 2), and that the amounts had always been just "estimates."

(BCI 43 [LBHI Docket No. 3776] Barclays Rule 2004 Obj. ¶¶ 2, 9-15; *see* 6/24/09 Tr.

[LBHI Docket No. 4183] 43:5-11.)  Barclays argued discovery would be unduly

burdensome and inappropriate, in part, because "Barclays faced a considerable risk that

many of the assets it acquired would turn out to be worth far less than Lehman

represented."  (BCI 43 [Barclays Rule 2004 Obj.] ¶ 44.)

      481.    On June 25, 2009, over Barclays' objection, the Court granted the Rule

2004 Motion, authorizing discovery from Barclays.  (6/24/09 Tr. [LBHI Docket No.

4164].)  Through July, August and early September of 2009, the Movants conducted

extensive and expedited discovery relating to the topics noted in the Rule 2004 Motion.

      482.    The last deposition was taken on Saturday, September 12, 2009, of Mr.

Klein, one of Barclays' principal negotiators.  Three days later, on September 15, 2009,

LBHI filed its Rule 60 Motion.  It did so in compliance with the one-year deadline under

Rule 60(c)(1), as LBHI had previewed to the Court at the June 24, 2009 hearing

regarding Rule 2004 discovery.  (*See* 6/24/09 Tr. [LBHI Docket No. 4183] 38:16-41:3.)

## THE VALUATION EVIDENCE

## I.    BARCLAYS RECEIVED A WINDFALL OF APPROXIMATELY $13 BILLION BEYOND WHAT WAS DISCLOSED TO THE COURT

483.    In the Sale Transaction as closed, Barclays received value materially in

excess of what was disclosed to the Court.  Barclays thus benefited from the Sale

Transaction far beyond what was approved by the Court (the "Barclays Windfall").  The

values of the financial assets as disclosed to the Court were materially less than the

values of the financial assets acquired by Barclays in the transaction that closed.

Moreover, the values of the liabilities that Barclays was to assume that were disclosed to

the Court were materially inflated as compared to the liabilities actually assumed by

Barclays in the Transaction that closed.

### A.    The Value Of The Transaction That Was Disclosed To The Court

484.    The Court was told that the value of assets (including real estate) being

transferred to Barclays was $48.69 billion.  (*See supra* ¶¶ 276-283.)  As for assumed

liabilities and other consideration, the Court was told that Barclays was paying a total of

$50.54 billion in cash and assumed liabilities.  (*See supra* ¶¶ 276-283.)  No other

valuation disclosures were made to the Court.  (*See generally* M.261 [9/19/08 Tr.];

M.260 [9/17/08]; M.118 (Sale Motion).)  The evidence presented at the Sale Hearing thus

informed the Court that the transaction provided a net benefit to the Debtors of

approximately $1.85 billion, as shown below:

| VALUES DISCLOSED TO THE COURT | | | |
| --- | --- | --- | --- |
| Assets | | Liabilities | |
| **Item** | **Amount (mm)** | **Item** | **Amount (mm)** |
| Financial Assets | $47,400 | Assumed Liabilities | $45,500 |
| Lehman headquarters | 960 | Lehman headquarters | 960 |
| Data Centers | 330 | Data Centers | 330 |
| | | Cure Amounts | 1,500 |
| | | Compensation | 2,000 |
| | | Cash Amount | 250 |
| **Total** | **$48,690** | **Total** | **$50,540** |
| **NET BENEFIT TO THE DEBTORS** | | | **$ 1,850** |

(*See* M.261 [9/19/08 Tr.] 47:1-49:17, 138:23-139:22; 99:22-100:4; *see also supra* n.114.)

485.    At trial, it was finally revealed that the Court was not apprised of a number of material matters concerning the valuation of the assets and liabilities:

- that there was a Take-Out Agreement between Barclays and the FRBNY where Barclays essentially stepped into the shoes of the FRBNY and took over the FRBNY's financing obligations to Lehman, and received all the collateral—valued at $50.6 billion by the FRBNY, (*see supra* ¶¶ 195-205, 293);

- that $45.5 billion of the $47.4 billion figure disclosed to the Court represented a negotiated price for the collateral backing the repo, which included the residential mortgages addressed in a separate clause of the Asset Purchase Agreement than the Long Positions, (*see supra* ¶¶ 279-281; *see also* M.156B [Zmijewski Report] ¶¶ 38-40, Ex. D-1; M.1 [APA]6);

- that the negotiated price for the repo collateral was based on a liquidation exercise conducted at the direction of Jim Seery the morning of the Sale Hearing, (*see supra* ¶¶ 248-250, 264, 278-280);

- that $1.9 billion of the $47.4 billion figure was the value of so-called unencumbered clearance box assets, (*see supra* ¶¶ 262-264, 278-280); or

- that, according to Barclays' interpretation of the Clarification Letter, billions in additional assets were added to the deal and not included within the $47.4 billion figure (*see supra* ¶¶ 324-329).

B.    **The Valuation Of The Transaction That Actually Closed**

1.    **Movants presented detailed valuation opinions by experts with experience in the relevant financial markets**

486.    To calculate the value of the assets and liabilities in the Transaction that actually closed, Movants presented six qualified and experienced experts who established (a) the valuation as of the Closing Date of approximately 12,000 unique securities on a security-by-security basis, (b) applicable accounting principles, and (c) the industry customs and practices concerning securities valuation and the conduct and duties of custodial agents in repo lending arrangements.

487.    Movants' six experts are associated with Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc. ("Movants' Experts").  Four of these experts offered valuation opinions, i.e., Professor Mark Zmijewski, Mark Slattery, John Olvany and Joseph Schwaba.[176]  Each of these experts provided a valuation opinion on securities within his particular expertise.  These four experts conducted an independent valuation of the Initial Inventory and the JPM Inventory, which together include the Repo Collateral and a portion of the clearance box assets.  (*see, e.g.*, M.156B [Zmijewski Report], M.154B [Schwaba Report], M.155B [Slattery Report], M.152 [Olvany Report].)[177]

488.    Professor Mark E. Zmijewski is the Leon Carroll Marshall Professor of Accounting and Deputy Dean at The University of Chicago Booth Graduate School of

---

[176]  In addition to the four valuation experts, Movants also presented testimony from John Garvey and John Schneider.  (*see, e.g.*, M.151 [Garvey Report], M.153 [Schneider Report].)  Messrs. Garvey and Schneider did not offer valuation opinions.  Instead, Mr. Garvey provided testimony concerning relevant accounting standards.  Mr. Schneider was an expert on industry custom and practice in the repo market and provided rebuttal testimony about tri-party repo custodial practices.

[177]  Professor Zmijewski also provided testimony in rebuttal to a number of additional opinions offered in the Pfleiderer Report.  (M.156B [Zmijewski Report] ¶ 11 (Opinions 4, 7-12).)

Business.  (M.156B [Zmijewski Report] ¶ 1.)  He is a founder and principal of Navigant

Economics (Chicago Partners).  (*Id*.)

489.    First, using Barclays' Acquisition Balance Sheet—that is, accepting

Barclays' figures as is—Professor Zmijewski compared the fair value of the total assets

received by Barclays to the net value of the transaction as represented to the Court.

(9/20/10 [Zmijewski] 22:14-24:6; M.156B [Zmijewski Report] ¶ 11 (Opinions 1-2).)

490.    Barclays itself reported an immediate economic gain from the Sale

Transaction of $4.17 billion.  (BCI 134; M.105A; 9/20/10 [Zmijewski] 25:19-26:1.)

Accepting Barclays' valuation of the securities demonstrates a "day-one" gain of $4.17

billion and a Barclays Windfall of $6.02 billion.  As Professor Zmijewski explained:

> [R]oughly 4.2 billion comes from the immediate economic
> gain recognized by Barclays in the sale transaction.  So
> Barclays recognized a 4.2 billion dollar gain, according to
> movants, and with respect to the court-approved transaction,
> Lehman should have recognized a 1.85 billion dollar gain.
> Add those two numbers together and it's a six billion dollar
> windfall.

(9/20/10 [Zmijewski] 26:8-14; *see also* M.910 [Zmijewski Dem.] 9-10.)

491.    Next, Professor Zmijewski calculated Barclays Windfall after correcting

for Barclays' undervaluation of the financial assets it received.  Professor Zmijewski

summarized the findings of the other valuation experts to calculate Barclays' total

undervaluation of the Initial Inventory and JPM Inventory at $5.1 billion.  (M.156B

[Zmijewski Report] ¶¶ 11 (Opinions 1-2), 12, 14, 20, 24, Ex. A-2.)  The table below,

based on Professor Zmijewski's Report, summarizes Barclays' undervaluation of

particular classes of securities as calculated by each of Movants' four valuation experts.

| Summary of Barclays' Undervaluation of Initial and JPM Inventory[178] (amounts in billions of dollars) | | |
|---|---|---|
| **Expert** | **Asset Class** | **Barclays' Undervaluation** |
| Zmijewski | Equities | $0.5407 |
|  | JPM Inventory | $1.6573 |
| Slattery | Rates, Credits, and Securitized Products | $2.3803 |
| Olvany | Corporate Bonds | $0.3814 |
| Schwaba | Municipal Securities | $0.1499 |
| **Total Barclays' Undervaluation** | | **$5.1098** |

(M.156B [Zmijewski Report] ¶11; 9/20/10 [Zmijewski] 42:18-43:18; *see also* M.910 [Zmijewski Dem.] 17.)

492.    When the securities are valued appropriately, the actual immediate economic gain to Barclays from the Sale Transaction was much greater than Barclays reported:  $11.20 billion.  (9/20/10 [Zmijewski] 33:23-34:10; *see also* M.910 [Zmijewski Dem.] 14.)  In other words, Barclays' $4.17 billion reported gain was understated by $7.029 billion once the assets transferred and the actual consideration paid to Lehman are accurately valued.  (*Id.*)  The following table based on Professor Zmijewski's testimony and the demonstratives that he used during the trial illustrate Barclays' gain on acquisition.

---

[178] The terms "Initial Inventory" and "JPM Inventory" are used herein as defined in the Zmijewski Report.  (*See* M.156B [Zmijewski Report] ¶ 11 n.5.)  In his report, Barclays' expert Professor Pfleiderer defines "Repo Collateral" as the "inventory of trading portfolio securities [Barclays] acquired when it replaced the FRBNY, as LBI's primary source of financing on Thursday, September 18, 2008."  (BCI 341 [Pfleiderer Report] ¶ 5(a).)  Table 2 of the Pfleiderer Report sets forth what is included within the term.  The Pfleiderer Report uses the term "Schedule B breakout analysis" to describe certain assets removed from its analysis of the Repo Collateral.  (BCI 341 [Pfleiderer Report) 64 n.77.)

| | ($ Billions) |
|---|---|
| Barclays' Undervaluation | $5.110 |
| Unrecorded Assets and Transaction Costs | 1.380 |
| Overstated Liabilities Assumed | 0.539 |
| Barclays' Reported Acquisition Gain | 4.170 |
| Barclays' Economic Gain | $11.199 |

(9/20/10 [Zmijewski] 33:23-34:10; *see also* M.156B [Zmijewski Report] ¶ 11 (Opinion

2), 26; Exs. B-1, B-2; M.910 [Zmijewski Dem.] 14.)

493.    Comparing the accurate day-one gain to the transaction value described to

the Court, Professor Zmijewski calculated the full amount of Barclays Windfall at

$13.051 billion.  (M.156B [Zmijewski Report] ¶¶ 11 (Opinion 2), 27, Exs. B-1, B-2; *see

also* M.910 [Zmijewski Dem.] 8, 10.)  As Professor Zmijewski explained at trial:

> According to movants, the court-approved value in this
> transaction was that Lehman should have recognized a gain
> of 1.85 billion.  And therefore, Lehman should have
> recognized a gain of 1.85 billion.  What happened is
> Barclays recognized a gain of 11.2 billion.  To calculate the
> windfall, it's the sum of those two numbers or
> approximately thirteen billion dollars.

(9/20/10 [Zmijewski] 25:13-18; *see also* M.910 [Zmijewski Dem.] 8, 10.)

494.    Using the following demonstrative, Professor Zmijewski testified at trial

about the various components to Barclays' Windfall:

| ($ Billions) | Movants' Experts | Barclays' Reported |
|---|---|---|
| Barclays' Undervaluation | $5.110 | $— |
| Unrecorded Assets and Transaction Costs | 1.380 | — |
| Overstated Liabilities Assumed | 0.539 | — |
| Barclays' Reported Acquisition Gain | 4.170 | 4.170 |
| Barclays' Acquisition Gain / Economic Gain | 11.199 | 4.170 |
| Barclays' Transaction Value Approved by Court | — (1.850) | — (1.850) |
| Barclays Windfall | $13.049 | $6.020 |

(9/20/10 [Zmijewski] 27:12-23; *see also* M.910 [Zmijewski Dem.] 10.)

495.    When the financial assets are properly valued, Barclays Windfall was thus over $13 billion more than what was disclosed to the Court.  (M.156B [Zmijewski Report] ¶¶ 11 (Opinion 2), 27, Exs. B-1, B-2.)  Professor Zmijewski explained at trial:

> . . . there's seven billion dollars difference between the six billion windfall and the thirteen billion on the previous slide.  That's seven billion dollars composed of the following parts:  first, we have about a 5.1 billion dollar undervaluation of financial assets.  There's about 775 million dollars of unrecorded assets for which Barclays has a claim against Lehman.  There are some liabilities that were overstated.  And then there are some liabilities that movants believe weren't appropriately included as liabilities.  And then there's transactions costs.  So those are the components.  And I have a slide that delineates all of that.

(9/20/10 [Zmijewski] 26:25-27:11; *see also* M.910 [Zmijewski Dem.] 10.)

## 2.    All other valuations for the Repo Collateral were very close to Movants' valuation

### (i)    Other valuations before the Court

496.    Evidence adduced at trial demonstrated that a number of contemporaneous, third-party valuations of the repo collateral were available to the parties, but none were presented to the Court at the Sale Hearing.

497.    JPM, custodial agent for the Fed Repo, placed the value of the Fed Repo at

$50.6 billion as of Wednesday, September 17, 2008.  (M.119A [Leventhal Decl.] ¶ 9;

M.45; M.147 at 000070; M.909.)

498.    As demonstrated at trial, JPM's valuation was based on the definition of

"market value" imposed by Federal regulation.  As Ms. Leventhal of the FRBNY noted

in her October 4, 2008 e-mail to Mr. Hughes, the definition of  "market value" used to

value securities in the government's PDCF program was quite specific and rigorous:

> Market Value.  The most recently available closing bid
> price for the particular Security as made available to the
> Bank by a recognized pricing service which Bank uses for
> pricing such Security in the ordinary course of business,
> plus, with respect to debt Securities, any accrued interest on
> such Securities (to the extent not reflected in such pricing)[.]
> Notwithstanding the foregoing, cash shall be valued at face
> value.

(M.705 at 2; 9/7/10 [Leventhal] 159:16-163:10.)  Barclays offered no competent

evidence that JPM's valuation of the collateral deviated in any material way from this

applicable regulation.  (10/7/10 [Pfleiderer] 60:1-25 (admitting that he had no reason to

doubt that this was the operative definition of market value used by JPM).)

499.    Barclays' own custodial agent, BoNY, valued the collateral transferred on

September 18, 2008 at $45 billion which, when added to the $7 billion of cash that

Barclays was to receive, brought the total at closing to $52 billion.  (M.47; M.73 at

006647; M.84 at 008149; M.64; M.200.)

500.    Barclays' own contemporaneous documents reflected that Barclays placed

the total value of the securities it received via the repo at around $52 billion, before

Barclays later elected to mark down those values.  (*See supra* ¶ 390.)

501.     Even the security-by-security schedules exchanged by the parties in the week of September 15, placed the value of the Repo Collateral at approximately $49.9 billion, against $45 billion in cash advanced.  (*See*, *e.g.*, M.381 at 3.)

502.     In sharp contrast to all these valuations, including the third party valuations by JPM and BoNY—the leading custodial agents in the industry—Barclays' put the value of the Repo Collateral at only $45.5 billion, months after the closing. (M.105A; M.102N; M.103N; *see also* BCI 341 [Pfleiderer Report] ¶ 62 (Table 2).)  The only other valuation that ascribes so low a value to the Repo Collateral was the liquidation valuation performed by Seery and his team on the morning of the Sale Hearing.  (M.147 at 000070; 5/3/10 [Seery] 142:14-25, 144:6-13, 146:15-147:1, 177:24-178:12; *see also supra* ¶¶ 247-250.)  Barclays' only explanation for having arrived at a valuation that so precisely matches that liquidation valuation was to chalk it up to mere "coincidence."  (Barclays' Reply Memorandum, Motion to Exclude Movants' Experts, at 44-45 n.40 [Docket No. 10806].)

> **(ii)     Movants' expert John Schneider offered unrebutted testimony on the customs, practices and reliability of the custodial marking process**

503.     The Court accepted Movants' Expert John Schneider as an expert in "custodial services with particular reference to the policies and procedures followed by custodians and repurchase agreement."  (9/21/10 [Schneider] 151:7-12.)

504.     Mr. Schneider has over 20 years of experience working with financial services companies, during which he has designed and evaluated governance and control environments, including the custodial valuation process.  (M.153 [Schneider Report] ¶¶ 5-7, App. II.)

505.    Mr. Schneider concluded that BoNY and JPM, as custodians and tri-party

agents to the Barclays and Lehman repo and Fed Repo, respectively, were well qualified

to value the collateral at issue.  (M.153 [Schneider Report] ¶¶ 9-11.)

506.    Mr. Schneider's opinion, based on his actual knowledge and expertise in

the area of custodial services, rebutted Professor Pfleiderer's generic opinion that the

BoNY and JPM marks were unreliable.  (M.153 [Schneider Report] ¶¶ 13-28; BCI 341

[Pfleiderer Report] ¶ 43; 10/7/10 [Pfleiderer] 140:23-25 (admitting not an expert on

custodial services or repos), 85:9-13 (admitting he did not do an independent valuation),

97:17-22 (same), 112:5-16 (same).)

507.    Mr. Schneider testified about the important role of custodial banks in

valuing repo collateral:

> Bank of New York and JPMorgan . . . have a responsibility
> to get the value right on a daily basis and just given the size
> and scale of both the tri-party collateral that is valued daily,
> I believe they have policies, procedures, underlying
> controls and systems to make sure that they get this right on
> a recurring basis.

(9/21/10 [Schneider] 162:11-163:4; M.153 [Schneider Report] ¶ 57.)

508.    Mr. Schneider explained that "BoNY and JPM are the two tri-party repo

agents that control the vast majority of the tri-party repurchase custodial business in the

United States."  (M.153 [Schneider Report] ¶ 27.)  He testified, "[t]hey essentially are the

[tri-party repo custodial] market . . . They represent 2.8 trillion dollars of that market [per

day] as of the point in time in 2008."  (9/21/10 [Schneider] 156:25-157:23; M.153

[Schneider Report] ¶¶ 9, 27-28. )

509.    Mr. Schneider described how BoNY and JPM value large repos that last a

day or less "all the time," and there is "nothing whatsoever" that is "particularly unusual

about a collateral agent having only one day to value large amounts of securities."

(9/21/10 [Schneider] 165:24-167:3; M.153 [Schneider Report] ¶ 27.)

510.    Furthermore, Mr. Schneider explained that BoNY and JPM would not have difficulties valuing "non-traditional" collateral because "they have ... implemented processes to be able to value those securities [g]oing through the hierarchy ... of pricing policies."  (9/21/10 [Schneider] 165:4-23, 153:7-23; M.153 [Schneider Report] ¶¶ 41-42.)

511.    Not only did JPM and BoNY have established systems and procedures to accurately value the repo collateral, they were contractually and legally obligated to maintain adequate processes and safeguards to be able to value the collateral under the short time constraints that were common in the repo market.  (9/21/10 [Schneider] 152:15-153:1; M.153 [Schneider Report] ¶¶ 10-11.)

512.    Barclays submitted no credible evidence in response to Schneider's testimony.  Professor Pfleiderer has no special knowledge or any expertise regarding repurchase agreements, custodial services or valuations.  He disavowed any expertise in those areas.  (10/7/10 [Pfleiderer] 140:23-25; *see also* 10/6/10 [Pfleiderer] 11:5-7 (proffering Professor Pfleiderer as an expert in financial economics and valuation only), 14:21-41 (same).)

> **(iii)    The custodial valuations are very close to each other and to Movants' valuation; Barclays' valuation is the outlier**

513.    The independent valuations conducted by Movants' Experts are consistent with valuations conducted at the time of the Sale Transaction by JPM and BoNY.

(M.156B [Zmijewski Report] ¶ 11 (Opinion 1).)

514.    King, then-head of Barclays' PMTG group, admitted that JPM and BoNY had each independently valued the same collateral within 0.1% of each other.  (8/25/10 [King] 157:11-158:15; *see also* M.777 at 00079369.)

515.    Barclays' internal and self-interested valuation is the outlier among the available valuations.  BoNY and JPM's valuations, comparing the securities that they both valued, are only 1.28% apart.  (M.821 [Zmijewski Decl.] ¶ 74, Ex. X-1; 9/20/10 [Zmijewski] 162:1-17.)  The valuations independently derived by Movants' Experts are 1.99% lower than BoNY's and 3.83% lower than JPM's.  (M.821 [Zmijewski Decl.] ¶ 74, Ex. X-1.)  Barclays' calculations, by contrast, are almost 13% lower than the custodial valuations and over 10% lower than the valuations of Movants' Experts.  (*See id.*)

### (iv)    There is significant overlap between the Repo Collateral and the Fed Repo

516.    In an effort to explain the $5 billion difference between its valuation and that of the custodial agents and Movants' Experts, Barclays argued that the actual Repo Collateral transferred to Barclays "consisted of billions of dollars of assets that were not included in the Fed Repo, and that appeared to be of lower quality and higher risk than the assets that had been in the Fed Repo."  (BCI Opp. ¶ 127.)  The evidence did not support Barclays' contention.

517.    The repo custodians (BoNY in the case of the Initial Inventory and JPM in the case of the JPM Inventory) valued the Repo Collateral that overlaps with that in the Fed Repo at approximately $41.20 billion.  (M.821 [Zmijewski Decl.] ¶ 70.)  Movants' Experts have valued these same securities, which overlap with those in the Fed Repo, at $40.09 billion.  (*Id.*)  Barclays has valued those at only $35.97 billion.  (*Id.*)

518.    Thus, Barclays' valuation of the *overlapping* securities accounts for over $4 billion of the undervaluation. In other words, 80% of the valuation difference between Barclays and Movants can be attributed to overlapping assets. (*Id.*; 9/20/10 [Zmijewski] 45:10-20, 47:2-22; *see also* M.910 [Zmijewski Dem.] 19-20.)

519.    Moreover, and contrary to Barclays' contention, even accepting Barclays' original definition of illiquids, the ratio of liquid securities to illiquid securities was roughly the same between the collateral in the Fed Repo and the Repo Collateral Barclays actually received. (M.821 [Zmijewski Decl.] ¶¶ 71-73, Ex. IX-1.)

520.    King confirmed that Barclays received only $10 billion of collateral through the repo that was non-overlapping collateral (*i.e.,* collateral that was not cash and not in the Fed Repo). (8/25/10 [King] 159:19-24, 153:4-20.) Moreover, contrary to Barclays arguments about "non-overlapping" collateral, the $10 billion in non-overlapping collateral was not of any worse quality than the collateral for which it was substituted. In fact, a significant portion of the non-overlapping securities were equities according to King, and Barclays "made a load" on equity securities on Friday, September 19 when the equities markets appreciated sharply. (8/25/10 [King] 170:9-23; 4/30/10 [Clackson] 29:4-12; M.230.) King, the Barclays trader who remained involved in making valuation adjustments to the securities for months after the Closing Date, admitted a $3 billion "discount" between his marks and the marks of Barclays' custodian BoNY on the Initial Inventory. (8/25/10 [King] 160:21-161:13.)

**C.    Barclays' Valuation Mirrors The Undisclosed Liquidation Value Analysis Conducted On The Morning Of September 19, 2008**

521.    Only one "valuation" as of the Closing Date is consistent with the $45.5 billion valuation offered by Barclays:  the undisclosed liquidation valuation, with deep

reductions by asset class, that was conducted by Barclays and Lehman on the morning of

September 19, 2008, as a prelude to, and excuse for, the "Friday asset grab."

522.    As discussed above (*see supra* ¶¶ 240-249), former Lehman employee

Seery, Lehman's then-Managing Director for Fixed Income Loans, admitted that, on the

morning of September 19, shortly before the Sale Hearing before this Court, he instructed

Lehman traders to assign liquidation values – not market values – broadly by asset class,

to the Repo Collateral in order to arrive at a "negotiated price" (not a market price) for

the securities.  (5/3/10 [Seery] 142:14-25, 144:6-13, 146:15-147:1, 177:24-178:12; M.147

at 000070.)

523.    A similar process was undertaken at Barclays, resulting in the Haircut

Summary spreadsheet that was then forwarded to Lehman.  (M.45; M.45N [native Excel

file of M.45]; M.45M [metadata to M.45N]; 4/29/10 [Clackson] 267:11-23; 8/25/10

[King] 51:17-52:12.)  King testified that he was asked by Barclays on that Friday to

assess if the Repo Collateral was worth more than the $45 billion loan.  (8/25/10 [King]

50:5-21.)  King lamented how there were problems with the custodial marks and so he

just assumed the appropriate realizable value was likely to be significantly less.  (8/25/10

[King] 66:17-68:1.)  King admitted that Barclays Haircut Summary (M.45) was a

schedule he and his team put together the morning of September 19 to "triangulate some

kind of value" for the collateral in the Fed Repo.  (8/25/10 [King] 51:17-52:12.)  While

he said it was not based on a fire sale, he admitted it was Barclays intention to liquidate

and so it was based on "as orderly a runoff as one can contemplate in the months

following the bankruptcy" or if "sold over time."  (8/25/10 [King] 53:16-54:5.)

524.    King's instructions from management were to monetize the value of the securities "through disposals or hedges."  (8/25/10 [King] 29:15-23.)  He admitted that he was valuing the risk, not necessarily the fair market value of the position.  (*See, e.g.*, 8/25/10 [King] 32:24-33:11, 69:9-24.)  King also admitted he took into account the bulk size of a position when valuing the securities.  (8/25/10 [King] 72:6-74:13.)  He assumed he would be liquidating in a declining market and each time he liquidated part of the position it would be at a lower bid than the time before.  (8/25/10 [King] 73:5-19.)

525.    The liquidation values on Seery's spreadsheet were subsequently mis-described to the Court at the Sale Hearing, by Ms. Fife, a lawyer unaware of the liquidation value exercise, as market values.  (M.261 [9/19/08 Tr.] 46:19-47:4; *see also supra ¶¶* 269-274.)  The testimony of Barclays' highest executive, Varley, among others, supports the conclusion that the value of the assets was deliberately undervalued in this way to ensure that Barclays would have a "buffer" and the deal would be "capital accretive" to Barclays.  (6/22/10 [Varley] 102:16-103:17, 106:22-107:10, 110:24-111:1; M.12 at 00166340.)

526.    The Haircut Summary document authored by Barclays in the early hours of September 19 (M.45; M.45N; M.45M; 8/25/10 [King] 51:17-52:12), and the undisclosed liquidation analysis conducted by the Lehman traders on the morning of September 19 (5/3/10 [Seery] 142:14-25, 144:6-13, 146:15-147:1, 177:24-178:12; M.147 at 000070), are the only valuations that are consistent with the valuations that Barclays later ascribed to these securities in its Acquisition Balance Sheet.  (BCI 134; M.105A; M.102N; M.103N; M.143; *see also* BCI 341 [Pfleiderer Report] ¶ 62 (Table 2).)  It is hardly a coincidence that in its post-Sale Transaction Acquisition Balance Sheet Barclays

valued the Repo Collateral for accounting purposes at approximately $45.5 billion, (*see,*

*e.g.*, M.105A; BCI 341 [Pfleiderer Report] ¶ 62 (Table 2)); that was precisely the value

that Barclays' management and traders had, without disclosing it to the Court, negotiated

with certain Lehman executives as the maximum price that Barclays was willing to pay

for those securities.  (*See*, *e.g.*, 5/3/10 [Seery] 142:14-25, 144:6-13, 146:15-147:1,

177:24-178:12; M.147 at 000070.)

> **D.** **Barclays' Acquisition Balance Sheet Does Not Reflect The Fair Value Of The Securities As Of The Closing Date**

527.    As detailed below (*see infra* ¶¶ 552-679), the evidence adduced at trial

refuted the notion that the post-Sale Transaction valuation conducted by Barclays, for

purposes of its financial accounting and public reporting requirements, accurately values

the securities at fair market value as of the Closing Date.  Movants' Experts demonstrated

that Barclays employed a biased valuation methodology to systematically – and

substantially – undervalue the transferred securities.  As such, the values Barclays

ascribed to these securities for purposes of Barclays' Acquisition Balance Sheet bear no

resemblance to the fair market value of those securities as of the Closing Date.

> **1.** **Barclays' Acquisition Balance Sheet value is the outlier among all available valuations**

528.    Barclays summarily rejected the independent valuations provided by the

two premier tri-party repo custodians in the world, BoNY and JPM, which settle over $1

trillion in repos every day (M.153 [Schneider Report] ¶¶ 27-28), and whose independent,

real time, valuations of the securities at issue in this case were within 1% of each other.

(M.821 [Zmijewski Decl.] ¶ 74, Ex. X-1.)  In certain cases, Barclays' valuations were

significantly lower than the values calculated by BoNY, Barclays' own custodial agent in

the repo transaction.  As noted, Barclays' calculations are almost 13% lower than

BoNY's and JPM's valuations and over 10% lower than Movants' Experts.  (M.821

[Zmijewski Decl.] ¶ 74, Ex. X-1.)



(M.909 (containing 9-17 JPM); M.119A [Leventhal Decl.] ¶9 (containing 9-17 Fed);

M.45 (containing 9-19 Fed); M.102N (containing 9-19 BoNY values and Barclays' Exit

Prices for Initial Inventory); M.103N (containing 9-17 JPM and Barclays Exit Prices for

JPM Inventory); M.156B [Zmijewski Report] ¶11 (Opinion 1)(to get Movants' Exit

Price, add Barclays' Undervaluation to Barclays' Exit Price); M.147 at 000070

(containing Seery Value); 5/4/10 [Seery] 144:6-13, 177:24-178:12 (same); *see also*

Movants' Closing Demonstrative Slides at 174.)

529.    Even as Barclays purported to reject the custodian's prices as unreliable, it

selectively used those very prices for purposes of its accounting when it suited Barclays'

objective to ascribe low acquisition values to the securities.  (*See* Teague Dep. Tr. 65:4-

66:6 (testifying that Barclays used BoNY prices for Giants Stadium Bonds after

performing only a "cursory" review); *see also* M.251 (showing Barclays had increased

the value of the Giants Bonds from 10-40% to 100% of face value by 12/31/08); M.242

(showing $350 million gain to Barclays upon mark-up of the Giants Stadium Bonds); *see*

*also* M.958 [Olvany Dem.] 12-14.)

### 2.     The valuation dates Barclays used are flawed

530.     For its own accounting purposes, Barclays elected to use prices as of the

close of business on September 22, or, in some cases, prices from weeks and even months

later.  (M.102N; M.103N; 9/2/10 [Romain] 63:10-12, 68:22-69:9, 71:11-23.)  Barclays'

election to price the securities at later points in time resulted in the systemic

undervaluation of relevant securities when they were transferred to Barclays.

