# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
:
In re:                                          :        Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*,         :        Case No. 08-13555 (JMP)
:
Debtor.                                  :        (Jointly Administered)
:
:
:
:
:
------------------------------------------------------------x
:
*In re*:                                         :        SIPA Proceeding
:
LEHMAN BROTHERS INC.,                            :        Case No. 08-01420 (JMP)
:
Debtor.                                  :
:
------------------------------------------------------------x

**PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW**
**OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF**
**LEHMAN BROTHERS HOLDINGS INC, ET AL., WITH RESPECT**
**TO RULE 60 MOTION AND ADVERSARY COMPLAINT**

The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al.,

(the "Committee") hereby submits its proposed findings of facts and conclusions of law with

respect to (I) the Motion Of Official Committee Of Unsecured Creditors Of Lehman Brothers

Holdings Inc., et al., Pursuant To 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), And Fed. R. Bankr.

P. 9024, For Relief From Order Pursuant To 11 U.S.C. §§ 105(a), 363, And 365 And Federal

Rules Of Bankruptcy Procedure 2002, 6004 And 6006 Authorizing And Approving (a) Sale Of

Purchased Assets Free And Clear Of Liens And Other Interests And (b) Assumption And

Assignment Of Executory Contracts And Unexpired Leases, Dated September 20, 2008 (And

Related SIPA Sale Order) And Joinder In Debtors' and SIPA Trustee's Motions For An Order

Under Rule 60(b) To Modify Sale Order, dated September 15, 2009 (the "<u>Committee's Rule 60 Motion</u>") and (II) the Committee's Adversary Complaint (Adv. Proc. No. 09-01733) (the "<u>Committee's Proposed Findings and Conclusions</u>").[1]

1.      The Committee incorporates as if set forth fully herein the proposed findings of fact and conclusions of law set forth in LBHI's Proposed Findings of Fact and Conclusions of Law.

2.      On Wednesday, September 17, 2008, the Office of the United States Trustee appointed the Committee.  <u>BCI 827</u>.[2]

3.      On Wednesday, September 17, 2008, the Committee conducted its first meeting to, among other things, select its professionals, including its counsel, Milbank and financial advisors, Houlihan and FTI.  <u>See</u> Purcell Dep. Tr. 6:17-19; 5/6/10 [Burian] 77:6-8.

4.      At that meeting, in addition to the Sale Transaction, the Committee faced a wide range of issues in addition to consideration of the Sale Transaction, and began reviewing and considering those other, urgent issues for the first time.  Purcell Dep. Tr. 7:17-8:4; 5/6/10 [Burian] 93:17-94:4.

---

[1]      Concurrently herewith the Committee is filing its Post-Trial Memorandum (I) In Support Of (A) Motion, Pursuant To 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), And Fed. R. Bankr. P. 9024, For Relief From September 19 Sale Orders, (B) Relief On Counts I-III Of Committee's Adversary Complaint, And (C) Proposed Findings Of Fact And Conclusions Of Law And (II) IN Opposition To Motion Of Barclays' Capital Inc. To Enforce Sale Order And Secure Delivery Of All Undelivered Assets (the "<u>Post-Trial Memorandum</u>").  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Post-Trial Memorandum.

[2]      Unless otherwise noted, all exhibits referenced herein (cited as either "M. __" or "BCI __") have been admitted into evidence.  Citations to the trial transcript of the evidentiary hearings held in connection with Movants' Adversary Complaints and Rule 60 Motions are presented here as "Date of testimony [Witness] page:lines" (<u>e.g.</u>, 5/6/10 [Burian] ___.).  All designated deposition testimony has been admitted into evidence as BCI 1108.  Designated deposition transcripts are cited as "[Deponent] Dep. Tr. page:lines" (<u>e.g.</u>, Burian Dep. Tr. __.).

5.      On September 17, 2008, the Court held a hearing on proposed bidding procedures in connection with the Sale Transaction (the "Bid Procedures Hearing").  M. 260.

6.      Less than an hour had elapsed between Milbank's retention and the start of the Bid Procedures Hearing.  6/25/10 [Despins] 10:5-7.  Newly-selected (and proposed) Committee counsel first asked counsel for the Debtors for an agreement to adjourn the Bid Procedures Hearing.  Debtors' counsel refused.  Id. [Despins] 10:14-16.   When Committee counsel arrived at Court, he requested (albeit unsuccessfully) that the Court adjourn the Bid Procedures Hearing. M. 260 at 27:21-28:3.

7.      On September 18, 2008, the Debtors and their counsel, Weil, formally introduced the Sale Transaction to the Committee's professionals for the first time at Weil's offices.  See O'Donnell Dep. Tr. 9:24-11:15; 5/6/10 [Burian] 81:20-24; 6/25/10 [Despins] 10:20-12:22.

8.      During this meeting, the Debtors described the Sale Transaction to the Committee as critical, necessary, and emergent.  5/6/10 [Burian] 82:6-11.  The Committee was also advised that very little could be done by the Committee to diligence the transaction.  Id. [Burian] 89:11-15.

9.      The Committee was advised that the Sale Transaction would benefit the estates since the estates were realizing going-concern value for the assets, in lieu of a wholesale liquidation.  8/23/10 [Shapiro] 53:19-21, 66:19-20; 10/6/10 [Pfleiderer] 85:6-12, 85:16-21, 208:3-17, 210:18-24; 5/6/10 [Burian] 85:14-19, 85:24-86:2, 89:2-3.

10.      Receipt of going-concern consideration for the assets was of paramount importance to the Committee.  5/6/10 [Burian] 113:2-114:9, 114:19-116:25.  Had the Committee known that Lehman was liquidating assets to Barclays (as opposed to receiving going concern

3

value), that would have formed a basis for the Committee to object to the Sale Transaction.  Id.,

Burian Dep. Tr. (12/17/09) 301:19-25.

11.     At the September 18, 2008 meeting, the Debtors provided the Sept. 16 Balance

Sheet of assets and liabilities that were to be included in the Sale Transaction.  M. 2.  The

balance sheet showed a balanced transaction (i.e., assets equaled liabilities).  Id.  While a buffer

existed between the trading assets ($72.5 billion) and trading liabilities ($68.4 billion), the

Committee professionals properly considered the Cure and Compensation Liabilities of $4.25

billion a "package" that balanced out the buffer, making assets equal assumed liabilities.  5/6/10

[Burian] 88:11-17; 5/7/10 [Burian] 30:16-31:1.   The Committee was also told that the

Compensation Liabilities were taken off the Lehman books.  5/6/10 [Burian] 193:8-17, 88:11-17.

See also 5/7/10 [Burian] 12:22-13:1.

12.     Later that evening (Thursday, September 18), representatives from Houlihan

participated in a conference call with James Seery, at the time Lehman Brothers' Global Head of

Fixed Income, at which point Seery provided the same high-level of information recounted at the

meeting held in Weil's offices earlier that day.  See M. 378; M.379; 5/6/10 [Burian] 95:13-24.

