**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

Debtors.

Chapter 11 Case No.
08-13555 (JMP)
(Jointly Administered)

In re

LEHMAN BROTHERS INC.,

Debtor.

Case No. 08-01420 (JMP)

## POST-TRIAL MEMORANDUM OF LAW AND FACT
## OF BARCLAYS CAPITAL INC.

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

November 22, 2010

# TABLE OF CONTENTS

OVERVIEW OF THE STRUCTURE OF BARCLAYS' POST-TRIAL SUBMISSION ..............1

PRELIMINARY STATEMENT ................................................................................2

SUMMARY MEMORANDUM OF LAW AND FACT..............................................10

I.    MOVANTS HAVE FAILED TO PRESENT ANY EVIDENCE THAT JUSTIFIES
      RELIEF UNDER EITHER RULE 60(B) OR THE BANKRUPTCY CODE........................11

      A.   There Is No Basis For Rule 60(B) Relief........................................................11

           1.   Rule 60(b) Relief Cannot Be Granted Because Movants Presented No
                Evidence That Would Have Changed The Outcome Of The Sale Hearing................12

                a.   As A Matter Of Law, Rule 60(b) Relief Cannot Be Granted Unless
                     Movants Have Presented New Evidence That Would Have Changed The
                     Outcome of The Sale Hearing................................................................12

                b.   The Legal Standard Is Whether Movants Have Presented Evidence Of
                     Outcome-Altering Facts That Existed At The Time Of The Sale, But That
                     Were Not Presented To The Court At The Time Of The Sale..............................14

                c.   The Legal Standard Is Whether The New Evidence Would Have Caused
                     This Court To Deny The Sale Motion, Not Whether A *De Novo* Review
                     By A Different Judge Might Have Produced A Different Result...........................15

                d.   Even If It Had Been Presented 25 Months Ago, The Evidence Presented In
                     This Rule 60 Proceeding Would Not Have Changed The Fact That The
                     Barclays Transaction Was Better Than Any Available Alternative, And
                     Was Correctly Approved. ....................................................................18

                     i.    The Evidence At Trial Confirmed That The Sale Transaction Was
                           Better Than A Liquidation And Better Than Any Other Alternative. ............ 19

                     ii.   The Evidence Confirmed That All Parties Acted In Good Faith................... 27

                     iii.  Movants Have Failed To Present Any Evidence That, If Presented In
                           September 2008, Would Have Changed Any Of The Court's Findings
                           Set Forth In The Sale Order. .........................................................32

                     iv.   The Trial Confirmed That The Disclosures Provided In September
                           2008 Satisfied Any Reasonable Disclosure Requirement The Law
                           Could Impose.    .........................................................................37

                     v.    The Trial Proved That Movants' Claims About The Allegedly Flawed
                           Disclosures Are *False*. ...............................................................42

i

vi.   The Trial Proved That Any "Hypothetical Disclosure" Would Have Been Consistent With The Comprehensive Disclosures That Were Made, And Would Have Confirmed The Reasonableness Of The Sale. ........ 50

vii.  Movants Knew The Information They Claim Was Not Disclosed In September 2008, And Chose Not To Raise Any Concern Because *They Knew* It Was Consistent With The Deal Approved By The Court, And *Would Not Change The Outcome.* ................................................................ 59

2.   The Rule 60(b) Claims Must Be Denied For The Independent Reason That Rule 60(b) Does Not Provide A Basis For Modifying The Purchase Agreement. ................................................................................................. 63

  a.   Rule 60(b) Does Not Authorize Affirmative Relief. ............................... 64

  b.   Rule 60(b) Does Not Provide A Basis For Modifying The Parties' Purchase Agreement:  There Must Be A State Law Basis For Doing So. ............. 65

  c.   Movants Have Not Even Alleged, Let Alone Established, A State Law Basis For Reforming The Purchase Agreement ....................................... 66

3.   The Rule 60(b) Claims Must Be Denied Because Movants Have Not Satisfied The Elements Of The Specific Rule 60(b) Provisions They Invoke. ......................... 70

  a.   Movants Have Not Demonstrated A "Mistake" Within The Meaning Of Rule 60(b)(1). ......................................................................................... 71

  b.   Movants Have Not Demonstrated The Existence of "New Evidence" Within The Meaning Of Rule 60(b)(2). ................................................... 72

  c.   Movants Have Not Demonstrated A Misrepresentation Within The Meaning Of Rule 60(b)(3). ...................................................................... 77

  d.   Movants Have Not Demonstrated "Any Other Reason That Justifies Relief" Under Rule 60(b)(6). ................................................................... 78

B.   There Is No Basis For Section 549 Relief. ....................................................................... 79

1.   Section 549 Is Inapplicable Because The Court Approved The Sale Of All Assets In Dispute. ..................................................................................................... 80

  a.   The Court Approved The APA, Which Expressly Provided For The Sale Of All Assets "Used In Connection With The Business" Except Those Expressly Excluded. ............................................................................... 81

  b.   The APA Also Identified Specific Categories Of Assets That Include The Disputed Assets And The Repo Collateral. ........................................... 84

  c. By Its Objective Terms, The Sale Order Approved The Clarification Letter, Which Specifically Identifies The Repo Collateral And Disputed Assets As Purchased Assets...................................................86

  d. Movants Are Barred From Arguing That The Clarification Letter Was Not Approved By The Court......................................................................................88

  e. Even If The Court Did Not "Approve" The Clarification Letter *Per Se*, The Provisions Of The Clarification Letter Are Still Operative Because The Sale Order Allowed The Parties To Make Amendments To The APA.........89

 2. Even If The Transfer Of The Repo Collateral And Disputed Assets Had Not Been Authorized (It Was), Movants Are Now Legally Barred From Seeking The Return Of Assets They Agreed To Transfer.......................................................91

 3. Even If Movants' 549 Claim Were Valid And Not Legally Barred, The Piecemeal Relief Sought By Movants Is Impermissible Because It Would Effectively Impose A New Contract On Barclays That Barclays Never Agreed To. ..................................................................................................................92

C. There Is No Basis For Section 559 Relief. .......................................................94

 1. Movants' Section 559 Claims Require A Modification Of The Sale Order Under Rule 60(b), And Therefore Must Be Denied Because There Is No Basis For Rule 60(b) Relief. ..................................................................................94

 2. Section 559 Cannot Be Used To Modify The Express Terms Of A Written Contract Providing That The Repo Collateral Was To Be Acquired As Purchased Assets...................................................................................................95

 3. Section 559 Was Rendered Moot Because The Parties Expressly Agreed In The Purchase Agreement That Barclays Was Acquiring All Of The Repo Collateral....................................................................................................95

 4. Section 559 Does Not Apply Because The Nature Of The Assets In The Repo Collateral Places It Outside the Scope Of The Statutory Definition Of Repo Collateral....................................................................................................96

 5. Section 559 Does Not Apply Because There Was No "Excess" Collateral. ...............97

 6. Any Possible Section 559 Claim Is Expressly Barred By The Release In The December 2008 Settlement. ..............................................................................99

II. ALL CLAIMS RELATING TO THE REPO COLLATERAL ARE BARRED BY THE RELEASE IN THE COURT-APPROVED DECEMBER 2008 SETTLEMENT..........99

III. EVEN IF RULE 60(B) RELIEF MIGHT OTHERWISE BE AVAILABLE, THE LAW PROTECTS BARCLAYS' RELIANCE UPON THE FINALITY OF THE SALE ORDER AND THE PURCHASE AGREEMENT, AND PRECLUDES THE RELIEF MOVANTS SEEK. ...................................................................104

A. Rule 60(b) Motions Are Disfavored, And Movants Have Not Satisfied Their "Heavy Burden" For Justifying The One-Year Delay In Bringing Their Claims. ..........104

B. Because The Rule 60(b) Motions Challenge A Section 363 Sale Order, Movants Face Additional Legal Obstacles That Bar Their Claims. .................................................106

   1. The Doctrine of Equitable Mootness Bars Movants' Claims. ...................................106

   2. The Principle Of Finality Contained In Section 363(m) Of The Bankruptcy Code Bars Movants' Claims Because They Have Failed To Demonstrate Any Bad Faith. ...................................................................................................108

   3. Even If Movants Had Demonstrated Any Inequitable Conduct (Which They Have Not), The Doctrines of Unclean Hands And *In Pari Delicto* Would Bar Their Claims...........................................................................................109

C. Because The Rule 60(b) Motions Seek To Modify A Sale Order That Was Obtained At The Request Of The Lehman Movants, And Without Objection From The Committee, And That Movants Then Successfully Defended On Appeal, There Are A Series Of Insurmountable Legal Doctrines That Bar Movants' Claims. ..............................................................................................................110

   1. The Mandate Rule Dictates That This Court Lacks Jurisdiction To Alter The Sale Order That Was Affirmed By The District Court. ..............................111

   2. The Doctrine Of Judicial Estoppel Bars Movants' Claims......................................112

   3. The Doctrine of Equitable Estoppel Bars Movants' Claims.....................................114

   4. The Doctrine of Waiver Bars Movants' Claims. ......................................................118

D. The Constitution Prohibits The Relief Movants Seek. ...................................................119

   1. The Constitution Prohibits The Reformation Of The Purchase Agreement Absent An Established State Law Basis For Doing So, And Protects Barclays' Reasonable, Investment-Backed Expectation That The Sale Order And Purchase Agreement Were Final and Binding..........................................................120

   2. The Doctrine of Constitutional Avoidance Holds That The Court Should Avoid Any Interpretation Of Rule 60(b) Or The Bankruptcy Code That Could Arguably Trigger Constitutional Issues. .................................................................121

IV. BARCLAYS IS ENTITLED TO EACH OF THE DISPUTED ASSETS. ..........................121

A.  Barclays Is Entitled To The "Clearance Box Assets.".....................................122

    1.  The Plain Text Of The Purchase Agreement Provides That The Clearance Box Assets Are Purchased Assets. ....................................................................122

    2.  The Trustee's Reliance Upon The DTCC Letter To Override The Plain Text of The Purchase Agreement Contradicts Both The Plain Text Of The Agreements And The Overwhelming Extrinsic Evidence........................................123

    3.  The Trustee Cannot Avoid The Overwhelming Extrinsic Evidence Confirming That Barclays Was Acquiring The Clearance Box Assets.........................................128

    4.  In Addition To Contradicting The Plain Text Of The Agreements And The Extrinsic Evidence, The Trustee's Argument Is Fundamentally Illogical, As Demonstrated By The Evidence At Trial....................................................................129

    5.  An Additional Reason To Reject The Trustee's DTCC Argument Is That, As The Trustee's Representative Admitted At Trial, The Argument Renders A Provision Of The Clarification Letter Superfluous....................................................130

B.  Barclays Is Entitled To The ETD Margin Deposits.........................................................130

    1.  The ETD Margin Deposits Are Purchased Assets Under The Plain Terms Of The Purchase Agreement. ...........................................................................131

    2.  The Overwhelming Weight Of The Extrinsic Evidence Confirms That The ETD Margin Deposits Were Purchased Assets. ..........................................132

    3.  This Court Should Reject Movants' Arguments That Barclays Is Not Entitled To The ETD Margin Deposits. ....................................................................135

        a.  This Court Should Reject Movants' Arguments That The ETD Margin Deposits Were Not Intended To Be Transferred To Barclays.............................135

        b.  This Court Should Reject Movants' Arguments That The SEC Rules Prohibit The Transfer Of A Subset Of The ETD Margin Deposits. ....................144

C.  Barclays Is Entitled To $769 Million In Securities From The Rule 15c3-3 Account, "Or Securities Of Substantially The Same Nature And Value.".......................146

V.  THE COURT SHOULD DISMISS THE COUNTS IN THE ADVERSARY COMPLAINTS FILED BY MOVANTS. ...........................................................................153

CONCLUSION.................................................................................................................154

# TABLE OF AUTHORITIES

**Cases**

*American Tissue, Inc. v. Donaldson Lufkin & Jenrette Securities Corp.*,
    351 F. Supp. 2d 79 (S.D.N.Y. 2004)...................................................................... 34

*Andrulonis v. United States*,
    26 F. 3d 1224 (2d Cir. 1994).................................................................................. 65

*Croce v. Kurnit*,
    737 F.2d 229 (2d Cir. 1984)................................................................................ 124

*Davis v. Musler*,
    713 F.2d 907 (2d Cir. 1983).................................................................................. 13

*Fisher v. Kanas*,
    288 Fed. Appx. 721 (2d Cir. 2008)........................................................................ 81

*Fitzgerald v. Field*,
    No. 98-7574, 1999 WL 177278 (2d Cir. 1999) ..................................................... 13

*In re Allegiance Telecom, Inc.*,
    356 B.R. 93 (Bankr. S.D.N.Y. 2006).................................................................... 132

*In re American Freight Sys.*,
    126 B.R. 800 (D. Kan. 1991)................................................................................ 63

*In re Atravasaada Land and Cattle Co.*,
    388 B.R. 255 (Bankr. S.D. Tex. 2008) ................................................................ 91

*In re BCD Corp.*,
    119 F.3d 852 (10th Cir. 1997) .............................................................................. 63

*In re CCGK Investors*,
    145, B.R. 908 (N.D. Ill. 1992) ........................................................................... 116

*In re Delphi Corp.*,
    No. 05-44481 (RDD), 2009 WL 2482146 (Bankr. S.D.N.Y. 2009)....................... 35

*In re Gerlinger, Inc.*,
    2008 Bankr. LEXIS 4560 (Bankr. N.D. Ohio Aug. 25, 2008) .............................. 91

*In re Kmart Corp.*,
    318 B.R. 409 (Bankr. N.D. Ill. 2004) ................................................................... 91

*In re Lawrence*,
    293 F.2d 615 (2d Cir. 2002)................................................................................ 116

*In re Lionel*,
    722 F.2d at 1063 (2d Cir. 1983) ................................................................................ 18

*In re LWD, Inc.*,
    332 B.R. 543 (Bankr. W.D. Ky. 2006) ..................................................................... 63

*In re Metaldyne Corp.*,
    409 B.R. 661 (Bankr. S.D.N.Y. 2009) .................................................................... 18

*In re Polycel Liquidation Co.*,
    2007 WL 77336 (D. N.J. Jan. 8, 2007) ................................................................... 64

*In re Smith*,
    236 B.R. 91 (Bankr. M.D. Ga. 1999) ...................................................................... 91

*In re Stone*,
    588 F.2d 1316 (10th Cir. 1978) ............................................................................... 14

*In re Sun Valley Products*,
    328 B.R. 147 (Bankr. D.N.D. 2005) ....................................................................... 34

*In re Tri-Cran*,
    98 B.R. 609 (Bankr. D. Mass. 1989) ..................................................................... 110

*In re Wilmington Hospitality*,
    2003 WL 21011689 (Bankr. E.D. Pa. 2003) .......................................................... 65

*International Fidelity Insurance Company v. County of Rockland*,
    98 F. Supp. 2d 400 (S.D.N.Y. 2000) ..................................................................... 136

*Koslowski v. Coughlin*,
    871 F.2d 241 (2d Cir. 1989) .................................................................................... 65

*Lucille v. City of Chicago*,
    No. 95-2109, 1995 WL 606926 (7th Cir. Oct. 31, 1995) ....................................... 65

*Matura v. United States*,
    189 F.R.D. 86 (S.D.N.Y. 1999) .............................................................................. 13

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 72 (2006) ................................................................................................. 82

*Paneccasio v. Unisource Worldwide, Inc.*,
    532 F.3d 101 (2d Cir. 2008) .................................................................................. 124

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002) ................................................................................... 35

*Press v. Chemical Investment Servs. Corp.*,
  166 F.3d 529 (2d Cir. 1999)..................................................... 82

*Taracorp, Inc. v. NL Industries, Inc.*,
  73 F.3d 738 (7th Cir. 1996) ..................................................... 136

*Terry Oilfield Supply Co., Inc. v. American Sec. Bank, N.A.,*
  195 B.R. 66 (S.D. Tex. 1996) ................................................... 70

*Triangle Capital Corp. v. I.M.C. Mgmt. Corp.*,
  127 F.R.D. 444 (D. Mass. 1989)............................................... 14

*United States v. Baus*,
  834 F.2d 1114 (1st Cir. 1987).................................................. 14

*United States v. Int'l Bhd. of Teamsters*,
  247 F.3d 370 (2d Cir. 2001).............................................. 13, 73

## Statutes

11 U.S.C. § 101 (47)(A)(i)......................................................... 97

11 U.S.C. § 363(m)................................................................... 108

11 U.S.C. § 549 ....................................................................... 79

11 U.S.C. § 559................................................................... 94, 98

15 U.S.C. § 78c(a)(41)............................................................. 97

15 U.S.C. § 78j(b) ................................................................... 82

17 C.F.R. § 240.15c3-3(e) .................................................. 85, 147

## Other Authorities

Charles A. Wright, et al., *Federal Practice & Procedure* § 2859 ................................................ 16

Restatement (Second) of Contracts § 154 ........................................................ 68

Securities Exchange Act of 1934, § 10(b) ................................................................ 82

U.S. Const. Amend. V (Due Process Clause and Takings Clause)........................................... 120

## Rules

Fed. R. Civ. P. 60............................................................................ passim

Barclays Capital Inc. ("Barclays") hereby submits its post-trial brief in support of its Opposition to the Rule 60(b) Motions filed by Lehman Brothers Holdings Inc. ("LBHI" or the "Debtor"), the Trustee appointed under the Securities Investor Protection Act ("SIPA") for Lehman Brothers Inc. ("LBI") (the "Trustee"), and the Unsecured Creditors Committee (the "Committee"), and in support of Barclays' Motion To Enforce The Sale Order And Secure Delivery Of All Undelivered Assets.

## OVERVIEW OF THE STRUCTURE OF BARCLAYS' POST-TRIAL SUBMISSION

1.      In light of the voluminous factual record and the numerous legal issues raised by the Rule 60(b) motions, Barclays has structured its submission in the following manner in an effort to assist the Court in reaching and formulating a decision in this case:

2.      Our submission begins with a "Summary Memorandum of Law and Fact" that explains the multiple, independently sufficient reasons why the Court should (a) deny the Rule 60(b) motions, and (b) declare that Barclays is entitled to each of the Disputed Assets.[1]  At the outset, the Summary Memorandum directly addresses the questions raised by the Court at the end of the October 21, 2010, closing arguments.  Where appropriate, we cross reference the legal discussions in the relevant sections of our January 29, 2010 brief ("January Brief") or our April 5, 2010 reply brief ("April Brief"), both of which are adopted and incorporated by reference in this submission.[2]

3.      The Summary Memorandum cites to two detailed addenda.  Addendum 1 contains our proposed "Findings of Fact" ("FOF"), which contains a detailed list of each material fact the record evidence has established.  This Addendum is divided into two subsections:  Subsection A

---

[1]  The term "Disputed Assets" as used in this brief refers to the Clearance Box Assets and the ETD Margin (both as defined in Barclays' January 29, 2010 Opposition brief), and the $769 million in securities referenced in paragraph 8(ii) of the Clarification Letter.  In general, any capitalized terms not defined in this brief have the same meaning given to them in the January Brief and the April Brief.

[2]  The January Brief is Docket Entry 6815; the April Brief is Docket entry 8076.

lists the most important facts that dictate the outcome of this case; Subsection B lists the subsidiary facts that support each fact in Subsection A.

4.     Addendum 2 contains our proposed "Conclusions of Law" ("COL"), which sets out the applicable rules of law, with citations to governing authorities. Where a point of law is unsettled or unclear, we provide summary argument explaining our view of the best interpretation of the governing law.

5.     We also attach three other addenda to this submission. Addendum 3 is a set of definitions of terms used in the brief and the FOF. Addendum 4 is an annotation of the Statement of Facts in our January Brief: it provides cites to the FOF paragraphs that support, and provide record citations to, the evidence that supports each paragraph in the January Brief. Addendum 5 is a set of demonstrative timelines, all of which contain citations to record evidence.

## PRELIMINARY STATEMENT

6.     The protracted trial in this case has demonstrated the following basic truths that require the Rule 60(b) motions to be denied, and Barclays' motion to secure delivery of the Undelivered Assets to be granted:

- The Court's approval of the Sale achieved the benefits to the estate, the creditors, and the public interest that were represented to the Court at the time of the Sale;[3]

- All parties acted in good faith, and there were no conspiracies, fiduciary breaches, or efforts to mislead the Court;[4]

- There is no evidence that, if presented at the time of the Sale, would have changed the outcome of the Sale Motion in any way;[5]

---

[3]   *See* FOF ¶¶ 22-24, 36, 56.

[4]   *See* FOF ¶ 4.

[5]   *See* FOF ¶ 58, 59.

- The parties agreed to the terms of the Purchase Agreement under circumstances of immense uncertainty, particularly with respect to the value of the Purchased Assets and many of the Assumed Liabilities, thereby accepting (as a matter of law) any risk associated with those values being higher or lower than estimated or expected;[6]

- At the time of the Sale, Movants knew the information on which they have based their claims, yet chose not to raise any concern because they knew that information was consistent with the Sale that was approved; they then waited almost a year before raising their claims, which they argue are based on "newly discovered evidence." But the trial showed otherwise: as proven by the documents this Court ordered to be produced from the Committee and the unrebutted testimony of Jim Seery about what he explicitly told the Committee before the Closing, Movants have actively concealed from both the Court and from Barclays their understanding of the facts relating to their claims in order to justify those belated (and baseless) claims;[7]

- Movants' conduct at the time of the Sale and for months after the Sale confirmed that they all understood that Barclays was entitled to the Disputed Assets.[8]

7.    This memorandum outlines for the Court the reasons why the application of the law to the facts in this case requires dismissal of all claims set forth in the Rule 60(b) Motions, and the granting of the relief sought by Barclays with respect to the Disputed Assets. However, before presenting the several independent reasons why Barclays should prevail in this matter, Barclays recounts the general background to this dispute.

* * * * *

8.    Once thought "too big to fail," LBHI filed the largest bankruptcy in history on September 15, 2008, causing the worst financial crisis in half a century to enter a new and more dangerous phase. Lehman's broker-dealer, LBI, was headed for the largest ever SIPC liquidation, and there was widespread concern that the freezing of over a hundred thousand

---

[6] *See* FOF ¶ 1.

[7] *See* FOF ¶¶ 4.4.10.5-4.4.10.9, 64, 65.

[8] *See* FOF ¶¶ 48:102-48:119, 49.18-49.32.

customer accounts and the fire-sale liquidation of LBI's financial assets would trigger a contagion of panic that would wreak havoc on the financial system.

9.     In this uncertain environment, Barclays saw an opportunity to make a strategic acquisition that involved great risk, but also the possibility of great reward.  Shortly after the LBHI filing, the senior management of Lehman and Barclays negotiated a deal in which Barclays would acquire all of the assets used in the LBI broker-dealer and investment banking business, excluding certain specified assets (such as commercial real estate, private equity, and over-the-counter derivatives).  Barclays would offer every LBI employee a job, would accept the transfer of tens of thousands of customer accounts, and would continue to operate the North American investment banking and broker-dealer business — thereby keeping a central player in the world's financial system alive, and avoiding some of the risk of systemic meltdown posed by a SIPC liquidation of the LBI business.

10.    The deal was vigorously supported by SIPC, the SEC, and the Federal Reserve. Those government entities, like the negotiators, knew that the deal had to be approved and consummated with exceptional speed in order to work:  as was widely reported in the press, Lehman was in chaos, its employees were abandoning their positions and ceasing to work, and the markets were panicking;[9] if the Business disintegrated before the Sale closed, then the benefits of the Sale, both to Barclays and to the financial system, would be lost.  For that reason, on September 17, the lawyers representing Lehman and the regulators who supported the Sale asked the Court to schedule an extraordinarily expedited approval hearing on September 19. Two days later, at the public hearing on September 19, the Lehman lawyers and government regulators urged this Court to approve the Sale.

---

[9]  *See e.g.* BCI Ex. 918 (television clip reporting on employees leaving positions and market chaos caused by LBHI bankruptcy filing).

11.     The Court conducted an extensive, eight-hour hearing that began in the late afternoon and lasted past midnight on September 19.  The Court heard testimony from Lehman's lead negotiator, Bart McDade, and its independent financial adviser, Barry Ridings of Lazard, as well as an extensive presentation from Harvey Miller, one the nation's leading bankruptcy lawyers, and his experienced partner Lori Fife.  The Court heard a description of "major changes" in the Sale, of "many moving parts," and of revisions to the Asset Purchase Agreement (APA) that had been filed two days earlier.  Objectors claimed that Barclays was getting too good a deal, and that the Sale could not be approved without a final written contract.

12.     But shortly after midnight, the Court approved the Sale.  Recognizing that it faced an unprecedented emergency unlikely to be repeated, the Court overruled the objections, holding that the expedited approval was an example of the "remarkable flexibility" of the Bankruptcy Code to deal with exceptional circumstances, and that under the exceptional circumstances presented, a sale to Barclays was the best alternative for the estates, their creditors, their employees, and the public interest.  The Court made clear that it would remain available "for as long as it takes" to get a Sale Order agreed upon by all the parties.[10]  Early Saturday morning, the Court entered the Sale Order — an order that had been originally filed by Lehman's lawyers at Weil Gotshal, but was modified to reflect the Court's comments at the Sale Hearing, certain creditor concerns, and the input of Barclays, the Trustee, the OCC, and the DTCC.

13.     That historic Sale Order approved the Purchase Agreement, which it defined to include both the APA and a "letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008 (as same may be subsequently modified or amended or clarified . . . ."  BCI Ex. 16 (Sale Order) at p.1.  While the Court had been told such a

---

[10] BCI Ex. 49 (9/19/08 Tr.) at 243:20-22; *see also id.* at 253:13-25.

Clarification Letter was necessary to document the "major changes" and "many moving parts" necessitated by events, the letter agreement was not finished by the time the Sale Hearing ended, and therefore could not be, and was not, presented to the Court before entry of the Sale Order. However, the Sale Order also provided that the letter agreement could be further amended and finalized "without further approval," as long as the Creditors Committee consented to any post-hearing changes and there were no changes that were materially adverse to the Lehman estates. BCI Ex. 16 (Sale Order) at ¶ 25.

14.     On all of the foregoing, there appears to be no disagreement between Movants and Barclays.  There is also no disagreement that the parties worked over the weekend at the offices of Weil Gotshal to finalize the Clarification Letter, and then executed that letter agreement and closed the Sale on the morning of Monday, September 22, 2008, shortly before the markets opened.  There is also no disagreement that Weil Gotshal filed the Clarification Letter in Court later that day and served it on all parties, and that for the next eleven months all of the parties treated the Clarification Letter as part of the approved Purchase Agreement — citing it in pleadings, enforcing and implementing its terms, and describing it as "binding on the parties."[11]  Finally, it is also beyond any reasonable dispute that the Committee chose not to raise any objection with the Court, either at the time of the Closing or for many months after, and before this proceeding had never informed the Court that it contended that material changes had been made without its consent.

15.     The disagreement in this case arises, most centrally, because Movants claim they did not realize that the Clarification Letter allowed Barclays to acquire assets worth more than assumed liabilities (as recorded on the Barclays balance sheet under IFRS accounting), and have

---

[11] *See generally* FOF ¶¶ 63, 64.

asserted (or at least insinuated) that Barclays conspired with the Lehman executives involved in the Sale negotiations (all but Bart McDade) to create a deal that would secretly deliver an "embedded gain" to Barclays. Thus, Movants make allegations of a "secret discount," of estimated asset values that were "understated," of estimated liability values that were "overstated," and of a transaction that was described to the Court as a "wash" but in fact was secretly designed to be a transfer of net value from the Lehman estates to Barclays.

16. The trial proved that each of these allegations is false. In each case, the evidence showed that Movants' claims are either based upon a gross distortion of the facts, or are directly contradicted by the facts. For example:

- The centerpiece of Movants' case was their contention that the APA's definition of the Long Positions as having a "book value" of approximately $70 billion disguised the alleged fact that the actual Lehman marks on those securities were $5 billion higher – this being their main evidence of a "secret discount." But the trial proved that the actual Lehman marks on the Long Positions — the marks shown on *all documents* as well as on the database that is Lehman's most reliable source for its "marks" or "book values" (GFS) — were *not* $5 billion higher than the APA's estimate, but were actually *less* than $70 billion. *See* FOF ¶¶ 9.1, 9.2, 4.5.6.7-4.5.6.9.

- The trial also proved that the discussions over the accuracy of the Lehman marks were not at all secret, and that the assets which had the biggest valuation problems were the residential mortgage securities, which were *not even included* in the APA's definition of Long Positions, and for which the APA provided no valuation estimate. The trial also proved that the Lehman negotiators (including Bart McDade), Lazard, and Weil Gotshal were all aware of the valuation discussions, both at the beginning of the week and with respect to the Repo Collateral delivered at the end of the week; as both Mr. McDade and Jim Seery testified, they did not believe in either instance that Barclays received a "discount." Rather, as they both testified, Barclays believed in good faith that the fair market value of the illiquid assets it was acquiring was less than the stale Lehman marks: the trial proved that belief was more than reasonable.[12]

- The trial proved that Movants knew the Lehman and BoNY marks on the Repo Collateral, and had the specific CUSIPs in the Repo Collateral, *before the Closing*; they also knew that Barclays believed those marks were higher than the

---

[12] *See* FOF ¶¶ 9.1.2, 24, 9.3, 38.7, 38.8, 4.4, 48.39.

true, realizable value of those illiquid assets. *See* FOF ¶¶ 48.39-48.61. In the Rule 2004 discovery, Movants received information *confirming* that on *its public financial statements, independently audited by PWC,* Barclays valued the assets in the Repo Collateral at amounts far less than the Lehman and BONY marks (at amounts that turned out to roughly consistent with the estimates made at the time of the Sale). *See* FOF ¶¶ 37.2, 53.11, 65.1. Nonetheless, a year after receiving the Lehman and BONY marks, Movants filed their Rule 60(b) Motions based on the patently false claim that the difference between the Lehman and BoNY marks and the Barclays estimates was a "secret $5 billion discount" that was first "revealed" in the Rule 2004 discovery. *See* FOF ¶¶ 48.39-61. They then waited another six months to produce a group of experts who attempted to prove that the value of the CUSIPS in the Repo Collateral, which Movants have had since the Closing, was $5 billion higher than Barclays' independent (and independently audited) valuations. The trial proved that the opinions of Movants' experts were *not credible*, and outright misleading in numerous respects. *See* FOF ¶¶ 53.6, 53.9.4, 53.11.3, 53.12.5, 53.14.3.5-53.14.3.7, 53.17.5, 53.18.3, 53.20.4, 53.21.3, 53.21.4, 54.

- The trial also proved that the estimates Lehman made for the exposure Barclays was assuming for "Comp" and "Cure" obligations were reasonable and made in good faith by Lehman, that there were good reasons for these amounts to exceed certain estimated accruals on LBI's provisional (and inaccurate) balance sheets, and that the "transaction adjustments" made to those accruals were shared openly with Weil Gotshal, Lazard, and Alvarez & Marsal *before* the Sale Hearing (i.e., there was no secret effort to "inflate" the liabilities).[13]

- The trial also proved that it is simply false to equate the fact that Barclays recorded an acquisition gain with the assertion that the Sale transferred net value from Lehman to Barclays: the Barclays acquisition gain was attributable entirely to assets that had value to Barclays, but that would likely have had little or no value to Lehman in a liquidation. Moreover, *all* of the assets Barclays acquired would have been worth less to Lehman in a liquidation, and therefore a gain to Barclays simply does not mean that Lehman transferred value that it otherwise could have kept. Lehman transferred a portfolio of volatile and illiquid assets to Barclays that in a SIPC liquidation would have triggered an enormous loss, and in exchange received $46.54 billion in cash ($45 billion to pay off a liability, so the Sale yielded $1.54 billion, just as the Court was told at the Sale Hearing).[14] The Sale also prevented what LBHI Board member (and current Chairman) Michael Ainslie described at trial as "enormous claims" that would have been brought by LBI customers against LBHI, which guaranteed LBI's debts.[15]

---

[13] *See* FOF ¶¶ 10, 12, 48.62-48.77, 4.4.12.

[14] *See* FOF ¶¶ 24, 5.11, 63.15.4.

[15] FOF ¶ 56.3; *see also* BCI Ex. 529.

- Finally, the trial proved that everyone involved acted in good faith; that the Sale was indeed better than a liquidation for the estates, the creditors, the employees, the customers, the financial markets, and the public; that the Sale was the best and only viable option available at the time; and that the Court was correct to approve it.[16]

17.     Counsel for the Committee in this case has stated that in approving the Sale and the Sale Order under circumstances of immense uncertainty, the Court took a "leap of faith."[17]  It relied upon the parties to act in good faith to finalize the transaction; it relied upon the Committee to ensure that any changes were acceptable; and it relied upon all parties to come back to Court (at any time, as the Court made clear at the Sale Hearing) if there was any issue of serious disagreement.

18.     The trial in this case proved that the Court's faith was not misplaced.  The Barclays and Lehman negotiators all acted in good faith, as did their independent legal and financial advisers, who were involved every step of the way.  The Sale Transaction was not only the best and only deal available, it was also a fair deal — for the estates, for the creditors, and for the public interest.  The Court has previously indicated that by providing a full airing of all the relevant facts, the trial might also further serve the public interest by providing complete transparency regarding all aspects of this historic transaction.  The Court should now make a decision that will again further public policy, while also fulfilling the mandates of law and justice:  the Court should (i) confirm the finality of the Sale Order that was affirmed on appeal, and deny the Rule 60(b) motions in full, and (ii) awards Barclays the Undelivered Assets promised under the plain terms of the Purchase Agreement.

---

[16] *See* FOF ¶¶ 4, 56, 57, 58, 59.

[17]  4/9/10 Tr. at 202:13-17.

## SUMMARY MEMORANDUM OF LAW AND FACT

19.     This summary memorandum outlines the independent reasons why the Court should (a) deny the Rule 60(b) motions, and (b) declare that Barclays is entitled to each of the Disputed Assets.

20.     As appropriate, this summary memorandum cites back to Barclays' January Brief and April Brief.  But it follows a different structure from the January Brief.  Instead of addressing the contractual interpretation issues *before* addressing the Rule 60(b) issues, we address them *after* first explaining why there is no basis for relief under Rule 60(b) or the Bankruptcy Code.  In addition, in an effort to be as responsive as possible to the questions raised by the Court at the October 21 closing argument, our discussion of the Rule 60(b) claims reverses the order of argument used in the January Brief:

- *First*, we explain each of the various reasons why Movants have not satisfied the specific requirements of Rule 60(b) and the various Bankruptcy Code provisions they invoke.  In particular, Movants have not presented any evidence that would have justified a different outcome at the September 2008 Sale Hearing (i.e., that would have justifiably caused the Court to deny approval of the Sale Transaction); they also have not demonstrated any legal or factual basis for reforming or modifying the Purchase Agreement executed on September 22, 2008; and they also have not satisfied the specific elements of the Rule 60(b) and Bankruptcy Code provisions they invoke.  *See* Section I, *infra*.

- *Second*, we explain that the December 2008 Settlement bars *all* Movants from advancing *any* claims relating to the Repo Collateral.  *See* Section II, *infra*.

- *Third*, we explain that, even if there were any conceivable merit to the Rule 60(b) claims (and even if the December Settlement were ignored), a series of different legal bars (such

as the Mandate Rule and estoppel and waiver doctrines) protect the finality of the Sale Order and the Purchase Agreement, and under the circumstances of this case preclude the relief Movants seek.[18] *See* Section III, *infra*.

## I. MOVANTS HAVE FAILED TO PRESENT ANY EVIDENCE THAT JUSTIFIES RELIEF UNDER EITHER RULE 60(B) OR THE BANKRUPTCY CODE.

21.     The evidence presented in the evidentiary hearings in this case has confirmed what Barclays asserted in its January Brief:  the basic elements of Rule 60(b) and the Bankruptcy Code provisions invoked by Movants are not satisfied, and there is no factual basis for the relief Movants request.  *See* January Brief at pp. 232 — 296 (Sections III-V, ¶¶ 521-670).

### A.     There Is No Basis For Rule 60(B) Relief.

22.     There are three independent reasons why Movants have failed to demonstrate any basis for relief under Rule 60(b):  (1) Movants failed to present any evidence at trial that could support a finding that there was any better alternative for the Lehman Estates and creditors than the Sale Transaction, and therefore they have failed to satisfy the legal requirement of showing evidence that would have "changed the outcome" of the September 19, 2008 Sale Hearing (or any hypothetical Sale Hearing held in September 2008); (2) Movants failed to present evidence establishing any basis for modifying the Purchase Agreement, and therefore they have failed to demonstrate a factual basis to justify the relief they seek; and (3) in addition to the foregoing deficiencies, which cut across all of their claims, Movants failed to present evidence sufficient to carry their heavy burden of proof on the specific elements of each of the individual provisions of Rule 60(b) and the Bankruptcy Code that they invoke.

---

[18]  By contrast, the January Brief took the opposite approach, by first explaining why the Mandate Rule, judicial and equitable estoppel, and waiver all precluded the relief sought in the Rule 60(b) Motions, and then demonstrating the deficiencies in those claims under both Rule 60(b) and the Bankruptcy Code.

1.     <u>Rule 60(b) Relief Cannot Be Granted Because Movants Presented No Evidence That Would Have Changed The Outcome Of The Sale Hearing.</u>

23.    As we explained in our January Brief, one independent basis for denying the Motions is that Movants have failed to satisfy the Rule 60(b) legal requirement that they must present evidence that *would have changed the outcome* of the Sale Hearing held in September 2008. *See* January Brief, ¶¶ 559-569. Indeed, Movants did not even attempt to present evidence disputing the two key facts that supported, and continue to support, the correctness of the Court's decision to approve the Sale Transaction: (a) the Sale Transaction was superior to a liquidation of the LBI Business for the estates, the creditors, and the public, and (b) there was no alternative bidder who would have paid greater consideration for the Purchased Assets than the consideration provided by Barclays. For those two simple reasons, Movants cannot (and do not) contend that they have presented any evidence that would even potentially have caused the Court to deny approval of the Sale Transaction.

    a.    <u>As A Matter Of Law, Rule 60(b) Relief Cannot Be Granted Unless Movants Have Presented New Evidence That Would Have Changed The Outcome of The Sale Hearing.</u>

24.    Towards the end of the October 21, 2010 closing argument, the Court noted that its approach to the extraordinary Rule 60(b) motions filed in this case is to ask "what would I do as of 25 months ago if I knew all the facts that were in the record today," and then suggested this "may be a debatable point as it relates to the standard under 60(b) that I should be applying." 10/21/10 Tr. at 248:6-20. Barclays respectfully submits that the point of law is not debatable: Second Circuit cases flatly hold that to obtain any relief under Rule 60(b), Movants must show one or more facts that were in existence as of September 20, 2008, and that would have caused

the Court to deny the relief requested in the Sale Motion (*i.e.*, that would have caused the Court to refuse to approve the Sale). *See* COL ¶¶ 15-10.1.[19]

25.     As demonstrated in our January Brief, our Closing Argument Demonstratives, and our Conclusions of Law submitted with this brief, courts in this circuit and throughout the country have repeatedly held that Rule 60(b) relief may *not* be granted unless the evidence presented "probably would have changed the outcome" of the case. *See* January Brief ¶ 559; Closing Argument Demonstrative Slide 251; COL ¶ 15. This legal standard has been expressly applied to claims brought under Rule 60(b)(1), Rule 60(b)(2), Rule 60(b)(3), and Rule 60(b)(6). *See* COL ¶¶ 15.2. It is not a debatable point.[20]

26.     Moreover, the logic of Rule 60(b) requires that this *must be* the legal standard. Rule 60(b) motions provide the rare and disfavored remedy of upsetting the finality of an existing court order. To grant that relief, there must necessarily be a factual basis that persuades the Court that *it would not have issued the Order in the first place* had the "mistake" or "new evidence" or other basis for Rule 60(b) relief been presented at the time of the original proceeding.[21]

---

[19] Unlike a trial in which there may be multiple claims and multiple different outcomes (e.g., ranging from complete dismissal of all claims to granting all claims and all damages on all claims, to a whole spectrum of potential outcomes in which some claims are granted and some denied, with varying levels of damages imposed), a § 363 sale motion has only a binary result: either it is approved, or it is not approved. Thus, in this context, the requirement that the Rule 60(b) movant must show evidence that would have "changed the outcome" can only mean that the evidence is sufficient to show that the sale motion in question would have been denied, rather than approved. *See* COL ¶¶ 15.4. (In any event, even if all that were required was a showing only that the Sale Order would have been issued with different provisions, Movants have nonetheless failed to satisfy that standard too. *See* Section I(A)(1)(d), *infra*.)

[20] *See generally United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 201) (no relief despite proof of perjury, because result would have been the same); *see also Fitzgerald v. Field*, No. 98-7574, 1999 WL 177278, at *2 (2d Cir. 1999) (affirming rejection of Rule 60(b)(3) relief where the alleged fraud "could not have affected the outcome"); *Matura v. United States*, 189 F.R.D. 86, 89 (S.D.N.Y. 1999) ("Rule 60(b)(1) affords a party relief from a material mistake that changed the outcome of the court's judgment.").

[21] In their initial Rule 60 motions, Movants invoked authorities that suggest that a Rule 60(b) movant need not show that he or she is "likely" to prevail, but instead must simply "make allegations that, if established at trial, would constitute a valid claim or defense." *See e.g.*, LBHI Rule 60 Motion at ¶ 140 (citing *Davis v. Musler*, 713 F.2d 907, 915 (2d Cir. 1983)). These authorities reflect the different standard some courts have applied in deciding whether to

27.     *Movants have never disputed the existence of the legal requirement that Rule 60(b) requires Movants to present evidence showing that the outcome would have been different.* Indeed, in their replies to Barclays' January Brief, Movants said *nothing* in response to the argument that their Rule 60(b) motions should be denied because they failed to present evidence that "would have changed the outcome." *Compare* January Br. at § III(E) *with* Movants' Reply Briefs.[22] Despite never disputing this legal requirement, Movants have made no effort to show how they can satisfy it — for the simple reason that, as explained below, they cannot do so.

b.      The Legal Standard Is Whether Movants Have Presented Evidence Of Outcome-Altering Facts That Existed At The Time Of The Sale, But That Were Not Presented To The Court At The Time Of The Sale.

28.     As the Court itself noted at the closing argument, it would have been impossible for every single fact presented in the protracted trial of this case to have been presented in any real-world Section 363 hearing. *See* 10/21/10 Tr. at 251:10-18. Both as a logical and a legal matter, the Rule 60(b) standard does not require the Court to consider whether *any* fact in the enormous record created in this proceeding might conceivably have changed the outcome. Rather, the law imposes a series of constraints on which facts the Court should consider in

---

deny a Rule 60(b) motion outright (on the papers), or whether to conduct additional evidentiary hearings. *Id.* But that lower standard does not apply where the Rule 60 motion has actually been tried. *See, e.g., Triangle Capital Corp. v. I.M.C. Mgmt. Corp.*, 127 F.R.D. 444, 446 (D. Mass. 1989) (60(b) evidentiary hearing is appropriate where allegations are plausible, but that allegations must be proven by clear and convincing evidence to justify relief); *United States v. Baus*, 834 F.2d 1114, 1123 (1st Cir. 1987) (party seeking relief under 60(b) must plead facts that would entitle him to relief and then prove those facts through evidentiary hearing); *In re Stone*, 588 F.2d 1316, 1319 (10th Cir. 1978) (same). In this case, after more than 35 trial days and 40 fact and expert witnesses, there can be no doubt that (as the Court recognized at the October 21 closing argument) the Court has already conducted *more* of an evidentiary hearing than it ever could have done in the context of approving a § 363 sale. 10/21/10 Tr. at 257:10-21.

[22] Similarly, at the October 21 closing argument, Movants' counsel did not dispute the legal standard: he merely attempted to persuade the Court that applying that legal standard raises too many hypotheticals and imponderables. *See e.g.* 10/21/10 Tr. at 248:21-251:21. But as the Court correctly responded, the question presented is "a little less of a conundrum" because it simply asks whether the Court would still have approved the Sale Transaction had the parties presented the completed Clarification Letter to it (along with as comprehensive a description as could have been possible under the circumstances of the discussions and negotiations that led to the completion of the Clarification Letter). *Id.* at 251:22-253:10.

evaluating whether the Rule 60(b) standard is satisfied: *first*, the fact must be one that was in existence at the time of the Sale, and cannot be one that came into existence only later (such as the subsequent performance of the financial markets, the subsequent profitability of the Business acquired by Barclays, etc.);[23] *second*, given that Movants are seeking to rewrite central provisions of the Sale Order in what amounts to a wholesale challenge to the validity of the Sale Order (*see* COL ¶ 6.5-6.7, 2.18-2.19), the Court should not consider any fact that Movants knew about at the time, and therefore could have presented before the Closing of the Sale, before the time to seek reconsideration, before the deadline for filing an appeal, or before the Mandate issued;[24] *third*, given that Movants seek to rewrite the terms of an express, written contract, the Court should not consider any fact that was *known to be uncertain* at the time of the Sale, and the uncertainty of which was accepted by the parties when they decided to proceed with the Sale on an expedited schedule.[25]  To be clear, Barclays respectfully submits that the Rule 60(b) motions should be denied whether the Court adopts the standard articulated above, or instead decides to consider whether *any facts at all* that are in the record would have altered the outcome.

        c.      <u>The Legal Standard Is Whether The New Evidence Would Have Caused This Court To Deny The Sale Motion, Not Whether A *De Novo* Review By A Different Judge Might Have Produced A Different Result.</u>

29.     At the October 21 closing argument, the Court made a comment that suggested another possible question, which is whether the standard under Rule 60(b) should ask if the evidence presented would have impacted the Judge who actually presided over the original Sale

---

[23] *See* COL ¶ 10 (summarizing prohibitions under both § 363 of the Bankruptcy Code and Rule 60(b) of considering *ex post* information).

[24] *See* COL ¶¶ 2-7.

[25] *See* COL ¶¶ 12.7-12.8.

Hearing, or whether the standard should ask what another judge might have done. *See* 10/21/10 Tr. at 256:13-257:10.

30.     Barclays respectfully submits that the standard should be what the objective record demonstrates the actual fact-finder and decision-maker in the original proceeding would have done if confronted with the evidence presented by the Rule 60(b) proceeding. An inquiry into "would another judge have seen it the same way" involves a speculative judgment about what another judge would have decided based on the record that was presented, and therefore amounts to an inquiry into "judicial mistake" by the initially-presiding judge. As a matter of black-letter law, any such claim is time-barred. *See* COL ¶ 7.4. The law in the Second Circuit is crystal clear: any claim of judicial mistake under Rule 60(b) must be brought before the deadline for filing an appeal. *See* COL ¶ 7.4. Thus, at least for a Rule 60(b) claim filed after the time for filing an appeal, the inquiry should not involve any second-guessing of the initially-presiding judge's decision; rather, it should look solely at whether there is a basis for concluding that the initially-presiding judge would have reached a different outcome if he or she had been presented with the evidence presented in the Rule 60(b) proceeding.

31.     Nevertheless, as Barclays argued during the October 21 closing argument, the standard should also be an objective one, based upon the public statements and findings this Court made in deciding to approve the Sale Transaction. *See e.g.,* 10/21/10 Tr. at 137:22-138:8, 139:3-10. The purpose of Rule 60(b) is not to second-guess prior rulings, or to revisit prior rulings with the benefit of hindsight. *See generally* COL ¶ 22.7-22.11, 23.5; Wright & Miller, 11 *Federal Practice & Procedure*, § 2859 (under Rule 60(b)(2), "the evidence must have been in existence at the time of trial"). Rather, by definition, it is an extraordinary remedy that is granted only when information that was *not* presented in the initial trial is subsequently presented as a

basis, under extremely limited circumstances, for changing the outcome of the prior trial.  COL ¶ 1.1-1.2, 15.

32.    At the Sale Hearing, this Court articulated the objective facts that amply supported its approval of the Sale Transaction.  *See e.g.*, BCI Ex. 49 (9/19/08 Tr.) at 248:8-12 ("**I have to approve this transaction because it's the only available transaction**."); *id.* at 248:25-249:11 ("**Only Barclays has the support of the regulators.  Only Barclays is prepared to close.  Only Barclays can deliver the customer accounts to safe harbors.  And the customer property, which is the principal concern of the SIPC trustee, a case which is also pending before me now, will be best protected by virtue of approving the sale**."); *id.* at 250:5-21 (finding that "**the consequences of not approving a transaction could prove to be truly disastrous**," and that absent approval of the Sale "**The harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable**"); *id.* at 251:6-252:11 ("**I believe that sophisticated negotiations cannot be parsed neatly into the constituent parts because they're integrated and interrelated in the result of give and take**.").

33.    Similarly, the Sale Order this Court approved sets forth twenty-two specific findings which supported the relief granted in the Sale Order.  BCI Ex. 16 (Sale Order) at ¶¶ A-V.  Running throughout these findings are the very same objective facts that the Court publicly articulated at the end of the Sale Hearing.  *See e.g.*, *id.* at ¶ C (finding "Notice" was adequate under the "exigent circumstances" that resulted from "**the wasting nature of the Sellers' assets**"); *id.* at ¶ D (finding the estates would suffer "Irreparable Harm" if the Sale was not approved "**given the wasting nature of the Purchased Assets**"); *id.* at ¶¶ H & I (finding "Sale in Best Interests" of the "estates, their creditors and other parties in interest" and good "Business

Justification" existed "**given the wasting nature of the Purchased Assets**"); *id.* at ¶¶ J & K (finding "Arm's-Length Sale" and "Good Faith Purchaser" based principally on evidence presented by Harvey Miller, Bart McDade and Barry Ridings — all of whom still support the Sale as a good faith transaction and the best available alternative);[26] *id.* at ¶¶ L & M (finding Sale to Barclays the "Highest and Best Offer" because it "**will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative**" and finding "Consideration" was "reasonably equivalent value or fair consideration" as defined in fraudulent conveyance statutes because "**No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Purchased Assets for an amount that would give greater economic value to the Debtors' estates**").

34.     As a matter of law, Movants cannot prevail on their Rule 60(b) Motions because they have failed to present any evidence that disproves these fundamental reasons that the Court published as the objective, factual basis for its approval of the Sale and the Sale Order.

> d.     <u>Even If It Had Been Presented 25 Months Ago, The Evidence Presented In This Rule 60 Proceeding Would Not Have Changed The Fact That The Barclays Transaction Was Better Than Any Available Alternative, And Was Correctly Approved.</u>

35.     The legal standard for approving a sale under § 363 of the Bankruptcy Code is whether there is a "good business reason" — such as where the assets to be sold are declining in value — for the sale. *See generally In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983); COL ¶ 18.1-18.2.  In making this determination, "the Court should not substitute its business judgment for that of the Debtor's." *In re Metaldyne Corp.*, 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009); *see* COL ¶ 18.3.  In the Sale Order, this Court concluded that this § 363 standard had been satisfied. BCI Ex. 16 (Sale Order) at ¶ I.  Movants have never sought to challenge that fundamental

---

[26] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 215:6-216:11 (Court's response to creditor objection of lack of evidence of good faith) *with* FOF ¶¶ 4.1.5, 4.2.2, 4.3.5.

conclusion, and therefore have never even attempted to demonstrate that there is evidence that would have "changed the outcome," as required by Rule 60(b).  *See* COL ¶ 15.

        i.    <u>The Evidence At Trial Confirmed That The Sale Transaction Was Better Than A Liquidation And Better Than Any Other Alternative.</u>

36.      The evidence presented at trial in this case overwhelmingly confirmed four key facts that were presented at the Sale Hearing as the basis for approving the Sale:  (i) the Sale Transaction generated more value for the estates and creditors than could be generated from the sale of the Purchased Assets in an LBI liquidation; (ii) there was no alternative bidder of any kind, and certainly no alternative bidder who would have paid higher consideration for the Purchased Assets acquired by Barclays; (iii) the assets of the Business were rapidly deteriorating in value; and (iv) the Sale Transaction protected customers, preserved jobs, and stabilized the financial markets — and therefore was in "the national interest."  *See* FOF ¶¶ 2, 36.11, 56, 58.7. Those four facts confirm that, for the reasons articulated by the Court at the Sale Hearing, the Section 363 "good business justification" standard was amply satisfied.  *See* COL ¶ 18.1-18.2; FOF ¶¶36.11, 59.19.  Thus, the Court was absolutely correct to approve the Sale, and there has been no evidence presented in this proceeding that could justify a different conclusion.

37.      Indeed, Movants have not disputed those four facts.  In their Rule 60(b) motions and reply briefs, Movants never once contested these four facts, or the bottom line conclusion that there was a "good business reason" for approving the Sale.  In addition, despite hiring eight different experts (two of whom were not presented at trial), Movants never sought to present any expert testimony that contested these central facts.  Thus, the Court should find that these facts are both undisputed and correct, and form the basis for rejecting the Rule 60(b) motions in their entirety.

38.     The record is replete with evidence confirming these four central facts.  *See generally* FOF ¶¶ 2, 36, 56, 58.  At the time of the Sale Hearing, the Court was repeatedly told by the lawyers representing both LBHI and LBI that the Purchased Assets were "wasting," were "fragile," and were losing value as a result of both the market conditions and the LBHI bankruptcy filing.  BCI Ex. 11 (Sale Motion) at ¶¶ 6, 7; BCI Ex. 49 (9/19/08 Tr.) at 102:3-103:11.  Thus, Lehman's lead lawyer, Harvey Miller, correctly called the Business that was being sold a "melting ice cube" that was "already half melted."  BCI Ex. 49 (9/19/08 Tr.) at 244:17-18.  Movants presented *no evidence* to dispute, disprove, undermine, or demonstrate any error whatsoever in these representations made by the lawyers who represented LBHI and LBI at the time of the Sale.

39.     In proffering the testimony of Lehman's lead negotiator Bart McDade, Harvey Miller further emphasized that absent approval of the Sale, "*liabilities in the hundreds of billions of dollars* would be triggered against Lehman Holdings which would in turn deplete the property available to distribution of creditors.  It would adversely affect the debtors other nondebtor subsidiaries to the extent they have any value."  BCI Ex. 49 (9/19/08 Tr.)  at 102:13-18 (emphasis added); *see also id.* at 98:10-12 (the Sale "avoids losses that could total *in the hundreds of billions of dollars*") (emphasis added).  Mr. Miller continued the proffer of Mr. McDade's testimony by stating:  "He would further testify, Your Honor, that *the shock of this transaction not being consummated in the public markets could be immeasurable and could ignite a panic in the financial condition that we now face in the United States.*"  *Id.* at 102:23-103:1 (emphasis added).  Movants presented *no evidence* to dispute, disprove, undermine, or demonstrate any error whatsoever in these representations made by Bart McDade and Harvey Miller.

40. Similarly, the proffered testimony at the Sale Hearing of the independent financial adviser from Lazard, Barry Ridings, emphasized that "there was downward pressure on financial asset prices, and Lehman's inventory positions diminished in value and its liquidity began to contract," that "Lehman's portfolio was particularly vulnerable because it held significant volumes of illiquid residential mortgages and structured credit products," that "the sale of LBI must be immediately consummated or there will be little or nothing to sell," that "these assets have substantially greater value if they are sold as a going concern," and that "[w]ithout Barclays, Lehman would be forced to sell discreet assets for a fraction of the value that will be realized from this transaction." *Id.* at 142:23-25, 143:4-6, 143:17-19, 144:18-19, 144:22-24. Mr. Miller's proffer of Mr. Ridings' testimony also included the following:

> Lehman is selling its North American investment banking and capital markets business. This business focuses on fixed income, equities, trading, advisory services, futures and investment banking. *The costs to Lehman and counterparties, as pending transactions unwind, if this transaction is not approved, will run into the many billions of dollars. Counterparties will be required to liquidate their collateral positions, which may entail a wholesale dumping of the collateral into the marketplace with the attendant erosion of values. The deficiencies that counterparties may incur will result in massive claims against the assets of the Lehman estates.* Ten to twelve thousand employees may not find any employment. *Any failure to consummate may potentially cause a major shock to the financial system.*

*Id.* at 146:1-14 (emphasis added). Again, Movants presented *no evidence* to dispute, disprove, undermine, or demonstrate any error whatsoever in these representations made by Lehman's independent financial adviser at the time of the Sale.

41. The evidence presented at the Sale Hearing also established that Barclays was the only viable bidder for the LBI Business. As Ms. Leventhal of the Federal Reserve Bank of New York told the Court on September 17, 2008, "the sale process was widely reported, and what was also widely reported is that there weren't that many possible bidders. The number is very small. The number that met the requirements in terms of financial capability and regulatory

qualifications — we're not talking twenties, tens even. We're talking one or two." BCI Ex. 48 (9/17/08 Tr.) at 64:24-65:4 (Leventhal). The proffered testimony of Lazard's Barry Ridings confirmed that "[t]here are few potential purchasers for this business because any buyer must meet regulatory requirements, have sufficient capital and have the strategic capability to operate the business from day one," and that "[d]espite tremendous publicity associated with this case, not one firm, other than Barclays, showed up with an interest in the assets as whole." BCI Ex. 49 (9/19/08 Tr.) at 143:20-23, 144:19-22. Mr. Ridings therefore concluded that "Barclays' offer is the highest and best offer for these assets." *Id.* at 145:24-25. Once again, Movants presented *no evidence* to dispute, disprove, undermine, or demonstrate any error whatsoever in these representations made at the time of the Sale.

42.     In sum, Movants presented *no evidence* to contradict in any way the representations made at the time of the Sale which established that Barclays was the only viable bidder, that the Sale Transaction was the best option available, that the Business was a wasting asset, and that the Sale Transaction was superior to a liquidation for the Lehman estates, the Lehman creditors, the Lehman customers, the Lehman employees, and the financial markets and economy in general. *See generally* FOF ¶¶ 2, 56.

43.     Moreover, the evidence presented at trial *overwhelmingly confirmed* the fact that the Sale Transaction was in the best interests of the Lehman estates, their creditors, their employees, their customers, and the public interest. *See generally* FOF ¶¶ 36, 56. Indeed, even though it is not legally appropriate to assess the factual bases for approving the Sale Transaction with the benefit of *ex post* information or hindsight, the evidence confirmed that *even with the benefit of hindsight*, the Barclays Sale was the best available transaction, and better than a liquidation.

44.     For example, Lehman's lead negotiator, Bart McDade, confirmed at trial that none of the allegations in the Rule 60(b) motions changed his fundamental view that the Sale Transaction was the best alternative available to Lehman:

> Q.      Based on everything that you know now, do you believe that the transaction that Lehman did with Barclays was the best transaction that Lehman had available to it at [that] time?
>
> A.      Yes.
>
> Q.      And do you believe that the Barclays transaction that was done by Lehman in September 2008 was better for Lehman, its creditors and everyone else than any alternative that was available?
>
> A.      Yes, I do.

4/26/10 Tr. at 242:23-243:6.

45.     Likewise, Lehman's independent financial adviser, Lazard's Barry Ridings, repeatedly confirmed that, after reviewing the Rule 60(b) motions and the Barclays Acquisition Balance Sheet, it remains his unqualified professional opinion that the Sale Transaction was the highest and best use for the Purchased Assets, and that a liquidation would have been worse for the Lehman estates and creditors, and for the public:

> Q.      You had past experience with Drexel Burnham and the failure of that investment bank; is that correct?
>
> A.      Unfortunately, yes, I was a managing director at Drexel when it also went bankrupt.
>
> Q.      And did your experience there help inform the views that you held on September 19th as you've just described?
>
> A.      Yes.
>
> Q.      Was it possible to calculate the potential losses to Lehman of a liquidation as of September 19th with any certainty?
>
> A.      I don't think you could have done it with certainty because you would have been making assumptions. *But in a*

> *financial meltdown of this magnitude, the prices of*
> *securities would have dropped by enormous amounts.*

> Q.  *And it was your view on September 9th [19th] that a sale to*
> *Barclays was superior to any liquidation by Lehman*?

> A.  *Yes.*

> Q.  Since September 19th, have you learned anything that
> would cause you to change that conclusion?

> A.  No. *I believe today that there was no other alternative;*
> *that that was the best alternative at the time.*

Ridings Dep. Tr. 12:9-13:4 (emphasis added) (objections omitted).

> Q.  So you didn't rely on any precise valuation of assets and
> liabilities when you recommended approval of the sale to
> the court on September 19th?

> A.  Again, my testimony was that it was the highest and best
> alternative that we had, and the alternative was liquidation.
> *I was confident and remain confident that this transaction*
> *was better than a liquidation would have been.*"

Ridings Dep. Tr. at 65:10-15 (emphasis added) (objections omitted).

46.  Likewise, the unrebutted testimony of Jim Seery (as well as that of Alex Kirk and

Bart McDade) confirmed that Lehman's executives believed that the sale of the Repo Collateral

in a true, Drexel-type liquidation scenario, would have yielded vastly less than the $45 billion

repo loan advanced by Barclays.  *See* FOF ¶¶ 24.9, 37.14.

47.  Barclays also presented unrebutted expert testimony from Professor Paul

Pfleiderer confirming that, even viewed with hindsight, the Sale Transaction was the best

available alternative, and was better than a liquidation:

> Indeed, given the market conditions, the significant uncertainty
> regarding asset values (and even asset identity), the reasonable
> perception that any transaction needed to be completed within days
> of the bankruptcy filing, the consequent inability to do more than
> minimal due diligence for a transaction of this size and complexity,
> and the risks inherent in investing tens of billions of dollars in

securities and the financial services industry in the face of some of the worst economic conditions since the Great Depression, *no rational purchaser would have paid more for the assets that Barclays purchased than Barclays did based on what was known and knowable at the time*. That no competing bidders offered to do so was unsurprising at the time, and it continues to be unsurprising now given all the factors discussed above.

BCI Ex. 341 at ¶ 128 (emphasis added).

Furthermore, it is my view that it was reasonable to believe at the time, and is reasonable to conclude today, that the fire-sale which would have ensued absent the Transaction would have been worse for creditors and other interested parties.

BCI Ex. 341 at ¶ 129 (emphasis added).

Basically, we have here a simple situation where there were gains to both parties in the transaction, which is what economists are always looking at, when they look for gains to trade. *Lehman Brothers did better than what it would have done if it would've had a liquidation. There's no doubt in my mind that that's the case with very, very strong probability.* And Lehman Brothers couldn't have done better, the estate could not have done better by selling it to another bidder for more, because there wasn't another bidder.

10/6/10 Tr. at 208:12-20 (emphasis added).

48.     Barclays also presented unrebutted expert testimony from Tony Leitner, an established expert in the field of exchange-traded derivatives, that if Barclays had not acquired the ETD accounts from Lehman, that would have precipitated "the largest liquidation of options positions in the history of the United States."  10/5/10 Tr. at 43:16-44:10 (Leitner).  Mr. Leitner explained that the far-reaching ramifications of this would have been devastating, both for the Lehman estates (which would likely have lost all their ETD Margin Deposits and could well have faced additional liabilities as well), and also for the markets more generally. 10/5/10 Tr. at 42:4-46:5, 46:10-47:18, 48:11-49:10, 49:22-52:13 (Leitner); *see also* FOF ¶¶ 34.10.7-34.10.11.

49.     The record is also replete with evidence that the Sale accomplished the public benefits that were described at the Sale Hearing.  As Harvey Miller testified at trial, "I would say

generally, the transaction did accomplish that in terms of the employees, in terms of the customers of LBI. I think it was of enormous benefit to the nation and to the city. And it accomplished what I think we set out to accomplish. We saved a business that on Monday the 22nd, if the transaction had not closed, would have been catastrophic, with 10,000 people out of work, pandemonium, values lost, an empty building in a real estate market that was crumbling. So I am very proud of what happened." 4/28/10 Tr. 93:23-94:6 (Miller). Similarly, Shari Leventhal of the New York Fed testified that the Sale was important to preserve jobs, protect customers, and stabilize the markets, and that "to the extent that there was a shining light, the sale of the Lehman Brother broker-dealer was certainly something that increased stability and restored some confidence, albeit, you know, very, very bad market, nonetheless." 9/7/10 Tr. at 18:15-18 (Leventhal); *see also id.* at 16:12-17:10 (Leventhal testifying that the Fed supported the Sale because of the employees and customers who were impacted, and the impact on the unstable markets); *id.* at 22:13-15 (Leventhal testifying that she still believes that the Fed's support for the Sale was well-founded).

50. Based on all of the foregoing, the Court should hold that all the evidence confirms the Court's original findings that (i) the Sale Transaction was superior to a liquidation of the Purchased Assets that were sold to Barclays, (ii) there was no alternative bidder of any kind, and certainly no alternative bidder who would have paid higher consideration for the Purchased Assets acquired by Barclays, (iii) the Business was a rapidly wasting asset; and (iv) the Sale provided enormous public benefits to employees, customers, and the financial markets generally. Because those findings fully justified entry of the Sale Order, the Court should hold that Movants have failed to satisfy the legal requirement of presenting any evidence that would have changed the outcome of the Sale Hearing, and should therefore deny the Rule 60(b) motions.

51.     Movants have repeatedly insinuated (falsely and without proof or justification) that there was bad faith in the Sale negotiations, and have even alleged that nine different Lehman executives committed fiduciary breaches.  *See* FOF ¶¶ 4.5.1 – 4.5.2.  The trial overwhelmingly proved that these allegations are baseless and that all parties acted in good faith.

52.     Despite their insinuations, Movants failed to present any evidence of bad faith by any Lehman executive:  they simply accused people of acting in bad faith because they accepted market-standard bonuses that Barclays had to offer in order to keep the Business intact.  *See* FOF ¶¶ 4.1-4.5.  Movants called only two of the executives they unjustly accused of fiduciary breaches, and presented no evidence of any *quid pro quo* or similar foul play.  *See* FOF ¶¶ 4.5, 4.5.3.

53.     To the contrary, Movants admit and assert that the lead Lehman negotiator, Bart McDade, is a person of "integrity" and acted in good faith; and the evidence shows that Mr. McDade agreed to the terms of the Sale, and was fully aware of what Movants claim was a "secret" $5 billion discount, the principal act of bad faith about which they complain.  *See* FOF ¶¶ 4.2.4-4.2.7, 48.48.  Moreover, Mr. McDade testified that he continues to believe, even with the benefit of hindsight and having heard all of Movants' allegations, that the Sale was the best alternative for the Lehman estates and creditors, and better than a liquidation.  *See* FOF ¶¶ 18.2, 18.4; *see also* 4/26/10 Tr. at 242:19-23, 198:13-19 (McDade is supportive of the Sale and knowledgeable of its terms).

54.     If Movants had indeed uncovered any genuine act of bad faith, it is implausible that Lehman's lead negotiator (McDade), lead lawyer (Harvey Miller), independent financial adviser (Barry Ridings), and independent Board member (Michael Ainslie) would testify at trial that they believe everyone acted in good faith, and that they are unaware of any basis for alleging

bad faith or fiduciary breach.  *See* FOF ¶ 4.1.  Even the current CEO of LBHI — Alvarez &

Marsal's Bryan Marsal — testified that he had no basis for accusing anyone of a fiduciary

breach.  *See* FOF ¶ 4.1.4.

55.      In addition, ample affirmative evidence was presented at trial that confirmed the

arm's length and good faith nature of the negotiations.  *See* FOF ¶¶ 4.1-4.4.  To begin with, the

evidence showed that Weil Gotshal was fully informed and involved with respect to *all* aspects

of the transaction.[27]  This directly contradicts Movants' core complaint that "the lawyers didn't

know" and therefore unwittingly provided misleading disclosures.  That is simply not true.  The

Court should credit Harvey Miller's testimony that he and his colleagues *knew* there was a

"persistent theme" in the transaction discussions that Lehman's marks were too high (FOF ¶

48.39); *knew* there was ongoing work all week and all weekend in an effort to determine accurate

valuations in an exceptionally tumultuous market (FOF ¶ 48.39.2); *knew* that Lehman did not

have an accurate balance sheet (FOF ¶ 3.1.1); and knowing all those things, as Mr. Miller

testified plainly and unambiguously at trial, during the Sale Hearing he and Ms. Fife provided a

$47.4 billion valuation estimate as "guidance" for how the values for some of the trading assets

had dramatically fallen, not as a "valuation cap" (FOF ¶ 37.1).  The Court should also credit Mr.

Miller's testimony that because the Sale was a transaction to buy a Business, because Barclays

was acquiring the Purchased Assets "irrespective of their values," and because the Sale Order on

its face approved the not-yet-finalized Clarification Letter, he made a good faith and correct

judgment that he did not need to come back to Court to seek additional approval – and did *not*

make an "egregious mistake."  *See* FOF ¶¶ 5.8, 42.2, 43.4.6.

---

[27] *See generally* ¶ 43; *see e.g.* ¶¶ 4.2.12, 4.5.11.4, 18.1.1, 38.4 – 38.10, 31.21.3, 31.23.3.4, 31.23.4.3, 31.24, 31.25.3,
31.26, 32.9, 42.4, 44.2.14.1-44.2.14.2, 46.6, 67.2.7.

56. Moreover, there are a series of other witnesses who were involved in the Sale negotiations, whose testimony overwhelmingly disproved Movants' accusations and insinuations of bad faith, and whose testimony was unrebutted and should be fully credited by the Court:

- The Court should credit the testimony of Mark Shapiro, who conceived of the § 363 sale as a way to avoid a disastrous liquidation, and who testified that all parties acted transparently and in good faith in negotiating the terms of that § 363 sale. *See* FOF ¶ 4.4.5.1. Mr. Shapiro has never been accused of any fiduciary breach, and his testimony was never rebutted, either on cross examination or through other evidence. *See* FOF ¶ 4.4.5.2.

- The Court should credit the testimony of Steve Berkenfeld, who signed the APA and Clarification Letter for Lehman. *See* FOF ¶ 4.4.6.1. Mr. Berkenfeld's testimony refuted the notion that the "lawyers were kept in the dark," and refuted the notion that the financial schedule he initialed somehow governed the deal. *See* FOF ¶ 4.4.6.2. Mr. Berkenfeld has never been accused of a fiduciary breach, and he did not believe there were any secrets. *See* FOF ¶ 4.4.6.4. Mr. Berkenfeld's testimony was not rebutted, either on cross-examination or through any other evidence.

- The Court should credit the testimony of Jim Seery — an independent party, who is a partner at Sidley & Austin, is affiliated with none of the parties in this case, and gave credible testimony that was never rebutted, either on cross-examination or by any other evidence. Mr. Seery's testimony demonstrates not only the good faith of the Lehman executives, but the *bad faith* of Movants — and in particular of the Committee, who received a full briefing from Mr. Seery regarding the $5 billion valuation difference on the night before the Closing, yet waited a year to allege that this same information constituted a "secret discount." *See* FOF ¶¶ 4.4.10.1-4.4.10.4.[28]

- While they were not involved in negotiating the terms of the Sale, and have had their roles in the transaction grossly distorted, Mr. Lowitt and Mr. Kelly both gave testimony that should be credited by the Court. Mr. Lowitt's testimony proved that the Debtor's "special counsel" failed to asked precise questions in deposition, and built his case upon a false understanding of "book value" — ignoring the fact that Barclays and Lehman had only September 12 marks to review during the Sale negotiations. *See* FOF ¶ 4.5.6.11. Like Mr. Shapiro, Mr. Kelly testified to the extreme uncertainty surrounding the Cure estimate, and his good faith efforts to refine that estimate. *See* FOF ¶ 4.5.11. Movants falsely and unfairly attacked Mr. Kelly's credibility at the closing argument: converting an innocent debate over

---

[28] Mr. Seery was not listed by Movants as an executive who was alleged to have breached his fiduciary duties; Movants attacked his credibility for the first time at the October 21 closing argument — based on no evidence, other than his receipt of a standard market bonus. The Court should reject that unfounded attempt to attack the integrity of a reputable executive and distinguished member of the bankruptcy bar.

semi-legible handwriting into the basis for their implausibly overreaching allegation of a vast conspiracy, involving virtually all senior management at Lehman and Barclays (not to mention their independent auditors, financial advisers, and lawyers — all of whom were either in on the fictional conspiracy or somehow duped by it).  *See* FOF ¶¶ 4.5.9, 67.

- The Court should credit the testimony of Vic Lewkow, who is a senior partner at Cleary Gottlieb, an officer of the Court, and a witness whose testimony was never rebutted, either through cross-examination or otherwise.  *See* FOF ¶ 4.4.7.  Mr. Lewkow testified that the parties acted in good faith, there were no secrets, and there was no effort to mislead the Court or keep information from the Court.  *See* FOF ¶ 4.4.7.1.

- The Court should credit the testimony of Ed Rosen, a senior partner at Cleary Gottlieb and a highly respected expert in SEC regulations and exchange-traded derivatives.  *See* FOF ¶ 4.4.8.  Mr. Rosen testified that his efforts in suggesting language for the Clarification Letter were always to be as clear and precise as possible, and refuted the Trustee's *ex post* attempts to misconstrue the contract.  *See* FOF ¶¶ 4.4.8.1-4.4.8.2, 31.14, 31.15, 31.25.12.

- The Court should credit the testimony of Michael Klein, who is not a Barclays executive, is an independent consultant, and who testified credibly that all parties acted in good faith and that no efforts were made to keep information from the Court.  *See* FOF ¶ 4.4.9.

- The Court should credit the testimony of Patrick Clackson, the Barclays CFO.  *See* FOF ¶ 4.4.16.   Mr. Clackson gave unrebutted testimony explaining that he initially expected to be able to account for some of the Comp liabilities and all of the Cure liabilities on a future income statement, rather than on the Acquisition Balance Sheet.  *See* FOF ¶ 4.4.16.1.  That testimony directly refuted the unjust and false accusation by Movants that internal Barclays emails showed that Barclays "knew" that it was going to spend less than the estimated amounts for Comp and Cure.  FOF ¶ 4.4.16.2.  Mr. Clackson testimony was never rebutted, either on cross examination or through any other fact or expert witness.  FOF ¶ 4.4.16.3.

- The Court should credit the testimony of John Varley, Bob Diamond, Rich Ricci, Archie Cox, and Jonathan Hughes: the senior Barclays executives who, at varying levels of involvement, made the decisions that committed Barclays to this extraordinary transaction.  *See* FOF ¶¶ 4.4.13-4.4.16, 4.4.17-4.4.18.  In the middle of the worst financial crisis in half a century, they made the decision to take significant risks by acquiring the failed LBI Business.  *See* FOF ¶¶ 1.1-1.8.  Their trial testimony proved that they acted in good faith and made no attempt to keep anything secret — least of all their expectation of an acquisition gain on the Barclays Acquisition Balance Sheet, a fact that they *publicly announced* on September 17, 2008, and that was reported in newspapers around the world.  *See* FOF ¶ 4.4.14.1.  Their testimony, and that announcement, belied Movants' false

accusations about a "secret" plan to give Barclays an "embedded gain."  *See* FOF ¶ 4.4.12.

- The Court should credit the testimony of Stephen King, one of Barclays' senior traders responsible for assessing Lehman's trading assets.   Mr. King testified to the pervasive valuation uncertainty that Barclays faced in September 2008, during a period of extreme market turmoil.  Mr. King testified that Lehman's trading assets were exceptionally difficult to value because so many of them were illiquid, including numerous different kinds of structured financial products, collateralized products, and mortgage securities.  His testimony was never contradicted and was corroborated by his contemporaneous documents.  *See* FOF ¶ 4.4.19.

- Finally, the Court should credit the testimony of Gary Romain, the Barclays Head of Technical Accounting who testified that (a) the draft acquisition balance sheets were constantly changing and very uncertain for more than four months after the Closing because the information was incomplete, the accounting was uncertain, and the proper valuation of the illiquid assets was uncertain (*see* FOF ¶¶ 4.4.20, 4.4.20.1), (b) the effort at all times was to prepare an Acquisition Balance Sheet that reflected the fair value of the Purchased Assets as defined under the accounting rules, and there was never any effort to understate that fair in order to "hide" any gain or value (*see* FOF ¶ 4.4.20.2), (c) PWC was actively involved in both the accounting and valuation judgments Barclays made throughout the four month process of creating the Acquisition Balance Sheet (*see* FOF ¶ 4.4.20.3), (d) the Acquisition Balance Sheet reflects only the "consideration" that is recognized under the accounting rules on a balance sheet, and does not reflect all consideration Barclays provided under the Purchase Agreement (*see* FOF ¶ 4.4.20.4), and (e) the Barclays acquisition gain of approximately $4.1 billion was entirely attributable to assets that had value to Barclays as a going concern but that would likely have had little or no value to Lehman in a liquidation of the LBI Business — i.e., intangibles, fixtures, fittings, and the net value in the ETD accounts that in a liquidation would have been seized by clearing corporations and exchanges (*see* FOF ¶ 4.4.20.5).[29]

57.     In sum, the evidence at trial, including in particular the testimony of the witnesses who were involved in the negotiations, overwhelmingly confirmed that the Sale was negotiated at arm's length and in good faith.  *See* FOF ¶ 4.

---

[29]  Barclays respectfully submits that the Court should of course also credit all of Barclays' other witnesses (including especially Ken Raisler, Liz James, and Neal Ullman — each of whom gave testimony that confirmed Barclays' entitlement to the Disputed Assets and disproved the baseless contractual arguments of the Trustee); Barclays highlights the witnesses above as those whose testimony most directly rebuts Movants' allegations of bad faith.  *See generally* FOF ¶¶ 4.4-4.5.

<u>Movants Have Failed To Present Any Evidence That, If Presented In September 2008, Would Have Changed Any Of The Court's Findings Set Forth In The Sale Order.</u>

58.     In addition to the fact that Movants have not even attempted to challenge the two fundamental facts justifying approval of the Sale (it was better than a liquidation, there was no alternative bidder, and there was an imminent risk of an enormous loss of value), Movants have also failed to present any evidence that could disturb *any* of the findings set forth in the Sale Order.  *See* FOF ¶ 58.  There is therefore no basis for finding that *any aspect* of the Sale Order would have been any different had the information presented in this Rule 60(b) proceeding been presented in September 2008.

59.     Indeed, it is worth emphasizing that Movants have never identified any specific findings in the Sale Order that they believed would not have been entered had their allegedly "new evidence" been presented at the time.  Nor have they ever identified what specific modifications they are asking the Court to make to the Sale Order.  Movants' failure to be specific about the relief they seek reflects the fundamental fact that they have *no basis* for asserting that *any* aspect of the Sale Order would have been any different even if the Court had been presented in September 2008 with *all* of the information that has been presented in this Rule 60(b) proceeding.

60.     *First*, there is obviously a series of purely procedural findings in the Sale Order that Movants have not challenged and cannot challenge.  *See* FOF ¶¶ 59.1.1-59.1.2, 59.1.17, 59.1.22 (finding no challenge to Sale Order ¶¶ A, B, Q, and V).

61.     *Second*, Movants have not challenged (and cannot challenge) the finding that there were "exigent circumstances," including the "wasting nature of the Sellers' assets," that necessarily called for shorter notice periods than might be provided under more normal circumstances, required a prompt consummation of the Sale, and supported the finding that a

"reasonable opportunity to object" was given.  *See* BCI Ex. 16 (Sale Order) at ¶¶ A, F, U; FOF

¶¶ 59.1.3, 59.1.6, 59.1.21.  Given the undisputed emergency circumstances, and the undisputed

fact that a liquidation of the Purchased Assets would have been disastrous, Movants also have

not challenged (and cannot challenge) the fact that the estates would have suffered "irreparable

harm" if the Sale was not approved "on an expedited basis."  *See* BCI Ex. 16 (Sale Order) at ¶ D;

FOF ¶ 59.1.4.  Thus, findings C, D, F, and U of the Sale Order cannot and should not be

disturbed.

62.     *Third*, in addition to the procedural finding that there will be a corresponding

order in the LBI SIPC proceeding (not disputed), paragraph E of the Sale Order found that the

DTCC demanded that Barclays cover the liabilities of LBI's accounts at the DTCC, and that

Barclays "agreed to do so upon the terms and conditions specified in the Purchase Agreement, as

amended."  BCI Ex. 16 (Sale Order) at ¶ E.  This finding did nothing more than affirm that

Barclays agreed to satisfy DTCC's concerns in the manner set forth under the plain terms of "the

Purchase Agreement, as amended."  *Id.*  That was exactly what happened, as confirmed by the

evidence presented at trial.  *See* FOF ¶ 59.1.5.

63.     *Fourth*, paragraph G of the Sale Order finds that the Debtors had "full corporate

power and authority to execute the Purchase Agreement."  BCI Ex. 16 (Sale Order) at ¶ G.

While they presented as their first witness the Chairman of the Board of both LBHI and LBI,

Movants have never argued that the Board failed to authorize Lehman management to enter into

the Sale.  To the contrary, their board member witness, Michael Ainslie, admitted that (a) the

Board delegated to Lehman management the details of how to negotiate the terms of the Sale,

and (b) he did not believe any Lehman executives involved in the negotiations had breached their

fiduciary duties.  *See* FOF ¶¶ 59.1.7, 4.1.3.  That testimony, together with the Board Minutes that

clearly demonstrate that the Board authorized Lehman management to negotiate and consummate the Sale, prove that there is no basis for revisiting the finding set forth in paragraph G of the Sale Order.

64.     *Fifth*, as already explained in detail above, Movants have not challenged (and cannot challenge) the fact that a liquidation of the Purchased Assets would have been worse for the estates, and that there was no alternative bidder. *See generally* FOF ¶¶ 59.1.8-59.1.9, 59.1.12; *see* Section I(A)(1)(c)(i), *supra*. Thus, there is no basis for questioning the findings set forth in paragraphs H, I, or L of the Sale Order.

65.     *Sixth*, for the same reasons, Movants presented no evidence that could call into question the findings in paragraph M of the Sale Order related to the fairness of the Consideration Barclays provided (and the corresponding finding in paragraph R that the Sale was not entered into for the purpose of a "Fraudulent Transfer"). It is an established principle of law that the terms "reasonably equivalent value or fair consideration" under the Uniform Fraudulent Conveyance Act and Uniform Fraudulent Transfer Act refer to a standard that considers the "totality of the circumstances," rather than an amount precisely equal to "appraised value." *See* COL ¶ 21. As Judge Lynch has held, "the formula for determining reasonably equivalent value is not a fixed mathematical formula." *American Tissue, Inc. v. Donaldson Lufkin & Jenrette Securities Corp.*, 351 F. Supp. 2d 79, 106 (S.D.N.Y. 2004). Rather, in determining reasonable equivalence, it is critical to consider (a) whether the "financial condition of the business was deteriorating,"[30] and (b) whether any "other persons or entity or group of entities has offered to

---

[30] *In re Sun Valley Products*, 328 B.R. 147, 157 (Bankr. D.N.D. 2005).

purchase the Acquired Assets or the Sale Securities for greater economic value to the Debtors estates."[31]

66.     In this case, the Purchased Assets were "wasting" and no one else was willing to pay more than Barclays (whether as an alternative bidder, or in a liquidation). By definition, then, Barclays paid "reasonably equivalent value or fair consideration" as those terms are defined in paragraph M of the Sale Order. When "sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight." *Peltz v. Hatten,* 279 B.R. 710, 738 (D. Del. 2002). This conclusion is reinforced by the case law holding that payment of 75% of appraised value constitutes "value" and "fair consideration" — a threshold Barclays indisputably satisfied in this case. *Compare* COL ¶ 21.5 *with* FOF ¶¶ 59.1.13, 59.1.18. Thus, there is no basis for questioning the findings in paragraphs M or R of the Sale Order.

67.     *Seventh,* as explained above, Movants failed to present evidence to support their assertion of fiduciary breach or bad faith, and there is therefore no basis for questioning the findings set forth in paragraphs J and K of the Sale Order. *See* Section I(A)(1)(d)(ii), *supra*.

68.     The remaining findings in the Sale Order are not challenged by Movants as erroneous. Instead, they contain uncontroverted facts that do nothing but reinforce the protections and benefits Barclays was *supposed* to be provided under the Sale Order, and that Movants have no basis for seeking to unravel:

- Finding N - "Free and Clear": This finding provides that because Debtors and LBI are the sole and lawful owners of the Purchased Assets, Barclays shall

---

[31] *In re Delphi Corp.*, No. 05-44481 (RDD), 2009 WL 2482146, at *9 (Bankr. S.D.N.Y. 2009).

acquire the Purchased Assets "free and clear" of any liens or "Interests" (as defined in the Sale Order). BCI Ex. 16 (Sale Order) at ¶N. It also provides that this right to obtain assets "free and clear" is subject to the ongoing rights of the Options Clearing Corporation ("OCC") to the margin deposits to be transferred to Barclays under the Sale: "*From and after the Closing Date, all securities, cash, collateral and other property transferred to accounts of the Purchaser at OCC shall be subject to all rights of OCC therein in accordance with the By-Laws and Rules of OCC including, without limitation, the security interests and setoff rights of OCC with respect thereto.*" *Id.* This provision would have been meaningless and unnecessary if the parties were not intending to transfer all of LBI's margin deposits at the OCC to Barclays, and therefore this finding confirms and *provides disclosure* of one of the elements of the transaction about which Movants now complain. Obviously, Movants have no basis for complaining that a finding in the Sale Order should be changed because the fact that it discloses is not to their liking.

- <u>Finding O - "Free and Clear Findings Needed By Purchaser"</u>: This finding made clear to all parties in interest that Barclays "would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors," if the Sale of the Purchased Assets "was not free and clear of all Interests of any kind or nature whatsoever, or if the purchaser would, or in the future could, be liable for any of the Interests." BCI Ex. 16 (Sale Order) at ¶ O. Movants would obviously like to eliminate this finding from the Sale Order, but they have made no effort to contest the accuracy of this finding, and there is no basis for doing so.

- <u>Finding P — "No Liability Findings Needed By Purchaser"</u>: This finding likewise made clear to all parties in interest that Barclays "will not consummate the transactions contemplated by the Purchase Agreement unless Purchase Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of Purchaser or its affiliates, members or shareholders or the Purchased Assets will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or Excluded Liability." BCI Ex. 16 (Sale Order) at ¶ P. Again, Movants would obviously like to eliminate this finding from the Sale Order, but they have made no effort to contest the accuracy of this finding, and there is no basis for doing so.

- <u>Finding S — "No Successor Liability"</u>: Here, the Sale Order finds that the transfer of the Purchased Assets "*shall not result in* (i) the Purchaser having any liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or (ii) *the Purchaser having any liability or responsibility to the Debtors except as is expressly set forth in the Purchase Agreement*." BCI Ex. 16 (Sale Order) at ¶ S (emphasis added). The Rule 60(b) Motions are nothing if not a frontal assault upon this basic finding that was so central to the Sale Transaction; yet Movants presented no evidence that could justify questioning either the accuracy or appropriateness of this finding.

36

- Finding T — "Cure/Adequate Assurance": This finding set forth the precise procedures for challenging the Cure amounts paid by Barclays, and Movants do not contest that those procedures were properly followed. This finding makes no reference to the estimate of potential exposure for all Cure amounts, which was obviously an uncertain amount since the APA provided that Barclays was required to make Cure payments only for those contracts it chose, in its sole discretion, to assume within 60 days of the Closing. BCI Ex. 1 (APA) at § 2.5. Moreover, the evidence confirmed that the Cure estimate was made in good faith, was understood by all parties to be highly uncertain, and was impossible for Barclays to evaluate properly before the Closing. *See* FOF ¶¶ 12.3-12.9, 14.1, 14.2. Movants have therefore presented no evidence that could support any questioning of the accuracy of Finding T.

69. In sum, the evidence presented in this trial does not provide any basis to question or modify any one of the twenty-two different findings set forth in the Sale Order. *See* FOF ¶¶ 59.1.1-59.1.22. Accordingly, the Rule 60(b) motions should be denied.

iv. The Trial Confirmed That The Disclosures Provided In September 2008 Satisfied Any Reasonable Disclosure Requirement The Law Could Impose.

70. Unable to present evidence that would have changed the *outcome* of the Sale Hearing, Movants have repeatedly argued that the disclosures at the Sale Hearing were imperfect and that those imperfections somehow justify the relief they seek (even though those alleged imperfections would not have altered the outcome). As a matter of law, that argument is unavailing: Movants *must* present evidence that would have changed the outcome, or else their motions *must* be denied. *See* Section I(A)(1)(a), *supra*.

71. Nevertheless, even if imperfect disclosures were an independent basis for relief, Movants' claims would have to be denied. While they have built their case around alleged shortcomings in the disclosures made at the Sale Hearing, Movants have consistently failed to acknowledge the fundamental facts that clearly *were disclosed*, and that encompass all of the information they allege was not disclosed. Specifically, as the evidence presented at trial repeatedly confirmed, the APA and the representations at the Sale Hearing properly disclosed the

basic terms of the Sale, the enormous uncertainties over asset and liability valuations, and the

urgent need for immediate approval of the Sale *despite those uncertainties*, as follows:

- <u>The Basic Terms And Economics Of The Sale Were Disclosed As Follows:</u>

  - Barclays was acquiring "all of the assets of Seller and its Subsidiaries used in connection with the Business" with the *only* exception being the expressly identified Excluded Assets;[32]

  - There was no total valuation for all of the Purchased Assets, and there were no valuation estimates of any kind for seventeen of the specifically enumerated Purchased Assets, including financial assets such as "deposits" and 50% of Lehman's "residential mortgage securities";[33]

  - The Consideration Barclays was paying for the Purchased Assets consisted of (a) a definite Cash Amount equal to $250 million plus the appraised value of the buildings, plus (b) a series of Assumed Liabilities for which the APA provided no total valuation;[34]

  - The Consideration was never — not in the Sale Motion, not in the September 17 hearing, not in the September 19 Sale Hearing, not anywhere — described as being a function of or tied to the "book value" of any or all of the Purchased Assets;[35]

  - While the numbers kept changing, it was clear that both under the APA as drafted, and based upon the revised estimates provided in Court at the Sale Hearing, the trading assets being transferred exceeded the value of the trading liabilities by an amount equal to approximately $2 billion plus whatever value could be ascribed to the residential mortgage securities Barclays was acquiring (the riskiest and most difficult to value of the Purchased Assets);[36]

  - The Sale would yield to the Lehman estates the Cash Amount (which was $1.54 billion), in exchange for which Lehman would transfer a financial

---

[32] *See* BCI Ex. 1 (APA) at p.6 (definition of Purchased Assets); *see also* FOF ¶ 5.

[33] BCI Ex. 1 (APA) at pp. 6-8; 4/28/10 Tr. at 94:23-95:11, 106:4-21, 107:22-108:17 (Miller); Miller Dep. Tr. at 50:24-51:6; 4/27/10 Tr. at 28:3-5, 97:3-98:8.(McDade); 6/25/10 Tr. at 84:15-87:25 (Despins); O'Donnell Dep. Tr. at 32:9-14; *see also* FOF ¶¶ 3.1-3.2, 47.

[34] BCI Ex. 1 (APA) at § 3.1 at p. 14; 4/28/10 Tr. at 99:24-101:13 (Miller); 8/31/10 Tr. at18:6-19:8 (Lewkow); *see also* FOF ¶¶ 7.1-7.4.

[35] BCI Ex. 1 (APA) at § 3.1 at p. 14; BCI Exs. 1, 11, 48 (9/17/08 Tr.), BCI Ex. 49 (9/19/08 Tr.); BCI Ex. 5 (Clarification Letter) at § 1(a)(ii); 5/7/10 Tr. at 247:9-20 (Ricci); 4/28/10 Tr. at 99:24-101:13 (Miller); 8/31/10 Tr. at 26:12-27:11, 28:12-20, 98:12-100:19 (Lewkow); 5/3/10 Tr. at 9:18-10:5 (Hughes); 4/26/10 Tr. at 113:13-132:3 (Ainslie); *see also* FOF ¶¶ 7.1-7.4.

[36] BCI Ex. 49 (9/19/08 Tr.) at 46:20-47:7, 49:8-17 (Fife); FOF ¶¶ 8, 37.9.

inventory to Barclays that contained a multi-billion dollar "buffer"; however, as represented by Lehman's chief negotiator Bart McDade, its independent financial adviser Barry Ridings, and its lead lawyer Harvey Miller, any positive value in the Purchased Assets would rapidly dissipate and disappear if the Sale was not consummated, as that would lead to the disintegration of the Business, the loss of employees needed to manage the assets, a contagion of panic in the marketplace, and the dramatic decline in the values of financial assets held by Lehman;[37]

o   Thus, the basic economics of the deal were that Barclays was acquiring the Business on terms that it believed were commercially acceptable to it, and Lehman was avoiding a disastrous liquidation in which any positive value in the Business would be lost, and there was a substantial risk that the value of the assets would drop far below what Barclays was willing to pay and the estate would face massive additional claims.[38]

- The Uncertainties Regarding The Sale Were Disclosed As Follows:

o   The Purchased Assets were "fragile," were "sensitive," would not "stay in place," and were generally falling in value, both because of the markets and because Lehman was "unable to deliver to Barclays the assets that were originally intended under the APA";[39]

o   There had been "major changes" in the transaction and there were "many moving parts" moving at great "velocity," with changes finalized only half an hour before the Sale Hearing began; there was to be a Clarification Letter that would document these changes, and which the Sale Order expressly included within the definition of the Purchase Agreement that Lehman was seeking to have approved; that not-yet-drafted Clarification Letter could not be presented at the Sale Hearing, which caused some creditors to object unsuccessfully that there was no "final" agreement; [40]

o   As with the emergency actions taken by the Government in response to the financial crisis, there was no time for "ordered reports, appraisals, physical inventories, a review of each and every document relating to the transaction"; instead, it "was necessary to protect the greater good and not to lose the forest for the trees"; [41]

---

[37]  BCI Ex. 5 (Clarification Letter) at § 4; FOF ¶¶ 36, 56, 57, 58.

[38]  FOF ¶¶ 18.2-18.4, 56.

[39] BCI Ex. 11 (Sale Motion) at ¶ 17; BCI Ex. 48 (9/17/08 Tr.) at 29:1-15, 30:6-14, 92:25–93:9; BCI Ex. 49 (9/19/08 Tr.) at 92:25-93:9; *see also* FOF ¶ 26.

[40] BCI Ex. 49 (9/19/08 Tr.) at 59:19-25; *see also* FOF ¶ 39.

[41] BCI Ex. 49 (9/19/08 Tr.) at 59:19-25; *see also* FOF ¶ 36.12; *see generally* FOF 36.

- o The trading inventory that on September 16 had been estimated at $70 billion had changed, and now consisted of trading assets estimated on September 19 to be $47.4 billion; neither the residential mortgage securities nor the "deposits" nor over a dozen other Purchased Assets were included in either estimate;[42]

- o The Trustee could "not really tell" what the value would be of the assets that would remain with the LBI estate, or how many customers would remain, but nonetheless strongly supported immediate approval of the Sale;[43]

- o No one could predict with any confidence what would happen if the Sale were not approved, but the overwhelming consensus was that the result would be disaster for the Lehman estates, the creditors, and the public financial markets.[44]

- The Reasons For Approving The Sale On An Emergency Basis Despite All Of The Uncertainties Were Disclosed As Follows:

  - o The Sale Transaction was fundamentally the sale of an ongoing Business, which would preserve approximately 10,000 jobs and provide a solvent broker-dealer for tens of thousands of customers;[45]

  - o Expedited approval of the Sale was in "the national interest" (as evidenced by the strong support of SIPC, the SEC, and the New York Fed);[46]

  - o Despite these uncertainties, Lehman's independent advisers and lead negotiator, supported by SIPC, the SEC, and the New York Fed, all urged that the Sale would be superior to a liquidation for both Lehman estates, their creditors, employees, customers, and the public, and superior to any other alternative because there was no other bidder, and no viable prospect of any other bidder.[47]

72.    Those disclosures provided ample notice to all interested parties of the nature of this extraordinary transaction, and the Court should re-affirm its judgment that they were

---

[42] FOF ¶¶ 9.1, 37.

[43] [43] BCI Ex. 49 (9/19/08 Tr.) at 73:20-74:1 (Caputo), 75:5-12, (Kobak), 76:18-77:3. 78:9-16 (Giddens); *see also* FOF ¶¶ 47.1-47.2, 47.5, 47.7.

[44] FOF ¶¶ 36.3-36.29, 47.

[45] BCI Ex. 49 (9/19/08 Tr.) at 60:9-23, 61:9-13 (Miller), 73:20-74:1 (Caputo), 144:25-145:4 (Ridings Proffer); *see also* FOF ¶¶ 36.3-36.19.

[46] BCI Ex. 49 (9/19/08 Tr.) at 73:20-74:1 (Caputo on behalf of SIPC), 75:6-10 (Kobak), 65:5-11 (Leventhal on behalf of the NY Fed), 65:21-66:1 (Bambach on behalf of the SEC); *see also* FOF ¶¶ 36.19, 36.22-36.33.

[47] FOF ¶¶ 36.15-36.19, 36.22-36.25, 1.9, 2.7-2.8, 2.13-2.17.

complete, proper, reasonable, and appropriate.  *See* FOF ¶¶ 58.1, 58.7, 59.1.3, 61.2, 61.3.  Indeed, in affirming the Sale Order, the District Court rejected the assertion that the disclosures were inadequate to satisfy Due Process.  BCI Ex. 41 at p. 20, n.7.

73.     Neither the Bankruptcy Code nor the case law articulates a precise level of disclosure that is required under a § 363 sale.  Rather, as the Court noted on the night of the Sale Hearing, one of the "remarkable features" of the Bankruptcy Code is that it provides the "flexibility" to deal with emergency circumstances.  *See* BCI Ex. 49 (9/19/08 Tr.) at 248:13-15 (Court).  Contrary to the baseless suggestions of Movants' counsel at the closing argument, Barclays has never suggested that this flexibility is the same thing as an excuse to make incomplete or misleading disclosure.  *See* 10/21/10 Tr. at 14:19-15:14 (Gaffey).  Rather, the Code's flexibility reflects the fact that the only practical, fair, and appropriate standard for disclosure in a § 363 sale is this:  there must be a *good faith* disclosure of the terms of the § 363 sale that provides notice to interested parties that is *reasonable under the circumstances*.  *See* COL ¶ 20.

74.     The Committee has suggested that this case should be remembered as a case in which the Court articulates and enforces the duty of "disclosure," in a decision that will be "cited often."  10/21/10 Tr. at 110:14-19 (Teece).  Barclays respectfully submits that the Court should apply a standard of disclosure that requires good faith and reasonable disclosure under the circumstances, and that preserves the Bankruptcy Code's extraordinary flexibility that made this historic transaction possible.  The Court should hold that that the evidence presented at trial confirmed that this standard was more than satisfied in this case.

75.    In addition to proving that the actual disclosures were reasonable and made in good faith, the trial also proved that Movants' allegations regarding the flaws in the disclosures were *false.*

76.    *First, Movants claim that the asset values disclosed to the Court were* "*understated*"*: the trial proved that claim was <u>false</u>.*  The centerpiece to Movants' case is the assertion that the APA's definition of the Long Positions as having a "book value" of "approximately $70 billion" was understated by $5 billion due to a secretly negotiated "discount."[48]  The trial proved that claim to be utterly false.  The Lehman GFS system and all contemporaneous documents show that the book value for the Long Positions as defined in the APA was actually less than $70 billion; not more.[49]  *See* FOF ¶ 9.1.  Unable to rely on actual data to support their assertion, Movants instead present a distorted picture based on various recollections of a series of different discussions over asset values.  Movants' assertions ignore that:  (a) Bart McDade, Jim Seery, and many other Lehman executives were well aware of these valuation discussions, and specifically described them not as an effort to provide a "discount," but instead as an effort to arrive at fair market value (*see* FOF ¶¶ 9.3, 9.6, 9.7, 38), and (b) these valuation discussions involved not only the APA-defined Long Positions, but also Lehman's residential mortgages, for which the APA did not provide any valuation estimate, and which therefore could not have had their values misrepresented (*see* FOF ¶¶ 3.2, 8.2, 9.1.2, 53).  These

---

[48]  LBHI Br. at ¶5; Committee Br. at ¶¶ 1, 4; LBHI 4/ 910 Argument Materials at p.1; Movants' Argument Materials for 9/10/10 Hearing on Motions to Exclude Experts at p. 7; 4/9/10 Tr. at 13:15-24, 17:20-22, 27:15-22  (Gaffey).

[49]  The only document that Movants suggested contradicted Professor Pfleiderer's analysis on this point was shown to be completely unreliable: it contained an obviously erroneous entry for a $28.2 billion bond from an Argentinian bank.  FOF ¶ 9.1.10.

mortgages were the hardest assets to value, and likely were the most overvalued. *See* FOF ¶¶ 4.4.19.6, 53.20.1.

77.　　Similarly, the trial proved that the estimate of $47.4 billion provided at the Sale Hearing was (a) an estimate of what had become the Long Positions (*i.e.*, the Repo Collateral and Clearance Box Assets), rather than an estimate for *all* Purchased Assets (*see* FOF ¶ 37), (b) a reasonable estimate of the market value of those assets, and not a fire-sale liquidation value *see* FOF ¶ 37.14, (c) an estimate that Harvey Miller testified was "guidance," and that he agreed was not intended to be the "valuation cap" that Movants have unjustifiably tried to impose, *see* 4/28/10 Tr. at 106:22-107:7 (Miller); FOF ¶ 37.1, and (d) an estimate that did not include the residential mortgage securities, which were discussed separately at the Sale Hearing — but which it subsequently turned out were not available to be acquired by Barclays as a separate asset class, but instead were acquired only to the extent included in the Repo Collateral (and therefore Barclays did *not* receive one of the asset classes — which the Court was told had a value of approximately $3 billion — that was described at the Sale Hearing as a separate source of value, over and above the Long Positions).

78.　　*Second, Movants claim that the liability values disclosed to the Court were "overstated":  the trial proved that claim was <u>false</u>*.  The trial proved that Bart McDade, Harvey Miller, Mark Shapiro, and all of the Barclays negotiators understood that when Harvey Miller told the Court that there was an "estimate" of $2 billion for Barclays' "exposure" for compensation liabilities, he was referring to both bonus payments and severance payments, because that was the parties' contracting intent.  *See* FOF ¶¶ 10.2, 10.4.1.  No one involved in the negotiations gave any contrary testimony.[50]  This $2 billion estimate was a reasonable

---

[50]　The fact that a PWC auditor for Barclays who had nothing to do with the negotiations temporarily formed a contrary understanding is both irrelevant and was proven to be based upon a misunderstanding.  *See* FOF ¶ 10.7.

estimate — Barclays actually spent over $1.95 billion on bonus, severance, and related tax payments. *See* FOF ¶ 11. The fact that the Barclays CFO, Patrick Clackson, initially hoped to account for a portion of these compensation payments on Barclays income statement rather than its Acquisition Balance Sheet is irrelevant to the reasonableness of the estimate, and explains the evidence that Movants distorted in an effort to show that Barclays planned to spend less than the full amount. *See* FOF ¶¶ 4.4.16.1-4.4.16.3. The trial made clear that the Barclays Human Resources Department always expected it would cost substantially more than $1.3 billion just to pay the bonuses to all employees, and that the severance payments would require several hundred million dollars more. *See* FOF ¶ 11.1.

79. Similarly, the trial proved that when Harvey Miller told the Court that there was an estimate of "potential exposure" of $1.5 billion for Cure payments, both he and Bart McDade understood — and the APA made clear — that he was disclosing a rough estimate of a highly contingent liability, the actual amount of which could not be determined until Barclays determined which contracts it would assume (in its sole discretion, as provided under Section 2.5 of the APA). *See* FOF ¶¶ 12-13. The evidence also showed that it was exceptionally difficult to determine an accurate Cure estimate, because the estimated accrual for LBI's trade payables was only part of the estimate (contracts with LBHI might service the Business and be assumed as well), and other business and financial trading contracts that contained liabilities would not be included in the estimated accrual for trade payables. *See* FOF ¶¶ 12.4-12.7, 12.9. This inevitable uncertainty surrounding the Cure estimate was admitted by Alvarez & Marsal executive David Coles, who reviewed the Cure estimate at the time of the Sale and became the Lehman CFO shortly thereafter: he has extensive experience in bankruptcy restructurings and sales, and admitted that it would have been a "Herculean task" to come up with a Cure estimate,

that it would be "pretty spectacular" to get the estimate anywhere close to "the real number," and that "it's typical for the actual liability that is settled by a purchaser to be markedly lower" than the amount of any Cure estimate. *See* FOF ¶¶ 12.8.1-12.8.2. Moreover, unrebutted testimony of multiple witnesses proved that Barclays had neither the time nor the information necessary to do a pre-Closing integration analysis to determine how many such contracts they would eventually assume (a task the APA gave Barclays 60 days to complete), and so could not possibly have known before the Closing what its total Cure liability would end up being. *See* FOF ¶ 14.1. The trial also proved that there was considerable uncertainty over the accounting treatment for Cure payments — i.e., whether they would be booked on the income statement (as Barclays CFO Patrick Clackson initially planned) or on the Acquisition Balance Sheet (as PWC ultimately required, in discussions that continued for several weeks after the Closing). *See* FOF ¶ 14.9.5. The trial further proved that initial estimates were made of the Cure amounts that would be needed for the "mission critical" or "Closing Date" contracts, but that did not include the other contracts associated with the Business that Barclays would have 60 days to assess. *See* FOF ¶¶ 14.4-14.6. Again, all of this evidence disproves Movants' claim that Barclays always "knew" that it was going to spend less on Cure than the amount estimated at the Sale Hearing, and that the estimate was therefore flawed and "overstated." *See* FOF ¶ 4.4.17.3.

80. *Third, Movants' claim the Court was told the Sale was a "wash," but that in fact the Sale had been secretly structured to give Barclays an "embedded gain": the trial proved that claim was <u>false</u>.* Harvey Miller, Lehman's lead lawyer, who described the deal to the Court and proffered the testimony of Bart McDade at the Sale Hearing, testified as follows:

> Q.    Did you ever represent to the Court that this deal was going to be a "wash"?
>
> A.    I did not.

> Q. Did you say in words or substance to the Court on the 17th or on the 19th, that assets and liabilities would "be in balance"?
>
> A. Since I didn't view the deal as that kind of a transaction, I'm sure I never said that.

4/28/10 Tr. at 98:24-99:6; (Miller) *see also* FOF ¶ 6.

81. Mr. Miller also testified that he did not see any inconsistency between his disclosures to the Court and the fact that Barclays had *publicly announced* on September 17, 2008, its expectation that the Sale would result in a multi-billion dollar accounting gain. *See* FOF ¶ 18.1.1. He further testified that he did not think Barclays had an obligation to disclose in Court its publicly-announced expectation of an accounting gain, since it is widely understood that bankruptcy purchasers are not involved in non-profit or "eleemosynary" endeavors, an accounting gain "did not really go to the substance of the transaction," and the public announcement was "in the public domain." 4/28/10 Tr. at 105:4-106:3 (Miller); s*ee also* FOF ¶ 18.1.1.

82. Similarly, Lazard's Barry Ridings, Lehman's independent financial adviser who testified at the Sale Hearing that the Sale was superior to a liquidation, testified in this case that (a) he did not believe the deal was structured to be a "wash" (*see* FOF ¶ 6.3.7), and (b) he was not surprised that Barclays had publicly announced its expectation of a multi-billion dollar acquisition gain. *See* FOF ¶ 18.1.

83. The trial also proved that the APA contained neither representations and warranties regarding values nor a post-closing accounting and true-up to ensure a wash (*see* FOF ¶¶ 6.1); that both Lehman Board member Michael Ainslie and current LBHI CEO Bryan Marsal agreed that without such provisions, there was *no way* to provide for the deal to be a "wash" given the enormous uncertainty over asset and liability value (*see* FOF ¶¶ 6.2.4, 6.3.8.6); that the

Court was expressly told at the Sale Hearing that the "upside sharing" provision in the APA, which Ms. Fife loosely referred to as a "true up," had been "eliminated from this transaction" (*see* BCI Ex. 49 (9/19/08 Tr.) at 47:7-10 (Fife); FOF ¶ 48.35); that until late October 2008, the *draft* minutes from the Lehman Board meeting showed that the reference to the deal being "basically" a "wash" defined that in terms of Barclays acquiring $70 billion of assets versus $64 billion of liabilities (BCI Exs. 473, 765, 766, 770, 771, 773, 788, 789; FOF ¶ 6.3.8.2); that Bart McDade never told Barclays that he believed the deal was supposed to be even roughly a "wash" (FOF ¶ 6.3.4); that Mr. McDade agreed there was no "representation" or agreement that the deal would be a wash, but rather that his personal understanding was that the negotiations "ended up" with a "rough" balance between assets and liabilities (*see* 4/27/10 Tr. at 27:2-22 (McDade); FOF ¶ 48.15.1); that Bart McDade never told Harvey Miller about that understanding (*see* FOF ¶ 6.3.4); that Bart McDade agreed that Lehman was selling many assets that were not valued at all, and that were not included in his understanding that the deal would be a "wash" (*see* FOF ¶ 6.3.6); that many assets in the Sale had value to Barclays as a going concern but would likely have little or no value to Lehman in a liquidation (*see* FOF ¶ 54); and that if Barclays had a gain from such assets, it would not be at all inconsistent with Bart McDade's understanding of the Sale (*see* FOF ¶ 54.1).

84.     Finally, the trial proved that Barclays' expected accounting gain was *no secret*: Barclays publicly announced it two days before the Sale Hearing and it was published in press reports around the world.  *See* FOF ¶¶ 9.4.1, 17.3, 48.16.  The trial also showed that because of the enormous risks in the transaction, the immense uncertainty in the markets, and the increased regulatory scrutiny due to the financial crisis, Barclays needed the Sale to generate positive capital on its Acquisition Balance Sheet (*see* FOF ¶¶ 55.3.5-55.3.6); that whether such a gain

was possible depended upon two things that were not possible to know with certainty before the Closing — the valuation of all the assets and liabilities, and the accounting treatment for those assets and liabilities (i.e., which would be accounted for on the Acquisition Balance Sheet and which on a future income statement) (*see* FOF ¶¶ 54.3, 54.5, 56.6.1-56.6.3); that as of the Closing, Barclays was "Scared to death" and "worried" that it would *not* have the acquisition gain it needed and had publicly announced (*see* FOF ¶ 4.4.15.2); and that, ultimately, Barclays was able to announce an acquisition gain that was entirely attributable to assets that had value to Barclays as a going concern but would likely have had little or no value to Lehman in a liquidation. *See* FOF ¶¶ 4.4.20.5, 18.2, 48.29, 54.

85.     *Fourth, Movants claim the Court was never told about the so-called "additional assets": the trial proved that claim was <u>false</u>.* The trial proved that the Court was told that Barclays was acquiring all assets in the Business (as defined in the APA) except those that were specifically excluded, and the Clearance Box Assets, the ETD Margin, and the 15c3-3 were all assets used in that Business, and were not specifically excluded. *See* FOF ¶¶ 5.1, 5.2, 29, 30, 31. Moreover, the trial proved that the Clearance Box Assets were included in the APA's definition of the Long Positions, and hence were disclosed. *See* FOF ¶ 29.5. They were also disclosed because they were included in the $47.4 billion estimate provided at the Sale Hearing. *See* FOF ¶ 37. The trial also proved that the APA specifically referenced "exchange-traded derivatives" and "deposits," and the Sale Order specifically referenced ETD Margin as an asset being transferred to Barclays, and therefore ETD Margin Deposits were specifically disclosed. *See* FOF ¶ 31.1-31.6. The trial also proved that the value of the ETD accounts was not known at the time of Sale Hearing. *See* FOF ¶ 33. The trial also confirmed that the deposits in the 15c3-3 account were "deposits," which were disclosed as a Purchased Asset in the APA. FOF ¶¶ 30.4.1,

30.4.2.  Moreover, the trial showed that in his October 18, 2008, "state of the estate" presentation, Harvey Miller specifically described to the Court how the "700 odd million dollars in securities" from the 15c3-3 account were being transferred to Barclays as part of the Sale.  *See* BCI Ex. 485 (10/16/08 Tr.) at 58:1-13; FOF ¶ 45.3.7.3.

86.       *Fifth, Movants claim that while the Court was told Barclays was acquiring "no cash," it was in fact acquiring billions of dollars in "cash": the trial proved that claim was <u>false</u>*.  The record demonstrates that Mr. Miller told the Court that Barclays was not acquiring any of the "Retained Cash," or the "free cash" (as Mr. Miller described it at trial) that it was promised in the APA.  *See* FOF ¶¶ 31.23.4.6.  The record also demonstrates that the Court was told, through the Sale Order it was asked to approve, that Barclays was acquiring Lehman's ETD Margin at the OCC — whether in the form of cash or other forms of collateral, and subject to the rights of the OCC.  *See* FOF ¶ 31.23.4.7.  The transfer of this cash ETD Margin was further disclosed to Movants (including Weil Gotshal) over the weekend, and expressly agreed to by the Trustee — with no one objecting that it was inconsistent with the disclosures given in Court for almost a full year.  *See* FOF ¶¶ 31.24-31.32, 32.  The remaining cash ETD Margin transferred to Barclays was a mixture of customer and proprietary cash margin located in the accounts of Lehman's futures customers, and some proprietary futures accounts.  *See* FOF ¶ 31.22, 31.23.  The evidence showed that Barclays and Lehman executives *expressly discussed* the transfer of "margin" from both "House and Customer" futures accounts.  *See* FOF ¶ 31.17.  And Harvey Miller's trial testimony demonstrates that there is a distinction between the "free cash" Barclays was not acquiring (and did not acquire), and cash pledged as ETD Margin, and that it was Mr. Miller's understanding that Barclays was acquiring all of the cash ETD Margin Deposits held in Lehman's customer accounts, whether described as customer property or Lehman property,

because "as a general proposition, with the accounts being transferred, everything relating to those accounts was being transferred." 4/28/10 Tr. at 89:12-90:15 (Miller).

vi.     <u>The Trial Proved That Any "Hypothetical Disclosure" Would Have Been Consistent With The Comprehensive Disclosures That Were Made, And Would Have Confirmed The Reasonableness Of The Sale.</u>

87.     Even if the Court were to conclude that there were shortcomings in the disclosures made at the September 19 Sale Hearing, or that the parties should have returned to Court on or before the morning of September 22 to present the Clarification Letter, the evidence at trial showed that any "additional disclosures" that might be hypothesized would simply have confirmed that the Sale was reasonable and was correctly approved.

88.     To demonstrate this, Barclays has formulated a list of "hypothetical disclosures," set forth below, that reflects the facts actually proved at trial, rather than Movants' distortions. Barclays respectfully submits that if this list of hypothetical disclosures had been made either at the Sale Hearing on September 19, or at a hypothetical Sale Hearing on September 22, it would simply have *confirmed* everything else the Court was being told, and would have *reinforced* the Court's conclusion that the Sale was a good faith transaction, was the best available deal, and should be expeditiously approved. (In addition, after each "hypothetical disclosure," Barclays footnotes the evidence demonstrating that the hypothetical disclosure was, in fact, *fully encompassed* within the actual disclosures made in September 2008).

<u>List of Hindsight Hypothetical Disclosures</u>

1.     Barclays has already advanced $45 billion in cash to LBI to replace the New York Fed's repo loan to LBI, and is going to forgive that loan if the Sale is approved. This effectively increases the cash consideration it is paying in this transaction to $46.5 billion. *See* FOF ¶¶ 19, 57.1.1. Especially in light of the terrible financial crisis, no one is willing to pay more than that amount (plus the assumed liabilities) to acquire the

Purchased Assets Barclays is acquiring.  *See* FOF ¶¶ 1.4, 1.5, 2, 57.2-57.4.[51]

2.  The Purchased Assets therefore include the Repo Collateral received from this repo transaction.  Thus far, in connection with the repo transaction, Barclays has received Repo Collateral assets marked by Lehman at $42.9 billion and given "collateral values" by BONY of $43.1 billion, but believed by Barclays to be worth substantially less — approximately $40 billion (or less).  *See* FOF ¶¶ 23, 24.4-24.6.  Under the normal repo market-standard "haircut" schedule and the Master Repurchase Agreement between LBI and Barclays, and consistent with the terms used by the Fed in its repo, Barclays is entitled to receive an additional $7 billion in Repo Collateral; however, Barclays believes this additional available collateral is likely to be illiquid, materially different from the Fed Repo Collateral, and worth significantly less than its marks.  *See* FOF ¶¶ 22.5, 25.[52]

   a.  A significant portion of the assets in the Repo Collateral (more than 50%) are illiquid and difficult to value.  *See* FOF ¶¶ 3.3, 16.2.1, 16.2.2, 24.2, 53.7.[53]

   b.  The Lehman marks are stale, and the BONY marks are in many cases not indicative of market value, especially for the illiquid assets.  Lehman lead negotiator Bart McDade and his Lehman colleagues agree that, because Lehman has not been marking its books in the normal process since the September 15 bankruptcy, and since many of the illiquid assets are extremely difficult to value, Barclays has reason to be concerned about the reliability of the marks.  *See* FOF ¶¶ 9.6, 24.5, 24.3, 16.2.1, 24.2, 38.5-38.8, 48.48.[54]

---

[51] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 63:16-22 (Miller) (disclosing that Barclays had advanced $45.5 billion to LBI to replace the Fed's repo loan and had "received the collateral that Lehman had posted in connection therewith"); *id.* at 64:18-65:4 (explanation by Harvey Miller that Barclays was paying cash consideration of $1.54 billion); *id.* at 143:20-145:25 (proffered testimony of Barry Ridings that Sale was highest and best use and provided more value to estates than a liquidation, and that there were not alternative buyers); *id.* at 93:6-98:12 (proffered testimony of Bart McDade that Sale was best deal available, and would save the Estate potentially "hundreds of billions of dollars" in losses).

[52] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 43:11-20, 46:19-47:4 (disclosing that there were "a lot of moving parts to" and "major changes in" the transaction and that the value of the Long Positions had decreased to $47.4 billion); *id.* at 59:19-25, 92:25-93:9, 109:19-22 (describing "wasting" and "melting" nature of the assets); BCI Ex. 11 (Sale Motion) at ¶¶ 6, 8, 11-13, 24 (describing falling nature of the assets); BCI Ex. 48 (9/17/08 Tr.) at 21:2-5, 29:1-15 (describing "fragile" and "wasting" nature of Purchased Assets, and explaining that they were falling in value as a result of the bankruptcy and the market turmoil).

[53] *Compare*  BCI Ex. 48 (9/17/08 Tr.) at 21:2-5, 29:1-15; BCI Ex. 49 (9/19/08 Tr.) at 59:19-25, 92:25-93:9, 109:19-22 (disclosing that the assets were "fragile" and "wasting," that there had been no time for appraisals of the Purchased Assets, and that there were "many complex securities involved" in the transaction).

[54] *Compare*  BCI Ex. 48 (9/17/08 Tr.) at 21:2-5, 29:1-15; BCI Ex. 49 (9/19/08 Tr.) at 59:19-25, 92:25-93:9, 109:19-22 (disclosing that the assets were "fragile" and "wasting," that there had been no time for appraisals of the Purchased Assets, and that there were "many complex securities involved" in the transaction); *see also* BCI Exs.

c.    As the Committee has been told, Barclays and Lehman have been unable to agree upon a definite value for these Repo Collateral assets, and therefore have simply agreed to treat the Repo Collateral as worth the loan amount:  this reflects the commonsense judgment that the standard repo haircuts accurately reflect the risk that in actually selling those assets in as orderly a fashion as possible, Barclays would most likely receive an amount approximately equal to the amount of the loan (or less).  *See* FOF ¶¶ 4.5.10.7, 38.7, 48.50-48.53.[55]

3.    Barclays is also acquiring "clearance box assets" marked by Lehman at approximately $1.9 billion, but believed by Barclays to be worth less.  These are generally assets that are so illiquid they cannot even be pledged as collateral.  *See* FOF ¶¶ 28, 37.3.[56]

4.    The Repo Collateral that will be transferred to Barclays plus all of the Clearance Box Assets have an estimated value of $47.4 billion.  *See* FOF ¶ 37.[57]

a.    This is an estimate of what these assets are actually likely to be worth to Barclays, assuming it can sell them in an orderly process over time, but the actual value could be higher or lower.  *See* FOF ¶¶ 24.8-24.9, 38.8.[58]

b.    Even if the estimate is perfectly accurate as of now, the actual value will obviously change before Barclays is able to sell those assets, as market conditions change — Barclays bears the risk of any fall in value, and will

---

915-918 (news clip from September 15, 2008 providing example of public disclosure of chaos at Lehman and employees deserting the building).

[55] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 48:8-10, 59:19-23, 63:16-22 (disclosing that the parties were working to finalize the Clarification Letter, that there had been no time for appraisals of the Purchased Assets, and that Barclays had advanced $45.5 billion to LBI to replace the Fed's repo loan and "received the collateral that Lehman had posted in connection therewith"); *see also* 5/4/10 Tr. at 44:5-45:3, 61:12-17, 66:7-24, 76:21-25, 77:3-5, 77:8-10, 79:5-19 (Seery) (testifying as to advising the Committee that Barclays and Lehman could not agree upon the market value of the Repo Collateral and were treating it as approximately $45.5 billion and that Barclays would keep any value in the Repo Collateral that exceeded the loan amount).

[56] *Compare*  BCI Ex. 1 (APA) at pp. 6-7 (defining "Purchased Assets" to include "all of the assets…used in connection with the Business" and including all "Long Positions" in the definition of "Purchased Assets"); BCI Ex. 49 (9/19/08 Tr.) at 46:19-47:4 (disclosing that the estimated value of what had become of the Long Positions had decreased to $47.4 billion); *see also* FOF ¶¶ 7, 37.

[57]  *Compare* BCI Ex. 49 (9/19/08 Tr.) at 47:4-5 (disclosing that the value of what had become of the Long Positions had decreased to $47.4 billion).

[58]  *Compare* 5/4/10 Tr. at 44:5-45:3, 66:7-24, 76:21-25, 77:3-5, 77:8-10, 79:5-19 (Seery) (testifying as to advising the Committee that, while Barclays and Lehman disagreed about the value of the Repo Collateral, they were close enough in their valuations to agree that the market value of the Repo Collateral was approximately $45.5 billion); *see also* BCI Ex. 11 (Sale Motion) (not discussing any values); BCI Ex. 48 (9/17/08 Tr.) (not discussing asset values); BCI Ex. 49 (9/19/08 Tr.) (discussing estimated values without providing any representation about whether the values were accounting vales, book values, liquidation values, appraised values, or simply estimated realizable values).

receive the upside of any increase in value.  *See* FOF ¶¶ 24.8-24.9, 48.46, 48.35.[59]

5.  In connection with its agreement to acquire 72,000 customer accounts, Barclays is also receiving $769 million in securities from LBI's 15c3-3 reserve account, which represents less than half of the assets in that account.  If there is any regulatory obstacle to making that transfer, Lehman has agreed to transfer an equivalent amount from outside of the account.  *See* FOF ¶¶ 1.8.1, 28, 30.3, 45.1, 45.3.[60]

6.  As stated in the APA, Barclays is acquiring LBI's ETD businesses and all assets and deposits — including all ETD Margin Deposits — associated with those businesses.  Some of this ETD Margin is pledged in the form of cash, some in the form of securities.  All of it is encumbered, and thus none of it falls into the category of "free cash" that the court was told Barclays was not to receive in the deal, as Harvey Miller testified.  The amount of any "net value" or "net liability" that might exist in these accounts is extremely uncertain and unknown.  *See* FOF ¶¶ 31.3-31.10, 31.15-31.18, 31.23.4, 32.8, 32.1, 32.9, 32.10, 32.14, 33.[61]  The most that can be said is that:

a.  Barclays is assuming all settlement obligations associated with these ETD accounts, which represents an enormous exposure to future losses (potentially in the billions).  *See* FOF ¶¶ 31.4, 31.6, 34.1, 34.5.[62]

b.  By assuming the ETD accounts, Barclays is protecting customers.  *See* FOF ¶¶ 31.1, 34.10.3, 34.10.11.[63]

---

[59]  *Compare* 5/4/10 Tr. at 61:12-17 (Seery) (testifying as to advising the Committee that Barclays would keep any value in the Repo Collateral that exceeded the loan amount).

[60]  *Compare*  BCI Ex. 1 (APA) at p.6 (generally defining Purchased Assets as all assets used "in connection with the Business"), at p.2 (defining "Business" to include the "capital markets business" including "the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses" and "LBI's business as a futures commission merchant"), and at p.6 (subsection (b) of definition of Purchased Assets identifying "all deposits" including "required capital deposits" that are "associated with the Business" as Purchased Assets, and subsection (d), defining Purchased Assets as including all assets within the definition of "Long Positions", which included all "government securities").

[61]  *Compare*  BCI Ex. 1 (APA) at p.6 (generally defining Purchased Assets as all assets used "in connection with the Business"), at p.2 (defining "Business" to include the "capital markets business" including "the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses" and "LBI's business as a futures commission merchant"), and at p.6 (subsection (b) of definition of Purchased Assets identifying "all deposits" including all "required capital deposits" that are "associated with the Business" as Purchased Assets, and subsection (d), defining Purchased Assets as including all assets within the definition of "Long Positions", which included all "government securities" and all "exchange-traded derivatives"); BCI Ex. 49 (9/19/08 Tr.) at 113:6-7, 113:10-11, 113:14-15, 113:18-19, 114:10-17 (McDade testifying that the ETD-related businesses were being transferred to Barclays); BCI Ex. 16 (Sale Order) at ¶ N (providing that ETD margin deposits, including margin held in the form of cash, that were being transferred to Barclays were still subject to the rights of the OCC).

[62]  *Compare* BCI Ex. 49 (9/19/08 Tr.) at 113:6-7, 113:10-11, 113:14-15, 113:18-19, 114:10-17 (McDade testifying as to the ETD-related businesses being assumed by Barclays).

    c.       The amount of the margin requirements in the ETD accounts has fluctuated wildly in the week leading up to the Closing, reflecting the massive volatility in the markets: for example, in just 3 days during the week of September 15, the margin requirement at the OCC has increased by over $1.2 billion. *See* FOF ¶ 34.6.[64]

    d.       The Trustee has signed two different agreements with the OCC confirming that "all margin deposits," including any cash margin, will be transferred to Barclays as part of Barclays' assumption of responsibility for the accounts. *See* FOF ¶¶ 31.20, 31.23. The OCC has also informed Weil Gotshal, the Trustee, and SIPC that it is planning to transfer LBI's ETD Margin Deposits to Barclays as of the Closing, including approximately $1 billion in cash ETD Margin Deposits. *See* FOF ¶ 31.21. The OCC has made clear that if the Sale does not close promptly, and if Barclays does not agree to assume these accounts, it will liquidate the accounts, which as with the CME liquidation, is likely to trigger losses that will eat through all of the margin deposits and which could potentially create a large liability for the estate. *See* FOF ¶¶ 34.8-34.10.[65]

    e.       The LBI futures accounts for its futures customers contain both customer margin (owned by the customers, who would be transferred to Barclays and would continue to own that margin) and proprietary margin deposited by LBI as a "buffer" to ensure that there would always be sufficient assets to meet any regulatory segregation and secured amount requirements. *See* FOF ¶¶ 31.1, 31.27.1.[66]

    f.       The CFTC specifically approved a "bulk transfer" to Barclays of all of LBI's proprietary and customer futures accounts, BCI Ex. 843, and both the language of that approval order and unrebutted expert testimony confirms that this approval encompassed the transfer of everything in those accounts – *i.e.*, all positions and all margin, whether owned by LBI or owned by customers. *Id.*; 10/5/10 Tr. at 56:11-57:23 (transferring futures accounts "with everything in it" is "what the bulk transfer order is designed to do" and is "[p]recisely" what the CFTC's order in this case did); *see also* FOF ¶¶ 31.12, 31.23.1.3, 31.23.3.5, 31.27.4.

---

[63] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 61:9-13, 72:6-73:8, 79:3-8, 93:20-22, 240:21-22 (explaining that the Sale would benefit Lehman's customers).

[64] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 61:16-19 (describing that the CME had seized and liquidated LBI's ETD accounts, triggering a substantial loss).

[65] These facts were obviously known by, and hence "disclosed to," SIPC and the SIPC Trustee, who did not believe any further disclosure to the Court was needed.

[66] *Compare* BCI Ex. 1 (APA) at pp. 2, 6-7 (defining "Purchased Assets" to include "all of the assets" that were "used in connection with the Business," including specifically all "required capital deposits" that were "associated with the Business," and defining "Business" to include specifically "LBI's business as a futures commission merchant").

g.    Barclays may have some positive net value in these various ETD accounts, or may have a net liability to deposit more margin in these accounts right away, or in short order. In this market, and under these circumstances, it is simply not possible to know that or predict how that will work out. *See* FOF ¶¶ 34, 48.96-48.101.[67]

h.    If Barclays does not acquire the Lehman ETD accounts, any possible net value in those accounts will not be available to the estates, because the clearinghouses have already started seizing and closing out the accounts, triggering losses to Lehman. They will continue to do so if there is no Sale to Barclays. *See* FOF ¶¶ 34.10, 34.8.1.[68]

7.    The $2 billion estimate for Barclays Compensation obligations is intended to cover both the 2008 bonus payments Barclays is required to pay, and the severance payments Barclays is required to pay for any Transferred Employees terminated before December 31, 2008. *See* FOF ¶ 10.[69]

8.    The estimate of Barclays Cure payment obligations is very rough, and only a "guesstimate" of the maximum exposure Barclays faces: the final liability could be anywhere from zero to $1.5 billion. *See* FOF ¶¶ 12.3, 12.5-12.9.[70]

9.    As is clear from all the disclosures that have been made, the values of the assets and liabilities being transferred to Barclays are highly uncertain. *See* FOF ¶¶ 3, 47.[71] The agreement does not contain any representations

---

[67] *Compare* BCI Ex. 1 (APA) at p.6, § 2.3(i) (defining "Purchased Assets" to include the "Long Positions," and defining "Assumed Liabilities" to include "Short Positions"); *and* BCI Ex. 49 (9/19/08 Tr.) at 43:11-20, 46:19-25, 59:11-25, 92:25-93:5, 96:20-97:2, 102:23-103:1, 142:13-22, 251:22-252:2 (describing market turmoil and uncertainty, "emergency" circumstances, "many moving parts," no time for "ordered reports, appraisals,"); BCI Ex. 11 (Sale Motion) at ¶ 17 (describing "fragile," "sensitive" "vulnerable" nature of Purchased Assets); BCI Ex. 48 (9/17/08 Tr.) at 29:1-15 (noting that the Purchased Assets will not "stay in place").

[68] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 61:16-19 (disclosing that the CME had auctioned off the Lehman proprietary ETD positions traded there, resulting in a $1.6 billion loss to the estate); *id.* at 239:19-21 (noting that the "administration is finished" absent the Sale); *id.* at 244:17-24 (noting that absent the Sale, "there will be very little to distribute to creditors, if anything.").

[69] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 99:22-25 (disclosing that Barclays would be assuming "exposure for the employees" that was "estimated to have a value of approximately — an exposure of approximately two billion dollars"); *id.* at 101:23-102:2 (disclosing that "thousands" of LBI employees would be "entitled to substantial benefits from Barclays in the form of compensation, bonuses and severance payments that are based upon the employee's prior performance while with Lehman").

[70] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 100:1-4 (disclosing that Barclays had a $1.5 billion "potential exposure" for cure amounts "relating to contracts and leases"); BCI Ex. 11 (Sale Motion) at ¶ 14 (providing that Barclays "shall have the right, but not the obligation, to take assignment of contracts and leases which are designated for assumption and assignment by Purchaser"); BCI Ex. 1 (APA) at § 2.5 (providing that Barclays did not have the obligation to pay any cure amounts unless it chose, in its sole discretion, to assume a Related Contract within 60 days of the Closing).

[71] *Compare* BCI Ex. 11 (Sale Motion) at ¶ 17 (noting the "fragile and highly vulnerable nature of the Purchased Assets"); BCI Ex. 48 (9/17/08 Tr.) at 29:10-12 (noting the "wasting" nature of the assets); BCI Ex. 49 (9/19/08 Tr.)

or warranties as to those values, and there are no guarantees to Barclays as to what those values may be. *See* FOF ¶¶ 6.1, 6.2, 58.4.[72]  What is clear about the valuations is this:

a.      The financial assets will be worth much less to Lehman in a liquidation of LBI than in this Sale, because the Business will disintegrate, there will be no traders left to manage the assets, and the panic and losses in markets generally will be even greater than has been seen thus far — in other words, all of the trading inventory being sold will be worth substantially less than $46.5 billion if not sold to Barclays, *see* FOF ¶¶ 55.1, 56, 18.2, 18.4;[73]

b.      Any potential net value in the ETD accounts will be unavailable to Lehman in a liquidation, because the exchanges and clearinghouses will seize the accounts and sell off the assets in a fire sale as CME did, eating through any ETD Margin and potentially creating additional claims against the estate, *see* FOF ¶¶ 34.10, 34.8.1;[74]

c.      There are many assets that are being transferred to Barclays for which no valuation estimates have been given because while they may have significant value to Barclays, they will likely have little or no value to Lehman in a liquidation (this includes intangibles such as customer lists and software, as well as fixtures and fittings, and the ETD accounts).  *See* FOF ¶¶ 4.5.20.5, 18.2, 55.[75]

---

at 92:25-93:2 (disclosing that the value of Lehman's business has "rapidly deteriorated"); *id.* at 99-100 (providing only "estimates" of "potential exposure" for Cure and Comp obligations); BCI Ex. 48 (9/17/08 Tr.) at 29:1-15 (referring to Purchased Assets that will not "stay in place").

[72] *Compare*  BCI Ex. 1 (APA) at pp. 6-8, § 2.3 (providing no representations or warranties as to the value of the Purchased Assets or Assumed Liabilities, or any estimates for most of the Purchased Assets or Assumed Liabilities).

[73] *Compare* BCI Ex. 48 (9/17/08 Tr.) at 29:1-15 (Harvey Miller arguing that "[t]he consensus among all of the business people, Your Honor, and the professionals was there would be nothing to sell in two weeks.  This is really and truly a wasting asset"), 31:2-9 (Harvey Miller stating that "this is such a perishable asset that if we don't take this action, due process — nothing will matter"); BCI Ex. 49 (9/19/08 Tr.) at 98:10-12 (Bart McDade's proffer that the Sale "saves the jobs of thousands of employees and avoids losses that could total in the hundreds of billions of dollars"), 144:18-145:4 (Barry Ridings' proffer that the assets have "substantially greater value if they are sold as a going concern . . . .  Without Barclays, Lehman would be forced to sell discreet assets for a fraction of the value that will be realized from this transaction").

[74] *Compare* BCI Ex. 49 (9/19/08 Tr.). at 61:16-19, 239:16-21 (disclosing that the CME had auctioned off the Lehman proprietary ETD positions traded there, resulting in a $1.6 billion loss to the estate).

[75] *Compare*  BCI Ex. 1 (APA) at pp. 6-8 (definition of "Purchased Assets" that lists seventeen different categories of Purchased Assets with no valuation estimates, including "intangibles," trading systems, "books and records," "furniture and equipment"); BCI Ex. 49 (9/19/08 Tr.) at 239:19-21 (noting that the "administration is finished" absent the Sale), 244:17-24 (noting that absent the Sale, "there will be very little to distribute to creditors, if anything"); *id.* at 61:16-19, 239:16-21 (disclosing that the CME had auctioned off the Lehman proprietary ETD positions traded there, resulting in a $1.6 billion loss to the estate).

10.     All of the foregoing is consistent with, and a narrowing of, the terms of the APA filed on September 17, and is now being written out (or has just been written out) in a Clarification Letter, that can either be approved prospectively now or brought into Court for formal approval once it is executed.[76]

    a.     The Clarification Letter actually narrows and provides more precision to the definition of Purchased Assets by spelling out the foregoing, and providing that Barclays does not acquire assets of any subsidiaries other than LBI and does not acquire any government securities or mortgage-related securities except as contained in the specifically defined categories of Purchased Assets that are identified in the Clarification Letter (the Repo Collateral, the Clearance Box Assets, the ETDs and ETD Margin Deposits, and the $769 million in Rule 15c3-3 securities (or securities of equivalent value). *See* BCI Ex. 5 (Clarification Letter) at ¶¶ 1(a), 1(d).[77]

    b.     It also provides that the $45 billion cash advance is being forgiven, and that no other "Short Positions" are being assumed with respect to the trading inventory Barclays is acquiring — except for the ETDs, where Barclays is acquiring both long and short positions (assets and liabilities).[78]

11.     This Sale was negotiated at arm's length, with Barclays and Lehman trying to satisfy goals that were different, but entirely consistent with one another:[79]

    a.     From Lehman's perspective, the critical goal has been to make sure the deal yields more value than would be received in a liquidation of LBI (or from any other bidder, had there been one); Lehman and its independent financial advisers from Lazard have unequivocally concluded that is certainly the case. *See* FOF ¶¶ 18.3.2, 18.1.2, 18.2, 18.4, 36.18, 56.2, 56.4, 56.5, 56.8, 56.9.[80]

---

[76] *Compare* BCI 49 at 48:5-10, 55:19-20 (disclosing that the parties were preparing the Clarification Letter to address the changes in the transaction).

[77] *Compare* BCI Ex. 1 (APA) at pp. 6-8 (definition of "Purchased Assets").

[78] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 47:4-5 (disclosing that the value of the Long Positions had decreased to $47.4 billion and that the liabilities "in connection with those assets" were valued at $45.5 billion), 63:16-22 (disclosing that Barclays had advanced $45.5 billion to LBI to replace the Fed's repo loan and "received the collateral that Lehman had posted in connection therewith").

[79] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 144:2-5 (Ridings proffer that "the negotiations were at arm's length, difficult and aggressively negotiated by the parties, that the asset purchase agreement is the result of good faith negotiations").

[80] *Compare* BCI Ex. 48 (9/17/08 Tr.) at 29:1-15 (Harvey Miller explaining that "[t]he consensus among all of the business people, Your Honor, and the professionals was there would be nothing to sell in two weeks. This is really and truly a wasting asset"), 31:2-9 (Harvey Miller stating that "this is such a perishable asset that if we don't take this action, due process — nothing will matter"); BCI Ex. 49 (9/19/08 Tr.) at 98:10-12 (Bart McDade's proffer that

b. From Barclays' perspective, it is trying to acquire a Business for strategic reasons. FOF ¶¶ 1.10, 18.31. In addition, to satisfy its regulators in a time of immense financial uncertainty, Barclays needs the Sale to result in an acquisition gain on the Barclays Acquisition Balance Sheet, which will be formulated based upon U.K accounting rules and Barclays' independent valuation and accounting judgments, with oversight from its auditors at PWC. *See* FOF ¶¶ 18.3.1, 16, 53.4.[81]

   i. That accounting gain is far from guaranteed, and in fact Barclays is very concerned ("Scared to death") that it will not materialize (*see* FOF ¶¶ 4.5.15.2, 16.2);[82]

   ii. Nevertheless, the Sale is strategically very important for Barclays, and it is willing to take the risk based upon the terms set forth in the Purchase Agreement, and the assurance that it will face no liabilities that are not expressly set forth in the Purchase Agreement (*see* FOF ¶1.10).[83]

c. The Lehman goal and the Barclays goal are entirely consistent: all of the assets will be worth more to Barclays as a going concern than to Lehman in a liquidation, and some of the assets, such as the intangibles and the ETD accounts, may have significant value to Barclays but may well have *no or negative value* to Lehman in a liquidation. *See* FOF ¶¶ 18.2, 18.3, 55, 56.[84]

12. The Sale is the best deal available for the Lehman estates and creditors, there are no other bidders, and the Sale is overwhelmingly in the *public interest*, which is why it is supported by the NY Fed and other government regulators. *See* FOF ¶¶ 56, 36. It should therefore be approved. [85]

---

the Sale "saves the jobs of thousands of employees and avoids losses that could total in the hundreds of billions of dollars"), 144:18-145:4 (Barry Ridings' proffer that the assets have "substantially greater value if they are sold as a going concern…Without Barclays, Lehman would be forced to sell discreet assets for a fraction of the value that will be realized from this transaction"); BCI Ex. 11 (Sale Motion) at Ex. 2 (disclosing that Sale was better than a liquidation or any other alternative, there were "wasting assets," and "time was of the essence"); BCI Ex. 11 (Sale Motion) at ¶¶ 6, 11, 17 (disclosures relating to Sale being better than a liquidation).

[81] *Compare* BCI Exs. 381, 382 (providing disclosure in the public domain that Barclays expected an accounting gain from the Sale).

[82] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 43:11-20, 244:17-24 (describing "major changes" and "many moving parts" and "melting" assets, thereby disclosing the obvious risk and uncertainty in the transaction).

[83] *Compare* BCI Ex. 16 (Sale Order) at ¶¶ O, P (disclosing that Purchaser "[n]eeded" numerous assurances of no liabilities "except as is expressly set forth in the Purchase Agreement" in order to close on the transaction).

[84] *Compare* BCI Ex. 11 (Sale Motion) at ¶¶ 7-8, 24; BCI Ex. 48 (9/17/08 Tr.) at 31:2-9; BCI Ex. 49 (9/19/08 Tr.) at 92:25-93:9, 144:18-145:25, 244:17-24.

[85] *Compare* BCI Ex. 49 (9/19/08 Tr.) at 59:13-25, 60:9-23, 61:9-13, 73:20-74:1, 75:6-10, 98:10-12, 144:18-145:4, 244:17-24 (arguing repeatedly that approval of the Sale is in the "national interest").

89.     Barclays respectfully submits that the foregoing (hindsight) "hypothetical disclosures" (a) are consistent with (and subsumed by) the disclosures that were made in September 2008; (b) eliminate any conceivable claim Movants could have about "deficient" or "flawed" disclosures; and (c) confirm the Court's decision to approve the Sale based upon the findings set forth in the Sale Order.

> vii.    <u>Movants Knew The Information They Claim Was Not Disclosed In September 2008, And Chose Not To Raise Any Concern Because *They Knew* It Was Consistent With The Deal Approved By The Court, And *Would Not Change The Outcome*.</u>

90.     Finally, there is additional proof that the outcome would not have been any different had the issues raised in this proceeding been raised in September 2008:  in September 2008, Movants *knew all of the information about which they now complain*, yet chose not to raise any concerns about that information with the Court at the time.  *See generally* FOF ¶¶ 48-49. The reason they did not raise any concerns is clear:  they also *knew* that the Court had approved all the terms of the Purchase Agreement, and would confirm that approval if presented with any of the information about which Movants now complain.  *See* FOF ¶¶ 39, 56, 58.  Thus, Movants' inaction in September 2008 (and for many months afterwards) is *proof* that there is no "outcome-altering" evidence, and the Rule 60(b) Motions should be denied.

91.     For example, before the Closing on September 22, 2008, Movants *knew* the express terms of the Clarification Letter, and that it provided for Barclays to acquire all of the Repo Collateral, the Clearance Box Assets, the ETD Margin (as also confirmed in the Sale Order, the TAA and numerous e mails with the OCC), and the $769 million in 15c3-3 securities (or equivalent securities).  *See* FOF ¶¶ 31.14, 43, 44.1.5, 45.1, 44.4, 48.1-48.9, 48.120-48.125. Movants chose not to come back to Court because they believed those terms had *already been*

*approved* (and hence would certainly be approved if presented in a new hearing). *See* FOF ¶¶ 39, 58. They are in no position now to argue otherwise.

92. Before the Closing, Movants also knew there was approximately a $5 billion difference between the Lehman marks and the value estimated for the Repo Collateral in the negotiations. *See* FOF ¶¶ 48.39-48.61. This knowledge was proven through Movants' internal documents, especially those produced based upon the Court's order in the first week of trial (*see* FOF ¶¶ 48.60-48.61); it was also proven through the testimony of Jim Seery (and others), who testified that he explained to the Committee in detail the $5 billion valuation difference. *See* FOF ¶¶ 48.46, 48.49, 48.50, 48.52, 48.53. Movants chose not to raise any concern about this $5 billion valuation difference at the time of the Sale because they *knew* that the Court had approved the Sale despite enormous uncertainty over asset values, and they knew that a new hearing to discuss the uncertainty over asset values would not lead to a different outcome. *See* FOF ¶¶ 39, 56, 58. Indeed, Movants did not even raise their concerns about the "$5 billion discount" or "haircut" or "reduction" that was described throughout their internal documents from September and October 2008 when, two months later, the Trustee sought and obtained Court approval to transfer assets worth *approximately $5 billion* to Barclays as part of a settlement *designed to enforce the Clarification Letter*, and *to complete the transfer of all Repo Collateral to Barclays* (after a significant reduction for settlement purposes). *See* FOF ¶¶ 52.2-52.7, 60. Having kept their internal discussions (and alleged concerns) about a "$5 billion discount" secret throughout that period of time, they are in no position to raise the issue now.

93. Before the Closing, Movants knew that Barclays was acquiring LBI's ETD accounts, and thereby assuming ETD liabilities that were unknown and not estimated and ETD Margin that was unknown and not estimated. *See* FOF ¶¶ 31.3-31.10, 31.15, 33, 48.78-48.101.

Movants chose not to raise this at the time because they knew the Court had approved the Sale despite enormous uncertainty over asset values and liability values, and they knew that a new hearing to discuss the uncertainty over asset values and liability values would not lead to a different outcome (particularly since most if not all value in the ETD accounts would likely be lost to Lehman absent a Sale, and Barclays was taking on a huge risk in acquiring those accounts with limited information). *See* FOF ¶¶ 39, 56, 58. They are in no position to suggest otherwise now.

94. Before the Closing, Movants knew that the estimates of Barclays' exposure for the Comp and Cure obligations were higher than the estimated LBI accruals for bonus and trade payables on a provisional LBI balance sheet. *See* FOF ¶¶ 4.4.12.1, 48.64-48.65, 48.75, 65.4.1.1. Yet they chose not to raise that with the Court because they knew that the Sale was approved despite the uncertainty over liability values and that a new hearing to discuss that uncertainty would not lead to a different outcome. *See* FOF ¶¶ 39, 56, 58. They are in no position to suggest otherwise now.

95. Before the Closing, Movants knew that Barclays was making employment and bonus offers to senior Lehman executives who had some involvement in the transaction. *See* FOF ¶¶ 4.3, 48.126-48.130. Yet they chose not to raise that with the Court because they knew that it had been publicly disclosed that Barclays had to retain the top talent in the Business, it was obvious that to do so Barclays had to make bonus offers (as it was required to do under the APA), and they knew this information did not impact the good faith of the negotiations, and would not impact the Court's approval of the Sale. *See* FOF ¶¶ 4.3, 48.126-48.130, 58. They are in no position to suggest otherwise now.

96.     Furthermore, Movants' *conduct* at the time of the Closing and for months afterwards confirms that the disclosures made at the Sale Hearing were complete, proper, and adequate.  The Debtor's lawyers at Weil Gotshal and advisers at Alvarez & Marsal created summaries showing all of the Purchased Assets being transferred to Barclays, which included all of the Disputed Assets and the Repo Collateral.  *See* FOF ¶¶ 49.5, 49.28, 49.29, 49.17, 48.18, 31.26.2.  They also created summaries describing a $5 billion "reduction" that was "negotiated" from "Lehman 'stale' marks" and that they characterized as a "Negotiated mark haircut."  *See* BCI Ex. 131; FOF ¶¶ 49.13.1, 49.15, 49.16.  The Trustee approved the transfer of Clearance Box Assets after being expressly told they were proprietary and non-customer assets.  *See* FOF ¶¶ 44.5, 49.32, 63.8.  The Trustee confirmed that he was "OK" with the transfer of all of Lehman ETD Margin to Barclays.  *See* FOF ¶¶ 31.23.1.4, 50.18, 35.9.  The Trustee worked with Barclays to identify the ETD Margin Deposits held in foreign futures accounts, in order that those assets could be transferred to Barclays.  *See* FOF ¶¶ 35.12, 52.15.  Throughout all of this conduct from September 22, 2008, to May of 2009, Movants never once came back to Court to claim that the disclosures had been incomplete or flawed because the Sale Hearing transcript did not contain an explicit discussion of the precise facts and descriptions of the Sale Transaction that *their own documents* contained.  To the contrary, they told the District Court that "all relevant facts were disclosed to the Bankruptcy Court."  *See* M. 405 at pp. 16, 23; M. 552 at p.4, n.1; FOF ¶ 61.2.

97.     For the foregoing reasons, the Court should deny the Rule 60(b) Motions because Movants have failed to satisfy the legal requirement of presenting evidence that would have changed the outcome of the Sale Hearing.

2. The Rule 60(b) Claims Must Be Denied For The Independent Reason That Rule 60(b) Does Not Provide A Basis For Modifying The Purchase Agreement.

98. A second, independent basis for denying the Rule 60(b) Motions is that Movants have failed to present any factual basis for modifying the Purchase Agreement. *See generally* January Brief, at ¶¶ 525-540. Indeed, Movants have never specified either what provisions of the Sale Order or Purchase Agreement they want changed or how they should be changed. The Debtor and the Committee did not even bother to attach a Proposed Order to their Rule 60(b) motions, and the Trustee's Proposed Order essentially dealt only with his contractual interpretation claims. The reason Movants have been so vague in identifying the relief they seek is this: *they want the Court to <u>reform</u> the express terms of a written contract they agreed to in September 2008, but they have absolutely <u>no legal basis</u> for requesting that relief.*

99. If Movants were simply seeking "relief from" the Court's ruling (which is all that Rule 60(b) provides for) by asking this court to vacate the Sale Order entirely, it might be unnecessary for them to demonstrate a state-law basis for reformation of the Purchase Agreement (though of course such relief would be time-barred, equitably moot, and otherwise barred).[86] However, because Movants seek to maintain the Sale, but with terms that are different than in the parties' written agreements (and, indeed, that were *never* agreed to by the parties and that squarely conflict with the terms that *were* agreed to in writing and orally), they must demonstrate a basis for reforming the written instruments to include the terms they now seek to impose, and to exclude those they seek to remove. COL ¶¶ 11.[87]

---

[86] In addition, Movants would likely still need to show a state-law basis for rescission of the Purchase Agreement to "undo" the Sale Transaction and return the parties to their original positions.

[87] This principle explains why all of the cases Movants rely upon (save one) involve courts vacating § 363 sales in their entirety. *See, e.g., In re American Freight Sys.*, 126 B.R. 800, 805 (D. Kan. 1991); *In re BCD Corp.*, 119 F.3d 852 (10th Cir. 1997); *In re Tri-Cran*, 98 B.R. 609 (Bankr. E.D. Mass. 1989). The one exception is *In re LWD, Inc.*, 332 B.R. 543 (Bankr. W.D. Ky. 2006), but in that case the court never considered or discussed the legal issue of

100.     It is well-established that Rule 60(b) does not authorize courts to grant affirmative relief. *See* COL ¶¶ 11.1-11.5; *see also* January Brief at ¶¶ 526-530. To the contrary, Rule 60(b) merely provides a basis to grant relief from an existing judgment (or final order), so that the Court may re-assess the merits of a case, and determine if that judgment or order was correctly entered in the first place. *See* COL ¶¶ 11 (no affirmative relief), 15 (must change the outcome).[88] It does not grant any substantive rights to any of the parties, and does not provide any independent legal basis for the Court to impose liability upon a party, or — most importantly — *to alter the express terms of a contract*. *See* COL ¶¶ 11.6-11.10. Thus, in the context of a Rule 60(b) challenge to a court order that approved an express written contract and that seeks the relief of imposing a new contract (as opposed to vacating the contract and returning the parties to their original position), courts have repeatedly held that Rule 60(b) does *not* allow the Court to rewrite the contract; rather, a contract may not be modified unless there is a *state law basis* for asking the Court to reform the contract. COL ¶¶ 11.6-11.10.[89]

---

whether the court had the power to modify the contract; in addition, *LWD* is distinguishable on several other grounds. *See* COL ¶¶ 13.5-13.9. In the only other of Movants' cases that involved a *modification* of a sale order under Rule 60(b), rather than the vacation of such an order, the court modified the sale order in order to *conform* it to the purchase contract, not vice versa. *In re Polycel Liquidation Co.*, 2007 WL 77336, at *9 (D. N.J. Jan. 8, 2007). In other words, *In re Polycel* does not involve the modification of a contract to match statements made at a sale hearing, it involves modification of a sale order to match what was actually agreed to between the parties. It therefore is entirely consistent with, and supportive of, the position already articulated by Barclays. *See* COL ¶¶ 14.5-14.7.

[88] In a sense, the Court has already effectively granted something akin to that relief: by conducting an extensive evidentiary hearing on the Rule 60(b) motions, the Court has certainly afforded Movants every opportunity to present evidence to the Court that allows it to revisit the merits of the Sale Order. Indeed, as the Court recognized at the closing argument, the evidentiary hearings in this case go *way beyond* what could ever conceivably have been presented in any § 363 sale hearing, let alone an emergency hearing such as occurred in this case. 10/21/10 Tr. at 251:10-18. As explained above, that extensive presentation of evidence has failed to show any basis for changing the outcome of the original Sale Hearing (approval of the Sale and issuance of the Sale Order). In addition, however, the evidence presented in this case fails to present a basis for *modifying the Purchase Agreement*.

[89] While Movants have noted in the past that Barclays has filed motions invoking Rule 60(b), those motions could hardly have been more different from those filed by Movants. First, the Barclays motions did not seek to modify the Purchase Agreement in any way; rather, they sought only to ensure that erroneously designated contracts were not assumed under the terms of the Sale Order. Thus, the relief Barclays requested was entirely consistent with all of

<u>Rule 60(b) Does Not Provide A Basis For Modifying The Parties'
Purchase Agreement: There Must Be A State Law Basis For
Doing So.</u>

101. Where a Rule 60(b) motion seeks to modify a court order approving a *contract*,

courts have held that Rule 60(b) does not authorize the Court to "tinker" with the agreement

approved by the prior order, *Lucille v. City of Chicago*, No. 95-2109, 1995 WL 606926, at *1

(7th Cir. Oct. 31, 1995), or to "indulge a party's discontent over the effects of its bargain,"

*Koslowski v. Coughlin*, 871 F.2d 241, 246 (2d Cir. 1989); s*ee also* COL ¶¶ 11.6-11.10, 22.7-

22.12; January Brief at ¶¶ 531-534, 575-576. As the Second Circuit unambiguously held, a

party's "hindsight assessment of its bargain is not a permissible grounds for Rule 60(b) relief."

*Andrulonis v. United States*, 26 F.3d 1224, 1235 (2d Cir. 1994). As the United States

Bankruptcy Court for the Eastern District of Pennsylvania explained, "numerous circuit courts,

including our own, have held that Rule 60 (aptly titled 'Relief From Judgment or Order') may

only be used to set aside a judgment or order, not grant affirmative relief." *In re Wilmington

Hospitality*, 2003 WL 21011689, at *4 (Bankr. E.D. Pa. 2003). For that reason, the court refused

to use Rule 60 to "reform" a stipulated agreement that it had previously approved. *Id.*

102. Movants have not identified a single case, and Barclays is not aware of one, in

which a court relied upon Rule 60(b) as the basis for modifying a contract. That is simply not

what Rule 60(b) authorizes. Thus, as a matter of law, in order to obtain judicial relief that results

in the modification of the express terms of the Purchase Agreement (including the Clarification

---

the legal principles discussed above. Furthermore, while Rule 60 was invoked, the Barclays motions did not
actually seek to change or modify *a single word* of either the Sale Order or the Purchase Agreement. *See* Motion of
Barclays Capital Inc. For Relief Concerning Certain Contracts Erroneously Posted With The "Closing Date
Contracts," *In re Lehman Bros. Holding*, No. 08-13555, Docket No. 908; Motion of Barclays Capital Inc. For Relief
Concerning An American Express Contract Erroneously Posted With The Closing Date Contracts, *In re Lehman
Bros. Holding*, No. 08-13555, Docket No. 959.

Letter), Movants must show a state law basis for reformation.  *See* COL ¶¶ 11; January Br. at ¶¶ 535-540.

c.    <u>Movants Have Not Even Alleged, Let Alone Established, A State Law Basis For Reforming The Purchase Agreement.</u>

103.    Pursuant to the Scheduling Order entered on October 27, 2009, Movants filed not only Rule 60(b) motions in this case, but also Adversary Complaints that were filed on November 16, 2009.  LBHI Complaint. Adv. Proc. No. 09-01731 (JMP), Doc. No. 1, at Count I; Trustee Complaint, Adv. Proc. No. 09-01732 (JMP), Doc. No. 1, at Count XIII.  In neither their Rule 60(b) motions nor their Adversary Complaints did *any* Movant allege *any* state law basis for reforming the Purchase Agreement.  *Id.*; LBHI Br.; Trustee Br.; Committee Br.  They did not even try to do so, and should not be permitted to raise any such claim now, after the trial has been completed.

104.    Movants have not alleged a state-law basis for reforming the contract because there is none.  There are only two bases for reforming a contract:  a mutual mistake that occurred in the drafting process, and resulted in a contract different than the one agreed to by the parties; or a unilateral mistake coupled with fraudulent misrepresentation concerning the terms of the contract.  COL ¶¶ 12.3-12.6, 12.9-12.10.

105.    Movants have not even alleged, let alone demonstrated, any mutual mistake that could possible justify reforming a contract.  The doctrine of mutual mistake requires that *both* parties must have agreed to one deal, but a mistake in the drafting process resulted in a contract that does not reflect that deal.  COL ¶¶ 12.3-12.6.  Where at least one party intended to agree to the deal reflected in the actual contract, there is, by definition, no *mutual* mistake, and no grounds for reformation.  COL ¶¶ 12.3-12.6.

106.     Unrebutted testimony demonstrates that *Barclays was certainly not mistaken* concerning the terms of the written contracts (indeed, there is no evidence that Lehman was mistaken either, but for present purposes it is enough to show that Barclays was not, and therefore there was no *mutual* mistake).  The Purchase Agreement reflects the deal to which Barclays agreed, and there is no evidence that Barclays ever agreed to the terms of the contract Movants appear to be trying to impose.  FOF ¶¶ 1.10, 27.1, 59.1.15, 63.15 .  Indeed, there does not appear to be any dispute about this, since Movants' whole theory is that Barclays intended to enter into a contract with the terms of the Purchase Agreement, and to acquire all of the Repo Collateral and all of the Disputed Assets.

107.     Second, Movants have not even alleged, let alone demonstrated, the type of unilateral mistake plus fraudulent conduct that, in extreme circumstances, may justify reforming a contract.  That doctrine requires one party to know that the *written contract* does *not* reflect the deal to which the party has agreed, and then to mislead the other party concerning the terms of that written contract.  COL ¶¶ 12.9-12.10.  There has been no allegation of such facts in this case, and given the extensive involvement of independent advisers at Weil Gotshal, Simpson Thacher and Lazard, and the involvement of Bart McDade and other Lehman executives in negotiating the terms of the Sale, there is no conceivable basis that this rare doctrine of reformation could be satisfied in this case.

108.     In addition to the fact that the doctrine of mistake is not satisfied on its face, it is also black-letter law that a contract may not be reformed over any alleged "mistake" that is either (a) a mistaken understanding of how events are likely to unfold (such as, how Barclays may account for the deal, what its ultimate acquisition gain may be, what its accountants or consultants may advise as to the value of certain intangible assets or financial assets, the extent

to which ETD Margin may or may not be seized by clearing agencies or available to Barclays, whether the Business or the markets will perform well or poorly), or (b) a mistaken understanding of a fact that existed at the time of the contract's execution, but with respect to which the party knew it had only "limited information," and decided to proceed with the contract despite that uncertainty. *See* COL ¶¶ 12.7-12.8; January Brief at ¶¶ 535-540. If a contracting party was "not only aware that his knowledge was limited but undertook to perform in the face of that awareness, he bears the risk of mistake." RESTATEMENT (SECOND) OF CONTRACTS at § 154. Thus, numerous courts have held that a party cannot invoke the doctrine of "mistake" to reform a contract where it was clear that the contract was executed in the face of *uncertainty* over the very facts about which the party claims there was a "mistake." *See* COL ¶¶ 12.7-12.8.

109. In this case, the parties agreed to the terms of the Purchase Agreement despite obvious uncertainty as to:

- The value of all assets, especially the numerous illiquid assets in the Repo Collateral (which had marks of $49.9 billion which Movants were told Barclays believed were too high, and for which different estimates were made, and no final estimate was included in the contract), *see* FOF ¶¶ 47, 48.39-48.61; *see also* Addendum 5 (Demonstrative Timelines) at Tab 1.

- The value of the Clearance Box Assets, which were estimated at $1.9 billion but believed to be worth much less (and for which no estimate was included in the contract), *see* FOF ¶¶ 28.1, 37.3, 48.105-48.109;

- The value of ETD liabilities and ETD Margin, whether the ETD accounts would be seized by clearing agencies, exchanges or brokers, or would be transferred to Barclays as provided for in the agreement, and the possibility for any "net value" in the ETD accounts (for which, again, the contract made no estimate because of its obvious uncertainty)*, see* FOF ¶¶ 33, 34, 48.96-48.101;

- The amount of ETD Margin held in the form of cash (Weil Gotshal and the Trustee were told by the OCC that there was approximately $1 billion cash ETD Margin at the OCC, but the amounts were changing constantly, and the amount of ETD Margin in other ETD accounts was known to be uncertain), *see* FOF ¶¶ 31.23, 32;

- The amount Barclays would have to spend on Cure and Comp, for which only "estimates" could be given, *see* FOF ¶¶ 12, 10.2, 47.2, 47.9, 47.10, 48.62-48.72, 48.73, 48.77;

- The value of the total assets and the value of the total liabilities in the Sale, for which the Purchase Agreement provided no estimates*, see* FOF ¶¶ 47, 6.1, 6.2, 58.4;

- Whether Barclays would in fact value the assets and account for the Sale in a manner that would allow for an acquisition gain, or instead would suffer a loss, *see* FOF ¶ 16.2.

110.    All of these facts, and many more, were *uncertain* as of the Sale Hearing on September 19 and as of the time the parties executed the Purchase Agreement at the Closing on September 22, 2008.  *See* FOF ¶ 47.  Indeed, the disclosures made to the Court underscored the immense uncertainty involved in the transaction.  *See* FOF ¶¶ 36.11, 36.12, 39.1-39.3, 39.7.

111.    As a matter of law, in light of the foregoing evidence of uncertainty, there can be no basis for any party to invoke the doctrine of "mistake" to seek reformation of the Purchase Agreement.  COL ¶¶ 12.7-12.8.  There is no other basis for reformation of the Purchase Agreement.  *See* COL ¶¶ 11, 12, 13.

112.    Finally, at the most fundamental level, the premise of contractual reformation is that there was a "real contract" to which the written contract must be "reformed" (since the written contract reflected a mutual mistake of some kind).  COL ¶¶ 12.1-12.6.  In this case, Movants have not demonstrated any evidence of a contractual agreement that existed between the parties *other than* the contract set forth in the actual Purchase Agreement.  To the contrary, the trial evidence has proven that Barclays would *not* have agreed to a contract that required the deal to be a "wash" on the Barclays Acquisition Balance Sheet, and never did agree to any such deal; to the contrary, on the day the APA was filed in Court, *before* the Sale was approved, Barclays *publicly announced* that it expected the Sale to result in a multi-billion dollar gain on its balance sheet.  *See* FOF ¶¶ 16, 6.2, 6.3, 17, 18.3.1.  Movants have never presented the "reformed

contract" to the Court, but they have suggested that they simply wish to enforce the contract that was "disclosed to the Court." LBHI Br. at pp. 1-2, ¶¶ 2-3, 127; Trustee Br. at p. 41, ¶ 1, Committee Br. at pp. 1, 50, ¶ 80. As Barclays has repeatedly emphasized, however, the contract disclosed to the Court was, first and foremost, one that was for "all of the assets" that were "used in connection with the Business" except those expressly excluded, with no total value for all Purchased Assets and no total value for all Assumed Liabilities. *See* FOF ¶ 5.

113. Moreover, as one court has explained, a written contract cannot be modified by oral statements, even when those statements are made in the context of a Bankruptcy Court approval hearing. COL ¶¶ 14.1-14.4. "Bankruptcy is drastic and expensive enough without allowing the debtor and court to approve a contract and later void it on grounds that they would not have approved it if they had bothered to understand it." *Terry Oilfield Supply Co., Inc. v. American Sec. Bank, N.A.,*195 B.R. 66, 73 (S.D. Tex. 1996).

114. Thus, since Rule 60(b) does not authorize reformation of the Purchase Agreement, and since there is no other legal basis for reformation of the Purchase Agreement, Movants are not entitled to the relief they seek, the Rule 60(b) motions should be denied, and the Adversary Complaints should be dismissed.

3. <u>The Rule 60(b) Claims Must Be Denied Because Movants Have Not Satisfied The Elements Of The Specific Rule 60(b) Provisions They Invoke.</u>

115. The third, independent ground for denying the Rule 60(b) Motions is that Movants have not proven facts sufficient to satisfy the elements of any of the Rule 60(b) provisions they invoke.

a.    Movants Have Not Demonstrated A "Mistake" Within The Meaning Of Rule 60(b)(1).

116.    It is well-established that the only "mistakes" covered by Rule 60(b)(1) are (a) judicial mistakes, which cannot be raised after the time for appeal has expired (and therefore any such claim of mistake would have been time-barred in this case if it had been raised), *see* COL ¶ 7.4, and (b) "excusable litigation mistakes," *see* COL ¶¶ 22.1.  As a matter of law, in challenging a court order that approved a *contract*, the only kind of "excusable litigation mistake" that can satisfy Rule 60(b)(1) is a mistake that satisfies the state law doctrine of mistake so as to allow reformation of the contract.  *See* COL ¶¶ 22.2.

117.    As explained above, Movants have never even alleged that the state law doctrine of mistake has been satisfied in this case, and for good reason:  the parties agreed to the Purchase Agreement despite substantial uncertainty over the values of the Purchased Assets and the estimated Cure and Comp liabilities (s*ee* FOF ¶¶ 3.1, 14, 12.5), and therefore, as a matter of law, any alleged "mistake" regarding those values cannot form the basis for reformation.  *See* COL ¶¶ 12.7-12.8.

118.    Moreover, even if the law did not require the state law doctrine of mistake to be satisfied in this context, the evidence proved that Movants have not demonstrated anything that could be considered an "excusable litigation mistake."  Movants claimed that the lawyers "did not know" the truth about the Sale, and therefore made faulty disclosures; but Movants were unable to get their own lawyer, Harvey Miller, to testify that Movants have discovered some critical piece of information that was kept from him, thereby leading to an "excusable litigation mistake."  *See generally* Miller Dep. Tr. at 59:18-60:7; 4/28/10 Tr. at 117:13-118:5.  To the contrary, the trial proved that the lawyers were intimately involved in the Sale negotiations, and made comprehensive disclosures, both through the filing of the APA and at the Sale Hearing.

*See* FOF ¶¶ 4.2.12, 36.2, 36.7-36.13, 36.26, 39.1-39.4, 42, 43.  The trial also proved that all the estimated values, in the APA and in the Sale Hearing, were reasonable and not "mistakes."  *See* FOF ¶¶ 9.4.1, 10, 12.  The lawyers also clearly knew the terms of the Clarification Letter, since *they drafted it*; none of the lawyers involved in that drafting testified that they believed it contained a mistake.  *See* FOF ¶ 43.  And Mr. Miller testified that he continues to believe that it was not an "egregious mistake" for him to conclude that it was not necessary for him to bring the Clarification Letter back to the Court for additional approval — because the Clarification Letter did not materially change the deal that was approved by the Court (and certainly did not make any change that was materially adverse to the Estate), which was a deal to buy a *Business*, including *all* the assets in that Business except those specifically excluded.  *See* FOF ¶¶ 43.4.6; *see also* FOF ¶ 43.4.5.  Further, as explained above, even if Mr. Miller had brought the letter back to the Court to confirm its approval, the facts demonstrate overwhelmingly that approval would have been confirmed.  *See* Section I(A)(1), *supra*; *see* FOF ¶¶ 58; *see also* FOF ¶ 36.

> b. <u>Movants Have Not Demonstrated The Existence of "New Evidence" Within The Meaning Of Rule 60(b)(2).</u>

119.    Rule 60(b)(2) requires the existence of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)."  Fed. R. Civ. P. 60(b)(2).  As a matter of law, this requires Movants to demonstrate "new evidence" they could not have discovered "with reasonable diligence" prior to September 30, 2008.  COL ¶¶ 23.1.  Moreover, as with the relief sought under the other Rule 60(b) provisions, because the order being challenged here is an order approving a *contract*, Movants must prove that the "new evidence" is sufficient to justify reformation of the Purchase Agreement.  COL ¶ 23.7.

120. The Second Circuit has elaborated upon the test for determining what constitutes "new evidence" under Rule 60(b)(2) as follows:

> [T]he Movant must demonstrate that (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the Movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.

*United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001).

121. Movants cannot even come close to satisfying any element of this standard. First, in evaluating what Movants knew or reasonably could have known with "due diligence," the Court must as a matter of law (a) impute all of the knowledge of each Lehman executive to the Lehman Movants (including the Trustee), even if that executive had a conflict of interest, unless that executive is proven to have "totally abandoned" Lehman's interests — a standard Movants never even sought to satisfy, and clearly could not satisfy with respect to any Lehman executive (let alone all of them), and (b) impute to all Movants information that was known to any Movant (since they reasonably could have discovered information from one another, and there was no evidence that they hid information from one another). COL ¶¶ 8, 23.3-23.4; *see* FOF ¶¶ 4.5, 48.

122. In any event, the evidence proved overwhelmingly that Movants knew, or reasonably should have known, all the information upon which they have relied in bringing their claims. *See* FOF ¶¶ 48-52. Principally, Movants complain about the plain terms of the Clarification Letter — which they obviously knew before Closing. *See* FOF ¶¶ 48.1-48.11. Thus, any claim that is based upon the following facts is decidedly *not* based upon "new evidence": (a) that Barclays was acquiring the so-called "additional assets" (expressly stated in the APA and the Clarification Letter); (b) that Barclays was acquiring all of the Repo Collateral (expressly stated in the APA and the Clarification Letter); (c) that the inadvertent Repo

"termination notice" was declared void *ab initio* (expressly stated in the Clarification Letter and, in any event, irrelevant since the Clarification Letter defines Purchased Assets to include the Repo Collateral, which was therefore being sold to Barclays without regard to this provision); and (d) the fact that there were no valuation estimates in the contract, and that Barclays was acquiring those assets "irrespective of their values," as Harvey Miller admitted was the case (and which was clear on the face of the Purchase Agreement). Miller Dep. Tr. at 39:17-40:18, 50:14-51:6.

123. Movants also complain about a supposed "secret $5 billion discount" in the Repo which the trial proved was (a) a valuation difference based upon a good faith difference of opinion over the value of illiquid assets, and (b) was *actively discussed* before the Closing, and in the days and weeks following the Closing. *See* FOF ¶¶ 48.39-48.61, 49.11-49.16, 50.5-50.13, 52.2-52.10. The trial proved that Movants received the Lehman marks and the BONY marks of the Repo Collateral before the Closing, and also received the Lehman marks on the Clearance Box Assets. *See* FOF ¶ 46. If Movants thought that the valuation difference between the marks from Lehman or BONY marks and the valuation estimates provided in Court were a problem, were a basis for questioning the Sale Order, or were a basis for requesting a provision requiring set valuations in the contract (or a "true-up," or a "wash" requirement), then they should have raised the issue at the time — *not a full year later*.

124. Indeed, the trial proved that in meetings on September 29 and 30 (and hence before the expiration of the 10-day period during which Rule 60(b)(2) requires Movants to demonstrate justifiable ignorance "despite due diligence"), Alvarez & Marsal and the Committee discussed the $5 billion valuation difference, and a Committee advisor expressed the view that the estates should "*get $5.5 billion back*." *See* FOF ¶¶ 50.5-50.7. Further, Committee

documents and Alvarez & Marsal documents during the weeks following the Closing show discussion of a "*$5 billion discount*," a $5 billion "Negotiated mark haircut," and a $5 billion "negotiated reduction"; Movants did not make any effort to show that these documents reflected information discovered only after September 30, 2008, and therefore those documents should all be found to reflect the state of Movants' knowledge during the ten day period in which they are required to show "justifiable ignorance" under Rule 60(b)(2). *See* FOF ¶¶ 49.15-49.16.

125.    Movants also complain that the estimates given in Court for the exposure Barclays faced for Cure and Comp obligations were "inflated" above certain "accruals" on LBI's estimated balance sheets by "transaction adjustments." The trial proved that the information showing these "transaction adjustments" was sent to Weil Gotshal, Lazard, and Alvarez & Marsal *before* the Sale Hearing — thus, this was not "new evidence." *See* FOF ¶ 48.64.1.

126.    Movants complain that the Sale was supposed to be a "wash," and that they did not know Barclays expected to report an "embedded gain." But on September 17, 2008, Barclays *publicly announced* its expectation of an acquisition gain, and this information was sent to and circulated among Lehman's senior executives as well as Lazard, the Committee, and the Committee's advisors — and it was also published in newspapers all over the world. *See* FOF ¶¶ 48.16-48.26. The fact that Barclays expected to have an acquisition gain is *not* new evidence.[90]

127.    Movants complain that Barclays acquired ETD Margin in the form of cash margin deposits (and, for that matter, in any form). Again, this is provided for on the face of the Clarification Letter, and therefore is not "new evidence." Moreover, the Sale Order expressly contemplates that Barclays will acquire cash margin. *See* FOF ¶ 48.84. The APA provided for Barclays to acquire all assets used in the business including "deposits." FOF ¶¶ 48.78-48.79. In

---

[90]  Moreover, on the face of the APA and the Clarification Letter, it is crystal clear the deal was not required to be a wash. *See* FOF ¶¶ 6.1-6.2.

addition, before the Closing, Weil Gotshal and the Trustee received information from the OCC stating that there was approximately $1 billion in cash margin at the OCC. *See* FOF ¶¶ 48.86-48.87; *see also* FOF ¶¶ 31.21, 31.22.4-31.22.5. The Trustee also signed two agreements with the OCC prior to the Closing that expressly referred to cash margin being transferred to Barclays. *See* FOF ¶¶ 31.20.1-31.20.6; *see also* FOF ¶¶ 48.85.1-48.85.5. Thus, the fact that cash ETD Margin Deposits were being transferred to Barclays is not "new evidence" under Rule 60(b)(2).

128.     Movants may argue that the *precise amount* of cash ETD Margin (or ETD Margin more generally) was not known at the time of the Closing, and that this information, along with the amount of "net value" in the ETD accounts, was not and could not be discovered until after September 30, 2008. As Barclays demonstrated at trial, it is certainly true that Barclays did not and could not know this information for a whole variety of reasons, including (a) the information available to Barclays was substantially incomplete before the Closing and for weeks thereafter, (b) the Lehman records were "a mess" and the futures system was commingled with the foreign exchange system, thereby combining information for assets and customers Barclays was acquiring with those Barclays was not acquiring, and (c) the margin requirements and ETD values were fluctuating wildly throughout the week of September 15, 2008, making even the incomplete information that was available insufficient to demonstrate anything about any possible net value or net liability associated with the ETDs. *See* FOF ¶ 33.[91]

129.     But these holes in the available information on ETDs and ETD Margin Deposits were obviously *known at the time*. *See* FOF ¶¶ 33.4-33.5. If it is *known* that information is unavailable at the time a party enters into a contract, then that party cannot later come back to try

---

[91] It may be the case, however, that *Lehman*, at least as a corporate entity, had access to more information than Barclays, but as Bryan Marsal has explained, the "collapse" of the Lehman systems and the ensuing "chaos" at Lehman after the LBHI bankruptcy likely explains the inability to identify any definite information on the ETDs that week. FOF ¶¶ 3.15, 33.6-33.10

to modify the contract by claiming that "new evidence" about how those uncertainties played out demonstrates a mistake. *See* COL ¶¶ 23.6, 12.7-12.8. Or stated in the formulation of the Rule 60(b)(2) test, a party cannot be "justifiably ignorant" of facts that it knows at the time are unknowable, and which it accepts as unknowable. COL ¶ 23.2. Stated differently, the "new evidence" must be something that *contradicts* facts that were thought to be established at the time: otherwise, it is just "cumulative," or it is evidence that would not change the outcome, and therefore fails the standard of Rule 60(b)(2). COL ¶ 15. Even if this is not generally true, it at least must necessarily be the case in the context of a Rule 60(b)(2) motion to challenge an order *approving a contract*: in that unusual context, the "new evidence" is legally unable to change the outcome unless it establishes a state law basis for reforming the contract, and therefore it *cannot be* evidence of something that the Movant knew was uncertain at the time the contract was executed. COL ¶¶ 12.7-12.8.

c.  <u>Movants Have Not Demonstrated A Misrepresentation Within The Meaning Of Rule 60(b)(3).</u>

130.  Rule 60(b)(3) requires Movants (a) to prove a misrepresentation by "an opposing party," (b) with particularity, and by clear and convincing evidence. COL ¶¶ 24.2-24.5. In addition, as with the other Rule 60(b) claims, because Movants are challenging an order that approved a contract, they must prove that the misrepresentation would justify reformation of the contract. COL ¶¶ 24.1.

131.  Movants cannot satisfy any of these standards. Rule 60(b)(3) does not apply in the context of an order approving a contract because it requires a misrepresentation by an opposing party *in litigation.* COL ¶¶ 24.3. Movants have not cited a single case where Rule 60(b)(3) was applied to modify an order approving a contract so as to then *reform the contract*, and Barclays is aware of none. Here, Barclays and Lehman were not opposing parties; they both

wanted the Sale Order approved, and they negotiated in good faith to agree upon the Purchase Agreement covered by that Sale Order. *See* FOF ¶¶ 4.1, 47.1-47.6, 47.8-47.10.

132.     In any event, there were no misrepresentations, and certainly Movants have not satisfied the high standard of demonstrating any by "clear and convincing evidence." COL ¶ 24.4. As explained above, the disclosures made to the Court were accurate, reasonable, and made in good faith. *See* Section I(A)(1)(d)(iv); *See* FOF ¶¶ 5-9, 36-42. No Lehman negotiator has accused Barclays of any misrepresentations during the negotiations. *See* FOF ¶¶ 41.2, 4.4. To the contrary, there is overwhelming testimony from Bart McDade, Harvey Miller, Barry Ridings, Jim Seery, Mark Shapiro, Vic Lewkow, Ed Rosen, and others confirming that all parties acted in good faith, and no misrepresentations were made — between the parties, or to the Court. *See* FOF ¶¶ 4, 5-9, 36-42.

> d.     Movants Have Not Demonstrated "Any Other Reason That Justifies Relief" Under Rule 60(b)(6).

133.     As a matter of law, Rule 60(b)(6) does not apply when Movants have cast their claims for relief within the ambit of one of the other provisions of Rule 60(b). COL ¶¶ 25.1-25.2. This does not mean that Rule 60(b)(6) applies if the Court concludes that the other provisions of Rule 60(b) *are not satisfied*; it means that Rule 60(b)(6) applies only if Movants show that their claims for relief simply cannot be articulated in the terms described by the other provisions of Rule 60(b). COL ¶¶ 25.1-25.2. In this case, Movants have repeatedly framed their claims for relief in terms covered expressly by Rules 60(b)(1), (b)(2), and (b)(3): they have repeatedly claimed (falsely) that there were "mistakes" (innocent or otherwise), "secrets" that

have been "newly discovered," and "misrepresentations" (innocent or otherwise).[92] Thus, as a matter of law, Movants should not be permitted to invoke Rule 60(b)(6).

134.     Even if that legal barrier to invoking Rule 60(b)(6) could be surmounted, Movants have failed to demonstrate "any other reason that justifies relief," as required by Rule 60(b)(6). As set forth above and extensively in the Proposed Findings of Fact, the trial proved that (a) the Sale was negotiated in good faith (*see* FOF ¶ 4); (b) the disclosures were reasonable and made in good faith (*see* FOF ¶¶ 5-9, 36-42); (c) there was no secret discount or understatement of estimated asset values (*see* FOF ¶¶ 9.1-9.7); (d) there were no inflated liabilities (*see* FOF ¶¶ 10, 12, 14); (e) the Sale Transaction was a fair deal (*see* FOF ¶¶ 56-57); (f) the Sale Transaction was the only available deal, and was vastly superior to a liquidation (*see* FOF ¶¶  2, 36.3-36.29, 56.4, 56.12); and (g) the Sale Transaction served the public interest (*see* FOF ¶ 56).

**B.**     There Is No Basis For Section 549 Relief.

135.     Section 549 only provides a mechanism for the return of assets that were transferred away from the estate without authorization by this Court or under the Bankruptcy Code.  11 U.S.C. § 549.  Movants do not claim that Section 549 can provide any basis for relief with respect to assets that were the subject of an authorized transfer, and neither the plain language of the statute nor any case law would support such a proposition.

136.     Indeed, Movants have not cited a single case that has applied section 549 to void a transfer of property in connection with an approved Section 363 sale.  Rather, the typical Section 549 case arises when the debtor makes a sale that it believed (or contended) was in the "ordinary

---

[92]  LBHI Br. at ¶¶ 145-158 (mistake, inadvertence or excusable neglect), ¶¶ 159-161 (newly discovered evidence), ¶¶ 162-166 (misrepresentation — innocent or not); LBHI Reply Br. at ¶¶ 150-161 (mistake), ¶¶ 162-182 (newly discovered evidence), ¶¶ 183-184 (misrepresentations — innocent or not); LBI Br. at ¶¶ 91- 105 (mistake); LBI Reply Br. at ¶¶ 200-203 (mistake); Committee Br. at ¶¶ 63-70 (mistake, inadvertence or excusable neglect), ¶¶ 71-72 (newly discovered evidence); Committee Reply Br. at ¶¶ 186-195 (mistake), ¶¶ 196-215 (newly discovered evidence), ¶¶ 216-220 (misrepresentation).

course of business" and hence did not require court approval, and subsequently the trustee or a creditor challenges the transfer, and claims that it should be voided because it required court approval. *See* COL ¶ 27.2. There is also no case that has allowed a party that agreed to the express terms of a written contract governing a Section 363 sale, and that then defended the Section 363 Sale Order on appeal by invoking that express written contract, to come back to the Bankruptcy Court a year later claiming that select parts of the contract were "unauthorized" and hence voidable under Section 549. Thus, as a threshold matter, Movants should not be entitled to Section 549 relief unless they are able to establish a basis for modifying the Sale Order, which they cannot do. *See* Section I(A), *supra*.

137. Moreover, as explained below, Movants are not entitled to Section 549 relief because (1) the transfers at issue were authorized, (2) even if they had not been authorized (or were somehow "de-authorized" under Rule 60), Movants are legally barred from now seeking the return of such assets, and (3) the piecemeal relief sought by Movants is impermissible because it would effectively impose a different contract on Barclays than the one agreed upon by the parties.

1. Section 549 Is Inapplicable Because The Court Approved The Sale Of All Assets In Dispute.

138. Barclays and the Trustee maintain that the Clarification Letter was approved and are seeking to enforce the terms of the Clarification Letter. Trustee Reply Br. at ¶ 187; *see id.* at ¶¶ 185, 200. LBHI — after successfully invoking the Clarification Letter on previous occasions — and the Committee now assert that, in effect, only parts of the Clarification Letter were approved (the parts that relieved Lehman of billions of dollars of obligations, but without the provisions that were the quid pro quo for these concessions from Barclays). In either event, whether the Clarification Letter was approved or not, the transfer of the Disputed Assets and

securities making up the Repo Collateral (along with all other non-excluded assets used in connection with the Business) was authorized.

a.    <u>The Court Approved The APA, Which Expressly Provided For The Sale Of All Assets "Used In Connection With The Business" Except Those Expressly Excluded.</u>

139.    Movants do *not* contest that the APA (absent the Clarification Letter) was approved. *See, e.g.,* LBHI Reply Brief ¶ 159 ("LBHI seeks to modify the Sale Order only to eliminate unauthorized changes made to the deal, not to change the underlying Asset Purchase Agreement or parts of the Clarification Letter that were legitimately approved, *i.e.*, the parts that made no material changes."). Consequently, there is no dispute that the transfer of any assets encompassed within the APA's definition of "Purchased Assets" (and which were not specifically identified "Excluded Assets") was expressly authorized. The APA was submitted to the Court, was the subject of the written Sale Motion, and was expressly approved by the Court's Sale Order. *See* BCI Ex. 11 (Sale Motion) at Ex. 2; BCI Ex. 16 (Sale Order) at p.1; FOF ¶¶ 5.13-5.14.

140.    The APA defined the Purchased Assets — *i.e.* the assets being sold and transferred to Barclays — in the broadest possible terms: "***all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)***."[93] COL ¶ 38. Courts have uniformly interpreted the phrase "in connection with" to be the broadest possible language — broader than "relating to" or similar catch-all phrases. *See e.g., Fisher v. Kanas*, 288 Fed. Appx. 721, 723 (2d Cir. 2008) (discussing Supreme Court's broad interpretation of "in connection with" language in Securities Litigation Uniform Standards Act) (citing *Merrill*

---

[93] The "Business" was likewise defined in the broadest possible terms: "'<u>Business</u>' means the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant." BCI Ex. 1 (APA) at p.2 (definition of "Business").

*Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 72, 85 (2006)); *Press v. Chemical Investment Servs. Corp.*, 166 F.3d 529 (2d Cir. 1999) ("The Second Circuit has broadly construed the phrase 'in connection with,' interpreting the Congressional intent" of Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b)) (citations omitted). And while the APA did not provide a total value for all of the Purchased Assets whose transfer to Barclays the Court was asked to authorize, it was clearly in excess of $70 billion. *See* FOF ¶¶ 5.2-5.4, 5.7, 8.1-8.2.

141. The Sale Motion adopted and incorporated by reference the definition of "Purchased Assets" in the APA, which was attached to the Sale Motion. BCI Ex. 11 (Sale Motion) at 3 n.1 & 14 n.2. The Sale Motion also described the breadth of the assets to be sold: "the Purchaser will assume ownership of substantially all operations of LBI" (*id.* at ¶ 10) and "the Purchased Assets include LBI's assets," (*id.* at ¶ 14).

142. The hearings leading up to the approval of the Sale Transaction also make clear the breadth of what was being sold — essentially all non-excluded assets of LBI. BCI Ex. 48 (9/17/08 Tr.) at 19:8-10 ("Essentially, it provides for a sale of the assets of the broker dealer, which I'll refer to, Your Honor, as LBI."); BCI Ex. 49 (9/19/08 Tr.) at 98:19-22 ("He would testify that the asset purchase agreement provides for the sale of the North American broker-dealer business of LBI."); *id.* at 93:15-19 ("consummate a sale of the broker-dealer business"); *id.* at 101:7-9 ("the sale of Lehman's broker-dealer business has been known worldwide"); *id. at* 107:5-9 ("Q. [A]re there any businesses remaining at LBI that are not being transferred to Barclays? A. No."); *id.* at 107:16-22 ("The assets of those business units . . . will be transferring to Barclays."); *id.* at 143:17-19 ("the sale of LBI"); *id.* at 146:1-2 ("Lehman is selling its North American investment banking and capital markets business.").

143. The trial conclusively — indeed, without dispute — established that the 15c3-3 assets, the ETD Margin Deposits, the Clearance Box Assets, and the securities that made up the Repo Collateral were assets "used in connection with the Business." *See* FOF ¶¶ 29.2, 30.3, 31.3, 31.6-31.9, 48.44.[94] Indeed, Movants have never articulated any contractual interpretation or theory by which these assets would not be assets "used in connection with the Business."[95]

144. Similarly, the assets are *not* Excluded Assets. Movants do not even argue that the Clearance Box Assets, the 15c3-3 deposits, or any of the Repo Collateral securities were identified as "Excluded Assets" in the APA — they plainly are not listed as such. BCI Ex. 1 (APA) at pp. 2-4.[96] In his reply brief in support of his Rule 60(b) motion (but *not* in his opening brief, *not* in any of his correspondence over several months of discussions of these assets, and *not* at any other time prior to his March 2009 reply brief), the Trustee argued that ETD Margin was covered by subparagraph (n) of the APA's definition of "Excluded Assets." *See* March 18, 2009 Trustee Reply Br. at ¶¶ 77-82. But as is clear from the face of the APA, and as the trial confirmed, the reference to "derivatives contracts" in subparagraph (n) was a reference to *over-the-counter* derivatives contracts, not to exchange-traded derivatives, which were included in the

---

[94] *See* BCI Ex. 1 (APA) at pp. 2-4, 6-7; 4/30/10 Tr. at 216:22-217:12 (Hughes); 5/3/10 Tr. at 6:24-8:6, 8:19-21, 42:15-24 (Hughes); 8/27/10 Tr. at 55:3-56:1, 56:13-15, 196:3-197:8 (Klein); 8/24/10 Tr. at 99:5-23, 99:24-102:7 (Rosen); 5/4/10 Tr. at 164:23-165:11 (Seery); 4/30/10 Tr. at 59:24-60:9 (Clackson).

[95] Instead, Movants have pointed to supposedly inconsistent statements by Barclays representatives in this litigation that the assets were "additional." *See, e.g.*, LBHI Br. at ¶¶ 105-117; Committee Br. at ¶¶ 50-54; Trustee Br. at ¶ 4. However, they were only "additional" in the sense that they were added to the list of other *specifically identified* "Purchased Assets." *See* FOF ¶¶ 28.1-28.3. The APA expressly provided that this list was neither exhaustive nor exclusive: it was merely a list of specifically identified Purchased Assets that would provide Barclays some assurance (falling short of a true "Representations and Warranties" clause, but analogous to that in this sense), so that Barclays would have a sense of what was in "the Business" it was acquiring. FOF ¶¶ 5.1-5.3. In any event, such after-the-fact descriptions (whether accurate or not) cannot change the plain language of the APA and Sale Motion, or the fact that all of the Disputed Assets and Repo Collateral are indeed assets used "in connection with the Business."

[96] Even if the DTC letter somehow contractually limited the Clearance Box securities that Barclays is otherwise entitled to under the Purchase Agreement (it does not), that would still not present an "authorization" issue under Section 549, as the APA (which provided for the transfer of the Clearance Box securities) was approved.

definition of Purchased Assets as explicitly recognized in the Sale Order.  *See* FOF ¶¶ 31.4, 31.10-31.11, 31.25; *infra*, Section IV(B).

145.    Thus, since all of the Repo Collateral and all of the Disputed Assets were covered by the definition of Purchased Assets in the APA, their transfer to Barclays was authorized by the Sale Order — irrespective of whether the Clarification Letter was approved.

> b.    The APA Also Identified Specific Categories Of Assets That Include The Disputed Assets And The Repo Collateral.

146.    In addition to defining Purchased Assets to include all assets "used in connection with the Business," the APA defines the Purchased Assets as "including," but not being limited to, a list of specifically identified categories of assets.  *See* COL ¶¶ 38.1-38.2.  The Repo Collateral and the Disputed Assets are covered by these specific and non-exclusive categories of Purchased Assets listed in the APA.[97]  COL ¶ 39.

147.    The APA specifically includes in the definition of Purchased Assets "government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short term agreements with a book value as of the date of approximately $70 billion (collectively, 'Long Positions')."  BCI Ex. 1 (APA) at p. 6 (definition of Purchased Assets).  The trial confirmed what is clear on the face of this language:  under the APA, Barclays was acquiring *all* of LBI's assets in those six categories.  *See* COL ¶¶ 39.1-39.3.  All of the Repo Collateral securities fell within this broad definition of the Long Positions.  *See* COL ¶ 39.5.  So did the Clearance Box Assets.  *See* FOF ¶ 29; COL ¶ 39.7.2.  Indeed, Professor Pfleiderer's unrebutted analysis confirmed that the Clearance Box Assets were contained within the APA's

---

[97]    The APA explicitly provides that the list of Purchased Assets is non-exclusive; it states that the word "including" shall mean "'including, without limitation' and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it."  BCI Ex. 1 (APA) at p. 10 (definition of "including"); COL ¶ 38.2.  Thus, whether or not the Court concludes that the specific list covers the Disputed Assets and the Repo Collateral, the APA's broad definition of Purchased Assets as all assets "used in connection with the Business" covers those assets, as explained in subsection I(B)(1)(a), *supra*.

definition of the "Long Positions," and thus that they were Purchased Assets under the APA. 10/6/10 Tr. at 55:25-57:12 (Pfleiderer). Moreover, the trial proved that the estimate of $47.4 billion provided at the Sale Hearing covered the core trading inventory that consisted of the Repo Collateral *and the Clearance Box Assets* — so in addition to such assets being covered by the definition of the Long Positions in the APA, the updated valuation estimate of these core trading assets at the Sale Hearing disclosed that they were being transferred to Barclays. In addition, it was disclosed at the Sale Hearing that Barclays had advanced approximately $45 billion to replace the Fed repo loan, and had "received the collateral that Lehman had posted in connection therewith" — further disclosing that Barclays was acquiring the securities that made up the Repo Collateral. *See* FOF ¶ 22.4. Thus, there can be no doubt that the Court approved the acquisition of all of the Repo Collateral and Clearance Box Assets.[98]

148.     The APA also specifically includes in the definition of Purchased Assets all "deposits" that are "associated with the Business." BCI Ex. 1 (APA) at p. 2. The 15c3-3 assets and the ETD Margin Deposits are clearly "deposits." *See* 17 C.F.R. § 240.15c3-3(e) (requiring a broker dealer to maintain a reserve account made up of "deposits" of cash and qualified securities); BCI Ex. 3a (TAA, which refers to ETD margin as "all margin deposits," which were all being transferred to Barclays); 8/24/10 Tr. at 101:10-102:7 (Rosen) (the assets posted as ETD Margin Deposits are deposits associated with the Business that Barclays was to acquire). Beyond being so identified in the APA, the trial proved that the ETD Margin Deposits were also part and parcel of, and inseparable from, the "exchange-traded derivatives," which were expressly listed in the APA as Purchased Assets. *See* FOF ¶¶ 31.19.1, 31.19.2; COL ¶ 39.9. Further, both 15c3-3 deposits and ETD Margin Deposits are "typical brokerage assets" that the

<hr />

[98]  In addition, of course, the Court further approved the acquisition of all of the Repo Collateral through its approval of the December Settlement, which was approved after an extensive disclosure (including from the New York Fed) regarding the details of the repo transaction. *See* Section III, *infra*; FOF ¶ 60.

Trustee stated at the Sale Hearing would be transferred to Barclays.  BCI Ex. 49 (9/19/08 Tr.) at 77:22-23.

> c.  By Its Objective Terms, The Sale Order Approved The Clarification Letter, Which Specifically Identifies The Repo Collateral And Disputed Assets As Purchased Assets.

149.  In addition to being included within the original APA, the Disputed Assets and the Repo Collateral securities were specifically identified in the Clarification Letter.  BCI Ex. 5 (Clarification Letter) at ¶¶ 1(a)(ii), 8.  As set forth more fully in the January Brief (at ¶¶ 618-630), the Clarification Letter, although not completed at the time of the Sale Hearing, was expressly approved by the Court in its Sale Order.  *See* FOF ¶ 39.2-39.3, 39.10.  The "Purchase Agreement" is defined in the Sale Order as including "that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008."  BCI Ex. 16 (Sale Order) at p. 1; *see id.* at p. 12 ("The Purchase Agreement and all the terms and conditions thereto are hereby approved.").  It was certainly understood by all (and noted in the Sale Hearing) that the Clarification Letter had not yet been finalized or exhaustively described in detail, and yet it was being expressly approved in the Court's Sale Order.  *See* FOF ¶¶ 39.1-39.11.  This was wholly appropriate given the exigencies of the situation (where Movants and government agencies alike strongly argued that immediate approval was required in the interests of the creditors, Lehman employees, and the national interest), and the fact that the Court is not required to review final sale documents (or even have a hearing) before authorizing the transfer of certain assets when circumstances warrant.  *See* January Br. at ¶¶ 619-623.

150.  Essentially, at the request of the parties (and government agencies), and given the circumstances, the hearing on approval of the Purchase Agreement (including the agreed modifications later memorialized in writing in the Clarification Letter) proceeded even though the Clarification Letter existed only in its oral form, as certain understandings were reached

shortly before the hearing commenced. Whether the Clarification Letter is viewed as having been approved in its then-existing oral form or prospectively in its final written form, the Sale Order expressly approves the Clarification Letter and it is far too late to challenge this approval.

151. The Debtor's initial Rule 60(b) motion made reference to the fact "Even a mistake by the Court is a basis for relief under Rule 60(b)(1)." LBHI Rule 60(b) Br. at ¶ 145. After Barclays pointed out that under clear Second Circuit case law any alleged judicial mistake of fact or law must be challenged by the deadline for appeal or else it is barred (January Br. at ¶¶ 544-545), Movants have been careful not to characterize their Rule 60 motions as being in any way based on judicial mistake. However, any suggestion that it was inappropriate for the Court to enter a Sale Order approving a not-yet finalized Clarification Letter, or that the Court made some other legal or factual mistake, is necessarily a claim based on judicial mistake, and therefore untimely and barred.

152. Indeed, in LBHI's Rule 60(b) Reply Brief (adopted by other Movants), LBHI states that it is only challenging "material changes to the deal made after the Sale Order was issued." LBHI Reply Br. ¶ 196. What the evidence adduced at trial shows is that Movants and their representatives knew of and agreed to what Movants now claim (wrongly) are material changes — the express inclusion of the Disputed Assets and Repo Collateral in the Purchase Agreement — *before* the Sale Hearing. Consequently, even if the more specific identification of these assets as "Purchased Assets" constituted a "material change" to the APA (they did not), they were not made after the Sale Order but rather beforehand.

153. Therefore, the approval of the Clarification Letter is an additional way in which the transfer of these assets was approved.

154. Movants negotiated, agreed to, and knew the terms of the Clarification Letter. Movants made the determination that no further Court approval of the Clarification Letter was needed. 4/28/10 Tr. 117:14-118:6 (Miller). LBHI's lead counsel, Mr. Miller — who still represents LBHI in matters other than with respect to these claims, and whom the Trustee's representative admitted was representing the Trustee and the LBI estate in the Sale negotiations (FOF ¶ 4.2.12) — testified that (even after reviewing Movants' Rule 60 briefs) he still believes no further approval was required for the Clarification Letter. Miller Dep. Tr. at 48:15-49:15, 56:4-9. Simpson Thacher, LBHI's other outside counsel, also believed that all necessary approvals were obtained and did not believe any further approval was required. 8/30/10 Tr. at 106:21-107:5 (Keller). Movants successfully invoked the Clarification Letter, including in the appeal of the Sale Order where they took the position, *inter alia*, that the Sale Order approved the "Purchase Agreement," which was defined to *include* the Clarification Letter. BCI Ex. 33 at pp. 9, 12, 16, 22. Movants gave *every* indication to Barclays that they did not believe (and would not contend) that the Clarification Letter required any further approval by the Court. *See* FOF ¶¶ 43.4-43.5, 63. Indeed, no Movant even suggested to Barclays that the Clarification Letter was not approved until *eleven months* after the Closing. *See* FOF ¶ 64. Consequently, as set forth more fully in Barclays' January Brief (at ¶¶ 461-468, 469-472, 473-474), the well established legal doctrines of waiver, equitable estoppel, and judicial estoppel preclude Movants from now taking the position that the Clarification Letter was not approved. And because the District Court's mandate affirmed the Sale Order's approval of the Purchase Agreement (expressly defined to include the Clarification Letter), this Court lacks jurisdiction to alter the

District Court's ruling by finding that the approved Purchase Agreement did *not* include the Clarification Letter.

e. Even If The Court Did Not "Approve" The Clarification Letter *Per Se*, The Provisions Of The Clarification Letter Are Still Operative Because The Sale Order Allowed The Parties To Make Amendments To The APA.

155. Even if the Court were to conclude that the Clarification Letter itself was not approved *per se* (despite the language in the Sale Order and the District Court's decision) because the final written version of the Clarification Letter was not submitted to the Court for express discussion and approval (and was filed with the Court after the Sale Order was issued), the Sale Order expressly allowed the parties to make further changes to the APA without further approval of the Court if the parties (including the Committee) agreed and there was not a material adverse effect on the estates. BCI Ex. 16 (Sale Order) at ¶ 25.

156. Barclays, the Lehman estates, and the Committee all agreed to the terms of the Clarification Letter (and therefore any changes to the APA contained therein). *See* FOF ¶¶ 43.3-45.5. While the Committee claims that it "did NOT consent," the Sale Order clearly could not have been intended to allow the Committee to be equivocal about its consent; to give Harvey Miller and Jim Seery the clear impression that they consented ("if it's okay with you, it's okay with us") (*see* FOF ¶¶ 43.3-5, 48.125); *to refrain from coming back to Court to state plainly that they were objecting to terms in the Clarification Letter as material changes to which they (secretly) did not consent;* and then, a year later, to come back to Court saying material changes were made, and must be nullified, because the Committee (having had a year to study the contract) now announces that it "did NOT consent." Under any fair reading of the Sale Order and the law of waiver, the Committee waived its right to take such an inequitable and cynical approach to this transaction. *See* COL ¶ 5; Section III(C)(4), *infra*.

157.     In any event, as described above, the supposed "additional" assets were already in the APA, and therefore their inclusion of these in the Clarification Letter could not cause a material adverse effect, and there was authorization for the transfer of these assets from the approval of the APA.  But even if the Clarification Letter had added additional assets that were not part of the Purchased Assets in the APA (it did not), the Clarification Letter also made many changes favorable to Movants, which must be considered in assessing whether the Clarification Letter had a material adverse effect on the estates.  *See e.g.,* January Brief at ¶ 187.  Movants have failed to show that the overall effect of the changes in the Clarification Letter was materially adverse to the estates; therefore, they have failed to establish that any such changes were not authorized pursuant to the objective terms of the Sale Order — *even if* the Clarification Letter were held to be not specifically approved by the Court.

158.     Indeed, the trial confirmed that the Clarification Letter made changes favorable to the Lehman estates.  It *narrowed* the overall definition of Purchased Assets.  *See* FOF ¶¶ 43.4.5.  It reduced the amount of assets Barclays would receive from the 15c3-3 account from all such assets — *all* of which were "assets used in connection with the Business" — to an amount of $769 million of securities, which thereby excluded $1 billion of assets that otherwise would have been acquired.  *See* FOF ¶¶ 30, 45.1.  More generally, the trial proved that the Disputed Assets were always among the Purchased Assets, and that if they had not been transferred to Barclays they would have been worth much less to the Lehman Estates.  In particular, the ETD Margin Deposits would have been *worthless* to the Lehman Estates.  *See* FOF ¶¶ 24.8-24.9, 29, 31.1-31.10, 55.  Thus, even if those assets had been "added to the deal" (which they were not, since they were always in the deal and the Sale Order), that addition would not have been adverse to

the Estates, because those assets would not have been available to Lehman in an LBI liquidation. *See* FOF ¶ 54 .

> ### 2. Even If The Transfer Of The Repo Collateral And Disputed Assets Had Not Been Authorized (It Was), Movants Are Now Legally Barred From Seeking The Return Of Assets They Agreed To Transfer.

159. Even if the Court were to conclude that the Trustee made unauthorized transfers of property to Barclays, that does not entitle the Trustee (or other Movants) to an order requiring the uncompensated return of property that Movants bargained away in order to get Barclays to consummate the transaction. Equitable defenses apply to Section 549 claims. For instance, "the common law principle of equitable estoppel retains its viability in bankruptcy litigation." *In re Gerlinger, Inc.*, 2008 Bankr. LEXIS 4560, at 34 (Bankr. N.D. Ohio Aug. 25, 2008) (applying equitable estoppel to bar 549 claim); *see also In re Smith*, 236 B.R. 91, 99-100 (Bankr. M.D. Ga. 1999) (considering application of equitable estoppel defense in § 547 preference avoidance action); *In re Atravasaada Land and Cattle Co.*, 388 B.R. 255, 272-73 (Bankr. S.D. Tex. 2008) (applying equitable estoppel in fraudulent transfer action); *In re Kmart Corp*., 318 B.R. 409, 416 (Bankr. N.D. Ill. 2004) (in a § 547 avoidance and § 550 recovery action, court finds affirmative defense of equitable estoppel is legally cognizable as a "threshold" defense to statutory cause of action).

160. The transfer of assets the Trustee now contends was "unauthorized" was not some inadvertent or fraudulent transfer of assets that the Trustee seeks to undo because it was done in secret and without his knowledge or that was not part of the negotiated bargain. Rather, the transfers here were pursuant to a negotiated contract that the Trustee (and LBHI) entered into with Barclays, and the Trustee's promise to transfer these assets to Barclays induced Barclays to complete the transaction that the Trustee, and other Movants, continue to enjoy benefits from, and tellingly do not seek to undo. *See generally* FOF ¶ 63.8. The record evidence establishes

that Barclays would not have closed the transaction if the Disputed Assets and the Repo Collateral were not going to be transferred to Barclays.[99]  A party (including a bankruptcy trustee) cannot promise to transfer certain assets as part of a sale transaction in order to induce a purchaser to enter and consummate the transaction, and then later claim that it is entitled to those assets back (without compensation) because the transfer of those assets was not sufficiently disclosed to the Court and hence not authorized.  As set forth more fully in Section III herein, Movants have waived such a claim and are equitably and judicially estopped, and barred by the doctrines of *in pari delicto* and unclean hands, from bringing such a claim.  *See infra*, Sections III(B) and III(C).  Moreover, because Movants could have included and addressed such issues as part of the appeal prior to the District Court's mandate, the Mandate Rule also prevents the relief sought by Movants.  *See* COL ¶¶ 2.3-2.6; *see also* Addendum 5 (Demonstrative Timelines) at Tab 1.

> 3.      Even If Movants' 549 Claim Were Valid And Not Legally Barred, The Piecemeal Relief Sought By Movants Is Impermissible Because It Would Effectively Impose A New Contract On Barclays That Barclays Never Agreed To.

161.     Movants do *not* seek to void the APA or the Clarification Letter.  Rather, Movants — by seeking to void certain parts of the Clarification Letter while enforcing others based on their *ex post* interpretation of *their own* allegedly deficient disclosure of the parties' agreement — seek to impose on Barclays (a year after the deal) a contract that is at odds with the contract that Barclays entered into (the APA, originally and as revised by the Clarification Letter) and that was never agreed to by the parties.  There is *no* evidence that Barclays agreed to a contract that accepted the terms of the Clarification Letter favorable to Movants but did not include the

---

[99] *See, e.g.*, 4/26/10 Tr. at 199:3-8 (McDade); 4/27/10 Tr. at 39:11-20 (McDade); 5/3/10 Tr. at 36:3-22 (Hughes); 6/22/10 Tr. at 23:16-24:8, 32:8-34:11 (Diamond); *see also* FOF ¶¶ 59.1.15.

transfer of the Disputed Assets and all of the Repo Collateral securities, provisions that were the *quid pro quo* for the terms favorable to Movants. Nor could some fictional oral agreement trump the express, written contracts entered into by sophisticated parties after extensive negotiations and drafting by some of the country's most sophisticated law firms. Indeed, Movants do not even *allege* that the parties agreed to the contract that they now seek to enforce; instead, they seek to effect a "transaction" that was not agreed to by the parties but was (they claim) "the transaction that was actually *disclosed* at the Sale Hearing." LBHI Br. ¶ 15. Consequently, the effect of granting the Section 549 relief sought by Movants (whether based on Rule 60(b) relief or otherwise) would be to rewrite the parties' contract.

162. It is a fundamental principle of American jurisprudence that Courts may not rewrite contracts. *See* COL ¶¶ 29.6, 12.1-12.2. To do so would amount to an unconstitutional taking (COL ¶ 29.1-7) and, under the doctrine of "constitutional avoidance," this Court should not interpret the bankruptcy rules in a way that might raise a constitutional issue. *See* COL ¶¶ 29:8-9. This principle, of course, applies in bankruptcy cases as well. Even where there are grounds for rescission, partial rescission of a contract is impermissible. *See* COL ¶¶ 12.11-12.15. The narrow exception to this is when there has been a mutual mistake — but that involves alteration of the contract only because it is necessary to give effect to the parties' actual bargain — not to alter it. *See* COL ¶¶ 12:3-12.6. That narrow exception (mutual mistake) has not even been alleged here. Statements made at a sale hearing cannot supplant or redefine the parties' sale agreement. *See* COL ¶ 14. Therefore, Movants' request for this Court to effectively re-write the parties' carefully negotiated contract — on Section 549 or any other grounds — must be denied.

163.     Indeed, Movants have not cited, and Barclays has not found, any case in which Section 549 was used to avoid parts of a contract piecemeal. This is because such relief is impermissible.[100]

C.     There Is No Basis For Section 559 Relief.

164.     Movants contend that they are entitled to recover the "excess value" in the Repo Collateral under Section 559 of the Bankruptcy Code. *See* LBHI Br. at ¶¶ 134-137; Committee Br. at ¶¶ 81-82; Trustee Compl. at ¶¶ 135-138. Section 559 provides that if a "repo participant" liquidates a "repurchase agreement" with a debtor, then "any excess of the market prices received on liquidation" of the repo collateral over the amount of the repo loan, plus interest, plus the expenses of liquidation, "shall be deemed property of the estat[e]." 11 U.S.C. § 559. Movants' claim that they are entitled to any such "excess value" has no merit for multiple reasons, all of which are laid out in the January Brief, and summarized briefly below. *See* Barclays Opp. Br. at ¶¶ 648-670.

1.     Movants' Section 559 Claims Require A Modification Of The Sale Order Under Rule 60(b), And Therefore Must Be Denied Because There Is No Basis For Rule 60(b) Relief.

165.     On its face, the Sale Order provides that the approved Purchase Agreement includes the Clarification Letter. BCI Ex. 16 (Sale Order) at p.1 and ¶ 3. On its face, the Clarification Letter provided that *all* assets in the Repo Collateral were being acquired by Barclays as Purchased Assets. BCI Ex. 5 (Clarification Letter) at ¶¶ 1(a)(ii)(A), 13.[101] Thus, any claim that Movants wanted to make that Section 559 applied and required Barclays to return

---

[100] If the Court were to conclude that the transfer of any assets had not been authorized for whatever reason and that some action was required to address that circumstance, because the evidence shows that the sale would have been approved even after a full 35-day presentation and disclosure of all relevant sale details, and because the deal cannot be rewritten and no party wants it unscrambled, the Court should now authorize them *nunc pro tunc*.

[101] As explained above, it was also clear on the face of the APA that Barclays was acquiring all of the types of securities that were used in the Repo Collateral. *See* Section I(B)(1)(b), *supra*.

any alleged "excess" Repo Collateral was waived as of the time that the Lehman Movants agreed to the Clarification Letter, and the Committee chose not to object. *See* COL ¶ 5. In addition, any such claim is barred as a matter of numerous other preclusion doctrines protecting the finality of the Sale Order and the Purchase Agreement. *See* COL ¶¶ 2, 3, 4, 6, 9.

166. Accordingly, Movants cannot obtain relief under Section 559 without first modifying the Sale Order under Rule 60(b). As explained above, their Rule 60(b) motions should be denied, and therefore there is no basis for Section 559 relief.

2. <u>Section 559 Cannot Be Used To Modify The Express Terms Of A Written Contract Providing That The Repo Collateral Was To Be Acquired As Purchased Assets.</u>

167. Movants have not cited — and Barclays has not found — any case in which Section 559 has been held to justify rewriting an express written contract that, as the Purchase Agreement does here, expressly conveys all assets held as repo collateral as "Purchased Assets," in a scenario where the repo loan has been forgiven and the transaction has been subsumed into a larger sale transaction. *See generally* FOF ¶¶ 19, 20, 22, 60. There is no reason for this Court even to consider adopting such a rule in this case, where the evidence shows that the parties intended *from the beginning* that, assuming the Sale was approved, all assets in the Repo Collateral would be conveyed to Barclays as Purchased Assets that were part of the overall Sale Transaction. *See* FOF ¶¶ 5, 48.41-48.53, 60; *see also* Section I(B)(1), *supra*.

3. <u>Section 559 Was Rendered Moot Because The Parties Expressly Agreed In The Purchase Agreement That Barclays Was Acquiring All Of The Repo Collateral.</u>

168. Movants argue that Section 559 applies because Barclays issued a Notice of Termination on September 19, 2008, which required any "excess collateral" to be returned to the Debtor. LBHI Br. at ¶¶ 134-137; Committee Reply Br. at ¶¶ 157, 244; Trustee Reply Br. at ¶ 207. That is false for several reasons: there was no "excess collateral," especially as of

September 19; and the Notice was issued inadvertently as part of an automatic process, and the parties expressly agreed it would be deemed null and void *ab initio* — an express agreement that was plain on the face of the Clarification Letter (rendering all Section 559 claims time-barred, waived, and estopped).

169.     But even if Movants were right, and the termination notice transferred the ownership of the "excess collateral" back to the LBI estate, the LBI estate and the Debtor then *expressly agreed* to transfer any such putative excess collateral as part of the Purchased Assets being acquired by Barclays.  In other words, the Section 559 claim is entirely mooted by the express terms of the Purchase Agreement.  *See* January Brief at ¶¶ 652-659.  COL ¶¶ 28.4-28.5.

        4.     <u>Section 559 Does Not Apply Because The Nature Of The Assets In The Repo Collateral Places It Outside the Scope Of The Statutory Definition Of Repo Collateral.</u>

170.     Movants' Section 559 claim fails on yet another ground — the Fed Replacement Transaction that is at issue was not a "repurchase agreement" within the meaning of the statute, and thus Section 559 is inapplicable.  *See* January Br. at ¶¶ 669-670.  The Bankruptcy Code defines a repurchase agreement as an agreement to transfer *only certain types of collateral*; specifically, "certificates of deposit, mortgage related securities (as defined in Section 3 of the Securities Exchange Act of 1934), mortgage loans, interests in mortgage related securities or mortgage loans, eligible bankers' acceptances, qualified foreign government securities (defined as a security that is a direct obligation of, or that is fully guaranteed by, the central government of a member of the Organization for Economic Cooperation and Development), or securities that are direct obligations of, or that are fully guaranteed by, the United States or any agency of the United States."  11 U.S.C. § 101 (47)(A)(i).[102]  COL ¶ 28.7.

---

[102] This definition uses the phrase "mortgage related securities," but that term is defined specifically in the Bankruptcy Code to cover only a very narrow subset of mortgage securities — only those "rated in one of the two

171.    Here, approximately 30 percent of the collateral underlying the Barclays Repo is
not within the Section 101(47) definition.  As Professor Pfleiderer testified — without rebuttal or
cross-examination — at least $9.3 billion of the collateral did not constitute repo assets as
defined in 11 U.S.C. § 101(47)(A).  BCI Ex. 346 at ¶ 3; 10/6/10 Tr. at 15:16-24 (Pfleiderer).
Under the basic principle of *expressio unius est exclusio alterius*, the fact that the Repo
Collateral contained these non-conforming assets rendered Section 559 inapplicable.  Thus,
Section 559 did not at any time apply to the Fed Replacement Transaction.  COL ¶¶ 28.8-28.9.

5.    Section 559 Does Not Apply Because There Was No "Excess" Collateral.

172.    In any event, as the trial established, Barclays did not receive any "excess" Repo
Collateral that could possibly be recovered under Section 559.  Thus, as was argued in the
January Brief, even if all other legal deficiencies in the Section 559 argument were ignored, there
is no basis for finding that there was any "excess collateral" that Barclays was required to return
to the estate.  *See* January Br. at ¶¶ 660-662.  As of September 19, 2008, Barclays had advanced
$45 billion in cash, and had received Repo Collateral marked at approximately $43 billion, but
correctly believed by Barclays to be worth several billion dollars less than that amount.  *See* FOF
¶¶ 20.1, 23.1-23.2, 38.8.4.1.  At that time, there certainly was no "excess."  Indeed, until
December 22, 2008, Barclays continued to have received Repo Collateral that Barclays valued
for accounting purposes at only approximately $40 billion.  *See* FOF ¶ 53.11.2.  Even after
receiving the assets in the December Settlement, Barclays had Purchased Assets categorized as
"Repo Collateral" that were booked at only $45.5 billion, but which if *they had been liquidated*

---

highest rating categories by at least one nationally recognized statistical rating organization"– not the many different
kinds of illiquid, structured mortgage products acquired by Barclays in the Sale Transaction.  *See* 11 U.S.C. § 101
(47)(A)(i) (defining "mortgage related securities" by reference to the definition "contained in Section 3 of the
Securities Exchange Act of 1934)"); 15 U.S.C. § 78c(a)(41) (Section 3 of the 1934 Act, defining "mortgage related
security" as "a security that is rated in one of the two highest rating categories by at least one nationally recognized
statistical  rating organization . . . .").

for purposes of a § 559 analysis, would have generated far less value than that.  *See* FOF ¶¶ 38.8.4, 24.8-24.9.

173.    Movants failed to prove the existence of any "excess" collateral for a further reason.  Under Section 559, whether there is "excess" is determined by the following formula: "any excess of the market prices received on liquidation of such assets (or if any such assets are not disposed of on the date of liquidation of such repurchase agreements, at the prices available at the time of liquidation of such repurchase agreements from a generally recognized source or the most recent closing bid quotation from such a source) over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements."  11 U.S.C. § 559.  There is no evidence in the record showing that Barclays received any excess at market prices upon liquidation of the Repo Collateral it received — nor could there be because Barclays did not.[103]  Nor have Movants shown any excess as of the supposed date of liquidation of the repurchase agreement — September 19, 2008 — "at the prices available at the time of liquidation of such repurchase agreements from a generally recognized source or the most recent closing bid quotation from such a source."  They cannot do so because, as Professor Pfleiderer opined without rebuttal, "for many positions of significant indicated value in the Repo Collateral, *there is no generally recognized pricing source available*."[104]  BCI Ex. 341 at ¶ 57 (emphasis added); COL ¶ 28.13.

---

[103] As Mr. Romain testified, Barclays analyzed its gains and losses on all securities it acquired in the Sale Transaction through the end of 2008  and concluded that net of hedging costs it had made approximately $50 million.  9/2/10 Tr. at 85:4-88:17 (Romain).  Approximately $700 million of gain is attributable to increases, based on post-Closing events, of the valuation of the highly illiquid Pine and Giants securities that remained on Barclays' books.  FOF ¶ 53.25.

[104] This practical problem further illustrates why Section 559 should not be read to apply where, as here, a substantial amount of the collateral consists of highly illiquid securities that do not meet the Bankruptcy Code's definition of repo collateral.  *See* Section I(C)(4)*, supra.*

<u>Any Possible Section 559 Claim Is Expressly Barred By The Release In The December 2008 Settlement.</u>

174.   Finally, as explained in the January Brief and below, any Section 559 claim is necessarily barred by the Release in the Court-approved December Settlement.  *See* January Br. at ¶ 663-668; Section II, *infra*; *see also* COL ¶¶ 28.6, 26.

## II.   **ALL CLAIMS RELATING TO THE REPO COLLATERAL ARE BARRED BY THE RELEASE IN THE COURT-APPROVED DECEMBER 2008 SETTLEMENT.**

175.   Even if the Court were to ignore the fact that Movants cannot satisfy Rule 60(b) or the provisions of the Bankruptcy Code they invoke, it nonetheless should deny Movants' motions to the extent they relate in any way to Repo Collateral.  On December 22, 2008, the Court granted the Trustee's request for approval of a settlement between the Trustee, Barclays, and JPMorgan.  BCI Ex. 39.  That December Settlement provided that "*the Trustee, on behalf of LBI and the LBI estate*, hereby does and shall be deemed to *forever release … BarCap …* from and in respect of *all Claims*, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, *relating to*":

- the "Replacement Transaction," defined as the "*reverse repurchase transaction with LBI in which BarCap would fund $45 billion to LBI for the Fed Portfolio*";

- the "Subject Funds," which were the $7 billion "transferred by LBI to an account at JPMorgan early on the morning of September 19, 2008 as a result of the fact that not all of the Fed Portfolio securities were delivered to BarCap under the Replacement Transaction"; and

- the "Delivered Securities," which were "*the securities listed on Schedule A to the Clarification Letter*."

BCI Ex. 9 at ¶ 4(d) and ¶¶ A, D, & E (emphasis added) (the "Release").

176.   This Release bars all Movants from bringing any claims relating to the Repo Collateral.  It is undisputed that, as the Trustee represented to the Court in requesting approval

for the December Settlement, the Repo Collateral was property held by *LBI*. *See* FOF ¶ 60.4.2; COL ¶¶ 26.1-26.2. Thus, only LBI could ever conceivably have had a *direct* claim to the Repo Collateral, and LBI clearly released any such claim. *See* FOF ¶ 60.4. The only claims that could in theory be brought by LBHI or the Committee to recover assets in the Repo Collateral would be *derivative* claims: since they did not directly own the assets in the Repo Collateral (and have never claimed otherwise), their only conceivable standing to bring a claim to recover assets in the Repo Collateral was derivative of whatever LBI's potential *direct* claims might be.

177. It is black-letter law, never disputed by Movants, that a release in a settlement agreement executed by a person with actual or potential direct claims not only bars that person from bringing those claims or potential claims, *but also bars any other person who has indirect, derivative claims*. *See* COL ¶¶ 26.3-26.4. Thus, the Release in the December Settlement bars not only the Trustee, but also LBHI and the Committee. *See* COL ¶¶ 26.3-26.4.

178. The only argument Movants have made in response to this point was in a footnote in the reply brief filed by LBHI in March 2010, where it stated: "LBHI's claims relating to the repo collateral are not derived from the repo agreement itself, rather they are based on Barclays and a few executives taking *assets from within the LBHI estate* and transferring them to Barclays under cover of the repo transaction." LBHI Reply Br. at n.87 (emphasis added). But it is simply *false* to assert that any assets in the Repo Collateral were or would have been "assets from within the LBHI estate." *See* FOF ¶ 60.4.2. Any asset in the Repo Collateral that had *not* been transferred to Barclays *would indisputably have been an asset held within the LBI estate, not within the LBHI estate*. *See* FOF ¶¶ 19, 60.4.2. The reason for that is simple: *the Repo Collateral assets were all assets owned by LBI, not by LBHI*. *See* FOF ¶¶ 19, 60.4.2.

179. It is certainly true that both LBHI and LBI were included in the Purchase Agreement's definition of "the Seller," but that does not change the fact that the specific assets in the Repo Collateral (like virtually all other Purchased Assets) were owned by *LBI*, not by LBHI, and would have been held by the LBI estate had there been no Sale. *See* FOF ¶ 19. Thus, whatever rights and obligations LBHI may have as a "Seller" under the Purchase Agreement, it does not have any *direct* claim to recover any of the Purchased Assets that were held by LBI; instead, any claims it has are *indirect*, and derivative of the rights of LBI.[105] Movants have never argued or explained how any other conclusion is possible.

180. Thus, all of the Movants are barred by the Court-approved Release in the December Settlement. Indeed, the fact that Movants have brought claims to recover portions of the Repo Collateral is an *obvious breach* of the Release in the December Settlement.

181. Barclays recognizes that statements were made at the hearing to approve the December Settlement that the settlement would not constitute "collateral estoppel," and that rights would generally be preserved. *See* FOF ¶¶ 60.8-60.10. But none of those statements mean that the Release being approved was somehow meaningless, or subject to being undone. *See* FOF ¶ 60.9. Moreover, the Order that was presented for approval, and that was approved, was crystal clear:

- it "ORDERED" that the motion to approve the December Settlement, *which included the Release*, was "*granted in all respects*" (BCI Ex. 39 at p. 1) (emphasis added);

---

[105] For example, if the Court were to hold that Barclays was not entitled to any of the Disputed Assets (whether as a matter of contractual interpretation or Rule 60(b) relief), and if that ruling were upheld on appeal, then those assets would belong to the LBI estate, not the LBHI estate. The Trustee's most recent Interim Report directly confirms this, by referring to those assets as potential assets of the LBI estate. Trustee's Fourth Interim Report for the Period May 11, 2010 through October 26, 2010. LBHI would be benefited by any such award only *indirectly* — for example, if there were a surplus in the LBI estate created by those assets, that would presumably allow for a distribution to be made to LBHI as the equity owner of LBI.

- it "ORDERED that *the settlement agreement (the 'Settlement Agreement') is authorized and approved*" — again, this approved Settlement Agreement *included the Release* (*id.* at p. 2) (emphasis added);

- it "ORDERED that nothing in this Order shall bind, be collateral estoppel or otherwise prejudice *any other matter in this case*, the Chapter 11 Cases or any related case with respect to the facts alleged in the Motion or in the accompanying Moore Declaration, Leventhal Declaration, or LaRocca Declaration, *other than the approval of the Settlement Agreement and the authorization for the Trustee to take such action and execute the Settlement Agreement … and transfer of the Settlement Payments to Barclays.*" (*id.*) (emphasis added);

- it "ORDERED that all objections to the Motion or the relief requested therein … are *overruled on the merits*" (*id.*) (emphasis added).

182. There is no way to read this Order or the December Settlement Agreement as providing for a Release that could be nullified if certain facts were subsequently proved. *See* COL ¶¶ 26.1-26.2. The Order (and the statements at the hearing to approve the Order) protected the rights of parties to other matters. For example:

- The evidence shows that Harvey Miller and the Debtor were very concerned that, while they *agreed* that "Barclays was entitled to the $7 billion" (BCI Ex. 676, at p. 1), there may well be viable claims against JPMorgan; the Order makes clear that the statements in the Sale Motion (and accompanying materials such as the Leventhal Declaration or Moore Declaration) would not preclude such claims or be viewed as facts that would in any way prejudice such claims. *See* BCI Ex. 39; FOF ¶ 60.8.

- Similarly, if there were any conceivable claim against the New York Fed, the statements in the Sale Motion and accompanying materials would not be considered to have been found as facts that might prejudice such claims.

- Similarly, any potential claims against Barclays, either for discovery or to assert that any *other assets* may have been transferred to Barclays in error (for example, the claims relating to the Disputed Assets), would not be barred by collateral estoppel or otherwise prejudiced by the Order.

183. While "other matters" such as these were not to be prejudiced or subject to collateral estoppel, it is logically impossible to read the Order as allowing claims *against Barclays* that were *specifically released* in the approved December Settlement Agreement. If that were the intent of the "no collateral estoppel" language in the Order and at the hearing, then

there would have been no settlement, because the Settlement Agreement and Release would have been rendered meaningless (at least as to Barclays).[106]  Thus, all claims, by all Movants, that relate in any way to the Repo Collateral are covered by the plain language of the Release and should be held to be barred as a matter of law by the Court-approved December Settlement Agreement.

184.  Indeed, what is even more incredible is that the December Settlement transferred assets worth approximately $5 billion, at a time when Movants *knew and had discussed* that there was approximately a $5 billion valuation difference between the marks on the Repo Collateral and the Repo Loan, a fact discussed with the Committee on the night before the Closing — and a fact that the Committee strategically chose not to raise in its opposition to the motion to approve the December Settlement.  BCI Exs. 37, 38.

185.  Finally, the record demonstrates, and the Trustee *admitted*, that at the time he asked the Court to approve the December Settlement, the Trustee (a) did not say anything at all to the Court about a $47.4 billion valuation cap or limit of any kind whatsoever (FOF ¶ 52.6), and (b) did not believe it was necessary to reach any conclusion, and had not reached any conclusion, as to whether or not the December Settlement would cause Barclays to receive more than $47.4 billion *in Repo Collateral alone* (FOF ¶ 67.3.2.3).  Thus, at the time he asked the Court to approve the December Settlement, the Trustee believed it was possible the settlement would *itself* result in all the Repo Collateral acquired by Barclays being worth more than $47.4 billion, leaving aside all of the other Purchased Assets Barclays was entitled to recover under the

---

[106] Moreover, because any such interpretation of the Order would render provisions of the December Settlement Agreement meaningless, it violates established principles of contractual interpretation, and therefore should be rejected.  *See* COL ¶ 37.  It also violates Barclays "reasonable, investment-backed expectations" that were based on the plain language of the Order and the Release, and therefore would at a minimum raise profound constitutional concerns, which means any such interpretation should be disfavored.  *See* COL ¶ 29.

plain terms of the Purchase Agreement.  FOF ¶ 67.3.2.3.[107]  That admission completely

undermines the credibility of any assertion by any Movant that the Court's approval was

somehow limited to the transfer of Purchased Assets worth no more than $47.4 billion.

## III.   EVEN IF RULE 60(B) RELIEF MIGHT OTHERWISE BE AVAILABLE, THE LAW PROTECTS BARCLAYS' RELIANCE UPON THE FINALITY OF THE SALE ORDER AND THE PURCHASE AGREEMENT, AND PRECLUDES THE RELIEF MOVANTS SEEK.

186.     As explained at length in Barclays' January Brief and in the COL, there are

numerous legal doctrines that protect the finality of the Sale Order and the Purchase Agreement,

and that bar the relief Movants seek.  *See* January Br. at ¶¶ 334-687, COL ¶¶ 2-7, 9.  Movants

cannot evade these legal bars by claiming they "did not know" the information on which they

have based their claims, because they *did know* that information:  as the trial established,

Movants knew all material information before the Rule 2004 discovery, and certainly knew

enough that it would be grossly unjust to grant them the relief they seek — a new Sale Order and

a new Purchase Agreement — at this late stage.

### A.     Rule 60(b) Motions Are Disfavored, And Movants Have Not Satisfied Their "Heavy Burden" For Justifying The One-Year Delay In Bringing Their Claims.

187.     As an initial matter, Rule 60(b) motions are disfavored, particularly as a

mechanism for challenging a Section 363 Sale Order.  COL ¶ 1.  The reason for that is precisely

because the law seeks to protect the "finality" of such sale orders, both to protect the rights and

expectations of those who rely on such orders and to encourage future bidders in bankruptcy

sales (COL ¶¶ 1.2-1.3).  The trial further confirmed that there are substantial public policy

reasons not to alter the Sale Order in this case:  testimony from Shari Leventhal of the New York

---

[107]  Indeed, on the face of the Sale Motion and the Leventhal Declaration, the Trustee told the Court in December 2008 that Barclays *was entitled* to over $49 billion in Repo Collateral alone.  *See* FOF ¶ 60.10.1.1.

Fed confirmed this, as did statements made in a prior hearing in this case by the Trustee's representative, James Kobak. *See* FOF ¶¶ 56.14-56.15; COL ¶ 1.4.

188. It is also black letter law in this circuit that any claim that the Court made a mistake of law or fact in approving the Sale Order is time-barred: any such claim had to be brought before the deadline for filing an appeal. *See* COL ¶ 7.4.

189. For the remaining Rule 60(b) claims, the case law holds that Movants have a "heavy burden" in demonstrating why they reasonably delayed a full year (or five days less than a full year) to bring their claims. *See* COL ¶¶ 7.5-7.6. Movants cannot possibly satisfy that burden. The trial established that as of the Closing, Movants knew (among many other things) (a) the plain terms of the Clarification Letter, including that it provided for Barclays to acquire *all* of the Repo Collateral and Disputed Assets (*see* FOF ¶¶ 48.41-48.46, 48.102-48:119, 48.78-48.95); (b) the fact that those plain terms did not provide any valuations of the Purchased Assets (*see* FOF ¶¶ 5, 47; (c) the fact that there was approximately a $5 billion valuation difference between the stale Lehman "marks" on the Repo Collateral and Clearance Box Assets and the valuation estimates given in Court (*see* FOF ¶¶ 48.39-48.61); (d) the fact that cash ETD Margin was being transferred to Barclays (*see* FOF ¶¶ 48.78-48.95); (e) the fact that the value of the Purchased Assets and Assumed Liabilities was highly uncertain (*see* FOF ¶ 47); (f) the fact that certain "transaction adjustments" had to be made to the Comp and Cure estimates (*see* FOF ¶¶ 4.4.12.1, 48.65, 48.66, 48.75, 65.4.1); (g) the fact that Cure estimates were filled with guesswork, and Barclays had the contractual right to assume no contracts and pay nothing in Cure (*see* FOF ¶¶ 12, 48.62-48.72); (h) the fact that Barclays had announced its expectation of a multi-billion dollar accounting gain on the Sale (*see* FOF ¶ 17); and (i) the fact that Barclays was making employment and bonus offers to Lehman executives, including some who were involved

in the transaction (*see* FOF ¶¶ 4.3, 4.4).  Movants knew even more by the time the deadline for

filing a motion for reconsideration expired, *see* FOF ¶¶ 46-52, 65.1, even more by the deadline

for filing an appeal, *see* FOF ¶¶ 46-52, 65.1, 65.2, even more by the time they filed their briefs

defending the Sale Order on appeal, *see* FOF ¶¶ 46-52, 61.2, and even more while they waited

for the District Court to issue a decision upholding the Sale Order, *see* FOF ¶ 61.4.

190.     Under these circumstances, Movants cannot satisfy their "heavy burden" of

justifying their one-year delay.  They claim they needed the Rule 2004 discovery before bringing

their claims, but the evidence shows that Movants based their claims entirely on the distortion of

emails and related facts they had *before* the Rule 2004 discovery was conducted.  *See* FOF ¶¶

65.3.3, 65.4.  Thus, even before considering any of the other legal doctrines implicated in this

case that bar the relief Movants seek (described below), Movants' claims should be denied for

the simple reason that they are unable to satisfy the timeliness requirement of Rule 60(b) itself.

B.      <u>Because The Rule 60(b) Motions Challenge A Section 363 Sale Order, Movants
        Face Additional Legal Obstacles That Bar Their Claims.</u>

1.      <u>The Doctrine of Equitable Mootness Bars Movants' Claims.</u>

191.     Because they seek to modify the central terms in an un-stayed Order approving a

Section 363 Sale, Movants must do more than merely satisfy the timeliness requirement of Rule

60(b).  They must also, as an initial matter, show why their claims are not barred by the doctrine

of equitable mootness, which as a matter of established case law (as well as logic) applies to

Rule 60(b) challenges in just the same way as it applies to direct appeals.  COL ¶¶ 6.1-6.3.

192.     Movants have not even attempted to demonstrate, and cannot demonstrate, why

their claims are not barred by the doctrine of equitable mootness.  To the contrary, the statements

made to the District Court by the Lehman Movants in defending the Sale Orders on appeal

establish that *they agree* that any attempt to modify the un-stayed Sale Order by removing the

central provisions protecting Barclays from subsequent liability claims violates the principle of equitable mootness.  COL ¶¶ 6.4-6.7; FOF ¶ 61.2.

193.    The Bay Harbour appellants argued they could be awarded relief without undoing the Sale because they were merely seeking to modify the "free and clear of all liens" provision of the Sale Order.  BCI Ex. 41 at p.14.  The District Court rejected this contention as "specious," based on this Court's finding that "Barclays demanded that the sale be free and clear of liens, and without that term no sale would have occurred."  *Id.* at 19.  Thus, the District Court held that the appellants' claim was equitably moot in light of the "comprehensive change in circumstances" that had taken place.  *Id.* at 19 n.7.  In reaching this decision, Judge Cote accepted the arguments of LBHI and the Trustee, who both argued that the claim by appellants was equitably moot because "in view of the comprehensive change in circumstances that has occurred, *it would be inequitable* for the Court to grant Bay Harbour's requested relief."  M. 552 at 10; *see also id.* at 10-16; LBHI Appellate Brief at 30-33; COL 6.4-6.6.

194.    The same doctrine of equitable mootness that barred Bay Harbour's appeal bars the Rule 60(b) relief sought by Movants.  *See* COL ¶ 6.

195.    Indeed, the law firm that represented LBHI, LBI and the Trustee in the negotiations explicitly told the Committee in October 2008 that, *even then*, their claims were equitably moot because the Sale had closed and the Sale Order was not stayed.  On October 13, 2008, the Committee's lawyer Luc Despins sent an email to Weil Gotshal in which he stated that the Committee believed the securities transferred to Barclays were worth "billions more" than $47.4 billion.  *See* FOF ¶ 50.12.  In response, Weil Gotshal's Lori Fife stated:  "I really am at a loss to figure out why you and the other Committee professionals are spending so much time on the Barclays sale.  What could you or anyone for that matter do even if it turned out that the

assets turned out to be greater? *As you know, the sale has been consummated which effectively moots out any relief you might be seeking.*"  FOF ¶ 50.12 citing BCI Ex. 389 (emphasis added). This statement was made during the course of Weil Gotshal's representation of LBHI, and *admits* that any challenge to the Sale and the Sale Order — including an attempt to claw back securities or otherwise bring a claim that was barred by the Sale Order's express provisions — was equitably moot even as early as October 2008.  As recounted in our January brief, and further set forth below and in our Findings of Fact, Weil Gotshal and the Trustee both successfully argued this same point to the District Court in defending the Sale Order on appeal. *See* January Br. at ¶¶ 242-245; Section III(B)(1), *infra*; FOF ¶ 61.2.

2.  <u>The Principle Of Finality Contained In Section 363(m) Of The Bankruptcy Code Bars Movants' Claims Because They Have Failed To Demonstrate Any Bad Faith.</u>

196.   The Bankruptcy Code also contains an explicit statutory provision that protects the finality of a sale order, and bars Movants' claims:  Section 363(m) provides that the "validity" of a § 363 Sale Order may not be challenged on appeal absent a finding of bad faith. 11 U.S.C. § 363(m).  As explained above, the relief Movants seek, like the relief sought by the Bay Harbour appellants, is equivalent to a challenge to the validity of the Sale Order, as the District Court held.  *See* COL ¶ 6.5-6.6.  That holding is the law of the case.  COL ¶ 6.7.

197.   Section 363(m) has been held to apply to Rule 60(b) claims as well as to appeals. *See* COL ¶ 9.3.  Whether the Court agrees with that holding generally, it certainly should hold that the principle of Section 363(m) applies to a Rule 60(b) motion to modify a Sale Order *that has already been successfully defended on appeal*.  *See* COL ¶ 9.5.  There is no case that has ever granted a Rule 60(b) motion seeking to modify a Sale Order that was affirmed on appeal, and Barclays is not aware of any case that has even considered such a motion:  as a matter of logic, if the relief sought in the Rule 60(b) motion is the kind of relief that would have triggered

the Section 363 requirement that "bad faith" be shown if it had been brought on appeal, then it certainly should trigger that same requirement when brought as a Rule 60(b) motion. *See* COL ¶¶ 9.3-9.5. Thus, since Movants have failed to demonstrate any bad faith, *see* FOF ¶ 4, their Rule 60(b) Motions must be denied.

3. <u>Even If Movants Had Demonstrated Any Inequitable Conduct (Which They Have Not), The Doctrines of Unclean Hands And *In Pari Delicto* Would Bar Their Claims.</u>

198. Movants seek equitable relief, yet they ignore the fact that (a) any conceivable inequitable conduct of the Lehman executives (and there was none) would be legally imputed to the Lehman Movants (COL ¶¶ 8, 23.3-23.4), and (b) it is the Lehman Movants and the Committee who have acted inequitably, by concealing from Barclays and the Court for over a year their knowledge of the information on which they based their claims (information that was produced only as a result of this Court's discovery order), their intent to bring those claims, and the theories they had for bringing those claims (such as the "wash" theory, the "$47.4 billion valuation cap" theory, and the "discount" theory, none of which were based on information from the Rule 2004 discovery, and none of which were mentioned during numerous court hearings and meetings with Barclays for over a year). *See* FOF ¶ 65.

199. It is well-established that a movant may not seek equitable relief if they have unclean hands, or if they were themselves involved in the alleged misconduct. *See* COL ¶ 17. Even if the Court were otherwise inclined to find a basis for granting any equitable relief to Movants, both of those doctrines would bar such relief.

C.    Because The Rule 60(b) Motions Seek To Modify A Sale Order That Was
      Obtained At The Request Of The Lehman Movants, And Without Objection From
      The Committee, And That Movants Then Successfully Defended On Appeal,
      There Are A Series Of Insurmountable Legal Doctrines That Bar Movants'
      Claims.

200.   In addition to the general untimeliness of the Rule 60(b) motions, and the fact that

they are barred by the doctrine of equitable mootness and the bad faith requirement of Section

363(m), they are also barred by a series of doctrines that prevent Movants from prevailing given

the truly extraordinary (and unprecedented) procedural posture of this case.  Movants seek to

modify a Sale Order that:

- the Lehman Movants successfully persuaded this Court to enter, and to which the
  Committee chose not to object;

- was appealed, with both the Lehman Movants and the Committee opposing those
  appeals; and

- was affirmed on appeal, based upon arguments advanced by the Lehman
  Movants.

201.   No Court has ever allowed (or even considered allowing) such extraordinary

relief.  And there is a good reason for that:  there are numerous legal doctrines that preclude it.

In fact, the only case Barclays has found vacating a Section 363 sale order in which there was a

prior appeal — and the sole case Movants cite for the proposition that simply because a sale

order was appealed does not mean Rule 60 relief is unavailable — demonstrates what Movants

could have done to avoid these various legal bars.[108]  In *In re Tri-Cran,* 98 B.R. 609 (Bankr. D.

Mass. 1989), the Trustee (*who was not a party to the appeal*) uncovered information about the

sale as the appeal was pending and promptly asked the district court to stay its decision so the

Bankruptcy Court could consider the new evidence in a Rule 60(b) proceeding — thereby

avoiding an affirmance of the Sale Order and an appellate mandate, and promptly putting the

---

[108] *See* Committee Reply Br. at ¶ 182 ("simply because the Sale Order was appealed and affirmed does not mean
that Rule 60 relief cannot be obtained post-appeal") (citing *In re Tri-Cran*, 98 B.R. at 618).

110

courts, the buyer, and other parties on notice that they should not rely on his support of the sale and that he did not intend to relinquish his right to challenge the sale based on the information in his possession at the time. Because Movants failed to do the same, the following bars preclude the relief they seek.

1.   The Mandate Rule Dictates That This Court Lacks Jurisdiction To Alter The Sale Order That Was Affirmed By The District Court.

202.   As explained at length in the January Brief, and in our Conclusions of Law, the Mandate Rule denies this Court *jurisdiction* to grant any claims that were explicitly or implicitly decided on appeal, or that were "includable" on appeal. *See* COL ¶¶ 2.1-2.6. Thus, the Mandate Rule provides there is no jurisdiction to address any claim by Movants to modify the Sale Order to remove provisions that limit Barclays' liability, since that was the *explicit issue* raised on appeal, and rejected by the District Court. *See* FOF ¶¶ 61.1-61.5. In addition, the Mandate Rule provides there is no jurisdiction to address the following claims: (a) the claim that the Sale Order did not approve the Clarification Letter (or erred in approving it prospectively), since any such claim was clearly "includable" on appeal and the facts relevant to such a claim were plainly in existence as of the date of the Closing (and hence by the date of the appeal deadline) (*see* FOF ¶ 63.5); (b) the claim that the Sale Order and Purchase Agreement should have contained express valuation findings or requirements (the information needed for that claim existed as of the Closing) (*see* FOF ¶¶ 5.6-5.8, 6.1-6.2); (c) the claim that the Sale Order was issued in error because the Comp and Cure estimates made in Court were too high (all the information for those claims was clearly in existence as of the deadline for filing an appeal) (*see* FOF ¶¶ 50.14-50.15); (d) the claim that the disclosures at the Sale Hearing were inadequate because they did not mention specific assets that were in the Clarification Letter and for which the Clarification Letter provided no values (this information all existed at the time of Closing, and hence such a claim

could have been raised on appeal) (*see* FOF ¶¶ 48.1-48.11); and (e) the claim that the estimated

values of the trading assets provided to the Court incorporated a "discount," were deliberately

"understated," and exceeded $47.4 billion (as the Committee concluded in its October 10 memo)

(*see* FOF ¶¶ 50.5-50.13).  In short, *all of Movants' claims are barred by the Mandate Rule.*

203.     There are Second Circuit cases suggesting that there is *no exception* to the

Mandate Rule (unlike the more general law of the case rule).  *See* COL ¶ 2.9-2.11.  In any event,

any possible exception to the Mandate Rule requires Movants to show that they did not know,

and with reasonable due diligence could not have known, the information on which they have

based their claims until some time *after* the appellate mandate issued.  *See* COL ¶¶ 2.12-2.19.

The appellate mandate from the District Court affirming the Sale Order issued on March 16,

2009; the final appellate mandate from the Second Circuit, finally dismissing all appeals of the

Sale Order, issued on June 19, 2009.  FOF ¶ 61.4; Addendum 5, Demonstrative Timelines at Tab

1.  As explained above, and amply set forth in the Findings of Fact, Movants cannot possibly

demonstrate that they were "justifiably ignorant" of the information on which they have based

their claims as of either of those dates.  *See* FOF ¶¶ 46-52.

2.     The Doctrine Of Judicial Estoppel Bars Movants' Claims.

204.     The Sale Order was not only affirmed on appeal; it was affirmed on appeal *at the*

*urging of the Lehman Movants,* and with at least the implicit support of the Committee.  *See* FOF

¶¶ 61-62.  The Mandate Rule applies with special force where the party seeking to disturb the

mandate is the very party who sought the mandate in the first place.  *See* COL ¶¶ 2.7-2.8.  The

reason for that is obvious:  the doctrine of judicial estoppel precludes a party from adopting

positions that contradict those they successfully took in prior litigation.  *See* COL ¶¶ 3.1-3.4.

The doctrine applies whether the party's prior position was "explicit or implied through silence."

*See* COL ¶¶ 3.5-3.6.  Thus, the Committee's decision not to object to the Sale because of the

"lack of a viable alternative"; its decision not to appeal; and its decision to file a "Counterstatement" of issues on appeal under a rule that allows such filings only by *appellees* (i.e., those who *oppose* the appeal) all confirm that the Committee is subject to judicial estoppel. *See* COL ¶ 3; FOF ¶¶ 61-62.

205.     The Findings of Fact and the January Brief list out the numerous representations made by the Lehman Movants (and adopted by the Committee through its silence, its decision not to appeal, and its Counterstatement on appeal) that are contradicted by the positions Movants have asserted in this case. *See* FOF ¶¶ 64-65; January Brief at ¶¶ 242-245. To take just a few examples, Movants are judicially estopped from contradicting their prior successful positions that (a) a liquidation of LBI would have been a potential catastrophe, contrary to the "national interest," and vastly worse than the Sale to Barclays (*see* FOF ¶ 36.11); (b) there were no alternative bidders (*see* FOF ¶ 2); (c) the Court was properly asked to approve the Purchase Agreement even though there was no final Purchase Agreement (*see* FOF ¶ 39); (d) the Court was properly asked to approve the Purchase Agreement even if it could be characterized as a "discount" or "fire sale," and despite the immense uncertainty over the identity and value of the Purchased Assets (*see* FOF ¶ 40); (e) Barclays acted in good faith (*see* FOF ¶ 4), and (f) "*all relevant facts were disclosed to the Bankruptcy Court*" (*see* FOF ¶ 61.2). These two final representations were explicitly made by the Lehman Movants on appeal, and the others were implicitly or explicitly adopted on appeal. *See* FOF ¶¶ 61.2.3-61.2.31. Thus, the foregoing list of representations were *all* adopted long *after* the Clarification Letter was executed, FOF ¶ 63, *after* the final Cure payment numbers were published showing actual payments far less than the estimate, FOF ¶ 13, and *after* the Court was told (in the December 5, 2008 Motion to Approve the December Settlement) that Barclays was supposed to acquire as Purchased Assets $49.7

billion in Repo Collateral and was asked to approve a settlement transferring billions of assets to complete that repo transaction, FOF ¶¶ 52.2-52.3.  In addition, these representations were allowed to stay in the appellate record as a basis for affirming the Sale Order for *months after* Barclays published its Acquisition Balance Sheet showing that the Sale was *not* a wash and was *not* subject to a $47.4 billion "valuation cap."  *See* FOF ¶¶ 61-62, Addendum 5, Demonstrative Timelines, at tab 1.

206.    Thus, while a party may be able to evade judicial estoppel where it can show that it did not have the "relevant correct information," Movants cannot possibly satisfy that standard in this case.  *See generally* FOF ¶¶ 46-52.

3.    <u>The Doctrine of Equitable Estoppel Bars Movants' Claims.</u>

207.    In addition to their zealous defense of the Sale Order on appeal, *for over eight months*, Movants consistently treated the Clarification Letter as part of the approved Purchase Agreement and treated the Purchase Agreement and Sale Order as final.  *See* FOF ¶ 63. Moreover, during those eight months, the Trustee (a) approved the transfer of Clearance Box Assets (*see* FOF ¶ 44.5); (b) approved the transfer of ETD Margin to Barclays, confirmed that he was "OK" with the transfer of cash ETD Margin to Barclays, stated that he would "gladly consent" to the requirement in the Transfer and Assumption Agreement requiring the transfer of "all margin deposits" to Barclays, and worked with Barclays' counsel to identify foreign ETD Margin Deposits that would be acquired by Barclays (*see* FOF ¶¶ 31, 35); (c) successfully asked this Court to approve the transfer of approximately $5 billion in undelivered Repo Collateral in order to enforce and fulfill the terms of the Clarification Letter (*see* FOF ¶ 60); and (d) specifically argued to the Court that it was "too late" for the Committee or anyone else to try to modify the Purchase Agreement that was approved by the Sale Order (and which the Trustee said included the Clarification Letter) (*see* FOF ¶ 60.10).  In addition, throughout that eight

month period, the parties repeatedly invoked the Clarification Letter as part of the approved Purchase Agreement, *see* FOF ¶ 63, including through a filing in Court stating expressly that the Clarification was "binding on the parties." *See* FOF ¶ 63.3.

208. Barclays reasonably relied upon this conduct by (a) most importantly, agreeing to close the Sale on September 22, 2008, which it would not have done if it did not believe the Clarification Letter was a valid agreement and that the Sale Order's protections against future liability were valid and final (FOF ¶ 63.15); and (b) taking numerous actions pursuant to the terms of the Purchase Agreement, including the Clarification Letter, that it would not have taken if it had been told that the Agreement and Sale Order were not final, and were going to be modified to Barclays' detriment — such as, for example, accepting the transfer of approximately 72,000 customer accounts (and dealing with the fact that it had to wait over a year to receive most of the customer property associated with those accounts, while in the interim it made every effort to protect those customers and the solvency of their accounts) (FOF ¶ 63.15.2); offering employment, bonus payments, and severance protection to approximately 10,000 employees (FOF ¶ 63.15.3); making bonus and severance payments in the winter and spring of 2009 (FOF ¶ 63.15.3); and paying cure amounts (FOF ¶ 63.15.6).

209. The first time any Movant ever raised the possibility of a Rule 60(b) motion to modify the Sale Order in order to allow claims against Barclays was at the June 24, 2009 hearing to consider the Rule 2004 motion for discovery (FOF ¶ 65.3.2) — which, not coincidentally, was *after* the Second Circuit had finally dismissed the appeal of the Sale Order (FOF ¶ 65.3.2).[109] Similarly, at no point before September 15, 2009, when Movants filed their Rule 60 motions, did

---

[109] It is worth noting that the concept of a Rule 60(b) motion was *not* raised in the Debtor's initial Rule 2004 motion, and when Barclays complained in its opposition that the Debtor was implicitly attacking the Sale Order, the Debtor responded in its reply brief by disclaiming that it was doing any such thing — only to raise Rule 60(b) for the first time at the oral argument (which, unlike its initial briefing, came *after* the Second Circuit's dismissal of the appeal of the Sale Order). *See* FOF ¶ 65.3.

Movants mention to Barclays or the Court that they believed the terms of the Clarification Letter were not approved prospectively by the Sale Order.  *See* FOF ¶ 64.3.

210.    Under the foregoing facts, the doctrine of equitable estoppel is triggered and acts as an additional bar to Movants' claims.  The doctrine prevents a party from asserting rights that contradict its prior conduct or statements upon which the opposing party reasonably relied.  *See* COL ¶¶ 4.1-4.3.  That is clearly the case here, as explained above.  Moreover, equitable estoppel is frequently applied in bankruptcy cases because bankruptcy is a "forum where finality of court orders is particularly important."  *In re Lawrence*, 293 F.2d 615, 621 (2d Cir. 2002); *see also* COL ¶¶ 4.4-4.11.

211.    The only way for Movants to avoid equitable estoppel is to demonstrate that it was not reasonable for Barclays to rely upon the finality of the Sale Order and Purchase Agreement.  *See* COL ¶ 4.2.  It is not enough for them to show that they made an "error" — even if their error was reasonable or innocent, if it was reasonable for Barclays to rely upon the conduct and representations of Movants that repeatedly confirmed the finality of the Sale Order and the Purchase Agreement and the approval of the Clarification Letter.  *See* COL ¶ 4.9.  Movants cannot possibly satisfy that standard, especially since it is clear that their inequitable conduct was engaged in despite full knowledge of the information they have relied upon to bring their claims, which they actively concealed from Barclays and the Court.  *See* FOF ¶¶ 46-52, 66.

212.    Indeed, the case law holds that a party cannot avoid equitable estoppel by claiming that it did not have "all the information" because "certain depositions and discovery were not fully complete"; rather, once a party is "armed with knowledge of a *potential claim*," it should "at least inform" whoever the target of that claim may be "that such a claim was possible."  *In re CCGK Investors*, 145, B.R. 908, 911 (N.D. Ill. 1992); COL ¶ 4.10.

213.     In this case, the trial proved that Movants *did* have "full information" throughout the more than nine month period between the Closing and the start of the Rule 2004 discovery (FOF ¶¶ 64-65); at a minimum, Movants certainly were "armed with knowledge" sufficient to show the existence of whatever claims they ended up believing they had. *Id.* They certainly did not make an "error" and did not lack relevant information; instead, they made a cynical choice to "lay in the weeds," and to wait for an opportunistic way to bring their claims, if and when the circumstances might allow it. *See* FOF ¶¶ 64-67. They did not disclose their understanding of the facts and their beliefs about potential claims during 2008 because the emergency concerns of the financial crisis were still imminent. *See* FOF ¶¶ 1, 64-67. By May of 2009, however, the markets had stabilized, and were improving; by September, they were even stronger. *See* FOF ¶ 65.6. Whether or not this was *the direct cause* of Movants' Rule 60(b) motions, it was certainly a *prerequisite*: there is *no way* Movants would have brought their claims if the financial markets had still been in a state of extreme distress in September 2009, or if Barclays had not reported positive results. *See* FOF ¶¶ 1, 3.4.

214.     At a minimum, the timing of this litigation reflected a strategic choice by Movants, and does *not* reflect the existence of any "secrets" at the time of the Sale. As Jim Seery testified, given his detailed discussions with the Committee before the Sale Hearing and before the Closing, Movants' conduct in this litigation — and the Committee's concealment of its knowledge — is, to say the least, distressing:

> I was absolutely clear. And again, if there wasn't a difference between the amount of money that Barclays advanced and what the committee believed the securities to be worth, we wouldn't have had any discussions. Why would we be having a debate right after the big meeting and then subsequently several into the night to review these items if there was no disagreement on the value versus the amount advanced? We went through this a number of times. And, frankly, that's what has made me a little bit distressed about this litigation. The idea that this is a great secret? It wasn't a secret. They knew exactly what this was.

5/4/10 Tr. at 67:24-68:9 (Seery). And the accuracy of Mr. Seery's testimony was confirmed by the internal Committee memos produced in response to this Court's discovery order. *See* FOF ¶¶ 49.13, 50.11, 50.15, 50.24.

4. The Doctrine of Waiver Bars Movants' Claims.

215. Finally, even if Movants were to overcome the Mandate Rule and estoppel principles, Movants have clearly waived any claim that the Clarification Letter was not approved by the objective terms of the Sale Order, that the Clarification Letter constituted a material change without Committee consent or a material adverse change to the estates, that the Sale was supposed to be a "wash," that there should have been a provision requiring a post-closing reconciliation and "true-up," or any other claim that the relationship between asset and liability values need to be fixed and certain. Any and all of those claims could have been raised in this Court (a) before Closing, (b) before the September 30, 2008, deadline for seeking reconsideration or a "new trial" under FRCP 59, or (c) on appeal. Movants chose to raise none of those claims, despite knowing the facts they now say give them a basis for bringing such claims. *See* FOF ¶¶ 64-67. The doctrine of waiver bars them from bringing claims now that, if they should have been brought at all, should have been brought before Closing, as a motion for reconsideration, or on appeal.

216. The most acute example of waiver is the Committee's failure to come back to Court before Closing, or within a day of Closing, to assert its apparent view that it "did NOT consent" to what its lead lawyer (Luc Despins) testified at trial he believed were "material changes" contained in the Clarification Letter. *See* FOF ¶ 49.4. The Sale Order expressly provided that the Committee *had* to consent to such material changes. BCI Ex. 16 (Sale Order) at ¶ 25; FOF ¶ 39.6. The Lehman Movants and Barclays obviously believed the Clarification Letter was consistent with the deal described to the Court and did not make material changes,

and hence did not require Committee consent (FOF ¶¶ 39.6, 42.2.4, 43.4.4, 43.4.6, 43.5, 49.2-49.4, 63); moreover, Harvey Miller and Jim Seery clearly understood that the Committee *had* given its consent, by telling him twice, in effect, "if it's OK with you, it's OK with us." *See* FOF ¶¶ 43.3-43.4, 4.5.10.10, 4.5.10.11, 48.125. Since the Committee's lead lawyer admitted at trial he believed at the time of the Closing that there were material changes in the Clarification Letter to which the Committee did not consent, the Committee had both a right and an obligation under the Sale Order to raise that view clearly by coming back to Court: it knew it had that right (and obligation), and it knowingly relinquished that right. *See* FOF ¶ 49.4. That is the definition, under black letter law, of *waiver*. *See* COL ¶ 5. The Committee should therefore be barred as a matter of law from raising any assertion that the Clarification Letter caused a "material change" or a "material adverse change" in contravention of the Sale Order. (The Lehman Movants, of course, are estopped from making any such claim; but if for any reason estoppel were held not to apply to either Lehman Movant, then they too should be viewed to have waived any such claim.)

217.    Finally, even if a claim about the alleged non-approval or alleged material adverse changes in the Clarification Letter were not waived by not being raised at the time of Closing or shortly thereafter, it was clearly waived when the Committee chose not to appeal the Sale Order, and chose instead to join the Lehman Movants in opposing the appeals. *See* FOF ¶¶ 61, 62. By that time, Movants certainly knew the information on which they have based their claims, and knowingly relinquished their right to make any such claims. *See* FOF ¶¶ 46-51 (Movants' knowledge); *id.* at ¶¶ 61-63 (Movants' conduct on appeal).

D.    <u>The Constitution Prohibits The Relief Movants Seek.</u>

218.    The nature of the relief sought by Movants is so unprecedented, and so contrary to settled expectations as to the finality of the Sale Order and Purchase Agreement, that it implicates serious constitutional concerns.

1.     <u>The Constitution Prohibits The Reformation Of The Purchase Agreement Absent An Established State Law Basis For Doing So, And Protects Barclays' Reasonable, Investment-Backed Expectation That The Sale Order And Purchase Agreement Were Final and Binding.</u>

219.    The Constitution prohibits the taking of private property without Just Compensation and Due Process. *See* U.S. CONST. AMEND. V (Due Process Clause and Takings Clause); COL ¶¶ 29.1-29.2. It is well-established that where Government conduct diminishes or destroys the value of private property through conduct that violates "reasonable, investment-backed expectations," especially expectations that are based in part upon reliance on prior Government action or representations, the protections of the Takings Clause are triggered. *See* COL ¶¶ 29.3-29.4. The Takings Clause protects private property from judicial action, as well as legislative or regulatory action, that takes property in violation of settled expectations based upon pre-existing property rights. *See* COL ¶¶ 29.5-29.7.

220.    It is also well-established that a contract is private property covered by these protections. *See* COL ¶ 29.2. Likewise, the case law holds that a court cannot reform a contract absent a state law basis for doing so. *See* COL ¶ 29.6.

221.    Based on the foregoing, any decision that modifies the Purchase Agreement in this case absent finding a state law basis for reformation (and no such basis can be found, or has been alleged) necessarily triggers the protections of the Fifth Amendment. As the facts described above and set forth in the Findings of Fact demonstrate, Barclays has a reasonable, investment-backed expectation that the Sale Order and Purchase Agreement were valid, final, and binding. *See* FOF ¶¶ 65:5-65.14 (Movants' support of Clarification Letter); *id.* at ¶¶ 52.5, 52.16 (Movants' conduct on appeal); *id.* at ¶¶ 60.2, 60.5.1, 60.5.2, 60.5.3 (Movants' conduct at December settlement); *id.* at ¶ 63.15 (Barclays' reliance); *id.* at ¶¶ 63.15.2, 63.15.3, 63.15.4 (Barclays' reasonable, investment-backed expectation). As set forth in the January brief and the

Conclusions of Law, the Constitution simply does not permit the Court to rewrite the Purchase Agreement under these circumstances: there is no precedent for it,[110] and it violates fundamental notions of fair play, justice, and the private property protections in the Fifth Amendment. COL 29.7

> 2. The Doctrine of Constitutional Avoidance Holds That The Court Should Avoid Any Interpretation Of Rule 60(b) Or The Bankruptcy Code That Could Arguably Trigger Constitutional Issues.

222. It is well-established that if the interpretation of a statute or rule of law might *potentially* raise a constitutional concern, then a court ought to avoid that interpretation, in favor of an interpretation that does not raise that concern. *See* COL ¶¶ 29.8-29.9. Thus, to the extent the Court believes it is unclear whether Rule 60(b) or Section 549 of the Bankruptcy Code allow reformation of the contract despite the absence of a state law basis for such reformation, the doctrine of constitutional avoidance dictates that the Court should hold that those rules do not allow such relief. *See* COL ¶¶ 29.8-29.9.

## IV. BARCLAYS IS ENTITLED TO EACH OF THE DISPUTED ASSETS.

223. Barclays adopts and incorporates all of the arguments made in its January Brief and its April Brief demonstrating that, as a matter of straightforward contractual interpretation, it is entitled to each of the Disputed Assets. Below, we provide summary arguments that merely emphasize how the evidence presented at trial confirms what we argued in the pre-trial briefs.

224. At the outset, we reiterate the following point from our earlier briefs: the central premise of the Debtor's Rule 60(b) case is that the Clarification Letter *does provide* that Barclays

---

[110] There has never been a case that has interpreted either Rule 60(b) or Sections 549 or 559 of the Bankruptcy Code to allow a Bankruptcy Court to revise the *express terms* of a *written contract* that (a) was agreed to by the parties at the time of the sale and approved by the objective terms of a Section 363 sale order, (b) was successfully invoked by the party requesting relief for over six months in numerous subsequent judicial actions before the Bankruptcy Court and the District Court as part of the approved purchase contract, and (c) was reasonably relied upon by all parties for almost a full year before it was challenged.

was acquiring all of the Disputed Assets, and that this is why (in their unjustified view) the contract and the Sale Order need to be modified.[111] Since the Debtor was a Seller, and since the Trustee admits that he relied upon the Debtor's executives and independent lawyers at Weil Gotshal to negotiate the terms of the Purchase Agreement (including the Clarification Letter), this *admission* by the Debtor should be held to be dispositive, as confirming the Barclays interpretation of the plain text of the Clarification Letter, and rejecting the Trustee's strained interpretations. *See* January Br. at ¶¶ 47.334, 442-46; April Brief at ¶ 10.

      A.      <u>Barclays Is Entitled To The "Clearance Box Assets."</u>

            1.      <u>The Plain Text Of The Purchase Agreement Provides That The Clearance Box Assets Are Purchased Assets.</u>

225.      The plain text of both the APA and the Clarification Letter convey the Clearance Box Assets to Barclays. With the exception of certain assets expressly excluded therein, the APA conveys to Barclays all assets used "in connection with" LBI's business. BCI Ex. 1 (APA) at p.6. The unrebutted — indeed, unchallenged — evidence at trial established that the Clearance Box Assets were used in connection with LBI's business. *See* FOF ¶ 29. Professor Pfleiderer's unrebutted testimony established that these assets were encompassed within the definition of the Long Positions. *See* FOF ¶ 29.5. Movants have not even asserted that these assets were expressly excluded in the APA. Accordingly, the APA's plain text conveys the Clearance Box Assets to Barclays.

226.      As for the Clarification Letter, the Trustee's lead lawyer and 30(b)(6) representative, Mr. Kobak, admitted at trial that the *plain text* of its paragraph 1(a)(ii)(B) entitles Barclays to receive *all* of LBI's Clearance Box Assets. *See* FOF ¶¶ 44.1.5, 44.1.6. That was a necessary admission, as there is no other way to read that plain text. Paragraph 1(a)(ii)(B) of the

---

[111] *See generally* Movants' Rule 60(b) Brief and Complete Trial Record.

Clarification Letter provides that the Purchased Assets being transferred to Barclays include the "securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing." BCI Ex. 5 (Clarification Letter) at ¶ 1(c)(ii)(B). This necessarily includes the "securities and other assets" held in LBI's 'clearance boxes'" at the DTC, which were LBI's primary clearance boxes and held the vast majority of the $1.9 billion in Clearance Box Assets identified to Barclays as still available for transfer so as to induce Barclays to close on the transaction, despite the fact that many other Purchased Assets could not be delivered. *See* FOF ¶ 44.1.8. Moreover, Schedule B to the Clarification Letter is a security-by-security list of the assets to be transferred — and more than 98% of the listed assets were in LBI's DTC clearance boxes. *See* FOF ¶¶ 44.1.7, 44.1.8. Thus, the Trustee's argument that LBI's assets in the DTC clearance boxes were "excluded" directly contradicts the plain language of the Purchase Agreement and must therefore be rejected.

2. The Trustee's Reliance Upon The DTCC Letter To Override The Plain Text of The Purchase Agreement Contradicts Both The Plain Text Of The Agreements And The Overwhelming Extrinsic Evidence.

227. Instead of addressing the contractual language in the Clarification Letter that actually governs the transfer of the Clearance Box Assets, the Trustee relies upon the DTCC Letter, which he argues is the "more specific" of the two agreements and was intended to override the Purchase Agreement on this point. LBI Rule 60 Br. at ¶ 81; LBI Rule 60 Reply Br. at ¶¶ 156-157. He also relies on the testimony of Isaac Montal of the DTCC that he understood that Barclays was agreeing to give up the Clearance Box Assets based on his recollection of a statement by a Barclays executive that "we're not taking anything" (Trustee Rule 60 Br. at ¶ 147 (quoting Montal Dep. Tr. at 100:6-12); *see* 10/21/10 Tr. at 129:9-16 (McGuire); 5/6/10 Tr. at 12:22-31:1 (Montal)) — an alleged understanding never shared with nor relied upon by the Trustee at the time. This argument cannot be squared either with the plain language of the agreements or with the contemporaneous conduct of the parties.

228.     First, there is no conflict or inconsistency between the DTCC Letter and the Clarification Letter, and therefore the doctrine that the "specific governs the general" does not apply.  *See generally Paneccasio v. Unisource Worldwide, Inc*., 532 F.3d 101, 111 (2d Cir. 2008) (holding there is "'no factual predicate for application of the principle that where a specific contract provision conflicts with a more general provision, the specific provision controls[,] . . . [s]ince there is no inconsistency.'" ) (quoting *Croce v. Kurnit*, 737 F.2d 229, 237-38 (2d Cir. 1984)) (ellipses in original).  Here, the Clarification Letter identified specific securities that would be included as Purchased Assets to be acquired by Barclays from LBI, and the DTCC Letter provided that (no matter what securities Barclays might be acquiring), Barclays would *not* assume LBI's accounts at DTCC in which the securities were held; instead, the DTCC would have the benefit of a $250 million guaranty and certain other rights to be used in winding down the LBI accounts.  *Compare* BCI Ex. 5 (Clarification Letter) *with* BCI Ex. 6 (DTCC Letter).  While the DTCC Letter explains that Barclays was not acquiring *the LBI accounts themselves*, it did not purport in any way to modify the Purchase Agreement's grant of *the assets within those accounts* to Barclays.  *See* BCI Ex. 6.  The unrebutted evidence at trial established that this distinction between clearance box accounts and the contents of such accounts is fundamental and well-recognized in the industry.  *See* FOF ¶ 44.2.1.  Indeed, the DTCC's representative admitted at trial that the Clarification Letter had nothing to do with the DTCC Letter or the deal struck between the DTCC and Barclays.  *See* FOF ¶ 44.2.5.

229.     But even if the "specific governs the general" doctrine were applied, the Trustee's argument fails based upon the plain text of the agreements.  The Clarification Letter provides that the Purchased Assets include "such securities and other assets held in LBI's 'clearance boxes' as of the time of Closing, *which at the close of business on September 21, 2008, were as*

*specified on Schedule B previously delivered by the Seller and accepted by Purchaser . . . .*"
BCI Ex. 5 (Clarification Letter) at § 1(a)(ii)(B) (emphasis added). In contrast, the DTCC Letter
is entirely silent as to the disposition of *any* of the *specific assets* located within LBI's clearance
boxes at the DTCC, and is therefore not "more specific" than the Clarification Letter. Indeed,
the "*most* specific" indication of the parties' intent is found on Schedule B to the Clarification
Letter, which lists out, *CUSIP by CUSIP*, the Clearance Box Assets that the Seller agreed
Barclays was entitled to acquire. *See* FOF ¶ 44.1.7.[112] Over 98% of the securities listed on
Schedule B *were located in the LBI accounts at DTCC*. *See* FOF ¶ 44.1.8. Thus, the most
specific indicators of the parties' intent — the plain text of the Purchase Agreement and the
specific *contractual schedule* of Clearance Box Assets being acquired by Barclays —
unambiguously confirm that the Clearance Box Assets (almost all of which were held in the
DTC clearance boxes) were Purchased Assets, and were never removed from the Sale.

230.     Ample evidence presented at trial further confirmed that Barclays did not agree to
forego its right to the Clearance Box Assets. *See* FOF ¶¶ 44.2.9, 44.3. Mr. Montal's recollection
and understanding of the vague statement that "we're not taking anything" — which no one else
recalls — is at odds with his own testimony, the testimony of other witnesses, *all* of the
*contemporary* evidence, and, most importantly, the plain text of both contracts. *See* FOF ¶¶
44.1-44.4.

231.     Mr. Montal admitted that the DTCC was not in any way concerned with the terms
of the Sale between Barclays and Lehman, or with how the Clarification Letter disposed of the
Clearance Box Assets as between the Trustee and Barclays. *See* FOF ¶ 44.2.6. Thus, on its face,
Mr. Montal's testimony contradicts the argument the Trustee seeks to use his testimony for.

---

[112]   Schedule B also provided that this CUSIP by CUSIP list was "without prejudice" to Barclays identifying other
Clearance Box Assets to which it was entitled under the Clarification Letter. *See* FOF ¶ 44.1.7.1.

232.     Moreover, the Trustee's attempt to use Mr. Montal's testimony to change the terms of the Clarification Letter cannot be squared with all the other evidence in the case.  Cleary Gottlieb attorney Ed Rosen, who was involved in negotiating with DTCC on Barclays' behalf, testified that he was on the teleconferences during which Mr. Montal recalls the statement about "not taking anything" being made, that he has no recollection of any such statement, and that if anything like that was said, it could only have meant — and obviously would have meant — that Barclays was not taking *the accounts*, and their associated liabilities.  *See* 8/24/10 Tr. at 255:4-256:14 (Rosen); *see also* FOF ¶¶ 44.2.1-44.2.3, 44.3.3.3.  Likewise, while Mr. Montal believes it was Mr. LaRocca from Barclays who made the alleged statement, Mr. LaRocca's deposition testimony made clear that (a) he was not a negotiator, (b) he did not have a clear understanding of what the Clearance Box Assets even were, and (c) he did not have a speaking role on those calls.  Larocca Dep. Tr. at 55:20-24, 149:8-16, 166:8-17.

233.     It is not just the evidence from Barclays that confirms that Mr. Montal's understanding was mistaken.  *The written evidence from the DTCC's own lawyer confirms this*.  An email written by Sheldon Hirshon — the DTCC's outside counsel — shows that during the negotiations over the Closing weekend, after considering its options and assessing the risks it actually faced, the DTCC agreed to accept *only a $250 million guarantee*.  As Mr. Hirshon described the deal:

> The ***$250mm Barclays guarantee*** and the resi's were to be provided to protect DTCC from any losses it would incur as a result of not ceasing to act for LBI.  As I said, the resi's were pulled from the deal ***leaving only the Barclays guarantee*** and, after an internal review of the situation, DTCC accepted the revised deal.

BCI Ex. 376 (emphasis added).  This email makes no mention of the DTCC receiving the Clearance Box Assets as additional protection against settlement obligations, in replacement of the lost "resis."  Rather, it confirms that the DTCC agreed that the $250 million guarantee would

provide sufficient protection ("leaving _**only**_ the Barclays' guarantee"). The evidence also shows that this judgment proved correct, as the DTCC's total losses arising from the Lehman bankruptcy were less than $60 million. *See* FOF ¶ 44.2.12. Thus, this Court need not consider any hypothetical dispute that might have arisen between the DTCC and Barclays over rights to the Clearance Box Assets had the DTCC actually needed them.

234. More generally, the trial established that the parties' post-Closing conduct directly contradicts the Trustee's current litigation position. After the Closing, Weil Gotshal — whom the Trustee admits was negotiating the Sale on its behalf as well as on the Debtor's behalf — compiled and filed with the Court (without objection from the Trustee or anyone else) a Schedule B which listed Clearance Box Assets, 98% of which were in LBI's DTC clearance boxes (*see* FOF ¶¶ 44.18, 44.5.2, 44.5.3-44.5.5); the Debtor's independent advisers at Weil Gotshal and Alvarez & Marsal prepared numerous documents showing that $1.9 billion of clearance box assets were included in the Purchased Assets being transferred to Barclays (only $36 million of which were at clearing houses other than DTCC) (*see* FOF ¶¶ 44.1.8.1-44.1.8.3); likewise, the Committee's documents show that it understood that approximately $1.9 billion in Clearance Box Assets were being transferred (*see* FOF ¶¶ 44.5.4-44.5.5); and finally, the Trustee knowingly transferred hundreds of millions of dollars of proprietary Clearance Box Assets from LBI's DTC boxes to Barclays (*see* FOF ¶¶ 44.5.6).

235. Thus, although this Court should not look beyond the plain language of the Purchase Agreement because that language is not ambiguous (COL ¶ 30), if extrinsic evidence were considered, it would overwhelmingly support Barclays' entitlement to the Clearance Box Assets. *See* FOF ¶¶ 44.2-44.5.

### 3. The Trustee Cannot Avoid The Overwhelming Extrinsic Evidence Confirming That Barclays Was Acquiring The Clearance Box Assets.

236.     The Trustee's only answers to the plain text of the Clarification Letter and the plain import of Schedule B to the Clarification Letter are that (a) he "was not focused" on the filing of Schedule B, and (b) Weil Gotshal, which drafted the Clarification Letter on the Trustee's behalf, was supposedly not aware of the terms of the DTCC Letter when it did so. 5/5/10 Tr. at 176:2-16 (Kobak); Kobak Dep. Tr. at 22:24-23:15; *see also* FOF ¶¶ 44.2.7-44.2.8, 44.2.14.1-44.2.14.4, 44.5.3.1.  As to the first, the Trustee's supposed failure to review the various drafts of Schedule B that were available to him both before and after the Closing is, as a matter of law, *not* a basis for disregarding the plain meaning of the contract, including its attached schedule.  *See* COL ¶ 36.  Further, the Trustee's billing records, which show that 13 Hughes Hubbard lawyers charged the estate more than $150,000 for reviewing and monitoring the negotiation and drafting of the Clarification Letter, suggest that this convenient lack of "focus" is neither credible nor excusable.  *See* FOF ¶¶ 43.2, 44.5.3.1.

237.     As for the Trustee's second argument, the evidence adduced at trial established that the Trustee's contention that Weil Gotshal was unaware of the DTCC Letter when it drafted the Clarification Letter is simply false.  The unrebutted evidence and contemporaneous documents establish that:  (a) Weil Gotshal and others were fully briefed on the agreement with the DTCC on a lengthy conference call (*see* FOF ¶¶ 44.4.1-44.4.2); (b) the Trustee's own lawyer sent a copy of the DTCC Letter to Weil Gotshal's deal lawyers (*see* FOF ¶¶ 44.2.14.1-44.2.14.2); (c) half-an-hour later, Weil Gotshal circulated a revised draft of the Clarification Letter which *expressly referenced the agreement contained in the DTCC Letter*, while at the same time changing the definition of Purchased Assets to *expressly include* the assets within LBI's "074 clearance box' at DTC" (*see* FOF ¶¶ 44.2.14.1-44.2.14.2, 44.4.4); and (d) 46 minutes after that,

Weil Gotshal circulated another draft Clarification Letter, which corrected the reference to the DTCC Letter and *broadened* the language conveying the clearance box assets to Barclays (*see* FOF ¶¶ 44.4.5-44.4.6). Thus, there can be no doubt that Weil Gotshal — who Mr. Kobak admitted represented the Trustee in the drafting of the Clarification Letter (*see* FOF ¶¶ 44.2.7-44.2.8) — not only had the opportunity to review the DTCC Letter, but had actually done so when it drafted the language that the Trustee now concedes unambiguously conveys the Clearance Box Assets to Barclays. *See* FOF ¶ 44.4. That drafting history cannot be squared with the Trustee's current litigation position. *See* FOF ¶ 44.4.7.

      4.    <u>In Addition To Contradicting The Plain Text Of The Agreements And The Extrinsic Evidence, The Trustee's Argument Is Fundamentally Illogical, As Demonstrated By The Evidence At Trial.</u>

238. The Trustee's argument that Barclays gave up the Clearance Box Assets to appease the concerns of the DTCC makes no sense for at least two reasons. First, as Mr. Hughes testified, the idea that Barclays would on Sunday have been willing to give up assets whose identification had been required to induce Barclays to go forward with the deal on Friday is simply implausible.[113] *See* FOF ¶ 44.2.9.1. Second, even under the Trustee's construct, Barclays would have had no reason to relinquish assets *to the Trustee* in order to address the *DTCC's* concerns. *See* FOF ¶ 44.2.9.2. At most, although it did not in fact do so, DTCC might have insisted on some lien or further recourse to Barclays to protect itself from losses beyond the $250 million guaranty (a guaranty which the DTCC has admitted was more than sufficient, *see* FOF ¶ 44.2.12). But Barclays would have had no reason to agree to give back *to the Trustee* assets that the contract specifically promised, and which had been critical to Barclays'

---

[113] Recognizing this central logical flaw, the Trustee repeatedly insinuated at trial that Barclays was willing to give up those assets as a result of due diligence conducted at the DTC over the weekend. But that wishful assertion is completely unsupported in the record. Although a Barclays due diligence team went to DTC that weekend, the evidence shows that diligence was to assess the potential settlement obligations and risks (which Barclays declined to assume), not to value the Clearance Box Assets with a view to giving them up. *See* FOF ¶ 44.2.13.

willingness to close the deal, merely to protect *the DTCC* against potential losses, when such a lesser alternative was available.

5. An Additional Reason To Reject The Trustee's DTCC Argument Is That, As The Trustee's Representative Admitted At Trial, The Argument Renders A Provision Of The Clarification Letter Superfluous.

239. Finally, the rule that a contract is not to be construed to render any of its provisions superfluous is yet an additional reason requiring rejection of the Trustee's argument. *See* COL ¶ 37. At trial, the Trustee's representative Mr. Kobak *admitted* that the Trustee's proposed reading of the Clarification Letter's grant of the Clearance Box Assets to Barclays as limited to conveying the customer assets in LBI's clearance boxes to Barclays would be redundant of Paragraph 8 of the Clarification Letter, which transferred all customer property to Barclays, and would give no meaning to the inclusion of the clearance box provision in paragraph 1 of the Clarification Letter. *See* FOF ¶ 44.1.6. (The Trustee's proposed reading also cannot be squared with Mr. Kobak's admission that he understood that Schedule B included LBI proprietary — i.e., non-customer — assets. *See* FOF ¶ 44.1.9.) By contrast, the Trustee's argument that *Barclays'* reading of the DTCC Letter would render a portion of the *DTCC Letter* superfluous is mistaken. As Mr. Rosen testified, the portion of the DTCC Letter that reads "[a]s part of this closeout process the Trustee hereby authorizes DTC to accept and act upon instructions from NSCC to deliver securities from the DTC LBI account," grants DTCC the authority it required to close out pending transactions that did not involve the proprietary assets transferred to Barclays. *See* FOF ¶ 44.2.15.

B. Barclays Is Entitled To The ETD Margin Deposits.

240. The trial demonstrated that the ETD-related assets in the Sale Transaction had two unique characteristics relative to the other asset classes Barclays acquired. First, while described as "Purchased Assets," the ETDs carried with them potentially enormous *liabilities*: an ETD

position can be either an asset or a liability, and therefore by acquiring LBI's ETD accounts, Barclays was assuming significant *future obligations* to perform on hundreds of thousands of individual contracts after the Closing, and that performance could result in substantial gain *or substantial losses*. *See* FOF ¶¶ 33.5, 34.1, 34.7. Second, prior to the Closing, Barclays was not able even *to identify*, let alone properly value, the universe of the open positions in LBI's ETD accounts and the collateral held in those accounts — and hence had no ability to determine the overall risk profile or potential value associated with those accounts. *See* FOF ¶¶ 33.1-12. There is simply no disputing the fact that LBI's ETD business could only be described during the week of September 15, 2008 as a black box — a box that could potentially carry some reward, but that could likewise generate substantial and unquantifiable losses. It was *in this context* that the parties agreed, in plain and unambiguous terms, that LBI would transfer its ETD accounts — in their entirety, including all ETD Margin Deposits — to Barclays. *See* FOF ¶¶ 31.1-22, 31.24, 34.2.

      1.     <u>The ETD Margin Deposits Are Purchased Assets Under The Plain Terms Of The Purchase Agreement.</u>

241. Under the plain terms of the APA, the Purchased Assets were defined as "all of the assets used by Seller and its Subsidiaries in the Business except as specifically excluded," including without limitation, among other things, "exchange traded derivatives" and "all deposits" including "all required capital deposits" that were "associated with the Business." *See* FOF ¶ 31.1-.8; COL ¶ 39.9. The plain terms of the APA likewise make clear that the ETD Margin Deposits — as opposed to assets relating to LBI's *over-the-counter* "*derivatives contracts*" — were not "specifically excluded" under the APA. *See* FOF ¶¶ 31.9-10, 31.27.

242. It is *undisputed* that LBI's ETD businesses were part of the "Business" Barclays was acquiring, which expressly included LBI's "trading and advisory businesses" and its

"business as a futures commission merchant."  *See* FOF ¶ 31.7.  Indeed, "exchange traded derivatives" were specifically identified as among both the Purchased Assets and the Assumed Liabilities.  *See* FOF ¶¶ 31.2-3, 31.6.  And it is likewise *undisputed* that the ETD Margin Deposits constituted both "assets used in connection with" those businesses and "deposits . . . associated with" those businesses.  *See* FOF ¶ 31.8-9.

243.    If there were any doubt that the ETD Margin Deposits constituted Purchased Assets under the APA, the Clarification Letter resolved that doubt by expressly confirming that the Purchased Assets included "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)."  *See* FOF ¶ 31.13-14.  As the Trustee's representative *expressly admitted* at trial, this provision "wasn't limited in any way"; "It said any property."  5/5/10 Tr. at 122:23-123:9 (Kobak), FOF ¶ 31.14.1.  Thus, by the Trustee's own admission, under the plain and unambiguous language of the Purchase Agreement, the ETD Margin Deposits constituted Purchased Assets.  This Court's inquiry need go no further, for "[a] court should not look beyond the confines of the contract to extrinsic evidence if its relevant provisions are plain and unambiguous."  *See* COL ¶ 30.2.  Rather, "[w]hen the parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms."  *In re Allegiance Telecom, Inc.*, 356 B.R. 93, 98 (Bankr. S.D.N.Y. 2006) (Drain, J.); *see also* COL ¶ 30.

> 2.    <u>The Overwhelming Weight Of The Extrinsic Evidence Confirms That The ETD Margin Deposits Were Purchased Assets.</u>

244.    Should this Court find it appropriate to consider the contemporaneous extrinsic evidence in an effort to confirm that the parties intended to include the ETD Margin Deposits in the deal, the trial record contains an abundance of such evidence, and none to the contrary. Among other things, the contemporaneous evidence demonstrates that:

- The parties included a provision in the Sale Order that expressly contemplated that ETD Margin Deposits, including any cash margin, would be transferred to Barclays subject to the OCC's lien over these assets — a provision that would have made no sense if the ETD Margin Deposits were not intended to be transferred to Barclays (FOF ¶ 31.11);

- In addition to the Clarification Letter, the Trustee executed two additional agreements that expressly provided for the transfer to Barclays of "all margin deposits" — including all cash margin — at the OCC, and the Trustee conceded at trial that he understood when he signed these agreements that this was exactly what they provided (FOF ¶ 31.20.1-31.20.6);

- Unrebutted fact witness testimony confirmed that Barclays and LBI representatives actively discussed the fact that Barclays would receive all of the ETD Margin Deposits (FOF ¶¶ 31.21.2-31.21.4, 31.17, 32.6-32.7, 32.11), and contemporaneous documentary evidence in the record confirms the reliability of this testimony (FOF ¶¶ 31.21.1-31.21.5);

- Contemporaneous documentary evidence in the record also confirms that Weil Gotshal, the Trustee and his representatives, and representatives of SIPC were all *expressly told* that all ETD Margin Deposits at the OCC, including cash margin, were going to be transferred to Barclays upon the Closing (FOF ¶¶ 31.21-31.22), and there is no evidence that a single one of them raised any objection to this (FOF ¶¶ 31.18-31.19);

- The evidence shows that prior to the Sale Hearing, the CFTC approved a bulk transfer of all of LBI's proprietary and customer futures accounts (FOF ¶ 31.12), and unrebutted expert testimony on the standard practice in the industry confirmed that transferring those accounts in their entirety – with everything in them is precisely "what the bulk transfer order is designed to do, to make sure that that happens" 10/5/10 Tr. at 56:11-57:9 (Leitner); FOF ¶¶ 31.12, 31.21.3.5, 31.27.4; COL ¶ 44;

- Weil Gotshal confirmed several times after the Closing that it believed the ETD Margin Deposits were Purchased Assets (FOF ¶ 31.26); and

- The Trustee's actions for many months after the Closing (and sworn statements made on his behalf as recently as several months *after the commencement of this litigation*) leave no room for doubt that the Trustee understood that ETD Margin Deposits were Purchased Assets (FOF ¶¶ 31.1-31.13).

245. In addition to the vast body of contemporaneous extrinsic evidence demonstrating that the parties intended to include the ETD Margin Deposits in the deal, the record is likewise replete with evidence of why this decision made sense from the perspective of both of the

parties. From Barclays' perspective, the evidence conclusively demonstrates that (i) Barclays was unable to ascertain the composition of LBI's ETD positions prior to the Closing (FOF ¶ 31.1-31.12), and (ii) the potential exposure on these positions was enormous given the nature of these positions, their sheer size, and the market volatility at the time (FOF ¶¶ 34.1-34.8). As unrebutted expert testimony established, "no rational purchaser" would ever acquire the ETD accounts and positions under these circumstances without also acquiring the ETD Margin Deposits; doing so would contradict standard industry practice, and would be irrational. FOF ¶ 31.19. From LBI's perspective, the record evidence demonstrates that (i) LBI's ETD accounts were in imminent risk of being liquidated absent their transfer to Barclays (FOF ¶ 34.8.8, 34.10.4), (ii) this would have been "*the largest liquidation of options positions ever in the United States*" (FOF ¶ 34.10.3), (iii) such a liquidation presented the risk that all of the ETD Margin Deposits would be lost (FOF ¶¶ 31.10.5-34.10.6), (iv) the costs attendant to this liquidation could well exceed the posted ETD Margin, thus leading to incalculable additional claims against the estate (FOF ¶¶ 34.10.6-34.10.11 ), and (v) such a liquidation would have defeated the Trustee's purpose of protecting customer positions and ensuring their orderly transfer to a solvent broker-dealer (FOF ¶ 34.10.3). Indeed, Harvey Miller told this Court at the Sale Hearing that, in light of what the CME had done in liquidating LBI's ETD accounts at the CME, it was clear that "this administration is finished if this transaction is not completed, Your Honor." BCI Ex. 49 (9/19/08 Tr.) at 239:17-21 (Miller).

246. The record evidence, including unrebutted expert testimony, confirmed that, under these circumstances, two things were clear. *First*, it would have been irrational and contrary to normal industry practice and understanding for Barclays to assume LBI's ETD obligations without getting the associated margin, for that was its only protection against

potentially devastating losses.  *See* FOF ¶ 34.19.  *Second*, given the choice between (a)

transferring its ETD accounts and all assets associated with those accounts to Barclays, and (b)

retaining those accounts with all their attendant obligations, it would have been irrational for

Lehman to conclude anything other than that it was in the best interests of the estate and its

customers to transfer its ETD accounts, including all ETD Margin Deposits, to Barclays.  *See*

FOF ¶¶ 34.4-34.10.

<ol start="3" style="list-style-type: decimal">
<li><u>This Court Should Reject Movants' Arguments That Barclays Is Not Entitled To The ETD Margin Deposits.</u></li>
</ol>

<ol style="list-style-type: lower-alpha">
<li><u>This Court Should Reject Movants' Arguments That The ETD Margin Deposits Were Not Intended To Be Transferred To Barclays.</u></li>
</ol>

247.    The Trustee's various efforts to undermine Barclays' contractual right to the ETD

Margin Deposits fail as a matter of law both because they are precluded by governing legal

principles and because they are refuted by the factual record that has been established in this

case.

248.    *First*, in his March 2010 reply brief, the Trustee claimed for the very first time

that paragraph (n) of the APA's definition of Excluded Assets excluded ETD Margin Deposits

from the deal.[114]  Paragraph (n) provides that the Excluded Assets include "all assets relating to

the IMD Business and derivatives contracts."   BCI Ex. 1 (APA) at p. 4, ¶ (n).  While the Trustee

elicited trial testimony from witnesses confirming that ETD Margin is comprised of assets

relating to *exchange-traded* derivatives, *e.g.*, 8/24/10 Tr. at 209:17-23 (Rosen); 10/5/10 Tr. at

113:14-114:4 (Leitner), this testimony is beside the point:  paragraph (n) *does not deal with*

*exchange-traded derivatives*; to the contrary, it deals with "derivatives contracts."   BCI Ex. 1

---

[114] Trustee Reply Br. at ¶¶ 77-81; *compare* Trustee R.60 Br. (not making any argument relating to subparagraph (n) of the APA's definition of Excluded Assets) *and* BCI Exs. 156, 158, 165, 167, 179, 920, 970 (Trustee letters to Barclays from January 2009 through June 2009 discussing ETD Margin, where argument relating to subparagraph (n) of the APA's definition of Excluded Assets was never made).

(APA) at p. 4, ¶ (n).  Without exception, when the parties intended to refer to "exchange-traded derivatives," they used the term "exchange-traded derivatives" — not the term "derivatives contracts," which was used solely to describe over-the-counter derivatives, which were *indisputably* excluded from the deal.  BCI Ex. 1 (APA) at p.6;  BCI Ex. 5 (Clarification Letter) at p.1; *see* FOF ¶ 31.10; *see also* BCI Ex. 124.  As a matter of law, because the parties used different terms to describe "exchange-traded derivatives" (as in paragraph (d) of the APA's Purchased Assets provision) and "derivatives contracts" (as in paragraph (n) of the APA's Excluded Assets provision), it must be presumed that "they intend this language to mean different things."  *Taracorp, Inc. v. NL Industries, Inc.*, 73 F.3d 738, 744-45 (7th Cir. 1996); *see also International Fidelity Insurance Company v. County of Rockland*, 98 F. Supp. 2d 400, 412-13 (S.D.N.Y. 2000) ("Sophisticated lawyers . . . must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning.").

249.    Moreover, the exclusion of assets "primarily related" to "derivatives contracts" obviously means that *the derivatives contracts themselves* are also excluded assets, since they are obviously related to themselves.  That means that the Trustee's argument would require the Court to conclude that subparagraph (n) *was excluding the exchange-traded derivatives positions themselves*:  even Movants have never argued that, and the plain text of the APA and all the extrinsic evidence confirms that Barclays *was* acquiring the exchange-traded derivatives, and was *not* acquiring the over-the-counter derivatives contracts.  *See* FOF ¶¶ 31.6-31.10.  Thus, the Trustee's argument is illogical, proves too much, is contradicted by the plain terms of the APA, and must therefore be rejected.  *See* COL ¶¶ 30, 31, 32, 39.9-39.10.

250.     The extrinsic evidence confirms that the parties *specifically intended* to draw a distinction between "exchange-traded derivatives," as referenced in paragraph (d) of the definition of Purchased Assets, and "derivatives contracts," as referenced in paragraph (n).  In particular, days after the Closing, Weil Gotshal informed Barclays of its understanding of paragraph (n), and in particular, of whether it was intended to exclude all derivatives contracts or only those derivatives contracts associated with the IMD business.  *See* BCI Exs. 320, 807.  Mr. Murgio of Weil Gotshal explained that the clause was not intended to be limited to IMD-related derivatives because "only exchange-traded derivatives went to Barclays and ALL other derivatives are excluded."  BCI Ex. 1104 at pp. 4-5 (emphasis in original).  *Every fact witness in this case* who was asked about the meaning of paragraph (n) confirmed that they shared Weil Gotshal's understanding that it related solely to *over-the-counter derivatives*, and not to exchange-traded derivatives.  *See* FOF ¶ 31.10.  There is not a single iota of evidence in the record to support the Trustee's contrary claim.  Thus, the governing principles of contract interpretation and *all* of the relevant evidence refute the Trustee's after-the-fact attempt to transform paragraph (n) of the APA's Excluded Assets provision into a provision that excluded ETD Margin Deposits from the deal.

251.     *Second*, the Trustee relies on the drafting history of the Clarification Letter to suggest that Weil Gotshal rejected Barclays' proposal to include a specific provision in the Clarification Letter making clear that the ETD Margin Deposits were Purchased Assets.  The record evidence demonstrates the precise opposite — that, in fact, Weil Gotshal *accepted verbatim* **two separate proposals** made by Barclays to address this issue.  *See* FOF ¶¶ 31.25.8-31.25-15.  The first proposal was to include language in the cash exclusion provision to make clear that it did not apply to a series of different kinds of cash or cash equivalents maintained,

including in particular customer cash and cash in the Rule 15c3-3 account, as well as cash held "by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit, or in any other form) the obligations of LBI or any other person in an account maintained by or on behalf of LBI and for which Purchaser shall become responsible as of the Closing." BCI Ex. 249 at § 1(d). Weil Gotshal *retained* this language in its subsequent draft (BCI Ex. 270), and neither Weil Gotshal nor the Trustee ever raised any objection to it. BCI Ex. 270; 8/24/10 Tr. at 124:5-125:8 (Rosen); 5/5/10 Tr. at 58.15-24 (Kobak). The evidence demonstrates that Weil Gotshal removed that provision only after, and as a direct result of, discussions in which the parties agreed to remove from the deal the cash deposits held in the Rule 15c3-3 account. *See* 8/24/10 Tr. at 147:17-148:11, 149:19-151:7, 155:18-24 (Rosen); FOF ¶¶ 31.25.7-.8. At that point, because Weil Gotshal had removed the whole provision instead of just the language dealing with the 15c3-3 cash, Barclays proposed language that even more clearly and concisely provided that the Purchased Assets included "any property" held as ETD Margin Deposits. *See* FOF ¶¶ 31.25.10-31.25.15; 8/24/10 Tr. at 203:5-20 (Rosen). Once again, Weil Gotshal accepted Barclays' proposal, and *Weil Gotshal* incorporated that proposed language — "(and any property that may be held to secure obligations under such derivatives)" — into the final agreement. BCI Ex. 5; 8/24/10 Tr. at 119:20-120:22 (Rosen).

252.     *Third*, the Trustee's remaining efforts to avoid the contractual obligation to transfer the ETD Margin Deposits to Barclays all share a common thread: they all rely (impermissibly) on one or another variation of movants' purported, yet undisclosed, subjective intent. In particular, the Trustee argues that, while the plain language of all the relevant deal documents states that LBI was to transfer to Barclays all ETD Margin Deposits, and the Trustee admittedly *understood* that he was authorizing the transfer of all ETD Margin Deposits to

Barclays, he *only meant* to transfer to Barclays a subset of the ETD Margin Deposits.[115]  At one point, the Trustee claimed that he meant to authorize the transfer only of that portion of the ETD Margin (including cash) needed to cover the liabilities associated with the ETD positions. Kobak Dep. Tr. at 282:14-283:21.  At another point, the Trustee claimed that he meant to authorize the transfer only of that portion of the ETD Margin that constituted either customer property (which could include cash) or LBI proprietary margin if it was *not cash* assets.  Trustee R. 60 Br. at ¶¶ 67-71, 85-86.  In other instances, the Trustee suggested that he meant to authorize the transfer only of that portion of the ETD Margin (including cash) that constituted property *relating to* customer accounts.  5/5/10 Tr. at 127:5-9, 150:25-151:7, 147:1212-148:21 (Kobak). And in still other instances, the Trustee claimed that he meant to authorize the transfer only of that portion of the ETD Margin (including cash) that constituted customer property, period. Trustee Reply Br. at ¶¶ 101-106.

253.    The mere fact that the Trustee has made so many internally inconsistent claims concerning his understanding at the time should itself suffice to discredit each of these shifting positions.  *See* COL ¶ 34.  Indeed, the Trustee's representative *himself concedes* that the agreements he executed in September  2008 provided in unambiguous terms for the transfer to Barclays of *all ETD Margin Deposits.  See* FOF ¶¶ 31.20, 31.22, 31.23.2.3, 31.23.3.3.  As the Trustee's representative admitted at trial, the ETD parenthetical in the Clarification Letter "*wasn't limited in any way,*" 5/5/10 Tr. at 122:23-123:9 (Kobak), nor was the Transfer and Assumption Agreement, which he conceded provided for the transfer of "*all* of the margin deposits held by OCC with respect to those accounts."  5/5/10 Tr. at 115:9-117:2 (Kobak).  The Trustee's representative similarly admitted that all "customer-related" margin was being

---

[115] Kobak Dep. Tr. at 282:14-283:21; Trustee R. 60 Br. at ¶¶ 67-71, 85-86; 5/5/10 Tr. at 127:5-9, 150:25-151:7, 147:12-148:21 (Kobak); Trustee Reply Br. at ¶¶ 101-106.

transferred to Barclays, and that the "customer-related" margin includes both LBI proprietary assets and customer assets in the customer accounts. 5/5/10 Tr. at 127:5-9, 150:25-151:7, 147:12-148:21 (Kobak). Harvey Miller shared this understanding, testifying that Barclays was acquiring all of the ETD Margin held in Lehman's customer accounts (including any cash), whether described as customer property or Lehman property, because "as a general proposition, with the accounts being transferred, everything relating to those accounts was being transferred." 4/28/10 Tr. at 89:12-90:15 (Miller).

254.    Moreover, there is no credible support in the trial record — not in the trial testimony, not in the provisions of the governing agreements, and not in the contemporaneous evidence of what the parties intended — for distinguishing between the various types of ETD Margin Deposits in dispute, whether it be a distinction between options margin and futures margin, proprietary margin and customer margin, margin in an amount equal to the constantly fluctuating margin requirements on any given day and amounts in excess of those requirements, or cash margin versus margin in other forms. *See* FOF ¶ 31.23. In particular, the trial evidence, including the parties' agreements, the CFTC's bulk transfer order, the OCC's emails and agreements, and the testimony of Kenneth Raisler, Ed Rosen, Liz James, Anthony Leitner, and even Mr. Kobak, the Trustee's representative, confirms that Barclays was acquiring *all* ETD Margin Deposits in relation to *all* of LBI's ETD accounts — including both options accounts and futures accounts, and including both proprietary accounts and customer accounts. *See* FOF ¶ 31.23.

255.    Even if the Court were to credit any of the Trustee's many claims concerning his "understanding" at the time, none of them can serve to vary the unambiguous terms of the various agreements the Trustee signed. *See* COL ¶¶ 30, 31, 32. This is particularly true because

the Trustee admits that he never once told *anyone* that he believed there was a limit of any kind

on the types of ETD Margin that were included in the deal.  *See* FOF ¶ 32.6; COL ¶ 33 (as a

matter of law, unexpressed subjective intent is irrelevant to the interpretation of a contract, even

if the contract is held to be ambiguous).  Thus, regardless of which of the Trustee's purported

understandings, if any, were in fact his "understanding" at the time he agreed that Barclays was

to acquire "all margin deposits," his understanding was legally irrelevant.  *See* COL ¶¶ 30-33.

 256.    Finally, Movants are likely to rely on testimony from Lehman's lead negotiator,

Bart McDade, that the ETD Margin Deposits were "not intended" to be included in the deal.

4/26/10 Tr. at 234:20-22 (McDade).  The trial proved, however, that Mr. McDade indisputably

**never informed Barclays** of that (alleged) understanding.  4/27/10 Tr. at 45:24-46:1 (McDade);

5/3/10 Tr. at 50:21-51:6 (Hughes); 8/24/10 Tr. at 111:8-15, 120:20-25, 179:3-20; 199:21-210:22

(Rosen); 9/8/10 Tr. at 88:12-17 (Raisler); 8/30/10 Tr. at 20:2-5 (James).  Indeed, the trial also

showed that (a) Mr. McDade never told this understanding to **anyone at Weil Gotshal** — who

agreed to a provision in the Sale Order contemplating the transfer of ETD Margin Deposits, who

received an email from the OCC confirming the transfer of ETD Margin Deposits to Barclays

(including approximately one billion dollars in cash), who added language to the Clarification

Letter confirming that Barclays was acquiring "any property" held as ETD Margin Deposit, and

who after the Closing prepared numerous summaries of the Sale that confirmed that Barclays

was acquiring all ETD Margin Deposits (FOF ¶¶ 31.23.1.1, 31.26, 31.29-31.32); (b) McDade

never told this understanding to **Jim Seery**, who testified at trial that, as Lehman's representative,

*he* clearly understood that all ETD Margin Deposits were being transferred to Barclays when he

discussed the ETDs with the Committee (FOF ¶ 31.28); and (c) McDade never told this

understanding to the **Trustee or any of his representatives**, who signed two agreements

confirming that Barclays was acquiring "all margin deposits" and all "collateral" including collateral in the form of "cash," who received the same OCC emails that Weil Gotshal received confirming the transfer of ETD Margin Deposits to Barclays, and who agreed to the transfer of ETD Margin Deposits to Barclays after the Closing and worked with Barclays for months to find additional such deposits that would be transferred (FOF ¶¶ 31.31-31.32). Thus, Mr. McDade's understanding of what was intended was something he kept to himself and shared with no one else.

257.    In any event, the trial shows that there is a reason Mr. McDade might have formed a misimpression of what was happening with respect to ETD Margin Deposits: first, he admitted that he was not personally involved in any of the discussions about the ETDs or the ETD Margin Deposits, and he therefore admitted that he did not know "*one way or the other*" whether the ETD Margin Deposits were included in the deal. *See* FOF ¶¶ 31.29-31.30; 4/27/10 Tr. at 45:13-46:1 (McDade). Second, Mr. McDade also admitted that he realized that the ETD Margin Deposits were encumbered assets that were "not ours to give," 4/27/10 Tr. at 46:5-10 (McDade), and that they would likely be wiped out in a liquidation of LBI (i.e., unless these ETD accounts were transferred to Barclays, there was likely nothing there for Lehman). 4/27/10 Tr. at 46:5-10 (McDade). Thus, since he assumed those assets were lost anyway, he would not have thought about whether they were going to Barclays "one way or another" (FOF ¶ 34.10.6). But he knew that the APA provided for Barclays to acquire "all of the assets used in connection with the Business," and that the Business included ETDs. FOF ¶¶ 31.1-31.6. And he never testified that he believed ETD Margin Deposits were ever identified as *Excluded Assets*. Thus, the objective evidence overwhelmingly shows that he *should have understood* that ETD Margin

Deposits were Purchased Assets, which simply reinforces why, as a matter of law, his testimony about his undisclosed subjective intent is irrelevant and cannot be considered. COL ¶ 33.

258. Indeed, the fact remains that Mr. McDade's testimony that the ETD Margin Deposits were not intended to be included in the transaction runs directly contrary to *all* of the contemporaneous evidence concerning what the parties believed at the relevant time: the APA's clear provision that Barclays was acquiring "all of the assets" used "in connection with the Business," including the ETD Business, and including all "deposits" that were "associated with the Business" (FOF ¶ 31.3); the provision in the Sale Order addressing the transfer of ETD Margin Deposits to Barclays (FOF ¶ 31.11); the email correspondence discussing the transfer of ETD Margin Deposits to Barclays (FOF ¶¶ 32.1, 31.24); documents reflecting a meeting the parties had in which the transfer of ETD Margin Deposits to Barclays was expressly discussed (FOF ¶¶ 31.23); the drafts of agreements and other transaction documents being prepared and exchanged, which expressly *required* LBI to transfer ETD Margin Deposits to Barclays (FOF ¶¶ 31.20, 31.25); and most importantly, the final, unambiguous written agreements the parties in fact settled upon and executed (FOF ¶ 31.23.2.3). The fact is that all of the parties' communications and agreements at the time contemplated the transfer to Barclays of all ETD Margin Deposits, and there is no evidence that Mr. McDade or any other Movant told *anyone* of a purported intent that the ETD Margin not be included in the transaction — a prospect that the unrebutted evidence established *would not have been acceptable to Barclays* or *any* rational purchaser (*see* FOF ¶ 31.19). Thus, *irrespective* of Mr. McDade's undisclosed, subjective intent (or the Trustee's, for that matter), this Court must enforce the plain terms of the parties' written agreements, which expressly provide for the transfer of all ETD Margin Deposits to Barclays. *See* COL ¶¶ 30-33.

b.      This Court Should Reject Movants' Arguments That The SEC
        Rules Prohibit The Transfer Of A Subset Of The ETD Margin
        Deposits.

259.    The Trustee may argue that the transfer of $507 million in OCC Margin would

violate SEC Rule 15c3-3 or SIPA on the ground that such assets constitute "customer property"

under SIPA § 16(4)(B) because they are taken into account in calculating the reserve requirement

under Rule 15c3-3.  This argument is meritless for several reasons.  First, this position would

contradict Sections 7(a) and 8(f) of SIPA, which permit the Trustee to transfer estate property

and customer property where the Trustee deems that such a transfer is in the best interests of the

estate and the transfer is approved by the Court.

260.    Second, even if the Trustee were subject to the requirements of Rule 15c3-3 (and

he is not, *see* Section IV(C), *infra*), nothing in that Rule purports to or could, as a matter of law,

restrict the ability of a broker-dealer to transfer assets that are simply components in the

*calculation* of the reserve requirement, rather than assets contained in the reserve account itself.

*See* January Brief at ¶¶ 407-408.

261.    Third, OCC Margin cannot properly be considered "customer property" under

SIPA, because customer-related debit items may only be considered "customer property" where

defined by the Commission as such through administrative rulemaking.  SIPA § 16(4)(B).  The

Commission has not issued a rule under Section 16 of SIPA that would permit the OCC Margin

to be treated as "customer property" under this definition.

262.    Fourth, the OCC Margin at issue is *not* "customer property" under SIPA because

it is undisputed that the assets are *LBI proprietary assets*.  *See* FOF ¶ 3.1.27.7.2.  Moreover, the

assets are significantly different from the types of assets that are generally treated as customer

property.  Unlike reserve account deposits and securities held in "good control locations," a

broker-dealer does not have an unfettered right to the prompt return of OCC margin without the

payment of money; the OCC margin is collateral for positions in the broker-dealer's account at the OCC.

263.     Moreover, the alternative to transferring the accounts and related margin to Barclays was not the return of the margin to the LBI estate, but liquidation by OCC of the positions in the accounts and the application of the margin to any amounts due upon liquidation. The OCC was entitled to apply the margin to satisfy LBI's obligations, and it would be perverse if the Trustee lacked authority to transfer that margin, subject to the OCC's lien, for the benefit of LBI's customers and other creditors.

264.     In addition to being legally unfounded, the Trustee's position is patently inequitable, and is a direct violation (and attempted confiscation) of Barclays' rights under the governing Purchase Agreement. Although the OCC account in which this $507 million was held was a customer account, the unrebutted record evidence establishes, and the Trustee admits, that the ETD Margin Deposits in that account were LBI *proprietary* assets. *See* FOF ¶ 31.27.7.2. The Trustee unambiguously agreed that those LBI assets would be transferred to Barclays. *See* FOF ¶¶ 31.22, 31.23.2, 31.27.

265.     Moreover, the vast majority of the positions in that account were held on behalf of *Lehman affiliates*. By assuming responsibility for those positions, Barclays incurred net losses of *over $100 million* – losses that neither the LBI estate nor any affiliate estate have ever answered for. Barclays absorbed this entire cost. *See* FOF ¶¶ 31.27.7, 31.27.7.1, 349.3.

266.     Given the lack of information with which Barclays entered into the ETD component of this transaction, Barclays could never have determined in advance of the Closing either (1) how much it would incur in losses on affiliate positions in that account, or (2) whether some or all of the margin in that account (or in any other account, for that matter) was factored

into LBI's 15c3-3 calculation (a calculation that was never made a condition of the Sale in any way).  *See* FOF ¶¶ 33, 34.  Moreover, it is undisputed that the margin in that OCC account was the only risk mitigant Barclays had against the liabilities Barclays was assuming in taking over the affiliate positions in that account.  *See* ¶ FOF 31.27.7.1.  For the Trustee first to unload the positions in those accounts on Barclays by signing a written agreement promising Barclays "all margin deposits" as protection, and then to claim, nearly a year later, an after-the-fact justification for why Barclays should *not* receive those "margin deposits," would be an inequitable result by any standard.  For this reason, and because, as explained above, the Trustee has the full authority to transfer LBI property when he determines that such a transfer is in the best interests of the estate and is approved by the Court (as he clearly did here), this Court should reject any argument (by anyone) that Barclays is not entitled to the $507 million in ETD Margin Deposits contained in LBI's 074C account at the OCC.

C.      Barclays Is Entitled To $769 Million In Securities From The Rule 15c3-3
        Account, "Or Securities Of Substantially The Same Nature And Value."

267.    The trial demonstrated that the assets deposited in LBI's reserve account pursuant to SEC Rule 15c3-3 were "Purchased Assets" under the APA, and therefore were to be conveyed to Barclays even prior to execution of the Clarification Letter.  The APA provides that, except for specifically identified "Excluded Assets," Barclays would receive "*all* assets" that were "used *in connection with* the Business," and further specifically identifies as Purchased Assets all the assets and "deposits" that were "associated with the Business."  *See* FOF ¶ 31.1.1-31.1.2.  Undisputed testimony at trial established that the 15c3-3 Assets were "used in connection with" the Business as defined in the APA (FOF ¶ 30.3), which included the "capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses," and "LBI's business as a futures commission merchant."  *See* FOF ¶

30.3.1; COL 39.11. In addition, by the very terms of SEC Rule 15c3-3, the assets held in the 15c3-3 accounts are "deposits." *See* 17 C.F.R. § 240.15c3-3(e). Thus, they are, by definition, "deposits" that are "associated with the Business" and, hence, covered by the plain terms of subsection (b) of the APA's definition of Purchased Assets. *See* FOF ¶ 30.4. Finally, the APA specifically identified all "government securities" as Purchased Assets, and did not identify any "government securities" as Excluded Assets, (FOF ¶¶ 43.4.5.3, 45.4) thus, to the extent such securities were held in the Rule 15c3 account, they were further covered by this specific definition of Purchased Assets. The APA does not identify assets held in the 15c3-3 account as Excluded Assets. *See* FOF ¶ 30.2.[116] Thus, the APA's plain text provided that *all* assets held in the 15c3-3 account were always to be conveyed to Barclays as Purchased Assets.

268. After signing the APA, but prior to the Sale Hearing on September 19, Lehman informed Barclays that it faced enormous difficulty delivering many of the financial securities identified as Purchased Assets in the APA. *See* FOF ¶¶ 45.3.1. In response to this problem, Barclays was concerned that it would not be able to close, and asked Lehman to identify what assets it was able to deliver. *See* FOF ¶¶ 28.1-28.3, 45.3.1. In addition to the Repo Collateral, Lehman identified the Clearance Box Assets and the 15c3-3 assets as available to be transferred. *See* FOF ¶ 45.3.1. Thus, when the Clarification Letter enumerated the *narrowed* set of assets that were still available to be transferred to Barclays, it specifically provided that, in connection with the transfer of customer accounts, Barclays would receive "to the extent permitted by applicable law, and as soon a practicable after the Closing, $769 million of securities as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of

---

[116] Movants might argue that the *cash* deposits held in the Rule 15c3-3 account were an Excluded Asset because the APA provided that, except for $1.3 billion in Retained Cash, cash was an Excluded Asset. BCI Ex. 1 (APA) at p. 2 (subsection (b) of definition of Excluded Assets). However, the testimony at trial proved that the general exclusion of "cash" from the Sale referred to "free cash," and hence not to cash that was pledged pursuant to a specific requirement. *See* FOF ¶ 45.5.

1934, as amended, or securities of substantially the same nature and value."   BCI Ex. 5

(Clarification Letter) at ¶ 8(ii).

269.    The Trustee argues that because the Clarification Letter provides that Barclays

would receive the $769 million of securities from the 15c3-3 account only "to the extent

permitted by law," Barclays is not entitled to receive these assets unless there was an excess in

the reserve account, all customer claims were satisfied, and the SEC approved the withdrawal.[117]

This argument should be rejected for two reasons.  First, the "applicable law" does *not* impose

any of these conditions.[118]  *See* COL ¶¶ 45.  Second, even if "applicable law" did impose such

conditions, the plain text of the Clarification Letter provides that if there is a regulatory obstacle

of some kind, Barclays should receive "securities of substantially the same nature and value."

BCI Ex. 5 (Clarification Letter) at ¶ 8(ii).

270.    The "applicable law" provides that (a) the Rule 15c3-3 restrictions apply to

operating broker-dealers, not to SIPA Trustees in a SIPC liquidation (COL ¶¶ 45.3-45.5), and (b)

SIPA Trustees have authority to transfer any property of a liquidating broker-dealer, including

customer property, if the Trustee concludes that it is in the best interests of the estate and the

transfer is approved by a Court (COL ¶ 45.6-45.8).  Here, the Trustee expressly approved the

transfer as part of the overall sale of the entire broker-dealer Business (with limited exceptions)

— a sale that the Trustee and others believed to be in "the national interest."  *See* FOF ¶¶ 45.5,

---

[117] *See* Trustee Br. at ¶¶ 60-66.

[118] Moreover, the Trustee's current position that he must satisfy all customer claims prior to performing under the
Purchase Agreement is inconsistent with the Trustee's own actions with respect to Lehman's PIM and PAM
accounts.  In moving for the transfer to Barclays of billions in customer property related to those accounts, the
Trustee acknowledged that some LBI customers might receive a higher recovery than others, but successfully
argued to this Court that this concern was outweighed by the benefits of the Barclays-Lehman transaction to the
estate as a whole.  *See* FOF ¶ 45.5.

36.11.  Thus, "applicable law" *does* permit the transfer of the $769 million in securities from the 15c3-3 account, and those securities should be transferred, as promised.[119]

271.     Even if "applicable law" created an obstacle to transferring $769 million of securities from the Rule 15c3 account, the Clarification Letter unambiguously provides that Barclays then is entitled to "securities of substantially the same nature and value."   BCI Ex. 5 (Clarification Letter) at ¶ 8(ii).  Any other conclusion renders the "or" clause in paragraph 8(ii) of the Clarification Letter meaningless, which violates a standard doctrine of contractual interpretation.  *See* Barclays' January Br. at ¶¶ 419-420; FOF at ¶ 45.4; *see also* COL ¶¶ 37.

272.     Indeed, it was not until *after* filing his Rule 60(b) Motion that the Trustee first attempted to provide an *alternate* meaning to the "or" clause so as to avoid rendering it meaningless:  he argues that it was intended to ensure that substitute securities could be used in the event that securities in the 15c3 reserve account matured before they were transferred to Barclays.  *See* FOF ¶¶ 45.2-45.3.  This interpretation should be rejected based on the plain text of the Clarification Letter.  The "or" clause was not necessary to deal with maturing securities:  there is nothing in the Clarification Letter suggesting that Barclays was being promised *specific CUSIPs* from the 15c3-3 account, that would somehow cease to become available if they matured; rather, Barclays was being promised a certain amount of value, and the fact that certain securities might occasionally mature and the proceeds be used to acquire more securities would be normal practice, and have no impact on the contractual right Barclays had to receive $769 million in securities.  Thus, the Trustee's argument does not provide any meaningful content to the "or" clause, and therefore should be rejected as a matter of law.  *See* COL ¶ 37

---

[119]  The Trustee and Barclays have stipulated that to the extent the Court holds that "applicable law" requires the showing of an "excess" in the Rule 15c3-3 account, that factual issue has been deferred, and no findings are being sought with respect to that issue.  Oct. 4, 2010 Stipulation Between Trustee and Barclays.

(interpretations which render contractual clauses meaningless or redundant are disfavored and should not be adopted).

273. Even if there were an ambiguity regarding the meaning of the "or" clause, the extrinsic evidence overwhelmingly supports the Barclays interpretation. The *only extrinsic evidence* the Trustee relies upon to support his interpretation of the "or" clause is legally irrelevant because it is nothing more than unexpressed, subjective intent. *See* COL ¶ 33. The Trustee relies upon the testimony of Mr. Robert Messineo, a partner at Weil Gotshal who participated in drafting the Clarification Letter, who testified that he believed the "or" clause was to deal with maturing securities.[120] However, Mr. Messineo admitted that (a) he did not participate in the contractual negotiations of the relevant provisions, and (b) he did not communicate his understanding of the "or" clause to anyone at Barclays, or even to his own partner, Harvey Miller. *See* FOF ¶ 45.2.

274. Moreover, the testimony of Mr. Miller, who (unlike Mr. Messineo) did participate in the negotiations regarding the 15c3-3 asset, expressly rejects the Trustee's proposed reading of the "or" clause. *See* FOF ¶ 45.2.2. While testifying as Weil Gotshal's 30(b)(6) representative, Mr. Miller was directly asked in deposition whether the "or" clause was designed to address the issue of maturing securities, and he answered "I don't think that was contemplated at the time." *See* FOF ¶ 45.2.3.2.[121]

275. In contrast to the absence of any relevant extrinsic evidence supporting the Trustee's interpretation of the Clarification Letter, there is ample, relevant extrinsic evidence

---

[120] *See* Trustee Reply Br. at ¶¶ 36-38..

[121] Although the Trustee may rely upon other testimony from Mr. Miller relating to the assets from the Rule 15c3-3 account, his testimony at trial regarding Barclays' right to $769 million in 15c3-3 securities cannot change the plain text of the "or" clause in the Clarification Letter, or his own admission that this "or" clause had nothing to do with maturing securities — and hence would be meaningless if it were not providing that Barclays was to receive the securities *even if* there were regulatory issues with transferring them directly from the Rule 15c3-3 account. *See generally* COL ¶ 37; FOF ¶ 45.2 (including 45.2.3.2); April Br. at ¶¶ 102-105.

supporting the Barclays' interpretation: i.e., the "or" clause was added to the Clarification Letter to ensure that *even if* "applicable law" did not allow the Trustee to transfer the $769 million in securities from the 15c3-3 reserve account itself, Barclays would nonetheless receive "securities of substantially the same nature and value."   BCI Ex. 5 (Clarification Letter) at § 8(ii).  As of 7:54 p.m. on September 21, 2008, the draft Clarification Letter provided that Barclays' right to the $769 million in securities was *unconditional*:  it contained *neither* the "applicable law" clause, *nor* the "or" clause.  *See* FOF ¶ 45.3.2.  The evidence shows that after that draft was circulated, Mr. Miller raised a concern with Barclays representatives that regulatory issues might prevent LBI from transferring assets out of the 15c3-3 reserve account.  *See* FOF ¶ 45.3.3-45.3.4. The Barclays lawyer most knowledgeable about SEC issues, Cleary Gottlieb attorney Ed Rosen, testified that he communicated to Mr. Miller that he did not believe there were any regulatory obstacles to the transfer, but that the concern could be easily addressed by adding the phrase "to the extent permitted by applicable law."  *See* FOF ¶ 45.3.5.  However, in the same conversation, the Barclays representatives made clear that Barclays had to be sure that if for any reason, contrary to Mr. Rosen's view, there were a regulatory obstacle to the transfer of assets from the Rule 15c3 account, Lehman would transfer equivalent assets from elsewhere.  *See* FOF ¶ 45.3.5. This demand was consistent with Barclays' insistence, on Friday September 19, that Lehman identify Purchased Assets (including the assets in the 15c3-3 account) that could still be transferred, and that were sufficient to give Barclays the comfort it needed that it could close the deal, notwithstanding all the risks it faced.  *See* FOF ¶ 45.3.5.2.

276.    What happened next is undisputed, and dispositive:  after this "hallway conversation," Weil Gotshal circulated a draft Clarification Letter that contained *both* the clause "to extent permitted by applicable law" *and also* the clause "or securities of substantially the

same nature." *See* FOF ¶ 45.3.5. These two clauses were added *at the same time*, and for the same reason: to reflect the "hallway conversation" in which Barclays suggested that the agreement be modified to address Mr. Miller's concerns regarding regulatory issues (which Barclays believed were unfounded), *and* to ensure that Barclays would receive the assets no matter what. *See* FOF ¶ 45.3.5. There is no other plausible way to interpret the objective evidence presented in this case.

277. More importantly, this is the *only* objective evidence of the parties' intent regarding the "or" clause. Although Mr. Miller has testified that Lehman never expressly agreed to such a demand, Barclays' representatives testified that they believed an agreement had been reached, and the objective evidence confirms Barclays' understanding. *See* FOF ¶¶ 45.3.3-45.3.4. Barclays reasonably understood the language "or securities of substantially the same nature" to have been added in response to its demand for alternate securities, and merely modified the clause to add the phrase "and value" in order to ensure Barclays was fully protected, with language that was as clear as possible. *See* FOF ¶ 45.3.4.3 . No other possible explanation was ever communicated to Barclays as to why the "or" clause was being added, and the clause would be meaningless if Lehman had not in fact acceded to Barclays' demand that it receive $769 million in securities regardless of any legal restrictions on the transfer of funds from LBI's reserve account itself.

278. The extrinsic post-Closing evidence also confirms that *none of the Movants* treated Barclays' right to the $769 million in securities as conditional. *See* FOF ¶ 45.3.7. Instead, in numerous documents, and in a statement made to the Court in a "state of the estate" presentation by Mr. Miller, Movants uniformly acknowledged that Barclays would receive $769

million in securities from the 15c3-3 account, without ever suggesting that this entitlement was conditional or uncertain.  *See* FOF ¶ 45.3.7.[122]

279.    The Trustee has relied upon a December 11, 2009, submission from the SEC made in connection with the Trustee's October 5, 2009, motion for allocation of property in the estate.  *See* Trustee Reply Br. at ¶ 15; FOF ¶ 45.5.  While the SEC obviously has enforcement authority over Rule 15c3-3 and a view as to how those rules may relate to SIPA, any views it expresses in this case cannot be divorced from its own support for the Sale at the time:  it supported this Sale knowing full well that Barclays was acquiring "all assets" that were "used in connection with the Business," which necessarily included the assets in the Rule 15c3-3 account.  *See* FOF ¶ 30.  The SEC also has expansive oversight authority over SIPC and, by extension, the SIPC Trustee.  *See e.g.* 15 U.S.C. § 78ggg.  If it believed the Trustee's approval of the transfer of $769 million in securities from the 15c3-3 account (with no mention of any "excess" requirement) was unauthorized, it could and should have said so at the time — before Barclays relied upon the enforceability of the contract.  *See* Section III, *supra*.  The inequity and basic unfairness of defeating Barclays' reasonable expectations is not mitigated simply because the Trustee's argument may receive after-the-fact support from the SEC.

## V.    THE COURT SHOULD DISMISS THE COUNTS IN THE ADVERSARY COMPLAINTS FILED BY MOVANTS.

280.    As explained in the January Brief, the parties agreed in Stipulated Orders entered on January 6, 2010, and January 13, 2010, that several of the counts in Movants' Adversary Complaints (filed November 16, 2009) should be resolved as part of this Rule 60(b) proceeding

---

[122]  Movants have relied upon internal accounting documents from December of 2008 and January 2009 in which Barclays accountants expressed the view that the still undelivered $769 million in securities was awaiting SEC approval.  *See* Trustee Reply Br. at ¶¶ 46, 56.  These documents show nothing more than that there was confusion within the Barclays finance department as to why these securities had not yet been delivered.  They do not reflect, and could not reflect, the views of anyone who was actually involved in the negotiations, or who understood the meaning of the "or" clause.  9/2/10 Tr. at 201:1-2, 205:10-23, 215:12-216:5 (Romain).

(even though stayed for procedural purposes). Our January Brief marches through each of those "partially stayed" claims and explains why the denial of the relief called for in the Rule 60(b) Motions requires the denial of the relief claimed in each of those counts as well. *See* January Br. at ¶¶ 671 — 685. Barclays adopts and incorporates those arguments here.

281. Barclays also respectfully submits that, given the extensive evidentiary hearing in this matter, and the similarity between the "fully stayed" counts (i.e., those that the parties agreed would technically not be resolved in this proceeding) and the "partially stayed counts" (i.e., those that were stayed for procedural purposes but agreed to be resolved in this proceeding), the Court's resolution of this proceeding will likely dispose of *all* counts in the Adversary Complaints. Specifically, Barclays respectfully submits that the denial of the Rule 60(b) motions would likely require dismissal of all fully stayed claims in Movants' Complaints as a matter of collateral estoppel and law of the case (and Barclays reserves the right to make such filings and other appropriate responses to the Adversary Complaints, as contemplated by the stipulation referenced above).

## CONCLUSION

282. For the foregoing reasons, the Court should (a) deny the Rule 60(b) motions in their entirety, and (b) grant Barclays the relief requested in its Motion To Enforce The Sale Order And Secure Delivery Of All Undelivered Assets.

Dated:      New York, New York
              November 22, 2010

                                   Respectfully submitted,

                                   BOIES, SCHILLER & FLEXNER LLP

By:    /s/ Jonathan D. Schiller
                                 Jonathan D. Schiller
                                 Jack G. Stern
                                 575 Lexington Avenue
                                 New York, New York 10022
                                 Tel: (212) 446-2300
                                 Fax: (212) 446-2350
                                 Email: JSchiller@bsfllp.com
                                          JStern@bsfllp.com

                                 Hamish P. M. Hume
                                 5301 Wisconsin Avenue, N.W.
                                 Washington, D.C. 20015
                                 Tel: (202) 237-2727
                                 Fax: (202) 237-6131
                                 Email: HHume@bsfllp.com

                                 *Attorneys for Barclays Capital Inc.*