**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | |

**ADDENDUM 1 TO POST-TRIAL**
**MEMORANDUM OF BARCLAYS CAPITAL INC.**

**PROPOSED FINDINGS OF FACT**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350
*Attorneys for Barclays Capital Inc.*

November 22, 2010

# TABLE OF CONTENTS:
## BARCLAYS' PROPOSED FINDINGS OF FACT

A.    Summary List Of Material Facts Proved At Trial ............................................................1

    i.    Facts Demonstrating The Risk Barclays Took, The Difficulty In Valuing
Financial Assets, And The Absence Of Any Other Viable Bidder.........................1

    ii.    Facts Showing The Good Faith Of The Negotiations, The Disclosures Of
The Central Terms Of The Sale Through The APA, And The Fact That
The Sale Was Never Agreed Or Represented To Be A "Wash." ............................1

    iii.    Facts Showing That The APA's Estimate Of The Long Positions Was
Reasonable And Accurate, And Did Not Disguise A $5 Billion Discount. ............1

    iv.    Facts Showing The Reasonableness Of The Comp And Cure Estimates,
The Satisfaction Of The Comp And Cure Obligations, And The Barclays
Internal Estimates Of Accounting For The Comp And Cure Obligations...............2

    v.    Facts Showing The Significance Of The Barclays Need For Capital
Accretion, The Public Announcement Of The Expected Acquisition Gain,
And The Consistency Of That Gain With The Sale Being In The Best
Interests Of The Lehman Estates And Creditors. ...................................................2

    vi.    Facts Showing The Fed's Insistence That Barclays Replace Its Repo Loan,
The Risk Barclays Took In Undertaking The Repo Transaction, And The
Reasons Barclays Had For Doubting The Value Of The Repo Collateral. .............3

    vii.    Facts Showing Lehman's Inability To Deliver Purchased Assets, The Near
Collapse Of The Sale, The Identification Of Assets That Still Could Be
Delivered, And The Facts Proving That Those Assets Were Already
Within The Definition Of Purchased Assets Under The APA. ...............................3

    viii.    Facts Showing That ETD Margin Deposits Were Always Purchased
Assets, And That The Parties Agreed To The Transfer Of All Assets In
The ETD Accounts, Including The ETD Margin Deposits, Despite The
Uncertainty Over What If Any "Net Value" And Risk Of Future Exposure
Was Associated With Those Accounts. ..................................................................4

    ix.    Facts Showing The Reasonable And Good Faith Disclosures Made At The
Sale Hearing, The Nature Of The $47.4 Billion Estimate Provided At The
Sale Hearing, And The Basis Upon Which The Representatives Of LBHI
And LBI Persuaded The Court To Approve The Sale Despite The Lack Of
A Final Contract And The Considerable Uncertainty Involved In The Sale..........5

    x.    Facts Showing The Knowledge Of All Parties Of The Drafting Of The
Clarification Letter, And The Extrinsic Evidence Rebutting The Trustee's

Contractual Interpretation Arguments On Clearance Box Assets, ETD Margin Deposits (Including Cash Margin), And The 15c3-3 Assets. ....................5

xi.     Facts Showing The Movants' Knowledge, At The Time Of The Sale And Throughout The Period They Defended The Sale On Appeal, Of All The Essential Information Which They Have Distorted In This Proceeding As The Alleged Basis For Their Rule 60(b) Claims. ....................................6

xii.    Facts Showing That The Barclays Acquisition Balance Sheet Reflects Reasonable Valuations Of The Financial Inventory Acquired In The Sale, That Movants' Experts Were Unreliable, And That The Barclays Acquisition Gain Was Entirely Attributable To Assets That Would Likely Have Had Little Or No Value To Lehman In A Liquidation.................................7

xiii.   Facts Showing That The Sale Was Better Than A Liquidation For The Lehman Estates, The Lehman Creditors, And The Public Interest, And That The Consideration Barclays Paid Was More Than Anyone Else Would Have Paid And Therefore Was "Fair Consideration" And "Reasonably Equivalent Value." ..............................................................7

xiv.    Facts Showing That Movants Failed To Present Evidence That Would Have Changed The Outcome Of The Sale Hearing, And Facts That Confirm The Accuracy Of All Of The Findings In The Sale Order.......................7

xv.     Facts Showing The Movants' Conduct In Connection With The December 2008 Settlement, The Successful Defense Of The Sale Order, And The Repeated Reliance On The Finality Of The Sale Order And The Clarification Letter As Part Of The Approved Purchase Agreement. ....................8

xvi.    Additional Facts Showing That Movants' Claims Lack Credibility, That Movants Concealed Their Understanding Of The Information Relating To The Sale And Their Intent To Bring Claims, And That Movants Have Relied On A Misleading Or Distorted Version Of Words And Phrases In Presenting Their Case. ...........................................................................8

xvii.   Facts Showing The Lehman Movants' Failure To Comply With Terms Of The Purchase Agreement They Executed. ............................................9

B.      Detailed List of Material Facts Proved At Trial ................................................10

i.      Facts Demonstrating The Risk Barclays Took, The Difficulty In Valuing Financial Assets, And The Absence Of Any Other Viable Bidder......................10

ii.     Facts Showing The Good Faith Of The Negotiations, The Disclosures Of The Central Terms Of The Sale Through The APA, And The Fact That The Sale Was Never Agreed Or Represented To Be A "Wash." ..........................23

iii.   Facts Showing That The APA's Estimate Of The Long Positions Was
Reasonable And Accurate, And Did Not Disguise A $5 Billion Discount. ..........51

iv.   Facts Showing The Reasonableness Of The Comp And Cure Estimates,
The Satisfaction Of The Comp And Cure Obligations, And The Barclays
Internal Estimates Of Accounting For The Comp And Cure Obligations.............59

v.   Facts Showing The Significance Of The Barclays Need For Capital
Accretion, The Public Announcement Of The Expected Acquisition Gain,
And The Consistency Of That Gain With The Sale Being In The Best
Interests Of The Lehman Estates And Creditors. ...................................................72

vi.   Facts Showing The Fed's Insistence That Barclays Replace Its Repo Loan,
The Risk Barclays Took In Undertaking The Repo Transaction, And The
Reasons Barclays Had For Doubting The Value Of The Repo Collateral. ...........79

vii.   Facts Showing Lehman's Inability To Deliver Purchased Assets, The Near
Collapse Of The Sale, The Identification Of Assets That Still Could Be
Delivered, And The Facts Proving That Those Assets Were Already
Within The Definition Of Purchased Assets Under The APA. ............................88

viii.   Facts Showing That ETD Margin Deposits Were Always Purchased
Assets, And That The Parties Agreed To The Transfer Of All Assets In
The ETD Accounts, Including The ETD Margin Deposits, Despite The
Uncertainty Over What If Any "Net Value" And Risk Of Future Exposure
Was Associated With Those Accounts. .................................................................94

ix.   Facts Showing The Reasonable And Good Faith Disclosures Made At The
Sale Hearing, The Nature Of The $47.4 Billion Estimate Provided At The
Sale Hearing, And The Basis Upon Which The Representatives Of LBHI
And LBI Persuaded The Court To Approve The Sale Despite The Lack Of
A Final Contract And The Considerable Uncertainty Involved In The Sale.......124

x.   Facts Showing The Knowledge Of All Parties Of The Drafting Of The
Clarification Letter, And The Extrinsic Evidence Rebutting The Trustee's
Contractual Interpretation Arguments On Clearance Box Assets, ETD
Margin Deposits (Including Cash Margin), And The 15c3-3 Assets. ................141

xi.   Facts Showing The Movants' Knowledge, At The Time Of The Sale And
Throughout The Period They Defended The Sale On Appeal, Of All The
Essential Information Which They Have Distorted In This Proceeding As
The Alleged Basis For Their Rule 60(b) Claims. ...............................................167

xii.   Facts Showing That The Barclays Acquisition Balance Sheet Reflects
Reasonable Valuations Of The Financial Inventory Acquired In The Sale,
That Movants' Experts Were Unreliable, And That The Barclays
Acquisition Gain Was Entirely Attributable To Assets That Would Likely
Have Had Little Or No Value To Lehman In A Liquidation..............................199

xiii.    Facts Showing That The Sale Was Better Than A Liquidation For The
         Lehman Estates, The Lehman Creditors, And The Public Interest, And
         That The Consideration Barclays Paid Was More Than Anyone Else
         Would Have Paid And Therefore Was "Fair Consideration" And
         "Reasonably Equivalent Value." ........................................................................232

xiv.     Facts Showing That Movants Failed To Present Evidence That Would
         Have Changed The Outcome Of The Sale Hearing, And Facts That
         Confirm The Accuracy Of All Of The Findings In The Sale Order...................239

xv.      Facts Showing The Movants' Conduct In Connection With The December
         2008 Settlement, The Successful Defense Of The Sale Order, And The
         Repeated Reliance On The Finality Of The Sale Order And The
         Clarification Letter As Part Of The Approved Purchase Agreement. ................245

xvi.     Additional Facts Showing That Movants' Claims Lack Credibility, That
         Movants Concealed Their Understanding Of The Information Relating To
         The Sale And Their Intent To Bring Claims, And That Movants Have
         Relied On A Misleading Or Distorted Version Of Words And Phrases In
         Presenting Their Case. .....................................................................................261

xvii.    Facts Showing The Lehman Movants' Failure To Comply With Terms of
         The Purchase Agreement They Executed. .........................................................278

## A.    SUMMARY LIST OF MATERIAL FACTS PROVED AT TRIAL

### i.    Facts Demonstrating The Risk Barclays Took, The Difficulty In Valuing Financial Assets, And The Absence Of Any Other Viable Bidder.

1.    Barclays Took Enormous Risks In Acquiring Lehman's North American Broker-Dealer Business In September 2008.  *See* FOF § B, 1.1-1.10.

2.    During The Week Of September 15, 2008, There Were No Other Viable Bidders For Lehman's North American Broker-Dealer Business.  *See* FOF § B, 2.1-2.17.

3.    During The Week Of September 15, 2008, It Was Extremely Difficult To Value The Financial Assets That Were Owned By Lehman's North American Broker-Dealer Business, And That Were Being Transferred To Barclays As Part Of The Sale.  *See* FOF § B, 3.1-3.5.

### ii.    Facts Showing The Good Faith Of The Negotiations, The Disclosures Of The Central Terms Of The Sale Through The APA, And The Fact That The Sale Was Never Agreed Or Represented To Be A "Wash."

4.    The Terms Of The Sale Were Agreed Through An Arm's Length, Good-Faith Negotiation.  *See* FOF § B, 4.1-4.5.

5.    The Asset Purchase Agreement (APA) Disclosed The Central Terms Of The Sale, Which Were That Barclays Was To Acquire All Assets In The Business (Except Those That Were Specifically Excluded) For A Consideration Equal To A Definite Cash Amount And The Assumption Of Assumed Liabilities Of An Indefinite Amount.  *See* FOF § B, 5.1-5.15.

6.    The APA Did Not Provide For A "Wash" Or "Balanced" Transaction, And The Sale Was Not Presented To The Court As A "Wash" Or "Balanced" Transaction.  *See* FOF § B, 6.1-6.3.

7.    Neither The APA Nor Any Other Representation Made In Connection With The Sale, Either Oral Or Written, Ever Indicated That Barclays Was Paying A Price That Was Based Upon, Or Equal To, The Book Value Of Any Of The Purchased Assets.  *See* FOF § B, 7.1-7.4.

8.    The APA Disclosed The Fact That The Value Of Trading Assets Would Exceed The Value Of Trading Liabilities — *i.e.*, There Was A "Buffer" Based On The Marked Values In The Trading Inventory.  *See* FOF § B, 8.1-8.11.

### iii.    Facts Showing That The APA's Estimate Of The Long Positions Was Reasonable And Accurate, And Did Not Disguise A $5 Billion Discount.

9.    The APA's Definition Of The Long Positions As Having A "Book Value As Of The Date Hereof Of Approximately $70 Billion" Was An Estimate Of The Value Of The Long

Positions As Defined In The APA, And Was Not Intended To, And Did Not, Disguise $5 Billion Of Value That Was To Be Transferred To Barclays.  *See* FOF § B, 9.1-9.7.

    **iv.**    **Facts Showing The Reasonableness Of The Comp And Cure Estimates, The Satisfaction Of The Comp And Cure Obligations, And The Barclays Internal Estimates Of Accounting For The Comp And Cure Obligations.**

10.    The $2 Billion Estimate For The Compensation Obligations Barclays Agreed To Assume Under The APA Was Intended To Cover Both 2008 Bonus Payments And The Severance Payments Barclays Agreed To Under The APA, As Well As Any Tax Obligations Connected With Such Bonus And Severance Payments.  *See* FOF § B, 10.1-10.8.

11.    Barclays Paid Over $1.95 Billion In Bonus, Severance, And Related Tax Obligations Pursuant To Its Obligations Under The APA.  *See* FOF § B, 11.1-11.6.

12.    Lehman Executives Made A Good Faith Effort To Estimate The Total Exposure Barclays Faced With Respect To Its Obligations Under § 2.5 Of The APA To Make Cure Payments For Any Contract It Chose To Assume Within 60 Days Of Closing (As Well As Related Contract Payments Required By § 2.5).  *See* FOF § B, 12.1-12.9.

13.    Barclays Satisfied Its Obligation To Make Cure Payments For Any Contract It Chose To Assume Within 60 Days Of Closing.  *See* FOF § B, 13.1-13.7.

14.    Prior To Closing, Barclays Did Not And Could Not Know How Much It Would Need To Spend To Satisfy Its Comp And Cure Obligations.  *See* FOF § B, 14.1-14.9.

15.    The Unrebutted Testimony Of Patrick Clackson And Gary Romain Established That Barclays Initially Planned To Account For Some Of Its Comp And Cure Obligations On Its Income Statements Rather Than Its Acquisition Balance Sheet.  *See* FOF § B, 15.1-15.7.

    **v.**    **Facts Showing The Significance Of The Barclays Need For Capital Accretion, The Public Announcement Of The Expected Acquisition Gain, And The Consistency Of That Gain With The Sale Being In The Best Interests Of The Lehman Estates And Creditors.**

16.    Barclays Could Not, And Would Not, Have Agreed To The Sale Unless It Believed The Sale Was Likely To Result In An Acquisition Gain That Would Protect Its Regulatory Capital Position.  *See* FOF § B, 16.1-16.2.

17.    The Fact That Barclays Expected To Record A Multi-Billion Dollar Acquisition Gain Was Not A Secret, But Instead Was Something That Barclays Publicly Announced On September 17, 2008, The Same Day That The APA Was Filed In Court.  *See* FOF § B, 17.1-17.4

18.    An Acquisition Gain For Barclays Was Consistent With The Sale Being In The Best Interests Of The Lehman Estates And Creditors.  *See* FOF § B, 18.1-18.4.

**vi.** **Facts Showing The Fed's Insistence That Barclays Replace Its Repo Loan, The Risk Barclays Took In Undertaking The Repo Transaction, And The Reasons Barclays Had For Doubting The Value Of The Repo Collateral.**

19.    On Or Around September 16, 2008, The New York Federal Reserve Insisted That Barclays Advance $45 Billion In Cash To Replace The Fed's "Repo" Loan To LBI.  *See* FOF § B, 19.1-19.4.

20.    On September 18, 2008, Barclays Advanced $45 Billion In Cash To Replace The NY Fed's Repo Loan To LBI.  *See* FOF § B, 20.1.

21.    Barclays Would Never Have Agreed To Do The Fed Repo Replacement Transaction Absent Its Desire To Acquire The Business For Strategic Purposes.  *See* FOF § B, 21.1-21.5.

22.    In Return For Its $45 Billion Cash Advance, Barclays Was Entitled To Receive Repo Collateral That Exceeded $45 Billion In Value By An Amount Consistent With The Terms Of The NY Fed Repo Loan That It Was Replacing.  *See* FOF § B, 22.1-22.5.

23.    On September 18, 2008, Barclays Received Repo Collateral That Was Marked By Lehman At Less Than $43 Billion, And That Was Given Aggregate "Collateral Value" Marks By The Barclays Repo Custodian, Bank Of New York Mellon (BoNY), Of Approximately $43.1 Billion.  *See* FOF § B, 23.1-23.2.

24.    Barclays Had Good Reasons To Doubt The Accuracy Of Both The Lehman Marks And The BoNY Marks On The Repo Collateral That It Received On September 18, 2008.  *See* FOF § B, 24.1-24.9.

25.    As Of September 19, 2008, Barclays Believed That Lehman And Its Repo Custodian, JPMorgan Chase ("JPM"), Would Make Up For The $7 Billion Shortfall In Repo Collateral By Delivering Additional Collateral That Was Likely Worth Considerably Less Than $7 Billion.  *See* FOF § B, 25.1-25.9.

**vii.** **Facts Showing Lehman's Inability To Deliver Purchased Assets, The Near Collapse Of The Sale, The Identification Of Assets That Still Could Be Delivered, And The Facts Proving That Those Assets Were Already Within The Definition Of Purchased Assets Under The APA.**

26.    By September 19, 2008, It Became Clear That Lehman Was Unable To Deliver The Inventory Of Financial Assets It Had Identified In The APA.  *See* FOF § B, 26.1-26.4.

27.    Because Of Lehman's Inability To Deliver Assets, On September 19, 2008, Barclays Negotiators Told Lehman Negotiators That Barclays Might Not Be Able To Close The Transaction, And Asked Lehman's Negotiators What Other Assets In The Business Were Still Available To Be Transferred.  *See* FOF § B, 27.1-27.2.

28.    On September 19, 2008, Before The Sale Hearing, Lehman Identified Both Clearance Box Assets Marked At $1.9 Billion And More Than $1 Billion In 15c3-3 Assets As

Assets In The Business That Would Be Transferred To Barclays In The Sale.  *See* FOF § B, 28.1-28.3.

29.    The Clearance Box Assets Were Purchased Assets Under The APA Because They (A) Were Assets Used In The Business, (B) Were Not Excluded Assets, And (C) Were Encompassed Within The "Long Positions" Defined As Purchased Assets In The APA. *See* FOF § B, 29.1-29.5.

30.    The 15c3-3 Assets Were Assets Used In The Business And Were Not Excluded Assets, And Were "Required Capital Deposits" And Hence Were Purchased Assets Under The APA.  *See* FOF § B, 30.1-30.4.

   **viii.    Facts Showing That ETD Margin Deposits Were Always Purchased Assets, And That The Parties Agreed To The Transfer Of All Assets In The ETD Accounts, Including The ETD Margin Deposits, Despite The Uncertainty Over What If Any "Net Value" And Risk Of Future Exposure Was Associated With Those Accounts.**

31.    The Assets Posted To Secure Obligations Associated With LBI's Exchange-Traded Derivatives ("ETD Margin Deposits") Were Understood At The Time Of The Sale And For Months After The Closing, By Both Lehman And Barclays, To Be Assets Used In The Business That Barclays Was Acquiring, And Therefore Assets That Would Be Transferred To Barclays As Part Of The Sale.  *See* FOF § B, 31.1-31.32.

32.    Counsel To The Trustee And LBHI Were Told Repeatedly That LBI's ETD Accounts Contained Cash Margin And That All Such Cash Margin Was Being Transferred To Barclays, Yet Neither Counsel Nor Any Lehman Executives Objected.  *See* FOF § B, 32.1-32.22.

33.    It Was Not Possible For Barclays To Know What If Any Net Value Might Be Associated With The Exchange-Traded Derivatives And Associated Collateral As Of The September 19 Sale Hearing, Or At Any Time Prior To The September 22 Closing, Even Though It Undertook Its Best Efforts To Ascertain Such Information.  *See* FOF § B, 33.1-33.12.

34.    Barclays Faced Substantial Risks In Acquiring LBI's ETD Accounts.  *See* FOF § B, 34.1-34.10.

35.    For Months After The Closing, And *After* He Admits He Was Aware Of Everything He Now Claims He Did Not Know At The Time Of The Closing, The Trustee Continued To Acknowledge Barclays' Entitlement To The ETD Margin Deposits And To Authorize Their Transfer To Barclays.  *See* FOF § B, 35.1-35.13.

       **ix.**    **Facts Showing The Reasonable And Good Faith Disclosures Made At The Sale Hearing, The Nature Of The $47.4 Billion Estimate Provided At The Sale Hearing, And The Basis Upon Which The Representatives Of LBHI And LBI Persuaded The Court To Approve The Sale Despite The Lack Of A Final Contract And The Considerable Uncertainty Involved In The Sale.**

36.     The Sale Was Presented To The Court For Approval As The Sale Of The Business, And As The Best Alternative For The Estates, The Creditors, And The Public. *See* FOF § B, 36.1-36.29.

37.     The $47.4 Billion Estimate Given At The Sale Hearing Was A Reasonable Estimate Of The Repo Collateral And The Clearance Box Assets — Which Were The Assets Which Had Effectively Become The Long Positions. *See* FOF § B, 37.1-37.15.

38.     Lehman and Barclays Reasonably Estimated The Realizable Value Or Fair Market Value Of The Repo Collateral To Be Approximately $45.5 Billion. *See* FOF § B, 38.1-38.8.

39.     The Lawyers Representing LBHI And LBI Asked The Court To Approve The Clarification Letter Prior To The Finalization Of The Clarification Letter, And The Court Agreed To Do So. *See* FOF § B, 39.1-39.11.

40.     The Lawyers Representing LBHI And LBI Successfully Persuaded The Court To Approve The Sale Despite Objections From Certain Creditors That Barclays Was Getting A Discount, And Despite Requests From Creditors That With More Time A Better Offer Might Emerge. *See* FOF § B, 40.1-40.5.

41.     The Creditors Committee Chose Not To Object To The Sale Because There Was No Better Alternative. *See* FOF § B, 41.1-41.5.

42.     The Terms of The Sale Order Were Negotiated Among The Parties — Including The Debtor, The Trustee, And The Committee — Before, During, And After The Sale Hearing. *See* FOF § B, 42.1-42.4.

       **x.**    **Facts Showing The Knowledge Of All Parties Of The Drafting Of The Clarification Letter, And The Extrinsic Evidence Rebutting The Trustee's Contractual Interpretation Arguments On Clearance Box Assets, ETD Margin Deposits (Including Cash Margin), And The 15c3-3 Assets.**

43.     The Lawyers Representing LBHI And LBI, The Lawyers Representing The Trustee, And The Financial Advisors And Lawyers Representing The Committee, All Were Present During The Weekend Negotiations At The Offices Of Weil Gotshal In Which The Clarification Letter Was Revised And Finalized, And Then Executed As Part Of The Purchase Agreement. *See* FOF § B, 43.1-43.5.

44.     The Parties Never Agreed To Remove Any Of The Clearance Box Assets From The Definition Of Purchased Assets. *See* FOF § B, 44.1-44.5.

45.    The Barclays And Lehman Negotiators Agreed That Barclays Would Receive $769 Million In Securities From The Rule 15c3-3 Account, Or, If There Were Any Regulatory Obstacle To Doing So, Barclays Would Receive "Securities Of Substantially The Same Nature And Value" From Outside The Account.  *See* FOF § B, 45.1-45.6.

> **xi.    Facts Showing The Movants' Knowledge, At The Time Of The Sale And Throughout The Period They Defended The Sale On Appeal, Of All The Essential Information Which They Have Distorted In This Proceeding As The Alleged Basis For Their Rule 60(b) Claims.**

46.    Prior To The Closing, LBHI's Lawyers And The Creditors' Committee Had An Accurate List Of The Cusips That Were Being Transferred To Barclays.  *See* FOF § B, 46.1-46.7.

47.    All Movants Either Supported, Agreed To Or Acquiesced In The Sale With Full Knowledge That There Was Substantial Uncertainty Concerning The Value Of The Purchased Assets And The Amount Of Assumed Liabilities In The Transaction.  *See* FOF § B, 47.1-47.10.

48.    At The Time Of The Closing, LBHI, LBI, And The Creditors' Committee All Knew The Terms Of The Sale, And All Knew The Information On Which They Have Based The Claims In Their Rule 60(B) Motions.  *See* FOF § B, 48.1-48.130.

49.    In Addition To The Evidence Showing Movants' Knowledge As Of The Closing, There Is Further Evidence That, Prior To The Time For Moving For Reconsideration Or A New Trial Under Rule 59, LBHI, The Trustee, And The Creditors' Committee All Knew The Terms Of The Sale, And All Knew The Information On Which They Have Based The Claims In Their Rule 60(B) Motions.  *See* FOF § B, 49.1-49.32.

50.    Prior To The Time For Noticing An Appeal Of The Sale Orders (November 10, 2008), LBHI, LBI, And The Creditors' Committee All Knew The Terms Of The Sale, And All Knew The Information On Which They Have Based The Claims In Their Rule 60(B) Motions.  *See* FOF § B, 50.1-50.26.

51.    Prior To The Time That They Filed Their Briefs Supporting The Sale Order On Appeal, LBHI And The LBI Trustee Knew The Terms Of The Sale, And All Knew The Information On Which They Have Based The Claims In Their Rule 60(B) Motions.  *See* FOF § B, 51.1-51.3.

52.    Prior To The Time That The Sale Orders Were Affirmed On Appeal, LBHI, LBI, And The Creditors' Committee All Knew The Terms Of The Sale, And All Knew The Information On Which They Have Based The Claims In Their Rule 60(B) Motions.  *See* FOF § B, 52.1-52.16.

### xii.    Facts Showing That The Barclays Acquisition Balance Sheet Reflects Reasonable Valuations Of The Financial Inventory Acquired In The Sale, That Movants' Experts Were Unreliable, And That The Barclays Acquisition Gain Was Entirely Attributable To Assets That Would Likely Have Had Little Or No Value To Lehman In A Liquidation.

53.    The Barclays Acquisition Balance Sheet Reflects Valuations Of The Financial Inventory Acquired In The Sale That Reflect Reasonable And Good Faith Judgments About The Fair Value Of Those Assets, As Required Under The Accounting Rules. *See* FOF § B, 53.1-53.25.

54.    Movants' Experts' Valuations Are Not Credible And Are Unreliable As Shown By Numerous Egregious Flaws, Including Deliberate Efforts To Mislead The Court. *See* FOF § B, 54.1-54.6.

55.    The Barclays Acquisition Balance Sheet Shows An Acquisition Gain Of $4.1 Billion, Which Is Entirely Attributable To Assets Which Had Value To Barclays As A Going Concern, But Which Would Likely Have Had Little Or No Value To Lehman In A Liquidation. *See* FOF § B, 55.1-55.5.

### xiii.    Facts Showing That The Sale Was Better Than A Liquidation For The Lehman Estates, The Lehman Creditors, And The Public Interest, And That The Consideration Barclays Paid Was More Than Anyone Else Would Have Paid And Therefore Was "Fair Consideration" And "Reasonably Equivalent Value."

56.    Even If Viewed In Hindsight, The Sale Was The Best Alternative For The Lehman Estates, Creditors, And The Public, And Was Vastly Superior To The Liquidation That Would Have Ensued Absent The Sale. *See* FOF § B, 56.1-56.15.

57.    The Consideration Barclays Provided Constituted Reasonably Equivalent Value Or Fair Consideration, As Those Terms Are Used In Paragraph M Of The Sale Order. *See* FOF § B, 57.1-57.6.

### xiv.    Facts Showing That Movants Failed To Present Evidence That Would Have Changed The Outcome Of The Sale Hearing, And Facts That Confirm The Accuracy Of All Of The Findings In The Sale Order.

58.    The Movants Presented No Evidence At Trial That, If Presented At The Time Of The Sale Hearing, Would Have Caused The Court Not To Approve The Sale. *See* FOF § B, 58.1-58.7.

59.    The Evidence Presented At Trial Has Confirmed The Accuracy Of All Of The Factual Findings Set Forth In The Sale Order. *See* FOF § B, 59.1-59.2.

**xv.** **Facts Showing The Movants' Conduct In Connection With The December 2008 Settlement, The Successful Defense Of The Sale Order, And The Repeated Reliance On The Finality Of The Sale Order And The Clarification Letter As Part Of The Approved Purchase Agreement.**

60. In December 2008, The Trustee Successfully Asked This Court To Approve A Settlement In Which Barclays Was Given A Full And Unconditional Release Over All Claims Relating In Any Way To The Repo Collateral. *See* FOF § B, 60.1-60.10.

61. In Response To The Appeals Filed Against The Sale Order, The Lehman Movants Filed Briefs Asking For The Sale Order To Be Affirmed, And The Committee Filed A Counter-Statement Of Issues That Effectively Defended The Sale Order And Opposed The Appeals. *See* FOF § B, 61.1-61.5.

62. The Creditors' Committee Chose Not To Appeal The Sale Orders, But Instead Filed A Counter-Statement Of Issues On Appeal That Is Available Only To Appellees, Thereby Effectively Opposing One Of The Appeals That Was Filed. *See* FOF § B, 62.1-62.6.

63. Both Movants And Barclays Repeatedly Cited And Relied Upon The Clarification Letter As Part of The Approved Purchase Agreement For Months After The Closing. *See* FOF § B, 63.1-63.16.

**xvi.** **Additional Facts Showing That Movants' Claims Lack Credibility, That Movants Concealed Their Understanding Of The Information Relating To The Sale And Their Intent To Bring Claims, And That Movants Have Relied On A Misleading Or Distorted Version Of Words And Phrases In Presenting Their Case.**

64. For A Full Year After Agreeing To The Clarification Letter, Movants Never Once Claimed That The Clarification Letter Was Not Approved By The Sale Order. *See* FOF § B, 64.1-64.3.

65. Movants Concealed From Barclays And The Court Their Understanding Of The Information On Which They Have Based Their Claims, And Their Intent To Bring Those Claims. *See* FOF § B, 65.1-65.6.

66. Movants Have Relied Upon A Distorted Or Misleading Use Of Various Words And Phrases. *See* FOF § B, 66.1-66.3.

67. The Trial Evidence Proved That Movants Distorted A Series Of Facts And Documents To Try To Fit Their Various Conspiracy Theories And Allegations Of Wrongdoing. *See* FOF § B, 67.1-67.3.

xvii.    **Facts Showing The Lehman Movants' Failure To Comply With Terms Of The Purchase Agreement They Executed.**

68.    The Trustee Has Not Yet Delivered To Barclays Clearance Box Assets, ETD Margin, And 15c3 Assets Valued At Approximately $3.5 Billion — All Of Which Are Owed Under The Plain Terms Of The Purchase Agreement.  *See* FOF § B, 68.1.

B.    **DETAILED LIST OF MATERIAL FACTS PROVED AT TRIAL**

    i.    **Facts Demonstrating The Risk Barclays Took, The Difficulty In Valuing Financial Assets, And The Absence Of Any Other Viable Bidder.**

**1.**    **Barclays Took Enormous Risks In Acquiring Lehman's North American Broker-Dealer Business In September 2008.**

1.1.    As acknowledged in the testimony of Lehman's lead negotiator (Bart McDade), lead lawyer (Harvey Miller of Weil Gotshal), and independent financial adviser (Barry Ridings of Lazard), Barclays took enormous risks in agreeing to buy the LBI business in September 2008.  4/27/10 Tr. at 21:6-12 (McDade); 4/28/10 Tr. at 94:24-95:12 (Miller); Ridings Dep. Tr. at 65:16-66:20.

1.2.    Barclays took the risk that the Business it was acquiring might disintegrate before it could be absorbed and operated.  8/27/10 Tr. at 14:22-15:17 (Klein); 8/23/10 Tr. at 11:17-12:1 (Shapiro).

1.3.    Barclays took the risk that, by acquiring an investment banking business in the middle of a terrible financial crisis in which the future of the whole financial industry was in doubt, it might be acquiring a business that would not be profitable in the future.  8/23/10 Tr. at 48:13-25 (Shapiro).

1.4.    At the time Barclays was considering the acquisition of Lehman's North American Business, the financial markets were in such distress that some experts were discussing whether it was "The End of Capitalism."  BCI Exs. 887-888.

1.5.    In the two weeks before the closing of the Sale, the country experienced a series of unprecedented shocks to its financial system.

        1.5.1.    On September 7, 2008, the U.S. Government seized Fannie Mae and Freddie Mac. BCI Exs. 891, 892.

        1.5.2.    On September 14, 2008, Bank of America acquired Merrill Lynch in a distress sale.  BCI Exs. 892-894, 905.

        1.5.3.    On September 15, 2008, LBHI filed for bankruptcy.  BCI Exs. 905, 11 at ¶ 1.

        1.5.4.    On September 16, 2008, the Reserve Fund's Primary Fund "broke the buck." BCI Exs. 892, 986.

        1.5.5.    On September 16, 2008, the Federal Reserve took over 80 percent of AIG. BCI Exs. 892, 899.

        1.5.6.    On September 21, 2008, Goldman Sachs and Morgan Stanley announced that they were becoming bank holding companies.  BCI Exs. 893, 894.

1.6.    Barclays took the risk that the financial assets it was acquiring would continue to lose value and trigger future losses.  4/28/10 Tr. at 18:23-19:12 (Miller); 9/20/10 Tr. at 112:10-12, 112:20-22 (Zmijewski).

1.7.    Barclays took the risk that a critical mass of Lehman's employees would leave the Business — employees who were needed to successfully integrate and manage the Business.  8/27/10 Tr. at 15:11-17 (Klein); 8/23/10 Tr. at 50:16-25 (Shapiro); 8/31/10 Tr. at 15:6-23 (Lewkow); McGee Dep. Tr. at 30:7-32:19, 72:15-74:9, 74:13-24; 8/24/10 Tr. at 90:22-92:8 (Exall); 4/29/10 Tr. at 36:7-20 (Lowitt).

1.8.    Barclays took a risk on acquiring LBI's customer accounts.

    1.8.1.    Barclays agreed to take over 72,000 customer accounts.  BCI Ex. 42 at ¶ 18.

    1.8.2.    Under the Purchase Agreement, the Trustee was required to transfer *all* of the customer property associated with the customer accounts transferred to Barclays.  BCI Ex. 5 (Clarification Letter) at § 8(i).

    1.8.3.    There were operational difficulties that impeded these transfers, which led to two different settlements with the Trustee:

        1.8.3.1    First, there were operational problems in transferring certain "ACATs" assets, that was not resolved until a settlement in January 2009.  *See* 08-1420 Docket Nos. 586, 690.

        1.8.3.2    Second, the Trustee failed to deliver over a billion dollars in additional customer property that was not finally resolved until December 2009 — prior to which time, Barclays took the risk of attempting to ensure the transferred customers were satisfied with the assets credited to their accounts.  *See* BCI Ex. 36.

1.9.    Despite widespread publicity that the LBI Business was available to be purchased and that the transaction with Barclays was expected to yield an immediate multi-billion dollar accounting gain for Barclays, no other entity was willing to take the risks that Barclays took by offering to acquire the Business.  6/22/10 Tr. at 183:10-184:2 (Varley); 10/7/10 Tr. at 20:2-17 (Pfleiderer); 4/30/10 Tr. at 121:6-123:4, 142:2-12, 180:10-181:3 (Hughes); 6/21/10 Tr. at 226:16-227:13 (Diamond); 8/23/10 Tr. at 58:10-59:1 (Shapiro); BCI Ex. 16 (Sale Order) at ¶¶ N-P.

1.10.    The Sale was strategically very important for Barclays, and it was willing to take the risk of the transaction based upon the terms set forth in the Purchase Agreement, and the assurance that it would face no liabilities other than those which it expressly agreed to assume.  BCI Ex. 16 (Sale Order) at ¶¶ O-P, S (finding that "Free and Clear Findings Needed By Purchaser," "No Liability Findings Needed By Purchaser," and that the transfer of the Purchased Assets "shall not result in" any liabilities to Purchaser "except as is expressly set forth in the Purchase Agreement").

**2.    During The Week Of September 15, 2008, There Were No Other Viable Bidders For Lehman's North American Broker-Dealer Business.**

2.1.    After the collapse of Bear Stearns in March 2008, Lehman retained Lazard in an attempt to attract a buyer or strategic investor.  Ridings Dep. Tr. at 8:20-9:8; 8/23/10 Tr. at 19:2-20:18 (Shapiro).

2.2.    From the Spring through the Summer of 2008 and up to the time of LBHI's bankruptcy filing, Lazard spoke with a number of parties it identified as potential buyers or investors in Lehman, but "none of those came to fruition."  Ridings Dep. Tr. at 10:6-9; BCI Ex. 49 (9/19/08 Tr.) at 100:8-17 (McDade Proffer); McGee Dep. Tr. at 10:25-11:24, 67:14-22; *see* BCI Ex. 11 (Sale Motion) at ¶ 7; 5/4/10 Tr. 143:24-164:13 (Seery).

2.3.    Throughout the summer of 2008, senior executives at Lehman "canvassed the world" without success to find a buyer or strategic investor who could help Lehman out of its financial difficulties.  McGee Dep. Tr. at 67:14-22; *see* 5/4/10 Tr. at 164:3-13 (Seery); BCI Ex. 48 (9/17/08 Tr.) 25:10-18 (Miller); *see* BCI Ex. 905.

2.4.    After LBHI's bankruptcy filing on September 15, 2008, Lazard was again retained to serve as Lehman's financial advisor in a potential Section 363 sale of the LBI broker-dealer business.  Ridings Dep. Tr. at 8:20-9:8; 8/23/10 Tr. at 20:19-21:5 (Shapiro); Miller Dep. Tr. at 18:12-14.

2.5.    The Sale Motion noted that "[a]ttempts to pursue strategic alternatives were thwarted by [Lehman's] financial deterioration and lack of support from other entities."  BCI Ex. 11 (Sale Motion) at ¶ 7.

2.6.    During the September 17, 2008 hearing, Harvey Miller advised the Court that "[f]or months now, Lehman Brothers has been pursuing strategic alternatives….[T]he public, the financial markets knew that these assets were for sale."  BCI Ex. 48 (9/17/08 Tr.) 25:10-18 (Miller).

2.7.    Only a very small number of potential bidders were even potentially qualified to acquire Lehman's North American broker-dealer business.  BCI Ex. 49 (9/19/08 Tr.) at 59:13-19 (Miller), 146:20-25 (Ridings Proffer).

2.7.1.    As Mr. Miller told the Court as part of Mr. Ridings' proffer, the "universe" of entities that were qualified to acquire Lehman was "less than a half dozen possible entities," none of which other than Barclays made a bid to purchase the LBI business.  BCI Ex. 49 (9/19/08 Tr.) at 146:20-25 (Ridings Proffer); *see also id.* at 59:17-19 (Miller).

2.7.2.    As Ms. Leventhal from the Federal Reserve Bank of New York told the Court, "the sale process was widely reported, and what was also widely reported is that there weren't that many possible bidders.  The number is very small.  The number that met the requirements in terms of financial capability and regulatory qualifications — we're not talking twenties, tens even.  We're talking one or two."  BCI Ex. 48 (9/17/08 Tr.) at 64:24-65:4 (Leventhal).

2.8.    Of the "one or two" financial entities that potentially might have had the "financial capability and regulatory qualifications" that could even make them at least theoretical candidates for acquiring the Lehman North American broker-dealer business, Goldman Sachs and Morgan Stanley both declared themselves bank holding companies on September 21, 2008 in order to access additional federal government financing — confirming that they were in no position to take additional risks by acquiring a large broker-dealer business.  6/22/10 Tr. at 11:22-12:15, 31:6-32:7 (Diamond); 10/6/10 Tr. at 24:16-25:18 (Pfleiderer).  BCI Exs. 893, 894.

2.9.    During the week of September 15, 2008, the international financial press reported the Barclays-Lehman transaction in terms that suggested that the deal was extremely favorable for Barclays. BCI Exs. 111, 115, 381-382, 796-797.

2.10.   The articles at the time described the transaction as one in which Barclays would pay $250 million for trading assets worth $4 billion more than trading liabilities.  BCI Exs. 111, 115, 381-382, 796-797.

2.11.   Press articles published during the week of September 15, 2008 explicitly mentioned Barclays' expectation of an acquisition gain.  BCI Exs. 381-382.

2.12.   The articles at the time made no mention of the additional liabilities Barclays was assuming for Comp and Cure, made no mention of the fact that Lehman was unable to deliver the promised assets, made no mention of the fact that Barclays had been required to advance $45 billion in cash to replace the NY Fed's lending position, and made no mention of the fact that in exchange Barclays received different collateral than it had been promised, and that most of the collateral it received were highly illiquid assets.  BCI Exs. 111, 115, 381-382, 796-797.

2.13.   Despite this extremely favorable description of the Sale Transaction in the financial press, no other bidders came forward.  BCI Exs. 111, 115, 381-382, 796-797; 10/7/10 Tr. at 20:2-17 (Pfleiderer); BCI Ex. 49 (9/19/08 Tr.) at 145:5-9 (Ridings Proffer); 6/22/10 Tr. at 183:10-184:2 (Varley).

2.14.   Lazard contacted many entities that "expressed an interest" in pursuing a transaction with Lehman, "but not one of them, nor any other entity, had expressed the desire or ability to step into Barclays' shoes."  BCI Ex. 49 (9/19/08 Tr.) at 145:10-13 (Ridings Proffer).

2.15.   At the Sale Hearing, the Committee told the Court that it was not objecting to the Sale because of the "lack of a viable alternative."  BCI Ex. 49 (9/19/08 Tr.) at 67:9-14 (Despins).

2.16.   There were no viable bidders for Lehman other than Barclays.  6/25/10 at 61:4-20 (Despins); Ridings Dep. Tr. at 10:11-25, 12:18-13:4, 65:10-15; 5/4/10 at 62:16-21 (Seery); 6/22/10 at 28:22-29:8 (Diamond); 6/22/10 at 183:9-19 (Varley); BCI Ex. 48 (9/17/08 Tr.) at 64:19-65:4 (Leventhal); BCI Ex. 49 (9/19/08 Tr.) at 247:14-253:25 (the Court).

2.17.   During the Rule 60(b) evidentiary hearings, the Movants failed to present any expert
testimony, or any other evidence, that other potential bidders would have come forward
to bid on the Lehman North American business had any of the information that Movants
claim was not disclosed been made public.  *See generally* M. 151, M. 152, M. 153, M.
154, M. 154B, M. 155, M. 155B, M. 156, M. 156B, M. 821-825; 9/20/10 Tr.
(Zmijewski); 9/21/10 Tr. (Zmijewski, Garvey, Schneider); 9/29/10 Tr. (Schwaba);
9/30/10 Tr. (Slattery); 10/4/10 Tr. (Olvany).

**3.**     **During The Week Of September 15, 2008, It Was Extremely Difficult To Value The Financial Assets That Were Owned By Lehman's North American Broker-Dealer Business, And That Were Being Transferred To Barclays As Part Of The Sale.**

3.1.     During the week of September 15, 2008, there was no accurate balance sheet for the business Barclays was acquiring and no total valuation for all of the Purchased Assets. BCI Ex. 49 (9/19/08) at 63:23-64:8 (Miller); 4/28/10 Tr. at 94:24-95:12 (Miller); 4/27/10 Tr. at 39:11-23 (McDade); 9/2/10 Tr. at 72:17-73:5 (Romain); 8/27/10 Tr. at 16:24-18:18 (Klein); 8/23/10 Tr. at 36:19-37:21 (Shapiro); 8/31/10 Tr. at 44:5-25 (Lewkow).

3.1.1.     As Lehman's lead lawyer, Harvey Miller, testified, Lehman "never had what I would call an accurate balance sheet." Miller Dep. Tr. at 40:8-18.

3.1.2.     Because the Sale Transaction was negotiated in the middle of the month, there was no fully reconciled and accurate balance sheet for LBI as of any day during the week of the negotiations. 4/28/10 Tr. at 209:17-210:3 (Kelly); *see* 4/29/10 Tr. at 92:6-12 (Lowitt).

3.1.3.     Because Barclays was acquiring a Business that was only a subset of the businesses operated by LBI, there would not, even under ordinary circumstances, have been an accurate balance sheet for the Business Barclays was acquiring. 8/27/10 Tr. at 16:24-18:18 (Klein); s*ee* 9/2/10 Tr. at 25:6-14 (Romain).

3.1.4.     Lehman had difficulty identifying the precise inventory that it could deliver due to the collapse of its systems and the seizure of assets by counterparties. 4/27/10 Tr. at 39:11-23 (McDade); 8/23/10 Tr. at 36:19-37:21 (Shapiro); 8/25/10 Tr. at 15:10-16:6 (King); 8/27/10 Tr. at 16:24-19:21 (Klein); 4/29/10 Tr. at 162:18-163:8 (Lowitt); 6/21/10 Tr. at 52:4-13 (Marsal); Ridings Dep. Tr. at 52:15-25.

3.1.5.     As admitted by Bryan Marsal, who became Lehman's Chief Restructuring Officer shortly after LBHI's bankruptcy filing, the calamity of the LBHI bankruptcy caused Lehman's internal systems to "collapse," which in turned triggered "chaos" throughout Lehman. 6/21/10 Tr. at 52:4-13 (Marsal); Marsal Dep. Tr. at 122:18-123:10; *see also* LaRocca Dep. Tr. at 33:8-34:13.

3.1.6.     During the week of September 15, 2008, Lehman's counterparties, including its clearing bank JPMorganChase, were exercising termination rights and seizing collateral, making it difficult for Lehman to identify with any certainty the inventory of financial assets it had available to transfer in the Sale. BCI Ex. 49 (9/19/08 Hearing Tr.) at 63:23-64:8 (Miller); 4/27/10 Tr. at 39:11-23 (McDade); 8/23/10 Tr. at 36:19-37:21 (Shapiro); 4/29/10 Tr. at 162:18-163:8 (Lowitt); 8/25/10 Tr. at 41:17-42:22 (King); 8/27/10 Tr. at 46:23-47:7 (Klein); 4/29/10 Tr. at 201:8-19 (Clackson); 4/30/10 Tr. at 181:6-12 (Hughes); 5/6/10 Tr. at 102:1-103:2 (Burian); 8/31/10 Tr. at 44:5-25 (Lewkow); Tonucci Dep. Tr. at 90:5-13, Ridings Dep. Tr. at 44:15-45:22.

3.1.7.     The inventory of financial assets that was available to be delivered to Barclays in the Sale was constantly changing throughout the week, making it even more difficult to value that inventory.  4/27/10 Tr. at 39:11-23 (McDade); 8/23/10 Tr. at 36:19-37:21 (Shapiro); 8/25/10 Tr. at 15:10-16:4 (King); 8/27/10 Tr. at 16:24-19:21 (Klein); 8/31/10 Tr. at 44:5-25, Ridings Dep. Tr. at 44:15-45:22; Tonucci Dep. Tr. at 90:5-13.

3.2.     There were no valuation estimates of 17 of the specifically enumerated Purchased Assets in the APA including financial assets such as "required capital deposits" and 50% of Lehman's "residential mortgage securities."  BCI Ex. 1 (APA) at pp. 6-8; 4/28/10 Tr. at 106:5-22, 107:23-108:18 (Miller); Miller Dep. Tr. at 50:24-51:6; 4/27/10 Tr. at 28:4-6, 97:6-98:11. (McDade); 6/25/10 Tr. at 84:16-88:1 (Despins); O'Donnell Dep. Tr. at 32:9-14.

3.3.     The markets throughout the week of September 15, 2008 were tumultuous and volatile, making it difficult to determine the value of even liquid securities, as their values were changing unpredictably by the minute.  4/27/10 Tr. at 19:4-24 (McDade); King Dep. Tr. at 50:2-23.

3.3.1.     As Harvey Miller testified, the markets were drying up and the "values were plummeting and were continuing to plummet[] and nobody was able to project when it would hit bottom."  4/28/10 Tr. at 18:19-19:12 (Miller).

3.3.2.     Following the Lehman bankruptcy, "even relatively liquid markets became extremely fragmented and broken."  8/25/10 Tr. at 8:12-25 (King).

3.3.3.     The markets were changing by the minute, which resulted in different valuations by different people at different times throughout the week.  8/27/10 Tr. at 39:24-40:14 (Klein); 8/31/10 Tr. at 124:25-125:16 (Lewkow); Ridings Dep. Tr. at 18:5-11.

3.3.4.     Major indices tracking different categories of assets were extremely volatile, and trending down, during the week of September 15-22, 2008.  *See generally* BCI Exs. 943, 944, 1083, 1073, 1072, 1074, 1084, 1077, 1081, 1082, 1075, 1078, 1076, 1080, 1079.

3.3.4.1     The equity markets dropped by over 4% on September 15, 2008.  BCI Ex. 1079 (demonstrative summarizing BCI Exs. 928, 990, 1053).

3.3.4.2     Fixed income securities, including Government Agency securities, dropped in value during the week.  BCI Ex. 1083 (demonstrative summarizing BCI Ex. 850); BCI Ex. 1073 (demonstrative summarizing BCI Ex. 848); BCI Ex. 1072 (demonstrative summarizing BCI Ex. 849).

3.3.4.3     The Volatility Index of the Chicago Board Options Exchange spiked, indicating the crisis of confidence in the markets.  BCI

Exs. 1082 and 1081 (demonstratives summarizing BCI Ex. 931);
10/6/10 Tr. at 36:5-37:2 (Pfleiderer).

3.3.4.4    The market for leveraged loans, auction rate securities, high-yield bonds, and commercial paper decreased dramatically, further contributing to the sharp decline in values. BCI Exs. 1075 (demonstrative summarizing BCI Ex. 929); BCI Ex.1076 (demonstrative summarizing BCI Exs. 929, 991); BCI Ex. 1084 (demonstrative summarizing BCI Ex. 929); BCI Ex. 1074 (demonstrative summarizing BCI Ex. 924); BCI Ex. 1078 (demonstrative summarizing BCI Ex. 926); BCI Ex. 1077 (demonstrative summarizing BCI Ex. 1097).

3.4.    During the week of September 15, 2008, many securities that may previously have been liquid or partially liquid became completely illiquid and were not trading, which made it very difficult to value many of the securities held by Lehman and to be acquired by Barclays. Kobak Dep. Tr. at 39:6-11; 9/8/10 Tr. at 54:11-55:2 (Leventhal); 5/6/10 Tr. at 78:15-79:15 (Burian); 9/21/10 Tr. at 9:12-16 (Zmijewski); 10/6/10 Tr. at 20:11-20 (Pfleiderer); Marsal Dep. Tr. at 122:18-123:10.

3.4.1.    Lehman's lead negotiator, Bart McDade, admitted that the markets were in turmoil, were exceptionally volatile, and that liquidity had diminished to dramatically low levels:

"Q.  I'd like to direct your attention now to the circumstances of the week of September 15th, 2008.  The markets at that point during that week, throughout that week, were, as I think you've described them, tumultuous and volatile, correct?

A.  That's correct.

Q.  And the market had changed dramatically from Friday to Saturday and then again from Saturday to Sunday, again from Sunday to Monday and changed again from Monday at 9 a.m. to Monday at 11 a.m. and continued to change, correct?

A.  Yes, they did.

Q.  And the prices were changing dramatically, correct?

A.  That's correct.

Q.  Now, at your deposition, you said that all the markets had shut down. Can you explain what you mean by that?

A.  What I meant by markets shutting down, normal trading volumes had shrunk to small percentages of their norm in all asset classes from liquid asset classes, like government securities, all

> the way through to the lesser liquid asset classes. There was a tremendous amount of uncertainty and really a shrinkage of capital that was being used by market makers across the world."

4/27/10 Tr. at 19:4-24 (McDade).

3.4.2.  Lehman's lead lawyer, Harvey Miller, testified that the financial markets were plummeting, which created enormous uncertainty in the transaction:

> "… It was made very clear that this was an extraordinary case. And on Wednesday, the 17th, at the time of the hearing, the market was beginning to cease up. Commercial Paper market was drying up. The crisis was getting extremely worse than we had anticipated. Credit — there was a crisis of confidence. Credit markets dried up. We were on the edge of a financial collapse of the dimensions which I don't think anybody could have imagined, probably much more severe than the crisis of the so-called Great Depression. During the course of the hearing on sale procedures, I think that I explained to the Court that this was a moving target, that it was a very fluid situation. It was changing every hour, every minute. Values were plummeting and were continuing to plummeting (sic) and nobody was able to project when it would hit bottom."

4/28/10 Tr. at 18:19-19:12 (Miller).

3.4.3.  As the Trustee's 30(b)(6) representative, James Kobak, admitted, there were assets in the transaction that were extremely difficult to value. Kobak Dep. Tr. at 39:6-39:11.

3.4.4.  As the Trustee's 30(b)(6) representative, James Kobak, admitted, during the week of September 15, 2008, Lehman's marks for certain securities were higher than what the assets could actually be sold for in the market. Kobak Dep. Tr. at 38:18-39:5, 40:6-21.

3.4.5.  As the Trustee's 30(b)(6) representative, James Kobak, admitted, although the Trustee was responsible for producing an opening balance sheet for the LBI estate, the Trustee and his financial adviser at Deloitte have not yet finalized an opening balance sheet for the LBI SIPC liquidation, and have not been willing to rely upon Lehman's marks or any of the JPMorgan or BoNY custodial marks for the securities held in LBI's inventory. Kobak Dep. Tr. at 38:18-39:5, 40:6-21, 153:25-154:25, 156:6-157:6, 161:11-20.

3.4.6.  The Trustee's 30(b)(6) representative, James Kobak, admitted that Trustee financial adviser Deloitte concluded that they "had trouble valuing the securities." Kobak Dep. Tr. at 161:11-20.

3.4.7.  As the Trustee's financial advisor, Deloitte, admitted it was unable to value the securities in the transaction because so many of them were illiquid and difficult to value.  Karp Dep. Tr. at 66:18-67:3; 67:20-68:21; *see also* Kobak Dep. Tr. at 40:22-25, 41:5-6, 9-14.

3.4.8.  For over a year <u>a</u>fter the Closing of the Sale Transaction, the Trustee and his financial advisor at Deloitte have been unable to value the assets transferred to Barclays.  Kobak Dep. Tr. at 40:6-21, 153:25-154:10, 156:6-157:23, 159:25-160:5, 161:11-20.

3.4.9.  Due to the difficulty in valuing the illiquid financial assets held by Lehman, many of which were transferred to Barclays in the Sale Transaction, the Trustee and his financial advisor at Deloitte have yet to produce an opening day balance sheet for LBI as of the September 19, 2008 SIPC liquidation filing.  Kobak Dep. Tr. at 28:7-29:14; Karp Dep. Tr. at 29:17-30:13, 107:9-15.

3.4.10.  Over half of the assets in the Repo Collateral, by value, were categorized under Lehman's system as Level 2 or 3 assets, which means they could not be reliably valued based upon a daily transaction price because they were illiquid — and hence were by definition more difficult to value reliably than liquid assets.  10/6/10 Tr. at 93:16-95:7 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 29).

3.4.11.  The unrebutted expert testimony of Professor Pfleiderer established that the majority of the assets in the Repo Collateral were illiquid and difficult to value:

> "Q.      And your basic opinion as a financial economist is that these are very difficult to value in the best of times, and in September 2008, they were particularly difficult to value, correct?
>
> A.      My opinion is that a good part of the assets that were acquired were difficult to value, and they were particularly difficult at the time because of the market turmoil, or the market turmoil added to the difficulty."
>
> 10/7/10 Tr. at 6:21-7:3 (Pfleiderer).

3.4.12.  The unrebutted expert testimony of Professor Pfleiderer also established that the illiquid Level 2 and 3 assets in the Repo Collateral required subjectivity and judgment to value, and that therefore a range of reasonable valuations is possible for these assets, even in normal circumstances:

> "Q.      Well, can we then agree whether it's Lehman classifying them or Barclays classifying them, there were level one, level two, and level three assets in the deal, correct?
>
> A.      Yes, that's correct.

Q.      Okay.  And using that as our base, level three assets you'd say require a lot of judgment, a lot of subjectivity to value, correct?

A.      That is generally correct, yes.

Q.      And you could reasonably expect a range of valuations to come out of a level three valuation, correct?

A.      Because judgment is involved, that would generally be true, yes.

Q.      And that's your view with respect to *level two*, as well, it requires judgment, maybe perhaps not all the same degree of judgment and discretion, but some *judgment and subjectivity with respect to level two assets,* correct?

A.      There's judgment involving those as well, generally speaking.

Q.      And therefore, you could get a *range of reasonable numbers,* that's your opinion?

A.      That is my opinion, yes.

Q.      And, in fact, you would say even on level one, I think you said a few times yesterday, it's not all automatic.  Even in level one, things that are classified as level one, may from time to time, have some small level of subjectivity, correct?

A.      *In particular, the need to mark level one assets to an exit price involved some judgment.*  So even if we observed the actual transaction prices that are occurring in the market, there's still some judgment involved in determining how to mark those to an exit price.  So even judgment is involved there, yes."

10/7/10 Tr. at 7:17-8:22 (Pfleiderer) (emphasis added).

3.4.13.    Professor Pfleiderer's unrebutted testimony also established that approximately 60% of the trading inventory Barclays consisted of Level 2 and 3 assets, and hence was difficult to value and subject to differing judgments as to potential valuations:

"Q.      Can you explain to the Court what the next demonstrative shows?

A.      So what this comes from, I should explain, is that in the Lehman GFS system, Lehman had to categorize these assets that were on its books according to these three levels of classification,

level one, level two, and level three.  And so I'm using here the Lehman classifications for the trading portfolio, and I'm including here all the assets that were delivered to Barclays in the initial or in the December inventory.  *And what you see is a simple pie chart that shows that about forty percent of these are level one, and about fifty-six, fifty-seven percent is level two, and 2.1 percent level three, and then there's some that can't be categorized, they're unavailable, they don't have, for instance, a level classification in the GFS system.*

Q.    Is this information on this demonstrative, Professor Pfleiderer, significant in any way to your opinions in this case?

A.    It's extremely significant, because if we were looking at a pie chart that was all green, then it would be perhaps possible to do a pure mechanical valuation of this.  Although I should point out that even within the level of green, there's a spectrum, and so it may not even be possible then.  But *we're looking at a pie chart where the majority is red, and so we're already into the interior part of that spectrum where it's not a mechanical procedure.* …

Q.    And is that relevant to your opinion about the risks and uncertainties that faced Barclays when they acquired these assets?

A.    It is indeed.  *The risk and uncertainty of these assets that are colored red is generally going to be greater,* at least in terms of knowing what the value is, than what the risk of not knowing the value of what's in green, because there, you can go out and observe with some degree of ease traded prices."

10/6/10 Tr. at 93:10-94:21 (Pfleiderer) (emphasis added); *see also* BCI Ex. 1103a (Pfleiderer Demonstrative 28).

3.4.14.    Professor Pfleiderer's unrebutted testimony also established that the vast majority of the disagreement between Movants and Barclays over the valuation of the assets acquired by Barclays related to the illiquid Level 2 and 3 assets:

"Q.    What does the next demonstrative show?

A.    So the next shows where the disagreement is between — I'll characterize it between the movants and Barclays, and basically divides that disagreement between two classifications. The green, which as I've represented, are in many ways, somewhat easier to value, although even in that inventory they're not all extremely simple.  And the red, which are these assets, and I've combined here levels two and three in the red, those are assets that are more difficult to value, and involve some

judgment.  And as you can see, almost all — well, I shouldn't say all, almost all, but at least eighty-four percent of the disagreement here is in the red zone.  In other words, not surprisingly, in those assets where judgment is involved, and difficult to value.

Q.    And is this significant to your opinions in this case?

A.    I think it's very significant, because in the red zone reasonable people can disagree about valuation.  So one can expect to find differences, and the red zone gives one some latitude to make different assumptions, and get values higher or lower, based upon the fact that some additional assumptions have to be put in and some judgments made to come up with values."

10/6/10 Tr. at 95:9-96:5 (Pfleiderer); *see also* BCI Ex. 1103a (Pfleiderer Demonstrative 28).

3.4.15.    Lehman's system may have categorized some assets as Level 2 that should more properly have been categorized as Level 3.  *See* BCI Ex. 1103a (Pfleiderer Demonstrative 32); 10/6/10 Tr. at 138:4-18 (Pfleiderer).

3.4.16.    Bloomberg and Capital IQ contained no information at all for approximately 26% of the Repo Collateral transferred to Barclays in September 2008 (measured as a percentage of value using BoNY marks).  BCI Ex 1103a (Pfleiderer Demonstrative 32); 10/6/10 Tr. at 97:1-98:10 (Pfleiderer).

3.5.    By the end of the week, all references to "book value" were removed from the Purchase Agreement because the nature and value of the assets were too uncertain and too volatile to make "book value" a meaningful concept by the end of the week.  5/7/10 Tr. at 250:2-13 (Ricci); *see also* BCI Ex. 228 (draft Clarification Letter as of September 19, 2008 recognizing that the Long Positions "did not have a book value of $70 million" [sic]); BCI Exs. 238, 505, 642 (drafts of Clarification Letter with no reference to "book value"); BCI Ex. 5 (final Clarification Letter with no reference to "book value").

ii. **Facts Showing The Good Faith Of The Negotiations, The Disclosures Of The Central Terms Of The Sale Through The APA, And The Fact That The Sale Was Never Agreed Or Represented To Be A "Wash."**

4. **The Terms Of The Sale Were Agreed Through An Arm's Length, Good-Faith Negotiation.**

4.1. The unrebutted testimony of Movants' own witnesses and of all the independent witnesses involved in the Sale negotiations confirmed that the Sale was negotiated at arm's length and in good faith.

4.1.1. Harvey Miller was Lehman's lead lawyer, and he testified that he had reviewed the Movants' Rule 60 motions, and that he does not believe any former Lehman executive acted in bad faith. Miller Dep. Tr. at 47:5-15, 59:18-60:7.

4.1.2. Bart McDade was Lehman's lead negotiator, and his testimony confirmed that the Sale was negotiated at arm's length and in good faith.

4.1.2.1 Mr. McDade, testified at the September 19, 2008 Sale Hearing, the negotiations were in good faith and at arm's length. 4/26/10 Tr. at 145:8-11, 147:2-6, 148:17-22 (McDade).

4.1.2.2 At trial, Mr. McDade's testimony confirmed that he still believes all Lehman executives acted in good faith, and he gave no testimony suggesting he believed anyone acted in bad faith or acted improperly. 4/27/10 Tr. at 37:13-21, 38:14-19 (McDade).

4.1.3. Movants' own witness, the Chairman of the Lehman Board Michael Ainslie, admitted that he believes that no Lehman employees breached their duty of care or loyalty to Lehman during the Sale negotiations. 4/26/10 Tr. at 139:3-7 (Ainslie).

4.1.4. Movants' own witness, Alvarez & Marsal CEO Bryan Marsal, admitted that he does not have "any evidence" that any of the Lehman executives involved in negotiating the Sale breached their fiduciary duties to Lehman. Marsal Dep. Tr. at 76:9-16.

4.1.5. Lehman's independent financial adviser, Barry Ridings of Lazard, testified that he had reviewed Movants' Rule 60 motions, that he "has no reason to believe" that any former Lehman executive acted in bad faith in the negotiations with Barclays, and that he believed "they all acted in good faith." Ridings Dep. Tr. at 27:15-18, 49:13-50:11.

4.1.6. When asked whether he believed that Mr. McDade, Mr. Tonucci, Mr. Kirk, and Mr. Lowitt had acted in good faith in their dealings with Barclays, Lehman's independent financial adviser, Barry Ridings of Lazard, testified that "I think they all acted in good faith." Ridings Dep. Tr. at 50:4-11.

4.2.  The unrebutted evidence showed that independent parties whom the Movants have never accused of any wrongdoing were actively involved in all aspects of the Sale negotiations.

    4.2.1.  Lazard was intimately involved in, and observed, the Sale negotiations, and conducted diligence concerning the trading assets to be transferred.  8/23/10 Tr. at 22:2-22 (Shapiro); Ridings Dep. Tr. at 28:25-29:8; BCI Ex. 196; *see also* BCI Ex. 49 (9/19/08 Tr.) at 142:8-10.

    4.2.2.  Barry Ridings had direct knowledge of the negotiations when he testified on September 19, 2008, that the negotiations were in good faith and at arm's length.  BCI Ex. 49 (9/19/08 Tr.) at 142:8-10.

    4.2.3.  Mr. Ridings and Lazard have not been accused of breaching any duties to Lehman.  BCI Ex. 46 at p. 2; *see also* BCI Ex. 863 at ¶¶ 70-81.

    4.2.4.  Bart McDade was Lehman's lead negotiator.  4/26/10 Tr. at 148:17-22 (McDade); 8/27/10 Tr. at 32:18-25 (Klein); 4/28/10 Tr. at 25:19-21 (Miller); 8/23/10 Tr. at 25:21-25, 121:18-20 (Shapiro).

    4.2.5.  The LBHI and LBI Boards were informed by Lehman's counsel that Bart McDade would maintain his independence throughout the negotiations.  BCI Ex. 104 at p. 3.

    4.2.6.  Mr. McDade never received either a bonus offer or an actual bonus from Barclays. 4/26/10 Tr. at 144:13-14 (McDade).

    4.2.7.  Mr. McDade has not been accused of any fiduciary breach.  BCI Ex. 46 at p. 2.

    4.2.8.  Mark Shafir was the Lehman executive to whom Bart McDade delegated responsibility for negotiating the APA, subject to Mr. McDade's final approval.  8/27/10 Tr. at 113:5-6 (Klein).

    4.2.9.  Mr. Shafir announced on September 18, 2008 that he was leaving Lehman to join Citigroup.  8/27/10 Tr. at 113:7-20 (Klein); Kirk Dep. Tr. at 44:6-12.

    4.2.10.  Mr. Shafir never negotiated an employment contract with Barclays and never received a bonus from Barclays.  8/27/10 Tr. at 113:7-20 (Klein); Kirk Dep. Tr. at 44:6-12.

    4.2.11.  Mr. Shafir is not accused of a fiduciary breach.  BCI Ex. 46 at p.2.

    4.2.12.  The law firms of Weil Gotshal and Simpson Thacher both represented LBHI and LBI during the Sale negotiations, and both were intimately involved in negotiating and finalizing both the APA and the Clarification Letter.  8/24/10 Tr. at 119:25-120:19, 140:6-141:25, 144:15-145:5, 192:8-15 (Rosen); 8/31/10 Tr. at 54:11-55:7, 64:1-13 (Lewkow); 4/28/10 at 69:25-70:25, 71:11-17

(Miller); 8/30/10 Tr. at 104:22-105:14, 106:15-20, 107:10-18 (Keller); BCI Exs. 228, 238, 249, 460-466.

    4.2.12.1    Indeed, the Trustee's representative testified at trial that Weil Gotshal was representing the Trustee in the negotiations, including in the drafting and finalization of the Clarification Letter. 5/5/10 Tr. at 59:19-25 (Kobak).

4.2.13.    Movants have not accused Weil Gotshal or Simpson Thacher of breaching any duties to Lehman. BCI Ex. 46 at p. 2.

4.3.    The fact that Barclays was making bonus offers to senior Lehman executives was publicly disclosed and approved by the Lehman boards, and is not a basis for finding a fiduciary breach. BCI Ex. 11 (Sale Motion) at ¶ 19; BCI Ex. 49 (9/19/08 Tr.) at 149:11-16 (Ridings); BCI Ex. 104 at p. 3.

4.3.1.    In making their baseless claims of fiduciary breach, Movants rely solely upon the fact that some of the executives involved in the negotiations accepted employment offers from Barclays, and subsequently received market standard bonuses — as was required under the plain terms of the APA. LBHI Br. at ¶ 18 & notes 2-12; APA § 9.1(c).

4.3.2.    Barclays made these bonus offers for legitimate business reasons: in order to keep the Business intact and to prevent "flight risk" with respect to top executives in the Business, it was imperative that Barclays offer senior Lehman executives employment contracts, including competitive bonus commitments. 8/27/10 Tr. at 15:11-17 (Klein); 8/23/10 Tr. at 50:16-25 (Shapiro); 8/31/10 Tr. at 15:6-23 (Lewkow); McGee Dep. Tr. at 73:20-74:9; 8/24/10 Tr. at 59:4-8, 91:20-92:5.

4.3.3.    The bonus offers were not secret: Barclays and Lehman disclosed publicly that Barclays would retain the top executives in the Business and pay them bonuses. BCI Ex. 11 (Sale Motion) at ¶ 19; BCI Ex. 49 (9/19/08 Tr.) at 149:11-16 (Ridings).

4.3.4.    The LBHI and LBI Boards were told by Lehman's counsel that Barclays was making offers to senior Lehman executives and that "interested firm employees were involved in the transaction on behalf of the firm." BCI Ex. 104 at p. 3.

4.3.5.    The LBHI and LBI Boards were told by Lehman's counsel that the Barclays bonus offers to senior Lehman executives included a "cash bonus" and "retention award." BCI Ex. 104 at p. 3.

4.3.6.    After being told about these cash bonuses, retention awards, and that "interested firm employees were involved in the transaction on behalf of the firm," the LBHI and LBI boards approved the Sale. BCI Ex. 104, at pp.6-7.

4.4.    The unrebutted evidence showed the good faith and arm's length nature of the Sale negotiations.

    4.4.1.    The witnesses to the negotiations testified at trial that the negotiations were conducted in good faith under extremely difficult circumstances. 4/27/10 Tr. at 37:13-21, 38:14-19 (McDade); 4/28/10 Official Tr. at 112:10-19 (Miller); 8/23/10 Tr. at 30:18-20, 31:4 (Shapiro); 8/27/10 Tr. at 40:25-42:6 (Klein); 8/31/10 Tr. at 14:18-15:5, 16:5-9, 17:12-20, 228:22-229:14 (Lewkow); 9/7/10 Tr. at 21:18-22:2 (Leventhal); Ridings Dep. Tr. at 49:13-0:11.

    4.4.2.    There were vigorous disagreements between Barclays and Lehman during the negotiations. 8/23/10 Tr. at 26:18-27:11 (Shapiro); 8/27/10 Tr. at 25:15-27:24 (Klein); 8/31/10 Tr. at 16:10-21 (Lewkow).

    4.4.3.    Lehman executives negotiated aggressively on behalf of Lehman in good faith. 8/23/10 Tr. at 26:18-27:11, 28:19-24, 30:18-20, 31:4 (Shapiro).

    4.4.4.    As Barclays' negotiators testified, the negotiations were rigorous, fair and at arm's length. 8/27/10 Tr. at 25:15-27:24 (Klein); 8/31/10 Tr. at 16:10-21 (Lewkow).

    4.4.5.    During the week of September 15, 2008, Mark Shapiro was a Managing Director and Head of Restructuring at LBI. 8/23/10 Tr. at 7:20-24 (Shapiro).

        4.4.5.1    Mark Shapiro conceived of the § 363 sale as a way to avoid a disastrous liquidation, and testified that all parties acted transparently and in good faith in negotiating the terms of that § 363 sale. 8/23/10 Tr. at 11:1-16, 16:6-17:3, 26:18-27:11, 30:18-20, 31:4 (Shapiro).

        4.4.5.2    Mr. Shapiro has never been accused of any fiduciary breach, and his testimony was never rebutted, either on cross examination or through other evidence. BCI Ex. 46 at p.2; *see generally* Complete Trial Record.

    4.4.6.    During the week of September 15, 2008, Steven Berkenfeld was a Managing Director, Chief Investment Officer, and head of legal compliance of the audit division. 4/27/10 Tr. at 135:18-136:3 (Berkenfeld).

        4.4.6.1    Steven Berkenfeld signed the APA and Clarification Letter for Lehman. BCI Ex. 1 (APA) at p. 42; BCI Ex. 5 (Clarification Letter) at p. 11.

        4.4.6.2    Mr. Berkenfeld's testimony refuted the notion that the "lawyers were kept in the dark," and refuted the notion that the financial schedule he initialed somehow governed the deal. 4/27/10 Tr. at 105:9-20, 106:8-15, 108:25-109:4, 111:25-112:8, 115:8-116:7, 123:15-124:17, 143:23-142:12, 183:23-184:15 (Berkenfeld).

4.4.6.3    Mr. Berkenfeld testified that he did not believe there were any secrets. 4/27/10 Tr. at 105:9-20, 106:8-15, 108:25-109:4, 111:25-112:8, 115:8-116:7, 123:15-124:17, 143:23-142:12, 183:23-184:15 (Berkenfeld).

4.4.6.4    Mr. Berkenfeld has never been accused of any fiduciary breach and his testimony was not rebutted, either on cross-examination or through any other evidence. BCI Ex. 46 at p.2; *see generally* Complete Trial Record.

4.4.7.    Vic Lewkow is a senior partner at Cleary Gottlieb, an officer of the Court, and a witness whose testimony was never rebutted, either through cross-examination or otherwise. 8/31/10 Tr. at 8:14-19 (Lewkow); *see generally* Complete Trial Record.

4.4.7.1    Mr. Lewkow testified that the parties acted in good faith, there were no secrets, and there was no effort to mislead the Court or keep information from the Court. 8/31/10 Tr. at 16:10-21, 14:18-15:5, 16:5-9, 17:12-20, 228:22-229:14 (Lewkow).

4.4.8.    Ed Rosen is a senior partner at Cleary Gottlieb, an officer of the Court, and an expert in SEC regulations and exchange-traded derivatives. 8/24/10 Tr. at 94:14-96:10 (Rosen).

4.4.8.1    Mr. Rosen testified that his efforts in suggesting language for the Clarification Letter were always to be as clear and precise as possible. 8/24/10 Tr. at 198:17-199:10 (Rosen).

4.4.8.2    Mr. Rosen's testimony directly refuted the Trustee's *ex post* attempts to misconstrue the contract. 8/24/10 Tr. at 199:17-200:14 (Rosen).

4.4.9.    Michael Klein is an independent consultant, not a Barclays executive. 8/27/10 Tr. at 7:16-21 (Klein).

4.4.9.1    Mr. Klein testified that all parties acted in good faith, and no efforts were made to keep information from the Court. 8/27/10 Tr. at 40:25-42:6 (Klein).

4.4.9.2    Mr. Klein testified that in response to a request from Mr. Miller, he made an effort to explain the "flow of funds" associated with the details of the repo transaction, made no effort to mislead anyone, and attempted to give whatever information he could about a transaction in which the values of the assets were highly uncertain. 8/27/10 Tr. at 59:23-60:25, 61:7-17, 150:15-152:22 (Klein).

4.4.10.     During the week of September 15, 2008, Jim Seery was a Managing Director of Lehman and was responsible for fixed income loans.  5/3/10 Tr. at 112:20-113:8 (Seery).

4.4.10.1     Jim Seery is currently a partner at Sidley & Austin, and a respected member of the bankruptcy bar, is affiliated with none of the parties in this case, and gave credible testimony that was never rebutted, either on cross-examination or by any other evidence.  5/3/10 Tr. at 117:23-24 (Seery); *see generally* Complete Trial  Record.

4.4.10.2     Mr. Seery testified that while he had met with Barclays' lawyers before his trial testimony, he would have been just as happy to meet with lawyers from the Movants, who never asked for such a meeting.  5/3/10 Tr. at 118:20-119:10 (Seery); 5/4/10 Tr. at 89:14-90:9 (Seery).

4.4.10.3     Mr. Seery's testimony demonstrated the good faith of the Lehman executives.  5/4/10 Tr. at 89:4-90:12, 165:12-166:23 (Seery).

4.4.10.4     Mr. Seery also testified to the fact that the Committee, whose advisors Mr. Seery knew personally and briefed fully concerning the $5 billion valuation difference before the Closing, waited a year to allege that this same information constituted a "secret discount."  5/4/10 Tr. at 33:9-34:14, 44:3-25, 55:22-56:8, 60:6-62:6, 66:5-22, 67:24-69:9, 77:1-3, 77:6-8, 79:3-17 (Seery).

4.4.10.5     Mr. Seery testified that he found movants' allegation of a "secret discount" troubling in light of his dealings with them:

"Q.   Please tell Judge Peck, were you clear with them about this five billion negotiated value, the difference between what the collateral was in the repo and what the parties believed its value was in the market that day?

A.    We were — I was absolutely clear.  And again, if there wasn't a difference between the amount of money that Barclays advanced and what the committee believed the securities to be worth, we wouldn't have had any discussions.  Why would we be having a debate right after the big meeting and then subsequently several into the night to review these items if there was no disagreement on the value versus the amount advanced?  *We went through this a number of times.  And, frankly, that's what has made me a little bit distressed about this litigation.  The idea that this is a great secret?  It wasn't a secret.  They knew exactly what this was.*"

5/4/10 Tr. at 67:20-68:9 (Seery) (emphasis added).

4.4.10.6    Unrebutted testimony by Jim Seery confirmed that, before the Closing, Houlihan knew about the discussions between Barclays and Lehman concerning the Repo Collateral value. 5/4/10 Tr. at 43:16-23, 76:18-23, 77:1-3, 77:6-8 (Seery); BCI Ex. 143 at 381190.

4.4.10.7    Unrebutted testimony by Jim Seery confirmed that, before the Closing, the Committee knew that, given the illiquid nature of the assets in the Repo Collateral, Barclays and Lehman could not agree on the value of the Repo Collateral but ultimately treated it as having an estimated market value of approximately $45.5 billion. 5/4/10 Tr. at 67:24-68:9, 76:18-23, 77:1-3, 77:6-8 (Seery).

4.4.10.8    Unrebutted testimony by Jim Seery confirmed that, before the Closing, the Committee knew that the "haircut" in the Repo was approximately $5 billion, and knew that Barclays would keep any collateral value greater than the loan amount. 5/4/10 Tr. at 33:12-25, 60:10-17, 61:10-15, 67:24-68:9 (Seery).

4.4.10.9    Unrebutted testimony by Jim Seery confirmed that, after the Committee met briefly with Michael Klein on September 22, they met with Seery for a further, more complete explanation of the valuation issues. 5/4/10 Tr. at 68:21-69:23 (Seery).

4.4.10.10    Like Harvey Miller, Jim Seery testified that the Committee assented to the Closing after being told about the key economic terms of the transaction and the implications of not closing the transaction. *See* Miller Dep. Tr. at 29:10-25, 101:13-102:5; 4/28/10 Tr. at 118:14-24 (Miller); 5/4/10 Tr. at 64:10-13, 66:9-22, 79:15-20 (Seery).

4.4.10.11    Jim Seery testified that it was clear to him that the Committee knew (after being told about the terms of the transaction) that it had the right to veto the transaction, but assented to the Closing. 5/4/10 Tr. at 64:10-13, 66:9-22, 79:15-20 (Seery).

4.4.10.12    Jim Seery testified that it was clear to him that the Committee assented to the transaction after being told that it was the only alternative to a disastrous liquidation. 5/4/10 Tr. at 64:9-13, 66:5-22, 79:15-20 (Seery).

4.4.10.13    After Lehman described to the Committee the risks of not closing, the Committee consented to the sale. 5/4/10 Tr. at 62:14-21, 65:22-66:3 (Seery).

4.4.10.14 Mr. Seery was not listed by Movants as an executive who was alleged to have breached his fiduciary duties. BCI Ex. 46 at p. 2.

4.4.10.15 Movants attacked Mr. Seery's credibility for the first time at the October 21 closing argument based on no evidence other than his receipt of a standard market bonus — a bonus that was not discussed or offered or paid until long after the Closing. 5/3/10 Tr. at 115:4-117:22 (Seery); 5/4/10 Tr. at 90:20-91:8 (Seery); 10/21/10 Tr. at 46:8-13, 76:17-19 (Gaffey).

4.4.11. During the week of September 15, 2008, Alex Kirk was global head of principal businesses at LBI. Kirk Dep. Tr. at 6:25-7:20, 8:9-20.

4.4.11.1 Alex Kirk was the Lehman executive who assisted Bart McDade in the negotiations and discussions with Barclays that occurred on Friday September 19, 2008, during which there was a danger that Barclays would not go forward with the Sale if Lehman was unable to identify assets that were still available to be transferred to Barclays. 8/31/10 Tr. at 53:11-16 (Klein); 4/26/10 Tr. at 194:21-24 (McDade); see also 4/26/10 Tr. at 198:25-199:5 (McDade); 4/27/10 Tr. at 39:10-19 (McDade); 6/22/10 Tr. at 34:8-11 (Diamond); 5/3/10 Tr. at 36:3-22 (Hughes).

4.4.11.2 Alex Kirk testified that, during the course of negotiations, he had no intention of joining Barclays, he told Bob Diamond that he had no such intention, and he received no employment contract or bonus offer during the negotiations. Kirk Dep. Tr. at 8:21-9:22, 10:11-11:11, 12:11-18, 14:12-18, 15:25-16:12.

4.4.11.3 Alex Kirk testified that he decided to join Barclays only after the Sale closed on September 22, 2008. Kirk Dep. Tr. at 8:21-9:22, 12:11-18.

4.4.12. The trial testimony of John Varley, Bob Diamond, Rich Ricci, Patrick Clackson, and Jonathan Hughes, the senior Barclays executives who made the decisions that committed Barclays to the Sale, demonstrates that they acted in good faith and made no attempt to keep anything secret (least of all their expectation of an acquisition gain on the Barclays Acquisition Balance Sheet) and refutes Movants' allegations about a "secret" plan to give Barclays an embedded gain. 5/7/10 Tr. at 125:14-126:9, 126:33-127:16, 135:24-136:5, 164:5-165:19, 254:1-254:7 (Ricci); 6/21/10 Tr. at 111:21-112:12, 158:4-16, 172:21-173:7 (Diamond); 6/22/10 Tr. at 17:22-21:4 (Diamond), 76:6-77:18, 113:8-114:8, 192:15-25 (Varley); 4/30/10 Tr. 123:9-124:6 (Hughes); 4/30/10 Tr. at 99:14-100:16 (Clackson).

4.4.13. During the week of September 15, 2008, John Varley was CEO of the Barclays Group. 6/22/10 Tr. 6:8 (Varley).

4.4.13.1    Mr. Varley testified that his recommendation to Barclays' board that Barclays pursue negotiations with Lehman was based on two considerations: (i) that Barclays would need to evaluate the actual market value of the assets it would acquire; and (ii) under a "great deal of focus" from regulators in mid-September 208, Barclays could only proceed if "we were able to protect our capital ratios through a transaction of this sort."  6/22/10 Tr. at 91:2-24, 179:2-11 (Varley).

4.4.13.2    Mr. Varley testified that there was "transparency as to our requirement that there was a positive delta between trading assets and trading liabilities."  6/22/10 Tr. at 111:7-19 (Varley).

4.4.13.3    Mr. Varley testified that Lehman's marks as of September 12 were "irrelevant" by Monday morning and, therefore, rather than "creating a discount to fair value," Barclays was "creating a realistic assessment of trading value."  6/22/10 Tr. at 107:2-5 (Varley).

4.4.13.4    Mr. Varley testified that the transaction involved risk and uncertainty — the week of the transaction was the riskiest he had seen in his long career in banking and under such circumstances it is "impossible to describe any such transaction as de-risked." 6/22/10 Tr. at 126:1-7, 173:8-15, 175:11-17 (Varley).

4.4.13.5    The document from John Varley's desk file which refers to a "negotiated discount" of $5 billion, M. 12 at BCI-EX-00166340, does not establish that the APA's estimated value of long positions was "discounted" below market value.

    4.4.13.5.1    Mr. Varley's document instead shows that Barclays planned to record the original long positions on its own books at less than Lehman's book values.  6/22/10 Tr. at 110:12-23, 111:7-19 (Varley).

4.4.13.6    Mr. Varley testified that he agreed with Mr. McDade that the transaction was presented to the Court in a fair and balanced manner and that the transaction was the best available at the time.  6/22/10 Tr. at 181:21-183:9 (Varley).

4.4.14.    During the week of September 15, 2008, Bob Diamond was President of Barclays.  6/21/10 Tr. at 111:21-112:2 (Diamond).

4.4.14.1    Mr. Diamond testified that there was no effort to keep the expectation of a $4 billion buffer between trading assets and trading liabilities a secret and that Barclays publicly announced that expectation in its investor call — and none of the Movants

expressed to him or the Court that the buffer was inconsistent with their understanding of the deal.  6/22/10 17:22-21:4 (Diamond); *see* 6/21/10 Tr. at 172:21-173:7 (Diamond).

4.4.14.2    Mr. Diamond testified that Barclays tried to "find the appropriate value of the assets" and that there was a "mismatch between trading assets and trading liabilities around capital accretion" because Barclays had to differentiate between the values of the assets "that the market would bear" and Lehman's marks from September 12, which were "off."  6/21/10 Tr. at 176:9-177:7 (Diamond).

4.4.14.3    Mr. Diamond testified that Barclays' management sought to ensure that the Sale would result capital accretion — *i.e.*, that the transaction would result in an acquisition gain and protect the company's regulatory capital position.  6/21/10 Tr. at 148:11-25 (Diamond).

4.4.14.4    While Barclays expected and needed a buffer between trading assets and trading liabilities and an accounting gain on the transaction to protect its capital, Mr. Diamond testified that there were "no guarantees" that it would actually realize that gain. 6/21/10 Tr. at 119:13-120:14, 141:4-142:5, 144:8-23, 148:11-149:14, 171:9-172:1, 233:2-234:15 (Diamond).

4.4.14.5    Mr. Diamond testified that because of the chaos in the market on Friday, September 19, 2008, and the amount of Risk Barclays was facing, Barclays would not have "gone forward with the deal" without the 15c3-3 assets, the Clearance Box Assets, or the ETD margin.  6/22/10 Tr. at 23:16-24:8, 32:8-34:11 (Diamond).

4.4.15.    During the week of September 15, 2008, Rich Ricci was Chief Operating Officer of Barclays.  5/7/10 Tr. at 125:25-126:4.

4.4.15.1    Mr. Ricci testified that he is not a lawyer, was not sure what disclosure was required to the Court, and that he relied on his lawyers to make sure all that needed to be disclosed would be disclosed.  5/7/10 Tr. at 164:5-167:11, 176:19-24, 201:14-202:5, 213:21-25, 225:22-227:6, 227:12-228:10 (Ricci).

4.4.15.2    Mr. Ricci testified about his communications with Mr. Clackson at the time of the Closing and the day after in which he wrote that he "was worried" after seeing e-mails explaining that the "valuation of trading positions" continued to be a "moving part" and "outside repo not enough assets."  Mr. Ricci had written to Mr. Clackson, on the day of the Closing that he remained,

"scared to death."  BCI Ex. 292; M. 580; 5/7/10 Tr. at 237:4-23, 259:21-260:23 (Ricci).

4.4.16.    During the week of September 15, 2008, Patrick Clackson was the CFO of Barclays.  4/28/10 Tr. at 185:4-10 (Clackson).

4.4.16.1    Mr. Clackson testified that he initially expected to be able to account for some of the Comp liabilities and all of the Cure liabilities on a future income statement. 4/30/10 Tr. at 86:10-87:14, 88:18-90:2 (Clackson).

4.4.16.2    This testimony directly refuted Movants' accusation that internal emails prove that Barclays knew that it was going to spend less than the estimated amounts for Comp and Cure, and thereby refuted Movants' insinuation of bad faith conduct.  *See, e.g.*, M. 24, 41, 95, 135, 234; BCI Exs. 774, 775, 776.

4.4.16.3    This testimony was never rebutted, either on cross examination or through any other fact or expert witness.  4/30/10 Tr. at 86:8-87:11, 88:15-90:2 (Clackson); LBHI Br. at ¶ 65; Committee Br. at ¶¶ 56-57; *see generally* Complete Trial Record.

4.4.17.    During the week of September 15, 2008, Archie Cox was Chairman of Barclays America.  4/30/10 Tr. at 204:10-13.

4.4.17.1    Mr. Cox testified that "Barclays wanted the Court to be in the position to make the right decision" and at no stage did he have "any concern that any of the information being provided to the Court was in any way inaccurate or incomplete."  4/30/10 Tr. at 206:20-24, 207:18-21 (Cox).

4.4.17.2    Mr. Cox testified that he thought the 3,000 contracts "was an estimate of what the number of contracts that were mission critical" and "the 200 million is an estimate of what would be owed on those contracts."  M. 11; 6/22/10 Tr. at 226:13-16 (Cox).

4.4.17.3    This testimony establishes a clear distinction between "mission critical" closing date contracts and all other contracts Barclays might choose to assume 60 days after closing which directly refutes the Movants' accusation that Mr. Cox's notes prove that Barclays knew that it was going to spend less than the estimated amount for Cure, and thereby refuted Movants' insinuation of bad faith conduct.  M. 11.

4.4.18.    During the week of September 15, 2008, Jonathan Hughes was General Counsel of Barclays.  4/30/10 Tr. at 115:12-21 (Hughes).

4.4.18.1    Mr. Hughes testified that Barclays never attempted to keep secret the fact that it expected to record an accounting gain on its Acquisition Balance Sheet.  4/30/10 Tr. 123:9-124:6 (Hughes).

4.4.18.2    Mr. Hughes testified that the transaction involved significant risk for Barclays.  4/30/10 Tr. 180:4-9, 180:11-182:7, 186:17-187:6 (Hughes)

4.4.18.3    Mr. Hughes testified that Barclays believed the transaction was accurately disclosed to the Court as a deal to acquire an entire Business, including all assets in the Business.  4/30/10 Tr. 229:7-13 (Hughes)

4.4.19.    During the week of September 15, 2008, Stephen King was the Head of the Portfolio Mortgage Trading Group ("PMTG").  King Dep. Tr. at 8:24-9.9.

4.4.19.1    The testimony of Stephen King was never contradicted and was corroborated by contemporaneous documents.  *See* Complete Trial Record.

4.4.19.2    Mr. King testified to the pervasive valuation uncertainty that Barclays faced in September 2008, during a period of extreme market turmoil.  8/25/10 Tr. at 8:11-24, 13:16-14:16, 17:1-13, 26:17-28:2 (King).

4.4.19.3    Mr. King testified that Lehman's trading assets were exceptionally difficult to value because so many of them were illiquid, including structured products and mortgage products. 8/25/10 Tr. at 26:17-28:2, 33:25-34:8, 60:22-61:14, 66:23-67:25 (King).

4.4.19.4    Mr. King testified that the identity of Lehman's trading assets kept changing and that a significant portion of the assets in the Repo Collateral actually delivered to Barclays on September 18 were different from those that had been pledged to the NY Fed. 8/25/10 Tr. at 15:9-16:5, 23:19-24:16, 55:10-56:5, 152:25-153:25 (King).

4.4.19.5    Mr. King testified to Barclays' concern that Lehman's marks and custodial marks did not accurately reflect the actual value of the trading assets Barclays expected to be purchasing.  8/25/10 Tr. at 66:23-67:25, 158:15-159:17, 224:10-225:12, 165:12-21, 182:23-183:21 (King).

4.4.19.6    Mr. King testified more specifically to his expertise in evaluating complex mortgage-backed securities, his assessment that Lehman's marks on its holdings of such securities greatly exceeded their actual market value, and that he valued the

mortgage securities at roughly half of what they were marked by Lehman.  8/25/10 Tr. at 37:22-38:22, 119:10-20, 158:15-159:17, 224:10-225:12, 182:23-183:21 (King).

4.4.19.7    Mr. King testified that, even after the Closing, Barclays had been unable to determine from Lehman what its risk position and exposure was at the OCC, demonstrating the difficulty in evaluating the potential value and liabilities associated with the ETD accounts.  8/25/10 Tr. at 79:11-81:6 (King); *see also* BCI Exs. 290, 294.

4.4.20.    During the week of September 15, 2008, Gary Romain was the Head of Technical Accounting for Barclays.  9/2/10 at 12:18-19 (Romain).

4.4.20.1    Mr. Romain testified that the draft acquisition balance sheets were constantly changing and very uncertain for more than four months after the Closing, because the information was incomplete, the accounting was uncertain, and the proper valuation of the illiquid assets was uncertain.  9/2/10 Tr. at 13:22-14:22 (Romain).

4.4.20.2    Mr. Romain testified that the effort at all times was to record an Acquisition Balance Sheet that reflected the fair value of the Purchased Assets as defined under the accounting rules, and there was never any effort to understate that fair in order to "hide" any gain or value.  9/2/10 Tr. at 15:9-16 (Romain).

4.4.20.3    Mr. Romain testified that PWC was actively involved in both the accounting and valuation judgments Barclays made throughout the four month process of creating the Acquisition Balance Sheet.  9/2/10 Tr. at 15:17-23 (Romain); FOF ¶¶ 53.

4.4.20.4    Mr. Romain testified that the Acquisition Balance Sheet reflects only the "consideration" that is recognized under the accounting rules on a balance sheet, and does not reflect all consideration Barclays provided under the Purchase Agreement.  9/2/10 Tr. at 13:12-17, 48:9-25 (Romain).

4.4.20.5    Mr. Romain testified that the Barclays acquisition gain of approximately $4.1 billion was entirely attributable to assets that had value to Barclays as a going concern but that would likely have had little or no value to Lehman in a liquidation of the LBI Business — i.e., intangibles, fixtures, fittings, and the net value in the ETD accounts that in a liquidation would have been seized by clearing corporations and exchanges.  9/2/10 Tr. at 73:12-74:12, 84:19-85:3 (Romain).

4.5.    The Movants failed to present any evidence of fiduciary breach.

4.5.1.    In its Rule 60(b) motion, the Debtor insinuated that certain former Lehman executives had breached their fiduciary duties because they received bonus awards from Barclays; the Debtor did not list the specific individuals it was accusing, however, until Barclays demanded that they be identified in an interrogatory.  LBHI Br. at p. 2, ¶¶ 14, 18 & notes 2-12, 26, 115;  BCI Ex. 46, at p. 2.

4.5.2.    In response to the Barclays interrogatory, the Debtor and the Trustee identified nine former Lehman executives whom they allege committed fiduciary breaches.  BCI Ex. 46 at p. 2.

4.5.3.    Of those individuals, the Movants called only two (Ian Lowitt and Martin Kelly) to testify at trial.  See BCI Ex. 46, at p. 2.

4.5.4.    Movants did not even depose two of the former Lehman executives whom they accuse of fiduciary breach (Michael Gelband and Gerald Donini). Gerard Reilly, whom Movants also accused of fiduciary breach, died in December 2008.  BCI Ex. 46 at p. 2; LBHI Br. at ¶ 25 n. 16; *see generally* LBHI Br.; LBHI Reply Br.

4.5.5.    During the entire trial, and in particular in their questioning of Mr. Lowitt and Mr. Kelly, Movants never asked a single question about "fiduciary" duties, and introduced no evidence of any quid pro quo agreement with Barclays or any other even potential breach of loyalty or care.  *See* 4/28/10 (Kelly); 4/29/10 (Lowitt); *see generally* Complete Trial Record.

4.5.6.    During the week of September 15, 2008, Ian Lowitt was the CFO of Lehman.

        4.5.6.1    From 2007 through September 2008, Mr. Lowitt had been Chief Administrative Officer for Lehman.  4/29/10 Tr. at 11:4-15 (Lowitt).

        4.5.6.2    Due to his experience as Chief Administrative Officer for Lehman, Lowitt had valuable knowledge about Lehman's operations and infrastructure that was critical to Barclays' ability to integrate the Lehman Business.  4/29/10 Tr. at 11:4-15; 36:10-20 (Lowitt).

        4.5.6.3    Mr. Lowitt was one of eight or nine senior Lehman executives who received an offer of employment from Barclays before the Closing because of their senior roles in the organization, and because keeping them with the Business was essential to ensuring that the Business did not disintegrate, and could be properly integrated into Barclays after the Closing.  BCI Ex. 11 (Sale Motion) at ¶ 19; BCI Ex. 104 at p. 3; 4/29/10 Tr. at 22:22-23:5; 38:1-5; 54:5-8 (Lowitt).

4.5.6.4    The Movants falsely accused Mr. Lowitt of writing off $5 billion of value on the Long Positions that were defined in the APA as having a book value of approximately $70 billion.  LBHI Br. at 39 n. 39; BCI Ex. 1103a (Pfleiderer Demonstrative 9); 10/6/10 Tr. at 42:15-43:2 (Pfleiderer).

4.5.6.5    The Movants alleged that Mr. Lowitt's handwriting on an early version of the Berkenfeld Schedule proved that there was a "mark down" of $5 billion on the Long Positions as defined in the APA.  M. 15; 4/29/10 Tr. at 99:20-25 (Lowitt).

4.5.6.6    The early version of the Berkenfeld Schedule with Lowitt's handwriting on it actually showed marks on the Long Positions as defined in the APA that were *less* than the marks in the final Berkenfeld Schedule.  BCI Ex. 106a; BCI Ex 1103a (Pfleiderer Demonstrative 10); 10/6/10 Tr. at 43:3-45:19 (Pfleiderer).

4.5.6.7    The marks or book values for the APA Long Positions as shown on the early version of the Berkenfeld Schedule with Lowitt's handwriting on it were *less* than $70 billion, not $5 billion more, as Movants falsely claimed.  M. 15; 4/29/10 Tr. at 145:20-146:1 (Lowitt); BCI Ex. 1103a (Pfleiderer Demonstrative 9); 10/6/10 Tr. at 42:15-43:2 (Pfleiderer).

4.5.6.8    The words "Mark Down" on the early version of the Berkenfeld Schedule with Lowitt's handwriting on it most likely referred to the fact that (a) Barclays believed the "Mortgages," which were not in the APA definition of Long Positions, were worth substantially less than the Lehman marks, and (b) some of the other assets had to be adjusted slightly to reflect the fact that the only available marks were from September 12, 2008.  4/29/10 Tr. at 96:21-97:13; 99:20-25; 143:13-145:19 (Lowitt); BCI Ex. 1103a (Pfleiderer Demonstrative 9); 10/6/10 Tr. at 42:15-43:2 (Pfleiderer).

4.5.6.9    The Lehman marks on the Long Positions as defined in the APA were less than $70 billion as of every day from September 12 through to September 19, and therefore Lowitt was not and could not have been involved in any secret agreement to give Barclays a secret $5 billion discount by understating the Long Positions as having a book value of "approximately $70 billion." BCI Ex. 1103a (Pfleiderer Demonstrative 11 — summarizing BCI Exs. 501, 502, 667-670, 808); 10/6/10 Tr. at 47:23-48:13 (Pfleiderer).

4.5.6.10    Mr. Lowitt's handwritten notes on the early version of the Berkenfeld Schedule reflected notes he made during meetings

with Bart McDade, and do not reflect any secret agreement made with Barclays to give Barclays a $5 billion discount.  4/29/10 Tr. at 142:15-22 (Lowitt); 4/27/10 Tr. at 31:13-25 (McDade).

4.5.6.11    The Debtor's "special counsel" failed to asked precise questions of Mr. Lowitt in deposition, and built his case upon a false understanding of "book value" — ignoring the fact that Barclays and Lehman only ever had September 12 marks to review during the September 15-16 Sale negotiations.  4/29/10 Tr. at 78:7-81:19; 143:13-146:6; 172:9-174:15; 180:16-181:11 (Lowitt).

4.5.6.12    The unrebutted evidence contradicts Movants' assertions, based on inferences drawn from emails between Ian Lowitt and Gerard Reilly, *see* M. 25, that "the original plan was to retrofit the agreed purchase price into Lehman's books" and that "Barclays was actually invited to participate in this markdown process." LBHI's Rule 60(b) Br. at ¶ 58.

4.5.6.12.1    The evidence is unrebutted that Lehman never marked its book values down to reflect Stephen King's valuation of the Long Positions — the figures in the Berkenfeld Schedule and the APA correspond to the September 12 balance sheet Lehman gave to King.  4/29/10 Tr. at 162:10-17 (Lowitt); *see also* FOF ¶ 9.

4.5.7.    During the week of September 15, 2008, Martin Kelly was Lehman's Global Financial Controller.  4/28/10 Tr. at 132:9-11.

4.5.8.    Martin Kelly acted in good faith and there is no basis for movants to brand him a liar.  4/26/10 Tr. at 163:11-22 (McDade) (Bart McDade testifying that, after many years of working with Mr. Kelly, he considered Mr. Kelly to be "a man of great integrity"); 4/27/10 Tr. at 39:15-19 (McDade); 8/23/10 Tr. at 28:19-24 (Shapiro); 4/26/10 Tr. at 139:3-7 (Ainslie); Marsal Dep. Tr. at 76:9-16; Ridings Dep. Tr. at 49:13-50:11; 10/21/10 Tr. at 31:5.

4.5.9.    Mr. Kelly had a legitimate basis for testifying that he may have written the phrase "matched book down" rather than "marking book down" in his notes listing certain items requiring attention.

4.5.9.1    Mr. Kelly received a September 17, 2008 email from Ian Lowitt stating: "need to shrink matched book which as of yesterday was much larger than expected."  M. 589.

4.5.9.2    Mr. Lowitt's instruction to Mr. Kelly was to shrink the matched book, which "was the repo book or parts of the repo book, so I know that there were changes in the repo balances that were moving across."  4/28/10 Tr. 177:22-24 (Kelly).

| | |
|---|---|
| 4.5.9.3 | Whether Mr. Kelly wrote "marking book down" or "matched book down," the evidence is unrebutted that Lehman never marked its book values down to reflect Stephen King's valuation of the Long Positions — the figures in the Berkenfeld Schedule and the APA correspond to the September 12 balance sheet Lehman gave to King. *See* 4/29/10 Tr. at 162:10-17 (Kelly); *see also* FOF ¶¶ 9. |

4.5.10.    Mr. Kelly's role in connection with the transaction was limited.

| | |
|---|---|
| 4.5.10.1 | Kelly did not have any role in negotiating the terms of the transaction, valuing the assets to be transferred to Barclays, drafting the legal documentation, advising the Lehman Board, or appearing at the sale hearings. Mr. Kelly merely participated in due diligence efforts and other tasks that his supervisors asked him to perform. 4/28/10 Tr. 136:1-137:10 (Kelly). |
| 4.5.10.2 | Mr. Kelly did not receive any offer of employment from Barclays before the Closing and worked for the LBHI Estate, not Barclays, until October 10, 2008. M. 117; 4/28/10 Tr. 143:21-144:19 (Kelly). |
| 4.5.10.3 | Mr. Kelly was approached by the Debtor's advisors, Alvarez & Marsal, with an opportunity to remain on the Lehman team, which Mr. Kelly did until he finally agreed to join Barclays on October 10, 2008. M. 117; 4/28/10 Tr. 143:21-144:19 (Kelly). |

4.5.11.    Mr. Kelly acted in good faith in attempting to assist in making cure estimates, and certainly did not act in a manner that was intended to, or actually did, mislead anyone.

| | |
|---|---|
| 4.5.11.1 | As Mr. Kelly testified, his team produced an initial estimate of $2.25 billion for cure payments, though there was no simple means to quantify that estimate, as Lehman's ledgers did not keep information corresponding to "cure" payments. 4/28/10 Tr. 240:7-13 (Kelly). |
| 4.5.11.2 | At some point during the week of Closing, Mr. Kelly believed that the cure payment estimate should be lower, and thought a more accurate estimate was $1 billion. 4/28/10 Tr. 204:13-18 (Kelly). |
| 4.5.11.3 | Mr. Kelly told Mr. Lowitt about his new estimate, and the two of them told Mr. McDade. 4/28/10 Tr. 204:18-206:4 (Kelly). |
| 4.5.11.4 | Mr. Kelly also discussed the $1 billion estimate with Lori Fife at Weil Gotshal in the morning before the hearing on September 19, in response to her inquiry following up on the "transaction |

adjustment" balance sheet that Mr. Kelly had provided to Weil. 4/28/10 Tr. 207:4-15, 270:18-271:6, 286:18-287:17 (Kelly).

4.5.12.    Plaintiffs cannot rely on documents showing "transaction adjustments" to support a claim that Kelly was trying to keep the revised estimates a "secret."

4.5.12.1    Mr. Kelly and others at Lehman repeatedly provided documents to lawyers and advisors for Lehman expressly showing those transaction adjustments.  4/28/10 Tr. 207:25-208:8 (Kelly); BCI Ex. 207 (sending "transaction adjustment" balance sheet to Weil); BCI Ex. 209 (sending "transaction adjustment" balance sheet to Lazard); BCI Ex. 212 (sending "transaction adjustment" balance sheet to Alvarez & Marsal).

4.5.13.    Movants failed to carry their burden of proving that any of the nine Lehman employees whom they accused of committing fiduciary breaches actually breached any fiduciary duty owed to Lehman.  *See* FOF 4; BCI Ex. 46 at p. 2; Complete Trial Record.

**5.    The Asset Purchase Agreement (APA) Disclosed The Central Terms Of The Sale, Which Were That Barclays Was To Acquire All Assets In The Business (Except Those That Were Specifically Excluded) For A Consideration Equal To A Definite Cash Amount And The Assumption Of Assumed Liabilities Of An Indefinite Amount.**

5.1.    The APA defined "Business" as "the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant."  BCI Ex. 1 (APA) at p. 2.

5.2.    The APA defined "Purchased Assets" as "all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)…." BCI Ex. 1 (APA) at p. 6.

5.3.    The APA defined "including" as 'including, without limitation' and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it."  BCI Ex. 1 (APA) at p. 10.

5.4.    Thus, Barclays was to acquire all assets used "in connection with" the Business, as defined in the APA, which included Lehman's North American capital markets businesses, investment banking business, and business as a futures commission merchant. 4/27/10 Tr. at 211:21-213:3 (Berkenfeld); 8/23/10 Tr. at 32:12-33:12 (Shapiro); 4/30/10 Tr. at 180:15-181:5 (Hughes); 6/21/10 Tr. at 199:22-200:13 (Diamond); 6/22/10 Tr. at 83:23-84:24 (Varley); 8/27/10 Tr. at 33:20-34:8 (Klein); 8/31/10 Tr. at 18:6-19:8, 23:24-24:16 (Lewkow).

5.5.    Harvey Miller understood that Barclays was to acquire all assets used in connection with the Business.  4/28/10 Tr. at 94:7-15 (Miller).

5.6.    There is no provision in the APA, originally or as amended, that required or provided for assets to be equal to liabilities.  BCI Exs. 1, 5.

5.7.    There is no provision in the APA, originally or as amended, that provided total valuations for all the Purchased Assets.  BCI Exs. 1, 5

5.8.    Before the Closing, Harvey Miller understood that the Sale was the purchase of a business and the assets that went with that business, to the extent not excluded, irrespective of their value.  Miller Dep. Tr. at 39:17-40:18, 50:14-51:6.

5.9.    Harvey Miller understood that the Sale was not a balance sheet transaction in which assets and liabilities would "balance" or "wash."  4/28/10 Tr. at 98:25-99:7 (Miller); Miller Dep. Tr. at 60:12-21.

5.10.    Section 3.1 of the APA provides that "The aggregate consideration for the value of the Purchased Assets shall be (a) the Cash Amount and (b) the assumption of the Assumed Liabilities by Purchaser."  BCI Ex. 1 (APA) at § 3.1.

5.10.1.    Thus, the APA's provision defining the consideration Barclays would pay did not determine the consideration based upon the book value of the Purchased Assets.  BCI Ex. 1 (APA) at § 3.1.

5.11.    The "Cash Amount" was a definite amount of $250 million plus the appraised value of the real estate.  4/28/10 Tr. at 99:25-100:20 (Miller); 8/31/10 Tr. at 18:6-19:8 (Lewkow).

5.11.1.    Based upon an appraisal of the real estate at $1.29 billion, the Clarification Letter defined the Cash Amount as $1.54 billion. BCI Ex. 5 (Clarification Letter) at ¶ 4.

5.12.    The APA provided no total valuation for the Assumed Liabilities.  BCI Ex. 1 (APA) at § 2.1; 8/31/10 Tr. at 18:6-19:8 (Lewkow).

5.13.    The APA was submitted to the Court as an attachment to the Sale Motion.  BCI Ex. 11.

5.13.1.    The version of the APA submitted as an attachment to the Sale Motion contained a number of handwritten edits.  BCI Ex. 11 (Sale Motion) at Ex. 2.

5.13.2.    Those handwritten edits included the following edit to the definition of the Long Positions:  "with a book value as of the date hereof of approximately $70 billion."  BCI Ex. 11 (Sale Motion) at Ex. 2, p. 7.

5.13.3.    The handwritten edits were made by a Simpson Thacher lawyer late at night on September 16 or early in the morning on September 17.  8/31/10 Tr. at 39:3-40:15, 127:12-129:4 (Lewkow).

5.14.    The APA was expressly approved by the Court's Sale Order. BCI Ex. 16 (Sale Order) at ¶ 3.

5.15.    Contrary to Movants' false assertions, the basic terms of the APA did not change as a result of the Clarification Letter:

5.15.1.    The Clarification Letter confirmed that the Sale was the acquisition of all of the assets used in the "Business" as defined in the APA, subject to a narrowing of the definition of the Purchased Assets Barclays was acquiring. See FOF ¶ 43.4.5.

5.15.2.    The unrebutted testimony established that any references to "Lehman 2" versus "Lehman 3," or to the "changes" in the Sale that occurred late in the week of September 15, 2008, reflected solely the fact that the deal had become more uncertain and risky for Barclays because Lehman was unable to deliver assets and Barclays had been required to advance $45 billion to LBI in advance of the Sale being approved; but the testimony confirmed that the fundamental deal never changed – Barclays was acquiring the LBI Business, as defined in the APA.  4/29/10 Tr. at 201:12-202:21, 261:1-16 (Clackson); 4/30/10 Tr. at 180:16-182:7 (Hughes); 5/3/10 Tr. at 92:19-25 (Hughes);

6/21/10 Tr. at 154:6-18, 244:7-12 (Diamond); 6/22/10 Tr. at 131:23-132:4
(Varley).

**6.**     **The APA Did Not Provide For A "Wash" Or "Balanced" Transaction, And The Sale Was Not Presented To The Court As A "Wash" Or "Balanced" Transaction.**

6.1.    On the face of the Purchase Agreement, the transaction was not a "wash."  The APA contained:

6.1.1.    No representation or warranty regarding the values of the Purchased Assets and Assumed Liabilities in the transaction.  BCI Ex. 1.

6.1.2.    No requirement of any definite relationship between Purchased Assets and Assumed Liabilities.  BCI Ex. 1.

6.1.3.    No requirement of a "wash."  BCI Ex. 1.

6.1.4.    No provision of any kind regarding the ultimate impact on the Barclays or Lehman balance sheet.  BCI Ex. 1..

6.1.5.    No requirement for any appraisal or final valuation of financial inventory or any other Purchased Asset (other than for the real estate).  BCI Ex. 1.

6.1.6.    No requirement that there be a "true up" based upon a final valuation of all assets and liabilities.  BCI Ex. 1.

6.2.    The contract contains no mechanism to ensure any particular profit or loss outcome for either Lehman or Barclays.  4/27/10 Tr. at 213:15-214:5 (Berkenfeld).

6.2.1.    The APA never contained a "true-up" that would require a final valuation or accounting for all of the financial inventory.  BCI Ex. 1.

6.2.2.    The one provision in the APA that provided for a limited "upside sharing" was removed from the contract, as the court was expressly told.  BCI Ex. 49 (9/19/08 Tr.) at 47:7-10 (Fife).

6.2.3.    Lehman Board Member Michael Ainslie admitted that absent representations and warranties regarding values, and post-closing reconciliation and true-up provisions, the deal could not be a "wash."  4/26/10 Tr. at 138:7-25 (Ainslie).

6.2.4.    Lehman CEO Bryan Marsal admitted that, without a true-up provision, the deal could not be a "wash."  6/21/10 Tr. at 62:23-63:3 (Marsal).

6.3.    The deal was not structured to be a balance sheet deal or a "wash."  8/23/10 Tr. at 35:24-36:4 (Shapiro); 4/28/10 Tr. at 96:9-21, 98:25-99:7, 103:21-104:4, 126:19-127:1 (Miller); Ridings Dep. Tr. at 25:5-26:2.

6.3.1.    The deal could not have been a wash because "we didn't have a good balance sheet to work from to begin with and that was not the nature of what we were trying to negotiate."  8/23/10 Tr. at 35:24-36:4 (Shapiro).

6.3.2.    Harvey Miller never represented to the Court that the Deal would be a "wash" or a balanced transaction because he did not view the deal that way.  4/28/10 Tr. at 98:25-99:7 (Miller).

6.3.3.    "Everyone understood that the agreement did not require there to be such a balance" between assets and liabilities.  BCI Ex. 419 at p. 2; *see also* 8/27/10 Tr. at 37:2-8 (Klein).

6.3.4.    Mr. McDade never told Harvey Miller or anyone from Barclays that he understood the deal to be a "wash."  4/27/10 Tr. at 55:17-23 (McDade); 4/28/10 Tr. at 126:14-127:3 (Miller).

6.3.5.    Mr. Miller admitted that this was "not a balance sheet deal" from his or "Mr. McDade's perspective" because "nobody really had a firm fix on the assets."  4/28/10 Tr. at 96:9-21, 103:21-104:4, 126:19-127:1 (Miller).

6.3.6.    Mr. McDade testified that Barclays was acquiring many assets that had not been valued (such as customer lists), and that he did not take the value of those assets into consideration when assessing whether the deal would be a "wash."  4/27/10 Tr. at 28:4-19.

6.3.7.    Lehman's independent financial advisor, Barry Ridings of Lazard, confirmed that the deal was not structured to be a "wash."  Ridings Dep. Tr. at 25:5-26:2.

6.3.8.    Any concept of a "wash" that the Lehman board could have had was a very rough concept, and included the concept that assets would actually exceed liabilities.

> 6.3.8.1    Until at least the end of October 2008, numerous different draft Lehman Board minutes showed the "wash" concept as involving assets of $70 billion and liabilities of $64 billion, plus the assumption of certain employees and accounts.  BCI Ex. 789 at 20863; *see also* BCI Exs. 473, 765, 766, 770, 771, 773, 788, 790-793.

> 6.3.8.2    Even though numerous other written changes were made to the draft Board minutes during September and October 2008, the phrase about a wash including assets of $70 billion and liabilities of $64 billion was not deleted.  BCI Ex. 789 at 20863; *see also* BCI Exs. 473, 765, 766, 770, 771, 773, 788, 790-793.

> 6.3.8.3    It was not until November 7, 2008, that Lehman lawyer Jeffrey Welikson deleted the references to $70 billion in assets and $64 billion in liabilities from the draft Lehman board minutes.  BCI Ex. 794 at p.4.

> 6.3.8.4    Lehman Board member Michael Ainslie admitted that the Board did not have any understanding one way or another of whether

the "wash" concept would involve book values, market values, or liquidation values.  4/26/10 Tr. at 131:8-132:25 (Ainslie).

6.3.8.5    Lehman Board member Michael Ainslie admitted that the Board delegated all of the details of how to negotiate the Sale to Lehman management.  4/26/10 Tr. at 87:18-25, 130:16-22, 131:8-14, 132:11-16, 134:9-24 (Ainslie).

6.3.8.6    Lehman Board member Michael Ainslie admitted that he believed it was a mistake of Lehman management not to include a true-up requirement in the Purchase Agreement, since without such a provision there was no way that the deal could be a wash. 4/26/10 Tr. at 138:11-139:4 (Ainslie).

6.3.9.    The 30(b)(6) representative for the law firm that represented the Committee, Milbank Tweed, admitted that the Committee never suggested any provisions that would have structured the transaction as a "wash."  O'Donnell Dep. Tr. at 104:10-105:7.

**7.    Neither The APA Nor Any Other Representation Made In Connection With The Sale, Either Oral Or Written, Ever Indicated That Barclays Was Paying A Price That Was Based Upon, Or Equal To, The Book Value Of Any Of The Purchased Assets.**

7.1.    The APA defined consideration as "The aggregate consideration for the Purchased Assets shall be (a) the Cash Amount and (b) the assumption of the Assumed Liabilities by Purchaser." BCI Ex. 1 (APA) at § 3.1.

7.2.    The Court was never told that Barclays was paying a "price" equal to or based upon "book value" of Purchased Assets.  BCI Exs. 1, 5, 11, 48 (9/17/08 Tr.), 49 (9/19/08 Tr.).

7.2.1.    The references to the term "book value" in the APA are made in the definition of one category of Purchased Assets (the "Long Positions"), and one category of Assumed Liabilities (the "Short Positions"), which if viewed together showed assets that were approximately $1 billion *greater* than liabilities, even if all other Purchased Assets were ignored.  *Compare* BCI Ex. 1 (APA) at p. 6 (d) *with id.* at § 2.3(i).

7.2.2.    The Sale Motion does not use the term "book value."  BCI Ex. 11.

7.2.3.    The Sale Motion does not state Barclays was paying a price equal to or based upon "book value."  BCI Ex. 11.

7.2.4.    The Sale Motion provided: "In exchange for the purchased assets, Buyers will pay Sellers approximately $1.7 billion in cash.  In addition, Buyer is assuming various liabilities of Sellers, including transfer taxes, accounts payable in the ordinary course of business, cure costs, and future liabilities under assigned contracts and leases."  BCI Ex. 11 (Sale Motion) at ¶ 14.

7.2.5.    There is no reference to "book value" or indication that the price Barclays was paying was equal to or determined as a function of "book value" at the September 17, 2008 Bidding Procedures Hearing.  BCI Ex. 48 (9/17/08 Tr.).

7.2.6.    There was no reference to "book value" or indication that the price Barclays was paying was equal to or determined as a function of "book value" at the September 19, 2008 Sale Hearing.  BCI Ex. 49 (9/19/08 Tr.).

7.2.7.    Ms. Fife never stated that the $47.4 billion figure was a book value; rather, she stressed that the value of assets Lehman had available to transfer had declined dramatically. BCI Ex. 49 (9/19/08 Tr.) at 47:1-4.

7.2.8.    The Clarification Letter removed all references to the term "book value" from the definition of "Purchased Assets" and from the Purchase Agreement more generally; it contains no references to "book value" and no indication that the price Barclays was paying was equal to or determined as a function of "book value."  BCI Ex. 5 (Clarification Letter) at § 1(a)(ii); 5/7/10 Tr. at 250:2-4 (Ricci).

7.3.    The consideration to be paid by Barclays was not based upon the "book value" of the Long Positions, as that term is defined in subsection (d) of the APA.  4/28/10 Tr. at 99:25-101:14 (Miller); 8/31/10 Tr. at 26:12-27:11 (Lewkow).

    7.3.1.    The APA did not allocate any portion of the consideration to certain Purchased Assets.  BCI Ex. 1; 8/31/10 Tr. at 28:12-20, 99:18-19 (Lewkow); 5/3/10 Tr. at 9:18-10:5 (Hughes).

    7.3.2.    It is therefore an inaccurate distortion of the Sale to treat portions of the consideration as paying for certain of the Purchased Assets, and other portions of the consideration as paying for other Purchased Assets.  8/31/10 Tr. at 28:12-20, 99:18-19 (Lewkow); 5/3/10 Tr. at 9:18-10:5 (Hughes).

    7.3.3.    Rather, the APA provided that the consideration defined in § 3.1 (which included the Assumed Liabilities) was a total consideration to be paid for all of the Purchased Assets.  BCI Ex. 1.

    7.3.4.    Section 12.3 of the APA, which required both the "Seller and Purchaser" to allocate Consideration to the Purchased Assets, was a tax provision intended to prevent Purchaser and Seller from "taking inconsistent positions with the IRS."  As a business matter, however, there was no allocation of consideration to specific Purchased Assets.  8/31/10 Tr. at 98:13-100:19 (Lewkow).

7.4.    The Lehman Boards' approval of the Sale was not predicated on any particular basis for valuing LBI's Assets.  4/26/10 Tr. at 113:16-132:5 (Ainslie).

**8.      The APA Disclosed The Fact That The Value Of Trading Assets Would Exceed The Value Of Trading Liabilities — *i.e.*, There Was A "Buffer" Based On The Marked Values In The Trading Inventory.**

8.1.    The APA provided that the Purchased Assets included $70 billion of Long Positions and $1.3 billion of Retained Cash.  BCI Ex. 1 (APA) at p. 6 (d) (definition of "Long Positions"); *id.* at pp. 2, 6 (definition of "Retained Cash").

8.2.    The APA also provided that the Purchased Assets included 50% of LBI's residential mortgage securities ("Resis"), for which no valuation estimate was provided in the APA. BCI Ex. 1 (APA) at p. 6 (e).

8.3.    The APA provided that the Assumed Liabilities included trading liabilities of $69 billion. BCI Ex. 1 (APA) at p. 12 (i) (definition of "Short Positions").

8.4.    Therefore, looking solely at trading assets (plus cash) and trading liabilities, the APA provided for a "buffer" of $2.3 billion *plus* whatever value was attributable to the 50% of the Resis that were being acquired by Barclays.  BCI Ex. 1 (APA) at p. 6 (d) (definition of "Long Positions"), (e), p. 12 (i) (definition of "Short Positions"), pp. 2, 6 (definition of "Retained Cash").

8.5.    Lehman's internal documents, including documents used in the negotiations, as well its internal database of book values, all demonstrate that the Lehman marks on the LBI Resis were approximately $6.5 billion as of September 12, 15, and 16 — which means 50% of the Resis had marks of $3.25 billion.  BCI Exs. 191; M.15.

8.6.    Bart McDade and the other Lehman negotiators, as well as numerous other Lehman executives, knew that 50% of the Resis were marked by Lehman at approximately $3.25 billion.  M. 15; BCI Ex. 486.

8.7.    Thus, Lehman knew that if the Lehman marks on the Resis were included in the calculation, the APA provided for a "buffer" between trading assets (including cash) and trading liabilities of approximately $5.5 billion, ignoring all other assets in the Business (and all other Assumed Liabilities).

8.8.    At the Sale Hearing, counsel for the Debtor told the Court she did not know the value of the Resis, and counsel for DTCC estimated that 100% of the Resis were worth $6 billion — which means 50% was estimated to be worth $3 billion.  BCI Ex. 49 (9/19/08 Tr.) at 49:18-25, 51:24-53:8.

8.9.    Thus, based on the value for the Resis that was discussed at the Sale Hearing, the APA provided on its face for a "buffer" between trading assets (including the cash originally in the APA) and trading liabilities of approximately $5.3 billion, ignoring all other assets in the Business (and all other Assumed Liabilities).

8.10.   The Court was told that though there were "many changes" to the transaction by the time of the Sale Hearing, there was still a "buffer" (or positive difference) between the Long Positions and the Short Positions:

"In terms of the economic changes, they result largely because of the markets, unfortunately. And from the time that the transaction was actually entered into till now, the markets dropped and the value of the securities dropped as well. So, originally, we were selling assets that had a value of seventy — approximately seventy billion dollars. *And today, Your Honor, we're only selling assets that have a value of 47.4 billion dollars. Barclays is assuming liabilities, however, of 45.5 billion dollars in connection with those assets. So that has not changed from the original transaction.*"

BCI Ex. 49 (9/19/08 Tr.) at 46:21-47:7 (Fife) (emphasis added).

8.11.    The buffer between $47.4 billion and $45.5 billion described at the Sale Hearing did not include the Resis, which were described at the Sale Hearing just as they were in the APA: as a separate category of assets, in addition to the Long Positions. BCI Ex. 49 (9/19/08 Tr.) at 47:1-4, 49:8-17.

### iii.    Facts Showing That The APA's Estimate Of The Long Positions Was Reasonable And Accurate, And Did Not Disguise A $5 Billion Discount.

**9.    The APA's Definition Of The Long Positions As Having A "Book Value As Of The Date Hereof Of Approximately $70 Billion" Was An Estimate Of The Value Of The Long Positions As Defined In The APA, And Was Not Intended To, And Did Not, Disguise $5 Billion Of Value That Was To Be Transferred To Barclays.**

9.1.    The Lehman marks for the Long Positions as of September 12, 15, 16, 17, 18, and 19 were less than $70 billion — not $75 billion, as Movants falsely claim.  10/6/10 Tr. at 47:23-49:16 (Pfleiderer); *see* BCI Ex. 1103a (Pfleiderer Demonstrative 11 — citing and summarizing BCI Exs. 501, 670, 808).

    9.1.1.    Movants' repeated assertion that the book value of the Long Positions was $75 billion is untrue.  *Compare* LBHI Br. at ¶ 5; LBHI Argument Materials for April 9, 2010 Hearing at p. 1 and Movants' Argument Materials for Hearing on Motions to Exclude Experts September 10, 2010 at p. 7 *with* 10/6/10 Tr. at 48:16-49:22 (Pfleiderer).  *See* BCI Ex. 1103a (Pfleiderer Demonstratives 8-12).

    9.1.2.    The Long Positions, which were identified as having a "book value" of "approximately $70 billion" in the APA, do not include the residential mortgage securities, a separate class of assets for which the APA provided no value.  BCI Ex. 1 (APA) at p. 6 (definition of Purchased Assets).

    9.1.3.    The evidence shows that the "Collateralized Short Term Agreements," which were included in the definition of Long Positions, were Lehman loan receivables, were worth $10 billion, and were not the subject of any markdowns or valuation discussions.  BCI Ex. 106; M. 15; 8/25/10 Tr. at 43:14-45:8, 145:23-146:8 (King); 10/6/10 Tr. at 39:8-20, 42:3-14 (Pfleiderer).

    9.1.4.    Lehman's books for September 12-19, 2008 show Long Positions of less than $70 billion.  BCI Ex. 1103a (Pfleiderer Demonstrative 11 — summarizing BCI Exs. 501, 502, 667-670, 808); 10/6/10 Tr. at 47:23-48:13 (Pfleiderer).

        9.1.4.1    The Global Funding System ("GFS") data is the source of the Lehman marks or "book values."  4/27/10 Tr. at 30:23-31:4 (McDade); 4/29/10 Tr. at 146:2-6 (Lowitt); 9/21/10 Tr. at 140:11-141:7 (Garvey).

        9.1.4.2    The GFS data for September 12-19, 2008 show Long Positions of less than $70 billion.  BCI Ex. 1103a (Pfleiderer Demonstrative 11 — summarizing BCI Exs. 501, 502, 667-670, 808); 10/6/10 Tr. at 47:23-48:13 (Pfleiderer).

        9.1.4.3    The GFS data for September 12, 2008, shows a Lehman "book value" or "marks" on the Long Positions of $65.8 billion. BCI Exs. 501, 808, 809, 1103a (Pfleiderer Demonstrative 11).

9.1.4.4    The GFS data for September 15, 2008, shows a Lehman "book value" or "marks" on the Long Positions of $64.42 billion. BCI Exs. 502, 808, 809, 1103a (Pfleiderer Demonstrative 11).

9.1.4.5    The GFS data for September 16, 2008, shows a Lehman "book value" or "marks" on the Long Positions of $62.57 billion. BCI Exs. 667, 808, 809, 1103a (Pfleiderer Demonstrative 11).

9.1.5.    During the September 15-16 negotiations, the only Lehman marks that were available for Barclays to review were marks reflecting market activity on September 12. 4/29/10 Tr. at 67:14-22 (Lowitt); 8/25/10 Tr. at 13:17-14:17, 17:2-5, 46:12-20 (King); BCI Exs. 191, 909, 910, 912.

9.1.5.1    The normal process for Lehman to produce final "marks" or "book values" for its portfolio of securities involved a "T+1" system in which the final marks for a given day would become available only at the end of business on the following business day. 4/29/10 Tr. at 67:14-69:3 (Lowitt); Krishnan Dep. Tr. at 164:14-166:9.

9.1.5.2    In the afternoon of September 15, Lehman finance professionals attempted to gather the most up-to-date marks on LBI's portfolio of securities, which were marks as of September 12. BCI Ex. 486.

9.1.5.3    Late in the afternoon on September 15, Lehman provided Barclays with a summary schedule of September 12 marks for LBI's portfolio of financial securities. BCI Ex. 191; 8/25/10 Tr. at 16:11-17:14 (King).

9.1.5.4    As Stephen King testified, during the September 15-16 negotiations, he made handwritten notations on the September 12 summary schedule showing the September 12 Lehman marks that he was given during his September 15-16 review of LBI's trading assets. BCI Ex. 191; 8/25/10 Tr. at 17:2-10 (King).

9.1.5.5    Between 6 pm and 8 pm during the evening of September 15, Lehman sent Barclays trader Stephen King a series of backup files showing lists of CUSIPS with their most recent marks, all of which explicitly stated that they reflected Lehman marks as of September 12. BCI Exs. 909, 910, 912.

9.1.5.6    As Stephen King testified, during the course of that September 15-16 review, he never received any Lehman marks for any date after September 12. 8/25/10 Tr. at 13:17-14:17 (King).

9.1.6.    On September 15, the schedule Barclays was given of Lehman marks from September 12, 2008 showed marks for the Long Positions that were less than

$70 billion.  BCI Exs. 910, 912, 191 (subtracting Mortgages & Mortgage Backed Securities); 8/25/10 Tr. at 13:17-14:17, 17:2-5, 46:12-20 (King); 10/6/10 Tr. at 40:4-42:2 (Pfleiderer).

9.1.7.    The Long Positions reflected on the financial schedule with Ian Lowitt's handwriting were less than $70 billion.  M.15; BCI Ex. 1103a (Pfleiderer Demonstrative 9); 10/6/10 Tr. at 42:15-43:2 (Pfleiderer).

9.1.8.    The Long Positions reflected on the financial schedule initialed by Steven Berkenfeld, dated September 16, 2008, were actually higher than the earlier version with Lowitt's handwriting — but still less than $70 billion.  Compare BCI Ex. 160 with M. 15; BCI Ex. 106; BCI Ex. 1103a (Pfleiderer Demonstrative 10); 10/6/10 Tr. at 43:3-45:19 (Pfleiderer).

9.1.9.    The value of the Long Positions in the board deck given to the Barclays was less than $70 billion.  M.6 at p. 5 (subtract $6.5 billion of residential mortgage securities); 4/30/10 Tr. at 94:25-97:1 (Clackson); 9/2/10 Tr. at 75:15-76:10 (Romain).

    9.1.9.1    The only reason the board deck provided to the Barclays Board showed total assets of $75 billion was because it included $6.5 billion of Mortgages.  M. 6.

    9.1.9.2    Since the $6.5 billion of Mortgages were not included in the APA's definition of Long Positions, the Barclays board deck shows a total value for the Long Positions of less than $70 billion.  4/30/10 Tr. at 94:25-97:1 (Clackson); M. 6; BCI Ex. 1 at p.6.

9.1.10.    During their cross-examination of Professor Pfleiderer, Movants repeatedly suggested that M. 190 was inconsistent with his conclusion that at all relevant times the value of the Long Positions in GFS was less than $70 billion; but Movants' suggestion was incorrect.  M. 190; 10/7/10 Tr. at 36:14-39:16, 62:11-64:20, 156:11-161:23 (Pfleiderer).

    9.1.10.1    Movants asserted that a spreadsheet attached to M. 190 showed a total market value for Long Positions in GFS of approximately $73 billion as of either September 17 or 18, 2008.  M. 190; 10/7/10 Tr. at 36:14-39:16, 62:11-64:20 (Pfleiderer).

    9.1.10.2    Movants' suggestion that M. 190 is inconsistent with Professor Pfleiderer's conclusion that at all relevant times the value of the Long Positions in GFS was less than $70 billion is unpersuasive for two reasons.

    9.1.10.3    First, Movants failed to demonstrate that the securities listed in the column that they contended totaled to approximately $73 billion comprised securities that met the APA's definition of

Long Positions and did not include securities that, like the residential mortgage securities, were not Long Positions. As a result, Movants failed to establish that the comparison they suggest is an apples-to-apples comparison. 10/7/10 Tr. at 38:22-39:11 (Pfleiderer) ("So what this may be is an orange, and it has to be converted into an apple before you can actually compare it with the 70.")

9.1.10.4    Second, the spreadsheet attached to M. 190 was shown to be flawed and unreliable as the result of a $28 billion clerical or computational error. 10/7/10 Tr. at 156:11-161:23 (Pfleiderer).

9.1.10.4.1    Approximately $28.2 billion of the approximately $73 billion total market value listed in the spreadsheet attached to M. 190 was attributable to a single bond issued by Bank Bilbao of Argentina. M. 190; 10/7/10 Tr. at 157:19-158:14 (Pfleiderer).

9.1.10.4.2    Three other valuations of the same bond — by Barclays, by BoNY, and by Movants' expert Olvany — put the value of that same bond at approximately $280 million, or roughly one percent of the value attributed to it in the spreadsheet attached to M. 190. This discrepancy appears to be the result of a computational or clerical error in M. 190. 10/7/10 Tr. at 159:5-161:23 (Pfleiderer).

9.1.10.5    Even assuming that the $73 billion figure on M. 190 consists entirely of securities meeting the APA's definition of Long Positions, correcting that $28 billion error produces a figure well below $70 billion.

9.1.10.6    Accordingly, M. 190 does not contradict Professor Pfleiderer's testimony.

9.2.    Movants' assertion that the Lehman GFS data may be missing over $5 billion of securities that fall within the APA's definition of Long Positions is contradicted by the evidence.

9.2.1.    As Lehman executives testified, GFS is the best available source of the Lehman marks. 4/27/10 Tr. at 30:22-31:4 (McDade); 4/29/10 Tr. at 146:2-6 (Lowitt).

9.2.2.    As Movants' expert John Garvey confirmed, GFS is the best available source of the Lehman marks. 9/21/10 Tr. at 140:11-141:7 (Garvey).

9.2.3.    Professor Zmijewski's criticism of the GFS system as incomplete was based on an erroneous and incomplete analysis.

9.2.3.1    Professor Zmijewski questioned the reliability of GFS based on his inability to reconcile the September 19 GFS value for the long positions cited by Professor Pfleiderer (BCI Ex. 670 ($55.95 billion)) with the GFS September 19 data that he was reviewing; however, Professor Zmijewski was mistakenly looking at an incomplete data set produced on April 2, 2010 instead of the complete data set that was produced by Barclays on April 21, 2010 with a letter explain the correction. *Compare* BCI Ex. 503 (incomplete file showing a total of $54.69 billion for September 19) *with* M. 821 at ¶65 (citing a $54.69 billion figure). *See also* BCI Ex. 670 (Complete file produced in replacement of BCI Ex. 503, showing a total of $55.95 billion with a letter explaining the correction); BCI Ex. 1103a (Pfleiderer Demonstrative 13 — summarizing production correspondence relating to the replacement of the incomplete file with a complete file); 10/6/10 Tr. at 49:23-51:3 (Pfleiderer).

9.2.3.2    Most if not all of the CUSIPs Professor Zmijewski was unable to identify on GFS could be identified by using another identifier such as the International Securities Identification Number ("ISIN"). BCI Ex. 1103a (Pfleiderer Demonstratives 14-17); 10/6/10 Tr. at 51:7-55:24 (Pfleiderer).

9.2.3.3    In any event, Professor Zmijewski's analysis is immaterial, because the "missing CUSIPS" he identified had a total value of less than 2% of the marked value of the Long Positions. 10/6/10 Tr. at 51:7-52:18 (Pfleiderer).

9.2.3.4    Professor Pfleiderer was able to identify 133 of these securities on GFS through identifiers other than CUSIP number, proving that Professor Zmijewski's analysis was incomplete and was ignoring the fact that securities could be identified in ways other than the use of CUSIP number.  10/6/10 Tr. 54:17-55:9 (Pfleiderer).

9.2.4.    The GFS data was not and could not be modified to hide $5 billion of value.

9.2.4.1    Under normal operating conditions, it takes one full business day for GFS data to be finalized so as to reflect the final marks reflecting market activity for the previous day — this is called the "T+1" process.  Krishnan Dep. Tr. at 164:14-166:9; 4/29/10 Tr. at 67:14-69:3 (Lowitt); 10/6/10 Tr. at 59:9-60:4 (Pfleiderer).

9.2.4.2    After the T+1 process has been completed (*i.e.*, as of the close of business on the business day following the business day for which marks are being finalized), the GFS database is closed for further adjustments and can not be modified after that time. Krishnan Dep. Tr. at 116:18-117:18, 165:9-166:3, 171:16-19; 10/6/10 Tr. at 59:9-60:4 (Pfleiderer).

9.2.4.3    With respect to the business days from September 12 through 19 of 2008, there were two instances in which exceptions were made to the normal operation of the GFS process, and in which a special environment was created at the request of Alvarez & Marsal: one was for September 12 and one was for September 19. Krishnan Dep. Tr. at 171:5-15, 172:24-173:21, 197:22-198:11; 10/6/10 Tr. at 57:19-59:8 (Pfleiderer).

9.2.4.4    These two live "special environments" for the GFS database resulted in non-material adjustments of approximately a $100 million change (for September 12) and a $16 million change (for September 19). Krishnan Dep. Tr. at 171:5-15, 172:24-173:21, 197:22-198:11; 10/6/10 Tr. at 57:19-59:8 (Pfleiderer).

9.2.5.    Movants provided no evidence at trial that could support a finding that GFS was incomplete or unreliable for purposes of showing that the Lehman marks on the Long Positions as of September 12-19, 2008 were less than $70 billion, not $5 billion more, as they have falsely claimed throughout this case. *See* Complete Trial Record.

9.3.    To the extent the values on the Berkenfeld Schedule or set forth in the APA were at all higher than the Lehman "book values" or "marks," that difference resulted from good-faith valuation efforts, not a secret agreement to understate the fair market value of any of the assets. 4/27/10 Tr. at 25:19-27:2, 31:14-32:1 (McDade); 4/27/10 Tr. at 112:9-24 (Berkenfeld); 8/25/10 Tr. at 26:14-28:3, 83:16-24 (King).

9.3.1.    As Bart McDade testified, any difference resulting from the valuation process reflected a change in the fair market valuation of the assets, not a discount. 4/26/10 Tr. at 156:8-20 (McDade); 4/27/10 Tr. at 31:14-20 (McDade).

9.3.2.    The valuation process that started early in the week of September 15, 2008 was an effort to "get to fair market value" and take into account any deterioration in value during that "chaotic week." 4/29/10 Tr. at 202:9-21 (Clackson); 6/21/10 Tr. at 55:4-56:1 (Marsal); 9/2/10 Tr. at 15:7-16 (Romain).

9.4.    The testimony relating to a $5 billion "difference" or "loss" or "delta" is consistent with the publicly disclosed buffer between the value of trading assets and the value of the associated trading liabilities — not a "secret discount," as alleged by Movants. *See e.g.*, BCI Ex. 110 at pp. 2, 5.

9.4.1.    Barclays publicly announced that it was "acquiring trading assets with a current estimated value of $72 billion and trading liabilities with a current estimated value of $68 billion" — and that "we absolutely expect to preserve that buffer" of $4 billion.  BCI Ex. 110 pp. at 2, 5.

9.4.2.    Barclays also publicly announced that the "72.7" was "a net number," that the mortgage paper "has been heavily written down," and that "we have been through a process where we took the original marks, reviewed them and then took some further write downs, but that is against the very small portion, less than 5% of that book."  BCI Ex. 110 at pp. 3; *see* 10/6/10 Tr. at 44:2-46:19 (Pfleiderer).

9.4.3.    The GFS data and contemporaneous documents show that Lehman had the Mortgages marked at $6.5 billion, so that 50% of that would have been $3.25 billion rather than the marked-down value reached by Barclays. M.15, BCI Exs. 191, 501, 808, 1103a (Pfleiderer Demonstratives 11, 35).

9.4.4.    Thus, if the Lehman marks for the mortgages are used instead of the "heavily written down" Barclays values, then the "buffer" that Barclays publicly announced would be greater than $4 billion, and might approximate or even exceed $5 billion.  BCI Ex. 110 at pp. 2, 3, 5; *Compare* M.15; BCI Exs. 191, 501, 808, 1103a (Pfleiderer Demonstrative 11) *with* BCI Ex. 106; *see* 10/6/10 Tr. at 44:2-46:19 *(*Pfleiderer).

9.5.    When combined with the asset and liability values listed in the APA, the Lehman marks on the mortgages show a transaction that could be interpreted as a $5.5 billion "loss versus [Lehman] marks."    M.7; BCI Ex. 1103a (Pfleiderer Demonstratives 21-22).

9.5.1.    The evidence shows that assets in the APA may have been thought by Lehman to have total marks as high as $74.5 billion — including $70 billion of Long Positions, $3.25 billion for 50% of the mortgages at Lehman marks, and $1.3 billion of Retained Cash.  BCI Ex. 1103a (Pfleiderer Demonstrative 21).

9.5.2.    Trading liabilities in the APA had marks of $69 billion for the Short Positions. *Id.*

9.5.3.    Thus, comparing the trading assets (plus the Retained Cash referenced in the APA) with the trading liabilities, there was a potential "loss versus our marks" to Lehman of $5.5 billion, as referenced in a September 16, 2008 email from Martin Kelly to Ian Lowitt and Paolo Tonucci, and as reflected in Martin Kelly's handwritten notes. *Id.*; M. 7; M. 14.

9.5.4.    From LBI's accounting perspective, the assumption by Barclays of Cure and Comp obligations would reduce the potential loss versus Lehman marks only to the extent there was an accrual on the provisional LBI balance sheet that was being assumed by Barclays.  10/6/10 Tr. at 67:14-69:2 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 22).

9.5.4.1    Even if Barclays had a potential exposure for Comp and Cure obligations that was three or four times as large as the LBI accruals for trade payables and bonus (indeed, even if Barclays actually paid out three or four times as much as those accruals), the impact on the Lehman loss would only be impacted by the amount of the accrual on the provisional LBI balance sheet that was eliminated.  10/6/10 Tr. at 68:22-69:2 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 22).

9.5.4.2    There were good reasons why the estimate of the Barclays potential exposure for Comp and Cure were higher than the accruals on the provisional LBI balance sheet for trade payables and bonus. *See* FOF ¶¶ 10, 12, 14.

9.5.4.3    Thus, the internal Lehman estimates of the potential loss versus Lehman marks in the Sale was reduced only by the amount of approximately $1 billion, which reflected one estimate of LBI accruals for trade payables and bonus.  M. 14; BCI Ex. 1103a (Pfleiderer Demonstrative 22).

9.5.4.4    Martin Kelly's handwritten notes show an estimate of a $5 billion loss that reflects the difference between trading assets, on the one hand, and trading liabilities plus a $1 billion accrual, on the other hand.  M. 14.

9.6.    During the week of September 15, 2008, the Lehman marks were stale because the books were not being marked properly after September 12, 2008 due to operational and personnel problems that arose as a result of the LBHI bankruptcy filing in the early morning hours of September 15, 2008.  6/21/10 Tr. at 52:4-13 (Marsal); 4/27/10 Tr. at 146:18-148:13 (Berkenfeld).

9.6.1.    Lehman's books had not been marked since Friday, September 12, 2008.  4/2710 Tr. at 36:1-6, 91:2-9 (McDade); Tonucci Dep. Tr. at 138:22-141:3.

9.6.2.    Bryan Marsal has admitted that Lehman was in "chaos" and its system in a state of "collapse" after the September 15, 2008 LBHI bankruptcy filing.  6/21/10 Tr. at 15:13-16:7, 52:4-10 (Marsal).

9.6.3.    Professor Pfleiderer analyzed the Lehman marks from the week of September 15, 2008, and concluded that they were materially stale and out of date, especially for illiquid assets.  10/6/10 Tr. at 107:10-109:5 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstratives 39-40).

9.7.    Even if the books were being marked properly, the only marks available during the all-night negotiations from September 15-16 were marks showing values as of the end of the day on September 12, which were out of date as of the time of the negotiations, and which did not reflect the market turmoil on September 15, 2008.  4/29/10 Tr. at 67:14-69:3 (Lowitt); 4/27/10 Tr. at 22:4-25 (McDade).

iv.    **Facts Showing The Reasonableness Of The Comp And Cure Estimates, The Satisfaction Of The Comp And Cure Obligations, And The Barclays Internal Estimates Of Accounting For The Comp And Cure Obligations.**

10.    **The $2 Billion Estimate For The Compensation Obligations Barclays Agreed To Assume Under The APA Was Intended To Cover Both 2008 Bonus Payments And The Severance Payments Barclays Agreed To Under The APA, As Well As Any Tax Obligations Connected With Such Bonus And Severance Payments.**

10.1.    The APA Required Barclays to take on obligations for 2008 bonuses for Transferred Employees, and to provide severance payments in accordance with Lehman's severance system, to any Transferred Lehman employees who were terminated before December 31, 2008.

    10.1.1.    The APA required Barclays to pay each "Transferred Employee whose employment is terminated … severance payments and benefits" in an unspecified amount.  BCI Ex. 1 (APA) § 9.1(b) at p. 34.

    10.1.2.    The APA required Barclays to "pay each Transferred Employee an annual bonus ('08 Annual Bonuses'), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule" delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the 'Accrued 08 FY Liability')."  BCI Ex. 1 (APA) § 9.1(c) at p. 35.

10.2.    Harvey Miller informed the Court that Barclays' exposure for liabilities associated with Transferred Employees was estimated to be approximately $2.0 billion.

    10.2.1.    Harvey Miller stated at the Sale Hearing that "Barclays will also assume exposure for the employees that accept offers of employment, which is estimated to have a value of approximately — an exposure of approximately two billion dollars."  BCI Ex. 49 (9/19/08 Tr.) at 99:22-25 (Miller).

10.3.    BCI Ex. 106 (the "Berkenfeld Schedule") does not require Barclays to pay $2 billion for "bonuses."  (BCI Ex. 106 is the same document as M. 2).

    10.3.1.    The "Berkenfeld Schedule" is not initialed by representatives of both parties. BCI Ex. 106.

    10.3.2.    The "Berkenfeld Schedule" does not contain an entry for "bonuses."  BCI Ex. 106.

    10.3.3.    The "Berkenfeld Schedule" contains an entry of "2" billion for "Comp."   BCI Ex. 106.

10.4.    All negotiators testified that the estimate of $2 billion for 2008 compensation of former
Lehman employees included both severance and bonus payments

    10.4.1.    As Harvey Miller testified, the compensation obligation "was supposed to
cover both severance pay and bonuses."  4/28/10 Tr. at 32:20-33:2 (Miller).

    10.4.2.    As Mark Shapiro testified, the term "comp" encompassed "a combination of
the bonuses that they would pay and if into the extent that they weren't paying
someone a bonus because they were terminating that person's bonus it would
include severance for that person." 8/23/10 Tr. at 120:20-24 (Shapiro).

    10.4.3.    As Bart McDade testified, "Barclays also assumed a two billion compensation
liability with respect to the combination of the employees' bonus process and
the severance process…."  4/26/10 Tr. at 161:1-10 (McDade).

    10.4.4.    As Rich Ricci testified, his "understanding was that [the compensation
obligation] … was to cover all…compensation, which included bonuses as
well as severance."  5/7/10 Tr. at 149:11-13 (Ricci).

10.5.    Bryan Marsal agreed that the numbers on the Berkenfeld Spreadsheet included an
estimate for "severance."  6/21/10 Tr. at 56:23-57:5.

10.6.    On October 8, 2008, Alvarez & Marsal gave a presentation to the Committee, in which it
summarized the main assets and liabilities in the Sale, and listed the "severance" liability
but not the "bonus" liability — confirming that the "severance" liability was just as
significant, and was obviously included in any estimate of the obligations Barclays was
assuming for compensation to former Lehman employees.  *See* BCI Ex. 131a.

10.7.    The recollections of PwC auditor Michael Guarnuccio of a conversation he had with Paul
Exall of Barclays was based on a misunderstanding or miscommunication, and is not
relevant to the intent of the parties who negotiated the Sale.  8/23/10 Tr. at 188:1-10
(Exall).

    10.7.1.    Barclays stipulated that PwC auditor Michael Guarnuccio would testify (if
called) that he had a conversation in September 2008 with Paul Exall, during
which Mr. Exall "stated that he believed the two billion dollar estimate was
for bonus payments only not for severance pay."  6/25/10 Tr. at 5:17-21.

    10.7.2.    Mr. Exall was not a negotiator of any portion of the Sale, including the
compensation and bonus provisions.  8/24/10 Tr. at 13:17-14:7 (Exall).

    10.7.3.    Mr. Exall testified that in September 2008 he did not have a clear
understanding regarding the precise nature of Barclays' legal obligations
under the APA.  8/23/10 Tr. at 187:16-19, 188:1-15 (Exall).

    10.7.4.    Mr. Exall testified that his conversation with Mr. Guarnuccio was "around
Barclays' overall compensation plans" and that Mr. Guarnuccio may have
misunderstood the conversation.  8/23/10 Tr. at 187:8-11, 188:1-8 (Exall).

10.7.5.    In any event, whatever Mr. Exall might have thought or said in a conversation with Mr. Guarnuccio, it does not reflect what any negotiator of the Sale believed or intended in negotiating the terms of the APA. *See* FOF ¶ 104.

10.8.    PwC eventually signed off on the accruals that Barclays made in connection with the Sale transaction, which reflected a $2 billion accrual for both bonus and severance payments. 8/23/10 Tr. at 188:18-22 (Exall); 9/2/10 Tr. at 40:5-9 (Romain).

**11.    Barclays Paid Over $1.95 Billion In Bonus, Severance, And Related Tax Obligations Pursuant To Its Obligations Under The APA.**

11.1.    As Paul Exall, Barclays' Head of Compensation Analytics, testified, as early as September 23, 2008, Barclays' compensation modeling indicated that Barclays would have to spend as much as $1.77 billion on 2008 bonuses for Transferred Employees, not counting severance payments (which ultimately totaled $265 million).  8/23/10 Tr. at 185:8-14 (Exall); 8/24/10 Tr. at 54:17-55:4, 56:23-57:11, 89:25-91:2 (Exall); *see* M. 91 at 2 (discussion of "Sensitivity Analysis"); BCI Ex. 142 (entries for "Severance").

11.2.    Barclays' Paul Exall created a schedule for use by Barclays' outside auditor, PwC, to show the amount Barclays paid or committed to pay to or on behalf of Transferred Employees for pre-acquisition services — including bonus, severance payments, and related taxes.  BCI Ex. 142.

    11.2.1.    Paul Exall created the schedule identified as BCI Ex. 142 (the "Compensation Schedule").  8/23/10 Tr. at 189:2-6 (Exall); Exall Dep. Tr. at 61:21-62:10 (Discussing Dep. Exhibit 281B, which was marked at Trial as BCI Ex. 142).

    11.2.2.    The Compensation Schedule was created for use by Barclays' outside auditor PricewaterhouseCoopers.  Exall Dep. Tr. at 20:16-21:9; 74:2-9; 75:2-8.

    11.2.3.    As Mr. Exall testified, the Compensation Schedule details "the discharge of our obligations to former Lehman Brothers employees in respect of their prior service and compensation for their prior service for Lehman Brothers."  Exall Dep. Tr. at 74:2-9.

11.3.    Excluding the bonus component of severance payments it has made or committed to make, Barclays has incurred $1.674 billion in 2008 bonus payments and related taxes to, or on behalf of, Transferred Employees.

    11.3.1.    The Compensation Schedule includes an entry under "Payments" for "Bonus including social tax" of $1.529 billion.  This amount includes $1.271 billion in cash bonus amounts and $258 million in equity bonus awards.  BCI Ex. 142.

        11.3.1.1    The Compensation Schedule includes a "Payable in future" entry for "Payroll tax on Equity compensation" of $9 million.  This amount relates to the $258 million in equity bonus awards, and is therefore properly characterized as bonus.

    11.3.2.    The Compensation Schedule includes an entry under "Payments" for "IBD Grad Programmes" of $11 million.  BCI Ex. 142.

        11.3.2.1    As Mr. Exall testified, payments for "IBD Grad Programmes" "were the annual bonuses payable to graduates that were on our investment banking graduate program.  But they were former Lehman Brothers graduates that we obviously took on as part of the acquisition."  8/23/10 Tr. at 192:7-14 (Exall).

11.3.2.2    The entry of $11 million for "IBD Grad Programmes" is therefore properly characterized as a bonus.

11.3.3.    The Compensation Schedule includes an entry under "Payable in future" for "Acquisition Buyout vesting over 2 years," of $53 million.  BCI Ex. 142.

11.3.3.1    As Mr. Exall testified, payments for "Acquisition Buyout vesting over 2 years" "related to performance bonus awards that were due and payable to an individual under his contract with Lehman Brothers that Barclays matched as part of the acquisition."  8/23/10 Tr. at 193:17-23 (Exall).

11.3.3.2    The entry of $53 million for "Acquisition Buyout vesting over 2 years" is therefore properly characterized as a bonus.

11.3.3.3    The Compensation Schedule includes a "Payable in future" entry for "Payroll taxes on Acq. buyout" of $3 million.  This amount relates to the $53 million in "Acquisition Buyout" performance bonus awards, and is therefore properly characterized as bonus.

11.3.4.    The Compensation Schedule includes an entry under "Other items" for "ISP Awards" of $56 million.  BCI Ex. 142.

11.3.4.1    As Mr. Exall testified, the "incentive share plan" ("ISP") is "the name of the stock award program we have in place at Barclays." Exall Dep. Tr. at 141:24-142:3.

11.3.4.2    As Mr. Exall further testified, the figure for ISP awards on BCI Ex. 142 relates solely to pre-acquisition obligations of Transferred Employees.  Exall Dep. Tr. at 151:5-14.

11.3.4.3    The entry of $56 million for "ISP Awards" is therefore properly characterized as a bonus.

11.3.4.4    The Compensation Schedule includes an "Other Items" entry for "Payroll taxes on ISP awards" of $2 million.  This amount relates to the $56 million in "ISP Awards," and is therefore properly characterized as bonus.

11.3.5.    The Compensation Schedule includes an entry under "Payments" for "Replacement RSUs" of $11 million.

11.3.5.1    As Mr. Exall testified, Replacement RSUs were "cash awards that Barclays gave to former Lehman Brothers employees to replace the lost value of bonus awards that they had received earlier in 2008 from Lehman Brothers."  8/23/10 Tr. at 191:20-22 (Exall).

11.3.5.2    The entry of $11 million for "Replacement RSUs" is therefore properly characterized as a bonus.

11.4.    Barclays has paid or committed to pay approximately $265 million in severance payments to Transferred Employees in connection with their pre-acquisition services for Lehman.

11.4.1.    The Compensation Schedule includes a "Payments" entry for "Severance" of $238 million.

11.4.2.    The Compensation Schedule includes a "Payable in future" entry for "Severance" of $27 million.

11.5.    Barclays has paid or committed to pay $12 million in payroll amounts for Transferred Employees in connection with their pre-acquisition services for Lehman.

11.5.1.    The Compensation Schedule includes a "Payments" entry for "Pre 22/9 payroll items" of $12 million.  *See also* Exall Dep. Tr. at 79:4-80:15.

11.6.    Pursuant to its obligations under the APA, Barclays has paid or committed to pay a total of $1.951 billion in compensation to, or on behalf of, Transferred Employees in connection with their pre-acquisition services for Lehman — including predominantly bonus, severance payments and related taxes.  This total is consistent with the $2 billion estimate provided to the Court on September 19, 2008, and set forth on the Berkenfeld Schedule.  BCI Ex. 142. BCI Ex. 49 (9/19/08 Tr.) at 99:22-25 (Miller); BCI Ex. 106; *see also* FOF ¶10.

**12.    Lehman Executives Made A Good Faith Effort To Estimate The Total Exposure Barclays Faced With Respect To Its Obligations Under § 2.5 Of The APA To Make Cure Payments For Any Contract It Chose To Assume Within 60 Days Of Closing (As Well As Related Contract Payments Required By § 2.5).**

12.1.    Section 2.5 of the APA provides that Barclays would be responsible for paying both (a) the ordinary course amounts due under any "Related Contracts" (as defined in the APA) until such contracts were designated as either "Rejected Contracts" or "Purchased Contracts" (both as defined in the APA), and (b) the "cure amount" with respect to any Related Contract that Barclays chose (in its sole discretion) to designate as a Purchased Contract within 60 days of the Closing.  BCI Ex. 1 (APA) at § 2.5.

12.2.    The estimates provided during the week of the potential exposure Barclays faced for payments under § 2.5 of the APA were made by Lehman executives, not by Barclays employees.  4/26/10 Tr. at 161:11-19 (McDade); 4/29/10 Tr. at 122:18-23 (Lowitt); 4/29/10 Tr. at 198:17-199:4 (Clackson); 5/7/10 Tr. at 151:2-16 (Ricci).

12.3.    Lehman employees made a good faith estimate of Barclays' maximum potential exposure to make payments under § 2.5 of the APA.  8/23/10 Tr. at 100:7-15 (Shapiro).

12.3.1.    As Mark Shapiro testified, the cure number "was an estimate.  And it was our best guesstimate, effectively, as to what Barclays might have to pay in the event that it took on, you know, a substantial portion of the contracts. But there was no guarantee, certainly, that anybody who's a bankruptcy practitioner and, you know, there were, obviously, a lot of sophisticated bankruptcy practitioners around this transaction, knew that that 1.5 billion dollar number was an up to number.  It could be smaller, frankly, it could have been larger."  8/23/10 Tr. at 100:7-15 (Shapiro).

12.4.    The estimate for the maximum potential exposure Barclays might have to pay under § 2.5 of the APA was necessarily broader than the estimated accrual for LBI's trade payables, as shown on the provisional LBI balance sheet, because (a) the estimated LBI accrual would not include amounts owed on contracts with non-LBI entities, such as LBHI, which might have contractual relationships with vendors or counterparties who service the Business, and hence be among those Barclays could assume, (b) the estimated LBI accrual would not include amounts owed for services performed (or about to be performed during the 60 day period covered by § 2.5) but not yet invoiced, and (c) the estimated LBI accrual would not include amounts owed on contracts that were not trade or vendor payables as such, but rather amounts owed on trading contracts that might be designated as Purchased Contracts.  4/28/10 Tr. at 284:19-285:18 (Kelly); 9/29/10 Tr. at 24:19-25:12 (Coles).

12.5.    The cure estimate was necessarily uncertain and reflected a large potential exposure because the Business was very large and had a substantial number of contracts that might require cure payments if assumed.  8/23/10 Tr. at 44:16-25 (Shapiro); 4/28/10 Tr. at 114:22-115:19 (Miller).

12.6.    Mr. McDade made a good faith effort to ensure that the cure estimate was based on reasonably accurate information.  4/26/10 Tr. at 169:20-170:1 (McDade).

12.7.    All Lehman executives with knowledge of the Cure estimate believe that it was based on the best good faith effort at the time, but was necessarily very uncertain.  8/23/10 Tr. at 44:16-25, 100:7-15 (Shapiro); 4/26/10 Tr. at 169:20-170:1 (McDade); 4/27/10 Tr. at 175:19-176:10 (Berkenfeld); 4/29/10 Tr. at 92:13-19; 4/28/10 Tr. at 285:25-286:7 (Kelly).

12.8.    Acting as administrator of LBHI, Alvarez & Marsal knew at the time of the Sale that estimating cure exposure for such a large business would be a "Herculean task" and that it would be "pretty spectacular" to get "close to the real number."  9/29/10 Tr. at 24:19-25:12 (Coles).

    12.8.1.    Mr. Coles testified about the efforts conducted by Lehman to estimate the cure exposure and explained that "it was usually a Herculean task for an organization to reach out across its subsidiaries, get a copy of every executory contract and then attempt to figure out how much could be — would need to be paid to cure it.  If this came out on — came to me probably on the 19th, so it might have been done on the 18th, that was pretty spectacular to get that close to the real number for what must have been thousands of executory contracts."  9/29/10 Tr. at 24:19-25:12 (Coles).

    12.8.2.    Mr. Coles testified:

> "Q.    Have you seen and experienced those estimates ending up being off by a wide margin?
>
> A.    Yes.  But if on the trying to identify the pool and then by what ultimately a purchaser might be able to negotiate to get these contracts assumed and assigned out.
>
> Q.    Is that based on your experience in the business?  Is it understood that these are fairly, you know, rough estimates and difficult estimates to come up with?
>
> A.    It's easier to know the — it's difficult to work out the total potential exposure but it's possible, and then from that total exposure it's typical for the actual liability that is settled by a purchaser to be markedly lower than that."
>
> 9/29/10 Tr. at 25:13-24 (Coles).

12.9.    The law firm representing LBHI and LBI, Weil Gotshal, informed the Court in the Sale Motion and at the Sale Hearing that the cure estimate was an estimate of "potential exposure" and was a contingent (and therefore uncertain) number.  BCI Ex. 49 (9/19/08 Tr.) at 100:1-4 (Miller); BCI Ex. 11 (Sale Motion) at ¶ 14; BCI Ex. 1 (APA) at § 2.5.

**13.    Barclays Satisfied Its Obligation To Make Cure Payments For Any Contract It Chose To Assume Within 60 Days Of Closing.**

13.1.    On September 19, 2008, the proposed cure amounts for Closing Date Contracts to be assumed by Barclays were posted publicly on the Epiq website.  BCI Exs. 12-15.

13.2.    On October 1, 2008, revised cure amounts for Closing Date Contracts to be assumed by Barclays were posted publicly on the Epiq website.  BCI Exs. 22-24.

13.3.    As of November 21, 2008, the proposed cure amounts for all Designated Contracts to be assumed by Barclays were posted publicly on the Epiq website.  BCI Ex. 506.

13.3.1.    As of November 21, 2008, the proposed cure amounts for all Designated Contracts to be assumed by Barclays that were posted publicly on the Epiq website showed total cure amounts of $109 million.  BCI Ex. 506.

13.4.    As of July 14, 2009, cure amounts under Closing Date Contracts and Designated Contracts totaled $238 million.  BCI Ex. 171; *see* Stipulations of Fact at ¶ 128.

13.5.    As of September 2, 2010, the total amount Barclays had paid on cure amounts for Closing Date Contracts and Designated Contracts was over $240 million.  9/2/10 Tr. at 47:2-48:4 (Romain); *see also* Stipulations of Fact at ¶ 128.

13.6.    In addition to the approximately $240 million Barclays has paid in cure amounts, Barclays also paid millions more to cover the ordinary course amounts owed for services performed during the 60 days after the Closing, as specified in § 2.5 of the APA — amounts which are not reflected on the Barclays Acquisition Balance Sheet.  9/2/10 Tr. at 44:23-45:4 (Romain).

13.7.    Movants make no allegation that Barclays has failed to make any of the payments required under § 2.5 of the APA.  LBHI Br. at ¶¶ 155-58; Committee Br. at ¶ 57.

**14.    Prior To Closing, Barclays Did Not And Could Not Know How Much It Would Need To Spend To Satisfy Its Comp And Cure Obligations.**

14.1.    Before the Closing, Barclays did not have the time and information needed to do a proper integration analysis to determine which contracts Barclays would need to assume, and therefore it could not know how much it would have to pay in cure payments.  4/30/10 Tr. at 72:1-12, 74:2-75:14 (Clackson); 4/28/10 Tr. at 114:22-115:19 (Miller); 8/23/10 Tr. at 44:6-45:15(Shapiro); 8/31/10 Tr. at 92:16-25, 93:9-12, 235:20-236:7 (Lewkow).

14.2.    The cure estimate was provided by Lehman and Barclays had no idea how that number was calculated.  4/30/10 Tr. at 72:1-12, 73:5-11 (Clackson); 4/26/10 Tr. at 161:11-19 (McDade); 4/29/10 Tr. at 122:18-23 (Lowitt).

14.3.    Under the September 17, 2008 Order (I) Approving the Break-Up Fee and Expense Reimbursement, (II) Certain Matters Relating to Competing Bids, if Any, (III) Approving the Form and Manner of Sale Notices and (IV) Setting the Sale Hearing Date in Connection With the Sale of Certain of the Debtors' Assets, Barclays was required to assume certain Closing Date Contracts before the Closing and Barclays posted a list of those most essential contracts with proposed cure amounts before the Sale Hearing.  BCI Exs. 12-15.

14.4.    Barclays received an estimate of $200 million for "mission critical" contracts, but that estimate related only to potential Closing Date Contracts, not to the entire universe of contracts Barclays might assume.  8/23/10 Tr. at 55:11-14, 55:17-22 (Shapiro); *see also* 6/22/10 Tr. at 226:12-16 (Cox).

14.5.    The document showing Archie Cox's handwritten notes referring to an estimated $200 million cure amount for "mission critical" contracts was referring to the Closing Date contracts, not to all of the potential contracts Barclays might assume.

    14.5.1.    Archie Cox of Barclays received a faxed copy of the Berkenfeld Schedule at 10:55 am on September 18, 2008, the day before Barclays need to post cure amounts for Closing Date Contracts, and he wrote on that document: "We needed these contracts…The 200 mil is more than 3,000 contracts mission critical."  M. 11.

14.6.    As Archie Cox explained, the 3,000 contracts "was an estimate of what the number of contracts that were mission critical, and I think the 200 million is an estimate of what would be owed on those contracts."  6/22/10 Tr. at 226:12-16 (Cox).

14.7.    The Committee admitted that the estimated cure liability was necessarily contingent because it was based on those contracts that Barclays, in its sole discretion, would choose to assume within 60 days of Closing.  5/7/10 Tr. at 12:5-7, 13:21-22 (Burian); 6/25/10 Tr. at 99:15-100:7 (Despins); O'Donnell Dep. Tr. at 95:23-96:11; 12/17/09 Burian Dep. Tr. at 268:18-269:3, 269:19-270:2.

14.8.    As Mr. McDade and Mr. Miller testified, the estimated Cure liability was necessarily contingent because it was based on those contracts that Barclays, in its sole discretion, would choose to assume within 60 days of Closing.

14.8.1.    Mr. McDade knew that the cure estimate was an uncertain amount because the amount of the liability was contingent on Barclays' decision to assume or not certain contracts, at Barclays' sole discretion. 4/27/10 Tr. at 52:19-53:11 (McDade).

14.8.2.    As Mr. Miller testified, "Under the terms of the transaction, there was an opportunity for Barclays to take assignments of executory contracts and perhaps leases. Obviously, in the short time frame, there had been no determination as to what executory contracts or what leases would be assumed. And a figure was derived as to the potential exposure. *This was a contingent figure.* If they assumed — I mean, if all those contracts were assumed by the debtor-in- possession and then assigned to Barclays, these — this amount might be the cure amount." 4/28/10 Tr. at 32:8-19 (Miller) (emphasis added); *see also id.* at 112:11-20; Miller Dep. Tr. at 81:5-10.

14.9.    The amount Barclays would have to pay in bonuses and severance payments to Transferred Employees was uncertain.

14.9.1.    Because Barclays did not have time before Closing to do an integration analysis, it was not known how many employees would be kept and how many would be terminated, and therefore the total severance liability was uncertain. 4/28/10 Tr. at 114:7-25 (Miller).

14.9.2.    Because most Transferred Employees did not have contractually guaranteed bonus amounts, the amount of their bonus entitlement was uncertain, and was determined based both upon a formula that attempted to pay them less than their 2007 bonus (to reflect market conditions), while also attempting to ensure that the key employees and groups were retained by the Business. BCI Ex. 579; McGee Dep. Tr. at 30:7-32:19, 72:15-74:9, 74:13-24.

14.9.3.    Thus, as Harvey Miller testified, the total amount that Barclays would end up having to pay in bonuses and severance payments was an uncertain, contingent amount. Miller Dep. Tr. at 81:5-14.

14.9.4.    Mr. Clackson testified:

"Q.    And the 1.35, once again for me and for His Honor, what does that refer to in terms of the comp? What are you moving off of the acquisition balance sheet in terms of comp and over toward your profit and loss statement?

A.    So the estimate we had for comp there was number 2 in that formula. So I think we had an estimate that we were going to pay two billion dollars. And in terms of what accounting liability we'd

reflect in the opening balance sheet or the completion balance sheet, at the time we thought we would only reflect accounting liability for bonuses, where we had a name-by-name list of the bonuses we were going to guarantee to individuals.  So of that two billion, the 1.35 was the amount where I thought we had a name-by-name list. The balance, the 650 million dollars balance, I think as I said yesterday, was money which we're expected to spend for the other individuals who were taking on the other of the 10,000 people we were taking. We didn't know how many of those we would keep or whether they would go, and so we didn't know whether that conversation on liability related to bonus or severance."

4/30/10 Tr. at 86:20-87:14 (Clackson).

14.9.5.    Mr. Ricci testified that, "Early in the week, we had various conversations about both the treatment, accounting treatment of the comp accrual as well as the cure accrual and there was some discussion about whether, you know, we would trade in P&L for accounting purposes or balance sheet, it would have made a difference to the opening gain and there were some issues around the technical treatment of that, and what was appropriate."  5/7/10 Tr. at 255:19-256:4 (Ricci).

**15.    The Unrebutted Testimony Of Patrick Clackson And Gary Romain Established That Barclays Initially Planned To Account For Some Of Its Comp And Cure Obligations On Its Income Statements Rather Than Its Acquisition Balance Sheet.**

15.1.    The entries for Comp and Cure on the various draft acquisition balance sheets prepared by Barclays accounting personnel between September 15 and a few days after the Closing were not estimates of the total amount that Barclays expected or intended to spend on those line items, but instead reflected the amount that Barclays expected to have to accrue on its Acquisition Balance Sheet, not including amounts it might accrue on its Profit & Loss Statement (or Income Statement).  4/30/10 Tr. at 82:23-83:11, 85:2-25, 86:20-87:21, 89:18-90:5 (Clackson); 9/2/10 Tr. at 42:9-43:3 (Romain).

15.2.    There was an initial belief that Barclays would account for the cure liability on future P&L statements, and not on the Acquisition Balance Sheet.  BCI Ex. 289.

15.3.    During the week before the Closing, Barclays accounting personnel prepared draft acquisition balance sheets on the assumption that the applicable accounting rules would require that at least some portion of Barclays' spend on Comp and Cure be accrued on future income (P&L) statements, whatever the amount spent ultimately proved to be.  4/30/10 Tr. at 82:23-83:11, 85:2-25, 86:20-87:21, 89:18-90:5 (Clackson); 9/2/10 Tr. at 41:23-42:16 (Romain).

15.4.    In preparing its draft acquisition balance sheets, Barclays' accounting personnel were required to determine the appropriate accounting treatment for whatever amounts would be spent, allocating the anticipated spend on each of those line items between liabilities to be accrued on the acquisition balance sheet and costs that would be charged to future income (P&L) statements.  4/30/10 Tr. at 82:23-83:11, 85:2-25, 86:20-87:21, 89:18-90:5 (Clackson); 9/2/10 Tr. at 41:23-42:17 (Romain).

15.5.    During the September 15-16 negotiations, for example, the Barclays CFO, Patrick Clackson, expected to be able to be able to account for all of the estimated Cure liabilities and $650 million of the estimated comp liability on the Barclays' income statement, not on the Acquisition Balance Sheet.  4/30/10 Tr. at 82:23-83:11, 85:2-25, 86:20-87:21, 89:18-90:5 (Clackson).

15.6.    As Mr. Clackson testified, his initial belief that he could account for part of the comp liability on Barclays' future income statement was incorrect, and he realized that there "would actually be a liability [he]'d have to assume on day one against [his] acquisition balance sheet." 4/29/10 Tr. at 217:14-218:8 (Clackson); *see also* M. 24.

15.7.    Mr. Clackson's initial belief that he could account for part of the comp liability on Barclays' future income statement did not affect the amount Barclays "was going to pay" and is consistent with Barclays' intent to comply with its compensation obligations under the Purchase Agreement, and with the reasonableness of the estimates given for the Barclays exposure for the Cure and Comp obligations.  4/29/10 Tr. at 257:18-258:15 (Clackson).

v.    **Facts Showing The Significance Of The Barclays Need For Capital Accretion, The Public Announcement Of The Expected Acquisition Gain, And The Consistency Of That Gain With The Sale Being In The Best Interests Of The Lehman Estates And Creditors.**

16.    **Barclays Could Not, And Would Not, Have Agreed To The Sale Unless It Believed The Sale Was Likely To Result In An Acquisition Gain That Would Protect Its Regulatory Capital Position.**

16.1.    The Barclays' Board and Barclays' management believed it was critically important for Barclays to ensure that the accounting impact of the Sale on the Barclays balance sheet would not impair capital, but instead would result in positive regulatory capital accretion. 6/21/10 Tr. at 148:11-25 (Diamond); 6/22/10 Tr. at 91:2-24, 103:2-17 (Varley).

16.2.    While Barclays expected and needed an accounting gain on its Acquisition Balance Sheet to protect its capital, there were no guarantees that it would actually realize that gain. 6/21/10 Tr. at 119:13-120:14, 141:4-142:5, 144:8-23, 148:11-149:14, 171:10-172:2, 233:3-234:16 (Diamond); 6/22/10 Tr. at 102:16-103:1, 113:11-18 (Varley); *see* 9/2/10 Tr. at 80:4-19 (Romain); LaRocca Dep. Tr. at 47:7-49:12; BCI Exs. 292, 290, 289, M. 580, M. 806.

16.2.1.    Approximately 60% of the trading assets acquired by Barclays were classified by Lehman as Level 2 or 3 assets, which means they were illiquid, they could not be valued reliably based upon a daily transaction price, and their value could vary significantly based upon differences in judgment, and changes in the market.  10/6/10 Tr. at 93:10-94:21 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 29).

16.2.2.    Many of these assets were extremely complex, structured financial products — such as collateralized debt obligations (CDOs), collateralized loan obligations (CLOs), residential mortgage backed securities (RMBS), and other kinds of asset-backed securities (ABS), the valuation of which were being widely questioned in the middle of the financial crisis.  BCI Exs. 988, 986, 987, 1095 at p. 2, 1103a (Pfleiderer Demonstrative 5-6); 10/6/10 Tr. at 26:19-32:11 (Pfleiderer).

16.2.3.    As of the Closing, Barclays was unable to determine from Lehman what the "risk position" was in relation to the ETD accounts Barclays had acquired. BCI Ex. 290, 294.

16.2.4.    On the night of the Closing, in an email that directly reflected the immense risk Barclays had just taken and the enormous uncertainty over the value of the assets Barclays had received, Barclays COO Rich Ricci emailed Barclays CFO Patrick Clackson and told him that he was "Scared to death."  BCI Ex. 292.

16.2.5.    On the night of the Closing, in response to emails reflecting the uncertainty over the value of the assets Barclays had received and the fact that Barclays

believed that "outside the repo, not enough assets," Barclays COO Rich Ricci emailed Barclays CFO Patrick Clackson and told him that "I am worried." M. 580.

16.2.6.     Gary Romain, Barclays' lead accountant on the deal, wrote on the day of the Closing, "we've basically got no idea where negative goodwill will end up…" BCI Ex. 289.

16.2.7.     Gary Romain testified at trial that at the time of the Closing Barclays could not and did not know what if any negative goodwill would be reflected on the final Acquisition Balance Sheet.  9/2/10 Tr. at 80:4-19 (Romain).

16.2.8.     As reflected in the emails of Barclays COO Rich Ricci stating that he was "Scared to death" and "worried," and as proven by the uncertain values associated with the assets Barclays had acquired, Barclays was not and could not be certain whether it would record the acquisition gain that had been described to the Barclays board and public investors.  BCI Ex. 292; M. 580; BCI Ex. 289; 9/2/10 Tr. at 80:4-19 (Romain); 10/6/10 Tr. at 93:10-94:21, 212:15-216:7 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 29).

**17.    The Fact That Barclays Expected To Record A Multi-Billion Dollar Acquisition Gain Was Not A Secret, But Instead Was Something That Barclays Publicly Announced On September 17, 2008, The Same Day That The APA Was Filed In Court.**

17.1.    Barclays made no effort to keep secret the fact that it expected and planned for the Sale to result in a multi-billion dollar acquisition gain on its Acquisition Balance Sheet.  BCI Ex. 110; 6/22/10 Tr. at 91:17-21 (Varley); 6/21/10 Tr. at 141:16-142:5 (Diamond); 5/3/10 Tr. at 14:9-13 (Hughes); 5/7/10 Tr. at 146:21-147:2 (Ricci).

17.2.    On September 17, 2008, Barclays announced its planned acquisition of Lehman, publicly stating:

17.2.1.    That the deal involved a $4 billion buffer between trading assets and trading liabilities (BCI Ex. 110 at p. 2; M.263 at 25458);

17.2.2.    That Barclays had "structured" the Sale in order to "ensure" that the transaction had a "buffer" that it "absolutely expect[ed] to preserve" (BCI Ex. 110 at p. 5);

17.2.3.    That Barclays expected a post-tax accounting gain (assets greater than liabilities) of approximately $2 billion (BCI Ex. 110 at pp. 2, 5); and

17.2.4.    That the expected accounting gain was attributable to the $4 billion buffer and to financial assets that would increase its Tier 1 Capital (BCI Ex. 110 at p. 5).

17.3.    Prior to the Sale Hearing, the worldwide financial press reported that the Sale had a $4 billion buffer and that Barclays expected to record a multi-billion dollar acquisition gain. BCI Exs. 796, 111, 797, 798, 115.

17.4.    Bart McDade and the Committee were aware of Barclays' publicly announced expectation of an acquisition gain prior to the Sale Hearing and the Closing.

17.4.1.    On September 17, 2008, the fact that Barclays publicly announced its expectation that it would record a multi-billion dollar post-tax gain was emailed to Bart McDade and other senior Lehman executives.  BCI Ex. 189 at p. 2.

17.4.2.    On September 17, 2008, Bart McDade received and opened the email discussing the Barclays expectation of an accounting gain from the Sale.  BCI Ex. 190; 4/27/10 Tr. at 56:17-58:2.

17.4.3.    Before the Sale Hearing, the Committee knew of Barclays' publicly announced expectation of a multi-billion dollar post-tax gain, and received information from one of its creditors stating that Barclays was receiving a "windfall discount" of "at least several billion dollars." BCI Ex. 198, 219.

17.4.4.    Before the Closing, the Committee distributed to its members the complete transcript of the Barclays investor teleconference describing Barclays' publicly announced expectation of an acquisition gain.  BCI Ex. 261 at 9128.

17.4.5.    At all times during the week leading up to the Sale, the Committee expected that Barclays would have an economic gain on the overall transaction and that it was "making out like bandits."  5/7/10 Tr. at 27:21-28:17, 36:16-37:9 (Burian).

**18.    An Acquisition Gain For Barclays Was Consistent With The Sale Being In The Best Interests Of The Lehman Estates And Creditors.**

18.1.    As Mr. McDade, Mr. Miller, and Mr. Ridings confirmed, Barclays' expectation of an acquisition gain was consistent with the transaction that they had intended to accomplish and which they had negotiated.  4/27/10 Tr. at 62:5-8 (McDade); 4/28/10 Tr. at 104:20-106:4 (Miller); Ridings Dep. Tr. at 65:10-15.

18.1.1.    Mr. Miller testified:

"Q.    If Barclays announced on September 17th, two days before the hearing, publically, in an analysts call, and reported in the press that it anticipated to have a multibillion dollar accounting gain if the sale were approved, would that be inconsistent with your understanding of the sale you presented to Judge Peck?

A.    Not inconsistent with my understanding.  We live in an era of financial engineering.  And an accounting gain, which is not, at least in my terms, in real money, would not have made any difference.

Q.    Would you also agree with me, it's not uncommon for someone to buy assets in a bankruptcy process and make money on that purchase?

A.    In my experience, people who come to the bankruptcy court to buy assets do not do it as eleemosynary institutions.

Q.    Are —

A.    They do it —

Q.    — I'm sorry.

A.    — in the hope that they're going to make money and that it's going to be in some way accretive to them.

Q.    And if they hope and announce that it may be accretive to them, are they required to file such statements — public statements in the court, in your experience?

A.    I don't know whether you're asking for a legal opinion or just general advice.  If your question is premised upon some fiduciary duty, I would have to explore that and research it. I don't think I'm really qualified to answer that question.

Q.    If a purchase made, as Barclays, I represent to you, that they did in a public announcement on the 17th of anticipated

accounting game in this proceeding, would you have brought it to the Court's attention on the 19th?

A.    I'm not quite sure I would have.  I don't — an accounting game really did not go to the substance of the transaction and I assume if they made a public announcement it was in the public domain."

4/28/10 Tr. at 104:20-106:4.

18.1.2.    Mr. Ridings testified:

"Again, my testimony was that it was the highest and best alternative that we had, and the alternative was liquidation.  I was confident and remain confident that this transaction was better than a liquidation would have been."  Ridings Dep. Tr. at 65:10-15

18.1.3.    Mr. McDade testified:

"Q.  Is there anything inconsistent with Barclays having after-tax negative goodwill immediately upon the closing of the transaction with what you were intending to accomplish?

A.  No."

4/27/10 Tr. at 62:5-8 (McDade).

18.2.    As Mr. McDade and Mr. Marsal admitted, an acquisition gain for Barclays was consistent with the Sale being the best option for Lehman because many of the assets had value to Barclays but likely little or no value to Lehman in a liquidation.  4/27/10 Tr. at 97:21-98:2 (McDade); 6/21/10 Tr. at 66:11-16 (Marsal).

18.3.    The contract provided that Barclays acquired the Purchased Assets irrespective of their values, but that does not mean values were irrelevant to the parties; in fact, there were good faith efforts throughout the week of September 15, 2008, to estimate the value of trading assets.

18.3.1.    Barclays needed the deal to be commercially acceptable and not to impair capital — assets had to be valued accurately to assess that.  5/3/10 Tr. at 17:5-18:15 (Hughes); 6/22/10 Tr. at 91:2-24, 103:2-17 (Varley).

18.3.2.    Lehman needed to ensure the Sale was the best alternative and better than a liquidation.  8/31/10 Tr. at 33:21-34:19 (Lewkow).

18.4.    Lehman's financial adviser Lazard and Bart McDade concluded that the Sale was the best alternative and better than a liquidation, and confirmed that conclusion in this litigation,

after reviewing the Barclays acquisition gain.  Ridings Dep. Tr. at 12:18-13:4, 65:10-15;
4/26/10 Tr. at 242:23-243:6 (McDade).

     **vi.**    **Facts Showing The Fed's Insistence That Barclays Replace Its Repo Loan,
The Risk Barclays Took In Undertaking The Repo Transaction, And The
Reasons Barclays Had For Doubting The Value Of The Repo Collateral.**

**19.**    **On Or Around September 16, 2008, The New York Federal Reserve Insisted That
Barclays Advance $45 Billion In Cash To Replace The Fed's "Repo" Loan To LBI.**

19.1.    To facilitate an orderly wind-down of LBI, the New York Federal Reserve provided
financing to LBI, pursuant to a repurchase agreement, in an amount exceeding $45
billion.  BCI Ex. 30; 9/7/10 Tr. at 7:9-8:14 (Leventhal); Miller Dep. Tr. at 36:24-39:4;
5/7/10 Tr. at 182:11-183:18 (Ricci); 4/26/10 Tr. at 187:1-8 (McDade); and 4/30/10 Tr. at
175:6-21 (Hughes).

19.2.    On learning of a potential sale of LBI's Business to Barclays, the NY Fed decided that it
wanted Barclays, rather than the NY Fed, to bear the risk of lending tens of billions of
dollars to LBI against the assets pledged in the repo pending the closing.  BCI Ex. 30;
9/7/10 Tr. at 7:9-8:23, 23:18-24:8 (Leventhal).  Stipulation of Fact ¶ 134.

19.3.    As stated in the unrebutted testimony of Shari Leventhal of the New York Federal
Reserve, among others, the NY Fed "required Barclays to agree to assume the obligation
to finance LBI."  BCI Ex. 30; 9/7/10 Tr. at 8:24-9:2 (Leventhal); 4/26/10 Tr. at 187:1-8
(McDade); 4/30/10 Tr. at 175:6-21 (Hughes); Miller Dep. Tr. at 36:24-39:4; 5/7/10 Tr. at
182:11-183:18 (Ricci); and Ridings Dep. Tr. at 43:19-44:14.

19.4.    The Order governing sale procedures that this Court entered on September 17, 2008,
expressly required any bidder to agree to assume the obligation to finance LBI as a
condition for bidding on the Sale.  *See* September 17, 2008 Order (I) Approving the
Break-Up Fee and Expense Reimbursement, (II) Certain Matters Relating to Competing
Bids, if any, (III) Approving the Form and Manner of Sale Notices and (IV) Setting the
Sale Hearing Date in Connection with the Sale of Certain of the Debtors' Assets (Docket
No. 88) at Exhibit A, ¶ 3.

**20.    On September 18, 2008, Barclays Advanced $45 Billion In Cash To Replace The NY Fed's Repo Loan To LBI.**

20.1.    On September 18, 2008, Barclays Advanced $45 Billion In Cash To Replace The NY Fed's Repo Loan To LBI.  5/3/10 Tr. at 32:22-33:9 (Hughes); 6/22/10 Tr. at 168:19-169:4 (Varley); LaRocca Dep. Tr. at 36:9-41:10; Hraska Dep. Tr. at 56:22-57:7; Rodefeld Dep. Tr. at 22:24-25:5; BCI Ex. 30 at ¶ 11; BCI Ex. 50 (12/22/08 Tr.) at 19:11-15 (Kobak); BCI Exs. 116-121.  Stipulation of Fact ¶ 136.

**21.**    **Barclays Would Never Have Agreed To Do The Fed Repo Replacement Transaction Absent Its Desire To Acquire The Business For Strategic Purposes.**

21.1.    The Fed Repo Replacement Transaction increased the risk to Barclays because it required Barclays to make a $45 billion cash payment in return for assets that were not subject to adequate due diligence and were of uncertain total value.  6/22/10 Tr. at 172:16-173:18 (Varley); 5/3/10 Tr. at 33:6-24, 39:22-40:17 (Hughes); 4/29/10 Tr. at 202:9-21 (Clackson).

21.2.    Absent its desire to acquire Lehman's North American business assets, Barclays would not have entered into the Repo Replacement Transaction.  8/25/10 Tr. at 54:6-55:10 (King).

21.3.    The Fed Repo Replacement Transaction required Barclays to put $45 billion in capital at risk in order to receive an unhedged book of long positions at a time of extreme uncertainty in the markets, something no other market participant appeared willing to do. 8/27/10 Tr. at 46:2-47:15 (Klein).

21.4.    Assumption of the Fed Repo was a condition of any competing bid under the bidding procedures ordered by the Court, and no competing bidder willing to assume that risk ever emerged.  9/7/10 Tr. at 8:24-10:10, 80:16-17 (Leventhal).

21.5.    Because it required Barclays to transfer $45 billion in cash to acquire an unhedged portfolio of assets, the Repo Replacement Transaction substantially increased the risk to Barclays in the overall Sale Transaction, which was originally intended to convey a hedged portfolio of assets (Long Positions and Short Positions).  BCI Ex. 1 (APA) at p. 6 and § 2.3(i); 9/7/10 Tr. at 15:2-5 (Leventhal).

**22.    In Return For Its $45 Billion Cash Advance, Barclays Was Entitled To Receive Repo Collateral That Exceeded $45 Billion In Value By An Amount Consistent With The Terms Of The NY Fed Repo Loan That It Was Replacing.**

22.1.    Repo transactions typically contain haircuts where the amount of the loan advanced is less than the amount of the collateral offered to secure the loan.  9/7/10 Tr. at 52:5-53:13 (Leventhal); 5/6/10 Tr. at 111:8-13 (Kobak); 5/7/10 Tr. at 204:16-25 (Ricci); Petrie Dep. Tr. at 78:2-6; Tonucci Dep. Tr. at 17:5-15.

22.2.    The New York Federal Reserve Bank (The "Fed") applied haircuts to the collateral that it lent against in the Fed Repo based on a schedule approved by the Fed's Board of Governors.  9/7/10 Tr. at 50:22-51:14, 119:18-120:14 (Leventhal); *see* 4/28/10 Tr. at 63:8-13 (Miller).

22.3.    The Fed Repo was structured so that the Fed would lend Lehman cash in exchange for collateral with value in excess of the loan in an amount determined by the haircut schedule.  9/7/10 Tr. at 50:22-51:14, 90:9-13, 119:18-120:14 (Leventhal).

22.4.    As Mr. Miller told the Court on September 19, 2008, Barclays had stepped into the shoes of the Federal Reserve in connection with a $45 billion Repo Transaction and acquired the "collateral that Lehman had posted in connection therewith."  BCI Ex. 49 (9/19/08 Tr.) at 63:16-22 (Miller).

22.5.    As it was replacing the Fed, Barclays was to receive the same collateral that had been used to secure the Fed Repo, according to terms consistent with those "used in the New York Fed's repurchase agreement with LBI on the night of September 17th" and therefore, according to these market standard terms, the amount of collateral would exceed the $45 billion advanced by Barclays by an amount consistent with the terms of the NY Fed's repo transaction.  BCI Ex. 30 at p. 5; 9/7/10 Tr. at 161:9-162:1, 162:9-163:3, 164:5-165:1 (Leventhal); 4/29/10 Tr. at 115:8-24 (Lowitt).

23.    **On September 18, 2008, Barclays Received Repo Collateral That Was Marked By Lehman At Less Than $43 Billion, And That Was Given Aggregate "Collateral Value" Marks By The Barclays Repo Custodian, Bank Of New York Mellon (BoNY), Of Approximately $43.1 Billion.**

23.1.    On September 18, 2008, Barclays received Repo Collateral that was marked by Lehman at less than $43 billion.  BCI Ex. 982; BCI. Ex. 144 at p. 4; BCI Ex. 532; BCI Ex. 650 at p. 67; 5/4/2010 Tr. at 53:22-54:13, 151:2-5 (Seery); Tonucci Dep. Tr. at 124:24-125:10; *see* 4/9/10 Tr. at 39:19-40:1 (Gaffey); *see also* BCI Exs. 736, 739.

23.2.    The Repo Collateral was given aggregate collateral value marks by Bank of New York Mellon (BoNY) of approximately $43.1 billion.  S*ee* BCI Ex. 144 at pp. 3, 5; BCI Exs. 332, 431; 8/25/10 Tr. at 63:14-64:10 (King).

**24.    Barclays Had Good Reasons To Doubt The Accuracy Of Both The Lehman Marks
And The BoNY Marks On The Repo Collateral That It Received On September 18,
2008.**

24.1.    The value of Lehman's trading assets was very much in doubt in September 2008, as the
financial markets were in their worst state of crisis since the Great Depression, and some
were predicting "The End of Capitalism."  BCI Exs. 887, 888.

24.2.    Lehman itself doubted the validity of its own marks, concluding that "many of these
positions were so illiquid that…if we were to try to sell them, given our
circumstances…the bids might be down 20 percent."  Kirk Dep. Tr. At 95:20-96:16.

24.3.    Lehman itself concluded that the value of the Repo Collateral was closer to $45 billion
than the $50 billion shown in the Lehman marks.  4/26/10 Tr. at 224:10-24 (McDade).

24.4.    When Barclays reviewed the Fed Repo Collateral — a different and more valuable
portfolio than what Barclays actually received — Barclays estimated its realizable value
to be $44.6 billion.  M.45; 8/25/10 Tr. at 53:3-19 (King).

24.5.    As Barclays' senior trader, Stephen King, testified, BoNY's custodial marks were
unreliable and overstated the value of the Repo Collateral.  8/25/10 Tr. at 173:1-8,
224:19-21, 225:10-13 (King); 10/6/10 Tr. at 101:17-102:3, 105:2-18 (Pfleiderer).

24.6.    Stephen King testified that his initial and very rough estimates indicated that the BoNY
marks on the Repo Collateral Barclays actually received on September 18, 2008 were
overstated by several billion dollars.  8/25/10 Tr. at 224:11-225:13 (King).

24.7.    The values reflected on M. 200 were BoNY marks, did not reflect any Barclays
valuations, and included $7 billion in assets that were not transferred to Barclays at the
time of the Sale, and that became the subject of the December Settlement.  Malloy Dep.
Tr. at 11:2-20.

24.8.    If Barclays had needed to liquidate the Repo Collateral immediately, rather than in an
orderly liquidation over time, there might not have been any bid for the portfolio or the
recovery could have been as low as "50 cents" on the dollar or in the range of "20 billion
dollars."  King Dep. Tr. 111:2-115:6.

24.9.    In a fire sale liquidation or an LBI liquidation absent a Sale, the Repo Collateral would
have been worth far less than $45.5 billion.  Ridings Dep. Tr. at 11:12-13:4; 5/4/10 Tr. at
21:6-23:1, 29:9-11 (Seery); 10/7/10 Tr. at 186:22-187:9 (Pfleiderer).

**25.    As Of September 19, 2008, Barclays Believed That Lehman And Its Repo Custodian, JPMorgan Chase ("JPM"), Would Make Up For The $7 Billion Shortfall In Repo Collateral By Delivering Additional Collateral That Was Likely Worth Considerably Less Than $7 Billion.**

25.1.    As of September 19, 2008 Barclays faced a shortfall of $7 billion in the Repo Replacement Transaction.  4/28/10 Tr. at 61:3-15 (Miller); 4/29/10 Tr. at 271:7-23 (Clackson); 8/25/10 Tr. at 55:20-56:9, 153:4-14 (King); BCI Ex. 30 at ¶¶ 12-14; BCI Ex. 29 at ¶¶ 11-12.

25.2.    As of September 19, 2008, JPM held collateral from LBI that included a set of securities, including RACERS, that Barclays believed to be of questionable value when Barclays refused to extend a $15.8 billion repo secured by those assets.  5/4/10 Tr. at 12:8-23, 13:14-14:2 (Seery); 9/7/10 Tr. at 26:16-27:2, 152:21-153:21-153:21 (Leventhal).

25.2.1.    When Barclays' John Mahon questioned Lehman's Jim Seery about whether the RACERS were "acceptable repo collateral," Mr. Seery advised him that "they may not be an appropriate security."  5/4/10 Tr. at 13:14-14:2, 144:5-145:19 (Seery).

25.3.    As of September 19, 2008, and thereafter, Barclays executives would have preferred to retain the $7 billion in cash that they believed was deposited in a Barclays account at JPM, rather than receive collateral that was worth substantially less than $7 billion.  8/25/10 Tr. at 165:13-22, 166:14-19 (King).

25.4.    During discussions held late in the evening on Sunday September 21, 2008 (or early in the morning on Monday September 22, 2008), Barclays understood that, in order to complete the repo transaction, JPM proposed transferring to Barclays securities marked at $8.55 billion, including the $5 billion of RACERS, the structured security that Barclays had previously rejected.  BCI Exs. 874, 962; 8/31/10 Tr. at 68:12-69:13 (Lewkow).

25.5.    After JPM had provided the list of securities it proposed transferring to make up for the $7 billion shortfall, Barclays expressed its concern that the securities were worth much less than, and perhaps half of, the marks of $8.55 billion.  Miller Dep. Tr. at 26:19-27:10; 9/7/10 Tr. at 26:16-27:2 (Leventhal).

25.6.    Contemporaneous notes taken by Lehman's Jim Seery on September 21, 2008 indicate that the Committee was present at a pre-Closing meeting in which Barclays estimated the value of the securities marked at $8.55 billion to be worth "50%" of the marked amount.  BCI Ex. 650 at p. 67; *see also* 5/4/10 Tr. at 49:18-56:8.

25.6.1.    Mr. Seery testified:

"Q.    Was there discussion at this meeting Sunday with JPMorgan of Barclays paying seven billion in cash back to Lehman in exchange for JPMorgan providing undelivered securities to complete the repo transaction?

> A.      JPMorgan was insisting that Barclays take all of the
> securities that were delivered, and they wanted the cash and
> wanted to deliver the 8.55 in securities to Barclays.
>
> Q.      The RACERS?
>
> A.      The RACERS.  Barclays was complaining about not only
> the RACERS but the other securities they got and the value of
> those securities and claiming that JPMorgan had put securities into
> that delivery that may not have been appropriate."
>
> 5/4/10 Tr. at 55:4-15 (Seery).

25.7.   Notes taken by Mark Korycki of Alvarez & Marsal confirm that the securities marked at
$8.55 billion were believed to be "worth ½ am't."  BCI Ex. 144 at p. 3.

25.8.   In the October and November 2008 settlement negotiations concerning the $7 billion
shortfall, JPM itself confirmed that the marks on some of the illiquid assets in a later
proposed set of settlement securities (which ultimately became Annex A to the settlement
agreement and were distinct from the set of securities proposed before the Closing) were
not "reliable indicators of realizable value."  M. 640; M. 641.

25.9.   Approximately $5 billion of the $8.55 billion consisted of the RACERS, which, Barclays
believed (and Lehman agreed), were worth significantly less than their marked value.
BCI Exs. 874, 962; Miller Dep. Tr. at 26:14-27:10; 8/27/10 Tr. at 67:15-24 (Klein).

> 25.9.1.    In a September 22, 2008 email, Barclays' Jasen Yang noted that the RACERS
> were worth, at most, 40-50% of their marked value.  BCI Ex. 962.
>
> 25.9.2.    Harvey Miller testified that early on the morning of September 22, 2008, the
> deal began to fall apart as a result of JPM's insistence that Barclays take the
> RACERS:
>
>> "And we thought everything was going well at that point, and
>> people proceeded all night working on finalizing the sale, the
>> closing.  And there were people sleeping all the over the place here
>> on the floor, and I think it must have been around 5 or 6 A.M.
>> when Archie Cox, who was I guess the senior officer of Barclays,
>> who had been here the whole weekend, came into one of the
>> conference rooms and said there's no deal, and I think that shocked
>> everybody. And when he was pressed why, he said because — and
>> he had a piece of paper in his hand — the securities that JPM was
>> going to release to Barclays in his view were simply not worth $7
>> billion.  And he particularly alluded to one security called the
>> Racers, R-A-C-E-R-S, which had an attributed value of $5 billion,
>> which he said wasn't worth anything close to $5 billion."
>>
>> Miller Dep. Tr. at 26:14-27:10.

25.9.3.    Michael Klein testified that Lehman's professionals agreed with Barclays' views as to the value of the RACERS:

> "A few hours thereafter, after this meeting, there was a set of securities runs that were delivered from JPM to Barclays; that was the run, or as I understood it to be the run, of the securities that would be transferred.  And at that time it was made aware to me — or it was made — I was made aware that the securities that were in that run were worth substantially less.  And in fact there was one particular security that I can recall that Lehman's professional said was worth next to zero, something called a RAZER or RACER, which had a notional five billion number."

8/27/10 Tr. at 67:15-24 (Klein).

**vii.** **Facts Showing Lehman's Inability To Deliver Purchased Assets, The Near Collapse Of The Sale, The Identification Of Assets That Still Could Be Delivered, And The Facts Proving That Those Assets Were Already Within The Definition Of Purchased Assets Under The APA.**

**26.** **By September 19, 2008, It Became Clear That Lehman Was Unable To Deliver The Inventory Of Financial Assets It Had Identified In The APA.**

26.1. By the morning of Friday September 19, it had become clear that Lehman was unable to deliver the other assets in the long inventory due to close outs by counterparties and JPMorgan's "hostile" actions.  BCI Ex. 49 (9/19/08 Tr.) at 61:14-19, 63:23-64:8 (Miller); 4/27/10 Tr. at 39:7-23 (McDade); 8/23/10 Tr. at 37:5-8 (Shapiro); Kirk Dep. Tr. at 54:16-55:10, 62:23-64:21, 72:10-19, 74:14-75:7, 4/29/10 Tr. at 163:12-14 (Lowitt); 5/7/10 Tr. at 209:9-11 (Ricci).

26.2. As Ian Lowitt testified, "[m]uch of the collateral that had been spoken about at the beginning of the week was not unencumbered and we were not in a position to deliver to Barclays."  4/29/10 Tr. at 163:12-14 (Lowitt).

26.3. As Mark Shapiro testified, he "was afraid, truthfully, that Barclays would not close because we were not able to convey to them what we originally said we were going to be conveying to them…." 8/23/10 Tr. at 37:5-8 (Shapiro).

26.4. Harvey Miller described this at the Sale Hearing, explaining the seizure and freezing of assets, and stating:  "the result is that we were unable — or LBI is unable to deliver to Barclays the assets that were originally intended under the APA.  That's one of the reasons, Your Honor, for the amendments that we heard about earlier today."  BCI Ex. 49 (9/19/08 Tr.) at 63:23-64:8 (Miller); *see id.* at 61:16-19.

**27.    Because Of Lehman's Inability To Deliver Assets, On September 19, 2008, Barclays Negotiators Told Lehman Negotiators That Barclays Might Not Be Able To Close The Transaction, And Asked Lehman's Negotiators What Other Assets In The Business Were Still Available To Be Transferred.**

27.1.    Unrebutted testimony established that the Sale was in danger of collapsing unless Lehman was able to identify assets in the Business that had value and were available to be transferred other than the Repo Collateral.  4/26/10 Tr. at 198:22-199:12 (McDade); 4/27/10 Tr. at 39:11-20 (McDade); 6/22/10 Tr. at 34:8-11 (Diamond); 5/3/10 Tr. at 36:3-22 (Hughes).

27.2.    By the morning of Friday September 19, it had become clear that Lehman was unable to deliver the other assets in the long inventory due to close-outs by counterparties and JPMorgan's "hostile" actions.  BCI Ex. 49 (9/19/08 Tr.) at 61:14-19, 63:23-64:8 (Miller); 4/27/10 Tr. at 39:7-23 (McDade); 8/23/10 Tr. at 37:5-8 (Shapiro); Kirk Dep. Tr. at 54:16-55:10, 62:23-64:21, 72:10-19, 74:14-75:7, 4/29/10 Tr. at 163:12-14 (Lowitt); 5/7/10 Tr. at 209:9-11 (Ricci).

**28.** **On September 19, 2008, Before The Sale Hearing, Lehman Identified Both Clearance Box Assets Marked At $1.9 Billion And More Than $1 Billion In 15c3-3 Assets As Assets In The Business That Would Be Transferred To Barclays In The Sale.**

28.1.    On September 19, 2008, Lehman identified as assets in the Business available to transfer (i) the Clearance Box assets that were marked at $1.9 billion, but believed by Barclays to be worth much less, and (ii) assets held in LBI's Rule 15c3-3 reserve account.  Kirk Dep. Tr. at 105:4-19; 4/26/10 Tr. at 187:14-19; 201:15-18, 224:10-24 (McDade); 4/29/10 Tr. at 45:1-4 (Lowitt).  BCI Ex. 591 (email from I. Lowitt to C. O'Meara:  "We worked all night to find what inventory we have available to sell.").

28.2.    Unrebutted testimony established that, before the Sale Hearing began, Lehman identified the Clearance Box Assets and the assets in the Rule 15c3 reserve account assets as available to be transferred, and agreed that those assets would be transferred to Barclays as part of the Sale.  4/26/10 Tr. at 201:15-18 (McDade); 4/29/10 Tr. at 45:1-4 (Lowitt); Kirk Dep. Tr. at 105:4-19; 8/31/10 Tr. at 45:15-47:22, 46:3-47:17, 60:14-21 (Lewkow).

28.3.    Unrebutted testimony established that the Clearance Box Assets and the Rule 15c3 reserve account assets were assets in the business that were not specifically identified to Barclays before September 19, 2008.  *See* FOF ¶¶ 29, 30.

**29.    The Clearance Box Assets Were Purchased Assets Under The APA Because They (A) Were Assets Used In The Business, (B) Were Not Excluded Assets, And (C) Were Encompassed Within The "Long Positions" Defined As Purchased Assets In The APA.**

29.1.    The APA defines "Purchased Assets" as "all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)."  BCI Ex. 1 (APA) at p. 6.

29.2.    It was not disputed — and unrebutted testimony established — that the Clearance Box Assets were assets used in connection with LBI's Business. 5/3/10 Tr. at 6:24-8:6, 42:15-24 (Hughes); 8/27/10 Tr. at 55:3-56:1, 56:13-15, 196:3-23 (Klein).

29.3.    The plain text of the APA and unrebutted testimony established that the Clearance Box Assets were not "Excluded Assets" under the APA.  BCI Ex. 1 (APA) at pp. 2-4; 5/3/10 Tr. at 6:24-8:6, 42:15-24 (Hughes); 8/27/10 Tr. at 55:3-56:1, 56:13-15, 196:3-23 (Klein).

29.4.    The APA specifically included "Long Positions" with a book value of approximately $70 billion in the definition of "Purchased Assets."  BCI Ex. 1 (APA) at p. 6.

29.5.    The unrebutted testimony of Professor Pfleiderer established that the Clearance Box Assets were "part of the original estimate of the long positions in the APA."  10/6/10 Tr. at 55:25-57:12 (Pfleiderer).

29.5.1.    Schedule B to the Clarification Letter lists 3,841 unique securities.  BCI Ex. 19.

29.5.2.    Of those Schedule B securities, Professor Zmjewski did not find 668 in GFS by looking for them by CUSIP.  10/6/10 Tr. at 51:7-56:23 (Pfleiderer).

29.5.3.    Of the remaining 3,173 securities listed on Schedule B, all but four are listed in GFS on September 15 and 16, 2008, within categories that comprise the "Long Positions" under the APA.  10/6/10 Tr. at 55:25-57:12 (Pfleiderer); BCI Ex. 19; BCI Exs. 502, 667.

29.5.4.    Those four securities also did not appear on the backup to Barclays' Acquisition Balance Sheet (that is, were neither transferred to Barclays nor expected to be transferred to Barclays).  10/6/10 Tr. at 55:25-56:23 (Pfleiderer).

29.5.5.    If the value (measured by Lehman marks) of the 668 Schedule B securities that Professor Zmijewski was unable to find in GFS were added to the Long Positions listed in GFS, Professor Pfleiderer concludes that "we still come out under seventy billion," and therefore still within the estimate of the Long Positions set forth in the APA. 10/6/10 Tr. at 55:25-57:12 (Pfleiderer).

**30.** **The 15c3-3 Assets Were Assets Used In The Business And Were Not Excluded Assets, And Were "Required Capital Deposits" And Hence Were Purchased Assets Under The APA.**

30.1.    The Purchase Agreement provides that Barclays shall receive all Lehman assets used in "the Business."

    30.1.1.    The APA provides that Barclays shall receive "all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)."  BCI Ex. 1 (APA) at p. 6.

    30.1.2.    The Clarification Letter reiterates that Barclays shall acquire "all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case excluding the Excluded Assets)."   BCI Ex. 5 (Clarification Letter) at 1.

30.2.    The 15c3-3 assets were not Excluded Assets under the Purchase Agreement.

    30.2.1.    The 15c3-3 assets are not Excluded Assets under the APA.  BCI Ex. 1 (APA) at 2-4.

    30.2.2.    The 15c3 assets are not Excluded Assets under the Clarification Letter.  BCI Ex. 5 (Clarification Letter) ¶ 1(c) at pp. 2-3.

30.3.    The 15c3-3 assets were used in Lehman's "Business."

    30.3.1.    The "Business" is defined as "the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant." BCI Ex. 1 (APA) at p. 2.

    30.3.2.    The 15c3-3 assets were held in a reserve account pursuant to SEC Rule 15c3-3, and were used in connection with Lehman's "capital markets businesses," as well as in its fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses.  8/27/10 Tr. at 55:3-56:1, 56:13-15 (Klein); 5/3/10 Tr. at 8:19-21 (Hughes).

    30.3.3.    As part of its acquisition of this Business, Barclays took on over 72,000 "Private Investment Management" ("PIM") customer accounts, containing assets in excess of $40 billion.  BCI Ex. 42 at ¶¶ 18, 21.

    30.3.4.    All U.S. broker dealers are required to maintain reserve accounts such as those holding the 15c3-3 assets pursuant to SEC Rule 15c3.  *See* Customer Protection - Reserves and Custody of Securities, 17 C.F.R. § 240.15c-3 (2009); Trustee's Rule 60(b) Br. at ¶ 60.

30.4.    The 15c3-3 assets are also deposits specifically identified as "Purchased Assets" under the Purchase Agreement.

    30.4.1.    The APA provides that Barclays shall receive "all deposits (including customer deposits, security deposits for rent, electricity, telephone or otherwise and required capital deposits) and prepaid charges and expenses of Seller and its Subsidiaries associated with the Business, other than any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets."  BCI Ex. 1 (APA) at p. 6.

    30.4.2.    SEC Rule 15c3-3(e) requires a broker dealer to maintain a reserve account made up of "deposits" of cash and qualified securities.  17 C.F.R. § 240.15c3-3(e).

**viii.** **Facts Showing That ETD Margin Deposits Were Always Purchased Assets, And That The Parties Agreed To The Transfer Of All Assets In The ETD Accounts, Including The ETD Margin Deposits, Despite The Uncertainty Over What If Any "Net Value" And Risk Of Future Exposure Was Associated With Those Accounts.**

**31.** **The Assets Posted To Secure Obligations Associated With LBI's Exchange-Traded Derivatives ("ETD Margin Deposits") Were Understood At The Time Of The Sale And For Months After The Closing, By Both Lehman And Barclays, To Be Assets Used In The Business That Barclays Was Acquiring, And Therefore Assets That Would Be Transferred To Barclays As Part Of The Sale.**

31.1.    LBI traded in exchange-traded options and futures ("ETDs") for its own proprietary purposes and also held and cleared ETDs on behalf of affiliates and non-affiliate customers.  BCI Ex. 340 at ¶¶ 23-28; 5/5/10 Tr. at 105:21-106:1 (Kobak); 9/8/10 Tr. at 94:22-96:5 (Raisler).

31.2.    The APA provides that "'Purchased Assets' means all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)."  BCI Ex. 1 (APA) at p.6; 4/28/10 Tr. at 94:7-15 (Miller).

31.3.    The APA provides that the "Purchased Assets" include, "without limitation," "all deposits, including (… required capital deposits). . . associated with the Business."  BCI Ex. 1 (APA) at p.6 (subsection (b) of definition of Purchased Assets); *id.* at p. 10 (definition of "Including").

31.4.    The APA provides that the "exchange traded derivatives" were Purchased Assets.  BCI Ex. 1 (APA) at p. 6 (subsection (d) of definition of Purchased Assets).

31.5.    The APA provides that "short positions" in "exchange traded derivatives" were Assumed Liabilities.  BCI Ex. 1 (APA) at § 2.3 (i) (definition of Assumed Liabilities), *id* at p. 6.

31.6.    The exchange-traded derivatives business was a component of the "Business" that Barclays was to acquire.  BCI Ex. 1 (APA) at p. 2 ("'Business' means the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant"); BCI Ex. 124 at p.1; BCI Ex. 320 at 5868; 5/3/10 Tr. at 20:14-23 (Hughes); 5/7/10 Tr. at 244:18-245:3 (Ricci); 5/4/10 Tr. at 164:23-165:11 (Seery); 8/24/10 Tr. at 99:5-100:11 (Rosen); 8/30/10 Tr. at 13:4-10 (James); 10/5/10 Tr. at 55:1-18 (Leitner).

31.7.    The Business (as defined in the APA) included exchange-traded derivatives traded on both domestic and foreign exchanges through accounts with various domestic and foreign brokers and clearing corporations.  BCI Ex. 340 at ¶ 22; 8/30/10 Tr. at 13:4-10 (James).

31.8.    The assets posted as ETD Margin Deposits are assets used in the Business that Barclays was to acquire.  5/3/10 Tr. at 21:9-13 (Hughes); 10/5/10 Tr. at 55:1-56:10, 118:24-119:2

(Leitner); 5/4/10 Tr. at 164:23-165:11 (Seery); 8/24/10 Tr. at 99:24-102:7 (Rosen); 8/31/10 Tr. at 57:21-18, 59:14-21 (Lewkow).

31.9.    The assets posted as ETD Margin Deposits are deposits associated with the Business that Barclays was to acquire.  8/24/10 Tr. at 101:10-102:7 (Rosen).

31.10.   The reference to "derivatives contracts" in paragraph (n) of the APA's definition of Excluded Assets referred to over the counter derivatives contracts, and did not refer to ETDs.  BCI Ex. 1 (APA) at p.10; 8/24/10 Tr. at 219:16-220:23 (Rosen); BCI Ex. 1104 at pp.4, 5, 24; BCI Ex. 124.

31.11.   The parties inserted a provision into the Sale Order, included as paragraph N of the final Sale Order, that expressly provides that the transfer of ETD Margin Deposits to Barclays would be subject to the rights of the OCC.  BCI Exs. 16, 220; 8/24/10 Tr. at 102:8-103:3, 103:18-104:20 (Rosen).

 31.11.1.   The final sentence of Paragraph N of the Sale Order would have been meaningless if Lehman's ETD Margin Deposits at the OCC were not being transferred to Barclays.  BCI Ex. 16 (Sale Order) at ¶ N ("From and after the Closing Date, all securities, cash, collateral and other property transferred to accounts of the Purchaser at OCC shall be subject to all rights of OCC therein in accordance with the By-Laws and Rules of OCC including, without limitation, the security interests and setoff rights of OCC with respect thereto."); 8/24/10 Tr. at 106:25-107:23 (Rosen).

31.12.   The CFTC expressly approved the bulk transfer from LBI to Barclays of the entirety of LBI's house and customer futures accounts" *i.e.,* both the positions and the collateral in those accounts.  BCI Ex. 843.

 31.12.1.   It is standard practice in the industry for a bulk transfer of a broker-dealer's futures accounts to be accomplished by transferring the entirety of its accounts — including both the positions and the associated collateral in those accounts. 10/5/10 Tr. at 56:11-57:9, 118:24-119:12 (Leitner); 9/8/10 Tr. at 84:22-85:10, 87:11-88:12 (Raisler); indeed, that is "precisely" what "the bulk transfer order is designed to do, to make sure that the happens."  10/5/10 Tr. at 56:11-57:23 (Leitner).

31.13.   The Clarification Letter provides that the Purchased Assets include "any property that may be held to secure obligations under" the ETDs.  BCI Ex. 5 (Clarification Letter) at § 1(a)(ii)(C); 8/24/10 Tr. at 119:24-120:24 (Rosen).

31.14.   The phrase "any property that may be held to secure obligations under" the ETDs was understood by all parties at the time of the Sale to mean ETD Margin Deposits.

 31.14.1.   The Trustee's 30(b)(6) representative, James Kobak, admitted at trial that he understood that the ETD-related parenthetical "did not limit the collateral to customer collateral," and "wasn't limited in any way":

> "Q.   [Y]ou understood that the exchange-traded derivative discussion in the APA did not limit the collateral to customer collateral, correct?
>
> A.   It just referred, I think, to margin or collateral — I think in the final version of the clarification it's that language we saw it. It wasn't limited in any way, no.
>
> Q.   Okay. It said "any property". It wasn't limited to customer property, correct?
>
> A.   It said 'any property,' yes."
>
> 5/5/10 Tr. at 124:3-11 (Kobak).

31.14.2.    The 30(b)(6) representative for LBHI and Alvarez & Marsal, Philip Kruse, admitted that the ETD-related parenthetical encompassed "any collateral" associated with the ETDs, and testified under oath with regard to ETD Margin Deposits that: "I know obviously it's part of the deal."  Kruse Dep. Tr. at 191:12-192:5; 194:12-18 (LBHI 30(b)(6)).

31.14.3.    Barclays understood that the ETD-related parenthetical encompassed all ETD Margin Deposits.  5/3/10 Tr. at 44:7-45:8 (Hughes); 8/24/10 Tr. at 125:14-24 (Rosen); 9/8/10 Tr. at 138:16-139:24 (Raisler).

31.15.  Any business person engaged in the business of exchange-traded derivatives would understand the phrase "any property held to secure obligations under" ETDs to refer to ETD Margin Deposits.  BCI Ex. 340 at ¶ 11; *see also* 8/24/10 Tr. at 125:14-24 (Rosen); 9/8/10 Tr. at 138:12-139:22 (Raisler).

31.16.  Barclays always understood that the ETD Margin Deposits were Purchased Assets under the APA.  BCI Ex. 217; 4/30/10 Tr. at 216:22-217:12 (Hughes); 8/24/10 Tr. at 99:5-101:9, 111:10-17 (Rosen); 8/30/10 Tr. at 19:14-20:10, 20:16-21:19, 23:17-24:11 (James); 9/8/10 Tr. at 84:3-12, 84:23-85:10 (Raisler).

31.17.  Barclays and Lehman representatives actively discussed the fact that "House and Customer" "Margin" would be transferred to Barclays.  8/30/10 Tr. at 20:15-21, 21:4-19, 23:17-24:11 (James); BCI Ex. 217; *see also* 9/8/10 Tr. at 84:22-85:9 (Raisler).

31.17.1.    Contemporaneous documentary evidence confirms that Barclays and Lehman representatives actively discussed, on 9/18/08, the fact that ETD Margin Deposits would be transferred to Barclays.  BCI Ex. 217.

31.18.  No one ever indicated to Barclays that they believed the ETD Margin Deposits were excluded from the transaction.  9/8/10 Tr. at 88:13-18 (Raisler); 8/30/10 Tr. at 20:4-10 (James); 8/24/10 Tr. at 104:8-11106:11-19, 109:6-11, 110:8-15, 111:7-14, 120:19-24, 122:21-23 (Rosen); 5/5/10 Tr. at 34:17-35:6, 84:23-85:1, 92:9-93:1, 99:7-11, 127:19-128:6, 154:16-22 (Kobak); 4/27/10 Tr. at 45:25-46:2 (McDade).

31.19.  Barclays would not have agreed to assume LBI's ETD-related obligations if it was not also acquiring the ETD Margin Deposits.  6/22/10 Tr. at 23:16-23 (Diamond); 5/3/10 Tr. at 22:10-15 (Hughes); 5/7/10 Tr. at 246:1-8 (Ricci); 8/30/10 Tr. at 14:5-6 (James); 10/5/10 Tr. at 15:16-20, 148:24-149:5 (Leitner).

31.19.1.  No rational acquirer would have been willing to acquire LBI's ETD businesses without getting all of the ETD Margins Deposits.  10/5/10 Tr. at 15:14-24, 62:16-63:4, 118:24-119:12 (Leitner).

31.19.2.  Moreover, the unrebutted record evidence – including the unrebutted expert testimony of Tony Leitner, the unrebutted testimony of Ken Raisler, the unrebutted testimony of Liz James, and the unrebutted testimony of Ed Rosen – confirms that it is standard industry practice for all ETD Margin Deposits to be transferred with the transfer of ETD positions and accounts, that it would contradict such practice for anything else to happen, and that it would require special provisions, or plumbing, to provide for any other result.  10/5/10 Tr. at 89:4-22, 59:7-60:1 (Leitner); 9/8/10 Tr. at 84:23-87:9, 87:11-88:12 (Raisler); 8/30/10 Tr. at 19:18:24 (James); 8/24/10 Tr. at 99:16-23, 111:15-112:3 (Rosen).

31.20.  In addition to signing the Clarification Letter, the Trustee understood and signed two separate agreements that expressly provided for the transfer of all ETD Margin Deposits to Barclays.

31.20.1.  Late at night on September 19, 2008 or early in the morning on September 20, 2008, during or immediately after the Sale Hearing, the Trustee's representative, James Kobak signed a version of the Transfer and Assumption Agreement which provided for the transfer of "all margin deposits" from LBI's account to Barclays, and then authorized the use of that signature to endorse the final Transfer and Assumption Agreement, which also provided for the transfer of "all margin deposits" LBI's account to Barclays.  5/5/10 Tr. at 105:8-20 (Kobak); BCI Exs. 230, 231.

31.20.2.  The final Transfer and Assumption Agreement, which is endorsed by the Trustee, OCC, and Barclays, provides:

"For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, *Lehman hereby sells, assigns, transfers, and sets over to Barclays,* without recourse Dr without representation or warranty (other than as expressly provided herein), all of Lehman's rights, title, interests, powers, privileges, remedies . . . in, to, under, and in respect of the Account, as of the Effective Date including with respect to:  (i) the Clearing Fund deposit; (ii) *all margin deposits held by OCC with respect to the Account*; (iii) all settlement obligations with regard to transactions in cleared contracts; and (iv) all rights and obligations in respect of

> exercises of option contracts and assignments of such exercises."

> BCI Ex. 3 (emphasis added).

31.20.3.   The Trustee understood when he signed the Transfer and Assumption Agreement that "LBI was transferring all of its OCC accounts to Barclays," that "that transfer included all of the margin deposits held by OCC with respect to those accounts," and that "Lehman, LBI, had given up all of its rights, title, interest, powers, privileges, remedies, obligations, concerning those accounts and the margin deposits." 5/5/10 Tr. at 117:6-118:4 (Kobak).

31.20.4.   Late in the night on September 19, 2008, or early in the morning on September 20, 2008, either during or immediately following the Sale Hearing, the Trustee signed the Collateral Account Agreement, which confirmed that all of LBI's ETD Margin Deposits were to be transferred to Barclays. BCI Ex. 230 at 3375; BCI Ex. 231 at 6078.

31.20.5.   The Collateral Account Agreement that the Trustee's representative signed provides:

> "LBI has assigned to Barclays all rights in securities cash, and other property ('Collateral') pledged by LBI to The Options Clearing Corporation ('OCC') and held for OCC's benefit at J.P. Morgan Chase. . . . LBI hereby authorizes and directs J.P. Morgan Chase to transfer on its books as of the close of business on Friday, September 19, 2008, the Collateral pledged to OCC. to the account or accounts of Barc1ays Capital Inc. and to reflect on the records of J.P. Morgan Chase that such Collateral is pledged to OCC by Barclays Capital Inc."

> BCI Ex. 230 at 3375 (Collateral Account Agreement); BCI Ex. 231 at 6078 (Collateral Account Agreement).

31.20.6.   The Collateral Account Agreement is evidence of the Trustee's agreement that "LBI has assigned to Barclays all rights in securities, cash and other property ('Collateral') pledged by LBI to OCC." BCI Ex. 231 at 6078; Kobak Dep. Tr. at 282:4-283:21 (acknowledging that under the Collateral Account Agreement, cash and securities would be transferred to Barclays).

31.21.   The Trustee was expressly told that Barclays was acquiring all ETD Margin Deposits.

31.21.1.   The Trustee, two of his lawyers, and SIPC counsel Ken Caputo were told — prior to signing the Clarification Letter, prior to authorizing the final version of the Transfer and Assumption Agreement with Barclays' changes, and prior to the Closing — that "the LBI accounts and all positions, cash and securities collateral that are held by OCC in respect of those accounts are intended to be transferred to Barclays and that Barclays is assuming all obligations with

respect to those accounts" and that, at that time, "OCC [wa]s holding nearly $1 billion in cash for the accounts of LBI."  BCI Ex. 233.

31.21.2.    The Trustee testified that he read and understood the OCC's email informing him that "the LBI accounts and all positions, cash and securities collateral that are held by OCC in respect of those accounts are intended to be transferred to Barclays and that Barclays is assuming all obligations with respect to those accounts" and that, at that time, "OCC [wa]s holding nearly $1 billion in cash for the accounts of LBI."  5/5/10 Tr. at 113:1-114:9 (Kobak).

31.21.3.    Both the Trustee and Weil Gotshal were aware of the possibility that there may be excess margin at the OCC.  5/5/10 Tr. at 114:20-115:16 (Kobak); BCI Ex. 235.

31.21.4.    The Trustee's representative testified that he received, read, and understood an email he received from the OCC at 4:03 p.m. on Sunday, September 21, 2008 — prior to endorsing the Clarification Letter and prior to the Closing — that stated "Having heard nothing further from you with respect to cash held by OCC in respect of the LBI accounts, and in accordance with the terms in the Transfer and Purchase Agreement, all such cash in the accounts will be transferred to Barclays assuming that the transaction closes this evening." BCI Ex. 262; 5/5/10 Tr. at 118:24-119:8 (Kobak).

31.21.5.    The Trustee was again advised, on September 21, 2008, at 4:37 pm, that the OCC accounts would be transferred to Barclays.  BCI Ex. 267.

31.22.    The Trustee understood at the time he authorized the transfer of all ETD Margin Deposits to Barclays that they included LBI proprietary assets.

31.22.1.    The Trustee's 30(b)(6) representative testified that he understood "in the week prior to the closing" that the OCC accounts "included customer positions in exchange-traded derivatives," 5/5/10 Tr. at 104:19-24 (Kobak), and that Barclays was getting "any margin or collateral that would be associated with those positions."  5/5/10 Tr. at 128:7-11 (Kobak).

31.22.2.    The Trustee's 30(b)(6) representative testified that, as he understood the facts "in the week prior to the closing," the OCC accounts "include[d] LBI positions in exchange-traded derivatives" in addition to customer positions, 5/5/10 Tr. at 105:21-106:1 (Kobak); *id.* at 106:13-18, and that "Barclays was taking on ETD positions of LBI, the proprietary positions."  5/5/10 Tr. at 125:10-14, 128:12-14 (Kobak).

31.22.3.    The Trustee's 30(b)(6) representative testified that he "had a general understanding" — and that "it was logical" to him — that "there would be some kind of collateral, whatever you want to call it" to support these LBI proprietary positions.  5/5/10 Tr. at 106:19-107:6, 107:15-18.  (Kobak).

31.22.4.    The Trustee's 30(b)(6) representative testified that when he signed the Transfer and Assumption Agreement, he understood that "the LBI accounts and all positions, cash and securities collateral that are held by OCC in respect of those accounts are intended to be transferred to Barclays and that Barclays is assuming all obligations with respect to those accounts" and that, at that time, "OCC [wa]s holding nearly $1 billion in cash for the accounts of LBI." 5/5/10 Tr. at 113:14-115:19 (Kobak).

31.22.5.    The Trustee's 30(b)(6) representative testified that he never made any effort, after being told that there was collateral, including $1 billion in cash, in LBI's OCC accounts, to "find out whether there was LBI collateral in the OCC accounts, and, if so, how much." 5/5/10 Tr. at 107:15-18 (Kobak).

31.23.    There is no basis in the record for according different treatment to different types of ETD Margin Deposits.

31.23.1.    There is no basis in the record for according different treatment to options-related ETD Margin Deposits and futures-related ETD Margin Deposits.

31.23.1.1    It is undisputed that the ETDs Barclays acquired included both options and futures. BCI Ex. 1 (APA) at pp.6, 10; BCI Ex. 3a; BCI Ex. 5 (Clarification Letter) at §1(a)(ii)(C); BCI Ex. 217 at pp. 4, 10; BCI Ex. 807 at p. 19932; BCI Ex. 320a at 5854, 5867, 5870; 8/24/2010 Tr. at 99:6-24, 115:2-7 (Rosen).

31.23.1.2    The Purchase Agreement expressly provides that Barclays was to acquire ETD Margin Deposits associated with the ETDs that it was to acquire, without distinguishing between options or futures. BCI Ex. 5.

31.23.1.3    The contemporaneous documentary evidence confirms that Barclays was to acquire the ETD Margin Deposits relating to both options accounts and futures accounts. BCI Ex. 3a (Transfer & Assumption Agreement provides that Barclays is acquiring "all margin deposits" relating to three different OCC accounts, which included the options accounts (074 and 273) and the futures account (084)); BCI Ex. 843 (CFTC Bulk Transfer Order approving the transfer of the entirety of all of LBI's futures accounts); 9/8/10 Tr. at 88:19-89:4, 89:21-25, 122:17-19 (Raisler); BCI Ex. 217 (showing that the OCC told Barclays and Lehman representatives that it was going to transfer all property held in the OCC's options and futures accounts to Barclays); BCI Exs. 231, 232, 233, 235 (showing that Barclays and Lehman representatives discussed the fact that LBI was to transfer to Barclays all "margin" and "collateral" associated with LBI's futures accounts).

31.23.1.4    The Trustee repeatedly approved transfers of margin to Barclays from both LBI's options accounts and its futures accounts. BCI Ex. 470 (confirming that it was "OK" from the Trustee's perspective to treat all OCC margin as belonging to Barclays); 9/8/10 Tr. at 127:21-128:21, 129:11-130:19, 130:20-132:19 (Raisler) (confirming that the Trustee cooperated with Barclays representatives to arrange for transfers of futures margin); 8/30/10 Tr. at 51:25-52:13 (James) (same); 5/5/10 Tr. at 149:24-150:5, 151:19-152:11 (Kobak).

31.23.2.    There is no factual basis in the record for according different treatment to LBI proprietary assets versus customer assets.

31.23.2.1    It is undisputed that Barclays was assuming LBI's obligations under both its proprietary and its customer ETD accounts. BCI Ex. 3a; BCI Ex. 233; 5/5/10 Tr. at 112:12-113:17 (Kobak).

31.23.2.2    The Purchase Agreement expressly provides that Barclays was to acquire "any property" securing LBI's obligations under any of the ETDs it was acquiring. BCI Ex. 5 (Clarification Letter) at § 1(a)(ii)(C).

31.23.2.3    The Trustee admitted at trial that the phrase "any property" as used in the Clarification Letter "did not limit the collateral to customer collateral" but instead covered "any property"; indeed, he admitted that it "*wasn't limited in any way.*" 5/5/10 Tr. at 123:25-124:11 (Kobak) (emphasis added).

31.23.2.4    The Trustee admitted at trial that all "customer-related" margin was being transferred to Barclays, and that the "customer-related" margin included both LBI proprietary assets and customer assets in the customer accounts. 5/5/10 Tr. at 128:7-11, 152:4-11, 148:15-149:25 (Kobak).

31.23.2.5    The Trustee likewise admitted at trial that there were proprietary accounts as well as customer accounts at the OCC, that the proprietary accounts necessarily contained margin in the form of LBI proprietary assets, and that he understood he was approving the transfer of all ETD Margin Deposits at the OCC to Barclays. 5/5/10 Tr. at 105:17-106:4, 124:8-12 (Kobak).

31.23.2.6    Harvey Miller confirmed his understanding that Barclays was to receive all property in LBI's customer accounts, including all cash in those accounts, regardless of whether they constituted LBI assets or customer assets. 4/28/10 Tr. at 89:13-90:16 (Miller).

31.23.3.    There is no factual basis in the record for according different treatment to margin assets up to the constantly fluctuating margin requirement amount and any amount of margin assets that are in excess of those requirements on any given day.

31.23.3.1    The Purchase Agreement expressly provides that the Purchased Assets include "any property that may be *held*" in relation to the acquired ETDs — not only that property which was <u>required</u> at any particular point in time.  BCI Ex. 5 (emphasis added).

31.23.3.2    The Transfer & Assumption Agreement likewise expressly provided that LBI would transfer "all margin deposits <u>held</u> by OCC with respect to the Account."  BCI Ex. 3A (emphasis added).

31.23.3.3    The Trustee admits that, in signing the Transfer and Assumption Agreement, he understood he was approving the transfer of "<u>all</u> margin deposits" in LBI's OCC accounts.  5/5/10 Tr. at 117:6-118:4 (Kobak) (emphasis added).

31.23.3.4    The OCC emails sent to Weil Gotshal and the Trustee and his representatives over the weekend of September 20-21, 2008, expressly stated that the OCC would transfer to Barclays all cash "<u>held</u> by OCC in respect of the LBI account",  BCI Ex. 262,  and "all positions, cash and securities collateral <u>that are held</u> by OCC in respect [the OCC] accounts," BCI Ex. 626 (emphasis added), and the Trustee raised no objection to this.  5/5/10 Tr. at 115:3-16, 122: 3-8 (Kobak).

31.23.3.5    The CFTC's bulk transfer order expressly approved the transfer of the entirety of LBI's futures "accounts."  BCI Ex. 843.  The Trustee admitted at trial that the ETD-related parenthetical in the Clarification Letter "wasn't limited in any way."  5/5/10 Tr. at 124:3-11 (Kobak).

31.23.3.6    The record evidence established that the parties would have had to craft specific provisions to effectuate an agreement that Barclays would get some portion of the ETD Margin Deposits but not purported excess, however defined, and that no such provisions were ever discussed.  10/5/10 Tr. at 59:7-60:1 (Leitner); 5/5/10 Tr. at 127:19-128:18 (Kobak); 8/24/10 Tr. at 111:7-14 (Rosen); 9/8/10 Tr. at 87:11-88:12 (Raisler).

31.23.3.7    The Trustee admitted at trial that the ETD Margin parenthetical in the Clarification

31.23.4.    There is no factual basis in the record for according different treatment to cash ETD Margin Deposits versus ETD Margin Deposits in other forms.

31.23.4.1  This Court's Sale Order provided that Barclays was acquiring Lehman's ETD Margin at the OCC — whether in the form of cash or other forms of collateral, and subject to the rights of the OCC.  BCI Ex. 16.

31.23.4.2  The Purchase Agreement expressly provides that Barclays was to acquire "any property" securing the ETD obligations it was assuming, and the Trustee confirmed that this phrase "wasn't limited in any way."  BCI Ex. 5; 5/5/10 Tr. at 123:25-124:11 (Kobak).

31.23.4.3  Weil Gotshal, the Trustee and his representatives, and Barclays were all expressly told prior to the Closing that the OCC accounts included a billion dollars in cash and that the OCC was going to transfer this cash to Barclays upon the Closing, and no one objected to this or indicated that it was contrary to their understanding of the parties' agreement.  BCI Ex. 233; BCI Ex. 262; 5/5/10 Tr. at 127:19-25, 154:16-22 (Kobak); 8/24/10 Tr. at 104:8-11(Rosen); 9/8/10 Tr. at 88:13-18, 148:15-149:9 (Raisler); 8/30/10 Tr. at 20:4-10 (James).

31.23.4.4  In addition to the Clarification Letter, the Trustee signed two other agreements that called for the transfer to Barclays of all margin deposits at the OCC, including cash.  BCI Ex. 3A; BCI Ex. 230 at CGSH0003375; BCI Ex. 231 at HHR_00006078.

31.23.4.5  It is undisputed that no one ever discussed the fact that the ETD Margin Deposits would be limited to that portion of them that was in a form other than cash.  5/5/10 Tr. at 127:19-128:18 (Kobak); 8/24/10 Tr. at 111:7-14 (Rosen).

31.23.4.6  The Court was told Barclays was not acquiring any of the "Retained Cash" — or the "free cash" or "unencumbered cash" as Harvey Miller described it — that it was originally going to acquire under the APA (4/28/10 Tr. at 89:22-90:7 (Miller)), but the Court was also provided with a Sale Order which expressly contemplated the transfer to Barclays of the ETD Margin Deposits, including cash, at the OCC — which, pursuant to the expressed terms of the Sale Order, were *encumbered* by an OCC lien.  BCI Ex. 16 (Sale Order) at ¶ N.

31.23.4.7  The record evidence confirms that the ETD Margin Deposits were encumbered cash, as opposed to "free cash" or "unencumbered cash" that the Court was told Barclays would no longer be receiving.  10/5/10 Tr. at 44:1-45:15 (Leitner); 8/30/10 Tr. at 57:16-58:16 (James); 9/8/10 Tr. at 91:3-93:15, 104:11-

105:1, 115:13-116:3, 117:10-22, 118:17:121:7, 125:20-127:20
(Raisler); BCI Ex. 16 (Sale Order) at ¶ N.

31.24.  Weil Gotshal was repeatedly told that Barclays was acquiring all ETD Margin Deposits, never objected or expressed any disagreement with that fact, and expressly adopted the language in the Clarification Letter confirming that Barclays was acquiring the ETD Margin Deposits.

31.24.1.  On Friday afternoon, September 19, 2008 at 2:23 pm, Weil Gotshal was asked to agree to "[a]nother sale order change" to "protect [the OCC's] usual rights, security interests, etc. under its rules with respect to all position and collateral transferred that are being transferred from LBI accounts at OCC to Barclays accounts at OCC." BCI Ex. 220.

31.24.2.  This "sale order change" made clear that the transfer of ETD Margin to Barclays would be subject to the rights of the OCC by providing that, "[f]rom and after the Closing Date, all securities, cash, collateral and other property transferred to accounts of the Purchaser at OCC shall be subject to all rights of OCC therein in accordance with the By-Laws and Rules of OCC including, without limitation, the security interests and setoff rights of OCC with respect thereto." BCI Ex. 220.

31.24.3.  Weil Gotshal agreed to the inclusion of this provision in the Sale Order, which was then presented to and approved by the Court. BCI Ex. 16 (Sale Order) at paragraph N.

31.24.4.  At 12:45 pm on Saturday, September 20, 2010, three different Weil Gotshal lawyers (Ronit Berkovich, Shai Waisman, and Rod Miller), all of whom were representing LBHI, LBI and the Trustee in the Sale negotiations, received an email from counsel for the OCC stating that "OCC is seeking to confirm its understanding that the LBI accounts and all positions, cash and securities collateral that are held by OCC in respect of those accounts are intended to be transferred to Barclays  and that Barclays is assuming all obligations with respect to those accounts . . . . [t]he mechanism by which OCC proposes to accomplish this purpose is to simply rename the LBI accounts as accounts of Barclays," and none of them, nor anyone else, objected to or disagreed with this statement. BCI Ex. 233.

31.25.  The drafting history of the Clarification Letter confirms that Barclays, Weil Gotshal, and the Trustee all understood that ETD Margin Deposits were included in the Purchased Assets.

31.25.1.  Barclays proposed a provision for inclusion in the Clarification Letter at 11:12 p.m. on Saturday, September 20, 2008, providing that, among other things, the ETD Margin Deposits were not Excluded Assets. BCI Ex. 249.

31.25.2.  Specifically, subpart (ii) of the Excluded Assets definition, which Barclays proposed at 11:12 p.m. on Saturday, September 20, 2008, carved out of the

cash exclusion provision the following two items: 1) "cash . . . maintained by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise; and 2) "cash . . . maintained by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person." BCI Ex. 270/M. 629 (highlighted).

31.25.3.    Weil Gotshal retained Barclays' proposed subpart (ii), which carved ETD Margin Deposits out of the Excluded Assets definition, in a draft it circulated at 7:54 p.m. on September 21, 2008, raised no objection to it, and indicated that it did not expect the Clarification Letter to change further with the exception of certain "points which depend on the resolution of the current discussions." BCI Ex. 270/M.629 (highlighted)

31.25.4.    The ETD Margin Deposits were not being discussed at the time Weil Gotshal sent its 7:54 p.m. email on September 21, 2008, and were likewise not discussed at any point thereafter; therefore, the Weil Gotshal email of 7:54 p.m. on September 21, 2008 confirmed that the language carving ETD Margin Deposits *out* of the *Excluded* Assets definition was not expected to change. 8/24/10 Tr. at 179:2-19, 199:17-200:13 (Rosen); Miller Dep. Tr. at 30:6-17; 4/28/10 Tr. at 81:25-83:17 (Miller); 5/5/10 Tr. at 99:7-11; 127:19-128:18 (Kobak).

31.25.5.    Barclays' proposed subpart (ii), which carved ETD Margin Deposits out of the Excluded Assets definition, was still included in the draft Clarification Letter at the time the Trustee's representative executed it at between 1:00 and 2:00 a.m. on the morning of September 22, 2008. 5/5/10 Tr. at 94:13-16 (Kobak).

31.25.6.    The Trustee never indicated to anyone that any provision of any draft of the Clarification Letter was unacceptable, including the provision that carved ETD Margin Deposits out of the Excluded Assets definition; he thereby indicated that this provision was acceptable to the Trustee. 5/5/10 Tr. at 99:7-11 (Kobak).

31.25.7.    Sometime between 3:00 and 4:00 a.m. on the morning of September 22, 2008, Barclays and Lehman lawyers had a discussion concerning the cash in LBI's 15c3-3 account and agreed that it would not be included in the Purchased Assets. This discussion did not include any discussion relating to cash ETD Margin Deposits. 4/28/10 Tr. at 81:25-83:17 (Miller); Miller Dep. Tr. at 30:6-17.

31.25.8.    At 4:36 a.m. on the morning of September 22, 2008, Weil Gotshal circulated a revised draft of the Clarification Letter that reflected the parties' immediately preceding discussion about the 15c3-3 cash. BCI Ex. 280; 8/24/10 Tr. at 147:17-148:11, 149:19-151:7, 155:18-24 (Rosen).

31.25.9.    Weil Gotshal's proposed revision removed from the Excluded Assets
definition the language that carved out cash maintained "by or on behalf of
LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or
otherwise, or by or on behalf of any clearing agency or clearing organization
to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or
in any other form) the obligations of LBI or any other person." BCI Ex. 280.

31.25.10.    Sometime after 4:36 a.m. but before the closing on the morning of September
22, 2008, Barclays realized that Weil Gotshal's proposed deletion went
beyond removing from the Excluded Assets definition the language that
carved out the 15c3-3 cash and also removed the language relating to ETD
Margin Deposits. 8/24/10 Tr. at 120:8-25, 122:25-124:4 (Rosen).

31.25.11.    Upon realizing that Weil Gotshal's proposed revision went beyond its
intended effect, Barclays' attorneys prepared a handwritten mark-up of the
then current version of the Clarification Letter in which they proposed the
insertion of a provision in the Purchased Assets section making clear that
Purchased Assets include not only the exchange-traded derivatives but also
"any property that may be held to secure obligations under such derivatives."
8/24/10 Tr. at 120:8-25, 122:25-124:4 (Rosen).

31.25.12.    As Ed Rosen explained at trial, he prepared the parenthetical in as concise and
clear a manner as possible:

"Q.        And you sent that back to Weil because you wanted
to avoid becoming embroiled in extensive negotiations. Isn't
that right?

A.  Over words, yes.  I didn't want to get involved in a
protracted negotiation of words.  And as a result, I formulated
what I thought would be the most clear and concise and brief
formulation of the concept that I was trying to convey, and put
it in the documents.  Because for every time you add a clause
or a word, you're inviting something — you're inviting a
dispute or an argument or a negotiation.  And we were very
early in the morning at that point in time.  And so I wanted to
just make sure that if there was any issue, it wasn't about
wording, it was about substance.  Because that provision is as
clear a definition of margin and guarantee fund deposits as I
was able to draft under the circumstances and at the time.  I
thought it was abundantly clear."

8/24/10 Tr. at 203:5-20 (Rosen).

31.25.13.    Barclays' attorneys handed their handwritten mark-up of the Clarification
Letter to Weil Gotshal, which the Trustee admits was representing him as well
as LBHI in this transaction, and Weil Gotshal accepted Barclays' proposed

language without objection and inserted it into the final version of the
Clarification Letter. 8/24/10 Tr. at 119:19-120:18 (Rosen); BCI Ex. 5.
8/24/10 Tr. at 120:19-24, 185:1-23 (Rosen); 5/5/10 Tr. at 59:19-25 (Kobak)
(admitting that Weil Gotshal represented the Trustee as well as LBHI in this
transaction).

31.25.14.   Weil Gotshal would not have agreed to include this language in the final
Clarification Letter unless it believed Barclays was acquiring all ETD Margin
Deposits. 8/24/10 Tr. at 203:5-20, 119:19-120:18 (Rosen).

31.25.15.   While the Trustee claims that the drafting history of the Clarification Letter
shows that Weil Gotshal *rejected* Barclays' proposal to include ETD Margin
Deposits in the deal, in fact, the drafting history confirms precisely the
opposite — that all parties understood that ETD Margin Deposits were in the
deal, and that all parties agreed to the inclusion of language in the
Clarification Letter to make this clear. 8/24/10 Tr. at 119:19-120:18 (Rosen);
BCI Ex. 5.

31.26.   After the Sale closed on September 22, 2008, Weil Gotshal repeatedly confirmed that
Barclays was acquiring the ETD Margin Deposits as a separate Purchased Asset.

31.26.1.    In an internal memo circulated on September 26, 2008, Weil enumerated as
being "IN" the deal both "exchange-traded derivatives" and "any property that
may be held to secure obligations under such derivatives." BCI Ex. 807.

31.26.2.    In an internal memo circulated to A&M the next day, September 27, 2008,
Weil adopted the language of the Clarification Letter in defining Purchased
Assets to include "all exchange-traded derivatives (and any property that may
be held to security [sic] obligations under such derivative [sic])." BCI Ex.
320.

31.27.   All ETD Margin Deposits in LBI's customer accounts were understood to be Purchased
Assets.

31.27.1.    As a matter of standard business practice, broker-dealers holding ETD
positions on behalf of customers post proprietary assets to the segregated and
secured margin accounts as a buffer to ensure that they remain in compliance
with applicable regulations. BCI Ex. 340 at ¶ 43; 9/8/10 Tr. at 96:24-97:24
(Raisler); 8/30/10 Tr. at 24:15-26:7, 62:16-19 (James).

31.27.2.    In normal business practices, all such funds are transferred to the acquiring
firm. 8/30/10 Tr. at 64:24-66:6 (James); 9/8/10 Tr. at 85:11-14, 86:4-87:9
(Raisler).

31.27.3.    The Trustee's 30(b)(6) representative testified that he understood "in the week
prior to the closing" that the OCC accounts "included customer positions in
exchange-traded derivatives," 5/5/10 Tr. at 104:19-24, and that Barclays was

getting "any margin or collateral that would be associated with those positions." 5/5/10 Tr. at 128:7-11 (Kobak).

31.27.4.  On September 19, 2008, the CFTC approved a bulk transfer of the entirety of LBI's house and customer futures accounts to Barclays (BCI Ex. 843) — "with everything in it" — and that was "precisely" what "the bulk transfer order was designed to do." 10/5/10 Tr. at 57:10-23 (Leitner).

31.27.4.1  The transfer of the entirety of a broker-dealer's futures accounts is the standard procedure in the industry for effectuating a bulk transfer of a house and customer futures business. 10/5/10 Tr. at 56:11-57:9 118:24-119:12 (Leitner); 9/8/10 Tr. at 84:22-85:9, 87:10-88:11 (Raisler).

31.27.5.  Lehman's lead deal counsel, Harvey Miller, agreed at trial that all margin associated with LBI's customer ETD accounts would go to Barclays, irrespective of whether it was comprised of customer or proprietary assets and irrespective of whether it was in the form of cash. 4/28/10 Tr. at 89:13-90:16 (Miller).

31.27.6.  The Trustee likewise admitted that all "customer-related" margin was to be transferred to Barclays, and that the "customer-related" margin included both LBI proprietary assets and customer assets in the customer accounts. 5/5/10 Tr. at 128:7-11, 151:4-11, 147:15-149:1 (Kobak).

31.27.7.  The majority of positions in LBI's customer options account at the OCC were held by LBI on behalf of *LBI affiliates* that were insolvent and that never made good to Barclays for the losses on their positions. Dziemian Dep. Tr. at 102:6-23, 103:20-105:14; 9/2/10 Tr. at 215:3-11 (Romain).

31.27.7.1  The only protection Barclays received against these losses on affiliate options (and affiliate futures, for that matter) was the margin that LBI had posted in relation to those positions. Id.; BCI Ex. 40 at ¶¶ 19, 99; 10/5/10 Tr. at 32:8-33:18 (Leitner).

31.27.7.2  As LBI admits, all of the assets in all of LBI's OCC accounts at the time of the Closing — including LBI's OCC customer options account (074C) — were LBI proprietary assets, not customer assets. Trustee Reply Br. at ¶ 70.

31.28.  James Seery, a Lehman employee who "had an active role in the events and negotiations relating to the Sale Transaction," who "participated in the discussions at Weil Gotshal over the weekend between the approval hearing and the September 22 closing" (M. Ex. 568), and who had discussions with the Creditors' Committee concerning, among other things, the ETD component of the transaction, BCI Ex. 124, testified at trial that the Purchased Assets included the ETD Margin Deposits. 5/4/10 Tr. at 164:23-165:7 (Seery).

31.29.  Bart McDade admitted that he did not recall one way or another what the deal was with
respect to ETDs and ETD Margin Deposits.  4/27/10 Tr. at 45:20-24 (McDade).

> "Q.        [Y]ou were not personally involved in and you do not personally
> recall one way or the other what the deal was with respect to exchange traded
> derivatives and their collateral.
>
> A.        To the specifics, yes, that's correct."
>
> 4/27/10 Tr. at 45:20-24 (McDade).

31.30.  Bart McDade admitted that he was not personally involved in any negotiations with
Barclays over the ETDs or ETD Margin Deposits.  4/27/10 Tr. at 45:25-46:2 (McDade).

> "Q.        [Y]ou were not personally involved in those [exchange-traded
> derivatives] negotiations, correct?
>
> A.        That's correct."
>
> 4/27/10 Tr. at 45:25-46:2 (McDade).

31.31.  Because Bart McDade admitted that he did not recall one way or another what the deal
was with respect to ETD Margin Deposits, and was not personally involved in discussing
the ETD Margin Deposits with Barclays, his statement that he believed ETD Margin
Deposits were not to be "included" simply reflects his subjective state of mind, not any
objective fact regarding what was actually communicated between Barclays and Lehman
during the week of September 15, 2008.  *Compare* 4/27/10 Tr. at 45:20-46:2 (McDade)
*with* 4/26/10 Tr. at 234:18-22 (McDade)

31.32.  Neither Bart McDade nor any other Lehman or Trustee negotiator or representative ever
communicated to Barclays that ETD Margin would not be included as a Purchased Asset.
4/26/10 Tr. at 45:20-46:1 (McDade); 5/5/10 Tr. at 127:19-25, 154:16-22 (Kobak);
8/24/2010 Tr. at 104:8-11 (Rosen); 9/8/10 Tr. at 88:12-17, 148:13-149:7 (Raisler)
(Trustee's interpretation that "any property" refers only to specific types of customer
collateral inconsistent with Raisler's understanding and was never communicated to
him);  8/30/2010 Tr. at 20:4-10 (James).

**32.  Counsel To The Trustee And LBHI Were Told Repeatedly That LBI's ETD Accounts Contained Cash Margin And That All Such Cash Margin Was Being Transferred To Barclays, Yet Neither Counsel Nor Any Lehman Executives Objected.**

32.1.  Weil Gotshal, the Trustee, and their representatives were repeatedly told that LBI's ETD accounts contained *cash,* and that all such cash was being transferred to Barclays, and neither the Trustee, Weil Gotshal, nor any other representative of LBHI or LBI made any objection or gave any contrary response.  BCI Exs. 220, 231, 233, 234, 262, 265, 267.

32.1.1.  The Trustee never objected to the transfer of cash ETD Margin until he filed his Rule 60 brief on September 15, 2009 — nearly a year after the Closing. Trustee Rule 60 Brief at ¶¶ 67-71.

32.2.  The composition of LBI's ETD Margin Deposits as between cash and securities changed significantly throughout the week of September 15, 2008.  BCI Exs. 646, 693.

32.3.  Barclays did not and could not know how much of LBI's ETD Margin Deposits were in the form of cash at the time of the Closing.  8/30/10 Tr. at 84:22-85:3 (James); 9/8/10 Tr. at 120:14-21 (Raisler).

32.4.  Barclays always understood that the Purchased Assets included all ETD Margin Deposits, regardless of whether they were in the form of cash or government securities.  6/22/10 Tr. at 23:21-23 (Diamond), 5/3/10 Tr. at 22:10-15 (Hughes), 5/7/10 Tr. at 246:7-8 (Ricci); 8/30/10 Tr. at 13:24-14:14, 19:14-24, 20:8-12, 42:10-15 (James) (all testifying to their understanding that all margin was included in the deal).

32.5.  Weil Gotshal was expressly told that ETD Margin Deposits in the form of cash would be transferred to Barclays, and did not object.  BCI Exs. 220, 233, 5.

32.6.  The Trustee was expressly told that ETD Margin Deposits in the form of cash would be transferred to Barclays, and did not object.  5/5/10 Tr. at 113:14-23 (Kobak); BCI Exs. 231, 233, 262, 265, 267.

32.7.  The Trustee's 30(b)(6) representative admitted that he understood that ETD Margin Deposits in the form of cash were not excluded from the deal simply because they were in the form of cash.  Kobak Dep. Tr. at 282:14-284:3.

32.8.  The ETD Margin Deposits were encumbered assets at the time of the Sale Transaction. 10/5/10 Tr. at 42:4-46:5, 98:12-19 (Leitner); 8/30/10 Tr. at 58:2-11, 89:3-7 (James); 9/8/10 Tr. at 92:23-93:15, 115:13-116:3  (Raisler); BCI Ex. 16 (Sale Order) at ¶ N.

32.9.  In explaining Weil Gotshal's representations relating to "no cash" being transferred to Barclays, Weil Gotshal's lead bankruptcy lawyer, Harvey Miller, testified that these representations referred to "free cash, unencumbered cash" and did not refer to "margin cash associated with the customer's account."  4/28/10 Tr. at 89:23-90:8 (Miller).

32.10.  When asked whether he understood that only customer cash would be transferred to Barclays, and no proprietary cash, Harvey Miller further testified that "I'm not sure how you would characterize that as whether it's Lehman cash or customer cash.  But as a general proposition, with the accounts being transferred, everything relating to those accounts was being transferred." 4/28/10 Tr. at 90:9-16 (Miller) (emphasis added).

32.11.  The Trustee agreed that ETD Margin Deposits in the form of cash would be transferred to Barclays.  BCI Ex. 3a; BCI Exs. 156, 231, 470, 5; 5/5/10 Tr. at 113:14-23 (Kobak).

32.12.  The Sale Order expressly contemplated that ETD Margin Deposits in the form of cash would be transferred to Barclays.  BCI Ex. 16 (Sale Order) at ¶ N.

32.13.  The Sale Order made clear that all of the ETD Margin Deposits being transferred to Barclays were encumbered assets, as opposed to "free cash, unencumbered cash" of the type Harvey Miller understood people to be referring to at the September 19, 2008 Sale Hearing.  BCI Ex. 16 (Sale Order) at ¶ N.

32.14.  Weil Gotshal and Barclays' attorneys all understood the statement made to the Court concerning "cash" to be referring to "free cash," as opposed to encumbered cash.  4/28/10 Tr. at 89:13-90:16 (Miller); 8/24/10 Tr. at 111:7-14 (Rosen).

32.15.  As made clear by the Sale Order provision that was proposed by the OCC, accepted by the parties, and included in the Sale Order that was issued by this Court, and as confirmed by unrebutted fact and expert witness testimony in this case, cash posted as margin in an ETD account is an encumbered asset; it is not "free cash."  BCI Ex. 220, BCI Ex. 16; 9/8/10 Tr. at 125:20-126:18 (Raisler); 10/5/10 Tr. at 42:4-46:5, 98:12-19 (Leitner).

32.16.  Cash is a form of property, and therefore "any property" includes cash.  5/5/10 Tr. at 124:3-11 (Kobak) (Trustee 30(b)(6) designee James Kobak) (testifying that the ETD-related parenthetical "wasn't limited in any way"); Kruse Dep. Tr. at 191:12-192:5; 194:12-18 (LBHI 30(b)(6) designee Kruse) (testifying that that the ETD-related parenthetical encompassed "any collateral" associated with the ETDs); 15 U.S.C. § 78lll(4) (SIPA states that "The term 'customer *property*' means *cash* and securities…") (emphasis added); *see also* 11 U.S.C. § 741(4) (defining "customer *property*," for purposes of stockbroker liquidation, as "*cash*, security, or other property, and proceeds of such cash, security, or property, received, acquired, or held by or for the account of the debtor, from or for the securities account of a customer") (emphasis added); *In re Verestar, Inc.*, 343 B.R. 444, 464 (Bankr. S.D.N.Y. 2006) ("[C]ash is property of the entity that has control."); *Matter of Willows of Coventry, L.P.*, 154 B.R. 959, 966 (Bankr.N.D. Ind. 1993) ("*Cash* collateral is, by definition, *property* of the estate.") (emphasis added).

32.17.  The version of the Clarification Letter that all of the parties executed provided that the Purchased Assets included "exchange-traded derivatives (and *any property* that may be held to secure obligations under such derivatives)."  BCI Ex. 5.

    32.17.1.  The committee received the final Clarification Letter at 5:26 am on September 22.  BCI Ex. 281.

32.18.    By agreeing to a Sale Order provision that contemplated the transfer of cash margin at the OCC to Barclays, by agreeing that "*any property* held to secure obligations under the" ETDs would be Purchased Assets, and by agreeing that "margin cash" was different from "free cash," Weil Gotshal, acting in its capacity as the Debtor's law firm and agent in negotiating the Sale, has repeatedly agreed that ETD Margin Deposits in the form of cash would be transferred to Barclays.  BCI Exs. 5, 16, 220, 235; 4/28/10 Tr. at 89:13-90:16 (Miller).

32.19.    The Clarification Letter's cash exclusion provision expressly carved out cash encompassed by the definition of Purchased Assets so that such cash remained as part of the deal.  BCI Ex. 5 (Clarification Letter) at § 1(c).

32.20.    The Clarification Letter's cash exclusion provision did not apply to ETD Margin Deposits in the form of cash because the ETD Margin Deposits were encompassed by the definition of Purchased Assets.    BCI Ex. 5 (Clarification Letter) at § 1(a)(ii)(C).

32.21.    The ETD Margin Deposits were composed of a combination of cash and securities.  BCI Ex. 646; BCI Exs. 680-92; M.494; M.495; 5/3/10 Tr. at 22:16-23:12 (Hughes).

32.22.    The portion of the ETD Margin Deposits that consisted of securities were not "cash equivalents" as that phrase was used in the Purchase Agreement.  BCI Ex. 731a at 187; BCI Exs. 680-692; BCI Exs. 972, 973.

    32.22.1.    The Purchase Agreement identifies, as one of the Excluded Assets, "cash or cash equivalents."  BCI Ex. 1; BCI Ex. 5.

    32.22.2.    The Purchase Agreement does not define the term "cash equivalents."  *Id.*

    32.22.3.    There is no evidence that the meaning of the term "cash equivalents" was ever specifically discussed among the parties.

    32.22.4.    Each party to the Purchase Agreement used the term "cash equivalents" in its publicly filed annual report to mean certain "highly liquid" securities with "maturities of less than three months."  BCI Ex. 731a; Barclays' 2007 Annual Report at p.157 ("For the purposes of the cash flow statement, cash comprises cash on hand and demand deposits, and *cash equivalents comprise highly liquid investments* that are convertible into cash with an insignificant risk of changes in value *with original maturities of less than three months*."); Lehman Brothers Holding, Inc. 2007 Annual Report at p. 97 ("Cash equivalents include highly liquid investments not held for resale *with maturities of three months or less* when we acquire them") (emphases added).[1]

---

[1] Although the Barclays and Lehman 2007 Annual Reports are not trial exhibits, the Court may take judicial notice of them because they are publicly filed documents (and moreover, both were prepared by a parties to this action).  *See Kramer v. Time Warner*, 937 F.2d 767, 773 (2d Cir. 1991); *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x 474 (2d Cir. 2006); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665 (2d Cir. 2009).

32.22.5.    Therefore, the best evidence of what the parties intended by the phrase "cash equivalents" is the parties' annual reports, which define it to include only highly liquid securities with maturities of three months or less.

32.22.6.    None of the ETD Margin Deposits consisted of securities with a term of maturity of three months or less.  BCI Exs. 680-692, 972, 973.

32.22.7.    The definition of the term "cash equivalents" in SEC Regulation T ("Regulation T"), promulgated under the authority of the Securities Exchange Act of 1934, is irrelevant to what the parties intended the phrase "cash equivalents" to mean.

32.22.7.1    The evidence shows that neither party believed the definition of the phrase "cash equivalents" in Regulation T was a definition they would normally use; to the contrary, their normal use was set forth in their annual reports, which defined the term to include only certain highly liquid securities with a term of maturity of three months or less.  *See* BCI Ex. 731a at p. 201 (Barclays 2008 Annual Report at p. 97. ("[C]ash equivalents comprise highly liquid investments that are convertible into cash with an insignificant risk of changes in value *with original maturities of less than three months*"); Barclays Bank PLC 2007 Annual Report (SEC Form 20-F) at p.157, *available at* http://www.sec.gov/Archives/edgar/data/312069/000119312508 065551/d20f.htm (same) *and* Lehman Brothers Holding Inc. 2007 Annual Report (SEC Form 10-k) at p.97, available at http://www.sec.gov/Archives/edgar/data/806085/000110465908 005476/a08-3530_110k.htm ("Cash equivalents include highly liquid investments not held for resale *with maturities of three months or less when we acquire them*.").[2]

32.22.7.2    The "principal purpose" of Regulation T "is to regulate extensions of credit by brokers and dealers; it also covers related transactions within the Board's authority under the Act.  It imposes, among other obligations, initial margin requirements and payment rules on certain securities transactions."  12 C.F.R. 220.1(a).

---

[2] Barclays' 2008 Annual Report, quoted in the text, is admitted in evidence as BCI Ex. 731a.  Barclays' 2007 Annual Report and LBI's 2007 Annual Report, also cited in the text, are not.  However, the Court may take — and Barclays requests that the Court take — judicial notice under Fed. R. Evid. 201 of the fact that these reports were filed and, in the reports, the term "cash equivalents" was defined as quoted.  The Court can take judicial notice "at any stage of the proceeding," and must do so where the requested fact is "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."  *Id.*  Courts routinely take judicial notice of information contained within reports publicly filed with the S.E.C.  *Kramer v. Time Warner*, 937 F.2d 767 (2d Cir. 1991); *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x 474 (2d Cir. 2006); *Garber v. Legg Mason, Inc.*, 347 F. Appx. 665 (2d Cir. 2009).  Barclays has provided prior notice to Movants of its intent to request the Court to take judicial notice of these facts, as the rule prefers, but does not require.  Fed. R. Evid. 201(e).

32.22.7.3    Regulation T defines "cash equivalent" as "securities issued or guaranteed by the United States or its agencies, negotiable bank certificates of deposit, bankers acceptances issued by banking institutions in the United States and payable in the United States, or money market mutual funds."  12 C.F.R. § 220.2.

32.22.7.4    As the text of Regulation T itself makes clear, its definition of cash equivalents is inapplicable to the government securities that LBI posted to secure its ETD obligations for two reasons:

32.22.7.4.1    First, the part of Regulation T that contains the definition of cash equivalents does not apply to "the deposit of securities with an option or futures clearing agency for the purpose of meeting the deposit requirements of the agency" and hence does not apply to the ETD Margin Deposits.  12 C.F.R. § 220.9(b).

32.22.7.4.2    Second, the part of Regulation T that contains the definition of cash equivalents does not apply to LBI, which was an exempted borrower under that provision.  12 C.F.R. § 220.1(b)(3)(ii) (providing that this part does not apply to credit extended to "an exempted borrower," which is defined as a registered broker or dealer with a substantial portion of its business consisting of transactions with persons other than brokers or dealers, and includes those that maintain "at least 1000 active accounts on an annual basis for persons other than brokers, dealers, and persons associated with a broker or dealer"); BCI Ex. 49 (9/19/08 Tr.) at 72:14-19 (Caputo) (stating at Sale Hearing that LBI had over 600,000 customers, 130,000 of whom were non-institutional, thus qualifying LBI as an exempted borrower).

33. **It Was Not Possible For Barclays To Know What If Any Net Value Might Be Associated With The Exchange-Traded Derivatives And Associated Collateral As Of The September 19 Sale Hearing, Or At Any Time Prior To The September 22 Closing, Even Though It Undertook Its Best Efforts To Ascertain Such Information.**

33.1.  Barclays attempted throughout the week of September 15, 2008, to obtain as much information as possible about LBI's ETD accounts. 8/30/10 Tr. at 18:7-22, 32:11-21 (James); 9/8/10 Tr. at 121:8-20, 123:21-124:5 (Raisler).

33.2.  The information Barclays received concerning LBI's open ETD positions and ETD Margin Deposits during the week of September 15, 2008, was inaccurate and incomplete, and what information Barclays did receive was provided with insufficient time to be of use in protecting against risk. 9/8/10 Tr. at 124:6-125:1 (Raisler) (the information Barclays received was "dramatically incomplete"); 8/24/2010 Tr. at 112:15-23, 216:22-217:3 (Rosen); 8/30/2010 Tr. at 19:6-8, 30:2-31:16, 44:16-22 (James).

33.3.  Barclays was not able to obtain a full listing of LBI's open ETD positions and ETD Margin Deposits until after the Closing. BCI Exs. 259, 290, 294; 8/30/10 Tr. at 18: 7-22, 42:16-25, 47:19-49:13 (James); 9/8/10 Tr. at 124:6-125:1 (Raisler) (Barclays was still learning about LBI accounts and positions after the Closing); 10/5/10 Tr. at 127:15-128:20 (Leitner).

33.4.  LBI itself could not determine the composition of its open ETD positions and ETD Margin Deposits prior to the Closing. 5/5/10 Tr. at 191:19-192:18 (Kobak); 8/30/10 Tr. at 118:7-22, 42:22-25 (James).

33.5.  The Trustee's representative, James Kobak, testified that no one involved in the transaction knew the value of the ETD accounts (positive or negative) at the time of Closing. 5/5/10 Tr. at 191:19-192:18 (Kobak).

33.6.  LBI's books and records were in disarray during the week of September 15, 2008. 8/30/10 Tr. at 18:7-22, 46:3-22 (James); *see also* 6/21/10 Tr. at 52:4-13 (Marsal); Marsal Dep. Tr. at 122:18-123:10.

33.7.  LBI's computer systems commingled its futures positions with its FX positions. 8/30/2010 Tr. at 46:3-22, 51:9-19 (James).

33.7.1.  Barclays was acquiring the futures business and assets, but not the FX business and assets. Thus, the commingling of this information on the Lehman system prevented Barclays from obtaining accurate information on the futures business and assets before the Closing, and for several weeks after. 9/2/10 Tr. at 24:25-25:9 (Romain).

33.8.  LBI's risk system commingled its over-the-counter and exchange-traded options positions. 8/25/10 Tr. at 75:1-15 (King).

33.9.  LBI held positions on behalf of its affiliates in both house and customer accounts in the
U.S. and around the world.  8/30/2010 Tr. at 23:14-16, 48:24-49:7, 45:15-22, 47:19-49:3
(James).

33.10.  LBI's systems issues and the state of LBI's books and records during the week of
September 15, 2008, contributed to LBI's inability to identify its open ETD positions for
Barclays prior to the Closing.  8/30/10 Tr. at 42:22-25, 43:10-13, 43:21-44:8, 46:3-22,
47:12-24, 48:12-50:9 (James).

33.11.  On the afternoon of the closing, September 22, 2008, Barclays trader and risk manager
Stephen King explained in an e-mail that "*It is clear that LB has absolutely no idea what
it's OCC risk position is.  We know it is between 2 billion short and 4 billion long.  They
do not know what has been booked to what entity.  We cannot see.  We are now four days
into making zero progress on this with them.*"  BCI Ex. 290 (emphasis added).

33.12.  Barclays did not have a system capable of aggregating and valuing the ETD options
positions it did learn about prior to the Closing, or assessing their risk position, until
sometime in October 2008.  8/31/10 Tr. at 47:4-18 (James); 8/25/10 Tr. at 74:13-25,
75:15-21 (King); 9/2/10 Tr. at 24:11-25:5 (Romain).

**34.    Barclays Faced Substantial Risks In Acquiring LBI's ETD Accounts.**

34.1.    There was substantial risk associated with Barclays' assumption of LBI's ETD Accounts. BCI Ex. 970 at Ex. C, p.16 (p.180 of .pdf), item # 238 ("LBI and Barclays experience difficulty verifying trade risk as positions were being transferred from LBI to Barclays"); *id.* at p.17 (p.181 of .pdf), item # 241 ("Internally, LBI cannot discern which accounts have actually settled versus what may have settled because Chase still may have been making some settlements even after it decided to lock LBI out on 9/19/08. Some accounts may need additional funding to settle");    5/5/10 Tr. at 126:11-17 (Kobak); 8/24/10 Tr. at 112:15-113:13, 117:2-21, 126:14-127:1 (Rosen); 9/8/10 Tr. at 102:18-104:10, 105:6-106:16, 110:15-24, 117:23-118:3, 123:18-124:23 (Raisler); 10/5/2010 Tr. at 21:23-22:14 (Leitner) (amount of margin requirements indicated tremendous risk); *id.* at 23:17-25:1, 30:1-23 (unhedged positions increased risk of portfolio); *id.* at 28:15-29:8 (VIX positions); *id.* at 31:1-32:7 (funding exposure).

34.2.    The Trustee's 30(b)(6) representative, James Kobak, admitted that, at the time Barclays assumed responsibility for the LBI accounts, he "assumed" that "there was probably substantial risk with derivative positions, especially during the climate at the time." 5/5/10 Tr. at 126:11-17 (Kobak).

34.3.    Barclays was concerned about the risks associated with assuming LBI's ETD accounts. 8/24/10 Tr. at 112:15-114:11, 117:2-21, 217:12-19, 224:2-13 (Rosen); 9/8/10 Tr. at 105:6-106:16, 110:13-24, 117:23-118:3, 123:21-124:5 (Raisler).

34.4.    The Trustee's 30(b)(6) representative, James Kobak, admitted that he knew prior to the closing that Barclays was concerned about the risks associated with assuming LBI's ETD accounts, and he testified that he "certainly knew that the OCC was." 5/5/10 Tr. at 126:18-127:18 (Kobak).

34.5.    Barclays faced huge exposure due to ETD positions in LBI's OCC accounts.  9/8/10 Tr. at 182:23-184:5, 105:6-106:16 (Raisler).

34.6.    The values of LBI's open ETD positions fluctuated by hundreds of millions of dollars per day during the week of September 15, 2008.  BCI Exs. 646, 693; 8/30/2010 Tr. at 38:4-10; 39:3-8; 39:14-18; 40:6-25 (James); 10/5/10 Tr. at 35:8-38:13 (Leitner).

34.6.1.    In the three days between Monday, September 15, 2008, and Thursday, September 18, 2008, the margin requirements on LBI's OCC accounts nearly tripled, increasing from $789.6 million on September 15, 2008 to $2.069 billion on Thursday, September 18, 2008 — an increase of nearly $1.3 billion. BCI Ex. 646; 10/5/10 Tr. at 35:2-36:11 (Leitner).

34.6.1.1    From Monday, September 15 to Tuesday, September 16, 2008, the margin requirement at the OCC increased from $789.6 million to $1.36 billion.  BCI Ex. 646, 693; 10/5/10 Tr. at 35:15-18, 35:22-25 (Leitner).

34.6.1.2   From Tuesday, September 16 to Wednesday, September 17, 2008, the margin requirement at the OCC increased again, from $1.59 billion to $1.404 billion. BCI Ex. 646; 10/5/10 Tr. at 35:18-22 (Leitner).

34.6.1.3   From Wednesday, September 17 to Thursday, September 18, 2008, the margin requirement at the OCC increased again, this time by over $500 million, from $1.404 billion to $2.069 billion. BCI Ex. 646; 10/5/10 Tr. at 36:1-4 (Leitner).

34.7.   The substantial fluctuations in the values of LBI's open ETD positions made it impossible to pinpoint their value as of any particular point in time. 8/24/2010 Tr. at 111:15-112:3, 112:15-23, 113:17-114:13, 126:14-127:1 (Rosen); 8/25/10 Tr. at 79:12-81:7 (King); 10/5/10 Tr. at 32:8-35.2 (Leitner).

34.8.   The exchanges and clearing houses did not believe that the margin deposits in LBI's ETD accounts were sufficient to protect against the risk of loss associated with the positions in those accounts.

34.8.1.   On Thursday, September 18, 2008, as a self-protective measure, the CME auctioned off the Lehman proprietary ETD positions traded there, at a cost to the Lehman estate of approximately $1.6 billion. BCI Ex. 49 (9/19/08 Tr.) at 61:16-19, 239:17-21; 9/8/10 Tr. at 98:13-18, 99:13-100:23 (Raisler).

34.8.2.   Prior to conducting its auction, the CME expressed to Barclays that the existence of initial margin alone was not enough to provide comfort to a clearing house; CME was also relying on the credit strength of the clearing member. 9/8/10 Tr. at 93:16-94:8 (Raisler).

34.8.3.   After the CME auction, the ICE Futures Exchange similarly took self-protective measures, liquidating all of Lehman's positions on the following day. 9/8/109 Tr. at 104:1-16, 104:21-105:5 (Raisler).

34.8.4.   On Friday, September 19, 2008, the OCC refused to release to LBI any of the margin assets in LBI's OCC accounts. BCI Ex. 970 at ¶73 ("[T]he Options Clearing Corporation invoked its exchange rules as a basis to refuse to release over $400 million of computed excess margin on September 19th, 2008"); 9/8/10 Tr. at 106:17-107:2, 107:12-24 (Raisler); Jones Dep. Tr. 15:19-16:24, 43:3-9.

34.8.5.   On Friday, September 19, 2008, the OCC drew down on letters of credit to provide still further security against potential losses in LBI's OCC accounts. BCI Ex. 1052; BCI Ex. 978 at ¶¶ 41-42.

34.8.6.   The OCC, despite having full information about LBI's positions and associated margin, could not determine the value of LBI's ETD accounts in the two days immediately preceding the Closing. BCI Ex. 236 ("based on a market movements Friday, a significant amount of it may be excess, but OCC

won't know until tomorrow"), BCI Ex. 242 ("While we have indicated that there may be some release of excess margin collateral on Monday, Saturday morning preliminary numbers actually showed a $5.1 million margin deficit, so I would not look for any large release.").

34.8.7.   The OCC, despite the fact that it was holding over $2 billion in margin as collateral to secure LBI's ETD-related obligations, was still sufficiently concerned about its exposure on those accounts on Sunday, September 21, 2008, that it was planning to liquidate the accounts on the following day if the transfer to Barclays did not occur.  BCI Exs. 262, 267.

34.8.7.1   On Sunday, September 21 at 4:03 pm, the OCC clearly communicated its intention to liquidate the LBI accounts if the deal did not close, stating:  "If the transaction does not close tonight, OCC would need to immediately liquidate and close out the LBI accounts and is preparing to do so."  BCI Ex. 262.

34.8.7.2   On Sunday, September 21, 2008 at 4:15 pm, SIPC implored the OCC not to liquidate the LBI accounts, stating:  "I urge you in the strongest possible terms not to take precipitous action."  BCI Ex. 265.

34.8.7.3   Later that Sunday, at 4:37 pm, upon hearing the concerns of SIPC, the OCC indicated it would nonetheless have no choice but to liquidate the Lehman accounts if the deal was not consummated, stating:  "OCC cannot allow the positions to remain in place if no transaction is concluded tonight because *OCC will then be exposed to loss if the market moves against LBI's positions*."  BCI Ex. 267. (emphasis added).

34.9.   If Barclays had not received the ETD Margin Deposits, its acquisition of LBI's ETDs would have generated a loss immediately after the Closing of over $1.5 billion.

34.9.1.   The exchange-traded options that Barclays acquired in the Sale Transaction carried a net negative value at the time of Closing of over $1 billion.  9/2/10 Tr. at 27:23-28:17 (Romain).

34.9.2.   The exchange-traded options that Barclays acquired in the Sale Transaction lost nearly $400 million in value (net of hedges) in the two weeks immediately following the Closing — before Barclays was able to implement an effective hedging strategy.  BCI Ex. 147 at p.2; 8/30/10 Tr. at 50:13-51:20 (James) (futures alone lost $700 million the week following the Closing); 9/2/10 Tr. at 226:20-227:11 (Romain) (losses were between $300 and $400 million net of hedges); Clark Dep. Tr. at 55:13-56:22, 60:7-61:8.

34.9.3.   Barclays sustained over $140 million in losses in closing out ETD positions that LBI had held on behalf of LBI affiliates.  9/2/10 Tr. at 208:9-13, 214:13-21 (Romain); BCI Ex. 147 at pp. 2-3.

34.9.4.    Barclays incurred over $100 million in costs in the months following the Closing administering LBI's customer futures accounts.  8/30/10 Tr. at 50:17-51:19 (James) (included $60 million from currency trading exposures plus £20 million in exposures related to European customers).

34.10.  If they had been kept by the estate, LBI's ETD accounts would likely have little if any value to the estate, and may well have generated a substantial liability.

34.10.1.    The risk of loss associated with LBI's ETD accounts would have been much greater had those accounts remained with LBI because they would have been subject to a forced liquidation and would have been entirely unhedged.  BCI Exs. 262, 267; 10/5/10 Tr. at 36:12-24 ("this would have been all Lehman's risk"), 42:4-43:3, 52:14-53:15 (Leitner).

34.10.2.    The OCC would have liquidated LBI's ETD accounts on Monday, September 22, 2008, if Barclays had not agreed to accept LBI's obligations under those accounts.  BCI Exs. 262, 267.

34.10.3.    The liquidation of LBI's OCC accounts would have been the largest liquidation of an equity options portfolio in history, 10/5/10 Tr. at 43:16-44:10 (Leitner), and presented a substantial risk of unrecoverable loss to LBI's customers, 10/5/10 Tr. at 49:22-50:18 (Leitner).

34.10.4.    All exchanges and clearing houses would have had the same powers and incentives as those of the OCC to protect themselves by liquidating LBI's ETD accounts absent their transfer to Barclays.  10/5/10 Tr. at 44:25-46:5 (Leitner); 8/30/10 Tr. at 58:21-59:14 (James); 9/8/10 Tr. at 104:11-107:24 (Raisler); 4/27/10 Tr. at 46:6-11 (McDade); BCI Exs. 262, 265, 267, 970 at 73 (pp. 37), ¶¶ 143-46 (pp.68-70).

34.10.5.    All of LBI's ETD Margin Deposits would have been subject to seizure by clearing houses and exchanges in an account liquidation to cover the costs of that liquidation.  10/5/10 Tr. at 45:5-22 (Leitner); 8/30/10 Tr. at 57:16-58:16 (James); 9/8/10 Tr. at 104:11-107:24, 117:7-22, 118:17-119:3, 120:7-121:7, 125:17-127:17 (Raisler).

34.10.6.    It is very unlikely that LBI's ETD accounts would have had any significant value to the Lehman Estate absent their transfer to Barclays.  10/5/10 Tr. at 43:16-44:24 (Leitner); 8/30/10 Tr. at 58:21-59:2 (James); 4/27/10 Tr. at 46:6-11, 46:21-47:25 (McDade).

34.10.7.    LBI's ETD Margin Deposits were not the limit on the amount of loss Lehman could have sustained in such a liquidation.  10/5/10 Tr. at 46:10-47:18 (Leitner); 8/30/10 Tr. at 58:17-59:14 (James); 9/8/10 Tr. at 126:10-18 (Raisler).

34.10.8.    Any losses sustained in such a liquidation that went above and beyond LBI's ETD Margin Deposits would have given rise to additional claims against the

Lehman estate.  8/30/10 Tr. at 58:17-59:14 (James); 10/5/10 Tr. at 48:11-49:10 (Leitner); 9/8/10 Tr. at 127:5-20 (Raisler); 4/27/10 Tr. at 46:5-10 (McDade).

34.10.9.   As Harvey Miller explained to the Court at the September 19 Sale Hearing, given the significant losses that LBI incurred when the CME closed out LBI's ETD accounts on that exchange, "[t]his administration is finished if this transaction is not completed, Your Honor."  BCI Ex. 49 (9/19/08 Tr.) at 239:17-21.

34.10.10.   The Lehman negotiators recognized that if Barclays did not assume LBI's ETD obligations, the ETD Margin Deposits could be wiped out in a liquidation.  4/27/10 Tr. at 46:6-11, 46:21-47:25 (McDade).

34.10.11.   Movants were also aware that a liquidation of LBI's ETD accounts would have caused substantial harm to LBI's customers.  5/5/10 Tr. at 138:8-24 (Kobak); 10/5/10 Tr. at 49:22-50:18, 52:4-13 (Leitner); BCI Ex. 267.

**35.      For Months After The Closing, And *After* He Admits He Was Aware Of Everything He Now Claims He Did Not Know At The Time Of The Closing, The Trustee Continued To Acknowledge Barclays' Entitlement To The ETD Margin Deposits And To Authorize Their Transfer To Barclays.**

35.1.    The Trustee's 30(b)(6) representative testified that he understood "in the week prior to the closing" that the OCC accounts "include[d] LBI positions in exchange-traded derivatives," 5/5/10 Tr. at 105:21-106:4 (Kobak), *id.* at 107:11-13 (Kobak), and that "Barclays was taking on ETD positions of LBI, the proprietary positions." 5/5/10 Tr. at 125:10-14 (Kobak).

35.2.    The Trustee's 30(b)(6) representative testified that, at that same time, he "had a general understanding" — and that "it was logical" to him — that even if there was no proprietary cash in LBI's ETD accounts, "there would be some kind of collateral, whatever you want to call it" to support these LBI proprietary positions. 5/5/10 Tr. at 105:19-107:6 (Kobak).

35.3.    The Trustee's 30(b)(6) representative testified that he knew for a fact by "sometime in October" that the collateral in LBI's OCC accounts included LBI *proprietary* assets, *both* in the form of *cash* and in the form of securities. 5/5/10 Tr. at 109:21-110:25 (Kobak).

35.4.    For *months* after the Closing, the Trustee cooperated with Barclays representatives in their efforts to obtain the ETD Margin Deposits, and authorized several different transfers of ETD Margin Deposits to Barclays. 8/30/2010 Tr. at 51:25-52:13 (James); 9/8/10 Tr. at 127:21-128:21, 129:11-130:19 (Raisler).

35.5.    On October 2, 2008, at 1:28 pm, the OCC wrote to the Trustee, explaining that "OCC will continue to follow the directions of BCI . . . and otherwise act with respect to positions and collateral carried under both [former LBI account numbers] at the direction of BCI without consent from the Trustee." BCI Ex. 470.

35.6.    Also in its October 2, 2008 1:28 pm email, OCC stated its "belie[f] that there was no need for the consent . . . that you sent . . . relating to the transfer of certain positions." BCI Ex. 470.

35.7.    Also in its October 2, 2008 1:28 pm email, OCC requested that the Trustee "[p]lease let OCC know immediately if you know of any reason that OCC should not continue to treat BCI Ex. as the owner of the 074 accounts." BCI Ex. 470.

35.8.    On October 3, 2008 at 9:04 am, after speaking with Trustee lawyer Carolyn Levine regarding OCC's October 2, 2008 1:28 pm email, OCC counsel James McDaniel again wrote to the Trustee's lawyers: "I think we are all on the same page here. . . . so please let me know asap if we have any issues that need immediate resolution." BCI Ex. 470.

35.9.    In their internal email response to OCC's October 2, 2008 1:28 pm and October 3, 2008 at 9:04 am emails, Trustee lawyer Christopher Kiplok wrote to other Trustee lawyers James Kobak and Carolyn Levine and operational personnel Laura Vecchio: "I think we are OK with the below" — the "below" being OCC's stated intent to "act with respect to

positions *and collateral* [in LBI's former OCC accounts] at the direction of BCI without consent from the Trustee." BCI Ex. 470.

35.10. On November 14, 2008, the Trustee's representative, James Kobak, stated in writing that he was "aware of the Transfer and Assumption Agreement, dated September 19, 2008, which of course I executed on his behalf, and the Trustee fully intends to comply with its terms." BCI Ex. 156.

35.11. In that same letter, the Trustee's representative, James Kobak, stated that the collateral deposited in respect of LBI's former futures and options positions at the OCC "can be transferred to Barclays (and the Trustee will gladly consent) if Barclays will live up to its bargain and assume the obligations involved for all customers." BCI Ex. 156.

35.12. As of July 15, 2009, the Trustee continued to work to apprise Barclays of the extent to which LBI proprietary collateral held by overseas brokers was recoverable. BCI Ex. 920.

35.13. As late as February 2009, the Trustee continued to believe that the ETD Margin Deposits were Purchased Assets. BCI Ex. 978 at ¶¶ 50, 51 (pp.11-12).

35.13.1.    In December of 2008, the OCC commenced an interpleader action relating to competing claims to $80 million in LBI proprietary cash that was in LBI's OCC accounts at the time of the closing. BCI Ex. 978 at p.p. 1-2; *id.* at ¶¶ 41-42.

35.13.2.    On February 6, 2009, the Trustee filed an "Answer To The Options Clearing Corporation's Interpleader Complaint and Statement of Claim to the Interpleader Funds." BCI Ex. 978.

35.13.3.    Never once in that pleading did the Trustee suggest that Barclays was not entitled to any LBI proprietary cash at the OCC, despite the fact that the Trustee admittedly knew by that point that the cash at the OCC was all proprietary cash. 5/5/10 Tr. at 109:21-110:25 (Kobak); BCI Ex. 978.

35.13.4.    To the contrary, the Trustee implicitly conceded that the collateral in LBI's margin accounts constituted "Purchased Assets" under the Purchase Agreement, and premised his claim on the fact that this particular $80 million was never deposited into those accounts, asserting:

> "[T]o the extent that the LC Proceeds were held by the OCC in a suspense account and never deposited in LBI's (or Barclays') margin account at the OCC, and accordingly do not constitute 'Purchased Assets' within the meaning of the Purchase Agreement or 'margin deposits' (or are not otherwise part of LBI's 'Account') within the meaning of the TAA, LBI is entitled to the Funds and Barclays has acquired no interest in the Funds."

> BCI Ex. 978 at ¶ 50; 9/8/10 Tr. at 141:4-143:12 (Raisler).

ix.     **Facts Showing The Reasonable And Good Faith Disclosures Made At The Sale Hearing, The Nature Of The $47.4 Billion Estimate Provided At The Sale Hearing, And The Basis Upon Which The Representatives Of LBHI And LBI Persuaded The Court To Approve The Sale Despite The Lack Of A Final Contract And The Considerable Uncertainty Involved In The Sale.**

36.     **The Sale Was Presented To The Court For Approval As The Sale Of The Business, And As The Best Alternative For The Estates, The Creditors, And The Public.**

36.1.    The APA defines "Purchased Assets" as "all of the assets…used in connection with the Business" except specifically identified "Excluded Assets."  BCI Ex. 1 (APA) at p. 6.

36.2.    The APA provides that "'Business' means the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant."  BCI Ex. 1 (APA) at p. 2.

36.2.1.    At trial, Harvey Miller testified:

"Q.    And the business that you saved, I believe you've always characterized that in terms of the sale transaction as the purchase of the North American business.  Is that right?

A.    North American capital markets business.

Q.    And that business was sold, through the asset purchase agreement.  And that provided for Barclays to acquire all assets used in connection with that business, except for those which were explicitly excluded, correct?

A.    That's correct."

4/28/10 Tr. at 94:7-15 (Miller).

36.3.    In the Sale Motion, the Debtor argued that "[t]he sale of the Purchased Assets is critical to the stabilization of value.  Each day that the Purchased Assets are subject to the vagaries and vicissitudes of the marketplace and the impact of bankruptcy diminishes the value of such assets."  BCI Ex. 11 (Sale Motion) at ¶ 6.

36.4.    The Debtor further argued that "[t]he proposed sale will maximize the value of the Purchased Assets and avoid rapid erosion of their value." BCI Ex. 11 (Sale Motion) at ¶ 8.

36.5.    In the Sale Motion, LBHI further argued that "[t]he expeditious consummation of the sale pursuant to the Purchase Agreement maximizes the value of the Purchased Assets and serves the best interests of all parties." BCI Ex. 11 (Sale Motion) at ¶ 13.

36.6.   The Sale Motion indicated that the Sale to Barclays was "unique because of the fragile and highly vulnerable nature of the Purchased Assets." BCI Ex. 11 (Sale Motion) at ¶ 17.

36.7.   At the September 17, 2008 hearing, Harvey Miller argued:

> "And if we had the luxury of an asset that would stay in place or a group of assets that would stay in place and would still be there two weeks from now, we clearly would have done the normal process of getting a sale procedures order entered, having a period of time for people to get — do whatever due diligence they wanted to do. … The consensus among all of the business people, Your Honor, and the professionals was there would be nothing to sell in two weeks. This is really and truly a wasting asset."

> BCI Ex. 48 (9/17/08 Tr.) at 29:1-12.

36.8.   At the September 17, 2008 hearing, Harvey Miller argued that the Sale would calm the "dangerous" financial markets:

> "[I]f it wasn't the unique nature of these assets, the sensitivity of these assets and what has happened in the marketplaces — one of the purposes of doing this transaction, Your Honor, is to try and soothe the markets and to — it'd be a counter force to the volatility that's going on.  I don't know if Your Honor has a screen in your office, but if you watched what's happening to the market today, it's dangerous."

> BCI Ex. 48 (9/17/08 Tr.) at 30:6-14.

36.9.   During the September 17, 2008 hearing, Harvey Miller stated that "this is such a perishable asset that if we don't take this action, due process — nothing will matter." BCI Ex. 48 (9/17/08 Tr.) at 31:1-9.

36.10.  Harvey Miller explained to the Court that:  "If it's not approved, no one can predict with any certainty the consequences other than to note that there will be additional turmoil and thousands of transactions will be suspended…. The substance of this transaction is to continue a business for the benefit of the general economy, the employees whose lives are at stake and to fit a small piece into the jigsaw puzzle of maintaining a stable economy."  BCI Ex. 49 (9/19/08 Tr.) at 60:9-23 (Miller).

36.11.  Harvey Miller argued to the Court that:  "To dissipate that effort, by rejecting a transaction that is intended to save jobs, protect customers and enable a relatively smooth transition of the LBI business and bring value to all involved, would be a miscarriage of justice and detrimental to the national interest."  BCI Ex. 49 (9/19/08 Tr.) at 61:9-13 (Miller).

36.12.  At the September 19, 2008 Hearing, Harvey Miller argued to the Court that:

> "In making those decisions that the government or parties involved wait for ordered reports, appraisals, physical inventories, a review of each and every

> document relating to the transaction, I think, Your Honor, the answer is no.
> They had to do what was necessary to protect the greater good and not to
> lose the forest for the trees."

> BCI Ex. 49 (9/19/08 Tr.) at 59:19-25 (Miller).

36.13. At the Sale Hearing, Harvey Miller argued that "[i]f [the Sale is] not approved, no one can predict with any certainty the consequences other than to note that there will be additional turmoil and thousands of transactions will be suspended. The volatility and distress of the liquidation of collateral positions will be unmatched in history." BCI Ex. 49 (9/19/08 Tr.) at 60:9-13.

36.14. During the Sale Hearing, the Trustee described the diminishing nature of LBI's assets:

> "And there are potential assets which are also valued highly on the balance
> sheet. As to what those assets will be, many of which appear to be — have
> decreased, because of market conditions, substantially in value just in a
> matter of days, I really cannot tell." BCI Ex. 49 (9/19/08 Tr.) at 78:12-16.

36.15. In proffering Bart McDade's testimony during the Sale Hearing, Harvey Miller stated that "as each hour has passed and uncertainty is prolonged, investor's [sic] faith in the market has weakened the value of Lehman's business and it has rapidly deteriorated.… Absent approval of the Barclays' transaction, the broker-dealer business would discontinue as a going concern and adversely impact the credit markets on a global scale in ways that are immeasurable." BCI Ex. 49 (9/19/08 Tr.) at 92:25-93:9.

36.16. Bart McDade proffered testimony during the Sale Hearing that the Sale "saves the jobs of thousands of employees and avoids losses that could total in the hundreds of billions of dollars." BCI Ex. 49 (9/19/08 Tr.) at 98:10-12.

36.17. Mr. McDade proffered testimony at the September 19 Sale Hearing that:

> "He would testify, Your Honor, that if the transaction is not consummated, it
> will result in the largest failure of a broker-dealer in the history of the United
> States and will cripple the credit markets for some time to come.  He would
> further testify, Your Honor, that the shock of this transaction not being
> consummated in the public markets could be immeasurable and could ignite a
> panic in the financial condition that we now face in the United States.  He
> would testify that it is essential to an orderly financial market that this
> transaction be consummated as early as possible in the interest of all
> stakeholders of these two cases.  And in the interest of the public in general
> and the economy in general, and to avoid a dislocation in the market, Your
> Honor."

> BCI Ex. 49 (9/19/08 Tr.) at 102:19-103:7 (McDade Proffer).

36.18. Mr. Ridings proffered testimony at the September 19 Sale Hearing that the assets have "substantially greater value if they are sold as a going concern…Without Barclays,

Lehman would be forced to sell discreet assets for a fraction of the value that will be realized from this transaction. By selling the business as a going concern, Lehman has preserved approximately nine to ten thousand jobs for its employees and avoided significant costs and claims that would have resulted if there were mass layoffs and a cessation of operations." BCI Ex. 49 (9/19/08 Tr.) at 144:18-145:4.

36.19.   Ken Caputo of SIPC argued that expeditious approval was needed to protect customers:

> "As soon as possible it needs to close. The sooner the better. That's going to provide certainty to parties and counterparties so that they can take the actions that they deem necessary to protect their clients but it also provides certainty to the hundreds of thousands of customers. And that provides comfort to the markets and I think comfort on a national scale as Mr. Miller alluded." BCI Ex. 49 (9/19/08 Tr.) at 73:20-74:1 (Caputo).

36.20.   The Trustee's lawyer, James Kobak, argued that expeditious approval was needed to protect customers: "the trustee has made an investigation and is prepared to approve the transaction, thinks that the transaction is in the best interest of customers and creditors of the SIPC estate including some of the — or all the changes that have been discussed today." BCI Ex. 49 (9/19/08 Tr.) at 75:6-10 (Kobak).

36.21.   At trial, the Trustee's representative admitted that the Trustee does not dispute that Barclays was a "good faith purchaser" because Barclays was "the only game in town":

> "Q.   Yes, sir, you've testified that you adopted this brief and incorporated by reference, correct?
>
> A.   I mean, there is material that precedes this and follows it that explains what this sentence, which is in the nature of a topic sentence, says such as the prospects for a competitive bid were slim; we've been pursuing strategic alternatives; Barclays was the only game in town. We have not really disputed any of that and we don't dispute it today. So in that sense they were a good faith purchaser.
>
> Q.   And you still don't dispute that, correct?
>
> A.   Those statements, yes.
>
> Q.   I'm sorry, what did you say?
>
> A.   The statements that there weren't competitive bids, that Barclays were the people that were willing to step up, that they were willing to take lots of accounts and so forth. We've never disputed that.
>
> Q.   You've never disputed that Barclays was, as you put it a moment ago, the only game in town, correct?
>
> A.   That's what we were led to believe. I don't — yes, we don't dispute it.

Q.  You don't dispute it today?

A.  I don't dispute it today."

5/5/10 Tr. at 190:1-22 (Kobak).

36.22.  At the Sale Hearing, Shari Leventhal of the New York Fed urged the Court to approve
the Sale in order to protect the markets and the public interest:

> "We believe that the timeliness here is — the time line that's been in place
> here is what is necessary, what is required under these very, very unique
> circumstances.  We're looking, in terms of our mandate, at financial stability
> here, and it is vitally important that this transaction go forward as quickly as
> possible in order to preserve the financial stability that, at this point, is already
> very fragile."  BCI Ex. 48 (9/17/08 Tr.) at 65:5-11 (Leventhal).

36.23.  Alistaire Bambach, chief bankruptcy counsel for the SEC, urged the Court to approve the
Sale in order to protect the markets and the public interest:

> "As you are aware, the commission has a statutory obligation to protect both
> the customers of the broker-dealer and the public investors at the holding
> company level.  We strongly support this very, very important transaction.  It
> is in the strong interests of the investing public."  BCI Ex. 48 (9/17/08 Tr.) at
> 65:21-66:1 (Bambach).

36.24.  Robert Wasserman of the CFTC urged the Court to approve the Sale in order to protect
the markets and the public interest:

> "…I just wanted to add that, in the interest of the futures markets as well, this
> is a situation that really should be dealt with as quickly as possible and that I
> support the representations of my colleagues at the Fed and the SEC."  BCI
> Ex. 48 (9/17/08 Tr.) at 69:19-22 (Wasserman).

36.25.  Ms. Leventhal of the NY Fed told the Court that there were limited possible bidders:

> "At the New York Fed, we, like many in this courtroom, have been working
> around the clock since before last weekend.  And as was widely reported in
> the press, we started working around the clock in an attempt to find a
> purchaser for Lehman.  And the sale process was widely reported, and what
> was also widely reported is that there weren't that many possible bidders.  The
> number is very small.  The number that met the requirements in terms of
> financial capability and regulatory qualifications — we're not talking
> twenties, tens even.  We're talking one or two."  BCI Ex. 48 (9/17/08 Tr.) at
> 64:19-65:4.

36.26.  Mr. Miller told the Court that there was no alternative to the transaction other than a
disastrous liquidation and responded to objections to a "discount" and "fire-sale deal" by
explaining that the assets being sold were falling in value and that "if the alternative

happens, there will be very little to distribute to creditors, if anything." BCI Ex. 49
(9/19/08 Tr.) at 244:11-24.

36.27.  At trial, .the Committee's counsel acknowledged that "the Barclays transaction was better
than a liquidation … the assumption was that this was a going concern bid and therefore,
it was better than liquidation." 6/25/10 Tr. at 61:1-20 (Despins).

36.28.  In the Sale Order and at the Sale Hearing, the Court found that "there is no better or
alternative transaction for these assets." BCI Ex. 49 (9/19/08 Tr.) at 250:13-21; *see* BCI
Ex. 16 (Sale Order) at ¶ 1 (the transaction was "necessary and appropriate to maximize
the value of the Debtors' estates").

36.29.  At the Sale Hearing, the Court explained that:

> "I believe that one of the remarkable aspects of our Bankruptcy Code, as it
> has evolved, is its remarkable flexibility to different circumstances. The
> lawyers who are appearing before me this evening are truly among the
> best and the brightest in the field. And some have participated in the
> evolution of bankruptcy as a field, nationally and internationally. We
> must close this deal this weekend not because the markets demand it,
> although that's certainly a part of it. Lehman Brothers became a victim.
> In effect, the only true icon to fall in the tsunami that has befallen the
> credit markets. And it saddens me. I feel that I have a responsibility to all
> the creditors, to all of the employees, to all of the customers and to all of
> you. Arguments have been made this evening by objectors, some
> questioning whether or not if I were to delay approval another better
> transaction might be realized or discovered. And that's a preposterous
> notion. As I said on Wednesday, it's very apparent to me that for a
> transaction of this sort to happen, only Barclays can do it. Only Barclays
> has the support of the regulators. Only Barclays is prepared to close.
> Only Barclays can deliver the customer accounts to safe harbors. And the
> customer property, which is the principal concern of the SIPC trustee, a
> case which is also pending before me now, will be best protected by virtue
> of approving the sale."

BCI Ex. 49 (9/19/08 Tr.) 248:13-249:11 (Court).

**37.     The $47.4 Billion Estimate Given At The Sale Hearing Was A Reasonable Estimate Of The Repo Collateral And The Clearance Box Assets — Which Were The Assets Which Had Effectively Become The Long Positions.**

37.1.    Harvey Miller testified that the $47.4 billion figure was an estimate of the changed value of the long positions provided for "guidance" — not a "valuation cap," as movants claim. 4/28/10 Tr. at 106:23-107:8 (Miller).

37.2.    After months of work to value the illiquid assets in the Repo Collateral for purposes of its Acquisition Balance Sheet (audited by PwC and filed with the SEC and FSA), Barclays valued the assets in the Repo Collateral (including everything received in the December 2008 Settlement) plus the Clearance Box Assets at approximately $47 billion.  9/2/10 Tr. at 33:25-34:9 (Romain).

37.3.    The $1.9 billion of Lehman marks for the Clearance Box Assets was higher than Barclays expected those assets to be worth.  Keegan Dep. Tr. at 130:22-133:15; M. 819; M. 580.

37.3.1.    The proprietary assets in LBI's clearance boxes generally could not be used even as collateral "because they were the most illiquid and hardest to value securities that Lehman Brothers owned on its balance sheet."  Kirk Dep. Tr. at 106:13-17; 10/6/10 Tr. at 56:18-23 (Pfleiderer).

37.4.    Mr. Kobak testified to his understanding that the trading assets and trading liabilities had "gone from 70 versus 69 to 47.4 versus 45.4."  5/5/10 Tr. at 197:24-198:5 (Kobak).

37.5.    Mr. Shapiro testified that "the forty-seven represented the corollary of the long position[s]."  8/23/10 Tr. at 114:11-18 (Shapiro).

37.6.    Mr. Hughes testified to his understanding that "the $47.4 was a reference to the diminution in value of the long positions."  4/30/10 Tr. at 191:2-192:22 (Hughes).

37.7.    Mr. Kruse, LBHI's and Alvarez's Rule 30(b)(6) witness on the $47.4 billion number, testified that the $47.4 billion figure appeared to refer not to the total of all assets but rather a "corollary" of the long positions described in subsection (d) of the APA.  Kruse Dep. Tr. at 201:3-202:3.

37.8.    Right after discussing the change in the Long Positions during the Sale Hearing, Lori Fife described additional changes in the treatment of LBI's residential real estate mortgage securities, which the APA identified as a category of Purchased Asset separate from the Long Positions.  BCI Ex. 49 (9/19/08 Tr.) at 47:1-4, 49:8-17.

37.9.    DTCC's counsel told the Court on September 19 that LBI had "six billion dollars of residential mortgages," which meant that the 50% of this portfolio that Barclays expected to receive was valued by Lehman at approximately $3 billion — which was not included in the $47.4 billion estimate of the Long Positions provided by Ms. Fife.  BCI Ex. 49 (9/19/08 Tr.) at 52:21-23.

37.10.  The $47.4 billion estimate did not include an estimate for numerous other Purchased
Assets in the APA that were not valued.  BCI Ex. 1 (APA) at pp. 6-8; 4/28/10 Tr. at
107:23-108:12 (Miller); 4/27/10 Tr. at 28:4-10, 97:6-98:7 (McDade).

37.11.  The Committee stated that it understood the $47.4 billion to be an estimate of the Repo
Collateral only, until Saul Burian later changed his testimony and asserted that he
understood the $47.4 figure to include the Clearance Box Assets in addition to the Repo
Collateral.  BCI Ex. 37 at p. 8, n. 12; Committee Br. at p. 13, n. 27; 12/7/09 Burian Dep.
Tr. at 40:18-41:22; 5/7/10 Tr. at 76:9-83:24 (Burian).

37.12.  Ms. Fife never stated that the $47.4 billion figure was a book value.  BCI Ex. 49 (9/19/08
Tr.) at 47:1-4.

37.13.  Ms. Fife also informed the Court directly that there had been "some other changes that
were made to the contracts" affecting the definition of "what are called purchase[d]
assets."  BCI Ex. 49 (9/19/08 Tr.) at 48:5-7.

37.14.  The $47.4 billion estimate provided to the Court on September 19 by Ms Fife was not an
estimate of what the assets would be worth in a liquidation of the LBI Business: as
Professor Pfleiderer testified, "it's almost inconceivable" that such a liquidation of the
assets transferred to Barclays "would have generated as much as 47.4 billion dollars, "
and very likely would have generated "significantly less." 10/7/10 Tr. at 186:22-187:9
(Pfleiderer); *see also* 5/4/10 Tr. at 20:17-23:1 (Seery); Kirk Dep. Tr. at 95:14-96:16; King
Dep. Tr. at 111:2-115:6.

37.15.  Bart McDade conveyed to the Court the complexity and uncertainty associated with
many of the securities being transferred to Barclays when he explained that, "[t]there are
many complex securities involved.  Many different models that we use to evaluate those
securities."  BCI Ex. 49 (9/19/08 Tr.) at 109:21-22.

**38.    Lehman and Barclays Reasonably Estimated The Realizable Value Or Fair Market
Value Of The Repo Collateral To Be Approximately $45.5 Billion.**

38.1.    The term "liquidation value" can have different meanings:  as used by traders, it does not
imply a fire sale liquidation or the type of liquidation that would have occurred to the LBI
Business and all of its assets had there not been a Sale to Barclays; rather, it refers to the
fair market value of the assets, measured in terms of a reasonable estimate of what can be
realized for those assets in an orderly sale (or liquidation) process.  5/3/10 Tr. at 143:22-
144:5, 152:15-25, 158:12-21 (Seery); 5/4/10 Tr. at 21:6-23:1 (Seery); 5/4/10 Tr. at 21:6-
23:1 (Seery); 10/4/10 Tr. at 106:20-107:24 (Olvany); 10/7/10 Tr. at 185:24-186:21
(Pfleiderer).

38.2.    On September 19, 2008, before Barclays received a spreadsheet from Paolo Tonucci
indicating the securities it had actually received in the Repo, it attempted to determine
their fair market value by reviewing and roughly valuing the securities that had been in
the Fed Portfolio (the "Fed Facility Haircut Analysis").  *See* M. 45; 8/25/10 Tr. at 51:17-
54:5 (King).

38.3.    As Stephen King testified, the Fed Facility Haircut Analysis was an attempt to determine
the realizable value of the Fed Portfolio, not its "fire sale" value:

> "Q.    Now, this morning assessment, early morning assessment on the
> 19th of the September, this was the Fed portfolio. This was not what you
> received in the replacement repo, was it, ultimately?
>
> A.    Well, it was not — it was not — I mean, although it — I think it's
> date — what date is it dated?  The 19th.  It was not what we received. I
> mean, some of it was but not all of it was.
>
> Q.    And was this a subjective assessment in terms of its timing and
> how it was put together?
>
> A.    Well, as I described earlier, it — we were trying to be as objective
> as possible but it necessarily had some subjectivity.
>
> Q.    Was this based on a fire sale or an orderly sale?
>
> A.    It was based on — it was not a fire sale. It was based on as orderly
> runoff as one can contemplate in the months following the bankruptcy."
>
> 8/25/10 Tr. at 53:3-19 (King).

38.4.    On September 19, 2008, Barclays expressed its concerns about the value of the Repo
Collateral to Lehman.  *See* Kirk Dep. Tr. at 92:6-24.

38.5.    Shortly thereafter, Lehman's Alex Kirk received from Paolo Tonucci a schedule
indicating those assets that had actually been transferred to Barclays in the Repo.  He

then asked Lehman senior managers to "try to value the list given the market conditions that day." Kirk Dep. Tr. at 95:14-96:3.

38.6.  Kirk testified that "generally the response was the markets are too volatile, there's too many line items, it's not possible to get this done in any pinpoint fashion in this timeframe," and that the Lehman traders ultimately concluded that "many of these positions were so illiquid that…if we were to try to sell them, given our circumstances…the bids might be down 20 percent." Kirk Dep. Tr. at 95:20-96:16.

38.7.  While Barclays and Lehman disagreed about the value of the Repo Collateral, they were close enough in their respective valuations to agree that a reasonable estimate of the market value was approximately equivalent to the loan amount.  8/27/10 Tr. at 169:20-170:8 (Klein).

    38.7.1.  Bart McDade testified that Lehman and Barclays estimated the market value of the Repo Collateral to be $5 billion less than the marked value and agreed to the transaction:

> "Q.  I want to know about the forty-five. Putting aside the 15c3, the unencumbered box, isn't it right that your deal team and Barclays' deal team went through a process to value the assets that went to Barclays as part of the Fed repo and concluded out of that process the value was forty-five billion dollars?
>
> A.  To the best of my knowledge, yes.
>
> Q.  Okay.  And that is — when you heard it, it was your understanding that that was the market value of that collateral, is that right?
>
> A.  That's correct.
>
> Q.  And your understanding of market value is the ability to transact securities of a normal lot size in the marketplace, is that right?
>
> A.  That's right."
>
> 4/26/10 Tr. at 224:10-24 (McDade).

    38.7.2.  Lehman's Jim Seery testified that he informed the Committee's advisors that Barclays and Lehman had agreed to an estimated market value of the Repo Collateral of approximately $45.5 billion.  5/4/10 Tr. at 76:2-77:8 (Seery).

38.8.  Lehman's Jim Seery testified that earlier in the day on Friday, September 19, 2008, he received an analysis of the Fed Facility collateral showing "what the securities were worth versus what [Lehman's] marks were." 5/3/10 Tr. at 143:22-144:5 (Seery).

38.8.1.    The analysis Seery received addressed the assets that had been in the Fed Repo Collateral, rather than the assets that Barclays had actually received in the Repo Replacement Transaction.  5/3/10 Tr. at 175:25-176:4 (Seery); BCI Ex. 650 at p. 70.

38.8.2.    Seery testified that he understood the analysis was aimed at determining the fair market value of the securities and not at determining the value of the securities in the liquidation of LBI that would have occurred absent the sale to Barclays (a situation in which LBI would not have had the infrastructure or personnel necessary to manage the portfolio and in which there would have been further panic by customers, counterparties and in the markets generally, *see* FOF ¶ 56).

38.8.2.1    Seery testified:  "It included a sale of all of the securities and all of the other assets and what they would have looked like. We didn't do a liquidation value in the term, the way the term is normally used in bankruptcy court, where you have a liquidation analysis that goes along with a disclosure statement.  We really tried to look at, you know, what the securities were worth versus what our marks were."  5/3/10 Tr. at 143:22-144:5 (Seery).

38.8.2.2    Seery testified:  "…I don't know if I used the term liquidation bid.  In our parlance, on Wall Street, when you sell something, you're liquidating it.  So how much would it take to liquidate that position, to sell that position.  Again, in bankruptcy, liquidation sometimes has a different connotation."  5/3/10 Tr. at 152:15-25 (Seery).

38.8.2.3    Seery testified:  "We were trying to come up with best estimates. In these kinds of markets, the analysis that we were doing very, very quickly was how much could you get if you sold your positions in the market over the next couple of days.  It assumed that those traders were at their desks, at work, getting paid, selling the positions into the market.  We didn't ask them to assume that there was financial Armageddon, meltdown, whatever the terms Mr. Ridings has used throughout his deposition.  We didn't seek that out, nor did we provide that kind of information to him.  I don't know that you could have." 5/4/10 Tr. at 22:12-23:1 (Seery).

38.8.3.    Seery did not recall when he wrote the $45.5 billion figure in his notes. 5/3/10 Tr. 183:13-184:2; 5/4/10 Tr. 29:18-30:21.

38.8.3.1    Seery may have written the $45.5 billion figure in his notes in response to a September 19, 2008 5:55 pm email from Alex Kirk stating that the value of the collateral was $45.5 billion, but that Kirk did not know the "marked value."  *See* BCI Ex. 679.

38.8.3.2    Seery testified that the $45.5 billion figure in his notes was not the result of the September 19, 2008 analysis he had received, "simply because the math doesn't work": $50.64 billion — $6.04 billion = $44.6 billion, *not* $45.5 billion. 5/3/10 Tr. at 182:17-183:12; BCI Ex. 650 at p. 70.

38.8.4.    Barclays eventually valued the repo collateral — including the December settlement — at approximately $45.5 billion. BCI Exs. 133, 357 at ¶ 20, 947 (showing how much from the initial inventory reflected on the acquisition balance sheet was on Schedule B); 9/2/10 Tr. at 17:22-18:2, 34:10-35:21, 127:19-128:3 (Romain); 10/6/10 Tr. at 87:6-17 (Pfleiderer).

38.8.4.1    After months of valuation efforts, Barclays valued the initial inventory, as of September 22, 2008, at approximately $40 billion dollars. BCI Ex. 357 at ¶ 20; 9/2/10 Tr. at 37:17-22 (Romain); 10/6/10 Tr. at 87:6-17 (Pfleiderer); *see* FOF ¶ 53.2.

38.8.4.2    With extensive participation and guidance from PricewaterhouseCoopers, Barclays valued the December settlement at $5 billion, including $1.25 billion of cash and approximately $3.75 billion of securities. BCI Exs. 133a, 138a, 357 at ¶ 20; 9/2/10 Tr. at 36:11-37:10 (Romain); 10/6/10 Tr. at 87:6-17 (Pfleiderer); *see* FOF ¶¶ 53.23, 53.5.2.

38.8.4.3    Movants do not dispute the accuracy of Barclays' valuation of the assets in the December Settlement, measured as of December 22, 2008. 9/20/10 Tr. at 118:13-16 (Zmijewski).

**39.    The Lawyers Representing LBHI And LBI Asked The Court To Approve The Clarification Letter Prior To The Finalization Of The Clarification Letter, And The Court Agreed To Do So.**

39.1.    At the Sale Hearing, Harvey Miller advised the Court that the transaction had changed since the Sale Motion had been filed:

> "In any event, Your Honor, as we described last Wednesday, there are a lot of moving parts to this transaction.  And they've been moving with great velocity over the last days since Wednesday.  And as a consequence, Your Honor, there has had to be some major changes in the transaction.  And unfortunately, they weren't finalized until about a half hour ago."

> BCI Ex. 49 (9/19/08 Tr.) at 43:14-20 (Miller).

39.2.    At the Sale Hearing on September 19, 2008, the lawyers from Weil Gotshal representing LBHI and LBI explained to the Court that: "And we've clarified in a clarification letter which we're hoping to finalize and actually present to Your Honor whenever it comes down here."  BCI Ex. 49 (9/19/08 Tr.) at 48:8-10 (Fife)

39.3.    At the Sale Hearing on September 19, 2008, the lawyers from Weil Gotshal representing LBHI and LBI explained to the Court that the Purchase Agreement documentation was not complete.  BCI Ex. 49 (9/19/08 Tr.) at 48:8-10 (Fife), 59:19-25, 60:23-61:1 (Miller).

39.4.    At the Sale Hearing on September 19, 2008, the lawyers from Weil Gotshal representing LBHI and LBI presented the Court with a proposed Sale Order prepared and reviewed by the parties, including the Committee.  4/28/10 Tr. at 23:23-24:2 (Miller); 6/25/10 Tr. at 21:5-14 (Despins); Miller Dep. Tr. at 20:24-22:9; O'Donnell Dep. Tr. at 42:13-43:11; *see also* BCI Ex. 11 (Sale Motion) at Ex. 3.

39.5.    The Sale Order expressly provided for prospective approval of the final Purchase Agreement, including the Clarification Letter that was not yet completed, and authorized amendments to the Purchase Agreement so long as those changes did not have a material adverse effect on the Debtors' estates.  BCI Ex. 16 (Sale Order) at p. 1, ¶¶ 3, 25; *see also* BCI Ex. 17.

39.6.    The Committee knew that there would be changes made in a Clarification Letter and therefore requested a provision in the Sale Order requiring its consent.  6/25/10 Tr. at 21:5-14 (Despins); O'Donnell Dep. Tr. at 42:13-43:11; BCI Ex. 16 (Sale Order) at ¶ 25.

39.7.    At the Sale Hearing, creditors objected on the basis that the final Purchase Agreement was not complete and not available for review by the Court and interested parties.  BCI Ex. 49 (9/19/08 Tr.) at 82:20-83:8 (Bienenstock), 169:3-9, 172:20-173:9, 173:17-23 (Golden).

39.8.    The Court responded to the creditor objections by stating:

"...many of the objections, but not all of them, raise questions as to vagueness in the asset purchase agreement, ambiguous provisions in the asset purchase agreement, concerns with respect to the sale of nondebtor assets, and confusion associated with the speed with which the transaction is proceeding that makes it more difficult for parties-in-interest to comprehend precisely how they're affected by the transaction.…my working premise is that in a manner somewhat comparable to the level of cooperation described by the SIPC trustee that has existed between the regulators and the SIPC trustee and Mr. Miller's firm in making this dramatically emergent transaction happen, that through discovery — informal discovery, parties-in-interest, including the creditors' committee, has gotten to the point of at least acquiescing because the transaction is so significant to the markets, to the employees, to the U.S. economy, to the world economy. I think I know what's going on here, and I'm not saying that you necessarily know how your client's rights are affected. But I have a pretty good idea, even with the modifications that I've only heard about as recently as when I took the bench an hour or two ago, I can't remember what time it was. I understand this deal, not in every aspect but certainly in broad outline. I have notice. This is a hearing. I believe that for due process purposes we are all here with, perhaps cobbled together notice, but it's notice."

BCI Ex. 49 (9/19/08 Tr.) at 83:14-21, 84:3-21.

39.9.   The Sale Order expressly denied and overruled all creditor objections on the merits and with prejudice. BCI Ex. 16 (Sale Order) at p. 12 ¶ 2; *see also* BCI Ex. 17.

39.10.  The Court's Sale Order explicitly contemplated that the Purchase Agreement governing the Sale would include a "clarifying" letter agreement which may be subsequently amended or modified. BCI Ex. 16 (Sale Order) at p. 1. The Sale Order also provided that if any creditor wished to object to the sale, they should promptly seek a stay of the Sale Order or risk having their appeal deemed moot. BCI Ex. 16 (Sale Order) at p. 22.

39.11.  After this Court approved the Clarification Letter, Movants defended it on appeal, repeatedly cited and relied upon it in their appellate submissions and submissions to this Court, and never claimed (until their Rule 60 motions) that it was not approved and binding on the parties. *See* FOF ¶¶ 61, 63, 64.

**40.    The Lawyers Representing LBHI And LBI Successfully Persuaded The Court To Approve The Sale Despite Objections From Certain Creditors That Barclays Was Getting A Discount, And Despite Requests From Creditors That With More Time A Better Offer Might Emerge.**

40.1.    At the Sale Hearing, creditors (other than the Committee) objected to the Sale on the basis that Barclays was receiving a "discount value," "a fire-sale deal," and there was not sufficient evidence as to "whether the proposed purchase price represents a fair value for these assets."  BCI Ex. 49 (9/19/08 Tr.) at 170:8-14, 174:6-8 (Golden), 227:5-14 (Angelich).

40.2.    One of the objecting creditors urged the Court to allow more time for possible competing offers. BCI Ex. 49 (9/19/08 Tr.) at 167:20-168:3, 171:16-172:2, 174:9-21 (Golden).

40.3.    The lead lawyer representing LBHI and LBI, Harvey Miller of Weil Gotshal, responded to the creditor objections that Barclays was receiving a "discount" and a "fire sale," and that it would be better to wait for competing offers, by making the following statement:

> "…Your Honor, the proceeds of the sale, the 250 million dollars, is going to the SIPC trustee, the one billion 290 million dollars is going to the estate.  There is a creditors' committee.  Those proceeds are safe. Hopefully, we're going to go into the more conventional procedures of Chapter 11.  I don't want to use the melting ice cube.  It's already half melted, Your Honor.  The steps have had happened, the things that have happened since Wednesday, make it imperative that this sale be approved. In the interest of all of the stakeholders, including Mr. Golden's clients, they will benefit by this, Your Honor, because if the alternative happens, there will be very little to distribute to creditors, if anything."

> BCI Ex. 49 (9/19/08 Tr.) at 244:11-24 (Miller).

40.4.    The Court responded to the creditor objections by stating:

> "Arguments have been made this evening by objectors, some questioning whether or not if I were to delay approval another better transaction might be realized or discovered. And that's a preposterous notion. As I said on Wednesday, it's very apparent to me that for a transaction of this sort to happen, only Barclays can do it. Only Barclays has the support of the regulators. Only Barclays is prepared to close. Only Barclays can deliver the customer accounts to safe harbors."

> BCI Ex. 49 (9/19/08 Tr.) at 248:25-249:8.

40.5.    The Sale Order expressly denied and overruled those creditor objections on the merits with prejudice. BCI Ex. 16 (Sale Order) at ¶ 2; *see also* BCI Ex. 17.

**41.    The Creditors Committee Chose Not To Object To The Sale Because There Was No Better Alternative.**

41.1.    At the Sale Hearing on September 19, 2008, the Committee announced that it was not objecting to the Sale because there was no viable alternative.  BCI Ex. 49 (9/19/08 Tr.) at 67:9-14 (Despins); 6/25/10 Tr. at 60:23-61:20 (Despins).

41.2.    At the Sale Hearing on September 19, 2008, the Court noted that the Committee had acquiesced to the Sale, and the Committee did not express any disagreement with that observation.  BCI Ex. 49 (9/19/08 Tr.) at 84:3-12.

41.3.    Before the Sale Hearing, Mr. Burian and other Committee advisors had been told that:  (i) Barclays had replaced the Fed repo, paying the LBI obligation to the Fed of approximately $45.5 billion and acquiring repo collateral valued at anywhere from $50.64 billion to approximately the amount of the obligation, BCI Ex. 143 at pp. 3-5; Burian Dep. Tr. at 222:6-18, 222:24-224:15, 224:21-225:7; 225:10-227:25, (ii) "the $5 billion" was "the netting of the 50 billion to get to 45 billion" in Barclays' replacement of the Fed repo, *id.* at 225:20-22, (iii) because the repo collateral was believed to have lost value, Lehman had also identified for Barclays securities valued by Lehman at approximately $1.9 billion that were still available to be transferred and were going to be transferred, *id.* at 315:16-316:9, and, (iv) as of the date the APA was filed, Barclays was anticipating realizing an after-tax acquisition gain of approximately $2 billion.  *Id.* at 194:17-196:17; O'Donnell Dep. Tr. at 39:24-40:11.

41.4.    Committee professionals did not object to the Sale at the Sale Hearing on September 19, during the drafting and completion of the Clarification Letter over the weekend of September 20-21, at the Closing on September 22, or at any time thereafter.  BCI Ex. 49 (9/19/08 Tr.) at 67:9-14 (Despins); 5/6/10 Tr. at 119:2-7 (Burian); 6/25/10 Tr. at 33:11-34:5, 49:12-18 (Despins); *see also* O'Donnell Dep. Tr. at 51:4-11.

41.5.    Beyond not objecting to and not appealing the Sale Order, the Creditors' Committee affirmatively defended the Sale Order in opposing one of the appeals of the Sale Order. *See* FOF ¶ 62.

**42.    The Terms Of The Sale Order Were Negotiated Among The Parties — Including The Debtor, The Trustee, And The Committee — Before, During, And After The Sale Hearing.**

42.1.    Weil Gotshal submitted a draft version of the Sale Order as part of the Sale Motion on September 17, 2008.  BCI Ex. 11 (Sale Motion) at Ex. 3.

42.2.    The parties revised the draft Sale Order before, during and after the Sale Hearing. *Compare* BCI Ex. 11 (Sale Motion) at Ex. 3 (Sale Order attached to Sale Motion filed September 17) *with* BCI Ex. 16 (final Sale Order).

    42.2.1.    The parties revised the draft Order after the Sale Motion was filed and before the Sale Hearing began.  *See* BCI Ex. 218 (email between Weil and Cleary lawyers negotiating terms of the Sale Order before the Sale Hearing on Friday, September 19, 2008 at 10:52 am).

    42.2.2.    As Victor Lewkow testified, after the Sale Hearing ended, the parties — including "the Trustee, I believe, and the Creditors' Committee and some other creditors" — "stayed [and] worked out the details of the proposed form of sale order for submission to Your Honor."  8/31/10 Tr. 54:15-18 (Lewkow).

    42.2.3.    As Harvey Miller testified, after the Sale Hearing, "it took another hour, hour and a half as everybody sat around these tables and reviewed the sale order. There were some changes made to it and I think it must have been around 1 a.m. and 2 a.m. that Judge Peck signed the sale order."  4/28/10 Tr. 23:23-24:2 (Miller).

    42.2.4.    As Dennis O'Donnell of Milbank testified, paragraph 25 of the Sale Order was "one of several that were — was discussed during the sale hearing and after the sale… It was anticipated that the changes might be made, the Debtors had represented that to the Court, and the Committee wanted to ensure that it had the ability to consent to any such changes."  O'Donnell Dep. Tr. at 42:13-43:11.

42.3.    Whenever a party requested a revision to the Sale Order, the requests went through Weil for final approval.  *See* BCI Ex. 220 (OCC proposing language to the Sale Order by first asking Barclays' lawyers at Cleary and then seeking final approval by Weil attorneys).

42.4.    As part of the revisions, Weil expanded the definition of "Purchase Agreement" from the original draft by adding the following language to the final version:  "collectively with that First Amendment Clarifying Asset Purchase Agreement dated September 19, 2008 and that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008 (as same may be subsequently modified or amended or clarified, the 'Purchase Agreement')."  BCI Ex. 16 (Sale Order) at p. 1; BCI Ex. 11 (Sale Motion) at Exhibit 3.

**x.    Facts Showing The Knowledge Of All Parties Of The Drafting Of The Clarification Letter, And The Extrinsic Evidence Rebutting The Trustee's Contractual Interpretation Arguments On Clearance Box Assets, ETD Margin Deposits (Including Cash Margin), And The 15c3-3 Assets.**

**43.    The Lawyers Representing LBHI And LBI, The Lawyers Representing The Trustee, And The Financial Advisors And Lawyers Representing The Committee, All Were Present During The Weekend Negotiations At The Offices Of Weil Gotshal In Which The Clarification Letter Was Revised And Finalized, And Then Executed As Part Of The Purchase Agreement.**

43.1.    Over the weekend of September 20-21, representatives of the Creditors' Committee and the Trustee were at Weil Gotshal's offices while the Clarification Letter was being revised and finalized. Miller Dep. Tr. at 29:5-25, 97:21-98:7; 5/4/10 Tr. at 187:19-188:24 (Kobak); 5/6/10 Tr. at 124:6-13 (Burian).

43.2.    The Trustee and 12 lawyers at his law firm billed over $150,000 between September 19 and 22 for work with descriptions such as "review of continuing revisions to APA, Clarification Letter and numerous rounds of negotiations with Weil, Cleary, and other professionals re changing terms to sale and timetable for closing consultations with HHR, SIPC and SEC teams re same." BCI Ex. 40 at pp. 26-34.

43.2.1.    Trustee Giddens billed 34 hours to the Estate over the weekend of September 20-21, 2008. His timesheets indicate that, among other things, he "review[ed]…continuing revisions to APA, Clarification Letter and [had] numerous rounds of negotiations with Weil, Cleary, and other professionals re changing terms to sale and timetable for closing…" and "[p]articipated in round-the-clock negotiations with Lehman, Barclays, SIPC and regulators on sale issues with review of Clarification Letter and accompanying sale documents." BCI Ex. 40 at pp. 26, 30.

43.2.2.    James Kobak billed 18 hours to the Estate over the weekend of September 20-21, 2008. He billed for, among other things, "[n]umerous conference calls and drafts throughout day w/ SIPC, trustee, DTC, Weil, and banks," and "review, revise and approve final documents and DTCC documents, discuss negotiating parties." BCI Ex. 40 at pp. 28, 31-32.

43.2.3.    While James Kobak testified at trial that Anson Frelinghuysen spent "a lot of the day" on September 20 "working on finishing up a brief in a pro bono case" (5/4/10 Tr. at 188:6-16 (Kobak)), Mr. Frelinghuysen billed 26 hours to the Estate over the weekend of September 20-21, 2008. BCI Ex. 40 at pp. 27-28.

43.2.3.1    Mr. Frelinghuysen's timesheets for September 20-21 reflect that, among other things, he "monitored and participated in transaction negotiations between LBHI, LBI, and Barclays Capital" and "[c]ontinued monitoring and participating in

transaction negotiations between LBHI, LBI, and Barclays
Capital including participation in negotiations with various
parties and support Trustee position to amendments and
clarifications."  BCI Ex. 40 at pp. 27-28.

43.3.    Before the Closing, Committee representatives indicated their consent to, or acquiescence
to, the Sale Transaction:  "Saul Burian said if it's okay with you guys, it's okay with us
and they left."  4/28/10 Tr. at 118:15-25 (Miller); *see also* 5/4/10 Tr. at 64:10-13 (Seery);
Miller Dep. Tr. at 29:10-25, 101:13-102:5; BCI Ex. 50 (12/22/08 Tr.) at 56:8-9 (Miller);
*cf.* 5/6/10 Tr. at 160:20-162:12 (Burian).

43.4.    Before the Closing, Harvey Miller of Weil Gotshal consulted with the other parties,
including Barclays and the Creditors' Committee, and concluded that it was not
necessary to present the Clarification Letter for further Court approval.  4/28/10 Tr. at
117:14-118:6 (Miller); Miller Dep. Tr. at 48:15-49:15.

   43.4.1.    Because the Clarification Letter was consistent with the nature of the
   transaction described to Court, both Harvey Miller and Victor Lewkow agreed
   that it was not necessary to return to Court for further approval.  Miller Dep.
   Tr. at 48:15-49:15; 8/31/10 Tr. at 72:21-73:17 (Lewkow); 4/28/10 Tr. at
   117:14-118:6 (Miller).

      43.4.1.1    Mr. Miller testified:

         "Q.    And did this Clarification Letter represent, in
         substance, the deal that the Court had approved Friday
         night or early Saturday morning?

         A.    In my view, yes.

         Q.    And is that why you and Weil Gotshal concluded
         that it was not necessary to take this specific letter back to
         the Court for further approval?

         A.    Yes. I was reminded, as a 30(b)(6) witness, I did not
         recall that there was actually a discussion about going back
         to Court in connection with the Clarification Letter.  That
         occurred sometime during either Sunday evening or
         Monday morning, in which there was a discussion and the
         conclusion of that discussion was it wasn't necessary.

         Q    And the reason it wasn't necessary was what?

         A.    It did not change the deal that was presented to the
         Court."

         Miller Dep. Tr. at 48:15-49:15.

43.4.1.2       Mr. Lewkow testified:

"And Mr. Miller said something to the effect — I don't remember his words but said something to the effect, it seems to me that we haven't done anything in this clarification letter inconsistent with what we told the Court, that we don't have to go back. We can close as desired without having to go back to the Court. Does anyone disagree? And most of us don't like to disagree with Mr. Miller. But no one did disagree. And that was — and we proceeded on that basis.

Q.       Let me ask you a question. I asked Mr. Miller during this trial — I read to him a comment, an assertion, presented to Judge Peck on April 9th, during the parties' opening arguments as to this decision that you've just testified about. At page 58, line 1 through 3, movants' counsel said, and I quote, said to Judge Peck, "But the fact remains not bringing the clarification back to Court is a mistake and an egregious one."

What is your comment on that assertion?

A.       I don't — at the time when Mr. Miller — the conversation I just testified to when he said what he said then seemed right to me. I didn't think we had changed any of the substance certainly to the negative to the estate. So it didn't seem to me we needed to go back then. And I agree with Mr. Miller's testimony."

8/31/10 Tr. at 72:21-73:17 (Lewkow).

43.4.2.    The Sale Order allowed for prospective approval of the Clarification Letter as long as there would be no "material adverse effect on the Debtors' estates." BCI Ex. 16 (Sale Order) at ¶ 25.

43.4.3.    The Court stated at the Sale Hearing that "[w]e must close this deal this weekend." BCI Ex. 49 (9/19/08 Tr.) at 248:19.

43.4.4.    Dennis O'Donnell testified that the Creditors' Committee received the text of the Clarification Letter on September 22, 2008 and did not tell Weil that there were material changes that would require the Committee's consent:

"Q.       Based on the text of the Clarification Letter, did Milbank ever tell Weil that there were material changes requiring Committee consent?

A.       No."

143

O'Donnell Dep. Tr. at 51:4-11.

43.4.5.   The Clarification Letter narrowed the overall definition of Purchased Assets from what had originally been agreed upon in the APA.

    43.4.5.1   The APA defined the Purchased Assets to include "all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)." BCI Ex. 1 (APA) at § 1.1, p. 6 (definition of "Purchased Assets").

    43.4.5.2   The Clarification Letter narrowed the definition of Purchased Assets to include only "(i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter." BCI Ex. 5 (Clarification Letter) at § 1(a).

    43.4.5.3   The Clarification Letter narrowed the definition of Purchased Assets by providing that government securities and mortgage securities were being transferred to Barclays only as specified in the Clarification Letter or APA (such as the provisions relating to the Repo Collateral, Clearance Box Assets, ETDs and ETD Margin and the provision requiring transfer of $769 million in securities); otherwise, these types of securities were not being transferred. BCI Ex. 5 (Clarification Letter) at § 1(b).

    43.4.5.4   The Clarification Letter also added to the list of Excluded Assets, to make clear that Barclays was not acquiring collateralized debt obligations, collateralized agreement obligations, over the counter derivatives, TBA mortgage notes, certain asset-backed securities and corporate agreements, and certain mortgage servicing rights. BCI Ex. 5 (Clarification Letter) at § 1(c).

    43.4.5.5   The Clarification Letter extinguished Barclays' right to repayment of the $45 billion in cash it had paid to LBI on September 18. BCI Ex. 5 (Clarification Letter) at § 13.

        43.4.5.5.1   The Clarification Letter also removed the "Short Positions" from the definition of Assumed Liabilities. BCI Ex. 5 (Clarification Letter) at § 3. Despite the formal elimination of these liabilities, however, Barclays did assume the exchange-traded derivative "short positions" — which represented significant liabilities.

43.4.6.  Harvey Miller rejected Movants' accusation that it was an "egregious mistake" not to return to the Court for approval of the Clarification Letter:

> "Q.     If my friend referred to the decision not to bring the clarification letter back as a mistake what is your view of that?
>
> A.     The issue was whether there was any material change in the basic transaction which had been presented to the Court. And after discussion a number of people including, I think, the creditors' committee representatives who where there the conclusion was there was no material change that required going back to the Court.
>
> In fact, as late as, I think, two months after the closing in a meeting with the attorneys for the creditors' committee the question was raised again and the issue, which was discussed, I think his name Matthew Barr, a partner of Milbank, do you want to rethink that and we said that we are perfectly comfortable that there was no material change and Mr. Barr said fine, as far as the committee's concerned, unless they see the variance of two billion dollars they won't say anything — anything further, I should say."

4/28/10 Tr. at 117:14-118:6 (Miller).

43.5.  After signing the Clarification Letter, the Lehman Movants defended it on appeal, repeatedly relied upon it in their appellate and other submissions, and never claimed (until their Rule 60 motions) that it was not approved and binding on the parties.  *See* FOF ¶¶ 61-64.

**44.      The Parties Never Agreed To Remove Any Of The Clearance Box Assets From The Definition Of Purchased Assets.**

44.1.    Like the plain language of the APA, the plain language of the Clarification Letter provides that the Clearance Box Assets — including LBI's proprietary assets in its clearance boxes at the DTC — are "Purchased Assets."

44.1.1.    The Clarification Letter expressly defines "Purchased Assets" as including "all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (excluding the Excluded Assets)."  BCI Ex. 5 (Clarification Letter) at ¶ 1(a).

44.1.2.    It was not disputed — and unrebutted testimony established — that the Clearance Box Assets were assets used primarily in connection with LBI's Business. 5/3/10 Tr. at 6:24-8:6, 42:14-23 (Hughes); 8/27/10 Tr. at 55:3-56:1, 56:13-15, 196:3-23 (Klein).

44.1.3.    The plain text of the Clarification Letter and unrebutted testimony established that the Clearance Box Assets were not Excluded Assets under the Clarification Letter.  BCI Ex. 5; BCI Ex. 1 (APA) at pp. 2-4; 5/3/10 Tr. at 6:24-8:6, 42:14-23 (Hughes); 8/27/10 Tr. at 55:3-56:1, 56:13-15, 196:3-23 (Klein).

44.1.4.    The Clarification Letter specifically provides that Purchased Assets include "such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on  Schedule B previously delivered by Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may elect within 60 days after the Closing to return any such securities to LBI; provided, that no securities owned by LBHI or any subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets."  BCI Ex. 5 (Clarification Letter) at ¶ 1(a)(ii)(B).

44.1.5.    The Trustee's lead counsel and corporate representative, Mr. Kobak, admitted that the plain language of the Clarification Letter provides that Barclays is to receive LBI's clearance box assets at the DTC.  5/5/10 Tr. at 71:1-18, 173:14-17, 177:5-9 (Kobak).

44.1.6.    The Trustee's lead counsel and corporate representative, Mr. Kobak, admitted that the Trustee's proposed reading of the Clarification Letter's clearance box asset language as effecting a transfer of customer assets only would render the language of paragraph 1(a)(ii)(B) of the Clarification Letter redundant.  5/5/10 Tr. at 85:5-14 (Kobak).

44.1.7.    Schedule B to the Clarification Letter reflected the parties' contemporaneous efforts to list CUSIP-by-CUSIP the LBI clearance box assets to be transferred to Barclays.  BCI Ex. 5; BCI Ex. 19 at p. 3; BCI Ex. 20; BCI Ex. 251; BCI Ex. 819, 5/5/10 Tr. at 71:1-18, 177:5-9 (Kobak).

44.1.7.1     "Schedule B lists securities believed to be held in LBI's 'clearance boxes' as of the time of the Closing (as defined in the Clarifying Letter) and is without prejudice to the right of Barclays to receive other securities held in such clearance boxes but not listed on Schedule B or to return securities, in each case pursuant to the terms of the Clarifying Letter."  BCI Ex. 20.

44.1.8.     More than 98 percent of the securities listed on Schedule B to the Clarification Letter were securities in LBI's DTC clearance boxes.  BCI Exs. 309 at p. 8, 388, 756, 757.

44.1.8.1     The drafts of Schedule B that were circulated prior to and after the Closing included a summary of the categories of Clearance Box Assets.  BCI Exs. 309 at pp. 8, 388, 756, 757.

44.1.8.2     After adjusting for worthless Lehman paper, the drafts of Schedule B show that three of the five categories of Clearance Box Assets, accounting for $1,940,832,182.5, or more than 98 percent, of the value of the Clearance Box Assets based on Lehman's marks, were assets at the DTC.  (If the worthless Lehman paper — all of which was at the DTC — is included, the percentage of Clearance Box Assets at DTC would be even higher).  BCI Exs. 309 at p. 8, 388, 756, 757; Denig Dep. Tr. at 56:18-57:8; 1/15/10 Hraska Dep. Tr. at 76:14-20.

44.1.8.2.1     $862,689,264 of Clearance Box Assets per Lehman's marks were in DTC account 074.  BCI Exs. 309 at p. 8, 388, 756, 757; Denig Dep. Tr. at 56:18-21.

44.1.8.2.2     $300,929, 347.47 of Clearance Box Assets per Lehman's marks were in DTC account 636.  *Id.*

44.1.8.2.3     $777,263,571.04 of Clearance Box Assets per Lehman's marks that were part of a "Bony Tri Pledge" that were located at DTC.  (If the worthless Lehman paper — all of which was at the DTC — is included, Lehman's marks for the "Bony Tri Pledge" would be $1, 035,256,662.11 at Lehman's marks).  BCI Exs. 309 at p. 8, 388, 756, 757; Denig Dep. Tr. at 56:22-8; 1/15/10 Hraska Dep. Tr. at 76:14-20.

44.1.8.2.4     Only the Clearance Box Assets at Euroclear 22780 and CAD were assets listed on Schedule B that were not located at DTC.  BCI Exs. 309 at p. 8, 388, 756, 757.

147

44.1.8.3    Movants have never contested that more than 98 percent of the
Clearance Box Assets were at DTC.

44.1.9.    Mr. Kobak admitted that he understood that Schedule B to the Clarification
Letter listed proprietary LBI assets.  5/5/10 Tr. at 173:14-17 (Kobak).

44.2.    The plain language reading of the Clarification Letter does not conflict with the plain
language of the DTCC Letter; the former gives Barclays the unencumbered LBI assets
within LBI's clearance boxes, while the latter makes clear that LBI's DTC clearance
boxes themselves are not a Purchased Asset, but is silent about the disposition of the
assets within those clearance boxes.

44.2.1.    There is a fundamental distinction between clearance box accounts,
themselves, and the assets held within those accounts.  8/24/10 Tr. at 127:16-
128:13, 255:3-25 (Rosen); 5/3/10 Tr. at 56:11-57:2 (Hughes); 5/6/10 Tr. at
28:23-25; 60:16-61:7 (Montal).

44.2.2.    The Clarification Letter provides that Purchased Assets include "such
securities and other assets held in LBI's 'clearance boxes'… provided that no
securities owned by LBHI or any subsidiary of LBHI (other than LBI…) are
'Purchased Assets' even if held in LBI's 'clearance boxes.'"  BCI Ex. 5
(Clarification Letter) at § 1(a)(ii)(B).

44.2.3.    The DTCC Letter provides that "Barclays has indicated, and hereby agrees,
that all of the accounts of LBI maintained at the Clearing Agency Subsidiaries
(the 'Accounts') constitute 'Excluded Assets' within the meaning of the
APA."  BCI Ex. at 6 p. 2.

44.2.4.    The DTCC Letter further provided that Barclays would provide a "Guaranty"
to the DTCC in the form of a "Cash Deposit," and that "Recourse with respect
of this Guaranty shall be solely limited to the Cash Deposit, and upon
payment of the Cash Deposit to DTCC, Barclays shall have no further liability
in respect of such Guaranty."  BCI Ex. at 6 p. 2.

44.2.5.    The DTCC's representative admitted at trial that the Clarification Letter had
nothing to do with the DTCC Letter or the deal struck between the DTCC and
Barclays and never requested a change to the plain language of the
Clarification Letter:

"Q.    Now, sir, once you had obtained this agreement with
Barclays, what, if anything, did you do to make sure that the
clarification letter that the parties to the sale were working on over
that weekend was conformed to reflect the details of your letter
agreement with Barclays?

A.    We did nothing.  We were not a party to that agreement.
We weren't a party to the APA.  We didn't believe that we had any
obligation or interest as to what was being dealt with within the

clarification letter.  And, in fact, the reason that we insisted on having this exhibit as a separate document and not be part of a clarification letter or longer document that dealt with the APA was because we had limited interest to make sure that these provisions were in place but did not want to get involved with anything else that might have been negotiated or agreed upon between the parties. . . .

Q.      Well, you agree that the DTC was not a party to the entire deal, right?

A.      Correct.

Q.      And you agree that DTC did not participate in the negotiation of the deal between the Lehman entities and Barclays, right?

A.      Correct. . . .

Q.      Now, the DTCC was — I think you testified this morning, and I just want to confirm it — you were not a party to the clarification letter, right?

A.      Correct.

Q.      And in fact, the clarification letter was not something DTCC ever intended to be a party to, and therefore, it was not something that DTCC or its counsel focused on.  Is that right?

A.      Correct."

5/6/10 Tr. at 26:18-27:7; 31:20-32:1; 63:3-10 (Montal).

44.2.6.   The DTCC's representative admitted at trial that the Clarification Letter had nothing to do with the DTCC Letter or the deal struck between the DTCC and Barclays.  5/6/10 Tr. at 26:18-27:7; 31:20-32:1; 63:3-10 (Montal).

44.2.7.   The Trustee's lead lawyer and 30(b)(6) designee, James Kobak, admitted that the Trustee and his representatives were "not actively involved in the negotiations of the clarification letter," but instead approved "a deal negotiated by Lehman with advice of its lawyers at Weil Gotshal." Kobak Dep. Tr. at 22:24-23:15.

44.2.8.   Mr. Kobak admitted that Weil Gotshal represented the Trustee in negotiating and drafting the Clarification Letter.  5/5/10 Tr. at 59:19-60:4 (Kobak).

44.2.9.   Neither the Lehman negotiators or lawyers nor the Barclays negotiators or lawyers understood the DTCC Letter to be removing the clearance box assets

at the DTC from the Purchased Assets.  5/3/10 Tr. at 54:1-11 (Hughes);
4/27/10 Tr. 45:1-45:5 (McDade); 4/28/10 Tr. at 87:13-18 (Miller); 8/24/10 Tr.
at 129:5-17; 254:2-11 (Rosen); 5/7/10 Tr. at 262:11-17 (Ricci).

44.2.9.1        Barclays general counsel Jonathan Hughes testified:

> "Q.    Now, was it Barclays' understanding at the
> time that this letter that has been marked as BCI
> Exhibit 6 affected in any way Barclays' entitlement
> to LBI's clearance box assets?
>
> A.     Certainly not.
>
> Q.     Was Barclays ever asked by Lehman
> Brothers or the DTCC or anyone else as part of the
> negotiations of the Barclays Exhibit 6 agreement, to
> relinquish any right to any of the clearance box
> assets?
>
> A.     Nobody ever made any suggestion of that
> sort to Barclays, nor indeed if such a suggestion had
> been made would we have agreed to it. I think it's
> worth noting that the clearance box assets were only
> raised for the particular purpose of identifying the
> value that we spoke about earlier, in circumstances
> in which Barclays was greatly concerned about the
> amount of that value that could be delivered. For us
> to give up that additionally identified value within
> — at any point in time would seem to me to be
> nonsensical, but equally for that to have purportedly
> happened within hours of that agreement having
> been reached, it just didn't happen. And as I say, if
> it would've been suggested, Barclays clearly would
> have rejected it.
>
> Q.     Did anyone ever suggest prior to closing that
> the DTCC letter agreement with Barclays that is
> Barclays Exhibit 6, reduced in any way Barclays'
> rights to the Lehman clearance box assets?
>
> A.     No.
>
> Q.     Does the DTCC and Barclays letter
> agreement that is Barclays Exhibit 6 address
> different subject matters than the clarification letter?
>
> A.     Very much so, yes."

5/3/10 Tr. at 54:1-11 (Hughes).

44.2.9.2    Even if Barclays had been willing to use the clearance box assets to reassure the DTCC — and it was not — there would have been no reason to give them up to the Trustee instead of making them available to the DTCC if and to the extent actually required to address any losses it suffered, with any assets not needed by DTCC going to Barclays.

44.2.10.    The DTCC letter reflects the agreement between Barclays and DTCC that Barclays would provide $250 million for the potential losses that DTCC might face. 5/3/10 Tr. at 51:21-52:14 (Hughes); BCI Exs. 6, 376.

44.2.11.    An email written by Sheldon Hirshon — the DTCC's outside counsel — shows that the DTCC's own representatives also understood that, after considering its options and assessing the risks it actually faced, the DTCC had agreed to accept only a $250 million guarantee and did not require the assets within LBI's clearance box accounts.  BCI Ex. 376.

44.2.11.1    Mr. Hirshon's email states in pertinent part that that: "The *$250mm Barclays guarantee* and the resi's were to be provided to protect DTCC from any losses it would incur as a result of not ceasing to act for LBI.  As I said, the resi's were pulled from the deal *leaving only the Barclays guarantee* and, after an internal review of the situation, DTCC accepted the revised deal."  BCI Ex. 376 (emphasis added).

44.2.11.2    Mr. Montal admitted that Mr. Hirshon's description of the "revised deal" documented in the DTCC Letter was correct. 5/6/10 Tr. at 51:15-52:2 (Montal).

44.2.12.    The DTCC's decision to accept only $250 million more than satisfied any need that the DTCC had for protection; its losses in connection with the Lehman bankruptcy totaled less than $60 million.  5/6/10 Tr. at 72:2-73:15 (Montal).

44.2.13.    There is no evidence supporting the Trustee's assertions at trial that a Barclays due diligence team working at the DTCC on the weekend before the Closing valued the Clearance Box Assets; to the contrary, Mr. Montal's testimony is that Barclays personnel "came in very early Sunday morning, came to DTCC's offices to inspect all of Lehman's books and records, which we had made available, and, I guess, do whatever due diligence they wanted to do with respect to those accounts," 5/6/10 Tr. at 20:22-21:1 (Montal), and Mr. Rosen's testimony is that the due diligence was being done on both sides, "because both sides wanted to know what the risks were…."  Rosen Dep. Tr. at 151:8-18.

44.2.14.    The DTCC Letter is consistent with the Purchase Agreement as amended.

44.2.14.1    After being briefed on the agreement with the DTCC, Weil Gotshal received a copy of the DTCC Letter at 4:05 am from the Trustee's counsel.  BCI Ex. 658.

44.2.14.2    After receiving the DTCC Letter from the Trustee's lawyers, Weil Gotshal amended the Clarification Letter to ensure that it was taken into account in the Purchase Agreement. 5/3/10 Tr. at 52:14-17 (Hughes); 8/24/10 Tr. at 132:19-133:25, 134:7-9 (Rosen); BCI Exs. 505 at 13403, 642, 5 at p.3 § d, 658.

44.2.15.    The uncontradicted testimony of Mr. Rosen established that the portion of the DTCC Letter that reads "[a]s part of this closeout process the Trustee hereby authorizes DTC to accept and act upon instructions from NSCC to deliver securities from the DTC LBI account," grants DTCC the authority it required to settle or close-out pending transactions that did *not* involve the proprietary assets being transferred to Barclays.  8/24/10 Tr. at 256:14-257:4 (Rosen).

44.3.    The unrebutted testimony of those who drafted and negotiated the Clarification Letter confirms that the parties to the Clarification Letter understood and intended that Barclays was to receive all of LBI's Clearance Box Assets, including those at the DTC, and that the DTCC Letter did not change this understanding and intent.

44.3.1.    Barclays' lawyers and negotiators understood and intended the Clarification Letter to convey the Clearance Box Assets to Barclays.  5/3/10 Tr. at 56:11-57:2 (Hughes); 8/24/10 Tr. at 132:13-133:20 (Rosen).

44.3.2.    Lehman's lawyers and negotiators likewise understood and intended the Clarification Letter to convey the Clearance Box Assets to Barclays.

44.3.2.1    The Trustee's lead lawyer and 30(b)(6) designee, James Kobak, admitted that the Trustee and his representatives were "not actively involved in the negotiations of the clarification letter," but instead approved "a deal negotiated by Lehman with advice of its lawyers at Weil Gotshal." Kobak Dep. Tr. at 22:24-23:15.

44.3.2.2    Mr. Kobak further admitted that Weil Gotshal represented the Trustee in negotiating and drafting the Clarification Letter. 5/5/10 Tr. at 59:19-60:4 (Kobak).

44.3.2.3    Weil Gotshal's Harvey Miller understood that the Clarification Letter by its plain terms conveyed the Clearance Box Assets to Barclays.  4/28/10 Tr. at 124:20-125:4.

44.3.2.3.1    Mr. Miller and his colleagues prepared numerous documents in the days immediately following the Closing that further confirmed their understanding that the Clarification Letter was intended to

convey the Clearance Box Assets to Barclays.
BCI Exs. 19, 757, 309, 807 at pp. 2-3, 742.

44.3.2.4    Mr. McDade, Lehman's lead negotiator, also understood that
Barclays was intended to receive the Clearance Box Assets.
4/27/10 Tr. at 43:1-16; *see also* Kirk Dep. Tr. at 207:15-208:17,
214:11-215:3.

44.3.3.    The DTCC's Isaac Montal — on whose testimony the Trustee relies for his
assertion that the Clearance Box Assets were removed from the deal —
admitted that he had no knowledge of or involvement in the drafting or
negotiation of the Clarification Letter.  5/6/10 Tr. at 26:18-27:7; 31:20-32:1;
63:3-10 (Montal).

44.3.3.1    Mr. Montal testified that, based solely on discussions relating
entirely to the DTCC Letter, he formed an understanding that
Barclays was not taking the Clearance Box Assets at the DTC.

44.3.3.2    But the evidence shows that Mr. Montal never told anyone else
of his understanding or intent.

44.3.3.3    The testimony of all of the Lehman and Barclays negotiators and
lawyers confirmed that neither Mr. Montal nor anyone else ever
communicated the notion that the DTCC Letter was intended to
or did in fact remove the clearance box assets at the DTC from
the Purchased Assets.  5/3/10 Tr. at 54:1-11 (Hughes); 4/27/10
Tr. 45:1-5 (McDade); 4/28/10 Tr. at 87:13-18 (Miller); 8/24/10
Tr. at 129:5-17; 254:2-11 (Rosen); 5/7/10 Tr. at 262:11-17
(Ricci); Kirk Dep. Tr. at 207:15-208:17, 214:11-215:3.

44.4.    The drafting history confirms that the parties intended the Clarification Letter to convey
all of LBI's Clearance Box Assets — including those at the DTC — to Barclays.

44.4.1.    Barclays and the DTCC reached agreement on the deal documented in the
DTCC Letter before midnight Sunday, September 21, 2008.  Rosen Dep. Tr.
at 153:11-14.

44.4.2.    That agreement was then explained to all parties during a telephonic meeting
between Weil Gotshal, the Trustee's lawyers, representatives of the Creditors'
Committee, Barclays' lawyers, and the DTCC.  8/24/10 Tr. at 132:9-133:25
(Rosen).

44.4.3.    At 4:06 am, on Monday, September 22, 2008, the Trustee's counsel provided
a copy of the DTCC Letter to Weil Gotshal.  BCI Ex. 658.

44.4.4.    At 4:36 a.m., Weil Gotshal circulated a draft Clarification Letter.  BCI Ex.
505.

44.4.4.1    That draft added a new section 1(d), which referred to the agreement documented in the DTCC Letter as "such agreement as LBI and DTC may agree upon."  BCI Ex. 505 at § 1(d).

44.4.4.2    That draft also revised the definition of Purchased Assets to include:  "such securities and other assets held in LBI's '074 clearance box' at DTC…." BCI Ex. 505 at § 1(a)(ii)(B) at p. 1 of attachment.

44.4.5.    At 5:22 a.m. Weil Gotshal circulated a revised draft of the Clarification Letter. BCI Ex. 642.

44.4.5.1    That draft corrected the description of the agreement documented in the DTCC Letter to read as follows:  "the agreement among LBI, Purchaser and DTC entered into in connection with the Closing."  BCI Ex. 642 at § 1(d).

44.4.5.2    That draft also *broadened* the definition of Purchased Assets to include "such securities and other assets held in LBI's 'clearance boxes.'"  BCI Ex. 642 at § 1(a)(ii)(B) at p. 1 of attachment.

44.4.5.3    That change to the definition of Purchased Assets was made to "clarif[y] that Barclays was getting all of the clearance box assets . . . the previous provision had limited it simply to the DTCC 074 account.  And it was brought to the attention of the lawyers that the clearance box assets were not only not limited to the 074 account at DTCC, but they were not limited to DTCC, although the vast majority, I understand, were located at DTCC."  8/24/10 Tr. at 133:8-15 (Rosen).

44.4.6.    The clearance box-related language in the 5:22 a.m. draft of the Clarification Letter remained unchanged in the final Clarification Letter.  BCI Exs. 5, 642.

44.4.7.    That drafting history is inconsistent with the Trustee's argument that the parties intended the DTCC Letter to remove the assets within LBI's DTC clearance boxes from the definition of Purchased Assets.  8/24/10 Tr. at 132:9-134:21 (Rosen).

44.5.    The parties' post-Closing course of performance contradicts the Trustee's present contention that Barclays was not entitled to receive LBI's clearance box assets at the DTC, and thereby confirms that the parties intended to convey those assets to Barclays.

44.5.1.    Between the September 22, 2008, Closing and September 30, 2008, Weil Gotshal and Lehman personnel worked with Barclays and its representatives to finalize Schedule B to the Clarification Letter, more than 98% of the assets on which were in LBI's DTC clearance boxes.  BCI Exs. 309, 388, 737, 742, 757.

44.5.2.    Schedule B was filed with the Court by Weil Gotshal and Barclays on
September 30, 2008.  BCI Exs. 19, 20.

44.5.3.    Although Schedule B was available to the Trustee at the closing table and a
copy of the final Schedule B was delivered to the Trustee's lawyers on
September 30, 2008, the day Schedule B was filed with the Court, the Trustee
never objected that its listing of billions of dollars of assets within LBI's DTC
clearance boxes was inconsistent with his understanding of the deal.  BCI Exs.
757, 554; 5/5/10 Tr. at 177:5-19 (Kobak).

44.5.3.1    The Trustee's representative testified:

"Q.    And what you're saying is the APA,
including the clarification letter, provides that
Schedule B lists securities and trading positions
transferred under the purchase agreement to
Barclays, correct?

A.    Yes.

Q.    Now, when you saw this, and by "you" I
mean the trustee, did you think that any response to
this was appropriate?

A.    No. I read this sentence even today as just
declaring what the clarifying letter says. We
certainly weren't taking a position either way. I
don't think we had any reason at that time to know
the positions that Barclays might be taking.

Q.    Well, sir, you knew —

A.    So — and we had a million things going on,
so we didn't focus very particularly on this. And
I'm speaking in my corporate capacity as well as
my personal capacity."

5/5/10 Tr. at 177:5-19 (Kobak).

44.5.4.    After the Closing, the Movants and their representatives and advisers prepared
numerous documents showing that $1.9 billion of Clearance Box Assets were
among the Purchased Assets being transferred to Barclays (only $36 million
of which were outside LBI's DTC boxes).  BCI Exs. 742, 807, 320, 131a, 756.

44.5.5.    After the Closing, lawyers representing LBHI and LBI informed Committee
Counsel that Barclays had acquired approximately $1.9 billion in Clearance
Box Assets — only $36 million of which were outside LBI's DTC boxes.
BCI Ex. 756; BCI Ex. 131a; *see* FOF 44.1.8.

44.5.6.    The Trustee knowingly authorized the post-Closing transfer of non-customer, proprietary LBI assets from LBI's DTC clearance boxes to Barclays. Frelinghuysen Dep. Tr. at 67:20-68:22; BCI Ex. 40 at pp. 46-47; BCI Ex. 514; Frelinghuysen Dep. Tr. at 73:20-74:19; BCI Ex. 825; 8/23/10 Tr. at 162:1-6 (Ullman); BCI Ex. 517, BCI Ex. 825; 8/23/10 Tr. at 162:7-19 (Ullman); BCI Exs. 517, 675; 8/23/10 Tr. at 162:20-23,163:5-25 (Ullman).

44.5.6.1    On September 24, 2008, Mr. Frelinghuysen, the Trustee's counsel with responsibility for authorizing transfers of assets from LBI's DTC clearance boxes, met with Barclays executive Alastair Blackwell *to discuss the transfer of non-customer assets*. Frelinghuysen Dep. Tr. at 47:15-16, 47:21-48:2, 48:5-14, 67:20-68:22; BCI Ex. 40 at 46-47.

44.5.6.1.1    The Trustee's counsel understood that his conversation with Blackwell concerned *non-customer assets*. Frelinghuysen Dep. Tr. at 74:13-19.

44.5.6.1.2    The Trustee's counsel understood that the non-customer assets being discussed were not PIM, PAM, or Prime Brokerage assets. Frelinghuysen Dep. Tr. at 67:20-68:22.

44.5.6.2    The next day, after discussing Mr. Blackwell's request to transfer proprietary, non-customer assets with the Trustee's lead counsel, Mr. Kiplok, the Trustee's counsel sent Blackwell a form of certification that the Trustee would require be used to request the transfer of non-customer assets to Barclays: "I represent and confirm to you that the inventory and accounts listed in the schedule attached as Exhibit A to this letter are assets of Lehman Brothers Inc., which were sold to Barclays Capital Inc. pursuant to the Asset Purchase Agreement dated as of September 16, 2008, as amended." BCI Ex. 514; Frelinghuysen Dep. Tr. at 70:19-24; 73:20-74:19.

44.5.6.3    At 3:20 p.m. on September 29, 2008, Barclays executive Neal Ullman sent the Trustee's counsel a request for the transfer of $161 million of non-customer LBI assets in LBI's DTC clearance boxes. BCI Ex. 825; 8/23/10 Tr. at 162:1-6 (Ullman).

44.5.6.4    Eleven minutes later, the Trustee's counsel — echoing the language of the certification he had sent Blackwell four days earlier — asked Ullman to "confirm that the attachments to the email below represent assets of Lehman Brothers Inc. that were sold to Barclays Capital Inc. pursuant to the Asset Purchase

Agreement dated as of September 16, 2008." BCI Exs. 517, 825; 8/23/10 Tr. at 162:7-19 (Ullman).

44.5.6.5    Twenty minutes later, Ullman provided the requested confirmation and the Trustee's counsel authorized DTC to transfer the requested clearance box assets to Barclays. BCI Ex. 517, 675; 8/23/10 Tr. at 162:20-23; 163:5-25 (Ullman).

44.5.6.6    Movants introduced no evidence that the Trustee or his counsel objected to this request for the transfer of proprietary assets from LBI's clearance boxes at the DTC as inconsistent with the DTCC Letter.

**45.    The Barclays And Lehman Negotiators Agreed That Barclays Would Receive $769 Million In Securities From The Rule 15c3-3 Account, Or, If There Were Any Regulatory Obstacle To Doing So, Barclays Would Receive "Securities Of Substantially The Same Nature And Value" From Outside The Account.**

45.1.    The Clarification Letter provides that Barclays shall receive $769 million of securities of the type held in its reserve account.

45.1.1.    Section 8 of the Clarification Letter is titled "Transfer of Customer Accounts" and provides that:

"In connection [with the transfer of all customer accounts of LBI] Purchaser shall receive … (ii) to the extent permitted by applicable law … $769 million of securities as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3…or securities of substantially the same nature and value…."  BCI Ex. 5 (Clarification Letter) at p. 4.

45.1.2.    The plain meaning of this provision is that, if there is a legal prohibition against transferring the $769 million in securities from inside the reserve account,[3] Barclays "shall receive" "securities of substantially the same nature and value" from outside the account.

45.1.3.    The $769 million to which Barclays is entitled represents less than half of the amount in the Rule 15c3-3 reserve account at the time of Closing.  BCI Ex. 221; *see* 8/27/10 Tr. at 201:1-202:23 (Klein); 8/31/10 Tr. at 60:10-63:24 (Lewkow).

45.1.4.    Neither the APA nor the Clarification Letter identify the 15c3-3 Assets as "Excluded Assets".  BCI Ex. 1 (APA) at 2-4.

45.2.    The Trustee's interpretation of the "or" clause is inconsistent with the admissible evidence regarding that clause

45.2.1.    After initially briefing his claim, the Trustee provided an *ex post* interpretation of the "or" phrase as a provision purportedly intended to protect against losses from the Rule 15c3-3 reserve account caused by the maturation of securities within the account.   Trustee Reply Br. at ¶¶ 34-40, 54-61.

45.2.2.    The Trustee's explanation is inconsistent with other aspects of the Purchase Agreement.

45.2.2.1    Unlike other sections of the Clarification Letter (for example, with respect to Schedules A and B, referring to the Repo Collateral and Clearance Box Assets, respectively), there is no reference in Section 8(ii) to specific CUSIPs that were to be

---

[3] There is no such prohibition.  *See* Barclays' COL ¶ 45.

transferred to Barclays. *Compare* BCI Ex. 5 (Clarification Letter) at §§ 1(a)(ii)(A) & (B) *with id.* at § 8(ii).

45.2.2.2      Section 8(ii) simply provides the value of the securities to be transferred. BCI Ex. 5 (Clarification Letter) at § 8(ii).

45.2.2.3      If the "or" clause were omitted, the provision would still require the transfer of any securities held in the reserve account. The fact that some of those securities might mature and be replaced by others would not create an ambiguity.

45.2.3.      The Trustee's explanation of the "or" clause is inconsistent with the evidence presented regarding what was communicated between the parties regarding the meaning of the "or" clause.

45.2.3.1      Robert Messineo, who testified in support of the Trustee's interpretation, was not a part of the "hallway conversation" and did not communicate his understanding of the phrase to anyone at Barclays, or to his own partner, Harvey Miller. Messineo Dep. Tr. 17:7-24, 21:20-22:12; 22:16-23:5; 26:23-25, 27:6-11.

45.2.3.2      Harvey Miller, lead counsel for Lehman, denies the Trustee's interpretation of the clause:

> "Q.      Was it your understanding that if the LBI or the estate was no longer in a position of transferring the specific security because it had matured, it would have the ability to transfer an alternative similar security of the same value?
>
> A.      I don't think that was contemplated at the time that this was drafted."
>
> Miller Dep. Tr. at 94:9:17 (objection omitted).

45.2.3.3      There was never any discussion with Barclays of the need to account for maturing securities within the reserve account. 8/27/10 Tr. at 72:16-20 (Klein).

45.2.3.4      The Trustee's representative, James Kobak, did not participate in the discussion, and therefore also did not communicate his understanding to anyone. Trustee Reply Br. ¶ 29.

45.3.      The extrinsic evidence demonstrates that Barclays' right to $769 million in securities of the type held in the 15c3-3 account is unconditional.

45.3.1.    On Friday, September 19, Barclays demanded that Lehman identify Purchased Assets still available for transfer and of sufficient value to persuade Barclays to go forward with the transaction.  8/27/10 Tr. at 50:14-52:21 (Klein).

45.3.1.1    In partial response, Lehman identified the assets held in the 15c3-3 reserve account as Purchased Assets as assets in the Business that were available to be transferred to Barclays, and that would be transferred to Barclays.  8/31/10 Tr. at 46:3-47:17 (Lewkow); Kirk Dep. Tr. at 105:4-19.

45.3.2.    By late Sunday, September 21, drafts of the Clarification Letter included neither the phrase "to the extent permitted by applicable law" nor the phrase "or securities of substantially the same nature and value."  BCI Ex. 270 at p. 4.

45.3.3.    After that draft was circulated, Weil raised a concern about whether the transfer of the Rule 15c3-3 assets might be subject to legal or regulatory constraints.  8/31/10 Tr. at 62:25-64:13 (Lewkow).

45.3.4.    Also after that draft was circulated, on late Sunday, September 21, or early Monday September 22, representatives of Weil and Barclays had a "hallway" conversation.  8/31/10 Tr. (Lewkow) at 61:2-8.

45.3.4.1    In the hallway conversation, the parties discussed whether the transfer of the Rule 15c3-3 account assets might be subject to legal or regulatory constraints.  8/31/10 Tr. at 62:25-64:13 (Lewkow).

45.3.4.2    Barclays did not agree that there were any regulatory obstacles to the transfer of the assets in the Rule 15c3-3 account, but agreed to include language to address those concerns.  Barclays made clear, however that, to the extent legal constraints prevented transfer of 15c3-3 assets, Barclays should get substitute assets.  8/31/10 Tr. at 62:25-64:13 (Lewkow); 8/31/10 Tr. at 226:19-24 (Lewkow); 8/24/10 Tr. at 138:25-139:6; 141:11-24 (Rosen).

45.3.4.3    The language "or securities of substantially the same nature" was added in response to the Barclays demand for alternate securities. 8/24/10 Tr. at 141:11-24 (Rosen).

45.3.4.4    This was the "economic substance of the transaction."  8/24/10 Tr. at 141:11-24 (Rosen).

45.3.5.    Immediately after the "hallway conversation," early in the morning on Monday September 22, the next draft of the Clarification Letter that was circulated included in paragraph 8(ii) both the phrase "to the extent permitted

by applicable law" and the phrase "or securities of substantially the same nature." M. 447 at p. 5.

      45.3.5.1    The fact that these two phrases were added together, immediately after the "hallway conversation" about the regulatory issues, proves that the "or" clause was intended to address Barclays' demand that it receive the assets whether or not there was any regulatory obstacle. 8/24/10 Tr. at 141:11-24 (Rosen).

      45.3.5.2    Barclays understood this language to satisfy its concerns expressed in the hallway conversation. 8/24/10 Tr. at 141:11-24 (Rosen).

      45.3.5.3    Barclays modified the clause only to add the phrase "and value" to the "or" clause, in order to make sure the language was as clear and precise as possible. Rosen Dep. Tr. 110:18-111:6.

45.3.6.    Later on Monday, the Clarification Letter was signed in its final form and filed with the Court. BCI Ex. 18.

45.3.7.    After Closing, Weil Gotshal did not treat Barclays' right to the securities as conditional:

      45.3.7.1    The morning of Closing, Luc Despins emailed Harvey Miller to ask "what happened to regulated capital?" In response, Miller stated "We keep the cash and PAIB securities — $469. Barclay gets securities $763m Figures approx." BCI Ex. 287.

      45.3.7.2    Shortly thereafter, Saul Burian emailed Miller and asks "to be clear regarding your last email to Luc, do you mean that of the 2.2-2.3 of reserves, LBI keeps 1.5B and B gets 763mm?..." Miller responds simply, "Yes." BCI Ex. 288.

      45.3.7.3    On October 16, 2008, in his "State of the Estate" presentation, Mr. Miller explained to the Court:

          "And all during that week, Your Honor — and that was a terrible week, the market was going down, values were disappearing. And when we go to the closing, there was no billion three hundred million dollars. The only money at LBI, and the SIPA trustee can tell us that also, was in the 15c3-3 account which was the reserve account for protection of customers. And in that account, there was a billion dollars in cash and there was 700 odd million dollars in securities for customers. . . . And as part of the Barclays closing, because Barclays was taking the

customer accounts, they got the 700 odd million dollars in securities."

BCI Ex. 485 at 58:1-13.

45.3.8.    After Closing, the Creditors' Committee did not treat Barclays' rights as conditional — or the reserve fund as an asset that could be used only for customer claims

45.3.8.1    Shortly after Closing, Fazio circulated among Milbank and Houlihan an email from Harvey Miller stating that "we keep the cash and the PAIB securities — $469.  Barclays gets securities $763m Figures approx," and commented:

"Wait, this sounds like what we pushed them to do — take the cash and cash equivalents and only give Barclays the 763 of securities.   Of the 2.2-2.3 in the reserves, we got 1.5B!!! What am I missing?"  BCI Ex. 839 at p. 1.

45.3.8.2    Minutes later, Burian emailed Houlihan and Milbank:

"I just read the letter.  We 'won' the issue — harvey must have held firm that no cash meant no cash and we got 500mm more than the settlement Tom was advocating."  BCI Ex. 847 at p. 1.

45.3.8.3    Later, Burian emailed the Creditors' Committee and described "the final version of the 'Clarification Letter'" as follows:

"Regulatory accounts/deposits:  Barclays was insisting on taking all $2.2-2.3B of these accounts, even though *immediately* upon closing they would have been able to release to themselves approximately $1B of that amount.  Company wanted to propose a settlement that Barclays return the $1B to LBI and retain the rest.  In light of our refusal to consent, the Company got more aggressive and ultimately cut a deal with Barclays in which Barclays only gets $763mm of the *securities* in these deposit/regulatory accounts.  All cash and cash equivalents (approx. $1.5B) will be retained by LBI (the broker dealer)."  BCI Ex. 811 at p. 2.

45.3.8.4    In response to Mr. Burian's summary on September 22, 2008, Mr. Fazio responded with a list of "the couple of open items to confirm," including:  "Contest the $763mm of securities

162

transferred (to be determined in the grand scheme." BCI Ex. 811 at p. 1.

45.3.8.5    On October 6, 2008, Tully emailed Fleming, Jones and Shafer of Lehman attaching a "Recap" of the Barclays deal, listing as an "asset" an entry of ".80" for "Securities." BCI Ex. 332 at p. 3.

45.3.8.6    On October 10, 2008, Milbank and Houlihan circulated a draft memorandum regarding "LBI Sale: Value of Assets Transferred to Barclays," which included among the "components of value that were transferred to Barclays" an entry for "reserves related to customer accounts" with a value of "$0.8." BCI Ex. 813b at p. 3.

45.3.9.    After Closing, the Trustee's Representative did not treat Barclays' rights as conditional — or the reserve fund as an asset that could be used only for customer claims

45.3.9.1    On September 29, 2008, Alvarez employee Mary Korycki took notes of a meeting with representatives of Lehman, Alvarez & Marsal, and Weil, Gotshal. M. 382. Those notes included the following:

Under "Barclays" "Assets," listed number "3" is "$769 mm securities pledged with J.P.M. segregated acct. 15(c)-3" M. 382 at 4889.

"1.9 unencumbered securities" and "769 securities from lock up" are listed together without explanation. M. 382 at 4890.

In charts for "Assets" and "Liab," "Securities" worth "0.8" is listed on the asset side. M. 382 at 4891.

45.4.    The Trustee erroneously claims that under the terms of the Purchase Agreement, all customer claims must be fully satisfied in the SIPA liquidation prior to transferring the $769 million in securities.

45.4.1.    In theory, the parties could have conditioned Barclays' right to receive certain assets on the successful conclusion of the SIPC liquidation, but they did not do so.

45.4.2.    Rather, they agreed that the Trustee would deliver the $769 million in securities to Barclays "as soon as practicable after the Closing." BCI Ex. 5 (Clarification Letter) at § 8(ii).

45.4.3.  This provision would have been meaningless if the parties had intended (which they did not) for the SIPC liquidation to be concluded before the $769 million in securities would be transferred to Barclays.

45.5.  The Trustee has already accepted the possibility that the Lehman customers whose accounts were transferred will receive all of their property even though other customers that remained with the estate may not.

45.5.1.  On November 20, 2009, the Trustee asked this Court to approve a settlement that would transfer over $1 billion in customer property to Barclays (and approve the prior transfer of over $42 billion) for the benefit of PIM customers who had been transferred to Barclays.  BCI Ex. 504.

45.5.2.  The SEC, the NY Fed and SIPC supported the motion.  BCI Ex. 51 at 14:11-12.

45.5.3.  There were objections to the Trustee's motion, which the Court summarized as follows:

"[A]t the end of the day this may be discriminatory as to their rights because certain customers are getting 100 cents and getting the benefit of transferred accounts while they're left behind in a claims resolution process in which, just using the REPO example, as but one example of that, they may later be determined to have rights as true customers, but they may suffer a shortfall thereby suffering discriminatory treatment relative to those customers who are benefited by today's motion."

BCI Ex. 51 at 22:2-10, 22:23-23:2, 23:16-24:13.

45.5.4.  These objectors asked for the right to claw back some of the assets at a later date.  BCI Ex. 51 at 24:18-25.

45.5.5.  The Trustee's representative, Jim Kobak, responded to these claims of discrimination by telling the Court:

"The statutory authority for transferring accounts is completely separate from the claims process.  Basically, two remedies in the statute.  … And as I say, there was always I think an understanding that most of the accounts would be transferred but there would be a residue of accounts that for one reason or another would not be transferred, and they would be part of the claims process.  And that's exactly what's happened in this case.  And there's no requirement that a net equity calculation or a determination that people could be paid 100 percent or anything else, has to happen before it's possible to do an account transfer.  That may have been done in some other cases that were much smaller, but in a case like Lehman it would have been impossible for anyone to determine

what the net equity might be. Whether there was any possibility of shortfall. What could be done with these accounts if people didn't take them.

And, frankly, Ms. Granfield is here, but I think if people had gone to Barclays and said oh, Barclays wants to take the accounts but, by the way, maybe we can only transfer eighty percent of the property that goes with those accounts or ninety percent or seventy-five percent at least right away, I very much doubt that Barclays would have participated in any transaction like that…. And the next time some liquidation like this happened, God forbid that it happens, but it happened once it could happen again, I think any potential transferee would have real cold feet if they didn't know that there would be a complete transfer of property to go along with the accounts that they were going to have to administer for those customers."

BCI Ex. 51 at 32:16-34:3.

45.5.6.     Mr. Kobak's statement at the December 10, 2009 hearing confirmed that the Trustee agrees that (a) SIPA authorizes the transfer of any property, including customer property, without having to first do a calculation of what the final distributions will be to customers (confirming Barclays' legal argument), (b) the Trustee has accepted and approved the risk of a shortfall and the fact that the Barclays Sale might lead to different recoveries between the customers whose accounts were transferred and those whose accounts were not transferred (confirming Barclays view that this is legally permissible), and (c) the Trustee believes that public policy would be undermined if the Court failed to transfer the assets which Barclays was promised and reasonably expected at the time of the Sale, as that sends a terrible message to future potential bidders, and hence is bad policy (confirming Barclays' view). BCI Ex. 51 at 32:16-34:3.

45.5.7.     Mr. Kobak's statement at the December 10, 2009 hearing also confirmed that the Trustee understood that when the customer accounts were transferred to Barclays, all of the assets in those accounts would be transferred: this confirms that for the ETD futures customers whose accounts were transferred, *everything* in their accounts was understood to be transferred, as both the Mr. Kobak and Mr. Miller have testified they understood.  5/5/10 Tr. at 128:7-11, 152:4-11, 148:15-149:25, (Kobak); 4/28/10 Tr. at 89:12-90:15 (Miller).

45.5.8.     The Court granted the Trustee's motion in December 2009 relating to the transfer of customer property for the PIM customers.  BCI Ex. 36.

45.6.   LBHI is jointly and severally liable for the $769 million in securities of the type held in the 15c3-3 account.

45.6.1.    The Seller in the Clarification Letter was the same as the Seller in the APA —
and included both LBI and LBHI.  M. 1 at p. 1; M. 3 at 1.

45.6.2.    LBHI has made no argument that it is prohibited by statute or regulation from
meeting the obligation to provide Barclays with $769 million in securities "of
substantially the same nature and value" as those held in LBI's reserve
account.  *See generally* LBHI Br.; LBHI Reply Br.

     **xi.**     **<u>Facts Showing The Movants' Knowledge, At The Time Of The Sale And Throughout The Period They Defended The Sale On Appeal, Of All The Essential Information Which They Have Distorted In This Proceeding As The Alleged Basis For Their Rule 60(b) Claims.</u>**

**46.**    **Prior To The Closing, LBHI's Lawyers And The Creditors' Committee Had An Accurate List Of The Cusips That Were Being Transferred To Barclays.**

46.1.    Before the Closing, Lehman Treasurer Paolo Tonucci sent Weil Gotshal a schedule of CUSIPs transferred to Barclays as repo collateral.  BCI Ex. 237.

46.2.    That schedule was sent to the Creditors' Committee before the Closing.  BCI Exs. 830, 739, 258.

46.3.    A schedule of the "clearance box" assets was filed with the Court as "Schedule B."  BCI Ex. 19.

46.4.    Out of more than 11,000 CUSIPs transferred to Barclays in the Sale, all but 27 are found on the Repo Collateral schedule circulated by Paolo Tonucci or Schedule B.  BCI Ex. 1103a (Pfleiderer Demonstrative 88); 10/6/10 Tr. at 198:13-199:5 (Pfleiderer).

46.5.    Out of more than 11,000 CUSIPs on Schedule A and Schedule B, 15 on Schedule A were not transferred to Barclays, and 773 on Schedule B have still not been delivered to Barclays.  BCI Ex. 1103a (Pfleiderer Demonstrative 88); 10/6/10 Tr. at 198:13-199:10 (Pfleiderer).

46.6.    Lehman's lawyers knew before the Closing that the repo collateral was marked in excess of $49.9 billion:  $5 billion more than the Repo loan, and more than $47.4 billion.  BCI Ex. 237.

46.7.    The Committee knew before the Closing that the repo collateral was marked in excess of $49.9 billion:  $5 billion more than the Repo loan, and more than $47.4 billion.  BCI Exs. 830.

**47.    All Movants Either Supported, Agreed To Or Acquiesced In The Sale With Full Knowledge That There Was Substantial Uncertainty Concerning The Value Of The Purchased Assets And The Amount Of Assumed Liabilities In The Transaction.**

47.1.    The Debtor and the Trustee agreed to and supported the Sale, with full knowledge that there was uncertainty about the identity and value of the inventory that could be delivered to Barclays.  4/27/10 Tr. at 39:11-23 (McDade); Ridings Dep. Tr. at 44:15-45:22; 8/23/10 Tr. at 36:19-37:21 (Shapiro); Kobak Dep. Tr. at 39:6-11; BCI Ex. 49 (9/19/08 Tr.) at 43:14-20 (Miller), 47:1-4 (Fife), 78:9-16 (Giddens).

47.2.    The Debtor and the Trustee agreed to and supported the Sale, with full knowledge that the deal was not conditioned or dependent upon particular valuations.  BCI Ex. 49 (9/19/08 Tr.) at 59:19-25, 60:23-61:1 (Miller), 75:5-17 (Kobak); 4/28/10 Tr. at 106:5-22, 107:23-108:12 (Miller); 5/5/10 Tr. at 196:6-197:11 (Kobak).

47.3.    The Debtor agreed to and supported the Sale, with full knowledge that the markets were tumultuous and volatile in September 2008 and that the values of the assets to be transferred were changing by the minute.  4/27/10 Tr. at 19:4-24 (McDade), 4/28/10 Tr. at 18:24-19:13 (Miller).

47.4.    The Debtor agreed to and supported the Sale, with full knowledge that the APA did not provide a value for many of the Purchased Assets.  4/27/10 Tr. at 208:7-210:6, 212:2-213:3 (Berkenfeld); 4/28/10 Tr. at 107:19-108:18 (Miller); 6/21/10 Tr. at 65:6-15, 66:11-16 (Marsal).

47.5.    The Trustee agreed to and supported the Sale, with full knowledge that the APA did not provide a value for many of the Purchased Assets and that there was no total valuation given for the all of the Purchased Assets in the APA.  Kobak Dep. Tr. at 36:4-37:11.

47.6.    The Trustee agreed to and supported the Sale, with full knowledge that the extraordinary circumstances of the financial crisis in September 2008 meant that there was no time for an appraisal of all of the Purchased Assets.  BCI Ex. 49 (9/19/08 Tr.) at 73:20-74:9 (Caputo), 75:5-12 (Kobak); Kobak Dep. Tr. at 38:23-41:14, 53:8-54:4, 54:6-8;  4/28/10 Tr. at 18:23-19:12 (Miller).

47.7.    At the September 19, 2008 Sale Hearing, the Trustee acknowledged that (i) not all customer accounts were being transferred to Barclays (several thousand would be left with the Estate or transferred elsewhere), and (ii) there was great uncertainty concerning the assets that would remain in the LBI estate, particularly given the decline in LBI's asset base and deteriorating values in the period leading up to the LBI SIPC liquidation. BCI Ex. 49 (9/19/08 Tr.) at 76:18-77:3, 78:9-16 (Giddens).

47.7.1.    The Trustee specifically admitted that in considering what the value would be of the assets that would remain with the estate, "I really cannot tell." *Id.* at 78:12-16.

47.8.    The Committee decided not to object to the Sale, and thereby acquiesced in the Sale, with full knowledge that that there was uncertainty concerning the value of particular

categories of Purchased Assets and uncertainty as to the aggregate value of the Purchased Assets.  O'Donnell Dep. Tr. at 29:10-20, 104:10-16, 105:2-7; 5/6/10 Tr. at 205:18-206:16 (Burian); 5/7/10 Tr. at 57:5-10 (Burian); 12/17/09 Burian Dep. Tr. at 289:2-5.

47.9.    The Committee decided not to object to the Sale, and thereby acquiesced in the Sale, with full knowledge that that there was uncertainty concerning the amount of particular liabilities to be assumed by Barclays and uncertainty as to the aggregate amount of the Assumed Liabilities.  O'Donnell Dep. Tr. at 29:21-30:17, 31:24-32:14, 104:21-25, 105:2-7; 5/6/10 Tr. at 206:17-207:16 (Burian); 12/7/09 Burian Dep. Tr. at 289:7-291:12.

47.10.    The Committee decided not to object to the Sale, and thereby acquiesced in the Sale, with full knowledge that "much was uncertain" concerning the value of assets to be transferred and liabilities to be assumed.  O'Donnell Dep. Tr. at 85:13-20.

**48.    At The Time Of The Closing, LBHI, LBI, And The Creditors' Committee All Knew The Terms Of The Sale, And All Knew The Information On Which They Have Based The Claims In Their Rule 60(B) Motions.**

a.    *Movants' Knowledge of the Terms of the Purchase Agreement, Including the Clarification Letter*

48.1.    LBHI negotiated and executed the Purchase Agreement, including the Clarification Letter.  BCI Ex. 5.

48.1.1.    The Clarification Letter was executed "just before the market opened" on Monday, September 22, 2008. Miller Dep. Tr. at 27:20-28:9.

48.2.    Weil Gotshal, LBHI's outside counsel, was involved directly in the negotiation and drafting of the Purchase Agreement, including the Clarification Letter, which was negotiated and executed at Weil Gotshal's office.  8/24/10 Tr. at 119:24-120:18, 140:5-141:24, 144:14-145:4, 192:7-14 (Rosen); 8/31/10 Tr. at 54:11-55:7, 64:1-13 (Lewkow); 4/28/10 at 70:1-71:1, 71:12-18 (Miller); BCI Exs. 228, 238, 249, 460-466.

48.3.    As The Trustee's 30(b)(6) representative testified, Weil represented both LBHI and LBI in the negotiations:

"Q.   Weil Gotshal was representing both Lehman Brothers Inc.; you, the trustee; and Lehman Brothers Holding Company, correct?

A.   Yes.

Q.   Okay.  And you knew that at the time?

A.   Yes.

Q.   And you didn't object to that, did you?

A.   No."

5/5/10 Tr. at 59:19-25 (Kobak).

48.4.    Simpson Thacher, LBHI's other outside counsel, also reviewed and was involved in the drafting of the Purchase Agreement, including the Clarification Letter.  8/30/10 Tr. at 104:22-105:14, 106:15-20, 107:10-18 (Keller); BCI Exs. 228, 238, 249, 460-465.

48.5.    Lazard, LBHI's financial advisor, was also aware of the Clarification Letter.  Ridings Dep. Tr. at 14:15-21.

48.6.    Representatives of Alvarez & Marsal, the administrator of the LBHI Estate, were at Weil Gotshal over the weekend when the Clarification Letter was being negotiated and finalized, and they followed the Sale Transaction negotiations.  Fogarty Dep. Tr. at 24:21-26:2; BCI Exs. 429, 448.

48.7.    The Committee's advisors from Milbank and Houlihan Lokey were present over the
weekend of September 20-21, 2008 and provided with drafts of the Clarification Letter
and explanations of its terms.  BCI Exs. 227, 240; O'Donnell Dep. Tr. at 55:3-18, 57:7-2;
5/6/10 Tr. at 124:6-13 (Burian);  *see also* BCI Exs. 257, 253.

48.8.    Over the weekend of September 20-21, 2008, representatives of the Creditors'
Committee had various discussions concerning the terms of the Clarification Letter with
representatives of the Trustee while at Weil Gotshal's offices.  4/29/10 Burian Dep. Tr. at
79:10-80:5.

48.9.    Based upon Weil Gotshal's cooperation with the Committee, the Trustee reasonably
could have discovered all relevant facts by inquiring of either the Debtor or the
Committee, and there was no evidence presented at trial that could support a finding that
the Trustee was unable to learn this information.  *See* Complete Trial Record.

48.10.   Weil Gotshal filed the Clarification Letter with the Court on behalf of LBHI on the
Closing Date (September 22, 2008).  BCI Ex. 18.

48.11.   Simpson Thacher described and included the Purchase Agreement, including the
Clarification Letter, in LBHI's 8-K dated September 22, 2008.  8/30/10 Tr. at 108:12-
109:8 (Keller); BCI Ex. 413.

####    b.    *Movants' Knowledge of Barclays' Anticipated*
####          *Gain — Assets Not Equaling Liabilities*

48.12.   The only values stated in the APA were higher for assets than liabilities — approximately
$70 billion in long positions and $1.3 billion in retained cash, and approximately $69
billion in short positions.  BCI Ex. 1 (APA) at pp. 2, 6-7.

48.13.   There is no provision in the APA, originally or as amended, that required or provided for
assets to be equal to liabilities.  BCI Exs. 1, 5.

48.14.   Before the Closing, Harvey Miller understood that the Sale was the purchase of a
business and the assets that went with that business, to the extent not excluded,
irrespective of their value; it was not a balance sheet transaction.  Miller Dep. Tr. at
39:17-40:18, 50:14-51:6.

48.15.   On September 16, 2008, the Lehman Boards approved the Sale after being told that the
Sale would involve the transfers of greater assets than liabilities "[f]or LBI, the
transaction was described as a wash — with Barclays assuming liabilities ($64 billion)
basically equivalent to the assets ($70 billion) plus assuming some employees and
accounts."  4/26/10 Tr. 81:25-82:4 (Ainslie); BCI Exs. 473, 765, 766, 770, 771, 773, 788,
789.

    48.15.1.    Thus, any concept the Lehman board had that the Sale was a "wash" was an
extremely rough concept, based on assets that were actually greater than
liabilities.

48.16.  On September 17, 2008, Barclays held a public teleconference for analysts and investors to announce and describe the proposed Barclays/Lehman transaction.  During that teleconference, Barclays stated that the transaction included a "buffer" between trading assets and liabilities that it "expect[ed] to preserve," and that it would be "capital ratio accretive without additional equity issuance" due to "the negative goodwill from the transaction, which amounts to about 2 billion US dollars post tax."  BCI Ex. 110 at p. 2.

48.17.  The worldwide financial press reported that the Sale involved a $4 billion "buffer" between trading assets and liabilities. *See, e.g.* BCI Exs. 111, 115, 796-798.

48.18.  The worldwide financial press reported that Barclays expected the Sale to result in a multi-billion dollar accounting gain.  *See, e.g.,* BCI Exs. 381, 382.

48.19.  On September 17, 2008, Lehman Senior Vice President Roger Freeman reported to Bart McDade and 24 other Lehman executives that Barclays had explained during its analyst call that "[t]his transaction, due to $2bn in after-tax negative goodwill is accretive to capital ratios immediately."  BCI Ex. 189

48.20.  Before the Closing, Weil Gotshal was aware that Barclays had announced it expected an acquisition gain on the Sale.  Harvey Miller believed that Barclays' anticipated acquisition gain was not inconsistent with Weil's understanding of the deal or how it presented the deal to the Court; he also "assume[d] that Barclays was not making this acquisition for the purpose of taking a loss."   Miller Dep. Tr. at 62:9-65:6, 64:20-65:5, 70:9-17.

48.21.  On September 17, 2008, Ann Marie Miller of Houlihan Lokey emailed herself a Reuters article reporting that "[t]he deal would also lift Barclays' capital ratio…because of a negative goodwill adjustment from the deal amounting to about $2 billion after tax."  BCI Ex. 198.

48.22.  On September 19, 2008, Michael Fazio of Houlihan Lokey told his colleagues to "[l]isten to Barclays' investor call," which, at the time, could be replayed on Barclays' investor relations web site.  BCI Ex. 386; 5/3/10 Tr. at 27:14-16 (Hughes).

48.23.  Before the Closing, Saul Burian of Houlihan Lokey reviewed the transcript of Barclays' investor teleconference, which described Barclays' publicly announced expectation of an acquisition gain.  5/7/10 Tr. at 16:18-18:14 (Burian).

48.24.  Before the Closing, Saul Burian of Houlihan Lokey learned that Barclays expected to record an "accounting gain" on the Sale.  5/7/10 Tr. at 15:4-15 (Burian).

48.25.  Before the Closing, the Committee circulated the complete transcript of Barclays' investor teleconference, which described Barclays' publicly announced expectation of an acquisition gain.  BCI Ex. 261.

48.26.  In response to an email from Jacob Goldfield concerning the "Barclays Investor Call Transcript from Wednesday where they described how great the Lehman buy is / -$2bn goodwill after tax," Edward Gilbert (of Committee member Shinsei Bank) assured Mr.

Goldfield that "[w]e will make sure this information is considered in the Lehman proceeding."  BCI Exs. 285, 827.

48.27.   On September 17, 2008, Lazard received and discussed an email from Lehman product controller Gerard Reilly indicating that he believed the "purchase will be at a fixed discount on the assets that remain to reflect the bulk size of the purchase."  BCI Ex. 196.

48.28.   Before the Sale Hearing, Luc Despins of Milbank circulated an email to Committee advisers at Milbank and Houlihan Lokey reflecting a Goldman Sachs analysis that the Sale "allows Barclays to cherry pick owned inventory, investment and other assets at a windfall discount to FMV (the discount is at least several billion dollars)."  BCI Ex. 219.

48.29.   Before the Closing, the Committee was aware that the Sale involved Barclays receiving assets that had value to it but likely little to no value to Lehman.  6/25/10 Tr. at 90:5-12, 91:2-18 (Despins).

48.30.   Before the Closing, Saul Burian of Houlihan Lokey came to believe that Barclays would realize an economic gain on the transaction and "at all times" he advised the Committee of that.  5/7/10 Tr. at 27:21-28:17, 36:16-37:9 (Burian); *see also* 6/25/10 Tr. at 89:11-21 (Despins).

48.31.   When describing the deal before the Closing, Saul Burian of Houlihan Lokey indicated that "Barclays is making out like bandits on the broker/dealer business."  5/7/10 Tr. at 27:21-28:17 (Burian).

48.32.   The Trustee never communicated to anyone that he would not approve the deal if Barclays was likely to record a profit on the deal.  Kobak Dep. Tr. at 49:10-16.

48.33.   Before the Closing, the Movants were aware that other Lehman creditors believed that Barclays was getting a "discount" or a "fire-sale deal."  BCI Ex. 49 (9/19/08 Tr.) at 3:3-22, 4:2-13, 24:10-14, 173:24-174:8 (Golden), 227:11-14 (Angelich).

48.34.   During the week of the Sale, at least one Lehman senior executive believed that the Sale could be characterized as Barclays acquiring "net assets" of $4 billion for $250 million, without even looking at any of the intangible assets.  BCI Ex. 384.

48.35.   Before the Closing, the Movants were aware that the APA provision for a limited "upside sharing" had been removed from the contract.  BCI Ex. 49 (9/19/08 Tr.) at 3:3-22, 4:2-13, 24:10-14, 47:7-10 (Fife).

48.36.   Before the Closing, the Committee's counsel never suggested contractual provisions to ensure that the transaction would be a "wash" or balanced transaction.  O'Donnell Dep. Tr. at 92:25-94:10, 111:2-8.

48.37.   Mr. Marsal, who became LBHI's CEO, understood that the only way to put together a transaction where the assets equaled the liabilities would be one where "you would give yourself some kind of decent cushion when you are looking at those assets…what would be appropriate…would be some kind of hold-back" or true-up provision whereby asset

values and liabilities were determined some time after the deal closed.  Marsal Dep. Tr. at 123:11-125:2.

48.38.  Mr. Ainslie, a Lehman board member, also understood that the only way for assets to equal liabilities would be to have a true-up provision in the sale contract.  4/26/10 Tr. at 138:7-139:4 (Ainslie).

### c.    Movants' Knowledge of Alleged $5 Billion "Discount"

48.39.  Harvey Miller understood that the markets were in terrible shape at the time, so values were fluid and there was a "persistent theme" that Lehman was "always aggressive on its marks."  Miller Dep. Tr. at 34:6-20.

48.39.1.    Harvey Miller also knew that Lehman and Barclays traders were working all weekend to attempt to assess and determine the accurate values of the financial securites being transferred, which involved reviewing thousands of CUSIPs, and was what he called "a huge task."  Miller Dep. Tr. at 25:14-26:3, *see generally id.* at 25:14 - 28:5.

48.39.2.    Mr. Miller's law firm also received the schedule showing the Lehman marks on the repo collateral as $49.9 billion.  BCI Ex. 237.

48.39.3.    Mr. Miller's law firm was also integrally involved in drafting and finalizing the Clarification Letter that provided for Barclays to acquire all of the Repo Collateral.  *See generally* FOF ¶ 43; BCI Ex. 5 at ¶¶ 1(a)(ii)(A) and 13.

48.40.  Alvarez & Marsal acknowledged that apart from the efforts of Lehman and Barclays traders to value the assets for purposes of the deal, there was no systematic marking of the Lehman assets during the week of September 15.  Marsal Dep. Tr. at 22:15-24:21, 38:15-25.

48.41.  Before the Closing, Harvey Miller was aware that that "the Fed…put a lot of pressure on Barclays to take over the Fed's position" in the Repo.  Miller Dep. Tr. at 36:22-37:14.

48.42.  On September 17, 2008, in-house Lehman attorney Scott Lechner emailed Weil Gotshal attorneys explaining that the "firm is working on a 50 billion repo that needs to be done with Barclays." He asked for their thoughts on ensuring that Barclays could "liquidate free of a stay," and suggested that the "better approach was to include the assets they are purchasing in the purchase agreement that is approved by the bankruptcy court and SIPIA [sic]."  BCI Ex. 193.

48.43.  Before the Closing, Movants were aware that that Barclays had "stepped into the shoes of the Federal Reserve" by advancing $45 billion in cash and receiving "the collateral that Lehman posted in connection therewith."  BCI Ex. 49 (9/19/08 Tr.) at 3:3-22, 4:2-13, 24:10-14, 63:16-22 (Miller).

48.44.  Before the Closing, Harvey Miller understood that the Repo Collateral was a Purchased Asset.  Miller Dep. Tr. at 39:17-40:3.

48.45.  The Trustee understood that "all of the collateral in the repo was to be a purchased asset acquired by Barclays," and that that "would include any excess collateral that there might be."  Kobak Dep. Tr. at 135:5-15.

48.46.  Before the Closing, Lehman's Jim Seery made clear to the Committee that Barclays would keep any value in the Repo Collateral that exceeded the loan amount.  5/4/10 Tr. at 61:7-15 (Seery).

48.47.  On September 19, 2008, Lehman's Paolo Tonucci sent Barclays a spreadsheet of the Repo Collateral that had actually been transferred to Barclays and noted that it contains Lehman marks, which are less than the BoNY marks for the collateral — proving that Lehman also had the BoNY marks.  BCI Ex. 895.

48.48.  By September 19, 2008, Bart McDade knew that Lehman and Barclays had estimated the market value of the Repo Collateral to be $5 billion less than the marked value, and agreed to the transaction.  4/26/10 Tr. at 187:1-8, 187:14-25, 224:10-24 (McDade).

48.49.  Before the Closing, Lehman's Jim Seery discussed with the Committee's advisors the $5 billion difference between the Repo loan amount and the marked value of the Repo Collateral.  5/4/10 Tr. at 33:9-34:14, 60:6-17 (Seery); 5/6/10 Tr. at 100:16-20 (Burian).

48.50.  Before the Closing, Lehman's Jim Seery informed the Committee's advisors that Barclays and Lehman disagreed about the value of the Repo Collateral.  5/4/10 Tr. at 55:22-56:8, 56:13-57:16, 60:6-62:6, 67:20-68:9 (Seery); *see also* BCI Ex. 650 at p. 67.

48.51.  On September 19, 2008, Lehman independently analyzed the Repo Collateral actually delivered to Barclays as reflected on the spreadsheet generated earlier in the day and determined that much of the collateral was difficult to value and, if Lehman tried to sell the assets, "bids might be down 20 percent." Kirk Dep. Tr. at 95:14-96:16.

48.52.  Before the Closing, Lehman's Jim Seery discussed with the Committee's advisors that Lehman's traders had attempted to independently value the Repo Collateral and that there was a "question" about its market value.  5/4/10 Tr. at 33:9-34:5 (Seery); *see also id*. at 42:10-43:12.

48.53.  Before the Closing, Lehman's Jim Seery informed the Committee's advisors that, while Barclays and Lehman disagreed about the value of the Repo Collateral, they were close enough in their valuations to treat the market value of the Repo Collateral as approximately $45.5 billion.  5/4/10 Tr. at 44:3-25, 66:5-22, 76:19-23, 76:24-77:8, 79:3-17 (Seery); 5/7/10 Tr. at 92:11-93:8; 96:24-97:17 (Burian).

48.54.  Before the Closing, the Committee understood that the $47.4 billion figure mentioned by Lori Fife at the Sale Hearing was a valuation of the Repo Collateral only, as reflected in a Committee submission stating that, "[a]t the Sale Hearing, the Lehman Sellers indicated the value of the Fed Portfolio Securities was $47.4 billion."  BCI Ex. 37 at p. 8, n.12; Burian Dep. Tr. at 40:18-41:22.

48.55.  The Trustee never told anyone before the Closing that he believed the deal was capped at $47.4 billion.  Kobak Dep. Tr. at 115:12-116:2, 116:19-23, 117:9-14.

48.56.  The Trustee understood that neither the Purchase Agreement nor the Sale Order included a $47.4 billion cap and never asked for such a cap to be included in those documents.  Kobak Dep. Tr. at 115:12-116:2, 116:12-18.

48.57.  Before the Closing, the Movants received schedules indicating that the Repo Collateral was marked in excess of $49.9 billion — approximately $5 billion more than the Repo loan.  *See* BCI Exs. 237, 830, 739, 258.

48.58.  On Sunday, September 21, 2008, representatives of Lehman, Barclays, the Committee, JPMorgan, and the New York Fed held a meeting to discuss the Repo transaction and the $7 billion shortfall in the Repo Collateral that had been transferred to Barclays.  The parties discussed that Barclays was challenging the "marked value" for the repo collateral and believed its value was less than $49 billion of "face value," and that Barclays was likewise concerned about the value of the securities JPMorgan was offering to make up for the $7 billion shortfall.  5/4/10 Tr. at 47:21-49:6, 49:14-17, 54:14-21, 55:22-56:8, 56:13-57:16, 62:22-63:6 (Seery); BCI Ex. 650 at p. 67; *see also* Miller Dep. Tr. at 23:14-27:19; 9/7/10 Tr. at 26:16-27:2 (Leventhal).

48.59.  Before the Closing, the Committee raised its concerns about the $5 billion "mismatch" issue with Weil Gotshal.  O'Donnell Dep. Tr. at 157:4-24.

48.60.  As documented by the Committee advisors, before the Closing they "told Lehman/Weil that the pieces of the transaction that were being described to [them] added up to $52-53 billion rather than the approximately $47 billion that had been described in court the Friday before."  Shortly thereafter, Lehman told them that "some of the marks shown on Schedule A were 'out of date' and that the parties (Lehman and Barclays) had agreed to a $5 billion discount as the appropriate 'mark to market' adjustment for the securities."  BCI Ex. 813a.

48.61.  Before the Closing, the Committee came to believe that the Lehman executives, "in cahoots with their soon to be bosses/partners at barcap," "negotiated a sweetheart deal" to transfer to Barclays securities "worth $5 billion more than both the lehman and barcap guys said they were worth when the securities were transferred."  BCI Ex. 814.

  48.61.1.  Prior to filing its Rule 60(b) motion a year later, the Committee never expressed this belief to Barclays or to the Court.

### d.  *Movants' Knowledge of Cure Estimate Uncertainty*

48.62.  The APA, which LBHI executed and which the Trustee, his counsel, and Committee counsel reviewed prior to the Sale Hearing, provides that, "[f]or a period of 60 days after the Closing," Barclays would have "the right upon notice to Seller to designate any contract related to the assets purchased from the Seller" to be a "Purchased Contract."  If Barclays designated a contract as a Purchased Contract, then "such Purchased Contract shall be assigned to the Purchaser and upon such assignment Purchaser shall be obligated

to pay or cause to be paid the cure amount in respect of such Purchased Contract." BCI Ex. 1 (APA) at § 2.5; 6/25/10 Tr. at 15:2-12 (Despins); BCI Ex. 40 at pp. 45-50.

48.63. The Sale Motion, which was filed on LBHI's behalf and which Trustee and Committee counsel reviewed prior to the Sale Hearing, made clear that Barclays "shall have the right, but not the obligation, to take assignment of contracts and leases which are designated for assumption and assignment by Purchaser." BCI Ex. 11 (Sale Motion) at ¶ 14; 6/25/10 Tr. at 15:2-12 (Despins); BCI Ex. 40 at pp. 45-50.

48.64. Prior to the Sale Hearing, Weil Gotshal, Lazard, and Alvarez & Marsal all *knew* that the estimates for Barclays' potential exposure for Cure obligations was substantially higher than the estimated accrual on LBI's provisional balance sheet. BCI Exs. 207, 209, 212.

    48.64.1.   On September 18 and 19, 2008, Weil Gotshal, Lazard, and Alvarez & Marsal were sent spreadsheets showing an LBI accrual for "Trade Payables" that was less than the estimate of "Cure," and that was increased by a "transaction adjustment." BCI Exs. 207, 209, 212; Coles Dep. Tr. at 23:5-21.

48.65. David Coles, the Alvarez & Marsal managing director who became CFO of LBHI on or about September 26, 2008, noted the cure amount, including the transaction adjustment, when he received Lehman's draft post-Sale balance sheet on September 18, 2008. He testified that he has "never seen" a cure figure "maintained" on a system and that calculating such a figure "was usually a Herculean task for an organization to reach out across its subsidiaries, get a copy of every executory contract and then attempt to figure out how much could be —would need to be paid to cure it." He understood that it was "pretty spectacular to get that close to the real number for what must have been thousands of executory contracts." BCI Ex. 212; 9/29/10 Tr. at 24:21-25:14 (Coles).

48.66. It is unrebutted that, on the morning of September 19, 2008, in response to questions about the spreadsheet with the "transaction adjustments" provided to Weil on September 18, 2008, Martin Kelly of Lehman gave Lori Fife of Weil a revised cure estimate of $1 billion. 4/28/10 Tr. at 207:2-14, 270:17-271:18, 286:15-23 (Kelly).

48.67. At the Sale Hearing, at which representatives of the Movants appeared, Harvey Miller indicated that Barclays would be assuming cure payments which were estimated to have a "potential exposure" of $1.5 billion. BCI Ex. 49 (9/19/08 Tr.) at 3:3-22, 4:2-13, 24:10-14, 70:19-20, 71:4-7, 100:1-4 (Miller).

48.68. Harvey Miller understood that the cure estimates were made by Lehman personnel and that "the figure on executory contracts was always a very contingent figure. Thus, nobody knew what contracts were going to be assumed…." Miller Dep. Tr. at 80:18-81:14.

48.69. On September 18 and 19, 2008, Weil Gotshal, along with Cleary Gottlieb, posted three lists of Closing Date Contracts on the LBHI Epiq website. These initial lists reflected cure amounts for the Closing Date Contracts of approximately $180 million. BCI Exs. 12-15.

48.70.  Alvarez & Marsal's David Coles was aware that "it's difficult to work out the total potential exposure" for cure payments, and that "it's typical for the actual liability that is settled by a purchaser to be markedly lower than that." 9/29/10 Tr. at 25:13-24 (Coles).

48.71.  The Committee understood that the cure liability was contingent on those contracts that Barclays, in its sole discretion, would choose to assume within 60 days of the Closing. 5/7/10 Tr. at 12:5-7, 13:21-22 (Burian); 6/25/10 Tr. at 99:16-100:8 (Despins); O'Donnell Dep. Tr. at 95:23-96:11; 12/7/09 Burian Dep. Tr. at 268:19-269:3, 269:19-270:2.

48.72.  The Committee was aware that the cure amounts for the Closing Date Contracts were available on the Epiq website before the Sale Hearing, reviewed those filings, and could have calculated the total amount listed at that time. O'Donnell Dep. Tr. at 97:12-99:11.

### e.    Movants' Knowledge of 2008 Compensation Estimate Uncertainty/Inclusion Of Severance

48.73.  During the Sale Hearing, at which representatives of the Movants appeared, Harvey Miller stated that "Barclays will also assume exposure for the employees that accept offers of employment, which is estimated to have a value of approximately — an exposure of approximately 2 billion dollars." BCI Ex. 49 (9/19/08 Tr.) at 3:3-22, 4:2-13, 24:10-14, 70:19-20, 71:4-7, 99:22-25 (Miller).

48.74.  Prior to the Closing, Movants understood that the compensation estimate related to both the bonus and severance obligations that Barclays was assuming. *See* 4/26/10 Tr. at 161:1-10 (McDade); 4/28/10 Tr. at 32:20-24 (Miller); 6/21/10 Tr. at 45:9-14 (Marsal); 8/23/10 Tr. at 120:12-24 (Shapiro); 12/7/09 Burian Dep. Tr. at 266:17-267:21; 5/6/10 Tr. at 108:10-23 (Burian); BCI Ex. 143 at p. 5.

48.75.  On September 18 and 19, 2008, Weil Gotshal, Lazard, and Alvarez & Marsal were sent spreadsheets showing LBI's accrual for bonus that was less than the estimates of "Comp," and that was increased by a "transaction adjustment." BCI Exs. 207, 209, 212; Coles Dep. Tr. at 23:5-21.

48.76.  Before the Closing, Lehman was aware that the compensation estimate was properly higher than the estimated accrual on the provisional LBI balance sheet for bonuses because (a) Lehman's accrual reflected only the cash component of bonuses but not their equity component; (b) Lehman's accrual did not reflect a full accrual for the entire year; and (c) the accrual did not include an amount reflecting the Barclays exposure for severance payments that might have to be made. 4/27/10 Tr. at 48:21-49:18 (McDade).

48.77.  The Committee understood that the compensation figure was necessarily an estimate, because of the existence of conditions that might bear on the amounts Barclays would ultimately pay. 12/7/09 Burian Dep. Tr. at 289:20-290:12; *see also* 6/25/10 Tr. at 99:16-21 (Despins).

### f.    Movants' Knowledge of Purchase of LBI's Exchange-Traded Derivatives Business, Including Deposited Margin

48.78.    The APA, and the Clarification Letter amended, expressly provided that *all* LBI assets used in connection with the business were being transferred to Barclays, except those assets identified in the APA as excluded assets. ETD margin was not identified as an excluded asset in the APA or the Clarification Letter. BCI Ex. 1 (APA) at pp. 2-4, 6; BCI Ex. 5.

48.79.    The APA specifically and expressly includes as Purchased Assets all "deposits" (including "required capital deposits"), and the ETD margin deposited at the OCC clearly fits within that definition. BCI Ex. 1 (APA) at p. 6.

48.80.    On September 18, 2008, LBI and Barclays personnel discussed and arranged for the transfer to Barclays of all "House Margin and Collateral" and all collateral in customer futures accounts. BCI Ex. 217.

48.81.    On or about September 18, 2008, Lehman's Jim Seery explained to the Committee that Lehman's exchange-traded derivatives business would be transferred to Barclays. 5/4/10 Tr. at 163:8-164:22 (Seery); BCI Ex. 124.

48.82.    Jim Seery understood that the exchange-traded derivatives business that Barclays was purchasing "would necessarily include the actual positions and their margin." 5/4/10 Tr. at 164:23-165:7 (Seery).

48.83.    Weil Gotshal was asked to incorporate a request from the OCC for the inclusion of a Sale Order provision preserving the OCC's lien over "all securities, cash, collateral and other property" at the OCC once transferred to Barclays. BCI Ex. 220.

48.84.    The Sale Order, which was supported by the Trustee, contemplated the transfer of OCC margin to Barclays. BCI Ex. 16 (Sale Order) at ¶ N; 5/5/10 Tr. at 179:16-181:1 (Kobak).

48.85.    The Trustee understood and signed three separate agreements that expressly provided for the transfer of all ETD Margin Assets to Barclays.

48.85.1.    On September 19, during or immediately after the Sale Hearing, the Trustee's representative, James Kobak, signed a version of the Transfer and Assumption Agreement, and then authorized the use of that signature to endorse the final Transfer and Assumption Agreement. 5/5/10 Tr. at 103:7-105:20 (Kobak); BCI Exs. 230, 231.

48.85.2.    The final Transfer and Assumption Agreement, which is endorsed by the Trustee, OCC, and Barclays, provides: "For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lehman hereby sells, assigns, transfers, and sets over to Barclays, without recourse Dr without representation or warranty (other than as expressly provided herein), all of Lehman's rights, title, interests, powers, privileges, remedies …in, to, under, and in respect of the Account, as of the Effective Date including with

respect to:  (i) the Clearing Fund deposit; (ii) all margin deposits held by OCC with respect to the Account; (iii) all settlement obligations with regard to transactions in cleared contracts; and (iv) all rights and obligations in respect of exercises of option contracts  and assignments of such exercises."  BCI Ex. 3.

48.85.3.    The Trustee understood when he signed the Transfer and Assumption Agreement in the early morning of Saturday, September 20, 2008, that "LBI was transferring all of its OCC accounts to Barclays," that "that transfer included all of the margin deposits held by OCC with respect to those accounts," and that "Lehman, LBI, had given up all of its rights, title, interest, powers, privileges, remedies, obligations, concerning those accounts and the margin deposits."  5/5/10 Tr. at 117:6-118:4 (Kobak).

48.85.4.    On September 19, 2008 either during or immediately following the Sale Hearing, the Trustee signed the Collateral Account Agreement.  BCI Exs. 230, 231.

48.85.5.    The Collateral Account Agreement that the Trustee's representative signed provides:

"LBI has assigned to Barclays all rights in securities cash, and other property ('Collateral') pledged by LBI to The Options Clearing Corporation ('OCC') and held for OCC's benefit at JPMorgan Chase LBI hereby authorizes and directs JPMorgan Chase to transfer on its books as of the close of business on Friday, September 19, 2008, the Collateral pledged to OCC to the account or accounts of Barc1ays Capital Inc. and to reflect on the records of JPMorgan Chase that such Collateral is pledged to OCC by Barclays Capital Inc."

BCI Exs. 230, 231.

48.85.6.    The final Clarification Letter, which LBHI and LBI signed, provided that Purchased Assets included:  "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)."  BCI Ex. 5.

48.86.    On the afternoon of September 20, 2008, the Trustee and Weil Gotshal were notified by email that the OCC would be transferring "all positions, cash and securities" at the OCC to Barclays, including "nearly $1 billion in cash."  BCI Ex. 233.

48.87.    Later on the afternoon of September 20, 2008, the Trustee and Weil Gotshal were notified that, having heard no objection, the OCC would transfer "all such cash in the accounts" to Barclays.  BCI Ex. 262.

48.88.    The Trustee's 30(b)(6) representative testified that he understood "in the week prior to the closing" that the OCC accounts "included customer positions in exchange-traded derivatives," and that Barclays was getting "any margin or collateral that would be associated with those positions."  5/5/10 Tr. at 105:21-106:1, 128:7-11 (Kobak).

48.89.  The Trustee's 30(b)(6) representative testified that he "had a general understanding" and that "it was logical" to him that "there would be some kind of collateral, whatever you want to call it" to support these LBI proprietary positions.  5/5/10 Tr. at 106:19-107:6 (Kobak).

48.90.  The Trustee's 30(b)(6) representative testified that he understood at the time that he received the OCC emails that the OCC was going to transfer all cash and securities collateral at the OCC to Barclays.  5/5/10 Tr. at 113:14-23, 118:24-119:12 (Kobak) (discussing BCI Exs. 233, 262).

48.91.  The Trustee was again advised, on September 21, 2008 at 4:37 pm, that the OCC accounts would be transferred to Barclays.  BCI Ex. 267.

48.92.  Between 6:30 and 8:00 am on September 22, 2008, Weil Gotshal inserted the ETD parenthetical into the Clarification Letter.  8/24/10 Tr. at 120:7-24 (Rosen); BCI Ex. 5.

48.93.  The final Clarification Letter signed by LBHI and the Trustee defined Purchased Assets as including "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)."  BCI Ex. 5; 5/5/10 Tr. at 55:23-56:18, 56:22-58:7, 57:21-58:7 (Kobak); *see also* Frelinghuysen Dep. Tr. at 35:17-36:11.

    48.93.1.  The Trustee's representative, James Kobak, understood that the ETD-related parenthetical "did not limit the collateral to customer collateral," and "wasn't limited in any way."  5/5/10 Tr. at 124:3-11 (Kobak).

    48.93.2.  LBHI's 30(b)(6) representative, Philip Kruse, admitted that that ETD-related parenthetical  encompassed "any collateral" associated with the ETDs, and testified under oath with regard to the ETD Margin that: "I know obviously it's part of the deal."  Kruse Dep. Tr. at 191:12-192:5, 194:12-18.

    48.93.3.  Any business person engaged in the business of exchange-traded derivatives would understand the phrase "any property held to secure obligations under" ETDs to refer to ETD Margin Assets.  BCI Ex. 340 at ¶ 11;  *see also* 8/24/10 Tr. at 125:14-24 (Rosen); 9/8/10 Tr. at 138:14-139:22 (Raisler).

48.94.  Before the Closing, the Committee was aware that the exchange traded derivatives and property held to secure those derivatives were Purchased Assets and that their value was uncertain.  *See* O'Donnell Dep. Tr. at 84:19-85:20, 87:13-17.

48.95.  The Trustee's 30(b)(6) representative testified that he understood "in the week prior to the closing" that the OCC accounts "included customer positions in exchange-traded derivatives," and that Barclays was getting "any margin or collateral that would be associated with those positions."  5/5/10 Tr. at 105:21-106:1, 128:7-11 (Kobak).

### g.    Movants' Knowledge that the ETD Accounts Could Have Positive Value

48.96.  On September 18, 2008 at 6:23 pm, LBI circulated a new iteration of BCI Ex. 106 (the Berkenfeld Schedule), which estimated the financial assets and liabilities in the deal. BCI Ex. 206.

48.97.  The September 18, 2008 6:23 pm schedule set forth LBI's new "9/16 estimate," which showed $3.2 billion in ETD-related assets versus $1.7 billion in ETD-related liabilities, and compared that estimate to the "per contract estimate" reflected in the earlier Berkenfeld Schedule (BCI Ex. 106), which showed $4.5 billion of ETD-related assets versus $4.5 billion in ETD-related liabilities. BCI Ex. 206.

48.98.  On September 19, 2008 at 12:52 am, Lehman circulated to financial advisors at Lazard yet another iteration of the balance sheet containing estimates as of September 17, 2008. BCI Ex. 209.

48.99.  The September 19, 2008 at 12:52 am balance sheet estimated ETD-related assets of $3.6 billion versus ETD-related liabilities of $1.7 billion. BCI Ex. 209.

48.100.Thus, prior to the closing, Movants knew that it was at least conceivable that the ETD accounts would have positive net value for Barclays, albeit subject to substantial uncertainty.  BCI Exs. 206, 209.

48.101.As of the Sale Hearing, the Trustee believed there was substantial risk associated with LBI's ETD Accounts.  5/5/10 Tr. at 126:11-17 (Kobak).

### h.    Movants' Knowledge of Clearance Box Assets and 15c3 Deposit

48.102.Before the Closing, the Committee was aware that Barclays had demanded that Lehman identify assets other than the Repo Collateral that had value and were available to be transferred, in order to ensure that the buffer was adequately maintained.  12/7/09 Burian Dep. Tr. at 264:20-265:10; BCI Ex. 818.

48.103.While with Weil Gotshal before the Sale Hearing, Bart McDade agreed in a call with Alex Kirk that the Clearance Box Assets and the 15c3 Assets were to be identified as available for transfer to Barclays; McDade and Weil were aware that these assets were in the deal.  Kirk Dep. Tr. at 104:24-105:19, 110:23-111:19; 4/26/10 Tr. at 199:18-200:6 (McDade); *see also* 5/5/10 Tr. at 59:19-25 (Kobak).

48.104.Shortly before the Sale Hearing began, Michael Klein met with Weil Gotshal, Cleary, Lehman, and Lazard and reviewed the changes in the transaction, including the identification of the Clearance Box Assets and 15c3 Assets.  8/31/10 Tr. at 45:15-47:22 (Lewkow); *see also* 5/5/10 Tr. at 59:19-25 (Kobak).

48.105.On Friday before the Sale Hearing and during the weekend before the Closing, lawyers representing LBHI and LBI understood and intended that the assets in the Clearance Boxes at DTC were Purchased Assets.  BCI Ex. 737; *see also* 5/5/10 Tr. at 59:19-25 (Kobak).

48.106. Before the Closing, Harvey Miller understood that the Clearance Box Assets were included among the Purchased Assets that would be transferred to Barclays. Miller Dep. Tr. at 42:19-44:16; BCI Exs. 251, 737

48.107. Before the Sale Hearing, Lehman's Jim Seery advised the Committee that the Clearance Box Assets, marked by Lehman at $1.9 billion, would be transferred to Barclays. 5/7/10 Tr. at 87:8-10 (Burian); BCI Ex. 834

48.108. Emails sent during the Sale Hearing recess (when Weil explained the "major changes" in the transaction) indicate that certain creditors were "sqwaking [sic]" about the transfer of $1.9 billion of Clearance Box Assets. BCI Ex. 225; BCI Ex. 49 (9/19/08 Tr.) at 43:11-22.

48.109. That same email indicates that Weil and Lazard were aware of, and supported, the transfer of the Clearance Box Assets that were valued at $1.9 billion. BCI Ex. 225.

48.110. After the agreement with the DTCC was reached, the Trustee was aware that the Clarification Letter was revised to reflect that agreement and continued to specifically identify as Purchased Assets "such securities and other assets held in LBI's '074 clearance box' at DTC." BCI Exs. 505, 642; see 8/24/10 Tr. at 132:3-133:25 (Rosen).

48.111. Early on September 22, 2008, Weil Gotshal, the Trustee's counsel, Barclays' counsel, the Committee's advisors, and the DTCC held a telephonic meeting during which the agreement with the DTCC was discussed and explained. 8/24/10 Tr. at 132:3-133:25 (Rosen).

48.112. Early on September 22, 2008, the Committee advisors met with Barclays' Michael Klein and discussed, among other things, the inclusion of $1.9 billion in Clearance Box Assets in the sale. 5/7/10 Tr. at 32:8-14, 78:9-12 (Burian); BCI Ex. 130.

48.113. Early on September 22, 2008, representatives from Cleary, Weil (representing LBHI and LBI), and Houlihan Lokey participated in a hallway discussion regarding the 15c3 deposit. 8/24/10 Tr. at 140:20-141:24 (Rosen); 8/31/10 Tr. at 62:19-63:24 (Lewkow); 5/6/10 Tr. at 139:6-141:1 (Burian); 5/5/10 Tr. at 58:18-24 (Kobak).

48.114. During that discussion, the parties agreed that Barclays would acquire $769 million in securities from the reserve account. 8/24/10 Tr. at 140:20-141:24 (Rosen); 8/31/10 Tr. at 62:19-63:24 (Lewkow); see 5/6/10 Tr. at 139:6-141:1 (Burian); see also 5/5/10 Tr. at 58:18-24 (Kobak).

48.115. Weil Gotshal, the Trustee and his lawyers were aware that on Sunday evening drafts of the Clarification Letter provided that "Purchaser shall receive…(ii) cash, cash equivalents, bank deposits or similar cash items maintained (A) by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise." BCI Ex. 270.

48.116. The final Clarification Letter, which LBHI and LBI signed, provided: "…Purchaser shall receive... (ii) to the extent permitted by applicable law and as soon as practicable after the

Closing, $769 million of securities as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value." BCI Ex. 5 (Clarification Letter) at ¶ 8.

48.117. The final Clarification Letter defines Purchased Assets: "Purchased Assets shall include...such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser. . . ." BCI Ex. 5 (Clarification Letter) at ¶ 1(a)(ii)(B).

48.118. Schedule B was "on the closing table" for the Trustee to review. BCI Ex. 757.

48.119. The Trustee never complained or otherwise indicated that Schedule B was inconsistent with his understanding of the assets that Barclays acquired. 5/5/10 Tr. at 177:5-19 (Kobak).

### i.    Movants' Knowledge That Drafting of Clarification Letter Was Completed After Sale Hearing Without Any Further Court Approval

48.120. The Movants knew that the changes to the transaction would be documented after the Sale Hearing. BCI Ex. 49 (9/19/08 Tr.) at 3:3-22, 4:2-13, 24:10-14, 43:15-20; BCI Ex. 16 (Sale Order) at p. 1; O'Donnell Dep. Tr. at 42:13-43:11.

48.121. Over the pre-Closing weekend, 13 lawyers at the Trustee's law firm billed over $150,000 for work described as "review of continuing revisions to APA, Clarification Letter and numerous rounds of negotiations with Weil, Cleary, and other professionals re changing terms of sale and timetable for closing and consultations with HHR, SIPC and SEC teams re same," "round-the-clock negotiations with Lehman, Barclays, SIPC and regulators on sale issues with review of Clarification Letter and accompanying sale documents," work to "monitor and participate in sale discussions and review of final sale documents," and the like. BCI Ex. 40 at pp. 26-27, 30, 34.

48.122. On September 20, 2008, Luc Despins of Milbank emailed Harvey Miller and asked him to "make sure that [the Weil Gotshal] corporate team" involved Milbank senior transactional attorney Crayton Bell "in all discussions and meetings with respect to the documentation and closing of the Barclays transaction." BCI Ex. 785.

48.123. Milbank transactional attorney Crayton Bell was present at Weil Gotshal's office over the weekend of September 20-21, 2008 and was provided with drafts of the Clarification Letter. O'Donnell Dep. Tr. at 57:5-58:2; *see also* BCI Ex. 240.

48.124. Late on September 21, 2008 or early on September 22, 2008, Weil Gotshal held a meeting attended by representatives of Barclays and the Committee during which Weil Gotshal decided not to return to Court for further approval of the Clarification Letter because, in Weil's view, it "did not change the deal that was presented to the Court." Miller Dep. Tr. at 48:15-49:15; 4/28/10 Tr. at 117:13-21 (Miller).

48.125. Before the Closing, the Committee understood that it had the right to veto the deal; it did not exercise that right and instead told Harvey Miller, "if it's okay with you, it's okay with us."  5/4/10 Tr. at 64:9-13, 66:5-67:1 (Seery); Miller Dep. Tr. at 29:10-25, 101:13-102:5.

### *j.    Movants' Knowledge Of Barclays' Hiring Of Lehman Executives*

48.126. On September 16, 2008, the Lehman Boards approved the Sale after being told about Barclays' cash bonus offers, and that "interested Firm employees were involved in the transaction negotiations."  BCI Exs. 104, 788; *see also* Kruse Dep. Tr. at 180:19-182:2.

48.127. Movants were aware that Barclays sought to retain the top executives in the Business because the Sale Motion, which was filed on LBHI's behalf and which Trustee and Committee counsel reviewed before the Sale Hearing, stated that "[a]pproximately 200 employees of the Sellers have been designated as key to the success of the business, and 8 employees have been designated as critical to the success of the business.  The retention of a substantial majority of key employees, and all 8 critical employees, is a condition precedent to the Closing."  BCI Ex. 11 (Sale Motion) at p. 8; 6/25/10 Tr. at 15:2-12 (Despins); BCI Ex. 40 at pp. 45-47.

48.128. During the Sale Hearing, at which Movants appeared, Barry Ridings testified that the APA required, as a closing condition, the retention by Barclays of eight key Lehman employees.  BCI Ex. 49 (9/19/08 Tr.) at 3:3-22, 4:2-13, 24:10-14, 149:11-16.

48.129. Bryan Marsal testified that he knew that Lehman executives involved in negotiations would be offered employment contracts by Barclays, and that that is "fairly typical in most M&A transactions…."  Marsal Dep. Tr. at 73:4-74:23.

48.130. Simpson Thacher, the other law firm representing LBHI in the transaction, understood that certain Lehman employees that were involved in the transaction negotiations were, at the same time, negotiating employment agreements with Barclays.  He testified that given the circumstances, such a situation was "unavoidable."  Keller Dep. Tr. at 37:22-39:10.

**49.      In Addition To The Evidence Showing Movants' Knowledge As Of The Closing, There Is Further Evidence That, Prior To The Time For Moving For Reconsideration Or A New Trial Under Rule 59, LBHI, The Trustee, And The Creditors' Committee All Knew The Terms Of The Sale, And All Knew The Information On Which They Have Based The Claims In Their Rule 60(B) Motions.**

49.1.    The paragraphs above reflecting Movants' knowledge as of the Closing are incorporated herein by reference.

   ***a.      Movants' Knowledge Of The Terms Of The Purchase Agreement, Including The Clarification Letter***

49.2.    After the Closing, the Committee received the final Clarification Letter and, therefore, was aware that it provided that Barclays was to acquire the Repo Collateral, the Clearance Box Assets, the exchange-traded derivative margin, and the $769 million in 15c3-type securities. O'Donnell Dep. Tr. at 48:2-6; BCI Ex. 834.

49.3.    Upon reviewing the final Clarification Letter after the Closing, the Committee did not tell anyone that it had identified any material changes, and did not express any concern to anyone that the Clarification Letter had not been authorized by the Court.  O'Donnell Dep. Tr. at 51:4-11, 106:6-19.

49.4.    The Committee's lead lawyer, Luc Despins of Milbank, testified that in September 2008 he believed that the Clarification Letter modified the transaction in ways that required the Committee's consent, but he did nothing to bring that to the Court's attention even though, in his view, those changes were made without Committee consent:

   "Q.      And so is it fair to say that in September of 2008 you were aware that the clarification letter made certain changes to the transaction?

   A.      That's a logical inference, yeah.

   Q.      And you testified that you had asked the Court that no changes be made without your consent, correct?

   A.      Correct.

   Q.      And you had told Mr. Miller that he needed your consent, correct?

   A.      Um-hmm.

   Q.      You have to answer audibly.

   A.      Yes.  I'm sorry.  Yes.

   Q.      And you didn't give your consent, did you?

   A.      No, we did not.

Q.      Now did you ever consider going back to the Court and saying, in substance, Your Honor, you told him not to make any changes without our consent.  They went ahead and did it anyway.  We objected.  Did you ever consider doing that?

A.      Not without having the full understanding of what the changes were and the impact that the changes might have had for the estate.

Q.      Well, you knew that the changes had been made.

A.      I knew that —

Q.      You knew changes had been made, correct?

A.      That some changes had been made, yes.

Q.      And you knew what the changes were 'cause they were written right there in the clarification letter, right?

A.      Well, I knew that I could read the document and say we're changing that and we're changing that section, *et cetera*.  But what we don't know is the impact of those changes on the value received by the estate.  So I don't want to run to court on a half-baked theory that there are some changes but, frankly, Judge, I don't understand what the impact of those changes are. So I — what I'm telling you is that we wanted to have the schedules.  We wanted to understand what happened to those schedules and the marks.  And obviously, the game plan was — after I gained a full understanding of that and briefing the committee, if warranted, that we would be eventually going back to the Court.

…

Q.      You were asked whether you believed that if the clarification letter did not change the basic transaction presented to the Court, whether your consent was needed, and you said your consent was not needed under those circumstances. Do you recall that?

A.      That's correct.

Q.      Now, in fact, you believe that the clarification letter did change the transaction presented to the Court, correct?

A.      I think that a fair reading of that letter is that it did modify the transaction, yes.

Q.      And under those circumstances, you believed your consent was required, correct?

A.      That's correct.

> Q.    And it was never given?
>
> A.    That's correct."
>
> 6/25/10 Tr. at 48:23-49:11, 119:4-18 (Despins); *see also* FOF ¶ 49.

49.5.   After the Closing, Weil Gotshal drafted and circulated to, among others, Alvarez &
Marsal, detailed summaries of the transaction that described the terms of the purchase
agreement and confirmed that the Repo collateral, the Clearance Box Assets, and "any
property" held as ETD Margin are Purchased Assets.  BCI Exs. 807, 320, 325; *see also*
Fogarty Dep. Tr. at 35:15-23.

49.6.   On September 26, Bryan Marsal, founding member of Alvarez & Marsal and Lehman's
CEO, directed James Fogarty of Alvarez & Marsal to "outline what was sold and what
was kept per the agreement and confirm that that is actually what happened."  Fogarty
Dep. Tr. at 32:7-33:18, 34:5-25.

49.7.   To make sure he understood the terms of the Purchase Agreement, Mr. Fogarty (and
other members of Alvarez & Marsal) reviewed the APA and the Clarification letter, met
with lawyers from Weil Gotshal, received and reviewed a detailed summary from Weil
Gotshal describing the terms of the deal and what assets and liabilities were transferred
pursuant to the Purchase Agreement, and met with Lehman executives who participated
in negotiating the deal.  Fogarty Dep. Tr. at 32:7-33:13, 34:20-36:21, 41:18-42:4.

49.8.   On September 29, 2008, LBHI filed a motion stating that the Clarification Letter "is
binding on the parties" and attaching Schedules A and B that "as more fully described in
the Clarifying Letter," contain lists of securities "transferred under the Purchase
Agreement." BCI Ex. 19 at p. 3.

49.9.   Alvarez & Marsal understood, by September 30, 2008, which Lehman assets and
liabilities were transferred pursuant to the Purchase Agreement and the $5 billion
valuation issue, but did not raise those issues with the Court because they "had other
priorities" at that time.  Kruse Dep. Tr. at 242:2-244:7.

### b.    *Movants' Knowledge Of Barclays' Anticipated Gain — Assets Not Equaling Liabilities*

49.10.  Notes from a September 29 or 30 meeting among Weil Gotshal, Lehman negotiators Alex
Kirk and Paulo Tonucci, and various members of Alvarez & Marsal, to discuss the details
of the Sale Transaction show assets exceeding liabilities by $3.45 billion.  BCI Ex. 144;
Fogarty Dep. Tr. at 80:2-21, 81:12-22.

### c.    *Movants' Knowledge Of Alleged $5 Billion "Discount"*

49.11.  After the Closing, Lehman retained access to GFS (*i.e.*, Lehman books and records).
Krishnan Dep. at 171:25-172:18; *see also* M. 122 at §§ 3.01, 3.12.  Therefore, Lehman
(including Alvarez & Marsal) could look up, for instance, the Lehman marks on the

securities transferred to Barclays for any date in September. Krishnan Dep. at 171:25-172:18.

49.12. On September 26, 2008, the Committee received the final versions of Schedules A and B to the Clarification Letter, which were essentially identical to those they received pre-Closing. BCI Exs. 812, 812a and 812b.

49.13. On September 28, 2008, Luc Despins advised Houlihan Lokey to audit Schedules A and B "because if there is an issue with them we need to speak up now before the trail gets cold!" BCI Ex. 812.

49.13.1. After reviewing these schedules, Brad Geer of Houlihan described his concern about whether the securities on Schedule A "really were only worth the amount that was agreed to between leh and bar, or if they were worth more." He noted, "[w]e can price a fairly big portion of the securities but there are some that we won't know on sched A. Those that we have looked at seem to suggest that they're worth more than implied by the negotiated mark in the deal, which amount isn't shown in detail on any schedule. I.e. The two sides somehow said — that although the detailed schedule A totals to X, it's really on worth Y in the aggregate (because the marks in the system are somehow outdated, which seems odd...). The diff between X and Y is s[e]veral billion." BCI Ex. 812.

49.14. In a September 29 or 30 meeting among Weil Gotshal, Lehman negotiators Alex Kirk and Paulo Tonucci, and various members of Alvarez & Marsal, the $5 billion "valuation difference" was described and explained by the Lehman negotiators to the Alvarez personnel analyzing the Sale Transaction. BCI Ex. 144; Korycki Dep. Tr. at 88:14-17; Fogarty Dep. Tr. at 55:10-25, 68:11-69:5, 100:17-101:8, 113:9-114:14; Coles Dep. Tr. at 70:21-71:9, 73:4-74:7.

49.15. In numerous documents prepared by Alvarez & Marsal or the Committee's financial advisers that are dated in early October 2008, there are descriptions of the Sale as involving (a) a "$5 billion discount" that was agreed between Barclays and Lehman, (b) a $5 billion "reduction" that was "negotiated" from "Lehman 'stale' marks," (c) and a $5 billion "Negotiated mark haircut." *See, e.g.,* BCI Exs. 131, 332, 813a.

49.15.1. Movants never presented any evidence to demonstrate that these documents reflected information that came to them only after September 30, 2008.

49.15.2. To the contrary, the evidence shows that these documents reflect information that the Movants had *before* September 30, 2008. O'Donnell Dep. Tr. at 141:13-25; BCI Exs. 144, 816, 833..

49.16. The Court should therefore find that Movants had information about a $5 billion "discount," "reduction," or "Negotiated mark haircut" before September 30, 2008. BCI Exs. 144, 816, 833

### d.    Movants' Knowledge of Cure Estimate Uncertainty

49.17.  After the Closing, Weil Gotshal drafted and circulated detailed summaries of the transaction that noted that the "Purchased Contracts," defined as "any Contract related to the assets purchased from Seller by Purchaser that Purchaser designates as a Related Contract within 60 days following the Closing" were included as Purchased Assets.  BCI Exs. 807, 320, 325.

### e.    Movants' Knowledge Of Barclays' Acquisition Of ETD Margin, Clearance Box Assets, And $769 Million Of 15c3-3 Securities.

49.18.  The 30(b)(6) witness for Alvarez & Marsal and LBHI on the issue of, *inter alia,* ETD margin, Philip Kruse, admitted that the September 27, 2008 Weil Gotshal transaction summary, which Alvarez received at the time, made clear that ETD margin was being transferred to Barclays as part of the Sale Transaction:  "I know obviously it's part of the deal as it's summarized by Weil in that e-mail."  BCI Ex. 325; Kruse Dep. Tr. at 191:12-192:5; 194:12-18.

49.19.  For months after the Closing, the Trustee authorized the transfer of ETD margin to Barclays.  9/8/10 Tr. at 127:21-135:21 (Raisler); 8/30/10 Tr. at 51:25-52:10.

49.20.  Immediately after the Closing, lawyers representing LBHI, LBI, and the Trustee confirmed to lawyers for Barclays that the assets held in LBI's DTC Clearance Boxes as listed on Schedule B to the Clarification Letter were Purchased Assets.  BCI Ex. 309.

49.21.  The final version of Schedule B prepared after the Closing by lawyers representing LBHI, LBI, and the Trustee listed several categories of assets worth approximately $1.9 billion, the overwhelming majority of which was in LBI's DTC accounts.  BCI Ex. 757; *see also* 5/5/10 Tr. at 58:18-24 (Kobak).

49.22.  Immediately after the Closing, Luc Despins of Milbank emailed Harvey Miller to ask whether the transaction had closed and "[w]hat happened to regulated capital[.]"  Miller responded that the deal had closed "10 minutes ago" and that "[Lehman] keeps the cash and PAIB securities - $469.  Barclays gets securities $763m Figures approx."  Neither Miller nor Despins indicated that Barclays' right to the securities would be conditioned on there being an excess in the reserve account.  BCI Ex. 284.

49.23.  Immediately thereafter, Saul Burian attempted to clarify Harvey Miller's statement to Luc Despins:  "To be clear regarding your last email to Luc, do you mean that of the 2.2-2.3 of reserves, LBI keeps 1.5B and B gets 763mm?  Essentially, we get all cash and cash equivalents and they took the portion of the reserves that were in securities?"  Mr. Miller responded, "[y]es."  BCI Ex. 288.

49.24.  Post-Closing Committee emails indicate that the Committee believed that it had "won" the issue regarding the 15c3 deposit, and do not indicate that Barclays' right to the 15c3 securities was conditional:  "I just read the letter.  We 'won' the issue — [H]arvey must have held firm that no cash meant no cash and we got 500mm more than [then] settlement Tom was advocating."  BCI Ex. 847.

49.25.   Shortly after the Closing, Saul Burian confirmed to the Committee Barclays' entitlement
to the 15c3 securities, writing that Lehman "cut a deal with Barclays in which Barclays
only gets $763mm of the securities in these deposit/regulatory accounts.  All cash and
cash equivalents (approx. $1.5B) will be retained by LBI (the broker-dealer)."  BCI Ex.
834.

49.26.   Immediately thereafter, the Committee's advisors began planning a challenge to
Barclays' right to the 15c3 securities, as Michael Fazio of Houlihan Lokey listed an
"open item" to "[c]ontest the $763mm of securities transferred (to be determined in the
grand schem[e])."  BCI Ex. 811.

49.27.   On September 25, 2008, Committee counsel received a list of Clearance Box Assets that
was "not necessarily the final" but was "very close."  This list included the assets at the
DTC.  BCI Ex. 756.

49.28.   The Weil Gotshal transaction summary, which was prepared for and shared with Alvarez
& Marsal on September 27, 2008, shows that both Weil and Alvarez understood that the
Clearance Box Assets and the 15c3 deposit was transferred to Barclays in the Purchase
Agreement.  BCI Ex. 325.

49.29.   Alvarez's and LBHI's 30(b) witness on the assets that were transferred to Barclays, Mr.
Kruse, admitted that the Weil Gotshal transaction summary made clear the $769 million
15c3 deposit was being transferred to Barclays pursuant to the terms of the Purchase
Agreement:  "Obviously, it's here in the document that was provided to us," referring to
the summary.  Kruse Dep. Tr. at 153:14-15.

49.30.   The Trustee was served with a copy of Schedule B on September 30, and
contemporaneous emails show that at least three of his Hughes Hubbard lawyers
reviewed it that day.  BCI Ex. 524.

49.31.   After the Closing, lawyers representing LBHI, LBI and the Trustee informed Committee
counsel that Barclays had acquired approximately $1.9 Billion in Clearance Box Assets
— which necessarily included the DTC assets.  BCI Ex. 756.

49.32.   The Trustee knowingly authorized the post-Closing transfer of non-customer clearance
box assets to Barclays.  BCI Ex. 375.

**50.    Prior To The Time For Noticing An Appeal Of The Sale Orders (November 10, 2008), LBHI, LBI, And The Creditors' Committee All Knew The Terms Of The Sale, And All Knew The Information On Which They Have Based The Claims In Their Rule 60(B) Motions.**

50.1.    The Paragraphs above reflecting Movants' knowledge as of the Closing and the time for moving for reconsideration or a new trial under Rule 59, are incorporated herein by reference.

> *a.    Movants' Knowledge Of The Terms Of The Purchase Agreement Including The Clarification Letter*

50.2.    During an October 2, 2008 hearing, the Trustee explained to the Court that the Repo Collateral was "deemed to be purchased assets within the meaning of the asset purchase agreement." Two LBHI attorneys and four Committee attorneys attended this hearing, but none of them questioned or disagreed with the Trustee's statement. BCI Ex. 803 at 3:3-18, 72:3-9. The reference to the "asset purchase agreement" necessarily includes the Clarification Letter, which defines the Repo Collateral as a purchased asset. BCI Ex. 5.

> *b.    Movants' Knowledge of Barclays' Anticipated Gain — Assets Not Equaling Liabilities*

50.3.    On October 6, 2008, Committee advisor FTI circulated Alvarez & Marsal's "Draft Barclays Deal Recap" which indicated that there was a "Negotiated Mark Haircut" of $5 billion, and that there was a "Net 'Book' Loss" to LBI of $3.27 billion based on BoNY marks. BCI Ex. 332 at p. 1.

50.4.    On October 6, 2008, Alvarez & Marsal circulated a "Recap" of the Sale reflecting a $3.1 billion "Loss on Sale" based on BoNY marks, with assets exceeding liabilities. BCI Ex. 431 at p. 2.

> *c.    Movants' Knowledge of Alleged $5 Billion "Discount"*

50.5.    On October 1, 2008, members of Alvarez & Marsal met representatives of the Committee and discussed the Sale Transaction, including what Movants call the $5 billion "discount." BCI Ex. 144; Korycki Dep. Tr. at 88:14-17; Fogarty Dep. Tr. at 55:10-25, 68:11-69:5, 100:17-101:8, 113:9-114:14; Coles Dep. Tr. at 70:21-71:9, 73:4-74:7.

50.6.    During this period of extensive Alvarez inquiries, Martin Kelly was working with Alvarez, not Barclays. 4/28/10 Tr. at 282:9-283:6 (Kelly).

50.7.    While discussing the value of the Repo Collateral during an October 1, 2008 meeting with Alvarez & Marsal, Mike Fazio expressed his belief that Barclays "took $5 billion more collateral" and that the Estate "should get $5.5 billion back." BCI Ex. 816.

50.8.    In an October 6, 2008 email, Committee advisor FTI noted that, "[c]lose of business on Thursday the Fed wanted out the repo and required Barclays to step into the trade." BCI Ex. 332.

50.9.   The Committee's representatives, including Committee professionals Milbank, Houlihan Lokey, and FTI, attended an October 8, 2008 presentation at Weil Gotshal where Alvarez & Marsal explained that the Sale involved a "negotiated $5 billion discount" against the "Book value per Lehman 'stale' marks."  BCI Ex. 131a.

50.10.  During his deposition, Philip Kruse of Alvarez & Marsal acknowledged that the "$5 billion discount" referred to in the October 8, 2008 presentation is the same discount referred to in LBHI's Rule 60 motion; when asked whether the discount is "different in any way," he testified:  "Well, no.  Again, because it applies to the same group of securities, the repo collateral, I think it is the same concept being communicated."  Kruse Dep. Tr. at 142:11-144:6.

50.11.  On October 10, 2008, the Committee's advisors drafted a memorandum summarizing their understanding of the transaction.  The memo stated that "[t]he night of the close of the transaction, we told Lehman/Weil that the pieces of the transaction that were being described to [them] added up to $52-53 billion rather than the approximately $47 billion that had been described in court the Friday before."  Shortly thereafter, Lehman responded that "some of the marks shown on Schedule A were 'out of date' and that the parties (Lehman and Barclays) had agreed to a $5 billion discount as the appropriate 'mark to market' adjustment for the securities."  The memorandum concludes that "[i]t appears that the assets transferred were significantly greater, and liabilities assumed were significantly less, than the figures represented in court (by at least a few billion dollars in each case)."  BCI Ex. 813a.

50.12.  On October 13, 2008, Luc Despins wrote to Lori Fife:  "our concern is with respect to the securities which were transferred. Houlihan has reviewed them and cannot even come close to the amount which was announced in court (I think it was $47.4 billion) ... Houlihan's review would indicate that the securities transferred could be worth billions more than the $47.4 billion."  In response, Lori Fife wrote: "I really am at a loss to figure out why you and the other Committee professionals are spending so much time on the Barclays sale. What could you or anyone for that matter do even if it turned out that the assets turned out to be greater? *As you know, the sale has been consummated which effectively moots out any relief you might be seeking.*"  BCI Ex. 389 (emphasis added).

50.13.  Between October 28 and November 13, 2008, Lehman (through Alvarez & Marsal) was given further access to September 12, 2008 (and later September 19, 2008) GFS data through a "special environment" set up at its request.  BCI Ex. 1107; Krishnan Dep. Tr. at 41:7-16, 170:11-17.

### d.    Movants' Knowledge of Cure Estimate Uncertainty

50.14.  On October 1, 2008, three revised lists of cure payments for Closing Date Contracts were posted on Epiq.  These show the payments revised downward to approximately $106 million.  BCI Exs. 22-24, 506.

50.15.  On October 10, 2008, the Committee's advisors drafted a memorandum summarizing their understanding of the transaction.  The memo reflects the advisors' understanding

and belief that the actual cure payments would be substantially less than the estimate for potential cure liability: "With respect to the $2.5 'cure liability' that Barclays assumed...there is still no list summarizing what cure assumptions could lead to anything even close to this type of cure payments...." BCI Ex. 813a.

###   e.   Movants' Knowledge of 2008 Compensation Estimate Uncertainty/Inclusion Of Severance

50.16.   The Committee's representatives attended an October 8, 2008 presentation where Alvarez & Marsal confirmed that Barclays' compensation liability included its obligation to pay severance to discharged employees. *See* BCI Ex. 131a.

50.17.   On October 10, 2008, the Committee's advisors drafted a memorandum summarizing their understanding of the transaction. The memo described the advisors' understanding of the liabilities assumed by Barclays: "*With respect to the $2.5 'cure liability' that Barclays assumed*...there is still *no list summarizing what cure assumptions could lead to anything even close to this type of cure payments*....A similar argument could be made for the $2 billion employee compensation liability — *there is no way it's that high*." BCI Ex. 813a (emphasis added).

###   f.   Movants' Knowledge of Purchase of LBI's Exchange-Traded Derivatives Business, Including Deposited Margin

50.18.   On October 3, 2008, in response to an OCC email requesting that the Trustee "let OCC know immediately if you know of any reason that OCC should not continue to treat BCI as the owner of the 074 accounts," the Trustee's representative, Christopher Kiplok, stated that "I think we are OK with" the OCC's position that it would "act with respect to position and collateral carried under [former LBI accounts] at the direction of BCI without consent from the Trustee." BCI Ex. 470.

50.19.   The Trustee's 30(b)(6) representative testified that he knew for a fact "probably in October" that the collateral in LBI's OCC accounts included LBI proprietary cash in addition to securities. 5/5/10 Tr. at 109:21-110:25 (Kobak).

50.20.   For months after the Closing, the Trustee cooperated with Barclays representatives in their efforts to obtain the ETD margin and authorized several different transfers of ETD Margin to Barclays. 8/30/2010 Tr. at 51:25-52:13 (James); 9/8/10 Tr. at 127:21-135:21 (Raisler).

###   g.   Movants' Knowledge of Clearance Box Assets and 15c3 Deposit

50.21.   On October 6, 2008, Committee advisor FTI circulated Alvarez & Marsal's "Draft Barclays Deal Recap" which indicated that Barclays was to receive "0.80" billion "securities (15-c-3-3)" and "1.90" billion in the "Unencumbered Box." BCI Ex. 332.

50.22.   The Committee's representatives attended an October 8, 2008 presentation where Alvarez & Marsal confirmed that assets purchased by Barclays included "$1.9 Billion Unencumbered Box." BCI Ex. 131a; *see also* Kruse Dep. Tr. at 125:2-17.

50.23.   Alvarez's and LBHI's 30(b)(6) witness, Mr. Kruse, admitted that Alvarez's understanding as of October 8, 2008 was that the Clearance Box Assets were transferred to Barclays as part of the Purchase Agreement, and that the approximate value of such assets was $1.9 billion.  Kruse Dep. Tr. at 125:7-17.

50.24.   On October 10, 2008, the Committee's advisors drafted a memorandum summarizing their understanding of the transaction.  The memo stated that the "components of value that were transferred to Barclays" included "[m]isc. securities 'in the box' at transaction date" valued at $1.9 billion and "[r]eserves related to customer accounts" valued at $0.8 billion.  BCI Ex. 813a.

50.25.   In an October 16, 2008 "state of the estate" presentation, Harvey Miller told the Court that "as part of the Barclays closing, because Barclays was taking the customer accounts, they got the 700 odd million dollars in securities."

    50.25.1.   Six committee attorneys, three Trustee attorneys, and the Trustee himself attended the hearing, but none of them disagreed with Mr. Miller's statement.  BCI Ex. 485 at 7:15-23, 8:10-20, 21:2-8, 58:9-13.

### h.   *Movants' Knowledge of Barclays' Hiring of Lehman Executives*

50.26.   On October 9, 2008, Committee advisors at FTI circulated an article indicating that "[a] Chapter 11 bankruptcy document filed by Lehman Brothers Holdings Inc says that Barclays has identified eight individuals out of the New York staff of 10,000 who are vital to make the deal succeed and a further 200 who are identified as 'key'.  It is thought that these eight directors will be locked into two-year contracts worth between $10m and $25m a year."  BCI Ex. 838.

**51.**    **Prior To The Time That They Filed Their Briefs Supporting The Sale Order On Appeal, LBHI And The LBI Trustee Knew The Terms Of The Sale, And All Knew The Information On Which They Have Based The Claims In Their Rule 60(B) Motions.**

51.1.    The Paragraphs above reflecting Movants' knowledge as of the Closing, the time for moving for reconsideration or a new trial under Rule 59, and the time for noticing an appeal of the Sale Orders, are incorporated herein by reference.

    *a.*    ***Movants' Knowledge of the Terms of the Purchase Agreement Including the Clarification Letter***

51.2.    On December 12, 2008, LBHI filed a brief opposing a creditor's appeal of the Sale Order and invoked the terms of the Clarification Letter as a reason for denying the appeal and affirming the Sale Order "in all respects."  M. 405 at pp. 4, 9, 12, 18, 23, 26; *see also* FOF ¶ 61.   The Trustee filed a brief adopting LBHI's brief.  M. 552 at p. 4, n. 1; *see also* FOF ¶ 61.

    *b.*    ***Movants' Knowledge of Revisions To APA Completed After Sale Hearing Without Any Further Court Approval***

51.3.    Approximately two months after the Closing, Harvey Miller discussed with Committee counsel his prior determination that it was unnecessary to return to Court for further approval of the Clarification Letter.  Milbank attorney Matthew Barr stated that the Committee was "fine" with Mr. Miller's prior determination that the Clarification Letter did not make a material change to the agreement and said that it would not pursue the issue unless it saw a "variance of two billion dollars…." 4/28/10 Tr. at 117:23-118:6 (Miller).

**52.    Prior To The Time That The Sale Orders Were Affirmed On Appeal, LBHI, LBI, And The Creditors' Committee All Knew The Terms Of The Sale, And All Knew The Information On Which They Have Based The Claims In Their Rule 60(B) Motions.**

52.1.    The paragraphs above reflecting Movants' knowledge as of the Closing, the time for moving for reconsideration or a new trial under Rule 59, the time for noticing an appeal of the Sale Orders, and the time that they filed their briefs supporting the Sale Order on appeal are incorporated herein by reference.

**a.    *Movants' Knowledge of Alleged $5 Billion "Discount"***

52.2.    On December 5, 2008, the Trustee executed the December Settlement Agreement, releasing Barclays "from and in respect of all Claims, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to" the Repo Collateral.  BCI Ex. 9 at § 4(d).

52.3.    The Trustee then moved for approval of the December Settlement Agreement, specifying that it "is designed to achieve the intended economic outcome" of the Fed Replacement Transaction in which Barclays was supposed to have received securities marked at approximately $50 billion in exchange for a payment of $45 billion — a $5 billion difference.  BCI Ex. 29 at ¶ 7; *see also* FOF ¶ 60.

52.4.    On December 21, 2009, Houlihan Lokey advised Quinn Emanuel that, before the Closing, it "uncovered" that Lehman employees, "in cahoots" with their soon to be bosses/partners at Barclays, transferred securities to Barclays worth $5 billion more than Lehman and Barclays said that they were worth.  BCI Ex. 814; *see also* 5/7/10 Tr. at 108:6-109:4 (Burian).

52.5.    At a hearing on the December Settlement on December 22, 2008, the Trustee told the Court Barclays is entitled to Repo Collateral "valued at over forty-nine billion dollars under the Clarification Letter — "the purchase agreement approved by Your Honor." BCI Ex. 50 (12/22/08 Tr.) at 19:12-20:10; *see also* Kobak Dep. Tr. at 151:12-154:10.

52.6.    At the hearing, no one mentioned a "wash" or a "$47.4 billion valuation cap." BCI Ex. 50; *see also* Kobak Dep. Tr. at 148:6-22, 151:12-154:10.

52.7.    At the December 22, 2008 hearing on the December Settlement, the Committee did not mention its belief that Lehman executives were "in cahoots" with Barclays to transfer a "$5 billion discount."  BCI Ex. 50; BCI Ex. 814.

52.8.    On February 3, 2009, the Committee advisors attended a meeting with Barclays representatives.  During the meeting, the Committee never asserted that there was a valuation cap in the deal, and never disclosed that they had independently valued the securities on Schedule A and concluded they were worth billions of dollars more than what the Court and Committee were told.  BCI Ex. 761; 8/25/10 Tr. at 85:25-87:11 (King).

52.9.   On February 9, 2009 Barclays filed its Form 6-K reporting a gain on acquisition of £2.262 billion ($4.1 billion).  BCI Ex. 134.

52.10.  On February 19, 2008, Bryan Marsal wrote to Barclays seeking information on comp and cure liabilities but not arguing deal was required to be a "wash" or subject to $47.4 billion "valuation cap."  BCI Ex. 161.

### b.    Movants' Knowledge of Cure Estimate Uncertainty

52.11.  By November 22, 2008, all of Barclays' cure payment obligations as of that date were posted on the Epiq website.  They totaled $109 million, not $1.5 billion.  BCI Ex. 506.

52.12.  The Committee was aware that all cure amounts for Designated Contracts were posted on the Epiq website by November 22, 2008, and could have calculated the total amount at that time.  O'Donnell Dep. Tr. at 99:12-100:10; BCI Ex. 867.

### c.    Movants' Knowledge of Purchase of LBI's Exchange-Traded Derivatives Business, Including Deposited Margin

52.13.  On November 14, 2008 (after the Trustee admittedly knew everything he now claims he did not know at the time of Closing), the Trustee's representative, James Kobak, stated in writing that he was "aware of the Transfer and Assumption Agreement, dated September 19, 2008, which of course I executed on his behalf, and the Trustee fully intends to comply with its terms."  BCI Ex. 156.

52.14.  In that same letter, the Trustee's representative, James Kobak, stated that the collateral deposited in respect of LBI's former futures and options positions at the OCC "can be transferred to Barclays (and the Trustee will gladly consent) if Barclays will live up to its bargain and assume the obligations involved for all customers…"  BCI Ex. 156.

52.15.  As of July 15, 2009, the Trustee continued to work to apprise Barclays of the extent to which collateral held by overseas brokers was recoverable.  BCI Ex. 920.

52.16.  Throughout the appeal period, Movants repeatedly cited and relied upon the Clarification Letter both in their appellate papers and in submissions to this Court and never claimed during the appeal period that the Clarification Letter was not approved and binding on the parties.  *See* FOF ¶¶ 61-64.

**xii.** **Facts Showing That The Barclays Acquisition Balance Sheet Reflects Reasonable Valuations Of The Financial Inventory Acquired In The Sale, That Movants' Experts Were Unreliable, And That The Barclays Acquisition Gain Was Entirely Attributable To Assets That Would Likely Have Had Little Or No Value To Lehman In A Liquidation.**

**53.** **The Barclays Acquisition Balance Sheet Reflects Valuations Of The Financial Inventory Acquired In The Sale That Reflect Reasonable And Good Faith Judgments About The Fair Value Of Those Assets, As Required Under The Accounting Rules.**

53.1.    Because the applicable accounting rules preclude taking into account various economically relevant factors, the Acquisition Balance Sheet reflects valuations of the financial inventory acquired in the Sale that "deviate from the economic reality" in that they are higher than what a willing buyer would pay for these trading assets. 10/6/10 Tr. at 19:24-20:10, 71:21-72:3, 75:6-10, 75:17-76:23, 76:24-77:3, 79:22-80:16 (Pfleiderer); 9/2/10 Tr. at 62:3-21 (Romain); 9/21/10 Tr. at 97:19-98:10, 99:12-100:8, 103:20-104:1, 116:22-117:7 (Garvey).

   53.1.1.    The accounting rules governing the Acquisition Balance Sheet did not allow Barclays to take into account the block size of a financial asset. 9/2/10 Tr. at 62:3-21 (Romain); 9/21/10 Tr. at 56:13-21 (Garvey); 10/6/10 Tr. at 74:21-75:2 (Pfleiderer); BCI Ex. 1002a at pp. 70-73.

   53.1.2.    The accounting rules did not allow Barclays to reflect in its acquisition balance sheet the unknown identity of a large portion of the financial inventory it acquired in the Sale.  9/21/10 Tr. at 55:18-56:7 (Garvey).

   53.1.3.    The accounting rules did not allow Barclays to reflect in its acquisition balance sheet its ability — or inability — to risk manage the assets, which would be relevant to interpret the fair value of these assets from an economic perspective. 10/6/10 Tr. at 73:6-17 (Pfleiderer).

   53.1.4.    Absent the Sale to Barclays, the trading inventory acquired in the Sale would have generated "significantly less" value than what it was valued at on Barclays' acquisition balance sheet. 10/7/10 Tr. at 186:7-187:9 (Pfleiderer).

53.2.    Barclays' acquisition balance sheet was not finalized for months after the closing due to the size and complexity of the transaction. 9/2/10 Tr. at 14:2-22 (Romain).

   53.2.1.    The size and complexity of the portfolio purchased by Barclays, which included many illiquid securities that were difficult to value, are one major reason for lengthy valuation process — and testing of the valuations — that took place for months after the closing. 9/2/10 Tr. at 14:7-22 (Romain).

   53.2.2.    Some of the Purchased Assets and Assumed Liabilities were unknown to Barclays at the time of Closing, and it took months to identify and value them.

53.2.2.1    Barclays needed to engage external consultants to value the intangible assets, because it did not have the necessary expertise to do so internally. 9/2/10 Tr. at 20:21-21:11 (Romain).

53.2.2.2    Barclays did not know and could not have known the net value of the exchange traded derivatives at the time of the Closing. 9/2/10 Tr. at 23:25-26:5 (Romain); *see* FOF ¶ 33.

53.2.2.3    Barclays' senior accountant Gary Romain had to call a colleague from London to focus on "getting an understanding of the futures assets and liabilities, because it was clear there were multiple issues which were being resolved only slowly." 9/2/10 Tr. at 25:19-26:11, 26:22-27:6 (Romain).

53.2.3.    There were uncertainties as to the accounting treatment of Purchased Assets and Assumed Liabilities that had to be clarified.

53.2.3.1    The valuation date was discussed with Barclays' independent auditor PwC, and at PwC's suggestion, Barclays used September 22 — the actual Closing date. *See* FOF ¶ 53.9.

53.2.3.2    The accounting treatment of the cure and comp liabilities was initially uncertain and was clarified after discussions with PwC months after the Closing. *See* FOF ¶ 15.

53.3.    Barclays' valuations were performed by market participants with a feel for the conditions prevailing in September 2008. 10/7/10 Tr. at 177:10-178:6 (Pfleiderer).

53.4.    Barclays' valuation personnel acted in good faith with the objective to state the fair value of the assets purchased in the transaction under the applicable accounting rules. 10/7/10 Tr. at 185:19-23 (Pfleiderer); 9/2/10 Tr. at 14:23-15:23 (Romain).

53.4.1.    The Barclays valuation of the assets acquired in the Sale was primarily determined by work managed by the Independent Valuation Group within the Product Control Group, which is within the Finance Department. 9/2/10 Tr. at 31:11-16 (Romain); BCI Ex. 341 at ¶¶ 51-52; Landreman Dep. At 7:5-16, 189:13-190:12, 201:10-203:11; Teague Dep. at 24:5-16, 25:4-26:11, 37:10-38:6, 175:18-176:4.

53.4.2.    The Independent Valuation Group — or Indepent Valuation Control ("IVC") — within the Product Control Group generally has responsibility for performing price testing on valuations performed by trading desks, and therefore the use of this group to value the assets acquired from Lehman reflected the application of standard practice as applied to the circumstances of the Sale. *Id.*

53.4.3.     Within IVC, Sean Teague, Richard Landreman, and Mark Washtell led the effort to value the assets acquired from Lehman, with each having slightly different areas of responsibility.  *Id*.

53.4.4.     Each of the three Barclays valuation professionals primarily responsible for performing and managing the valuation work that determined the values at which the assets acquired from Lehman would be booked on the acquisition balance sheet (Mark Washtell, Richard Landreman, and Sean Teague) has testified under oath that their objective was at all times to state the fair value of the assets under applicable accounting rules.  Landreman Dep. Tr. at 197:20-23, 198:8-11; Teague Dep. Tr. at 279:25-280:14; Washtell Dep. Tr. at 220:21-221:4, 221:9-19.

53.4.5.     Each of the three Barclays valuation professionals primarily responsible for performing and managing the valuation work that determined the values at which the assets acquired from Lehman would be booked on the acquisition balance sheet has testified under oath that the instructions given to them, and those they gave to their team, were to value the assets at fair value. Landreman Dep. Tr. at 197:24-198:7; Teague Dep. Tr. at 280:18-281:7; Washtell Dep. Tr. at 221:5-12.

53.4.6.     Each of the three Barclays valuation professionals primarily responsible for performing and managing the valuation work that determined the values at which the assets acquired from Lehman would be booked on the acquisition balance sheet has testified under oath that no one ever suggested to them that they should understate the value of the assets in any way or to do anything other than estimate fair value as accurately as possible.  Landreman Dep. Tr. at 198:12-199:4; Teague Dep. Tr. at 281:8-282:3; Washtell Dep. Tr. at 222:2-18.

53.4.7.     Each of the three Barclays valuation professionals primarily responsible for performing and managing the valuation work that determined the values at which the assets acquired from Lehman would be booked on the acquisition balance sheet has testified under oath that they believe that their ultimate valuation reflected fair value.  Landreman Dep. Tr. at 201:5-9; Teague Dep. Tr. at 282:4-8; Washtell Dep. Tr. at 223:11-15.

53.4.8.     Gary Romain, the senior Barclays Chief accountant responsible for preparing the acquisition balance sheet, likewise confirmed under oath that Barclays valued the assets at fair market value, as defined in the accounting rules. 9/2/10 Tr. at 60:7-11 (Romain); 4/30/10 Tr. at 49:7-16, 71:5-25 (Clackson).

53.4.9.     Barclays' Acquisition Balance Sheet was prepared with the extensive participation of and guidance from PricewaterhouseCoopers auditors.  10/6/10 Tr. at 146:5-22 (Pfleiderer); 10/7/10 Tr. at 95:11-96:17 (Pfleiderer); BCI Exs. 959, 995, 727b, 870a, 996, 604, 615, 601, 605, 607, 612, 613, 618, 1054,

592a, 596, 597, 619, 600, 1000, 1000a, 616, 583; M. 307, M. 252, M. 337, M. 341, M. 338, M. 340.

53.4.10.   Movants proffered no evidence whatsoever that called into question the good faith of the Barclays personnel who prepared the acquisition balance sheet or the valuations that fed into it. *See generally* Complete Trial Record.

53.4.11.   None of Movants' experts opined that Barclays intentionally understated the value of the assets received in the transaction. 9/20/10 Tr. at 115:9-117:11 (Zmijewski); 9/21/10 Tr. at 85:6-86:4 (Garvey); 9/30/10 Tr. at 67:2-6 (Slattery).

53.5.   Despite Movants' insinuations, there was no evidence that any of Barclays' valuations were affected by any trader incentive to undervalue any of the assets, and there was substantial evidence that they were not.

53.5.1.   Movants offered no evidence of any valuation that was affected by any such incentive.

53.5.2.   The valuation process was undertaken with extensive participation and guidance from PwC, which found no evidence of any such undervaluation. BCI Ex. 592a.

53.5.3.   The Barclays valuation and accounting personnel who oversaw the preparation of the acquisition balance sheet and the valuations underlying it offered uncontradicted testimony denying that any such undervaluation occurred.  Landreman Dep. Tr. at 197:20-23, 197:24-198:7, 198:12-199:4, 198:8-11, 201:5-9; Teague Dep. Tr. at 279:25-280:17, 280:18-281:7, 281:8-282:3, 282:4-8; Washtell Dep. Tr. at 220:21-221:4, 221:5-12, 221:9-19, 222:2-18, 223:11-15; 9/2/10 Tr. at 59:3-25 (Romain); *see also* id. at 85:2-13, 87:14-89:7; 4/30/10 Tr. at 49:6-16, 71:5-25 (Clackson).

53.5.4.   Professor Pfleiderer looked for evidence of such systematic undervaluation and found none.  10/7/10 Tr. at 185:19-23 (Pfleiderer).

53.5.5.   Both contemporaneous documents and the uncontradicted testimony of Barclays' Chief Financial Officer Patrick Clackson showed that senior management wanted to be able to report as large a negative goodwill figure as possible, a goal that would have been frustrated by any undervaluation of assets.  4/30/10 Tr. at 32:25-33:6 (Clackson); 10/7/10 Tr. at 174:16-177:9 (Pfleiderer); BCI Ex. 292; M. 580, M. 806; *see also* 10/6/10 Tr. at 140:19-143:2 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstratives 52-53).

53.5.6.   Increasing Tier 1 capital ratios was an important objective for Barclays at this time, and understating the values of the securities acquired would have reduced Barclays' Tier 1 capital ratio. M. 263 at p.1; BCI Ex. 110 at p. 1, 2.

53.5.7.    The Barclays valuation professionals primarily responsible for the valuations were not traders, but rather members of Barclays' independent pricing group, called the Product Control Group, who were not subject to any trader incentives. Washtell Dep. Tr. at 5:23-6:14; Landreman Dep. Tr. at 6:18-7:16; Teague Dep. Tr. at 11:17-12:5; 10/7/10 Tr. at 175:10-20 (Pfleiderer).

53.5.8.    For the subset of assets where traders had principal input into determining the fair values at which certain assets would be booked on the Acquisition Balance Sheet (the assets valued by the Principal Mortgage Trading Group ("PMTG"), Professor Pfleiderer demonstrated that the traders sometimes reached valuations that were higher than the independent Product Control Group, and sometimes lower — evidencing that there was no systematic bias for traders always to mark assets lower.  *See* BCI Ex. 1103a (Pfleiderer Demonstrative 52-53); 10/6/10 Tr. at 140:19-143:2 (Pfleiderer).

53.6.    The testimony of Movants' valuation experts was illogical and self-contradictory, because they simultaneously claimed Barclays undervalued some of the assets acquired from Lehman, and also admitted that they did not question the accuracy of the values on Barclays' Acquisition Balance Sheet, which was audited by PwC and filed with the SEC and FSA.

53.6.1.    The Barclays' Acquisition Balance Sheet was prepared under IFRS by Barclays' senior accountant, Gary Romain.  9/2/10 Tr. at 13:8-17, 73:25-74:1 (Romain); 9/21/10 Tr. at 36:21-24 (Garvey); BCI Ex. 592a.

53.6.2.    Movants' accounting expert, Mr. Garvey, is not an expert in IFRS accounting, which governed Barclays' transaction accounting. 9/21/10 Tr. at 34:7-19, 39:17-22, 40:1-5, 40:13-20 (Garvey).

53.6.3.    Mr. Garvey did not opine that Barclays' financial statements are materially misstated. 9/21/10 Tr. at 46:3-11, 85:1-86:4 (Garvey).

53.6.4.    Mr. Garvey admitted that he was not opining that the Barclays' Acquisition Balance Sheet understated the value of the assets acquired from Lehman in the Sale, either by a material amount or by any amount.  9/21/10 Tr. at 83:8-84:2 (Garvey).

53.6.5.    Neither Mr. Garvey nor any of Movants' other experts opined that Barclays' Acquisition Balance Sheet was unreasonable or incorrect as filed. 9/21/10 Tr. at 84:17-25 (Garvey); s*ee generally* M. 151, 152, 153, 154, 154B, 155, 155B, 156, 156B, 821-825.

53.7.    More than half of the trading portfolio acquired by Barclays in the transaction consisted of Level 2 or Level 3 assets for which there were no quoted prices in active markets, which therefore required judgment to value, and which could therefore be reasonably accorded a range of values. 10/6/10 Tr. at 90:21-93:9; 93:10-94:21 (Pfleiderer); 9/21/10 Tr. at 57:4-58:11 (Garvey); BCI Exs. 1103a (Pfleiderer Demonstratives 28, 29), 1002a at pp. 9-12.

53.7.1.    As Professor Pfleiderer opined and Movants' experts repeatedly admitted, "judgment is involved" in valuing these assets, allowing different experts or market participants to find a range of reasonable values for the same financial asset.  10/6/10 Tr. at 95:23-96:5, 123:23-124:3  (Pfleiderer); 9/21/10 Tr. 86:5-14, 86:19-88:4, 91:14-92:23, 172:16-173:6 (Garvey); 9/20/10 Tr. at 105:20-23, 106:1-3 (Zmijewski); 9/30/10 Tr. at 63:6-13, 64:21-25, 143:18-144-19, 145:3-146:6 (Slattery); 10/4/10 Tr. at 47:13-22, 49:9-50:7 (Olvany); 9/21/10 Tr. at 178:7-16 (Schneider).

53.7.2.    Approximately 58% of the trading portfolio acquired by Barclays in the transaction was classified by Lehman in GFS as Level 2 or Level 3 assets, requiring a significant amount of valuation judgment. BCI Exs. 1002a at pp. 9-12, 1103a (Pfleiderer Demonstratives 28, 29 — summarizing M. Exs. 285N, 102N, 103N; BCI Exs. 501, 502, 667-670).  10/6/10 Tr. at 93:10-94:21 (Pfleiderer); see also *see also* BCI Exs. 1002a at pp. 9-12.

53.7.3.    The vast majority of the valuation difference between Barclays' valuation and Movants' valuation of the trading portfolio acquired by Barclays in the transaction — over $4 billion of a total of $5.1 billion — was attributable to assets for which no quoted prices in active markets were available. BCI Ex. 1103a (Pfleiderer Demonstrative 30 — summarizing M. Exs. 102N, 103N, 285N, 156, 821; BCI Exs. 501, 502, 667-670); 10/6/10 Tr. at 95:8-96:16 (Pfleiderer); *see also* BCI Exs. 1103a (Pfleiderer Demonstrative 28); *id.* (Pfleiderer Demonstrative 31 — summarizing M. Exs. 102N, 103N, 285N, 156, 821; BCI Exs. 501, 502, 667-670); 10/6/10 Tr. 96:17-25 (Pfleiderer).

    53.7.3.1    Approximately 65% of the valuation difference between Movants and Barclays relates to securitized products that are by definition difficult to value. 10/6/10 Tr. at 98:14-99:6 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 33 — summarizing M. Exs. 102N, 103N, 285N, 156, 821N).

    53.7.3.2    Mortgage-backed securities, which were at the core of the 2008 financial crisis, represent over 40% of the valuation difference between Movants' valuation and Barclays' valuation of the portfolio acquired by Barclays in the transaction. BCI Ex. 1103a (Pfleiderer Demonstrative 30 — summarizing M. Exs. 102N, 103N, 285N, 156, 821; BCI Exs. 501, 502, 667-670); 10/6/10 Tr. at 95:8-96:16 (Pfleiderer); *see also* BCI Exs. 1103a (Pfleiderer Demonstrative 28); *id.* (Pfleiderer Demonstrative 31 — summarizing M. Exs. 102N, 103N, 285N, 156, 821; BCI Exs. 501, 502, 667-670); 10/6/10 Tr. 96:17-25 (Pfleiderer).

    53.7.3.3    Over 26% of the Initial Trading Inventory Barclays acquired could not even be identified on either Bloomberg or Capital IQ, and therefore, involved a significant amount of judgment by anyone to reach a reasonable valuation as required by the

> accounting rules. 10/6/10 Tr. at 97:11-98:10 (Pfleiderer); BCI
> Ex. 1103a (Pfleiderer Demonstrative 28 — summarizing BCI
> Ex. 1002a at pp. 9-12); *id.* (Pfleiderer Demonstrative 32 —
> summarizing M. Exs. 102N, 285, Bloomberg and Capital IQ
> data).

53.7.4.    Approximately 30% of the valuation difference between Barclays and
Movants valuation of the initial inventory can be attributed to 18 % of the
Repo Collateral that was not initially in the Fed Repo and could not be easily
valued by Barclays due to the lack of visibility as to the identity of these
assets. 10/6/10 Tr. at 205:4-207:8 (Pfleiderer); BCI Ex. 1103a (Pfleiderer
Demonstratives 36, 36B — comparing Barclays valuations with the BoNY
marks and summarizing M. Exs. 285N, 589N, 909; BCI Exs. 743, 745); *see
also* BCI Ex. 1103a (Pfleiderer Demonstrative 36B — comparing Barclays'
valuations with Movants valuations).

53.8.    There was no generally recognized pricing source available for the illiquid assets in the
Repo Collateral.

53.8.1.    Professor Pfleiderer's unrebutted testimony is that "for many positions of
significant indicated value in the Repo Collateral, there is no generally
recognized pricing source available." BCI Ex. 341 at ¶ 57.

53.8.2.    The illiquid securities in the Repo Collateral were exceptionally difficult to
value. *See* FOF ¶ 53.7.

53.9.    Barclays' use of September 22 as the valuation date was reasonable. BCI Ex. 870a;
10/6/10 Tr. at 148:13-149:20, 150:8-151:12 (Pfleiderer).

53.9.1.    At PwC's suggestion, Barclays used September 22 — the actual Closing date
— as the appropriate date as of which to measure the value of the Purchased
Assets acquired in the Sale Transaction. BCI Ex. 870a; 9/2/10 Tr. at 63:17-
66:5 (Romain).

53.9.2.    Movants' expert Mr. Garvey admitted that using September 22 as the
valuation date could be reasonable. 9/21/10 Tr. at 125:6-13 (Garvey).

53.9.3.    As Mr. Garvey admitted, the accounting rules refer to the "acquisition date"
and not "acquisition time," meaning that the accounting rules do not require
that values be measured as of 12:01 a.m. on the Closing date for purposes of
accounting for the transaction in the acquisition balance sheet. 9/21/10 Tr. at
117:13-118:10 (Garvey); *see also* 9/2/10 Tr. at 63:9-63:16 (Romain).

53.9.4.    Movants' experts' opinion that valuing the securities as of the close of
business on September 19 would more accurately reflect the value of the
acquired securities at Closing than valuing those securities at the close of
business on the actual Closing date of September 22 is unreasonable. 10/6/10

Tr. at 149:21-151:12 (Pfleiderer); *compare* BCI Ex. 994 or BCI Ex. 1103a
(Pfleiderer Demonstrative 57) with 9/21/10 Tr. at 66:25-67:4 (Garvey).

53.9.4.1   Mr. Garvey's opinion regarding the valuation date was based on
the mistaken understanding that the Closing had occurred on
September 19th, which he corrected after talking to his counsel
on two occasions during his deposition by creating a new and
unsupported distinction between "closing date" and
"measurement date". 9/21/10 Tr. at 66:8-24, 110:13-111:11,
113:6-9, 113:10-114:8, 114:24-115:6 (Garvey).

53.9.4.2   Professor Zmijewski's choice of September 19, 2008 (as
opposed to September 22, 2008) as the measurement date was
based on Movants lawyers' belief that the Closing "occurred,
effectively, on September 19th," which is inaccurate. 9/20/10 Tr.
at 167:1-7 (Zmijewski).

53.9.4.3   As Professor Zmijewski admitted, using September 19, 2008 as
the measurement date fails to account for any changes affecting
the market between 4:00 pm on September 19 and 12:01 am on
September 22. 9/20/10 Tr. at 171:15-20, 174:15-18 (Zmijewski).

53.10.  Barclays' decision not to adopt the BoNY marks as a basis for valuing all of the assets in
the inventory is reasonable. 10/6/10 Tr. at 101:17-102:3, 105:2-18 (Pfleiderer).

53.10.1.   The BoNY marks were as of September 18, and did not systematically reflect
market activity as of September 18, 2008. 10/6/10 Tr. at 102:5-17 (Pfleiderer).

53.10.2.   The JPM marks were as of September 17, "the last day that JPM valued the
inventory." 9/20/10 Tr. at 70:10-21 (Zmijewski).

53.10.3.   The only marks or valuations of the securities as of September 22 are those on
Barclays' Acquisition Balance Sheet — there were no custodian or other
marks. 10/6/10 Tr. at 102:5-17 (Pfleiderer); 9/20/10 Tr. at 70:10-21
(Zmijewski); 10/6/10 Tr. at 107:10-108:25, 109:8-22 (Pfleiderer); *see* BCI Ex.
895 (showing schedule sent with Lehman marks on 9/19) with 10/7/10 Tr. at
63:2-12 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 39 —
summarizing BCI Exs. 488-493).

53.10.4.   As a custodian who deals with buyers and sellers, BoNY marks to "mid," not
to "bid" and therefore BoNY's marks do not represent "fair value" under the
accounting rules, which required Barclays to mark its trading assets at bid.
10/6/10 Tr. at 102:18-24 (Pfleiderer).

53.10.5.   Repo custodians cannot be assumed to have the feel for the market needed to
reliably value complex, illiquid assets, like the approximately 30% of the repo
collateral that was not standard repo collateral. BCI Ex. 346 at ¶ 3; 10/6/10 Tr.
at 102:25-103:7 (Pfleiderer); 10/7/10 Tr. at 140:11-141:17 (Pfleiderer).

53.10.6. The BoNY marks are less reliable than Barclays' valuation because the BoNY marks were not audited by an independent accounting firm. 10/6/10 Tr. at 103:8-11 (Pfleiderer); *see also* 10/8/10 Tr. at 47:25-48:17 (the Court); 10/6/10 Tr. at 146:5-22, 120:17-24 (Pfleiderer).

53.10.7. There are numerous examples — including BoNY's marking the "Lehman affiliated" paper transferred to Barclays in the initial inventory at par despite Lehman's bankruptcy — of dubious BoNY marks. BCI Ex. 1103a (Pfleiderer Demonstrative 38 — summarizing M. Exs. 102N, 156, 285N, 821, Movants' Expert Reports); 10/6/10 Tr. at 103:12-104:7 (Pfleiderer); 9/21/10 Tr. at 169:16-170:4, 187:16-188:3 (Schneider).

53.11. Barclays' independent valuation of the Repo Collateral as reflected on Barclays' PwC-audited Acquisition Balance Sheet was reasonable. 10/6/10 Tr. at 19:17-23 (Pfleiderer); *see also* id. at 87:6-89:14.

53.11.1. For purposes of preparing its own books, Barclays was required to make its own independent valuation judgments regarding the fair value of the assets it received, using its "own valuation methodologies," and could not "just rely on the marks that another party had attributed to those." 9/2/10 Tr. at 76:25-77:10 (Romain).

53.11.2. Barclays reasonably valued the assets that made up Repo Collateral (including all assets delivered in the December Settlement) on its acquisition balance sheet at $45.5 billion. BCI Exs. 133, 357 at ¶ 20, 947 (showing how much from the initial inventory reflected on the acquisition balance sheet was on Schedule B); 9/2/10 Tr. at 17:22-18:2, 34:10-35:21, 127:19-128:3 (Romain); 10/6/10 Tr. at 87:6-17 (Pfleiderer) ; *see also* BCI Ex. 357 at ¶ 17-20.

53.11.2.1 The collateral received in September 2008, before the transaction closed, was valued at approximately 40.5 billion. BCI Ex. 357 at ¶20; 9/2/10 Tr. at 37:17-22 (Romain); 10/6/10 Tr. at 87:6-17 (Pfleiderer).

53.11.2.2 The assets received in the December Settlement, which was not received until December 22, 2008, was valued at approximately $5 billion, including approximately $1.25 billion of cash and approximately (and just under) $3.75 billion of securities. BCI Exs. 133a, 138a, 357 at ¶20; 9/2/10 Tr. at 36:11-37:10 (Romain); 10/6/10 Tr. at 87:6-17 (Pfleiderer).

53.11.3. Mr. Schneider's testimony regarding the generic reliability of repo custodian marks is irrelevant and unreliable.

53.11.3.1 Mr. Schneider's testimony regarding the general reliability of custodial marks was not specific to the repo collateral at issue in this litigation. 9/21/10 Tr. at 151:23-152:3 (Schneider).

53.11.3.2 Mr. Schneider neither valued any of the particular collateral at issue here nor examined the accuracy of any of the custodial marks at issue here. 9/21/10 Tr. at 152:4-10, 167:20-168:16, 173:15-18, 174:4-8 (Schneider).

53.11.3.3 Mr. Schneider testified that BoNY and JPM marks were reliable without performing any analysis of either custodian's valuation methodologies. 9/21/10 Tr. at 173:7-9, 173:10-14 (Schneider).

53.11.3.4 Mr. Schneider testified that BoNY and JPM marks, as a general proposition in normal circumstances, were reliable (for purposes of repo transactions) without taking into consideration JP Morgan's own warnings in October and November 2008 that its marks in these circumstances were not reliable indicators of realizable value. 9/21/10 Tr. at 178:21-25, 194:7-14 (Schneider); M. 640, M. 641; *see also* BCI Ex. 974.

53.11.3.5 Mr. Schneider failed to take into account JP Morgan's recent testimony before two financial crisis commissions concerning the dubious value of Lehman's collateral in its repo transactions in September of 2008. 9/21/10 Tr. at 183:25-186:11 (Schneider).

53.11.3.6 Mr. Schneider admitted that custodial marks are set for the limited purpose of complying with particular repo agreements and are not intended to be used for purposes of a broker dealer's acquisition accounting. 9/21/10 Tr. at 178:21-179:5 (Schneider).

53.11.3.7 Mr. Schneider did not analyze whether the assets delivered to Barclays as part of the repo transaction qualified as repo collateral within any contract or under the Bankruptcy Rules. 9/21/10 Tr. at 154:7-10, 183:1-10, 183:11-24 (Schneider).

53.11.3.8 Mr. Schneider was unable to reconcile his view regarding the reliability of custodian marks for the Repo Collateral with the Trustee's decision not to adopt the custodian marks to determine precisely the amount of value that was transferred to Barclays in the repo transaction. 9/21/10 Tr. at 196:25-197:24, 198:8-200:13 (Schneider).

53.11.3.9 Mr. Schneider was unable to explain how BoNY and JP Morgan could assign widely divergent values to the same collateral. 9/21/10 Tr. at 176:4-178:16 (Schneider).

53.12. Barclays' valuation of the Pine CLO on its Acquisition Balance Sheet was reasonable. 10/6/10 Tr. at 137:5-15 (Pfleiderer).

53.12.1. The valuation of Pine CLO involved a significant amount of judgment.

53.12.1.1   Pine was classified by Lehman's GFS system as a Level 2 security — although Professor Pfleiderer opined that it better fits the definition of a Level 3 security — which is how Barclays' classified it. 10/6/10 Tr. at 138:4-18 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 43 — summarizing M. Exs. 102N, 285N, 821, 155, 824; BCI Ex. 501).

53.12.1.2   Pine was a complex, Lehman-structured product which could only be valued by making assumptions and judgments about many uncertainties at every level of its structure. 10/6/10 Tr. at 111:18-112:17; 114:6-11 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 44); BCI Ex. 607 at p. 13.

53.12.2.   There are multiple layers of risk that have to be assessed in valuing Pine, including: the credit risk of the underlying borrowers, participation risk, and funding risk. BCI Ex. 1103a (Pfleiderer Demonstratives 44, 46); 10/6/10 Tr. at 112:18-114:11, 115:17-116:4 (Pfleiderer).

53.12.3.   Barclays reasonably valued Pine at a bid price of $429 million.

53.12.3.1   Barclays' PMTG assessed multiple layers of risks and assigned risk factors to each. 10/6/10 Tr. at 115:9-16, 120:4-11 (Pfleiderer); BCI Exs. 1103a (Pfleiderer Demonstratives 47), 607 at pp. 14-15.

53.12.3.2   The reasonableness of Barclays' PMTG valuation of Pine was confirmed by PwC after an extensive audit. BCI Ex. 607 at pp. 11-13; 10/6/10 Tr. at 120:12-121:5 (Pfleiderer).

53.12.3.3   The reasonableness of Barclays' PMTG valuation of Pine is further confirmed by the independent valuation work performed by (a) the independent valuation firm Gifford Fong Associates, which was retained by JP Morgan to value the Pine CLO, and valued it at approximately 50 percent of par pre-Bankruptcy (approximately $500 million), and (b) JP Morgan's own internal pre-Bankruptcy valuation at approximately 70 percent of par. 10/6/10 Tr. at 121:7-122:4, 116:5-117:6 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstratives 48); BCI Ex. 1005.

53.12.4.   Barclays' higher post-acquisition valuations of Pine reflect an increase in the value of Barclays' interest in Pine which occurred after an Event of Default was declared by Trustee US Bank on October 20, 2008 and not any undervaluation of Pine as of its acquisition on September 22, 2008.

53.12.4.1   US Bank declared an Event of Default on October 20, 2008 because the value of the "Underlying Assets" had dropped below 100% of the aggregate outstanding amount of the class A notes. BCI Ex. 1035.

53.12.4.2    After the Event of Default, Barclays elected to accelerate the
Note, which it believed effectively protected it from any funding
risk, including the risk that the "eligible investments" held by
Pine could be drawn down by borrowers; Barclays therefore
increased its valuation of Pine as of the end of the year 2008.
10/6/10 Tr. at 122:9-123:5 (Pfleiderer).

53.12.4.3    Movants' expert Mr. Slattery conceded that the October 20,
2008 Event of Default increased the value of Pine. 9/30/10 Tr. at
138:8-13 (Slattery).

53.12.4.4    PWC believed that Barclays year-end valuation of Pine was the
"most optimistic" approach, and that valuations from $520
million to $612 million as of year end would be "more
reasonable" than Barclays' year-end value of $705 million.
9/30/10 Tr. at 165:11-166:22 (Slattery); 10/6/10 Tr. at 123:6-17
(Pfleiderer).

53.12.5.    Movants' expert Slattery unreasonably valued the Pine CLO at $817 million,
but conceded that this price might have exceeded what a willing market
participant would have been willing to pay. 9/30/10 Tr. at 139:21-140:16
(Slattery).

53.12.5.1    When he made his valuation, Mr. Slattery did not know that the
Pine CLO was created solely for purposes of obtaining financing
from the Federal Reserve, was not intended for sale (or even
sold), and was constructed from portions of underlying loans
that Lehman had been unable to sell. 9/30/10 Tr. at 138:19-
139:11 (Slattery); 10/6/10 Tr. at 116:5-24 (Pfleiderer); 10/7/10
Tr. at 142:20-143:15 (Pfleiderer).

53.12.5.2    Mr. Slattery did not calculate a mid or an ask price for Pine; he
simply concluded that his modeled price was a bid price and so
applied no liquidity adjustment. 9/30/10 Tr. at 140:17-141:17
(Slattery).

53.12.5.3    In valuing Pine, Mr. Slattery chose not to take into account the
risk that the bankrupt Lehman Commercial Paper, Inc. (LCPI)
would not pass on payments made by the borrowers to holders of
the Pine CLO, which is, in fact, what happened. 9/30/10 Tr. at
128:13-20, 129:3-8 and 130:18-131:7 (Slattery); 10/6/10 Tr. at
136:5-137:4 (Pfleiderer).

53.12.5.4    Mr. Slattery was not aware that the LCPI estate has, in fact,
taken the position that payments received by Pine may be
preference claims that can be avoided. 9/30/10 Tr. at 132:24-

133:4 and 137:3-6 (Slattery); 10/6/10 Tr. at 136:13-137:4; *see also* BCI Exhibit 1007.

53.12.5.5    Mr. Slattery was not aware that many creditors beside the Pine CLO have claims against the assets of the LCPI Estate and therefore did not consider this risk in his valuation of Pine. 9/30/10 Tr. at 131:8-14 and 132:16-23 (Slattery).

53.12.5.6    Mr. Slattery ignored PwC's concerns that Barclays' post-acquisition decision to mark up Pine following the Event of Default in October 2008 was the "most optimistic" approach. 9/30/10 Tr. at 163:18-164:12, 166:4-25 (Slattery); BCI Ex. 996.

53.12.5.7    Despite his understanding that the Event of Default increased the value of Pine because it eliminated the risk of a drawdown of funds by the underlying borrowers, Mr. Slattery did not take the risk of such a drawdown into account even though no EOD had occurred as of September 22, 2008. 9/30/10 Tr. at 138:8-18 (Slattery).

53.12.5.8    Mr. Slattery's $817 million valuation of Pine is inconsistent with the Alvarez & Marsal offer to purchase Pine from Barclays in April 2009 (i.e. after the Event of Default that increased the value of Pine) for only $600 million (plus the approximately $50 million in distributions made to that date). 9/30/10 Tr. at 137:23-138:4 (Slattery); 10/6/10 Tr. at 135:9-136:4 (Pfleiderer).

53.12.5.9    Mr. Slattery's $817 million valuation of Pine is inconsistent with Barclays' post-bankruptcy valuations that were audited by PwC, and the pre-bankruptcy valuations by Gifford Fong Associates and JP Morgan and others, which he chose not to consider in his analysis. 9/30/10 Tr. at 123:22-124:6, 125:23-25, 127:18-128:6, 164:5-12 (Slattery); 10/6/10 Tr. at 132:6-21 (Pfleiderer).

53.13.    Barclays' valuation of PMTG assets (excluding Pine), as reflected on Barclays Acquisition Balance Sheet and audited by PwC, is reasonable. 10/6/10 Tr. at 146:23-147:14 (Pfleiderer).

53.13.1.    The PMTG securities — almost all of which were classified as Level 2 or 3 in Lehman's GFS system — were difficult to value and many of them could be characterized as "toxic assets." 10/6/10 Tr. at 137:16-138:3; BCI Ex. 1103a (Pfleiderer Demonstrative 51 — summarizing M. 102N, M. 258N; BCI Exs. 501. 502. 667-670).

53.13.2.    Barclays' valuation of the PMTG assets involved a substantial price-testing process. 10/6/10 Tr. at 140:7-18 (Pfleiderer).

53.13.3.    PWC extensively reviewed and analyzed Barclays' valuation of PMTG assets during its audit, looked "at the processes that were followed, assumptions that are being made, inputs into models" and confirmed that it was "within the bounds of what's reasonable." 10/6/10 Tr. at 143:3-145:8 (Pfleiderer); BCI Exs. 592a, 618, 607, 1103a (Pfleiderer Demonstratives 54-55 — summarizing BCI Exs. 592a, 618, 607).

53.13.4.    Movants' insinuation that PMTG assets were undervalued because Barclays' traders had an incentive to undervalue traded assets to recognize a profit in the P&L is unsupported by any evidence. 10/6/10 Tr. at 140:19-143:2 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstratives 52-53): *see* FOF ¶ 53.5.

53.13.5.    Barclays Product Control Group also independently tested any pricing done by traders. Landreman Dep. Tr. at 10:2-8, 19:3-9.

53.14.    Barclays' valuation of the equities purchased in the transaction, as reflected on Barclays' Acquisition Balance Sheet and audited by PwC, is reasonable. 10/6/10 Tr. at 147:15-159:10 (Pfleiderer).

53.14.1.    Barclays's use of September 22 as the valuation date was reasonable. *See* FOF ¶ 53.9.

53.14.2.    Both sides' experts agree that, for purposes of stating fair value, market liquidity must be accounted for by adjusting prices to "bid" prices. 9/20/10 Tr. at 52:7-12 (Zmijewski); 9/21/10 Tr. at 93:20-23 (Garvey); 10/6/10 Tr. at 102:18-24 (Pfleiderer).

53.14.3.    Barclays' methodology to determine the bid-ask spreads for September 22, 2008, so that they could then adjust reported prices to the appropriate bid prices, was reasonable. 10/6/10 Tr. at 151:13-153:3, 156:22-157:12; 158:6-159:4 (Pfleiderer).

53.14.3.1    Because there was no available live data for September 22, the estimate of the bid-ask spreads for September 22, 2008 — by Barclays or Movants — necessarily involved some judgment. 10/6/10 Tr. at 151:13-153:3 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 58).

53.14.3.2    Using historical (non-live) data creates reliability issues. 9/20/10 Tr. at 189:6-20, 202:13-203:8 (Zmijewski); 10/6/10 Tr. at 151:25-152:8 (Pfleiderer).

53.14.3.3    Movants' expert Mr. Olvany agreed that using "live" data is more reliable for obtaining market information than historical data. 10/4/10 Tr. at 72:1-7 (Olvany).

53.14.3.4    Lacking "live" data for September 22, Barclays used "live" data from a later date to determine bid-ask spreads for that date, and then adjusted those observed spreads to estimate what spreads would have been on September 22 based on the average ratios of spreads between those two dates. Washtell Dep. Tr. at 123:13-124:17, 127:23-128:12.

53.14.3.5    Given what could be observed and the issues caused by the difference between historical and live data, Barclays' valuation judgment is reasonable. 10/6/10 Tr. at 157:6-12 (Pfleiderer).

53.14.3.6    Professor Zmijewski's use of historical bid-ask spread produced the nonsensical result of negative bid-ask spreads and does not take into account the downward selection bias of his using historical data and basing his spread calculation on spreads from only the securities for which reported data is avalaible, which are the most liquid and therefore have the lowest spreads. 9/20/10 Tr. at 189:16-190:24; 195:17-22;198:9-200:17; 202:13-203:8 (Zmijewski); *see also* 10/6/10 Tr. at 153:4-157:12 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 59-60).

53.14.3.7    Professor Zmijewski's calculation of bid-offer spreads in September using historical data was unreliable and could lead to the unreasonable result of a wider average bid-ask spread in December even if for the majority of CUSIPS, the bid-ask spread was wider in September.  10/7/10 Tr. at 166:10-168:9 (Pfleiderer).

53.14.4.    PWC extensively reviewed, analyzed, tested, and approved Barclays' valuation of the equities portfolio during its audit, including its methodology for estimating bid-ask spreads. 10/6/10 Tr. at 158:6-159:10 (Pfleiderer); BCI Exs. 616, 1103a (Pfleiderer Demonstratives 61-63 — summarizing BCI Ex. 616).

53.15.  Barclays' valuation of the treasury securities, as reflected on Barclays' acquisition balance sheet and audited by PwC, is reasonable. 10/6/10 Tr. at 162:9-16, 163:1-8. (Pfleiderer).

53.15.1.    The only source of difference between Barclays and Movants' valuations of treasuries was the valuation date. 10/6/10 Tr. 162:9-16 (Pfleiderer).

53.15.2.    Barclays' use of September 22 as the valuation date as recommended by its external independent auditors at PwC was reasonable. BCI Ex. 870a; 10/6/10 Tr. at 148:13-149:20, 150:8-151:12 (Pfleiderer); *see* FOF ¶ 53.9.

53.16.  Barclays reasonably valued the agency-debt securities it acquired in the transaction, as PwC confirmed after performing a substantive audit. 10/6/10 Tr. at 163:19-165:2 (Pfleiderer); *see* BCI Ex. 1103a (Pfleiderer Demonstrative 67).

53.16.1.   Approximately 46% of the securities in this portfolio were Level 2 assets, which were illiquid, could not be sold easily, and could not be valued based upon a reliable daily transaction price.  10/6/10 Tr. at 162:22-163:18 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 66).

53.16.2.   The Government seizure of Fannie Mae and Freddie Mac on September 7, 2008 created uncertainty and instability in the market for agency-debt securities.  10/6/10 Tr. at 164:3-21 (Pfleiderer); BCI Exs. 891, 901, 902.

53.16.3.   PWC approved the 5% liquidity adjustment applied by Barclays in its valuation of agency-debt securities. BCI Ex. 592a.

53.17.  Barclays' valuation of the Municipal securities it acquired in the transaction, as reflected on Barclays' Acquisition Balance Sheet and audited by PwC, is reasonable.  10/6/10 Tr. at 171:22-172:22 (Pfleiderer); 10/7/10 Tr. at 128:7-129:16 (Pfleiderer)

53.17.1.   The auction rate market was "frozen or close to being frozen … starting in February of 2008." 10/6/10 Tr. at 170:11-171:3 (Pfleiderer); 10/7/10 Tr. at 178:25-180:11 (Pfleiderer); BCI Ex. 1055.

53.17.2.   By June 2008, many corporate holders of auction rate securities had marked them down on their own books by as much as 70% to reflect the extreme illiquidity of those securities.  10/7/10 Tr. at 181:14-183:10 (Pfleiderer); BCI Ex. 1056a.

53.17.3.   Barclays' application of a 20% liquidity adjustment to the auction-rate securities that failed at auction was reasonable. 10/6/10 Tr. at 171:22-172:10 (Pfleiderer).

53.17.4.   PWC extensively reviewed and analyzed Barclays' valuation of municipal bonds during its audit and concluded that "[Barclays'] process was a reasonable basis for determining fair value." 10/6/10 Tr. at 172:11-22 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 74 — summarizing BCI Ex. 592 and 618); see also BCI Exs. 618, 592a.

53.17.5.   Movants' expert Schwaba's valuation of 26 bonds is unreliable. See e.g. 10/6/10 Tr. at 171:4-21 (Pfleiderer).

53.17.5.1   Mr. Schwaba failed to perform any analysis of the trading activity in any of the 26 bonds he valued despite his inability to identify any actual purchasers for those bonds on September 19, 2008. 9/29/10 Tr. at 71:4-72:1 (Schwaba).

53.17.5.2   Mr. Schwaba biased his analysis upward by using bonds that actually traded on September 19th, 2008 — by definition the most liquid such securities — as comparables in his valuation of 26 bonds that did not trade. 9/29/10 Tr. at 71:4-8, 72:25-73:3 (Schwaba); 10/6/10 Tr. at 154:20-155:14 (Pfleiderer).

53.17.5.3    Mr. Schwaba failed to consider how many of the comparable securities he used were level 1, 2 or 3 and therefore was unable to assess whether their values were based on a reliable daily transaction price. 9/29/10 Tr. at 73:20-74:21 (Schwaba).

53.17.5.4    Mr. Schwaba valued nine auction rate securities at par despite the fact that each had failed at auction prior to September 2008 and despite opining in his report — an opinion he subsequently changed in his July 15 declaration —  that auction rate securities that failed at auction would trade below par. 9/29/10 Tr. at 90:13-16, 91:12-18, 92:5-9 (Schwaba).

53.17.5.5    Mr. Schwaba had originally valued 2 auction-rate securities that had failed at auction *above* par, which he acknowledged was unreasonable. 9/29/10 Tr. at 93:15-20, 94:7-12, 95:3-16 (Schwaba).

53.17.5.6    Because Mr. Schwaba failed to consider the fact that the failed auction-rate securities he used as comparables likely traded at par only because they were being bought back in non-arm's-length transactions, he made no effort to screen out such inappropriate comparables, which biased his valuations upward. 9/29/10 Tr. at 98:6-19, 98:20-99:22, 102:3-104:15, 104:24-106:16 (Schwaba); BCI Exs. 1017, 1014, 1015, 1012 (Schwaba); 10/6/10 Tr. at 171:4-21 (Pfleiderer).

53.17.5.7    There is extensive evidence demonstrating that it is highly likely that the only reason a failed auction rate security would trade at or near par in September 2008 was that numerous banks were agreeing, under enormous pressure from regulators, to buy back the securities from non institutional (private individual) customers — a phenomenon that would in no way apply to Barclays or increase the value of the auction rate securities held by Barclays.  BCI Exs. 1012, 1014, 1015, 1017; 10/6/10 Tr. at 171:7-21 (Pfleiderer).

53.18.    Barclays' valuation of the Giants Stadium bonds it acquired in the transaction, as reflected on Barclays' Acquisition Balance Sheet and audited by PwC, was reasonable. 10/6/10 Tr. at 172:23-175:15, 179:13-18 (Pfleiderer).

53.18.1.    Because of the absence of available vendor prices for the Giants bonds, the fact that the ARS market was frozen, the fact that ARS bonds had generally been trading below par, and the fact that there had been no successful auctions of these bonds since a failed auction in March 2008, Barclays' use of the BoNY marks was reasonable. Teague Dep. Tr. at 62:12-63:9; 9/29/10 Tr. at 92:1-9 (Schwaba); 10/4/10 Tr. at 114:20-115:2 (Olvany); 10/6/10 Tr. at 173:4-174:6, 174:7-21, 178:22-179:12 (Pfleiderer).

53.18.2.    Had they applied the same methodologies they used in valuing other bonds to the Giants bonds, Movants' experts Slattery and Zmijewski would have adopted the BoNY marks to value the Giants bonds just as Barclays did. 10/6/10 Tr. at 177:5-22 (Pfleiderer).

53.18.3.    Movants' Expert Olvany's valuation of the Giants bonds is unreliable. 10/6/10 Tr. at 175:16-177:2, 178:1-13 (Pfleiderer)

53.18.3.1    Because Barclays adopted BoNY's marks on the Giants bonds, Mr. Olvany's analysis of the Giants bonds directly contradicts his mandate that he value only securities for which Barclays' valuation differed from BoNY's valuation by at least a million dollars. 10/6/10 Tr. at 178:1-13 (Pfleiderer)

53.18.3.2    Mr. Olvany was not aware of and did not consider the fact that BoNY, in this case, was not just the custodian of but also the Trustee for the Giants Bonds when rejecting the BoNY marks for the bonds. 10/4/10 Tr. at 81:20-82:9 (Olvany).

53.18.3.3    Mr. Olvany failed to analyze the level of activity in the auction-rate securities market as of September 2008. 10/4/10 Tr. at 89:14-16 (Olvany).

53.18.3.4    Mr. Olvany's understanding that there had been successful auctions of any of the Giants bonds between March 2008 and September 2008 is unsupported by any record evidence and inaccurate. 10/4/10 Tr. at 90:14-22, 92:8-10 (Olvany); Teague Dep. Tr. at 62:12-63:9.

53.18.3.5    Mr. Olvany failed to consider the credit rating of the insurer or financial guarantor of the Giants bonds. 10/4/10 Tr. at 98:13-15, 99:19-100:2 (Olvany).

53.18.3.6    Mr. Olvany failed to investigate or consider whether or not, leading up to the transaction, Lehman had difficulty selling its Giants bonds. 10/4/10 Tr. at 102:17-21 (Olvany).

53.18.3.7    Mr. Olvany failed to consider whether or not there was an auction agent in place as of September 22, 2008 or before February 2008. 10/4/10 Tr. at 102:22-103:25 (Olvany).

53.18.3.8    Mr. Olvany failed to consider the market conditions affecting the Giants bonds and their particular rating at the time they were redeemed in April 2008, months before the transaction was contemplated. 10/4/10 Tr. at 110:4-9; 111:2-11 (Olvany).

216

53.19. Barclays' valuation of the corporate securities it acquired in the transaction, as reflected on Barclays' Acquisition Balance Sheet and audited by PwC, was reasonable.  10/6/10 Tr. at 180:15-181:7 (Pfleiderer).

    53.19.1.   These corporate securities — none of which were classified by Lehman as Level 1 securities — were difficult to value. 10/6/10 Tr. at 180:15-23 (Pfleiderer).

    53.19.2.   Barclays looked at vendor prices from 5 sources and used the lowest price as a proxy for the exit price, without taking any further liquidity adjustment. 10/6/10 Tr. at 180:15-181:7 (Pfleiderer).

    53.19.3.   PwC reviewed and tested Barclays' valuation of Corporates and "concluded that the vendor prices used were appropriate." 10/6/10 Tr. at 180:15-181:4 (Pfleiderer).

53.20. Barclays' valuation of the Agency RMBS portfolio it acquired in the transaction, as reflected on Barclays' Acquisition Balance Sheet and audited by PwC, was reasonable. 10/6/10 Tr. at 181:8-182:11 (Pfleiderer).

    53.20.1.   Residential Mortgage-backed securities are difficult to value and they could not simply be "mechanically valued." 10/6/10 Tr. at 181:13-20 (Pfleiderer).

    53.20.2.   Barclays separated the RMBS portfolio into two categories, applying a 1% liquidity adjustment to the "simpler type of securities" and a 10% liquidity adjustment to the "much more complex" agency CMOs. 10/6/10 Tr. at 181:8-182:8 (Pfleiderer).

    53.20.3.   PwC reviewed the methodology used by Barclays to value the RMBS portfolio acquired in the transaction and concluded that it was reasonable. 10/6/10 Tr. at 181:8-182:11 (Pfleiderer); BCI Ex. 618 at PwC-BarCapWP_00022935, 000229357-8; BCI Ex. 592 at PwC-BarCap_000128031-2 (*see also* 592a); BCI Ex. 1103a (Pfleiderer Demonstratives 83-84).

    53.20.4.   Movants' valuation of Agency RMBS is unreliable: Mr. Slattery used a novel, untested, and unreliable method to derive liquidity discounts for the Agency debt securities he valued.10/6/10 Tr. at 164:22-167:11, 167:20-169:3 (Pfleiderer); BCI Ex. 1027.

        53.20.4.1   Mr. Slattery' s methodology involved deriving bid-ask spreads for Agency RMBS in September 2008 by taking bid-ask spread information from 2001(from an alleged Bank of America source document that was never produced and that he never personally saw)  and multiplying it by a ratio derived from a table of estimates of normal versus distressed bid-ask spreads in a 1997 book. 9/30/10 Tr. at 81:7-83:8, 85:5-12, 85:16-86:1,  91:5-19, 93:3-94:20 (Slattery).

53.20.4.2   As Professor Pfleiderer testified, this methodology was
unreliable because, among other things, the estimates of
"distressed" bid-ask spreads were from an undefined period in
the 1990s that was not as distressed as the September 2008
period.  10/6/10 Tr. at 166:12-167:19 (Pfleiderer).

53.20.4.3   The 2001 bid-ask spread numbers allegedly came from Bank of
America and were given to Mr. Slattery by his colleague, Mr.
Powell, who worked at Bank of America in 2001. Mr. Slattery
never saw any source document for these numbers. 9/30/10 Tr.
at 93:11-94:20 (Slattery).

53.20.4.4   Mr. Slattery's valuation of the RMBS portfolio was also
deliberately misleading and misstated:  he claimed that the
complex formula he used calculated the "mid" prices he showed
in his work papers, and that he then adjusted those "mid" prices
down to bid prices using liquidity adjustments.  In fact, his
formula calculated the "bid" prices shown in his work papers,
and he misleadingly *grossed up* those bid prices to artificially
inflated mid prices (in documents that were never produced),
and then misleadingly presented work papers showing the
artificially inflated mid price being adjusted back down to a bid
price.  9/30/10 Tr. at 102:2-107:2; 111:8-112:4 (Slattery);
10/6/10 Tr. at 182:12-189:7 (Pfleiderer); 10/7/10 Tr. at 183:23-
185:10 (Pfleiderer); BCI Exs. 1028, 1029, 1033a (Pfleiderer
Demonstrative 86)1041-1044, 1099; M. 927.

53.20.4.5   By misleadingly inflating the mid prices generated by his
formula, and adjusting those prices *up* to artificially inflated mid
prices, rather than *down* to a bid price that his alleged
methodology would actually require, Mr. Slattery inflated his
overall valuation of the RMBS portfolio by over a hundred
million dollars.  10/6/10 Tr. at 183:3-20 (Pfleiderer); 10/7/10 Tr.
at 184:8-185:6 (Pfleiderer); BCI Exs. 1028, 1029, 1041-1044,
1099; M. 927.

53.20.4.6   On cross-examination, Mr. Slattery admitted that he made an
error in one of his valuation spreadsheets (BCI Exhibit 1046).
Instead of using the average of the available OAS numbers, as
intended, the spreadsheet was set up to use the last listed OAS
number in the price calculations. 9/30/10 Tr. at 121:14-122:8
(Slattery).

53.21.   Barclays' valuation of the December Settlement portfolio using December values was
reasonable. 10/6/10 Tr. at 196:6-197:19 (Pfleiderer); 10/7/10 Tr. at 50:17-53:10
(Pfleiderer).

53.21.1.    The December Settlement value was "unknowable" in September 2008 and it would therefore make "no economic sense" to value the December Settlement portfolio using September marks. 10/6/10 Tr. at 196:6-197:19 (Pfleiderer); 10/7/10 Tr. at 50:17-52:8 (Pfleiderer); 9/21/10 Tr. at 120:16-121:7 (Garvey); 10/7/10 Tr. at 50:17-52:8 (Pfleiderer).

53.21.2.    None of Movants' experts disagree with Barclays' valuation of the December Settlement portfolio as of December 22, 2008. 9/20/10 Tr. at 118:13-19 (Zmijewski); 10/6/10 Tr. at 196:13-16 (Pfleiderer).

53.21.3.    Movants' valuation of the December Settlement using September values makes "no economic sense." 10/6/10 Tr. at 196:6-197:19 (Pfleiderer); 10/7/10 Tr. at 50:17-52:8, 170:9-171:17 (Pfleiderer).

> 53.21.3.1    Professor Zmijewski admitted that he did not value the Barclays claim that led to the December Settlement the way he would normally value a claim and testified that to value a claim one would ordinarily calculate the expected value by making an assessment of what the cash flows would be and what the risk of those cash flows would be and the timing of those cash flows, and discount the value back to the point in time to be valued at. 9/20/10 Tr. at 127:16-128:1, 128:12-16 (Zmijewski).

> 53.21.3.2    Professor Zmijewski testified that he did not do that analysis "because my understanding of the settlement agreement is that the settlement agreement states that those securities satisfied the claim that was on September 22nd .  So it's satisfied, so I used the value as of September 22nd of those securities."  9/20/10 Tr. at 128:2-8 (Zmijewski).

> 53.21.3.3    Professor Zmijewski's approach resulted in a valuation of the Barclays' claim at nearly 100 cents on the dollar (with no discounting for litigation risk or delay) and $1.6 billion more than the actual value of the assets transferred in the December Settlement, which is inconsistent with his own stated methodology and is an unreasonable result.  9/20/10 Tr. at 68:18-69:12, 125:23-128:7, 128:23-129:10 (Zmijewski); 10/7/10 Tr. at 50:17-52:8 (Pfleiderer).

> 53.21.3.4    Because Professor Zmijewski's approach entirely depends on the historical valuation of the securities used as settlement tender, it can produce what Professor Pfleiderer termed "absurd" results, including valuations of a litigation claim at *more* than 100 cents on the dollar.  10/6/10 Tr. at 196:17-197:19 (Pfleiderer).

53.21.4.    Professor Zmijewski's valuation of the December Settlement securities unreasonably relies on September 17 JPM marks that JPM itself cautioned did

not provide a reliable indication of realizable value and should not be used. 9/20/10 Tr. at 136:17-137:14, 140:25-142:7 (Zmijewski); M. 640, M. 641.

53.22. Unlike Movants' valuation methodologies, Barclays' valuations were subject to two levels of review and testing undertaken independently by Barclays' Product Control Group and PwC. 9/2/10 Tr. at 14:23-15:23 (Romain); 10/6/10 Tr. 140:7-18, 191:15-193:21 (Pfleiderer); Landreman Dep. Tr. at 10:2-8, 19:3-9.

53.23. Barclays' valuation judgments were extensively audited by PwC, which concluded that Barclays' valuations of the financial inventory acquired in the Sale were reasonable. 9/2/10 Tr. at 15:17-23, 72:11-23 (Romain); 10/6/10 Tr. at 120:17-24, 143:18-144:2, 146:5-22, 181:5-7, 182:7-11, 193:13-18 (Pfleiderer); 10/7/10 Tr. at 94:17-96:17 (Pfleiderer); BCI Ex. 592a.

   53.23.1. The process undertaken by PwC "in the ordinary course of its audit" provided "greater reliability than if [Barclays' valuation judgments] hadn't been scrutinized." 10/8/10 Tr. at 47:25-48:17 (the Court); 10/6/10 Tr. at 146:5-22 (Pfleiderer); 10/7/10 Tr. at 95:11-96:17 (Pfleiderer); BCI Exs. 959, 995, 727b, 870a, 996, 604, 615, 601, 605, 607, 612, 613, 618, 1054, 592a, 596, 597, 619, 600, 1000, 1000a, 616, 583; M. 307, 252, 337, 341, 338, 340.

   53.23.2. Movants' accounting expert did not offer an opinion as to the adequacy of PwC's audit of the transaction. 9/21/10 Tr. at 129:14-131:15 (Garvey).

53.24. As Professor Pfleiderer confirmed, the valuations of the financial inventory acquired in the Sale that are reflected on Barclays' Acquisition Balance Sheet are reasonable and good faith valuations. BCI Ex. 592a; 10/6/10 Tr. at 87:18-89:14 (Pfleiderer); 10/7/10 Tr. at 185:11-23 (Pfleiderer).

53.25. While Barclays did not sell all the assets in the Repo Collateral by December 31, 2008, it attempted to calculate the gains and losses it made on the whole portfolio by looking at the gains and losses from the assets it did sell before that date, plus the change in the mark to market value of the assets it did not sell by that date. 9/2/10 Tr. at 189:13-20 (Romain). Based upon this calculation, Barclays *estimated* that the net gain on all assets, including the change in value due to changes in mark to market accounting on the assets that were not sold, was approximately $450 million, offset by hedging losses of approximately $400 million. M. 242; 9/2/10 Tr. at 85:19-86:17 (Romain).

   53.25.1. Of the $450 million gross gain realized or recognized by Barclays, approximately $350 million related to an increased valuation on Barclays' books of the Giants position and approximately $350 million related to an increased valuation on Barclays' books of the Pine CLO, both of which were marked up after the acquisition date due to events that occurred after the Closing. 9/2/10 Tr. at 87:14-23, 88:6-14 (Romain).

   53.25.2. As Gary Romain testified, without the gains recognized due to these internal write-ups of the Giants and Pine CLO positions, "the P&L on the rest of the inventory is a 250 million dollar loss." 9/2/10 Tr. at 88:15-17 (Romain).

53.25.3.    A $50 million net gain on the total inventory received as part of the transaction is inconsistent with Movants' theory that the securities acquired were significantly undervalued on the Acquisition Balance Sheet. 9/2/10 Tr. at 88:18-25, 89:16-23 (Romain); BCI Ex. 341 at ¶¶ 65-71.

**54.      Movants' Experts' Valuations Are Not Credible And Are Unreliable As Shown By Numerous Egregious Flaws, Including Deliberate Efforts To Mislead The Court.**

54.1.     Movants' experts' valuations are unreliable because they are infected by both litigation bias and hindsight bias. 10/6/10 Tr. at 88:16-89:11 (Pfleiderer).

>    54.1.1.      Movants' experts are all employed by or affiliated with Navigant Economics, an "economic consulting firm that consults primarily in the litigation or dispute space." 9/21/10 Tr. at 27:9-15 (Garvey).

>    54.1.2.      Movants' experts performed their valuation work in a litigation context. 9/20/10 Tr. at 108:7-109:3 (Zmijewski).

>    54.1.3.      Movants' experts, who worked collaboratively, knew that they needed to value the Sale Transaction securities at approximately $5 billion more than the value of those securities on Barclays Acquisition Balance Sheet in order to support Movants' claims. 9/20/10 Tr. at 110:22-111:7 (Zmijewski).

>    54.1.4.      Movants' experts' valuations were performed more than a year after the transaction and necessarily fail to "capture all of the important characteristics of the market" as of the time the assets had to be valued for reporting purposes. 10/7/10 Tr. at 88:20-89:2, 177:19-178:6 (Pfleiderer).

>    54.1.5.      Because they were not subject to any public reporting requirements, the reasonableness of Movants' experts' valuations was never tested or audited. 10/6/10 Tr. at 192:15-193:18 (Pfleiderer).

54.2.     Valuing the December Settlement securities as of September 19, as Movants' experts did, is "absurd" because the securities Barclays received in December could not have been identified or valued before then, and valuing them in December at a higher September price would artificially inflate Barclays' Acquisition Balance Sheet, only to trigger an immediate loss on the income statement to reflect the economic reality of what Barclays actually received in the Settlement. 10/6/10 Tr. at 196:17-197:19 (Pfleiderer).

54.3.     Unlike the Barclays valuation professionals, none of Movants' valuation experts were market participants in September 2008. 9/20/10 Tr. at 111:21-112:9 (Zmijewski); 10/4/10 Tr. at 44:2-5, 83:7-84:19,  84:20-22, 87:9-88:8 (Olvany); 9/29/10 Tr. at 75:12-16 (Schwaba); 9/30/10 Tr. at 59:13-15, 60:3-11, 75:7-76:5, 156:22-157:6,  165:2-8 (Slattery).

54.4.     Movants' experts used different methodologies to value similar securities and would have reached substantially different valuations had they all valued the entire portfolio. 10/6/10 Tr. at 177:3-25, 189:20-193:18 (Pfleiderer); *see e.g.* BCI Ex. 1103a (Pfleiderer Demonstrative 77).

>    54.4.1.      For example, on the 48 securities that they each valued independently, Professor Zmijewski's judgments differ sharply from those of his colleague, Mr. Slattery, leading to substantial valuation differences — as much as 80% in

some instances — adding up to hundreds of millions of dollars. 9/20/10 Tr. at 160:6-16-161:17-24, 164:10-14, 164:15-165:2 (Zmijewski); 9/30/10 Tr. at 143:18-146:6 (Slattery); 10/6/10 Tr. at 189:20-193:18 (Pfleiderer); BCI Exs. 1103a (Pfleiderer Demonstrative 86), 1098.

54.4.2.    Mr. Olvany's valuations directly conflicted with other Movants' experts' methodologies used to value the same type of assets. 10/4/10 Tr. at 47:13-22 (Olvany).

54.4.3.    Mr. Olvany valued the Giants bonds at par, which directly contradicts Mr. Schwaba's opinion that failed auction-rate securities would trade below par. 10/4/10 Tr. at 93:9-94:12 (Olvany), M. 154 at appendix 3, ¶30.

54.5.    Movants' main valuation expert, Professor Zmijewski, relied on the results of other Movants experts' calculations, which he "never looked at" or tested in any way. 9/20/10 Tr. at 107:1-108:6, 117:12-17, 117:18-118:7 (Zmijewski).

54.6.    Movants experts have conceded many flaws in their valuation methodologies, rendering each of their opinions unreliable.

54.6.1.    Professor Zmijewski's methodologies are flawed.

54.6.1.1    Professor Zmijewski's use of existing Lehman and custodian marks directly conflicts with the Trustee's valuation judgment not to use those marks, and his testimony that the assets were difficult to value in their ongoing valuation efforts. 9/21/10 Tr. at 6:24-9:16 (Zmijewski).

54.6.1.2    Despite the Trustee's concession that he "didn't think anyone thought the resis were worth anything near what they were marked at," Professor Zmijewski affixed marks comparable to the Lehman marks and did not question the accuracy of those marks. 9/20/10 Tr. at 226:16-229:25 (Zmijewski).

54.6.1.3    The starting point for Professor Zmijewski's "windfall" calculation — an assumption that liabilities were required to exceed assets by $1.85 billion — was provided by an expert who was withdrawn and predicated on the unsupported notion that there was a valuation cap of $47.4 billion for the assets transferred to Barclays. 9/21/10 Tr. at 12:6-13:16 (Zmijewski).

54.6.1.4    Professor Zmijewski's windfall calculation inaccurately compares all gains to Barclays, including assets that would have had little or no value to the Estate, against an incomplete set of costs, payments and liabilities incurred by Barclays. 9/20/10 Tr. at 32:20-33:22, 101:15-102:22 (Zmijewski); 9/21/10 Tr. at 17:12-18:9 (Zmijewski).

54.6.1.5   Professor Zmijewski made a $260 million error in Movants' favor when he used September 19 liability data based on the mistaken assumption that Barclays had used September 19 margin data. 9/20/10 Tr. at 223:3-16 (Zmijewski); BCI Ex. 1000a. Professor Zmijewski's assumption was mistaken, as Barclays in fact used September 22 margin data. 9/20/10 Tr. at 214:10-215:4, 223:3-224:24 (Zmijewski); 10/6/10 Tr. at 193:19-196:5 (Pfleiderer); BCI Ex. 1000a.

54.6.1.6   Despite his understanding that securities had to be valued at bid, Professor Zmijewski failed to apply a liquidity adjustment to a significant number of the securities transferred as part of the December Settlement, based on his mistaken impression that Barclays had not done anything to account for the liquidity issue with respect to those securities. 9/20/10 Tr. at 129:21-22, 151:2-156:2, 186:15-19 (Zmijewski).

54.6.1.7   Despite acknowledging that the accounting rules require valuing the securities at a "clean price" — that is, without including accrued interest — Professor Zmijewski failed to adjust "dirty" prices to clean prices for December Settlement securities. 9/20/10 Tr. at 156:21-157:4, 158:14-21 (Zmijewski).

54.6.1.8   Professor Zmijewski's analysis of allegedly "Missing CUSIPs" on GFS is inaccurate. M. 910 (Zmijewski Demonstrative 53); 9/20/10 Tr. at 89:8-90:14 (Zmijewski); BCI Ex. 1103a (Pfleiderer Demonstratives 14-18); 10/6/10 Tr. at 51:7-54:1 (Pfleiderer).

54.6.2.   Mr. Slattery's methodologies are not credible and are unreliable.

54.6.2.1   Mr. Slattery's valuation of the RMBS portfolio was deliberately misleading and misstated: he claimed that the complex formula he used calculated the "mid" prices he showed in his work papers, and that he then adjusted those "mid" prices down to bid prices using liquidity adjustments. In fact, his formula calculated the "bid" prices shown in his work papers, and he misleadingly *grossed up* those bid prices to artificially inflated mid prices (in documents that were never produced), and then misleadingly presented work papers showing the artificially inflated mid price being adjusted back down to a bid price. 9/30/10 Tr. at 102:2-107:2; 109:15-112:11 (Slattery); 10/6/10 Tr. at 182:12-189:7 (Pfleiderer); 10/7/10 Tr. at 183:23-185:10 (Pfleiderer); BCI Exs. 1028, 1029, 1033a (Pfleiderer Demonstrative 84), 1041-1044, 1099; M. 927.

54.6.2.2    By misleadingly inflating the mid prices generated by his formula, and adjusting those prices *up* to artificially inflated (and fraudulent) mid prices, rather than *down* to a bid price that his alleged methodology would actually require, Mr. Slattery inflated his overall valuation of the RMBS portfolio by million of dollars.  10/6/10 Tr. at 183:3-20 (Pfleiderer); 10/7/10 Tr. at 184:8-185:6 (Pfleiderer); BCI Exs. 1028, 1029, 1041-1044, 1099; M. 927.

54.6.2.3    Mr. Slattery claimed, and his work papers purported to show, that his calculation of bid prices was based upon the simple calculation of taking the mid prices generated by his valuation formula, and multiplying it by a liquidity factor.  9/30/10 Tr. at 96:14-99:13 (Slattery).

54.6.2.4    Mr. Slattery's report, testimony and summary workpapers claimed and purported to show that his mid prices came from a complicated valuation formula (the "break even prepayment" methodology) set forth in his backup workpapers.  9/30/10 Tr. at 104:18-105:4, 107:3-109:14  (Slattery); 10/6/10 Tr. at 182:12-188:23 (Pfleiderer); 10/7/10 Tr. at 183:21-185:7 (Pfleiderer); BCI Exs. 1028, 1029, 1041-1044, 1099; M.927.

54.6.2.5    Mr. Slattery also testified that it was possible to find in his backup work papers the mid values that his "break even prepayment" methodology yielded, and which were set forth on his summary work sheets.  9/30/10 Tr. at 122:9-123:1 (Slattery).

54.6.2.6    In fact, for all of the Agency RMBS that he valued and a significant portion of the non-Agency RMBS that he valued (i.e., for a total of 345 RMBS CUSIPS), Slattery's back-up work papers *do not show any of the mid values* Slattery uses in his summary work papers; *instead, the back-up work papers show the bid prices shown in Slattery's summary work papers.*  BCI 1099; 10/6/10 Tr. at 185:18-187:8, 188:20-189:7 (Pfleiderer); 9/30/10 Tr. at 102:2-107:2, 109:15-112:11 (Slattery); BCI Exs. 1028, 1029, 1041-1044; M. 927.

54.6.2.7    When confronted with this in cross-examination, Mr. Slattery claimed that he could identify the mid values produced by his "break even prepayment" methodology; after being given an opportunity to do so, he identified a value on a back up paper that he testified was a mid value for one of the CUSIPs that was transferred to Barclays and that he valued.  9/30/10 Tr. at 108:6-109:14 (Slattery).

54.6.2.8   After being shown evidence that the mid value he identified was not actually for a CUSIP that was transferred, Mr. Slattery admitted that it was actually a value for one of the "comparables" he used in his formula, and therefore was *not* a "mid" value for a CUSIP transferred to Barclays and subject to his valuation. 9/30/10 Tr. at 113:6-24, 115:19-116:9 (Slattery).

54.6.2.9   Mr. Slattery *conceded* that he created inflated artificial grossed up bid values for at least some of the securities he valued: for Agency trust IOs and POs, he claims his formula did not determine "mid" values but only determined bid values, which Mr. Slattery *admitted* he grossed up by using the liquidity factor which his work papers misleadingly show as adjusting the grossed up number *down* to the bid prices. 9/30/10 Tr. at 109:22-112:11 and 158:12-159:14 (Slattery).

54.6.2.10   For these IOs and POs, there was no reason for Mr. Slattery to present work papers showing a liquidity adjustment *down* from a mid value to a bid value since, as he *admitted*, his formula calculated a number that corresponds to the lower number that he shows as a bid: if he truly believed his formula calculated a bid rather than a mid, then he should just have presented the results of the formula, with no downward adjustment. The fact that his work papers contained a "mid" value that was determined by a gross up calculation can only be understood as an effort to mislead.

54.6.2.11   Thus, the only plausible conclusion from the evidence of Mr. Slattery's 345 "missing mids" is that Mr. Slattery deliberately tried to mislead Barclays and the Court: as he testified, his formula was designed to calculate a mid value; he then secretly grossed that mid value up to higher, artificially inflated "false mid value"; he and his staff concealed, or at least failed to produce, the work papers showing that secret gross up (there must have been a gross up because there is no other explanation for where the "false mid values" come from (*see* BCI 1099)); he then presented work papers showing the inflated "false mid value" being adjusted down to a "bid" value (which in fact was simply the mid value his original formula calculated). 9/30/10 Tr. at 102:2-112:11 (Slattery); 10/6/10 Tr. at 182:12-189:7 (Pfleiderer); 10/7/10 Tr. at 184:8-185:10 (Pfleiderer); BCI Exs. 1028. 1029, 1041-1044, 1099; M. 927.

54.6.2.12   Mr. Slattery's testimony was not credible and should be rejected by the Court.

54.6.2.13    For some 6,035 securities (more than 90% of the 6,667 securities he valued), Mr. Slattery assigned values on the basis of "a data mining exercise," in which he took the average of any reported prices he could find and employed no judgment, turning the difficult exercise of valuing Level 2 or 3 securities into a "mechanical exercise that's just using limited information, and comes up with an undervaluation that's based upon that." 9/30/10 Tr. at 24:21-26:5, 67:7-68:18 (Slattery); 10/6/10 Tr. at 190:1-191:11 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 85).

54.6.2.14    Mr. Slattery's valuation of the RMBS securities and the Agency debt securities used a novel, untested, and unreliable methodology, based upon bid-ask spreads from a 1997 text book, other data that was allegedly from Bank of America in 2001 but that was never produced, and an assumption that the distress in the market in the mid-1990s was comparable to that in September 2008. *See* FOF ¶ 53.20; 10/6/10 Tr. at 164:25-167:22 (Pfleiderer); BCI Exs. 1027, 1027a.

54.6.3.    Mr. Garvey's opinions are inconsistent and unreliable.

54.6.3.1    Mr. Garvey was offered as an accounting expert but is not an expert in IFRS, the accounting rules that governed Barclays' reporting of the transaction through its Acquisition Balance Sheet. 9/21/10 Tr. at 39:17-22, 40:1-5, 40:13-20 (Garvey).

54.6.3.2    Any valuation opinions Mr. Garvey offered are irrelevant since he admitted he is not a valuation expert and "did not attempt to value any of the securities" relevant to this litigation. 9/21/10 Tr. at 81:21-24, 81:25-82:1 (Garvey).

54.6.3.3    Mr. Garvey confirmed at trial that, during his initial deposition testimony, he used "closing date, measurement date and valuation date as the same thing," and that in deposition *he initially testified that he understood the date of the closing to be September 19, 2008*. 9/21/10 Tr. at 110:12-23, 114:24-115:7 (Garvey).

54.6.3.4    Mr. Garvey confirmed at trial that in his deposition, after two different recesses requested by counsel for Movants, *he changed his testimony* to state that while the Closing had occurred on September 22 (contrary to his initial deposition testimony that it was September 19), he nonetheless believed the correct "measurement date" was a different concept, and was September 19.  9/21/10 Tr. at 106:23-115:6 (Garvey).

54.6.3.5 Mr. Garvey testified at trial that he did not change his testimony at deposition because counsel for Movants told him that the Closing actually occurred on September 22, 2008, and not on September 19, 2008 as he had originally testified at deposition. 9/21/10 Tr. at 113:9-115:6 (Garvey).

54.6.3.6 Mr. Garvey's testimony at trial was not credible.

54.6.4. Mr. Olvany's valuations are unreliable: they inflate the value of the corporate bonds (and Giants Stadium auction rate securities) Barclays acquired in the Sale, and are solely based on his contradictory and uninformed opinion.

54.6.4.1 Mr. Olvany's valuation of the Giants bonds directly contradicts his assignment from the Movants, which was limited to value bonds for which the difference between Barclays and BoNY values was over one million dollars, providing Movants with an artificial source of undervaluation by Barclays — since while Barclays' marks were consistent with custodian marks for these bonds. 10/6/10 Tr. at 178:1-8 (Pfleiderer).

54.6.4.2 Mr. Olvany's valuations were higher than the range of values determined by other parties, but he never analyzed this discrepancy. 10/4/10 Tr. at 53:2-54:20 (Olvany).

54.6.4.3 Mr. Olvany admitted that the model that he designed to value the Giants bonds produced unreasonable valuations, which he discarded, and that his valuation of the Giants bonds ultimately was based on nothing other than his "opinion" that the Giants bonds should be valued at par despite the frozen ARS market and the bonds failure at auction. 10/4/10 Tr. at 73:15-75:23, 75:24-76:3, 80:22-81:3 (Olvany).

54.6.4.4 Mr. Olvany opined that whether the Giants bonds had been the subject of successful auctions between March and September 2008 was irrelevant to the valuation of these bonds, which is inconsistent with Movants expert Schwaba's opinion. 10/4/10 Tr. at 93:5-8 (Olvany); M. 154 at appendix 3, ¶30.

54.6.4.5 Mr. Olvany considered redemptions of the Giants bonds that occurred months after the Closing, despite arguing at trial that it was improper for Barclays to have considered that information when it later revalued the bonds. 10/4/10 Tr. at 109:14-110:3, 113:3-23, 114:3-6 (Olvany).

54.6.4.6 Despite his understanding that the appropriate valuation would take into consideration "liquidity issues," Mr. Olvany failed to make any liquidity adjustment for the bonds he valued in the context of this litigation, which resulted in a higher estimate than

Barclays' valuation. 10/4/10 Tr. at 66:16-19, 67:15-68:6, 69:20-23 (Olvany).

54.6.5.    Mr. Schwaba's opinions are not credible and are unreliable.

54.6.5.1    Mr. Schwaba admitted that his deposition testimony was based on an inaccurate definition of auction-rates securities due to confusion at the time of his deposition. 9/29/10 Tr. at 78:9-79:4, 81:22-83:7 (Schwaba).

54.6.5.2    Mr. Schwaba admitted at trial that his testimony alleging that Barclays' counsel asked him at deposition to equate the definition of auction-rates securities to adjustable-rate securities was false, and he conceded that "it was an error in confusion on [his] part." 9/29/10 Tr. at 79:5-81:18, 83:15-84:21, 85:5-6 (Schwaba); M. 825 at ¶¶ 6-8.

54.6.5.3    Mr. Schwaba changed his deposition testimony regarding whether auction-rates securities that failed at auction would trade below par. 9/29/10 Tr. at 92:1-24 (Schwaba).

54.6.5.4    Mr. Schwaba changed the valuation of a CUSIP to a lower number in an errata produced after his original report, which is consistent with the analysis performed by PwC for that CUSIP. 9/29/10 Tr. at 106:22-109:16 (Schwaba).

54.6.5.5    Before changing his testimony on the point, Mr. Schwaba had stated in his report that "[f]ailed ARS would trade below par and may be subject to restricted liquidity." M. 154 at appendix 3, ¶30.

54.6.5.6    While Mr. Schwaba maintained under oath that he had considered in valuing the bonds whether they had failed at auction, his analysis is nowhere to be found in his work papers. 9/29/10 Tr. at 85:19-86:12, 88:15-25 (Schwaba).

**55.**     **The Barclays Acquisition Balance Sheet Shows An Acquisition Gain Of $4.1 Billion, Which Is Entirely Attributable To Assets Which Had Value To Barclays As A Going Concern, But Which Would Likely Have Had Little Or No Value To Lehman In A Liquidation.**

55.1.    LBHI, the Trustee and the Creditors Committee knew that many of the assets that contributed to Barclays' acquisition gain "might have little or no value to Lehman as a nonoperating company." 4/27/10 Tr. at 97:6-98:2 (McDade); 4/28/10 Tr. at 109:5-13, 109:22-110:8 (Miller); 5/6/10 Tr. at 85:7-15 (Burian); 6/21/10 Tr. at 66:11-16, 69:11-20, 102:18-103:1 (Marsal); 5/6/10 Tr. at 83:17-25 (Burian), 6/25/10 Tr. at 90:5-12, 91:2-18 (Despins)

55.2.    Without the net value of the exchange-traded derivatives and the intangibles, Barclays would not have realized an accounting gain from the transaction. BCI Ex. 133; 9/2/10 Tr. at 15:24-17:5, 183-19:7 (Romain).

55.3.    The intangibles (including software, customer lists and supplier lists), plus ancillary business assets such as fixtures and fittings, represent $1.98 billion on the Acquisition Balance Sheet; these assets would likely have had little or no value to Lehman in a liquidation. 4/28/10 Tr. at 109:5-13 (Miller); 4/27/10 Tr. at 97:6-13 (McDade); 6/22/10 Tr. at 233:3-13 (Cox); BCI Ex. 133.

55.3.1.    If Barclays had accounted for the transaction under U.S. GAAP instead of International Financial Reporting Standards ("IFRS"), it would not have included the value of intangible assets in the negative goodwill calculation. 9/2/10 Tr. at 84:19-85:3 (Romain).

55.3.2.    Under IFRS, Barclays was required to recognize on its acquisition balance sheet the value of all the intangibles, based on the potential future revenue they might generate. 9/2/10 Tr. at 19:11-25 (Romain).

55.4.    Barclays recorded net value of approximately $2.4 billion from the ETD accounts it acquired from Lehman (reflecting $6.1 billion in assets and $3.7 billion in liabilities associated with ETDs, both options and futures).  9/2/10 Tr. at 18:15-23, 22:4-24:4 (Romain); BCI Ex. 133.

55.4.1.    If Barclays had not acquired the LBI ETD accounts, those accounts would have been seized and liquidated by exchanges and clearing houses, triggering a loss of ETD Margin Deposits.  9/8/10 Tr. at 104:11-105:1 (Raisler); 10/5/10 Tr. at 30:8-12, 44:25-46:5 (Leitner); BCI Exs. 262, 265, 267, 970.

55.4.2.    Thus, if they had not been transferred to Barclays, the ETDs and ETD Margin Deposits would have been extremely unlikely to generate any positive value for the estate, and may well have generated a net liability. BCI Ex. 49 (9/19/08 Tr.) at 61:16-19, 239:17-21 (Miller); 4/27/10 Tr. at 46:-11 (McDade); *see* FOF ¶ 34.8.

55.5.    The liabilities and "consideration" on the Acquisition Balance Sheet includes only those liabilities and consideration that the accounting rules require to be accrued on the Acquisition Balance Sheet, and do not include all liabilities that are listed in the APA as part of the "consideration" that is legally defined under § 3.1 of the APA.  9/2/10 Tr. at 48:9-25 (Romain).

**xiii.** **Facts Showing That The Sale Was Better Than A Liquidation For The Lehman Estates, The Lehman Creditors, And The Public Interest, And That The Consideration Barclays Paid Was More Than Anyone Else Would Have Paid And Therefore Was "Fair Consideration" And "Reasonably Equivalent Value."**

**56.** **Even If Viewed In Hindsight, The Sale Was The Best Alternative For The Lehman Estates, Creditors, And The Public, And Was Vastly Superior To The Liquidation That Would Have Ensued Absent The Sale.**

56.1.   The LBHI and LBI boards were told that the Sale was better for the estates than a liquidation. BCI Ex. 104.

56.2.   The liquidation of LBI that would have occurred absent the Sale to Barclays would likely have resulted in the complete disintegration of the Business and worse panic and losses in the financial markets than that actually experienced in September 2008. *See, e.g.,* BCI Ex. 48 (9/17/08 Tr.) at 64:19-65:4; BCI Ex. 49 (9/19/08 Tr.) at 60:1-61:13, 67:9-14, 93:6-94:20, 102:19-103:7, 143:17-19, 144:18-19, 144:22-24, 146:4-14, 244:11-24, 250:13-21, 251:13-21; see BCI Ex. 16 (Sale Order) at ¶ 1; 4/26/2010 at 242:23-243:6 (McDade); 4/28/2010 at 22:20-24 (Miller); 6/25/2010 at 61:4-20 (Despins); 5/6/2010 at 118:6-7 (Burian); Ridings Dep. Tr. at 12:18-13:4, 27:5-14, 35:19-37:15, 65:10-15; 8/23/2010 at 57:19-58:9 (Shapiro); *see also* 5/4/2010 at 62:16-21 (Seery); 6/22/2010 at 28:22-29:8 (Diamond); 6/22/2010 at 183:10-20 (Varley); 10/6/10 Tr. at 84:16-25, 85:22-86:4 (Pfleiderer).

56.3.   As Lehman Board Member Michael Ainslie testified, in the absence of the sale to Barclays, LBI's liquidation could be an "open-ended negative series of claims" on the Estate. 4/26/10 Tr. at 96:7-12 (Ainslie).

56.4.   As Movants consistently testified, the Barclays Sale was the best available transaction for the Estate and was far better than an LBI liquidation. 4/26/2010 at 242:23-243:6 (McDade); 4/28/2010 at 22:20-24 (Miller); 6/25/2010 at 61:4-20 (Despins); 5/6/2010 at 118:6-7 (Burian); Ridings Dep. Tr. at 12:18-13:4, 27:5-14, 35:19-37:15, 65:10-15; 8/23/2010 at 57:19-58:9 (Shapiro); *see also* 5/4/2010 at 62:16-21 (Seery); 6/22/2010 at 28:22-29:8 (Diamond); 6/22/2010 at 183:10-20 (Varley); 10/6/10 Tr. at 84:16-25, 85:22-86:4 (Pfleiderer).

56.5.   Movants presented no evidence to contradict the proffered Sale Hearing testimony of Mr. Ridings that "the sale of LBI must be immediately consummated or there will be little or nothing to sell," that "these assets have substantially greater value if they are sold as a going concern," and that "[w]ithout Barclays, Lehman would be forced to sell discreet assets for a fraction of the value that will be realized from this transaction." BCI Ex. 49 (9/19/08 Tr.) at 143:17-19, 144:18-19, 144:22-24.

56.6.   Movants presented no evidence to contradict Ms. Leventhal's statement to the Court on September 17, 2008, that "the sale process was widely reported, and what was also widely reported is that there weren't that many possible bidders. The number is very

small.  The number that met the requirements in terms of financial capability and regulatory qualifications — we're not talking twenties, tens even.  We're talking one or two."  BCI Ex. 48 (9/17/08 Hearing Tr.) at 64:24-65:4.

56.7.  Movants presented no evidence to contradict the proffered Sale Hearing testimony of Mr. Ridings that:  "There are few potential purchasers for this business because any buyer must meet regulatory requirements, have sufficient capital and have the strategic capability to operate the business from day one," and that "Despite tremendous publicity associated with this case, not one firm, other than Barclays, showed up with an interest in the assets as a whole."  BCI Ex. 49 (9/19/08 Hearing Tr.) at 143:20-23, 144:19-22.

56.8.  Movants presented no evidence contrary to the proffered Sale Hearing testimony of Mr. Ridings that "Barclays' offer is the highest and best offer for these assets."  BCI Ex. 49 (9/19/08 Hearing Tr.) at 145:24-25.

56.9.  Movants presented no evidence contrary to the substantial body of evidence submitted at trial establishing that the sale to Barclays yielded more value to the Estate and its creditors than a liquidation would have.  Ridings Dep. Tr. at 12:9-13:4, 65:10-15; 4/26/10 Tr. at 198:12-21, 242:13-243:6 (McDade); 6/22/10 Tr. at 60:12-61:11(Diamond); 6/22/10 Tr. at 183:10-184:2 (Varley); 6/25/10 Tr. at 61:1-20 (Despins); 8/23/10 Tr. at 115:8-116:3 (Shapiro).

56.10.  None of Movants' experts opined that there was any better alternative to the Sale.  *See* M. 151, M.152, M.153, M.154, M.154B, M.155B, M.156, M.156B, M.821-825; 9/20/10 Tr. 7:20-230:17 (Zmijewski); 9/21/10 Tr. at 6:3-25:25 (Zmijewski); 9/21/10 Tr. at 27:3-145:18 (Garvey); 9/21/10 Tr. at 146:12-200:14 (Schneider); 9/29/10 Tr. at 43:13-116:2 (Schwaba); 9/30/10 Tr. at 5:19-166:24 (Slattery); 10/4/10 Tr. at 5:19-122:5 (Olvany).

56.11.  As Professor Pfleiderer testified, the estates could not have obtained higher value from any other purchaser than they obtained from Barclays. BCI Ex. 341 at ¶¶ 128, 129, 134; 10/6/10 Tr. at 208:15-24 (Pfleiderer).

  56.11.1.  Professor Pfleiderer offered unrebutted testimony — as to which Movants did not even cross-examine him — that "Basically, we have here a simple situation where there were gains to both parties in the transaction, which is what economists are always looking at, when they look for gains to trade. *Lehman Brothers did better than what it would have done if it would've had a liquidation.  There's no doubt in very my mind that that's the case with very, very strong probability*.  And Lehman Brothers couldn't have done better, the estate could not have done better by selling it to another bidder for more, because there wasn't another bidder."  10/6/10 Tr. at 208:12-20 (emphasis added).

  56.11.2.  Professor Pfleiderer also opined — without rebuttal or cross-examination — that:  "Indeed, given the market conditions, the significant uncertainty regarding asset values (and even asset identity), the reasonable perception that any transaction needed to be completed within days of the bankruptcy filing,

the consequent inability to do more than minimal due diligence for a transaction of this size and complexity, and the risks inherent in investing tens of billions of dollars in securities and the financial services industry in the face of some of the worst economic conditions since the Great Depression, *no rational purchaser would have paid more for the assets that Barclays purchased* than *Barclays did based on what was known and knowable at the time.* That no competing bidders offered to do so was unsurprising at the time, and it continues to be unsurprising now given all the factors discussed above." BCI Ex. 341 at ¶ 129 (emphasis added).

56.11.3.    Professor Pfleiderer also opined — without rebuttal or cross-examination — that: "Furthermore, it is my view that it was reasonable to believe at the time, and is reasonable to conclude today, that *the fire-sale which would have ensued absent the Transaction would have been worse for creditors and other interested parties.*" BCI Ex. 341 at ¶ 129 (emphasis added).

56.12.    The Court was told by Lehman that there was no alternative to the transaction other than a disastrous liquidation. BCI Ex. 48 (9/17/08 Tr.) at 64:19-65:4; BCI Ex. 49 (9/19/08 Tr.) at 67:9-14, 244:11-24, 250:13-21; see BCI Ex. 16 (Sale Order) at ¶ 1.

56.13.    Barclays' recognition of an acquisition gain was not in any way inconsistent with the Sale being a desirable transaction for Lehman and far superior to a liquidation. 4/26/10 Tr. at 62:2-5, 242:23-243:2, 243:3-6 (McDade); 4/28/10 at 22:20-24, 105:1-4 (Miller); Ridings Dep. Tr. at 12:18-13:4, 27:5-14, 65:10-15; 10/6/10 Tr. at 207:18-211:1 (Pfleiderer).

56.14.    There is a strong public policy interest in upholding the finality of the Sale Order.

56.14.1.    The Trustee's lawyer acknowledged that revising the Sale *ex post*, in a manner adverse to Barclays, would have a chilling effect on future acquirers:

"And the next time liquidation like this happened, God forbid that it happens, but it happened once it could happen again, I think any potential transferee would have real cold feet if they didn't know that there would be a complete transfer of property to go along with the accounts that they were going to have to administer for those customers." BCI Ex. 51 (12/10/09 Hearing Tr.) at 33:23-34:3 (Kobak).

56.14.2.    Shari Leventhal of the New York Fed testified:

"Q.    Is there, in your view, a public policy interest in protecting the finality of the sale of LBI to Barclays?

A.    On this point, I'm not — I can't really speak for the Fed because it's not an issue that we've taken to that level. But from my own perspective, I think it's difficult to unscramble an omelet. I think that doing so sends a message to would-be acquirers that might come forward in the future should there be, God forbid, this

234

kind of situation again, that it's not worth getting into it. And it
could be damaging to the ability to affect these kinds of
transactions going forward if there isn't finality when they're
done."

9/7/10 Tr. at 22:16-23:1 (Leventhal).

56.15.    The Debtor's CEO, Bryan Marsal, agreed that if Barclays had not been willing to
advance $45 billion to replace the New York Fed's lending position and to complete the
Sale, the consequences could have been severe: "I don't know what would have
happened.  The jobs would have been jeopardized.  The wind-down would have been less
smooth.  And it probably would have precipitated even a deeper crisis, global crisis, than
what was already happening."  Marsal Dep. Tr. at 188:16-21.

**57.    The Consideration Barclays Provided Constituted Reasonably Equivalent Value Or Fair Consideration, As Those Terms Are Used In Paragraph M Of The Sale Order.**

57.1.    Barclays paid, in the form of cash and assumed liabilities, more than $52.44 billion to acquire the assets that it purchased in the Sale.

57.1.1.    Barclays paid $46.54 billion in cash (including $45 billion for repo collateral of uncertain value, the appraised value of the real estate, and $250 million) in the Transaction.  5/3/10 Tr. at 32:22-33:9 (Hughes); 6/22/10 Tr. at 168:19-169:4 (Varley); LaRocca Dep. Tr. at 36:9-41:10; Hraska Dep. Tr. at 56:22-57:7 (Day 1); Rodefeld Dep. Tr. at 22:24-25:5; BCI Ex. 30 at ¶ 11; BCI Ex. 50 (12/22/08 Tr.) at 19:11-15 (Kobak); 8/31/10 Tr. at 18:6-19:8 (Lewkow); BCI Exs. 116-121; BCI Ex. 49 (9/19/08 Tr.) at 139:6-140:6, 244:11-16.

57.1.2.    Barclays also assumed additional liabilities for compensation and cure that had an estimated exposure of as high as $3.5 billion and ultimately required over $2.2 billion to be paid.  BCI Ex. 49 (9/19/08 Hearing Tr.) at 99:22-25, 100:1-4; BCI Exs. 142a, 171, 133; 8/23/10 Tr. at 194:3-8 (Exall); 9/2/10 Tr. at 46:17-47:20 (Romain).

57.1.3.    Barclays also assumed more than $3.7 billion in exchange-traded derivatives liabilities.  9/2/10 Tr. at 21:25-22:12; 22:23-23:6 (Romain).

57.1.4.    Barclays also assumed billions of dollars in liabilities to customers, which were supposed to be offset by customer assets, but because the Trustee did not immediately transfer all such assets, were carried by Barclays for months. FOF 1.8.

57.1.5.    As part of the legally defined consideration required under the APA, Barclays also assumed other liabilities not reflected on its Acquisition Balance Sheet, including all liabilities incurred after the Closing in running the Business going forward as required under § 2.3(a), and the ordinary course payments for Related Contracts for up to 60 days after the Closing, as required under section 2.5 of the APA.  8/31/10 Tr. at 18:6-19:8, 22:17-23:1 (Lewkow); 9/2/10 Tr. at 44:18-46:7, 47:21-48:13, 51:4-17 (Romain)

57.2.    Movants presented no evidence contrary to the substantial body of evidence submitted to the Court both in September 2008 and at trial that the Sale produced more value for the Lehman estates than would have been received through either a sale of the Purchased Assets in an LBI liquidation or a sale to any other bidder.  *See* FOF ¶ 56.

57.3.    Movants presented no evidence contrary to the evidence submitted at the Sale Hearing and at trial establishing that the value of the Purchased Assets was rapidly deteriorating at the time of the Sale Hearing.  BCI Ex. 49 (9/19/08 Tr.) at 143:17-19, 144:18-145:4, 244:11-24; 8/27/10 Tr. at 15:11-17 (Klein); 8/23/10 Tr. at 50:16-25 (Shapiro); BCI Ex. 11 (Sale Motion) at ¶ 6.

57.4.    As paragraph M of the Sale Order correctly found, it was precisely because Barclays was providing consideration that was greater than the value that could be received in a liquidation of LBI or from any other bidder, and precisely because the assets were deteriorating in value, that the consideration constituted "reasonably equivalent value" and "fair consideration" under the totality of the circumstances, and hence satisfied the meaning given those terms in the statutes cited in paragraph M of the Sale Order. *See* BCI Ex. 16 (Sale Order), at ¶ M; *see* COL ¶ 21.

57.5.    The record evidence establishes that the Consideration Barclays paid was fair market value, because no other willing buyer would have paid more for the Purchased Assets that were acquired. 10/6/10 Tr. at 84:16-25, 85:22-86:4, 208:12-20, 209:13-211:1 (Pfleiderer); 10/7/10 Tr. at 19:19-20:17 (Pfleiderer).

57.6.    While there was no "appraised value" for the Purchased Assets, the record establishes that the consideration Barclays paid was substantially more than 75% of any possible view of what the appraised value would have been, and Movants have never contended otherwise. *See generally* BCI Ex. 133; 9/2/10 Tr. at 13:8-11, 47:21-48:13, 51:4-5 (Romain); 10/6/10 Tr. at 87:9-89:17, 89:25-90:7 (Pfleiderer); *see also* M. 910 at p. 16.

57.6.1.    The values contained on the Barclays Acquisition Balance Sheet reflect fair values as defined by the accounting rules, and, due to the strictures of those rules that do not permit consideration of economically relevant factors, overstate the fair market value of the Purchased Assets as acquired in a single acquisition of the entire Business, under the circumstances of the Sale. BCI Exs. 1103a (Pfleiderer Demonstratives 23-24), 1002a; 10/6/10 Tr. at 19:25-20:10, 71:21-72:3, 75:11-13, 75:17-76:23, 76:24-77:3, 79:22-80:16 (Pfleiderer); 9/2/10 Tr. at 61:2-23 (Romain); 9/21/10 Tr. at 97:19-98:10, 99:12-100:8, 103:20-104:1, 116:22-117:7 (Garvey).

57.6.2.    The consideration shown on the Acquisition Balance Sheet shows consideration as defined under the accounting rules, which excludes significant portions of the consideration Barclays paid to acquire the Purchased Assets. 9/2/10 Tr. at 13:12-17, 48:9-25 (Romain).

57.6.3.    Nevertheless, even if the values on the Acquisition Balance Sheet were treated as "appraised values," and even if the consideration shown on the Acquisition Balance Sheet were treated as the total consideration Barclays provided, Barclays paid consideration that significantly exceeded 90% of value as defined under the accounting rules, and hence vastly more than 75% of any view of what "appraised value" was. *See generally* BCI Ex. 133; 9/2/10 Tr. at 13:12-17, 26:15-27:18, 47:21-48:19, 51:4-15 (Romain).

57.6.4.    Even if the Movants' accounting valuations were accepted, and even if the accounting values were treated as "appraised values," and even if the consideration shown on the Acquisition Balance Sheet were treated as the total consideration Barclays provided, Barclays paid consideration that substantially exceeded 75% of appraised value. *See generally* BCI Ex. 133;

9/2/10 Tr. at 13:8-17, 47:21-48:13, 51:4-15 (Romain); 10/6/10 Tr. at 87:6-89:14, 89:25-90:7 (Pfleiderer); *see also* M. 910 at p. 16.

### xiv.   Facts Showing That Movants Failed To Present Evidence That Would Have Changed The Outcome Of The Sale Hearing, And Facts That Confirm The Accuracy Of All Of The Findings In The Sale Order.

**58.**   **The Movants Presented No Evidence At Trial That, If Presented At The Time Of The Sale Hearing, Would Have Caused The Court Not To Approve The Sale.**

58.1.   This Court approved the Sale for the reasons set forth in the Sale Order and further elaborated upon in open Court.  BCI Exs. 16 at pp. 2-12, 49 (9/19/08 Tr.) at 247:14-248:12, 250:13-251:3 (the Court).

58.2.   Nothing that Movants have presented in the course of this hearing has altered this Court's fundamental finding that the Sale Transaction was better for the Estate, its creditors, its employees, and the public interest than any available alternative, including a liquidation. *See generally* Complete Trial Record.

58.3.   Nothing that Movants have presented in the course of this hearing would support a finding that the Debtor and the Trustee did not exercise reasonable business judgment in entering into the Sale Transaction.

58.4.   Just as the APA contained no total valuations and no representations or warranties of values, the Court made no findings of specific valuations, and could not have made any such findings given the nature of the assets and the emergency nature of the hearing. Rather, the Court approved the Sale because "the consequences of not approving a transaction could prove to be truly disastrous," and "[t]he harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable."  BCI Ex. 49 (9/19/08 Tr.) at 250:16-21.

58.5.   Nothing that Movants have presented in the course of this hearing supports any finding that the Sale Order was procured by fraud, misrepresentation, or wrongdoing of any kind. *See* Complete Trial Record.

58.6.   If this Court had known at the time of the Sale Hearing everything that it now knows as a result of this Rule 60 proceeding, this Court would have approved the Sale Transaction for the same reasons that are set forth in the Sale Order and were further elaborated upon at the Sale Hearing.

58.7.   At the conclusion of the Approval Hearing, the Court explained the compelling reasons for approving the Sale and identified the following significant considerations, none of which would have changed based on what Movants have presented in the course of the evidentiary hearings:

> "This is not simply approving the transaction because Mr. Miller is putting pressure on me to do so.  *This is not approving the transaction because I know it's the best available transaction.  I have to approve this transaction because it's the only available transaction*."  BCI Ex. 49 (9/19/08 Tr.) at 248:8-12 (emphasis added).

"I believe that one of the remarkable aspects of our Bankruptcy Code, as it has evolved, is its remarkable flexibility to different circumstances…. *We must close this deal this weekend not because the markets demand it, although that's certainly a part of it….I feel that I have a responsibility to all the creditors, to all of the employees, to all of the customers and to all of you.*" BCI Ex. 49 (9/19/08 Tr.) at 248:13-25 (emphasis added).

"Arguments have been made this evening by objectors, some questioning whether or not if I were to delay approval another better transaction might be realized or discovered. And that's a preposterous notion. As I said on Wednesday, it's very apparent to me that for a transaction of this sort to happen, only Barclays can do it. Only Barclays has the support of the regulators. *Only Barclays is prepared to close. Only Barclays can deliver the customer accounts to safe harbors.* And the customer property, which is the principal concern of the SIPC trustee, a case which is also pending before me now, will be best protected by virtue of approving the sale." BCI Ex. 49 (9/19/08 Tr.) at 248:25-249:11 (emphasis added).

"One could be a theoretical bankruptcy jurist and say transactions such as this should always be subject to more time so that parties can better assess the consequences of the transactions…. This is Friday. This case was filed on Monday. What we're doing is unheard of but imperative. I am completely satisfied that I am fulfilling my duty as a United States bankruptcy judge in approving this transaction and in finding that *there is no better or alternative transaction for these assets, that the consequences of not approving a transaction could prove to be truly disastrous.* And those adverse consequences are meaningful to me as I exercise this discretion. *The harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable.*" BCI Ex. 49 (9/19/08 Tr.) at 250:5-21 (emphasis added).

"Moreover, it's not just about avoiding harm. Approving the transaction secures whether for ninety days or for a lifelong career employment for 9,000 employees at Lehman, and *holds together an operation the value of which is really embedded in the talent of the employees*, their knowledge, their relationship, their expertise and their ability to create value to the economy." BCI Ex. 49 (9/19/08 Tr.) at 250:22-251:3 (emphasis added).

"I believe that *sophisticated negotiations cannot be parsed neatly into the constituent parts because they're integrated and interrelated* in the result of give and take." BCI Ex. 49 (9/19/08 Tr.) at 251:6-9 (emphasis added).

"I know that I need to approve this transaction. I am absolutely confident in my judgment. But I also know that this is so exceptional relative to the experience that I have had both as bankruptcy lawyer and as judge to know that it could never be deemed a precedent for future cases unless someone could argue that there is a similar emergency. It's hard for me to imagine a similar emergency. And so, as to

those objectors who say it would be establishing bad precedent to approve this transaction, I say no. *This is not a bad precedent. To the contrary. It's an extraordinary example of the flexibility that bankruptcy affords under circumstances such as this. It's an example that creative minds working diligently day and night even under the worst of circumstances can create remarkably complicated transactions that preserve value. I am proud to have been part of this process.*" BCI Ex. 49 (9/19/08 Tr.) at 251:21-252:11 (emphasis added).

**59.    The Evidence Presented At Trial Has Confirmed The Accuracy Of All Of The Factual Findings Set Forth In The Sale Order.**

59.1.    In the Sale Order entered on September 20, 2008, this Court made 22 findings of fact that are denominated findings A-V, on the basis of which it entered the Sale Order. BCI Ex. 16 (Sale Order) at pp. 2-12.

59.1.1.    Movants do not and can not dispute Finding A (Jurisdiction and Venue).

59.1.2.    Movants do not and can not dispute Finding B (Statutory Predicates).

59.1.3.    The evidence in the record confirms Finding C (Notice) by showing that there were "exigent circumstances" and that the "wasting nature of the Sellers' assets" justified a shorter notice period.  BCI Ex. 16 (Sale Order) at ¶ C; *see* FOF ¶ 3.

59.1.4.    The evidence in the record confirms Finding D (Irreparable Harm) by showing that that the Sale to Barclays was the only and best alternative available to the Debtors' estates.  BCI Ex. 16 (Sale Order) at ¶ D; *see* FOF ¶¶ 2, 36, 56, 57, 11, 40, 41.

59.1.5.    The evidence in the record confirms Finding E (LBI) by showing that  LBI was represented in the negotiations and that the Trustee sought and received the approval of the Sale Order in the SIPA proceeding and that Barclays negotiated with the DTCC to address their concerns and DTCC agreed to accept $250 million from Barclays to satisfy any need that the DTCC had for protection.  BCI Ex. 16 (Sale Order) at ¶ E; BCI Ex. 17; *see* FOF ¶¶ 40, 42, 44, 47.

59.1.6.    The evidence in the record confirms Finding F (Opportunity to Object) by showing that the Court approved the Sale despite objections from certain Creditors and that despite its opportunity to do so, the Creditors Committee chose not to object to the Sale but instead supported it on appeal.  BCI Ex. 16 (Sale Order) at ¶ F; *see* FOF ¶¶ 39-41, 62.

59.1.7.    The evidence in the record confirms Finding G (Corporate Authority) by showing that the transaction was approved by the LBHI and LBI Boards and that the Boards granted authority to the Lehman executives to negotiate and close the transaction.  BCI Ex. 16 (Sale Order) at ¶ G; BCI Ex. 104 at pp. 6-7; *see* FOF at ¶ 4.

59.1.8.    The evidence in the record confirms Finding H (Sale in Best Interests) by showing that approval of the Sale was "in the best interests of the Debtors, their estates, their creditors and other parties in interest."  BCI Ex. 16 (Sale Order) at ¶ H; *see* FOF ¶¶ 2, 11, 36, 40, 41, 56, 57.

59.1.9.    The evidence in the record confirms Finding I (Business Justification) by showing that the Sale was the best alternative to maximize the value of the

Debtors' estates, particularly given the wasting nature of the Purchased Assets. BCI Ex. 16 (Sale Order) at ¶ I; *see* FOF ¶¶ 2, 11, 36, 40, 41, 56, 57.

59.1.10.    The evidence in the record confirms Finding J (Arm's-Length Sale) by showing that the sale negotiations were conducted in good faith and at arm's-length. FOF ¶ 4.

59.1.11.    The evidence in the record confirms Finding K (Good Faith Purchaser) by showing that Barclays acted in good faith, as explained in FOF ¶ 4.

59.1.12.    The evidence in the record confirms Finding L (Highest and Best Offer), which Movants do not dispute, by showing that the Sale was the highest and best alternative to maximize the value of the Debtors' estates. BCI Ex. 16 (Sale Order) at ¶ L; *see* FOF ¶¶ 2, 11, 36, 40, 41, 56, 57.

59.1.13.    The evidence in the record confirms Finding M (Consideration) by showing that Barclays provided reasonably equivalent value or fair consideration in the Transaction as set forth in FOF ¶ 57.

59.1.14.    The evidence in the record confirms Finding N (Free and Clear) by showing that Barclays acted in good faith, as explained in FOF ¶ 4.

59.1.15.    The evidence in the record confirms Finding O (Free and Clear Findings Needed by Purchaser) by showing that Barclays would not have closed the Transaction without the protections provided in the Sale Order, as set forth in FOF ¶ 1.

59.1.16.    The evidence in the record confirms Finding P (No Liability Findings Needed by Purchaser) by showing that Barclays would not have closed the Transaction without the protections provided in the Sale Order, as set forth in FOF ¶ 1.

59.1.17.    Movants do not and can not dispute Finding Q (Satisfaction of 363(f) Standards).

59.1.18.    The evidence in the record confirms Finding R (No Fraudulent Transfer) by showing that the negotiations leading to the transaction were conducted in good faith by Barclays, LBHI, and the SIPA Trustee for LBI. BCI Ex. 16 (Sale Order) at ¶ R; *see* FOF ¶ 4.

59.1.19.    The evidence in the record confirms Finding S (No Successor Liability) by showing that Barclays would not have closed the Transaction without the protections provided in the Sale Order as set forth in FOF ¶ 1.

59.1.20.    The evidence in the record confirms Finding T (Cure/Adequate Assurance) by showing that Barclays complied with its cure obligations under the APA, as set forth in FOF ¶ 13.

59.1.21.  The evidence in the record confirms Finding U (Prompt Consummation), by
showing that time was of the essence in approving the Sale at a time where
"Values were plummeting and were continuing to plummeting (sic) and
nobody was able to project when it would hit bottom."  4/28/10 Tr. at 18:23-
19:12 (Miller); BCI Ex. 49 (9/19/08 Tr.) at 73:20-74:1 (Caputo); *see* BCI Ex.
16 (Sale Order) at ¶ U, FOF ¶¶ 3, 36.

59.1.22.  Movants do not and can not dispute Finding V (Personally Identifiable
Information).

59.2.  This Court's Sale Order makes no findings concerning the values of any particular asset
or liability, or of assets and liabilities in the aggregate.  BCI Ex. 16.

**xv.    Facts Showing The Movants' Conduct In Connection With The December
2008 Settlement, The Successful Defense Of The Sale Order, And The
Repeated Reliance On The Finality Of The Sale Order And The Clarification
Letter As Part Of The Approved Purchase Agreement.**

**60.    In December 2008, The Trustee Successfully Asked This Court To Approve A
Settlement In Which Barclays Was Given A Full And Unconditional Release Over
All Claims Relating In Any Way To The Repo Collateral.**

60.1.    In December 2008, the Trustee asked this Court to approve a settlement of a dispute
between the Trustee, JP Morgan Chase, and Barclays over securities that Barclays was
supposed to receive as collateral in the Fed Replacement Repo, but did not.  BCI Ex. 29;
BCI Ex. 50 (12/22/08 Tr.) at 18:12-24:7.

60.2.    The Settlement Agreement the Trustee asked the Court to approve expressly recognized
that it was *always the intention* of Lehman, from the time of the Replacement Transaction
onward, for Barclays to acquire *all* of the Repo Collateral:

> "When BarCap and LBI agreed to engage in the Replacement Transaction,
> it was BarCap's and LBI's intention that the securities in the Fed Portfolio
> would be included in "Purchased Assets" as defined in the Asset Purchase
> Agreement dated as of September 16, 2008, as amended (the "Asset
> Purchase Agreement"), which Asset Purchase Agreement was authorized
> and approved by an order of the court (the "Bankruptcy Court") presiding
> over LBI's SIPA liquidation case on September 20, 2008."

> BCI Ex. 9 at ¶ E.

60.3.    On December 22, 2008, the Court approved that settlement.  BCI Ex. 39.

60.4.    The Settlement Agreement approved by the Court included the following release:

> "[T]he Trustee, on behalf of LBI and the LBI estate, hereby does and shall
> be deemed to forever release, waive and discharge [BarCap] from and in
> respect of all Claims, whether known or unknown, foreseen or unforeseen,
> suspected or unsuspected, liquidated or unliquidated, contingent or fixed,
> currently existing or hereafter arising, in law, equity or otherwise, relating
> to the Subject Funds, the Replacement Transaction or the Delivered
> Securities."

> BCI Ex. 9 at ¶ 4(d).

60.4.1.    The "Replacement Transaction" was defined as the "reverse repurchase
transaction with LBI in which BarCap would fund $45 billion to LBI for the
Fed Portfolio." *Id*. at ¶ A.

60.4.2.    The "Subject Funds" were defined as the "$7 billion [that] was transferred by
LBI to an account at JPMorgan early on the morning of September 19, 2008

as a result of the fact that not all of the Fed Portfolio securities were delivered to BarCap under the Replacement Transaction." *Id.* at ¶ D.

60.4.3.  The "Delivered Securities" were defined as "the securities listed on Schedule A to the Clarification Letter." *Id.* at ¶ E.

60.5.  At the December 22, 2008 hearing, Harvey Miller and James Kobak indicated that the settlement completed the transaction intended by the Purchase Agreement:

60.5.1.  Mr. Kobak told the Court: "And again, I just want to make it clear that what this settlement really accomplishes is *completing the very transaction contemplated in the purchase agreement as approved by this Court*." BCI Ex. 50 (12/22/08) at 23:21-24 (Kobak) (emphasis added).

60.5.2.  Mr. Kobak emphasized the Trustee's "very careful consideration of this settlement and the factual bases" for it, the fact that the Trustee and his lawyers "met several times with representatives of other parties and with the Fed to ask questions and make sure we understood the facts and circumstances," and that "[w]e also insisted that attorneys for Mr. Miller and other attorneys for LBHI and Alvarez & Marsal be informed of the settlement terms and have opportunities for meetings and to obtain information all of which has occurred." BCI Ex. 50 (12/22/08 Tr.) at 22:11-17, 23:4-7.

60.5.3.  Mr. Miller explained that the Debtor did "not object" to the settlement, *Id.* at 32:6-8, and confirmed that "we spent a considerable amount of time with the SIPC Trustee, with the staff, with the former Lehman people in going through the facts relating to this transaction." BCI Ex. 50 (12/22/08 Tr.) at 32:22-25. Mr. Miller also confirmed that "We understand what was to be contemplated and to be performed under the asset purchase agreement. And this is within the spirit of that agreement." *Id.* at 33:15-17.

60.6.  Correspondence between Weil, Lehman and Alvarez acknowledged that Barclays was entitled to the remaining Repo Collateral. BCI Ex. 676.

60.6.1.  Lehman executive Madelyn Antoncic explicitly conceded in an email to Harvey Miller, Bryan Marsal, and numerous other Alvarez & Marsal executives on December 13, 2008, that with respect to the Barclays claim for the $7 billion, "was agree they are due" that amount. BCI 676, at 1.

60.6.2.  This correspondence between Ms. Antoncic, Mr. Miller, Mr. Marsal and others at Alvarez & Marsal demonstrates that LBHI wished to ensure that it preserved possible claims against JMorganChase — *not* against Barclays, whom it acknowledged was entitled to the $7 billion being claimed. BCI Ex. 676.

60.7.  Shari Leventhal of the NY Fed submitted a declaration in support of the December Settlement indicating that the intent of the Purchase Agreement was to transfer all of the Repo Collateral to Barclays as Purchased Assets:

"Notwithstanding that both Depository Trust Company ('DTCC') and the Fedwire Securities Service remained open for several hours past their normal closing times in an effort to complete this transaction, operational issues interfered with the ability to transfer all of the intended securities to Barclays.  When, at 11PM, DTC (sic) had to close, Barclays had received approximately $42.7 billion of the approximately $49.7 billion in securities it was expecting under the terms of the September 18th Repo."

BCI Ex. 30 at ¶ 14.

60.8.    The Order approving the December Settlement provided for a limited reservation of claims as to matters other than those covered by the Settlement Agreement:

"ORDERED that the Motion is granted in all respects…."  BCI Ex. 39 at p. 1.

"ORDERED that the settlement agreement (the 'Settlement Agreement') is authorized and approved pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and sections 105(a) and 363 of the Bankruptcy Code"; BCI Ex. 39 at p. 2.

"ORDERED that nothing in this Order shall bind, be collateral estoppel or otherwise prejudice *any other matter* in this case, the Chapter 11 Cases or any related case with respect to the facts alleged in the Motion or in the accompanying Moore Declaration, Leventhal Declaration, or LaRocca Declaration, *other than the approval of the Settlement Agreement and the authorization for the Trustee to take such action and execute the Settlement Agreement and such documents as may be necessary or appropriate to effectuate the Settlement Agreement and transfer of the Settlement Payment to Barclays.*"  *Id.* (emphasis added).

"ORDERED that all objections to the Motion or the relief requested therein…are overruled on the merits." *Id.*

60.9.    Barclays' counsel emphasized at the December 22, 2008 hearing that the terms of the December Settlement would be final:

"What will be final, Your Honor, is your approval of the settlement agreement and the intended transfer of the settlement securities and the settlement payment to Barclays."  BCI Ex. 50 (12/22/08) at 40:12-14 (Schiller).

60.10.    At the December 22, 2008 hearing, the Trustee's counsel stressed that it was too late for the Committee to challenge the Court's approval of the Purchase Agreement:

"The one remaining objection, as I understand it, is the objection of the committee in the Chapter 11 case.  And their objection, as I understand it, is primarily that they seek extensive information about some background facts leading up to the transaction.  *The information that they seek we think really has nothing to do with this aspect of the purchase agreement itself and it's just*

*using this motion as a vehicle either to reopen the Court's approval of the purchase agreement or to investigate unrelated claims and transactions. We think it's too late to do the former and with respect to the latter, nothing in the motion or the proposed order forecloses any investigation or claims that might be made about anything else.* And as I've said, the trustee himself intends to investigate some of these matters himself."

BCI Ex. 50 (12/22/08 Tr.) at 24:15-25:3 (Kobak) (emphasis added).

60.10.1.    There is no basis for Movants' claim that Barclays tried to avoid disclosing that it received securities marked by Lehman at an amount totaling more than $47.4 billion.

    60.10.1.1    The December Settlement papers disclosed that Barclays was supposed to receive $49.7 billion in Repo Collateral alone, not including the other securities to be transferred under the Purchase Agreement.  BCI Ex. 29 at ¶¶ 7, 10; *see also* BCI Ex. 30 at ¶ 14.

60.10.2.    Movants rely on a letter from Jamie Dimon of JPMorgan Chase to John Varley of Barclays as a basis for their false claim that Barclays concealed the value of securities being transferred under the Purchase Agreement.  M. 360; *see* 6/21/10 Tr. at 213:24-215:11 (Gaffey direct examination of Diamond); 6/22/10 Tr. at 149:2-151:12 (Varley).

    60.10.2.1    That letter was prepared by JPMorgan Chase in a litigation context in which Barclays was asserting substantial claims against JPMorgan Chase.  6/22/10 Tr. at 24:16-22 (Diamond); 146:20-147:22 (Varley).

    60.10.2.2    The accusations made in that letter are contradicted by the disclosures that were made in connection with the December Settlement.  BCI Ex. 29 at ¶ 10; *see also* BCI Ex. 30 at ¶ 14; FOF ¶¶ 38, 52, 61.

**61.    In Response To The Appeals Filed Against The Sale Order, The Lehman Movants Filed Briefs Asking For The Sale Order To Be Affirmed, And The Committee Filed A Counter-Statement Of Issues That Effectively Defended The Sale Order And Opposed The Appeals.**

61.1.    On October 16, 2008, the Bay Harbour appellants filed a Notice of Appeal of the Sale Order and on November 14, 2008, they filed their Opening Brief in support of the appeal. M. 551.

 61.1.1.    The appellants argued that the Sale Hearing was conducted without "actual notice of material terms" of the Sale. M. 551 at p. 4.

 61.1.2.    The appellants argued that "there was no real indication of what was being sold and for what nor transparency" into the sales process. M. 551 at p. 3.

 61.1.3.    The appellants challenged the Bankruptcy Courts' approval of the sale to Barclays free and clear of liabilities. M. 551 at p. 28.

 61.1.4.    The appellants challenged the Bankruptcy Courts' conclusion that Barclays was a purchaser in good faith pursuant to § 363(m). M. 551 at pp. 22-25.

61.2.    On December 12, 2008, after Movants had all the knowledge described at FOF ¶¶ 46-52, the Debtor and Trustee filed briefs opposing the Bay Harbour appeal, defending the Sale Orders and arguing that "all relevant facts regarding the Sale were disclosed to the Bankruptcy Court." M. 405 at pp. 16, 23; M. 552 at p. 4, n.1.

 61.2.1.    On December 12, 2008, the Debtor asked the District Court to affirm the Sale Order "in all respects," and the Trustee adopted LBHI's Brief. M. 405 at p. 4; M. 552 at p. 4, n. 1.

 61.2.2.    The Trustee opposed "vacating the Sale Orders because of the havoc such a result would cause in the SIPA proceeding that he administers, in which many decisions have been made based on the entry of the Sale Orders, and during which many billions of dollars of property have changed hands," and stated that the Sale Orders had been "fully implemented." M. 552 at pp. 1, 10.

 61.2.3.    The Trustee acknowledged that "[t]he week of September 14, 2008 has been widely recognized as one of the most tumultuous in recent history for the U.S. financial markets," and that "[f]or most of 2008, the global financial markets and worldwide economic conditions were depressed and volatile, characterized by a continued lack of liquidity in the credit markets, significantly depressed volumes in most equity markets, a widening in certain fixed income credit spreads compared to the end of the 2007 fiscal year, and declining asset values." M. 552 at pp. 1, 4 (internal quotations and citations omitted).

 61.2.4.    The Debtor stated that "[a]ll relevant facts regarding the Sale were disclosed to the Bankruptcy Court." M. 405 at p. 23.

61.2.5.    The Debtor admitted that "[t]he fact that no higher or better offers were made prior to the Sale Hearing indicates that the purchase price paid by Barclays was the highest price the market would support."  M. 405 at p. 39.

61.2.6.    The Debtor admitted that "the prospects for a competitive bid were slim" and that "LBHI had been pursuing strategic alternatives for months prior to the Sale, and the potential purchasers were aware that LBHI had been searching for a buyer" well before the Bankruptcy filing.  M. 405 at p. 18.

61.2.7.    The Debtor stressed that the "market was aware that the Lehman enterprise was available for purchase or investment," that the "universe of entities qualified to purchase LBI was very limited," and that "of this extremely small universe, not (sic) one came to the Sale Hearing with a better offer even though parties in interest were provided with an opportunity to top Barclays's bid."  M. 405 at pp. 18-19.

61.2.8.    The Debtor admitted that "LBI could not survive absent approval of the Sale," and that "the likelihood of finding another qualified purchaser was nonexistent."  M. 405 at p. 25.

61.2.9.    The Trustee admitted that "for all intents and purposes Barclays was the only serious bidder. . ." and that "if approval of the APA were delayed, another better transaction" would not have been realized.  M. 552 at pp. 17, 18.

61.2.10.   The Debtor argued that the Sale was "an arm's length, extensively negotiated transaction made in good faith by Barclays, LBHI, and the SIPA Trustee for LBI."  M. 405 at p. 3.

61.2.11.   The Trustee argued that "the Court heard the credible testimony of two witnesses that LBI's broker-dealer business was experiencing a liquidity crisis, that the negotiations leading up to the APA were at arm's length, objective, aggressively pursued, and in good faith. . . ." M. 552 at p. 17.

61.2.12.   The Debtor admitted that "the Bankruptcy Court correctly concluded that it: 'heard ample evidence. . . that would support good faith findings here. This was an arm's length transaction, negotiated aggressively.'"  M. 405 at p. 26.

61.2.13.   The Debtor argued that "[c]ontrary to Bay Harbour's contentions the record demonstrates that Barclays acted in good faith."  M. 405 at p. 18.

61.2.14.   The Debtor argued that the sale was "necessary to provide certainty to parties and counter-parties of hundreds of thousands of transactions and to provide comfort to public customers and others." M. 405 at 33-34.

61.2.15.   The Debtor argued that the "evidence at the Sale Hearing demonstrated that if the Sale was not 'immediately consummated . . . there will be little or nothing to sell.'"  M. 405 at p. 24 (internal citation omitted).

61.2.16.    The Trustee stated that there was pressure from regulators and federal agencies "to sell LBI's broker-dealer business no later than September 19 in order to preserve the business."  M. 552 at p. 14.

61.2.17.    The Debtor invoked the statement of the SEC at the September 17, 2008 procedures hearing that 'extraordinary efforts' were made by the SEC, FRBNY, SIPC, and CFTC to get the transaction 'to a point where the firm would be in a position to be available [September 19] for a sale.'"  M. 405 at p. 24 (brackets in original).

61.2.18.    The Trustee invoked the statement of the Federal Reserve Bank of New York at the September 17, 2008 procedures hearing that: "'We're [the Federal Reserve Bank of New York] looking, in terms of our mandate, at financial stability here, and it is vitally important that this transaction go forward as quickly as possible in order to preserve the financial stability that, at this point, is very fragile.'"  M. 552 at pp. 14-15 (brackets in original).

61.2.19.    The Trustee quoted the SEC's statement that: "'we [the Securities and Exchange Commission in New York] think it's critical for this to happen by the end of the week also.'"  M. 552 at p. 15 (brackets in original).

61.2.20.    The Trustee quoted the Commodity Futures Trading Commission's statement that: "'in the interest of the futures markets as well, this is a situation that really should be dealt with as quickly as possible and ... [the Commodity Futures Trading Commission] support[s] the representations of ... the Fed and the SEC.'"  M. 552 at p. 15 (brackets in original).

61.2.21.    The Debtor also argued that "if the Sale did not close on September 19 or that weekend, the effect on the broker-dealers business and on Lehman Holdings would be devastating."  M. 405 at p. 25.

61.2.22.    The Debtor admitted that "[i]n the perspective of the facts and unique circumstances demonstrated, it was self-evident that the immediate consummation of the Sale to Barclays was the only viable option to enable public customer accounts and trading to continue on an uninterrupted basis and preserve billions of dollars in value for public customers."  M. 405 at pp. 26-27.

61.2.23.    The Debtor admitted that:

> "The Purchased Assets were deteriorating rapidly.  If the Sale had not been consummated immediately, there would have been virtually no assets left to purchase.  The evidence below showed that the Sale enabled almost 10,000 Lehman employees to have a chance at continued employment with Barclays.  In addition, the Sale 'made available a greater pool of assets to the [D]ebtors' estates, because the exposure under Lehman Holdings['] guarantee to the broker-dealer will be substantially less.'"

M. 405 at pp. 38-39 (citations omitted) (brackets and edits in original).

61.2.24.    The Debtor argued that:

> "Had the Bankruptcy Court not approved the Sale, the consequences would have been dire. The prejudices and harm resulting from the stranding of hundreds of thousands of customer accounts and the complete breakdown of all transactions defy imagination.  The record establishes that '[a]bsent approval of the Barclays' transaction, the broker-dealer business would discontinue as a going concern and adversely impact the credit markets on a global scale in ways that are immeasurable."

> M. 405 at pp. 37-38 (citations omitted) (brackets and edits in original).

61.2.25.    The Debtor admitted that:

> "The evidence demonstrated that, if the Sale was not approved, [t]he costs to Lehman and counterparties, as pending transactions unwind, [would] run into the many billions of dollars. Counterparties [would] be required to liquidate their collateral positions, which [could] entail a wholesale dumping of the collateral into the marketplace with the attendant erosion of values. The deficiencies that counterparties [could] incur [would] result in massive claims against the assets of the Lehman estates. Ten to twelve thousand employees may not find any employment. Any failure to consummate [could] potentially cause a major shock to the financial system."

> M. 405 at p. 39 (citations omitted) (brackets and edits in original).

61.2.26.    The Trustee stated that "[a]t the time of the Sale Hearing, an expedient transfer of LBI's customer accounts to a qualified buyer capable of carrying out the ongoing operation of LBI's broker-dealer business was crucial to preserve and stabilize the global financial markets." M. 552 at p. 14.

61.2.27.    The Trustee admitted that if the Sale were not approved expeditiously, the "[c]ontinued uncertainty as to the consummation of the asset sale would have held devastating consequences for the distressed and volatile financial market." BCI Ex. 33 at p. 15.

61.2.28.    The Trustee argued that "it was necessary to consummate the sale to a qualified buyer — of which there were few — as soon as was practicable," and quoted from the September 19, 2008 Sale Hearing:

"If the transaction is not consummated, it will result in the largest failure of a broker-dealer in the history of the United States and will cripple the credit markets for some time to come .... [T]he shock of this transaction not being consummated in the public markets could be immeasurable and could ignite a panic in the financial condition that we now face in the United States... [I]t is essential to an orderly financial market that this transaction be consummated as early as possible in the interest of all stakeholders of these two cases. And in the interest of the public in general and the economy in general, and to avoid a dislocation in the market."

M. 552  at p. 15.

61.2.29.  The Trustee argued in his brief "that any party objecting to the Sale Order must 'exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot." M. 552 at p. 8 (quoting BCI Ex. 16, the Sale Order at ¶ 29).

61.2.30.  The Trustee argued that "[i]f the sale of assets to Barclays were now to be unwound, months of labor-intensive work—and billions of dollars of transfers of LBI's customers' cash and securities—would be undone, upending the substantial progress that has already been achieved towards the SIPA proceeding's goal of returning customer property" and that "undoing the sale of the Purchased Assets to Barclays now would result in renewed uncertainty regarding consummation of the sale, causing major disruption in the already volatile global financial markets."  M. 552 at p. 14.

61.2.31.  The Trustee stated that "[t]o now dismantle the sale would create a renewed sense of insecurity in a global financial market that arguably is more distressed and more volatile than it was three months ago when the Bankruptcy Court authorized and approved the Sale Orders." M. 552 at p. 15.

61.3.  On October 20, 2008, after obtaining all the knowledge described at FOF ¶¶ 46-52, the Committee submitted a Counter-Statement of Issues on Appeal to the Noteholders' appeal.  BCI Ex. 398.  The rules permit such counter-statements to be filed only by parties opposing the appeal (appellees).  Fed. R. Bankr. P. 8006.

61.3.1.  The Committee's Counter-Statement asserted that Barclays "purchased the property covered by the Appealed Orders (the 'Property') in good faith." BCI Ex. 398 at ¶ 1.

61.3.2.  The Committee's Counter-Statement asserted that the Sale Orders were "fully consummated."  BCI Ex. 398 at ¶ 1.

61.3.3.  The Committee's Counter-Statement also asserted that "the Appealed Orders contain detailed findings of fact with respect to the arms-length nature of negotiations among the Debtors and Barclays, and where no collusion has been found." BCI Ex. 398 at ¶ 2.

61.3.4.     The Committee's Counter-Statement stated that the Bankruptcy Court concluded that:

61.3.4.1     "there was ample evidence to find Barclays to be a purchaser in good faith" BCI Ex. 398 at ¶ 5;

61.3.4.2     "the Debtors' estates would suffer immediate and irreparable harm if the sale did not proceed" BCI Ex. 398 at ¶ 5;

61.3.4.3     "the sale was in the best interests of the Debtors, their estates and other parties in interests" BCI Ex. 398 at ¶ 5;

61.3.4.4     "Barclays' offer was fair consideration and reasonably equivalent value that provided the greatest recovery for the Debtors' estates" BCI Ex. 398 at ¶ 5; and

61.3.4.5     "time was of the essence in consummating the sale."  BCI Ex. 398 at ¶ 5.

61.4.     Movants maintained all of their above positions on appeal before the District Court through March 16, 2009, when the District Court ruled in favor of Movants and entered its judgment affirming the Sale Order and through the Second Circuit's final mandate on June 19, 2009.  BCI Exs. 403, 404; *see also* BCI Ex. 41.

61.5.     At no time while the appeal was pending (through June 19, 2009) did Movants ask the District Court or the Second Circuit to stay the appeal or seek remand to this Court in order to further examine any issues or seek any relief, despite having all the knowledge described at FOF ¶¶ 46-52.

**62.    The Creditors' Committee Chose Not To Appeal The Sale Orders, But Instead Filed A Counter-Statement Of Issues On Appeal That Is Available Only To Appellees, Thereby Effectively Opposing One Of The Appeals That Was Filed.**

62.1.    The Creditors' Committee did not appeal the Sale Orders.  O'Donnell Dep. Tr. at 103:5-8.

62.2.    On September 29, 2008, the Informal Noteholder Group (consisting of Aegon USA, AIG Global Investment Group, Alliance Bernstein, Blackrock, Inc., Capital Guardian Trust Company, Cyrus Capital Partners, Pacific Investment Management Company, Thrivent Financial for Lutherans, Western Asset Management Company, and York Capital Management) filed a Notice of Appeal of the Sale Order.  BCI Ex. 391.

62.3.    On October 9, 2008, the Informal Noteholder Group filed its Designation of Record on Appeal and Statement of Issues to be Presented on Appeal.  BCI Ex. 393.

62.4.    In its Designation of Record on Appeal and Statement of Issues to be Presented on Appeal, the Informal Noteholder Group presented, as issues for appeal, whether the Bankruptcy Court erred in "authorizing the sale to Barclays," whether the Bankruptcy Court erred in concluding that "Barclays was a purchaser in good faith," whether the Bankruptcy Court erred in approving the Sale "free and clear of liabilities to Barclays," and whether the Bankruptcy Court erred in concluding that the Sale "complied with the Due Process clause of the Fifth Amendment of the United States Constitution."  BCI Ex. 393 at ¶¶ 1-4.

62.5.    In response to the Informal Noteholder Group's appeal, on October 20, 2008, the Creditors' Committee submitted its Counter-Statement of Issues Presented on Appeal and Counter-Designation of Additional Items to be Included in the Record on Appeal pursuant to Rule 8006, which allows such a Counter-Statement only by appellees.  *See* BCI Ex. 398; Fed. R. Bankr. P. 8006.

62.6.    In its Counter-Statement, the Creditors' Committee asserted, among other things, that Barclays "purchased the property covered by the Appealed Orders (the 'Property') in good faith," that "the sale authorized by the Appealed Orders has been fully consummated," that "the Appealed Orders contain detailed findings of fact with respect to the arms-length nature of negotiations among the Debtors and Barclays," and that "no collusion has been found."  BCI Ex. 398 at ¶¶ 1-2 (emphasis added).

**63.    Both Movants And Barclays Repeatedly Cited And Relied Upon The Clarification Letter As Part of The Approved Purchase Agreement For Months After The Closing**

63.1.    On September 22, 2008, the Debtor filed with the Court and served on all parties a "Notice of Filing of Purchase Agreement Approved by Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases."  BCI Ex. 18; *see* BCI Exs. 5, 820.

63.2.    The "Notice of Filing of Purchase Agreement Approved by Order" attached the APA, the First Amendment to the APA, and the Clarification Letter.  BCI Ex. 18; *see* BCI Exs. 5, 820.

63.3.    On September 29, 2008, LBHI filed a motion seeking approval to file schedules to the Clarification Letter under seal and stated expressly that the Clarification Letter "clarifies the intention of the Parties with respect to certain provisions of the Purchase Agreement, amends the Purchase Agreement in certain respects, and is binding on the Parties.  As more fully described in the Clarifying Letter, the Schedules contain lists of securities and trading positions transferred under the Purchase Agreement."  BCI Ex. 19 at p. 3; *see* BCI Exs. 742-744, 749, 754, 755.

63.4.    The Movants did not move for reconsideration of the Sale Order within the ten day period under Fed. R. Bankr. P. 9023(e). Fed. R. Bankr. P. 9023(e) (incorporating Fed. R. Civ. P. 59(e)).

63.5.    In December 2008, the Debtor invoked and relied upon the Clarification Letter in its opposition to the Bay Harbor Appeal:

63.5.1.    "Thereafter, on September 20, 2008, the parties executed a clarification letter to further clarify their intentions as to the Original APA ("Clarification Letter").  The Original APA, First Amendment, and Clarification Letter collectively constitute the APA." M. 405 at p. 9.

63.5.2.    "LBHI gave notice of the filing of the APA that was approved by the Sale Order, which attached the APA, including the Clarification Letter, and notified parties that the Sale had been consummated. The securities and trading positions that were transferred to Barclays under the APA are set forth in Schedules A and B to the Clarification Letter." M. 405 at p. 16.

63.6.    After the Closing, the Trustee authorized the transfer of the ETD margin to Barclays in accordance with the Clarification Letter.  9/8/10 Tr. at 127:21-135:21 (Raisler); 8/30/10 Tr. at 51:20-52:13 (James).

63.7.    On September 26, 2008, the Trustee transferred over 72,000 customer accounts to Barclays pursuant to § 8 of the Clarification Letter:

63.7.1.    While there was an understanding that Barclays would acquire certain customer accounts in the Sale, thereby protecting customers, the APA did not contain any provision that explicitly provided for the transfer of any customer accounts, and therefore additional documentation was required to provide for that.  BCI Ex. 1.

63.7.2.    Section 8 of the Clarification Letter provided for the transfer of customer accounts and customer property to Barclays.

63.7.3.    Pursuant to § 8 of the Clarification Letter, on September 26, 2008, the Trustee transferred over 72,000 Private Investment Management (PIM) customer accounts to Barclays. BCI Ex. 42 at ¶ 18.

63.7.4.    In June 2009, the Trustee's First Interim Report stated that:

> "Seamlessly, as far as virtually all PIM customers were concerned, the LBI account holders became Barclays account holders, and all assets from their PIM accounts appeared on their Barclays account statements. Again, consistent with the orders of the District Court and this Court, the Trustee's exercise of statutory authority provided immediate account access, avoided disruption of trading, preserved account value, and relieved the LBI Estate of the administrative burden of handling the possible tens of thousands of claims." BCI Ex. 42 at ¶ 18.

> "The Trustee's significant and unprecedented efforts in executing the PIM account transfers pursuant to the sale of LBI's brokerage business to Barclays were instrumental in protecting customers and preserving customer value in uncertain times." BCI Ex. 42 at ¶ 20.

63.8.    The Trustee authorized post-closing transfers of Clearance Box assets pursuant to the terms of the Clarification Letter:

63.8.1.    On September 26, 2008, the Trustee authorized a post-closing transfer of Clearance Box assets marked at approximately $269 million.  BCI Ex. 375.

63.8.2.    On September 29, 2008, the Trustee authorized a post-closing transfer of Clearance Box assets marked at $161 million.  BCI Ex. 675.

63.9.    After the Closing, the Debtor worked to develop Schedules A and B to the Clarification Letter, and filed those schedules in Court.

63.9.1.    After the Closing, the Debtor and Weil Gotshal worked to develop Schedules A and B to the Clarification Letter.  BCI Exs. 743, 744, 749-753, 755, 757; see BCI Ex. 302.

63.9.2.   On September 29, 2008, LBHI filed a motion stating that the Clarification Letter "clarifies the intention of the Parties with respect to certain provisions of the Purchase Agreement, amends the Purchase Agreement in certain respects, and is binding on the Parties.  As more fully described in the Clarifying Letter, the Schedules contain lists of securities and trading positions transferred under the Purchase Agreement."  BCI Ex. 19 at p. 3; *see* BCI Exs. 742-744, 749, 754, 755.

63.10.  On October 2, 2008, the Trustee successfully opposed a TRO by arguing that the Clarification Letter provided for all Repo Collateral to be transferred to Barclays:

63.10.1.   On September 26, 2008, Friedman, Billings, Ramsey Group (FBR) filed a complaint and emergency motion seeking to compel the Trustee to transfer certain securities to FBR.  *See* BCI Ex. 803 (10/12/08 Tr.) at 59:15-60:1.

63.10.2.   On October 2, 2008, the Trustee opposed FBR's complaint and motion to compel, explaining:

63.10.2.1   Paragraph 13 of the Clarification Letter  provides that the "body of property" that was part of the Barclays repurchase agreement were Purchased Assets.  BCI Ex. 803 (10/12/08 Tr.) at 71:13-72:9 (Wiltenburg).

63.10.2.2   "Our information is that that defined event, that is, the Barclays repurchase agreement, included a body of property and then, pursuant to the September 20th agreement, those same securities were deemed to be purchased assets within the meaning of the asset purchase agreement." BCI Ex. 803 (10/12/08 Tr.) at 72:3-9 (Wiltenburg).

63.11.  Based on an express provision of the Clarification Letter, in an October 16, 2008 "state of the estate" presentation, Harvey Miller told the Court that "as part of the Barclays closing, because Barclays was taking the customer accounts, they got the 700 odd million dollars in securities."  BCI Ex. 485 (10/16/08 Tr.) at 58:9-13.

63.11.1.   Six Committee attorneys, three Trustee attorneys, and the Trustee himself attended the hearing, but none of them disagreed with Miller's statement.  BCI Ex. 485 (10/16/08 Tr.) at 7:15-23, 8:10-20, 21:2-8, 58:9-13.

63.12.  In December 2008, the Trustee repeatedly cited and relied upon the Clarification Letter in seeking approval for the December Settlement:

63.12.1.   "The Clarification Letter provided that the Replacement Transaction was terminated, and that the securities that had actually been delivered were 'deemed to constitute part of the Purchased Assets' under the Purchase Agreement." BCI Ex. 29 at ¶ 16.

63.12.2.　"At the time of the purchase agreement, Barclays had loaned LBI forty-five billion dollars. And Barclays was to receive securities valued at over forty-nine billion dollars to cancel the loan. Under the purchase agreement approved by Your Honor, that party became a significant part of what Barclays obtained under the agreement, the agreement that this Court approved and that allowed tens of thousands of customer accounts to be transferred." BCI Ex. 50 (12/22/08 Tr.) at 19:12-20:10 (Kobak).

63.12.3.　"And again, I just want to make it clear that what this settlement really accomplishes is completing the very transaction contemplated in the purchase agreement as approved by this Court." BCI Ex. 50 (12/22/08 Tr.) at 23:21-24 (Kobak).

63.12.4.　The Clarification Letter was referred to a total of 23 times in support of the December Settlement:  seven times in the Trustee's motion for approval (BCI Ex. 29), four times in the Leventhal declaration (BCI Ex. 30), five times in the LaRocca declaration (BCI Ex. 31), and seven times during the December 22, 2008 hearing (BCI Ex. 50).

63.12.5.　Despite that express reliance on the Clarification Letter and all of those references to the Clarification Letter, no Movant ever suggested that the Clarification Letter was not approved or not binding on the parties.  See generally Trial Tr.; LBHI Br., Trustee Br., Committee Br., LBHI Reply Br., Trustee Reply Br., Committee Reply Br., M. 124; M. 350; M. 351; BCI Ex. 871.

63.13.　On August 6, 2009, after seeking and obtaining Rule 2004 Discovery, the Trustee expressly stipulated that the Clarification Letter was part of the approved Purchase Agreement:

63.13.1.　"On September 20, 2008, the Court entered the sale order (the 'Sale Order') approving the Asset Purchase Agreement, as modified, clarified, and/or amended by the First Amendment To Asset Purchase Agreement, dated September 19, 2008, and a letter agreement, dated as of September 20, 2008, clarifying and supplementing the Asset Purchase Agreement." BCI Ex. 377 at p. 2.

63.14.　The Trustee has admitted that the Sale Order authorized the Clarification Letter prospectively:  "The Trustee also does not assert that the Clarification Letter was unauthorized as a result of having been finalized after the Court issued the Sale Order." Trustee Reply Br. at ¶ 187; *see Id.* at ¶¶ 185, 200.

63.15.　Barclays acted in reliance on and pursuant to the terms of the Purchase Agreement, including the Clarification Letter, in undertaking significant actions that it would not have undertaken if it had been told that the Purchase Agreement and Sale Order were not final, and were going to be modified to Barclays' detriment:

63.15.1.  Barclays accepted to Close based on the terms of the Clarification Letter. BCI Ex. 5.

63.15.2.  Barclays accepted the transfer of approximately 72,000 customer accounts even though it had to wait over a year for the Trustee to deliver all of the customer property associated with those accounts, while in the interim Barclays made every effort to protect those customers and the solvency of their accounts. *See* FOF ¶ 1.

63.15.3.  Barclays offered employment, made bonus payments, and provided severance protection to approximately 10,000 employees.  BCI Ex. 49 (9/19/08 Tr.) at 60:19-61:13, 98:10-12, 101:18-102:2, 144:18-145:4.

63.15.4.  Barclays paid the Cash Amount of $1.54 billion.  BCI Ex. 49 (9/19/08 Tr.) at 48:16-23; BCI Ex. 5 (Clarification Letter) at ¶ 4.

63.15.5.  Barclays continued to provide debtor-in-possession financing.  BCI Ex. 48 (9/17/08 Tr.) at 70:20-23.

63.15.6.  Barclays assumed contracts and made related cure payments.  BCI Ex. 1 (APA) at § 2.5.

63.15.7.  Barclays fully integrated Lehman's North American operations into its existing operations — an enormous and costly undertaking.  6/21/10 Tr. at 231:16-232:5.

63.15.8.  Barclays finalized its acquisition accounting, and filed its Acquisition Balance Sheet as part of its publicly filed financial statements, based upon the finality and validity of the Purchase Agreement and Sale Order.  BCI Ex. 134.

63.16.  What the Movants argued just months after the Closing in the course of opposing Bay Harbor's appeal — that the transaction had been fully consummated and that it would be impossible to unscramble the eggs — was even more true when Movants filed their Rule 60 Motions nearly a year after the Closing and is even more true today, more than two years after the Closing.

### xvi. **Additional Facts Showing That Movants' Claims Lack Credibility, That Movants Concealed Their Understanding Of The Information Relating To The Sale And Their Intent To Bring Claims, And That Movants Have Relied On A Misleading Or Distorted Version Of Words And Phrases In Presenting Their Case.**

**64.    For A Full Year After Agreeing To The Clarification Letter, Movants Never Once Claimed That The Clarification Letter Was Not Approved By The Sale Order.**

64.1.    After the Lehman Movants signed and filed the Clarification Letter with the Court, Movants repeatedly invoked and relied upon the Clarification Letter and never once asserted that the Clarification Letter had not been approved prospectively by the Sale Order.  *See* FOF ¶ 63.

64.2.    It was not August of 2009, after the Court made a comment about whether it had approved the Clarification Letter in an unrelated proceeding, that the Movants took the position that the terms of the Clarification Letter were not approved and that they were inconsistent with the deal that was described to the Court.  M.127 at 107:12-21.

64.3.    At no point before September 15, 2009, when Movants filed their Rule 60 Motions, did Movants assert that they believed the terms of the Clarification Letter were not approved prospectively by the Sale Order.

64.3.1.    For example, in their Rule 2004 motion papers, Movants did not mention that they believed the Clarification Letter had not been approved.  M. 124; M. 350; M. 351; BCI Ex. 871.

64.3.2.    It was not until September 15, 2009, when Movants filed their Rule 60(b) Motion, that they sought to strike "the Sale Order's reference to the so-called Clarification Letter, which was not before the Court, and in fact not even completed, when the Sale Order was signed, and which purported to effect substantial and material amendments to the transaction the Court had previously approved."  LBHI Br. at p. 2; *see id.* at ¶¶ 3, 87, 118-122, 148; Trustee Br. at ¶¶ 4, 10, 46-49.

**65.    Movants Concealed From Barclays And The Court Their Understanding Of The Information On Which They Have Based Their Claims, And Their Intent To Bring Those Claims.**

65.1.    The evidence at trial demonstrated that Movants understood the issues and information upon which they base their Rule 60 motions as of the Closing, as of the time to seek reconsideration, and throughout the appeal period.  *See* FOF ¶¶ 46-52.

> 65.1.1.    At no point during the appeal period did Movants:
>
> > 65.1.1.1    assert that the Clarification Letter was not prospectively approved by the Court;
> >
> > 65.1.1.2    assert that there was a valuation cap in the deal;
> >
> > 65.1.1.3    assert that the Lehman employees were "in cahoots" with Barclays, BCI Ex. 814;
> >
> > 65.1.1.4    disclose that they believed the securities on Schedule A were worth "billions more" than what the Court was told, BCI Ex. 389;
> >
> > 65.1.1.5    disclose their belief that there was a secret "$5 billion discount," or "haircut" or "mismatch," *see* BCI Exs. 813a, 814; *see also* O'Donnell Dep. Tr. at 141:13-25.

65.2.    Through the appeal period, despite numerous opportunities to do so, Movants never disclosed to Barclays or the Court their knowledge of the issues and information upon which they base their Rule 60 motions.

> 65.2.1.    Movants had an opportunity to raise these issues with the Court any time after the September 22, 2008 Closing, but did not do so.
>
> 65.2.2.    Movants had the opportunity to raise those issues with the Court at the December 22, 2008 Settlement Hearing, but did not do so.  BCI Ex. 50.
>
> 65.2.3.    The Committee had the opportunity to raise its concerns at the February 3, 2009 meeting with Barclays, but did not do so.  8/25/10 Tr. at 85:24-87:12 (King).
>
> 65.2.4.    On February 19, 2009, Mr. Marsal wrote to Barclays seeking information on cure and comp liabilities but did not argue that the deal was required to be a "wash" or subject to a $47.4 billion "cap."  BCI Ex. 161.
>
> 65.2.5.    Movants also had the opportunity to raise the issues with the Court or with Barclays in its Rule 2004 motion papers or arguments, but did not do so.  M. 445; M. 124; M. 350; M. 351; BCI Ex. 871.

65.3.    When Movants sought Rule 2004 discovery in May 2009, they denied that they planned a "wholesale attack" on the Sale Order:

> "Contrary to Barclays' suggestions, this is not a 'wholesale attack' on the Sale Transaction.  LBHI has not formulated 'potential claims' against Barclays. Nor is it seeking to retrade the deal. Rather, LBHI is asking for discovery to find out exactly what happened during the short, tumultuous, period of time at issue."

> BCI Ex. 871 at ¶ 1.

65.3.1.    Movants did not raise the concept of a Rule 60(b) motion in their Rule 2004 motions filed on May 18, 2009. M. 124.

65.3.2.    Movants first raised the prospect of a Rule 60 Motion in response to the Court's questions at the June 24, 2009 hearing on the 2004 discovery motion, after the Second Circuit had already issued the final mandate denying an appeal of the Sale Order:

> "I think I have an opportunity to come back under Rule 60 and revisit the sale order at that point on the grounds of mistake.  Should a smoking gun indicate grounds of misrepresentation or fraud, I also have that opportunity.  And Rule 60 also allows the Court to give relief from the order for any other reason that justifies relief."

> M. 445 at 38:24-39:5 (Gaffey).

65.3.3.    Movants produced no "smoking gun," but instead have relied upon *as their principal evidence the very same emails* that they had before the Rule 2004 discovery, and that the Debtor had attached to its reply brief in support of Rule 2004 discovery.  *See* BCI Ex. 871 at ¶¶ 8, 17 & n.7, 18, Exs. 1, 5, 9; LBHI Br. at ¶¶ 22, 25, 98.

65.4.    In their Rule 60 submissions, Movants affirmatively misrepresented and concealed their pre-closing knowledge of the information and issues upon which they base their Rule 60 Motions.

65.4.1.    Contrary to LBHI's assertion, there is no "new evidence" that the estimates of Barclays exposure for the Cure and Comp liabilities were higher than Lehman's accruals — this was known to Weil Gotshal, Lazard and Alvarez before the Sale Hearing.  LBHI Br. at ¶ 67.

65.4.1.1    Weil Gotshal, Lazard, and Alvarez & Marsal all received provisional LBI balance sheets on September 18 and 19 showing the "transaction adjustments" increasing the estimated accruals relating to "Compensation Payable" and "Trade Liabilities." BCI Exs. 207, 209, 212.

65.4.1.2    LBHI originally featured these "transaction adjustments" as evidence that the Cure and Comp estimates were secretly inflated — ignoring the fact that its own advisors received these documents before the Sale Hearing. LBHI Br. at ¶¶ 59, 67.

65.4.2.    In its Rule 60(b) submissions, the Committee stated that during the weekend before the Closing, "no mention of the negotiated $5 billion discount was made (either to the Committee or in the Clarification Letter)…." Committee Reply Br. at ¶ 206.

65.4.2.1    Committee documents that were withheld until this Court's April 28, 2010 Order reveal that, before the Closing, Committee advisors knew of the $5 billion difference between the marks on the Repo Collateral and the parties' estimated value for those securities:

> "The night of the close of the transaction we told Lehman/Weil that the pieces of transaction that were being described to us added up to $52-53 billion rather than the approximately $47 billion that had been described in court the Friday before. A few hours after we raised the issue, Lehman came and got us and sat down to try and show us how things added up. We were told that some of the marks shown on Schedule A were 'out of date' and that the parties (Lehman and Barclays) *had agreed to a $5 billion discount* as the appropriate 'mark to market' adjustment for the securities."

> BCI Ex. 813a (emphasis added).

65.5.    At least as early as April 2009, the LBHI Estate was secretly planning to raise claims against Barclays.

65.5.1.    In April 2009 the Estate made offers to repurchase the Pine CLO — one of the most illiquid assets Barclays acquired from Lehman — at prices over one hundred million dollars below what Movants' expert contends it was worth. BCI Ex. 1006.

65.5.2.    In attempting to exclude evidence of those April 2009 offers, the Estate's special counsel asserted that there was an agreement in April 2009 that, "[n]o mention was to be made of this in the litigation." 10/6/10 Tr. at 133:4-8 (Tambe).

65.5.3.    But in April 2009 there was no litigation. BCI Ex. 380 at p. 1.

65.5.4.    Several months later, in June 2009, the Estate asserted that it needed Rule 2004 discovery to investigate whether it had any potential claims against

Barclays and expressly denied any present intention to raise claims against Barclays.  6/24/09 Tr. at 36:10-16, 40:23-41:3 (Gaffey).

65.5.5.    The Estate never told Barclays or the Court in April 2009 that the Estate anticipated this or any similar litigation.  BCI Ex. 871 at p. 1.

65.6.    By the time Movants filed their Rule 2004 and Rule 60 briefs, the markets had recovered.

65.6.1.    For example, after falling from approximately 1,250 on September 22, 2008 to less than 900 in December 2008, the daily total return on the S&P/LSTA Leveraged Loan 100 Index came back to above 1,200 at the end of May 2009. BCI Ex. 1076 (demonstrative summarizing BCI Exs. 929, 991).

**66.    Movants Have Relied Upon A Distorted Or Misleading Use Of Various Words And Phrases.**

66.1.    The evidence at trial proved that the word "discount" can be used in multiple ways, and the Movants deliberately tried to use the word to distort the facts rather than to present the truth.

   66.1.1.    The word "discount" has different meanings depending on context and can be used in ways that do *not* reflect or imply price that is less than fair market value (i.e., what a willing buyer would pay to acquire the assets in question). 10/6/10 Tr. at 82:4-83:11 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 25.)

   66.1.2.    The word "discount" could be used to describe an "adjustment" or "reduction" from stale or inflated prices, in an effort to bring them up to date and make them more accurate:

      66.1.2.1    That is not a "discount" in the strict economic sense because it is not seeking to arrive at a value that is less than fair market value. 10/6/10 Tr. at 82:4-83:11 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 25.)

      66.1.2.2    Nevertheless, economists sometimes speak of taking a "discount" from a value that exceeds fair market value. 10/6/10 Tr. at 82:4-83:11 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 25.)

   66.1.3.    The word "discount" could be used to describe paying a price for a large portfolio of securities that is less than the aggregate amount of what the accounting rules require the assets in that portfolio to be booked at (i.e., the "P*Q" accounting concept for determining mark to market values for a large portfolio of assets. 10/6/10 Tr. at 82:4-83:11 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 25); 9/21/10 Tr. at 105:3-17 (Garvey).

      66.1.3.1    Accountants may describe this as a "block discount" or "bulk discount." 10/6/10 Tr. at 81:11-83:11 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 25); 9/21/10 Tr. at 105:3-17 (Garvey).

      66.1.3.2    However, if no other buyer is willing to pay more for the entire portfolio of assets, then this is also not a discount from fair market value as matter of economic and market reality (FMV$_{EMR}$). 10/6/10 Tr. at 82:4-83:11 (Pfleiderer); Pfleiderer Demonstrative 23, 25.

   66.1.4.    The word "discount" could be used to describe providing one buyer a lower price than could be received from another buyer. 10/6/10 Tr. at 82:4-83:11 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 25.)

66.1.4.1    That is a true discount in the economic sense.  10/6/10 Tr. at 82:4-83:11 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 25.)

66.1.4.2    For an economist to find that such a discount has been provided, there must be evidence that another buyer existed who would have paid more.  10/6/10 Tr. at 82:4-83:11 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstrative 25).

66.1.4.3    The unrebutted testimony from Professor Pfleiderer established that the Sale Transaction did not involve a true economic discount:

> "Q.    Based on all of your analysis and we're going to talk about the repo collateral shortly, and the evaluation of it. Based on all your analysis of the economics of this transaction, do you believe that this transaction involved a discount in that final truest, strictest sense of Barclays getting a price that was less than what another buyer would be willing to pay?
>
> A.    Absolutely not.  I certainly have seen nothing that would indicate there was some other buyer that was willing to pay any more.
>
> …
>
> Q.    So taking all of that into account, is there any evidence, again in your professional opinion as a financial economist, that Barclays received a discount in this transaction in the strict economic sense of receiving a price less than what someone else would pay, whether in a single transaction or in multiple transactions in a liquidation?
>
> A    Absolutely not.  There's no evidence of that that I've seen."

> 10/6/10 Tr. at 84:16-25, 85:22-86:4 (Pfleiderer).

66.1.5.    In asking questions and presenting argument, the Movants deliberately avoided ever giving precise definitions for the term discount.

66.2.    The trial proved that, especially in the context of the acquisition of a broker-dealer business and the portfolio of financial assets, the phrase "fair market value" can have different meanings, and the Movants tried to use the phrase to distort the facts rather than to present the truth.

66.2.1.   The term "fair market value" refers to the amount at which an asset or group of assets can be sold to a willing buyer at a given point in time.  9/2/10 Tr. at 60:12-17 (Romain).

66.2.2.   The term "fair market value" under the accounting rules refers to a concept that may be summarized by the formula "P times Q," with P being the exit price per security and Q reflecting the quantity of those securities.  9/21/10 Tr. at 100:12-101:16 (Garvey); BCI Ex. 1002a at pp. 70-73.

66.2.3.   The term "fair market value" from an economic perspective may take into account the block size of particular position (such as if a portfolio includes so many positions in a particular security that it has more than the daily trading volume in that position, making it impossible to sell all of those securities in a short amount of time without dramatically depressing the market price), or the bulk size of an overall portfolio, which simply because of its overall size, is impossible to sell in a short amount of time:  these characteristics of a financial portfolio may impact what a willing buyer would pay to buy an entire portfolio of securities.  9/21/10 Tr. at 99:12-100:8, 103:20-104:1 (Garvey); 9/2/10 Tr. at 62:3-16 (Romain); 10/6/10 Tr. at 79:22-80:16 (Pfleiderer); BCI Ex. 1002A, 1103a (Pfleiderer Demonstrative 23).

66.2.4.   The accounting rules do not allow one to take into account the size of a portfolio, or the volume of positions acquired for a particular position within that portfolio, to establish its fair market value, and therefore the values of a portfolio under the accounting rules may in that sense "deviate from the economic reality."  10/6/10 Tr. at 80:11-16, 19:24-20:10, 71:21-72:3, 75:6-14, 74:17-75:4, 76:24-77:3, (Pfleiderer); 9/2/10 Tr. at 62:3-16 (Romain); 9/21/10 Tr. at 56:13-21, 97:19-98:10, 116:22-117:7  (Garvey); BCI Exs. 1002a at pp. 70-73, BCI Ex. 1103a (Pfleiderer Demonstrative 24).

66.2.5.   In asking questions and presenting argument, the Movants deliberately avoided ever giving precise definitions for the term fair market value.

66.3.   The trial proved that the phrase "liquidation value" can be used in multiple ways, and the Movants tried to use the phrase to distort the facts rather than to present the truth.

66.3.1.   The term "liquidation value" can have different meanings:  as used by traders, it does *not* imply a fire sale liquidation or the type of liquidation that would have occurred to the LBI Business and all of its assets had there not been a Sale to Barclays; rather, it refers to the fair market value of the assets, measured in terms of a reasonable estimate of what can be realized for those assets in an orderly sale (or liquidation) process.  5/3/10 Tr. at 152:15-25, 158:12-21 (Seery); 10/4/10 Tr. at 106:20-107:24 (Olvany); 10/6/10 Tr. at 185:18-17 (Pfleiderer); 10/7/10 at 185:18-186:19 (Pfleiderer).

66.3.1.1   Professor Pfleiderer testified:

> Q.      Do you, as a financial economist, believe the phrase liquidation value can be meant and understood in different ways?
>
> A.      Indeed, yes.
>
> Q.      What are those different ways?
>
> A.      Well, I've seen the term used by traders to simply mean what you sell it for.  And so that would be, just again, the exit price that you would get, and then of course, we have liquidation value used perhaps in the context of a Chapter 7 bankruptcy, where you're liquidating something in a situation that's quite different than what you're selling a security in active markets.  So you do need to be careful, and I probably should've been careful interpreting what Mr. Tambe was saying, because liquidation can mean various things in various contexts.
>
> 10/7/10 Tr. at 186:7-21 (Pfleiderer).

66.3.1.2    Movants' expert, John Olvany, understood "liquidation value" to mean what a willing buyer would pay for the securities if they were sold.  10/4/10 Tr. at 108:21-109:2 (Olvany).

66.3.1.3    Jim Seery testified unequivocally that he did not perform a fire sale liquidation analysis or an analysis of what any of the LBI securities would sell for in a scenario of an LBI liquidation with no sale, and made clear the distinction between the term "liquidation value" when used by traders, as opposed to the way it is sometimes used in a bankruptcy context:

> "It included a sale of all of the securities and all of the other assets and what they would have looked like. We didn't do a liquidation value in the term, the way the term is normally used in bankruptcy court, where you have a liquidation analysis that goes along with a disclosure statement.  We really tried to look at, you know, what the securities were worth versus what our marks were.
>
> …
>
> "I don't know if I used the term liquidation bid.  In our parlance, on Wall Street, when you sell something, you're liquidating it.  So how much

269

would it take to liquidate that position, to sell that
position.  Again, in bankruptcy, liquidation
sometimes has a different connotation."

5/3/10 Tr. at 143:24-144:5, 152:17-23 (Seery).

"We were trying to come up with best estimates. In
these kinds of markets, the analysis that we were
doing very, very quickly was how much could you
get if you sold your positions in the market over the
next couple of days.  It assumed that those traders
were at their desks, at work, getting paid, selling the
positions into the market.  We didn't ask them to
assume that there was financial Armageddon,
meltdown, whatever the terms Mr. Ridings has used
throughout his deposition.  We didn't seek that out,
nor did we provide that kind of information to him.
I don't know that you could have."

5/4/10 Tr. at 22:16-23:1 (Seery)

66.3.2.    In asking questions and presenting argument, the Movants deliberately
avoided ever giving precise definitions for the term "liquidation value."

**67.    The Trial Evidence Proved That Movants Distorted A Series Of Facts And Documents To Try To Fit Their Various Conspiracy Theories And Allegations Of Wrongdoing.**

67.1.    The Movants falsely claimed that Barclays and a group of Lehman executives agreed upon a secret $5 billion discount.  This claim was based upon a series of distortions and falsehoods.

    67.1.1.    The Movants falsely claimed that Barclays and a group of Lehman executives deliberately understated the "book value" of the Long Positions in the APA as "approximately $70 billion" as of September 16, 2008 — which Movants falsely claimed was $5 billion higher than that amount.

        67.1.1.1    In fact, the "book value" of the Long Positions was *less* that $70 billion as of September 16, 2008 (and all other days from September 12-19, 2008).  BCI Ex. 1103a (Pfleiderer Demonstrative 11 — summarizing BCI Exs. 501, 502, 667-670, 808); 10/6/10 Tr. at 47:23-48:13 (Pfleiderer).

    67.1.2.    The Movants distorted the meaning of the internal Lehman emails of Lehman Product Controller Gerry Reilly, now deceased, and which referred to his "understanding" that the Sale involved Barclays acquiring the Lehman trading assets at a "fixed discount" to reflect the "bulk size" of the purchase.

        67.1.2.1    Movants' own accounting expert, Mr. Garvey, admitted at trial that the way the Sale was *publicly described* — as the acquisition of a business with trading assets of $72 billion and trading liabilities of $68 billion for consideration of $250 million — could easily be understood by an accountant to be a deal that involved a "bulk discount," even if in fact the negotiators themselves never used the term or the concept of "bulk discount" in the negotiations.  9/21/10 Tr. at 104:7-106:5 (Garvey).

        67.1.2.2    Movants' own accounting expert, Mr. Garvey, also admitted that the "fair market value" of a portfolio of securities may well be less than the "fair market value" of those securities under the accounting rules, because the accounting rules do not permit certain economic realities to be taken into account.  9/21/10 Tr. at 116:5-117:7 (Garvey).

        67.1.2.3    The unrebutted expert testimony of Professor Pfleiderer further confirmed that the word "discount" could be used in many different ways that do *not* indicate a price that is less than what a willing buyer would pay for the assets.  10/6/10 Tr. at 82:1-83:11 (Pfleiderer); BCI Ex. 1103a (Demonstrative 25).

67.1.2.4    The unrebutted testimony of Professor Pfleiderer also confirmed that the consideration Barclays provided in the Sale was *more* than any other buyer would pay, and *more* than would have been generated by the Estates in a liquidation of the LBI business, and therefore was *not* a discount in the true economic sense of the word — i.e., it was *not* less than any other willing buyer would pay for the Purchased Assets. BCI Ex. 341 at ¶¶ 128, 129, 134; 10/6/10 Tr. at 208:12-24 (Pfleiderer).

67.1.2.4.1    None of the Movants experts challenged this conclusion of Professor Pfleiderer.

67.1.2.5    In any event, the Reilly email referring to a "fixed discount" to reflect the "bulk size" of the purchase was *not secret*: it was sent to the Debtor's chief outside financial advisor, Lazard. BCI Ex. 196.

67.1.2.6    Lazard's Director, Mr. Arthur Bruhmuller, received the Reilly email referencing a "fixed discount" on September 17, and explained: "We are trying to get a sense for how marks have evolved since Friday. I think the first priority would be to see the inventory of what's being sold, how the marks have evolved and info on the buyer discount." BCI Ex. 196.

67.1.2.7    In addition, Movants had access to all of Reilly's emails long before the Rule 2004 discovery, as evidenced by the fact that they attached the emails to their reply brief in support of their motion for Rule 2004 discovery. BCI Ex. 871 at Exhibits 5, 9..

67.1.3.    The Movants falsely claim that a Martin Kelly email from the morning of September 16 that references a "$5 billion loss versus our marks" reveals the existence of a secret discount. M. 7.

67.1.3.1    The unrebutted testimony of Professor Pfleiderer explained that the reference to a $5 billion loss in Mr. Kelly's email is consistent with information that was publicly disclosed at the time of the Sale. 10/6/10 Tr. at 63:21-66:20 (Pfleiderer); BCI Ex. 1103a (Pfleiderer Demonstratives 20-22).

67.1.3.2    The unrebutted testimony of Professor Pfleiderer also explained that Mr. Kelly's notes confirm his view that the "$5 billion loss versus our marks" refers instead to a "loss" that is similar to the publicly announced buffer, calculated by including all mortgages at Lehman's marks, and does not reflect a secret mark down on the Long Positions. 10/6/10 Tr. at 63:21-66:20 (Pfleiderer); BCI Ex 1103a (Demonstrative 21); *see also* BCI Ex. 417 at 115169.

67.1.3.3    The concept that Lehman might be selling the Business and its portfolio of securities at a loss versus September 12 marks (or any marks) during the week of September 15, 2008 was *not* a secret:  (a) the worldwide press reported that the deal involved a $4 billion buffer,  BCI Exs. 111, 115, 796, 797, 798; (b) by no later than October 6, 2008, Alvarez & Marsal was calculating that the Sale resulted in an estimated loss of $3.27 billion *even if* Barclays had to pay the full amount of the "potential exposure" for cure based on the initial estimate of $2.25 billion.  BCI Ex. 332.

67.1.4.    The Movants falsely assert that a document in the files of Barclays Chairman John Varley confirms their "secret" discount theory.

67.1.4.1    John Varley explained at trial that the reference to a "discount" in the document in his files was consistent with what he publicly announced to the world on September 17, two days before the Sale Hearing.

67.1.4.2    First, Barclays needed to ensure that assets were properly marked to market.  6/22/10 Tr. at 116:4-10 (Varley); M. 16 at p. 15 (discussing marking mortgages down).

67.1.4.3    Second, Barclays needed to ensure there was a "buffer" that would ensure positive capital accretion.  6/22/10 Tr. at 116:4-10 (Varley); M. 16.

67.1.4.4    Barclays was open and transparent about this process before the Sale Hearing; the buffer was neither a discount in the true economic sense of the word (though some might call it that), nor was it secret.

67.1.4.5    In any event, the document from Mr. Varley's files shows that Barclays planned to record the original long positions on its own books at *less than* $70 billion — i.e., at an amount lower than Lehman's book values, so as to reflect their accurate fair market values after taking the "discount" from the stale and inflated Lehman values.  M. 12 at 166340; 6/22/10 Tr. at 110:12-23, 111:7-19 (Varley).

67.1.5.    The Movants falsely assert that an email by a Barclays tax professional confirms their secret discount theory.

67.1.5.1    A September 18, 2008 email from Beatrice Montaudy, an employee in Barclays' Group Tax department, refers to "the 'discount' between the value of the assets acquired and the purchase price."  M. 31.

67.1.5.2   The evidence shows that the word "discount" in this email matches up precisely with, and is identical to, the publicly announced "buffer" between trading assets and trading liabilities.

67.1.5.3   Ms. Montaudy refers to a $2.5 billion discount on the equities, which corresponds precisely to the difference between the "long" value of the trading assets in the equities category (which was $8.8 billion) and the "short" value of the trading liabilities in the equities category (which was $6.3 billion). *Compare* M. 31 *with* M. 2.

67.1.5.4   Thus, the used of the word "discount" by Ms. Montaudy reflects nothing more than a technical tax analysis of the "buffer" in the Sale Transaction that was publicly described in the Barclays investor teleconference and in the worldwide financial press. *See* BCI Exs. 111, 115, 796, 797, 798.

67.1.5.5   There is no evidence that there was anything secret about the concept reflected in Ms. Montaudy's email.

67.1.5.6   There is no evidence that the tax discussion involving the word "discount" in Ms. Montaudy's email was ultimately even applicable to the Sale, given the change in values of the assets available to transfer before the Closing.

67.2.   Movants falsely assert that Barclays a group of Lehman executives conspired to use the Repo to deliver the secret discount to Barclays.

67.2.1.   The Movants rely upon an email from deceased former Lehman Product Controller Gerry Reilly, which refers to the operational difficulties in the transaction, and queries whether the easiest way to deliver assets to Barclays would be by defaulting on the repo.  M. 29.

67.2.2.   The Movants likewise rely upon a series of emails among Lehman finance professionals during the week of September 15, 2008 in which they are struggling to determine how to mark the assets that would be delivered to Barclays.  M. 21, M. 25.

67.2.3.   The emails upon which Movants rely refer simply to the internal *operational problems* Lehman's finance department was having in delivering securities: i.e., determining which securities to deliver, at what marks, and how to ensure that the "buffer" that was clear from the face of the original APA (and was publicly disclosed) would be preserved (as Barclays had publicly announced it would).  4/29/10 Tr. at 102:18-25; 105:6-106:14; 173:25-177:6 (Lowitt); M. 263.

67.2.4.    The internal emails among the Lehman finance professionals were all available to Movants long before the Rule 2004 discovery, as evidence by the fact that they were attached to the Debtor's reply brief in support of its motion Rule 2004 discovery.  *See* BCI Ex. 871 at Exhibits 5, 9.

67.2.5.    The unrebutted testimony of Barclays CFO Ian Lowitt is that Barclays did not ever mark the assets on Lehman's books.  4/29/10 Tr. at 162:10-17 (Lowitt).

67.2.6.    The unrebutted testimony of Shari Leventhal of the New York Fed is that the Fed "required" Barclays to take over its repo with LBI.  9/7/10 Tr. at 8:24-9:2 (Leventhal).

67.2.7.    The uncontroverted evidence confirms that Weil Gotshal understood that if the Sale was approved, then all of the collateral in the Repo transaction would become part of the Purchased Assets to be acquired by Barclays.

    67.2.7.1    The plain terms of the Clarification Letter, which were drafted and approved by Weil Gotshal, provides that Barclays would acquire all of the Repo Collateral as Purchased Assets.  BCI Ex. 5 (Clarification Letter) at ¶¶ 1(a)(ii)(A), 13.

    67.2.7.2    Prior to the Sale Hearing, on September 17, 2008, Scott Lechner, a Lehman lawyer, had already written Weil lawyers rejecting any such possibility:  "Question is how to unwind the repo if a deal gets done in a manner that protects Barclays. E.g. *how do they actually purchase the assets*. One idea would have been on Friday when LBI goes into receivership that Barclays take the assets as a foreclosing lender. I would have thought better approach was to *include the assets they are purchasing in the purchase agreement that is approved by the bankruptcy court and SIPIA*." [sic]).  BCI Ex. 193 (emphasis added).

    67.2.7.3    On September 24, 2008, Marie Stewart, Global Head of Accounting Policy at LBI, wrote to Lehman lawyer Emma Bailey that "I spoke to David Murgio of Weil re the Barclays Repurchase Agreement and got his view on how it works (*which is we sold assets and Repo is terminated and there are no settle-up payments to be made*)."  BCI Ex. 301a (emphasis added).

    67.2.7.4    During his deposition as a 30(b)(6) representative for Weil Gotshal, Harvey Miller was shown the Marie Stewart email in which she reports that Weil Gotshal lawyer had stated that "we sold assets and Repo is terminated and there are no settle-up payments to be made" and Miller testified that there was "*Never going to be a true-up*."  Miller Dep. Tr. at 106:23-107:6, 107:20-22 (emphasis added).

67.2.7.5    Harvey Miller also testified that "it developed over that weekend as to how the repo was resolved, and as I testified before, essentially, it was, in effect, terminated." Miller Dep. Tr. at 106:23-107:6, 107:20-22.

67.3.    The Movants falsely claim that after the Closing, Barclays took additional steps to hide the value of the assets it received.

67.3.1.    Movants falsely suggest that Barclays secretly reverse-engineered its independent valuations of the assets delivered in the Repo Collateral to arrive at a valuation of approximately $45.5 billion, to be consistent with the alleged "liquidation value" (which Movants falsely characterize as a fire sale value) generated by Jim Seery before the Closing. 10/21/10 Tr. at 49:1-52:4 (Closing Argument).

67.3.1.1    The unrebutted testimony of Gary Romain is that Barclays did not value the assets in the Repo Collateral separately from other assets, or attempt to target a specific valuation outcome of any number, including the $45.5 billion number shown on the document from Jim Seery's files (a document Romain had never seen before). M. 47; 9/2/10 Tr. at 16:24-18:2, 38:16-40:2 (Romain).

67.3.1.2    The fact that the assets in the Repo Collateral ended up having a valuation on the Acquisition Balance Sheet that is close to a value predicted for a similar portfolio of assets at the time of the Sale is neither surprising nor sinister: it is a coincidence that the numbers are identical, but it is not a surprise that they are close to one another, given that they are both attempting to determine fair market value for a similar portfolio of assets.

67.3.1.3    In any event, the evidence overwhelmingly proved that Barclays valued the assets it acquired in the Sale based upon an effort to determine fair values as defined under the accounting rules, with the oversight and guidance of PWC. *See* FOF ¶ 53.

67.3.2.    Movants falsely assert that after Barclays received a letter from JP Morgan's CEO Jamie Dimon, Barclays tried to hide the amount of assets that it was entitled to receive in the Sale.

67.3.2.1    The truth is that after receiving Mr. Dimon's letter, Barclays worked with JPMorgan Chase and the Trustee to formulate a settlement that would be presented to the Court by informing the Court, in no uncertain terms, that (a) Barclays was entitled to receive $49.7 billion in repo collateral alone, and (b) the Clarification Letter entitled Barclays to keep those repo collateral assets as Purchased Assets, and (c) while the

settlement provided Barclays with less than the $7 billion of repo collateral not yet delivered, no one could say exactly how much the settlement assets were worth.  *See* FOF ¶¶ 53, 60.

67.3.2.2   Thus, the Dimon letter had exactly the opposite impact on Barclays that Movants claim:  within two months of receiving the letter, Barclays was supporting a motion from the Trustee that told the Court that Barclays was supposed to receive $49.7 billion in repo collateral, and made no effort to hide any value, or to represent that all assets added up to exactly $47.4 billion.

67.3.2.3   Indeed, the Trustee's 30(b)(6) representative admitted that when he asked the Court to approve the December Settlement, the Trustee had not determined one way or another (and hence did not think it important to resolve) whether the Settlement would result in Barclays acquiring Repo Collateral that alone (independent of all other Purchased Assets) would exceed the $47.4 billion amount that the Trustee and Movants now seek to impose as a "cap" on the Sale.  Kobak Dep. Tr. at 148:6-152:4.

67.3.2.4   In any event the Dimon letter was created for litigation purposes to defend against a claim that JP Morgan had unlawfully removed $7 billion from a Barclays account, and should therefore not be credited for the truth of any of the assertions therein.  6/22/10 Tr. at 163:14-164:10 (Varley).

### xvii. Facts Showing The Lehman Movants' Failure To Comply With Terms of The Purchase Agreement They Executed.

**68. The Trustee Has Not Yet Delivered To Barclays Clearance Box Assets, ETD Margin, And 15c3 Assets Valued At Approximately $3.5 Billion — All Of Which Are Owed Under The Plain Terms Of The Purchase Agreement.**

68.1.   To date, the Trustee has not delivered Clearance Box Assets, ETD Margin Deposits, and 15c3 assets valued at approximately $3.5 billion. 9/2/10 Tr. at 55:15-59:14 (Romain); BCI Exs. 133, 136 at § 5, 146 at p. 1.

    68.1.1.   The Trustee has not delivered approximately $870 million of clearance box assets.

        68.1.1.1   Barclays has identified undelivered Clearance Box Assets which it booked on its Acquisition Balance Sheet as being worth $707 million. BCI Ex. 133 at p. 3 line 13; 9/2/10 Tr. at 32:18-33:1, 55:15-56:2 (Romain).

        68.1.1.2   In addition to the undelivered clearance box assets which it booked on its Acquisition Balance Sheet, Barclays has identified additional clearance box assets, and principal and interest associated with all of the undelivered clearance box assets, which has not been booked on its acquisition balance sheet and which it estimates to be worth approximately $162 million. BCI Ex. 146 at p. 1; 9/2/10 Tr. at 58:13-59:14 (Romain)

        68.1.1.3   Neither the Trustee nor any of the other Movants have ever disputed that the Trustee has failed to deliver all of the Clearance Box Assets.

        68.1.1.4   The unrebutted testimony of Professor Paul Pfleiderer confirmed that the Trustee has failed to deliver approximately 800 CUSIPs that were listed on Schedule B. 10/6/10 Tr. at 199:6-10 (Pfleiderer); see BCI Ex. 1103a (Pfleiderer Demonstrative 18 — summarizing M. 716N, BCI Ex. 743 at attachments 1 and 2).

        68.1.1.5   The evidence shows that after the Closing, former Lehman operations employees worked on refinements to the list of unencumbered Clearance Box Assets, and identified a series of such assets which were put on lists that were sent to the Trustee in March of 2009, but which the Trustee has not delivered. 8/14/09 Hraska Dep. Tr. at 142:13-143:24; BCI Exs. 734, 735, 164; *see also* BCI Exs. 158, 165, 167.

        68.1.1.6   Whether the values are determined based solely upon the Lehman marks on the CUSIPS on Schedule B that have not been delivered, or based upon the lists of CUSIPS identified by

former Lehman operations executives after the Closing 9and which were valued on the Acquisition Balance Sheet0, the total value of undelivered Clearance Box Assets is in excess of $700 million. BCI Ex. 133 at p. 3 line 13; 9/2/10 Tr. at 32:18-33:1, 55:15-56:2 (Romain).  BCI Ex. 757 (showing Lehman marks of CUSIPS on schedule B at $1.977 b when adjusted for Lehman paper, of which $777 million was transferred as BoNY tri-pledge on September 19), 375, 422; M. 593 (showing an additional transfer of approximately $430 million of Schedule B assets, leaving approximately $800 million of undelivered Schedule B assets).

68.1.2.    The Trustee has not delivered approximately $1.9 billion of ETD Margin Deposits.

68.1.2.1    Barclays has identified undelivered ETD Margin Deposits which it booked on its Acquisition Balance Sheet as worth $1.4 billion. at ¶17 (showing there is approximately $900 million in government treasuries that constitute undelivered OCC Margin Deposits); BCI Ex. 1000a (showing that the approximately $900 million undelivered OCC Margin Deposits was recorded on Barclays acquisition balance sheet); BCI Ex. 353 at ¶¶8, 17 (showing that there is undelivered futures margin of approximately $500 million); *id.* at Exs. 1 and. 3 (showing that the approximately $500 undelivered futures margin was recorded on Barclays acquisition balance sheet); *See also* BCI Ex. 146.

68.1.2.2    In addition to the undelivered clearance box assets which it booked on its Acquisition Balance Sheet, Barclays has identified additional ETD Margin Deposits, which has not been booked on its Acquisition Balance Sheet and which it estimates to be worth approximately $500 million. BCI Exs. 146 (showing that $80 million in Letters of Credits proceeds that constituted ETD Margin Deposits were not delivered and not recorded on Barclays' Acquisition Balance Sheet), 147 at ¶ 42 (f) (showing that all but $470 million of undelivered futures margin was recorded on Barclays' acquisition balance sheet); M. 495 at p. 2 (showing that approximately $238 million of undelivered house futures margin was not recorded on Acquisition Balance Sheet), *id.* at p. 6 (showing that the approximately $168 million of undelivered customer futures collateral was not recorded on Barclays' Acquisition Balance Sheet).

68.1.2.3    Of the total amount of undelivered ETD Margin Deposits that is not recorded on Barclays Acquisition Balance Sheet,

approximately $80 million is the subject of the OCC Interpleader action. BCI Ex. 146; *see* Docket No. 08-01759 (JMP).

68.1.2.4    A significant portion of the undelivered ETD Margin Deposits are held by Lehman affiliates, and therefore may have a collection risk. 9/2/10 Tr. at 57:21-58:12 (Romain).

68.1.2.5    Neither the Trustee nor any of the other Movants have ever disputed that the Trustee has failed to deliver all of the ETD Margin Deposits.

68.1.3.    The Trustee has not delivered $769 million of 15c3 assets.

68.1.3.1    Barclays has identified $769 million of undelivered 15c3 assets, the totality of which was recorded on Barclays Acquisition Balance Sheet. BCI Ex. 133 at p.3 line 17; 9/2/10 Tr. at 33:21-34:6 (Romain).

68.1.3.2    Neither the Trustee nor any of the other Movants have ever disputed that the Trustee has failed to deliver 15c3 assets.