UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | |

**ADDENDUM 2 TO POST-TRIAL
MEMORANDUM OF BARCLAYS CAPITAL INC.**

<u>**PROPOSED CONCLUSIONS OF LAW**</u>

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
*Attorneys for Barclays Capital Inc.*

November 22, 2010

# **TABLE OF CONTENTS**

CONCLUSIONS OF LAW ........................................................................................1

1.    Rule 60(B) Motions Are Generally Disfavored And Are Especially Disfavored In Attacks On Bankruptcy Sale Orders. .....................................................................1

2.    The Mandate Rule Provides That A Lower Court Has No Jurisdiction To Alter An Order That Was Affirmed On Appeal, And Therefore Bars All Claims That Were Raised Or Could Have Been Raised During The Pendency Of The Appeal. .....................2

    A.    The Mandate Rule Bars Matters Expressly Or Implicitly Decided On Appeal. ...................................................................................................2

    B.    The Mandate Rule Bars Claims That Could Have Been Raised On Appeal. .........3

    C.    The Mandate Rule Applies With Special Force Where A Party Changes A Position It Had Successfully Advocated. ................................................4

    D.    The Mandate Rule Arguably Has No Exceptions, And Any Possible Exception Should Be Construed Narrowly, And Should Require The Presentation Of New Evidence That Was Not Known And Not Reasonably Knowable During The Pendency Of The Prior Appeal. .....................4

3.    Judicial Estoppel Bars Litigants From Adopting Positions Contrary To Those They Successfully Advocated To This Court Or The District Court. ...................................8

4.    Equitable Estoppel Bars Litigants From Now Taking Positions Inconsistent With Their Prior Conduct On Which the Opposing Party Reasonably Relied. ..........................10

5.    Waiver Bars Litigants From Making Claims Inconsistent With Their Prior Conduct When That Conduct Was Inconsistent With An Intent To Bring The Current Claims. ..............................................................................................13

6.    Equitable Mootness Bars The Modification Of A Completed Transaction In A Manner That Deprives The Buyer Of Bargained-For Rights. ...........................................14

7.    A Movant May Not Bring A Rule 60(B) Motion Based On Judicial Mistake Of Fact Or Law After The Appeal Deadline And, For All Other Types Of Rule 60(B) Motions, The Movant Bears A "Heavy Burden" In Proving The Delay Was Reasonable. ............................................................................................17

    A.    Claims of Judicial Errors of Fact and Law Must Be Brought Within the Appeal Period. ...............................................................................17

    B.    Claims of Other Types of Error Must Be Brought Within a Reasonable Time. ...................................................................................................18

8.      The Law Imputes The Knowledge Of A Corporation's Agents To The Corporation And To A Bankruptcy Trustee Appointed For That Corporation, And Also Imputes Knowledge That Was "Reasonably Discoverable." ....................................19

9.      Where A Section 363 Sale Order Has Been Affirmed On Appeal, Rule 60(B) Relief Is Not Available Absent A Finding Of Bad Faith.....................................................22

10.     *Ex Post* Information Must Be Disregarded In This Proceeding Because It Is Legally Irrelevant Under 60(B) And Section 363.............................................24

        A.      Ex Post Information Is Legally Irrelevant Under Rule 60(b) And Must Be Disregarded. ...........................................................................24

        B.      Ex Post Information Is Legally Irrelevant In Challenging A Section 363 Sale.............................................................................24

11.     Rule 60(B) Does Not Provide A Basis For Modifying A Contract. .................................25

        A.      Rule 60(b) Does Not Authorize Affirmative Relief. .............................................25

        B.      Rule 60(b) Does Not Authorize Modification Of Contractual Terms. .................26

12.     New York Contract Law Allows For Reformation Of A Contract Only In Very Limited Circumstances. ...........................................................................28

        A.      A Party Seeking Reformation Based On Mutual Mistake Must Satisfy A Heavy Burden Of Showing An Agreement Between The Parties That Was Not Properly Reflected In The Written Instrument. ...............................................29

        B.      Black-Letter Law Provides That A Mistake Cannot Be Based On Matters That Were Known By The Parties To Be Uncertain At The Time......................30

        C.      Reformation Can Be Based On Unilateral Mistake Only Where One Party Has Fraudulently Misled The Other Concerning The Terms Of The Written Instrument. ...............................................................................31

        D.      Because Partially Rescinding A Contract Has The Same Effect As Reforming A Contract, New York Law Precludes Partial Rescission, Particularly Where The Contract Contains A Non-Severance Clause.................32

13.     Section 105 Does Not Allow A Court To Modify A Contract. .........................................33

14.     The Court May Not Revise A Written Contract Based Upon Oral Statements Made At The Sale Approval Hearing. ...............................................................................36

15.     Rule 60(B) Relief Is Unavailable Where The Evidence Presented Would Not Have Changed The Outcome. ...........................................................................38

16.     Rule 60(B) Relief Is Unavailable Where Many Actions Have Been Taken In
Reliance On The Judgment. ............................................................................................40

17.     Rule 60(B) Relief Is Unavailable Is Where The Movant Has Substantial
Responsibility For Creating The Situation For Which Relief Is Sought. .........................40

18.     The Standard For Approving A Sale Under § 363 Of The Bankruptcy Code Is
Whether There Is A Good Business Justification, Which Necessarily Is Satisfied
If The Sale Is better than any other available deal, and Superior To A Liquidation
Of The Assets Being Sold. ...............................................................................................41

19.     It Is Permissible And Appropriate For A Court To Consider The Public Interest In
Determining Whether To Approve A § 363 Sale. ...........................................................42

20.     While There Is No Established Standard For Disclosure In A Section 363 Sale,
The Proper Standard Should Be "Reasonable And Good Faith Disclosure Under
The Circumstances." ........................................................................................................43

21.     As Used In Paragraph M Of The Sale Order, The Terms "Reasonably Equivalent
Value" And "Fair Consideration" Are Satisfied, By Definition And As A Matter
Of Law, If There Were No Other Bidders And The Consideration Provided Was
Believed To Be More Than Would Be Received In A Liquidation. .................................46

22.     In A Rule 60(B)(1) Challenge To An Order Approving A Contract, The Only
Kind Of "Mistake" That Can Justify Relief Is A "Mutual Mistake Of Fact" That
Would Justify Reformation Under State Contract Law. ...................................................48

23.     In A Rule 60(B)(2) Challenge To An Order Approving A Contract, The "New
Evidence" Must Demonstrate A Mutual Mistake Of Fact Or Other Basis For
Reformation Of The Contract, And Cannot Simply Be Evidence Of A Fact That
Was Known To Be Uncertain At The Time The Parties Entered Into The
Contract. ...........................................................................................................................52

24.     In A Rule 60(B)(3) Challenge To An Order Approving A Contract, The Alleged
"Fraud, Misrepresentation, Or Misconduct" Must Be Sufficient To Justify
Reformation Of The Contract, And Must Otherwise Satisfy The Requirements Of
Rule 60(B)(3). ..................................................................................................................54

        A.      Only Misconduct By An "Opposing Party" May Be Considered .........................54

        B.      Claims of Misconduct Must Be Pleaded With Particularity and Proven By
                Clear and Convincing Evidence ............................................................................55

25.     Rule 60(B)(6) Catch-All Relief Is Limited To Outcome-Altering "Unusual And
Extreme" Circumstances Not Considered In Any Of The More Specific Clauses
Of Rule 60(B). ..................................................................................................................55

26.    The Release In The Court-Approved December 2008 Settlement Bars All Claims
Relating To The Repo Collateral. ....................................................................57

27.    Section 549 Relief Is Unavailable Where The Court Has Approved The Sale, And
Section 549 Cannot Be Used To Modify The Terms Of A Sale After The Fact. ..............58

    A.    A Sale May be Approved Under § 363 Before the Sale Contract is
Finalized ...........................................................................................59

    B.    Section 549 Does Not Allow a Court to Modify the Terms of the Parties'
Contract .............................................................................................61

28.    Section 559 Does Not Apply To Purchased Assets, Does Not Provide Relief For
Settled Claims, Does Not Apply When There Is No "Excess" Collateral, And
Applies Only Where The Bankruptcy Code's Definition Of A "Repurchase
Agreement" Is Satisfied. .........................................................................63

    A.    A § 559 Claim is Moot if the Movant Subsequently Sells Allegedly
"Excess" Repo Collateral to the Repo Counter-Party ...........................63

    B.    The Trustee's Release In the December Settlement Bars Any § 559
Claims. .............................................................................................64

    C.    An Agreement Is Not a "Repurchase Agreement" Within the Meaning of §
559 If a Substantial Portion of the Collateral Is Not Within the Statutory
Definition. ........................................................................................64

    D.    Section 559 Affords Relief Only If the Movant Proves the Creditor Had an
Excess Based on a Price "Available" From or Closing Bid Quotations
From a Generally Recognized Source. ..............................................65

29.    The Constitution Does Not Permit A Court To Modify The Terms Of A Contract
Absent A State Law Basis For Doing So. .........................................................66

30.    The Plain Text Of The Purchase Agreement Should Govern Its Interpretation. ..............69

31.    The Merger Clause In The Purchase Agreement Precludes Consideration Of
Contrary "Understandings." .......................................................................70

32.    Extrinsic Evidence Is Relevant Only If, And Only To The Extent That, There Is
An Ambiguity In The Plain Text Of The Purchase Agreement .................................71

33.    Even If Extrinsic Evidence Is Relevant, Unexpressed Subjective Intent Is
Irrelevant. ..........................................................................................72

34.    If The Purchase Agreement Is Ambiguous, The Parties Conduct And Performance
Of Their Obligations Is The Best Evidence Of Their Intent ....................................73

35.   If A Contract Is Ambiguous, Expert Testimony Regarding The Industry Practice And custom IS Relevant. ......................................................................................74

36.   A Party's Failure To Understand The Terms Of A Contract Is No Basis For Refusing To Enforce Those Terms. ..................................................................................74

37.   An Agreement Should Be Interpreted So That All Of Its Provisions Are Meaningful. ..................................................................................................................75

38.   The APA Defined The Purchased Assets In The Broadest Possible Terms, And Made Clear That Any Asset Used "In Connection With The Business" Was A Purchased Asset, Whether Specifically Identified In The APA Or Not. ..........................76

39.   The Plain Text Of The APA And The Clarification Letter Each Provide That The Repo Collateral And The Disputed Assets Are Purchased Assets. ..................................77

40.   The Plain Text Of The APA Provides That Barclays Is Not Obligated To Pay Cure Amounts Except To The Extent That It Chose, In Its Sole Discretion, To Assume Contracts Related To The Business Within 60 Days Of The Closing. ...............84

41.   The Plain Text Of The APA Provides That Barclays Was Assuming Obligations To Make Both Bonus And Severance Payments To Transferred Employees, And Refers To A Total Estimate For "Comp" Of $2 Billion. ...................................................85

42.   The Plain Text Of The Purchase Agreement Provides That Cash Which Was Pledged As ETD Margin Or Otherwise Identified As A Purchased Asset Was A Purchased Asset, And Was Not Covered By The General Reference To Cash In The Excluded Assets Definition .........................................................................................86

43.   The Term "Cash Equivalents" In The Clarification Letter Refers To Assets That Are Truly Equivalent To Cash, And Should Not Include Any Securities That The Parties Would Not Have Defined As "Cash Equivalents" In Their Audited, Publicly Filed Financial Reports.........................................................................................87

44.   The CFTC Rules Relating To "Bulk Transfers" Contemplate That All Of The Assets In Or Relating To The Futures Accounts That Are Subject To The Bulk Transfer, Including Any And All Margin Deposits In Those Accounts, Are To Be Transferred With The Accounts...........................................................................................92

45.   A SIPC Trustee Is Authorized Under SIPA To Transfer Some Or All Of The Assets In The 15c3-3 Account Of A Broker-Dealer Who Had Been Placed Into A SIPC Liquidation If The Trustee Concludes That It Is In The Best Interests Of The Estate And The Customers. ...................................................................................94

46.   As A Matter Of Law, LBHI Is Jointly And Severally Liable To Barclays For Any Undelivered Assets. ...............................................................................................96

47.     To The Extent Public Policy Is Considered In The Interpretation Of The Purchase
        Agreement, It Should Reinforce The Normal Application Of State Law Principles
        Of Contractual Interpretation, And Should Not Be A Basis For Adopting Contrary
        Interpretations. ..............................................................................................................97

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Adduono v. World Hockey Ass'n,*
    824 F.2d 617 (8th Cir. 1987) ............................................................. 25

*Alexander & Alexander Serv., Inc. v. These Certain Underwriters at Lloyd's, London,*
    136 F.3d 82 (2d Cir. 1998)................................................................. 88

*Allegheny Energy v. DQE, Inc.,*
    74 F. Supp. 2d 482 (W.D. Pa. 1999)...................................................... 60

*American Home Assur. Co. v. Am. Fidelity,*
    261 F. Supp. 734 (S.D.N.Y. 1966)......................................................... 4

*American Tissue, Inc. v. Donaldson Lufkin & Jenrette Sec. Corp.,*
    351 F. Supp. 2d 79 (S.D.N.Y. 2005)...................................................... 47

*American Totalisator Co. v. Fair Grounds Corp.,*
    No. 91-500, 1992 U.S. Dist. LEXIS 17795 (E.D. La. Nov. 17, 1992) ................... 28

*Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation,*
    605 F.2d 648 (2d Cir. 1979)............................................................... 18

*Andresakis v. State of Conn.,*
    No. 96-9467, 1997 WL 383456 (2d Cir. July 9, 1997).................................. 50

*Andrulonis v. United States,*
    26 F.3d 1224 (2d Cir. 1994)............................................................... 50

*Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.,*
    189 F.3d 208 (2d Cir. 1999)........................................................... 69, 72

*Arista Records LLC v. Usenet.com, Inc.,*
    633 F. Supp. 2d 124 (S.D.N.Y. 2009)..................................................... 53

*ATSA of California, Inc. v. Continental Ins. Co.,*
    754 F.2d 1394 (9th Cir. 1985) ............................................................ 4

*Avedis v. Herman,*
    192 F.R.D. 477 (S.D.N.Y. 2000) ...................................................... 38, 39

*Banco Nacional de Cuba v. Farr,*
    383 F.2d 166 (2d Cir. 1967)............................................................... 5

*Barrington Mgmt. Co., Inc. v. Paul E. Draper Family L.P.,*
    695 N.E.2d 135 (Ind. App. Ct. 1998) ..................................................... 63

*Battery Assoc. Inc. v. J&B Battery Supply Inc.*,
    944 F. Supp. 171 (E.D.N.Y. 1996) ...................................................................... 96

*Beach Renourishment, Inc. v. Fla. Dep't of Env. Prot.*,
    130 S.Ct. 2592 (2010) ........................................................................................ 67

*Bernheim v. Jacobs*,
    144 F. App'x 218 (3d Cir. 2005) ........................................................................ 6

*Bero Contracting & Dev. Corp. v. Vierhile*,
    796 N.Y.S.2d 808 (N.Y. App. Div. 2005) .......................................................... 71

*Bettis v. Kelly*,
    No. 02 Civ. 104, 2004 WL 1774252 (S.D.N.Y. Aug. 9, 2004) ....................... 38, 55

*Biosyntec, Inc. v. Baxter Healthcare Corp.*,
    746 F. Supp. 5 (D. Or. 1990) ............................................................................. 58

*Blue Diamond Coal Co. v. Trustees of UMWA Combined Ben. Fund*,
    249 F.3d 519 (6th Cir. 2001) ............................................................................. 40

*Brandt v. Lazard Freres & Co., LLC*,
    1997 WL 469325 (S.D. Fla. Aug. 1, 1997)........................................... 20, 31, 46, 54

*Bronner v. Walrath*,
    202 N.Y.S. 577 (N.Y. App. Div. 1924) ............................................................. 97

*Brooklyn Life Ins. Co. of N.Y. v. Dutcher*,
    95 U.S. 269 (1877)............................................................................................. 73

*Brummerstedt v. Am. Airlines, Inc.*,
    No. 91-c-8382, 1994 WL 530807 (N.D. Ill. Sept. 29, 1994)................................. 27

*Buffalo Wings Factory, Inc. v. Mohd*,
    No. 1:07cv612, 2008 WL 2557999 (E.D. Va. June 23, 2008................................. 55

*Burrell v. United States*,
    467 F.3d 160 (2d Cir. 2006)................................................................................ 5

*Byrd v. Hoffman*,
    417 B.R. 320 (D. Md. 2008) .............................................................................. 14

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*,
    117 F.3d 655 (2d Cir. 1997)............................................................................... 40

*Capital Wireless Corp. v. Deloitte & Touche*,
    627 N.Y.S.2d 794 (N.Y. App. Div. 1995) .......................................................... 22

*Cashner v. Freedom Stores, Inc.*,
   98 F.3d 572 (10th Cir. 1996) ............................................................. 49

*Center v. Hampton Affiliates, Inc.*,
   66 N.Y.2d 782 (1985) ...................................................... 19, 21, 22, 53

*Cevasco v. National R.R. Passenger Corp.*,
   606 F. Supp. 2d 401 (S.D.N.Y. 2009)................................................. 72

*Chimart Assoc. v. Paul*,
   66 N.Y.2d 570 (1986) ............................................................ 29, 31, 49

*Citadel Equity Fund Ltd. v. Aquila, Inc.*,
   168 F. App'x 474 (2d Cir. 2006) ........................................................ 89

*Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*,
   --- F. Supp. 2d ---, 2010 WL 3952926 (S.D.N.Y. Oct. 8, 2010)................ 29, 30

*Clearview Assocs., Inc. v. Clearview Gardens First Corp.*,
   168 N.Y.S.2d 432 (N.Y. Sup. Ct. 1957) ............................................. 63

*Cobos v. Adelphi Univ.*,
   179 F.R.D. 381 (E.D.N.Y. 1998) ...................................................... 39

*CompuDyne Corp. v. Shane*,
   453 F. Supp. 2d 807 (S.D.N.Y. 2006)............................................ 19, 53

*Continental Ins. Co. v. Atlantic Cas. Ins. Co.*,
   603 F.3d 169 (2d Cir. 2010)............................................................. 76

*Cordiano v. Metacon Gun Club, Inc.*,
   575 F.3d 199 (2d Cir. 2009).............................................................. 65

*County of Morris v. Fauver*,
   707 A.2d 958 (N.J. 1998).................................................................. 62

*County of Suffolk v. Stone & Webster Eng'g Corp.*,
   106 F.3d 1112 (2d Cir. 1997)............................................................ 16

*Creamer v. Laidlaw Transit, Inc.*,
   76 F. App'x 273 (10th Cir. 2003) ...................................................... 39

*Crumpton v. Bridgeport Educ. Ass'n*,
   993 F.2d 1023 (2d Cir. 1993)............................................................ 29

*Cusano v. Horipro Entm't Group*,
   301 F. Supp. 2d 272 (S.D.N.Y. 2004)........................................... 72, 73

*Daiichi Seihan USA v. Infinity USA, Inc.*,
    625 N.Y.S.2d 527 (N.Y. App. Div. 1995) .......................................................................... 70

*De Saracho v. Custom Food Mach., Inc.*,
    206 F.3d 874 (9th Cir. 2000) ........................................................................................... 55

*DeFunis v. Odegaard*,
    416 U.S. 312 (1974)......................................................................................................... 63

*Dick's Clothing & Sporting Goods, Inc. v. Phar-Mor, Inc.*,
    212 B.R. 283 (N.D. Ohio 1997)....................................................................................... 24

*Doynow Sales Assoc., Inc. v. Rocheux Intern. of New Jersey, Inc.*,
    647 F. Supp. 2d 296 (S.D.N.Y. 2009).............................................................................. 73

*Eastern Enters. v. Apfel*,
    524 U.S. 498 (1998)......................................................................................................... 66

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988)......................................................................................................... 69

*Epps v. Howes*,
    573 F. Supp. 2d 180 (D. D.C. 2008) ................................................................................ 39

*Evans v. Jeff D.*,
    475 U.S. 717 (1986)................................................................................................... 67, 68

*F.D.I.C. v. Currier*,
    No. 98-2212, 1999 WL 979235 (10th Cir. Oct. 28, 1999) ................................................ 49

*Faulkner v. Nat'l Geographic Soc'y*,
    452 F. Supp. 2d 369 (S.D.N.Y. 2006)............................................................................... 72

*Fetik v. New York Law School*,
    No. 97 CIV. 7746, 1999 WL 459805 (S.D.N.Y. June 29, 1999)............................................ 39

*Fine v. Bellefonte Underwriters Ins. Co.*,
    758 F.2d 50 (2d Cir. 1985)............................................................................................. 2, 3

*Fisher v. Kanas*,
    288 F. App'x 721 (2d Cir. 2008) ...................................................................................... 77

*Fitzgerald v. Field*,
    No. 98-7574, 1999 WL 177278 (2d Cir. Mar. 26, 1999)...................................................... 38

*Fogel v. Chestnut*,
    668 F.2d 100 (2d Cir. 1981)............................................................................................... 3

*Fox Film Corp. v. Springer*,
   273 N.Y. 434 (1937) ............................................................................................... 88

*Freedman v. Value Health, Inc*.,
   34 F. App'x 408 (2d Cir. 2002) .............................................................................. 60

*Freedom, N.Y., Inc. v. United States*,
   438 F. Supp. 2d 457 (S.D.N.Y. 2006)..................................................................... 39

*Galli v. Metz*,
   973 F.2d 145 (2d Cir. 1992)..................................................................................... 75

*Garber v. Legg Mason, Inc.*,
   347 F. Appx. 665 (2d Cir. 2009).............................................................................. 89

*General Star Indem. Co. v.  Custom Editions Upholstery Corp.*,
   940 F. Supp. 645 (S.D.N.Y. 1996)........................................................................... 72

*Goodheart Clothing Co. v. Laura Goodman Enters., Inc.*,
   962 F.2d 268 (2d Cir. 1992)..................................................................................... 75

*Gouldbourne v. J.F. Jelenko & Co.*,
   No. 98 Civ 7243, 2000 WL 546762 (S.D.N.Y. Jan. 13, 2000)............................... 18

*Griggs v. Marion Hosp. Corp.*,
   No. 2004-CV-4241, 2005 WL 1802249 (S.D. Ill. July 28, 2005) .......................... 10

*Hall v. C.I.A.*,
   437 F.3d 94 (D.C. Cir. 2006) ................................................................................... 48

*Hangzhou Silk Import & Export Corp. v. PCB Int'l Indus., Inc.*,
   No. 00 Civ. 6344, 2002 WL 2031591 (S.D.N.Y. Sept. 5, 2002)............................ 74

*Hughes v. State of Washington*,
   389 U.S. 290 (1967).................................................................................................. 67

*Humbles v. Reuters Am., Inc.*,
   No. 05-CV-4895, 2006 WL 2547069 (E.D.N.Y. Aug. 31, 2006)........................... 19

*In re 240 North Brand Partners, Ltd.*,
   200 B.R. 653 (9th Cir. BAP 1996)........................................................................... 41

*In re 310 Assocs.*,
   346 F.3d 31 (2d Cir. 2003)....................................................................................... 17

*In re 3dfx Interactive, Inc.*,
   2009 WL 223266 (Bankr. N.D. Cal. Jan. 6, 2009) ................................................. 20

*In re Acorn Hotels, LLC,*
   251 B.R. 696 (Bankr.W.D. Tex. 2000) ................................................................ 15, 40, 61

*In re Actrade Fin. Tech., Ltd.,*
   424 B.R. 59 (Bankr. S.D.N.Y. 2009) ................................................................................. 73

*In re Adelphia Commc'n Corp.,*
   367 B.R. 84 (S.D.N.Y. 2007) ................................................................................... passim

*In re Alan Gable Oil Dev. Co.,*
   No. 91-1526, 1992 WL 329419 (4th Cir. Nov. 12, 1992) .................................................. 23

*In re Allegiance Telecom, Inc.,*
   356 B.R. 93 (Bankr. S.D.N.Y. 2006) ................................................................................. 69

*In re Alpha Indus., Inc.,*
   84 B.R. 703 (Bankr. D. Mont. 1988) ................................................................................. 48

*In re Am. Freight Sys., Inc.,*
   126 B.R. 800 (D. Kan. 1991) ............................................................................................ 45

*In re Apollo Air Passenger Computer Reservation Sys.,*
   720 F. Supp. 1061 (S.D.N.Y. 1989) ................................................................................. 75

*In re BCD Corp.,*
   119 F.3d 852 (10th Cir. 1997) .......................................................................................... 46

*In re Bradlees Stores, Inc.,*
   No. 00-16033, 2001 WL 1112308 (S.D.N.Y. Sept. 20, 2001) ................................ 9, 30, 50

*In re Brookfield Clothes, Inc.,*
   31 B.R. 978 (S.D.N.Y. 1983) ...................................................................................... 43, 44

*In re Bulk Oil (USA) Inc.,*
   No. 89-B-13380, 2007 WL 1121739 (S.D.N.Y. Apr. 11, 2007) ........................................ 38

*In re Cable One CATV,*
   169 B.R. 488 (Bankr. D. N.H. 1994) ................................................................................. 48

*In re Canyon P'ship,*
   55 B.R. 520 (Bankr. S.D. Cal. 1985) ................................................................................ 46

*In re Carlton Concrete Corp.,*
   No. 08-CV-242, 2008 WL 4443233 (E.D.N.Y. Sept. 26, 2008) ........................................ 51

*In re CBI Holding Co.,*
   529 F.3d 432 (2d Cir. 2008) .............................................................................. 21, 22, 53

*In re CCGK Investors*,
    145 B.R. 908 (N.D. Ill. 1992) ............................................................. 13

*In re Chateaugay Corp.*,
    988 F.2d 322 (2d Cir.1993).......................................................... 14, 88

*In re Chrysler LLC*,
    576 F.3d 108 (2d Cir. 2009).................................................... 41, 42, 44

*In re Chung King, Inc.*,
    753 F.2d 547 (7th Cir. 1985) ................................................................ 1

*In re Coastal Indus., Inc.*,
    63 B.R. 361 (Bankr. N.D. Ohio 1986) ............................................. 43, 44

*In re Colarusso*,
    280 B.R. 548 (Bankr. D. Mass. 2002) ................................................. 12

*In re Condere Corp.*,
    228 B.R. 615 (Bankr. S.D. Miss. 1998)............................................... 47

*In re Crazy Eddie Sec. Litig.*,
    802 F. Supp. 804 (E.D.N.Y. 1992) ..................................................... 22

*In re Dairy Mart Convenience Stores, Inc.*,
    351 F.3d 86 (2d Cir. 2003)................................................................. 34

*In re Delphi Corp.*,
    No. 05-44481, 2009 WL 2482146 (Bankr. S.D.N.Y. 2009)................. 47

*In re Delta Air Lines, Inc.*,
    374 B.R. 516 (S.D.N.Y. 2007)............................................................ 33

*In re Enron Corp.*,
    352 B.R. 363 (Bankr. S.D.N.Y. 2006) .................................................. 1

*In re Ferrara S.p.A.*,
    441 F. Supp. 778 (S.D.NY. 1977)....................................................... 75

*In re Frankel*,
    191 B.R. 564 (Bankr. S.D.N.Y. 1995) .................................................. 1

*In re Garfinkle*,
    672 F.2d 1340 (11th Cir. 1982) .......................................................... 13

*In re Garofalo's Finer Foods, Inc.*,
    186 B.R. 414 (N.D. Ill. 1995) ............................................................ 59

*In re Gen. Motors Corp.*,
 407 B.R. 463 (Bankr. S.D.N.Y. 2009) ........................................................................ 10, 42, 44

*In re General Insecticide Co.*,
 403 F.2d 629 (2d Cir. 1968) ............................................................................................. 1

*In re Gucci*,
 126 F.3d 380 (2d Cir. 1997) ........................................................................................ 23, 48

*In re Home & Hearth Plano Pkwy., L.P.*,
 320 B.R. 596 (Bankr. N.D. Tex. 2004) ............................................................................ 11

*In re Hyler*,
 No. 04-32952, 2009 WL 2849129 (Bankr. N.D. Cal. Apr. 22, 2009) .................................... 49

