**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. |
| | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| | |
| In re | |
| | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| | |
| Debtor. | |

**ADDENDUM 5 TO POST-TRIAL**
**MEMORANDUM OF BARCLAYS CAPITAL INC.**

**<u>DEMONSTRATIVE TIMELINES</u>**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

*Attorneys for Barclays Capital Inc.*

November 22, 2010

| Tab | Title |
|---|---|
| 1. | Timeline Showing That Movants Have Known The Information About Which They Now Complain Since The Time Of The Sale, But Waited A Year To Raise It With The Court. |
| 2. | Timeline Showing Significant Events Confirming Barclays' Entitlement To The ETD Margin Deposits. |
| 3. | Timeline Showing The Drafting History Of The Clarification Letter That Confirms Barclays' Entitlement To The ETD Margin Deposits. |
| 4. | Timeline Showing The Drafting History Of The Clarification Letter That Confirms Barclays' Entitlement To The Clearance Box Assets. |
| 5. | Timeline Showing That The Trustee Knowingly Authorized The Post-Closing Transfer To Barclays Of Non-Customer Clearance Box Assets Held In LBI's DTCC Accounts. |
| 6. | Timeline Showing The Drafting History That Confirms Barclays' Entitlement To $769 Million In Securities From The LBI Rule 15c3 Account, Or Substantially Equivalent Securities From Outside The Accounts. |

**Timeline Showing That Movants Have Known The Information About Which They Now Complain Since The Time Of The Sale, But Waited A Year To Raise It With The Court.**

**September 16**

Barclays and Lehman agree to APA in which Barclays acquires "all assets" used in the Business, without definite values for all assets or all liabilities. BCI Ex. 1: 4/28/10 Tr. at 106:4-21, 107:22-108:11 (Miller).

**September 16**

Early Morning
The Lehman Boards approve the Sale after being told about Barclays' cash bonus offers, that "interested Firm employees were involved in the transaction negotiations," and that "For LBI, the transaction was described as a wash – with Barclays assuming liabilities ($64 billion) basically equivalent to the assets ($70 billion)...." – NO SECRET. 4/26/10 Tr. 81:25-82:4 (Ainslie); BCI Exs. 104, 788.

**September 17**

7:00 am
Barclays publicly announces that the Sale was "structured" to have a $4 billion buffer that Barclays says we "expect to preserve" and its expectation that the Sale will result in approximately $2 billion of post-tax acquisition gain – NO SECRET. BCI Ex. 110.

**September 17**

9:08 am
Lehman Senior Vice President Roger Freeman reports to Bart McDade and 24 other Lehman executives that Barclays had explained during its analyst call that "This transaction, due to $2bn in after-tax negative goodwill is accretive to capital ratios immediately" – NO SECRET. BCI Ex. 189.

**September 17**

3:17 pm
In-house Lehman attorney Scott Lechner emails Weil Gotshal attorneys explaining that the "firm is working on a 50 billion repo that needs to be done with Barclays." He asks for their thoughts on ensuring that Barclays could "liquidate free of a stay," and suggests that the "better approach was to include the assets they are purchasing in the purchase agreement that is approved by the bankruptcy court and SIPIA [sic]" – NO SECRET. BCI Ex. 193.

**September 17**

5:59 pm
Lazard discusses an email from Gerry Reilly saying he believed the "purchase will be at a fixed discount on the assets that remain to reflect the bulk size of the purchase" – NO SECRET. BCI Ex. 196.

**September 17-18**

The $72 billion / $68 billion "buffer" is widely reported in the worldwide financial press – NO SECRET. BCI Exs. 111, 796-798.

**Between September 18 and 21**

Saul Burian of Houlihan Lokey advises the Creditors' Committee "at all times" that he believes Barclays would realize an "economic gain" on the transaction and that Barclays was "making out like bandits" on the broker-dealer business. 5/7/10 Tr. at 27:20-28:16 (Burian).

**September 18**

Afternoon
Barclays advances $45 billion in cash to LBI to replace the Fed Repo loan and receives Repo Collateral of highly uncertain value. BCI Ex. 30 at ¶ 11: 9/8/10 Tr. at 65:24-66:9 (Leventhal).

**September 18**

Late Evening
Weil Gotshal, Lazard, and Alvarez & Marsal are sent spreadsheets showing LBI's accrual for "Trade Payables" and comp that are less than the estimates of "Cure" and "Comp" and that contain "transaction adjustments" – NO SECRET. BCI Exs. 207, 209, 212: Coles Dep. Tr. at 23:5-21.

September 16, 2008     September 17, 2008     September 18, 2008

**September 19**

Late Evening September 18 to Early Morning

Weil Gotshal, along with Cleary, posts three lists of Closing Date Contracts on the LBHI Epiq website. These initial lists reflect cure amounts for the Closing Date Contracts of approximately $180 million – NO SECRET. BCI Exs. 12-15.

**September 19**

JPMorgan shuts down Lehman's access to its securities accounts. Kirk Dep. Tr. at 72:13-14, 73:25–74:13.

**September 19**

Morning

In response to questions about the "transaction adjustments" balance sheet, Lehman gives Lori Fife of Weil a revised cure estimate of $1 billion – NO SECRET. 4/28/10 Tr. at 207:4-15, 270:13-22, 286:11-15 (Kelly).

**September 19**

Bart McDade knows that Lehman and Barclays have estimated the market value of the Repo Collateral to be $5 billion less than the marked value, and agrees to the transaction – NO SECRET. 4/26/10 Tr. at 186:25-187:7, 187:19-24, 224:7-21 (McDade).

**September 19**

11:05 am

Luc Despins of Milbank circulates an email to Committee advisers at Milbank and Houlihan showing Goldman Sachs's analysis that the Sale "allows Barclays to cherry pick owned inventory, investment and other assets at a windfall discount to FMV (the discount is at least several billion dollars)" – NO SECRET. BCI Ex. 219.

