WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
In re                                          :   Chapter 11 Case No.
                                               :
LEHMAN BROTHERS HOLDINGS INC., et al.,         :   08-13555 (JMP)
                                               :
                        Debtors.               :   (Jointly Administered)
-----------------------------------------------------------------x
```

### NOTICE OF DEBTORS' MOTION PURSUANT TO SECTION 363(b) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO ENTER INTO AND PERFORM UNDER A SERVICES AGREEMENT WITH LEHMAN EUROPE

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases (together, the "Debtors") for authorization to enter into and perform under a services agreement with Lehman Europe, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **December 15, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Shai Y. Waisman, Esq. and Robert J. Lemons, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S.

Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; and (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner, Esq. and Brian M. Resnick, Esq., co-counsel to the administrators for Lehman Europe (as defined in the Motion); (vi) Linklaters LLP, 1345 Avenue of the Americas, New york, New York 10105, Attn: Martin Flics, Esq. and Titia Holtz, Esq., co-counsel to the administrators for Lehman Europe, so as to be so filed and received by no later than **December 8, 2010 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: November 23, 2010
       New York, New York

/s/ Robert J. Lemons
Shai Y. Waisman
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-----------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO SECTION 363(b)**
**OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO ENTER INTO AND**
**PERFORM UNDER A SERVICES AGREEMENT WITH LEHMAN EUROPE**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors in possession (together, the "Debtors"), submit this motion (the "Motion") and respectfully represent:

**Preliminary Statement**

1.       Prior to the commencement of these chapter 11 cases, the Debtors and their affiliates functioned as a single, integrated operation.  Even today, as they work to manage and realize value from their worldwide assets for the benefit of their creditors, the Debtors and their "various corporate entities comprise an 'integrated enterprise.'"  *See Lehman Brothers Special Financing Inc. v. BNY Corporate Trustee Servs. Ltd. (In re Lehman Brothers Holdings Inc.)*, 422 B.R. 407, 420 (Bankr. S.D.N.Y. 2010).  As before the Commencement Date (defined

below), the Debtors and their affiliates continue to be dependent on information technology platforms and systems based in London – and now under the control of the Administrators to Lehman Europe (each as defined below) – to evaluate and unwind the asset positions that were originally booked through such systems.

2.      The commencement of these chapter 11 cases and the appointment of the Administrators to Lehman Europe permanently ended the free flow of information between the Debtors and their UK affiliates.  On November 21, 2008, this Court authorized LBHI to enter into a Transition Services Agreement (the "TSA") with the Administrators of Lehman Europe that, among other things, allowed LBHI continued access to the London-based information systems that are critical to the Debtors' ability to unwind the asset positions booked therein.  The TSA was a valuable and often utilized agreement for the Debtors during these chapter 11 cases, with information critical to the Debtors estates flowing from Lehman Europe to the Debtors.

3.      The TSA expired on November 14, 2010.  Since that date, LBHI has negotiated with the Administrators for a temporary extension of the TSA, on the condition that LBHI seek approval of a new services agreement (the "SA") with Lehman Europe, attached hereto as Exhibit A.

4.      The scope of the services to be provided to the Debtors under the SA is significantly reduced compared to the TSA, being limited primarily to (i) systems access and data provision necessary for the Debtors to continue unwinding derivatives trades that were originally booked through Lehman's London-based systems, and (ii) the provision of other data that may be required to support ongoing or potential litigation, alternative dispute resolution proceedings, other disputes, and settlement discussions in relation to other assets.  The TSA, by comparison, provided the Debtors with physical access to Lehman Europe's facilities, and for a

broader range of services to be shared between the Debtors and Lehman Europe, such as employee services, tax services, and IT support.  Even as it related to information systems, the TSA provided the Debtors with access to a broader range of information systems and data related not only to derivatives, but also real estate and loans.  These information systems needs are now met by resources within LBHI.  (A substantial amount of the relevant data has also been migrated to LBHI, but the Debtors still need to request certain types of data from Lehman Europe).  The TSA also provided the Debtors with access to Lehman Europe's treasury and finance systems, which the Debtors no longer require, having migrated off of Lehman Europe's systems and established their own middle and back offices in both the United States and Europe.

5.    The commercial terms of the SA are substantially similar to the TSA previously approved by the Court, with two material changes.  The first change relates to the cost of services that both LBHI and Lehman Europe will be required to pay when one receives services from the other.  Under the TSA, service charges have been calculated as cost, plus 15% of cost.  Under the SA, these services charges will increase to cost, plus 20% of cost.  Notwithstanding this 5% increase in service charges, however, the Debtors anticipate that the actual cost of services will be substantially reduced in relation to the much reduced scope and volume of services to be provided to the Debtors and the reciprocal 5% increase in service charges to Lehman Europe for any services provided to Lehman Europe under the SA.

6.    The second material change relates to the liabilities provided by LBHI to Lehman Europe.  Under the TSA, broadly, each party's liability was capped at an aggregate amount of 125% of the service charges paid or payable to the provider of services in each year.  The SA caps liability at £2 million for Lehman Europe, and £10 million for LBHI.  In addition, there will be no cap on LBHI's liability in certain circumstances, including in cases in respect of

any successful claims that may be made under or in connection with this agreement against any

Lehman Europe entity by any affiliate of LBHI, or in connection with LBHI's access to Lehman

Europe's computer systems, or use of data obtained thereby. Given that LBHI has been

accessing Lehman Europe's systems since 2009 without incident, LBHI considers this liability

exposure to be minor.

7.      With respect to all of the above costs, although LBHI will be the only

Debtor party to the SA, all costs incurred by LBHI will be allocated among the Debtors and their

non-debtor affiliates based upon usage, using the same allocation methodology that has been in

use during the pendency of these chapter 11 cases.

8.      In the Debtors' business judgment, the terms of the SA are reasonable, and

any increased burden that they may impose on the Debtors due to increased cost is far

outweighed by the importance to the Debtors of continued access to Lehman Europe's

information systems – particularly considering that the *actual* cost, due to the reduced volume

and scope of services, is likely to be much lower than under the TSA. Absent continued access

to Lehman's European information systems and continued data provision from Lehman Europe,

the Debtors' derivatives valuation and realization operations in Europe will be significantly

delayed, until such time as the Debtors have completed the migration of these services to

information systems that are under the Debtors' control. These operations are critical to the

Debtors' ability to preserve, manage, and unwind their respective asset positions booked through

London-based systems, and any delay may result in a considerable loss of value to the Debtors'

estates. It is therefore in the best interest of the Debtors' estates and their creditors for LBHI to

enter into the SA.

## Background

9.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.      On September 15, 2008, Lehman Brothers Europe Limited (in administration), Lehman Brothers International Europe (in administration), Lehman Brothers Holdings Plc (in administration) and Lehman Brothers Ltd (in administration) companies incorporated in England and Wales (collectively, "Lehman Europe") entered into joint administration pursuant to orders of the United Kingdom's High Court of Justice, Chancery Division, wherein Anthony Victor Lomas, Steven Anthony Pearson, Dan Yoram Schwarzmann and Michael John Andrew Jervis (the "Administrators") were appointed as joint administrators.

11.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

12.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

13.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

On March 11, 2010, the Examiner filed its report with the Court (the "Examiner's Report")

[Docket No. 7531].

14.     On March 15, 2010, the Debtors filed their joint chapter 11 plan pursuant

to section 1121 of the Bankruptcy Code [Docket No. 7572].  On April 14, 2010, the Debtors

filed their revised joint chapter 11 plan [Docket No. 8330] and disclosure statement for their

revised joint chapter 11 plan pursuant to section 1125 of the Bankruptcy Code [Docket No.

8332].

## Jurisdiction

15.     This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b).

## Lehman's Business

16.     Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman had been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.

17.     Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

**Relief Requested**

18.     By this Motion, the Debtors request authority for LBHI to enter into and perform under the SA among Lehman Europe, the Administrators, and LBHI, dated as of November 14, 2010, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

**Need For A the SA**

19.     The Debtors continue to require access to Lehman Europe's information systems, both to realize maximum value, and mitigate claims, arising from the Debtors' pre-petition trading activities that were booked through Lehman's London-based systems.  In particular, the Debtors require continued access to Lehman Europe's controlled information systems to support the valuation and unwinding of the derivatives positions that have been booked through such systems.  Although the Debtors are currently in the process of migrating the trade populations held within Lehman Europe's systems to valuation systems established by the Debtors for the purpose of unwinding their London-based trades, this migration is not yet complete.  Therefore, absent continued access to Lehman Europe's systems at this time, the Debtors' valuation activities will be significantly impacted until the migration to new valuation systems is completed.

20.     In addition, both Lehman Europe and the Debtors recognize that as a result of pending and potential litigation and/or settlement discussions with derivatives counterparties, it will be necessary for both parties to make specific data requests of each other in the future.  Finally, certain data requests that were made during the term of the TSA remain pending and will need to be completed under the SA.

**Material Terms**
**and Differences Between The TSA And The SA**

21.     The Debtors and the Administrators have negotiated the SA at arms'
length and in good faith.  Like its predecessor TSA, the SA allows the Debtors to maintain
access to critical information systems, data and records from Lehman Europe.  In addition,
Lehman Europe can continue to request access to data information and records from the Debtors.
Most critically for the Debtors, the SA will allow the Debtors to continue to receive the data
necessary to value its structured and unstructured derivative trades.

22.     The following is a summary of the salient terms of the SA:[1]

| | |
|---|---|
| ***Services*** | Lehman Europe and LBHI will use reasonable endeavors to provide to each other, upon request, access to and use of the data sets and information records held in the IT applications set forth in Parts 1 and 2 of Schedule 1 to the SA. |
| ***Term*** | The term for each of the individual Services is set forth on Schedule 1.  The Services have terms between 6 and 24 months.  The term of the SA is structured such that the SA expires when all of the individual Services have expired.  All services can be extended by negotiation, no later than 1 month prior to expiry. |
| ***Standards of Service*** | The standard of service to be provided by each party will be that which applied in the 6 month period prior to the effective date of the SA. |
| ***Third Party Consents*** | Some of the data requested may be held in IT applications (the "Third Party Applications") and systems owned by, or licensed to third parties (the "Third Parties").  To the extent that either LBHI or Lehman Europe act as a supplier of data held in Third Party Applications, the consent of the relevant Third Parties may be required.  Each party will use reasonable endeavors to obtain such consents from Third Parties. |

---

[1]     The contents of this summary are qualified entirely by the terms of the SA.  In case of any conflict between
the summary and the SA, the terms of the SA govern.

