Form 210A (10/06)

# United States Bankruptcy Court
## Southern District Of New York

In re Lehman Brothers Holdings, Inc., et al. , Chapter 11 Case No. 08-13555 (JMP)

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a).
Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of
the transfer, other than for security, of the claim referenced in this evidence and notice.

| | |
|---|---|
| **DEUTSCHE BANK AG, LONDON BRANCH**<br>Name of Transferee | **BANK OF KAOHSIUNG OFFSHORE BANKING BRANCH**<br>Name of Transferor |
| Name and Address where notices to transferee should be sent:<br>Deutsche Bank AG, Hong Kong Branch<br>Level 60 International Commerce Centre<br>1 Austin Road West<br>Kowloon<br>Hong Kong<br>Attention: Jack Tsai<br>Email: jack.tsai@db.com<br>dpg.execution@db.com<br><br>Phone: +852 2203 8660<br>Last Four Digits of Acct #: 46947 | Court Claim #46947 (amends #11502)<br><br>Amount of Claim: US$3,062,098.33<br>Date Claim Filed: 26/10/2009<br>Phone:  +8867 556 4760<br>Attn: Jean Chang<br>Email: jeanchang@mail.bok.com.tw<br>Last Four Digits of Acct. #:46947 |

Name and Address where transferee payments
should be sent (if different from above):

I declare under penalty of perjury that the information provided in this notice is true and correct
to the best of my knowledge and belief.

By:_____    Date:___25TH NOVEMBER, 2010___

Transferee/Transferee's Agent    Johan Sudman    Tod Macri
Director    Managing Director

*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

Form 210B (10/06)

# United States Bankruptcy Court
## Southern District Of New York

In re Lehman Brothers Holdings, Inc., et al. , Chapter 11 Case No. 08-13555 (JMP)

## NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

Claim No. 46947 was filed or deemed filed under 11 U.S.C. § 1111(a) in this case by the alleged transferor. As evidence of the transfer of that claim, the transferee filed a Transfer of Claim Other than for Security in the clerk's office of this court on ___November 2010  (date).


Bank of Kaohsiung Offshore Banking Branch

Address of Alleged Transferor:
5F
168 Po Ai 2nd Road
Kaohsiung
Taiwan


Attention: Jean Chang
Tel: +8867 556 4760
Email: jeanchang@mail.bok.com.tw

Name of Transferee:
Deutsche Bank AG, London Branch

Address of Transferee:
Deutsche Bank AG, Hong Kong Branch
55/F Cheung Kong Center
2 Queen's Road Central
Hong Kong

Attention:  Jack Tsai
Tel: +852 2203 8660
Email: jack.tsai@db.com
Dpg.execution@db.com


| ~~DEADLINE TO OBJECT TO TRANSFER~~ |
| --- |

The alleged transferor of the claim is hereby notified that objections must be filed with the court within twenty (20) days of the mailing of this notice. If no objection is timely received by the court, the transferee will be substituted as the original claimant without further order of the court.


Date:_____                                  _____
                                                                     **CLERK OF THE COURT**

**LBHI Notice of Assignment**

TO:    United States Bankruptcy Court for the
       Southern District of New York ("**Bankruptcy Court**")

TO:    Lehman Brothers Holdings Inc. ("**Debtor**")
       Chapter 11
       Case No. 08-13555 (JMP)

       Attn:    Lehman Brothers Holdings Claims Processing Center
       c/o Epiq Bankruptcy Solutions, LLC
       FDR Station
       P.O. Box 5076
       New York NY 10150-5076
       United States of America

Date: 25th November, 2010

Claim #: 46947

**BANK OF KAOHSIUNG OFFSHORE BANKING BRANCH,** its successors and assigns
("**Seller**"), for good and valuable consideration the receipt and sufficiency of which are hereby
acknowledged, does hereby unconditionally and irrevocably sell, transfer and assign unto:

> **DEUTSCHE BANK AG, LONDON BRANCH**
> c/o Deutsche Bank AG, Hong Kong Branch
> Level 60 International Commerce Centre
> 1 Austin Road West
> Kowloon
> Hong Kong
>
> Attn: Johan Sudiman / Jack Tsai
> Distressed Products Group
> Email: dpg.execution@db.com
> Phone: +852 2203 8660
> Fax: +44 113 336 2011

its successors and assigns ("**Buyer**"), all rights, title and interest in and to the claim of Seller,
including all rights of stoppage in transit, replevin and reclamation in the outstanding amount of

US$3,062,298.33 (the "**Claim**") against the Debtor in the Bankruptcy Court, or any other court with jurisdiction over the bankruptcy proceedings of the Debtor.

Seller hereby waives any objection to the transfer of the Claim to Buyer on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Seller acknowledges and understands, and hereby stipulates that an order of the Bankruptcy Court may be entered without further notice to Seller transferring to Buyer the Claim and recognizing the Buyer as the sole owner and holder of the Claim.

You are hereby directed to make all future payments and distributions, and to give all notices and other communications, in respect of the Claim to Buyer.

IN WITNESS WHEREOF, the undersigned has duly executed this Evidence of Transfer of Claim by its duly authorized representative dated 25th November, 2010.


**BANK OF KAOHSIUNG OFFSHORE BANKING BRANCH**


By:_____

Name:   JC  S·J  Chen

Title:

SVP & GENERAL MANAGER

| United States Bankruptcy Court/Southern District of New York<br>Lehman Brothers Holdings Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | **PROOF OF CLAIM** |
|---|---|

| In Re:<br>Lehman Brothers Holdings Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) | |
|---|---|---|
| Name of Debtor Against Which Claim is Held<br>Lehman Brothers Holdings Inc. | Case No. of Debtor<br>08-13555 | |

UNIQUE ID

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000046947

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

BANK OF KAOHSIUNG OFFSHORE BANKING BRANCH
ATTN:JC S.J CHEN
6F 168, PO AI 2ND ROAD
KAOHSIUNG,TAIWAN

Telephone number: 886 7 556 6798   Email Address: JC@mail.bok.com.tw

☑ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** 11502
(If known)

Filed on: 09/11/2009

Name and address where payment should be sent (if different from above)

BANK OF KAOHSIUNG OFFSHORE BANKING BRANCH
6F 168, PO AI 2ND ROAD
KAOHSIUNG,TAIWAN

Telephone number: 886 7 556 6798   Email Address: JC@mail.bok.com.tw

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $ 3,062,098.33

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

**2. Basis for Claim:** GUARANTOR OF LBAH CREDIT LINKED LOAN
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____
  **3a. Debtor may have scheduled account as:** _____
  (See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: _____
Value of Property: $ _____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$ _____ Basis for perfection: _____

Amount of Secured Claim: $ _____ Amount Unsecured: $ _____

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $** _____
(See instruction #6 on reverse side.)

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$ _____

**7. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED / RECEIVED
OCT 2 6 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date:<br><br>10/19/2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br>SVP & General Manager<br>JC S.J Chen |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | |
|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecure. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

---

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

# Bank of Kaohsiung
## Offshore Banking Branch

To ：Epiq Bankruptcy Solutions, LLC

757 Third Avenue, 3rd Floor

New York, NY 10017

Attn ：Lehman Brothers Holdings Claims Processing

Fm ：JC S.J Chen

Bank of Kaohsiung Offshore Banking Branch

Re ：Lehman Brothers Holding Inc.

Case No. 08-13555

DD ：09/04/2009

Enclosed our facilities to Lehman Brothers your case no. 08-13555, we would like to inform you the details as following ：

1. Proof of Claim.
2. Analysis of Claim.
3. Interest Rate Advise Facsimile.
4. Proof of Debt on Hong Kong.
5. Lehman Brothers Asia Holdings Ltd. June 22, 2007 Credit Linked Loan USD 3,000,000.00 Term Sheet.
6. The Execution Copy of the Credit Linked Loan Agreement.
7. June 9, 2005 Unanimous Written Consent of The Executive Committee of The Board of Directors of Lehman Brothers Holdings Inc.

Regards

Bank of Kaohsiung Offshore Banking Branch

SVP & General Manager

JC S.J Chen

# Analysis of Claim

2009.09.01

| | | |
|---|---|---|
| Principal amount: | US$ | 3,000,000.00 |
| Date of the last interest period begin: (Refer to the advise facsimile) | | 2008/06/20 |
| Interest rate of the last period: (Refer to the advise facsimile) | | 4.9025% |
| Date of the LBAH winding-up order: (Refer to the proof of debt on Hong Kong) | | 2008/11/19 |
| The number of days: | | 152 |
| Claim interest amount: | US$ | 62,098.33 |
| Total amount of claim: | US$ | 3,062,098.33 |

Bank of Kaohsiung

Offshore Banking Branch

..................................................................................

Authorized Signature

SVP & General Manager

JC S.J Chen

# LEHMAN BROTHERS

## FACSIMILE

| | |
|---|---|
| **DATE:** Jun 23 2008 | **PAGES (INCLUDING COVER):**   1 |

| | |
|---|---|
| **TO:** | Bank of Kaohsiung, Treasury Dept & Offshore Banking Branch<br>Attn: Jean Chang<br>Email: jeanchang@mail.bok.com.tw |
| **FROM:** | Wilson Suen/Operations<br>(852) 2252-6365 (Direct Phone Number)<br>(852) 2372-5365 (Fax Number) |
| **MESSAGE:** | USD 3Million CMC Magnetics Credit Linked Loan<br><br>Drawdown date : Jun 22 2007<br><br>Repayment date : Jun 20 2009 |

Dear Emily,

Please be advised of the rate fixing details with regards to the subject loan transaction:

| | |
|---|---|
| Interest Period: | From Jun 20 2008 to Sep 22 2008 |
| 3 Month Libor: | 2.8025% |
| Spread: | 2.10% |
| All-in-rate: | 4.9025% |
| Interest Payable amount: | USD 38,402.92 |

Please do not hesitate to contact us if you have further queries.

