UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>**LEHMAN BROTHERS INC.**,<br><br>Debtor. | Case No. 08-01420 (JMP) |

**MOTION FOR LEAVE TO FILE INCORPORATED MEMORANDUM OF LAW BY
BARCLAYS CAPITAL INC. IN RESPONSE TO
<u>POST-TRIAL SUBMISSIONS BY THE SEC AND SIPC</u>**

# TABLE OF CONTENTS

MEMORANDUM OF BARCLAYS CAPITAL, INC. IN RESPONSE TO POST-TRIAL SUBMISSIONS OF SEC AND SIPC ................................................................................2

    1.    The Court Should Reject The Assertion That SEC Rule 15c3-3 Applies To SIPA Trustees. ................................................................................................4

    2.    The Court Must Reject The SEC And SIPC Arguments Relating To The $507 Million In OCC Margin. .............................................................................8

    3.    The Litigation Position Of The SEC And SIPC Is Unfair To Barclays As A Good Faith Purchaser Of Assets With Trustee And Court Approval. ................11

CONCLUSION ................................................................................................................14

# TABLE OF AUTHORITIES

**Statutes**

15 U.S.C. § 78fff-1(a) ............................................................................................. 5, 6

15 U.S.C. § 78fff-2(f) ................................................................................................. 6

15 U.S.C. § 78*lll*(4) .................................................................................................. 6

15 U.S.C. §§ 78eee(c) and (d) .................................................................................. 14

**Other Authorities**

5 COLLIER ON BANKRUPTCY ¶ 541.LH[3][b] (16th ed. 2010) ..................................... 5

**Rules**

Rule 15c3-3 ....................................................................................................... passim

Barclays Capital Inc. ("Barclays") moves this Court for leave to file the incorporated memorandum of law in response to the Post-Trial Brief of the Securities and Exchange Commission ("SEC") and the Post-Hearing Statement of the Securities Investor Protection Corporation ("SIPC") in Support of the Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b).

The SEC and SIPC have asked this Court to adopt positions that are contrary to law, contrary to the factual record in this case, and contrary to the unqualified support they gave to the Sale Transaction in September 2008 and for many months (if not years) thereafter. Most importantly, the SEC and SIPC ask the Court to hold that a series of legal pre-requisites must be satisfied before certain of the Purchased Assets may be transferred to Barclays. The SEC and SIPC did not raise these alleged pre-requisites at the time of the Sale: they were not identified at the Sale Hearing, and the SEC and SIPC were not communicate them to Barclays at the time that Barclays was making an enormous investment (and taking an enormous risk) by acquiring the LBI Business. Indeed, the SEC and SIPC did not raise these alleged pre-requisites with the Court until long after the Sale had closed (more than two years after the Closing in the case of the SEC, and more than a year and a half after the Sale in the case of SIPC).

Barclays is entitled to an opportunity to respond. There was no prior discussion with the Court about these two submissions, and when the parties agreed to their simultaneous post-trial briefing, there was no contemplation that such submissions would be made. In particular, this is the first time that the SEC has seen fit to articulate any views at all in this case since its express and vigorous support for the Sale in September 2008. In order to address such a belated attempt to influence the Court on the merits of such a protracted dispute, Barclays respectfully asks the Court for the opportunity to submit the memorandum set forth below.

# MEMORANDUM OF BARCLAYS CAPITAL, INC.
# IN RESPONSE TO POST-TRIAL SUBMISSIONS OF SEC AND SIPC

1.  At the time of the Sale Transaction, in September 2008, the SEC and SIPC supported the Barclays acquisition of the LBI broker-dealer business *even though* they knew it was highly uncertain how many customers would remain behind with the LBI estate, and what the value of the assets would be that were left with the estate to meet those claims.[1] They also knew that the Purchase Agreement contained no provision making the transfer of any assets to Barclays conditioned upon there being sufficient assets in the estate to satisfy any remaining customer claims. The reason they supported the Sale despite those uncertainties was that the Sale was better than the only available alternative – a potentially disastrous liquidation of the entire LBI business that would have left all customers immeasurably worse off. As explained in Barclays' post-trial brief, none of the Movants have even attempted to dispute the fact that the Sale Transaction (understood and enforced based on the plain terms of the Purchase Agreement, as interpreted by Barclays) was far superior to the complete liquidation of LBI that it avoided. Barclays Post-Trial Br. at ¶¶ 36-50. Nor do either SIPC or the SEC.

