B 210A (Form 210A) (12/09)

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

In re **Lehman Brothers Holdings Inc.**                    Case No. **08-13555**

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| **ILLIQUIDX LTD** | **Caja de Ahorros de Vigo, Ourense y Pontevedra** |
|---|---|
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee should be sent:

Court Claim # (if known): **60351**
Total Amount of Claim Filed:
USD $ 70,875.00 (equivalent to 50,000.00 Euros) plus all fees & interest
Amount of Claim Transferred:
USD $ 70,875.00 (equivalent to 50,000.00 Euros) plus all fees & interest
ISIN/CUSIP: XS0282208718
Date Claim Filed: October 30, 2009

**Galina Alabatchka**
**Managing Director**
**Illiquidx Ltd**
**107-111 Fleet Street**
**London EC4A 2AB, UK**
**Phone: +44 207 936 9309**
**Email: amore@illiquidx.com**

Name and Address where transferee payments should be sent (if different from above):

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By:_____                    Date:  November 30, 2010
          Transferee/Transferee's Agent

*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

Form 210B (12/09)

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

In re **Lehman Brothers Holdings Inc.**                    **Case No. 08-13555**

## NOTICE OF TRANSFER OF CLAIM
## OTHER THAN FOR SECURITY

Claim No. **60351** was filed or deemed filed under 11 U.S.C. § 1111(a) in this case by the
alleged transferor. As evidence of the transfer of that claim, the transferee filed a Transfer of Claim
Other than for Security in the clerk's office of this court on **November 30, 2010**

**Caja de Ahorros de Vigo, Ourense y Pontevedra**          **ILLIQUIDX LTD**
Name of Alleged Transferor                                 Name of Transferee


Address of Alleged Transferor:                             Address of Transferee:

**Avda. Garcia Barbon 1-3**                                **Illiquidx Ltd**
**36201, Vigo, Garcia**                                    **107-111 Fleet Street**
**Spain**                                                  **London EC4A 2AB**
**Attn: Victoria Vazquez Sacristan**                       **United Kingdom**

~~DEADLINE TO OBJECT TO TRANSFER~~
The alleged transferor of the claim is hereby notified that objections must be filed with the court
within twenty-one (21) days of the mailing of this notice. If no objection is timely received by the
court, the transferee will be substituted as the original claimant without further order of the court.


Date:_____                    _____
                                  CLERK OF THE COURT

### AGREEMENT AND EVIDENCE OF TRANSFER OF CLAIM
### LEHMAN PROGRAM SECURITY

TO:     THE DEBTOR AND THE BANKRUPTCY COURT

1.      For value received, the adequacy and sufficiency of which are hereby acknowledged, **Caja de Ahorros de Vigo, Ourense y Pontevedra** ("Seller") hereby unconditionally and irrevocably sells, transfers and assigns to **IlliquidX Ltd** (the "Purchaser"), and Purchaser hereby agrees to purchase, as of the date hereof, (a) an undivided interest, to the extent of the nominal amount specified in Schedule 1 attached hereto (the "Purchased Claim"), in Seller's right, title and interest in and to Proof of Claim Number 60351 acquired by or on behalf of Seller (the "Proof of Claim") against Lehman Brothers Holdings, Inc., debtor in proceedings for reorganization (the "Proceedings") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), administered under Case No. 08-13555 (JMP) (the "Debtor"), (b) all rights and benefits of Seller relating to the Purchased Claim, including without limitation (i) any right to receive cash, securities, instruments, interest, damages, penalties, fees or other property, which may be paid or distributed with respect to the Purchased Claim or with respect to any of the documents, agreements, bills and/or other documents (whether now existing or hereafter arising) which evidence, create and/or give rise to or affect in any material way the Purchased Claim, whether under a plan or reorganization or liquidation, pursuant to a liquidation, or otherwise, (ii) any actions, claims (including, without limitation, "claims" as defined in Section 101(5) of Title 11 of the United States Code (the "Bankruptcy Code")), rights or lawsuits of any nature whatsoever, whether against the Debtor or any other party, arising out of or in connection with the Purchased Claim, (iii) any rights and benefits arising out of or in connection with any exhibit, attachment and/or supporting documentation relating to the Purchased Claim, and (iv) any and all of Seller's right, title and interest in, to and under the transfer agreements, if any, under which Seller or any prior seller acquired the rights and obligations underlying or constituting a part of the Purchased Claim and any and all of Seller's right, title and interest in, to and under any right or remedy of Seller or any prior seller against any prior seller in respect of the Purchased Claim, but only to the extent related to the Purchased Claim, (c) any and all proceeds of any of the foregoing (collectively, as described in clauses (a), (b), and (c), the "Transferred Claims"), and (d) all rights and benefits of Seller the security or securities (any such security, a "Purchased Security") relating to the Purchased Claim and specified in Schedule 1 (as "Lehman Programs Securities to which Transfer Relates") attached hereto together with all rights and claims of the Seller against the issuer of each Purchased Security in respect thereof.

2.      Seller hereby represents and warrants to Purchaser that: (a) the Proof of Claim was duly and timely filed on or before 5:00 p.m. (prevailing Eastern Time) on November 2, 2009 in accordance with the Court's order setting the deadline for filing proofs of claim in respect of "Lehman Program Securities"; (b) the Proof of Claim relates to one or more securities expressly identified on the list designated "Lehman Programs Securities" available on http://www.lehman-docket.com as of July 17, 2009; (c) Seller owns and has good and marketable title to the Transferred Claims, free and clear of any and all liens, claims, set-off rights, security interests, participations, or encumbrances created or incurred by Seller or against Seller; (d) Seller is duly authorized and empowered to execute and perform its obligations under this Agreement and Evidence of Transfer; (e) the Proof of Claim includes the Purchased Claim specified in Schedule 1 attached hereto; and (f) Seller has not engaged in any acts, conduct or omissions, or had any relationship with the Debtor or its affiliates, that will result in Purchaser receiving in respect of the Transferred Claims proportionately less payments or distributions or less favorable treatment than other unsecured creditors.

3.      Seller hereby waives any objection to the transfer of the Transferred Claims to Purchaser on the books and records of the Debtor and the Court, and hereby waives to the fullest extent permitted by law any notice or right to receive notice of a hearing pursuant to Rule 3001(e) of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law, and consents to the substitution of Seller by Purchaser for all purposes in the case, including, without limitation, for voting and distribution purposes with respect to the Transferred Claims. Purchaser agrees to file a notice of transfer with the Court pursuant to Federal Rule of Bankruptcy Procedure 3001(e) including this Agreement and Evidence of Transfer of Claim. Seller acknowledges and understands, and hereby stipulates, that an order of the Court may be entered without further notice to Seller



transferring to Purchaser the Transferred Claims, recognizing Purchaser as the sole owner and holder of the Transferred Claims, and directing that all payments or distributions of money or property in respect of the Transferred Claim be delivered or made to Purchaser.

4.      All representations, warranties, covenants and indemnities shall survive the execution, delivery and performance of this Agreement and Evidence of Transfer of Claim and the transactions described herein. Purchaser shall be entitled to transfer its rights hereunder without any notice to or the consent of Seller. Seller hereby agrees to indemnify, defend and hold Purchaser, its successors and assigns and its officers, directors, employees, agents and controlling persons harmless from and against any and all losses, claims, damages, costs, expenses and liabilities, including, without limitation, reasonable attorneys' fees and expenses, which result from Seller's breach of its representations and warranties made herein.

5.      Seller shall promptly (but in any event no later than three (3) business days) remit any payments, distributions or proceeds received by Seller in respect of the Transferred Claims to Purchaser. Seller has transferred, or shall transfer as soon as practicable after the date hereof, to Purchaser each Purchased Security to such account, via Euroclear or Clearstream (or similar transfer method), as Purchaser may designate in writing to Seller. This Agreement and Evidence of Transfer supplements and does not supersede any confirmation, any other automatically generated documentation or any applicable rules of Euroclear or Clearstream (or similar transfer method) with respect to the purchase and sale of the Purchased Security.

