**Response Deadline: December 6, 2010 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time: December 22, 2010 at 10:00 a.m. (Eastern Time)**

HOGAN LOVELLS US LLP
Christopher R. Donoho, III
David Dunn
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

*Attorneys for Lloyds TSB Bank plc*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
In re:                                                        :
                                                              :  Chapter 11
    LEHMAN BROTHERS HOLDINGS INC., *et al.*,                  :
                                                              :  Case No. 08-13555 (JMP)
                                                              :
                Debtors.                                      :  (Jointly Administered)
                                                              :
------------------------------------------------------------- x

**RESPONSE OF LLOYDS TSB BANK PLC TO DEBTORS' SIXTY-SEVENTH**
**OMNIBUS OBJECTION TO CLAIMS (VALUED DERIVATIVE CLAIMS)**

Lloyds TSB Bank plc ("Lloyds"), by and through its undersigned counsel, hereby responds to the Debtors' Sixty-Seventh Omnibus Objection to Claims (Valued Derivative Claims) (the "Claim Objection"), insofar as the Claim Objection relates to Claim Nos. 17727, 17728, 17729 and 17730 (collectively, the "Lloyds Claims"),[1] and, in support hereof, Lloyds states as follows:

---

[1] Relevant documents in support of the Lloyds Claims were uploaded in connection with the Derivative Questionnaire (as defined in the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(C)(3) Establishing the Deadline for Filing Proofs of Claim . . . [Docket No. 4271] (the "Bar Date Order")) to the website set forth in the Bar Date Order for the submission of supporting documentation.

1

**PRELIMINARY STATEMENT**

1.  Lloyds timely filed its claims and provided the Debtors with a relevant and appropriately thorough explanation and documentation of the losses it experienced under terminated derivative transactions in which Lloyds had engaged. Nevertheless, Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors") are seeking to reduce the amount of the Lloyds Claims on the sole basis—without any calculation or explanation—that the asserted claim amounts are "greater than the fair, accurate, and reasonable values determined by the Debtors." Claim Objection ¶ 11.

2.  Lloyds complied with the procedures set forth in the documentation governing the derivative transactions for calculating the amounts owed as a result of events of default under each master agreement with respect to the Debtors, resulting in the termination of the transactions; however, as described in paragraphs 13 and 14 below, Lloyds agrees to adjust some of the calculations. That the Debtors may have arrived at an alternate valuation—through purported methodologies that the Debtors have largely declined to identify or disclose to Lloyds despite frequent requests from Lloyds for insight into the differences between the parties' calculations—cannot change the fact that the governing documents empower Lloyds (as the non-defaulting party), using prescribed market-standard methodologies, to calculate the key component of the measure of damages under the terminated transactions.

3.  The Court should overrule the Claim Objection insofar as it relates to the Lloyds Claims and allow the Lloyds Claims (other than as agreed) as provided herein.

**BACKGROUND**

**I.    The LBSF Claims**

4.  Lloyds and co-Debtor Lehman Brothers Special Financing Inc. ("LBSF") entered into an ISDA Master Agreement, dated as of January 13, 1994 (together with the Schedule and

the Credit Support Annex thereto and certain Confirmations thereunder, including any amendments to the foregoing, the "LBSF Master Agreement"), which governs the terms of certain derivative transactions entered into between Lloyds and LBSF. By the parties' choice of law, the LBSF Master Agreement and the transactions thereunder are governed by English law.

5.   In connection with the LBSF Master Agreement, LBHI executed that certain Guarantee of Lehman Brothers Holdings Inc., dated January 13, 1994, unconditionally guaranteeing LBSF's obligations under the LBSF Master Agreement. The Schedule to the LBSF Master Agreement designates LBHI as a Credit Support Provider.[2]

6.   As of the filing of LBHI's voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Lloyds and LBSF were party to multiple outstanding derivative transactions governed by the LBSF Master Agreement (collectively, the "LBSF Transactions").

