UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
:
In re:                                                             :        **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,                       :        **08-13555 (JMP)**
:
Debtors.                                       :        **(Jointly Administered)**
:
-------------------------------------------------------------------x

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr.P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| **BEINT, L.L.C.** | **MERRILL LYNCH CREDIT PRODUCTS, LLC** |
|---|---|
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee should be sent:

    P.O. Box 8342
    New York, NY 10150
    E-mail: tradeclaims@beint.net
    Phone: N/A
    Last Four Digits of Acct #: N/A

With a copy to:

Louis Smookler
Reitler Kailas & Rosenblatt LLC
885 Third Avenue, 20th Floor
New York, New York 10022
Phone: 212-209-3059
Fax: 212-371-5500
e-mail: lsmookler@reitlerlaw.com

Name and Address where transferee payments should be sent (if different from above): N/A

Court Claim # (if known): 3584
Amount of Claim: $228,880,046.91
Amount of Claim to be Transferred: $200,530,046.91
Date Claim Filed: March 31, 2009

Name and Address of Transferor:

c/o Bank of America Merrill Lynch
Bank of America Tower, 3rd Floor
One Bryant Park, New York, NY 10036

**\*\*PLEASE SEE ATTACHED DOCUMENTS\*\***

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____            Date: _12/6/10_____
    Transferee/Transferee's Agent
    Louis Smookler/Authorized Signatory

*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.*

## EVIDENCE OF PARTIAL TRANSFER OF CLAIM

TO:  Clerk, United States Bankruptcy Court, Southern District of New York

AND TO: Merrill Lynch Credit Products, LLC

      Merrill Lynch Credit Products, LLC, with offices located at c/o Bank of America Merrill Lynch, Bank of America Tower, 3rd Floor, One Bryant Park, New York, NY 10036 ("Seller"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and pursuant to the terms of a Transfer of Claim Agreement dated as of December 8, 2009, does hereby certify that it has unconditionally and irrevocably sold, transferred and assigned to BEINT, L.L.C., its successors and assigns, with an address of P.O. Box 8342, New York, NY 10150  ("Buyer"), a portion of all right, title and interest in and to the claims of Seller (originally held by Genfina SCRL) AGAINST LEHMAN BROTHERS HOLDINGS INC. (and its affiliates) in the amount of $200,530,046.91, docketed as Claim No. 3584 (the "Claim") in the United States Bankruptcy Court, Southern District of New York, Case No. 08-13555 (JMP) (Jointly Administered).

      Seller hereby waives any notice or hearing requirements imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, and stipulates that an order may be entered recognizing this transfer and sale of the Claim as an unconditional sale and assignment and Buyer herein as the valid owner of the Claim.  You are hereby requested to make all future payments and distributions, and to give all notices and other communications, in respect to the Claim to Buyer.

      IN WITNESS WHEREOF, dated as of the _3rd_ day of December, 2010.

WITNESS:

_____
(Signature)
Name:  JEFF BENESH
Title:  ASSOCIATE
(Print name and title of witness)

**MERRILL LYNCH CREDIT PRODUCTS, LLC**

By: _____
(Signature of authorized corporate officer)
Name:  RON TOROK
Title:  VICE PRESIDENT
Tel.:

WITNESS:

_____
(Signature)
Name:  MICHAEL GROSSMAN
Title:  ASSOCIATE

**BEINT, L.L.C.**

By: _____
Name:  Louis Smookler
Title:  Authorized Signatory

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Lehman Brothers Holding Inc. | Case Number:<br>08-13555 (JMP) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Genfina SCRL (formerly known as Genfina SA) | □ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>Clifford Chance US LLP, Attention: Jennifer B. Premisler<br>31 West 52nd Street, New York, NY 10019-6131<br><br>Telephone number:<br>(212) 878-8000 | Court Claim Number:_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br>Genfina SCRL, Attention: Philippe Renard<br>Place du Trone 1, B-1000 Brussels<br><br>Telephone number: | □ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>□ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| 1. Amount of Claim as of Date Case Filed:        $_____228,880,046.91_____<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>□ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim.<br><br>□ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B) |
| 2. Basis for Claim:    see attachment<br>(See instruction #2 on reverse side.) | |
| 3. Last four digits of any number by which creditor identifies debtor: _____<br><br>3a. Debtor may have scheduled account as: _____<br>(See instruction #3a on reverse side.) | □ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| 4. Secured Claim (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff:   □ Real Estate   □ Motor Vehicle   □ Other<br>Describe:<br><br>Value of Property:$_____  Annual Interest Rate___%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $_____  Basis for perfection: _____<br><br>Amount of Secured Claim: $_____  Amount Unsecured: $_____ | □ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>□ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>□ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| 6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | □ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(_). |
| 7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain. | Amount entitled to priority:<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)              0000003584

| | |
|---|---|
| Date: 25.Ⅲ.09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>GUIDO VANHOVE  DIRECTOR        JEAN-PIERRE HISLAIRE  DIRECTOR |

FOR COURT USE ONLY

FILED / RECEIVED

MAR 31 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>Lehman Brothers Holding Inc., *et al.*<br><br><div align="center">Debtors</div> | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br><br>Jointly Administered |

## ATTACHMENT TO PROOF OF CLAIM OF GENFINA SCRL

Genfina SCRL, formerly known as Genfina SA, ("Genfina") by its authorized representative submits this proof of claim (the "Claim") against Lehman Brothers Holding Inc. ("LBHI").

### Chapter 11 Administration Filings

1.    On September 15, 2008, LBHI filed a petition for relief (the "Petition Date") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On that same day, Lehman Brothers International (Europe) ("LBIE") entered insolvency administration in the United Kingdom and PricewaterhouseCoopers was designated as administrator. Subsequent to the Petition Date, various subsidiaries of LBHI filed voluntary petitions under chapter 11 of the Bankruptcy Code (such entities together with LBHI, the "Debtors").

2.    On September 16, 2008, this Court approved the retention of Epiq Bankruptcy Solutions, LLC by LBHI as noticing and claims agent in the above captioned cases.

3.    As of today, the Debtors have not moved this Court to set a claims bar date in these cases.

### Genfina's Claim

4.    Prior to the Petition Date, Genfina and LBIE (collectively, the "Parties") entered into a certain Master ISDA Agreement (together with the Schedule thereto, the "Master Agreement") dated April 5, 2007 to govern the terms of certain swap transactions that were to be entered into between the Parties. A copy of the Master Agreement is attached hereto as Exhibit A.

5.    LBIE's obligations under the Master Agreement and the transactions entered into between the Parties thereunder are guaranteed by LBHI pursuant to that certain Guarantee of Lehman Brothers Holdings Inc. (London Branch) dated April 10, 2007 (the "Guarantee"). Pursuant to the Guarantee, LBHI guaranteed the payment of all obligations due and owing by LBIE to Genfina under each of the transactions entered into under the Master Agreement. See Guarantee at ¶ (a). A copy of the Guarantee is attached hereto as Exhibit B.

6.    Pursuant to Confirmations dated May 10, 2007 and September 5, 2008, the Parties entered into swap transactions in respect to ordinary shares of Gaz Natural SDG SA (together the "Transactions"). Copies of the Confirmations for the Transactions are attached hereto as Exhibit C.

7.    Following the appointment of an administrator for LBIE on September 15, 2008, an Event of Default occurred under the Master Agreement. Master Agreement § 5(a)(vii).

8.    On September 19, 2008 Genfina sent LBIE a notice terminating the Transactions (the "Termination Notice"). A copy of the Termination Notice is attached hereto as Exhibit D. Pursuant to § 6(a) of the Master Agreement, Genfina designated September 22, 2008 as the Early Termination Date.

NYB1606908.3

9.     On December 19, 2008, Genfina sent LBIE a statement showing Genfina's calculation of the termination amount due and payable between the Parties (the "Calculation Statement"). A copy of the Calculation Statement is attached hereto as Exhibit E.

10.    As set forth in the Calculation Statement, the amount payable to Genfina by LBIE is € 161,467,405.23. As of the Petition Date, such amount in U.S. dollars is $ 228,880,046.91.

11.    Accordingly, Genfina holds a valid claim against LBHI under the Guarantee and in the total amount of $ 228,880,046.91, exclusive of any costs, fees, interest or costs of carry.

