# Exhibit C

Page 1

1         HIGHLY CONFIDENTIAL - R. AZERAD

2         UNITED STATES BANKRUPTCY COURT

3         SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                          Chapter 11

7    LEHMAN BROTHERS       Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

     ----------------------x

11                  REVISED

12        * * *HIGHLY CONFIDENTIAL* * *

13       DEPOSITION OF ROBERT AZERAD

14         New York, New York

15         August 17, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24041

Page 6

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2        MR. LAYDEN:  David Layden with Jenner
 3   & Block for the Examiner.
 4   BY MR. TAMBE:
 5        Q.   Mr. Azerad, by whom are you employed
 6   currently?
 7        A.   Barclays Capital.
 8        Q.   And how long have you been employed by
 9   Barclays Capital?
10        A.   Since September of 2008.
11        Q.   In what position are you employed by
12   Barclays?
13        A.   I am a director in the Treasury
14   Department of Barclays Capital.
15        Q.   Based here in New York?
16        A.   Based here in New York.
17        Q.   And since you began working for
18   Barclays in September of 2008, has your title or
19   position changed?
20        A.   No.
21        Q.   If you could briefly describe for us
22   what your duties are as a director in the
23   Treasury Department.
24        A.   I am in charge of the Liquidity
25   Management Team for New York.
          TSG Reporting - Worldwide (877) 702-9580
```

Page 7

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2        Q.   And if you could just briefly describe
 3   the organization of that team.  Who reports to
 4   you?  Who do you report to?
 5        A.   I report to Steve Sell, S-E-L-L, who
 6   is the U.S. Treasurer, and under me, I have two
 7   direct reports, Yaseen Akhtar, which I'm going
 8   to spell for you -- y-A-S-E-E-N, and then the
 9   last name is spelled A-K-H-T-A-R -- and Scott
10   Alvey, A-L-V-E-Y.
11             Scott doesn't have anyone under him.
12   Yaseen has a team of about, I guess about six or
13   seven people reporting under him.
14        Q.   If you could just briefly describe
15   what it means to be the director of the Treasury
16   Department responsible for liquidity management
17   in New York.  What do you mean by that?
18        A.   Primarily liquidity reporting and a
19   little bit of liquidity management.  That's
20   essentially what kind of Yaseen and I and
21   Yaseen's teams are doing.  Scott Alvey is in
22   charge of the Barclays Bank Delaware brokerage
23   CD program.
24        Q.   When did you first receive an offer of
25   employment by Barclays?
          TSG Reporting - Worldwide (877) 702-9580
```

Page 8

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2        A.   I believe it was at the same time as
 3   most other U.S. employees of Lehman Brothers,
 4   which I believe was the weekend of September 18
 5   or 19th.  I don't have a calendar in front of
 6   me, but whatever was the Sunday or Monday.
 7        Q.   So roughly the end of the week in
 8   which Lehman Brothers declared bankruptcy?
 9        A.   That is correct, yes.
10        MR. STERN:  Jay, if you don't mind, I
11   have a monthly calendar for September, which
12   may help the witness.
13        MR. TAMBE:  Great.  Thank you.
14        MR. STERN:  Just if I could keep it in
15   front of Mr. Azerad for reference.
16        Q.   If you take a look at September 15, do
17   you remember that --
18        A.   That would have been September 21,
19   which would have been a Sunday, I believe.
20        Q.   So you believe it was September 21
21   that you received an offer of employment from
22   Barclays; is that right?
23        A.   To the best of my recollection.  I
24   was -- I received an e-mail, which I had to
25   reply yes or no, depending on whether I was
          TSG Reporting - Worldwide (877) 702-9580
```

Page 9

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2   willing to accept an offer from Barclays, and I
 3   believe it was at the same time as most other
 4   U.S. employees of Lehman Brothers.
 5        Q.   Okay.  And the e-mail that you recall
 6   receiving on September 21, did that contain an
 7   offer of employment?
 8        A.   I don't exactly remember how the
 9   wording of the e-mail was, was structured, but I
10   took it to be an offer of employment.
11        Q.   Let me ask the question a little
12   differently.  There was an e-mail.  Was there an
13   attachment, an employment agreement or a
14   contract?
15        A.   There was nothing.  It was just the
16   text of the e-mail, I don't remember seeing any
17   attachment, and then I had to respond to it.
18        Q.   Okay.  And you responded to it, right?
19        A.   I responded to it.
20        Q.   On Monday, the 22nd, you responded,
21   correct?
22        A.   I don't remember when precisely.  It
23   may have been on Sunday.  It may have been on
24   Monday.
25        Q.   Do you recall the terms of your offer
          TSG Reporting - Worldwide (877) 702-9580
```

## Page 10

1       HIGHLY CONFIDENTIAL - R. AZERAD
2   of employment being spelled out in this Sunday,
3   September 21, e-mail?
4       A.   No, I don't recall currently if the
5   terms were contained in that e-mail.
6       Q.   I'm just going to show you -- just
7   mark this as 174.
8       (Exhibit 174, an e-mail from R. Azerad
9       dated 9/22/08, marked for identification, as
10      of this date.)
11      Q.   I have had placed before you a
12  document marked as 174.  Would you take a look
13  at that.  Let me know when you're done with it.
14      A.   Uh-huh.  Okay.
15      Q.   That's the e-mail where you accepted
16  the offer of employment, right?
17      A.   That is correct.
18      Q.   We have not had produced to us the
19  e-mail you described, which was the e-mail to
20  you --
21      A.   Uh-huh.
22      Q.   -- around Sunday, the 21st, describing
23  this offer of employment.  Have you seen that
24  offer recently?
25      A.   No, I have not.
TSG Reporting - Worldwide (877) 702-9580

## Page 11

1       HIGHLY CONFIDENTIAL - R. AZERAD
2       MR. TAMBE:  We would ask counsel to
3   produce a copy of that e-mail and any
4   attachments to that e-mail.
5       MR. STERN:  I'm surprised you don't
6   have it.  But I'll double-check.
7       MR. TAMBE:  And maybe it's in the
8   various documents that have come over, but
9   we have not detected it.
10      MR. STERN:  We'll double-check for
11  sure.
12      Q.   Do you recall ever signing a written
13  employment agreement with Barclays?
14      A.   No, I don't.
15      Q.   And when you joined Barclays in
16  September of 2008, what was your understanding
17  of what your compensation would be?
18      A.   I had no understanding per se, meaning
19  that my -- let me -- if you don't mind, let me
20  step back.
21      My understanding at that time was that
22  my salary was going to remain the same as at
23  Lehman Brothers and bonuses was going to be
24  variable as it has been at Lehman Brothers.
25      Q.   And that was your understanding when
TSG Reporting - Worldwide (877) 702-9580

## Page 12

1       HIGHLY CONFIDENTIAL - R. AZERAD
2   you sent this e-mail, Exhibit 174?
3       A.   Uh-huh.
4       Q.   Yes?
5       A.   Yes, that's correct.
6       Q.   And through whom, from whom did you
7   get that understanding?
8       A.   I don't remember at that time.  The
9   way I would -- it was like, the way I would
10  describe it, was kind of my intuitive
11  understanding at that time that this would be
12  the way -- the way it would play out.
13      Q.   Fair enough.  And was that your
14  understanding even before you received the
15  Sunday e-mail which offered the employment?
16      A.   I don't recall.
17      Q.   Did you have a general sense in the
18  days leading up to that weekend that in some way
19  Barclays was going to offer employment to Lehman
20  employees, take care of your salary and bonuses?
21      A.   It was my understanding at that time
22  that a large number of Lehman employees would be
23  transitioning to Barclays.
24      Q.   Including several people that you were
25  working with, right?
TSG Reporting - Worldwide (877) 702-9580

## Page 13

1       HIGHLY CONFIDENTIAL - R. AZERAD
2       A.   Including several people that I would
3   be working with, yes.
4       Q.   And prior to your move to Barclays,
5   your direct report was to Mr. Tonucci; is that
6   right?
7       A.   That's correct.
8       Q.   He was your immediate boss, right?
9       A.   He was my immediate boss.
10      Q.   And you understood that Mr. Tonucci
11  would be going over to Barclays as well,
12  correct?
13      A.   That was my understanding at that
14  time.  I don't recall having any discussion with
15  Mr. Tonucci about it.
16      Q.   Prior to joining Barclays, what was
17  your position at Lehman?
18      A.   Prior to joining Barclays, I was the
19  Global Head of Assets and Liabilities Management
20  at Lehman Brothers.
21      Q.   And for how long had you held that
22  position at Lehman?
23      A.   I became the acting head in March of
24  2008.  I don't recall when I was made the
25  official head.
TSG Reporting - Worldwide (877) 702-9580

Page 14

1      HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   Is it fair to say from your answer
3   that since March of 2008 you were functioning as
4   the Asset and Liability -- Global head of asset
5   and Liability Management at Lehman?
6      A.   Yes.
7      Q.   And prior to March 2008, what was your
8   position at Lehman?
9      A.   I was the Head of Global Financial
10  Management Reporting.
11     Q.   And how long had you held that
12  position?
13     A.   I believe since 2006.
14     Q.   And when did you start at Lehman?
15     A.   In January of 2000.
16     Q.   In your role as Global Head of Asset
17  and Liability Management at Lehman, did you --
18  withdraw that.  As Global Head of Asset and
19  Liability Management at Lehman, just describe
20  briefly what your day-to-day duties were.
21     A.   I had a large number of people
22  reporting to me that could be classified in kind
23  of three groups:  Liquidity reporting, liquidity
24  management, and also had the Treasury Funding
25  Desk reporting to me.

TSG Reporting - Worldwide (877) 702-9580

Page 15

1      HIGHLY CONFIDENTIAL - R. AZERAD
2      The Treasury Funding Desk had two or
3   three primary responsibilities, which was the
4   unsecured debt, the unsecured debt issuance, the
5   management of the liquidity pool and, in
6   conjunction with cash and collateral management,
7   the intercompany funding of Lehman.
8      Q.   So let's drill down on these different
9   parts of your work.  Let's start with liquidity
10  reporting.
11     While you were at Lehman, what sorts
12  of things are captured under liquidity
13  reporting?  What is liquidity reporting?
14     A.   Liquidity reporting is essentially
15  measuring the liquidity metrics that informs
16  Lehman of its liquidity position.
17     Q.   When you say "liquidity position,"
18  it's just how much cash Lehman has available or
19  can raise; is that roughly what that is?
20     A.   That's one of the metrics, but that's
21  not the -- the cash position or the liquidity
22  pool is one of the metrics.
23     Q.   So cash is one of the metrics.  Is
24  borrowing capacity another of the metrics?
25     A.   No, it's not.

TSG Reporting - Worldwide (877) 702-9580

Page 16

1      HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   Okay.  So what are the other metrics?
3      A.   The other metrics was the detailed
4   analysis of our secured funding, detailed
5   reporting of our unsecured debt, a reporting of
6   our contingent liquidity risk.
7      Q.   Anything else?
8      A.   And, yes, the measure of our cash
9   capital position.
10     Cash capital is an industry concept
11  which measure liabilities with life, remaining
12  life greater than one year.
13     MR. STERN:  Excuse me.  One of your
14  previous answers referred to detailed
15  analysis of unsecured funding.  You said
16  unsecured or secured?
17     THE WITNESS:  It was both.
18     Q.   Just recapping this liquidity metrics,
19  you've got cash, detailed analysis of secured
20  funding, reporting of unsecured debt; is that
21  right?
22     A.   Unsecured, yes.
23     Q.   Reporting of contingent liquidity
24  risks?
25     A.   Uh-huh.

TSG Reporting - Worldwide (877) 702-9580

Page 17

1      HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   Right?  Measuring of the cash capital
3   position?
4      A.   That is correct.
5      Q.   And a measurement or reporting of the
6   liabilities with lives greater than one year?
7      A.   No, that's just the definition of
8   "cash capital."
9      Q.   And when you referred to analysis of
10  secured funding, would that include repo
11  funding?
12     A.   That's correct.
13     Q.   So, again, going back to your
14  day-to-day responsibilities, under liquidity
15  reporting you are receiving detailed information
16  about all of these different liquidity metrics,
17  correct?
18     A.   That's correct.
19     Q.   Another part of your job is not just
20  to get -- was not just to get the liquidity
21  reports, but then to manage the liquidity of the
22  firm, correct?
23     A.   It was to set the parameters, the
24  policy.  In Lehman parlance, the funding
25  framework.

TSG Reporting - Worldwide (877) 702-9580

Page 18

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    Q.    Can you describe for us what it means
3  to set the funding framework?
4    A.    These are essentially rules which a
5  summary of which can be found in our annual
6  report and 10-K and 10-Q filing explaining how
7  we intend to fund Lehman.
8    Q.    And in addition to yourself, were
9  there other individuals at Lehman who were
10  responsible for setting the funding framework?
11    A.    Yes.  I mean, obviously the funding
12  framework had to be agreed upon by the Finance
13  Committee of Lehman.  The CFO, the Global
14  Treasurer and other people were members of the
15  Finance Committee.
16    Q.    Going back to your listing of
17  duties --
18    A.    If I may just add one thing.  My role
19  was essentially to make proposals, but the
20  Finance Committee was a governance body.  That
21  was where the decisions were ultimately being
22  made.
23    Q.    And just so I understand your
24  clarification, this is with respect to the
25  funding framework; is that right?

TSG Reporting - Worldwide (877) 702-9580

Page 19

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    A.    That's correct.
3    Q.    You would make a proposal and the
4  Finance Committee would make the decision?
5    A.    Uh-huh.
6    Q.    Is that right?
7    A.    That's correct.
8    Q.    Going back to your day-to-day
9  responsibilities at Lehman, you referenced the
10  Treasury Funding Desk and I believe information
11  or actions concerning the Treasury Funding Desk,
12  and one of those had to do with unsecured debt
13  issuance?
14    A.    Uh-huh.
15    Q.    Yes?
16    A.    I'm sorry.
17    Q.    You just have to say yes or no so she
18  could record it.
19        Describe that function a little
20  further.  What does that entail?
21    A.    The Treasury Funding Desk, upon
22  instruction generally from the treasurer and all
23  the CFO, was then liaising with either the
24  Commercial Paper Desk, which is part of the
25  Fixed Income Division of Lehman, or with the

TSG Reporting - Worldwide (877) 702-9580

Page 20

HIGHLY CONFIDENTIAL - R. AZERAD
1
2  Syndicate Desk, which is also part of the Fixed
3  Income Division, to issue short-term or
4  long-term debt.  It would then also liaise with
5  the Derivative Desk to swap the desk -- to swap
6  the debt if we deem it -- if it was deemed to be
7  an appropriate decision.
8    Q.    So, again, just to put this in context
9  in terms of managing the liquidity of Lehman,
10  this is providing liquidity to Lehman either
11  through short-term commercial paper or long-term
12  borrowing, correct?
13    A.    That is correct.
14    Q.    There were three aspects under the
15  Treasury Funding Desk that you described.
16  Another one was the management of the liquidity
17  pool.  Would you describe what you meant by
18  that?
19    A.    Yes, Lehman Brothers Holding had a
20  liquidity pool, and the function of the funding
21  desk, again, was to manage on a day-to-day basis
22  the liquidity pool, meaning in which instrument
23  the liquidity pool was going to be invested.
24    Q.    And the last component of the Treasury
25  Funding Desk had to do with intercompany funding

TSG Reporting - Worldwide (877) 702-9580

Page 21

HIGHLY CONFIDENTIAL - R. AZERAD
1
2  of Lehman.
3    A.    Uh-huh.
4    Q.    Can you describe what you meant by
5  that?
6    A.    Lehman had many legal, many different
7  legal entities.  The way that most of the
8  unsecured debt in the U.S. was raised through
9  Lehman Brothers Holdings, Inc. and so to the
10  extent that some subsidiaries were in need of
11  unsecured funding when there would be an
12  unsecured loan from Holdings to these different
13  legal entities.
14    Q.    I should have picked this up earlier.
15  Were you employed both by Lehman Brothers, Inc.
16  and Lehman Brothers Holdings, Inc.?
17    A.    No, I believe -- I believe I recall,
18  I'm not a hundred percent sure, I was an
19  employee of Holdings.
20    Q.    Focusing on the secured funding aspect
21  of your work, that was done through repos,
22  correct?
23    A.    That was a primary form of secured
24  funding.
25    Q.    What other form of secured funding did

TSG Reporting - Worldwide (877) 702-9580

## Page 22

HIGHLY CONFIDENTIAL - R. AZERAD

1
2    you have at Lehman?
3        A.    There was repo and there were also
4    stock loan.  There were also some asset-backed
5    debt being issued as well.
6        Q.    So, focusing in on the repo part of
7    it, could you describe for me what your duties
8    were with respect to repo agreements that Lehman
9    entered into as part of its liquidity
10   management?
11       A.    The secured funding was placed under
12   the responsibility of the Prime Services
13   division.  My role within Treasury was to
14   analyze the secured funding book by counterparty
15   and by asset class and by legal entity,
16   obviously.
17       Q.    For what purpose were you analyzing
18   the secured funding book?
19       A.    It's one of the -- secured funding
20   was, on a percentage basis, the primary source
21   of funding for Lehman Brothers.
22       Q.    And as we get closer to September 15,
23   was it the case that other funding sources for
24   Lehman Brothers were less and less accessible to
25   Lehman Brothers?

TSG Reporting - Worldwide (877) 702-9580

## Page 23

HIGHLY CONFIDENTIAL - R. AZERAD

1
2        A.    Yes.
3        Q.    For example, the CP Desk, the CP
4    funding function, was that available to Lehman
5    in the early weeks of September 2008?
6        A.    We may have done one or two CP trades
7    at the beginning of the week, but it's probably
8    fair to say that, by the end of the week, we had
9    lost our ability to issue CP.
10       Q.    And the week you're referring to?  You
11   have a calendar there.
12       A.    This is the week starting September 8.
13       Q.    So, by the end of the week of
14   September 8, you had lost that ability?
15       A.    To the best of my knowledge.
16       Q.    Okay.  How about long-term --
17   issuances of long-term debt, what was the
18   capacity for Lehman to do that in the first few
19   weeks of September?
20       A.    I don't know.  It was -- it was our
21   policy at Lehman not to issue long-term debt
22   between the end of the quarter and our earnings
23   release, which I think came on September 9th or
24   September 10th.  So we never tried to issue
25   long-term debt in the first few weeks of -- in

TSG Reporting - Worldwide (877) 702-9580

## Page 24

HIGHLY CONFIDENTIAL - R. AZERAD

1
2    the first week and a half in September.
3        Q.    But how about leading up to that,
4    let's go back to August then, what was the
5    prospect like for Lehman issuing long-term debt
6    in August?
7        A.    I don't remember exactly, but
8    discussions that were held with the Syndicate
9    Desk, which -- but they were clearly not as
10   favorable as earlier in the year.
11       Q.    In the days, immediate days leading up
12   to the 15th, so the 11th, the 12th of September
13   of that weekend, would you describe for us what
14   the liquidity position of Lehman Brothers was
15   during those days?
16       A.    I don't recall the exact numbers.  I
17   have a vague understanding -- I have a vague
18   remembrance it was probably -- started the week
19   somewhere in the $30 billion, that's for
20   holding, Inc., and we probably ended the week
21   around September 12th -- it's hard to tell.  I
22   don't recall exactly what -- how we ended
23   September -- how we ended the liquidity pool on
24   September 12, but we did lose liquidity during
25   that week.

TSG Reporting - Worldwide (877) 702-9580

## Page 25

HIGHLY CONFIDENTIAL - R. AZERAD

1
2        Q.    Now, when Lehman did secured financing
3    through or secured borrowing through a repo
4    facility, it had to post as collateral
5    securities, correct?
6        A.    That is correct.
7        Q.    And those securities had a market
8    value, correct?
9        A.    That is correct.
10       Q.    Who within Lehman determined the
11   market value of securities that were posted as
12   collateral for a repo agreement?
13       A.    It was a tri-party repo agreement,
14   which was the primary form for a repo
15   transaction.  Then our tri-party custodian,
16   JPMorgan Chase, was valuing the securities.
17       Q.    And Lehman's ability to borrow against
18   that value of securities would be subject to
19   haircuts that were placed by the lender; is that
20   correct?
21       A.    That is correct.
22       Q.    So JPMorgan decides, determines what
23   the value is, correct?
24       A.    The market value.
25       Q.    The market value.  And then Lehman's

TSG Reporting - Worldwide (877) 702-9580

Page 26

1          HIGHLY CONFIDENTIAL - R. AZERAD
2    ability to borrow dollars against that value is
3    discounted by a haircut, correct?
4        A.   That is correct.
5        Q.   And were the haircuts negotiated with
6    your lender individually?
7        A.   Generally, yes.  I was not part of the
8    discussion, but that is my understanding.
9        Q.   And they would be set out in a
10   schedule to the relevant repo agreements,
11   correct?
12       A.   That is correct, typically referred to
13   as Schedule A.
14       Q.   Okay.  Who within Lehman would have
15   negotiated those haircuts with repo lenders in
16   that time period, which is the first two weeks
17   of September?
18       A.   It would have been the sales force,
19   which would have been part of the front office
20   sales force, Prime Service, perhaps Fixed
21   Income, perhaps Equities.
22       Q.   Can you think of any particular names
23   of people who would have led that effort at
24   Lehman?
25       A.   I don't have specific names.  There

TSG Reporting - Worldwide (877) 702-9580

Page 27

1          HIGHLY CONFIDENTIAL - R. AZERAD
2    were people like Bill Lista, who I know had been
3    involved in the past in repo negotiation.
4    Whether he was involved that particular week I
5    don't recall.
6        Q.   Would you provide the front office
7    people with parameters for negotiating these
8    schedules?
9        A.   No.
10       Q.   The deals that they struck with
11   lenders on the Schedule A, the haircut schedule,
12   would affect the ability of Lehman to borrow,
13   correct?
14       A.   It would affect the amount of cash we
15   could raise against our securities.
16       Q.   Because, as the haircuts increased,
17   your borrowing ability against the same base of
18   assets would decrease, correct?
19       A.   That is correct.
20       Q.   So were you involved in directing or
21   working with the front office team in
22   determining the haircuts?
23       A.   I don't recall.
24       Q.   How about market valuation, did you
25   get involved in the process of reviewing the

TSG Reporting - Worldwide (877) 702-9580

Page 28

1          HIGHLY CONFIDENTIAL - R. AZERAD
2    values set by your tri-party provider, JPMorgan?
3        A.   No, I was not.
4        Q.   Were you aware of any significant
5    discrepancies between JPMorgan's valuation of
6    securities and Lehman's own internal marks of
7    those securities?
8        A.   Not specifically related to September
9    8, but relating to my time at Lehman Brothers in
10   Treasury, I am aware that from time to time
11   there have been discrepancies between our market
12   values and JPMorgan market values.  And again,
13   not specifically related to September 8, but
14   related to my time at Lehman Brothers, I am
15   aware that there had been working groups between
16   Lehman and JPMorgan to try to understand the
17   differences.
18       Q.   Let's roll over into the week of
19   September 15.  What I would like to do for the
20   next little while is now walk through and find
21   out from you what you were doing, where you were
22   during that week, and let's take it almost day
23   by day.
24       So let's start with September 15.  You
25   recall September 15, right?

TSG Reporting - Worldwide (877) 702-9580

Page 29

1          HIGHLY CONFIDENTIAL - R. AZERAD
2        A.   I -- well, I have -- let me kind of
3    make a general statement.  In the week preceding
4    September 15, I think the month preceding
5    September 15, Lehman had -- my team in Treasury,
6    including myself, including Paolo Tonucci, had
7    been working very long hours trying to satisfy
8    various requests for information from the rating
9    agencies, from different regulators, from our
10   own internal management, and that probably
11   was -- that workload increased at the beginning
12   of September 8, just among many other things,
13   because it was the end of our quarter, August
14   31, so we had to prepare our earnings release.
15       The week of September 15 is almost a
16   year -- it's almost a year ago, and I have some
17   recollection, not detailed recollection, now of
18   what happened that week.
19       Q.   Okay.  Fair enough.  So what I'd like
20   to do for the next little while is get your
21   recollection of what you were doing that week
22   and certain events that week, and later on this
23   morning, we'll go back and look at some
24   documents that might help you remember other
25   aspects of that week.  Fair?

TSG Reporting - Worldwide (877) 702-9580

Page 30

**HIGHLY CONFIDENTIAL - R. AZERAD**

1    
2    A.    Yes.
3    Q.    So let's go back to September 15.  You
4  remember September 15, generally, right?
5    A.    I remember -- what I remember from
6  September 15 is me walking into the office and
7  having to tell my team that Lehman Brothers had
8  filed for bankruptcy.  I think it must have been
9  on the morning of September 15th, but I learned
10  about the decision I think late on Sunday,
11  September 14.
12    Q.    That weekend leading into September
13  15, where were you?
14    A.    That weekend I was -- I was working in
15  the office, either in my own office, which is at
16  1301 Sixth Avenue, which is where Treasury was
17  located, and I was also at 745 Seventh Avenue.
18    Q.    And what were you doing that weekend
19  in the office?
20    A.    I was helping Paolo Tonucci as best as
21  I could.  We had several requests for
22  information and we were also trying to finalize
23  our liquidity metrics for September 12.
24    Q.    The requests for information that you
25  had, were those from prospective buyers of

TSG Reporting - Worldwide (877) 702-9580

Page 31

**HIGHLY CONFIDENTIAL - R. AZERAD**

1    
2  Lehman Brothers?
3    A.    I don't recall precisely.  They may
4  have been.  There were also requests from the
5  Federal Reserve as well.
6    Q.    Were you aware of indications of
7  interest to purchase Lehman in the days leading
8  up to 15th?
9    A.    Yes, I was.
10    Q.    And were you involved at all in
11  providing information to any of those parties
12  that had expressed an interest in Lehman
13  Brothers?
14    A.    I remember having a meeting with Bank
15  of America in the week ending September 14th.  I
16  don't remember which days precisely of the week.
17  I don't remember which days precisely, but it
18  must have been toward the second half of that
19  week, so from the 10th to the 12th.  And I was
20  also aware of an interest by Barclays, and I
21  may, although I don't recall precisely, I may
22  have provided information to Barclays.
23    Q.    Were you aware of any requests for
24  information from either Barclays or Bank of
25  America the weekend prior to the 15th?

TSG Reporting - Worldwide (877) 702-9580

Page 32

**HIGHLY CONFIDENTIAL - R. AZERAD**

1    
2    A.    I don't recall precisely.  My
3  recollection is bank of -- I did not receive any
4  information -- any requests for information from
5  Bank of America the Saturday or the Sunday.  I
6  may have received, but I don't recall precisely,
7  requests for information from Barclays.
8    Q.    You described some requests for
9  information from the Fed.  Do you recall the
10  nature of those requests?
11    A.    The Fed was interested in our
12  liquidity metrics.
13    Q.    And you stated that that weekend, the
14  weekend of the 13th and 14th, some of your time
15  was spent assessing your liquidity metrics for
16  the 12th; is that correct?
17    A.    That is correct.
18    Q.    Can you describe further what you mean
19  by that?
20    A.    There was some uncertainty about where
21  we finished our liquidity from a liquidity
22  standpoint at the end of the 12th.  There were
23  large movements of securities and cash between
24  Lehman and the street and also across Lehman
25  entities, and there was a team of people,

TSG Reporting - Worldwide (877) 702-9580

Page 33

HIGHLY CONFIDENTIAL - R. AZERAD

1    
2  primarily led by Prime Services, which was
3  trying to get a better handle on what happened.
4    Q.    Now, on or about the 12th of September
5  you learned of some changes in the way the Fed
6  was going to be applying haircuts to the
7  collateral in the Fed facility; is that right?
8    A.    Not on the 12th.  It was on the -- it
9  must have been on the 14th or the 15th.
10    Q.    Okay.  And what was your understanding
11  of the change in the Fed's approach to haircuts
12  in that time period?
13    A.    What I recall was on the -- either on
14  the 14th or on the 15th, the Fed made an
15  announcement extending liquidity facilities to
16  other broker-dealers, Merrill Lynch, Goldman
17  Sachs, Morgan Stanley, in particular, but did
18  not make the same offer to Lehman Brothers.
19    So, in particular, because it became a
20  critical funding facility during the week of
21  September 15th, the primary dealer credit
22  facility, which is typically referred to as a
23  PDCF, we -- Lehman was operating under a
24  different schedule, haircut schedule, I believe,
25  than what was offered to other broker-dealers.

TSG Reporting - Worldwide (877) 702-9580

```
 1        HIGHLY CONFIDENTIAL - R. AZERAD
 2      Q.   And was the haircut schedule that
 3   Lehman was operating under, was that itself
 4   changed or altered in any way between the 12th
 5   and the 15th?
 6      A.   We did not use the PDCF on the 12th.
 7   We started using it on the 15th.
 8      Q.   Okay.  So on the 15th you described
 9   one of the tasks you dealt with on the 15th was
10   telling your team about the filing of the
11   bankruptcy, right?
12      A.   Uh-huh.
13      Q.   Yes?
14      A.   That is correct.
15      Q.   In terms of reviewing and managing
16   Lehman's liquidity on the 15th, what were you
17   doing?
18      A.   We were trying to kind of grapple with
19   the aftermath of a bankruptcy of Lehman Brothers
20   Holding.  Our liquidity at Lehman was global --
21   our liquidity reporting was global in nature and
22   primarily focused on the holding company, and we
23   had to change our focus starting on the 15th to
24   now focus on our U.S. broker-dealer, Lehman
25   Brothers, Inc., which is typically referred to
```

TSG Reporting - Worldwide (877) 702-9580

```
 1        HIGHLY CONFIDENTIAL - R. AZERAD
 2   as LBI.
 3      Q.   On the 15th, what were the sources of
 4   secured funding that were available to Lehman?
 5      A.   By "Lehman," you mean LBI?
 6      Q.   I mean LBI.
 7      A.   For LBI, we had a few term repo
 8   transactions that were struck before the 15th
 9   and contractually obliged to continue since LBI
10   was still in operations, and then we had the --
11   and then we had the PDCF.
12      Q.   If I understand your earlier answer
13   correctly, you said the PDCF became available to
14   Lehman on the 15th?
15      A.   No, it was available prior to the
16   15th.  We did not use it except for a few test
17   trades when it became available back in I
18   believe March or April of 2008, but it was
19   available prior to the 15th.
20      Q.   And other than the PDCF, what other
21   Fed facilities were available to Lehman, to LBI,
22   for funding on the 15th?
23      A.   We were also using the TSLF.  I don't
24   recall precisely how much we were funding
25   through the TSLF, but it was -- it was primarily
```

TSG Reporting - Worldwide (877) 702-9580

```
 1        HIGHLY CONFIDENTIAL - R. AZERAD
 2   somewhat liquid agency securities.
 3        On the 15th, we knew that most of the
 4   repo transactions maturing on the 15th were not
 5   going to be rolled, for obvious reasons, and
 6   therefore, the PDCF was going to become the
 7   primary source of funding for LBI.
 8      Q.   Did Lehman also amend its existing
 9   tri-party funding agreement with Barclays on the
10   15th?
11      A.   I don't recall.
12      Q.   Do you have a general recollection
13   that Lehman began to borrow from Barclays during
14   that week, the week of the 15th?
15      A.   Yes, we entered into a repo
16   transaction.  I don't recall when.  It must have
17   been either on the 15th or the 16th.
18      Q.   Did you play any role in negotiating
19   that repo transaction with Barclays you say
20   either on the 15th or the 16th?
21      A.   I did not play any role in
22   negotiating.
23      Q.   Did you play any role whatsoever in
24   connection with that repo transaction?
25      A.   To the best of my recollection, my
```

TSG Reporting - Worldwide (877) 702-9580

```
 1        HIGHLY CONFIDENTIAL - R. AZERAD
 2   primary role was just to report on our secured
 3   funding position for LBI.  So, because it became
 4   available and because it became a source of
 5   funding, it became part of a reporting.
 6      Q.   And do you understand that the nature
 7   of the funding provided by Barclays changed as
 8   that week went on?
 9      A.   My recollection is that the repo
10   facility grew during that week.  How to --
11   that's probably -- that was -- that essentially
12   is my -- is my recollection.  And then there was
13   a -- it became very large on the night of the
14   18th, the Thursday.
15      Q.   And was it your understanding that the
16   Barclays repo facility became very large on the
17   night of Thursday, the 18th, because Barclays
18   was essentially stepping into the shoes of the
19   Fed?
20      MR. STERN:  Objection to the form.
21      A.   My understanding is that there was a
22   transfer of securities, and I use the word
23   "transfer" in the loosest non-legal term
24   possible, between LBI and Barclays, and my
25   understanding is that the repo played a role in
```

TSG Reporting - Worldwide (877) 702-9580

## Page 38

1          HIGHLY CONFIDENTIAL - R. AZERAD
2    that transfer.
3        Q.   Okay.  So your understanding is that
4    the repo, the Barclays repo, was the way in
5    which securities were transferred from Lehman to
6    Barclays?
7        MR. STERN:  Objection to the form.
8        A.   I'm not trying to -- I haven't -- the
9    week of September 15th I have not seen the
10   purchase agreement or the contract between
11   Lehman and Barclays, so I can't tell you how the
12   transfer of securities was going to be done.  My
13   understanding is was that if the transaction was
14   successful, the securities being repo'd to
15   Barclays would not come back to Lehman
16   eventually.
17       Q.   Was there going to be a default on the
18   repo?
19       A.   Again, I haven't seen the form of the
20   transaction.  It was my understanding on the
21   week of September -- on the week of September
22   15th that if there was no transaction being
23   done, then LBI would not be able to survive as a
24   broker-dealer indefinitely.
25       So at some point something would have

TSG Reporting - Worldwide (877) 702-9580

## Page 39

1          HIGHLY CONFIDENTIAL - R. AZERAD
2    happened, a repo transaction would have failed
3    or something else would have happened, depending
4    on when the -- depending on when LBI would have
5    filed for receivership.
6        Q.   Okay.  We'll come back to that.  On
7    the 15th did you also learn about a potential
8    transaction between Lehman and Barclays where
9    Barclays would be purchasing the North American
10   operations of LBHI?
11       A.   To the best of my recollection, I
12   believe I became aware of discussions between
13   Lehman and Barclays post-bankruptcy, because
14   obviously they also took place prior to the
15   bankruptcy on Tuesday.
16       Again, this is my best of my
17   recollection the -- what happened this week is
18   somewhat.  I may not have exact date, but
19   somewhere around the 16th is when I believe that
20   there were ongoing discussions.
21       Q.   And do you recall how you found out
22   about those discussions on the Tuesday?
23       A.   It must have been as a side discussion
24   with Paolo Tonucci.
25       Q.   You told me earlier that you had not

TSG Reporting - Worldwide (877) 702-9580

## Page 40

1          HIGHLY CONFIDENTIAL - R. AZERAD
2    seen the Asset Purchase Agreement; is that
3    right?
4        A.   The week -- I hadn't seen it the week
5    of September 15th or the week of September 22nd.
6        Q.   When did you see it?
7        A.   I became aware of it as part of the
8    work I was -- as part of the litigation work I
9    was doing on behalf of Barclays in 2009.
10       Q.   What litigation work were you doing on
11   behalf of Barclays in 2009?
12       MR. STERN:  I'm going to instruct the
13   witness not to answer.  That's privileged.
14       Q.   Are you aware of something called a
15   clarification letter?
16       A.   I'm not aware of it.  I should say at
17   that time, on September 2008, I was not aware of
18   a clarification letter.
19       Q.   Okay.  Have you seen the clarification
20   letter?
21       A.   To the best of my knowledge, no.
22   Clearly not in September 2008.
23       Q.   During the week of September 15, 2008,
24   what was your understanding of the overall
25   economics of this transaction between Barclays

TSG Reporting - Worldwide (877) 702-9580

## Page 41

1          HIGHLY CONFIDENTIAL - R. AZERAD
2    and Lehman?
3        A.   I didn't have an understanding of the
4    economics of a transaction between Lehman and
5    Barclays.  I was asked during that two weeks to
6    provide information, which I believe was used as
7    part of a negotiation, but I was not -- I was
8    not kept abreast of the economics of a
9    transaction.
10       Q.   Just in round terms, do you know what
11   was the value of the assets that Barclays was
12   buying?
13       A.   Yes, that I was part -- I was part of
14   the team which I believe the weekend of
15   September 20th was helped to establish the
16   opening balance sheet.  So, yes, I was aware of
17   a value.
18       Q.   So, from your involvement in that
19   process of preparing the opening balance sheet,
20   you're aware of the assets that Barclays was
21   purchasing, correct?
22       MR. STERN:  Objection to the form.
23       A.   I was part of the -- yes, I was.  That
24   was also part of my day-to-day responsibilities
25   of tracking secured funding.

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - R. AZERAD
2 Q. And as part of your involvement in the
3 process of preparing the opening balance sheet,
4 you also became aware of the liabilities that
5 Barclays was assuming?
6 A. I recall seeing an opening balance
7 sheet for both assets and liabilities, but my
8 role on the opening balance sheet was primarily
9 focused on the asset side, plus obvious -- plus
10 the associated repo transactions, not other
11 aspects of the liabilities.
12 Q. And what's your general recollection
13 of the total value of assets that were
14 transferred from Lehman to Barclays as part of
15 the sale transaction?
16 A. I don't have a good recollection.  I
17 believe that on Thursday night, the 18th, there
18 was approximate -- there was approximately
19 something between 40 and 50 billion dollars of
20 assets being transferred from -- being repo'd
21 from Lehman to Barclays, but I was not told what
22 was the overall size of assets, the ultimate
23 asset list being purchased from Lehman by
24 Barclays.
25 Q. Other than the securities that were
TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - R. AZERAD
2 transferred Thursday night, the 18th, were you
3 also aware that there were other securities and
4 assets identified on the 19th of September for
5 transfer to Barclays?
6 A. I was working on a schedule, which
7 turned out to be not a very useful exercise,
8 trying to identify assets that might be
9 transferred to Barclays.
10 Q. I'm sorry, I'm not sure if that
11 answers my question.  Were you aware of
12 securities, in addition to securities
13 transferred on Thursday night, that were
14 transferred to Barclays on the 19th?
15 A. There were -- I was aware that there
16 were additional securities, I believe, being
17 transferred.  I don't remember whether it was on
18 the 19th or it was in the subsequent days, but
19 this was not the only transfer of securities
20 between Barclays and -- between Lehman and
21 Barclays.
22 Q. Putting aside securities, were you
23 also aware of transfers of cash and receivables
24 from Lehman to Barclays?
25 A. To the best of my knowledge, no.  I'm
TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - R. AZERAD
2 aware that Barclays purchased other assets
3 besides securities, but I don't have the exact
4 list of assets that Barclays purchased from
5 Lehman.
6 Q. What's your best understanding of what
7 assets Barclays purchased other than securities?
8 A. Well, there were a few things, and
9 perhaps, by receivables, that's not the way that
10 I refer to it, so I should probably ask you if
11 you have specific receivables, but there were a
12 few things that Barclays purchased.
13 It was -- there was a claim on
14 securities held -- or, securities or cash held
15 by Lehman as part of a 15c3-3 lockup which
16 should have returned to LBI as part of the
17 unwinding of LBI, or should return to LBI as
18 part of the unwinding of LBI.  That might be
19 what you refer to by cash and receivables.  I
20 think of it as being part of the 15c3-3 assets.
21 And then there were also the
22 headquarters of Lehman at 745 Seventh Avenue, I
23 believe, at least from what I've read in some of
24 the external communications, that was also
25 purchased by Barclays.
TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - R. AZERAD
2 Q. To your recollection or understanding,
3 were any assets concerning excess options or
4 derivatives margin that was also transferred by
5 Lehman to Barclays?
6 A. I remember having discussions on
7 whether or not this could be transferred to
8 Barclays.  I don't remember whether there
9 were -- it became part of a final purchase
10 agreement.
11 Q. And with whom do you recall having
12 those discussions?
13 A. I don't recall precisely.  I don't
14 recall precisely.
15 Q. Sir, I've handed you a one-page
16 document previously marked as Exhibit 136A.
17 A. Thank you.
18 Q. Take a moment to review it.  Let me
19 know when you're done.
20 (Document review.)
21 A. I've read the e-mail.
22 Q. There's a reference in this document
23 to -- the second sentence in the e-mail at the
24 bottom, which is from Mr. Kelly to Ian Lowitt.
25 You are not shown as a copy on any of these
TSG Reporting - Worldwide (877) 702-9580

Page 46

1          HIGHLY CONFIDENTIAL - R. AZERAD
2    e-mails.
3          Let me read a sentence to you and ask
4    you a question about it:  "Final price did not
5    change meaningfully.  Approximately a 5B,"
6    billion, "all in economic loss versus our marks
7    and 3.6B," billion, "of resi assets left
8    behind."
9          Do you see that?
10    A.  Yes.
11    Q.  Was it your general understanding that
12    that was the nature of the economics of the
13    deal?
14          MR. STERN:  Objection to the form.
15    A.  I don't understand what Martin Kelly
16    says in this e-mail.
17    Q.  Do you have an understanding
18    independent of this e-mail that roughly the
19    economics of the deal were a $5 billion loss in
20    economic value against the Lehman marks?
21    A.  To the best of my recollection, no.
22    Q.  To the best of your recollection or
23    understanding, were the economics of the deal
24    such that there was a loss to Lehman and a gain
25    to Barclays as a result of this transaction?
          TSG Reporting - Worldwide (877) 702-9580

Page 47

1          HIGHLY CONFIDENTIAL - R. AZERAD
2          MR. STERN:  Objection to the form.
3    A.  No.  My understanding of the
4    transaction is that there was uncertainty both
5    as it refers to the value of a specific asset,
6    but more generally as part of the general market
7    uncertainty.  There was a significant increase
8    in volatility that week as a result of, in part,
9    of the bankruptcy of Lehman Brothers, the
10    purchase of Merrill Lynch by Bank of America,
11    and the rescue plan of AIG, and that uncertainty
12    was in part as a result of a transaction
13    transferred from Lehman to Barclays.
14    Q.  Do you have my question in mind?
15    Because I'm not sure you answered my question.
16          MR. STERN:  Objection.
17          MR. TAMBE:  Just read back my
18    question.
19          (Record read.)
20          MR. STERN:  Objection.  He already
21    testified he didn't recall the economics.
22    A.  That's -- I do not -- what I do recall
23    that week was that there was significant
24    uncertainty, asset prices in general, not just
25    on Lehman asset prices, but just asset prices in
          TSG Reporting - Worldwide (877) 702-9580

Page 48

1          HIGHLY CONFIDENTIAL - R. AZERAD
2    general, and that by acquiring these assets,
3    essentially the uncertainty on the valuation of
4    these assets was transferred from Lehman to
5    Barclays.  It may have resulted in a gain or in
6    a loss.  That I -- that I don't know.  I
7    don't --
8    Q.  Okay.  So if there was a gain to
9    Barclays from this transaction, you know nothing
10    about it?
11    A.  When Barclays announced its results at
12    the end of 2008, I believe, and you can look at
13    the press announcement from Barclays, I believe
14    that Barclays announced that it was making --
15    that the transaction resulted in a gain.
16          The transaction, again, in a loose
17    sense, I don't remember the exact text, it's
18    public -- it's public information, I believe
19    that Barclays said that it made a gain as a
20    result of the transaction.
21    Q.  And other than what you read in that
22    public announcement, you know nothing else about
23    any gain to Barclays, isn't that right?
24    A.  That is correct.  Let me try to be
25    slightly more specific.  There is, if I can,
          TSG Reporting - Worldwide (877) 702-9580

Page 49

1          HIGHLY CONFIDENTIAL - R. AZERAD
2    there is kind of a gain -- and gain, meaning if
3    you're thinking of a -- to crystalize a gain or
4    a loss, whatever was going to be the outcome of
5    the transaction, you have to sell the assets.
6          The amount of assets being transferred
7    from Lehman to Barclays meant it was, I believe,
8    to the best of my knowledge of someone who has
9    been in an investment bank for now eight or nine
10    years, it would have been difficult for Barclays
11    to liquidate these assets in a very short amount
12    of time.
13          So there was uncertainty for any
14    parties, Lehman or Barclays, how much these
15    assets would have been sold at if you wanted to
16    crystalize the gain or the loss.
17    Q.  Do you know if there was an attempt
18    made in the transaction to compensate Barclays
19    for this uncertainty?
20          MR. STERN:  Objection to the form.
21    A.  I was not part of the negotiation
22    between Lehman and Barclays.  I was helping
23    people who may have been involved in the
24    negotiation when they asked me specific
25    questions.  I was not part of the negotiation.
          TSG Reporting - Worldwide (877) 702-9580

Page 50

```
1          HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   Were you involved in any revaluation
3  or marking down of Lehman assets at the time
4  they were transferred from Lehman to Barclays?
5      A.   I was not part of the -- this would
6  have been done, if it had been done, by the --
7  By Product Control Group.  Product Control at
8  Lehman was responsible for marking assets.
9      Q.   Are you aware of any markdown of
10 assets by the Product Control Group in
11 connection with the transfer of assets from
12 Lehman to Barclays?
13     A.   To the best of my knowledge, no.
14     Q.   I show you a document marked
15 Exhibit -- previously marked Exhibit 126.  Take
16 a moment to look at this one-page document.  Let
17 me know when you're done.
18          (document review.)
19     A.   I've read the e-mail.
20     Q.   You're not shown as a copy on any of
21 these e-mails, but I'll ask you about a couple
22 of phrases that are used.
23          At the bottom of this e-mail, the
24 e-mail from Gerry Reilly to Ian Lowitt and
25 others, there's a reference to the amount of
```

Page 51

```
1          HIGHLY CONFIDENTIAL - R. AZERAD
2  block discount, do you see that?
3      A.   Yes.
4      Q.   Does that phrase have any meaning to
5  you in connection about the Lehman/Barclays
6  transaction?
7          MR. STERN:  Objection to the form.
8      A.   I don't know when Gerry Reilly wrote
9  this e-mail, used the word "block discount,"
10 what he meant by it.
11     Q.   Does the phrase "block discounts" have
12 any meaning to you in connection with the repo
13 work that you have done at Lehman?
14          MR. STERN:  Objection to the form.
15     A.   No, I'm not -- no.
16     Q.   Again, at the bottom of that page in
17 that e-mail, there's a reference to "defaulting
18 on repo could be the best, as discount could be
19 taken from a haircut."  Do you see that?
20     A.   Yes.
21     Q.   Do you have any recollection or
22 understanding of a discount being provided by
23 Lehman to Barclays via the haircut on the repo?
24          MR. STERN:  Objection to the form.
25     A.   No.  Again, I had not seen at that
```

Page 52

```
1          HIGHLY CONFIDENTIAL - R. AZERAD
2  time the purchase agreement between Lehman and
3  Barclays.  In a repo transaction, I believe, as
4  you mentioned earlier, there is always a
5  haircut, meaning a discount from market value.
6  So the lender would not provide financing
7  against asset dollar for dollar but would apply
8  a haircut.  The understanding is if the borrower
9  defaults, then the lender keeps the securities
10 but also keeps the uncertainty about the final
11 disposal -- the value of the securities when he
12 finally disposes of them.
13     Q.   So, using round numbers, if Barclays
14 had provided $45 billion of financing against
15 $50 billion of assets, the haircut would be the
16 $5 billion, correct?
17          MR. STERN:  Objection to the form.
18          Are you still referencing this
19 exhibit?
20          MR. TAMBE:  No, I'm not.  We're having
21 a discussion.
22     Q.   Do you have any question?
23     A.   Yeah, I don't --
24          MR. STERN:  Let's hear the question
25 again.
```

Page 53

```
1          HIGHLY CONFIDENTIAL - R. AZERAD
2          (Record read.)
3      A.   In a conceptual way.  Again, we are
4  not saying these are the actual numbers.  If
5  there is a difference between what is typically
6  referred to as the pledge value versus the
7  market value of a security, then yes, this is
8  how you could define haircut.
9      Q.   Going back to your previous answer,
10 your understanding is if the borrower defaulted,
11 the lender would get to keep the securities,
12 correct?
13     A.   This is what I observed when I was at
14 Lehman when there were a few hedge funds which
15 defaulted earlier in 2008.  Lehman had -- Lehman
16 was providing financing and when the hedge fund
17 defaulted, Lehman went and took control of the
18 securities.
19     Q.   When you did review the Asset Purchase
20 Agreement, did you see any reference to
21 defaulting on the repo in the Asset Purchase
22 Agreement?
23          MR. STERN:  Objection.  I believe this
24 calls for communications with counsel.
25          MR. TAMBE:  I don't think it does.
```

Page 54

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    Q.    You reviewed the APA?
3        MR. STERN:  Did you review --
4    A.    No, when I reviewed -- I believe that
5    Alan Kaplan, who is the -- was Barclays'
6    counsel, sent me --
7        MR. STERN:  Let me just stop you there
8    because I don't want you to testify to your
9    communications with counsel.  I'm just going
10    to instruct you not to answer.  Let's wait
11    for the next question.
12    Q.    Don't tell me what you said to Alan,
13    what Alan said to you, but you saw a copy of the
14    Asset Purchase Agreement, right?
15    A.    Not in September 2008.
16    Q.    Whenever you saw it.  In 2009 you saw
17    it, correct?
18    A.    If I had seen it, it would have been
19    part of the communication I had with Alan
20    Kaplan.
21    Q.    Fine.  So put aside your communication
22    with Mr. Kaplan.
23        MR. STERN:  I don't think he can do
24    that, Jay.
25        MR. TAMBE:  Yes, he can.
TSG Reporting - Worldwide (877) 702-9580

Page 55

HIGHLY CONFIDENTIAL - R. AZERAD
1
2        MR. STERN:  Jay, in fairness,
3    please --
4        MR. TAMBE:  In fairness, if he saw a
5    document, the mere fact that that document
6    was provided to him by counsel doesn't make
7    it privileged.
8        MR. STERN:  If he's reviewing it with
9    counsel.
10        MR. TAMBE:  He hasn't said he reviewed
11    it with counsel, Jack.
12        MR. STERN:  I think he did.
13        MR. TAMBE:  He did not say that.
14        MR. STERN:  I'm not looking for a
15    fight here.
16        MR. TAMBE:  Nor am I.
17        MR. STERN:  All I'm concerned about is
18    protecting the privilege.  So why don't you
19    ask the next question and I'll either object
20    or instruct him not to answer.
21    Q.    You received a copy of the APA
22    sometime in 2009, correct?
23    A.    No, that's not what I said.  What I
24    said is if I had received it, which I don't
25    recall, it would have been in 2009 as part of
TSG Reporting - Worldwide (877) 702-9580

Page 56

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    the work I was doing for counsel at Barclays.
3    Q.    Okay.  And if you had received it,
4    would you have reviewed it?
5    A.    No, I would only have reviewed it to
6    the extent that it was part of the work I was
7    doing with counsel that requested me to review
8    it.  I had -- I had no interest per se in
9    reviewing this document, which was at that point
10    history.
11    Q.    When in 2009 were you requested by
12    counsel to review the document?
13    A.    That's not -- that's not what I said.
14    Q.    When in 2009 did you have these
15    discussions about -- which included reviewing
16    the APA?
17        MR. STERN:  I think I'm going to
18    instruct you not to answer.  I think any --
19    I don't want you to reveal anything about
20    your discussions with counsel.
21        MR. TAMBE:  When they occurred?
22        MR. STERN:  Yes, when they occurred,
23    circumstances of when they occurred, any of
24    that.
25    Q.    Other than Mr. Kaplan, were any other
TSG Reporting - Worldwide (877) 702-9580

Page 57

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    counsel involved in that event?
3        MR. STERN:  To the best of your
4    recollection.
5    A.    Alan Kaplan was the lead counsel, is
6    the assistant counsel -- was the lead counsel
7    for Barclays.  He may have had other people on
8    his staff involved.  What I recall was there
9    was -- it was -- is that I had discussion with
10    Alan Kaplan.
11    Q.    Other than any discussions you've ever
12    had with any counsel for Barclays, have you ever
13    discussed with anyone whether the Asset Purchase
14    Agreement provided for a default on the repo?
15    A.    No, to the best of my knowledge.
16    Q.    Other than counsel, have you ever had
17    a discussion with anyone about whether there was
18    a discount in the transaction where a gain was
19    conferred on Barclays?
20    A.    No, to the best of my knowledge.
21    Q.    Have you talked with Mr. Tonucci about
22    his deposition last Friday?
23    A.    I have not talked to Paolo Tonucci.
24    Q.    When is the last time you talked to
25    him?
TSG Reporting - Worldwide (877) 702-9580

Page 58

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A.    It must have been sometime last week
3    as part of a -- Paolo Tonucci is the head of the
4    Balance Sheet Group for Barclays group, and so
5    we do have regular interaction.  He had received
6    a request from the Federal Reserve about doing
7    an analysis on Barclays' U.S. operation and we
8    had a discussion about this request.
9    Q.    Was it your understanding -- go ahead.
10   A.    So, just to continue, I had a quick
11   series of e-mail this morning with Paolo Tonucci
12   regarding the application of a limit framework
13   as it applies to Barclays Capital by Group
14   Treasury in London.  It has nothing, nothing to
15   do with the -- with his deposition.
16   Q.    The request from the Federal Reserve
17   that you discussed with Mr. Tonucci, was that in
18   connection with the Lehman/Barclays transaction?
19   A.    No.
20   Q.    Sir, I have placed before you a
21   two-page document marked Exhibit 60B at a
22   previous deposition, two-page document.  Take a
23   look at it.  Let me know when you're done.
24   (Document review.)
25   A.    I think I have reviewed the document.
TSG Reporting - Worldwide (877) 702-9580

Page 59

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    Q.    Have you seen this document before
3    today?
4    A.    To the best of my knowledge, no, I
5    don't believe I was copied or copied on this
6    document.  I was not on the "to" or "CC" line.
7    Q.    If you look at the attachment to the
8    document, page 2 of Exhibit 60B?
9    A.    Yes.
10   Q.    Is that a form of document that you're
11   familiar with?
12   A.    This is an Excel spreadsheet.  I'm not
13   sure what some of the column means.  From what I
14   can surmise by reading this e-mail, this
15   document was created by JPMorgan.
16   Q.    Who was your tri-party provider?
17   A.    It was our tri-party custodian.
18   Q.    Custodian.  And it was the tri-party
19   custodian on the Fed facility, correct?
20   A.    That is correct.  And there were three
21   TSLF, PDCF, OMO are programs by the Fed.
22   Q.    You're referring to the left-hand
23   column of page 2 of this exhibit, correct?
24   A.    Uh-huh, that is correct.
25   Q.    Just looking at page 2 of Exhibit 60B,
TSG Reporting - Worldwide (877) 702-9580

Page 60

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    the column that says "Current Market," do you
3    see that?
4    A.    Yes.
5    Q.    And the grand total at the bottom of
6    that column is 49.7 billion, do you see that?
7    A.    Yes.
8    Q.    Do you understand that to mean that
9    the current market value of assets pledged by
10   Lehman to the Fed was 49.7 billion as of the
11   date of this report?
12   MR. STERN:  Objection to the form.
13   A.    I did not create this spreadsheet so I
14   cannot comment on what this column means.
15   Q.    Would you at Lehman have created
16   analogous spreadsheets that listed the market
17   value of securities pledged by Lehman to the Fed
18   under the various Fed facilities?
19   A.    We would have, yeah, we would have.
20   Q.    And you would have played a role in
21   the preparation of the review of those kind of
22   reports?
23   A.    It would have been done generally by
24   my group.
25   Q.    And just in round terms, was it your
TSG Reporting - Worldwide (877) 702-9580

Page 61

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    understanding that in the middle of the week of
3    September 15 the borrowing that Lehman had from
4    the Fed was approximately $44 billion against
5    assets of a value of $49.7 billion?
6    MR. STERN:  Objection to the form.
7    A.    I don't recall.
8    Q.    No recollection at all?
9    A.    I don't recall.  I'm -- I'm --
10   MR. STERN:  Objection to the form.
11   A.    There may be documents that you have
12   that would show that, but I don't recall.
13   Q.    Mr. Azerad, I've handed you a
14   three-page document previously marked as Exhibit
15   140A.
16   A.    Uh-huh.
17   Q.    Take a moment to look at the three
18   pages.  Let me know when you're done.
19   A.    Sure.
20   (Document review.)
21   Q.    You've reviewed it?
22   A.    Yes, I have.
23   Q.    And that's an e-mail from you to
24   Kelly, Martin Kelly, and others, right?
25   A.    That is correct.
TSG Reporting - Worldwide (877) 702-9580

Page 62

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    Q.    And you attach a file called the
3    Summary File Inventory, do you see that?
4    A.    Yes.
5    Q.    Turn to page 2 of this exhibit,
6    Exhibit 140A.  Could you describe for me what
7    information is shown on that page?
8    A.    It's showing at a high level the
9    inventory of Lehman Brothers, Inc., using the
10   same classification that Lehman used in its
11   external filing.  So the asset class, CDs and
12   other money market instruments, corporate debt,
13   corporate equities, government and agencies,
14   mortgage and mortgage-backed derivatives.  There
15   is an adjustment, which I don't recall what it
16   was, and that's -- that is how the inventory was
17   typically classified.
18   Q.    And --
19   A.    No, please.
20   Q.    In terms of the valuation of the
21   inventory?
22   A.    Uh-huh.
23   Q.    What valuation would have been used to
24   prepare this spreadsheet?
25   A.    Treasury used a system at Lehman

TSG Reporting - Worldwide (877) 702-9580

Page 63

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    called GFS, which I believe stands for Global
3    Financial System, and so we were using the same
4    valuation system as product control.
5    Q.    Okay.  So you would have used GFS to
6    prepare a spreadsheet of this nature?
7    A.    That would have -- I don't recall how
8    this spreadsheet was prepared.  Generally, when
9    we were -- the basis of our reports was
10   generally GFS.  It may have been, and again, I
11   don't recall, there may have been a file that I
12   received from someone else asking me to use this
13   file which contained market value information,
14   but in general, Treasury was relying on GFS to
15   value assets.
16   Q.    The third column over has a heading
17   "Available for Transfer," do you see that?
18   A.    Uh-huh.
19   Q.    Do you have an understanding of what
20   was reflected in that column?
21   A.    I don't recall at this point.
22   Q.    Turn to the last page of Exhibit 140A?
23   A.    Yes.
24   Q.    Is that a form of document that you
25   recognize?

TSG Reporting - Worldwide (877) 702-9580

Page 64

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    A.    Yes.
3    Q.    And what is it?
4    A.    One analysis that we tried to do the
5    week of September 15th was to understand the
6    secured funding transaction existing between
7    Lehman U.S. broker-dealer, LBI, and Lehman
8    European broker-dealer, Lehman Brothers
9    International Europe, which is typically
10   referred to by its acronym, LBIE.
11          The reason why it became an important
12   analysis is LIBE had filed for bankruptcy, I'm
13   not sure if it's exact term, but was no longer
14   operating as of September 15th, and so our
15   understanding at that -- the base -- the
16   assumption behind this analysis is that the
17   secured funding transaction that existed between
18   these two entities would not -- would not be
19   unwound, meaning that securities that financed
20   by LBI would not return to LBI and vice-versa.
21   That's column A and column B.
22   Q.    What's column C?
23   A.    Column C refers to the matched book.
24   "Matched book" is a term which is, in my mind,
25   overused, but in that particular instance what

TSG Reporting - Worldwide (877) 702-9580

Page 65

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    it meant was the series of reverse repo and repo
3    put on by the repo desk or the secured funding
4    desk in Prime Services, so they were borrowing
5    and lending securities.
6    Q.    As part of a prime brokerage functions
7    or part of a liquidity function for Lehman or
8    both?
9    A.    No, as the second term in this column
10   C indicates, "Prop," it was meant to be
11   proprietary, meaning it was supposed to make
12   money for the -- for Lehman.
13   Q.    So running a matched book to earn
14   fees, effectively?
15   A.    That's not the way that you typically
16   make money in a matched book that you run for
17   profit.  They are -- I'm talking here in
18   conceptual terms, not specifically relating to
19   these numbers because I don't have knowledge how
20   they intended to make money, but they typically
21   make money because of maturity transformation or
22   because of credit risk, meaning that you reserve
23   securities at a higher haircut than what you
24   lent to the street.
25   Q.    And did you have an understanding

TSG Reporting - Worldwide (877) 702-9580

1    **HIGHLY CONFIDENTIAL - R. AZERAD**
2  **during the week of September 15th that the size**
3  **of the matched book was being shrunk as part of**
4  **the process of selling assets from Lehman to**
5  **Barclays?**
6      MR. STERN:  Objection to the form.
7      A.    I may -- I may recall that it was
8  being shrunk.  If you look at page 3 of the
9  Exhibit 140A, the majority of the matched book
10 is in an asset class called Government &
11 Agencies, which was -- generally, it's a very
12 liquid asset class.  A lot of financing
13 transaction is not only through tri-party repo,
14 but also through a central clearing counterparty
15 called the FICC, and most of our effort in terms
16 of understanding secured funding was not -- was
17 not focused on that particular line.
18     **Q.    If you look at the last column, which**
19 **is titled "-(A)+(B)+(C)," do you have any**
20 **understanding of what information is contained**
21 **in that column or how it relates to the other**
22 **columns?**
23     A.    Well, you mean what does it -- can you
24 just rephrase your question?
25     **Q.    I can see the total.  I'm just trying**

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  to figure out what's the significance of the
3  last column?  What does it identify?
4      A.    When you look at -- again, I don't
5  recall precisely why I did this analysis, but
6  from kind of conceptually what was based on my
7  understanding today, what the analysis is trying
8  to show is if you look at securities that LBI
9  had, they can be categorized in kind of two
10 groups:  They're securities owned by LBI and
11 securities borrowed by LBI.
12        The securities borrowed by LBI would
13 be in column B and column C and securities --
14 column A is an adjustment because these were
15 securities most likely, though not with certain,
16 that was lent to LBIE.  So, to the extent that
17 they were owned by LBI, it would probably be
18 safe to assume that they would not be returned
19 to LBI.
20     Q.    So the last column is just showing
21 that information on that basis?
22     A.    So that column is just how much
23 securities net of what we have lent we have
24 borrowed from LBIE, and then the matched book,
25 prop matched book, to be precise, of LBI is.

1      HIGHLY CONFIDENTIAL - R. AZERAD
2  That's what -- that's what -(A)+(B)+(C) seems to
3  indicate.
4        Then --
5      **Q.    Go ahead.**
6      A.    -- some of the securities borrowed,
7  that's the bottom, just -- so just to continue,
8  can also be used to cover shorts.  That's the
9  other thing to also understand, that the
10 reverses can also be used to cover short
11 positions.
12       MR. STERN:  When you're done with
13 this, I would like to just take a short
14 break.
15       MR. TAMBE:  That's fine.  We can break
16 now.
17       (Recess; Time Noted:  10:59 A.M.)
18       (Time Noted:  11:06 A.M.)
19 BY MR. TAMBE:
20     **Q.    On the second page of Exhibit 140A,**
21 **the "Available for Transfer" column?**
22     A.    Yeah.
23     **Q.    Do you recall any discussions during**
24 **the week of the 15th about identifying assets of**
25 **LBI that were available for transfer to**

1    **HIGHLY CONFIDENTIAL - R. AZERAD**
2  **Barclays?**
3      A.    Yes.
4      **Q.    Can you just generally describe that**
5  **process?**
6      A.    My role in that process was, as part
7  of the role in Treasury of liquidity reporting,
8  we had an understanding about the secured
9  funding of LBI.  We also had because it was a
10 source, it was a use of unsecured funding about
11 the unencumbered assets, meaning assets funded
12 unsecured left in LBI, so it was I was asked
13 during that week to help various people with
14 trying to identify assets that could be
15 transferred to Barclays.
16     **Q.    Do you recall whether it was earlier**
17 **in the week or later in the week that you were**
18 **asked to be involved in this process?**
19     A.    I don't remember when it started.  I
20 was clearly involved starting the 18th.  It may
21 have been earlier.
22     **Q.    And who had asked you to become**
23 **involved in this process?**
24     A.    I don't recall precisely.  My best
25 recollection would have been Paolo Tonucci.

## Page 70

HIGHLY CONFIDENTIAL - R. AZERAD

1
2      Q.    And do you recall who else was
3  involved in this process?
4      A.    Well, Martin Kelly was involved, Gerry
5  Reilly was involved, Ian Lowitt was involved,
6  Frank Pearn was involved, and Operations
7  obviously was involved as well.  So people like
8  Jim Hraska would have been involved as well.
9      Q.    And on Friday, the 19th of September,
10  do you recall any discussions about identifying
11  a specific target number of additional assets to
12  be identified for transfer to Barclays?
13      A.    I don't recall specific -- I don't
14  recall specifically a target number.  I do
15  recall that there was additional work on the
16  19th and in subsequent days about assets to be
17  transferred to Barclays.
18      Q.    And you were involved on the 19th and
19  on subsequent days in that process of
20  identifying additional assets to be transferred
21  to Barclays, correct?
22      A.    I was, although my role became more of
23  a project -- more of a coordinator as opposed to
24  a data provider.  One of the issues that we
25  faced on the 19th, and it did not get resolved

TSG Reporting - Worldwide (877) 702-9580

## Page 71

HIGHLY CONFIDENTIAL - R. AZERAD

1
2  prior to when the transaction closed, was that
3  we relied, to do some of the analysis, we relied
4  on information provided by JPMorgan Chase, and I
5  believe starting on the 19th, JPMorgan Chase did
6  not provide us with the information.  So the
7  data that I had access to was not -- was no
8  longer reliable and Operations became the
9  primary source of data.
10      Q.    Starting on the 19th, were you relying
11  also on information provided by Bank of New
12  York?
13      A.    Starting on the 19th, I recall having
14  a series of e-mail exchanges with people at
15  Barclays about trying to understand which assets
16  had been transferred between Lehman and
17  Barclays.  There were, at least from the Lehman
18  perspective, I obviously cannot talk on behalf
19  of Barclays, there were some uncertainty about
20  which assets had been received by Barclays.  So
21  the files that Barclays sent me may have been
22  created by Bank of New York.  That I don't know.
23  I just thought of them as being the Barclays
24  file.
25      "I don't recall" as opposed to "I

TSG Reporting - Worldwide (877) 702-9580

## Page 72

HIGHLY CONFIDENTIAL - R. AZERAD

1
2  don't know."
3      Q.    Do you recall any process of
4  reconciling the Barclays file or the Bank of New
5  York file against the Lehman information
6  concerning the same assets?
7      A.    Well, we had a list of assets that we
8  thought got transferred to Barclays.  Barclays
9  had a list of assets that it claimed to have
10  received.  So part of our job was to compare the
11  two files and to flag out any differences.
12      Q.    And were you involved in that process?
13      A.    I was involved in that process.
14      Q.    And tell me roughly how long that
15  process took to run its course.
16      A.    I don't recall when this process
17  ended.  At some point what I recall is that the
18  process migrated to operations.  Again, just to
19  repeat myself, after the 19th, Treasury, for a
20  variety of reasons, was no longer a reliable
21  source of information.
22      So we had people who were able to do
23  what I would call number-crunching analysis, but
24  we had to rely on other people's files to do the
25  data, and to the extent that there was need for

TSG Reporting - Worldwide (877) 702-9580

## Page 73

HIGHLY CONFIDENTIAL - R. AZERAD

1
2  a conciliation, it would have been done by
3  Operations I believe within Lehman.
4      Q.    I've handed you a multi-page document
5  previously marked as Exhibit 2.  Take a look at
6  the cover e-mail and the attached spreadsheets.
7  Let me know when you're done.
8      (Document review.)
9      A.    Before we review the document, if I
10  may ask a question.  Is a question going to
11  be on the spreadsheet, and at which point we need
12  to review the spreadsheet carefully, or is it
13  going to be on the cover e-mail?
14      Q.    Let me start with the cover e-mail,
15  and I think what's the first page of the
16  spreadsheet or what appears to be a summary
17  page.
18      A.    Okay.
19      Q.    I'll start there, but I might ask you
20  questions about the spreadsheet later, so let's
21  take it in stages.
22      A.    Okay.  I will then do just a cursory
23  review of the spreadsheet.
24      Q.    That's good idea.
25      (Document review.)

TSG Reporting - Worldwide (877) 702-9580

Page 82

HIGHLY CONFIDENTIAL - R. AZERAD

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  Barclays became -- was already, but became one
3  of the largest funding source of LBI, was to try
4  to understand what exactly -- what exactly
5  Barclays and Lehman entered into, not -- just on
6  that particular day, not -- not the broad
7  context.
8      Q.    And that process, is that the same
9  process you were testifying about before, which
10 is going through and identifying assets that
11 were available to be transferred to Barclays?
12     A.    No, these were two separate things.
13 They were what I would call, even though the
14 term is probably slightly ironic, but there is
15 what I would call the "business as usual
16 liquidity reporting," which that week was
17 anything but usual, and we were trying to
18 understand the liquidity position of LBI because
19 LBI's position that week was precarious, was
20 fragile, and so getting a handle of just where
21 LBI's liquidity position was a critical
22 mission.
23          That's -- but that's separate from
24 what I would call the special project or the
25 one-off requests that I was working on in

TSG Reporting - Worldwide (877) 702-9580

Page 83

HIGHLY CONFIDENTIAL - R. AZERAD

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  conjunction with a transaction between Lehman
3  and Barclays.
4      Q.    Was part of what you were doing, these
5  two different aspects of the work you were doing
6  on the 18th and 19th, do I understand it the
7  assets that were being pledged under the
8  Barclays repo could in fact be purchased by
9  Barclays?
10         MR. STERN:  Objection.
11     A.   No.
12         MR. STERN:  Objection to the form.
13     A.   Again, I don't want to go, because --
14 into kind of legal terms of purchase.  I prefer
15 to use the word "transfer."
16     Q.    So were you trying to get an
17 understanding of the assets that were being
18 pledged in the Barclays -- could be transferred
19 to Barclays?
20     A.   Yes, they could be transferred to
21 Barclays.
22     Q.    And that was part of what you were
23 trying to do, identify if they could be
24 transferred to Barclays?
25     A.   Identify assets that could be

TSG Reporting - Worldwide (877) 702-9580

Page 84

HIGHLY CONFIDENTIAL - R. AZERAD

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  transferred to Barclays.
3      Q.    And who was helping you in that task?
4      A.    There were various people in my team.
5  I think that one -- I mean, the one name that
6  kind of stuck in my head on the 18th, because
7  she also worked very late that night, was Cindy
8  Aprigliano, A-P-R-I-G-L-I-A-N-O.
9      Q.    Anyone else you remember?
10     A.    I believe that Cindy had under her a
11 brand-new analyst who just started at Lehman a
12 few months ago by the name of George Hawes,
13 H-A-W-E-S.  Cindy and George were typically
14 doing analysis on kind of secured funding.
15         There were other people also involved.
16 I don't remember whether they were involved that
17 particular -- that particular night of the 18th.
18         (Exhibit 176, a document bearing Bates
19 Nos. 10331692, marked for identification, as
20 of this date.)
21     Q.    I've handed you a one-page document
22 marked Exhibit 176.  Let me know when you're
23 done reviewing it.
24         (Document review.)
25     A.    Okay.

TSG Reporting - Worldwide (877) 702-9580

Page 85

HIGHLY CONFIDENTIAL - R. AZERAD

1  HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.    Have you seen this document before
3  today?
4      A.    I don't recall precisely, but clearly
5  the fact that my name is mentioned means that it
6  must have been sent to me.
7      Q.    And do you see this is a series of
8  e-mails concerning the pricing and market
9  value --
10     A.    Uh-huh.
11     Q.    -- of the Barclays repo collateral?
12         MR. STERN:  Objection to the form.
13     A.    I'm not -- well, it's hard to tell
14 without looking at the attachment.  What -- what
15 this e-mail traffic seems to be focused on was
16 trying to find a price for Cusips, but again,
17 containing the -- I'm assuming containing the
18 attached file, which I have not reviewed.
19     Q.    And do you have a recollection of a
20 process on the 19th of September where you were
21 retrieving GFS pricing for certain securities in
22 connection with the Lehman/Barclays transaction?
23     A.    We were trying to -- I think, as I
24 mentioned earlier, GFS was our primary source of
25 data in Treasury, and GFS had market value

TSG Reporting - Worldwide (877) 702-9580

Page 86

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2   information in the securities.
 3       Q.   And do you have a recollection of a
 4   process on the 19th where you were getting
 5   information from GFS for the purpose of valuing
 6   the assets in the Lehman/Barclays transaction?
 7       A.   The report that we were providing on
 8   the 19th to the extent that it came from Treasury
 9   as opposed to us using someone else's file,
10   would have been most likely sourced from GFS.
11       Q.   Do you recall there being any
12   discussion on the 19th about whether you were
13   going to use GFS pricing or Bank of New York
14   pricing or some other pricing for these assets?
15       A.   No, on the 19th -- I don't recall.
16   What I recall on the 19th is that we were
17   operating under a great deal of uncertainty
18   primarily because we did not receive the file
19   from JPMorgan or information from JPMorgan.
20   That's what I primarily recall from what
21   happened on the 19th.
22       Q.   Was it your understanding on the 19th
23   that the Fed repo facility was terminated?
24       MR. STERN:  Objection to the form.
25       A.   During the -- 19th is a Friday, I
```

TSG Reporting - Worldwide (877) 702-9580

Page 87

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2   believe.  During the 19th I believe I became
 3   aware that there would be a hearing in fronts of
 4   the judge that night, but I'm not -- I was, to
 5   the best of my recollection, I was not aware of
 6   the fact that you presented, that the Fed
 7   facility would be canceled.
 8       Q.   Was any Fed borrowing in place on
 9   Friday, the 19th?
10       A.   I don't recall.  There were -- one of
11   the earlier exhibits that you showed had like
12   three Fed borrowing, the OMO, the TSLF and the
13   PDCF.  I don't recall where we stood.  My --
14   there must be reports, but I don't remember
15   today.
16       Q.   Do you have any recollection that the
17   Barclays repo facility that we're talking about
18   on the 18th, when that went into place, the Fed
19   facility, the borrowing under the Fed facility
20   was reduced down to zero?
21       A.   Not in the way that you cannot -- not
22   in the way that you -- that you describe it.  On
23   the 18th, typically the -- if you go back prior
24   to the 18th, typically the Fed would be funding
25   what was left, what --
```

TSG Reporting - Worldwide (877) 702-9580

Page 88

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2   I shouldn't say that.  Can you just
 3   repeat the question?
 4       (Record read.)
 5       A.   I don't recall.
 6       Q.   So, as far as your recollection goes,
 7   on Friday, the 19th, there could have been
 8   borrowings under the Barclays repo as well as
 9   under the Fed facility?
10       A.   No, on the 19th, I would have known
11   how LBI would have been, to the best of my
12   knowledge, and there were, as I said, there was
13   uncertainty, but I would have known that there
14   were -- that the PDCF would not -- would have
15   been reduced to zero.
16       What I was trying to say is that I
17   would have looked at the -- I would have looked
18   at the outputs.  This is kind of how LBI was
19   funded that night.  I was -- I don't recall
20   having any discussion of the Barclays repo
21   resulting in the Fed facility being reduced to
22   zero.
23       Q.   Okay.  The issues you referenced
24   before about having -- not getting the data from
25   JPMorgan on the 19th?
```

TSG Reporting - Worldwide (877) 702-9580

Page 89

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2       A.   Uh-huh.
 3       Q.   Did Lehman get, subsequent to the
 4   19th, data from JPMorgan with market value
 5   calculation?
 6       A.   It may have, but at that point I don't
 7   think that when I transferred from Lehman to
 8   Barclays that JPMorgan provided the information.
 9   It may have provided it subsequent to that, but
10   I'm not aware of it.  I mean, just --
11       Q.   Finish your answer.  Go ahead.
12       A.   I just want to add one thing.  I do
13   recall receiving a file on Sunday, not directly,
14   but indirectly, but the file was from JPMorgan,
15   but the file had some errors in it which was --
16   and I don't think that we -- and that was, that
17   was I believe having to do with securities held
18   by JPMorgan, but it was, because it had errors
19   in it, it was not deemed to be a dependable
20   file.
21       Q.   Do you remember from whom you got that
22   file?
23       A.   No, I don't remember.
24       Q.   And your recollection is that the file
25   that you got on that Sunday did not have
```

TSG Reporting - Worldwide (877) 702-9580

Page 90

HIGHLY CONFIDENTIAL - R. AZERAD

1      HIGHLY CONFIDENTIAL - R. AZERAD
2  information concerning the Barclays repo
3  securities?
4      A.   To my recollection, the file that I
5  received on Sunday had to do with securities
6  held by JPMorgan.
7      Q.   So not related to Barclays' repo, is
8  that what you're saying?
9      A.   Well, you can always create a link
10  between the two, but not -- but in a stricter
11  sense, no.
12      Q.   I'm just trying to understand --
13      MR. STERN:  In other words, related to
14  is a very broad concept.
15      Q.   Let me ask you then, did the JPMorgan
16  valuation that you received that Sunday contain
17  valuations of the securities that had been
18  pledged by Lehman to Barclays under the Barclays
19  repo?
20      A.   No.  Again, it refers to my knowledge,
21  it refers to securities held by JPMorgan.  It
22  would have been -- it would have been a fact
23  which would have been helpful had it been
24  accurate because we were trying to understand
25  which -- to reconcile what we thought was

TSG Reporting - Worldwide (877) 702-9580

Page 91

1      HIGHLY CONFIDENTIAL - R. AZERAD
2  transferred to Barclays and what Barclays said
3  was transferred to it, and obviously part of the
4  uncertainty is what security did JPMorgan send
5  to Barclays versus what securities did JPMorgan
6  had kept.
7      So having information related to the
8  securities that JPMorgan had kept would have
9  been helpful by just kind of -- in us trying to
10  understand what was transferred to Barclays from
11  our perspective, but there were, from what I
12  recall, errors in the file.
13      Q.   And what's your understanding about
14  the nature of the errors?  Were they valuation
15  errors?  Identification of Cusip errors?  What
16  was the nature of the errors?
17      A.   From what I remember, they were
18  double-counting of securities.
19      Q.   Were you involved in any efforts to
20  rectify those errors, to have a conversation
21  with JPMorgan to correct the file?
22      A.   From what I recall, when JPMorgan sent
23  us the file, it was not -- it was part of an
24  ongoing negotiation between Lehman and JPMorgan.
25  I was not part of those discussions.

TSG Reporting - Worldwide (877) 702-9580

Page 92

1      HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   I've handed you a two page document
3  marked as Exhibit 157A.  Take a moment to look
4  at it.  Let me know when you're done.
5      (Document review.)
6      A.   I'm done.
7      Q.   Have you seen this document before
8  today?
9      A.   No, I have not.  I don't believe I was
10  copied on any of these e-mails.
11      Q.   I just want to ask you a question
12  about the topic that's discussed in one of these
13  e-mails.  That's in the first -- the second
14  e-mail on the first page.
15      A.   The e-mail from David Aronow to Paolo
16  Tonucci?
17      Q.   Yes, with a copy to Ian Lowitt.  And
18  there's a reference in the first paragraph of
19  that e-mail that "Barclays' Operations team has
20  recalculated the value of the collateral that it
21  received from us last night and they are more
22  than fully collateralized, including the
23  haircuts applied," do you see that?
24      A.   Uh-huh.
25      Q.   Did you have any discussions with

TSG Reporting - Worldwide (877) 702-9580

Page 93

1      HIGHLY CONFIDENTIAL - R. AZERAD
2  anyone at Barclays on the 19th about Barclays
3  being more than fully collateralized, including
4  the haircuts applied?
5      A.   No, I don't remember.
6      Q.   Do you have any reason to believe that
7  Barclays was not fully collateralized on
8  September 19th?
9      MR. STERN:  Objection to the form.
10      A.   I believe, although I don't have
11  detailed knowledge, but the transaction on the
12  18th was done under the tri-party repo agreement
13  between Lehman and Barclays and it would have
14  been under a tri-party repo agreement the
15  responsibility of a custodian to make sure that
16  Barclays was appropriately collateralized.
17      Q.   And do you have any reason to believe
18  that Barclays wasn't fully collateralized on the
19  19th?
20      MR. STERN:  Objection to the form.
21      A.   I, again, to repeat myself, my
22  understanding, which may not be what happened,
23  but my understanding was that the transaction on
24  the 18th was done under a tri-party repo
25  agreement and, therefore, it would have been

TSG Reporting - Worldwide (877) 702-9580

---

Page 94

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2    JPMorgan Chase's responsibility to make sure
 3    that there was -- I believe JPMorgan was a
 4    custodian -- to make sure that there would be
 5    appropriate collateralization. This is part
 6    of -- this is part of a custodian's
 7    responsibility.
 8          Q.   I'm just asking a slightly different
 9    question. In all the things that you have heard
10    and looked at, do you have any reason to believe
11    that Barclays was not fully collateralized on
12    the 19th?
13          MR. STERN:  Objection to the form.
14          Q.   Have you seen any documents that
15    suggested that to you?  Has anyone said that to
16    you?
17          MR. STERN:  Objection to the form.
18          A.   I don't recall.
19          Q.   Was it your understanding on the 19th
20    that Lehman was standing down from transferring
21    any further collateral to Barclays?
22          A.   Can you -- I'm sorry.  I'm not
23    familiar with the word "standing down."  Can you
24    just describe what you mean?
25          Q.   Let's put the exhibit aside.  Was it
```

TSG Reporting - Worldwide (877) 702-9580

---

Page 95

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2    your understanding midday on the 19th that
 3    Lehman was stopping any further transfers of
 4    collateral to Barclays?
 5          A.   No, that was not my understanding.
 6          Q.   Your understanding was the opposite,
 7    correct?
 8          A.   I was continuing to do work on the
 9    19th of securities that could be transferred
10    from Lehman to Barclays.
11          Q.   Was it your understanding that the
12    securities that were going to be transferred
13    from Lehman to Barclays on the 19th, that those
14    were separate and apart from the repo
15    transaction?
16          MR. STERN:  Objection to the form.
17          A.   What do you mean by the "repo
18    transaction"?
19          Q.   The Barclays repo transaction on the
20    18th that we've been talking about.
21          MR. STERN:  Objection to the form.
22          A.   My understanding -- well, I was led to
23    believe, because I was asked to continue working
24    on the 19th on a list of assets that could be
25    transferred from Lehman to Barclays.  So I
```

TSG Reporting - Worldwide (877) 702-9580

---

Page 96

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2    was --
 3          That's my answer.
 4          Q.   And in connection with that effort on
 5    the 19th, did anyone ever say to you that the
 6    assets that you were identifying to be
 7    transferred from Lehman to Barclays were in
 8    connection with the Barclays repo transaction?
 9          A.   So just to rephrase your question,
10    it's not that -- I knew that these assets were
11    going to be transferred.  What I said is that
12    they could be transferred.  This was the
13    purpose, this was the purpose of my analysis was
14    available for transfer or could be transferred.
15          Q.   Now do you have my question --
16          A.   So, to go back to your question, the
17    repo transaction on the 18th was done on the
18    18th and it was done.  So, to the extent that
19    there were -- I was working on assets outside of
20    the repo transaction of the 19th that could be
21    transferred to Barclays.
22          MR. STERN:  Are we done with 157A?
23          MR. TAMBE:  For now.
24          MR. STERN:  You're handing the witness
25    Exhibit 151A?
```

TSG Reporting - Worldwide (877) 702-9580

---

Page 97

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2          Q.   Yes.  Mr. Azerad, I've handed you a
 3    three-page document marked Exhibit 151A.
 4          A.   Uh-huh.
 5          Q.   Take a look at that document.  Let me
 6    know when you're done.
 7          A.   Sure.
 8          (Document review.)
 9          A.   Before you start your question on
10    Exhibit 151A, I'm not -- it's not clear to me
11    that the third page of the attachment, the final
12    page, is related to this series of e-mails, but
13    perhaps it is.
14          Yes, I guess it is.  The details of
15    15c3.  That's fine.  I'm sorry, I didn't see the
16    beginning.
17          MR. STERN:  That's fine.  Why don't
18    you take your time and read all of these
19    e-mails.
20          Q.   Let me know when you're done reviewing
21    those e-mails.
22          A.   Okay.  I'm done.
23          Q.   Do you recall having seen this
24    collection of documents before today?
25          A.   Yes, I recall seeing this document
```

TSG Reporting - Worldwide (877) 702-9580

Page 98

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    before today.
3        Q.    And this is in connection with the
4    preparation of the opening balance sheet that
5    you talked about before, correct?
6        A.    That is correct.
7        Q.    And you were involved in that process,
8    correct?
9        A.    I was involved in that process.
10       Q.    Drawing your attention to your e-mail,
11   this is the one sort of the third e-mail down on
12   the page 1.
13       A.    Is that the one sent at 10:27?
14       Q.    That's the one sent at 10:27.  And
15   this is September 20, the Saturday, correct?
16           You have a calendar there?
17       A.    Based on the calendar, yes, it is.
18       Q.    And in your e-mail to Martin Kelly and
19   the others, were you attempting to identify
20   broadly the components of the asset side of the
21   balance sheet?
22       A.    That is, yeah, my -- what I was trying
23   to do was two things.  I was looking at the
24   inventory -- at the inventory being transferred
25   and also the 15c3-3 claim as well.

Page 99

HIGHLY CONFIDENTIAL - R. AZERAD
1
2        Q.    Okay.  In your e-mail from 10:27,
3    which of those -- do you have the 15c3-3 claim
4    included as part of the items that you're
5    listing there?
6        A.    Not as part of my e-mail as of 10:27.
7        Q.    Okay.
8        A.    Well, let me step back.
9            MR. STERN:  I think what's confusing
10   is there's two e-mails by Mr. Azerad.
11           MR. TAMBE:  No, there's only one timed
12   10:27.  There's only one timed 10:27.
13           MR. STERN:  I see what you're saying,
14   but there's two e-mails in this document
15   from Mr. Azerad.  I think that's the
16   confusion.
17           MR. TAMBE:  No, it's not.  That's the
18   confusion you're adding.
19           MR. STERN:  I'm not adding confusion.
20   I'm just trying to clarify.
21       A.    There are some question of things
22   which I'm kind of trying to recollect, which I
23   don't have a good recollection.
24           MR. STERN:  Let me just hear what the
25   question is.  What is the question?

Page 100

HIGHLY CONFIDENTIAL - R. AZERAD
1
2         (Record read.)
3        A.    Yes, there is one somewhat confusion
4    is as follows:  In the first sentence of that
5    e-mail, it says, "Classifications of the assets
6    by asset class should be done by end of day
7    today."  What I don't recall is what assets I
8    meant when I was referring to that.
9            Then I specifically made two -- I
10   specifically listed two assumptions it was going
11   to use to do the work, neither of which had to
12   do with the 15c3-3, both of which had to do with
13   transfers of securities.
14           So the reason I was confused is
15   because at the top of the e-mail, there was a
16   discussion of the "classification of the assets by asset
17   when the "classification of the assets by asset
18   class" mean.  There's -- there's two ways in
19   which I can describe it, one which would
20   include, the other one which would not include,
21   and I don't recall which is the correct
22   interpretation.
23       Q.    But just focusing on your e-mail at
24   10:27, you had two components there, right?  You
25   had the repo and then you had the non-actionable

Page 101

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    box, correct?
3        A.    These were the two assumptions.
4        Q.    And then Mr. Tonucci, in response to
5    your e-mail of 10:27, states, "We also need to
6    add the 15c3 cash in the receivables."  Do you
7    see that?
8        A.    Yes, I see that at 10:31.
9        Q.    And in a later iteration of your
10   calculation, did you in fact add the 15c3 cash
11   as part of the calculation?
12           MR. STERN:  Objection to the form.
13       A.    I think when I look at my first
14   e-mail, the one sent at 10:34, I would say that
15   I didn't have the details about how the lockup,
16   which is either cash and/or securities, so I
17   didn't have the mix of a lockup behind the
18   15c3-3.
19           If I look at the spreadsheet attached
20   on the last page, it's -- the last line above
21   the end footnote says "Total Segregated."  It
22   didn't -- I don't think it has a breakdown how
23   the segregation was done.
24       Q.    At some point after you wrote these
25   e-mails or received these e-mails in Exhibit

Page 102

HIGHLY CONFIDENTIAL - R. AZERAD

1
2  151A did you identify the amount of 15c3-3
3  amounts that would be included on the opening
4  balance sheet?
5      A.   This is -- this is what I recall:
6  There was some uncertainty, understandable
7  uncertainty, but nevertheless, uncertainty,
8  about the amount of cushion, what I would call
9  cushion, but I want to -- because it's a vague
10 term, I want to kind of define it in the 15c3-3.
11     At some point in the process, and I
12 don't remember when, I was given a number which
13 was somewhere between 7 and 8 hundred million
14 dollars to put on the opening balance sheet.
15 And now let me define the word "cushion."  The
16 15c3-3 obviously is something that
17 broker-dealers have to do per the regulations.
18 It typically represents money segregated which
19 would present customer assets which, by
20 segregation, that's the way that the
21 broker-dealer would protect these assets.
22     There is what I would call the
23 cushion, which is that the broker-dealer, for a
24 variety of reasons, some of them mandated by the
25 S.E.C., some of them just as part of the normal

TSG Reporting - Worldwide (877) 702-9580

Page 103

HIGHLY CONFIDENTIAL - R. AZERAD

1
2  process, would typically segregate more assets
3  than what it has to, strictly speaking, to
4  protect customer assets.
5      If you look at the spreadsheet
6  attached on page 3, it talks about the 3 percent
7  ADI, that's one source of the cushion, and then
8  it also talks of specifically the word "cushion"
9  is mentioned twice in the spreadsheet, one as
10 for the customer, the other one for PAIB.
11     This is what I meant when they said
12 that there was uncertainty around this type of
13 cushion.
14     Q.   You said at some point you were
15 provided a number of 700 million or 800 million?
16     A.   Between -- I don't exactly remember
17 the number, but it was between the 700 and 800
18 number.
19     Q.   Who provided that number to you?
20     A.   I don't remember.  It may have been
21 Paolo Tonucci.  It may have been Martin Kelly.
22 I don't remember.
23     Q.   Once that number was provided to you,
24 did you include it on the draft of the balance
25 sheet that you were preparing?

TSG Reporting - Worldwide (877) 702-9580

Page 104

HIGHLY CONFIDENTIAL - R. AZERAD

1
2      A.   I don't remember if I -- if I kind of
3  revised the draft of the balance sheet
4  subsequent to that, but if I had, then, yes, I
5  will have used that number.
6      Q.   Going back to your 10:27 e-mail on
7  Exhibit 151A?
8      A.   Uh-huh, yes.
9      Q.   The bottom half of the page, your
10 first item is the repo with Barclays as of
11 Thursday night, do you see that?
12     A.   Yes.
13     Q.   And you have in parentheses 49
14 billion?
15     A.   Uh-huh.
16     Q.   Right?
17     A.   Yes.
18     Q.   And you have that broken out as 42
19 billion of securities and 7 billion of cash, do
20 you see that?
21     A.   Yes.
22     Q.   The 42 billion of securities, do you
23 recall what your valuation was based on?
24     MR. STERN:  Objection to the form.
25     A.   I believe that, and again, if you read

TSG Reporting - Worldwide (877) 702-9580

Page 105

HIGHLY CONFIDENTIAL - R. AZERAD

1
2  the bottom of the e-mail, the "P.S." section, it
3  was based on the repo file sent by Operations on
4  Friday morning and the box report, which relied
5  on GFS as of Friday morning.
6      Q.   And do you recall the sourcing of the
7  prices that were in those reports, the Ops --
8  the files sent by Ops and the box report?
9      A.   I don't remember the source of the
10 pricing sent by Ops.  The box report should have
11 been, assuming that this was our usual box
12 report, should have been sourced from GFS.
13     Q.   When you referred to the repo file
14 sent by Ops, is there a particular file or
15 particular person that you're referring to when
16 you refer to repo file sent by Ops?
17     A.   I don't remember precisely what
18 happened, meaning which person in Ops sent the
19 file.  What I do remember is, again, because --
20 just to repeat myself -- because Chase did not
21 provide us with the information, meaning the --
22 on the normal day, Chase would provide us with a
23 file that would have how the securities were
24 being financed.  Chase did not provide us with
25 this information on the 19th, and so we had to

TSG Reporting - Worldwide (877) 702-9580

Page 106

HIGHLY CONFIDENTIAL - R. AZERAD

1
2  rely on -- we could not rely -- I'm sorry, I was
3  interrupting myself.  We could not rely on our
4  usual source of data, which was GFS.  We had to
5  rely on Operations to give us this information.
6        (Exhibit 177, a document bearing Bates
7    Nos. 303398 with attachment, marked for
8    identification, as of this date.)
9    Q.  Sir, I have placed before you a
10  three-page document marked Exhibit 177.  Take a
11  moment to look at it.  Let me know when you're
12  done.
13   A.  Okay.
14   Q.  You done?
15   A.  No, I'm not done.  I'm just reading
16  through it.
17   Q.  Let me know when you're done.
18       (Document review.)
19   A.  I'm done.
20   Q.  If you look at the back end of this
21  document, an e-mail chain, it starts with some
22  of the same e-mails about the balance sheet that
23  we were looking at before.  See that?
24   A.  Yes.
25   Q.  And there's a discussion on page 1 and

TSG Reporting - Worldwide (877) 702-9580

---

Page 107

HIGHLY CONFIDENTIAL - R. AZERAD

1
2  about the reserve calculation on the 15c3
3  amounts, do you see that?
4    A.  Yes.
5    Q.  Did you play any role in doing the
6  reserve calculations on the 15c3 amounts?
7    A.  Can you -- what do you mean by "role"?
8    Q.  Did you do the calculations, the
9  reserve calculations?
10   A.  No, I was -- I did not do the
11  calculation.
12   Q.  Who did?
13   A.  It would have been someone in Tony
14  Stucchio's group, who is -- I'm assuming Tony
15  Stucchio must have been listed.
16   Q.  Anthony Stucchio?
17   A.  Anthony Stucchio.
18   Q.  What group was that?
19   A.  He was in the -- head of Regulatory
20  Reporting at Lehman.  He was under Martin Kelly.
21  I don't know if he was a direct report of Martin
22  Kelly or whether -- but he was in Martin Kelly's
23  group.
24   Q.  And would those reserve calculations
25  have been provided to you to be included on the

TSG Reporting - Worldwide (877) 702-9580

---

Page 108

HIGHLY CONFIDENTIAL - R. AZERAD

1
2  balance sheet?
3    A.  It would have -- it would have been
4  one of the inputs that I would have used to
5  calculate the cushion, which, again, I don't
6  want to repeat myself, but as I defined it in
7  one of my previous answers.
8    Q.  One of the people on this e-mail chain
9  is someone called Irina Veksler?
10   A.  Yes.
11   Q.  Do you know who that is?
12   A.  Irina Veksler was reporting to me.
13  She was part of the Liquidity Reporting Team.
14  She was involved that weekend in drafting the
15  opening balance sheet.
16   Q.  Sir, I've handed you a two page
17  document marked Exhibit 147A.
18   A.  Yes.
19   Q.  Take a moment to review that.  I'll
20  ask you a couple questions.
21       (Document review.)
22   A.  I've read the e-mail.
23   Q.  Starting from the back of the e-mail
24  chain, it's the e-mail that begins at the bottom
25  of page 1 over to page 2?

TSG Reporting - Worldwide (877) 702-9580

---

Page 109

HIGHLY CONFIDENTIAL - R. AZERAD

1
2    A.  The e-mail sent at 6:45 by Jasen Yang?
3    Q.  That's right, to you and others.
4    A.  Yes.
5    Q.  And in that e-mail is a discussion
6  about a file or schedule produced by Barclays'
7  Ops of the collateral currently held at BONY, do
8  you see that?
9    A.  Yes.
10   Q.  Do you recall having any discussions
11  with Jasen Yang about the subject matter of this
12  e-mail?
13   A.  I was involved on the 19th and in
14  subsequent days in trying to understand which
15  securities had been transferred to Barclays.  It
16  was a difficult exercise from the Lehman
17  standpoint because Chase did not provide us with
18  this file, which would have been the case not
19  under kind of normal -- under normal
20  circumstances.
21       So we were -- so what we did, for lack
22  of a better word, as a second best solution was
23  asking Barclays to send us their file.
24   Q.  And then the first e-mail on this
25  page, page -- the first page of Exhibit 147A, do

TSG Reporting - Worldwide (877) 702-9580

Page 110

HIGHLY CONFIDENTIAL - R. AZERAD

1
2    you see that as an e-mail from you back to Jasen
3    Yang providing a file back to Jasen?
4        A.   I don't recall exactly what it says,
5    but the way I read the e-mail now, the one at
6    6:15, I'm assuming that's the one you're
7    referring to from my BlackBerry?
8        Q.   No, I'm actually referring to the
9    e-mail at the very top of the page.
10       A.   I'm sorry.
11       Q.   The one at 7:19.
12       A.   The one at 7:19?
13       Q.   Yes.
14       A.   Yes, the 1.9 billion I had -- was not
15   part of a reconciliation process.  This was --
16   this was -- I mentioned that I was, on the 19th
17   and in subsequent days, I was involved in trying
18   to identify additional collateral that could be
19   transferred to Barclays, and I don't remember
20   precisely what the 1.9 billion refers to.
21       One of the former -- one of the
22   previous exhibits that you showed me also had a
23   1.9 billion which was described as being the
24   non-actionable box, which is a Lehman term.  So
25   let me -- I just want to kind of define it.  The

TSG Reporting - Worldwide (877) 702-9580

Page 111

HIGHLY CONFIDENTIAL - R. AZERAD

1
2    non-actionable box is a box of assets which is
3    financed on an unsecured basis.  The reason it's
4    called non-actionable is because it's -- as part
5    of our analysis of the box, we try to separate
6    assets which we thought were left in the box,
7    left unencumbered, but could be financed from
8    assets left in the box, but couldn't be financed
9    on a "business as usual" basis.  That could be
10   the same 1.9 billion.
11       (Exhibit 178, an e-mail from M. Kelly
12   to R. Azerad dated September  20, 2008, with
13   attachment, marked for identification, as of
14   this date.)
15       Q.   Sir, I handed you a two-page document
16   marked Exhibit 178.
17       A.   Let me read the document.
18       Q.   Let me know when you're done.
19       (Document review.)
20       A.   I've read the document.
21       Q.   This is a document you've seen before
22   today?
23       A.   Yes, I've seen this document before
24   today.
25       Q.   And the attachment to the document is

TSG Reporting - Worldwide (877) 702-9580

Page 112

HIGHLY CONFIDENTIAL - R. AZERAD

1
2    a draft version of the balance sheet that you
3    were working on that weekend, correct?
4        A.   That is correct.  I was not the only
5    person working on the draft, but I was one of
6    the contractors.
7        Q.   And focusing on the e-mail in the
8    first page of the document, the e-mail from
9    Brett Beldner to Martin Kelly?
10       A.   Yes.
11       Q.   With you as a copy?
12       A.   Uh-huh.
13       Q.   That e-mail states that you focused on
14   the asset side of the balance sheet; is that
15   right?
16       A.   That is correct.
17       Q.   Going to page 2 of the exhibit.
18       A.   Yes.
19       Q.   And focusing on the asset side, you've
20   got a line item for cash and cash equivalent, do
21   you see that?
22       A.   Yes.
23       Q.   And then you have a second category
24   for inventory, do you see that?
25       A.   Yes.

TSG Reporting - Worldwide (877) 702-9580

Page 113

HIGHLY CONFIDENTIAL - R. AZERAD

1
2        Q.   And the valuation on the inventory is
3    44,846, correct?
4        A.   Yes.
5        Q.   I assume that's in millions?
6        A.   That is a fair assumption.
7        Q.   And then you have a line item for
8    receivables with, in parentheses, 15c3 lockup
9    release of a billion, right?
10       A.   Yes.
11       Q.   The inventory total number that you
12   have there, 44,846, do you recall what pricing
13   sources that was based on?
14       A.   I believe that you had the information
15   in one of the previous exhibits.
16       Q.   So the Ops file and the box report?
17       A.   That is, again, I -- that's what I --
18   in that previous exhibit, which I'm assuming was
19   sent prior to this e-mail, this is what I claim
20   we would have been using.  I don't recall
21   whether I would have changed my source
22   information, but that's what I claim at that
23   point.  So, to the best of my recollect, this is
24   what I used.
25       Q.   And to the best of your recollection,

TSG Reporting - Worldwide (877) 702-9580

---

Page 114

HIGHLY CONFIDENTIAL - R. AZERAD

1
2    during that weekend, the weekend of, what is it,
3    the 20th/21st, do you recall changing your
4    pricing source information for the pricing of
5    the inventory?
6        A.    I don't recall.
7        Q.    On the liability side of the balance
8    sheet, did you play any role in providing that
9    information?
10       A.    If any role I played was for 45
11   billion for the repo, which is the part of the
12   financing for cash received from Barclays.
13       Q.    There's a line item on that balance
14   sheet, page 2 of Exhibit 178, says equity, 3.346
15   billion.  Do you see that?
16       A.    Yes, I see.
17       Q.    Do you have any understanding as to
18   what that line item relates to?
19       A.    No.  I mean, it's, besides what it
20   says here, the e-mail that you -- based on the
21   e-mail that you provided in Exhibit 178 on the
22   first page, I'm assuming that this part of the
23   balance sheet was created by Brett Beldner.
24       Q.    And what was Brett Beldner's position?
25       A.    He was the head of the U.S. Accounting

TSG Reporting - Worldwide (877) 702-9580

---

Page 115

HIGHLY CONFIDENTIAL - R. AZERAD

1
2    Policy at Lehman Brothers, reporting to Mary
3    Stewart, who reported to Martin Kelly.
4            (Exhibit 179, an e-mail chain, the
5        earliest in time from G. Reilly to K. Wong,
6        dated September 22, 2008, with attachment,
7        marked for identification, as of this date.)
8        Q.    Keep that one before.  I'm going to
9    hand you an exhibit marked 179.
10       A.    Okay.
11           (Document review.)
12       A.    I've seen this Exhibit 179.
13       Q.    I just want to -- if you could turn to
14   page 2 of Exhibit 179.
15       A.    Yes.
16       Q.    And it's similar in form to page 2 of
17   Exhibit 178 that we were looking at before,
18   correct?
19       A.    That is correct.
20       Q.    Okay.  So there's a slight difference
21   in the total values as well as some of the line
22   items, do you see that?
23       A.    Yes, I see that.
24       Q.    Okay.  Do you have any understanding
25   of the line item and assets that reads

TSG Reporting - Worldwide (877) 702-9580

---

Page 116

HIGHLY CONFIDENTIAL - R. AZERAD

1
2    "Derivatives and Other Contr." with a value of
3    80 million?  Do you have any understanding as to
4    what that relates to?
5        A.    No, I don't recall.
6        Q.    And on the next item up, the next item
7    up, which is "Commercial Paper & Money Market
8    Instruments," there's a similar item on Exhibit
9    178, but with a different value.  Do you have
10   any understanding as to the reason for the
11   differences?
12       A.    No, I mean, I can see that the
13   differences in value is $63 million, which on a
14   transaction -- a balance sheet of about 53
15   billion would not have -- it's very small.  I
16   don't remember why the number changed.  There
17   were uncertainty throughout the weekend and on
18   subsequent days trying, again, trying to
19   understand which assets were transferred, that
20   could be transferred, so trying to establish the
21   opening balance sheet.
22       Q.    Now, I apologize if I have already
23   asked you this, but do you have a recollection
24   of excess margin on derivatives transactions
25   being transferred from Lehman to Barclays?

TSG Reporting - Worldwide (877) 702-9580

---

Page 117

HIGHLY CONFIDENTIAL - R. AZERAD

1
2        A.    What do you mean by "excess margin on
3    derivatives transactions"?
4        Q.    There's reference in some of the
5    documents to a margin concerning the OCC trades.
6        A.    Okay.
7        Q.    Do you have an understanding or
8    recollection of any excess margin on OCC
9    transactions being transferred from Lehman to
10   Barclays?
11       A.    I don't recall.
12       Q.    What, if anything, have you heard
13   about OCC margin in connection with the
14   Lehman/Barclays transaction?
15       A.    From what --
16           MR. STERN:  This should exclude any
17   conversations with counsel.
18           THE WITNESS:  I understand that.
19       A.    I believe that when I think of OCC
20   margin, and again, this is my recollection, this
21   might not be accurate, there were some of the
22   margin being held by -- by either the OCC or
23   JPMorgan Chase, which I believe was -- became
24   essentially frozen, meaning it was not returned
25   to Lehman, but I could be incorrect.

TSG Reporting - Worldwide (877) 702-9580

---

Page 118

HIGHLY CONFIDENTIAL - R. AZERAD

1
2    I remember that there was some -- that
3    the unwind of a position at -- the unwind of a
4    transfer of a termination of a transfer at OCC
5    was not as smooth as what it should have been.
6    **Q.   Looking at the balance sheet draft in**
7    **Exhibits 178 and 179, in the assets that are**
8    **included in these two spreadsheets you have not**
9    **made any provision for this OCC margin; is that**
10   **right?**
11       A.   Again, I don't remember what -- what
12   derivative and other contractual, I'm assuming
13   agreements, that's typically how it would have
14   been represented on the Lehman balance sheet, of
15   80 million represents, but assuming that it's --
16   assuming that this is not related to the OCC
17   margin, I don't recall having the OCC margin
18   being part of this opening balance, being part
19   of this opening balance sheet.
20       **Q.   When is the first time you remember**
21   **having any discussions with anyone, other than**
22   **lawyers, about the OCC margin, as you understand**
23   **it?**
24       A.   I think it must have been an informal
25   discussion I may have had -- I don't remember --

TSG Reporting - Worldwide (877) 702-9580

Page 119

HIGHLY CONFIDENTIAL - R. AZERAD

1
2        Let me step back.  What is your
3    question?  If you can repeat it.
4        (Record read.)
5        A.   I don't remember who was the first
6    person.
7        **Q.   The question was when, not who.**
8        A.   I don't remember when was -- who was
9    the first person and when did -- or when did the
10   first discussion happen.
11       **Q.   And in connection with the first**
12   **discussion, do you recall, about OCC margin, did**
13   **that discussion concern adding the OCC margin as**
14   **an asset or an addition to the balance sheet for**
15   **Barclays?**
16       A.   No, what I -- no, what I recall about
17   the OCC margin, the first discussion was what I
18   previously disclosed, which was the fact that
19   it -- that it was frozen.  I don't remember by
20   whom.
21       **Q.   Going back to 178, and the calculation**
22   **for the inventory total, page 2 of Exhibit 178?**
23       A.   Yes.
24       **Q.   The valuation information that you**
25   **would have included in this spreadsheet was as**

TSG Reporting - Worldwide (877) 702-9580

Page 120

**HIGHLY CONFIDENTIAL - R. AZERAD**

1
2    **of what date?**
3        A.   Again, I don't recall.  There was an
4    e-mail that you showed me earlier that would
5    have -- that had some specific dates, which I
6    think was -- but I don't remember when was this
7    value being calculated.
8        **Q.   In your day-to-day operations for a**
9    **repo that was done on the 18th --**
10       A.   Uh-huh.
11       **Q.   -- would you have calculated values as**
12   **of the 18th or some other day?**
13       MR. STERN:  Objection to the form.
14       A.   Generally, to my -- to the best of my
15   knowledge, in a normal repo transaction, I
16   believe that the custodian -- actually, I don't
17   even know it for a fact so I prefer not to say.
18   I prefer to say that I don't recall.
19       But I do want to repeat that we had at
20   that point significant data issue at Lehman for
21   a variety of reasons, but chief among them the
22   fact that JPMorgan did not provide us with the
23   information.
24       (Exhibit 180, an e-mail chain, the
25   first in time from M. Kelly to R. Azerad,

TSG Reporting - Worldwide (877) 702-9580

Page 121

HIGHLY CONFIDENTIAL - R. AZERAD

1
2    dated September 21, 2008, marked for
3    identification, as of this date.)
4        MR. STERN:  What is your sense of
5    timing in terms of lunch break?
6        MR. TAMBE:  Probably shortly after
7    this exhibit and maybe some follow-up
8    questions.
9        MR. STERN:  Okay.
10       **Q.   I handed you a three-page document**
11   **marked as Exhibit 180.  Take a moment to look at**
12   **that and let me know when you're done.**
13       A.   Sure.
14       (Document review.)
15       A.   I've read Exhibit 180.
16       **Q.   And this exhibit touches on this issue**
17   **of the data valuation, right?**
18       A.   Uh-huh.
19       **Q.   Right?**
20       A.   Yes, that's correct.
21       **Q.   And just to make sure I'm**
22   **understanding this, is it the case that you had**
23   **valued the repo transaction for the collateral**
24   **transferred on Thursday as of Thursday closing**
25   **prices?**

TSG Reporting - Worldwide (877) 702-9580



Page 122

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2          MR. STERN:  Objection to the form.
 3     A.   Let's hear the question again.
 4          (Record read.)
 5     A.   I was not involved in the valuation.
 6     Q.   But --
 7     A.   What this e-mail -- this e-mail
 8   traffic says I was asking confirmation from
 9   Martin Kelly and other people about which source
10   of prices to use to do the analysis, but I was
11   not part of the exercise that was done to price
12   the securities.
13     Q.   Okay.  Does this, having reviewed this
14   e-mail chain, can you confirm that the prices
15   you in fact did use for the balance sheet that
16   you prepared for the Thursday transfer were
17   using Thursday prices and for the Friday
18   transfers used the Friday prices?
19     A.   That's what Jim Hraska in the e-mail
20   sent at 12:26 said.
21     Q.   Subsequent to receiving these e-mails,
22   have you any reason to believe that Mr. Hraska
23   wasn't accurate in describing the valuation?
24     A.   I don't --
25          MR. STERN:  Objection to the form.
```
TSG Reporting - Worldwide (877) 702-9580

Page 123

```
 1        HIGHLY CONFIDENTIAL - R. AZERAD
 2     A.   I don't recall seeing an e-mail from
 3   Jim Hraska changing what he said in the e-mail
 4   at 12:26.
 5     Q.   So the answer to my question is no,
 6   you're not aware of any reason?
 7     A.   I don't recall.
 8          MR. STERN:  Objection to the form.
 9     Q.   After you joined Barclays in September
10   2008, were you involved with any effort to
11   revalue the collateral that had been transferred
12   from Lehman to Barclays?
13     A.   Yes, I --
14          MR. STERN:  If this involves work you
15   did for counsel --
16          THE WITNESS:  Counsel.
17          MR. STERN:  Don't identify the work
18   you did for counsel, and I'll instruct you
19   not to answer.
20     A.   I will follow my attorney's
21   recommendation.
22          MR. TAMBE:  And Jack, what's the basis
23   of the objection?  Is it attorney-client
24   privilege?
25          MR. STERN:  It's work product and
```
TSG Reporting - Worldwide (877) 702-9580

Page 124

```
 1        HIGHLY CONFIDENTIAL - R. AZERAD
 2   attorney-client privilege.
 3     Q.   Can you identify the lawyers who asked
 4   you to do the work in revaluing the collateral?
 5          MR. STERN:  Objection.  I'm going to
 6   instruct you not to answer because answering
 7   it would reveal work product.
 8     Q.   And sir, could you tell me when you
 9   were asked to do this by the lawyers?
10          MR. STERN:  Objection.  I'm going to
11   instruct you not to answer.
12     Q.   And other than yourself, did other
13   people assist with this project of revaluing the
14   collateral?
15          MR. STERN:  I instruct you not to
16   answer.
17          MR. TAMBE:  What basis?
18          MR. STERN:  I'm not going to allow the
19   witness --
20          MR. TAMBE:  Just state the basis.  I
21   don't need a speech.  Just state the basis.
22   State it for the record.
23          MR. STERN:  Work product and
24   attorney-client privilege.
25          MR. TAMBE:  Let's take a lunch break
```
TSG Reporting - Worldwide (877) 702-9580

Page 125

```
 1        HIGHLY CONFIDENTIAL - R. AZERAD
 2   now.
 3          (Luncheon Recess; Time Noted:  12:39
 4   P.M.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
TSG Reporting - Worldwide (877) 702-9580

Page 126

```
1           HIGHLY CONFIDENTIAL - R. AZERAD
2               AFTERNOON SESSION
3          (Time Noted: 1:32 P.M.)
4    ROBERT AZERAD, resumed and
5       testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. TAMBE:
8       Q.   Good afternoon, Mr. Azerad.
9       A.   Good afternoon.
10      Q.   I wanted to revisit one of the
11   documents we've been talking about this morning
12   which was marked as Exhibit 175, I believe.
13      A.   Are you talking about this document?
14      Q.   Yes, this is the multi-page document
15   that had not been assembled properly.  We have
16   assembled it in Bates order now.  I want to ask
17   you a couple of questions about it.
18      First, if you could take a moment to
19   look at the cover e-mail and the attached
20   spreadsheets.
21      A.   Okay, it's a multi-page attached
22   spreadsheet.  Is it okay if I just have a
23   cursory look at the attached spreadsheet,
24   assuming that most of your questions will be
25   focused on the beginning, your first three
```
TSG Reporting - Worldwide (877) 702-9580

Page 127

```
1           HIGHLY CONFIDENTIAL - R. AZERAD
2    pages?
3       Q.   That's a fair assumption, but I might
4    ask you about particular columns, so why don't
5    you take a cursory look at the spreadsheet.  Let
6    me know when you're done.
7          (Document review.)
8       A.   I've read the e-mail.
9       Q.   Turning your attention to this e-mail
10   and the exhibits, are you generally familiar
11   with this document?
12      A.   I don't recall seeing it at that time,
13   but clearly the e-mail sent at 4:46 on Friday
14   morning was sent to me, among other people.
15      Q.   Okay.  And you were working at the
16   office overnight Thursday night into Friday
17   morning the week of the bankruptcy, right?
18      A.   That particular night, the night of
19   the -- between the 18th and the 19th, I was in
20   the office.
21      Q.   And I think you described in the
22   morning session that among the various things
23   you were doing was identifying assets available
24   for transfer to Barclays, correct?
25      A.   That could be transferred to Barclays.
```
TSG Reporting - Worldwide (877) 702-9580

Page 128

```
1           HIGHLY CONFIDENTIAL - R. AZERAD
2       Q.   That could be transferred to Barclays.
3       And as you did a cursory review of the
4    spreadsheet, did you see that the various assets
5    that are identified in this spreadsheet have a
6    column "Available for Transfer," do you see
7    that?
8       A.   Yes, I see that.  Column F, I believe.
9       Q.   And is it your understanding that the
10   document at page 3 of this exhibit, Bates number
11   ending in 4635 --
12      A.   Uh-huh.
13      Q.   -- that is a summary or roll-up of the
14   information contained in the subsequent
15   spreadsheets?
16      A.   I don't recall the document, so what
17   I -- to be able to answer your question, I would
18   need to look at the document in Excel
19   spreadsheet and actually do some validation of
20   the column, do a validation of a summary.
21      Q.   But generally, having seen this
22   document, do you recall having been involved in
23   the preparation of a spreadsheet that identified
24   the Cusips and the amounts available to be
25   transferred to Barclays in that time period,
```
TSG Reporting - Worldwide (877) 702-9580

Page 129

```
1           HIGHLY CONFIDENTIAL - R. AZERAD
2    18th or 19th of September?
3       A.   There were many efforts going on, some
4    of them being led by my team, some of them being
5    led by Operations, and some of them also being
6    led by Product Control to try to understand what
7    could be transferred to Barclays.  I believe
8    that the spreadsheet was sent by Chris Mincak to
9    Gerry Reilly, so this is a part of stream of
10   effort coming from Product Control.
11      Q.   There's various listings of Cusips
12   also contained in column D, which is titled
13   "Balance Sheet"?
14      A.   Yes.
15      Q.   Do you see that?
16      A.   Uh-huh.
17      Q.   Do you have an understanding --
18      MR. STERN:  I'm sorry, column D?
19      MR. TAMBE:  D, yeah.
20      MR. STERN:  D, as in dog?
21      MR. TAMBE:  Dog.
22      MR. STERN:  Oh, I see.  You're not
23   referring to the third page, you're
24   referring to the fourth page.
25      MR. TAMBE:  Yes, fourth page onward,
```
TSG Reporting - Worldwide (877) 702-9580

Page 130

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    the various spreadsheets which have the
3    listing of particular securities.
4         MR. STERN:  Okay.  Fine.
5    A.   Yes.
6    Q.   What is your understanding of the
7    information that's contained in that column, the
8    "Balance Sheet" column?
9    A.   Again, I was not involved in the
10   creation of that spreadsheet, so I cannot
11   comment with confidence on what that column
12   means, meaning it appears to me, looking at this
13   document now, that this refers to balance sheet
14   numbers.
15   Q.   Would that be market value numbers for
16   these securities?
17   A.   Typically balance sheet numbers refer
18   to market values.
19   Q.   And looking at the spreadsheet in
20   Exhibit 175, does it identify the source of the
21   price information that appears in the balance
22   sheet column?
23   A.   I don't remember when I looked, but
24   again, I had a cursory look at the spreadsheet,
25   so I may have missed it, but I don't remember

Page 131

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    seeing the source of information.
3    Q.   If you could also turn your
4    attention -- you can set that one aside.  If you
5    can turn your attention back to 151A that we
6    discussed this morning.
7    A.   Yes.
8    Q.   This was an e-mail concerning the
9    preparation of the opening balance sheet.  Do
10   you remember?
11   A.   I remember.
12   Q.   In your e-mail dated September 20 at
13   10:27, you had an item concerning 1.9 billion of
14   collateral.  Do you see that?
15   A.   Yes.  That's item number 2?
16   Q.   Item number 2 in that e-mail, right.
17   If you could put before you Exhibit 178 and 179
18   that we discussed this morning.
19   A.   It's not a problem.  Let me try to
20   find them.
21   Q.   Do you have them?  Looking at the
22   attachment to 178, it's a two-page exhibit?
23   A.   Uh-huh.  Yes.
24   Q.   There is a draft balance sheet
25   attached?

Page 132

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    A.   Yes.
3    Q.   The $1.9 billion component in the
4    e-mail which is Exhibit 151A?
5    A.   Yes.
6    Q.   Where is that -- well, let me ask you,
7    is that included in the valuation of assets that
8    you have on page 2 of Exhibit 178?
9         MR. STERN:  Objection to the form.
10   A.   Complicated here.  Let me just --
11        I'm sorry, can you repeat the
12   question?
13        (Record read.)
14   A.   Let me understand.
15        MR. STERN:  Objection to the form.
16   A.   It's -- it's hard for me to tell.  The
17   1.9 billion of Exhibit 151A was sent to me as
18   of -- was sent by me, sorry, as of 10:27.  I'm
19   assuming all these are based on New York time,
20   not GMT, in New York time.  And the 178, the
21   exhibit in 178 was sent to me at 8:39 P.M. on
22   the Saturday.
23        What I was trying to explain this
24   morning is, starting on September 19, the
25   Friday, there was a fair amount of uncertainty

Page 133

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    about the information that Lehman had access to
3    as it relates to the inventory of LBI -- or,
4    securities held by LBI, I should say, and so all
5    the analysis we did was done on the best effort
6    basis.
7         It could be that, in between these two
8    e-mails, there were some additional refinement I
9    received in terms of the data, which means that
10   the 1.9 billion that I referred to as of 10:27
11   may or may not become some other numbers as of
12   8:39 P.M. that day.
13   Q.   Let's try it another way.  Looking at
14   Exhibit 178, which has the balance sheet, if you
15   turn to page 2?
16   A.   Uh-huh.  Yes.
17   Q.   And looking at the listing of assets
18   that are included in that balance sheet, do you
19   know whether those include items which would
20   have been in the non-actionable box?
21   A.   This is where I have an issue about
22   answering accurately to your question.  I
23   mentioned earlier that, I think in one of my
24   previous answers in one of your previous
25   questions this afternoon, that there were, to

Page 134

1       HIGHLY CONFIDENTIAL - R. AZERAD
2   the best of my recollection, three streams of
3   work being done to ascertain the assets that
4   could be transferred to Barclays.  There was one
5   by Product Control, there was one by Treasury,
6   and one by Operations.
7           One led by Treasury, the effort led by
8   Treasury essentially fizzled because we didn't
9   have good information.  We eventually, I don't
10  know when exactly the decision was made, we
11  relied on the file provided by Operations, I
12  believe Jim Hraska or someone working for Jim
13  Hraska.
14          My vague recollection is that the
15  amounts were about the same, may have been
16  slightly different, but I think that they were
17  roughly kind of roughly in the same ballpark,
18  and so when you ask me the question of is the
19  1. -- is there a 1.9 and does it refer to the
20  same 1.9 that you refer to in Exhibit 151A, I
21  have trouble answering the question.
22      Q.   Okay.  Were you aware of any
23  discussions in connection with preparation of
24  Exhibit 178A about --
25      A.   You mean 178?
        TSG Reporting - Worldwide (877) 702-9580

Page 135

1       HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   178.  Let me start again.
3          Were you aware of any discussions in
4   connection with the preparation of Exhibit 178
5   about including or excluding the non-actionable
6   box from the calculation of assets?
7      A.   My understanding and my recollection,
8   I should say, is that the non-actionable box,
9   which again refers to the ability in a normal
10  market environment to finance assets in a
11  secured basis, that's what it means by
12  non-actionable, was not a determining factor on
13  whether or not assets in that box could or could
14  not be transferred to Barclays.
15      Q.   Were the items in that box included in
16  the assets that are set forth in Exhibit 178A --
17  178?
18      A.   Again --
19      MR. STERN:  Why don't you take your
20  time and read 178 and think about the
21  question.
22      A.   I mean, if I look at Exhibit 178 and
23  the e-mail from Brett Beldner to Martin Kelly,
24  item number 1 in that e-mail talks about 2
25  billion of assets that may be -- that may not --
        TSG Reporting - Worldwide (877) 702-9580

Page 136

1       HIGHLY CONFIDENTIAL - R. AZERAD
2   that may be locked up.  In between parentheses
3   it says "can be transferred."
4          That seems to indicate, again, reading
5   this e-mail today, that we're still talking
6   about the same 1.9 billion that I referred to as
7   of Exhibit 151A, because at that point we knew
8   that the quality of the work that was done by
9   Treasury -- we knew that the work that was being
10  done by Treasury to look -- to create the list
11  of assets that could be transferred to Barclays
12  was relying on information that may or may not
13  be correct.  That's because at that point we
14  didn't have, I believe, good information in GFS,
15  which was the source of information for
16  Treasury.
17          But it looks as if, based on the
18  e-mail from Brett Beldner in paragraph 1, that
19  we're still talking about the same 1.9 billion.
20  So if this is correct, then to go back to your
21  earlier question, then, yes, 1.9 referred to in
22  151A, based on my interpretation in Brett's
23  e-mail, would have been included in the
24  spreadsheet found on page 2 of Exhibit 178.
25      Q.   And in the answer you just gave you
        TSG Reporting - Worldwide (877) 702-9580

Page 137

1       HIGHLY CONFIDENTIAL - R. AZERAD
2   discussed the quality of the GFS information?
3      A.   That's correct.
4      Q.   What were the problems you were having
5   with the GFS information that weekend?
6      A.   The primary issue from a Treasury
7   standpoint is that we had not ascertained which
8   securities were kept by JPMorgan and which
9   securities were being allocated to Barclays, and
10  there were also, besides Barclays, there were
11  also I believe two or three repo counterparts
12  which also were funding LBI as of Friday night.
13          I don't remember, I believe one of
14  them was BGI, Barclays Global Investors, but
15  that was separate from the transaction that we
16  had with Barclays.  That was a long-standing
17  repo transaction.  One of them was Dresdner Bank
18  and I don't remember the name of the third repo
19  counterpart.
20          So because we didn't have the, what we
21  call the allocation file from JPMorgan, it was
22  difficult for us in Treasury to understand what
23  assets were -- could be transferred to Barclays.
24  What was -- what happened is Operations, which
25  was looking at actual depot position, was able
        TSG Reporting - Worldwide (877) 702-9580

Page 138

HIGHLY CONFIDENTIAL - R. AZERAD

1
2 to kind of provide a better picture of the
3 assets that were left unencumbered and,
4 therefore, could be transferred to Barclays.
5    Q.   I just want to better understand these
6 different sources of information.  The Treasury
7 work stream looked to the GFS information as the
8 reasons you just stated, found it to be not
9 complete or reliable for its purposes that
10 weekend, correct?
11    A.   That's correct.
12    Q.   And I think you said ultimately the
13 work stream that provided the data that was
14 relied on was the Ops, Operations Work Team; is
15 that correct?
16    A.   That's correct.
17    Q.   You said they had visibility of what
18 was in the depot, is that right?
19    A.   That is correct.
20    Q.   What do you mean by that?  What
21 information were they seeing that was not being
22 captured by GFS?
23    A.   Well, the way that -- let me try to
24 be -- what they had access to was actual
25 position held by depot -- what Operations had

TSG Reporting - Worldwide (877) 702-9580

Page 139

HIGHLY CONFIDENTIAL - R. AZERAD

1
2 access to was actual information provided by
3 depot, such as DTC being one of them, being
4 probably the primary of them, but there were
5 other depot as well that LBI had in the U.S. and
6 outside the U.S.
7    There were typically -- I don't
8 believe, again, I'm not an expert in GFS, how --
9 why this information was not fed in GFS on the
10 kind of day-to-day basis, but the information
11 from GFS, as it was explained to me that week
12 and that weekend, was dependent on getting
13 information from JPMorgan Chase on what -- on
14 which securities they were -- they allocated and
15 which securities were left at the Lehman account
16 at JPMorgan Chase.
17    Q.   And again --
18    A.   Now, depot --
19    MR. STERN:  Wait for a question.
20    Q.   Have you finished your answer?
21    A.   No.  No.  Please, continue.
22    Q.   Was there someone at Lehman who told
23 you that weekend that there were problems with
24 the GFS information?
25    A.   I'm sure I heard it.  I don't remember

TSG Reporting - Worldwide (877) 702-9580

Page 140

HIGHLY CONFIDENTIAL - R. AZERAD

1
2 who told me that there was issue with the GFS
3 information.
4    Q.   And did the people that told you there
5 was problems with the GFS information tell you
6 what other data should be used, for example, the
7 Ops data stream?
8    A.   No, that's not the way I believe that
9 it -- I don't believe this is how it happened.
10 I think that they were -- I don't know when
11 operations started its effort, but product
12 control and Treasury I think worked side-by-side
13 almost as a dual track project.
14    I don't know when Operations kind of
15 started its own effort, but what I do know is
16 that, at the end, the data, the source data for
17 the information came from Operations.  So,
18 therefore, the analysis, I'm sorry, came from
19 Operations.
20    Q.   In describing the problem at GFS, I
21 think you described a problem with identifying
22 particular securities, identifying specific
23 Cusips, was that part of the problem?
24    A.   Yeah.  Let me give you an example, for
25 instance.  I think in one of the previous

TSG Reporting - Worldwide (877) 702-9580

Page 141

HIGHLY CONFIDENTIAL - R. AZERAD

1
2 exhibits that you showed me this morning there
3 were a series of repo transactions between LBI
4 and LBIE, and I believe that GFS was still
5 showing this transaction as still being
6 outstanding even though our assessment at that
7 time, and I don't know, at least assessment of
8 Treasury, not necessarily senior management or
9 legal assessment, but the assessment of Treasury
10 is that these repos had failed, meaning LBI in
11 their return of cash back to LBI, they were
12 never going to be settled in a normal way, but I
13 believe that GFS still had this information as
14 if they were still outstanding and still ready
15 to be settled.  That would be one of the issues
16 that we had with GFS.
17    Q.   Did you also have an issue with GFS
18 about the valuation in the GFS system for a
19 particular security?
20    A.   Treasury was never -- was never
21 involved in the valuation of the assets.  We
22 rely on either GFS or other source of data as
23 directed to value the securities.  I think that
24 you showed me this morning an exhibit that
25 the -- with some e-mail between myself and I

TSG Reporting - Worldwide (877) 702-9580

Page 142

HIGHLY CONFIDENTIAL - R. AZERAD
1  think either Paolo Tonucci or Martin Kelly where
2  I was asking which source of data -- which
3  source of pricing I should be using.
4      Q.   Now, the third work stream that you
5  described, you talked about Treasury, talked
6  about Operations and the third was PCG, correct,
7  Product Control Group?
8      A.   That's exhibit -- whatever was the big
9  exhibit that you showed me at the beginning.
10  175, I believe.  I'm not sure, but it's -- it
11  came from Product Control.
12      Q.   175 did?
13      A.   Yes.
14      Q.   And how do you know that?
15      A.   Because I know Chris Mincak and I know
16  Gerry Reilly.
17      Q.   And they were with Product Control?
18      A.   They were in Product Control.
19      Q.   Would the pricing information that
20  feeds into GFS come from the Product Control
21  Group?
22      A.   I'm not an expert.  I'm not familiar
23  enough with the valuation process at Lehman to
24  be able to answer your question.  Product

TSG Reporting - Worldwide (877) 702-9580

Page 143

HIGHLY CONFIDENTIAL - R. AZERAD
1  Control was involved.  I don't know whether -- I
2  don't know which other parties would have been
3  involved in the valuation process.
4      Q.   The information that Operations had
5  access to, the actual positions held by DTC and
6  other custodians?
7      A.   Yes.
8      Q.   Did that information also carry with
9  it valuation information?
10      A.   I can't answer your question.  I
11  haven't seen the source -- I haven't seen the
12  source document from DTC so I don't remember
13  whether or not the valuation came from DTC or
14  came from Lehman.  What we were using -- the
15  value of information from Treasury's standpoint
16  from DTC was knowing which Cusip and the
17  quantity of the Cusip.  I don't remember the
18  valuation where it came from.
19      Q.   Is it possible that you used the DTC
20  information for identifying the Cusip and the
21  quantity, but obtained pricing of value
22  information from another source?
23          MR. STERN:  Objection to the form.
24      A.   It was an e-mail that you showed me

TSG Reporting - Worldwide (877) 702-9580

Page 144

HIGHLY CONFIDENTIAL - R. AZERAD
1  this morning which I think said that that was
2  obtained, the pricing information at least from
3  one of the file, from Operations.  I don't
4  remember what -- which source of information
5  Operations used.
6      Q.   At any time during the weekend of
7  September 20th, 21st or thereafter, did you
8  prepare a valuation using pricing information
9  from the Bank of New York?
10          MR. STERN:  Objection to the form.
11      A.   Sorry, can you repeat the question?
12          (Record read.)
13      A.   What do you mean by "valuation"?
14      Q.   Did you ever calculate a value of the
15  assets transferred from Lehman to Barclays using
16  Bank of New York prices?
17          MR. STERN:  Objection to the form.
18      A.   Again, I was not involved in the
19  valuation process at Lehman.  What I -- what I
20  recall was, as part of another stream of work I
21  was involved with, was trying to understand the
22  assets being transferred -- the assets which had
23  been transferred from Lehman to Barclays, we
24  received I think it was one of your e-mail

TSG Reporting - Worldwide (877) 702-9580

Page 145

HIGHLY CONFIDENTIAL - R. AZERAD
1  exhibits from this morning a file from Barclays.
2  I don't know which source of which pricing
3  information that file had, but there may have
4  been comparison between Cusip and prices between
5  Lehman and -- between Lehman and Barclays, but
6  not valuation per se, just comparison of
7  numbers.
8      Q.   Look at Exhibit 147A and also have
9  before you Exhibit 178.  If you look at the
10  second page of Exhibit 147A, that's the e-mail
11  from Jasen to you and others, do you see that?
12      A.   Yes.
13      Q.   There's a reference in that e-mail to
14  a BONY market value, B-O-N-Y market value, of
15  approximately it says 45 million, do you see
16  that?
17      A.   Yes.
18      Q.   Do you understand that at least in
19  this e-mail to be a reference to 45 billion?
20      A.   That would be my understanding, yes.
21      Q.   So, taking that as a reference to BONY
22  market value of approximately 45 billion, if you
23  now turn to Exhibit 178, there that draft
24  balance sheet, opening balance sheet, shows

TSG Reporting - Worldwide (877) 702-9580

1      HIGHLY CONFIDENTIAL - R. AZERAD
2   total cash and inventory of what, 51.8 billion?
3          MR. STERN: I'm sorry, what are you
4   looking at?
5      A.   I'm sorry, I don't see 51.8.
6      Q.   I'm adding two numbers.  I'm adding
7   the cash and the 44.8 billion.
8      A.   Oh, okay, but you don't include the
9   receivables.
10     Q.   I'm not including the receivables, no.
11     A.   Then, yes, it should be 51.8.
12     Q.   Okay.  Did you ever hear about a $6
13  billion discrepancy between the BONY valuation
14  and any valuations that you had been using for
15  calculating the value of assets transferred from
16  Lehman to Barclays?
17         MR. STERN:  Objection to the form.
18     A.   I don't recall hearing about the 6
19  billion.
20     Q.   Have you heard of any significant
21  pricing discrepancies between the BONY pricing
22  for the Lehman assets transferred to Barclays
23  and the values that were used by Lehman in
24  transferring those assets to Barclays?
25     A.   I'm sorry, can you repeat the
        TSG Reporting - Worldwide (877) 702-9580

1      HIGHLY CONFIDENTIAL - R. AZERAD
2   question?
3          (Record read.)
4      A.   What do you mean by "significant"?
5      Q.   Well, anything above a billion
6   dollars.
7      A.   That there were pricing differences
8   probably, yes.  I don't remember the amount of
9   the pricing differences.
10     Q.   If there had been a pricing
11  discrepancy of say 10 percent of the value of
12  the assets, is that something that would have
13  caught your attention?
14         MR. STERN:  Objection to the form.
15     A.   The charge for us and I believe, from
16  my recollection, is we did not -- that there was
17  disagreement between us and Barclays about the
18  actual securities transferred, so we had -- we
19  thought we had transferred some securities which
20  Barclays claimed never to have received and
21  vice-versa, and so when you talk about valuation
22  in general, it's hard for me to answer this
23  question.
24     Q.   The disagreements that you recall
25  between Lehman and Barclays over the securities
        TSG Reporting - Worldwide (877) 702-9580

1      HIGHLY CONFIDENTIAL - R. AZERAD
2   transferred, was the magnitude of that
3   disagreement in the several billion dollars?
4          MR. STERN:  Objection to the form.
5      A.   I don't remember the exact amount.  I
6   know that we had been in -- I had -- I know that
7   I had exchanged e-mails with Operations and with
8   Barclays trying to create kind of a -- create a
9   list of assets that had been transferred between
10  Lehman and Barclays, and I do remember that it
11  was a very difficult exercise.
12     Q.   Was the process that you talked about
13  earlier, the process on September 19th of
14  identifying additional assets to transfer to
15  Barclays, part of this disagreement?
16         MR. STERN:  Objection to the form.
17     A.   No.  What I said and what I continue
18  saying is not to transfer, but could be
19  transferred.  I was not -- I was not
20  part of the negotiation between Lehman and
21  Barclays, so I don't know which assets had been
22  discussed as part of the transfer.
23     Q.   Was identifying the assets to be
24  transferred to Barclays, whether or not they
25  were actually transferred, identifying the
        TSG Reporting - Worldwide (877) 702-9580

1      HIGHLY CONFIDENTIAL - R. AZERAD
2   assets that could be transferred to Barclays on
3   September 19, was that because Barclays believed
4   it had not received enough value in the assets
5   that were transferred from Lehman to Barclays?
6          MR. STERN:  Objection to the form.
7      A.   I don't know.  That is a question I
8   think which is best asked with Barclays.  I was
9   just asked to continue working on the list of
10  assets that could be transferred to Barclays.
11     Q.   Do you recall hearing from anyone on
12  Friday, September 19, that Barclays was asking
13  for additional assets and collateral because
14  they thought they hadn't gotten enough?
15     A.   I don't recall precisely.  I -- I
16  recall that on the -- that during that night,
17  the night between the 18th and the 19th,
18  Barclays had to deposit cash, I believe 7
19  billion, which is based on this balance sheet,
20  at JPMorgan Chase, which would seem to indicate
21  that they were expecting more securities to be
22  transferred.
23         MR. STERN:  Could you repeat the
24  question, please?
25         (Record read.)
        TSG Reporting - Worldwide (877) 702-9580

Page 150

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2     A.   What I do recall, and again, not --
 3          MR. STERN:  The question asks if you
 4   recall anyone telling you that.
 5     A.   I don't --
 6     Q.   Answer the question.
 7     A.   I don't recall specifically someone
 8   telling me that.
 9     Q.   Were you ever given a target amount of
10   assets to identify on September 19 as additional
11   assets or collateral to be made available for
12   transfer to Barclays?
13     A.   Not to the best of my recollection.  I
14   think that we were trying to come up with a list
15   of assets that could be transferred to Barclays,
16   but I don't recall hearing about a target.
17     Q.   So you just had to keep looking for
18   assets until there were no more defined?
19          MR. STERN:  Objection to the form.
20     Q.   Was that your instruction?
21     A.   Well, it was -- you made it sound as
22   if every asset that were identified was going to
23   be transferred to Barclays.  That I don't know
24   and I don't know now and I didn't know at the
25   time.  My job was more narrowly focused on just
```

TSG Reporting - Worldwide (877) 702-9580

Page 151

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2   trying to understand which assets could be
 3   transferred to Barclays.
 4     Q.   And there was no dollar amount that
 5   you were provided as to when you could stop
 6   trying to identify additional assets, correct?
 7   You had to just keep identifying as many assets
 8   as you could that could be transferred to
 9   Barclays?
10          MR. STERN:  Objection to the form.
11     A.   I mean, they --
12          I'm sorry, can you repeat the
13   question?
14          (Record read.)
15     A.   Yes, although what's -- that's not the
16   way that I -- that's not the way that I, going
17   back to that week, it's not the way that I felt
18   about it.  What happened is that we had a series
19   of assets left at Chase and so we had -- the
20   purpose of a lot of this exercise was trying to
21   find assets outside of Chase that could be
22   transferred to Barclays.
23     Q.   And as part of that exercise of trying
24   to find these assets outside of Chase, there was
25   no limit set on a number that you were shooting
```

TSG Reporting - Worldwide (877) 702-9580

Page 152

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2   for, is that your testimony?
 3     A.   There was no -- I don't recall hearing
 4   about a limit.
 5     Q.   Sir, I've handed you a one-page
 6   document marked Exhibit 164A.  Take a moment to
 7   look at it.  Let me know when you're done.
 8          (Document review.)
 9     A.   I'm done.
10     Q.   Have you seen this document before
11   today?
12     A.   I don't recall, but you show it no me
13   and clearly I am on some of -- I am both on the
14   "to" and on the "from" line, so I must have seen
15   the document at that time.
16     Q.   The document concerns a discussion,
17   the subject line says "Box Summary versus Spero
18   Report," do you see that?
19     A.   Yes.
20     Q.   Does the term "box summary" have any
21   meaning to you?
22     A.   "Box" is a term which is very loosely
23   used.  It has -- it has multiple meanings, and
24   in that particular context, I don't remember
25   what "box summary" means.
```

TSG Reporting - Worldwide (877) 702-9580

Page 153

```
 1          HIGHLY CONFIDENTIAL - R. AZERAD
 2     Q.   How about the phrase "Spero report,"
 3   does that have any meaning to you?
 4     A.   Spero was an employee of Lehman
 5   Brothers, and I don't recall what the Spero
 6   report means.
 7     Q.   And then there's a calculation set out
 8   at the bottom of that e-mail chain from John
 9   Vergel de Dios to you and Henry Domenici?
10     A.   Yes.
11     Q.   Do you understand the information
12   contained in that e-mail?
13     A.   I'm afraid I don't recall what it
14   means.  The numbers -- I'm not sure what it
15   means.
16     Q.   You respond to that e-mail by
17   forwarding it to Paolo Tonucci and you state,
18   "FYI - 3.$2 billion of risk.  I'm
19   double-checking the numbers."  Do you see that?
20     A.   Yes.
21     Q.   Do you have any understanding as you
22   sit here about what you meant by that?
23     A.   I'm afraid not.
24          MR. STERN:  At some point if we could
25   take a really short break, whenever it's
```

TSG Reporting - Worldwide (877) 702-9580

---

Page 166

```
1           HIGHLY CONFIDENTIAL - R. AZERAD
2   got secured financings against those assets,
3   correct?
4           MR. STERN:  Objection to the form.
5      A.   I'm not sure.  Some of these assets
6   may have been -- may have been pledged.  Some
7   may not have been.  I don't know which one --
8   which ones were pledged, which ones were not
9   pledged to secure secured -- to get secured
10  financing.
11     Q.   If you go back to 86B and 87B, looking
12  at 86B first, which is the three-page document,
13  on page 1 there's a column F titled "PCG
14  Liquidity Value"?
15     A.   Yes.
16     Q.   Do you have any understanding of what
17  that term "PCG liquidity value" means?
18     A.   No, I don't.
19     Q.   Is that a term that you use in your
20  day-to-day business?
21     A.   No, it's not a term that we use.
22     Q.   On Exhibit 87B --
23     A.   Yes.
24     Q.   -- there's a column F titled "MV w
25  Liquidity."  Do you see that?
```
TSG Reporting - Worldwide (877) 702-9580

---

Page 167

```
1           HIGHLY CONFIDENTIAL - R. AZERAD
2      A.   Yes.
3      Q.   Is that a phrase you're familiar with?
4      A.   No, it's not.
5      Q.   Not a phrase that you use in your
6   day-to-day business, correct?
7      A.   That's correct.
8           MR. TAMBE:  I want to take a short
9      break.  I think I'm almost done with my line
10     of questioning.  Let me check.
11          (Recess; Time Noted: 2:58 P.M.)
12          (Time Noted:  3:04 P.M.)
13  BY MR. TAMBE:
14     Q.   Just a couple of questions, Mr.
15  Azerad. Stephen King, was Mr. Stephen King at
16  Barclays?  Is that a name you're familiar with?
17     A.   The name is familiar.  He was involved
18  in the transfer -- in the transfer of assets.  I
19  believe he works in the group at Barclays called
20  PMTG.
21     Q.   Do you know what "PMTG" stands for?
22     A.   I don't know.
23     Q.   In late September were you involved in
24  the preparation of Schedules A and B to the
25  Asset Purchase Agreement?
```
TSG Reporting - Worldwide (877) 702-9580

---

Page 168

```
1           HIGHLY CONFIDENTIAL - R. AZERAD
2      A.   I was involved.
3      Q.   Will you describe that process, the
4   preparation of Schedules A and B?
5      A.   To the best of my recollection,
6   Schedule A referred to the asset transfers on
7   Thursday night and Schedule B was part of the
8   exercise of trying to identify assets that could
9   be transferred to Barclays.
10     Q.   And that's the process that you had
11  talked about earlier in your deposition about
12  having taken place in September 19 and later; is
13  that right?
14     A.   That is correct.
15     Q.   And what's listed in Schedule B then
16  is a listing of the assets that actually were
17  transferred or to be transferred to Barclays
18  pursuant to that process?
19          MR. STERN:  Objection to the form.
20     A.   I'm sorry, can you repeated the
21  question?
22          (Record read.)
23     A.   No, that's -- that's not what I said.
24  I said that the exercise that we did for
25  Schedule B was a list of assets that could be
```
TSG Reporting - Worldwide (877) 702-9580

---

Page 169

```
1           HIGHLY CONFIDENTIAL - R. AZERAD
2   transferred to Barclays.
3      Q.   Were any of the assets on Schedule B
4   actually transferred to Barclays?
5      A.   I don't know.  The work that Treasury
6   did on Schedule B, as I mentioned in one of my
7   previous answers, didn't generate good results
8   and so we switched to the list provided by
9   Operations.  To the best of my knowledge, we
10  never tried to reconcile the two lists, so it
11  may well be, I don't know.
12     Q.   Do you have any understanding of any
13  Schedules A and B being filed with the court?
14     A.   As I mentioned earlier, I haven't seen
15  the -- in September, I hadn't seen the Asset
16  Purchase Agreement.
17     Q.   As you sit here today, are you aware
18  of Schedules A and B having been filed with the
19  court?
20     A.   I'm not aware of it.
21     Q.   As you sit here today, are you aware
22  of a Schedule B that definitively lists the
23  assets that actually were transferred to
24  Barclays?
25     A.   I'm not aware of it.
```
TSG Reporting - Worldwide (877) 702-9580

---

Page 170

HIGHLY CONFIDENTIAL - R. AZERAD

1  HIGHLY CONFIDENTIAL - R. AZERAD
2      MR. TAMBE:  Subject to production of
3  documents and rulings of the court and
4  privilege invocations that have been made
5  today, I want to pass the witness to the
6  other counsel.
7  EXAMINATION BY
8  MR. ROTHMAN:
9      Q.   Good afternoon, Mr. Azerad.  My name
10 is Seth Rothman.  I represent the Trustee.
11     A.   Good afternoon.
12     Q.   I'd like to start by marking as the
13 next exhibit an e-mail string.  The top e-mail
14 is -- doesn't involve you.  It's from Mr.
15 Tonucci to Mr. Blackwell.  You'll see the first
16 e-mail in the string is from Mr. Tonucci to you
17 and others.
18     (Exhibit 182, an e-mail chain, the
19     earliest in time from P. Tonucci to R.
20     Azerad and others, dated September 20, 2008,
21     marked for identification, as of this date.)
22     Q.   Why don't you take a minute to review
23 that.  I'm only going to ask you about the
24 bottom-most e-mail on the page.
25     (Document review.)
   TSG Reporting - Worldwide (877) 702-9580

Page 171

1  HIGHLY CONFIDENTIAL - R. AZERAD
2      A.   I'm ready.
3      Q.   Do you recall receiving this e-mail
4  from Mr. Tonucci?
5      A.   I don't recall, but I was clearly
6  listed as one of the recipients.
7      Q.   Okay.  The e-mail is -- the subject
8  line is "Non-actionable box," correct?
9      A.   Yes.
10     Q.   First line he writes, "We need to go
11 through where all of this is.  Some may be in
12 the DTC box which may be mixed up with the
13 tri-party pledge on Thursday."
14     That's what the Mr. Tonucci wrote in
15 his e-mail, correct?
16     A.   Yes.
17     Q.   Do you know what he meant by the "DTC
18 box"?
19     A.   Not specifically.
20     Q.   Is that a phrase with which you are
21 familiar, "DTC box"?
22     A.   It's a phrase with which I'm familiar,
23 or at least I've used in the past.  Lehman had
24 more than one DTC boxes, and by "Lehman," I
25 meant LBI.
   TSG Reporting - Worldwide (877) 702-9580

Page 172

1  HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   When you say -- you said before, I
3  think, that the word "box" has different
4  meanings depending on context.  When you say
5  that LBI had different boxes of DTC, how are you
6  using that term "box"?
7      A.   As a synonym for accounts.
8      Q.   So one of the accounts at the DTC
9  would be the O74 account; is that correct?
10     A.   That's how it was referred to within
11 Lehman.
12     Q.   And when you talk about the
13 non-actionable box, and I know you explained
14 this already today, but in that context, you're
15 not referring to the non-actionable box as an
16 account, are you?
17     A.   No, that would have a different
18 definition.  By in the context of non-actionable
19 box, "box" is meant to be synonym with a
20 portfolio or a list of unencumbered securities.
21     Q.   So let me just see if I understand
22 whether there's a relationship between the DTC
23 account and the non-actionable box.
24     Is it the case that there may be
25 securities in the DTC box that are also counted
   TSG Reporting - Worldwide (877) 702-9580

Page 173

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  toward the portfolio that would represent the
3  non-actionable box?
4      A.   It may -- it very well may be.
5      Q.   And there may also be securities in
6  the DTC boxes that would not be within the
7  non-actionable box, is that also true?
8      A.   It may very well be.
9      Q.   And what distinguishes between the
10 securities that are in the non-actionable box
11 and the ones that aren't?  Is it that they're
12 not encumbered and can be pledged?
13     A.   No, the non-actionable box is a Lehman
14 expression which refers back to the Lehman
15 funding framework and it refers to a set of
16 securities which Lehman on a -- was funded on an
17 unsecured basis.  Therefore, they would have
18 been left unencumbered.
19     Q.   If we can return to Exhibit 182.  Mr.
20 Tonucci again in his e-mail says, "We need to go
21 through where all of this is."  Did you
22 understand him to be referring to the
23 non-actionable box when he said that?
24     A.   That's my understanding today.  I
25 don't remember how on September 20th, when
   TSG Reporting - Worldwide (877) 702-9580

Page 182

HIGHLY CONFIDENTIAL - R. AZERAD

1         HIGHLY CONFIDENTIAL - R. AZERAD
2 have identified another 300 million of mortgages
3 in 636." Is that another box at the DTC?
4     A. That's another account at the DTC.
5     Q. That's all I have for that e-mail.
6 Thank you.
7        We saw, sir, on a draft balance sheet
8 that we looked at before that you had listed a
9 $1 billion receivable from the 15c3 lockup?
10     A. That's correct.
11     Q. Remember that?
12     A. Yes, I do remember that.
13     Q. Where did that $1 billion figure come
14 from, do you recall?
15     A. I don't recall precisely.
16     Q. Was that a product of a 15c3
17 computation that was done at or around this
18 time?
19     A. I don't recall precisely. I mean,
20 we -- I recall that LBI did several calculations
21 of a 15c3-3 that week, the week of September
22 15th.
23     Q. I'm going to mark as Exhibit 185 an
24 e-mail from you to Martin Kelly dated Sunday,
25 9/21/2008, and it has an attachment to it.

TSG Reporting - Worldwide (877) 702-9580

---

Page 183

1         HIGHLY CONFIDENTIAL - R. AZERAD
2     (Exhibit 185, an e-mail from R. Azerad
3 to M. Kelly dated September 21, 2008, with
4 attachment, marked for identification, as of
5 this date.)
6     (Document review.)
7     A. I've read the attachment.
8     Q. Do you recognize it?
9     A. Yes, I do.
10     Q. Can you tell me what it is?
11     A. It was, as of September 21, which is a
12 Sunday, an analysis, a high-level analysis of
13 the 15c3 lockup on specifically the cushion,
14 which in a what I would call the perfect unwind
15 scenario should return to LBI.
16     Q. Did you prepare the three-page
17 attachment?
18     A. I believe I -- I believe that I wrote
19 the three-page attachment. Clearly other people
20 helped me prepare it.
21     Q. Who helped you prepare it?
22     A. Tony Stucchio's group. Tony, Anthony
23 Stucchio, as I mentioned in one of the earlier
24 questions, was the head of the Regulatory
25 Reporting Group at Lehman and his group was

TSG Reporting - Worldwide (877) 702-9580

---

Page 184

1         HIGHLY CONFIDENTIAL - R. AZERAD
2 involved in the calculation, in fact, was
3 responsible for the calculation of the 15c3-3
4 formula.
5     Q. So he is providing you with the
6 numbers for this presentation; is that right?
7     A. That is correct.
8     Q. And you are responsible for the text?
9     A. I may have had also other -- advised
10 some other people. Legal may have helped,
11 because, reading the text, there's clearly some
12 legal claims being made and I don't pretend to
13 be a lawyer in any sense of the word.
14     Q. Is there a reason why you prepared
15 this attachment?
16     A. To the best of my recollection, this
17 attachment must have been used as part of a
18 justification and part of the backup for the 1
19 billion claim which was on the opening balance
20 sheet which was mentioned earlier.
21     Q. The attachment is a PowerPoint
22 presentation, correct?
23     A. This is a -- I believe it is a
24 PowerPoint presentation, yes.
25     Q. Were you asked to give a presentation

TSG Reporting - Worldwide (877) 702-9580

---

Page 185

1         HIGHLY CONFIDENTIAL - R. AZERAD
2 to somebody about the 15c3 lockup?
3     A. I don't recall how this presentation
4 was being used after I sent to Martin Kelly.
5     Q. Did Mr. Kelly ask you to prepare this?
6     A. I don't recall.
7     Q. You don't recall the purpose of this
8 presentation beyond what you've already told me?
9     A. That is the best of my recollection.
10     Q. Do you recall if this was meant to be
11 presented to Barclays or sent to Barclays?
12     A. I don't recall.
13     Q. I know you've told us this already,
14 but what was Mr. Kelly's position at Lehman?
15     A. He was the Global Head of Financial
16 Control.
17     Q. Do you know if he was familiar with
18 15c3?
19     A. Anthony Stucchio reported to him. I
20 don't recall, directly or indirectly, but that
21 was -- he was -- this was part of his
22 responsibility.
23     Q. You told me before this is a top line
24 presentation, correct?
25     A. That is correct.

TSG Reporting - Worldwide (877) 702-9580

Page 202

HIGHLY CONFIDENTIAL - R. AZERAD
1
2  within Lehman, that's correct.
3      Q.   If you look under the ADP --
4      A.   Yes.
5      Q.   -- column, there's an entry marked
6  "Other"?
7      A.   Yes.
8      Q.   And then it has pending adjustments in
9  parentheses of 3.9 billion, do you see that?
10     A.   I see that.
11     Q.   Do you know what that is?
12     A.   I don't recall.
13     Q.   Okay.  I'm going to mark as Exhibit
14  189 an e-mail string.  The top e-mail is from
15  Mark Lee to Martin Kelly.  I don't think you're
16  listed on this string, and I see that there's
17  another e-mail attached to it.
18        (Exhibit 189, an e-mail string, the
19      earliest in time from J. Potenciano to W.
20      Burke and others, dated September 21, 2008,
21      with attached e-mail string, marked for
22      identification, as of this date.)
23     A.   There seems to be -- there appears to
24  be two -- there's one series of e-mails, and
25  then after the blue page there's another series

TSG Reporting - Worldwide (877) 702-9580

Page 203

HIGHLY CONFIDENTIAL - R. AZERAD
1
2  of e-mails.
3      Q.   Yes, the e-mail string attached,
4  behind the blue page was attached to the e-mail
5  that's in front of the blue page.
6        MR. STERN:  So focus first on the
7      front of the blue page and then after that.
8      Q.   I'm only going to, if it helps, I'm
9  only going to ask you about the e-mail that's in
10  front of blue page, but go ahead and read the
11  whole thing if you like.
12        (Document review.)
13     A.   Okay, I've read the exhibit.
14     Q.   The first e-mail is from Mark Lee to
15  Martin Kelly.  Can you tell me who Mark Lee is?
16     A.   Mark Lee was a Lehman employee and in
17  September of 2008 was asked, I don't remember by
18  whom, to work on the 15c3-3 reserve formula.
19        Let me be more -- let me be more
20  precise.  He was not part of Tony Stucchio's
21  group, but he was -- he was acting I guess as an
22  interface between Martin Kelly and the Reg.
23  Reporting Group, the Regulatory Reporting Group.
24     Q.   Do you know what group he was in?
25     A.   I don't recall precisely which group.

TSG Reporting - Worldwide (877) 702-9580

Page 204

HIGHLY CONFIDENTIAL - R. AZERAD
1
2  It's -- he had something to do with finance and
3  information technology.
4      Q.   He notes in his e-mail, "Just spoken
5  to Robert."  Do you see that?
6      A.   Yes.
7      Q.   Do you know if he's referring to you?
8      A.   I don't remember if I spoke to Mark
9  Lee September 22nd in the evening.  I was also
10  involved in -- in this effort, as you can infer
11  from some of the e-mails sent on here.
12     Q.   About three lines down he writes, "So
13  Robert is going to take the last Joel file and
14  make some assumptions.  The guys are working to
15  bring to 2.3 billion down so we have to take
16  some hit for this now."
17        Does seeing that give you any
18  indication one way or the other as to whether
19  the Robert he's referring to is you?
20     A.   To the best of my recollection, it
21  must have been me.  I don't remember any -- any
22  other Robert working on this project.
23     Q.   Do you know what the Joel file is?
24     A.   I believe what he's referring to is
25  the file sent by Joel Potenciano.

TSG Reporting - Worldwide (877) 702-9580

Page 205

HIGHLY CONFIDENTIAL - R. AZERAD
1
2      Q.   Do you know what the 2.3 billion
3  refers to?
4      A.   No, I don't recall.
5      Q.   It says in the second line, "The
6  numbers are taking too long to move
7  significantly and there is now misassumptions re
8  the ADI required to remain (see attached)."
9        That's the first part of that
10  sentence.  Do you know what that refers to?
11     A.   The attachment is what you have after
12  the blue page?
13     Q.   Yes.
14     A.   Okay.  I'm sorry.
15     Q.   As far as I can tell, I mean ...
16     A.   I'm sorry, can you repeat the
17  question?
18     Q.   I just want to know if you understand
19  what he meant when he wrote that.
20     A.   Not precisely.
21     Q.   Do you have a general understanding?
22     A.   My general understanding is that the
23  calculation of the 15c3-3 formula, I don't know
24  at which point, whether it started prior or
25  after September 19, became more and more

TSG Reporting - Worldwide (877) 702-9580

Page 206

HIGHLY CONFIDENTIAL - R. AZERAD
2  difficult for a variety of reasons, but to the
3  best of my understanding, primarily because it
4  was, when I had a discussion with someone from
5  the Reg. group, and I don't remember which
6  person, it was explained to me that the 15c3-3
7  formula was supposed to apply to a going concern
8  entity, not an entity which had filed for
9  bankruptcy or receivership.
10      Q.   He refers to the ADI.  Do you know
11  what that stands for?
12      A.   I believe A and D stands for aggregate
13  debit.  I'm not sure what the "I" --
14      Q.   Items?
15      A.   -- stands for.
16      Q.   That's a portion of the calculation
17  that needs to be locked up; is that correct?
18      A.   That's my understanding.  That's my
19  understanding.
20          I recall that at that time in
21  September we sometimes used ADI to identify a
22  part of the cushion which I referred to earlier,
23  which is cash or securities provided by LBI as
24  part of a 15c3 -- as part of a lockup required
25  by the calculation.
        TSG Reporting - Worldwide (877) 702-9580

Page 207

1      HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   So if the cushion gets released, does
3  the ADI also get released, or does it remain?
4      MR. STERN:  Objection to the form.
5      A.   I'm not an expert of the -- of the
6  15c3-3 formula.  My understanding is the ADI is
7  part of a formula driving the assets to be
8  segregated.  To the extent that the formula
9  changes, then you may have adjustments upward or
10  downward to the assets that needs to be
11  segregated.  But it doesn't sound natural to me
12  to talk about the ADI being released.  The ADI
13  is just an item in the formula.
14      Q.   If you look at the e-mail just below
15  the one that we're looking at, it's an e-mail
16  from Martin Kelly to Mark Lee, he writes, "We
17  need to get for ourselves and give to Barclays
18  comfort that the ADP balances will be
19  meaningfully reduced.  We put in 3.9 billion as
20  a placeholder."  That's what Mr. Kelly's e-mail
21  says, correct?
22      A.   That's what it says, yes.
23      Q.   I realize this is something that he
24  wrote, but do you know what my understanding as you
25  sit here today as to what that means?
        TSG Reporting - Worldwide (877) 702-9580

Page 208

1      HIGHLY CONFIDENTIAL - R. AZERAD
2      A.   No, I don't recall.
3      Q.   Do you recall any discussions about a
4  $3.9 billion placeholder?
5      A.   I don't recall.
6      Q.   Do you recall anything about an effort
7  to reduce the ADP balances?
8      A.   Not specifically.  The thrust of the
9  efforts as I recall around the 15c3-3 formula
10  and lockup at that time was since LBI -- this
11  was, again, either -- I don't remember when LBI
12  filed for receivership, it was either shortly
13  before or shortly after, was to provide for the
14  unwind of the -- of the items requiring for a
15  segregation of under a 15c3-3 formula in the way
16  that was as expeditious as possible, but I don't
17  recall specific discussion around the ADP.
18      MR. STERN:  Want to take a short
19  break?
20      MR. ROTHMAN:  Sure.
21      (Recess; Time Noted:  4:25 P.M.)
22      (Exhibit 190, an e-mail chain, the
23  earliest in time from R. Azerad to P.
24  Tonucci and others dated September 21, 2008,
25  marked for identification, as of this date.)
        TSG Reporting - Worldwide (877) 702-9580

Page 209

1      HIGHLY CONFIDENTIAL - R. AZERAD
2      (Exhibit 191, an e-mail chain, the
3  earliest in time from J. Potenciano to W.
4  Burke and others, dated September 21, 2008,
5  with attachment, marked for identification,
6  as of this date.)
7      (Exhibit 192, an e-mail from R. Azerad
8  to P. Tonucci dated September 22, 2008,
9  marked for identification, as of this date.)
10      (Time Noted:  4:38 P.M.)
11  BY MR. ROTHMAN:
12      Q.   While we were the off the record, I
13  marked three exhibits.  We'll take them in
14  order.  Exhibit 190, which you have in front of
15  you, Mr. Azerad, is an e-mail string.  The top
16  e-mail is from Martin Kelly to Mark Lee dated
17  Monday, 9/22/2008.  The e-mail below that is the
18  one I'm going to ask you about.  That's from
19  Mark Lee to you.  It's dated Sunday, September
20  20.
21      A.   I've read Exhibit 190.
22      Q.   Okay.  I just direct your attention to
23  the line in the e-mail from Mr. Lee to you where
24  he writes, "The guys are focused on the 2.3
25  billion now and reducing this as priority."
        TSG Reporting - Worldwide (877) 702-9580

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4

5    In re:                    )
                               ) Chapter 11
6    LEHMAN BROTHERS           ) Case No. 08-13555(JMP)
                               )
7    HOLDINGS, INC., et al.,   )
                               )
8            Debtors.          )
     --------------------------)

9

10

11

12

13

14       HIGHLY CONFIDENTIAL DEPOSITION OF

15            ALASTAIR BLACKWELL

16           New York, New York

17        Friday, August 7, 2009

18

19

20

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR, CLR

25   JOB NO. 24037

Page 6

```
1
2    A L A S T A I R   B L A C K W E L L,
3       called as a witness, having been duly sworn
4       by a Notary Public, was examined and
5       testified as follows:
6    EXAMINATION BY
7    MR. HINE:
8       Q.   Good morning, Mr. Blackwell.
9       A.   Good morning.
10      Q.   How are you?
11      A.   Very good, thanks.
12      Q.   I am sure your counsel has told you
13   what's going on here today, but we are here
14   taking a deposition involving the Lehman
15   bankruptcy proceedings.
16          My name is Bill Hine and I am from
17   Jones Day, which is the firm that's special
18   counsel to LBHI.  Several of the other counsel
19   along the table will introduce themselves
20   later, but they represent various entities that
21   are involved in this proceeding.
22          So the way this is going to work is
23   I am going to ask you a bunch of questions
24   first and they will all take turns with you
25   later as we progress.
```

Page 7

```
1            Blackwell - Highly Confidential
2       A.   Understood.
3       Q.   As we go, I am going to be asking
4    you a series of questions.  You are under oath,
5    so you will answer the questions.  At some
6    points in time you will hear your counsel state
7    an objection.  That doesn't mean you don't have
8    to answer the question.  That just means he is
9    either preserving the record or he wants to ask
10   me to clarify the question.  If he instructs
11   you not to answer, that's up to you as well,
12   but the mere fact that he makes an objection
13   doesn't mean you don't have to answer the
14   question.
15          In that vein, I'd like to ask you
16   just please ask me to clarify any question
17   where I might misuse an acronym or a word.  I
18   feel like I am learning a new language here
19   reading all you folks' e-mail, so I know there
20   is technical financial words that you guys use
21   and you understand readily, but if you need me
22   to clarify one, I want to have a clear question
23   so you can answer it.
24          I think your counsel has probably
25   told you, but you have been designated as a
```

Page 8

```
1           Blackwell - Highly Confidential
2    30(b)(6) witness for a select set of issues in
3    this case and those issues relate to Schedules
4    A and B of the Clarification Letter.  We will
5    get to that later, but I just want to let you
6    know that, and that I will alert you to that
7    fact when we get to that portion of the
8    deposition, so in that portion you will be
9    speaking on behalf of Barclays.
10          So I am ready to proceed if you are.
11   Are we ready to do this?
12      A.   Absolutely, yes.  Thank you.
13      Q.   Can we start off with a little
14   background information about you.
15          You are currently employed by
16   Barclays Capital; correct?
17      A.   I am, yes.
18      Q.   And what is your present position?
19      A.   I am responsible for the Americas
20   operations department for capital markets.
21      Q.   Okay.  And do you have a title?
22      A.   I am a managing director.
23      Q.   When did you start your employment
24   at Barclays?
25      A.   I received a contract after
```

Page 9

```
1           Blackwell - Highly Confidential
2    bankruptcy, I don't know exactly when I signed
3    that, but it would have been, I think, two
4    weeks after bankruptcy that I signed a contract
5    to join Barclays.  I wasn't one of those people
6    that received an e-mail and clicked off on it,
7    for instance.
8       Q.   Okay.  When did you -- that's the
9    contract, we will get to that in a second, but
10   when did you consider yourself a Barclays
11   employee?
12      A.   Post bankruptcy.
13      Q.   Was it upon the closing of the sale
14   transaction?
15      A.   I would think so, yes.
16      Q.   And just as we go forward, if I
17   refer to the sale transaction, can we agree
18   that that will be the transaction that closed
19   on the 22nd of September 2008 whereby certain
20   assets were transferred to Barclays?  Can we
21   agree on that?
22      A.   What time is that?
23      Q.   I don't know the time.
24      A.   Midnight from that day.
25      Q.   Okay.  So is it fair to say after
```

## Page 14

1      Blackwell - Highly Confidential
2  which is led by James Black and informally
3  managed by Alex Crepeau until about a week ago.
4      **Q.  When you talk about operations**
5  **function, is there a component of that of your**
6  **work that covers valuing or marking assets?**
7      A.   I want to be very precise about the
8  way I would describe that.  There is a function
9  in operations that values positions, but that's
10 using data, pricing data, that is either
11 purchased from a third party or is consumed
12 from a front office trading source, so we are
13 not determining a valuation on a security.  We
14 do not determine valuation.
15     **Q.   But you mark the security with this**
16 **information that you receive from a third**
17 **source?**
18     A.   It's a mechanical process.
19 Inventory, mark, it gives you a result.  It's
20 not -- you are not applying any thought to it
21 other than is that actually the security that
22 our mark ties out to.
23     **Q.   Could we go back now to your last**
24 **position you held at Lehman.**
25          **First of all, how long did you work**
TSG Reporting - Worldwide  (877) 702-9580

## Page 15

1      **Blackwell - Highly Confidential**
2  **for Lehman?**
3      **A.   I worked for Lehman from November**
4  **27th, 2000 until the 22nd of September, 2008.**
5      **Q.   And what was the last position you**
6  **held at Lehman?**
7      **A.   I was global head of operations for**
8  **both capital markets and IMD.  I was in the**
9  **process of taking responsibility for Aurora**
10 **loan services, but I hadn't been formally**
11 **announced, so that was matter of a few weeks'**
12 **worth of effort, but I didn't have any formal**
13 **management responsibility at that point, so you**
14 **will see information in my e-mails associated**
15 **with Aurora.**
16     **Q.   And who did you report directly to**
17 **in that position?**
18     **A.   I reported to Ian Lowitt.**
19     Q.   Anyone else?
20     A.   No.
21     Q.   And who were your direct reports?
22     A.   In the United States, Neal Ullman,
23 who is global head of our clearance and custody
24 function.  Monty Forrest, who is global head of
25 prime services operations.  Kirk Butryn who was
TSG Reporting - Worldwide  (877) 702-9580

## Page 16

1      Blackwell - Highly Confidential
2  co-head of equity operations.  Alex Crepeau,
3  who was responsible for regulatory operations,
4  tax, operations control, client valuations and
5  margin.  I believe that's all of them from
6  memory.  In the U.K. there is a gentleman
7  called Garth Barker Goldie, who is responsible
8  for European operations, and in Asia,
9  Christopher Flanagan, who was responsible for
10 our Asian operations.  And there was also --
11 actually, there is another gentleman called
12 Stewart Nineham who was my CAO in -- global
13 CAO.
14     **Q.   Can you explain to me in your Lehman**
15 **role whether your group was responsible for**
16 **valuing or marking securities?  Same question**
17 **only I am trying to see if the Lehman role was**
18 **the same.**
19     A.   It was identical.  In terms of
20 consumption of data, any model-driven pricing
21 would be front-end trading, trading
22 responsibility to provide a mark, and finance
23 function at Lehman Brothers, product control,
24 for want of a better term, was responsible for
25 price testing, so they would test the models to
TSG Reporting - Worldwide  (877) 702-9580

## Page 17

1      Blackwell - Highly Confidential
2  ensure that those were accurate and produce the
3  result that they were intended to do.
4      **Q.   And who were in charge of those**
5  **functions at Lehman; do you recall?**
6      A.   The front office was various
7  different business heads, so, I mean,
8  ultimately it would have been Bart as president
9  and head of risk effectively, but Gelband was
10 responsible for the fixed income division and
11 Jerry Donini was responsible for equities, and
12 the IMD business theoretically didn't take any
13 risk.
14     **Q.   I don't mean to be intrusive, but I**
15 **have to ask you some questions about your**
16 **compensation.**
17     MR. SHAW:  This is all highly
18 confidential.
19     MR. HINE:  Yes.
20     **Q.   When you transitioned from Lehman,**
21 **your position at Lehman to your position at**
22 **Barclays, did your compensation increase?**
23     **A.   No, actually, it declined.**
24     Q.   Declined.  In what way?
25     A.   I had a two-year guarantee from
TSG Reporting - Worldwide  (877) 702-9580

Blackwell - Highly Confidential
1
2   Lehman Brothers in 2007 and the first year of
3   that guarantee was -- for 2007 I think was
4   $2.7 million.  The second year was
5   $3.5 million.  My -- obviously the majority of
6   that comp gets paid in stock.  At the point of
7   transition there was a process which you
8   probably see in my e-mail where I was offered a
9   certain role and I considered it over a period
10  of time and decided to do something slightly
11  different and at that point we agreed that I
12  would have a two-year contract because of
13  uncertainty about where the future would lead
14  and the compensation was tied to my 2007
15  number, so it was probably approximately
16  $700,000 less.  There were some additional
17  incentive payments for longevity at two points
18  in September of this year and September of
19  next, but I think the headline number was
20  probably less than overall what my Lehman
21  compensation would have been in 2008.
22      Q.   And what position were you
23  considered for that -- you alluded to a
24  suggestion of a position and you opted for
25  something else.  Could you just explain to me

1       Blackwell - Highly Confidential
2   what you meant by that?
3       A.   I had been global head at Lehman
4   for, I think, three or four months, a
5   relatively a short period of time.  The role
6   that I was offered was running Americas
7   operations and being co-head of the equity
8   operations organization.  In my mind that was
9   taking me back four or five years in my career
10  and I didn't really see the -- it didn't feel
11  appropriate, so I was a little unhappy that
12  that was what I was being offered and I
13  certainly wasn't -- yeah, I was -- it wasn't --
14  it didn't feel like the right thing for me at
15  that point, but I was very keen to help
16  everyone with the integration process.  I felt
17  I had a moral obligation to my team to make
18  sure that happened, and though I was being
19  offered jobs externally for some period of
20  time, I felt I wanted to stay and see this
21  through and put faith in the organization to
22  find me a role in the future, which I am still
23  hoping will happen.
24      Q.   You said you were head of global for
25  only three months.  What was your position

1       Blackwell - Highly Confidential
2   prior to your position as head of global for
3   Lehman?
4       A.   I had global responsibility for
5   prime services operations.  I also had global
6   responsibility for equity operations, and in
7   addition to that I was European head of
8   operations, so I commuted back and forth
9   between London and New York almost on a weekly
10  basis for about a year, little less than a
11  year.
12      Q.   Back to your compensation, can we
13  just break it into some components here just so
14  I understand it.  I take it at Lehman you had a
15  base salary?
16      A.   Yes.
17      Q.   And what was that?
18      A.   I think it was $200,000.
19      Q.   And then you had -- am I correct to
20  say you had a cash component bonus and an
21  equity component bonus?
22      A.   Yes, that's correct.  Off the top of
23  my head I wouldn't be able to tell you.  I
24  could go back and look at documents and confirm
25  it, but the number I recall would be

1       Blackwell - Highly Confidential
2   $2.5 million of bonus, of which somewhere
3   between 50 and -- I would imagine somewhere
4   around 50 percent would be cash, 50 percent
5   securities, deferred five-year equity.
6       Q.   And that was for 2007, you said?
7       A.   Correct.
8       Q.   Now, in 2008 your base salary was
9   still the same; correct?
10      A.   Correct.
11      Q.   Okay.  And then you expected to make
12  3.2 in bonus, whether it's cash or equity?
13      A.   No, my base was 200.  I was
14  expecting 3.5, so I was expecting 3.3.
15      Q.   You are right.  I am bad at math.
16          When you went to Barclays, out of
17  that 3.3 did you receive any of it?
18      A.   No.
19      Q.   Did you receive any payment from
20  Barclays that was supposed to have compensated
21  you for your 2008 bonus?
22      A.   I received a bonus in February in
23  the normal compensation cycle, so yes, I
24  received a bonus payment, but I think it was to
25  compensate me for -- that it was to retain me

## Page 22

Blackwell - Highly Confidential

1
2    as an employee of the organization and I was
3    performing an important role within the
4    organization.
5        Q.    Okay.  So you didn't view it as
6    reimbursing you or compensating you for the
7    first nine months of the year that you have
8    spent at Lehman; is that right?
9        A.    No.
10       Q.    No, it's not right or -- I asked a
11   strange question.
12          Did you view it as compensating you
13   for your first nine months of work that you had
14   spent at Lehman in 2008?
15       A.    No.
16       MR. HINE:  I want to show you a
17   document here which we are going to mark as
18   Exhibit 55 B.
19       (Exhibit 55 B, letter dated October
20   2, 2008, Bates stamped BCI-EX-00077291
21   through BCI-EX-00077293, marked for
22   identification.)
23       Q.    Mr. Blackwell, I have just handed
24   you a document marked as 55 B.  I just wanted
25   to ask you if you have ever seen that document

## Page 23

Blackwell - Highly Confidential

1
2    before.
3        A.    Yes.
4        Q.    What is that?
5        A.    That is the contract that Carol
6    Machell handed me, offered me to become an
7    employee of Barclays Capital.
8        Q.    And is that your signature on the
9    last page?
10       A.    Yes.
11       Q.    You said you wanted to say something
12   in addition to supplement your prior testimony.
13       A.    Yes.  I just wanted to mention that
14   in addition to my regular compensation in 2008,
15   Lehman Brothers awarded me a special stock
16   award, I think it was in July, of some deferred
17   stock issued at a discounted price, which would
18   vest in three years.  There was no partial
19   vesting.  It was full vesting in three years.
20   So I just wanted to put that on the record as
21   well.
22       Q.    And that is part of your Lehman
23   compensation for 2008?
24       A.    It was approximately --
25       MR. SHAW:  Objection.  Foundation.

## Page 24

Blackwell - Highly Confidential

1
2        A.    Sorry.  Could you ask the question
3    again?
4        Q.    Why did they give you that award?
5        MR. SHAW:  Objection.  Foundation.
6        MR. HINE:  You can answer.
7        A.    My understanding is that we were
8    obviously seeing a lot of employees leave the
9    firm at that point in time, there was a lot of
10   movement in the marketplace, people moving
11   around, and I think my understanding was it was
12   to show that I was a valued employee.
13       Q.    Okay.  And what was the value of
14   this -- did you say it was an option?
15       A.    Deferred stock.  I don't have the
16   document, I haven't looked at it for a very
17   long time, but it was approximately a million
18   dollars of deferred discounted Lehman
19   securities.
20       Q.    And did you consider that part of
21   your compensation for your work in 2008?
22       A.    I considered it as part of my
23   compensation in 2008, yes.  I didn't consider
24   it in the headline number I gave you of
25   $2.7 million.  That was in addition.

## Page 25

Blackwell - Highly Confidential

1
2        Q.    I understand.  We will just look at
3    your contract here for a second.  You have
4    testified about some of this.  I just want to
5    make sure I understand it.
6            Where it says "Compensation," the
7    heading Compensation, it mentions a base salary
8    of 200,000.  That's what you testified earlier;
9    correct?
10       A.    Correct.
11       Q.    So that's your base salary now at
12   Barclays?
13       A.    It is.
14       Q.    Then it talks about a 2008
15   guaranteed cash bonus.  Do you see that line?
16       A.    I do.
17       Q.    And now is that -- have you been
18   paid that?
19       A.    I have.
20       Q.    And is that -- what is that for?
21   Why were you paid that?
22       MR. SHAW:  Objection.  Foundation.
23       A.    Compensation for my employment by
24   Barclays.
25       Q.    Okay.  So that's compensation for

1    **Blackwell - Highly Confidential**
2    **your employment by Barclays for the period that**
3    **you worked for them in 2008?**
4             MR. SHAW:  Objection.  Foundation.
5             MR. HINE:  You can answer.
6        A.    I would think of these in the normal
7    course of business when you transfer between
8    companies, if I moved to Citibank, for
9    instance, I would have expected to receive a
10   guarantee or award to move in a half year, so
11   when I think of this, this is for my period of
12   employment with Barclays, but I think it's
13   relatively standard practice that somebody at
14   my level leaving between organizations, which
15   is effectively what happened, would be
16   compensated and I would think of that as my OA
17   comp.
18        Q.    Later on I see 2008 EPP
19   Recommendation.  Do you see that heading?
20        A.    I do.
21        Q.    Can you describe for me what this
22   is?
23        A.    I understand this to be deferred
24   compensation, a stock award, to the value --
25   and I'm not sure what it was awarded at, I

1        Blackwell - Highly Confidential
2    haven't paid any attention to it, but it's an
3    award that will vest over a three-year period,
4    so if I am an employee in three years from now
5    at Barclays, then I will receive that -- I will
6    receive that stock.
7        Q.    Okay.  Did you, in fact, receive
8    this award on March 15th, 2009?
9        A.    I received the award, but not on
10   March 15th.
11       Q.    When did you receive it?
12       A.    I don't know the precise date, but
13   it was late.  It was later in the year.
14       Q.    Okay.  Do you have an approximate
15   date you can give me?
16       A.    No.
17       Q.    Then I see something called 2009
18   guaranteed cash bonus.  Do you see that?
19       A.    I do.
20       Q.    Now, is that the bonus that you
21   previously described when you were talking
22   about the bonus that you expect to receive from
23   Barclays going forward?
24       A.    This is the bonus I expect to
25   receive for my work and performance in 2009.

1        Blackwell - Highly Confidential
2        Q.    And continuing down on the list we
3    see 2009 EPP recommendation, which appears to
4    be a stock award.
5             Is that what you expect to receive
6    as a stock bonus for your work in 2009?
7        A.    Yes.
8        Q.    Now, continuing further down you see
9    a special cash award which mentions the sum of
10   $1.225 million.  Do you see that?
11       A.    I do.
12       Q.    What is that for?
13       A.    I think this is --
14            MR. SHAW:  Objection.  Foundation.
15       A.    I think this is an award, it's
16   effectively a retention payment to encourage me
17   to stay at the firm over that period of time,
18   because, again, there have been alternatives
19   along the way and I want to stay at Barclays,
20   so I think that's what that payment is for.
21       Q.    And you haven't received that yet?
22       A.    No.
23       Q.    But you expect to receive it on the
24   anniversary of your employment?
25       A.    Yes.  22nd of September I would

1        Blackwell - Highly Confidential
2    expect to receive the first half of that
3    payment.
4        Q.    Can you tell me when you first began
5    discussions with Barclays about your employment
6    arrangement that you expected to have with
7    them?
8        A.    It was in the week immediately
9    after -- immediately after LBI's filing after
10   the 22nd.  I don't think discussions began
11   until later in that week.  I think around the
12   24th or 25th, but I can't recall precisely.
13       Q.    Okay.  Can I just clarify some
14   dates.  I will represent LBHI filed on the
15   15th.
16       A.    Absolutely.
17       Q.    Correct?  Okay.  LBI filed on the
18   19th; correct?
19       A.    Yes.
20       Q.    Okay.  And during that week did you
21   have any discussions with Barclays about your
22   potential employment there?
23       A.    No.
24       Q.    Did you have any discussions with
25   anyone else?

Blackwell - Highly Confidential
1
2    A.   I was incredibly busy, incredibly
3    busy.  Friends and family were concerned and
4    it's possible that I made reference to the fact
5    that I would become a Barclays employee at some
6    point, I assumed.  I had an assumption.  I had
7    no knowledge that I would be and I had no
8    discussions that were suggested I would be.
9    Q.   And so did I understand you
10   correctly to say that you didn't have such
11   discussions until after the closing of the sale
12   transaction?
13   A.   Yes.  It wasn't until, I think, the
14   earliest the 24th.  It was certainly into
15   the -- post LBI's bankruptcy after the APA was
16   signed.
17   Q.   And who did you have those
18   discussions with at Barclays?
19   A.   Carol Machell.  At Barclays, Carol
20   Machell.
21   Q.   Did you discuss it with Michael
22   Evans at all?
23   A.   Absolutely not.
24   Q.   And Carol Machell is the person who
25   ultimately became your supervisor?

Blackwell - Highly Confidential
1
2    A.   Absolutely.
3    Q.   What do you recall about those
4    discussions?
5    A.   The financial component was of
6    little interest to me, frankly.  I was
7    expecting that we would discuss a role and the
8    discussion didn't go very well, because I
9    wasn't very happy in terms of the role.  The
10   focus wasn't on the financial components.  I
11   have no dependents.  I don't -- the money isn't
12   the main motivator in why I go to work.  I was
13   looking for an interesting role in an
14   organization which I thought would be an
15   interesting place to be and the role that I was
16   initially offered I thought was -- didn't meet
17   my expectations and, therefore, I actually
18   considered leaving.  What we had discussed in
19   that first set of conversations was that I
20   would go away and think about it and, again, I
21   wanted to be responsible and work with Carol to
22   ensure there was a smooth integration, so that
23   wouldn't mean I would leave immediately, but
24   work for a period of time, certainly into the
25   new year to help with a smooth transition of my

Blackwell - Highly Confidential
1
2    staff.
3    Q.   Was there any back-and-forth on the
4    numbers?
5    A.   Yes, because it was -- the original
6    contract I was offered was more money than
7    this.
8    Q.   So could you just summarize what the
9    back-and-forth was?
10   A.   It was more about the duration, the
11   value of the contract, the cash award or
12   whatever -- I don't recall the numbers exactly,
13   but it was more than this contract.
14   Q.   When you say "the duration," you
15   mean the length of your expected employment?
16   A.   This contract effectively has
17   several components, but I would look at it as a
18   two-year contract, and the contract that I was
19   offered was a one-year contract with two years
20   of incentive payments.  From memory.  I may not
21   be precise.  But certainly the role was the
22   core part of my focus.
23   Q.   During the week of the 15th, in
24   other words, after LBHI's filing leading up to
25   eventually LBI's filing, did you have any

Blackwell - Highly Confidential
1
2    understanding of the arrangements that had been
3    made as to compensation for former Lehman
4    employees?
5    A.   No.
6    Q.   Did you have any knowledge of the
7    provisions in the APA that related to
8    compensation?
9    A.   No.
10   Q.   Did you have any role in negotiating
11   those types of provisions?
12   A.   No.  I was asked to make lists of
13   people who were critical to certain things, but
14   that was it.
15   Q.   Did you hear any rumors about how
16   former Lehman employees were going to be
17   compensated when they moved to Barclays?
18   A.   Can you be precise about the time
19   frame you are talking about?
20   Q.   I am talking about the week of --
21   let's talk about the week of September 15th.
22   In other words, LBHI has filed, LBI has not yet
23   filed, but that five-day period.
24   A.   All I had heard was speculation in
25   the press, and from my recollection I can't

Page 38

1       Blackwell - Highly Confidential
2       Q.    Was that instruction related to the
3    bankruptcy?
4       A.    No, it wasn't related to the
5    bankruptcy.  It was related to LBI's
6    functioning, ongoing functioning.
7       Q.    Did you have any discussion -- when
8    you say "LBI's functioning," is that -- are you
9    talking about the fact that LBI did not file
10   for bankruptcy until several days later?
11      A.    Correct.
12      Q.    Okay.  So what were you doing to
13   assure LBI's functioning?
14      A.    Ian asked me to do two things.  Be
15   able to be -- be able to function -- have LBI
16   function as an entity by itself from an
17   operational standpoint, so -- and also work
18   with treasury to create a funding ladder for
19   the week, based on the settlement activity
20   that would be taking place over the course of
21   that week, lay out a cash flow, and also put a
22   payment protocol in so that no payment, no cash
23   could leave LBI.  So that was done.  Myself and
24   Bridget O'Connor, who was the Lehman head of
25   technology, went away and worked with our

Page 39

1       Blackwell - Highly Confidential
2    respective teams and our teams then worked
3    together to execute that.  We worked into, I
4    think, the early hours of the night to
5    determine what we thought the cash flows would
6    be.  I provided that ladder, funding ladder, to
7    the treasury department, which is run by Paolo
8    Tonucci.
9       Q.    So you used a lot of words there.  I
10   just want to see if I understand.
11          Is this the financing that was
12   provided by the Fed to LBI?
13      A.    No.  This is -- the cash flows -- in
14   the securities business, exchange securities
15   for cash.  In the exchange of securities for
16   cash, obviously some security is leaving, some
17   securities are coming into inventory.  Some
18   client securities are coming in and leaving.
19   And the associated cash flows that went with
20   that was to understand what the net cash
21   position each day would be if the firm had
22   perfect settlement.  And when I say "perfect
23   settlement," I mean all transactions, so all
24   securities and consideration settled on the
25   contractual settlement date.

Page 40

1       Blackwell - Highly Confidential
2       Q.    So back to your role during that
3    week, now on the 15th you learned that LBHI has
4    filed for bankruptcy; correct?
5       A.    Is that -- what day of the week --
6       Q.    That's Monday.
7       A.    That's the Monday.  I think it was
8    Sunday night.
9       Q.    So you heard about it Sunday night?
10      A.    I think so.  It was the 14th.  Late
11   Sunday night.
12      Q.    What did you hear -- apparently on
13   the 15th Barclays and Lehman start speaking
14   again and they eventually arrive at an APA.
15          Can you describe for me any role you
16   played in that process?
17      A.    I didn't know that Barclays -- I
18   wasn't involved in any of those discussions, so
19   I played no role.
20      Q.    Okay.  So did the APA come as a
21   surprise to you when you heard that?
22      A.    I didn't know -- does the
23   agreement --
24      Q.    That was a bad question.
25          How did you first hear that there

Page 41

1       Blackwell - Highly Confidential
2    was going to be a sale transaction between
3    Barclays and Lehman?
4       A.    I think on the Monday what I was
5    asked to do as another set of actions was work
6    towards a conversion and the way I would
7    interpret a conversion is that there is going
8    to be some -- either some asset sale or the
9    whole organization is going to be sold as a
10   going concern ,the LBI organization would be
11   sold as a going concern.  So I'm sure you can
12   see it in my e-mail as well, there was a series
13   of meetings to create a project plan, to
14   work -- which involved technology, finance,
15   operations, to have -- create a fully
16   functioning broker/dealer for whenever that was
17   going to be.  So that was an incredibly onerous
18   piece of work.  These things normally take
19   months and years to create and we were given a
20   very compressed time frame to try and do that,
21   so I was trying to get a business up and
22   running again potentially.  That's the way I
23   interpreted that.  Those were my marching
24   orders at that point.  So I had no idea what
25   the content -- what sale meant.

```
 1          Blackwell - Highly Confidential
 2      Q.   Did you have an understanding of the
 3  terms of the Asset Purchase Agreement?
 4      A.   I didn't know an Asset Purchase
 5  Agreement existed at that point.
 6      Q.   Have you ever seen an Asset Purchase
 7  Agreement?
 8      A.   I have, but not -- I have, yes, I
 9  have, but much, much, much post bankruptcy.
10  Maybe weeks afterwards.
11      Q.   Okay.  That was a badly phrased
12  question.
13          Have you -- when I meant "Asset
14  Purchase Agreement," I meant the Asset Purchase
15  Agreement that's at issue in this case, which
16  is the one between Barclays and Lehman.
17          So am I correct to understand you to
18  say you didn't see that agreement until after
19  the closing of the sale transaction?
20      A.   I believe so.  It may have hit my
21  e-mail.  I don't ever remember reading it.  I
22  think it's highly unlikely that I saw it until
23  after bankruptcy, and it's certainly the case
24  that I was asking Jonathan Hughes post
25  bankruptcy --
```

```
 1          Blackwell - Highly Confidential
 2      MR. SHAW:  Let's not get into any
 3  discussions you had with Jonathan.
 4      MR. HINE:  Is Jonathan a lawyer?
 5      MR. SHAW:  He is the general
 6  counsel.
 7      MR. HINE:  So you are asserting a
 8  privilege over that conversation?
 9      MR. SHAW:  Yes.
10      Q.   I just want to be clear.  When we
11  talk here, when you said "bankruptcy," you were
12  talking LBI's bankruptcy?
13      A.   I am talking about LBI's bankruptcy,
14  yes.  I had no knowledge of an APA pre
15  bankruptcy and the content of it.
16      Q.   Did you have any understanding of
17  what the sale transaction was supposed to
18  accomplish?
19      A.   I had a set of actions to perform,
20  which was providing data to my supervisor, to
21  Ian Lowitt, and those components were
22  clearly -- at certain points it became clear
23  they were part of the transaction, but I didn't
24  know what part, and I had very limited
25  understanding.  It was perform this task, get
```

```
 1          Blackwell - Highly Confidential
 2  the task done, and that's what I tried to
 3  execute as effectively as I could.
 4      Q.   And so did you ever -- again, I
 5  understand that and we will go through those
 6  tasks as we go, but did you ever have any
 7  inkling about a $70 billion figure with respect
 8  to the assets that were going to be transferred
 9  to Barclays?
10      A.   70 billion?
11      Q.   Yes.
12      A.   That's not a number that sticks out
13  in my memory, no.
14      Q.   Did you ever hear anyone talk about
15  a discount that was being awarded to Barclays
16  with respect to Lehman assets?
17      A.   No.  And I think when I was asked
18  what the deal content was by one of my
19  colleagues, I pointed them in someone else's
20  direction to the deal lawyers.  I didn't have
21  details of that.
22      Q.   Did you have any -- I'm not asking
23  about whether you were involved in discussions,
24  but did you hear any rumors or, you know, water
25  cooler talk about a discount being awarded to
```

```
 1          Blackwell - Highly Confidential
 2  Barclays as to Lehman assets?
 3      A.   I don't think so, no.
 4      Q.   Did you ever hear the phrase "block
 5  discount" used in connection with the sale
 6  transaction?
 7      A.   Block discount, no.
 8      Q.   Did you ever hear that phrase or a
 9  similar phrase used when it came to valuing
10  assets that were supposed to be transferred to
11  Barclays?
12      A.   No.  I wasn't focused on anything
13  related to valuation, so that wasn't really --
14  making lists of securities was different than
15  determining what they should be worth in
16  aggregate.
17      Q.   We will get into that more.  I
18  understand.
19          Did you ever hear anyone refer to
20  the transaction as a wash transaction or words
21  to that effect?
22      A.   No.
23      Q.   Is it fair to say that you really
24  were fairly unfamiliar with the specific
25  contractual terms of that transaction during
```

Page 46

1    **Blackwell - Highly Confidential**
2    **that week?**
3        A.    Very unfamiliar.
4        Q.    I want to show you a document --
5    some of these documents I am going to show you
6    just to see if you know about them or what you
7    know about them.
8        A.    I'd just like to make a point.  I
9    was sending or receiving about a thousand
10   e-mails a day at that time, I think,
11   approximately, so documents passed across my
12   e-mail.  It was physically impossible for me to
13   consume all that information.
14       MR. HINE:  I understand.
15       Let's mark this as the next exhibit.
16       (Exhibit 56 B, e-mail dated May 29,
17       2009, Bates stamped 10295594, with attached
18       fax, Bates stamped 10300652, marked for
19       identification.)
20       Q.    Mr. Blackwell, I am handing you a
21   document that's marked as Exhibit 56 B, which
22   appears to be an e-mail in or about Monday,
23   September 15th, 2008, and attached to it is a
24   fax that's addressed to you and it's attaching
25   a document entitled Custodial Undertaking in

Page 47

1        **Blackwell - Highly Confidential**
2    **Connection With Master Repurchase Agreement.**
3        A.    The repo agreement.
4        Q.    Right.  So my question to you is
5    have you ever seen this agreement or this
6    document?
7        MR. SHAW:  Take a chance to look
8        through it.
9        (Document review.)
10       A.    I don't recall looking at this.  I
11   think it's a standard repo agreement.
12       Q.    Can I just ask you a question or two
13   about -- this repo agreement relates to an
14   agreement between Lehman, Barclays and JPMC or
15   JPMorgan Chase.
16       In your role as head of operations,
17   did you deal with repurchase agreements of this
18   nature?
19       A.    We processed repurchase agreements.
20   We didn't agree to commercial terms of a
21   repurchase agreement, but we processed it.
22       Q.    What do you mean by process it?
23       A.    So in terms of the technical way
24   that you would manage a tri-party repo
25   agreement is that you have a tri-party agent

Page 48

1        Blackwell - Highly Confidential
2    and two counterparties.  A firm's tri-party
3    agent selects the collateral based on the
4    agreement terms, what collateral becomes
5    eligible, and will pledge that.  You book
6    something called a shell on -- operations book
7    a shell to the value that the tri-party agent
8    has pledged based upon their market value, and
9    so those components are then fed into a system
10   to record the repo transaction.  So that is
11   sort of bread and butter activity for a
12   broker/dealer, how a broker/dealer would fund
13   itself.  So it's a daily event with multiple
14   counterparties.  Chase were Lehman's primary
15   tri-party agent.
16       Q.    So there was a pre-existing Master
17   Repurchase Agreement involving these three
18   parties; is that right?
19       A.    I believe so.  I don't know.
20       Q.    My real question is do you know why
21   this was executed or this was either presented
22   to you or executed on the 15th, which is the
23   date of the LBHI bankruptcy?
24       A.    From looking at this it looks like
25   they were trying to set up a new agreement.  I

Page 49

1        Blackwell - Highly Confidential
2    don't think it was used ultimately.
3        Q.    You don't think --
4        A.    I don't think so, because I think --
5    because Bank of New York were Barclays' -- I
6    think the attempt here was due to a technical
7    constraint, Lehman Brothers did not have
8    tri-party structure in place because of the
9    volume of transactions.  The operational
10   technicalities of doing this were too complex.
11   So the goal was to set up -- I think, I may be
12   wrong, because I'm not the expert, the team
13   that run this are the experts, hence why they
14   are on here.  The finance team and the treasury
15   team and the operations team responsible for
16   processing the repo are the experts.  I believe
17   from memory that there was an attempt to set up
18   a Barclays arrangement with Chase at that
19   point.  I think this was scrapped as a
20   structure.  I think so, but I may be wrong.
21       Q.    Who should I ask -- who would you
22   ask if you really wanted -- I understand you
23   don't have intimate knowledge, but who should I
24   ask that question?
25       A.    Well, the business person that would

1          Blackwell - Highly Confidential
2      Q.   Okay.  Can we go through some
3  terminology here just so I understand.
4          I see in a lot of e-mails the phrase
5  "BONY tri-party."  Can you just tell me what
6  that is meant to encompass?
7      A.   BONY is Bank of New York.  Tri-party
8  is a type -- is a repo.
9      Q.   Okay.  I didn't mean to interrupt
10 you, but we have been discussing a repurchase
11 transaction on September 18th involving
12 Barclays, Lehman and BONY.
13         Is that what you folks call the BONY
14 tri-party in the e-mail, generally?
15     A.   I think that's very broad.
16     Q.   What would you understand that BONY
17 tri-party to be?
18     A.   Depends on the context.
19     Q.   Okay.  Did there come a point in
20 time -- well, let's step back to the Monday
21 again.
22         Did you learn at some point that the
23 fed was providing some kind of financing to LBI
24 during that week?
25     A.   Yes.  We had been pledging more and

1          Blackwell - Highly Confidential
2  more of our -- we had a large repo under
3  various different schemes with the Fed.
4      Q.   When you say various different
5  schemes, is that -- I see acronyms PDFC, OMO
6  and TSLF.  Is that what --
7      A.   Correct.
8      Q.   So those are three different Fed
9  programs?
10     A.   Yes.
11     Q.   Am I correct to say that on Monday
12 night, Tuesday night and Wednesday night of
13 that week the Fed was providing some sort of
14 financing under those programs to Lehman?
15     A.   It was a repo, again, pledging
16 assets through Chase and a tri-party agent to
17 the Fed and the Fed provided cash.
18     Q.   And now were you involved in
19 selecting the assets that were pledged?
20     A.   The mechanism by which assets are
21 selected are driven by the repurchase
22 agreements and the schedules attached to the
23 repurchase agreements that are in place.  So it
24 was eligible collateral.  So that's an
25 automated process in a normal course of

1          Blackwell - Highly Confidential
2  business in that your tri-party agent will look
3  at the eligible collateral and pledge that on
4  your behalf to the Fed and then you get a file
5  from in this instance Chase, which is uploaded
6  into your system, into your repo shell to
7  reflect the securities that are being pledged.
8      Q.   Okay.  Is that what took place in
9  this instance?
10     A.   As far as I understand, in the early
11 part of the week, that's absolutely what
12 occurred.
13     Q.   So, again, I'm not trying to put
14 words in your mouth.  I am just trying to
15 translate it into something that a non-finance
16 person can understand.
17         Is it correct to say that JPMC or
18 Chase selected the securities that were pledged
19 to the Fed?
20     A.   That would be my understanding of
21 the mechanism.  The individuals within the
22 business, treasury and operations that
23 transacted or carried out those functions could
24 give you a much more precise answer.
25     Q.   So you are talking about within

1          Blackwell - Highly Confidential
2  Lehman's treasury department?
3      A.   Yes, and operations, Jim Hraska.
4      Q.   Jim Hraska?
5      A.   Yes.
6      Q.   And at some point you learned, I
7  take it, that there was going to be some kind
8  of transaction where Barclays would be
9  providing that financing instead of the Fed;
10 correct?
11     A.   Correct.
12     Q.   Tell me what you understood about
13 that.
14     A.   I was initially contacted -- I think
15 conversations had already been taking place
16 between John Coghlan, treasury and Barclays
17 about how a repo process would take place.  A
18 gentleman called David Aranow and John Feraca
19 were -- both of them were asked by John Coghlan
20 to basically run the process of moving the
21 collateral that was currently pledged to the
22 Fed under the various programs, and I am going
23 to caveat that, I will come back to that in a
24 second, under the various programs, and the
25 collateral that was eligible over to Bank of

1              Blackwell - Highly Confidential
2      New York.  Now, I think the first conversations
3      were had on the 17th -- sorry, I think --
4      that's when I first started to hear about this,
5      I think, around the 17th, and I think it was
6      determined it was technically -- not say
7      impossible, but incredibly difficult to move
8      that amount of collateral on that day, which
9      was, I think, what had been discussed, so it
10     was then determined that that would then happen
11     the following -- I think it was the following
12     day, so there was some setup work that was
13     required and you will see that communication
14     flying around between treasury, operations and
15     business as how to set this -- set the
16     mechanism up to facilitate that.  And this is a
17     very large amount of collateral --
18          Q.    Sure.
19          A.    -- so there are a lot of operational
20     complexities to it.  So at that point that's
21     when I was aware that we were in the process
22     of -- that Barclays were going to be funding
23     the LBI entity through the repo and taking the
24     Fed's exposure away or relieving Fed's
25     exposure.

1              Blackwell - Highly Confidential
2          MR. SHAW:  When you reach a logical
3      stopping point, we have been going about an
4      hour.
5          MR. HINE:  Do you want to take a
6      break?
7          THE WITNESS:  Another five minutes
8      or so.
9          Q.    I think I understood what you just
10     said.  Now, do you know if the same collateral
11     that was supporting the Fed financing on
12     Wednesday night was, in fact, transferred to
13     Barclays to support its tri-party?
14          A.    It wasn't.  No, it wasn't.  It
15     was -- again, there is -- it's an awful lot of
16     operational complexity, it's a huge number of
17     securities and no -- there were differences in
18     the schedule that the Fed held versus what
19     actually then ended up in Bank of New York's --
20     in Bank of New York's tri-party account.
21          Q.    Okay.  So this is -- when I see the
22     phrase "Bank of New York tri-party," that's --
23     if it's dated at this time, it's probably
24     talking about the Barclays tri-party with Bank
25     of New York acting as the agent; correct?

1              Blackwell - Highly Confidential
2          MR. SHAW:  Objection to form.
3          A.    Again, it's a broad term.  I'd need
4      specific --
5          Q.    I will withdraw that question.  I
6      understand.
7              So what is the difference, if you
8      know, between the collateral that was
9      supporting the Fed financing on Wednesday night
10     and the collateral that was transferred to
11     Barclays on sometime Thursday?
12          MR. SHAW:  Objection to form.
13          A.    There were a series of operational
14     issues that occurred at Chase, first of all,
15     and also the repurchase agreement, collateral
16     that's eligible to be transferred to BONY,
17     create a difference, so, you know, those
18     operational processes at Chase which were -- I
19     don't have any visibility over and, frankly,
20     have limited visibility at what's happened at
21     Chase post the event as well, resulted in some
22     of the collateral being delivered from the Fed
23     into the Lehman box and pended settlement took
24     place, so that the securities that were
25     released from the Fed were delivered into the

1              Blackwell - Highly Confidential
2      Lehman box and trades that were pended for
3      settlement were settled that were unrelated to
4      the repo, but were trades that had been entered
5      into by Lehman Brothers on a previous date.
6          Q.    So am I correct -- so Chase settled
7      other trades with the money -- with the
8      securities that had been released from the Fed
9      funds?
10          A.    So Barclays had paid $5 billion to
11     Chase and paid that to the Fed, the Fed
12     released $5 billion worth of collateral, what
13     the Fed believed is $5 billion worth of
14     collateral to Chase, and that went into the
15     clearance box and settlement took place.
16          Q.    Okay.  And then so then what
17     collateral was ultimately transferred to
18     support the Barclays repo?
19          A.    There are schedules that show that
20     collateral.  So again, collateral that was
21     eligible under the repurchase agreement was
22     delivered.  The remaining securities that came
23     back from the Fed, some portion of them, again,
24     subject to operational friction and
25     eligibility, were then delivered to Bank of New

Page 62

Blackwell - Highly Confidential

1  York.
2      Q.   And were you involved in that
3  process of the delivery to Bank of New York?
4      A.   My team were actively involved.  I
5  was doing very many different things at that
6  time, so Monty Forrest and Jim and the team of
7  people within the repo ops area in conjunction
8  with the treasury department and with the
9  trading desk, the financing trading desk, were
10  all working hard to get that.  I was being
11  asked also questions by my management and
12  whether these things were happening.  I was
13  also liaising with Barclays when -- certainly
14  when the first 5 billion -- we were trying to
15  do it in 5 billion pieces so there was no
16  daylight exposure to Lehman.  That mechanism
17  resulted in the outcome I described before,
18  which was some leakage, because of Chase's
19  method -- Chase's internal operational issues,
20  and so there was some discussion, but it went
21  very quiet for a period of time until the 40
22  billion of cash was paid by Barclays or the 45
23  billion of cash was paid by Barclays, and then
24  settlement took place with the Fed and DTC.
25

TSG Reporting - Worldwide  (877) 702-9580

Page 63

Blackwell - Highly Confidential

1
2  Settlement processes were kept open until the
3  early hours of the morning, which is
4  unprecedented, to allow this massive volume of
5  collateral to work its way through the system
6  and settle.
7      Q.   You mentioned someone named Jim.  Is
8  that Jim Hraska?
9      A.   Jim Hraska.
10      Q.   Is it fair to say he was more mired
11  in the details of this transfer of collateral
12  than you were?
13      A.   Absolutely.  He is an industry
14  expert in the space.  The Fed consult with Jim,
15  so he is expert in this process.
16      MR. HINE:  Okay.  Why don't we take
17  a break now.  I have some documents to show
18  you about this whole topic, so you need to
19  rest up.
20      (Recess was taken from 10:31 to
21  10:42.)
22  BY MR. HINE:
23      Q.   Mr. Blackwell, we were talking about
24  the transition from the Fed repo arrangement on
25  Wednesday to the replacement transaction with

TSG Reporting - Worldwide  (877) 702-9580

Page 64

Blackwell - Highly Confidential

1
2  Barclays and BONY on Thursday.
3      Before we get into how that took
4  place and any problems that had to do with
5  that, could I just run a couple documents by
6  you just so I can understand what's being said
7  in these e-mails to the extent you remember.  I
8  know you had several e-mails during that period
9  of time, but let's just start with this one.
10      MR. HINE:  Let's mark that.
11      (Exhibit 58 B, e-mail dated
12  September 17, 2008, Bates stamped 77752,
13  marked for identification.)
14      ( Exhibit 59 B, e-mail dated
15  9-17-2008, marked for identification.)
16      Q.   Mr. Blackwell, I handed you an
17  e-mail which we have marked as Exhibit 58 B
18  which is an exchange between you and some other
19  folks on Wednesday, September 17th, and some
20  earlier e-mails below.
21      I just wanted to understand
22  what's -- you appear to be congratulating some
23  folks here about doing a good job.  In one of
24  the e-mails Mr. Feraca talks about yielding the
25  max from both PDCF and Barclays financing.

TSG Reporting - Worldwide  (877) 702-9580

Page 65

Blackwell - Highly Confidential

1
2      Could you just give me a sense of --
3  was this a difficult effort to get this
4  financing in place on Tuesday?
5      A.   I think it was hard all week.  It
6  was a very challenging environment to be
7  operating in, to say the least.  I just think
8  John as the person responsible for financing
9  and I think it's just congratulating everyone
10  for -- under the construct of the agreement to
11  delivering an excellent result and just
12  thanking people.  I have no more information
13  about this than that.
14      Q.   My question is this was a Tuesday
15  night e-mail, the one in the middle.  Now, the
16  PDCF, that's referring to the Fed's financing;
17  correct?
18      A.   The Primary Dealer's Credit
19  Facility.
20      Q.   That's a Fed program?
21      A.   Fed facility, yes.
22      Q.   Now, it also refers to Barclays
23  financings in the same sentence.
24      What financings does Barclays have
25  in place on Tuesday?

TSG Reporting - Worldwide  (877) 702-9580

Page 66

1    **Blackwell - Highly Confidential**
2        A.   I don't recall.  I'm assuming it's
3    referring to a repo, but I have no idea.
4            MR. SHAW:  Bill, just so it's clear,
5        although the date that appears on the sent
6        line says Wednesday, September 17th, it's
7        Greenwich meantime, so it's also Tuesday.
8            MR. HINE:  You are right.
9        **Q.   I guess my main point for that**
10   **document is you don't really have any knowledge**
11   **of other of Barclays' financings on the Monday,**
12   **Tuesday, Wednesday of that week?**
13       A.   Correct.
14       **Q.   So your role during that week with**
15   **respect to Barclays' financing was the one that**
16   **was put in place on Thursday to replace the Fed**
17   **financings of Wednesday night; is that right?**
18       A.   Yes.
19       **Q.   Okay.  If you could turn to the next**
20   **document, which is marked as Exhibit 59 B,**
21   **again, it's an e-mail stream involving yourself**
22   **and others.  It talks in the bottom about not**
23   **doing the Barclays PDCF trade tonight.  Do you**
24   **see that language?**
25       A.   Yes.

Page 67

1        Blackwell - Highly Confidential
2        **Q.   Now, this is Wednesday night, and I**
3    **believe you previously testified, was there a**
4    **discussion of possibly doing that transition**
5    **transaction on Wednesday night?**
6            MR. SHAW:  Objection to form.  It's
7        not clear to me what the "this is Wednesday
8        night" refers to.
9            MR. HINE:  Let me just rephrase it.
10       **Q.   You see the e-mail at the bottom of**
11   **this document which is sent says it's sent on**
12   **Wednesday, September 17th.  Do you see that?**
13       **A.   Yes.**
14       **Q.   And the first line of that e-mail**
15   **says "we are not doing the Barclays' PDCF trade**
16   **tonight."  Do you see that?**
17       **A.   I do.**
18       **Q.   And that's Mr. Ullman sending that**
19   **e-mail to you; correct?**
20           MR. SHAW:  Can I just note for the
21       record the witness is underlining the
22       phrases you have pointed out to him on the
23       exhibit.
24           MR. HINE:  Okay.
25           MR. SHAW:  I'm not allowed to do

Page 68

1        Blackwell - Highly Confidential
2    that, I take it.
3            MR. HINE:  Probably a good idea just
4        to --
5            THE WITNESS:  It's a habit.
6            MR. HINE:  Okay.  Not a problem.
7        **Q.   My question was what discussions**
8    **were there about possibly having the Barclays**
9    **take over this financing role from the Fed on**
10   **Wednesday night?**
11           MR. SHAW:  Objection.  Foundation.
12       **A.   I don't have any -- I wasn't**
13   **involved in those discussions, so -- you would**
14   **probably -- yeah, I wasn't involved in those**
15   **discussions.**
16       **Q.   Okay.  Continuing on with that**
17   **e-mail, it says "we will be increasing the**
18   **tri-party trade we have been doing with**
19   **Barclays at BONY to 13 billion."  Do you see**
20   **that?**
21       A.   I do.
22       **Q.   What is that referring to?**
23       A.   It refers to the fact that Barclays
24   would be extending financing for that night of
25   13 million.

Page 69

1        Blackwell - Highly Confidential
2        **Q.   So this is a separate tri-party that**
3    **Barclays has with Lehman and BONY?**
4        A.   The same tri -- they are a
5    tri-party.  A tri-party agreement is one
6    tri-party agreement.  So this is an arrangement
7    where Barclays are providing cash in return for
8    securities.
9        **Q.   Okay.  So the 13 billion refers to**
10   **the amount that's apparently needed to get**
11   **through that night or to get into the next day;**
12   **is that right?**
13       A.   Or that was the available
14   collateral.  I don't know why 13 billion was 13
15   billion, but that was the transaction that was
16   done.
17       **Q.   Could you just -- what is your**
18   **understanding of why Barclays did not affect**
19   **this transaction on Wednesday as opposed to**
20   **Thursday?**
21       **A.   My understanding was that it wasn't**
22   **the case of Barclays -- it wasn't the case that**
23   **Barclays didn't want to.  It was technically**
24   **un -- it wasn't feasible to actually put a**
25   **mechanism in place to allow that transaction to**

Page 70

1              Blackwell - Highly Confidential
2    happen.
3         Q.    Okay.
4         A.    Because of the scale and complexity.
5         Q.    So why was it possible to do that on
6    Thursday?
7         A.    Because a mechanism was put in
8    place.
9         Q.    So you folks had been working on
10   putting this mechanism in place previously?
11        A.    No, that day.  So it was -- when --
12   on the Wednesday, then through Wednesday
13   through Thursday there was a mechanism put in
14   place.
15        Q.    As to the collateral that was
16   originally supporting the Fed, and you
17   described that some of it made it to Barclays
18   but there were issues as to that transfer, did
19   you have any role in placing a value on that
20   collateral?
21        A.    Operations are not placing a value
22   on the collateral.  The systems that operations
23   use have a value associated with them, so not
24   figuring out that this equity or this bond is
25   worth -- we are not marking the security in

Page 71

1              Blackwell - Highly Confidential
2    that regard.  Chase, again, would have primary
3    role in terms of collateral selection based on
4    the schedules of the agreement.
5         Q.    And did you ever hear any
6    discussions about a discount or a haircut that
7    was applied to that collateral?
8              MR. SHAW:  Asked and answered.
9         A.    No.  Not that I recall, no.
10        Q.    Okay.  What do you understand the
11   term "haircut" to mean with respect to repos
12   generally?
13             MR. SHAW:  Objection.  Foundation.
14        A.    I would -- I'm not an expert in
15   terms of that process, so, again, commercial
16   components would be agreed by the business.
17        Q.    Could you describe for me -- well,
18   let me just ask about two other documents
19   before we go further.
20             (Exhibit 60 B, e-mail dated
21        9-18-2008, marked for identification.)
22        Q.    Mr. Blackwell, I am handing you a
23   copy of the document marked as Exhibit 60 B,
24   which is an e-mail stream which appears to be
25   dated September 18th, 2008, and attached to it

Page 72

1              Blackwell - Highly Confidential
2    is a spread sheet of some sort.  I know that --
3    I don't see your name on this e-mail, but I
4    wanted to ask you about the spread sheet that's
5    attached.
6              Have you ever seen a spread sheet
7    like this?
8              MR. SHAW:  Objection.  Form.
9         A.    It's possible I have seen one.  I
10   don't recall seeing one, but it's a schedule of
11   collateral values.  It's being provided by -- I
12   assume this is being provided by JPMorgan.
13        Q.    Why do you say that?
14        A.    Because of who it's being sent from.
15        Q.    The title of the spread sheet says
16   BONY Transaction Anticipated Pre Funding.  Do
17   you have any idea what that could mean?
18        A.    No.
19        Q.    Do you have any idea what the column
20   to the far right means where it says
21   Anticipated Pre Funding Dollar Amount?
22        A.    Only just the literal interpretation
23   of the title.  It's a valuation.
24        Q.    Do you have any understanding of the
25   value of the different types of collateral that

Page 73

1              Blackwell - Highly Confidential
2    were posted to the different Fed programs
3    listed here?
4         A.    At the time?
5         Q.    Yes.
6         A.    Possibly.  I mean, I didn't look at
7    the detail.  And, again, the detail is
8    thousands of CUSIPs.  It's meaningless looking
9    at lists.  It does have to be applied based on
10   the rules.
11        Q.    Do you have any understanding of the
12   aggregate amounts of the collateral you were
13   trying to transfer?
14        A.    I knew we were trying to transfer
15   $45 billion.  That was the headline number,
16   approximate number.
17        Q.    Is it fair to say there were some
18   problems in transferring the collateral to or
19   unexpected issues arose with respect to
20   transferring the collateral from the Fed
21   program to the Barclays repo?
22             MR. SHAW:  Objection to form.
23        A.    There were problems, yes, there
24   were.
25        Q.    Could you just generally describe

Page 74

1      **Blackwell - Highly Confidential**
2  **for me what the problems were and how they**
3  **resolved themselves or didn't resolve**
4  **themselves?**
5       A.   The process was designed that Chase
6  would pay -- sorry, Barclays would pay
7  $5 billion, and I explained this earlier,
8  $5 billion to -- Barclays would pay that to
9  Chase, Chase would pay that to the Fed, the Fed
10 would deliver $5 billion in collateral.
11      MR. BYMAN:  Could I ask you to speak
12 a little louder.
13      THE WITNESS:  Okay.  Do you want me
14 to repeat that?
15      MR. BYMAN:  If you would, I'd
16 appreciate it.
17      A.   Barclays paid -- my understanding
18 was Barclays paid Chase -- paid Lehman, their
19 tri-party agent, Chase, $5 billion.  $5 billion
20 was paid to the Fed.  The Fed released
21 $5 billion worth of collateral.  Their
22 valuations, not Lehman's valuations, but their
23 valuations based on what had been pledged the
24 previous night.  That collateral came into
25 Chase's box and was not delivered to BONY, to

TSG Reporting - Worldwide  (877) 702-9580

Page 75

1      Blackwell - Highly Confidential
2  Bank of New York.
3      **Q.   To satisfy other transactions that**
4  **you mentioned earlier?**
5       A.   Yeah, and I don't have visibility
6  over what those transactions were.
7      **Q.   So was this -- could you just kind**
8  **of relay what you tried to do to resolve this**
9  **issue?**
10      A.   I didn't try and resolve the issue.
11 A team of people that were managing it for me,
12 Monty, the global head of that function, and
13 Jim worked hard with treasury and my
14 settlements team as well to try and resolve
15 that issue, but it was mainly a dialogue with
16 Chase, the Fed, and there was an open line in
17 place that was being managed out of Jim's
18 office.
19      **Q.   Okay.  And were you -- when you say**
20 **"open line," what do you mean by that?**
21      A.   Open conference -- a phone line that
22 every participant could dial into.
23      **Q.   And did you participate in that**
24 **conference call?**
25      A.   I may have been on it briefly, very,

TSG Reporting - Worldwide  (877) 702-9580

Page 76

1      Blackwell - Highly Confidential
2  very briefly.  I wasn't sitting in that room.
3  I was in and out.
4      **Q.   Is it fair to say that Jim Hraska or**
5  **the other individual you mentioned are the ones**
6  **that have in-depth knowledge of how this**
7  **problem was addressed?**
8       A.   Jim Hraska.
9      **Q.   Okay.  Do you have an understanding**
10 **of whether the full compliment of collateral**
11 **that Barclays was expecting to be posted to**
12 **their repo ever made it to Barclays?**
13      A.   I don't believe the full value made
14 it, no.
15      **Q.   Do you know what amount did not?**
16      A.   Exact numbers, no, but the full
17 amount did not make it.
18      **Q.   Do you have approximate numbers?**
19      A.   Off the top of my head, I don't.  It
20 would be in an e-mail, but it wasn't the
21 complete amount.
22      **Q.   Is there a $7 billion number that --**
23 **does that sound like the approximate amount?**
24      A.   There was a cash repo that I
25 understood that was put on for 7 billion that

TSG Reporting - Worldwide  (877) 702-9580

Page 77

1      Blackwell - Highly Confidential
2  night as well which was pledged to Barclays to
3  make up some of the shortfall.
4      **Q.   Okay.  Did that money go to**
5  **Barclays?**
6       A.   I understand that it did or should
7  have done, but it was held properly -- I don't
8  know.  Actually, I don't want to misspeak.
9  It's probably in my -- again, it would be in my
10 e-mail.
11      **Q.   And when you said put in place, that**
12 **was Thursday night?**
13      A.   Overnight Thursday, yes, into the
14 early hours of Friday.
15      (Exhibit 61 B, e-mail dated
16 9-17-2008, marked for identification.)
17      **Q.   Mr. Blackwell, I am handing you a**
18 **document that's been marked as 61 B, which is**
19 **an e-mail stream dated September 17th, 2008,**
20 **and the subject line reads "key points from**
21 **today's call with Alastair pertinent to**
22 **equities."**
23      **My question to you is have you ever**
24 **seen this document?**
25      A.   I would have seen it in my -- I was

TSG Reporting - Worldwide  (877) 702-9580

Page 86

1    Blackwell - Highly Confidential
2 unfamiliar with.  Post of the event, yes, it's
3 something I became aware of.
4    Q.   Since you have been at Barclays you
5 have seen it?
6    A.   Yes, I don't know whether I have
7 seen it, but I am aware of its existence.
8    Q.   And what's your understanding of
9 what that Clarification Letter did with respect
10 to the transaction?
11    MR. SHAW:  Foundation.
12    A.   I actually don't know.  I really --
13 I don't know.  I know a Clarification Letter
14 exists and I don't recall reading it.  It's
15 been referred to.  That's all.
16    Q.   Do you have any understanding of the
17 two schedules that are attached to the
18 Clarification Letter, which are called
19 Schedules A and B?
20    A.   I am aware of Schedules A and B,
21 yes.
22    Q.   What are you aware of about them?
23    A.   Schedule A is the original repo
24 transaction, the original Fed repo transaction,
25 the assets are transferred to BONY.  Schedule B

TSG Reporting - Worldwide  (877) 702-9580

Page 87

1    Blackwell - Highly Confidential
2 was unencumbered assets within the clearing
3 boxes.
4    Q.   Just so I understand that, we have
5 been talking about the Fed repo which was
6 replaced by a Barclays repo and those -- that
7 collateral was to comprise Schedule A; is that
8 right?
9    MR. SHAW:  Objection to form.
10    A.   My understanding is Schedule A was
11 the collateral that made it to Barclays.  Now,
12 in a normal repo process there is substitution
13 and change, so it doesn't always work, it's not
14 always going to be precise, and that's just
15 reality.  Every single repo that would be
16 processed would be different.
17    Q.   So your understanding was that the
18 collateral that was posted to the Barclays repo
19 was to become -- was to be included in
20 Schedule A?
21    MR. SHAW:  Objection to form.
22    MR. HINE:  You can answer.
23    A.   I think that would be my
24 understanding.
25    Q.   And is this an understanding that

TSG Reporting - Worldwide  (877) 702-9580

Page 88

1    Blackwell - Highly Confidential
2 you had during that weekend or is this
3 something you developed later?
4    A.   Afterwards.  I didn't spend any time
5 in terms of reconciling -- as an operations
6 organization we are reconciling and there was a
7 transfer of information between the parties
8 that would share information and Chase stopped
9 providing us with information on the Friday
10 morning, so we had no visibility over what was
11 going on there, but we did compare what had
12 transferred between Barclays and Lehman to
13 ensure that we were reconciled, and seen there
14 a very small difference of -- what we had
15 recorded on our books was less than
16 $30 million.  So it was an accurate reflection
17 of what transferred.  Or our books are an
18 accurate reflection of what transferred.
19    Q.   How about Schedule B, did you have
20 any role with respect to Schedule B over that
21 weekend?
22    A.   Yes.  I mean, over the course of the
23 weekend my team were working with treasury to
24 refine a list of unencumbered assets sitting
25 within the clearance boxes.

TSG Reporting - Worldwide  (877) 702-9580

Page 89

1    Blackwell - Highly Confidential
2    Q.   And why were you doing that?
3    A.   Because I was asked to do it.
4    Q.   Did you have any understanding as
5 part of the transaction why that was being
6 done?
7    A.   That was part of -- all I had was
8 there was negotiations going on and I was asked
9 to find -- to identify a set of securities that
10 were unencumbered in the clearance box.
11    Q.   Did you have any understanding about
12 that being used to fill some shortfall in the
13 assets that were supposed to have been
14 transferred to Barclays?
15    A.   I didn't know why precisely, so no.
16 What I was trying to do was mechanically create
17 a list or assist in mechanically creating a
18 list of assets that were unencumbered.
19    Q.   And when you say "unencumbered,"
20 what does that mean in that context?
21    A.   Unencumbered means there was a
22 methodology applied which would be firm --
23 predominantly firm inventory or assets that
24 were available to be re-hypothecated.
25    Q.   And were you only looking in the

TSG Reporting - Worldwide  (877) 702-9580

## Page 90

Blackwell - Highly Confidential

1
2  clearance boxes at DTC?
3      A.   We were looking -- we looked at
4  Euroclear.  We looked in several places.
5      Q.   Could you just tell me the places
6  you looked.
7      A.   From memory, I think it was Canada,
8  the Canadian depo, DTC, and Euroclear.  Two --
9  I think two boxes at DTC and a physical box at
10  Chase, I think.  Again, this is -- I may not be
11  a hundred percent precise, but those depos
12  would be the primary locations.
13      Q.   When you say "we looked," can you
14  describe for me is this -- when did you start
15  looking?
16      A.   I think there was an ongoing process
17  over the course of the weekend.  I don't know
18  when precisely.  Again, I think you will find I
19  was actually in the office all of the night on
20  Thursday, so Thursday, Friday became one day
21  and all that time I don't have an exact
22  recollection of when that happened.
23      Q.   Okay.  But is it fair to say it was
24  sometime at end of the week, it wasn't an
25  effort started Monday or Tuesday?

## Page 91

Blackwell - Highly Confidential

1
2      A.   Oh, absolutely not.
3      Q.   And did you look at the OCC as well?
4      A.   Possibly.  I can't comment on that.
5      Q.   Just for my own, I see reference to
6  an 074 box and then a 636 box.  Could you
7  explain to me the difference between the two?
8      A.   The 074 box is predominantly an
9  equity clearing box, DTC clearing box, and --
10  sorry, 626 box?
11      Q.   636.
12      A.   636 is predominantly corporates,
13  corporate bonds.
14      Q.   I see something else referred to as
15  a non-actionable box.  Is that a term you are
16  familiar with?
17      A.   Yeah.  The non-actionable box, I
18  believe, was the list of securities that we
19  thought were -- some securities are actionable,
20  some securities are not.  Securities that are
21  customer assets, for instance, you wouldn't --
22  they are not unencumbered, they are
23  fully-paid-for customer assets, so that's the
24  difference between the two.
25      Q.   Now, when you did this effort over

## Page 92

Blackwell - Highly Confidential

1
2  the weekend to assemble these assets that were
3  to go into Schedule B, did you know there was
4  going to be a Schedule B or were you shooting
5  towards that goal?
6      MR. SHAW:  Objection to form.
7      Q.   Bad question, but you can still
8  answer it.
9      A.   I was creating a schedule.  I didn't
10  know what it was going to be called, what it
11  was going to be used for.  Again, I was working
12  with a very large group of people to produce
13  this, so...
14      Q.   I guess I was asking did you know
15  the term "Schedule B" or that it was going to
16  be a schedule to a Clarification Letter at that
17  time?
18      A.   I didn't know it was going to be a
19  schedule to a Clarification Letter.  It may
20  have been labeled as Schedule B, but, again, I
21  didn't know its purpose.
22      Q.   Fair to say you were not involved in
23  any of the court proceedings in the bankruptcy?
24      A.   No.
25      Q.   Is it fair to say that you didn't

## Page 93

Blackwell - Highly Confidential

1
2  help prepare documents that were filed in any
3  of the courts?
4      A.   Not directly, no.
5      MR. SHAW:  I think we had a slight
6  ambiguity.  I believe you asked is it fair
7  to say he was not involved and he said no,
8  but I think the intent was --
9      MR. HINE:  Let me just ask it again.
10      Q.   Were you ever involved in preparing
11  documents that were to be filed in the
12  bankruptcy proceeding in this case?
13      A.   I prepared documents for my
14  management which would invariably -- some
15  content of that would have gone into the
16  bankruptcy proceedings.
17      Q.   Is it fair to say that you were not
18  involved in preparing the Clarification Letter
19  and its schedules that were ultimately filed
20  with the court?
21      A.   I certainly didn't prepare the
22  letter, but there may have been data that came
23  from -- that I contributed to that were part.
24      Q.   Let's get back to this effort to
25  locate unencumbered assets.

Page 94

1    Blackwell - Highly Confidential
2        How many assets did you locate?
3    What's the value of the assets that you
4    located, if you recall?
5        A.   I think it was -- initially it was
6    about -- it was over $2 billion, but there was
7    Lehman paper within there, so it's difficult to
8    put a value on that, so...
9        Q.   And who places the value on those
10   assets?
11       A.    Normally that would be model driven,
12   so the finance organization would place a value
13   on it or a third-party source.
14       Q.   And is it fair to say that your
15   operations group did not place the value on
16   those assets?
17       A.   That's fair.
18       Q.   I apologize for jumping back to the
19   Schedule A and the repo, but as to the
20   valuation of the assets that are posted as
21   collateral for the Barclays repo, we see
22   reference in some of the documents to BONY
23   placing a value on them.  Why is BONY placing a
24   value on those assets?
25       A.   Because they are Barclays' tri-party

Page 95

1        Blackwell - Highly Confidential
2    agent.  You would expect them to place a value
3    on the collateral that they received.
4        Q.   And is that valuation that's
5    different or was different than the valuation
6    that Lehman had placed on those assets?
7        MR. SHAW:  Objection.  Foundation.
8        A.   I believe it was different by -- I'm
9    not sure the exact amount.
10       Q.   Do you recall any discussions about
11   the difference between those two values?
12       A.   I didn't have any of those
13   discussions, so no, I don't recall those
14   discussions.
15       Q.   That would not fall within the
16   operation group's purview generally?
17       A.   Jim may have had conversations with
18   them, with Bank of New York, Chase and the Fed
19   at that time, but he would be the right person
20   to ask.
21       Q.   So is it fair to say you would not
22   have intimate knowledge of BONY's valuation of
23   those assets?
24       A.   No, I wouldn't.
25       MR. HINE:  I want to show you

Page 96

1        Blackwell - Highly Confidential
2    another document.
3        (Exhibit 62 B, e-mail dated
4    September 17, 2008, Bates stamped 10293351,
5    marked for identification.)
6        Q.   Mr. Blackwell, I am handing you a
7    copy of a document marked 62 B, which is an
8    e-mail between Mr. Ullman and yourself on
9    September 17th, 2008.
10       Have you ever seen this document
11   before?
12       A.   I would have thought so, yes.
13       Q.   Can you just take a minute and
14   review it and see -- my question to you is
15   going to be what is Mr. Ullman being cynical
16   about or concerned about?
17       MR. SHAW:  Objection.  Foundation.
18       A.   I don't know exactly what's going
19   through his mind, but I think you can see from
20   the e-mail that he has uncertainty about we
21   don't know the terms of a deal and he is
22   speculating about -- he is speculating about
23   what is going on.  That is all.  I have no idea
24   why he thought this.  You would have to ask
25   him.

Page 97

1        Blackwell - Highly Confidential
2        Q.   Do you have any recollection of
3    discussing this issue with him or anyone else?
4        A.   No.  I didn't have time to discuss
5    conjecture and speculation at that point in
6    time.  I was purely doing my function as much
7    as I possibly could.
8        MR. HINE:  I want to show you
9    another document.
10       (Exhibit 63 B, e-mail dated
11   September 19, 2008, Bates stamped 10294630,
12   marked for identification.)
13       Q.   Mr. Blackwell, I am handing you a
14   document marked as Exhibit 63 B, which is an
15   e-mail stream involving yourself from the
16   period September 19th, 2008 dating back to the
17   prior date, September 18th.  I don't have many
18   questions about this document.
19       What I really want to ask you about
20   is I see a series of documents like this,
21   e-mails, discussing fails, so I just want to
22   understand what fails are and how they related
23   to what you were doing at this point in time.
24       A.   I think there were a lot of
25   questions being asked about the clearance

Page 102

1      Blackwell - Highly Confidential
2    Saturday or Sunday, but it was over the
3    weekend.
4      **Q.    So in the end did Barclays end up
5    getting the fails?**
6      A.    No.  Barclays did not take
7    responsibility for the clearance box, just the
8    unencumbered assets sitting in the clearance
9    box.
10     **Q.    Okay.  I am not trying to put words
11   in your mouth.  So you were able or your team
12   was able to take certain unencumbered assets
13   out of the clearance box and somehow it was
14   transferred to Barclays, just those assets?**
15     MR. SHAW:  Objection.
16   Mischaracterizes prior testimony.
17     A.    I made a schedule of unencumbered
18   assets and in the following week there was
19   discussion with the trustee of LBI to move some
20   assets and some assets did move based on that
21   schedule.
22     **Q.    Okay.  And those were unencumbered
23   assets?**
24     A.    Unencumbered assets.
25     **Q.    So just so I understand, that would**

TSG Reporting - Worldwide  (877) 702-9580

Page 103

1      **Blackwell - Highly Confidential**
2    not have included the fails?
3      A.    Does not include the fails.  Now, I
4    want to clarify one point here as it relates to
5    PIM, because PIM was the private investment
6    management business.  That hadn't transferred
7    at that point.  Assets did transfer
8    subsequently and the PIM business doesn't have
9    any fails either, its contractually-settling
10   business, so it's a non-fail environment.  So
11   the full set of customer assets are in the
12   customer accounts.
13     MR. HINE:  Let's mark this.
14     (Exhibit 64 B, e-mail dated
15   9-18-2008, marked for identification.)
16     **Q.    Mr. Blackwell, I am handing you a
17   document marked as Exhibit 64 B, which is an
18   e-mail between yourself and Mr. Eickbush dated
19   September 18th, 2008 and it references in the
20   subject line something called a fails call, and
21   I believe this is the topic we have just been
22   discussing?**
23     A.    I'm sorry, what day is this?
24     **Q.    Upper right-hand corner says
25   September 18th.**

TSG Reporting - Worldwide  (877) 702-9580

Page 104

1      **Blackwell - Highly Confidential**
2      A.    Okay, yes.
3      **Q.    Do you have any recollection of that
4    fails call?**
5      A.    I don't think Greg was on that call.
6    I have a recollection of a call with the
7    Barclays lawyers on that -- I think over that
8    night, so that's the Thursday night.  Again, we
9    were trying to ascertain the value and the
10   number of fails and, again, it's sort of
11   pertaining to taking control of the box or just
12   taking the inventory.
13     **Q.    Okay.  And do you recall anything
14   else about that call?**
15     A.    I provided data, which is, again, in
16   my e-mail, which was provided to the Weil
17   lawyers as well, and that was the end of the
18   discussion.  I think we spoke to Bart and just
19   told him what we had done and that was it and
20   that was the end of the issue until the
21   weekend.
22     **Q.    I see the use of a phrase in this
23   e-mail "cherrypicking of assets."  Do you see
24   that?**
25     A.    Yeah.  I don't -- he wasn't on the

TSG Reporting - Worldwide  (877) 702-9580

Page 105

1      Blackwell - Highly Confidential
2    call, so this is conjecture and speculation on
3    his part.  I don't know.  You would have to ask
4    him why.
5      **Q.    Does that phrase have any meaning to
6    you in this context?**
7      A.    I think the latter part of that
8    sentence makes more sense.  I think what he is
9    saying is, my interpretation of this, and you
10   should ask Greg for his perspective, would be
11   that the unencumbered securities within the box
12   are part of any transaction potentially, and,
13   again, he wasn't party to any deal details or
14   nor was I, so this is his speculation, so he is
15   speculating that it's unencumbered assets.
16     (Exhibit 65 B, e-mail dated
17   September 19, 2008, Bates stamped 10298087,
18   marked for identification.)
19     **Q.    Mr. Blackwell, I am handing you a
20   copy of an exhibit marked 65 B, which is Bates
21   stamped 102 -- not Bates stamped, but it's
22   marked with numbers at the bottom 10298087
23   through -- well, actually, they are all marked
24   087, but it appears to be an e-mail stream from
25   September 19th in which you are one of the**

TSG Reporting - Worldwide  (877) 702-9580

## Page 122

1      Blackwell - Highly Confidential
2      Q.   Do you recall anything else about
3  that conversation?
4      A.   No, not really apart from -- I
5  really don't -- I don't even know what I was
6  talking about, to be honest.  I don't know what
7  the subject of the conversation was about, but
8  it was some piece of data that I handed over
9  and -- or something of that nature.  I really
10 can't recall.
11     Q.   At the very top you talk about what
12 they bought.  Do you see that phrase?
13     A.   Yes.  I didn't know.
14     Q.   You didn't know what they bought?
15     A.   No.
16     Q.   My question was is there push-back
17 from Barclays during this period of time about
18 the assets that they thought they bought but
19 they are not getting?
20         MR. SHAW:  Objection to form.
21     A.   I wasn't having conversations with
22 Barclays about what assets.  I was doing my
23 task.  I didn't know what the deal was, so I
24 don't know.  In terms of data that was being
25 shared, I was sharing information with my

TSG Reporting - Worldwide  (877) 702-9580

## Page 123

1      Blackwell - Highly Confidential
2  management and attending in meetings at 745
3  with people and that was happening constantly
4  24 hours a day pretty much, so I don't recall
5  what it's specifically referring to.
6      Q.   Okay.  I understand you weren't in
7  conversations with Barclays, but do you recall
8  any just general scuttlebutt or your general
9  understanding about Barclays pushing back as to
10 the assets they thought they were buying?
11     A.   The only thing I recall was the
12 clearance boxes and there are obviously assets
13 that fall under the Fed repo, but that was
14 before this point, fall under the Fed repo that
15 would not be eligible as collateral to be
16 delivered to -- as part of a regular repo,
17 because the Fed takes lower-quality assets, but
18 that's standard commercial terms.
19     Q.   The Fed takes lower-quality assets
20 than a repo between private parties?
21     A.   Yes.
22     Q.   That's pretty standard?
23     A.   The PDCF was created to create
24 liquidity for that very purpose, to allow
25 poorer quality assets to be lent so that it

TSG Reporting - Worldwide  (877) 702-9580

## Page 124

1      Blackwell - Highly Confidential
2  would create liquidity in the market.
3      Q.   And does the Fed get a bigger
4  haircut or discount as to the collateral that's
5  posted for those?
6      A.   I'm not sure.
7      Q.   You are not sure?
8      A.   I'm not sure.
9         (Exhibit 69 B, e-mail dated
10 September 19, 2008, Bates stamped 93219,
11 marked for identification.)
12     Q.   Mr. Blackwell, I am handing you a
13 document which is marked as 69 B which is an
14 e-mail stream taking place on Friday the 19th.
15 You are involved in this stream.
16         My question has to do with the part
17 of it that's on the second page.  Please take
18 your time to look at it.
19         (Document review.)
20     A.   Okay.
21     Q.   In that e-mail -- have you had a
22 chance to review the document?
23     A.   Yes.
24     Q.   In the e-mail that I am referring
25 to, which is between Mr. John Palchynsky and

TSG Reporting - Worldwide  (877) 702-9580

## Page 125

1      Blackwell - Highly Confidential
2  Mr. Hraska and others, CC'd to you on the 19th
3  at 3:57 p.m., he discusses seven -- "as per
4  Barclays' request, 7 billion cash was allocated
5  to their lock-up last night.  If securities
6  were/can be used instead, that would free up
7  margin collateral by reducing the amount of
8  higher haircut securities allocated to the JP
9  Chase Bank loan."
10         Could you explain to me what that
11 means, if you understand it?
12         MR. SHAW:  Objection.  Foundation.
13     A.   The technical experts would be
14 better to explain this to you.  I think that
15 would be -- I can make an attempt to explain it
16 to you, but I think --
17     Q.   Do you have an understanding of what
18 it means?  I understand you are not the
19 technical expert.
20     A.   Just almost literally that 7 billion
21 of cash, collateral, the loan I think was
22 referred to earlier where securities were
23 pledged to Chase as a loan and 7 billion of
24 cash was pledged to Barclays.  That 7 billion.
25 And I think John is referring -- John

TSG Reporting - Worldwide  (877) 702-9580

Page 138

1          Blackwell - Highly Confidential
2    orders for that weekend, which are 15C3 and the
3    unencumbered securities in the clearance boxes.
4         **Q.   Can you tell me what you recall of**
5    **the 15C3 securities you just mentioned?**
6              MR. SHAW:  Is this a logical time to
7    take our lunch break?
8              MR. HINE:  Yes.  Do you want to
9    break for lunch?  Okay.  Sounds good.
10             (Lunch recess was taken at 12:30.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 139

1          Blackwell - Highly Confidential
2         (Time noted:  1:14.)
3    A L A S T A I R   B L A C K W E L L,
4         resumed as a witness, was examined and
5         testified as follows:
6    CONTINUED EXAMINATION BY
7    MR. HINE:
8         **Q.   Good afternoon, Mr. Blackwell.**
9         A.   Good afternoon.
10        **Q.   Hope you had a good lunch.  We have**
11   **some more talking to do here, unfortunately for**
12   **you.  I think we had left off with -- we had**
13   **mentioned 15C3.**
14             **Could you just explain to me what**
15   **you were doing over that weekend as far as**
16   **trying to locate assets in 15C3 accounts?  And**
17   **I meant the weekend of the 20th, 21st.**
18        A.   I wasn't trying to locate assets in
19   15C3.
20        **Q.   Okay.  What were you trying to do**
21   **with respect to 15C3 accounts?**
22        A.   It isn't an account.  It's not an
23   account.  It's a calculation that historically
24   was run once a week and is designed for
25   customer protection.  It's a regulatory

Page 140

1          Blackwell - Highly Confidential
2    requirement you run this calculation and what I
3    was doing was trying -- working in conjunction
4    with the people that were responsible for
5    producing that, which is the finance
6    organization, was to rerun a calculation.
7         **Q.   And why did it need to be rerun?**
8         A.   To come up with -- I was asked to
9    come up with what is the number, what is the
10   sum, basically, run the calculation and come up
11   with a number.  That is the 15C3 calculation.
12        **Q.   Okay.  And then what was to be done**
13   **with that calculation once you did it?**
14        A.   Provide it to the -- my supervisors
15   and for them to have an understanding of what
16   that number was.
17        **Q.   Did you have any understanding of**
18   **how that calculation related to the transaction**
19   **that was going on between Barclays and Lehman?**
20        A.   In terms of -- running the
21   calculation was to find out whether -- what the
22   calculation was, come up with a number.
23        **Q.   And did you have any understanding**
24   **of what your superiors were going to do with**
25   **that number once you gave it to them?**

Page 141

1          **Blackwell - Highly Confidential**
2         A.   Compare that to what was locked up
3    as cash to -- cash and securities to protect
4    customers.
5         **Q.   And am I correct if that calculation**
6    **yielded a number that was lower than what was**
7    **previously locked up, that would release some**
8    **assets to Barclays; is that right?**
9              MR. SHAW:  Objection.  Foundation.
10        A.   It would mean there is an excess.
11   It would mean there is an excess of cash locked
12   up or securities locked up as part of customer
13   protection.
14        **Q.   And why were they trying to find out**
15   **whether there was an excess?**
16             MR. SHAW:  Objection.  Foundation.
17        A.   I was asked to go recalculate the
18   numbers, so I worked with the finance people
19   who own the calculation as a whole, operations
20   are an input to some of the lines in the
21   calculation and we work towards creating that.
22        **Q.   And who at finance are charged with**
23   **doing this calculation?**
24        A.   At the time, Tony Stucchio, Anthony
25   Stucchio, who reported to Martin Kelly.

Page 142

```
1           Blackwell - Highly Confidential
2         (Exhibit 74 B, e-mail dated
3    9-20-2008, marked for identification.)
4        Q.   Mr. Blackwell, I am handing you a
5    copy of a document marked as Exhibit 74 B,
6    which is an e-mail stream dated September 20th,
7    2008 involving yourself and several others
8    including Ian Lowitt and some of your people in
9    your group.  I think I am mixing two concepts
10   here, so I just want to get some clarification
11   on what we have just been talking about after
12   you have had a chance to look at the e-mail.
13            (Document review.)
14       A.   Okay.
15       Q.   Have you had a chance to look at it?
16       A.   I have.
17       Q.   Could you tell me what you recall
18   about this discussion that's embodied in this
19   e-mail?
20       A.   It's just a -- it's a list of things
21   that we were working on.  It's two things that
22   we were working on.  Looking for the
23   unencumbered -- trying to define a list of
24   unencumbered assets, and what it's saying here
25   is that 15C3, if there is excess, and that
```
TSG Reporting - Worldwide  (877) 702-9580

Page 143

```
1           Blackwell - Highly Confidential
2    potentially there is money that can be released
3    as an unencumbered asset of the firm.
4        Q.   I think I understand what you said.
5    I just want to make sure.
6            This is during a period of time when
7    your group is trying to locate unencumbered
8    assets which would then presumably be
9    transferred to Barclays for whatever purpose?
10       A.   Right.
11           MR. SHAW:  Objection.  Foundation.
12       Q.   And I see here mentioned the goal is
13   1.9 billion.  Do you see that?
14       A.   Yes.
15       Q.   Who set that goal or where did that
16   goal come from?
17       A.   Ian is saying guys, we need 1.95
18   billion.
19       Q.   Okay.  Ian is after the below
20   e-mail; right?  The e-mails are from the bottom
21   up in sequence?
22       A.   Yes.  It would have come from Ian or
23   Paolo.
24       Q.   Do you recall any discussions about
25   why we need 1.9 billion in unencumbered assets?
```
TSG Reporting - Worldwide  (877) 702-9580

Page 144

```
1           Blackwell - Highly Confidential
2        A.   Again, people closer to the deal
3    were negotiating whatever they were
4    negotiating.  I was being asked to carry out an
5    action.  I have a goal.  Find 1.9 billion of
6    unencumbered assets.
7        Q.   I just want to make sure, you were
8    not involved in the setting of that goal or --
9    am I correct to say you don't have any
10   knowledge of why that number was passed down to
11   you?
12       A.   I haven't -- no, I don't have
13   knowledge.
14       Q.   And now as I read this e-mail, the
15   bottom e-mail is Monty Forrest reporting on
16   some of the efforts to find unencumbered
17   assets; correct?
18       A.   Yes.
19       Q.   Okay.  And as we get to the upper
20   e-mail, Ian says he really needs 1.95 billion;
21   is that right?
22       A.   Yes.
23       Q.   But I don't understand what he means
24   by a shortfall in the 15C3 lock-up release.
25   Can you explain that?
```
TSG Reporting - Worldwide  (877) 702-9580

Page 145

```
1           Blackwell - Highly Confidential
2        A.   I don't know exactly -- the way I
3    would interpret this would be if he is looking
4    for -- if the target is to find 1.95 billion of
5    unencumbered securities, then -- if there is no
6    excess in the 15C3 or there is an excess, we
7    don't know at this point, because we haven't
8    rerun the calculation, then potentially finding
9    more unencumbered assets because you wouldn't
10   take -- if it is not an excess, you can't take
11   it, so it's a sum.
12       Q.   Is it correct to say he is asking
13   for a little more in the assets in case there
14   was no excess in 15C3, but actually there was a
15   shortfall --
16           MR. SHAW:  Objection.  Foundation.
17       Q.   -- in 15C3?  Is that right?
18       A.   No, I wouldn't interpret it like
19   that.  I think he is saying find -- review --
20   we are not looking for assets that aren't
21   there.  We are going through a process in a
22   very methodical way based on a set of -- an
23   understood approach which are under the rules
24   that we would apply to our depos, to the boxes
25   of Lehman Brothers, to find unencumbered
```
TSG Reporting - Worldwide  (877) 702-9580

Page 146

1           Blackwell - Highly Confidential
2 securities based on those rules to come up with
3 a list. The data that we had, because Chase
4 had failed to send files for a period of time,
5 was incredibly difficult to work with.
6 Broker/dealer assets aren't run -- aren't used
7 to running over a weekend, they work on a
8 five-day week normally, so trying to create
9 this data was difficult. So we are combing
10 through the data to create a list of
11 unencumbered assets. We are recalculating the
12 15C3 to see what the segregation -- what the
13 lock-up requirement would be, on a hypothesis
14 that as customer assets had left Lehman
15 Brothers, then the requirement for a lock-up
16 would be reduced, so that would create an
17 unencumbered asset. So we weren't looking for
18 things that weren't there. We were looking for
19 things that were there based on the
20 challenge -- very challenged and uncertain data
21 that we had.
22     Q.   I think I understood what you just
23 said, but did you mean that over the previous
24 week presumably customers had left Lehman and
25 that would reduce the requirement for the 15C3

TSG Reporting - Worldwide  (877) 702-9580

Page 147

1           Blackwell - Highly Confidential
2 lock-up or reserve?
3     A.   That was a hypothesis.
4     Q.   And you were doing the calculation
5 to test that hypothesis?
6     A.   Yes.
7     Q.   Did it prove to be correct?
8     A.   I don't know what conclusion we
9 ultimately reached, because the data was so
10 challenging we didn't reach a conclusion that
11 weekend.
12     Q.   So do you know if there was an
13 excess in the end?
14     A.   I don't. I don't recall whether
15 there was an excess or not.
16     Q.   When you say the data was so -- what
17 data are you talking about?
18     A.   Stock record data. Books and
19 records of the firm are dependent on several
20 data feeds; trade data -- new trade data that
21 comes from the front office, external trade
22 data, so repo, for instance, coming from Chase,
23 these are all of the trades -- securities we
24 have pledged, I need that data, that needs to
25 be fed in, and then you carry out third

TSG Reporting - Worldwide  (877) 702-9580

Page 148

1           Blackwell - Highly Confidential
2 world -- a third-party check of your depos
3 versus the outside world, so your custody
4 information. We had partial information around
5 repo coming back in and we had no visibility
6 over our depo at Chase, because they had
7 removed access to their systems, so we couldn't
8 operate in the normal course of business.
9     Q.   Depo means deposit?
10     A.   Depo means like a clearing box. I
11 would use that term interchangeably.
12     Q.   And why had Chase cut off this data
13 stream?
14     A.   As a result of the funding activity
15 that is taking place. I believe -- and this
16 is -- I didn't have a conversation with Chase,
17 but they rescinded access. I passed that
18 information on to Paolo and asked him to speak
19 to Chase, because -- he in the end called Chase
20 and they still would not give us access to the
21 systems.
22     Q.   Did they ever restore access to the
23 system?
24     A.   Not that I'm aware of.
25     Q.   Were you party to any of those

TSG Reporting - Worldwide  (877) 702-9580

Page 149

1           Blackwell - Highly Confidential
2 conversations between Lehman and Chase about
3 this issue?
4     A.   No, I was not.
5     Q.   Do you have any understanding of why
6 they were restricting access to the system?
7     A.   I believe it's a dispute that they
8 had with Barclays around the financing trades
9 that were put on at that point.
10     Q.   Do you have any more detail in your
11 understanding than that?
12     A.   Just around -- just that.
13          (Exhibit 75 B, e-mail dated
14     9-20-2008, marked for identification.)
15     Q.   Mr. Blackwell, I am handing you a
16 document marked as Exhibit 75 B, which is a
17 similar e-mail stream to the one you previously
18 just looked at marked as sent on September
19 20th, 2008. It appears to me to be the same
20 e-mail stream, only the last entry is a little
21 different than previously. So my question has
22 to do with the first entry on page 1 after you
23 have had a chance to look at it.
24        (Document review.)
25     A.   Okay.

TSG Reporting - Worldwide  (877) 702-9580

Page 150

Blackwell - Highly Confidential
1
2    Q.    Have you had a chance to look at it?
3    A.    I have.
4    Q.    In the first paragraph of this
5    e-mail it's mentioning an 8:00 call and it
6    appears to relay certain groups of assets and
7    eventually there is a line that says the total
8    is 2.181 billion.  Do you see that?
9    A.    I do.
10    Q.    Are these the assets that your group
11    identified as unencumbered assets?
12    MR. SHAW:  Objection.  Vague as to
13    time.
14    Q.    Do you have an understanding of what
15    this list of assets is?
16    A.    I understand what is trying to be
17    shown here, yes.
18    Q.    Could you tell me what it is?
19    A.    The team of people, so finance,
20    operations working through the process I
21    described to identify assets on the books and
22    records that were highlighted as inventory,
23    unencumbered inventory, this is the breakdown
24    by clearance boxes.
25    Q.    I think previously you testified
TSG Reporting - Worldwide  (877) 702-9580

Page 151

Blackwell - Highly Confidential
1
2    that there was about $2 billion in assets that
3    you ultimately identified.
4    A.    Which is consistent.
5    Q.    My question for you is do you
6    believe this is pretty close to the end result
7    of your effort to find unencumbered assets?
8    A.    This was a point in time.  That work
9    continued.  I can't emphasize enough how
10    challenging the system environments were.
11    Getting information was happening.  We had
12    technology teams working through the night to
13    extract data from the systems in a non-standard
14    environment.  This is not what we are designed
15    to do and when they were designed to do them,
16    and we weren't getting the third-party feeds we
17    needed to to give us the hundred percent
18    confidence on the data that we had.  So there
19    is uncertainty here.  So at that point in time
20    there was a call -- I'm not sure that I was
21    actually on that call.  I think I was tied up
22    on another issue.  But this was the result of
23    that night's work, the overnight work that was
24    done by the technology and operations and
25    finance to come up with that list.
TSG Reporting - Worldwide  (877) 702-9580

Page 152

Blackwell - Highly Confidential
1
2    Q.    Okay.  Do you know when that process
3    came to a conclusion?
4    MR. SHAW:  Objection.  Assumes facts
5    not in evidence.  Foundation.
6    MR. HINE:  You can answer.
7    A.    It continued.  It continued.  My
8    team continued working on this to try and
9    identify the unencumbered assets into the early
10    part of the following week.
11    Q.    So even after the closing it
12    continued?
13    A.    We didn't have access to data and
14    then we had virtually no access then, so it
15    just stopped.  The work stopped.
16    Q.    When did it stop?
17    A.    I don't know precisely.
18    Q.    If you look at this list, there is
19    four different classes of assets.
20    Do you recall any other classes of
21    assets that were identified as being
22    unencumbered other than the four listed here?
23    A.    No.  These were the main buckets.  I
24    described these earlier as well.
25    Q.    Now, when it says "mortgages," do
TSG Reporting - Worldwide  (877) 702-9580

Page 153

Blackwell - Highly Confidential
1
2    you see that on number 4?  Do you recall any
3    discussions or -- any discussions over that
4    weekend about Barclays getting a greater
5    percentage of the mortgage-based assets than
6    was previously agreed to?
7    A.    No.
8    Q.    Is the term resi's used to describe
9    this type of asset, mortgage-based asset?
10    A.    Possibly.  Without seeing the list
11    of securities, I would be speculating.
12    Q.    Am I correct to say that you were
13    not -- would have no knowledge of discussions
14    between Barclays and Lehman as to the
15    disposition of residential mortgage-based
16    assets?
17    A.    That's correct.  I think there is
18    one point worth mentioning here.  You can see
19    even here that Chase are taking assets, again,
20    so we don't know exactly what's in the real
21    world box.  That's really showing you the
22    uncertainty of the data.
23    Q.    And you are pointing to something.
24    Can you just tell me which line you are
25    pointing to?
TSG Reporting - Worldwide  (877) 702-9580

Page 162

1      Blackwell - Highly Confidential
2      Q.    So the 15.8 repo that's mentioned in
3   your e-mail is the HIC loan that you just
4   talked about?
5      A.    Yes.
6      Q.    And "Chase want to liquidate," the
7   phrase you use there, that's meant to --
8      A.    I think that meeting is probably
9   documented, because I think Hughes Hubbard were
10  present at the time as well and Weil, so I
11  can -- there is a lot of information around
12  that meeting.
13     Q.    Do you recall anything else about
14  that meeting?
15     A.    It was -- yeah, there was -- it was
16  a discussion around the repo transactions,
17  Barclays' and Chase's position at that point.
18     Q.    Okay.  Do you recall anything other
19  than what you just told us?
20     A.    That was -- I believe that was the
21  main thrust.  Rich Ricci at the time also
22  stated that we weren't taking responsibility
23  for the clearance boxes and that's when I think
24  the meeting broke up, pretty much broke up, or
25  was about to break up, but I think I left the
            TSG Reporting - Worldwide  (877) 702-9580

Page 163

1      Blackwell - Highly Confidential
2   room.
3      Q.    Do you have any knowledge of how
4   this issue was resolved ultimately, if at all?
5      A.    No.  Not the 15.8, no.
6      Q.    Did you have any other follow-on
7   interaction with this 15.8 issue?
8      A.    No.  Just one of the repos that were
9   on.
10          (Exhibit 80 B, e-mail dated
11     September 22, 2008, Bates stamped 464767,
12     marked for identification.)
13     Q.    Mr. Blackwell, I am handing you a
14  copy of Exhibit 80 B, which is an e-mail stream
15  dated September 22nd, 2008 in which you are
16  involved, and after you have had a chance to
17  look at it, I have a quick question about it.
18          (Document review.)
19     A.    Okay.
20     Q.    Do you see on the second page where
21  it says -- an e-mail from Mr. Scagnelli where
22  he says "DTC has a free pledge chill on 636,"
23  do you see that?
24     A.    Yes.
25     Q.    Can you explain to me what that
            TSG Reporting - Worldwide  (877) 702-9580

Page 164

1      Blackwell - Highly Confidential
2   means, if you know?
3      A.    I would interpret that as meaning
4   that DTC has locked everyone out of the system,
5   that they are controlling the clearance box at
6   this point.  They are not taking direction.
7      Q.    Okay.  And that --
8      A.    That means we couldn't do anything.
9      Q.    Okay.  And later on I see your
10  e-mail which says "we need to get to DTC PDQ."
11     A.    Yes.
12     Q.    Do you recall what -- did you, in
13  fact, get to the DTC?
14     A.    Yes.  They didn't release anything.
15  DTC -- I don't think I actually spoke to them.
16  I don't believe we were in a position to be
17  able to -- we weren't controlling the box.  It
18  was in the hands of the trustee.
19     Q.    Okay.  And so was there a meeting
20  about this or do you have any knowledge of what
21  happened after this?
22     A.    No.  We didn't -- we ceased to have
23  any ability to impact the books and records of
24  LBI.  That's my recollection.  And this was
25  just, again, another part of the data issues
            TSG Reporting - Worldwide  (877) 702-9580

Page 165

1      Blackwell - Highly Confidential
2   that we were experiencing and probably close to
3   the end.
4      Q.    Can you describe for me what your
5   role has been with respect to these assets,
6   these unencumbered assets after the closing,
7   since you have gone to Barclays?
8      A.    Most of my -- my focus is obviously
9   trying to get management and structure in
10  place, so some -- I have been in some meetings
11  along the way.  Jim Hraska has worked probably
12  most closely with Martin Kelly, Robert Azerad
13  in the post -- at Barclays to assist.  I'd
14  say -- so it's been limited to the series of
15  meetings as it relates to these two specific
16  issues.
17     Q.    Two issues meaning the unencumbered
18  assets and --
19     A.    The 15C3.
20     Q.    And do you have a recollection of
21  what's gone on since the closing as to these
22  issues or --
23     A.    Again, more on the periphery of what
24  I have done, I have reviewed methodology to
25  ensure that I feel comfortable that the
            TSG Reporting - Worldwide  (877) 702-9580

Page 166

1           Blackwell - Highly Confidential
2    approach that someone like Monty or Jim has
3    taken makes sense to me, which it does, and I
4    feel very comfortable with the methodology
5    under the terms of the agreement, so where it's
6    been necessary to have my input, then I have
7    been involved.  So I think we have created
8    additional schedules since bankruptcy at
9    Barclays which have been made available, so
10   that's been the extent of my involvement.  And
11   the 15C3 calculation is rerun every week by the
12   trustee of LBI.
13        Q.    Previously I mentioned that you have
14   been designated as a 30(b)(6) witness for
15   select issues in this case by Barclays, so I
16   just wanted to have a few minutes to address
17   that issue in this deposition, so for this
18   portion of the deposition it will be a 30(b)(6)
19   deposition.
20             Have you ever -- did you review the
21   30(b)(6) deposition notice that we provided to
22   Barclays?
23        A.    I don't believe I have seen it.
24             MR. SHAW:  If you show it to him, he
25   might know it.

Page 167

1           Blackwell - Highly Confidential
2             MR. HINE:  Let's mark this as an
3    exhibit.
4             (Exhibit 81 B, Debtors' Second Rule
5    30(b)(6) Deposition Notice to Barclays on
6    Issues Relating to the Transfer of Assets,
7    marked for identification.)
8        Q.    Mr. Blackwell, I am handing you a
9    copy of Exhibit 81 B, which is a copy of the
10   Debtors' Second Rule 30(b)(6) Deposition Notice
11   to Barclays on Issues Relating to the Transfer
12   of Assets.
13             My first question is have you ever
14   seen this document before?
15        A.    In my discussions with Jonathan I
16   think I may have seen some portion --
17             MR. SHAW:  We are not going to get
18   into the substance of those discussions.
19        Q.    I don't want to ask you about a
20   privileged communication you might have had,
21   but can you please turn to Schedule A of that
22   document.
23             As I understand from Barclays, you
24   have been designated as a witness as to the
25   first two topics listed on that schedule, so

Page 168

1           Blackwell - Highly Confidential
2    could you just take a minute and just take a
3    look at those topics.
4             (Document review.)
5        A.    Understood.
6        Q.    Okay.  You will see those topics
7    relate to Schedules A and B that we have talked
8    about previously in the deposition, so I just
9    want to spend a little time talking about those
10   two schedules.
11             Let's look at topic number 1.  Were
12   you involved in the selection of the securities
13   that made their way into Schedule A?
14             MR. SHAW:  Objection to form.
15        Q.    Let me rephrase it.
16             Were you involved in the selection
17   of the securities that are listed in Schedule A
18   to the Clarification Letter?
19        A.    I was involved in the transfer of
20   the Fed assets over to Barclays, so in terms of
21   selecting the assets, the selection was done as
22   I -- was done as I described, which was under
23   the terms of the repo agreement that was in
24   place between Lehman and Barclays at that time,
25   so eligible collateral is a component of that

Page 169

1           Blackwell - Highly Confidential
2    agreement and had been in place for some time.
3    So selection is done -- was done -- the assets
4    were put into the Fed repo.  We know that there
5    were operational issues that I described in
6    terms of the assets changing because of the
7    settlement that took place at Chase, and then
8    there is also a subset of securities that
9    weren't eligible under the legal terms -- under
10   the commercial terms of the repo agreement
11   Barclays had in place with Lehman, which was
12   standard practice, that's why the Fed had
13   stepped in and provided liquidity to the whole
14   market with the PDCF, so poorer quality
15   collateral was funded by the Fed.
16             So it was clear based on the
17   schedules which securities fell outside of that
18   in terms of their quality.  So yes, my team
19   worked with finance with the treasury team to
20   refine that list based on that requirement, and
21   in addition to that there were obviously some
22   substitutions that had to take place to make up
23   value, so my team worked again with finance and
24   the clearance teams to drive that -- to
25   finalize that list, but the list is a

## Page 170

1    Blackwell - Highly Confidential
2    reflection of what moved.
3        MR. HINE:  Okay.  Let me go at it a
4    different way here.  I have, unfortunately,
5    some hefty exhibits to pass to you.
6        (Exhibit 82 B, e-mail dated
7    September 20, 2008, Bates stamped BCI-CG
8    00035134, marked for identification.)
9        Q.   Mr. Blackwell, I am handing you a
10   lengthy exhibit marked as 82 B, which is a
11   list -- it's a document Bates stamped BCI-CG
12   00035134 through 35954.  I am not going to ask
13   you about the contents of this entire document,
14   but I would like to direct your attention, if
15   you could take a minute and look at the page --
16   first page after the e-mail cover, the covering
17   e-mail, which is marked with the Bates number
18   35138.  Do you see that page?
19       A.   Yes.
20       Q.   Can you tell me whether -- you will
21   see in this page a little summary of different
22   classes of collateral and their market value.
23   Do you see that?
24       A.   I do.
25       Q.   Could you tell me whether this is

## Page 171

1        Blackwell - Highly Confidential
2    the collateral that made its way into
3    Schedule A?
4        A.   I would assume that it is, based on
5    the fact I provided the data to Paolo, but it's
6    Paolo's team that would have put this together,
7    so would have interpreted the valuations and
8    the content based on that.
9        Q.   Do you know if the value of the
10   securities listed on Schedule A is what's
11   listed here under the column Market Value?
12       A.   I don't know.  It would be dependent
13   on how -- again, how -- I don't know how Paolo
14   ultimately put this together.
15       Q.   And when you say "Paolo," you are
16   talking about Mr. Tonucci?
17       A.   Yes.
18       Q.   So it's his team that would do the
19   valuation of this schedule?
20       A.   It's his team that created the
21   summary.  Jim Hraska and my team, Monty
22   Forrest, helped create the data and pushed it
23   up to the treasury team for them to package.
24       Q.   Now, did the list of securities that
25   ultimately were listed on Schedule A change

## Page 172

1        Blackwell - Highly Confidential
2    over time?
3        A.   Not that I understand, no.
4        Q.   Okay.
5        A.   What was at the Fed and what made it
6    to Barclays was different for a very sensible
7    set of reasons as I described, so -- and
8    perfectly legitimate reasons based on the legal
9    contracts that were in place at the time.
10       Q.   I understand that, but then at some
11   point the securities that made it to Barclays
12   were listed in Schedule A; correct?
13       A.   Right.  So then it would be -- there
14   was a reconciliation carried out to the best of
15   our ability to what BONY had received, so that
16   would be part -- that would be what's in
17   Schedule A.
18       Q.   What are you reconciling when you
19   did that reconciliation?
20       A.   Lehman books and records to a BONY
21   statement.  So effectively Barclays to Lehman,
22   what moved.
23       Q.   Barclays to Lehman?
24       A.   Yes.
25       Q.   Once the September 18th repurchase

## Page 173

1        Blackwell - Highly Confidential
2    agreement was put in place and the securities
3    or assets that were collateral for the Fed
4    moved, some of which I understand didn't make
5    it because of the issues you have talked about
6    with respect to BONY, but once that set of
7    securities made it into the Barclays -- to
8    support the Barclays repo, were there any other
9    further changes to that set of collateral
10   between that time and the time that it was
11   listed on Schedule A?
12       A.   Not that I'm aware of.  I can't --
13   Paolo would be better placed to describe that,
14   if there had been any change.
15       Q.   Mr. Tonucci would know specifically
16   about that?
17       A.   Yes.
18       (Exhibit 83 B, e-mail dated
19   September 21, 2008, Bates stamped BCI
20   006647 through BCI 006653, marked for
21   identification.)
22       Q.   Mr. Blackwell, I am handing you a
23   copy of Exhibit 83 B, which is a document Bates
24   stamped BCI 006647 through 6653.  My first
25   question is if you have ever seen this document

Page 194

Blackwell - Highly Confidential

1
2    unencumbered.
3        Q.    Did you have a number of
4    conversations with Mr. Lowitt over the weekend
5    about the subject of the unencumbered assets?
6        A.    I would imagine so, yes.
7        Q.    But is it fair to say they kind of
8    blur a little bit into one?
9        A.    It was -- yes.  It was -- they did.
10   It's hard to know exactly when and where these
11   conversations took place, but clearly we were
12   using e-mail a lot as well to just ask people
13   to create it.
14       Q.    Were any of your conversations with
15   Mr. Lowitt face to face?
16       A.    Some of them would be, yes.  Ian was
17   not -- some of them might have been.  Fairly
18   infrequently.
19       Q.    Did Mr. Lowitt prefer to communicate
20   by e-mail?
21       A.    I just had a very narrow set of
22   actions I was focused on, right, so I think it
23   wasn't a question whether he preferred to
24   communicate or not.  I was doing the task that
25   had been sent me and he wanted updates.  He

Page 195

Blackwell - Highly Confidential

1
2    would send "any update."  I think there are
3    lots of e-mails like that, and there were lots
4    of e-mails from me to the various teams that
5    were working on these things saying "any
6    updates."
7        Q.    Understood.  Do you remember when
8    your first conversation with Mr. Lowitt was
9    about this task that he had sent you?
10       A.    No, and it's possible it was Paolo
11   that initiated the work even.  Paolo Tonucci
12   may have even initiated the work.
13       Q.    So you may have gotten your marching
14   orders indirectly from Mr. Lowitt?
15       A.    That's quite possible.
16       Q.    You said that your task changed over
17   time and that your first task was to determine
18   whether there was, in fact, any unencumbered
19   assets; is that correct?
20       A.    Correct.
21       Q.    Did you have any understanding of
22   why it was you had been sent this task?
23            MR. SHAW:  Objection.  Asked and
24   answered.
25       A.    As I stated earlier, I had a goal

Page 196

Blackwell - Highly Confidential

1
2    that was sent me.  It wasn't a period of time
3    when we were asking lots of questions about why
4    we were doing it.
5        Q.    Did you come to learn at any time
6    that the purpose of you and your team
7    identifying unencumbered assets was that they
8    be transferred to Barclays?
9            MR. SHAW:  Objection.  Asked and
10   answered.
11       A.    There was a -- my understanding was
12   at some point later on over the course of the
13   weekend, I actually think it may even have been
14   the Monday that we were talking about
15   transferring these assets, talking with I think
16   the trustee of LBI even at that point.
17       Q.    That was a conversation you had with
18   the trustee of LBI?
19       A.    I didn't, no, but people within my
20   organization or people within the former Lehman
21   organization were having those conversations.
22       Q.    Okay.  What do you remember about
23   that conversation?
24       A.    I don't -- I didn't have it, so I
25   don't recall it.

Page 197

Blackwell - Highly Confidential

1
2        Q.    You just remember that there was a
3    conversation with the trustee?
4        A.    Yes.
5            MR. SHAW:  Objection.
6        Q.    About the subject of transferring
7    assets?
8        A.    I recall that there were -- there
9    was a dialogue with the trustee.
10       Q.    When you say "the trustee," do you
11   mean the trustee directly or the trustee's
12   office and his staff?
13       A.    I think it's probably something like
14   Anson Frelinghuysen.
15       Q.    We will put that under staff.
16            The second part of your marching
17   orders appears to be to ascertain the existence
18   or otherwise of any excess in Lehman's 15C3
19   account; is that correct?
20       A.    It was to recalculate the 15C3.  The
21   moneys and securities that were locked up in
22   association with that were managed by the
23   treasury function, I contributed data into the
24   calculation which finance ran and we ran that
25   calculation.

Page 198

1    Blackwell - Highly Confidential
2    Q.    And as I understand it, it is
3    Mr. Tonucci's team I think you said owns that
4    calculation?
5    A.    No, it's not.  It's Tony Stucchio
6    who reported to Martin Kelly.
7    Q.    And Mr. Kelly's position at the time
8    was?
9    A.    Financial controller.
10   Q.    And that's a separate reporting
11   stream from yourself and separate --
12   A.    Reported to Ian.
13   Q.    And separate from Mr. Tonucci?
14   A.    Paolo reported to Ian.
15   Q.    Did anybody tell you at any point,
16   Mr. Blackwell, that a certain amount of the
17   excess, if any, in the 15C3 fund was to be
18   transferred to Barclays?
19   MR. SHAW:  Objection to form.  Asked
20   and answered.
21   A.    There was a discussion about a
22   mechanism potentially, and I think I had that
23   conversation with Gerard LaRocco, to transfer
24   cash if the SEC, Mike Macchiaroli, signed off
25   that there was, indeed, an excess at a point in

Page 199

1    Blackwell - Highly Confidential
2    time.  Now, that changed.  That was a mechanism
3    we looked at and discarded.  So that's the only
4    conversation that I had around moving cash.
5    Q.    When did you have that conversation
6    with Mr. LaRocco?
7    A.    I don't recall, again, exactly the
8    exact time.  It was probably on -- late on
9    Saturday, maybe Sunday, but certainly over that
10   weekend.
11   Q.    Mr. LaRocco was employed by Barclays
12   at that time; correct?
13   A.    Correct, but that was more about how
14   do you technically move money over a weekend.
15   Q.    What was the mechanism you discussed
16   with Mr. LaRocco?
17   A.    This is an operational process.  You
18   can't move money on a weekend, so discussing
19   opening up a bank account at -- I think it was
20   at Wells Fargo.  We didn't pursue that any
21   further.
22   Q.    It sounded like you also discussed
23   with Mr. LaRocco the need for the SEC to sign
24   off on any transfer of 15C3 funds; is that
25   accurate?

Page 200

1    Blackwell - Highly Confidential
2    A.    Well, the SEC would have to give --
3    it is a bankrupt entity -- or the SEC would
4    need to approve any cash movement out of the C3
5    lock-up.
6    Q.    What's the basis of your knowledge
7    about that subject?
8    A.    Just -- what do you mean by the
9    "basis"?
10   Q.    How is it you are able to testify
11   about that fact?
12   A.    What fact?
13   Q.    That the SEC would have to approve
14   any transfer from a bankrupt entity.
15   A.    Because of the experience that I
16   have had.
17   Q.    That's all I was asking.
18        Did you have any conversations with
19   the SEC that weekend about the subject of the
20   15C3 in particular?
21   A.    Not over that weekend, no.  I think
22   I had conversations with -- I had many
23   conversations with the SEC post, but not over
24   that weekend.
25   Q.    The conversations that you have had

Page 201

1    Blackwell - Highly Confidential
2    with the SEC subsequent to that weekend, are
3    they related to the transfer of funds from
4    Lehman's 15C3 account to Barclays?
5    MR. SHAW:  Objection.  Form.
6    A.    I wouldn't characterize them that
7    way.  The -- no, I wouldn't characterize them
8    that way.
9    Q.    How would you characterize them?
10   A.    The conversations I had with the SEC
11   have been around asset transfers, not
12   necessarily related to moneys due from the
13   15C3, although I think I have had one
14   conversation post the LBI bankruptcy with Mike
15   Macchiaroli and some other members of his
16   office where we discussed this and provided --
17   I think we may have -- we had a discussion
18   around the 15C3.  That was probably the only
19   direct conversation we have had specifically
20   around the 15C3.  Then in relation to other
21   asset transfers, the PIM asset transfer, we
22   have had a plethora of conversations of which
23   the 15C3 is a source of customer protection
24   and, therefore, moneys that you would expect
25   would be released as it relates to the PIM

Page 202

Blackwell - Highly Confidential

1
2    transfer, so it's slightly tangential.
3        Q.    When did you have this conversation
4    with Mr. Macchiaroli?
5        A.    I don't know the exact date.  It was
6    probably on the Tuesday -- sometime in the
7    first week.
8        Q.    And when you say "the first week,"
9    just so we have a clear record --
10       A.    My first week at Barclays.
11       Q.    Who else was present for that
12   conversation with Mr. Macchiaroli?
13       A.    Kendall McLaughlin and Alex Crepeau,
14   I think.  I may not be correct.
15       Q.    Who is Kendall McLaughlin?
16       A.    He was responsible for regulatory
17   operations at Lehman Brothers.
18       Q.    Does he work for Barclays now?
19       A.    He does not at present.  He did
20   transfer.  He subsequently left.
21       Q.    Do you know where he is employed
22   now?
23       A.    Citibank.
24       Q.    And Mr. Crepeau you mentioned
25   earlier.  Was he --

TSG Reporting - Worldwide  (877) 702-9580

Page 203

Blackwell - Highly Confidential

1
2        A.    Kendall's boss.
3        Q.    Did he transfer to Barclays?
4        A.    He did.
5        Q.    And is he still employed by
6    Barclays?
7        A.    He is.
8        Q.    Do you know what his position is?
9        A.    He is responsible for regulatory
10   operations.  He replaced Kendall.  He had
11   previously post bankruptcy been responsible for
12   the LBI TSA, the services provided by Barclays
13   to LBI for operations only.
14       Q.    Do you recall why it is you met with
15   Mr. Macchiaroli?
16       A.    Yes.  We discussed the potential
17   transfer of -- we wanted to transfer the
18   initial funding of the PIM accounts so -- this
19   is actually -- this meeting is later.  This is
20   a week later, actually.  Sorry.  My
21   recollection is wrong.  This is later on, this
22   meeting.
23       Q.    So if we are talking about the
24   closing of the deal on Monday, the 22nd, of
25   September, you think it's sometime the week

TSG Reporting - Worldwide  (877) 702-9580

Page 204

Blackwell - Highly Confidential

1
2    of --
3        A.    I think it's later.
4        Q.    The week of Monday 29th?
5        A.    Or even possibly later.
6        Q.    Possibly afterwards?
7        A.    Yes.  So we were talking about the
8    transfer of the loan, the cash in the 15C3 that
9    was related to the margin loans, and that was,
10   I think, the first element of the conversation,
11   and I think the second component of the
12   conversation was as it related to the
13   $769 million worth of securities, Ginnie Maes
14   held at Chase that potentially were going to be
15   delivered as part of the -- that was one way to
16   satisfy the component of the APA, it would
17   either be securities or some alternative value.
18       Q.    Can you explain to me a little more
19   about your conversation that related to the
20   first alternative, the first part.  You said it
21   was cash in the 15C3 account or fund that
22   related to the margin.  What do you mean by
23   that?
24       A.    That's related to PIM.  PIM
25   customers take, borrow money against their

TSG Reporting - Worldwide  (877) 702-9580

Page 205

Blackwell - Highly Confidential

1
2    positions.  They can borrow up to 440 percent
3    of value.
4        Q.    And you said the second subject, I
5    think probably the subject that I am more
6    interested in, is the $769 million of Ginnie
7    Mae securities that you said were potentially
8    to be transferred pursuant to the agreement
9    with Barclays; correct?
10       A.    769 value, so that was either going
11   to be satisfied through Ginnie Maes or other
12   alternative value, if there is an excess in the
13   C3, the 769 value.
14       Q.    It sounds like you have an
15   understanding now of the deal between Barclays
16   and Lehman, is that correct, at least in this
17   respect?
18       A.    Yes.
19       Q.    Can you tell me without waiving any
20   privilege, of course, and any of my questions
21   are not designed to discover information that
22   you discussed with your attorneys, but can you
23   tell me how it is you came to have that
24   understanding of the APA.  I ask because your
25   answers to Mr. Hine's questions suggested you

TSG Reporting - Worldwide  (877) 702-9580

## Page 206

Blackwell - Highly Confidential

1
2    weren't really involved and have no knowledge
3    of the deal and now you are telling me you have
4    some knowledge of the deal.
5        A.    This was after the event, after the
6    deal had closed, I believe, and that was where
7    these conversations began, in terms of
8    actioning the content of the deal.
9        Q.    Right.  Okay.
10       A.    It doesn't mean I had an
11   understanding of the whole deal.
12       Q.    I understand.  I don't think you
13   quite answered my question, though, which is
14   how is it that you came to have an
15   understanding that this was a term of the deal?
16       MR. SHAW:  If you can answer the
17   question without revealing discussions with
18   counsel.
19       A.    That is probably the most likely
20   source.
21       Q.    Okay.  Let's try it this way.  What
22   did you and Mr. Macchiaroli discuss in this
23   meeting that you testified about that took
24   place sometime in the week of September 29th or
25   perhaps later?

TSG Reporting - Worldwide  (877) 702-9580

## Page 207

Blackwell - Highly Confidential

1
2        A.    Asking the SEC to review the
3    calculation and release and authorize --
4    provide their sign-off that the C3 had an
5    excess or otherwise, but have an opinion on the
6    C3 and authorize a sign-off to the trustee of
7    LBI to release the cash related to the margin
8    balances, as I mentioned before, another
9    element of the PIM transfer, and securities
10   from -- securities from JPMorgan Chase.
11       Q.    Was this a meeting that you had
12   requested, Mr. Blackwell?
13       A.    I don't recall whether I requested
14   it.  It's quite possible I did.  The SEC set up
15   an office at 745, so were available.
16       Q.    Where did the meeting take place, at
17   the SEC's office at 745?
18       A.    Correct.
19       Q.    And this was Mr. Macchiaroli's
20   office?
21       A.    Yes.
22       Q.    Do you have any notes of the
23   conversation you had there?
24       A.    I don't believe I do.  I could go
25   back to my -- I could go back and try and

TSG Reporting - Worldwide  (877) 702-9580

## Page 208

Blackwell - Highly Confidential

1
2    review my papers.
3        Q.    Where would they be if you had them?
4        A.    Where would they be?  They are most
5    likely going to be in my e-mail and they are
6    also potentially in my boxes of files which I
7    have already reviewed and looked through, so I
8    can do that based on these questions.
9        Q.    Your counsel and I can talk off the
10   record about our document requests.
11       What was Mr. Macchiaroli's response
12   to your request that the SEC review and sign
13   off the 15C3 calculation?
14       A.    I don't think he was comfortable
15   doing it, doing that at that point.  He wanted
16   to get a better understanding of the books and
17   records at that point.  So I think we continued
18   to work with members of the SEC and to try and
19   provide them with a better understanding and
20   the finance team probably led that effort in
21   terms of the overall 15C3.
22       Q.    At the time you asked
23   Mr. Macchiaroli to sign off on this
24   calculation -- withdrawn.  I am going to set
25   that up a little better.

TSG Reporting - Worldwide  (877) 702-9580

## Page 209

Blackwell - Highly Confidential

1
2        You testified in response to
3    Mr. Hine's questions that you were
4    uncomfortable about the accuracy of the C3
5    calculation over the weekend of September 20th
6    and 21st; correct?
7        A.    To be precise, what I said, I was
8    uncomfortable about some of the inputs into the
9    calculation, not the calculation itself.
10       Q.    I didn't mean to mischaracterize
11   your testimony.  I didn't mean to suggest that
12   somehow the formula wasn't properly applied,
13   but it seemed to me that as of Sunday night,
14   the 21st, you were not comfortable that the
15   calculation, because of the reasons you have
16   testified to, you are not comfortable that the
17   calculation or the result of the calculation
18   was a hundred percent accurate; is that
19   correct?
20       A.    That's correct.
21       Q.    And what happened between Sunday the
22   21st of September and this meeting with the SEC
23   a week or so hence that allowed you to become
24   comfortable that the calculation was correct?
25       A.    I wasn't talking about the accuracy

TSG Reporting - Worldwide  (877) 702-9580

Blackwell - Highly Confidential
1  I was discussing with Mike the fact that there
2  are multiple components for 15C3 calculation,
3  multiple components, of which I am not expert
4  at the multiple components.  Over the course of
5  the weekend leading -- the 21st, 20th, 21st,
6  the work that was done was to determine the
7  operational components that go into a 15C3
8  calculation which is some of the components
9  that we would -- that operations would provide,
10 and there are many other components that make
11 that up.  That calculation then determines how
12 much money is locked up.  I don't know at that
13 point in time when that conversation happened
14 how much money was locked up.  Mike and the
15 trustee of LBI knew how much money was locked
16 up and what the value of that calculation was.
17 But I would need to look at papers from there
18 to determine whether there was an excess.  The
19 request was on the basis that if Mike felt
20 there was an excess, when could we discuss
21 having the $769 million worth of securities.
22 If there isn't an excess, then I'm not
23 expecting him to release the securities.  But
24 then alternative value would need to be found

Blackwell - Highly Confidential
1  away from the C3.
2      Q.   We will come back to the alternative
3  value in a little bit.
4          Have you had any subsequent
5  conversations with the SEC about the subject of
6  C3?
7      A.   Yes.  Again, as it pertained to the
8  margin debits and the PIM asset transfer,
9  multiple.  Too many to list.
10     Q.   Have you had any conversations with
11 the SEC about the $769 million?
12     A.   I don't think I have had any
13 subsequent conversations.
14     Q.   Do you know if anybody else at
15 Barclays has had conversations with the SEC
16 about the release of 769 from the 15C3 account?
17     A.   I don't know is the -- I don't know.
18     Q.   Were you ever asked over the
19 weekend, sir, the weekend of September 20th and
20 21st, to do any work as it relates to Lehman's
21 margin or deposits at the OCC or any other
22 exchange?
23     A.   I don't recall doing any work on
24 that.

Blackwell - Highly Confidential
1      Q.   Do you recall ever hearing that
2  Lehman's margin or deposits at the OCC or any
3  other exchange were ever part of the deal
4  between Lehman and Barclays?
5      A.   Over the deal weekend, no.
6      Q.   That answer suggests to me that
7  subsequently to the deal weekend you have heard
8  that.
9      A.   I understand that to be the deal.
10     Q.   And, again, without wishing to
11 invade any privilege that you may have, can you
12 tell me how it is you came to learn that piece
13 of information?
14     A.   I learned that as part of some
15 conversations that I think took place --
16 meetings that took place between the trustee of
17 LBI, a member of my staff, and Barclays'
18 counsel, so I...
19     Q.   That's fine.  It's probably not
20 privileged, but I don't need to go into it.
21         You said in response to one of
22 Mr. Hine's questions that one of your
23 responsibilities over the weekend was to
24 monitor settlement activity between various

Blackwell - Highly Confidential
1  clearing organizations.
2      A.   Not over the weekend, because there
3  is no settlement can take place over the
4  weekend.
5      Q.   I'm sorry.  I misspoke.
6          Was monitoring settlement activity
7  in various clearing organizations part of your
8  responsibility in the week preceding the LBI
9  bankruptcy on the 19th of September?
10     A.   Correct.
11     Q.   Can you tell me a little more about
12 your role in monitoring the settlement
13 activity, please.
14     A.   My settlement teams were obviously
15 working very closely with these exchanges to
16 try and clear the business and working with the
17 treasury team to fund -- to make sure the boxes
18 were funded as much as they possibly could, and
19 over the course of that week funding obviously
20 started to disappear, so settlement started to
21 wind down.  The most notable event apart from
22 Chase not providing clearance on the Friday
23 before bankruptcy was DTC raising the debit cap
24 to zero, which basically prevented us from

Page 218

1  Blackwell - Highly Confidential
2  being able to settle transactions.
3        Q.  What does that mean, raising the
4  debit cap to zero?
5        A.  It means that the account is
6  effectively not funded, so the process of
7  settlement can't take place.
8        Q.  I have heard that over the week
9  prior to LBI's bankruptcy that DTC was
10 threatening not to clear trades.
11       Is that the same thing that you have
12 just told me in slightly different language?
13       A.  Yes.
14       Q.  Do you have an understanding of why
15 DTC was threatening not to clear trades?
16       A.  Because the account -- because of
17 funding, funding the account, cash being made
18 available to fund the account.  The treasury
19 organization would fund all the clearing
20 systems.  If they had insufficient cash to fund
21 or insufficient cash to fund a clearing
22 mechanism, then the mechanism doesn't work.
23       Q.  Did you have any conversations with
24 anybody at DTC about the funding issues you
25 just described?

TSG Reporting - Worldwide  (877) 702-9580

Page 219

1        Blackwell - Highly Confidential
2        A.  I was informed by Neal Ullman, who
3  had a direct call with DTC, I had a
4  conversation, I think it was an e-mail
5  conversation and then ultimately a conversation
6  directly with Ian when we became aware of the
7  situation.  I asked Paolo as well if he could
8  fund the account.  So that was -- and asked him
9  to -- I think there is an e-mail me asking for
10 $1.2 billion to be put into the clearance box.
11       Q.  What was Mr. Tonucci's response to
12 your request?
13       A.  I don't remember one.
14       Q.  You took that as a no?
15       A.  I, yeah, moved on.
16       Q.  At any point did you have an
17 understanding, Mr. Blackwell, of the terms of
18 the deal between Lehman and Barclays as to
19 Lehman's DTC box?
20       A.  I think I have discussed this in
21 some of my earlier answers.  I was under the
22 working assumption that there would be a
23 conversion of, I think, the 074 box, the DTC
24 box.  That was not accurate.  There was
25 definitely dialogue between the regulators,

TSG Reporting - Worldwide  (877) 702-9580

Page 220

1  Blackwell - Highly Confidential
2  which I wasn't in, but I'm aware of, between
3  the regulators, DTC and Barclays and Lehman as
4  to Barclays taking responsibility.  I think
5  Barclays was very clear that we not take
6  responsibility for the liabilities of the
7  boxes.
8        Q.  You testified earlier that you had
9  made a suggestion that Barclays go and look at
10 Lehman's DTC books.  Do you remember that?
11       A.  I do.
12       Q.  For what purpose were you making
13 that suggestion?
14       MR. SHAW:  Asked and answered.
15       A.  So that it was possible to
16 understand any settlement risk.
17       Q.  Was that suggestion made at a time
18 when Barclays was considering stepping into
19 Lehman's shoes at DTC?
20       MR. SHAW:  Objection.  Foundation.
21       A.  I don't know what the -- I don't
22 know.
23       Q.  Well, let me ask it this way:  The
24 conversion plan about which you have testified,
25 you said that as of, I believe, Friday

TSG Reporting - Worldwide  (877) 702-9580

Page 221

1        Blackwell - Highly Confidential
2  afternoon, maybe around 5:00, you said the
3  conversion plan was no longer going to be
4  affected; is that correct?
5        A.  Correct.
6        Q.  Did you understand at any point
7  after 5:00 on Friday Barclays was still
8  assessing the risk in Lehman's DTC box?
9        A.  Not at that point.  That issue
10 didn't come up until Sunday.
11       Q.  Do you have any understanding as to
12 why the issue arose on Sunday?
13       A.  I believe it's because the
14 regulators and other entities that were
15 involved in signing off on the deal were
16 insisting that the box should be -- Barclays
17 should take responsibility for the box, which
18 they did not want to do.
19       Q.  Where did you get that
20 understanding, that the regulators wanted
21 Barclays to take over the box?
22       A.  I would have heard it either from
23 Ian or from -- maybe even from Alex Crepeau.
24       Q.  Does that answer exhaust your
25 recollection of the regulators' interactions

TSG Reporting - Worldwide  (877) 702-9580

Page 230

```
 1        Blackwell - Highly Confidential
 2      A.   Quite possibly, but again, the focus
 3  of this e-mail on this e-mail trail and the
 4  focus of what I am doing as the operations
 5  manager is trying to identify based on the set
 6  of criteria unencumbered securities.  I don't
 7  know what was discussed in court.  I have no
 8  idea.  And it was, frankly, of little interest
 9  to me at that point.
10      Q.   Miss Rudofker writes:  "Alastair" --
11  and she spells your name wrong -- "and Neal are
12  working on getting it ring-fenced/moved if
13  needed."
14          Was that your understanding of what
15  your marching orders were that weekend, to get
16  the 15C3 assets and the unencumbered box
17  ring-fenced and moved, if needed?
18      A.   I couldn't technically do that.  I
19  could identify assets.  I can't move anything
20  over the weekend.  I couldn't move cash at the
21  weekend and I couldn't move securities related
22  to it, so practically that's not possible, so
23  my marching orders, as I said, was to identify
24  the assets and provide that information, what
25  are the assets that are currently unencumbered,
```

Page 231

```
 1        Blackwell - Highly Confidential
 2  and recalculate the C3.
 3      Q.   Did anyone ever tell you that cash
 4  had been removed from the deal between Lehman
 5  and Barclays?
 6      A.   That was my understanding of why 769
 7  cash couldn't move, it had to be securities,
 8  but I think that was a post -- that was a
 9  post-weekend event.  That's my recollection.
10      Q.   Your recollection -- and the event
11  you are talking about is you learning that the
12  reason the transfer is 769, not some number in
13  cash, is because, as you understood it, the
14  terms of the deal was that no cash could go to
15  Barclays?
16      A.   That was after the weekend, as I
17  thought 769 was a strange number.
18      Q.   Okay.  I think you have answered my
19  question as to timing, but not actually my
20  question.
21          Is it correct that your
22  understanding was that the reason the deal
23  between Barclays and Lehman was the transfer of
24  $769 million in Ginnie Mae securities rather
25  than that number or some other number in cash
```

Page 232

```
 1        Blackwell - Highly Confidential
 2  was because cash had been excluded from the
 3  deal with Barclays?
 4      A.   I don't think -- I don't think I
 5  would have known that.  I think I may have
 6  learned that subsequently.  Around the time my
 7  understanding would have been securities needed
 8  to move or alternative value.
 9      Q.   From whom did you gain that
10  understanding, sir?
11      A.   It's going to have been from a
12  similar set of people you see in my e-mails.
13  It's going to be Ian, Martin or Paolo who would
14  have informed me of that.
15      Q.   So one of the three, to the best of
16  your recollection, you can't remember which,
17  would have told you that the reason the deal
18  changed from I think it was a billion
19  dollars -- does that sound right to you?
20          MR. SHAW:  Objection.  Foundation.
21      Q.   I think there is probably a number
22  of proper objections to that question.
23          Did you ever have an understanding
24  that some other value different to $769 million
25  was to be transferred from Lehman's C3 account
```

Page 233

```
 1        Blackwell - Highly Confidential
 2  to Barclays?
 3      A.   Over the course of the weekend I had
 4  spent time, that conversation I had with Gerard
 5  around the billion dollars of cash at Wells
 6  Fargo, so I had a conversation about the
 7  mechanism to potentially move that.  That's
 8  where my involvement was.
 9      Q.   So based on your conversation with
10  Mr. LaRocco, you had understood that one
11  component of the deal between Barclays and
12  Lehman was to move a billion dollars of cash
13  which was held in that Wells Fargo account
14  which was that 15C3 account?
15      A.   Correct, dependent, though, on
16  determining there was an excess, and there
17  would be alternative value.
18      Q.   And when the deal is finally inked
19  in the Clarification Letter, that number has
20  changed, hasn't it?  It's no longer $1 billion;
21  correct?
22      A.   That is my understanding, yes.
23      Q.   That number has changed from
24  $1 billion to $769 million; correct?
25      A.   Correct.
```

Page 234

1          Blackwell - Highly Confidential
2      Q.    And just so we have got a clear
3  record, I think we are there, but one more
4  question, your understanding of the reason that
5  the deal changed from $1 billion in cash from
6  Wells Fargo, assuming there is an excess in the
7  C3 account, the reason it changed from that
8  $1 billion to 769 of Ginnie Mae securities was
9  a belief that no cash was to go to Barclays
10 under this deal?
11         MR. SHAW:  Objection to form.
12     A.    I don't have -- over the course of
13 the weekend when the Clarification Letter was
14 being produced, I have no understanding of that
15 at all.
16     Q.    I understand that, sir.  That wasn't
17 my question.
18     A.    Post the event that is a
19 possibility.  It is not something I spent a
20 huge amount of my time discussing.
21     Q.    But you believe the basis of your
22 knowledge, such as it is, comes from
23 conversations with Mr. Lowitt, Mr. Tonucci and
24 Mr. Kelly?
25     A.    Most likely.

Page 235

1          Blackwell - Highly Confidential
2         (Exhibit 93 B, Management of the
3  Unencumbered Asset Gap, marked for
4  identification.)
5         (Recess was taken from 3:33 to
6  3:38.)
7  BY MR. OXFORD:
8      Q.    Mr. Blackwell, you have in front of
9  you what I have marked as Exhibit 93 B, which
10 is a document -- a one-page document
11 entitled -- two-page document entitled
12 Management of the Unencumbered Asset Gap.
13     Do you recall seeing this document
14 before?
15     A.    When I was reviewing my e-mail, I
16 think I saw something like this, if not this
17 one.
18     Q.    And when you say reviewing your
19 e-mail, do you mean in preparation for this
20 deposition?
21     A.    Absolutely.
22     Q.    Did that review refresh your
23 recollection about the events that took place
24 at the time this document was created?
25     A.    I think this is the -- to the extent

Page 236

1          Blackwell - Highly Confidential
2  that it is consistent with the attempt to look
3  for 1.95 billion of collateral.  At that point
4  that was a target.  I don't know why that
5  target was set, but that was the target.  That
6  target subsequently became irrelevant or
7  raised.
8      Q.    When did it become irrelevant or
9  raised?
10     A.    It was -- the target ceased to be --
11 over the course of the weekend it ceased to be
12 about finding a specific number.  It was what
13 is available unencumbered collateral.
14     Q.    And was that change in emphasis
15 something that Mr. Lowitt communicated to you?
16     A.    I believe so, yes.
17     Q.    And again, just so we are clear, the
18 idea then was to find as much unencumbered
19 collateral as possible so that it could be
20 transferred to Barclays?
21     A.    No, that wasn't my understanding.
22 It was to identify unencumbered collateral and
23 determine what value -- determine what was a
24 list of unencumbered securities so that a value
25 could be applied to it.  I don't know that the

Page 237

1          Blackwell - Highly Confidential
2  intent was to transfer all of it to Barclays.
3  I think the terms of the APA state that the
4  contents of the clearance boxes, i.e., the
5  unencumbered securities in the clearance boxes
6  would be transferred, so I think this is an
7  earlier iteration of that.
8      Q.    When you say the APA, Mr. Blackwell,
9  the APA to me means the Asset Purchase
10 Agreement that was signed on 16th of September.
11 Is that a document you are referring to?
12     A.    I'm not sure which date.  Whatever
13 legal agreement was in place.  I've seen it
14 subsequently, but my understanding is it was --
15 that was my understanding.
16     Q.    And is it your understanding that
17 whatever legal agreement this may be, the APA
18 or something else, transfers in terms of
19 unencumbered collateral, it transfers what to
20 Barclays?
21         MR. SHAW:  Asked and answered.
22     A.    The contents of the -- the
23 unencumbered assets in the clearing box.
24     Q.    Clearance box was broader to your
25 mind than DTC; correct?

## Page 238

1    **Blackwell - Highly Confidential**
2        A.   Yes, it would be.
3        Q.   Was it -- I think you testified that
4    it included Euroclear?
5        A.   Correct.
6        Q.   It also included Canadian exchanges?
7        A.   Not exchanges.
8        Q.   Sorry.  Then I apologize for my
9    layman's language.  It included certain
10   clearance corporations in Canada?
11       A.   Correct.
12       Q.   What else were you -- withdrawn.
13           Where else were you looking for
14   unencumbered collateral, if anywhere else?
15       A.   We were looking in the clearance
16   depos of LBI, and I don't know all the numbers
17   off the top of my head, but there are a list of
18   depos that would fall under LBI and we would --
19   the teams would have looked in those depos and
20   discounted some of them as not being depos, so
21   the focus is really on, I think, three or four
22   core pools of unencumbered securities.
23       Q.   The document that I have marked as
24   93 B says:  "The objective is to deliver to BCI
25   $195 billion as unencumbered collateral by COB

## Page 239

1    **Blackwell - Highly Confidential**
2    Friday, September 19th."  Do you see that?
3        A.   I do.
4        Q.   I read COB to be short for close of
5    business.  Do you read that also?
6        A.   I do.
7        Q.   Do you know why this document has as
8    its objective the delivery of unencumbered
9    collateral by the close of business on Friday,
10   September 19th?
11       A.   I actually don't, and I think
12   somebody like Paolo would be better answering
13   this question.
14       Q.   Did you ever have an understanding
15   that there was any effort to transfer
16   unencumbered collateral to Barclays by close of
17   business on Friday, September 19th?
18       A.   Possibly.  I don't recall that as a
19   major part of the fact pattern that we were
20   working towards at that time, but that's
21   possible.
22       Q.   Do you recall anything else about an
23   effort to transfer collateral to Barclays on
24   Friday, the 19th?
25       A.   No.

## Page 240

1        Blackwell - Highly Confidential
2        Q.   Can you explain for me what your
3    understanding is of a 15C3 account, just to
4    make sure we are not passing each other when we
5    are talking about it?
6        MR. SHAW:  Objection.  Asked and
7    answered, and I think also the problem you
8    are going to run into, again, is the use of
9    15C3 account.
10       MR. OXFORD:  You are right.  He did
11   correct that earlier.
12       Q.   Do you have an understanding of what
13   the requirements are of SEC rule 15C33?
14       A.   I'm at an expert on that rule.
15       Q.   Okay.  That's useful.  That was my
16   next question.
17           Do you have a general understanding
18   of what the rule requires?
19       A.   I have a general understanding what
20   it requires.
21       Q.   Can you tell me what that general
22   understanding is?
23       A.   The purpose of the calculation is to
24   protect customer assets by calculating a figure
25   and that figure is then -- it then requires you

## Page 241

1        Blackwell - Highly Confidential
2    to deposit either cash or securities, whichever
3    the security types are eligible, into an
4    account for that customer's protection.
5        Q.   And do you have an understanding of
6    the various elements of the calculation --
7        A.   No, I don't.
8        Q.   -- that goes into the 15C3
9    calculation?  You don't know?
10       A.   I don't.
11       Q.   Do you have any understanding of how
12   secured loans are treated under 15C3?
13       A.   No.
14       Q.   Do you have any understanding of how
15   overdrafts are treated under 15C3?
16       A.   I don't.
17       Q.   Do you have any understanding of how
18   margin that is posted at the options clearing
19   corporation is treated under 15C3?
20       A.   I don't.
21       (Exhibit 94 B, e-mail dated
22   9-22-2008, marked for identification.)
23       Q.   Okay, Mr. Blackwell, I have put in
24   front of you a document marked Exhibit 94 B,
25   which is a one-page e-mail that at the bottom

Page 246

1       Blackwell - Highly Confidential
2   pledging margin to -- all of the exchange
3   margin, so the names mentioned here, Craig
4   Jones, Dan Fleming. I believe you are speaking
5   to Dan at some point.
6       **Q.   Mr. Fleming has operational
7   responsibility for or had, rather, operational
8   responsibility for the margin at OCC during the
9   month of September '08?**
10      A.   Correct.
11      **Q.   Did he report to Mr. Jones or did
12  Mr. Jones report to him?**
13      A.   Mr. Jones reported to Dan Fleming.
14      **Q.   Are both of those individuals still
15  at Barclays?**
16      A.   They are.
17      **Q.   Do you know why the other Lehman
18  individuals would be copied on an e-mail about
19  this subject? Did they also have
20  responsibility for this area?**
21      A.   I don't. There seem to be
22  regulatory people, regulatory finance people on
23  here, so I don't know what -- reading through
24  the e-mail trail, I don't know what the
25  ultimate genesis of this trail of work is.
        TSG Reporting - Worldwide  (877) 702-9580

Page 247

1       Blackwell - Highly Confidential
2       **Q.   Which are the regulatory finance
3   people?**
4       A.   Peter Tennison and Tony Stucchio,
5   and then there are product controllers in Frank
6   Pearn and Gerry Reilly.
7       **Q.   Thank you. That's all I have for
8   that document.
9       Can you have in front of you, it's
10  one of the big fat ones that Mr. Hine marked,
11  85 B. Can you open the page to the last
12  document in here which starts at Bates range
13  4607 and it's entitled at the top Exhibit B6
14  Source Schedule B Final, Schedule B. Do you
15  see that?**
16      A.   I do.
17      **Q.   Do you recognize this document or
18  know what it is?**
19      A.   I believe I know what it is.
20      **Q.   Can you tell me what it is, please.**
21      A.   I believe this is the unencumbered
22  collateral list.
23      **Q.   When you say "the unencumbered
24  collateral list," can you be a little more
25  specific, please?**
        TSG Reporting - Worldwide  (877) 702-9580

Page 248

1       **Blackwell - Highly Confidential**
2       A.   List of securities that were
3   unencumbered in the clearance box of Lehman
4   Brothers.
5       **Q.   As of which date?**
6       A.   I don't know the date. I'm not
7   going to say what date it was, but the schedule
8   being created over that weekend is my
9   understanding.
10      **Q.   This might be a slightly vague
11  question. It's not intended to be in any way
12  tricky. I am just trying to get a sense of
13  whether you think this is in some way the
14  product of the work that your team did over the
15  weekend to identify unencumbered assets. Is
16  that a fair reading of the situation?**
17      A.   I'm aware of a Schedule B that we
18  contributed to, so I'm assuming based on the
19  title of the document, but without a number to
20  compare it, it's difficult for me to --
21      **Q.   It is in alphabetical order, but I
22  take your point.**
23      MR. SHAW: I will note that on
24  page 1, Schedule B6, which I think is what
25  you are looking at, has a title by it
        TSG Reporting - Worldwide  (877) 702-9580

Page 249

1       Blackwell - Highly Confidential
2   saying Monday Transfers Par Amount.
3       A.   Right. So it's only one component
4   of Schedule B.
5       MR. OXFORD: Which page?
6       MR. SHAW: Third page of the
7   document after the first blue page. You
8   see there is F/N and exhibit.
9       MR. OXFORD: Yeah, I don't think
10  that's got anything to do with that. Okay.
11      A.   So this document equals that 2.6
12  number?
13      **Q.   Is that your understanding?**
14      A.   Well, that's -- I don't know how
15  this is laid out, so I think that's a fair
16  point.
17      **Q.   In compiling your list of
18  unencumbered assets, which may not be exactly
19  what is at Bates range 4607 and following, did
20  you or your team undertake any effort to take
21  out securities that were owned by Lehman's
22  customers?**
23      MR. SHAW: Objection. Vague as to
24  time.
25      **Q.   At any point over the weekend when**
        TSG Reporting - Worldwide  (877) 702-9580

Page 250

Blackwell - Highly Confidential

1
2    you were combining a list of unencumbered
3    assets that informs this Schedule B that we are
4    looking at, did you or your team undertake any
5    efforts to deduct from that list of CUSIPs any
6    CUSIPs that were owned by Lehman customers?
7            MR. SHAW:  Objection to form.
8            You can answer.
9        A.   Of course.  Unencumbered assets by
10   definition are not customer assets, however, we
11   had data within the -- we had data challenges,
12   so some of the accuracy of the data was
13   challenging.  We applied a rationale, as I
14   described before, around memo seg and memo to
15   just take firm inventory, we excluded customer
16   inventory and were -- we applied a methodology
17   absolutely with the intent of protecting
18   customer assets all the way through the
19   process.
20       Q.   Have you ever done any analysis to
21   determine whether or not any customer assets
22   ended up on Schedule B?
23       A.   I think there were some analysis,
24   that's possible.  I can't -- there was
25   definitely analysis on Schedule B and

TSG Reporting - Worldwide  (877) 702-9580

Page 251

Blackwell - Highly Confidential

1
2    refinement of it, and it's possible, but I
3    think if that happened, then there was a
4    correction that took place.
5        Q.   And who did that analysis?
6        A.   I would imagine it's going to be the
7    finance team and Jim Hraska in conjunction
8    maybe with the regulatory ops team.
9        Q.   Were you involved in that analysis?
10       A.   Not doing the analysis.  I think I
11   have seen analysis over the months post
12   bankruptcy.
13       Q.   Were you involved in reviewing the
14   analysis that was done by others?
15       A.   It's possible.  I can't confirm that
16   a hundred percent, but it's possible I reviewed
17   analysis.  There was no intent to move customer
18   assets.
19       Q.   When you say there was no intent to
20   move customer assets, do you include in your
21   definition of customers Lehman affiliates?
22       A.   I include the way these schedules
23   were created or the way that the unencumbered
24   assets were created was using 931 inventory
25   accounts, which are firm positions, firm being

TSG Reporting - Worldwide  (877) 702-9580

Page 252

Blackwell - Highly Confidential

1
2    LBI positions.
3        Q.   Why do you use the date of 9/31?
4        A.   I don't use the date.  It's an
5    account identifier.  931 is an account range.
6        Q.   I understand.
7        A.   So it's a distinct account range
8    that we analyze, firm inventory accounts.
9        Q.   Is it possible that Lehman's system
10   showed that multiple parties, including
11   customers of Lehman and Lehman itself, could
12   have entitlement to the same security in the
13   clearance box?
14       A.   Yes, but there was a methodology
15   applied to identify that.
16       Q.   What was that methodology?
17       A.   Again, using 931 accounts, taking
18   the difference between the value of the
19   customer -- taking a total value of the
20   position in the box, taking only the component
21   which was a -- taking only the component that
22   was the trading book component, and if that
23   trading book component was bigger than the
24   total position, then there was an adjustment
25   there as well, so absolutely we are taking the

TSG Reporting - Worldwide  (877) 702-9580

Page 253

Blackwell - Highly Confidential

1
2    most conservative component and if there was
3    any doubt in terms of total position and if the
4    position in the box was less than the -- was
5    less than the -- less than or equal to the
6    customer position, we left that position there.
7    So we didn't -- there was a methodology for
8    each of the schedules that absolutely was
9    designed to protect the customer assets.
10       Q.   So I understand this, if, for
11   example, there were a million shares of IBM and
12   Lehman's books and records showed that there
13   was an entitlement to those million shares by a
14   customer and by Lehman, those under your
15   methodology would have been excluded from your
16   list of unencumbered assets?
17       A.   Yes.  That was the intent.
18       Q.   Does the same apply to securities
19   that Lehman's books and records show an
20   entitlement to by not only Lehman, by which I
21   mean LBI, the broker/dealer, but also a Lehman
22   affiliate?
23       A.   Jim would be a better person to
24   explain exactly how he applied the methodology,
25   but there was deliberate methodology applied to

TSG Reporting - Worldwide  (877) 702-9580

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------x

     In Re:                     Chapter 11

5    LEHMAN BROTHERS             Case No. 08-13555 (JMP)

     HOLDINGS, INC., et al.,     (Jointly Administered)

6    -----------------------------)

7

8         * * * HIGHLY CONFIDENTIAL * * *

9       VIDEOTAPED DEPOSITION OF ALVIN H. BROWN

10              New York, New York

11           Friday, January 8, 2010

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 27031

22

23

24

25

## Page 6

1    A. BROWN - HIGHLY CONFIDENTIAL
2    Creditors Committee.
3         MS. LEE:  Shinzong Lee from
4    Simpson Thacher.
5         MR. ROTHMAN:  Seth Rothman from
6    Hughes Hubbard on behalf of the SIPA
7    Trustee.
8         MR. THOMAS:  And let me just note
9    that this is part two of a 30(b)(6)
10   deposition of Simpson Thacher as opposed
11   to an individual deposition of the
12   witnesses.
13        * * *
14   A L V I N   B R O W N,  called as a witness,
15   having been duly sworn by a Notary
16   Public, was examined and testified as
17   follows:
18   EXAMINATION BY
19   MR. THOMAS:
20   Q.   Mr. Brown, good afternoon.
21   A.   Good afternoon.
22   Q.   Would you please state your full
23   name?
24   A.   Alvin Howard Brown.
25   Q.   And have you been deposed before?
TSG Reporting - Worldwide    877-702-9580

## Page 7

1    A. BROWN - HIGHLY CONFIDENTIAL
2    A.   I have.
3    Q.   So you understand how this process
4    works.  If at any point you're not sure what
5    question I'm asking, please ask me to
6    rephrase.  I'll be happy to try.
7    A.   Yes.
8    Q.   Do you understand you've been
9    designated by Simpson to be the 30(b)(6)
10   witness on a couple of topics here today?
11   A.   Yes.
12   Q.   And those topics include generally
13   the compensation and cure liabilities assumed
14   by Barclays and the employment offered to
15   Lehman executives by Barclays.
16   A.   I just didn't understand -- after
17   "compensation" what was the next word that
18   you --
19   Q.   Cure payments, liabilities.
20   A.   Okay.
21   Q.   We'll work through it and see how
22   we do.
23   A.   Fine.
24   Q.   How long have you been with
25   Simpson?
TSG Reporting - Worldwide    877-702-9580

## Page 8

1    A. BROWN - HIGHLY CONFIDENTIAL
2    A.   Since May of 1983.  So about 26
3    years.
4    Q.   And what is your area of practice?
5    A.   I'm the head of the Executive
6    Compensation and Employee Benefits Group at
7    the firm.
8    Q.   And when was the first time you
9    became involved in the Lehman/Barclays
10   transaction?
11   A.   September of 2008.  It was after
12   Labor Day.  I don't -- I don't remember the
13   exact date.
14   Q.   And had you worked previously for
15   or with Lehman Brothers?
16   A.   During the course of my time at
17   Simpson?
18   Q.   Yes.
19   A.   Yes.
20   Q.   Had they been a regular client of
21   the firm for many years?
22   A.   Yes.
23   Q.   And can you describe what work you
24   have done for Simpson over the years?  You
25   personally?
TSG Reporting - Worldwide    877-702-9580

## Page 9

1    A. BROWN - HIGHLY CONFIDENTIAL
2    A.   For Simpson?
3    Q.   Or excuse me.  For Lehman.  What
4    work have you done for -- on behalf of Lehman
5    while at Simpson?
6         MR. AMER:  Do you mean in very
7    general terms?
8         MR. THOMAS:  Yes.
9    A.   Actually, my involvement was in my
10   early years at Simpson generally and I
11   addressed some questions related to ERISA or
12   compensation.  But hadn't worked with them for
13   years until this.
14   Q.   And when this came up, the
15   transaction with Barclays, why were you
16   brought into the matter?
17   A.   Because my partner in the group
18   had a personal issue conflict that he couldn't
19   be available for the weekend that was going to
20   be relevant and I was asked to step in.
21   Q.   Do you recall the week that Lehman
22   Brothers Holding filed bankruptcy being
23   roughly September 15th?  Is that consistent
24   with your recollection?
25   A.   Yeah.  That's consistent.
TSG Reporting - Worldwide    877-702-9580

## Page 10

A. BROWN - HIGHLY CONFIDENTIAL

1
2  Q.   And do you recall whether you were
3  over -- physically went over to Lehman
4  Brothers' building on that Monday after the
5  filing?
6  A.   Yes.
7  Q.   And you spent a good part of the
8  day there?
9  A.   Yes.
10  Q.   And what were you doing there?
11  A.   Negotiating the benefit provisions
12  of an acquisition agreement.
13  Q.   And can you elaborate a little
14  more on the benefit provisions, what precisely
15  you mean?
16  A.   There were provisions in the
17  agreement that related to the treatment or
18  handling of the employees of the Lehman
19  entities.  And I was addressing those issues
20  along with two partners from Weil Gotshal.
21  Q.   And who were they?
22  A.   Andy Gaines and Amy Rubin.
23  Q.   And did you continue to work on
24  those issues through the week or just for a
25  couple of days, or do you recall?

TSG Reporting - Worldwide   877-702-9580

## Page 11

A. BROWN - HIGHLY CONFIDENTIAL

1  A.   My recollection, yes, but
2  intermittently.
3  Q.   So through the time of closing?
4  A.   Really, after the agreement was
5  signed my involvement was pretty attenuated.
6  Q.   And by agreement, are you
7  referring to the original executed APA?
8  A.   Correct.
9  Q.   Let me go ahead and show you this.
10  I might refer to it later.  It was previously
11  marked as Exhibit 1.  Take a moment and review
12  and just confirm whether that's the agreement
13  that you were involved in negotiating and
14  drafting.
15  A.   I mean the title of it is the same
16  title as the agreement.  You know, without --
17  I'm assuming that if it is, it is the one that
18  I worked on.
19  Q.   If you would --
20  A.   It's certainly the same title.
21  Q.   Sure.  And if you'd flip to
22  Section 9.
23  A.   (Witness complies.)
24  Q.   Are those sections or issues some

TSG Reporting - Worldwide   877-702-9580

## Page 12

A. BROWN - HIGHLY CONFIDENTIAL

1  of the sections and issues that you worked on?
2  A.   Yes.
3  Q.   Let's put that aside for a second.
4  And let me show you a document -- we'll refer
5  back to that in a minute.  But let me show you
6  a document marked Exhibit 489 which is the
7  LBHI board minutes.
8  (Document review.)
9  Q.   Let me start by asking if you
10  recognize the document itself.
11  A.   Only because it's identified.  But
12  I'm not sure.
13  Q.   Have you had occasion to read this
14  document before?
15  A.   I have read it in connection with
16  preparing for this deposition.
17  Q.   Okay.
18  A.   I'm not sure I saw it before that.
19  But I...
20  Q.   Do you recall attending this board
21  meeting described here?
22  A.   Yes.
23  Q.   And you're listed as a present on
24  the first page.

TSG Reporting - Worldwide   877-702-9580

## Page 13

A. BROWN - HIGHLY CONFIDENTIAL

1  Do you see that?
2  A.   Yes.
3  Q.   If you would turn, please to page
4  number 3 of this document.
5  A.   (Witness complies.)
6  Q.   The second paragraph reads, "Mr.
7  Roberts -- " do you understand that to be a
8  Weil Gotshal lawyer?
9  A.   I don't remember who he was with.
10  Q.   Okay.
11  It reads, "Mr. Roberts resumed by
12  describing that it is a condition to the
13  transaction that eight specific firm employees
14  enter into employment agreements with
15  Barclays.  He stated that Mr. McGee was one of
16  those employees, so interested firm employees
17  were involved in the transaction negotiations
18  on behalf of the team."
19  Do you see that?
20  A.   Yes.
21  Q.   And so Simpson was aware at the
22  time the deal was being negotiated that
23  members of Lehman negotiating the deal were at
24  the same time negotiating employment

TSG Reporting - Worldwide   877-702-9580

## Page 14

1    A. BROWN - HIGHLY CONFIDENTIAL
2  agreements with Barclays, correct?
3        MR. HINE:  Object to the form.
4        A.    Well, I'm not sure -- from your
5  question I'm just not -- you said Simpson was
6  aware?
7        Q.    Yes.  Simpson Thacher.
8        A.    I was aware.
9        Q.    Good enough.
10       A.    Okay.
11       Q.    And you're the firm designee on
12  this issue.
13       A.    Okay.
14       Q.    Do you recall that being raised in
15  the -- in a board minute, a discussion of the
16  fact that certain employees, Lehman employees
17  who were negotiating a transaction were at the
18  same time negotiating for future employment
19  and bonus agreements with Barclays?
20       MR. HINE:  Object to the form.
21       A.    No.  No.  Not --
22       Q.    You don't recall that?
23       A.    I don't recall that being a point
24  of discussion in the form you just asked me.
25       Q.    Okay.  Do you recall that it was

TSG Reporting - Worldwide    877-702-9580

## Page 15

1    A. BROWN - HIGHLY CONFIDENTIAL
2  described to the board that interested firm
3  employees were involved in transaction
4  negotiations on behalf of LBHI?
5        A.    Yes.
6        Q.    And at the last paragraph on this
7  page do you see where it says "Mr. Brown of
8  Simpson Thacher & Bartlett reported on the
9  employee benefits aspect of the proposed sale
10  agreement.  He..." being yourself "...reported
11  that the firm proposed post-closing covenants
12  to protect employee benefits but that the only
13  commitment Barclays would make is to keep
14  severance levels in place for the balance of
15  the calendar year."
16       Do you see that?
17       A.    Yes.
18       Q.    The reference to employee benefits
19  and the keeping of severance levels in place
20  for the balance of the calendar year, is that
21  issue described in Section 9 of the original
22  APA, Exhibit 1?
23       A.    Yes.
24       Q.    It goes on.  Further down in the
25  paragraph, it says, "Mr. Brown described the

TSG Reporting - Worldwide    877-702-9580

## Page 16

1    A. BROWN - HIGHLY CONFIDENTIAL
2  draft employment letters for eight specific
3  former employees which are a condition to the
4  deal.  He described that draft employment
5  letters provide for at-will employment for a
6  period of time with salary and guaranteed cash
7  bonus and a retention award."
8        Is that an accurate summation of
9  your description to the board?
10       A.    Based on my recollection, yes.
11       Q.    And did you actually review the
12  employment agreements of those individuals?
13       A.    No.
14       Q.    How did you know about the terms
15  of the agreements?
16       A.    I saw a draft of the form of
17  letter.  But not the actual completed letters
18  for the individuals.
19       Q.    And the form of the letter made
20  clear that salary and guaranteed cash bonus
21  and retention award were being provided?
22       A.    You know, at this point I don't
23  recall.  But...
24       Q.    You have no reason to believe this
25  description's inaccurate.

TSG Reporting - Worldwide    877-702-9580

## Page 17

1    A. BROWN - HIGHLY CONFIDENTIAL
2        A.    I do not.
3        Q.    So in any event you and presumably
4  others at Simpson were aware of the fact that
5  people -- at least some of the people
6  negotiating the deal on behalf of LBHI were at
7  the same time being offered employment with
8  Barclays including salary, guaranteed cash
9  bonus and retention awards?
10       MR. HINE:  Object to the form.
11       MR. AMER:  Objection to the form
12  of the question.  You can answer.
13       A.    Yes.
14       Q.    If you would turn to page 4,
15  please.
16       A.    (Witness complies.)
17       Q.    The last paragraph reads, "The
18  directors asked questions about the sale and
19  license-back of the Lehman Brothers name and
20  the ability to solicit firm employees if the
21  deal does not go forward, and the fact that
22  Barclays will have already signed up
23  approximately 200 of the firm's employees."
24       Do you recall that the -- Barclays
25  was concerned about being able to retain the

TSG Reporting - Worldwide    877-702-9580

## Page 18

A. BROWN - HIGHLY CONFIDENTIAL
1
2   firm's employees which they were going to be
3   buying?
4       A.   Yes.
5       Q.   And did that make sense to you in
6   this environment that Barclays was concerned
7   that they were essentially buying the
8   business, that they be able to retain the
9   Lehman employees that made up the business?
10      MR. HINE:  Object to the form.
11      A.   Yes.
12      Q.   Let me show you a document that
13  we'll mark as Exhibit 531.
14          (Deposition Exhibit 531, document
15      bearing production number STB 09661,
16      marked for identification as of this
17      date.)
18  BY MR. THOMAS:
19      Q.   And let me know when you've had a
20  chance to review it.
21          (Document review.)
22      A.   Okay.
23      Q.   Do you recognize this as an e-mail
24  from yourself to a couple people at Lehman and
25  other Simpson attorneys dated September 17th,

TSG Reporting - Worldwide    877-702-9580

## Page 19

A. BROWN - HIGHLY CONFIDENTIAL
1
2   2008?
3       A.   Yes.
4       Q.   And in here you write in part
5   the second paragraph, "I wanted to be sure
6   that you knew that I would be happy to speak
7   to you or any of the Big 8 or other senior
8   executives as they worked through the
9   employment letters or other arrangements with
10  Barclays."
11          Do you see that?
12      A.   I do.
13      Q.   Do you recall if you ever ended up
14  doing further work in terms of the substance
15  of the employment letters?
16      A.   I -- yes.
17      Q.   And did you?
18      A.   No.
19      Q.   Turning back to the original APA
20  and that Section 9.  Section 9.1.  Is it fair
21  to say that Section 9.1 addresses two types of
22  employment -- employee benefits; one involving
23  severance payments and one involving bonus
24  payments?
25      A.   Could you repeat the question?

TSG Reporting - Worldwide    877-702-9580

## Page 20

A. BROWN - HIGHLY CONFIDENTIAL
1
2       Q.   Sure.  Within Section 9.1 which is
3   Employment Benefits there's both an assumed
4   liability by the purchaser in terms of
5   severance and bonus payments, correct?
6           MR. HINE:  Object to the form.
7           MR. AMER:  You can answer.
8       A.   Yes.
9       Q.   Do you know if there was ever any
10  effort to calculate that liability?
11      A.   I don't recall.
12      Q.   Do you have any recollection of a
13  $2 billion number?
14      A.   Yes.
15      Q.   Is it your recollection that $2
16  billion number was someone's estimate of
17  potential liability under Section 9.1?
18          MR. HINE:  Object to the form.
19      A.   Yes.  But not with respect to the
20  section that you just were referencing.  The
21  $2 billion number really related to subsection
22  C.
23      Q.   Do you recall ever seeing it on
24  a -- where do you recall seeing the $2 billion
25  number?

TSG Reporting - Worldwide    877-702-9580

## Page 21

A. BROWN - HIGHLY CONFIDENTIAL
1
2       A.   It was on a schedule.
3       Q.   And did the schedule have a
4   separate line item for severance?
5       A.   I don't recall.
6       Q.   And do you know who calculated the
7   $2 billion figure?
8       A.   I do not.
9       Q.   Were you involved in that process
10  in any way?
11      A.   In calculating the number?
12      Q.   Yes.
13      A.   No.
14      Q.   Do you have any understanding what
15  it entailed specifically?
16      A.   Yes.
17      Q.   And -- let me go ahead and show
18  you a document we'll mark as 532.
19          (Deposition Exhibit 532, document
20      bearing production number LBHI 013444
21      with attached spreadsheet, marked for
22      identification as of this date.)
23      A.   Okay.
24      Q.   Have you ever seen this document
25  before?

TSG Reporting - Worldwide    877-702-9580

## Page 22

A. BROWN - HIGHLY CONFIDENTIAL

1  
2    A.    No.  
3    Q.    Let me ask you to take a moment to  
4  review the attachment to the e-mail.  
5    A.    The attachment to --  
6    Q.    The cover is an e-mail --  
7    A.    Oh, I see.  Okay.  Sorry.  
8    Q.    The cover is an e-mail from Kelly  
9  Martin to Richard Krasnow, an attorney at Weil  
10  Gotshal, dated September 18th, 2008.  
11    A.    Right.  
12    Q.    The spreadsheet attachment, do you  
13  recall whether as part of your work with  
14  respect to the Barclays sales transaction, you  
15  ever reviewed sheets like this?  
16    A.    Yes.  
17    Q.    And did you?  
18    A.    Yes.  But not this one.  
19    Q.    How do you -- how are you certain  
20  a year later that it's not this one?  
21    A.    I've just never seen it before.  
22    Q.    Did you see a lot of spreadsheets?  
23    A.    No.  Well, in this transaction?  
24  No.  
25    Q.    Have you seen more than one?

TSG Reporting - Worldwide    877-702-9580

## Page 23

A. BROWN - HIGHLY CONFIDENTIAL

1  
2    A.    Not that I recall.  
3    Q.    When you say spreadsheet, are you  
4  referring to just a one-page schedule?  
5    A.    Correct.  
6    Q.    You never saw any of the backup as  
7  to how that schedule was built up?  
8    A.    (Witness shakes head.)  
9        MR. AMER:  You have to answer.  
10        THE WITNESS:  Oh.  
11    A.    No.  
12    Q.    If you would look at the last page  
13  of this document under the Liabilities column,  
14  do you see the fourth section there, Payables?  
15    A.    Yes.  
16    Q.    And do you see Compensation  
17  Payable?  
18    A.    Yes.  
19    Q.    And do you see that there was a  
20  transaction adjustment to that payable?  
21    A.    Yes.  
22    Q.    Were you aware at the time that  
23  there was a transaction adjustment to the  
24  estimate for compensation payables?  
25    A.    Not that I recall.

TSG Reporting - Worldwide    877-702-9580

## Page 24

A. BROWN - HIGHLY CONFIDENTIAL

1  
2    Q.    You don't recall having  
3  discussions with Weil Gotshal lawyers about  
4  that issue?  
5    A.    No.  
6    Q.    Do you have an understanding of  
7  why there would be a transaction adjustment?  
8        MR. GATTO:  Object to the form of  
9    the question.  
10    Q.    To the compensation payable.  
11        MR. AMER:  Same objection.  Since  
12    he doesn't recall there being an  
13    adjustment.  
14    A.    No.  I mean...  
15    Q.    Do you have any knowledge as to  
16  whether this line item, Compensation Payable,  
17  includes severance?  
18    A.    No.  
19    Q.    Do you know whether Lehman pays a  
20  larger or smaller percentage of its yearly  
21  bonuses as cash than Barclays does?  
22        MR. AMER:  Object to the form of  
23    the question.  
24    A.    I don't recall.  
25    Q.    Do you know whether the $2 billion

TSG Reporting - Worldwide    877-702-9580

## Page 25

A. BROWN - HIGHLY CONFIDENTIAL

1  
2  figure you're referring to was adjusted in  
3  order to allow for the fact that Barclays pays  
4  a higher percentage of cash compensation?  
5        MR. HINE:  Object to the form.  
6    A.    No.  
7    Q.    Do you understand whether there  
8  was any adjustment to the figure in order to  
9  cover the entire Lehman fiscal year for the  
10  compensation amounts due?  
11        MR. HINE:  Object to the form.  
12    A.    No.  
13    Q.    Do you have any understanding of  
14  where that $2 billion figure came from or how  
15  it was calculated?  
16    A.    Yes.  
17    Q.    Can you tell me.  
18    A.    My understanding was that that was  
19  the number for the accrued bonuses for the  
20  Lehman employees for that year.  It had been  
21  agreed to and was put on the schedule.  
22    Q.    And where did that understanding  
23  come from?  
24    A.    I don't -- it was from one of the  
25  participants or part of the team that was

TSG Reporting - Worldwide    877-702-9580

## Page 26

A. BROWN - HIGHLY CONFIDENTIAL

1      A. BROWN - HIGHLY CONFIDENTIAL
2  involved in negotiating but I don't recall
3  specifically who it was.
4      Q.  Do you recall which party it was
5  from?
6      A.  No.
7      Q.  Is this something that you
8  actually recall from a year and a half ago or
9  is it something that you've learned in
10  preparation for this deposition?
11      MR. HINE:  Well, hold on.  Before
12  you answer that --
13      MR. THOMAS:  That's a timing
14  question.  That can't be privileged.
15      MR. HINE:  I'm cautioning him not
16  to reveal privileged information he
17  might have learned after September 30th.
18  We have a waiver here.  So if your
19  answer entails something that you
20  learned after September 30th you're not
21  allowed to waive the privilege.
22      A.  I'm not -- could you repeat the
23  question because I'm not sure --
24      Q.  Your understanding about this $2
25  billion figure, is this an actual recollection

TSG Reporting - Worldwide    877-702-9580

## Page 27

1      A. BROWN - HIGHLY CONFIDENTIAL
2  of yours from a year and a half ago or is it
3  something you've come to understand more
4  recently in connection with this deposition?
5      MR. HINE:  Same warning.
6      A.  When you say my understanding of
7  this, I mean, what I told you was my
8  understanding and I really hadn't had
9  discussions that changed that since then.
10      Q.  So this is based on your
11  recollection from a year ago.
12      A.  My recollection.
13      Q.  Now, what did you do to prepare
14  for today's deposition?
15      A.  I met with my counsel.
16      Q.  Anything else?
17      A.  Actually, no.
18      Q.  If -- so turning back to the --
19  Section 9.1 of the original APA did you draft
20  this language in any part of the 9.1?
21      A.  Yes.
22      Q.  Which portions did you draft?
23      A.  That I can't recall.
24      Q.  Were you the original drafter?
25      A.  No.

TSG Reporting - Worldwide    877-702-9580

## Page 28

1      A. BROWN - HIGHLY CONFIDENTIAL
2      Q.  Do you know who was?
3      A.  Somebody at Cleary.  I dealt with
4  Arthur Cohen who's a partner at Cleary but I
5  don't -- the draft came originally to me and
6  my understanding was it had been drafted by
7  Cleary and I marked it up.
8      Q.  Do you recall any changes you made
9  to (b) or (c)?  Section (b) or (c) of 9.1.
10      A.  I don't recall the specifics.
11      Q.  Okay.  Is it your under -- let's
12  say that after Barclays -- the Barclay
13  transaction was consummated 90 percent of the
14  employees were severed.  Barclays would have
15  to pay severance for those employees, correct,
16  pursuant to 9.1(b)?
17      MR. AMER:  Objection to the form
18  of the question.
19      Q.  9(c).  Strike that.
20      If Barclays -- under 9.1 Barclays
21  would have to pay severance payments to
22  employees severed prior to the end of the
23  year; is that correct?
24      A.  Correct.
25      Q.  And if there were a lot of

TSG Reporting - Worldwide    877-702-9580

## Page 29

1      A. BROWN - HIGHLY CONFIDENTIAL
2  severances -- strike that.
3      And you know if that would involve
4  paying those employees all of their accrued
5  2008 bonus money.
6      A.  Yes.
7      Q.  So there's potentially a lot of
8  assumed liability by taking on that severance
9  obligation; is that correct?
10      MR. HINE:  Objection.
11      A.  Correct.  Yes.
12      Q.  Is it your belief that if Barclays
13  had terminated 90 percent of the employees,
14  that the remaining 10 percent of the employees
15  would have to get paid $2 billion?
16      MR. ROTHMAN:  Objection to the
17  form.
18      MR. HINE:  Same objection.
19      MR. AMER:  You can answer.
20      A.  No.  That's not my understanding.
21  Or my belief.
22      Q.  In that event if that -- in that
23  scenario, would some of the $2 billion be sent
24  to pay bonuses to the retained employees and
25  severance to the severed employees?

TSG Reporting - Worldwide    877-702-9580

## Page 30

```
1          A. BROWN - HIGHLY CONFIDENTIAL
2            MR. HINE:  Object to the form.
3        A.   Well -- no.  I mean, I --
4            MR. AMER:  If you don't understand
5    the question tell him.
6        A.   Yeah.  Can you repeat the
7    question?
8        Q.   Sure.  There's $2 billion we've
9    referred to.
10       A.   Right.
11       Q.   And I think you've said that if
12   90 percent of the employees are severed you
13   wouldn't have to pay the whole $2 billion to
14   the remaining 10 percent for bonuses.  My
15   question is wouldn't some of the $2 billion
16   under your -- under the section here be going
17   to pay the accrued bonuses of those severed?
18       A.   Yes.
19           MR. HINE:  Object to the form.
20       A.   As well as severance.
21       Q.   Okay.  So the $2 billion includes
22   both bonus and severance?
23           MR. HINE:  Object to form.
24           MR. KAY:  Objection.
25       A.   No.
```
TSG Reporting - Worldwide    877-702-9580

## Page 31

```
1          A. BROWN - HIGHLY CONFIDENTIAL
2        Q.   Can you explain?
3        A.   Yes.  The bonus -- in order to
4    prevent people from being terminated and
5    deprived of their bonus, the arrangement was
6    that if they were terminated they would
7    receive their accrued bonus and they would be
8    paid severance under the severance
9    arrangements so that the $2 billion -- if
10   90 percent of the people were terminated and
11   they represented 90 percent of the bonus pool,
12   they would be paid the 90 percent of the bonus
13   pool and to the extent they were covered under
14   severance arrangements they would also be paid
15   the severance arrangements that they were
16   entitled to.  If they were severed before
17   12/31/2008.
18       Q.   But those that were severed,
19   although they would be getting paid in effect
20   their accrued bonus for 2008, that payment
21   would actually be in the form of a severance
22   payment, correct?
23           MR. HINE:  Object to the form.
24       A.   I mean, you know, to me it's a
25   bonus payment that's being paid because
```
TSG Reporting - Worldwide    877-702-9580

## Page 32

```
1          A. BROWN - HIGHLY CONFIDENTIAL
2    somebody's being severed.  To you that may be
3    a severance payment.  I distinguish the
4    severance payment that somebody gets purely on
5    account of being severed from things that get
6    accelerated by virtue of a termination.
7        So, for instance, if somebody was
8    entitled to a retirement payment under a
9    non-qualified retirement arrangement and the
10   got severed and that accelerated the payment,
11   I wouldn't call that a severance payment.  I
12   would call that an accelerated retirement
13   payment that's triggered by severance.
14       So I would say they would get
15   severance and they would get a bonus.  The $2
16   billion or their portion of the $2 billion
17   would be the bonus and the severance would be
18   whatever the severance was.
19       Q.   Well, however it's characterized,
20   if there was a 90 percent -- or 90 percent of
21   the compensation, of the $2 billion 90 percent
22   would go to the 90 percent terminated and the
23   10 percent would go to the 10 percent
24   retained, correct?
25       A.   Correct.
```
TSG Reporting - Worldwide    877-702-9580

## Page 33

```
1          A. BROWN - HIGHLY CONFIDENTIAL
2        Q.   Turning back to Exhibit 532 which
3    is the e-mail attaching the two-page
4    spreadsheet.
5        A.   Okay.
6        Q.   What do you understand the term
7    transaction adjustment to refer to?
8            MR. HINE:  Object to the form.
9        A.   Generally?
10       Q.   Yes.
11       A.   It's some kind of either purchase
12   price or other calculation change.
13       Q.   And are you -- do you know how the
14   estimates for potential exposure on cure
15   liabilities was calculated?
16       A.   No.
17       Q.   Do you have any knowledge of what
18   those amounts were?
19       A.   No.
20           Yeah, go ahead.
21       Q.   I mean --
22       A.   I'm not sure I know what a cure
23   liability is so --
24       Q.   Okay.  Or -- well, let's take a
25   look at Section 2.5 of the APA.  Would you
```
TSG Reporting - Worldwide    877-702-9580

Page 1

1

2                 UNITED STATES BANKRUPTCY COURT

3                 SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5        In Re:

6                                  Chapter 11

7        LEHMAN BROTHERS          Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,   (Jointly Administered)

9                    Debtors.

10       ------------------------x

11

12                 DEPOSITION OF SAUL BURIAN

13                    New York, New York

14                    December 17, 2009

15

16       Reported by:

17       MARY F. BOWMAN, RPR, CRR

18       JOB NO. 26532

19

20

21

22

23

24

25

Page 6

BURIAN

1
2     (Exhibit 457-B, Notice of Deposition
3     marked for identification, as of this date.)
4         THE VIDEOGRAPHER:  This is the start
5     of the tape labeled number 1 of the
6     videotape deposition of Saul Burian in the
7     matter of In re Lehman Brothers Holding,
8     Inc., et al.
9         This deposition is being held at
10     575 Lexington Avenue, New York, New York, on
11     Thursday, December 17, 2009, at
12     approximately 9:34 a.m.
13         My name is Steve Sanpietro from TSG
14     Reporting, Inc.  I am the legal video
15     specialist.  The court reporter today is
16     Mary Bowman in association with TSG
17     Reporting.
18         Will the court reporter please swear
19     in the witness.
20         (Witness affirmed)
21         THE VIDEOGRAPHER:  Will counsel please
22     state your appearance for the record.
23         MR. STERN:  Jack Stern, from Boies,
24     Schiller & Flexner for Barclays.
25         MS. OBERKAMPF:  Camille Oberkampf from

Page 7

BURIAN

1
2     Boies, Schiller & Flexner for Barclays.
3         MS. SCHAFFER:  Tracy Schaffer and
4     Susan Turk from Jones Day for LBHI.
5         MR. OXFORD:  Neil Oxford from Hughes,
6     Hubbard & Reed for the SIPA trustee.
7         MR. TECCE:  James Tecce, Quinn
8     Emanuel, Urquhart, Oliver & Hedges for the
9     official committee.
10         MR. WHITMER:  Tyler Whitmer, Quinn
11     Emanuel, for the committee.
12         MS. TAGGART:  Erica Taggart with Quinn
13     Emanuel for the committee and the witness.
14     SAUL BURIAN,
15         called as a witness by the parties,
16         having been duly affirmed, testified as
17         follows:
18     EXAMINATION BY
19     BY MR. STERN:
20         Q.   Good morning, Mr. Burian.  Could you
21     describe for us your education, starting with
22     college?
23         A.   Sure.  Good morning.
24             I went to Yeshiva College here in New
25     York City.  I went to Columbia University School

Page 8

BURIAN

1
2     of Law, also here in the city.
3         Q.   Could you describe your professional
4     experience before you joined Houlihan Lokey?
5         A.   Starting after law school or --
6         Q.   Yes.
7         A.   So after I left Columbia, I joined the
8     firm Kramer Levin Naftalis & Frankel.  I was
9     there for 13, 14 years, and then joined Houlihan
10     Lokey, which is where I am now.
11         Q.   What was your position at Kramer Levin
12     when you left Kramer Levin?
13         A.   I was a partner of the firm.
14         Q.   In what practice area?
15         A.   Restructurings and business
16     reorganizations.
17         Q.   And was that your practice area for
18     your entire time at Kramer Levin?
19         A.   The first short period of time I split
20     my time between the corporate department and the
21     restructuring department.  I wanted to
22     specialize in distressed transactions.
23         Q.   So for how many years at Kramer Levin
24     did you practice bankruptcy law?
25         A.   Again, I'm not sure what you mean by

Page 9

BURIAN

1
2     bankruptcy law.  I spent most of my time in the
3     early years doing corporate transactions in and
4     around insolvencies.  I did public offerings and
5     other stuff as well, but for the most part
6     corporate transactions that related to
7     restructuring matters.
8         Later on, I started working more
9     broadly on restructuring matters.  So you decide
10     when that means I started doing bankruptcy law
11     and when I didn't.
12         Q.   Fine.
13         When was Houlihan Lokey first engaged
14     to serve as financial advisor to the creditors
15     committee in the Lehman case?
16         A.   I will consider engagement to be when
17     the committee said you're hired, not when the
18     court order was entered.  We interviewed with
19     the committee, I believe it was the Wednesday
20     night after the filing.  If you have a calendar,
21     I could be more specific about dates.  But it
22     was that Wednesday night.
23         Q.   For ease of reference, I'll give you a
24     calendar for September 2008.
25         A.   OK.  So I would say Wednesday, the

BURIAN
1
2 17th of September.
3    Q.   And how did Houlihan go about
4 selecting its team for this representation?
5       MS. TAGGART:  Object to form.
6       THE WITNESS:  Does that mean I
7 continue or I stop?
8       MS. TAGGART:  Yes, go ahead.
9    A.   Well, in a financial restructuring
10 group, we have a number of managing directors
11 who have experience in complicated matters.  We
12 were invited to meet with the committee on that
13 Wednesday morning, the 17th, and it was a
14 combination of who had availability for a matter
15 this time consuming and this complex, as well as
16 who had the requisite combination of skills for
17 a deal of this size.
18       There is no specific formulas.  It is
19 probably similar to how you got involved in the
20 Barclays litigation.
21    Q.   Ultimately who were the key members of
22 the Houlihan team?
23       MS. TAGGART:  Object to form and to
24 time.  When -- when do you mean?
25    Q.   At the outset.

BURIAN
1
2    A.   You know, Lehman is a very, very large
3 matter.  Eric Siegert and I sort of quarterback
4 the whole transaction, but -- the whole
5 representation of the committee, but with
6 respect to a variety of different areas, there
7 are different people that day-to-day are more
8 responsible than others.
9       This has required a pretty significant
10 effort.
11    Q.   During the first week of your
12 engagement, who were the most senior members of
13 your team?
14    A.   Eric and I.  Mike Fazio.  Brad Geer.
15 Tanja Alto was very active.
16       We then had certain people that we
17 were trying to get up to speed on different
18 assets.  We had the financial institutions group
19 that was very active the first couple -- you
20 know, first couple of months, mainly on
21 Neuberger Berman and its related assets.
22       It is hard to answer with -- is that
23 the answer you are looking for?
24    Q.   That's fine.
25       Were you and Mr. Siegert the most

BURIAN
1
2 senior members of the team?
3    A.   Again, senior in terms of age, senior
4 in terms of the firm?
5       Jeff Werbalowsky, who is the co-CEO of
6 our firm, attended the pitch and was available
7 when and if we needed him.
8       If you are asking who actually
9 performed services, billed time, recorded time
10 and organized work groups, Eric and I were the
11 two managing directors that did that.
12    Q.   You supervised the matter?
13       MS. TAGGART:  Object to form.
14       Go ahead.
15    A.   I worked on the matter and supervised
16 it as well.  And we split up responsibilities
17 for different things.
18    Q.   And what role did Mr. Fazio have?
19    A.   Then or now?
20    Q.   At the time in the first week after
21 the engagement.
22    A.   You know, we were drinking from a
23 firehose in all sorts of issues.  Mike was
24 supporting me in trying to understand the
25 Barclays transaction, give advice, and also

BURIAN
1
2 trying to get our arms around all the
3 non-Barclays-related issues, you know, at
4 Lehman.
5    Q.   What was Mr. Geer's role?
6    A.   There, too, Brad was also helpful in
7 trying to figure out what needed to get done,
8 assign responsibilities, and he, too, focused on
9 aspects of the Barclays transaction.
10       At that point in time, I don't know if
11 it is possible to really adequately describe how
12 much was going on at once.  And therefore, just
13 to create lists of what had to get done was a
14 full-time job.
15       So Brad and Mike were extremely
16 helpful in that regard.
17    Q.   At the time, did you feel that you had
18 selected a team that was highly qualified to do
19 the assignment that you had?
20       MS. TAGGART:  Objection to form.
21    A.   Yeah, I'm not sure -- we were
22 comfortable that the representation of the
23 committee was adequate, and the committee
24 selected us because they had confidence in us, I
25 guess.

Page 14

BURIAN

1
2    Q.    You felt that you had a team that was
3    highly qualified to analyze the financial
4    aspects of the bankruptcy sale?
5        MS. TAGGART:  Object to form.
6        A.    When we first got involved, we didn't
7    know what the sale was.  So it is sort of a
8    chicken and egg problem.
9        We had a team that has as much or more
10   experience in advising committees in complex
11   transactions of all types.  All types, not just
12   financials.  And we didn't know exactly what
13   would be faced, but our job is try to dive in,
14   understand it the best we can and give advice.
15       Q.    And I understand that the situation
16   was very expedited.  Did you feel that you had a
17   team that was as capable as any financial
18   advisory team of handling such an expedited
19   situation?
20       MS. TAGGART:  Object to form.  Calls
21   for speculation.
22       A.    Again, you keep on talking about as
23   qualified or as any other team.  Theoretically I
24   can get an all-star dream team of people,
25   parachute them in, and I could cherry-pick from

Page 15

BURIAN

1
2    every firm around the world and find the right
3    person that could match up with every single
4    need.  That's not the way the real world works.
5    That's not the way restructuring firms work.
6        So no, we were not as qualified as any
7    team I can imagine could have been at the time.
8    And if anything, as you know, Houlihan Lokey
9    does not have a capitals markets practice.  We
10   don't do sales and trading.  We don't do public
11   offerings.
12       As many, many of these things we don't
13   do, and therefore, in retrospect, it might have
14   been nice to have some of that expertise.
15       Q.    What other financial advisors worked
16   for the committee in that time period?
17       MS. TAGGART:  Objection, foundation.
18       A.    There was another financial advisory
19   firm that was retained the same night, FTI
20   Consulting.
21       Q.    Did Houlihan work with FTI Consulting
22   in the period from September 17 through the end
23   of September?
24       A.    Sure.
25       Q.    **Did FTI have the capital markets**

Page 16

BURIAN

1
2    **experience that you just said Houlihan lacked?**
3        **A.    No.  I mean not to my knowledge.  They**
4    **focused mainly on the TSA aspects of the**
5    **transaction and the integration and computer IT**
6    **issues, which was an area that we were not as**
7    **familiar with.**
8        Q.    Did Houlihan ever advise the committee
9    that it felt that Houlihan lacked certain
10   necessary experience to handle the assignment?
11       MS. TAGGART:  Hold on.  Wait, I want
12   to read that.
13       Is this before or after the retention,
14   Jack?  Are you asking before or after the
15   retention did Houlihan advise the committee?
16       MR. STERN:  At any time.
17       MS. TAGGART:  Then I will object to
18   privilege.  You can answer before the
19   retention.
20       MR. STERN:  You're instructing him not
21   to answer?
22       MS. TAGGART:  Yes, I am instructing
23   not to answer after the retention about
24   Houlihan's advice to the committee about the
25   experience that Houlihan had.

Page 17

BURIAN

1
2    So you should -- can you read, reread
3    the question.
4        And you should answer up until the
5    point that you were retained.
6        (Record read)
7        A.    We did not believe we lacked necessary
8    experience, nor did we -- we advised the
9    committee accurately about what our relative
10   strengths and weaknesses were, and they chose us
11   as the firm to represent them.
12       Q.    At any time did Houlihan provide legal
13   advice to the committee?
14       A.    No.
15       THE WITNESS:  Sorry.
16       MS. TAGGART:  That's all right.
17   Objection.
18       It's OK.  I was just going to tell you
19   to answer yes or no to that, so go ahead.
20       A.    No.
21       Q.    We have premarked as Exhibit 457-B the
22   30(b)(6) notice for this deposition.
23   Mr. Burian, you understand that you're
24   testifying today both in your individual
25   capacity and as a 30(b)(6) representative of

BURIAN

1  
2  **Q. Did reviewing that material refresh**
3  **your recollection concerning the facts?**
4  A. Well, there are two aspects of this
5  deposition, right? I was told that I'm the
6  Houlihan representative even beyond things that
7  I have direct personal knowledge of, if I feel
8  comfortable I can say with authority that they
9  occurred or didn't occur.
10  So to the extent that they related to
11  events that I was not directly part of, they
12  might have.
13  **Q. They might have refreshed your**
14  **recollection?**
15  A. Again, there are two aspects of this.
16  There is things that I know because I was there,
17  I did, I saw, I participated.
18  **Q. Let me focus on that. Let me focus on**
19  **that.**
20  **Did anything that you reviewed in**
21  **preparation for this deposition refresh your**
22  **recollection concerning those matters, those**
23  **matters you were involved in?**
24  A. Yeah. I had some notes that we
25  produced that helped me remember the -- how the

BURIAN

1  
2  deal was described to us at different times.
3  **Q. Did you review any privileged**
4  **communications?**
5  MS. TAGGART: Object to form and I
6  guess foundation.
7  But if you know if you reviewed
8  privileged communications, you can answer.
9  A. You have to define that for me,
10  because it keeps changing. I know there was a
11  hearing about that yesterday, but I don't
12  think -- I don't think so. Things I got were
13  redacted. It was -- I think I only received
14  what you received. So if you received
15  privileged information, then yes, but I don't
16  think you did, so no.
17  **Q. Did you review any summaries of the**
18  **sale transaction that Houlihan had provided to**
19  **the committee?**
20  A. No. No.
21  **Q. Did you review any summaries of the**
22  **sale approval hearing that Houlihan had provided**
23  **to the committee?**
24  A. No.
25  **Q. During the period from September 17**

BURIAN

1  
2  **through September 22, when Houlihan provided**
3  **summaries to the committee concerning the**
4  **transaction, what was the purpose of those**
5  **summaries?**
6  MS. TAGGART: Object to form. And
7  vague.
8  A. We didn't provide written summaries to
9  the committee. I don't know that wasn't your
10  question, but I am trying to move this along.
11  We didn't provide written summaries.
12  **Q. It is your testimony today that**
13  **Houlihan never provided a written summary of the**
14  **status of negotiations or the status of the**
15  **agreement?**
16  A. I have no recollection of any written
17  Houlihan summary of the transaction.
18  **Q. I would like to mark as the next**
19  **exhibit a document labeled "limited Objection of**
20  **Official Committee of Unsecured Creditors."**
21  **(Exhibit 458-B, document labeled**
22  **"Limited Objection of Official Committee of**
23  **Unsecured Creditors" marked for**
24  **identification, as of this date.)**
25  **Q. This will be labeled 458-B.**

BURIAN

1  
2  A. You are not marking the attachments?
3  You are just the objection?
4  **Q. Correct. We will get to the**
5  **attachments separately.**
6  **Mr. Burian, do you recognize the**
7  **document that we have marked as Exhibit 458-B?**
8  A. I do.
9  **Q. And what is it?**
10  A. It's my committee's limited objection
11  to the SIPC settlement with Barclays.
12  **Q. And at the time you submitted a**
13  **declaration that supported this objection; is**
14  **that right?**
15  A. I did. I see it is not attached.
16  **Q. We will mark that separately, but my**
17  **question is, when you submitted your declaration**
18  **in support of this objection, did you review the**
19  **objection itself?**
20  A. Yeah, I must have.
21  **Q. And do you recall whether you did or**
22  **not?**
23  A. I did. I mean I must have.
24  **Q. At the time, did you believe that**
25  **everything stated in the objection was accurate?**

Page 30

**BURIAN**

1
2     A.    In this objection?
3     Q.    Yes.
4     A.    At the time did I think everything
5  stated in this objection -- the things that
6  concerned me, I checked, I read, and would have
7  corrected if I thought there was a mistake.
8        If there is things in here that don't
9  relate to me, then I may have left it to Quinn
10  Emanuel to get right.
11     Q.    Let's look at page 8, and specifically
12  footnote 12.  Do you see that?
13     A.    Yes.
14     Q.    It states, "At the sale hearing, the
15  Lehman sellers indicated the value of the Fed
16  portfolio securities was 47.4 billion dollars."
17        As of the time this objection was
18  submitted, was that an accurate statement of
19  what the committee believed the 47.4 billion
20  dollars represented?
21        MS. TAGGART:  Objection to form, and
22  as worded I am going to object on privilege
23  and instruct not to answer.
24        So don't answer.
25        MR. STERN:  You're instructing him not

Page 31

**BURIAN**

1
2  to answer?
3        MS. TAGGART:  Yes.  He should not
4  answer what the committee believed was the
5  value of the Fed portfolio at that time.
6  And I know there is going to be a
7  deposition, a 30(b)(6) deposition of the
8  committee, so --
9        MR. STERN:  You have instructed him
10  not to answer?
11        MS. TAGGART:  Yes.  I think any
12  understanding that he has of what the
13  committee believed at that time would be
14  based on privileged communications, so I am
15  instructing not to answer.
16        And that's also not something that's
17  in the 30(b)(6) notice.  He is testifying
18  for Houlihan and he is the Houlihan 30(b)(6)
19  witness.
20        MR. STERN:  He is also testifying in
21  his individual capacity.
22     Q.    Let me ask a different question.
23  Mr. Burian, looking again at footnote 12 of this
24  objection, at the time that you reviewed this
25  objection, did you have any reason to believe

Page 32

**BURIAN**

1
2  that this statement was an inaccurate or false
3  statement?
4        MS. TAGGART:  Hold on.  The statement
5  being that the Lehman sellers had said that
6  the value of the Fed portfolio was 47.4
7  billion?
8        MR. STERN:  Please, please.  I think
9  you know that you are entitled to object to
10  form or to instruct not to answer.  But
11  speaking objections are not allowed.
12        Let me ask the question again.  Let's
13  see if we can adhere to the rules.
14     Q.    Mr. Burian, looking again at
15  footnote 12, it states, "At the sale hearing,
16  the Lehman sellers indicated the value of the
17  Fed portfolio securities was 47.4 billion."
18        My question to you, based on your
19  personal knowledge, at the time that was said to
20  the court in this submission, was that an
21  accurate statement of what you understood the
22  47.4 billion dollars to represent?
23        MS. TAGGART:  Object to form.
24     Q.    You can answer.
25        MS. TAGGART:  You can answer if you

Page 33

**BURIAN**

1
2  understand.
3     A.    What definition are we using for Fed
4  portfolio securities?  Are we using the
5  colloquial definition of the securities that
6  were part of the repo, or using your definition
7  that says in retrospect it included 7 billion in
8  cash, it didn't include 7 billion in cash?
9        You know, that's why I stated to you
10  earlier that you were going to have this
11  problem, because I don't know what Barclays
12  intended it to include and, as you know, the
13  7 billion in cash may or may not have been
14  moved.
15     Q.    Let's look back at --
16     A.    At the closing, not at the hearing.
17  So --
18     Q.    Let's look back at paragraph 7, which
19  begins on page 4.
20     A.    Paragraph 7 of the --
21     Q.    Of the committee's objection.  You can
22  put the 30(b)(6) notice to the side.  I'm not
23  referring to that.
24     A.    OK, but in -- I kept it out only
25  because I was concerned about definitions.

Page 38

BURIAN

1
2      Q.   So you believed that the judge was
3   apprised that the securities worth 47.4 billion
4   dollars were going to be transferred and that
5   the securities were part of the repo?  Is that
6   correct?
7      A.   Yeah, now that I think about it, there
8   may have been vagueness about transferred or
9   kept because of the cancellation of the repo.  I
10  don't remember that detail.
11           But yeah, that basically 47.4 billion
12  of securities, Barclays was going to end the
13  transaction by taking, keeping, being
14  transferred to 47.4 billion of securities.
15      Q.   Those are the securities that were
16  being transferred as part of the repo, correct?
17      A.   I don't remember that -- I don't
18  remember -- we can look at the transcript
19  together if you like, how definitive Lori was
20  about -- Ms. Fife from Weil, how definitive she
21  was about exactly where the securities came
22  from.
23      Q.   That's why I am focusing on this.  In
24  December 2008, the committee told Judge Peck
25  that it understood that at a sale hearing, the

Page 39

BURIAN

1
2   Lehman sellers indicated the value of the Fed
3   portfolio securities was 47.4 billion dollars.
4   You have no reason to believe that that
5   statement to Judge Peck in December of 2008 was
6   an inaccurate or false statement, do you?
7      A.   Again, because maybe I am missing a
8   nuance here, I know now and I knew in December
9   that there was a lot of confusion about what was
10  part and not part of the Fed portfolio package.
11  There were allegations that JP Morgan took
12  assets, problems that DTC refused to clear
13  assets.
14           There were all sorts of disputes going
15  on that for the most part were not explained to
16  us.  We were told -- I understand that some cash
17  was substituted.
18           So if you are asking me did I know in
19  December whether some very narrow definition of
20  exact collateral for a specific repo in one
21  particular place was 47.4, I would have assumed
22  not.  It was an amalgam of a bunch of things.
23           Are you asking me sitting at the
24  hearing whether I thought that Lori was
25  describing the transaction that I had been

Page 40

BURIAN

1
2   described earlier that day, that was we have a
3   repo, we have collateral for the repo and they
4   are going to -- that that's 47.4, yes.
5           So what this footnote is saying, and
6   it wasn't meant to be parsed the way you are
7   parsing it, what this footnote is saying is,
8   golly gee whiz, the transaction was a simple
9   transaction in which the repo obligations and
10  the assets were being transferred.  And the Fed
11  portfolio securities were at that time, we
12  thought, what those securities -- the bucket of
13  securities that were involved.
14           Is that helpful?
15      Q.   Let me try to ask my question again,
16  because I need an answer to my question, which
17  is a simple question.
18           Footnote 12 of this objection, which
19  is dated as of December 19, 2008, states, "At
20  the sale hearing, the Lehman sellers indicated
21  the value of the Fed portfolio securities was 47
22  billion dollars."
23           My question is, as of the time this
24  objection was submitted, as of the time this
25  statement was made to Judge Peck, you did not

Page 41

BURIAN

1
2   have any reason to believe, did you, that this
3   was an inaccurate statement of what the Lehman
4   sellers had indicated?
5           MS. TAGGART:  Objection --
6      Q.   Yes or no?
7           MS. TAGGART:  Objection to form, asked
8   and answered.  He just gave that answer.  He
9   can answer one more time, but that's going
10  to be all.
11      A.   I didn't go back and read the whole
12  trial transcript when this was filed, and
13  therefore, I didn't have a view as to whether
14  this was a direct quote or not of Ms. Fife.
15      Q.   Did you have any reason to believe
16  this was an inaccurate statement of what she had
17  said?
18           MS. TAGGART:  Objection, asked and
19  answered.  Object to form.
20           OK, do you want to answer that again?
21      A.   I think it was an accurate description
22  of what we all thought she said.
23      Q.   Let's turn now to another part of the
24  objection, paragraph 9 on page 6.  It states,
25  "The hearing" -- are you with me on paragraph 9?

Page 42

BURIAN

1
2  A.  I am.
3  Q.  Paragraph 9 states, "The hearing to
4  consider approval of the transaction (the sale
5  hearing) commenced on Friday evening,
6  September 19, 2008.  At the sale hearing, the
7  Lehman sellers advised the court of certain
8  changes to the sale transaction's terms since
9  executing the purchase agreement on
10  September 16th, purportedly resulting from
11  dramatic changes in the value of the Fed
12  portfolio securities being transferred to
13  Barclays, now 47.4 billion dollars, and
14  liabilities being assumed by Barclays, now
15  45.5 billion dollars."
16      Now, do you see that this refers to
17  liabilities being assumed by Barclays of 45.5
18  billion dollars?  Do you see that?
19  A.  I see the words, yeah, sure.
20  Q.  And at the time that this objection
21  was submitted, did you understand that
22  45.5 billion dollars to refer to the amount of
23  Lehman's repurchase agreement obligation to the
24  Fed?
25      MS. TAGGART:  Objection to form.

Page 43

BURIAN

1
2  If you understand the question, you
3  can answer.
4  A.  No.
5  Q.  You didn't understand the 45.5 billion
6  dollars to refer to the amount that Lehman owed
7  the Fed under its repurchase agreement?
8  A.  That's correct, I did not.
9  Q.  You did not.
10  A.  Jack, you are referring to --
11  Q.  Are we off the record?
12  A.  No, we are on the record.
13      When you asked that question,
14  referring to what date?  You keep asking about
15  what Lehman owed the Fed.  According to the
16  affidavit, there was no Fed loan.  It was a
17  Barclays loan at that date.
18      And I just don't -- I'm happy to
19  say -- you say is it yes or no and play games,
20  but I want to get to the --
21  Q.  Did you understand the 45.5 billion to
22  be the amount that Barclays would pay in
23  replacing the Fed repo?
24  A.  I can't answer that either.  No.
25  Q.  Why not?

Page 44

BURIAN

1
2  A.  Because I have no idea what Barclays
3  paid the Fed, and they were different times, and
4  I don't know -- I don't know if Barclays
5  extended more funds over a period of time from
6  the takeout of the Fed.
7      What this sentence says is we thought
8  and we were told that the Barclays' repo
9  obligation as of the weekend, as of that Friday
10  hearing, was 45.5 billion.  And the assets
11  supporting it had dropped to 47.4 billion.
12      I know I didn't answer yes or no, but
13  I am trying to correct the obvious misstatements
14  or try to make sure this goes faster.
15      MS. TAGGART:  Make sure you say what
16  you need to explain your answer.
17  A.  Was that helpful or you want me to
18  answer yes or no?
19  Q.  Hold on.
20      So what you're telling me, Mr. Burian,
21  is that this sentence in paragraph 9 of the
22  objection is saying that the committee thought
23  that the Barclays repo obligation as of the sale
24  approval hearing was 45.5 billion and the assets
25  supporting it were 47.4 billion?  Is that

Page 45

BURIAN

1
2  correct?
3  A.  Yes.  That's correct.  What the
4  committee thought.  That's what I was told, what
5  I thought.
6  Q.  Now let me move on to another
7  document.  Let's mark this as the next exhibit.
8      (Exhibit 459-B, transcript dated
9  December 22, 2008 marked for identification,
10  as of this date.)
11  Q.  Exhibit 459-B is an excerpt of a
12  transcript of a hearing before Judge Peck on
13  December 22, 2008, and I am going to point you
14  to a specific section of this and then ask you a
15  question about it.
16      Looking at page 45 of the transcript,
17  you see Mr. Kirpalani is speaking?
18  A.  I do.
19  Q.  Do you know who Mr. Kirpalani is?
20  A.  I do.
21  Q.  Who is he?
22  A.  A lawyer at Quinn Emanuel.
23  Q.  And he represents the creditors
24  committee?
25  A.  That is correct.

Page 46

BURIAN

1
2   Q.   And at the bottom of page 45, starting
3   at line 21, when Mr. Kirpalani says, "Your Honor
4   knows better than I, from the Friday night when
5   you approved the sale going forward, were
6   thereafter spun into a whole variety of
7   additional discussions and negotiations into
8   Saturday and Sunday.  And we did submit the
9   declaration of Mr. Saul Burian from Houlihan
10  Lokey, who was involved -- who was intimately
11  involved in those negotiations.
12       "The sale order itself made the
13  creditors committee a party, if you will, to the
14  transaction in the sense that it couldn't be
15  changed without the creditor committee's
16  consent, even an immaterial change."
17       And my question is, to your knowledge,
18  was that statement to Judge Peck by the
19  creditors committee counsel an accurate
20  statement?
21       MS. TAGGART:  Objection to form.
22  Compound.
23       Q.   Was it an accurate statement?
24       A.   As long as you understand what
25  intimately involved in those negotiations means,

Page 47

BURIAN

1
2   yes.
3       Q.   And help me understand intimately
4   involved in those negotiations.
5       A.   I was intimately involved in all
6   creditor committee aspects of the negotiations.
7   But I was not intimately involved in what
8   appeared to be all sorts of discussions and
9   negotiations among and by other parties during
10  that fateful weekend.
11      Q.   So subject to that qualification,
12  Mr. Kirpalani's statement is accurate, correct?
13      A.   The court order, I'm told, has the
14  terms of what changes the committee needs to
15  look at.  I think he is summarizing here the
16  idea that if there were changes, we were
17  supposed to -- if the company believed that
18  there were changes, they would need to get our
19  consent.
20      But the standard relates back to the
21  order.
22      Q.   And you were familiar with the sale
23  order at the time it was issued?  You read it?
24      A.   At the time it was issued?  Exactly
25  what time is that?

Page 48

BURIAN

1
2   Q.   Did you read the sale order before the
3   closing?
4   A.   No.
5       Q.   Coming back to Mr. Kirpalani's
6   statement, I just want to make sure I understand
7   your testimony.  I think you explained to me
8   your involvement in the negotiations.  Subject
9   to that explanation, is what Mr. Kirpalani told
10  Judge Peck correct?
11      MS. TAGGART:  Object to form.
12      A.   I refer back to the sale order for
13  what the consents were needed or not needed, but
14  otherwise, yeah.
15      Q.   Now, did you attend the sale hearing?
16      A.   I -- well, which one?
17      Q.   The sale hearing on September 19, the
18  final sale approval hearing?
19      A.   I attended most of it or a large
20  portion of it.
21      Q.   It ran into the Sabbath?
22      A.   Correct.
23      Q.   So I understand that you wouldn't be
24  there during the Sabbath, correct?
25      A.   I was not there during the Sabbath,

Page 49

BURIAN

1
2   correct.
3       Q.   You would make an attempt -- what --
4   do you recall at what time you left the sale
5   hearing?
6       A.   I mean we could back into it by
7   seeing -- you know, 18 minutes after sunset, I
8   would have left, but I don't remember the exact
9   time.  I was --
10      Q.   I understand.  I understand.
11      Do you recall whether you were present
12  for the opening of the sale hearing?
13      A.   Absolutely.
14      Q.   Were you present for a recess that was
15  taken shortly after the hearing began?  If you
16  remember?
17      A.   I'm not sure exactly which recess you
18  are referring to, if there was, but I was
19  there -- I went through all of the
20  case-in-chief, and I think I left when some
21  parts were beginning -- some of the smaller
22  creditors were beginning to make statements.
23      It was -- must have been, I'm
24  assuming, not the beginning of the hearing.
25  What time did the hearing start?  Do you

Page 74

BURIAN

1
2  on the record why I am giving a privilege
3  instruction.
4       MR. STERN:  Then we are going to be
5  here longer than seven hours.
6       MS. TAGGART:  I have reasons why I am
7  giving this privilege instruction.  If you
8  would like not to hear them, that's OK.
9       MR. STERN:  I just want the
10 instruction.
11      MS. TAGGART:  I am instructing not to
12 answer.
13      MR. STERN:  You are instructing him
14 not to answer.
15      Q.   Did you ever -- after the closing on
16 September 22, 2008, did you ever have a
17 discussion with anyone from Lehman or Weil or
18 Lazard concerning whether any aspect of the
19 final purchase agreement was inconsistent with
20 what Weil had represented to Judge Peck at the
21 sale approval hearing?
22      MS. TAGGART:  You can answer yes or no
23 to that.
24      A.   Yes.
25      Q.   Did you have any such discussion with

Page 75

BURIAN

1
2  Weil or Lehman or Lazard at any time between
3  September 22 and the end of September, 2008?
4       A.   I don't specifically recall the exact
5  dates.  Part of the problem here is, you keep on
6  using the phrase "inconsistent."  If a contract
7  says securities are being transferred, that's
8  not -- that may not be inconsistent.  But if I
9  am not sure whether the securities that were
10 actually transferred were or were not
11 consistent, asking me very narrow questions
12 about did I find an inconsistency in the
13 document doesn't help anything.  I honestly
14 don't know if I should answer yes or no to that.
15      Q.   Well, you --
16      A.   I truly am trying to explain.  If it
17 helps it go faster, great.  If it doesn't, I'll
18 pay for the three seconds.
19      My point is, our questions were not
20 what the document said, but how -- what actually
21 happened pursuant to the documents.  So I don't
22 know if it was exactly between the 22nd and
23 23rd, but on multiple occasions we asked people
24 from Lazard and Weil, not the privileged stuff,
25 for reconciliations, this provision says

Page 76

BURIAN

1
2  this, what happened under that provision in
3  order to determine whether that provision or
4  whether the execution of that provision was
5  consistent or inconsistent.
6       Does that help?
7       Q.   Consistent or inconsistent with what?
8       A.   With what we thought the judge was
9  apprised.
10      Q.   What you thought the judge was told?
11      A.   With what the judge was told.
12      So --
13      Q.   Let me just break this down into two
14 sections.  I am going to come to what you are
15 talking about, which is the analysis of the
16 transfers.  But right now I'm just focusing on
17 the face of the agreement.  And I would like to
18 try to get an answer to that before moving on to
19 the list of questions that you referred to.
20      Did you have any discussion with
21 anyone from Lehman or Weil or Lazard between
22 September 22 and September 30 concerning whether
23 anything on the face of the final agreements,
24 anything on the face of the final agreements was
25 not consistent with what Weil had represented to

Page 77

BURIAN

1
2  the court concerning the agreement?
3       A.   When you say "inconsistent," what you
4  mean is directly opposite?
5       Q.   What do you understand the word
6  "inconsistent" to mean?
7       MS. TAGGART:  Object to form.
8  Argumentative.
9       A.   We had many conversations about, that
10 some of these aspects were not described in
11 detail to the court.  That does not necessarily
12 mean that they were inconsistent with the
13 transaction that was described to the court.
14      Q.   So tell me about those --
15      A.   That's why I am having trouble with --
16 yes.
17      Q.   Tell me about those discussions in
18 which you discussed whether specifics of the
19 final agreement had been described to the court.
20      MS. TAGGART:  This is the same time
21 period and the same people we were speaking
22 about before.
23      A.   Are we talking about during that
24 weekend?
25      Q.   We are talking about from September 22

BURIAN

2  through the end of September.
3       A.   Oh, we did not have detailed
4  conversations about that, during that period of
5  time.  Again, if it happened between 22nd or the
6  30th.  It may have been early October when the
7  Weil Gotshal lawyers finally got some sleep.  I
8  don't remember exactly what it was, but we would
9  have had more general conversations regarding
10  what exactly happened as opposed to, you know,
11  the more detailed conversations of whether this
12  was described in detail or not described in
13  detail.
14       Q.   How soon after the closing on
15  September 22 did you review the final
16  clarification letter that is Exhibit C to
17  Deposition Exhibit 26?
18       A.   I was pretty tired also.  I don't -- I
19  know I got it Monday, Tuesday or Wednesday.  I
20  can't recall exactly when I read it completely.
21       Q.   Do you think you read it the week of
22  September 22?
23       A.   I certainly read portions of it during
24  that week.
25       Q.   When you did that review of the

BURIAN

2  clarification letter, were there any provisions
3  of the clarification letter that you thought
4  should be brought to Judge Peck's attention?
5       MS. TAGGART:  I am going to -- this is
6  after the closing?  I am going to object to
7  that answer and instruct not to answer on
8  privilege.
9       If you communicated something about
10  that to somebody, then -- that's outside the
11  committee or your financial advisors, you
12  can answer.
13       A.   It is the same answer in that I read
14  it and had questions.  We were specifically told
15  that our consent was not necessary and
16  therefore, that this clarification letter was
17  not a change.
18       To go and say to the estate that they
19  were wrong or there was a mistake, you know, at
20  that point in time didn't make sense.  It was a
21  question of, great, the transaction closed, tell
22  us what happened and confirm what we were
23  represented.
24       It was more review for the purposes of
25  follow-up, not for -- no one at that point in

BURIAN

2  time, at least I did not at that point in time
3  have, you know, an "I got you" mentality, is
4  this consistent or inconsistent.  It was, a lot
5  happened.  A lot of people knew about what
6  happened and I don't.  You know, explain it to
7  me, so that I could determine whether it was,
8  you know, consistent or inconsistent.
9       Q.   Who told you that the clarification
10  letter was not a change?
11       MS. TAGGART:  Objection.  You can
12  answer if there is anybody at -- that's not
13  the Houlihan, the committee or your counsel.
14       A.   That Saturday night and Sunday
15  morning, when we got the clarification letter,
16  you know, we asked about it.  We were told that
17  this was a means of execution in order to avoid
18  a double transfer of the securities.
19       The idea was to change the APA from a
20  purchase of assets to a closeout of a repo in a
21  manner consistent with what Ms. Fife had told
22  the court, and that there were, you know, other
23  provisions obviously in order to clarify the
24  APA, and we specifically asked whether you
25  wanted, needed committee consent to anything and

BURIAN

2  were told no.
3       Q.   OK.  You said you were told.  Who was
4  telling you those things?
5       A.   Well, I said a lot of things in that
6  answer.  So the part about the committee
7  consent, the most important conversation was
8  probably with me and Harvey from Weil Gotshal,
9  where we made it very clear as it got later and
10  later Sunday that we were going to be unable to
11  get a quorum of the committee, and there was a
12  limit to how late we could have calls, and
13  therefore, we were reaching the time where if
14  committee consent were needed, it just would not
15  be available.
16       And then later on, before I left for
17  the evening, we confirmed again, saying is there
18  any need for us to be here, do you need us to
19  sign off on anything, and we were told that the
20  transaction was moving forward and the committee
21  was not necessary.
22       Q.   Who told you that and what did they
23  say?
24       A.   Most of the conversations were in the
25  hallways at Weil, so I'm not sitting down in

Page 82

BURIAN

1
2 organized conference rooms where we introduce
3 ourselves.
4         But the main conversation on both
5 those fronts, both before the committee went to
6 sleep and before I left, were me and, I believe
7 Harvey.  You know, Tom Roberts was there.  Lori
8 Fife was all around the place.  There were
9 corporate lawyers from Weil, but the main
10 conversation -- really the conversation that I
11 have a firm recollection of before I left was me
12 and Harvey.
13     Q.   And in that conversation, did you
14 discuss whether the clarification letter would
15 create any changes that would have to be
16 described to Judge Peck after the closing?
17     A.   Described to Judge Peck after closing?
18     Q.   Yes.
19     A.   No, I didn't have a conversation with
20 Harvey about post-closing disclosure.  No.
21     Q.   Did Mr. Miller ever indicate to you
22 that he thought that there was some aspects of
23 the clarification letter that would have to be
24 disclosed to Judge Peck?
25     A.   No.

Page 83

BURIAN

1
2     Q.   At the time, did you believe that any
3 such disclosure would be necessary?
4     A.   At which exact time?  I mean there was
5 a --
6     Q.   At the time you had those discussions.
7     A.   I am going to focus on the last
8 conversation, so for your benefit, I actually
9 had a draft of the clarification letter at that
10 time.
11         We asked the question.  So obviously
12 it was a thought in my mind as to whether or not
13 this was or was not, but we didn't have the
14 background or the details of what -- not what
15 the words meant, but what was actually happening
16 pursuant to those words, and therefore, I was
17 concerned and asked the question, and that --
18 and the answer I was given was, we are going to
19 sit down with you now and explain it to you.
20         And then we had that explanation, and
21 then we confirmed that in light of the
22 explanation, we are going to go home, do you
23 need us, and we were told no.
24     Q.   OK.  Focusing on the words in the words in

Page 84

BURIAN

1
2 the agreement that you had as of that time that
3 caused you to think that a further disclosure
4 should be made to Judge Peck, concerning the
5 words of the agreement?
6     A.   Concerning the words of the agreement.
7         MS. TAGGART:  Object to form.
8     A.   It is too narrow of a question to
9 really answer, because assuming that these words
10 were describing businesses and assets, as we
11 were explained, then we thought on balance, the
12 clarification letter was fine.
13         Clearly, whether -- clearly a true-up
14 or an explanation of what actually closed would
15 be useful.  I didn't form a legal view as to
16 whether and how that would be communicated to
17 Judge Peck.
18     Q.   And the true-up, would that have
19 concerned the identity or value of assets being
20 transferred?
21         MS. TAGGART:  Object to form.
22     A.   Look at paragraph 4 on page 3 of the
23 clarification letter.
24     Q.   No.  Let's stick with my question.
25     A.   You asked me about the words of the

Page 85

BURIAN

1
2 letter, so I am trying to give you an example.
3         There is a number there on the bottom
4 of page 3 in paragraph 4 which is an aggregate
5 of 1.29 billion dollars.  In my experience, it
6 would be highly unlikely if at some point the
7 judge were not informed of what exactly the
8 aggregate consideration was actually paid for
9 the assets.
10         So did I have a problem with the words
11 on the bottom of page 3?  No, I didn't think
12 about it then, but you are asking me the
13 question now.  Did I have an expectation that
14 they would be disclosed either in the form of
15 filing documents with the court or saying to
16 your Honor, good news, we closed and we got 1.29
17 billion dollars?  Of course.
18     Q.   So you are talking about confirmation
19 that the consideration was actually paid?
20     A.   Not confirmation.  Just what the
21 number was.  Remember at the hearing, Ms. Fife
22 said that there is still open issues.  We found
23 out that one of the issues related to, you know,
24 whether it was pre or post commission, and that
25 issue was ultimately settled.

Page 86

BURIAN

1
2    So I would have expected -- so again,
3  fixing that number was in my view consistent
4  with Ms. Fife's disclosure to the court that
5  there was going to be a relatively modest
6  negotiation on the exact amount.  The words
7  here --
8    Q.   You are talking about the appraisal of
9  buildings?
10    A.   Not only the appraisal.  It was also
11  whether or not you used the pre-fee or post-fee
12  number.
13    Q.   For the buildings?
14    A.   For the buildings.
15    Q.   So --
16    A.   But they --
17    Q.   Let's go back to your list of
18  questions.
19       MS. TAGGART:  He needs to finish.
20    A.   I want to finish answering your
21  question.
22       So your focusing on the words in
23  paragraph 4 is a perfect example where I
24  understood the words, I was not troubled that it
25  was inconsistent with, to use your language, on

Page 87

BURIAN

1
2  the order itself, but I did have an expectation
3  that there would be disclosure at some point of
4  what actually happened.
5    Q.   Now, let's stick with this agreement
6  that you're looking at, the clarification
7  letter, which is Exhibit C.  If you look at
8  page 1, under the first section, purchased
9  assets, you see that in Section 1(a)(ii) -- are
10  you with me?
11    A.   I'm listening.
12    Q.   Exhibit C, if you could just look at
13  Exhibit C.
14    A.   Give me one second, please.
15       Yeah.  Sorry.
16    Q.   On page 1 of Exhibit C, this is the
17  clarification letter, on the first page under
18  Section 1(a)(ii), you see it says, "With respect
19  to Clauses A, D and E of the definition of
20  purchased assets in the original agreement,
21  instead of the items referred to in such
22  clauses, A, the securities owned by LBI and
23  transferred to purchaser or its affiliates under
24  the Barclays repurchase agreement" --
25    A.   Where are you?

Page 88

BURIAN

1
2    Q.   On the clarification letter --
3    A.   Page 1?
4    Q.   Exhibit C, page 1, the bottom part of
5  the page, Section 1(a)(ii).
6    A.   Now I see it, OK.
7    Q.   "With respect to Clauses A, D and E of
8  the definition of purchased assets in the
9  original agreement, instead of the items
10  referred to in such clauses --
11    A.   Right.
12    Q.   -- "A, the securities owned by LBI and
13  transferred to purchaser or its affiliates under
14  the Barclays repurchase agreement as defined
15  below, as specified on Schedule A, previously
16  delivered by seller and accepted by purchaser."
17  That reference to the Barclays repurchase
18  agreement, based on that reference, did you
19  understand that the repurchase agreement
20  collateral would be included as a purchased
21  asset?
22    A.   Yes.
23    Q.   And --
24    A.   I am sorry.  We are talking
25  colloquially, not whatever definition we talked

Page 89

BURIAN

1
2  about earlier.
3    Q.   For now going forward, let's ignore
4  the definitions in the 30(b)(6) notice and we
5  will define things as we go along.
6    A.   OK, OK.  So yes, I did.
7    Q.   At the time, did you also, based on
8  your experience, understand that it is common in
9  financings like the Fed repurchase agreement for
10  there to be a cushion or a haircut in valuing
11  the assets in relation to the liabilities?
12       MS. TAGGART:  Object to form.
13       MS. SCHAFFER:  Objection to form.
14    A.   I was aware that repos, the amount,
15  the amount lent on a repo was usually slightly
16  less than the value of the securities that
17  backed the repo.  I know "lent" is not the
18  technical term, it is a purchase and sale, but
19  the amount extended by the repo participants.
20    Q.   So you understood that the value of
21  the securities purchased under the repurchase
22  agreement would typically exceed the amount of
23  cash paid for those securities?
24    A.   Typically exceed.
25    Q.   Typically.

**BURIAN**

1
2    A.    In a normal situation.
3    Q.    And were you aware that the Fed had
4    advance rates or haircuts that it made available
5    publicly?
6        MS. TAGGART:  Object to form.
7    Foundation.
8    A.    I was not aware of any public
9    announcement by the Fed as to what their repo
10   advance rates were for these assets.
11   Q.    Were you aware that there were sources
12   by which you could find out the Fed's advance
13   rates?
14       MS. TAGGART:  Object to form.
15   Foundation.
16   A.    No.
17   Q.    Did you have any reason to think that
18   those advance rates were a secret?
19       MS. TAGGART:  Object to form.
20   Foundation.
21   A.    I didn't think about it.  I didn't
22   know one way or the other.
23   Q.    At the time, did you understand that
24   the repo collateral that was being included as a
25   purchased asset included that haircut?

**BURIAN**

1
2        MS. TAGGART:  Object to the form.
3    A.    No.
4    Q.    What did you understand all the repo
5    collateral to mean?
6        MS. TAGGART:  Object to vague as to
7    time.
8    A.    It is a good point.  As of what time?
9    Q.    As of the time you read this
10   agreement.
11   A.    First time, post closing, preclosing?
12   Yesterday?
13   Q.    Post closing, when you read the final
14   clarification letter.
15   A.    Right.
16   Q.    And it states, "The securities owned
17   by LBI and transferred to purchaser or its
18   affiliates under the Barclays repurchase
19   agreement."
20       Did you understand that to mean all of
21   the securities that had been transferred to
22   Barclays in connection with the repurchase
23   agreement?
24       MS. TAGGART:  I am still going to have
25   to object, vague as to time, and he can't

**BURIAN**

1
2    answer everything after the closing.  Could
3    you be a little more specific.
4    Q.    Is there -- there is an objection, but
5    you can answer.
6        MS. TAGGART:  Well, as it is, I would
7    have to do on privilege.  I wouldn't allow
8    him to answer the question of anytime that
9    his understanding post closing, of what he
10   thought that it meant.
11       So I guess I have to object and
12   instruct not to answer.
13   Q.    At the time after the closing that you
14   read this agreement, the clarification letter, I
15   think we established that you understood that
16   the repo collateral was being treated as a
17   purchased asset; is that correct?
18   A.    Yes.
19   Q.    Did you understand that the haircut
20   was a part of the repo collateral?
21   A.    I told you before, no.  My answer is
22   in my affidavit.  I'm not sure I understand --
23   I'm happy to try to get you to ask the question
24   more properly, if you like, but my answer is in
25   my affidavit.

**BURIAN**

1
2    I thought that the repo collateral was
3    less than the value -- the value was less than
4    the amount outstanding on the Barclays repo.
5    Q.    That's not what I am asking.  I am not
6    asking what you understood the value to be.  I
7    am asking whether you understood that under the
8    clarification letter, all the repo collateral
9    would be treated as a purchased asset.
10   A.    You asked that several times, and I
11   said yes, but then you asked a follow-up
12   question about my understanding of the value.
13   Q.    OK.  So the answer is yes?
14   A.    I --
15       MS. TAGGART:  He needs to explain it.
16   A.    I understood that the transaction was
17   being modified from an asset purchase agreement
18   where you would have to transfer securities, to
19   a repo closeout in which the assets already held
20   by Barclays would just stay at Barclays and not
21   be sent back pursuant to the closeout of the
22   repo and then transferred again.  That was my
23   understanding.
24   Q.    Now, with respect to that category of
25   securities which were to be listed on

BURIAN

1
2 whole transcript, and I told you that I left
3 after what I thought was the most important
4 part, when it was subsequently described to me
5 as being the description of the deal by Weil.
6 So I can't say what occurred after I left and
7 the transcript does speak for itself.
8          I will tell you -- I am sorry, your
9 question was again?  I was so focused on the
10 other parts.
11     Q.   Did Weil Gotshal ever tell the court
12 at the final approval hearing that there were
13 firm valuations for the classes of assets that
14 were being transferred to Barclays?
15     A.   The asset purchase agreement talks
16 about book value.  We were told it was a book
17 value on the Lehman books, and Lori, Ms. Fife,
18 talked about that we now have assets of 47.4,
19 and to us, that was -- that meant that they
20 thought they had assets of 47.4.  It sounded
21 pretty firm to us.
22     Q.   We have covered the 47.4 already.
23 What I am talking about is the entire array of
24 purchased assets.  Did Weil Gotshal ever tell
25 the court that there were specific valuations or

BURIAN

1
2 appraisals prepared for each class of purchased
3 assets?
4          MS. TAGGART:  Object to form.
5     Q.   To the best of your knowledge.
6     A.   To the best of my knowledge, the
7 appraisals were not -- I don't believe that they
8 described in particular the appraisal on the
9 real estate yet, but Ms. Fife gave the range and
10 informed the court that there may need to be an
11 adjustment.
12          There was no appraisal of the
13 securities.  They were described as being worth
14 a particular value, which in the context of the
15 asset purchase agreement meant book value on the
16 Lehman books.
17          And there was specifically no
18 representation about the value of the franchise,
19 which was being paid 250 million dollars, that
20 was a number that was the price, and there was
21 no -- to the best of my knowledge, no
22 representation or appraisal other than either
23 Miller or Ms. Fife saying if the transaction
24 doesn't occur, we think it may be worth
25 significantly less than 250 million, but no

BURIAN

1
2 attempt to value what it was worth if -- you
3 know, in an ordinary course, stable environment.
4          So there were three -- at that time,
5 there were three buckets of assets.  One had
6 appraisals, but not finalized.  One had a
7 particular value, but not off of an appraisal,
8 and the other one, there was no attempt to make
9 an appraisal.
10     Q.   Let's take a look at the original
11 asset purchase agreement, which is Exhibit A
12 within Deposition Exhibit 26.  And I want to
13 point you to page 6, which lists a series of
14 purchased assets.
15          I want to focus on a number of the
16 assets that are described here.  If you see,
17 item B refers to all deposits.  Do you see that
18 description?
19     A.   Yes.
20     Q.   In your view at the time of the
21 approval hearing, did you believe that that
22 asset category could have value to Barclays?
23          MS. TAGGART:  Object to form.
24 Foundation.
25     A.   Sure.

BURIAN

1
2     Q.   Did you have a valuation or any
3 representation concerning the value of that
4 asset category?
5     A.   No.
6     Q.   It was uncertain?
7     A.   Yes.
8          MS. TAGGART:  Object to form.
9     Q.   Looking at category C, that refers to
10 "transferred property leases together with all
11 improvements, fixtures and other appurtenances
12 thereto and rights in respect thereof."
13          At the time of the sale approval
14 hearing, did you believe that that asset would
15 have value to Barclays?
16     A.   Yes.
17     Q.   Did you have a valuation for that
18 asset category?
19     A.   It was in the real estate appraisals.
20     Q.   Well, the real estate appraisals
21 related to the headquarters buildings and data
22 centers, correct?
23     A.   Yes.
24     Q.   Was there a valuation for the leases?
25     A.   We need to go back to the definition

Page 114

BURIAN

1
2   **Q.   So --**
3   A.   What time frame are you asking me?
4   **Q.   I am asking you from the closing on**
5   **September 22 through the end of September,**
6   **September 30, whether at any time you had a**
7   **different view than the view you just described.**
8           MS. TAGGART:  Object to form.
9           You can try to answer.
10  A.   I don't recollect having a different
11  view that we made a mistake not supporting and
12  not objecting.  I didn't -- I do remember
13  putting on our -- putting on our tickler sheet
14  to verify, trust and verify.
15  **Q.   And the items that you needed to**
16  **verify were those considerations that you**
17  **described concerning the employees, effect on**
18  **the financial system; is that right?**
19  A.   No.  I never said that.
20  **Q.   Let me make sure I understand your**
21  **previous answer.  As I understood it, you said**
22  **that various credible people were saying things**
23  **such as in the absence of the sale, there would**
24  **be dire consequences for Lehman?**
25  A.   That's not what I said.  What I said

Page 115

BURIAN

1
2   was that -- that is also true.  That's not what
3   I said.
4           What I said was credible people were
5   explaining to us what the transaction was and
6   what the import of these documents meant.  So
7   that even though I couldn't verify whether what
8   A or B or C exactly was, I had a degree of
9   comfort that highly credible people were telling
10  me they looked into these questions and this is
11  what it means.  And based on those
12  representations, even though I didn't have
13  enough information to support, I felt
14  comfortable not objecting.
15          It is also true that we were told by a
16  variety of people about the dire consequences to
17  the world as we know it, you know, if the
18  transaction did not close, but that's not what I
19  was referring to, you know, when I talked about
20  relying on third parties.
21  **Q.   OK.  But those statements about the**
22  **dire consequences --**
23  A.   I am sorry.  And it also was not what
24  I meant when I said trust and verify.  I was not
25  going to go verify whether the deal didn't

Page 116

BURIAN

1
2   happen, you know, financial markets would have
3   been disturbed.
4           When I said trust and verify, I wanted
5   to verify that the representations as to what
6   the deal was, is, were in fact what occurred in
7   connection with the deal.  I mean it wasn't to
8   figure out whether or not the SEC governors
9   would have preferred the deal to close or not.
10  Commissioners, not governors.
11  **Q.   In forming your view that despite the**
12  **lack of information the committee should not**
13  **object to the sale, did you take into**
14  **consideration the other factors that were being**
15  **described at the time?  In other words, the dire**
16  **consequences for Lehman, the dire consequences**
17  **for employees, the consequences for the**
18  **financial system, the concerns of the federal**
19  **regulators, did you take those factors into**
20  **consideration?**
21          MS. TAGGART:  Objection to form.  The
22  preface misstated his testimony.
23          But you can answer.
24  A.   I took those into consideration in
25  terms of context and timing.  Not in terms of

Page 117

BURIAN

1
2   substance.  Should I explain?
3   **Q.   Yes.  What does that mean?**
4   A.   The fact that a regulator or any third
5   party is saying I'm worried about the impact on
6   something else, that's not -- that's extraneous
7   to the bankruptcy estate, is relevant to the
8   speed and timing of the transaction, but would
9   not be a reason to compromise rights and assets
10  of the estate.  My fiduciary duty is to
11  creditors of the Lehman estates.
12          But vis-a-vis timing of hey, there is
13  a reason why we are going to throw some of the
14  procedural protections out the window and do
15  this in an unbelievably quick time frame and
16  instead of doing direct diligence, you are going
17  to rely on other people's representations,
18  there, I did feel that those considerations as
19  to timing were relevant.
20          It was also true that those timing
21  issues also had some impact directly on the
22  Lehman estate, vis-a-vis the desire to transfer
23  customer accounts and bring in a SIPC trustee.
24  The issues relating to other foreign
25  jurisdictions and Lehman operations and a

Page 118

BURIAN

1
2  concern of would the Lehman franchise be less
3  valuable to Barclays if there were a significant
4  delay, vis-a-vis the retention of employees and
5  the rest.
6       So the factors that you provided were
7  relevant in the time frame and procedural
8  context of the matter, but would not alone have
9  been enough to say, sure, you know, we don't
10 care what happens, or give away estate assets,
11 or the estate should assume liabilities it
12 wouldn't otherwise have to assume.
13      You seem confused. I know I'm not
14 supposed to help, but for instance --
15      Q.   No, just --
16      A.   -- one could have asked for an
17 adjournment of the hearing, right? My options,
18 if I were the committee, is not limited to
19 support or object. And whether we looked for an
20 adjournment to delay consideration of the
21 hearing was impacted by all those issues I
22 raised in my answer.
23      Q.   OK. Now, going back to the APA,
24 page 12, on page 12, there is a continuation of
25 a list of assumed liabilities, and item I lists

Page 119

BURIAN

1
2  all short positions. Do you see that?
3      A.   Yes.
4      Q.   Now, at the time in September of 2008,
5  did you recognize that those short positions
6  might have been more profitable to Barclays to
7  own than the long positions?
8       MS. TAGGART: Object to form.
9      A.   Did I believe that the short positions
10 were more profitable than the longs?
11      Q.   Did you consider whether in those
12 circumstances, in that week of September 2008,
13 the short positions might be more profitable to
14 own than the long positions? Did you consider
15 that?
16      A.   We were told the opposite.
17      Q.   Who told you that?
18      A.   These were listed as liabilities, and
19 my understanding when we met that Thursday at
20 Weil, when the deal was presented to us, whether
21 it was by Harvey Miller or by one of his
22 partners or by Mark Shapiro or Jim Seery, it was
23 a give and take.
24      We were told that Barclays was taking
25 all the short positions related to the book, and

Page 120

BURIAN

1
2  these were liabilities and obligations that
3  you -- that Barclays, not you -- that Barclays
4  was taking, and therefore, we needed to look at
5  the net impact of the transaction, which is
6  essentially even exchange.
7       The context of that conversation is
8  that these positions were contras and not
9  positives.
10      Q.   I understand these positions were
11 listed as liabilities, but you understood at the
12 time what a short position was?
13      A.   I understand what a short position is.
14      Q.   And did you understand that a short
15 position in certain circumstances may be more
16 profitable than a long position?
17      A.   The -- this is not just shorts,
18 though. These are also repos, obligations.
19 So --
20      Q.   I understand. I am focusing on short
21 positions.
22      A.   Theoretically could a short position
23 be positive? Yes. But then theoretically a
24 long could be negative, if it is an option and
25 not ownership of that security.

Page 121

BURIAN

1
2       By the way, can we back up. This is
3  as of when? Because we were told that all these
4  shorts were closed out and that you didn't take
5  any shorts. So is this before Thursday or after
6  Thursday, the 18th?
7      Q.   Well, I'm just asking -- I was asking
8  about your understanding based on reading the
9  agreement.
10      A.   But when? My understanding reading
11 the agreement on Friday --
12      Q.   Well, you understand that the short
13 positions ultimately were not available, is what
14 you are saying?
15      A.   My understanding is that Barclays did
16 not take any short positions.
17      Q.   Right. So my question was simply
18 whether at one point when it was contemplated
19 that Barclays would take short positions,
20 whether those positions might be under certain
21 circumstances more valuable than the long
22 positions.
23      MS. TAGGART: Object to form. Asked
24 and answered.
25      Q.   I agree.

Page 122

**BURIAN**

1
2   A.   Specifically the answer is -- now you
3   are asking more generally as opposed to
4   specifically.  You said before could a -- let me
5   finish -- could a short be more valuable than a
6   long, but now you are asking me whether I
7   considered whether the short positions were more
8   valuable than the long positions.
9        No, that was not our contemplation and
10  not what we thought.
11  **Q.   You didn't recognize at the time that**
12  **that was a possibility?**
13       MS. TAGGART:  Objection, asked and
14       answered.  Object to form.
15  A.   In the aggregate, we were specifically
16  told that the aggregate of paragraph I was a
17  69 billion dollars contra, and the aggregate of
18  paragraph -- the definition of the purchased
19  assets you showed me before, was approximately
20  170 billion positive.
21       So could there have been a single
22  position that was a positive versus a negative?
23  But in the aggregate this was a one --
24  approximately a 1 billion dollar positive
25  differential.

Page 123

BURIAN

1
2   **Q.   I understand that you were told there**
3   **was a liability, but my question was simply**
4   **whether short positions, short positions in the**
5   **aggregate could have had more positive value**
6   **under the circumstances than the long positions.**
7   A.   No.
8        MS. TAGGART:  Object to form.  Asked
9   and answered.
10  **Q.   That's not -- that was impossible?**
11  A.   That was not even a remote
12  contemplation at the time in any of the meetings
13  or discussions that I attended.  Nor would that
14  be consistent with anything that was told to us
15  or explained to us.
16       And this is a perfect example of what
17  I described before, which is trust and verify.
18  Which is read the -- read the agreement and
19  understand what it says, but not have the
20  opportunity to look beneath those words to look
21  at and diligence it, and why we took no position
22  at the hearing.
23  **Q.   So let's move on to verification.  You**
24  **did do some verification work before the**
25  **closing; is that right?**

Page 124

**BURIAN**

1
2        MS. TAGGART:  Object to form.
3   A.   We attempted to do some verification
4   work.
5   **Q.   You attempted to do some verification**
6   **work before the closing, correct?**
7   A.   Correct.
8   **Q.   Time was limited, correct?**
9   A.   Time and cooperation.
10  **Q.   Whose cooperation was limited?**
11  A.   Barclays and Lehman.
12  **Q.   What did Barclays fail to provide to**
13  **you that you requested of Barclays?**
14  A.   We requested innumerable times for a
15  complete list of what assets were transferring,
16  what liabilities were being assumed and what the
17  marked values, the book values were, and as of
18  what dates those marks related to.
19  **Q.   Are you talking about the Lehman**
20  **marks?**
21  A.   I'm talking about the marks relevant
22  to the transfer of those assets.  Our
23  understanding was that Barclays was not marking
24  the Lehman assets and that the book value
25  references in the contract were the Lehman

Page 125

BURIAN

1
2   marks.
3        So when Lori Fife, Ms. Fife stood up
4   in court and says a number, that was the Lehman
5   marks against which these transfers were being
6   measured.
7   **Q.   So just to be clear, are you saying**
8   **that you made specific requests from Barclays**
9   **for information concerning Lehman's marks?**
10  A.   To be clear, we made specific requests
11  of anyone and everyone who would listen to us,
12  sort of like the Old Testament prophet screaming
13  out in the wild and no one listening, saying
14  could we please have some understanding, a list
15  of what assets are moving, to whom they are
16  moving and how they are marked.
17  **Q.   And you're saying you did not receive**
18  **that information?**
19  A.   We did not receive that information.
20  Well, what time period, sir?
21  **Q.   Well, I am focusing on the time period**
22  **between the sale approval hearing and the**
23  **closing.**
24  A.   That is correct.
25       Oh, what I should actually say --

32 (Pages 122 to 125)

Page 126

1          BURIAN
2     Q.   There is no question.
3     A.   I know, but I am finishing my answer.
4     What I should actually say is I never got
5     anything that was so described to me or Houlihan
6     as representing such a list.
7     Q.   Let's mark this as the next exhibit.
8          (Exhibit 460-B, document Bates stamped
9     WGM Lehman E1592 with attachments marked for
10    identification, as of this date.)
11         (Exhibit 461-B, document Bates stamped
12    HLHZ11913 with attachment marked for
13    identification, as of this date.)
14    Q.   Let me show you what we have marked as
15    461-B.  And have -- 461-B in front of you.
16    A.   This one?
17    Q.   Yes, take 461-B.  We will get to the
18    others.
19         Do you see that 461-B is a document
20    dated Sunday, September 21, 2008, 11:34 a.m.,
21    addressed from Brian Kelly at Milbank to Ann
22    Comisky and Brian -- and Michael Fazio?
23    A.   Yes.
24    Q.   And what do you understand this
25    material to be?

Page 127

1          **BURIAN**
2     A.   The material attached to the e-mail?
3          MS. TAGGART:  Objection, vague as to
4     time.  Do you mean sitting here today or
5     then?
6     Q.   Do you recall reviewing this material
7     at the time it was received on September 21?
8     A.   No.
9     Q.   Do you know whether others at Houlihan
10    did?
11    A.   Yes.
12    Q.   Who conducted that review?
13    A.   For the most part, Michael Livanos.
14    Q.   And did Mr. Livanos report to you
15    concerning his review of this information?
16         MS. TAGGART:  This is just asking for
17    a yes or no.
18    A.   Who is "you"?
19         MS. TAGGART:  So I think he is
20    asking --
21    Q.   You personally.
22         MS. TAGGART:  -- Mike Livanos to you,
23    Saul Burian.
24    A.   Me personally.
25    Q.   Yeah.

Page 128

1          BURIAN
2     A.   Not as a 30(b) rep.
3          No.
4     Q.   Did Mr. Livanos report to others at
5     Houlihan concerning the information contained in
6     this exhibit?
7     A.   Yes.
8     Q.   And what did he report?
9          MS. TAGGART:  I am going to object and
10    I think that calls for privileged
11    information on work product.  I am willing
12    to have some testimony about that
13    discussion, but I am going to need to have
14    an agreement from you that that doesn't
15    waive privilege.  I think there is a work
16    product privilege that can be waived about
17    that discussion.
18         THE WITNESS:  So I can answer, but it
19    doesn't --
20         MS. TAGGART:  I need an agreement from
21    him that that's not going to waive
22    privilege.
23         MR. STERN:  I have no idea what you
24    are talking about with privilege.
25    Q.   All I am asking is, with respect to

Page 129

1          **BURIAN**
2     the information that's in Exhibit 461-B, if
3     Houlihan ever developed an understanding
4     concerning what this information was.
5          MS. TAGGART:  That's a different
6     question.  I would object to form.
7          You can answer that yes or no to the
8     extent you understand it.
9     A.   Yes.
10    Q.   What was that understanding?
11         MS. TAGGART:  That's -- I am sorry,
12    objection to anything past the closing.  You
13    can say what was your understanding of
14    Houlihan's understanding preclosing of what
15    this information was.
16    A.   It changed over time.  But our
17    understanding was that this was a preliminary
18    list of securities as of an indeterminate date
19    that may or may not go over to Barclays with
20    marks that were as of a -- that were as of a
21    date that we weren't sure.  At different times,
22    Monday, Tuesday, Wednesday or Thursday, unclear
23    as to what the marks represented.
24         So that's what we understood this
25    document to be.

Page 138

BURIAN

1
2  A.   No.
3  Q.   **Houlihan.**
4  A.   No.  As I said to you before, we were
5  specifically told that these were not the market
6  values of these assets as of that time.
7  Q.   **And who specifically told you that?**
8  A.   The last conversation on which we
9  relied on was a conversation with Michael Klein,
10 Harvey Miller, I believe Tom Roberts was there,
11 Mike Fazio.
12 Q.   **Did you ask what the source of these**
13 **market value figures was?**
14 A.   Houlihan did ask.
15 Q.   **And what was Houlihan told?**
16 A.   They were told these were old marks
17 from Lehman of securities that may or may not be
18 still at Lehman.
19 Q.   **Did you understand that this was a**
20 **list of securities that Barclays was to have**
21 **received in connection with replacing the Fed**
22 **repurchase agreement?**
23 A.   That is a nuance or detail that I am
24 not 100 percent sure.  The conversations were
25 not about the repo.  The conversations were what

Page 139

BURIAN

1
2  is Barclays getting.
3       Obviously, when you look at the
4  clarification letter, which we did not have at
5  the time, you could say these were backing the
6  repo or should have been backing the repo in the
7  sense of the cash substitution, but I don't
8  think that we understood Sunday morning that
9  nuance.
10      Our understanding was this was a list
11 of assets that was a working list of assets that
12 some large portion of were going to be
13 transferred to Barclays.
14 Q.   **You didn't have a draft clarification**
15 **letter by the time you left in the early morning**
16 **of September 22?**
17 A.   Oh, yeah, by then I did.  But you were
18 asking about our initial understanding of what
19 this document represented, what this list of
20 securities represented.  And that's what I was
21 answering.
22 Q.   **Did there ever come a time before the**
23 **closing when Houlihan understood that this list**
24 **was intended to represent securities to be**
25 **transferred to Barclays in connection with**

Page 140

BURIAN

1
2  replacing the Fed repo?
3  A.   No.
4  Q.   **Did anyone from Houlihan ever sit down**
5  **with anybody from Lehman or Barclays or Weil or**
6  **Lazard and review this list with them?**
7  A.   We tried.  There was a very excited
8  environment at the time.  There were huge
9  meetings that we were asked not to attend that
10 appeared to be or were described to us to relate
11 to JP Morgan holding back -- someone used the
12 word "stealing," someone used the word
13 "selling," someone used the word "set offing" --
14 securities that we were led to believe or we
15 thought meant some of these securities, and with
16 all the hubbub going around about what actually
17 was being transferred, in that context, we would
18 say to people what -- where are you, what are
19 being transferred?
20      At one point in time, we finally did,
21 we, Houlihan finally did sit down with Jim Seery
22 and with -- someone and maybe some of his junior
23 people there, and said OK, we got this list, we
24 have looked at this list, we are confused by the
25 list, explain it to us.

Page 141

BURIAN

1
2       And we did make several comments about
3  the list, though.  It was a relatively
4  short, though, almost like doing us a favor by
5  giving us -- you know, giving us some time on
6  that busy night.
7  Q.   **What comments did you make about the**
8  **list, or did Houlihan make about the list?**
9  A.   I was not --
10 Q.   **What comments did Houlihan make about**
11 **the list?**
12 A.   Right.  So I will give you the
13 substance of the comments, as they percolated up
14 to me generally, and in light of my following up
15 with them.
16      But our comments were, do we now know
17 which -- whether this is the list of
18 securities -- have you been able to determine
19 what actually is there and being transferred?
20 Is this something we can rely on as the core
21 business securities?
22      The second issue was -- and this was
23 the main issue -- when were these marks as of?
24 And our understanding was that these marks were
25 from earlier in the week.  Can you explain all

Page 142

BURIAN
1
2 the noise we are hearing about how these
3 securities dropped in value?  Because when you
4 look at a variety of the categories, it looks
5 like they went up in value or stayed stable, so
6 can you explain to us what is going on.  What is
7 the concern, what is the give and take, what's
8 going on.
9      Q.   And who had this conversation?
10      A.   This was Brad Geer and Mike Fazio with
11 Jim Seery and his juniors.
12      Q.   Now --
13      A.   Well, you asked generally did we have
14 any -- that percolated up to me, and then that
15 led to several hours later, you know, my telling
16 Harvey, I know we are very busy, I know there is
17 a lot going on and we are only the committee,
18 but we need an explanation of what is happening,
19 partly because of concerns that were percolating
20 up about what's going on here.
21           And that led to what we still believe
22 is the single most important conversation, the
23 one with the principals right before we left.
24      Q.   That was a conversation with Harvey
25 Miller?

Page 143

BURIAN
1
2      A.   Harvey Miller, Michael Klein,
3 et cetera.
4      Q.   Anybody else?
5      A.   I told you before I believe Tom
6 Roberts was there.  I believe Lori Fife was in
7 and out.  Mike Fazio was the Houlihan person
8 with me.
9      Q.   Now, before you left the building,
10 before you left Weil in the early morning hours
11 of September 22 --
12      A.   It could have been late morning hours.
13      Q.   Or late morning hours, were -- was
14 Houlihan invited to stay through the closing, in
15 order to review and finalize the schedules?
16      A.   Definitely not to review and finalize
17 schedules.  Was I invited to stay?  I was
18 welcome to eat as much pizza as I liked.  I
19 can't tell you how many football games I watched
20 during the first month of Lehman sitting in
21 rooms being ignored by lawyers, you know,
22 starting on the 19th through October.
23           We were specifically disinvited from
24 many of the important meetings.  We asked to sit
25 during the negotiation by Tom Roberts of the

Page 144

BURIAN
1
2 clarification letter, where the estate was going
3 through the issues, and we were told you are not
4 permitted to.
5           I walked into one of the very large
6 meetings and just sat down in a chair and
7 listened to the SEC, to the DTC, Barclays, and
8 Lehman and JP Morgan go in and out, everybody
9 yelling at JP Morgan about issues.  I certainly
10 was not invited, but they were not so impolite
11 as to demand that I leave.  Although there was a
12 time when people took a break, and we purposely
13 stayed in our seat so we didn't have to walk in
14 the room again and be asked to leave.
15           So to say invited is a tough one.  We
16 spent so much time begging to be paid attention
17 to, that to them, if we wanted to sit there, we
18 were welcome, but we were not included in
19 discussions.  So --
20           MR. STERN:  Mark this as the next
21      exhibit, please.
22      A.   If you are asking me was I invited, I
23 would say no.  Was I welcome to hang around, the
24 answer was yes.
25           (Exhibit 462-B, document Bates stamped

Page 145

BURIAN
1
2 MTHM5739 marked for identification, as of
3 this date.)
4      Q.   We have marked as Exhibit 462-B an
5 e-mail exchange between Harvey Miller and Luc
6 Despins and others, and I am just going to focus
7 on one part of the message from Harvey Miller.
8           In his e-mail to Mr. Despins and
9 others, September 25, 10:28 a.m., he states,
10 "You were invited to stay Monday a.m. as the
11 schedules were reviewed and finalized."
12           Is it your testimony that that is not
13 accurate?
14      A.   My testimony is I'm defining what
15 "invited" means.  Harvey was not involved in --
16 to the best of my knowledge, in these schedules,
17 and I think that anyone who was there would
18 recollect that we were certainly not involved or
19 invited to finalize schedules and be there.
20           I think that we were welcome to remain
21 on the floor, to walk around the 25th conference
22 center, eat as much popcorn as we liked, and to
23 see people exchanging schedules or signing
24 documents, and I was clear that I felt welcome
25 to stay, but was I invited to actively

Page 150

BURIAN

1
2    Q.   If you can answer my question, we will
3  get through this a lot faster.
4        My question is, do you recognize this
5  material as including schedules that Milbank
6  received and Houlihan ultimately received after
7  the closing?
8    A.   Are you asking me if I got this after
9  the closing?
10   Q.   Did Houlihan receive this?
11   A.   I can't look at every single page, but
12  yes, Houlihan got a list from Milbank of what
13  Weil sent to Milbank of the not final list of
14  assets that purportedly went across or in the
15  repo transaction remained at Barclays.
16   Q.   Did Houlihan understand what these
17  schedules were?
18   A.   I told you that we understood them to
19  be exactly what I said, a list of indeterminate
20  date with indeterminate marks as of an unknown
21  date of assets that comprise -- that was not the
22  final list of what went over to Barclays.
23   Q.   Did you understand -- did Houlihan
24  understand that the first attachment was a
25  preliminary version of Schedule A to the

Page 151

BURIAN

1
2  clarification letter?
3    A.   We understood that the first part was
4  a preliminary schedule of Schedule A to the
5  clarification letter relating to the collateral
6  on the repo.
7    Q.   Did Houlihan understand that the
8  second part was a preliminary Schedule B to the
9  clarification letter?
10   A.   We did.
11   Q.   And did Houlihan ask any questions of
12  Lehman concerning these lists?
13   A.   I can't tell you it was directly
14  related to this list, but it is the same
15  questions that we asked repeatedly over that
16  time frame from the closing until today.
17   Q.   Did Houlihan compare the Schedule A
18  attached to 460-B to the Schedule A it
19  previously received as reflected in 461-B?
20       MS. TAGGART:  When?
21       Wait.  Don't answer yet.
22       When?  Are you saying at any time?  I
23  need to know for my privilege objection.
24   Q.   Did Houlihan compare the Schedule A in
25  460-B and Schedule A in 461-B at any time after

Page 152

BURIAN

1
2  Houlihan received 460-B?
3        MS. TAGGART:  I will object on work
4  product grounds and instruct you not to
5  answer as to the internal analysis that
6  Houlihan did of the schedules.
7        MR. STERN:  Why don't we stop for
8  lunch.  Let's go off the record.
9        THE VIDEOGRAPHER:  Time is 1:01 p.m.
10  We are now off the record.
11       (Recess)
12       (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 153

BURIAN

1
2        AFTERNOON SESSION
3        1:41 p.m.
4        THE VIDEOGRAPHER:  The time is the
5  time is now 1:41 p.m.  We are now back on
6  the record.
7  BY MR. STERN:
8    Q.   Mr. Burian, this morning, I believe
9  you referred to your approach as one of trust
10  and verify.  Do I have that right?
11   A.   Correct.
12   Q.   What did Houlihan do after the
13  closing to verify the information it had been
14  given?
15   A.   In what period of time?
16   Q.   After the closing.
17   A.   Well, there are different periods of
18  time.
19   Q.   Go chronologically.?
20       MS. TAGGART:  Well, object to form.
21       You can answer what you did with
22  anyone outside of Houlihan or the committee,
23  and why don't we take it up through
24  December, and if he wants to go on after
25  that, we will take it one at a time.

Page 154

BURIAN

1
2    A.   The main thing we did was to request
3    reconciliation from the company as to what
4    exactly occurred in order to be able to verify
5    that the representations were true and that what
6    happened was consistent with the court order.
7         At that point in time, we fully
8    expected -- we did not expect there to be any
9    problems.  We thought that what we were
10   concerned about, there must be logical
11   answers for and there was not great concern
12   or urgency and we also knew that as an
13   official committee and a more normal
14   environment, we would have the opportunity,
15   the debtor would be responsive now that the
16   crisis was over.
17        So for the most part, in the October
18   and November time frame, it was mainly asking
19   for reconciliations of and getting, you know, a
20   better understanding of what exactly Barclays
21   got and did not get.
22        Obviously, at some point in time, you
23   file, someone filed, maybe the SIPA trustee
24   filed a settlement motion which described the
25   transaction by the affidavits, by the Barclays

Page 155

BURIAN

1
2    and other parties to that transaction and that
3    took it up a notch.  That made us nervous
4    because then we were much more concerned because
5    there seemed to be facts that contradicted what
6    we had heard.
7         We still expected there to be
8    perfectly rationale explanations, so during
9    that period of time, I believe we started
10   interacting based on the judge's direction
11   directly with Barclays and its
12   representatives through Cleary Gottlieb, its
13   law firm.  That's when we met for the first
14   time in an effort to --
15   Q.   February 3?
16   A.   That sounds right.
17   Q.   Now, let's just go back in time to the
18   week after the closing.  The period between
19   September 22 and September 30.  What
20   verification efforts did Houlihan undertake in
21   that period of time?
22   A.   To the best of my knowledge, we merely
23   wanted to get a complete and final list of what
24   exactly -- what the documents were.  As you see,
25   you gave me an exhibit earlier in the morning

Page 156

BURIAN

1
2    that was saying, well, here is a preliminary
3    list and I'm sure that either directly or
4    indirectly, we would have said OK, the deal
5    closed, where is the final list.
6         But other than asking for verification
7    of what transferred and, you know -- we probably
8    did not do much.
9    Q.   Were you aware that on September 30,
10   Weil filed with the court the final versions of
11   Schedule A and Schedule B?
12   A.   I don't remember the exact date, but I
13   do know at some point schedules -- at some
14   point, the document you handed me as an exhibit
15   was filed with the court.  You probably know the
16   date.
17        But at some point the schedules were
18   filed, although that was not what we asked
19   for in the sense of that was a redacted
20   version for public consumption.  I don't
21   remember if it was under seal, but I think
22   the marks were all off, it was not directly
23   responsive to what we were looking for.
24   Q.   At some point, at some point in
25   October, did Houlihan meet with Alvarez & Marsal

Page 157

BURIAN

1
2    to get more information concerning the asset
3    transfers?
4    A.   To Barclays?
5    Q.   Yes.
6    A.   We never met with Alvarez & Marsal
7    specifically about the asset transfers.  We met
8    with Alvarez & Marsal about a broad variety of
9    topics on a consistent basis.  There were
10   meetings where Barclays issues were raised, but
11   it wasn't -- the purpose of the meetings were
12   not to talk about Barclays.
13   Q.   Did either Houlihan or FTI, to the
14   best of your knowledge, ever receive information
15   from Alvarez & Marsal concerning the assets that
16   had been transferred to Barclays?
17   A.   That's a very broad question because
18   it could relate to a lot of different pieces.
19   So it is hard.
20   Q.   Let me try to make it more specific.
21   A.   I'm in a meeting --
22   Q.   Let me try to make it more specific.
23        (Exhibit 463-B  memo dated October 6,
24   2008 marked for identification, as of this
25   date.)

Page 178

BURIAN

1
2    Q.    Let me ask a new question.  What did
3    Houlihan do in October 2008 to dig into
4    questions relating to this line negotiated 5
5    billion dollar reduction?
6        A.    At my direction and supervision, we
7    renewed our request for a reconciliation of what
8    exactly was transferred to Barclays, when it was
9    transferred, what the Lehman marks of those
10    assets were, and as of what date.
11        Q.    And in October of 2008, did you get
12    responses to those inquiries?
13        A.    I don't remember specifically when we
14    got responses, how.  I know there was a catty
15    sort of response at Weil at one point, why do
16    you care, the transaction closed, the appeal
17    period is over, something like that.  But
18    generally speaking, I'm sure there was back and
19    forth, but I do not remember receiving any
20    reconciliation or any, you know, global answer
21    to the questions we were asking.
22        Q.    If you didn't receive the information,
23    did you or the committee consider going to the
24    judge to ask for expedited discovery concerning
25    these questions?

Page 179

BURIAN

1
2        MS. TAGGART:  Object to form and
3    privilege and I am going to instruct not to
4    answer on attorney/client and work product.
5    So don't answer.
6        Q.    If you felt there was information that
7    was important information you needed, did you
8    personally realize that you could go to the
9    court and request the court's assistance?
10        A.    Yes.
11        Q.    Did you do anything to request the
12    court's assistance?
13        A.    Obviously, it is up to counsel to make
14    these decisions.  But in my view, there was
15    nothing that would warrant expedited transaction
16    because the transaction closed, security is
17    probably not there anymore.  Barclays was good
18    for the money.  So if there was a mistake and
19    money had to be returned, that's not the type of
20    thing that you would run to court with your hair
21    on fire saying there has to be an expeditious
22    resolution.
23        We also were dealing with an estate
24    that was beleaguered by a number of issues
25    that we had never seen before in a

Page 180

BURIAN

1
2    restructuring where the senior parties at
3    Weil and others were burning night after
4    night and, therefore, to take what we hoped
5    was merely going to be a reconciliation of
6    what happened in a manner consistent with the
7    court order to the level of running to a
8    judge to say it has got to be dealt with
9    today seemed disproportionate and
10    unnecessary.
11        Q.    So a 5 billion dollar reduction did
12    not rise to the level, in your view, as
13    something worth bringing to the court's
14    attention?
15        MS. TAGGART:  Object to form,
16    misstates the testimony.
17        A.    Oh, no -- that's completely --
18        MS. TAGGART:  Argumentative.
19        A.    That's completely not what I said.
20        Q.    Let's go back to October of 2008.
21        A.    I want to finish my answer.
22        Q.    Let me ask the question.?
23        MS. TAGGART:  Again, he needs to
24    finish his answer to the question that you
25    posed.

Page 181

BURIAN

1
2        MR. STERN:  I think he answered?
3        MS. TAGGART:  No, he didn't answer.
4    Finish your answer.
5    Q.    Go ahead.
6    A.    That's --
7        MS. TAGGART:  Do you want to hear the
8    question again?
9        THE WITNESS:  Sure.
10        MS. TAGGART:  "So a 5 billion dollar
11    reduction did not rise to the level, in your
12    view, as something worth bringing to the
13    court's attention?"
14        A.    Five billion dollars is an enormous
15    amount of money and it is certainly something
16    that we will take very careful attention to, and
17    if we believe we are owed, we will bring to the
18    court's attention to collect.
19        The question that I was answering was
20    whether or not at that time, we thought
21    expeditious discovery was something that I
22    personally would recommend to counsel and to
23    the committee and what I answered was that at
24    that time, our expectation was we were not
25    owed, that no one had taken improperly 5

Page 182

BURIAN

1
2  billion dollars.  Frankly, even at that time,
3  I found it hard to believe that someone would
4  misrepresent to the court or that people
5  would not tell counsel what the full
6  transaction was and, therefore, that the
7  judge would not be apprised of something as
8  important as 5 billion dollars.
9      And therefore, even then, my
10  assumption as a supervisor of the assignment was
11  that we, at the direction of the committee,
12  merely had a bookkeeping reconciliation and we
13  would write a report that would just balance the
14  books and we would be done.  There was
15  confusion, but that there wouldn't be any real
16  serious problem here.
17      Q.   Now, I believe you said that when you
18  saw this reference to negotiated a 5 billion
19  dollar reduction, it made you nervous, is that
20  right?
21      A.   That is correct.
22      Q.   And it was something that you felt you
23  needed to dig into, is that correct?
24      A.   It was something that confirmed to me
25  the need to get the reconciliation done and make

Page 183

BURIAN

1
2  sure that the transfers were as described.
3      Q.   But it is not something that you felt
4  in October 2008 warranted an effort to enlist
5  the court's assistance in getting further
6  information?
7      MS. TAGGART:  Object to form,
8  mischaracterizes his testimony and asked and
9  answered.
10      A.   At that time, I had the expectation of
11  cooperation.  There was no reason to go to Judge
12  Peck.
13      Q.   And did you get cooperation in the
14  month of October?
15      A.   Again, I told you I think of these
16  time periods in buckets and not in particular
17  days and I was getting enormous cooperation in
18  the month of October from the debtor on a myriad
19  of issues worth many, many billions of dollars
20  besides Barclays.
21      So you have to look at cooperation in
22  a broader context when you want to criticize
23  a debtor estate or demand a court order for
24  expeditious discovery.  So the answer is I
25  was getting a lot of cooperation.

Page 184

BURIAN

1
2      Did I get answers to this particular
3  question in October?  Well, I still haven't
4  gotten the answers so the answer is no.
5      Q.   Your testimony is as of today, you
6  still haven't gotten the answers?
7      MS. TAGGART:  Objection, he just said
8  his testimony.  I object to form and
9  argumentative.
10      If you want it say it again, you can.
11      A.   As of today, to the best of my
12  knowledge, I have never received a
13  reconciliation of what was originally part --
14  assumed to be part or contemplated to be part of
15  the transaction as signed on that Tuesday and
16  described that Wednesday in court which got the
17  70 billion and 69 billion.  I never got a
18  reconciliation of what exactly was intended by
19  the numbers Ms. Fife said in court and what the
20  basis of that was and whose marks they were as
21  of what date.
22      I have never received the bridge
23  between the 70 and the -- now I am getting a
24  little confused, if I am wrong, the 47.4
25  number, I think, as to how much of that was

Page 185

BURIAN

1
2  purported to be, as she described and
3  everyone was saying in conference rooms,
4  market deterioration in the portfolio as
5  compared to closeouts or securities that
6  turned out not to have been returned to
7  Lehman.  Nor have I even received, to the
8  best of my knowledge, even the most simplest
9  request of what exactly did go over and what
10  were the marks on that date that they went
11  over.
12      So I haven't gotten, to the best of my
13  knowledge, even the simplest stuff, let alone
14  what we really need to write the memo and be
15  done.
16      Q.   In October, did you request an
17  opportunity to discuss those questions with Ms.
18  Fife or Mr. Miller?
19      A.   I don't remember if it was done
20  through a formal invitation or request.  We said
21  in meetings -- at that point in time, I was
22  spending many, many, many nights with Ms. Fife
23  working on a variety of things and in those
24  meetings, we would always -- we would say
25  periodically where are we on the reconciliation,

Page 186

BURIAN

1
2  when are we getting those documents, how is it
3  going.
4      Q.   Did you ever ask Ms. Fife what the
5  47.4 represented in relation to the 70?  Or any
6  of those other figures that you just mentioned?
7      A.   Ms. Fife wouldn't be the right person
8  to ask for the back-up for it because she said
9  in court -- and I believe, you know, either she
10 or someone else at Weil said to us that was the
11 numbers we got from our clients as to what was
12 available to be transferred.
13          Our assignment was not, you know,
14 repeat to me that you repeated numbers from
15 Lehman.  Our assignment was to go beyond what
16 Weil was told and balance the book.
17          At that point in time, there was
18 absolutely no great urgency.  The expectation
19 was this was going to be fine and we would
20 get the numbers and we would move on.  It
21 wasn't like we need to go track an asset that
22 was a melting ice cube, that value was being
23 lost.  What was done was done and we expected
24 a explanation, and if the explanation didn't
25 comport to what was supposed to happen, we

Page 187

BURIAN

1
2  felt confident we would be able to get the
3  assets back.
4      Q.   Do you remember on February 3, 2009,
5  you came to these offices and met with certain
6  executives from Barclays and certain lawyers
7  from Barclays?
8      A.   I believe you were there.
9      Q.   And you had an opportunity to ask
10 questions concerning the transaction?
11     A.   We did.
12     Q.   After that meeting, did you or anyone
13 else from Houlihan raise any follow-up
14 questions?
15     A.   Sure.
16     Q.   Who did you call?
17     A.   Well, we were not allowed to call
18 Barclays directly.  We were told not to.
19     Q.   Did you ask for a follow-up meeting?
20         MS. TAGGART:  Wait, wait.  He is still
21 finishing his answer.
22     Q.   Did you ask for follow-up meeting?
23         MS. TAGGART:  He is finishing his
24 answer to the first question.
25     A.   I understand the communications were

Page 188

BURIAN

1
2  through counsel.  We followed up by asking for
3  information and I remember reviewing one or two
4  letters in that regard and I remember the
5  conference call with Lindsey Greenfield that I
6  believe it was either before or after that
7  meeting where I once gain explained what I was
8  tying to do, what we were trying to do.
9          It was not hostile.  We just wanted to
10 write a report and be done because we assumed
11 there were reasonable answers, and so my
12 understanding from the -- again, I told you
13 there were buckets.  So there was a bucket of
14 times from September to the filing of the
15 motion in December.  You're now asking about
16 the second bucket of time from December
17 through mid February, right?
18     Q.   Let me just ask you a specific
19 question.  When you were talking about this
20 reference, Exhibit 464-B, to a 5 billion dollar
21 reduction.
22     A.   Correct.
23     Q.   At that meeting on February 3, 2009,
24 did you ask Barclays' executives any questions
25 concerning that issue?

Page 189

BURIAN

1
2         MS. TAGGART:  Which meeting is that?
3     Q.   February 3, 2009 meeting.
4     A.   The Barclays executives at that
5  meeting, to the best of my knowledge, said they
6  were not involved in any way in the negotiations
7  of the transaction, but had two roles; one was
8  to compare taking the assets and hedging them,
9  and the other one spoke a lot about the
10 mechanics of transfer.
11         At that meeting, we specifically asked
12 about negotiations, development of marks and
13 were told that they were not involved.
14         I also think we followed up and said
15 whose marks were they that they were taking
16 these assets at and I believe they were told,
17 but I can't -- I can't tell you with certainty
18 who said it, but I think we were told that they
19 were the Lehman marks.
20         But again, the three individuals from
21 Barclays were very clear at that meeting they
22 were not -- that's why we followed up and asked
23 for meetings with the former Lehman CFO who is
24 now a Barclays employee to talk about
25 developments of marks.

Page 190

BURIAN

1    BURIAN
2    So indirectly -- so to answer your
3    question with clarity and specificness,
4    specificity, sorry, we asked about marks and
5    who developed them, but it became obvious
6    those were the wrong people to ask those
7    details to.
8    Q.    Again, referring to 464-B and this
9    reference to a 5 billion dollars reduction, did
10   you understand that 5 billion dollars to relate
11   to the repo or to something else?
12        MS. TAGGART:  Objection, foundation.
13        MS. SCHAFFER:  Objection to form.
14   A.    It is on the line of repo.  Looking at
15   it now, it looks likes it relates to that line.
16   But I honestly had -- I, to make this go
17   quicker, I understood the 5 billion reduction to
18   relate to marks on securities that were
19   purportedly transferred to Barclays.
20        I wasn't thinking whether it was the
21   repo assets or not, because it was a Schedule
22   A and Schedule B, but it is on the same line
23   as the Schedule A, what looks like Schedule A
24   type assets.
25   Q.    You didn't know whether that figure

Page 191

1    BURIAN
2    related to the haircut in the repo or whether it
3    related to something else?
4    Q.    Is that fair?
5        MS. TAGGART:  Objection, form.
6    A.    I certainly had no idea.  The word
7    "haircut" never came up.
8    Q.    And you never asked?
9    A.    OK, are you talking about at the
10   February meeting with you?
11   Q.    I am talking about October.
12   A.    Or talking about the committee meeting
13   with the committee?
14   Q.    I am talking about October.  This
15   presentation by Alvarez, Exhibit 464-B.
16   A.    The word "haircut" never came up, to
17   the best of my knowledge, at the committee
18   meeting with Alvarez.
19   Q.    But I think you testified earlier that
20   you were generally aware that the purchase
21   agreements typically involve a haircut, is that
22   right?
23        MS. TAGGART:  Objection, asked and
24   answered, misstates the testimony.
25   Q.    Is that right?

Page 192

1    BURIAN
2    A.    What I said before, I said my
3    understanding was this repo was short
4    collateral.  But generally speaking, repo
5    participants will lend or advance less than the
6    full value of the securities.
7    Q.    And you were given information that JP
8    Morgan had marked the repo collateral at 49.9
9    billion, is that right?
10   A.    Nope.
11   Q.    You were not given that information?
12   A.    Nope.  We talked earlier that the only
13   person who ever told me about JP Morgan marks is
14   you.
15   Q.    You were given information that
16   somebody had marked the repo collateral at 49.9
17   billion, correct?
18        MS. TAGGART:  Object to form.
19   A.    Yes, we were told at some point in
20   time there was a bucket of assets to be
21   transferred to Barclays or retained by Barclays
22   that had a Lehman mark of around 49. something
23   billion dollars.
24        MR. STERN:  Let's mark as the next
25   exhibit this document.

Page 193

1    BURIAN
2        (Exhibit 466-B, document Bates stamped
3    HLHZ 35872 through 74 marked for
4    identification, as of this date.)
5    Q.    My only question about 466-B is
6    whether this is a document you recall seeing?
7    A.    I don't have a specific recollection
8    about this e-mail.  October 10?
9    Q.    Let's take a short break.
10        THE VIDEOGRAPHER:  The time now is
11   2:33 p.m., we are now off the record.
12        (Recess)
13        THE VIDEOGRAPHER:  This is the start
14   of tape number 4.  The time is now 2:43 p.m.
15   We are now back on the record.
16   Q.    Let's go back to September 17, the
17   Wednesday I believe you testified that Houlihan
18   was first engaged, at least informally.  At that
19   point in time, did you receive the sale motion
20   that Weil had made?
21   A.    At that point in time, did I receive
22   it?
23   Q.    Yeah.
24   A.    I already had it.
25   Q.    You had it.  OK.  And you reviewed

Page 194

BURIAN

2  that?
3      A.  I did.
4      Q.  As of that date, the 17th, were you
5  aware that Barclays had issued a press release
6  and had an analyst call concerning the
7  transaction?
8      A.  I can't tell you that I knew that the
9  17th.  I don't remember if I knew it on the
10  17th.  I don't think -- I don't know if I knew
11  it on the 17th.
12      MR. STERN:  All right, let's mark this
13  as the next exhibit.
14      (Exhibit 467-B, document Bates stamped
15  HLHZ 16856 through 57 marked for
16  identification, as of this date.)
17      Q.  I have shown you the document that we
18  have marked as 467-B, and before you take a look
19  at it, let me just tell you where I am going to
20  focus you on, then I will give you a chance to
21  review it.
22      First I am going to ask you who Ann
23  Marie Miller is.  And then I am going to
24  focus you on the first two paragraphs on page
25  1 of this exhibit and then on the second

Page 195

BURIAN

2  page, the 6th and 7th paragraph.
3      A.  OK.
4      Q.  Is this something -- well who is Ann
5  Marie Miller?
6      A.  Ann Marie Miller works for me.  She is
7  an officer, a junior officer in the group who
8  has been active in the Lehman matter.
9      Q.  Do you recall seeing this document on
10  or around September 17?
11      A.  Yeah, I -- I don't remember seeing
12  this e-mail in particular.  I'm not on it.  Are
13  you asking me about the e-mail or the press
14  release that's copied on the e-mail?
15      Q.  Well, the substance of the e-mail?
16      A.  I mean, I was in the room.  I knew --
17  I don't have a specific recollection of
18  receiving a copy of this news article.
19      Q.  OK.  Let's turn to the second page.
20      A.  Obviously Houlihan had it, Ann Marie
21  had it.
22      Q.  Yes, looking at the second page, the
23  sixth paragraph down states, "For Barclays, the
24  deal will have an immediate positive impact.
25  Expected to add to earnings in the first year

Page 196

BURIAN

2  and will provide a very high return on
3  investment, Varley said.  The deal would also
4  lift Barclays' capital ratio even before the
5  bank completes a planned capital injection
6  alongside the deal because of a negative good
7  will adjustment from the deal, amounting to
8  about 2 billion dollars after tax."
9      That information that I just read, is
10  that information that you were aware of on or
11  around September 17?
12      MR. SNOO::  Object to form.
13      A.  Not the 17th itself.  I got the -- I
14  saw either a summary or the press release itself
15  or that information about those statements
16  sometime the morning of the 18th to the 21st.  I
17  don't remember exactly when I saw this.
18      Q.  Do you recall whether you were aware
19  of this before the sale approval hearing?
20      MS. TAGGART:  Object to form.
21      A.  My memory is that I was given this
22  Saturday night, the 20th, is my best
23  recollection, but I can't be sure.  I just
24  honestly don't know.  I wasn't -- the problem is
25  I wasn't in the office and didn't have access to

Page 197

BURIAN

2  e-mail for an extended period of time.
3      So my -- I was in the office Friday
4  morning, but I was doing other things.  We
5  can talk about that if you want later, but
6  I -- I just -- I know I knew it, these
7  quotes.  I remember talking about knowing
8  these quotes on the 20th -- I mean on the
9  21st and I believe I got them on the night of
10  the 20th.  I don't have any firm recollection
11  before that.
12      Q.  Was the fact that Barclays had
13  announced that it anticipated a negative good
14  will adjustment of 2 billion dollars after tax
15  something that you considered at the time to be
16  a basis for objecting to the sale?
17      MS. TAGGART:  Object to form.
18      A.  A basis, that alone a basis for
19  objection?  No.
20      Q.  Let's move to the 18th of September,
21  which was a Thursday.  And I'll ask you if you
22  can tell me what meetings and conversations you
23  took part in -- that is, you personally -- on
24  that Thursday, September 18, in connection with
25  the sale transaction.

Page 198

**BURIAN**

1
2    A.   "In connection" is very broad, but the
3    main thing was, we had an organizational meeting
4    at Weil where the committee advisors sat down
5    with the Weil and Lehman teams in a big room,
6    chaired by Harvey, and the purpose was, the main
7    purpose of the Weil Gotshal and Lehman teams
8    were, we know you only got retained and this is
9    your first meeting, but we have a hearing
10   tomorrow to approve the sale.  And there was a
11   clear understanding that you are not going to
12   get to do much and we are going to tell you what
13   we did and that's going to have to be enough.
14        So we spent time at that meeting going
15   through some of the history and some of the
16   details of the transaction.  We also talked
17   about other things at that meeting beyond
18   Barclays.  So that was the main opportunity
19   or meeting with representatives of the estate
20   about this transaction.
21        Obviously the transaction -- you asked
22   a very broad question.  The transaction came up
23   at other subsequent meetings either directly or
24   indirectly.
25   Q.   During the day on the 18th, let's say

Page 199

**BURIAN**

1
2    from 8 a.m. to 6 p.m., were you at Weil Gotshal
3    for that entire period?
4    A.   No.
5    Q.   You were there for meetings or a
6    meeting?
7    A.   I don't know how you define "meeting."
8    In bankruptcy land, meetings sort of never end.
9    They sort of move from one to the other.
10   Q.   That's my question.
11   A.   Yeah, we met, I spoke to my guys.  We
12   met with FTI and Milbank, started comparing
13   notes of what was going on.  We had a big
14   meeting that all the estate reps came in.  I'm
15   sure we had a huddle thereafter.  And at some
16   point, you know, I left Weil and actually went
17   to Lehman itself.
18   Q.   While you were at Weil for the meeting
19   or meetings that took place there, what were you
20   told in connection with the Barclays
21   transaction?
22   A.   I can't repeat everything verbatim.  I
23   can tell you that we were given a balance sheet
24   which I have seen as an exhibit somewhere that
25   was -- that was produced by someone.  And we got

Page 200

**BURIAN**

1
2    the whole speech about how the world rests on
3    this transaction closing, and the Fed, the
4    Treasury and everyone else.
5        We had a long conversation about, you
6    know, the fact that there were no
7    alternatives, and this made sense, and that
8    Barclays is getting a great deal because they
9    are getting a franchise asset, you know, of
10   the whole Lehman trading division for only
11   250 million, but it is worthless to us if we
12   don't do the deal.  So don't look in their
13   pocket, look in your own pocket.
14        We had a whole discussion about what
15   the company was trying to do to finalize
16   timing-wise and to -- what was left open to
17   negotiate and what were the hurdles to
18   closing and then we had someone walk us
19   through the economics of the securities
20   transfer.
21   Q.   Now, given your experience in
22   restructuring and in bankruptcy-related work, I
23   assume that you had existing relationships with
24   a number of people who were involved in these
25   meetings?

Page 201

**BURIAN**

1
2    A.   I knew many of the people in the room.
3    Q.   You knew some of the people from Weil?
4    A.   I knew -- yes.
5    Q.   Were people from Lazard at any of
6    these meetings?
7    A.   You know, it's funny, they really
8    played, in correlation to us, a very small role.
9    I don't -- again, it is like the answer to the
10   other question about the Alvarez & Marsal
11   meeting where I said I don't remember them being
12   there, but my gosh, that's the kind of meeting
13   they would be at.  I don't know for sure.  I
14   don't recall.  I would assume they were, but I
15   don't know.
16   Q.   Did you know Barry Ridings from
17   previous work?
18   A.   Sure.  I don't remember if Barry was
19   there or not.
20   Q.   And you knew Jim Seery from prior
21   experience?
22   A.   I knew Jim Seery.
23   Q.   And on the 18th, am I right that in
24   addition to this larger meeting, what you and
25   your team really wanted to do was to talk to Jim

BURIAN

1
2  **Q.   Yes.**
3     A.   He was not part of those either.
4     **Q.   Do you know whether Eric Siegert had**
5  **any separate conversations with Jim Seery about**
6  **the transaction?**
7     A.   I have not been informed that there is
8  anything, meaning in person or by telephone.
9     **Q.   By phone?**
10    A.   Not by -- I mean, obviously there is
11 an e-mail here, but not --
12    **Q.   Well, Siegert was not in New York**
13 **City?**
14    A.   Correct.  Thursday he was.
15    **Q.   Oh, he was?**
16    A.   Thursday he was and, therefore, they
17 clearly communicated at the big Weil meeting.
18 He was at the meeting and I'm sure Eric must
19 have said something, I don't remember.  But to
20 the best of my knowledge, there was no
21 substantive follow-up diligence meeting that
22 Eric was part of.
23    **Q.   OK, with Jim Seery.  All right.  So**
24 **this call with Jim Seery took place the evening**
25 **of the 18th around 9 p.m., is that right?**

BURIAN

1
2     A.   Thursday night.
3     **Q.   OK.  Where were you Thursday night?**
4     A.   I was at Lehman, the building -- now
5  the Barclays building.
6     **Q.   745 Seventh?**
7     A.   The one that is now that ugly color of
8  blue or green -- used to be green.  Now it is
9  blue.
10    **Q.   What were you doing at that time?**
11    A.   I was meeting with senior management
12 of Lehman focused on what else was melting down
13 outside of the Barclays transaction.
14    **Q.   And what else was melting down?**
15    A.   I mean, it was a very broad, long
16 conversation.  I produced my notes to you of
17 that conversation, which only doesn't even do
18 full justice, I guess, to all the details.
19       But Lehman is a, was a multinational
20 investment bank, stopped cold turkey an
21 arbitrary time and date.  There was just a
22 never ending number of issues and concerns
23 and we wanted to know what was it that
24 impacted creditors that we needed to jump on
25 to immediately to preserve and protect value.

BURIAN

1
2     **Q.   We will take a look at your notes.**
3        MR. STERN:  Let's mark this as the
4  next exhibit.
5        (Exhibit 472-B, document Bates stamped
6     HLHZ 38187 through 191 marked for
7     identification, as of this date.)
8     **Q.   What is the document that we have**
9  **marked as 472-B?**
10    A.   Looks like pages of notes I took the
11 evening of the 25th through the morning of the
12 26th.
13    **Q.   I am sorry, you mean the 18th--**
14    A.   I am sorry, the morning -- the evening
15 of the 18th through the morning of the 19th, I
16 apologize.
17    **Q.   That's OK.  Aside from these notes,**
18 **did you take any other notes concerning the**
19 **transaction at any time from the 17th through**
20 **the 22nd?**
21    A.   I definitely remember writing things
22 down.  But they were not -- like, for instance,
23 the answer is I -- there is nothing that I have
24 or could find that I haven't given to counsel
25 and been reviewed by them.  I do have a

BURIAN

1
2  recollection of things, but not notes like this,
3  not coherent, but for instance, the balance
4  sheet nits and jottles, but I --
5        MS. TAGGART:  I don't want to
6  misrepresent, there are -- and if it hasn't
7  been there, it is not on a privilege log
8  there have been some notes that have been
9  withheld on the privilege grounds.
10       MR. STERN:  From the 17th through the
11 27th?
12       MS. TAGGART:  Maybe, I could check the
13 dates if that's possible.  It wasn't
14 withheld because it was after that time.  It
15 was withheld because there was
16 attorney/client communications.
17    A.   I can help you go through and see what
18 dates they were from.
19    **Q.   The balance sheet that you are**
20 **referring to, can you describe that to me?**
21    A.   Can I ask someone to give it to you?
22    **Q.   Sure, if you have it.**
23    A.   Could someone give that exhibit that
24 was handed out at the --
25       MS. TAGGART:  It is Exhibit 19.  I

Page 218

BURIAN

1
2  don't think we have a copy of it, but that's
3  what he is talking about.
4      Q.   OK.  All right.  Looking back at
5  Exhibit 472-B, were these --
6      A.   Now these are my notes.
7      Q.   472-B?  These are your notes, this is
8  your handwriting?
9      A.   Yes.  My mother would be appalled, but
10 yes.
11     Q.   I think we can make it out.
12         Did these notes reflect more than one
13 meeting?
14     A.   These multiple pages?
15     Q.   Yes.
16     A.   Yes.
17     Q.   Can you take me through the notes and
18 tell me which sections relate to different
19 meetings if you can recall starting at the top?
20     A.   Sure, to the best of my knowledge,
21 Thursday night the 18th, first page, second
22 page, and probably, I can't be certain, but
23 probably up to where it says A/R on the third
24 page.
25     Q.   OK.

Page 219

BURIAN

1
2      A.   No, including the A/R.
3      Q.   Including the A/R, OK, and then after
4  the A/R, when would you have taken those notes?
5      A.   I believe this was early on Friday
6  morning, the -- here is the issue.  I don't
7  remember if the balance of this page and the
8  next page up to the line that goes like this --
9  with the camera, up to this line.
10     Q.   OK.
11     A.   I don't remember if that was one call
12 or a quick call, hang up, and then a call back,
13 you know, 20 minutes later.  If I had to swear
14 or guess, I think it was two, but it was such --
15 so close to each other, I don't know if it
16 matters.
17     Q.   After that line with the diamond and
18 the line through it on page 38190, the notes
19 after that, when were those taken?
20     A.   I believe that that was -- I'm not
21 sure, but I believe that that was a subsequent
22 call later in the morning on Friday before the
23 hearing.
24     Q.   The hearing was in the afternoon.
25 Could these notes have been taken in the

Page 220

BURIAN

1
2  afternoon?
3      A.   They were -- well, let me back up and
4  make it easier for you.  If you turn the page,
5  these are my contemporaneous notes of what I was
6  told, the transaction was going into the hearing
7  on Friday.  I remember being anxious and nervous
8  that I got these and I had to figure out like --
9  I missed the beginning of the hearing and I had
10 to get moving and also wanted to describe this
11 to the committee before the hearing started.
12     Q.   You're talking about page 38191?
13     A.   The last page.
14     Q.   OK, fine.
15     A.   So if you work backwards, this was the
16 final communication to me before the hearing and
17 then the one -- so now backing up, I don't
18 remember if this little bottom piece was part of
19 that same conversation, but it got so confusing
20 if I turn the page and said -- it would be like
21 me, and what I think happened is I started
22 taking notes at the bottom, trying to figure out
23 how what they are now telling me comports with
24 what they told me earlier in the day, and I said
25 forget it, switch, just tell me what was, what

Page 221

BURIAN

1
2  is, and let's ignore the previous two
3  conversations that we had because if you are
4  telling me those are all wrong anyway.
5         So let's get what was as of the
6  hearing date on Wednesday and what is as of
7  now that I am going to court.  So my point is
8  I don't remember exactly if these notes below
9  that squiggly -- not the squiggly line, the
10 arched line, were part of the previous
11 conversation or part of the next one.
12     Q.   OK, fine.  Let me just go through this
13 with you and I'm going to skip through the first
14 two pages and I'm going to start with the third
15 page which is Bates number 38189.  The bottom
16 half of that page with the X through it, do you
17 see that?
18     A.   Well, for the camera, the X and these
19 lines.
20     Q.   Yes, and we have this as an exhibit,
21 so we will be able to refer to it.
22     A.   OK.
23     Q.   The bottom half of the page, can you
24 tell me what that says?
25     A.   You want me to read my handwriting?

Page 222

BURIAN

```
1                    BURIAN
2      Q.   Yes.  It looks like it says
3    L-B/something?
4      A.   S-B.
5      Q.   S-B.  What does the S-B relate to?
6    What does that mean?
7      A.   Long book/short book.
8      Q.   And then what does it say?
9      A.   50.64 B, assets; 27.4 B agencies,
10   equities, corporate.
11     Q.   And then what does it say?
12     A.   Collateralized repo of Barclays Fed
13   loan.
14     Q.   And then what does it say?
15     A.   They took all the Fed securities,
16   Corp. something or other, CDO, financing of -- I
17   think it says Corp. loan sales, but I'm not
18   sure.
19          MR. STERN:  Do we have the original of
20   these notes?
21          MR. WHITMER:  It is going to take me a
22   minute to make sure I don't have any
23   anything privileged in them.
24     Q.   What does the next line say?
25     A.   The original is not going to help you.
```

Page 223

BURIAN

```
1                    BURIAN
2    It is my handwriting.  Do you want me to keep on
3    reading?
4      Q.   You think it says Corp. loan sales,
5    but you're not sure.  CDO --
6      A.   It says financing of, I think it says
7    Corp. loan something.
8      Q.   OK.  And then the next line, what does
9    that say it?  It looks like there is a number?
10     A.   5 billion.
11     Q.   What does that relate to?
12     A.   I don't know.  I mean --
13     Q.   Next line.
14     A.   Total extension, 45.5 billion.
15     Q.   Below that?
16     A.   Cure payments, 250, underneath an
17   arrow that says 250, good will payment, and then
18   another below that, an arrow that says, comp and
19   severance.
20     Q.   Hold on for a second.  We need to give
21   her a break.
22          So below comp and severance, what does
23   it say?
24     A.   I think it says 1.02 and then it says
25   New Jersey appraisals, 110 million shy.
```

Page 224

BURIAN

```
1                    BURIAN
2      Q.   OK, and then next line?
3      A.   Repo 50.6, here it says million.
4      Q.   It says MM?
5      A.   MM.
6      Q.   And then below that?
7      A.   No upside in the portfolio.
8      Q.   And to the bottom left, it says 5
9    p.m.?
10     A.   Correct.
11     Q.   What is that a reference to?
12     A.   I honestly don't know.
13     Q.   And going back to the 5 billion dollar
14   figure in the middle of your notes, did you tell
15   me that you don't recall what that represents?
16     A.   We have to --
17          MS. TAGGART:  Wait, hold on, let me
18   just read that.  I was dealing with
19   originals.
20          OK, go ahead.
21     A.   You need to be more clear about the
22   question, about what I thought it represented.
23     Q.   Well, let's do it both ways.  I think
24   you read your notes under -- it says they took
25   all the Fed securities and under that, there is
```

Page 225

BURIAN

```
1                    BURIAN
2    a figure with a dollar sign, 5B.  Do you see
3    that?
4      A.   Yup.
5      Q.   Do you know or do you remember what
6    that is a reference to?
7      A.   No.  Because -- no.
8          MS. TAGGART:  For the record, we have
9    the original of that page.  Well --
10     Q.   Do you know with whom you were
11   speaking when you took those notes?
12     A.   Yeah.  I also want to explain the
13   cross-out.  Jim Seery and Mark Shapiro, one or
14   both of them were on the phone for all three of
15   these pages.  That's where the information came
16   from on all three of these pages and --
17     Q.   In the last page --
18          MS. TAGGART:  Let him finish.
19     A.   -- and the 5 billion I think it was
20   the netting of the 50 billion to get to 45
21   billion, 45.5.  Although I honestly don't
22   remember how that correlates to 27.4 on the
23   right side.
24     Q.   Why do you think the 5 billion was
25   netting of the 50 billion to get to 45.5?
```

Page 226

**BURIAN**

1
2  A.  I don't know if I can -- I am happy to
3  explain to you the -- they were on the phone
4  rattling this off.  I didn't get a chance to ask
5  them questions.  And then as soon as they were
6  done, like there was like a lot of noise in the
7  background, like whispering or shuffling and
8  talking, and then they came back on the phone
9  and said something to the effect of, oh, my,
10  although the language was more investment
11  banking then oh, my.  That's all wrong, scratch
12  that and forget it.
13       I told you before I don't remember if
14  they said scratch that, forget it.  I turned
15  the page and then was told the top of the
16  next page or if they hung up on me and then
17  came back shortly thereafter and gave me the
18  information on the top of the page.  So this
19  was OK, Saul, here is what's going on, 50.64,
20  we got 25, 4 --collateralized, running
21  through the issues, and then oh, mumble,
22  mumble, mumble, noise, noise, noise, forget
23  that, scratch it.  Let me tell you what's
24  really going on.
25       I believe they hung up on me -- not

Page 227

BURIAN

1
2  hung up on me being nasty, I have got to go.
3  There was a lot of noise in the background
4  and bedlam and they were preparing for the
5  hearing and yada, yada, yada, but it wasn't a
6  two-way conversation where I could say, what
7  is that 5 billion, what is that, what is the
8  127.4.
9       It was write down what someone was
10  very very, very quickly, next page -- two
11  pages over is much more of me participating
12  in the conversation and saying, whoa, whoa,
13  whoa, not that page, next page, of me saying
14  I want to understand it better, I need to get
15  this right, and you need to explain this to
16  me.
17       That's why I don't want to sound like
18  an idiot, someone says what did you write
19  down, what's your recollection.  I was really
20  trying to write down as fast as I could what
21  someone was throwing at me and then they hung
22  up or said scratch it and move on.  So if you
23  look at the next page, what they said to me
24  was -- I am sorry I don't know if there is a
25  question.

Page 228

BURIAN

1
2  Q.  What was the question?
3  A.  What is --
4  Q.  Let's hear the question because we are
5  going to be here late in the evening if you
6  don't answer the question.
7       (Record read as follows:)
8       "Q:  Why do you think the 5 billion
9  was netting of the 50 billion to get to
10  45.5?"
11  A.  I don't have -- I do not have a
12  specific recollection of what that number was.
13       MR. STERN:  Can you in the record
14  reflect the question again.
15  Q.  You believe at some point in this
16  conversation with Jim Seery and possibly Mark
17  Shapiro, that they ended the conversation?
18  A.  Correct.
19  Q.  And then did they call you back or did
20  you call them back?
21  A.  As I said earlier, I don't remember if
22  I was on hold for a period of time and there was
23  a conversation that continued or they hung up
24  and one of us called each other back.
25       My impression was they were running

Page 229

BURIAN

1
2  from room to room or, I don't know if they
3  were Lehman or Weil, so it was hard to reach
4  them.  So I -- subject to the fact that I am
5  not 100 percent sure if there was one long
6  conversation or a separate one, I think that
7  they called me back.  I'm not 100 percent
8  sure.
9  Q.  On this sheet that's bearing Bates
10  number 38189, do you recall when you crossed out
11  the information at the bottom half of the page?
12  A.  During the conversation -- at the end,
13  when they said scratch that, forget it, ignore
14  that, that is all wrong, I crossed it out and
15  turned the page.
16  Q.  When -- and you have specific
17  recollection that they said that is all wrong?
18       MS. TAGGART:  Object to form,
19  argumentative.
20  A.  Absolutely -- I am sorry, absolutely.
21  Q.  Who said that?
22  A.  I believe it was Seery, but it could
23  have been Mark Shapiro.
24  Q.  Do you recall whether both of them
25  were on that call?

Page 230

BURIAN

1
2      A.   I do not recall if both were on the
3  call.
4      Q.   OK.  Do you recall whether they said
5  that all of this information that you crossed
6  out was wrong or some parts of it were wrong?
7      A.   It wasn't that specific.  It was let's
8  start all over, let's not be confused, that's
9  wrong, that's wrong, let me tell you what the
10  deal was.  As you --
11      Q.   So then you --
12          MS. TAGGART:  Wait, he is finishing.
13      A.   As you can see in the context of the
14  conversation, they came back, I was still
15  confused, and then we had the last conversation
16  before the hearing.  So this was iterative.
17      Q.   You say as you can see, but I can't
18  necessarily see that.  I am really relying on
19  your testimony and your recollection.  Because I
20  don't think it is obvious from what's on the
21  page.
22      A.   Well, what's on the --
23          MS. TAGGART:  What's the question?
24      Q.   Let's turn to the next page --
25      A.   Can I just be clear because I think

Page 231

BURIAN

1
2  the question was when did I --
3          MR. STERN:  Is something the matter?
4          MS. TAGGART:  You were making a speech
5  about your comment on his testimony.
6          MR. STERN:  I wasn't making a speech,
7  certainly not compared to your speech making
8  today.
9          MS. TAGGART:  Are you going to let me
10  to answer you questions now?  Would you like
11  to know what's the matter?
12          MR. STERN:  I have given you plenty of
13  time to make speeches.  Let's ask the next
14  question.
15          MS. TAGGART:  You ask questions and he
16  will give you the answer.
17      A.   I am answering your question.
18      Q.   You have to answer questions, OK?  It
19  is not an opportunity just to speak.?
20          MS. TAGGART:  Let's get on with a
21  question, not a little talk about this.
22      Q.   Looking at the next page, 38190, what
23  does that information reflect?
24      A.   The top half above the curved line, as
25  I previously testified, represents a telephone

Page 232

BURIAN

1
2  conversation with Lehman representatives that
3  followed them telling me to ignore the previous
4  information.
5      Q.   OK.  So above the curved line is a
6  conversation with whom?
7      A.   I believe it was Jim Seery and Mark
8  Shapiro or just Mark Shapiro.
9      Q.   And read to me these notes, so that we
10  know what they say.
11      A.   45.5 -- dollar line sign, 45.5 long,
12  all shorts closed out, I wrote in paren, maybe
13  some.  And then I crossed out at that time, the
14  maybe some.
15          Loan is at 45.5, real estate, real
16  estate, RE --- losing 100 MM.  Comp and
17  severance losing the upside in the portfolio,
18  no cash.  350 PIM broker, I can't reed what
19  the next two items are with the numbers.  I
20  know what they represent, but I'll stick to
21  answering the question and reading it to you.
22  So I can't read it, it was P, and then
23  something and then 220 and then 300.  Then
24  something else, 110 and then 1150.  And they
25  have totalling of those columns which have

Page 233

BURIAN

1
2  the 330 to 450.
3          Then 20-30-B closed out, space,
4  crossed out and beneath that is a line,
5  repo-but nothing after the dash, and then
6  below that, I believe that scrawl is
7  agencies-1 to 2.  I think it may say pass
8  through, but I'm not sure what that says,3 to
9  5 percent, Corp., 5 to 10 percent,
10  ill-liquid, empty, nothing there, space.
11          Should I stop at the line?
12      Q.   Is that when the conversation ended?
13      A.   As I said to you earlier, I wasn't
14  sure if below the line was that conversation or
15  the beginning of the next conversation when I
16  continued to be confused and insisted on not
17  relating back to things, but starting all over
18  Wednesday to Friday as opposed to interim
19  conversations that I was told don't -- that's
20  why I was not sure.
21      Q.   What would help me to understand --
22          MS. TAGGART:  I have the originals and
23  I will note there is a change in pen color,
24  so if you want to refer to that, there is
25  the original page.

Page 234

```
                    BURIAN
 1
 2      Q.   On page 3841 --
 3      A.   Am I allowed to see that, too?
 4           MS. TAGGART:  Sure this is the next
 5      page, but the back of it has some privilege,
 6      so please don't look under that.
 7      Q.   This is a separate pen.  OK.
 8           So just --
 9      A.   Were you asking me if that's a
10      separate pad?
11      Q.   It is a different -- on page 38191, it
12      appears from the original that that's written in
13      a different pen.
14      A.   Different pen, it is the same pad.
15      Q.   I said pen.
16      A.   Oh, yeah, OK.  I thought you said pad,
17      P-A-D.
18      Q.   So does that refresh your
19      recollection, looking at the original, that the
20      last page of this exhibit 38190 -- I am sorry,
21      38191 was written at a different time than most
22      of the blue notes on 38190?
23      A.   It doesn't refresh my recollection.
24      It is what I said now at least three times,
25      which is the last page of these notes was from
```

Page 235

```
                    BURIAN
 1
 2      that last conversation before the hearing.  My
 3      only ambiguity was on the previous page which is
 4      page -- where is the squiggly line page?  Here,
 5      it ended 190 and now looking at this, I notice
 6      that the numbers on the right side, 47.4, 45.5,
 7      2 cure, two employees is in a different color
 8      pen, and that's consistent with what I said
 9      before, that some portion of this page may have
10      been the beginning of the next conversation and
11      not only, you know, part of that conversation.
12      Q.   And when did the next conversation
13      take place, the conversation that's reflected on
14      38191?
15      A.   That was -- well, I have a firm
16      recollection that this conversation ended with
17      Saul, I got to go to the hearing.
18      Q.   Who said that?
19      A.   Probably I think Mark Shapiro; I got
20      to go. So this was whatever period of time that
21      the people with Mark felt he had to get there in
22      time for.  So back it up from when the hearing
23      started to when someone would have thought
24      travel was necessary, the hearing was 2 o'clock.
25      Probably 1, 1:30.
```

Page 236

```
                    BURIAN
 1
 2      Q.   So you believe this last page reflects
 3      notes of a conversation with Mark Shapiro?
 4      A.   I don't remember if Jim Seery was on
 5      that call or not and who else was on the call,
 6      but definitely I believe Mark was on this call.
 7      Q.   So this -- OK.  So this last page is
 8      the 19th which is a Friday?
 9      A.   Correct.
10      Q.   And --
11      A.   Well, the other page is also the 19th.
12      Q.   And the previous two pages were early
13      Friday, I think you said the very beginning of
14      the notes started on the 18th?
15      A.   The top, I don't know the squiggles of
16      189, where it says 4.6, 9, 3-6, 1.5, 2. I don't
17      know when that was from.  But above that, up to
18      the A/R that we drew a line by A/R, that was
19      from the night before.
20      Q.   Now, looking at the top of page 38190,
21      where it says 45.5 long, all shorts closed out,
22      loan is at 45.5?
23      A.   Um-hm.
24      Q.   What did you understand all that to
25      mean?
```

Page 237

```
                    BURIAN
 1
 2      A.   It was exactly what I told you
 3      earlier, that it was no haircut, it was a direct
 4      even-for-even match.
 5      Q.   So your recollection is that you were
 6      told by Jim Seery and/or Mark Shapiro that there
 7      was no haircut in the repo?
 8      A.   The word "haircut" never came up in
 9      the conversation.  So the answer is no to that
10      question.
11      Q.   So they never told you there was no
12      haircut?
13      A.   They told me that we had a 45.5 asset
14      position against a loan of 45.5.  I then
15      deducted 45.5 from 45.5 and determined that
16      there was nothing, no value in excess of the
17      loan on my own without being told that.
18      Q.   And you're sure as you sit here today
19      that that is what they told you concerning the
20      terms of the repo?
21           MS. TAGGART:  Objection to form.
22           MS. SCHAFFER:  Objection to form.
23           MS. TAGGART:  Asked and answered.
24      A.   The terms of the repo never came up in
25      the conversation.
```

Page 238

BURIAN

1
2    Q.   What was this a reference to?
3    A.   I was told that it was 45.5 billion
4  dollars of assets going to Barclays against a
5  45.5 billion dollar loan from Barclays.  The
6  mechanics of Fed portfolio securities, cash,
7  noncash, all that stuff in these quick
8  conversations was irrelevant.  We were just
9  focusing on the substance of what was moving to
10  whom.
11    Q.   You say there was no discussion of
12  there being a repo?
13    A.   This was described as, right, the loan
14  was described as Barclays' loan to us which at
15  the time we thought it was a simple transaction
16  at Barclays stepping into the full amount that
17  the Fed was owed.  The -- there was no
18  discussion on the mechanics of that step in.
19    Q.   So in other words, this discussion at
20  the top of 38190, you did understand to relate
21  to the repo?
22    A.   Getting back to what I said was -- I
23  didn't give it it a second thought of whether it
24  related or didn't.  I can't tell you if I knew
25  then what I know how about the clarification

Page 239

BURIAN

1
2  letter and the mechanic for execution.  The
3  conversation was quick.  It was short.  It was
4  pressured and it was about, hey, just tell me
5  the substance of what is happening, what are we
6  giving, what are we getting.  I don't have -- we
7  didn't talk about haircuts or mechanics.
8    Q.   Did you have an opportunity to ask
9  them what the basis was for the 45.5 long figure
10  at the top of page 38190?
11    MS. TAGGART:  Object to form.
12    A.   I did later in the next page in that
13  conversation.  But at this conversation, I
14  merely wrote down what they told me.
15    Q.   What did they tell you was the basis
16  for the 45.5 long?
17    A.   I don't remember specifically if they
18  said the basis for the 45.5 is, but all the
19  conversations, these were -- I thought they were
20  the Lehman marks.
21    Q.   OK.
22    A.   And --
23    Q.   Did you have a chance to find out from
24  them how that 45.5 long on page 28190 related,
25  if it did, to the 50.64 billion dollar figure on

Page 240

BURIAN

1
2  page 38189?
3    A.   I was told that that number -- that
4  that whole thing was wrong or misunderstanding
5  of the transaction, I should rely on these
6  numbers, and then of course, they call back and
7  said this is what you should rely on.
8    Q.   I don't think that answers my
9  question.
10    A.   We didn't go back and forth comparing
11  this to the conversation they told me to ignore.
12    Q.   Let me ask you my question again.  Did
13  you have a chance to ask or did you ever find
14  out whether there was any relationship between
15  the 45.5 long at the top of page 38190 and the
16  50.64 at the middle of page 28189?
17    MS. TAGGART:  Objection, asked and
18  answered.
19    A.   Only in the context of the
20  conversations that revolved around -- that ended
21  in my notes on page 191.
22    Q.   And what did you find out about the
23  relationship between those two figures?
24    A.   That they were wrong.
25    Q.   Both figures were wrong?

Page 241

BURIAN

1
2    A.   No, that the 45.5 was right, but did
3  not represent a par value.  It represented a
4  mark value.
5    Q.   What did you -- what were you told the
6  45.5 represented?
7    A.   Let's back up to when?
8    Q.   During this conversation?
9    A.   On page 190?
10    Q.   Yes.
11    A.   That these were the value of the long
12  position being transferred to Barclays.
13    Q.   And do you know, did they tell you who
14  arrived at that value?
15    A.   I don't remember a specific
16  conversation about who marked the book, but the
17  understanding of the conversation was we were
18  talking a common language and that these were
19  the Lehman marks.
20    Q.   Did they explain to you what the
21  figure 50.64B on page 38189 represented?
22    A.   I am sorry?
23    Q.   Did they explain to you what the 50.64
24  billion figure on page 38189 represented?
25    A.   In the subsequent conversations?

## Page 242

BURIAN

1
2  Q.  **In any conversation.**
3  A.  Well, as I said to you before, in that
4  very quick conversation, they said, OK, here's
5  numbers, he rattled down, we got 50.64 billion
6  of assets with 27.4 billion representing these
7  things and he ran through the numbers, I took
8  notes as quickly as I could, and then he told me
9  scratch that, it is all wrong, I'll get back to
10 you.  Or I was on hold for a while.  I don't
11 remember if it was the same conversation or
12 separate.
13         In the subsequent conversation, we did
14 not go back to that, and as I said earlier,
15 because we were so confused about what we are
16 going back to and what we are not going back
17 to, we decided to scrap all the conversations
18 and start all over on 191, just tell me what
19 the deal is.
20 Q.  **That doesn't answer my question.**
21 A.  I tried.
22 Q.  **My question is very narrow.  Did**
23 **Mr. Seery or Mr. Shapiro, whoever else was in**
24 **this conversation with you, explain to you the**
25 **basis of the 50.64 billion dollar figure at the**

## Page 243

BURIAN

1
2  **middle of page 38189?**
3  A.  **No.**
4         MS. TAGGART:  Is this a good time for
5  a break?
6         MR. STERN:  You need a break?  OK.
7         THE VIDEOGRAPHER:  The time is now
8  3:49 p.m., we are now off the record.
9         (Recess)
10        THE VIDEOGRAPHER:  This is the start
11 of tape number 5.  The time is 4:01 p.m., we
12 are now back on the record.
13 Q.  **Let me hand you an exhibit previously**
14 **marked as Exhibit 338-B.  And we have the**
15 **original of this.  Could you for the record just**
16 **describe the original to us?**
17 A.  **Can I hold it up to the camera?  Does**
18 that help?
19 Q.  **Sure.**
20 A.  It's a -- a manila folder with -- the
21 back of the manila folder has two different
22 handwritings on it.  The predominant one is blue
23 and that's a felt-like pen or Roller Ball, and
24 then a more cheaper pen, there is a different
25 shade of blue or black that's on the center.

## Page 244

BURIAN

1
2  Q.  **And the different shade says the word**
3  **"RESIs" and there are two numbers 2.5 and 3.5**
4  **below it.**
5  A.  **Correct.**
6  Q.  **Can you tell us what this is?**
7  A.  **This is an exhibit, this is a**
8  document -- how is that for a neutral phrase? --
9  that was given to me by Michael Klein early the
10 morning of the 22nd of September.
11 Q.  **Are the notations on this document**
12 **notations that were made during the course of**
13 **the meeting that you had?**
14 A.  **Yes.**
15 Q.  **And tell me who was in the meeting?**
16 A.  From Houlihan, it was me and Mike
17 Fazio.  I believe Lori Fife was in for the part
18 or all of the meeting but certainly Harvey
19 Miller was there for the whole meeting.  I think
20 Tom Roberts.  Maybe Krasnow, I don't remember.
21        MS. TAGGART:  Off the record for just
22 a moment.
23        THE VIDEOGRAPHER:  Off the record.
24        (Recess)
25        (Exhibit 473-B, document Bates stamped

## Page 245

BURIAN

1
2  LBHI 4414 through 4415 marked for
3  identification, as of this date.)
4         (Exhibit 474-B, document Bates stamped
5  MTHM 5778 marked for identification, as of
6  this date.)
7         THE VIDEOGRAPHER:  The time is 4:07
8  p.m., we went off the record at 4:04 p.m.
9  Q.  **When we went off the record, we were**
10 **looking at 338-B and I asked you who was in the**
11 **meeting and you told me from Houlihan, it was**
12 **you and Mike Fazio, Lori Fife for part of the**
13 **meeting, certainly Harvey Miller was there for**
14 **the whole meeting, you said you thought Tom**
15 **Roberts, maybe Krasnow, you didn't remember.**
16 **Anybody else?**
17 A.  Well, Richard Klein from --
18 Q.  **Michael Klein?**
19 A.  Michael Klein, the Barclays
20 representative.
21 Q.  **And where did the meeting take place?**
22 A.  One of the smaller conference rooms on
23 the 25th floor of Weil.
24 Q.  **At what point in the meeting did**
25 **Mr. Klein write on the Manila folder that we**

Page 246

BURIAN

1
2  have marked as Exhibit 338-B?
3      A.   Very, very early.  It was -- when we
4  say meeting --
5      Q.   Conversation.
6      A.   It was very early.  I mean, that's
7  what this was about.
8      Q.   And describe to me how the
9  conversation went.
10     A.   To do that accurately, I need to give
11 you the five seconds before the conversation
12 started, because there was a --
13     Q.   Sure.
14     A.   So pressure is building throughout the
15 night and it is now morning.  We are hearing
16 things about the clarification letter, things
17 changing.  My guys are telling me that there is
18 this list of assets that doesn't match what we
19 have been told was going to be the deal and the
20 court, we are getting anxious and upset and
21 finally I turned to Harvey and said, we are
22 tired and we are being ignored and we are not
23 doing anything or something to that effect, we
24 need to know what is going on, what is the deal,
25 do we have a problem, is there a problem.

Page 247

BURIAN

2      And he was like, well, I don't know,
3  negotiations, yada, yada, yada.  And I say,
4  Harvey, we can't delay anymore.  We need to
5  know.  He turned, like said, wait there a
6  second, and he basically grabbed Michael and I
7  wasn't part of the conversation, but the
8  implication from the body language was I know
9  you're busy, there was a separate room where
10 Archie Cox was, a lot of other important people,
11 and my impression, he said this is something
12 that you have to make time for and I won't say
13 in an exasperated way, because he is very
14 polite, but in a time-sensitive way, he came
15 into the room and it wasn't like, hey, wait for
16 me, I am going to bring other people.  It was
17 like now is your opportunity to get information.
18     So Mike and I sat down and he came in
19 and I think Harvey may have said a preamble
20 or something like, hey, you tell us what the
21 deal is.  I believe he said us, including
22 him, he may have meant me, but he said, I
23 think he said us, I think he wanted to hear
24 it himself, and then Mike launched into what
25 purported to be the final negotiated deals,

Page 248

BURIAN

1
2  now 1:30 to 2:30 in the morning, and he, you
3  know, there has been a lot of confusion and
4  he said this is what happened and this is
5  what's going on, and this is why you should
6  be comfortable.  And he -- all the markings
7  on that page are his markings.  Other than me
8  writing the other print, the RESIs 2.5, 3.5.
9      Q.   I see.  That's your handwriting.
10     A.   That's my handwriting.
11     Q.   And what was your basis for making
12 that notation?
13     A.   It was after the conversation -- it
14 was after he finished and he handed me the
15 folder and then I asked him how does -- he
16 didn't understand the context of the whole
17 conversation, like we were doing the back first
18 I asked him how does that split, 50/50 or RESIs
19 at 2 and a half, 3 and a half, all the numbers
20 we have been reading, and as my wont, I doodled
21 "RESIs 2 and a half, 3 and a half."  And he --
22     Q.   What did you understand that to
23 represent?
24     A.   My doodle?
25     Q.   Yes.

Page 249

BURIAN

1
2      A.   That I had said 2 and a half, 3 and a
3  half, I wanted to understand how that correlated
4  to which assets were going or not going.  And
5  then I doodled -- I guess I figured it would be
6  somewhere in this quadrant that those would
7  belong in one of the boxes, but I --
8      Q.   You were not sure?
9      A.   No, I was sure what my question was,
10 explain to me in this morass why the deal was
11 50/50, why it was we had upside in some of these
12 things, how come originally in court it was
13 going to the DTC, and I think 2 and a half or 3
14 and a half was going to stay or go, those
15 details are fuzzy now in my whole explanation
16 of what the deal is, where do the RESIs fit in.
17 That is what I was saying when I doodled that on
18 the manila folder.
19     Q.   Did you understand that Barclays was
20 receiving certain of the RESIs through the repo
21 replacement?
22     A.   I had no idea if it was through or not
23 through.  I did know that the new deal included
24 some RESIs.  I asked how those RESIs compared to
25 other RESIs, because there were three sets of

Page 250

BURIAN

1
2 RESIs.  It was -- at different times, there was
3 confusion in my mind of RESIs that were not
4 going to Barclays, RESIs that were going
5 Barclays, RESIs staying at DTC, RESIs that were
6 being split, and until today, I have never
7 gotten an explanation.
8     Q.   Did you know whether there are certain
9 RESIs that would be seized by JP Morgan?
10    A.   That would be subsequently seized?
11    Q.   Or had been?
12         MS. TAGGART:  Object to form,
13 foundation.
14    A.   I am sorry, what's the question?
15    Q.   Did you know whether there were
16 certain RESIs that either had been or would be
17 seized by JP Morgan?
18         MS. TAGGART:  Object to form,
19 foundation.
20    A.   Not with particularity.  I knew
21 leading up to this meeting Wednesday -- sorry,
22 Thursday and Friday hearing about how assets
23 weren't coming back and Saturday and Sunday were
24 endless meetings and wranglings, the deal is go
25 to blow up, JP Morgan won't cooperate, can't we

Page 251

BURIAN

1
2 Fed do something, all that stuff.  About
3 transfers from JP Morgan, I do not remember
4 whether the word "RESIs" were particularly
5 referenced in that connection.
6     Q.   So going back to the manila folder,
7 upper left quadrant, there is a notation 49.9
8 that's circled.
9     A.   The upper left is 72.68.
10    Q.   I am focusing on 49.9 and next to
11 that, it says, "Premarked."  What did you
12 understand that 49.9 figure to be?
13    A.   I have a very clear recollection.
14 The -- what was going on was we were trying to
15 understand what the deal was and when Mike told
16 us, Mr. Klein told us was, yes, you're right,
17 you have seen reports and you have seen numbers
18 that's close to 50 million dollars, and you've
19 seen -- and that basically we are getting -- we,
20 Barclays is getting -- I'm not sure 44.4 or 44.9
21 now that I am looking at it carefully, but we
22 are getting roughly 50 billion of assets with a
23 premark value --
24    Q.   Excuse me for a second.  Are you
25 saying you don't know whether this number that's

Page 252

BURIAN

1
2 circled --
3         MS. TAGGART:  No, no, he gets to do
4 the whole answer and then you can have a
5 clarification.  But --
6     Q.   You mentioned 44.4 or 44.9.
7         MR. STERN:  Please, Erica.
8         MS. TAGGART:  No, he gets to finish --
9 you have got a transcript.  You can ask
10 things, but he gets to answer.
11    Q.   Are you saying that figure is 49.9 or
12 44 --
13         MS. TAGGART:  No, no --
14         MR. STERN:  Please, would you stop?
15         MS. TAGGART:  No, you interrupted.  He
16 has to put his answer on the record and then
17 you can clarify anything that you want.
18         Why don't you go back to what you were
19 answering, and then you can ask the
20 clarification.  We have the whole transcript
21 you can go back to any part to get
22 clarification.
23         Why don't you keep going.
24    A.   I must admit, Erica, I am a little
25 lost.

Page 253

BURIAN

1
2     Q.   I think that's because your counsel is
3 interrupting.  Let me ask a question.?
4         MS. TAGGART:  Wait, wait, wait.
5         MR. STERN:  We are going to be here
6 very late tonight.
7         MS. TAGGART:  No, we are going to stop
8 it at 7.
9         MR. STERN:  No, we are not.
10        MS. TAGGART:  Do you have any more to
11 add to your answer.  Is there any more that
12 you want to add to your answer?  It is OK,
13 if you don't know and we can do a new
14 question and new answer.
15    A.   I was explaining the 49.49 premarked
16 number that's circled on the page, and then I
17 said, wow, look, the jiggle is not closed.  But
18 there is no question in my mind that that was,
19 at the time, it was 49.9 billion and that the
20 intention was that he was saying to me you're
21 right, you showed me an exhibit earlier, you're
22 right that your concern was that roughly 50
23 billion of securities, which matches up to
24 Exhibit 461-B, at the time I didn't have this.
25    Q.   You did not have 461-B?

Page 254

BURIAN

1
2    A.    Not in my hands, and as I said
3    earlier, I knew that there was confusion and we
4    were concerned about what securities were going
5    and what appeared to be a difference in the
6    valuation, in the value of what Barclays was
7    getting, and that, you know, was there a 45.5
8    billion in liabilities against 50 billion of
9    assets, and therefore, what he said to me was,
10   hey, 49.9 that you have been looking at is
11   premark.  That's stuff that relates to not
12   today's value, that's premark.
13           We asked at one point premarked as of
14   when and he says, listen, it doesn't matter
15   if it is, you know, what the date and when,
16   but I am telling you, when we came in this
17   meeting today and we are trying to close the
18   transaction, 49.9 is the old value of what it
19   was we are getting.
20           And then he said, post mark, which
21   means, which was we have lost 4 to 5 billion
22   dollars over the last period of time.
23   Markets have been, a lot of ill-liquids.  We
24   said what time period did it happen.
25   Saturday.  You know, it was like listen, you

Page 255

BURIAN

1
2    want an explanation of the deal, here is the
3    deal.  50 billion of assets, they have
4    dropped in value, and they are now -- we
5    agree with Lehman that these assets are worth
6    44 to 45, and therefore, you know, we were
7    short.  We are adding 1.9 billion of assets
8    that are unencumbered that were not part of
9    the repo to get to a total of what Barclays
10   is getting of 47.
11           And that is my absolute understanding
12   of the left, top left quadrant of the page
13   and that 47 is tied to -- is the final number
14   as compared to the 72 which is where what he
15   said was the original contemplation when the
16   document was originally signed.
17       Q.    I think you said that you personally
18   did not have the information contained in 461-B
19   at the time of this conversation with Mr. Klein
20   and Mr. Miller.  Is that right?
21       A.    That is correct.
22       Q.    But your team -- the Houlihan team,
23   that is -- did have the information reflected in
24   Exhibit 461, is that right?
25       A.    That is correct.

Page 256

BURIAN

1
2       Q.    Did anybody from your team bring to
3    your attention the information in 461-B that is
4    summarized right under tab A?
5       A.    Yes.
6       Q.    Who did that?
7       A.    It came up a number of times.  The
8    most obvious one is Mike Fazio who goaded me or
9    convinced me I need to be much more firm to get
10   an explanation of what was going on, following
11   his conversations with Seery where we were told
12   those numbers are no longer relevant and that
13   both the corpus of what was being transferred
14   may not be accurate and the value of what was
15   being transferred has degraded.
16           And therefore, that was in my mind
17   when I said in an aggressive manner, we need
18   to understand what is going on and, frankly,
19   that is also why when Michael Klein, not
20   Fazio, explained this to me, I was relieved.
21   Because it footed in a positive way, it
22   footed in a benign explanation to what it is
23   that I had been hearing from my team and
24   things were OK, as opposed to nefarious.
25       Q.    Did you believe at the time that there

Page 257

BURIAN

1
2    was a certain valuation, in other words, a
3    valuation with certainty of the repo collateral
4    that Barclays had received?
5       MS. TAGGART:  Object to form.
6       A.    When Michael said to me, Mr. Klein
7    said it was between 44 and 45, so obviously
8    that's a range.
9       Q.    It's a range.  Did you know whether
10   that was a figure that reflected a valuation by
11   Barclays?
12       A.    It was -- is there a rest of the
13   question?
14       Q.    No, that was the question.  Did you
15   know whether that was a range that reflected a
16   valuation by Barclays?
17       A.    Michael told me that there was
18   deterioration in value from the premark.  I know
19   that we were discussing all day long, they
20   appeared to be discussing all day long what
21   securities were there and what the values were.
22   The implication was that for the purposes of
23   closing the transaction, they agreed that the
24   securities were worth 44 to 45.
25       Q.    Did that reflect a formal valuation or

Page 258

BURIAN

1
2  an agreement?
3       MS. TAGGART:  Object to form.
4       A.   I -- the Lehman books were either
5  ill-liquids and other things, the marking
6  process at Lehman was complicated.  It wasn't a
7  formal valuation in my understanding.  So I
8  can't tell you -- the distinction between a
9  valuation and an agreement is short of vague
10 because of the way in which Lehman marked their
11 books.  My understanding, this was a good faith
12 number agreed upon by the parties as to the
13 value of the securities, actually tangible
14 value.
15      Q.   Did you understand it to be an
16 estimated value?
17      A.   There is a range, 44 to 45.  So it has
18 got to be an estimate, right?
19      Q.   Further down on the folder, there is a
20 line that says, "Timing of 49.9."  Do you see
21 that?
22      A.   I do.
23      Q.   Could you explain to me the notes that
24 appear below that?
25      A.   Do you want me to read them to you?

Page 259

BURIAN

1
2       Q.   Read them and then tell me what you
3  understood them to mean.
4       A.   Well, we only did the top left
5  quadrant, not the top right.  But first they
6  described to me what the economic substance of
7  the transaction is and then below the line, I
8  said OK, now all the nonsense, the last two
9  days, let's talk about what the problems have
10 been and how we are actually going to effectuate
11 the transaction described above and, therefore,
12 timing of 49.9 is shorthand for how the premark
13 securities were going to move.  And to make
14 things simple, I thought that all these
15 numbers -- well, since -- it says 41 to 42 of it
16 was transferred to Barcap from JPM.  I think
17 that was as of Friday, but -- it says Friday, as
18 of Friday.  But 8.55 was held up.
19      As you know from my affidavit, I have
20 questions about that 8.55 number.  Then there
21 is an arrow there that says somehow or
22 another decided that in lieu of 8.55, that is
23 not -- that didn't make it across, that a
24 substitute 7.4 of cash for that 8.55.  So on
25 a premark basis, what he's telling me is

Page 260

BURIAN

1
2  you're getting, we are taking 48.4 to 50.4 of
3  premark value and that's how this stuff
4  spread across.
5       Q.   Now, these part of the notes, did
6  Mr. Klein provide this information on his own or
7  did Mr. Miller, Harvey Miller provide some of
8  the information that Michael Klein wrote down?
9       A.   Mr. Miller didn't say a word.  This is
10 all Michael Klein explaining this to me in a
11 charged environment to explain that there was
12 nothing nefarious going on.
13      Q.   So Harvey Miller, nobody else in the
14 meeting said anything relating to the 8.55 or
15 the 7.4?
16      A.   Certainly not at the beginning when
17 this was being written.  This is Michael telling
18 us what the day's resolution was, Michael Klein,
19 I am sorry, I will say Mr. Klein.  Whether there
20 was a subsequent conversation, I don't remember.
21      Q.   Did anyone in that conversation
22 reference a box loan that JP Morgan had made to
23 Lehman?
24      A.   Not in this conversation.
25      Q.   Now, I think you said that Mike Fazio

Page 261

BURIAN

1
2  had reviewed 461-B?
3       A.   What I said to you is Mike Livanos
4  reviewed it.  I can't tell you how much time
5  Fazio did or did not.  He certainly saw the
6  summary of the front page.
7       Q.   OK.  You think that Mike Fazio saw the
8  summary?
9       A.   Definitely saw the summary.
10      Q.   OK, and the summary refers to a cash
11 line of 7 billion.  Do you see that?
12      A.   I do.
13      Q.   In this meeting with Mr. Klein, did
14 Michael Fazio ask any questions about the
15 relationship between the 7.4 and the 7 billion
16 that is listed on Exhibit 461-B?
17      A.   Nope.
18      Q.   Did Mr. Fazio, during this
19 conversation, ask any questions about the
20 relationship between the total figure, the 49.9
21 billion in Exhibit 461-B and the 49.9 figure
22 that appears on Exhibit 338-B?
23      A.   No.
24      Q.   How long was the conversation in which
25 Mr. Klein wrote these notes?

Page 262

**BURIAN**

1
2    A.    Ten to 20 minutes, 10 to 15 minutes.
3    **Q.    And then how did the conversation end?**
4    A.    Well, I started to ask a question
5    about the RESIs and didn't get an answer.  There
6    was agitation that Michael Klein was needed
7    elsewhere.  Mike Fazio tried to have the
8    conversation about mark, when, post mark, how,
9    as of what date.  We didn't make specific
10    reference to this, but the idea was --
11    **Q.    This being 461-B?**
12    A.    Yeah, yeah.  I mean, I frankly -- and
13    maybe I was naive -- I took comfort in the fact
14    that the number footed because it showed that
15    this -- what Michael Klein said to me was
16    consistent with what I was told by my guys,
17    which is, hey, there is a list of securities
18    that purport to be part of the transfer.  It is
19    close to 50 billion dollars.  Hey, what's up,
20    when the Barclays loan is 45.5, and here I had
21    a, not only a plausible but consistent
22    explanation of the mismatch, that there was some
23    significant deterioration in value in the
24    interim.  Mike wanted to ask about that and that
25    was cut off or not included and then I know I

Page 263

BURIAN

2    turned to Harvey and said Harvey, are you
3    comfortable with this, is this what's going on,
4    and he said, yeah, or something to that effect.
5    You know, and then the conversation clearly
6    ended with us saying, gentlemen, or something
7    like that, if this is what's going on, this is
8    an explanation, I got it, I understand it, you
9    know, I can't diligence this, I have to trust
10    you and what you're telling me is going on.
11         But this is going on, it sounds like
12    there is a mess up with JP Morgan and the
13    values have dropped in value.  You know, we
14    don't understand why those values would have
15    dropped, but if that's where Lehman and you
16    guys are and the values dropped, we will get
17    a reconciliation and it is what it is.
18    **Q.    There is a reference here to add box
19    1.9.  What is that a reference to?**
20    A.    Again, we do need for completion --
21    because I don't think -- this part of the story
22    you're not hearing, talk about the top right
23    corner which you --
24    **Q.    I am asking about the add box, 1.9,
25    that's my question?**

Page 264

**BURIAN**

1
2    A.    The add box, that basically
3    Michael Klein telling me in order to match up
4    with the right side of the page, Barclays needed
5    to be paid additional securities to balance the
6    transaction.  And therefore, we had to give him
7    that -- they had to find securities that were
8    not originally part of the Fed loan in order to
9    make up for the liabilities being assumed and
10    the deterioration in value.
11    **Q.    Now, this meeting or this conversation
12    was not the first time you had heard of that
13    asset category?**
14    A.    Of the 1.9 asset category?
15    **Q.    Yeah.**
16    A.    Oh, again, there was lack of precision
17    about numbers have been flying around, but
18    before this, I saw a clarification letter that
19    talked about assets on a B list or something.
20    **Q.    Do you recall any discussion before
21    the approval hearing concerning the clearance
22    box assets being estimated by Lehman to be worth
23    1.9 billion?**
24    A.    I think my notes have a reference
25    to -- the night, right before the hearing in the

Page 265

BURIAN

2    final summary of the hearing -- I am trying to
3    remember when I first heard about this.
4         But I do know that some point, whether
5    it was Friday before the hearing or it was
6    Saturday night or Sunday, that they were
7    looking for additional assets to make up for
8    the deterioration in value or the stuff that
9    JP Morgan took or that didn't show up, you
10    know, when they were trying to do the repo.
11    **Q.    You don't recall whether you were told
12    that before the hearing?**
13    A.    It is sort of like the name of the
14    analyst.
15    **Q.    You don't remember?**
16    A.    I'm a little nervous to say yes
17    because I don't have a specific recollection.
18    **Q.    Then that's fine.**
19         Now, you wanted to tell me about the
20    upper right-hand corner of this chart,
21    Exhibit 338-B?  Did you want to tell me about
22    that?
23    A.    I wanted to give you the context for
24    understanding how the 1.9 was used to foot to
25    the 47.  That's the reason for that.

Page 266

BURIAN

1
2  Q.  OK, was there anything else you
3  thought I should know about Exhibit 338-B?
4  MS. TAGGART:  Objection to form.
5  A.  Yeah, yeah, I think the most important
6  part of the whole conversation was the right
7  side of the balance sheet, not the left, and
8  that is Michael Klein said, hey, we are owed 45
9  and a half billion dollars, as you know, Saul,
10  the extra liabilities we are assuming on the
11  cures and employee severance is 4 and a quarter.
12  Even after taking the 1.9 billion of additional
13  securities, we are short, and this is about as
14  close to a quote as I can tell you, is you made
15  2 billion dollars this weekend.  If anything,
16  you should be happy.
17  Q.  Now, the 4.25 billion, what did you
18  understand that to be comprised of?
19  A.  There was, in some notes it is 4
20  billion, in some it is 4.25, but that was described
21  as Barclays -- Barclays was supposed to --
22  whether they did or not, we can talk about if
23  you want, but at this time, my understanding was
24  Barclays was going to be responsible for paying
25  all the accrued compensation and severance

Page 267

BURIAN

1
2  liabilities of the 10 to 12,000 Lehman employees
3  that were supposed to -- that were going to go
4  over to Barclays and -- and that included the
5  severance for people who declined to go to
6  Barclays and the accrued comp for those who went
7  to Barclays and the other portion of this was
8  someone's estimate of what the cure costs were
9  for those contracts necessary to deliver the
10  franchise to Barclays.
11  Q.  OK.  On the comp portion of what you
12  just discussed, what did you understand the
13  estimate of Barclays' potential exposure to be?
14  A.  I only understood what people told me
15  and I can go look at the balance sheet that's
16  Exhibit 19, if it was 2 or 225, one of them had
17  a 25 at the end.  Whether it was the cure or the
18  severance, but so someone -- I was told that
19  that number was either 2 billion or 2.25
20  billion, was the assumed liabilities in respect
21  of employees.
22  Q.  You had the APA though, didn't you?
23  A.  Sure.
24  Q.  And you -- did you read the APA on,
25  provisions on compensation and severance for

Page 268

BURIAN

1
2  transferred employees?
3  A.  I did.
4  Q.  And from that, did you understand what
5  Barclays' potential exposure was?
6  A.  No.
7  Q.  Nobody gave you an estimate?
8  A.  I just told you what the estimate was
9  and then you asked me if I got it from the APA.
10  The APA has words, it says I am picking up
11  liabilities.  I got the estimate from Weil and
12  Lehman and at the court hearings.  I didn't get
13  that from the APA.  I don't believe the APA has
14  a number.
15  Q.  But you had access to the APA?
16  A.  I had more than access to the APA.  I
17  had a copy of the APA.
18  Q.  And with respect to cure payments, did
19  you understand that under Section 2.5 of the
20  APA, Barclays had discretion concerning which
21  contracts it would and would not assume?
22  MS. TAGGART:  Objection, form, calls
23  for a legal conclusion.  The document speaks
24  for itself.
25  A.  I understood that Barclays had the

Page 269

BURIAN

1
2  right to cherry-pick those contracts necessary
3  for the operation of the Business, capital B.
4  My comment earlier was not about cure,
5  it was about the severance and accrued comp,
6  not about the cure.
7  Q.  What did you understand Weil Gotshal
8  to have told the court concerning Barclays'
9  exposure with respect to cure payments?
10  MS. TAGGART:  Object to form.
11  MS. SCHAFFER:  Objection.
12  A.  Again, at the hearings I was at, you
13  know, I don't remember particularly every single
14  reference.  I can tell you that my understanding
15  at the time was that the liabilities that
16  Barclays -- that Barclays was going to assume
17  the cure, severance, and accrued comp of the
18  Lehman employees.
19  Q.  Did you understand that there was some
20  uncertainty concerning the actual cure payments
21  that Barclays would ultimately make?
22  MS. TAGGART:  Object to form,
23  foundation.
24  A.  Sure.  I understood that there was
25  still open as to which contracts Barclays would

Page 270

BURIAN

1
2   take.
3       Q.   And did you or did anybody on your
4   team review the list of closing date contracts
5   that were filed on September 18?
6       A.   I don't have a firm recollection on
7   that topic.
8       Q.   You don't recall whether anybody on
9   your team looked at that list and added up the
10  cure amounts that were on that list?
11      A.   I don't know for sure if someone
12  mechanically added up the -- the cure was
13  discussed and we moved on pretty quickly from
14  that issue.
15      Q.   Let's go back to Friday before the
16  approval hearing.  Let me give you what we have
17  marked as Exhibit 473-B.
18      A.   Is this a.m. or p.m.?
19      Q.   Well, it is -- I think it is 20
20  minutes after midnight on the 19th.  Because it
21  is GMT time.  So you should subtract four hours.
22           I want to first ask you if this is
23  something you have seen before?
24      A.   Never saw this before.  Well, I don't
25  recall seeing this before.

Page 271

BURIAN

1
2   Q.   It says, "Please see questions below
3   from Houlihan," and then you see there is a list
4   of questions.
5       A.   Yes, do you want me to read them.
6       Q.   No, I am asking you if you see that
7   there is a list of questions here.
8       A.   Yes, I see a list of 1 through 19.
9       Q.   Do you know who prepared that list?
10      A.   I do not.
11      Q.   Do you know whether anybody from
12  Houlihan followed up with Lehman on some or all
13  of the questions that were listed here?
14      A.   You are making it sound like this is a
15  Houlihan list as opposed to Jackie Marcus taking
16  notes in a meeting and saying here, here are the
17  things that Houlihan wants to know.  And I can't
18  make that assumption.
19      Q.   OK, all right, so this may be a list
20  that Jackie Marcus prepared based on
21  conversations with Houlihan?
22      A.   Yeah, I mean, again, we are not -- I'm
23  not supposed to guess in a deposition.
24      Q.   But that's --
25      A.   Typically if there is a Houlihan list,

Page 272

BURIAN

1
2   we probably would have e-mailed it to her and
3   she would have forwarded it as opposed to this
4   looks like it has been typed into the body of
5   the e-mail itself.
6       Q.   OK.  Let me show you Exhibit 474-B.
7   Unfortunately, this is a difficult document to
8   read, but this is the way it was produced to us.
9   Now, do you see at the top that you are copied
10  or you are sent an e-mail with a list of e-mails
11  below it?
12      A.   I do.
13      Q.   Do you recall receiving this e-mail?
14      A.   I don't recall specifically receiving
15  this e-mail.  I read it and I don't -- I'm not
16  going to question or debate that I got it.  I
17  don't specifically remember the e-mail.
18      Q.   All right, let me start at the bottom
19  and I'll just read the bottom e-mail which is
20  September 19, 8:51 a.m. and it looks like it is
21  an e-mail from somebody at Goldman Sachs to
22  Danny Golden.  Who is Danny Golden?
23      A.   Danny is a partner at Akin Gump, the
24  law firm.
25      Q.   And he represented bond holders in

Page 273

BURIAN

1
2   connection with the Lehman bankruptcy?
3       A.   He represented an ad hoc group of
4   Lehman creditors.  I read it.  I just quickly
5   read it, if you want to save the time of
6   reading.
7       Q.   I'm happy to read it.  It says,
8   "Danny, details of our argument are that the
9   estate should only be authorized to sell
10  Barclays those assets which are necessary to
11  obtain the U.S. investment banking and
12  broker/dealer business.  The proposed sale goes
13  way beyond this in that it allows Barclays to
14  cherry-pick owned inventory, investment and
15  other assets at windfall discount to FMV.  The
16  discount is at least several billion dollars."
17           Now, is that a statement that you were
18  aware of before the approval hearing?
19      A.   I don't recollect whether I
20  specifically read that statement.  I was aware
21  of chatter, as there is in every bankruptcy
22  sale, about people who are not informed of
23  what's going on, worried that Barclays was
24  getting a good deal in a variety of respects.
25  11 o'clock in the morning, you know, as I

## Page 274

BURIAN

1
2  testified earlier, there are at least two,
3  probably three conversations with Barclays -- I
4  mean with Lehman about this topic.  And there
5  are clear mistakes in the e-mail about how the
6  transaction was structured, and typically, while
7  it is interesting to hear the uninformed market,
8  what I rely on is my access, my diligence, and
9  the information I get directly from the horses'
10 mouth and my understanding of the transaction,
11 directly.
12          So yeah, I heard from Danny in court,
13 out of court or at some time, maybe I read
14 this, maybe I didn't.  I knew generally that
15 there was a concern just like there was a
16 concern about whether it was Barclays taking
17 over European businesses.  I mean, this is
18 just one of many rumors or concerns about
19 what was going on worldwide in Lehman.  That
20 creditors brought up.
21      Q.   And you did not attach much weight to
22 it?
23          MS. TAGGART:  Object to form.
24      A.   It is not about attaching much weight
25 about it.  But the deal never was that Barclays

## Page 275

BURIAN

1
2  was only getting what was the minimum necessary
3  to run the U.S. I-B business.
4          The deal, as I was explained in the
5  conference rooms, were that there was going
6  to be a balanced exchange of the owned
7  securities to match against, you know, the
8  liabilities, and frankly, that was a positive
9  for us, not a negative, because we were a
10 bankrupt estate.  We wouldn't be able to
11 manage the book or hedge against the book.
12 So the premise was wrong.
13          So when you are looking at that, hey,
14 in retrospect, he may be dead on, but at the
15 time, I would have, A, been very, very busy
16 and not sleeping and I was probably on the
17 phone with either the committee or trying to
18 reach the Lehman folks, Mark Shapiro, et
19 cetera.  So this is not something that would
20 be like a hold-your-horses, material moment.
21      Q.   You referred to a balanced exchange of
22 assets and liabilities.  Does that mean the
23 assets would equal the liabilities?
24      A.   Other than Michael telling me I made 2
25 billion dollars at the end, and I have asked

## Page 276

BURIAN

1
2  twice for that exhibit which I know you have, I
3  think Exhibit 19 from the Weil meeting, what was
4  described to us was we are selling the franchise
5  cheaply for 250 million and we all recognize
6  that was -- people thought that was a great deal
7  for the franchise and we are selling the
8  buildings for fair value.
9          But when it came to the securities
10 being transferred, the tradeable book, that
11 that was a 100 percent balanced transaction
12 against the liabilities against the book,
13 plus the assumptions of cure, severance,
14 and -- cure, severance and accrued
15 compensation.  There is no question that's
16 the way it was described.  And that's what
17 Michael was addressing at that meeting when
18 he went back to it that night.
19      Q.   So you made a comment that Michael is
20 telling me I made 2 billion dollars.  What does
21 that mean?
22      A.   What it means is when --
23      Q.   Who is the "I" in Michael telling me I
24 made 2 billion dollars, who is the I?
25      A.   Being facetious, I am, the creditors

## Page 277

BURIAN

1
2  of Lehman.  I am the embodiment of the creditors
3  of Lehman.
4      Q.   Oh, in other words, he is saying the
5  creditors made 2 billion.
6      A.   The estate, we are up, we did well.
7      Q.   Now, going back to the assets, the
8  purchased assets --
9      A.   You asked me a question about what I
10 think he meant when he said that I made 2
11 billion dollars which is what I reached for this
12 to explain.
13      Q.   I think you answered it.  My question
14 was who was the "I" he was referring to.?
15          MS. TAGGART:  Hold on, let me see.
16      A.   Can you read that back, I don't know
17 if I answered that.
18          MS. TAGGART:  OK, there is a pending
19 question.  "So you made a comment that
20 Michael telling me I made 2 billion dollars,
21 what does that mean?"
22          Do you want to -- is there any more
23 that you would like to answer on that
24 question?
25      A.   I don't think I was finished.  You

Page 278

```
                    BURIAN
 1
 2     interrupted when you said who is the I.  I think
 3     I could be wrong.
 4          But that the 2 billion I made was I
 5     was told golly, gee whiz, they are getting 44
 6     to 45 in securities plus the 1.9 for a total
 7     of approximately 46 to 47.  He rounded it up
 8     to 47, but they are taking 49.75 billion of
 9     liabilities and it is no longer in balance.
10     I made 2 billion bucks over the weekend.  And
11     that is all there is.  That's what the value
12     is and Barclays is going -- not do me a
13     favor, but Barclays is going to close and
14     this is what the deal now is.  So that's what
15     the conversation about the I as in the
16     creditors made money.
17        Q.   In other words, assuming those
18     estimated figures were accurate?
19        A.   No.
20          MS. TAGGART:  Object to form,
21     misstates the testimony.
22        A.   No, being told these are the figures
23     upon which the closing is going to proceed and
24     all that's left going on is lawyers documenting
25     being told this is the deal.
```

Page 279

```
                    BURIAN
 1
 2        Q.   Sir, you did not understand that the
 3     figures were estimates?
 4          MS. TAGGART:  Objection to form and
 5     argumentative.
 6        A.   You did not say that before.  Yes, I
 7     knew it was 44 to 45.  So I made approximately 2
 8     billion over the weekend.
 9        Q.   Did you --
10        A.   But the corpus of securities were now
11     nailed down and their value was 44 to 45
12     billion.
13        Q.   Did you understand that both on the
14     asset side and the liability side, the figures
15     Mr. Klein and others discussed with you were
16     estimates?
17        A.   Let's take that compound question.  On
18     the liability side, no.  I thought that 45
19     was -- 45.5 was as consistent as a number gets
20     throughout this whole thing.  And therefore,
21     that was the balance of a loan.  That did not
22     appear to be an estimate, other than, other than
23     as a rounding, right, because I doubt it was
24     exactly 45.5 with no cents.  But it was not a
25     number that was moving or subject to change.  It
```

Page 280

```
                    BURIAN
 1
 2     was a rounding of a number.
 3          The 4.25 was always consistent of what
 4     the -- I was told the cure -- not the cure.
 5     The severance and the accrued comp came off
 6     Lehman's books and records as what they
 7     accrued on their balance sheet.  So that was
 8     the Lehman number for what was the liability.
 9          I don't know if the camera can see the
10     expression on the face because you are making
11     it hard --
12        Q.   Did you --
13        A.   I don't know if the camera can see,
14     you are making a lot of funny faces and I'm not
15     done answering the question.
16        Q.   When you finish, I am going to follow
17     up with a question because I found your
18     testimony incredible.
19          MS. TAGGART:  No, no, no, you are not
20     testifying about his testimony.
21          Why don't you answer --
22        Q.   Go ahead.
23        A.   That's fine, I am telling you what I
24     thought in the room at the time and why --
25        Q.   What question are you answering?  What
```

Page 281

```
                    BURIAN
 1
 2     is my question?
 3          MS. TAGGART:  Wait, wait, he will just
 4     answer the question that's fending.
 5        Q.   I want to find out, do you know what
 6     my question is?
 7          MS. TAGGART:  You can ask that after
 8     he answers the question.
 9          MR. STERN:  I am entitled to know if
10     the witness is answering my question.
11          MS. TAGGART:  You can read the
12     question back next.
13        Q.   Sir, do you know what question you are
14     answering?
15          MS. TAGGART:  Why don't you read back
16     the last question.
17        Q.   No, no, no.  Mr. Burian, do you know
18     what question you are answering?
19          MS. TAGGART:  Don't answer that.  You
20     don't have to answer that.
21        Q.   What is the question?
22          MS. TAGGART:  If we have a question
23     about --
24        Q.   What is the question you are
25     answering?
```

Page 286

BURIAN

1
2    THE VIDEOGRAPHER:  The time is now
3  4:57 p.m., we are now off the record.
4    (Recess)
5    THE VIDEOGRAPHER:  This is the start
6  of tape number 6.  The time is now 5:10 p.m.
7  we are now back on the record.
8    **Q.   We were on the subject of whether**
9  **there was a balance in the transaction between**
10  **assets and liabilities.  Was it your**
11  **understanding prior to the closing that there**
12  **would be perfect, equivalent, mathematical**
13  **balance between purchased assets and assumed**
14  **liabilities?**
15    A.   I'm struggling with the word "perfect
16  mathematical balance."  And I don't know if
17  there is a special meaning your attaching to
18  that term.  And certainly there was not a
19  balance with respect to the 250 million for the
20  franchise.
21    We believed and we still believe the
22  franchise was worth more than that.  But I
23  did believe that when it came to the
24  securities side and either the set-off or the
25  repo, plus the liabilities assumed in respect

Page 287

BURIAN

1
2  of employees and cures, that the intent of
3  the transaction was that, based on the
4  estimates as of closing, they would be in
5  balance.
6    **Q.   So that view is limited to the**
7  **tradeable financial assets?**
8    MS. TAGGART:  Object to form,
9  mischaracterizes the testimony.
10    A.   Yeah, tradeable -- some of these
11  stocks were ill-liquids, they didn't trade much.
12  But when you talk about the kind of things you
13  find on Exhibits A and B, the securities, the --
14  they were supposed to -- I will get yelled at
15  for not answering the question, so I am trying
16  to be very, very careful to answer exactly the
17  question.
18    So my understanding was that the other
19  parts of the transaction were what they were,
20  but vis-a-vis the Fed and then Barclays
21  liabilities plus those assumed liabilities I
22  referred to, they were supposed to match the
23  assets, and net, net, net, what this
24  transaction was about, was getting rid of the
25  book, which is supposed to be a benefit to

Page 288

BURIAN

1
2  us, and selling the real estate.
3    You could argue whether that was pure
4  balance on the real estate, the appraisals
5  were what they were, and I'm not challenging
6  those appraisals, and then 250 for the
7  franchise which that franchise could be worth
8  more or less.  So there was no balance there.
9    **Q.   OK. And you understood that there**
10  **were a number of additional purchased assets in**
11  **addition to the securities, correct?**
12    MS. SCHAFFER:  Objection.
13    A.   There was a real estate, yes, there
14  was the real estate and assets associated with
15  the business, the franchise.
16    **Q.   And the list of purchased assets that**
17  **we went through earlier today?**
18    MS. TAGGART:  Object to form.
19    A.   I don't know if you are saying that as
20  in addition to what I said or as further
21  clarification to what I said because most of the
22  list of assets and purchased assets relate to
23  lawyers being careful in my understanding to
24  define what is the franchise being transferred
25  for 250 million dollars.

Page 289

BURIAN

1
2    **Q.   You did not have a definite valuation**
3  **for all purchased assets in the aggregate as of**
4  **the closing, is that right?**
5    A.   Yes.
6    **Q.   You did not have a definite valuation**
7  **of all the assumed liabilities in the aggregate**
8  **as of the closing, is that correct?**
9    A.   Define valuation.  We had -- we,
10  again, 45.5 doesn't require a valuation.  It is
11  a number I'm told.  There is a loan.  The
12  balance is rounded to approximately 45.5, that's
13  a number.  It is not a valuation.
14    So I had that and I had on the other
15  liabilities, I had a description of how they
16  were derived.  One wouldn't value those
17  liabilities.  One would describe them and would
18  perhaps, using your words from before, provide
19  the estimate of them.
20    **Q.   So you did not have a definite**
21  **valuation of all the assumed liabilities in the**
22  **aggregate as of the closing?**
23    MS. TAGGART:  Object to form, asked
24  and answered.
25    **Q.   Am I right about that?**

Page 290

BURIAN

1
2    A.   I did not know at the closing which
3 contracts you were going to take.  I did not
4 know at the closing the precise exact number of
5 what the severance and accrued comp was for
6 employees.  I didn't know if an employee might
7 have died between Saturday and Monday.  I just
8 didn't know that.
9    Q.   In other words, there were conditions
10 that might bear on the amounts ultimately paid
11 for comp and severance?
12    A.   On the comp and severance side, sure.
13    Q.   If you look at your copy of the APA
14 which is in front of you tab A of Exhibit 92.
15    A.   Exhibit 92.
16    Q.   This is the exhibit you have in front
17 of you, I am sorry, Exhibit 26.  Exhibit 26.
18 Looking at Exhibit 26, tab A, page 11, do you
19 see there under Section 2.3, there is a list of
20 assumed liabilities.
21    A.   There are.
22    Q.   Did you have a valuation for the
23 assumed liabilities listed under categories A,
24 B, D, E, and F?
25    A.   You said A, I was reading A, what --

Page 291

BURIAN

1
2    Q.   B, D, E, and F.  My question is
3 whether you had a valuation or an estimated
4 valuation for those categories as of the
5 closing?
6    A.   No.
7    Q.   And looking at the next page, looking
8 at categories G and H, did you have a valuation
9 or an estimated valuation for those categories
10 of assumed liabilities?
11    A.   Not a specific valuation, no.
12        MR. STERN:  Let's mark as the next
13 exhibit e-mail dated September 19, 2008.
14        (Exhibit 475-B, e-mail dated September
15     19, 2008 marked for identification, as of
16     this date.)
17    Q.   I have put in front of you Exhibit
18 475-B.  I will ask you to look at it and tell me
19 if you recognize it?
20    A.   I do not.  I recognize it is an e-mail
21 from Barry Ridings to Mark Shapiro.
22    Q.   That's the e-mail at the top and then
23 below that, there is an e-mail from Eric Siegert
24 to Barry Ridings copying you.  Do you see that?
25    A.   Yup.

Page 292

BURIAN

1
2    Q.   Mr. Siegert writes, and this is as of
3 September 19, I believe it is listed as
4 Minneapolis, so I believe in New York, it's
5 about 10:11 a.m.  Mr. Siegert writes, how did
6 the Fed actions --
7    A.   Minneapolis is one-hour difference?
8    Q.   Is it one or two?
9    A.   I think it is one, right?
10    Q.   In any event, it is 8:11 a.m. in
11 Minneapolis.  And Mr. Siegert writes, "How did
12 the Fed actions potentially impact the value of
13 the book.  Will Barclays maybe get a windfall
14 selling our marked down book at some stupid
15 price to the Feds.  We can't let that happen."
16        Do you recall seeing that message from
17 Mr. Siegert to Mr. Ridings?
18    A.   I remember talking about this issue.
19 I don't remember this particular e-mail.
20    Q.   What was the issue that this e-mail
21 addresses?
22    A.   I mean, shortly after the Fed let --
23 after the government let Lehman fail, they
24 announced a rescue package of some sort that
25 allowed a modification to the program under

Page 293

BURIAN

1
2 which real estate and other types of securities
3 could be borrowed against to preserve liquidity
4 in the system and the question was whether or
5 not there was -- whether or not that change in
6 the Fed -- the first step was whether or not we
7 were eligible for the Fed program because did
8 we -- could we get liquidity and preserve the
9 value of the assets that way.
10        And secondly, whether there was a
11 quick flip going on where we were going to
12 give assets based on Lehman's marks of value,
13 but then the government program would ascribe
14 higher values for the purposes of collateral
15 to those same exact securities.
16    Q.   And when Mr. Siegert referred to our
17 marked down book, what do you understand he was
18 referring to?
19        MS. TAGGART:  Objection, foundation.
20    A.   He was -- I believe he was referring
21 to "our" as in Lehman, we take our -- we take
22 things personally, and we were told that values
23 had been dropping over the four to nine weeks
24 prior to the sales transaction, and therefore,
25 the assumption was that fair market value was

Page 298

**BURIAN**

1
2  he says, "Interesting to understand what a
3  bargain Barclays thinks it has."
4        And my question is, at any time before
5  the sale approval hearing or after the sale
6  approval hearing, did the committee believe
7  that the acquisition gain that Barclays
8  anticipated was a basis to object to the
9  transaction?
10       MS. TAGGART:  I am going to object to
11  form and also for calling for privileged
12  communications and instruct not to answer.
13       Q.   Did the committee ever have a view --
14  withdrawn.
15       Did you ever have an opinion one way
16  or the other concerning whether the
17  anticipated gain that Barclays announced on
18  September 17, 2008, was a basis for the
19  committee to object to the sale?
20       A.   I got the transcript as you saw on
21  Sunday.  After the transaction was approved.
22  And we were in effectuation mode, not objection
23  mode.  The judge had signed an order.
24       So the context of your question about
25  objecting isn't really relevant.  The idea

Page 299

**BURIAN**

1
2  that Barclays had said that they are going to
3  book a profit on the transaction was
4  extremely troubling and it was together with
5  the other stuff we talked about, Fazio and
6  Geer's review of those schedules that
7  prompted me to demand that we get a full
8  understanding and update as to what, exactly
9  what was being transferred and at what values
10  to whom.  And that's why I was so aggressive
11  in demanding that we have that meeting.
12       Q.   OK.  Houlihan was aware, as of
13  September 17, was it not, that Barclays had
14  announced on September 17 that it anticipated
15  booking a profit on the transaction?
16       A.   I told you earlier I'm not sure if I
17  knew about it or we knew about on the 17th or
18  18th because we got retained the night of the
19  17th and we were not -- I was not at my own
20  office.  We were awaiting our turn to interview
21  until very late.  So as you said earlier, I
22  don't know if I knew about that, 17th or the
23  18th.
24       Q.   But you may have?
25       A.   Yes, when I -- I'm not sure if I knew

Page 300

**BURIAN**

1
2  it, then I guess I may have.
3       Q.   Earlier in the deposition, we looked
4  at a Houlihan e-mail as of the 17th that
5  referred to it, correct?
6       MS. TAGGART:  Object to form and asked
7  and answered.
8       A.   I don't remember that, particularly
9  telling you on the 17th.  I can't tell you now
10  whether I knew that fact on the 17th or the
11  18th.
12       Q.   But you may have?
13       A.   I may have.
14       MS. TAGGART:  Object to form.
15       Q.   At that time, at that time, did you
16  consider that to be a basis for objecting to the
17  sale?
18       MS. TAGGART:  Object to form.
19       A.   A single isolated fact out of context
20  is not or is a basis for objection?  You object
21  to a transaction based on the totality of the
22  transaction and whether it is fair.  The right
23  response to that was to investigate, to ask
24  questions, to find out.  It was a basis for
25  asking follow-up questions to understand what

Page 301

**BURIAN**

1
2  was going on.
3       I did not spend a lot of time thinking
4  about the accounting treatment by Barclays.
5  The fact that they booked was less relevant
6  than understanding what we were giving and
7  what we were getting.  And I was positive
8  that, for instance, they were getting a great
9  deal on the franchise.  I didn't dive into at
10  the time what made up the negative 2 billion
11  of good will, how it was calculated, or what
12  that number meant other than to do the
13  investigations and ask the questions that we
14  talked about earlier.
15       Q.   And in itself, in isolation, that
16  fact, in your view, was not a basis to object?
17       MS. TAGGART:  Objection, asked and
18  answered, objection to form.
19       A.   Again, if someone said to me what
20  those words mean is, and not understanding what
21  you are hearing from everyone else in the
22  transaction, Barclays is taking the book for 2
23  billion less than what it's worth, it certainly
24  would have been a basis for objection and would
25  have been a very, very serious conversation.

Page 302

BURIAN

1
2    But telling me that some foreign
3    company through accounting rules that I was not
4    familiar with was taking a position on the
5    assets that they were getting for accounting
6    treatment when the transaction was complex,
7    multifaceted and involved assets that I did
8    know, I did believe they were getting on the
9    cheap, e.g., the global franchise, the Lehman
10    name and the rights thereto, wasn't a huge --
11    was it was important enough to follow up and
12    ask, but not enough to run into court with my
13    hair on fire.
14        Q.    You say it was important enough to
15    ask.  Did you ask anybody from Barclays before
16    the sale approval hearing on what basis Barclays
17    anticipated such a gain?
18        A.    We were not given that opportunity.
19        Q.    Did you attempt to ask that question?
20        A.    We were going to play linguistics
21    about what does it mean to attempt.  But when
22    you are on the phone with somebody who says I
23    only have a couple of seconds, here is the
24    story, no, no, no scratch that, click, I am
25    going to call you back, call you back, here is

Page 303

BURIAN

2    the final numbers, it is bedlam here, I am
3    really busy, you don't spend a lot of time
4    asking them about what -- their adversary is --
5    their accounting treatment.
6        You are saying, hey, Mark, hey Jim,
7    what is the deal, what are you giving and
8    what are you getting.  And I walked you
9    through the time frame there.  So to say that
10    I didn't attempt is not fair, but to say in a
11    short window we had of communication, it
12    didn't come up, that is fair.
13        Q.    I am not asking you to make a judgment
14    what's fair and not fair.  I am asking you did
15    you attempt to ask Barclays on what basis it
16    anticipated recording a gain on the transaction?
17        A.    Before the sale hearing?
18        Q.    Yes.?
19        MS. TAGGART:  Object to form, asked
20    and answered.
21        A.    I amend my answer.  Sorry, I confused
22    the Lehman employees with Barclays.
23        I never had a conversation with
24    Barclays about any topic prior to the sale
25    hearing.  So there was no discussion with

Page 304

BURIAN

2    them about any of these topics.
3        Q.    Did you request any conversations --
4    withdrawn.
5        Did you request an opportunity to
6    speak with anybody at Barclays about its
7    anticipated gain?
8        A.    No.
9        MR. STERN:  Let's mark this as the
10    next exhibit.  This will be 479-B.
11        (Exhibit 479-B, document Bates stamped
12    CMTE 882 marked for identification, as of
13    this date.)
14        Q.    Is this a document that you recognize
15    or had ever seen before?
16        A.    It does not look familiar.
17        Q.    Do you recognize any of the names on
18    this exhibit 479-B?
19        A.    Nope, I do not.
20        MR. STERN:  This will be the next
21    Exhibit 480.
22        (Exhibit 480-B, document Bates stamped
23    HLHZ 9119 through 9120 marked for
24    identification, as of this date.)
25        MS. TAGGART:

Page 305

BURIAN

2        THE WITNESS:  Do this mean it came
3    from us, CMTE.
4        MS. TAGGART:  The committee.
5        THE WITNESS:  It came from us?
6        MS. TAGGART:  The committee members,
7    instead of Houlihan.
8        THE WITNESS:  Oh, so it could be
9    internal by the committee members.
10        MS. TAGGART:  Right.
11        Q.    So looking at Exhibit 480-B, is this a
12    series of e-mails that you recognize?
13        A.    I mean, it is redacted.  So I do
14    remember reading the last -- second to last
15    e-mail, the response by Harvey to Luc.
16        Q.    Let's go to the part that's not
17    redacted, starting with the bottom e-mail from
18    Luc Despins, 9/22/2008, 7:15 a.m. AST, to Harvey
19    Miller.  "One, did it close; two, what happened
20    to regulated capital."  And what I wanted to ask
21    is on the second question, what did you
22    understand that to relate to?
23        A.    The controversy or discussions
24    relating to the 15c3 accounts.
25        Q.    What did you know about those

BURIAN

1
2    Q.   In that discussion or huddle, do you
3 remember what the lawyers from Weil said?
4    A.   Not with specificity.  I remember, it
5 was for the most part, consistent with what I
6 was told right before the hearing.  You know, I
7 think there was confusion about how we are going
8 to handle DTC, which then played out in the
9 hearing when Sheldon Hirschhorn stood up and
10 going back and forth.  I think there was some
11 confusion about which RESIs were in and out.  I
12 think Lori was trying to explain to Luc some of
13 what had already been explained to me since I
14 got down to the hearing, I didn't have a chance
15 to talk to Luc beforehand.
16    Q.   Did you or anybody else from Houlihan
17 take notes of that discussion?
18    A.   To my knowledge, no.  Just a
19 conversation.
20    Q.   Any other recollection of what was
21 said in that huddle?
22    A.   You know, it is not really relevant.
23 I mean, wow, look at this crowd, I can't believe
24 we are all at full capacity.
25    Q.   General commentary?

BURIAN

1
2    A.   When was the last time the bankruptcy
3 court had the media staked out outside.
4    Q.   In that huddle, did Mr. Miller, Harvey
5 Miller speak?
6    A.   I don't remember whether it was Lori
7 or Harvey that went through what the changes
8 were.  I'm sure if we were talking about -- it
9 was commentary about, wow, this is really,
10 really short and it may go all night and kind of
11 deal with all the objections and what are you
12 going to do about people showing up who don't
13 know where their assets are and cures and the
14 attitude was it will be what it will be and we
15 will muddle through.
16    Q.   At the courthouse, did anyone
17 representing the committee complain to Lehman or
18 Barclays about the inclusion in the sale of
19 clearance box assets?
20    MS. TAGGART:  Objection, foundation.
21    Q.   The so-called 1.9 bucket?
22    A.   I understood that this was necessary
23 to balance the transaction because of a
24 combination of a loss of value in the portfolio
25 and/or the fact that securities that were

BURIAN

1
2 supposed to be in that bucket weren't there and
3 the reason I am giving an explanation was is
4 that "complain," we said we would like to
5 understand that, is that true.  But it wasn't
6 like how dare you add those securities to the
7 package.  It wasn't don't do it.  It was why are
8 they necessary and let's make sure we understand
9 this later.
10    MR. STERN:  Can you reread my question
11 please.
12    (Record read).
13    MS. TAGGART:  Same objection.
14    A.   Is there a question?
15    Q.   Yes, that question.
16    A.   As I just said, don't think I would
17 characterize it -- I don't know if you would
18 characterize it as a complaint or not, but it
19 was what -- explain to us how this is and why it
20 is necessary.
21    Q.   And your previous answer referred to
22 what you understood as of the hearing?
23    A.   My previous answer?
24    MS. TAGGART:  Object to form.
25    MR. STERN:  Withdrawn.  Withdrawn.

BURIAN

1
2 Let's go off the record for a second.
3    THE VIDEOGRAPHER:  The time is 6:02
4 p.m., we are going off the record.
5    (Recess)
6    THE VIDEOGRAPHER:  The time is 6:04
7 p.m., we are now back on the record.
8    A.   Are you going to reask me the question
9 you asked off record?
10    Q.   Let me think about it.?
11    MS. TAGGART:  Off the record, there
12 was some discussion about a prior question,
13 answer.
14    I guess, all my question to you, and
15 Jack can ask his own, is there anything that
16 you want to clarify based on some of the
17 off-the-record conversation?
18    A.   Yeah, I, sitting here, I don't
19 remember whether or not I am combining pre and
20 post hearing information and the explanation for
21 1.9 billion box assets and honestly it has been
22 a long day, I don't remember if I knew it at the
23 hearing or I found out Saturday night or Sunday
24 following the hearing.  I just don't recollect
25 right now.

BURIAN

1
2    THE VIDEOGRAPHER:  Counsel, can I have
3  one second.  When you said off the record, I
4  thought you were going off the record.
5    Can you please reiterate for the
6  record what you said I had taken under the
7  sound out.
8    MS. TAGGART:  Before the witness
9  answered, I had said that while we were off
10  the record previously, there had been some
11  discussion about an earlier question and
12  answer that the witness had had and I asked
13  the witness if he wanted to clarify anything
14  on the record now.
15    THE WITNESS:  Did you get my answer on
16  the sound.
17    MS. TAGGART:  I believe I did.  Yes.
18  Thank you.
19    A.    That related to whatever my counsel
20  just said.
21    Q.    Let's go back to the sale approval
22  hearing.  At any point before that hearing or
23  during the recess at that hearing, did anyone
24  acting on behalf of creditors committee express
25  concern to Lehman or Barclays about the prospect

BURIAN

1
2  of including clearance box assets, the so-called
3  1.9 bucket among the purchased assets, if you
4  remember?
5    MS. TAGGART:  Objection, foundation.
6    A.    I don't specifically remember a
7  conversation about the clearance box assets, but
8  it was a consistent theme of what assets were
9  being added, whether assets were being added and
10  whether -- and why.  So it wouldn't surprise me
11  or not surprise me.  I don't specifically
12  recollect it being narrow to clearance box
13  assets.
14    Q.    Now, the next day after you returned
15  from the Sabbath and went to Weil, what was the
16  first thing you did?
17    A.    I don't remember the first thing I
18  did.
19    Q.    Do you remember generally what your
20  activities were?
21    A.    Yeah, I found Mike Fazio and anybody
22  else that was there, that was my people.  I got
23  an update on what occurred and where things
24  stood.
25    Q.    Which of your people were there?

BURIAN

1
2    A.    I know for sure Mike Fazio was there.
3  I don't remember whether Ann Miller and/or Tanja
4  Aalto was there, A-A-L-T-O, and there probably
5  was, there may have been probably was associate
6  or analyst.  But I don't have a firm
7  recollection.
8    Q.    And while you were at Weil that
9  Saturday evening, did you review any drafts of
10  the clarification letter?
11    A.    I don't remember whether I got drafts
12  of the clarification letter Saturday night into
13  Sunday morning or after I went home to change
14  and came back, whether I got it sometime on
15  Sunday.  I don't have a specific recollection of
16  that timing.
17    Q.    Now, over what weekend, did you
18  participate in any meetings with the creditors
19  committee or any conversations with the
20  creditors committee?
21    A.    I did.
22    Q.    Did you report to the creditors
23  committee concerning the status of the
24  transaction?
25    MS. TAGGART:  Just respond yes or no

BURIAN

1
2  to that.
3    A.    I reported to the creditors committee
4  my understanding of the status of the
5  transaction.
6    Q.    And what did you tell the creditors
7  committee?
8    MS. TAGGART:  I am going to object on
9  privilege and instruct not to answer.
10    Q.    What was the purpose of the your
11  report to the committee concerning the status of
12  the transaction?
13    MS. TAGGART:  OK, you can answer that.
14  Don't reveal any of the substance of the
15  communication and I object to form, but if
16  you understand it, you can go ahead and
17  answer it.
18    A.    We were to keep the committee up to
19  date on what we knew about a very important
20  transaction of an estate that they were
21  fiduciaries of.
22    Q.    Were you providing any legal advice to
23  the committee?
24    A.    Me personally?  Houlihan, me --
25    Q.    Houlihan?

Page 322

**BURIAN**

1
2    A.   No, we don't provide legal advice to
3    clients.
4        **Q.    What did you tell the committee about**
5    **the status of the transaction?**
6        MS. TAGGART:  I am going to object and
7        instruct not to answer on privilege.
8        **Q.    Were there certain decisions that the**
9    **committee needed to make based on the**
10   **information you were providing?**
11       MS. TAGGART:  Hold on.  Object to form
12       and foundation, but if you know, you can
13       answer.
14       A.   Can you read me back the question.
15           (Record read)
16       A.   It turned out to be no.
17       **Q.    If the committee did not have any**
18   **decisions to make, then what was the purpose of**
19   **reporting information to them?**
20       MS. TAGGART:  Objection to form.
21       A.   I could tell you have never
22   represented a creditors committee before.
23       **Q.    Actually, I have.**
24       A.   Oh, well, it's -- the creditors
25   committee wanted to be up to speed and informed

Page 323

**BURIAN**

1
2    about what was going on; was the Barclays
3    transaction going to close or not going to
4    close.  Was there -- they had heard about JP
5    Morgan issues, what were they, they wanted to be
6    informed.  They wanted to exercise their
7    reasonable diligence to know what was going on.
8        **Q.    Well, did the committee consider**
9    **whether there might be an opportunity post**
10   **closing to challenge the transaction?**
11       MS. TAGGART:  I am going to object
12       to --
13       **Q.    Or a reason to challenge the**
14   **transaction?**
15       MS. TAGGART:  I will object on form
16       and privilege and instruct not to answer.
17       **Q.    Over the weekend leading to the**
18   **closing, did the committee consider whether it**
19   **should challenge the transaction or bring to the**
20   **court's attention any aspects of the**
21   **transaction?**
22       MS. TAGGART:  Objection, form,
23       foundation and privilege, and I'll instruct
24       not to answer.
25       **Q.    Did you have any discussions with**

Page 324

**BURIAN**

1
2    **anybody at Weil either before the closing or**
3    **after the closing, concerning whether it might**
4    **be necessary to return and appear before Judge**
5    **Peck to provide a further description of the**
6    **transaction?**
7        MS. SCHAFFER:  Objection to form.
8        MS. TAGGART:  I am just going to --
9        what time period are you asking?
10       **Q.    Let's say over the weekend leading to**
11   **the closing or in the few days following the**
12   **closing.?**
13       MS. TAGGART:  You can answer.
14       A.   Yes.
15       **Q.    And with whom did you have any such**
16   **discussion?**
17       A.   Mainly with Mr. Miller in connection
18   with my asking him if he was comfortable that he
19   could close this transaction without going back
20   to court and without committee consent.
21       **Q.    When did that discussion take place?**
22       A.   That conversation took place before we
23   left, obviously.  It took place in connection
24   with my objection to the transfer of 15c3 cash,
25   when I said something to the effect of how do

Page 325

**BURIAN**

1
2    you transfer cash when a document is clear on
3    its face that the cash is not part of that
4    transaction.  And then it came up in connection
5    with our leaving when I asked whether or not we
6    needed to consent to this or not.
7        **Q.    So am I right that you had a number of**
8    **conversations with Mr. Miller on this subject?**
9        MS. SCHAFFER:  Objection to form.
10       A.   The first one I tried to give you a
11   context because it wasn't about this subject.
12   It was about whether or not the estate should
13   agree to give all that cash to Barclays.  It
14   wasn't like the conversation wasn't about going
15   back to Judge Peck.  The conversation was about,
16   I don't know, I wouldn't be giving away that
17   cash, and as you can see from the result,
18   someone ultimately agreed with me that giving
19   that cash was not the right answer.
20           The second conversation, I do agree
21   with your characterization which is it was
22   about, do you need me, and do you need, you
23   know -- are you going to close and how are you
24   going to close.
25           Now that I think about it, there may

Page 326

BURIAN

1
2  have been a very short other conversation
3  somewhere in the 11 to 12 o'clock range when we
4  told the debtor that our committee was going to
5  bed and that we were concerned that we were
6  going to not be able to muster a quorum, and
7  again, we are not involved in all these
8  conversations, the clarification letter.
9        I think I may have said this earlier,
10 if I didn't, I will say it again, we were not
11 permitted to audit, to sit in the meeting
12 where the clarification letter was discussed
13 and negotiated and you guys are
14 going in there, we are just telling you if
15 modifications come out of that meeting where
16 you need our consent, we are losing the
17 committee and we are concerned about a
18 quorum.
19       So maybe that was more of an
20 announcement and not a conversation.  But it
21 was, I want to be complete in those
22 conversations -- in those interactions.
23    Q.   What did Mr. Miller say to you
24 concerning whether he was comfortable closing
25 the transaction without going back to court?

---

Page 327

BURIAN

1
2    A.   I think his quote was I don't need
3  you.  I wasn't sure at the time --whether he
4  meant generally I was worthless or about this
5  transaction.  But following up, he made it clear
6  that I was welcome to stay or go, I was welcome
7  to have quorum of the committee or not, but it
8  was irrelevant and unnecessary.
9    Q.   I want to distinguish between two
10 things which I think you said you discussed with
11 Mr. Miller, with Harvey Miller.
12       One was whether he was comfortable
13 closing the transaction without going back to
14 court.  Second was whether he was comfortable
15 closing the transaction without creditors
16 committee consent.
17       Let me focus on the first.  What
18 did Harvey Miller say to you about whether he
19 was comfortable closing the transaction
20 without going back to court?
21    A.   I apologize.  When I said he was
22 comfortable closing without me, I thought it was
23 obvious that of course that meant he didn't need
24 to go to court.
25       He did not -- I don't remember the

---

Page 328

BURIAN

1
2  exact words, but he told me that this
3  transaction was closing tonight, there was --
4  they were not going back to court.
5    Q.   Did he say anything to explain to you
6  why he was comfortable closing the transaction
7  without going back to court?
8    A.   It was not a debate.  It was not a
9  let's go through the following issues and
10 analyze each one.  It was his conclusion that
11 this transaction was closing and I didn't say do
12 you need to go to court.  I said do you need my
13 consent, my committee consent which was a lower
14 standard than going back to court, and when he
15 said to me no, you can do what you want, we
16 don't need you, to me, that was obvious that he
17 was not going back to court.
18    Q.   Did Mr. Miller explain to you why in
19 his view committee consent was not necessary to
20 close the transaction?
21       MS. SCHAFFER:  Objection to form.
22    A.   We did not have a long discussion.
23 The implication was clear that this was -- he
24 did not explain it to me.  I had my impressions,
25 but he did not verbalize in that conversation a

---

Page 329

BURIAN

1
2  detailed explanation as to why he was
3  comfortable.
4    Q.   What were your impressions?
5       MS. TAGGART:  Objection to form, asked
6  and answered.
7    A.   Well, throughout the conversation
8  really it was the follow-up, the repercussions
9  of the main meeting with Michael Klein that all
10 this stuff was plumbing, that when it came to
11 what was in or out of the business, e.g., what
12 was, you know, a contract or not a contract or
13 was -- you know, the details with respect to
14 particular assets that were necessary for
15 operating the business, those were details that
16 were consistent with the court order, they were
17 transferring the operating business and lawyers
18 will be lawyers they will fight about it.  But
19 these were not big deals vis-a-vis the real
20 estate, they had compromised it and that was
21 done and consistent with more or less what Lori
22 said.  And the big issue was on the securities
23 where we were both comfortable that if anything
24 net, net, net, this was better, not worse, than
25 what was described to the court.

Page 330

BURIAN

1
2    So the conversation with Harvey was --
3    the foundation of the conversation with
4    Harvey about do you need me, e.g., do you
5    need this committee to consent to anything
6    was premised on or following the explanation
7    we both received as to what the transaction
8    was.
9    Q.   Now, what you just testified to, are
10   those statements that Mr. Miller made to you or
11   are those are inferences that you are drawing?
12       MS. TAGGART:  Object to form.
13   A.   I was clear in explaining to you the
14   context of his statements and then you followed
15   up and asked me what were my impressions and I
16   explained to you why I believe Harvey was
17   comfortable at the time or my understanding of
18   why Harvey was comfortable at the time because
19   of the background of our interaction just a
20   short period before the conversation.
21   Q.   So those were your impressions, not
22   precisely what he said?
23   A.   As I said to you before, it was not a
24   debate or an explanation.  Harvey told me his
25   conclusion in -- as a summation of our

Page 331

BURIAN

1
2    conversations.
3    Q.   What did he say specifically on that?
4        MS. TAGGART:  Objection form, asked
5    and answered.
6    A.   Define "what."  You said, What did he
7    say about that?  Define "that."
8    Q.   What, if anything, did he say
9    specifically concerning whether in his view it
10   was necessary to have committee consent in order
11   to close the transaction?
12       MS. TAGGART:  Objection, asked and
13   answered.
14   A.   The best I can do for -- as close as I
15   can get to for a quote was I don't need you.  I
16   don't care if you stay or go.
17       MR. STERN:  Go off the record.
18       THE VIDEOGRAPHER:  The time is 6:25
19   p.m., we are now off the record.
20       (Recess)
21       THE VIDEOGRAPHER:  The time is 6:25
22   p.m., we are now back on the record.
23   Q.   We have been talking about
24   conversations that you had at Weil Gotshal on
25   the 21st going into the 22nd of September, 2008.

Page 332

BURIAN

1
2    Based on everything you learned about
3    the transaction over that weekend before the
4    closing, based on what you were told about
5    the transaction, based on what you read in
6    the agreements that you were given, at any
7    time after the closing, let's say between
8    September 22 and September 30, did you have a
9    discussion with anyone concerning whether it
10   would be prudent or necessary to return to
11   Judge Peck concerning the transaction?
12       MS. TAGGART:  I am going to object on
13   privilege to the extent that's a discussion
14   with the committee, but if you spoke to
15   anyone outside of Houlihan and the committee
16   on that topic, you should go ahead and
17   answer.
18   A.   I don't recollect conversations with
19   third parties about going back to Peck other
20   than as someone else might have thought it was
21   an implied threat when they said things like we
22   want to understand it better, we made a list of
23   the assets we, want to understand the marks, we
24   want to know why the premark was 50 and post
25   mark was 44, 45.  So when you're pushing for

Page 333

BURIAN

1
2    that information, but I don't believe I ever
3    said the words "or else" or said, you know, we
4    are going to Judge Peck or something like that.
5    Q.   After the closing, did you ever have
6    any discussion with anybody at Weil or do you
7    know whether Milbank had any discussion with
8    anybody at Weil concerning whether it would be
9    necessary or appropriate or warranted to return
10   to Judge Peck concerning the transaction?
11   A.   Yes.
12   Q.   What were those discussions?
13       MS. TAGGART:  I am going to just
14   caution you not to reveal any
15   attorney/client privilege.  You can answer
16   if you communicated with someone other than
17   Milbank and the committee and Houlihan and
18   also why don't we take it through April of
19   this year.
20   A.   Well, --
21   Q.   Let me rephrase the question.  Between
22   the time of the closing and November 11, 2008,
23   did anyone from Houlihan or Milbank have any
24   discussion with anybody from Weil concerning
25   whether it would be necessary or warranted to



Page 334

BURIAN

2  return to Judge Peck concerning the transaction
3  or whether it would be appropriate to appeal his
4  sale order?
5       MS. TAGGART:  Objection, foundation as
6  to Milbank.
7       You can go ahead and answer.
8       A.   I don't know about Milbank.  And I
9  don't remember any nonprivileged conversation
10 with a third party regarding appeal of the sale
11 order.
12      What I -- I said yes before, but I
13 think we are miscommunicating about my yes.
14      Q.   Well, do you recall discussions on
15 this subject that occurred between the time of
16 the closing and November 2008?
17      A.   Again, this subject being narrowly to
18 appeal?
19      Q.   To go back to Judge Peck or to appeal.
20      A.   And go back to Judge Peck for what
21 reason?
22      Q.   Well, either to seek reconsideration,
23 to provide him with information.  Or any other
24 reason you may have discussed?
25      MS. TAGGART:  Same limitation.

Page 335

BURIAN

2       A.   I don't remember the specific dates
3  and in that November time period, I was still in
4  my trust-and-verify mode where I guess naively,
5  in retrospect, I assumed the transaction was as
6  described and no assets were taken in excess of
7  the values we were told.
8       So in that time frame, we really, my
9  focus and Houlihan's focus was to get a
10 reconciliation.  I would be surprised but I
11 can't be clear if it is in the November time
12 frame if there wasn't a nonprivileged
13 conversation where it was said in my presence
14 or said to Weil or someone else, if this is
15 not right, we have got to get those assets
16 back and that would presume an action before
17 Peck.  But it was not about appealing the
18 order because it was way after the ten-day
19 period and I can't even tell you for sure
20 that was in the November time frame.
21      MS. TAGGART:  I think that we have
22 gone over time.  I'm willing to make some
23 small accommodation.
24      MR. STERN:  Just a few more questions.
25      Q.   Did the committee ever consider making

Page 336

BURIAN

2  a motion for reconsideration of the sale order?
3       MS. TAGGART:  Objection and instruct
4  not to answer on privilege.
5       Q.   Did the committee ever consider
6  appealing the sale order?
7       MS. TAGGART:  Same objection and
8  instruction.
9       Q.   Did the committee ever consider making
10 a motion for expedited discovery in order to
11 obtain information that the committee believed
12 it was missing?
13      MS. TAGGART:  Same objection and
14 instruction.
15      MR. STERN:  Thank you.  No further
16 questions.
17      MS. SCHAFFER:  I don't have any
18      (Continued on next page for jurat)
19
20
21
22
23
24
25

Page 337

BURIAN

2  questions.
3       MS. TAGGART:  That concludes the video
4  record for today.  The time is now 6:32
5  p.m., we are off the record.
6
7
8       _____
9       SAUL BURIAN
9  Subscribed and sworn to
10 before me this    day
11 of December, 2009.
12
13 _____
14
15
16
17
18
19
20
21
22
23
24
25

Page 1

1

2                UNITED STATES BANKRUPTCY COURT

3                SOUTHERN DISTRICT OF NEW YORK

4       ------------------------x

5       In Re:

6                                    Chapter 11

7       LEHMAN BROTHERS          Case No. 08-13555(JMP)

8       HOLDINGS, INC., et al,    (Jointly Administered)

9                    Debtors.

10      ------------------------x

11

12              DEPOSITION OF SAUL BURIAN

13                  New York, New York

14                  April 29, 2010

15

16      Reported by:

17      MARY F. BOWMAN, RPR, CRR

18      JOB NO. 30252

19

20

21

22

23

24

25

Page 10

BURIAN

1 business.
2   Q.   What was the purpose of the call?
3   A.   To provide that update and to make
4 sure the committee was aware of what was
5 happening.
6   Q.   You were providing an update about the
7 negotiations that you were participating in over
8 the weekend with respect to the Barclays sale
9 transaction?
10   A.   Not exactly, no.  The call was
11 scheduled to give an update and perhaps provide
12 an update of negotiations that we may have
13 participated in.  At the time of the committee
14 call, we had not participated in any such
15 negotiations.
16   Q.   So what were you updating the
17 committee about in the call?
18   A.   It was a previously scheduled call.
19 It was a weekend, so we had a time.  What we
20 tried to do was give them an update of what we
21 then knew regarding the transaction.
22   Q.   And at the time of the call, had you
23 been over at Weil while the negotiations were
24 going on or the deal was being finalized?
25

Page 11

BURIAN

1   A.   We were at Weil Gotshal on the 25th
2 floor on and off starting Friday night through
3 the closing -- through Sunday -- Monday early
4 morning.
5   Q.   You write that -- let me just ask you,
6 what do you remember about that call in terms of
7 substance?
8   A.   That call in particular?
9   Q.   Yes.
10   A.   It wasn't very substantive.  I don't
11 remember exactly the call, honestly.  We didn't
12 have a lot of answers to people's questions.  We
13 gave them an update, that we are still waiting
14 for an understanding of the assets that were
15 being transferred.
16   We described to them what appeared to
17 be some confusion as to the JP Morgan issues.  I
18 remember describing that there were very large
19 rooms and a lot of people getting very excited
20 and JP Morgan being leaned on to do certain
21 things that they were refusing to do.
22   I remember mentioning that the DFC was
23 also having clearance and other issues and
24 demanding something from someone, but that, you
25

Page 12

BURIAN

1 know, we did not have details.
2   Q.   Do you remember anything else said in
3 the call?
4   A.   I remember that we discussed concern
5 about how -- which assets were moving, who the
6 assets were owned by, which entity, and what
7 their valuations were.
8   Q.   Anything else that you recall?
9   A.   You can prod my memory, but --
10   MR. TECCE:  I just caution him not to
11 testify to the extent it is attorney/client
12 communications.
13   But otherwise, you can answer.
14   A.   There were so many committee calls
15 during those few days.  There may have been an
16 update with respect to Farr, the Nomura
17 transaction.  I don't remember if it was that
18 transaction or not.
19   At the same time, there was an
20 instability in some of the Asian assets for
21 Lehman which we were trying to focus on.  But
22 again, I'm trying to be fully responsive but
23 also not stretch.  I don't remember exactly.
24   Q.   When you say you remember discussing

Page 13

BURIAN

1 concern about which assets were moving and what
2 their valuations were, can you be more specific
3 in what you're talking about?
4   A.   The committee asked us a very simple
5 question, what assets are going and what are
6 they worth, and unfortunately, we had to tell
7 them we were not sure what assets were moving,
8 nor do we have a reliable update as to what they
9 were worth or how they were booked.
10   We were asked whether they were LBHI
11 assets or LBI assets, how the RESIs were
12 treated, and we expressed concern that we
13 honestly were not sure.  The understanding was
14 that there were -- that we had old information
15 relating to what the assets are and that we were
16 going to get an update as to how they were being
17 treated for the transaction.
18   Q.   In the third sentence of your letter
19 to the committee, you write, "It was critical to
20 get your input."
21   What input was that?
22   A.   Well, there were a variety of things
23 that we got input on.  The problem is -- help me
24 out here -- everything was -- most of the call
25

BURIAN

1
2   was legal issues in the call.
3          MR. TECCE:  You can't answer the
4   question to the extent it reveals
5   attorney/client communication.  If it is a
6   discussion about your analysis of the
7   transaction with the committee, then you can
8   testify to that generally.
9          MR. THOMAS:  I think you would agree
10  if it is not for the purpose of providing
11  legal advice, it is not attorney/client
12  protected.
13         MR. TECCE:  No, but I -- I think -- I
14  don't want to clutter your record, but I
15  think my instruction is pretty clear.
16         If it is an attorney/client
17  communication, you can't get into it.  If it
18  is you advising the committee about your
19  understanding about the economic analysis of
20  the transaction, then you can get into it.
21         I don't know that he can parse through
22  his mind what was done for the purposes of
23  providing legal advice or not.
24      Q.   My question is, what is the critical
25  input that you got from the committee that night

BURIAN

1
2   in the call?
3      A.   The critical input was a recognition
4   in light of the hour that we were uncomfortable
5   making a firm recommendation with respect to the
6   transaction, and that if there were serious
7   issues, that we were not to make commitments on
8   behalf of the committee in light of the fact
9   that they couldn't be fully informed and that --
10  I am going to keep answering unless you object.
11  I don't know where the legal analysis and the
12  practical analysis ends.
13         But the idea that we specifically
14  asked the company prior to the call that this
15  was it, we were not going to -- we were losing
16  the people in Japan.  We were losing our
17  chairman, one of the chairmen to the committee
18  after this call.  Do you need us to consider
19  consenting to something?
20         And we were told no.
21         And we discussed with the committee
22  what to do when they were no longer available,
23  since there was nothing to consent to or to
24  specifically present to the committee, and that
25  was the most important discussion during that

BURIAN

1
2   call.
3      Q.   Did the committee give you authority
4   to consent?
5      A.   No.
6      Q.   What did they say in terms of whether
7   you could consent or not?
8          MR. TECCE:  Again he has to be
9   cautioned if this conversation with the
10  committee took place in the context of
11  discussion with his counsel, he can't speak
12  to it.
13         MR. THOMAS:  It is a direction from
14  the committee on a course of action by
15  Houlihan Lokey.
16         MR. TECCE:  We can go off the record
17  and talk to him about what was said.  But if
18  that direction was given to their counsel,
19  then that's not something that he is free to
20  testify to.
21         MR. THOMAS:  First of all, just
22  because it came from the counsel doesn't
23  mean it's necessarily privileged.
24      Q.   Do you remember who was doing the
25  talking on behalf of the committee?

BURIAN

1
2      A.   The committee is not a single
3   individual.  The committee is a body of -- made
4   up of individuals.  I feel comfortable saying
5   that I was directed as a Houlihan rep in the
6   room that there was nothing that we were asked
7   to consent to, we couldn't give a -- forget
8   about complete.  We couldn't give a coherent
9   explanation of exactly what the transaction was
10  at that time.  And that we were instructed not
11  to make any commitments on behalf of the
12  committee.
13      Q.   Under any situation?
14         MR. TECCE:  Objection to the form of
15  the question.
16      A.   Under any situation?  We didn't ask if
17  the building was on fire what to do.  We asked
18  what to do if -- it was very hard at times to
19  even guess what request would be made of us, and
20  therefore, instead of sitting there and trying
21  to think of every hypothetical, we were told --
22  we gave the debtor fair opportunity.  We've
23  asked for explanations, we've advised them as to
24  when the committee was meeting, and in fact had
25  delayed the meeting throughout the day until the

BURIAN

1 believe you were preserving?
2        MR. TECCE:  Objection to form.
3        A.   I did not think of it in anything
4 other than generally, that if someone -- if
5 they -- if Barclays took more assets or Lehman
6 gave Barclays more assets than what they told us
7 or told the judge, one way or another, we would
8 get them back.  They would be hearing from us or
9 from the LBI estate.
10        I did not think about what type of
11 claim that would be.  You know, I didn't spend
12 any time on that.
13        Q.   You write, "We did not consent."  You
14 put "consent" in quotes.  Why did you do that?
15        A.   Because I was referencing the legal
16 obligation -- not the legal obligation.  The
17 court order, the court order had this idea that
18 the committee would have a consent right.  It
19 was a defined right of consent.  The debtor can
20 do what they want as long as they are
21 comfortable legally and willing to suffer the
22 consequences if they are wrong, without going to
23 a committee for consent.  The only reason we had
24 a consent right is because of what was written

BURIAN

1 into the order.
2        So I was referencing the fact that we
3 had more than just whatever any creditor would
4 have.  We had a -- you know, we typically
5 have -- we had a specific consent right.
6        Q.   Did you ever tell anyone from Barclays
7 that you did not consent to the transaction?
8        A.   I never -- I don't remember
9 specifically.  I do remember at the -- telling
10 Michael Klein very clearly that I'm relying on
11 his and the debtor's representations.  I can't
12 confirm or deny, and that we will get a
13 reconciliation at the end.
14        Q.   And you --
15        A.   I was also never asked for a consent
16 by Barclays.
17        Q.   Do you recall telling anyone on the
18 night/morning before the transaction closed that
19 the committee did not consent?
20        A.   I made it very clear that the
21 committee was not asked for a consent.  We
22 didn't go in and say don't close this
23 transaction, we do not consent.  We made it very
24 clear that we don't have the capacity to consent

BURIAN

1 or not, and we haven't been asked to consent to
2 anything.
3        Q.   How did you make that clear?
4        MR. TECCE:  I would like to have a
5 general objection.  The purpose of this
6 deposition is going over his economic
7 analysis.  I have given you some leeway, but
8 these questions about what he said about
9 committee consent has nothing to do with his
10 economic analysis of the transaction.
11        Go ahead, you can answer.
12        MR. THOMAS:  It is coming right out of
13 a document we just got yesterday.
14        A.   We covered this last deposition too.
15        What was your question again?
16        Q.   How did you make that clear?
17        A.   Leading up to the committee hearing,
18 meeting, hearing, committee meeting, we told
19 debtor representatives that we needed more
20 information.  We had to brief the committee,
21 we're going to lose the capacity to consent.
22        Thereafter, the most -- you know, it
23 was a while ago.  The most clear conversation
24 was with Harvey Miller, where I said to him, you

BURIAN

1 know, do you need me, do you need anything?
2        He said -- well, he made a joke, he
3 said, I never need you.  He also said, no, we
4 don't need you, we are going forward.
5        At the end of the Michael Klein
6 meeting, I also made clear -- Tom Roberts was
7 there, Harvey was there -- gentlemen, we can't
8 possibly diligence this.  We can't consent or
9 not consent to this.
10        Q.   Did you put the word "consent" in
11 quotes to indicate that you weren't formally
12 giving consent while nonetheless not objecting?
13        MR. TECCE:  Objection to form.
14        A.   Not really.  It is sort of -- there is
15 a committee approach and me personally.  Again,
16 as my e-mail says, if this transaction were the
17 transaction that closed, it was better than at
18 least I expected.  And therefore, I might or
19 might not have made a recommendation.
20        But we did not give any consent.
21        Q.   In the next paragraph, you write that,
22 "I have attached to this e-mail the final
23 version of the clarification letter that details
24 the modifications."

BURIAN

2  Q.  And the all in approximate value of
3  47 billion, how did you calculate that?
4        MR. TECCE:  Objection to form.
5     A.  I took Barclays and Lehman's gross-up
6  of the assets to 45 billion, plus the 1.9, to
7  round to 47.
8     Q.  And what do you mean by "gross-up"?
9     A.  Well, they said to me -- made it sound
10 like they were doing me a big favor -- they were
11 really only worth 44 to 45 billion, but we
12 agreed they would be worth 45 billion for
13 closing purposes.
14    Q.  Is that what you recall, they agreed
15 they would be worth 45 billion for closing
16 purposes?
17    A.  Are you asking me what they told me or
18 what I -- or -- that that's what happened at the
19 closing?
20    Q.  Do you recall them telling you that?
21    A.  Yeah.  At the Sunday night, we were
22 told they were treating these assets as 45
23 billion and therefore, the net transfer to
24 Barclays was 47 billion.
25    Q.  You go on to write, "They are

BURIAN

2  forgiving the Fed loan of 45.5 billion and
3  assumed liabilities of 4.2 billion"?
4     A.  4.25.
5     Q.  "4.25 billion, for a total of 49 plus
6  billion"?
7     A.  Correct.
8     Q.  The 4.25 billion, where does that come
9  from?
10    A.  That was the original number in the
11 APA or disclosed to the Court for what the
12 combination of cure and employee expenses that
13 were supposed to be assumed by Barclays.  I
14 believe that that number was adjusted down to
15 3.75 at the Friday hearing, but Sunday night
16 everyone still kept talking about 4.25, and I
17 got confused.
18    Q.  At this time, did you understand that
19 the cure estimate was an estimate of potential
20 cure?
21        MR. TECCE:  Objection.
22    Q.  And that Barclays had an option which
23 contracts to assume?
24        MR. TECCE:  Objection to form.
25        THE WITNESS:  Jamie, what do I do when

BURIAN

2  you say that?
3        MR. TECCE:  You can answer the
4  question.  That's OK.
5     A.  My understanding was that this was the
6  company's and Barclays' good faith estimate of
7  the range of what it would cost to run the
8  broker/dealer, the contracts they might need.
9     Q.  Did you understand it to be an
10 estimate of potential cure in terms of what
11 potential exposure Barclays might have?
12    A.  We knew there would be revisions.  For
13 instance, since Barclays needed a Bloomberg
14 contract, they probably have one, and the fact
15 that we owe a couple hundred grand on Bloomberg
16 terminals, you know, maybe they wouldn't pay
17 that.  So I understood it to be an estimate.
18    Q.  You are an attorney, you read the
19 contracts, right?
20    A.  I am a retired attorney and I read
21 most of the contracts.
22    Q.  Did you have an understanding that
23 Barclays could elect to assume zero contracts
24 and have zero cure payment liability?
25        MR. TECCE:  Objection to form.

BURIAN

2        You can answer.
3     A.  I understood that legally Barclays
4  could take or not take what they like, but
5  economically, they would need certain assets to
6  run their business, and that would be highly
7  impractical.
8     Q.  You go on to write, "Depending on how
9  they do liquidating the book, they will make or
10 lose money."  Do you see that?
11    A.  Yes.
12    Q.  Can you explain what you mean by
13 "depending on how they do liquidating the book"?
14    A.  They are getting 45 billion dollars of
15 assets.  They are going to hold them, they are
16 going to sell them, they are going to do
17 something with them, and whatever they do, they
18 do.  They will make money or lose money.
19        You know, notwithstanding your
20 colleague's oral argument, we have never been
21 against Barclays making money or losing money on
22 the deal if they want to take the risk to hold
23 their assets long term or short term.
24    Q.  So there is no requirement that there
25 be a certain net relationship between assets and

Page 54

BURIAN

1   liabilities on the deal?
2       MR. TECCE:  Objection to form.
3       A.   There absolutely was.
4       Q.   Where is that found?
5       A.   What I said was depending on what they
6   do in the future, they may make money or lose
7   money.
8       Q.   Where is that requirement found?
9       A.   We have gone through this before.  I
10  will tell you again what my understanding is,
11  and what we believe was represented to the Court
12  was that we all knew Barclays was making a lot
13  of money in buying the broker/dealer, and we all
14  suspected the appraisals may come out on the low
15  side of reasonable when it comes to the
16  property.
17      But when it came to the trading book,
18  they were being sold in good faith for fair
19  market value, the way that any broker/dealer
20  would mark their books.
21      Q.   You go on to write, "We did not
22  consent," and you emphasize "not" in all
23  capitals.  Why were you giving that such an
24  emphasis?  Was there an issue of whether you
25

Page 55

BURIAN

1   would consent?
2       A.   No.  It was because there was concern
3   about -- by the committee about whether we were
4   going to be asked for our consent or not, and a
5   lot of the business people on the committee were
6   concerned about, well, what happens at 2 in the
7   morning if they turn to you and say, if you
8   don't consent, we don't close, and the fate of
9   the free world is on your shoulders.
10      And the committee discussed it and
11  said, you know, don't succumb to pressure.  We
12  don't know enough to consent or not consent, the
13  same way we did not support the sale at the
14  Friday hearing.  And I wanted to make it clear
15  that we followed direction.
16      Q.   Do you believe -- did you believe that
17  your not consenting might prevent the deal from
18  closing?
19      MR. TECCE:  Objection to form.
20      A.   This is a hypothetical.  I do believe
21  that our nonconsent -- I did believe our -- I
22  turned out to be wrong, that the fact that we do
23  not consent would provide some discipline on the
24  parties and not allow Barclays to take advantage
25

Page 56

BURIAN

1   of the debtor and take more than what the judge
2   was told.
3       Q.   When you left the building, you left
4   before the deal was signed; is that right?
5       MR. TECCE:  Objection to form.
6       A.   Yes.
7       Q.   When you left the building, did you
8   think they were going to go ahead and close or
9   not close?
10      A.   We were told unequivocally --
11  unequivocally?  We were told clearly that they
12  were closing.
13      Q.   Even though you're saying that you
14  didn't give your consent?
15      A.   I didn't -- I'm sure you know this.
16  We didn't need to give consent or not.  If they
17  were closing with a degree of comfort that this
18  was consistent with the court order, they were
19  free to close with me or without me.
20      Q.   On Monday when you -- September 22,
21  when you learned they had closed, did you --
22  without committee consent, as you say, it is
23  your position, did you think it was improper for
24  them to close?
25

Page 57

BURIAN

1       MR. TECCE:  Objection to form.
2       A.   I didn't have enough information to
3   say yes or no.  I personally thought that if
4   they did what they said they were going to do,
5   that was fine with me.  But that was not a
6   committee position.
7       Q.   What is it -- what do you mean when
8   you say they did what they said they were going
9   to do?  What did they say they were going to do?
10      A.   What I described to the committee.  If
11  in fact 45 billion of assets were transferred
12  for 47 billion of liabilities, so as Michael
13  Klein said to me, you made 2 billion dollars
14  this weekend, and all of the other items
15  discussed, the other two items, I thought it was
16  an OK deal to do.
17      Q.   Now, when you say 45 billion in
18  assets, you didn't mean the entire value of the
19  assets being transferred was just 45 billion,
20  did you?
21      A.   I was focusing on the issues in
22  dispute.  Every time you ask me a question and I
23  answer, I am going to answer it in the context
24  of your question.  If you want, I will recount
25

BURIAN

1
2  and say, you know, read the whole purchase
3  agreement of all the assets that were
4  transferred.
5        I was not talking about the real
6  estate, the licenses, you know, and all the
7  other items that were transferred, and I already
8  said to you, and I said this the last
9  deposition, that the committee was advised and
10  we clearly understood that Barclays was getting
11  what we thought was a very good deal in picking
12  up a preeminent broker/dealer for merely
13  250 million bucks.
14    Q.   When you said 45 billion most
15  recently, you were referring to the
16  securities --
17    A.   The trading assets plus the cash,
18  right?  It turns out there was cash included.
19    Q.   Plus the 1.9 billion clearance box
20  assets?
21    A.   Correct -- well, 45 -- correct, plus
22  the 1.9, right, so 47 all in.
23    Q.   You go on to write, "We said we
24  understand" --
25    A.   I'm sorry.  I may have misspoke before

BURIAN

1
2  when I said they were getting the 45 for the 47,
3  and those numbers were off by 2 billion.
4    Q.   Let me just clarify the numbers you
5  meant.
6    A.   It is here in the e-mail.  We were
7  going through it again.  I was just talking too
8  quickly.
9        But basically that they got, Barclays
10  took roughly 47 billion of assets and was
11  assuming 45.5 billion -- they were forgiving the
12  45.5 billion of the loan.  It turns out it may
13  have only been 45 billion.  We were told it was
14  45.5.  And again, let's change 4.25 to 3.75.
15  And we made a mistake that night.  So we were
16  still net positive.
17    Q.   When did you come to learn that it was
18  45 and not 45.5?
19    MR. TECCE:  Objection to form.
20    A.   When did I come to learn that fact?
21  Honestly I'm still not sure.  The first time I
22  actually saw it from a reliable source was when
23  I read the December JPM settlement with the LBI
24  trustee and Barclays.
25        I believe that that's where I finally

BURIAN

1
2  saw it in writing by someone who was standing up
3  and saying this is the number.
4    Q.   When was the first time you were aware
5  that it might be 45 billion and not 45.5
6  billion?
7    A.   I honestly don't remember.
8    Q.   What time period?  Was it near the
9  time of the closing?  Was it a month later, a
10  year later?
11    A.   It may have been -- well, it couldn't
12  be a year later because December is not a year
13  past September.
14        I don't want to guess.  I think that
15  that Sunday or Monday, it came up that there was
16  confusion, and we asked what it was.  I think
17  the Sunday of the closing or the Monday of the
18  closing was the first time I first started
19  hearing about what was the exact loan number.
20    Q.   So you are aware as of Sunday,
21  September 21st, that the 45.5 number that
22  Barclays was paying in cash might in fact be
23  45.0?
24    MR. TECCE:  Objection to form.
25    A.   No, no, no.  I was told by Barclays it

BURIAN

1
2  was 45.5 and I believed them.  There were
3  issues, you know, just reconciliations of, you
4  know, someone saying, oh, was it 45 or 45.5, but
5  we clarified that Sunday night, and I told my
6  committee it was 45.5 based on what I was told.
7    Q.   Who told you it was 45.5?
8    A.   Michael Klein.
9    Q.   When did he tell you that?
10    A.   He told me that Monday morning when we
11  finally sat down and got an explanation of --
12  what does the clarification mean and what is
13  really going on here.  What is the transaction
14  that they are closing.
15    Q.   So if he told you that Monday morning,
16  that wouldn't have been the source of your
17  telling the committee 45.5?
18    A.   That would have been.
19    Q.   It would not have?
20    A.   Would have been.
21    Q.   He told you that Monday morning?
22    A.   Yes.
23    Q.   He told you that on Monday morning
24  prior to your Sunday night committee call?
25    A.   You are asking me about the e-mail

BURIAN

1
2  that was sent Monday morning to the committee.
3      Q.   OK.  Did you bring it up on the call,
4  45.5 on the call?
5      A.   I don't remember.  I definitely told
6  them that there is a little I could tell them
7  with specificity about any number, and they were
8  waiting for understanding.
9          Did I specifically raise 45.5 versus
10 45?  Honestly, A, I don't remember, and B, I
11 think -- I know we talked about the 5, the
12 valuation issues, the 5 billion.  That issue may
13 have gotten lost in that issue.
14     Q.   You say, "We said we understand what
15 they're telling us and expect to see computer
16 runs of all transfers at some point in
17 connection with the closing documentation."
18         When you say computer runs of all
19 transfers, are you referring to the list of
20 securities that transferred over to Barclays as
21 part of the sale transaction?
22     MR. TECCE:  Objection.
23     A.   That might be part of it.
24     Q.   What else?  What else did you mean
25 when you said computer runs of all transfers?

BURIAN

1
2      A.   Our understanding was these securities
3  were in multiple accounts, perhaps in multiple
4  names, with complicated clearing or transfer
5  mechanics, and what I expected was a set of
6  statements saying the following from the
7  following account went to the following person
8  that was marked at the following value.  This
9  transferred through DTC from these accounts.
10         I expected someone to give me the
11 equivalent of a flow of funds at a closing.
12 Here is what we got, here is where it came from,
13 here is what it was worth as of the closing.
14     Q.   Did you get that at some point?
15     A.   For this question, I am assuming you
16 mean Houlihan Lokey.
17     Q.   Yes.
18     A.   I'm here for the whole firm.
19         The answer is no.
20     Q.   What did you get in terms of computer
21 runs?
22     A.   Well, we got -- I'm not sure it was a
23 computer run.  I will answer it more broadly.
24 What we got was the same thing we got Sunday
25 without numbers, that same list of securities

BURIAN

1
2  that we got Sunday, which we were told on Sunday
3  to ignore.
4      Q.   And in addition, beyond that list of
5  securities that were transferred --
6      A.   Well, again, are you telling me they
7  were transferred, I should assume they were
8  transferred?
9      Q.   OK.
10     A.   We went through this before.  I don't
11 know that, and I've actually been told that all
12 the assets and securities on that list were
13 probably not transferred.  So I just don't know.
14     Q.   So your testimony is that Houlihan
15 Lokey didn't know what securities were
16 transferred and still don't know that today?
17     A.   I still do not have reconciliation of
18 what Lehman assets were actually transferred
19 from which accounts, from which debtor and what
20 values were ascribed to them.
21     Q.   You've added on a couple of things
22 now.
23         Isn't it true that Houlihan Lokey knew
24 in September of 2008 which securities were
25 actually transferred over to Barclays?

BURIAN

1
2      A.   No.  By the way, you didn't know that
3  either.
4      Q.   OK.
5      A.   If you read the JP Morgan settlement,
6  you were 7 billion shy.  You didn't know what
7  cash you got.
8      Q.   Did you know -- did Houlihan know
9  99 percent of what securities had transferred
10 over?
11     A.   No.  Well, I -- I can't say -- if I
12 don't know the corpus, I can't tell you the
13 percentage.
14     Q.   Didn't you in fact --
15     A.   So I don't know.
16     Q.   Didn't you in fact get a list of
17 securities as part of the collateral on Sunday?
18     A.   We got Sunday a list of securities as
19 of an indeterminate date with marks that we were
20 told not to rely on.
21     MR. TECCE:  I would like the record to
22         reflect that his notice for today's
23         deposition is not a notice that he is a
24         30(b)(6) witness.
25     THE WITNESS:  Oh, I am sorry.

BURIAN

1
2    A.   You are asking me whether 50, 60
3    people, if any of them had any conversation with
4    some other group of 50 or 60 people over a
5    three-month period.  I honestly have no idea.
6        Q.   The question was to your knowledge.
7    Are you aware of any communications between the
8    trustee's representatives and the committee's
9    representatives?
10       A.   The first time I had -- first time I
11   can absolutely certainly tell you that I was
12   involved in a conversation was, at some point in
13   time Jones Day was retained on behalf of the
14   estate, and they told me they were coordinating
15   or -- with -- they were talking to the LBI
16   estate about their issues as well.
17            MR. GREEN:  Objection.
18            MR. TECCE:  Objection.  To the extent
19   that --
20       A.   This is all hearsay.  I mean I -- I,
21   Saul Burian, did not engage with the LBI estate
22   about these issues.  We have enough issues with
23   the LBI estate.
24       Q.   So your testimony is you're not aware
25   of any communications in the month of September

BURIAN

1
2    of 2008 between yourself or other
3    representatives of the committee and any
4    representatives of the trustee?
5            MR. TECCE:  Objection.
6        A.   The testimony is I am not aware of
7    when any of that group first discussed with any
8    of the other group those issues.  I have no
9    idea.
10       Q.   So you did have conversations with
11   representatives of the trustee at Weil Gotshal
12   on Sunday, but you don't recall discussing the
13   5 billion dollar issue?
14            MR. MILLS:  Object to the form.
15       A.   I do not specifically recall talking
16   about -- I'm sure we talked about are you
17   comfortable with the clarification letter,
18   what's going on vis-a-vis the valuation of the
19   assets.  Do you know what date these things are
20   booked at.
21            I'm sure there were conversations
22   about the transaction.  But I don't think it
23   was, do you think that we are being ripped off
24   by 5 billion dollars?  I don't think it was the
25   5 billion dollar issue.  I think it was more

BURIAN

1
2    general than that.  You know, what's going on.
3    Do you know what's being transferred.  Are you
4    comfortable with LBI's commitments of how much
5    and where it is going to.  That sort of thing.
6        Q.   Was there any discussion -- would that
7    discussion also include the fact that the
8    parties were not using claimant's book values
9    for the purposes of the deal?
10            MR. MILLS:  Objection to form.
11            MR. TECCE:  Objection to form.
12       A.   Never -- did that come up in my
13   conversation with the LBI trustee?
14       Q.   Or the trustee's representatives.
15       A.   I don't -- not in particular.  I think
16   we had this thing on Sunday.  Clearly they had a
17   list of assets, the draft Schedule A.  It didn't
18   match up.
19            Again, I think -- I would be surprised
20   if we did not say to the trustee's reps, do you
21   know what assets are moving, do you know as of
22   what date they are booked.  Do you know what
23   modifications are being made to those values.
24   Those would be the questions I would have asked.
25       Q.   And wouldn't you have shared with them

BURIAN

1
2    information about the fact that the parties had
3    agreed, as you say, to value the assets at a
4    lower amount?
5            MR. TECCE:  Objection to form.
6        A.   I don't remember if we specifically
7    said that -- I mean my assumption was they had
8    the same Schedule A I had.  There were lawyers
9    in the room.  Some of them were young,
10   relatively young, who did seem to -- seemed to
11   know surprisingly less than I did about the
12   transaction.  It was like the blind talking to
13   the blind and deaf.
14            I'm not sure there is any -- those
15   conversations, if they occurred, were short and
16   unfulfilling.
17       Q.   So the conversations would have
18   involved the securities being transferred and
19   their valuation, but you're not sure whether the
20   specific issue of the fact that the parties were
21   treating them at less than book value was
22   discussed?
23       A.   I'm saying in the context of that
24   night, the conversations probably included me
25   trying to find out what they knew about the

Page 82

BURIAN

1
2  transaction.  Do you know if this is being
3  transferred, do you know what values are being
4  used.  And them essentially telling me no.
5      Q.  And do you recall one way or another
6  whether in the course of those conversations you
7  communicated the fact that the parties were not
8  using the Lehman book values of the securities,
9  but were rather using a lower negotiated value?
10         MR. TECCE:  Objection to form.
11         MR. GREEN:  Objection.
12         MR. MILLS:  Objection to form.
13     A.  I couldn't have communicated that
14  because I didn't know it.
15         THE VIDEOGRAPHER:  We are at the end
16  of the tape.  We are now going off the
17  record.  The time is 7:07 p.m.
18         (Recess)
19         THE VIDEOGRAPHER:  We are back on the
20  record, the time is 7:09 p.m.  We are at the
21  beginning of the tape labeled number 2.
22     A.  Can you reask the question so I can
23  finish?
24     Q.  You weren't finished with your answer?
25     A.  No, I wasn't.

Page 83

BURIAN

1
2      Q.  The question is, do you recall one way
3  or another whether or not in the course of those
4  conversations with representatives of the
5  trustee, you communicated the fact the parties
6  were not using Lehman book values of the
7  securities, but were rather using negotiated
8  values?
9         MR. TECCE:  Objection to form.
10         MR. MILLS:  Objection to form.
11         MR. GREEN:  Objection.
12     A.  I can tell you clearly I would not
13  have communicated that at the time.  At the
14  time, we believed the transaction was being
15  negotiated off Lehman's looks and records with
16  respect to the fair market value of the
17  securities as would be marked by any other
18  broker/dealer at the time.
19     Q.  At the bottom of the first page, you
20  wrote, "The total purchased assets were books at
21  approximately 49.4 billion dollars, but dropped
22  in value to about 44 to 45 billion dollars."  So
23  that you knew that the book value on Lehman's
24  books was in the 49 to 50 billion dollar range?
25         MR. TECCE:  Objection to form.

Page 84

BURIAN

1
2      Q.  Is that part correct?
3      A.  As of what date, sir?
4      Q.  As of the last date they were put on
5  the books?
6      A.  No, I don't know that.  I do know that
7  we were given a run that they said was outdated
8  and was not current that had the Lehman books at
9  50 billion, roughly 50 billion.  But no -- after
10  we asked this question repeatedly, we were not
11  told this was the marks as of the close of
12  business on Friday.
13     Q.  You are aware that when Barclays
14  received at least part of the repo collateral,
15  the securities in the repo collateral, that they
16  looked at it and they thought it was worth less
17  than what it was marked at?
18         MR. TECCE:  Objection, form.
19     A.  Marked by who and when?
20     Q.  So you don't know what I mean when I
21  say less than what it was marked at?
22     A.  Again, the problem is, you know -- and
23  I don't know in the sense of I am sure that it
24  was -- I'm pretty sure, I've not been told, that
25  you mark -- that Barclays received assets and

Page 85

BURIAN

1
2  marked them for less than 50 billion.  Mike told
3  me that he was expecting to mark them at 47
4  billion.
5         So if that's what you are asking me,
6  yes, we expected them to be less than 50 billion
7  which is less than what they were marked by
8  Lehman as of some time during the week prior to
9  the closing.
10         If you're asking me whether I knew or
11  thought that Barclays was going to take
12  securities that they marked for the purposes of
13  the transaction and then marked them lower on
14  their books, that would surprise me, that would
15  surprise me.
16     Q.  I'm not sure I understand the last
17  part.
18     A.  That's what I understood your question
19  to be.  Where you asked me -- my understanding
20  of your question was did I know that Barclays
21  got assets and marked them lower than they were
22  booked.
23         What I am saying is I believe I
24  understood they were going to mark them for less
25  than 50 billion, but I'm not sure why that's

Page 86

BURIAN

1
2  even relevant.  But if you are asking me did I
3  expect Barclays to mark them as less than the
4  fair market value at the time of the closing?
5  No, of course not.  That's what we expected the
6  closing to be based on on both sides.
7      Q.   You expected the closing to be based
8  on fair market value?
9      A.   We expected the closing to be based on
10  the manner in which any reasonable broker/dealer
11  would mark their books at the time; in
12  particular, how Lehman was doing it.  Many of
13  the assets were assets that you needed -- you
14  understood you needed some familiarity with them
15  and therefore, the Lehman process.
16      Q.   So when you wrote your sentence, the
17  total purchased asset -- let me clarify.  When
18  you talk about the total purchased assets, you
19  are talking about the trading assets?
20      A.   The trading.
21      Q.   The total purchased assets were booked
22  at approximately 49.4 billion, but dropped in
23  value to about 44 to 45 billion.  Did you think
24  that they were on, now on Lehman's books at 44
25  to 45 billion?

Page 87

BURIAN

1
2      A.   Whether they were uploaded and
3  accounted for that way, I didn't think about it
4  that way.  What I was told was, and I believed
5  was, that after a good-faith analysis of what
6  happened on Friday in the markets, that this is
7  what Lehman books would be if analyzing what the
8  corpus of assets that were being transferred.
9      I don't know, there was so much
10  paperwork -- when A&M took it over and everyone
11  went to Barclays, I can't tell you that Friday
12  night, someone actually typed into the
13  accounting software, you know, the update.  I
14  don't know if that's true.  I do know that what
15  we were told was the value of these assets based
16  on how these things were booked would be 44 to
17  45 and that Barclays was doing us a favor and
18  rounding up to 45.
19      Q.   What mattered to you was the fair
20  market value of the assets and not what was --
21  what may or may not be on Lehman's books?
22      MR. TECCE:  Objection to form.
23      A.   What mattered to me is that these
24  assets were fairly valued in a manner consistent
25  with the Lehman process.

Page 88

BURIAN

1
2      Q.   If there was a difference between the
3  value of the assets as marked on Lehman's books
4  and accurate fair market value, which one of
5  those two was relevant to you?
6      MR. TECCE:  Objection to form.
7      A.   You need to parse that because there
8  is no simple answer to that.  You are talking
9  about a government Treasury bill?  There is no
10  difference.  You are talking about -- you asked
11  me a question --
12      Q.   You are rejecting my predicate of the
13  question?
14      A.   No, because I can't answer the
15  question the way it has been asked.  If you want
16  to say -- I can't answer your question.  If you
17  want me to explain, I'll explain.  If you don't
18  want me to explain, I won't explain.
19      Q.   Can you answer the question of if
20  there was a difference between the value of the
21  assets as marked on Lehman's books and the
22  accurate fair market value of the same assets,
23  which one of those two would be relevant to you?
24      MR. MILLS:  Object to form.
25      MR. GREEN:  Objection.

Page 89

BURIAN

1
2      MR. TECCE:  Objection to the form of
3  the question.
4      A.   Is that theoretical fair market value?
5  Whose fair market value are you comparing
6  Lehman's books to?  How am I deriving the fair
7  market value valuation?
8      Q.   How do you understand it to provide
9  fair market value?
10      A.   It is your question -- tell me what
11  you are asking and I will answer it.
12      Q.   Previously you said fair market value,
13  you used fair market value?
14      A.   Correct.
15      Q.   That's what you were interested in?
16      A.   I said I was interested in how a
17  broker/dealer would value the securities in a
18  manner consistent with the Lehman's books and
19  records, the process of the Lehman's records.
20  Why don't we read back what I said.  I am
21  butchering it now because I am nervous.  Why
22  don't we read it back.
23      Q.   Let me rephrase the question.
24      During the week, complete and utter
25  financial chaos in the week of bankruptcy at

BURIAN

1
2 Lehman, the marks on Lehman's books had not been
3 fully updated, and there was a difference
4 between the marks on their books and the
5 accurate fair market value of those assets,
6 which mark would have been relevant to you for
7 the purposes of your analysis?
8        MR. TECCE:  Objection to form.
9        A.   Unfortunately, it is a more
10 complicated answer than what you're asking me.
11 Fair market value in a manner consistent with
12 the way broker/dealers value their book.  Not
13 liquidation value, not dump and run, not, you
14 know, then and there was a mistake, then yeah,
15 fair market value would trump a mistake in the
16 Lehman books.
17       Q.   And by --
18       A.   If you're talking about changing the
19 manner of valuation, then no, that wasn't the
20 case.  If you want, I will give you a for
21 instance.  We are having this conversation and
22 you insist on keeping it on a theoretical basis
23 where I have been offering to explain it.
24       Q.   Are you finished with your answer?  So
25 as I understand your -- you're not aware of --

BURIAN

1
2 when you referred to the book value or being
3 booked at approximately 49 billion dollars, it
4 is your testimony that you had no idea whether
5 that was the then current book value of those
6 assets?
7        A.   We were not -- well, then current as
8 of Sunday night?
9        Q.   Yes.
10       A.   We did not know.
11       Q.   Did you ask anyone?
12       A.   Yeah.
13       Q.   Who did you ask?
14       A.   We asked the debtor reps who were
15 still there and in and out.  We asked lawyers.
16 I don't think that specifically -- I mean, it
17 became very clear after the, you know, when the
18 debtor finally said OK, you're an official
19 committee, we owe you some face time to explain
20 the transaction to you, it became obvious
21 that -- they said the 49 billion dollars was an
22 old-and-cold number.  So it wasn't a relevant
23 question to say that number that's no longer
24 relevant and old and cold, on what date was that
25 booked at?  It was silly question.  As the night

BURIAN

1
2 progressed, it became less and less relevant.
3        Q.   By old and cold, you mean a number
4 that had not been updated?
5        A.   It was no longer relevant.
6        Q.   Why was it no longer relevant?
7        A.   Because it was a mark that did not
8 reflect the current book.
9        Q.   The current book or current market
10 value of the assets?
11       A.   Those are the same.
12       MR. TECCE:  Objection to form.
13       A.   Current fair market value consistent
14 with the way Lehman was doing it.
15       Q.   You write, "If this is not what
16 actually happened, they will be hearing from us
17 or from the LBI estate."  Is that what actually
18 happened?
19       MR. TECCE:  Objection to form.
20       MR. GREEN:  Join in the objection.
21       A.   To the best of my knowledge, what I
22 described in this e-mail is far from what
23 actually happened.
24       Q.   What actually happened do you believe?
25       A.   I don't really -- I don't have a full

BURIAN

1
2 reconciliation of what actually happened.  I do
3 know that the assets that Barclays received with
4 respect to the trading broker/dealer securities
5 were, in fact, worth substantially more than
6 what was represented.
7        Q.   What is the basis for your saying --
8 first of all, what do you understand the value
9 to be that you just referred to?
10       A.   I don't have a firm opinion on value
11 sitting here today.  I can tell you that I read
12 the Jim Seery deposition and was shocked to
13 learn that Friday morning, at the instruction of
14 Barclays, Lehman changed the whole methodology
15 of how they were supposed to value assets and
16 just ran around and said if I had to dump 50
17 billion of assets in three to five days, what
18 would I get for them?  Oh, 5 billion less than
19 book.  That was the first time, you know -- we
20 never dreamed that people were looking at these
21 assets on a liquidating, dump-and-run basis.
22       Q.   That's your interpretation of Mr.
23 Seery's testimony?
24       A.   My interpretation of his testimony?
25       Q.   Yeah.  What is the basis for what you

Page 106

BURIAN

1
2  upon a review of the clarification letter?
3      MR. TECCE:  Objection to form.
4      A.   I believe that I sent this from my car
5  and that I opened the clarification letter on my
6  Blackberry and read that sentence, it was very
7  hard to read on those things.  So I do not
8  believe that I read the whole letter.  I believe
9  that I looked for that provision, that sentence
10 as to what was being transferred.
11     Q.   You make a reference to doing a brief
12 note explaining math, do you see that?
13     A.   Yes.
14     Q.   Is that Exhibit 760, the memo
15 contained in 760?
16     A.   Yeah, I mean, the committee was really
17 put upon.  We spent a lot of time, there were a
18 lot of issues and my suggestion was let's try to
19 put things in writing so that they can see it
20 and help call go faster.
21     Q.   Let me show you a document --
22     A.   Whenever you are at an appropriate
23 time, I would like to take a bio break.
24     Q.   Sure, now would be great?
25         THE VIDEOGRAPHER:  Going off the

Page 107

BURIAN

1
2  record, the time is 7:38 p.m.
3      THE VIDEOGRAPHER:  Back on the record,
4  the time 7:46 p.m.
5      (Exhibit 763, e-mail dated
6  September 22, 2008 marked for
7  identification, as of this date.)
8      Q.   Let me show you a document we have
9  marked as 763.  Do you recognize that document?
10     A.   I'm looking at it.  Yes, -- oh, here
11 is a 45.5. yeah, so I was right, I heard about
12 it Sunday or Monday.  Yeah, I see it.
13     Q.   The question is do you recognize this
14 e-mail you received on September 22?
15     A.   I do.
16     Q.   From Michael Fazio?  OK.  So you
17 started to mention about the 44 versus 45.5.  Do
18 you recall, does this refresh your recollection
19 that at least as of Monday morning, you're aware
20 of the issue of 45 versus 45.5 billion?
21         MR. TECCE:  Objection to form.
22     A.   Yeah, as I mentioned, I wasn't sure
23 when I first heard it floating around.  But yes,
24 obviously -- he listed -- Mike Fazio, my
25 partner, lists for me four items that should go

Page 108

BURIAN

1
2  into the reconciliation that I mentioned at the
3  end of my e-mail to the committee.
4      Q.   What do you mean by a reconciliation?
5      A.   Well, those are the words we use
6  internally.  We thought this was merely --
7  reconciling the data to you know what occurred
8  and getting information from -- I am going to
9  say from Barclays, but Barclays controlled the
10 Lehman data as well.  So getting information
11 from Barclays either in its capacity as Barclays
12 or in its capacity as running the Lehman systems
13 to prove up against what we were told was the
14 closing, what happened, so we could put this
15 transaction to bed.
16     Q.   And what is your best recollection of
17 where you learned that the number was or might
18 be 45 billion as opposed to 45.5 billion?
19     A.   As I said to you before, the only time
20 I heard definitively it was 45 was when I read
21 the JPM Barclays SIPA trustee settlement papers.
22     Q.   Where did you first hear that it might
23 be?  Presumably the reading of the trustee
24 papers, that was much later than September 22?
25     A.   So your question is when did I first

Page 109

BURIAN

1
2  hear whether there was an issue of 45, 5 versus
3  45?
4      Q.   Yeah, where did you learn it not when?
5      A.   You asked me that before.  I told you
6  I wasn't sure when.
7      Q.   It is not when, it is where did you
8  learn it from?
9      A.   I don't have a firm recollection on
10 that.
11     Q.   Do you think it was someone told you
12 over the weekend or was it prior to the weekend?
13         MR. MILLS:  Object to form.
14         MR. TECCE:  Objection to form.
15     A.   Do you have my notes?  It could be --
16 I don't want to guess.  I don't recall.  It
17 could have been that when people were describing
18 the deal someone was at 45, someone said 45.5
19 and we noted the difference.  It could be Mike
20 Fazio noted it.  I don't remember.
21     Q.   In addition to that item, the second
22 item here is, listed as an open item is fair
23 market value of the 53 billion gross amount, do
24 you see that?
25     A.   Yes.

Page 114

```
1                    BURIAN
2      Q.   So your testimony is that as of Sunday
3  night, you did not know that Lehman's book value
4  of securities being transferred, was greater
5  than 45 billion?
6           MR. MILLS:  Objection to form.
7           MR. TECCE:  Objection to form.
8      A.   I did not know that.
9      Q.   Did you believe that to be the case?
10     A.   Again, I believed that at some point
11 prior to Friday, there was a bunch of assets
12 that may or may not go to Barclays that was 50
13 billion in value.
14          I had no understanding -- actually,
15 that's not fair.  I assumed that when the debtor
16 and Barclays tell me that the fair market value
17 of these assets that they have agreed upon in
18 good faith, yada, yada, is 44, 45 billion, if
19 the books were going to be marked that night,
20 they would have been marked at 44 or 45 billion.
21 It is -- you are asking me a question that I
22 don't see the distinction between the two.
23     Q.   In a situation where the books,
24 because of the chaos of the week, had not been
25 updated and parties both thought the fair market
```

Page 115

```
1                    BURIAN
2  value of the assets was lower than was on the
3  books, and arrived at a valuation, what they
4  thought the fair market value was, about 45
5  billion dollars, what would you consider to be
6  the book value as you used that term?  Would it
7  be what is the stale marks, stale marks on the
8  books or what the parties believe was the fair
9  market value?
10          MR. TECCE:  Objection to form.
11          You can answer the question.
12          MR. GREEN:  Join in the objection.
13     A.   So long as the parties agreed to that
14 number in a manner consistent with the way book
15 value for a broker/dealer is done, then I would
16 have thought that was the right -- that was the
17 book value upon the closing should have been.
18          We have no objection whatsoever to
19 Barclays saying this asset is booked too high
20 because we think the discounted rate should be
21 X, Y and Z, you guys did it this way, because in
22 a manner consistent with the way broker/dealers
23 do their jobs, if you have an illiquid asset,
24 you do your best guess on the assumptions and if
25 people want to discuss them, that's a fair
```

Page 116

```
1                    BURIAN
2  discussion and we will work according to
3  negotiation, I want the fair value of the book
4  on the asset and, frankly, reasonable people can
5  disagree.
6           But that's in the context of what is
7  the value of that asset for the purposes of a
8  broker/dealer operating as a going concern, you
9  know, dealing with their book.
10          It is not golly, gee, whiz, we don't
11 care what the numbers are, we get a 5 billion
12 discount, nor is it that you change the rules of
13 the game and say, by the way, make believe you
14 are selling 50 billion in assets in three or
15 four days.
16          Those are both inconsistent with -- so
17 the party, to answer your question completely
18 and fairly, if the parties modified value in a
19 manner consistent with the way Lehman books were
20 done, then that would be OK.
21     Q.   And when you say consistent with the
22 way Lehman books were done, you mean consistent
23 with the process by marking to market?  You
24 don't mean what values happen to be written on
25 the books somewhere?
```

Page 117

```
1                    BURIAN
2      A.   Right.  I'll even go further, if they
3  have an asset that there is no market for that,
4  they use a discounted cash flow basis and say
5  the cash flow is worth 10 every year and the
6  discount rate was 12 and Barclays said, you
7  know, our aren't the cash flows 9 and wouldn't a
8  better discount rate be 14?
9           That discussion is consistent with the
10 way you mark the book.  That's the conversation
11 a good broker/dealer would be having internally
12 when they discuss marking their books and
13 someone intelligent looks at them and says
14 golly, gee, whiz, are you sure that's right,
15 don't you think it should be X, Y or Z and the
16 numbers moved a million here, a million there,
17 that's to be expected.
18     Q.   So if the reduction in value was the
19 result of good faith efforts to value those
20 assets consistent with industry standards, you
21 would have no problem with that?
22          MR. TECCE:  Objection to form.
23     A.   That's not what I said.  If there were
24 in good faith efforts to value them as a
25 broker/dealer would value its book as a going
```

Page 118

BURIAN

1
2  concern, then the answer is yes and I admit that
3  there could be differences.
4          But that's where we had the problem
5  before.  That doesn't mean fair market value is
6  different.  It is not that they agree different.
7  They agree on what is fair market value for that
8  purpose in that context.  And that's what the
9  deal was, good faith book value.
10  Q.   Your third point there says, "Verify
11  no exchange-traded options or other positions
12  were transferred."  Do you know what that's
13  referring to?
14  A.   That's what we talked about before.  I
15  wasn't very involved on this point, but I
16  understand that exchange-traded derivative
17  positions were not supposed to be transferred.
18  Q.   What was the basis of that
19  understanding?
20  A.   Again, you asked me that before, I
21  told you I don't remember the specific basis.
22  Q.   Do you recall exchange traded
23  derivatives expressly being included in both the
24  original APA and the purchase agreement --
25  A.   I'm happy --

Page 119

BURIAN

1
2  MR. TECCE:  Objection to the form of
3  the question.
4  A.   I said to you before, if you want to
5  play a guessing game, I'll guess.  If you want
6  me to look at the APA or clarification letter, I
7  don't mind.
8          My best recollection sitting here
9  today is they are not supposed to be included,
10  but I don't have a firm recollection.
11  Q.   I think I have forgotten where it is.
12          Let me go ahead and show you a
13  document that we will mark as 764. -- no, let's
14  use -- let me show you a document marked as
15  Exhibit 764.
16  A.   Well, I guess Mr. O'Donnell did
17  forward my e-mail.
18          (Exhibit 764, e-mail dated December 5,
19  2008 marked for identification, as of this
20  date.)
21  Q.   I didn't have do ask the question, we
22  already confirmed the first point?
23  A.   No, you asked me before.
24  Q.   This is exhibit 764 an is an e-mail
25  dated December 5, 2008, 1:36 p.m.  And attached

Page 120

BURIAN

1
2  to it --
3          MR. TECCE:  Well, that's the date at
4  the top, but if you want to look -- the date
5  of the e-mail --
6          MR. THOMAS:  Sure.  It's forwarding an
7  e-mail dated September 22, 2008.
8          MR. TECCE:  Thank you.
9  Q.   Do you see that?
10  A.   Are you asking me?
11  Q.   Yes.
12  A.   Yes, sorry.  I guess you are always
13  asking me.
14  Q.   And do you recognize the attachment to
15  this e-mail chain?
16  A.   I know what it purports to be.  I know
17  it is a clarification letter.  I can't tell you
18  whether this is the right version stapled here,
19  but yeah, it is supposed to be the clarification
20  letter.
21  Q.   And if you would look --
22  A.   It is unsigned though.  If you look at
23  the last page, it is unsigned.
24  Q.   I will -- if there is a difference in
25  language I'm not going to ask you about, you can

Page 121

BURIAN

1
2  reserve your rights to amend your answer or we
3  can get a signed one later.
4          Let me ask you to look please at Bates
5  number page MPHM 0013443, first page of the
6  clarification letter, do you see that section
7  entitled, "purchased assets, excluded assets"?
8  A.   I do.
9  Q.   Do you see the first purchased asset,
10  there is all of the assets of the seller used
11  primarily in the business or necessary for the
12  operation of the business?
13  A.   I do.
14  Q.   Unless -- I'm skipping some words,
15  except as ordinary specifically provided in the
16  agreement or in this letter?  And then if you
17  look please at subsection A(ii).
18  A.   Yeah.
19  Q.   And would you take a moment to read
20  through that please.
21  A.   There are two A(ii)s.  Do you mean the
22  A(ii) within paragraph A or --
23  Q.   That's a good point, starts on the
24  first page of the clarification letter.  It is
25  section 1A(ii)?

Page 142

BURIAN

1
2    Q.    Generally?
3    A.    Yes.
4    Q.    So did you do any analysis of that
5  schedule A that you received?  You personally at
6  this time?
7    A.    No.
8    Q.    Do you know if Houlihan did?
9    A.    Analysis is a stretch, but yes, we
10 looked at it and --
11   Q.    Let me show you a document we will
12 mark as 776 --767.
13     (Exhibit 767, e-mail marked for
14     identification, as of this date.)
15   Q.    Do you recognize this e-mail chain
16 that at least part of which you were on?
17   A.    I see what it is.  I don't remember
18 specifically having seen it before.
19   Q.    The e-mail from Mr. Bell to you,
20 Michael Fazio and Tanja Alto, does she work with
21 Houlihan?
22   A.    She works at Barclays.
23   Q.    It says, "Attached please find
24 schedule B referred to in the clarification
25 letter."  Do you see that?

Page 143

BURIAN

1
2    A.    I do.
3    Q.    Did you receive schedule B, did
4  Houlihan receive schedule B of the securities?
5    A.    Yes.
6    Q.    At least as much --
7    A.    We received schedule B to the
8  clarification letter.
9    Q.    And you had seen drafts of schedule
10 the A and B on Sunday at Weil, correct?
11   A.    I'm not so sure we saw schedule B.  I
12 honestly don't remember.  I don't know.  And I'm
13 not sure we saw a draft of schedule A.  What we
14 saw was on Sunday, what turned out to be
15 identical to schedule A, but what was
16 represented at the time as not a draft of the
17 attachment.  It was a list of assets that people
18 thought might be in the repo as of a date they
19 had described.
20   Q.    Let me show you a document we will
21 mark as 768.  And at the top, it is coming in
22 Michael Livanos, do they work with Houlihan?
23     (Exhibit 768, e-mail marked for
24     identification, as of this date.)
25   A.    He works with Houlihan.

Page 144

BURIAN

1
2    Q.    And when he says, "Got it.  Taking a
3  look at it now."  Do you know what that's
4  referring to?
5    A.    Just from the e-mail, it looks like he
6  has a copy of the schedule A.  And that he is
7  taking a look at it.
8    Q.    And what is Mr. Livanos' background?
9    A.    He is an associate at Houlihan Lokey.
10   Q.    Do you know what he was doing with it,
11 beyond taking a look at it?
12   A.    Yeah, we wanted to see what was
13 transferred, how it changed from what we had
14 been given.  That was part of our diligence of
15 what happened in the closing.
16   Q.    Were you part of -- did you personally
17 work on any of the analyses or efforts to value
18 the securities that were transferred as far as
19 the Barclays sale transaction?
20     MR. TECCE:  Objection, form.
21   A.    They were done at my direction.  But I
22 didn't personally look things up on Bloomberg.
23   Q.    Did you -- were you copied with the
24 results?
25   A.    I don't -- I've seen them, I don't

Page 145

BURIAN

1
2  remember if I was copied on particular e-mails.
3    Q.    Who were the people running that,
4  those efforts to try to value the securities
5  that were transferred?
6    A.    No one was trying to value the
7  securities that were transferred.  We didn't
8  really have a feel for exactly what securities
9  were transferred.  We did look at the schedule A
10 that we received, the shorthand, I am calling it
11 schedule A on Sunday, and we did have Mike stay
12 up all night trying to figure out what he can
13 get quotes on and immediate supervision, was,
14 you know, through the chain and Miller, Tanja
15 Alto, Mike Fazio and Brad Geer, but I already
16 told you what the result was.  G-E-E-R.  I told
17 you what the results of that analysis was.
18   Q.    You said you didn't have a feel for
19 what securities were transferred.  Didn't you
20 have a list of securities that were transferred?
21   A.    We are going over this again.  As of
22 what date?
23   Q.    Well, you had a list of certainly most
24 of the securities that were being transferred
25 prior to closing, right?

Page 146

BURIAN

1
2          MR. TECCE:  Objection to form.
3          A.   I wasn't sure of that, no.  I had a
4    list of securities as of an uncertain date with
5    uncertain value in a tumultuous environment
6    where everyone is yelling and screaming that
7    people aren't sending things over, things aren't
8    there, should be there, you have junior people
9    from Lehman running down to DTC to check if the
10   securities were there and we had a list that
11   people told us not rely on.
12         We took it seriously and tried to
13   parse what those securities were listed at to
14   the extent we can get market information.  But
15   if you are asking me did we try to take a look
16   at what the market value of the public
17   securities on the schedule that we got on Sunday
18   were, yes.  If you ask me did we try to value
19   securities that were being transferred, the
20   answer is we didn't know.
21         Q.   My question really, is it your
22   testimony that you didn't even have a feel for
23   which securities were being transferred?
24         MR. TECCE:  Objection, form.
25         A.   We assumed it was some subset of what

Page 147

BURIAN

1
2    was given to us on Sunday, plus or minus what
3    could be a material amount.
4          Q.    But still, the vast majority, you
5    understood that the vast majority of securities
6    that were being transferred to Barclays were on
7    the list you were provided with Sunday, right?
8          A.    I made that assumption, but it could
9    have been right, it could have been wrong and,
10   frankly, when we heard the explanation about the
11   market movement and how the assets were affected
12   by the market, we had our doubts because so many
13   of the assets were -- had not deteriorated in
14   the market and, frankly, had moved up a little
15   bit that the whole thing was quite confusing.
16         Q.    As you sit here today, you don't know
17   whether most of the securities had transferred
18   to Barclays were, in fact, on the list you were
19   provided with as of Sunday before closing?
20         A.    I've been told that most of those
21   assets -- that represents a significant portion
22   of the assets that were transferred to Barclays.
23         Q.    And more than a significant portion.
24   Most, virtually all of the assets transferred to
25   Barclays, securities transferred to Barclays

Page 148

BURIAN

1
2    were on the list, apart from the clearance box
3    securities, were on the list provided to you on
4    Sunday, correct?
5          MR. MILLS:  Object to the form.
6          A.    I don't know that for a fact.
7          Q.    Do you believe that to be the case?
8          A.    I don't know.
9          Q.    So you think people may have given you
10   the wrong list of securities back in September
11   of 2008?
12         A.    I think that people gave me a list
13   that I was told was inaccurate, incomplete, and
14   wrong.  There was a lot of yelling and screaming
15   about securities moving all over the place and
16   then, lo and behold, I get the exact, identical
17   list five or six days later, no changes.
18         Yes, I was very suspicious if that
19   list was accurate.
20         Q.    So what you are saying is because the
21   list, the final list filed with the Court was
22   the same as the list that you were shown on
23   Sunday, that causes you to be suspicious about
24   whether the Sunday list was accurate?
25         MR. TECCE:  Objection to form.

Page 149

BURIAN

1
2          A.    I wasn't going to choose which was
3    which.  I had no reason to doubt that a Sunday
4    list was a list of securities off the Lehman
5    system.  I was surprised that the identical list
6    was filed, whenever that was, Wednesday,
7    Thursday, whenever it was filed, and that caused
8    us to ask questions.
9          Q.    Doesn't that just mean they gave you
10   an accurate list on Sunday?
11         A.    And that they lied to us on Sunday?
12   Which I --
13         Q.    What's your basis for saying that?
14         A.    Because on Sunday, we were told that
15   the assets were moving around because it had a
16   50 billion asset, we were told it was 44, 45.
17   Yes, one plausible explanation this is a list of
18   the assets, but the marks were from earlier in
19   the week and that all the transfers among and
20   all the yelling and screaming with JP Morgan and
21   DTC amounted to zero changes in the assets from
22   Sunday to Thursday.  That could be.  It didn't
23   sound right to me, but it could be.
24         Q.    Do you have any basis for believing
25   that the list you were given Sunday and the list

BURIAN

1
2  that was filed with the Court is not an accurate
3  reflection of the securities that were actually
4  transferred to Barclays?
5      A.   I would be happy to take your
6  representation if you are willing to put your
7  credibility on it.  We have not found anyone who
8  is willing to stand up and say this is what we
9  got.  I don't have a complete list of the assets
10  and how they were marked that went across.
11      Q.   When did you first come to believe
12  that anyone at Lehman or Weil or Barclays was
13  lying to you?
14      A.   I actually -- there is one regret I
15  have in this transaction is I was naive in that
16  I never seriously -- I did not seriously
17  consider that we were directly misrepresented to
18  until very late in the game.
19      Q.   When is late in the game
20  approximately?
21      A.   When the results started coming in for
22  the 2004.  I was always firmly in the camp of
23  this is a reconciliation that had plausible
24  explanations.  Junior people would write a
25  report, I would look at it, and the committee

BURIAN

1
2  would be happy.
3          Never -- well, I started to worry when
4  I read the JPM settlement documents.  I started
5  to worry then and I was very worried in February
6  when I particularly asked Lindsay Granfield and
7  asked counsel for Barclays and we had the
8  conference calls and said guys, just write the
9  report for me.  I am just trying to write a
10  report and be done.  Tell me what securities
11  went, when they went, and from whom they went
12  and I'll go away.  And when I got obfuscation
13  back, I started -- I must be -- maybe even
14  before the 2004, I started to get concerned.
15      Q.   If it were demonstrated to your
16  satisfaction that a reasonable value, a
17  reasonable market valuation of the repo
18  collateral was indeed in the 45 billion dollar
19  range, would you then be satisfied?
20      A.   In a manner consistent with how Lehman
21  broker/dealer would have marked their books as a
22  going concern?
23      Q.   Yes.
24      A.   I think that that fact would have been
25  consistent with a representation we received.

BURIAN

1
2  There may be other issues obviously.
3      Q.   Are there other issues?  If that were
4  demonstrated to you, would you be satisfied that
5  the deal that went forward was appropriate?
6      MR. TECCE:  Objection to form.
7      A.   Again, there are a number of issues.
8  And we are dealing with hypothetical that
9  appears not to be the case based on Jim Seery's
10  deposition and based on -- affidavit, I'm sorry,
11  and based on what has been uncovered about a 5
12  billion dollar negotiated discount from the
13  start.
14          But what I expected to happen was a
15  good faith analysis consistent with how a going
16  concern broker/dealer would have done it as to
17  what the values are.  If the values would have
18  been off by a little here and there because
19  people had concerns about particular assets,
20  that would not have surprised me that the
21  numbers would have moved from 50 billion to some
22  number north or south of that.  And I would have
23  thought that was consistent with what the judge
24  was told.
25      Q.   Other than the valuation issue that

BURIAN

1
2  you have identified, is there any other thing
3  you have a problem with concerning how the deal
4  was finalized, closed?
5      MR. TECCE:  Objection to form.
6      A.   I'm not the repository of every issue.
7  I think that we -- there is ambiguity about you
8  want -- yes, if you want -- if, in fact, it is
9  true that we didn't get back the regulated
10  capital but nevertheless, Barclays still wants
11  763 of securities, I'd have a problem with that.
12  That was never the context of the deal.
13          If, in fact, there were assets that
14  were transferred that were at LBHI, or belonged
15  to LBHI, I'd want them back.  In, if fact, there
16  were exchange-traded options, the stuff Mike is
17  concerned about.  But, you know, all this would
18  be known when we get the list.
19      MR. THOMAS:  We can switch the tape.
20      THE VIDEOGRAPHER:  Going off the
21  record, the time is 8:45.
22      (Recess)
23      THE VIDEOGRAPHER:  Back on the record,
24  the time is 8:49 p.m.  We are beginning of
25  the tape labeled 3.

Page 154

BURIAN

1
2     Q.   Let me show you the document marked as
3  769, and the top of it is an e-mail from Brad
4  Geer to Michael Fazio and Bell, Crayton and I
5  would like to ask you about one of the
6  attachments.  First of all, do you recognize
7  what the first attachment is?
8          (Exhibit 769, e-mail marked for
9  identification, as of this date.)
10    A.   I do.
11    Q.   Would you describe what it is, please?
12    A.   It is a summary of what we have been
13  referring to as schedule A.
14    Q.   What do you understand to be reflected
15  on schedule A?
16    A.   A summary by security type of the
17  securities and the book value of the repo
18  collateral.
19    Q.   And the next document, next attachment
20  at the top, it says, "LBI sale, value of assets
21  transferred to Barclays."  Do you see that?
22    A.   Yes.
23    Q.   Do you recognize this document?
24    A.   I do.
25    Q.   And you have had a chance to review it

Page 155

BURIAN

1
2  in the last couple of days?
3     A.   Yes.
4     Q.   And would you describe what the
5  document is, please?
6     A.   It's a draft summary which is a -- of
7  input from a variety of people into some of our
8  concerns that we want to investigate in the
9  Barclays sale.
10    Q.   And about halfway down, it says, the
11  components of value that were transferred to
12  Barclays are as follows, excluding buildings --
13  excuse me.  First one is schedule A assets.  And
14  do you understand that to be essentially the
15  repo collateral securities that were actually
16  transferred to Barclays?
17         MR. TECCE:  Objection to form.
18    A.   Again, is what they told us was being
19  schedule A, but yeah, it is -- the 4307 foots to
20  the 43069 on the previous page.
21    Q.   Column lines, "Approx collateral
22  released from JPM, 7 billion dollars," is that
23  broken out separately because of the whole JPM
24  issue and securities that didn't go to Barclays
25  and eventually --

Page 156

BURIAN

1
2     A.   It is broken out separately because
3  the face amount was supposed to be 50 million --
4  50 billion and the schedule on that list
5  included 7 billion of cash which, you know, I'm
6  not sure why he broke it out this way, but it is
7  7 billion of cash assets that either was
8  supposed to go or did go but never actually made
9  it to Barclays.
10    Q.   Do you know whose cash that was, the 7
11  billion?
12    A.   I am not getting involved in that one.
13    Q.   So if you get back to the -- we are
14  talking about, the issue was the repo collateral
15  50 billion versus 45 billion, you have to add
16  the 7 back into the 43 to get back to apples to
17  apples?
18    A.   Correct, correct.
19    Q.   So we are talking about repo
20  collateral of about 50 billion and then
21  miscellaneous securities in the box at
22  transaction date, those are the clearance box
23  securities?
24         MR. MILLS:  Object to the form.
25    A.   Correct.  To correct a previous answer

Page 157

BURIAN

1
2  here, you see Brad using 53 billion dollar which
3  foots to Mike Fazio's number from a previous
4  question where I thought it might be including
5  the RESIs.  We had two possibilities of what it
6  meant.  This is just support for the fact that
7  he is referring to your interpretation which is
8  the face amount plus the box assets.
9     Q.   And the reserves related to customer
10  accounts, that's the 15c3 assets, the 763
11  million in securities?
12    A.   Yeah, rounded up to 800,000.
13    Q.   Million?  800 million, right?
14    A.   800 million.  Sorry.  I'm tired.
15    Q.   So that totals to 52.8 billion?
16    A.   Right.
17    Q.   What was the 50 billion -- and call it
18  50 billion because I am adding the 7 billion
19  back to the 43 billion.  You will understand
20  what I am referring to?
21    A.   Yup.
22    Q.   And what was that value based upon?
23  How did you get the 50 billion?
24    A.   This is just write-off -- we saved a
25  copy of the schedule A we had received on Sunday

Page 158

BURIAN

1    BURIAN
2    and this is right off the Lehman marks.
3        Q.    The 50 billion in Lehman marks minus a
4    schedule A haircut, is that right?
5        A.    Correct, that's what it says.
6            MR. TECCE: Actually, can you tell him
7        where you are getting 50 from in this box?
8        A.    43.07 plus the 7 billion in cash is
9    50.07.
10           MR. TECCE: Sorry.
11       Q.    And by -- what is meant by -- let me
12   ask you -- do you know who prepared this
13   document?
14       A.    Again, this is a compilation, this
15   insert to this document was prepared by Brad
16   Geer, I believe, to the best of my knowledge.
17       Q.    And is this something that you
18   reviewed at the time?
19       A.    I did not review at the time this
20   insertion that went to Crayton Bell.
21       Q.    In terms of the attachment that's
22   entitled "LBI sale," the two-page value of
23   assets transferred to Barclays' document?
24       A.    At some point, I saw this. I did not
25   see this at the time that it was -- Brad made

Page 159

1    BURIAN
2    his comments. My understanding is Crayton
3    wanted help in understanding what the issues
4    were, Brad filled in some details, sent it back
5    to Crayton, and in the ordinary course, Evan
6    Flack or Dennis O'Donnell or somebody from
7    Milbank, maybe Crayton, would clean it up and
8    would send it to me for my thoughts.
9        Q.    And does this incorporate your
10   thoughts?
11       A.    This draft, this draft never went
12   anywhere. So do I disagree with the math we
13   just went through? No.
14       Q.    What was the purpose of the draft?
15       A.    To crystallize for Milbank -- this is
16   dated October 10. On October 8, we received a
17   presentation from Alvarez & Marsal that included
18   a brief, one-page summary of a transaction that
19   had a line that said 5 billion dollar discount
20   to reflect our daily marks or something like
21   that. There was an out -- there was a value
22   reduction and they reflected the marks. We
23   were --
24       Q.    You already knew about that issue?
25       A.    No.

Page 160

1    BURIAN
2            MR. TECCE: Objection to form.
3        A.    We were surprised to see it presented
4    that way by A&M. We knew that there was a 45
5    billion dollars securities supposed to be
6    transferred. We knew that basically some old
7    marks that were no longer relevant, the
8    difference was 5 billion. We had never seen it
9    presented that way that the Lehman books on that
10   day were 50 billion and someone reduced it by
11   some negotiated discount by 5 billion.
12           We weren't that -- we were concerned
13   but not that concerned because the language said
14   in the thing, on the page to reflect stale
15   marks. That was sort of consistent with Weil
16   with what we were represented the night before
17   the closing.
18       Q.    Had you previously assumed that the
19   Lehman marks of 50 billion were from some prior
20   day?
21       A.    Yes, we were told ignore them, they're
22   stale. So we always assumed they were old and
23   cold.
24       Q.    Did you know what was literally on the
25   books as of Sunday?

Page 161

1    BURIAN
2        A.    No, we didn't look at book on Sunday.
3        Q.    Did you ask to see what was on --
4        A.    We asked to see what the final assets
5    that went, how were they booked, what is the
6    transfer.
7        Q.    Is that when you got the schedule A
8    securities list?
9        A.    No. This is subsequent to -- before
10   and subsequent to getting the schedule A list on
11   Thursday before closing.
12       Q.    Well, put aside schedule A. Is it in
13   response to your inquiries, were you given the
14   list of securities which later came to equal
15   schedule A?
16       A.    Refer back in the deposition. You
17   have asked this. I have answered it.
18       Q.    You seemed to move a little bit?
19       A.    It is not moving.
20       Q.    Did you know on Sunday, did you think
21   that the 50 billion Lehman marks was not the
22   current Lehman marks, just old marks and there
23   were new marks on the books now or did you think
24   they were still the marks on the book and just
25   they were outdated and you didn't have --

Page 162

BURIAN

1  BURIAN
2  A.  I didn't have a firm recollection as
3  to whether or not this was the close of business
4  on Wednesday, Tuesday -- Wednesday, Thursday or
5  Friday.  We suspected because of the hullabaloo
6  about value that it must have been before that
7  and we were told it was outdated, so if you mark
8  it based on the fair market value as a
9  continuing business and consistent with the way
10 a broker/dealer would do it if it was done on
11 Friday, there would be no reason, no discussion
12 other than along the edges.  With a 5 billion
13 reduction, it better be pretty old.
14 Q.   How old would it have to be to make
15 sense in that market?
16     MR. TECCE:  Objection form.
17 A.   I haven't done the analysis.  If you
18 look at the page, page 2 of what you are showing
19 me, the summary, you know -- as you know from
20 the material we provided you, some of the
21 agencies, Treasuries, some of this stuff we
22 could take a look at.  But a lot of these other
23 things are indecipherable and we did not do an
24 analysis.
25 Q.   You are saying some of the assets and

Page 163

BURIAN

1  BURIAN
2  repo collateral were very difficult to value?
3  A.   No, I am saying they were difficult
4  for us to value because we had no facility with
5  them, no description with them, didn't have
6  access to the models that we used to value them.
7  Q.   Were you told that models were used to
8  value them?
9  A.   Oh, yeah, we were told that many of
10 these were private securities that they used
11 Excel spreadsheets or other formulas for valuing
12 them.
13 Q.   So you had -- what is -- it says
14 schedule A haircut.  Can you explain what that
15 is?
16 A.   The difference between the 50 billion
17 and 45 billion.
18 Q.   And --
19 A.   Or in this case, the 53 billion and
20 47, 48 billion.
21 Q.   So the new information you learned
22 from the Alvarez presentation on October 8 was
23 what?
24     MR. TECCE:  Objection to form.
25 A.   It wasn't new.  It was disturbing the

Page 164

BURIAN

1  BURIAN
2  way it was presented.  The idea that the marks
3  were stale and people looked at these things was
4  fine.  We never heard it described as a 5
5  billion dollar discount and that was very
6  disturbing.
7  Q.   Further down, underneath your -- so
8  you have a net total of 47.8, when you factor in
9  the 5 billion dollar reduction, correct?
10 A.   Correct.
11 Q.   Further down, it says, summary,
12 summary A at face value shows approximately 43
13 billion in value based on the marks in the
14 Lehman system at the time of the transaction.
15 Do you see that?  So the 43 billion, you
16 understood, was based upon the marks in the
17 Lehman system at the time of the transaction?
18 A.   No.
19     MR. TECCE:  Objection to form.
20 Q.   So this is inaccurate?
21 A.   It's guessing a little bit.  It's
22 based on the last -- we never got any update in
23 the schedule A with numbers that we got on
24 Sunday and we never got confirmation if they had
25 closed the books on Friday and marked them or

Page 165

BURIAN

1  BURIAN
2  not.  We suspected they didn't.  We didn't know
3  if it was done on Tuesday, Wednesday or
4  Thursday.
5      So the assumption was, since we never
6  got anything, this is the last there was and
7  then people had to make adjustments on the fly.
8  It was not -- Brad couldn't have known this for
9  a fact.  This is supposition.
10 Q.   How do you know he couldn't have known
11 this?
12 A.   Because I've asked him.  I've
13 discussed this.  I was involved.  He would have
14 told me.
15 Q.   So you think he is just making an
16 assumption here that he shouldn't have made?
17 A.   I think this is an internal crib
18 sheet.  It never went anywhere and I think a
19 more accurate way of saying it is, this is the
20 value in the last presentation or run that we
21 got from Lehman as opposed to saying this was
22 the Lehman marks.
23 Q.   You don't know one way or another
24 whether the marks were -- that run was current
25 or from --

BURIAN

which is what we have been going around and saying.

Q. Was it your understanding that when it says the amount that was agreed to between Lehman and Barclays, was it your understanding that that was an agreed amount that they came up with?

A. Mike Klein specifically told me that the value was between 44 and 45 and they agreed to round it up to 45.

Q. So there was, Barclays was thinking it was worth 44 or 45 and then Lehman was thinking -- do you know what Lehman's thinking was?

MR. TECCE: Objection to form.

A. I wasn't given a blow-by-blow of what it was. I was told that it -- they looked at it and whether there was room for dispute, Barclays was going to be charitable and round it up.

Q. So the number, your understanding is the number that the parties treated as value of the assets was something that was agreed to?

MR. TECCE: Objection to form.

A. Again, I don't know if you are



BURIAN

attaching meaning to the word "agreed to" by asking me it three times, but it is the same answer.

Q. That's yes?

A. I was told that this was a number rounded up from Barclays' view of fair market value that Lehman agreed to.

Q. And that was your understanding at the time of the deal also, correct?

A. We are talking about Sunday night, right?

Q. Yes.

A. So my understanding was that the parties in good faith looked at the assets in a manner consistent with how a broker/dealer would do, all of which turned out to be false, but that was my understanding at the time, and concluded that a range of 44 to 45 was fair and that they were going to treat it at 45.

Q. OK, skipping a couple of sentences, "Those we have looked at seem to suggest they are worth more than implied by the negotiated mark in the deal, which amount isn't shown detailed in any schedule."



BURIAN

A. Correct.

Q. That was your understanding of the situation as well?

MR. TECCE: Objection to form.

A. My understanding of the situation is we were not given a security-by-security analysis of how and which dropped in value and, therefore, you know, we didn't have an ability to reconcile the totals. That's what he said.

Q. But as of September 28, was it also your understanding that your -- based on your review of the securities that that review suggested that the securities were worth more than the parties had agreed to treat them as?

A. As I said before, based on what we were given Sunday, the analysis we quickly did in the limited time available, we were very worried, worried enough to demand an explanation and upset enough that Harvey actually said, OK, I'll get you someone to walk you through it. Then we got an explanation and we said we need to verify it. So I'm not sure what you are trying to go over again.

Q. And the attempts you tried to verify



BURIAN

that are referred to in the document, Exhibit 770 --

A. This is the same, this is the same.

Q. Those attempts would suggest --

A. This is the same, this is the same information that led me to the concerns that led me to make the request that got me the representations. This is September 28 -- this is a couple of days after the closing.

We just got a schedule which to our surprise was identical to the other one. We said this doesn't make a lot of sense, they are telling us this, there must be something going on here, let's figure out what's going on. Hey Milbank, go figure it out. Nothing happens.

We get the presentation from A&M. Oh, it looks like there really could be a problem. Let's make sure, Milbank understands what we are talking about, and let's make sure they demand the information.

Q. As of the date --

A. We kept escalating that degree of concern as we didn't get facts that contradicted our thesis.

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4

5

     IN RE:                      )
6    LEHMAN BROTHERS HOLDINGS,    ) Chapter 11
     INC., et al.,               ) Case No.
7                                ) 08-13555(JMP)
              Debtors.           )
8    _____ )

9

10

11

12

13

14

15           DEPOSITION OF ERIC CLARK

16             New York, New York

17         Wednesday, February 24, 2010

18

19

20

21

22

23

24   Reported by:

     PATRICIA A. BIDONDE, RPR
25   JOB #:  28627

Page 6

1          E. Clark
2        P R O C E E D I N G S
3          (Deposition Exhibit 647, notes
4      made by Eric Clark dated October 16,
5      2008, marked for identification, as of
6      this date.)
7          (Deposition Exhibit 648,
8      declaration of Eric Clark signed on
9      January 8, 2010, marked for
10     identification, as of this date.)
11         (Deposition Exhibit 649, report
12     from the former Lehman product
13     controllers of the PNL, marked for
14     identification, as of this date.)
15  E R I C   C L A R K, called as a witness,
16     having been duly sworn by a Notary
17     Public, was examined and testified as
18     follows:
19  EXAMINATION BY
20  MR. OXFORD:
21     Q.   Good morning, Mr. Clark.  We met
22  off the record.  My name is Neil Oxford.  I'm
23  with the law firm Hughes Hubbard & Reed, and
24  we represent Mr. Giddens, the SIBA trustee, in
25  this litigation.
      TSG Reporting - Worldwide    877-702-9580

Page 7

1          E. Clark
2          Have you ever been deposed
3   before?
4     A.   I have not.
5     Q.   Just some basic grouped rules.
6          If you can let me finish your
7   question before you begin to answer it, it
8   will allow Patricia to take everything down in
9   a timely manner.
10         It will also allow Mr. Shaw to
11  object in the unlikely event that I have an
12  objection to a question.
13         If you don't understand any of my
14  questions, I will be happy to try and rephrase
15  them, but if you do answer them, I will assume
16  that you have understood them.  Is that fair?
17    A.   Yes.
18         MR. SHAW:  What if his
19  understanding differs from your
20  understanding?
21         MR. OXFORD:  Then I think you'll
22  have an objection.
23    Q.   And if you would like a break at
24  any time, please, just let me know.
25         Can you tell me, please,
      TSG Reporting - Worldwide    877-702-9580

Page 8

1          E. Clark
2   Mr. Clark, what you did to prepare for this
3   deposition?
4     A.   I spoke to colleagues who were
5   also involved with aspects of the Lehman case,
6   so Stephen King and Lily McInerney and Hatim
7   Banaja.
8     Q.   Can you give me the spelling of
9   the last one, please?
10    A.   H-a-t-i-m, B-a-n-a-j-a.
11    Q.   And did you review any documents,
12  sir?
13    A.   I -- the one we have in front of
14  us, I reviewed that.  I've seen e-mails as
15  part of --
16         MR. SHAW:  We're not going to go
17  into what you did while you were meeting
18  with counsel.
19         THE WITNESS:  Okay.
20         MR. OXFORD:  Just so the record
21  is clear, Mr. Clark was pointing to
22  Exhibit 647 as the document that he
23  reviewed.
24    Q.   Is that correct?
25    A.   Yes.
      TSG Reporting - Worldwide    877-702-9580

Page 9

1          E. Clark
2     Q.   Thank you.
3          Other than the Exhibit 647,
4   Mr. Clark, did you review any e-mails during
5   your preparation that refreshed your
6   recollection about the events that are
7   described in your declaration?
8     A.   No.
9     Q.   Okay.  Looking at Exhibit 647,
10  please, can you tell me what this document is,
11  please?
12    A.   These were my notes talking to
13  how at the -- the listed options taken as
14  parts of the acquisition were dealt with.
15    Q.   I see that the notes are dated
16  the 16th of October of 2008.  Is that correct?
17    A.   Yes.
18    Q.   Were they created at that date?
19    A.   I'm not sure I understand the
20  question.  I --
21    Q.   Let me try it a different way.
22         For what purpose did you create
23  these notes?
24    A.   Pull together the events around
25  this issue.
      TSG Reporting - Worldwide    877-702-9580

Page 14

1          E. Clark
2    quite wide.
3              I would think they had some.
4    They... do you mind asking your question in a
5    different format?  I feel like I'd have to say
6    yes, because they would have to have some
7    knowledge of the equity markets, so they would
8    have some expertise.
9          Q.   Can you tell me, as best you
10   know, what expertise they did have?
11         A.   I would be speculating.
12         Q.   Okay.  Thank you.  I'm not
13   looking for your speculation.
14              To your knowledge, sir, did the
15   PMTG include specialists in single stock
16   listed options?
17         A.   To my knowledge, they did not
18   include specialists.
19         Q.   To your knowledge, sir, was there
20   another group within Barclays that specialized
21   in --
22         A.   There was, yes.
23         Q.   I just want to make sure we have
24   a clean record.
25              To your knowledge, sir, was there
         TSG Reporting - Worldwide     877-702-9580

Page 15

1          E. Clark
2    another group within Barclays that did
3    specialize in that trading and risk management
4    of that single stock listed options such as
5    those that were transferred from the Lehman
6    accounts 074C and 074F?
7          A.   It's worth making the point that
8    the size and nature of the portfolio taken on
9    would mean that we did not have people in
10   Barclays -- who, within Barclays, were doing
11   similar work.  We were dealing with Barclays
12   with much smaller numbers of listed options.
13              I don't know whether they have
14   experience doing that in other firms, but they
15   wouldn't have picked that up doing it in
16   Barclays US because of different sizes of the
17   portfolios.  But I would count those people as
18   experts in managing listed option equity risk.
19         Q.   Do you know the name of the group
20   you've just described, sir?
21         A.   Equity derivatives trading.
22         Q.   Do you have an understanding,
23   sir, of the volumes of positions that the
24   equity derivatives trading group at Barclays
25   in September of 2008 was typically handling?
         TSG Reporting - Worldwide     877-702-9580

Page 16

1          E. Clark
2          A.   I don't know the answer to that
3    question, but I think it's in the high
4    hundreds, low thousands.  But that number
5    could be off.
6          Q.   And is that a number of trades
7    being executed every day, sir?
8          A.   No.  It would be a number
9    referring to trades done across positions over
10   perhaps a month.
11         Q.   Do you know if any individual
12   from the trading group you've just described
13   were consulted in the management of the risk
14   associated with owning the options described
15   in your memorandum?
16         A.   Once post-closing?  Yes.  I know
17   that they were consultants.
18         Q.   Could you give me the names of
19   those individuals, please, sir.
20         A.   Nick Moriera.  I'll spell that.
21   Nick, as you expect, and then Moreira,
22   M-o-r-i-e-r-a.  Thierry, T-h-i-e-r-r-y, Lucas,
23   L-u-c-a-s, and Nick Lehhane, L-e-h-h-a-n-e.
24              The Thierry Lucas, I'm not sure
25   I'm spelling it right.  I'd have to check.
         TSG Reporting - Worldwide     877-702-9580

Page 17

1          E. Clark
2          Q.   How do you know, sir, that these
3    people were consulted in the management of
4    risk you've just described?
5          A.   My role at the time was to do the
6    accounting for the equity derivatives desk in
7    addition to a couple of other
8    responsibilities, a couple of other trading
9    desks.
10         Q.   And the next bullet point, sir,
11   under your summary, you write:  "They were
12   removed from the Lehman system infrastructure,
13   but could not be booked on the Barcap
14   infrastructure due to capacity constraints
15   (positions was in excess of 70,000 options)."
16         Do you see that?
17              MR. SHAW:  You need to answer it
18   orally.
19         A.   Sorry.  Repeat the question,
20   please.
21              MR. OXFORD:  Could you read it
22   back, please.
23              (Record read.)
24         A.   Yes.
25         Q.   Do you know the name, sir, of the
         TSG Reporting - Worldwide     877-702-9580

E. Clark

1
2    Lehman system infrastructure from which the
3    systems were removed?
4         A.   I can't recall.
5         Q.   Do you know when they were
6    removed, sir?  Was it on the 22nd?
7         A.   I don't know.  Thereabouts,
8    but...
9         Q.   Well, I think you told me earlier
10   that the portfolio was transferred to the PMTG
11   on the 22nd.
12        What did you mean by that, sir?
13        A.   Post-closing, PMTG were the
14   owners of that portfolio, so...
15        Q.   Are you describing in your last
16   answer risk transfer within various groups
17   within Barclays?
18        A.   I'm not.
19             As part of the acquisition,
20   Barclays became the owners of a number of
21   assets, and PMTG were the owners.
22        Q.   Okay.  So let's back up.
23             You -- can you tell me what you
24   mean by, "At acquisition, the portfolio was
25   transferred to PMTG"?

E. Clark

1
2         A.   So when the transaction closed,
3    Barclays became owners of a number of assets.
4              PMTG were the desk nominated to
5    take ownership of all of those assets.  And
6    the listed options are part of those assets,
7    so they would -- that's why I phrase it as
8    they took over the -- they were transferred to
9    the -- they became the owners.
10        Q.   You go on to say that the
11   positions "couldn't be booked on the Barcap
12   infrastructure due to capacity constraints."
13        What do you mean by that, sir?
14        A.   The Barclays system would not
15   support that number of this type of product.
16   It was not designed to do so.
17        Q.   And when, to your knowledge, sir,
18   did Barclays first become aware of that?
19        MR. SHAW:  Objection.  Calls for
20   speculation.  Foundation.
21        You can answer if you know.
22        A.   I don't know the answer to that
23   question, but it would have been very close to
24   after closing.
25        Q.   Do you know what the capacity was

E. Clark

1
2    of the Barcap infrastructure?
3         A.   I do not know.
4         Q.   The next bullet of your summary,
5    sir, says, "Barcap executed S&P index futures
6    and options as hedges against the portfolio."
7         Do you see that?
8         A.   I do, yes.
9         Q.   When did Barcap execute those
10   hedges?
11        A.   In the days following the
12   closing.
13        Q.   Can you be more specific?
14        A.   In the two days following
15   closing, but then some of them, I think, would
16   have been done after that.
17        Q.   Who within Barclays, sir, would
18   have the most knowledge about when those
19   hedges described in your third bullet were
20   executed?
21        A.   That information would be
22   available from the system that we have, so it
23   would be accessible by a number of people.
24             You say "most knowledge."  That's
25   not quite the right -- there were a number of

E. Clark

1
2    different people who could get it.
3         Q.   What is the name of the system,
4    sir, that you would access to if you did not
5    have permission?
6         A.   It's called Sophis, S-o-p-h-i-s.
7    That's the Barclays equities risk system.
8         Q.   So, sir, if you wanted to know
9    when the hedges you describe in bullet point 3
10   were executed, you or someone on your behalf
11   would be able to create a Sophis system?
12        A.   Yes.
13        Q.   Would that be a difficult thing
14   to do?
15        A.   I'm not sure of the
16   record-keeping, but I would not think so.
17        Q.   Do you know who at Barclays would
18   be responsible for executing those hedges?
19        A.   The three gentlemen I mentioned:
20   The two Nicks and Thierry, probably most of
21   the people that were doing it.  There may be
22   others on the equity desk.  But it would be
23   mainly them.
24        Q.   Do you have any knowledge, sir,
25   of why Barclays did not put on stock-specific

Page 26

E. Clark

1
2     A.   I would have spoken to the two
3  individuals, Lily and Hatim, who I mentioned
4  at first.
5     Q.   Millie's last name is?
6     A.   Lily.  Lily McInerney, who was
7  the first person, and Hatim.  They worked for
8  Lehman.  I spoke to them.
9          I can't recall anyone else.
10  There were -- there were conversations.
11     Q.   Would you agree with me that
12  Barclays, either as of the close or shortly
13  after the close of this deal, had enough
14  information to place at least the S&P index
15  hedges that they placed?
16          MR. SHAW:  Objection to form.
17     A.   I think the basis that they made
18  the decision to execute those trades was based
19  on their broad assumptions about that
20  portfolio.  They lacked the knowledge they
21  would want.
22          But I think there was -- the
23  trading decisions would have been made on a
24  mixture of what they were aware of about the
25  portfolio and also their assumptions around

TSG Reporting - Worldwide    877-702-9580

Page 27

E. Clark

2  what sort of -- what that portfolio was likely
3  to contain, given the nature of Lehman's
4  business, and also, I would say, their
5  appetite to market risk, their feeling around
6  the market at the time.
7          So I think it's a combination of
8  those -- it's a combination of those things.
9     Q.   If Lehman, sir, had -- withdrawn.
10          If Barclays had a list of the
11  individual options positions that it was
12  acquiring from OCC prior to the close, do you
13  believe Barclays was in a position to
14  adequately hedge that risk?
15          MR. SHAW:  Objection to form.
16          That question got garbled in the
17  middle of it.
18     Q.   Sir, if Barclays, prior to the
19  closing of the transaction, had a list of the
20  equity options that it was acquiring from
21  Lehman, do you believe that Barclays had
22  enough information to hedge any risk
23  associated with the ownership of those
24  options?
25          MR. SHAW:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 28

E. Clark

2          You can answer if you know.
3     A.   If they had it.
4          And the information -- you're
5  saying if they had a list of the options,
6  they -- it would not.
7          These are -- these are complex
8  positions which you need to have in a computer
9  system in order to see how they move when the
10  market moves, so I -- really, a list of the
11  options as the broad economic details of the
12  transactions, it would have been helpful.
13          But without them on a system, it
14  would not have been close to being able to
15  fully hedge them.
16     Q.   Okay.  Are you aware, sir,
17  whether or not Barclays acquired the Lehman
18  system infrastructure on which these options
19  were managed while at Lehman?
20     A.   They did acquire that
21  infrastructure.
22     Q.   And are you aware, sir, whether
23  or not Lehman -- withdrawn.
24          Are you aware, sir, whether or
25  not Barclays had transferred to them the

TSG Reporting - Worldwide    877-702-9580

Page 29

E. Clark

2  Lehman employees who were responsible for
3  managing the risk associated with carrying
4  these options on Lehman's books?
5          MR. SHAW:  Objection to form.
6     A.   I am speculating a little bit,
7  but yes, I think they were transferred.  Those
8  employees moved across to Barclays.
9     Q.   Okay.  Did those employees
10  include Lily McInerney?
11     A.   She's a product controller and
12  accountant, like I am, so she should not be
13  managing the risk, and the same with Hatim.
14     Q.   Okay.  Do you know the name of
15  the individuals at Lehman who were responsible
16  for managing the risk of Lehman's equity
17  options prior to the purchase of that business
18  by Barclays?
19     A.   I don't.
20     Q.   Okay.  Now, your fourth bullet
21  point, sir, says:  The "positions were booked
22  back on to the Lehman infrastructure on
23  October 2nd."
24          Do you see that?
25     A.   Yes.

TSG Reporting - Worldwide    877-702-9580

Page 30

E. Clark

1
2      Q.   And how is it you know the
3  positions were booked back on that
4  infrastructure?
5      A.   Conversations at the time with
6  the people who were managing that process.
7      Q.   Okay.  And who were those people?
8      A.   Lily and Hatim, again, would have
9  been involved.  They would not have been doing
10  the actual booking, and I don't remember the
11  names of the people who were physically
12  getting them back in.
13      Q.   Do you know, Mr. Clark, who was
14  responsible for the decision to rebook these
15  positions to the Lehman infrastructure on
16  October 2nd?
17      A.   Stephen King.
18      Q.   Do you know, sir, whether or not
19  between the time when the positions were
20  removed from the Lehman infrastructure -- I
21  think you said shortly after the closing and
22  October 2 -- whether these positions were
23  booked in any computer system or
24  infrastructure?
25      A.   My understanding, they were not

TSG Reporting - Worldwide     877-702-9580

Page 31

E. Clark

1
2  booked in any computer system.
3      Q.   Okay.  Do you have any
4  understanding, sir, of why they were not
5  booked back to the Lehman infrastructure prior
6  to October 2nd?
7      A.   I think it's a combination of
8  nobody had the idea for a few days, and then
9  we needed to think whether there was a better
10  way of doing it.  And then it took a bit of
11  time to get them back on.
12      Q.   Do you know why Mr. King made the
13  decision to move the positions back to the
14  Lehman infrastructure on October 2nd?
15      MR. SHAW:  Objection.
16      Foundation.
17      A.   At the time, it was the best
18  place for them to go, to move to somewhere
19  where we would be able to manage the risk that
20  they had from the situation we were in where
21  we couldn't.
22      Q.   Then do you agree, sir, that
23  Lehman's system infrastructure would have been
24  the best place for them to be able to manage
25  the risk associated with owning those

TSG Reporting - Worldwide     877-702-9580

Page 32

E. Clark

1
2  positions between the closing of the
3  transaction and October 2nd?
4      MR. SHAW:  Objection.
5      Foundation.
6      A.   May I read it back, please?
7      MR. OXFORD:  Of course.
8      A.   (Reading.)  I can't talk to the
9  state of the Lehman systems for the period of
10  time post-closing to somewhat before October
11  the 2nd, so I would -- so I don't think I can
12  answer that -- that question.
13      Q.   Do you have any reason to
14  believe, sir, that there was some defect in
15  the Lehman's systems that made it
16  inappropriate for the transfer of those
17  positions back to the Lehman system prior to
18  October 2nd?
19      MR. SHAW:  Objection.
20      Foundation.
21      A.   I'm not sure the systems were on
22  for a few days afterwards.
23      "Defect" depends on your
24  definition.  I don't think that would -- I'm
25  not sure it would have been possible.

TSG Reporting - Worldwide     877-702-9580

Page 33

E. Clark

1
2      Q.   And you're not sure it would have
3  been possible because the systems couldn't be
4  switched on?
5      MR. SHAW:  Objection.
6      Foundation.
7      A.   I'm not sure it would have been
8  possible because I don't know whether they
9  were switched on.
10      Q.   Your next bullet point, sir,
11  reads:  "PMTG desk owned the risk of the
12  options and the related hedges from the
13  acquisition to their transfer to the ex-Lehman
14  traders on October 7th."
15      Do you see that?
16      A.   I do, yes.
17      Q.   Can you explain what you mean by
18  that, please?
19      A.   Barclays had become owners of
20  these positions, and the PMTG desk was where
21  those positions were held.  So these positions
22  are, indeed, other positions that were taken
23  on.
24      So to account for those
25  positions, the PMTG desk would make or lose

TSG Reporting - Worldwide     877-702-9580

Page 34

E. Clark

1
2  money based on the market movements from them.
3      Q.    The related hedges that you refer
4  to in that bullet point, sir, are those the
5  S&P index futures and options hedges that are
6  described in bullet point 3?
7      A.    They are, yes.
8      Q.    Do they include any other hedges?
9      A.    Not to my knowledge.
10     Q.    Okay.  So is the following the
11  correct chronology?  The OCC 74M and F
12  positions were moved from the Lehman
13  infrastructure in an attempt to book on the
14  Barclays infrastructure sometime in the days
15  immediately following the close of the
16  transaction.  Is that correct?
17     A.    Do you mind repeating the
18  question, please.
19         MR. OXFORD:  Could you read it
20      back, Patricia.
21         (Record read.)
22     A.    I think "moved" is not quite the
23  right word, because the Lehman infrastructure
24  just wasn't really there anymore.  It had
25  been, to my knowledge, switched off.

TSG Reporting - Worldwide    877-702-9580

Page 35

E. Clark

2  But I think to your question, we
3  did attempt to get them onto Barclays' systems
4  for the few days following the closing.
5      Q.    And that attempt was
6  unsuccessful, sir?
7      A.    It was, yes.
8      Q.    And on October 2nd, the Lehman
9  infrastructure was revived.  Correct?
10     A.    By October 2.
11     Q.    Thank you.
12  By October 2nd, the Lehman
13  infrastructure was revived.  Correct?
14     A.    Yes.
15     Q.    And the same positions that had
16  been removed from the Lehman infrastructure
17  were rebooked on October 2nd?
18         MR. SHAW:  Objection.
19         Mischaracterizes prior testimony.
20     Q.    Is that correct, sir?
21     A.    Similar to my previous -- I don't
22  know if "removed" is quite the right word.
23         But they did go back onto the
24  Lehman -- they were booked onto the Lehman
25  infrastructure on the 2nd.

TSG Reporting - Worldwide    877-702-9580

Page 36

E. Clark

1
2      Q.    Well, maybe I'm missing
3  something.
4         But if they never left that
5  Lehman infrastructure, why did they need to be
6  booked on it?
7      A.    They would have been originally
8  in ex-Lehman legacy books, so they needed to
9  be put in new books to reflect that -- who
10  owned them, which books they were parceled
11  into.
12     Q.    And the options and related
13  hedges, sir, were transferred to the ex-Lehman
14  traders on October 7th?  Is that correct?
15     A.    That's correct, yes.
16     Q.    And the ex-Lehman traders were
17  now employed by Barclays?
18     A.    That's correct, yes.
19     Q.    Were these the same traders who
20  managed the -- withdrawn.
21         Were these the same Lehman
22  traders who were responsible for managing the
23  risk of the same options while they were
24  employed by Lehman?
25         MR. SHAW:  Objection.

TSG Reporting - Worldwide    877-702-9580

Page 37

E. Clark

1
2  Foundation.
3      A.    I'm afraid I don't know.
4      Q.    Who would know the answer to that
5  question?
6         MR. SHAW:  Objection.
7  Foundation.
8      A.    I think Lily would know that.
9      Q.    Your next bullet point reads,
10  sir:  "PMTG agreed to pay the ex-Lehman
11  options desk USD $80 million for the cost they
12  would likely incur in closing the option
13  positions."
14         Do you see that, sir?
15     A.    I do, yes.
16     Q.    Is that a reference to the
17  options positions that had been placed as
18  hedges, or is it a reference to the options
19  positions that Barclays had acquired from
20  Lehman OCC 74M and F accounts?
21     A.    I think it would cover both, but
22  I'm speculating somewhat.
23     Q.    Well, who would -- withdrawn.
24         What's the source of your
25  information for this statement, sir?

TSG Reporting - Worldwide    877-702-9580

Page 38

E. Clark

1
2        A.    E-mails and conversations at the
3    time between the -- the agreement between
4    Stephen King and the ex-Lehman listed options
5    traders about what was necessary in order for
6    them to take on the positions and likely costs
7    that they would incur, both in, to your point,
8    moving the existing hedge into a single stock
9    hedge and also closing -- where necessary,
10   closing the options themselves.
11        Q.    Are you able to tell me, sir,
12   when that agreement between PMTG and the
13   ex-Lehman's options desk was reached?
14        A.    I couldn't tell you the exact
15   date now, but my guess would be sometime in
16   the couple of days before the 2nd.
17            MR. SHAW:  The 2nd or the 7th?
18            THE WITNESS:  2nd.  Thank you.
19        Q.    Your next bullet point reads,
20   sir:  "PMTG agreed that the ex-Lehman desk
21   would act on an agency basis for the PMTG desk
22   to put on appropriate stock and option hedges
23   for the portfolio as the existing hedge's
24   underlying was the S&P index, while the
25   underlying risks of the portfolio were the

TSG Reporting - Worldwide    877-702-9580

Page 39

E. Clark

1
2    price and volatility of the individual
3    stocks."
4            Do you see that, sir?
5        A.    I do, yes.
6        Q.    Can you explain to me what you
7    mean by that?
8        A.    The portfolio was -- as a single
9    stock portfolio, there would have been risks
10   in it that would not have been caught by the
11   index hedges.
12            And, for example, the single
13   stock delta, vega, and gamma, which are
14   measurements of how the option valuation moves
15   given movements in different market variables,
16   those -- the impact of those variables would
17   not be captured by the hedges that we had on.
18   There would be an element of that, but in no
19   way close to being hedged.
20            So to get out of the S&P hedges
21   into the appropriate single stock hedges to
22   have a hedge portfolio would cost money.
23            And the PMTG desk agreed with the
24   single stock traders, the legacy Lehman single
25   stock traders, that -- for a period of time --

TSG Reporting - Worldwide    877-702-9580

Page 40

E. Clark

1
2    I think it was a couple of days -- they would
3    act as an agent, really, to try and get the
4    portfolio into a position where they were
5    comfortable to take it on as part of their own
6    portfolio, and through that process, there
7    would be closing options and also switching
8    hedges.
9            So to your point, they would have
10   been getting out of S&Ps into the appropriate
11   single stocks, because we would now have sight
12   of the underlying risks or the underlying
13   equities that were part of the portfolio but
14   also the option risks that they would have
15   created, which would -- otherwise, it would
16   have been very difficult.  You cannot hedge
17   those before you have them on the system.
18        Q.    And there's an agreement between
19   PMTG and the ex-Lehman desk that's in your
20   seventh bullet, sir.
21            Can you tell me when this
22   agreement was reached?
23        A.    Not exactly, but in the couple of
24   days before the -- before they started to do
25   it.

TSG Reporting - Worldwide    877-702-9580

Page 41

E. Clark

1
2        Q.    Before they started --
3        A.    So a couple of days prior to
4    October the 2nd.  Maybe a day.
5        Q.    Sir, the last bullet of your
6    summary reads:  "The initial estimation of
7    this cost was $100 million.  The final
8    estimate from the ex-Lehman traders was close
9    to $200 million, and this difference drove the
10   p&l change seen by the PMTG desk on these
11   positions."
12            Do you see that?
13        A.    I do, yes.
14        Q.    Can you explain to me what you
15   mean by that?
16        A.    When they were reaching an
17   agreement that there would be an agency basis
18   for getting the options into appropriate --
19   excuse me -- the option portfolio into an
20   appropriate state, the Lehman traders felt
21   that they wanted to take it on that they had
22   been hedged.
23            The ex-Lehman guys -- traders --
24   excuse me -- gave an estimate of what they
25   thought that would -- what sort of cost they

TSG Reporting - Worldwide    877-702-9580

Page 42

```
 1                    E. Clark
 2  would incur in the market, doing the various
 3  things they were going to do to get the hedges
 4  and close out some positions but offsetting
 5  hedges onto these single stock options.
 6          And I heard in the discussion
 7  there was an estimate given of 100 million,
 8  and then once we got to the end of the
 9  process, that number turned out -- had come in
10  at 200 million.
11      Q.   Do you have any understanding,
12  sir, of the final cost of that exercise?
13      A.   Could you be more specific about
14  which bit you're asking for?
15      Q.   Well, I'm afraid it's driven from
16  your memo, so maybe I need to ask you to be
17  more specific about your memorandum.
18      You say: "The initial estimation
19  of this cost was $100 million."
20          Do you see that?
21      A.   Yes.
22      Q.   What are you referring to when
23  you talk about "this cost"?
24      A.   That's the cost of getting the
25  portfolio into a position where they had
```
TSG Reporting - Worldwide   877-702-9580

Page 43

```
 1                    E. Clark
 2  hedged as much of the risks using the
 3  appropriate single stock hedging options so
 4  that they were comfortable to take the
 5  portfolio on.
 6      Q.   So the estimated cost for
 7  doing -- putting on the best possible
 8  hedges -- again, this is the portfolio of
 9  positions in 074M and F that Barclays acquired
10  from Lehman -- was initially $100 million?  Is
11  that correct?
12          MR. SHAW:  Objection to form.
13      A.   Do you mind repeating?  I'll read
14  it.
15          (Reading.)  I would say the 100
16  million refers to the cost of getting the
17  portfolio into position where they were
18  comfortable to take it.
19          There would have been, to your
20  point, some hedges executed.  They would have
21  been trading out of those positions as well,
22  all of which is likely to generate costs.  An
23  estimate was made of 100 million, and it came
24  in at 200 million.
25      Q.   From whom did you get these
```
TSG Reporting - Worldwide   877-702-9580

Page 44

```
 1                    E. Clark
 2  initial and final costs, sir?
 3      A.   The final costs would have come
 4  out from the accounting information that I was
 5  given by the product controllers who were
 6  looking after that system.
 7          When you say the initial costs --
 8      Q.   The initial estimate of $100
 9  million.
10      A.   That was out of the discussions
11  with Stephen King and the Lehman legacy
12  traders.
13      Q.   Can you be more precise, sir,
14  than the round figure of 200 million as to the
15  final cost of fully hedging and making the
16  ex-Lehman desk comfortable with the risk of
17  managing these positions taken from OCC
18  account 74M and F, as you've described?
19          MR. SHAW:  Objection to form.
20      A.   No, I cannot.
21      Q.   Where would that information be
22  contained, sir?  Would it be contained in a
23  document?
24          MR. SHAW:  Objection to form.
25  Foundation.
```
TSG Reporting - Worldwide   877-702-9580

Page 45

```
 1                    E. Clark
 2      A.   I think the -- it would be
 3  difficult to get to that number, because the
 4  positions were now booked into portfolios and
 5  mixed up with -- mixed up -- combined with
 6  other positions.
 7      Q.   Where did you get your estimate,
 8  sir, of close to $200 million?
 9      A.   It would have been from the
10  systems, so -- but within the number that I
11  would have used to get to that 200 was --
12  would also have included other factors.  So
13  it's hard to strip it out.
14      Q.   What other factors would it have
15  included, sir?
16      A.   Market movements.
17      Q.   Any other factors apart from
18  market movements?
19      A.   I can't think of anything that
20  would be significant.
21      Q.   Okay.  Moving down the page, sir,
22  there's a series of -- there's, it looks like,
23  a table that is headed:  "P&L calculation for
24  the period PMTG owned the options."
25          Do you see that?
```
TSG Reporting - Worldwide   877-702-9580

Page 46

E. Clark

1
2     A.    I see.
3     Q.    Is that period September 22nd to
4 October 7, 2008?
5     A.    Yes.
6     Q.    And taking each of the entries in
7 turn, can you describe for me what they
8 represent to you, sir?
9     A.    The options number is the P&L
10 movement on the single stock option portfolio
11 that we had.
12         The Hedges (options and futures
13 at Barcap) are the listed options and futures
14 put on that we discussed earlier to Barclays'
15 infrastructure.
16         Hedges (futures at Lehman) were
17 similarly hedging transactions done, but they
18 were separate, because they were done on the
19 Lehman infrastructure.
20         Stock (assignments and hedges) is
21 the P&L impact on the stock trades that were
22 done as part of managing the portfolio risks
23 and also assignments where options had, during
24 the period, expired.  And they expired in the
25 money for whether we or the account's party

TSG Reporting - Worldwide    877-702-9580

Page 47

E. Clark

1
2 owned them or we or the exchange owned them,
3 depending upon where the option was, and that
4 meant we would have had to purchase or to sell
5 stock, depending on which way around the
6 option was.
7         And then "Payment by PMTG for
8 likely cost of closing positions" is what we
9 discussed.
10     Q.    Looking at the first hedges line
11 there, sir, that has the entry -- a positive
12 entry of 349 million, is it fair to
13 characterize that as the profit from hedges
14 that were placed sometime prior to October 7th
15 through the date of October 7th?
16     A.    Yes.  Yes, it is.
17     Q.    And is that same description also
18 accurate for the $80 million figure below
19 that?
20     A.    Yes, it is.  They were prior to
21 October the 7th up to October the 7th.
22     Q.    And are you able to give me any
23 further description of the hedges that were
24 put on at Lehman?  Were those single stock
25 hedges or S&P hedges?

TSG Reporting - Worldwide    877-702-9580

Page 48

E. Clark

1
2     MR. SHAW:  Objection.
3 Mischaracterizes prior testimony.
4     A.    From the comment, it says,
5 "Futures at Lehman," so I would read that as
6 S&P futures.  But I am speculating somewhat.
7     Q.    And the $349 million profit on
8 hedges, sir, was -- is that the profit from
9 the hedges that were put on by the ex-Lehman
10 desk on an agency basis?
11     A.    No.
12     Q.    What is it, sir?
13     A.    It's the profit on the indexing
14 future and options done by the Barclays
15 traders.
16     Q.    Described in bullet point 3?
17     A.    Yes.
18     Q.    Is there any profit or loss prior
19 to October 7th of the hedges that are
20 described in the second to last bullet point
21 under your summary, sir?
22     A.    I'm afraid I don't understand
23 your question.
24     Q.    What I'm trying to do is link the
25 narrative in your summary of events to the

TSG Reporting - Worldwide    877-702-9580

Page 49

E. Clark

1
2 figures in your calculation at the bottom of
3 the page.  That's not a question.  I'm just
4 trying to explain what I'm -- where my
5 questions are drawn from.
6     A.    Thank you.
7     Q.    And you told me that the 349
8 relates to the S&P index futures and options
9 hedges that Barcap placed that were described
10 in bullet point 3.
11         The hedges that result in an
12 $80-million profit immediately below the 349
13 figure, is there a narrative description that
14 describes those hedges in your summary?
15     A.    The second to last point refers
16 to them executing hedges, stock and option,
17 and with -- it doesn't mention the futures
18 within that, but I would -- I would treat it
19 as characterizing all the hedging activity
20 that they were doing around the portfolio,
21 which included some futures.
22     Q.    Right.  I think we now understand
23 each other.
24         So is it true, to the best of
25 your knowledge, sir, that the hedging

TSG Reporting - Worldwide    877-702-9580

E. Clark

1
2 reflected in bullet point 3 results in the
3 $349 million profit, which is the second line
4 of your calculation?
5     A.   That's right, yes.
6     Q.   And the profit that results from
7 the hedging described in your second to last
8 bullet point is the 80 million, which is the
9 third line?
10     A.   That's not right.
11          Within a number of these lines,
12 you would see the activities that the P&L
13 impact -- excuse me -- of the activities I
14 mention, so I list sort of stock option.
15          As we've said, I could have put
16 futures in there as well, and they would have
17 been in a number of these categories.  Perhaps
18 I can give an example of what they might be
19 doing.
20          In options, they might be -- in
21 the options figure of 6620, that could include
22 them executing listed options transactions,
23 which you would count as hedges or to close
24 the portfolio, given the complexity of it.
25          Now, you would see that as

TSG Reporting - Worldwide    877-702-9580

E. Clark

1
2 hedging, as described in the penultimate
3 point, but I wouldn't -- it's not in another
4 line.  It's in the 6620 line with the market
5 movements and other things driving the option
6 valuation.
7     Q.   When you say "the 6620 line,"
8 sir --
9     A.   662.  Excuse me.
10          So your question, it's not in
11 there, because it's spread both in there and
12 in other lines.
13     Q.   I understand.  Thank you.
14          Turning the page on Exhibit 647,
15 sir, you have a section on "Valuation and
16 Price Testing."
17          Do you see that?
18     A.   I do, yes.
19     Q.   Just so we're clear, we're
20 talking about the same options that came from
21 074M and F.  Correct?
22     A.   We are, yes.
23     Q.   The second paragraph reads:  "The
24 valuation team has price tested the valuation
25 of the positions at acquisition and checked

TSG Reporting - Worldwide    877-702-9580

E. Clark

1
2 the overall valuation of the same portfolio at
3 the transfer date."
4          Do you see that?
5     A.   I do, yes.
6     Q.   Do you know when the valuation
7 team actually valued the positions?
8     A.   I'm sorry.  I can't recall.
9     Q.   Do you know if they did it at
10 acquisition or sometime between the
11 acquisition and the date of your memorandum?
12     A.   I know that they did it between
13 acquisition and the date of the memorandum.
14     Q.   But you can't be more specific
15 than that?
16     A.   They would have done it quite
17 close to acquisition, so far closer than it
18 was to the date of the memorandum.
19          But they can't have done it at
20 acquisition.  The timing doesn't work.
21     Q.   Who's responsible for the
22 valuation team, sir?
23     A.   At the time, there was a chap
24 called Jerry Shi.
25     Q.   Is he no longer employed by

TSG Reporting - Worldwide    877-702-9580

E. Clark

1
2 Barclays?
3     A.   He is no longer employed by
4 Barclays.
5     Q.   Do you know where he's employed
6 today?
7     A.   I don't, actually.  No.  I'm
8 sorry.
9     Q.   Your memo goes on to say:  "The
10 valuation team's price testing data is
11 independent and ultimately from OPRA at 4 p.m.
12 snap time."
13          Do you see that?
14     A.   I do, yes.
15     Q.   What's OPRA?
16     A.   I cannot recall exactly what OPRA
17 stands for.  It is a pricing service that can
18 give you listed options prices.
19     Q.   Do you know what snap time is,
20 sir?
21     A.   Snap time is a term meaning when
22 you mark positions.  So you could see it,
23 though it may not be exactly the same time as
24 your end of trading days show, which those
25 prices can then be used to work out what you

TSG Reporting - Worldwide    877-702-9580

Page 54

1          E. Clark
2  made or lost during the day.
3      Q.  Do you know the acquisition date
4  that's used in this valuation, sir?  Is it the
5  22nd of September?
6      A.  I think it may be the 19th.  I'm
7  not sure.
8      Q.  Who would I ask if I wanted to
9  know the answer to that question?
10          MR. SHAW:  Objection.
11  Foundation.
12          You can answer if you know.
13      A.  You can ask me, but I'd need to
14  go and check.
15      Q.  Who would you check with?
16      A.  Check with Charles Utley, who
17  runs that team now.
18          I may be able to access the
19  records myself also, but...
20      Q.  To your knowledge, sir, did the
21  valuation team use Lehman's prices to value
22  the positions at acquisition?
23      A.  They would not have done that,
24  because they would have used an independent
25  source of prices.  Those prices couldn't be
          TSG Reporting - Worldwide    877-702-9580

Page 55

1          E. Clark
2  the same as the Lehman prices such that they
3  would -- could be marked at the same level.
4  But that is not what you would do in price
5  testing.
6      Q.  Okay.  That's all I have for this
7  document.
8          MR. OXFORD:  It may be a good
9  time to take a break.
10          (Recess taken from 2:08 p.m. to
11  2:17 p.m.)
12  BY MR. OXFORD:
13      Q.  Could you have Exhibit 648 in
14  front of you, please.
15      A.  Yes.
16      Q.  And that sir, is your declaration
17  that you signed on January 8, 2010.  Correct?
18      A.  It is, yes.
19      Q.  Can you turn in the first
20  instance to paragraph 9, please.
21      A.  (Complying.)
22      Q.  You have it there, sir?
23      A.  I do.
24      Q.  It says, "From the closing
25  through October 7, 2008, when the LBI options
          TSG Reporting - Worldwide    877-702-9580

Page 56

1          E. Clark
2  (and the long and short securities positions
3  associated with the exercise or assignment of
4  the options pending or settled in the options
5  accounts as of the closing) lost substantial
6  value."
7          Do you see that?
8      A.  Yes.
9      Q.  It goes on to say, "Attached as
10  Exhibit 1 is a statement of the profits and
11  losses, as provided by the product controllers
12  of the trading books, arising from the
13  activity of the Barclays' equity options
14  traders in managing the portfolio prior to the
15  transfer of the positions on October 7."
16          Do you see that?
17      A.  Yes.
18      Q.  And you conclude that, "The total
19  losses in value in this regard amounted to 730
20  million."
21          Correct?
22      A.  Yes.
23      Q.  And you refer them to Exhibit 1?
24      A.  Yes.
25      Q.  Could you turn to Exhibit 1,
          TSG Reporting - Worldwide    877-702-9580

Page 57

1          E. Clark
2  please, sir.
3      A.  (Complying.)
4      Q.  Do you have it there, sir?
5      A.  Yes.
6      Q.  It's titled, "Profit/Loss on 074M
7  and 074F Options Position From Acquisition
8  Through Trading."
9          Do you see that?
10      A.  Yes.
11      Q.  Could you explain to me, in turn,
12  what each of the three boxes represent,
13  please?
14      A.  The first box is the P&L on the
15  options we've been discussing and any related
16  stocks.  By "related" I mean ones that were
17  taken through assignment from acquisition to
18  the 1st of October.
19          The second box is from the 2nd of
20  October through to -- it says the 6th.  And
21  then -- both for options and stocks.  And then
22  the last one would be the sum of those two.
23      Q.  Exhibit 1 doesn't take account of
24  any of the hedging activity that's described
25  in Exhibit 647.  Is that correct?
          TSG Reporting - Worldwide    877-702-9580

Page 58

E. Clark

1
2    A.   That's right, yes.
3    Q.   Can you tell me why that is,
4  please, sir?
5    A.   The Exhibit 1 was done as an
6  exhibit for the declaration, which was about
7  the listed options.
8         So the activity on hedging was
9  not related to the kind of statements I was
10  making around listed options.
11    Q.   In what sense is it not related,
12  sir?
13    A.   I would -- the declaration is
14  talking about the listed options portfolio and
15  the exhibit has the P&L for those listed
16  options portfolio.  So that's what I mean by
17  it's not related.
18    Q.   But if you look at Exhibit 647,
19  sir, your October 16th memo, at the bottom of
20  the first page you describe the P&L
21  calculation for the period PMTG owned the
22  options.  Correct?
23    A.   That's right, yes.
24    Q.   And you include in that P&L
25  calculation the positive effect of the hedges

TSG Reporting - Worldwide    877-702-9580

Page 59

E. Clark

1
2  Barclays placed.  Correct?
3    A.   Oh, yes.
4    Q.   So why do you include it in your
5  memo of October 16, 2008, but not in your
6  discussion of the P&L in your declaration
7  paragraph 9?
8    A.   I think you've asked me that
9  already, and I think I answered, but the
10  declaration is about the listed options
11  position.  And so it's to support the listed
12  options positions numbers.
13    Q.   If you were to add in the net
14  effect of the hedges that were placed that are
15  described in your October 16, 2008,
16  memorandum, it's accurate that the total
17  losses you describe in paragraph 9 would be
18  reduced.  Is that correct?
19    A.   Yes.
20    Q.   Can you tell me how much they
21  would be reduced by?
22    A.   349.
23    Q.   Would they also be reduced by the
24  hedges that you've characterized as futures at
25  Lehman, sir?

TSG Reporting - Worldwide    877-702-9580

Page 60

E. Clark

1
2    A.   They would.  I did not mention
3  that number because it offsets with the
4  payment that was made by PMTG.  So to include
5  all of it, that's where I got my 349.  But you
6  are right.
7    Q.   So I'm correct that the 80
8  million in profit on the hedges that you
9  describe as futures at Lehman should also be
10  deducted from that 730 million in paragraph 9
11  of your declaration, sir?
12         MR. SHAW:  Objection.
13  Mischaracterizes prior testimony.
14    A.   I agree with his objection of
15  your phrasing of the question.  How can I
16  comment on "should" if you were to
17  characterize what you're trying to achieve by
18  doing it.
19    Q.   I think you're both giving me
20  excellent objections.  So let me try it
21  another way.
22         Do you agree, sir, that the
23  losses in total value that you describe as
24  $730 million in paragraph 9 of your
25  declaration were offset by the 349 million in

TSG Reporting - Worldwide    877-702-9580

Page 61

E. Clark

1
2  hedges that you reference in 647?
3    A.   Yes.
4    Q.   Do you agree that those losses
5  were also offset by profit on hedges of 80
6  million that you describe as futures on hedges
7  at Lehman?
8    A.   Yes.
9    Q.   Your P&L calculation, sir, on
10  Exhibit 647, do you have that in front of you,
11  sir?
12    A.   Yes, I do.
13    Q.   It doesn't include a credit for
14  any margin posted at the OCC.  Is that
15  correct?
16    A.   That's correct.  Yes.
17    Q.   Can you tell me why that is?
18    A.   That's not part of this memo.
19    Q.   Is there a reason that it's not
20  part of this memo?
21    A.   I was not seeking to talk about
22  the margin when I wrote this memo nor do I
23  have any knowledge really around the margin.
24    Q.   Can you have in front of you what
25  I marked as Exhibit 649, please, sir.  And

TSG Reporting - Worldwide    877-702-9580

Page 82

E. Clark

1
2      Q.    Okay.  Could you turn to
3  paragraph 11, please.
4          MR. SHAW:  So we're clear on the
5  record about what he's being designated
6  to testify about, he's being designated
7  to testify only about whether Barclays
8  hedged the options and futures positions
9  and whether and to the extent to which
10  any reported losses, e.g., the alleged
11  loss of $730 million reflected on
12  Exhibit 534-A topic 25 have been offset
13  by hedging the assets.
14          And specifically when I say
15  "hedging the assets," I'm referring only
16  to the -- when I say "assets," I'm
17  referring only to the options and the
18  futures positions.
19      Q.    Okay.  Does Mr. Shaw's
20  representation reflect your understanding,
21  Mr. Clark, as to what you were designated to
22  be a witness on?
23      A.    Yes.
24      Q.    Have we exhausted your
25  recollection on the topics on which you were

TSG Reporting - Worldwide    877-702-9580

Page 83

E. Clark

1
2  designated?
3          Let me put it another way.
4          Do you have any information about
5  the topics for which you've been designated
6  that we have not discussed today?
7      A.    That's quite a wide question.
8  Not relevant -- not relevant information --
9  excuse me.
10          You have the memo, which is where
11  I drew together my understanding of what
12  happened.  So I suppose I could say I followed
13  the process of trying to pull together what I
14  understood and that's the results of it.
15          So there's nothing that I judged
16  at the time to be relevant that I didn't put
17  in there.  So I would say not relevant
18  information.
19      Q.    When you say "relevant," relevant
20  to what?  Your memorandum at Exhibit 647?
21      A.    That memorandum was my
22  understanding of what -- my notes of what
23  happened at the time.  So there's nothing else
24  that I would put in.
25          And I think that answers your

TSG Reporting - Worldwide    877-702-9580

Page 84

E. Clark

1
2  question.  But your phrasing made me just be a
3  bit careful because nonrelevant, I guess I
4  would designate it out.  But it's all in the
5  memo.
6          MR. OXFORD:  Okay.  I don't think
7  I have any further questions for you at
8  this time, Mr. Clark.  I believe counsel
9  for the committee has a couple of
10  questions.
11          MR. DAKIS:  Just a couple of
12  questions.
13  EXAMINATION BY
14  MR. DAKIS:
15      Q.    I'm Robert Dakis from Quinn
16  Emanuel Urquhart Oliver & Hedges.  We
17  represent the official committee of unsecured
18  creditors of Lehman Brothers Holdings.
19          My questions revolve mostly
20  around Exhibit 647.  And I just want to make
21  sure that my understanding of the exhibit is
22  clear.
23          It's correct that you created
24  Exhibit 647 in October of 2008?
25      A.    Yes.

TSG Reporting - Worldwide    877-702-9580

Page 85

E. Clark

1
2      Q.    In October of 2008, did you share
3  Exhibit 647 with any of your colleagues?
4      A.    I did, yes.
5      Q.    Who did you share this with?
6      A.    Francis Pearn, Lilly McInerney,
7  Jerry Shi.  I don't recall others.
8  There may have been others.  But they would
9  have been the people who I'm likely to need to
10  send it to.
11      Q.    In October of 2008, did you
12  create any other summaries of any other
13  portions of the Lehman Brothers acquisition?
14      A.    I did not, no.
15      Q.    In October of 2008, did Francis
16  Pearn ever share with you any summaries of the
17  Lehman transaction she created?
18          MR. SHAW:  He.
19      A.    He.
20      Q.    He.  I'm sorry.
21      A.    I don't recall that he did.
22      Q.    In October of 2008 did Lilly
23  McInerney ever share any summaries of the
24  Lehman transaction with you?
25      A.    I don't recall that she did.

TSG Reporting - Worldwide    877-702-9580