531.     The values on Barclays' acquisition balance sheet are not reflective of the

value of the securities at Closing.  Under the Asset Purchase Agreement, the risk of loss

and all title and interest in the securities transferred to Barclays as of 12:01 a.m. on

September 22, 2008.  (M.1 [APA] ¶ 4.1.)  Movants' experts provided unrebutted

testimony that the best proxy for the value of the securities at Closing was the prices that

prevailed as of the close of business on Friday, September 19, 2008.  (M.151 [Garvey

Report] ¶¶ 59-70 (Opinion 2(c)); M.822 [Garvey Decl.] ¶¶ 31-44; M.821 [Zmijewski

Decl.] ¶¶ 8-11; 9/20/10 [Zmijewski] 48:23-49:19; M.154B [Schwaba Report] 3 n.2, ¶ 13;

M.155B [Slattery Report] 3 n.4; M.823 [Olvany Decl.] ¶ 18; 10/4/10 [Olvany] 54:21-

55:6.)  Barclays' Acquisition Balance Sheet values do not reflect the value of the

securities at Closing because those values include declines in prices that occurred after

risk of loss had passed to Barclays.  (M.821 [Zmijewski Decl.] ¶21, Ex. II-1; 9/20/10

[Zmijewski] 49:15-19; *see also* M.910 [Zmijewski Dem.] 22-23.)

532.     Movants' accounting expert, John Garvey, gave unrebutted testimony that

the accounting rules do not support the use of valuation dates after the effective

Measurement Date.  (M.151 [Garvey Report] ¶ 60; M.822 [Garvey Decl.] ¶¶ 34, 37;
9/21/10 [Garvey] 63:9-71:3; *see also* M.913 [Garvey Dem.] 18-20.)  Value is measured
when Closing is effective.  (*Id.*)  Closing was effective at 12:01 a.m. on Monday,
September 22, 2008.  (*Id.*)  As a practical matter here, the relevant values available were
those that prevailed as of September 19, 2008 end of day.  (*Id.*)[179]

533.    Even Barclays' management originally contemplated using September 19,
2008 as the measurement date.  (M.287; M.780; M.813; 9/2/10 [Romain] 63:17-64:5,
178:21-179:2.)  Indeed, the majority of the securities were part of the Initial Inventory
that was transferred to Barclays by Friday, September 19.  (*See, e.g.*, 8/25/10 [King]
105:8-106:5; 4/29/10 [Lowitt] 114:3-9; M.102N; M.813 at 00008679; M.333 at
00128030.)  Barclays also began risk managing (or hedging) these securities on Friday,
September 19.  (8/25/10 [King] 106:14-17.)  Yet, Barclays valued securities within the
Initial Inventory as of the end of the day on September 22, 2008 or various dates in the
period September 23 through September 30.  (M.102N; 9/2/10 [Romain] 63:10-12,
68:22-69:9; M.333 at 00128030-31.)  No Barclays witness was put on the stand to offer
any justification at trial for Barclays' selection of these post-Closing valuation dates.

534.    Ignoring the Asset Purchase Agreement, Barclays attempted to justify its
selection of post-Closing dates for the valuation of securities on the theory that it did not
have "practical control" over or "substantive ability to transact" with respect to the
securities.  (M.287; M.780.)  Mr. Garvey, Movants' accounting expert, explained that
these concepts have no support in governing accounting rules.  (9/21/10 [Garvey] 63:9-

---

[179] Accounting convention says Measurement Date (or Acquisition Date) is the date when the risk
and rewards of ownership transfer from one party to the other party.  (M.822 [Garvey Decl.] ¶ 34.)

24; M.151 [Garvey Report] ¶¶ 60-63; M.822 [Garvey Decl.] ¶ 37; *see also* M.913

[Garvey Dem.] 18.)

535.    Barclays also sought to employ the "date of receipt" rationale to value the

JPM Inventory—the inventory of securities it received in settlement of the $7 billion

claim it had as of Closing—on the date it received those securities, December 22, 2008.

(M.103N; M.287; M.333 at 00128031; 9/2/10 [Romain] 71:11-23, 161:24-162:4.)  By

doing so, Barclays impermissibly built into its valuation a significant decline in the value

of those securities post-Closing, three months *after* risk of loss had already passed to

Barclays.  (*See infra* ¶¶ 579-586.)

536.    As Movants demonstrated, Barclays selection of post-Closing dates for

valuation alone accounts for over $2 billion of the $5 billion valuation difference between

Barclays and Movants.[180]

### 3.    The liquidity adjustments Barclays used do not reflect the fair value[181]

537.    Barclays' undervaluation also resulted from Barclays' use of steep

liquidity haircuts (or discounts) for certain types of securities that Barclays ordinarily

either did not discount at all or did not discount as steeply.  (M.102N; M.103N;

---

[180] The valuation date issue includes (a) Barclays' use of September 22 closing prices instead of September 19, 2008 closing prices for the Equities (*see* M.821 [Zmijewski Decl.] ¶ 22 ($290 million for Equities); (b) Barclays' use of sales prices for post-closing transactions between September 22 and September 30, most of which were internal sales within Barclays (*see* M.824 [Slattery Decl.] ¶¶ 26-27 ($389 million for post-closing internal sales)); and (c) Barclays' use of a December 22 date, three months after the Sale Transaction, to value the JPM Inventory (*see* M.821 [Zmijeski Decl.] ¶ 25 n.54 ($1.657 billion for JPM inventory)).

[181] Fair value accounting rules under U.S. Generally Accepted Accounting Principles allow the practice of marking securities from the "mid" (the mid point between a bid and an offer price) to a bid price to approximate an "exit price."  (M.151 [Garvey Report] ¶ 35.)

Landreman Dep. Tr. 61:8-15, 154:3-156:14, 156:25-158:8; Washtell Dep. Tr. 161:13-162:7.)

538.    At trial, Barclays submitted little or no support for any of its valuation decisions or judgments.  At deposition, Barclays PCG witnesses admitted that Barclays did not check if its valuation of the securities transferred from Lehman was consistent with its valuation of similar securities already on Barclays' books.  (Washtell Dep. Tr. 32:9-33:8, 38:4-39:17; Teague Dep. Tr. 89:21-91:2, 91:11-94:14.)  Barclays elected not to put any of these people on the stand at trial.  Neither did Barclays' expert Professor Pfleiderer make any effort to check Barclays' valuation for consistency.  (10/7/10 [Pfleiderer] 108:5-109:20.)

539.    Barclays' outsize liquidity adjustments account for at least $800 million of the valuation difference between Movants and Barclays.  (*See* M.821 [Zmijeski Decl.] ¶ 38 ($251 million for Equities); M.910 [Zmijewski Dem.] 26 (same); M.824 [Slattery Decl.] ¶ 6 ($377 million for U.S. Agency Debt Securities and $181 million for Agency RMBS securities); M.920 [Slattery Dem.] 7-8, 14 (same); M.825 [Schwaba Decl.] ¶¶ 10-11 ($38 million for municipal securities).)

### 4.    PwC's audit of Barclays' financial statements was not an independent valuation

540.    Barclays presented no witnesses at trial who could validate the procedures and judgments employed in preparing Barclays' Acquisition Balance Sheet.  Romain, Barclays' head of technical accounting, admitted that he did not value the securities.  (9/2/10 [Romain] 142:15-22, 144:12-145:3.)  Neither did King; nor did Professor Pfleiderer.  (8/25/10 [King] 111:10-12; 10/7/10 [Pfleiderer] 112:5-16.)  Instead, Barclays

sought validation for its values by repeatedly invoking the fact that PwC (from which

Barclays called no witness) had audited Barclays' financial statements.

541.    But an audit is not an independent valuation.  At trial, Professor Pfleiderer

admitted as much.

> Q    And in terms of what PWC did, they performed an
> audit, correct?
>
> A    That's my understanding, yes.
>
> Q    It's not your understanding that PWC here was
> asked to do an independent CUSIP-by-CUSIP valuation of
> the securities that had come over, correct?
>
> A    I don't believe that was what they were charged to
> be, no.

(10/7/10 [Pfleiderer] 91:18-24.)

542.    Mr. Garvey has stated the same and explained:

> [A]n audit of the financial statements is not the same as an
> independent valuation of a securities portfolio … Professor
> Pfleiderer and PWC either ignored or disregarded certain
> mistakes in calculations and judgments in their preparation
> of the fair market value adjustments and in PWC's audit of
> those adjustments.

(9/21/10 [Garvey] 47:7-12, 60:10-63:1, 71:6-75:10; *see also* M.913 [Garvey Dem.] 4, 14,

22-24.)

543.    Barclays' Head of Technical Accounting, Romain, put it best:  auditors are

"masters of negative assurances" who are willing only to go so far as saying they "do not

take exception."  (9/2/10 [Romain] 66:23-67:15.)

544.    Instead of calling its own valuation witnesses—such as the PCG

employees who actually prepared the Acquisition Balance Sheet—Barclays sought to

have this Court admit wholesale unexplained PwC documents discussing what PwC

purportedly did during its audit.  During the hearing on the admissibility of those PwC

documents, the Court ruled that double hearsay contained within those documents was

inadmissible:

> I agree . . . that to the extent that there are hearsay problems
> embedded in these business records, the hearsay within
> hearsay rule, Rule 805, applies.  And for purposes of
> judicial review of these documents, I will not give any
> weight whatsoever or treat as competent evidence
> statements recorded within these documents that constitute
> hearsay and that do not otherwise correspond with a
> recognized exception to the hearsay rule.

(10/8/10 [Judge Peck] 47:10-17.)

545.    The Court also ruled:

> So the documents are admitted for the purposes of
> demonstrating that an audit was conducted, and that the
> audit included some review and testing of judgments
> personnel of the Barclays valuation.  To the extent that
> there is hearsay within hearsay, I will disregard such
> hearsay statements.

(10/8/10 [Judge Peck] 48:18-23 (admitting BCI 592a, 596, 597, 600, 601, 604, 607, 612,

and 613).)

546.    Much of the double hearsay in the PwC documents concerned the

statements allegedly attributed to Barclays' management about Barclays' methodology

and judgment.  Absent that double hearsay, which was properly excluded, and with no

witness from Barclays with first hand knowledge about its valuations, the evidentiary

record is insufficient to validate Barclays' valuation of the securities transferred from

Lehman.

### E.    Barclays Had An Incentive To Undervalue The Securities

547.    By ascribing artificially low values to the securities for purposes of its

Acquisition Balance Sheet, Barclays sought (a) to provide itself a buffer against post-

Closing declines in value, and (b) to maximize post-Closing profits for its trading desks. As Barclays' own witnesses conceded, there was a direct relationship between the value ascribed to a security at acquisition and the trading gains or losses that Barclays realized upon the ultimate disposition (sale) of that asset.

548.    For example, Stephen King confirmed that since there was not a purchase price ascribed to each and every security purchased in the Sale Transaction, the lower the price ascribed to a security for purposes of Barclays' acquisition accounting, the higher the gain to Barclays if it subsequently marked up or sold the position for more.  (8/25/10 [King] 102:15-104:23; *see also id.* 100:17-101:5 (substantial amount of King's compensation dependent on maximizing P&L).)  Professor Pfleiderer, too, conceded this linkage.  (BCI 341 [Pfleiderer Report] ¶ 51(11); 10/6/10 [Pfleiderer] 141:9-143:2 (PMTG/Sales marked down more assets than marked up);10/7/10 [Pfleiderer] 103:3-105:8 (traders involved in valuation process have personal financial incentive to maximize P&L to maximize their own bonuses); *see also* 9/21/10 [Garvey] 50:9-51:3.)

549.    Barclays had not only the motive to ascribe artificially low values to the securities, it had the opportunity to do so as well.  The Acquisition Balance Sheet was not finalized until February 2009, about five months after the Closing Date.  (BCI 134.)  During those months, there were sharp declines across a number of financial markets.  (*See, e.g.*, M.156B [Zmijewski Report] ¶ 31, Ex. C-1.)  During those same months, King and Yang were traders that remained involved in giving input to the PCG employees on issues concerning the valuation of the securities.  (9/2/10 [Romain] 163:2-6; Landreman Dep. Tr. 52:24-53:6, 100:8-17.)  Indeed, Professor Pfleiderer admitted that the traders,

PCG, and PwC were sometimes simultaneously expressing opinions and views about valuation.  (10/6/10 [Pfleiderer] 140:7-18; *see also* Teague Dep. Tr. 35:10-19.)

550.    Barclays' motivation to undervalue the securities so as to protect trading gains and minimize trading losses was well illustrated on the valuation of the equity securities.  Romain urged PwC to adopt a post-Closing valuation date for those securities, pointing out that the equity securities had sharply declined in value during the day on September 22 and thereafter.  (9/2/10 [Romain] 180:12-185:6; M.780.)  PwC ultimately expressed that it took no exception to the use of close of business values from September 22, 2008, based upon the representations of Barclays' management.  (9/2/10 [Romain] 66:23-67:15.)  That one decision, standing alone, resulted in a $300 million reduction in the valuation of the equity securities.  (M.780 at 00218503; M.333 at 00128030; Washtell Dep. Tr. 97:7-23; M.156B [Zmijewski Report] ¶ 19, Ex. A-1; M.821 [Zmijewski Decl.] ¶ 22; *see also* M.910 [Zmijewski Dem.] 22.)  Numerous other decisions by Barclays on issues of pricing and liquidity—most never justified by Barclays to the Court—further depressed the values ascribed to the Repo Collateral.

551.    The only lower limit to Barclays' valuation of the Repo Collateral apparently was the consideration Barclays paid to obtain that collateral— $45 billion.  If the valuation was any lower than $45 billion, that could have negatively impacted Barclays' regulatory capital requirements.  (8/25/10 [King] 181:18-182:5; *see also* 6/21/10 [Diamond] 213:12-17, 154:6-18.)   Also, if Barclays valued the securities at less than $45 billion, Barclays would have to report a loss on the Sale Transaction.  King admitted as much.  (8/25/10 [King] 181:18-182:5.)   Ultimately, Barclays maneuvered the valuation to $45.5 billion, just over the consideration paid, so as to (a) clear the

regulatory capital threshold, (b) maximize its post-Closing profits and/or (c) minimize any post-Closing losses.

## II.    BARCLAYS RECEIVED FAR MORE IN ASSETS AND PAID FAR LESS CONSIDERATION THAN WAS DISCLOSED TO THE COURT

### A.    The Financial Assets That Barclays Received Had A Far Greater Value Than Disclosed To The Court

552.    Notwithstanding the representations to the Court at the September 19 Sale Hearing that the value of the trading assets being acquired was $47.4 billion (M.261 [9/19/08 Tr.] 47:1-4), Barclays accounted for the financial assets it received in the Sale Transaction at $50.16, including $45.5 billion for the Repo Collateral (M.105A; BCI 133a; 9/2/10 [Romain] 15:24-16:6, 92:9-25; BCI 341 [Pfleiderer Report] ¶ 62 (Table 2)), a value that Professor Pfleiderer later accepted wholesale as "reasonable," notwithstanding his failure to do any independent valuation of the securities.  (*See, e.g.*, 10/6/10 [Pfleiderer] 87:6-24; BCI 341 [Pfleiderer Report] ¶¶  5(a), 51(c).)  Using Barclays' own $50.16 billion valuation of the financial assets it received, this value is significantly more than the $47.4 billion represented to the Court.  (M.105A at 00115844; M.261 [9/19/08 Tr.] 47:1-4.)

553.    In fact, Barclays valuation was far too low.  Barclays received financial and non-financial assets that exceeded the $47.4 billion figure disclosed to the Court ***by over $10 billion*** once appropriate adjustments are made to Barclays' Acquisition Balance Sheet to reflect the value of the Transaction that closed.  (*Id.*; M.156B [Zmijewski Report] ¶ 11 (Opinions 1-2).)

554.    Based on Professor Zmijewski's analysis and the independent valuations conducted by Movants' other valuation experts, Professor Zmijewski calculated two adjustments to Barclays Acquisition Balance Sheet on the asset side.

555.    First, Professor Zmijewski summarized in his report his findings and those

of the other valuation experts so to calculate and adjust for Barclays' undervaluation of

the Initial Inventory and JPM Inventory by $5.1 billion.

> So instead of the fair value balance sheet, the acquisition
> balance sheet, showing -- essentially, it's 44.8 billion in
> assets.  Movants believe the correct number is 49.9 billion
> dollars.  So that's the first adjustment to the assets.

(9/20/10 [Zmijewski] 29:15-18; M.156B [Zmijewski Report] ¶¶ 11 (Opinions 1-2), 12,

14, 20, 24, Ex. A-2, B-1, B-2; *see also* M.910 [Zmijewski Dem.] 13-14, 16-17.)

556.    Second, Professor Zmijewski made an adjustment of $775 million

representing Barclays' claim for assets not recorded on Barclays' Acquisition Balance

Sheet.  This adjustment was based on Mr. Romain's calculations.

> Q.    Okay.  So again, if you were looking at or trying to
> total up all of the value transferred to Barclays or claimed
> by Barclays as of the acquisition date, you add in that 775
> million as something that it has not yet received and hasn't
> yet been captured by the acquisition balance sheet, is that
> correct?
>
> A.    Correct.  Barclays has various claims against
> Lehman.  Some of those claims are already in the
> acquisition balance sheet.  However, according to Mr.
> Romain, 775 million of those claims were not recorded as
> part of the acquisition balance sheet.
>
> Q.    And was there any independent valuation work
> done on that item, the 775 million, by movants' experts?
>
> A.    No.  We're using Mr. Romain's numbers.  There
> isn't enough information about those assets to conduct an
> independent valuation.  So we used Mr. Romain's numbers
> that he had in his testimony and his notes to his testimony.

(9/20/10 [Zmijewski] 30:11-31:2; M.156B [Zmijewski Report] 15 n.43; M.247 at

00218490; M.500 at 8; *see also* M.910 [Zmijewski Dem.] 13.)

557.    The evidence summarized above and detailed below demonstrated that at Closing, Barclays received financial and non-financial assets valued at roughly $10 billion more than the total value disclosed to the Court at the Sale Hearing.  (M.105A; 9/20/10 [Zmijewski] 32:1-2; M.261 [9/19/08 Tr.] 47:1-4; *see also* M.910 [Zmijewski Dem.] 13.)

558.    As discussed *infra*, Movants presented unrebutted testimony from valuation experts with expertise in valuing the various types of securities that are at issue in this matter.  These securities are assets in the Initial Inventory and the JPM Inventory, other financial assets and nonfinancial are not included.  Movants' valuation experts demonstrated that Barclays undervalued these securities by at least $5.110 billion as of the Closing.  (M.156B [Zmijewski Report] ¶11 (Opinion 1), Ex. A-2; *see also* M.910 [Zmijewski Dem.] 16-17.)

559.    The reports submitted by Movants' experts were accepted in evidence in their entirety.[182]  The opinions and valuation testimony are summarized below:

## 1.    Equities and JPM Inventory (Professor Mark Zmijewski )[183]

560.    Professor Zmijewski independently valued two distinct portfolios of securities Barclays received in the Sale Transaction:  (a) the portfolio of Equity securities, which Professor Zmijewski opined Barclays undervalued by $541 million as of the Closing Date (M.156B [Zmijewski Report] ¶¶ 11 (Opinion 1), 19, Ex. A-1; *see also*

---

[182] *See* M.151 [Garvey Report]; M.152 [Olvany Report]; M.153 [Schneider Report]; M.154B [Schwaba Report]; M.155B [Slattery Report]; M.156B [Zmijewski Report]; M.821 [Zmijewski Decl.]; M.822 [Garvey Decl.]; M.823 [Olvany Decl.]; M.824 [Slattery Decl.]; M.825 [Schwaba Decl.].

[183] In addition to the opinions discussed in this section and *supra*, Professor Zmijewski also provided testimony about adjustments to liabilities (M.156B [Zmijewski Report] ¶¶ 26, 27 n.51, Ex. B-1; 9/20/10 Tr. [Zmijewski] 32:3-33:14), and in rebuttal to a number of additional opinions offered in the Pfleiderer Report (*see* M.156B [Zmijewski Report] ¶ 11 (Opinions 4, 7-12)), which are discussed *infra* at ¶¶ 675-679.

M.910 [Zmijewski Dem.] 26); and (b) the JPM Inventory, which Professor Zmijewski

opined Barclays undervalued by at least $1.657 billion as of the Closing Date (M.156B

[Zmijewski Report] ¶¶ 11 (Opinion 3), 31, Ex. C-1; *see also* M.910 [Zmijewski Dem.]

41.)

### (i)    Equities

561.    As stated in Professor Zmijewski's report and declaration and as he

testified at trial, Barclays' undervalued the portfolio of cash equities it acquired by $541

million.  (M.156B [Zmijewski Report] ¶¶ 11 (Opinion 1), 19, Ex. A-1; M.821 [Zmijewski

Decl.] ¶ 22; 9/20/10 [Zmijewski] 53:20-54:7; *see also* M.910 [Zmijewski Dem.] 26.)

562.    Professor Zmijewski explained that Barclays' undervaluation was the

consequence of two deliberate decisions Barclays made to drive down the value of the

securities:  the valuation date it used and the liquidation adjustment it applied.  (*Id*.)

*Valuation Date*

563.    Professor Zmijewski noted that Barclays' use of a September 22 close of

business valuation date resulted in a $290 million diminution in the value of the equity

securities.  (M.821 [Zmijewski Decl.] ¶ 22; 9/20/10 [Zmijewski] 40:23-41:19;  *see also*

M.910 [Zmijewski Dem.] 22.)

564.    The Asset Purchase Agreement states that "…the Closing shall be deemed

effective and all right, title and interest of Seller to be acquired by Purchaser hereunder

shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the

Closing Date."  (M.1 [APA] ¶ 4.1.)  It is undisputed that pursuant to the contract, the risk

of loss passed to Barclays at 12:01 a.m. on the Closing Date, September 22, 2008.  (*See,

e.g., id*.; Stip. ¶ 143 (stipulating to finalization of Clarification on September 22, 2008);

M.813 at 00008679 (noting "acquisition was effective prior to open of business in the UK

on 9/22" and "majority of the securities had been received prior to that date and were

legally owned and controlled by BarCap as of open of business 9/22").)

565.    Professor Zmijewski opined that available market prices as of the close of

business on Friday, September 19 are the best proxy for the value of the cash equities as

of 12:01 a.m., September 22.  (M.156B [Zmijewski Report] ¶ 15; M.821 [Zmijewski

Decl.] ¶ 9; 9/20/10 [Zmijewski] 48:23-49:19; *see also* M.910 [Zmijewski Dem.] 23-24.)

566.    Movants' accounting expert, John Garvey, also opined on the valuation

date issue and testified that "the use of valuation dates that were later than the closing

date … there really is no support in the accounting -- in the auditing literature or

accounting literature to do that in my opinion."  (9/21/10 [Garvey] 51:24-52:3, 63:9-

68:10; *see also* M.151 [Garvey Report] ¶¶ 18-30, 61; M.822 [Garvey Decl.] ¶¶ 31-38;

M.913 [Garvey Dem.] 5, 9, 18-20.)  Mr. Garvey explained it was his opinion that the

"securities should be valued as of 12:01 a.m. on the 22nd … which practically means the

19th." (9/21/10 [Garvey] 66:25-67:4; *see also* M.780 (Barclays acknowledged

"practically 19 September close"); M.287 (same); M.913 [Garvey Dem.] 20.)  Mr.

Garvey also testified that in his review of Barclays' documents, he saw no cites or

references to accounting rules to justify the use of September 22 prices to value the

securities.  (9/21/10 [Garvey] 70:14-71:3.)  Mr. Garvey's testimony, on this point, was

unrebutted.

567.    As Professor Zmijewski explained, the U.S. equity indices declined by at

least 3% from the open on September 22 to the close on that day.  (M.821 [Zmijewski

Decl.] ¶ 21; 9/20/10 [Zmijewski] 49:2-19; *see also* M.910 [Zmijewski Dem.] 23.)

568.    Barclays has offered no evidence and presented no witnesses to support that prices from the close of business on September 22 were appropriate to value securities as of 12:01 a.m. on that same day given that the close of business on September 22 captured an entire day of downward movement in the equities markets *after* the risk of loss had already passed to Barclays.[184]

### Bid-Offer Adjustment

569.    Professor Zmijewski also demonstrated that another $251 million of Barclays' $541 million undervaluation of the equity securities was due to Barclays' inflated liquidity adjustment using the artificially high bid-ask spread calculation conducted by Barclays.  (M.156B [Zmijewski Report] ¶¶ 16-19, Ex. A-1; M.821 [Zmijewski Decl.] ¶ 38, Ex. III-1; M.151 [Garvey Report] ¶¶ 41-42, 48-49; 9/20/10 [Zmijewski] 53:20-54:21; *see also* M.910 [Zmijewski Dem.] 26.)  Barclays calculated and applied a bid/ask spread adjustment of 4.32%.  (M.821 [Zmijewski Decl.] 27-32; M.294; M.780; BCI 616; *see also* M.821 [Zmijewski Decl.] ¶¶ 27-32.)  The convoluted methodology that Barclays used to derive these deep discounts was unprecedented.  In fact, it substantially departed from Barclays' own practices and procedures. (Washtell Dep. Tr. 127:23-128:12, 128:24-129:10.)

570.    Professor Zmijewski explained that Barclays calculated its bid/ask spread adjustment by implementing an inappropriate "backdating" methodology.  (M.821 [Zmijewski Decl.] ¶ 27; 9/20/10 [Zmijewski] 54:8-21, 188:3-9, ; *see also* M.821 [Zmijewski Decl.] ¶¶ 27-32.)  Barclays collected bid/ask spreads for a sample of

---

[184] All of the equities positions at issue were part of the Initial Inventory and had already been transferred to Barclays by September 19, 2008.  (M.156B [Zmijewski Report] 4 n.5.)

securities on December 18, 2008 to calculate the adjustment it would make to the

September 22 prices.  (*Id.*)

571.    Professor Zmijewski testified that Barclays' approach to deriving a

liquidity adjustment was not only ad hoc and novel, it was mathematically wrong because

Barclays used an incorrect methodology to calculate a "scaling factor."  (M.156B

[Zmijewski Report] ¶¶ 18-19, n.37; M.821 [Zmijewski Decl.] ¶¶ 35-36; 9/20/10

[Zmijewski] 54:8-58:2.)

572.    Professor Zmijewski explained that the bid/ask spreads for the sample of

2103 securities Barclays collected on December 18, 2008 was 1.93 (193%).  (M.821

[Zmijewski Decl.] ¶ 31; 9/20/10 [Zmijewski] 55:17-58:2; *see also* M.910 [Zmijewski

Dem.] 29-33.)  Professor Zmijewski further explained how Barclays also collected the

bid/ask spreads for a sample of 459 securities on September 22, 2008.  (*Id.*)  The average

bid/ask spread for this subset was 0.67 on September 22.  (*Id.*)  On December 18, the

average bid/ask spread for this 459 subset was a factor of 1.16.  (*Id.*)

573.    Based on this information, Barclays developed a scaling factor, which

Professor Zmijewski opined was incorrect.  (9/20/10 [Zmijewski] 55:17-62:4.)  Professor

Zmijewski opined that "Barclays created a methodology that gave them, even though

September is less than December, gave them a scaling factor not less than one, but

greater than one.  It is an incorrect methodology in my view."  (9/20/10 [Zmijewski]

57:12-17.)  Professor Zmijewski further demonstrated that "[i]nstead of getting a number

less than one, they get a number of more than 200%." (9/20/10 [Zmijewski] 62:3-4.)

574.    Professor Zmijewski explained that instead of taking the relationship

between September and December for the 459 securities, which is a factor of .58 or 58%

(0.67/1.16), Barclays used a scaling factor over double that size.  (9/20/10 [Zmijewski] 58:3-62:4; M.910 [Zmijewski Decl.] ¶¶31-32; *see also* M.910 [Zmijewski Dem.] 33.) Barclays used a scaling factor of 2.23 (223%) which it multiplied by 1.93 to arrive at a bid/ask spread of 4.32%.  (*Id.*)

575.    Professor Zmijewski calculated and applied a bid/ask spread adjustment of 1.48%.  (9/20/10 [Zmijewski] 53:2-19; M.156B [Zmijewski Report] 12 n.37, Ex. A-1; M.821 [Zmijewski Decl.] ¶ 38; *see also* M.910 [Zmijewski Dem.] 25.)  That was a conservative adjustment.  (*Id.*)  If he had calculated a more customary mid-to-bid adjustment, his adjustment would have been roughly 0.75%.  (9/20/10 [Zmijewski] 53:2-19.)  A smaller adjustment would yield a higher value for the securities.  (*Id.*)

576.    Professor Zmijewski calculated his bid/ask spread using September 19 bid/ask spread data, which was available for over 2000 cusips.  (M.156B [Zmijewski Report] ¶ 38; M.821 [Zmijeski Decl.] ¶¶ 37-38.)

577.    Barclays presented no witness and no evidence in support of its outsize liquidity adjustment for the equity securities.  Even Professor Pfleiderer did not offer any such support for Barclays' position.  While presenting an example that purported to support Barclays' math, Professor Pfleiderer admitted that the numbers he had used in the example were "purely hypothetical" and he was "not going to sit here and say that this [example] is fully representative of what's going on."  (10/6/10 [Pfleiderer] 154:24-157:6.)  Moreover, Professor Pfleiderer did not endorse Barclays' scaling factor.  All Professor Pfleiderer was willing to state about the scaling factor was that the methods used to calculate it "can be reasonable." (10/6/10 [Pfleiderer] 157:6-12.)

578.    No PCG witness testified at trial in support of Barclays' liquidation adjustment.

### (ii)    JPM Inventory

579.    Professor Zmijewski also demonstrated that Barclays understated the value of the JPM Inventory by at least $1.657 billion.  (M.156B [Zmijewski Report] ¶¶ 11 (Opinion 3), 28, 31, Ex. C-1; M.821 [Zmijewski Decl.] 17 n.54; 9/20/10 [Zmijewski] 73:18-25; *see also* M.910 [Zmijewski Dem.] 41; M.151 [Garvey Decl.] ¶¶ 43-44.)

580.    Professor Zmijewski explained that Barclays used a December 22, 2008 valuation date for the JPM Inventory it received through its December Settlement with JPM.  (M.156B [Zmijewski Report] ¶¶ 28-31; 9/20/10 [Zmijewski] 35:25-36:4, 41:25-42:10; M.103N.)

581.    As discussed *supra* in ¶¶ 530-536 and 563-568, risk of loss transferred to Barclays as of 12:01 a.m. on the Closing Date, which was September 22, 2008.

582.    As of the closing, Barclays had a claim for $7 billion in cash or securities that JPM withheld.  (*See supra* ¶¶ 409-436.)  In December 2008, Barclays compromised with JPM and settled its $7 billion claim, agreeing with JPM to take cash and securities that Barclays valued in total at far less than $7 billion.  (*See supra* ¶¶ 437-441.)

583.    Applying simple arithmetic, Barclays undervalued its $7 billion claim by approximately $2.010 billion by accounting for this claim at the $4.99 billion value Barclays ascribed to the cash and securities it received under the settlement.  (M.105A; M.119C ¶13; 9/20/10 [Zmijewski] 69:13-24; *see also* M.910 [Zmijewski Dem.] 40-41.) Indeed, this Court approved the settlement on the premise that Barclays was receiving in December cash and securities that would have been worth $7 billion in September 2008:

> . . . I believe, if I'm understanding the transaction
> correctly, that the working premise of it is that the 1.25
> billion dollars in cash consideration, which is going to
> Barclays, upon approval, along with the securities that have
> been identified, is intended to compensate Barclays for the
> diminution in value over time of those securities such that
> Barclays is receiving the same seven billion dollars in
> value, assuming it's approved today and consummated
> tomorrow, that it would have received if the transaction had
> been consummated as contemplated in September. Am I
> right in understanding that? That's a premise that I have. I
> just want to confirm it. And then assuming that's correct, I
> want to know what the current value of the transaction is.

(BCI 50 [12/22/08 Tr.] 41:21-42:8.)