13.     On the morning of Friday, September 19, acting at Seery's direction, the Lehman

traders developed liquidation values for the repo assets that would be transferred to Barclays.

5/3/10 [Seery] 152:7-9, 144:6-10, 146:25-147:12, 154:20-23, 159:25-160:2;

5/4/10 [Seery] 24:1-6.

14.     Seery knew Barclays had no intention of liquidating the assets.  5/3/10 [Seery]

160:12-16, 160:5-11.  Seery also was preparing Barry Ridings of Lazard Frères, Lehman's

investment banker, to testify at the Sale Hearing on the issue of why the Sale Transaction

presented a better alternative to a liquidation.  See Id. [Seery] 141:22-142:9, 143:1-21, 155:21-

156:1, 156:10-14, 158:2-6.  Mark Shapiro, another Lehman executive, confirmed that the

Lehman traders' exercise was undertaken for that purpose, i.e., to prepare Ridings' testimony.

See 8/23/10 [Shapiro] 114:25-115:7, 115:8-16, 116:21-117:3, 117:12-19.

15.    Seery's instruction to develop a liquidation valuation for the repo collateral

resulted in a figure of $45.5 billion.  5/3/10 [Seery] 172:13-23, 183:20-23, 187:12-19, 172:24-

173:8, 173:23-174:10, 185:3-13, 183:13-23, 183:24-184:2, 187:24-188:3.   The $45.5 billion

figure nearly matched the figure Barclays arrived at when, that morning (Friday, September 19),

it marked down the Fed Repurchase Agreement collateral value of $50.64 billion by at total of

$6.04 billion.  M. 45; M. 147.  See also 5/3/10 [Seery] 184:14-16.

16.    On Friday, September 19, 2008, prior to the Sale Hearing, representatives from

Houlihan, including Saul Burian, participated in a rushed telephone conference with Lehman

representatives, Seery and/or Shapiro, regarding the Sale Transaction.  5/6/10 [Burian] 100:13-24,

99:16-100:15.  During the course of that conversation, Burian received three different

descriptions of the Sale Transaction, each of which Burian memorialized in notes he prepared

contemporaneously with that discussion.  M. 380; 5/6/10 [Burian] 99:16-100:15.

17.    The purpose of this call was to inform the Committee of changes to the Sale

Transaction that had taken place since the Lehman Sellers filed the APA and Sale Motion.

5/6/10 [Burian] 100:24-101:2.  Seery told Burian that the approximately $72 billion matching

transaction described in the APA had changed as a result of a decline in the value of assets being

transferred, an inability to locate certain assets and the short positions being closed out by the

Lehman Sellers' counterparties.  Id. [Burian] 102:9-22.

18.    During the September 19 call, Seery initially disclosed to Burian, in the first of three descriptions of the Sale Transaction, that Barclays had stepped into the shoes of the New York Fed as overnight repurchase lender to LBI.  As repo lender, Barclays had advanced approximately $45.5 billion of cash secured by $50.6 billion of pledged assets.  Thus, Lehman had borrowed $45.5 billion, and there was a $5 billion difference (i.e., a $5 billion haircut) between the pledged assets and the amount of the Fed loan that Barclays had assumed.  See Id. [Burian] 101:7-25.

19.    At the conclusion of that first description, however, Burian was advised clearly and specifically that the description he just received was wrong and it should be crossed out, scratched and forgotten.  M. 380; 5/6/10 [Burian] 103:9-10, 103:12-22.  Seery then provided a new, second description of the transaction to Burian.  Id. [Burian] 104:2-4.  After Burian crossed out his notes consistent with Seery's instructions, Burian began recording the second description of the Sale Transaction that Seery provided.

20.    In the second description, Seery described the changes to the Sale Transaction in broad details, explaining that Lehman only had $45.5 billion of long positions left to transfer and that all the shorts were closed out.  Instead of transferring shorts, Barclays was assuming the Fed Repo loan in the amount of $45.5 billion.  Burian was also told that the Compensation and Cure Liabilities remained the same,  and there would be no cash transferred to Barclays.  See id. [Burian] 104:9-21 (describing second rendition); M. 380 at HLHZ0038190 (memorializing second rendition).  Seery then told Burian the estate is $2 billion ahead from the Sale Transaction reflected in the APA because Lehman has $47.4 billion of assets against $45.5 billion of liabilities, plus the cure and compensation liabilities of roughly $4 billion.  5/6/10 [Burian] 107:10-12.

21.     At this point, Burian was thoroughly confused, unaware, of among other things, how the $47.4 billion matched with the $45.5 billion long positions, and he told Seery to repeat the description simply, comparing it to the description provided earlier in the week in the APA. Id. [Burian] 107:13-108:1.  Burian flipped the pages of his notes again and proceeded to record Seery's third description of the Sale Transaction.  M. 380.

22.     Seery explained that in the original transaction reflected in the APA, Barclays would receive $72 billion of assets and assume $68 billion of liabilities (in addition to the cure and compensation).  Seery informed Burian that the Lehman Sellers now would transfer $47.4 billion of assets to Barclays, and Barclays would assume $45.5 billion of liabilities that essentially consisted of money owed to Barclays under the Barclays Repurchase Agreement. 5/6/10 [Burian] 108:10-23.  See also M. 147 at 70.  Burian was also told that the Cure and Compensation Liabilities and the goodwill payment of $250 million remained the same as provided in the APA.  5/6/10 [Burian] 108:21-23.

23.     At all times during this conversation, Burian understood the values ascribed to the financial portfolio were "going concern," mark-to-market values in a manner in which any reasonable broker-dealer would mark its books at the close of business every single day.  5/6/10 [Burian] 112:2-21.

24.     At no time during the September 19 conversations (or any time thereafter), was the Committee or its representatives, including Burian, informed that the methodology for valuing the assets had changed from book, or mark-to-market valuation, as described in the APA, to a liquidation methodology.  Id.  Similarly, neither Seery nor Shapiro advised Burian of the $5 billion block discount from the book value of the Purchased Assets or about Barclays' imperative that it receive a day-one gain on acquisition.  See 5/6/10 [Burian] 114:10-18.

7

25.    At the time of the call (immediately before Burian went to the Sale Hearing), neither the Committee nor its representatives were provided and did not have a schedule of the assets that comprised the $47.4 billion.  Instead, they had no way of diligencing or confirming these representations and were trusting the Lehman Sellers' representations.  5/6/10 [Burian] 116:23-25.

26.    Seery never told Burian that liquidation valuations had been ascribed to the assets. 5/3/10 [Seery] 191:12-18.  See also 5/4/10 [Seery] 113:23-114:4, 114:8-17.

27.    Seery never told Burian that the values ascribed to the Purchased Assets were negotiated settlement values reached in an agreement between Lehman and Barclays prior to the Sale Hearing.  5/4/10 [Seery] 94:4-7, 99:6-9, 101:1-7, 115:2-10, 123:21-24.