*In re Int'l Philanthropic Hosp. Found.*,
 No. 05-01097, 2006 WL 618276 (Bankr. C.D. Cal. Jan. 4, 2006) ........................................ 58

*In re Ionosphere Clubs, Inc.*,
 85 F.3d 992 (2d Cir. 1995) ............................................................................................ 11

*In re J.F. Hink & Son*,
 815 F.2d 1314 (9th Cir. 1987) ...................................................................................... 9, 11

*In re Jamesway Corp.*,
 No. 93 B 43697, 1995 Bankr. LEXIS 267 .................................................................... 26, 49

*In re Kalikow*,
 602 F.3d 82 (2d Cir. 2010) ......................................................................................... 33, 35

*In re Karpe*,
 84 B.R. 926 (Bankr. M.D. Pa. 1988) ............................................................................... 48

*In re Kjeldahl*,
 52 B.R. 916 (D. Minn. 1985) ......................................................................................... 14

*In re Lady H Coal Co., Inc.*,
 193 B.R. 233 (Bankr. S.D. W. Va. 1996) ......................................................................... 47

*In re Lawrence*,
 293 F.3d 615 (2d Cir. 2002) .................................................................................... 1, 13, 45

*In re Lehman Bros. Holdings, Inc*,
 415 B.R. 77 (S.D.N.Y. 2009) ............................................................................. 8, 16, 43, 44

*In re Lionel*,
 722 F.2d 1063 (2d Cir. 1983) ......................................................................................... 42

*In re LWD, Inc.*,
    332 B.R. 543 (Bankr. W.D. Ky. 2005) .................................................................. 34, 35, 45

*In re Marlar*,
    288 B.R. 823 (Bankr. W.D. Ark. 2003) ................................................................................ 4

*In re Martin*,
    91 F.3d 389 (3rd Cir. 1996) ......................................................................................... 45

*In re Meiselman*,
    105 F.2d 995 (2d Cir. 1939) ......................................................................................... 62

*In re Metaldyne Corp.*,
    409 B.R. 661 (Bankr. S.D.N.Y. 2009) ....................................................................... 42, 60

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005) ..................................................................... 15, 27, 32, 61

*In re Miller Min., Inc.*,
    219 B.R. 219 (Bankr. N.D. Ohio 1998) .................................................................... 59

*In re Musicland Holding Corp.*,
    386 B.R. 428 (S.D.N.Y. 2008) .................................................................................. 29

*In re N. Broadway Funding Corp.*,
    34 B.R. 620 (Bankr. E.D.N.Y. 1983) ................................................................... 28, 50

*In re Nelson's Estate*,
    209 N.Y.S.2d 344 (N.Y. Sur. 1961) ...................................................................... 32, 63

*In re New River Shipyard, Inc.*,
    355 B.R. 894 (Bankr. S.D. Fla. 2006) .................................................................... 14

*In re New York Trap Rock Corp.*,
    42 F.3d 747 (2nd Cir. 1994) ..................................................................................... 45

*In re Newport Offshore, Ltd.*,
    86 B.R. 325 (Bankr. D. R.I. 2988) .......................................................................... 12

*In re PCH Assoc.*,
    60 B.R. 870 (S.D.N.Y. 1986) .................................................................................... 74

*In re Polycel Liquidation, Inc.*,
    No. 06-2183, 2007 WL 77336 (D. N.J. Jan. 8, 2007) ............................................. 37

*In re Residential Resources Mortg. Inv. Corp.*,
    98 B.R. 2 (Bankr. D. Ariz. 1989) ............................................................................. 64

*In re Rome Family Corp.*,
    Bankr. No. 02-11771, 2010 WL 1381093 (D. Vt. Mar. 31, 2010) .................................. 45, 51

*In re Sanders*,
    408 B.R. 25 (Bankr. E.D.N.Y. 2009) ..................................................................... 55

*In re Seychelles, P'ship*,
    32 B.R. 708 (N.D. Tex. 1983) ............................................................................. 48

*In re St. Stephen's 350 E. 116th St.*,
    313 B.R. 161 (Bankr. S.D.N.Y. 2004) ............................................................... 38, 55

*In re Straightline Inv., Inc.*,
    525 F.3d 870 (9th Cir. 2008) ............................................................................... 59

*In re Summit Ventures, Inc.*,
    161 B.R. 9(Bankr. D. Vt. 1993) .......................................................................... 23

*In re Sun Valley Prod.*,
    328 B.R. 147 (Bankr. D. N.D. 2005) ................................................................... 47

*In re Teligent*,
    326 B.R. 219 (S.D.N.Y. 2005) ............................................................................. 11

*In re Trans World Airlines, Inc.*,
    No. 01-00056, 2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001) .................................. 42, 44

*In re Tri-Cran*,
    98 B.R. 609 (Bankr. D. Mass. 1969) .................................................................. 6, 7

*In re Varat Enter., Inc.*,
    81 F.3d 1310 (4th Cir. 1996) .............................................................................. 12

*In re Verilink Corp.*,
    405 B.R. 356 (Bankr. E.D. Ala. 2009) ................................................................. 20

*In re Vick*,
    75 B.R. 248 (Bankr. E.D. Va. 1987) .................................................................... 12

*In re Vitta*,
    409 B.R. 6 (Bankr. E.D.N.Y. 2009) .................................................................. 18, 38

*In re Vota*,
    165 B.R. 92 (Bankr. D. R.I. 1994) ...................................................................... 34

*In re Ware*,
    117 B.R. 1 (Bankr. D.D.C. 1990) .................................................................... 25, 26

*In re Webcor, Inc.*,
   392 F.2d 893 (7th Cir. 1968) ................................................................. 98

*In re Wilde Horse Enter., Inc*.,
   136 B.R. 830 (Bankr. C.D. Cal.1991).............................................. 41, 45

*In re Wilmington Hospitality LLC*,
   No. 01-19401DWS, 2003 WL 21011689 (Bankr. E.D. Pa. April 18, 2003) ................... 26, 49

*International Controls Corp. v. Vesco*,
   556 F.2d 665 (2d Cir. 1977)...................................................................... 17

*International Marble & Granite of Colo., Inc. v. Congress Fin. Corp.*,
   465 F. Supp. 2d 993 (C.D. Cal. 2006) ............................................. 32, 62

*Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.*,
   917 F.2d 100 (2d Cir. 1990)...................................................................... 71

*J.H. Cohn & Co. v. Am. Appraisal Assoc. Inc.*,
   628 F.2d 994 (7th Cir. 1980) .................................................................... 13

*Jarecki v. Shung Moo Louie,*
   95 N.Y.2d 665 (2001) ............................................................................... 70

*Kagan v. Caterpillar Tractor Co.*,
   795 F.2d 601 (7th Cir. 1986) .................................................................... 17

*Kaiser Aetna v. United States*,
   444 U.S. 164 (1979).......................................................................... 67, 68

*Karara v. Univ. of Denver*,
   No. 93-1087, 1993 WL 371386 (10th Cir. Sept. 23, 1993) ................... 51

*Kenney v. Facilities Performance Group*,
   No. 09-CV-0478, 2010 WL 916189 (N.D. Okla. Mar. 9, 2010) ........... 39

*Kirk v. Schindler Elevator Corp.*,
   No. 03 Civ. 8688, 2004 WL 2726001 (S.D.N.Y. Nov. 29, 2004) ......... 39

*Kirschner v. KPMG LLP*,
   --- F.3d ---, 2010 WL 4644062 (2d Cir. Nov. 18, 2010) .......... 20, 21, 22, 41

*Klos v. Lotnicze*,
   133 F.3d 164 (2d Cir. 1997)...................................................................... 72

*Kokusai Kisen Kabushiki Kaisha v. Columbia Stevedoring Co.*,
   23 F. Supp. 403 (S.D.N.Y. 1938)............................................................. 77

*Kosakow v. New Rochelle Radiology Assoc.*,
   274 F.3d 706 (2d Cir. 2001)........................................................................ 10

*Kozlowski v. Coughlin*,
   871 F.2d 241 (2d Cir. 1989)........................................................................ 51

*Kramer v. Time Warner*,
   937 F.2d 767 (2d Cir. 1991)........................................................................ 89

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
   337 F.3d 314 (3d Cir. 2003)........................................................................ 10

*L&E Corp. v. Days Inn of Am., Inc.*,
   992 F.2d 55 (4th Cir. 1993) ........................................................................ 97

*La Barbera v. Whitney Trucking, Inc.*,
   245 F.R.D. 142 (S.D.N.Y. 2007) ................................................................. 18

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994).................................................................................... 66

*Lans v. Gateway 2000, Inc.*,
   110 F. Supp. 2d 1 (D.D.C. 2000) ................................................................ 28

*Lee v. BSB Greenwich Mortg. L.P.*,
   267 F.3d 172 (2d Cir. 2001)........................................................................ 70

*Leonard v. Lowe's Home Centers, Inc.*,
   83 F. App'x 402 (2d Cir. 2003) ................................................................... 17

*Lewis v. Cal. Bd. of Prison Terms*,
   264 F. App'x 647 (9th Cir. 2008) ................................................................ 39

*Litman v. Mass. Mut. Life Ins. Co.*,
   825 F.2d 1506 (11th Cir. 1987) .................................................................... 4

*Louisville Bedding Co. v. Pillowtex Corp.*,
   455 F.3d 1377 (Fed. Cir. 2006)................................................................... 27

*Lucille v. City of Chicago*,
   No. 95-2109, 1995 WL 606926 (7th Cir. Oct. 31, 1995) ........................... 26

*Lummus Co. v. Commonwealth Oil Refining Co.*,
   280 F.2d 915 (1st Cir. 1960)....................................................................... 62

*Lynch v. United States*,
   292 U.S. 571 (1934).................................................................................... 66

*Matura v. United States*,
    189 F.R.D. 86 (S.D.N.Y. 1999) ........................................................................ 38

*Mazzone v. Stamler*,
    157 F.R.D. 212 (S.D.N.Y. 1994) ...................................................................... 17

*MDFC Loan Corp. v. First Shopping Ctr. P'ship*,
    Civ. No. 93C4481, 1996 WL 99909 (N.D. Ill. Mar. 1, 1996) ............................... 10

*Menashe v. Sutton*,
    90 F. Supp. 531 (S.D.N.Y. 1950)...................................................................... 40

*Merryman v. Gottlieb*,
    99 A.D.2d 893 (N.Y. App. Div. 1984) .......................................................... 32, 61

*Metlyn Realty Corp. v. Esmark, Inc.*,
    763 F.2d 826 (7th Cir. 1985) ................................................................. 29, 56, 61

*Metropolitan Life Ins. Co. v. RJR Nabisco*,
    906 F.2d 884 (2d Cir. 1990).............................................................................. 70

*Migliore v. Manzo,*
     28 A.D.3d 620 (N.Y. App. Div. 2006) ............................................................. 74

*Miller v. JetBlue Airways Corp.*,
    No. 102398/2009, 2009 WL 2514155 (N.Y. Sup. Ct. Aug. 17, 2009).................. 58

*Montefiore Med. Ctr. v. Crest Plaza LLC,*
    No. 05535/08, 2009 WL 1675994 (N.Y. Sup. Ct. June 16, 2009)......................... 71

*N.L.R.B. v. Catholic Bishop of Chicago*,
    440 U.S. 490 (1979)........................................................................................... 68

*Nash v. Kornblum*,
    12 N.Y.2d 42 (1962) .......................................................................................... 29

*Negron v. Weiss*,
    No. 06-cv-1288, 2006 WL 2792769 (E.D.N.Y.  Sept. 27, 2006) ......................... 10

*Nemaizer v. Baker*,
    793 F.2d 58 (2d Cir. 1986)........................................................................... 50, 51

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)......................................................................................... 8, 9

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
    442 F.3d 101 (2d Cir. 2006)............................................................................... 73

*O'Callaghan v. Shirazi*,
  204 F. App'x 35 (1st Cir. 2006) ..................................................................... 40

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand*,
  322 F.3d 147 (2d Cir. 2003) ........................................................................... 40

*Olle v. Henry & Wright Corp.*,
  910 F.2d 357 (6th Cir. 1990) ......................................................................... 57

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
  848 F.2d 414 (3d Cir. 1988) ...................................................................... 9, 10

*Peltz v. Hatten*,
  279 B.R. 710 (D. Del. 2002) ..................................................................... 46, 53

*Pence v. Langdon*,
  99 U.S. 578 (1878) ........................................................................................ 14

*Perelman v. Snowbird Ski Shop, Inc.*,
  626 N.Y.S.2d 304 (N.Y. App. Div. 1995) ..................................................... 57

*Philip v. Mayer, Rothkopf Indus., Inc.*
  635 F.2d 1056 (2d Cir. 1980) ........................................................................ 38

*PRC Harris, Inc. v. Boeing Co.*,
  700 F.2d 894 (2d Cir. 1983) .......................................................................... 18

*Press v. Chemical Inv. Servs. Corp.*,
  166 F.3d 529 (2d Cir. 1999) .......................................................................... 77

*Prince of Peace Enter., Inc. v. Top Quality Food Market, LLC*,
  496 F. Supp. 2d 354 (S.D.N.Y. 2007) ........................................................... 39

*Rancourt v. Verba*,
  678 A.2d 886 (Vt. 1996) ................................................................................ 62

*Rand Int'l Leisure Prods., Ltd. v. TekSource, L.C.*,
  No. 97 CV 0319, 1998 WL 372356 (E.D.N.Y. July 2, 1998) ........................ 56

*Reynolds v. C.I.R.*,
  861 F.2d 469 (6th Cir. 1988) ........................................................................... 9

*Richard v. Allen*,
  No. 95-3451, 1996 WL 102419 (6th Cir. Mar. 7, 1996) ................................ 18

*Rodriguez v. Mitchell*,
  No. 96-2534, 1997 WL 311801 (2d Cir. June 4, 1997) .................................... 2

*Rosenshein v. Kleban*,
    918 F. Supp. 98 (S.D.N.Y. 1996) ............................................................ 9

*Ruckelshaus v. Monsanto*,
    467 U.S. 986 (1984) ................................................................... 66, 68

*Ruzow v. Nyco Minerals Inc.*,
    245 A.D.2d 746 (N.Y. App. Div. 1997) ................................................ 73

*Sarinsky's Garage Inc. v. Erie Ins. Co.*,
    691 F. Supp. 2d 483 (S.D.N.Y. 2010) ................................................. 72

*Saxe v. E.F. Hutton & Co., Inc.*,
    789 F.2d 105 (2d Cir. 1986) ............................................................... 77

*Scherer v. City of New York*,
    No. 03 Civ. 8445, 2007 WL 2710100 (S.D.N.Y. Sept. 7, 2007) ........... 56

*Schultz v. F.D.I.C.*,
    Civ. No. 85-5085, 1993 WL 661751  (D. S.D. Jan. 28, 1993) .............. 40

*Schum v. Bailey*,
    578 F.2d 493 (3d Cir. 1978) ............................................................... 39

*SEC v. H.K. Freeland and Co.*,
    91 Civ. 7986, 1993 WL 33659 (S.D.N.Y. Feb. 1, 1993) ..................... 20

*Seese v. Volkswagenwerk, A.G.*,
    679 F.2d 336 (3d Cir. 1982) ................................................................. 3

*Seidle v. GATX Leasing Corp.*,
    45 B.R. 327 (S.D. Fla. 1984) ............................................................. 11

*Sewell v. The 1199 Nat'l Benefit Fund for Health & Human Servs.*,
    187 F. App'x 36 (2d Cir. 2006) ............................................................ 9

*Sherman v. Verizon Va., Inc.*,
    220 F.R.D. 2602 (E.D. Va. 2002) ....................................................... 55

*Simmons v. Cal. Inst. of Tech.*,
    209 P.2d 581 (Cal. 1949) ............................................................. 32, 62

*Simon v. Pay Tel Mgmt., Inc.*,
    No. 91-2220, 1992 WL 9429 (7th Cir. Jan. 22, 1992) ....................... 18

*Simons v. Crowley*,
    112 N.Y.S.2d 851 (N.Y. Sup. Ct. 1952) ........................................ 32, 62

*Slater v. Slater,*
   208 A.D. 567 (N.Y. App. Div. 1924) ................................................................ 32

*Slattery Skanska Inc. v. Am. Home Assur. Co,*
   67 A.D.3d 1 (N.Y. App. Div. 2009) .................................................................. 29

*Sloan v. Bertelsmann Music Group,*
   No. 92-1825, 1993 WL 359470 (4th Cir. Sept. 16, 1993) ................................. 18

*Snyder v. Consol. Freightways, Inc.,*
   No. 92-16960, 1994 WL 27737 (9th Cir. Jan. 28, 1994) .................................... 98

*Srinivasan v. Devry Inst. of Tech.,*
   1995 WL 242307 (9th Cir. April 25, 1995) ....................................................... 39

*Standard Oil Co. of Cal. v. United States,*
   429 U.S. 17 (1976) ........................................................................................ 5, 6

*Terry Oilfield Supply Co., Inc. v. American Sec. Bank, N.A.,*
   195 B.R. 66 (S.D. Tex. 1996) ...................................................................... 36, 75

*TIG Premier Ins. Co. v. Hartford Acc. & Indem. Co.,*
   35 F. Supp. 2d 348 (S.D.N.Y. 1999) ................................................................ 74

*Travelers Indem. Co. v. Scor Reinsurance Co.,*
   62 F.3d 74 (2d Cir. 1995) ................................................................................ 74

*TVT Records v. Island Def Jam Music Group,*
   412 F.3d 82 (2d Cir. 2005) .............................................................................. 71

*UCAR Int'l, Inc. v. Union Carbide Corp.,*
   No. 00-cv-1338, 2004 WL 137073 (S.D.N.Y. Jan. 26, 2004) ...................... 19, 53

*United States v. Bank of N.Y.,*
   14 F.3d 756 (2d Cir. 1994) .............................................................................. 51

*United States v. Ben Zvi,*
   242 F.3d 89 (2d Cir. 2001) ......................................................................... 2, 3, 6

*United States v. Fernandez,*
   506 F.2d 1200 (2d Cir. 1974) ............................................................................ 5

*United States v. Int'l Bhd. of Teamsters,*
   247 F.3d 370 (2d Cir. 2001) ............................................................ 1, 38, 52, 56

*United States v. Jones,*
   294 F. App'x 624 (2d Cir. 2008) ........................................................................ 2

*United States v. One Douglas A-26B Aircraft*,
  662 F.2d 1372 (11th Cir. 1981) .................................................................................... 25, 26

*United States v. One Hundred Nineteen Thousand Nine Hundred Eighty Dollars*,
  680 F.2d 106 (11th Cir. 1982) ........................................................................................ 25

*United States v. One Toshiba Color Television*,
  213 F.3d 147 (3d Cir. 2000)............................................................................................ 25

*United States v. Quinones*,
  511 F.3d 289 (2d Cir. 2007)............................................................................................ 13

*United States v. Quintieri*,
  306 F.3d 1217 (2d Cir. 2002)........................................................................................ 3, 6

*United States v. Salerno*,
  932 F.2d 117 (2d Cir.1991)....................................................................................... passim

*United States v. Stanley*,
  54 F.3d 103 (2d Cir. 1995)........................................................................................ 3, 6, 30

*United States v. Tenzer*,
  213 F.3d 34 (2d Cir. 2000)............................................................................................... 5

*United States v. Vidal*,
  136 F. App'x 438 (2d Cir. 2005) ................................................................................... 3, 6

*United States v. Winstar*,
  518 U.S. 839 (1996)....................................................................................................... 66

*United States. v. Cirami*,
  535 F.2d 736 (2d Cir. 1976)........................................................................................... 56

*Universal City Studios, Inc. v. Reimerdes*,
  104 F. Supp. 2d 334 (S.D.N.Y.2000)............................................................................. 20

*Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*,
  528 F.3d 712 (10th Cir. 2008) ....................................................................................... 48

*Veal v. Geraci*,
  23 F.3d 722 (2d Cir.1994)............................................................................................... 20

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*,
  1 N.Y.3d 470 (2004) ...................................................................................................... 29

*Vonderahe v. Polaniecki*,
  276 B.R. 856 (S.D. Ohio 2001) ..................................................................................... 59

*Wagner v. Prof'l Eng'rs in Cal. Gov't*,
    354 F.3d 1036 (9th Cir. 2004) ........................................................ 8

*Waldorf v. Borough of Kenilworth*,
    878 F. Supp. 686 (D. N.J. 1995) .................................................... 28

*Westmark Dev. Corp. v. Century Surety Co.*,
    199 F.R.D. 491 (W.D.N.Y. 2001) .................................................. 19

*William P. Pahl Equip. Corp. v. Kassis*,
    588 N.Y.S.2d 8 (N.Y. App. Div. 1992) ......................................... 30

*Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.*,
    22 A.D.3d 308 (N.Y. App. Div. 2005) .......................................... 96

*Yagoda v. Strang Corp.*,
    Civ. No. 08-1901, 2008 WL 4606306 (D. N.J. Oct. 16, 2008)....... 62

*Yankee Atomic Power Co. v. United States*,
    94 Fed. Cl. 678 (2010) ................................................................... 3

*Zedner v. United States*, 547 U.S. 489 (2006) ............................... 9

## **Statutes**

11 U.S.C. § 101 ............................................................................... 64

11 U.S.C. § 102 ........................................................................ 43, 59

11 U.S.C. § 105 ............................................................................... 33

11 U.S.C. § 363 ........................................................................ 23, 59

11 U.S.C. § 549 ............................................................................... 58

11 U.S.C. § 559 ........................................................................ 63, 65

11 U.S.C. § 1125 ............................................................................. 44

7 U.S.C. § 2(a)(1)............................................................................ 92

## **Other Authorities**

11 WILLISTON ON CONTRACTS § 31:5 (4th ed. 2009) ..................... 29

13 S. WILLISTON ON CONTRACTS § 1543, p. 75 (3d ed. 1970) ....... 51

17A Am. Jur. 2d Contracts § 533 .................................................. 33, 63

17B C.J.S. Contracts § 459 ........................................................................................... 33, 63

18B Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 4478.3 (2d. ed. 2002)...................... 3

Glen Banks, N.Y. PRAC., CONTRACT LAW § 8.11 (2009) ............................................. 98

RESTATEMENT (SECOND) OF CONTRACTS ........................................................... passim

Wright & Miller, 11 FEDERAL PRACTICE AND PROCEDURE, § 2859 ...................................... 25, 55

## **Rules**

12 C.F.R. § 220.1(a).................................................................................................... 91

12 C.F.R. § 220.2 ................................................................................................... 92, 93

12 C.F.R. § 220.9(b) ..................................................................................................... 93

15 U.S.C. § 78fff-1(a) ................................................................................................... 98

15 U.S.C. § 78fff-2(f) ................................................................................................... 98

17 C.F.R. § 1.65 ........................................................................................................... 94

17 C.F.R. § 190.06.................................................................................................. 94, 95

17 C.F.R. § 240.15c3-3 .......................................................................................... 95, 96

Fed. R. Bankr. P. 7009................................................................................................. 55

Fed. R. Bankr. P. 9006................................................................................................. 52

Fed. R. Bankr. P. 9014................................................................................................. 55

Fed. R. Civ. P. 9(b) ...................................................................................................... 56

Fed. R. Civ. P. 60 ............................................................................................. 17, 24, 52

Fed. R. Evid. 201 ......................................................................................................... 89

N.Y. Rules of Professional Conduct, Rule 3.3(a) ......................................................... 7

## <u>CONCLUSIONS OF LAW</u>

1.    <u>**RULE 60(B) MOTIONS ARE GENERALLY DISFAVORED AND ARE
ESPECIALLY DISFAVORED IN ATTACKS ON BANKRUPTCY SALE
ORDERS.**</u>

1.1.    Rule 60(b) motions seek "extraordinary relief," require a showing of "exceptional

circumstances," and are "generally not favored." *United States v. Int'l Bhd. of Teamsters*, 247

F.3d 370, 391 (2d Cir. 2001); *In re Enron Corp.*, 352 B.R. 363, 369 (Bankr. S.D.N.Y. 2006).

1.2.    Because the finality of bankruptcy sales is necessary to encourage serious bidders,

a bankruptcy court's discretion under Rule 60(b) to vacate a sale order is "very limited." *In re

Chung King, Inc.*, 753 F.2d 547, 549-50 (7th Cir. 1985) (to overturn a confirmed sale, a court

must find "a fundamental defect which would shock the conscience"); *accord, In re General

Insecticide Co.*, 403 F.2d 629, 630-31 (2d Cir. 1968) (Rule 60 standard stricter in bankruptcy

cases, given the importance of ensuring the finality of judicial sale orders); *In re Frankel*, 191

B.R. 564, 572 (Bankr. S.D.N.Y. 1995) (only "fundamental errors or compelling equities" allow

for Rule 60(b) relief).

1.3.    There is a well-established public policy of upholding the finality of sale orders

issued by bankruptcy courts, so as to encourage potential acquirers to make bids on assets in

bankruptcy. *In re Chung King, Inc.*, 753 F.2d 547, 549 (7th Cir. 1985) (finality policy necessary

to encourage serious bidders); *In re Lawrence*, 293 F.3d 615, 621 (2d Cir. 2002) (finality policy

"particularly important" in bankruptcy).

1.4.    As the Trustee has stated to this Court:

…I think if people had gone to Barclays and said oh, Barclays wants to take the
accounts but, by the way, we can only transfer eighty percent of the
property that goes with those accounts or ninety percent or seventy-five percent at
least right away, ***I very much doubt that Barclays would have participated in any***

1

*transaction like that. **And the next time some liquidation like this happened**,
God forbid that it happens, but it happened once it could happen again, **I think
any potential transferee would have real cold feet** if they didn't know that there
would be a complete transfer of property to go along with the accounts that they
were going to have to administer for those customers.*

BCI Ex. 51 (12/10/09 Tr.) at 33:17-34:3 (emphasis added).

**2.    THE MANDATE RULE PROVIDES THAT A LOWER COURT HAS NO
JURISDICTION TO ALTER AN ORDER THAT WAS AFFIRMED ON APPEAL,
AND THEREFORE BARS ALL CLAIMS THAT WERE RAISED OR COULD
HAVE BEEN RAISED DURING THE PENDENCY OF THE APPEAL.**

**A.    The Mandate Rule Bars Matters Expressly Or Implicitly Decided On
Appeal.**

2.1.    The mandate rule is a jurisdictional limitation on a court's ability to alter an order

after it has been challenged and affirmed on appeal. *Fine v. Bellefonte Underwriters Ins. Co.*,

758 F.2d 50, 52 (2d Cir. 1985).  This means the burden is on the Movants to demonstrate their

ability to bring their claims notwithstanding the District Court's affirmance of the Sale Order

(and the Second Circuit mandate dismissing the appeal).

2.2.    The mandate rule requires compliance by lower courts "with the dictates of the

superior court and forecloses relitigation of issues expressly or *impliedly* decided by the appellate

court."[1] *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (emphasis in original) (citations

omitted); *see also Rodriguez v. Mitchell*, No. 96-2534, 1997 WL 311801, at *1-2 (2d Cir. June 4,

1997) (denying Rule 60(b) motions because appellate decision put the issue beyond the authority

of the lower court).

---

[1] The mandate rule applies to both factual and legal determinations. *United States v. Jones*, 294
F. App'x 624, 628 (2d Cir. 2008) (law of the case precludes reconsideration of findings of fact
and law where party could have challenged those findings on prior appeal).

**B.** **The Mandate Rule Bars Claims That Could Have Been Raised On Appeal.**

2.3.     In addition to applying to issues expressly or impliedly decided by the appellate

courts, the mandate rule forecloses consideration of issues that *could have been raised* during a

prior appeal but were not.  *United States v. Vidal*, 136 F. App'x 438, 439-40 (2d Cir. 2005);

*United States v. Zvi*, 25 F. App'x 34, 36 (2d Cir. 2001); *United States v. Stanley*, 54 F.3d 103,

107 (2d Cir. 1995).  Thus, a lower court may not modify an affirmed order "on the basis of

matters included *or includable*" in a prior appeal.  *Seese v. Volkswagenwerk, A.G.*, 679 F.2d 336,

337 (3d Cir. 1982) (emphasis added); *United States v. Quintieri*, 306 F.3d 1217, 1225-31 (2d Cir.