**September 19**

Late Morning to Early Afternoon

Lehman's Jim Seery discusses the changes in the transaction with the Committee's financial advisors. He describes the "5B" repo haircut and certain haircuts that correspond to the "Fed Facility Haircut Analysis" (i.e., "1 to 2%" for Agencies) – NO SECRET. 5/4/10 Tr. at 33:11-34:16, 42:12-43:14 (Seery): BCI Exs. 143a, 650.

**September 19**

Lehman independently analyzes the Repo Collateral actually delivered to Barclays as reflected on the spreadsheet generated earlier in the day and determines that much of the collateral is difficult to value and, if Lehman tried to sell the assets, "bids might be down 20 percent." Kirk Dep. Tr. at 95:14-96:16.

**September 19**

12:56 pm

Paolo Tonucci sends Barclays a spreadsheet of the Repo Collateral that had actually been transferred to Barclays. He notes that it contains Lehman marks, which are less than the BONY marks for the collateral – proving that Lehman had the BONY marks – NO SECRET. BCI Ex. 895.

**September 19**

1:38 pm

Lazard's Barry Ridings writes to his colleague that he has "No time to speak on anything else" because the "Leh deal totally restructured" and he is "Talking to creditors." BCI Ex. 387.

**September 19**

Afternoon

While with Weil Gotshal, Bart McDade agrees in a call with Alex Kirk that the Clearance Box Assets and the 15c3 Assets are to be transferred to Barclays. McDade and Weil are aware that these assets are in the deal – NO SECRET. Kirk Dep. Tr. at 104:24-105:19, 110:23-111:19: 4/26/10 Tr. at 199:21-200:6 (McDade).

September 19, 2008

**September 20, Shortly After Midnight**

The Sale Order is issued; the Order specifically approves the "Purchase Agreement" (defined as both the APA and a "letter agreement" "that may be subsequently modified or amended or clarified") and contemplates the transfer of OCC margin to Barclays. BCI Ex. 16.

**September 19**

4:11 pm
In an email exchange before the Sale Hearing, Lehman's Jim Seery asks Alex Kirk about the Clearance Box Assets estimated by Lehman at $1.9 billion. BCI Ex. 678.

**September 19**

Shortly before the Sale Hearing begins, Michael Klein meets with Weil Gotshal, Cleary, Lehman, and Lazard and reviews the changes in the transaction, including the identification of the Clearance Box Assets and 15c3 assets – NO SECRET. 8/31/10 Tr. at 45:15-47:22 (Lewkow).

**September 19**

4:36 pm
The Sale Hearing begins. BCI Ex. 49 (9/19/08 Tr.) at 1.

**September 19**

4:43 pm
The Sale Hearing recesses so that the "major changes" and "a lot of moving parts" in the transaction can be explained to those in attendance. BCI Ex. 49 (9/19/08 Tr.) at 43:11-22, 45:19.

**Sept. 19**

5:40 pm
During the recess, Weil Gotshal explains the changes in the transaction. Emails indicate that creditors are "sqwaking [sic]" in response to the identification of the $1.9 billion of Clearance Box Assets. BCI Ex. 225.

**September 19**

5:41 pm
The Sale Hearing reconvenes. BCI Ex. 49 (9/19/08 Tr.) at 45:19.

**September 19**

5:55 pm
In an email exchange with Jim Seery, Alex Kirk confirms that he believes the market value of the Repo Collateral is $45.5 billion. BCI Ex. 679.

**September 19-20**

During the Sale Hearing, the Debtor's counsel explains –
• Rejecting the transaction would be "detrimental to the national interest." BCI Ex. 49 (9/19/08 Tr.) at 61:9-13.
• The "melting ice cube" has "already half melted." BCI Ex. 49 (9/19/08 Tr.) at 244:17-18.
• In the alternative, "there will be very little to distribute to creditors, if anything." BCI Ex. 49 (9/19/08 Tr.) at 244:20-24.
• "LBI is unable to deliver to Barclays the assets that were originally intended under the APA." BCI Ex. 49 (9/19/08 Tr.) at 63:23-64:8.

**September 19-22**

13 lawyers at the Trustee's firm bill over $150,000 for work described as "review of continuing revisions to APA, Clarification Letter and numerous rounds of negotiations with Weil, Cleary, and other professionals re changing terms to sale and timetable for closing and consultations with HHR, SIPC and SEC teams re same," "round-the-clock negotiations with Lehman, Barclays, SIPC and regulators on sale issues with review of Clarification Letter and accompanying sale documents," work to "monitor and participate in sale discussions and review of final sale documents," and the like. BCI Ex. 40 at pp. 26-27, 30, 34.

**September 20**

Sometime prior to 2:32 am
The Trustee signs the TAA authorizing the transfer of "all margin deposits" at the OCC to Barclays with knowledge that the OCC margin includes LBI proprietary assets. The Trustee also signs the Collateral Account Agreement authorizing the transfer of "all rights in securities, cash, and other property" at the OCC to Barclays. BCI Ex. 231

**September 20**

Morning
Meetings at Weil Gotshal to work on the Clarification Letter. Miller Dep. Tr. at 22:17-23:9, 29:5-25, 97:21-98:7.

**September 20**

**11:15 am**
Luc Despins emails Harvey Miller and asks him to "make sure that [his] corporate team" involves Milbank senior transactional attorney Crayton Bell "in all discussions and meetings with respect to the documentation and closing of the Barclays transaction." BCI Ex. 785.

**September 20**

**12:45 pm**
The Trustee and Weil Gotshal are notified by email that the OCC will be transferring "all cash and securities" at the OCC to Barclays, including "nearly $1 billion in cash." BCI Ex. 233.

**September 20**
The Trustee sends no senior lawyers to Weil Gotshal and instead, Mr. Kobak "went out on a bike ride." 5/4/10 Tr. at 210:3-12 (Kobak).