| | |
|---|---|
| ***Computer Based Resources*** | As access to data and information may require either party to have access to the other's information systems, the party whose systems are to be accessed may take reasonable measures to restrict access to these systems or data unrelated to the needs of the accessing party. |
| ***Costs*** | Costs will be each party's fully loaded costs (taking into account overhead costs, any actual payments made by the supplier to third party providers and any associated costs) plus 20% of such costs. |
| ***Liability*** | Except for certain exceptions, any liability incurred by one party with respect to the other is capped at £2 million for Lehman Europe, and at £10 million for LBHI. |
| ***Indemnities*** | LBHI is obligated to indemnify Lehman Europe against all losses, liabilities, claims, damages or expenses (including legal fees and expenses) incurred by Lehman Europe in connection with any claims made against it by virtue of LBHI's access to Lehman Europe's information systems or the use of Lehman Europe's information systems. |
| | Furthermore, LBHI is obligated to provide Lehman Europe with an indemnity in respect of any successful claims that may be made against any Lehman Europe entity by any affiliate of LBHI. |
| | These indemnities are not subject to the £10 million liability cap set forth above. |

As stated above, the only material differences between the terms of the SA and the TSA that was previously approved by this Court are as follows:

| Material Term | TSA | SA |
|---|---|---|
| ***Cost*** | Cost plus 15%. | Cost plus 20%. |
| ***Liability*** | Capped at 125% of the annual service charges. | Capped at £2 million for Lehman Europe and £10 million for LBHI (other than certain indemnities). |

## Cost Allocation Among the Debtors

23.     Although LBHI will be the only Debtor party to the SA, costs incurred by LBHI will be allocated among the Debtors and their non-debtor affiliates based upon usage, using the same allocation methodology that has been in use during the pendency of these chapter 11 cases.

### Approval of the SA
### Is in the Best Interests of the Debtors and Their Estates and Creditors

24.     Ample authority exists for approval of the SA.  Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition or other use of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

25.     The Debtors have entered into the SA in the exercise of their sound business judgment and with a reasonable basis for their decision.  The SA provides the Debtors with access to critical data and information systems controlled by Lehman Europe.  Absent the SA, the Debtors' derivatives valuation and realization activities in London will be severely impacted until the Debtors successfully migrate these operations to systems under the their control.  This delay, in turn, will prolong the time in which the Debtors are able to settle and

recover value from the trades that were booked through Lehman Europe's systems.  By allowing

the Debtors to retain control of their European operations, the SA provides significant value to

the Debtors's estates, and in turn, to all stakeholders in these chapter 11 cases.  For all the

foregoing reasons, entry into the SA represents an exercise of the Debtors' sound business

judgment, is in the best interests of the Debtors' estates and creditors, and should be approved.

### Waiver of Bankruptcy Rule 6004(h)

26.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale

or lease of property…is stayed until expiration of 10 days after entry of the order, unless the

Court orders otherwise."  Fed. R. Bank. P. 6004(h).  The SA provides that it shall terminate

automatically if Lehman Europe has not received notice by December 17, 2010, of this Court's

approval of the Motion.  Approval by this Court is also a condition precedent to effectiveness of

the SA.  Accordingly, and in order to avoid any disruption in services, a waiver of the ten-day

stay is requested.

### Notice

27.     No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;

(v) the United States Attorney for the Southern District of New York; (vi) the attorneys for

Lehman Europe; and (vii) all other parties entitled to notice in accordance with the procedures

set forth in the second amended order entered on June 17, 2010 governing case management and

administrative procedures for these cases [Docket No. 9635].  The Debtors submit that no other

or further notice need be provided.

28.         No previous request for the relief sought herein has been made by

the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  November 23, 2010
        New York, New York


/s/ Robert J. Lemons
Shai Y. Waisman
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# Exhibit A

**Execution Version**

Dated 14 November 2010

# LEHMAN BROTHERS HOLDINGS INC.

and

# LEHMAN BROTHERS EUROPE LIMITED

# LEHMAN BROTHERS INTERNATIONAL (EUROPE)

# LEHMAN BROTHERS HOLDINGS PLC.

# LEHMAN BROTHERS LTD

and

# ANTHONY VICTOR LOMAS, STEVEN ANTHONY PEARSON, DAN YORAM SCHWARZMANN, DEREK ANTHONY HOWELL and MICHAEL JOHN ANDREW JERVIS

(as "**Administrators**")

# SERVICES AGREEMENT

Linklaters

Linklaters LLP
One Silk Street
London EC2Y 8HQ

Telephone (44-20) 7456 2000
Facsimile (44-20) 7456 2222

Ref RC, WR, CA

# Table of Contents

**Contents**                                                                          **Page**

1    Definition and Interpretation ............................................................................... 1

2    Condition Precedent and Performance of Services ............................................ 6

3    Third Party Suppliers .......................................................................................... 7

4    Additional Arrangements and Agreements ........................................................ 8

5    Price and Payment ............................................................................................ 10

6    Acknowledgements and Obligations ............................................................... 11

7    Term and Termination ...................................................................................... 12

8    Service Review ................................................................................................. 13

9    Liability ............................................................................................................. 13

10   Contract Management ....................................................................................... 15

11   Changes ............................................................................................................ 15

12   Dispute Resolution ........................................................................................... 15

13   Intellectual Property Rights .............................................................................. 16

14   Data Protection ................................................................................................. 16

15   Confidentiality .................................................................................................. 17

16   Force Majeure ................................................................................................... 18

17   Non-Solicitation ................................................................................................ 18

18   Independent Contractors and Sub-Contractors ................................................ 19

19   Other Provisions ............................................................................................... 19

Schedule 1 Services and Charges ............................................................................ 26

1    Charging Principle ............................................................................................ 29

2    Employees ......................................................................................................... 29

3      IT Application Access..............................................................................................29

4      Data Extraction ......................................................................................................29

5      Other......................................................................................................................29

Schedule 2 Change Control..............................................................................................31

**This Agreement** is made on 14 November 2010 **between**:

(1)    **LEHMAN BROTHERS HOLDINGS INC.**, a corporation established under the laws of the State of Delaware whose registered office is at 1271 Ave of the Americas, 45 Floor, New York, NY 10019, USA ("**LBHI**");

(2)    **LEHMAN BROTHERS EUROPE LIMITED** (in administration), **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (in administration), **LEHMAN BROTHERS HOLDINGS PLC** (in administration) and **LEHMAN BROTHERS LTD** (in administration) companies incorporated in England and Wales (together "**Lehman Europe**"); and

(3)    **ANTHONY VICTOR LOMAS, STEVEN ANTHONY PEARSON, DAN YORAM SCHWARZMANN, DEREK ANTHONY HOWELL** and **MICHAEL JOHN ANDREW JERVIS** each a partner of PricewaterhouseCoopers LLP, Plumtree Court, London, EC4A 4HT (the "**Administrators**"),

together the "**Parties**", each being a "**Party**".

**Background**:

(A)    LBHI is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 *et seq* (the "**Bankruptcy Code**"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on 15 September 2008 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (Case No. 08-13555) (the "**Bankruptcy Case**").

(B)    Anthony Victor Lomas, Steven Anthony Pearson, Dan Roram Schwarzmann and Michael John Andrew Jervis have been appointed to act as joint administrators of Lehman Brothers International Europe (in administration), Lehman Brothers Holdings Plc (in administration) and Lehman Brothers Ltd (in administration) on 15 September 2008 pursuant to orders of the High Court of Justice, Chancery Division as set out in the schedule to the Original TSA and as joint administrators of Lehman Brothers Europe Limited (in administration) on 23 September 2008 pursuant to an appointment by the directors as set out in the schedule to the Original TSA.  On 30 November 2009 Derek Anthony Howell was been appointed to act as joint administrator of Lehman Europe pursuant to an order of the High Court of Justice, Chancery Division.

(C)    The Parties and Neuberger Berman Holdings LLC entered into a transition services agreement on 14 November 2008 (the "**Original TSA**") for the provision of certain transitional services over a period of 24 months and this Original TSA expires on [13 November 2010].

(D)    The Parties now wish to enter into a new services agreement whereby (a) Lehman Europe will provide, or cause to be provided, to LBHI (and/or its Affiliates existing on the date hereof), (collectively hereinafter referred to as the "**LBHI Entities**") certain services and (b) LBHI will provide, or cause to be provided, to Lehman Europe (and/or its Affiliates existing on the date hereof), (collectively hereinafter referred to as the "**Lehman Europe Entities**") certain services.