Best Regards

The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipients named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

Rule 80 / 2008

PROOF OF DEBT - GENERAL FORM
債權證明表 - 一般通用表格
FORM 63A    表格63A
[Rule 80]    [規則第 80 條4]

IN THE HIGH COURT OF THE                          香港特別行政區
HONG KONG SPECIAL ADMINISTRATIVE REGION           原訟法庭
COURT OF FIRST INSTANCE                            高院公司清盤案件
COMPANIES WINDING-UP PROCEEDINGS                   2008 年第 443 宗
NO. 443 OF 2008

| | |
|---|---|
| Except in the case of claims for wages or salary, where the debt proved for exceeds $250 a fee of $40 must be paid hereon otherwise the proof cannot be admitted. 如所證明債權款額超過$250, 必須繳交費用$40, 否則債權證明表將不獲接納,但申索工資或薪金者除外。 | |

IN THE MATTER of the Companies Ordinance          有關《公司條例》事宜
and                                                  及
IN THE MATTER of
Lehman Brothers Asia Holdings Limited (In Liquidation)   有關 美國雷曼兄弟亞洲控股有限公司(清盤中) 事宜

Date of Winding-up Order: 19 November 2008
清盤令的日期: 二零零八年十一月十九日

| 1 | Name of creditor 債權人姓名 / 名稱(中英文姓名 / 名稱) | Bank of Kaohsiung Offshore Banking Branch | |
|---|---|---|---|
| 2 | Address and telephone no. of creditor 債權人地址及電話 | Address 地址 | 5F, 168, Po Ai 2nd Road, Kaohsiung, Taiwan |
| | | Phone 電話 | 886 7 5572363 |
| | Fax 傳真號碼 | | 886 7 5565276 |
| | Email 電郵 | | jerry@mail.bok.com.tw |
| 3 | Total amount of claim, including any outstanding uncapitalised interest as at the date of the winding-up order 申索總額,包括任何在清盤令的日期尚未支付且未轉作本金的利息 | (Analysis of claim can be supplied on separate sheet signed by creditor or person authorized to act on his behalf) (申索的分析可另紙述明, 但該等散頁必須由債權人或獲授權代其行事者簽署) | |
| | | Currency 貨幣     US $    3,062,098.33     元 | |
| 4 | Details of any documents by reference to which the debt can be substantiated [Note: Either the originals or copies of documentary evidence should be submitted. Bills of exchange or other negotiable securities must be produced before the proof can be admitted. The Official Receiver or liquidator may call for any document or evidence to substantiate the claim at his discretion.] 任何可供參閱以證實債權的文件的詳情 [註: 須呈交文件證據的正本或副本。匯票或其他可流轉的抵押品必須先予出示,否則債權證明表將不獲接納。破產管理署署長或清盤人可的情要求提供任何可用以證實有關申索的文件或證據。] | As attached facility agreement | |
| 5 | If total amount above includes outstanding uncapitalised interest please state amount 如上述總額包括尚未支付且未轉作本金的利息, 請述明款額 | Principal amount : USD3,000,000.00 Interest amount : USD62,098.33 | |
| 6 | Particulars of how and when debt incurred 詳述債項是何時及如何招致的 | 2007.06.22 Credit Linked Loan | |
| 7 | Particulars of any security held, the value of the security, and the date it was given 所持抵押品的詳情與價值,及作出該項抵押的日期 | None | |
| 8 | I hereby declare that the particulars set out in this Proof of Debt are, to the best of my knowledge and belief, true and correct. 本人現聲明: 盡本人所知所信, 本債權證明表所列各項詳情均真實無誤。 | | |
| | Signature of creditor or person authorized to act on his behalf 債權人或獲授權代其行事者的簽署 | Bank of Kaohsiung Offshore Banking Branch Authorized Signature | |
| | Name in BLOCK LETTERS 姓名 / 名稱 | JC S.J Chen | HKIC No. 香港身分證號碼 |
| | Position with or relation to creditor and means of knowledge of the matters declared herein 在債權人機構所持職位或與債權人的關係, 和獲悉本債權證明表內所聲明事項的途徑 | Position : SVP & General Manager Means of Knowledge : Account Book | |

Warning: A person convicted of making a false statement in respect of a proof of debt shall be liable to a fine of Level 6 (as defined in s.113B and Schedule 8 of the Criminal Procedure Ordinance, Cap. 221) and imprisonment for 6 months. (s.349 and s.351 of the Companies Ordinance, Cap. 32)
警告: 任何人如被裁定就債權證明表作出虛假陳述而罪名成立, 可處第 6 級罰款(罪款額根據香港法例第221章《刑事訴訟程序條例》第113B條及附表8所訂) 及監禁6個月。

To be returned to the provisional liquidator or, if a liquidator has been appointed, to the liquidator.
此表格須交還臨時清盤人, 或如已委任清盤人, 則須交還清盤人。

Note: The proof cannot be admitted for voting at the first meeting unless it is properly completed and lodged with the provisional liquidator (liquidator for general meetings) not later than the time specified in the notice for submitting proof.
註: 債權證明表必須填寫妥當, 並須在不遲於召開第一次會議的通知書內所指明提交債權證明表的時間前向臨時清盤人(如屬大會則為清盤人) 送交, 否則不能在該會議上進行的, 表決而獲接納。

ORO 44 (10/2004)

# LEHMAN BROTHERS

*23016600 >040*

Under no circumstances may a copy of this term sheet be shown, copied, transmitted or otherwise given to any person other than your authorized representatives. *Investors must read this term sheet with reference to Appendix A attached.*

*All definitions used in this term sheet and not otherwise defined will bear the meaning and have the same effect as in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions, as published by the International Swaps and Derivatives Association, Inc.*

## CMC Magnetics Corp.
## Credit Linked Loan (the "Loan")

### Strictly Confidential

*Summary of the Loan*
Lender enters into a CMC Magnetics Corp. Credit Linked Loan with the Borrower (the "Loan") creating exposure to the Reference Entity.  Upon the occurrence of an "Event of Default" with respect to the Reference Entity, the Loan will redeem early and the Lender shall receive an amount of Deliverable Obligations, as further described below, which may have a market value below par, but subject to a minimum of zero.

| | |
|---|---|
| **Borrower:** | Lehman Brothers Asia Holdings Ltd.<br>(The Borrower is guaranteed by Lehman Brothers Holdings Inc rated A1/A+) |
| **Lender:** | BANK OF KAOHSIUNG, OFFSHORE BANKING UNIT Branch . |
| **Reference Entity:** | **CMC Magnetics Corp.** |
| **Reference Obligation:** | CMC Magnetics Corp 0% 3 June 2012 (ISIN: XS0303681182) |
| **Loan Amount:** | USD 3,000,000 |
| **Commitment Date:** | **June 15, 2007** |
| **Drawdown Date:** | **June 22, 2007** |
| **Repayment Date:** | **June 20, 2009**, subject to Early Repayment, except that, upon the occurrence of an Event of Default, the Repayment Date will be the Event of Default Redemption Date. |
| **Interest Rate:** | 3 month USD Libor + **2.10%**, p.a., Act/360 in respect of each Interest Period |
| **Interest Payment Dates:** | Quarterly (Modified Following business day convention). For the avoidance of doubt the first Interest Payment Date shall be on September 20, 2007. |
| **Early Repayment:** | The Borrower has the right, but not the obligation to repay the Loan on and date after the Drawdown Date with 5 Business Days prior notice at a Repayment Amount of 100%; provided that the Borrower shall pay the additional Repayment Amount of 0.50% if the Borrower exercises the right to repay the Loan on or before [6months from Drawdown date]. |
| **Repayment Amount:** | 100%, subject to Early Repayment provided that: |

---

This term sheet is for indicative purposes only, is subject to change without notice, and is neither meant to be, nor should it be construed as, an attempt to define all of the terms and conditions regarding a proposed loan.  Clients are advised to make an independent review and reach their own conclusions regarding the economic benefits and risks of this transaction and the legal, regulatory, credit, tax and accounting aspects of this transaction as it relates to their particular circumstances.  This term sheet does not constitute an offer or a solicitation to enter into a loan of the type generally described above.  Although the indicative information set forth above is reflective of the terms, as of the specified date, under which Lehman Brothers believes such loan might be structured, no assurance can be given that such loan could in fact be executed and no specific lender or borrower is obligated to enter into such loan.  Terms contained in any final loan documentation with respect to the proposed loan shall prevail over this term sheet.  Neither Lehman Brothers Holdings Inc. nor any of its affiliates accepts any liability of any kind for any direct or indirect loss arising from this term sheet or any of its contents.

# LEHMAN BROTHERS

Upon the first occurrence of an Event of Default, as determined by the Calculation Agent, *in its sole and absolute discretion*, the Loan will be redeemed at zero per cent (0%) of the Loan Amount and, in the event of such redemption, the Borrower will arrange for the delivery, to the Lender, of a nominal amount of Deliverable Obligations equal to the Loan Amount on or by the Event of Default Redemption Date.

Delivery of any Deliverable Obligations shall be made upon payment by the Lender of all applicable transfer or stamp taxes and in accordance with the usual market practice for delivery of an asset of that type, subject to compliance by the Lender with all applicable laws and regulations in respect of the holding of the relevant Deliverable Obligations. Delivery shall be made to the Lender or, where the relevant Deliverable Obligations can be transferred by book entries, by transfer to an account in the relevant book entry system nominated by the Lender.

However, if it is impossible or illegal (including, without limitation, due to a failure or any clearing or other book entry system or due to any law or regulation or due to the terms of the Deliverable Obligations) to deliver or procure delivery of any Deliverable Obligations, then the Issuer will pay to the Noteholder pro rata, in lieu of delivery of the Deliverable Obligations, a USD amount equal to the Liquidation Price multiplied by the Principal Amount.

**Liquidation Price:**  The best clean bid price, expressed as a percentage, obtained for such obligations by the Calculation Agent on the second Business Day following the Credit Event Determination Date, upon the solicitation of three dealers selected by the Calculation Agent.

**Redemption Settlement:**  Upon the first occurrence of an Event of Default, as determined by the Calculation Agent in its sole and absolute discretion, the Borrower will either (i) redeem the Loan at zero and arrange for the delivery, to the Lender, of Deliverable Obligations in a nominal amount equal to the Loan Amount of the Loan held by the Lender to the Lender at the risk of the Lender on or by the Event of Default Redemption Date; or, (ii) pay to the Lender on the Event of Default Redemption Date, in lieu of delivery of the Deliverable Obligations, an amount expressed in US Dollars, equal to the best available bid price, excluding accrued interest, of the Deliverable Obligations, in the same nominal amount as the Loan held by such Lender, such bid price to be obtained and determined by the Calculation Agent on the second Business Day following the Calculation Date at such time, from such Dealer or Dealers and in such markets as it chooses in its sole and absolute discretion.

Delivery of any Deliverable Obligations shall be made upon payment by the Lender of all applicable transfer or stamp taxes and in accordance with the usual market practice for delivery of an asset of that type, subject to compliance by the Lender with all applicable laws and regulations in respect of the holding of the relevant Deliverable Obligations. Delivery shall be made to the Lender or, where the relevant Deliverable Obligations can be transferred by book entries, by transfer to an account in the relevant book entry system nominated by the Lender.

**Event of Default:**  means the determination by the Calculation Agent, by delivery of the Event of Default Notice, *in its sole and absolute discretion* (it being understood that the Calculation Agent shall have no obligation to determine an Event of Default at any time) that there has been in existence, or there is occurring, at any time on or after the Commitment Date and on or prior to the

This term sheet is for indicative purposes only, is subject to change without notice, and is neither meant to be, nor should it be construed as, an attempt to define all of the terms and conditions regarding a proposed loan. Clients are advised to make an independent review and reach their own conclusions regarding the economic benefits and risks of this transaction and the legal, regulatory, credit, tax and accounting aspects of this transaction as it relates to their particular circumstances. This term sheet does not constitute an offer or a solicitation to enter into a loan of the type generally described above. Although the indicative information set forth above is reflective of the terms, as of the specified date, under which Lehman Brothers believes such loan might be structured, no assurance can be given that such loan could in fact be executed and no specific lender or borrower is obligated to enter into such loan. Terms contained in any final loan documentation with respect to the proposed loan shall prevail over this term sheet. Neither Lehman Brothers Holdings Inc. nor any of its affiliates accepts any liability of any kind for any direct or indirect loss arising from this term sheet or any of its contents.

## LEHMAN BROTHERS

scheduled Repayment Date any of the following events or conditions with respect to the Reference Entity:

**Bankruptcy** means the Reference Entity (a) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (b) becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within 30 calendar days of the institution or presentation thereof; (e) has a resolution passed for its winding up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (g) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 calendar days thereafter; (h) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) to (g) (inclusive).

**Failure to Pay** means after the expiration of any applicable (or deemed) Grace Period (after the satisfaction of any conditions precedent to the commencement of such Grace Period), the failure by the Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure.