2.  Yet now, more than two years later, the SEC and SIPC ask the Court to hold that Barclays is not entitled to receive certain assets unless and until all customer claims have first been satisfied. They base this new claim on legal assertions that directly contradict the plain text of the statutes and regulations they purport to invoke. First, they ask the Court to hold that a SIPA Trustee's powers to transfer property are limited by SEC regulations that on their face apply only to operating broker-dealers, and that do not apply (and have never been applied) to SIPA Trustees. Second, they ask the Court to hold that the SEC rules which *permit* a broker-dealer to transfer certain assets somehow *prohibit* a SIPA Trustee from transferring those same

---

[1] *See e.g.* BCI Ex. 49 (September 19, 2008 Transcript), at 76:8 – 78:16.

assets. There is no reasonable reading of the statutes that can support these interpretations. Moreover, the SEC and SIPC have never previously promulgated these interpretations outside this litigation context. . Under these circumstances, the Court should not give any deference to the SEC and SIPC, but instead should reject their arguments.

3. In addition, the baseline premise for the submissions by the SEC and SIPC is the unfounded factual suggestion to the Court that, "according to the Trustee," the transfer of certain assets to Barclays will increase an alleged "deficiency" in the 15c3-3 reserve account, and may prevent the satisfaction of remaining customer claims.[2] Those suggestions are unsupported, and Barclays believes they are false; they also directly contradict the *express stipulation* entered into by the Trustee and Barclays that no factual findings would be made with respect to the Trustee's unproven assertion that there *may* have been a deficiency in the 15c3 account at the time of the Sale, or that there *may* currently be a shortfall in LBI's ability to resolve remaining customer claims.[3] Barclays has not even been permitted full discovery on these factual claims, let alone an opportunity to present evidence to rebut them.[4]

4. In any event, evidence should not be required on those factual issues because the law does not require either a Rule 15c3-3 reserve formula calculation or a resolution of all customer claims before a trustee may conclude, as the Trustee in this case concluded at the time of the Sale, that a transfer of assets as part of an overall sale transaction is in the best interest of the estate. The law permitted the Trustee to agree to transfer $769 million of securities from the Rule 15c3-3 reserve account irrespective of whether there is an "excess" or "surplus" in that

---

[2] *See e.g.* SEC Br. at pp. 2, 8, 10.

[3] *See* Stipulation and Order Between the Trustee and Barclays Concerning Certain Claims Under Paragraph 8(ii) of the Clarification Letter Made in the Motion and Adversary Complaint Filed by the Trustee and the Motion to Enforce the Sale Order Filed by Barclays at 5.

[4] *See generally* Barclays' Motion To Compel Production Of Date And Analyses Concerning LBI's 15c3-3 Reserve Calculation, filed September 21, 2010.

3

account; and that is exactly what the Trustee agreed to do. The law also permitted the Trustee to agree to the transfer of "all margin deposits" held by LBI to secure exchange-traded derivatives at the OCC and other exchanges or clearing houses; again, that is exactly what the Trustee agreed to do. Barclays would never have taken the risks it took if it had known that the support for the Sale from the Trustee, SIPC, and the SEC, as well as the Trustee's explicit promises at the time of the Sale, were secretly conditioned on a series of factual assumptions that were not shared with Barclays, that related to obviously uncertain facts, and that were not required by either the law or the plain text of the Purchase Agreement.

### 1. The Court Should Reject The Assertion That SEC Rule 15c3-3 Applies To SIPA Trustees.

5. As a matter of law, the positions of the SEC and SIPC are fundamentally mistaken because they fail to recognize the statutory distinction between the authority of a broker-dealer and that of a SIPA trustee. They both take the position that Rule 15c3-3 limits the ability of a SIPA trustee to transfer property that is sold in a SIPA proceeding. That contention has never been announced in a formal rulemaking or any similar guidance, and it is incorrect as a matter of straightforward statutory and regulatory interpretation.