6.      Each of Seller and Purchaser agrees to (a) execute and deliver, or cause to be executed and delivered, all such other and further agreements, documents and instruments and (b) take or cause to be taken all such other and further actions as the other party may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement and Evidence of Transfer, including, without limitation, cooperating to ensure the timely and accurate filing of any amendment to the Proof of Claim.

7.      Seller's and Purchaser's rights and obligations hereunder shall be governed by and interpreted and determined in accordance with the laws of the State of New York (without regard to any conflicts of law provision that would require the application of the law of any other jurisdiction). Seller and Purchaser each submit to the jurisdiction of the courts located in the County of New York in the State of New York. Each party hereto consents to service of process by certified mail at its address listed on the signature page below.

IN WITNESS WHEREOF, this AGREEMENT AND EVIDENCE OF TRANSFER OF CLAIM is executed this 30th day of November 2010.

**Caja de Ahorros de Vigo, Ourense y Pontevedra**          **Illiquidx Ltd**

By:                                                        By:
Name:                                                      Name: Celestino Amore
Title:                                                     Title: Managing Director

Avenida Garcia Barbon 1-3                                  107-111 Fleet Street
36201, Vigo, Galicia                                       London EC4A 2AB
Spain                                                      UNITED KINGDOM





Schedule 1

**Transferred Claims**

**Purchased Claim**

100% of EUR50,00.00 which is the equivalent of $70,875.00 (the outstanding amount of ISIN/CUSIP XS0282208718 as described in the Proof of Claim as of 30th November, 2010), plus all accrued interest, fees and other recoveries due.

**Lehman Programs Securities to which Transfer Relates**

| Description of Security | ISIN/CUSIP | Issuer | Guarantor | Principal/Notional Amount | Coupon | Maturity | U.S. $ Amount claimed in Proof of Claim with respect to Lehman Programs Securities to which Transfer relates |
|---|---|---|---|---|---|---|---|
| Issue of EUR12,648,000 Equity-Linked Notes due February 2010 unconditionally and irrevocably Guaranteed by Lehman Brothers Holdings Inc. | XS0282208718 | Lehman Brothers Treasury Co. B.V. | Lehman Brothers Holdings Inc. | 100% of the ISIN/CUSIP XS0282208718 under the Proof of Claim, which is EUR50,000 (which is equivalent of USD $70,875.00), plus all accrued interest, fees and recoveries due. | Not applicable | 9th of February 2010 | EUR50,000 (which is equivalent of USD $70,875.00) (using an exchange rate of EUR/USD = 1.4175), plus all accrued interest, fees and recoveries due. |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

Ch-11 LEHMAN BROTHERS HOLDINGS, INC.

Debtor

Case No. 08-13555

Chapter 11

### NOTICE OF TRANSFER OF CLAIM
### PURSUANT TO RULE 3001(e)

PLEASE TAKE NOTICE that any and all claims of Ms. Angelina Ozores Ozores, of Spanish nationality, domiciled for these purposes at Calle Pontevedra, nº 1, 4ºD, Vigo (Pontevedra) (Spain) and bearer of Spanish identity card number 33158601-F ("Assignor") that are scheduled by the Debtor(s) and or filed as an original or amended Proof of Claim against the Debtor(s), including but not limited to the following:

| Proof of Claim Amount | Proof of Claim No. |
| --- | --- |
| $70,875 | 0000060351 |

have been transferred and assigned to Caja de Ahorros de Vigo, Ourense y Pontevedra ("Assignee"). The signature of Assignor on this document is evidence of the transfer of the claims and all rights thereto.

Assignor hereby waives any notice or hearing requirements imposed by Rule 3001 of the Bankruptcy Rules, and stipulates that an order may be entered recognizing this Assignment as an unconditional assignment and the Assignee herein as the valid owner of the Claim. You are hereby requested to make all future payments and distributions, and to give all notices and other communications, in respect of the Claim to the Assignee.

ASSIGNEE: Caja de Ahorros de Vigo,
Ourense y Pontevedra
(Caixa Nova)
Address:    Avda. García Barbon 1-3
36201, Vigo, Galicia
Spain

Signature:
Name:
Title:
Date:

Mª Victoria Vázquez Sacristán
Subdirectora General

ASSIGNOR:  Mr. Angelina Ozores Ozores.
Address:    Attn: Ms. Angelina Ozores Ozores
Calle Pontevedra, nº 1, 4ºD
36201, Vigo (Pontevedra)
Spain

Signature:
Name:    ANGELINA OZORES OZORES
Title:
Date:    22 ND SEPTEMBER 2040

United States Bankruptcy Court/Southern District of New York

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

**LEHMAN SECURITIES PROGRAMS
PROOF OF CLAIM**

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al., Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000060351

Note: This form may not be used to file claims other than those based on Lehman Programs Securities as listed on http://www.lehman-docket.com as of July 17, 2009

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

**Angelina Ozores Ozores**
Address:    García Barbón, 1 -7ª
            36201 Vigo (Spain)
Attention:  Mr. Luis Piñeiro Santos
(please see Section 7 of the Attachment for full contact details)

Telephone number:34 (0) 986826341    Email Address:  lpineiro@caixanova.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:_____
    (If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

Telephone number:              Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

1. Provide the total amount of your claim based on Lehman Programs Securities. Your claim amount must be the amount owed under your Lehman Programs Securities as of September 15, 2008, whether you owned the Lehman Programs Securities on September 15, 2008 or acquired them thereafter, and whether such claim matured or became fixed or liquidated before or after September 15, 2008. The claim amount must be stated in United States dollars, using the exchange rate as applicable on September 15, 2008. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the claim amounts for each Lehman Programs Security to which this claim relates.

Amount of Claim: $ [...](see Attachment)        (Required)    70,875 USD

☒ Check this box if the amount of claim includes interest or other charges in addition to the principal amount due on the Lehman Programs Securities.

2. Provide the International Securities Identification Number (ISIN) for each Lehman Programs Security to which this claim relates. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the ISINs for the Lehman Programs Securities to which this claim relates.

International Securities Identification Number (ISIN):    See Attachment    (Required)    XS0282208718

3. Provide the Clearstream Bank Blocking Number, a Euroclear Bank Electronic Reference Number, or other depository blocking reference number, as appropriate (each, a "Blocking Number") for each Lehman Programs Security for which you are filing a claim. You must acquire a Blocking Number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the Blocking Numbers for each Lehman Programs Security to which this claim relates.

Clearstream Bank Blocking Number, Euroclear Bank Electronic Instruction Reference Number and or other depository blocking reference number:

[...] (see Attachment)    6060295    (Required)

4. Provide the Clearstream Bank, Euroclear Bank or other depository participant account number related to your Lehman Programs Securities for which you are filing this claim. You must acquire the relevant Clearstream Bank, Euroclear Bank or other depository participant account number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). Beneficial holders should not provide their personal account numbers.

Accountholders Euroclear Bank, Clearstream Bank or Other Depository Participant Account Number:

[...](see Attachment)    96287    (Required)

5. Consent to Euroclear Bank, Clearstream Bank or Other Depository: By filing this claim, you consent to, and are deemed to have authorized, Euroclear Bank, Clearstream Bank or other depository to disclose your identity and holdings of Lehman Programs Securities to the Debtors for the purpose of reconciling claims and distributions.

FOR COURT USE ONLY

**FILED / RECEIVED**

OCT 30 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 16/10/2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.  Ms. Angelina Ozores Ozores |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| Lehman Brothers Holdings Inc., *et al.* | Chapter 11 |
| Debtors | Case No. 08-13555 (JMP) |
| | Jointly Administered |

## ATTACHMENT TO PROOF OF CLAIM OF ANGELINA OZORES OZORES

Angelina Ozores Ozores ("Claimant") submits this attachment to the proof of claim (the "Claim") against Lehman Brothers Holdings Inc. ("LBHI").