7.   The filing of a voluntary Chapter 11 petition for relief by LBHI, a Credit Support Provider, on September 15, 2008 constituted an Event of Default pursuant to Section 5(a)(vii) of the LBSF Master Agreement. As a consequence, Section 6(a) of the LBSF Master Agreement permitted Lloyds, as the Non-defaulting Party, to designate an Early Termination Date and terminate all outstanding transactions under the LBSF Master Agreement. Lloyds did so by notice to LBSF dated September 15, 2008, in which it designated September 15, 2008 as the Early Termination Date in respect of the LBSF Transactions.

8.   Lloyds and LBSF agreed in the Schedule to the LBSF Master Agreement that, for the purpose of Section 6(e) of the LBSF Master Agreement, the Second Method and Market

---

[2] Capitalized terms used and not otherwise defined in this Response have the same definitions set forth in the LBSF Master Agreement or the LBCC Master Agreement (defined below), as appropriate.

3

Quotation apply.  Accordingly, upon the occurrence of an Early Termination Date, Section 6(e)(i)(3) of the LBSF Master Agreement provides the following instructions for determining the amount payable in respect of the Early Termination Date:

> If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (<u>determined by the Non-defaulting Party</u>) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

LBSF Master Agreement § 6(e)(i)(3) (emphasis added).  The LBSF Master Agreement further defines Settlement Amount as follows:

> "Settlement Amount" means, with respect to a party and any Early Termination Date, the sum of:—
>
> (a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and
>
> (b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

LBSF Master Agreement § 14, "Settlement Amount."

9.    In accordance with its right and obligation to determine the Settlement Amount, Lloyds sought Market Quotations for each LBSF Transaction or group of LBSF Transactions, except in circumstances where a Market Quotation would not (in Lloyds' reasonable belief) produce a commercially reasonable result.  With the exception of the eleven LBSF Transactions described in further detail below, Lloyds either could not obtain a Market Quotation with respect

4

to the LBSF Transactions or determined that the Market Quotations would not (in its reasonable belief) produce a commercially reasonable result.  Accordingly, Lloyds applied the Loss methodology with respect to the majority of the LBSF Transactions by "reasonably determin[ing] in good faith . . . its total losses and costs (or gain, in which case expressed as a negative number)."  LBSF Master Agreement § 14, "Loss."

10.     Based on these calculations, by notice dated September 29, 2008 to LBSF pursuant to Section 6(d) of the LBSF Master Agreement (the "LBSF Section 6(d) Statement"), Lloyds advised LBSF that the net amount payable by LBSF as a result of the termination of the LBSF Transactions was $82,474,838.69, calculated as follows (in accordance with Section 6(e)(i)(3) of the LBSF Master Agreement): the Settlement Amount (a credit of $95,555,975.19) plus the Termination Currency Equivalent of the Unpaid Amount owed to Lloyds ($138,829.92) less the Termination Currency Equivalent of the Unpaid Amounts owing to LBSF ($13,219,966.42).  LBSF has not contested Lloyds' calculations of the Unpaid Amounts.

11.     On September 18, 2009, Lloyds filed Claim Nos. 17727 and 17728 (collectively, the "LBSF Claims") against LBSF as principal obligor and LBHI as guarantor, respectively, asserting claims of not less than $86,495,307, consisting of (a) the $82,474,838.69 amount described in the LBSF Section 6(d) Statement; (b) accrued interest at the Default Rate of $4,020,468 through September 14, 2009; and (c) an unliquidated amount of reasonable expenses, including reasonable legal fees and expenses, pursuant to Section 11 of the LBSF Master Agreement.  Lloyds also asserted that the LBSF Claims are entitled to secured status to the extent of rights of setoff, recoupment and/or netting Lloyds may have with respect to any claims that the Debtors may assert against Lloyds.

12.     On or before October 22, 2009, Lloyds submitted the necessary Derivative Questionnaire and Guarantee Questionnaire (as defined in the Bar Date Order) and uploaded the required supporting documentation to the website established by the Debtors for the submission of such materials.