### Reservation of Rights

12.    Genfina expressly reserves the right to amend, modify and/or supplement this Claim at any time, in any respect and for any reason, including but not limited to, for the purposes of (a) fixing, increasing, or amending the amounts referred to herein, and (b) adding or amending documents and other information and further describing the claims. Genfina does not waive any right to amounts due for any claim asserted herein by not stating a specific amount due for any such claim at this time, and Genfina reserves the right to amend or supplement this proof of claim, if Genfina should deem it necessary or appropriate, to assert and state an amount for any such claim.

13.    This Claim is made without prejudice to the filing by Genfina and any related entities of additional proofs of claim for any additional claims against the Debtors and non-debtor entities affiliated with the Debtors of any kind of nature or nature, including, without limitation, claims for administrative expenses, additional interest, late charges, and related costs and expenses, and any and all other charges and obligations reserved under the applicable documents and other transaction documents, and claims for reimbursement in amounts that are not fully ascertainable.

NYB1606908.3

14.     The filing of this Claim is not intended to be and shall not be deemed to be or construed as (a) a waiver or release of any right to claim specific assets; any rights of setoff, recoupment, or counterclaim; or any other right, rights of action, causes of action, or claims, whether existing now or hereinafter arising, that Genfina has or may have against LBHI, its affiliated entities or any other person, or persons, and Genfina expressly reserves all such rights, or (b) an election of remedies.

15.     Nothing herein modifies, alters, amends and/or waives any right Genfina may have under applicable law or any agreement or understanding to assert and recover from LBHI, its affiliated entities or any other person or persons, upon rights, claims, and monies.

16.     In executing and filing this claim, Genfina does not submit itself to the jurisdiction of this court for any other purpose than with respect to this Claim. This Claim is not intended to be, and shall not be construed as (i) an election of remedies, (ii) a waiver of any past, present or future defaults, or (iii) a waiver or limitation of any rights remedies, claims or interests of Genfina.

## Notices

17.     All notices, communications and distributions with respect to this Claim should be sent to:

Genfina SCRL
Place du Trône, 1
B-1000 Brussels
Attention: Philippe Renard


With a copy to:

Clifford Chance US LLP
31 W. 52nd Street
New York, New York 10019
Attention: Jennifer B. Premisler, Esq.

4

**Exhibit A**

(Multicurrency-Cross Border)

# ISDA®

International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of 5 April, 2007

### LEHMAN BROTHERS INTERNATIONAL (EUROPE)

### GENFINA SA

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.    Interpretation

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    Obligations

(a)    *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:-

   (i)    in the same currency; and

   (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

   (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:-

      (1)    promptly notify the other party ("Y") of such requirement;

      (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

      (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

      (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:-

         (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

         (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii) *Liability.* If:-

    (1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

    (2)  X does not so deduct or withhold; and

    (3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.      Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:-

(a)    *Basic Representations.*

    (i) *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii) *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii) *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv) *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v) *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

<div align="center">3</div>

<div align="right">ISDA© 1992</div>

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:-

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:-

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:-

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:-

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*.    The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:-

(1)    the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)    the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)        *Termination Events*.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6

ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:-

> (i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):-
>
> > (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or
> >
> > (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;
>
> (ii) *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));
>
> (iii) *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);
>
> (iv) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or
>
> (v) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event*.

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate*. If:-

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c). *Effect of Designation.*

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations.*

(i) *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i) *Events of Default.* If the Early Termination Date results from an Event of Default:-

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)   *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events.* If the Early Termination Date results from a Termination Event:-

(1)   *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)   *Two Affected Parties.* If there are two Affected Parties:-

(A)   if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)   if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

10

ISDA© 1992

7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:-

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    Contractual Currency

(a)    *Payment in the Contractual Currency*.  Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency").  To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*.  To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party.  The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*.  To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*.  For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

11

9.       Miscellaneous

(a)      *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)      *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)      *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)      *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)      *Counterparts and Confirmations.*

    (i)   This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii)  The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)      *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)      *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.      Offices; Multibranch Parties

(a)      If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)      Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)      If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.      Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA© 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.   Notices**

(a)   *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:-

   (i)   if in writing and delivered in person or by courier, on the date it is delivered;

   (ii)   if sent by telex, on the date the recipient's answerback is received;

   (iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

   (iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

   (v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)   *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.   Governing Law and Jurisdiction**

(a)   *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)   *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:-

   (i)   submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

   (ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)   *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

<center>13</center>

<center>ISDA® 1992</center>

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)      *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

14.      Definitions

As used in this Agreement:-

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:-

(a)      in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)      in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)      in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)      in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14                                                          ISDA® 1992

"*Defaulting Party*" has the meaning specified in Section 6(a).

"*Early Termination Date*" means the date determined in accordance with Section 6(a) or 6(b)(iv).

"*Event of Default*" has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

"*Illegality*" has the meaning specified in Section 5(b).

"*Indemnifiable Tax*" means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

"*law*" includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and "lawful" and "unlawful" will be construed accordingly.

"*Local Business Day*" means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

"*Loss*" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

"*Market Quotation*" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

ISDA© 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:-

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

ISDA® 1992

**"Specified Indebtedness"** means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

**"Specified Transaction"** means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

**"Stamp Tax"** means any stamp, registration, documentation or similar tax.

**"Tax"** means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

**"Tax Event"** has the meaning specified in Section 5(b).

**"Tax Event Upon Merger"** has the meaning specified in Section 5(b).

**"Terminated Transactions"** means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

**"Termination Currency"** has the meaning specified in the Schedule.

**"Termination Currency Equivalent"** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

**"Termination Event"** means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

**"Termination Rate"** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

**"Unpaid Amounts"** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

<div align="center">17</div>

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.    The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS                           GENFINA SA
INTERNATIONAL (EUROPE)
(Name of Party)                            (Name of Party)

By: _____            By: _____

Name:   ANDREE WATT                       Name:   O. JACQUIER

Title:                                    Title:   Head of 1 o 4.

Date:   AUTHORISED SIGNATORY              Date:   09.05.07.

        18/04/2007

18

(Multicurrency–Cross Border)

<div align="center">

**SCHEDULE**
to the
Master Agreement
dated as of 5 April, 2007
between
**LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Party A"),**
a company incorporated with unlimited liability
under the laws of England and Wales
and
**GENFINA SA ("Party B"),**
a corporation organized under the laws of
Belgium

</div>

## Part 1:  Termination Provisions

In this Agreement:-

(a)     **"Specified Entity"** means in relation to Party A for the purpose of:-

<div align="center">

Section 5(a)(v),     Not applicable.
Section 5(a)(vi),    Not applicable.
Section 5(a)(vii),   Not applicable.
Section 5(b)(iv),    Not applicable.

</div>

<div align="center">

and in relation to Party B for the purpose of:-

</div>

<div align="center">

Section 5(a)(v),     Not applicable.
Section 5(a)(vi),    Not applicable.
Section 5(a)(vii),   Not applicable.
Section 5(b)(iv),    Not applicable.

</div>

(b)     **"Specified Transaction"** will have the meaning specified in <u>Section 14</u> of this Agreement.

(c)     The **"Cross Default"** provisions of <u>Section 5(a)(vi)</u> will apply to Party A and Party B, provided that Section 5(a)(vi) shall be deleted and replaced by:

"(vi)     *Cross Default.*  If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period). Notwithstanding the foregoing, if the Specified Indebtedness is a guarantee or indemnity (or any other instrument having similar effect), no Cross Default shall occur under this Section 5(a)(vi) (1) if such Specified Indebtedness is paid in accordance with its terms.

19

The following provisions apply:

"Specified Indebtedness" will have the meaning specified in Section 14 of this Agreement.

"Threshold Amount" means the lesser of (i) USD 100 million and (ii) three percent (3%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and EUR 100 million , in the case of Party B (or its equivalent in any other currency).

For purposes hereof, "Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

(e)     The "Automatic Early Termination" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)     Payments on Early Termination. For the purpose of Section 6(e) of this Agreement, Loss and the Second Method will apply.

(g)     "Termination Currency" means euro ("EUR").

(h)     Additional Termination Events will apply. The following shall constitute · an Additional Termination Event:

Ownership Maintenance. With respect to Party·B, at any time and for any reason, Suez SA, or its successor, ceases to own beneficially and of record (directly or indirectly) at least 50.1% (determined on a fully diluted basis) of the capital stock of each class of Party B. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Part 2: Tax Representations**

(a)     Payer Tax Representations. For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) and 6(e) of this Agreement) to be made by it to the other party under this Agreement. . In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement,

20

_provided_ that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under _Section 4(a)(iii)_ of this Agreement by reason of material prejudice to its legal or commercial position.