584. Once again taking a conservative approach (to yield a lower value),

Professor Zmijewski conducted a security level analysis to determine the value of the

JPM Inventory as of the Closing, rather than December 22. His analysis shows that

Barclays undervalued the JPM Inventory value by at least $1.657 billion. (M.156B

[Zmijewski Report] ¶¶ 28, 31, Ex. C-1; M.821 [Zmijewski Decl.] ¶ 25 n.54; *see also*

M.910 [Zmijewski Dem.] 41.) Professor Zmijewski's analysis was unrebutted.

585. Professor Zmijewski described his valuation methodology in great detail.

(*See, e.g.*, M.156B [Zmijewski Report] ¶ 30; Ex. C-1; M.821 [Zmijewski Decl.] ¶ 56, Ex.

V-1; 9/20/10 [Zmijewski] 70:7-73:17; *see also* M.910 [Zmijewski Dem.] 41.) He started

with the JPM custodial valuation as of September 17. (*Id*.) He then used a methodology

to roll forward those values from September 17 to September 19 using Lehman's GFS

system. (*Id*.) For those securities not found within GFS, he grouped them into Barclays'

asset categories, and calculated an appropriate roll forward adjustment based on assets

within the same asset category that could be found in GFS. (*Id*.) Finally, he applied

Barclays' liquidity adjustments to adjust from mid to a bid, or exit price. (*Id*.) Professor

Zmijewski tested his methodology, using independent third-party prices to cross check

the GFS data, and the differences between the two methods are immaterial – less than

1%. (*Id*; *see also* M.910 [Zmijewski Dem.] 42; M.821 [Zmijewski Decl.] ¶ 56, Ex. V-1.)

586.    Barclays presented no affirmative evidence in support of December 22,

2008 as the controlling valuation date. No witness testified in support of this proposition.

### 2.    Municipal Bonds (Joseph Schwaba)

587.    Joseph Schwaba, an expert with over 35 years experience in fixed income

and derivative markets, demonstrated in his report, declaration, and at trial, that Barclays

undervalued 26 municipal bonds it received from Lehman by $149.9 million. (M.154A

[Schwaba CV] App. I; M.154B [Schwaba Report] ¶8, Ex. II; M.825 [Schwaba Decl.] ¶

28; M.102N; *see also* M.917 [Schwaba Dem.] 1, 3.) The majority of that undervaluation

was the result of an error that Barclays only conceded during trial: the $107.8 million

undervaluation attributable to seven municipal bonds that Barclays valued at $1/10^{th}$ of one

penny. (M.154B [Schwaba Report] Ex. II; M.102N; 10/7/10 [Pfleiderer] 124:12-24;

9/29/10 [Schwaba] 59:21-23; *see also* M.917 [Schwaba Dem.] 5.) Sean Teague, the

Barclays employee responsible for valuing municipal bonds, testified at his deposition

that valuing bonds at $1/10^{th}$ of one penny was an "oversight on our part," which he did

not learn of until Movants brought it to his attention. (Teague Dep. Tr. 166:11-167:23.)

This $107.8 million "oversight" was missed by Barclays and its auditors PwC, and

overlooked by Professor Pfleiderer. Barclays has not made any adjustments to its

Acquisition Balance Sheet to correct this admitted "oversight." Barclays did not produce

a single witness to explain it and has never explained its valuation of these municipal

bonds. (9/29/10 [Schwaba] 64:18-20.) Professor Pfleiderer also testified this was a

mistake. (10/7/10 [Pfleiderer] 124:25-125:4.)

588.    As for the remainder of the municipal bonds valued by Mr. Schwaba,

Barclays applied a 20% liquidity discount to certain adjustable rate municipal securities,

which accounts for $38 million of the $150 million undervaluation Mr. Schwaba

calculated.  (M.154B [Schwaba Report] ¶ 11, Ex. II; M.825 [Schwaba Decl.] ¶¶ 10-11;

9/29/10 [Schwaba] 59:23-60:1, 65:2-10; *see also* M.917 [Schwaba Dem.] 8.)

589.    Barclays attacks only one segment of the total portfolio that Schwaba

valued - the failed auction rate securities he valued at par, which represents only nine of

the 26 bonds (7 unique CUSIPs) and $25.5 million of the $149.9 million undervaluation

he calculated.  (M.825 [Schwaba Decl.] ¶¶ 5-6; 9/29/10 [Schwaba] 74:22-110:4

(Barclays' cross examination); 10/6/10 [Pfleiderer] 171:4-172:22 (Barclays' direct

examination), 178:22-179:12 (same).)  Mr. Schwaba demonstrated that several auction

rate securities actually traded at par on September 19, 2008 regardless of whether those

securities had experienced a failed auction.  (M.825 [Schwaba Decl.] ¶ 28; 9/29/10

[Schwaba] 52:8-53:10, 66:9-67:5.)  Specifically, 93 auction rate securities with

previously failed auctions traded at par on September 19, 2008.  (*Id*.)  Indeed, Barclays

itself valued four auction rate securities it had received from Lehman at par even though

those securities had experienced failed auctions.  (*Id*.; 9/29/10 [Schwaba] 87:21-88:6.)

Mr. Schwaba's valuation of the municipal bond portfolio was the only complete

valuation presented to the Court.

### 3.    Treasuries, Agencies, MBS and CLOs (Mark Slattery)

590.    Movants presented Mark E. Slattery, an independent consultant with

Navigant Economics (Chicago Partners) and a Chartered Financial Analyst as an expert

in fixed income securities, including agency and non-agency residential mortgage back

securities ("RMBS") and other securitized products, financial modeling, and risk

management.  (M.155B [Slattery Report] ¶¶ 1, 9, 10, App. I; 9/30/10 [Slattery] 5:21-21:13.)

591.    Mr. Slattery valued 6,667 out of the total 11,938 CUSIPS in the Initial Inventory and JPM Inventory.  (M.155B [Slattery Report] ¶ 5.)  These securities were U.S. Treasury and Agency debt securities, Agency and Non-Agency RMBS, Collateralized Loan Obligations ("CLOs"), including the Pine CLO, Collateralized Debt Obligations ("CDOs"), and Commercial Mortgage-Backed Securities ("CMBS").  (*See, e.g.*, M.155B [Slattery Report] ¶¶ 15-16.)

592.    Mr. Slattery opined that Barclays undervalued these securities by at least $2.38 billion as of the Closing Date.  (M.155B [Slattery Report] ¶¶ 15-16; *see also* M.920 [Slattery Dem.] 5.)

593.    Mr. Slattery's valuation analyses are summarized below.

### (i)    U.S. Treasuries and Agencies

594.    As stated in Mr. Slattery's report and declaration, and as he testified at Court, and summarized in his demonstrative slides, Barclays undervalued 125 U.S. Treasury and Agency securities by $424 million.  (M.155B [Slattery Report] ¶¶ 17-27, Table 3; M.824 [Slattery Decl.] ¶ 6; *see also* M.921 [Slattery Dem.] 5-11.)

595.    These securities were AAA-rated, primarily fixed rate of interest, debt obligations of the U.S. Treasury, Federal agencies, and Federal government-sponsored enterprises.  (M.155B [Slattery Report] ¶¶ 25-27; 9/30/10 [Slattery] 28:18-29:5.)  These are highly liquid securities and the market for these securities is in the trillions.  (9/30/10 [Slattery] 29:6-13.)

596.    Mr. Slattery identified two components to Barclays' undervaluation of these securities: price differences and liquidity adjustment differences.

### *Difference Due to Price*

597.    Price accounted for $46.78 million or 11.0% of the undervaluation for both the U.S. Treasury Securities and the U.S. Agency Debt Securities.  (9/30/10 [Slattery] 29:14-31:5; *see also* M.920 [Slattery Dem.] 7.)  Mr. Slattery valued these securities based on "either actual, observable price quotes or by discounting each security-specific structured cash flow by actual, observable comparable market yields." (M.155B [Slattery Report] ¶¶ 24-25.)  Barclays has presented no evidence on the pricing source.  Professor Pfleiderer did not independently price these securities.

### *Difference Due to Liquidity Adjustments*

598.    Mr. Slattery concluded that the majority of Barclays' undervaluation for these securities was the result of the flat 5% liquidity discount (i.e., the equivalent of about a 10% bid-ask spread) that Barclays applied to the U.S. Agency Debt Securities; this flat 5% liquidity discount accounts for approximately $377 million (or 89.0%) of the $424 million undervaluation for this category of securities.  (M.155B [Slattery Report] ¶¶ 18-24; M.824 [Slattery Decl.] ¶6; 9/30/10 [Slattery] 31:6-9; M.102N; *see also* M.920 [Slattery Dem.] 8-9.)

599.    Mr. Slattery applied a liquidity adjustment to U.S. Agency Debt securities of approximately 0.82% (i.e., a 1.64% bid-ask spread).  (9/30/10 [Slattery] 31:10-12;  *see also* M.920 [Slattery Dem.] 8-9.)  The liquidity adjustment Mr. Slattery used is conservative and significantly higher than the observable bid-ask spreads reported by Fannie Mae at the time.  (M.928 at 2; M.824 [Slattery Decl.] ¶ 23; 9/30/10 [Slattery] 32:6-19;  *see also* M.920 [Slattery Dem.] 9.)

600.    The representative bid-ask spread for U.S. Agency Debt securities at the height of the financial crisis in 2008 was 0.02% to 0.04% (2 to 4 basis points). (M.928 at 2; M.824 [Slattery Decl.] ¶ 23.) The bid-ask spread used by Barclays was *500 times* higher. (*See id.*; 9/30/10 [Slattery] 31:17-32:24.)

601.    Mr. Slattery also demonstrated that Barclays' use of a flat 5% mid-to-bid adjustment caused aberrational results to the implied yields for certain securities. For example, looking at just one cusip - RTD019828 - Barclays' implied yield on this bond, which matured on the day of the Closing, was 643%. (M.155B [Slattery Report] 8, Table 4; 9/30/10 [Slattery] 34:13-35:5; *see also* M.920 [Slattery Dem.] 10-11.) Market expectations were that yields would be far less. (9/30/10 [Slattery] 33:21-34:7.) Prevailing yields in the market at that time were below 10%. (*Id.*)

602.    The models and methodologies Mr. Slattery applied are consistent with widely accepted market practices, including his application of a multiplier to convert "typical" to "stressed" bid-ask spreads, which is supported by published research. (M.824 [Slattery Decl.] ¶¶ 7, 15-21; BCI 1033; BCI 1027.) Mr. Slattery's methodology, aided by his extensive experience in the markets and his "market feel," was conservative and resulted in an adjustment that was 40 times larger than observed bid-offer spreads. (9/30/10 [Slattery] 32:10-19.)

603.    Barclays presented no witness in support of its outsize liquidity adjustment.

### (ii)    Agency RMBS

604.    Mr. Slattery demonstrated that Barclays undervalued 308 Agency RMBS securities by $728 million. (M.155B [Slattery Report] ¶¶ 28-42, Table 5, App. III; M.824

[Slattery Decl.] ¶¶ 28; 9/30/10 [Slattery] 35:9-44:16; *see also* M.920 [Slattery Dem.] 12-14.)

605.    These securities, which are collateralized with residential mortgages, were issued by Fannie Mae, Freddie Mac, and Ginnie Mae, and are a limited credit risk. (9/30/10 [Slattery] 35:9-17; *see also* M.920 [Slattery Dem.] 13.)  Fannie Mae and Freddie Mac are back-stopped by the Federal government; GNMA has the full faith and credit of the Federal government.  (*Id.*)

606.    The types of Agency RMBS included in Mr. Slattery's analysis are: (a) Agency Trust RMBS Strips (Interest Only & Principal Only); (b) Agency Collateralized Mortgage Obligations (CMOs); and (c) Other Agency RMBS.  (9/30/10 [Slattery] 35:9-17, 36:4-8, 42:2-7, 44:4-10; *see also* M.920 [Slattery Dem.] 14-16.)

607.    Mr. Slattery identified two components to Barclays' undervaluation of these securities: price differences and liquidity adjustment differences.

### *Difference Due to Price*

608.    Mr. Slattery also demonstrated that $547 million of Barclays' undervaluation in connection with Agency RMBS securities was due to pricing differences.  (M.824 [Slattery Decl.] ¶ 28; *see also* M.920 [Slattery Dem.] 14.)

609.    Mr. Slattery demonstrated that pricing differences for the 237 Agency CMO cusips and 47 Other Agency RMBS account for most of Barclays' undervaluation for these categories of securities.  (9/30/10 [Slattery] 42:2-7, 44:4-10; *see also* M.920 [Slattery Dem.] 14.)

610.    Mr. Slattery valued these securities using models and methodologies that are well developed, reliable and widely used in the industry.  (M.155B [Slattery Report]

¶¶ 40-42; M.824 [Slattery Decl.] ¶¶ 7, 28-32.)  No Barclays witness explained Barclays'

pricing methodology.  Professor Pfleiderer did not independently value these securities.

(10/7/10 [Pfleiderer] 148:6-149:17.)  He did not even test the models Barclays used to

value these securities.  (*Id.*)

611.    Mr. Slattery testified that Barclays appears to have priced these securities

using an artificially inflated risk premium.  (9/30/10 [Slattery] 42:2-24, 44:11-16; *see*

*also* M.920 [Slattery Dem.] 16-17.)  However, Barclays did not provide any evidence

from which its pricing methodology could be understood.  (9/30/10 [Slattery] 42:8-44:3;

*see also* M.920 [Slattery Dem.] 16.)  Moreover, some of the prices used by Barclays

resulted in absurd valuations.  (*Id.*)  For example, some of Barclays' prices resulted in

implied yields of several hundred percent for the Agency CMOs.  (*Id.*; M.255N at 11.)

### *Difference Due to Liquidity Adjustments*

612.    Mr. Slattery explained that Barclays improperly applied a flat 10%

liquidity discount to the majority of Agency RMBS securities, resulting in a $181 million

undervaluation within the total $2.83 billion undervaluation Mr. Slattery calculated.

(M.155B [Slattery Report] ¶¶ 30-32; M.824 [Slattery Decl.] ¶6; *see also* M.102N;

M.252.)

613.    Mr. Slattery explained the errors in Barclays' methodology used to arrive

at the 10% discount.  (9/30/10 [Slattery] 37:3-42:1; *see also* M.252.)  First, Barclays

derived this hypothetical discount based on a portfolio that did not resemble the portfolio

of Agency RMBS Barclays had actually acquired from Lehman.  (9/30/10 [Slattery]

40:15-23.)  Second, having calculated a 10% bid-ask spread, it should have used 5% as

its mid-to-bid adjustment (of course, that too would have been too high for this

population of securities). (9/30/10 [Slattery] 39:4-9, 39:24-40:7, 153:8-17.) Barclays did

not do so. (*Id*.) Instead, Barclays took the entire 10% bid-offer spread it had calculated

as its mid-to-bid adjustment, effectively doubling the bid-ask spread to 20%. (*See id*.)

Finally, Mr. Slattery explained, given the prevailing market conditions, it was simply

unreasonable for Barclays to apply an across-the-board 10% haircut to less risky Agency

RMBS securities. (9/30/10 [Slattery] 40:24-41:19, 154:5-20.)

　　　　614.　Mr. Slattery did not apply an across-the-board haircut and instead properly

stratified the Agency RMBS securities in order to apply more appropriate haircuts at a

more granular level. (M.155B [Slattery Report] ¶ 38.) Mr. Slattery did not use trading

ranges for dissimilar securities as proxies for bid-offer spreads but calculated spreads

based on comparable positions at a more granular level. (M.824 [Slattery Decl.] ¶¶ 6, 28,

32; M.921; M.252; *see also* M.920 [Slattery Dem.] 14.) Notably, Mr. Slattery's

methodology in some instances yielded an even higher liquidity adjustment than Barclays

for the more risky Agency RMBS—as high as 16%. (M.921; 9/30/10 [Slattery] 154:5-

10.)

　　　　615.　Almost all of Barclays' undervaluation for the higher-quality Agency

Trust RMBS Strip securities was due to Barclays' liquidity adjustment. (9/30/10

[Slattery] 36:2-20; M.920 [Slattery Dem.] 14.) Mr. Slattery, in contrast, applied a

liquidity adjustment averaging 1.6% for these same securities. (9/30/10 [Slattery] 36:24-

37:2, 40:24-42:1; *see also* M.920 [Slattery Dem.] 15.) The remainder of the $181

million undervaluation was related to the flat 10% haircut Barclays applied to the Agency

CMOs and Other Agency RMBS securities. (M.824 [Slattery Decl.] ¶¶ 6, 28; M.921;

M.252; 9/30/10 [Slattery] 35:9-36:15; *see also* M.920 [Slattery Dem.] 14, 16-17.)

616.    The models and methodologies Mr. Slattery applied are consistent with widely accepted market practices, including his application of a multiplier to convert "typical" to "stressed" bid-ask spreads, which is supported by published research. (M.824 [Slattery Decl.] ¶¶ 7, 15-25; 9/30/10 [Slattery] 19:14-21:13; BCI 1033.)  Mr. Slattery also used historical bid-ask spread information.  (BCI 1031; 9/30/10 [Slattery] 91:12-19.)

617.    While Mr. Slattery explained in detail his analysis and liquidity adjustments, Barclays presented no witness in support of Barclays' 10% across-the-board liquidity adjustment.

### (iii)    Non-Agency RMBS

618.    Mr. Slattery also demonstrated that Barclays undervalued 162 Non-Agency RMBS securities by $387 million.  (M.155B [Slattery Report] ¶¶ 43-49; 9/30/10 [Slattery] 44:17-46:12;  *see also* M.920 [Slattery Dem.] 18-19; BCI 1037.)

619.    Mr. Slattery used a detailed model-driven analysis to derive prices for these securities.  (M.155B [Slattery Report] ¶¶ 45-49, App. IV.)  His approach used individual loan level data to derive prices.  (*Id.*)  As for liquidity adjustments, to be conservative and reduce points of difference, Mr. Slattery simply adopted Barclays' liquidity adjustments, or used higher adjustments based on his experience.  (*Id.* ¶ 49.)

620.    Thus, Barclays' undervaluation of this asset class was driven entirely by the artificially low prices used by Barclays.  (M.824 [Slattery Decl.] ¶¶ 26-27.)  No Barclays witness was able to explain the prices used or how they were derived.  Mr. Slattery's testimony is unrebutted.

### (iv)    Pine

621.    Mr. Slattery also demonstrated that Barclays undervalued the Pine CLO by $389 million.  (M.155B [Slattery Report] ¶¶ 54-65; M.824 [Slattery Decl.] ¶ 33; 9/30/10 [Slattery] 46:13-51:15; *see also* M.920 [Slattery Dem.] 20-22.)

622.    Barclays' valued the Pine CLO at $428.6 million on its Acquisition Balance Sheet.  (BCI 341 [Pfleiderer Report] App. 4, at 116; M.102N.)  Barclays' valuations were significantly lower – approximately 53% lower – than the values calculated by BoNY, Barclays' own custodial agent in the repo transaction, who valued it at $914,983,902.  (*See, e.g.*, BCI 341 [Pfleiderer Report], App. 4, at 116; M.102N.)  JPM had valued it at $919,964,982 billion in connection with the Fed Repo.  (M.909N.)

623.    Mr. Slattery independently valued this security at $817,297,291.  (*See, e.g.*, M.155B [Slattery Report] ¶ 54.)

624.    Barclays, all but acknowledging that it had improperly undervalued the Pine CLO, later marked-up the value of this security by $353,000,000 by December 31, 2008—an 83% mark-up.  (M.251; M.242; *see also* M.920 [Slattery Dem.] 22.)  However, Barclays never made any corresponding adjustment to its Acquisition Balance Sheet accounting to reflect this mark-up.



(M.909 (containing 9/17/08 JPM (Fed Repo)); M.102N (containing 9/19/08 BoNY);

M.155B [Slattery Report] ¶54 (Movants' valuation as of Closing Date); M.102N

(containing Barclays' valuation as of 9/30/08); M.251 (containing Barclays marked-up

valuation by 12/31/08; *see also* M.920 [Slattery Dem.] 22.)

625.    Barclays marked-up the Pine CLO even though the underlying credit was

worse by December 31 and the only changed condition was that an Event of Default was

called in October.  (9/30/10 [Slattery] 50:18-51:8, 138:8-13; M.251; M.242.)

626.    The fact, however, was known or knowable as of September 22, 2008

because LBHI had already declared bankruptcy.  (9/30/10 [Slattery] 49:23-50:3.)

627.    Pine is a collateralized loan obligation backed by 55 commercial credit

facilities, mostly senior secured revolvers.  (*See, e.g.,* 9/30/10 [Slattery] 46:21-47:6.)  The

Pine CLO was an "inverted" structure, meaning the funding obligation was on the junior

note holders, not the A-1 note holders.  (*See, e.g.,* 9/20/10 [Slattery] 47:7-48:7; *see also*

M.920 [Slattery Dem.] 21.)  Barclays was the A-1 note holder and thus did not have a

funding obligation.  (9/20/10 [Slattery] 48:8-14.)

628.    The A-1 note is thus akin to a closed fund (stand alone) and as of September 19, 2008 was secured by more than enough collateral to satisfy all obligations to A-1 note holders.  (9/20/10 [Slattery] 48:8-14.)  In other words, the underlying collateral value was greater than the par value of the A-1 security.  (M.155B [Slattery Report] ¶ 56.)  On this basis, Mr. Slattery valued the A-1 notes at par.

629.    Professor Pfleiderer did not attempt to value this structure or review Barclays' approach aside from deeming it "reasonable."  (10/6/10 [Pfleiderer] 137:9-12; BCI 341 [Pfleiderer Report] App. 4 at 116-117.)  Mr. Slattery, in contrast, performed a detailed valuation of the A-1 position and also provided an analysis of Barclays' approach.  (M.155B [Slattery Report] ¶¶ 55-62.)

630.    Mr. Slattery showed that using reasonable default/repayment risk assumptions (as reflected in market prices on the underlying credits), the A-1 noteholder was, in fact, over-collateralized and therefore not subject to significant default risk.  (9/30/10 [Slattery] 161:8-162:5.)  This held true under three scenarios including one where cash was converted to loans, one where all underlying credits were drawn down, and one where an event of default occurred.  (*Id.*)  All three provided a net asset value greater than 100 percent relative to the A-1 position in Pine.  (*Id.*)

631.    Professor Pfleiderer recognized the inverted structure of Pine, but ignored the benefit of this structure in his discussion of funding risk.  (10/6/10 [Pfleiderer] 114:12-116:4; *see also* 9/30/10 [Slattery] 161:16-162:5.)

632.    Professor Pfleiderer also appeared to rely on a snippet of the Examiner's Report and on e-mail from JPM that referred to a "Gifford Fong" valuation of Pine.  (10/6/10 [Pfleiderer] 116:5-119:3.)  However, Gifford Fong's valuations were conducted

prior to September 4, 2008 and were not supported by any detailed documentation

explaining the valuation.  (BCI 1005.)  In addition, JPM, who apparently hired Fong,

priced the Pine CLO A-1 notes far higher than Gifford Fong.  (10/7/10 [Pfleiderer]

137:19-143:22; M.909 (9/17/08 JPM Valuation at essentially par).)

633.    Barclays offered no affirmative evidence in support of its Pine CLO

valuation methodology.

### (v)    CLOs

634.    As stated in Mr. Slattery's report, as testified at Court, and summarized in

his demonstratives, Barclays undervalued six CLO securities (excluding the Pine CLO)

by $12 million.  (M.155B [Slattery Report] ¶¶ 50-53; 9/30/10 [Slattery] 51:16-52:18; *see

also* M.920 [Slattery Dem.] 24.)

635.    The majority of Barclays' undervaluation was driven by price.  (M.155B

[Slattery Report] ¶¶ 50, Table 7.)

636.    Mr. Slattery valued these securities using the Intex model and market

yields to determine price.  (M.155B [Slattery Report] ¶¶ 52-53; 9/30/10 [Slattery] 51:21-

52:1.)  Barclays' failed to produce the back-up sufficient to determine the pricing details

for these CLOs.  (M.155B [Slattery Report] ¶ 51; 9/30/10 [Slattery] 52:2-18.)

### (vi)    CDOs and CLOs

637.    Mr. Slattery also concluded that Barclays undervalued 30 CDO and

CMBS securities by $22 million.  (M.155B [Slattery Report] ¶¶ 66-68; 9/30/10 [Slattery]

52:19-53:20;  *see also* M.920 [Slattery Dem.] 25-26.)

638.    Mr. Slattery valued these securities using the Intex model and market

yields to determine price.  (M.155B [Slattery Report] ¶ 67; 9/30/10 [Slattery] 53:11-14.)

No Barclays witness explained Barclays pricing methodology or assumptions.  Indeed,

Barclays did not even produce sufficient documents in discovery from which its methodology could be determined.  (9/30/10 [Slattery] 53:15-20; *see also* M.920 [Slattery Dem.] 26.)

### (vii)   Third Party Valuations

639.     Mr. Slattery also valued 6035 securities using third-party prices and BoNY prices.  (M.155B [Slattery Report] ¶¶ 4-5, 69-73.)  This set of securities was largely comprised of those securities where the difference between Barclays' value and the BoNY value was less than $1 million.  (*Id.* at ¶ 4.)  Also included were 40 securities where the difference was greater than $1 million but for which Barclays had provided insufficient documentation to permit a more granular analysis.  (*Id.* at 2 n.3.)

640.     Mr. Slattery concluded that Barclays undervalued these 6,035 securities by $419 million based on the third party valuations.  (M.155B [Slattery Report] ¶ 69; 9/30/10 [Slattery] 53:21-58:12;  *see also* M.920 [Slattery Dem.] 27-28.)

641.     Mr. Slattery valued these securities using methodologies that he has regularly used to value securities in his 20 years in the market.  (9/30/10 [Slattery] 53:21-54:12; M.824 [Slattery Decl.] ¶ 7.)

642.     Third party data from one or more of Bloomberg, Capital IQ, FactSet, and Interactive Data was available for 4,515 of the 6,035 CUSIPS.  (M.155B [Slattery Report] ¶ 71; *see also* M.920 [Slattery Dem.] 28.)

643.     Mr. Slattery used the BoNY price for the remaining 1,520 securities where he was unable to obtain a reliable third party price.  (M.155B [Slattery Report] ¶ 73.)

644.     Mr. Slattery confirmed that where both third party and BoNY prices were available, the BoNY prices were in same neighborhood as average third party prices.  (9/30/10 [Slattery] 54:13-55:20; *see also* M.920 [Slattery Dem.] 28.)

645.    There were 62 securities—about 1% of this population—where the third party price was outside two standard deviations from BoNY and Barclays.  For these securities, Mr. Slattery used BoNY's prices.  (*Id.*; M.155B [Slattery Report] ¶ 71.)

646.    For all prices obtained from third party providers and BoNY, Mr. Slattery then applied mid-to-bid adjustments consistent with the opinions of Movants' Valuation Experts.  (M.155B [Slattery Report] ¶¶ 72-73; 9/30/10 [Slattery] 56:6-10.)

647.    As a check on the reliability of the data he used, Mr. Slattery compared the available third party prices for those securities.  (*See supra* ¶ 644.)  Where he had conducted an in depth analysis, that comparison showed that the third party prices were comparable to those yielded by Mr. Slattery's analysis.  This further buttressed the reliability of the third-party data.  (M.155B [Slattery Report] ¶ 71; 9/30/10 [Slattery] 56:22-57:14.)

648.    Barclays' primary attack on Mr. Slattery's valuation of these securities was that with respect to a small number of these securities Mr. Slattery's data set yielded prices that were different from the prices contained in the JPM dataset upon which Professor Zmijewski relied for his valuation of the JPM inventory.  However, as Barclays' own charts demonstrate, those price discrepancies between the BoNY and JPM valuations amount to no more than $264 million.  (BCI 1098.)  That is, if Movants had abandoned a principled approach and simply taken the lowest price as between BoNY and JPM, then Movants' valuation would have been some $264 million lower.  In other words, the Barclays undervaluation would have been $4.9 billion, as apposed to $5.1 billion.  (*See, e.g.,* M.156B [Zmijewski Report] ¶ 11 (Opinion 1); BCI 1098.)

649.    Barclays' cherry picking of the lowest price from two different date sets

is, however, inappropriate.  As Professor Zmijewski testified, when viewed as a whole,

the JPM and BoNY valuations were very close and yielded overall results close to 1% of

each other.  (9/20/10 [Zmijewski] 163:23-164:14; M.821 [Zmijewski Decl.] ¶ 74, Ex. X-

1; *see also* 9/30/10 [Slattery] 57:19-58:12.)  At trial, Professor Zmijewski explained how

he had specifically looked at the issue of using BoNY versus JPM:

> . . . I addressed that issue in my declaration, which is in tab
> -- I guess it's tab 3, and the last exhibit, X-1, which is the
> last page of the declaration.  If you look at the last page of
> the declaration, what I do is, for this reason, you know, for
> the reason of how well are BoNY -- how well do BoNY
> prices map to JPM prices.  Naturally, there could be
> differences at a particular security level.  I asked the
> question for this purpose "How do those two prices look
> against each other at a large level?"
>
> So I have, for the overlap betw -- for the 11,938
> securities, the overlap between BoNY and JPM for those
> securities is 8,047.  And if you look at the value in BoNY
> for those 8,047 securities that are overlapping with JPM,
> the value in BoNY is, on September 19th, 38.85 billion.
> And for JPM, two days earlier, because it's September 17th,
> it's 39.4 billion, which is a difference of 1.28 percent.  So I
> specifically looked at this issue, and it's in my declaration.

(9/20/10 [Zmijewski] 162:1-18; *see also* M.821 [Zmijewski Decl.] Ex. X-1.)  Professor

Zmijewski further explained:

> For Mr. Slattery, he used BoNY because those are -- BoNY
> is the available price marks on September 19th for all these
> securities.  JPM wasn't available on September 19th for all
> these securities.  And I used JPM for September 17th for
> the JPM inventory because BoNY wasn't available for
> those securities, and what I did was to check that to make
> sure that it was reasonable to do.  I compared at the
> portfolio level, which is what you want to do with the entire
> portfolio, 8,000 CUSIPs.  They're within one percent of
> each other.  JPM's higher than BoNY, but that makes sense
> because it's two days later and we know that these
> securities dropped in price a little bit.  I use a 3.4 percent

reduction from GPS (sic).  So that makes sense.  And you check it at the portfolio level.

I agree, cherry-picking and observation like this, there's a difference and it looks strange, but there's no way to do your analysis in a consistent way security by security.  You look at what custodial marks you're going to use and see if at the portfolio level they're reasonable or not.  And I did that.

(9/20/10 [Zmijewski] 163:16-164:9.)

### 4.    Corporate Bonds (John Olvany)

650.    Movants' expert John J. Olvany valued 22 bonds, including four Giants Stadium Bonds, corporate bonds, and covered bonds.  Mr. Olvany concluded that Barclays undervalued these securities by at least $381 million as of the Closing.  (M.152 [Olvany Report] ¶¶ 7-8; M.823 [Olvany Decl.] ¶ 4; 10/4/10 [Olvany] 17:1-22;  *see also* M.958 [Olvany Dem.] 5.)

651.    Mr. Olvany is a Senior Advisor with Navigant Economics (Chicago Partners) with over 20 years of industry experience—16 years with a specialization in corporate bonds.  (M.152 [Olvany Report] ¶¶ 5-6; M.152A [Olvany CV].)  Among other qualifying experience, he was formerly a Managing Director at Morgan Stanley, where he ran the Fixed Income Institutional Sales and Trading Group in Chicago.  (*Id.*)  In this role, as well as other sales and trading roles throughout his career, Mr. Olvany routinely performed fair market valuations of securities similar to the securities he valued here.  (10/4/10 [Olvany] 12:17-14:13.)  Mr. Olvany testified at length about his experience, including his experience with corporate auction rate securities like the Giants Stadium Bonds he valued in this matter.  (10/4/10 [Olvany] 7:1-14:18.)