28.    Seery described the $45.5 billion figure as a negotiated settlement value for the first time when testifying in response to questions from Barclays' counsel during the second day of his trial testimony in this case.  5/4/10 [Seery] 115:2-10, 123:21-24.  Seery did not describe the $45.5 billion figure as a negotiated settlement amount either (a) in his first deposition in September 2009, (b) in the Declaration he submitted in the case in January 2010, (c) in his second deposition in March 2010, (d) in his notes of his conversations with Burian relating to the Sale Transaction between September 19-21, 2008, or (e) during his direct examination by Committee counsel on the first day of his trial testimony.  5/4/10 [Seery] 94:4-7, 99:6-9, 101:1-7, 115:2-10, and 123:21-24.  That description also does not appear in Burian's notes of his conversations with Seery regarding the Sale Transaction.  See 5/4/10 [Seery] 103:16-20.

29.    While the Committee was aware that Barclays ultimately would realize a profit from operating a preeminent broker-dealer, the Committee did not know that Barclays would realize an immediate gain on the trading assets as a result of an embedded $5 billion block

discount off their book value and the attribution of liquidation values. 5/7/10 [Burian] 27:25-28:7, 29:18-20, 118:8-22. The Committee knew that the book or mark-to-market value of the assets might exceed the related liabilities, but that excess was absorbed by the Cure and Compensation Liabilities. See 5/6/10 [Burian] 88:11-17; 5/7/10 [Burian] 30:16-31:1.

30.     Seery testified that liquidation values and market values were converging at this time. 5/3/10 [Seery] 153:4-5. Notwithstanding the tumultuous state of the markets, market value as of that period was not converging with liquidation value. See 5/6/10 [Burian] 115:16-21. At this time, there was a flight to quality and a significant portion of the assets to be transferred to Barclays consisted of high quality, liquid securities. Id. 115:23-116:20.

31.     On September 19, 2008, there was a hearing concerning the approval of the Sale Transaction. M. 261.

32.     During the Sale Hearing, the Lehman Sellers indicated changes had taken place to the transaction outlined in the APA and stated the values of the assets transferred had declined from $70 billion to $47.4 billion because of market deterioration. M. 261 at 46:20-47:15. With respect to the method used to arrive at those values, McDade, LBHI's president, testified that a line-by-line valuation had been performed the night before, and the day of the Sale Hearing to update the marks. Id. at 109:6-110:3, 126:21-127:1.

33.     During the Sale Hearing, the Lehman Sellers proffered Ridings' testimony that, among other things, the assets had substantially greater value if sold on a going-concern basis as provided in the Sale Transaction than if sold in a liquidation. Id. at 144:18-24.

34.     During the Sale Hearing, Burian participated in off-the-record discussions about why the going-concern sale was necessary to avoid a liquidation. In particular, Ridings stressed to Burian the need to avoid a liquidation. 5/6/10 [Burian] 122:17-123:5.

35.     The presentation to the Court at the Sale Hearing (including LBHI's counsel's statements regarding changes to the Sale Transaction made on and off the record) squared with the third description provided to Burian by Seery and Shapiro on the call hours before.  5/6/10 [Burian] 123:20-124:1.

36.     No mention was made during the Sale Hearing (or at the side-bar conversation during a recess) of substantial disagreements between the Lehman Sellers and Barclays over how aggressively Lehman had been marking its book.  M. 261; 5/6/10 [Burian] 122:17-123:5.

37.     At no point during the Sale Hearing, was the Court or the Committee informed that the methodology of valuing the assets had changed from the book value mark-to-market methodology described in the Asset Purchase Agreement to a liquidation methodology.  At no time during the Sale Hearing, was the Court or the Committee advised that the $47.4 billion figure was a negotiated settlement value arrived at following negotiations between a handful of Lehman principals and Barclays.  See 6/25/10 [Despins] 113:22-114:10; 5/6/10 [Burian] 114:10-14, 192:6-10, 112:18-21, 156:19-22; 5/7/10 [Burian] 66:8-12, 92:18-21.

38.     On Saturday, September 20, 2008, the Court entered the Sale Order.  M. 441.  At all times, including from the filing of the Sale Motion until entry of the Sale Order, the Sale Transaction was represented to the Court and the Committee as (a) a going-concern sale, the consummation of which avoided a wholesale liquidation of the assets and (b) a balanced transaction where the liabilities Barclays would assume either equaled or exceeded the assets that would be transferred to Barclays.

39.     The factors that the Committee considered important in arriving at its position to neither oppose or support the Sale Transaction included the apparent lack of a viable alternative and the belief that the Sale Transaction presented a going-concern bid that was better than

liquidation.  6/25/10 [Despins] 61:5-17.  <u>See also</u> 5/6/10 [Burian] 118:6-24 .  Rather than risk a

liquidation of the trading assets by taking a more aggressive position, <u>e.g.</u>, by formally objecting,

the Committee did not oppose the Sale Transaction.  <u>Id.</u>; 5/6/10 [Burian] 167:23-168:5.

40.    Had the Committee known about the undisclosed discount and the attribution of

liquidation values, then it would have opposed the Sale Transaction.  5/6/10 [Burian] 113:2-

114:9, 114:19-116:25.  <u>See also</u> Burian Dep. Tr. (12/17/09) 301:19-25.

41.    The Sale Order approved the Sale Transaction based on the record presented to

the Court prior to and at the Sale Hearing.  <u>M. 441</u> at 2.

42.    The Sale Order provided specifically that the rights of the respective Lehman

Sellers to allocate the proceeds among them were reserved expressly (except for the real estate

assets) that the Court was making no finding with respect to any such allocation, and that no such

finding would be made without further Order of the Court on an application from LBHI or the

Committee.  <u>See</u> <u>Id.</u> at ¶ 30.

43.    At the Sale Hearing, the Court was advised that there would be a Clarification

Letter that would clarify which subsidiaries (if any) were to be included in the sale.  <u>M. 261</u> at

48:5-10.

44.    After the Sale Order had been entered and the Sale Transaction consummated, the

Clarification Letter was filed with the Court, as an exhibit, on the afternoon of September 22,

2008, along with the Asset Purchase Agreement and a First Amendment.  <u>M. 3</u>.

45.    The Clarification Letter was never presented to the Court for review or approved

(either in a motion requesting its approval or otherwise).  <u>M. 127</u> at 106:17-107:3.

46.    The Sale Order only approved the Clarification Letter to the extent it

"supplemented" and "clarified" the APA.  The Clarification Order "amended" the APA in a

material manner.  To that end, it was never approved by the Sale Order and has never been the subject of a Court Order approving it.  M. 257.

47.     The Clarification Letter did not provide an accurate or complete description of the Sale Transaction.  The Clarification Letter makes no mention of a $5 billion block discount off the assets' book value or the radical change in valuation methods with respect to the trading assets.  M. 3; 5/6/10 [Burian] 48:5-25.