2002); *Yankee Atomic Power Co. v. United States*, 94 Fed. Cl. 678, 719 (2010) ("The mandate

rule precludes consideration of any issue within the scope of the underlying judgment, not

merely those issues raised on appeal").

2.4.     If a party could have raised certain arguments or was aware of specific evidence

prior to the appellate court's decision, the lower court is not permitted to deviate from the

appellate court's mandate based upon that evidence or those arguments.  *United States v.

Quintieri*, 306 F.3d 1217, 1225-31 (2d Cir. 2002); *Accord Fine v. Bellefonte Underwriters,* 758

F.2d 50, 52 (2d Cir. 1985); *Fogel v. Chestnut*, 668 F.2d 100, 109 (2d Cir. 1981) ("It would be

absurd that a party who has chosen not to argue a point on a first appeal should stand better as

regards the law of the case than one who had argued and lost.").

2.5.     A lower court is not "permitted to reconsider its own rulings made before appeal

and not raised on appeal."  18B Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 4478.3

(2d. ed. 2002).

2.6.    Furthermore, the mandate rule even applies to litigants who were not parties to the prior appeal. *In re Marlar*, 288 B.R. 823 (Bankr. W.D. Ark. 2003). Doing so is especially appropriate where the litigant had enough information at the time to join the prior appeal or file its own appeal, but chose not to do so.

### C.    The Mandate Rule Applies With Special Force Where A Party Changes A Position It Had Successfully Advocated.

2.7.    The mandate rule applies with special force where a party changes a position it successfully advocated in the prior appeal, as a party successful on an appeal "cannot change its mind and take unilateral action in a trial court to modify the mandate of [a superior] court." *Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1515 (11th Cir. 1987); *see Am. Home Assur. Co. v. Am. Fidelity*, 261 F. Supp. 734, 735 (S.D.N.Y. 1966) ("plaintiffs are barred by the former action from now attacking the arbitration procedure they previously sought enforced.").

2.8.    Allowing the successful party to seek to modify a judgment would lead to uncertainty and invite abuse. It would be contrary to the strong policy favoring finality of judgments. *See Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1516 (11th Cir. 1987) (quoting *ATSA of California, Inc. v. Continental Ins. Co.*, 754 F.2d 1394, 1396 (9th Cir. 1985)).

### D.    The Mandate Rule Arguably Has No Exceptions, And Any Possible Exception Should Be Construed Narrowly, And Should Require The Presentation Of New Evidence That Was Not Known And Not Reasonably Knowable During The Pendency Of The Prior Appeal.

2.9.    Several Second Circuit cases indicate that there are no exceptions to the "rigid" mandate rule. For example, in contrasting the mandate rule with the more flexible law of the case rule (which allows reconsideration based on new evidence and other compelling circumstances), then-Judge Sotomayor described the mandate rule as follows: "This rule that the

district court's authority on remand is limited to those issues left open by the mandate is a firm

one and rigidly binds the district court." *Burrell v. United States*, 467 F.3d 160, 165 (2d Cir.

2006).

2.10.    The Second Circuit has held that a "trial court is barred from reconsidering or

modifying any of its prior decisions that have been ruled on," *Burrell v. United States*, 467 F.3d

160, 165 (2d Cir. 2006), and has applied the mandate rule despite claims of new evidence and

"even though [the trial court] evidently felt the new evidence supported his disagreement with

that decision," *United States v. Tenzer*, 213 F.3d 34, 40 (2d Cir. 2000).

2.11.    "The issue presented to us, therefore, is whether a district court, on remand after

appeal, may change the law of the case as established by this court on the basis of new evidence.

We are constrained to hold that it may not unless, of course, authorized to do so by the terms of

the remand." *United States v. Fernandez*, 506 F.2d 1200, 1202-03 (2d Cir. 1974); *Banco

Nacional de Cuba v. Farr*, 383 F.2d 166, 177-78 (2d Cir. 1967) (mandate rule "prevents the

lower court from considering newly discovered evidence").

2.12.    Even if an exception to the mandate rule exists for "newly discovered evidence,"

it must be evidence that was not discovered, or with reasonable diligence could not have been

discovered, until after the appellate mandate was rendered.  When considering a Rule 60

challenge to an affirmed order based on fraud that was not discovered until after the initial

affirmance, the Supreme Court noted that "the appellate mandate relates to the records and issues

then before the court, and does not purport to deal *with possible later events*."  *Standard Oil Co.

of Cal. v. United States*, 429 U.S. 17, 18 (1976) (emphasis added).

2.13.    While the language in *Standard Oil* discusses the mandate as dealing with "issues

then before the [appellate] court," the Second Circuit has applied the mandate rule to issues that

could have been before the appellate court, but were not because a party failed to raise those

issues despite having an opportunity to do so.  *United States v. Quintieri*, 306 F.3d 1217, 1225-

31 (2d Cir. 2002) (explaining that under the mandate rule, "where an issue was ripe for review at

the time of an initial appeal but was nonetheless foregone, it is considered waived and the law of

the case doctrine bars the district court on remand and an appellate court in a subsequent appeal

from reopening such issues"); *Accord United States v. Vidal*, 136 F. App'x 438, 439-40 (2d Cir.

2005); *United States v. Zvi*, 25 F. App'x 34, 36 (2d Cir. 2001); *United States v. Stanley*, 54 F.3d

103, 107 (2d Cir. 1995).

2.14.    Therefore, the mandate rule bars lower courts from considering any claim relating

to an appealed order, unless that claim "deals with possible later events" occurring after the

appellate mandate.  *See Standard Oil Co. of Cal. v. United States*, 429 U.S. 17, 18 (1976).

Where there is an appellate mandate, courts only have jurisdiction to consider a "Rule 60(b)

motion based on matters that *come to light after the appellate court has issued a decision*."

*Bernheim v. Jacobs*, 144 F. App'x 218, 222 (3d Cir. 2005) (emphasis added).

2.15.    To the extent a Rule 60(b) claim is based on information discovered or

discoverable when an appeal was pending, the decision in *In re Tri-Cran*, 98 B.R. 609 (Bankr. D.

Mass. 1969), provides an example of what should be done to avoid the mandate rule.  *Tri-Cran*

involved a § 363 sale that was challenged on appeal even though the sale was not stayed pending

appeal.  *Id.* at 613.  As the appeal was pending, a Chapter 11 Trustee investigated the sale and

discovered information casting doubt on the propriety of the sale.  *Id.*  Upon discovering this

information, the Trustee — who was not a party to the original appeal — filed a motion asking

the district court to stay its decision and to remand the case to the bankruptcy court, which the

district court granted.  *Id.*  The bankruptcy court ultimately set aside the sale, as there was no

appellate mandate restricting the court's jurisdiction because the movants acted diligently upon

discovering evidence as the appeal was pending.

2.16.    In this case, unlike *Tri-Cran*, the Movants knew all the information on which their

claims were based *before the Closing*, let alone before the mandate issued.  FOF ¶ 48.  They

certainly knew all the information on which they have based their claims before the deadline for

filing an appeal.   FOF ¶¶ 46-48.  But even if that were not the case, the decision in *Tri-Can*

demonstrates that if the Movants had really believed any information they learned while the

appeal was pending, such as the Barclays announcement of its accounting gain in February 2009,

created a potential problem that might cause them to even consider, at some point in the future,

challenging the Sale Orders that they were then *defending on appeal*, they were obligated to

inform the District Court of that concern.  They did not do so.

2.17.    Indeed, as a matter of law, while the appeal was pending, the lawyers representing

the Trustee and the Debtor had an obligation to tell the District Court if they learned anything

that they believe contradicted their representations to the District Court (such as, for example,

their representation that "all relevant facts were disclosed to the Bankruptcy Court").  N.Y. Rules

of Professional Conduct, Rule 3.3(a).  They did not do so.  *As a matter of law, they are therefore*

*barred by the Mandate Rule from now relying upon information that they had while they were*

*defending the Sale Order on appeal, as an alleged basis for asking this Court to make the same*

*kinds of drastic modifications to the Sale Order that they persuaded the District Court **not to***

***permit**.  See* FOF ¶ 61; COL ¶¶ 6.5-6.7.

2.18.    As explained below (COL ¶¶ 6.5-6.7), in affirming the Sale Order on appeal, Judge Cote held that a *modification* to the Sale Order that involved removing any of the protections against successor liability that Barclays had insisted be included in the Sale Order (*see* BCI 16 (Sale Order), ¶¶ O, P, and S) was equivalent to a challenge to "the validity" of the Sale Order.  *In re Lehman Bros. Holdings, Inc*, 415 B.R. 77, 85 (S.D.N.Y. 2009).  That ruling, like all of the District Court's rulings, is the law of the case and covered by the Mandate Rule, and this Court is not free to depart from it.

2.19.    Thus, as a matter of law, the Movants are barred by the Mandate Rule (which is part of, and includes, the law of the case doctrine), from seeking the relief from the Sale Order that they successfully asked the District Court to deny to the Bay Harbour appellants.

3.    **JUDICIAL ESTOPPEL BARS LITIGANTS FROM ADOPTING POSITIONS CONTRARY TO THOSE THEY SUCCESSFULLY ADVOCATED TO THIS COURT OR THE DISTRICT COURT.**

3.1.    Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contrary argument to prevail in another phase."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted).

3.2.    The doctrine applies to a party's assertions of fact and law.  *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004).  It safeguards the integrity of the judicial process by avoiding unfair results and protecting the court from chameleonic litigants who seek to prevail in different phases of a case on opposite theories.  *Id.*

3.3.    The doctrine is particularly important in bankruptcy cases and works to prevent a party from "thwart[ing] a bankruptcy order which has been 'conceived and fostered through its

participation.'" *In re J.F. Hink & Son*, 815 F.2d 1314, 1318 (9th Cir. 1987) (citations omitted);

*see also Rosenshein v. Kleban*, 918 F. Supp. 98, 104 (S.D.N.Y. 1996).[2]

3.4.    "Judicial estoppel is invoked where (1) a party's later position is 'clearly

inconsistent' with its earlier position, and (2) the party has succeeded in persuading a court to

accept its earlier position." *Sewell v. The 1199 Nat'l Benefit Fund for Health & Human Servs.*,

187 F. App'x 36, 40 (2d Cir. 2006).[3]

3.5.    A bankruptcy court's granting of a debtor's motion for approval of an agreement

constitutes acceptance of the debtor's statements that the agreement is fair, reasonable and in the

best interest of the estate and creditors. *In re Bradlees Stores, Inc.*, No. 00-16033, 2001 WL

1112308, at *11 (S.D.N.Y. Sept. 20, 2001); *accord Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th

Cir. 1988) (a bankruptcy court's approval of an agreement constitutes "judicial acceptance" for

purposes of judicial estoppel).

3.6.    Judicial estoppel doctrine also applies to parties who acquiesce by silence and by

signing off on the final terms of transaction documents. *See, e.g., Oneida Motor Freight, Inc. v.

United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988) (applying judicial estoppel to bar debtor's

suit against bank because suit was "clearly contrary" to debtor's prior silence and treatment of

---

[2] Despite some earlier authority requiring a "separate proceeding," the Supreme Court's decision in *New Hampshire*, which was reaffirmed in *Zedner v. United States*, 547 U.S. 489, 504-06 (2006), makes clear that for judicial estoppel to apply the earlier, inconsistent position need be made only in an earlier "phase" of the same litigation. *See, e.g., Sewell v. The 1199 Nat'l Benefit Fund for Health & Human Serv.*, 187 F. App'x 36, 40-41 (2d Cir. 2006) (judicial estoppel invoked because position on appeal conflicted with position on motion for reconsideration in the district court).

[3] Although a factor, detrimental reliance of the party seeking estoppel is not necessary because the judicial estoppel doctrine is concerned with protecting the integrity of the judicial system rather than the litigants. *See In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999).

bank's claim as undisputed in Chapter 11 proceedings); *Negron v. Weiss*, No. 06-cv-1288, 2006

WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006) (same); *Griggs v. Marion Hosp. Corp.*, No. 2004-

CV-4241, 2005 WL 1802249, at *2 (S.D. Ill. July 28, 2005) (judicial estoppel barred former

debtor's discrimination claim because of debtor's silence and failure to list claim as an asset in

bankruptcy proceedings); *MDFC Loan Corp. v. First Shopping Ctr. P'ship*, Civ. No. 93C4481,

1996 WL 99909, at *8 (N.D. Ill. Mar. 1, 1996) (judicial estoppel bars the taking of a position that

is "clearly inconsistent" with a "prior position, whether explicit or implied through silence").

*See also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321

(3d Cir. 2003) (following *Oneida*).


4.    **EQUITABLE ESTOPPEL BARS LITIGANTS FROM NOW TAKING
POSITIONS INCONSISTENT WITH THEIR PRIOR CONDUCT ON WHICH
THE OPPOSING PARTY REASONABLY RELIED.**

4.1.    "The doctrine of equitable estoppel is properly invoked where the enforcement of

the rights of one party would work an injustice upon the other party due to the latter's justifiable

reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assoc.*, 274

F.3d 706, 725 (2d Cir. 2001).


4.2.    Equitable estoppel applies where:  (1) a party makes a misstatement of fact or

engages in other conduct (including silence) with reason to believe that the other party will rely

upon it; (2) the other party reasonably relies upon it; and (3) suffers prejudice as a result.

*Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d 706, 725-26 (2d Cir. 2001).


4.3.    Equitable estoppel applies even if the party that induced reliance acted without

any intent to deceive.  *Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d 706, 726 (2d Cir.

2001).

4.4.      Parties in bankruptcy who agree to certain terms or request the court to adopt

specific positions (as well as those who hold claims derived from those who agree or request

specific relief from the court) are often estopped from later taking a contrary position.  *In re*

*Ionosphere Clubs, Inc.*, 85 F.3d 992, 999-1000 (2d Cir. 1995); *In re Teligent*, 326 B.R. 219, 226-

27 (S.D.N.Y. 2005).[4]

4.5.      Thus, for example, the Second Circuit applied equitable estoppel to prevent a

trustee from seeking to recover insurance premiums paid by a debtor pursuant to a contract the

debtor had assumed on the ground that they exceeded limits imposed by state law.  *Ionosphere*

*Clubs, Inc.*, 85 F.3d 992, 999-1000 (2d Cir. 1995).  "Based on equitable principles, once a party

accepts the proceeds and benefits of a contract, that party is estopped from renouncing the

burdens the contract places upon him."  *Id.* at 999-1000.

4.6.      "The notion that a party in bankruptcy can be permitted to thwart a bankruptcy

order which has been conceived and fostered through its participation has been vigorously

rejected."  *Ionosphere Clubs, Inc.*, 85 F.3d 992, 1000 (2d Cir. 1995) (quoting *In re J.F. Hink &*

*Son*, 815 F.2d 1314, 1318 (9th Cir. 1987)).

4.7.      Silence alone can give rise to equitable estoppel.  Courts apply equitable estoppel

when a party has an opportunity to object to a bankruptcy order, fails to do so, and then

challenges the order based on information of which it was previously aware.  *In re Varat Enter.,*

---

[4] *Accord, In re Home & Hearth Plano Pkwy., L.P.*, 320 B.R. 596, 609 (Bankr. N.D. Tex. 2004)
(debtor estopped from recovering surplus proceeds generated from the sale of his home because
he had previously stipulated that he had no equity in the home); *Seidle v. GATX Leasing Corp.*,
45 B.R. 327, 330 (S.D. Fla. 1984) (Trustee equitably estopped from recovering preferential
transfers because of the debtor's "execution of a stipulation which was predicated on their
validity and by its representations to the bankruptcy court in seeking approval for that
stipulation.").

*Inc.*, 81 F.3d 1310, 1317 (4th Cir. 1996); *In re Colarusso*, 280 B.R. 548, 560 (Bankr. D. Mass. 2002) (defendant's failure to object during sale proceedings "induced the other parties to the transaction to reasonably rely on the finality of the proceedings and thus precludes her from claiming any right to the property"); *In re Newport Offshore, Ltd.*, 86 B.R. 325, 326 (Bankr. D. R.I. 2988) (equitable estoppel barred the Army's Rule 60 challenge to a prior bankruptcy order because it failed to object to the order and instead chose "to sit back, knowing that its silence and inaction would be interpreted as" approval).

4.8.    In *In re Varat Enterprises*, the court applied equitable estoppel to prevent a creditor from challenging a confirmed plan because the creditor failed to raise any objection at the time the bankruptcy court approved the plan.  Equitable estoppel was appropriate because the creditor knew the critical facts, did not object, and the other parties involved "had a right to assume it could rely on [the creditor's] conduct."  *In re Varat Enter., Inc.*, 81 F.3d 1310, 1318-19 (4th Cir. 1996).

4.9.    Additionally, a party who affirmatively represents its consent to a contract, court order, or specific conduct is estopped from taking an inconsistent position — even if that party was "innocent" in making an "error" that the position was based on — so long as the other party's reliance on that consent was reasonable.  *In re Vick*, 75 B.R. 248, 249 (Bankr. E.D. Va. 1987).

4.10.    A party cannot escape equitable estoppel by arguing that even though it had knowledge of some of the relevant facts, it did not have "all the information" because "certain depositions and discovery were not fully complete."  *In re CCGK Investors*, 145 B.R. 908, 911

(N.D. Ill. 1992).  Once a party is "[a]rmed with the knowledge of a potential claim" in this

context, it should "at least inform" the other party "that such a claim was possible."  *Id.*

4.11.   As the cases demonstrate, bankruptcy courts frequently apply equitable estoppel

because finality in bankruptcy proceedings is "particularly important."  *In re Lawrence*, 293 F.3d

615, 621 (2d Cir. 2002).

**5.     WAIVER BARS LITIGANTS FROM MAKING CLAIMS INCONSISTENT WITH
THEIR PRIOR CONDUCT WHEN THAT CONDUCT WAS INCONSISTENT
WITH AN INTENT TO BRING THE CURRENT CLAIMS.**

5.1.   Waiver is the intentional relinquishment of a known right.  *United States v.*

*Quinones*, 511 F.3d 289, 321 n.21 (2d Cir. 2007).  Though waiver and estoppel are related and

sometimes used interchangeably, there are differences in application:

> Waiver . . . focuses on intent.  If an individual intentionally relinquishes a known
> right, either expressly or by conduct inconsistent with an intent to enforce that
> right, he has waived it.  Estoppel, on the other hand, focuses on the effects of the
> conduct of the obligee.  It arises when a party's conduct misleads another into
> believing that a right will not be enforced and causes the other party to act to his
> detriment in reliance upon this belief.

*J.H. Cohn & Co. v. Am. Appraisal Assoc. Inc.*, 628 F.2d 994, 1000 (7th Cir. 1980).

5.2.   Bankruptcy courts apply waiver to bar a party from challenging a sale order when

that party could have asserted its objection at the time of the sale hearing, yet chose not to do so.

*In re Garfinkle*, 672 F.2d 1340, 1347-48 (11th Cir. 1982) (waiver and equitable estoppel

prevented buyer from challenging the validity of the sale based upon the existence of leases on

the property, because the buyer knew of the leases but made no objection at the time the court

approved the Sale, and the "Trustee would not have entered into the Contract with appellants if

they had made their objections known beforehand"); *accord Byrd v. Hoffman*, 417 B.R. 320, 330

(D. Md. 2008) (a "party in interest waive[s] its objection . . . when it fail[s] to raise the objection

prior to or at the [] hearing, despite the party's ability to raise the objection at the hearing"); *In re*

*New River Shipyard, Inc.*, 355 B.R. 894, 910-12 (Bankr. S.D. Fla. 2006) (creditor barred by

waiver and estoppel from bringing a challenge to a confirmation plan where the party was aware

of its basis for the objection at the time of the order, yet did not object); *In re Kjeldahl*, 52 B.R.

916, 921 (D. Minn. 1985) (waiver implied from failure to object to sale).

5.3.    Although Movants' note that a party is not deemed to have waived a right when it

fails to act on mere "suspicion or rumor," their own case expressly finds that waiver does occur

from silence in the face of "knowledge of facts which will enable the party to take effectual

action," and that waiver also occurs if the party "willfully shut[s] his eyes to what he might

readily and ought to have known."  *Pence v. Langdon*, 99 U.S. 578, 581 (1878).

## 6.    EQUITABLE MOOTNESS BARS THE MODIFICATION OF A COMPLETED TRANSACTION IN A MANNER THAT DEPRIVES THE BUYER OF BARGAINED-FOR RIGHTS.

6.1.    The doctrine of equitable mootness applies where a transaction "has been

consummated, with all of the attendant consequences of transferring and transforming a

multibillion dollar enterprise, including its relationship to third parties, governmental entities,

suppliers, customers and the communities in which it does business."  *In re Motors Liquidation*

*Co.*, 430 B.R. 65, 81-82 (S.D.N.Y. 2010).

6.2.    The doctrine is "especially pertinent in bankruptcy proceedings, where the ability

to achieve finality is essential to the fashioning of effective remedies."  *In re Chateaugay Corp.*,

988 F.2d 322, 325 (2d Cir.1993).  Although most often applied in the context of an appeal of an

unstayed sale order where the transaction has been consummated, it also applies when a Rule

60(b) motion seeks to modify a completed sale because Rule 60(b) relief is equitable in nature.
*In re Acorn Hotels, LLC*, 251 B.R. 696, 703-704 (Bankr.W.D. Tex. 2000).

6.3.    Equitable mootness precludes both the unwinding of a completed transaction that
has been approved by a bankruptcy court ***and*** the rewriting of even a "small provision" of the
terms of a § 363 sale.  *In re Motors Liquidation Co.*, 430 B.R. 65, 81-82 (S.D.N.Y. 2010).  This
rule requiring a completed sale to be left "undisturbed" furthers the "policy of finality in
bankruptcy sales," because otherwise "potential buyers would discount their offers to the
detriment of the bankruptcy's estate by taking into account the risk of further litigation and the
likelihood that the buyer will ultimately lose the asset, together with any further investments or
improvements made in the asset."  *Id*. (quoting *United States v. Salerno*, 932 F.2d 117, 122-23
(2d Cir.1991)).

6.4.    Thus, Judge Sweet applied equitable mootness to bar the claim of a bondholder
who claimed that, by modifying one provision of the sale order, he could be granted monetary
compensation without the need to unwind the sale of the assets of General Motors to a
government-sponsored entity.  The court held that "the terms of a carefully negotiated
commercial transaction" could not be rewritten to change the terms of the deal and place
additional liability on the buyer.  *In re Motors Liquidation Co.*, 430 B.R. 65, 81-82 (S.D.N.Y.
2010);  *accord, In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 145 (2d Cir. 2005)
(equitable mootness barred court from modifying agreed plan by voiding certain releases,
because the "bargain struck by the debtor and the released parties might have been different
without the releases"); *In re Adelphia Commc'n Corp.*, 367 B.R. 84, 97 (S.D.N.Y. 2007)
(equitable mootness barred suggested remedy of "selective disgorgement," which "would rewrite
the terms of the bargain, which is beyond the power of the Court"); *In re Acorn Hotels, LLC*, 251

B.R. 696, 704-05 (Bankr. W.D. Tex. 2000 (equitable mootness precluded Rule 60(b) relief

because purchaser "would have balked at purchasing the assets of the debtor" without the clause

movant sought to vacate).

6.5.    Similarly, in this very case, Judge Cote rejected as both statutorily and equitably

moot an appeal of the Sale Order, even though the appellants did "not challenge the sale, but

only the terms of the sale."  *In re Lehman Bros. Holdings, Inc*., 415 B.R. 77, 85 (S.D.N.Y. 2009).

The appellants claimed they could be awarded relief without undoing the sale by modifying the

"free and clear of all liens" provision of the Sale Order.  The District Court rejected this

contention as "specious," based on this Court's finding that "without that term no sale would

have occurred;" thus, the claim was equitably moot in light of the "comprehensive change in

circumstances" that had taken place.  *Id*. at 85.

6.6.    Judge Cote thus accepted the arguments of LBHI and the Trustee, who both

argued that a "comprehensive change in circumstances" had occurred and that the claim was

equitably moot.  LBHI Bay Harbour Brief at 30-33 (*e.g*., "It is incontrovertible that a

comprehensive change in circumstances has occurred"); Trustee Bay Harbour Brief at 10-16

(*e.g*., "in view of the comprehensive change in circumstances that has occurred, it would be

inequitable for the Court to grant Bay Harbour's requested relief").

6.7.    Judge Cote's holding — that modifying a small provision of the Sale Order, such

as the "free and clear of all liens" provision, is a challenge to the entirety of the Sale and thus

barred by the doctrine of equitable mootness — is the law of the case. *See County of Suffolk v.

Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997) (decisions made in previous

stages of the same litigation become the "law of the case" and cannot be subsequently

challenged).

**7.    A MOVANT MAY NOT BRING A RULE 60(B) MOTION BASED ON JUDICIAL MISTAKE OF FACT OR LAW AFTER THE APPEAL DEADLINE AND, FOR ALL OTHER TYPES OF RULE 60(B) MOTIONS, THE MOVANT BEARS A "HEAVY BURDEN" IN PROVING THE DELAY WAS REASONABLE.**

7.1.    Rule 60(c) provides that "[a] motion under Rule 60(b) must be made within a

reasonable time — and for reasons (1), (2), and (3) no more than a year after the entry of

judgment or order or the date of the proceeding."  Fed. R. Civ. P. 60(c).

7.2.    The fact that a Rule 60(b) motion is filed within one year does not end the

inquiry.  The motion must be brought within a "reasonable time," for "the one-year period

represents an extreme limit, and the motion will be rejected as untimely if not made within a

'reasonable time,' even though the one-year period has not expired."  *Kagan v. Caterpillar

Tractor Co.*, 795 F.2d 601, 610 (7th Cir. 1986).

7.3.    "What constitutes a 'reasonable time' depends on the facts and circumstances of

each case."  *Mazzone v. Stamler*, 157 F.R.D. 212, 214 (S.D.N.Y. 1994).

**A.    Claims of Judicial Errors of Fact and Law Must Be Brought Within the Appeal Period.**

7.4.    A claim of judicial error, whether factual or legal, must be raised by an appeal or

by a Rule 60 motion filed before the expiration of the deadline for appeal.  *Leonard v. Lowe's

Home Centers, Inc.*, 83 F. App'x 402, 403 (2d Cir. 2003) (error of law); *In re 310 Assocs.*, 346

F.3d 31, 35 (2d Cir. 2003) (error of fact); *International Controls Corp. v. Vesco*, 556 F.2d 665,

670 (2d Cir. 1977).  "Under Second Circuit authority, a Rule 60(b) motion may be made to

correct a court's own mistake of law or fact so long as such motion is made before the time for appeal expires." *In re Vitta*, 409 B.R. 6, 11 (Bankr. E.D.N.Y. 2009).

### B. Claims of Other Types of Error Must Be Brought Within a Reasonable Time.

7.5.    For Rule 60(b) motions not based on judicial error, the rule is that for claims made "barely within the one-year time limit," there is a "corresponding increase in the burden that must be carried to show that the delay was 'reasonable.'" *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 656 (2d Cir. 1979).

7.6.    Where a motion is filed shortly before the one-year outside deadline, the movant must carry a "heavy burden" in establishing the delay was reasonable. *Simon v. Pay Tel Mgmt., Inc.*, No. 91-2220, 1992 WL 9429, at *9-10 (7th Cir. Jan. 22, 1992).

7.7.    In determining whether a movant meets this burden, courts "balance the interest in finality with the reasons for delay." *PRC Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 897 (2d Cir. 1983).

7.8.    Prejudice to the other party is a factor, *La Barbera v. Whitney Trucking, Inc.*, 245 F.R.D. 142, 145 (S.D.N.Y. 2007), but a delay may be unreasonable even if no prejudice is shown. *Gouldbourne v. J.F. Jelenko & Co.*, No. 98 Civ. 7243, 2000 WL 546762, at *1 (S.D.N.Y. Jan. 13, 2000).

7.9.    A movant bears the burden of proving that any delay in filing was reasonable. *Richard v. Allen*, No. 95-3451, 1996 WL 102419, at *1 (6th Cir. Mar. 7, 1996); *Sloan v. Bertelsmann Music Group*, No. 92-1825, 1993 WL 359470, at *1 (4th Cir. Sept. 16, 1993).