- Trustee Giddens, though not present at Weil, bills 16 hours to the matter in one day, including 9.7 hours for "the review of continuing revisions to the APA and the clarification letter and numerous rounds of negotiation with Weil, Cleary and other professionals, re changing terms to sale and timetable for closing and consultations with HHR, SIPC, and SEC teams, re same.'" 5/5/10 Tr. at 47:14-49:15 (Kobak) (quoting BCI Ex. 40 at p. 26).
- The Trustee sends a second-year associate to Weil to participate in negotiations but the associate spends "a lot of the day" working on a "brief in a pro bono case." 5/4/10 Tr. at 187:21-188:12 (Kobak). That associate bills 26 hours to the estate over September 20-21. BCI Ex. 40 at pp. 27-28.

**September 21**
The Bay Harbour appellants file a Notice of Appeal of the Sale Order, but do not seek to stay the Sale Order. BCI Ex. 27 at p. 17.

**September 21**

**Morning**
Movants receive drafts of Schedule A, showing the marked value of the Repo Collateral at $49.9 billion, $5 billion more than the loan amount – NO SECRET. BCI Exs. 237, 830, 739, 258; see also 5/6/10 Tr. at 136:12-21 (Burian); 5/4/10 Tr. at 49:9-15 (Seery).

**September 21**

**4:03 pm**
The Trustee and Weil Gotshal are notified that, having heard no objection, the OCC will transfer "all such cash in the accounts" to Barclays. The OCC also threatens to liquidate LBI's accounts on Monday morning absent the transfer of the accounts to Barclays. BCI Ex. 262.

**September 21**

**4:37 pm**
The OCC renews its threat to liquidate LBI's accounts on Monday morning absent the transfer of the accounts to Barclays. BCI Ex. 267.

**September 21**

**Late Afternoon/Early Evening**
The Committee attends a meeting with Barclays, Lehman, JPM, and the NY Fed. 5/4/10 Tr. at 47:24-49:8, 63:2-3 (Seery).

- The Repo transaction is discussed among the lawyers, advisors, and the principals of Lehman, Barclays, and JPM. 5/4/10 Tr. at 49:16-19 (Seery).
- The Committee is told that Barclays was challenging the "marked value" for the repo collateral and believed its value was less than $49 billion of "face value" – NO SECRET. 5/4/10 Tr. at 55:24-56:10, 56:15-57:18 (Seery); BCI Ex. 650 at p. 67.
- The Committee is told that Barclays was concerned about the value of the securities they had received and the securities JPM was offering to make up for the $7 billion shortfall. The parties discuss Barclays' concern that the securities marked at $8.55 billion are actually worth half that amount. 5/4/10 Tr. at 54:16-23 (Seery); BCI Ex. 650 at p. 67; Miller Dep. Tr. at 23:14-27:19; 9/7/10 Tr. at 26:16-27:2 (Leventhal).

September 20, 2008                                                              September

**September 21**

Following the large meeting with all of the principals, the Fed, and JPM, Committee advisors meet with Jim Seery to "review the particulars of the transaction." 5/4/10 Tr. at 59:21-60:2 (Seery).

- The Committee probes "the difference between the forty-five billion advanced and the fifty, roughly, face value of those assets … and their concern was that five billion dollar difference." They also discuss that there is no better deal available for Lehman – NO SECRET. 5/4/10 Tr. at 60:8-62:8, 63:9-64:10 (Seery).

- The Committee and Mr. Seery discuss, throughout the evening and early morning hours before the Closing, how the parties came up with the $45.5 billion versus the $49 billion "of face." The Committee knows it has the right to go to Court if they object "but they didn't object." 5/4/10 Tr. at 66:7-24 (Seery).

**September 21**

**Late Night to Early Morning September 22**

- As documented by the Committee advisors, Lehman informs them that the marks shown on Schedule A were "out of date" and that the parties "had agreed to a $5 billion discount as the appropriate 'mark to market' adjustment for the securities." BCI Exs. 813a, 814.

- The Committee believes that the Lehman executives, "in cahoots with their soon to be bosses/paltrners at barcap," "negotiated a sweetheart deal" to transfer to Barclays securities "worth $5 billion more than both the lehman and barcap guys said they were worth…." BCI Ex. 814.

- Weil Gotshal holds a meeting attended by representatives of Barclays and the Creditors' Committee in which Weil decides not to return to Court for further approval of the Clarification Letter because, in Weil's view, it "did not change the deal that was presented to the Court." Miller Dep. Tr. at 48:15-49:15; 4/28/10 Tr. at 117:13-21 (Miller).

- The agreement with the DTC is explained during a telephonic meeting between Weil Gotshal, the Trustee's lawyers, representatives of the Creditors' Committee, Barclays' lawyers, and the DTC. 8/24/10 Tr. at 132:10-134:1 (Rosen).

**September 21-22**

After reviewing the transcript of Barclays' September 17 analyst call, Committee members note that Barclays had "described how great the Lehman buy is" and was expecting "$2bn goodwill after tax," and comment that it is "Interesting to understand what a bargain Barclays thinks it has." BCI Exs. 285, 291.

**September 22-30**

Weil Gotshal confirms multiple times that "any property" securing ETDs are Purchased Assets. BCI Exs. 807, 320.

**September 22**

Before the Closing, the Committee raises its concerns with Weil Gotshal over the $5 billion "mismatch" issue, an "overall theme" over the pre-Closing weekend. O'Donnell Dep. Tr. at 154:25-156:14, 157:4-24, 164:25-165:6.

**September 22**

**After Midnight**

Michael Klein meets with Mr. Burian, Mr. Fazio, Mr. Miller, and other lawyers from Weil Gotshal.

- Mr. Klein is brought in to explain the "flow of funds" relating to the Fed Repo, issues with JPMorgan, and why the transaction was being held up. 8/27/10 Tr. at 60:3-25 (Klein); M. 410.