**Now it is agreed** as follows:

**1        Definition and Interpretation**

**1.1      Definitions**

In this Agreement, unless the context otherwise requires:

"**Additional Services**" has the meaning given in Clause 2.5;

"**Affiliate**" means, (save in the case of Lehman Europe) with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, control by a general partner, by contract or otherwise; whether or not such control arises as a result of the appointment as liquidators, provisional liquidators, administrators, administrative receivers, supervisors, conservators, chapter 11 trustees or equivalent, or similar office holder, provided that such other Person shall no longer be deemed an Affiliate once such control ceases and in the case of Lehman Europe, any entity in administration (i) that was a group undertaking (as defined in the Companies Act 2006) of Lehman Europe as at 15 September 2008, and (ii) all or a majority of whose administrators are partners in the same partnership as all or the majority of the administrators of Lehman Europe;

"**Applicable Law**" means any applicable federal, state, local or foreign law, statute, ordinance, rule or regulation and all applicable requirements, rules and standards of any Governmental Body, including industry codes of practice, the FSA rules and regulations and any individual guidance, direction or written request of the FSA from time to time;

"**Bankruptcy Case**" has the meaning given in the recitals;

"**Business Day**" means a day which is not a Saturday, Sunday or a public holiday in England and New York;

"**CCN**" has the meaning given to that term in paragraph 2 of Schedule 2 (*Change Control*);

"**Change**" has the meaning given to that term in Clause 11 (*Changes*);

"**Charges**" means the charges payable under Schedule 1 (*Services and Charges*) Part 3 (*Charges*) along with any charges for Additional Services requested by the Recipient and/or incurred under Clauses 4.1.1;

"**Change Control**" means the process described in Schedule 2 (*Change Control*);

"**Commencement Date**" means the date that notice of fulfilment of the Condition Precedent is received by Lehman Europe;

"**Condition Precedent**" has the meaning given to that term in Clause 2.1;

"**Dependent Service Element**" has the meaning given to that term in Clause 3.2 (*Dependencies on Third Parties*);

"**Dispute**" has the meaning given to that term in Clause 12 (*Dispute Resolution*);

"**Disputes Procedure**" means the procedure for the resolution of Disputes contained in Clause 12 (*Dispute Resolution*);

"**FSA**" means the UK Financial Services Authority;

"**Governmental Body**" means any government or governmental or regulatory, judicial or administrative, body thereof, or political subdivision thereof, whether foreign, federal, state,

national, supranational or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) or any self-regulatory organisation, including, but not limited to, the US Financial Industry Regulatory Authority and the FSA;

"**Group**" shall in respect of any company mean that company and any and all group undertakings (as such term is defined in Section 1161 of the Companies Act 2006 as amended) from time to time of that company;

"**Information Systems**" means computing, telecommunications or other digital operating or processing systems or environments, including computer programs, data, databases, computers, computer libraries, communications equipment, networks and systems. When referenced in connection with the Services, Information Systems shall mean the Information Systems accessed and/or used in connection with the Services;

"**Intellectual Property Rights**" means trade marks, service marks, trade names, domain names, get-up, logos, patents, inventions, registered and unregistered design rights, copyrights, database rights and all other similar rights in any part of the world including, where such rights are obtained or enhanced by registration, any registration of such rights and applications and rights to apply for such registrations;

"**LBHI Services**" means the services that LBHI shall provide, or cause to be provided, to the Lehman Europe Entities as more particularly set out in Schedule 1 (*Services and Charges*) Part 2 (*Lehman Europe Services*) and any Additional Services that LBHI has agreed to provide or procure pursuant to Clause 2.5;

"**Lehman Europe Services**" means the services that Lehman Europe shall provide, or cause to be provided, to the LBHI Entities as more particularly set out in Schedule 1 (*Services and Charges*) Part 1 (*Lehman Europe Services*) and any Additional Services that Lehman Europe has agreed to provide or procured pursuant to Clause 2.5;

"**Losses**" means all loss, liability, claims, damage or expense (including legal fees and expenses);

"**Notice**" has the meaning given in Clause 19.10 (*Notices*);

"**Person**" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organisation, Governmental Body or other entity;

"**Recipient**" means LBHI Entities in relation to the Lehman Europe Services and Lehman Europe Entities in relation to the LBHI Services;

"**Recipient Data**" means data and information relating to the Recipient's business that is processed as part of the Services;

"**Relationship Manager**" means Savvas Mavridis in relation to LBHI and Roddy Tippen in relation to Lehman Europe;

"**Representative**" of a Person means any director, officer, employee, agent, consultant, accountant, auditor, attorney or other representative of such Person;

"**Right**" has the meaning given in Clause 19.9 (*Waiver*);

"**Services**" means, as the context requires, the LBHI Services, the Lehman Europe Services and any Additional Services agreed or provided pursuant to Clause 2.5 and "**Service**" means any one of them;

"**Software**" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies and application programming interfaces, interactive data language, database schema, in each case whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organise and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all software-related specifications documentation including user manuals and other training documentation related to any of the foregoing;

"**Supplier**" means Lehman Europe in relation to the Lehman Europe Services and LBHI in relation to the LBHI Services;

"**Technology**" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, business and marketing information, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, non-public or Confidential Information, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology;

"**Term**" means, in relation to each Service, the period commencing on the Commencement Date and ending on the expiry of the period of time set out next to the description of such Service in Schedule 1 (*Services and Charges*);

"**Third Party Agreement**" means any agreement with a third party for the provision of goods, a service, lease or licence relating to, or necessary for, the provision of the Services whether entered into before or after the date of this Agreement;

"**Third Party Consent**" means any permission, consent, agreement or authorisation required from a third party, whether under a Third Party Agreement or otherwise, for the provision of the Services by the Supplier, or their receipt by the Recipient;

"**Third Party Supplier**" means any third party providing goods, a service, lease or licence under a Third Party Agreement; and

"**VAT**" means within the European Union, such tax as may be levied in accordance with (but subject to derogations from) the Directive 2006/112/EC and, outside the European Union, any similar tax levied by reference to added value or sales.

**1.2    Singular, Plural, Gender**

References to one gender include all genders and references to the singular include the plural and vice versa.

**1.3    References to Persons and Companies**

References to:

**1.3.1**    a person include any company, partnership or unincorporated association (whether or not having separate legal personality); and

**1.3.2**    a company shall include any company, corporation or any body corporate, wherever incorporated.

### 1.4 References to Subsidiaries and Holding Companies

The words "holding company", "parent undertaking", "subsidiary" and "subsidiary undertaking" shall have the same meaning in this Agreement as their respective definitions in the Companies Act 2006.

### 1.5 Schedules etc.

References to this Agreement shall include any Recitals and Schedules to it and references to Clauses and Schedules are to Clauses of, and Schedules to, this Agreement. References to paragraphs and Parts are to paragraphs and Parts of the Schedules.

### 1.6 Headings

Headings shall be ignored in interpreting this Agreement.

### 1.7 Information

References to books, records or other information mean books, records or other information in any form including paper, electronically stored data, magnetic media, film and microfilm.

### 1.8 Modification etc. of Statutes

References to a statute or statutory provision include:

(i)     that statute or provision as from time to time modified, re-enacted or consolidated whether before or after the date of this Agreement;

(ii)    any past statute or statutory provision (as from time to time modified, re-enacted or consolidated) which that statute or provision has directly or indirectly replaced; and

(iii)   any subordinate legislation made from time to time under that statute or statutory provision which is in force at the date of this Agreement,

provided that nothing in this Clause 1.8 (*Modification etc. of Statutes*) shall operate to increase the liability of any Party beyond that which would have existed had this Clause 1.8 (*Modification etc. of Statutes*) been omitted.

### 1.9 Legal Terms

References to any English legal term shall, in respect of any jurisdiction other than England, be construed as references to the term or concept which most nearly corresponds to it in that jurisdiction.

### 1.10 Non-limiting Effect of Words

The words "including", "include", "in particular" and words of similar effect shall not be deemed to limit the general effect of the words that precede them.

### 1.11 Parties

References to the "**Parties**" means the parties to this Agreement and their respective successors and permitted assigns. References to "**third parties**" shall not include members of the Recipient's or the Supplier's Group.

### 1.12 Precedence

If there is any conflict, apparent conflict or ambiguity in or between any of sections of the Agreement set out below, the sections will be applied in the following order of precedence with the sections higher in the order of precedence prevailing over the Parties:

(i)     the Clauses;

(ii)    the Schedules; and

(iii)   any other document referred to in this Agreement.

## 2      Condition Precedent and Performance of Services

### 2.1    Condition Precedent

**2.1.1**   The rights and obligations of each Party under this Agreement shall have no force or effect unless and until LBHI obtains the approval of the United States Bankruptcy Court to enter into this Agreement (the "**Condition Precedent**").

**2.1.2**   LBHI shall notify Lehman Europe promptly and in any event no later than one (1) Business Day following fulfilment of the Condition Precedent and the rights and obligations of each Party under this Agreement shall take effect from the date of such notification.

**2.1.3**   If Lehman Europe has not received notice of the fulfilment of the Condition Precedent by or on 17 December 2010, this Agreement shall terminate automatically.

### 2.2    Provision of Lehman Europe Services

Subject to obtaining any necessary Third Party Consents, Lehman Europe shall use reasonable endeavours to provide or procure the provision of each of the Lehman Europe Services to the LBHI Entities for the applicable Term and LBHI undertakes to pay for them, in accordance with the terms of this Agreement.

### 2.3    Provision of LBHI Services

Subject to obtaining any necessary Third Party Consents, LBHI shall use reasonable endeavours to provide or procure the provision of each of the LBHI Services to Lehman Europe for the applicable Term and Lehman Europe undertakes to pay for them in accordance with the terms of this Agreement.

### 2.4    Standard of Service

**2.4.1**   The Supplier shall use reasonable endeavours to ensure that the Services are provided to the same standard to which they were, on average, provided by or on behalf of the Supplier during the 6 month period prior to the Commencement Date.

**2.4.2**   Without prejudice to Clause 9 (*Liability*), to the maximum extent permitted by law, the Parties acknowledge and agree that the Services are provided as-is, that the applicable Recipient assumes all risks and liabilities arising from or relating to its use of and reliance upon the Services

### 2.5    Additional Services

If a Recipient wishes to receive an additional service related to the subject matter of this Agreement which is not a Service listed in Schedule 1 (*Services and Charges*), the Recipient may request such service as if it were a Change in accordance with Clause 11

(*Changes*) and Schedule 2 (*Change Control*). Each such service, to the extent agreed to or provided, following the Change Control process shall be an **"Additional Service"** and shall be provided to the Recipient at the charges and for the duration set out in the CCN.

## 2.6   Clarity about LBHI Entities.

Notwithstanding anything to the contrary herein, for the avoidance of doubt, Lehman Brothers Holdings plc, Lehman Brothers Limited, LB UK RE Holdings Limited, Lehman Brothers International (Europe), Storm Funding Limited, Mable Commercial Funding Limited, Lehman Brothers UK holdings Limited, Lehman Brothers Europe Limited and Cherry Tree Mortgages (as well as any other Lehman Europe Affiliates) shall not be deemed an LBHI Entity under this Agreement.