**Restructuring** (a) means that, with respect to one or more Obligations and in relation to an aggregate amount of not less than the Default Requirement, any one or more of the following events occurs in a form that binds all holders of such Obligation, is agreed between the Reference Entity or a Governmental Authority and a sufficient number of holders of such Obligation or is announced (or otherwise decreed) by the Reference Entity or a Governmental Authority in a form that binds all holders of such Obligation, and such event is not expressly provided for under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred:

(i)     a reduction in the rate or amount of interest payable or the amount of scheduled interest accruals;

(ii)    a reduction in the amount of principal or premium payable at maturity or at scheduled redemption dates;

(iii)   a postponement or other deferral of a date or dates for either (A) the payment or accrual of interest or (B) the payment of principal or premium;

(iv)    a change in the ranking in priority of payment of any Obligation, causing the Subordination of such Obligation to any other Obligation; or

This term sheet is for indicative purposes only, is subject to change without notice, and is neither meant to be, nor should it be construed as, an attempt to define all of the terms and conditions regarding a proposed loan. Clients are advised to make an independent review and reach their own conclusions regarding the economic benefits and risks of this transaction and the legal, regulatory, credit, tax and accounting aspects of this transaction as it relates to their particular circumstances. This term sheet does not constitute an offer or a solicitation to enter into a loan of the type generally described above. Although the indicative information set forth above is reflective of the terms, as of the specified date, under which Lehman Brothers believes such loan might be structured, no assurance can be given that such loan could in fact be executed and no specific lender or borrower is obligated to enter into such loan. Terms contained in any final loan documentation with respect to the proposed loan shall prevail over this term sheet. Neither Lehman Brothers Holdings Inc. nor any of its affiliates accepts any liability of any kind for any direct or indirect loss arising from this term sheet or any of its contents.

# LEHMAN BROTHERS

(v)     any change in the currency or composition of any payment of interest or principal to any currency which is not a Permitted Currency.

(b) Notwithstanding the provisions of (a) above, none of the following shall constitute a Restructuring:

(i)     the payment in euros of interest or principal in relation to an Obligation denominated in a currency of a Member State of the European Union that adopts or has adopted the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union;

(ii)     the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) above due to an administrative adjustment, accounting adjustment or tax adjustment or other technical adjustment occurring in the ordinary course of business; and

(iii)     the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) above in circumstances where such event does not directly or indirectly result from a deterioration in the creditworthiness or financial condition of the Reference Entity.

(c)     For the purposes of (a) and (b) above, the term Obligation shall be deemed to include Underlying Obligations for which the Reference Entity is acting as provider of a Qualifying Guarantee. In the case of a Qualifying Guarantee and an Underlying Obligation, references to the Reference Entity in (a) shall be deemed to refer to the Underlying Obligor and the reference to the Reference Entity in (b) shall continue to refer to the Reference Entity.

**Obligations:**     Bonds and Loans

**Obligation Characteristics:**     The Obligation(s) shall have the following characteristics:

(i)     Not Sovereign Lender
(ii)     Not Subordinated
(iii)     Not Domestic Currency
(iv)     Not Domestic Issuance
(v)     Not Domestic Law

**Default Requirement** means USD 10,000,000, or its equivalent in the relevant currency or currencies in which an Obligation is denominated, as of the occurrence of the relevant Events of Default.

**Payment Requirement** means USD 1,000,000, or its equivalent in the relevant currency or currencies in which an Obligation is denominated, as of the occurrence of the relevant Failure to Pay or Potential Failure to Pay (if applicable)

**Potential Failure to Pay:**     The failure by a Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations without regard to any grace period or any conditions precedent to the commencement of any grace period applicable to such Obligation.

**Event of Default Notice:**     means an irrevocable notice by the Calculation Agent (which may be oral, including by telephone) to the parties that describes an Event of Default that occurred on or after the Commitment Date and on or prior to the scheduled Redemption Date;

This term sheet is for indicative purposes only, is subject to change without notice, and is neither meant to be, nor should it be construed as, an attempt to define all of the terms and conditions regarding a proposed loan. Clients are advised to make an independent review and reach their own conclusions regarding the economic benefits and risks of this transaction and the legal, regulatory, credit, tax and accounting aspects of this transaction as it relates to their particular circumstances. This term sheet does not constitute an offer or a solicitation to enter into a loan of the type generally described above. Although the indicative information set forth above is reflective of the terms, as of the specified date, under which Lehman Brothers believes such loan might be structured, no assurance can be given that such loan could in fact be executed and no specific lender or borrower is obligated to enter into such loan. Terms contained in any final loan documentation with respect to the proposed loan shall prevail over this term sheet. Neither Lehman Brothers Holdings Inc. nor any of its affiliates accepts any

# LEHMAN BROTHERS

**Deliverable Obligations:**        Bonds and Loans of the Reference Entity in respect of which a Credit Event Notice has been sent.

**Deliverable Obligation Characteristics:** The    Deliverable    Obligations shall have the following characteristics:

(i)      Standard Specified Currencies
(ii)     Not Subordinated
(iii)    Not Sovereign Lender
(iv)     Not Domestic Issuance
(v)      Not Domestic Law
(vi)     Not Contingent
(vii)    Assignable Loan
(viii)   Transferable
(ix)     Not Bearer
(x)      Maximum Maturity: 30 years



**Event of Default Redemption Date:**        Thirty (30) days following the Calculation Date

**Calculation Date:**        The date on which the Calculation Agent determines that an Event of Default has occurred.

**Business Day:**        A day on which banks are open for business in New York, London

**Calculation Agent:**        Lehman Brothers International (Europe)

**Arranger:**        Lehman Brothers Asia Limited



**Documentation:**        Loan Agreement

**Governing Law:**        English Law

**Usage of the Loan:**        The net proceeds from the loan will be used for the general funding purposes of the Borrower or its affiliates, including, but not limited to, general working capital, and short-term investment, if any.

**Independent Analysis:**        The Investor is responsible for its own independent analysis of and decision regarding all matters relating to this transaction and any applicable laws and regulations and the risks involved in entering into this transaction as they relate to such purchaser's own circumstances. The purchaser should consult its own counsel, accountants and other advisors on these and all matters it deems relevant.

This transaction is suitable only for, and should be made only by an investor who has no need for liquidity and understands and can afford the financial and other risks of this transaction.

***THE CREDIT RISK OF THE LOAN S IS THAT OF THE REFERENCE ENTITY. EARLY REPAYMENT OF THE LOAN MAY BE TRIGGERED THROUGH CERTAIN EVENTS THAT ARE LINKED TO THE PERFORMANCE OF THE REFERENCE ENTITY AND THE BORROWER. LENDER MAY BE DELIVERED DELIVERABLE OBLIGATIONS THAT MAY HAVE A MARKET VALUE BELOW PAR, SUBJECT TO A MINIMUM OF ZERO. PURCHASE OF THE NOTES MAY INVOLVE A HIGH RISK OF LOSS.***

This term sheet is for indicative purposes only, is subject to change without notice, and is neither meant to be, nor should it be construed as, an attempt to define all of the terms and conditions regarding a proposed loan. Clients are advised to make an independent review and reach their own conclusions regarding the economic benefits and risks of this transaction and the legal, regulatory, credit, tax and accounting aspects of this transaction as it relates to their particular circumstances. This term sheet does not constitute an offer or a solicitation to enter into a loan of the type generally described above. Although the indicative information set forth above is reflective of the terms, as of the specified date, under which Lehman Brothers believes such loan might be structured, no assurance can be given that such loan could in fact be executed and no specific lender or borrower is obligated to enter into such loan. Terms contained in any final loan documentation with respect to the proposed loan shall prevail over this term sheet. Neither Lehman Brothers Holdings Inc. nor any of its affiliates accepts any

**EXECUTION COPY**

Dated 22 June 2007

# US$3,000,000

# FACILITY AGREEMENT

Between

## LEHMAN BROTHERS ASIA HOLDINGS LIMITED
as Borrower

## LEHMAN BROTHERS INTERNATIONAL (EUROPE)
as Calculation Agent

## LEHMAN BROTHERS ASIA LIMITED
as Arranger

and

## BANK OF KAOHSIUNG, OFFSHORE BANKING BRANCH
as Lender

**TABLE OF CONTENTS**

Contents                                                                                          Page

1        DEFINITIONS AND INTERPRETATION ................................................................ 1

2        THE FACILITY ...................................................................................................... 13

3        PURPOSE .............................................................................................................. 13

4        CONDITION OF DRAWDOWN ............................................................................. 13

5        DRAWDOWN ........................................................................................................ 14

6        REPAYMENT ........................................................................................................ 14

7        PREPAYMENT AND CREDIT EVENT ................................................................. 14

8        INTEREST ............................................................................................................. 16

9        INTEREST PERIODS ........................................................................................... 17

10       CHANGES TO THE CALCULATION OF INTEREST ........................................... 18

11       TAX ........................................................................................................................ 18

12       REPRESENTATIONS ........................................................................................... 18

13       GENERAL UNDERTAKINGS .............................................................................. 20

14       FACILITY DEFAULT ............................................................................................ 20

15       CHANGES TO THE PARTIES .............................................................................. 21

16       ROLE OF THE CALCULATION AGENT AND THE ARRANGER ......................... 21

17       CONDUCT OF BUSINESS BY THE PARTIES .................................................... 24

18       PAYMENT MECHANICS ...................................................................................... 24

19    NOTICES...................................................................................................................25

20    CALCULATIONS AND CERTIFICATES ...........................................................26

21    PARTIAL INVALIDITY.................................................................................27

22    REMEDIES AND WAIVERS...........................................................................27

23    AMENDMENTS AND WAIVERS .....................................................................27

24    COUNTERPARTS .......................................................................................27

25    GOVERNING LAW.......................................................................................27

SCHEDULE 1 DRAWDOWN REQUEST ...................................................................28

**THIS AGREEMENT** is dated 22 June 2007 and made between:

(1)    **LEHMAN BROTHERS ASIA HOLDINGS LIMITED** as borrower (the "**Borrower**");

(2)    **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** as calculation agent (the "**Calculation Agent**");

(3)    **LEHMAN BROTHERS ASIA LIMITED** as arranger (the "**Arranger**"); and

(4)    **BANK OF KAOHSIUNG, OFFSHORE BANKING BRANCH** as lender (the "Lender").

**IT IS AGREED** as follows:

# 1    DEFINITIONS AND INTERPRETATION

## 1.1    Definitions

In this Agreement:

"**Accreting Obligation**" means any obligation (including, without limitation, a Convertible Obligation or an Exchangeable Obligation), the terms of which expressly provide for an amount payable upon acceleration equal to the original issue price (whether or not equal to the face amount thereof) plus an additional amount or amounts (on account of original issue discount or other accruals of interest or principal not payable on a periodic basis) that will or may accrete, whether or not (A) payment of such additional amounts is subject to a contingency or determined by reference to a formula or index, or (B) periodic cash interest is also payable.

"**Affiliate**" means, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"**Assignable Loan**" means a Reference Entity Loan that is, capable of being assigned or novated to at a minimum commercial banks or financial institutions (irrespective of their jurisdiction of organization) that are not then a lender or a member of the relevant lending syndicate, without the consent of the relevant Reference Entity or the guarantor, if any, of such Reference Entity Loan (or the consent of the applicable borrower if the Reference Entity is guaranteeing such Reference Entity Loan) or any agent.

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing or registration.

"**Bankruptcy**" means the Reference Entity (a) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (b) becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding its inability generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (i) results in

a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within 30 calendar days of the institution or presentation thereof; (e) has a resolution passed for its winding up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (g) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 calendar days thereafter; (h) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) to (g) (inclusive);

"**Bond**" means any obligation of a type included in the "Borrowed Money" Obligation Category that is the form of, or represented by, a bond, note (other than notes delivered pursuant to Reference Entity Loans), certified debt security or other debt security and shall not include any other type of Borrowed Money.