6. Rule 15c3-3 was promulgated under Section 15 of the Securities Exchange Act of 1934, and it applies only to broker-dealers; on its face, it has no application to SIPA trustees or to bankruptcy courts handling SIPA proceedings. *See* Post-Trial Memorandum of Law and Fact of Barclays Capital Inc. ("Barclays' Br.") at ¶ 270; Proposed Conclusions of Law at ¶¶ 45.1-45.5. The Disputed Assets were not sold by a broker-dealer subject to SEC regulation, but by a SIPA trustee, pursuant to the powers of a SIPA trustee and this Court.

7. Section 7(a) of SIPA provides that a SIPA trustee "shall be vested with the same powers *and title* with respect to the debtor and the property of the debtor . . . as a trustee in a case

under title 11 of the United States Code." 15 U.S.C. § 78fff-1(a) (emphasis added). While the notion of vesting "title" in a bankruptcy trustee was eliminated in the Bankruptcy Code of 1978, it was replaced with a series of provisions that have the same net effect: *i.e.*, the trustee controls and represents the estate, which consists of all property of the debtor, and the trustee is authorized to transfer that property as if it were the direct owner of it. *See* 5 COLLIER ON BANKRUPTCY ¶ 541.LH[3][b] (16th ed. 2010) (referring to sections 541, 323(a) and 363(b) of the Bankruptcy Code); *see also* 11 U.S.C. § 1141(b) (providing that after a reorganization plan, "title" is *returned* to the debtor). Section 7(a) of SIPA was amended in 1978 to replace references to the pre-1978 Bankruptcy Act with references to title 11, but the reference to vesting "title" remains in the statute, which emphasizes that *the insolvent broker-dealer loses title to all its assets*. Moreover, the SEC promulgated Rule 15c3-3 before the 1978 amendments, at a time when it was if anything even more clear that once a SIPC liquidation commences, it is the *SIPA trustee*, not the broker-dealer, that holds title to the assets in the 15c3-3 account; nevertheless, Rule 15c3-3 says nothing at all about any limitations on the ability of a SIPA trustee to sell those assets.

8. In sum, SIPA does not simply place the SIPA trustee in the shoes of the broker-dealer. Rather, it gives the SIPA trustee control over all the property of the broker-dealer, and the ability to transfer that property.

9. The plain statutory language of the Bankruptcy Code and of SIPA permit a SIPA trustee to transfer *any* broker-dealer property and *any* customer property, so long as the trustee determines, as he did here, that the transfer is in the best interests of the estate and the transfer is approved by the Court. *See* Barclays' Proposed Conclusions of Law at ¶¶ 45.6-45.8, citing 15

5

U.S.C. § 78fff-2(f); 15 U.S.C. § 78fff-1(a).[5] Indeed, those points of law are not themselves disputed by the SEC or SIPC: they cannot dispute the fact that the *statutory language* of SIPA and the Bankruptcy Code give the SIPA trustee the power to transfer property of the estate or customer property. But they assert, without any support, that these statutory powers under SIPA and the Bankruptcy Code are somehow limited by an SEC regulation that applies on its face only to broker-dealers, not to SIPA trustees. That is not correct. A regulation promulgated under one statute cannot by implication somehow limit the powers expressly provided under two different statutes. Whatever SEC regulatory requirements may apply to an insolvent broker-dealer, those requirements do not apply to a SIPA trustee, which has a *separate statutory regime* governing its rights and powers.

10. Congress could have chosen to limit a SIPA trustee's powers as currently advocated by the SEC and SIPC, but did not. The SEC and SIPC similarly could have adopted rules under SIPA to do so, but did not. It is simply false for the SEC to suggest that the *SIPA Trustee* of LBI is subject to the SEC's regulation *of broker-dealers*.