## CLAIM

1. The Claimant submits this Claim with respect to certain securities guaranteed by LBHI and as set forth on the Lehman Programs Securities list posted by LBHI on July 17, 2009 in accordance with the Bar Order. Such Lehman Programs Securities include:

| ISIN | BLOCKING NUMBER | PARTICIPANT ACCOUNT NUMBER | PRINCIPAL AMOUNT OF ISSUE HELD (EUR) | CLAIM AMOUNT (USD) |
|---|---|---|---|---|
| XS0282208718 | 6060295 | 96287 | 50,000 | 70,875 |
| **TOTAL** | | | | 70,875 (1) |

(1) Or such other amount as may be determined in accordance with the terms of the applicable documentation and subject to applicable law.

**RESERVATION OF RIGHTS**

2. Claimant expressly reserves the right to amend or supplement this Claim at any time, in any respect and for any reason, including but not limited to, for the purposes of (a) fixing, increasing, or amending the amounts referred to herein, and (b) adding or amending documents and other information and further describing the claims. Claimant does not waive any right to amounts due for any claim asserted herein by not stating a specific amount due for any such claim at this time, and Claimant reserves the right to amend or supplement this proof of claim, if Claimant should deem it necessary or appropriate, to assert and state an amount for any such claim.

3. This Claim is made without prejudice to the filing by Claimant and any related entities of additional proofs of claim for any additional claims against LBHI and its affiliated debtors (the "Debtors") and non-debtor entities affiliated with the Debtors of any kind or nature, including, without limitation, claims for administrative expenses, additional interest, late charges, and related costs and expenses, and any and all other charges and obligations reserved under the applicable documents and other transaction documents, and claims for reimbursement in amounts that are not fully ascertainable.

4. The filing of this Claim is not intended to be and shall not be deemed to be or construed as a waiver or release of any right to claim specific assets; any rights of setoff, recoupment, or counterclaim; or any other right, rights of action, causes of action, or claims, whether existing now or hereinafter arising, that Claimant has or may have against LBHI, its affiliated entities or any other person, or persons, and Claimant expressly reserves all such rights.

5. Nothing herein modifies, alters, amends and/or waives any right Claimant may have under applicable law or any agreement or understanding to assert and recover from

**BREAKDOWN OF CLAIM**

8.  See Annex.

**ANNEX**

**BREAKDOWN OF CLAIM: ISIN XS0282208718**

The Claimant invested EUR 50,000 purchasing 50 notes issued by Lehman Brothers Treasury Co. B.V. on 9 February 2007 with ISIN code number XS0282208718 and whose maturity date was established to take place on 9 February 2010.

The Notes were issued under the "*US$ 60,000,000,000 Euro Medium-Term Note Program of Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus A.G.*" dated 9 August 2006 (the "**Program**"). The terms and conditions to be applied to this issuing are those appearing in the Program (the "**Terms and Conditions**").

According to the final terms dated 29 March 2007 (the "**Final Terms**") there is a final redemption amount to be paid on 9 February 2010 and which should be calculated by the Calculation Agent according to a formula attached to the Final Terms as an Annex.

The Final Terms also establish an early redemption amount (according to clause 8 (f) (*Early Redemption Amounts*) and clause 10 (a) (vi)) to be paid if an event of default occurs:

"*In respect of each Note, an amount in the Specified Currency equal to the fair market value of such Note (disregarding credit risk of the Issuer) (which value shall be less the proportion attributable to that Note of the reasonable cost to the Issuer of unwinding any related hedging arrangements) on such day as is selected by the Calculation Agent in its sole and absolute discretion (provided that such day is not more than 15 days before the date fixed for redemption of the Note).*"

The Calculation Agent was, in turn, Lehman Brothers International Europe, now in insolvency and unable to perform its role.

Thus, until such situation is solved for the time being our claim is for the principal invested.

Since the "*Global notes pertaining to debtors' schedules and statements*" released by the United States Bankruptcy Court of the Southern District of New York set out on its section 7 that "otherwise indicated, all amounts are reflected in U.S. dollars" we have calculated the principal amount in U.S. dollars according to the average dollar-euro exchange rate as of 15 September 2008, published by the Federal Reserve Bank of New York on the website http://www.ny.frb.org/markets/foreignex.html (EUR = 1,4175

USD)  and we have also calculated in Euros the additional interest  just as established in the Terms and

Conditions (and then in U.S. dollars according to the mentioned exchange rate).

**Principal amount in U.S. dollars:**

EUR 50,000 x USD 1,4175 = USD 70,875

**H
A
N
D

D
E
L
I
V
E
R
Y**

_TP_
RECEIVED BY:

_10-30-09_
DATE

_4:52 am_
TIME

*Execution Copy*

**FINAL TERMS dated 9 February 2007**

**LEHMAN BROTHERS TREASURY CO. B.V.**
*(incorporated with limited liability in The Netherlands and
having its statutory domicile in Amsterdam)*
**Issue of EUR 12,648,000 Equity-Linked Notes due February 2010
relating to Banco Bilbao Vizcaya Argentaria SA  and Telefonica de Espana S.A.**
unconditionally and irrevocably guaranteed by
**LEHMAN BROTHERS HOLDINGS INC.**
*(incorporated in the State of Delaware)*

**PART A – CONTRACTUAL TERMS**

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated 9 August 2006 and the supplemental Prospectuses dated 26 September 2006, 17 October 2006 and 19 December 2006. This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with such Base Prospectus. Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus as so supplemented

**Risk Factors**

**Prospective investors of Notes should carefully consider the following information in conjunction with other information contained in these Final Terms and the Base Prospectus before purchasing the Notes. The attention of prospective investors is drawn to pages 14 to 25 of the Base Prospectus, headed "Risk Factors".**

**These Final Terms however cannot disclose all of the risks and other significant aspects of the Notes and investment decisions should not be made solely on the basis of these risk factors since the information contained herein cannot serve as a substitute for independent individual advice which is tailored to the requirements, investment objectives, experience, knowledge and circumstances of a prospective investor.**

**Each prospective investor of Notes should consider carefully whether the Notes are suitable for it in the light of its circumstances and financial position and in view of the complexity and risks inherent in the Notes. Prospective investors of Notes should be experienced with respect to derivatives, particularly options and options transactions. Furthermore, prospective investors of Notes should understand the risks of transactions involving the Notes and should reach an investment decision only after careful consideration of the suitability of the Notes in light of their particular financial circumstances and after consultation with their own legal, tax, accountancy and other professional advisers. No person should deal in the Notes unless that person understands fully the nature of the relevant transaction. Such transaction is suitable only for, and should be made only by, an investor who has no need for liquidity and understands and can afford the financial and other risks of this transaction.**

*Issue Price*

The Issue Price in respect of the Notes may not be an accurate reflection of the market value of such Notes as at the Issue Date. The price at which the Notes may be sold in secondary market transactions may be lower than the Issue Price. In particular, the Issue Price in respect of the Notes may take into account, among other things, the distribution fee payable to any appointed distributor of the Notes with respect to the offer and sale of the Notes.

*Factors affecting the Shares and the redemption amount under the Notes*

Prospective investors in the Notes should be familiar with investments in the global capital market and with derivatives and the Shares generally. The Notes can be volatile instruments. Changes in the price or market value of Shares and/or changes in the circumstances of the Company may result in sudden and large fluctuations in the value of the Notes. The value of the Shares may vary over time and may increase or decrease by reference to a variety of factors, which may include, but are not limited to, corporate actions and macro economic factors.

The Final Redemption Amount is variable and dependant on the Closing Price of each Share on the Final Observation Date relative to such Share's Initial Price. Prospective investors should be aware that the Notes are not capital protected. If the Notes are not redeemed early following a Mandatory Early Redemption Event, as described below and the Final Price of the Worst Performing Share is less than the Floored Initial Price of such Share, the Final Redemption Amount will be less than 100 per cent. of the Issue Price and may even be nil.

*The Notes may be redeemed prior to maturity*

In the event that the Issuer or the Guarantor would be obliged to increase the amounts payable in respect of any Notes due to any withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or on behalf of The Netherlands or the USA, as the case may be, or any political subdivision thereof or any authority therein or thereof having power to tax, the Issuer may redeem all outstanding Notes in accordance with the Terms and Conditions.

In the event of early redemption, a holder of Notes (a "**Noteholder**") may not be able to reinvest the redemption proceeds in a comparable security and receive a return on investment which is as high as that of the Notes. The Issuer is not liable for any disadvantage a Noteholder may incur in respect of the new investment or non-investment of its capital.