13.     Subsequent to the filing of the LBSF Claims, Lloyds discovered that it had in fact obtained Market Quotations with respect to eleven of the terminated LBSF Transactions, namely inflation swaps with Lloyds reference numbers IS07004996, IS07003071, IS07003077, IS08005758, IS08004912, IS08007322, IS08009487, IS08010024, IS08002109, IS08010343, and IS08010411.  Adjusting the Settlement Amount to reflect the Market Quotations for these trades results in a net change of $6,208,101 in favor of LBSF in respect of such Transactions, as follows:

| Lloyds Reference | Original Claim Amount ($) | Adjusted Claim Amount ($) | Difference ($) |
|---|---|---|---|
| IS07004996 | -1,803,900 | -2,036,034 | -232,134 |
| IS07003071 | -2,244,781 | -2,604,120 | -359,339 |
| IS07003077 | -2,521,815 | -3,146,460 | -624,645 |
| IS08005758 | -499,944 | -1,105,420 | -605,476 |
| IS08004912 | -220,997 | -476,958 | -255,961 |
| IS08007322 | 500,730 | 299,090 | -201,640 |
| IS08009487 | -94,489 | -488,590 | -394,101 |
| IS08010024 | 200,140 | -163,336 | -363,476 |
| IS08002109 | -425,330 | -884,460 | -459,130 |
| IS08010343 | -66,112 | -1,080,530 | -1,014,418 |
| IS08010411 | 1,286,749 | -411,032 | -1,697,781 |
|  |  | **Total:** | -6,208,101 |

14.     Accordingly, Lloyds agrees that it would be appropriate to reduce the amount of each of the LBSF Claims by $6,208,101, resulting in the amount of each LBSF Claim being adjusted to $80,287,206.

15. Through the Claim Objection, the Debtors seek to reduce and reclassify each of the LBSF Claims as an unsecured claim in the amount of $26,480,252.50, again, without explanation.

## II. The LBCC Claims

16. Lloyds and co-Debtor Lehman Brothers Commercial Corporation ("LBCC") entered into an ISDA Master Agreement, dated as of April 24, 2006 (together with the Schedule and the Credit Support Annex thereto and certain Confirmations thereunder, including any amendments to the foregoing, the "LBCC Master Agreement," and, together with the LBSF Master Agreement, collectively, the "Master Agreements"), which governs the terms of certain derivative transactions entered into between Lloyds and LBCC. By the parties' choice of law, the LBCC Master Agreement and the transactions thereunder are governed by English law.

17. In connection with the LBCC Master Agreement, LBHI executed that certain Guarantee of Lehman Brothers Holdings Inc., dated April 26, 2006, unconditionally guaranteeing LBCC's obligations under the LBCC Master Agreement. The Schedule to the LBCC Master Agreement designates LBHI as a Credit Support Provider.

18. As of the filing of LBHI's voluntary petition for relief under Chapter 11 of the Bankruptcy Code, Lloyds and LBCC were party to multiple outstanding derivative transactions governed by the LBCC Master Agreement (collectively, the "LBCC Transactions")

19. The filing of a voluntary Chapter 11 petition for relief by LBHI, a Credit Support Provider, on September 15, 2008 constituted an Event of Default pursuant to Section 5(a)(vii) of the LBCC Master Agreement. As a consequence, Section 6(a) of the LBCC Master Agreement permitted Lloyds, as the Non-defaulting Party, to designate an Early Termination Date and terminate all outstanding transactions under the LBCC Master Agreement. Lloyds did so by

7

notice to LBCC dated September 15, 2008, in which it designated September 15, 2008 as the Early Termination Date in respect of the LBCC Transactions.

20. Lloyds and LBCC agreed in the Schedule to the LBCC Master Agreement that, for the purpose of Section 6(e) of the LBCC Master Agreement, the Second Method and Market Quotation apply. Accordingly, upon the occurrence of an Early Termination Date, Section 6(e)(i)(3) of the LBCC Master Agreement provides the following instructions for determining the amount payable in respect of the Early Termination Date:

> If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (<u>determined by the Non-defaulting Party</u>) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

LBCC Master Agreement § 6(e)(i)(3) (emphasis added). The LBCC Master Agreement further defines Settlement Amount as follows:

> "Settlement Amount" means, with respect to a party and any Early Termination Date, the sum of:—
>
> (a) the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and
>
> (b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

LBCC Master Agreement § 14, "Settlement Amount."