(b)     **Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement Party A represents that it is a company incorporated with unlimited liability under the laws of England and Wales and Party B represents that it is a corporation duly organized and validly existing under the laws of Belgium.

(c)     **Tax Representations in Confirmations.** For purposes of _Sections 2(d)(i)(4)_ and _3(f)_, any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

21

**Part 3: Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in Section 4(a)(iii) of this Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B, containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A and Party B | For its most recent fiscal quarter, or with respect to Party B, its most recent fiscal half year, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, Party B, prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |

22

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit B to this Schedule. | Promptly after execution of this Agreement. | No |

**Part 4: Miscellaneous**

(a)    **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to Party A:

Address:    Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE
England

Attention:    Documentation Manager
Telephone No.:    (44) 20 7102 1209
Facsimile No.:    (44) 20 7102 2044

For all purposes

Address for notices or communications to Party B:

Address:
16 rue de la Ville l'Evêque
F-75008 PARIS

Attention:    Olivier Jacquier
Telephone No.:    00331 4006 6504
Facsimile No.:    00331 4006 6682

For all purposes

(b)    **Process Agent.** For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent:    Not applicable.

Party B appoints as its Process Agent:    Suez Global LNG Ltd.
101 Wigmore Street
London  W1U 1QU
United Kingdom

(c)    **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(d)    **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:

Party A is a Multibranch Party and may act through its head office in London and the following Offices: Amsterdam, Frankfurt, Madrid, Milan, Paris, Stockholm, and Zurich.

23

Party B is not a Multibranch Party.

(e)     Calculation Agent. The Calculation Agent is Party A.

(f)     Credit Support Document.

In the case of Party A:

Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of Party B: not applicable

(g)     Credit Support Provider.

Credit Support Provider means in relation to Party A:            Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B:    Not applicable

(h)     Governing Law. This Agreement will be governed by and construed in accordance with the laws of England and Wales.

(i)     Netting of Payments. Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions.

(j)     "Affiliate" will have the meaning specified in Section 14 of this Agreement, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

**Part 5: Other Provisions**

Miscellaneous:

(a)     Representations.  Section 3 of this Agreement is hereby amended by adding the following additional subsections:

(g)     *No Reliance.*  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction.  No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(h)     *Assessment and Understanding.*  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the risks of that Transaction.

(i)     *Status of Parties.*  The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

24

(j)    *No Agency.*  It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

(b)    **Set-off.**  Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

    (f)    *Set-off.*

    (i)    In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

    (ii)    For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

    (iii)    If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

    (iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(c)    **Transfer.**  Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor.

(d)    **Notices.**  For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent

(e)    **Service of Process.**  The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(f)    **Outstanding Specified Transactions.**  Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(g)    **Waiver of Trial By Jury.**  Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(h)    **Accuracy of Specified Information.**  Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or

25

unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(i)     **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" end inserting in lieu thereof the word "first".

(j)     **Default Under Specified Transaction.** Section 5(a)(v) is hereby amended to read as follows:

(v)     *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

(1)     defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)     defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)     defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)     disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(k)     **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if *that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.*

(l)     **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or

in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement.  It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(m)    Recording of Conversations.  Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction. Promptly upon the request by a party, the other party will provide a copy of such recording to the party making the request.

(n)    Transactions. With respect to each Option Transaction, Party B represents to Party A:

　　　(1)    understands that the Option Transactions have not been registered under the Securities Act of 1933, as amended (the "Securities Act") and are being offered and sold in reliance on the exemption to the registration requirements of the Securities Act provided under Section 4(2) thereof;

　　　(2)    understands and acknowledges that Party A has no obligation to register the Option Transactions under the Securities Act or any other United States federal or state securities law, and that the Option Transactions must be held indefinitely by the purchaser thereof unless subsequently registered under such securities laws or an exemption from such registration is available;

　　　(3)    agrees that in the event that at some future time it wishes to dispose of the Option Transactions in whole or in part (such disposition currently not being foreseen or contemplated), it will not transfer the same except in a transaction exempt from or not subject to the registration requirements of the Securities Act; and

　　　(4)    understands that each Confirmation may bear a legend to substantially the following effect:

　　　　THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; AND SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.

Part 6: Additional Terms for FX Transactions and Currency Options

(a)    Incorporation and Amendment of 1998 FX and Currency Option Definitions

　　　(i)    Incorporation of 1998 FX and Currency Option Definitions.  The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

27

(ii)    Amendment of 1998 FX and Currency Option Definitions.  The following amendments are made to the 1998 Definitions:

Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

Currency Obligation.  "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)    Confirmations. Any confirmation (whether provided by mail, facsimile, e-mail or other electronic means, and whether manually or electronically generated) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement even where not so specified in such confirmation and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as modified therein.

(c)    Netting and Related Provisions.  Section 2(c) shall not apply to FX Transactions or Currency Option Transactions.  In lieu thereof, the following shall apply:

(i)    Netting, Discharge and Termination of FX Transactions. The following provisions shall apply to FX Transactions:

Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

(ii)    Netting, Discharge and Termination with Respect to Currency Option Transactions.  The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)    Inconsistencies. In the event of any conflict between:

(i)    the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

(ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(iii)    the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

28

(e)    Definitions.  Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

| | |
|---|---|
| **LEHMAN BROTHERS**<br>**INTERNATIONAL (EUROPE)**<br>*(Name of Party)* | **GENFINA SA**<br><br>*(Name of Party)* |
| By: | By: |
| Name:    ANDREE WATT | Name: |
| Title: | Title:    Head of A4 |
| Date:    AUTHORISED SIGNATORY | Date:    olivier JACqvIER |
| 23/04/2007 | 09.05.07 |

29

**Exhibit B**

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC. (LONDON BRANCH)

LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Party A") and GENFINA SA ("Party B") have entered into a Master Agreement dated as of 5 April, 2007, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction", the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until the first to occur of (i) receipt by Party B of a written notice of termination from Guarantor or (ii) none of the obligations of Party A remain outstanding. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.
(LONDON BRANCH)

Name:    James J. Killerlane III

Title:    Vice President

Date:    April 10, 2007

2

**Exhibit C**

# LEHMAN BROTHERS

| | |
|---|---|
| Date: | 10 May 2007 |
| To: | Genfina SA |
| | Attention:    O. Jacquier / S. Val |
| | Facsimile:    +33 (0) 1 4006 6682 |
| From: | Lehman Brothers International (Europe) |
| | Attention:    Frederique Gilain-Huneeus |
| | Facsimile:    +44 (0) 20 7067 8022 |
| Effort Id: | [ ] |
| Global Id: | [ ] |

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers International (Europe) ("Party A") and Genfina SA ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 5 April 2007, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction and performing its obligations thereunder is within its capacity, is duly authorized and does not violate any laws or regulations of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives and accordingly the other Party shall have no liability howsoever arising (except in the case of fraud) to the other Party with respect thereto. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law).

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 10 May 2007 |
| Effective Date: | 10 May 2007 |
| Termination Date: | The Cash Settlement Payment Date, if Cash Settlement applies, and the Settlement Date, if Physical Settlement applies. |
| Shares: | Ordinary shares (*acciones ordinarias*) of Gas Natural SDG SA (Bloomberg Code: GAS SM) |
| Exchange(s): | Sistema de Interconexión Bursátil (SIBE) (Automated Quotation System) |
| Related Exchange(s): | MEFF Renta Variable |

**Equity Amounts:**

| | |
|---|---|
| Equity Amount Payer: | Party A |
| Equity Amount Receiver: | Party B |
| Number of Shares: | The number of Shares (as determined by the Calculation Agent at any given point in time and notified to Party B on a daily basis) up to 1,000,000 in respect of which Party A has established its Hedge Positions in relation to this Transaction during the Hedge Execution Period. |
| Hedge Execution Period: | The period from and including the Trade Date to and including 25 May 2007. |
| Hedge Unwind Period: | The period from and including 17 September 2007 to and including the Valuation Date. |
| Equity Notional Amount: | The Number of Shares multiplied by the Initial Price. |
| Equity Notional Reset: | Not Applicable |
| Type of Return: | Total Return |
| Initial Price: | 100.25% of the volume-weighted average execution price per Share in the Settlement Currency at which Party A actually establishes its Hedge Positions for this Transaction, as determined by the Calculation Agent. Party A will act in good faith and in a commercially reasonable manner in order to minimize the price at which it will put in place its Hedge Positions in relation to this Transaction. For each Exchange Business Day, |