### (i)      Giant Stadium Bonds

652.    Approximately $349 million of Barclays' undervaluation is attributable to

four Giants Stadium Bonds with a total face value of $408,325,000.  (M.152 [Olvany

Report] ¶¶ 9-10; 10/4/10 [Olvany] 17:10-22; *see also* M.958 [Olvany Dem.] 5-8.)  For

purposes of its acquisition balance sheet, Barclays valued the four Giants Stadium Bonds

at $58,995,135—10% of face value for three of the bonds and 44% of the face value for

one bond.  (M.152 [Olvany Report] ¶¶ 27-28; 10/4/10 [Olvany] 20:19-21:7; M.102N; *see

also* M.958 [Olvany Dem.] 5-8.)

653.    The Giants Stadium Bonds are corporate auction rate securities issued by

Giants Stadium LLC to finance the new stadium at the Meadowlands in New Jersey.

(M.152 [Olvany Report] ¶ 11; 10/4/10 [Olvany] 19:16-20:6.)

654.    Barclays adopted the BoNY prices to value the Giants Stadium Bonds.

(M.152 [Olvany Report] ¶¶ 28-29; 10/4/10 [Olvany] 33:6-18; M.102N; *see also* BCI 341

[Pfleiderer Report] App. 4 at 112.)  Barclays claimed it used the BoNY prices only as a

last resort when Barclays did not have enough other information to value the securities.

(Teague Dep. Tr. 50:10-17, 65:4-66:23.)  However, Mr. Teague, the Barclays employee

responsible for valuing the Giants Stadium Bonds, admitted he did only a cursory review

for information before electing to use the BoNY marks for the Giants Stadium Bonds.

(Teague Dep. Tr. 65:4-66:23.)  Soon after Closing, however, Barclays ultimately marked

up these securities to par—a gain of $349 million.  (M.152 [Olvany Report] ¶ 28; M.339;

M.242; M.251.)  Barclays has not made any adjustments to its Acquisition Balance Sheet

to correct for the massive post-closing mark-up on the values it ascribed to the Giants

Stadium Bonds.

655.    Mr. Olvany valued these same four Giants Stadium Bonds at par.  (M.152 [Olvany Report] ¶ 25.)  In support of his valuation, Mr. Olvany provided unrebutted testimony—based on information available to Barclays as of September 19, 2008, including Bloomberg data, Offering Documents, and a Moody's Rating Report dated September 17, 2008—demonstrating the market dislocation in the auction rate market had not impacted the fundamental credit characteristics of the Giants Stadium Bonds. (10/4/10 [Olvany] 35:3-36:18, 21:15-22:14; M.823 [Olvany Decl.] ¶¶ 11-14; M.930 [Offering Circular]; BCI 1061; BCI 1062; BCI 1063; BCI 1064; *see also* M.958 [Olvany Dem.] 14.)

656.    Mr. Olvany explained that the Giants Stadium Bonds were a corporate auction rate security with an investment grade rating and a variable coupon rate.  (10/4/10 [Olvany] 19:16-20:18, 35:3-36:18; M.152 [Olvany Report] 11-12; *see also* M.958 [Olvany Dem.] 6.)  According to the offering documents, the coupon rate would either be determined by an auction process or a predetermined maximum fail rate of 22%.  (M.152 [Olvany Report] ¶ 15; M.930 [Offering Circular] 51, App. K (Auction Procedures).)  The coupon is determined by the holder of the notes at auction or, if there is no auction, the rate could be set as high as the predetermined maximum fail rate of 22%.  (M.152 [Olvany Report] ¶¶ 12, 15.)

657.    Mr. Olvany also explained that in addition to the four Giants Stadium Bonds underwritten by Lehman that Barclays acquired there were an additional three bonds it did not hold underwritten by Goldman Sachs.  (10/4/10 [Olvany] 24:20-25:8.)

658.    Mr. Olvany reviewed the auction history of the Giants Stadium Bonds and discovered one of the bonds underwritten by Goldman Sachs had a failed auction in

March 2008 and paid at the predetermined maximum fail rate of 22%. (10/4/10 [Olvany] 89:17-22.) Shortly thereafter, the issuer (the Giants) exercised its right to redeem this bond paying 22%. (*Id.*) Mr. Olvany took all this information into account in valuing the bonds at par. (M.152 [Olvany Report] ¶ 24; M.823 [Olvany Decl.] ¶¶ 11-12; *see also* BCI 1069.)[185]

659.    Mr. Olvany also explained the reliance he placed on the creditworthiness of the Giants ability to redeem. The Giants had no prior defaults on coupon or principal, a debt service reserve fund existed to cover interest payments for 6 to 12 months, and the security had received a recent investment grade rating by Moody's. (M.152 [Olvany Report] ¶¶ 21, 28; 10/4/10 [Olvany] 35:3-24; M.823 [Olvany Decl.] ¶ 13.)

660.    Barclays itself subsequently marked-up of the Giants Stadium Bonds, first on October 31, 2008, and then again by December 31, 2008—both mark-ups occurring prior to the filing of Barclays' Acquisition Balance Sheet. (M.152 [Olvany Report] ¶ 28; M.823 [Olvany Decl.] ¶ 17; M.242; M.251; M.339.)

661.    On October 31, 2008, prior to the appointment of Goldman Sachs as the new broker-dealer, Barclays increased the value of three of the bonds from 10% to 75% of face value. (*Id.*) Barclays increased value of one bond from 44% to 80% of face value. (*Id.*) By December 31, 2008, Barclays increased the value of all four bonds to 100% of face value. (*Id.*)

---

[185] Barclays attempted through cross to establish that the Giants' April 2008 redemption was not predictive of the possibility of future redemptions because market conditions may have been different and the bond redeemed in April 2008 was better rated/better priced. Mr. Olvany disagreed and explained the salient inquiry is the willingness of the Giants to redeem, not market conditions. (10/4/10 Tr. [Olvany] 109:18-111:1.)



(M.152 [Olvany Report] ¶ 28; M.823 [Olvany Decl.] ¶17.)

662.    By December 31, 2008, Barclays had disposed of $102 million of the

Giants Stadium Bonds at 100% of face value (par).  (M.152 [Olvany Report] ¶¶ 20.)  By

Spring 2009, the issuer had redeemed all of the remaining Giants Stadium Bonds at 100%

of face value (par).  (M.152 [Olvany Report] ¶¶ 20, 29; M.314; BCI 1069; M.242;

M.310.)

663.    Barclays' bases for subsequently marking-up the Giants Stadium Bonds

do not reflect changed circumstances since September 2008.  (M.339.)  Barclays new

found understanding of the rate mechanism and the rate resulting from a failed auction

was knowable as of the Closing Date through the offering documents and does not justify

Barclays' $350 million mark-up by December 31, 2008.  (M.823 [Olvany Decl.] ¶¶ 16-

17; 10/4/10 [Olvany] 33:23-35:2; *see also* M.958 [Olvany Dem.] 14.)

664.    The risk posed by the monoline wrapper was knowable as of the Closing

Date.  (10/4/10 [Olvany] 35:3-24, 98:4-99:2; M.823 [Olvany Decl.] ¶ 14; *see also* M.958

[Olvany Dem.] 14.)  However, as Mr. Olvany explained, the monoline wrapper risk is a red herring.  (*Id.*)  Mr. Olvany did not base his valuation on the rating of the monoline, and he explained its irrelevance to his analysis.  (*Id.*)[186]

665.    Moreover, it was known or knowable as of the Closing Date from the offering documents that a new broker-dealer auction agent would be appointed and by when.  (M.930 [Offering Circular] App. K-1 through K-20; 10/4/10 [Olvany] 35:25-36:11; M.823 [Olvany Decl.] ¶ 19; *see also* M.958 [Olvany Dem.] 14.)

666.    The ability and possibility the issuer would redeem was knowable as of the Closing Date.  (M.152 [Olvany Report] ¶¶ 21-22, App. III ¶ 1; 10/4/10 [Olvany] 36:9-11.)

667.    The size of the Giants Stadium Bonds also should not be a factor in determining the fair market value of a position under FAS 157.  (9/21/10 [Garvey] 56:13-21; 10/4/10 [Olvany] 109:3-13; *see also* M.958 [Olvany Dem.] 14; M.913 [Garvey Dem.] 11.)

668.    Neither Professor Pfleiderer nor any PCG witness testified in support of Barclays' valuation.

### (ii)    Other Corporate Bonds

669.    Mr. Olvany also concluded that Barclays undervalued 18 other corporate bonds by $32,109,189.  (M.152 [Olvany Report] ¶¶ 30-36, 44-50, Ex. II; 10/4/10

---

[186] During cross-examination of Mr. Olvany, Barclays' counsel suggested that Barclays was justified in subsequently marking-up the Giants Stadium Bonds because FGIC, the monoline wrapper for three of the Giants Stadium Bonds, was replaced by FSA, the existing monoline wrapper for the other Giants Stadium Bonds (including the bonds underwritten by Goldman Sachs).  Barclays suggested this substitution effected the value of the bonds.  Barclays has submitted no evidence to support this proposition, as there is none.  Mr. Olvany addressed this issue on redirect when he described, using a Bloomberg screenshot, that FGIC was still the monoline insurer on three of the Giants Stadium Bonds as of April 2009.  (10/4/10 Tr. [Olvany] 98:4-102:16, 118:13-120:9; *see also* BCI 1063.)

[Olvany] 17:10-22; *see also* M.958 [Olvany Dem.] 15.)  These other corporate bonds

include fixed rate and variable rate bonds.  (M.152 [Olvany Report] ¶ 31.)

670.    Approximately $10 million of this undervaluation was attributable to a

corporate bond issued by Intelsat Bermuda LTD.  (M.152 [Olvany Report] Ex. II; 10/4/10

[Olvany] 38:21-39:14; *see also* M.958 [Olvany Dem.] 17.)  Barclays valued this bond at

zero.  (*Id*; M.102N.)  Its custodian, BoNY, valued it at $88.5.  (*Id*.)  All but admitting its

mistake, in a declining market, Barclays marked up the value for this bond to $56 by

December 31, 2008.  (*See* M.251N(4), Corporate Credit Tab, Line 338; *see also* M.958

[Olvany Dem.] 17.)

671.    Mr. Olvany valued four of the corporate bonds using actual traded prices

of specific securities of the issuer obtained from TRACE.  (M.152 [Olvany Report]

¶¶ 32-33; 10/4/10 [Olvany] 36:23-37:10, 48:19-21.)

672.    Mr. Olvany valued the other 14 bonds using basic bond math.  (M.152

[Olvany Report] ¶¶ 34-35, App. III ¶¶ 5-10; 10/4/10 [Olvany] 37:11-21, 48:22-49:5.)

Inputs were entered into a discounted cash flow (DCF) model.  (M.152 [Olvany Report]

¶¶ 34-35, App. III ¶¶ 5-10.)  Inputs included interest rate, maturity date, and frequency of

payment to determine cash stream.  (M.152 [Olvany Report] ¶¶ 34-35, App. III ¶¶ 5-10.)

Adjustments were made to risk-free DCF to adjust for credit risk.  (M.152 [Olvany

Report] ¶ 35, App. III ¶ 5.)

673.    No Barclays witnesses provided any testimony in support of Barclays'

valuation of these securities.

### B.    Barclays Added Undisclosed Assets To The Deal Through The Weekend Asset Scramble

674.    In addition to the undervaluation of the Repo Collateral, another significant driver of the Barclays' Windfall is the over $5.5 billion in assets added to the Transaction as a result of the weekend asset grab that was never disclosed to the Court. (*See supra* ¶¶ 251-268.)  These undisclosed assets that Barclays either received or to which it has laid claim are comprised of three items totaling over $4.5 billion based on Barclays' own valuation for purposes of its Acquisition Balance Sheet:  (a) margin associated with certain exchange-traded derivatives in the amount of $2.37 billion, (b) unencumbered "clearance box" assets, including $778.9 million within the Initial Inventory and $707 million of additional unencumbered "clearance box" assets, and (c) $770 million of 15c3-3 assets.  (M.105A.)[187]  In addition to the above amounts Barclays recorded on its Acquisition Balance Sheet, Barclays has contended it is entitled to an additional $775 million in unrecorded assets not as yet recorded by Barclays.[188]  Over $3

---

[187]  The Acquisition Balance Sheet has a line item labeled "15c3 asset," accompanied by a notation, "$770 million."  (M.105A at 00115844.)  As to the $2.37 billion in margin associated with the exchange traded derivatives, this figure is the net of five line items on Barclays' Acquisition Balance Sheet:  "OCC margin against exchange traded options," "OCC customer and clearing margin," "Futures assets," "Exchange traded options – derivative MTM," and "Futures customer payables."  (M.105A at 00115845.)  The unencumbered assets are captured within two line items on Barclays' Acquisition Balance Sheet:  $778.9 million within the "Initial Inventory" and $707 million in "Additional unencumbered assets," a total of $1.48 billion.  (M.105A; BCI 341 [Pfleiderer Report] Table 2, ¶ 114.)  In contemporaneous e-mails and schedules, however, the unencumbered assets were consistently put at a higher value of $1.9 billion.  (M.62; M.65; M.37; M.97; M.88.)  In independently valuing the Initial Inventory, Movants' valuation experts determined that approximately $4.96 billion of Barclays' undervaluation related to the Repo Collateral and the rest—approximately $200 million—related to the unencumbered assets.  (M.156A [Zmijewski Report] ¶ 11 (Opinion 1) n.7.)  Thus, as it did with respect to the Repo Collateral, Barclays has also undervalued the unencumbered "clearance box" assets.

[188]  As discussed by Professor Zmijewski, Mr. Romain calculated the amount of the unrecorded and undelivered assets at $775 million.  (M.156B [Zmijewski Report] 15 n.43; 9/20/10 [Zmijewski] 30:1-21.)  Mr. Romain noted additional undelivered, unrecognized assets totaling $765 million composed of (a) collateral related to Lehman affiliates' futures accounts ($460 million), (b) OCC margin ($80 million), (c) unencumbered clearance box assets ($162 million), and (d) other principal and interest ($63 million).  (M.247 at 4.)  Mr. Romain later updated the Lehman affiliate amount to $470 million.  (M.500 at 8.)

billion of the $5.5 billion in assets described above are so-called "Undelivered Assets" to which Barclays has laid claim.  (Barclays Opp. ¶ 332; *see also* Barclays Opp. ¶¶ 336-441.)[189]

### C.    Barclays Incurred Far Less In Liabilities Than Was Disclosed To The Court

675.    The Barclays' Windfall is driven not only by the assets transferred to Barclays beyond what was disclosed to the Court, but also by the fact that Barclays assumed liabilities that were far less than what the Court had been told.  On the liabilities side, Barclays' overstated liabilities such as comp, cure, and OCC liabilities.  (9/20/10 [Zmijewski] 32:3-33:22; *see also* M.910 [Zmijewski Dem.] 13.)  In addition, Barclays' Acquisition Balance Sheet includes liabilities for tax deferred and transaction costs that give the appearance that Barclays paid more than it did and thus Movants have adjusted for these figures in calculating Barclays' Windfall.  (*Id.*)

676.    At the Sale Hearing, the Court was told "Barclays will also assume exposure for the employees that accept offers of employment, which is estimated to have a value of approximately—an exposure of approximately two billion dollars."  (M.261 [9/19/08 Tr.] 99:22-25.)  As discussed *supra*, the evidence adduced demonstrated that the $2 billion told to the Court included only Barclays' liability related to the payment of

---

[189] Barclays seeks delivery of unencumbered "clearance box" assets in excess of $700 million. Barclays Opp. ¶¶ 378 (remaining "Clearance Box Assets. . . likely worth in excess of $700 million"); BCI 359 [Hraska Decl.] ¶¶ 5-8 (not in evidence).)  Barclays also seeks delivery of just under $2 billion in "Undelivered Margin".  (Barclays Opp. ¶¶ 415 (referring, for total value of Undelivered Margin, to declarations attached as BCI exhibits 354 and 353), ¶ 415 n.164 ($80 million in cash margin held in LBI's OCC accounts that has been subsequently interpled by the OCC); BCI 354 [Jones Decl.] ¶ 17 (not in evidence) (margin in form of government securities posted to LBI's OCC accounts with a value of $968,133,505.24 as of Dec. 31, 2009); BCI 353 [James Decl.] ¶ 8 (margin securing LBIs proprietary futures with a value of approximately $457,205,950.14); *id.* ¶¶ 14, 16-17 (LBI proprietary assets or customer property securing LBI's customer futures positions with a value of approximately $488,648,614.96).)  Finally, Barclays seeks delivery of $769 million related to 15c3-3 assets.  (Barclays Opp. ¶ 417 ($769 million related to 15c3-3).)

bonuses.  (*See supra* ¶¶ 133-142.)  Barclays' actual assumed liability for bonuses was

only $1.55 billion, not $2 billion.  (*See supra* ¶¶ 346-371.)  On its Acquisition Balance

Sheet, however, Barclays recorded its comp liability at $2 billion.  (M.105A.)

Accordingly, in calculating Barclays' Windfall, Professor Zmijewski adjusted for

Barclays' $450 million inflation of its comp liability.  (M.156B [Zmijewski Report] ¶¶ 11

(Opinion 2), 26 n.49, Ex. B-1.)

676.    The "cure" liability disclosed to the Court at the Sale Hearing was $1.5

billion.  (M.261 [9/19/08 Tr.] 100:1-4.)  As discussed *supra*, this $1.5 figure represented

to the Court was nowhere close to the actual cure liability Barclays intended to assume.

(*See supra* ¶¶ 143-150.)  At the time of the Sale Hearing, Barclays knew it would assume

cure amounts in the range of $200 million.  (*See supra* ¶¶ 148-149.)  Low and behold, in

the end, Barclays in fact assumed cure amounts just over $200 million.  Barclays'

Acquisition Balance Sheet included $222 million in cure as a liability.  (M.105A.)

Subsequently, Barclays produced a schedule supporting that Barclays increased its cure

amounts by $14 million to $238 million overall.  (BCI 171 at 00077286.)  Movants'

expert Professor Zmijewski adjusted Barclays cure liability figure upward by $14 million

to account for this change.  (M.156B [Zmijewski Report] ¶¶ 11 (Opinion 2) 26, n.49;

9/20/10 [Zmijewski] 33:5-9.)

678.    Professor Zmijewski also made an adjustment of $103 million for

Barclays overstatement of its OCC trading liabilities.  He reviewed Barclays' calculation

of this figure and determined that Barclays mix-and-matched dates—using a mid value

from September 22, 2008 and a bid value from September 19, 2008—resulting in a $103

million overstatement of the OCC trading liability.  (M.156 (Zmijewski Report) 15 n.44,

Ex. B-1 n.3; M.267 at 00110237-38 (Barclays memorandum on valuation of OCC

liabilities); 9/20/10 [Zmijewski] 32:3-19.)

679.    Finally, in the calculation of Barclays' Windfall, Professor Zmijewski also

adjusted $605 million for $531 million in deferred taxes and $74 million in Transaction

Costs included on Barclays' Acquisition Balance Sheet, which are not consideration paid

to the Debtors and should not be included in any calculation of the amount of

consideration paid to Lehman, even if properly included on Barclays' Acquisition

Balance Sheet.  (M.105A; M.156B [Zmijewski Report] ¶¶ 11 (Opinion 2), 27, Ex. B-2;

9/20/10 [Zmijewski] 32:20-33:4.)

## III.    PROFESSOR PFLEIDERER'S TESTIMONY DID NOT REBUT MOVANTS' EXPERTS' INDEPENDENT VALUATIONS OR THEIR CALCULATION OF THE BARCLAYS' WINDFALL

680.    Barclays presented only one expert in support of its $45.5 billion valuation

of the Repo Collateral—Professor Pfleiderer.  No PCG employee ever took the stand.

Nor did any PwC witness.  Professor Pfleiderer, who testified for two full days

(a) conceded that he had not independently valued a single security at issue on either a

fair market value or economic value basis, and (b) could not state unequivocally that he

actually agreed with Barclays' accounting valuation for any particular security.  (*See,

e.g.*, 10/7/10 [Pfleiderer] 85:9-13, 97:17-22, 112:5-16.)  Professor Pfleiderer opined in his

report, declarations, and at trial on accounting issues, but admitted he is no expert in

accounting.  (BCI 341 [Pfleiderer Report] 2 n.3 ("I am not a CPA"), 4 n.5; 10/6/10

[Pfleiderer] 21:12-25 (not an expert in accounting or auditing), 71:21-22 (same); 10/7/10

[Pfleiderer] 65:18-22 (same), 101:5-22 (same), 109:21-24 (same).)  He also opined on

repo lending issues, such as the reliability of the BoNY and JPM marks (BCI 341

[Pfleiderer Report] ¶¶ 20, 43), and the percentage of the Repo Collateral acceptable or

eligible for a repo loan (BCI 346 [1/21/10 Decl.]), but again conceded he is no expert on

this area either.  (10/7/10 [Pfleiderer] 140:23-25 (not an expert on custodial customs and

practices), 141:13-14 (same);10/6/10 [Pfleiderer] 136:22 (not an expert on bankruptcy

law).)[190]  Professor Pfleiderer ultimately said nothing that refuted Movants' detailed,

security-by-security valuation analysis.

> **A.**    **Professor Pfleiderer Did No Independent Valuation And Did Not
> Provide Any Empirical Data In Support Of Barclays' Valuation**

681.    Professor Pfleiderer did no independent valuation on a security-by-

security basis to determine the fair value of the securities comprising the Repo Collateral.

(10/7/10 [Pfleiderer] 85:9-13, 97:17-22, 112:5-16.)[191]  He simply opined that, to him,

Barclays' $45.5 billion valuation for purposes of its Acquisition Balance Sheet seemed

"reasonable" in the aggregate based upon his review of Barclays' procedures.  (*See* BCI

341 [Pfleiderer Report] ¶¶ 9, 49-54; 10/6/10 [Pfleiderer] 87:6-24.)

682.    The evidence adduced, however, demonstrated that Barclays did not

follow or, for some securities, did not have its own policies and procedures in valuing the

Repo Collateral.  Barclays did not have existing policies and procedures to value asset

classes it had not previously owned before.  (*See*, *e.g.*, Washtell Dep. Tr. 33:22-34:22,

---

[190] Professor Pfleiderer also generically opined on available alternatives and the purported
benefits of the transaction to the LBHI and LBI estates, Lehman's creditors, Lehman's customers, and
public financial markets all would have been worse off.  (BCI 341 [Pfleiderer Report] ¶¶ 5, 123-131.)
These opinions are not supported with any level of specificity or empirical data.  Moreover, they are not
relevant to issue at hand—the value of the Repo Collateral.

[191] Professor Pfleiderer does not have the expertise to do an independent fair market valuation.
Such an opinion requires expertise in the valuation of all of the asset classes at issue, selection of the
appropriate valuation date, as well as the selection of an appropriate liquidity adjustment.  Professor
Pfleiderer, while well-credentialed, admitted he does not have the "market feel" (10/7/10 Tr. [Pfleiderer]
89:4-90:16), nor can the qualifications of his staff or client fill in the gaps where his qualifications lack.  (*Id.*
("I, being an academic, I'm not trading in the market everyday, so I don't have that knowledge that a
traders would have."); *see also* BCI 341 [Pfleiderer Report] 80 (Pfleiderer's CV).)

41:8-24; Landreman Dep. Tr. 47:2-9, 58:11-24; Teague Dep. Tr. 65:15-66:6, 126:9-127:13.) Many policies and procedures Barclays did have were ignored and, instead, Barclays came up with ad hoc methods used solely for purposes of creating Barclays Acquisition Balance Sheet. For instance, Barclays' valuation professionals would ordinarily price test trader marks, not create valuations from scratch. (Landreman Dep. Tr. 10:1-:8, 19:3-18, 75:5-8, 155:16-18, 159:4-8; Washtell Dep. Tr. 61:6-14, 154:6-12; Teague Dep. Tr. 37:10-38:11.) Yet, in valuing the Repo Collateral, Barclays did not review existing marks by Lehman's traders or speak to these former Lehman traders to gather information, even though many of those traders were employed by Barclays when the valuations were underway. (Landreman Dep. Tr. 22:24-23:6, 28:3-9; Washtell Dep. Tr. 61:6-23, 154:19-155:5; Teague Dep. Tr. 70:3-8, 70:17-71:8, 140:18-141:6.) Barclays also failed to analyze whether it marked the securities it received from the Repo Collateral at the same price at which it held the same or similar positions. (Washtell Dep. Tr. 32:9-33:8, 38:16-18; Teague Dep. Tr. at 89:21-94:14.) Barclays further applied liquidity adjustments to securities for purposes of its acquisition accounting where it did not make such adjustments for other positions of the same asset class already on its books. (*See* Landreman Dep. Tr. 156:25-157:14; Washtell Dep. Tr. 68:1-12, 73:3-17; Teague Dep. Tr. 89:21-90:20, 95:3-96:8.) At trial, neither Professor Pfleiderer nor any other Barclays witness testified about Barclays' valuation procedures and policies in the normal course of business.

683.    Professor Pfleiderer apparently satisfied himself that he did not need to perform his own valuation, and could assess Barclays' valuation, in which he had no involvement, against Barclays' procedures. Even though Barclays' procedures did not

exist at the pertinent time or were not followed, in Professory Pfleiderer's view, it was

sufficient that he or his staff had spoken with the individuals at Barclays who purportedly

conducted the valuation.  (BCI  341 [Pfleiderer Report] ¶¶ 49-50, 60; 10/6/10 [Pfleiderer]

90:8-20; 10/7/10 [Pfleiderer] 110:14-22.)  However, those employees had little, if any,

recollection of ever having spoken with him.  (Landreman Dep. Tr. 187:19-188:23;

Washtell Dep. Tr. 188:15-22, 189:5-7, 191:9-192:4; Teague Dep. Tr. 103:21-105:6.)

And, although these purported interviews are practically the sole basis for his opinion,

Professor Pfleiderer testified he did not record anywhere what those individuals even said

to him.  (10/7/10 [Pfleiderer] 111:2-113:12.)  Moreover, for any interviews he did not

attend personally, he testified he was briefed orally only.  (10/7/10 [Pfleiderer] 111:15-

19.)  No notes from those interviews were produced by him or his staff.

684.    Also, although Professor Pfleiderer repeatedly claimed he was not opining

on accounting issues (10/6/10 [Pfleiderer] 21:12-25, 71:21-22; 10/7/10 [Pfleiderer]

65:18-22, 101:5-22, 109:21-24; BCI 341 [Pfleiderer Report] 2 n.3, 4 n.5), he relied

heavily on the fact that Barclays' financials had been audited as a basis for finding

Barclays' valuation "reasonable."  (BCI 341 [Pfleiderer Report] ¶¶ 109-111, 119-121;

10/6/10 [Pfleiderer] 158:6-159:4; 10/7/10 [Pfleiderer] 94:17-95:10.)  Professor Pfleiderer

took comfort in this fact although he never spoke directly to anyone from PwC (10/7/10

[Pfleiderer] 90:17-91:3), did not know exactly what PwC's audit entailed (10/7/10

[Pfleiderer] 85:9-13), and submitted his report before PwC's production of its workpapers

(BCI 341 [Pfleiderer Report] 30 n.49; M.822 [Garvey Decl.] 11 n.36).

685.    Since Professor Pfleiderer performed no independent valuation, is not an

accountant, and did not even speak to anyone at PwC, not surprisingly, he did not and

could not opine that the $45.5 billion value at which Barclays accounted for the Repo

Collateral on its Acquisition Balance Sheet was the upper bound of the accounting fair

value.  (10/7/10 [Pfleiderer] 101:4-102:6.)  Instead, applying factors such as block size

and subjective factors specific to Barclays, including Barclays' familiarity and experience

with certain asset classes, informational gaps, and ongoing risk management of the

positions, Professor Pfleiderer opined that $45.5 billion is the upper bound of "economic

value," again, without any security level valuation to back-up his contention.  (10/6/10

[Pfleiderer] 19:25-20:10; 10/7/10 [Pfleiderer] 100:13-101:16.)

686.    Professor Pfleiderer acknowledged accounting conventions prohibit taking

bulk size, the risk of managing the assets, and the effect of asymmetrical information into

account; his only point is that they impact economic value and a buyer would thus take

them into account.  (10/6/10 [Pfleiderer] 74:21-75:2 (block size); *id*. 73:1-74:3 (risk of

managing the asset); *id*. 74:4-14 (asymmetric information).)  Professor Pfleiderer simply

changed the yardstick from mark-to-market under the accounting rules to economic value

and concluded that adjusting for economic realities is not a "discount" per se because "…

if no other buyer is willing to pay more, then this is the fair market value as would be

used by an economist."  (10/6/10 [Pfleiderer] 82:1-83:1.)

687.    Economic value is not what the Court was told and not what the parties

contracted for.  The Asset Purchase Agreement said "book value."  (*See supra* ¶¶ 52-57.)

The Court was told market value at the Sale Hearing.  (*See supra* ¶¶ 277-282.)  The Court

was never told about a bulk discount to account for the economic value to Barclays or a

liquidation analysis.

688.    Often interchanging the concepts of economic value and mark-to-market values, Professor Pfleiderer also stated repeatedly, in a conclusory fashion, that Barclays' values (ostensibly mark-to-market accounting values) were within the range of reasonableness.  At no point did Professor Pfleiderer guide the Court on what was that zone of reasonableness.  (10/7/10 [Pfleiderer] 9:8-10:21.)  Nor, at the Sale Hearing on September 19, had anyone apprised the Court about a potential range of "reasonable" values spanning $5 billion.  (10/7/10 [Pfleiderer] 22:4-22.)  Nor was any range of reasonable values noted by Barclays in its disclosures to its investors.  (10/7/10 [Pfleiderer] 11:25-12:23, 15:2-6, 16:22-17:2, 17:18-21.)

689.    As discussed above, the only valuation in the vicinity of $45.5 billion other than Barclays' value and Professor Pfleiderer's "economic value" was the result of a liquidation exercise conducted the morning of the Sale Hearing on September 19 by Jim Seery and his team.  (*See supra* ¶¶ 240-250, 521-526.)  Professor Pfleiderer offered no explanation for how $45.5 billion could be the liquidation value, Barclays' mark-to-market accounting value, and Professor Pfleiderer's upper bound of economic value. Barclays sole explanation is that this is a mere "coincidence."  (Barclays' Reply Memorandum, Motion to Exclude Movants' Experts, at 44-45 n.40 [Docket No. 10806].)

**B.      Barclays Has Turned Professor Pfleiderer Into A Rebuttal Expert On Valuation Topics For Which He Has Provided No Affirmative Opinion About Barclays' Valuation**

690.    Barclays casts Professor Pfleiderer as an affirmative expert, but he really served as little more than a rebuttal expert who offered many of his rebuttal opinions for the first time at trial.  While Professor Pfleiderer undertook no independent valuation and performed no critical analysis of Barclays' methodology, at trial he testified at length about Movants' Experts' valuations.  Movants' Experts addressed areas all outside of

Professor Pfleiderer's expertise and, unlike Professor Pfleiderer, came up with specific

valuations based on a detailed, security-by-security analysis, while Professor Pfleiderer's

conclusion was merely that economic value is "something less than $45.5."

### 1.  Rebuttal to Professor Zmijewski

### (i)  Equities

691.    Notwithstanding that Professor Pfleiderer did no independent valuation of

the equities, provided no critical analysis about Barclays' valuations of equities, and

provided no rebuttal report or declaration on this point prior to taking the stand, at trial,

Professor Pfleiderer testified in rebuttal to Professor Zmijewski's opinions on this issue.