48.     The Committee never acquiesced to or otherwise consented to any transaction that differed from the transaction presented to the Court at the Sale Hearing.  Until the conclusion of discovery with respect to the Rule 60 Motions in this case, the Committee was unaware of Barclays' insistence on receiving a day-one gain in connection with the Sale Transaction, the $5 billion block discount off of the book value of the purchased assets, the overstatement of the cure and compensation liabilities, the use of the Barclays Repurchase Agreement to funnel a $5 billion discount to Barclays, or the change in valuation methodology from book or mark-to-market value to liquidation value.  See 4/26/10 [McDade] 184:18-22, 184:23-185:7, 205:12-20; 4/30/10 [Hughes] 122:21-123:8, 123:9-124:6, 124:7-12, 124:13-17, 125:3-7, 126:8-12, 148:2-149:22; 6/21/10 [Diamond] 154:6-10; 6/22/10 [Varley] 110:12-111:19, 115:25-116:10.  See also 6/25/10 [Despins] 113:22-114:10; 5/6/10 [Burian] 114:10-14, 156:19-22, 192:6-10, 112:18-21, 113:2-114:9;  5/7/10 [Burian] 66:8-12, 92:18-21; M. 28; Tonucci Dep. Tr. 32:4-33:9, 133:15-21, M. 41; M. 130, 4/28/10 [Kelly] 211:15-18, 206:4-8, 206:17-24, 207:8-14, M. 32; M. 34; M. 17; M. 11; M. 104; M. 107; M. 106.

49.     The Committee became aware of the September 17 Press Release and Analyst Call after the Sale Hearing.  BCI 291; BCI 285; Burian Dep. Tr. (12/17/09) 196:13-197:11, 298:20.  The September 17 Press Release and Analyst Call concerned the abandoned transaction

reflected in the APA.  The September 17 Press Release and Analyst Call did not apprise the

Committee or its representatives of the material features of the consummated Sale Transaction.

5/7/10 [Burian] 24:3-25.

50.      On Saturday September 20, 2008, the Committee advisors were present at the

offices of Weil while meetings occurred between the Debtors, Barclays and other interested

parties in connection with the Sale Transaction and its closing.  5/6/2010 [Burian] at 124:7-13.

51.      Committee counsel insisted to LBHI's counsel that they keep the Committee

professionals involved in all discussions and meetings with respect to the Sale Transaction.  M.

367.

52.      When they arrived on that Saturday, Committee representatives requested a

breakdown of the assets being transferred and the marks ascribed to the assets.  5/6/2010 [Burian]

at 126:14-21.  That request was not satisfied on that Saturday.  The Committee representatives

were excluded from most substantive discussions and negotiations during the weekend and were,

for the most part, ignored.  Id. at 125:22-126:3, 126:18-20.

53.      At 3:00 p.m. on September 20, 2008, the Debtors finally forwarded the

Committee a copy of the working draft of the Clarification Letter.  BCI 239.  Although the

Committee received a draft of the Clarification Letter, the Committee was not permitted to

participate in any negotiation sessions regarding the terms of the Clarification Letter or otherwise.

5/6/2010 [Burian] at 125:22-126:3.

54.      On Sunday, September 21, 2008, the Committee advisors returned to Weil's

offices expecting to receive a list of the assets that were being transferred.  5/6/2010 [Burian] at

133:11-18.  Finding none, Committee representatives reiterated their requests for a schedule of

assets being transferred, demanding the same from Seery.  Id. at 134:2-11.

55.      At or around 11:30 a.m. on September 21, 2008, counsel for the Debtors sent counsel for the Committee copies of the schedule of assets that supposedly were going to be delivered to Barclays as part of the Sale Transaction (the "September 21 Schedules").  M. 381.

56.      The September 21 Schedules delivered to the Committee indicated that the repo securities had a market value of approximately $49.9 billion, notwithstanding that the Committee was previously told the securities were worth no more than $45.5 billion.  Id.; 5/6/2010 [Burian] at 135:13-21.

57.      The September 21 Schedules did not indicate the date that the listed securities were marked.  Id.  Given the discrepancies between the September 21 Schedules and the representations made in Court and to the Committee advisors, the Committee advisors asked Seery for an explanation.  Id.

58.      The Lehman Sellers' representatives informed the Committee advisors that the marks were of an indeterminate date, that they could not confirm that the September 21 Schedules were an accurate list of the securities to be transferred to Barclays.  The Lehman Sellers' representatives also told the Committee representatives to treat the September 21 Schedules as stale and that they would get them updated information once they obtained it.  Id.

59.      The September 21 Schedules contained more that 12,000 CUSIPs.  After receiving the September 21 Schedules, the Committee advisors attempted to diligence the schedules.  Id. at 136:15-137:10.  There were large groups of CUSIPS, however, for which the Committee advisors could not find relevant information.  Id. at 137:16-138:8.  Moreover, it was impossible to value all 12,000 of the securities during the closing weekend.  Id.; Trial 5/4/2010 [Seery] at 125:25-126:2; 10/7/2010 [Professor Pfleiderer] at 9:3-7.

14

60.      As of 11:00 p.m., the updated schedules or information regarding the assets being transferred that Seery committed to provide 12 hours before had not yet been given to the Committee.  5/6/2010 [Burian] at 135:12-21, 146:13-15.  During a conference call among the Committee and its advisors at approximately 12:00 midnight, the Committee advisors, inter alia, attempted to provide an update to the Committee, discussed the discrepancies between the September 21 Schedules and the statements made at the Sale Hearing, and advised that they were awaiting explanations from the Debtors.  Id. at 147:25-148:6, 146:4-147:21; 6/25/10 [Despins] 30:4-19, 71:3-4, 147:25-148:8

61.      Uncertainty over the schedules of assets being transferred and the marked value of those securities, as well as discrepancies between information provided that weekend to Committee representatives and information provided to the Court during the Sale Hearing, created a level of agitation that prompted the Committee representatives to insist on a meeting to obtain an explanation.  5/6/10 [Burian] 151:2-10, 151:11-16; 8/27/10 [Klein] 165:1-9.  See M. 410 [Manila Folder].

62.      In response to this inquiry, early Monday morning on September 22, 2008, a few hours before closing, the Committee advisors met with Michael Klein, an advisor and agent to Barclays in connection with the Sale Transaction, and certain attorneys from Weil regarding the terms of the Sale Transaction.  Id. at 149:23-150:3.

63.      Klein proceeded to outline the components of the Sale Transaction for the Committee advisors on a manila folder.  M. 410; 5/6/10 [Burian] 151:11-155:7.  All handwriting on the folder is Klein's, other than markings regarding "RESIs" in the middle of the folder and certain circles around numbers.  8/27/10 [Klein] 165:1-9; 5/6/10 [Burian] 152:8-11.

64.     During this meeting, Klein explained that the deal as reflected in the Asset
Purchase Agreement originally provided that Lehman was selling $72 billion of long positions in
securities in exchange for Barclays' assuming $68 billion of short positions -- but that deal had
changed.  5/6/10 [Burian] 151-19-25; 5/7/10 [Burian] 93:1-8.  Klein advised that because of
declines in the market, the marked value of the securities dropped from $49.4 billion to
somewhere between $44 and $45 billion.  Id.

65.     To compensate for this decline, Klein advised that $1.9 billion of additional assets
would be transferred to Barclays.  5/6/10 [Burian] 152:5-7.