7.10.    A lengthy delay is reasonable only if the movant did not know, and could not have known, of the grounds for Rule 60 relief sooner.  *Westmark Dev. Corp. v. Century Surety Co.*, 199 F.R.D. 491, 497 (W.D.N.Y. 2001) (motion "must be filed within a reasonable time after the basis for relief is or should be known").

7.11.    "In considering the finality of judgments, Rule 60(b) should not be employed simply to relieve a party from a voluntary and deliberate choice that later turns out to be unfortunate."  *Humbles v. Reuters Am., Inc.*, No. 05-CV-4895, 2006 WL 2547069, at *5 (E.D.N.Y. Aug. 31, 2006).

**8.    THE LAW IMPUTES THE KNOWLEDGE OF A CORPORATION'S AGENTS TO THE CORPORATION AND TO A BANKRUPTCY TRUSTEE APPOINTED FOR THAT CORPORATION, AND ALSO IMPUTES KNOWLEDGE THAT WAS "REASONABLY DISCOVERABLE."**

8.1.    As a matter of law, evidence is not "new" if it was known by ***any*** of the Movants' executives, employees, or agents (including their attorneys and financial consultants).

8.2.    "Knowledge and actions of a corporation's employees and agents are generally imputed to the corporation where the acts are performed on behalf of the corporation and are within the scope of their authority."  *UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00-cv-1338, 2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004); *see also CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 824 (S.D.N.Y. 2006).

8.3.    The company is bound even if the officers' knowledge is "never actually communicated to it."  *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985) (citing RESTATEMENT (2D) OF AGENCY § 272).

8.4.     The law of imputation applies to agents of a corporation, such as law firms and financial advisers, just as it does to employees.  Attorneys are agents for their clients, and the knowledge of a litigant's counsel is imputed to the litigant.  *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir.1994).  *See also Universal City Studios, Inc. v. Reimerdes*, 104 F. Supp. 2d 334, 349 (S.D.N.Y.2000) (imputing an attorney's knowledge to his client for the purpose of determining the timeliness of a motion); *SEC v. H.K. Freeland and Co*., 91 Civ. 7986, 1993 WL 33659, at *7 (S.D.N.Y. Feb. 1, 1993) (respondents bound by order their attorney signed, even though they never learned of its precise terms).

8.5.     "In general, when an agent is employed to represent a principal with respect to a given matter and acquires knowledge material to that representation, for purposes of assessing the principal's rights and liabilities vis-a-vis a third person the agent's knowledge is imputed to the principal."  *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir.1994).

8.6.     Likewise, the knowledge of corporate officers and lawyers who act as agents for a debtor corporation is also imputed to a bankruptcy trustee, for the trustee stands in the shoes of the debtor corporation, even if the Trustee had not been appointed at the time of the alleged misconduct.  *Kirschner v. KPMG LLP*, --- F.3d ---, 2010 WL 4644062, at *1 (2d Cir. Nov. 18, 2010) (imputing knowledge of corporate agents to Trustee); *see also, In re Verilink Corp.*, 405 B.R. 356, 362 n.2 (Bankr. E.D. Ala. 2009) ("Thus, the knowledge and conduct of the Verilink Defendants, as agents for their corporate principal, is fully imputable to the Trustee, who merely stands in the shoes of Verilink.").  Indeed, this is true even with respect to the Debtor's "former principals."  *In re 3dfx Interactive, Inc.*, 2009 WL 223266, at *13 (Bankr. N.D. Cal. Jan. 6, 2009) ("knowledge of Debtor's former principals is imputed to it as it would have been imputed to the Trustee"); *Brandt v. Lazard Freres & Co., LLC*, 1997 WL 469325, at *4 (S.D. Fla. Aug. 1, 1997)

(where adverse interest exception was not applicable, the court will "impute the officers' and

directors' knowledge of the alleged breach to the Trustee, as successor of the Bank").  It is

certainly true with respect to the knowledge of officers of the corporation who are still with the

corporation at the time the Trustee is appointed.

       8.7.    There is an exception to the imputation rule called the "adverse interest"

exception, but "New York courts and the Second Circuit have cautioned that this exception is a

narrow one and that the guilty manager 'must have totally abandoned' his corporation's interests

for it to apply."  *In re CBI Holding Co.*, 529 F.3d 432, 448 (2d Cir. 2008).  "***It cannot be invoked***

***merely because [the officer] has a conflict of interest or because he is not acting primarily for***

***his principal***."  *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 785 (1985) (emphasis added)

(citing RESTATEMENT (2D) OF AGENCY § 282(1)).  Furthermore, the adverse interest exception is

*not* satisfied simply "by showing that the insiders intended to benefit themselves by their

conduct."  *Kirschner v. KPMG LLP*, --- F.3d ---, 2010 WL 4644062, at *3 (2d Cir. Nov. 18,

2010).

       8.8.    To illustrate the extremely high bar imposed by the "total abandonment" standard,

the RESTATEMENT provides:

> P appoints A to negotiate for the purchase of Blackacre, agreeing to pay him a
> commission of 10 per cent if he succeeds in persuading the owner to sell it and if
> A finds no defects in the title of record or otherwise.  In investigating the title, A
> discovers an unrecorded equitable interest owned by T and, *believing that the
> transaction will not be consummated if he reveals this equity to P*, conceals his
> knowledge from P, who buys Blackacre upon A's favorable report.  *P is affected
> by A's knowledge*.

RESTATEMENT (2D) OF AGENCY § 282(1), illustration 4 (emphasis added).

8.9.    Movants incorrectly assert that the adverse interest exception applies even if an

officer acts with "mixed motives."  The Second Circuit, the New York Court of Appeals, and the

RESTATEMENT have all made clear that the exception is very narrow, it applies only in a case of

"total abandonment" of the employer's interests, and it does *not* apply if the officer's motives are

at all "mixed," even if his motivation is "primarily" personal.  *Kirschner v. KPMG LLP*, --- F.3d

---, 2010 WL 4644062, at *3 (2d Cir. Nov. 18, 2010); *Center v. Hampton Affiliates*, 66 N.Y.2d

782, 785 (1985); *In re CBI Holding Co., Inc.*, 529 F.3d 432, 448 (2d Cir. 2008).

8.10.    Even the cases cited by movants explicitly follow this same standard, and these

cases only denied summary judgment motions because there was a fact issue as to whether the

employee's motives were mixed or *entirely* personal.  *In re Crazy Eddie Sec. Litig.*, 802 F. Supp.

804, 817 (E.D.N.Y. 1992) (adverse interest exception is applicable only if officer "acts entirely

for his or another's purposes" and is *not* applicable "when the agent acts both for himself and for

the principal, though his primary interest is inimical to the principal"); *Capital Wireless Corp. v.

Deloitte & Touche*, 627 N.Y.S.2d 794, 797 (N.Y. App. Div. 1995) (same).

9.    **WHERE A SECTION 363 SALE ORDER HAS BEEN AFFIRMED ON APPEAL,
RULE 60(B) RELIEF IS NOT AVAILABLE ABSENT A FINDING OF BAD
FAITH.**

9.1.    In the Sale Order, this Court specifically held that Barclays was "entitled to all of

the benefits and protections afforded by Bankruptcy Code section 363(m)."  BCI Ex. 16 (Sale

Order) at ¶ 18.

9.2.    Section 363(m) provides as follows:

The reversal or modification on appeal of an authorization under subsection (b) or
(c) of this section of a sale or lease of property does not affect the validity of a
sale or lease under such authorization to an entity that purchased or leased such

property in good faith, whether or not such entity knew of the pendency of the
appeal, unless such authorization and such sale or lease were stayed pending
appeal.

11 U.S.C. § 363(m).

9.3.    While it formally applies to *appeals* of sale orders, Section 363(m) has been

applied to Rule 60(b) attacks as well.  *See, e.g.*, *In re Summit Ventures, Inc.*, 161 B.R. 9, 11

(Bankr. D. Vt. 1993) (declining to undo sale and finding that principles of Section 363(m) apply

to Rule 60(b) motions to prevent attacks upon sale orders absent a showing of bad faith).  In

*Summit Ventures*, the court held:

> Good faith purchasers in bankruptcy sales are explicitly protected in Section
> 363(m) of the Bankruptcy Code.  Although a strict reading of Section 363(m)
> limits its application to appeals, courts have extended the principle of it to . . .
> Rule 60(b) motions.  The principle which animates Section 363(m) is that, absent
> bad faith, courts ought not break the promises made in bankruptcy sales.

161 B.R. at 11 (internal citations omitted).[5]

9.4.    Section 363(m) is intended to afford purchasers of a debtor's assets an "assurance

of finality" with respect to "who has rights to the estate property."  *In re Gucci*, 126 F.3d 380,

387 (2d Cir. 1997).  *See also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (Section

363(m) "furthers the policy of finality in bankruptcy sales").  That same principle applies fully in

the Rule 60(b) context.

---

[5] Some courts outside this Circuit have limited the application of § 363(m) to the appellate
context, but even those courts have recognized the importance of the policy of finality in
bankruptcy cases that underlies Section 363(m).  *See, e.g.*, *In re Alan Gable Oil Dev. Co.*, No.
91-1526, 1992 WL 329419, at *4 (4th Cir. Nov. 12, 1992) ("though section 363(m) does not in
the strictest sense apply to [a] Rule 60(b) motion, the policy favoring protection of good faith
purchasers of estate property does").

9.5.    Even if the § 363(m) "bad faith" requirement does not apply to every type of Rule 60(b) challenge to a sale order, at the least it should be applied where, as here, the order has been affirmed on appeal and the appellate court has rejected challenges to the order's core provisions, held that the sale was adequately noticed, and found that the purchaser acted in good faith.

## 10.    *EX POST* INFORMATION MUST BE DISREGARDED IN THIS PROCEEDING BECAUSE IT IS LEGALLY IRRELEVANT UNDER 60(B) AND SECTION 363.

### A.    *Ex Post* Information Is Legally Irrelevant Under Rule 60(b) And Must Be Disregarded.

10.1.    It is not permissible to use evidence of facts that did not exist at the time of the Sale — such as the *ex post* stabilization of the financial markets, the various Government stimulus packages, or the subsequent performance and gains earned by Barclays — in asking the Court to modify the Sale Order.  Rule 60(b) requires Movants to demonstrate either a "mistake" of an *existing fact* at the time of the Sale, or "new evidence" of a fact that existed at the time of the Sale, or fraud (which necessarily requires deceit as to a *fact* in existence at the time of the Sale).  *See generally* Fed. R. Civ. P. 60(b); Wright & Miller, 11 FEDERAL PRACTICE AND PROCEDURE, § 2859 (under Rule 60(b)(2), "the evidence must have been in existence at the time of trial.").

### B.    *Ex Post* Information Is Legally Irrelevant In Challenging A Section 363 Sale.

10.2.    The rules governing challenges to Section 363 sales do not permit consideration of events occurring after the sale was approved.  *See Dick's Clothing & Sporting Goods, Inc. v. Phar-Mor, Inc.*, 212 B.R. 283, 290 (N.D. Ohio 1997) ("only events occurring up until the time of the order confirming the sale are relevant to the issue of good faith" in challenging a § 363 sale).

## 11.    RULE 60(B) DOES NOT PROVIDE A BASIS FOR MODIFYING A CONTRACT.

### A.    Rule 60(b) Does Not Authorize Affirmative Relief.

11.1.    Rule 60 is captioned "Relief from Judgment or Order," and subsection (b), by its terms, permits a court to "relieve a party or a party's legal representative from a final judgment, order, or proceeding" based upon the reasons enumerated therein.  Rule 60(b) does not authorize a court to do anything other than relieve a party from the order or judgment challenged, much less provide that a court may award a different kind of relief than had been originally ordered.

11.2.    Rule 60(b) is available "only to set aside a prior order or judgment.  It cannot be used to impose additional affirmative relief."  *United States v. One Hundred Nineteen Thousand Nine Hundred Eighty Dollars,* 680 F.2d 106, 107 (11th Cir. 1982) (reversing district court Rule 60 order directing payment of funds to the IRS instead of to the parties originally held entitled to the funds).

11.3.    Under Rule 60(b), courts may only set aside prior orders or judgments, not change the relief that had been granted.  *Id.* at 107.  "Rule 60(b) is available only to set aside a prior judgment or order; courts may not use Rule 60 to grant affirmative relief in addition to the relief contained in the prior order or judgment."  *Delay v. Gordon,* 475 F.3d 1039, 1044 (9th Cir. 2007) (citation omitted).  *Accord, United States v. One Toshiba Color Television,* 213 F.3d 147, 158 (3d Cir. 2000) (Rule 60(b) allows vacatur of order, but not "monetary relief or relief in the form of a transfer of property"); *United States v. One Douglas A-26B Aircraft*, 662 F.2d 1372, 1377 (11th Cir. 1981) (relief sought was more than setting aside prior order and thus "beyond the remedial authority conferred on the courts by Rule 60(b)"); *Adduono v. World Hockey Ass'n*, 824 F.2d 617, 620 (8th Cir. 1987); *In re Ware*, 117 B.R. 1, 2 (Bankr. D.D.C. 1990).

11.4.    Affirmative relief may only be granted if there is some independent basis for the relief, beyond Rule 60(b) itself. *See In re Wilmington Hospitality LLC*, No. 01-19401DWS, 2003 WL 21011689, at *4 (Bankr. E.D. Pa. April 18, 2003).  Thus, for example, if a Rule 60(b) movant seeks modification of the terms of a consent order or a court-approved contract, the motion should be denied unless there is a state law basis (such as reformation) for the requested modification. *Id.  See also In re Jamesway Corp.*, No. 93 B 43697, 1995 Bankr. LEXIS 267, at *5-6 (denying 60(b) motion to amend assumption order where movant lacked adequate grounds for reformation under New York state law); *United States v. One Douglas A-268 Aircraft*, 662 F.2d 1372, 1378 (11th Cir. 1981) ("The relief sought by appellant here is without question beyond reopening of the prior judgment and therefore cannot be granted under Rule 60(b)").

11.5.    Bankruptcy courts have similarly rejected demands that they order affirmative relief under Rule 60(b).  "[N]umerous circuit courts, including our own, have held that Rule 60 (aptly titled 'Relief From Judgment or Order') may only be used set to aside a judgment or order, not grant affirmative relief." *In re Wilmington Hospitality LLC*, No. 01-19401DWS, 2003 WL 21011689, at *4 (Bankr. E.D. Pa. April 18, 2003); *see also In re Ware*, 117 B.R. 1, 2 (Bankr. D.D.C. 1990) (denying motion under Rule 60(b) to modify final orders and retroactively require party to adversary proceeding to re-convey property back to debtor's estate).

**B.    Rule 60(b) Does Not Authorize Modification Of Contractual Terms.**

11.6.    As Rule 60(b) may not be used to grant affirmative relief, it does not authorize an order changing the terms of an executed sale contract. *See In re Wilmington Hospitality LLC*, No. 01-19401DWS, 2003 WL 21011689, at *4 (Bankr. E.D. Pa. April 18, 2003) (refusing to "reform" or otherwise revise a stipulated agreement). *See also Lucille v. City of Chicago*, No. 95-2109, 1995 WL 606926, at *1 (7th Cir. Oct. 31, 1995) (affirming denial of motion seeking

"to *add* terms" to approved agreement, because Rule 60(b) does not allow court to "tinker" with the agreement) (emphasis in original).

11.7.    In addition to the fact that Rule 60(b) on its face does not authorize the modification of bargained-for contractual provisions, the doctrine of equitable mootness, as discussed above, bars Rule 60(b) relief and any other type of relief that would rewrite the terms of a negotiated agreement that has been closed and has resulted in the transfer of a multi-billion dollar business.  *In Metromedia Fiber Network*, 416 F.3d 136, 145 (2d Cir. 2005); *United States v. Salerno*, 932 F.2d 117, 122-23 (2d Cir. 1991); *In re Motors Liquidation Co.*, 430 B.R. 65, 81-82 (S.D.N.Y. 2010); *In re Adelphia Commc'n Corp.*, 367 B.R. 84, 97 (S.D.N.Y. 2007) (any effort to "rewrite the terms of the bargain" is beyond the power of the Court").

11.8.    The courts also reject attempts to vacate orders under Rule 60(b) on the basis that an order does not fairly reflect the intent of the parties where such "intent" is not specifically reflected in the order.  *See, e.g.*, *Brummerstedt v. Am. Airlines, Inc.*, No. 91-c-8382, 1994 WL 530807, at *3 (N.D. Ill. Sept. 29, 1994) (rejecting argument that party would not have entered into agreement had it known that other side would be free to bring subsequent litigation:  "The short answer to this contention is that American should have put this 'intent' in writing, and submitted it to the court as a draft order").

11.9.    Parties who enter into judicially approved contracts may not prevail upon the court to undo the judgments approving those contracts simply because, with the benefit of hindsight, that party thinks it should have made a different deal.  *See, e.g.*, *Louisville Bedding Co. v. Pillowtex Corp.*, 455 F.3d 1377, 1380-81 (Fed. Cir. 2006) (rejecting request to nullify "a bargained-for provision in the settlement agreement"); *In re N. Broadway Funding Corp.*, 34

B.R. 620, 623 (Bankr. E.D.N.Y. 1983) (court would not void its order simply because

"subsequent developments indicate that the bargain is more beneficial to one side than to the

other").

11.10.   No relief is appropriate where the "factual basis" upon which the agreement was

reached has not changed and the only possible change is "the applicants' knowledge of the

relevant facts."  *In re N. Broadway Funding Corp.,* 34 B.R. 620, 622 (Bankr. E.D.N.Y. 1983);

*Lans v. Gateway 2000, Inc*., 110 F. Supp. 2d 1, 5 (D.D.C. 2000) (rejecting Rule 60(b) challenge

and upholding agreement where request for relief was premised solely on a new understanding of

the effect of a specific provision in the contract); *Waldorf v. Borough of Kenilworth*, 878 F.

Supp. 686, 694 (D. N.J. 1995) (rejecting Rule 60(b) challenge and upholding agreement where

request for relief was "based only upon evidential rethinking and other morning-after

quarterbacking by successive trial counsel."); *Am. Totalisator Co. v. Fair Grounds Corp*., No.

91-500, 1992 U.S. Dist. LEXIS 17795, at *3-4 (E.D. La. Nov. 17, 1992) (rejecting Rule 60(b)

challenge and upholding agreement where request for relief was premised on a new

interpretation of contractual terms).

## 12.    NEW YORK CONTRACT LAW ALLOWS FOR REFORMATION OF A CONTRACT ONLY IN VERY LIMITED CIRCUMSTANCES.

12.1.   Few principles of contract law are more fundamental than that the courts may not

rewrite the terms of the parties' agreement.  *See* 11 WILLISTON ON CONTRACTS § 31:5 (4th ed.

2009) ("it is not the function of the judiciary to change the obligations of a contract which the

parties have seen fit to make").

12.2.   "[C]ourts may not by construction add or excise terms, nor distort the meaning of

those used and thereby make a new contract for the parties under the guise of interpreting the

writing." *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004)

(internal quotation omitted); *Slattery Skanska Inc. v. Am. Home Assur. Co*, 67 A.D.3d 1, 13

(N.Y. App. Div. 2009) (same); *In re Musicland Holding Corp.*, 386 B.R. 428, 438 (S.D.N.Y.

2008) (affirming bankruptcy court's refusal to read terms into agreement that were not explicitly

in the contract), *aff'd*, 318 F. App'x 36 (2d Cir. 2009); *Crumpton v. Bridgeport Educ. Ass'n*, 993

F.2d 1023, 1028 (2d Cir. 1993) (court "not entitled to expand or contract the agreement of the

parties as set forth in the consent decree") (internal quotation omitted).

### A.    A Party Seeking Reformation Based On Mutual Mistake Must Satisfy A Heavy Burden Of Showing An Agreement Between The Parties That Was Not Properly Reflected In The Written Instrument.

12.3.    There is a narrow exception to this rule that allows a court to reform a contract

where the movant can establish, by clear and convincing evidence, that the contract as written

was based upon a mutual mistake of an existing fact, and therefore does not embody the true

agreement as mutually intended.  *See, e.g.*, *Nash v. Kornblum*, 12 N.Y.2d 42, 46 (1962).

12.4.    To show the kind of mutual mistake necessary to reform a contract, a party must

show that "the parties have reached an oral agreement and, unknown to either, the signed writing

does not express that agreement." *Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, --- F.

Supp. 2d ---, 2010 WL 3952926, at *6 (S.D.N.Y. Oct. 8, 2010) (quoting *Chimart Assoc. v. Paul*,

66 N.Y.2d 570, 573 (1986)).  Mutual mistake only applies where the parties had the *same intent*

with respect to an agreement, but the written instrument does not reflect that intent; thus, there

can be no mutual mistake sufficient to reform the contract if the Purchase Agreement properly

reflects Barclays understanding of the deal.  *See id.* at *7 ("To plead a claim for mutual mistake,

the factual allegations must establish that *both* contracting parties shared the same erroneous

29

belief as to a material fact, and their acts do not in fact accomplish their mutual intent.")
(emphasis added).

12.5.    Similarly, a contract cannot be reformed under the doctrine of mutual mistake if
one party never agreed to the terms that the other party is trying to impose.  This is because
"[t]he proponent of reformation must show in no uncertain terms … exactly what was really
agreed upon between the parties," for "[r]eformation is not a mechanism to interject into the
writings terms or provisions not agreed upon."  *William P. Pahl Equip. Corp. v. Kassis*, 588
N.Y.S.2d 8, 12 (N.Y. App. Div. 1992).

12.6.    Moreover, "[t]he burden upon a party seeking reformation is a heavy one since it
is presumed that a deliberately prepared and executed written instrument accurately reflects the
true intention of the parties."  *Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, --- F. Supp. 2d
---, 2010 WL 3953926, at *7 (S.D.N.Y. Oct. 8, 2010) (quoting *William P. Pahl Equip. Corp. v.
Kassis*, 588 N.Y.S.2d 8, 12 (N.Y. App. Div. 1992)).

   **B.      Black-Letter Law Provides That A Mistake Cannot Be Based On Matters
           That Were Known By The Parties To Be Uncertain At The Time.**

12.7.    Further, it is well established that the doctrine of mutual mistake does not apply
where the alleged mistake relates to matters over which there was acknowledged *uncertainty*.
The doctrine of mutual mistake applies to mistakes of "*existing facts* at the time of execution."
*In re Bradlees Stores, Inc.*, 291 B.R. 307, 312 (Bankr. S.D.N.Y. 2003) (emphasis added).  "A
party's predictions or judgment as to events to occur in the future, even if erroneous, is not a
'mistake.'"  *Id*. at 312.

12.8.    Similarly, if a party is aware that he has only "limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient," then the party takes the risk of that mistake, and cannot later seek to revise the contract based on the doctrine of mutual mistake.  *Brandt v. MIT Dev. Corp.*, 552 F. Supp. 2d 304, 323 (D. Conn. 2008) (*quoting* RESTATEMENT (SECOND) OF CONTRACTS § 154).

**C.    Reformation Can Be Based On Unilateral Mistake Only Where One Party Has Fraudulently Misled The Other Concerning The Terms Of The Written Instrument.**

12.9.    Unilateral mistake occurs where the written instrument is consistent with one party's understanding of the contract and intent in entering into the contract, but is inconsistent with the deal to which the other party thought it had agreed.  A contract can only be reformed to reflect that party's mistaken understanding as to the terms of the contract where "the parties have reached agreement and, unknown to one party but known to the other (who has misled the first), the subsequent writing does not properly express that agreement."  *Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 573 (1986); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 166 (requiring "the other party's fraudulent misrepresentation as to the contents or effect of a writing" before a writing can be reformed based on unilateral mistake).

12.10.   Thus, if the Purchase Agreement was consistent with Barclays' understanding of the deal, but was inconsistent with the Movants' understanding, the contract can be reformed to impose the terms Movants thoughts were in the deal only if Barclays knew Movants believed those terms were in deal and fraudulently misled Movants into believing the Purchase Agreement accurately reflected those terms.  *See Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 573 (1986).  Thus, if Movants' allegations of fraud do not relate to "fraudulent misrepresentation as

to the *contents or effect of a writing*," then they cannot establish unilateral mistake.

RESTATEMENT (SECOND) OF CONTRACTS § 166.

**D.    Because Partially Rescinding A Contract Has The Same Effect As Reforming A Contract, New York Law Precludes Partial Rescission, Particularly Where The Contract Contains A Non-Severance Clause.**

12.11.    New York contract law precludes partial rescission of a contract.  *Merryman v. Gottlieb*, 99 A.D.2d 893, 894 (N.Y. App. Div. 1984) ("[I]f this particular contract should have been rescinded at all, it should have been rescinded completely and not partially."); *Slater v. Slater,* 208 A.D. 567, 573 (N.Y. App. Div. 1924) ("[A] contract cannot be rescinded in part and stand good for the residue.") (citation omitted), *aff'd*, 240 N.Y. 557 (1925).

12.12.    Partial rescission is impermissible because a party cannot "accept the benefits on the one hand while shirking its disadvantages on the other."  17B C.J.S. Contracts § 459. Retention of "only the benefits of the transaction amounts to unjust enrichment and binds the parties to a contract which they did not contemplate."  *Simmons v. Cal. Inst. of Tech.*, 209 P.2d 581, 587 (Cal. 1949).  *Accord*, *International Marble & Granite of Colo., Inc. v. Congress Fin. Corp.*, 465 F. Supp. 2d 993, 1004 (C.D. Cal. 2006); 17A Am. Jur. 2d Contracts § 533.[6]

12.13.    This New York rule is entirely consistent with the bankruptcy rule prohibiting the modification of bargained-for contractual provisions and the rewriting of terms of a negotiated agreement.  *In Metromedia Fiber Network*, 416 F.3d 136, 145 (2d Cir. 2005); *United States v.*

---

[6] *Accord, Simons v. Crowley*, 112 N.Y.S.2d 851, 856 (N.Y. Sup. Ct. 1952); *Yagoda v. Strang Corp.*, Civ. No. 08-1901, 2008 WL 4606306, at *2 (D. N.J. Oct. 16, 2008) (party may not "have her proverbial cake, and eat it too" by repudiating just the unfavorable parts of a contract); *County of Morris v. Fauver*, 707 A.2d 958, 966 (N.J. 1998) (same); *Rancourt v. Verba*, 678 A.2d 886, 888 (Vt. 1996) (it must be "all-or-nothing;" party may not "retain favorable portions of the contract and disregard the rest"); *In re Nelson's Estate*, 209 N.Y.S.2d 344, 346-47 (N.Y. Sur. 1961), *aff'd*, 225 N.Y.S.2d 982 (App. Div. 1962) (same).

*Salerno*, 932 F.2d 117, 122-23 (2d Cir. 1991); *In re Motors Liquidation Co.*, 430 B.R. 65, 81-82

(S.D.N.Y. 2010); *In re Adelphia Commc'n Corp.*, 367 B.R. 84, 97 (S.D.N.Y. 2007) (any effort to

"rewrite the terms of the bargain" is beyond the power of the Court").

12.14.   The parties' agreement in this case states explicitly that no portion may be

severed if the severance would have a material adverse effect on any party's economic interests:

> If any term or other provision of this Agreement is invalid, illegal, or incapable of
> being enforced by any law or public policy, all other terms or provisions of this
> Agreement shall nevertheless remain in full force and effect so long as the
> economic or legal substance of the transactions contemplated hereby is not
> affected in any manner materially adverse to any party.

BCI Ex. 1 (APA) at § 13.8.

12.15.   Where an agreement contains such a non-severance clause, application of the "no

partial rescission" and  equitable mootness rules is even more compelling.  *In re Delta Air Lines,*

*Inc.*, 374 B.R. 516, 523-524 (S.D.N.Y. 2007) (rejecting request to vacate releases which,

particularly in light of no-severance clause, were an "integral part" of the contract and could not

"equitably be undone in isolation").

## 13.   SECTION 105 DOES NOT ALLOW A COURT TO MODIFY A CONTRACT.

13.1.   Section 105 of the Bankruptcy Code provides that the "court may issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of" the

Bankruptcy Code.  11 U.S.C. § 105(a).