- During the meeting, Mr. Klein tells the Committee representatives that the $49.9 billion for the Repo Collateral did not reflect market value. Mr. Klein tells them that Barclays believed the assets were worth much less and ascribes a value of $44-45 billion to the Repo Collateral, $5 billion less than the marks – NO SECRET. 5/6/10 Tr. at 152:23-153:19 (Burian); 8/27/10 Tr. at 234:16-23 (Klein): M. 410.

er 21, 2008

**September 22, Around 8 am**

The Sale closes. Schedules A and B are available for inspection by the Trustee and the Committee at the Closing. The summary page of Schedule B identifies assets in the DTCC clearance boxes by name (DTC 074 and DTC 636). BCI Exs. 309, 302, 304.

**September 22**

Early Morning
Following the meeting with Michael Klein, Houlihan is not satisfied and asks to meet with Jim Seery to go back over the terms of the transaction. Mr. Seery answers "every question they put to" him. The Committee representatives do not veto the deal. 5/4/10 Tr. at 66:7-24, 69:13-70:6 (Seery).

**September 22**

Early Morning
Representatives from Cleary, Weil Gotshal, and Houlihan Lokey participate in a hallway discussion regarding the 15c3 regulatory capital account. The parties agree that Barclays will take only the $769 million in securities in the reserve account but that if Barclays cannot have those securities, $769 million in securities "would be made available from outside the account." 8/24/10 Tr. at 140:21-141:25 (Rosen); 8/31/10 Tr. at 62:19-63:24 (Lewkow); 5/6/10 Tr. at 140:18-142:13 (Burian).

**September 22**

Around 4 am
Saul Burian tells Harvey Miller, "Everything's fine, and going forward, if it's okay with you, it's okay with us," and "If you guys are satisfied with it, we're satisfied," and leaves Weil Gotshal's offices. Miller Dep. Tr. at 29:10-25, 101:13-102:5.

**September 22**

4:05 am
The Trustee's counsel sends the DTCC letter to Weil transactional lawyers. BCI Ex. 658.

**September 22**

8:18 am
Harvey Miller confirms to Luc Despins that Barclays would receive "securities $763m Figures approx." in regulated capital. BCI Ex. 839.

**From September 22**

Lehman retains access to GFS (i.e., Lehman books and records). Krishnan Dep. at 171:25-172:18, 191:24-200:9; see also M. 122 at §§ 3.01, 3.12.

**For Months After September 22**

The Trustee authorizes the transfer of ETD margin to Barclays. 9/8/10 Tr. at 127:18-135:18 (Raisler); 8/30/10 Tr. at 51:21-52:9 (James).

**September 25**

The Committee receives a list of Clearance Box Assets that, according to Lehman, is "not necessarily the final" but is "very close." BCI Ex. 756.

**September 26**

The Committee receives final versions of Schedules A and B to the Clarification Letter, which are essentially identical to those they received pre-Closing. BCI Ex. 812.

**September 26**

4:13 pm
The Trustee authorizes a post-Closing transfer of Clearance Box Assets marked at approximately $269 million. BCI Ex. 375.

September 22, 2008                                      September 25, 2008    September 26, 2008

**September 30**

Deadline for seeking reconsideration under 59(b)

**September 28**

Luc Despins advises Houlihan Lokey to audit Schedules A and B "because if there is an issue with them we need to speak up now before the trail gets cold!" After reviewing them, Brad Geer voices Houlihan's concern that the securities in Schedule A were "worth more than implied by the negotiated mark in the deal." BCI Ex. 812.

**September 29**

LBHI files a motion stating that the Clarification Letter "is binding on the parties" and attaching Schedules A and B that "as more fully described in the Clarifying Letter," contain lists of securities "transferred under the Purchase Agreement." BCI Ex. 19 at p. 3; see BCI Exs. 742-744, 749, 754, 755.

**September 29**

The Informal Noteholder Group files a Notice of Appeal of the Sale Order. BCI Ex. 391.

**September 29-30**

Alvarez & Marsal meet with Lehman executives (including Paolo Tonucci and Alex Kirk) to review the economics of the transaction and discuss the "$5.1" billion haircut in the Barclays Repo – NO SECRET. BCI Ex. 144: Korycki Dep. Tr. at 88:14-17; Fogarty Dep. Tr. at 54:22-55:22, 68:11-69:5, 100:17-101:8, 113:9-114:14; Coles Dep. Tr. at 70:21-71:9, 73:4-74:7.

During this period of extensive Alvarez inquiries, Martin Kelly – author of the "$5B all in economic loss" email – is working with Alvarez, not Barclays. 4/28/10 Tr. at 282:5-283:2 (Kelly).

**September 29**

**3:52 pm**

The Trustee authorizes a post-Closing transfer of Clearance Box Assets marked at $161 million. BCI Ex. 675.

**September 30**

Weil Gotshal sends to the Trustee's lawyers the "filed schedules" including the Schedule B Clearance Box Assets. BCI Ex. 524.

**September 29-October 6**

Alvarez's "Draft Barclays Deal Recap" indicates that there was a "Negotiated Mark Haircut" of $5 billion, that Barclays was to receive "0.80" billion "securities (15-c-3-3)" and "1.90" billion in the "Unencumbered Box," and that there was a "Net 'Book' Loss" to LBI of $3.27 billion based on BONY marks – NO SECRET. BCI Ex. 332.

**October 1**

While discussing the value of the Repo Collateral during a meeting between Alvarez & Marsal, Houlihan, and FTI, Mike Fazio of Houlihan states that he "believes we should get $5.5 Billion Back." BCI Ex. 816.

**October 1**

Three revised lists of cure payments for Closing Date Contracts are posted on Epiq. These show the payments revised downward to approximately $106 million – NO SECRET. BCI Exs. 22, 24.

**October 2**

The Trustee explains to the Court that the Repo Collateral was "deemed to be purchased assets within the meaning of the asset purchase agreement" – NO SECRET. BCI Ex. 803 (10/2/08 Tr.) at 72:3-9.