## 2.7   Personnel

Each Supplier will have the right, in its sole discretion, to (i) designate which personnel or third party service providers it will assign to perform Services, and (ii) remove and replace such personnel or third party service providers at any time.

## 2.8   Superseding Provisions

Notwithstanding anything to the contrary contained in this Agreement:

2.8.1   no Supplier shall be required hereunder to take any action (including by providing any Services) that would constitute, or that the Supplier reasonably believes would constitute, (i) a violation of Applicable Law, including any requirement of any Governmental Body or (ii) any other violation of a third party's rights;

2.8.2   no Supplier shall be required hereunder to fund the Services or otherwise provide financial support, benefits or other consideration on the Recipient's behalf to third parties, and the obligation to perform any Service involving funds shall be subject to the Recipient having previously made such funds available to the Supplier specifically for such purpose; and

2.8.3   a Supplier shall not be responsible for any failure to provide Services hereunder to the extent arising from (i) the Recipient's operations or systems or otherwise by the acts or omissions of the Recipient or individuals acting on its behalf or (ii) a third party's failure to provide such Services (including Third Party Suppliers).

## 3   Third Party Suppliers

## 3.1   Third Party Consents

3.1.1   The Supplier shall:

(i)   use reasonable endeavours to obtain all necessary Third Party Consents; and

(ii)   use reasonable endeavours to maintain all such Third Party Consents.

3.1.2   The Recipient shall provide the Supplier with such assistance as the Supplier may reasonably require to obtain the Third Party Consents, including assistance with negotiating the terms of consents with Third Party Suppliers.

3.1.3   The Recipient shall pay for any fees or charges imposed by a Third Party Supplier for the provision of any such Third Party Consent.

**3.2      Dependence on Third Parties**

**3.2.1**      Where a Third Party Consent or Third Party Agreement is required in order for the Supplier to provide any element of the Services (a "**Dependent Service Element**") and

(i)      that Third Party Consent either:

(a)      has not been obtained;

(b)      has expired or been terminated or been revoked; or

(c)      the Recipient does not pay fees or charges associated with the provision of any Third Party Consent, or

(ii)      that Third Party Agreement terminates or expires,

the Supplier shall not be obliged to provide the Dependent Service Element.

**3.2.2**      If the Supplier is excused from providing a Dependent Service Element pursuant to Clause 3.2.1 (*Dependence on Third Parties*), the Supplier shall notify the Recipient as soon as reasonably practicable.

**3.3      Compliance with Third Party Agreements**

The Recipient shall comply with the terms of the Third Party Agreements and Third Party Consents to the extent they are relevant to the receipt of the Service and to the extent that the Recipient has been notified of the terms of such Third Party Agreements and Third Party Consents.

**3.4      Relationship with Third Party Suppliers**

The Supplier shall manage exclusively its relationship with the Third Party Suppliers and the Recipient shall not discuss with any Third Party Supplier the provision of the Services, except to the extent required to do so by law.

**4      Additional Arrangements and Agreements**

**4.1      Computer-Based Resources**

**4.1.1**      To the extent that the provision of the Services involves the Recipient ("**Accessing Party**") accessing the Supplier's Information Systems ("**Providing Party**"), (a) the Providing Party may take reasonable measures to restrict access by the Accessing Party to any systems or data unrelated to the needs or rights of the Accessing Party (b) such access shall be subject to the Accessing Party complying with all reasonable security measures implemented by the Providing Party as deemed necessary by such Providing Party to protect its Information Systems (provided that the Providing Party has notified the Accessing Party of such security measures) and (c) the Providing Party shall not be obliged to continue access if the Providing Party is unable to do so due to regulatory or legal restrictions or it is no longer technically possible to do so in which event the Providing Party shall notify the Accessing Party and the parties shall enter into good faith discussions in order to determine whether suitable alternative arrangements can be put in place and if so, the nature of such arrangements (the costs of which shall be borne by the Accessing Party).

4.1.2    Where an LBHI Entity is the Accessing Party, LBHI shall indemnify Lehman Europe as the Providing Party against all Losses incurred by Lehman Europe as the Providing Party in connection with any third party claims made against Lehman Europe as Providing Party arising by virtue of the access to Information Systems granted to LBHI or any LBHI Entity as Accessing Party or LBHI's or any LBHI Entity's as Accessing Party's use of the same under Clause 4.1.1 above. The following process shall apply to any claims made under this Clause 4.1.2:

(i)     Lehman Europe shall notify LBHI in writing as soon as reasonably practicable after it becomes aware of any such claims;

(ii)    Lehman Europe shall not make any admission as to liability or compromise or agree to any settlement in respect of any claim without the prior written consent of LBHI (such consent not to be unreasonably withheld or delayed);

(iii)   by no later than 5 Business Days of receiving notification from Lehman Europe in accordance with Clause 4.1.2(i), LBHI shall assume, at its own expense, the conduct of or the right to settle all negotiations and litigation arising from any claim and Lehman Europe shall give LBHI all reasonable assistance in connection with those negotiations and such litigation at LBHI's request and expense; and

(iv)    Lehman Europe uses all reasonable endeavours to mitigate all Losses between the date Lehman Europe becomes aware of any such claims and the date on which LBHI assumes conduct pursuant to Clause 4.1.2(iii).

## 4.2    Access

4.2.1    The Recipient will allow the relevant Supplier and its Representatives reasonable access to the facilities premises, infrastructure and personnel of the Recipient in connection with the Supplier's delivery of the Services subject to the Recipient having given prior consent to such access, such consent not to be unreasonably withheld. The Supplier shall seek the Recipient's consent by way of a written request submitted no less than 5 Business Days before the access is requested to take place.

4.2.2    The Supplier will allow the relevant Recipient and its Representatives reasonable access to the facilities premises, infrastructure and personnel of the Supplier in connection with the Recipient's receipt of the Services subject to the Supplier having given prior consent to such access, such consent not to be unreasonably withheld. The Recipient shall seek the Supplier's consent by way of a written request submitted no less than 5 Business Days before the access is requested to take place.

## 4.3    Further Access

The Parties recognise and understand that there will be substantial endeavours following the Commencement Date in the continuing efforts of LBHI and Lehman Europe to divest the remaining assets and wind down the operations and/or assets while maintaining the continuity thereof. As such, the Parties will work together to reasonably accommodate each other in such endeavours while balancing each other's needs for information and support.

## 5        Price and Payment

### 5.1      Pricing

The Charges payable by the Recipient in respect of the provision of the Services by the Supplier shall be calculated in the manner described in Schedule 1 (*Services and Charges*) Part 3 (*Charges*).

### 5.2      Invoicing Procedures

The Charges shall be invoiced by the Supplier monthly in arrears. The amount payable under an invoice shall reflect usage of Services by the Recipient for that period along with an additional amount equal to 20% of the Charges for that month. The Recipient shall pay the amount of such invoice by wire transfer to the Supplier within five (5) days of the date of such invoice as instructed by the Supplier.

### 5.3      No Right to Set-Off

The Recipient shall pay the full amount of costs and disbursements incurred under this Agreement, and shall not set-off, counterclaim or otherwise withhold any other amount owed to the Supplier on account of any obligation owed by the Supplier to the Recipient.

### 5.4      Value Added Tax

**5.4.1**    All amounts stated in this Agreement are exclusive of VAT. If VAT is chargeable in respect of all or any of the amounts paid to the Supplier under this Agreement the Recipient shall, upon receipt of a valid VAT invoice, pay to the Supplier such VAT at the rate for the time being and from time to time properly chargeable, in respect of the relevant supply of goods or services by the Supplier.

**5.4.2**    Where under the terms of this Agreement, one Party is liable to indemnify, reimburse or pay expenditure incurred by another Party in respect of any costs, charges or expenses, the payment shall include an amount equal to any VAT thereon not otherwise recoverable by the other Party, subject to that Party using all reasonable endeavours to recover such amount of VAT as may be practicable.

### 5.5      Payments Gross

All sums payable by a Party under this Agreement shall be paid free and clear of any deductions, withholdings, set-offs or counterclaims, save only as may be required by law. Where any payment (excluding interest) paid to the Supplier under this Agreement is subject to a deduction or withholding in respect of any taxation, the sum payable shall be increased to such sum as will ensure that after payment of such taxation the recipient shall be left with a sum equal to the sum that it would have received in the absence of such withholding or deduction.

### 5.6      Interest

If any Party defaults in the payment when due of any sum payable under this Agreement (howsoever determined) the liability of that Party shall be increased to include interest on such sum from the date when such payment is due until the date of actual payment (as well after as before judgment) at a rate per annum of 1.5 per cent above the Bank of England base rate.

### 5.7      Indemnity Payments

Where any payment is made under this Agreement pursuant to an indemnity, compensation or reimbursement provision and that sum is subject to a charge to taxation in the hands of the recipient the sum payable shall be increased to such sum as will ensure that after payment of such taxation (and after giving credit for any tax relief available in respect of the matter giving rise to the payment) the recipient shall be left with a sum equal to the sum that it would have received in the absence of such a charge to taxation.

## 6    Acknowledgements and Obligations

### 6.1    Acknowledgements

Each Party agrees that the terms and conditions of this Agreement and the exclusions and limitations contained in it are fair and reasonable having regard to the following:

6.1.1    that this Agreement is related to services provided by insolvent companies in circumstances where it is usual that no representations and warranties can be given by or on behalf of Lehman Europe or the Administrators;

6.1.2    that this Agreement is related to services provided by a company in the Bankruptcy Case in circumstances where it is usual that no representations and warranties can be given by or on behalf of LBHI; and

6.1.3    each Party has relied solely upon the opinions of itself and its professional advisors concerning the services to be provided under this Agreement; their quality, condition, description, fitness and/or suitability for any purpose, the possibility that some or all of them may have defects not apparent on inspection and examination, and the use it intends or proposes to put them to.