"**Borrowed Money**" means with respect to the Reference Entity, one or more obligations of such Reference Entity (excluding an obligation under a revolving credit arrangement for which there are no outstanding, unpaid drawings in respect of principal) for the payment or repayment of borrowed money (which term shall include, without limitation, deposits and reimbursement obligations arising from drawings pursuant to letters of credit).

"**Business Day**" means a day on which banks are open for business in London and New York.

"**Clearstream, Luxembourg**" means Clearstream Banking, société anonyme.

"**Commitment**" means US$3,000,000, to the extent not cancelled, reduced, prepaid or transferred by the Lender under this Agreement.

"**Commitment Date**" means 15 June 2007.

"**Convertible Obligation**" means any obligation that is convertible, in whole or in part, into Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of the holders of such obligation or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation).

"**Credit Event**" means the first occurrence of any of the following at any time on or after the Commitment Date and on or prior to the Repayment Date, as determined by the Calculation Agent in its sole and absolute discretion (but without being obliged to do so), based on Publicly Available Information (the date of such determination being the "**Credit Event Determination Date**"):

Bankruptcy;
Failure to Pay; or
Restructuring.

"**Credit Event Notice**" means an irrevocable notice from the Calculation Agent to the Borrower which describes a Credit Event that occurred during the Credit Observation Period. The Credit Event which is the subject of the Credit Event Notice need not be continuing on the date the Credit Event Notice is effective. Upon the occurrence of a Restructuring Credit Event:

(a)    the Calculation Agent may deliver multiple Credit Event Notices with respect to the Reference Entity to which such Credit Event applies, each such Credit Event Notice setting forth the amount of the Loan for which the Deliverable Obligation Amount relates (the "**Exercise Amount**");

(b)    if the Calculation Agent has delivered a Credit Event Notice that specifies an Exercise Amount that is to be less than the Deliverable Obligation Amount which equates to 100% of the Loan, it shall be construed as if the Loan consisted of two loans in respect of that specific Reference Entity, one which has a Deliverable Obligation Amount equal to the Exercise Amount and, upon delivery of the Credit Event Notice, will be settled in accordance with the terms herein, and the other, which will have a Deliverable Obligation Amount equal to the Deliverable Obligation Amount outstanding prior to such Credit Event Notice minus the Exercise Amount and will continue in effect;

(c)    the Exercise Amount in connection with a Credit Event Notice describing a Credit Event other than a Restructuring must be equal to a Deliverable Obligation Amount equating to 100% of the Loan (and not a portion thereof); and

(d)    the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount of 1,000,000 units of the currency (or, if Japanese Yen, 100,000,000 units) in which the Loan is denominated or an integral multiple thereof.

"**Credit Event Redemption Date**" has the meaning set out in Clause 7.1.4.

"**Credit Observation Period**" means the period from and including the Commitment Date to and including the later of (x) the Scheduled Repayment Date and (y) the Grace Period Extension Date if (i) the Credit Event is a Failure to Pay that occurred after the Scheduled Repayment Date, and (ii) the related Potential Failure to Pay occurred on or prior to the Scheduled Repayment Date.

"**Default**" means a Facility Default or any event or circumstance specified in Clause 14 (*Facility Default*) which would, with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing, be a Facility Default.

"**Default Requirement**" means US$10,000,000 or its equivalent in any currency or currencies in which an Obligation is denominated as of the occurrence of the relevant Credit Event.

"**Deliver**" means to deliver, novate, transfer (including, in the case of a Qualifying Guarantee, transfer of the benefit of the Qualifying Guarantee), assign or sell, as appropriate, in the manner customary for the settlement of the Deliverable Obligations (which shall include executing all necessary documentation and taking any other necessary actions), in order to convey all right, title and interest in the

Deliverable Obligations free and clear of any and all liens, charges, claims or encumbrances (including, without limitation, any counterclaim, defense (other than a counterclaim or defense based on (a) any lack or alleged lack of authority or capacity of a Reference Entity to enter into any Obligation or, as applicable, an Underlying Obligor to enter into any Underlying Obligation, (b) any actual or alleged unenforceability, illegality, impossibility or invalidity with respect to any Obligation or, as applicable, any Underlying Obligation, however described, (c) any applicable law, order, regulation, decree or notice, however described, or the promulgation of, or any change in, the interpretation by any court, tribunal, regulatory authority or similar administrative or judicial body with competent or apparent jurisdiction of any applicable law, order, regulation, decree or notice, however described, or (d) the imposition of, or any change in, any exchange controls, capital restrictions or any other similar restrictions imposed by any monetary or other authority, however described) or right of set off by or of the Reference Entity or, as applicable, an Underlying Obligor). "Delivery" and "Delivered" will be construed accordingly.

"**Deliverable Obligations**" means the Reference Obligation and any Bonds or Reference Entity Loans with the Deliverable Obligation Characteristics.

"**Deliverable Obligation Characteristics**" means:

(i)     Not Subordinated

(ii)    Specified Currency - Standard Specified Currencies

(iii)   Not Contingent

(iv)    Transferable

(v)     Not Bearer

(vi)    Maximum Maturity: 30 years

(vii)   Assignable Loan

(viii)  Not Sovereign Lender

(ix)    Not Domestic Issuance

(x)     Not Domestic Law


"**Designated Maturity**" means 3 months.

"**Drawdown Date**" means the date of the drawdown, being the date on which the Loan is to be made as specified in the Drawdown Request.

"**Drawdown Request**" means a notice substantially in the form set out in Schedule 1 (*Drawdown Request*).

"**Due and Payable Amount**" means the amount that is due and payable under (and in accordance with the terms of) a Deliverable Obligation on the Credit Event Redemption Date, whether by reason of acceleration, maturity, termination or otherwise (excluding sums in respect of default interest, indemnities, tax gross-ups and other similar amounts).



"**Early Repayment Date**" means one or more Business Days on which the Borrower elects to prepay the Loan pursuant to Clause 7.2 *(Optional Prepayment of Loan)*.

"**Equity Securities**" means:

in the case of a Convertible Obligation, equity securities (including options and warrants) of the issuer of such obligation or depositary receipts representing those equity securities of the issuer of such obligation together with any other property distributed to or made available to holders of those equity securities from time to time; and in the case of an Exchangeable Obligation, equity securities (including options and warrants) of a person other than the issuer of such obligation or depositary receipts representing those equity securities of a person other than the issuer of such obligation together with any other property distributed to or made available to holders of those equity securities from time to time.

"**Euroclear**" means Euroclear Bank S.A./N.V. as operator of the Euroclear System.

"**Exchangeable Obligation**" means any obligation that is exchangeable, in whole or in part, for Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of holders of such obligation (or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation).

"**Facility**" means the term loan facility made available under this Agreement as described in Clause 2 *(The Facility)*.

"**Facility Default**" means any event or circumstance specified as such in Clause 14 *(Facility Default)*.

"**Facility Office**" means the office or offices notified by the Lender to the Borrower in writing as the office or offices through which it will perform its obligations under this Agreement.

"**Failure to Pay**" means after the expiration of any applicable (or deemed) Grace Period (after the satisfaction of any conditions precedent to the commencement of such Grace Period), the failure by the Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure.

"**Finance Documents**" means this Agreement and any other document designated as such by the Lender and the Borrower and "**Finance Document**" means any of such documents.

"**Governmental Authority**" means any de facto or de jure government (or any agency, instrumentality, ministry or department thereof), court, tribunal, administrative or other governmental authority or any other entity (private or public) charged with the regulation of the financial markets (including the central bank) of the Reference Entity or the jurisdiction of organisation of the Reference Entity.

"**Grace Period**" means the earlier of (a) the applicable grace period with respect to payments under the relevant Obligation under the terms of such Obligation in effect as of the later of the Commitment Date and the date as of which such Obligation is issued or incurred and (b) 30 calendar days.

"**Grace Period Extension**" means in the event of a Potential Failure to Pay occurring on or prior to the Scheduled Repayment Date, and the relevant grace period ending after the Scheduled Repayment Date, the Repayment Date will become (i) in the event that the Calculation Agent determines that the Potential Failure to Pay is remedied during the Grace Period, and, in the absence of further Credit Events or further Potential Failures to Pay prior to or on the Scheduled Repayment Date, the later of (A) the Scheduled Repayment Date, and (B) the date which is the Business Day after the date of such remedy, in which case no additional interest will be payable for the period from the Scheduled Repayment Date to such amended Repayment Date, or (ii) in the event that such Potential Failure to Pay is not remedied (as determined by the Calculation Agent in its sole and absolute discretion) before the end of the Grace Period, the Credit Event Redemption Date (the adjusted Repayment Date pursuant to these provisions being the "**Grace Period Extension Date**").

"**Holding Company**" means, in relation to a company or corporation, any other company or corporation in respect of which it is a Subsidiary.

"**Interest Period**" means, in relation to the Loan, each period determined in accordance with Clause 9 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with Clause 8.3 (*Default interest*).

"**LIBOR**" means, in relation to the Loan:

(a)    the applicable Screen Rate; or

(b)    (if no Screen Rate is available for the currency or period of the Loan) the rate quoted by the Calculation Agent to leading banks in the London interbank market,

as of 11:00 a.m. (London time) on the Quotation Day for the offering of deposits in the currency of the Loan and for a period equal to the Designated Maturity.

"**Loan**" means the amount borrowed by the Borrower pursuant to the facility contemplated by this Agreement as repaid from time to time in accordance with the terms of this Agreement.

"**Margin**" means 2.10 per cent. per annum.

"**Maximum Maturity**" means an obligation that has a remaining maturity from the Credit Event Redemption Date of not greater than the period specified in the Deliverable Obligation Characteristics.

"**Modified Following Business Day Convention**" means if a relevant date is not a Business Day, such date shall be postponed to the first following day that is a Business Day unless that day falls in the next calendar month, in which case that date will be the first preceding day that is a Business Day.

"**Not Bearer**" means any obligation that is not a bearer instrument unless interests with respect to such bearer instrument are cleared via the Euroclear system, Clearstream, Luxembourg or any other internationally recognized clearing system.

"**Not Contingent**" means any obligation having as the Credit Event Redemption Date and all times thereafter an outstanding principal balance or in the case of obligations that are not Borrowed Money, a Due and Payable Amount, that pursuant

to the terms of such obligation may not be reduced as a result of the occurrence or non occurrence of an event or circumstance (other than payment). A Convertible Obligation, an Exchangeable Obligation and an Accreting Obligation shall satisfy the Not Contingent Deliverable Obligation Characteristic if such Convertible Obligation, Exchangeable Obligation or Accreting Obligation otherwise meets the requirements of the preceding sentence so long as, in the case of a Convertible Obligation or an Exchangeable Obligation, the right (A) to convert or exchange such obligation or (B) to require the issuer to purchase or redeem such obligation (if the issuer has exercised or may exercise the right to pay the purchase or redemption price, in whole or in part, inequity Securities ) has not bee exercised (or such exercise has been effectively rescinded) on or before the Credit Event Redemption Date.

If a Reference Obligation is a Convertible Obligation or an Exchangeable Obligation, then such Reference Obligation may be included as a Deliverable Obligation only if the rights referred to in clauses (A) and (B) above have not been exercised (or such exercise has been effectively rescinded) on or before the Credit Event Redemption Date.