11. The SEC and SIPC position also contradicts other provisions of SIPA. If Rule 15c3-3 applied to a SIPA trustee, the trustee would be required to make deposits into the reserve account for the benefit of customers. If that were true, then there would be no need for clause (D) of SIPA's definition of "customer property," which specifically provides that "customer property" can include not only all customer assets, but also "what *would have been* set aside or held for the benefit of customers." 15 U.S.C. § 78*lll*(4) (emphasis added). By definition, if Rule

---

[5] While the Movants have argued that the Court did not approve the transfer of the 15c3-3 assets set forth in the Clarification Letter, Barclays has amply rebutted that point in its prior briefings, including its post-trial brief filed November 22, 2010. *See e.g.* Barclays' Post-Trial Br. at ¶¶ 70-74, 138-154. Moreover, the SIPA Trustee himself has said that he believes the Clarification Letter was approved, and the SEC and SIPC have obviously known about the Clarification Letter for two years prior to their submissions of November 2010. *See* Trustee Reply Br. at ¶¶ 185, 187, 200.

15c3-3 operated to *require* the trustee to set aside or hold property for the benefit of customers, there would be no need for clause (D)'s provision to consider "what *would have been* set aside or held for the benefit of customers." Clause (D) was obviously based on the assumption that the 15c3-3 rules *do not apply* once a SIPA trustee is appointed. Thus, the entire distinction between customer property and general estate property would be eliminated, and clause (D) would be superfluous, if the Court accepted the litigation positions of the SEC and SIPC in this case.

12. More generally, there is no evidence that the SIPC Trustee in this case, or SIPC trustees in prior cases, have ever attempted to comply with all of the SEC rules that apply to broker-dealers. They do not do so, and it would make no sense for them to do so in the context of presiding over a SIPC liquidation. For example, there is no evidence that SIPC trustees normally make deposits in a reserve account as required by Rule 15c3-3, respect the "absolute rights" of customers under Rule 15c3-3(l), comply with the successor registration requirements of Rule 15b1-3 or amendment requirements of Rule 15b3-1, satisfy the filing requirements of Rule 17a-5(c) & (3), or register with FINRA under Rule 15b7-1. It would make no sense for SIPA trustees to be required to comply with these broker-dealer regulations, and they do not do so. Thus, in addition to being erroneous as a matter of law, the contention that the rules applicable to registered broker-dealers apply to SIPA trustees would have wide-ranging and unforeseen consequences that would apply in *any* SIPC liquidation.

13. The SEC argues that it would make "little sense" to construe Rule 15c3-3 as not continuing "when the brokerage firm fails." (SEC Br. at 8). But that argument incorrectly assumes that the insolvent broker-dealer is the entity making asset transfer decisions; in fact, in a SIPA liquidation, the decision to transfer assets is made by the *SIPA Trustee*, not the broker-dealer. In this case, the Purchase Agreement was approved by the Trustee, in consultation with

7

SIPC and the SEC. Thus, the system makes perfect sense. Moreover, even if the system did not make sense, the SEC and SIPC could have proposed a regulation to ensure that SIPA trustees would be subject to Rule 15c3-3; any such proposed rule would have required normal notice and comment procedures, and potential challenges under the Administrative Procedures Act. No such rulemaking ever occurred. The Court cannot and should not supplant such a rulemaking process by accepting the SEC's invitation to retroactively impose such a rule in this case.

14. Finally, it is worth emphasizing that the SEC explicitly states that its brief "addresses only the operation of Rule 15c3-3, and does not address any other issues raised by the parties, including factual questions or the interpretation of the Purchase Agreement." SEC Br. at Note 1. Thus, even if the Court agrees with the SEC's legal arguments, those arguments do not change the fact that the Trustee agreed to a contract that provides on its face that if (contrary to Barclays' view at the time and now) there is a problem created by "applicable law" in transferring assets from within the Rule 15c3-3 account, Barclays is nonetheless entitled to "securities of substantially the same nature and value."[6] Those assets can be transferred from *anywhere* – from the billions of dollars of LBI assets that are *not* in the Rule 15c3-3 account, or from any of LBHI's billions of dollars of assets. The SEC's brief does not address, and cannot impact, the simply fact that *both* LBHI *and* LBI are unconditionally obligated to transfer the $769 million in securities promised under paragraph 8(ii) of the Clarification Letter.