Where the Closing Price of both Shares on an Observation Date (other than the Final Observation Date) is higher than such Share's respective Initial Price, the Notes will be redeemed on the relevant Mandatory Early Redemption Date at the Mandatory Early Redemption Amount. The Mandatory Early Redemption Amount is set out in the Annex to these Final Terms.

*Early Redemption Amount and Cancellation Amount*

In the event of an early redemption for taxation reasons or in an event of default (as described in Item 23 of the Terms and Conditions of the Notes) or as a result of a Merger Event, Tender Offer Event, Nationalisation, Insolvency or Delisting as determined by the Calculation Agent (as described in the Annex), the Issuer may cancel the Notes and, if permitted by applicable law,

pay the holder of each Note the Early Redemption Amount or the Cancellation Amount, as the case may be. The amount payable will be calculated by reference to the fair market value of the Notes as determined by the Calculation Agent in its sole and absolute discretion and may be reduced by an amount referable to the cost to the Issuer of unwinding any related hedging arrangements as determined by the Calculation Agent. Investors in the Notes should understand that such Early Redemption Amount, or the Cancellation Amount, as the case may be, may be less than the Issue Price of the Notes or the amount the investor has paid for the Notes or the principal amount of the Notes, and may even be nil.

*Creditworthiness of the Issuer and Guarantor*

Any person who purchases the Notes is relying upon the creditworthiness of the Issuer and the Guarantor and has no rights against any other person. The Notes constitute general, unsecured, unsubordinated, contractual obligations of the Issuer and of no other person. The Notes rank pari passu among themselves.

*Secondary market and liquidity for the Notes*

There can be no assurance as to how any Notes will trade in the secondary market, whether there will be a secondary market or, if a secondary market exists, whether such market will be sustainable or liquid or illiquid.

The liquidity of the Notes may also be affected by restrictions, if any, on offers and sales of the Notes in some jurisdictions. In any case, due to the relative complexity and lower liquidity of the Notes if compared to more conventional financial instruments such as shares, comparatively larger spreads between bid and ask quotes should be expected.

*Potential conflicts of interest*

The Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may, from time to time, engage in purchase, sale or other transactions involving the Shares or related derivatives for their proprietary accounts and/or for accounts under their management and/or for clients. Such transactions may have a positive or negative effect on the price of the Shares and consequently on the value of the Notes. In addition, the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may, from time to time, act in other capacities with regard to the Notes (such as in an agency capacity and/or as the calculation agent) and may issue or participate in the issue of other competing financial instruments in respect of the Shares or similar shares in similar sectors or markets and the introduction of such competing financial instruments may affect the value of the Notes. The Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may also (i) act as underwriter or financial adviser in connection with future offerings of shares or other securities of the Company, any of its subsidiaries or affiliates and/or (ii) act in a commercial banking capacity for such companies in relation to any other related securities. Such activities could present certain conflicts of interest with the interest of Noteholders and may affect the value of the Notes. The Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries owe no duty or responsibility to any Noteholder (or any other party) to avoid such conflicts.

In connection with the offering of the Notes, the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may enter into one or more hedging transactions with respect to the Shares or related derivatives. In connection with such hedging or with respect to proprietary or other trading activities by the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries, the Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries may enter into transactions in the Shares or related derivatives which may affect the market price, liquidity or value of the Notes and which could be deemed to be adverse to the interests of the relevant Noteholders.

Such transactions could present certain conflicts of interest with the interest of Noteholders and may affect the value of the Notes. The Issuer, the Guarantor, the Dealer, the Calculation Agent and/or their respective subsidiaries owe no duty or responsibility to any Noteholder (or any other party) to avoid such conflicts.

*Investing in the Notes is not the same as investing in the Shares*

Prospective investors should be aware that the market value of the Notes may not have a direct relationship with the prevailing price of the Shares, in that changes in the prevailing price of the Shares will not necessarily result in a comparable change in the market value of the Notes.

*Risk-excluding or risk-limiting transactions*

Prospective investors may not rely upon being able to enter into transactions, which may exclude or limit loss exposure to the Notes during the term of the Notes. The possibility of entering into risk-excluding or risk-limiting transactions depends in particular on market conditions and the relevant underlying circumstances. Noteholders may be able to enter into such transactions only at an unfavourable market price resulting in an additional loss for such Noteholders.

Prospective investors intending to purchase Notes to hedge the market risk associated with investing in the Shares should be aware of the difficulties associated therewith. For example, the value of the Notes may not exactly correlate with the value of the Shares.

*Determinations by the Calculation Agent*

The Calculation Agent has certain discretions to determine whether certain events as further set out in the Annex have occurred. Prospective investors should be aware that any determination made by the Calculation Agent may have an adverse effect on the value of the Notes. For example, the Calculation Agent may determine that a Market Disruption Event has occurred or exists at a relevant time which may affect the determination of the price of the Shares on a relevant Scheduled Trading Day and/or may delay settlement in respect of the Notes. Any such discretion exercised by, or any calculation made by, the Calculation Agent (in the absence of manifest error) shall be binding.

*Adjustments*

The Calculation Agent may adjust the terms of the Notes in the case of a Potential Adjustment Event, Merger Event, Tender Offer, Nationalisation, Insolvency or Delisting pursuant to terms as set out in the Annex to these Final Terms. Such adjustment may have an adverse impact on

the value of the Notes. Any such discretion exercised by, or any calculation made by the Calculation Agent (in the absence of manifest error) shall be binding.

*Because the Global Notes are held by or on behalf of Euroclear and Clearstream, Luxembourg, investors will have to rely on their procedures for transfer, payment and communication with the Issuer.*

The Notes will be represented by one or more Global Notes. Such Global Notes will be deposited with a common depositary for Euroclear and Clearstream, Luxembourg. Except in the circumstances described in the relevant Global Note, investors will not be entitled to receive definitive Notes. Euroclear and Clearstream, Luxembourg will maintain records of the beneficial interests in the Global Notes. While the Notes are represented by one or more Global Notes, investors will be able to trade their beneficial interests only through Euroclear and Clearstream, Luxembourg.

While the Notes are represented by one or more Global Notes the Issuer will discharge its payment obligations under the Notes by making payments to the common depositary for Euroclear and Clearstream, Luxembourg for distribution to their account holders. A holder of a beneficial interest in a Global Note must rely on the procedures of Euroclear and Clearstream, Luxembourg to receive payments under the Notes. The Issuer has no responsibility or liability for the records relating to, or payments made in respect of, beneficial interests in the Global Notes.

Holders of beneficial interests in the Global Notes will not have a direct right to vote in respect of the relevant Notes. Instead, such holders will be permitted to act only to the extent that they are enabled by Euroclear and Clearstream, Luxembourg to appoint appropriate proxies. Similarly, holders of beneficial interests in the Global Notes will not have a direct right under the Global Notes to take enforcement action against the Issuer in the event of a default under the Notes but will have to rely upon their rights under the deed of covenant dated 9 August 2006 (as amended, supplemented or replaced from time to time), executed by Lehman Brothers Holdings Inc. ("**LBHI**"), Lehman Brothers Treasury Co. B.V. ("**LBTCBV**") and Lehman Brothers Bankhaus AG ("**LBB**").

| | | | |
|---|---|---|---|
| 1. | (i) | Issuer: | Lehman Brothers Treasury Co B.V. |
| | (ii) | Guarantor: | Lehman Brothers Holdings Inc. |
| 2. | (i) | Series Number: | 5879 |
| | (ii) | Tranche Number: | 1 |
| 3. | | Specified Currency or Currencies: | Euro ("**EUR**") |
| 4. | | Aggregate Nominal Amount: | |
| | (i) | Series: | EUR 12,648,000 |
| | (ii) | Tranche: | EUR 12,648,000 |
| 5. | | Issue Price: | 100.00 per cent. of the Aggregate Nominal Amount |
| 6. | | Specified Denominations: | |
| | | (i) Specified Denomination(s): | EUR 1,000 |
| | | (ii) Trading in Units: | Not Applicable |
| 7. | (i) | Issue Date: | 9 February 2007 |
| | (ii) | Interest Commencement Date: | Not Applicable |
| 8. | | Maturity Date: | 9 February 2010 subject to adjustment in accordance with the Modified Following Business Day Convention |
| 9. | | Interest Basis: | See the Annex |
| 10. | | Redemption/Payment Basis: | See the Annex |
| 11. | | Change of Interest or Redemption/Payment Basis: | Not Applicable |
| 12. | | Put/Call Options: | Not Applicable |
| 13. | (i) | Status of the Notes: | Senior Notes |
| | (ii) | Status of the Guarantee: | Senior Guarantee |
| 14. | | Method of distribution: | Non-syndicated |

**PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE**

| | | |
|---|---|---|
| 15. | Fixed Rate Note Provisions | Not Applicable |

| | | |
|---|---|---|
| 16. | Floating Rate Note Provisions | Not Applicable |
| 17. | Zero Coupon Note Provisions | Not Applicable |
| 18. | Index-Linked Interest Note/other variable-linked interest Note Provisions | Applicable |
| (i) | Index/Formula/other variable: | See Annex 1 |
| (ii) | Name and address of Calculation Agent responsible for calculating the interest due: | Lehman Brothers International (Europe) 25 Bank Street London E14 5LE |
| (iii) | Provisions for determining Coupon where calculated by reference to Index and/or Formula and/or other variable: | See Annex 1 |
| (iv) | Valuation Date(s)/Observation Date(s): | See Annex 1 |
| (v) | Provisions for determining Coupon where calculation by reference to Index and/or Formula and/or other variable is impossible or impracticable or otherwise disrupted: | See Annex 1 |
| (vi) | Interest Payment Date(s): | See Annex 1 |
| (vii) | Business Day Convention: | Modified Following Business Day Convention |
| (viii) | Additional Business Centre(s) (Condition 3(b)(B)): | Not Applicable |
| (ix) | Minimum Interest Rate: | See Annex 1 |
| (x) | Maximum Interest Rate: | Not Applicable |
| (xi) | Interest Determination Date(s): | Not Applicable |
| (xii) | Day Count Fraction: | 30/360 (unadjusted) |
| 19. | Dual Currency Note Provisions | Not Applicable |

**PROVISIONS RELATING TO REDEMPTION**

| | | |
|---|---|---|
| 20. | Call Option | Not Applicable |

21.  Put Option                      Not Applicable

22.  Final Redemption Amount of      As described in the Annex
     each Note:

23.  Early Redemption Amount of
     each Note

     Early Redemption Amount(s) of   In respect of each Note, an amount in the Specified
     each Note payable on            Currency equal to the fair market value of such Note
     redemption for taxation reasons (disregarding credit risk of the Issuer) (which value shall
     or on event of default and/or the  be less the proportion attributable to that Note of the
     method of calculating the same  reasonable cost to the Issuer of unwinding any related
     (if required or if different from  hedging arrangements) on such day as is selected by the
     that set out in the Conditions):  Calculation Agent in its sole and absolute discretion
                                      (provided that such day is not more than 15 days before
                                      the date fixed for redemption of the Note)

     Mandatory Early Redemption      As described in the Annex
     Amount of each Note:

**GENERAL PROVISIONS APPLICABLE TO THE NOTES**

24.  Form of Notes:                  Bearer Form

                                     Interests in a temporary global Note will be
                                     exchangeable for interests in a permanent global Note in
                                     bearer form

                                     Interests in a permanent global Note will be
                                     exchangeable for definitive Notes in bearer form in the
                                     limited circumstances described in the permanent global
                                     Note.

25.  Talons for future Coupons or    Not Applicable
     Receipts to be attached to
     Definitive Notes (and dates on
     which such Talons mature):

26.  Details relating to Partly Paid  Not Applicable
     Notes: amount of each payment
     comprising the Issue Price and
     date on which each payment is
     to be made and consequences (if
     any) of failure to pay, including
     any right of the Issuer to forfeit
     the Notes and interest due on
     late payment:

27.  Details relating to Instalment   Not Applicable

Notes and Instalment Dates:

28. Details relating to Extendible         Not Applicable
    Notes:

29. Details relating to Renewable          Not Applicable
    Notes:

30. Redenomination,                        Not Applicable
    renominalisation and
    reconventioning provisions:

31. Consolidation provisions:              The provisions in Condition 18 (*Further Issues of Notes*)
                                           apply

32. Other final terms:                     As described in the Annex

33. Governing Law:                         English law

## DISTRIBUTION

34. (i)   If syndicated, names and         Not Applicable
          addresses of Managers and
          underwriting commitments:

    (ii)  Date of Subscription             Not Applicable
          Agreement:

    (iii) Stabilizing Manager(s) (if       Not Applicable
          any):

35. If non-syndicated, name and            Lehman Brothers International (Europe)
    address of Dealer:                     25 Bank Street
                                           London E14 5LE

36. Total commission and                   Not Applicable
    concession:

37. Selling restrictions:

    (i)   Netherlands Selling              Not Applicable
          Restrictions:

    (ii)  Additional Selling               Not Applicable
          Restrictions:

## RESPONSIBILITY

The Issuer accepts responsibility for the information contained in these Final Terms. The
information contained in these Final Terms relating to the Shares has been extracted from

information published by the website of Madrid Stock Exchange (*Bolsa de Madrid*) (http://www.bolsamadrid.es.com). The Issuer confirms that such information has been accurately reproduced and that, so far as it is aware, and is able to ascertain from information published by Madrid Stock Exchange (*Bolsa de Madrid*) no facts have been omitted which would render the reproduced information inaccurate or misleading.

### APPLICATION FOR LISTING AND ADMISSION TO TRADING

These Final Terms comprise the final terms required to list and have admitted to trading the issue of Notes described herein pursuant to the U.S.$ 60,000,000,000 Euro Medium-Term Note Program of Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG.

Signed on behalf of the Issuer:


By:  ...........................................

　　Duly authorised

## PART B – OTHER INFORMATION

1. **LISTING**

   (i) Listing:                     The Irish Stock Exchange

   (ii) Admission to trading:       Application will be made for the Notes to be admitted
                                    to listing and/or trading on the Official List of the
                                    regulated Irish Stock Exchange and to trading on its
                                    regulated market.

                                    No assurance can be given as to whether or not or
                                    when such application for listing/admission to trading
                                    will be granted.

2. **RATINGS**

   Not Applicable

3. **NOTIFICATION**

   Not Applicable

4. **INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE
   ISSUE/OFFER**

   Save as discussed in the section headed "Subscription and Sale" on pages 132-140 of the
   Base Prospectus, so far as the Issuer is aware, no person involved in the offer of the
   Notes has an interest material to the offer.

5. **REASONS FOR THE OFFER, ESTIMATED NET PROCEEDS AND TOTAL
   EXPENSES**

   Not Applicable

6. **YIELD (Fixed Rate Notes Only)**

   Not Applicable

7. **HISTORIC INTEREST RATES**

   Not Applicable

8. **PERFORMANCE OF INDEX/FORMULA/other variable, EXPLANATION OF
   EFFECT ON VALUE OF INVESTMENT AND ASSOCIATED RISKS and other
   information concerning the underlying (INDEX-LINKED OR OTHER VARIABLE
   -LINKED NOTES ONLY)**

   See the Annex.

   Details on historical prices of the Shares of each Basket Company can be found on the
   website of the Madrid Stock Exchange (http://www.bolsamadrid.es.com).

The Issuer does not intend to provide post issuance information regarding the Shares of any Basket Company.