21. In accordance with its right and obligation to determine the Settlement Amount, Lloyds sought Market Quotations for each LBCC Transaction or group of LBCC Transactions. In each instance where Lloyds obtained at least three quotations for an LBCC Transaction, it eliminated the highest and lowest quotation and averaged the remaining quotations to determine the Market Quotation for such LBCC Transaction. In one instance, Lloyds could not determine a Market Quotation for the relevant LBCC Transaction and determined its Loss with respect to that LBCC Transaction.

22. Based on these calculations, by notice dated September 29, 2008 to LBCC pursuant to Section 6(d) of the LBCC Master Agreement (the "LBCC Section 6(d) Statement"), Lloyds advised LBCC that the net amount payable by LBCC as a result of the termination of the LBCC Transactions was $1,245,772.94, calculated as follows (in accordance with Section 6(e)(i)(3) of the LBCC Master Agreement): the Settlement Amount (a debit of $1,362,508.93) plus the Termination Currency Equivalent of the Unpaid Amount owed to Lloyds ($2,608,281.87 for the value of collateral posted by Lloyds as credit support) less the Termination Currency Equivalent of the Unpaid Amounts owing to LBCC ($0.00). LBCC has not contested Lloyds' calculations of the Unpaid Amounts.

23. On September 18, 2009, Lloyds filed Claim Nos. 17729 and 17730 (collectively, the "LBCC Claims") against LBCC as principal obligor and LBHI as guarantor, respectively, asserting claims of not less than $1,306,502, consisting of (a) the $1,245,772.94 amount described in the LBCC Section 6(d) Statement; (b) accrued interest at the Default Rate of $60,729 through September 14, 2009; and (c) an unliquidated amount of reasonable expenses, including reasonable legal fees and expenses, pursuant to Section 11 of the LBCC Master Agreement. Lloyds also asserted that the LBCC Claims are entitled to secured status to the

9

extent of rights of setoff, recoupment and/or netting Lloyds may have with respect to any claims that the Debtors may assert against Lloyds.

24. On or before October 22, 2009, Lloyds submitted the necessary Derivative Questionnaire and Guarantee Questionnaire and uploaded the required supporting documentation to the website established by the Debtors for the submission of such materials.

25. Through the Claim Objection, the Debtors seek to reduce and reclassify each of the LBCC Claims as an unsecured claim in the amount of $991,245.47, without explanation.

## ARGUMENT

### A. The Debtors Fail to Overcome the Prima Facie Validity of the Lloyds Claims

26. As a preliminary point, the claims objections do not meet the burden the Debtors carry to invalidate the Lloyds Claims. "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). Lloyds complied with the requirements set forth in the Federal Rules of Bankruptcy Procedure and the Bar Date Order for filing each of the Lloyds Claims. Thus, the Lloyds Claims are prima facie valid.

27. Moreover, the burden falls on "the objecting party to go forward and produce sufficient evidence to rebut the claimant's prima facie case." In re Greene, 71 B.R. 104, 106 (Bankr. S.D.N.Y. 1987); accord In re Oneida Ltd., 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009). The quantum of evidence required to overcome the prima facie validity of a filed claim must "be equal in force to the prima facie case . . . which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." Oneida, 400 B.R. at 389 (internal quotations omitted).