(1) Party A will guarantee to Party B that the price at which it will put in place its Hedge Positions in relation to the portion of this Transaction hedged that Exchange Business Day will be less than or equal to the VWAP in respect of that Exchange Business Day;

(2) Party A will put in place its Hedge Positions in relation to a number of Shares less than or equal to 15%

2

|  | of the average daily traded volume in respect of that Exchange Business Day. |
|---|---|
| VWAP: | The Volume Weighted Average Price per Share on the Exchange excluding blocks in respect of the period from the later of (i) the opening of the Exchange on such Exchange Business Day and (ii) the time when Party A begins establishing its Hedge Positions for this Transaction, until the earlier of (i) the closing of the Exchange on such Exchange Business Day and (ii) the time when Party A finishes establishing its Hedge Positions for this Transaction, as displayed on Bloomberg (or any successor service) page GAS SM <Equity> VAP in respect of the same period on such Exchange Business Day. |
| Unwind Price: | At any given point in time during the Hedge Unwind Period, 100% of the volume-weighted average execution price per Share in the Settlement Currency at which Party A, acting in its sole discretion, has actually unwound its Hedge Positions in relation to this Transaction on or before such point in time, as determined by the Calculation Agent at such point in time. |
| Final Price: | The Unwind Price as of the Valuation Time on the Valuation Date with respect to the Number of Shares. |
| Valuation Time: | The time at which Party A completes the unwind of its Hedge Positions in relation to this Transaction on the Valuation Date, but in any event no later than the close of business on the Exchange on the Valuation Date. |
| Valuation Date: | The earlier of 16 November 2007 and the Exchange Business Day on which Party A completes the unwind of its Hedge Positions in relation to this Transaction, as determined by the Calculation Agent. |
| Floating Amounts: | In consideration of the terms of this Transaction and in particular but without limitation the Collateral terms, Party B will not pay any Floating Amount to Party A hereunder. |

**Settlement Terms:**

| | |
|---|---|
| Settlement Currency: | EUR |
| Cash Settlement: | Applicable |
| Cash Settlement Payment Date: | 2 Currency Business Days following the Valuation Date |
| Settlement Method Election: | Applicable |
| Default Settlement Method: | Cash Settlement |
| Electing Party: | Party B |

Physical Settlement shall only be eligible as Settlement Method, if (i) a transfer of the Number of Shares to Party B is in compliance with all applicable laws and regulations (which includes, without limitation, any

3

requirement there might be in Spain, or under Spanish law, for approval from the Spanish Comisión Nacional de Energía ("CNE"), and prior approval of the CNE), and (ii) Party B has confirmed such compliance to Party A in writing.

Settlement Method Election Date:

The Scheduled Trading Day immediately preceding the first day of the Hedge Unwind Period.

*For the avoidance of doubt and as per Section 7.1 of the Equity Definitions, subject to the above conditions the Electing Party can give irrevocable notice to the other party of its election to have Physical Settlement apply to the Transaction on any Scheduled Trading Day from the Effective Date to and including the Settlement Method Election Date.*

Settlement Date:

*For the purposes of Physical Settlement, one Settlement Cycle following the day upon which the Electing Party serves notice of its election to have Physical Settlement to apply to the Transaction*

**Dividends:**

Dividend Period:

Second Period

Dividend Amount:

As determined by the Calculation Agent, 85% of the gross cash dividend per Share declared by the Issuer of the Shares on the relevant Dividend Payment Date multiplied by the Number of Shares (adjusted by the Calculation Agent for any reduction in case the ex-dividend date falls during the Hedge Unwind Period).

Dividend Payment Dates:

The date on which the relevant dividend is paid by the Issuer to the holders of record of the Shares (irrespective of whether such date falls after the Termination Date).

Re-investment of Dividends:

Not Applicable

Dividends:

For the avoidance of doubt, the parties acknowledge that "Dividends" includes dividends, extraordinary dividends and free cash distributions (non-cash distributions being dealt with under Potential Adjustment Events provisions, whereby the Calculation Agent is required to act in good faith and in a commercially reasonable manner to reflect, among other things, the economics of any non-cash distributions).

**Voting Rights:**

Party B acknowledges that if ever Party A acquires Shares for the purpose of hedging its position under the Transaction, the voting rights attached thereto shall be exercised –if at all– by Party A in its absolute and sole discretion.

**Share Adjustments:**

Method of Adjustment:

Calculation Agent Adjustment

4

**Extraordinary Events:**

**Consequences of Merger Events:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |

Tender Offer:                          Applicable

**Consequences of Tender Offers:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |
| Composition of Combined Consideration: | Not Applicable |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment (Calculation Agent Determination) |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Failure to Deliver: | Not Applicable |
| Insolvency Filing: | Applicable |

The definition of "Insolvency Filing" in Section 12.9(a)(iv) of the Equity Definitions shall be amended by adding the following sentence at the end: "unless any such proceeding or petition is not dismissed, discharged, stayed or restrained in each case within fifteen days of the institution or presentation thereof".

Section 12.9(b)(i) of the Equity Definitions is hereby amended by adding the following sentence at the end: "If neither party elects to terminate the Transaction, the Calculation Agent may adjust the terms of the Transaction upon the occurrence of such an event pursuant to Modified Calculation Agent Adjustment (as if such event were a Tender Offer)."

| | |
|---|---|
| Hedging Disruption: | Not Applicable |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Hedging Party: | Party A (for all Additional Disruption Events) |
| Determining Party: | Party A (for all Additional Disruption Events) |

5

Non-Reliance:                                         Applicable

Agreements and Acknowledgments                        Applicable
Regarding Hedging Activities:

Additional Acknowledgments:                           Applicable

**Credit Support Provisions:**

Collateral:                                           For purposes of this section, paragraphs one through ten
                                                      of the standard form 1995 ISDA Credit Support Annex
                                                      (Bilateral Form -- Transfer) (English law) (the "CSA")
                                                      are incorporated by reference herein subject to the
                                                      elections and modifications set out below. In case of any
                                                      inconsistency between the definitions or provisions of
                                                      this section and/or the CSA with the rest of this
                                                      Confirmation, the relevant definitions or provisions of
                                                      this section and/or the CSA shall prevail.

Elections and variables for the purposes of           "Base Currency" and "Eligible Currency" shall mean
Paragraph 11 of the CSA:                              EUR.

                                                      "Delivery Amount" and "Return Amount" has the
                                                      meaning specified in the CSA.

                                                      "Eligible Credit Support" shall be, for both parties cash
                                                      in EUR at a Valuation Percentage of 100%;

                                                      "Credit Support Amount" shall have the meaning as
                                                      defined in Paragraph 10, except that the words "the
                                                      Transferee's Exposure" shall be replaced by "nil".

                                                      The definition of "Exposure" in Paragraph 10 of the CSA
                                                      shall be deleted.

                                                      "Independent Amount" means zero with respect to Party
                                                      A and the Equity Notional Amount at any point in time
                                                      with respect to Party B.

                                                      For the avoidance of doubt, during the Hedge Execution
                                                      Period, the Equity Notional Amount will increase as
                                                      Party A establishes its Hedge Positions in relation to this
                                                      Transaction. Party B will therefore post, if requested, an
                                                      Independent Amount increasing gradually as Party A
                                                      establishes its Hedge Positions in relation to this
                                                      Transaction.

                                                      "Threshold" means zero with respect to both parties.

                                                      "Minimum Transfer Amount" means zero with respect to
                                                      both parties.

                                                      "Rounding" the Delivery Amount and the Return
                                                      Amount will be rounded up and down respectively to the
                                                      nearest integral multiple of EUR 1,000.

                                                      "Valuation Agent" means Party A.

                                                      "Valuation Date" means any Local Business Day.

                                                      "Valuation Time" means the close of business in the

                                                                                                          6

location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

"Notification Time" means 3.00 p.m., London time, on a Local Business Day.

"Exchange Date" has the meaning specified in Paragraph 3(c)(ii) of the CSA.

"Interest Rate" means with respect to EUR cash, zero.