692.    On a $251 million issue related to the liquidity adjustment applied,

Professor Pfleiderer did not testify that Professor Zmijewski got his liquidity adjustment

wrong or that Barclays got it right.  In fact, Barclays' expert Professor Pfleiderer

endorsed Professor Zmijewski's sample calculations and the plausibility of his bid/ask

analysis.  (10/6/10 [Pfleiderer] 153:7-22 ("The numbers are exactly what they are, and the

phenomenon he's addressing is something that can occur").)

693.    All that Professor Pfleiderer said was that hypothetically Barclays' scaling

factor "can be reasonable."  (10/6/10 [Pfleiderer] 157:3-12.)  He admitted his example

was "purely hypothetical" and he was "not going to sit here and say that this [example] is

fully representative of what's going on." (10/6/10 [Pfleiderer] 155:15-157:4.)  Professor

Pfleiderer further testified that it is impossible to test whether Barclays' bid-offer

adjustment on the equities makes sense since the bid-offers for the illiquid equity

positions without observable prices are unknown.  (10/7/10 [Pfleiderer] 81:15-82:25.)  In

so opining, Professor Pfleiderer relied heavily on Mark Washtell—the PCG professional

responsible for valuing the equities for purposes of Barclays Acquisition Balance Sheet—

but Mr. Washtell was not called to testify, and did not recall speaking with Professor

Pfleiderer.  (Washtell Dep. Tr. 188:15-22.)

694.    On the valuation date issue, Professor Pfleiderer did not bless Barclays use

of September 22nd close of business prices as the best proxy for the value at 12:01 a.m. on

September 22—the point in time when risk of loss transferred to Barclays—or supply his

opinion as to the value of the equities at 12:01 a.m. on September 22.  As Barclays'

documentary evidence provides, the market indices clearly show a decline of $300

million, approximately 3%, from the open to the close of business on September 22—a

decline that occurred after risk of loss had transferred to Barclays.  (M.1 [APA] §4.1; *see

supra* ¶ 550.)  Nothing Professor Pfleiderer said supports Barclays' contrary position.

### (ii)      JPM Inventory

695.    While Professor Pfleiderer did no independent valuation and is not an

accounting, auditing or law expert, he testified generically that (a) Movants do not

dispute Barclays valuation of the JPM Inventory for December 22 and (b) valuing the

JPM Inventory as of September 19 makes no economic sense to him.  (10/6/10

[Pfleiderer] 87:6-15, 196:13-197:1.)

696.    Professor Pfleiderer again focused only on the economic value to

Barclays, without citing any empirical data in support of his general testimony, and

ignored the question of the value of the JPM Inventory in the context of the Sale

Transaction.  Professor Pfleiderer ignored the facts and circumstances related to the $7

billion claim (*see supra* ¶¶ 409-441), the fact that it is undisputed that Barclays had a $7

billion claim as of Closing (*see supra* ¶¶ 409-441), that the $1.25 billion in cash paid

under the settlement was to compensate for the diminution in value (M.119 [Settlement

Motion] ¶ 20(b)), the Court's statements about the settlement (M.262 [12/22/08 Tr.]

41:15-42:8), and the value of the release Barclays received from JPM related to the $15.8

billion repo loan that Barclays refused to "roll" on September 18 (M.119 [attached

Settlement Agreement] ¶ 4(e).).

### 2.    Rebuttal to Mr. Schwaba

697.    In rebuttal to Movants' expert Mr. Schwaba, Professor Pfleiderer testified

only about the nine auction rate securities, that Barclays had valued at 80% of par, and

that Mr. Schwaba valued at par.[192]  Professor Pfleiderer admittedly is not an expert on the

subject of auction rate securities:

> Q      On the subject of auction rate securities, you don't
> have any extensive experience in trading or selling and
> buying auction rate securities, do you, sir?
>
> A      No, I do not.
>
> Q      Okay.  And you are not a market participant,
> actually buying or selling auction rate securities during
> 2008, were you, sir?
>
> A      No, I'm not, and that's again, just to say it once
> again, why I didn't do my own analysis here, but I realize
> that I didn't have a feel for the market, and my judgment
> had a later date in the litigation concepts would not be
> appropriate.

(10/7/10 [Pfleiderer] 120:25-121:10.)  Nonetheless, he concluded generically, without

any specificity, that Barclays' valuation of certain auction rate securities at 80% of par

was a reasonable valuation.  (10/6/10 [Pfleiderer] 172:3-10.)  Professor Pfleiderer

provided neither empirical data in support of his general testimony nor did he explain

why Barclays itself valued four auction rate securities it acquired from Lehman at par.

---

[192] These nine auction rate securities accounted for $25.5 million of Barclays' $150 million
undervaluation on 26 municipal securities, as calculated by Mr. Schwaba.  (M.825 [Schwaba Decl.] ¶10.)

(10/6/10 [Pfleiderer] 170:11-172:10; 10/7/10 [Pfleiderer] 121:22-122:5.)  Empirical data

has been provided only by Mr. Schwaba.  To this concrete data, Barclays has no answer.

698.   At trial, Professor Pfleiderer also admitted that the majority of the

differential calculated by Movants' expert Mr. Schwaba—approximately $107 million of

$150 million—was a result of a mistake on Barclays part:

> Q   And we've discussed the auction rate securities, but
> with respect to non-auction rate securities, you see that
> differential in value, the last two columns, Barclays' exit
> value 922 versus movant's exit value 919.
>
> You'd agree with me that the vast majority of that
> differential is a result of a mistake by Barclays, correct?
>
> A   The -- I agree there were seven bonds that were
> marked by BoNY at, I think it was seven, but I think a
> hundredth of a cent, and that was carried over.  That was a
> mistake, yes.

(10/7/10 [Pfleiderer] 124:3-11.)

### 3.   Rebuttal to Mr. Slattery

#### (i)   Mid-to-Bid

699.   Again, although Professor Pfleiderer did no independent valuation and no

critical analysis of Barclays' liquidity adjustments, Professor Pfleiderer testified

generically about two issues related to Mr. Slattery's mid-to-bid calculations on U.S.

Agency Debt Securities and Agency RMBS: (a) the size of his liquidity adjustments, and

(b) his back-up workpapers.

700.   As to the first issue, Professor Pfleiderer does not challenge the

methodology itself; he agreed with the use of historical information to generate a factor to

calculate distressed bid-offer spreads.  (10/6/10 [Pfleiderer] 165:11-18.)  Instead, he

generically complained that the factor Mr. Slattery used to arrive at his distressed bid-

offer spreads were not large enough because the period he borrowed from was not a comparable major event. (*Id.*) Professor Pfleiderer cited no empirical data in support of his general testimony.

701.    Only Mr. Slattery provided empirical data. The evidence adduced demonstrated that the liquidity adjustments Mr. Slattery applied were more than adequately distressed. With respect to the U.S. Agency Debt securities, Mr. Slattery explained the size of representative bid-ask spreads at the height of the financial crisis and how the spread Barclays used was 500 times greater (i.e. mid-to-bid 250 times greater). (9/30/10 [Slattery] 31:17-32:24; *see also* M.920 [Slattery Dem.] 9.) Mr. Slattery's average spread, on the other hand, was conservatively 40 times larger. (*Id.*) With respect to the Agency RMBS securities, in addition to the deficiencies with Barclays' methodology in arriving at a 10% mid-to-bid adjustment (*see supra* ¶¶ 612-617), Mr. Slattery explained how Barclays applied a flat 10% spread across-the-board without discrimination. (9/30/10 [Slattery] 40:8-23; *see also* M.824 [Slattery Decl.] ¶¶ 28-32.) Mr. Slattery, in contrast, applied adjustments of 10% and higher, but only where warranted. (9/30/10 [Slattery] 40:24-42:1; 154:5-155:17; M.921; M.824 [Slattery Decl.] ¶¶ 28, 32.) To this concrete evidence, Barclays had no answer.

702.    As to the second issue, Barclays, who itself has guarded tightly its valuation methodologies—refusing to produce granular level information about its valuations and putting up no witnesses who actually valued the securities—has contended both through its cross of Mr. Slattery and through Professor Pfleiderer, that Mr. Slattery improperly reverse engineered mid values and did not provide sufficient back-up. (10/6/10 [Pfleiderer] 186:11-189:7.)

703.    Every mid and bid is sourced in Mr. Slattery's work papers.  (BCI 1028; *see also* BCI 1041; BCI 1042; BCI 1043; BCI 1044; BCI 1045; M.921N.)  Mr. Slattery calculated mids from bids for 24 securities where bid prices were available, specifically the 24 Agency Trust IOs and POs securities.  (9/30/10 [Slattery] 158:12-159:14; BCI 1029.)  The reason for calculating mids for securities where Mr. Slattery identified bids was to provide an explanation of why his calculations were materially different from Barclays.  (9/30/10 [Slattery] 36:16-23.)  There was no real confusion on Barclays' part because, as Professor Pfleiderer noted, it was clear these were quoted prices not calculated prices because of the format.  (10/6/10 [Pfleiderer] 188:3-14.)

704.    Barclays, in contrast, has yet to identify how it even arrived at the 5% liquidity adjustment it applied to the U.S. Agency Debt securities.  (M.155B [Slattery Report] ¶¶ 23-24; 9/30/10 [Slattery] 31:6-12.)  Nor has it adequately explained its methodology and application of a 10% liquidity adjustment to most of the Agency RMBS securities.  (9/30/10 [Slattery] 37:14-19; M.155B [Slattery Report] ¶¶ 30-38.)

### (ii)    Pine

705.    Professor Pfleiderer did not do an independent valuation of Pine.  (BCI 341 [Pfleiderer Report], App. IV at 116; 10/7/10 [Pfleiderer] 134:21-135:5.)

706.    Professor Pfleiderer testified generically about the "reasonableness" of Barclays' valuation of the Pine CLO based upon what Barclays had told him and PwC's review of Barclays' valuation.  (10/6/10 [Pfleiderer] 115:6-16, 120:17-121:5, 137:9-15.)  He could neither opine that Barclays' value was correct nor that the facts as relayed to him by Barclays were necessarily true.  (10/6/10 [Pfleiderer] 111:15-138:18.)

707.    Professor Pfleiderer, relying on materials not in evidence, sought to show that others had placed the value of Pine lower than Movants and the custodians even if

not as low as Barclays.  (10/6/10 [Pfleiderer] 116:5-122:4.)  Professor Pfleiderer's

testimony fell flat when, contrary to the premise of his testimony, Movants demonstrated

that JPM had actually valued the Pine CLO at $919,964,982 as of September 17, 2008 for

purposes of the PDCF program.  (10/7/10 [Pfleiderer] 135:6-141:24; M.909 [JPM

Valuation].)  Professor Pfleiderer conceded he was not an expert on custodial customs

and practices and could not demonstrate that JPM's valuation at effectively par was not in

compliance with the applicable definition of "market value" used in the PDCF programs.

(10/7/10 [Pfleiderer] 140:23-25, 142:16-143:22; M.705 at 2; 9/7/10 [Leventhal] 159:16-

163:10.)

### 4.    Rebuttal to Mr. Olvany

708.    In stark contrast to Mr. Olvany who did a ground-up valuation, Barclays'

expert Professor Pfleiderer, who has no experience with corporate auction rate securities

and who did not do an independent valuation of the Giants Stadium Bonds before

blessing Barclays' valuation, provided a generic rebuttal to Mr. Olvany and failed to

explain away Barclays' subsequent write up to the Giants Stadium Bonds.  (BCI 341

[Pfleiderer Report], App. IV at 112; 10/6/10 [Pfleiderer] 172:23-177:2; 10/7/10

[Pfleiderer] 114:14-115:3, 120:25-121:21, 131:4-23; M.823 [Olvany Decl.] ¶ 16.)

709.    Professor Pfleiderer's testimony, in fact, supported why the disassociation

of the Giants Stadium Bonds from the swap made the bonds more valuable for Barclays

than they were for Lehman who, as the swap counterparty, had the incentive to set a low

rate on the bonds.  (10/7/10 [Pfleiderer] 115:4-120:24.)  The incentive to set a low rate

disappeared with the swap and the rate could be set as high as 22%.  (*Id.*)

710.    Professor Pfleiderer did not refute any of the primary factors driving Mr.

Olvany's valuation of the Giants Stadium Bonds at par, such as:  (a) the maximum fail

rate of the bonds was 22% and, thus, Barclays, as the holder of the bonds, would have the option in the face of a failed auction to set the rate as high as 22%; (b) upon termination of the swap, the Giants had no protection against payment of a rate as high as 22%; (c) the Giants had previously redeemed bonds subject to a failed auction and thus subject to the 22% maximum fail rate; and (d) the Giants had the financial wherewithal to pay a 22% rate or to redeem the bonds. (*See, e.g.,* M.152 [Olvany Report] ¶¶ 9-29.)

711.    Barclays also suggested Mr. Olvany admitted his model was unreasonable. (10/6/10 [Pfleiderer] 176:7-177:2.)  Mr. Olvany did not admit his model was unreasonable but only that a valuation of the Giants Stadium Bonds at a price above par was unreasonable.  (10/4/10 [Olvany] 75:17-76:3.)  He valued the Giants Stadium Bonds at par, not above par.  (M.152 [Olvany Report] ¶¶ 25, 27.)  His use of a discounted cash flow model was only to verify the valuation at par.  (M.152 [Olvany Report] ¶ 25, App. III ¶¶ 1-4.)

712.    Mr. Olvany explained his valuation of the Giants Stadium Bonds at par and why he had the requisite experience to perform such a valuation.  (*See supra* ¶¶ 650-668.)  To this concrete evidence, Barclays has provided no rebuttal.

## PROPOSED CONCLUSIONS OF LAW

I.    **LBHI IS ENTITLED TO RECOVER UNDER BANKRUPTCY CODE §§ 549 AND 550 AND TO A DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201 AND 2202**

713.    The parties agreed that the evidentiary hearing in this case would cover not only the Rule 60(b) claims asserted by the Movants, but also, *inter alia*, the parties' claims under Sections 549 and 550 of the Bankruptcy Code.  (Stipulation and Order Between Debtors, Trustee, Committee and Barclays Capital Inc. Concerning Certain Claims Made in Adversary Complaints Filed by LBHI, SIPA Trustee and Creditors Committee, So Ordered by Judge Peck on Jan. 13, 2010.)  The Court "so ordered" the stipulation memorializing that agreement.  (*Id.*)  And the evidence establishes that the Movants are entitled to recover on these claims.

### A.    The Court Did Not Approve The Transfer Of Extra Assets Memorialized Over The Weekend In The Clarification Letter

714.    Section 549 of the Bankruptcy Code provides, in pertinent part, that "the trustee may avoid a transfer of property of the estate – (1) that occurs after the commencement of the case; and … (B) that is not authorized under this title or by the court."  11 U.S.C. § 549.  Section 550, in turn, permits recovery of such unauthorized transfers, stating in pertinent part that "to the extent that a transfer is avoided under section … 549 … of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]"  11 U.S.C. § 550(a).  *See Christy v. Alexander & Alexander of New York Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey),* 130 F.3d 52,

57 (2d Cir. 1997) ("Section 550(a)(1) groups initial transferees with 'entit[ies] for whose benefit such transfer was made' and subjects both groups to strict liability.").

715.    Where, as here, the court did not approve the post-petition transfer of additional assets, the estate is entitled to avoid the transfer under Section 549, and recover the transferred property or the value of such property under Section 550.  *See, e.g., Sapir v. C.P.Q. Colorchrome Corp. (In re Photo Promotion Associates, Inc.),* 881 F.2d 6, 8-11 (2d Cir. 1989) (trustee allowed to recover property transferred in payment for defendant's services where court had not approved the transfer); *Sims v. Aalfs (In re Straightline Invs., Inc.)*, Nos. 99-1249, 97-13375, 2002 WL 31863838, at *1-2 (Bankr. N.D. Cal. Apr. 4, 2002) (trustee allowed to recover property transferred in connection with a lending arrangement to the extent its value exceeded court order limiting debtor's borrowing to $100,000);  *Musso v. Brooklyn Navy Yard Dev. Corp. (In re Westchester Tank Fabricators, Ltd.)*, 207 B.R. 391, 401-03 (Bankr. E.D.N.Y. 1997) (trustee could recover post-petition rent payments transferred pursuant to oral agreement because court had not approved the transfer).

716.    Where the court has authorized a transfer of property, these statutory provisions also allow the estate to recover value to the extent the value transferred exceeded the court's authorization.  *See, e.g., K & B Capital, LLC v. Official Unsecured Creditor's Comm. of LWD, Inc. (In re LWD, Inc.),* No. 5:05-CV-108, 2007 WL 2668512, at *1-2, 5 (W.D. Ky. Sept. 6, 2007) (after approving sale of substantially all the assets of a business, the court ordered purchaser to return assets transferred before the sale was approved, which transfer had not been approved by the court); *In re Straightline Invs., Inc.*, 2002 WL 31863838, at *1-2 (allowing trustee to recover property to the extent the

transfers exceeded court's authorization); *See also Remcor, Inc. v. Allegheny Int'l Inc. (In re Allegheny Int'l Inc.),* 158 B.R. 343 (Bankr. W.D. Pa. 1992) (allowing recovery of payments to environmental remediation company that exceeded the amount estimated to the court when it approved the contract in issue).  Section 549 relief is also available if the court that initially approved the sale later modifies its own order under Rule 60(b). *See, e.g., In re Intermagnetics Am. Inc.*, 926 F.2d 912 (9th Cir. 1991) (trustee was entitled to pursue Rule 60(b) and Section 549 relief where bankruptcy court issued a sale order based on misrepresentations of the parties).

717.    As demonstrated at trial in this case, billions of dollars in Lehman's assets were transferred to Barclays on or about September 22, 2008 (or Barclays claims entitlement to them), pursuant to the Clarification Letter, which was never approved by the Court.  (*See supra* p.6-7, ¶¶ 1, 345; 4/9/10 [Opening] 133:15-17; 10/21/10 [Closing] 136:22-137:12.)  These assets included (i) the excess collateral under the September 18 Repurchase Agreement, which Barclays retained as a result of the redefinition of the term "Purchased Assets" in Paragraph 1 of the Clarification Letter and  the addition of Paragraph 13 thereto, which effected the delivery of this excess collateral by enabling the delivery of the "haircut" collateral to Barclays without Court approval; (ii) the 15c3-3 assets; and (iii) the unencumbered box assets. (*See supra* ¶¶ 320-334.)[193]  As the Court

---

[193]    Barclays' failure to assume all the bonus and cure liabilities it was supposed to assume (as disclosed to the Court) also gave rise to an unauthorized transfer of assets to Barclays.  The Sale Transaction disclosed to and approved by the Court was premised on various forms of consideration being paid to Lehman, including the $2.0 billion in bonus and $1.5 billion in contract cure liabilities that Barclays was to assume.  The Court authorized the transfer to Barclays of a pool of Lehman assets in exchange for that, and other, consideration.  To the extent Barclays failed to pay all the bonus and cure liabilities represented to the Court, the transfer of assets premised on that payment was not authorized, at least as to an amount of assets equal in value to the unpaid consideration.  Therefore, the value of such assets is subject to recovery by Lehman under Sections 549 and 550.

has noted several times in this case (and as the evidence confirms), the Court was never

asked to, and therefore did not, approve the Clarification Letter.  (4/9/10 [Opening]

133:15-17; 10/21/10 [Closing] 136:22-137:12; *see also supra* ¶¶ 320-334 (detailing

material changes made to the deal and the Clarification Letter after the close of the Sale

Hearing and issuance of the Sale Order).)

718.    This determination by the Court, amply supported by the record, means

that any assets over and above the equivalent exchange of assets and liabilities disclosed

to and approved by the Court at the Sale Hearing were transferred to Barclays without the

Court's authorization and therefore all value above that balance should be repaid under

Sections 549 and 550.

**B.    Barclays' Strained Linguistic Analysis Is No Defense To These Claims**

719.    Barclays effectively asserts that the language of the Sale Order,

objectively read, authorized the parties freely to amend the transaction over the weekend,

unrestrained even by the "no material modifications" clauses in paragraphs 3 and 25 of

the Sale Order.  (Barclays Opp. ¶¶ 611-643; 10/21/10 [Closing] 137:13-138:8.)  There are

a number of problems with this contention.

720.    A fair and objective reading of the Sale Order does not support Barclays'

position.  In the preamble to the Sale Order, the Court defined several basic terms,

including "that certain Asset Purchase Agreement, dated September 16, 2008, among [the

parties], collectively with the First Amendment Clarifying Asset Purchase Agreement

dated September 19, 2008 and that letter agreement *clarifying and supplementing* the

Asset Purchase Agreement dated September 20, 2008 (as same may be subsequently

modified or amended or clarified, the "Purchase Agreement"); …"  (BCI 16 [Sale Order]

at 1 (emphasis added).)  The phrase "clarifying and supplementing" was used in

connection with the "letter agreement" because, as Ms. Fife had just relayed to the Court,

the letter was only supposed to clarify the Asset Purchase Agreement, not amend it.

(M.261 [9/19/08 Tr.] 48:5-10.)  The Court was never told, until the Rule 60 Motion, that

the term "amend" had been added to the draft clarification letter, nor was it ever told that

the letter was intended to amend the deal.  In short, the Court never approved the addition

of the term "amend" to the Clarification Letter.

721.    The phrase included in the following parenthetical, which collectively

defined the "Purchase Agreement" as including three separate documents, *i.e.*, the

parenthetical on which Barclays now relies "(as same may be subsequently modified or

amended or clarified)," was meant solely to ensure that later changes to these documents

were to be considered incorporated into the defined term "Purchase Agreement" and into

the Sale Order itself.  This was not a substantive, rights-granting provision of the Sale

Order.  In particular, this definitional shorthand was not, and was not intended to be, a

sight unseen, pre-approval of any and all subsequent amendments the parties might ever

decide to make to the deal that had been disclosed to the Court.

722.    If such an extraordinary abdication of its oversight role is what the Court

intended, it could have and would have so stated, in no uncertain terms.  But the Court

did not do so, since that was not the intent of this sentence, notwithstanding Barclays'

attempt to so assert now.  No one attending the Sale Hearing could possibly have

understood the term "amended" in this parenthetical to mean that the Court was granting

carte blanche to the parties to make whatever changes they wanted to the deal, no matter

how material, without needing further authorization from the Court.

723.    Barclays' overreaching interpretation of this section of the Sale Order, in which it asserts that the term "amended" in the parenthetical was meant to authorize the as-yet-unseen clarifying letter to materially amend the Asset Purchase Agreement (Barclays Opp. ¶ 612), is circular and unsupported by the evidence.  Barclays presented no evidence at trial remotely suggesting that the Court was ever told or understood this, or even that the parties themselves ever had this understanding.  Barclays had a chance to ask Miller, Lewkow, Berkenfeld, and others on the stand if they had that understanding, but Barclays chose not to broach that topic.  Barclays had every opportunity to ask any other lawyer involved in the deal, or any of the business people, including its own employees, if they understood this provision to read as Barclays now suggests, but Barclays chose not to ask that question.  Nor did Barclays present any evidence suggesting, let alone proving, that disinterested third parties objectively reading this preamble have interpreted it as expansively as Barclays suggests.  In short, there is nothing in the record supporting Barclays' litigation-driven, after-the-fact, and strained reading of this part of the Sale Order.

724.    To the extent Barclays' expansive reading of this provision suggests some supposed ambiguity in the Sale Order, that does not help Barclays' position.  It is well settled that there is no one in a better position to interpret the meaning of a bankruptcy court sale order than the very court that issued it.  *See, e.g., Devan v. Phoenix Am. Life Ins. Co. (In re Merry-Go-Round Enters., Inc.),* 400 F.3d 219, 227 (4th Cir. 2005) (affirming bankruptcy court's interpretation of its own order determining that it had not authorized a particular kind of transfer: "[A] bankruptcy court is deemed to be in the best position to interpret its own orders, and thus a court's interpretation of its own order must

be given substantial deference."); *Casse v. Key Bank Nat'l Ass'n (In re Casse),* 198 F.3d

327, 332-33 (2d Cir. 1999) ("The bankruptcy court was in the best position to interpret its

own orders."); *Colonial Auto Center v. Tomlin (In re Tomlin),* 105 F.3d 933, 941 (4th

Cir. 1997).  And the Court here has already interpreted its own Sale Order in this regard;

it did not embody an approval of the Clarification Letter.

725.    Barclays' argument fails for the additional reason that Barclays itself was

party to the decision not to bring the Clarification Letter back to the Court for approval.

As the Court noted at closing arguments:

> The problem is that you're making an argument about
> Court approval of the clarification letter and a very critical
> feature of the current dispute.  And it is absolutely clear,
> based upon the evidence, that the parties who prepared the
> clarification letter during the weekend immediately
> following the sale hearing were aware that one of the
> options available to them was to come back to court and to
> [obtain] express approval of that document which everyone
> recognizes effected certain substantial changes in the
> transaction.  In lieu of doing that, the parties, including
> Barclays, determined that no such approval was required
> and instead, the letter was lodged in the docket.  Thereafter,
> it was referenced in various pleadings.  But at [no] time did
> anyone ever seek formal approval of that document.

(10/21/10 [Closing] 138:12-25.)

726.    Barclays was not some disinterested and uninformed third party, reading

the Sale Order for the first time with no knowledge of what had transpired prior to its

issuance.  Barclays was intimately familiar with the terms of the Sale Transaction; the

operative agreements; the undisclosed aspects of the deal; the material changes made to

the deal over the weekend after the Sale Order was issued; the value of assets and

liabilities involved; and the negotiations surrounding and the terms of the final

Clarification Letter.  Barclays was also directly involved in deciding whether to bring this

letter back to the Court for approval, knowing full well that the Court volunteered to make itself available for that purpose, and knowing that there was time to do so despite its desire to close the transaction as soon as possible.  Indeed, no one was better informed about the terms of the transaction, including and all the undisclosed aspects of the deal, than Barclays.

727.    Barclays cannot now be heard to argue that it relied on the written Sale Order as if it were reading it in a vacuum.  Knowing how important the Sale Order was to securing the protections of Section 363 Barclays wanted (which Mr. Miller testified Barclays insisted upon), Barclays nevertheless joined in the decision not to bring the Clarification Letter to the Court for its approval.  Therefore, it was Barclays, and not innocent third party creditors, that assumed the risk that the Court might not interpret the Clarification Letter as Barclays would now like.  *See, e.g., W. Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus, Inc.),* 43 F.3d 714, 716-23 (1st Cir. 1994) (the failure of debtor and all-asset transferee "to obtain bankruptcy court approval of the asset transfer agreement terms privately negotiated between [them]" barred transferee from invoking the court's power to enforce such terms against third party); *In re Crystal Apparel, Inc.*, 220 B.R. 816, 819-26, 831-37 (S.D.N.Y. 1998) (former executives could not enforce "golden parachute" provisions that were never disclosed to court when it approved the sale bonus pool, and which could not be justified on other grounds); *see also Rajala v. Langer (In re Lodge America, Inc.),* 239 B.R. 580, 583-84 (D. Kan. 1999)  (Court could not grant equitable or *nunc pro tunc* relief from statutory mandates of Bankruptcy Code where loan transaction "never 'received actual, formal approval of the Court'").

728.    Having assumed the risk of not seeking Court approval, Barclays was not

entitled to "lie in the weeds" in the hope that issues like those raised in the Rule 60

Motions would never come to the Court's attention.  (*See, e.g.,* Barclays Opp. ¶¶ 616-

617, 622-30.)  Indeed, given its decision not to seek Court approval, Barclays is judicially

estopped from taking this position at this late date.

729.    Barclays benefitted from the approval of the Sale Order as written, and by

joining in the decision not to seek review of the Clarification Letter.  That strategic

decision purposefully avoided any consideration by the Court of the argument Barclays

now purports to raise, *i.e.*, that the Sale Order's preamble pre-approved any and all

material changes to the deal that might later be embodied in the "clarifying" letter.

Barclays is thus judicially estopped from now making that assertion now.  Moreover,

Barclays is judicially estopped from arguing that it relied on its own interpretation of the

preamble (purposefully uninformed by the Court's views on the subject) in closing the

materially changed deal, and arguing that anyone proffering a different interpretation was

required to raise it at the Sale Hearing.[194]

### C.    Barclays' Misreading Of The "No Material Change" Provisions Of The Sale Order Is Unsupportable

730.    Barclays also asserts that Paragraphs 3 and 25 of the Sale Order have no

effect as against Barclays or with respect to the material changes to the deal made over

---

[194]    *See, e.g., New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contrary position to prevail in another phase"); *Sewell v. The 1199 Nat'l Benefit Fund for Health & Human Servs.*, 187 Fed. Appx. 36, 40 (2d Cir. 2006) ("Judicial estoppel is invoked where (1) a party's later position is 'clearly inconsistent' with its earlier position, and (2) the party has succeeded in persuading a court to accept its earlier position.").

the weekend.  (Barclays Opp. ¶¶ 631-635.)  The plain language of these clauses show

otherwise.

731.    Paragraph 3 of the Sale Order provides, in pertinent part, that "The

Debtors are hereby authorized and directed to (1) execute the Purchase Agreement, along

with any additional instruments or documents that may be reasonably necessary or

appropriate to implement the Purchase Agreement, provided that such additional

documents do not materially change its terms; (2) consummate the Sale in accordance

with the terms and conditions of the Purchase Agreement and the other agreements

contemplated thereby …."  (BCI 16 [Sale Order] ¶ 3.)

732.    Remarkably, Barclays contends that this provision "does not apply to the

changes made in the Purchase Agreement, and hence does not apply to changes made in

or to the Clarification Letter (which is included within the definition of the Purchase

Agreement)," and therefore this paragraph "has no application to the Clarification Letter

itself."  (Barclays Opp. ¶ 633.)

733.    This is a semantic sleight-of-hand.  Barclays presented no evidence at trial

supporting this interpretation, despite having available to it any number of witnesses who

could have testified about such an interpretation if it had any basis.  Nor is there anything

in the transcript of the Sale Hearing or in the Sale Motion remotely suggesting that the

Clarification Letter was exempt from the "no material modifications" directive of the

Court.  Indeed, given Barclays' key role in negotiating, drafting, understanding, and

deciding not to seek approval of the Clarification Letter, Barclays is estopped from taking

this position, too.  Even if Barclays' strained interpretation of the provision were adopted,

the Court could still find on this record that material changes were made to the deal

through agreements other than those three documents defined in the Sale Order as

constituting the "Purchase Agreement," including the December Settlement (which was

used to deliver to Barclays part of its windfall), the TAA and TSA (through which

Barclays sought to hide terms about which the Court was not told), all the employment

and contract cure agreements Barclays signed (which allowed it to keep excess assets

over and above the balanced deal the Court approved), the DTCC Letter and other

documents involving the 15c3-3, clearance box and margin assets to which Barclays

claims entitlement.  In short, even if adopted, Barclays' "strained" argument provides no

cover for Barclays.

734.    Barclays makes a similar argument as to Paragraph 25 of the Sale Order,

entitled "Non-material Modification," which provides:

> The Purchase Agreement and any related agreements,
> documents or other instruments may be modified, amended
> or supplemented by the parties thereto, in a writing signed
> by such parties, and in accordance with the terms thereof,
> without further order of the Court, provided that any such
> modification, amendment or supplement does not have a
> material adverse effect on the Debtors' estates and has been
> agreed to between the Committee, the Debtors and the
> Purchaser.

(BCI 16 [Sale Order] ¶ 25.)

735.    Barclays contends that this limitation applies only to "further changes" to

the deal "between the time of the Sale Order and Closing," and it "does not apply to the

provisions of the Clarification Letter challenged by Movants, as those provisions were

part of the agreement between the parties before the Sale Hearing and described to the

Court."  (Barclays Opp. ¶ 634.)