66.     Klein also advised the Committee representatives the liabilities that Barclays was
assuming consisted of $45.5 billion of the Fed Loan and "extra liabilities" of $4.25 billion.  Id.;
M. 410.  The "extra liabilities" consisted of $2 billion of cure and $2.25 billion of compensation.
Id. [Burian] 152:13-23; M. 410.

67.     Klein described the Sale Transaction as economically advantageous for the estates,
who, according to Klein, were selling approximately $47 billion in financial assets in exchange
for Barclays' assumption of approximately $49.75 billion of liabilities.  5/6/10 [Burian] 152:13-
23; M. 410.  Klein informed the Committee advisors that the estates were doing two plus billion
better than the original transaction as reflected in the APA.  5/6/10 [Burian] 152:13-23.

68.     Klein's use of the terms pre-mark and post-mark was clear – it meant the market
value of the assets had dropped and the assets were re-marked at a lower market value.  5/6/10
[Burian] 151-25-156:14; 5/7/10 [Burian] 93:1-8.   Several times during the meeting, Klein used
the words "market value" in describing the values ascribed to the securities.  5/6/10 [Burian]
151:2-156:25; 8/27/10 [Klein] 234:21-24.

69.    At no point did Klein or any other representative of Barclays or Lehman indicate that the values ascribed to the securities on the Manila Folder reflected liquidation values. 8/27/10 [Klein] 234:21-24 (emphasis added); 5/6/10 [Burian] 156:15-18.  At no time during this meeting was the Committee advised that the parties agreed to value the portfolio of assets at $45.5 billion to facilitate Barclays' day-one gain.  5/6/2010 [Burian] 156:19-25.

70.    After Klein advised about the drop in value from $49.4 billion to $44-45 billion, the Committee representatives asked specifically for an explanation of the basis for concluding the market value of these assets had declined.  5/6/10 [Burian] 155:24-156:8, 159:10-14; 5/7/10 [Burian] 100:5-11.  They simply did not get an answer.  Id.

71.    Klein also advised Burian that the $44-45 billion figure relating to the repo securities included approximately $2.5 billion in RESIs, and that the remaining $3.5 billion of RESIs would go to the DTCC, subject to possible reversion to the estates if there were no liabilities owing from the estates to the DTCC.  5/6/10 [Burian] 158:1-9.

72.    Klein's depiction of the Sale Transaction on the Manila Folder was consistent with the representations made to the Court at the Sale Hearing and Seery's description of the Sale Transaction during his phone conversations with Committee advisors on the Friday prior to the Sale Hearing.  5/6/2010 [Burian] 167:23-168:5.

73.    The Committee left Weil's offices after the Klein meeting between 3:00 a.m. and 4:30 a.m. on Monday September 22, 2008, which was a few hours prior to the closing.  Id. [Burian] 162:14-16; 4/28/10 [Miller] 117:19-118:25.

74.    The conversation with Klein was the last substantive conversation among the Committee representatives, Barclays and the Lehman Sellers before the Committee representatives left Weil.  5/6/10 [Burian] 162:1-12;  see also Burian Dep. Tr. (12/17/09) 142:21-143:2.

17

75.    Shortly before leaving Weil's offices, Committee advisors indicated to the Debtors' representatives that they could not diligence the Sale Transaction or Klein's representations regarding the Sale Transaction, and that while they were not accepting the representations of Debtors' representatives and Klein, they wanted a reconciliation of the Sale Transaction, to independently verify their accuracy.  5/6/10 [Burian] 159:6-23.

76.    Hours after leaving Weil, Burian sent an email to the Committee describing the Klein conversation as he understood it, and which corresponds directly with what Klein depicted on the Manila Folder.  M. 713.

77.     Burian's memorandum to the Committee constitutes the most contemporaneous and comprehensive notes Burian has of the events that took place Sunday evening/Monday morning prior to the closing other than the Manila Folder.  5/6/10 [Burian] 163:5-168:6.

78.    When shown Burian's memorandum, Klein confirmed the symmetry between the memorandum and his conversation with Burian, acknowledging that it was a reasonable summary of the conversation.  8/27/10 [Klein] 241:18-242:3.

79.    Burian emphasized in his email to the Committee that the Committee did not consent to the Sale Transaction or any modifications to the description provided to the Court at the Sale Hearing.  M. 713.  See also BCI 811.  Burian also indicated that he had demanded that the Committee receive a complete reconciliation of all transfers in connection with the Sale Transaction.  Id.; 5/6/2010 [Burian] 167:23-168:5.

80.    The Committee neither consented to the post hearing modifications to the Sale Transaction nor expressed any intention to consent to the Sale Transaction before the closing weekend or any time thereafter.  6/25/10 [Despins] 33:1-34:19.  The Committee advisors left

Weil after the Klein meeting and before the closing because they did not want their presence to be misconstrued as acquiescence or consent to the Sale Transaction.  Id.

81.    Following the closing, the Committee immediately began pursuing a reconciliation of the Sale Transaction.  5/6/10 [Burian] 172:17-25.  The Committee's expectation was that it would receive a line-by-line, item by item, set of marks for the transferred securities showing the date of the mark and the method and manner of arriving at that mark.  6/25/10 [Despins] 35:22-25.

82.    The day after closing, on September 23, 2008, Milbank requested that Weil send them the final forms of schedules A and B to the Clarification Letter.  M. 368.  As of September 25, 2008, the Committee still had not been furnished with copies of the final schedules.  On the morning of Sept. 25, 2008, Milbank again emailed Weil requesting copies of the final schedules.  M. 369.  Later that day, Weil furnished copies of the schedules to Milbank.  M. 394.  In the cover email, Weil explained that the schedules were "not necessarily the final, reconciled lists of exactly what went over to Barclays."  Id.  The September 25 Schedules listed market values of approximately $49.9 billion – the very same value the Committee professionals were told were inaccurate when receiving the September 21 Schedules.

83.    On September 28, 2008, Houlihan, after reviewing the September 25 Schedules, advised Milbank that the September 25 Schedules were consistent with the September 21 Schedules previously received from Weil on 9/21/2008 that they were expressly told to ignore over the closing weekend because the marks were stale.  5/6/10 [Burian] 172:3-7, 172:10-12; M. 707.

84.     Later in the day on September 28, 2008, Weil received a revised form of the schedules of the transferred securities from counsel to Barclays.  M. 716.  Counsel for Barclays

noted that Barclays was reserving rights with respect to the schedules, and would not confirm
that the schedules reflected what was actually delivered to Barclays nor the market value of such
securities.  Id.

85.    In the immediate period after the closing, Houlihan continued its efforts to obtain
a reconciliation and closing statement from the Debtors' estates.  5/6/2010 [Burian] 172:17-25.
Immediately after closing, Michael Fazio from Houlihan impressed upon A&M the need to
resolve these issues.  Fazio Dep. Tr. 35:6-12, 40:20-41:2, 37:21-39:4.  In particular, during this
period, Fazio attempted to obtain a detailed listing of the securities transferred and the market
value of the securities as of the closing date.  Id.  Houlihan had numerous conversations and
meetings with A&M to discuss the Sale Transaction, including the value of the assets transferred
and liabilities assumed, the alleged decline in value of the Schedule A securities by $5 billion
and the estimated cure amounts of $2.25 billion (including Houlihan's request for backup).
Fazio Dep. Tr. at 40:2-41:2; 46:9-20; 59:23-60:16.