13.2.   The Second Circuit has repeatedly emphasized the limited nature of a court's §

105 powers:  "Section 105 does not authorize the bankruptcy courts to create substantive rights

that are otherwise unavailable under applicable law, or constitute a roving commission to do

equity."  *In re Kalikow*, 602 F.3d 82, 96 (2d Cir. 2010) (citation omitted).  The power granted to

the court under § 105 is "the power to exercise equity in carrying out the *provisions* of the

Bankruptcy Code, rather than to further the purposes of the code generally, or otherwise to do the

right thing." *Id.* at 97.  (emphasis in original).

13.3.    Section 105 is not applicable unless substantive relief is available under other

provisions of the Bankruptcy Code:  "It may be that NED's motion 'implicates' sections 361 and

362 of the Bankruptcy Code, but we have determined that NED is not entitled to substantive

relief under those sections.  Because no provision of the Bankruptcy Code may be successfully

invoked in this case, section 105(a) affords NED no independent relief."  *In re Dairy Mart*

*Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003).

13.4.    Even if § 105 did authorize modification of contractual terms, it could only do so

in conjunction with "clearly defined principles of law" — meaning any reformation of the

contract must be consistent with state-law contract principles requiring fraud or a mutual mistake

of fact.  *See In re Vota*, 165 B.R. 92, 93 (Bankr. D. R.I. 1994) ("Finally, when equitable

considerations conflict with clearly defined principles of law, this Court may not 'fashion

equitable remedies' to circumvent the legal guidelines.").

13.5.    *In re LWD, Inc.*, 332 B.R. 543 (Bankr. W.D. Ky. 2005), does not mean that § 105

may be used to modify the terms of the parties' contract.  In *LWD*, the Debtor never listed in the

schedules of his assets nor in the contract governing the § 363 sale (which provided for the

transfer of all of the debtor's assets) an insurance contract with a value of approximately

$350,000.[7]  The buyer, an *insider* of the Debtor, was aware of this asset when he bid on the

---

[7] In contrast, the Purchase Agreement (and specifically the Clarification Letter) expressly
identified as included assets every asset now in dispute.  *See* FOF ¶¶ 28-30.  Unlike the other

34

Debtor's property, but other bidders were not.  The sale was consummated, and the Sale Order

was never challenged on appeal.[8]

13.6.    Unsecured creditors later brought an adversary proceeding seeking a court order

requiring the buyer to pay an additional $350,000, the amount equivalent to the value of the

undisclosed insurance policy.  Under these extreme circumstances (an insider buyer that hid

material assets for its own benefit), the court granted relief under § 105.

13.7.    In *LWD*, the buyer's only defense was that the asset had been adequately

disclosed.  Based on the evidence presented, the court rejected this factual defense.  The buyer

did not prove or contend that it would not have bought the assets had it known it would have to

pay $350,000 more than the amount that it bid.

13.8.    Under *Kalikow* and the other previously mentioned Second Circuit cases, it would

be improper for a bankruptcy court in this circuit to do what the *LWD* court did (effectively

raising the agreed contractual price), if the buyer had raised the issue.  As previously explained,

§ 105 does not permit a court to rewrite a contract on grounds of "equity," particularly if there is

no violation of a separate section of the Bankruptcy Code and no basis for relief under other

provisions of the Code.  See COL  ¶¶ 13.1-13.4.

13.9.    In any event, here, unlike in *LWD*, Barclays was not an insider and there is no

evidence of intentional concealment that prevented creditors or other bidders from determining

---

bidders in *LWD*, Movants cannot show that at the time of sale they were unaware (or could not
with reasonable efforts have become aware) that the assets in dispute existed.

[8] In contrast, the Sale Order in this case was challenged on appeal, supported by Movants, and
was affirmed as part of the mandates that issued from the District Court and the Second Circuit
Court of Appeals.  See FOF ¶¶ 60-62.

that any assets listed on the face of the Clarification Letter actually existed, and there is therefore

no evidence that could possibly warrant relief akin to that granted in *LWD*.

**14.    THE COURT MAY NOT REVISE A WRITTEN CONTRACT BASED UPON
ORAL STATEMENTS MADE AT THE SALE APPROVAL HEARING.**

14.1.    A bankruptcy court has the power to approve or disapprove a post-petition

contract that is presented to it by the parties, but it does not have the power to modify the

contract so as to create a new contract that was never mutually agreed to by the parties.  This is

true even if statements made at the sale approval hearing are inconsistent with the terms of the

contract.  *See Terry Oilfield Supply Co., Inc. v. American Sec. Bank, N.A.*, 195 B.R. 66, 73 (S.D.

Tex. 1996).

14.2.    In *Terry Oilfield*, the court approved drilling contracts that granted to the buyer an

interest in the gas "in place" but not at the "well head."  At the court's approval hearing,

however, the court stated that the buyer's interest was in the "well head."  The debtor later

claimed that the court's statements at the approval hearing defined the scope of any authorization

to enter into the contract and thus defined the rights between the parties, regardless of the

contract.  *Id.* at 72-73.

14.3.    The court squarely rejected this attempt to elevate the words of the sale approval

hearing above the express terms of the contract:

> Despite what the bankruptcy court said, TransAmerican is liable to Terry
> according to the express terms of the court-approved contract.  The bankruptcy
> court cannot tell the parties what a contract means much less alter it at will.
> Although the bankruptcy courts have the power to impair the obligation of pre-
> petition contracts, it does not have the power to impair post-petition contracts.
> All it can do is approve or disapprove the post-petition contract.  The debtor in
> possession is liable according to the explicit terms of its contracts.

*Id.* at 72-73.

14.4.    While the statements at the sale approval hearing are relevant to a court's decision of whether to approve or disapprove a post-petition contract, and can form a basis for rescinding its approval of the contract *in its entirety* should those statements turn out to be fraudulent or made in bad faith, such statements cannot replace the express terms of the contract simply because they occurred during the sale approval hearing. *Id.* If the court misunderstood what it was doing, that misunderstanding works to the detriment of the debtor, not the buyer. *Id.* at 73. ("If the bankruptcy court misunderstood the effect of what it was doing, then that misunderstanding works to the detriment of TransAmerican, not Terry; TransAmerican was the ward of the bankruptcy court.")

14.5.    *In re Polycel Liquidation, Inc.*, No. 06-2183, 2007 WL 77336 (D. N.J. Jan. 8, 2007), is not, as Movants claim, an example of a court re-writing a contract to conform to disclosures (or the lack thereof) made at a sale approval hearing. In *Polycel*, a third-party that owned certain pool molds in the possession of the debtor did not receive any notice of the debtor's § 363 sale, which violated its due process rights. The court modified its sale order to the extent it applied to the pool molds owned by the third-party, as the third party's constitutional right to due process trumped the terms of the sale order.

14.6.    Although the court modified its order, it did not reform or rewrite the contract between the debtor and the buyer. Because the contract only transferred to the buyer the debtor's "right, title and interest" in the debtor's property, it did not provide for the transfer of title to the pool molds (because the Debtor never had title to the pool molds). *Id.* at *9.

14.7.    Thus, the court rejected the argument that it was rewriting the terms of the contract between the parties. Rather, the court just modified its order to the extent it deviated

from the terms of the express contract and transferred more than the buyer was entitled to under

the terms of the contract. *Id.* Although the third party received title to the molds, the court did

nothing to interfere with the buyer's potential cause of action against the debtor for its

contractual breach of warranty of good title to these assets.

## 15.    **RULE 60(B) RELIEF IS UNAVAILABLE WHERE THE EVIDENCE PRESENTED WOULD NOT HAVE CHANGED THE OUTCOME.**

15.1.    Rule 60(b) relief may not be granted except for a reason of "such importance that

it probably would have changed the outcome" of the case. *United States v. Int'l Bhd. Of

Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001) (no relief despite proof of perjury, because result

would have been the same); *see also Fitzgerald v. Field*, No. 98-7574, 1999 WL 177278, at *2

(2d Cir. Mar. 26, 1999) (affirming rejection of Rule 60(b) fraud claim where the alleged fraud

"could not have affected the outcome"); *Matura v. United States*, 189 F.R.D. 86, 89 (S.D.N.Y.

1999) ("Rule 60(b)(1) affords a party relief from a material mistake that changed the outcome of

the court's judgment.").

15.2.    The "changed the outcome" test is applicable to claims under **Rule 60(b)(1)**

(mistake and excusable neglect), *In re Bulk Oil (USA) Inc.*, No. 89-B-13380, 2007 WL 1121739,

at *10 (S.D.N.Y. Apr. 11, 2007); *Avedis v. Herman*, 192 F.R.D. 477, 478 (S.D.N.Y. 2000); *In re

Vitta*, 409 B.R. 6, 12 (Bankr. E.D.N.Y. 2009), **Rule 60(b)(2)** (newly discovered evidence),

*United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001); *Philip v. Mayer,

Rothkopf Indus., Inc*. 635 F.2d 1056, 1063 (2d Cir. 1980), **Rule 60(b)(3)** (fraud or

misrepresentation), *Bettis v. Kelly*, No. 02 Civ. 104, 2004 WL 1774252, at *2 (S.D.N.Y. Aug. 9,

2004), *aff'd*, 137 F. App'x 381 (2d Cir. 2005); *In re St. Stephen's 350 E. 116th St*., 313 B.R. 161,

174 (Bankr. S.D.N.Y. 2004), and **Rule 60(b)(6)** (catch-all), *Creamer v. Laidlaw Transit, Inc*., 76

F. App'x 273, 275 (10th Cir. 2003); *Srinivasan v. Devry Inst. of Tech.*, 1995 WL 242307, at *3

(9th Cir. April 25, 1995); *Epps v. Howes*, 573 F. Supp. 2d 180, 184 (D. D.C. 2008); *Freedom,*

*N.Y., Inc. v. United States*, 438 F. Supp. 2d 457, 463-64 (S.D.N.Y. 2006).

15.3.    Relief should not be granted if vacating the judgment would just be "an empty

exercise or futile gesture."  *Cobos v. Adelphi Univ.*, 179 F.R.D. 381, 389 (E.D.N.Y. 1998).[9]

15.4.    Unlike a trial in which there may be multiple claims and multiple different

outcomes (e.g., ranging from complete dismissal of all claims to granting all claims and all

damages on all claims, to a whole spectrum of potential outcomes in which some claims are

granted and some denied, with varying levels of damages imposed), a § 363 sale motion has only

a binary result:  either it is approved, or it is not approved.  Thus, in this context, the requirement

that the Rule 60(b) movant must show evidence that would have "changed the outcome" can

only mean that the evidence is sufficient to show that the sale motion in question would have

been denied, rather than approved, at least where, as here, the sale has closed and relief cannot be

granted without affecting bargained-for contractual rights.  See COL ¶ 6.

---

[9] *See also, e.g.*, *Lewis v. Cal. Bd. of Prison Terms*, 264 F. App'x 647, 649 (9th Cir. 2008) ("the
alleged fraud and newly discovered evidence at issue would not have changed the outcome");
*Schum v. Bailey*, 578 F.2d 493, 504-05 (3d Cir. 1978) (no relief under Rule 60(b)(1) or (2)
because the "evidence would not have affected the outcome"); *Kenney v. Facilities Performance
Group*, No. 09-CV-0478, 2010 WL 916189, at *1 (N.D. Okla. Mar. 9, 2010) (fraud not a basis
for Rule 60(b) relief unless it "affected the outcome"); *Prince of Peace Enter., Inc. v. Top
Quality Food Market, LLC*, 496 F. Supp. 2d 354, 356 (S.D.N.Y. 2007) ("change[] the outcome"
test); *Kirk v. Schindler Elevator Corp.*, No. 03 Civ. 8688, 2004 WL 2726001, at *1 (S.D.N.Y.
Nov. 29, 2004) (same); *Avedis v. Herman*, 192 F.R.D. 477, 478 (S.D.N.Y. 2000) (same); *Fetik v.
New York Law School*, No. 97 CIV. 7746, 1999 WL 459805, at *4 (S.D.N.Y. June 29, 1999)
(same).

16.    **RULE 60(B) RELIEF IS UNAVAILABLE WHERE MANY ACTIONS HAVE BEEN TAKEN IN RELIANCE ON THE JUDGMENT.**

16.1.    Relief also should not be granted if "many actions have been taken on the strength of the judgment" by the buyer and innocent third parties. *Menashe v. Sutton*, 90 F. Supp. 531, 533 (S.D.N.Y. 1950). *Accord, e.g., O'Callaghan v. Shirazi*, 204 F. App'x 35, 36 (1st Cir. 2006) (equity favored denial of Rule 60(b) relief in view of the substantial time that had passed since the judgment and the "reliance of parties upon that judgment"); *Blue Diamond Coal Co. v. Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 528-29 (6th Cir. 2001) (relief denied due to the substantial "reliance interest of the Combined Fund on the previous final judgment"); *Schultz v. F.D.I.C.*, Civ. No. 85-5085, 1993 WL 661751, at *8  (D. S.D. Jan. 28, 1993) (denying Rule 60(b) motion as untimely "because of the reliance CFF has placed on the 1986 judgment"); *In re Acorn Hotels, LLC*, 251 B.R. 696, 703 (Bankr. W.D. Tex. 2000) ("It is generally held that relief will not be appropriate if intervening rights have attached in reliance upon the judgment").

17.    **RULE 60(B) RELIEF IS UNAVAILABLE IS WHERE THE MOVANT HAS SUBSTANTIAL RESPONSIBILITY FOR CREATING THE SITUATION FOR WHICH RELIEF IS SOUGHT.**

17.1.    In addition, under the doctrines of *in pari delicto* and "unclean hands," Rule 60(b) relief is also unavailable if "movants' own fault, neglect, or carelessness" created the situation for which relief is sought. *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 662 (2d Cir. 1997).  For example, the Second Circuit applied *in pari delicto* in dismissing a claim for breach of fiduciary duty against an accounting firm where the debtor bore "at least substantially equal responsibility" for allowing a transaction to go forward on the basis of inflated projections. *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand*, 322 F.3d 147, 163-64 (2d Cir. 2003).

17.2.    "Indeed, the principle that a wrongdoer should not profit from his own misconduct is so strong in New York that we have said the defense applies even in difficult cases and should not be weakened by exceptions."  *Kirschner v. KPMG LLP*, --- N.Y.2d ---, 2010 WL 4116609 (Oct. 21, 2010) (internal quotation and citations omitted) (holding that derivative claims against outside auditor were barred by *in pari delicto* where agents for the company from which the claims were derived were substantially responsible for the misconduct).

17.3.    Thus, for example, if one party files a motion and states incorrect or incomplete information in arguing its motion, that party would be barred by *in pari delicto* from claiming that another party with equal knowledge failed to correct its arguments.

## 18.    THE STANDARD FOR APPROVING A SALE UNDER § 363 OF THE BANKRUPTCY CODE IS WHETHER THERE IS A GOOD BUSINESS JUSTIFICATION, WHICH NECESSARILY IS SATISFIED IF THE SALE IS BETTER THAN ANY OTHER AVAILABLE DEAL, AND SUPERIOR TO A LIQUIDATION OF THE ASSETS BEING SOLD.

18.1.    A motion for the sale of estate property outside the ordinary course of business may be approved if there is a "good business reason" for the sale.  *In re Chrysler LLC*, 576 F.3d 108, 118-19 (2d Cir. 2009).  The debtor should show that the disposition has a valid business justification and is in the best interest of estate, which necessarily is satisfied if the sale is better than any other available deal and is superior to a liquidation of the assets being sold.  Other relevant considerations include whether the sale is fair and reasonable, has been given adequate marketing, has been negotiated and proposed in good faith, and is an arms-length transaction.  *In re 240 North Brand Partners, Ltd.*, 200 B.R. 653, 659 (9th Cir. BAP 1996); *In re Wilde Horse Enter., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal.1991).

18.2.    The "most important[]" factor for the court in determining whether to approve a §

363 sale is whether the asset is decreasing in value.  *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir.

1983).  Thus, a sale should be approved when the court is faced with a "melting ice cube"

situation, a sale would prevent "further, unnecessary losses," no other potential buyers have

appeared despite "well-publicized efforts," and the only alternative "is an immediate liquidation

that would yield far less for the estate" and creditors.  *In re Chrysler LLC*, 576 F.3d 108, 118-19

(2d Cir. 2009).

18.3.    In deciding whether to approve a § 363 sale, "the Court should not substitute its

business judgment for that of the Debtor's."  *In re Metaldyne Corp.*, 409 B.R. 661, 667 (Bankr.

S.D.N.Y. 2009).

## 19.    IT IS PERMISSIBLE AND APPROPRIATE FOR A COURT TO CONSIDER THE PUBLIC INTEREST IN DETERMINING WHETHER TO APPROVE A § 363 SALE.

19.1.    It was entirely appropriate for the Court to give significant weight to the public

interest.  *See In re Gen. Motors Corp.*, 407 B.R. 463, 477 (Bankr. S.D.N.Y. 2009) (approving

sale in light of fears "of a systemic failure throughout the domestic automotive industry and the

significant harm to the overall U.S. economy that would result from the loss of hundreds of

thousands of jobs and the sequential shutdown of hundreds of ancillary businesses if GM had to

cease operations"); *In re Trans World Airlines*, *Inc.,* No. 01-00056, 2001 WL 1820326, at *14

(Bankr. D. Del. Apr. 2, 2001) (approving sale in view of the "substantial public interest in

preserving the value of TWA as a going concern," including "the preservation of jobs for TWA's

20,000 employees, the economic benefits the continued presence of a major air carrier brings to

the St. Louis region, and preserving consumer confidence in purchased TWA tickets").  *See also*

*In re Chrysler LLC*, 405 B.R. 84, 96 (Bankr. S.D.N.Y. 2009) (noting the "overriding concern of

the U.S. and Canadian governments to protect the public interest" against the failure of

Chrysler), *aff'd*, 576 F.3d 108 (2d Cir. 2009).

**20.    WHILE THERE IS NO ESTABLISHED STANDARD FOR DISCLOSURE IN A SECTION 363 SALE, THE PROPER STANDARD SHOULD BE "REASONABLE AND GOOD FAITH DISCLOSURE UNDER THE CIRCUMSTANCES."**

20.1.    Section 363 does not state a standard for the extent of disclosure required at a sale

hearing for approval of a proposed transaction.  In fact, in an emergency situation, no hearing at

all is required.  11 U.S.C. § 102.

20.2.    As this Court has observed, the Bankruptcy Code provides for flexibility, and a

proposed sale may be approved even if the court is not apprised of "every aspect" of the deal as

long as the court and interested parties understand it in "broad outline," and the "essential terms

of the transaction, with modifications," are disclosed and understood.  BCI Ex. 49 (9/19/08 Tr.)

at 84-85, 248.  This is particularly so where there is "no better or alternative transaction"

available, and the consequences of disapproval could be "truly disastrous" to the estates,

creditors, customers, and the national economy.  *Id.* at 250.

20.3.    On appeal of the Sale Order, Judge Cote held that "Judge Peck appropriately

considered and resolved due process interests throughout the sale process."  *In re Lehman Bros.

Holdings, Inc.*, 415 B.R. 77, 85 n.7 (S.D.N.Y. 2009); *accord, e.g., In re Brookfield Clothes, Inc.*,

31 B.R. 978, 985 (S.D.N.Y. 1983) (rejecting creditor's objection that emergency sale deprived

him of "the procedural safeguard of a disclosure statement" where sale process provided him

adequate information given the circumstances); *In re Coastal Indus., Inc.*, 63 B.R. 361,

368 (Bankr. N.D. Ohio 1986) (approving § 363 sale "with great haste, foregoing the protections

generally afforded the creditors… [including] full disclosure and an opportunity for review of the

plan of reorganization").

20.4.    Thus, the standard is reasonable and good faith disclosure under the

circumstances. *In re Lehman Bros. Holdings, Inc*., 415 B.R. 77, 85 (S.D.N.Y. 2009); *accord,*

*e.g., In re Brookfield Clothes, Inc*., 31 B.R. 978, 985 (S.D.N.Y. 1983); *In re Coastal Indus., Inc*.,

63 B.R. 361, 368 (Bankr. N.D. Ohio 1986). *See* 11 U.S.C. 1125(a)(1) (defining "adequate

information" for disclosure statements as "information of a kind, and in sufficient detail, as far as

is reasonably practicable" that would enable a hypothetical investor "to make an informed

judgment about the plan").

20.5.    To require disclosure of every conceivable fact of interest, even when urgent

circumstances make this impossible, would rob the Code of the very flexibility that has enabled

bankruptcy courts to act decisively in crisis situations. *See, e.g., In re Gen. Motors Corp.*, 407

B.R. 463 (Bankr. S.D.N.Y. 2009); *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL

1820326 (Bankr. D. Del. Apr. 2, 2001); *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y.

2009), *aff'd*, 576 F.3d 108 (2d Cir. 2009).  Disclosure is adequate if it provides the court with

sufficient information to determine that the proposed sale satisfies the standard for approval of a

§ 363 sale, *i.e*., that the sale is supported by valid business reasons, and is more advantageous to

the estate and creditors than liquidation or any other viable alternative. *Chrysler*, 576 F.3d at

118-19.

20.6.    Movants claim that a § 363 sale requires "full disclosure" or "complete

disclosure" but never attempt to define this or explain how such a requirement would function in

the context of an emergency sale.  Movants' cases do not support their contention that perfect

disclosure of every conceivable fact of interest is required. *See In re Wilde Horse Enterprises,*

*Inc.*, 136 B.R. 830, 837 (Bankr. C.D. Cal. 1991) (requiring "full disclosure of the relationship(s)

between the buyer and Debtor and any of their principals, officers and/or directors"); *In re New*

*York Trap Rock Corp.*, 42 F.3d 747, 754-755 (2nd Cir. 1994) (finding a duty to disclose

collusive bidding agreements); *In re Martin*, 91 F.3d 389, 395 (3rd Cir. 1996) (indicating that the

*trustee's* actions are subject to "complete disclosure and review" to prevent him from acting

unilaterally).

20.7.    For that reason, Rule 60 claims seeking to set aside § 363 sale orders because

assets involved in the sale were allegedly not properly disclosed to the court or other creditors

should be rejected where everyone had notice of the sale, the "assets were quite essential to

operation of the property," and the circumstances were "sufficient to prompt a reasonable party

to verify its understanding of the [assets] and inquire about the scope of the sale." *In re Rome*

*Family Corp.*, Bankr. No. 02-11771, 2010 WL 1381093, at *5 (D. Vt. Mar. 31, 2010).

20.8.    Courts have disturbed sale orders based on *ex post facto* allegations of inadequate

disclosure only where the debtor and buyer concealed material information relating to the sale

from the court and other prospective purchasers such that the buyer had a material advantage that

affected the outcome of the bidding process or the sale hearing. *See, e.g., In re Lawrence*, 293

F.3d 615 (2d Cir. 2002) (insider buyers possessed undisclosed material information about the

value of the assets being acquired); *In re LWD, Inc.*, 332 B.R. 543 (Bankr. W.D. Ky. 2005)

(debtors and insider buyer did not "disclose[] the asset in a manner sufficient to allow potential

bidders to value it properly and bid for it on a footing equal to that of the insider Defendant"); *In*

*re Am. Freight Sys., Inc.*, 126 B.R. 800 (D. Kan. 1991) (buyer and debtor knew the sale involved

24 acres with an appraised value of $1,675,000, but the court, creditors, and other potential

buyers believed the sale involved only 11 acres with an appraised value of $1,330,000); *In re*

*BCD Corp.*, 119 F.3d 852 (10th Cir. 1997) (auction bidders believed the risk of environmental

problems shifted to the buyer, but the terms of the actual sale allocated the risk differently).

20.9.    Thus, disclosures to the public, rather than to the Court, are relevant for the

purpose of proving good faith (as it would show lack of intent to keep the publicly disclosed

information secret), and in demonstrating that creditors and other interested parties had sufficient

knowledge of the terms of the proposed transaction such that the buyer did not have a material,

undisclosed advantage in the bidding process.

21.    **AS USED IN PARAGRAPH M OF THE SALE ORDER, THE TERMS
"REASONABLY EQUIVALENT VALUE" AND "FAIR CONSIDERATION" ARE
SATISFIED, BY DEFINITION AND AS A MATTER OF LAW, IF THERE WERE
NO OTHER BIDDERS AND THE CONSIDERATION PROVIDED WAS
BELIEVED TO BE MORE THAN WOULD BE RECEIVED IN A LIQUIDATION.**

21.1.    "When sophisticated parties make reasoned judgments about the value of assets

that are supported by then prevailing marketplace values and by the reasonable perceptions about

growth, risks, and the market at the time, it is not the place of fraudulent transfer law to

reevaluate or question those transactions with the benefit of hindsight." *Peltz v. Hatten,* 279 B.R.

710, 738 (D. Del. 2002); *see Brandt v. MIT Dev. Corp.,* 552 F. Supp. 2d 304, 323 (D. Conn.

2008) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 154).

21.2.    Consideration can be fair and reasonable even if less than appraised value,

particularly if no better offer is available and the offered price is better than what the estate

would receive in a liquidation. *In re Canyon P'ship,* 55 B.R. 520, 524-25 (Bankr. S.D. Cal.

1985) (even though price was just 70% of appraised "liquidation value," court accepted business

judgment that sale was "in the best interest of the estate," as this was the best offer despite

marketing efforts); *In re Condere Corp.,* 228 B.R. 615, 633 (Bankr. S.D. Miss. 1998) (sale approved where assets had been marketed and the offer was the only one received by the debtor, and the offered price was the best available under the circumstances); *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 244-245 (Bankr. S.D. W. Va. 1996) (sale approved where debtor had not received "any viable alternative offers" despite extensive marketing, the failure to approve would cause job losses and greater damage to creditors, and the offered price was greater than liquidation value).

21.3.    The "formula for determining reasonably equivalent value is not a fixed mathematical formula," but rather is a "totality of the circumstances" test. *American Tissue, Inc. v. Donaldson Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 106 (S.D.N.Y. 2005). Circumstances the courts should consider include whether the "financial condition of the business was deteriorating," *In re Sun Valley Prod.*, 328 B.R. 147, 157 (Bankr. D. N.D. 2005), and whether any "other persons or entity or group of entities has offered to purchase the Acquired Assets or the Sale Securities for greater economic value to the Debtors' estates," *In re Delphi Corp.*, No. 05-44481, 2009 WL 2482146, at *9 (Bankr. S.D.N.Y. 2009).

21.4.    Consideration may be fair and reasonable even if the transaction is profitable to the buyer:

> There is no question that bidders participate in the bankruptcy sale process in the hopes of obtaining a bargain price for the debtor's assets. Astute purchasers invest significant time and money in the investigation of the bankrupt's title and assets in an attempt to establish at what level they are willing to buy. They invest the time and money largely because they know that in a bankruptcy court when the hammer falls the deal is closed and final unless a party not only appeals but also obtains a stay. The fact that a good faith purchaser walks away from the court with a bargain does not ipso facto make the sale a bad deal and the buyer a bad faith purchaser.

*In re Cable One CATV*, 169 B.R. 488, 497 (Bankr. D. N.H. 1994).

21.5.    While there is no mathematical formula for "reasonably equivalent value" or 'fair consideration," courts have recognized that a payment that is 75 percent or more of the "appraised value" of the assets purchased out of bankruptcy is considered "value" or "fair consideration" in the context of a bankruptcy sale.  *See, e.g.*, *In re Alpha Indus., Inc*., 84 B.R. 703, 706 (Bankr. D. Mont. 1988); *In re Karpe*, 84 B.R. 926, 933 (Bankr. M.D. Pa. 1988); *In re Seychelles, P'ship*, 32 B.R. 708, 710 (N.D. Tex. 1983).  *See also In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) ("Generally speaking, a purchaser who pays 75 percent of the appraised value of the assets has tendered value.").