**October 6**

**3:31 pm**

Committee advisor FTI circulates Alvarez's summary of the transaction, indicating that the Sale involved a $5 billion "Negotiated Mark Haircut." BCI Ex. 332.

**October 6**

**9:01 pm**

Alvarez & Marsal circulates a "Recap" of the deal reflecting a $3.1 billion "Loss on Sale" based on BONY marks. BCI Ex. 431.

September 28, 2008        September 29, 2008        September 30, 2008

**November 10**

Deadline for filing Notice of Appeal
BCI Rule 60(b) Opp. Br. at ¶ 241 & n.105.

**October 8**

Alvarez & Marsal makes a presentation concerning the Sale attended by the Committee, explaining Barclays "negotiated a $5.0 billion reduction" from "Lehman 'stale' marks" in the Repo Collateral – NO SECRET. BCI Ex. 131a.

**October 10**

Committee advisors draft a memo noting that "With respect to the $2.5 'cure liability' that Barclays assumed...there is still no list summarizing what cure assumptions could lead to anything even close to this type of cure payments.... A similar argument could be made for the $2 billion employee compensation liability – there is no way it's that high" and concluding that "the assets transferred were significantly greater, and liabilities assumed were significantly less, than the figures represented in court (by at least a few billion dollars in each case)." BCI Ex. 813a.

**October 10**

Martin Kelly's last day working with Alvarez & Marsal; he then goes to work for Barclays. 4/28/10 Tr. at 282:12-283:9 (Kelly).

**October 13**

3:47 pm
Luc Despins writes to Lori Fife: "our concern is with respect to the securities which were transferred. Houlihan has reviewed them and cannot even come close to the amount which was announced in court (I think it was $47.4 billion)...Houlihan's review would indicate that the securities transferred could be worth billions more than the $47.4 billion." BCI Ex. 389.

**October 13**

11:50 pm
Lori Fife responds to Despins' email about the Committee's concern: "I really am at a loss to figure out why you and the other Committee professionals are spending so much time on the Barclays sale. What could you or anyone for that matter do even if it turned out that the assets turned out to be greater? As you know, the sale has been consummated which effectively moots out any relief you might be seeking." BCI Ex. 389.

**October 16**

In a "state of the estate" presentation, Harvey Miller tells the Court that "as part of the Barclays closing, because Barclays was taking the customer accounts, they got the 700 odd million dollars in securities." Six Committee attorneys, three Trustee attorneys, and the Trustee himself attend the hearing, but none of them disagree with Mr. Miller's statement. BCI Ex. 485 (10/16/08 Tr.) at 7:15-23, 8:10-20, 21:2-8, 58:9-13.

**October 20**

The Committee opposes the Informal Noteholder Group's appeal by submitting a Counter-Statement of Issues asserting that the Sale was negotiated at "arms-length" and that Barclays was a "purchaser in good faith." BCI Ex. 398.

**October 28-November 13**

Lehman/Alvarez is given further access to September 12 (and later September 19) GFS data through a "special environment" set up at Lehman/Alvarez's request. BCI Ex. 1107: Krishnan Dep. Tr. at 41:7-16, 170:11-17.

**Prior to October 31**

No later than "sometime in October," the Trustee admits knowing that the OCC accounts include LBI proprietary cash as well as securities. 5/5/10 Tr. at 109:4-23 (Kobak).

October 2008                                                                November 2008

**November 12**

The Bay Harbour appeal brief is filed. BCI Ex. 27.

**November 14**

The Trustee says he will "gladly consent" to the transfer of OCC collatreral to Barclays. BCI Ex. 156.

**Around November 22**

About two months after the Closing, Harvey Miller discusses with Committee counsel his prior determination that it was unnecessary to return to Court for further approval of the Clarification Letter. Milbank states that the Committee is "fine" with Mr. Miller's prior determination that the Clarification Letter did not make a material change to the agreement and says that it would not pursue the issue unless it saw a "variance of two billion dollars…." 4/28/10 Tr. at 117:22-118:5 (Miller).

**November 22**

All Barclays cure payment obligations are posted for Movants and the public on the Epiq website showing total of $109 million, not $1.5 billion – NO SECRET. BCI Ex. 506.

**November 2008**

**December 5**

The Trustee executes the December Settlement Agreement, releasing Barclays "from and in respect of all Claims, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to" the Repo Collateral. BCI Ex. 9 at § 4(d).

**December 5**

The Trustee moves for approval of the December Settlement Agreement, specifying that it "is designed to achieve the intended economic outcome" of the Repo Replacement Transaction in which Barclays was supposed to have received securities marked at approximately $50 billion in exchange for a payment of $45 billion – a $5 billion difference. BCI Ex. 29.

**December 12**

The Debtor and the Trustee file oppositions to the Bay Harbour appeal, defending the Sale Orders by invoking the Clarification Letter and arguing that "all relevant facts were disclosed to the Bankruptcy Court." BCI Ex. 33 at pp. 16, 23; BCI Ex. 34 at p. 4, n.1.

**December 21**

Houlihan advises Quinn Emanuel that before the Closing, it "uncovered" that Lehman employees, "in cahoots" with Barclays, transferred securities to Barclays $5 billion more than Lehman and Barclays said they were worth. BCI Ex. 814.

**December 19**

In objecting to the December 2008 Settlement, the Committee states that at "the Sale Hearing, the Lehman Sellers indicated the value of the Fed Portfolio Securities was $47.4 billion." BCI Ex. 37 at p. 8, n. 12.

**December 2008**

**December 22**

At a hearing on the December Settlement, the Trustee tells the Court Barclays is entitled to Repo Collateral "valued at over $49 billion" under the Clarification Letter – "the Purchase Agreement approved by Your Honor." No one mentions a "wash" or a "$47.4 billion valuation cap." The Committee fails to mention its belief that Lehman executives were "in cahoots" with Barclays and a "$5 billion discount." BCI Ex. 50 (12/22/08 Tr.) at 19:12-20:10; see Kobak Dep. Tr. at 151:12-154:10; BCI Ex. 814.