### 6.2    Mutual Obligations

The LBHI Entities shall, and Lehman Europe Entities shall:

6.2.1    provide on a timely basis such information, decisions and data as they may reasonably require for the purposes of the provision or receipt of the Services as the case may be;

6.2.2    participate in discussions regarding the provision of the Services to the extent reasonably required by the other in order to facilitate decision making in relation to the Services;

6.2.3    in the case of the Recipient, notify the relevant Supplier on a timely basis of any failures or deficiencies in the provision of the Services for which they are responsible under this Agreement;

6.2.4    maintain reasonable security measures to protect the other's systems, from third parties, and in particular from disruption by any "back door", "time bomb", "Trojan Horse", "worm", "drop dead device", "virus" or other computer software routine intended or designed to: (a) permit access or use of information technology systems by a third person other than as expressly authorised; or (b) disable, damage or erase or disrupt or impair the normal operation of any information technology systems;

6.2.5    not attempt to obtain access to, use or interfere with any information technology systems or data used or processed by the other except to the extent required to do

so to receive (in the case of the Recipient), provide (in the case of the Supplier) the Services or as provided for under this Agreement;

6.2.6   comply with its own then in-force security guidelines and policies (including policies on information flows) applicable to the performance, access and/or use of the Services and Information Systems. Where a Party receives access to the other Party's Information Systems, then it shall also comply with such other Party's security guidelines and policies to the extent it has been provided with copies or notified of their contents. and

6.2.7   exercise reasonable care in receiving the Services to (i) prevent access to the Services or Information Systems by unauthorised Persons and (ii) not damage, disrupt or interrupt the Services or Information Systems. Where LBHI Employees are on Lehman Europe premises they shall comply with Lehman Europe's site rules, health and safety requirements to the extent they have been notified of them and reasonable standards of decorum and decency. Where Lehman Europe Employees are on LBHI premises, they shall comply with LBHI's site rules, health and safety requirements to the extent they have been notified of them and reasonable standards of decorum and decency.

## 7    Term and Termination

### 7.1    Term

Subject to earlier termination in accordance with the terms of this Agreement each Service shall terminate at the expiry of the applicable Term and this Agreement shall expire when all Services provided under this Agreement have expired.

### 7.2    Termination on Notice

Either Party may terminate any (or all) of the Services, or any separable element of the Services (including any Services in respect of which that Party is the Supplier), at any time upon giving one month's written notice to the other Party.

### 7.3    Termination for Breach

A Party may terminate this Agreement (in whole or by Service) immediately by written notice to another Party if that other Party commits a material breach of its obligations under this Agreement (the "**Breaching Party**") and (where the breach is capable of being remedied) that breach has not been remedied within 30 days after receipt of notice giving full particulars of the breach and requiring the Breaching Party to remedy it.

### 7.4    Suspension of Service

A Party may suspend the Services in the event that the other Party (including, as applicable, any LBHI Entity or Lehman Europe Entity) materially defaults in its obligations to perform or provide Services to the such Party (including, as applicable, any LBHI Entity or Lehman Europe Entity) hereunder for so long as such default continues, provided that the Party suspending the services notifies the defaulting Party of such suspension in advance.

### 7.5    Survival of Rights on Termination or Expiry

Termination or expiry of this Agreement shall not affect any rights or obligations which may have accrued prior to termination or expiry. The obligations of each Party set out in any

Clause intended to survive such termination or expiry, including this Clause 7.4 (*Survival of Rights on Termination or Expiry*) and Clauses 1 (*Definition and Interpretation*), 5 (*Price and Payment*), 6 (*Acknowledgments and Obligations*), 9 (*Liability*), 12 (*Dispute Resolution*), 13 (*Intellectual Property Rights*), 15 (*Confidentiality*), 17 (*Non-Solicitation*) and 19 (*Other Provisions*), shall continue in full force and effect notwithstanding termination or expiry of this Agreement.

## 8    Service Review

**8.1**    No later than 1 month prior to the expiry of the Term for a Service the Parties shall meet to discuss in good faith any uncompleted Service requirements (along with any new service requirements) following the expiry of the Term and shall use reasonable endeavours to agree in writing what the Supplier's continuing obligations, if any, shall be in relation to the Service(s). Each Supplier shall implement the agreed Service(s) (including any agreed new services) under this Clause 8 within the time periods mutually agreed by the Parties, or (if no time periods have been agreed) as soon as reasonably practicable after agreement in writing has been reached.

**8.2**    Where no agreement is reached pursuant to Clause 8.1, each Service shall expire at the end of its Term.

## 9    Liability

**9.1**    **Exclusions of Liability**

**9.1.1**    Subject to Clause 9.3 (*Exceptions*) but otherwise notwithstanding any other provision of this Agreement, neither LBHI nor Lehman Europe shall be liable to the other or their respective Affiliates or to any third party, whether in contract (including under any indemnity), in tort (including negligence), under statute or otherwise, under or in connection with this Agreement for:

(i)    any liability to the extent that such liability is caused by, or is a result of:

(a)    the failure by the Recipient to perform any of their obligations under this Agreement;

(b)    any increase to the volume of Services requested or used by the Recipient or its Additional Service Recipients relative to the volumes requested or used by the Recipient under the Original TSA;

(c)    any failure by a Third Party Supplier to comply with, or any deficiency in the performance by a Third Party Supplier of, the terms of the relevant Third Party Agreement;

(ii)    any loss of production, loss of profit, loss of revenue, loss of contract, loss or corruption of data, loss of goodwill, business interruption or loss of claim; or

(iii)    any indirect or consequential losses.

**9.1.2**    Each of Clauses 9.1.1(i) to 9.1.1(iii) shall be construed separately and without limitation to each other.

**9.1.3**    Notwithstanding the other provisions of this Agreement LBHI shall be liable for any claims whether in contract (including under any indemnity), in tort (including

negligence), under statute or otherwise, under or in connection with this Agreement from any LBHI Affiliate which is not a party to this Agreement (a "**Non-Contracting Claimant**") against any Lehman Europe Entity. In the event that a Non-Contracting Claimant should raise a successful claim against any Lehman Europe Entity, whether in contract (including under any indemnity), in tort (including negligence), under statute or otherwise, under or in connection with this Agreement, LBHI shall fully indemnify that Lehman Europe Entity against such a successful claim.

**9.2    Fiscal Limits**

Subject to Clause 9.3 (*Exceptions*) and to the maximum extent permitted by law, aggregate liability, whether in contract (including under any indemnity), in tort (including negligence), under statute or otherwise under or in connection with this Agreement shall be limited to:

9.2.1    £2 million in the case of claims against Lehman Europe; and

9.2.2    £10 million in the case of claims against LBHI.

**9.3    Exceptions**

9.3.1    The limits on liability set out in this Clause 9 (*Liability*) shall not apply in respect of:

(i)    any liability for death or personal injury resulting from a Party's negligence;

(ii)    any liability for fraud or fraudulent misrepresentation by a Party;

(iii)    the obligation on a Recipient to pay the Charges that have become due;

(iv)    any breach of any obligations implied by Section 12 of the Sale of Goods Act 1979 or Section 2 of the Supply of Goods and Services Act 1982;

(v)    any liability under Clause 4.1.2; or

(vi)    any other liability to the extent which it cannot be lawfully excluded.

**9.4    Additional Liability Provisions**

9.4.1    **Obligations Several and Not Joint**

As between a Recipient and a permitted third-party assignee of the Recipient, the obligations of each such Party under this Agreement shall be several and not joint.

9.4.2    **Due Enquiry**

Each Party acknowledges that it will have to make its own enquiries to satisfy itself as to the accuracy and completeness of the information supplied to it in connection with this Agreement. Accordingly all liability on the part of LBHI, Lehman Europe and the Administrators in connection with the content of any such information and any representations or statements made in respect of the same is excluded to the fullest extent permitted by law.

9.4.3    **The Administrators**

(i)    A reference to the Administrators shall be construed as being to the Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Administrators.

(ii)    The Administrators have entered into and signed this Agreement as agents for and on behalf of Lehman Europe and neither they, their firm, or representatives shall incur any personal liability whatever in respect of any of the obligations undertaken by Lehman Europe; or in respect of any failure on the part of Lehman Europe to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this Agreement. The Administrators are Party to this Agreement in their personal capacities only for the purpose of receiving the benefit of all limitations, exclusions, undertakings, covenants and indemnities in their favour contained in this Agreement. The Administrators firm, employees and agents may enforce and rely on this Clause 9.4.3(ii) under this Agreement, to the same extent as if they or it were a Party.

## 10    Contract Management

### 10.1    Relationship Managers

The principal point of contact between LBHI and Lehman Europe in relation to issues arising out of this Agreement or the performance of the Services will be the Relationship Managers. Either Party may change the identity of its Relationship Manager at any time by written notice to the other.

## 11    Changes

Where either Party wishes to make a change to the Schedules to this Agreement or any document agreed pursuant to the terms of this Agreement or wishes a project to be undertaken (a "**Change**"), then such Change must be made in accordance with the provisions of Schedule 2 (*Change Control*). Any other amendment to or variation of this Agreement must be made in accordance with Clause 19.8 (*Variation*).

## 12    Dispute Resolution

**12.1.1**    The Parties shall attempt to resolve any dispute in relation to any aspect of, or failure to agree any matter arising in relation to, this Agreement or any document agreed or contemplated as being agreed pursuant to this Agreement (a "**Dispute**") informally through discussion following written notification thereof by the following individuals:

(i)    LBHI's Relationship Manager and Lehman Europe's Relationship Manager and if they cannot resolve the Dispute within ten Business Days following written notification thereof of the Dispute being raised; then

(ii)    the Dispute may be referred by any Party to a senior executive officer of LBHI and an Administrator of Lehman Europe and if, within ten Business Days of the Dispute having been referred to them no agreement has been reached, the dispute resolution process shall be deemed to have been exhausted in respect of the Dispute, and each Party shall be free to pursue the rights granted to it by this Agreement in respect of such Dispute without further reference to the dispute resolution process.