"**Not Domestic Issuance**" means any obligation other than an obligation that was, at the time of relevant obligation was issued (or reissued, as the case may be) or incurred, intended to be offered for sale primarily in the domestic market of the relevant Reference Entity.  Any obligation that is registered or qualified for sale outside the domestic market of the relevant Reference Entity (regardless of whether such obligation is also registered or qualified for sale within the domestic market of the relevant Reference Entity) shall be deemed not to be intended for sale primarily in the domestic market of the Reference Entity.

"**Not Domestic Law**" means any obligation that is not governed by the laws of (A) the Reference Entity, if such Reference Entity is a Sovereign, or (B) the jurisdiction of organisation of the Reference Entity, if such Reference Entity is not a Sovereign.

"**Not Sovereign Lender**" means any obligation that is not primarily owed to a Sovereign or Supranational Organisation, including, without limitation, obligations generally referred to as "Paris Club" debt.

"**Not Subordinated**" means an obligation that is not Subordinated to the most senior Reference Obligation in priority of payment.

"**Obligations**" means the Reference Obligation and any Borrowed Money of the Reference Entity with the Obligation Characteristics.

"**Obligation Characteristics**" means:

(i)        Not Sovereign Lender

(ii)       Not Subordinated

(iii)      Not Domestic Currency

(iv)      Not Domestic Issuance

(v)       Not Domestic Law

"**Party**" means a party to this Agreement and includes its successors in title, permitted assigns and permitted transferees.

"**Payment Requirement**" means US$1,000,000 or its equivalent in any currency or currencies in which an Obligation is denominated, as of the occurrence of the relevant Failure to Pay or Potential Failure to Pay.

"**Permitted Currency**" means (1) the legal tender of any Group of 7 country (or any country that becomes a member of the Group of 7 if such Group of 7 expands its membership) or (2) the legal tender of any country which, as of the date of such change, is a member of the Organization for Economic Cooperation and Development and has a local currency long-term debt rating of either AAA or higher assigned to it by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. or any successor to the rating business thereof, Aaa or higher assigned to it by Moody's Investors Service, Inc. or any successor to the rating business thereof or AAA or higher assigned to it by Fitch Ratings or any successor to the rating business thereof.

"**Potential Failure to Pay**" means the failure by the Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations without regard to any grace period or any conditions precedent to the commencement of any grace period applicable to such Obligation.

"**Publicly Available Information**" means information that reasonably confirms any of the facts relevant to the determination that a Credit Event has occurred and which:

(a)    has been published in an internationally recognised published or electronically displayed news sources (including, without limitation, Standard Public Sources), regardless of whether the reader or user thereof pays a fee to obtain such information; provided that, if the Borrower or any of its Affiliates is cited as the sole source of such information, then such information shall not be deemed to be Publicly Available Information unless the Borrower or one of its Affiliates is acting in its capacity as trustee, fiscal agent, administrative agent, clearing agent or paying agent for any Obligation; or

(b)    is information received from (A) the Reference Entity or (B) a trustee, fiscal agent, administrative agent, clearing agent or paying agent for any Obligation; or

(c)    is information contained in any petition or filing constituting a proceeding against or by the Reference Entity seeking a judgement of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or similar law affecting creditors' rights, or a petition presented for its winding-up or liquidation and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgement of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; or

(d)    is information contained in any order, decree or notice, however described, of a court, tribunal, regulatory authority or similar administrative or judicial body.

Publicly Available Information may be assumed to have been disclosed without violating any law, agreement or understanding regarding its confidentiality and need not state that the occurrence of the relevant Credit Event (i) has met the Default Requirement, (ii) is the result of exceeding any applicable Grace Period or (iii) has met the subjective criteria specified in certain Credit Events.

"**Qualifying Guarantee**" means an arrangement evidenced by a written instrument pursuant to which the Reference Entity irrevocably agrees (by guarantee of payment or equivalent legal arrangement) to pay all amounts due under an obligation (the "**Underlying Obligation**") for which another party is the obligor (the "**Underlying Obligor**") and that is not at the time of the Credit Event Subordinated to any unsubordinated Borrowed Money obligation of the Underlying Obligor (with references in the definition of Subordination to the Reference Entity deemed to refer to the Underlying Obligor). Qualifying Guarantees shall exclude any arrangement (i) structured as a surety bond, financial guarantee insurance policy, letter of credit or equivalent legal arrangement or (ii) pursuant to the terms of which the payment obligations of the Reference Entity can be discharged, reduced, assigned or otherwise altered as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). The benefit of a Qualifying Guarantee must be capable of being Delivered together with the Delivery of the Underlying Obligation.

"**Quotation Day**" means, in relation to any period for which an interest rate is to be determined, two business days (each being a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in London) before the first day of that period, unless market practice differs in the Relevant Interbank Market for the relevant currency, in which case the Quotation Day for that currency will be determined by the Lender in accordance with market practice in the Relevant Interbank Market (and if quotations for that currency and period would normally be given by leading banks in the Relevant Interbank Market on more than one day, the Quotation Day will be the last of those days).

"**Reference Entity**" means CMC Magnetics Corporation and any Successor thereto.

"**Reference Entity Loans**" means any obligation of the Reference Entity of a type included in the "Borrowed Money" Obligation Category that is documented by a term loan agreement, revolving loan agreement or other similar credit agreement and shall not include any other type of Borrowed Money.

"**Reference Obligation**" means , in respect of the Reference Entity, CMC Magnetics Corporation  US$100,000,000 zero per cent. notes due 3 June 2012 (ISIN: XS0303681182).

"**Relevant Interbank Market**" means the London interbank market.

"**Repayment Date**" means the Scheduled Repayment Date subject to Grace Period Extension.

"**Restructuring**" means,

(a)    means that, with respect to one or more Obligations and in relation to an aggregate amount of not less than the Default Requirement,  any one or more of the following events occurs in a form that binds all holders of such

Obligation, is agreed between the Reference Entity or a Governmental Authority and a sufficient number of holders of such Obligation or is announced (or otherwise decreed) by the Reference Entity or a Governmental Authority in a form that binds all holders of such Obligation, and such event is not expressly provided for under the terms of such Obligation in effect as of the later of the Commitment Date and the date as of which such Obligation is issued or incurred:

(i)    a reduction in the rate or amount of interest payable or the amount of scheduled interest accruals;

(ii)    a reduction in the amount of principal or premium payable at maturity or at scheduled redemption dates;

(iii)    a postponement or other deferral of a date or dates for either (A) the payment or accrual of interest or (B) the payment of principal or premium;

(iv)    a change in the ranking in priority of payment of any Obligation, causing the Subordination of such Obligation to any other Obligation; or

(v)    any change in the currency or composition of any payment of interest or principal to any currency which is not a Permitted Currency.

(b)    Notwithstanding the provisions of (a) above, none of the following shall constitute a Restructuring:

(i)    the payment in euros of interest or principal in relation to an Obligation denominated in a currency of a Member State of the European Union that adopts or has adopted the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union;

(ii)    the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) above due to an administrative adjustment, accounting adjustment or tax adjustment or other technical adjustment occurring in the ordinary course of business; and

(iii)    the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) above in circumstances where such event does not directly or indirectly result from a deterioration in the creditworthiness or financial condition of the Reference Entity.

(c)    For the purposes of (a) and (b) above, the term Obligation shall be deemed to include Underlying Obligations for which the Reference Entity is acting as provider of a Qualifying Guarantee. In the case of a Qualifying Guarantee and an Underlying Obligation, references to the Reference Entity in (a) shall be deemed to refer to the Underlying Obligor and the reference to the Reference Entity in (b) shall continue to refer to the Reference Entity.

"**Scheduled Repayment Date**" means 20 June 2009.

"**Screen Rate**" means, in relation to LIBOR, the British Bankers Association Interest Settlement Rate for the relevant currency (USD for the purpose of the Loan) and for a period equal to the Designated Maturity displayed on Reuters Page LIBOR01 screen. If the agreed page is replaced or service ceases to be available, the

Calculation Agent may specify another page or service displaying the appropriate rate after consultation with the Borrower.

"**Security**" means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Sovereign Agency**" means any agency, instrumentality, ministry, department or other authority (including without limiting the foregoing, the central bank) of a Sovereign.

"**Sovereign**" means any state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including, without limiting the foregoing, the central bank) thereof.

"**Specified Currency**" means an obligation that is payable in the currency or currencies specified above, or, any of the lawful currencies of Canada, Japan, Switzerland, the United Kingdom and the United States of America and the euro and any successor currency to any of the aforementioned currencies, which currencies shall be referred to collectively as the "**Standard Specified Currencies**."

"**Standard Public Sources**" means each of Bloomberg Service, Dow Jones Telerate Service, Reuter Monitor Money Rates Services, Dow Jones News Wire, Wall Street Journal, New York Times, Nihon Keizai Shinbun, Asahi Shinbun, Yomiuri Shinbun, Financial Times, La Tribune, Les Echos, and the Australian Financial Review (and successor publications), the main sources(s) of business news in the country in which the Reference Entity is organised and any other internationally recognised published or electronic news source.

"**Subordination**" means with respect to an obligation (the "**Subordinated Obligation**") and another obligation of the Reference Entity to which such obligation is being compared (the "**Senior Obligation**"), a contractual, trust or similar arrangement providing that (i) upon the liquidation, dissolution, reorganization or winding up of the Reference Entity, claims of the holders of the Senior Obligation will be satisfied prior to the claims of the holders of the Subordinated Obligation or (ii) the holders of the Subordinated Obligation will not be entitled to receive or retain payments in respect of their claims against Reference Entity at any time that the Reference Entity is in payment arrears or is otherwise in default under the Senior Obligation. "Subordinated" will be construed accordingly. For purposes of determining whether Subordination exists or whether an obligation is Subordinated with respect to another obligation to which it is being compared, the existence of preferred creditors arising by operation of law or of collateral, credit support or other credit enhancement arrangements shall not be taken into account, except that, notwithstanding the foregoing, priorities arising by operation of law shall be taken into account where the Reference Entity is a Sovereign.

"**Subsidiary**" means a subsidiary within the meaning of section 2 of the Companies Ordinance of Hong Kong (Cap. 32).

"**Successor**" shall have the meaning set out in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions (the "**Credit Derivatives Definitions**"), in each case as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**").

"**Supranational Organisation**" means any entity or organisation established by treaty or other arrangement between two or more Sovereigns or the Sovereign, Agencies of two or more Sovereign and includes, without limiting the foregoing, the International Monetary Fund, European Central Bank, International Bank for Reconstruction and Development and European Bank for Reconstruction and Development.

"**Swap Counterparty**" means Lehman Brothers Special Financing Inc.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Transferable**" means an obligation that is transferable to institutional investors without any contractual, statutory or regulatory restriction provided that none of the following shall be considered contractual, statutory or regulatory restrictions:

(a)    contractual, statutory or regulatory restrictions that provide for eligibility for resale pursuant to Rule 144A or Regulation S promulgated under the United States Securities Act of 1933, as amended (and any contractual, statutory or regulatory restrictions promulgated under the laws of any jurisdiction having a similar effect in relation to the eligibility for resale of an obligations); or

(b)    restrictions on permitted investments such as statutory or regulatory investment restrictions on insurance companies and pension funds.

"**Unpaid Sum**" means any sum due and payable but unpaid by the Borrower under the Finance Documents.

"**Unwind Costs**" means the greater of (a) the value of any transfer or stamp tax costs, early redemption or termination cost (howsoever defined), if any, due to be paid by the Borrower or the Swap Counterparty, as determined by the Calculation Agent in its sole and absolute discretion, in relation to any swap agreement, financing arrangement or other hedging transaction entered into by or on behalf of the Borrower or the Swap Counterparty in relation to the issuance of the Loan and (b) zero.