### 2. The Court Must Reject The SEC And SIPC Arguments Relating To The $507 Million In OCC Margin.

15. Even if the Court accepts the assertion that Rule 15c3-3 applies to SIPA Trustees (which it does not, as explained above), it should nonetheless reject the SEC's assertion that Rule

---

[6] BCI Ex. 5 (Clarification Letter) at ¶ 8(ii); *see generally* Barclay Post-trial Br. at ¶¶ 271-279 (and arguments cited therein from Barclays January Brief and April Brief).

8

15c3-3 somehow prohibits the transfer of assets *which are not even held in the Reserve Account*. SEC Br. at pp. 9-12.

16. The SEC argues that the assets which constitute the "debit items" used in the calculation of the 15c3-3 reserve requirement cannot be transferred if there is not an offsetting deposit made into the Rule 15c3-3 reserve account. *Id.* at 9-10. The SEC then asserts, without citation to any record evidence, that "According to the Trustee," $507 million of the margin deposits in LBI's accounts at the OCC were counted as "debit" items in LBI's Rule 15c3-3 calculation, and "The Trustee states" that if these assets are transferred to Barclays, that "will increase the shortfall in the Reserve Bank Account" (an alleged shortfall for which there is absolutely no record evidence). *Id.* at 10. SIPC likewise appears to adopt this argument. *See* SIPC Br. at p. 5.

17. The Court should reject this argument. First, neither Rule 15c3-3 nor any other rule prohibits the transfer of assets that are "debit items" in the calculation of the Rule 15c3-3 reserve requirement. *That is why the SEC brief and the SIPC brief do not cite <u>any rule</u> to support the argument.* Thus, even if the Rule 15c3-3 rules all apply to SIPA trustees, those rules clearly permit the transfer of assets that are "debit items"; that happens every single day in the life of a broker-dealer. The only impact of such transfer is that it *may impact the next calculation of the Rule 15c3-3 reserve requirement* – along with numerous other events that occur between each weekly calculation of that requirement, and which impact the calculation of that requirement. *See* Barclays January Br. at ¶¶ 407-408, 408 n.161; Barclays Post-trial Br. at ¶¶ 259-266. Thus, the SEC is arguing not only that Rule 15c3-3 applies to SIPA trustees, but also that it applies with *greater limitations, not found in the regulations*, than normally apply to broker-dealers. There is no legal basis for such an argument, and the Court should reject it.

18. Indeed, if the SEC's argument were correct, then the OCC would have been prohibited from foreclosing on the OCC margin deposits, which no party or regulator has ever suggested. The SEC's argument would preclude the OCC and other clearing houses or exchanges from using *all* margin deposits to secure the obligations of the customer trading accounts operated by clearing-members like LBI. That would undoubtedly come as a surprise to organizations such as the OCC, and would have a crippling impact on options trading.

19. Moreover, there is no evidence in the record showing that $507 million in OCC margin deposits was a "debit" item in the Rule 15c3-3 reserve formula calculation; nor was any other evidence presented regarding what other changes in debit and credit items occurred during the week of the Sale. For example, it may well have been the case that the transfer of over 70,000 customer accounts to Barclays (and the transfer of all "PAM" accounts to Neuberger Berman) *reduced* the credits in the 15c3-3 calculation by far more than the amounts of any reduction in debits. The Court should not accept the "say so" of the Trustee, or any arguments of the SEC and SIPC that are predicated on such "say so" assumptions that neither the Trustee nor any other Movant saw fit to support with record evidence. There likewise was no evidence presented of the alleged "deficiency" and alleged "shortfall" – which were specifically subject to a stipulation with the Trustee deferring all fact findings on such issues.