9.    **PERFORMANCE OF RATES OF EXCHANGE AND EXPLANATION OF EFFECT ON VALUE OF INVESTMENT (DUAL CURRENCY NOTES ONLY)**

Not Applicable

10.    **OPERATIONAL INFORMATION**

| | |
|---|---|
| ISIN Code: | XS0282208718 |
| Common Code: | 028220871 |
| Any clearing system(s) other than Euroclear Bank S.A./N.V. and Clearstream Banking Societe Anonyme and the relevant identification number(s): | Valoren: 2867249 |
| Delivery: | Delivery against payment |
| The Aggregate Nominal Amount of Notes issued has been translated into U.S. Dollars at the rate of USD$ 1 = EUR 0.7688   producing a sum of: | USD 16,451,612.00 |
| Names and addresses of Additional Paying Agent(s) (if any): | Not Applicable |

# ANNEX

1. **Final Redemption Amount of each Note**

   Unless previously redeemed or purchased and cancelled, and subject to the terms herein, each Note shall be redeemed on the Maturity Date at a Final Redemption Amount ("**FRA**") determined by the Calculation Agent on the Final Observation Date in accordance with the following:

   (i)   If the Final Price in respect of both Shares is equal to or greater than such Share's respective Initial Price:

   **FRA = SD x 109.00%**

   (ii)  Otherwise, if the Final Price$_{Worst}$ is less than Initial Price$_{Worst}$:

   **FRA = SD x 100%**

2. **Equity-Linked Coupon Amount**

   In respect of each Note, the Equity-Linked Coupon Amount ("**CA**") payable on each Interest Payment Date shall be an amount in the Specified Currency determined by the Calculation Agent on each Observation Date (including the Final Observation Date) in accordance with the following formula:

   **CA = SD x 1%**

3. **Mandatory Early Redemption Amount**

   If on any Observation Date (except the Final Observation Date), as set out in the left-hand column of the table below, the Closing Price of the Shares of both Basket Companies is equal to or greater than such Share's respective Initial Price (a "**Mandatory Early Redemption Event**"), each Note shall become due and payable on the Mandatory Early Redemption Date immediately following such Observation Date at an amount in the Specified Currency (the "**Mandatory Early Redemption Amount**") calculated by the Calculation Agent in accordance with the corresponding formula set out in the centre column of that table:

   | Observation Date | Mandatory Early Redemption Amount | Mandatory Early Redemption Date |
   |---|---|---|
   | 5 February 2008 | SD x 106% | 8 February 2008 |
   | 4 February 2009 | SD x 108% | 9 February 2009 |

   Where "**Mandatory Early Redemption Date**" means, in relation to the relevant Observation Date, the corresponding day specified as such in the right-hand column of the table above, subject to adjustment in accordance with the Modified Following Business Day Convention.

4.    **Definitions**

For the purposes of these Final Terms:

"**Basket**" means the basket of ordinary shares (each a "**Share**" and collectively the "**Shares**" which shall refer to any one or more of the shares included in the Basket, as the context requires) of 2 companies described in the table below (or any Replacement Basket Company (as defined below) selected by the Calculation Agent in accordance with the terms of this Annex (each a "**Basket Company**")):

| Basket Companies | Bloomberg |
|---|---|
| Banco Bilbao Vizcaya Argentaria SA | BBVA SM |
| Telefonica de Espana S.A. | TEF SM |

"**Calculation Agent**" means Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, United Kingdom;

"**Cancellation Amount**" means an amount in the Specified Currency:

(i)    determined by the Calculation Agent in its sole and absolute discretion acting in good faith and using Commercially Reasonable Procedures in order to produce a commercially reasonable result and determined as of the date that the Notes are cancelled or, if that would not be commercially reasonable, as of such date following the date that the Notes are cancelled as would be commercially reasonable;

(ii)    to be paid to the Noteholders following a cancellation, being the economic equivalent of (a) the material terms of the Notes, including the payments in respect of the Notes that would, but for the cancellation, have been required on or after the date that the Notes are, or are deemed to have been, cancelled (assuming satisfaction of any applicable conditions precedent with respect to the Notes) and (b) any option rights of the Noteholders in respect of the relevant Notes as the Calculation Agent may consider to be relevant; and (c) less any reasonable costs to the Issuer of unwinding any related hedging arrangements,

and where, in determining such amount, the Calculation Agent may in its sole and absolute discretion, consider any relevant information, including, without limitation, one or more of the following types of information:

(a)    quotations (either firm or indicative) supplied by one or more third parties that may take into account the current creditworthiness of the Calculation Agent at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Calculation Agent and the third party providing the quotation;

(b)    information consisting of relevant market data in the relevant markets supplied by one or more third parties including, without limitation, relevant rates, prices,

- 14 -

yields, yield curves, volatilities, spreads correlation or other relevant market data in the relevant market; or

(c)    information of the types described in (a) or (b) above from internal sources (including any affiliates of the Calculation Agent) if that information is of the same type used by the Calculation Agent in the regular course of its business for the valuation of similar transactions;

"**Closing Price**" means, in relation to each Share and any particular Scheduled Trading Day, the price per Share at the Valuation Time on such day, as determined by the Calculation Agent;

"**Commercially Reasonable Procedures**" means procedures which may include the following:

(b)    application of relevant market data from third parties or information from internal sources of pricing or other valuation models that are, at the time of determination of the Cancellation Amount, used by the Calculation Agent in the regular course of its business in pricing or valuing transactions between the Calculation Agent and unrelated third parties that are similar to the Notes; and

(c)    application of such valuation methods as is appropriate to the type, complexity or size of the transaction;

"**Disrupted Day**" means any Scheduled Trading Day on which an Exchange or Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred;

"**Early Closure**" means the closure on any Exchange Business Day of the Exchange or Related Exchange prior to its Scheduled Closing Time unless such earlier closing time is announced by such Exchange or Related Exchange at least one hour prior to the earlier of (i) the actual closing time for the regular trading session on the Exchange or Related Exchange on such Exchange Business Day and (ii) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution at the Valuation Time on such Exchange Business Day;

"**Exchange**" means the Madrid Stock Exchange (*Bolsa de Madrid*) or any successor exchange or quotation system on or any substitute exchange or quotation system to which trading in the Shares has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to such Share on such temporary substitute exchange or quotation system as on the original Exchange);

"**Exchange Business Day**" means, in respect of the Shares of each Basket Company any Scheduled Trading Day on which the relevant Exchange and the Related Exchange are open for trading during their respective regular trading sessions, notwithstanding any such Exchange or Related Exchange closing prior to its Scheduled Closing Time;

"**Exchange Disruption**" means any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general (i) to effect transactions in, or obtain market values for, the Shares on the

Exchange, or (ii) to effect transactions in, or obtain market values for, futures or options contracts relating to the Share on the relevant Related Exchange;

"**Extraordinary Dividend**" means a dividend or portion thereof characterised as such by the Calculation Agent;

"**Extraordinary Event**" means a Merger Event, Tender Offer, Nationalisation, Insolvency or Delisting;

"**Final Price**" means the Closing Price of the relevant Share on the Final Observation Date;

"**Final Price$_{Worst}$**" means the Final Price of the Worst Performing Share (where Performance is as determined in respect the Final Observation Date);

"**Initial Observation Date**" means 9 February 2007;

"**Initial Price**" means in relation to the Shares of each Basket Company, the Closing Price of each Share as determined by the Calculation Agent on the Initial Observation Date;

"**Initial Price$_{Worst}$**" means the Initial Price of the Worst Performing Share;

"**Interest Payment Date**" means 8 February 2008, 9 February 2009 and 9 February 2010, subject to a Mandatory Early Redemption Event and adjustment in accordance with the Modified Following Business Day Convention;

"**Mandatory Early Redemption Amount**" means the amount payable in respect of each Note as determined by the Calculation Agent pursuant to and in accordance with the provisions of section 3 of this Annex;

"**Market Disruption Event**" means, in respect of a Share comprised in the Basket, the occurrence or existence of (i) a Trading Disruption, (ii) an Exchange Disruption, which in either case the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time, or (iii) an Early Closure;

"**Observation Date**" means, subject to section 4 below, 5 February 2008, 4 February 2009 and 4 February 2010 (the "**Final Observation Date**") *provided, however, that* if any such day is not a Scheduled Trading Day then the relevant Observation Date shall be the first succeeding day which is a Scheduled Trading Day;

"**Related Exchange**" means the MEFF (*Mercado Espanol de Futuros Financieros*) **or ssssor** any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in futures or options contracts relating to the Shares has temporary relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the futures or options contracts relating to the Shares on such temporary substitute exchange or quotation system as on the original Related Exchange);