28.     In the instant matter, the Debtors fall well short of meeting the burden imposed on them to overcome the prima facie validity of the Lloyds Claims.  The Debtors seek to reduce the amount of the Lloyds Claims on the basis of a conclusory, wholly unsupported statement that the Lloyds Claims are "overvalued."  Although the Debtors provide a description of the general process employed in evaluating derivative claims, see Claim Objection ¶ 14, the Claim Objection says nothing about why the Debtors disagree with the amount thereof.  The Debtors provide not a shred of evidence to support their position, much less evidence specifically addressed at the Lloyds Claims, the parties' rights and obligations under the Master Agreements, any claimed defect in, the calculation or methodology underlying the calculation which Lloyds properly advanced, or the basis and evidentiary support for their own calculation.  All Lloyds has been given is a number, which happens to be approximately 30% of the number calculated and documented by Lloyds.

29.     Allegations of overvaluation are not evidence.  The Claim Objection should be overruled with respect to the Lloyds Claims based on the Debtors' failure to present any evidence to support their objection – no less sufficient evidence to carry their burden of proof.

**B.     The Lloyds Claims Comply with the Master Agreements**

30.     Even assuming arguendo that the Debtors have overcome Rule 3001(f)'s presumption of validity, no amount of scrutiny, review, analysis or reconciliation of the Lloyds Claims by the Debtors can overcome the terms of the Master Agreements to which the parties contractually agreed.

31.     Except as discussed above in ¶¶ 13-14, Lloyds correctly calculated the Settlement Amount by determining the Market Quotations for the Transactions under each Master Agreement or, where Market Quotations could not be determined or would not produce a

11

commercially reasonable result, the Loss attributable to such Transactions. The basis for all of the calculations and determinations of the loss suffered by Lloyds was properly and timely submitted by Lloyds as part of the claim process. Thus, no basis for reducing the Lloyds Claims has been presented (except as agreed to be modified and noted above), and the Lloyds Claims should be upheld.

32.     Moreover, even if the Debtors may have calculated the loss differently (of course, to its own advantage), they cannot substitute their judgment for the reasonable judgment of Lloyds for the simple reason that the contracts do not permit that. The Master Agreements expressly designate the Non-defaulting Party, i.e., Lloyds, as the party to calculate the Settlement Amount. See LBSF Master Agreement § 6(e)(i)(3) ("If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) . . .") (emphasis added); LBCC Master Agreement § 6(e)(i)(3) (same). The right to determine the Settlement Amount belongs exclusively to Lloyds as the Non-defaulting Party. Thus, to the extent the Debtors challenge Lloyds' calculation of the Settlement Amount under each Master Agreement, the Court should overrule the Claim Objection as inconsistent with the terms of the Master Agreements, since it does not provide evidence of any unreasonableness in Lloyds' calculations, but proposes to substitute the Debtors' calculations without contractual right, explanation or evidentiary support.

C.     **Lloyds Agrees that the Claims Are Unsecured.**

33.     The Debtors, as part of the Claim Objection, are seeking to reclassify the Lloyds Claims as unsecured, from secured. Given that Lloyds netted the value of the collateral posted by each party in determining the amount payable to Lloyds in accordance with each Master Agreement, and any security interest was satisfied, Lloyds agrees that the Lloyds Claims are properly treated as unsecured.

12

**D.      Reservation of Rights**

34.     Lloyds reserves the right to supplemental and/or amend this Response as necessary. To the extent that an evidentiary hearing is necessary on the merits of the Lloyds Claims, Lloyds reserves the right to request a full evidentiary hearing pursuant to Rule 9014(e) of the Federal Rules of Bankruptcy Procedure and Rule 9014-2 of the Local Rules of Bankruptcy Procedure.

WHEREFORE, for the reasons set forth above, Lloyds respectfully requests that the Court (a) overrule the Claim Objection; (b) allow the Lloyds Claims as provided herein; (c) award Lloyds its costs and disbursements in this action, including reasonable attorneys' fees; and (d) grant such other and further relief as the Court deems appropriate.

Dated: December 3, 2010
New York, New York

**HOGAN LOVELLS US LLP**

By: /s/ Christopher R. Donoho, III
    Christopher R. Donoho, III
    David Dunn
    875 Third Avenue
    New York, NY 10022
    Telephone: (212) 918-3000
    Facsimile: (212) 918-3100

*Attorneys for Lloyds TSB Bank plc*