Miscellaneous:

Calculation Agent:                    Party A

Any determination or calculation made by the Calculation Agent shall be subject to the agreement of Party B which shall be deemed to be given where Party B has made no written objection to the Calculation Agent of such determination or calculation within 2 London and Paris business days after having been notified of the proposed determination or calculation, including details of any relevant calculations and Party A's reasons for the proposed determination ("the Cut-Off Date"). In the event of any disagreement in relation to a determination or calculation which cannot be resolved by negotiation between Party B and the Calculation Agent within 2 London and Paris business days of the Cut-Off Date, each party agrees to be bound by the determination of a leading independent dealer or advisor in equity derivatives transactions, selected by agreement between the parties, whose fees and expenses, if any, shall be met equally by them both (the "Substitute Calculation Agent"). If the parties are unable to agree on a Substitute Calculation Agent within 2 London and Paris business days, then the dealers or advisors proposed by each of the parties shall, together, agree on a third party dealer or advisor, who shall be the Substitute Calculation Agent. All determinations and calculations by the Substitute Calculation Agent shall be binding and conclusive in the absence of manifest error.

Confidentiality:

Each of the Parties will keep the existence and the contents of this Transaction confidential and not disclose such information to any third party (other than the employees, lenders, royalty owners, counsel, accountants and other agents or professional advisers of the party) except (i) in order to comply with any applicable law, order, regulation, or exchange rule, (ii) to the extent necessary for the enforcement of this Transaction, or (iii) to the extent necessary to implement this Transaction.

Early Termination at the Election of Party B:

For any reason whatsoever, Party B may elect to terminate this Transaction (in whole or in part) by giving written notice to Party A, such date being defined as

7

"Early Termination Date", and determining whether Cash Settlement or Physical Settlement will apply.

In the event Physical Settlement applies, the Settlement Terms provisions above shall apply, except for the fact that "Settlement Date" will be one Settlement Cycle following the Early Termination Date.

In the event Cash Settlement applies, the Calculation Agent shall determine the effective date of the termination (being the date on which Party A completes the unwind of its Hedge Positions with respect to the terminated portion of the Transaction, subject to a maximum of two (2) calendar months from the Early Termination Date), the Cancellation Amount to be paid upon termination, the Party who should pay such cash amount and the date upon which such cash amount is due as if there had been an Additional Disruption Event for which the consequences are termination with Party A as the Hedging Party and Determining Party.

**Representations, Warranties and Undertakings:** Each Party represents, warrants and undertakes to other (which representations, warranties and undertakings shall be deemed to be repeated at the time of any determination made by the representing Party under the terms of this Confirmation) that:

(a) the representing Party's entry into this Transaction and the performance of its obligations hereunder will comply with and will not in any way be limited by (i) any trading restrictions imposed by the Issuer of the Shares which are legally binding on the representing party or generally accepted as matter of good practice, or (ii) any other applicable conditions or restrictions imposed by either the Issuer of the Shares or by any shareholders pact or agreement in relation to the Shares to which the representing party or any of its Affiliates is subject.

Party B represents that (aa) it has complied and will comply with the market abuse provisions of the Financial Services and Market Act 2000 as well as with all applicable market abuse legislations to which it is subject when entering into the Transaction, and (bb) Party B's reasons and objectives in entering into the Transaction constitute a genuine and legitimate business and commercial purpose.

(b) Party B acknowledges that Party A is entering into the Transaction in reliance of Party B making the above representations and Party B or its agents making such timely notifications and seeking such approvals as required in connection with the Transaction from such applicable regulatory authorities or stock exchanges, as the case may be.

**Additional Representations and Warranties** Party B represents, warrants and agrees to and with Party A that:

8

by Party B:

(1) it understands that, subject to the Physical Settlement Election, this Transaction is a cash settled instrument, and that it does not, by virtue of this Transaction alone obtain any beneficial or other ownership rights as to Shares (including, without limitation, as to voting and disposition, so that, for the avoidance of doubt, if, and to the extent that, Party A holds any Shares as Hedge Positions in relation this Transaction, Party A is not obliged to exercise voting rights it may have by reason of such shareholding in accordance with the wishes of Party B);

(2) it has not made, and will not make, any representations or warranties to other parties (including, without limitation, the Issuer and the Issuer's representatives or management) that it has, by virtue of this Transaction, any ownership or voting rights of a type contemplated by (3) above;

(3) it intends to, and will, make any and all required disclosures regarding any exposure it obtains to Shares under this Transaction;

(4) Without, for avoidance of doubt, prejudice to any obligation Party A in relation to Physical Settlement, Party A has no obligation to establish or maintain any particular type of Hedge Positions in relation to this Transaction, including, without limitation, any purchase or ownership of Shares.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number +44 (0) 20 7067 8022, Attention: Mrs. Frederique Gilain-Huneeus.

Yours sincerely,                                    Accepted and agreed to:

Lehman Brothers International (Europe)              Genfina SA

By:                                                By:
Name: Frédérique Gilain-Huneeus                    Name: Olivier Jacquier
Title: Executive Director                          Title: M&A Head
       Authorised Signatory

9

# LEHMAN BROTHERS

Date:        4 September 2008

To:          Genfina SA
             Attention:    G. Lamarche / S. Val
             Facsimile:    +33 (0) 1 4006 6682

From:        Lehman Brothers International (Europe)
             Attention:    Clement Cruse
             Facsimile:    +44 (0) 20 7067 9474

Effort Id:   [TBC]
Global Id:   [TBC]

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the Equity Swap Transaction (the "Transaction") entered into between Lehman Brothers International (Europe) ("Party A") and Genfina SA ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 5 April 2007, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction and performing its obligations thereunder is within its capacity, is duly authorized and does not violate any laws or regulations of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives and accordingly the other party shall have no liability howsoever arising (except in the case of fraud) to the other party with respect thereto. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law).

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
REGULATED BY THE FINANCIAL SERVICES AUTHORITY
25 BANK STREET LONDON E14 5LE
TELEPHONE 020 7601 0011  TELEX 888881 LEHMAN G
REGISTERED IN ENGLAND (No. 2538254) AT THE ABOVE ADDRESS



The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 5 September 2008 |
| Effective Date: | The Trade Date |
| Termination Date: | The Cash Settlement Payment Date, if Cash Settlement applies, and the Settlement Date, if Physical Settlement applies. |
| Shares: | Ordinary shares (*acciones ordinarias*) of Gas Natural SDG SA (Bloomberg Code: GAS SM) |
| Exchange(s): | Sistema de Interconexión Bursátil (SIBE) (Automated Quotation System) |
| Related Exchange(s): | MEFF Renta Variable |

**Equity Amounts:**

| | |
|---|---|
| Equity Amount Payer: | Party A |
| Equity Amount Receiver: | Party B |
| Number of Shares: | The number of Shares, as determined by the Calculation Agent at any given point in time, up to 5,636,678 (the "Maximum Number of Shares", representing 1.26% of the Issuer's share capital) actually purchased by Party A (on a settled or unsettled basis) on or before such point in time for the purpose of establishing its Hedge Positions in relation to this Transaction during the Hedge Execution Period, less the number of any Shares actually sold by Party A (on a settled or unsettled basis) on or before such point in time for the purpose of unwinding its Hedge Positions during the Hedge Unwind Period in relation to this Transaction. |
| | Accordingly, the parties acknowledge that the Number of Shares may change from time to time during the Hedge Execution Period and the Hedge Unwind Period. |
| | For the avoidance of doubt, Party A and Party B each acknowledges that the Number of Shares may not reach the Maximum Number of Shares. |
| Final Number of Shares: | The Number of Shares at the end of the Hedge Execution Period. |
| Hedge Execution Period: | The period from and including the Trade Date to and including the earlier of (i) the Exchange Business Day on which the Number of Shares equals for the first time the Maximum Number of Shares, (ii) the Settlement Method Election Notice Date or Early Termination Notice Date, as the case may be; and (iii) 5 December 2008. |
| Hedge Unwind Period: | If Cash Settlement applies, the period from and including 5 June 2009 to and including the Valuation |



Date.

| | |
|---|---|
| Equity Notional Amount: | ▪ At any given point in time during the Hedge Execution Period, the Number of Shares as of such time multiplied by the Initial Price as of such time; and |
| | ▪ At any given point in time after the Hedge Execution Period, the Final Number of Shares multiplied by the Initial Price as of the Initial Price Determination Date. |

For the avoidance of doubt, if for any reason whatsoever it becomes necessary to determine an amount corresponding to the Equity Notional Amount at any time before the Initial Price Determination Date, such amount shall be determined by Party A, acting in good faith and in a commercially reasonable manner, taking into consideration prevailing market conditions.

| | |
|---|---|
| Equity Notional Reset: | Not Applicable |
| Type of Return: | Total Return |
| Initial Price Determination Date: | The last day of the Hedge Execution Period. |
| Initial Price: | ▪ At any given point in time during the Hedge Execution Period, 100% of the volume-weighted average execution price per Share in the Settlement Currency at which Party A has actually purchased the Number of Shares (including any applicable brokerage fees, exchange fees, costs and expenses) on or before such point in time during the Hedge Execution Period for the purpose of establishing its Hedge Positions in relation to this Transaction, as determined by the Calculation Agent; and |
| | ▪ At any given point in time after the Hedge Execution Period, 100% of the volume-weighted average execution price per Share in the Settlement Currency at which Party A has actually purchased the Final Number of Shares (including any applicable brokerage fees, exchange fees, costs and expenses) during the Hedge Execution Period for the purpose of establishing its Hedge Positions in relation to this Transaction during the Hedge Execution Period. |

Accordingly, the parties acknowledge that the Initial Price may change from time to time during the Hedge Execution Period but will remain constant thereafter.