736.    As an initial matter, this last assertion is just not accurate.  As shown at

trial, there were material changes to the deal made "between the time of the Sale Order

and Closing."  There is no evidence, for example, that Paragraph 13 of the Clarification

Letter, the clause designed to allow Barclays to keep the excess repo collateral after

Barclays terminated the September 18 Repurchase Agreement, was ever even discussed

before the Sale Hearing.  No one, other than Barclays, even knew about the issue before

the weekend.  There is nothing in the record to indicate that the parties agreed to a new

definition of "Purchased Assets" before the Sale Hearing.  Indeed, the drafts of the

Clarification Letter admitted into evidence show that all of the material changes about

which the Movants complain were added to the Clarification Letter after the close of the

Sale Hearing.  (*See supra* ¶¶ 285-289, 320-332; M.53 (draft Clarification Letter

circulated at 2:39 p.m. on September 20); M.138 (adding Paragraph 13 at 6:06 p.m. on

September 21).)

737.    Nor has Barclays presented any evidence suggesting, let alone proving,

that the Court was told, understood, or intended that Paragraph 25 would have no

application to the Clarification Letter or changes to the deal which it embodied.  Barclays

presented no evidence that any of the lawyers or business people involved in the deal, for

either side, understood that to be the case.  Barclays had complete access to all these

individuals, including its own employees, at deposition and trial, and yet never broached

this subject or asked questions about this provision.

738.    Even adopting Barclays' strained reading of this clause, it does not exempt

the other documents used to effect the material changes to the deal about which Movants

complain: the December Settlement, TAA, TSA, employment and contract cure

agreements Barclays signed, DTCC Letter, and other documents involving the 15c3-3,

clearance box and margin assets to which Barclays claims entitlement.  There is no

dispute that the collective effect of these documents was materially adverse to the

Lehman estates, and many of them were not agreed to by the Committee and both

Debtors.  To argue otherwise is effectively to read this provision out of the Sale Order

altogether.  Indeed, the unambiguous language and intent of this provision is to prevent

changes to the deal that was disclosed to and approved by the Court that would cause

material harm to the Lehman estates.  Yet that is exactly what took place here, as the

Movants showed at trial.

### D.     Barclays' Other Arguments On This Issue Are Disingenuous

739.    Tacitly conceding that its reading of Paragraph 25 is fundamentally

flawed, Barclays argues that all the changes made to the deal over the weekend did not

have a "material adverse effect" on the estates.  (Barclays Opp. ¶¶ 636-644.)  Based on

examining in isolation discrete clauses of the Clarification Letter and ignoring their

combined economic effect of the Lehman estates, this argument is absurd.

740.    For example, Barclays argues that by deleting three subsidiaries and

redefining the assets being sold as those "primarily" used or "necessary" to the business,

the revised definition of "Purchased Assets" in the Clarification Letter somehow had a

"materially positive effect" on Lehman.  (Barclays Opp. ¶ 637-638.)  Barclays does not

specify how the inserting of "primary" and "necessary" reduced at all the value of the

assets transferred.  And this argument ignores the portion of the $11 billion windfall

transferred to Barclays through other provisions of that letter, and the $5 billion discount

and billions in assets that the parties' redefining "Purchased Assets," coupled with the

maneuver in Paragraph 13 of the Clarification Letter regarding Code Section 559,

encompassed.  Barclays argues that removing the reference to the $73-74 billion in assets

(presumably the "book value" in the Asset Purchase Agreement) had a "positive impact

on the Debtor's Estates, not a materially adverse one." (Barclays Opp. ¶¶ 639-640.) Not only is this fundamentally inconsistent with Barclays' position elsewhere in this case that this "book value" number was meaningless, but this assumes away the $69 billion "book value" of liabilities that the original balanced agreement included as going to Barclays. And, of course, it ignores the $11 billion windfall embodied in the deal that actually closed.

741.    Barclays argues that the 15c3-3, clearance box, margin and repo collateral were not really additional assets, they were part of the deal all along, and so their inclusion in the Clarification Letter had no materially adverse effect on the estates. (Barclays Opp. ¶ 641.) This is belied by the record, however, which clearly showed that the 15c3-3 and clearance box assets were added to the deal in the Friday asset "scramble." (*See, e.g.*, 5/7/10 [Ricci] 211:4-23; 4/26/10 [McDade] 195:1-15; 4/29/10 [Lowitt] 42:13-20 (his team identified around $3 billion of value).) Indeed, Barclays admitted before trial that the $1.9 billion in clearance box assets is the product of "a concerted effort to identify additional assets to transfer to Barclays" and thus one of the "additional categories of securities and other assets set forth in the Clarification Letter, which amended the APA." (Barclays Rule 2004 Opp. ¶ 52.) And as to the repo collateral, Barclays' contention ignores the huge discount on its value and that 7 billion of it was excess "haircut" collateral which Barclays was not entitled to keep under the Bankruptcy Code.

742.    Barclays also contends that by expanding the definition of "Excluded Assets" this provided a benefit, not an adverse effect, to Lehman. (Barclays Opp. ¶ 642.) This again ignores the economics of the Clarification Letter as a whole and its effect on

Lehman, including the fact that the list of "Excluded Assets" was to protect Barclays

from receiving assets it did not want.  And Barclays even asserts that because it paid

$45.5 in cash for the repo collateral, this "made the deal far riskier for Barclays, and more

beneficial to the Estates, than the original APA."  (Barclays Opp. ¶ 643.)  Again, this

ignores the windfall and the changed economics of the deal, and it disingenuously fails to

mention the Take-Out Agreement and Barclays' cozy financing arrangements with the

FRBNY (just as no one ever mentioned them at the Sale Hearing in 2008).  It also

sidesteps the unrebutted fact the Paragraph 13 of the Clarification Letter was used to

avoid returning excess repo collateral to Lehman, clearly a materially adverse

development for Lehman and its creditors.

743.    In the end, these make-weight arguments are misleading and unavailing,

and they provide no basis for avoiding the effect of Bankruptcy Code Section 549 and

550, which require the return to Lehman of assets the Court never approved being

transferred to Barclays.

**E.    LBHI Is Entitled To A Declaratory Judgment Defining Movants'
Rights And Barclays' Obligation To Return Assets, The Transfer Of
Which Was Not Approved By The Court**

744.    The parties also stipulated and the Court ordered that LBHI's Count IX,

for declaratory judgment under 28 U.S.C. §§ 2201 and 2202, would be adjudicated as

part of the evidentiary hearing on the Rule 60(b) Motions.  The Declaratory Judgment

Act provides, in pertinent part, that "[i]n a case of actual controversy within its

jurisdiction, … any court of the United States … may declare the rights and other legal

relations of any interested party seeking such declaration, whether or not further relief is

or could be sought.  Any such declaration shall have the force and effect of a final

judgment or decree and shall be reviewable as such."  28 U.S.C. § 2201.  Section 2202 of

the Act authorizes the Court to grant "[f]urther necessary or proper relief based on a

declaratory judgment or decree …, after reasonable notice and hearing, against any

adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202.

745.    A declaratory judgment claim is justiciable where, as here, "the facts

alleged … show that there is a substantial controversy, between parties having adverse

legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment." *Wedtech Corp. v. Federal Ins. Co.*, 740 F. Supp. 214, 220

(S.D.N.Y. 1990) (*quoting Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S.

270, 273 (1952)). "The party invoking the jurisdiction of the court must show that he is

immediately in danger of sustaining some direct injury which is not conjectural or

speculative." *Seidel v. Houston Casualty Co.*, 375 F. Supp. 2d 211, 226 (S.D.N.Y. 2005)

(citation omitted). These criteria clearly are met in this case, as Movants have shown that

they have already suffered harm in the amount of approximately $13 billion at the hands

of Barclays, and there is a clearly stated and ripe controversy between adverse parties,

Barclays and Movants, as to the ownership and rights to billions of dollars in assets (most

of which have been delivered to Barclays, but some of which Barclays claims it is still

owed). Indeed, there is no dispute here that an actual controversy exists, and that it falls

within the Court's jurisdiction. Barclays has never argued or made any showing

otherwise.

746.    The declaratory judgment LBHI seeks parallels Movants' substantive

claims, which they have proven at trial and which have already been decided in large part

with the Court's conclusion that it never approved the Clarification Letter. As shown at

trial and in Movants' submissions, material changes were made to the Sale Transaction

after the Sale Hearing and issuance of the Sale Order, principally through operation of the

Clarification Letter, which changes were never disclosed to or approved by the Court.

Those unauthorized changes, and the transfers of assets they purport to effect, should be

declared void and the applicable assets returned to Lehman.

747.    Principally, LBHI seeks a declaration that "[t]o the extent the Clarification

Letter, or other undisclosed modifications in the Sale Transaction, purported to authorize

the transfer of assets to Barclays over and above the transfer of assets [disclosed to and]

authorized by the Court, those transfers [and modifications] were void and unauthorized."

(LBHI Adv. Compl. ¶ 121(v).)  LBHI requests that this declaration be accompanied by an

order striking from the Clarification Letter or the Sale Order, or modifying as

appropriate, the provisions purporting to authorize the asset transfers the Court deems

void, and declaring that the assets whose transfer was not authorized remain the property

of Lehman.  (*See* LBHI Adv. Compl. ¶ 121.)

## II.    MOVANTS DEMONSTRATED AT TRIAL THAT THEY ARE ENTITLED TO RELIEF UNDER RULE 60(B)

748.    As explained in LBHI's Rule 60(b) Motion and its Reply Brief ("LBHI

Reply Br."), full and complete disclosure is the *sine qua non* of any sale under Section

363 of the Bankruptcy Code.  (LBHI Reply Br. ¶¶ 142-146 (citing case law).)  Full and

complete disclosure to the Court and to creditors is the price that must be paid for a buyer

to have the finality and other significant protections afforded by Section 363.  (*Id.*)

Where, as here, adequate disclosure was not made in connection with the Section 363

sale, relief from the order approving the sale is warranted, including under Section 105

and 549 of the Bankruptcy Code or under Federal Rule 60.  *See, e.g., Lawrence v. Wink*

*(In re Lawrence)*, 293 F.3d 615, 624 (2d Cir. 2002); *In re Emergency Beacon Corp.*, 666 F.2d 754, 760 (2d Cir. 1981).)

749.    In this case the failure to disclose material facts to the Court, the Lehman Board and creditors was manifest.  While one deal was disclosed to the Court, a fundamentally different deal was being transacted.  Even as to the aspects of the transaction that *were* disclosed, material changes were made through the Clarification Letter, which the Court never approved.  Accordingly, LBHI is entitled to the relief necessary to enforce the transaction that was actually disclosed to and approved by the Court -- *i.e.*, a balanced deal with assets and liabilities being transferred to Barclays being approximately in balance -- and to obtain relief from the Sale Order to the extent it purports to authorize the transfer of additional assets.

750.    LBHI has moved for relief under four separate subsections of Rule 60(b):

- 60(b)(1) – mistake, inadvertence or excusable neglect (LBHI Mot. ¶¶ 145-158; LBHI Reply Br. ¶¶ 150-161);

- 60(b)(2) – newly discovered evidence (LBHI Mot. ¶¶ 159-161; LBHI Reply Br. ¶¶ 162-182);

- 60(b)(3) and (b)(6) – innocent or intentional misrepresentation by either an opposing party or anyone else (LBHI Mot. ¶¶ 162-166; LBHI Reply Br. ¶¶ 183-184); and, alternatively,

- 60(b)(3), (b)(6) and (d) – fraud by an adverse party, any other party, or fraud on the Court (LBHI Mot. ¶¶ 167-170; LBHI Reply Br. ¶¶ 185-187.)

751.    To prevail on this Motion, LBHI need not prove it is entitled to relief under all these provisions.  It must show only that it satisfied one of these criteria and that it has a meritorious claim.  (*See* James W. Moore, *Moore's Federal Practice* § 60.24[1] (3d ed. 2009) (*citing Davis v. Musler*, 713 F.2d 907, 915 (2d Cir. 1983) and others); LBHI Mot. ¶¶ 139-144; LBHI Reply Br. ¶ 149.)  The Court may also consider equitable

principles in granting relief.  *See, e.g., Lasky v. Cont'l Prods. Corp.*, 804 F.2d 250, 256

(3d Cir. 1986); *Marshall v. Monroe & Sons, Inc.*, 615 F.2d 1156, 1160 (6th Cir. 1980);

*Whitaker v. Associated Credit Servs., Inc.*, 946 F.2d 1222, 1224 (6th Cir. 1991).

### A.    LBHI Is Entitled To Relief Under Rule 60(b)(1) Due To Multiple Mistakes Of Fact By Various Entities

752.    Rule 60(b)(1) allows for relief from court orders premised on a mistake or

inadvertence by any party, non-parties, or even the Court.  (*See* LBHI Mot. ¶¶ 145-158;

LBHI Reply Br. ¶¶ 150-161; *see* Fed. R. Civ. P. 60(b) advisory committee's note;

*Moore's Federal Practice* § 60.41[3].)  As Movants have shown at trial, the mistakes in

this case were legion.[195]

753.    It was at least a mistake to portray the Sale Transaction to both the Court

and the Lehman Boards as balanced or an equivalent exchange of assets and liabilities,

essentially a "wash," when it encompassed a built-in multi-billion dollar gain on

acquisition.  (*See, e.g., supra* ¶¶ 37-51, 56-73, 103-105, 383-389, 404-406, 470-473, 490,

492-495.)  This was the product of multiple subsidiary mistakes.  No one told the lawyers

the real economics of the deal.  For example, McDade failed to tell Miller or Ridings that

the Sale Transaction was supposed to be a balanced deal, meaning that they ended up

holding very different views of the deal than their client.  The Asset Purchase Agreement,

and therefore the Sale Motion, reflected a balanced deal -- as did the 9/16/08 Financial

Schedule -- but Barclays, one of the signatories of that agreement, claims it did not view

the deal as balanced at all but rather as one encompassing an asset/liability mismatch in

---

[195]    When the evidence is reviewed in terms of scienter, motive, opportunity, justification, excuse and any number of other considerations, the Court could very well determine that these "mistakes" were more than that, which might justify findings of bad faith, breach of fiduciary duty, misrepresentation or even fraud.  For purposes of this section, however, it is assumed the most innocent of explanations for all these discrepancies, *i.e.*, they were mere mistakes.

Barclays' favor.  Some of Barclays' chief negotiators, including Klein and Ricci, never

even read the Asset Purchase Agreement.  Berkenfeld, who signed for Lehman, was

unaware of the negotiated discount on assets, so he understood it was a roughly balanced

deal, as the agreement reflected, and was therefore in no position to correct the false

description of the assets as measured at "book value."  The Barclays Press Release and

Analysts Call announcing the transaction, both of which Barclays now claims reflected

its view of the deal, were never disclosed to the Court -- at the very least, a mistake -- and

even if they had been they would not have refuted the notion of a balanced deal.  Neither

addressed the assumed liabilities, the plug numbers that made the deal essentially a wash.

And neither disclosed that the values placed on transferred assets had clearly been the

subject of a negotiated reduction from book value.

754.    In what, at the very least, was serious error the Lehman and Barclays

Boards were told very different things as to the balanced versus mismatched nature of the

Sale Transaction.  Clearly someone was mistaken.  Senior officers for each of the parties,

Diamond, Ricci and McDade, held diametrically different views as to the balanced (or

unbalanced) nature of the deal.  Diamond said he had no authority to do a deal that was

not tilted in Barclays' favor.  McDade had authority only to do the opposite deal,

described to the Lehman Boards, *i.e.*, a balanced one.  To the extent the transaction was

supposed to include an asset/liability mismatch in Barclays favor, it was a mistake to get

approval from the Lehman Boards only for a balanced deal.  To the extent the deal was

supposed to be balanced, the authority secured from the Barclays Board was inadequate.

Again, someone at least was mistaken here.  As for the authority granted by the Lehman

Boards, it was a mistake for Miller not to have been informed that the deal was to be a

"wash" to the Lehman Boards, especially when his partners had given such descriptions and even edited the Board minutes later, never correcting the term "wash."  And as for Lowitt, who attended the Lehman Board meetings, it was at least a mistake for him not to disclose the existence of the $5 billion "all-in economic loss" against Lehman's marks about which he had been told about just before the meeting.

755.    It was at least a mistake to use the term "book value" in presenting the Sale Transaction to the Court (*i.e.*, in attaching the Asset Purchase Agreement to the Sale Motion), when the price was, in fact, lower than book value and determined through negotiations between the parties.  It was most certainly -- at least -- a mistake never to tell the Court that the price, ultimately, was based on liquidation values.

756.    Again, these critical disclosure mistakes were the product of subsidiary mistakes by several persons or entities.  On the Barclays side, it was a mistake for Barclays senior executives to deem the term "book value" to be "of little consequence." To the extent Barclays did not intend for the deal to be defined on that basis (which it now contends), it was a mistake for its own outside counsel, Lewkow, to select that very term to include in the agreement.  And it was a mistake for this change not to have been made plain to McDade or Miller, either.  On both sides, it was a mistake to allow the Court to be told the deal was defined in terms of "book value" when that was never true and in the end, liquidation prices were used.  It was at least a mistake for Seery (who developed the liquidation prices) to have sat in the courtroom during the Sale Hearing, within arms reach of Weil Gotshal attorneys, and never once to have tried to correct the incorrect disclosure Ms. Fife made about "market" values as to the revised transaction.  It was also a mistake for McDade to have portrayed such values as the product of a line-by-

line analysis, when such an analysis just never happened.  And, to the extent he

understood what was going on, it was a mistake for Ridings to portray the deal as better

than a liquidation, when it was in fact based on liquidation prices.  If he did not

understand those facts, it was a mistake for him to have testified at all.  And it was --

again, at the least -- a serious mistake for Barclays to sit silent while all of these incorrect

statements were made to the Court.

757.    There were multiple disclosure mistakes relating to Barclays' first buffer,

*i.e.,* the negotiated $5 billion discount on Lehman's assets to which the parties agreed.  It

was at least a mistake not to have reflected this in the Asset Purchase Agreement, the

9/16/08 Financial Schedule, the Sale Motion or any statement made to the Court.  It was

at least a mistake not to have informed the Court or creditors of the plan to write down

Lehman's books to reflect this discount.  And as for a newly-minted argument from

Barclays aimed at masking this discount, it was at least a mistake not to have informed

the Court, if in fact it was true, that the "intangibles" Barclays was getting were worth

some $2 billion dollars – that is, if that is not just an accounting gain Barclays now wants

to misuse to explain away its immediate gain.  If the intangibles were worth this much to

Barclays, they could have been worth that much to other potential bidders, especially

when coupled with an $11 billion day-one windfall, and the Court should have been told

that.

758.    There were multiple disclosure and other mistakes relating to the

September 18 Repurchase Agreement.  Most importantly, the crucial role the repo came

to play in the Sale Transaction was never disclosed to the Court, creditors, the Lehman

Boards, or even to Lehman's outside counsel, Weil Gotshal.  The role of the Take-Out

Agreement and the FRBNY's promise to provide next-day financing to Barclays, both of which substantially reduced the risks Barclays was taking on (and provided Barclays with considerable advantages over other potential bidders), were never disclosed. Nor was it ever disclosed that Barclays was paying $45 billion for collateral that Barclays, Lehman, BoNY and JPM all valued in the $50-52 billion range at the time. All of these were crucial disclosure mistakes.

759.    When it came time to close the Sale Transaction and finalize the Clarification Letter, the mistakes relating to the September 18 Repurchase Agreement became even more egregious. Because Barclays issued a Notice of Termination with respect to that repo agreement -- a notice Barclays itself now calls a mistake -- the parties had to address how Barclays was to keep the $50-52 billion in collateral, and they decided to maneuver around safe harbor provisions of the Bankruptcy Code outside the view of the Court and the creditors -- another mistake. The lawyers making disclosures at the Sale Hearing mistakenly were never told about this termination until the weekend. Otherwise, Ms. Granfield likely would not have provided assurances to the Court as to the preservation of safe harbors, yet another mistake. Not only did Barclays mistakenly fail to consider the implications under Section 559 of the Bankruptcy Code when it terminated the repo in the first place, the lawyers drafting the Clarification Letter mistakenly failed to consider this statutory provision when they agreed to insert paragraph 13, a provision supplied by Barclays' lawyers at Sullivan & Cromwell (the only ones who apparently did not make a mistake in this regard, at least from Barclays' perspective). And, in the end, the failure to disclose the Bankruptcy Code implications of paragraph 13 of the Clarification Letter to the Court, *i.e.*, that it served to memorialize an

end run around the Section 559 requirement that excess repo collateral be returned to the estate, was at the very least an egregious mistake.

760.    Mistakes -- at least -- were made as to the bonus and cure liabilities Barclays was supposed to assume as part of the Sale Transaction.  As for bonuses, while LBHI believes the language of subparagraph 9.1(c) of the Asset Purchase Agreement is unambiguous in that it requires Barclays to pay $2 billion in bonuses, exclusive of severance, to the extent Barclays contends it was under a different impression or that the agreement says otherwise or that it is in some way ambiguous, that all admits of a mistake by someone.  To the extent Barclays' negotiators did not review this provision thoroughly, or their counsel failed to explain it properly to them, such that they only identified their "$650 billion problem" after it was signed, that was another mistake.  And to the extent Barclays was always planning on paying less than $2 billion in bonuses but no one told the Court, creditors or Lehman, that was another mistake.  And finally, to the extent Barclays failed to pay the full amount, or feels it satisfied its obligations by including in the total payments for severance, taxes, payroll, performance based retention agreements, or compensation for Barclays own mistake in making late stock bonus payments, that was also a mistake, both under the contract and as a matter of disclosure.

761.    As for cure amounts, further mistakes are obvious.  The Court was told Barclays would assume approximately $1.5 billion in such liabilities.  The Court based its approval of the deal in part on that representation.  This estimate was wildly inflated by over a billion dollars.  No matter what the reason, or the excuse, this was at the very least a seriously mistaken estimate presented to the Court and relied upon by both the Court and creditors.

762.    Mistakes were made in the disclosure on which the Court relied when it asked how it should "value" the deal.  The answer the Court received was laced with mistaken assumptions, including that Barclays would assume $4.5 billion in liabilities, that the Lehman assets being sold were valued as disclosed in the Asset Purchase Agreement, that the deal was balanced, and that the intangibles were of negligible value. The Court's approval of the break-up fee, which along with other aspects of the deal helped dissuade other potential bidders, was based on this skewed and incomplete record.

763.    The record is also replete with what at the least were mistakes relating to the Clarification Letter.  It was finalized only after the conclusion of the Sale Hearing and the Court's issuance of the Sale Order.  Even the minimal disclosures made at the Sale Hearing about the Clarification Letter were wrong.  Contrary to what the Court was told, it did far more than merely "clarify" the Asset Purchase Agreement.  It made wholesale, material changes to the deal.  This mistake was made because the lawyers making disclosures to the Court were themselves never informed about the economics of the deal embodied in the letter, evidenced, for example, by the fact that at the time of the disclosure in Court, it was still being drafted in terms of the "book value" of Lehman's assets, a concept the business people had never actually followed, and apparently rejected by the time the Clarification Letter was done.

764.    The mistakes continued over the weekend before the closing.  For example, the disagreement that arose over the weekend concerning 15c3-3 accounts is a study in multiple mistakes, at the very least.  The discussions as to whether or not the Court was told that no cash was going to Barclays and what that meant (and the concomitant inability to locate a transcript) and whether that barred Barclays from getting

the cash in the 15c3-3 accounts, and the supposed resolution of that discussion with contractual provisions, along with the post-Closing dispute regarding the terms of the DTCC Letter, and whether the clearance box accounts at the DTCC are distinct from the assets in them, all lead to the conclusion that at the very least someone made serious mistakes as to these issues.  The same can be said for the parenthetical inserted into the Clarification Letter that has given rise to claims in this case.  At the least, someone made a mistake as to that inserted language.  And as to all of these assets located during the Friday asset "scramble," a serious mistake was surely made by someone since McDade thought they were searching for assets to fill a "shortfall" necessary to bring the deal back into what turned out to be a non-existent "balance."  As noted above, there were mistakes made on all sides as to paragraph 13 of the Clarification Letter.  And the conflicting testimony of Burian and Klein about their meeting and what was said and what Klein wrote on the manila envelope, demonstrate at the very least a mistake, either in disclosure or understanding, or both.

765.    And, of course, one of the most significant mistakes made in connection with the Clarification Letter was the decision not to bring the final letter back to the Court for its approval, especially after it was expressly decided by its drafters that the Clarification Letter would "amend" the Asset Purchase Agreement.  This reflected mistakes in assuming the letter did not make material changes to the transaction.  At the very least, it was a mistake not to investigate this issue in greater detail, and ask questions about, for example, the impact the change in definition to "Purchased Assets," the addition of additional assets worth billions of dollars and the insertion of paragraph 13 to eliminate obligations to return estate assets under the Bankruptcy Code.  This decision

also reflected the mistaken assumption that the deal had to close before the markets

opened on Monday, a premise now known to have been false.  (M.1; 8/31/10 [Lewkow]

177:7-178:21; Rosen Dep. Tr. 220:17-222:12.)

766.    In deciding not to bring the Clarification Letter to Court, it was also a

mistake to ignore the Court's express announcement that it would be available over the

weekend, if needed.  And, as the Court clearly explained in connection with the Rule 60

Motions, it was a mistake for Barclays and others to assume that just because a

clarification letter was mentioned in the Sale Order, that necessarily meant that any and

all changes made to the deal through that letter were pre-approved by the Court, sight

unseen.  In short, it was a mistake to assume the mere mentioning of a clarification letter

in the Sale Order was a license to close whatever deal the parties later thought

appropriate, without further involving the Court.  It also was a mistake for those involved

to have ignored, or failed to analyze, the materiality admonition in the Sale Order in that

regard.

767.    Mistakes were made concerning the role of the FRBNY.  Not only was the

Take-Out Agreement and the FRBNY's promise to provide next-day financing to

Barclays not disclosed, but the FRBNY's professed support for the Sale Transaction was

itself based on a mistaken failure to disclose.  The FRBNY stood up at the Sale Hearing

and voiced its support for the deal, without even mentioning to the Court that it had sold

this support to Barclays (under the Take-Out Agreement) in exchange for Barclays

agreeing to replace it in financing LBI.  To the extent the Court relied at all on the

FRBNY's governmental imprimatur, it did so under the mistaken assumption that the

FRBNY's support for the deal was that of a disinterested and neutral government

regulator, as opposed to a commercial actor whose support for the deal had been bought

and paid for.  This non-disclosure mistake continued when the FRBNY came to Court to

support the December 2008 Settlement between Barclays and JPM.  Not only was the

FRBNY's role in purportedly moderating that settlement skewed by its having sold its

support to Barclays, no one told the Court that Ms. Leventhal's declaration, filed in

support of the settlement, was not based on personal knowledge as to key facts (including

valuations) or that Barclays, but not JPM, had played a major role in preparing it.

     768.    There were wholesale mistakes in connection with who was making

disclosures to the Court and whether they were equipped to do so.  As noted, Miller was

never told by his client that it was to be a balanced deal.  He was not told anything that

explained the deal economics, the discount or the central role the repo had come to play

in the transaction by the time of the Sale Hearing.  Kelly, Lowitt and Tonucci, all of

whom knew of the discount, never set foot in Court.  Ridings and the lawyers appearing

at the Sale Hearing knew nothing of the liquidation pricing that was by then defining the

deal.  McDade, who testified, knew nothing of the liquidation analysis or the

overstatement of bonus and cure liabilities, or, apparently, that no line by line asset

valuation had in fact been conducted.  Meanwhile, those in the know on the Barclays side

sat back and did nothing to correct the skewed record being presented to the Court.

Hughes knew about the role of the repo, the Friday asset "scramble" and the discount,

and he said nothing.  Ricci knew of Barclays' intent not to pay all the assumed liabilities,

the Friday asset "scramble" and the buffer, yet he took no action to ensure proper

disclosures were made to the Court.  Seery knew of the liquidation analysis and, despite

being a bankruptcy trained lawyer, he said nothing. Klein knew of the $1.9 billions in additional assets, and he sat silent. At the very least, all of these were mistakes.

769.     Fundamental mistakes were made in connection with allowing Lehman executives to negotiate the price for Lehman assets across the table from Barclays, while they were at the same time negotiating their own personal employment contracts with Barclays. While LBHI believes the circumstances surrounding this disregard of an obvious conflict of interest warrants a finding of bad faith, breach of duty or fraud, for purposes of this section it is readily apparent that they constitute, at the very least, a serious mistake. A comparison of the Lehman Board minutes with what actually happened here shows that the Lehman Boards were not adequately informed on this issue. At the very least, since he was not involved in pricing assets, McDade could not properly play the role of a watchful neutral, focused on protecting Lehman's interests, as the Lehman Board was expecting. Nor were the Court or creditors ever told anything about this conflict of interest. Indeed, the CFO of Lehman was already signed up to a lucrative contract with Barclays, contingent on closing, when McDade assigned him the job of making his future employee happy by finding additional assets to add to the deal. If that was not a mistake, it is hard to imagine what is. Aside from that, Lehman executives charged with negotiating the price of assets (and who agreed to the $5 billion discount for Barclays) knew they were going to work for Barclays and would be assigned to help manage those very assets right after the Closing.

770.     The December Settlement reflected a number of mistakes. The underlying dispute was caused by Barclays' decision, on September 18, not to "roll" or renew a $15.8 billion repo (a decision not shared with JPM or Lehman) and the resulting

confusion as to the disposition of some $7 billion in cash that ended up in a Lehman account at JPM. As noted, the failure to disclose the FRBNY's bias was a mistake, both as to JPM in the negotiations and as to the Court in its approval considerations. Barclays also failed to investigate or address the improper disclosure accusations set forth in Jamie Dimon's letter to Varley. And, to the extent Barclays tries to rely on anything related to the December Settlement, including the Leventhal declaration, in pursuing its estoppel and other defenses with respect to the Rule 60 Motions, that is a mistake in light of Mr. Schiller's express and unqualified representations to the Court in December 2008 that its proceedings then would have no estoppel or preclusive effect.

771.    This list of mistakes is far from exhaustive. It merely illustrates just how many serious errors were made in connection with the disclosures that should have been made to the Court about the Sale Transaction. Rule 60 relief is warranted where, as here, myriad mistakes were made, particularly in presenting it to the Court for approval. The sheer volume and import of these mistakes cries out for redress.

772.    The legal authorities Barclays set forth in its opposition papers (Barclays Opp. Br. ¶¶ 570-581) provide no support for its position that critical mistakes should be ignored under Rule 60(b)(1). As explained in LBHI's reply papers (LBHI Reply Br. ¶ 156) it is not the law in the Second Circuit that only a narrowly defined set of so-called "excusable litigation mistakes" and mistakes by the Court can be redressed under Rule 60(b)(1). All types of mistakes (excusable or inexcusable, litigation related or otherwise), by any party can be so redressed. *See, e.g., In re Emergency Beacon Corp.*, 666 F.2d 754, 759 (2d Cir. 1981); *Stefanopoulous v. City of New York*, 07-cv-1045, 2008 WL 4820558, at *1 (2d Cir. Nov. 5, 2008). Indeed, it makes no sense to argue that only

"excusable" mistakes could be redressed but intentional or inexcusable ones could not.

Even if the law were as Barclays asserts, the mistakes set forth above would qualify

under that test.  The decision not to bring the Clarification Letter back to the Court for

approval, to the extent it was based on the lawyers not understanding the material

changes that had been made to the deal, was a litigation mistake.  The mistaken

disclosures concerning the balanced nature of the deal, the hidden discount, the role of

the repo, and many others, to the extent they were caused by mistaken beliefs, lack of

knowledge, the complexity and speed of the deal, were all litigation mistakes.  The

lawyers missing, ignoring, or deciding not to disclose the Section 559 ramifications of

paragraph 13 of the Clarification Letter was a litigation mistake.  Seeking approval of the

break-up fee on a flawed record was a litigation mistake.  Telling the Court (and potential

objectors) that the deal was based on market value, when liquidation prices were used,

was a litigation mistake.