86.    On October 8, 2008, the Committee and its advisors met with the Debtors and
their advisors (including A&M) as part of their regularly scheduled, monthly meetings to discuss
a wide array of issues affecting the estates.  5/6/2010 [Burian] 173:18-174:21; 6/21/2010 [Marsal]
8-15, 30:3-6; 6/25/2010 [Despins] 38:18-39:3.  In connection with the meeting, A&M prepared
slides purporting to reflect certain features of the Sale Transaction, stating, among other things,
"$43.1 Billion Repo Assets - Book value per Lehman 'stale' marks; negotiated a $5 billion
reduction."  BCI 131.

87.    The October 8 Presentation was based on a rushed meeting that certain A&M
representatives had with Tonucci and Kirk shortly after closing, from which Fogarty of A&M
emerged as "befuddled."  9/28/10 [Fogarty] 35:22-36:5.  The October 8 Presentation does not

reveal that the Committee or A&M were aware of the $5 billion block discount off of the

Lehman Sellers' books or mark-to-market values for the assets (or that the Committee had

sufficient information at the time to challenge it). Rather, the October 8 Presentation is

consistent with information previously provided to the Committee and A&M that the marks were

"stale" and out of date. Marsal Dep. Tr. at 170:17-171:10; 5/6/2010 [Burian] 176:5-178:1; Id.

181:20-182:4.

88.       As a result of the Sale Transaction, Barclays had control of Lehman's former

information systems, critical employees, institutional knowledge and infrastructure in the post-

closing period. 9/28/10 [Fogarty] 47:15-48:14; 5/6/10 [Burian] 173:10-17, Kruse Dep. Tr.

103:11-104:8, 9/29/10 [Coles] 33:1-14. In connection with the Sale Transaction, the parties

executed the TSA, which was intended to permit the estates post-closing access to these items.

6/21/2010 [Marsal] . However, almost immediately disputes arose between the parties in respect

of the parties obligations under the TSA. Id. 18:25-19:23. The disputes significantly hampered

the estates' ability to obtain information relating to the Sale Transaction or otherwise properly

administer the estates to the point where the estates nearly commenced litigation against

Barclays concerning the TSA. M. 397; 6/21/2010 [Marsal] 19:16-23.

89.       Following the October 8 Presentation, the Committee intensified its existing

efforts to obtain a reconciliation of the Sale Transaction. 5/6/10 [Burian] 177:14-25. See also

Fazio Dep. Tr. 77:13-23. Among those efforts was Milbank's request for a meeting with Weil to

discuss the Sale Transaction, including Houlihan's concerns regarding the schedules. M. 148.

Milbank advised Weil specifically about Houlihan's concerns about being unable to reconcile the

schedules with the $47.4 billion represented in court as the value of the transferred securities. Id.;

6/25/10 [Despins] 41:19-42:3.

21

90.     The request for a meeting was not well received; specifically, the need for such a meeting was questioned since the transaction had been consummated.  M. 148.  Notwithstanding Weil's reluctance, Milbank persisted, sending follow-up emails in late October and November 2008.  M.  371.  Ultimately, an initial exploratory meeting among counsel took place on November 21, 2008.  O'Donnell Dep. Tr. 145:4-146:15 ,151:6-14.

91.     During the October 2008 period, both counsel to the Committee and counsel to LBHI advised Barclays' counsel of the Committee's concerns about, and its investigation into, the Sale Transaction.  6/25/2010 [Despins] 44:14-45:7; O'Donnell Dep. Tr. 154:15-156:6; M. 370.

92.     Neither the October 8 Presentation nor the emails from the financial advisors to the Committee (BCI Ex. 812, 813 and 813) indicates that, nor provides evidence of, the Committee's or its professionals' understanding of the material terms of the consummated transaction, including, without limitation, knowledge of a $5 billion, negotiated block discount off of the Lehman Sellers' assets book value.

93.     In December 2008, the Trustee, JPMorgan and Barclays entered into the December Settlement in connection with the Barclays Repurchase Agreement.  M. 256.

94.     On December 5, 2008, the Trustee filed his Motion Under 11 U.S.C. §§ 105 And 363 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement in the SIPA proceeding ("Settlement Motion").  M. 119.

95.     Various declarations were filed in support of the Settlement Motion, including the Declaration of Shari D. Leventhal of the New York Fed.  M. 119.  The facts set forth in the declarations contradicted the representations provided to the Committee prior to the closing by Seery and Klein.  5/6/10 [Burian] 185:4-7, 186:25-187:2.

96.    On December 19, 2008, the Committee filed its limited objection to the Settlement Motion (the "Committee's Limited Objection"). M. 398. In the Committee's Limited Objection, the Committee described its investigation into the Sale Transaction and the discrepancies between the facts reported in the Settlement Motion and the facts recounted to the Court and the Committee concerning the Sale Transaction. See id. at ¶¶ 16-18. The Committee clearly stated its concerns about the $5 billion issue, i.e., the alleged decline in the market value of the securities transferred, and the Committee's failure to receive a reconciliation confirming the representations made to Committee professionals over the closing weekend.

97.    The Committee requested an adjournment of consideration of the Settlement Motion until a final reconciliation of the Sale Transaction had been provided and the Committee concluded its investigation into the Sale Transaction. Id. at ¶ 19.

98.    At the hearing on the Settlement Motion, counsel for the Committee reiterated its concerns regarding the Sale Transaction and the discrepancies over the values of the securities. M. 262 at 46:16-49:5.

99.    At the hearing in connection with the Settlement Motion, counsel for LBHI recognized that the Committee continued to investigate the Sale Transaction. M. 262 at 32:6-34:21.

100.    At the hearing in connection with the Settlement Motion, counsel for Barclays acknowledged that all parties' rights were preserved with respect to the Sale Transaction and that claims related to the Sale Transaction remained open to challenge. M. 262 at. 39:13-20.

101.    Following the Court's instruction at the December 22, 2008 hearing on the Settlement Motion that the Committee pursue information from Barclays regarding the Sale Transaction on a consensual basis, on December 26, 2008, the Committee sent an informal

23

document request to Barclays and the DTC relating to the Sale Transaction (the "December 26 Request") . M. 371. The December 26 Request asked for the production of, among other things, detailed schedules showing the securities to be transferred (and actually transferred), with their mark-to-market valuations on a security-by-security basis (and supporting documentation) as of three dates in time: September 16, 2008 (the APA), September 19, 2008 (the Sale Hearing), and September 22, 2008 (the closing). Id.