22.    **IN A RULE 60(B)(1) CHALLENGE TO AN ORDER APPROVING A CONTRACT, THE ONLY KIND OF "MISTAKE" THAT CAN JUSTIFY RELIEF IS A "MUTUAL MISTAKE OF FACT" THAT WOULD JUSTIFY REFORMATION UNDER STATE CONTRACT LAW.**

22.1.    "Relief under Rule 60(b)(1) motions is rare; such motions allow district courts to correct only limited types of substantive errors*."  Hall v. C.I.A*., 437 F.3d 94, 99 (D.C. Cir. 2006).  In particular:

> Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party in only two instances: (1) when a party has made an excusable litigation mistake or an attorney in the litigation has acted without authority; or (2) whe[n] the judge has made a substantive mistake of law or fact in the final judgment or order.

*Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*, 528 F.3d 712, 722-723 (10th Cir. 2008) (internal quotation omitted).

22.2.    Because Rule 60(b) may not independently be used to grant affirmative relief or to modify a contract, a Rule 60(b)(1) challenge seeking the relief of modifying a court-approved

contract (as opposed to one seeking to vacate a court-approved contract) must demonstrate a

state-law basis for modifying the contract.  *See* COL ¶ 11.

22.3.    A *unilateral* mistake regarding the negotiation or comprehension of an agreement

is not a valid basis for Rule 60(b)(1) relief:

> To the extent Perrin contends that his mistake is the type for which relief may be
> granted under Rule 60(b)(1), he is incorrect.  This type of mistake — one made in
> the negotiation of a contract or settlement — is not the type of mistake for which
> Rule 60(b)(1) provides relief; *i.e.*, mistakes that occur in the judicial process.

*F.D.I.C. v. Currier*, No. 98-2212, 1999 WL 979235, at *2 (10th Cir. Oct. 28, 1999); *see also*

*Cashner v. Freedom Stores, Inc*., 98 F.3d 572, 578-79 (10th Cir. 1996) (unilateral mistake as to

the interpretation of settlement agreement not grounds for Rule 60(b)(1) relief).

22.4.    Rule 60(b)(1) may not be used to set aside court-approved agreements (or to

rewrite such agreements) based upon a unilateral mistake.  *In re Hyler*, No. 04-32952, 2009 WL

2849129, at *3 (Bankr. N.D. Cal. Apr. 22, 2009) (no relief for unilateral mistake regarding what

personal property would be affected by a stipulation and sold by the trustee); *In re Wilmington*

*Hospitality*, No. 01-19401, 2003 WL 21011689, at *6 (Bankr. E.D. Pa. April 18, 2003) (no relief

unless there is a state law basis, such as *mutual* mistake justifying reformation); *In re Jamesway*

*Corp.*, No. 93 B 43697, 1995 Bankr. LEXIS 267, at *5 (Bankr. S.D.N.Y. Mar. 7, 1995) (denying

60(b) motion to amend assumption order where movant could not show *mutual* mistake, as

required for reformation under New York state law).

22.5.    A contract cannot be reformed for unilateral mistake; only mutual mistake, proven

with a "high order of evidence," will suffice.  *See Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573-

74 (1986).

22.6.    Furthermore, there can be no "mistake" under Rule 60(b)(1) where there was

acknowledged uncertainty:

> When applying the theory of mistake of fact under contract law, there must be
> excluded from consideration mistakes as to matters which the contracting parties
> had in mind as possibilities and as to the existence of which they took the risk.

*In re N. Broadway Funding Corp*., 34 B.R. 620, 622 (Bankr. E.D.N.Y. 1983) (citing 13 S.

WILLISTON ON CONTRACTS § 1543, p. 75 (3d ed. 1970)).

22.7.    "Rule 60 (and by reference Rule 9024), does not permit relief from a final order

when the effect of such relief would be to free the moving party from calculated and deliberate

choices and decisions."  *In re N. Broadway Funding Corp*., 34 B.R. 620, 623 (Bankr. E.D.N.Y.

1983).

22.8.    It is not the role of Rule 60 or this Court to relieve Movants from the

consequences of their free choices in a contractual negotiation.  A party's "dissatisfaction in

hindsight" with the effects of a bargain are not grounds for Rule 60(b)(1) relief.  *See Andrulonis

v. United States*, 26 F.3d 1224, 1235 (2d Cir. 1994); *see also Andresakis v. State of Conn.,* No.

96-9467, 1997 WL 383456, at *3 (2d Cir. July 9, 1997) (same); *Nemaizer v. Baker*, 793 F.2d 58,

61-64 (2d Cir. 1986) (declining to grant Rule 60(b)(1) or (6) relief to party who later regretted

preclusive effect of signed stipulation to dismiss).

22.9.    Similarly, any alleged "mistakes" relating to "predictions or judgment as to events

to occur in the future" cannot constitute "mistakes" for Rule 60(b) purposes.  *In re Bradlees

Stores,* 291 B.R. 307, 312 (Bankr. S.D.N.Y. 2003).

22.10.  Rule 60 does not allow a court to "indulge a party's discontent over the effects of its bargain." *Kozlowski v. Coughlin,* 871 F.2d 241, 246 (2d Cir. 1989).

22.11.  When "a party makes a deliberate, strategic choice" to enter into a contract that is approved by a court, she "cannot be relieved of such a choice merely because her assessment of the consequences was incorrect." *United States v. Bank of N.Y.,* 14 F.3d 756, 759 (2d Cir. 1994); *see also Nemaizer v. Baker*, 793 F.2d 58, 62 (2d Cir. 1986) ("Mere dissatisfaction in hindsight with choices deliberately made by counsel is not grounds for finding the mistake, inadvertence, surprise or excusable neglect necessary to justify Rule 60(b)(1) relief.").

22.12.  The "carelessness or ignorance of a litigant or its counsel does not provide grounds for relief under Federal Rule 60(b)(1)." *In re Carlton Concrete Corp*., No. 08-CV-242, 2008 WL 4443233, at *6 (E.D.N.Y. Sept. 26, 2008) (affirming bankruptcy court's denial of Rule 60(b)(1) motion); *see Karara v. Univ. of Denver*, No. 93-1087, 1993 WL 371386, at *2 (10th Cir. Sept. 23, 1993) ("Carelessness by a litigant or his counsel does not afford a basis for relief under Rule 60(b)(1).").

22.13.  Thus, a movant cannot obtain Rule 60(b) relief because he was mistaken about whether an asset would be included in a Section 363 sale – even when it was never disclosed to the court or other creditors that the asset would be involved in the sale – where, "with due diligence, the [movant] could have sought a determination as to ownership of the [asset], and as to whether the [asset] was included in the assets to be sold, prior to the sale, to correct that mistake understanding." *In re Rome Family Corp.*, Bankr. No. 02-11771, 2010 WL 1381093, at *4 (Bankr. D. Vt. Mar. 31, 2010).

23.    **IN A RULE 60(B)(2) CHALLENGE TO AN ORDER APPROVING A CONTRACT, THE "NEW EVIDENCE" MUST DEMONSTRATE A MUTUAL MISTAKE OF FACT OR OTHER BASIS FOR REFORMATION OF THE CONTRACT, AND CANNOT SIMPLY BE EVIDENCE OF A FACT THAT WAS KNOWN TO BE UNCERTAIN AT THE TIME THE PARTIES ENTERED INTO THE CONTRACT.**

23.1.    Rule 60(b)(2) applies only when there is "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b) (2). Rule 59(b) sets a 10 day deadline for moving for a new trial. Thus, Movants cannot demonstrate new evidence unless they can point to facts that, "with reasonable diligence," they could not have discovered before September 30, 2008. *See* Fed. R. Bankr. P. 9006(a) (including intermediate Saturdays, Sundays and legal holidays in calculating 10-day time period).

23.2.    The standard for "new evidence" claims pursuant to Rule 60(b)(2) is:

> [T]he Movant must demonstrate that (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the Movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.

*United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001).

23.3.    In determining whether a movant has met his burden of proving that alleged "new evidence" is truly "new," the Court must impute to the movant the cumulative knowledge of *all* of the movant's executives and employees. This imputation is legally required *even if* one or

more of them "has a conflict of interest or because he is not acting primarily for his principal."

*Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 785 (1985).[10]

23.4.    As noted above, COL ¶¶ 8.7-8.10, the "adverse interest" exception to the

imputation rule is highly limited:  "New York courts have cautioned that this exception is a

narrow one and that the guilty manager 'must have totally abandoned' his corporation's interests

for it to apply."  *In re CBI Holding Co., Inc.*, 529 F.3d 432, 448 (2d Cir. 2008).  "*It cannot be*

*invoked merely because [the officer] has a conflict of interest or because he is not acting*

*primarily for his principal*."  *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 785 (1985)

(emphasis added) (citing RESTATEMENT (2D) OF AGENCY § 282(1)).  *See also Arista Records*

*LLC v. Usenet.com, Inc*., 633 F. Supp. 2d 124, 152, n.19 (S.D.N.Y. 2009) (imputing knowledge

and rejecting company's claim that individuals with relevant knowledge were "rogue

employees").

23.5.    Furthermore, known uncertainty about the value of an asset precludes "new

evidence" that is merely a *post hoc* reassessment of the asset's "true" value.  "When

sophisticated parties make reasoned judgments about the value of assets that are supported by

then prevailing marketplace values and by the reasonable perceptions about growth, risks, and

the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those

transactions with the benefit of hindsight."  *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002);

---

[10] "Knowledge and actions of a corporation's employees and agents are generally imputed to the corporation where the acts are performed on behalf of the corporation and are within the scope of their authority."  *UCAR Int'l, Inc. v. Union Carbide Corp*., No. 00cv1338 (GBD), 2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004); *see also CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 824 (S.D.N.Y. 2006).  The company is bound even if the officers' knowledge is "never actually communicated to it."  *Center v. Hampton Affiliates*, 66 N.Y.2d 782, 784 (1985) (citing RESTATEMENT (2D) OF AGENCY § 272).

*see Brandt v. MIT Dev. Corp.*, 552 F. Supp. 2d 304, 323 (D. Conn. 2008) (quoting

RESTATEMENT (SECOND) OF CONTRACTS § 154).

23.6.    Finally, the concept of "new evidence" under Rule 60(b)(2) is limited to facts "in

existence at the time of trial."  Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 2859.

Facts that first came into existence after the sale may not be used to support a Rule 60(b)(2)

motion.

23.7.    Because Rule 60(b) may not independently be used to grant affirmative relief or

to modify a contract, a Rule 60(b)(2) challenge seeking the relief of a modified court-approved

contract (as opposed to one seeking to vacate a court-approved contract) must show new

evidence sufficient to demonstrate a state-law basis for modifying the contract.  *See* COL ¶ 11.

24.    **IN A RULE 60(B)(3) CHALLENGE TO AN ORDER APPROVING A
CONTRACT, THE ALLEGED "FRAUD, MISREPRESENTATION, OR
MISCONDUCT" MUST BE SUFFICIENT TO JUSTIFY REFORMATION OF
THE CONTRACT, AND MUST OTHERWISE SATISFY THE REQUIREMENTS
OF RULE 60(B)(3).**

24.1.    Because Rule 60(b) may not independently be used to grant affirmative relief or

to modify a contract, a Rule 60(b)(3) challenge seeking the relief of a modified court-approved

contract (as opposed to one seeking to vacate a court-approved contract) must be based on fraud,

misrepresentation or misconduct sufficient to demonstrate a state-law basis for modifying the

contract.  See COL ¶ 11.

A.    **Only Misconduct By An "Opposing Party" May Be Considered.**

24.2.    Rule 60(b)(3) allows relief on the basis of fraud, misrepresentation, or misconduct

"by an opposing party."

24.3.    The rule envisions an "opposing party" to be an adverse party in *litigation*.  *See*,
*e.g.*, *Sherman v. Verizon Va., Inc.*, 220 F.R.D. 260, 262 (E.D. Va. 2002) ("defendant, the
'adverse party' contemplated by Rule 60(b)(3), and *not* plaintiff's own attorney, must be the
author of any fraud, misrepresentation, or misconduct") (emphasis in original); *Buffalo Wings
Factory, Inc. v. Mohd*, No. 1:07cv612, 2008 WL 2557999, at *4, n.2 (E.D. Va. June 23, 2008)
(party's attorney not an "opposing party" under the rule); *In re Sanders*, 408 B.R. 25, 38 (Bankr.
E.D.N.Y. 2009) ("in order to vacate the Lift Stay Order under Rule 60(b)(3), the alleged fraud
must have been perpetrated by RSL, which was the opposing party in the Prior Case.").

**B.    Claims of Misconduct Must Be Pleaded With Particularity and Proven By
Clear and Convincing Evidence.**

24.4.    "[C]lear and convincing evidence" of wrongdoing is required for Rule 60(b)(3)
relief.  *De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 880 (9th Cir. 2000).

24.5.    Fraud and misrepresentation must be pleaded with particularity.  Fed. R. Civ. P.
9(b); Fed. R. Bankr. P. 7009, 9014(c).

24.6.    Rule 60(b)(3) may be granted only for fraud and other misconduct that would
have "changed the outcome" of the original proceeding.  *Bettis v. Kelly*, No. 02 Civ. 104, 2004
WL 1774252, at *2 (S.D.N.Y. Aug. 9, 2004), *aff'd*, 137 F. App'x 381 (2d Cir. 2005); *In re St.
Stephen's 350 E. 116th St.*, 313 B.R. 161, 174 (Bankr. S.D.N.Y. 2004).

**25.    RULE 60(B)(6) CATCH-ALL RELIEF IS LIMITED TO OUTCOME-ALTERING
"UNUSUAL AND EXTREME" CIRCUMSTANCES NOT CONSIDERED IN ANY
OF THE MORE SPECIFIC CLAUSES OF RULE 60(B).**

25.1.    Rule 60(b)(6) is a catch-all provision that allows a court to vacate its judgment for
"any other reason that justifies relief."  However, where a movant's Rule 60 claim falls within

the purview of any other section of Rule 60(b), relief under Section (b)(6) of the Rule is not

available.  "Controlling cases have held that if the reasons offered for relief from judgment can

be considered in one of the more specific clauses of Rule 60(b), such reasons will not justify

relief under Rule 60(b)(6)."  *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391-92 (2d

Cir. 2001).

25.2.    If the claims are based on alleged conduct covered by other subsections of Rule

60(b) (mistake, new evidence, misconduct), Rule 60(b)(6) may not be invoked.  *Scherer v. City

of New York*, No. 03 Civ. 8445, 2007 WL 2710100, at *4 (S.D.N.Y. Sept. 7, 2007) ("Since

Plaintiffs have asserted the motion under Rule 60(b)(2) and (3) …, the motion will not be

construed under Rule 60(b)(6)"); *U.S. v. Cirami*, 535 F.2d 736, 740 (2d Cir. 1976) ("Rule

60(b)(1) and 60(b)(6) are mutually exclusive, so that any conduct which generally falls under the

former cannot stand as a ground for relief under the latter") (internal quotation omitted); *Rand

Int'l Leisure Prods., Ltd. v. TekSource, L.C.*,  No. 97 CV 0319, 1998 WL 372356, at *2

(E.D.N.Y. July 2, 1998) (plaintiff "cannot avoid Rule 60(b)(2)'s requirements of materiality and

due diligence by reasserting the same claims under Rule 60(b)(6).").

25.3.    A Rule 60(b)(6) movant must satisfy the "heavy burden" needed to "protect the

finality of judgments against efforts to turn the vicissitudes of litigation into grounds for more

litigation still."  *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 832 (7th Cir. 1985) (denying

relief despite fraud by an expert witness).

25.4.    Rule 60(b)(6) is limited to "unusual and extreme situations where principles of

equity *mandate* relief," because "almost every conceivable ground for relief is covered under the

first three subsections." *Olle v. Henry & Wright Corp.,* 910 F.2d 357, 365 (6th Cir. 1990)

(emphasis in original).

**26.    THE RELEASE IN THE COURT-APPROVED DECEMBER 2008 SETTLEMENT
BARS ALL CLAIMS RELATING TO THE REPO COLLATERAL.**

26.1.    On December 5, 2008, the Trustee entered into a settlement agreement with

Barclays and JPMorgan to resolve the dispute over JPMorgan's failure to deliver repo collateral

corresponding to $7 billion in cash advanced by Barclays.  In that December Settlement, the

Trustee agreed to the following release:

> *[T]he Trustee, on behalf of LBI and the LBI estate, hereby does and shall be
> deemed to forever release*, waive and discharge each of JPMorgan and *BarCap*,
> their respective property and their respective current and former Representatives
> (for the avoidance of doubt, in (and only in) such current or former
> Representatives' respective capacities as such) *from and in respect of all Claims,
> whether known or unknown, foreseen or unforeseen, suspected or unsuspected,
> liquidated or unliquidated, contingent or fixed, currently existing or hereafter
> arising, in law, equity or otherwise, relating to the Subject Funds [the $7 billion
> withheld by JPMorgan], the Replacement Transaction [the Barclays-LBI repo
> agreement] or the Delivered Securities [the securities listed in Schedule A of the
> Clarification Letter].*

BCI Ex. 9 at ¶ 4(d) (emphasis added).

26.2.    The Court's Order approving the settlement stated that the settlement agreement

would not "bind, be collateral estoppel or otherwise prejudice any *other* matter in this case," but

it did not permit claims on *the very same matter* that was being resolved.  BCI Ex. 39 at p. 2

(emphasis added).

26.3.    A release binds non-parties that assert derivative claims, just as it binds the parties

to the release themselves.  *Perelman v. Snowbird Ski Shop, Inc*., 626 N.Y.S.2d 304, 305 (N.Y.

App. Div. 1995) (injured plaintiff and her husband who alleged derivative claim were properly

dismissed based upon plaintiff's executed release); *Miller v. JetBlue Airways Corp*., No.
102398/2009, 2009 WL 2514155, at *2 (N.Y. Sup. Ct. Aug. 17, 2009) (derivative claims barred
where holder of claim executed release); *Biosyntec, Inc. v. Baxter Healthcare Corp*., 746 F.
Supp. 5, 11 (D. Or. 1990) (same).

26.4.    LBI was Barclays' only counter-party in the repo agreement, and thus the Debtor
and the Committee do not have any direct rights regarding the Repo Transaction; their claims are
based derivatively on the Trustee's alleged rights.

## 27.    SECTION 549 RELIEF IS UNAVAILABLE WHERE THE COURT HAS APPROVED THE SALE, AND SECTION 549 CANNOT BE USED TO MODIFY THE TERMS OF A SALE AFTER THE FACT.

27.1.    The Bankruptcy Code, 11 U.S.C. § 549, allows a trustee or debtor in possession to
avoid a sale of the debtor's assets if the sale was not authorized by the Court.  Movants have not
cited a single case where Section 549 relief has been granted with respect to a § 363 sale that was
the subject of a court order.  As § 549 by its terms is limited to avoidance of unapproved sales, §
549 relief cannot properly be granted with respect to an approved sale, unless the order
approving the sale is vacated under Rule 60(b).  *In re Int'l Philanthropic Hosp. Found.*, No. 05-
01097, 2006 WL 618276, at *3-4 (Bankr. C.D. Cal. Jan. 4, 2006) ("as long as there is an order,
there is no recovery under Section 549," even if the order was based on insufficient information).
"If a trustee could recover a postpetition transfer merely by showing the judge was not provided
with sufficient evidence had she been better informed, problems would be created for parties
who otherwise would have simply relied on the order."  *Id.*

27.2.    This explains why the overwhelming majority of § 549 case involves occurs when
a debtor makes a sale that it believed (or contended) was in the "ordinary course of business"

and, thus, did not require court approval, but where a trustee or creditor challenges the transfer

and claims it should be voided because it did require court approval. *See In re Straightline Inv.,*

*Inc.*, 525 F.3d 870, 879 (9th Cir. 2008) (trustee challenged debtor-initiated transfer as

unauthorized post-petition transfer made out of the ordinary course of business and therefore

subject to avoidance under 549); *In re Miller Min., Inc.*, 219 B.R. 219, 220 (Bankr. N.D. Ohio

1998) (same); *In re Garofalo's Finer Foods, Inc.*, 186 B.R. 414, 419 (N.D. Ill. 1995) (same).

### A.    A Sale May be Approved Under § 363 Before the Sale Contract is Finalized.

27.3.    Under the Code, the Court may authorize a sale without reviewing and approving

the final version of the sale contract prior to closing, particularly where, as here, an emergency

situation exists.  Section 363(b) authorizes the Trustee to sell assets outside the ordinary course

of business "after notice and a hearing."  11 U.S.C. § 363(b).  Section 102 provides that the term

"after notice and a hearing" —

> (A) means *after such notice as is appropriate in the particular circumstances*, and
> such opportunity for a hearing as is appropriate in the particular circumstances;
> but
> (B) *authorizes an act without an actual hearing if such notice is given properly
> and if*—
>
> > (i) such a hearing is not requested timely by a party in interest; or
> >
> > (ii) *there is* insufficient *time for a hearing to be commenced before such
> > act must be done, and the court authorizes such act*.

11 U.S.C. § 102 (emphasis added).[11]

---

[11] The term "hearing" does not necessarily require a full blown evidentiary hearing as long as the
parties are given a fair opportunity to present their positions. *Vonderahe v. Polaniecki*, 276 B.R.
856, 858-59 (S.D. Ohio 2001) (status conference held sufficient).

27.4.    Thus, under Section 102(b), a sale under Section 363(b) may be authorized even without a hearing if appropriate notice is given and the exigencies of the circumstances require immediate approval.

27.5.    The Sale Order in this case specifically authorized the sale to Barclays, and the Sale Order explicitly stated that the transaction documents could be amended without further court approval after the hearing and before closing, as long as the amendments were contained in a writing signed by the "parties thereto," were "agreed to" by the Committee, and did not have a "material adverse effect" on the Debtors' estates.  BCI Ex. 16 (Sale Order) at ¶ 25.[12]

27.6.    "Material adverse effect" means an effect that causes the estates, overall, to lose materially more than they gained as a result of the amendments.  *Freedman v. Value Health, Inc.*, 34 F. App'x 408, 411 (2d Cir. 2002) (nondisclosure of losing contracts had no material adverse effect because losses were offset by profitable contracts).  *See also Allegheny Energy v. DQE, Inc.*, 74 F. Supp. 2d 482, 517-18 (W.D. Pa. 1999) (defining "material adverse effect" and finding that the denial of "the opportunity to receive a large stream of guaranteed future revenues" was materially adverse), *aff'd mem.*, 216 F.3d 1075 (3d Cir. 2000).

27.7.    The Sale Order did not require *written* approval from the Committee for any changes.  It states only that the "parties thereto" had to agree in writing to any amendments, and the Committee was not a party.  The amendments had to be "agreed to" by the Committee, but the Committee's agreement (unlike the parties') did not have to be in writing.  BCI Ex. 16 (Sale Order) at ¶ 25.

---

[12] As the Sale Order expressly authorized post-approval amendments without further court approval, there is no relevance to the cases cited by Movants, such as *In re Metaldyne*, 409 B.R. 661 (Bankr. S.D.N.Y. 2009), where unauthorized amendments agreed to by the debtor were deemed invalid.

27.8.    Implicit in the Sale Order is that, if the Committee did not agree to an amendment

to which the parties agreed in writing, the Committee was obliged to bring its disagreement

promptly to the attention of the Court.

**B.    Section 549 Does Not Allow a Court to Modify the Terms of the Parties'
Contract**

27.9.    As discussed above, COL ¶¶ 6, 12.11-12.15, the doctrine of equitable mootness

bars and the prohibition against of partial rescission bar § 549 relief and any other type of relief

that would rewrite the terms of a negotiated agreement that has been closed and that resulted in

the transfer of a multi-billion dollar business.  *In re Metromedia Fiber Network*, 416 F.3d 136,

145 (2d Cir. 2005); *United States v. Salerno*, 932 F.2d 117, 122-23 (2d Cir. 1991); *In re Motors

Liquidation Co.*, 430 B.R. 65, 81-82 (S.D.N.Y. 2010); *In re Acorn Hotels, LLC*, 251 B.R. 696,

704-05 (Bankr. W.D. Tex. 2000); *In re Adelphia Commc'n Corp.*, 367 B.R. 84, 97 (S.D.N.Y.

2007) (any effort to "rewrite the terms of the bargain" is beyond the power of the Court").

27.10.    The bankruptcy law cases prohibiting the rewriting of a contract are consistent

with state contract law, which prohibits partial rescission of "cherry picked" unfavorable

provisions in a negotiated contract.  Thus, if a Section 549 claimant seeks avoidance on the

grounds that post-hearing amendments were not authorized, the claimant must disavow all such

post-hearing amendments in their entirety.  It cannot "pick and choose" and seek to strike only

certain of the negotiated provisions while leaving in force other portions of the post-hearing

amendments that were the *quid pro quo* for the allegedly invalid provisions.  *Merry Realty Co. v.

Shamokin & Hollis Real Estate Co.*, 230 N.Y. 316, 323 (1921) (rescission "must be in whole and

not in part"); *Merryman v. Gottlieb*, 99 A.D.2d 893, 894 (N.Y. App. Div. 1984) ("if this

particular contract should have been rescinded at all, it should have been rescinded completely

and not partially"); *In re Meiselman*, 105 F.2d 995, 998 (2d Cir. 1939) (disaffirmance of contract

"invalid unless it covered the whole contract"); *Lummus Co. v. Commonwealth Oil Refining Co.*,

280 F.2d 915, 927-28 (1st Cir. 1960) ("It is fundamental that a single agreement cannot be

rescinded in part and affirmed in part").

27.11.   In other words, a movant cannot selectively construct a transaction that was not

contemplated by the parties and to which its counter-party did not agree.  "The theory underlying

such a rule is that retention of only the benefits of the transaction amounts to unjust enrichment

and binds the parties to a contract which they did not contemplate." *Simmons v. Cal. Inst. of

Tech.*, 209 P.2d 581, 587 (Cal. 1949).  *Accord*, *International Marble & Granite of Colo., Inc. v.

Congress Fin. Corp.*, 465 F. Supp. 2d 993, 1004 (C.D. Cal. 2006); 17A AM. JUR. 2D CONTRACTS

§ 533; 17B C.J.S. CONTRACTS § 459 ("party cannot accept the benefits on the one hand while

shirking its disadvantages on the other").

27.12.   Section 549 movants may not seek to remove from an agreement "the part[s]

[they] dislike and compel [the counter-party] to accept what is left." *Simons v. Crowley*, 112

N.Y.S.2d 851, 856 (N.Y. Sup. Ct. 1952); *Yagoda v. Strang Corp.*, Civ. No. 08-1901, 2008 WL

4606306, at *2 (D. N.J. Oct. 16, 2008) (party may not "have her proverbial cake, and eat it too"

by repudiating just the unfavorable parts of a contract); *County of Morris v. Fauver*, 707 A.2d

958, 966 (N.J. 1998) (same); *Rancourt v. Verba*, 678 A.2d 886, 888 (Vt. 1996) (it must be "all-

or-nothing;" party may not "retain favorable portions of the contract and disregard the rest"); *In*

*re Nelson's Estate*, 209 N.Y.S.2d 344, 346-47 (N.Y. Sur. Ct. 1961), *aff'd*, 225 N.Y.S.2d 982

(N.Y. App. Div. 1962) (same).[13]

**28.    SECTION 559 DOES NOT APPLY TO PURCHASED ASSETS, DOES NOT
PROVIDE RELIEF FOR SETTLED CLAIMS, DOES NOT APPLY WHEN
THERE IS NO "EXCESS" COLLATERAL, AND APPLIES ONLY WHERE THE
BANKRUPTCY CODE'S DEFINITION OF A "REPURCHASE AGREEMENT"
IS SATISFIED.**

28.1.    Section 559 provides that if a "repo participant" liquidates a "repurchase

agreement" with a debtor, then "any excess of the market prices received on liquidation" of the

repo collateral over the amount of the repo loan, plus interest, plus the expenses of liquidation,

"shall be deemed property of the estate."  11 U.S.C. § 559.

28.2.    Nothing in § 559 or elsewhere prohibits or limits a debtor from selling, with court

approval, any "excess" collateral that becomes property of the estate pursuant to § 559.

28.3.    The Sale Order expressly provides that the transfer of assets under the Purchase

Agreement is "not subject to rejection or avoidance by the Debtors or any successor chapter 11

or chapter 7 trustee appointed with respect thereto."  BCI Ex. 16 (Sale Order) at ¶ 5.