**March 16**

**MANDATE:** The District Court issues the Judgment affirming the Sale Orders. BCI Ex. 403; *see also* BCI Ex. 41. At no time before the District Court decision do the Movants bring to the attention of the District Court or the Bankruptcy Court the purported multi-billion dollar issues they had identified in connection with the Sale.

**February 3**

Committee advisors attend a meeting with Barclays representatives. During the meeting, the Committee never asserts that there was a valuation cap in the deal, never discloses that they had independently valued the securities on Schedule A and concluded they were worth billions of dollars more than what the Court and Committee were told, and never discloses its belief that there was a "$5 billion discount" as written in its internal documents. 8/25/10 Tr. at 85:25-87:11 (King).

**February 6**

The Trustee concedes in his OCC Interpleader Answer that, except for $80 million in dispute in that action, the margin in LBI's OCC accounts as of the Closing belongs to Barclays under the TAA and the Purchase Agreement. BCI Ex. 978.

**February 9**

Barclays announces an acquisition gain of $4.1 billion under IFRS (approximately $2 billion of which relates to intangibles, fixtures, fittings, and software, and $2.4 billion of which relates to the net value of the ETDs). BCI Exs. 133, 134.

**February 19**

Mr. Marsal writes to Barclays seeking information on comp and cure liabilities but not arguing deal was required to be a "wash" or subject to $47.4 billion "cap". BCI Ex. 161.

**June 19**

**MANDATE:** The Second Circuit dismisses the Bay Harbour appeal, making final the affirmance of the Sale Orders. BCI Ex. 404.

**May 18**

The Debtor's "special counsel" Jones Day files a motion seeking R. 2004 discovery. LBHI R. 2004 Br.

**June 22**

The Debtor's "special counsel" files a reply brief arguing possible grounds for 60(b) relief based upon Mr. Reilly's "block discount" email and Mr. Kelly's "$5B all in economic loss" email, thereby confirming that the Debtor had these emails during the appeal period but did not bring them to the attention of the Bankruptcy Court or appellate courts. LBHI R. 2004 Reply Br. at Exs. 1, 9.

**September 15**

Movants file Rule 60 motions claiming as "newly discovered," evidence of :
- a "$5B discount";
- cure and comp estimates being inflated by "transaction adjustments"; and
- the transfer of Clearance Box Assets, 15c3 securities, and OCC margin deposits. LBHI Br. at ¶¶ 160-61; Committee Br. at ¶ 71.

The Trustee claims Barclays was not entitled to any ETD margin other than customer property held by LBI or any cash. Trustee Br. at ¶ 67.

**December 7**

The Trustee admits in deposition that he understood Barclays was entitled to ETD margin, including cash, sufficient to cover the ETD liabilities. Kobak Dep. Tr. at 282:14-284:3, 306:19-307:5.

**December 11**

LBHI's counsel asserts that "the five billion dollar discount" "was not revealed until August of this year, in the 2004 discovery…." BCI Ex. 52 (12/11/09 Tr.) at 39:22-24.

| February 2009 | March 2009 | May 2009 | June 2009 | September 2009 | December 2009 |

# Timeline Showing Significant Events Confirming Barclays' Entitlement To The ETD Margin Deposits.

**September 16-19**
LBI deposits $1.2 billion in cash in OCC accounts to meet margin calls. BCI Ex. 646.

**September 18**
10:50 am
LBI and Barclays personnel discuss and arrange for the transfer to Barclays of all "House Margin and Collateral" and all collateral in customer futures accounts. BCI Ex. 217.

**September 18**
The CME closes out LBI's proprietary ETDs. BCI Ex. 49 (9/19/08 Tr.) at 61:16-19.

**September 19**
The ICE Futures Exchange closes out LBI's proprietary ETDs. 9/8/2010 Tr. at 104:10-25 (Raisler).

**September 19**
Between 10 am and Noon
The OCC refuses to release computed excess margin to Barclays. BCI Ex. 970 at ¶ 73.

**September 19**
Prior to 1:30 pm
The OCC draws down on letters of credit to increase the amount of accessible LBI margin assets. BCI Ex. 978 at ¶¶ 41-42.

**September 19**
Barclays learns for the first time about the VIX futures position at the OCC. 9/8/2010 Tr. at 124:3-16 (Raisler).

**September 19**
2:13 pm
The OCC requests a Sale Order provision preserving its lien over "all securities, cash, collateral and other property" at the OCC once transferred to Barclays. BCI Ex. 220.

**September 20**
Shortly After Midnight
The Court issues the Sale Order contemplating the transfer of OCC margin to Barclays. BCI Ex. 16.

**September 20**
Sometime prior to 2:32 am
The Trustee signs the TAA authorizing the transfer of "all margin deposits" at the OCC to Barclays with knowledge that the OCC margin includes LBI proprietary assets. BCI Ex. 231: 5/5/10 Tr. at 106:9-107:22 (Kobak).

**September 20**
Sometime prior to 2:32 am
The Trustee signs Collateral Account Agreement authorizing the transfer of "all rights in securities, cash, and other property" at the OCC to Barclays. BCI Ex. 231

**September 20**
11:12 pm
Barclays proposes language in the Clarification Letter to carve "margin" out of the cash exclusion. BCI Ex. 249.

**September 20**
12:45 pm
The Trustee and Weil Gotshal are notified by email that the OCC will be transferring "all cash and securities" at OCC to Barclays, including "nearly $1 billion in cash." BCI Ex. 233.

**September 21**
4:03 pm
The Trustee and Weil Gotshal are notified by email that, having heard no objection, OCC will transfer "all such cash in the accounts" to Barclays. BCI Ex. 262.