**12.1.2**    The provisions of this Clause 12 (*Dispute Resolution*) shall not:

(i)  prevent a Party from applying for interim relief whilst the Parties attempt to resolve a Dispute; or

(ii)  apply where a Party exercises any right to terminate the Agreement whether under Clause 7 (*Term and Termination*) or otherwise.

## 13  Intellectual Property Rights

### 13.1  Supplier Ownership and Licence

**13.1.1**  Subject to Clause 13.2 (*Recipient Ownership and Licence*), the Recipient agrees that if the Supplier, in the performance of its obligations under this Agreement, makes available to the Recipient any Intellectual Property Rights owned by, or licensed to, the Supplier or one of its Affiliates:

(i)  those Intellectual Property Rights will remain the sole property of the Supplier or its relevant Affiliate, or their licensors (as appropriate); and

(ii)  the Supplier, or its relevant Affiliate, or their licensors (as appropriate) owning such Intellectual Property Rights or materials, shall own all Intellectual Property Rights subsisting in any and all adaptations of, modifications and enhancements to and works derived from such materials or Intellectual Property Rights,

all such Intellectual Property Rights being the "**Supplier's Intellectual Property**".

**13.1.2**  Subject to obtaining the relevant Third Party Consents, the Recipient shall be licensed to use the Supplier's Intellectual Property for the Term solely for, and only to the extent necessary for, the receipt of the Services.

### 13.2  Recipient Ownership and Licence

**13.2.1**  The Intellectual Property Rights in the Recipient Data shall at all times remain the sole property of, or vest in, the Recipient or its relevant Affiliate.

**13.2.2**  The Recipient shall and, if applicable, shall procure that its Affiliates shall, grant a licence to the Supplier and its Affiliates to use the Recipient Data solely for, and only to the extent necessary for, the provision of the Services.

**13.3**  This Agreement shall not assign any ownership rights to Software, Technology or Intellectual Property between the Parties hereto.

**13.4**  The provisions of this Clause 13 shall be without prejudice to the rights granted to the Parties under the Original TSA.

## 14  Data Protection

**14.1**  Each Party confirms that, when acting as data processor on behalf of another Party pursuant to the terms of this Agreement, it shall: (a) only process personal data in accordance with the relevant data controller party instructions; (b) take appropriate technical and organisational measures to protect personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorised disclosure or access and against all other unlawful forms of processing; and (c) not transfer personal data outside of the European Economic Area except if and to the extent that (i) such personal data was transferred outside of the European Economic Area prior to the Commencement Date, (ii) it is lawful for the data controller to transfer such personal data outside of the European

Economic Area, or (iii) the transfer is necessary for the performance or receipt of the Services.

**14.2**   In this Clause 14, the terms "data processor", "data controller" and "personal data" shall have the meaning set out in the Data Protection Act 1998.

## 15   Confidentiality

**15.1**   **Confidentiality**

Subject to Clause 15.2 (*Exceptions*), each of the Parties shall treat as strictly confidential and not disclose or use any information received or obtained as a result of entering into this Agreement (or any agreement entered into pursuant to this Agreement) including the provisions of this Agreement and any agreement entered into pursuant to this Agreement ("**Confidential Information**").

**15.2**   **Exceptions**

The provisions of Clause 15.1 (*Confidentiality*) above shall not prohibit disclosure or use if and to the extent:

(i)   the disclosure or use is required by law, any regulatory body or any stock exchange;

(ii)   the disclosure or use is required to vest the full benefit of this Agreement in a Party or for the provision or receipt of the Services;

(iii)   the disclosure or use is required for the purpose of any judicial proceedings arising out of this Agreement or any other agreement entered into under or pursuant to this Agreement or the disclosure is made to a tax authority in connection with the tax affairs of the disclosing party;

(iv)   the disclosure is made to professional advisers or actual or potential financiers of a Party on terms that such professional advisers or financiers undertake to comply with the provisions of Clause 15 (*Confidentiality*) in respect of such information as if they were a party to this Agreement;

(v)   the information is or becomes publicly available (other than by breach of this Agreement);

(vi)   the other Parties have given prior written approval to the disclosure or use;

(vii)   the information is independently developed after the Commencement Date;

(viii)   the disclosure or use is required by the bankruptcy proceedings in re Lehman Brothers Holdings Inc., et al., Case No. 08-13555 (JMP); in the Bankruptcy Court, including the United States Trustee or the statutory official committee of unsecured creditors appointed therein;

(ix)   to information disclosed in the exercise of the statutory duties of the Administrators or to the extent required by current insolvency practice or to enable the Administrators properly to carry out the duties of their office,

provided that prior to disclosure or use of any information pursuant to Clause 15.2(i) (*Exceptions*) or 15.2(iii) (*Exceptions*), the party concerned shall promptly notify the other Party of such requirement with a view to providing that other party with the opportunity to

contest such disclosure or use or otherwise to agree the timing and content of such disclosure or use.

### 15.3 Parties

References to "Party" in this Clause 15 (*Confidentiality*) include members of the LBHI's and Lehman Europe's Group, and the Supplier and the Recipient shall each procure compliance by their respective Group members with this Clause 15 (*Confidentiality*).

### 15.4 Inside Information

15.4.1   The Parties acknowledge that, under the operation of this Agreement, they or their Affiliates may come into possession of inside information as that term is defined in the FSMA or any such equivalent legislation or regulation outside the UK ("**Inside Information**").

15.4.2   Each Party undertakes that it will not use or disclose any Confidential Information or Inside Information in any way that may amount to a breach of any Applicable Laws concerning the handling, use and disclosure of such Confidential Information and Inside Information.

15.4.3   Each Party shall ensure that appropriate information barriers are put in place to ensure no breach of confidence or Applicable Laws takes place.

15.4.4   Wherever possible, the Lehman Europe Entities and LBHI Entities shall not view or inspect details of the trading positions, outstanding obligations, trading records, real time trades or other Inside Information belonging to the other without the prior written consent of the other Party.

15.4.5   Where Lehman Europe Entities or LBHI Entities are entitled to disclose Confidential Information and/or information about trading positions and/or outstanding obligations or rights to a third party, they shall ensure that the third party is under a contractual obligation no less onerous than the obligations set out in this Clause 15.

15.4.6   The provisions of this Clause 15.4 are without prejudice to the Supplier's rights under Clause 2.8.

## 16      Force Majeure

No Party shall be liable to any other for any failure to fulfil its duties hereunder if and to the extent that such failure results from any circumstances beyond the reasonable control of that Party, which shall include (without prejudice to the generality of the foregoing) any act of God, any act of war or civil or public disorder or any industrial action (other than industrial action by employees of LBHI, Lehman Europe or their Affiliates).

## 17      Non-Solicitation

17.1   Subject to Clause 17.2, each Party shall not and shall ensure its Affiliates shall not:

(i)      at any time during the Term or for 6 months after termination or expiry of this Agreement, solicit or endeavour to entice away from or discourage from being employed or hired by the other Party or its Affiliates any person who is an employee of the other Party or its Affiliates and who, to that Party's knowledge, (a) is or was engaged in the provision or receipt of the Services during the Term and/or

(b) is or was engaged in the provision of Services (as defined in the Original TSA) under the Original TSA; or

(ii)    at any time during the Term or for 6 months after termination of this Agreement, employ or attempt to employ or hire or attempt to hire the services of as consultant or otherwise any person who is an employee of the other Party or its Affiliates and who, to that Party's knowledge, (a) is or was engaged in the Services during the Term and/or (b) is or was engaged in the provision of Services (as defined in the Original TSA) under the Original TSA,

whether or not such person would thereby commit a breach of his contract of service and save that this restriction shall not apply to any person who has received a notice of redundancy or dismissal.

**17.1.1**    Each of Clauses 17.1(i) and (ii) will be taken to constitute a separate obligation and will be construed independently of each other.

**17.1.2**    The restrictions in this Clause 17.1 shall not apply to a Party if a person who is or was an employee of the other Party, or its Affiliates, is employed as a result of (i) a response by that person to a public advertisement; or (ii) that person initiating employment discussions with the Party.

**17.2**    The Parties acknowledge that the requirements of Clause 17.1 can be waived on their mutual agreement.

## 18    Independent Contractors and Sub-Contractors

**18.1.1**    **Independent Contractors.**

In providing the Services hereunder, the Supplier shall act solely as independent contractor and nothing in this Agreement shall constitute or be construed to be or create a partnership, joint venture, or principal/agent relationship between the Supplier, on the one hand, and the Recipient, on the other. All Persons employed by the Supplier in the performance of its obligations under this Agreement shall be the sole responsibility of the Supplier.

**18.1.2**    **Subcontractors**.

Any Supplier may hire or engage one or more subcontractors to perform any or all of its obligations under this Agreement who shall be treated as Third Party Suppliers for the purposes of this Agreement.

## 19    Other Provisions

### 19.1    Whole Agreement

**19.1.1**    This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and (to the extent permissible by law) supersedes all prior representations or oral or written agreements between the Parties with respect to that subject matter, provided that neither Party is attempting to exclude any liability for fraudulent statements (including fraudulent pre-contractual misrepresentations on which another Party can be shown to have relied).

**19.1.2** Each Party acknowledges that it has not been induced to enter into this Agreement by any representation, warranty or undertaking not expressly incorporated into it.

**19.1.3** To the maximum extent permitted by law, all terms, conditions and warranties, other than those expressly set out in this Agreement, are excluded including all implied and statutory terms, warranties and conditions relating to satisfactory quality or fitness for purpose. If any legislation implies into this Agreement any term, condition or warranty which cannot be lawfully excluded then that term, condition or warranty shall be included in this Agreement to the extent required by the relevant legislation but each Party's liability in respect of any breach thereof shall be limited to the maximum extent (if any) permitted by that legislation. Further, except in the case of fraud, each Party agrees and acknowledges that its only right and remedy in relation to any representation, warranty or undertaking made or given in connection with this Agreement shall be for breach of the terms of this Agreement to the exclusion of all other rights and remedies (including those in tort or arising under statute).

## 19.2   Regulatory and Compliance

**19.2.1** Each Party shall be responsible for its own compliance with any and all Applicable Laws applicable to its performance under this Agreement.