"**US$**", "**USD**" and "**US Dollars**" means the lawful currency of the United States of America.

**1.2    Construction**

1.2.1.    Any reference in this Agreement to:

(a)    "**assets**" includes present and future properties, revenues and rights of every description;

(b)    a "**Finance Document**" or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended or novated;

(c)    "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(d)    a "**person**" includes any person, firm company, corporation, government, state or agency of a state or any association, trust or partnership (whether or not having separate legal personality) or two or more of the foregoing;

(e)    a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation; .

(f)    a provision of law is a reference to that provision as amended or re-enacted; and

(g)  .  unless a contrary indication appears, a time of day is a reference to London time.

1.2.2    Section, Clause and Schedule headings are for ease of reference only.

1.2.3.   Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

1.2.4.   A Default (other than a Facility Default) is "**continuing**" if it has not been remedied or waived and a Facility Default is "**continuing**" if it has not been waived.

### 1.3    Third Party Rights

A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Agreement.

## 2    THE FACILITY

Subject to the terms of this Agreement, the Lender makes available to the Borrower a US Dollar term loan facility in an amount equal to the Commitment.

## 3    PURPOSE

The Borrower may apply all amounts borrowed by it under the Facility for the general funding purposes of it, or of its Subsidiary, or of a Holding Company of it or its Subsidiary or of any other Subsidiary of that Holding Company, in each case including, but not limited to, general working capital and short-term investments.

## 4    CONDITION OF DRAWDOWN

The Lender will only be obliged to comply with Clause 5.4 (*Availability of Loan*) if on the date of the Drawdown Request and on the proposed Drawdown Date no Default is continuing or would result from the proposed Loan.

## 5    DRAWDOWN

### 5.1    Delivery of a Drawdown Request

The Borrower may utilise the Facility by delivery to the Lender of a duly completed Drawdown Request at any time and not later than the Drawdown Date.

### 5.2    Completion of a Drawdown Request

A Drawdown Request is irrevocable and will not be regarded as having been duly completed unless:

**5.2.1**    the amount of the drawdown complies with Clause 5.3 (*Amount*); and

**5.2.2**    it specifies the account and bank to which the proceeds of the Loan are to be credited.

### 5.3    Amount

The amount of the proposed Loan must be an amount which is equal to the Commitment.

### 5.4    Availability of Loan

If the conditions set out in this Agreement have been met, the Lender shall make the Loan available through its Facility Office.

## 6    REPAYMENT

**Repayment of Loan**

Subject to the other provisions of this Agreement (including without limitation the provisions under Clause 7.1 (*Credit Event*) and Clause 7.2 (*Optional Prepayment of Loan*)), the Borrower shall repay the Loan on the Repayment Date.

## 7    PREPAYMENT AND CREDIT EVENT

### 7.1    Credit Event

**7.1.1**    Upon the first occurrence of a Credit Event, as determined by the Calculation Agent in its sole and absolute discretion, the Calculation Agent shall serve a Credit Event Notice on both the Borrower and the Lender within three Business Days of the Credit Event Determination Date and the Borrower's obligation to pay any accrued interest and amount of the Loan shall be substituted and replaced by an obligation to either (i) arrange for the delivery of Deliverable Obligations with a face amount equal to the Loan to the Lender at the risk of the Lender (such amount being the "**Deliverable Obligation Amount**") or (ii) in the event (a) that it is impossible or illegal or due to any law, regulation or court order, to deliver the Deliverable Obligations, pay to the Lender an amount in accordance with Clause 7.1.3 or (b) where the Deliverable Obligations could be legally delivered to and accepted by a third party as may be designated by the Lender, deliver the Deliverable Obligations to such designated third party in each case at the risk of the Lender on or by the Credit Event Redemption Date in accordance with this Clause 7.1.

7.1.2    The delivery of the Deliverable Obligations (to be procured by the Borrower) pursuant to Clause 7.1.1 shall be effected in such commercially reasonable manner as the Calculation Agent shall, in its sole and absolute discretion, determine to be appropriate and customary for such delivery and customary for the settlement of the Deliverable Obligations in order to convey all right, title and interest to the Lender free and clear of liens, charges, claims or encumbrances created or incurred by the Borrower or any of its Affiliates, (other than any caused by the Lender or any of its Affiliates) on or prior to the Credit Event Redemption Date, provided that (i) if the Calculation Agent determines, in its sole and absolute discretion, that Settlement Disruption applies in respect of the Deliverable Obligations, as the case may be, the obligation to procure the delivery and settlement of the Deliverable Obligations as provided above shall be deferred until such time that the Settlement Disruption ceases to apply (subject to Clause 7.1.3) and (ii) delivery of the Deliverable Obligations shall be made upon payment by the Lender of all applicable transfer or stamp taxes and in accordance with the usual market practice for delivery of an asset of that type, subject to compliance by the Lender with all applicable laws and regulations in respect of the holding of the Deliverable Obligations, as the case may be. Delivery shall be made to the Lender or, where the Deliverable Obligations can be transferred by book entries, by transfer to an account in the relevant book entry system nominated by the Lender no later than 30 Business Days following the Credit Event Determination Date.

7.1.3    If, in the opinion of the Calculation Agent:

(a)    due to circumstances beyond the control of the Borrower, it is or would be impossible or illegal or due to any law, regulation or court order, for the Borrower to obtain or deliver some or all of the Deliverable Obligations to the Lender as provided in Clause 7.1.1, including, without limitation, circumstances in which the Borrower is or would be unable to obtain or deliver the Deliverable Obligations as a result of Settlement Disruption or due to any law, regulation or court order or failure of any relevant clearance system; and/or

(b)    due to circumstances within the control of the Lender (including, without limitation, its failure to take delivery of the Deliverable Obligations), the Borrower is unable to arrange, or conditions are not fulfilled, for the delivery of some or all of the Deliverable Obligations as provided in Clause 7.1.1 to the Lender,

and such circumstances continue for a period ending on the fifteenth Business Day following the Credit Event Redemption Date (the "**Delivery Cut-Off Date**"), the Borrower's delivery obligations under Clause 7.1.1 to the Lender with respect to Deliverable Obligations or relevant portion thereof the delivery of which to the Lender is affected by circumstances described above (the "**Undeliverable Obligations**") shall be substituted and replaced by an obligation to pay to the Lender, within three Business Days following the date on which the Calculation Agent determines the market value of the Undeliverable Obligations (as set out below), a cash amount in US Dollars equal to the best available clean bid price, excluding

accrued interest, expressed as a percentage, of such Undeliverable Obligations, such bid price to be obtained and determined by the Calculation Agent on the second Business Day following the Delivery Cut-Off Date at such time, from such three dealers and in such markets as it chooses in its sole and absolute discretion.

7.1.4    For the purposes of Clause 7.1:

"**Credit Event Redemption Date**" means the date so specified by the Calculation Agent in a notice to the Lender falling not more than 30 Business Days after the Credit Event Determination Date;

"**Settlement Disruption**" means an event has occurred or condition exists as a result of which the Deliverable Obligations cannot be cleared or transferred through the relevant clearance system or by the relevant settlement procedure for Deliverable Obligations.

## 7.2    Optional Prepayment of Loan

7.2.1    The Borrower shall have the right to prepay the Loan in full (the amount of the Loan being repaid being the "**Principal Prepayment**") on any Early Repayment Date upon giving five Business Days' notice to the Lender, at the "**Prepayment Amount**" as set out below.

7.2.2    If the Early Repayment Date falls on or before 22 December 2007, the Prepayment Amount shall be 100.50 per cent. of the Principal Prepayment plus accrued interest on the Principal Prepayment up to and excluding the Early Repayment Date calculated in accordance with Clause 8.1.

7.2.3    If the Early Repayment Date falls after 22 December 2007, the Prepayment Amount shall be 100 per cent. of the Principal Prepayment plus accrued interest on the Principal Prepayment up to and excluding the Early Repayment Date calculated in accordance with Clause 8.1.

7.2.4    Notwithstanding Clauses 7.2.1, 7.2.2 and 7.2.3 above, if a Credit Event occurs (as determined by the Calculation Agent) prior to the Early Repayment Date, any notice which has been given by the Borrower to prepay the Loan in accordance with this Clause 7.2 shall become void and the provisions of Clause 7.1 shall take precedence.

7.2.5    For the avoidance of doubt, any part of the Loan which is prepaid cannot be re-borrowed or re-drawn.

# 8    INTEREST

## 8.1    Calculation of interest

The rate of interest on the Loan for each Interest Period is the percentage rate per annum which is the aggregate of the applicable:

8.1.1    Margin; and

8.1.2    LIBOR.

Interest shall be calculated in accordance with the Day Count Convention set out in Clause 20.3.

### 8.2    Payment of interest

The Loan accrues interest on the amount of the Commitment outstanding from and including the Drawdown Date at the rate of interest specified above, payable in arrear on each Interest Payment Date (as defined under Clause 9.1.3) following each Interest Period.

If a Potential Failure to Pay has occurred with respect to the Reference Entity on or prior to an Interest Payment Date and such Potential Failure to Pay has not been cured on or prior to such Interest Payment Date, the amount of interest payable on such Interest Payment Date will be zero. Where the Potential Failure to Pay is subsequently cured, the amount of interest that would have been payable on such Interest Payment Date (but for the occurrence of the Potential Failure to Pay) (the "**Deferred Interest**") will be paid, on the basis that the relevant Potential Failure to Pay had not occurred, on the day falling three Business Days following the date on which all Potential Failures to Pay are cured.  No additional interest will be payable in respect of such Deferred Interest.

### 8.3    Default interest

8.3.1    If the Borrower fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which is the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted part of the Loan for successive Interest Periods, each of a duration selected by the Lender (acting reasonably).

8.3.2    If the overdue amount is principal of the Loan and became due on a day other than the last day of an Interest Period relating to the Loan, the first Interest Period applicable to that overdue amount shall be of a duration equal to the unexpired portion of that Interest Period and the rate of interest on that overdue amount for that Interest Period shall be the rate applicable to it immediately before it became due.

8.3.3    Any interest accruing under this Clause 8.3 shall be immediately payable by the Borrower on demand by the Lender.

8.3.4    Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

### 8.4    Notification of rates of interest

The Calculation Agent shall promptly notify the Borrower of the determination of a rate of interest under this Agreement.

## 9    INTEREST PERIODS

### 9.1    Duration of Interest Periods

9.1.1    Subject to Clause 9.1.2, each Interest Period shall commence from and including an Interest Payment Date to but excluding the next Interest

Payment Date. The first Interest Period shall commence on the Drawdown Date and end on the first Interest Payment Date thereafter.

9.1.2    An Interest Period for the Loan shall not extend beyond the Repayment Date, the date upon which the Loan is repaid or prepaid in full, the date upon which the Lender declares a Facility Default or the last day of the Interest Period immediately preceding the date upon which a Credit Event occurs.

9.1.3    "**Interest Payment Date**" means 20 September, 20 December, 20 March and 20 June of each year, subject to adjustment in accordance with the Modified Following Business Day Convention from and including 20 September 2007 to and including the Scheduled Repayment Date.

## 10    CHANGES TO THE CALCULATION OF INTEREST



If a Market Disruption Event occurs in relation to the Loan for any Interest Period, the rate of interest on the Loan for the Interest Period shall be the rate per annum which is the sum of:

**10.1**    the Margin; and

**10.2**    the rate notified to the Borrower by the Lender as soon as practicable and in any event before interest is due to be paid in respect of that Interest Period, to be that which expresses as a percentage rate per annum the cost to the Lender of funding the Loan from whatever source it may reasonably select.