20. It is especially inequitable for the SEC and SIPC to assert that the $507 million in OCC margin deposits should not be transferred to Barclays. As proven by the unrebutted evidence at trial, if Barclays had not agreed to acquire the OCC accounts as part of the Sale, the OCC would have liquidated the accounts, which almost certainly would have triggered losses that would have likely cost the estate all of the margin deposits at the OCC (including the $507 million at issue here), and potentially would have created a greater liability for the LBI estate.

Barclays Post-trial Br. at Addendum A (Findings of Fact), ¶¶ 34.8-34.10. In addition, such an OCC seizure and liquidation would have harmed customers, whose positions would have been liquidated in an OCC fire sale – a prospect that both the Trustee and SIPC wished to avoid. *Id.* at ¶ 34.10.11. By acquiring those accounts, Barclays was taking a huge risk with respect to the losses that were being generated by the positions. *Id.* at ¶¶ 34.1-34.10. Barclays agreed to take that risk based upon the express written assurance of the Trustee and the OCC that Barclays was acquiring "all margin deposits" at the OCC accounts. *Id.* at ¶¶ 31.12, 31.19-.21, 31.23, 31.27. For almost a year, the Trustee repeatedly affirmed Barclays' right to those assets. *Id.* at ¶¶ 31, 35. It would be a gross injustice for the Court to hold that the Trustee is now free, with the support of the SEC and SIPC, to change the terms of the deal, so as to capture $507 million of the assets that were indisputably included in "all margin deposits," and thereby to reap the windfall benefit of seizing assets that would never have been available to the estate absent the Barclays Sale.

21. Finally, Barclays notes that even if the SEC's statutory arguments were accepted, they would not change the fact that the Seller is obligated to perform the Purchase Agreement, and to deliver the assets promised under that agreement. There is no basis for asserting that Barclays ever agreed to take the risk that 'debit" items in the Rule 15c3-3 would be deemed to be non-transferrable (let alone the risk that this would occur as a result of *ex post* legal arguments submitted by the SEC more than two years after the Closing).

### 3. The Litigation Position Of The SEC And SIPC Is Unfair To Barclays As A Good Faith Purchaser Of Assets With Trustee And Court Approval.

22. In the course of his statement of unequivocal support for the Sale at the September 19, 2008 Sale Hearing, the SIPA Trustee for the LBI estate, Jim Giddens, expressly told the Court that (a) some customers would remain with the LBI estate, but he could not

11

specify how many, other than to say "there will be, by estimate, several thousand";[7] (b) it was not possible to say what the value of the customer claims and other liabilities would be – other than to say, "The liabilities, as best I can determine them, are in the billions.";[8] and (c) with respect to what the value would be of the assets that remained, all he could say was that "I really cannot tell."[9] In the course of his support for a Sale that was described by Mr. Miller as being in "the national interest," Mr. Giddens also stated that "Of course, in this proceeding, 500 million, three billion are really deemed to be de minimis numbers."[10]

23. Representatives from both the SEC and SIPC were present for Mr. Giddens' statements regarding the uncertainty over asset values and customer claims, and stood by their unequivocal support for the Sale.[11] *Neither one of them said anything at all about the transfer of assets to Barclays being conditioned upon the ability of the LBI estate to satisfy all claims of all customers who remained with the estate.*

24. Both the SEC and SIPC were obviously aware of the terms of the Sale. They received the APA that was filed with the Sale Motion, which provided for Barclays to acquire "all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)," which did not list the securities in the Rule 15c3-3 account as an Excluded Asset, and which did not contain any provision conditioning the transfer of any assets based upon LBI's compliance with the Rule 15c3-3 account requirements, or its ability to satisfy all remaining customer claims. BCI Ex. 1 (APA), at pp. 2-3, 6-9. They also were aware of the

---

[7] BCI Ex. 49 (9/19/08 Tr.) at 76:24 (emphasis added).

[8] BCI Ex. 49 (9/19/08 Tr.) at 78:11-12 (emphasis added).

[9] BCI Ex. 49 (9/19/08 Tr.) at 78:15-16 (emphasis added).

[10] BCI Ex. 49 (9/19/08 Tr.) ast 77:15-16.