"**Scheduled Closing Time**" means, in respect of the Exchange or Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such Exchange or

Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours;

"**Scheduled Trading Day**" means any day on which each Exchange and each Related Exchange are scheduled to be open for trading for their respective regular trading sessions;

"**SD**" means the Specified Denomination of a Note;

 "**Trading Disruption**" means any suspension of or limitation imposed on trading by the Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the Exchange or Related Exchange or otherwise (i) relating to the Share on the Exchange, or (ii) in futures or options contracts relating to the Share on the relevant Related Exchange;

"**Valuation Time**" means the official close of trading on the Exchange; and

"**Worst Performing Share**" means, in respect of the Final Observation Date, the Basket Company's Share having the lowest Performance, as determined by the Calculation Agent as at the Final Observation Date in accordance with the following formula:

$$Performance_i = \left( \frac{FinalPrice_i}{InitialPrice_i} \right)$$

5. **Disrupted Days**

If, in respect of the Shares of any Basket Company, any Observation Date is a Disrupted Day, then the Observation Date for the Shares of each Basket Company not affected by the occurrence of a Disrupted Day shall be the scheduled Observation Date and the Observation Date for the Shares of each Basket Company affected by the occurrence of a Disrupted Day shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to these Shares, unless there is a Disrupted Day relating to these Shares on each of the eight Scheduled Trading Days immediately following the scheduled Observation Date. In that case:

(a)     the earlier of (i) that eighth following Scheduled Trading Day and (ii) the day that is the third Business Day prior to the relevant Mandatory Early Redemption Date or the Maturity Date, as the case may be, shall be deemed to be the relevant Observation Date for the relevant Shares notwithstanding it is a Disrupted Day (the "**Deemed Date**"); and

(b)     the Calculation Agent shall determine its good faith estimate of the value for these Shares that would have prevailed but for that Disrupted Day as of the Valuation Time on that Deemed Date.

6.    **Potential Adjustment Events and Extraordinary Event**

(A)    *Definitions:* In this provision, the following terms will have the following meaning:

(i)    "**Delisting**" means that the relevant Exchange announces that pursuant to the rules of such Exchange, the Shares of a Basket Company cease (or will cease) to be listed, traded or publicly quoted on the relevant Exchange for any reason (other than a Merger Event or Tender Offer) and are not immediately re-listed, re-traded or re-quoted on an exchange or quotation system located in any member state of the European Union;

(ii)    "**Insolvency**" means that by reason of the voluntary or involuntary liquidation, bankruptcy, insolvency, dissolution or winding-up of or any analogous proceedings affecting a Basket Company (i) all the Shares of a Basket Company are required to be transferred to a trustee, liquidator or other similar official or (ii) holders of the Shares of a Basket Company, become legally prohibited from transferring them;

(iii)    "**Merger Date**" means the closing date of a Merger Event or, where a closing date cannot be determined under the local law applicable to such Merger Event, such other date as determined by the Calculation Agent;

(iv)    "**Merger Event**" means, as determined by the Calculation Agent in its sole discretion in respect of any relevant Shares, any (i) reclassification or change of such Shares that results in a transfer of or an irrevocable commitment to transfer all of such Shares outstanding to another entity or person, (ii) consolidation, amalgamation, merger or binding share exchange of the Basket Company with or into another entity or person (other than a consolidation, amalgamation, merger or binding share exchange in which such Basket Company is the continuing entity and which does not result in a reclassification or change of all of such Shares outstanding), (iii) takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person to purchase or otherwise obtain 100 per cent. of the outstanding Shares of the Basket Company that results in a transfer of or an irrevocable commitment to transfer all such Shares (other than such Shares owned or controlled by such other entity or person), or (iv) consolidation, amalgamation, merger or binding share exchange of the Basket Company or its subsidiaries with or into another entity in which the Basket Company is the continuing entity and which does not result in a reclassification or change of all such Shares outstanding but results in the outstanding Shares (other than Shares owned or controlled by such other entity) immediately prior to such event collectively representing less than 50 per cent. of the outstanding Shares immediately following such event (a "**Reverse Merger**"), in each case if the Merger Date is on or before the Final Observation Date;

(v) "**Nationalisation**" means that all the Shares or all or substantially all the assets of a Basket Company are nationalised, expropriated or are otherwise required to be transferred to any governmental agency, authority, entity or instrumentality thereof;

(vi) "**Potential Adjustment Event**" means any of the following:

(1) a subdivision, consolidation or reclassification of Shares (unless resulting in a Merger Event) or, a free distribution or dividend of any Shares to existing holders by way of bonus, capitalisation or similar issue;

(2) a distribution, issue or dividend to existing holders of the Shares of (a) such Shares or (b) other share capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of a Basket Company equally or proportionately with such payments to holders of such Shares or (c) share capital or other securities of another issuer acquired or owned (directly or indirectly) by the Basket Company as a result of a spin-off or other similar transaction, or (d) any other type of securities, rights or warrants or other assets, in any case for payment (in cash or otherwise) at less than the prevailing market price as determined by the Calculation Agent;

(3) an Extraordinary Dividend;

(4) a call by a Basket Company in respect of the relevant Shares which are not fully paid;

(5) a repurchase by a Basket Company or any of its subsidiaries of relevant Shares whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise;

(6) in respect of a Basket Company, an event that results in any shareholder rights being distributed or becoming separated from shares of common stock or other shares of the capital stock of the Basket Company pursuant to a shareholder rights plan or arrangement directed against hostile takeovers that provides upon the occurrence of certain events for a distribution of preferred stock, warrants, debt instruments or stock rights at a price below their market value, as determined by the Calculation Agent, provided that any adjustment effected as a result of such an event shall be readjusted upon any redemption of such rights; or

(7) any other event having, in the opinion of the Calculation Agent, a diluting or concentrative effect on the theoretical value of the Shares or of the composition of the Basket.

(ii)   **"Tender Offer"** means a takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person that results in such entity or person purchasing, or otherwise obtaining or having the right to obtain, by conversion or other means, greater than 10 per cent. and less than 100 per cent. of the outstanding Shares of a Basket Company, as determined by the Calculation Agent, based upon the makings of filings with governmental or self-regulatory agencies or such other information as the Calculation Agent deems relevant;

(iii)   **"Tender Offer Date"** means, in respect of a Tender Offer, the date on which Shares of a Basket Company in the amount of the applicable percentage threshold are actually purchased or otherwise obtained (as determined by the Calculation Agent).

(B)   *Potential Adjustment Events:* Following the declaration by a Basket Company of the terms of any Potential Adjustment Event, the Calculation Agent will, in its sole and absolute discretion, determine whether such Potential Adjustment Event has a diluting or concentrative effect on the theoretical value of the relevant Shares or on the composition of the Basket and, if so, the Calculation Agent in its sole and absolute discretion will determine in its sole and absolute discretion the appropriate adjustment(s), if any, to be made to the terms of the Conditions as the Calculation Agent determines appropriate to account for the Potential Adjustment Event and determine the effective date(s) of that adjustment(s) (including, without limitation, adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares). The Calculation Agent may (but need not) determine the appropriate adjustment(s) by reference to the adjustment(s) in respect of the Potential Adjustment Event made by an options exchange to options on the Shares traded on that options exchange.