When establishing its Hedge Positions, Party A shall purchase Shares pursuant to Party B's instructions including, but not limited to, the maximum price per Share and the maximum number of Shares that Party A shall purchase on any given day. Any instruction and amendment thereto shall take effect at the time

that Party A acknowledges receipt of the aforementioned instruction or amendment from Party B. The parties agree that instructions and amendments thereto as well as receipt acknowledgements of the same given orally or by email shall be binding and the number of amendments to the instructions is unlimited.

| | |
|---|---|
| Unwind Price: | At any given point in time during the Hedge Unwind Period, 100% of the volume-weighted average execution price per Share (including any applicable brokerage fees, exchange fees, costs and expenses) in the Settlement Currency at which Party A, acting in its sole discretion, has actually unwound its Hedge Positions in relation to this Transaction on or before such point in time, as determined by the Calculation Agent at such point in time. |
| Final Price: | The Unwind Price as of the Valuation Time on the Valuation Date. |
| Valuation Time: | The time at which Party A completes the unwind of its Hedge Positions in relation to this Transaction on the Valuation Date, but in any event no later than the close of business on the Exchange on the Valuation Date. |
| Valuation Date: | The earlier of (i) 5 September 2009 (the "Scheduled Valuation Date") and (ii) the Exchange Business Day on which Party A completes the unwind of its Hedge Positions (including for the purposes of any Cash-settled Early Termination) in relation to this Transaction, as determined by the Calculation Agent. |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amounts Payer: | Party B |
| Fixed Rate: | 0.225% |
| Fixed Amount Payer Payment Dates: | The fifth calendar day in each month during the Relevant Period, in each case subject to adjustment in accordance with the Following Business Day Convention. |
| | Where "Relevant Period" means the period starting from but excluding the Effective Date to and including the earlier of (i) the Early Settlement Date, if any, and (ii) the Termination Date, in each case subject to adjustment in accordance with the Following Business Day Convention. |
| Relationship between payments and Calculation Periods: | The amount payable on each Fixed Amount Payer Payment Date shall be the aggregate of the Fixed Amounts relating to each Calculation Period that ends on a calendar day falling in the Relevant Computation Period. |
| Notional Amount: | The Equity Notional Amount; provided that on any day from and including the first day of the Hedge |



Unwind Period until but excluding the Cash Settlement Payment Date, the Notional Amount shall be equal to the Equity Notional Amount minus the aggregate of the sale proceeds in the Settlement Currency realized by Party A upon its sale(s) of Shares (whether settled or unsettled at such time) (up until the close of business on that day, or if such day is not a Business Day, the close of business on the immediately preceding Business Day) for the purpose of unwinding its Hedge Positions during the Hedge Unwind Period in relation to this Transaction, as determined by the Calculation Agent.

For the avoidance of doubt, if for any reason whatsoever it becomes necessary to determine an amount corresponding to the Notional Amount at any time before the Initial Price Determination Date, or after the Settlement Method Election Date, such amount shall be determined by Party A, acting in good faith and in a commercially reasonable manner, taking into consideration prevailing market conditions.

| | |
|---|---|
| Fixed Rate Day Count Fraction: | Act/365 |
| Relevant Computation Period: | • In respect of the Fixed Amount Payer Payment Date scheduled to occur on 5 October 2008 (the "First Fixed Amount Payer Payment Date"), the period commencing on and including the Effective Date and ending on but excluding such First Fixed Amount Payer Payment Date; and |
| | • In respect of any subsequent Fixed Amount Payer Payment Date (each, a "Subsequent Fixed Amount Payer Payment Date"), the period commencing on and including the Fixed Amount Payer Payment Date immediately preceding such Subsequent Fixed Amount Payer Payment Date (including, for the avoidance of doubt, the First Fixed Amount Payer Payment Date) and ending on but excluding such Subsequent Fixed Amount Payer Payment Date. |
| Period End Dates: | Each calendar day. |
| **Floating Amounts:** | In consideration of the terms of this Transaction and in particular but without limitation the Collateral terms, Party B will not pay any Floating Amount to Party A hereunder. |
| **Settlement Terms:** | |
| Settlement Currency: | EUR |
| Cash Settlement: | Applicable |
| Cash Settlement Payment Date: | 2 Currency Business Days following the Valuation Date. |

| | |
|---|---|
| Settlement Method Election: | Applicable |
| Default Settlement Method: | Cash Settlement |
| Electing Party: | Party B |

Physical Settlement shall only be eligible as Settlement Method if (i) a transfer of the Final Number of Shares to Party B is in compliance with all applicable laws and regulations (which includes, without limitation, any requirement there might be in Spain, or under Spanish law, for approval from the Spanish Comisión Nacional de Energía ("CNE"), and prior approval of the CNE), and (ii) Party B has confirmed such compliance to Party A in writing.

Settlement Method Election Date:

The Scheduled Trading Day immediately preceding the first day of the Hedge Unwind Period.

For the avoidance of doubt and as per Section 7.1 of the Equity Definitions, subject to the above conditions, the Electing Party may, on any Scheduled Trading Day from the Effective Date to and including the Settlement Method Election Date (such Scheduled Trading Day, the "Settlement Method Election Notice Date"), give irrevocable notice to the other party of its election to have Physical Settlement apply to the Transaction.

Settlement Date:

For the purposes of Physical Settlement, one Settlement Cycle following the Settlement Method Election Notice Date.

**Dividends:**

| | |
|---|---|
| Dividend Period: | Second Period |
| Dividend Amount: | As determined by the Calculation Agent, 85% of the gross cash dividend per Share declared by the Issuer to holders of record of a Share on any record date occurring during the Dividend Period multiplied by the then prevailing Number of Shares. |
| Dividend Payment Dates: | The date on which the relevant dividend is paid by the Issuer to the holders of record of the Shares (irrespective of whether such date falls after the Termination Date). |
| Re-investment of Dividends: | Not Applicable |
| Dividends: | The parties acknowledge that "Dividends" includes ordinary cash dividends, extraordinary cash dividends and free cash distributions (non-cash distributions being dealt with under the Share Adjustment provisions below, whereby the Calculation Agent is required to act in good faith and in a commercially reasonable manner to reflect, among other things, the economics of any such non-cash distributions). |
| **Voting Rights:** | Party B acknowledges that to the extent that Party A holds any Shares as Hedge Positions in relation this |



Transaction, the voting rights attached thereto shall be exercised – if at all – by Party A in its sole and absolute discretion.

**Share Adjustments:**

Method of Adjustment:                    Calculation Agent Adjustment

Sections 11.2(e) of the Equity Definitions shall be amended by deleting subsection (iii) in its entirety and replacing it with the following:

"(iii) a non-cash ordinary dividend or a non-cash Extraordinary Dividend;"

**Extraordinary Events:**

**Consequences of Merger Events:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |

Tender Offer:                    Applicable

**Consequences of Tender Offers:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |
| Composition of Combined Consideration: | Not Applicable |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment (Calculation Agent Determination) |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Failure to Deliver: | Not Applicable |
| Insolvency Filing: | Applicable |

The definition of "Insolvency Filing" in Section 12.9(a)(iv) of the Equity Definitions shall be amended by adding the following sentence at the end: "unless any such proceeding or petition is not dismissed, discharged, stayed or restrained in each case within fifteen days of the institution or presentation thereof".