773.    Barclays also misleadingly has contended that "unilateral" mistakes

regarding the "negotiation and comprehension" of the transaction documents cannot be

redressed under Rule 60(b)(1).  (Barclays Opp. Br. ¶¶ 571-73.)  This just assumes away

the problem.  (*See* LBHI Reply Br. ¶ 157.)  Most of the mistakes listed above involve

what the Court was told, not LBHI's "unilateral" understanding of the deal documents.

Indeed, in most cases the mistakes were mutual.  One glaring example was deciding not

to seek Court approval for the Clarification Letter.  Another was not disclosing the

liquidation pricing upon which the deal was ultimately based to the Court.  These

mistakes were not unilateral.  They did not involve merely LBHI's understanding of the

deal.  Nor did they involve Weil Gotshal's not understanding the transaction either, as

Barclays contends.  (Barclays Opp. ¶ 572.)  The mistakes were the result of Barclays itself hiding things, or at the very least failing to correct misrepresentations made to the Court about the deal, which Barclays was in a position to correct.

774.    Barclays also misleadingly argues that Rule 60 cannot be used to reform a contract based on unilateral mistake.  (Barclays Opp. ¶¶ 535-539.)  As explained in LBHI's Reply Brief (LBHI Reply Br. ¶¶ 159-161), this unremarkable assertion misses the point.[196]  LBHI is not seeking to reform the contract between the parties.  It is seeking to enforce the contract that actually was disclosed to the Court.[197]  To the extent the Sale Order can be read to authorize parts of the deal that were not disclosed or approved, LBHI is entitled to have that order modified to correct that mistake.  State law doctrine on mutual versus unilateral mistakes in contracts has no application to Rule 60, especially where the mistakes involve failure to make proper disclosure to the Court.[198]

---

[196]  Barclays cannot seriously contend that all the mistakes here were unilateral mistakes by Lehman as to the interpretation of contracts.  For example, there are several mutual mistakes in contract interpretation here, arising in the disputes as to the Clarification Letter's provisions concerning the margin accounts and 15c3-3 assets.  Barclays' contention that the term "book value" in the Asset Purchase Agreement has no meaning reflects, at the very least a unilateral mistake by Barclays (whose counsel added that term) or more likely a mutual mistake as to what it meant.  Both sides were mistaken in allowing it to be disclosed to the Court without explanation to the contrary.  Barclays' contentions as to its obligation to pay $2 billion in bonuses under the Asset Purchase Agreement also is premised on an alleged mutual mistake as to the interpretation of subparagraph 9.1(c), claiming that provision is ambiguous in some way.  Even Barclays' suggestion at trial that the 9/16/08 Financial Schedule was not operative because it was not initialed by Barclays posits a mutual mistake.  In short, Barclays' argument on unilateral mistake is factually, as well as legally, wrong.

[197]  For similar reasons, Barclays' assertion that this is a case of Movants' "dissatisfaction in hindsight" (Barclays' Opp. ¶¶ 575-76) is also misplaced.  Movants are not dissatisfied with the deal described to the Court, they are trying to enforce that deal.  Movants contentions are not that the disclosed deal was unfair or inadequate, rather it is that the deal that was closed was not the same as that disclosed and approved by the Court.  Barclays cites no case holding that such a claim is beyond the purview of Rule 60(b).

[198]  Indeed, the parties have stipulated that LBHI's contractual claims are not to be decided at this point in the proceedings.  (Stipulation and Order Between Debtors, Trustee, Committee and Barclays Capitol Inc. Concerning Certain Claims Made in Adversary Complaints Filed by LBHI, SIPA Trustee and Creditor's Committee, So Ordered by Judge Peck on Jan. 13, 2010 at 4.)

775.    Lastly, Barclays proffers a "no harm, no foul" defense, arguing the Court is disabled from granting relief because even if it had known of all these material mistakes, it would have approved the Sale Order anyway.  This conjecture is dealt with in detail in the Post-Trial Memorandum, above, as it is contrary to law, the facts, logic and equity.

**B.    Separately, LBHI Is Entitled To Relief Under Rule 60(b)(2) Based On Newly Discovered Evidence**

776.    To constitute newly discovered evidence under Rule 60(b)(2), the movant must show that (i) the evidence was of facts that existed at the time of the trial or other dispositive proceeding; (ii) the movant was justifiably ignorant of the evidence despite due diligence; (iii) the evidence is admissible and probably would have changed the outcome; and (iv) the evidence is not merely cumulative or impeaching.  *See U.S. v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001).  The evidence on which LBHI bases its motion met this test.

**1.    The newly discovered evidence relates to facts in existence at the time of the Sale Hearing and the closing of the Sale Transaction**

777.    The newly discovered evidence featured in LBHI's Motion, and at trial, relates both to the terms of the deal and the inaccurate and incomplete disclosures made to the Court and the Lehman Boards.  Just by way of example, this is a partial listing of what was newly discovered only through Rule 2004 discovery that Barclays resisted and the Court had to order, includes the following:

- Lowitt, Kelly and Tonucci's testimony conceding the existence of a $5 billion discount, the plan to write down Lehman's books, the plan to intentionally default on the repo to grant Barclays the discount, and the inflation of bonus and cure liabilities;

- Berkenfeld's testimony that he was unaware of the discount and the plan to write down Lehman's books when he signed the Asset Purchase Agreement and 9/16/08 Financial Schedule;

- Documents and testimony from Barclays personnel, including Varley, Diamond and Ricci, confirming Barclays' internal "pre-condition" that Barclays make a first-day gain, that it was condition of the deal that it be capital accretive, and that Barclays never intended to pay all the bonus and cure liabilities disclosed to the Court;

- Documents and testimony showing what Barclays actually ended up paying Lehman employees was much less than the $2 billion in bonuses the Asset Purchase Agreement required, as well as Barclays' documents and testimony concerning its "$650 million problem" and its plan not to pay the entire $2.0 billion owed under subparagraph 9.1(c) of the Asset Purchase Agreement;

- Evidence concerning breaches of duty by Lehman executives, including Lowitt's employment contract being signed before Closing and before he was charged with locating additional assets to add to the deal, Kelly's feeding financial information to Barclays before the Closing and, Seery's multi-million dollar retention payment from Barclays despite his having no defined role with the company after Closing;

- The Take-Out Agreement, the FRBNY's promise to provide next-day financing to Barclays based on virtually the same pool of collateral as the Fed Repo, the FRBNY's selling its support for the Sale Transaction, and documents and e-mails confirming the cozy relationship between the FRBNY and Barclays that pervaded the December Settlement negotiations;

- Documents and testimony concerning the negotiation of the December 2008 Settlement between Barclays and JPM, from which LBHI was excluded, including the Jamie Dimon letter accusing Barclays of impropriety in disclosures to the Court, and communications between Barclays and FRBNY concerning the settlement discussions and asset valuations;

- PwC documents (and Barclays' stipulation as to how Guarnuccio would testify) confirming that Barclays understood it was required to pay $2.0 billion in bonuses, exclusive of severance;

- Documents and testimony concerning the liquidation analysis performed by Seery and various traders to reduce the value ascribed to assets going to Barclays;

- Documents and testimony concerning Barclays' threat not to close the Sale Transaction unless additional assets were added to the deal, including e-mails from Klein, Ricci and others on that score; and

- Documents and testimony concerning how Barclays accounted for the Sale Transaction, including the various iterations of its acquisition balance sheet, transaction adjustments, and the valuation of assets Barclays acquired.

778.    All this evidence and more was uncovered only after the Court, over Barclays' objection, ordered Rule 2004 discovery to proceed in June 2009.  It all involves facts, documents and circumstances that existed at the time of the dispositive hearing in issue, the Sale Hearing and Closing for most of this evidence, and for some items the hearing on the December Settlement.  It is not merely cumulative or impeaching and it probably should have changed the outcome of the Sale Hearing.

## 2.    LBHI was "justifiably ignorant" of this new evidence until recently, and without Rule 2004 discovery it would not have been found

779.    As explained in LBHI's Reply Brief, Lehman remained justifiably ignorant of this new evidence for some time, largely because of Barclays' recalcitrance and misconduct.  (LBHI Reply Br. ¶¶ 166-168.)  In short, Court-ordered Rule 2004 discovery was required to find the truth in this case, because virtually all the former Lehman employees with knowledge now work for Barclays, Barclays controls Lehman's electronic databases and documents, and Barclays was uncooperative in providing information to the administrators of the Lehman estate.  It is disingenuous for Barclays to argue this was not newly discovered evidence.  Barclays itself is principally responsible for it taking this long to come to light.  And as for the documents and evidence that was never in Lehman's possession in the first place – *i.e.*, the evidence under the exclusive

control of Barclays or third parties, like the FRBNY and PwC – there can be no argument

that this is not newly discovered by LBHI.

780.    Moreover, as explained below, in assessing "justifiable ignorance" in this

regard, one cannot ignore the circumstances under which A&M assumed control over the

administration of the LBHI estate.  As Marsal testified, when A&M first was retained, he

was expressly waved away from the Lehman-Barclays transaction by Berkenfeld and

others.  His team necessarily focused on trying to preserve data that it thought it would

need to run the estate, especially since employees were leaving in droves to work for

Barclays and Barclays was to gain title to all the applicable data and documents.  A&M

had absolutely no opportunity at the time to conduct comprehensive interviews of

departing employees, or even to gain a working understanding of the Sale Transaction –

an understanding it only developed later, by forcing Barclays to divulge documents,

information and eventually testimony.  Under these circumstances, and based on this

record, there is simply no basis for concluding that LBHI was not "justifiably ignorant"

of this evidence as to these complex facts.  *See, e.g., Alpern v. UtiliCorp United, Inc.*, 84

F.3d 1525, 1536 (8th Cir. 1996) (Rule 60(b) motion was timely despite movants

possessing the newly discovered evidence because they "lacked sufficient time to analyze

and submit the evidence" in the earlier proceeding); *W. Helicopter Servs., Inc. v.

Rogerson Aircraft Corp.*, 777 F. Supp. 1543, 1545 (D. Or. 1991) (despite evidence

having been disclosed earlier, Rule 60(b) motion was timely because movant had been

diligent in pursuing discovery).

### 3.    Barclays' other factual and legal defenses are misplaced

781.    Also inapposite here, is Barclays' contention that LBHI is charged with

the knowledge of its former employees in all respects.  (Barclays Opp. ¶¶ 585-586.)

First, that argument does not address the evidence noted above, which has always been in the exclusive possession of Barclays, PwC, Cleary Gottlieb, Klein, and the FRBNY, all of which was newly discovered and not known even by Lehman's former employees. That large volume of evidence alone is enough to satisfy the requirements for Rule 60(b)(2) relief. And Barclays' attempt to recharacterize the facts cannot help it in this regard. (*See* LBHI Reply Br. ¶¶ 169-174.)

782. Second, the well recognized "adverse interest" exception to the imputation rule applies under these circumstances.[199] In other words, LBHI is not charged with the knowledge of employees who have abandoned their principal's interests to benefit their own or another's purposes. *See In re CBI Holdings, Inc.*, 529 F.3d 432, 451-51 (2d Cir. 2008); *see also Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784-85 (1985) .[200] (*See* LBHI Reply Br. ¶¶ 175-182 (explaining these and other cases).)

783. This exception was recently affirmed by the New York Court of Appeals, which "decline[d] to alter [its] precedent" on this issue. *Kirschner v. KPMG LLP*, __ N.E.2d __, 2010 WL 4116609, 2010 N.Y. Slip Op. 07415, at 5 (Oct. 21, 2010) (declining to expand the exception in cases involving claims against outside professionals). The Court of Appeals recognized that although the knowledge agents acquire while acting within the scope of their authority is normally imputed to their principals, that

---

[199] This same case law and analysis applies to any *in pari delicto* defense Barclays may proffer, even outside the "newly discovered evidence" prong of Rule 60(b). (*See, e.g.,* Barclays Opp. ¶¶ 509-516.) Such a defense is unavailing for the reasons explained in this section.

[200] Barclays' case *Center v. Hampton Affiliates* does not even squarely address this exception. Instead, the court determined that the movant had presented no more than conclusory assertions that the agent had a conflict of interest and therefore the trial court's denial of summary judgment on that basis was appropriate. *Center,* 66 N.Y.2d at 785-86. In short, the Court of Appeals never really addressed or applied the proper test for this exception, it merely held that the movant had made an insufficient showing to even require such analysis.

presumption does not apply "where the corporation is actually the agent's intended victim." *Id.* at 10.  While under normal circumstances, the agent is presumed to communicate with the corporation about his activities, when the agent is engaged in victimizing his own corporation there is no logical basis for that presumption since he obviously would try to hide his acts from his intended victim.  *Id.* at 10-11.  In other words, there is no basis to impute the knowledge of an agent to his or her principal corporation where the fraud or misconduct is committed *against* the corporation, as opposed to *on behalf of* the corporation.  *Id.* at 10-12 ("The crucial distinction is between conduct that defrauds the corporation and conduct that defrauds others for the corporation's benefit.").  The adverse interest exception applies where, as here, "the scheme that benefited the insider operated at the corporation's expense." *Id.* at 12; *see id.* at 8, 17 (answering in the affirmative the third of the Second Circuit's certified questions, whether the adverse interest exception is available only where the insider's misconduct has harmed the corporation); *see also Kirschner v. KPMG LLP*, Nos. 09-2020-cv (L), 09-2027-cv (CON), 2010 WL 4644062 (2d Cir. Nov. 18, 2010) (affirming, based on Court of Appeals' answers to certified questions, district court's dismissal of lawsuit).

784.     In considering the Second Circuit's holding in *CBI*, the Court of Appeals reaffirmed that holding but declined the invitation to extend it for the proposition that the test for the exception turns "solely" on the motive of the agents in question.  *Kirschner*, 2010 WL 4116609, at 13-14.  Rather, the Court determined that in *CBI*, certain corporate officers acted in "total abandonment" of the corporation's interests in perpetrating a fraud aimed at "obtaining a bigger bonus for [CBI's president and chief executive officer and principal shareholder], and to preserve [his] personal control over the company." *Id.*

(citing *CBI*, 529 F.3d at 449).  Their "plundering" of corporate assets "deprived the

company of [its] opportunity to sell equity for value."  *Id.*  The plundering of corporate

assets can never be to the corporation's benefit, it is always a harm to the company.  The

misconduct of these employees therefore warranted application of the adverse interest

exception such that their knowledge was not imputed to the company they harmed.

785.    Here, the evidence demonstrated that numerous former Lehman

executives charged with negotiating and closing the Sale Transaction, among other

things, (i) failed to disclose, to the Lehman Board, Lehman's lawyers, and the Court, the

$5 billion discount embedded in the deal, (ii) overstated the amount of bonus and cure

liabilities Barclays was to assume, and (iii) made undisclosed material changes to the deal

that had been disclosed to and approved by the Court.  In the aggregate, such misconduct

visited an $11 billion harm on Lehman and deprived it of the chance to secure anything

above mere liquidation value for its pool of collateral.  Even a cursory review of the

material changes to the deal that Barclays claims were enacted through the Clarification

Letter after the Sale Order was issued confirms that these changes caused substantial

harm to Lehman, *i.e.*, (i) the billions in excess repo collateral Barclays was allowed to

keep through the addition of paragraph 13, (ii) an additional $769 million in 15c3-3

assets purportedly going from Lehman to Barclays, (iii) $1.9 billion in Lehman's

unencumbered box assets purportedly going to Barclays, (iv) billions in margin assets

purportedly going to Barclays, and (v) the redefining of Purchase Assets to eliminate the

term "book value" and thereby making sure to deliver to Barclays, at Lehman's expense,

the undisclosed $5 billion discount agreed to in the beginning of the week.  All these, and

the actions of the Lehman employees that gave effect to these changes, caused great harm

to Lehman, did nothing at all to promote Lehman's interests and furthered the interests of

their new employer, Barclays.

786.    Barclays tries to obscure this obvious conclusion by arguing that the Sale

Transaction also provided benefits to Lehman, in that Lehman was able to save jobs, and

avoid a disruptive winding down of accounts.  This just defines away the key inquiry. [201]

Even if Barclays were to identify some purported benefits to the estate resulting from the

Sale Transaction (despite the $11 billion windfall to Barclays and concomitant loss to

Lehman), that misses the point for purposes of applying the adverse interest exception.

Any benefits to Lehman were associated with the "disclosed" aspects of the Sale

Transaction, not those parts of the deal that were kept hidden from the Court.  They were

not benefits provided to Lehman as a result of the misconduct of its agents, which is what

is required for imputation under the above-referenced case law.  Thus, if the original

"disclosed" Sale Transaction provided benefits to the estate, the misconduct -- *i.e.*, the

misrepresentations, omissions, mistakes, breaches of duty, etc. -- in issue here relates

solely to the "undisclosed" aspects of that transaction, *i.e.*, the aspects of the "closed"

deal from which the Movants seeks relief.  This misconduct inexorably caused harm to

the Lehman estate, and Barclays has presented no evidence suggesting, let alone proving,

---

[201]    Moreover, none of these, however, are benefits to the estate, they are societal benefits and
benefits to third parties.  And, in any event, Barclays offers only conclusory assertions on this front,
asserting that Lehman "avoided a potentially catastrophic liquidation of LBI, which would have triggered
massive losses" and that assets were preserved, contracts and liabilities were assumed, thousands of jobs
were saved, and further market meltdown was avoided.  (Barclays Opp. ¶ 515; *see* ¶ 516.)  But Barclays
nowhere addresses whether the value it took over and above that approved by the Court outweighed these
supposed benefits.  Nor does Barclays show that Lehman would not have received these supposed benefits
if extra assets were not added to the deal after Court approval.  Barclays cannot even show that other
bidders, armed with the knowledge of a built-in day-one gain worth billions of dollars, might not have tried
to outbid Barclays for these assets.  In that case, the benefit Barclays espouses can only be considered
illusory.  *See CBI Holding*, 529 F.3d at 453 (appellees' suggestion of benefits to the corporation were
illusory in light of financial circumstances).

that Lehman could have benefited from this misconduct. Accordingly, the adverse

interest exception bars the imputation to Lehman of the knowledge of those Lehman

employees engaged in misrepresentations, nondisclosures, or other misconduct which

served to harm their principal.[202]

787.    Lastly, these employees' abandonment of the interests of their principal,

the adversity of interests between them and Lehman, and the harm they caused Lehman is

confirmed by the weight of the evidence concerning their motives and their actions. *See,*

*e.g., Kirschner*, 2010 WL 4116609, at 7 (recounting and implicitly upholding district

court's reasoning that facts relating to intent "could contribute to the explication of how

the fraud worked and to whose benefit it accrued"). As shown at trial, a number of senior

Lehman employees bent their to loyalty to Barclays, such that they did not disclose the

negotiated discount, the plan to write down Lehman's marks, or the planned repo default

to Lehman's lawyers, its boards and its other executives. Lowitt, for example, having

already been offered a lucrative Barclays job, sat silently while the deal was described as

a "wash" to the Lehman Boards, although he had read only a few hours before Kelly's e-

mail about the deal involving a "5b all in economic loss versus our marks" and inflated

---

[202]    Barclays, no doubt, will point to the knowledge of McDade as somehow providing a way
around this analysis. But, as shown at trial, McDade's knowledge of all aspects of the deal was woefully
incomplete, and therefore there is no basis to impute to Lehman complete knowledge of the misconduct of
all its employees based on the incomplete knowledge of one. For example, while McDade may have
known that the prices of the assets being sold were "negotiated" values, he mistakenly thought there had
been a line-by-line valuation performed of all Lehman's assets, as he misleadingly (albeit innocently)
testified in Court. While Barclays may argue that MdDade understood that the comp figure on the
September 16 Financial Schedule was overstated, he mistakenly believed that was to bring the deal into
balance and that the transaction was to be an exchange of roughly equivalent assets and liabilities, resulting
in no immediate gain to Barclays. McDade thought the Friday asset grab, to fill the "shortfall" about which
Barclays complained, was to bring the deal back into balance, not to provide more gains for Barclays. So
even if McDade's incomplete knowledge is imputed to Lehman, it can still recover on its Rule 60(b) claims
because McDade's level of understanding of the "undisclosed" aspects of the deal would not have alerted
anyone, even McDade, that any misconduct was afoot. Lehman and McDade remained justifiably ignorant
of those aspects of the deal.

accruals.  Two days later, Lowitt, now fully under contract to Barclays, led the effort to

add even more assets to the deal. (*See supra* ¶¶ 251-260.)

788.    Kelly, who wrote up the inflated compensation and cure estimates, was

also on his way to his next career at Barclays, and he knew it.  Indeed, all during this

week Kelly was feeding to Barclays financial and other information (including which

contracts were "mission critical" and therefore should be assumed, and opening balance

sheets) that one would not expect a truly disinterested executive to be providing to an

arms-length counterparty.  (*See supra* ¶¶ 18, 54, 115, 138-139, 141-148, 378-382.)

Similarly, while the Lehman Board was told about eight executives negotiating their

employment agreements, it was not told about the key role some of them had in pricing

the deal.

789.    Nor has Barclays offered any evidence to justify why Seery, the architect

of the liquidation pricing analysis that eventually defined the value Barclays would pay,

received a multi-million dollar retention payment and yet was given no real job at

Barclays.  The only inference reasonably to be drawn is to these payments were rewards

for services rendered to Barclays.[203]

790.    In short, although as Lehman officers these and other employees owed

fiduciary duties to Lehman, they owed no such duties to Barclays, other employees, their

---

[203]    Barclays presented no evidence as to the actual motive of these employees, other than to
proffer after-the-fact, self-serving declarations or testimony saying their motives were pure.  *See Center*, 66
N.Y.2d at 785 (conclusory statements are not enough in this context).  To augment this, Barclays elicited
testimony from witnesses who admittedly were ill-informed about key issues (including the most
questionable aspects of the deal) to the effect that they saw nothing evidencing bad faith.  (*See, e.g.,*
Ridings Dep. Tr. 49:22-50:3 (testifying that he had no reason to believe Lehman negotiators acted in bad
faith), *but see* 66:21-25 (did not know that values disclosed to the Court were based on *but see* liquidation
values); 8/23/10 [Shapiro] 28:16-18 (testifying that negotiations were conducted in good faith), 75:24-77:5
(not aware of discount); 4/28/10 [Miller] 112:11-20 (testifying comp and cure figures were good faith
estimates), 66:2-10 (did not know the source of estimates or how they were calculated).)  This is only
relevant to establishing whether these testifying witnesses were alert enough or fully informed.

subordinates or superiors, the financial markets, or even the U.S. economy as a whole.

Their job was to act in the best interests of Lehman only, not to secure their own future

employment, or employment for colleagues, or to protect other institutions or Barclays.

Their actions and testimony, however, show that saving their own jobs and the jobs of

their friends as well as aiding their future employer, Barclays, was their mission.[204]

Under these circumstances, Lehman cannot be charged with their knowledge as the

interests of these executives were clearly adverse to that of LBHI and its creditors.

### C.    Separately, LBHI Is Entitled To Relief Under Rule 60(b)(3) And 60(b)(6) Based On Innocent Or Intentional Misrepresentations Made To The Court

791.    Rule 60(b)(3) allows for relief based on fraud or misrepresentation by an

adverse party, while Rule 60(b)(6) provides for similar relief based on fraud or

misrepresentation by anyone else.  (LBHI Mot. ¶¶ 162-163; LBHI Reply Br. ¶¶ 183-184

(citing case law).)[205]  Claims of misrepresentation under these provisions can include

unintentional acts, not just misrepresentations or omissions prompted by scienter.  *See*

*Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995); *Anderson v. Cryovac, Inc.*, 862

---

[204] (*See, e.g.*, Felder Dep. Tr. 38:15-42:2 ("And then I wanted to make sure that most importantly, that I was going to be able to bring – that the people in the credit business at Lehman, I was going to be able to make sure they had jobs. . . ."); McGee Dep. Tr. 29:21-32:19 ("[] I'm not going to hold this deal up, I'm not going to hold up saving 11,000 jobs, I'm fine, I'll agree. I'm in."); 4/29/10 [Lowitt] 22:11-18 (Lowitt signed employment agreement with Barclays Sept. 18), 30:16-35:4 (Lowitt negotiated compensation terms of agreement with Ricci on September 16), 43:24-44:3 (Lowitt's employment with Barclays was contingent upon the transaction closing); M.108 (Lowitt's employment agreement with Barclays including roughly $6 million in compensation); M.56 ("If we don't succeed you and I are toast despite all our heroics"); 4/28/10 [Kelly] 140:5-144:16 (discussed employment prospects with Lowitt and Clackson prior to receiving contract from Barclays on Sept. 23); BCI 362 ¶ 8 (Kelly Decl.) (same); Tonucci Dep. Tr. 65:12-23 (discussed employment prospects on Sept. 19 and received contract from Barclays prior to closing).)

[205] This well-settled case law demonstrates the fallacy of Barclays' contention that these rules cannot apply here since Barclays was not an adverse party to LBHI in the bankruptcy proceedings.  Even if that were true, Rule 60(b)(3) and (6), acting together, still govern the same conduct, as the misrepresentations and omissions were committed by someone, adverse or not, within these proceedings.

F.2d 910, 923 (1st Cir. 1988); *U.S. v. One (1) Douglas A-26B Aircraft*, 662 F.2d 1372,

1374 n.6 (11th Cir. 1981).

792.    Here, the multiple failures to describe or misrepresentations of facts can

all qualify as, at the very least, innocent misrepresentations under Rule 60(b)(3) and (6),

and in many cases as intentional ones.  For example, the failure to disclose the imperative

of a first day gain or that this was a condition of the deal, was a material omission by

Barclays.  The failure to disclose the discount, the plan to mark down Lehman's books, or

the planned repo default were material omissions by those who knew of these facts.

Other omissions include the failure to disclose the Take-Out Agreement, the use of

liquidation pricing, the Friday asset "scramble," the amendments to the deal embodied in

the Clarification Letter, just to name a few.  Material misrepresentations included

informing the Court that Barclays would assume $4.5 billion in comp and cure liabilities,

that the assets going to Barclays were worth $47.4 billion, that valuation was governed by

"book value" and the assurances that no cash was going to Barclays and that no safe

harbors were being affected.  All of these, and more, were material misrepresentations

and omissions that warrant relief under these provisions – even assuming they were all

made innocently.

793.    Barclays offered no real response to this prong of LBHI's motion, other

than making suggestions such as that no misrepresentations or omissions were made

because, with the right clues, the Court could have figured it all out.  Hence, Barclays

General Counsel testified the truth could be "deduced" from "pieces of information."

(4/30/10 [Hughes] 126:13-127:1.)  This is not only disdainful of the concept of

transparency and disclosure that pervade all aspects of this Court's work, it is also flat

wrong. It would have been impossible for a non-insider to have deduced most of what was presented in this case. Indeed some of the best lawyers in the country, who were intimately involved in these proceedings, were evidently unable to "deduce" the truth about much of what was either not disclosed at all or misleadingly presented to the Court. Applying Barclays' cynical disclosure standard would eviscerate the real disclosure obligations under Section 363 as well as the rights protected by Rule 60(b)(3) and (6).

### D. Separately, LBHI Is Entitled To Relief Under Rules 60(b)(3), 60(b)(6) And 60(d) For Fraud By Certain Individuals Or Entities Or Fraud On The Court

794.    To the extent the mistakes, misrepresentations or omissions noted above were made with intent or scienter, the Court can and should grant relief under the fraud-based provisions of Rule 60(b)(3), (b)(6) and (d). (LBHI Mot. ¶¶ 167-170; LBHI Reply Br. ¶¶ 185-187.) This includes fraud on the court and conduct involving the corruption of the judicial process even if committed by a non-party to the proceedings. (*Id.*)

795.    The Movants presented pervasive evidence at trial to support a finding of scienter, bad faith and breach of duty here, or at the very least evidencing a fraud on the court. That evidence includes documents and testimony showing that:

- Lehman executives were negotiating employment arrangements with Barclays at the same time as they were agreeing to the pricing of Lehman assets, locating additional assets to add to the deal, and providing closely held information to Barclays;

- The Lehman Boards were not told enough about the role the Elite 8 would play in pricing the deal, were told nothing about Kelly, Tonucci and others' potential conflicts of interest, and were assured that McDade was to actively police this process and would act as a neutral watchdog for Lehman's interests (but were not told about his not being involved in pricing the assets being sold;

- McDade, Miller and Ridings, those assigned speaking roles in the Court proceedings, were kept in the dark about key aspects of the deal, including

the discount, the intent to write down Lehman's books, the plan to default on the repo, and the use of liquidation prices;

- The Lehman Boards were told very different things about the deal than the Barclays Board;

- Certain Lehman executives (who were planning on going to Barclays) and certain Barclays executives knew, but did not disclose to counsel or the Court, that Lehman's comp/cure liability figures were inflated and that Barclays was planning on not paying those amounts;

- Certain Lehman executives (who were planning on going to Barclays) and certain Barclays executives knew about, but did not disclose to counsel or the Court, the use of liquidation pricing in the final deal and the additional assets added to the transaction on Friday, September 19;

- Barclays' unexplained termination of the repo and equally unexplained eleventh-hour insertion of paragraph 13 into the Clarification Letter, which had the effect of avoiding the Section 559 requirement that excess collateral be returned to the estate was not disclosed to the Court, or even properly analyzed by counsel;

- The undisclosed Take-Out Agreement and the FRBNY's promise to provide next-day financing to Barclays, as well as the FRBNY's selling its support for the deal to Barclays and the FRBNY's ongoing close relationship with Barclays in the December Settlement negotiations, showed that Barclays had, in fact, "de-risked" the deal to a far greater extent than the Court was led to believe;

- Barclays' post-Closing effort to disguise its huge gain on acquisition (to allow it to manage earnings later), including its assertions that the gain was due to revaluing intangibles and other accounting rules, provided evidence of an intent to conceal its misconduct after the fact;

- Barclays attempted to mislead the Movants with a spreadsheet purporting to show that it paid $1.999 billion under subparagraph 9.1(c) of the Asset Purchase Agreement, when in fact it had paid considerably less than that amount in actual bonuses;

- Barclays obstructed further investigation and discovery, including its refusing to provide information to A&M, its nearly forcing A&M to sue under the TSA, its refusing to voluntarily provide information to the Creditors' Committee and A&M, its seeking to prevent Rule 2004 discovery, all evidence an entity bent on avoiding full disclosure of the operative facts; and

- Barclays attempted, even on the Rule 2004 motion, to mislead the Court with the suggestion that its gain was due to post-acquisition success in operating the acquired business, not (as it in fact was) an embedded gain built into the deal on acquisition.

796.    Taken as a whole, the record provides an ample basis for the Court to find fraud, bad faith and breach of duty under these circumstances – although the Court need not reach that question if it finds for the Movants under other provisions of Rule 60(b). Barclays' only response is to produce self-serving denials from only a few of the executives whose conduct is in question, and to elicit testimony from witnesses like Miller, Ridings, Berkenfeld and McDade, who were not fully informed of all the operative facts, to the effect that they themselves detected no bad faith, although they were kept in the dark as to critical parts of the deal.  That defense, and the minimal evidence developed by Barclays, is insufficient to counter the weight of the proof described above.

### E.    The Relief LBHI Seeks Is Authorized Under Rule 60, The Appropriate Vehicle For Addressing These Concerns

#### 1.    The relief Movants seek is consistent with Rule 60

797.    Through its Rule 60 Motion, LBHI asks the Court to enforce the Sale Transaction that was actually disclosed to the Court and, to the extent the Sale Order is inconsistent with that transaction, to modify the Sale Order to ensure that (i) the deal that was consummated is the same as that which was disclosed and approved by the Court; Rule 60 allows for this type of relief.  It provides great flexibility and a panoply of remedies to a court seeking to correct a prior order.  (*See supra* Post-Trial Memorandum LBHI Mot. ¶¶ 139-144; LBHI Reply Br. ¶¶ 188-194.)