102.    Thereafter, Committee counsel and Houlihan had a teleconference with Barclays' attorneys on January 13, 2009 regarding the Committee's document request and its attempts to obtain a reconciliation of the Sale Transaction. At the conclusion of the call, Barclays did not provide responses to the requests but instead suggested an in-person meeting. 5/6/10 [Burian] 188:19-189:19.

103.    On February 3, 2009, Committee counsel and its financial advisors had an in-person meeting with Barclays' attorneys and representatives to discuss the Sale Transaction. 5/6/10 [Burian] 191:1-4; Fazio Dep. Tr. 79:9-80:16.

104.    At the meeting, Barclays neither provided a reconciliation nor produced documents in response to the December 26 request. The Committee's questions remained unanswered. 8/25/10 [King] 211:24-212:5.

105.    After the February 3, 2009 meeting, the Committee again provided to Barclays' attorneys an informal document request (on February 10, 2009) clarifying the Committee's initial request and adding some additional categories of documents (the "February 10 Request"). M. 372.

106.    As of early March 2009, Barclays still had not responded to either the December 26 Request or the February 10 Request, despite Committee counsel's reminder to Barclays that those requests had been outstanding for some time.  M. 373.

107.    On or about March 20, 2009, Barclays produced documents purportedly responsive to the December 26 Request and the February 10 Request.  The production included thousands of pages of spreadsheets in an unsearchable format.  M. 375; M. 376.  Because the format in which Barclays produced the documents rendered them indecipherable to the Committee, the Committee requested that Barclays change the format in which they were produced.  Barclays initially declined to do so, but after weeks of negotiating, Barclays agreed to produce the spreadsheets in a different electronic format, which Barclays did on or about May 28, 2009.  M. 376.

108.    At no time prior to formal discovery did Barclays provide a final reconciliation or a balance sheet identifying the specific assets transferred, the specific liabilities assumed and their respective mark-to-market valuations on a security by security basis for September 19 (with an explanation of the methods used to arrive at those marks) to the Committee.  Fazio Dep. Tr. 80:2-16, 80:22-81:8.

109.    On May 18, 2009, LBHI moved for an order pursuant to Federal Rule of Bankruptcy Procedure 2004 authorizing discovery concerning transactions related to the Asset Purchase Agreement approved in the Sale Order and the SIPA Sale Order.  M. 124.

110.    On June 5, 2009, the Committee filed a response in support of and joined in the Rule 2004 Motion.  M. 350.

111.    Barclays opposed the Rule 2004 Motion and the Committee's Rule 2004 Joinder.  M. 259; M. 414.

112.    On June 25, 2009, the Bankruptcy Court entered an order granting the Rule 2004 Motion, authorizing LBHI, the Trustee and the Committee to take certain discovery from Barclays. M. 352.

113.    On September 15, 2009, LBHI, the Trustee and the Committee filed motions, pursuant to Federal Rule of Civil Procedure 60 and Federal Rule of Bankruptcy Procedure 9024 or otherwise, for relief from the Sale Order and the SIPA Sale Order.

114.    Shortly thereafter, LBHI, the Trustee and the Committee also each filed an adversary complaint against Barclays asserting claims arising out of or relating to the Sale Transaction.

## CONCLUSIONS OF LAW

1.      Based upon the findings of fact set forth above, and applying the principles set forth in the Committee's Rule 60 Motion and the Committee Reply, as supplemented by the Post-Trial Memorandum in support of the Committee's Rule 60 Motion, after due consideration of the entire record of the Rule 60 Hearing, and based upon the testimony and other documentary evidence submitted at the Rule 60 Hearing, the Court makes the following conclusions of law:

### A.     RULE 60 RELIEF IS WARRANTED WHEN SIGNIFICANT TRANSACTION TERMS WERE NOT DISCLOSED TO BANKRUPTCY COURT

2.      The Committee's Rule 60 Motion is granted for the reasons set forth herein.

3.      The Committee has demonstrated that Barclays failed to make significant disclosures to the Court regarding fundamental provisions of the Sale Transaction regarding value and the bases for the Court's consideration and entry of the Sale Order, including:

- the Sale Transaction was misrepresented to the Lehman Sellers' Board of Directors, the Court and the Committee as (1) a balanced, going-concern transaction (or one that favored the estates), (2) a better alternative than a liquidation, and (3) involving the sale of assets valued using a book or mark-to-market valuation methodology;

- Barclays concealed its insistence on a day-one-gain from the inception of the transaction and wrongly assumed the Court would approve the transaction irrespective of the value of the assets transferred;

- a handful of negotiators agreed to a $5 billion block discount off of the book value of the Lehman Sellers' assets but did not disclose that agreed discount to the Court, the Committee or the attorneys documenting the Sale Transaction or making representations to the Court;

- the parties facilitated the transfer of the $5 billion discount by valuing the securities at a liquidation valuation and terminating the Barclays Repurchase Agreement but never disclosed this fact to the Court;

- operating under the false assumption that the market value of the trading assets had declined, the Lehman Sellers acceded to Barclays' 11th hour demands and threats not to close by transferring (or agreeing to transfer) billions in additional assets to Barclays, including the Clearance Box Assets and the 15c3 Assets, facts that were not disclosed to the Court; and

- the book, or mark-to-market value of the securities transferred was not the $47.4 billion represented to the Court, but was approximately $52 billion; the liabilities associated with the Barclays Repurchase Agreement was not the $45.5 billion represented to the Court, but was $45.0 billion; and Cure and Compensation Liabilities were overstated by at least $1.8 billion.

**B.    BARCLAYS' FORFEITED ITS ENTITLEMENT TO 363(M) AND FINALITY PROTECTIONS**

4.      Barclays' failure to disclose to the Court its day-one gain imperative, the $5 billion discount off of the Purchased Assets' book value, billions in additional assets, the overstatements of liabilities, and other misconduct in procuring the Sale Order deprives Barclays of any entitlement to finality and section 363(m) protections.

**C.    SECTION 363(M) OF BANKRUPTCY CODE DOES NOT APPLY TO MOTIONS FILED PURSUANT TO RULE 60(B)**

5.      Bankruptcy Code Section 363(m) does not preclude the relief requested by the Committee.

6.      The affirmance of the Sale Order on appeal does not preclude the award of Rule 60 relief when the appeal concerned issues not germane to the relief requested in the Committee's Rule 60 Motion.

D.    **MULTIPLE BASES SUPPORT RELIEF UNDER RULE 60(B)**

1.    **COMMITTEE IS ENTITLED TO RULE 60(B)(1) RELIEF AS A RESULT OF MULTIPLE MISTAKES OF FACT**

7.    The circumstances surrounding the Sale Transaction includes a number of factual mistakes warranting relief from the Sale Order under Rule 60(b)(1).

8.    The Sale Transaction was described to the Court and the Committee as a going-concern, balanced exchange (i.e., the value of the financial assets presented in the transaction reflected the Lehman Sellers' book value that roughly equaled the assumed liabilities).

9.    The representation of the Sale Transaction as a balanced exchange was a mistake as the valuation, at all relevant times, included an undisclosed $5 billion negotiated discount from book value.