**A.    A § 559 Claim is Moot if the Movant Subsequently Sells Allegedly "Excess"
Repo Collateral to the Repo Counter-Party.**

28.4.    A claim is moot and may not be decided by a federal court if the decision will not

have any practical effect on the rights of the litigants.  *DeFunis v. Odegaard*, 416 U.S. 312,

316 (1974).

---

[13] *Accord*, *Clearview Assocs., Inc. v. Clearview Gardens First Corp.*, 168 N.Y.S.2d 432, 441
(N.Y. Sup. Ct. 1957);  *Barrington Mgmt. Co., Inc. v. Paul E. Draper Family L.P.*, 695 N.E.2d
135, 142 (Ind. App. Ct. 1998) ("The party rescinding a contract must repudiate the part of the
contract which is beneficial to him as well as that part of the contract which is not").

28.5.    Even assuming as correct Movants' argument that a portion of the Repo Collateral

transferred to Barclays was "excess" and reverted to the estate pursuant to § 559 on September

19, 2008, the Movants sold such reverted collateral back to Barclays on September 22, which

renders any § 549 issue moot.

**B.    The Trustee's Release In the December Settlement Bars Any § 559 Claims.**

28.6.    As discussed above, any § 559 claims that Movants may have had were released

in the December 2008 settlement agreement.  COL ¶ 26.

**C.    An Agreement Is Not a "Repurchase Agreement" Within the Meaning of § 559 If a Substantial Portion of the Collateral Is Not Within the Statutory Definition.**

28.7.    The Bankruptcy Code defines a "repurchase agreement" as an agreement to

transfer only certain types of collateral; specifically, "certificates of deposit, mortgage related

securities (as defined in Section 3 of the Securities Exchange Act of 1934), mortgage loans,

interests in mortgage related securities or mortgage loans, eligible bankers' acceptances,

qualified foreign government securities (defined as a security that is a direct obligation of, or that

is fully guaranteed by, the central government of a member of the Organization for Economic

Cooperation and Development), or securities that are direct obligations of, or that are fully

guaranteed by, the United States or any agency of the United States."  11 U.S.C. § 101(47)(A)(i).

28.8.    Thus, section 559 is only applicable to repurchase agreements that concern only

"*certain types* of underlying securities that are being sold and repurchased."  *In re Residential*

*Resources Mortg. Inv. Corp.*, 98 B.R. 2, 19 (Bankr. D. Ariz. 1989) (emphasis added).

28.9.    Under the principle of *expressio unius est exclusio alterius* (the mention of one

thing excludes the other), *see Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 221 (2d Cir.

2009) if a substantial portion of the collateral does not satisfy the statutory definition, the

agreement is not a "repurchase agreement" for Section 559 purposes.

**D.**     **Section 559 Affords Relief Only If the Movant Proves the Creditor Had an
Excess Based on a Price "Available" From or Closing Bid Quotations From a
Generally Recognized Source.**

28.10.  Even if it applies, Section 559 only entitles the estate to "any excess of the market

prices received on liquidation of such assets (or if any such assets are not disposed of on the date

of liquidation of such repurchase agreements, at the prices available at the time of liquidation of

such repurchase agreements from a generally recognized source or the most recent closing bid

quotation from such a source) over the sum of the stated repurchase prices and all expenses in

connection with the liquidation of such repurchase agreements."  11 U.S.C. § 559 (emphasis

added).

28.11.  The burden of proving any alleged "excess" is on the movant, and the absence of

closing bid quotations from a generally recognized source defeats any § 559 claim.

28.12.  Under the plain terms of § 559, the § 559 movant must prove the existence of any

alleged "excess" as of the time of "liquidation," and not as of some later time.

28.13.  Movants have not introduced any evidence of the "prices available" at the time of

liquidation "from a generally recognized source or the most recent closing bid quotation from

such a source."  Movants cite the marks from BONY and other custodial agents, but these are

plainly just estimates, with no suggestion that these "prices" were "available" from these agents

or that these agents were willing to buy the collateral from Barclays at any price at all.  FOF ¶¶

24.5-24.6; BCI Ex. 341 at ¶ 55 ("for many positions of significant indicated value in the Repo

Collateral, there is no generally recognized pricing source available.").  Quite the contrary, much

of the collateral was admittedly illiquid, and Barclays did not even receive $7 billion of the

promised collateral by the date of the alleged "liquidation."  FOF ¶¶ 3.4.10-3.4.11, 24.7, 25.8.

**29.    THE CONSTITUTION DOES NOT PERMIT A COURT TO MODIFY THE
TERMS OF A CONTRACT ABSENT A STATE LAW BASIS FOR DOING SO.**

29.1.    The U.S. Constitution prohibits the taking of private property without just

compensation, and without due process of law.  U.S. Const. Amend. V (Due Process Clause and

Takings Clause).

29.2.    A contract constitutes private property protected by the Takings Clause and the

Due Process Clause of the Constitution.  *See Lynch v. United States*, 292 U.S. 571 (1934);

*United States v. Winstar*, 518 U.S. 839 (1996).

29.3.    The Constitution protects private property, including private contractual rights,

against the imposition of retroactive liability that violates "settled expectations" and "reasonable,

investment-backed expectations."  *See generally Eastern Enters. v. Apfel*, 524 U.S. 498, 532

(1998) ("Retroactivity is generally disfavored in the law"); *id.* at 523-24 ("reasonable,

investment-backed expectations" are central to Takings Clause analysis) (citation and quotation

omitted); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ("settled expectations should

not be lightly disrupted").

29.4.    The Constitution protects private property, including private contractual rights,

against Government action that diminishes the value of the private property and that directly

contradicts prior Government conduct that gave rise to a "reasonable, investment-backed

expectation" that the property rights would be respected.  *See Ruckelshaus v. Monsanto*, 467

U.S. 986, 1016 (1984) (property owner's "reasonable, investment-backed expectations" that

Government would honor prior regulation prohibiting publication of trade secret data triggered protections of Takings Clause against such publication); *Kaiser Aetna v. United States*, 444 U.S. 164 (1979) (property owner had a "reasonable, investment-backed expectation" based upon oral acquiescence of Army Corps of Engineers that Government would not impose a right-of-way on private lake if connected to navigable waters).

29.5.    While the protections of the Takings Clause are typically applied to legislation and regulation, they likewise protect against judicial action that takes property in a manner that contradicts "reasonable, investment-backed expectations" that the property rights in question would be respected. *See generally Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env. Prot.,* 130 S.Ct. 2592, 2602 (2010) ("If a legislature *or a court* declares that what was once an established right of private property no longer exists, it has taken that property") (emphasis in original) (plurality); *Hughes v. State of Washington*, 389 U.S. 290, 298 (1967) (Due Process Clause forbids confiscation of property by a State "no less through its courts than through its legislature") (Stewart, J., concurring).

29.6.    It is also well-established that no court has the power to rewrite the terms of a contract, even one that is approved by the Court. *See generally Evans v. Jeff D.*, 475 U.S. 717, 726-27 (1986) ("the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed"); *In re Adelphia Commc'n Corp.*, 367 B.R. 84, 97 (S.D.N.Y. 2007) (rejecting request for remedy which "would rewrite the terms of the bargain, which is beyond the power of the Court").

29.7.    Based upon the foregoing authorities, where a Bankruptcy Court issues a Sale

Order approving a Sale under § 363 of the Bankruptcy Code that on its face approves a Purchase

Agreement that is defined to include a Clarification Letter "as same may be subsequently

modified or amended or clarified," and where the parties to that Purchase Agreement (including

the Clarification Letter) treat it as approved by the Sale Order for almost a year, invoke that

Purchase Agreement (including the Clarification Letter) in successfully defending the Sale Order

on appeal, and then invoke the Purchase Agreement and Clarification Letter in numerous

proceedings before the Bankruptcy Court as an "approved" contract, the Constitution protects the

"reasonable, investment-backed expectations" of the Purchaser, and prohibits the modification of

that Purchase Agreement absent an established state law basis for reformation.  *See Ruckelshaus*

*v. Monsanto*, 467 U.S. 986, 1016 (1984) (property owner's "reasonable, investment-backed

expectations" that Government would honor prior regulation prohibiting publication of trade

secret data triggered protections of Takings Clause against such publication); *Kaiser Aetna v.*

*United States*,  444 U.S. 164 (1979) (property owner had a "reasonable, investment-backed

expectation" based upon oral acquiescence of Army Corps of Engineers that Government would

not impose a right-of-way on private lake if connected to navigable waters); *see generally Evans*

*v. Jeff D.*, 475 U.S. 717, 726-27 (1986) ("the power to approve or reject a settlement negotiated

by the parties before trial does not authorize the court to require the parties to accept a settlement

to which they have not agreed").

29.8.    The doctrine of "constitutional avoidance" holds that a court should not interpret

provisions of law in a manner that might raise constitutional concerns.  *See N.L.R.B. v. Catholic*

*Bishop of Chicago*, 440 U.S. 490, 500 (1979) (noting that legislation "ought not be construed to

violate the Constitution if any other possible construction remains available"); *Edward J.*

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)

("where an otherwise acceptable construction of a statute would raise serious constitutional

problems, the Court will construe the statute to avoid such problems unless such construction is

plainly contrary to the intent of Congress").

29.9.    The doctrine of "constitutional avoidance" therefore holds that this Court should

not interpret Rule 60(b) or any provision of the Bankruptcy Code as empowering it to modify the

terms of the Purchase Agreement, given that (a) those provisions of law have never been held to

authorize the reformation of a contract, and (b) using such provisions for the first time ever to

reform a Purchase Agreement that was treated by the parties as approved an effective for almost

a year, including in proceedings before this Court and the District Court, raises "serious

constitutional problems," as set forth above.

## 30.    THE PLAIN TEXT OF THE PURCHASE AGREEMENT SHOULD GOVERN ITS INTERPRETATION.

30.1.    An unambiguous contract must be construed in accordance with its plain terms

and without resort to extrinsic evidence.  *Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins.*

*Co.*, 189 F.3d 208, 215 (2d Cir. 1999).

30.2.    As Judge Drain observed in *In re Allegiance Telecom, Inc.*, 356 B.R. 93, 98

(Bankr. S.D.N.Y. 2006) (internal quotations omitted):

> Under New York law, a written contract is to be interpreted so as to give effect to
> the intention of the parties as expressed in the unequivocal language they have
> employed.  Under New York law, . . . if a contract is unambiguous on its face, its
> proper construction is a question of law.  A court should not look beyond the
> confines of the contract to extrinsic evidence if its relevant provisions are plain
> and unambiguous.  When parties set down their agreement in a clear, complete
> document, their writing should be enforced according to its terms.

Moreover: "'[l]anguage whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation.'" *Id.* at 99 (quoting *Metropolitan Life Ins. Co. v. RJR Nabisco*, 906 F.2d 884, 889 (2d Cir. 1990); *see also Lee v. BSB Greenwich Mortg. L.P.*, 267 F.3d 172, 179 (2d Cir. 2001) ("any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms").

**31.    THE MERGER CLAUSE IN THE PURCHASE AGREEMENT PRECLUDES CONSIDERATION OF CONTRARY "UNDERSTANDINGS."**

31.1.    The Purchase Agreement contains an unambiguous "merger" or "integration" clause that prohibits the attempt to incorporate any oral representations or subjective understanding into the contract.  Section 13.5 of the APA provides in relevant part:

> This Agreement … represents[s] the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought….

BCI Ex. 1 (APA) at § 13.5.

31.2.    Under New York law, "[t]he purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing."  *Jarecki v. Shung Moo Louie,* 95 N.Y.2d 665, 669 (2001).  *See also Daiichi Seihan USA v. Infinity USA, Inc.,* 625 N.Y.S.2d 527, 528 (N.Y. App. Div. 1995) ("Any attempt … to alter the plain meaning of the contract by alleged oral modifications fails as a result of the contract's integration clause.").

31.3.    The presence of an integration clause prohibits a party's reliance upon negotiations that occur prior to signing of the contract.  *See Investors Ins. Co. of Am. v. Dorinco*

*Reinsurance Co.*, 917 F.2d 100, 104 (2d Cir. 1990) ("According to the parol evidence rule,

Investors is precluded from introducing extrinsic evidence of the contract's purpose in order to

vary the plain meaning of the writing.  This conclusion is particularly appropriate given the

[a]greement's 'integration clause,' which provides that the [a]greement represents the entire

understanding of the parties to the transaction.") (internal citations omitted); *Bero Contracting &

Dev. Corp. v. Vierhile,* 796 N.Y.S.2d 808, 809 (N.Y. App. Div. 2005) (since language in

agreement was clear and unambiguous and included a merger clause, parties could not introduce

"parol evidence, including evidence of prior negotiations between the parties").

31.4.   A merger clause similarly prohibits reliance upon oral representations or

agreements made *after* signing.  S*ee Montefiore Med. Ctr. v. Crest Plaza LLC,* No. 05535/08,

2009 WL 1675994, at *12 (N.Y. Sup. Ct. June 16, 2009) ("The Lease has a merger clause in

which the parties agreed that … any executory agreement thereafter is ineffective to change,

modify, or discharge the Lease unless put in writing and signed by the party to be charged.  New

York courts strictly enforce such merger clauses.").

31.5.   In accordance with the merger clause and the plain language rule, if the parties

enter into two agreements at the same time, the two contracts must be read together to avoid a

conflict, to the extent consistent with the plain language.  *TVT Records v. Island Def Jam Music

Group*, 412 F.3d 82, 89 (2d Cir. 2005).

## 32.   **EXTRINSIC EVIDENCE IS RELEVANT ONLY IF, AND ONLY TO THE EXTENT THAT, THERE IS AN AMBIGUITY IN THE PLAIN TEXT OF THE PURCHASE AGREEMENT.**

32.1.   Extrinsic evidence of the parties' intent is relevant to the interpretation of a

contract only if the court first decides that a provision in the contract is ambiguous — meaning a

term is reasonably susceptible to more than one interpretation. *Andy Warhol Found. for Visual Arts v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999); *Sarinsky's Garage Inc. v. Erie Ins. Co.*, 691 F. Supp. 2d 483, 486 (S.D.N.Y. 2010). Thus, "the intent of the parties may not be established from extrinsic evidence where the contract is not ambiguous." *Cevasco v. National R.R. Passenger Corp.*, 606 F. Supp. 2d 401, 419 (S.D.N.Y. 2009).

33.    **EVEN IF EXTRINSIC EVIDENCE IS RELEVANT, UNEXPRESSED SUBJECTIVE INTENT IS IRRELEVANT.**

33.1.    Under New York law, it is not a party's subjective intent that controls, but the objective language of the contract. *See, e.g., Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) ("When interpreting the meaning of a contract, it is the objective intent of the parties that controls. The secret or subjective intent of the parties is irrelevant.") (internal citations omitted); *Cusano v. Horipro Entm't Group*, 301 F. Supp. 2d 272, 277 (S.D.N.Y. 2004) ("When the terms of a contract are clear, '[t]he secret or subjective intent of the parties is irrelevant.'") *aff'd*, 126 F. App'x 521 (2d Cir. 2005). Thus, under New York law, "statements of subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract." *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 378 (S.D.N.Y. 2006).

33.2.    For example, in a dispute about whether an ambiguous insurance contract covered property owned by someone other than the insured, it was immaterial that a representative of the insurance company testified that it did not intend to insure the property of others, for "the subjective views of the insurer's officials, never communicated to the insured until litigation cannot establish the parties intent." *General Star Indem. Co. v.  Custom Editions Upholstery Corp.*, 940 F. Supp. 645, 656 (S.D.N.Y. 1996). Likewise, in determining whether a contract transferred only the publisher's share of royalties or also included the writer's share, it was

immaterial that the main principal of the seller intended to convey just the publisher's share

where such an intent was never expressed to the buyer.  *Cusano v. Horipro Entm't Group*, 301 F.

Supp. 2d 272, 276-78 (S.D.N.Y. 2004).

34.    **IF THE PURCHASE AGREEMENT IS AMBIGUOUS, THE PARTIES
       CONDUCT AND PERFORMANCE OF THEIR OBLIGATIONS IS THE BEST
       EVIDENCE OF THEIR INTENT.**

34.1.    In the event of contractual ambiguity, the parties' course of performance prior to

the onset of the dispute is the best guide to the proper interpretation of the agreement.  *New*

*Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 112 (2d Cir. 2006) ("In

interpreting an ambiguous contract provision, the factfinder should, when possible, apply the

same measure as the parties have applied in performing their obligations.") (internal quotation

omitted); *see also id.* at 112 ("[t]here is no surer way to find out what parties meant, than to see

what they have done") (quoting *Brooklyn Life Ins. Co. of N.Y. v. Dutcher*, 95 U.S. 269, 273

(1877)).

34.2.    Where ambiguities in the contract exist, "the subsequent conduct of the parties

[may] be used to indicate their intent."  *Estate of Hatch by Ruzow v. Nyco Minerals Inc.*, 245

A.D.2d 746, 749 (N.Y. App. Div. 1997).  Particularly relevant is any post-contract conduct of the

"parties that reflects their understanding of the contract's meaning."  *Doynow Sales Assoc., Inc.*

*v. Rocheux Intern. of New Jersey, Inc.*, 647 F. Supp. 2d 296, 309 (S.D.N.Y. 2009) (internal

quotation and citation omitted); *In re Actrade Fin. Tech., Ltd.*, 424 B.R. 59, 74 (Bankr. S.D.N.Y.

2009) ("the parties' interpretation of the contract in practice, prior to litigation, is compelling

evidence of the parties' intent").

**35.**    **IF A CONTRACT IS AMBIGUOUS, EXPERT TESTIMONY REGARDING THE
INDUSTRY PRACTICE AND CUSTOM IS RELEVANT.**

35.1.    Where a contract is ambiguous, expert testimony concerning industry practice is

relevant to the interpretation of the contract.  *Travelers Indem. Co. v. Scor Reinsurance Co.*, 62

F.3d 74, 78 (2d Cir. 1995) (holding that expert testimony concerning the custom and practice of

the reinsurance industry was relevant and admissible to aid in the interpretation of an ambiguous

reinsurance contract); *TIG Premier Ins. Co. v. Hartford Acc. & Indem. Co.*, 35 F. Supp. 2d 348,

351 (S.D.N.Y. 1999) (same); *In re PCH Assoc.*, 60 B.R. 870, 875 (S.D.N.Y. 1986) (allowing

expert testimony on the subject of whether certain provisions would ordinarily be excluded or

included in real estate contracts).

**36.**    **A PARTY'S FAILURE TO UNDERSTAND THE TERMS OF A CONTRACT IS
NO BASIS FOR REFUSING TO ENFORCE THOSE TERMS.**

36.1.    New York law is clear that, "[e]specially with regard to sophisticated business

people, capable of resort to counsel for advice, as is the situation here, the law presumes that

parties to a contract will only sign it if they fully understand its terms and conditions."

*Hangzhou Silk Import & Export Corp. v. PCB Int'l Indus., Inc.*, No. 00 Civ. 6344, 2002 WL

2031591, at *6 (S.D.N.Y. Sept. 5, 2002).

36.2.    "Ignorance of the terms and conditions of a contract is no defense for a party that

has already executed the contract."  *Hangzhou Silk Import & Export Corp. v. PCB Int'l Indus.,

Inc.*, No. 00 Civ. 6344, 2002 WL 2031591, at *6 (S.D.N.Y. Sept. 5, 2002).  *See also Migliore v.

Manzo,* 28 A.D.3d 620, 622 (N.Y. App. Div. 2006) ("where a written agreement between

sophisticated, counseled businessmen is unambiguous on its face, one party cannot defeat

summary judgment by a conclusory assertion that, owing to mutual mistake or fraud, the writing

did not express his own understanding of the oral agreement reached during negotiations")
(internal quotation omitted).

36.3.    Indeed, "even if the [debtor] and creditors' committee did not know what the
contracts they approved actually said, they are still bound by the language of those contracts.
Bankruptcy is drastic and expensive enough without allowing the debtor and court to approve a
contract and later void it on the grounds that they would not have approved if they had bothered
to understand it." *Terry Oilfield Supply Co. v. Am. Sec. Bank*, 195 B. R. 66, 73 (S.D. Tex. 1996).

36.4.    Where there is no fraud or duress "in the signing or inducement of the contracts,
and the cases do not involve parties of substantially unequal bargaining power or sophistication,
the buyers' contentions are insufficient to bring them within any exception to the general rule
that a person of ordinary understanding and competence is bound by the provisions of a contract
he signs whether or not he has read them." *In re Ferrara S.p.A.*, 441 F. Supp. 778, 781 (S.D.NY.
1977); *see also In re Apollo Air Passenger Computer Reservation Sys.,* 720 F. Supp. 1061, 1068
(S.D.N.Y. 1989) ("A competent person is held responsible for his signature to a document which
has not been fraudulently procured.  He is bound to know, bound to read what he signs").

## 37.    AN AGREEMENT SHOULD BE INTERPRETED SO THAT ALL OF ITS PROVISIONS ARE MEANINGFUL.

37.1.    It is black-letter law that a "court should interpret a contract in a way that ascribes
meaning, if possible, to all of its terms." *Goodheart Clothing Co. v. Laura Goodman Enters.,
Inc.*, 962 F.2d 268, 272-73 (2d Cir. 1992).  Thus, courts have a strong preference for interpreting
a contract in a manner that gives effective meaning to all of its terms, as opposed to one that
renders certain clauses superfluous or meaningless.  *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.
1992) ("Under New York law an interpretation of a contract that has the effect of rendering at

least one clause superfluous or meaningless … is not preferred and will be avoided if possible.")

(ellipses in original); RESTATEMENT (SECOND) CONTRACTS § 203(a) ("An interpretation which

gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation

which leaves a part unreasonable, unlawful, or of no effect.").

**38.    THE APA DEFINED THE PURCHASED ASSETS IN THE BROADEST
POSSIBLE TERMS, AND MADE CLEAR THAT ANY ASSET USED "IN
CONNECTION WITH THE BUSINESS" WAS A PURCHASED ASSET,
WHETHER SPECIFICALLY IDENTIFIED IN THE APA OR NOT.**

38.1.    The APA defined "Purchased Assets" as "all of the assets of Seller and its

Subsidiaries used in connection with the Business (excluding the Excluded Assets), including"

nineteen specifically identified assets.  BCI Ex. 1 (APA) at p. 6.  The "Business" is defined as

"the U.S. and Canadian investment banking and capital markets businesses of Seller including

the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses,

investment banking operations and LBI's business as a futures commission merchant."  BCI Ex.

1 (APA) at p. 2.

38.2.    The APA provided that the "word 'including' or any variation thereof means

'including, without limitation' and shall not be construed to limit any general statement that it

follows to the specific or similar items or matters immediately following it."  BCI Ex. 1 (APA) at

p. 10.

38.3.    Because contract provisions should be enforced according to their plain and

unambiguous meaning, *Continental Ins. Co. v. Atlantic Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir.

2010), all assets used in connection with the Business are Purchased Assets unless expressly

excluded.

38.4.    The phrase "in connection with" has the broadest possible meaning, and is

broader than phrases such as "related to" or "used primarily in."  *See Kokusai Kisen Kabushiki*

*Kaisha v. Columbia Stevedoring Co.*, 23 F. Supp. 403, 405 (S.D.N.Y. 1938) ("The Courts have

given the phrase 'in connection with' a broad interpretation"); *see Saxe v. E.F. Hutton & Co.,*

*Inc.*, 789 F.2d 105, 110-11 (2d Cir. 1986); *Fisher v. Kanas*, 288 F. App'x 721, 723 (2d Cir.

2008); *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529 (2d Cir. 1999).  Thus, the APA

provided the broadest possible definition of Purchased Assets, and any doubt about whether

something is a Purchased Asset should be resolved in favor of finding it a Purchased Asset.

38.5.    These principles must be applied when considering Movants' contentions that the

Clarification Letter granted Barclays "additional assets" — assets that had not previously been

included as Purchased Assets to be transferred to Barclays.

## 39.    THE PLAIN TEXT OF THE APA AND THE CLARIFICATION LETTER EACH PROVIDE THAT THE REPO COLLATERAL AND THE DISPUTED ASSETS ARE PURCHASED ASSETS.

39.1.    In addition to providing that Barclays was acquiring "all assets" used "in

connection with the Business," the APA provided that the Purchased Assets included LBI's

"government securities, commercial paper, corporate debt, corporate equity, exchange-traded

derivatives and collateralized short term agreements" which were estimated to have "a book

value as of the date hereof of approximately $70 billion" and were defined as the "Long

Positions."  BCI Ex. 1 (APA) at p. 6 (subsection (d) definition of Long Positions).

39.2.    The APA did not identify any "government securities, commercial paper,

corporate debt, corporate equity, exchange-traded derivatives [or] collateralized short term

agreements" as Excluded Assets.  BCI Ex. 1 (APA) at pp. 2-4 (definition of "Excluded Assets").

39.3.    Thus, as a straightforward matter of contractual interpretation, the APA provided

that Barclays was acquiring all of LBI's "government securities, commercial paper, corporate

debt, corporate equity, exchange-traded derivatives and collateralized short term agreements."

39.4.    The APA also provided that all "deposits" and all "required capital deposits" that

were "associated with the Business" were Purchased Assets.  BCI Ex. 1 (APA) at p. 6

(subsection (b) of definition of Purchased Assets).

39.5.    The assets in the Repo Collateral were Purchased Assets under the plain terms of

the APA.

39.5.1. It is undisputed that the assets in the Repo Collateral were assets used "in

connection with" the Business, as defined in the APA, and were

nowhere identified as Excluded Assets; hence, they were Purchased

Assets under the APA's general definition of Purchased Assets.

39.5.2. In addition, the assets in the Repo Collateral consisted of  "government

securities, commercial paper, corporate debt, corporate equity,

exchange-traded derivatives and collateralized short term agreements,"

and hence were Purchased Assets under that specific category in the

APA's definition of Purchased Assets.

39.6.    The plain text of the Clarification Letter also specifically confirms that the assets

in the Repo Collateral were Purchased Assets.  BCI Ex. 5 (Clarification Letter) at ¶¶ 1(a)(ii)(A),

13.

39.7.    The Clearance Box Assets were Purchased Assets under the plain terms of the

APA.

        39.7.1. It is undisputed that the Clearance Box Assets were assets used "in

connection with the Business," as defined in the APA, and were

nowhere identified as Excluded Assets; hence, they were Purchased

Assets under the APA's general definition of Purchased Assets.

        39.7.2. In addition, the Clearance Box Assets consisted of "government securities,

commercial paper, corporate debt, corporate equity, exchange-traded

derivatives and collateralized short term agreements," and hence were

Purchased Assets under that specific category in the APA's definition

of Purchased Assets.

39.8.    The plain text of the Clarification Letter confirmed that the Clearance Box Assets

were Purchased Assets.  BCI Ex. 5 (Clarification Letter) at ¶ 1(a)(ii)(B).

39.8.1. Indeed, the Debtor has *admitted* that the plain meaning of the Clarification

Letter provides for Barclays to acquire the Clearance Box Assets.  One

of the central arguments the Debtor has made in its Rule 60(b) motion

is that the Clarification Letter provided Barclays a right to the

Clearance Box Assets, which the Debtor falsely alleges was not

authorized.  *See e.g.* LBHI Br. ¶ 120 (asserting that the Clarification

Letter added the Clearance Box Assets to the deal).

39.8.2. Thus, as a matter of law, and as confirmed by the Debtor's *admission*, this

Court must conclude that the plain meaning of paragraph 1(a)(ii)(B) of

the Clarification Letter provides for the transfer of the Clearance Box

Assets to Barclays.

39.9.    The ETD Margin Deposits were Purchased Assets under the APA.

39.9.1. It is undisputed that the ETD Margin Deposits were assets "used in connection with the Business" as defined in the APA; on the face of the APA, it is also clear that "margin" or "collateral" associated with exchange-traded derivatives" are never identified as Excluded Assets; hence, ETD Margin Deposits were Purchased Assets under the APA's general definition of Purchased Assets.

39.9.2. In addition, the ETD Margin Deposits were assets used specifically "in connection with" (and were inseparable from) the "exchange-traded derivatives," and hence were Purchased Assets under that specific category in the APA's definition of Purchased Assets.