**September 21**
4:03 pm
The OCC threatens to liquidate LBI's accounts on Monday morning absent the transfer of the accounts to Barclays. BCI Ex. 262.

**September 21**
4:37 pm
The OCC renews its threat to liquidate LBI's accounts on Monday morning absent the transfer of the accounts to Barclays. BCI Ex. 267.

**September 21**
Just Prior to 6:11 pm
Barclays learns for the first time about open futures positions at two foreign exchanges. M. 730.

**September 21**
7:54 pm
Weil Gotshal retains the Clarification Letter provision carving 15c3-3 cash and margin out of the cash exclusion. BCI Ex. 270.

**September 22**
About 3-4 am
The hallway discussion concerning 15c3-3 cash occurs. 4/29/10 Tr. at 81:23-83:16 (Miller).

**September 22**
4:36am
Weil Gotshal deletes the Clarification Letter provision carving 15c3-3 cash and margin out of the cash exclusion. BCI Ex. 280.

**September 22**
Between 6 am and 8 am
Barclays' counsel proposes the insertion of the ETD parenthetical into the Clarification Letter. 8/24/10 Tr. at 122:25-124:4 (Rosen).

**September 22**
Between 6:30 and 8 am
Weil Gotshal inserts the ETD parenthetical into the Clarification Letter. 8/24/10 Tr. at 120:8-25 (Rosen); BCI Ex. 5.

September  16-19 2008

September  20-22 2008



**For Months After September 22**

The Trustee authorizes the transfer of ETD margin to Barclays. 9/8/10 Tr. at 127:18-135:18 (Raisler); 8/30/10 Tr. at 51:21-52:9 (James).

**September 22-29**

Barclays continues to learn for the first time about additional open futures positions. 8/30/10 Tr. at 83:14-18 (James).

**September 26**

Weil Gotshal confirms that "any property" securing ETDs are Purchased Assets. BCI Ex. 320.

**September 27**

Weil Gotshal re-confirms that "any property" securing ETDs are Purchased Assets. BCI Ex. 807.

**October 3**

The Trustee is "OK" with the OCC transferring collateral from LBI's accounts at the direction of BCI without consent from the Trustee." BCI Ex. 470.

**Prior to October 31**

No later than "sometime in October," the Trustee admits knowing the OCC account includes LBI proprietary cash as well as securities. 5/5/10 Tr. at 109:4-23 (Kobak).

**November 14**

The Trustee says he will "gladly consent" to the transfer of OCC collateral to Barclays. BCI Ex. 156.

**February 6**

The Trustee concedes in his OCC interpleader Answer that, except for $80 million in dispute in that action, the cash margin in LBI's OCC accounts as of the closing belong to Barclays under the TAA and the Purchase Agreement. BCI Ex. 978 at ¶ 51.

**September 15**

The Trustee files a Rule 60 motion claiming Barclays was not entitled to any ETD margin other than customer property held by LBI or any cash. Trustee Br. at 25.

**December 7**

The Trustee admits in deposition that he understood Barclays was entitled to ETD margin, including cash, sufficient to cover the ETD liabilities. Kobak Dep. Tr. at 282:14-284:3, 306:19-307:5.

September 22 2008 | October 2008 | November 2008 | February 2009 | September 2009 | December 2009

# Timeline Showing The Drafting History Of The Clarification Letter That Confirms Barclays' Entitlement To The ETD Margin Deposits.

# The Timing Of The Parties' Revisions To The Clarification Letter Show That ETD Margin Was Always Understood – By All Parties – To Be A Purchased Asset

**Sep. 22**

**6:00-8:00 a.m.:** Lawyers for Barclays raise the fact that margin has been inadvertently cut out by Lehman's proposed edits, and provide a handwritten markup containing the ETD parenthetical to Weil Gotshal. Weil Gotshal adds the ETD parenthetical to the Clarification Letter.  8/24/10 Tr. at 185:1-23 (Rosen).

**Sep. 22**

**4:36 a.m.:** In implementing the agreed-upon exclusion of 15c3 cash, Weil Gotshal deletes the entire provision proposed by Barclays.

**Sep. 21**

**7:54 p.m.:** Lawyers for LBHI circulate Barclays' 11:12 p.m. draft to SIPC and the Trustee. Cover e-mail states: "The portions highlighted in yellow concern the points which depend on the resolution of the current discussions. Otherwise, we reviewed the text of the letter...**I do not expect the letter to change**." BCI Ex. 270.

ETD Margin was not one of the issues under discussion. 8/24/10 Tr. at 179:3-20, 199:18 – 200:14 (Rosen).

**Sep. 22**

**3:00-4:00 a.m.:** Barclays and Lehman lawyers discuss 15c3-3 cash and agree to remove it from the deal. Miller Dep. Tr. at 30:6-17; 4/28/10 Tr. at 81:24 – 83:16 (Miller).

**Sep. 20**

**11:12 p.m.:** Lawyers for Barclays circulate a draft Clarification Letter that provides that "'Excluded Assets' shall not include… cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries maintained...by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI or any other person." BCI Ex. 249.

**Sep. 22**

**1:00-2:00 a.m.:** Trustee's representative signs the Clarification Letter. 5/5/10 Tr. at 93:11-14 (Kobak).

| Sep. 20, 2008 | Sep. 21, 2008 | Sep. 22, 2008 |

# Timeline Showing The Drafting History Of The Clarification Letter That Confirms Barclays' Entitlement To The Clearance Box Assets.

# After Barclays And The DTCC Reached An Agreement, The Parties Revised The Clarification Letter To Reflect The Agreement And To Broaden The Language Providing That All LBI Assets In Its DTC Clearance Boxes Are "Purchased Assets"

**Late Night – Early Morning**

The agreement with the DTCC is explained during a telephonic meeting between Weil, the Trustee's lawyers, representatives of the Creditors' Committee, Barclays' lawyers, and the DTCC. 8/24/10  Tr. at 132:10 – 134:1 (Rosen).