**19.2.2** Each Supplier and Recipient shall, save to the extent prevented by Applicable Law notify the other of (i) any material regulatory or compliance issue arising under this Agreement of which it becomes aware (ii) any development that may have a material impact on its ability to carry out the Services effectively and in compliance with Applicable Law and shall co-operate in good faith to resolve those issues.

**19.2.3** If a Party is contacted by a Governmental Body in connection with this Agreement, it shall, if permitted by the Governmental Body to do so:

(i)      promptly notify the other Parties and co-ordinate any interaction with the Regulator; and

(ii)     keep the other Parties informed of all discussions and correspondence with the Government Body,

unless it reasonably determines that to do so would create a conflict of interest between the Parties.

## 19.3   Publicity and Public Announcements

A Party must not make any public announcement or issue any circular relating to this Agreement without the prior written approval of the other Parties. This does not affect any announcement or circular required by law or any regulatory body or the rules of any recognised stock exchange, but the Party with an obligation to make an announcement or issue a circular shall consult with the other Parties so far as is reasonably practicable before complying with such obligation.

## 19.4   Further Assurances

Each Party shall from time to time execute such documents and perform such acts and things as any Party may reasonably require in order to give full effect to the provisions of this Agreement and the transactions contemplated by it.

## 19.5   Reasonableness

Each Party to this Agreement confirms it has received independent legal advice relating to all the matters provided for in this Agreement, including the provisions of Clauses 9 (*Liability*) and 19.1 (*Whole Agreement*), and agrees, having considered the terms of such Clauses and the Agreement as a whole, that the provisions of such Clauses and this Agreement are fair and reasonable.

## 19.6    Assignment

This Agreement shall be binding on and inure to the benefit of the Parties and their successors and permitted assigns. The Parties may not assign or novate all or any part of their rights or obligations under this Agreement nor any benefit arising under or out of this Agreement without the prior written consent of the other Party (not to be unreasonably withheld or delayed).

## 19.7    Third Party Rights

A person who is not a Party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of, or enjoy any benefit under, this Agreement.

## 19.8    Variation

Save as set out in Clause 11, no variation of this Agreement shall be effective unless in writing and signed by or on behalf of each of LBHI and Lehman Europe.

## 19.9    Waiver

No failure of any Party to exercise, and no delay by it in exercising, any right, power or remedy in connection with this Agreement (each a "**Right**") shall operate as a waiver of that Right, nor shall any single or partial exercise of any Right preclude any other or further exercise of that Right or the exercise of any other Right.

## 19.10  Notices

19.10.1 Any notice or other communication in connection with this Agreement (each, a "**Notice**") shall be:

(i)      in writing;

(ii)     delivered by hand, fax, registered post or courier using an internationally recognised courier company.

19.10.2 A Notice to LBHI shall be sent to the following address, or such other person or address as LBHI may notify to Lehman Europe from time to time:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas, 39th Floor
New York, NY 10020

Attention:John Suckow and Daniel J. Ehrmann

Facsimile: (646) 834 0874

with a copy to:

Weil, Gotshal & Manges
One South Place London,
EC2M 2WG

Attention: Barry Fishley

Facsimile: +44 207 903 0990

with a copy to:

Weil, Gotshal & Manges
767 Fifth Avenue New York, NY 10153

Attention: Jeffrey Osterman and Shai Waisman

Facsimile: (+1 212) 310 8007

with a copy to:

Alvarez & Marsal Europe LLP

One Finsbury Circus
London
EC2M 7EB

Attention: Bruce Matthews

Facsimile: +44 207 715 5201

with a copy to:

Alvarez & Marsal
600 Lexington Avenue
6th Floor
New York, NY10022

Attention: William Gordon

Facsimile: (+1 212) 759 5532

19.10.3  A Notice to Lehman Europe shall be sent to the following address, or such other person or address as Lehman Europe may notify to the LBHI from time to time:

Mike Jervis

PricewaterhouseCoopers Plumtree Court London EC4A 4HT

with a copy to:

Linklaters LLP One Silk Street London EC2Y 8HQ

Attention: Richard Cumbley

19.10.4  A Notice shall be effective upon receipt and shall be deemed to have been received:

(i)    60 hours after posting, if delivered by registered post;

(ii)   at the time of delivery, if delivered by hand or courier; or

(iii)  at the time of transmission in legible form, if delivered by fax.

## 19.11  Invalidity

19.11.1  If any provision in this Agreement shall be held to be illegal, invalid or unenforceable, in whole or in part, the provision shall apply with whatever deletion or modification is necessary so that the provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties.

19.11.2  To the extent it is not possible to delete or modify the provision, in whole or in part, under Clause 19.11.1 (*Invalidity*) then such provision or part of it shall, to the extent that it is illegal, invalid or unenforceable, be deemed not to form part of this Agreement and the legality, validity and enforceability of the remainder of this Agreement shall, subject to any deletion or modification made under Clause 19.11.1 (*Invalidity*), not be affected.

## 19.12  Counterparts

This Agreement may be entered into in any number of counterparts all of which taken together shall constitute one and the same instrument. Any Party may enter into this Agreement by executing any such counterpart.

## 19.13  Books and Records

All books, records and data (excluding any comingled data) maintained by a Supplier and owned by a Recipient with respect to the provision of a Service to such Recipient shall be the exclusive property of such Recipient. The Recipient, at its sole cost and expense, shall have the right to inspect, and make copies of, any such books, records and data (excluding any comingled data) during regular business hours upon reasonable advance notice to the Recipient. At the sole cost and expense of the Recipient, upon termination of the provision of any Service, the relevant books, records and data (excluding any comingled data) relating to such terminated Service shall be delivered by the Supplier to the Recipient in a mutually agreed upon format to the address of the Recipient set forth in Clause 19.10 or any other mutually agreed upon location; provided, however, that the Supplier shall be entitled to retain one copy of all such books, records and data (excluding any comingled data) relating to such terminated Service for archival purposes and for purposes of responding to any dispute that may arise with respect thereto.

## 19.14  Appointment of Process Agent

Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Clause 19.10.

## 19.15  Governing Law and Submission to Jurisdiction

19.15.1  This Agreement and any non-contractual obligations arising out of or in connection with it shall be governed by English law.

19.15.2  The Parties irrevocably agree that the courts of England are to have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any proceedings arising out of or in connection with this Agreement shall be brought in such courts. Subject to the Disputes Procedure, each of the Parties irrevocably submits to the jurisdiction of such courts and waives any objection to proceedings in any such court on the ground of venue or on the ground that proceedings have been brought in an inconvenient forum.

**In witness** whereof this Agreement has been duly executed.

**SIGNED** for and on behalf of
**LEHMAN BROTHERS HOLDINGS INC.**
}

by:

**SIGNED** for and on behalf of
**LEHMAN BROTHERS EUROPE LIMITED**
}

by:
one of the Administrators (as their agent
without personal liability in the presence
of:
Witness's signature:

Name:
Address:

Occupation:

**SIGNED** for and on behalf of
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**
}

by:
one of the Administrators (as their agent
without personal liability in the presence
of:
Witness's signature

Name:
Address:

Occupation:

**In witness** whereof this Agreement has been duly executed.

**SIGNED** for and on behalf of
**LEHMAN BROTHERS HOLDINGS INC.**

by:

**SIGNED** for and on behalf of
**LEHMAN BROTHERS EUROPE LIMITED**

by:
one of the Administrators (as their agent
without personal liability in the presence
of:
Witness's signature:

Name:          PAULA DAVIES
Address:       c/o PWC LLP
               ONE KINGSWAY
               CARDIFF CF10 3PW

Occupation:    SECRETARY

**SIGNED** for and on behalf of
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

by:
one of the Administrators (as their agent
without personal liability in the presence
of:
Witness's signature

Name:          PAULA DAVIES
Address:       c/o PWC LLP
               ONE KINGSWAY
               CARDIFF
               CF10 3PW

Occupation:    SECRETARY

**SIGNED** for and on behalf of
**LEHMAN BROTHERS HOLDINGS PLC.**

by:
one of the Administrators (as their agent
without personal liability in the presence
of:
Witness's signature:

Name:       PAULA DAVIES
Address:    C/O PWC LLP
            ONE KINGSWAY
            CARDIFF CF10 3PN

Occupation:   SECRETARY

**SIGNED** for and on behalf of
**LEHMAN BROTHERS LTD**

by:

**SIGNED** by
one of the Administrators on behalf of all of them
(without personal liability and solely for the purpose of
receiving the benefit of the provisions of this
Agreement in their favour in the presence of:

Witness's signature

Name:       PAULA DAVIES
Address:    C/O PWC LLP
            ONE KINGSWAY
            CARDIFF CF10 3PN

Occupation:   SECRETARY

## Schedule 1
## Services and Charges

### Part 1 - Lehman Europe Services

1.  Completion of the scoping, and where possible delivery, of the following structured requests:

| ACT reference | Request |
| --- | --- |
| DG002831 | CATS Credit |
| DG002818 | CATS Rates |
| DG002834 | CATS Syndicates |
| DG002752 | Dynamix |
| DG002818 | EF Cash |
| DG002740 | Euclid |
| DG002742 | GEDS |
| DG002742 | GEDS II |
| DG003667 | Global 1 tax |
| DG004563 | GSSR - Data extract |
| DG002820 | Laura |
| DG002780 | LIAM |
| DG002761 | Optmodel extract |
| DG003168 | PALS |
| DG002991 | Sales Vault |
| DG002877 | SnM |
| DG002785 | TWS Summit - tranche 1 |
| DG002785 | TWS Summit - tranche 2 |
| DG015863 | TWS Summit - tranche 3 |
| DG002867 | Vertigo |

The Term for this Service is 6 months.

2.  Continuation of LBHI's remote access to the LBHI Entities' data contained within the following IT applications maintained by Lehman Europe.