In this Agreement, "**Market Disruption Event**" means, at or about noon on the Quotation Day for the relevant Interest Period, the Screen Rate is not available and the Calculation Agent is unable to provide a quotation to determine LIBOR for the relevant currency and period.

## 11    TAX

**11.1**    Subject to Clause 11.2, all payments made pursuant to this Agreement shall be made without withholding or deduction for or on account of any present or future Tax.

**11.2**    If the Borrower is required by applicable law or regulation to make any such payment in respect of the Loan subject to any withholding or deduction for or on account of any Tax, the Borrower shall make such payment after such withholding or deduction has been made and shall account to the relevant authorities for the amount so required to be withheld or deducted.

**11.3**    The Borrower shall not be obliged to make any additional payments to the Lender in respect of any such withholding or deduction described in Clause 11.2.

## 12    REPRESENTATIONS

The Borrower makes the representations and warranties set out in Clauses 12.1 to 12.5 to the Lender on the date of this Agreement.

**12.1**    Status



12.1.1    It is a corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

12.1.2    It and each of its Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

12.1.3    it has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement and the transaction contemplated herein.

12.1.4    the Loan is in compliance with all laws and regulations applicable to it and the internal investment policy or otherwise of the Lender in whatever respect.

## 12.2   Binding obligations

The obligations expressed to be assumed by it in each Finance Document are, subject to any general principles of law limiting its obligations, legal, valid, binding and enforceable obligations.

## 12.3   Non-conflict with other obligations

The entry into and performance by it of, and the transactions contemplated by, the Finance Documents do not and will not conflict with:

12.3.1    any law or regulation applicable to it;

12.3.2    its constitutional documents; or

12.3.3    any agreement or instrument binding upon it or any of its assets.

## 12.4   Power and authority

It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Finance Documents to which it is a party and the transactions contemplated by those Finance Documents.

## 12.5   Validity and admissibility in evidence

All Authorisations required or desirable:

12.5.1    to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Finance Documents to which it is a party; and

12.5.2    to make the Finance Documents to which it is a party admissible in evidence in its jurisdiction of incorporation,

have been obtained or effected and are in full force and effect.

12.6   Neither the other party nor any of the other party's affiliates has made any representation whatsoever with respect to the Reference Entity, on which it is relying or is entitled to rely; and

12.7   The Borrower is entering into the Finance Documents for either investment, financial intermediation, hedging or other commercial purposes.

The Lender makes the representation and warranty set out in Clause 12.8.

**12.8** The Lender has taken all necessary corporate action to authorise the execution, delivery and performance of the Finance Documents and the loan transaction contemplated herein. Furthermore, the loan transaction contemplated herein is in compliance with all laws and regulations applicable to the Lender and the internal investment policy or otherwise of the Lender in whatever respect.

## 13   GENERAL UNDERTAKINGS

The undertakings in this Clause 13 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

### 13.1   Authorisations

The Borrower shall promptly:

**13.1.1** obtain, comply with and do all that is necessary to maintain in full force and effect; and

**13.1.2** supply certified copies to the Lender of,

any Authorisation required under any law or regulation of its jurisdiction of incorporation to enable it to perform its obligations under the Finance Documents and to ensure the legality, validity, enforceability or admissibility in evidence in its jurisdiction of incorporation of any Finance Document.

### 13.2   Compliance with laws

The Borrower shall comply in all respects with all laws to which it may be subject, if failure so to comply would materially impair its ability to perform its obligations under the Finance Documents.

## 14   FACILITY DEFAULT

Each of the events or circumstances set out in this Clause 14 constitutes Facility Default.

### 14.1   Non-payment

The Borrower does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless payment is made within 30 days of its due date.

### 14.2   Insolvency proceedings

Any corporate action, legal proceedings or other procedure or step is taken (other than as provided in any Finance Document) in relation to:

**14.2.1** the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Borrower;

**14.2.2** a composition, assignment or arrangement with any creditor of the Borrower;

14.2.3    the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of the Borrower or any of its assets; or

14.2.4    enforcement of any Security over any assets of the Borrower,

or any analogous procedure or step is taken in any jurisdiction and which is not discharged or set aside after 90 days from inception.

### 14.3    Acceleration

On and at any time after the occurrence of a Facility Default, the Lender may, by notice to the Borrower:

14.3.1    cancel the Commitment whereupon it shall immediately be cancelled;

14.3.2    declare that all or part of the Loan, together with accrued interest, and all other amounts accrued under the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable; and/or

14.3.3    declare that all or part of the Loan be payable on demand, whereupon it shall become immediately payable on demand by the Lender.

## 15    CHANGES TO THE PARTIES

Each of the Lender and the Borrower may assign or transfer by novation any of its rights and obligations under this Agreement with the prior written consent of the other.

## 16    ROLE OF THE CALCULATION AGENT AND THE ARRANGER

### 16.1    Appointment of the Calculation Agent

16.1.1    The Borrower appoints the Calculation Agent to act as its agent under and in connection with the Finance Documents and the Lender consents to such appointment.

16.1.2    The Borrower authorises the Calculation Agent to exercise the rights, powers, authorities and discretions specifically given to it under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions and the Lender consents to the exercise of such rights, powers, authorities and discretions.

### 16.2    Role of the Arranger

Except as specifically provided in the Finance Documents, the Arranger has no obligations of any kind to any other Party under or in connection with any Finance Document.

### 16.3    No fiduciary duties

16.3.1    Nothing in this Agreement constitutes the Calculation Agent or the Arranger as a trustee or fiduciary of any person.

16.3.2    Neither the Calculation Agent nor the Arranger shall be bound to account to the Lender for any sum or the profit element of any sum received by it for its own account.

16.3.3    For the avoidance of doubt, and without limitation, the Calculation Agent may determine the occurrence of a Credit Event and make determinations in relation to a Credit Event in its sole and absolute discretion. Such determination may be contrary to the interests of the Lender.

## 16.4    Business with the Borrower

The Calculation Agent and the Arranger may accept deposits from, lend money to and generally engage in any kind of banking or other business with the Borrower.

## 16.5    Rights and discretions of the Calculation Agent

16.5.1    The Calculation Agent may rely on:

(i)    any representation, notice or document believed by it to be genuine, correct and appropriately authorised; and

(ii)    any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify.

16.5.2    The Calculation Agent may assume, unless it has received notice in writing to the contrary in its capacity as agent for the Lender, that:

(i)    no Facility Default has occurred (unless it has actual knowledge of a Facility Default);

(ii)    any right, power, authority or discretion vested in any Party has not been exercised; and

(iii)    any notice or request made by the Borrower is made on behalf of and with the consent and knowledge of the Borrower.

16.5.3    The Calculation Agent may engage, pay for and rely on the advice or services of any lawyers, accountants, surveyors or other experts.

16.5.4    The Calculation Agent may act in relation to the Finance Documents through its personnel and agents.

16.5.5    When determining the existence of a Credit Event, the determination shall be made without regard to (A) any lack or alleged lack of authority or capacity of the Reference Entity to enter into any Obligation, (B) any actual or alleged unenforceability, illegality, impossibility or invalidity with respect to any Obligation, however described, (C) any applicable law, order, regulation, decree or notice, however described, or the promulgation of, or any change in, the interpretation by any court, tribunal, regulatory authority or similar administrative or judicial body with competent or apparent jurisdiction of any applicable law, order, regulation, decree or notice, however described or (D) the imposition of, or any change in, any exchange controls, capital restrictions or any other similar restrictions imposed by any monetary or other authority, however described. If the

Calculation Agent determines that an occurrence constitutes a Credit Event, such occurrence shall constitute a Credit Event whether or not such occurrence arises directly or indirectly from the circumstances described in (A), (B), (C) and/or (D) above.

**16.6 Responsibility for documentation**

Neither the Calculation Agent nor the Arranger:

16.6.1 is responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Calculation Agent, the Arranger, the Borrower or any other person given in or in connection with any Finance Document; or

16.6.2 is responsible for the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of or in connection with any Finance Document.

**16.7 Exclusion of liability**

16.7.1 Without limiting Clause 16.7.2, the Calculation Agent shall not be liable for any action taken by it under or in connection with any Finance Document, unless directly caused by its gross negligence or wilful misconduct.

16.7.2 No Party may take any proceedings against any officer, employee or agent of the Calculation Agent in respect of any claim it might have against the Calculation Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document and any officer, employee or agent of the Calculation Agent may rely on this Clause.

**16.8 Resignation of the Calculation Agent**

16.8.1 The Calculation Agent may resign and appoint one of its affiliates as successor by giving notice to the Lender and the Borrower.

16.8.2 Alternatively, the Calculation Agent may resign by giving notice to the Lender and the Borrower, in which case, the Borrower (after consultation with the Lender) shall appoint a successor Calculation Agent.

16.8.3 If the Borrower has not appointed a successor Calculation Agent in accordance with Clause 16.8.2 within 30 days after notice of resignation was given, the Calculation Agent may at the expense of the Lender appoint a successor Calculation Agent.

16.8.4 The retiring Calculation Agent shall make available to its successor such documents and records and provide such assistance as its successor may reasonably request for the purposes of performing its functions as Calculation Agent under the Finance Documents.

16.8.5 The resignation notice of the Calculation Agent shall only take effect upon the appointment of a successor.

16.8.6 Upon the appointment of a successor, the retiring Calculation Agent shall be discharged from any further obligation in respect of the Finance Documents but shall remain entitled to the benefit of this Clause 16. Its

successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

**16.9**   Credit appraisal by the Lender

The Lender confirms to the other Parties that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

16.9.1   the financial condition, status and nature of the Borrower and the Reference Entity;

16.9.2   the legality, validity, effectiveness, adequacy or enforceability of any Finance Document and any other agreement, Security, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

16.9.3   whether the Lender has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, Security, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

16.9.4   the adequacy, accuracy and/or completeness of any other information provided by the Calculation Agent, any Party or by any other person (except the Borrower) under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, Security, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document.

## 17   CONDUCT OF BUSINESS BY THE PARTIES

No provision of this Agreement will:

**17.1**   interfere with the right of any Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

**17.2**   oblige any Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

**17.3**   oblige any Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

## 18   PAYMENT MECHANICS

**18.1**   **Payments to the Lender**

18.1.1   On each date on which the Borrower is required to make a payment under a Finance Document, the Borrower shall make the same available to the Lender for value on the due date at the time and in such funds specified by

the Lender as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

18.1.2    Payment shall be made to such account in the principal financial centre of the country of that currency with such bank as the Lender may notify to the Borrower by not less than three Business Days' notice.

## 18.2    Payments to the Borrower

18.2.1    On each date on which the Lender is required to make a payment under a Finance Document, the Lender shall make the same available to the Borrower for value on the due date at the time and in such funds specified by the Lender as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

18.2.2    Payment shall be made to such account in the principal financial centre of the country of that currency with such bank as the Borrower may notify to the Lender in the Drawdown Request.

## 18.3    Business Days

18.3.1    Any payment which is due to be made on a day that is not a Business Day shall be made on the immediately following Business Day unless that day falls in the next calendar month, in which case such payment shall be made on the date that will be the first preceding day that is a Business Day.

18.3.2    Subject to Clause 7.1 (*Credit Event*), during any extension of the due date for payment of any principal or an Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

## 18.4    Currency of account

18.4.1    US Dollars is the currency of account and payment for any sum due from the Borrower under any Finance Document.

18.4.2    A repayment of the Loan or Unpaid Sum or a part of the Loan or Unpaid Sum shall be made in US Dollars.

18.4.3    Each payment of interest shall be made in US Dollars.

18.4.4    Each payment in respect of costs, expenses or Tax shall be made in the currency in which the costs, expenses or Tax are incurred.

# 19    NOTICES

## 19.1    Communications in writing

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax, letter or telex.

## 19.2    Addresses

The address, fax number and telex number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the

Finance Documents is that identified with its name below, or any substitute address, fax number, telex number or department or officer as the Party may notify to the other Parties by not less than five Business Days' notice.

**19.3   Delivery**

Any communication or document made or delivered by the Lender to another Party under or in connection with the Finance Documents will only be effective:

19.3.1   if by way of fax, when received in legible form; or

19.3.2   if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address; or

19.3.3   if by way of telex, when despatched, but only if, at the time of transmission, the correct answerback appears at the start and at the end of the sender's copy of the notice, and

19.3.4   if a particular department or officer is specified as part of its address details provided under Clause 19.2 (*Addresses*), if addressed to that department or officer.

**19.4   English language**

19.4.1   Any notice given under or in connection with any Finance Document must be in English.

19.4.2   All other documents provided under or in connection with any Finance Document must be:

(a)   in English; or

(b)   if not in English, and if so required by the Lender, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 20   CALCULATIONS AND CERTIFICATES

**20.1   Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by the Lender are prima facie evidence of the matters to which they relate.

**20.2   Certificates and Determinations**

Any certification or determination by the Lender of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**20.3   Day Count Convention**

Any interest, commission or fee accruing under a Finance Document in respect of a period will accrue from day to day and is calculated on the basis of the actual

number of days in such period (including the first but excluding the last day of such period) and a year of 360 days.

## 21    PARTIAL INVALIDITY

If, at any time, any provision of the Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 22    REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of the Lender, any right or remedy under the Finance Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

## 23    AMENDMENTS AND WAIVERS

No term of any of the Finance Documents may be amended or waived without the prior consent of the Lender and the Borrower and any such amendment or waiver will be binding on all Parties.

## 24    COUNTERPARTS

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

## 25    GOVERNING LAW

This Agreement is governed by English law.

This Agreement has been entered into on the date stated at the beginning of this Agreement and has been entered into outside the Republic of China.

### SCHEDULE 1
### DRAWDOWN REQUEST

To:      Bank of Kaohsiung, Offshore Banking Branch (the "**Lender**")

From:   Lehman Brothers Asia Holdings Limited (the "**Borrower**")

Dated: 22 June 2007

Dear Sirs

**US$3,000,000 Facility Agreement dated 22 June 2007**
**between the Lender and the Borrower (the "Facility Agreement")**

Terms defined in the Facility Agreement shall have the same meaning when used herein.

1      We wish to borrow a Loan on the following terms:

       Proposed Drawdown Date:    22 June 2007 (or, if that is not a Business Day, the next
                                  Business Day)

       Amount:                    the Commitment

2      We confirm that the condition specified in Clause 4 (*Condition of Drawdown*) is satisfied on
       the date of this Drawdown Request.

3      The proceeds of this Loan should be credited to:

       Citibank New York
       A/C Lehman Brothers Asia Holdings Ltd
       A/C 4068 8866

4      This Drawdown Request is irrevocable.


                          Yours faithfully



                   ......................................
                        authorised signatory for
                   Lehman Brothers Asia Holdings Limited

- 28 -

**LEHMAN BROTHERS ASIA HOLDINGS LIMITED**
as Borrower

Address:          Two International Finance Centre
                  8 Finance Street, Central
                  Hong Kong

Fax No:           (852) 2372 5456/(852) 2372 5052

Tel No:           (852) 2252 6456/(852) 2252 6052

Attention:        Sarah Bower, Director

By:

Vivian Wong
Authorised Signatory

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

as Calculation Agent

Address:          25 Bank Street
                  London E14 5LE

Fax No:           44 207 067 8388

Attention:        Louise Gray, Transaction Management


By:




**LEHMAN BROTHERS ASIA LIMITED**
as Arranger

Address:          Two International Finance Centre
                  8 Finance Street, Central
                  Hong Kong

Fax No:           (852) 2372 5456/(852) 2372 5052

Tel No:           (852) 2252 6456/(852) 2252 6052

Attention:        Chan Yuet Hung, Director

By:

Vivian Wong
Authorised Signatory

**LEHMAN BROTHERS ASIA HOLDINGS LIMITED**
as Borrower

| | |
|---|---|
| Address: | Two International Finance Centre |
| | 8 Finance Street, Central |
| | Hong Kong |
| Fax No: | (852) 2372 5456/(852) 2372 5052 |
| Tel No: | (852) 2252 6456/(852) 2252 6052 |
| Attention: | Sarah Bower, Director |

By:


**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

as Calculation Agent

| | |
|---|---|
| Address: | 25 Bank Street |
| | London E14 5LE |
| Fax No: | 44 207 067 8388 |
| Attention: | Louise Gray, Transaction Management |

By: *[signature]*

Tiki Maclennan
Authorised Signatory

**LEHMAN BROTHERS ASIA LIMITED**
as Arranger

| | |
|---|---|
| Address: | Two International Finance Centre |
| | 8 Finance Street, Central |
| | Hong Kong |
| Fax No: | (852) 2372 5456/(852) 2372 5052 |
| Tel No: | (852) 2252 6456/(852) 2252 6052 |
| Attention: | Chan Yuet Hung, Director |

By:

**BANK OF KAOHSIUNG, OFFSHORE BANKING BRANCH**
as Lender

| | |
|---|---|
| Address: | Bank of Kaohsiung, OBU |
| | 5F, 168 Po Ai 2nd Road |
| | Kaohsiung |
| | Taiwan |

Fax No:       886 7 556 3504

Tel No:       886 7 556 4760

Attention:    Ms Jean Chang

By:

BANK OF KAOHSIUNG
OFFSHORE BANKING BRANCH

*Su Chen Tai*

AUTHORIZED SIGNATURE
Vice president & Deputy
General manager
SU CHEN TAI

BANK OF KAOHSIUNG
OFFSHORE BANKING BRANCH

*Margaret Hsu*

AUTHORIZED SIGNATURE
Margaret Hsu
Manager

# DRAWDOWN REQUEST

To:     Bank of Kaohsiung, Offshore Banking Branch (the **"Lender"**)

From:   Lehman Brothers Asia Holdings Limited (the **"Borrower"**)

Dated:  22 June 2007

Dear Sirs

### US$3,000,000 Facility Agreement dated 22 June 2007
### between the Lender and the Borrower (the "Facility Agreement")

Terms defined in the Facility Agreement shall have the same meaning when used herein.

1    We wish to borrow a Loan on the following terms:

Proposed Drawdown Date:    22 June 2007 (or, if that is not a Business Day, the next Business Day)

Amount:                     the Commitment

2    We confirm that the condition specified in Clause 4 (*Condition of Drawdown*) is satisfied on the date of this Drawdown Request.

3    The proceeds of this Loan should be credited to:

Citibank New York
A/C Lehman Brothers Asia Holdings Ltd
A/C 4068 8866

4    This Drawdown Request is irrevocable.

Yours faithfully

Vivian Wong
Authorised Signatory
authorised signatory for
Lehman Brothers Asia Holdings Limited

# UNANIMOUS WRITTEN CONSENT OF THE

## EXECUTIVE COMMITTEE OF THE

## BOARD OF DIRECTORS OF

## LEHMAN BROTHERS HOLDINGS INC.

The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware:

WHEREAS, the Corporation has previously authorized by specific resolution, which authority has not been revoked (the "Outstanding Guarantee Resolutions"), the guarantee of all or specified obligations and liabilities of certain direct and indirect subsidiaries of the Corporation, each of which is a "Guaranteed Subsidiary" as such term is used in the Corporation's Code of Authorities as currently in effect (the "Code"),

WHEREAS, certain of the Guaranteed Subsidiaries presently enjoy full guarantees while others have only partial guarantees, and the Corporation now wishes to expand such partial guarantees to full guarantees,

WHEREAS, due to the passage of time the names of certain of the Guaranteed Subsidiaries have changed, rendering the Outstanding Guarantee Resolutions out of date to that extent,

WHEREAS, the Corporation wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,

WHEREAS, Management wishes to establish additional Guaranteed Subsidiaries,

WHEREAS, Management wishes to specify that to the extent lawful and allowable, guarantees issued by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, so as to secure certain tax and accounting benefits, and

WHEREAS, Management believes that it would facilitate the conduct of the business of the Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their entirety with this single document,

NOW THEREFORE BE IT,

05-09-05   11:G1   JDM INVESTMENTS                    ID=2923688294              NO.290  P.02
                                                                                          004
DE. 25. 2005   29:-.    I-MH- = 91202750029!                              NO.584    D82
26/06/2005     16:41    LEHMN + 916467582653

RESOLVED, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the Code;

RESOLVED, that the Outstanding Guarantee Resolutions are hereby superseded and replaced in their entirety with this single document, provided that any guarantees provided pursuant to the Outstanding Guarantee Resolutions and outstanding on the date hereof, whether in the form of a separately executed individual guarantee or otherwise, shall remain issued, outstanding and valid for all purposes;

RESOLVED, that guarantees provided by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, to the extent lawful and allowable, as specified on Schedule A hereto;

RESOLVED, that each of the persons listed in the Code (as it may be amended from time to time) as being authorized to approve individual guarantees issued by the Corporation with respect to Guaranteed Subsidiaries, or any proper delegee thereof (collectively, "Authorized Persons"), are hereby authorized, in the name and on behalf of the Corporation, to execute such guarantees in such form as is approved by an attorney of the Corporation and such Authorized Person, subject to any limitations specified herein, his or her execution of each such guarantee to be conclusive evidence of approval thereof; and to do such other acts and things as may be advisable or necessary in order to effect the purposes and intent of these resolutions; and

FURTHER RESOLVED, that any and all actions contemplated by the foregoing resolutions and taken by such Authorized Persons prior to the date hereof are hereby ratified, confirmed and approved in all respects.

Dated: June 7, 2005

Richard S. Fuld, Jr.                          John D. Macomber

2

**Schedule A**
**to LBHI Unanimous Written Consent**
**dated June 9 , 2005**

| | Name of Subsidiary | Issue Corporation guarantee from branch located in London, England, to the extent lawful and allowable? |
|---|---|---|
| 1. | Lehman Brothers Asia Holdings Limited | No |
| 2. | Lehman Brothers Bankhaus A.G. | Yes (London branch of such subsidiary only) |
| 3. | Lehman Brothers Commercial Bank | No |
| 4. | Lehman Brothers Commercial Corporation | No |
| 5. | Lehman Brothers Commercial Corporation Asia Limited | No |
| 6. | Lehman Brothers Equity Finance (Cayman) Limited | No |
| 7. | Lehman Brothers Finance S.A. | No |
| 8. | Lehman Brothers Holdings Plc | Yes |
| 9. | Lehman Brothers International (Europe) | Yes |
| 10. | Lehman Brothers Japan Inc. | No |
| 11. | Lehman Brothers (Luxembourg) Equity Finance S.A. | No |
| 12. | Lehman Brothers (Luxembourg) S.A. | No |
| 13. | Lehman Brothers OTC Derivatives Inc. | No |
| 14. | Lehman Brothers Securities Asia Limited | No |
| 15. | Lehman Brothers Securities N.V. | No |
| 16. | Lehman Brothers Special Financing Inc. | No |
| 17. | Lehman Brothers Treasury Co. B.V. | No |
| 18. | Lehman Re Limited | No |

3