[11] *See* BCI Ex. 48 (September 17, 2008 Transcript) at 65:21-66:1 (Bambach); BCI Ex. 49 (September 19, 2008 Transcript) at 73:20-74:1 (Caputo).

terms of the Clarification Letter: they were invited to participate on the "open line" on which all final issues relating to the Sale were clarified and resolved; their representative, the SIPA Trustee, was physically present (through his representatives) at the Weil Gotshal offices during the weekend discussion that culminated in the Closing; the SIPC Trustee and SIPC representatives, including the head of SIPC, received e mails from the OCC regarding the transfer of all margin, including all cash margin, to Barclays as part of the Sale; and both the SEC and SIPC representatives received the executed Purchase Agreement (including the Clarification Letter) that was filed in Court on September 22, 2008. *Id.* at ¶ 43 (Trustee representatives were present during Closing weekend); ¶ 32 (Trustee and SIPC were repeatedly told that all margin, specifically including cash, would be transferred). At no time did either SIPC or the SEC make any mention of their current assertion that Barclays is not entitled to any assets if the impact of the transfer might increase an alleged (but wholly unproven) "deficiency" in the Rule 15c3-3 reserve account, or might otherwise diminish the ability of the LBI estate to satisfy all customer claims. Indeed, SIPC did not raise any concern or argument regarding the terms of the Sale until April 2009, and the SEC did not do so until November 2010 – more than two years after the Closing of the Sale they unequivocally (and unconditionally) supported.

25. This lack of action is telling. Had the SEC or SIPC believed at the time of Closing that the Trustee lacked the power to transfer funds from the Reserve Account (or any of the Disputed Assets), those agencies could have and should have spoken out at the time of the transaction (or at a minimum, immediately after Closing, when the Clarification Letter was filed with the Court and served on all parties). Both agencies are statutory parties in interest to these proceedings. 15 U.S.C. §§ 78eee(c) and (d). Indeed, the first sentence of the SEC's brief emphasizes that the SEC "is a party" to this case. SEC Br. at p. 1.

26. It is fundamentally unfair to Barclays as a good faith purchaser who relied on the representations and actions of both the Trustee and the agencies to which he reports, the SIPC and the SEC, to impose *ex post* statutory interpretations that diminish Barclays' contractual rights. This is particularly true here, where unrebutted testimony at trial established that the Sale was in danger of collapsing before Lehman was able to identify assets used in the Business (which included the 15c3-3 assets) that had value and were still available to be transferred. (4/26/10 Tr. at 198:22-199:12 (McDade); 4/27/10 Tr. at 39:11-20 (McDade); 6/22/10 Tr. at 34:8-11 (Diamond); 5/3/10 Tr. at 36:3-22 (Hughes).)

27. To promote the possibility that a buyer steps up the next time United States markets are threatened by the collapse of a major broker-dealer, this Court must enforce the deal agreed to by the Trustee – as plainly permitted by statutory law. Now that the threat of imminent financial collapse has passed, this Court should not countenance new SEC commissioners repudiating their predecessors' positions before this Court in an effort to avoid any perceived political criticism that may arise in the event there turns out to be a shortfall in customer property.

## CONCLUSION

For the foregoing reasons, the Court should reject the arguments made by the SEC and SIPC and (a) deny Movants' Rule 60(b) motions in their entirety, and (b) grant Barclays the relief requested in its Motion To Enforce The Sale Order And Secure Delivery Of All Undelivered Assets.

Dated:    New York, New York
          November 29, 2010

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By:   /s/ Jonathan D. Schiller
      Jonathan D. Schiller
      Jack G. Stern
      575 Lexington Avenue
      New York, New York 10022
      Tel: (212) 446-2300
      Fax: (212) 446-2350
      Email: JSchiller@bsfllp.com
            JStern@bsfllp.com

      Hamish P. M. Hume
      5301 Wisconsin Avenue, N.W.
      Washington, D.C. 20015
      Tel: (202) 237-2727
      Fax: (202) 237-6131
      Email: HHume@bsfllp.com

*Attorneys for Barclays Capital Inc.*