(C)   *Merger Event or Tender Offer:* In respect of each Merger Event or Tender Offer, the following terms have the meanings given below:

*Share-for-Share* means, (i) in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists (or, at the option of the holder of such Shares, will consist) solely of New Shares and (ii) a Reverse Merger;

*Share-for-Other* means, in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists solely of Other Consideration;

*Share-for-Combined* means, in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists of Combined Consideration;

*New Shares* means ordinary or common shares, whether of the entity or person (other than the Basket Company) involved in the Merger Event or the making of the Tender Offer or a third party, that are, or that as of the Merger Date or Tender Offer Date are promptly scheduled to be, (A) publicly quoted, traded or listed on an exchange or quotation system located in any member state of the

European Union; and (B) not subject to any currency exchange controls, trading restrictions or other trading limitations;

***Other Consideration*** means cash and/or any securities (other than New Shares) or assets (whether of the entity or person (other than the Basket Company) involved in the Merger Event or the making of a Tender Offer or a third party); and

***Combined Consideration*** means New Shares in combination with Other Consideration.

If a Merger Event or a Tender Offer occurs, the Calculation Agent will in its sole and absolute discretion take any of the actions described in (1) (2) (3) and/or (4) below, as applicable:

(1)    (a)    in respect of each Share-for-Share Merger Event, on or after the relevant Merger Date make such adjustment(s) the Calculation Agent acting in its sole discretion considers appropriate to reflect the number of New Shares to which a holder of one relevant Share immediately prior to the occurrence of the Merger Event would be entitled upon consummation of the Merger Event and the New Shares will be deemed to be the relevant Shares and the issuer thereof will be deemed the Basket Company, respectively, and, if necessary, the Calculation Agent will adjust any other relevant terms (including, without limitation, adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares);

    (b)    in respect of each Share-for-Other Merger Event, on or after the relevant Merger Date, the amount of Other Consideration (as subsequently modified in accordance with any relevant terms and including the proceeds of any redemption, if applicable) to which a holder of one relevant Share would be entitled upon consummation of the Merger Event will be applied by the Calculation Agent to determine such adjustment(s) as it acting in its sole discretion considers appropriate in respect of such Share, and, if necessary, the Calculation Agent will adjust any other relevant terms (including, without limitation, adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares); or

    (c)    in respect of each Share-for-Combined Merger Event, on or after the Merger Date, the number of New Shares and the amount of Other Consideration (as subsequently modified in accordance with any relevant terms and including the proceeds of any redemption, if applicable) to which a holder of one of the relevant Shares would be entitled upon consummation of the Merger Event will be applied by the Calculation Agent to determine such

adjustment(s) as it acting in its sole discretion considers appropriate with respect to the affected Shares and the Issuer of such New Shares and, if necessary, the Calculation Agent will adjust any other relevant terms (including, without limitation, adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares);

(2) if at any time the Calculation Agent determines that a Merger Event or Tender Offer has led, or would lead, to the merger, consolidation or any other combination of the Shares of two or more Basket Companies (a "**Basket Company Merger**"), the Calculation Agent will determine which original Basket Company or Basket Companies should cease to be treated as a Basket Company  or Basket Companies for the purpose of these Conditions (each a "**Replaced Basket Company**") and shall be entitled to select one or  more new entities (as the case may be) (each a "**Replacement Basket Company**")  to be a Basket Company in place of the Replaced Basket Company or Basket Companies as of a date determined by the Calculation Agent (a "**Replacement Date**").  Any Replacement Basket Company will, to the extent practicable, be selected from the same industry, have shares denominated in the same currency and have a similar market capitalisation to the relevant Replaced Basket Company;

(3) on or after the relevant Merger Date or Tender Offer Date (A) make such adjustment(s) to the exercise, interest, payment or any other terms of the Notes as the Calculation Agent determines appropriate to account for the economic effect of such Merger Event or Tender Offer (provided in the case of a Tender Offer, the Shares will not change) and (including, without limitation, adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares), which may, but need not, be determined by reference to the adjustment(s) made in respect of such Merger Event or Tender Offer by an options exchange to options on the relevant Shares traded on such options exchange and (B) determine the effective date(s) of such adjustment(s); and/or

(4) either:

   (d) cancel the Notes in whole only and pay the Cancellation Amount (if any); or

   (e) determine which original Basket Company or Basket Companies should cease to be treated as a Basket Company or Basket Companies for the purpose of these Conditions and pay the Cancellation Amount (if any).

If a Merger Date or Tender Offer Date is scheduled to be after the Final Observation Date, the Calculation Agent will determine, with respect to the theoretical value of the Notes, the economic effect of the

announcement of a potential Merger Event of Tender Offer Event (including, without limitation, any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares) from the announcement date to such Final Observation Date, as applicable. If such economic effect is material, the Calculation Agent shall (acting in its sole and absolute discretion) adjust the terms of the Conditions to reflect such economic effect.

(D)   ***Nationalisation and Insolvency:*** If a Nationalisation or Insolvency occurs, the Calculation Agent shall, in its sole and absolute discretion take any of the actions described in (1) and/or (2) below:

(1)   on a Nationalisation, acting in its sole and absolute discretion, either:

(a)   treat the affected Basket Company as a Replaced Basket Company and select a Replacement Basket Company in the manner specified in paragraph (C) (2) above; or

(b)   make such other adjustment(s) to the terms of the Conditions or such determination as the Calculation Agent, acting in its sole and absolute discretion, considers appropriate to account for the Nationalisation; and/or

(2)   either:

(a)   request the Issuer to cancel the Notes in whole only and pay the Cancellation Amount (if any); or

(b)   determine which original Basket Company or Basket Companies should cease to be treated as a Basket Company or Basket Companies for the purpose of these Conditions and request the Issuer to pay the Cancellation Amount (if any).

(E)   ***Delisting:*** If a Delisting occurs, the Calculation Agent shall, in its sole and absolute discretion, take either of the actions described in (1) or (2) below:

(3)   treat the affected Basket Company as a Replaced Basket Company and select a Replacement Basket Company in the manner specified in (C) (2) above; or

(4)   either:

(a)   request the Issuer to cancel the Notes in whole only and pay the Cancellation Amount (if any); or

(b)   determine which original Basket Company or Basket Companies should cease to be treated as a Basket Company or Basket Companies for the purpose of these Conditions and request the Issuer to pay the Cancellation Amount (if any).

(F)   ***Valuation of Shares of Replacement Basket Companies:***  In calculating the Early Redemption Amount, Mandatory Early Redemption Amount or Final Redemption Amount, as the case may be, the Initial Price for the Replacement Basket Company Share shall be deemed to be the product of (a) the Closing Price of the Replacement Basket Company Share on the relevant Replacement Date, and (b) the quotient of the relevant Initial Price for the Replaced Basket Company Share and the Closing Price for the Replaced Basket Company Share on the relevant Replacement Date (as adjusted by the Calculation Agent in its discretion to reflect the cost to the Issuer or any affiliate of replacing the affected Share and adjusting any associated hedging arrangements).

7.   **Notification of Early Redemption, Mandatory Early Redemption Amount, Final Redemption Amount, Disrupted Days, Potential Adjustment Events and Extraordinary Events**

(i)    As soon as reasonably practicable after calculating or otherwise determining the Early Redemption Amount, the Mandatory Early Redemption Amount or the Final Redemption Amount, as the case may be, the Calculation Agent shall give notice of the relevant amount to the Issuer.

(ii)   The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the existence or occurrence of a Disrupted Day on any day which but for such Disrupted Day would have been an Observation Date.

(iii)  Upon the occurrence of a Potential Adjustment Event or Extraordinary Event, the Calculation Agent shall give notice as soon as practicable to the Issuer stating the occurrence of the Potential Adjustment Event, or Extraordinary Event, as the case may be, giving details thereof and the action proposed to be taken in relation thereto.

(iv)   Adjustments in accordance with the foregoing sections shall be calculated by the Calculation Agent, shall be notified to the Noteholders in accordance with Condition 15 and shall be (in the absence of manifest error) binding on all parties concerned. However, Noteholders should be aware that there may be, necessarily, some delay between the time at which any of the above events occur and the time at which it is reported to Noteholders.

8.   **The Calculation Agent**

The Calculation Agent shall act independently and not as an agent of the Issuer, the Guarantor or the Noteholders.  All determinations made by the Calculation Agent hereunder shall, in the absence of manifest error, wilful default or bad faith, be final and conclusive, and the Calculation Agent shall have no liability to the Issuer, the Guarantor, the Noteholders or any third party in relation to such determinations except in the case of its wilful default, or bad faith.

Nothing contained herein shall prevent the Calculation Agent from dealing in the Notes or from entering into any related transaction, including without limitation any swap or

hedging transactions with the Issuer, the Guarantor (or any of their respective affiliates) or any holder of the Notes (or any of its affiliates).