Section 12.9(b)(i) of the Equity Definitions is hereby amended by adding the following sentence at the end: "If neither party elects to terminate the Transaction, the Calculation Agent may adjust the terms of the Transaction upon the occurrence of such an event

pursuant to Modified Calculation Agent Adjustment (as if such event were a Tender Offer)."

| | |
|---|---|
| Hedging Disruption: | Not Applicable |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Hedging Party: | Party A (for all Additional Disruption Events) |
| Determining Party: | Party A (for all Additional Disruption Events) |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

**Credit Support Provisions:**

Collateral:

For purposes of this section, paragraphs one through ten of the standard form 1995 ISDA Credit Support Annex (Bilateral Form – Transfer) (English law) (the "CSA") are incorporated by reference herein subject to the elections and modifications set out below. In case of any inconsistency between the definitions or provisions of this section and/or the CSA with the rest of this Confirmation, the relevant definitions or provisions of this section and/or the CSA shall prevail.

Elections and variables for the purposes of Paragraph 11 of the CSA:

"Base Currency" and "Eligible Currency" shall mean EUR.

"Delivery Amount" and "Return Amount" each have the respective meaning specified in the CSA.

"Eligible Credit Support" shall be, for both parties cash in EUR at a Valuation Percentage of 100%;

"Credit Support Amount" shall have the meaning as defined in Paragraph 10, except that the words "the Transferee's Exposure" shall be replaced by "nil".

The definition of "Exposure" in Paragraph 10 of the CSA shall be deleted.

"Independent Amount" means (i) with respect to Party A, zero and (ii) with respect to Party B, at any point in time from and including the Trade Date to but excluding the Cash Settlement Payment Date or Settlement Date (as applicable), a cash amount in the Settlement Currency determined in accordance with the following formula:

$100\% \times IP \times NS$

as determined by the Calculation Agent as of the Valuation Time (as defined below) on the relevant Valuation Date (as defined below); whereby:

NS = Number of Shares (as of the relevant date)

IP = Initial Price (as of the relevant date)

"Threshold" means zero with respect to both parties.

"Minimum Transfer Amount" means zero with respect to both parties.

"Rounding" - the Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of EUR 1,000.

"Valuation Agent" means Party A.

"Valuation Date" means any Local Business Day.

"Valuation Time" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

"Notification Time" means 3.00 p.m., London time, on a Local Business Day.

"Exchange Date" has the meaning specified in Paragraph 3(c)(ii) of the CSA.

"Interest Rate" means with respect to EUR cash, zero.

**Miscellaneous:**

Calculation Agent:                    Party A

Any determination or calculation made by the Calculation Agent shall be subject to the agreement of Party B which shall be deemed to be given where Party B has made no written objection to the Calculation Agent of such determination or calculation within 2 London and Paris Business Days after having been notified of the proposed determination or calculation, including details of any relevant calculations and Party A's reasons for the proposed determination ("the Cut-Off Date"). In the event of any disagreement in relation to a determination or calculation which cannot be resolved by negotiation between Party B and the Calculation Agent within 2 London and Paris Business Days of the Cut-Off Date, each party agrees to be bound by the determination of a leading independent dealer or advisor in equity derivatives transactions, selected by agreement between the parties, whose fees and expenses, if any, shall be met equally by them both (the "Substitute Calculation Agent"). If the parties are unable to agree on a Substitute Calculation Agent within 2 London and Paris Business Days, then the dealers or advisors proposed by each of the parties shall, together, agree on a third party dealer or advisor, who shall be the Substitute Calculation Agent. All determinations and calculations by the



|  | Substitute Calculation Agent shall be binding and conclusive in the absence of manifest error. |
|---|---|
| Confidentiality: | Each of the parties will keep the existence and the contents of this Transaction confidential and not disclose such information to any third party (other than the employees, lenders, royalty owners, counsel, accountants and other agents or professional advisers of the party) except (i) in order to comply with any applicable law, order, regulation, or exchange rule, (ii) to the extent necessary for the enforcement of this Transaction, or (iii) to the extent necessary to implement this Transaction. |
| Early Termination at the Election of Party B: | For any reason whatsoever, Party B may elect to terminate this Transaction (in whole but not in part) by giving written notice to Party A on any day during the period from and including the Trade Date to but excluding the Scheduled Valuation Date (the "Early Termination Notice Date"), specifying whether Cash Settlement or Physical Settlement should apply to this Transaction (an "Early Termination"). |

If Physical Settlement applies (a "Physical-settled Early Termination"), the Settlement Terms provisions above shall apply *mutatis mutandis*, except for the fact that the Settlement Date will be deemed to occur one Settlement Cycle following the Early Termination Notice Date (the "Early Settlement Date") and (iii) Party B shall on the Early Settlement Date pay to Party A (i) the aggregate of any pro-rata accrued but unpaid Fixed Amount(s) in respect of the period from and including the Fixed Amount Payer Payment Date immediately preceding the relevant Early Settlement Date (as defined above) to but excluding such Early Settlement Date, as determined by the Calculation Agent (the "Aggregate Accrued Interest Amount") and/or, as the case may be, (ii) the Early Termination Fee.

If Cash Settlement applies (a "Cash-settled Early Termination"), the Calculation Agent shall determine (i) the relevant Valuation Date (being the date on which Party A completes the unwind of its Hedge Positions with respect to this Transaction, subject to a maximum of three (3) calendar months from the relevant Early Termination Notice Date), (ii) the Cancellation Amount to be paid upon termination (which, for the avoidance of doubt, shall take into account any Aggregate Accrued Interest Amount owed by Party B to Party A (calculated as described above in respect of the period from and including the Fixed Amount Payer Payment Date immediately preceding the relevant Early Settlement Date (as defined in (v) below) to but excluding such Early Settlement Date, (iii) the Early Termination Fee owed by Party B to Party A, as the case may be, (iv) the

party who should pay the Cancellation Amount and (v) the date upon which both the Cancellation Amount and the Early Termination Fee shall be due (the "Early Settlement Date"), as if there had been an Additional Disruption Event for which the consequences are termination with Party A as the Hedging Party and Determining Party.

For the avoidance of doubt, if an Early Termination occurs in accordance with the foregoing paragraphs, the Dividend Period shall end on, and include, the relevant Valuation Date (in case of a Cash-settled Early Termination) or the relevant Early Termination Notice Date (in case of a Physically-settled Early Termination).

| Early Termination Fee: | An amount in EUR to be determined by the Calculation Agent two Currency Business Days prior to the relevant Early Settlement Date (the "Early Termination Fee Determination Date") in accordance with the following formula: |
|---|---|

Early Termination Fee = Max(Relevant Equity Notional Amount x 0.15% - Aggregate Fixed Amount; 0)

Where:

"Aggregate Fixed Amount" means the aggregate of:

- any Fixed Amount(s) paid or scheduled to be paid by Party B on any Fixed Amount Payer Payment Date occurring during the period from but excluding the Effective Date to and including the relevant Early Settlement Date; and

- any applicable Aggregate Accrued Interest Amount,

in each case, as determined by the Calculation Agent; and

"Relevant Equity Notional Amount" means the prevailing Equity Notional Amount as of the relevant Early Termination Notice Date.

| Representations, Warranties and Undertakings: | (a) Each party represents, warrants and undertakes to other (which representations, warranties and undertakings shall be deemed to be repeated at the time any determination or election is made by the representing party or, in respect of Party B, at the time an instruction is given or amended in relation to the determination of the Initial Price under the terms of this Confirmation) that the representing party's entry into this Transaction and the performance of its obligations hereunder will comply with and will not in any way be limited by (i) any trading restrictions imposed by the Issuer of the Shares which are legally binding on the representing party or generally accepted as matter of good practice, or (ii) any other |
|---|---|

applicable conditions or restrictions imposed by either the Issuer of the Shares or by any shareholders pact or agreement in relation to the Shares to which the representing party or any of its Affiliates is subject.

(b) Party B represents, warrants and undertakes to Party A (which representations, warranties and undertakings shall be deemed to be repeated at the time of any determination or election made by Party B or at the time an instruction is given or amended by Party B in relation to the determination of the Initial Price under the terms of this Confirmation) that (i) it has complied and will comply with the market abuse provisions of the Financial Services and Market Act 2000 as well as with all applicable market abuse legislations to which it is subject when entering into the Transaction, and (ii) Party B's reasons and objectives in entering into the Transaction constitute a genuine and legitimate business and commercial purpose.

(c) Party B acknowledges that Party A is entering into the Transaction in reliance of Party B making the above representations and Party B or its agents making such timely notifications and seeking such approvals as required in connection with the Transaction from such applicable regulatory authorities or stock exchanges, as the case may be.

| | |
|---|---|
| Additional Representations and Warranties by Party B: | Party B represents, warrants and agrees to and with Party A that: |

(1) it understands that, subject to the Physical Settlement Election, this Transaction is a cash settled instrument, and that it does not, by virtue of this Transaction alone obtain any beneficial or other ownership rights as to Shares (including, without limitation, as to voting and disposition);

(2) it has not made, and will not make, any representations or warranties to other parties (including, without limitation, the Issuer and the Issuer's representatives or management) that it has, by virtue of this Transaction, any ownership or voting rights of a type contemplated by (1) above;

(3) it intends to, and will, make any and all required disclosures regarding any exposure it obtains to Shares under this Transaction; and

(4) Without, for avoidance of doubt, prejudice to any obligation of Party A in relation to Physical Settlement, Party A has no obligation to establish or maintain any particular type of Hedge Positions in relation to this Transaction, including, without limitation, any purchase or ownership of Shares.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number +44 (0) 20 7067 9474, Attention: Mr. Clement Cruse.

Yours sincerely,                                    Accepted and agreed to:

Lehman Brothers International (Europe)              Genfina SA

By: _____                        By: _____
Name:                                               Name:
Title:    Frederique Gilain-Huneeus                 Title:
          Authorised Signatory

**Exhibit D**

GENFINA SA

Place du Trône, 1

B-1000 Brussels

Lehman Brothers International (Europe)
25 Bank Street
London
E14 5LE
United Kingdom

**For the attention of the Documentation Manager**

September 19, 2008

**BY COURIER**

Dear Sir/Madam

**ISDA Master Agreement dated as of 5 April 2007 between Lehman Brothers International (Europe) ("Lehman Brothers") and Genfina SA ("Genfina")**

We refer to the ISDA Master Agreement dated as of 5 April 2007 between Lehman Brothers and Genfina (the **"Agreement"**).  Any defined terms used in this letter and not otherwise defined herein are as defined in the Agreement.

We hereby give notice that, as a result, among other things, of the Chapter 11 bankruptcy petition filed by Lehman Brothers' parent company, Lehman Brothers Holdings Inc. with the United States Bankruptcy Court and Lehman Brothers being subject to the appointment of an administrator in the United Kingdom on 15 September 2008, a present and continuing Event of Default under Section 5 (a)(vii) of the Agreement has occurred with respect to Lehman Brothers.

We hereby give you notice that we are exercising our right under Section 6(a) of the Agreement to terminate following an Event of Default and designate September 22, 2008 as an Early Termination Date in respect of all outstanding Transactions.

We reserve all rights and remedies provided in the Agreement or otherwise.

Yours sincerely

Gérard LAMARCHE

Chairman of the Board of GENFINA

UK/1842238/01

New/NEW

**Exhibit E**

GENFINA SCRL
Place du Trône, 1
B-1000 Brussels

19 December 2008

Lehman Brothers International (Europe) (in administration)
25 Bank Street
London
E14 5LE

**For the attention of the Documentation Manager and the Joint Administrators.**

Dear Sir/Madam,

**ISDA Master Agreement dated as of 5 April 2007 between Lehman Brothers International (Europe) ("Lehman Brothers") and Genfina SA ("Genfina")**

We refer to the ISDA Master Agreement dated as of 5 April 2007 between Lehman Brothers and Genfina (the "Agreement"). Any defined terms used in this Letter and not otherwise defined herein are as defined in the Agreement.

Pursuant to our letter dated 19 September 2008, we have exercised our rights under Section 6(a) of the Agreement and designated 22 September 2008 as the Early Termination Date in respect of all outstanding Transactions as a consequence of an Event of Default under Section 5(a)(vii).

The amount payable pursuant to Section 6(e) of the Agreement is EUR 161,467,405.23 which is payable by Lehman Brothers to Genfina by close of business today. Please use the following account for the above-noted payment:

We have attached details of the calculations made in determining the amount payable pursuant to Section 6(e) of the Agreement.

We reserve all rights and remedies provided in the Agreement or otherwise.


Very truly yours

GENFINA SA

By: Gérard LAMARCHE

Annex to the 19 December 2008 letter to LBIE

| | | | |
|---|---|---|---|
| equity swap June 08 | 5 400 000 | 27,41 | 148 014 000 |
| equity swap Sep 08 | 492 000 | 27,41 | 13 485 720 |
| total | | | 161 499 720 |

| | Nb of shares | Price | |
|---|---|---|---|
| | 90 000 | 29,87790 | 2 689 011 |
| | 122 000 | 29,22400 | 3 565 328 |
| | 100 000 | 28,96800 | 2 896 800 |
| | 180 000 | 28,94990 | 5 210 982 |

| | | | |
|---|---|---|---|
| total | 492 000,00 | | |
| average | | 29,19130285 | |
| fee | 0,225% | | |
| total fee | 32314,77 | | |

**Claim to be notified    161 467 405,23    euros**

# C L I F F O R D
# C H A N C E

**CLIFFORD CHANCE US LLP**

31 WEST 52ND STREET
NEW YORK NY 10019 6131

TEL +1 212 878 8000
FAX +1 212 878 8375
www.cliffordchance.com

Jennifer B. Premisler
Associate

DIRECT TEL +1 212 878 8170
DIRECT FAX +1 212 878 8375
Jen.Premisler@CliffordChance.com

March 23, 2009

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims Processing
757 Third Avenue, 3rd Floor
New York, NY 10017

Re:     Proof of Claim of Genfina SCRL (formerly known as Genfina SA)

Dear Lehman Brothers Holdings Claims Processing:

In connection with the bankruptcy of Lehman Brothers Holdings Inc., enclosed please find two (2) original proofs of claim that have been prepared on behalf of Genfina SCRL. At your earliest convenience, please date stamp or acknowledge receipt of one of the original proofs of claim and return it to me in the enclosed self addressed stamped envelope for our files.

If you have any questions, please feel free to contact me at (212) 878-3230.

Very truly yours,

Jen Premisler

Enclosures

NYB 1610129v2

FedEx Ship Manager - Print Your Label(s)                                              Page 1 of 1

From:    Origin ID: QNYA   (212) 878-3059
Jennifer Premisler
Clifford Chance US LLP
31 West 52nd Street

New York, NY 10019



Ship Date: 30MAR09
ActWgt: 1.0 LB
CAD: 4017091/INET9011
Account#: S *********

**Delivery Address Bar Code**

Ref #    6640394034/914590
Invoice #
PO #
Dept #

SHIP TO:    (212) 878-3230        BILL SENDER
**Attn: Lehman Bros. Holdings Claims**
**Epiq Bankruptcy Solutions, LLC**
**757 Third Avenue, 3rd Floor**

**New York, NY 10017**

TRK#    7964 7162 0199
0201

TUE - 31MAR      A1
**PRIORITY OVERNIGHT**

10017
NY-US

EWR

## ZB OGSA



After printing this label:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic valueof the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

Global Home | FedEx Mobile | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms of Use | Privacy Policy | Site Map |
This site is protected by copyright and trademark laws under US and International law. All rights reserved.© 1995- 2009 FedEx

https://www.fedex.com/shipping/shipAction.handle?method=doContinue                    3/30/2009

FedEx Ship Manager - Print Your Label(s)                                    Page 1 of 1

From:   Origin ID: QNYA  (212) 878-3059
Jennifer Premisler
Clifford Chance US LLP
31 West 52nd Street

New York, NY 10019



Ship Date: 30MAR09
ActWgt: 1.0 LB
CAD: 4017091/INET9011
Account#: S *********

Delivery Address Bar Code

SHIP TO:   (212) 878-3230        BILL SENDER

**Attn: Lehman Bros. Holdings Claims**
**Epiq Bankruptcy Solutions, LLC**
**757 Third Avenue, 3rd Floor**

**New York, NY 10017**

Ref #   6640394034/914590
Invoice #
PO #
Dept #



TRK#   7964 7162 0199              **TUE - 31MAR**      **A1**
[0201]                            **PRIORITY OVERNIGHT**

**ZB OGSA**

10017
NY-US
EWR



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic valueof the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.
Global Home | FedEx Mobile | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms of Use | Privacy Policy | Site Map |
This site is protected by copyright and trademark laws under US and International law. All rights reserved.© 1995- 2009 FedEx