## 2.   Courts need not find bad faith to grant Rule 60(b) relief

798.   Barclays erroneously claims that relief under Rule 60(b) is barred because LBHI has not proven that Barclays acted in bad faith.  (Barclays Opp. ¶¶ 522-524.)  First, that is not true as a factual matter.  As noted above, there is ample evidence of bad faith here, including that of Barclays whose executives sat silent while watching the Court being misled as to key aspects of the transaction, offered and paid exorbitant sums to key Lehman executives while they were still employed by Lehman and profited from their breaches of duty, purchased the support of the FRBNY without disclosing this to the Court, Lehman or JPM, obstructed investigation and discovery of the operative facts, and misleadingly used liquidation prices to insist (at a time when Lehman had no negotiating leverage) that more assets be added to the deal or else Barclays would not close.[206]

799.   The few cases on which Barclays has relied are distinguishable.  In *In re Summit Ventures, Inc.*, 161 B.R. 9 (D. Vt. 1992), the court merely held that a sale order could not be vacated upon the emergency motion of an unsecured creditor who claimed he did not have notice of the auction and wanted to make a better offer. *Id.* at 9-10.  The court rejected this argument, finding there was no abuse of discretion in the court confirming the sale because in all other respects the auction was fair and the purchaser

---

[206] Moreover, there is nothing in Section 363(m), the statute upon which Barclays relies, or in the authorities Barclays cites requiring LBHI to make such a showing.  11 U.S.C. § 363(m)(2008).  On its face, Section 363(m) applies to "appeals" and not to a Rule 60(b) motion for modification of a sale order. *See Edwards v. Golden Guernsey Dairy Co-op (In re Edwards)*, 962 F.2d 641, 644 (7th Cir. 1992) ("[S]ection 363(m) merely protects the bona fide purchaser during the period – that is, pending appeal – in which he otherwise would have no protection against the rescission of a judicial order approving the sale, and does not address the scope of collateral relief."). While purchasers have argued that Section 363(m) forecloses collateral attack on final sale orders, that argument has repeatedly been rejected. *See id.* "[T]o hold otherwise would be to make collateral relief under Rule 60(b) effectively unavailable against an entire category of bankruptcy court orders, a result that could not be reconciled ... with Fed. R. Bankr. P. 9024," which makes Rule 60 applicable in bankruptcy court. *In re Alan Gable Oil Dev. Co.*, No. 91-1526, 1992 WL 329419, at *4 (4th Cir. Nov. 12, 1992).

who bid did so in good faith.  *Id.* at 11.  The court's holding did not rest solely on the finding of good faith.

800.    Barclays' further argues that "[t]he reason Section 363(m) applies to Rule 60(b) attacks ... [is] to afford purchaser of a debtor's assets an 'assurance of finality' with respect to 'who has the rights to the estate property'."  (Barclays Opp. ¶ 524 (*quoting In re Gucci*, 126 F. 3d 380, 387 (2d Cir. 1997).)  However, *Gucci* deals with Section 363(m) in the context of an appeal.   Rule 60 is not even mentioned in that opinion, so it cannot support Barclays' assertion here.[207]  In sum, there is no requirement that Movants prove Barclays acted in bad faith to be granted Rule 60 relief.

## III.    BARCLAYS' PRECLUSION DEFENSES ARE WITHOUT MERIT

### A.    LBHI's Rule 60(b) Motion Was Timely Filed

801.    Courts look to a number of factors, including the complexity of the proceedings, the availability of relevant information, the presence of extraordinary circumstances, the diligence of the movant, equitable considerations, prejudice to the opposing party, the reasons for any delay in filing the motion, and whether the opposing party contributed to such delay, in assessing whether a Rule 60 movant has brought the motion within a "reasonable time."  (LBHI Reply Br. ¶¶ 209-210 (citing case law).)  In this case, all these factors weigh in favor of finding that the Rule 60 Motions were timely filed.

802.    The record reflects that LBHI acted diligently and responsibly in investigating the issues and filing its Rule 60 Motion under extraordinary circumstances.

---

[207]    Barclays also relies on *U.S. v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991), to support its contention that Section 363(m) applies to Rule 60 motions to afford purchasers finality with respect to property ownership.  However, just like *In re Gucci*, 126 F.3d 380, *Salerno* does not discuss the applicability of Section 363(m) to Rule 60 motions; nor does the case even mention Rule 60.

(*See* LBHI Reply Br. ¶¶ 211-219.)  As described above, when Alvarez & Marsal (A&M) was first retained, Marsal was warned away from examining the Sale Transaction by Berkenfeld, who was on his way to a job at Barclays.  Immediately after the closing, LBHI lost control of its books and records and was deprived of substantially all its institutional knowledge about the Sale Transaction and LBHI's operations.  A&M spent several months just trying to preserve data and figure out what assets were left in the estate.  There is no dispute that LBHI was in chaos at the time.  A&M had huge difficulty in trying to identify and value securities that remained and those that had gone to Barclays.  Indeed, it was many months before A&M had indications that it should be looking into the Sale Transaction at all.  And even then, Barclays withheld information.  A&M actually had to threaten a lawsuit just to get Barclays to provide basic information, let alone the relevant information that was only discovered through a Rule 2004 motion.  In the end, the record shows that LBHI took a timely, aggressive approach to investigating potential claims and it conducted a thoughtful and reasonable approach to preparing the filing the Rule 60 Motion.

803.    And as for the trail of breadcrumbs Barclays claims was laid out before A&M that supposedly should have allowed it to "deduce" all that went on here, the evidence at trial shows that Barclays' contentions on this score are just wrong.  For example:

- Barclays points to a brief, late-September 2008 meeting between Kirk and Tonucci and A&M, the notes for which supposedly mentioned a $5 billion "Diff Valuation" (BCI 144 at 4890-91) --  whatever that means -- and an October 8, 2008 presentation by A&M to the Creditors Committee briefly referring to a "negotiated $5 billion reduction" (BCI 131a).  But A&M witnesses, Marsal, Kruse, Fogarty, Coles and Korycki all testified (the latter four witnesses by deposition on Barclays' affirmative case) that they were in no position at the time to understand that isolated scrap of

information or its import.  Barclays did not call any of these witnesses to the stand at trial to try to challenge this testimony, which remains unrebutted;

- Barclays points to an October 1, 2008 meeting in which Creditors Committee advisors supposedly told A&M that the estates should try to "get $5.5 billion back" (BCI 816).  But the only testimony elicited by Barclays about the document is from Korycki, who said that she "was just taking notes" at the meeting and that she "didn't understand everything that was going on at the time."  (Korycki Dep. Tr. 24:20-25:6, 23:8-24:3, 37:11-15 ("[t]hat's what my notes say.  I can't recall the meeting."), 39:5-14.)  At the time, this was just one needle of information arising within a haystack of uncertain data relating to what was transferred to Barclays and how it was valued;

- Barclays points to one isolated excerpt from the testimony of Kruse, from A&M, for the proposition that the $5 billion reduction mentioned in Fogarty's slide was the same as that at issue in this case (Kruse Dep. Tr. 142:21-143:13).  Ignoring for a moment that Kruse's testimony was based on what he now knows to be the discount, Barclays ignores the vast majority of the testimony of Kruse, Fogarty and others from A&M who unequivocally testified that A&M was not able, prior to the Rule 2004 discovery in this case, to analyze the Sale Transaction, the Clarification Letter, the repo collateral, or whether LBHI might have claims arising from the transaction;

- Barclays points to the fact that in September and early October 2008, e-mails involving Weil Gotshal and A&M cited BoNY marks for the repo collateral in select documents (BCI 895; BCI 746; BCI 532).  But Barclays presented no evidence showing that, at the time, Weil Gotshal or A&M personnel were able to understand or interpret these figures or the values ascribed to the repo collateral, which were changing on a routine basis (even within Barclays), especially when all personnel with institutional knowledge or experience concerning this complex issue had left Lehman, and Weil Gotshal and A&M played no role in valuing the repo collateral or other assets going to Barclays.  In fact, all Weil Gotshal and A&M personnel testified that they were not familiar enough at the time with valuation issues to understand these marks;

- Barclays points to a small number of documents transmitting balance sheet adjustments to Weil Gotshal, Lazard and A&M before the Closing (BCI 207, 209, 212).  But Barclays presented no testimony from any of the recipients or from these entities showing that they knew the real economics of the deal at the time.  Rather, the weight of the testimony is to the contrary, and all Weil Gotshal, Lazard and A&M witnesses confirmed that they had no role in valuing assets, preparing the opening balance sheet, or interpreting or verifying these figures; and

- Barclays tries to argue that select Weil Gotshal documents, dated in September and October, reference the clearance box and 15c3-3 assets (BCI 320 at 5868, BCI 131a at 28, BCI 757). But that proves nothing as to Weil Gotshal's knowing where the valuation for these assets came from or the implications of adding these assets to the deal.

804. In the end, these isolated documents or snippets of information only demonstrate that anyone in A&M's or Weil Gotshal's position at the time would -- even using Barclays "deduction" test of disclosure -- have been unable to "deduce" from these small "pieces of information" the true economics of the Sale Transaction, especially as it dramatically changed after the Sale Hearing. Separately, Barclays misses the more fundamental point here, that even if credited, this information does nothing to relieve, excuse, or even address the flawed disclosures made to the Court. Even if Weil Gotshal *had* known all that we know now about the deal (and they clearly did not), the failure to disclose this information to the Court is the real issue here, not who ultimately was at fault for that failure. The disclosures were manifestly incomplete or improper, and the Movants seek to have that mistake (or worse) corrected, no matter who made them.

805. The record also shows that Barclays withheld information from LBHI. Indeed, Barclays was downright obstructionist. (LBHI Reply Br. ¶¶ 220-222.) Barclays was complicit in the misrepresentations and omissions in the September 2008 court hearings and Sale Motion, as its counsel and executives sat silently while the deal was misleadingly presented to the Court. Barclays failed to correct any of the misrepresentations and omissions, as explained in detail above. Barclays and the FRBNY, but certainly not any of the Movants, were solely responsible for failing to advise the Court about the Take-Out Agreement and the role the FRBNY had played in reducing the risks Barclays claimed it was undertaking. Barclays was responsible for the Friday asset "scramble" and the fact that liquidation prices were used to justify adding

more assets to the deal, while keeping this secret from the Court.  During the Closing

weekend, Barclays' agent Klein gave a misleading presentation to the Creditors

Committee (as well as to Miller) designed to throw them off the scent in their inquiries as

to apparent discrepancies in the numbers associated with the deal.  Barclays' conduct in

connection with the December Settlement negotiations (including its curiously close

relationship with the FRBNY, its ignoring the admonitions of JPM's Dimon about

misleading disclosures having been made to the Court, and its excluding LBHI from the

discussions) prove its desire to prevent key aspects of the Sale Transaction from ever

seeing the light of day.  And Barclays' post-Closing (i) efforts to prevent A&M from

seeing Lehman records, to the point that A&M actually had to threaten a lawsuit just to

get access to basic information, (ii) refusing to cooperatively provide adequate

information to the Creditors Committee and the Movants who were, at the time, just

trying to understand the deal that had closed (despite the Court instructing Barclays to do

so), and (iii) opposing Rule 2004 discovery, fighting access to PwC documents and

witnesses, trying to hide Barclays' dealings with the FRBNY, and the uncooperative

testimony of several of its key employees, all exhibit a strongly felt need on Barclays'

behalf to keep the real economics of the Sale Transaction under wraps.  All of this

necessarily delayed the Movants from learning all they needed to know in order to file

their Rule 60 Motions.  Where a party, like Barclays here, has contributed to the delay in

filing a Rule 60 Motion, it cannot argue that the motion was untimely.  *See In re Int'l*

*Fibercom, Inc.*, 503 F.3d 933, 945 (9th Cir. 2007); *U.S. v. Baus*, 834 F.2d 1114, 1123 (1st

Cir. 1987).

806.    Equitable considerations also warrant finding the Rule 60 Motions were timely filed.  (LBHI Reply Br. ¶¶ 223-225 (citing case law).)  Barclays has presented no evidence disputing the obvious point that third party creditors played no role in negotiating the Sale Transaction, making material changes to the deal, valuing the assets and liabilities transferred to Barclays, consummating the sale, and misdescribing it to the Court.  To ignore their interests simply because, as Barclays argues, it took too long for the truth to emerge would be fundamentally unfair and undermine the legitimacy of the entire Section 363 process.  Moreover, where, as here, many of the executives involved in the deal breached fiduciary duties they owed to Lehman, and by extension its creditors, it would be inequitable to reward that misconduct by not allowing the claims raised in the Rule 60 Motions.

807.    Finally, Barclays has not shown that it had suffered any undue prejudice as a result of the timing of the Rule 60 Motions.  (LBHI Reply Br. ¶¶ 226-228 (citing case law).)  The possibility that Barclays might lose the Motions is not undue prejudice in this regard.  *See Pratt v. Philbrook*, 109 F.3d 18, 22 (1st Cir. 1997).  Nor does Barclays' contention that it has hired employees, assumed market risks and changed its corporate structure (Barclays Opp. ¶ 558) evince prejudice.  The Movants are not trying to unwind the Sale Transaction.  They merely seek to have Barclays return the value of the undisclosed windfall it received.  Barclays can keep the benefit of the bargain that was disclosed to the Court; it just cannot keep the benefits that were never told to or approved by the Court.

808.    Rather, Barclays must show – and it has not – that its ability to gather evidence or adequately present its side of the case has been unfairly prejudiced by the

timing of the Rule 60 Motions. Barclays cannot make such a showing. It had complete

and unfettered access to all former Lehman employees who went to work at Barclays, the

entirety of Lehman's books and records, and Barclays' own employees with knowledge

of the Sale Transaction. While the Movants were denied access to information, Barclays

never was. And it has made no attempt to prove undue prejudice at trial.

### B.     The Mandate Rule Does Not Bar LBHI's Claims

809.    Barclays "mandate rule" arguments fail for the reasons set forth in LBHI's

Reply Brief. (*See* LBHI Reply Brief ¶¶ 236-251.) In sum, the district court's mandate in

the *Bay Harbour* appeal did not address the issues raised in the Rule 60 Motions. In

particular, Barclays has made no showing that the district court "necessarily" decided any

of the claims or defenses now before this Court. *See DeWeerth v. Baldinger*, 38 F.3d

1266, 1271 (2d Cir. 1994) (trial court could decide Rule 60(b) motion because appellate

panel "did not necessarily reject [appellant's] arguments" raised by such motion). (*See*

LBHI Reply Br. ¶¶ 237-242.) Issues not "cleanly raised" in the prior appeal are not part

of the mandate binding the trial court in later proceedings. *Indep. Petroleum Ass'n of*

*Am. v. Babbitt*, 235 F.3d 588, 597 (D.C. Cir. 2001).

810.    Here, the disclosure issues before this Court were never raised or

considered, nor were they expressly or even implicitly decided, by the district court in

*Bay Harbour*. Thus, the district court considered only two discrete issues concerning the

so-called Defalcated Funds that allegedly were improperly transferred from LBIE to LBI,

*i.e.*, whether (1) Bay Harbour was deprived of its due process rights in being denied

discovery about the Defalcated Funds, and (2) the Court had an adequate record at the

time of the Sale Hearing on which to conclude that Barclays was purchasing assets,

including possibly the Defalcated Funds, free and clear of liens. LBHI raised neither of

these issues in the Rule 60 Motion, a fact that Barclays does not dispute. And the *Bay Harbour* appeal dealt with whether Barclays was a "good faith purchaser" only in connection with the Defalcated Funds claims, not with respect to the additional, undisclosed and unapproved, aspects of the Sale Transaction being challenged by the Movants. (LBHI Reply Br. ¶¶ 237-242.)

811.    Contrary to Barclays' assertions, the mandate rule does not bar claims that LBHI could have, but did not, raise in the *Bay Harbour* appeal. (LBHI Reply Br. ¶¶ 243-248 (citing case law).) This is especially true where, as here, LBHI was only an appellee. Barclays cites no authority for the notion that the waiver rule on which it relies may apply against appellees, who (unlike appellants) have no say in what claims are decided on appeal. *See Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739-41 (D.C. Cir. 1995) (noting that Piedmont's status as an appellee raised unique concerns under the mandate rule, which the court refused to apply because, *inter alia*, appellees are not bound to put forth all possible grounds for affirmance in responding to the claims the appellant decides to bring). In this case, Bay Harbour defined the issues before the district court, not the Movants, so they did not waive arguments that they conceivably might have raised had they formed the appeal. (LBHI Reply Br. ¶¶ 243-248.)

812.    Lastly, the newly discovered evidence at issue here implicates a well-recognized exception to the mandate rule such that LBHI should be allowed to raise the arguments and claims in the Rule 60 Motions. (*See* LBHI Reply Br. ¶¶ 249-251 (citing case law).) In sum, to the extent that the district court had no access to this newly discovered evidence, the record on which its mandate was based was skewed or incomplete, and therefore that mandate does not bar challenges, like those here, based on

that new evidence.  For the reasons noted herein and in LBHI's reply papers, this exception clearly applies here.  (*Id.*)

813.    As explained in LBHI's Reply Brief, Barclays has presented no competent, or persuasive, legal authority to the contrary, and the Court should find against Barclays on this issue as a matter of law.  Moreover, the dearth of any trial evidence relating to this issue confirms that Barclays' mandate rule arguments have no merit as a factual matter.  Barclays has presented no evidence remotely suggesting, let alone proving, that anyone involved in the *Bay Harbour* appeal (counsel, any of the Movants, Barclays itself, the appellant, third parties, or the district court) ever believed the appeal should involve anything more than the above-mentioned, two discrete issues Bay Harbour raised concerning the Defalcated Funds.

814.    In the these proceedings, Barclays deposed Weil Gotshal attorneys, reviewed Weil Gotshal documents, and even had Mr. Miller on the stand at trial,[208] and yet Barclays asked no questions about their understanding of the scope of the appeal, nor did Barclays try to elicit any testimony concerning its waiver argument.  To have done so would have yielded testimony contrary to Barclays' position.  Likewise, Barclays did not question or try to elicit testimony on this issue from Mr. Marsal or anyone else from A&M, Mr. Ridings or anyone else from Lazard, Messrs. Keller or Brown or anyone from

---

[208]    In his closing argument, Barclays' counsel asserted that Barclays had not had a chance to take discovery from LBHI's professionals.  (10/21/10 [Closing Argument] 178:14-16.)  That statement was just not true.  Due to LBHI's waiver of privilege (the scope of which Barclays and LBHI defined by mutual agreement), Barclays was allowed (i) to request and review numerous otherwise privileged and other documents from the files of Weil Gotshal, A&M, Lazard and Simpson Thacher, (ii) to depose Weil Gotshal and Simpson Thacher lawyers and A&M and Lazard employees at length, and (iii) to call as witnesses or cross examine at trial such individuals, including Miller, Marsal, and Ridings.  It is plainly wrong to suggest that Barclays' ability to present its side of this dispute was somehow impeded by lack of access to LBHI's professionals.

Simpson Thacher, or even from former Lehman employees, all of whom Barclays had a

chance to depose in this case.  Nor did Barclays present any testimony, e-mails or

documents from its own employees, or former Lehman employees now working for

Barclays, or even Barclays' counsel (including Cleary Gottlieb or Boies Schiller, who

represented Barclays in the *Bay Harbour* appeal) that even arguably supports Barclays'

mandate rule argument or that relate in any way to what they considered at the time to

have been the issues on appeal or the scope of the purported waiver.

### C.    Barclays' Estoppel Defenses Are Baseless And Inapplicable

815.    As a last ditch effort to forestall a decision on the merits, Barclays parades

out every estoppel and waiver theory it can think of, none of which has any application or

preclusive effect under these unique circumstances.  These theories fail for the reasons

explained in LBHI's reply papers, and Barclays presented nothing at trial to alter that

analysis.  (LBHI Reply Br. ¶¶ 229-235, 252-257.)

816.    On a preliminary note, Barclays cannot rely on anything relating to the

December Settlement or the issues raised by the Creditors Committee and others at the

hearing on that settlement as support for its estoppel or waiver theories.  (LBHI Reply.

Br. ¶¶ 229-235.)  That is because, at the hearing, counsel for all parties to the settlement,

including Mr. Schiller, counsel for Barclays, provided explicit assurances on the record

that the proceedings would have no estoppel effect and that nothing done then would bar

future claims concerning to the Sale Transaction or related issues.  (M.262 [12/22/08 Tr.]

39:13-20; *see* 24:19-25:13, 34:10-21, 34:24-35:5, 40:8-19, 41:7-12, 45:13-20.)  Ignoring

the assurances of its own counsel, Barclays has still tried to argue, even as late as its

closing argument, that the December 22 hearing supports its estoppel theories.  Not only

is that improper on its face, it turns the doctrine of estoppel on its head.  If anything, the

December Settlement Hearing operates to estop Barclays from arguing now that the

Movants knew in December 2008 everything about the terms of the Sale Transaction or

the value of assets transferred to Barclays.  The Court determined at that hearing that that

was not so, and further discovery was needed on these and other issues.  This necessarily

meant that the Court felt there was not enough information on the topic available to the

Movants at the time.  Barclays participated at that hearing, raised no objection to that

determination, and instead provided assurances on which it now apparently seeks to

renege so it could get the settlement proceedings it was expecting from JPM.  If anyone,

Barclays is estopped from arguing the Movants were fully informed back in December

2008.

817.    To shoehorn this case into a judicial estoppel theory, Barclays argues that

LBHI is taking positions now that are inconsistent with positions it took in prior court

proceedings, *i.e.*, in connection with the Sale Motion and even the December Settlement,

a settlement from which it was expressly excluded.  (Barclays Opp. ¶¶ 461-466.)  But this

argument is premised on a fundamental mischaracterization of LBHI's position now.

LBHI is not seeking in its Rule 60 Motion to revise the deal presented to the Court, it

wants to enforce the deal that was disclosed, the one LBHI supported in the Sale Motion

and Sale Hearing.  LBHI is arguing against the undisclosed aspects of the deal, which by

definition it did not – and could not – argue in support of back in September 2008, since

they remained undisclosed then.  (LBHI Reply Br. ¶¶ 253-254.)

818.    Hoping to manufacture an equitable estoppel theory, Barclays argues that

because it relied on the terms of the transaction documents, LBHI is estopped from

bringing any claims thereunder.  (Barclays Opp. ¶¶ 469-472.)  But Barclays presents no

authority for this theory, which, if adopted, would foreclose all Rule 60 motions relating to any transaction that closed before the Rule 60 motion was filed.  (LBHI Reply Br. ¶¶ 255-256.)  Moreover, LBHI and the Movants have themselves relied on the transaction documents and representations made to the Court, and LBHI irreversibly changed its position based on that reliance.  If anything, the doctrine of equitable estoppel favors LBHI in its efforts to enforce the agreement as it was disclosed to and approved by the Court.  LBHI seeks only the return of Barclays' windfall, something Barclays should not reasonably have expected when it "relied" on the transaction documents here.

819.    Finally, Barclays asserts that because LBHI could have objected to the Sale Order at the time of its issuance, it has waived its claims here.  (Barclays Opp. ¶¶ 473-474.)  Not only would  this theory eviscerate the protections afforded by Rule 60 (*see* LBHI Reply Br. ¶ 257), but Barclays has presented no evidence at trial or otherwise establishing that LBHI made a "knowing" waiver of any of its rights.  The evidence is all to the contrary.  LBHI has shown that key aspects of the deal remained hidden from the Lehman Boards, McDade, Berkenfeld, Weil Gotshal, Lazard and others acting on LBHI's behalf at the time.

820.    Barclays also has presented no evidence that A&M, Weil Gotshal, and others acting on LBHI's behalf in the post-Closing period had access to and fully understood all the information they would need to effect a "knowing" waiver of any of LBHI's rights.  The dialogue between the parties at the December Settlement Hearing demonstrates otherwise.

### D.    Barclays' Release Arguments Are Unavailing

821.    Barclays argues that LBHI's Section 559 claim is somehow barred by a release the Trustee signed in connection with the December 2008 Settlement.  (Barclays

Opp. ¶¶ 663-668.)   Barclays cites no authority showing that LBHI can be bound by a release it never signed, as part of a settlement to which LBHI was not a party, pursuant to which LBHI received no consideration – not even a release from claims that might be raised against LBHI.  Nor has Barclays presented any evidence at trial suggesting, let alone proving, that LBHI knowingly waived or released any of its potential claims at the December Settlement hearing or otherwise.

822.    Barclays' contentions about the release barring "derivative" claims are also wrong.  Barclays cites no authority for its surmise that "[t]he Committee and the Debtor do not have a Section 559 claim of their own to bring; rather, any conceivable Section 559 claim they have is derivative of the Trustee's rights ...."  (Barclays Opp. ¶ 666.)  LBHI's Section 559 claim does not arise under the repo agreement itself, nor is it premised on LBI's rights thereunder.  Rather, it arises under Paragraph 13 of the Clarification Letter pursuant to which Barclays tried secretly to rescind its termination of that repo in order to take assets from within both the LBHI and LBI estates and transfer them to Barclays in violation of the Bankruptcy Code.  Barclays confuses a contractual claim under the repo agreement with LBHI's right to seek the return of assets improperly taken from the LBHI estate, by whatever means.  None of Barclays' cases addresses using a repo transaction to funnel assets out of a bankruptcy estate without disclosure, nor for that matter trying to use a release to bar independent claims by a party that did not sign the release.  And Barclays has presented no evidence showing that LBHI released any claims under the Bankruptcy Code or arising out of the Sale Transaction.  Indeed, LBHI expressly reserved all rights as to such claims.

823.    Moreover, Barclays overstates the scope of the release, which does not cover LBHI and, of course, was not signed by LBHI.  In paragraph 4(c) of the Settlement Agreement, JPM and Barclays release claims against "the Trustee, LBI and the LBI estate, their respective property and their respective [representatives and] subsidiaries," but "[n]othing in this Settlement Agreement shall release, waive or discharge any claims that JPMorgan or its affiliates may have against … LBHI and its affiliates in their respective bankruptcy cases, … with respect to … Advances [JPM claims it made to LBI (M.256 ¶ D, at 1)] and other [unrelated] transactions …."  (M.256 ¶ 4(c), at 5.)  In paragraph 4(e), JPM and Barclays released each other for all claims "relating to any alleged agreement of BarCap to enter into one or more triparty or other repurchase transactions involving LBI," but not LBHI.  (M.256 ¶ 4(e), at 6.)  And LBI is nowhere defined within the Settlement Agreement as purporting to include its parent, LBHI.  The Trustee had no authority to do so.

824.    Even in paragraph 4(d), the provision on which Barclays relies, "the Trustee, on behalf of LBI and the LBI estate" – no mention of LBHI – released JPM and Barclays as to claims relating only to "the Subject Funds, the Replacement Transaction or the Delivered Securities."  (M.256 ¶ 4(d), at 6.)  Even if this were to apply to LBHI, its Section 559 claim does not involve "the Subject Funds" (the $7 billion in cash transferred by LBI to an account at JPM on September 19, 2008 (M.256 ¶ D, at 1)), the "Delivered Securities" (those listed in Schedule A to the Clarification Letter, which as has been shown was never approved by the Court (M.256 ¶ E, at 2)), or to the "Replacement Transaction" whereby Barclays purported to step into the shoes of the FRBNY (M.256 ¶ A, at 1)).  LBHI's Section 559 claim does not purport to enforce rights or obligations

arising under the repo transaction whereby Barclays provided funding to LBI in exchange

for securities.  Rather, LBHI's Section 559 claim involves Barclays' failure, over the

weekend following the Sale Hearing, to comply with a statutory obligation to return

excess collateral to the LBHI and LBI estates following its termination of the September

18 Repurchase Agreement, and its improper manipulation of Paragraph 13 of the

Clarification Letter to effect this without alerting the Court.  Even if it applied to LBHI,

the limited scope of the release cannot reasonably be read to cover such a claim.[209]  Nor

does Barclays present any authority establishing that LBHI, or even LBI, had the right to

contractually release Barclays of this statutory obligation without express Court approval

– *i.e.*, approval that involved actually explaining to the Court the Section 559

ramifications of Paragraph 13, which of course was never done.  Indeed, at the December

2008 Settlement Hearing, this subject was never discussed at all, as all the parties,

including Barclays, made clear that the settlement was merely a means of completing the

transfer between JPM and Barclays of a subset of the repo collateral, and it had nothing

to do with claims arising under the Sale Transaction, the Clarification Letter or events

related thereto.  (M.262 [12/22/08 Tr.] 20:6-15, 33:18-34:21, 39:13-25, 40:9-11, 41:7-

11.)

---

[209]  Barclays itself has not felt bound by such an overreaching reading of these limited categories of released claims.  Despite Barclays releasing LBI as to these very types of claims (M.256 ¶ 4(c), at 5), Barclays has brought claims in this case against LBI (and LBHI as supposedly jointly and severally liable (Barclays Opp. ¶¶ 439-441)) for the delivery of "Purchased Assets" it claims it never received under the Asset Purchase Agreement and the Clarification Letter, including clearance box and other assets Barclays says it was to receive to make up for a shortfall in the securities it was to get under the September 18 Repurchase Agreement.  (Barclays Opp. ¶¶ 336-439.)  Under an unreasonably expansive reading of the term "Replacement Transaction," the release would bar Barclays from asserting these claims.  Thus, Barclays' own conduct shows that the release was never intended to bar all claims relating generally to the Asset Purchase Agreement, the Clarification Letter, the Replacement Transaction or the Sale Transaction, just claims relating to the specific assets at issue in the December Settlement.

## CONCLUSION

For the reasons set forth herein, as well as in LBHI's Rule 60 Motion and Reply Brief, and as explained in LBHI's opening and closing arguments, LBHI respectfully requests that the Court issue an order:

a) adopting in their entirety LBHI's Proposed Findings of Fact and Conclusions of Law as set forth herein;

b) granting judgment against Barclays on Counts III, IV and V of LBHI's Adversary Complaint;

c) issuing on Count IX of LBHI's Adversary Complaint a Declaratory Judgment, pursuant to 28 U.S.C. § 2201, that to the extent the Clarification Letter, or other undisclosed modifications in the Sale Transaction, purported to authorize the transfer of assets to Barclays over and above the transfer of assets disclosed to and authorized by the Court, those transfers and modifications are void and unauthorized, and issuing any other declarations the Court deems just and proper;

d) granting in its entirety LBHI's Rule 60 Motion;

e) denying in its entirety Barclays' Motion to Enforce Sale Order and to Secure Delivery of All Undelivered Assets;

f) granting a monetary award to the LBHI and LBI estates, based on an apportionment to be determined in further proceedings, reflecting the value of the assets improperly transferred to Barclays over and above that disclosed to and approved by the Court, in an amount to be determined by the Court, which LBHI estimates at approximately $13 billion;

g) declaring, pursuant to 28 U.S.C. § 2201, that the Disputed Assets at issue in Barclays' Motion to Enforce Sale Order and to Secure Delivery of All Undelivered Assets are the property of the LBHI and LBI estates and, to the extent they were already delivered to Barclays and not covered by the above monetary award, directing that they be turned over to such estates, based on an apportionment to be determined in further proceedings;

h) modifying the Sale Order and any related documents, as the Court deems appropriate, to give effect to the Court's decision and order;

i) awarding LBHI its attorneys fees, costs, expenses, and prejudgment interest, as appropriate; and

j) awarding LBHI such further relief as the Court deems just and proper.

Dated: November 22, 2010
        New York, New York

JONES DAY


By: /s/ Robert W. Gaffey

Robert W. Gaffey
Jayant W. Tambe
William J. Hine
Tracy V. Schaffer
222 East 41st Street
New York, NY 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

Attorneys for Debtors and
Debtors in Possession