10.    The evidence presented demonstrates that the Court and the Committee were told that the marked value of the assets (apart from the real estate and data centers) transferred in the Sale Transaction declined from $70 billion to $47.4 billion as a result of market deterioration. The market value of the Purchased Assets was significantly higher than the $47.4 billion disclosed to the Court and the Committee.

11.    The Clarification Letter was described as clarifying certain provisions of the APA concerning the addition of certain subsidiaries.

12.    The Clarification Letter was intended to effect, and did effect, materially amendments to the APA in a manner adverse to the estates.

13.    The Clarification Letter materially altered the Sale Transaction, resulting in the unauthorized transfer of billions of dollars of value to Barclays.

## 2. NEWLY DISCOVERED EVIDENCE PROVIDES A BASIS FOR RULE 60(B)(2) RELIEF

### (a) EVIDENCE WAS NEWLY DISCOVERED

14. The Committee has demonstrated, through the record developed at the trial of the Committee's Rule 60 Motion, new evidence warranting Rule 60(b) relief. Among other things, the following constitutes new evidence warranting relief under Rule 60(b)(2):

> (i)   The existence of Barclays' condition precedent that it realize an immediate, day-one gain on the Sale Transaction was not and could not have been discovered by the Committee prior to the Rule 2004 discovery.

> (ii)   The agreement between and among Barclays and a few Lehman Sellers' negotiators (who would soon transfer to Barclays) that the financial assets transferred to Barclays would be "valued" at $5 billion less than the existing book value of those assets was not and could not have been discovered by the Committee prior to the Rule 2004 discovery.

> (iii)   Barclays' use of the Barclays Repurchase Agreement as the conduit through which the $5 billion embedded discount would be transferred to Barclays was not and could not have been discovered by the Committee prior to the Rule 2004 discovery.

> (iv)   The attribution of liquidation values to the transferred assets was not and could not have been discovered by the Committee prior to the Rule 2004 discovery.

> (v)   The actual liability under the Barclays Repurchase Agreement was $45.0 billion, not $45.5 billion was not and could not have been discovered by the Committee prior to the Rule 2004 discovery.

> (vi)   The Cure and Compensation Liabilities were substantially lower (by approximately $1.8 billion) than the amounts disclosed to the Court was not and could not have been discovered by the Committee prior to the Rule 2004 discovery.

### (b) COMMITTEE WAS JUSTIFIABLY IGNORANT OF NEW EVIDENCE

15. The Committee was justifiably ignorant of this new evidence.

16.     The Committee diligently and promptly sought to discover the new evidence immediately upon its appointment.

### 3.     RULE 60(B)(3) AND RULE 60(B)(6) RELIEF ARE AVAILABLE ALTERNATIVELY AS RESULT OF MISREPRESENTATIONS MADE TO COURT

17.     The numerous misrepresentations made to the Court warrant Rule 60(b)(3) relief.

18.     The presentation of the Sale Transaction to the Court and the Committee as a going-concern, even exchange, where the book value of the assets equaled liabilities or favored the estates was a misrepresentation.

19.     The statements to the Court and the Committee that (i) book or mark-to-market values had declined because of market deterioration to $47.4 billion, (ii) the liabilities associated with the transferred assets was $45.5 billion, and (iii) Cure and Compensation Liabilities totaled not less than $3.5 billion, were each a misrepresentation.

20.     The disclosures to the Court misrepresented the economics of the Sale Transaction and the bases upon which the Court considered and approved the Sale Order.

### E.     COMMITTEE REQUESTED RULE 60 RELIEF ON TIMELY BASIS (RULE 60(C))

21.      The Committee requested Rule 60(b) relief in a timely manner and has satisfied Rule 60(c).

22.     At the time of the Closing, the Committee lacked sufficient information to justify challenging the Sale Transaction, appealing the Sale Order or filing a Rule 60(b) motion.

23.     At all time prior to the filing of the Committee's Rule 60 Motion, the Committee diligently sought information and a reconciliation of the Sale Transaction.

24.     Barclays' limited production of documents to the Committee and its communications with the Committee professionals prior to the commencement of discovery in this matter did little to advance the Committee's understanding of the Sale Transaction or provide the reconciliation the Committee requested.

F.    **NEITHER MANDATE RULE NOR ESTOPPEL OR WAIVER DOCTRINES PROVIDE BARCLAYS WITH VALID DEFENSES TO COMMITTEE'S RULE 60(B) MOTION AND ADVERSARY COMPLAINT**

25.    The Court overrules Barclays objections to the Committee Rule 60 Motion.

26.    The mandate rule does not preclude granting the Committee Rule 60(b) relief.

27.    The Committee did not appeal the Sale Order and was not a party to any appeal regarding the Sale Order.

28.    The District Court Decision does not contain an express mandate that precludes any of the relief requested in the Committee's Rule 60 Motion or Committee's Adversary Complaint.

29.    The Committee is litigating claims in an ongoing bankruptcy case following an unrelated appeal.

30.    It would be inequitable to apply the mandate rule against the Committee because the Committee had no ability to develop a sufficient record to lodge an appeal during the relevant period.

31.    The doctrine of judicial estoppel does not apply to the Committee's Rule 60 Motion because the Committee has taken consistent position during the pendency of the chapter 11 cases and this litigation.

32.    The Committee has consistently taken the position that it lacked sufficient information regarding the Sale Transaction and it was seeking a reconciliation in order to confirm the representations made to it and the Court regarding the Sale Transaction.

33.    The Committee has not waived its rights to the relief sought in the Committee's Rule 60(b) Motion.

34.    The Committee is not estopped from seeking the relief requested in the Committee Rule 60(b) Motion.

### G.    COMMITTEE NEVER CONSENTED TO SALE TRANSACTION

35.    The Committee did not consent to the material changes made to the Sale Transaction from that represented to the Court.

36.    The Committee's rights to challenge the Sale Order were not waived or impaired by the Court's approval of the December Settlement.

### H.    EVEN IF RULE 60 DOES NOT PROVIDE A BASIS FOR RELIEF, COURT RETAINS INHERENT POWER TO MODIFY ITS PRIOR ORDER

37.    Even in the absence of Rule 60(b) relief, relief from the Sale Order is warranted in order to hold Barclays to the terms of the Sale Transaction described to and approved by the Court.

38.    Barclays' inadequate disclosures (i.e., failing to identify a $5 billion discount, inflating liabilities, unilaterally changing valuation standards (from book to liquidation value), insisting on a day-one gain and demanding additional assets and threatening not to close if not received) incurably infected the sale process.

39.    Barclays' recalcitrance in responding to information requests from the Committee and LBHI hid the considerable gains Barclays realized.

40.    Based on the circumstances described herein, the Court will use its inherent power to grant the requested relief from the Sale Order.

### I.    RELIEF REQUESTED IN COMMITTEE'S ADVERSARY COMPLAINT

41.    The Court did not approve either the Clarification Letter or the transactions consummated thereunder pursuant to the Sale Order or any other order of the Bankruptcy Court.

42.    The Court awards judgment in the Committee's favor with respect to Counts I-III of the Committee's Adversary Complaint.