39.9.3. In addition, the ETD Margin Deposits were, by definition, both "deposits" and "required capital deposits," and hence were Purchased Assets under that specific category in the APA's definition of Purchased Assets.

39.10.  The plain text of the Clarification Letter confirms that the ETD Margin Deposits were Purchased Assets.  BCI Ex. 5 (Clarification Letter) at ¶ 1(a)(ii)(C).

39.10.1.  Indeed, the Debtor, who actually negotiated the terms of the Sale and the Clarification Letter, has *admitted* that the plain text of the Clarification Letter provides for the transfer of the ETD Margin Deposits.  A central premise of the Rule 60(b) motion filed by the Debtor is that Barclays *did acquire* the ETD Margin Deposits, which the Debtor (a) explicitly admits were covered by the plain terms of the

Clarification Letter (the "deal that closed"), but (b) claimed, falsely, was not approved by the Court and was an "additional asset". LBHI Rule 60(b) Br. at ¶ 114 (after discussing the ETD "margin accounts," the Debtor wrote "In the execution copy of the Clarification Letter, prepared several days after the Sale Hearing, the parties added for the first time a clause (A. 32 at ¶ 1(a)(ii)(C)) purporting to authorize the transfer to Barclays of those assets, too, totaling an additional $2.3 billion worth of securities and cash."); *see also id.* at ¶ 122 (*admitting* that Clarification Letter "resulted in Barclays receiving" the Clearance Box Assets, 15c3-3 assets, and ETD Margin Deposits, but claiming this was "never explained to the Court"). While the Debtor falsely argues that this provision was unauthorized, it *admits* that the plain meaning of paragraph 1(a)(ii)(C) of the Clarification Letter provides for the transfer of ETD Margin Deposits.

39.10.2.    Thus, as a matter of law, and as *confirmed by the Debtor's admission*, the Court must conclude that the plain text of paragraph 1(a)(ii)(C) of the Clarification Letter provides for the transfer of all ETD Margin Deposits to Barclays.

39.10.3.    Moreover, the unrebutted record evidence, including the unrebutted expert testimony of Tony Leitner, and the unrebutted testimony of fact witnesses who are also industry experts in this are, Ken Raisler, Ed Rosen, and Liz James, uniformly confirms that it is standard industry practice for *all* ETD Margin Deposits to be transferred with the

transfer of ETD positions and accounts, that it would contradict such practice for anything else to happen, and that it would require special provisions or plumbing to provide for any other result. FOF ¶¶ 31.19.1–31.19.2.

39.10.4.    Accordingly, the Court must conclude as a matter of law, as confirmed by the Debtor's *admission* and the unrebutted evidence, that Barclays is entitled to all ETD Margin Deposits, and that there is no basis in law, and no basis in the record, for distinguishing between different forms of ETD Margin Deposits. *See* FOF ¶ 31.23.

39.11.  The $769 million in securities held in the Rule 15c3-3 account (or their equivalent) were Purchased Assets under the APA.

39.11.1.    It is undisputed that the securities held in the Rule 15c3-3 account were "used in connection with the Business" and were never identified as Excluded Assets in the APA; hence, they were Purchased Assets under the APA's general definition of Purchased Assets.

39.11.2.    The securities in the Rule 15c3-3 account were also "government securities," and hence were Purchased Assets under that specific category in the APA's definition of Purchased Assets.

39.12.  The plain text of the Clarification Letter confirmed that Barclays was acquiring $769 million in securities from the Rule 15c3-3 account, or that, in the event of any regulatory

obstacle with transferring such securities from the account, Barclays would receive "securities of substantially the same nature and value."  BCI Ex. 5 (Clarification Letter) at ¶ 8(ii).

> 39.12.1.    Indeed, the Debtor *has admitted* that the Clarification Letter provides for Barclays to acquire the $769 million in securities described in paragraph 8(ii) of the Clarification Letter.  One of its central assertions in its Rule 60(b) motion is that the Clarification Letter *did entitle* Barclays to these assets, which it now claims (having drafted the contract at the time, supported the contract at the time, and successfully defended the contract on appeal), that this was not authorized.  *See e.g.* LBHI Br. at ¶ 122 (admitting that Clarification Letter "resulted in Barclays receiving" the Clearance Box Assets, 15c3-3 assets, and ETD Margin Deposits, but claiming this was "never explained to the Court").

> 39.12.2.    Thus, as a matter of law, this Court must conclude that the plain text of the Clarification Letter, as confirmed by the Debtor's admission, entitles Barclays to receive $769 million in assets from the 15c3-3 account, or "securities of substantially the same nature and value."

40.    **THE PLAIN TEXT OF THE APA PROVIDES THAT BARCLAYS IS NOT OBLIGATED TO PAY CURE AMOUNTS EXCEPT TO THE EXTENT THAT IT CHOSE, IN ITS SOLE DISCRETION, TO ASSUME CONTRACTS RELATED TO THE BUSINESS WITHIN 60 DAYS OF THE CLOSING.**

40.1.    The plain text of § 2.5 of the APA provides that Barclays is obligated to make cure payments only for contracts related to the Business that it chose to assume within 60 days of the Closing.  BCI Ex. 1 (APA) at § 2.5.

40.2.    The plain text of § 2.5 makes clear that Barclays is not obligated to assume any contracts related to the Business.  BCI Ex. 1 (APA) at § 2.5.

40.3.    Thus, the plain text of § 2.5 of the APA provides that Barclays was not obligated to make any cure payments, and would become obligated to make cure payments only to the extent it chose to assume any contracts related to the Business.  BCI Ex. 1 (APA) at § 2.5.

41.    **THE PLAIN TEXT OF THE APA PROVIDES THAT BARCLAYS WAS ASSUMING OBLIGATIONS TO MAKE BOTH BONUS AND SEVERANCE PAYMENTS TO TRANSFERRED EMPLOYEES, AND REFERS TO A TOTAL ESTIMATE FOR "COMP" OF $2 BILLION.**

41.1.    Section 9.1(a) of the APA provides that Barclays (or one of its subsidiaries) would offer employment to all active employees of the Business.  BCI Ex. 1 (APA) at § 9.1(a).

41.2.    Section 9.1(b) of the APA provides that Barclays (or one of its subsidiaries) would provide "severance payments" to any Transferred Employee (as defined in the APA) whose employment was terminated for any reason covered by section 9.1(b).  BCI Ex. 1 (APA) at § 9.1(b).

41.3.    Section 9.1(c) of the APA provides that Barclays (or one of its subsidiaries) would pay annual 2008 bonuses to all Transferred Employee "that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser." BCI Ex. 1 (APA) at § 9.1(c).

41.4.    It is undisputed that Barclays has paid bonuses under § 9.1(c) that equal or exceed "100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive

compensation (but not base salary)," and therefore Barclays has satisfied the requirement of §
9.1(c).

41.5.    Assuming that the phrase "and reflected on the financial schedule delivered to
Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser"
refers to the document that has been marked as BCI Exhibit 106, it refers to a schedule that
contains an entry of "Comp" of $2 billion.  BCI Ex. 106.

41.6.    The plain meaning of "Comp" is broader than just bonus, and therefore includes
severance.

41.7.    The plain text of the phrase "equal in amount to 100 percent of the bonus pool
amounts accrued in respect of amounts payable for incentive compensation (but not base salary)
and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and
initialed by an officer of each of Holdings and Purchaser," together with the schedule that it is
assumed to refer to using the word "Comp," cannot reasonably be read to impose a requirement
on Barclays to pay exactly $2 billion in bonuses, but must instead be read to impose a
requirement that Barclays make bonus payments equal to 100% of the accrued bonus pool
amounts, and that is consistent with the estimate of $2 billion for all "Comp" obligations.

41.8.    Even if the phrasing of § 9.1(c) is ambiguous, all of the unrebutted extrinsic
evidence demonstrates that the estimate of $2 billion for "Comp" was intended to cover both
bonus and severance payments.  FOF ¶ 10.

42.    **THE PLAIN TEXT OF THE PURCHASE AGREEMENT PROVIDES THAT
CASH WHICH WAS PLEDGED AS ETD MARGIN OR OTHERWISE
IDENTIFIED AS A PURCHASED ASSET WAS A PURCHASED ASSET, AND**

**WAS NOT COVERED BY THE GENERAL REFERENCE TO CASH IN THE
EXCLUDED ASSETS DEFINITION**

42.1.   The Clarification Letter provides that "Except as otherwise specified in the
definition of 'Purchased Assets,' 'Excluded Assets' shall include any cash, cash equivalents,
bank deposits, or similar cash items of Seller and its Subsidiaries."  BCI Ex. 5 (Clarification
Letter) at ¶ 1(c).

42.2.   The ETD Margin Deposits is "otherwise specified" as a Purchased Asset in the
APA's definition of Purchased Assets, and in the Clarification Letter's definition of Purchased
Assets.  BCI Ex. 1 (APA) at p. 6 (including in definition of Purchased Assets all "required
capital deposits" that were "associated with the Business," and all "exchange traded
derivatives"); BCI Ex. 5 (Clarification Letter) at ¶ 1(a)(ii)(C) (including in the definition of
Purchased Assets "any property" held as collateral for exchange-traded derivatives).

42.3.   Thus, the plain text of the Purchase Agreement provides that any cash pledged as
ETD Margin was not covered by the definition of Excluded Assets, and was instead covered in
the definition of Purchased Assets.

43.   **THE TERM "CASH EQUIVALENTS" IN THE CLARIFICATION LETTER
REFERS TO ASSETS THAT ARE TRULY EQUIVALENT TO CASH, AND
SHOULD NOT INCLUDE ANY SECURITIES THAT THE PARTIES WOULD
NOT HAVE DEFINED AS "CASH EQUIVALENTS" IN THEIR AUDITED,
PUBLICLY FILED FINANCIAL REPORTS.**

43.1.   The Purchase Agreement does not provide a definition for the term "cash
equivalents," which is listed in the Purchase Agreement's definition of Excluded Assets.  BCI
Ex. 1 (APA) at p. 2 (subsection (b) of definition of Excluded Assets); pp. 1-10 ("Definitions"
section, which does not include "cash equivalents").

43.2.    Where a term in a contract is not defined, it should be interpreted according to its

plain meaning.  *See e.g. In re Chateaugay Corp.*, 154 B.R. 843, 852 (Bankr. S.D.N.Y. 1993)

(holding that when a contract term is not defined, "the term therefore is accorded its ordinary and

common meaning.").

43.3.    The plain meaning of the term "cash equivalents" refers only to those assets that

are truly equivalent to cash (such as money market funds), and on its face does not cover any

other kind of securities at all.

43.4.    Where an undefined term in a contract is found to be ambiguous, the court should

look to the evidence of what the parties intended.  *See, e.g., Alexander & Alexander Serv., Inc. v.*

*These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir. 1998).  Absent any

direct evidence of what was intended, the best evidence of what the parties intended the term to

mean would be how the parties used that term in their ordinary course of business.  *See, e.g., Fox*

*Film Corp. v. Springer*, 273 N.Y. 434, 437 (1937) (explaining that courts should interpret

ambiguous contract terms "in light of the customs and practices of the business").

43.5.    In their publicly filed, independently audited financial statements, Barclays and

Lehman both defined cash equivalents to include only certain highly liquid securities with a term

of maturity of three months or less. *See* BCI Ex. 731a at p. 201 (Barclays 2008 Annual Report at

p. 97. ("[C]ash equivalents comprise highly liquid investments that are convertible into cash with

an insignificant risk of changes in value *with original maturities of less than three months*");

Barclays Bank PLC 2007 Annual Report (SEC Form 20-F) at p.157, *available at*

http://www.sec.gov/Archives/edgar/data/312069/000119312508065551/d20f.htm (same) *and*

Lehman Brothers Holding Inc. 2007 Annual Report (SEC Form 10-k) at p.97, available at

   
http://www.sec.gov/Archives/edgar/data/806085/000110465908005476/a08-3530_110k.htm

("Cash equivalents include highly liquid investments not held for resale *with maturities of three*

*months or less when we acquire them.*")[14]

     43.6.    Thus, the best evidence showing what the parties understood the term "cash

equivalents" to mean would, to the extent it could include any securities, at most include highly

liquid securities with maturities of three months or less, and would not include any other

securities.

     43.7.    The Movants have suggested that the definition of "cash equivalents" in the

Purchase Agreement should be determined by reference to SEC Regulation T ("Regulation T"),

promulgated under the authority of the Securities Exchange Act of 1934, and that this establishes

that the treasury bills deposited by LBI as margin should be treated as cash equivalents.  10/5/10

Tr. at 136:3-137:20.

     43.8.    The "principal purpose" of Regulation T "is to regulate extensions of credit by

brokers and dealers; it also covers related transactions within the Board's authority under the

Act.  It imposes, among other obligations, initial margin requirements and payment rules on

certain securities transactions."  12 C.F.R. § 220.1(a).

---

[14] Barclays' 2008 Annual Report, quoted in the text, is admitted in evidence as BCI Ex. 731a.
Barclays' 2007 Annual Report and LBI's 2007 Annual Report, also cited in the text, are not.
However, the Court may take — and Barclays requests that the Court take — judicial notice
under Fed. R. Evid. 201 of the fact that these reports were filed and, in the reports, the term "cash
equivalents" was defined as quoted.  The Court can take judicial notice "at any stage of the
proceeding," and must do so where the requested fact is "capable of accurate and ready
determination by resort to sources whose accuracy cannot be reasonably questioned."  *Id.*  Courts
routinely take judicial notice of information contained within reports publicly filed with the
S.E.C.  *Kramer v. Time Warner*, 937 F.2d 767 (2d Cir. 1991); *Citadel Equity Fund Ltd. v.
Aquila, Inc.*, 168 F. App'x 474 (2d Cir. 2006); *Garber v. Legg Mason, Inc.*, 347 F. Appx. 665
(2d Cir. 2009).  Barclays has provided prior notice to Movants of its intent to request the Court to
take judicial notice of these facts, as the rule prefers, but does not require.  Fed. R. Evid. 201(e).

43.9.   Regulation T defines "cash equivalent" as "securities issued or guaranteed by the United States or its agencies, negotiable bank certificates of deposit, bankers acceptances issued by banking institutions in the United States and payable in the United States, or money market mutual funds."  12 C.F.R. § 220.2.

43.10.   By the terms of Regulation T itself, its definition of cash equivalents is inapplicable to the government securities deposited or held by LBI's clearing houses as a matter of law for two reasons:

    43.10.1.   First, the definition of "cash equivalents" in Regulation T expressly excludes government securities deposited as margin with clearing houses or other brokers.

        a.   Regulation T provides that:

> The provisions of this part *shall not apply to the deposit of securities with an option or futures clearing agency* for the purpose of meeting the deposit requirements of the agency if:

(1) The clearing agency:

(i) Issues, guarantees performance on, or clears transactions in, any security (including options on any security, certificate of deposit, securities index or foreign currency); or

(ii) Guarantees performance of contracts for the purchase or sale of a commodity for future delivery or options on such contracts;

(2) The clearing agency is registered with the Securities and Exchange Commission or is the clearing agency for a contract market regulated by the Commodity Futures Trading Commission; and

(3) The deposit consists of any margin security and complies with the rules of the clearing agency that have been approved by the Securities and Exchange Commission or the Commodity Futures Trading Commission.

12 C.F.R. § 220.9(b).

b.    The government securities deposited as margin at the clearing

agencies serving LBI satisfy each of the preceding requirements.

*See* FOF ¶ 33.22.7.4.

43.10.2.    In addition, the part of Regulation T that contains the definition of

cash equivalents does not apply to LBI, which was an exempted

borrower under that provision.

a.    Section 220.1(b)(3)(ii) provides: "This part does not apply to . . . . [c]redit extended by a creditor based on a good faith determination that the borrower is an exempted borrower."

b.    "Creditor means any broker or dealer (as defined in sections 3(a)(4) and 3(a)(5) of the Act), any member of a national securities exchange, or any person associated with a broker or dealer (as defined in section 3(a)(18) of the Act), except for business entities controlling or under common control with the creditor." 12 C.F.R. § 220.2.

    c.      An exempted borrower, in turn, is a registered broker or dealer with a substantial portion of its business consisting of transactions with persons other than brokers or dealers, and includes those that "[m]aintain at least 1000 active accounts on an annual basis for persons other than brokers, dealers, and persons associated with a broker or dealer." 12 C.F.R. § 220.2.

    d.      As SIPC's representative Ken Caputo stated at the Sale Hearing, LBI had over 600,000 customers, 130,000 of whom were non-institutional, plainly qualifying it as an exempted borrower, and confirming that Regulation T had no application to LBI. BCI Ex. 49 (9/19/08 Tr.) at 72:14-19

**44.**    **THE CFTC RULES RELATING TO "BULK TRANSFERS" CONTEMPLATE THAT ALL OF THE ASSETS IN OR RELATING TO THE FUTURES ACCOUNTS THAT ARE SUBJECT TO THE BULK TRANSFER, INCLUDING ANY AND ALL MARGIN DEPOSITS IN THOSE ACCOUNTS, ARE TO BE TRANSFERRED WITH THE ACCOUNTS.**

44.1.    The Commodities Futures Trading Commission ("CFTC") regulates the operation of the exchange-traded futures business. 7 U.S.C. § 2(a)(1).

44.2.    The CFTC rules provide for the "bulk transfer" of the futures accounts of a broker-dealer's futures customers to another broker-dealer, if granted permission to do so by the CFTC. 17 C.F.R. §§ 1.65, 190.06. These rules allow the CFTC to approve the transfer of what are defined as "eligible" futures accounts under normal circumstances, and also permit the CFTC to approve the transfer of what are defined as "ineligible" accounts "in appropriate cases and to protect the public interest." 17 C.F.R. § 190.06 (h)(2) and (e)(1).

44.3.    Pursuant to its authority under its published regulations, on September 19, 2008, the CFTC authorized the transfer of LBI's futures accounts from LBI to Barclays, including accounts that were normally defined as "ineligible" under the CFTC rules. BCI Ex. 843. This action was specifically identified as being authorized under subsection (h)(2) of the CFTC regulation governing bulk transfers. *See* BCI Ex. 843 (citing to 17 C.F.R. § 190.06 (h)(2)).

44.4.    Subsection (h)(2) of the CFTC regulations governing bulk transfers explicitly contemplates the transfer of futures "accounts" *in their entirety*, and does not provide for the transfer of only the positions in those accounts.  17 C.F.R. § 190.06 (h)(2) ("Commission may . . . permit transfers of *accounts*") (emphasis added).

44.5.    The CFTC regulations also explicitly contemplate that, in connection with a bulk transfer of accounts, any "*money, securities and other property*" held to "*margin*" those accounts will also be transferred.  *See* 17 C.F.R. § 190.06 (c)(2) ("A transferee may accept a transfer of open commodity contracts even though the *money, securities and other property eligible for transfer under the regulations contained in this part is insufficient to fully margin such positions*, if the transferee agrees to accept the transfer subject to any loss due to the failure to recover such deficiency from the customers whose contracts it has accepted or from the estate of the debtor.") (emphasis added).

44.6.    Indeed, this CFTC regulation makes clear that the expectation is that the bulk transfer will carry with it the transfer of *all* ETD Margin Deposits, which normally will be enough to "margin" the accounts, however, the transferee "may" — *i.e.*, is *permitted to*, *but not required to* — accept the transfer "*even though*" the ETD Margin Deposits are not sufficient.  *See* 17 C.F.R. § 190.06 (c)(2).

44.7.    Thus, the CFTC regulations governing "bulk transfers" contemplate that all ETD Margin Deposits are transferred with the accounts.  *See generally* 17 C.F.R. § 190.06.

44.8.    The record evidence in this case uniformly confirms that bulk transfers made pursuant to the CFTC regulations referenced above involve the transfer of *all* ETD Margin Deposits associated with the accounts being transferred, and that, as a matter of standard industry

practice, such transfers are not made without the inclusion of all ETD Margin Deposits.  *See* FOF

¶¶ 31.12.1, 31.23.1.3, 31.27.4.1.  This was confirmed by the unrebutted expert testimony of Tony

Leitner, who is an established expert in exchange-traded derivatives, as well as by the testimony

of Ken Raisler, a Sullivan & Cromwell lawyer who is an expert in exchange-traded derivatives

and their regulation by the CFTC.  *Id.*  Likewise, the unrebutted testimony of Cleary Gottlieb

lawyer Ed Rosen, who is also an expert in exchange-traded derivatives, confirmed that when

ETD accounts are transferred, the rights to margin deposits associated with those accounts are

transferred as well.  FOF ¶¶ 4.4.8, 31.8, 31.9, 31.11, 31.14.3, 31.15-31.16.  Movants introduced

no record evidence to the contrary.

44.9.    Thus, as a matter of law, as confirmed by all of the record evidence regarding

industry practice, the bulk transfer of LBI's futures accounts to Barclays pursuant to the CFTC

rules provided for the transfer of *all* ETD Margin Deposits associated with those accounts.

Moreover, there is absolutely no basis under the law, and no basis in the record (*see* FOF ¶

31.21), for the Court to distinguish between any forms or components of these ETD Margin

Deposits — whether between cash or non-cash margin deposits, margin for futures or margin for

options, or margin that is considered "excess" at a particular point in time versus margin that is

not — as a matter of law, all of these ETD Margin Deposits are treated the same, and are

transferred with the accounts.  Thus, as a matter of law, and as a matter of the unrebutted

evidence in the record, the Court must conclude that when the ETD accounts were transferred to

Barclays, the rights to the ETD Margin Deposits associated with those accounts were necessarily

transferred as well.

**45.    A SIPC TRUSTEE IS AUTHORIZED UNDER SIPA TO TRANSFER SOME OR
ALL OF THE ASSETS IN THE 15C3-3 ACCOUNT OF A BROKER-DEALER
WHO HAD BEEN PLACED INTO A SIPC LIQUIDATION IF THE TRUSTEE**

## CONCLUDES THAT IT IS IN THE BEST INTERESTS OF THE ESTATE AND THE CUSTOMERS.

45.1.    SEC Rule 15c3-3(g) prohibits broker dealers from transferring assets from a 15c3-3 reserve account, but only where such a transfer will leave insufficient assets in the account to satisfy the broker-dealer's obligations as calculated under SEC Rule 15c3-3.  17 C.F.R. § 240.15c3-3 (g).

45.2.    SEC Rule 15c3-3 (g) does not require a broker-dealer to obtain SEC approval (or any other regulatory approval) to transfer assets from a 15c3-3 reserve account where such a transfer would not leave insufficient assets in the account to satisfy the broker-dealer's obligations under SEC Rule 15c3-3.  17 C.F.R. § 240.15c3-3 (g).

45.3.    SEC Rule 15c3-3 (g) on its face applies only to operating "broker-dealers" and does not regulate SIPA Trustees or courts supervising the liquidation of the estates of broker-dealers.  17 C.F.R. § 240.15c3-3 (g).

45.4.    Thus, the regulation that prohibits a broker-dealer from transferring from a 15c3-3 reserve account assets that are needed to satisfy the 15c3-3 reserve requirement applies only to operating broker-dealers, not to the estates of a broker-dealer that has been placed into SIPC liquidation.  *See* 17 C.F.R. § 240.15c3-3 (g).

45.5.    Moreover, SEC Rule 15c3-3 as a whole does not apply to the estates of broker-dealers, but only to operating broker-dealers; SIPA Trustees accordingly do not conduct weekly computations of the 15c3-3 reserve calculation or make corresponding adjustments to the reserve account.  17 C.F.R. § 240.15c3-3.

45.6.    SIPA and the Bankruptcy Code authorize a SIPA Trustee to transfer any property

of the estate of a broker-dealer where the Trustee has concluded that such transfer is in the best

interest of the estate and has obtained court approval for the transfer.  *See* 15 U.S.C. § 78fff-2(f);

15 U.S.C. § 78fff-1(a).

45.7.    SIPA authorizes a SIPA Trustee to transfer any customer property of the estate of

a broker-dealer where the Trustee has concluded that such transfer is in the best interest of the

estate and has obtained court approval.  *See* 15 U.S.C. § 78fff-2(f); 15 U.S.C. § 78fff-1(a).

45.8.    SIPA therefore authorizes a SIPA Trustee to transfer some or all of the assets in a

15c3-3 reserve account, irrespective of whether there is an excess in that reserve account, so long

as that transfer is part of a court-approved transfer of property that the Trustee has concluded is

in the best interests of the estate.

## 46.    <u>AS A MATTER OF LAW, LBHI IS JOINTLY AND SEVERALLY LIABLE TO BARCLAYS FOR ANY UNDELIVERED ASSETS.</u>

46.1.    It is well established that "[w]hen two or more persons co-sign a contract, they

generally have joint and several liability for the contract's obligations."  Glen Banks, N.Y.

PRAC., CONTRACT LAW § 8.11 (2009) (citing *Battery Assoc. Inc. v. J&B Battery Supply Inc.*, 944

F. Supp. 171, 178 (E.D.N.Y. 1996)); *see also Wujin Nanxiashu Secant Factory v. Ti-Well Int'l

Corp.*, 22 A.D.3d 308, 310-311 (N.Y. App. Div. 2005) ("Settled rules governing the

interpretation of contracts provide that when two or more entities take on an obligation . . .  they

do so jointly, and that words of severance are necessary to overcome this primary

presumption."); *Bronner v. Walrath*, 202 N.Y.S. 577, 578 (N.Y. App. Div. 1924) (holding four

signatories on a note jointly and severally liable and explaining that "[e]ach was liable to pay the

whole amount").

46.2.    The Purchase Agreement defines the "Seller" to include LBHI and LBI.  BCI Ex.

at p. 1 (definition of "Seller").

46.3.    A representative of LBHI signed both the APA, the First Amendment to the APA,

and the Clarification Letter.  BCI Ex. 1 (APA) at p. 43; BCI Ex. 2 (First Amendment) at p. 3;

BCI Ex. 5 (Clarification Letter) at pp. 11-12.

46.4.    Thus, LBHI is jointly and severally liable to perform all of the obligations of the

Seller under the Purchase Agreement.

**47.    TO THE EXTENT PUBLIC POLICY IS CONSIDERED IN THE
INTERPRETATION OF THE PURCHASE AGREEMENT, IT SHOULD
REINFORCE THE NORMAL APPLICATION OF STATE LAW PRINCIPLES
OF CONTRACTUAL INTERPRETATION, AND SHOULD NOT BE A BASIS
FOR ADOPTING CONTRARY INTERPRETATIONS.**

47.1.    The Trustee relies on a rule of construction that contracts "affecting the public

interest are to be construed in the manner most favorable to the public."  Trustee Rule 60 Motion

at ¶ 86.  However, this guide applies only to contracts that have *more than one reasonable*

*interpretation*, and cannot be applied where the contract is unambiguous or reasonably

susceptible to only one interpretation.[15]

---

[15] *See, e.g.*, *L&E Corp. v. Days Inn of Am., Inc.*, 992 F.2d 55, 58 (4th Cir. 1993) (reversing where lower court relied "on 'morality,' 'justice,' and 'the public interest' to defend its disregard for the plain language of the license application and the March 31 letter" because "general references to subjective notions of public policy cannot justify deviation from unambiguous contractual language"); *Snyder v. Consol. Freightways, Inc.*, No. 92-16960, 1994 WL 27737, at *1 (9th Cir. Jan. 28, 1994) (rejecting plaintiff's argument that a collective bargaining agreement should be read to serve the public interest because the plaintiff "failed to establish sufficient ambiguity" surrounding the contract terms "to justify application of Section 207 or reliance on other rules of construction"); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 207 ("In choosing among the *reasonable meanings* of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred.") (emphasis added).

47.2.    Moreover, the "public interest" cannot be narrowly construed.  There is a strong public interest, which cannot be ignored, which mandates that parties who step up to buy wasting assets in bankruptcy receive the full benefit of their bargain, lest, in future bankruptcies, potential bidders be discouraged from making bids.  *In re Webcor, Inc.*, 392 F.2d 893, 899 (7th Cir. 1968) ("If parties are to be encouraged to bid at judicial sales, there must be stability in such sales and a time must come when a fair bid is accepted and the proceedings are ended.").

Respectfully submitted,