**7:54 p.m.**

Weil Gotshal draft Clarification Letter: "such securities and other assets specified on Schedule [B] as Purchaser may, within 60 days after the Closing elect to receive...are Purchased Assets...." BCI Ex. 270.

**Before Midnight**

Oral agreement on basic terms of the DTCC Letter reached. Rosen Dep. Tr. at 153:11-14.

**4:05 a.m.**

Trustee's counsel sends DTCC Letter to Weil Gotshal. BCI Ex. 658.

**4:36 a.m.**

Weil Gotshal draft Section 1(d) provides that Barclays shall "pay at the Closing $250 million of the Cash Amount to the Depository Trust Clearance Corporation ('DTC') for deposit as collateral against LBI's obligations to the DTC (including its affiliated clearing organizations). **Such collateral account shall be maintained** in accordance with such agreement as LBI and DTC may agree upon."

Weil Gotshal changes definition of Purchased Assets to read: "Purchased Assets shall include...such securities and other assets **held in LBI's '074 clearance box' at DTC** (as defined below)...." BCI Ex. 505.

**5:22 a.m.**

Weil Gotshal revises draft Section 1(d) references to "the agreement among LBI, Purchaser and DTC entered into in connection with the Closing."

Weil Gotshal broadens definition of Purchased Assets: "Purchased Assets shall include...such securities and other assets **held in LBI's 'clearance boxes'**...." BCI Ex. 642.

**~ 8:30 a.m.**

Final Clarification Letter defines Purchased Assets: **"Purchased Assets shall include...such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser...."** BCI Ex. 5.

**Sep. 21, 2008**

**Sep. 22, 2008**

**Timeline Showing That The Trustee Knowingly Authorized The Post-Closing Transfer To Barclays Of Non-Customer Clearance Box Assets Held In LBI's DTCC Accounts.**

# The Trustee Knowingly Authorized
# The Post-Closing Transfer Of Non-Customer
# Clearance Box Assets To Barclays

### Sep. 24

Trustee's counsel meets with Alastair Blackwell to **discuss the transfer of non-customer assets to Barclays**. Frelinghuysen Dep. Tr. at 67:20 – 68:22; BCI Ex. 40 at pp. 46-47.

### Sep. 25, 5:40 p.m.

Trustee's counsel sends Blackwell the form of certification required for the transfer of non-customer assets to Barclays: "I represent and confirm to you that the inventory and accounts listed in the schedule attached as Exhibit A to this letter are **assets of Lehman Brothers Inc., which were sold to Barclays Capital Inc. pursuant to the Asset Purchase Agreement dated as of September 16, 2008, as amended**." BCI Ex. 514; Frelinghuysen Dep. Tr. at 73:20 – 74:19.

### Sep. 29, 3:20 p.m.

Neal Ullman sends Trustee's counsel a request for the transfer of $161 million of non-customer LBI assets. BCI Ex. 825; 8/23/10 Tr. at 162:1-6 (Ullman).

### Sep. 29, 3:31 p.m.

Trustee's counsel asks Ullman to "confirm that the attachments to the email below represent **assets of Lehman Brothers Inc. that were sold to Barclays Capital Inc. pursuant to the Asset Purchase Agreement dated as of September 16, 2008**." BCI Ex. 517, BCI Ex. 825; 8/23/10 Tr. at 162:7-19 (Ullman).

### Sep. 29, 3:50 p.m.

Ullman confirms; two minutes later trustee's counsel authorizes the transfer. BCI Exs. 517, 675; 8/23/10 Tr. at 162:20-23,163:5-25 (Ullman).

**Sep. 24, 2008**      **Sep. 25, 2008**      **Sep. 29, 2008**

# Timeline Showing The Drafting History That Confirms Barclays' Entitlement To $769 Million In Securities From The LBI Rule 15c3 Account, Or Substantially Equivalent Securities From Outside The Accounts.

# Extrinsic Evidence Confirms That The "Or" Clause Was Added To The Clarification Letter At The Same Time As The "Applicable Law" Clause In Response To Barclays' Demand That It Maintain An Unconditional Right To $769 Million In Securities

**Friday, Sep. 19**

Barclays asks Lehman to identify Purchased Assets still available for transfer and of sufficient value to persuade Barclays to go forward with the transaction. 5/7/10 Tr. at 206:13 – 207:5, 207:19 – 208:12 (Ricci); 4/30/10 Tr. at 186:12 – 187:1 (Hughes); 8/27/10 Tr. at 50:14 – 52:21 (Klein).

• Lehman identifies the assets held in the 15c3-3 Reserve Account as Purchased Assets that previously had not been specifically identified to Barclays. 8/31/10 Tr. at 46:3 – 47:17 (Lewkow); 4/26/10 Tr. at 201:16-19 (McDade), 4/29/10 Tr. at 44:24 – 45:2 (Lowitt); Kirk Dep. Tr. at 105:4-19.

**Sunday, Sep. 21**

**7:54 p.m.:** Drafts of the Clarification Letter provide that "Purchaser shall receive… (ii) cash, cash equivalents, bank deposits or similar cash items maintained (A) by or on behalf of LBI pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934 or otherwise." BCI Ex. 270 at p. 4.

**Late Sunday, Sep. 21, or Early Monday, Sep. 22**

"Hallway" conversation with representatives of Weil and Barclays. 8/31/10 Tr. at 61:2-8 (Lewkow).

**Monday, Sep. 22**

**4:36 a.m.:** The next draft of the Clarification Letter includes both the phrase "to the extent permitted by applicable law" **and** the phrase "or securities of substantially the same nature." M. 447 at p. 5.

• This language satisfies Barclays' concerns expressed in the hallway conversation. 8/24/10 Tr. at 141:12-25 (Rosen).

**Later on Monday**

The Clarification Letter is signed in its final form.

| Sep. 19, 2008 | Sep. 21, 2008 | Sep. 22, 2008 |