| IT Application |
| --- |
| CREX |
| Integrated Cross-Product Environment - ICE |
| MIDAS |
| Optmodel System |
| RAT |
| Smart Ticket |
| Summit |
| B2 - London |
| Credit Derivatives System (CDS) |

The Term for this Service is 6 months.

3.  Completion of the scoping, and where possible delivery, of any unstructured requests outstanding at the signing of this Agreement.

The Term for this Service is 24 months.

**4.**     Additional unstructured data requests arising after the Commencement Date.

The Parties acknowledge that it is likely that additional requirements for data will arise during the term of this Agreement.

This Lehman Europe Service covers the investigation, scoping, assessment of, and where possible the delivery of unstructured data requests which are made after the Commencement Date. Any such data request will be made via and subject to the data governance process that the Supplier may operate from time to time. For such unstructured requests a CNN is not required except by specific request from the Supplier.

The Relationship Manager must be notified by electronic email when a new request is made.

For the avoidance of doubt each additional request will be subject to the following evaluation through the data governance process:

i.      determination of whether with respect to the request, the data requested is (a) under Lehman Europe's control (b) whether the request is possible and in what form(s) the data may be retrieved; and (c) provide the results of such determination to the Recipient either verbally or by written communication.

ii.      determine the different cost components of the request in accordance with the charging principle in Schedule 1 (Services and Charges) Part 3 (Charges).

iii.      approve or reject the request. For the avoidance of doubt nothing in this paragraph 4 obliges Lehman Europe to satisfy all or any part of any data request under this paragraph 4.

TheTerm for this Service is 24 months

**Part 2 - LBHI Services**

1.    Completion of the scoping, and where possible delivery, of any unstructured requests outstanding at the signing of this Agreement.

The Term for this Service is 24 months.

2.    Additional unstructured data requests arising after the Commencement Date.

The Parties acknowledge that it is likely that additional requirements for data will arise during the term of this Agreement.

This LBHI Service covers the investigation, scoping, assessment of, and where possible the delivery of unstructured data requests which are made after the Commencement Date. Any such data request will be made via and subject to the data governance process that the Supplier may operate from time to time. For such unstructured requests a CNN is not required except by specific request from the Supplier.

The Relationship Manager must be notified by electronic email when a new request is made.

For the avoidance of doubt each additional request will be subject to the following evaluation through the data governance process:

i.    determination of whether with respect to the request, the data requested is (a) under LBHI's control (b) whether the request is possible and in what form(s) the data may be retrieved; and (c) provide the results of such determination to the Recipient either verbally or by written communication.

ii.    determine the different cost components of the request in accordance with the charging principle in Schedule 1 (Services and Charges) Part 3 (Charges).

iii.    approve or reject the request. For the avoidance of doubt – nothing in this paragraph 2 obliges LBHI to satisfy all or any part of any data request under this pargraph 2.

TheTerm for this Service is 24 months

**Part 3 – Charges**

## 1     Charging Principle

**1.1**    The Charges for any Service or any other obligation to be provided by any Supplier hereunder shall be charged to the Recipient at a cost equal to the Supplier's reasonable fully loaded costs and expenses for providing such Service or fulfilling such obligation as a direct result of the Recipients' requirements under this Agreement.

**1.2**    For the avoidance of doubt, the following shall be included in such reasonable fully-loaded costs and expenses:

      (i)      an allocation for overhead costs to the extent related to providing the Services;

      (ii)     the amount of actual payments made by the Supplier to third-party providers for providing the Services; and

      (iii)    associated overhead costs relating to the Services provided by such third-party providers.

**1.3**    This Schedule is without prejudice to the 20% mark-up described in Clause 5.2 which mark-up is additional to these Charges.

**Section 1 – Charges for Lehman Europe Services**

## 1     Employees/Third Party Rates

For Lehman Europe's staff and Third Party Suppliers (such as contractors and lawyers) the rates will remain as per the existing rates agreed under the Original TSA (as may be amended from time to time by agreement).

## 2     IT Application Access

The fully loaded cost of this Service, excluding any contractual uplift, will remain as per the existing IT cost model agreed under the Original TSA.

## 3     Data Extraction

The fully loaded cost of this Service will consist of staff costs as set out in paragraph 2 (Employees) above and any other related costs payable in accordance with the charging principle set out in paragraph 1 (*Charging Principles*) above.

## 4     Other

All other costs will be charged in accordance with the charging principle set out in paragraph 1 (*Charging Principles*) above.

**Section 2 – Charges for LBHI Services**

1    **Employees/Third Party Rates**

For LBHI's staff and Third Party Suppliers (such as contractors and lawyers) the rates will remain as per the existing rates agreed under the Original TSA (as may be amended from time to time by agreement).

2    **Data Extraction**

The fully loaded cost of this Service will consist of staff costs as referred to in paragraph 1 (Employees/Third Party Rates) above and any other related costs payable in accordance with the charging principle set out in paragraph 1 (*Charging Principles*) above.

3    **Other**

All other costs will be charged in accordance with the charging principle set out in paragraph 1 (*Charging Principles*) above.

**Schedule 2**
**Change Control**

1    **Right to Request Changes**

Within five Business Days of either LBHI or Lehman Europe notifying the other by electronic mail of a proposal for a Change, the Parties shall discuss the relevant Change (as notified) to agree whether they can proceed further with the proposed Change or to abandon the proposed Change.

2    **Progression of Changes**

If the Parties agree to proceed further with a Change following discussions under paragraph 1 then (unless otherwise agreed by the Parties) the Supplier shall, at the cost of the Recipient, prepare and submit to the Recipient a document, a change control notice ("**CCN**"), which shall substantially reflect the details of the Change and shall contain the matters to be agreed formally by the Parties in respect of that Change, within a reasonable period after the Parties agree to proceed further with that Change.

3    **Contents of the CCN**

Each CCN must contain:

(i)      a CCN serial number;

(ii)     the originator and date of the request for the relevant Change;

(iii)    the reason for the relevant Change;

(iv)    full details of the relevant Change

(v)     an estimated date for completion of the relevant Change;

(vi)    provision for approval by the Recipient and the Supplier for acceptance or rejection of the CCN.

4    **Scoping of CCN**

For each CCN submitted, the Recipient shall, within the period of validity of the CCN evaluate the CCN and, as appropriate:

(i)      determine whether with respect to the CCN, the service requested is (a) under their control (b) determine whether the service is possible and in what form(s); and (c) provide the results of such determination to the recipient

(ii)     determine the different cost components of the request in accordance with the charging principle in Schedule 1 (*Services and* Charges) Part 3 (*Charges*).

(iii)    approve the CCN;

(iv)    notify the Supplier of rejection of the CCN; or

(v)     endeavour to reach agreement with the Supplier on any changes needed to the CCN to make it acceptable to the Recipient and in the course of those endeavours the Recipient may require the Supplier to provide additional information.

5      **Acceptance of CCN**

If the Recipient accepts the CCN (either as submitted by the Supplier or as amended by agreement between the Parties under paragraph 4 (*Scoping of CCN*)) then the Recipient and the Supplier shall procure that their respective authorised representatives execute, as soon as possible thereafter, two copies of the CCN, with each Party retaining one copy of the executed CCN. Upon the CCN being executed by the Parties, the relevant Schedules shall be taken to have been amended in accordance with the CCN.

6      **Rejection of CCN**

Unless and until the Parties have agreed the contents of a CCN provided under this Schedule 2 (*Change Control*), the Parties must continue to perform their respective obligations under this Agreement without that variation.

7      **Limits**

For the avoidance of doubt, the execution of a CCN does not effect an amendment to a Clause of this Agreement and is only effective to amend the relevant Schedule to this Agreement.

8      Until such time as a Change is made in accordance with this Schedule 2 (*Change Control*), the Supplier shall, unless otherwise agreed in writing, continue to provide the Services as if the Change had not been requested or recommended.

9      Any discussion which may take place between the Recipient and the Supplier in connection with a Change and before the authorisation of a resultant Change in accordance with this Schedule 2 (*Change Control*) shall be without prejudice to the rights of any Party.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                               :

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

----------------------------------------------------------------x

## ORDER PURSUANT TO SECTION 363(b)
## OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO ENTER INTO AND
## PERFORM UNDER A SERVICES AGREEMENT WITH LEHMAN EUROPE

Upon the motion, dated November 23, 2010 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), for authorization to enter into a and perform under a services

agreement with Lehman Europe, pursuant to section 363 of title 11 of the United States Code

(the "Bankruptcy Code"), all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to

(i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and

Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the

Southern District of New York; (vi) the attorneys for Lehman Europe; and (vii) all other parties

entitled to notice in accordance with the procedures set forth in the second amended order

entered on June 17, 2010 governing case management and administrative procedures for these

cases [Docket No. 9635]; and a hearing (the "Hearing") having been held to consider the relief

requested in the Motion; and the Court having found and determined that the relief sought in the

Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest

and that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the SA is approved; and it is further

ORDERED that LBHI is authorized to enter into the SA; and it is further

ORDERED that the Debtors authorized to execute, deliver, implement and fully

perform any and all obligations, instruments, documents and papers and to take any and all

actions reasonably necessary or appropriate to consummate the SA, and perform any and all

obligations contemplated therein, including entering into any amendments to the SA without

further order from the Court, and all obligations of any of the Debtors thereunder shall be

deemed allowed administrative expense claims under section 503(b) of the Bankruptcy Code

against the applicable Debtor or Debtors; and it is further

ORDERED that the failure to specifically describe or include any particular

provisions of the SA shall not diminish or impair the effectiveness of such provision, it being the

intent of the Court that the Debtors are authorized to perform under the SA in its entirety; and it

if further

ORDERED that, notwithstanding Rule 6004(h) of the Federal Rules of

Bankruptcy Procedure, this Order shall take effect immediately; and it is further

ORDERED that this Order shall be binding on all parties in interest and their

respective successors and assigns, including, without limitation, any chapter 7 or chapter 11

trustees and any plan agent, administrator or trustee no matter how denominated; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order; and it is

further

Dated: December  __, 2010
       New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE