# Exhibit D

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5      In Re:

6                               Chapter 11

7      LEHMAN BROTHERS          Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,    (Jointly Administered)

9

               Debtors.

10

       ----------------------x

11

12

13

14      VIDEOTAPED DEPOSITION OF DAVID JAMES COLES

15               New York, New York

16              February 4, 2010

17

18

19

20

21

22

23      Reported by:

24      KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25      JOB NO. 27495

## Page 6

```
 1               D. Coles
 2             * * *
 3   DAVID JAMES COLES, called as a
 4      witness, having been duly sworn by a Notary
 5      Public, was examined and testified as
 6      follows:
 7   EXAMINATION BY
 8   MR. THOMAS:
 9       Q.   Mr. Coles, would you please state your
10   full name and address for the record?
11       A.   David James Coles.  21 East 66th
12   Street, New York, New York, 10065.
13       Q.   Have you been deposed before?
14       A.   Yes.
15       Q.   Approximately how many times?
16       A.   Two.
17       Q.   And if at any point you're not sure of
18   my question or you'd like to ask me to clarify
19   it or rephrase it, please ask me to do so; I'll
20   be happy to.
21       A.   Will do.
22       Q.   Would you please give you a brief
23   general description of your educational
24   background.
25       A.   Sure.  I'm a UK chartered accountant,
```

## Page 7

```
 1               D. Coles
 2   I have a degree in economics, and I started my
 3   career with Arthur Andersen in the UK.  I spent
 4   about four years in the audit practice before
 5   moving across into corporate recovery, whereby
 6   we performed a lot of investigations on behalf
 7   of secured lenders, ran a few companies in
 8   receivership, and then had the opportunity
 9   towards the end of my sixth year with Andersen
10   in the UK to move across to the U.S.
11         I moved to Andersen's New York office
12   and was there for about two years doing
13   turnaround-type work, and then at the end of
14   that two years, I started work with Alvarez &
15   Marsal, who were CRO on an assignment and we
16   were providing the support to the CRO, and then
17   for the next two years, I was largely working
18   with A&M but still an employee of Andersen.
19         So, at the end of those two years, I
20   had gotten my green card, felt comfortable about
21   leaving Andersen, and switched across to A&M.
22   And at that time, A&M was less than 20 people
23   and today is 1700 people.  So that would be 13
24   years ago, and I've been a managing director
25   since 2000.
```

## Page 8

```
 1               D. Coles
 2       Q.   And the last few years at A&M, how
 3   would you describe your duties and
 4   responsibilities?
 5       A.   The last few years have been a
 6   combination of management roles in turnarounds
 7   and management roles that have often led to
 8   liquidations and wind-downs.
 9       Q.   And for the non-accountants, can you
10   describe generally what turnarounds are?
11       A.   Yes.  Turnarounds is where there might
12   be a salvageable business and you're attempting
13   to improve the operations, perhaps refinance it,
14   and usually doesn't involve a bankruptcy, and
15   then a liquidation probably does involve a
16   bankruptcy and there's no go-forward enterprise.
17       Q.   And what is your current position
18   today?
19       A.   I am Chief Restructuring Officer at
20   Finlay Enterprises, Inc., which at one point was
21   a billion-dollar jewelry retailer, and it ran
22   the jewelry concessions within a number of
23   department store chains.  And then in the late
24   2000s, it -- it diversified into specialty
25   stores, and we weren't able to salvage a
```

## Page 9

```
 1               D. Coles
 2   go-forward business out of that either and so it
 3   liquidated through this past holiday selling
 4   season.
 5       Q.   Are you still a managing director of
 6   Alvarez?
 7       A.   Yes.
 8       Q.   So when you take these positions with
 9   a turnaround company, you retain your position
10   with Alvarez and take on a title or position
11   with the company?
12       A.   Yes, the -- the engagement letters are
13   always with Alvarez and it's Alvarez supplying
14   personnel.
15       Q.   When did you move over to Finlay?
16       A.   Finlay commenced in mid-February 2009.
17       Q.   When did you first have any
18   interaction with Lehman?
19       A.   September 16, 2008.
20       Q.   When you switched to Finlay in
21   February of '09, did that kind of end your
22   involvement with Lehman?
23       A.   Substantively, yes.  I remained a
24   director and might still be a director of some
25   very obtuse foreign subsidiaries.  We've been
```

Page 10

D. Coles

1
2  slowly moving me off those slates, but it's a
3  very complex org. chart so I may still be
4  hanging out there on a few subs.
5      Q.    On or about September 26, 2008, were
6  you appointed CFO of Lehman at the time?
7      A.    I can't remember the exact date.  That
8  would sound about right.
9      Q.    CFO, comptroller and co-treasurer?
10     A.    I think that's right, too.
11     Q.    Do you still hold any of those titles?
12     A.    No.
13     Q.    And approximately how long did you
14 function as CFO for LBHI?
15     A.    Through probably mid-February of 2009.
16     Q.    And in a turnaround environment like
17 this, what does the CFO, comptroller and
18 co-treasurer do?
19     A.    Well, this one I think early on we
20 realized it wasn't -- it wasn't a turnaround.
21 It was a controlled wind-down liquidation.  It
22 was -- job number 1 really was trying to control
23 cash and get a sense for liquidity.  It was
24 trying to support each of the separate business
25 units, and it was taking stock of the assets and

Page 11

D. Coles

1
2  the balance sheets of all of the entities that
3  we now found ourselves responsible for.
4      So this was the residual estate
5  following the sale to BarCap and also subsequent
6  to the other administrations going on in the
7  world, in Asia and in Europe.
8      Q.    Was part of that effort or process of
9  taking stock, did it involve an assessment of
10 what assets and liabilities had gone over to
11 Barclays as part of the transaction and what had
12 stayed with Lehman?
13     A.    Yes.
14     Q.    Let me go ahead and show you a
15 document that we'll mark as 583A.
16     (Exhibit 583A, an e-mail chain from M.
17 Kelly to J. Stiklorius dated September 18,
18 2008, marked for identification, as of this
19 date.)
20     Q.    And this is an e-mail chain that I
21 don't see your name on, but you're referred to
22 in it.  Do you know who Jonas Stiklorius is?
23     A.    I do.
24     Q.    Did I get that pronunciation right?
25     A.    Good enough.

Page 12

D. Coles

1
2      Q.    He's someone that worked with you at
3  Alvarez?
4      A.    Yes, he worked directly for me,
5  actually, in the early days there.
6      Q.    This is an e-mail, the second-in-time
7  e-mail -- excuse me, the first-in-time e-mail
8  from him to Kelly Martin says, "I'd like to
9  inquire about your availability to meet with
10 David Coles, Jim Fogarty, and myself for about
11 an hour to review the balance sheet and, in
12 particular, the anticipated post-transaction
13 balances."
14      Is that -- the post-transaction
15 balances, does that refer to the effort to make
16 sure you had taken stock of the assets and
17 liabilities that went over to Barclays and the
18 ones that stayed behind that you would be
19 responsible for?
20     A.    Yes.
21     Q.    Did you in fact meet on or about
22 September 28 with -- September 18, excuse me,
23 2008, with Kelly Martin?
24     A.    I can't recall.  Actually, it's Martin
25 Kelly.

Page 13

D. Coles

1
2      Q.    Martin Kelly.  Thank you.
3      Do you recall whether you had any
4  meetings with him that first week of the Lehman
5  bankruptcy?
6      A.    I can't recall that it was the first
7  week.  I do remember a couple of meetings that
8  Martin attended, and we did attempt to go
9  through a trial balance that he was compiling.
10     Q.    Would that have been sometime between
11 the filing of bankruptcy around the 15th of
12 September and before the closing of the Barclays
13 transaction on the 22nd of September?
14     A.    Probably -- I'm not sure.  It
15 certainly was in those first two weeks
16 post-filing.
17     Q.    Okay.  Here there's a reference by Mr.
18 Kelly to making this meeting happen today,
19 September 18.  Do you know one way or the other
20 whether it happened on that day?
21     A.    I don't.
22     Q.    Okay.  Let me show you another
23 document we'll mark as 584A.
24     (Exhibit 584A, e-mail chain from M.
25 Kelly to D. Coles and K. Wong, dated

Page 14

D. Coles

1
2  September 19, 2008, with attachment, marked
3  for identification, as of this date.)
4  Q.   And I'll note for the record this
5  appears to be the same or a very similar exhibit
6  as to Exhibit 470A, but it has -- it's a little
7  clearer printout of the attachment, which is why
8  I'm using it.
9       MR. TAMBE:  I'll also note it doesn't
10  have any Bates number on it.
11       MR. THOMAS:  Okay.
12  Q.   Do you recognize this e-mail chain
13  involving you dated September 18 and 19 of 2008?
14  A.   I don't.
15  Q.   The -- do you have any reason to doubt
16  that this was an e-mail chain that you
17  participated in?
18  A.   No.
19  Q.   The e-mail that appears to be from you
20  on September 18 to Kristy Wong, and do you
21  recall who Kristy Wong is?
22  A.   Yes.
23  Q.   Who is that?
24  A.   She worked under Martin Kelly, so was
25  perhaps an accounting manager because I think

Page 15

D. Coles

1
2  Martin Kelly was comptroller.
3  Q.   Okay.  In what appears to be your
4  e-mail, you write, "Some colleagues and I met
5  with Martin Kelly on Tuesday" -- and I guess as
6  an initial matter, that Tuesday would be
7  September 16 -- "on Tuesday and discussed the
8  consolidated balance sheet and the likely
9  post-BarCap sale BS."  Do you see that?
10  A.   Yes.
11  Q.   Dos that refresh your recollection as
12  to the timeframe in which you would have met
13  with Mr. Kelly?
14  A.   Yes.
15  Q.   Okay.  So that would have been on
16  approximately September 16, 2008?
17  A.   Yes.
18  Q.   Okay.  And the reference to the
19  "likely post-BarCap sale BS," can you just break
20  that out, what you mean?
21  A.   Yes.  So there would have been a
22  consolidated balance sheet at the time of the
23  sale, and what we were looking to get from
24  Martin and Kristy was a breakout of what assets
25  and liabilities had been sold or assumed by

Page 16

D. Coles

1
2  BarCap pursuant to that sale and what was left
3  with the residual estate that we, as -- as
4  LBHI's new executive office group, had
5  responsibility for.
6  Q.   And we can take a look at some later
7  documents back and forth between Alvarez and
8  Weil Gotshal, but did you ever meet with Weil
9  Gotshal at any point?
10  A.   Yes.
11  Q.   In this -- this preclosing period, do
12  you know if you had discussions with them?
13  A.   I don't recall.  I don't recall if it
14  was that first week or whether most of our
15  impetus was trying to reach company people
16  rather than debtors' counsel.
17  Q.   But at some point you had discussions
18  with Weil Gotshal about the terms of the sale
19  transaction and what was conveyed and what
20  wasn't?
21  A.   Yes.
22  Q.   You're asking here for, "Do you have a
23  concurrent consolidating BS file by entity that
24  you could send or grant us access," and then
25  Martin Kelly writes back to you and says,

Page 17

D. Coles

1
2  "David, please see latest draft attached."
3  A.   Yes.
4  Q.   Is this the type of information you
5  were asking for in your e-mail?
6  A.   It was getting there.  It's not quite
7  what I was requesting, because "consolidating"
8  would tend to have all of the subsidiaries and
9  have each of those laid down as a column, and
10  this is a consolidated balance sheet from what I
11  can tell.
12  Q.   I see.  And do you know whether some
13  of the -- strike that.  We'll come back to it.
14       If you would look, please, at the
15  second page of the attachment under "Payables"
16  about a third of the way down.  Do you see that?
17  A.   Yes.
18  Q.   Do you see "Bonus Payable," "Cure
19  Amounts," "Accounts Payable," do you see those
20  lines?
21  A.   Yes.
22  Q.   And following those lines over, do you
23  see that there's a -- listed as a $2 billion
24  transaction adjustment across from the "Bonus
25  Payable" amount?

Page 18

D. Coles

1
2       A.    Yes.
3       Q.    Do you have any understanding as to
4   the reason for that transaction adjustment?
5       A.    Yes.  I may not have before getting
6   this, this sheet, but the -- it was my
7   understanding that the transaction with BarCap
8   had a feature in it whereby BarCap assumed a
9   bonus pool for the employees it offered
10  positions to and, in addition, it sought to have
11  the estate assume and assign a vast quantity of
12  executory contracts and that this was an
13  estimate of the cure amounts necessary to be
14  able to effect that.
15      Q.    That's for the second line?
16      A.    Yes.
17      Q.    Okay.  And what was the basis -- let's
18  break it down.  On the compensation, first of
19  all, did you ever read the Asset Purchase
20  Agreement or the Final Purchase Agreement as
21  amended by the Clarification Letter?
22      A.    I may have had a copy.  I don't now
23  recall whether I read it page-for-page or simply
24  got like an executive summary of it.  A
25  colleague of mine, Jim Fogarty, was more on

Page 19

D. Coles

1
2   point on the transaction in those first few
3   weeks.
4       Q.    Okay.  Do you know if the accrual
5   amounts with respect to compensation also
6   included severance, potential severance
7   liability that Barclays was assuming as part of
8   the purchase agreement?
9       A.    I don't recall.
10      Q.    What was the -- for whatever
11  understanding you had with respect to the
12  compensation, the transaction adjustment here,
13  what was the basis for that understanding?
14      A.    To the extent that the purchaser,
15  BarCap, was assuming a liability that would
16  otherwise have been paid by LBI, then it was
17  taking credit for the assumption of those
18  liabilities in arriving at its net purchase
19  consideration.
20      Q.    Who told you that?
21      A.    I think I gathered that from my read
22  of the purchase agreement.
23      Q.    Okay.  Anything else that would have
24  fed into that understanding?
25      A.    No.

Page 20

D. Coles

1
2       Q.    Okay.
3       A.    Conversations with colleagues.
4       Q.    Now, if it was -- if there was a
5   transaction adjustment raising it that amount,
6   is that really assuming a liability that Lehman
7   would have otherwise had to incur, as you put
8   it?
9       MR. TAMBE:  Objection to the form of
10  the question.
11      You can answer.
12      A.    I think these were both estimates.  It
13  would have been -- it could have been quite
14  difficult as early as September 17 to have had
15  really solid numbers for both of these
16  categories, and on the cure payments in
17  particular, I did do some follow-up work with a
18  group within Lehman that I think did move across
19  to Barclays that wasn't part of the estate but
20  that tended to deal with all of the back office
21  servicing, and there was an individual there
22  whose name I don't now remember, but he was
23  tasked with creating an enormous database of all
24  these executory contracts.
25      And I know from having dealt with a

Page 21

D. Coles

1
2   number of bankrupt entities over the years that
3   that is required work to be done, but it's never
4   easy, and with an organization as complex as
5   Lehman, that was going to be very difficult.  So
6   he and his group spent a lot of time scanning
7   documents, figuring out what kind of cure was
8   necessary for somebody else, a subsequent
9   purchaser, BarCap, to assume and to have the
10  estate assume and assign those across to the
11  purchaser, and so I got a sense over the weeks
12  that followed and the months that followed
13  whether that number was a realistic number.
14      Q.    And was it your understanding whether
15  the number that was being calculated as an
16  estimate, as an estimate of what Barclays
17  actually would assume in terms of cure based
18  upon their election, assume certain some unknown
19  universe of contracts, or was it an estimate of
20  potential exposure, meaning that Barclays could
21  incur up to that amount if they, you know,
22  assumed all the contracts?
23      MR. TAMBE:  Objection to the form of
24  the question.
25      A.    I'm not exactly clear.  It -- what I

Page 22

1                 D. Coles
2    typically have seen, and which what I would have
3    assumed here, is that the number is the maximum
4    exposure and then you typically see a purchaser
5    use its existing business relationships with
6    vendors to negotiate lesser amounts.
7         Q.   Is it your understanding in this
8    transaction that Barclays had the discretion to
9    pick and choose which contracts it was going to
10   assume?
11            MR. TAMBE:  Objection to form.
12        A.   I think that is the case, yes.
13        Q.   So it wasn't agreeing to assume any
14   particular liability amount; rather, it was just
15   agreeing to assume cure amounts for whatever
16   contracts it assumed?
17        A.   That I'm not actually clear.
18        Q.   Okay.  In any event, just to go in a
19   little more detail about the work with the
20   group, so you would have gotten this at least --
21   at least as of September 18, 2008.
22            Do you recall whether you noted the
23   transaction adjustments at or about, you know,
24   at that time?
25        A.   I think it might have come on the

Page 23

1                 D. Coles
2    19th.
3         Q.   Oh, you're right.
4         A.   Yes.
5         Q.   Yes.  Okay, so on the 19th.  Do you
6    recall when you got this, did that kind of stand
7    out to you and you see the large transaction
8    adjustments?
9         A.   It wasn't the largest number on there.
10   In those early days of being on the case, our
11   whole -- I think my whole team struggled with a
12   renewed -- sorry, a new level of materiality
13   that had to come into play here because we were
14   dealing with billions and almost trillions of
15   dollars.
16            So I -- I think I would have noted
17   that column.  I would have been perhaps more
18   interested in the liquidity situation to make
19   sure that those assets that were very liquid
20   were under my control, secure, and that I was
21   being a custodian, a good custodian of those.
22        Q.   In terms of the -- let's take the
23   "Cure Payments," "Accounts Payable" line and
24   then "Transaction Adjustment."  Can you just
25   kind of walk through?  I understand that you

Page 24

1                 D. Coles
2    would have had other issues too, but what you
3    would have -- what you did do that you recall in
4    terms of investigating those or understanding
5    more about the transaction adjustments?
6         A.   Sure.  On the cure payment side, I had
7    earlier talked about an individual at Lehman,
8    and I think he had gone across to BarCap and he
9    was in Office Services.  And he was tasked with
10   creating this very substantial database of all
11   of these contracts, and there was a process by
12   which vendors, I remember one -- a motion
13   perhaps that was filed or a procedure for the
14   assumption and assignment of these contracts
15   where the vendors for these agreements would
16   have an ability to look online, check their
17   contract, check what was there for their
18   estimated cure, and then there was a procedure
19   by which, if they were comfortable, they could
20   accept the assumption and assignment across to
21   Barclays.
22        Q.   Is that the Epiq Website?
23        A.   I think Epiq did host it, yes.  It's
24   the kind of thing that Epiq does.  I'm not
25   actually sure whether Epiq did that.  Lehman may

Page 25

1                 D. Coles
2    well have had the technology available to do
3    that.
4         Q.   So your understanding of this, this
5    transaction adjustment figure here that you
6    called 1645, that -- so somebody at this point
7    would have already -- someone in Office Services
8    would have already tried to compile all those
9    contracts and come up with a number?
10            MR. TAMBE:  Objection to the form of
11   the question.
12        A.   Not exactly sure how that number was
13   arrived at specifically.  I know that the tasks
14   that that group were undertaking, I did mention
15   that it's usually a Heraclean task for an
16   organization to reach out across its
17   subsidiaries, get a copy of every executory
18   contract, and then attempt to figure out how
19   much would be -- would need to be paid to cure
20   it.
21            If this came out on -- came to me
22   probably on the 19th, so it might have been done
23   on the 18th, that was pretty spectacular to get
24   that close to a real number for what must have
25   been thousands of executory contracts.

Page 26

D. Coles

1
2     Q.   So that's not a number that would just
3  be in existence on a firm system --
4     A.   No.
5     Q.   -- that you could pull up?  It
6  involves a lot of work?
7     A.   I've never seen it maintained that
8  way.
9     Q.   Have you seen, had experience with
10 those estimates ending up being off by a wide
11 margin?
12    A.   Yes, both -- both on the trying to
13 identify the pool and then by what ultimately a
14 purchaser might be able to negotiate to -- to
15 get these contracts assumed and assigned over.
16    Q.   Is that, based on your experience in
17 the business, is it understood that these are
18 fairly, you know, rough estimates and difficult
19 estimates to come up with?
20        MR. TAMBE:  Objection to the form of
21 the question.
22    A.   It's easier to know the -- it's
23 difficult to work out the total potential
24 exposure, but it's possible, and then from that
25 total exposure, it's typical for the actual

Page 27

D. Coles

1
2  liability that is settled by the purchaser to be
3  markedly lower than that.
4     Q.   And is that a -- part of the function
5  of it being the actual amount being marketed
6  lower, the purchaser electing not to take on all
7  those contracts?
8     A.   That could be a part of it.
9     Q.   And did you go -- do you recall going
10 in like meeting with the person at Office
11 Services or people at Offices Services that
12 worked on this?
13    A.   Yes.  Remember, he and his group were
14 in a -- a different building, so I met him and
15 his immediate boss on-site, and then I think I
16 also met him over in the location where we were
17 housed.
18        Actually, I've just remembered his
19 name.  Terry Berman.
20    Q.   And so you're getting this on -- on
21 looks like the 19th, and you may not remember
22 the exact timeline or date, but just kind of
23 order of magnitude, you would have gotten this
24 the 19th.  When do you think you would have kind
25 of gone over and met with these folks to get a

Page 28

D. Coles

1
2  sense of how this was calculated?
3     A.   Probably within seven days of
4  receiving this.
5     Q.   So, okay, it could have been any time
6  in roughly that seven-day period?
7     A.   Yes.
8     Q.   And then what else did you do?  When
9  you went over there, you met with them, you
10 understood how they were trying to come up with
11 the number?
12    A.   Yes.
13    Q.   Did you -- did you have any follow-up
14 after that with them?
15    A.   Yes.  And this group was also a group
16 that I seem to recall we were very dependent on
17 to -- to run our back office as the estate,
18 because so many of the systems and processes
19 went across with BarCap that we, the residual
20 estate, needed a Transitional Services Agreement
21 back with BarCap for BarCap to provide us with
22 things that we were used to having and which
23 were essential.
24        So my discussions with Terry and
25 people who work with Terry would have been in

Page 29

D. Coles

1
2  connection with this cure payment amount
3  generally, but also the process and also the
4  process of providing the residual estate with
5  transitional services.
6        His group, for instance, would have
7  managed -- or, within that group in that
8  building, they managed the whole T & E
9  reimbursement.  So that's travel and
10 entertainment.  And we needed to continue to
11 operate systems as they had operated before and
12 keep employees in place to manage down the
13 assets, so it was important that we had a
14 process by which we could determine who was an
15 employee of the estate, who was an employee of
16 now of BarCap, and how we were going to settle
17 out people's T & E, for instance.
18    Q.   And when you got that sense of
19 understanding of how they had calculated this
20 transaction adjustment for cure amounts, was --
21 did -- did it seem like they had undergone a
22 reasonable process in trying to come up with
23 that amount to you, or did you have any further
24 questions or --
25        MR. TAMBE:  Objection to the form of

D. Coles

1
2   the question.
3       A.   I don't think I was in a position to
4   know how thorough that was.  I do remember
5   reflecting on the enormity of the task.  I don't
6   now remember how many contracts that comprised,
7   but it -- I mean, Lehman was the biggest thing
8   that I think anybody had seen at that point in
9   terms of a company going through a bankruptcy at
10  such short notice with such little planning.
11      Q.   And would that be a short amount of
12  time, a couple of days to come up with the type
13  of estimate?
14      A.   I don't think so.  I mean, this --
15  this was presumably the -- the best they could
16  come up with in two days.  It can take a lot
17  longer than that.
18      Q.   I guess what I was asking, compared to
19  other situations, was --
20      A.   Yes.
21      Q.   -- having just a couple days to come
22  up with these estimates a shorter period of time
23  than you've seen in other situations?
24      A.   That was very short.
25      Q.   And so they explained what they had

D. Coles

1
2   done, and then was there -- did you have any
3   follow-up beyond that in terms of any further
4   occasion to look in precisely how they had done
5   the estimate in more details?
6       MR. TAMBE:  Objection to the form of
7   the question.
8       A.   I don't think -- I don't think -- I
9   myself didn't further explore the original
10  estimate, but we did check in from time to time
11  on how much had actually been incurred to assume
12  and assign contracts, and I remember that number
13  being very low relative to 1645.  I seem to
14  recall it being around 300 million around the
15  time that I left, which would have been in
16  mid-February.
17      Q.   Did that -- and I guess the -- there
18  are two buckets of contracts Barclays would be
19  assuming.  One was the Closing Date Contracts,
20  which were actually listed prior to closing and
21  were being assumed upon closing, and then
22  another bucket that they had 60 days to decide
23  on whether to assume or not assume.  Is that
24  consistent with your recollection?
25      A.   That rings a bell.

D. Coles

1
2       Q.   And the initial bucket would have been
3   known, you know, as of closing in terms of the
4   amount of cure amounts being assumed, right?
5   Does that sound familiar?
6       A.   Well, they would have still been --
7       MR. TAMBE:  Objection to the form of
8   the question.
9       You can answer.
10      A.   I think they would have still been
11  estimates that were probably subject to a fair
12  amount of negotiation with the -- with the
13  vendor to determine whether that number was in
14  fact -- that estimate was accurate and whether
15  settling that amount would actually get the job
16  done in the contract to assumed and assigned.
17      Q.   Were you surprised by how much lower
18  the actual amount of cure assumed by Barclays
19  was --
20      A.   Yes.
21      Q.   -- compared to the estimate?
22      And did that surprise cause you to
23  take any further action or look into anything
24  else?
25      A.   It -- I think this is all -- this was

D. Coles

1
2   all post-BAPCA, where you have 90 days -- sorry,
3   you have 210 days to assume or assign, and so I
4   think I knew going in that there could be seven
5   months to determine whether or not the buyer
6   chose to take on the contract and have the
7   estate cure it and have it assigned across to
8   them.
9       So, I, knowing that there was 210 days
10  in there, I may not have fully understood quite
11  what the 60-day batch of contracts was and how
12  that fit into the 210 days, but I would have
13  known from a legal perspective that they really
14  had seven months to figure out whether to assume
15  or assign and cure and, hence, we wouldn't know
16  until the end of seven months what the real
17  number was.
18      Q.   I'm sorry, you had -- Barclays had,
19  even though the contract says Barclays had 60
20  days, to decide whether to assume or have Lehman
21  assume and assign?
22      A.   I guess the 60 days would have been a
23  term in the agreement between Lehman and
24  Barclays, but the bankruptcy code allows a
25  debtor 210 days to assume or assign.  Now, I'm

Page 34

D. Coles

1  not a lawyer, so I'm not exactly sure how those
2  two competing timeframes might interplay with
3  each other.
4      Q.  Do you recall that the, at or about
5  the time of closing, the amount of Closing Date
6  Contracts was first identified as approximately
7  180 million and then a revised version was filed
8  a little later that said 106 million,
9  approximately?
10     A.  I don't remember those numbers.  And I
11 actually don't think that that was in my work
12 stream area.  I think that was Jim Fogarty.
13     Q.  Okay.  The, other than -- is it Mr.
14 Berman?
15     A.  Yes.
16     Q.  Did you speak with anyone else
17 involved in this work effort?
18     A.  There was someone in that same
19 building where Terry worked who worked under
20 Terry.  I don't remember his name, but he
21 ultimately was let go by BarCap and the estate
22 picked him up.
23     Q.  Okay.
24     A.  And there was an individual that ran

Page 35

D. Coles

1  the T & E reimbursement area, and I don't now
2  remember his name.
3      Q.  And did you -- you discuss with each
4  of them how they kind of went about coming up
5  with this, the estimate for the transaction
6  adjustment for cure?
7          MR. TAMBE:  Objection to the form of
8  the question.
9      A.  I don't think I actually ever asked
10 that question, but I -- I would have assumed
11 that, and I did assume at the time, that they
12 knew what contracts Lehman was -- had signed and
13 was responsible for and that they had analyzed
14 that universe of contracts and attempted to
15 figure out what, if anything, was owed under
16 them.
17     Q.  And I had understood that that was
18 your understanding for what they had done to
19 come up with this number.  I'm just wondering,
20 was that understanding based on discussions with
21 them or reviewing some written work they had
22 done, or what was that based on?
23         MR. TAMBE:  Objection to the form of
24 the question.

Page 36

D. Coles

1      A.  Discussions with them.
2      Q.  Okay.
3      A.  I don't remember seeing the enormity
4  of this other listing, which I'm sure this
5  represented, because I think this was being done
6  online perhaps by Epiq, and it involved a lot of
7  scanning of contracts.  And then someone, be it
8  Epiq or Lehman/BarCap, was trying to estimate
9  what would have needed to be paid to cure these
10 contracts.
11     Q.  Do you know -- do you know who was
12 doing the estimate of what would be needed to
13 pay the -- cure the contracts?
14     A.  No.
15     Q.  So, I mean, you mentioned BarCap.  You
16 don't have any knowledge of anyone from Barclays
17 at the time, presale, being involved in this, do
18 you?
19     A.  Presale, no.
20     Q.  So this was a Lehman -- it would
21 necessarily have to be a Lehman's effort?
22         MR. TAMBE:  Objection to the form of
23 the question.  When was it a Lehman's
24 effort?

Page 37

D. Coles

1      A.  Post-sale, to the extent those
2  individuals were now BarCap employees, it
3  becomes a BarCap effort.
4      Q.  Sure, but the estimate was created
5  preclosing, right?  And here it is on a document
6  entitled "Balance Sheet As of September 17,
7  2008."
8          So we're talking about preclosing.
9  When we're talking about the estimate, the
10 transaction adjustment, the estimate of maximum
11 potential exposure, we're talking about
12 preclosing work, right?
13     A.  Yes.  In those early days getting a
14 good read of quite who you were working with was
15 a little difficult.
16     Q.  But in the preclosing days, you're not
17 aware of any, any involvement by anyone from
18 Barclays in that estimating process; is that
19 correct?
20     A.  I'm not, but I'd be surprised if
21 someone from Barclays hadn't taken a look at
22 that and got comfortable that that was a -- a
23 solid number.
24     Q.  Well --

Page 38

D. Coles

1
2    A.   I mean, if I was Barclays, I would
3    want that number to be as high as possible.
4    Q.   Well, do you have -- did you have any
5    discussions with Barclays about any involvement
6    in estimating that number?
7    A.   No.
8    Q.   And just to be clear, you're not aware
9    that anyone from Barclays was involved in coming
10   up with that estimate?
11   A.   No.
12   Q.   Okay.  And if in fact this contract --
13   have you had contracts -- have you been involved
14   in contracts where the purchaser was actually
15   committing to assume a certain amount of
16   liability?
17   A.   Yes.
18   Q.   Okay.  Is that common?
19   A.   Yes.  In fact, that's the situation
20   with Finlay with a very small go-forward part of
21   the business, where the employee liabilities,
22   for instance, might be a million dollars and the
23   purchaser is on the hook for a minimum of
24   625,000.
25   Q.   What happens if the estimates turn out

Page 39

D. Coles

1
2    to be high and the actual amount incurred turned
3    out to be lower?
4    A.   Well, with that mechanism that we had
5    in Finlay, that we have in Finlay, if, for
6    instance, it's going to happen, I think, the
7    purchaser ultimately takes more like 400,000 of
8    liabilities on.  It will have to pay the estate
9    the top-up to the minimum of 625.  So it'll
10   actually go out-of-pocket and write the estate a
11   check for 225,000.
12   Q.   And that's a function of the written
13   contract that two sophisticated --
14   A.   Yes.
15   Q.   -- parties entered?
16   Yes?
17   A.   Yes.  Well, one party is not that
18   sophisticated, as we're now finding out.
19   Q.   So, from your perspective, your
20   earlier comment about, you know, assumed
21   liabilities being part of consideration, that's
22   in a situation where the purchaser agrees to pay
23   a certain amount of liability, correct?
24   A.   Yes.
25   MR. TAMBE:  Objection to the form of

Page 40

D. Coles

1
2    the question.
3    A.   I think it's also a solution to not
4    being exactly clear what the ultimate number is
5    going to be, but when you're trying to compare
6    the virtue of one offer against another offer,
7    and if one offer has got a going concern
8    component to it with an assumption of
9    liabilities, you need to be able to, despite not
10   having a certainty of number, with a mechanism
11   whereby you say you have to take a minimum X, at
12   least you can put X in your analysis and know
13   that that party is liable for that.
14   Q.   And you've seen this drafted up in
15   contracts before, correct?
16   A.   Yes.
17   Q.   And so this is something that
18   sophisticated contract attorneys and advisors
19   can contract for?
20   A.   In -- in a normal negotiation where
21   there's time to negotiate, yes.
22   Q.   Did you think that there was not time
23   to draft up that contract language in the
24   Barclays transaction?
25   MR. TAMBE:  Objection to the form of

Page 41

D. Coles

1
2    the question.
3    You can answer.
4    A.   Very complex transaction, and I
5    understand that, from reading around the topic,
6    that Barclays was in negotiation prefiling, I'm
7    not sure that that was more than a week or two
8    of due diligence, and then closed the
9    transaction the week of the filing.
10   That's a very short period to do due
11   diligence, negotiate a contract, and then close,
12   but these were, you know, the circumstances were
13   unprecedented.
14   Q.   And these unprecedented circumstances,
15   is it your understanding that both the purchaser
16   and seller were assuming a wide range of risk
17   given the uncertainty associated with assets and
18   liabilities?
19   MR. TAMBE:  Objection to the form of
20   the question.  Foundation.
21   A.   I'm not sure that the risk was equally
22   kind of spread between both parties.  I think
23   the -- the buyer could, through mechanisms such
24   as this, by having some healthy estimates which
25   reduced the ultimate purchase consideration,

D. Coles

1  any way?
2      MR. TAMBE:  Objection to form and
3  foundation.
4      A.  My office was next door to Jim
5  Fogarty's.  As I mentioned, Jim Fogarty, who was
6  COO, had also been tasked with or had been
7  tasked with watching this transaction through
8  the closing, and then I know that he did some
9  deep analysis into the Cusips for the securities
10 that were transferred and he continued to just
11 analyze the transaction generally.
12      I am fairly confident that, through my
13 interaction with Terry Berman and a knowledge
14 that the cure amount was ultimately more like
15 300, and perhaps I knew that 60 days in because
16 of the 60-day, if I haven't asked you to cure it
17 and assume and assign it, I'm not ultimately
18 going to be able to, and that was an agreement
19 between the parties that trumped the code, I'm
20 pretty confident that I would have had a
21 conversation with Jim about that and would have
22 recognized that the way the contract was
23 written, that was a substantial pickup to the
24 purchaser compared with the estimate.

D. Coles

1
2      Q.  But do you recall that conversation or
3  are you just assuming?
4      A.  I'm pretty confident I would have had
5  that conversation.
6      Q.  And do you know when you would have
7  had -- or, when you had that conversation?
8      A.  Well, I think that, for the number to
9  have become concrete, it would have been -- it
10 sounds like it would have been 60 days in, so
11 sometime after the 60-day limit after the
12 closing.
13     Q.  Would the fact that the cure amounts
14 for the contract of the Closing Date Contracts,
15 would the fact that they were less than 200
16 million have caused you any concern or
17 questioning?
18     MR. TAMBE:  Objection to the form of
19 the question.
20     A.  I don't think I would have known how
21 the 200 related to what they might have been on
22 this list at 1645 as.  I think if they were at a
23 substantial discount from what they were those
24 particular contracts were in this 1645, that
25 could have alerted me to it looks like this

D. Coles

1
2  number ultimately is going to be much, much less
3  than 1645 and here's the first wave of them.
4      Q.  Do you know if -- do you know if you
5  tried to figure that out?
6      A.  I don't think I knew that number.  I
7  don't recall knowing that number.
8      Q.  Okay.  Do you recall the -- that the
9  Closing Date Contracts were actually listed
10 prior to closing?
11     A.  No.
12     Q.  Do you know one way or the other, or
13 you just don't recall?
14     A.  I don't recall.
15     Q.  On the -- the transaction adjustment,
16 1645, on the left you have these amounts in the
17 columns, 831, 917, do you see those, 701?
18     A.  Yes.
19     Q.  What is your understanding
20 of what those would be and why they would be
21 increased by a transaction adjustment?
22     MR. TAMBE:  Objection to the form of
23 the question.  Foundation.
24     A.  What would be typical in a balance
25 sheet is that the balance sheet would include an

D. Coles

1
2  amount for accounts payable.  Those are amounts
3  due to third parties for the provision of goods
4  and services that haven't been paid for as of
5  the date of that balance sheet.  It's not
6  typical in a going concern balance sheet to have
7  anything on -- included there for cure payment,
8  for instance.
9      So I would have read "cure
10 payments/accounts payable" to mean that, in the
11 case of these two estimated period-end balance
12 sheets, these first two columns, 831 and 917,
13 that that relates to an accounts payable
14 balance, and that the "Cure Payments"
15 description applies to the "Transaction
16 Adjustment" amount that's further into the
17 spreadsheet.
18     And I would have also known from
19 experience that companies, unless they have had
20 quite a lot of time after the date of a close
21 for a balance sheet, find it very difficult to
22 estimate what their accruals and liabilities are
23 because often those amounts aren't known until a
24 vendor sends an invoice at, let's say, the end
25 of the month.

D. Coles

1
2     And here we have a stub period that
3 ends at the -- on the 17th.  It's even more
4 difficult because you may end up having to
5 apportion an invoice that is for a longer
6 period.
7     Q.    At any point did you have occasion to
8 confirm that the -- the amounts in the left
9 column, the 701, 605, were not capturing all
10 cure payments?
11        MR. TAMBE:  Objection.  Objection to
12 the form of the question.
13     A.    No.
14     Q.    Okay.  Just so I understand you, when
15 you say you assume there were more in terms of
16 accounts payable, that means is it more current
17 amounts owed?
18     A.    Can you rephrase that?
19     Q.    You draw a distinction between kind of
20 the accounts payable aspect of it and the cure
21 aspect of it --
22     A.    Yes.
23     Q.    -- in explaining why there would be --
24     A.    Right.  Let's give an example.
25 Perhaps you have a contract for services to

D. Coles

1
2 provide IT support.  There may be -- the monthly
3 amount might be outstanding, so at the end of
4 August, for instance, you might owe August's
5 bill of $10 million, but that if you wanted to
6 ultimately cure that contract, there may be
7 something in that contract that says something
8 whereby you would have to pay more than that 10
9 million to take on the contract or less than
10 that 10 million.
11     Q.    And is that situation consistent with
12 your discussion with the Office Services folks?
13        MR. TAMBE:  Objection to the form of
14 the question.  Is what situation consistent?
15     A.    I don't remember having those -- that
16 specific a discussion.
17     Q.    I'm going to show you a document we'll
18 mark as 585A.
19        (Exhibit 585A, an e-mail from K. Wong
20 to M. Stewart and L. Chiu dated September
21 22, 2008, marked for identification, as of
22 this date.)
23     Q.    Do you recognize this chain involving
24 yourself and others on September 22, 2008?
25     A.    I don't remember this specific e-mail,

D. Coles

1
2 but I recognize these names with the exception
3 of Brett Beldner.
4     Q.    The original in time e-mail from Marie
5 Stewart, who is Marie Stewart?
6     A.    I think she was S.E.C. reporting for
7 Lehman and then moved across to BarCap.
8     Q.    Her e-mail subject, "David Coles of
9 A&M needs to talk to you at 4 P.M. today about
10 GL structure, et cetera.  He wants to get a
11 handle on Remain Co. and what Barclays need
12 too."
13        Is that consistent with your
14 recollection of some of the work -- you were
15 trying to get a handle on what assets and
16 liabilities had gone over and what assets and
17 liabilities remained with Lehman that you were
18 going to be responsible for?
19     A.    Yes.
20     Q.    And on the top of that, Kristy Wong
21 writes, "Just spoke to him.  He just wants to be
22 in the loop on how we are segregating assets
23 being sold to Barclays from the rest."
24        What does that mean?  How were
25 segregating assets?

D. Coles

1
2     A.    It's typical for a company to run a
3 trial balance or a general ledger account
4 structure, and knowing that the -- knowing now
5 that Barclays purchased the infrastructure, I
6 wanted to make sure that it was capable of
7 continuing to maintain and report to us a
8 statement of its assets, liabilities, P&L and
9 cash flow going forward.  Because we were very
10 reliant on Barclays because all of that
11 backbone, if you will, went across to Barclays
12 as part of the transaction, yet we were
13 responsible for a significant number of assets
14 and value of assets and needed to be able to
15 first understand what we were responsible for
16 and then slowly monetize those assets.
17     Q.    And did you have fairly regular
18 correspondence or communications with Kristy
19 Wong in this time period?
20     A.    Yes.
21        MR. TAMBE:  Objection to the form of
22 the question.
23     Q.    The people you're interacting with at
24 Lehman, whether they stayed at Lehman or went
25 over to Barclays, were they cooperative in

D. Coles

1
2  providing you information?
3      A.    Four out of ten.
4      Q.    Is that good or bad in your
5  experiences?
6      A.    It was -- it was pretty bad, but we --
7  we all recognized that they had probably put in
8  some really long days in the run-up to the
9  filing and then after the filing, and that their
10 employer had changed for those people who had
11 moved across to BarCap, they were now employed
12 by BarCap, and although they were obligated, or
13 BarCap was obligated to provide transitional
14 services, we were probably going to be
15 deemphasized as a priority.  So it was necessary
16 for us to continue to chase things so that we
17 got some attention.
18     Q.    So it had to do with more chasing and
19 asking than you would have liked?
20     A.    Yes.
21     Q.    Was there ever a point in time when
22 they flat-out refused to give you something you
23 needed?
24     A.    No.
25     Q.    Let me go ahead and show you a

D. Coles

1
2  document we'll mark as 586A.
3          (Exhibit 586A, a document bearing
4      Bates Nos. BCI-EX-(S)-6332 through 6340,
5      marked for identification, as of this date.)
6      Q.    Do you recognize this as an e-mail
7  from yourself dated September 24, 2008?
8      A.    I do.
9      Q.    And did you draft notices or
10 correspondence to vendors to try to explain the
11 Barclays transaction in terms of Barclays having
12 the election of assuming or not assuming certain
13 contracts?
14     A.    I think I did.  I mean, this e-mail
15 references a vendor letter and talking points.
16 Those would be standard operating procedure for
17 us in a situation like this.
18     Q.    Uh-huh.
19     A.    I don't recall the exact content.
20     Q.    And if you would look at the
21 attachments there, there's a Bates number at the
22 bottom right 6335, you have "Vendor Inquiries."
23 Do you see that?
24     A.    Yes.
25     Q.    Okay.  And then it's the draft letter

D. Coles

1
2  that's on 6339?
3      A.    Yes.
4      Q.    And on the following page, 6340,
5  second sentence at the top, "While the contracts
6  assumed at closing assumes the agreements
7  initially identified by Barclays, Barclays also
8  has the option to assume further agreements and
9  liabilities for 60 days following the close of
10 the sale.  Barclays is actively reviewing the
11 current Lehman contracts relating to the
12 broker-dealer business, and we request your
13 patience and cooperation during this transition
14 period."
15         Does that refresh your recollection
16 that it was basically a 60-day period that
17 Barclays had to decide which contracts it wanted
18 to assume --
19         MR. TAMBE:  Objection to form.
20     Q.    -- other than the ones identified
21 prior to closing as Closing Date Contracts?
22         MR. TAMBE:  Objection to the form of
23 the question.
24     A.    It says what it says.  I -- I can't
25 remember the 60 days other than from today.

D. Coles

1
2      Q.    Okay.  At the time, you would have, if
3  that's the case, that it was 60 days, at the
4  time you likely would have known it?
5      A.    I think so.
6      Q.    And did the -- on the second page of
7  this, which is 6336, second page of the Vendor
8  Inquiries, there's a Website given there, the
9  Epiq Systems?
10     A.    Yes.
11     Q.    Does that refresh your recollection
12 that it was --
13     A.    Yes.
14     Q.    -- hosted by Epiq?
15         And do you recall whether the Website
16 actually showed up to date which contracts
17 Barclays had assumed and the cure amounts for
18 those contracts?
19     A.    I believe that was its purpose.  I'm
20 not sure I visited it to explore that.
21         MR. THOMAS:  Okay.  Are you doing okay
22 break-wise?  Do you want a short break or do
23 you want to keep going?
24         THE WITNESS:  I'm fine.
25         Do you have a sense for timing?

Page 58

D. Coles

1              D. Coles
2        MR. THOMAS:  We're moving along really
3 good.
4        THE WITNESS:  Okay.
5        MR. THOMAS:  It's only the dark blue
6 tabs.
7        THE WITNESS:  If anyone else needs a
8 break, that's fine.  You want five minutes?
9        MR. THOMAS:  If everyone's okay, we'll
10 keep going.
11       MR. TAMBE:  We can keep going.
12   Q.  Let me show you a document we marked
13 this morning -- actually, marked previously as
14 563B.  These aren't your notes.  They're Ms.
15 Korycki's notes of a meeting.
16       My question to you is, do you recall
17 attending a meeting on or about September 29,
18 2008 with folks from Alvarez, Weil Gotshal and a
19 couple Lehman or former Lehman executives, Paolo
20 Tonucci and Alex Kirk, to discuss the details of
21 the Barclays transaction?
22   A.  I recall meeting with those types of
23 players.  Whether I was at this one on the 29th,
24 I'm not sure.  Paolo was a difficult person to
25 track down.

Page 59

D. Coles

1              D. Coles
2   Q.  And you have no reason to, if others
3 recall that you were there, you have no reason
4 to doubt that you were at this meeting?
5   A.  Correct.
6   Q.  And do you recall the purpose of the
7 meeting?
8   A.  No.
9   Q.  And just to be clear, putting aside
10 that you can't definitively say these notes are
11 of that meeting --
12   A.  Right.
13   Q.  -- you do remember such a meeting in
14 this general timeframe?
15   A.  I remember a meeting with -- I mean,
16 I've been at a meeting with those individuals.
17 Whether this was the topic, I'm not sure.  This
18 might well have been the meeting that Jim
19 Fogarty really tried to take the lead on.
20       If it is, it would have also had Bill
21 Fox at this meeting, and the main thrust of that
22 meeting, if this is the one, and if I was at it,
23 I think was a lot to do with the Cusips, which
24 was the security side of things.
25   Q.  The repo collateral that was

Page 60

D. Coles

1              D. Coles
2 transferred --
3   A.  Yes.
4   Q.  -- over to Barclays?
5   A.  Yes.
6   Q.  I think there was testimony that there
7 were other people from Alvarez & Marsal at this
8 meeting, and I think it includes Bill Fox, but
9 I'd have to check that.
10      I'm not going to go through a lot of
11 detail on these notes, but do you recall
12 generally that Lehman had a repo agreement with
13 the Fed shortly after bankruptcy and the Fed
14 asked Barclays to step into that repo agreement
15 essentially so the Fed could get out of it?
16      MR. TAMBE:  Objection to the form of
17 the question.
18   A.  Generally.  Generally, yes.
19   Q.  Looking at page 4889, do you recall at
20 this meeting, which you may or may not have been
21 at which may or may not have been led by Mr.
22 Fogarty, do you recall there being a flip sheet
23 resembling the chart at the top of 4889?
24   A.  I don't.
25   Q.  Do you recall generally that Barclays

Page 61

D. Coles

1              D. Coles
2 gave or was to give $45 billion in cash in
3 return for getting securities that were marked
4 at roughly in the $49.7 billion range?
5      MR. TAMBE:  Object to form.
6   A.  Generally, yes.
7   Q.  Do you recall in this meeting a
8 description of the assets that were conveyed to
9 Barclays as part of the sale transaction?
10   A.  I seem to remember either it existing
11 at that meeting or being produced pretty shortly
12 thereafter a very thick wad of paper that was
13 the Cusip listing of these securities.  I
14 remember that living in Jim Fogarty's office for
15 a long time.
16   Q.  Do you remember also getting a
17 detailed description from Weil Gotshal as to
18 what of the assets that went over as part of the
19 deal and what stayed?
20      MR. TAMBE:  Objection to the form of
21 the question.
22   A.  I don't recall.
23   Q.  Do you recall -- do you know who Lori
24 Fife -- sorry.  Go ahead.
25   A.  I did -- I did have conversations

Page 62

```
 1              D. Coles
 2   along those lines with Rod Miller.  I didn't
 3   have conversations with Lori Fife.
 4       Q.   Do you know if Lori Fife was on the
 5   phone for this meeting?
 6       A.   I don't recall that.  I don't think
 7   anybody was on the phone.
 8       Q.   Do you recall Rod Miller was at the
 9   meeting?
10       A.   I don't, but I wouldn't be -- I
11   wouldn't be surprised if he had been there.
12       Q.   Was Rod Miller and the folks at Weil
13   reasonably responsive to your requests for
14   information about the sale transaction?
15       A.   Yes.
16       Q.   Do you recall that, as part of the
17   sales transaction, there was also certain assets
18   from Lehman's unencumbered box or clearance box
19   transferred as part of the sale?
20       A.   Yes.  Those descriptions ring a bell.
21       Q.   Did you have occasion as part of your
22   work to -- strike that.  Do you recall that
23   approximately -- clearance box assets valued at
24   approximately 1.9 billion were to be conveyed as
25   part of the sale transaction?
```

Page 63

```
 1              D. Coles
 2       A.   No.  I remember having a certain
 3   degree of relief that this was all in Jim
 4   Fogarty's work stream.
 5       Q.   Okay.  Let me ask you to turn to page
 6   4890.  Do you recall there being an issue that
 7   not all of the 45 billion -- not all of the
 8   assets that Barclays was supposed to be
 9   receiving being received because of something
10   JPM did with respect to 7 billion of the 45
11   billion?
12          MR. TAMBE:  Objection to form.
13       A.   Yes, but I don't think as a result of
14   this meeting I might have been at.  I think from
15   just general discussion with colleagues after
16   the fact, and I do remember that it seemed as
17   though listing of securities was a bit of a
18   moving target.
19       Q.   That the securities -- that there was
20   a list of Fed repo securities, but that the
21   securities that actually went over to Barclays
22   were different than that list?
23          MR. TAMBE:  Objection to the form of
24   the question.  Mischaracterizes his
25   testimony.  Foundation.
```

Page 64

```
 1              D. Coles
 2       A.   I think it was more that there was
 3   quite a delay from us being informed that there
 4   was 45 billion in securities that it took a
 5   while to actually get that listing to tie out to
 6   45 billion in securities.
 7          It seemed as though some of the
 8   documentation was being prepared after the fact
 9   to support something, and that in itself
10   isn't -- might have surprised me at the time,
11   but in retrospect, doesn't surprise me now
12   because of the distress the organization was
13   going through and all of the stress that the
14   Treasury and Liquidity Team was being put
15   through in the days before the filing and
16   immediately after the filing.
17       Q.   Are you referring to the -- to the
18   list as Exhibits A and B that were eventually
19   filed with the court?
20          MR. TAMBE:  Objection to the form of
21   the question.
22       A.   I don't recall that level of detail.
23       Q.   Do you know -- you spoke of distress
24   to the company during this period of time.
25   During that week of September 15 after the
```

Page 65

```
 1              D. Coles
 2   bankruptcy filing, do you know whether the marks
 3   on the company's securities were being updated
 4   daily?
 5          MR. TAMBE:  Objection to form.
 6   Foundation.
 7       A.   I don't.  I don't know.
 8       Q.   Looking on 4890, almost near the
 9   bottom, there's a note there that says, "Paid
10   38," I think it's 38 billion, "cash to buy 42.9
11   billion Lehman assets."  It says, "Value
12   different valuation, 5.1," and then under "42.9
13   billion" it says "38," which should be 38
14   billion.
15          Do you recall at this meeting there
16   being a discussion of a difference in valuation
17   or a question of valuation, proper valuation,
18   for the assets that came over to Barclays?
19          MR. TAMBE:  Objection to the form of
20   the question and foundation.
21       A.   I think I do recall being aware of
22   that difference in valuation.  Whether I became
23   aware of it at this point in time, I'm not sure.
24   I liken some of this a little bit to that scene
25   in "Close Encounters" where the lights are
```

Page 66

D. Coles

1
2 flashing up on the board. You can see that the
3 lights are flashing, but you've got no idea what
4 it really means.
5       Q.   At some point did you have an
6 understanding that that valuation difference
7 arose because when securities that were marked
8 as about $43 billion were transferred to
9 Barclays, Barclays looked at them and said,
10 "This isn't worth $43 billion. We think it's
11 worth more like $38 billion"?
12       MR. TAMBE: Objection to the form of
13 the question.
14       MR. SHELLEY: Objection to the form of
15 the question.
16       A.   You're educating me at this point.
17    Q.   What did you -- what do you recall
18 about the difference, the valuation difference
19 between the 43 billion and the 38 billion and
20 the $5 -- $5 billion --
21       MR. TAMBE: Objection to the form of
22 the question and foundation.
23       MR. THOMAS: There is no question.
24       MR. TAMBE: Finish your question.
25    Q.   Let me restate it. What do you recall

Page 67

D. Coles

1
2 about the difference between the 43 billion
3 number and the $38 billion number and the $5
4 billion valuation difference?
5       MR. TAMBE: Objection to the form of
6 the question.
7       MR. SHELLEY: Objection to form.
8    A.   Very little, other than that
9 difference between 5 billion relating to marks.
10    Q.   Do you recall attending a presentation
11 to the Creditors Committee on October 8 that
12 included a description of that difference?
13    A.   No, but if that -- that was probably
14 our first Creditors Committee meeting, and I
15 certainly attended that and presented, and it
16 could well have been in that book.
17    Q.   Turning -- turning the page to 4891,
18 and under "Assets" do you see where it says "38
19 billion," then the "5 billion"?
20    A.   Yes.
21    Q.   And then the "43 billion." Does that
22 refresh your recollection of the description of
23 that difference at this meeting?
24       MR. TAMBE: Objection to the form of
25 the question.

Page 68

D. Coles

1
2    A.   No. It doesn't describe the
3 difference, it just restates it.
4    Q.   Okay. Fair enough. Let me ask you to
5 turn to -- well, the fact that it's restating
6 it, is this -- do you recognize this as a, some
7 type of attempted balance sheet here on the top
8 of the page?
9    A.   Yes.
10    Q.   Does the fact that it's -- that $5
11 billion difference is included in this manner,
12 does that give you -- refresh your recollection
13 as to the nature of the $5 billion difference,
14 other than it relates to marks and a difference
15 in valuation?
16       MR. TAMBE: Objection to the form.
17    A.   That isn't what it says.
18    Q.   Okay. On the prior page it refers to
19 a different valuation and it's referring to
20 Lehman assets, correct?
21       MR. TAMBE: Excuse me. Are you now
22 asking him to interpret these notes? Is
23 that what the question is?
24       MR. THOMAS: The question is clear.
25       MR. TAMBE: It's not. Objection to

Page 69

D. Coles

1
2 form and foundation.
3    A.   I think I said I remember the 5
4 billion number. It was to do with marks, and
5 I'm not sure that I learned that at this
6 meeting, if indeed I was at this meeting.
7    Q.   Let me go ahead and ask you to turn to
8 the exhibit previously marked as 461A. It's
9 entitled "Lehman Brothers Holdings, Inc. Report
10 to Unsecured Creditors Committee, October 8,
11 2008," and on the second page you're listed as
12 apparently someone responsible for a
13 presentation on significant transactions?
14    A.   Yes.
15    Q.   Do you recognize this document?
16    A.   Yes.
17    Q.   Is this part of a presentation that
18 Alvarez gave to the Creditors Committee?
19    A.   Yes.
20    Q.   Did you help prepare this written
21 presentation?
22    A.   Yes.
23    Q.   Did you help present the presentation?
24    A.   Yes.
25    Q.   And can you tell me, if you would turn

D. Coles

1
2  to page 4531, did you help prepare or contribute
3  to the content on page 4531?
4     A.  No.
5     Q.  Were you there when this was presented
6  to the Creditors Committee?
7     A.  Yes.
8     Q.  Under "Assets Purchased" do you see
9  where it says, "43.1 Billion Repo Assets - Book
10  Value per Lehman 'stale' marks; negotiated a $5
11  billion reduction"?
12     A.  Yes.
13     Q.  Does that refresh your recollection as
14  to the $5 billion difference between the 43
15  billion and 38 billion relating to an issue
16  concerning whether the Lehman marks were stale?
17     MR. TAMBE:  Objection to form.
18     A.  Well, this -- this page might have
19  been my first better understanding of how that 5
20  billion fit into the transaction.
21     Q.  The 5 billion that's referred to in
22  the notes of the meeting with Weil and former
23  Lehman employees, Kirk and Tonucci, on or about
24  September 29, do you know what -- do you have
25  any recollection of whether that was explained

D. Coles

1
2  to you, the $5 billion, at the time and what was
3  said about that?
4     MR. TAMBE:  Objection to the form of
5  the question.  Foundation.
6     A.  I remember certainly "marks" was used.
7  I'm seeing "stale marks" here.  I think that's
8  Jim quoting from that meeting, and it's "stale"
9  in inverted commas.
10     THE VIDEOGRAPHER:  I'm sorry.  I need
11  to switch the tapes.
12     The time is 4:22 P.M.  We're going off
13  the record.
14     (Pause in the proceedings.)
15     THE VIDEOGRAPHER:  The time is 4:26
16  P.M.  We're back on the record.  Video
17  number 2.
18  BY MR. THOMAS:
19     Q.  While keeping that page open, from the
20  U.C.C. presentation, let me also ask you to look
21  at 463B.  This is -- it's an e-mail with
22  representative of the Creditors Committee.  I'm
23  not going to ask you about the e-mail, but the
24  attachments, in the attachments, the first sheet
25  of which is a balance sheet put together by Ms.

D. Coles

1
2  Korycki, and I just wanted to ask if you had
3  seen this balance sheet before?
4     A.  I'm not sure.
5     Q.  Okay.  Under "Assets" do you see where
6  it says Repo Assets, 38 billion; Negotiated Mark
7  Haircut, 5 billion; Assets Transferred Under
8  Repo ('Stale' Marks), 43 billion?
9     A.  Yes.
10     Q.  Do you have any reason to believe that
11  the $5 billion difference, valuation difference,
12  between the marked amount of the Lehman repo
13  collateral sent to Barclays and the amount at
14  which it was valued, 38 billion that's reflected
15  in this balance sheet, which was circulated on
16  October 6 and the reference in your U.C.C.
17  presentation to the negotiated $5 billion
18  reduction against Lehman's stale marks, you
19  don't have any reason to believe that that $5
20  billion valuation issue was any different than
21  the valuation issue described to you in the
22  meeting with Mr. Kirk and Mr. Tonucci?
23     MR. TAMBE:  Objection to form.
24     MR. SHELLEY:  Objection to form.
25     MR. TAMBE:  Foundation.  Lack of

D. Coles

1
2  foundation.
3     A.  I think it's the same 5 billion.
4     Q.  And does reviewing these other
5  documents, does it refresh your recollection at
6  all about the discussion at the meeting with
7  Kirk and Tonucci and Weil about this $5 billion
8  valuation issue or difference?
9     MR. TAMBE:  Objection to form and
10  foundation.
11     A.  It's -- it's bringing back some
12  memories, yes.
13     Q.  Can you just describe what it was that
14  was explained to you at the meeting with Kirk
15  and Tonucci?
16     A.  I don't remember that.
17     Q.  Well, what were the memories that it's
18  bringing back?
19     A.  I remember the marks.  I remember the
20  word "stale."  I remember 5 billion.
21     Q.  Is it fair to assume that at the time
22  you would have either understood it or asked
23  somebody about it?
24     MR. TAMBE:  Objection to form.
25     A.  I don't think I knew what it meant.  I

D. Coles

1
2  was staring at flashing lights.
3      Q.    Well, again, do you recall -- you
4  don't recall the description of it given to you
5  in the Kirk and Tonucci and Weil meeting on or
6  about the 29th of September?
7      A.    I recall stale marks, 5 billion.
8      Q.    When you -- when you understood that
9  there was this valuation difference or issue
10  with respect to Lehman's marks on certain
11  securities that had been transferred to
12  Barclays, did it surprise you or cause you any
13  concern or cause you to take any follow-up
14  action?
15          MR. TAMBE:  Objection to form.
16      A.    No.  It didn't surprise me because I
17  didn't know what it meant.
18      Q.    Do you recall or do you have a
19  recollection of not recalling -- not knowing
20  what it meant?
21          MR. TAMBE:  Objection to form.
22      A.    I didn't -- I didn't focus enormously
23  on it.  I was comforted that Jim Fogarty was
24  hunting this stuff down.
25      Q.    And based upon your understanding of

D. Coles

1
2  the conditions at Lehman the week of September
3  15, would it surprise you if Lehman's marks by
4  the end of that week were stale and not up to
5  date, updated, or accurate?
6          MR. TAMBE:  Objection to the form of
7  the question.  Foundation.
8      A.    I wouldn't have had a basis for making
9  a determination.
10      Q.    Do you recall at the meeting with Kirk
11  and Tonucci and Weil whether someone from
12  Alvarez asked about the $5 billion difference or
13  whether it was volunteered by Kirk or Tonucci?
14      A.    I don't recall.
15      Q.    If it was going to be accounted for in
16  the balance sheet, would it have been important
17  to understand what exactly it was, the $5
18  billion difference?
19      A.    Yes.
20      Q.    Did you ever have -- we talked about
21  the transaction adjustment with respect to cure
22  and briefly with respect to compensation also.
23          Did you ever have occasion to
24  investigate or learn more about the transaction
25  adjustment for -- that related to compensation?

D. Coles

1
2      A.    What I do remember about that was in
3  the context of us, as the estate, wanting to
4  make sure that those individuals that BarCap had
5  retained solely for purposes of providing the
6  residual estate transitional services, that the
7  compensation was going to allow Barclays to
8  retain those people so that Barclays would be
9  able to perform under the Transitional Services
10  Agreement and that we, the estate, would get the
11  services we thought we could rightly expect.  So
12  we were -- and we also, of course, were
13  reimbursing Barclays for those transitional
14  services.  So we would have been interested in
15  what kind of bonus pool was available for those
16  people in the TSA.
17      Q.    And did that involve going back and
18  looking at the $2 billion number that's
19  referenced in the "Transaction Adjustment"
20  column?
21      A.    I seem to remember that the -- that
22  this was an evolving issue and that it wasn't
23  entirely clear, I don't think, that Barclays
24  was -- Barclays and Lehman I think had very
25  different compensation structures and

D. Coles

1
2  communication timelines and payment timelines in
3  terms of their year-end bonus pools, and so
4  there were individuals that Barclays had taken
5  on, former Lehman people, and there seemed to be
6  a lot of delay in getting crisp communication
7  out of BarCap as to how they were going to
8  communicate bonuses and when they were going to
9  communicate bones not only to the people that
10  they assumed and offered employment to, but also
11  those -- but also those people who were in the
12  transitional services box who were there for
13  just a very limited purpose and probably just a
14  short period of time.
15          And so we were seeking clarity on
16  that, but it was -- it was clear that there was
17  much debate within Barclays as to how to handle
18  some of this.
19      Q.    Have you ever had occasion to look at
20  or assess the value of the exchange-traded
21  derivatives or related collateral or margin that
22  was conveyed to Barclays as part of the sale
23  transaction?
24      A.    No.
25          MR. MILLS:  Object to the form.

Page 78

D. Coles

1
2   Q.   Do you know if you participated in a
3   meeting with FTI and Houlihan on approximately
4   October 2, 2008 to discuss issues in the case?
5       A.   That sounds broad enough that I could
6   have been at that.
7       Q.   Let me, just for good order, let me
8   show you an exhibit previously marked as 579A.
9   It's a one-page set of notes from the meeting
10  taken by Ms. Korycki, and if you would, just by
11  glancing at it, give me a sense whether it
12  triggers any recollection as to whether you were
13  at this meeting or not.
14      A.   It doesn't say I was there.
15      Q.   No, I'm not sure it says who was
16  there.
17      A.   No, it's not illuminating.
18      Q.   Okay.  Do you have any basis or reason
19  to believe that anyone working for Lehman or
20  Barclays did anything improper or acted in bad
21  faith in connection with this transaction?
22          MR. TAMBE:  Objection to form and
23  foundation.
24      A.   I don't, but I have seen many times
25  when a company is being purchased and there is

Page 79

D. Coles

1
2   an estate that is selling assets and those
3   individuals representing the estate are soon to
4   be employees of the purchaser.  Those employees
5   are in a conflicted situation, and those
6   employees would have to have very robust
7   integrity to be switching hats and yet
8   representing the estate in the process of
9   switching hats over to the new employer.  It's a
10  tough position to put employees in.
11      Q.   And it's one that commonly occurs out
12  of necessity?
13      A.   It -- yes.
14      Q.   And were you aware that Lehman
15  employees involved in negotiating the deal were
16  also at the same time negotiating employment
17  agreements with Barclays?
18      A.   Only after the fact.
19      Q.   Were you aware that the board was told
20  that?
21      A.   No.
22          MR. TAMBE:  Objection to the form of
23  the question.
24      A.   No.
25      Q.   Putting aside that potential for

Page 80

D. Coles

1
2   conflict, you're not aware of any evidence of
3   anyone acting in bad faith in connection with
4   the sales transaction, though; is that correct?
5          MR. TAMBE:  Objection to form and
6   foundation.
7       A.   I'm not aware of anything in
8   particular, no.
9          MR. THOMAS:  Thank you.  I have
10  nothing further.
11         THE WITNESS:  Thank you.
12         MR. TAMBE:  I have no questions.
13         MR. SHELLEY:  I have a few questions.
14  EXAMINATION BY
15  MR. SHELLEY:
16      Q.   Mr. Coles, I'm Scott Shelley with the
17  law firm Quinn Emanuel.  We're counsel for the
18  Official Committee of Unsecured Creditors.
19         I just have a few follow-up questions
20  about this Exhibit 579 we were talking about a
21  moment ago.  I believe you stated that looking
22  at the notes you thought they were not
23  illuminating as to who was there; is that
24  correct?
25      A.   Yes.

Page 81

D. Coles

1
2   Q.   Do you have any recollection at all as
3   to who may have been at that meeting?
4   A.   No.  579A, no.
5   Q.   Do you have any recollection of that
6   meeting at all?
7   A.   No.
8          MR. SHELLEY:  That's all I've got.
9   Thank you.
10         MR. THOMAS:  Nothing further.
11         THE VIDEOGRAPHER:  The time is 4:41
12  P.M.  We're going off the record.
13             oOo
14
15
16
17
18             _____
             DAVID JAMES COLES
19
20  Subscribed and sworn to
    before me this    day
21  of       2010.
22
             _____
23
24
25

Page 1

1

2                UNITED STATES BANKRUPTCY COURT

3                 SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5    In Re:

6                                 Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al,    (Jointly Administered)

9              Debtors.

10       ------------------------x

11

12            * * *HIGHLY CONFIDENTIAL* * *

13           DEPOSITION OF NANCY DENIG

14              New York, New York

15              August 21, 2009

16

17   Reported by:

18   MARY F. BOWMAN, RPR, CRR

19   JOB NO. 24044

20

21

22

23

24

25

DENIG - CONFIDENTIAL

1
2   NANCY DENIG,
3       called as a witness by the parties,
4       having been duly sworn, testified as
5       follows:
6   EXAMINATION BY
7   MR. HINE:
8       Q.   Good morning, Ms. Denig.  How are you?
9       A.   Good.
10      Q.   I introduced myself before, but my
11  name is Bill Hine.  I am from the firm of Jones
12  Day, which is special counsel to Lehman Brothers
13  Holdings, Inc. in connection with all the
14  bankruptcy proceedings that are going on.
15      So your deposition today is in
16  connection with those proceedings and some
17  discovery that we are taking in those proceedings.
18  Have you ever been deposed before?
19      A.   I have not.
20      Q.   Very simple.  I am going to ask you a
21  bunch of questions.  You are under oath, you are
22  going to give me truthful answers.
23      On occasion your counsel will raise an
24  objection or interpose an objection.  He is either
25  doing that for any number of reasons, but I just

DENIG - CONFIDENTIAL

1
2   wanted to let you know that it doesn't relieve you
3   of the obligation to answer the question.  You
4   still have to answer the question, unless of
5   course your counsel instructs you not to answer
6   the question, which he may do on occasion as well.
7       I think all the other counsel around
8   the table will introduce themselves as they get up
9   to ask you questions, if they have any, but if you
10  have any questions -- unless you have any
11  questions, we can get started.
12      One point of clarification before we
13  get started.  I see e-mails addressed to N. Bayne.
14  Is that you?
15      A.   That is my maiden name.
16      Q.   So if I see --
17      A.   Unfortunately when you were at Lehman,
18  when I got married -- my user profile before I got
19  married was N. Bayne, which was my maiden name.
20  When I got married, in order for them to change
21  the user name, they would have had to delete me
22  from the system altogether and I would have to
23  reapply for all my applications, which I didn't
24  want to do because I was already four years into
25  the company, so I left my user name as N. Bayne.

DENIG - CONFIDENTIAL

1
2       Q.   If I see an e-mail addressed to
3   N. Bayne at Lehman --
4       A.   That's me.
5       Q.   Could you tell me how long you worked
6   for Lehman?
7       A.   15 years.
8       Q.   So that's starting in --
9       A.   1994, January 20.
10      Q.   OK.  And could you kind of briefly
11  walk me through the progressions of positions you
12  held up until the end?
13      A.   I started as an analyst in customer
14  service, which dealt with like trade discrepancies
15  for fixed income products.
16      Moved to P&L in the finance division,
17  where I supported the repo desk for central
18  funding for all types of fixed income assets.
19      I then took on various different
20  groups throughout the life, sales support, trade
21  support, P&L, structured repo, EMG, trade and
22  sales support, and probably that was pretty much
23  it.  So I pretty much stayed on the fixed income
24  side pretty much all my career.
25      Q.   What was the last position you held?

DENIG - CONFIDENTIAL

1
2       A.   Last position, regional head for fixed
3   income repo, middle office, so that was trade
4   support, so we supported the traders in the daily
5   transactions that they executed.
6       We did sales support, which also
7   supported any trade confirmations, sales
8   confirmations, trade discrepancies with regards to
9   the salespeople.
10      We did -- we reported the P&L to the
11  business lines, and, you know, some various little
12  odds and ends, but nothing that needs to be
13  clarified.
14      Q.   Who did you report to in that
15  position?
16      A.   Jim Hraska.
17      Q.   Any other people that you reported to
18  directly?
19      A.   No.
20      Q.   How long have you held this position?
21      A.   Three years of all that.  I just kept
22  getting more stuff added to me as my career
23  progressed.  So I started with one group and got
24  another one, another, another, another.  But
25  basically all in the same business line.

DENIG - CONFIDENTIAL

1
2  shortfall?
3      A.   We weren't.
4      Q.   And so what did you do then?
5      A.   Because we basically ran out of time,
6  the Fed and the DTC depositories ended up shutting
7  down at a particular time and we didn't get
8  everything that we wanted to over, because it
9  wasn't enough time to do all the research.
10     Q.   And you're talking about Thursday
11 evening?
12     A.   Thursday evening around 11 o'clock.
13     Q.   So what was the shortfall by the time
14 of -- by the time you ended on Thursday night?
15     A.   I am not 100 percent sure of what the
16 final figure was, but I want to say it was
17 42 billion is what they received.
18     Q.   OK.  So 42 is not the shortfall, 42 is
19 what ultimately did make it?
20     A.   Yeah.
21     Q.   Was there a 7 or 8 billion dollar
22 shortfall, do you recall?
23     A.   Yes.
24     Q.   Is that the genesis of what I have
25 seen referred to as box loan?

DENIG - CONFIDENTIAL

1
2      A.   Yes.
3      Q.   And can you tell me what that is?
4      A.   Well, because we didn't -- we couldn't
5  make the rest of the collateral, because of the
6  timing, they didn't receive the value of
7  7 million -- 7 billion worth of collateral.  So
8  Chase lent Lehman 7 billion dollars to give back
9  to -- to give to Barclays to make up that.
10     Typically you wouldn't collateralize
11 cash with cash, but at that late hour, that was
12 really the only way to facilitate that so that
13 Barclays was made whole.
14     Q.   And what secured that loan?
15     A.   Chase.  The assets that we still had
16 in the box, that Lehman still had in the box.
17     Q.   And the box meaning what?
18     A.   Our free collateral box, meaning any
19 assets that didn't get delivered over to BoNY and
20 was still in the possession of Lehman Brothers,
21 Inc.
22     Q.   And is that the 074 box?
23     A.   No, it was a Chase box.
24     Q.   OK.  074 box is separate?
25     A.   That's a DTC box.

DENIG - CONFIDENTIAL

1
2      Q.   I understand.  OK.
3      So now you have gotten us through
4  Thursday night.  What did you do Friday morning or
5  Friday during the day?
6      A.   Well, we -- there was a lot of --
7      Q.   I just mean Friday, the 19th of
8  September.
9      A.   19th.  So first thing in the morning,
10 what we thought was pulled, that they were short
11 collateral that we didn't finish, to try to get as
12 much collateral that we knew was available in the
13 DTC, because at this point the Fed collateral was
14 all exhausted.  We didn't have Treasuries,
15 agencies.  They went.  They were delivered and
16 they were reconciled with Barclays, that they
17 received them.
18     The assets that we ran out of time to
19 send were the DTC, what you referenced as 074
20 collateral, 636 collateral, which are the two DTC
21 boxes that Lehman Brothers, Inc. owned.
22     The traders were basically using their
23 front-end capture system to determine what the
24 positions were that they had available and what
25 they knew as unencumbered, and they delivered

DENIG - CONFIDENTIAL

1
2  those via pledge mechanism to DTC, a DTC box for
3  BoNY, which was owned technically by Barclays.
4      Q.   And how much collateral was
5  transferred to the BoNY box in connection with
6  that effort?
7      A.   A billion dollars, a billion and
8  change.
9      Q.   And now what was the purpose of
10 transferring that to that BoNY box?
11     MR. SHAW:  Objection, foundation.
12     A.   We were under the impression we were
13 still short market value.
14     Q.   So that was short market value in
15 connection with the September 18 repo?
16     A.   Yes.
17     Q.   So was that billion and change to
18 substitute in for the cash that had been placed in
19 the repo through the box loan?
20     MR. SHAW:  Objection, foundation.
21     A.   It wasn't my -- it wasn't my
22 understanding, no.
23     Q.   What did you understand it to be for?
24     A.   It was just that BoNY said that they
25 didn't have enough market value, you need to give

Page 190

DENIG - CONFIDENTIAL

1              DENIG - CONFIDENTIAL
2   in a search for additional unencumbered
3   collateral; is that correct?
4      A.   That's correct.
5      Q.   Did you have an understanding of why
6   you were looking for this additional unencumbered
7   collateral?
8        MR. SHAW: Objection, asked and
9   answered.
10      A.   My impression was that we were -- we
11   had a shortfall in the delivery of the original
12   repo, and we were just trying to find the rest of
13   the -- the collateral to make up the shortfall in
14   market value.
15      Q.   Again, I am a little confused. Is the
16   shortfall in the market value of assets that were
17   delivered -- withdrawn. I'll try that question a
18   better way.
19      Can you be more specific about the
20   shortfall in the market value of securities that
21   were delivered that you just told me about?
22      A.   Sure. When pens went down on the end
23   of September 18, they came back to us, and who,
24   I'm not really sure who, but saying -- and it was
25   communicated down to us that we were short in the

Page 191

1              DENIG - CONFIDENTIAL
2   value, in I believe the 1.9 billion dollar range.
3      A billion of it was transferred Friday
4   morning, which we didn't know what the total
5   market value of that was until Monday, the 22nd,
6   but on Saturday, those assets were not reflected
7   in any of the documentation that anybody had at
8   that point, because we didn't receive the file
9   from BoNY until Monday morning.
10      So Saturday basically we were told to
11   look for -- we were told, tasked to look for
12   1.9 billion. We kept referring to a billion of it
13   was delivered already, so we were really on the
14   search for 900 million odd.
15      Q.   And your understanding about what you
16   were looking for and why came from conversations
17   with Mr. Hraska; is that correct?
18      A.   Mr. Hraska and Mr. Forrest.
19      Q.   Did anyone ever tell you, Ms. Denig,
20   that one of the reasons that additional collateral
21   was transferred to BoNY on Friday, the 19th, was
22   because Lehman had had to transfer cash as part of
23   the repo?
24      A.   I knew Lehman transferred cash as part
25   of the repo, so I wasn't sure how that was going

Page 192

1              DENIG - CONFIDENTIAL
2   to be reconciled. I thought that potentially
3   Chase and BoNY were kind of discussing that and
4   working that out. I wasn't sure that they -- they
5   segregated that collateral and were going to just
6   deliver it the very next day, if Barclays would
7   have given us the cash -- given Chase the cash
8   back, and then they were given collateral worth
9   that value.
10      I wasn't sure how they were going to
11   make that whole or whether they were just going to
12   leave it as cash.
13      Q.   When Mr. Hraska testified last week,
14   he told me that the reason additional collateral
15   was transferred on the 19th from Lehman to BoNY
16   for the benefit of Barclays, it was with the
17   intention of releasing some of the cash that had
18   been pledged as part of the September 18 repo.
19   Did Mr. Hraska ever tell that information to you?
20        MR. SHAW: Objection, form,
21   mischaracterizes Mr. Hraska's testimony.
22      But you can answer the question.
23      A.   As far as my recollection was, it was
24   to satisfy the shortfall of collateral. How that
25   was -- the 7 billion really didn't come more clear

Page 193

1              DENIG - CONFIDENTIAL
2   to me or people told me about it until later on,
3   but not at that particular time, no.
4      Q.   Have you ever heard at any time that
5   the reason additional unencumbered collateral was
6   moved to BoNY on the Friday, the 19th, was to
7   release the cash that had been transferred as part
8   of the repo on the 18th?
9      A.   I did not.
10      Q.   Do you have in front of you what has
11   previously been marked as Exhibit 237?
12      A.   Yes.
13      Q.   I am also handing you what has
14   previously been marked as Exhibit 150B. I don't
15   think Mr. Hine marked that this morning.
16      You will see, Ms. Denig, that both
17   Exhibit 237 and Exhibit 150B have attachments; is
18   that right?
19      A.   Yes.
20      Q.   And both the attachments appeared out
21   of the file name TRI09192008.xls?
22      A.   Yes.
23      Q.   But Exhibit 237 appears to be
24   version 3 of a spreadsheet with that same file
25   name; is that correct?

DENIG - CONFIDENTIAL

1
2    A.   OK, OK.
3    Q.   Do you have any understanding of the
4    difference between those two spreadsheets?  I am
5    obviously not expecting you to go through them
6    line by line, CUSIP by CUSIP, but just if you
7    could take a moment to look at them and tell me
8    whether you have any understanding of the
9    difference between the two, if any.
10   A.   I don't see a difference.
11   Q.   Just looking for the moment at
12   Exhibit 237.  Is that the spreadsheet that you
13   created?
14   A.   No.
15   Q.   It appears to be sent from you to
16   Kendall McLaughlin, William Bach and Bob Azerad?
17   A.   Correct, but I did receive it from the
18   Magics technology team.  It is either Magics or
19   BoNY, to be honest with you.  No, it was
20   definitely Magics.
21   Q.   Can you explain what you mean by
22   Magics?
23   A.   Magics is a front-end system that
24   would have been the mechanism that we did the
25   pledges.  So a trader inputs the information in,

DENIG - CONFIDENTIAL

1
2    feeds into a trader system, feeds down to a
3    settlement system, and then a delivery is made.
4        So according to the front-end system,
5    this is what the individual CUSIPs were that were
6    sent to BoNY on the 19th, the morning of the 19th.
7    And the market value -- where I wanted to see if
8    it is different is that the values on the last
9    page of both equal the same amount of money, one
10   billion eighty.
11       One of them is a warrant which they
12   didn't want, so I think they ended up delivering
13   that back.  So in Exhibit 237, you see how the
14   last page, you have a total market value of
15   1,035,000,000, and then there is this one line
16   that says 54 million?
17   Q.   Um-hm.
18   A.   And if you look at the file on the
19   last page of Exhibit 150, the total value was
20   1,090,059,000.  If you add up the two, it is the
21   same value.  So I'm assuming that the information
22   is consistent, that it reflects the same
23   information.
24   Q.   OK.
25   A.   The different version could just be

DENIG - CONFIDENTIAL

1
2    the fact that something, you know, was shuffled
3    around a little bit.
4    Q.   And the market values that you see
5    reflected on these two spreadsheets, Ms. Denig, is
6    a market value that's assigned by Lehman, correct?
7    A.   Yes.
8    Q.   And if I understand your testimony
9    correctly, these were CUSIPs that were transferred
10   out from Lehman's box of DTC to BoNY for the
11   benefit of Barclays on the 19th?
12   A.   That's correct.
13   Q.   And do you know whether or not the
14   CUSIPs reflected in Exhibits 150B and 237 were
15   ever returned to DTC's clearance boxes?
16   A.   I think this one asset was.  I think
17   that's why it is highlighted.  I'm pretty sure my
18   recollection is this was on the excluded list so
19   they kicked it back.  So in --
20   Q.   Just so we have a clear record --
21   A.   In Exhibit 237, you see there was this
22   one security, the last page that's highlighted,
23   and it is called the warrant, that's the type of
24   product it is.  Usually that was not something
25   that you can go raise cash for.  And it had a

DENIG - CONFIDENTIAL

1
2    market value of 54 million.  I think that was on
3    the excluded list and they did kick it back.
4    Q.   With the exception of that one warrant
5    worth 54 million dollars, is it correct that the
6    assets reflected in Exhibit 237 were not held in
7    LBI's clearance boxes as of the close of business
8    on the 19th of September?
9    A.   That's correct.
10   Q.   And is it also correct that, again
11   with that one exception of that one line item, the
12   54 million dollars, the assets reflected in
13   Exhibit 237 were not at any time after close of
14   business on September 19 ever included in LBI's
15   clearance boxes?
16       MR. SHAW:  Objection to form,
17   foundation.
18   A.   And I'm not 100 percent sure that
19   there weren't other discrepancies, but as of this
20   particular moment, when this particular file was
21   done, this is the only one that we knew of that
22   got kicked back.  In subsequent reconciliations
23   there could have been others.
24   Q.   Let me try it this way.  As of close
25   of business on Friday, with that one exception we

Page 198

DENIG - CONFIDENTIAL

2  have talked about, the CUSIPs that are reflected
3  on 237 were not in Lehman's clearance box,
4  correct?
5      A.   That's correct.
6      Q.   As of Monday morning, again with this
7  one exception, the CUSIPs reflected on 237 were
8  not contained in Lehman's clearance boxes,
9  correct?
10     A.   That's correct.
11     Q.   Thank you.  That is all I have for
12  those documents at the moment, I think.
13         (Exhibit 253, document Bates stamped
14         BCI-EX-S-00018190 through 191 marked for
15         identification, as of this date.)
16     Q.   Ms. Denig, you have in front of you
17  what has been marked as Exhibit 253, which is a
18  two-page document I'll identify for the record as
19  bearing the Bates range BCI-EX-S-00018190 through
20  91.
21         If you'd just take a moment to
22  familiarize yourself with that and let me know
23  when you have finished doing so.
24         OK.  Do you see below the --
25  Mr. Hraska's emoticon?

Page 199

DENIG - CONFIDENTIAL

2      A.   Is that what it is called?
3      Q.   I believe so.  It is the first time I
4  have had a chance to say "emoticon" on the record
5  anywhere.
6         It is an e-mail from you, Ms. Denig,
7  to John Rodefeld at Barclays, Wednesday, September
8  24th.
9      A.   Yes.
10     Q.   With a re: line "Just to summarize."
11         Can you explain to me the context in
12  which you sent this e-mail to Mr. Rodefeld,
13  please?
14     A.   Yes.  Jim asked me to follow up with
15  the clearance folks to find out if, in fact, we
16  did pledge this particular CUSIP to Barclays.
17  They didn't have it on their books anywhere, and I
18  didn't have it as a discrepancy on my
19  reconciliation with John.
20         So we went to the clearance folks, who
21  was this guy Ed Steffens.  He went -- which is the
22  original one.  He said this to Jim, which is
23  basically a reflection of what was in each box for
24  these three CUSIPs, so he was saying 074, there
25  was nothing in the box.  In 636 we had 20 billion,

Page 200

DENIG - CONFIDENTIAL

2  210 in the box and nothing in the other two.
3         I was telling him in this e-mail that
4  we already did pledge to him, which isn't
5  reflected anywhere else in the e-mail, that at 70
6  million, 210, and that we had additional 200 -- 20
7  million, 210 in the box.
8      Q.   Do you know at which point these
9  CUSIPs were pledged to Barclays?
10     A.   For the 70 million, 210, it was done
11  on -- it could have been done on a combination of
12  the 18th and the 19th, because ultimately my list
13  ended up being combined and I only knew of one
14  list, so I combined those as could have been
15  delivered on either date.  Though we could -- it
16  could be looked to see where.
17     Q.   And that answered my question with
18  respect to the 70 million.  The 20 million figure?
19     A.   Yes.
20     Q.   Is that the same answer?  Was it
21  pledged on either the 18th or the 19th?
22     A.   No, it was not.  It was still as of
23  September 24 sitting in the DTC box, 22 -- 636,
24  which is LBI's DTC box location.
25     Q.   At any point did that CUSIP get

Page 201

DENIG - CONFIDENTIAL

2  transferred or pledged to Barclays?
3         MR. SHAW:  Objection, foundation.
4      A.   I can't be sure.
5      Q.   To the best of your knowledge, was it
6  ever pledged or transferred to Barclays?
7      A.   I think so.
8      Q.   And when do you believe it was pledged
9  or transferred to Barclays?
10     A.   On the 29th or the 30th.
11     Q.   Thank you.  That is all I have about
12  that document.
13         (Exhibit 254, document Bates stamped
14         BCI-EX-S-18206 with attachment marked for
15         identification, as of this date.)
16     Q.   Ms. Denig, I have handed you what has
17  been marked as Exhibit 254, which is a one-page
18  e-mail having the Bates range BCI-EX-S-00018206,
19  and it has an attachment that was produced to us
20  in native form, and the place holder is
21  BCI-EX-S-00018207.
22         My question to you is a simple one,
23  Ms. Denig:  Do you know what this document is?
24     A.   It looks like a dump of information
25  that was in our DTC boxes as of 9/24 based on what

Page 1

1                      D. DZIEMIAN

2           UNITED STATES BANKRUPTCY COURT

3           SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                            Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,     (Jointly Administered)

9

10                  Debtors.

      ----------------------x

11

12

13

14          DEPOSITION OF DANIEL DZIEMIAN

15               New York, New York

16                March 4, 2010

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 28628

Page 6

D. DZIEMIAN

1
2  know.
3      A.    Okay.
4      Q.    As you see, you have Kathy as our
5  court reporter.  She's going to try and take
6  down everything we say today, so it's important
7  that you answer in a manner that she can
8  actually reflect on the transcript.  So
9  affirmative oral answers instead of nods or
10  shakes of heads are helpful.
11      A.    Okay.
12      Q.    Try not to talk over each other.
13  It'll happen at some point in the deposition,
14  but if you let me finish my question before you
15  give me your answer, that will be helpful.
16      Also, in the unlikely event I have a
17  question that Trish wants to object to, it will
18  allow her to get that on the record as well.
19      If you don't understand one of my
20  questions, please let me know.  I'll be happy to
21  try and rephrase it.  Okay?
22      A.    (Witness nods.)  Yes.
23      Q.    That's an example of a nodding as
24  opposed to a verbal answer.
25      And if you do answer a question, I'll

Page 7

D. DZIEMIAN

1
2  assume that you have understood it.  Is that
3  fair?
4      A.    Yes.
5      Q.    For how long, sir, were you employed
6  at Lehman?
7      A.    Since July of 2000.
8      Q.    What was your title when you were
9  first hired at Lehman?
10      A.    Vice president.
11      Q.    Did you have a particular specialty?
12  Were you vice president of something?
13      A.    The clearance area.  Purchase and
14  Sales and Options.
15      Q.    Purchase and Sales and Options?
16      A.    Yes.
17      Q.    Was that, sir, your title until you
18  joined Barclays in 2008?
19      A.    No.  I was promoted to senior vice
20  president.
21      Q.    Were you in the same area, sir?
22      A.    I had held a few different positions
23  at Lehman prior to September of 2008.
24      Q.    Could you, from July 2000 onwards,
25  could you tell me what those positions were,

Page 8

D. DZIEMIAN

1
2  please?
3      A.    One was being a project manager in the
4  Equity Middle Office.  One was the manager of
5  the Business Analyst Group.  One was the manager
6  of the Client Reporting Group.  One was managing
7  the Neuberger Berman correspondent clearing
8  business, and that was in addition to the
9  clearance responsibilities involving Purchase
10  and Sales and Options.
11      Q.    From which period time, sir, did you
12  have responsibility for the Purchase and Sales
13  of options?
14      A.    It was when I first joined Lehman and
15  then right before the integration.
16      Q.    Okay.  So from July 2000 until?
17      A.    Probably two years.
18      Q.    Sometime in 2002?
19      A.    Likely.
20      Q.    And seems like you picked up
21  responsibility for that area again sometime in
22  2008, is that accurate?
23      A.    Probably 2006.
24      Q.    In 2006 were you promoted to senior
25  vice president, sir?

Page 9

D. DZIEMIAN

1
2      A.    That happened the year before.
3      Q.    So in 2005, you were senior vice
4  president, correct?
5      A.    Yes, to my recollection.  It might
6  have been 2004 or -- or, yes, I would say 2005.
7      Q.    So, from 2006 onwards, you were senior
8  vice president with responsibility for the
9  clearing area for Purchase and Sales and
10  Options, correct?
11      A.    Yes, and for Neuberger Berman
12  correspondent clearing.
13      Q.    Okay.  Thank you.
14      Focusing on the time period from 2006
15  onwards --
16      A.    Uh-huh.
17      Q.    -- and leaving to one side the
18  Neuberger Berman issue --
19      A.    Yes.
20      Q.    -- and your responsibilities, can you
21  tell me on a day-to-day basis what were your
22  responsibilities in that role?
23      A.    Primary responsibilities involved
24  exception management.  It was basically
25  reconciliation responsibilities for all of the

3 (Pages 6 to 9)

Page 10

D. DZIEMIAN

1
2   equity and fixed income exchange-traded
3   instruments across all of the exchanges and also
4   for the options that were traded in the listed
5   markets and cleared through the OCC.
6       Q.    What was exception management?
7       A.    Basically it's just a comparison of
8   what you process internally versus what you
9   clear at the street level, and any differences
10  are considered exceptions that need to be
11  resolved.
12      Q.    Does that mean it was your
13  responsibility to compare Lehman's internal
14  records with the records of third parties such
15  as the OCC?
16      A.    From a trade processing standpoint,
17  yes.
18      Q.    Can you describe for me that
19  reconciliation process, sir?  In particular, how
20  often did the reconciliation process
21  particularly with the OCC take place?
22      A.    Every day.
23          MS. BLOOMER:  Objection to form.
24      Q.    Was that something you personally were
25  responsible for, sir?

Page 11

D. DZIEMIAN

1
2       A.    My team was.
3       Q.    And you had oversight responsibility,
4   correct?
5       A.    That's correct.
6       Q.    The systems that, the internal Lehman
7   systems, sir, that you were reconciling with the
8   OCC systems?
9       A.    Yes.
10      Q.    What were the names of the internal
11  Lehman systems?
12      A.    I'm not sure I can give you all of
13  them.  It was TMS, ADP.  Those were basically
14  the processing systems.  And data output from
15  both the OCC and TMS and ADP was run through an
16  internal application called Libra, also known as
17  BPSA.  That's how our trade breaks were produced
18  every day.
19      Q.    What's a trade break, sir?
20      A.    That's a -- that's a situation where
21  you have a trade processed either internally and
22  you did not have a clearance record to match
23  that at the OCC level or vice-versa.
24      Q.    The TMS system, sir, what information
25  about LBI's options would be retained in the TMS

Page 12

D. DZIEMIAN

1
2   system?
3       A.    It would be -- that's basically the
4   trade processing system.  So that's the trade
5   facility, the trade storage facility, and also
6   the trade routing mechanism that sends trades to
7   our vendor-based system which was the ADP, or
8   now known as Broadridge.
9       Q.    Can you give me an example of the
10  types of data about an option that would be
11  stored in TMS?
12      A.    All of the data elements would be
13  quantity, price, buy or sell side, trade date,
14  settlement date, whether there was any
15  commission, the principal, whether there were
16  any S.E.C. fees or any additional fees, and then
17  the end net money on a particular transaction.
18      Q.    What's the end net money?
19      A.    That would be principal minus any of
20  the fees or principal plus commissions on any of
21  the fees.  Depends on whether it was a buy or a
22  sell.
23      Q.    Would the TMS system also show whether
24  an option was in or out of the money?
25      A.    No, it would not.

Page 13

D. DZIEMIAN

1
2       Q.    Is there a system at Lehman that would
3   show that information?
4           MS. BLOOMER:  Objection.  Lack of
5   foundation.
6       A.    There is a system at the Broadridge
7   level which would determine whether an option
8   was in and out of the money.
9       Q.    Broadridge is the successor system to
10  ADP, sir?
11      A.    Well, it's just basically been a name
12  change.  ADP is also -- they're one and the
13  same.  You'll hear me say ADP.  I'm talking
14  about Broadridge, which is the new name.
15      Q.    When did the name change from ADP to
16  Broadridge?
17      A.    That I don't know.  I can't remember
18  that.
19      Q.    Was it sometime after you joined
20  Barclays?
21      A.    I believe it was before.
22      Q.    Sticking with TMS for the moment, sir,
23  would the data about options and TMS also
24  include data about whether an option was for
25  LBI's proprietary trading or whether it was for

4  (Pages 10 to 13)

Page 18

D. DZIEMIAN

1  you list for me, please, sir, the data relating
2  to options that is stored in ADP?
3  A.   I don't understand that question.
4  MS. BLOOMER:  Objection to form.
5  Q.   Do you remember giving me a list of
6  the information about options that was stored in
7  TMS?
8  A.   The data field elements of the trade?
9  Q.   Yes.  Do you remember that testimony?
10  A.   Yes.
11  Q.   Could you give me the same --
12  A.   I can't give you that for ADP.  It's
13  too widespread.
14  Q.   Can you tell me whether ADP has
15  information about the quantity?
16  A.   Yes, my specific role in terms of
17  options, we would generally rely on the PNS
18  blotters, which would show basically all of the
19  data field elements that I just described to you
20  for TMS.  Those would also be available on ADP.
21  We would also particularly use functionality to
22  view trade activity within the accounts that are
23  affected by options processing.
24  Q.   What's a PNS blotter, sir?

Page 19

D. DZIEMIAN

1  A.   It's basically a Broadridge Report
2  that demonstrates and displays all trading
3  activity that was processed the day before.
4  Q.   I understand that there's a lot of
5  data in ADP, sir, that you don't have
6  responsibility for or information about, but can
7  you tell me, please, what data fields in ADP
8  that relate to options are to the extent you are
9  familiar with them?
10  MS. BLOOMER:  Objection to form.
11  A.   Again, it would be any of the
12  necessary details and data field elements of a
13  trade:  Quantity, buy, sell, trade date,
14  settlement date, price, blotter code, RR number,
15  fees, S.E.C. fees, commissions, options
16  regulatory fees, principal money, net money.
17  Those are the ones that come to mind.
18  Q.   Is there a field in ADP that would
19  indicate whether an option was in or out of the
20  money?
21  A.   There's an application in ADP, as I
22  testified earlier.
23  Q.   Which application is that?
24  A.   That would be the Opti application.

Page 20

D. DZIEMIAN

1  Q.   Using the Opto application, sir, was
2  it possible to run a report that would indicate
3  whether Lehman options were in or out of the
4  money?
5  A.   You mean positions that were held in
6  Lehman?
7  Q.   Yes.
8  A.   It was more or less an online
9  application.  It was not report-driven.
10  Q.   Was it possible to generate a report
11  using that application?
12  A.   By screen scraping, but we rarely did
13  that.
14  Q.   What's screen scraping?
15  A.   It's basically taking the data from
16  the online and conforming it into a text-based
17  file.
18  Q.   Would the Opta application be able to
19  distinguish between options that were held by
20  Lehman for its own proprietary purposes and
21  options that were held within Lehman for the
22  benefit of customers?
23  MS. BLOOMER:  Objection to the form.
24  A.   I can't say whether it was split out

Page 21

D. DZIEMIAN

1  by customer firm or market maker.
2  Q.   Was there a field within ADP, sir,
3  that would indicate whether an option was held
4  for the benefit of a firm or the firm's
5  customers?
6  MS. BLOOMER:  I'm going to object to
7  form and to the ambiguity of the word
8  "firm."  Do you mean firm account or do you
9  mean firm as in LBI versus an affiliate,
10  Neil?  Because I'm -- I think it's confusing
11  until you clarify.
12  Q.   Do you understand my question, sir?
13  A.   I can tell you, as I mentioned
14  earlier, that the classification of an internal
15  account was based on account range for the most
16  part.  The way we had that set up internally at
17  ADP was the way it was classified at the OCC
18  level.
19  Q.   So ADP would reflect whether an option
20  was held in a customer, firm or market maker
21  account at OCC; is that correct?
22  A.   It was basically profiled at the B1
23  level and the ADP B1s enable you to classify
24  certain accounts as customer, as firm, and as

Page 22

```
 1           D. DZIEMIAN
 2  market maker internally based on your
 3  processing.
 4       Q.   You testified a few minutes ago, sir,
 5  a few moments ago, sir, that the classification
 6  was based on the account range for the most
 7  part?
 8       A.   Yes.
 9       Q.   Other than the account range, what was
10  the classification of internal accounts based
11  on?
12           MS. BLOOMER:  Objection to form.
13       A.   It was dependent on the account range
14  within the B1s I mentioned.
15       Q.   I just want to make sure I understood
16  your earlier answer.  You said that it was based
17  on the account range for the most part.  Do you
18  really mean that it was based exclusively on the
19  account range?
20       A.   Yes.
21       Q.   Thank you.  Can you describe the Libra
22  system for me, sir?
23       A.   I'm not responsible for that system.
24  We're basically the end-users of that, so I
25  can't tell you the particulars of it.
```

Page 23

```
 1           D. DZIEMIAN
 2  Basically, at a high level, it's a comparison
 3  engine that compares the data, as I mentioned
 4  earlier, that's cleared at the OCC level versus
 5  what's internally processed and provides an
 6  Exception Report based on the trading activity
 7  and the clearance activity at OCC level.
 8       Q.   Was it the Libra system, sir, that you
 9  and your team would use to reconcile the
10  internal Lehman data with the OCC data on a
11  daily basis?
12       A.   Libra did that reconciliation.
13       Q.   And once you had that reconciliation,
14  sir, what did you do with that?
15       A.   We reacted to all of the exceptions.
16  We worked closely with the listed options middle
17  office to clear any and all breaks that resulted
18  from prior day processing.
19       Q.   Did you do that on a daily basis, sir?
20       A.   Yes.
21       Q.   Did you continue to do that
22  reconciliation in the week of September 15,
23  2008?
24       A.   To my recollection, yes, we did.
25       Q.   Is it your recollection, sir, that you
```

Page 24

```
 1           D. DZIEMIAN
 2  and your team continued to reconcile Lehman's
 3  internal data with the OCC data through the
 4  close of business on the 19th of September?
 5       A.   Yes.
 6       Q.   Did you consider that you and your
 7  team, sir, on the 19th of September, 2008, were
 8  in fact able to reconcile the OCC data with
 9  Lehman's own records?
10       A.   I don't understand the question.
11       Q.   Were you able to clear up the breaks
12  that were highlighted by the Libra
13  Reconciliation Report on the 19th of September,
14  2008?
15       A.   Yes.  To us it was business as normal.
16       Q.   To your knowledge, sir, were there any
17  problems with the data feeds from the OCC into
18  Lehman's systems the week of the 15th?
19       A.   Not to my knowledge, no.
20       Q.   To your knowledge, sir, were there
21  problems with the data feeds from any other
22  third-party source into -- withdrawn.
23           Did you have responsibility for
24  reconciliation of derivatives at any exchange or
25  clearing organization other than the OCC, sir?
```

Page 25

```
 1           D. DZIEMIAN
 2       A.   No, I did not.
 3       Q.   Did you have any role with respect to
 4  margin at the OCC, sir?
 5       A.   Margin was not part of my
 6  responsibility.
 7       Q.   Do you know, sir, whether or not
 8  the -- withdrawn.  Do you know whether or not
 9  LBI traded options other than through the OCC?
10           MS. BLOOMER:  Objection to form.
11       A.   My area of responsibility was for
12  listed options.  I can't say whether there was
13  any other peripheral activity going on.
14       Q.   Other than --
15       A.   Other than listed options that cleared
16  through the OCC that I was responsible for.
17       Q.   Who did you report to in the period
18  that we've been discussing, '06 through '08?
19       A.   Neal Ullman.  N-E-A-L  U-L-L-M-A-N.
20       Q.   And Mr. Ullman reported up to whom, if
21  you know?
22       A.   Alastair Blackwell.
23       Q.   In September of 2008, sir, who were
24  the members of the team that reported up to you?
25       A.   You want me to list them individually?
```

7 (Pages 22 to 25)

Page 34

D. DZIEMIAN

1
2  you either needed to say yes or no to become an
3  at will employee of Barclays.
4      Q.   Was that e-mail sent around before the
5  22nd of September, 2008?
6      A.   I'm not a hundred percent sure.
7      Q.   Prior to receiving that e-mail, sir,
8  did you have any understanding that there may be
9  an agreement between Barclays and Lehman?
10     A.   I'd say so, yes.
11     Q.   Can you tell me what that
12  understanding was prior to receipt of the e-mail
13  you have just testified about?
14     A.   I can't exactly recall what my
15  understanding at that time was.
16     Q.   Okay.  I understand that it
17  happened --
18     A.   It's a long time ago.
19     Q.   -- several months and years ago, sir,
20  but sitting here today, can you give me the best
21  recollection you have of what your understanding
22  was prior to receiving the e-mail about the
23  offer of employment from Barclays, what the
24  agreement or potential agreement between Lehman
25  and Barclays may be?

Page 35

D. DZIEMIAN

1
2          MS. BLOOMER:  Objection.  Asked and
3  answered.
4      A.   It would be speculative on my part
5  to -- to let you know how I think I felt back
6  then, when I truly can't remember.
7      Q.   Okay.  Just so we're not talking past
8  each other, sir, I wasn't asking how you felt.
9  I was asking what information you had.
10         Does that change your answer?
11     A.   No, it doesn't.
12     Q.   Do you recall, Mr. Dziemian, being
13  asked at any point prior to September 22 to
14  provide information to Barclays in connection
15  with a potential deal between Lehman and
16  Barclays?
17     A.   I do not recall being asked.
18     Q.   Do you recall being asked to give any
19  information to anyone at Lehman with the
20  understanding that it was to be passed to
21  Barclays in connection with a potential deal
22  between Lehman and Barclays, again, in the same
23  timeframe, prior to September 22, 2008?
24         MS. BLOOMER:  Objection to form.
25     A.   Not to my recollection.

Page 36

D. DZIEMIAN

1
2      Q.   In preparing for your deposition
3  today, sir, did you look at any documents?
4          MS. BLOOMER:  You can answer.
5      A.   Can you clarify what you mean by
6  "documents"?
7      Q.   Yes.  Did you look at any e-mails or
8  pieces of paper --
9      A.   I thought I had testified earlier that
10  I didn't look at e-mails, but I did look at --
11         MS. BLOOMER:  That was a different
12  question.  He was asking you for about what
13  you did in preparing for your declaration.
14  Now he's asking what you did in preparing
15  for your deposition, which he hasn't asked
16  you who you met with yet, but so it's a
17  different question now and you can answer
18  the question.
19         THE WITNESS:  All right.
20         MR. OXFORD:  Thanks, Trish.
21     A.   The general reconciliation documents
22  that had been prepared throughout the time
23  period after September 22.
24         MS. BLOOMER:  You don't have to tell
25  him what documents you looked at.  You can

Page 37

D. DZIEMIAN

1
2  just tell him yes or no to the question.
3          THE WITNESS:  Okay.
4      Q.   Did any of those documents that you
5  reviewed in preparation for your deposition,
6  sir, refresh your recollection of the events
7  that are recorded in those documents?
8      A.   No.
9      Q.   Who did you meet with to prepare for
10  your deposition, sir?
11         MS. BLOOMER:  You can answer.
12     A.   As I recall, I met with Trisha from
13  Boies Schiller, there were a couple of other
14  Boies Schiller representatives that I can't
15  recall their names at this time, and I believe
16  Alan was there.
17         MS. BLOOMER:  He may have been.
18         THE WITNESS:  Right.  Alan Kaplan.
19     Q.   Outside of meetings with the lawyers
20  you have just identified, sir, did you meet with
21  anybody else or talk to anybody else in
22  connection with the preparation for your
23  deposition today?
24     A.   No, I did not.
25     Q.   Mr. Dziemian, were the LBI systems

10  (Pages 34 to 37)

Page 38

D. DZIEMIAN

1
2    that you were familiar with capable in September
3    of 2008 of providing a report of all of LBI's
4    options positions at the OCC?
5         MS. BLOOMER:  Objection to form.
6    A.   Yes, I would say.
7    Q.   Which systems would you use, sir, in
8    September 2008 if you were asked to provide such
9    a report?
10   A.   Before the 22nd?  After the 22nd?  The
11   whole month?
12   Q.   After the -- sorry, before the 22nd of
13   September 2008.  The Lehman systems I'm asking
14   about, sir, not the Barclays systems.
15   A.   Okay.  We would have used ADP and we
16   would have used OCC.
17   Q.   And would the ADP Report, sir, would
18   that report contain, or could it contain, the
19   list of information you gave me earlier that is
20   contained in the TMS system?
21        MS. BLOOMER:  Objection to form.
22   A.   We're talking about two different
23   reports, right?  So when we were talking about
24   TMS, we were talking about trade summaries, so
25   there was information such as price, there was

Page 39

D. DZIEMIAN

1
2    information such as buy, sell, and there were
3    fees and principal.
4         When you're talking about a Position
5    Report, the main criteria or data field elements
6    of those particular reports would be the
7    account, whether it was long or short, the
8    description of the option, and potentially a
9    closing price.
10   Q.   Would that Position Report also have
11   data about the quantity of the --
12   A.   Yes.
13   Q.   -- option, sir?
14   A.   That would be the long or short value.
15   Q.   And what information would be
16   indicated in the account field, sir, of such a
17   report?
18        MS. BLOOMER:  Objection to form.
19   A.   For the internal ADP Report, it would
20   be the account number.  At the OCC level, it
21   would be in which particular account that was
22   held, whether it be customer, firm or market
23   maker.
24   Q.   Focusing in on the internal ADP
25   Report --

Page 40

D. DZIEMIAN

1
2    A.   Yes.
3    Q.   -- for the moment, sir, would that
4    report be able to distinguish between account
5    numbers?
6    A.   I'm not sure I understand that
7    question.
8    Q.   Let me try and ask a better question.
9    Would it be possible to run an ADP
10   Report for account numbers reflecting customer
11   positions?
12        MS. BLOOMER:  Objection to form.
13   A.   Yes, we would have the ability to
14   separate that by customer, firm and market
15   maker.
16   Q.   In September 2008, while at Lehman,
17   sir, would you also have the ability to separate
18   that report by accounts that were held for
19   Lehman affiliates?
20        MS. BLOOMER:  Objection to form.
21   Accounts that were held for Lehman
22   affiliates?  Objection to form.
23   A.   The affiliates would be included in
24   the customer area of the report.
25   Q.   Were any affiliates included in the

Page 41

D. DZIEMIAN

1
2    firm or market maker areas of the report?
3    A.   I'm sorry, can you repeat that?
4    Q.   Sure.  Were any Lehman affiliates
5    included in the firm or market maker areas of
6    the ADP Report?
7    A.   The only affiliate that would have
8    been included in firm would be LBSF.
9    Q.   Why was LBSF included in the firm
10   account range?
11   A.   It was sometime before September 2008
12   they were considered to be a subordinated
13   affiliate and were thereby able to be treated as
14   a firm account.
15   Q.   What does it mean that they were
16   considered to be a subordinated affiliate?
17        MS. BLOOMER:  Objection.
18   A.   I don't know what it means from the
19   legal standpoint.
20   Q.   I'm not asking.  I understand you're
21   not a lawyer, sir.  I'm asking from your
22   standpoint, what does it mean to you?
23   A.   From my standpoint, it means that
24   LBSF, from that point forward, was to be
25   considered and treated as a firm account and

11 (Pages 38 to 41)

Page 42

D. DZIEMIAN

1
2 thereby would hold positions at the firm level
3 in the OCC and, similarly, would be classified
4 on the ADP system as being in the firm account
5 range.
6     Q.   Was there any way in the ADP system,
7 to your knowledge, sir, to distinguish between
8 affiliate and non-affiliate customers?
9         MS. BLOOMER: Objection to form.
10    A.   Not without including name and address
11 in the reports, which we did not do.
12    Q.   Would it be possible to run a report
13 in ADP that distinguished between affiliate and
14 non-affiliate customers, sir?
15        MS. BLOOMER: Objection. Asked and
16 answered.
17    A.   Are you asking would it be possible
18 today? Would it be possible back then? Would
19 it be possible ever?
20    Q.   All of my questions are directed
21 towards the period in September prior to
22 September 22, 2008, sir.
23    A.   I'm not sure if it would have been
24 possible.
25    Q.   Can you explain what you meant by your

Page 43

D. DZIEMIAN

1
2 earlier answer that referenced including name
3 and address of customers in the ADP Report?
4 What did you mean by that?
5     A.   The information from ADP was extracted
6 from an options trade date stock record. The
7 only information on the stock record would be
8 account number and what the basic position was
9 held, long, short, security ID, security
10 description. It did not include name and
11 address.
12    Q.   Would it be possible using the name
13 and address of the customer in the ADP Report to
14 distinguish in September 2008 between affiliate
15 and non-affiliate customers?
16        MS. BLOOMER: Objection. I think you
17 are misunderstanding his testimony.
18    A.   I don't recall ever attempting to
19 include name and address, so I can't answer the
20 question.
21    Q.   Based on your knowledge of the system,
22 sir, are you able to tell me one way or the
23 other whether you think it would be possible to
24 run a report in September 2008 from ADP that
25 would distinguish between affiliate and

Page 44

D. DZIEMIAN

1
2 non-affiliate customers?
3         MS. BLOOMER: Objection to form.
4 Calls for speculation.
5     A.   If you're asking my opinion in this
6 age of technology, of course.
7         MR. OXFORD: We've been going about an
8 hour. You want to take a five-minute break?
9         MS. BLOOMER: Sure.
10        (Recess; Time Noted: 10:32 A.M.)
11        (Time Noted: 10:46 A.M.)
12 BY MR. OXFORD:
13    Q.   Mr. Dziemian, did Lehman affiliate
14 customers have unique account numbers?
15        MS. BLOOMER: Objection.
16    A.   Can you just clarify the question?
17 When you say "unique account numbers," do you
18 mean each -- if you can clarify the question.
19    Q.   Did each affiliate have a unique
20 account number, sir?
21    A.   Each account within the affiliate
22 range had a separate and unique account number.
23    Q.   Tell me about the affiliate account
24 range, sir.
25    A.   I can't really say more than, from a

Page 45

D. DZIEMIAN

1
2 chart of accounts standpoint, I believe there
3 were certain accounts that were designated as
4 affiliate-related account ranges.
5     Q.   And if you had the chart of accounts,
6 sir, that reflected the designation of account
7 ranges as affiliate-related, would you then be
8 able to run a report in ADP that printed off the
9 positions, as we've described, for those
10 affiliates?
11        MS. BLOOMER: Objection to form.
12    A.   Are you talking about all positions or
13 are you talking about just option positions?
14    Q.   Just options positions.
15    A.   If you had the criteria of what
16 accounts you wanted to run that query on, yes,
17 you can then do that.
18    Q.   And it's your understanding, Mr.
19 Dziemian, that affiliates of LBI had certain
20 designated account ranges?
21    A.   That is my understanding.
22    Q.   The Positions Report, sir, that you
23 run from ADP in order to get the information
24 that you've just testified to, the position, the
25 description, the quantity, et cetera, of the

12 (Pages 42 to 45)

Page 46

D. DZIEMIAN

1
2      options, how long would it take to run such a
3      report?
4          MS. BLOOMER:  Objection.
5      A.   I can't really answer how long it
6      would take.
7      Q.   Would it take days, sir?
8      A.   No, it would not take days.
9      Q.   Would it take less than one day, sir?
10     A.   Yes, it would take less than one day.
11     Q.   Would it take less than half a day?
12     A.   Yes, it would take less than a half a
13     day.
14     Q.   Would it take less than four hours?
15     A.   Let's say around four hours.
16     Q.   You testified before the break about
17     the RISC application, sir.  Do you recall that
18     testimony?
19     A.   I do.
20     Q.   You said that there was some other
21     system that was called RISC or related to RISC
22     that wasn't an application.  Can you tell me
23     about that system, sir?
24     A.   What was known as the RISC system in
25     terms of my area of responsibility was the Rolfe

Page 47

D. DZIEMIAN

1
2      & Nolan futures system that was used to support
3      options processing for one of the Lehman
4      affiliates.
5      Q.   Which affiliate, sir?
6      A.   LBIE.
7      Q.   Again, before the break, sir, you said
8      that if you wanted to provide a report of LBI's
9      options positions, you would use ADP and OCC.
10     Do you remember that testimony, sir?
11     A.   I do.
12     Q.   Tell me about the OCC data and systems
13     it would use.
14     A.   Well, what we would do is we would --
15         MS. BLOOMER:  Objection to form.
16     A.   We would use the internal ADP
17     information and reconcile that versus the actual
18     OCC information.
19     Q.   In doing so, sir, would you
20     essentially be replicating the reconciliation
21     process that your team did on a daily basis at
22     the end of the trading day?
23         MS. BLOOMER:  Objection to form.
24     A.   Well, first of all, we don't do the
25     reconciliation at the end of a trading day.  We

Page 48

D. DZIEMIAN

1
2      do it on the beginning of the next day based on
3      prior day processing.  So it's a T1 or a trade
4      date plus one process.  And no, it would not be
5      the same because the Libra BPSA reconciliation
6      that I spoke about earlier is exception-based,
7      so that would just show you your exceptions.  If
8      you wanted to see your actual holdings, you
9      would then do the reconciliation internally
10     versus OCC.
11     Q.   Would you get a specific report from
12     the OCC, sir, to reconcile against the ADP
13     Report?
14     A.   There is an entire suite of reports on
15     the OCC that are available to you.  We would use
16     Positions Report.
17     Q.   What information is contained in the
18     OCC Positions Report?
19     A.   Most of what I had mentioned earlier.
20     I can't recall every data field, but it would
21     typically be the account that it's held in,
22     whether it be customer, firm, market maker; it
23     would be the quantity; it would be the strike
24     price; it would be whether it's long or short,
25     the description, maturity date, symbol.

Page 49

D. DZIEMIAN

1
2      Basically those are the primary data field
3      elements.  There might be more, but I don't know
4      what they are offhand.
5      Q.   Would the OCC Position Report have the
6      market price, sir?
7      A.   I'm not sure if it does.  It might
8      have the closing price.  I'm not sure a hundred
9      percent.
10     Q.   Would it be possible to run a report
11     from ADP of LBI's options positions that
12     included the closing price field?
13         MS. BLOOMER:  Objection to form.
14     A.   The Options Trade Date Stock Record
15     Report that I mentioned earlier does include
16     what is known as an ADP house price, so that
17     could be included in that.
18     Q.   What's --
19     A.   You have to understand there are
20     various sources of prices.
21     Q.   Sure.  What's the ADP house price,
22     sir?
23     A.   That's basically the vendor system or
24     the vendor that ADP would use, and that's where
25     they would get their price information from.

13 (Pages 46 to 49)

Page 50

D. DZIEMIAN

1
2     Q.    Which vendor, if you know, sir?
3     A.    I don't know.  The primary vendor
4  would be IDSI, but they probably use a host of
5  others.
6     Q.    You mentioned a suite of reports that
7  were available from the OCC, sir.  Apart from
8  the Positions Report that you have testified to,
9  what other reports are available from the OCC?
10    A.    A couple that come to mind.  It would
11 be an In The Money Report.  There's also, within
12 the OCC Encore application, the ability to
13 search clearance activity based on clearing
14 number.  There are Assignment Reports that come
15 from OCC.
16        Those would be the ones that
17 immediately come to mind.
18    Q.    What's an In the Money Report, sir?
19    A.    That's a report that basically shows
20 you whether the option that you're holding at
21 the OCC is in or out of the money.
22    Q.    Is it difficult to run these reports
23 from the OCC system, sir?
24        MS. BLOOMER:  Objection to form.
25    A.    Which reports exactly are you talking

Page 51

D. DZIEMIAN

1
2  about?
3     Q.    Let's say the -- start with the
4  Position Report.
5     A.    No, I wouldn't say it's difficult.
6     Q.    How long would it take you to run an
7  OCC Position Report such as the one that you
8  have described to me?
9        MS. BLOOMER:  Objection to form.
10    A.    To just run the report?
11    Q.    Yes.
12    A.    Less than an hour.
13    Q.    In what format does the report come
14 in, sir?  Is it an Excel spreadsheet?
15    A.    You can put it into an Excel
16 spreadsheet, but we typically would put that in
17 a PDF.
18    Q.    The In the Money Report, sir, how long
19 would that take to run?
20    A.    The same.  Less than an hour.
21    Q.    What's an Assignment Report?
22    A.    That shows you all of the option
23 positions that you are assigned on, meaning a
24 contra-broker has opted to early-exercise those
25 options.

Page 52

D. DZIEMIAN

1
2        (Exhibit 670A, a document bearing
3     Bates Nos. BCI-EX-00013187, marked for
4     identification, as of this date.)
5     Q.    Mr. Dziemian, I've handed you what I
6  have marked as Exhibit 670A, which is an e-mail
7  with a Bates range BCI-EX-00013187.
8     A.    Okay.
9     Q.    And an attachment, which is a few
10 pages long.
11        Now, you're not a sender or recipient
12 of this e-mail, sir.  Do you see that it's
13 titled "Long Positions in Short File"?
14    A.    I see -- I'm sorry, what?
15    Q.    The subject line is "Long Positions In
16 Short File"?
17    A.    Yes, I do see that.
18    Q.    In your experience, based on your time
19 at Lehman, sir, do you know what a reference to
20 long positions in short file might be?
21        MS. BLOOMER:  Objection.
22    A.    I have no idea what it is.
23    Q.    It says, "Attached is the -- just the
24 TIPS," T-I-P-S, "portion of the short file that
25 was sent to us."  Do you know what the TIPS

Page 53

D. DZIEMIAN

1
2  portion of a short file is?
3        MS. BLOOMER:  Objection to form and
4     foundation.
5     A.    Are you asking me do I know what TIPS
6  are, or are you asking me do I know what this
7  file is?
8     Q.    I'm asking you if you know what TIPS
9  are, first of all.
10        MS. BLOOMER:  Objection to form.
11    A.    It's a Treasury product.  It's an
12 inflation product.
13    Q.    Do you know which system, sir, the
14 attachment to this e-mail is produced from?
15        MS. BLOOMER:  Objection.  Lacks
16     foundation.
17    A.    No, I do not.
18    Q.    Mr. Dziemian, I've handed you what has
19 previously been marked in these depositions as
20 Exhibit 554.  Do you have that in front of you,
21 sir?
22    A.    I do.
23    Q.    It's an e-mail and a large attachment.
24 The subject line of the e-mail is "Net Long
25 Options 9/18."  Do you see that?

14 (Pages 50 to 53)

Page 58

```
 1            D. DZIEMIAN
 2  is an hour difference.
 3       So, in answering your question, you
 4  said less than an hour?
 5     Q.   Right.
 6     A.   I can't deduce that from these
 7  e-mails.
 8     Q.   Because you think the OCC is on
 9  central time?
10     A.   That's correct.
11       MS. BLOOMER:  Objection to form.
12     Q.   So it may --
13       MS. BLOOMER:  Lacks foundation.
14     Q.   Other than that one distinction, sir,
15  are you able to tell me whether or not, based on
16  this e-mail, the OCC provided the requested
17  information to Barclays within two hours of its
18  request?
19       MS. BLOOMER:  Objection to form.
20  Lacks foundation.
21       Are you asking him to tell you
22  anything other than read you this document,
23  Neil?
24       MR. OXFORD:  I think he has my
25  question.
```

Page 59

```
 1            D. DZIEMIAN
 2       MS. BLOOMER:  Lacks foundation.
 3     A.   Well, the way I would see it is, it
 4  was asked for at 3:47, and presuming that 3:47
 5  is New York time and the response came from
 6  Sheila at the OCC at 4:41, I would say it was
 7  fulfilled within at least less than three hours.
 8     Q.   Why three hours, sir?
 9     A.   With the hour difference, it's sort of
10  throwing me off a little bit.
11     Q.   So an hour difference from 4:41 is
12  5:41 P.M., sir?
13     A.   Right.
14       MS. BLOOMER:  Objection.
15     Q.   I'm just curious as to how you get the
16  three hours --
17       MS. BLOOMER:  Objection.
18     Q.   -- from 3:47 P.M. to 5:41 P.M.
19       MS. BLOOMER:  Is that a
20  question or are you just noting that you're
21  curious?
22     Q.   How do you get from 3:47 P.M. to 5:41
23  P.M.?
24     A.   I'm not sure.  So let's say less than
25  two hours it seems as though it was fulfilled.
```

Page 60

```
 1            D. DZIEMIAN
 2     Q.   That's all I have for that exhibit.
 3       (Exhibit 671A, a document bearing
 4     Bates Nos. OCC0036756 through 758, with
 5     attachment OCC0036758-0001 through 1357,
 6     marked for identification, as of this date.)
 7     Q.   Mr. Dziemian, I've handed you what I
 8  have marked as Exhibit 671A.  Take a look at
 9  that document and let me know whether you've
10  seen it before.
11     A.   Same as the previous, where I don't
12  recall specifically, but I am copied on the
13  e-mail so I must have seen it at some point.
14     Q.   Okay.  Looking at the report that's
15  attached to the e-mail, sir, are you able to
16  tell me anything about that report?
17       MS. BLOOMER:  Objection to form and
18  lacks foundation.
19     A.   It looks a heck of a lot like the last
20  report I just looked at, so same answers.
21     Q.   In your experience with Lehman, sir,
22  have you ever seen -- have you seen this kind of
23  report before?
24       MS. BLOOMER:  Objection to the form.
25     A.   Are there two reports in here or is
```

Page 61

```
 1            D. DZIEMIAN
 2  this just one report?  I see that there's a blue
 3  separator separating the accounts, market maker.
 4       In my experience in options clearance,
 5  yes, I have seen a report like that before.
 6     Q.   In what circumstances have you seen
 7  such a report, sir?
 8       MS. BLOOMER:  Objection to form.  Now
 9  we're talking about exactly this report or a
10  report like this?  Which is what he
11  testified to.
12       MR. OXFORD:  I think my question is
13  just fine, Trish.
14     A.   This would be a report that's
15  available on the OCC suite of reports.
16     Q.   In that case, could a report such as
17  this report attached to the e-mail at 671A have
18  been run by Lehman at any time the week of the
19  15th of September, 2008?
20       MS. BLOOMER:  Objection to the form.
21     A.   Yes, I would say so.
22     Q.   Does that answer also apply to the
23  report that is attached to the previous Exhibit
24  654A, sir?
25       MS. BLOOMER:  Objection to form.
```

                                   16  (Pages 58 to 61)

Page 62

```
 1           D. DZIEMIAN
 2      A.   Again, that would have been available
 3   in the suite of reports.
 4      Q.   Mr. Dziemian, I've handed you a
 5   document marked previously as Exhibit 555 in
 6   these depositions.  Take a moment to review that
 7   and let me know if you have seen this before.
 8      A.   So, as far as the e-mail, again, not
 9   specifically, but I was added to the chain so at
10   some point I must have seen it.
11      Q.   Did you review this document in
12   preparation for your deposition, sir?
13      A.   Not that I recall.
14      Q.   Do you see the top e-mail in the
15   chain, sir, is from Frank Pearn?
16      A.   Francis Pearn, yes.
17      Q.   Do you know Mr. Pearn?
18      A.   Just the name.  I don't know what his
19   responsibilities are or her responsibilities --
20   or, his.  Fine.
21      Q.   Was Francis Pearn a legacy Lehman
22   employee, to your knowledge?
23      A.   I don't know that.
24      Q.   I'll represent to you that Francis is
25   a man.  So Mr. Pearn sends to Tim Stack an
```

Page 63

```
 1           D. DZIEMIAN
 2   e-mail on Sunday, the 21st of September, at
 3   around 7:30 Greenwich Mean Time and he copies
 4   you on that e-mail, correct?
 5      A.   I am copied, yes.
 6      Q.   Do you know who Mr. Stack is?
 7      A.   I believe Tim is the head of futures
 8   trading for Barclays Capital.
 9      Q.   Mr. Pearn writes, and he signs it
10   Frank, which I think gives us the clue --
11      A.   Right, I just noticed that.
12      Q.   -- that I might not be off-base.
13           He writes, "Tim here are the OCC
14   statements for LBI as of 9/22 reflecting our
15   cash and securities collateral held for LBI
16   Account 074."  Do you see that?
17      A.   I do.
18      Q.   He then goes on to write, "Dan and
19   Craig provided these and can answer your
20   questions."  Do you see that?
21      A.   I do see that.
22      Q.   Did you provide the attached OCC
23   statements to Mr. Pearn?
24      A.   I do not recall providing those, no.
25      Q.   Does this e-mail reflect your --
```

Page 64

```
 1           D. DZIEMIAN
 2   sorry.  Does this e-mail refresh your
 3   recollection that you had some involvement in
 4   providing information, directly or indirectly,
 5   to Barclays in the week leading up to September
 6   22, 2008?
 7      A.   No, it does not.
 8      Q.   Were you working that Sunday, 21st,
 9   sir?
10      A.   As I recall, I was.
11      Q.   Was that routine for you?  Were you
12   normally in the office on a Sunday?
13           MS. BLOOMER:  Objection to form.
14      Assumes facts not in evidence.
15      A.   There was occasions where I was
16   working on Sunday, whether it be in the office
17   or remotely.
18      Q.   Were you in the office on Sunday,
19   21st, or working remotely?
20      A.   As I recall, I was in the office.
21      Q.   Mr. Pearn goes on to say that, "Dan
22   and Craig can answer your questions."  Do you
23   see that?
24      A.   I do.
25      Q.   Do you recall whether or not Mr. Stack
```

Page 65

```
 1           D. DZIEMIAN
 2   asked you any questions in connection with this
 3   e-mail and the attachment?
 4      A.   I do not recall.
 5      Q.   When was the first time you spoke to
 6   Mr. Stack?
 7      A.   I don't recall speaking to Mr. Stack.
 8      Q.   Ever?
 9      A.   I don't recall any conversations with
10   Mr. Stack.
11      Q.   Do you recall any conversations with
12   anybody with Barclays in the week prior to
13   September 22, 2008?
14      A.   I do not recall.
15      Q.   The report that's attached to the
16   e-mail at Exhibit 555, sir, is that one of the
17   reports that's part of the suite of reports you
18   testified was available from the OCC systems?
19      A.   So there are a couple of reports.  So
20   the account summary by CMO, yes.  That would be
21   something that the Clearance Team would look at.
22   The collateral inventory by CMO, again, that
23   was -- that was included in the suite of
24   reports, but not for the Clearance Team.
25      Q.   Does "CMO" stand for clearing
```

Page 90

D. DZIEMIAN

1
2      MS. BLOOMER:  Same objection and
3  instruction.
4      A.   I'd say that -- I'd say that it was an
5  idea that was confirmed and agreed by mutual
6  parties across both operations, Finance and
7  Regulatory.
8      Q.   Who in Finance was involved in that
9  decision?
10     A.   I can't recall specifically who.
11     Q.   Who in Regulatory was involved in that
12  decision?
13     A.   Again, I can't recall specifically
14  who.
15         (Exhibit 674A, a document bearing
16     Bates Nos. BCI-EX-00297544, with attachment,
17     marked for identification, as of this date.)
18     Q.   Mr. Dziemian, I've handed you what I
19  marked as Exhibit 674A, which is a document
20  bearing the Bates number BCI-EX-0027544.
21     A.   Yes.
22     Q.   Have you seen this document before,
23  sir?
24     A.   Yes, I have.
25     Q.   Did you create this document, sir?

Page 91

D. DZIEMIAN

1
2      A.   Yes, I did.
3      Q.   Can you tell me what it is?
4      A.   It's an extract summary of the bridge
5  account reconciliation across the LBI processing
6  system and the Barclays Capital ADP processing
7  system.
8      Q.   And which extract is it, sir?  What
9  information is extracted from?
10     A.   It's the information related
11  specifically to the affiliate activity.
12     Q.   What's the reference in the second
13  column, sir, to LBI ADP 012?
14     A.   That's the client number.  That's
15  Lehman Brothers' ADP client number.  The ADP has
16  certain client numbers for all of its clients.
17  That happened to be the LBI client number, as
18  224 is the Barclays Capital ADP.  That was the
19  new ADP system that we had set up.
20     Q.   And can you explain to me what are the
21  numbers under the ADP Debit and Credit columns,
22  the LBI ADP Debit and Credit columns, what do
23  those represent?
24     A.   Just the LBI side do you want to know?
25     Q.   Yes, for now.

Page 92

D. DZIEMIAN

1
2      A.   Okay.  That represents the activity
3  that was processed versus the actual affiliate
4  client accounts, and the end result in the
5  bridge accounts, in the denoted bridge accounts,
6  is basically the offset of all of that activity.
7          So in the example of number 1, "LBIE
8  customer exercise and assignment liquidations,"
9  that amount in total over the period of time
10  beginning September 23 had been processed versus
11  those accounts with all of the settlements
12  occurring to the BCI entities.  So all of that
13  activity was funded by Barclays Capital.  That
14  was really the main reason, primary reason, for
15  the bridge account methodology that we came up
16  with.
17     Q.   Did you make the entries reflected in
18  this exhibit on LBI's ADP record?
19         MS. BLOOMER:  Objection to form.
20     A.   I don't think I understood that
21  question.  Can you please ask it again, or may I
22  see it again?
23         MR. OXFORD:  Yes.  Can you read it
24     back, Kathy.
25         (Record read.)

Page 93

D. DZIEMIAN

1
2         MR. OXFORD:  Let me try and clean that
3  up a little bit, because it was vague.
4      Q.   There are a series of debits and
5  credits listed under the heading "LBI ADP 012,"
6  correct?
7      A.   That is correct.
8      Q.   Do those debits and credits reflect
9  entries that you made on LBI's ADP records?
10     A.   On LBI and BCI.
11     Q.   I understand that, sir.  I'm focusing,
12  for the purposes of these questions, on the LBI
13  ADP records.
14     A.   Yes, understood, but I would qualify
15  that that you need to see both sides of the
16  picture.
17     Q.   I understand.  Okay.  Can you tell me
18  what purpose you had, sir, in making entries on
19  LBI's ADP records?
20         MS. BLOOMER:  Objection to form.
21  Where did you come up with the word
22  "records"?  I'm not sure what that means, or
23  where you -- did he use the word "records"
24  at any point?
25     A.   Are you talking about the LBI

Page 94

D. DZIEMIAN

1
2  processing system?  The ADP processing system?
3  The LBI ADP processing system?
4     Q.   Yes.
5     A.   Is that what you're talking about?
6     Q.   Yes.
7     A.   The reason we needed to record the
8  entries in that manner is because, as I had
9  previously testified, there were no longer
10 settlement bank capabilities or settlement
11 facilities in OCC or in DTC 074, which was
12 formerly linked with OCC 074, and the settlement
13 bank that was formerly linked to OCC 074 was
14 changed from LBI to BCI.
15          So ordinarily the entries that you see
16 posted in these bridge accounts, the general
17 offset would have been either a bank account on
18 LBI or a settlement depository account on LBI,
19 but those no longer existed as of September 22.
20 They were all re- or switched and repointed to
21 Barclays Capital.  So all of that settlement
22 activity was happening in Barclays Capital as of
23 September 23.
24    Q.   And were the entries reflected in
25 Exhibit 674A, are those intended to account for

Page 95

D. DZIEMIAN

1
2  Barclays' belief or your belief, sir, that that
3  settlement activity was attributable not to
4  Barclays, but to LBI?
5      MS. BLOOMER:  Objection to form,
6  foundation, and I'm instructing the witness
7  not to answer to the extent that it would
8  require him to explain an understanding that
9  he formed through discussions with Barclays'
10 counsel.
11    A.   So you asked me if it's my
12 understanding that -- can you repeat that,
13 please?
14      (Record read.)
15    A.   Well, there's no real easy answer to
16 that, so the settlement obligations of the OCC
17 became the responsibility of Barclays Capital.
18 All of the underlying events and activities at
19 the OCC were funded by Barclays Capital.  It was
20 related to LBI affiliate activity.
21          The balances you see here are the end
22 results of all of that activity.  So the net
23 total across the BCI ADP 224 processing system,
24 that was the net funding that Barclays Capital
25 had to put up for the affiliate activity related

Page 96

D. DZIEMIAN

1
2  to LBI affiliates.
3     Q.   And is the purpose of this bridge
4  account, sir, to charge the net cost of closing
5  out those affiliate options positions back to
6  the LBI estate?
7      MS. BLOOMER:  Objection.  Lack of
8  foundation.
9     A.   I'm not exactly sure what the
10 disposition of those balances are at this time.
11    Q.   That wasn't quite my question.
12      MR. OXFORD:  Can you read back my
13 question?
14      (Record read.)
15      MS. BLOOMER:  I'm going to object to
16 the form and I'm going to again instruct you
17 not to answer the question to the extent it
18 would require you to disclose the substance
19 of discussions you had with Barclays'
20 counsel.
21    A.   I will say that the bridge account
22 reconciliations were established and put in
23 place to reconcile all of the activity and to
24 designate each of the specific and unique LBI
25 affiliates that all of the activity was

Page 97

D. DZIEMIAN

1
2  attributable to.
3     Q.   I appreciate that answer, sir.  Don't
4  think I don't when I ask my question for a third
5  time, but with respect, I don't think I got an
6  answer to it.
7      (Record read.)
8      MS. BLOOMER:  I'm going to object.
9  I'm going to give the same instruction and
10 asked and answered already twice now.
11    A.   Maybe that's answered in paragraph 14
12 of the declaration.
13    Q.   I can read your declaration, sir, and
14 reading paragraph 14, does that mean the answer
15 to my question is yes?
16      MS. BLOOMER:  Objection to the form.
17 He's tried three different ways to answer
18 the question now.  If you don't like any of
19 those three answers, he doesn't have to keep
20 trying again.
21      MR. OXFORD:  With respect, I think
22 he's tried three different ways not to
23 answer my question -- actually, maybe a
24 fourth now.
25      THE WITNESS:  No, I am trying to

Page 98

D. DZIEMIAN

1
2    answer your question.
3         MS. BLOOMER:  Asked and answered.
4    Objection.
5    Q.   Is the answer to my question "yes,"
6    sir?
7         MS. BLOOMER:  Asked and answered.
8    Objection.
9         (Record read.)
10   A.   That was not the purpose of the bridge
11   accounts.  The purpose of the bridge accounts
12   was to perform a comprehensive reconciliation
13   based on the activity of the affiliate activity
14   at OCC 074.
15   Q.   Is the effect of the bridge account,
16   sir, to charge back to the LBI estate the net
17   cost of closing out the affiliate accounts that
18   are reflected on Exhibit 674A?
19        MS. BLOOMER:  Objection to form.
20   A.   I would say that those balances would
21   serve as a basis for that.
22   Q.   Do you know, sir, why the
23   reconciliation is with the LBI estate, not the
24   individual LBI affiliates?
25        MS. BLOOMER:  Objection to form and I

Page 99

D. DZIEMIAN

1
2    instruct you not to answer to the extent it
3    requires you to disclose the substance of
4    discussions with Barclays' counsel.
5    A.   Yes, I didn't understand that
6    question.  Can you just please read that back?
7         (Record read.)
8    A.   When you say "with the LBI estate,"
9    I'm not sure what that means.
10   Q.   Withdrawn, actually.  Were you
11   involved in the close-out of the affiliated
12   options, sir?
13   A.   The remaining positions in OCC 074?
14   Q.   Yes.
15   A.   Yes.
16   Q.   Can you tell me what your role was?
17   A.   In conjunction with the listed
18   options, middle office and the business, we
19   performed an orderly liquidation of the
20   remaining positions that were held for
21   affiliates in OCC 074.
22   Q.   When did that orderly liquidation
23   begin, sir?
24   A.   As I recall, it was the expiration
25   Friday in October.  I don't recall the specific

Page 100

D. DZIEMIAN

1
2    date.
3    Q.   Who in the middle office were you
4    working with on this project?
5    A.   I don't recall any one specific
6    individual.
7    Q.   Do you know who made the decision,
8    sir, for the orderly liquidation of the
9    remaining affiliate positions, as you've
10   described?
11        MS. BLOOMER:  I'm going to object and
12   I'm going to instruct you not to disclose
13   the substance of discussions with Barclays'
14   counsel.
15   A.   I can't recall any one individual
16   making that decision.  I believe it was more a
17   consensus across the board.
18   Q.   Do you know if any affiliate options
19   were closed out prior to October 17, 2008?
20   A.   Not closed out in the form of
21   liquidation, but by way of the natural
22   assignment exercise activity at the OCC, which
23   was processed, again, versus the bridge accounts
24   I mentioned earlier.
25   Q.   Could those options that were not

Page 101

D. DZIEMIAN

1
2    closed out, other than through exercise of
3    assignment, have been closed prior to October
4    17, 2008?
5         MS. BLOOMER:  Objection to form:
6    A.   Are you asking me whether it was
7    possible?
8    Q.   Yes, I am.
9    A.   Yes, it was possible.
10   Q.   Do you know why the affiliate options
11   were not closed out prior to October 17, 2008?
12        MS. BLOOMER:  Objection to form and I
13   instruct you not to disclose the substance
14   of discussions with Barclays' counsel.  If
15   you have another basis for answering the
16   question, you can answer.
17   A.   As I recall, everyone just wanted to
18   be very clear on the action plan and what was
19   necessary after evaluating the situation and the
20   possible exposures.
21   Q.   What do you mean by "the possible
22   exposures"?
23   A.   Just generally what was left in the
24   OCC account in terms of the affiliates.
25   Q.   Do you know, sir, whether anybody at

26 (Pages 98 to 101)

Page 102

D. DZIEMIAN

1
2  Barclays took instructions from the affiliates
3  as to the exercise for close-out of their
4  options?
5      A.   I am not aware of any.
6      Q.   Mr. Dziemian, do you have an
7  understanding of the different types of options
8  customers that Lehman had in September 2008?
9      A.   Yes.
10     Q.   What different types of options
11 customers did Lehman have in September 2008?
12     A.   You're asking for general
13 classification?
14     Q.   Yes.
15     A.   In the customer account at OCC 074, we
16 held positions for the LBI affiliates, our
17 institutional client base, our prime services
18 client base, our PIM client base, and in OCC
19 273, we held positions for our Neuberger Berman
20 client base.
21     Q.   The references to prime services, was
22 that, sir, to your prime broker customers?
23     A.   Yes.
24     Q.   Was there a way on September 19, 2008,
25 sir, to determine the relative volume of options

Page 103

D. DZIEMIAN

1
2  trading across the different categories of
3  customers that you just described to me?
4      MS. BLOOMER:  Objection to form.
5      A.   To my recollection, there was little
6  or no volume throughout the entire week of 9/15
7  through 9/19.
8      Q.   By that answer, sir, do you mean to
9  communicate, sir, that there were no additional
10 options placed or exercised during that
11 timeframe?
12     A.   No.  No.  Exercising assignments are
13 completely different.  When you're talking about
14 trading volumes, you're talking about executions
15 at the exchange level.  That activity virtually
16 stopped as of September 15.  Exercise and
17 assignments continued as normal throughout that
18 week into the expiration weekend and from 9/22
19 and forward, as normal.
20     Q.   Would it be possible to determine on
21 September 19, 2008 the volume of positions,
22 existing positions, held on behalf of each of
23 the types of customers that you've just
24 described to me?
25     MS. BLOOMER:  Objection to form.

Page 104

D. DZIEMIAN

1
2      A.   Are you asking whether it would be
3  possible now or was it possible then or when
4  would it be possible?
5      Q.   Well, would it have been possible on
6  the 19th of September?
7      A.   Yes.  By developing any type of an
8  Excel type macro, we could have done that.
9      Q.   Without developing that macro, sir,
10 are you able to tell me sitting here today in
11 broad terms what the proportions of the
12 positions in 074C were relating to each of the
13 types of customers you've described to me?
14     MS. BLOOMER:  Objection to form.
15 Vague and ambiguous.
16     A.   I can't tell you what the exact
17 percentages across each of those division is in
18 terms of holdings was.
19     Q.   Sure.  I understand that.  Please
20 understand me.  I'm not asking for the exact
21 percentages.  My question is whether you're able
22 to give me an indication of what those
23 percentages may be, understanding that you might
24 not be able to do it to the decimal point.
25     MS. BLOOMER:  Objection to form.

Page 105

D. DZIEMIAN

1
2  Vague and ambiguous.
3      A.   I would say that the LBI affiliates
4  made up the majority of the positions that were
5  held in the customer account.
6      Q.   Are you able to give me any more
7  specification as to what the proportions of the
8  positions were across the other remaining types
9  of customers you've described to me?
10     MS. BLOOMER:  Objection to form.
11     A.   It would be -- it would be just a
12 guess.  I would say it's probably Prime
13 Services, Institutional, Barclays Wealth or, you
14 know, it's an impossible question to answer.
15     Q.   Okay.  Thank you.  I appreciate that.
16     If you could have paragraph 15 of your
17 declaration in front of you, please, sir.
18     A.   Yes.
19     Q.   In paragraph 15, you describe a bridge
20 account relating to non-PIM 074C customer
21 options, correct?
22     A.   Yes, that would be for Prime Services
23 and Institutional.
24     Q.   Your second sentence says, "Barclays
25 has continued to work with the SIPA Trustee for

27 (Pages 102 to 105)

D. DZIEMIAN

1  the LBI liquidation and its consultants to
2  settle up through LBI with these customers
3  whenever possible.  There are currently
4  unsettled entries relating to certain non-PIM
5  customer options in the LBI bridge account."  Do
6  you see that?
7      A.   Yes, I do.
8      Q.   Do you know how many unsettled entries
9  there are in that bridge account, sir?
10     A.   There are only seven or eight
11 positions left.
12     Q.   Do you know what the value of those
13 positions is, sir?
14     A.   Not exactly, but the net is definitely
15 under a million dollars.
16     MR. OXFORD:  Can we go off for a
17 second?
18     (Recess; Time Noted:  12:44 P.M.)
19     (Time Noted:  12:50 P.M.)
20     (Exhibit 675A, a document bearing
21 Bates Nos. BCI-EX-00297545, with attachment,
22 marked for identification, as of this date.)
23 BY MR. OXFORD:
24     Q.   Mr. Dziemian, is the ADP system able

D. DZIEMIAN

1  to distinguish between exchange-traded
2  derivatives and over-the-counter derivatives?
3      And when I'm asking about the ADP
4  system, I'm talking about as used at Lehman in
5  September 2008.
6      A.   OTC derivatives is not my realm of
7  responsibility.  In terms of options on the ADP
8  system, they would typically be set up in a
9  separate identifying range by ADP.  They call it
10 a security number.  So it would actually be
11 within that range that you would have an option
12 set up.
13     Q.   Would you have any problem in creating
14 an ADP Report and excluding from that report
15 over-the-counter derivatives?
16     MS. BLOOMER:  Objection to form.
17     A.   Yes, and the way we would do that is
18 by using an ADP Options Trade Date Stock Record
19 Report, which OTC derivatives would not be
20 included on.
21     MR. OXFORD:  Could you read back my
22 question and answer?  I just want to make
23 sure we were not talking past each other
24 there.

D. DZIEMIAN

1      (Record read.)
2      Q.   Mr. Dziemian, did you mean to say that
3  you would have a problem in excluding OTC
4  derivatives or you would not have a problem?
5      A.   Would not.
6      Q.   Thank you.  You have in front of you
7  what I have marked as Exhibit 675A, sir, do you
8  see that?
9      A.   I do.
10     Q.   Do you recognize that document?
11     A.   I do.
12     Q.   Can you tell me what it is, please?
13     A.   The report details a reconciliation of
14 074 activity that occurred after -- or, from
15 September 23 forward and related back to
16 positions that were formerly held in the LBI
17 processing system.
18     The entries in question involve cash
19 in lieu for the most part, where cash was
20 settled in lieu of securities and also stock
21 loan activity by way of the OCC program that was
22 in effect at Lehman.
23     Q.   Did you rely on this document in
24 creating your declaration, sir?

D. DZIEMIAN

1  A.   No.
2      MR. OXFORD:  Mr. Dziemian, I don't
3  have any further questions for you at this
4  time.  I appreciate your time and
5  cooperation.  Thank you.
6      THE WITNESS:  Thank you.
7      MR. OXFORD:  And for the record, I
8  don't think counsel for the other parties
9  have any questions.
10     MR. DAKIS:  The Committee has no
11 questions.
12     MS. CRAWFORD:  I have no questions.
13     (Time Noted:  12:56 P.M.)
14         oOo

_____
DANIEL DZIEMIAN

Subscribed and sworn to
before me this     day
of          2010.

_____

28  (Pages 106 to 109)

1

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4     -------------------------------x

      In Re:                    Chapter 11

5     LEHMAN BROTHERS            Case No. 08-13555 (JMP)

      HOLDINGS, INC., et al.,    (Jointly Administered)

6     -------------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9         DEPOSITION OF PAUL EXALL

10           New York, New York

11        Thursday, August 27, 2009

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 24380

22

23

24

25

1      P. EXALL - HIGHLY CONFIDENTIAL
2  you what's going to happen here but basically
3  I'm going to ask you a series of questions.
4  You're under oath.  You're going to answer the
5  questions as best you can.
6          At some point during the
7  deposition you might hear your attorney voice
8  an objection to either preserve an objection
9  or challenge a question that I might ask.
10 That doesn't relieve you of the obligation to
11 answer the question.  You still have to answer
12 the question.  I might change the question in
13 response to his deposition -- to his objection
14 but unless he instructs you not to answer you
15 still have to answer the question.  Okay?
16     A.   I understand.
17     Q.   In that regard if I ask a question
18 that's a little bit confusing or I misuse a
19 term that you folks use or an abbreviation
20 that you folks use, please correct me and ask
21 me to clarify the question.  I want to have a
22 clear question so I can get a clear answer,
23 okay?
24     A.   Okay.
25     Q.   Did you prepare at all for today's

1      P. EXALL - HIGHLY CONFIDENTIAL
2  deposition?
3      A.   Yes, I did.
4      Q.   How did you do that?
5      A.   I obviously met with counsel and
6  prepared over the course of the past week.
7  And I reviewed insofar as I could the
8  documentation and events around the time of
9  the acquisition insofar as I could recall them
10 and reference them.
11     Q.   Okay.  Did any of those documents
12 refresh your recollection about anything in
13 connection with this litigation?
14     A.   Yes, they did.  Yes.
15     Q.   Which documents are those?
16     A.   I don't recall.  I mean, I read
17 through a lot of old e-mail correspondence and
18 things like that that I have in relation to
19 the matter.  And I had discussions with people
20 that assisted me in the preparation of the
21 spreadsheet.
22     Q.   And you don't have any specific
23 document that refreshed your recollection
24 about that?
25     A.   Nothing specific.

1      P. EXALL - HIGHLY CONFIDENTIAL
2      Q.   Okay.  You're aware that you've
3  been asked to appear by Barclays as a 30(b)(6)
4  witness on specific topics, correct?
5      A.   Yes.
6      Q.   Okay.  Well, let's start off with
7  the 30(b)(6) notice.  I'm going to hand you a
8  copy of a document marked as Exhibit 279B
9  which is entitled Debtor's First Rule 30(b)(6)
10 Deposition Notice to Barclays on Issues
11 Pertaining to Accrued '08 FY Liability Under
12 the Asset Purchase Agreement.
13         And my question is have you ever
14 seen this deposition notice?
15     A.   I have.
16     Q.   Fair to say you reviewed this in
17 preparation for today's deposition?
18     A.   I have reviewed this, yes.
19     Q.   And if you look on Schedule A
20 which is the third page you'll see you've been
21 designated as a 30(b)(6) witness in connection
22 with bonus and severance payments made to
23 former Lehman employees, right?
24         MR. GREEN:  Object to the form of
25 the question.  That's not all the

1      P. EXALL - HIGHLY CONFIDENTIAL
2  schedule says.
3      A.   Okay.
4          MR. HINE:  Okay.
5      Q.   But in general you're here to
6  testify about bonus and severance payments
7  made to former Lehman employees, right?
8      A.   I'm here to represent that --
9  what's represented on the schedule prepared in
10 respect to this deposition.
11     Q.   Okay.  Now, that schedule is the
12 schedule -- the spreadsheet referenced in this
13 Schedule A?
14     A.   I believe it to be, yes.
15     Q.   And then a couple days ago we
16 received a replacement or an updated
17 spreadsheet so you understand that that's the
18 subject of today's deposition as well.
19     A.   I do.
20     Q.   Okay.  We'll get to that later.
21 I'm done with that exhibit.
22         Well, before I finish on that did
23 you undertake any investigation in connection
24 with being a 30(b)(6) witness?
25     A.   What do you mean by that?
     Q.   Well, did you look into any of the

1    P. EXALL - HIGHLY CONFIDENTIAL
2    issues that are embodied in that spreadsheet
3    in preparation for today's deposition?
4        A.   I prepared the spreadsheet,
5    itself.
6        Q.   Okay.
7        A.   So I understand the items on it
8    and can testify to those.
9        Q.   Okay.  Could you just give me a
10   little background about yourself?  You're a
11   Barclays employee; is that correct?
12       A.   Barclays Capital employee, that's
13   correct.
14       Q.   And how long have you been with
15   Barclays?
16       A.   As a permanent employee I've been
17   with Barclays since April 2000.  Prior to that
18   I consulted with Barclays Capital from around
19   June 2008.
20       MR. GREEN:  You mean 1998?  Excuse
21   me.
22       Q.   I think you just lost me.
23       A.   1998, sorry.
24       Q.   All right.  Just so I have it, you
25   consulted with Barclays from June 1998 to

1    P. EXALL - HIGHLY CONFIDENTIAL
2    April 2000?
3        A.   That's correct.
4        Q.   And from April 2000 you've been a
5    permanent employee of Barclays; is that right?
6        A.   That's right.
7        Q.   And in what capacity are you
8    employed by Barclays?
9        A.   Currently my job title would be
10   head of compensation analytics across
11   investment banking and investment management.
12       Q.   How long have you held that
13   position?
14       A.   I would estimate four -- three,
15   four, five years.
16       Q.   Okay.  And what were you before
17   that?
18       A.   I've been a director in HR for
19   several years.  The job role, itself, has
20   existed since -- it isn't sort of -- it's become a
21   formal role so to speak.  I've been doing this
22   particular function for Barclays Capital, for
23   BGI, and for Barclays Wealth, over a period of
24   time since I joined the HR department.
25       Q.   Okay.  And is it fair to say that

1    P. EXALL - HIGHLY CONFIDENTIAL
2    you've been in the HR department since you
3    came to Barclays?
4        A.   No, that's not correct.  Initially
5    in 2008 I joined the investment banking
6    finance department which then amalgamated into
7    the finance global department.  And I worked
8    there until approximately July 2001 when I
9    transferred down to HR.
10       Q.   Did any of your work prior to July
11   21 involve compensation issues?
12       A.   Insofar as it related to finance
13   matters and books and records of Barclays
14   Capital, yes.
15       Q.   Well, let me -- let's take a step
16   back.  If you were to describe your current
17   duties, could you just explain to me what your
18   duties and responsibilities are in your
19   current position?
20       A.   The primary responsibilities that
21   I assume are -- I work for Michael Evans as
22   the global head of HR across investment bank,
23   management.  My primary duties involve -- and
24   this is the best way I can describe it -- the
25   liaison between Barclays Capital HR and -- or

1    P. EXALL - HIGHLY CONFIDENTIAL
2    IBRAM HR because we span Barclays Global
3    Investors and Barclays Wealth, with the group
4    HR function and the board HR and remuneration
5    committee of Barclays PLC.  So any
6    compensation matters that require approval by
7    the remuneration committee under its terms of
8    reference as a committee of the board of
9    Barclays, those matters come through me
10   subject to approval by management.
11       Q.   Okay.  So --
12       A.   That's one of the primary roles.
13   The other functions I perform are some
14   analytical modeling around internal
15   compensation related matters for Barclays
16   Capital BGI and Wealth.
17       Q.   You keep saying different entities
18   here.  BGI is what?
19       A.   Yes.  Just to explain the
20   structure of what is known as investment
21   banking and investment management -- if you
22   look in the books -- in the published report
23   of the accounts of Barclays PLC there's
24   investment banking and investment management
25   and what's called GICB and then there's the

1    P. EXALL - HIGHLY CONFIDENTIAL
2    group center.  Investment Banking and
3    Investment Management comprise the three
4    businesses run by Mr. Diamond.  Barclays
5    Capital, Barclays Global Investors, now
6    subject to the sale to Blackrock, and Barclays
7    Wealth.
8         Q.    And your primary role is with that
9    group?
10        A.    That's correct.
11        Q.    And other groups you have a role
12   or not?
13        A.    No.
14        Q.    Okay.  So did I understand you
15   correctly that you interface between that
16   group, the one run by Mr. Diamond, with
17   respect to compensation matters to the
18   committee of the board who approves
19   compensation; is that right?
20        A.    Yes.  I do not liaise directly
21   with them.  We go through obviously our own
22   management who represent us on that committee.
23   And I liaise with the group HR function who
24   again represent them and others on that
25   committee.

1    P. EXALL - HIGHLY CONFIDENTIAL
2         Q.    Okay.  So Mr. Evans is -- and what
3    is his title?
4         A.    Mr. Evans is -- amongst other
5    things he's responsible for several
6    departments.  I'll probably to get this wrong
7    but in my capacity he's global head of human
8    resources across global investment global
9    management.
10        Q.    So you report to him?
11        A.    I do.
12        Q.    Do you report to anyone else
13   directly?
14        A.    Not directly.
15        Q.    Okay.
16        MR. GREEN:  Bill, I just want to
17   without giving a long speech say that
18   when you're getting background from Paul
19   of his understanding of the
20   organization, I mean this is just
21   background from him.  He's not speaking
22   as a 30(b)(6) deponent in terms of
23   taking a position for the company on
24   what the organizational structure is.
25        MR. HINE:  Fair enough.

1    P. EXALL - HIGHLY CONFIDENTIAL
2         MR. GREEN:  All right.
3    BY MR. HINE:
4         Q.    So, Mr. Exall, could you explain
5    to me -- you're aware that this whole
6    proceeding and these depositions have to do
7    with the sale -- a transaction between Lehman
8    and Barclays that closed on or around
9    September 22nd, 2008, correct?
10        A.    I understand that, yes.
11        Q.    Okay.  Could you just describe for
12   me generally any role you played in connection
13   with that transaction through -- what I'm
14   asking about is any role you played in the
15   negotiations of the transaction or the closing
16   or anything else related to it.
17        MR. GREEN:  Object to the form.
18   You may answer.
19        A.    I played no role whatsoever in any
20   negotiations whatsoever.
21        Q.    Okay.  So -- and, again, I just
22   want to get a sense of your general background
23   here.  You were not involved in discussions
24   concerning the compensation provisions that
25   later made their way into the Asset Purchase

1    P. EXALL - HIGHLY CONFIDENTIAL
2    Agreement; is that right?
3         MR. GREEN:  Objection to the form
4    of the question.  You may answer.
5         A.    Could you repeat the question,
6    please?
7         Q.    You were not involved, am I right,
8    in the negotiations or discussions concerning
9    the compensation provisions that later made
10   their way into the Asset Purchase Agreement in
11   this case; is that right?
12        A.    That is right.  I was not
13   involved.
14        Q.    Okay.  And how did you learn about
15   the compensation provisions that are embodied
16   in the Asset Purchase Agreement?
17        MR. GREEN:  Object to the form.
18        A.    I was passed a copy of the
19   purchase agreement by some colleagues in the
20   finance department.
21        Q.    Okay.
22        A.    And reading that and -- I came to
23   understand that there were some provisions in
24   there in relation to compensation.
25        Q.    Okay.  And were you passed -- when

P. EXALL - HIGHLY CONFIDENTIAL

1
2  were you passed that agreement?
3      A.  I can't recall the exact date but
4  it would have been on or around the 22nd of
5  September or shortly thereafter.
6      Q.  Okay.  And did you need to consult
7  that agreement to do your job from then on?
8      A.  It was a point of reference, yes.
9      Q.  Okay.  Were you passed any other
10 documents related to compensation in
11 connection with this transaction?
12     A.  Yes.
13     Q.  Like what?
14     A.  I requested to see a copy of the
15 schedule referred to in the APA.
16     Q.  Okay.
17     A.  The sale agreement.
18     Q.  Okay.
19     A.  And I was passed what was
20 represented to me as being that schedule.
21     Q.  Okay.  Anything else?
22     A.  I don't recall getting any other
23 specific sale-related documentation in that
24 regard, no.
25     Q.  Okay.  Have you ever seen a copy

P. EXALL - HIGHLY CONFIDENTIAL

1
2  of the first amendment to the Asset Purchase
3  Agreement?
4      A.  I don't believe so, no.
5      Q.  Okay.  Fair to say you don't have
6  any use for that document in connection with
7  the work you've performed with respect to
8  compensating former Lehman employees?
9          MR. GREEN:  Object to the form of
10 the question.
11         MR. HINE:  It was a bad question.
12 Let me try again.
13     Q.  Is it fair to say you haven't had
14 need to consult with the first amendment of
15 the APA in connection with the work you
16 performed with respect to compensation for
17 former Lehman employees?
18     A.  I did not consult it.
19     Q.  Okay.
20     A.  Consequently, I do not know if I
21 needed to.
22     Q.  Okay.  Fair enough.
23         Have you ever seen a document
24 called a clarification letter that was agreed
25 to between Barclays and Lehman in connection

P. EXALL - HIGHLY CONFIDENTIAL

1
2  with the Asset Purchase Agreement?
3      A.  I don't recall specifically seeing
4  that document.  I know of its existence but I
5  don't recall actually either seeing it or
6  having read it in any great detail.
7      Q.  Okay.
8      A.  If I did see it.
9      Q.  Do you have any understanding of
10 its purpose?
11     A.  No.  Not particularly.
12     Q.  Do you have any understanding of
13 how it relates in any way, if at all, to
14 compensation issues?
15     A.  No.
16     Q.  Okay.  Is it fair to say that
17 you've been able to do your job with respect
18 to compensation of former Lehman employees
19 without consulting the clarification letter?
20     A.  I believe so.
21     Q.  Okay.  And I believe you said
22 earlier that you prepared the spreadsheet that
23 we're going to be discussing here today?
24     A.  I did.
25     Q.  Okay.  And is that something that

P. EXALL - HIGHLY CONFIDENTIAL

1
2  you prepared in the normal course of your
3  employment?
4      A.  It was prepared in the normal
5  course of business in support of various
6  requirements from PriceWaterhouseCoopers as
7  part of their annual audit as well as the
8  ancillary or related regulatory filings that
9  they may or may not have had to prepare.
10     Q.  So when was it prepared?
11         MR. GREEN:  Object to the form.
12 You mean the spreadsheet?  When was the
13 original spreadsheet prepared?
14         MR. HINE:  Well, we'll just wait
15 till I get to the spreadsheet.  I just
16 want to get some background here.
17     Q.  We'll put that question aside.
18         So when did you learn of the
19 Lehman/Barclays sale transaction?
20     A.  I learned -- I don't recall
21 actually specifically learning when it
22 occurred.  I was aware that the initial
23 discussions were being held in New York
24 amongst various parties in relation to the
25 original form of the transaction whereby, I

P. EXALL - HIGHLY CONFIDENTIAL

1  **P. EXALL - HIGHLY CONFIDENTIAL**
2  **you speculate you would have talked about.**
3  **But do you recall any discussions between any**
4  **of your senior Barclays management about what**
5  **was being discussed or contemplated in**
6  **connection with compensation-related issues**
7  **concerning the Lehman Barclays proposed**
8  **transaction?**
9      MR. GREEN:  These are discussions
10     between Paul and senior management
11     you're asking about.
12         MR. HINE:  Yes.
13     A.   Sorry.  So let me just be clear.
14 You're asking do I know of any discussions
15 that my senior management may have had with
16 Lehman Brothers?
17     **Q.   No, no, no.  I'm asking did you**
18 **have any conversations with senior management**
19 **during that week, September 15th through**
20 **September 22nd, about the compensation issues**
21 **that were being discussed or considered in**
22 **connection with the Lehman Barclays**
23 **transaction?**
24     A.   I don't recall anything specific.
25 I do know that the initial sale agreement had

1      P. EXALL - HIGHLY CONFIDENTIAL
2  been concluded by the time I had come to New
3  York and was beginning to assist Mr. Evans in
4  whatever he needed me to do.  And it was my
5  understanding that the transaction was closed
6  at that point.
7      Q.   And at that point do you recall
8  the date you were --
9      A.   I look back -- I think it was on
10 or around the 20th or 21st of September that I
11 came across.  I forget the exact date but I
12 believe it was on or around there.
13     Q.   Okay.  So you thought the
14 transaction had closed by then?
15     A.   It was my general understanding
16 that the transaction for all intents and
17 purposes had been completed the prior week.  I
18 have subsequently come to understand that
19 there was a clarification agreement and
20 officially the judge may have sanctioned on a
21 later date.  You know, the legalities for me
22 are neither here nor there.  My understanding
23 is that the transaction had been concluded in
24 all material respects at that point.
25     Q.   Okay.  Did you have any

1      **P. EXALL - HIGHLY CONFIDENTIAL**
2  **understanding during that period about the $2**
3  **billion compensation figure that appeared on**
4  **the schedule that you had referenced earlier?**
5      MR. GREEN:  Could you show him
6      that figure?
7      MR. HINE:  Okay.  Let's get to
8      the -- let's get to that.
9      MR. GREEN:  Just so it's clear
10     what we're talking about.
11     MR. HINE:  Let's get to the
12     schedule.
13 BY MR. HINE:
14     **Q.   Mr. Exall, I'm going to hand you a**
15 **copy of a document that's previously been**
16 **marked as Exhibit 1 which is a copy of the**
17 **Asset Purchase Agreement which I think you've**
18 **been discussing.  And I'm also going to give you a copy**
19 **of you.  And I'm also going to give you a copy**
20 **of a document that's been marked as Exhibit 19**
21 **which I understand is the schedule that is**
22 **referenced in the APA.  If you want just take**
23 **a couple minutes to refresh -- review these**
24 **documents and I'll ask you some questions.**
25         **(Document review.)**

1      **P. EXALL - HIGHLY CONFIDENTIAL**
2      **MR. GREEN:  Are you ready, Paul?**
3      **THE WITNESS:  Yeah.**
4      **Q.   Now, my previous question had to**
5  **do with the schedule.  We'll call this the**
6  **9/16 schedule if you will.  Do you see the $2**
7  **billion compensation number in that schedule?**
8      **A.   I do.**
9      **Q.   Okay.  Did you, during the week of**
10 **September 15th to the 22nd say, did you have**
11 **any conversations with any of Barclays senior**
12 **management about that $2 billion comp figure?**
13     A.   I was made aware of this schedule
14 during that week.
15     Q.   Um-hum.
16     A.   And I'm certain I would have asked
17 someone questions with respect of the schedule
18 and what I understood it -- you know, what I
19 needed to interpret from it.  But, yes, in
20 general I would have had conversations with
21 people on this.
22     Q.   Okay.  And who gave you the
23 schedule?
24     A.   Mr. Clackson passed me the
25 schedule.

Page 38

P. EXALL - HIGHLY CONFIDENTIAL

1
2    Q.    And what did he tell you about it?
3    A.    He represented this as being the
4    schedule referred to in the APA.
5    Q.    Okay.  And you were looking down.
6    I think -- are you looking at Section 9.1(c)
7    of the APA?
8    A.    That is correct.
9    Q.    Okay.  So this Exhibit 19 is the
10   schedule -- or you understood that the
11   Exhibit 19 is the schedule referred to in
12   paragraph 9.1(c) of the APA, correct?
13   MR. GREEN:  Object to the form.
14   A.    This is a copy of the schedule
15   that was represented to me as being the
16   schedule referred to, correct.
17   Q.    Okay.  What did Mr. Clackson tell
18   you about that schedule?
19   MR. GREEN:  Object to the form.
20   Asked and answered.  You may answer.
21   A.    I don't recall what he told me
22   about it.  I asked him for a copy of it as
23   part of my own reading of the relevant
24   sections of the APA.
25   Q.    Okay.  And you had been previously

Page 39

P. EXALL - HIGHLY CONFIDENTIAL

1
2    provided a copy of the APA?
3    A.    Yes.
4    Q.    And who gave you that?
5    A.    I believe Mr. Gary Romaine gave me
6    a copy of the APA.
7    Q.    Okay.  And why did he give it to
8    you?
9    MR. GREEN:  Object to the form.
10   A.    He understood there to be
11   compensation related matters that I would
12   probably be -- need to be aware of.
13   Q.    Okay.  And I take it you reviewed
14   the APA after receiving a copy of it.
15   A.    In general, yes.  I can't testify
16   to having read it in any great depth.  I read
17   I think the sections in relation to me and
18   probably, to put a word on it, skimmed the
19   rest.
20   Q.    Okay.  I'm not trying to be tricky
21   here but is it fair to say you focused on
22   Section 9.1 of the APA and probably skimmed
23   the rest of it?
24   MR. GREEN:  Object to the form.
25   You may answer.

Page 40

P. EXALL - HIGHLY CONFIDENTIAL

1
2    A.    Yes.  I think that would be
3    reasonably accurate.
4    Q.    Okay.  Well, let's just take a
5    look at 9.1 for a minute.  If you wouldn't
6    mind turning to 9.1(a).  9.1(a), as I
7    understand it, has to do with Barclays
8    offering employment to certain individuals who
9    are defined as transferred employees.
10   Do you see that definition in
11   there?
12   A.    I see the term transferred
13   employee referred to.
14   Q.    Okay.  Is that a term you're
15   familiar with?
16   A.    No.
17   Q.    Well, I guess the reason I'm
18   asking is you're charged with supervising
19   compensation issues with respect to
20   transferred employees, right?
21   MR. GREEN:  Object to the form of
22   the question.  I think that
23   mischaracterizes his prior testimony.
24   A.    I would say that part of my
25   responsibility is in relation to compensation

Page 41

P. EXALL - HIGHLY CONFIDENTIAL

1
2    of the former Lehman Brothers employees that
3    Barclays Capital or Barclays acquired under
4    the transaction.  The meaning of transferred
5    employee in the sense of this agreement or any
6    other document I can't testify to not being a
7    lawyer and I just have no legal understanding
8    of that.
9    Q.    Okay.  So the term -- the defined
10   term transferred employees is not something
11   you use in the normal course of your business?
12   A.    Not in the normal course of my
13   business, no.
14   Q.    Okay.
15   Do you know how many employees --
16   well, let's just explore this for a minute.
17   You work on compensation issues related to
18   former Lehman employees who transferred to
19   Barclays, correct?
20   A.    Compensation of former Lehman
21   employees that came to work for Barclays.
22   Q.    Okay.  Now, do you know how many
23   of those folks there are?
24   A.    I recall, and I'm approximating
25   here, that there were in excess of 10,000

## Page 50

P. EXALL - HIGHLY CONFIDENTIAL

1
2 has been complied with by Barclays with
3 respect to former Lehman employees?
4         MR. GREEN:  Object to the form of
5     the question.  Calls for a legal
6     conclusion.
7     A.   I don't know whether this or any
8 other clause has been complied with.
9     Q.   Okay.
10     A.   I don't know what Barclays'
11 obligations are under these.  What I do know
12 is that when individuals across the firm have
13 been affected by a reduction in force exercise
14 they are subject to -- for consideration to
15 severance payments in the normal course of
16 business.
17     Q.   Okay.  And I believe you said that
18 you believe that's been done in accordance
19 with the former Lehman's policies?
20     A.   I believe that for former Lehman
21 Brothers employees the former Lehman Brothers
22 policy has been applied.
23     Q.   Okay.
24     A.   That's my understanding.
25     Q.   Okay.  Now, this provision, 9.1(b)

## Page 51

P. EXALL - HIGHLY CONFIDENTIAL

1
2 doesn't refer to the schedule that we talked
3 about earlier, right, that September 16th
4 schedule?
5         MR. GREEN:  Object to the form.
6     A.   I don't see any specific reference
7 to it.
8     Q.   Okay.  Now, if we turn to 9.1(c)
9 that has to do with bonus payments, correct?
10 In general?
11         MR. GREEN:  Object to the form of
12     the question.
13     A.   Again, I can't interpret the
14 clause.  I see the word bonus, annual bonuses
15 reflected in the clause.  But as to what it
16 may or may not refer to I really can't testify
17 in any legal capacity.
18     Q.   I understand.  I'm not asking for
19 your legal interpretation.  I'm asking as a
20 general matter as a person charged with
21 compensation issues and working with this
22 stuff.  Do you have a general understanding of
23 what this provision (c) entails in connection
24 with bonuses that were to be paid to former
25 Lehman employees?

## Page 52

P. EXALL - HIGHLY CONFIDENTIAL

1
2         MR. GREEN:  Object to form.
3     Do you have the question in mind?
4         THE WITNESS:  I'm just re-reading
5     the clause.
6     A.   Could you perhaps rephrase the
7 question?
8     Q.   Yeah.  Let's try again.
9         What is your understanding -- and
10 I understand you're not a lawyer and I'm not
11 asking for a legal conclusion as to this
12 paragraph.  But what is your understanding
13 about the amount of bonuses that are supposed
14 to be paid, were supposed to have been paid to
15 former Lehman employees who now are with
16 Barclays?
17     A.   I don't understand anything in
18 respect of this clause that refers to any
19 amount, quantum of bonus whatsoever.
20     Q.   Well, but it does refer to the
21 schedule, right?
22     A.   It refers to a schedule, yes.
23     Q.   Okay.  And what did you understand
24 that to mean when it refers to that schedule?
25         MR. GREEN:  Object to the form of

## Page 53

P. EXALL - HIGHLY CONFIDENTIAL

1
2 the question.  Calls for a legal
3 conclusion.
4     A.   It refers to a schedule.  And the
5 schedule, itself, does not have the word bonus
6 anywhere on it.
7     Q.   Okay.
8     A.   So I can't reach a conclusion as
9 to any -- in any capacity, personal, private,
10 on behalf of the company, as to what quantum
11 of bonus may or may not be referred to in this
12 clause.
13     Q.   Okay.  I understand.  I'm not
14 asking for a legal interpretation.  But in the
15 course of preparing the spreadsheet that we're
16 going to talk about and your work in
17 connection with compensation related to these
18 former Lehman employees, what did you
19 understand the $2 billion was supposed to
20 cover?
21         MR. GREEN:  Object to the form of
22     the question.
23     Q.   And when I say $2 billion I'm
24 referring to the 2 billion in the schedule,
25 the September 16th schedule.

1      **P. EXALL - HIGHLY CONFIDENTIAL**
2      MR. GREEN:  Object to the form of
3  the question.
4      A.  Again -- and to reiterate, I
5  cannot pass a legal opinion as to what the
6  obligations of Barclays may or may not be.  It
7  is my personal view, and that may be different
8  to the views of Barclays or anyone else in
9  Barclays that $2 billion is referred to as
10  comp.  And my understanding in a personal
11  capacity is that refers to compensation in all
12  its forms.
13      **Q.  In all its forms.  Meaning what?**
14      A.  In respect of pre-acquisition
15  service of the former Lehman Brothers
16  employees.
17      **Q.  What do you mean by compensation**
18  **in all its forms?**
19      A.  Again, I'm speaking in my personal
20  capacity as opposed to on behalf of Barclays.
21  Their definition of compensation may be
22  different than mine.
23      I understand personally
24  compensation to mean any manner of awards and
25  payments and reward to employees in general

1      P. EXALL - HIGHLY CONFIDENTIAL
2  that would encompass things like salary,
3  annual bonus, deferred stock, deferred cash.
4  Benefits.  Pensions.  Recruit -- you know, I
5  would say that there's no standard definition
6  of what is termed as compensation in either
7  the accounting environment or in the human
8  resources environment.  But my personal
9  understanding is that compensation is any form
10  of a award delivered to or on behalf of a
11  employee.  Or to their benefit.
12      **Q.  Okay.  I really didn't ask the**
13  **definition of compensation.  I'm trying to**
14  **find out what in preparing the spreadsheet**
15  **that we're going to talk about today and in**
16  **your work in connection with providing**
17  **compensation to the former Lehman employees,**
18  **is that $2 billion supposed to cover more than**
19  **bonuses?**
20      MR. GREEN:  Object to the form of
21  the question.  I think you did ask about
22  his understanding of the term
23  compensation to begin with so I think
24  the lead-in to your question was
25  inappropriate.  But, nevertheless, you

1      P. EXALL - HIGHLY CONFIDENTIAL
2  can answer the question.
3      A.  I can testify to the schedule,
4  itself, that's the subject of this deposition
5  which reflects the compensation delivered, the
6  wide discharge of compensation delivered to
7  former Lehman Brothers employees in respect of
8  their pre-acquisition service to Lehman
9  Brothers.
10      **Q.  But, Mr. Exall, you have no**
11  **understanding of what that $2 billion was**
12  **supposed to encompass in connection with**
13  **compensation to former Lehman employees?**
14      A.  I don't see it defined in the
15  agreement and I can't interpret it.
16      **Q.  Okay.  When you were asked to**
17  **prepare the schedule, were you told that it**
18  **should total up to $2 billion?**
19      A.  No.
20      **Q.  Were you told what the amount is**
21  **that in aggregate were supposed to have been**
22  **paid in any form of compensation to former**
23  **Lehman employees?**
24      A.  No.
25      **Q.  Do you have any understanding of**

1      **P. EXALL - HIGHLY CONFIDENTIAL**
2  **the amount of compensation that's supposed to**
3  **be paid to former Lehman employees?**
4      A.  No.
5      **Q.  Further into this paragraph you**
6  **see -- and I'm reading starting on the seventh**
7  **line down onto the eighth line it talks about**
8  **forms and proportions as are consistent with**
9  **purchaser's customary practices.**
10      **And it's referring to the annual**
11  **bonuses.  Do you see that sentence?**
12      A.  I do.
13      **Q.  What is -- just based on your**
14  **experience at Barclays, what is form and**
15  **proportions -- or what is Barclay's customary**
16  **practice with respect to annual bonuses?**
17      MR. GREEN:  Object to the form of
18  the question as to the extent it calls
19  for a legal conclusion.
20      A.  Our customary practice prior to
21  2008 in terms of annual bonus awards at
22  Barclays Capital --
23      **Q.  Right.**
24      A.  -- in general their annual bonuses
25  were delivered in the form of either cash or

1    P. EXALL - HIGHLY CONFIDENTIAL
2    cash and stock.
3        Q.   Right.
4        A.   Whereby above a certain threshold
5    an amount of the annual bonus was deferred or
6    delivered through a stock vehicle which would,
7    based at the time, through a tax table kind of
8    approach so above a certain threshold a
9    proportion was deferred or delivered in stock
10   and beyond a certain -- another step more
11   stock was delivered.
12       Q.   Okay.  And was this -- when you
13   said tax table you threw me there.  What did
14   you mean there?
15       A.   Sorry.  It's a term I use.  I
16   shouldn't use it.  We colloquially refer to it
17   as a tax table.  It's in effect if your bonus
18   is X, then there is no deferral into stock.
19   If it's above a certain threshold, a certain
20   proportion of the entire bonus is delivered in
21   stock.  If it's above another threshold,
22   further proportion of that bonus is delivered
23   in stock.
24       Q.   Okay.  And as a general matter
25   what percentage of bonus is provided in stock?

1        P. EXALL - HIGHLY CONFIDENTIAL
2        A.   In general, our customary practice
3    prior to 2008 was that any bonus -- and there
4    were regional fluctuations here based on the
5    exchange rate -- so I will quote this in
6    pounds.  Any bonus below 150,000 pounds
7    sterling there was no deferral or no delivery
8    in stock.  Any amounts above 150,000 pounds
9    but below 250,000 pounds of annual bonus,
10   10 percent of the entire amount was delivered
11   in stock.  Any amounts over and above 250,000
12   pounds, the first 250,000 pounds were
13   delivered -- 10 percent of that was delivered
14   in stock.  Any amount above 250,000 25 percent
15   was delivered in stock.
16       Q.   And this stock vested over time?
17       A.   That's correct.  Subject to the
18   rules of the stock -- of the plan itself, the
19   standard practice was to cliff vest at the end
20   of a three-year period.
21       Q.   Okay.  I saw that term cliff vest.
22   What does many mean?
23       A.   In general that means that it
24   vests in equal tranches, so to speak, so some
25   of our competitors in a stock award would --

1        P. EXALL - HIGHLY CONFIDENTIAL
2    let's say, as an example, if you had a hundred
3    pounds of an amount deferred into stock,
4    vesting over four years, if -- you can either
5    have pro rata vesting which is you could take
6    a quarter, a quarter, a quarter, and 25 would
7    accrue at the end of one, 25 after -- et
8    cetera.
9        Cliff vesting means that it only
10   vests at the end of the period concerned.  So
11   you'd only get the full hundred in this
12   example at the end of the fourth year.
13       Q.   And it was a custom to have a
14   three-year cliff vest period for stock
15   bonuses?
16       A.   It was our custom, yes.
17       Q.   All right.  And has this changed
18   since 2008?  You said prior to 2008.
19       A.   2008 was a unique year for
20   compensation and we delivered at Barclays
21   Capital -- at Barclays in a different way
22   subject to a different type of arrangement.
23       Q.   Are you talking about the former
24   Lehman employees when you say that or --
25       A.   No.  They were subject to our

1        P. EXALL - HIGHLY CONFIDENTIAL
2    standard practice that was employed prior to
3    this.
4        Q.   Okay.  So as a general matter, and
5    I know there's individuals, but as a general
6    rule this practice -- the prior practice that
7    you just described was applied to the former
8    Lehman employees that came to work at
9    Barclays?
10       A.   I believe that to be the case yes,
11   in most cases, yeah.
12       (Deposition Exhibit 280B, document
13       bearing production number
14       BCI-EX-00077287, marked for
15       identification as of this date.)
16       (Deposition Exhibit 281B, document
17       bearing production number
18       BCI-EX-00115843, marked for
19       identification as of this date.)
20   BY MR. HINE:
21       Q.   Mr. Exall, I'm handing you two
22   exhibits.  One is marked as Exhibit 280B which
23   is Bates stamped BCI-EX-00077287 which I
24   understand to be the original version of the
25   schedule that was provided to us.  And the

1    P. EXALL - HIGHLY CONFIDENTIAL
2    second document is marked as Exhibit 281B
3    which is Bates stamped BCI-EX-00115843 which,
4    Chris, I think you'll agree is the updated
5    schedule that was recently provided to us.
6         My first question, Mr. Exall, have
7    you ever seen these documents before?
8         A.   Yes.
9         Q.   You prepared these documents?
10        A.   I did.
11        Q.   Okay.  I want to -- and am I
12   correct that 281B is an updated replacement
13   version of 280B?
14        A.   Yes.
15        Q.   Okay.  Before we put away 280B
16   could you explain to me the differences and
17   why you had to update it?
18        A.   Sure.  280B as you referred to
19   here was the original schedule provided around
20   the middle of July I understand.  It reflected
21   what we believed to be an accurate picture of
22   the discharge of compensation to previous --
23   former Lehman Brothers employees in respect of
24   their prior pre-acquisition service.
25             It was thought to be accurate at

1    P. EXALL - HIGHLY CONFIDENTIAL
2    that time, although we were still
3    investigating certain items reflected on the
4    schedule.  Subsequent to those investigations
5    and the correction of a couple of
6    typographical errors as well as some of the
7    text was cut off from the narrative on the
8    right-hand side of the original schedule, the
9    updated schedule reflects a more accurate --
10   an accurate picture of the discharge of those
11   compensation items as of the date it was
12   produced.
13        Q.   Okay.  Now, other than typos is it
14   fair to say the main differences have to do
15   with severance entries?
16        A.   Yes.
17        Q.   Okay.  Just take a step back a
18   minute.  Why was this schedule -- and I'll
19   refer to them generically now, why was this
20   schedule prepared?
21        A.   The schedule was prepared in the
22   normal course of business to support the -- or
23   for production to -- primarily for production
24   to PriceWaterhouseCoopers as part of their
25   annual audit as well as any ancillary filings

1    P. EXALL - HIGHLY CONFIDENTIAL
2    they may or may not have had to provide as
3    part of their normal course of business as
4    auditors of Barclays.
5         Q.   Okay.  So this is someone from PwC
6    requested a schedule of compensation related
7    to the Lehman acquisition?
8         A.   I was instructed that this would
9    be needed in support of the annual audit and
10   other related filings by my finance
11   colleagues.
12        Q.   Who told you that?
13        A.   Mr. Romaine.
14        Q.   Romaine?
15        A.   Gary Romaine.
16        Q.   Okay.  And he is -- what was his
17   position?
18        A.   I believe -- I don't know -- I
19   can't recall his exact title but he's a
20   technical accountant in the finance
21   department.
22        Q.   Okay.  He's not in the HR
23   department, correct?
24        A.   No, no.
25        Q.   So is it correct to say that the

1    P. EXALL - HIGHLY CONFIDENTIAL
2    finance department requested this type of
3    schedule from your department?
4         A.   Mr. Romaine requested it of me,
5    yes.
6         Q.   Okay.  Any other purpose behind
7    this other than to assist PwC?
8         A.   No.  The primary purpose of this
9    was to assist PwC.
10        Q.   Any other purposes?
11        A.   I think we in general in support
12   of our own internal accounting records would
13   have prepared the schedule.  But the primary
14   purpose would be to support the annual audit
15   and regulatory filings that were required.
16        MR. GREEN:  Bill, I'm sorry.
17   Could we go off the record for one
18   second?
19        MR. HINE:  Sure.
20        (Discussion held off the record.)
21   BY MR. HINE:
22        Q.   Mr. Exall, I think you had
23   something you wanted to clarify?
24        A.   If you could repeat that question
25   in respect of why the schedule was prepared

| | |
|---|---|
| Page 70 | Page 71 |

**Page 70**

P. EXALL - HIGHLY CONFIDENTIAL

1
2      A.    There was no regular requirement
3  to update it.  There were certain points of
4  time that an update was required and as part
5  of the -- whether it be the annual report from
6  PriceWaterhouse or anything else in respect of
7  what they were looking at or passing an
8  opinion on.  So there are points in time at
9  which a schedule would have been updated and
10  presented formally to them.  I know they've
11  had a copy I believe of this schedule.  I'm
12  not sure whether they have a copy of 281B.
13      Q.    So when you said this schedule you
14  meant 280B?
15      A.    I meant 280B, yes.
16      Q.    Okay.  Now, did you start
17  preparing a schedule in this form or like this
18  starting in September of 2008?
19      A.    I don't recall the exact time when
20  we first produced the -- a first iteration of
21  the schedule or its predecessor without
22  guessing or consulting prior records, but what
23  I can say is that this schedule was -- or its
24  predecessor would have been prepared in Q4
25  2008.

**Page 71**

P. EXALL - HIGHLY CONFIDENTIAL

1
2      Q.    Okay.
3      A.    During that period, yes.
4      Q.    Okay.  And it's gone on through a
5  couple iterations between Q4 '08 and mid July
6  of '09; is that right?
7      A.    Of course.
8      Q.    Okay.  And the iteration following
9  the mid July version which is Exhibit 280B,
10  what I have in front of me as 280B -- 281B?
11      A.    281B, yes.
12      Q.    Okay.  Were there no iterations
13  between these two?
14      A.    That was the iteration.
15      Q.    Okay.
16      A.    We updated this Schedule 280B.
17  It's now become 281B.
18 RQ        MR. HINE:  Okay.  Chris, we're
19      going to request copies of all these
20      iterations going back to the fourth
21      quarter of '08 just as part of our
22      document requests.
23          MR. GREEN:  We'll take that
24      request under advisement.
25          MR. HINE:  Okay.

| | |
|---|---|
| Page 72 | Page 73 |

**Page 72**

P. EXALL - HIGHLY CONFIDENTIAL

1
2      Q.    All right.  Was either 280B or
3  281B prepared in any way in connection with
4  the discovery we're undertaking here in this
5  litigation?
6          MR. GREEN:  Object to the form of
7      the question to the extent it calls for
8      a legal conclusion.
9      A.    That is not my understanding.
10      Q.    Okay.  Were you ever asked to
11  prepare a schedule in response to discovery
12  requests in this case?
13      A.    No.
14      Q.    Okay.  So this is something you
15  had -- were you ever asked to alter these
16  schedules or modify them in any way with
17  respect to providing discovery in this case?
18          MR. GREEN:  Object to the question
19      to the extent it invades communications
20      between counsel and client.
21      Q.    I'm not asking you any discussions
22  you may have had with attorneys in connection
23  with this schedule.  But were you ever asked
24  to modify this schedule that you've been -- I
25  take it you've been maintaining this schedule

**Page 73**

P. EXALL - HIGHLY CONFIDENTIAL

1
2  for several months now, correct?
3      A.    That would be correct.
4      Q.    Since fourth quarter of '08,
5  right?
6      A.    Yes.
7      Q.    Were you ever asked to modify the
8  schedule in response to anything that was
9  taking place in this litigation here in the
10  US?
11      A.    Not to my recollection.
12      Q.    Okay.  Were you ever told in any
13  way that the amount of comp at the bottom,
14  you'll see at the bottom of 280B it totals to
15  1.999 billion.  Could you see that?
16      A.    Yes.
17      Q.    Were you ever told that that
18  number should be 2 billion when all was said
19  and done you should get down to 2 billion at
20  the end?
21      A.    No.
22      Q.    I'm not talking in connection with
23  this litigation.  I'm just asking in general.
24  Did anyone ever tell you that the total amount
25  of compensation should total about $2 billion?

Page 74

1  **P. EXALL - HIGHLY CONFIDENTIAL**
2      A.   I was asked to prepare the
3  schedule in respect of detailing the discharge
4  of our obligations to former Lehman Brothers
5  employees in respect of their prior service
6  and compensation for their prior service for
7  Lehman Brothers.  And this is what the
8  schedule represents.  It's items relating to
9  pre-acquisition services.
10     Q.   Okay.  But were you ever told that
11 it should be a total of $2 billion?
12     A.   No.
13     Q.   Do you have any understanding of
14 how this schedule and the compensation listed
15 in this schedule relates to the 9/16 balance
16 sheet or the schedule we looked at previously?
17     MR. GREEN:  The Exhibit 19?
18     Q.   Exhibit 19.
19     A.   The only reference point between
20 schedules 280B and 281B and the schedule you
21 have as Exhibit 19 is the OBS compensation
22 accrual line which is reflected on both 280B
23 and 281B.  The source referenced here is the
24 APA which references the $2 billion described
25 as comp on Exhibit 19.

Page 75

1  P. EXALL - HIGHLY CONFIDENTIAL
2      Q.   Okay.  So let's look at
3  Exhibit 281B.  I don't want to confuse the
4  record here.
5      A.   Okay.
6      Q.   281B is the most recent version of
7  this schedule, right?
8      A.   That's correct.
9      Q.   Just so I understand what you just
10 said, when you see on the -- OBS Compensation
11 Accrual, OBS stands for opening balance sheet;
12 is that right?
13     A.   Yes.  That's my understanding.
14     Q.   Okay.  And the source for the $2
15 billion number is the APA, correct?
16     A.   Yes.
17     Q.   And by that you mean the source
18 for the $2 billion is Exhibit 19 that we just
19 pointed to?
20     A.   That's correct.
21     Q.   Okay.  So now how do you -- I just
22 want to walk through preparing this schedule.
23 How do you get from the $2 billion number --
24 how do you break it into 17 -- into
25 1.7 billion in cash versus 300 million in

Page 76

1  **P. EXALL - HIGHLY CONFIDENTIAL**
2  equity?
3      A.   I was requested by Mr. Romaine
4  to -- for accounting purposes to estimate the
5  stock component of any such compensation that
6  may total 2 billion with the assumption that
7  we applied -- oh, sorry.  Let me say it again.
8      I was asked to estimate the stock
9  potential of any compensation that may be
10 represented by this 2 billion.
11     Q.   Okay.
12     A.   And the 300 million is an estimate
13 based on historic norms and experience under
14 the Barclays Capital stock deferral scheme.
15     Q.   Is that the scheme we talked about
16 earlier, the normal practice of Barclays?
17     A.   That is correct, yes.
18     Q.   Okay.  And when did he ask you to
19 do this?
20     A.   I believe it's a technical
21 accounting matter.  And it's really a question
22 for Mr. Romaine.
23     MR. GREEN:  I'm sorry.  Did you
24 say when or why?
25     MR. HINE:  Why.

Page 77

1  P. EXALL - HIGHLY CONFIDENTIAL
2      MR. GREEN:  Oh, I'm sorry.
3      A.   It's a technical accounting matter
4  in respect of how the -- my understanding is
5  how the acquisition is accounted for in the
6  books and records of Barclays PLC.  I don't
7  know the technical aspects behind it.
8      Q.   Okay.  Just a general question.
9  Has this allocation between cash and equity
10 changed at all since the fourth quarter of '08
11 when you first started preparing the schedule
12 to the present?
13     A.   Not to my recollection.  Again,
14 that would have to be something for Mr.
15 Romaine.
16     Q.   Okay.  And again I'm happy if you
17 tell me it's someone else's department.  I'm
18 not trying to get you to testify about things
19 you have no knowledge about.
20     A.   No, I understand.
21     Q.   In the next -- could you just tell
22 in the general structure here.  You have
23 payments -- I see payments in future and other
24 items.  Payments are cash outflows or expenses
25 that have already taken place?

1      P. EXALL - HIGHLY CONFIDENTIAL
2          MR. GREEN:  Object to the form.
3      Q.    That's a bad question but --
4      A.    My understanding is that these
5  were amounts that had been either paid in cash
6  or awarded in equity or paid as severance at
7  the time that this spreadsheet had been
8  prepared.
9          Payable in the future I understand
10  to be things that in most cases have not yet
11  been paid and were due and payable at a future
12  time through some sort of timing issue, et
13  cetera; whereas, other items were things that
14  were economic costs to Barclay PLC that were
15  related to awards that had already been made.
16          I guess you could actually
17  categorize the other items -- actually, the
18  way they're represented here the ISP awards
19  you could actually have recategorized that as
20  payments.  And payroll taxes, you could
21  categorize that as payable in the future.
22      Q.  I see.  When I -- again, just to
23  compare 280B and 281B I see in the first entry
24  under Payment it says Pre -- on 281B it says
25  Pre 22/9 Payroll Items and in 280B says

1      P. EXALL - HIGHLY CONFIDENTIAL
2  22/2.  Is that just a typo?
3      A.    Yes, it is.
4      Q.    Okay.  So back to 281B.  What does
5  this entry encompass?
6      A.    There are two general components
7  to the $12 million I believe you're referring
8  to.
9      Q.    Um-hum.
10      A.    In general, the first is a series
11  of payments made by Barclays on behalf of
12  former Lehman Brothers employees that were
13  expatriates.  So these are payments made to
14  tax authorities in other jurisdictions -- or
15  it may have been the US jurisdiction but in
16  the UK and other international jurisdictions
17  in respect of their pre-acquisition service.
18          These were liabilities that
19  effectively would have been for Lehman
20  Brothers but Barclays took on those
21  liabilities and funded them and made good on
22  those payments.
23      Q.    These are payments to the
24  individuals or to regulatory authorities?
25      A.    To regulatory authorities on

1      P. EXALL - HIGHLY CONFIDENTIAL
2  behalf of individuals.
3      Q.    Okay.  Just so I understand it,
4  these are Lehman employees who were ex-pats at
5  the time of the acquisition who had some
6  regulatory obligation to foreign authorities
7  or other authorities and Barclays paid that;
8  is that right?
9          MR. GREEN:  Objection to form.
10  You can answer.
11      A.    That is my understanding.
12      Q.    Okay.  And how much of this 12
13  million is that?
14      A.    I estimate it to be approximately
15  $7 million.
16      Q.    And that money didn't go to the
17  individuals; it went to some regulatory
18  authority, correct?
19      A.    That's my understanding.
20      Q.    Okay.  And then what's the
21  balance, the 7 from the 12?
22      A.    The balance of 5 -- as I said,
23  there were two items.  The balance of the 5
24  relates to payrolls that -- for former Lehman
25  Brothers employees that were due and payable

1      P. EXALL - HIGHLY CONFIDENTIAL
2  on and around the date of the bankruptcy.
3  Those payables are not going to be made.  They
4  were liabilities for the former Lehman
5  Brothers.  They were payables that were not
6  going to be paid.  My understanding was there
7  was no cash to make them.  As part of the
8  ordinary course of business to take on those
9  employees Barclays agreed to fund those
10  payrolls in respect of those pre-acquisition
11  services.
12      Q.    Okay.  Just so I understand the
13  pool of people we're talking about, you're
14  talking about payroll -- payroll amounts that
15  were due to the Lehman employees who came to
16  Barclays?
17      A.    Yes.
18      Q.    You're not talking about -- this
19  does not include payroll that was owed to
20  Lehman employees who stayed with Lehman,
21  correct?
22      A.    That's not my understanding.
23      Q.    We have a double negative there.
24      A.    Yeah.  There's a double negative.
25  It's my understanding those

Page 82

P. EXALL - HIGHLY CONFIDENTIAL

1    P. EXALL - HIGHLY CONFIDENTIAL
2    amounts relate to payroll in respect to former
3    Lehman Brothers employees in respect of their
4    pre-acquisition services but these employees
5    were employees that transferred or became
6    employees of Barclays Capital.
7        Q.    Okay.  So it's only folks who
8    transferred to Barclays, correct?
9        A.    That is my understanding in most
10    cases.
11        Q.    Okay.  When you say
12    pre-acquisition services, what do you mean?
13    Can I just use my colloquial term and you tell
14    me whether I'm right or wrong.  Is this base
15    salary that was owed to these folks as of
16    September 22nd?
17        MR. GREEN:  Object to the form of
18    the question.  Do you mean --
19        Q.    Well, let me back up.
20        MR. GREEN:  This specific
21    component of the first entry is what
22    you're talking about?
23        MR. HINE:  I'm talking about the
24    $5 million out of the 12 million that
25    we've been talking about.

Page 83

1    P. EXALL - HIGHLY CONFIDENTIAL
2        MR. GREEN:  Right.
3        Q.    Is that what I've seen referred to
4    as base salary?
5        A.    Not only.  I would suggest without
6    reviewing the records in detail or
7    investigating in general, if you're talking
8    payroll, you're talking any base salary paid
9    to the individual amongst other things that
10    are payroll related.
11        Q.    Like what?
12        A.    Benefits, pensions.  Anything that
13    may or may not -- or that may be part of an
14    individual's monthly salary or related items.
15        Q.    I understand.  But it's not bonus.
16    It's not annual bonuses, right?
17        A.    That's not my understanding, yes.
18        Q.    We've got a double negative.
19        A.    My understanding is that that was
20    a payroll item and I do not believe that there
21    were any - as you term them - annual bonus
22    payments incorporated in that.
23        Q.    When you say a payroll item you're
24    talking about the weekly or biweekly or
25    monthly checks that these folks were getting

Page 84

1    P. EXALL - HIGHLY CONFIDENTIAL
2    throughout the year.
3        A.    That's my understanding.
4        Q.    Okay.  And so is this 5 million
5    payments to those folks up to September 22nd
6    or does it go beyond September 22nd?
7        A.    I don't recall the exact dates.  I
8    don't know the exact dates to which the
9    payroll related.  I do know that they were the
10    payrolls that were due and payable at the time
11    that the acquisition was happening.  The risk
12    was -- and this was the commercial risk --
13    that these employees that were going to come
14    to work for Barclays were not going to get
15    paid for that month from Lehman Brothers.  They
16    would have had no monthly salary not being
17    employed by Barclays at that time.  So this
18    was a make-good, I guess goodwill gesture by
19    Barclays to fund the payroll to ensure the
20    smooth transition into the new structure.
21        Q.    Okay.  So presumably most of these
22    employees have been paid August 31st and this
23    is for the period of September for which they
24    worked?
25        MR. GREEN:  Objection to the form

Page 85

1    P. EXALL - HIGHLY CONFIDENTIAL
2    of the question.
3        A.    I don't know that for certain but
4    I believe that to be the case.
5        Q.    Okay.  But when I see the title it
6    says Pre-September 22nd payroll items, my
7    question is does that 5 million continue these
8    payroll items all the way to the end of the
9    year or is it just for the period in
10    September?  Do you understand my question?
11        A.    They do not relate to any payments
12    for the rest of the year.
13        Q.    Okay.  So the 5 million is just to
14    bring these employees up to September 22nd; is
15    that right?
16        A.    I can't testify to whether the
17    22nd of September is the exact date but what I
18    can tell you is that is for their salary and
19    related items as per a payroll that was due
20    and payable at the time in and around the
21    acquisition.  So whether that was the 23rd or
22    the 25th of September I can't testify.  I
23    don't know the exact dates.
24        Q.    Okay.  But assuming the date of
25    around September 22nd, this item, the $5

1    P. EXALL - HIGHLY CONFIDENTIAL
2    million, does not include payments for
3    October, November and December for those
4    employees; is that right?
5        A.    That is right.
6        Q.    Okay.  The next item we see is
7    replacement RSUs.  Could you tell us what that
8    is?
9        A.    RSU is an acronym to stand for
10    restricted stock units.
11        Q.    Okay.  And what are they?
12        A.    They are effectively in general
13    stock awards made to individuals that are
14    restricted in the sense that they either do
15    not vest immediately or can't be sold
16    immediately.
17        Q.    Okay.  Now, these are a form of
18    compensation that Lehman had previously used?
19        A.    Yes.
20        Q.    Okay.  Did Barclays previously use
21    these?
22        A.    Yes, we have.
23        Q.    Okay.  Now, I see that you cite
24    here $11 million and I just want to read your
25    source.  It says new RSUs granted as

1    P. EXALL - HIGHLY CONFIDENTIAL
2    replacements for ex-Lehman employees granted
3    to them in 2008 prior to the acquisition.
4        So just explain to me what's going
5    on here.  This is Barclays replacing some RSUs
6    that Lehman had previously granted to its
7    employees?
8        MR. GREEN:  Object to form.  You
9    may answer.
10        A.    There was a population of people
11    that were given stock awards by Lehman
12    Brothers earlier in 2008.  At the time of the
13    acquisition the value of those awards had
14    declined to zero.
15        Q.    Right.
16        A.    For these specific employees it
17    was decided that as a goodwill gesture,
18    Barclays would give restricted stock awards in
19    respect of that zero -- that original award
20    now valued at zero in effect to split the loss
21    50/50.
22        So as a hypothetical example if
23    the individual had been -- received an award
24    of stock to the value of $100 from Lehman
25    Brothers that had gone to zero at the time of

1    P. EXALL - HIGHLY CONFIDENTIAL
2    the bankruptcy, Barclays' goodwill gesture in
3    respect of that employee would have been to
4    give them a stock award to the value of 50 in
5    Barclays stock.
6        Q.    So it's in Barclays stock now.
7        A.    It's in Barclays stock but relates
8    to the value of stock awarded prior to the
9    acquisition by Lehman Brothers.
10        Q.    And that's based on the value of
11    Barclays stock as of around September '08,
12    correct?
13        A.    That's normal practice, yes.
14        Q.    And does this vest over a period
15    of time?
16        A.    It would have, yes.  I don't know
17    the specific vesting for this particular award
18    but that would be the normal course of events,
19    yes.
20        Q.    Would it be the three-year cliff
21    vest that you mentioned earlier?
22        A.    It may or may not have been.
23    Often -- in many cases we will mirror the
24    original vesting of an award at a previous
25    employer with a replacement award.  I can't

1    P. EXALL - HIGHLY CONFIDENTIAL
2    testify to what the vesting period because I
3    don't know it for this particular award.
4        Q.    Okay.  Well, if it vested over
5    time, would it be entered on the balance sheet
6    for this year?
7        A.    Sorry.  Excuse me?
8        Q.    If it had vested over time would
9    it be entered on the acquisition balance sheet
10    for this year?
11        MR. GREEN:  Object to the form of
12    the question.  You may answer if you
13    know.
14        A.    I believe that's a technical
15    accounting question.  I believe the answer to
16    be yes but I can't pass an exact accounting
17    opinion.  You should refer that to Mr.
18    Romaine.
19        Q.    Okay.  And when you say this is a
20    goodwill gesture are you saying that Barclays
21    wasn't obligated to do this under the APA?
22        MR. GREEN:  Objection to the form
23    of the question.  It calls for a legal
24    conclusion.
25        A.    I don't know what the APA

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   specifically obligated Barclays or anyone else
 3   to do.  I do know that this is a goodwill
 4   gesture for those employees.  That's my
 5   understanding of that award.
 6       Q.   Okay.  And are these very senior
 7   employees?
 8       A.   I believe they are -- there are --
 9   I -- hum.  I would categorize them as
10   employees -- I would suggest -- my
11   recollection is actually that they're a range
12   of employees.  There were some senior
13   employees and some junior employees in that.
14   I don't think that they were specifically
15   targeted as the senior group.  They were a
16   group of people that had received awards at
17   Lehman Brothers.
18       Q.   Whoever happened to be in the pool
19   of people who received an award.
20       A.   In the specific grouping, yes.
21       Q.   The next entry -- well, another
22   question on that.  Why is that not in the
23   equity column, that 11 million?
24       A.   I don't know.
25       Q.   Do you think it should be or is it
```

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   just a -- it's not paid in cash, right?
 3       A.   My understanding it was stock
 4   awards.
 5       Q.   Okay.  You don't know why it's
 6   in --
 7       A.   No.
 8       Q.   Okay.  You have to answer either
 9   yes or no.  If you shake your head --
10       A.   Oh, sorry.  I don't know why.
11       Q.   The next entry is Bonus Concluding
12   Social Tax.  Could you tell me what you mean
13   by social tax?  What is that?
14       A.   My interpretation of social tax
15   would be -- my understanding would be these
16   are any ancillary taxes that would be due and
17   payable to various regulatory authorities in
18   respect of any annual bonus payment at any
19   point in time in whatever jurisdiction they
20   have to be made in.
21       Q.   So is this like withholding tax?
22   Income tax?
23       A.   Not personal income tax, no.
24       Q.   Oh.  Just any --
25       A.   Let me characterize it again.
```

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   Where withholdings are required, yes, they
 3   would be included in that number.  It would
 4   also include whatever benefits may or may not
 5   be derived from any annual incentive payment
 6   that is made.  So I believe one of those to be
 7   FICA in the US.
 8       Q.   Okay.  So this would -- this
 9   figure of 1.529 billion includes all of that
10   type of regulatory requirements, correct?
11       A.   That's my understanding, yes.
12       Q.   Okay.  And when you say bonus
13   here, these are annual bonuses?
14           MR. GREEN:  Object to the form.
15       Q.   Well, let me show you another
16   document.  Maybe that helps me ask the
17   question better.
18           (Pause on the record.)
19       Q.   While we're trying to find the
20   document, do you see in the source it says TCR
21   27 Feb 2009?
22           MR. GREEN:  23rd Feb?
23       Q.   23 Feb.
24       A.   TCR is an acronym for our internal
25   on-line compensation review system.  It stands
```

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   for total compensation review.  The date 23
 3   February 2009 relates to the date the data
 4   were extracted from that system from which
 5   this -- that element of the schedule was
 6   prepared.
 7       Q.   Okay.  So this is just a database
 8   where you track compensation payments to
 9   employees?
10       A.   In effect, yes.
11       Q.   Oh, okay.  And would that data
12   have changed since February of '09 up until
13   the date you prepared this?
14           MR. GREEN:  Object to the form.
15       A.   I don't believe so.  The
16   compensation round had closed at that point.
17       Q.   Okay.
18       A.   Whilst there may be movements of
19   items subsequent to that, I think that data
20   extract is accurate.
21       Q.   When you say the compensation
22   round had been concluded, is there like an
23   annual schedule for the award of bonuses at
24   Barclays?
25           MR. GREEN:  Object to the form.
```

| | |
|---|---|
| **Page 94** | **Page 95** |

**Page 94**

1    P. EXALL - HIGHLY CONFIDENTIAL
2       A.   Yes.  There's a normal cycle that
3    is followed.
4       Q.   Okay.  So are you saying that
5    they've been awarded by February 23rd and they
6    probably didn't change between then and now?
7       A.   At the 23rd of Feb the cash
8    amounts would have been distributed through
9    the payroll.  The equity awards, the value
10   thereof would have been fixed.
11      Q.   Okay.
12      A.   The equity awards I don't believe
13   had been formally made in terms of the amount
14   of stock units at that point.  But the value
15   of those awards had been fixed.
16      Q.   But you're relatively confident
17   that there's been no substantial changes from
18   February 23rd to the present.
19      A.   Yes, I am.
20      Q.   Okay.  Let me hand you a copy of
21   an exhibit that's been previously marked as
22   216 which is a copy of a contract between
23   Barclays and Mr. Lowitt.  I'm just going to
24   use this as an example so I don't expect that
25   you're familiar with the terms but if you want

**Page 95**

1    P. EXALL - HIGHLY CONFIDENTIAL
2    to just take a minute to take a look at it.
3         (Document review.)
4         MR. GREEN:  Bill, while he's
5    looking at I should say that as I'm sure
6    you know this entire deposition is
7    designated highly confidential.
8         MR. HINE:  Highly confidential.
9         MR. GREEN:  And don't expect any
10   redesignation because it's all about
11   comp.
12        MR. HINE:  I understand.  I
13   understand.
14        MR. GREEN:  So it will remain that
15   way.
16        MR. HINE:  Well, I think our
17   agreement is we'll treat it as all
18   highly confidential and you guys let me
19   know if have you any re-designations.
20        MR. GREEN:  Right.
21        MR. HINE:  So that's fine.
22        MR. GREEN:  Right.
23   BY MR. HINE:
24      Q.   Mr. Exall, have you had a chance
25   to look at this document?

**Page 96**

1    P. EXALL - HIGHLY CONFIDENTIAL
2       A.   Yes.
3       Q.   And my question is Mr. Lowitt is
4    apparently awarded something entitled 2008
5    guaranteed cash bonus.
6         Do you see that?
7       A.   I do.
8       Q.   Do you understand that that bonus
9    is part of the bonus including social tax
10   entry that we just talked about on this
11   spreadsheet?
12      A.   Yes.
13      Q.   Okay.  Is there anything else on
14   Mr. Lowitt's contract that would be part of
15   that $1.5 billion figure?
16      A.   If I take Mr. Lowitt as the
17   example, the 4.56 million referred to in the
18   contract as being 2008 guaranteed cash bonus
19   would be part of the 1,271 number reflected as
20   cash in that line.
21      Q.   Okay.
22      A.   The EPP -- 2008 EPP recommendation
23   to the value of $1.44 million as reflected in
24   the contract, would be included in the $258
25   million number.

**Page 97**

1    P. EXALL - HIGHLY CONFIDENTIAL
2       Q.   I see.  Okay.
3       A.   Any ancillary social taxes and
4    whatever that were due and payable to whatever
5    authorities or any withholding tax in regard
6    with are included in those numbers as well.
7    Those obviously are not specified in the
8    contract as well.
9       Q.   I understand that.  But any
10   regulatory requirements related to those two
11   entries on its contract would be included in
12   the numbers that you put in the spreadsheet,
13   correct?
14      A.   That's correct.
15      Q.   Okay.  And how about where you see
16   he has a special cash award, is that in that
17   entry on the spreadsheet?
18      A.   No, it is not.
19      Q.   Okay.  Where would I find that
20   entry on the spreadsheet?
21      A.   It is not on the spreadsheet.
22      Q.   Okay.  So what is the special cash
23   award that I see several senior executives
24   from -- former Lehman executives getting?
25        MR. GREEN:  Object to the form of

Page 98

P. EXALL - HIGHLY CONFIDENTIAL

1   the question.
2       A.   My understanding of these special
3   cash awards is that they are retention awards
4   subject to future service of the employee.
5   They do not relate to pre-acquisition services
6   performed for Lehman Brothers in relation to
7   these individuals.  Consequently, they're not
8   on the schedule.
9       Q.   Okay.  So just so -- I was
10  confused about that.
11          So where I see special cash award
12  and various contracts that is to encourage the
13  individual to stay at Barclays for a period of
14  time, correct?
15      MR. GREEN:  Object to the form.
16  You may answer.
17      A.   That is my understanding of their
18  retention award.
19      Q.   When you say retention award
20  that's an inducement for them to stay a period
21  of time; is that right?
22      A.   Yes.  That's my understanding.
23      Q.   Okay.  And then -- and because
24  that was not meant to compensate them for work

Page 99

P. EXALL - HIGHLY CONFIDENTIAL

1   they had done at Lehman it's not part of your
2   spreadsheet; is that right?
3       A.   Totally not related to the
4   pre-acquisition service supplied by Lehman
5   Brothers and consequently are not on the
6   schedule.
7       Q.   Okay.  So this schedule is only
8   relating to pre-acquisition services that
9   former Lehman employees performed for Lehman;
10  is that right?
11      A.   Yes.  That's correct.
12      Q.   All right.  Thank you for
13  clarifying that.
14          While we're on Mr. Lowitt's
15  contract, again we'll use it an example but do
16  you see the provision that says termination
17  other than for cause?
18      A.   I see the provision.
19      Q.   And that lays out certain benefits
20  that he's entitled to if he gets terminated
21  without cause.  Is that what I would call a --
22  is that a severance payment?
23      MR. GREEN:  Take your time to read
24  the provision before you answer just to

Page 100

P. EXALL - HIGHLY CONFIDENTIAL

1   make sure your answer is addressed to
2   the question.
3       (Document review.)
4       A.   Can you repeat the question?
5       Q.   Well, why don't we do this.  We're
6   going to get to some entries called severance
7   on your spreadsheet so we'll come back to that
8   question.
9       A.   Yes.
10      Q.   It has to do with severance so
11  let's just postpone that question.
12          Let's go back to your spreadsheet.
13          The next entry I see is IBD Grad
14  Programs.  Could you tell me what that is?
15      A.   These -- the IBD grad program is
16  the graduate program implemented by the
17  former -- well, we had one at Barclays Capital
18  but the majority of the -- well, all the
19  people reflected on here are the former Lehman
20  Brothers graduates that were working in the
21  investment banking division of Lehman Brothers
22  that came on as part of the acquisition.  The
23  payments related to them are reflected here in
24  respect of their pre-acquisition service.

Page 101

P. EXALL - HIGHLY CONFIDENTIAL

1       These were made in June of 2009.
2   That is a quirk -- I term it a quirk.  It's
3   market practice for Lehman Brothers graduate
4   program to pay their annual bonuses to the
5   graduates at midyear.  It's different to the
6   policy that we had at Barclays Capital.  We
7   stuck to this -- their policy in respect of
8   the US graduates.
9       Q.   These are investment banking
10  division employees who went to grad school and
11  is this a payment to the grad school for the
12  school?
13      A.   No, no, no.  These are payments to
14  the individuals.  The graduate program as --
15  these are people as you pointed out are
16  graduates that we recruited off campus to come
17  and work for us.  They're on the former
18  graduate program within investment banking.
19  And their compensation is -- I would term it
20  as being quite rigorously standardized in the
21  sense that there's a lot of competition in the
22  market for these individuals and there's quite
23  a standardized form of compensation paid to
24  them.  And they're on the specific program

P. EXALL - HIGHLY CONFIDENTIAL

```
 1           P. EXALL - HIGHLY CONFIDENTIAL
 2   that is different to let's say non-graduate
 3   employees.
 4        Q.   So this isn't a bonus.  This is a
 5   compensation -- this is an extra form of
 6   compensation to them because they went to
 7   graduate school?
 8        A.   No.  It's an extra form of
 9   compensation because they're on the graduate
10   program and as part of that program they're
11   entitled to certain awards at certain points
12   in time.  June 2009 being the point in time at
13   which they were entitled to them.
14        Q.   Okay.  I guess I'm just not
15   understanding that.  You've recruited them out
16   of -- Lehman has recruited them out of a grad
17   school and this is a payment they get as an
18   extra incentive to come work for Lehman?
19        MR. GREEN:  Objection to form.
20   You may answer.
21        A.   This is for all intents and
22   purposes in general their annual bonus, okay?
23   Their timing is different than the general
24   population for whatever reason.  That's
25   standard practice at -- it was standard
```

P. EXALL - HIGHLY CONFIDENTIAL

```
 1           P. EXALL - HIGHLY CONFIDENTIAL
 2   practice at Lehman -- the cycle of their bonus
 3   awards or payments were midyear.  Whereas
 4   everyone else it's year end.
 5        Q.   Okay.  But they are still in grad
 6   school still?
 7        A.   No, no.  They have left grad
 8   school.  They're all graduates.  But they're
 9   part of our formal graduate program having
10   been recruited from grad school.
11        Q.   Okay.  And how are they eventually
12   transitioned from this program into becoming a
13   regular -- like, how do they transition to the
14   normal bonus cycle?
15        A.   I can't speak for the exact Lehman
16   policy but in general my understanding of the
17   graduate program that we have is that they
18   rotate for a certain period of time within the
19   business in which they work.  They learn their
20   business.  They, you know, work, they learn,
21   et cetera.  And as and when they -- the
22   graduate program is generally a finite amount
23   of time.  In Barclays Capital traditionally it
24   was 18 months.  The graduates did a bunch of
25   rotations in various business areas and they
```

P. EXALL - HIGHLY CONFIDENTIAL

```
 1           P. EXALL - HIGHLY CONFIDENTIAL
 2   were either employed or not employed at the
 3   end of that cycle by Barclays Capital.
 4        Q.   Okay.  So --
 5        A.   But I -- if the Lehman Brothers
 6   scheme is the same in general as the Barclays
 7   Capital scheme, that's how think I would
 8   transition into what I would term as the
 9   general population.
10        Q.   Okay.  I think I understand it.
11   So this is -- these are folks who had been in
12   this graduate program as of September 22nd and
13   now are able to continue in that same program
14   at Barclays?
15        A.   Yes.  That's my understanding of
16   it.
17        Q.   Okay.  So the $11 million here is
18   in lieu of an annual bonus for them?
19        A.   It's exactly the same for all
20   intents and purposes as any other compensation
21   delivered to any other ex-Lehman employee.
22   It's just that the timing is different.
23        Q.   Well, do they also receive a base
24   salary?
25        A.   Yes, they do.
```

P. EXALL - HIGHLY CONFIDENTIAL

```
 1           P. EXALL - HIGHLY CONFIDENTIAL
 2        Q.   Okay.  So they have a base salary
 3   and then an additional amount paid in or
 4   around June of every year; is that correct?
 5        A.   That's correct.
 6        Q.   And is this only the additional
 7   amount or does this also include the base
 8   salary?
 9        A.   This is the additional amount.
10        Q.   And where does their base salary
11   fall?
12        A.   In the normal books and records of
13   Barclays Capital.
14        Q.   So that would be up in the first
15   item, the $5 million we talked about earlier?
16        MR. GREEN:  Object to the form.
17        A.   I would say that insofar as the
18   IBD graduates may or may not have -- may have
19   been in the payrolls that Barclay made good
20   the answer would be yes.
21        In general, I don't believe -- I
22   believe that most of those investment banking
23   graduates were not part of that payroll cycle
24   and consequently any salary paid to them
25   pre-acquisition would have been borne -- the
```

1    P. EXALL - HIGHLY CONFIDENTIAL
2    costs would have been borne by Lehman Brothers
3    and post acquisition would have been borne by
4    Barclays Capital in the normal course of
5    business.  And those payments would not be
6    reflected in the schedule.
7         Q.   Okay.  So this $11 million for IBD
8    graduates is only -- does not include the base
9    salary component of their compensation.
10        A.   That's correct.
11        Q.   Okay.  It only includes the
12   portion of their compensation that they
13   receive every June.  Or thereabouts.
14        A.   It reflects what was paid to them
15   in June 2009.
16        Q.   Okay.  And --
17        A.   In respect of their
18   pre-acquisition service for Lehman Brothers.
19        Q.   So it's paid to them in June of
20   2009 but it relates to their work up until
21   September of 2008?
22        A.   Yes.
23        Q.   And how about their work from
24   September onward?
25        A.   This again comes back to the

1    P. EXALL - HIGHLY CONFIDENTIAL
2    difference in treatment between a graduate and
3    a non-graduate.  As I mentioned before,
4    graduate compensation is quite highly specific
5    and regulated within specified bands and it's
6    run in a different way to compensation for
7    non-graduates.  Consequently, these amounts
8    would have been June payable almost
9    irrespective of the performance of the
10   graduate.
11        So by the fact that we employed
12   them as part of the acquisition those would
13   have been paid in any event.  It's simply a
14   timing issue.
15        Q.   Well, does it mean that some of
16   that 11 million relates to work that they did
17   after September?
18        A.   I don't believe so to be the case.
19        Q.   You don't think so?
20        A.   No.
21        Q.   Why not?
22        A.   Because I believe as I mentioned
23   before that those amounts would have been June
24   payable to these graduates in any event.
25   Irrespective of their service.  These are --

1    P. EXALL - HIGHLY CONFIDENTIAL
2    as I said, their compensation is treated
3    somewhat differently to compensation among
4    non-graduates.
5         Q.   Okay.  And are they informed that
6    this is their annual bonus?
7         MR. GREEN:  Object to the form of
8    the question.
9         A.   I haven't seen what was given to
10   them as part of their graduate program.
11        Q.   Okay.  If we go back to the bonus
12   in the previous entry, the $1.529 billion,
13   does any of that encompass work that were
14   performed by former Lehman employees since
15   they've come to Barclays?  In other words,
16   after September 22nd?
17        MR. GREEN:  Object to the form.
18   Asked and answered.
19        A.   This schedule represents
20   compensation paid to former Lehman Brothers
21   employees in respect to their pre-acquisition
22   services for Lehman Brothers.
23        Q.   So am I correct to say that $1.529
24   billion does not relate in any way to work
25   these individuals performed for Barclays after

1    P. EXALL - HIGHLY CONFIDENTIAL
2    September 22nd?
3         A.   That is my understanding, yes.
4         Q.   And so in certain employment
5    contracts if I see anything relating to a 2009
6    bonus recommendation you're saying that would
7    not be in this $1.259 billion number?
8         A.   No, it wouldn't.  It would not be
9    in that number.
10        Q.   Okay.
11        A.   Well, could you show me an example
12   if you want to be specific?
13        Q.   I'm not sure I have one but I --
14        A.   I mean, if I refer back to Mr.
15   Lowitt's contract it talks about a 2008
16   guaranteed cash bonus and a 2008 EPP
17   recommendation.
18        Q.   Right.
19        A.   Those amounts are included on the
20   spreadsheet.  Had there been two additional
21   clauses referring to 2009 cash and stock,
22   those would not have been on the schedule.
23        Q.   Okay.  That was my question.
24        Now, when you see on his contract
25   he has a -- if you see on there it says

Page 110

P. EXALL - HIGHLY CONFIDENTIAL

1          P. EXALL - HIGHLY CONFIDENTIAL
2  compensation he has a base salary of 200,000.
           Do you see that?
3       A.   Yep. I do.
4       Q.   Is that on your spreadsheet at all
5  within any entries?
6       A.   No.
7       Q.   And why is that?
8       A.   Because that salary would have
9  been paid to him post-acquisition. The
10  schedule does not reflect any post-acquisition
11  obligations.
12       Q.   I understand. So that is
13  compensation he's receiving for work he's
14  performing for Barclay post-acquisition.
15       A.   That would be correct. The only
16  way that that -- some of that 200,000 would
17  have been part of this schedule is if it was
18  part of the pre-2009 payroll we discussed
19  previously.
20       Q.   I understand. Okay.
21       The next entry you'll see is
22  entitled Severance. Could you tell me what
23  that is meant to cover?
24       A.   That relates to payments and

Page 111

P. EXALL - HIGHLY CONFIDENTIAL

1          P. EXALL - HIGHLY CONFIDENTIAL
2  ancillary -- payments to individuals.
3  Withholding taxes and ancillary liabilities in
4  respect of the reduction in force exercise
5  implemented in Q4 2008 and Q1 2009 in respect
6  of former Lehman Brothers employees.
7       Q.   Okay. When I see RIF in the
8  source that's reduction in force?
9       A.   That acronym stands for reduction
10  in force, yes.
11       Q.   And what does that VIG stand for?
12       A.   I don't know what VIG actually
13  stands for. It is meant to refer to the Q1
14  2009 reduction in force exercise.
15       Q.   So RIF refers to the fourth
16  quarter '08 reduction in force?
17       A.   That's my understanding.
18       Q.   And the second acronym refers to
19  the first quarter of '09 reduction?
20       A.   That's my understanding.
21       Q.   Okay. And you got lists of --
22  what do your lists show from HR? I see a
23  reference from HR.
24       A.   We maintained -- we, HR,
25  maintained databases of payments made to

Page 112

P. EXALL - HIGHLY CONFIDENTIAL

1          P. EXALL - HIGHLY CONFIDENTIAL
2  individuals and related items on a
3  name-by-name-basis reflecting these items
4  totalling these amounts on the schedule.
5       Q.   Okay. Now, these individuals came
6  to work for Barclays at or around September
7  22nd and had left since then?
8       A.   These are former Lehman Brothers
9  employees that came and worked for Barclays
10  and then were part of the reduction in force
11  exercises, yes.
12       Q.   Okay. So they're not -- that list
13  does not include people who ever came to
14  Barclays at all.
15       A.   That's not my -- I believe that to
16  be the case, yes.
17       Q.   Okay. So if they received
18  severance it was from Lehman, not Barclays,
19  correct?
20       MR. GREEN: Object to the form of
21  the question. You can answer if you
22  know.
23       A.   I don't know.
24       Q.   Okay. Fair enough.
25       A.   I don't know.

Page 113

P. EXALL - HIGHLY CONFIDENTIAL

1          P. EXALL - HIGHLY CONFIDENTIAL
2       Q.   And how was their severance
3  calculated?
4       A.   The standard severance policy of
5  Lehman Brothers was applied in respect to --
6  in most cases in respect of former Lehman
7  Brothers employees and the application of that
8  policy resulted in severance payments being
9  calculated and awarded to individuals
10  concerned.
11       Q.   Okay. Now, this is -- these
12  severance payments are separate from the bonus
13  payments we talked about earlier.
14       A.   Yes, they are.
15       Q.   Okay. So these are -- is it
16  correct all of these payments have been made
17  to people who no longer work for Barclays,
18  correct?
19       A.   Yes.
20       Q.   Now, why in the entry do we have
21  some severance and it looks like it's payable
22  in the future? Do you see the entry I'm
23  talking about? The $27 million?
24       A.   I do.
25       Q.   What is that meant to cover?

Page 114

P. EXALL - HIGHLY CONFIDENTIAL
1
2     A.   These are meant to cover exactly
3  the same thing in that they are severance
4  related to former Lehman Brothers employees
5  that are part of the reduction in force
6  exercise.  But these are amounts that had not
7  at the time of the production of the schedule
8  either been paid or had been reconciled fully
9  to the extent that they had -- we can trace
10  the item to a payroll.
11     Q.   Can you explain that last part to
12  me.
13     A.   For the most part these amounts
14  have been paid.  Have actually been discharged
15  and the cash has left the account.  The 27
16  million reflect payments that have not as yet
17  been made.  All are still in the process of
18  being reconciled.
19     Q.   Meaning negotiating with the
20  individuals leaving?
21     A.   No.  Reconciling between what
22  people originally estimated their -- an
23  individual severance to be and what they were
24  eventually paid on the payroll.  There may be
25  differences between those two points.

Page 115

P. EXALL - HIGHLY CONFIDENTIAL
1
2     Q.   So am I correct to say that that
3  27 million entails either a reconciliation
4  issue that you just mentioned or something
5  that's been promised to someone after they
6  left but that's payable in the future.
7     A.   That's my understanding, yes.
8     Q.   Okay.  So if I wanted to know the
9  total amount of severance paid to former
10  Lehman employees or to be paid to former
11  Lehman employees I would add up the 238 and
12  the 27 million, correct?
13     A.   Yes.  And that would cover not
14  only the payment made to individuals and the
15  withholding associated with those but also an
16  estimate for ancillary benefits and amounts
17  that may be payable on those amounts to
18  various regulatory bodies.
19     Q.   So do you have any understanding
20  whether these severance entries related in any
21  way to the clause 9.1(c) of the APA that we
22  discussed earlier which talked about bonuses?
23          MR. GREEN:  Object to the form to
24     the extent it calls for a legal
25     conclusion.

Page 116

P. EXALL - HIGHLY CONFIDENTIAL
1
2     A.   I don't have a specific -- I don't
3  have specific knowledge as to how the two are
4  tied together or not as the case may be.  I'm
5  not qualified to interpret that.  What I can
6  say is that again these are severance related
7  to former Lehman Brothers employees related to
8  their service with Lehman pre-acquisition.
9     Q.   Okay.  In the Future Severance
10  entry in your note you talk about the RIF and
11  VIG list from HR and then you write, "And
12  includes 25 percent for benefits for RIF."
13     What does that refer to?
14     A.   We have made an estimate in these
15  amounts in this 27 million in respect of, as I
16  mentioned earlier, payments that may be due
17  and payable to regulatory bodies in respect of
18  benefits or people that are on salary
19  continuation.  So these are people that don't
20  get their severance upfront, they take it over
21  a period of time, and they're still covered by
22  benefits.  So those are payments, estimates in
23  respect of the benefit amounts that they're
24  still covered for during the period of their
25  severance.

Page 117

P. EXALL - HIGHLY CONFIDENTIAL
1
2     Q.   So is it correct to say 25 percent
3  of the 27 million is that type of benefit?
4     A.   I don't know if that's the exact
5  calculation.  I haven't got an answer for
6  that.
7     Q.   Okay.  If you refer back to
8  Exhibit 19 are these severance payments part
9  of the $2 billion in comp that you see listed
10  there or do you have any understanding about
11  that?
12          MR. GREEN:  Object.  Calls for a
13     legal conclusion.
14     A.   I don't know what that represents.
15  So I can't say whether those services are
16  included or not.
17     Q.   When you said that you were
18  pointing to the $2 billion on figure 19?
19     A.   Described as comp, yes.
20     Q.   Oh, okay.  When I looked at the
21  prior version, 280B, it says Severance 2 as
22  the title.  Or is that just a typo?
23     A.   Typo.
24     Q.   Okay.  And now you might have
25  covered this already but how did the severance

1　　　P. EXALL - HIGHLY CONFIDENTIAL
2　figures change from the time you prepared the
3　first version of this -- or version marked as
4　280B versus the most recent version?
5　　　　　I mean, I see they've gone down in
6　terms of the payment severance version but
7　they've gone up -- oh, no.  I guess they've
8　gone down in both instances.
9　　　　　MR. GREEN:  Object to the form.
10　　　A.   Could you just restate that
11　question?
12　　　Q.   If I compare the two severance
13　entries on Exhibit 280B with 281B it's fair to
14　say the severance numbers have reduced,
15　correct?
16　　　A.   That is correct.
17　　　Q.   And my question is why.
18　　　A.   If you aggregate them I believe
19　the Schedule 280B, the amounts of severance
20　total $314 million.  On Schedule 281B they
21　total $265 million.  That's approximately a
22　$40 million difference.
23　　　　　Is that right?
24　　　　　$50 million difference.  Excuse
25　me.

1　　　P. EXALL - HIGHLY CONFIDENTIAL
2　　　　　MR. GREEN:  Forty-nine.
3　　　A.   $49 million.  Okay.
4　　　　　The reason for the movement --
5　there are two reasons in general.  One was a
6　pure error on the spreadsheet.  There were
7　amounts paid -- there were amounts of
8　severance that were paid to individuals that
9　were included both in the bonus including
10　social tax line and in the severance line.
11　That related to approximately $28 million that
12　if I refer back to 280B that $28 million was
13　reflected in the 261 and was reflected in the
14　1,529.
15　　　Q.   So you're just removing the double
16　counting.
17　　　A.   We removed the double count and
18　moved it to the second schedule which we
19　discovered for the reconciliation award.
20　　　Q.   Okay.
21　　　A.   The other reduction of the
22　additional, what? -- $21 million relates to a
23　full -- a more full reconciliation of the
24　severances yet to be paid.  As I mentioned
25　earlier, we were in the process of reconciling

1　　　P. EXALL - HIGHLY CONFIDENTIAL
2　what original severances were estimated to be
3　for individuals versus what was actually
4　processed and paid ultimately to those
5　individuals.
6　　　　　And in the cross-comparisons of
7　the original database to the payroll we
8　discovered that people had been estimated to
9　receive severances substantially in excess to
10　what they actually received.  So the
11　difference between A and B is a reduction as
12　you see reflected on the schedule.
13　　　Q.   Okay.  Is any of the difference
14　between these two schedules -- the severance
15　entries on these two schedules the result of
16　any kind of change in policy at Barclays as to
17　severance payments?
18　　　A.   Not at all.
19　　　Q.   Okay.  And who would I ask if I
20　really wanted specifics on that question?
21　That would be --
22　　　　　MR. GREEN:  On which question?
23　　　Q.   On just severance payments.
24　　　A.   On policy or specific severance
25　payments?

1　　　P. EXALL - HIGHLY CONFIDENTIAL
2　　　Q.   Both.
3　　　A.   On policy I think you could direct
4　both sets of questions through to Mr. Kerman.
5　　　Q.   Okay.
6　　　A.   Although he's not responsible for
7　payroll.  You know, he may or may not pass
8　that question on.
9　　　Q.   But when you get the lists from
10　HR, is he the person preparing those lists?
11　　　A.   No.  It would be -- it's prepared
12　by, you know, people within HR function.
13　　　Q.   Okay.
14　　　A.   He doesn't prepare them, no.
15　　　Q.   Well, does he supervise those who
16　prepare them?
17　　　A.   He's the head of employee
18　relations.  I don't know whether he
19　particularly supervised the preparation of
20　these databases.  He knows of their existence.
21　　　Q.   But am I correct -- I mean, as
22　you've described it, it seems to be -- the
23　difference in the two schedules appears to me
24　to be just reconciling accounting errors or
25　reconciliation type errors; is that right?

P. EXALL - HIGHLY CONFIDENTIAL

1
2     MR. GREEN:  Object to form.
3     A.   The errors -- well, the two items
4  represent a double count of particular
5  individuals.
6     Q.   Right.
7     A.   Which were clear errors in the
8  production of the original spreadsheet.  As
9  well as a further reconciliation as to
10  estimated severance amounts versus actual
11  payments to former Lehman Brothers employees.
12  The reconciliation effort is a -- you know,
13  was -- is a joint effort between HR and
14  finance professionals.
15     Q.   Okay.  Now, if we looked at your
16  spreadsheets over time which you said you
17  started preparing them in the fourth quarter
18  of '08, is it fair to assume that the
19  severance numbers would have increased over
20  time?
21     MR. GREEN:  Object to the form.
22     A.   I don't recall.
23     Q.   I mean, the more people leave, the
24  more gets paid out in severance and these
25  numbers increase, correct?

P. EXALL - HIGHLY CONFIDENTIAL

1
2     A.   I would be speculating.  It sounds
3  plausible but I can't answer directly.  I
4  don't have the previous schedules in front of
5  me.
6     Q.   Okay.  Well, my question is how do
7  you know that these severance payments are
8  made in respect of work they did at Lehman
9  when they've been working for Barclays for six
10  or eight months now?  Where's the cutoff?
11     MR. GREEN:  Object to the form.
12     A.   In general, severance payments are
13  based on previous service at an employer.  The
14  vast majority of any individual receiving a
15  severance, the vast majority of their previous
16  service would have been in respect of Lehman
17  Brothers, services rendered to Lehman
18  Brothers.
19     Q.   So in preparing this schedule
20  which is only supposed to reflect service or
21  costs associated with their service at Lehman,
22  you're assuming that the entire amount of
23  severance paid to these individuals is in
24  respect of their service at Lehman; is that
25  right?

P. EXALL - HIGHLY CONFIDENTIAL

1
2     A.   That is what I am assuming on the
3  schedule, correct.
4     Q.   And theoretically at some point
5  any severance payment they received should
6  also include a component that relates to their
7  work at Barclays, right?
8     MR. GREEN:  Object to the form.
9     A.   Just repeat that question, please.
10     Q.   Well, theoretically over time if
11  these folks worked for Barclays for a period
12  of time, a portion of their severance has to
13  be allocated to the work they did at Barclays
14  as opposed to Lehman, right?
15     A.   That would be correct.
16     Q.   Okay.  But you haven't made that
17  allocation in preparing this spreadsheet?
18     A.   I don't believe so.  I can't
19  answer for my -- I believe that these
20  represent amounts paid to individuals for
21  their pre-acquisition service.
22     Q.   Okay.  The next entry talks about
23  the payroll tax on equity compensation.
24     A.   Yes.
25     Q.   Could you explain to me what that

P. EXALL - HIGHLY CONFIDENTIAL

1
2  is?
3     A.   Those would be amounts due and
4  payable to relevant tax authorities once the
5  equity awards reflected on the schedule are
6  vested and become vested by the employees.
7     Q.   So is this the three-year cliff
8  vest you talked about?
9     A.   Yes.
10     Q.   So three years from now there will
11  be some kind of obligation to regulatory
12  authorities based on individuals' receipt of
13  their stock bonus?
14     A.   That's my understanding.
15     Q.   And the 1.79 percent what is that
16  based on?
17     A.   That's an estimate made by finance
18  based -- you'd have to ask them.  My
19  understanding is it's based on a blended rate
20  of tax which is standard practice across
21  Barclays Capital.
22     Q.   Okay.  And then what is that --
23  1.9 percent of what?
24     MR. GREEN:  1.79 percent you mean?
25     Q.   I'm sorry.  1.79 percent of what?

Page 126

P. EXALL - HIGHLY CONFIDENTIAL

1
2    A.    It relates to the $258 million
3 of -- in the equity column of bonuses
4 including social taxes.  I should point out
5 here if you do a calculation of 1.79 on the
6 258 you don't get 9.
7    Q.    Right.  That's my question.
8    A.    The difference is the growth in
9 the Barclays stock price subsequent to the
10 award being made.  The tax will be payable,
11 due and payable, based on the ultimate value
12 of those awards when the vest.  So that 9
13 could increase over time.
14    Q.    Well, so this 1.79 assumes a
15 growth in the value of the stock that's
16 vesting over that three-year period, right?
17    A.    The 1.79 is the blended -- my
18 understanding is that the 1.79 is the blended
19 rate applied to the equity award respect of
20 tax.
21    Q.    Right.
22    A.    You will notice that's being
23 increased by a multiple of 2 on the
24 spreadsheet.
25    Q.    Right.

Page 127

P. EXALL - HIGHLY CONFIDENTIAL

1
2    A.    The reflects the fact that between
3 the date of award of these stock -- these
4 amounts of stock and the date at which these
5 schedules were prepared, the stock price of
6 Barclays underpinning the value of these
7 awards had roughly doubled.
8    Q.    From when to when?  From
9 September --
10    A.    These stock awards were made in
11 May 2009.  And the schedule is done as you see
12 it with all these -- it is an estimate of a
13 liability that is due and payable at some
14 future time.  That liability may or may not be
15 $9 million.  It could be different.
16    Q.    Okay.  But at present you're
17 estimating it at 9 million.
18    A.    That's correct.
19    Q.    And that's assuming or it's based
20 on an increase in the value of the Barclays
21 stock which is the item that you multiple by
22 1.79.
23    A.    My calculation would be the $258
24 million multiplied by 1.79 percent times 2,
25 the 2 factor representing the growth of the

Page 128

P. EXALL - HIGHLY CONFIDENTIAL

1
2 Barclay stock price.
3    Q.    Okay.  And now this $9 million
4 doesn't get paid to former Lehman employees,
5 right?  It gets paid to regulatory authorities
6 around the globe?
7    A.    Yes.
8    Q.    The next entry talks about
9 acquisition buyout vesting over two years.
10       Do you see that?
11    A.    I do.
12    Q.    $53 million.  What is that meant
13 to encompass?
14    A.    As described here, it's a bonus
15 relating to pre-acquisition performance by an
16 individual or individuals that worked for
17 Lehman Brothers and now work for Barclays.
18 These are commitments that we assumed and
19 embodied in contracts in respect of this
20 individual or individuals to deliver this
21 $53 million over the next two years.
22    Q.    Now, let's turn back to Mr.
23 Lowitt's contract.
24    A.    Yeah.
25    Q.    Do you see the special cash award

Page 129

P. EXALL - HIGHLY CONFIDENTIAL

1
2 to be awarded over two years?
3    A.    I do.
4    Q.    Is that this 50 -- part of this
5 $53 million you're talking about?
6    A.    No.
7    Q.    Okay.  So I don't see any other
8 entries here that could be that.  You're
9 saying that he's not one of the recipients of
10 the $53 million that you're talking about
11 here?
12    A.    No, he is not.
13    Q.    Okay.  And who is getting that
14 money?
15       MR. GREEN:  You can go ahead and
16 answer.
17    A.    A gentleman by the name of Mr.
18 Jonathan Hoffman.
19    Q.    And who is he?
20    A.    He is a principal trader in the
21 global markets business at Barclays Capital.
22    Q.    And why is he getting this money?
23    A.    The amount was owed -- was due and
24 payable to him by Lehman Brothers under his
25 contract with Lehman Brothers pre-acquisition.

Page 130

P. EXALL - HIGHLY CONFIDENTIAL

1
2    Barclays assumed that liability as part of the
3    acquisition process and embodied these amounts
4    of that compensation amongst others in that
5    contract and those amounts are due and payable
6    to him over time as specified in that
7    contract.
8         Q.    Okay.  Now, this is all -- the
9    entire 53 million goes to this one individual?
10        A.    That is correct.
11        Q.    Over a three-year period?
12        A.    He receives two tranches of $20
13   million in February '10 and February '11.  And
14   the additional 13 will effectively be
15   delivered in February of 2010.
16        Q.    Okay.  When I -- just for
17   clarification when it says February '10 that
18   means February 2010?
19        A.    That's correct.
20        Q.    And February '11 means February
21   2011?
22        A.    That is correct.
23        Q.    And maybe you explained this but
24   is this -- what is this to reflect as far as
25   his performance at Lehman?

Page 131

P. EXALL - HIGHLY CONFIDENTIAL

1
2         A.    He was owed -- under his contract
3    with Lehman Brothers, that was the amount due
4    and payable to him -- well, that is not the
5    entire amount.  But that is the amount
6    included on this spreadsheet.  Well, the
7    entire amount is included on this spreadsheet.
8    There's another element sitting in bonus
9    including social taxes.  The 53 million
10   represents the amount outside of the bonus
11   including social taxes amount and is in
12   respect -- the entire amount is in respect of
13   the contract that he had at Lehman Brothers
14   which guaranteed him a payout on his trading
15   performance.  And the amount relates to the
16   trading performance he did, for want of a
17   better word, pre-acquisition.
18        Q.    Okay.  So this is a con -- he had
19   a contract with Lehman that provided him X
20   amount of compensation based on his trading
21   performance and this number is the amount due
22   and payable to him up to September 22nd, 2008
23   under that contract?
24            MR. GREEN:  Object to the form of
25   the question.

Page 132

P. EXALL - HIGHLY CONFIDENTIAL

1
2         A.    That's correct.
3            MR. GREEN:  Well, could we go off
4    the record for one second?  Because I
5    think the record is unclear.  Or I can
6    add a clarification.
7            MR. HINE:  You want to add a
8    clarification?
9            MR. GREEN:  But I don't want to
10   testify.
11           MR. HINE:  No, no.  You can take a
12   break.
13           MR. GREEN:  Take a short break.
14           (Recess taken.)
15           MR. HINE:  Let's go back on the
16   record.
17        A.    A clarification of the previous
18   question perhaps is relevant.  The amounts --
19   the amounts payable to Mr. Hoffman were
20   amounts that were due and payable to him under
21   the contract with Lehman Brothers.  And the
22   clarification is they had not as yet at that
23   time been paid to him at all.  They were just
24   due and payable to him.  He hadn't received
25   any of that compensation.

Page 133

P. EXALL - HIGHLY CONFIDENTIAL

1
2         Q.    So Barclays undertook that
3    obligation to pay him what he was owed by
4    Lehman.
5         A.    That is correct.
6         Q.    Okay.  But in your note here it
7    says bonus relating to performance for one
8    January to 22 September '08.
9            Do you see that?
10        A.    I do.
11        Q.    Then it says but with future time
12   served criteria and a portion linked to future
13   production.
14            What does that mean?
15        A.    I can't -- I'll give you my
16   general interpretation of the terms.  The
17   specific legal interpretation of the
18   forfeiture clauses I can't really speak to all
19   that.
20        Q.    Sure.
21        A.    The intention was to deliver two
22   payments or two tranches of $20 million in
23   each of February 2010 and February 2011.
24   Those payments could be reduced -- each
25   payment could be reduced by up to 10 million

Page 134

P. EXALL - HIGHLY CONFIDENTIAL

1
2  should Mr. Hoffman had made losses in his
3  trading for Barclays Capital post-acquisition.
4          So for all intents and purposes we
5  promised Mr. Hoffman to pay him $20 million.
6  10 million of that 20 -- of each of the 20
7  could be re -- that 20 million could be
8  reduced by up to 10 million should he have
9  made losses for Barclays Capital in the
10 performance period subsequent to the
11 acquisition.
12     Q.   So part of the 53 is based on his
13 performance at Barclays, right?
14         MR. GREEN:  Object to the form.
15     A.   No.  The entire fee is based on
16 his pre-acquisition performance.  The delivery
17 of the residual 53 is to an extent relative to
18 his trading performance at Barclays.
19     Q.   All right.  So am I correct to
20 say -- and how much is at issue with respect
21 to his performance at Barclays?  I thought you
22 said 10 million --
23     A.   10 million of each of the 20 --
24 again, you would need a lawyer to interpret
25 the contract.

Page 135

P. EXALL - HIGHLY CONFIDENTIAL

1
2     Q.   Sure.  Sure.
3     A.   I'm giving you a general
4  intention, and my interpretation personal and
5  it may or may not -- somebody may or may not
6  agree with that or not.  Ten of the 20 -- of
7  each 20 was subject to forfeiture depending on
8  the extent of Mr. Hoffman's loss -- trading
9  loss for Barclay in each of those years.  And
10 the $13 million is also subject to him having
11 made money for Barclays subsequent to his --
12     Q.   So am I correct to say that the 53
13 million is based on his pre-acquisition
14 performance at Lehman but Barclays'
15 willingness to assume that liability is in
16 part based on how well he performs at
17 Barclays?
18         MR. GREEN:  Object to the extent
19 it calls for a legal conclusion.
20     A.   Barclays assumed the entire
21 liability and has structured some terms and
22 conditions around the delivery of that
23 liability.
24     Q.   Well, but that's a modification to
25 the agreement he had at Lehman, right?

Page 136

P. EXALL - HIGHLY CONFIDENTIAL

1
2     A.   The two agreements are distinct
3  and separate.  They're two individual
4  contracts that stand alone.
5     Q.   Okay.  But Barclays assumes a
6  $53 million obligation based on his work prior
7  to the acquisition, right?
8     A.   That's correct.
9     Q.   But Barclays' willingness to pay
10 that is contingent on at least in substantial
11 part on how well he performs for Barclays
12 thereafter, correct?
13     A.   That is correct.  As well as Mr.
14 Hoffman being in employment with Barclays at
15 the time.
16     Q.   Okay.  So he has to stay an
17 employee at Barclays at least through the
18 third payment.
19     A.   I don't know that for certain.
20 Again, I can't interpret the specific leaving
21 clauses or termination clauses under his
22 agreement.  But in general that's -- you know,
23 I would say it's based on future time served
24 criteria as well trading performance.
25     Q.   Okay.  And so is there an

Page 137

P. EXALL - HIGHLY CONFIDENTIAL

1
2  individual agreement with this Mr. Hoffman?
3     A.   Yes, there is.
4     Q.   Okay.  And -- okay.  Is there
5  anything else in this entry of 53 million
6  other than the Mr. Hoffman deal?
7     A.   Nope.
8     Q.   Okay.  I had a follow-up question
9  on the -- you had previously talked about the
10 social tax and the payroll tax in certain of
11 these entries.  Do you remember that?
12     A.   Yes.
13     Q.   And I didn't understand whether
14 you're talking about -- when you have an entry
15 for one of those taxes, are you talking about
16 the withholding obligation of Barclays or
17 Barclays' own obligation to pay those
18 authorities?
19         I don't know if that's a clear
20 question but --
21     A.   No, it's not.
22         MR. GREEN:  Object to the form.
23     Q.   Barclays has an obligation to
24 withhold personal income tax as to certain
25 individuals, right?

Page 138

1    P. EXALL - HIGHLY CONFIDENTIAL
2      A.   Yes.
3      Q.   So when you have an entry in here
4  on payroll tax, for example, is that -- where
5  it says payroll tax on equity compensation, do
6  you remember that discussion?
7      A.   Yes.
8      Q.   Is that just a withholding tax or
9  is it an obligation of Barclays to pay the tax
10 authorities?
11         MR. GREEN:  Object to the form.
12     A.   I actually don't know the answer
13 to that.  It is a tax that's due and payable
14 to the regulatory authorities.  As to whom
15 that liability relates, I don't know.
16     Q.   Okay.  And would that be the same
17 answer with respect to the social tax up in
18 the bonus entry?
19     A.   Yes.
20     Q.   Okay.
21     A.   What I can say is that the
22 withholding taxes that you referred to that
23 are -- these are the gross amounts payable to
24 those individuals in terms of -- so if I refer
25 again back to Mr. Lowitt's contract, we've got

Page 139

1    P. EXALL - HIGHLY CONFIDENTIAL
2  to pay him a cash advance of $4.56 million.
3  That's a gross amount payable to him.  He in
4  his individual capacity has to pay income tax
5  which we will withhold in entirety.  The
6  entire 4.56 is embodied in the 1,271 cash
7  component effectively.
8      Q.   Okay.  And I don't think I asked
9  you this but if we go to that bonus entry with
10 social tax, do you see that?
11     A.   Yes.
12     Q.   The 1.529 billion.  Could you give
13 me a percentage -- how much of that is the
14 social tax portion and how much is the actual
15 bonus paid to that individual?
16         MR. GREEN:  Object to form.
17     Q.   Gross bonus paid to that
18 individual.
19     A.   I don't have the exact amount but
20 I would categorize it as not significant.
21     Q.   Can you ball park percentages?
22     A.   Crickey.
23         If I had to guess I'd say maybe
24 $50 million.
25     Q.   $50 million?  Okay.  And --

Page 140

1    P. EXALL - HIGHLY CONFIDENTIAL
2      A.   And the reason I say that -- and,
3  again, not being a payroll professional I
4  can't speak for every social tax that may or
5  may not be payable as part of a payroll.
6      Q.   Sure.
7      A.   But one of the --the only one is
8  the FICA taxes that are payable to the US tax
9  authorities in whichever form that may be.
10 That's -- I know is 1 point something percent.
11 It's a very small percentage.  So I'm basing
12 my estimate on that primarily.
13         I do not believe that that -- if I
14 was to look at that line and if you -- I would
15 categorize the social tax item as being not
16 significantly material.
17     Q.   Okay.  And there are documents
18 somewhere at Barclays that would specify how
19 much that social tax is with respect to those
20 bonuses?
21     A.   Yes.
22     Q.   Okay.  How about the payroll tax
23 on equity compensation?
24     A.   What's your question?
25     Q.   That's a separate entry so I don't

Page 141

1    P. EXALL - HIGHLY CONFIDENTIAL
2  need to ask that question.  I apologize.  I
3  misunderstood that.
4      A.   Okay.
5      Q.   Okay.  The payroll tax on
6  acquisition buyout, what is that?
7      A.   The $3 million reflected on the
8  schedule, I believe or I understand the
9  calculation to be similar to the one
10 referenced in the payroll tax and equity tax
11 line in compensation of $53 million shown
12 directly above it on the schedule.
13     Q.   So that relates only to Mr.
14 Hoffman's deal with Barclays?
15     A.   That's my understanding.
16     Q.   And that money doesn't get paid to
17 him; he gets paid to a regulatory
18 authority?
19     A.   That's my understanding.
20     Q.   Can we skip down to ISP awards.
21 Could you explain to me what that is?
22     A.   The acronym?
23     Q.   Yes.
24     A.   The ISP stands for incentive share
25 plan.  It is a stock award program -- it's the

P. EXALL - HIGHLY CONFIDENTIAL

1
2  name of the stock award program we have in
3  place at Barclays and which we will utilize to
4  make these relevant awards.
5      Q.   Is this a plan that was in place
6  at Lehman prior to the acquisition?
7      A.   This plan was not in place at
8  Lehman, no.  They had similar stock award
9  programs under their own compensation schemes.
10     Q.   Okay.  And so what is this
11 $56 million being paid for?
12     A.   Okay.  So these -- the $56 million
13 directly relates to the $258,000,000 further
14 up in the Equity column under Bonus Including
15 Social Taxes.
16         The sequence of events was as
17 follows.  Under normal Barclays policy stock
18 awards are made in March of every year.  So
19 under the normal practice Barclays would have
20 made stock awards to individuals in March of
21 2009 in respect of their 2008 annual bonuses.
22     Q.   Okay.
23     A.   The stock awards for various
24 reasons were made in May 2009.  The value of
25 the awards -- well, because of the unforeseen

P. EXALL - HIGHLY CONFIDENTIAL

1
2  and unanticipated delay in making the awards
3  to individuals, during that period the stock
4  price at Barclays appreciated substantially
5  and in effect individuals received an amount
6  of stock units of less than what they would
7  have received had the awards been made under
8  the normal process in March 2009 because of
9  the increase in the stock price.
10         The $56 million reflects
11 additional shares awarded to those -- to
12 former Lehman Brothers employees and the
13 awards were not exclusive to former Lehman
14 Brothers employees.  This just reflects the
15 component related to former Lehman Brothers
16 employees to compensate them for that loss of
17 value that they had suffered as a result of
18 the normal process not having been followed in
19 that particular year.
20     Q.   So just so I understand why --
21 what caused the delay in the award of the
22 bonus -- of the stock bonuses?
23     A.   I can't speak for the specific
24 reason why.  I know there was a delay.
25     Q.   Was it related to the

P. EXALL - HIGHLY CONFIDENTIAL

1
2  Barclays/Lehman acquisition?
3      A.   No.  Not to my knowledge.
4      Q.   Okay.  So this -- if I understand
5  you correctly, this $56 million only relates
6  to stock awards granted to former Lehman
7  employees, right?
8      A.   This $56 million dollars, yes.
9      Q.   All right.  And it's to compensate
10 them for the delay in awarding that award from
11 March until May.
12     A.   That's correct.
13     Q.   But aren't the Lehman Brothers
14 employees granted their award back in
15 September?
16     A.   They were given a value, a dollar
17 value of award.  When it comes to granting an
18 amount of stock units they get an amount of
19 stock units based on the prevailing share
20 price at the time of the award grant.
21         So they would have received --
22 I'll give you a hypothetical example.  An
23 individual would have had $100 worth of stock
24 of value that was to be delivered to him in
25 March of 2009.  Assume the stock price in

P. EXALL - HIGHLY CONFIDENTIAL

1
2  March 2009 was a dollar.  He would have got a
3  hundred shares.  Those awards were never made
4  in March.  What happened was they were made in
5  May.  In May let's assume for argument's sake
6  the stock was $2.  He would only have got 50
7  shares.  He got -- and he's lost the stock
8  price appreciation he would have got on the
9  hundred shares had he been awarded them three
10 months prior.
11         The $56 million is to compensate
12 him for that loss of value in the respect of
13 the fewer amounts of shares that he ultimately
14 received.
15     Q.   Okay.  So it's actually the --
16 it's the value of the appreciation of the
17 stock he would have received from March to
18 May.
19     A.   It's not the entire value.  It's
20 to compensate him for that loss of value.  I
21 don't believe that the entire value is
22 reflected in this number.  It was to
23 compensate him for an extent of that, yes.
24     Q.   Well, here's my question.  If he's
25 granted in September $100 worth of stock bonus

Page 146

P. EXALL - HIGHLY CONFIDENTIAL

1
2  he would have gotten a hundred shares in
3  March -- or he would have gotten a hundred
4  shares in March if the price was a dollar
5  using your hypothetical, right?  He would also
6  have gotten his hundred shares in May if he
7  gets 50 shares at $2.  Why --
8      MR. GREEN:  Object to the form.
9      Q.   Well, I'm trying to use your
10 hypothetical.
11     A.   My hypothetical is that he would
12 not have got the hundred shares in May.  He
13 would have only got 50 shares in May.
14     Q.   But it would be worth $2 at that
15 time.
16     A.   That's correct.  The value would
17 have been the same.  But he has lost that.
18 Rewind to March.  If he had been awarded the
19 shares in March he would have a hundred shares
20 worth a dollar.  Those shares by May would
21 have been worth 200 at the stock price of 2.
22     Q.   Okay.
23     A.   You're giving him only a hundred
24 of value in May.
25     Q.   Okay.

Page 147

P. EXALL - HIGHLY CONFIDENTIAL

1
2      A.   That's the difference.
3      Q.   I see.  So this is done not only
4  for the former Lehman employees.  It's also
5  done for all the other Barclays employees who
6  suffered this same type of loss, right?
7      A.   They were granted for the
8  majority -- for other Barclays Capital
9  employees that received stock awards at the
10 time for the most part, yes.
11     Q.   So this is not --
12     A.   This is a subset of a wider
13 population.
14     Q.   This program, this ISP award was
15 not granted to former Lehman employees.  It
16 was granted Barclays wide to those who
17 qualified, right?
18     A.   To my knowledge, it was not
19 granted Barclays wide.  It was Barclays
20 Capital wide.
21     Q.   Okay.
22     A.   I don't -- I can't testify as to
23 if it was that specific, but there were more
24 individuals concerned than this.  I cannot say
25 it was a Barclays wide policy.  I don't know

Page 148

P. EXALL - HIGHLY CONFIDENTIAL

1
2  that to be true.
3      Q.   But it's not a former Lehman
4  employees policy only.
5      A.   Not only, no.
6      Q.   Okay.  So then why is this
7  award -- how is this award related to the work
8  they performed at Lehman?  Because, I mean,
9  basically it's compensating them for a delay
10 in a stock payment while at Barclays.
11     MR. GREEN:  Object to the form.
12     A.   The amount of the award is derived
13 directly from the equity awards that would
14 have been made under the normal course of
15 business.  And insofar as they are related to
16 pre-acquisition service on behalf of Lehman
17 Brothers, these -- the value of these awards,
18 the economic cost of these awards relate to
19 that pre-acquisition service.  It relates to
20 the delivery of the stock component of
21 compensation in many cases embodied in
22 contracts such as Mr. Lowitt's here.  Had they
23 been awarded in the normal course of business
24 in March of 2009.
25     Q.   Okay.  But --

Page 149

P. EXALL - HIGHLY CONFIDENTIAL

1
2      A.   They all relate to the awards
3  embodied -- well, if I take Mr. Lowitt as an
4  example, any additional shares he would have
5  been awarded under that program relate to the
6  2008 EPP recommendations that embodied in his
7  contract and the value thereof.
8      Q.   I understand how they relate to
9  it.  But the award -- isn't it true that the
10 award itself of the ISP is to compensate them
11 for mistakes or whatever problems occurred at
12 Barclays that caused this delay from March to
13 May, right?
14     MR. GREEN:  Object to the form.
15     A.   I can say that the $56 million has
16 nothing to do with post-acquisition service of
17 Barclays PLC.  It has everything to do with
18 the services that they provided
19 pre-acquisition to Lehman Brothers.
20     Q.   I'm not sure you've answered my
21 question.  I understand that the 258 million
22 comes from their pre-acquisition services.
23 But this additional 56 million, isn't it the
24 case, is paid to them because of some mistakes
25 or whatever happened at Barclays that caused

Page 150

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   this delay in awarding the bonus, right?
 3            MR. GREEN:  Object to the form.
 4       A.   It directly relates to the $258
 5   million insofar as the $56 million is derived
 6   specifically from the $258 million reflected
 7   on the schedule.
 8       Q.   All right.  I understand how it's
 9   derived from the 258 million and I understand
10   how the 258 million is derived from their
11   pre-acquisition work.  But the 56 million is
12   not compensation for pre-acquisition work.
13            MR. GREEN:  Asked and answered.
14   Bill, I think you've asked this question
15   three times and he's given you his
16   answer.
17            MR. HINE:  Well, I'm getting what
18   seems to be an evasive answer.
19            MR. GREEN:  No.  He's given you an
20   answer and it's an entirely appropriate
21   answer and there's no reason to ask it
22   until you get the answer you want.
23            MR. HINE:  All right.  I just want
24   an answer to the last one I asked.
25            MR. GREEN:  Could you repeat the
```

Page 151

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   question?
 3            (Record read.)
 4       Q.   Is that right?
 5       A.   No.  In my personal opinion it is
 6   not.  The $56 million would have been
 7   valued -- would have accrued to these
 8   individuals had they received their stock
 9   awards under the normal course of business.
10   It was directly compensation related to
11   pre-acquisition services in relation to Lehman
12   Brothers as derived from the shares that they
13   would have got had the normal course of
14   business been followed.
15       Q.   Okay.  Now, the payroll tax on
16   those awards, what is that?
17       A.   The calculation of those again is
18   an accounting -- is an estimate similar to the
19   one reflected previously on the schedule
20   entitled Payroll Tax on Equity Compensation.
21       Q.   So same method of estimating only
22   now you're estimating it based on 56 million?
23       A.   That's correct.
24       Q.   Okay.  Back to the 56 million for
25   a second.  It says here Additional shares
```

Page 152

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   awarded at 25P.  What does that P mean?
 3       A.   Pence.  English pence.  English
 4   pounds.
 5       Q.   So is that the equivalent of
 6   25 percent?
 7       A.   Yes.  25 cents on the dollar.
 8       Q.   Okay.  So 25 cents on the dollar
 9   as measured against the value of a Barclays
10   share from March to May?
11       A.   No.  That's not correct.  So if
12   you related back to the 258 it's roughly a
13   quarter.
14       Q.   Oh, I gottcha.  25 cents on the
15   dollar as compared to the 258 million.
16       A.   That would be correct.
17       Q.   Okay.  And 25 cents is not total
18   compensation for the value increase in
19   Barclays' share but it's a portion of the --
20   it's based on the -- as a portion of the
21   increase in Barclays' share price from March
22   to May?
23            MR. GREEN:  Object to form.
24       A.   I don't recall the loss of value
25   or the notional loss of value.  I don't recall
```

Page 153

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   the exact amounts.  I don't believe it's an
 3   exact lack-for-lack replacement.  I can't
 4   speak to whether it was more or less but I
 5   believe it was less.
 6       Q.   Okay.  Substantially less or
 7   just --
 8       A.   I don't recall.
 9       Q.   Okay.  But if I wanted to find
10   that out I would take the share price from
11   Barclays in March and compare it to May?
12       A.   You would think so.  That's not
13   practically how things work.  The stock awards
14   at any point in time are generally based on an
15   average stock price calculated over a number
16   of days in which stock would have been
17   purchased in the market to hedge the awards.
18            So there is a process underpinning
19   it.  There is some math -- there is
20   mathematical calculations behind all this that
21   had been produced.  But you can't simply just
22   take a spot price at a point in time.
23       Q.   I gottcha.
24            Now, if I look at the bottom line
25   it says Total Spend.  Do you see that?
```

Page 154

1    P. EXALL - HIGHLY CONFIDENTIAL
2       A.   I do.
3       Q.   That is -- that's not what
4    Barclays has spent to date, correct?  Because
5    that includes future payment.
6       MR. GREEN:  Object to the form.
7       A.   Not all those cash payments have
8    been made, no.
9       Q.   Okay.  In other words, if I wanted
10   to know the total amount that has been paid to
11   date, I would look up to the $1.543 billion
12   number?
13      A.   On this schedule that would be
14   correct.  I would suspect that on further
15   reconciliation some of the 27 million
16   reflected as severance under the payable in
17   the future may well flip up into the previous
18   category.
19      Q.   Okay.
20      A.   And obviously as time moves on
21   other amounts will.
22      Q.   Well, in the course of working on
23   the compensation for these former Lehman
24   employees were you aware that there's a
25   provision in the APA that required them to be

Page 155

1    P. EXALL - HIGHLY CONFIDENTIAL
2    paid by March 15th of 2009?
3       MR. GREEN:  Object to the form.
4       A.   I've seen the date March 15th,
5    2009.  I'm unsure as to what that obligates
6    Barclays to do or what it doesn't obligate
7    Barclays to do.
8       Q.   Okay.  So, in other words, the
9    March 15th, 2009 date is not something you've
10   been shooting to comply with in the course of
11   compensating these employees?
12      MR. GREEN:  Object to the form of
13   the question.  Are you speaking to him
14   personally?
15      MR. HINE:  Well, he's not paying
16   them.  Barclays is paying them.
17      MR. GREEN:  Okay.  So --
18      Q.   Is the March 15th, 2009 date
19   something that Barclays has taken into
20   consideration when it's paid these employees
21   these various forms of compensation?
22      MR. GREEN:  Object to the form.
23   You may answer if you know.
24      A.   I don't know specifically whether
25   we've taken -- it's a date that we know of.

Page 156

1    P. EXALL - HIGHLY CONFIDENTIAL
2    But I can't answer for the specific wording of
3    your question when you refer to paid.  Can you
4    rephrase that perhaps in some different way?
5       Q.   Yeah, let's try this.  You see the
6    entry for bonuses, bonus including social tax?
7       A.   Excuse me.  Oh, sorry.  On the
8    schedule?
9       Q.   On the spreadsheet.
10      A.   Yes.
11      Q.   Was that all paid or committed by
12   March 19th, 2009?
13      A.   The cash amounts -- certainly I
14   would say the vast majority if not all, but
15   there's always an exception.  People sometimes
16   don't want to be paid at a particular point in
17   time.  Those cash amounts would in the
18   majority have been paid and discharged by that
19   time.
20      Q.   Okay.
21      A.   The equity awards, again, I've
22   explained to you the delay in the award of
23   value -- the award of the amount of shares.
24   But I believe that at the time of bonus there
25   were compensation communications for employees

Page 157

1    P. EXALL - HIGHLY CONFIDENTIAL
2    they would have been aware of the value of
3    that stock.
4       Q.   Okay.
5       A.   As opposed to the amount of units
6    they would receive.  But, again, I'm not
7    specific on the date.
8       Q.   And the delay you talked about was
9    the one you previously mentioned from March to
10   May?
11      A.   That's correct.  In terms of the
12   equity awards, yes.
13      Q.   Any other entries on this
14   spreadsheet that were made before March 15th
15   2008 -- 2009?
16      A.   March 15th?  Sorry?  Could you
17   say that again?  Sorry.  I missed the
18   question.
19      Q.   Were any other entries on this
20   spreadsheet paid before March 15th, 2009?
21      MR. GREEN:  Objection to form.
22   You may answer if you know.
23      A.   Yes.  There were entries on the
24   spreadsheet prior to March 15th, 2009.
25      Q.   Like what?

Page 158

P. EXALL - HIGHLY CONFIDENTIAL

1  
2      A.    An example would have been
3  severance payments made to individuals
4  terminated under the RIF, reduction in force
5  program in Q4 2008 and Q1 2009 as one example.
6      Q.    Okay.  Any others?
7      A.    There are likely to be some bonus
8  advances that were made to particular
9  individuals that are included in the 1,271
10 number which is bonus to clean social taxes.
11 They may well have been paid prior to the 15th
12 of March 2009.
13     Q.    Okay.  Any others?
14     A.    Off the -- obviously, the pre-22/9
15 payroll items would have been discharged and
16 paid prior to the 15th of March 2009.
17     Q.    Why?  When were they paid?
18     A.    Well, as I've said to you 5
19 million of the $12 million relate to payrolls
20 that had to be made in September of 2008.
21     Q.    So they were paid in September
22 2008.
23     A.    That's my understanding.
24     Q.    Okay.  And the ex-pat regulatory
25 sum of $7 million, that was --

Page 159

P. EXALL - HIGHLY CONFIDENTIAL

1  
2      A.    I don't know exactly when that was
3  paid.
4      Q.    Okay.  Could you turn to the APA
5  again.  Section 9.1(c).
6      A.    (Witness complies.)
7      Q.    And I know you're not a lawyer and
8  I'm not trying to trip you up here but if you
9  refer to the section where it says -- do you
10 see the sentence about a third of the way down
11 the paragraph that starts, "Any amounts that
12 would have been allocated in respect of any
13 transferred employee who voluntarily
14 terminates employment before such award is
15 made shall instead be allocated among the
16 remaining transferred employees."
17     Do you see that?
18     A.    I do.
19     Q.    Did that ever happen?
20     MR. GREEN:  Objection to form.
21 You can answer if you know.
22     A.    I don't know.  Did what ever
23 happen?
24     Q.    Well, did someone who was supposed
25 to get a bonus, for example, and voluntarily

Page 160

P. EXALL - HIGHLY CONFIDENTIAL

1  
2  terminated did the bonus that he was supposed
3  to get thrown back in and get distributed
4  among the remaining transferred employees?
5      A.    I don't know.  I mean, there were
6  people that resigned.
7      Q.    Yeah.
8      A.    And they got nothing as they left.
9      Q.    Okay.  Let me give you a specific
10 question then.
11     MR. HINE:  Let's mark this.
12     (Deposition Exhibit 282B, document
13 bearing production numbers
14 BCI-EX-00113161 through BCI-EX-00113163,
15 marked for identification as of this
16 date.)
17 BY MR. HINE:
18     Q.    Mr. Exall, I'm handing you a copy
19 of an exhibit marked 282B which appears to be
20 a form of employment contract offered to Mr.
21 McDade dated December 18th, 2008.  It has
22 Bates stamps BCI-EX 00113161 through -63.
23     My first question is have you ever
24 seen this document before?
25     A.    I may have seen it.  I don't

Page 161

P. EXALL - HIGHLY CONFIDENTIAL

1  
2  recall.
3      Q.    Do you know if Mr. McDade signed
4  this employment contract with Barclays?
5      A.    No, I don't.
6      Q.    You don't know?
7      A.    I don't know.
8      Q.    Okay.  Just as an aside, do you
9  see the date is September 18th, 2008?
10     A.    I do.
11     Q.    Which is prior to the September
12 22nd closing.
13     Do you know how many Barclays
14 employees were offered employment contracts
15 before the closing?
16     A.    Before the 22nd of September?
17     Q.    Yeah.
18     A.    No.  I don't know.
19     Q.    Do you know how I could find that
20 out?  Would Mr. Evans know that?
21     A.    He wouldn't know off the top of
22 his head.  I guess it's a request you could
23 make.  And it could be found out.  It's
24 possible.
25     Q.    Okay.

Page 162

P. EXALL - HIGHLY CONFIDENTIAL

1
2     A.   We could count contracts.
3     Q.   Do you know if there was any
4  effort to offer employment terms to the --
5  what I've seen called as the Elite 8 or the
6  top eight people at Barclays prior to the
7  closing?
8           MR. GREEN:  Object to the form of
9  the question.  When you say closing what
10  date are you referring to?
11          MR. HINE:  I'm talking about
12  September 22nd, 2008.
13    A.   Sorry.  Could you repeat the
14  question?
15    Q.   Are you aware of any efforts to
16  offer employment or to discuss the terms of
17  employment with former Lehman executives prior
18  to September 22nd?
19    A.   I have no direct knowledge.  I
20  wasn't involved in any negotiations with any
21  of these employees.
22    Q.   Okay.  Have you heard anything
23  about that?
24    A.   I don't recall.
25    Q.   Do you have any understanding

Page 163

P. EXALL - HIGHLY CONFIDENTIAL

1
2  about former Lehman executives who signed
3  employment contracts with Barclays prior to
4  September 22nd, 2008?
5     A.   Do I have any what?  Sorry.
6     Q.   Understanding.
7     A.   What does that mean?
8     Q.   Well, do you have any knowledge
9  that, for example, Mr. Lowitt signed his
10  contract before the closing?
11    A.   I've never examined the contracts
12  in that respect, no.
13    Q.   Well, I didn't ask you if you
14  examined the contracts.  Do you have any
15  understanding about whether any of the senior
16  executives at Lehman were signed up by
17  Barclays before the closing?
18    A.   I don't know.
19    Q.   Okay.  Back to Mr. McDade's --
20    A.   Okay.
21    Q.   Whether he signed it or not I'm
22  not really sure, but my question is you'll see
23  in this document it refers to a cash bonus of
24  2008, right?  A 2008 EPP recommendation.
25       Do you see that?

Page 164

P. EXALL - HIGHLY CONFIDENTIAL

1
2     A.   I see that.
3     Q.   Do you see the special cash award?
4     A.   I do.
5     Q.   Now, did Mr. McDade -- Mr. McDade
6  resigned, correct?
7     A.   I don't know how -- I don't know
8  the circumstances around Mr. McDade's joining
9  or not or leaving or not from Barclays.
10    Q.   You don't know whether he was
11  terminated for cause or without cause.
12    A.   I have no knowledge of his
13  arrangements, no.
14    Q.   Okay.  Do you have any knowledge
15  of any individual that was supposed to be
16  offered awards like this who then left and my
17  question is what happened to that award money?
18          MR. GREEN:  Object to the form.
19    A.   I don't understand the question.
20    Q.   Well, if you look back at 9.1(c)
21  it purports to say -- it appears to say that
22  their award money should go back into the pool
23  and be shared among the all the transferred
24  employees and my question is did that in fact
25  ever happen?

Page 165

P. EXALL - HIGHLY CONFIDENTIAL

1
2           MR. GREEN:  Objection to form.
3  Calls for a legal conclusion.
4     A.   I don't know what Section 9.1(c)
5  obligates Barclays to do so I can't answer
6  that question.
7     Q.   Okay.  You don't know one way or
8  the other?
9     A.   I don't have an opinion on that.
10    Q.   Okay.  If you skip down further in
11  that paragraph, 9.1(c), you'll see it starts
12  with the word "however" and then from there to
13  the end of the paragraph it talks about a
14  circumstance where perhaps more than
15  10 percent of the transferred employees
16  voluntarily terminate.
17       Do you see that?
18    A.   I do.
19    Q.   Am I safe to assume that that did
20  not happen in connection with the
21  Barclays/Lehman transaction?
22          MR. GREEN:  I just want to caution
23  the witness to read the exact language
24  you're referring to.
25    Q.   It says, "However, the accrued '08

Page 166

P. EXALL - HIGHLY CONFIDENTIAL

1  P. EXALL - HIGHLY CONFIDENTIAL
2  FY liability shall be reduced if..."
3          MR. GREEN:  All the way to the end
4  of the paragraph?
5          MR. HINE:  Yes.
6          MR. GREEN:  Okay.  Take your time
7  to read that.
8      Q.   Take your time to read that but my
9  question is did that ever happen or are you
10 aware of that clause ever being invoked or
11 that many people ever left.  So just take your
12 time to read it.
13         MR. GREEN:  Object to the form
14 before he answers the question.
15         (Document review.)
16     A.   I can't speak for the obligations
17 that this places upon Barclays.  I don't know
18 what those are.  I can't interpret it.
19         Perhaps I can answer in a
20 different way.  I don't know what it means by
21 voluntarily terminated.  That would be my
22 question.  I don't know what exactly you're
23 asking me to answer.
24     Q.   Well, I understand you're not a
25 lawyer and I'm not trying to ask for any legal

Page 167

1  P. EXALL - HIGHLY CONFIDENTIAL
2  interpretation.  Is it correct to say that in
3  the course of your employment in your present
4  position you haven't heard anyone say, Oh,
5  more than 10 percent of the people left, we
6  should reduce the bonus pool?
7          MR. GREEN:  Object to form.
8      Q.   Or words to that effect?
9      A.   No one has said that to me, no.
10     Q.   Okay.  Did you understand that
11 anyone was ever considering that?
12     A.   My understanding is that this is a
13 clause in the APA and people are aware of it
14 and relevant people know what that means.  It
15 is a consideration.  It has been considered.
16 I do know that.
17     Q.   But did more than 10 percent of
18 the employees voluntarily terminate?
19         MR. GREEN:  Object to form.
20     A.   I can't answer -- I can't give you
21 a factual answer because I don't know the
22 extent to which -- I don't know what you're
23 defining as voluntary termination.  Perhaps
24 that means resignation.  I don't know what
25 this actually refers to.  I've never heard

Page 168

1  P. EXALL - HIGHLY CONFIDENTIAL
2  someone -- I've never personally heard someone
3  say that the section of the clause would
4  apply.
5      Q.   Okay.  And you don't have -- in
6  your experience working in the compensation
7  field you don't have an understanding of what
8  voluntarily terminate means?
9      A.   If you're asking for what I
10 understand by voluntarily termination I can
11 give you my view, my personal view, and that
12 may be different than the interpretation of
13 the APA or the position taken by Barclays.
14         My view is that that refers to
15 voluntary resignations by former Lehman
16 Brothers employees that decided
17 post-acquisition that they no longer wanted to
18 be employed by Barclays Capital and hence
19 resigned.
20     Q.   Okay.  And in your view did more
21 than 10 percent of the transferred employees
22 do that?
23     A.   I would like to -- well, I don't
24 know the exact number or the exact proportion.
25 I would -- I'd leave it at that.  I don't know

Page 169

1  P. EXALL - HIGHLY CONFIDENTIAL
2  the exact number or exact proportion but --
3  leave it at that.
4      Q.   Is it your sense that more than
5  10 percent have resigned?
6          MR. GREEN:  Object.  Calls for
7  speculation.
8      A.   If you want me to speculate I
9  will.  I will speculate that not more than
10 10 percent had voluntarily resigned under
11 these -- post-acquisition.
12     Q.   Okay.  Fair enough.  Thank you.
13     A.   I mean there would be other points
14 in time.  That's not to say that in the future
15 that if you aggregated it all up --
16     Q.   Sure.
17     A.   Right?
18     Q.   But you're speaking as of today.
19     A.   I'm speaking as of today.  To the
20 best of my knowledge, yes.
21         MR. GREEN:  Speculating as of
22 today, I might add.
23     A.   Speculating as of today, that's
24 correct.
25         MR. GREEN:  To the best of your --

Page 170

1   P. EXALL - HIGHLY CONFIDENTIAL
2       A.   To the best of my speculation.
3       Q.   Is it fair to say you don't have
4   any personal knowledge or understanding about
5   the circumstances of Mr. McDade leaving?
6       A.   No direct knowledge, no.
7       Q.   Do you have any indirect
8   knowledge?
9       A.   I don't know how or under what
10  circumstances he left, no.
11      Q.   Do you know how or under what
12  circumstances he received any compensation
13  from Barclays?
14      A.   I don't believe he received any
15  compensation from Barclays.  I don't know that
16  for fact.  But that is my general
17  understanding.
18      Q.   Okay.  Well let me introduce this
19  as an exhibit and maybe it will prompt a
20  further question.
21          (Deposition Exhibit 283B, document
22      bearing production number
23      BCI-EX-00113194, marked for
24      identification as of this date.)
25

Page 171

1       P. EXALL - HIGHLY CONFIDENTIAL
2   BY MR. HINE:
3       Q.   Mr. Exall, I'm handing you a copy
4   of a document marked as Exhibit 283B which
5   appears to be a W-2 statement in connection
6   with -- issued by Barclays to Mr. McDade and
7   my only question is whether this provides any
8   assistance to you in trying to figure out
9   whether Barclays paid Mr. McDade anything.
10          MR. GREEN:  Object to the form of
11      the question.  The document speaks for
12      itself.
13          MR. HINE:  Okay.
14          MR. GREEN:  Are you asking does it
15      refresh his recollection?
16          MR. HINE:  Yes.
17      A.   I've never seen this document.
18      Q.   Do you know why Mr. McDade was
19  paid anything if at all by Barclays?
20      A.   I have no idea.  As I've said
21  before, I have no knowledge of his
22  arrangements.
23      Q.   Fair enough.
24          (Deposition Exhibit 284B, document
25      bearing production numbers

Page 172

1       P. EXALL - HIGHLY CONFIDENTIAL
2       BCI-EX-(S)00027190 through
3       BCI-EX-(S)00027197, marked for
4       identification as of this date.)
5   BY MR. HINE:
6       Q.   Mr. Exall, I've handed you a copy
7   of a document marked as Exhibit 284B which is
8   an e-mail dated September 23rd and the
9   attachment thereto is Bates stamped
10  BCI-EX-00027719 through -197.  And my first
11  question after you've had a chance to review
12  it is have you ever seen this document before.
13      A.   Yes, I have this.
14      Q.   Could you explain to me what this
15  is?
16      A.   As explained on the front page, an
17  e-mail from Mr. Evans.  It represents an
18  update of our present bonus and related spend
19  in respect of the commitments we have made to
20  former Lehman employees as part of the
21  acquisition.
22      Q.   All right.  So I see several
23  iterations of this.  Is this a periodically
24  prepared analysis?
25      A.   Yes.  This was a set of

Page 173

1       P. EXALL - HIGHLY CONFIDENTIAL
2   analysis -- or this was an analysis prepared
3   daily for the purposes of the Executive
4   Committee of Barclays Capital for a certain
5   period following the acquisition.
6       Q.   Is it still prepared daily?
7       A.   No.
8       Q.   So this is -- immediately
9   following the acquisition this is a daily
10  summary?
11      A.   That's correct.
12      Q.   And how long did those summaries
13  go?  Do you know?
14      A.   I don't --
15          MR. GREEN:  Object to the form.
16      A.   I don't recall when we ceased
17  producing them.  I can't recall.
18      Q.   Who prepared these?
19      A.   I prepared the original one
20  personally drawing on work done by several HR
21  colleagues.  Thereafter individuals in my team
22  prepared the document and distributed it to
23  Mr. Evans for distribution.
24      Q.   Okay.  So do you have any way of
25  knowing whether you prepared this particular

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4

   -------------------------X

5

   In Re:

6                              Chapter 11

7   LEHMAN BROTHERS          Case No. 08-13555(JMP)

    HOLDINGS, INC., et al.,    (Jointly Administered)

8

9


            Debtors.

10  -------------------------X

11

12            VIDEOTAPED DEPOSITION

13                   OF

14            MICHAEL A. FAZIO

15            New York, New York

16         Friday, February 12, 2010

17

18

19

20

21

22

23

24  Reported by:

    ANNETTE ARLEQUIN, CCR, RPR

25  JOB NO. 27497

Confidential

Page 6

```
1                  M. Fazio
2         THE VIDEOGRAPHER: This is the start
3    of tape labeled No. 1 of the videotaped
4    deposition of Michael Fazio in the matter
5    In Re Lehman.
6         This deposition is being held at 575
7    Lexington Avenue, New York, New York on
8    February 12th, 2010 at approximately 9:31
9    a.m.
10        My name is Carlos Lopez from TSG
11   Reporting, Inc. and I am the legal video
12   specialist.
13        The court reporter is Annette
14   Arlequin in association with TSG Reporting.
15   Will counsel please introduce
16   yourselves for the record.
17        MR. STERN:  Sure.
18        Jack Stern from Boies Schiller &
19   Flexner for Barclays Capital, and with me
20   today is Michelle Sekowski.
21        MS. SCHAFFER:  Tracy Schaffer from
22   Jones Day representing LBHI.
23        MR. MILLS:  Carl Mills from Hughes,
24   Hubbard & Reed representing James W.
25   Giddens, SIPA Trustee.
```

Page 7

```
1                  M. Fazio
2         MS. TAGGART:  Erica Taggart with
3    Quinn, Emanuel, Urquhart, Oliver & Hedges
4    for the Committee and also the witness, and
5    I'm here with Tyler Whitmer.
6         THE VIDEOGRAPHER:  Will the court
7    reporter please swear in the witness.
8              *        *        *
9    M I C H A E L   A.   F A Z I O,  called as a
10      witness, having been duly sworn by a
11      Notary Public, was examined and testified
12      as follows:
13   EXAMINATION BY
14   MR. STERN:
15        Q.   Good morning, Mr. Fazio.
16        A.   Good morning.
17        Q.   What is your current position at
18   Houlihan?
19        A.   I'm managing director at Houlihan &
20   Lokey.
21        Q.   And was that your position in
22   September of 2008?
23        A.   That was.
24        Q.   In September 2008 did you attend the
25   hearing in the Lehman Brothers bankruptcy case
```

Page 8

```
1                  M. Fazio
2    to approve the sale transaction involving
3    Barclays and Lehman.
4         A.   Can you be more specific on what
5    date?
6         Q.   That was a hearing on September 19th,
7    which was a Friday.
8         A.   Yes, I was there.
9         Q.   When you arrived at the courthouse,
10   did you have any discussions with anyone from
11   Lehman or Barclays?
12        A.   Generally, no.  It would have been
13   more discussions with the Houlihan people and
14   Milbank people at the time.
15        Q.   Do you recall that during the course
16   of that hearing there was a recess in the
17   proceeding?
18        A.   Yes.
19        Q.   Did you participate in that recess?
20        MS. TAGGART:  Object to form.
21        A.   I don't know what you mean in terms
22   of participate.
23        Q.   Let me ask you, what did you do
24   during that recess?
25        A.   I was with my partner and we would,
```

Page 9

```
1                  M. Fazio
2    you know, I'd overhear some parts of
3    conversations, but I was not an active
4    participant in any of those conversations with
5    various people from the estate, Barclays or
6    whoever was participating.
7         Q.   Which partner are you referring to?
8         A.   It would have been the estate and
9    Barclays and -- the estate being Weil, Gotshal.
10        Q.   You said you were with your partner.
11        A.   That's correct.
12        Q.   Who was that?
13        A.   Saul Burian.
14        Q.   And what do you recall was said by
15   representatives of the estate during that
16   recess?
17        A.   I was not an active participant and
18   could barely overhear.  There were big crowds of
19   people that were gathered around, so I was on
20   the outskirts so I don't have an active
21   recollection of exactly what was said and who
22   was saying what to whom.
23        MR. STERN:  Let's mark as
24   Exhibit 618A, a one-page document.
25        (Deposition Exhibit 618A, Email dated
```

Page 10

M. Fazio

1      M. Fazio
2      9/18/08 from Fazio to Geer, Bates stamped
3      HLHZ0016316, marked for identification, as
4      of this date.)
5   BY MR. STERN:
6      Q.    Mr. Fazio, I've put in front of you a
7   document that we've marked as Exhibit 618A.
8      Can you tell me what this is?
9      A.    It's an email from myself to Brad
10  Geer asking him to listen to the Barclays
11  investor call or have somebody listen to the
12  investor call.
13     Q.    And why did you write this email?
14     A.    I was -- I had understood that there
15  was an investor call that Barclays was having
16  and I wanted to see if we could get additional
17  information with respect to the transaction.
18     Q.    Had you listened to that call?
19     A.    No, I have not.
20     Q.    And at the time you wrote this email,
21  you had not listened to it.
22     A.    That's correct.
23     Q.    How did you learn of that call?
24     A.    I do not know, recall, how I learned
25  of the call.

Page 11

M. Fazio

1      M. Fazio
2      Q.    Do you know if Mr. Geer did in fact
3   listen to that call?
4      A.    I do not recall.
5      Q.    Did you ever get a report from him
6   concerning that call?
7      A.    No.
8      Q.    Do you recall getting a report from
9   anyone concerning the substance of that call?
10     A.    No, I do not.
11     Q.    After the September 19th hearing that
12  we just referred to, what was your next
13  involvement in connection with the
14  Barclays/Lehman sale transaction?
15     A.    I attended two full days of
16  discussion on the 20th and 21st, or yeah, that's
17  Saturday and a Sunday, that's correct.
18     Q.    And what were your primary areas of
19  activity over that weekend, you personally?
20     A.    To understand the transaction as best
21  we could, to get information with respect to the
22  transaction and the securities that were being
23  transferred and the liabilities being assumed as
24  part of the transaction.
25     Q.    What work did you do over that

Page 12

M. Fazio

1      M. Fazio
2   weekend to understand the securities being
3   transferred?
4      MS. TAGGART:  Objection.  Calling for
5   potential privilege or work product
6   information.
7      You can describe generally the
8   activities, but I caution you not to go
9   into any internal Houlihan, if there's any,
10  projects or analysis at this time.
11     THE WITNESS:  Okay.
12  A.    Can you restate the question?
13     MR. STERN:  Do you want to reread it?
14     (Question was read back as follows:
15     "QUESTION:  What work did you do over
16  that weekend to understand the securities
17  being transferred?")
18     A.    We had meetings with the debtors and
19  we had a meeting with representatives from
20  Barclays associated on the 20th and 21st
21  meetings that we had to understand that.
22     Q.    Did you review any written material
23  concerning the securities?
24     A.    I was generally involved in projects
25  at Houlihan to understand or attempt to

Page 13

M. Fazio

1      M. Fazio
2   understand the securities being transferred,
3   yes.
4      Q.    What types of written material were
5   you given?
6      MS. TAGGART:  Objection and could
7   call for privileged information.
8      I'd ask you not to reveal any, if
9   there are any, written documents that were
10  generated by Houlihan, but you should
11  answer if you were given any documents by
12  anyone such -- beyond Houlihan or your
13  lawyers, including from Lehman or Barclays
14  or any of their representatives.
15     A.    I was given no information from
16  the -- from Barclays or from Lehman with respect
17  to the transaction.
18     Q.    You were given no written information
19  concerning the securities?
20     A.    That's correct.
21     Q.    Is it your recollection that you were
22  not provided a spreadsheet of securities being
23  transferred in connection with the transaction?
24     A.    Again, not from anybody, from
25  Barclays or the estate.

Page 14

```
 1                M. Fazio
 2       Q.   Did you receive spreadsheets from any
 3  other source?
 4            MS. TAGGART:  It's okay.  You can
 5       answer.
 6       A.   I would have received information
 7  from our lawyers with respect to securities
 8  which represent securities that were indicated
 9  to us being a detail of securities from earlier
10  in the week that were thought to being
11  transferred.
12       Q.   What did you do to analyze that
13  information?
14            MS. TAGGART:  I'm going to object to
15       the extent it calls for any internal
16       Houlihan analysis.
17            But you can describe either any
18       general tasks that you did or any
19       correspondence with anyone outside of
20       Houlihan or your attorneys.
21       A.   We had correspondence with Jim Seery,
22  with Mr. Klein, who was Barclays' investment
23  banker, with respect to the securities being
24  transferred on that, on the Friday.  It was
25  Saturday and Sunday.
```

Page 15

```
 1                M. Fazio
 2       Q.   When you say "correspondence," do you
 3  mean face-to-face meetings?
 4       A.   That's correct.
 5       Q.   Aside from discussions concerning the
 6  securities, did you do any independent analysis
 7  of the composition of those securities?
 8            MS. TAGGART:  I'm going to object on
 9       attorney-client and work product privilege.
10            If you did any analysis that you
11       shared with anyone other than Houlihan and
12       your attorneys, you should go ahead and
13       answer, otherwise I'd instruct you not to
14       answer any analysis that was internal
15       Houlihan or correspondence with your
16       attorneys.
17       A.   I did internal analysis.
18       Q.   Did you draw any conclusions as a
19  result of that analysis concerning the value of
20  the securities you reviewed?
21            MS. TAGGART:  You can -- hold on.
22       I'm going to object on
23       attorney-client and work product privilege
24       and instruct you not to answer.
25  BY MR. STERN:
```

Page 16

```
 1                M. Fazio
 2       Q.   I show you next a document that we
 3  previously marked as Exhibit 461B.
 4            Looking at Exhibit 461B, can you tell
 5  me what this is?
 6       A.   It appears to be an email from Brian
 7  Kelly from Milbank to myself and Ann Makowski,
 8  which has detailed spreadsheets associated with
 9  a list of securities that were detailed and
10  alleged to be the securities that were being
11  transferred on the -- associated with the sale.
12       Q.   Do you know who provided this
13  information to Mr. Kelly?
14       A.   I do not.
15       Q.   Did you review the attached
16  spreadsheets and information on September 21,
17  2008?
18       A.   Yes, I did.
19       Q.   What type of analysis did you do
20  concerning the securities listed in the
21  spreadsheet?
22            MS. TAGGART:  I'm going to object on
23       attorney-client and work product privilege
24       and instruct not to answer.
25  BY MR. STERN:
```

Page 17

```
 1                M. Fazio
 2       Q.   Did you do anything to determine
 3  whether there was a publicly available pricing
 4  source concerning the securities listed on the
 5  spreadsheet?
 6            MS. TAGGART:  Object to form.
 7       But you can answer.
 8       A.   I had staff that reported to me do
 9  some analysis with respect to the ability to get
10  prices on some of the securities in the
11  analysis, yes.
12       Q.   And what did they report to you?
13            MS. TAGGART:  I'm going to object and
14       instruct you not to answer on
15       attorney-client and work product privilege.
16  BY MR. STERN:
17       Q.   Was your staff able to obtain
18  publicly available pricing information for all
19  of the securities on the spreadsheets?
20            MS. TAGGART:  Hold on.
21       You can answer that yes or no.
22       A.   No.
23       Q.   Do you recall approximately what
24  percentage of the securities your staff was able
25  to obtain publicly available pricing information
```

Page 18

1              M. Fazio
2    for?
3          MS. TAGGART: I'm going to object and
4    instruct not to answer on privilege.
5    BY MR. STERN:
6          Q.   I ask you to please look at the third
7    page of this exhibit. Right there (indicating),
8    that summary sheet. It may be the second page
9    of your copy.
10         A.   It's the second page, yes.
11         Q.   The second page of the exhibit.
12               At the top it has a line that reads,
13   "Collateral" and then next to that it says,
14   "Market Value."
15               Do you see that?
16         A.   Yes, I do.
17         Q.   Is this a summary sheet that you
18   reviewed at the time that you received it?
19         A.   Yes.
20         Q.   And what was your understanding at
21   that time concerning the information reflected
22   here?
23         MS. TAGGART: Object to form.
24         I'm sorry. At what time?
25   BY MR. STERN:

Page 19

1              M. Fazio
2          Q.   At the time you received this.
3          MS. TAGGART: You can answer.
4          A.   On the Sunday that I received this,
5    and I don't know exactly what time, but my
6    understanding after having different discussions
7    with people that the market values were market
8    values associated with collateral earlier in the
9    week.
10         Q.   And were you ever told who assigned
11   those market values to the collateral?
12         A.   I was told that it came off of the
13   Lehman system earlier in the week.
14         Q.   Were you given a date earlier in the
15   week?
16         A.   I was given Monday, Tuesday time
17   periods.
18         Q.   And with respect to the line that
19   says "TP cash" and has a figure of $7 billion
20   next to that, what understanding did you have
21   concerning that information?
22         A.   There was discussion of whether or
23   not securities or cash were being transferred
24   from JPMorgan associated with the transaction,
25   and it was unclear whether securities would be

Page 20

1              M. Fazio
2    being transferred are cash and the cash was said
3    to be $7 billion. If the final securities that
4    were going over in cash in total, they were
5    looking at it and trying to figure out what
6    would be transferred. So it was indicated that
7    at the time it was $7 billion of cash they
8    thought would be being transferred.
9          Q.   And when you and others on behalf of
10   the committee learned that, did you discuss that
11   fact with anyone representing the estate?
12         MS. TAGGART: Object to form.
13         You can answer.
14         A.   We would -- we had discussions with
15   Jim Seery with respect to the transaction and
16   the securities and cash.
17         Q.   Did anybody acting on behalf of the
18   committee object that this cash was being
19   transferred in connection with the transaction?
20         MS. TAGGART: Objection. Foundation.
21         THE WITNESS: Repeat the question?
22   Sorry.
23         (Question was read back as follows:
24         "QUESTION: Did anybody acting on
25   behalf of the committee object that this

Page 21

1              M. Fazio
2    cash was being transferred in connection
3    with the transaction?")
4          A.   We were looking at the transaction as
5    a whole, so there were liabilities being assumed
6    and assets being transferred, so there was
7    discussion with respect to the transaction and
8    the components of the transaction and
9    understanding what was being transferred.
10               So since we did not have a detailed
11   schedule that people had said had been a final
12   schedule of securities or cash being
13   transferred, we had nothing to object to at that
14   time.
15         Q.   At the time you received this
16   information which reflects a transfer of cash of
17   $7 billion, was it your understanding that such
18   cash would be transferred to Barclays or had
19   been transferred to Barclays?
20         MR. MILLS: Object to the form.
21         A.   My understanding was that the estate
22   and Barclays were trying to figure out exactly
23   what securities they had and what was being
24   transferred associated with the transaction over
25   the weekend.

Page 22

```
            M. Fazio
 1
 2      Q.   Were you ever told that one possible
 3   approach to the transaction was that Barclays
 4   would retain the $7 billion in cash?
 5      A.   If the total securities were not as
 6   represented, the value of the securities was not
 7   as total represented, there would have to be a
 8   cash component to equate to the transaction that
 9   was represented court.
10      Q.   And that was cash from the LBI
11   estate, correct?
12      MS. TAGGART:  Object to form.
13      A.   I'm not sure where the cash and who
14   the repository of the cash was with and the
15   rightful owner of it, but it was, from the
16   estate, cash would have been had to have come
17   from the estate for the transaction.
18      Q.   And did the committee or anybody
19   acting on behalf of the committee or anyone else
20   in attendance that weekend, to your knowledge,
21   object to the possibility that such cash would
22   be included in the transaction?
23      MS. TAGGART:  Object to form and
24   foundation.
25   BY MR. STERN:
```

Page 23

```
            M. Fazio
 1
 2      Q.   If you remember.
 3      A.   The transaction was discussed as a
 4   whole so individual components, since we did not
 5   have a detailed schedule at all throughout this
 6   of any detail which showed the final securities
 7   in cash being transferred, there was nothing to
 8   object to.
 9      Q.   This makes reference to $7 billion in
10   cash.
11      My question is this:  Did anyone, to
12   your knowledge, object to the transfer of such
13   cash over the preclosing weekend?
14      MS. TAGGART:  Objection.  Asked and
15   answered.  Form, foundation.
16   BY MR. STERN:
17      Q.   You can answer.
18      A.   Since the transaction is taken as a
19   whole, we were not given final cash numbers or
20   securities being transferred so there was
21   nothing to object to.
22      Q.   I understand that.
23      Did anyone object, to your knowledge,
24   to the possibility that $7 billion in cash was
25   to be transferred as a part of the transaction?
```

Page 24

```
            M. Fazio
 1
 2      MS. TAGGART:  It's been now asked and
 3   answered four times.
 4      I object to form and foundation.
 5      You can answer it one more time.
 6      MR. STERN:  I don't think it's been
 7   answered.
 8      Can you repeat the question?
 9      (Question was read back as follows:
10      "QUESTION:  Did anyone object, to
11   your knowledge, to the possibility that
12   $7 billion in cash was to be transferred as
13   a part of the transaction?")
14      A.   As I've stated before, since the
15   transaction as a whole, we did not have detail
16   of which securities were being transferred or
17   what cash was being transferred with the
18   securities to offset the liabilities being
19   assumed by Barclays, we did not have anything to
20   object to at the time associated with cash or
21   securities being transferred.
22      Q.   You had a summary sheet indicating
23   that $7 billion in cash was included as part of
24   the assets being transferred to Barclays.
25      And my question is this:  Did anyone,
```

Page 25

```
            M. Fazio
 1
 2   to your knowledge, object to the inclusion of
 3   that cash in the transaction?
 4      MS. TAGGART:  Object to --
 5      MR. MILLS:  Objection to the form.
 6      MS. TAGGART:  Object to the form, to
 7   the preface.  It's argumentive.  It's been
 8   asked and answered.  And also to
 9   foundation.
10      A.   I believe I've answered the question
11   numerous times, but I'll answer it again for
12   you.
13      When we looked at the detail and we
14   had discussions about the detail of securities
15   and cash being transferred, we did not have a
16   final list of securities or cash being
17   transferred associated with the transaction and
18   so there was nothing to object to associated
19   with the transaction since we did not have
20   information on the final securities or cash
21   being transferred.
22      Q.   At some point did Houlihan learn that
23   the $7 billion in cash would be included in the
24   transaction?
25      MS. TAGGART:  Object to foundation.
```

Page 26

M. Fazio

1         MR. MILLS:  Objection.
2         MS. TAGGART:  Go ahead.
3      A.   I believe that subsequently and
4   subsequent information that came out and
5   Barclays indicating that they had not received
6   the cash, it had come to light that there was
7   $7 billion that was being transferred associated
8   with the transaction that had not gotten
9   transferred that Barclays was claiming that was
10  owed to them.
11     Q.   Did the committee learn at any point
12  that the $7 billion in cash had initially been
13  transferred to Barclays but then had been
14  removed by JPMorgan?
15        MS. TAGGART:  Object to form.
16  Foundation.
17     A.   I'm not aware.
18     Q.   You don't know?
19     A.   I don't know.
20     Q.   Okay.  Going back to the time when
21  you received Exhibit 461B and saw the reference
22  to $7 billion in cash, do you have any specific
23  recollection of anyone acting on behalf of the
24  Creditors Committee telling representatives of

Page 27

M. Fazio

1   Lehman or Barclays that that cash should not be
2   included in the final transaction?
3         MS. TAGGART:  Objection.  Asked and
4   answered.  Form, foundation.
5   BY MR. STERN:
6      Q.   Do you have any such recollection?
7      A.   As I have stated before, we were
8   given this sheet.  It was indicated that we did
9   not have the final securities being transferred
10  nor the cash balance associated with the
11  transaction, so there was nothing to object to
12  since we did not have the final form and
13  securities that were being transferred.
14     Q.   Putting aside the question of the
15  market value of the securities listed in
16  Exhibit 461B, did anyone indicate to you over
17  the preclosing weekend that Barclays would not
18  receive the securities listed in Exhibit 461B?
19        MS. TAGGART:  Object to form.
20     A.   There was discussion that the
21  Barclays people and the estate people were
22  trying to reconcile the exact securities that
23  were being transferred because they had to
24  reconcile what securities remained in the

Page 28

M. Fazio

1   possession of Lehman, and so there was question
2   as to which securities would finally be
3   transferred associated with the transaction
4   because they had to make sure that the
5   securities were in the possession of Lehman
6   Brothers.
7      Q.   Did you have an understanding that
8   certain securities had already been transferred
9   to Barclays as of that preclosing weekend?
10     A.   At the time, I was not aware that
11  some securities might have been transferred to
12  Barclays at that time.
13     Q.   Were you familiar with the fact that
14  Barclays had replaced the Fed's financing of LBI
15  prior to the preclosing weekend?
16        MS. TAGGART:  Object to form.
17     A.   Not prior to the preclosing weekend.
18  During the weekend I became aware of
19  that, yes.
20     Q.   During the September 19th hearing, do
21  you recall Mr. Miller informing the court that
22  Barclays had replaced the Fed's financing and
23  received the securities that had been pledged to
24  the Fed?

Page 29

M. Fazio

1         MS. TAGGART:  Object to form.
2   BY MR. STERN:
3      Q.   Do you recall that?
4      A.   I recall discussions over the weekend
5   about Barclays stepping into the shoes of the
6   Fed.
7         I don't remember if it was at the
8   hearing on Friday or over the weekend, but I was
9   not sure whether or not that transaction also
10  had taken place or that it was stepping into the
11  shoes the Fed and had guaranteed to step into the shoes
12  to the Fed, and whether or not the securities
13  had been transferred and whether Barclays had
14  actually paid off the Fed.  I was unaware
15  whether or not that had happened on the Friday
16  or over the weekend.
17     Q.   Over the weekend did you learn that
18  it had happened?
19     A.   There was --
20        MS. TAGGART:  Object to form.
21     A.   There was discussion that it had
22  happened, but there was still a lot of
23  reconciliations going on of what securities that
24  Barclays was getting associated with that

Page 30

M. Fazio

1 
2 transaction also.
3     Q.   But with respect to the securities
4 that had already been transferred, did you have
5 an understanding that this list contained in
6 Exhibit 461B reflected those securities?
7     A.   No.  I had an understanding that
8 these were securities earlier in the week, that
9 thought that Lehman had that they were being
10 transferred over to Barclays as part of the Fed
11 transaction and the whole transaction that was
12 being discussed on court on Friday.
13     Q.   You did not have an understanding
14 that the securities listed in 461B had already
15 been transferred to Barclays as a part of its
16 replacement of the Fed?
17     A.   No.
18     MS. TAGGART:  Asked and answered.
19 BY MR. STERN:
20     Q.   Okay.  At some point did you learn
21 that?
22     A.   I still to this day do not know or
23 have a detailed list from Barclays or the estate
24 of the exact securities transferred as of today
25 and the market values of those securities that

Page 31

M. Fazio

1 
2 were being transferred on Friday, the 19th or on
3 Monday, the 21st.
4     I'm sure Monday is the 22nd.  I
5 apologize.
6     Q.   So it's your testimony that as of
7 today you still do not have a complete list of
8 the securities that Barclays received in
9 connection with its replacement of the Fed.  Is
10 that your testimony?
11     A.   The testimony and I think what I just
12 said was that we do not have a listing from
13 Barclays of all the securities that they have
14 received associated with this transaction and
15 the market value of those securities as of the
16 close of the business on the 19th.  As of today
17 we do not have that listing.
18     Q.   Did you ever receive Schedule A to
19 the Clarification Letter?
20     MS. TAGGART:  Object to form.
21     And now you're asking him personally?
22     Go ahead.
23     A.   Sorry.  Repeat the question.  I'm
24 sorry.
25     Q.   Did you ever receive Schedule A to

Page 32

M. Fazio

1 
2 the Clarification Letter?
3     A.   I have received what has been
4 indicated to be Schedule A of the Clarification
5 Letter, yes.
6     Q.   Have you received Annex A to the
7 settlement between LBI, JPMorgan and Barclays --
8     MS. TAGGART:  Object to form.
9 BY MR. STERN:
10     Q.   -- concerning the $7 billion
11 shortfall?
12     A.   I would have to look at it to see
13 what annex A is, but I might have seen it but
14 I'd have to see it in front of me.
15     Q.   Okay.
16     MS. TAGGART:  Jack, can we take a
17 quick break?
18     MR. STERN:  Sure.
19     MS. TAGGART:  I'll just be a couple
20 minutes.
21     THE VIDEOGRAPHER:  The time is 10:04
22 a.m.  We're going off the record.
23     (Recess is taken.)
24     THE VIDEOGRAPHER:  The time is 10:07
25 a.m.  We're back on the record.

Page 33

M. Fazio

1 
2 BY MR. STERN:
3     Q.   Focusing again on the second page of
4 Exhibit 461B, it lists a total amount there of
5 $49.9 billion.
6     Do you see that?
7     A.   Yes, I do.
8     Q.   At some point over the preclosing
9 weekend did you learn the amount of the
10 financing that Barclays had assumed in replacing
11 the Fed, the loan amount that is?
12     A.   I was told that it was $45.5 billion,
13 yes.
14     Q.   And over that preclosing weekend, did
15 you raise any questions concerning the
16 difference between that $45 billion amount and
17 this $49.9 billion amount?
18     A.   Yes.
19     Q.   With whom did you raise those
20 questions?
21     A.   I had discussions Jim Seery and
22 discussions with Mr. Klein.
23     Q.   And what did you discuss on that
24 subject with Mr. Seery?
25     A.   I discussed wanting a detailed

## Page 34

M. Fazio

1
2  listing of the collateral that was being
3  transferred associated with the transaction and
4  the market values associated with the securities
5  being transferred.
6      Q.   What types of -- withdrawn.
7          What market values did you want?
8      A.   I wanted the closing market values as
9  of September 19th.
10     Q.   From Lehman?
11     A.   Yes.
12     Q.   And did you ever discuss with
13 Mr. Seery any concern about a $5 billion
14 mismatch or difference between the $49.9 billion
15 figure on Exhibit 461B and the $45 billion
16 amount of the loan?
17         MS. TAGGART:  Object to form.
18         THE WITNESS:  Repeat the question?
19         (Question was read back as follows:
20         "QUESTION:  And did you ever discuss
21     with Mr. Seery any concern about a
22     $5 billion mismatch or difference between
23     the $49.9 billion figure on Exhibit 461B
24     and the $45 billion amount of the loan?")
25     A.   We discussed the fair value of the

## Page 35

M. Fazio

1
2  securities being transferred associated with the
3  transaction.  It was more of a discussion of the
4  assets being transferred as opposed to the
5  $47.7 billion of securities that were supposed
6  to be transferred as part of the transaction.
7      Q.   My question focuses on the
8  $49.9 billion figure that is listed on
9  Exhibit 461B.
10         Did you have any discussion with
11 Mr. Seery concerning the difference between that
12 amount and the $45 billion amount of the loan?
13         MS. TAGGART:  Object to form.  Asked
14     and answered.
15     A.   We had discussions about the assets
16 being transferred, the liabilities being assumed
17 as part of the transaction, yes.
18     Q.   And were you able, was Houlihan able,
19 based on the information it had available to it,
20 to come to any assessment of the fair value of
21 the securities that were listed on Exhibit 461B?
22         MS. TAGGART:  You can answer that yes
23     or no or I don't know.
24     A.   No.
25     Q.   And is that because public pricing

## Page 36

M. Fazio

1
2  information was not available concerning many of
3  the securities listed?
4          MS. TAGGART:  I'm going to object and
5      instruct not to answer on attorney-client
6      and work product privilege.
7  BY MR. STERN:
8      Q.   Approximately when over this
9  preclosing weekend did you have your discussions
10 with Mr. Seery?
11     A.   I believe it was on Sunday.  I don't
12 have a time.
13     Q.   Let me show you a document that we've
14 previously marked as Exhibit 460B.
15         MR. STERN:  We do not have many
16     copies of this given the size but...
17         (Document review.)
18 BY MR. STERN:
19     Q.   This appears to be an email from
20 David Murgio at Weil, Gotshal to Bob Moore at
21 Milbank, and it attaches two documents, two
22 Excel spreadsheets; one labeled "Schedule A" and
23 one labeled "Schedule B."
24         Did you understand in connection with
25 the closing of the sale transaction that there

## Page 37

M. Fazio

1
2  was a Schedule A listing certain securities and
3  a Schedule B listing certain securities?
4      A.   Yes.
5      Q.   And what was your understanding of
6  what Schedule A was?
7          MS. TAGGART:  Object to form.
8  BY MR. STERN:
9      Q.   Or what Schedule A was intended to
10 be.
11         MS. TAGGART:  Same objection.
12     A.   Schedule A was and Schedule B were to
13 represent securities being transferred to
14 Barclays as part of the sale.
15     Q.   And did Houlihan do any further
16 review of Schedule A and Schedule B after the
17 closing?
18         MS. TAGGART:  I'm going to object and
19     instruct not to answer on privilege.
20 BY MR. STERN:
21     Q.   After the closing, did Houlihan have
22 any discussions with anyone representing Lehman
23 or Barclays concerning the identity or value of
24 the securities listed on Schedule A and Schedule
25 B?

Page 38

M. Fazio

1
2    A.   Yes.
3    Q.   When was the first such discussion
4  with representatives of Lehman?
5    A.   I don't have an exact recollection,
6  but it would have been in the week or following
7  that week, so it would have been the week of
8  September 22nd or September 29th.
9    Q.   And what was the substance of those
10  discussions with Lehman representatives?
11    A.   The substance of those discussions
12  were to attempt to get a detailed listing of the
13  securities being transferred associated with the
14  transaction, as well as the market values as of
15  the closing date.
16    Q.   And with whom did you have those
17  discussions?
18    A.   We had discussions with Paolo
19  Tonucci.  We had discussions with the A&M
20  representatives throughout the following
21  two weeks.
22    Q.   And did Houlihan in those discussions
23  express any concerns relating to the value of
24  the securities on Schedule A?
25    MS. TAGGART:  Object to form.

Page 39

M. Fazio

1
2    A.   We raised concerns of not having a
3  detailed list of the securities or the market
4  values associated with that transaction.
5    Q.   Did Houlihan do anything to itself
6  evaluate the value of the securities on the
7  Schedule A listing that Houlihan did have at
8  that time?
9    MS. TAGGART:  I'm going to object and
10  instruct not to answer on work product and
11  attorney-client privilege.
12  BY MR. STERN:
13    Q.   After the closing, did you
14  participate in any discussions with Weil,
15  Gotshal concerning the value of the securities
16  transferred to Barclays as a part of the Fed
17  replacement?
18    MS. TAGGART:  Object to form.
19    You can answer.
20    A.   I do not believe so.
21    Q.   Do you know whether anyone else from
22  Houlihan did?
23    MS. TAGGART:  Object to form.
24  Foundation.
25    A.   I do not know.

Page 40

M. Fazio

1
2    Q.   Do you know whether after the closing
3  Houlihan had any discussions with anyone acting
4  on behalf of Lehman concerning the difference
5  between the repo loan amount and the value of
6  the securities listed on the Schedule A?
7    MS. TAGGART:  Object to form.
8    A.   We had numerous conversations with
9  the Alvarez & Marsal people with respect to the
10  value of the securities and the identification
11  of those securities that were being transferred
12  as part of the transaction.
13    Q.   And your best recollection is that
14  those discussions with Alvarez took place
15  sometime after the closing?
16    A.   Yes.
17    Q.   And that would have been the week of
18  September 22nd or the week of September 29th?
19    A.   Yes.
20    Q.   Do you have any recollection one way
21  or the other concerning whether those
22  discussions began the week of September 22nd or
23  the week of September 29th?
24    A.   I believe they would have began the
25  week of September 22nd, but I don't have

Page 41

M. Fazio

1
2  specific dates.
3    Q.   And in those discussions with
4  Alvarez, did Houlihan raise any concern about a
5  $5 billion mismatch between the amount of the
6  repo loan, $45 billion, and the market value
7  listed in Exhibit 461B of $49.9 billion?
8    MS. TAGGART:  Object to form.
9    A.   We raised questions as to which
10  securities and the value of those securities
11  that were being transferred associated with the
12  transaction.
13    Q.   Did you raise any concerns relating
14  to the difference between the loan amount and
15  the value of the securities that were
16  transferred in connection with that repo
17  replacement?
18    MS. TAGGART:  Object to form.
19    A.   We were concerned with the value of
20  all the securities that were being transferred,
21  as well as the loan that was being assumed as
22  part of this transaction, yes.
23    Q.   And at that point in time after the
24  closing, did Houlihan do anything to access
25  publicly available information from Bloomberg or

Page 42

M. Fazio

1
2  other sources concerning the value of the
3  securities on the list that you had at that
4  time?
5      MS. TAGGART:  I'm going to object and
6      instruct not to answer on privilege.
7  BY MR. STERN:
8      Q.   Let me show you a document that's
9  previously been marked as Exhibit 504.
10     Do you recognize this series of
11 emails?
12     A.   Yes.
13     Q.   And what are they?
14     A.   They are emails to and from Luc
15 Despins associated with request for information
16 from Lori Fife at Weil, Gotshal.
17     Q.   Looking at the first page of this
18 exhibit at the bottom, there is an email from
19 Mr. Despins to Lori Fife copying you and
20 Mr. Geer and Mr. Bell, and he writes, "Lori,
21 this is not in connection with sealing motion,
22 although I want to know more about the schedules
23 before that issue is up before the court, but
24 rather our concern is with respect to the
25 securities which were transferred.  Houlihan has

Page 43

M. Fazio

1
2  reviewed them and cannot even come close to the
3  amount which was announced in court.  I think it
4  was $47.4 billion.  And there is also a
5  discrepancy on the liability side, although it
6  could be much smaller than the issue on the
7  asset side.  Houlihan's review would indicate
8  that the securities transferred could be worth
9  billions more than the $47.4 billion.  There may
10 very well be a logical explanation for all of
11 this, which is why the first meeting is just to
12 explore the issues."
13     You see that Mr. Despins says that
14 "Houlihan has reviewed them and cannot even come
15 close to the amount which was announced in
16 court."
17     What analysis had Houlihan done that
18 led Mr. Despins to make that comment.
19     MS. TAGGART:  I'm going to object and
20     instruct not to answer on attorney-client
21     and work product privilege.
22 BY MR. STERN:
23     Q.   Mr. Despins tells Weil, Gotshal that
24 Houlihan had done an analysis of the securities.
25     Do you see that?

Page 44

M. Fazio

1
2      A.   Yes.
3      Q.   What analysis had Houlihan done?
4      MS. TAGGART:  Same objection and
5      instruction.
6  BY MR. STERN:
7      Q.   What figure for market value had
8  Houlihan arrived at as a result of its analysis?
9      MS. TAGGART:  I'm going to object and
10     instruct not to answer on privilege.
11 BY MR. STERN:
12     Q.   Mr. Despins writes, "Houlihan's
13 review would indicate that the securities
14 transferred could be worth billions more than
15 the $47.4 billion."
16     Do you see that?
17     A.   Yes, I do.
18     Q.   Do you recall how many billions more
19 Houlihan's review indicated at the time?
20     MS. TAGGART:  Objection.  And
21     instruct you not to answer on
22     attorney-client and work product
23     privileges.
24 BY MR. STERN:
25     Q.   Was Houlihan's review at the time

Page 45

M. Fazio

1
2  reflected in writing?
3      MS. TAGGART:  You can answer yes or
4      no.
5      A.   We would have had written material
6  associated with our work.
7      Q.   And that written material, according
8  to Mr. Despins, would indicate that the
9  securities transferred could be worth billions
10 more than the $47.4 billion; is that right?
11     MS. TAGGART:  I'm going to object and
12     instruct you not to answer on privilege.
13 BY MR. STERN:
14     Q.   Following this series of emails, was
15 there a meeting?
16     MS. TAGGART:  Object to form.
17     A.   There were follow-up meetings
18 subsequently with the estate and -- I'll see,
19 this is October 15th.  There was always constant
20 meetings between the estate and the advisors.
21     Q.   I understand that, but with respect
22 to this specific request concerning Houlihan's
23 review indicating that the securities
24 transferred could be worth billions more than
25 the $47.4 billion, was there a follow-up

Page 46

M. Fazio

1
2  meeting?
3        MS. TAGGART:  Object to form and
4  foundation.
5        A.   I do not believe that between the
6  parties that are listed here there was a meeting
7  that was set up with respect to this email
8  chain.
9        Q.    Was there a meeting between anyone
10 else acting on behalf of the committee or anyone
11 else acting on behalf of Lehman concerning that
12 issue?
13        MS. TAGGART:  Object to form and
14 foundation.
15        A.   We would have meetings with the
16 estate on a regular basis and this was one of
17 the topics we would continually ask them to get
18 a detailed listing of the securities and the
19 market values as to the close of the business
20 on the 19th.
21        Q.   Did the estate ever provide Houlihan
22 with any information that indicated that the
23 securities transferred were not worth billions
24 more than the $47.4 billion?
25        MS. TAGGART:  Object to form.

Page 47

M. Fazio

1
2  Foundation.
3        Could you limit that at all by time?
4  BY MR. STERN:
5        Q.   Can you answer?
6        THE WITNESS:  Can you repeat the
7  question then?
8        MS. TAGGART:  Okay.  You can answer
9  yes or no to that.
10        And you can reread the question
11 again.
12        (Question was read back as follows:
13        "QUESTION:  Did the estate ever
14 provide Houlihan with any information that
15 indicated that the securities transferred
16 were not worth billions more than the $47.4
17 billion?")
18        A.   To my knowledge, I have never
19 received anything from the estate that has
20 detailed the final securities transferred and
21 the market value as of the close of business on
22 the 19th.
23        Q.   Aside from this email request and
24 whatever meetings followed from it, what did
25 Houlihan do to address any concern that it had

Page 48

M. Fazio

1
2  as a result of its review indicating that the
3  securities transferred could be worth billions
4  more than $47.4 billion?
5        MS. TAGGART:  Object to form,
6  foundation and also privilege.
7        You should not disclose anything you
8  did either internally with Houlihan or in
9  correspondence with your counsel.
10        But if you took any actions that you
11 know of with anyone other than that, go
12 ahead and answer.
13        A.   I had numerous meetings with the
14 Alvarez & Marsal people to continually ask to
15 follow up and get information associated with
16 the transaction, including the final securities
17 that actually were transferred and the fair
18 value of those on the 19th.
19        Q.   And what types of information did you
20 receive?
21        A.   I received no final listing from
22 anybody associated with the transaction.
23        Q.   What types of information did you
24 receive?
25        A.   I received no information that had

Page 49

M. Fazio

1
2  detailed information associated with the
3  transaction.
4        Q.   I'm not asking what you did not
5  receive.
6        I'm asking what did you receive.
7        A.   All we had were discussions.  I never
8  received any of their work products associated
9  with any detailed analysis that they may have
10 been doing.
11        To the best of my knowledge, they
12 have not received a final listing either from
13 anybody associated with the transaction,
14 associated with which securities and the fair
15 market value as of the 19th.
16        Q.   Did that concern you as of late
17 September, early October of 2008?
18        MS. TAGGART:  Object to form.
19        A.   Yes.
20        Q.   What did you do about that concern?
21        MS. TAGGART:  Objection.  Form,
22 foundation.  Asked and answered.
23        And I'll make the same privilege
24 instruction.  If you have anything to add
25 of anything you did besides working



Page 50

M. Fazio

1
2 internally at Houlihan or in communications
3 with your counsel.
4      A.   I had numerous discussions with the
5 Alvarez & Marsal people.
6      Q.   Did you feel they were not responding
7 to your concern?
8           MS. SCHAFFER:  Objection to the form.
9           MS. TAGGART:  Same objection.
10     A.   I felt that they were taking my
11 concern and my request very seriously and they
12 were trying to get the same information I was.
13     Q.   And describe for me exactly what your
14 concern was.
15          MS. TAGGART:  Object to form.
16     A.   When you have a transaction, you
17 usually have a detailed listing of every asset
18 and the assumed liabilities associated with the
19 transaction, and the fair market value of those
20 assets and liabilities.
21     We did not have this and still do not
22 have this associated with this transaction.
23     Q.   So it's your testimony that as of
24 today you still do not have that information.
25          MS. TAGGART:  Object to form.

Page 51

M. Fazio

1
2 Foundation.
3      A.   Absolutely.
4      Q.   Is there anything that you've
5 received between September 2008 and today and
6 has provided you with any more information
7 concerning the purchased assets and the assumed
8 liabilities and their respective value?
9           MS. TAGGART:  Object to form and
10 privilege as currently worded, so I'll
11 instruct not to answer on attorney-client
12 and work product.
13 BY MR. STERN:
14     Q.   Is there anything you've received
15 from parties other than the committee or counsel
16 to the committee or other people from Houlihan
17 that has provided you with that information?
18          MS. TAGGART:  Object to form.
19          MR. STERN:  Let me rephrase it.
20 BY MR. STERN:
21     Q.   Aside from communications with
22 counsel, aside from communications with
23 committee or within Houlihan, is there anything
24 that you've received since September 2008 that
25 has provided you with more information

Page 52

M. Fazio

1
2 concerning the assets purchased and the
3 liabilities assumed?  Is there anything?
4           MS. TAGGART:  Object to form.
5      A.   I may have seen information that
6 Alvarez & Marsal was working on associated with
7 some of the liabilities, the cure amounts and
8 analysis of that, but nothing with respect to
9 the detailed analysis of the securities being
10 transferred and their fair market value.
11     Q.   So it's your testimony that between
12 September of 2008 and today, you have not
13 received any further information from either
14 Lehman or Barclays concerning the assets
15 purchased and the liabilities assumed and their
16 respective values.
17          MS. TAGGART:  Objection.
18 Argumentative.
19 BY MR. STERN:
20     Q.   Is that your testimony?
21          MS. TAGGART:  I object to form.
22 Mischaracterizes the testimony.
23     If you can understand it, you can
24 answer it.
25     A.   Repeat the question.

Page 53

M. Fazio

1
2          MR. STERN:  I do have --let me just
3 before you repeat the question, I just have
4 to note for the record that these
5 objections violate the local rules, and
6 I've been very tolerant of these speaking
7 objections, but going forward I would
8 appreciate it if you would comply with the
9 local rules, Counsel.
10          MS. TAGGART:  I think I'm complying
11 with the local rules and I don't think that
12 you're supposed to be asking him to
13 reaffirm his testimony when he just
14 answered the question.
15          MR. STERN:  Can you repeat the
16 question?
17          (Question was read back as follows:
18          "QUESTION:  So it's your testimony
19 that between September of 2008 and today,
20 you have not received any further
21 information from either Lehman or Barclays
22 concerning the assets purchased and the
23 liabilities assumed and their respective
24 values?")
25          MS. TAGGART:  Same objections.

Page 54

1          M. Fazio
2          But you can answer.
3     A.   To date I have not received from
4  anyone a detailed listing that Barclays and
5  Lehman, the estate, have said these are the
6  final securities and these are their fair market
7  value off of the Lehman systems as of
8  September 19th, 2008, that's correct.
9     Q.   Between 2008 and today, have you
10 received any information from Barclays, either
11 directly or through a public sources or through
12 this case, concerning the purchased assets and
13 the assumed liabilities and their respective
14 values?
15        MS. TAGGART:  I'm going to object and
16     instruct not to answer on attorney-client
17     and work product privileges, especially
18     where it discusses Houlihan's analysis
19     related to this case.
20 BY MR. STERN:
21     Q.   No, my question is only whether you
22 have received anything from Barclays either
23 directly or through filings in this case or
24 public filings.
25        MS. TAGGART:  I'll stand by my

Page 55

1          M. Fazio
2     objection and instruction.
3  BY MR. STERN:
4     Q.   Going back to your meetings with
5  Alvarez after the closing, do you recall Alvarez
6  providing Houlihan with any information
7  concerning the Barclays replacement of the Fed
8  repo?
9     A.   I'm not sure if they've given us
10 anything with respect to the Fed repo
11 specifically.
12        We have talked about and discussed
13 the whole transaction and trying to get a whole
14 accounting for the entire transaction.
15     Q.   After the closing when you met with
16 Alvarez, did FTI participate in some of those
17 meetings?
18     A.   They would have been party to some of
19 those meetings.
20     Q.   Let's take a look at what has
21 previously been marked as Exhibit 463B.
22        Is this a document that you've seen
23 before?
24     A.   Yes, I have.
25     Q.   And when did you first see this

Page 56

1          M. Fazio
2  document?
3     A.   I would have seen it sometime in
4  October of 2008.
5     Q.   And skipping the first two pages and
6  looking at the remainder of the document, do you
7  know what that material is?
8     A.   It's a summary from Conor Tully,
9  associated with the transaction.
10    Q.   Looking at the third page of this
11 exhibit, you see at the bottom it says "Alvarez
12 & Marsal," on the bottom left?
13    A.   Yes.
14    Q.   And then to the right it says "Draft
15 Barclays Deal Recap"?
16    A.   Yes.
17    Q.   Do you know whether this summary was
18 prepared by Alvarez?
19    A.   I do not know.
20    Q.   Looking at this page, do you know
21 when you first received this?
22    A.   I would have received or looked at
23 this sometime in October of 2008.
24    Q.   And when you received this, did you
25 read it?

Page 57

1          M. Fazio
2     A.   I would have looked at it, yes.
3     Q.   And specifically the third page of
4  the document, the third page of this exhibit,
5  which has a column for "Assets" and a column for
6  "Liabilities," do you see that?
7     A.   Yes.
8     Q.   Do you recall whether you looked at
9  this at the time?
10    A.   Yes.
11    Q.   You did.
12    A.   Yes.
13    Q.   It has a line under the "Assets"
14 column that's labeled "Negotiated Mark Haircut."
15        Do you see that?
16    A.   Yes, I do.
17    Q.   What was your understanding of that
18 line at the time?
19    A.   My understanding and further
20 confirmed is that there was a detailed listing
21 of assets that were going to be transferred.
22 The company had a detailed listing which we had
23 seen previously at the time of the closing which
24 showed that the market value of the assets,
25 which were the market value that was prepared at

Page 58

M. Fazio

1
2     the beginning of the week, was substantially
3     over the market value at the end of the week,
4     and that $5 billion is a number that was an
5     approximate number of what they believed the
6     market value had declined between the beginning
7     of the week and the end of the week associated
8     with the assets.
9         Q.    And who was the "they" that you just
10    referred to?
11        A.    Jim Seery and Mr. Klein, and I would
12    imagine the other people that were working with
13    Mr. Seery and Mr. Klein.
14        Q.    And when you received this page that
15    refers to the negotiated mark haircut, did you
16    have any discussion with Alvarez concerning that
17    line?
18        A.    Absolutely. I've had discussions
19    with Alvarez in September and October associated
20    with getting a detailed listing of the assets
21    and the market value as of the close of business
22    on the 19th.
23        Q.    And what specifically did you discuss
24    with Alvarez concerning the negotiated mark
25    haircut of $5 billion?

Page 59

M. Fazio

1
2         A.    The discussion was very similar
3     consistently throughout this, which we need a
4     detail of assets and a detail of the market
5     values associated with the transaction, and the
6     value of those securities on the 19th of
7     September.
8         Q.    And what did Alvarez tell you
9     concerning this line "Negotiated Mark Haircut"?
10        A.    They did not have a detail of the
11    assets and did not have a detail of the assets
12    or the detail of the market values as of the
13    19th.
14        Q.    Under that it says, "Assets
15    transferred under repo stale marks."
16              What was your understanding of the
17    term "stale marks" when you received this?
18        A.    Stale marks referred to the marks
19    that were done at the beginning of the week
20    associated with the transaction, so it would
21    have been the Monday or Tuesday of that week
22    where the marks were done.
23        Q.    And did you discuss with Alvarez
24    after the closing, the issue of whether the
25    marks were stale?

Page 60

M. Fazio

1
2         MS. SCHAFFER: Objection to form.
3         A.    Yes, I did. I indicated, and I think
4     I've answered many times, that we have asked
5     them to get the updated marks associated with
6     the securities that were transferred.
7         Q.    And what did they tell you about
8     their ability to get updated marks from Lehman?
9         A.    They did not have the systems. The
10    systems had been transferred to Barclays and
11    Barclays had not given them an updated list of
12    the securities that were transferred and the
13    market values as of the 19th.
14        Q.    Were you seeking updated marks as of
15    September 19th?
16        A.    Yes, I was.
17        Q.    The systems at that time were still
18    under the control of Lehman, correct?
19        MS. TAGGART: Object to form.
20    Foundation.
21        A.    I do not know -- when you say under
22    the control, I do not know what you mean under
23    the control of Lehman.
24        Q.    Well, Barclays had not completed the
25    acquisition as of September 19th, correct?

Page 61

M. Fazio

1
2         MS. TAGGART: Object to form and
3     foundation.
4         A.    That's correct.
5         Q.    Did you ever find out whether Lehman,
6     that is, LBI, had updated its marks from
7     September 12th, 2008, to September 19th, 2008?
8         MS. TAGGART: Object to form and
9     foundation and potentially privileged.
10              You should disclose any information,
11    if any, that you received directly from
12    Lehman or its advisors, but if you have
13    heard any information related to this from
14    counsel, don't answer that.
15        THE WITNESS: So repeat the question.
16    Sorry.
17              (Question was read back as follows:
18    "QUESTION: Did you ever find out
19    whether Lehman, that is, LBI, had updated
20    its marks from September 12th, 2008, to
21    September 19th, 2008?")
22        A.    No, I did not find out.
23        MS. TAGGART: I think we'd like a
24    break. It's been about an hour.
25        MR. STERN: All right. You've asked

Page 62

```
1              M. Fazio
2     me to try to complete at a reasonable hour,
3     but if we keep on taking breaks, that's
4     going to be difficult.
5          We can take a break whenever you
6     want.
7          MS. TAGGART:  Okay.  Thank you.
8          THE VIDEOGRAPHER:  The time is 10:49
9     a.m.  We're going off the record.
10         (Recess taken.)
11         THE VIDEOGRAPHER:  The time is 10:59
12    a.m.  We're back on the record, Video No. 2.
13         MS. TAGGART:  Mr. Fazio wants to
14    clarify something for the record.
15         THE WITNESS:  For the record, I
16    wanted to clarify when we were talking
17    about Exhibit 463B and talking about the
18    third page of that exhibit, that I've seen
19    various schedules prepared.
20         I'm not sure if this is the exact
21    schedule that I have seen.  I was not on
22    this email and haven't seen the email, but
23    when we talked about transaction summaries,
24    I had seen some transaction summaries but
25    can't swear that this is the same version
```

Page 63

```
1              M. Fazio
2     that I had seen.
3     BY MR. STERN:
4          Q.   Do you recall receiving a summary of
5     the transaction from Alvarez during the week
6     after the closing?
7          A.   Not during the week after the
8     closing, no.
9          Q.   At what point?
10         A.   I would have seen when I've been
11    talking to Alvarez, things that they might have
12    been working on at the time, so I might have
13    seen a draft that looked like this.  I can't say
14    if the numbers are exactly the same at this
15    moment, but in October I think I would have seen
16    something that they would have been working on.
17         Q.   Do you have any reason to believe
18    that Alvarez would give a summary to FTI and not
19    provide you with a copy of the same summary?
20         MS. TAGGART:  Object to form.
21    Foundation.
22         A.   FTI does different things than we do,
23    so they probably give them many things
24    associated with the transaction and this whole
25    case that they don't give us.
```

Page 64

```
1              M. Fazio
2          Q.   You recall attending meetings with
3     Alvarez and FTI?
4          A.   Right.
5          Q.   After the closing, correct?
6          A.   Correct.
7          Q.   And do you recall one way or the
8     other whether you were given this summary in one
9     of those meetings?
10         A.   I do not recall receiving this
11    summary in any meeting.
12         I might have seen drafts of it that
13    they would have had, but I would not have been
14    given a copy of that.
15         Q.   You have a specific recollection that
16    you can testify to under oath that you did not
17    receive this summary in one of those early
18    meetings with Alvarez.
19         MS. TAGGART:  Objection.  Asked and
20    answered and argumentative.
21    BY MR. STERN:
22         Q.   Is that your testimony?
23         MS. TAGGART:  You know it's improper
24    for him to -- to ask him --
25         MR. STERN:  Please.
```

Page 65

```
1              M. Fazio
2          MS. TAGGART:  -- to reaffirm
3     testimony --
4          MR. STERN:  Please.
5          MS. TAGGART:  -- that he has already
6     given.
7          MR. STERN:  Counsel --
8          MS. TAGGART:  You can answer --
9          MR. STERN: -- this is not proper
10    under the local rules.
11         MS. TAGGART:  -- that question.
12    Asked and answered again.
13         MR. STERN:  Counsel, this is not
14    proper under the local rules.  You know
15    that.
16         MS. TAGGART:  Your question is not
17    proper under the local rules.
18         MR. STERN:  There's no reason to get
19    hostile.
20         Can you repeat the question.
21         (Question was read back as follows:
22    "QUESTION:  You have a specific
23    recollection that you can testify to under
24    oath that you did not receive this summary
25    in one of those early meetings with
```

| Page 70 | Page 71 |
|---|---|

**Page 70**

M. Fazio

1
2     Q.   So when you testified concerning the
3     line "Negotiated Mark Haircut," was that
4     testimony accurate?
5          MS. TAGGART:  Object to form.
6     A.   I have had discussions with Alvarez
7     and have seen documents that they have produced
8     for the committee which have used those terms,
9     and I have asked various questions of Alvarez
10    throughout this case and my understanding about
11    that $5 million is still the same; with respect
12    to what they know and the market value of the
13    securities that detail the transaction and the
14    transaction value of those securities as of the
15    19th has not been given to them or us as of this
16    date as far as I'm aware.
17    Q.   So you referred to $5 million.
18         You meant $5 billion?
19    A.   $5 billion, yes.
20    Q.   In your testimony concerning this
21    document and the line that reads "Assets
22    transferred under repo stale marks," was that
23    testimony accurate?
24         MS. TAGGART:  Object to form.
25         I think you're going to have to be

**Page 71**

M. Fazio

1
2     more specific about what testimony you want
3     him to discuss now.
4          MR. STERN:  I don't think so.
5     BY MR. STERN:
6     Q.   Was that testimony accurate?
7     A.   All my testimony --
8          MS. TAGGART:  Object to form.
9     A.   -- is accurate, yes.
10         And with respect to stale marks, they
11    have used that term before, Alvarez & Marsal.
12    Q.   Okay.  Let me show you a document
13    that we've previously marked as Exhibit 466.
14         I'll ask you to please review that
15    and tell me what it is.
16         (Document review.)
17    A.   It's an email from Brad Geer to
18    Crayton Bell and myself.
19    Q.   And what is the attachment to it?
20    A.   Well, there's a lot of redacted
21    things, but the attachment is, it looks like it
22    says "Footnote A, securities transferred under
23    Barclays repo agreement."
24    Q.   And do you see on that document
25    there's handwritten brackets next to certain of

**Page 72**

M. Fazio

1
2     the figures?
3     A.   Yup.
4     Q.   Do you know whose notation that is?
5     A.   No, I do not.
6     Q.   Aside from that one document that's
7     labeled HLHZ 0035874, do you recall whether
8     anything else was attached to this email?
9     A.   I do not recall.
10    Q.   You recall earlier we referred to an
11    email that Mr. Despins sent to Weil, Gotshal
12    which referred to a review by Houlihan of
13    certain securities.
14         Can you tell me who at Houlihan did
15    that review, which people?
16         MS. TAGGART:  You can answer, but
17    answer with names only.
18    A.   Staff persons; Michael Livanos,
19    Andrew McNamara, Angela Lorenzano and there's
20    probably several others.
21    Q.   Anyone else?
22    A.   There's probably several other staff
23    people that report to those people that would
24    have been working on it.
25    Q.   And were you involved in that review?

**Page 73**

M. Fazio

1
2     A.   Yes.
3     Q.   And aside from yourself, were there
4     any other senior people involved in that review?
5     A.   I would have shared results with some
6     of my partners.
7     Q.   Who?
8     A.   Brad Geer primarily.
9     Q.   Saul Burian?
10    A.   Saul might have gotten a copy from
11    Brad or somebody.  I don't know.
12    Q.   What was the purpose of that review?
13         MS. TAGGART:  Objection.
14         Objection, and I'm going to instruct
15    not to answer on attorney client and work
16    product privilege.
17    BY MR. STERN:
18    Q.   Is that a review that Houlihan did in
19    anticipation of litigation concerning the sale
20    transaction?
21         MS. TAGGART:  Objection.  Calls for
22    legal conclusion.
23         I'm going to object also not to
24    answer on attorney-client and work product
25    privileges.

Page 74

M. Fazio

1
2      MR. STERN:  So you're instructing him
3   not to answer.
4      MS. TAGGART:  Yes.
5  BY MR. STERN:
6      Q.   Is that a review that Houlihan would
7   have done for the benefit of the committee in
8   any event?
9      MS. TAGGART:  You can answer yes, no
10  or I don't know to that.
11     A.   We would have attempted to review the
12  security evaluation --
13     MS. TAGGART:  No, wait.  Stop.
14     THE WITNESS:  Go ahead.  What's your
15  question?
16     MS. TAGGART:  I want you to just
17  answer the question.
18     Read the question again.
19     (Question was read back as follows:
20     "QUESTION:  Is that a review that
21  Houlihan would have done for the benefit of
22  the committee in any event?")
23     A.   We may have.
24     Q.   Let me show you a document that we've
25  previously marked as Exhibit 464B.

Page 75

M. Fazio

1
2      These are excerpts from a
3   presentation that Alvarez gave on October 8,
4   2008, and my question is do you recall attending
5   a presentation that Alvarez gave to the
6   committee on October 8, 2008?
7      A.   I believe I was there, yes.
8      Q.   And turning to the fourth page of
9   this document, please, it's the page with the
10  Bates number ending 4447.
11     A.   Okay.
12     Q.   It's labeled Roman three "Significant
13  Transactions" at the top.
14     Do you see that?
15     A.   Yes, I do.
16     Q.   Do you recall being present for the
17  part of the presentation in which this slide was
18  reviewed?
19     And you can take a minute to review
20  it.
21     (Document review.)
22     A.   Yes.
23     Q.   And do you recall what was said by
24  the participants concerning information on this
25  slide when it was presented?

Page 76

M. Fazio

1
2      A.   To the best of my recollection,
3   Mr. Fogarty would have been giving a summary of
4   the transaction and detailing the information
5   that they had at the time, and would have gone
6   through these numbers with the committee.
7      Q.   And do you recall saying anything
8   during this part of the presentation?
9      A.   I would have said stuff during this
10  presentation as well as in privileged
11  conversations with counsel and our committee,
12  asking questions about the details and getting
13  details associated with the securities that were
14  actually transferred and their actual marks on
15  the 19th.
16     Q.   Do you recall what you actually said?
17     A.   I don't remember verbatim what I
18  said.
19     Q.   Do you recall generally?
20     A.   Generally I would have asked where
21  they stand on getting the detailed schedule of
22  assets associated with the transaction and the
23  marks on the 19th.
24     Q.   Do you recall commenting at all on
25  the line that states, "Negotiated a $5 billion

Page 77

M. Fazio

1
2   reduction"?
3      A.   We would have talked with Fogarty and
4   the estate about this many times; that these
5   were stale marks and the actual marks as
6   represented to us, the actual marks as
7   represented by Mr. Seery and Mr. Klein, the
8   actual marks had declined significantly between
9   the time of the last run and the Friday the
10  19th.
11     Q.   My question is a bit more specific
12  than that.
13     Going back in time to this meeting,
14  if you recall, did you say anything at this
15  meeting specifically concerning this line which
16  states, "Negotiated a $5 billion reduction"?
17     A.   I would have commented, like I said,
18  on the entire line and the fact that the stale
19  marks and the securities detail that we did not
20  have associated with the transaction or they
21  didn't have associated with coming up with a
22  detail mark-to-market of all the securities
23  transferred and their market values on the 19th.
24     Q.   Do you recall your specific words on
25  that subject at this meeting?

Page 78

```
1              M. Fazio
2     A.   No, I do not.
3     Q.   Did you take any notes during the
4  meeting?
5     A.   I do not believe so.
6     Q.   Were you involved in any analysis of
7  the cure liability that Barclays had assumed?
8         MS. TAGGART:  You can answer that
9  yes, no or I don't know.
10    A.   No.
11    Q.   Do you recall attending a meeting in
12 February 2009 at these offices, Boies Schiller,
13 with representatives of Barclays Capital?
14    A.   Yes.
15    Q.   And do you recall that Mr. King and
16 Mr. Keegan from Barclays and Mr. Larocca from
17 Barclays attended that meeting?
18    A.   I believe all three were present.
19    Q.   And do you recall there was
20 discussion at that meeting concerning Barclays'
21 replacement of the Fed repo?
22    A.   Yes.
23    Q.   At that meeting were you and others
24 from Houlihan given an opportunity to ask
25 questions that you had concerning Barclays'
```

Page 79

```
1              M. Fazio
2  replacement of the Fed repo?
3     A.   We asked questions that we wanted to
4  ask, yes, we were given the opportunity.
5     Q.   Did Barclays refuse to answer any of
6  yours questions?
7     A.   I don't know if they refused to
8  answer any question.
9         I know that they -- we had still come
10 out of that meeting requesting significant
11 amounts of information that we did not get, so
12 if you say that we did not get information that
13 we had requested numerous times, then I would
14 say that they didn't answer all the questions.
15    Q.   I understand that there was a
16 follow-up request by the committee for
17 documents; is that right?
18    A.   That's correct.
19    Q.   Putting aside the request for
20 documents, were there any questions that you
21 posed in that meeting that the Barclays people
22 refused to answer?
23         MS. TAGGART:  Object to form.
24 Argumentative.  Asked and answered.
25         You can answer again.
```

Page 80

```
1              M. Fazio
2     A.   As I said, the main purpose of the
3  meeting is to get information associated with
4  the detailed schedules that we had requested
5  numerous times and have not received, so if you
6  say did they not answer a question by not giving
7  us information, I would contend that they didn't
8  answer all our questions, yes.
9     Q.   In the meeting, do you recall a
10 specific question that you or others on behalf
11 of the committee asked that Barclays did not
12 answer?
13    A.   We asked for documents and we did not
14 receive them, so I think that's a question, can
15 we get the documents, and since we haven't
16 received them, I guess that's a non-answer.
17    Q.   Well, do you recall when the
18 committee made its request for documents?
19    A.   I don't have the exact dates, no.
20 I'd have to go back to emails and requests for
21 information.
22    Q.   Subsequently Barclays did produce
23 documents to the committee.
24         Do you recall that?
25         MS. TAGGART:  Object to form.
```

Page 81

```
1              M. Fazio
2  Foundation.
3     A.   They have given some documents to the
4  committee, that's correct.
5         They have not answered all of my
6  questions to give me a detailed listing of every
7  security that was transferred and its market
8  value on the 19th.
9     Q.   Have you reviewed Professor
10 Pfleiderer's report in this case?
11    A.   I do not believe I have.  I'd have to
12 see it, but I don't believe so.
13    Q.   Do you recall the volume of material
14 that Barclays produced after that February 2009
15 meeting?
16         MS. TAGGART:  Object to form and
17 foundation.
18         And are you including in this
19 litigation?
20 BY MR. STERN:
21    Q.   Do you recall how many documents
22 Barclays produced voluntarily to Houlihan after
23 that February 2009 meeting?
24         MS. TAGGART:  Object to form.
25 Foundation.
```

Page 82

```
                M. Fazio
 1
 2          And if you won't say that you're
 3    asking something about the litigation, then
 4    I have to instruct on privilege and
 5    instruct not to answer.
 6          Just ask before the litigation and
 7    I'll let him answer, but if it gets into
 8    what has he seen and talked about, what
 9    production we've gotten from Barclays --
10          MR. STERN:  Please, please, Counsel,
11    Counsel, I'm not looking for speeches.
12    BY MR. STERN:
13      Q.   After the February 2009 meeting,
14    Houlihan received documents from Barclays,
15    correct?
16          MS. TAGGART:  Objection and -- still
17    objecting to form, and unless you're going
18    to limit it before the litigation, I'm
19    going to instruct not to answer on
20    privilege.
21          MR. STERN:  You're instructing him
22    not to answer whether Houlihan received
23    documents from Barclays on grounds of
24    privilege?
25          MS. TAGGART:  Well, yes, because if
```

Page 83

```
                M. Fazio
 1
 2    you're asking --
 3          MR. STERN:  Okay.  Fine.  Fine.  I
 4    don't agree with that assertion or many of
 5    your other assertions concerning
 6    privilege but --
 7          MS. TAGGART:  Are you just asking
 8    whether you Barclays have given --
 9          MR. STERN:  -- we can take that up
10    separately.
11          MS. TAGGART: -- him Houlihan
12    documents?
13          MR. STERN:  Please.  This is not a
14    time for us to have a colloquy.
15    BY MR. STERN:
16      Q.   After that February 2009 meeting and
17    after Barclays produced documents to the
18    committee, what did the committee do to raise
19    any follow-up questions with Barclays?
20          MS. TAGGART:  Objection.
21          And I'm going to instruct not to
22    answer if you --
23          MR. STERN:  Did --
24          MS. TAGGART:  -- to the extent --
25    hold on -- to the extent that you have
```

Page 84

```
                M. Fazio
 1
 2    information from communication with
 3    counsel.  Well, then I'm going to instruct
 4    not to answer.
 5    BY MR. STERN:
 6      Q.   To your knowledge, did you or anyone
 7    else acting on behalf of the committee raise any
 8    follow-up questions with Barclays after that
 9    February 2009 meeting?
10          MS. TAGGART:  You can answer that yes
11    or no.
12      A.   We have had communications through
13    the lawyers on follow-up items on a continuous
14    basis, yes.
15      Q.   And what were those questions?
16          MS. TAGGART:  Object to form.
17      A.   We have a --
18          MS. TAGGART:  Wait.
19          THE WITNESS:  Go ahead.
20          MS. TAGGART:  You mean the questions
21    that he asked the counsel or that he thinks
22    was asked of Barclays?
23          MR. STERN:  Let me ask a question.
24    BY MR. STERN:
25      Q.   What questions did the committee
```

Page 85

```
                M. Fazio
 1
 2    raise with Barclays after the February 2009
 3    meeting?
 4          MS. TAGGART:  Object to form.
 5    Foundation.
 6          But to the extent you know what the
 7    committee asked, you can answer.
 8      A.   There was a memo written from counsel
 9    requesting additional information associated
10    with this transaction.
11      Q.   That was a request for additional
12    documents, correct?
13      A.   That's correct.
14      Q.   Aside from that, did you or anybody
15    else acting on behalf of the committee request a
16    follow-up meeting with representatives of
17    Barclays concerning any questions that you had?
18          MS. TAGGART:  I'm going to object to
19    form, foundation and privilege.
20          You can respond whether you --
21      A.   I have not had direct conversations
22    with Barclay personnel.
23          I know our counsel has had many
24    conversations with Barclays' counsel.
25      Q.   Do you know if your counsel or
```

Page 86

M. Fazio

1   anybody from Houlihan has requested, ever
2   requested, a further meeting with Barclays after
3   that February 2009 meeting?
4        MS. TAGGART: I'm going to object to
5        form, foundation and privilege except to
6        the extent you should answer -- hold on,
7        you should answer whether you did any
8        such --
9   A.   I had no direct conversations with
10  Barclay personnel for a request of a meeting
11  with them, me and a Barclay personnel.
12  Q.   Okay. So, in other words, you met
13  with Barclays in February 2009 and you did not
14  request any follow-up meeting with Barclays; is
15  that right?
16       MS. TAGGART: Objection. Asked and
17       answered. Form, foundation.
18       You should respond to what you
19       personally did if that's correct.
20  A.   And I responded numerous times to
21  you, but I'll respond again.
22       I did not have any conversations with
23  Barclay personnel for a follow-up meeting.
24  Q.   If you had open questions, why didn't

Page 87

M. Fazio

1   you press for a follow-up meeting with Barclays?
2        MS. TAGGART: Object to form.
3        Foundation.
4        You can answer, but don't reveal any
5        communications that you had with counsel.
6   A.   Most of my conversations were with
7   counsel with regard to this matter and I had no
8   direct conversations with Barclay, and as such,
9   I guess it's all privileged.
10  Q.   Sir, you remember attending a
11  face-to-face meeting with representatives of
12  Barclays in February 2009, correct?
13  A.   That's correct.
14  Q.   And do you recall that the Barclays
15  representatives indicated their willingness to
16  address the committee's questions?
17  A.   They had answered most of our
18  questions other than the information that we
19  requested on the detailed schedules that was
20  subject matter of the follow-up letters that
21  were sent to Barclays and yourselves.
22  Q.   And after documents were produced,
23  nobody acting on behalf of the committee, to
24  your knowledge, requested a follow-up meeting

Page 88

M. Fazio

1   with Barclays representatives; is that correct?
2        MS. TAGGART: Object to form,
3        foundation and privilege.
4        If you have any information that's
5        separate from your communications with
6        counsel, then you can talk about that.
7   A.   All of my conversations were with
8   counsel.
9   Q.   Putting aside your communications
10  with counsel, do you have any knowledge of any
11  request for a follow-up meeting with Barclays
12  any time after that February 2009 meeting?
13       MS. TAGGART: First, for the record,
14       I object to Mr. Stern laughing as he's
15       asking that question.
16       MR. STERN: I'm not laughing.
17       MS. TAGGART: I'm objecting to form.
18       MR. STERN: I'm not laughing. I'm
19       asking a question.
20  BY MR. STERN:
21  Q.   Aside from your communications with
22  counsel, do you have any recollection of the
23  committee requesting a follow-up meeting with
24  Barclays?

Page 89

M. Fazio

1        MS. TAGGART: Okay. You can answer
2   if you have knowledge outside of
3   communications with counsel.
4   A.   I have no knowledge outside of
5   discussions with counsel.
6   Q.   Based on the written material that
7   you received from Barclays, did you have any
8   follow-up questions to raise with Barclays?
9        MS. TAGGART: Object to form.
10       You can answer yes or no to that.
11  A.   We have many follow-up questions and
12  information requests from Barclays.
13  Q.   Did you ever suggest that there
14  should be a follow-up, face-to-face meeting with
15  Barclays in order to address those questions?
16       MS. TAGGART: Objection. Form,
17       foundation and I'm going to instruct not to
18       privilege -- no to answer on the scope of
19       privilege if this was communication with
20       the you and your counsel.
21       If you disclosed that to someone
22       other than Houlihan and your counsel, you
23       can answer.
24  A.   All my discussions were with counsel

Page 90

1            M. Fazio
2  on this matter.
3       Q.   Well, then let me just ask about your
4  point of view.
5            Would you have found it helpful,
6  given your review of the documents that Barclays
7  provided, to have a face-to-face meeting once
8  again with Mr. King, for example, with
9  Mr. Keegan, for example?
10            MS. TAGGART:  Object to form.
11            To the extent you understand, you can
12  answer.
13       A.   I think that there's many things that
14  we have requested from Barclays, and to ask them
15  to give us that information and to have that
16  information would be very helpful, yes.
17       Q.   So in your view, it would have been
18  helpful to have had a follow-up meeting with
19  Mr. King and Mr. Keegan.
20       A.   I did not --
21            MS. TAGGART:  Object to form.
22       A.   -- say that.
23       Q.   Well, that was my question though.
24       A.   I understand that, but I --
25       Q.   Can you answer my question?

Page 91

1            M. Fazio
2            The question is --
3            MS. TAGGART:  Okay.  Now you're
4  interrupting him.
5            MR. STERN:  Let me just ask a
6  question.
7  BY MR. STERN:
8       Q.   The question is --
9            MS. TAGGART:  You have to wait till
10  he finishes his answer before you ask the
11  next question.
12            Do you have anything more to say?
13            THE WITNESS:  No.
14       A.   Go to the next question.
15       Q.   The question is, would you have found
16  it helpful at the time after receiving
17  spreadsheets and other materials from Barclays
18  to have had a follow-up, face-to-face meeting
19  with Mr. King and Mr. Keegan for example?
20            MS. TAGGART:  Object to form.  Asked
21  and answered.
22       A.   I believe we have had many
23  communications with my lawyers on what we
24  believe is best.  It's clearly more information
25  we can get from Barclays is always better

Page 92

1            M. Fazio
2  associated with this transaction.
3       Q.   Do you know of any reason, do you
4  know of any reason why the committee did not
5  request a follow-up meeting with the Barclays
6  representatives?
7            MS. TAGGART:  I'm going to object to
8  form and instruct not to answer on
9  attorney-client and work product privilege.
10  BY MR. STERN:
11       Q.   Did it concern you personally that at
12  no time after that February 2009 meeting did the
13  committee request a follow-up meeting with
14  Barclays representatives?  Did that concern you?
15            MS. TAGGART:  Objection to form and
16  I'm going to instruct not to answer on
17  privilege.
18  BY MR. STERN:
19       Q.   Do you recall that when Barclays
20  initially produced documents to the committee,
21  those documents were produced in a TIFF format?
22       A.   I don't recall what format they were
23  received in.
24       Q.   Do you recall subsequently they were
25  produced in a native format?

Page 93

1            M. Fazio
2       A.   I don't recall what formats they were
3  received in.
4            MR. STERN:  We'll mark this as the
5  next exhibit.
6            (Deposition Exhibit 619A, Email dated
7  9/22/08 from O'Donnell to various
8  individuals with attachment, Bates stamped
9  HLHZ0009061, marked for identification, as
10  of this date.)
11  BY MR. STERN:
12       Q.   Looking at Exhibit 619A, can you tell
13  me what it is?
14       A.   It's a memo from Dennis O'Donnell to
15  various people, I won't read everybody off, but
16  setting forth in connection with the committee
17  call at 1:00 p.m., an email from Houlihan Lokey
18  summarizing the current state of the
19  LBI/Barclays transaction.
20       Q.   Did you have any role in drafting the
21  email from Houlihan Lokey summarizing the
22  current state of the LBI/Barclays transaction?
23       A.   I would have reviewed it.
24       Q.   Do you know who drafted it?
25       A.   I don't recall who the principal

Page 94

M. Fazio

author was, no.

3    Q.    Was that email prepared by Houlihan
4  in order to communicate certain facts to the
5  Creditors Committee?
6        MS. TAGGART:  Object to form.
7    A.    It would have been written to
8  summarize the current state of the transaction
9  as we knew it as of that time.
10    Q.    And was that email prepared in order
11  to provide information that the committee would
12  need in order to make a decision concerning the
13  transaction?
14        MS. TAGGART:  I'm going to instruct
15    not to answer on privilege and object to
16    form.
17  BY MS. TAGGART:
18    Q.    Do you know whether that email was
19  prepared by Houlihan Lokey in anticipation of
20  litigation concerning the LBI/Barclays
21  transaction?
22        MS. TAGGART:  I'm going to object and
23    instruct not to answer on privilege.
24  BY MR. STERN:
25    Q.    Do you know whether that email from

Page 95

M. Fazio

2  Houlihan Lokey would have been sent to the
3  committee and whether the committee would have
4  needed that information in any event, whether or
5  not it was prepared in anticipation of
6  litigation?
7        MS. TAGGART:  Object to form,
8    foundation and I'm going to instruct not to
9    answer on privilege.
10  BY MR. STERN:
11    Q.    Regardless of whether there was any
12  anticipation of litigation at the time, did the
13  Houlihan Lokey email contain information that
14  the committee needed at the time in order to
15  make certain decisions?
16        MS. TAGGART:  Object to form,
17    foundation and instruct you not to answer
18    on privilege.
19        MR. STERN:  Let's mark this as the
20    next exhibit.
21        (Deposition Exhibit 620A, Email chain
22    beginning with email dated 9/21/08 from
23    O'Donnell to Bell, Bates stamped
24    MTHM00007214 through 7218, marked for
25    identification, as of this date.)

Page 96

M. Fazio

2  BY MR. STERN:
3    Q.    This appears to be a series of emails
4  referring to a "Summary of the LBI Sale
5  Hearing."
6        Do you see that?
7    A.    That's the title of this, yes.
8    Q.    Looking at the second page of this
9  exhibit, does this refresh your recollection
10  that you received a copy of that Summary of the
11  LBI Sale Hearing at the time of this email?
12        (Document review.)
13    Q.    Do you see that you're copied as a
14  cc?
15    A.    I did not see my name yet, sorry.
16    Q.    It's a long list.
17        (Document review.)
18    A.    I see my name there, yes, finally.
19    Q.    Now do you recall whether the Summary
20  of the LBI Sale Hearing was sent to the
21  committee in order to communicate certain facts
22  to the committee concerning the sale hearing?
23        MS. TAGGART:  Object to form,
24    foundation.
25        I'm going to instruct not to answer

Page 97

M. Fazio

2  on privilege.
3        And also note that this is a summary
4    from Milbank.
5  BY MR. STERN:
6    Q.    Same question.
7        MS. TAGGART:  Same objections and
8    instruction.
9  BY MR. STERN:
10    Q.    Regardless of the author, do you know
11  whether this Summary of the LBI Sale Hearing was
12  intended to communicate certain facts to the
13  committee concerning the sale hearing?
14        MS. TAGGART:  So same objections and
15    instructions.  Don't answer.
16  BY MR. STERN:
17    Q.    Do you know whether this summary was
18  prepared in anticipation of litigation
19  concerning the sale transaction?
20        MS. TAGGART:  Same objections and
21    instruction.
22  BY MR. STERN:
23    Q.    Do you know whether this is a summary
24  that the committee would have needed in any
25  event, without regard to whether there might be

Page 98

1          M. Fazio
2    anticipated litigation, in order to make certain
3    decisions concerning the transaction?
4          MS. TAGGART:  Same objections and
5    instruction.
6    BY MR. STERN:
7      Q.  I'll give you a document that we
8    previously marked as Exhibit 476B, and I'll just
9    point out that in the cc line there's a lengthy
10   list of recipients and you are included as one.
11         Can you tell me what this document
12   is?
13     A.   There's a bunch of information that's
14   been redacted, but the attachment is entitled
15   "Transcript Barclays/Lehman Agreement
16   Announcement September 17th, 2008."
17     Q.   Now with respect to the information
18   that was redacted, do you know whether the
19   information consisted of a summary of the
20   transcript that was attached?
21         MS. TAGGART:  You can answer yes or
22   no or I don't know to that.
23     A.  I do not know.
24     Q.   Do you know whether the information
25   that was redacted included facts that the

Page 99

1          M. Fazio
2    committee needed to know?
3          MS. TAGGART:  You can answer yes or
4    no or I don't know.
5      A.  I don't know.
6      Q.   Do you know whether the information
7    that was redacted was information that was
8    prepared in anticipation of litigation relating
9    to the sale transaction?
10         MS. TAGGART:  I'm going to object to
11   form, foundation and instruct not to answer
12   on privilege.
13   BY MR. STERN:
14     Q.   Do you know whether the information
15   that's redacted is information that the
16   committee would have needed in any event,
17   without regard to any anticipated litigation?
18         MS. TAGGART:  I'm -- same objections
19   and instruction.
20   BY MR. STERN:
21     Q.   Do you know whether the information
22   that was redacted was information that the
23   committee needed in order to make certain
24   decisions in connection with the sale
25   transaction?

Page 100

1          M. Fazio
2          MS. TAGGART:  Same objection and
3    instruction.
4          MR. STERN:  Let's mark this as the
5    next exhibit.
6          (Deposition Exhibit 621 A, Email
7    chain beginning with email dated 9/20/08
8    from Fazio to O'Donnell with attachment,
9    Bates stamped HLHZ0027996 through 998,
10   marked for identification, as of this
11   date.)
12   BY MR. STERN:
13     Q.  I'll ask you to please review 621A
14   and tell us what it is.
15         (Document review.)
16     A.  It's an email from myself to Dennis
17   O'Donnell, Craig Bell and Brad Geer.  The
18   subject matter is Lehman/Barclays.
19     Q.  Now in the bottom email on the first
20   page Mr. Bell writes, "Here is the draft
21   Clarification Letter.  This represents Weil's
22   view of the deal and Barclays is reviewing
23   Dennis O'Donnell.  Can you please send to the
24   Houlihan team."
25         And then above you write an email to

Page 101

1          M. Fazio
2    Mr. O'Donnell, Mr. Bell and Mr. Geer.
3          In your communication which is
4    redacted here, were you commenting on the draft
5    Clarification Letter?
6          MS. TAGGART:  I'm going to object and
7    instruct not to answer on privilege.
8    BY MR. STERN:
9      Q.   In your communication, were you
10   suggesting changes to the Clarification Letter?
11         MS. TAGGART:  Same objection and
12   instruction.
13   BY MR. STERN:
14     Q.   Do you know whether before you wrote
15   your email you reviewed the draft that had been
16   provided to you?
17         MS. TAGGART:  You can answer.
18     A.  I do not know.
19     Q.   Now before the September 19th Sale
20   Hearing, did you participate in any discussions
21   with Mr. Seery, James Seery, concerning the
22   anticipated transaction?
23     A.   I believe I was party to a conference
24   call with him.
25     Q.   In that conference call, do you

Page 102

M. Fazio

1
2  recall whether Mr. Seery described to Houlihan
3  how the exchange-traded derivatives business
4  would be treated in the anticipated transaction?
5      A.   I do not recall specifically how he
6  indicated it would be treated.
7      Q.   Do you recall generally?
8      A.   I do not recall generally what he
9  would have said in that meeting with regard to
10 the exchange-traded derivatives.
11     Q.   So you have no recollection
12 concerning what Mr. Seery told you concerning
13 how the exchange-traded derivatives business was
14 going to be treated in the anticipated
15 transaction.
16     A.   We talked about the transaction in
17 general and what was going and what was staying,
18 and it was represented that all the people,
19 which would include people associated with
20 exchange-traded derivatives, were going with the
21 transaction.
22     Q.   Do you recall anything that Mr. Seery
23 told you before the Sale Hearing concerning the
24 transfer of the exchange-traded derivatives
25 business to Barclays aside from the people who

Page 103

M. Fazio

1
2  worked in the business?
3      A.   No.  I do not remember specifically,
4  no.
5      MR. STERN:  I have no further
6  questions.
7      THE VIDEOGRAPHER:  The time is 11:45
8  a.m.  We're going off the record.
9      (Time noted:  11:45 a.m.)
10
11
12 _____
13     MICHAEL A. FAZIO
14
15 Subscribed and sworn to before me
16 this    day of      2010.
17
18 _____
19
20
21
22
23
24
25

Page 104

1
2      C E R T I F I C A T E
3
4  STATE OF NEW YORK   )
5              ) ss.:
6  COUNTY OF QUEENS   )
7
8      I, ANNETTE ARLEQUIN, a Notary Public
9  within and for the State of New York, do
10 hereby certify:
11     That MICHAEL A. FAZIO, the witness
12 whose deposition is hereinbefore set forth,
13 was duly sworn by me and that such
14 deposition is a true record of the
15 testimony given by such witness.
16     I further certify that I am not
17 related to any of the parties to this
18 action by blood or marriage; and that I am
19 in no way interested in the outcome of this
20 matter.
21     IN WITNESS WHEREOF, I have hereunto
22 set my hand this 12th day of February, 2010.
23
24 -----------------------------------
25     ANNETTE ARLEQUIN, CCR, RPR

Page 105

1
2      I N D E X
3
4  Witness                  Page
5
6  MICHAEL A. FAZIO
7    MR. STERN                    7
8
9  QUESTIONS INSTRUCTED NOT TO ANSWER
10   Page   Line
11    15    24
12    16    24
13    17    14
14    18    4
15    36    5
16    37    19
17    39    10
18    42    6
19    43    20
20    44    5
21    44    10
22    44    21
23
24
25

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4     ------------------------x

5     In Re:

6                          Chapter 11

7     LEHMAN BROTHERS        Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al,   (Jointly Administered)

9              Debtors.

10    ------------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF ERIC JONATHAN FELDER

14            New York, New York

15             July 31, 2009

16

17    Reported by:

18    MARY F. BOWMAN, RPR, CRR

19    JOB NO. 24018

20

21

22

23

24

25

1          FELDER - HIGHLY CONFIDENTIAL
2    transcript as highly confidential, and
3    within a week, we will dedesignate as
4    appropriate under the order.
5    EXAMINATION BY
6    MR. CARDEN:
7          Q.    Good morning, Mr. Felder.
8          A.    Good morning.
9          Q.    You are currently employed by
10   Barclays, correct?
11         A.    Correct.
12         Q.    What is your current position, sir?
13         A.    I'm the head of global credit trading.
14         Q.    And how long have you held that
15   position?
16         A.    Since September '08.
17         Q.    And as head of global trading, just
18   generally speaking, what are your
19   responsibilities?
20         A.    Responsible for secondary trading of
21   cash corporate bonds, credit default swaps, loans,
22   and the municipal securities business rolls into
23   credit.
24         Q.    Prior to being employed by Barclays,
25   you were cohead of fixed income at Lehman

1          FELDER - HIGHLY CONFIDENTIAL
2    Brothers, correct?
3          A.    Correct.
4          Q.    Starting on September 9 or thereabouts
5    of 2008?
6          A.    I believe it was September 8.
7          Q.    I am sorry, I meant that -- that's
8    exactly what I meant to say actually.
9          Prior to that, what was your -- what
10   was your previous title and job?
11         A.    I was global head of global credit
12   products, since June of '08.
13         Q.    And in that position, what were your
14   responsibilities?
15         A.    The businesses that rolled up into
16   global credit products were high-grade, high-yield
17   CDOs, municipals, and the credit portion of
18   emerging markets, the corporate credit portion of
19   emerging markets.
20         Q.    In connection with your
21   responsibilities as global head of credit
22   products, did you have any responsibilities of any
23   kind with regard to repos?
24         A.    No.
25         Q.    And when you took over as head of

1          FELDER - HIGHLY CONFIDENTIAL
2    fixed income on September 8, 2008, what were your
3    responsibilities?
4          A.    They were never specifically told to
5    me.
6          Q.    Did you have an understanding as to
7    what they were to be?
8          A.    We had -- I had a brief conversation
9    with Mike Gelband, with Hyung Lee, who is my
10   cohead, about how the portfolio would be split up
11   between the two of us in a normal business
12   environment, and I was going to be responsible
13   for -- or focus on the credit portion and the
14   mortgage portion, and then Hyung would focus on FX
15   and commodities and more focus outside of the U.S.
16   with my focus in the U.S., because he came from
17   Asia.
18         Q.    I would like you to tell me what you
19   consider to have been in the fixed income area at
20   Lehman Brothers as of the time that you had that
21   conversation.
22         A.    In fixed income, you would have had
23   rates, commodities, foreign exchange, credit,
24   mortgages, emerging markets, and financing would
25   have been part of fixed income, or it might have

1          FELDER - HIGHLY CONFIDENTIAL
2    been a JV with equity.  I don't know exactly how
3    it was set up because you obviously finance more
4    than just fixed-income product.  And commercial
5    real estate.
6          Q.    I'm just going to read you a list of
7    asset classes and if you tell me whether you
8    consider them to have been in the fixed income
9    area at Lehman as of September 2008.  All right?
10   And I'm just reading now what legends I have been
11   given, so these might not be completely fulsome.
12         CDs and other money market
13   instruments?
14         A.    Yes.
15         Q.    Total -- corporate obligations and
16   spot?
17         A.    I don't know what that means.
18         Q.    OK.  Corporate stocks and options?
19         A.    No.
20         Q.    Derivatives and other -- and it is cut
21   off so I can't -- it would have been some
22   derivative products.
23         A.    There would have been some, yeah.
24         Q.    Some.  OK.
25         Governments and agencies would have

1        FELDER - HIGHLY CONFIDENTIAL
2  been a fixed income, correct?
3     A.   Correct.
4     Q.   Mortgages and -- any mortgage-backed
5  securities would have been as well, correct?
6     A.   Correct.
7     Q.   Now, when you had the conversation
8  concerning how to divide the fixed income
9  portfolio, was it -- it was divided along product
10  lines or asset classes as well as geography?
11     A.   That was the initial intention.  It
12  was -- nothing was ever put into --
13     Q.   It never functioned?
14     A.   Because, you know, that week was
15  the -- when the firm ultimately went under.
16     Q.   Let's talk about that week.  We are
17  now talking about the week of -- I brought a
18  calendar so we have a, as I said before, a prop.
19  Why don't you avail yourself of it as you wish.  I
20  don't see any need to mark it.  The dates are what
21  they are from time immemorial to the end of time.
22     You were made the head of fixed income
23  on Monday, the 8th of September, correct?
24     A.   Correct.
25     Q.   At some time that week there began to

1        FELDER - HIGHLY CONFIDENTIAL
2  be discussions concerning the sale of the entire
3  firm?
4     A.   Correct.
5     Q.   Were you involved in any of those
6  conversations?
7     A.   I was involved in, if people needed
8  information, I was there to help gather
9  information that would have been needed.
10     Q.   OK.  Let's talk -- is there any other
11  way in which you were -- strike that.
12     I take it you weren't negotiating for
13  the firm in any respect?
14     A.   I was not negotiating.
15     Q.   You were providing a support, support
16  for those who needed information in connection
17  with the negotiations that were ongoing at the
18  time with Bank of America and perhaps others,
19  correct?
20     A.   Correct.
21     Q.   Was there anyone in particular that
22  was asking you for information during that week?
23     A.   There would be a number of people that
24  would say go get a particular person and send them
25  to a room or tell -- relay instructions throughout

1        FELDER - HIGHLY CONFIDENTIAL
2  that -- really from Friday on.
3     Q.   Are we talking about Friday the 12th?
4     A.   Correct.
5     Q.   So your first conversations concerning
6  any transaction in which the firm was to be sold
7  to B of A or anyone else began on that Friday?
8     A.   I never had a conversation about a
9  transaction.  It was -- I was told to go to a
10  legal office and help in providing and gathering
11  any information that would have been needed for a
12  due diligence.
13     Q.   What kind of information were you
14  asked to get?
15     A.   In most cases, it was to get a product
16  expert around a specific asset class that either
17  Barclays or Bank America wanted to discuss.  Or
18  specifically, within -- within credit, where that
19  business had rolled up in to me, if I had any risk
20  reports or specific information that was asked.
21     Q.   Were you asked to provide any
22  valuations or assist in the obtaining of
23  valuations of any asset classes?
24     A.   No.
25     Q.   Were any of the people with whom you

1        FELDER - HIGHLY CONFIDENTIAL
2  worked to your knowledge asked to provide
3  valuations on any asset classes?
4     A.   I would be assuming.
5     Q.   Let's go back to who asked you to help
6  on that Friday.  Can you give me any names of
7  people who were involved?
8     A.   Mike Gelband.
9     Q.   What was Mike's position at the time?
10     A.   He was global head of all of debt and
11  equity.  So all -- excuse me, all of fixed income
12  and equity.
13     Q.   Did you report to him?
14     A.   I reported to Mike.
15     Q.   Anyone else, anyone other than Mike
16  ask you to provide any information on that Friday,
17  the 12th?
18     A.   I believe Ian Lowitt, who was the CFO,
19  and not specifically information but Bart McDade
20  would tell people where to go and be ready for
21  any, you know, any questions or requests.  And I'm
22  sorry, also Alex Kirk.
23     Q.   I was going to ask you about Alex.
24  What was Alex's position at that time?
25     A.   I don't know the exact definition of

## Page 18

FELDER - HIGHLY CONFIDENTIAL

1  it, but he was brought back by Bart and he was on
2  the executive committee, and I believe his title
3  at that time was head of principal investing.
4  He -- but he had been the prior co-COO of fixed
5  income, and so it -- he had a -- he had an
6  institutional knowledge of a broad array of the
7  asset classes within fixed income.
8
9      Q.   And you said that Bart brought him
10  back.  Did he bring him back from outside the
11  firm?
12      A.   He had left the firm in early '08.
13      Q.   When did Bart bring him back?
14      A.   I believe it was June.  At the same
15  time he brought Mike Gelband back.  They came back
16  together.
17      Q.   Do you have any recollection as to any
18  specific information that either Mike or Ian,
19  Bart, Alex asked you to provide?  I'm talking
20  about documentary information as opposed to simply
21  going to some room at some point.
22      A.   It was generally around position -- it
23  was around the business heads bringing position
24  sheets or risk reports.
25      Q.   So at some time on the 12th, do you

TSG Reporting - Worldwide  (877) 702-9580

## Page 19

FELDER - HIGHLY CONFIDENTIAL

1
2  have a recollection of having been asked to
3  provide the position sheets for some particular
4  area in the fixed income department?
5      A.   On Friday, I don't remember the law
6  firm, but I was with the Bank America people and
7  they asked to look at credit positions.  They
8  didn't seem focused on any of the investment grade
9  securities.  They wanted to look at the leveraged
10  loans.
11          So I had Jim Seery, who ran leveraged
12  loans, come to the law offices and then proceed
13  with those conversations.
14      Q.   Do you have a recollection of having
15  provided any printouts of positions in the fixed
16  income area to B of A?  Not personally but I mean
17  in connection with the work you were doing on
18  behalf of the firm?
19      A.   There were definitely risk reports in
20  these meetings.  I don't know if they were turned
21  over to Bank America or reviewed there and then
22  kept.
23      Q.   What are you calling a risk report?
24  Are they position reports, the positions that the
25  firm had, long and short positions?

TSG Reporting - Worldwide  (877) 702-9580

## Page 20

FELDER - HIGHLY CONFIDENTIAL

1
2      A.   It depends on the asset class, how the
3  risk reports are, are set up.  I'm only
4  knowledgeable really about the credit-specific
5  risk reports.  But they generally give a broad
6  overview and will list top positions as opposed to
7  a very detailed line-by-line summary of the
8  business.
9      Q.   When you say top positions, are you
10  talking about, say, the top 100 positions that the
11  firm is maintaining?  Or how are you
12  characterizing that?
13      A.   Within a business -- the individual
14  risk manager would set it up however they reviewed
15  the risk themselves.  So it might be the top 20
16  longs and the top 20 shorts, or it might be the
17  top jump to default positions or the top current
18  positions, depending on how you would look at the
19  risk.  There would be different buckets.
20      Q.   How are the valuations on the
21  positions in such reports established by the firm
22  or how were they established?
23      A.   Traders mark their positions each day.
24      Q.   You didn't have any responsibility for
25  valuations, I take it?

TSG Reporting - Worldwide  (877) 702-9580

## Page 21

FELDER - HIGHLY CONFIDENTIAL

1
2      A.   The traders within the business that I
3  run had to mark their positions.
4      Q.   But you didn't do it personally?
5      A.   I did not mark positions.
6      Q.   But you were overseeing those who were
7  marking positions to establish valuations for the
8  positions in the area where you had
9  responsibility, correct?
10      A.   I was overseeing desk heads who were
11  overseeing the traders who were marking.
12      Q.   Now, I have seen a phrase used about a
13  dirty valuation.  What's a dirty valuation?  Does
14  that phrase mean anything to you?
15      A.   Dirty price means something to me, not
16  dirty valuation.
17      Q.   OK, dirty price?
18      A.   That would be a security without
19  accrued interest.
20      Q.   Did you ever have occasion during the
21  time that Lehman was speaking to B of A to look at
22  any of the valuations for the positions within
23  your area of responsibility?
24          MR. CERESNY:  To clarify, when you say
25  valuations, you mean marks?

TSG Reporting - Worldwide  (877) 702-9580

1          FELDER - HIGHLY CONFIDENTIAL
2          THE WITNESS:  Yes.
3          (Record read)
4     A.  I saw -- I could see the marks on
5  positions within credit.
6     **Q.  When you say the positions within**
7  **credit, would you amplify upon that for me?  What**
8  **do you mean by that?**
9     A.  Cash corporate bonds, credit default
10  swaps.
11    **Q.  Treasuries?**
12    A.  Treasuries are in -- would be used as
13  a hedge within the credit space, and any marks on
14  Treasuries would be automatically fed from the
15  Treasury group that marked them.
16    **Q.  But at Lehman, Treasuries were not**
17  **within fixed income?**
18    A.  They were within fixed income.
19    **Q.  In the credit area of fixed income?**
20    A.  Correct.  They were in the interest
21  rate business.
22    **Q.  You said you were having a meeting or**
23  **had a meeting with B of A on the Friday.  Was**
24  **this -- let's talk a little bit about your**
25  **meetings with B of A.  Did you have more than one?**

1          **FELDER - HIGHLY CONFIDENTIAL**
2     A.  I was there throughout the day.  And
3  there were -- there were different meetings
4  throughout the day.
5     **Q.  What was your role in those meetings?**
6     A.  I was gathering information for, as I
7  mentioned earlier, for example, when they wanted
8  to talk about leveraged loans, I would go get Jim
9  Seery.  I gave a brief overview of our credit
10  business.
11         And then away from that, I was really
12  facilitating getting the right people to the
13  location in order to have -- for them to have the
14  more detailed conversations by asset class.
15    **Q.  And did your meetings with B of A**
16  **continue through the weekend or was it only on the**
17  **Friday?**
18    A.  It was just Friday.
19    **Q.  Did you have any meetings of any kind**
20  **with regard to the sale of the firm on the weekend**
21  **of the 13th and 14th of September?**
22    A.  I had similar -- I went to a different
23  law firm on Saturday where the Barclays team was
24  and had a similar function, where I was there to
25  try to facilitate anything that people would --

1          FELDER - HIGHLY CONFIDENTIAL
2  information people would have needed.
3     **Q.  Do you recall with whom at Barclays**
4  **you were meeting?**
5     A.  It was Jerry Del Missier, Eric
6  Bommensath, and I believe Mike Keegan.
7     **Q.  Did you have meetings with any B of A**
8  **people on Sunday?  Pardon me, I apologize.  Did**
9  **you have any meetings with any Barclays people on**
10  **Sunday?**
11    A.  I don't believe so.
12    **Q.  So your meeting with Del Missier,**
13  **Bommen -- how do you say his name?**
14    A.  Bommensath.
15    **Q.  And Keegan on Saturday, at a law firm?**
16    A.  Yes.
17    **Q.  Did you or someone underneath your**
18  **area of responsibility provide any position lists**
19  **of any kind to the Barclays people?**
20    A.  I would assume so.
21    **Q.  But you don't recall?**
22    A.  They -- there were risk reports again
23  that were -- that were at the meetings.
24    **Q.  OK, let's -- I want to get to the week**
25  **of the 15th, and before we step off on Monday**

1          **FELDER - HIGHLY CONFIDENTIAL**
2  **morning, did you have any other meetings of any**
3  **kind with anybody at Lehman or Barclays or B of A**
4  **on that weekend in a -- that you haven't spoken**
5  **about just generally now?**
6     A.  Just at the law firm on Friday and
7  Saturday.
8     **Q.  Let's start Monday morning.  You**
9  **arrive at the office on Monday morning, and tell**
10  **me -- you know, I want to get -- I am going to let**
11  **you do something I don't like to do.  I would like**
12  **a narrative of what you ended up doing that week,**
13  **so it will maybe short focus our questions and**
14  **maybe shorten this up a little bit.**
15         **Why don't you tell me what happened**
16  **Monday morning when you got into the office, and**
17  **we will start off.**
18    A.  It was -- I got to -- I got to the
19  office Monday morning.  I believe I went to Mike
20  Gelband to ask for instructions as to what I was
21  supposed to be doing, what I was supposed to be
22  directing people to be doing, given the firm had
23  filed for bankruptcy.  I was trying to keep people
24  calm and be supportive, you know, and obviously in
25  a tough time.

## Page 30

FELDER - HIGHLY CONFIDENTIAL

1

2    Q.   And did you ever direct anyone with

3  regard to any of the asset classes that you

4  mentioned to any room other than the room you have

5  just described on the Monday?

6    A.   On the Monday? I don't know if they

7  ended up in other rooms. I would say, come up to

8  the 32nd floor, and then there were just so many

9  people going around that it's possible that

10 someone ended up in a different room than that

11 room.

12   Q.   I understand. I am asking if you

13 recall having directed anybody else to a different

14 room that day.

15   A.   No, I don't.

16   Q.   How long were you at the firm on that

17 Monday, the 15th?

18   A.   I was there until I believe, I believe

19 5 or 6 o'clock. It might have been a little bit

20 later. Everyone was -- there were still a lot of

21 people there, and the requests for me to do things

22 had stopped, so I was just sort of waiting up

23 there. So I went -- so I left.

24   Q.   You went home?

25   A.   I might have gone and grabbed a drink

TSG Reporting - Worldwide  (877) 702-9580

## Page 31

FELDER - HIGHLY CONFIDENTIAL

1

2  and then gone home.

3    Q.   I understand. But did you come back

4  to the office that day?

5    A.   No.

6    Q.   The next time you came to the office

7  was when?

8    A.   Was Tuesday.

9    Q.   First thing in the morning?

10   A.   I believe Tuesday was the day that I

11 met with Jerry Del Missier and Bob Diamond about

12 my role specifically, and I don't recall if I went

13 directly to the Barclays building at 200 Park or

14 to the old Lehman -- I don't recall which I went

15 to first.

16   Q.   When you say your role, you are

17 talking about your role to be at Barclays, if

18 Barclays purchased --

19   A.   If there was -- yes.

20   Q.   If there was a transaction?

21   A.   Correct.

22   Q.   Let's hold on that for just a moment.

23 That was on the Tuesday, you believe?

24   A.   I believe it was on the Tuesday.

25   Q.   So it would have been Tuesday, the

TSG Reporting - Worldwide  (877) 702-9580

## Page 32

FELDER - HIGHLY CONFIDENTIAL

1

2  16th, correct?

3    A.   Correct.

4    Q.   Did you have any conversations with

5  anybody at Lehman Brothers or Barclays the evening

6  of Monday on the telephone?

7    A.   Bart called me and told me that Bob

8  and Jerry would be reaching out to me over the

9  next day to set up a meeting and I should be

10 expecting that.

11   Q.   Were there any other calls from anyone

12 at Lehman Brothers or Barclays on the evening of

13 Monday, September 15?

14   A.   I believe I spoke to Tom Humphrey.

15   Q.   You called Tom or he called you?

16   A.   I don't recall.

17   Q.   Now, Tom Humphrey was one of the

18 people who worked underneath you in the fixed

19 income area, correct?

20   A.   No. He was the global head of fixed

21 income sales.

22   Q.   That was not within your area of

23 responsibility as cohead of global -- pardon me,

24 of global fixed income?

25   A.   That wasn't -- at different points,

TSG Reporting - Worldwide  (877) 702-9580

## Page 33

FELDER - HIGHLY CONFIDENTIAL

1

2  the global head of fixed income sales either

3  reported to the head of fixed income or didn't.

4  Sometimes it was separate up into Steve Lessing,

5  who ran all distribution.

6        So I had never -- I wasn't -- I had

7  never been told specifically whether Tom reported

8  to me or not.

9    Q.   All right, fine.

10        Did -- I am sorry, maybe you said

11 this. Did you call Tom or did he call you?

12   A.   I don't recall.

13   Q.   Do you remember what you spoke to Tom

14 about?

15   A.   I asked him how is it going -- he was

16 still there.

17   Q.   Still at the firm?

18   A.   Still physically at 745 Seventh. So I

19 was trying throughout the night -- I don't think I

20 went to sleep. I was trying to find out are

21 things -- how are things going. And he -- I

22 remember he gave me an update, and he said it

23 seems like things were going OK.

24   Q.   You were checking in with him to check

25 the status of what was happening?

TSG Reporting - Worldwide  (877) 702-9580

FELDER - HIGHLY CONFIDENTIAL

1  A.   Yes.
2  Q.   When you left the office on Monday,
3  was it your understanding that Barclays was going
4  to purchase the broker dealer or was going to
5  purchase certain assets of Lehman Brothers?
6  A.   All I --
7  MR. STERN:  Objection to the form.
8  Q.   Go ahead.
9  A.   What does that mean?
10  MR. STERN:  It means --
11  Q.   It means I didn't ask a particularly
12  good question on this particular question, but it
13  is good enough for the present purposes.
14  MR. STERN:  Let's hear the question
15  again.
16  (Record read).
17  MR. CARDEN:  I would say Lehman
18  Brothers, the assets -- pardon me, the
19  broker dealer is not an asset of Lehman
20  Brothers, so I think the question is fine,
21  but I will rephrase it if you really want me
22  to.
23  MR. STERN:  Yeah.
24  Q.   When you left on Monday, was it your

FELDER - HIGHLY CONFIDENTIAL

1  understanding that the negotiations were still to
2  purchase the entire broker dealer or purchase some
3  specific positions or other assets of Lehman
4  Brothers?
5  A.   I didn't have specific knowledge.
6  Q.   Did you have any general knowledge at
7  all?  Had you heard anything?
8  A.   All I had heard during the day was
9  that there was the possibility that Barclays could
10  buy the broker dealer.
11  Q.   When you left on Monday, so far as you
12  knew, that was the conversation that was taking
13  place, it was the purchase of the broker dealer?
14  MR. STERN:  Objection to the form.
15  A.   I didn't have any new -- I didn't have
16  any new specifics of the details.
17  Q.   OK.  Now, on Tuesday, did there come a
18  time when you understood that Barclays was
19  considering purchasing something less than the
20  entire broker dealer of Lehman Brothers?
21  A.   No.
22  Q.   Did there ever come a time during the
23  week of September 15 when you understood that
24  Barclays was going to be purchasing certain

FELDER - HIGHLY CONFIDENTIAL

1  specific assets, meaning positions, asset classes
2  and the like of Lehman Brothers?
3  A.   I had always heard it was the broker
4  dealer.
5  Q.   When did you first learn that it
6  wasn't the broker dealer that Barclays had
7  purchased?
8  A.   I actually thought they did purchase
9  the broker dealer.
10  Q.   To this day?
11  A.   Yes.
12  Q.   OK.
13  A.   Is that not --
14  MR. STERN:  There is a distinction
15  between the assets of the broker dealer and
16  the stock of LBI, so --
17  MR. CARDEN:  OK.
18  MR. STERN:  That's I think where the
19  confusion lies.  There really shouldn't be
20  any confusion.  Not that you shouldn't be
21  confused, but rather there shouldn't be any
22  confusion on the record because the
23  agreement is a matter of public record.
24  Q.   Let's goes to Tuesday when you're

FELDER - HIGHLY CONFIDENTIAL

1  having your conversation with Mr. Diamond and
2  Mr. Del Missier, right?  That was at Barclays?
3  A.   Correct.
4  Q.   Was anyone else present other than the
5  three of you?
6  A.   I believe Michael Evans was there.
7  Q.   Who is Michael Evans?
8  A.   He runs human resources for Barclays.
9  But I'm not positive.
10  Q.   Do you recall whether that was the
11  morning of the 16th?
12  A.   I believe it was the morning.
13  Q.   You can't recall whether you went
14  straight there or whether you went to the office
15  of Lehman Brothers first?
16  A.   Correct.
17  Q.   How long did you meet with Mr. Diamond
18  and Mr. Del Missier?
19  A.   It was probably about 45 minutes.
20  Q.   Do you know if anyone else at Lehman
21  Brothers was meeting with them as well?
22  A.   I don't.
23  Q.   Did you see any Lehman Brothers people
24  waiting to meet with them?

FELDER - HIGHLY CONFIDENTIAL

1
2   A.   No.  But I do know that other Lehman
3   people met with them the night before.
4   Q.   Do you know who met with them the
5   night before?
6   A.   I believe Tom Humphrey sent me, I
7   believe, an e-mail saying that he had met with
8   them.  But away from that, I didn't know anyone
9   specifically.
10   Q.   Did you ever learn that other people
11   at Lehman Brothers had met with Mr. Diamond at
12   some point on the Monday or the Tuesday?
13   A.   Jerry Donini told me that he met with
14   them.  I don't recall when.
15   Q.   Tell me as best you can what
16   Mr. Diamond and Mr. Del Missier said to you and
17   what you said to them in that meeting on the
18   morning of September 16.
19   A.   They said that they would like for me
20   to join the firm running the credit business.
21   Then we got into specifics of what that actually
22   meant.  And so it was -- they spoke about that it
23   is credit trading, just high grade, high yield.
24   We were comparing it to my function at Lehman.  So
25   not CDOs, not emerging markets.

FELDER - HIGHLY CONFIDENTIAL

1
2   They explained the structure of the
3   firm, how sales trading and research all roll up
4   in separate verticals as opposed to having the
5   whole business, and that I would be running the
6   trading portion of the credit business.
7   We spoke about that for a while,
8   because I thought that was a major structural
9   difference, so we spoke about that for a while.
10   Then we spoke about what compensation
11   they would be willing to offer me.
12   Q.   What did they tell you about
13   compensation?
14   A.   They said they -- I had -- I had
15   contracts from Lehman, and so they said that they
16   were -- you know, they wanted to do what they
17   could do to have me in as close to the same spot
18   that I would have been in if I had stayed at
19   Lehman and Lehman didn't go bankrupt to join
20   Barclays.
21   Q.   Did they give you a specific number,
22   what that meant?
23   A.   The specific numbers within -- for my
24   '08 compensation for Lehman, the cash component
25   was $25 million.  And so they said they would give

FELDER - HIGHLY CONFIDENTIAL

1
2   me $25 million for '08 compensation, split in cash
3   and equity.
4   In Lehman, I had that in cash, so I
5   said, you know, I said if it is doable all in
6   cash, that that would be closer to keeping me in
7   the same spot than not.
8   They had to check if that was doable,
9   so there were a few days then after that before
10   anything -- before I got anything back that
11   indicated that -- but they said they would work to
12   see if that made sense.  They wanted to see the
13   Lehman documents, as well.
14   Q.   Meaning Lehman documents related to
15   your compensation --
16   A.   Yes.
17   Q.   -- or the --
18   A.   No, Lehman documents related to the
19   compensation.
20   I told them -- I had gotten the Lehman
21   money, I already had the cash.  I told them I
22   intended to give that money back to Lehman as
23   well.  And so if there was a way to have the
24   Barclays money given to me earlier than the
25   February date, which was the standard date, that

FELDER - HIGHLY CONFIDENTIAL

1
2   that would be preferable.  So they had to -- they
3   checked on that.
4   And then we spoke about making sure
5   that -- I said, look, I want this to be fair and
6   us to have -- start to be a very good working
7   relationship, so whatever we need to put in the
8   contract so, you know, I am really going to be
9   here and stay.  I don't want to get this cash from
10   you and then have the ability to leave.
11   So we wrote into the document that I
12   had to stay until March of '09, otherwise I would
13   have had to give that money back.  And then --
14   Q.   Give the '08 money back?
15   A.   Yes.
16   And then -- I am trying to think if
17   there are any other things.  And then I wanted to
18   make sure that most importantly, that I was going
19   to be able to bring -- that the people in the
20   credit business at Lehman, I was going to be able
21   to make sure that they had jobs and that they were
22   coming also, so we could keep the whole business
23   together, and that I would have some ability to
24   decide who of the people would have -- would be in
25   each seat.  So that I was actually empowered in

FELDER - HIGHLY CONFIDENTIAL

1 the business, so that we spoke about that.
2     Q.   And did they speak in that meeting on
3 the Monday -- pardon me, the Tuesday morning,
4 about '09 compensation?
5     A.   I had '09 guaranteed for Lehman.  That
6 wasn't the way the Barclays deals were set up from
7 what I was told.  So it was for '08 and then
8 for -- for a portion of the people, I don't know
9 the number, there were retention payments that
10 were one year from your start date and then two
11 years from your start date, and so I was eligible
12 for the retention payments, the two retention
13 payments.
14     And that, I believe, was a set
15 percentage of 25 percent of the '08 number.  I
16 believe that was the number.  But there was no
17 guaranteed -- no guaranteed '09 compensation.
18     Q.   Other than a retention?
19     A.   Other than a retention.
20     Q.   And were there -- strike that.
21     When they finally got back to you on
22 your request to have it all paid in cash, was the
23 answer that yes, they would pay it all in cash?
24     A.   Yes.

FELDER - HIGHLY CONFIDENTIAL

1     Q.   And was the answer also that they
2 would pay it earlier than February?
3     A.   Yes.
4     Q.   And when did they pay it?
5     A.   The date I believe was -- set in the
6 contract was October 31st.  I don't recall the
7 exact date that the payment occurred.
8     Q.   And no portion of your '08 income then
9 was equity or stock in Barclays.  It was all cash?
10     A.   Correct.
11     Q.   Now, when you spoke to them about
12 bringing the people in your area over, did you ask
13 whether or not there would be bonuses or payments
14 available for them as well?
15     A.   Yeah.  There was the assumption that
16 people were going to get compensated for -- that
17 people were going to have employment contracts
18 with Barclays.
19     Q.   And when you say there was an
20 assumption, what was that based on in your mind?
21     A.   That people wouldn't -- you wouldn't
22 get the people if you didn't compensate them.
23 People wouldn't have come for nothing.
24     Q.   Did there ever come a time when you

FELDER - HIGHLY CONFIDENTIAL

1 heard that a specific pool of money that had been set
2 aside for the purposes of bringing people over
3 from Lehman to Barclays?
4     A.   Only when I read it in the New York
5 Post.
6     Q.   All right.  So you have your meeting
7 with Diamond and Del Missier on Tuesday morning,
8 and following that meeting, you went back to
9 Lehman, I take it?
10     A.   Yes.
11     Q.   And I would like you to describe for
12 me your day, if you will, in general terms, and
13 then we will come back as to what you were doing
14 on Tuesday, the 16th.
15     A.   Really for the rest of that week, it
16 was just trying to keep the people together.
17 People were out interviewing, people were getting
18 job offers from other firms.  There was a lot of
19 uncertainty.
20     And I was also trying to relay any
21 instructions that were given around what people
22 sitting in the seats should be doing and that
23 was -- that was the rest -- pretty much the rest
24 of the week.

FELDER - HIGHLY CONFIDENTIAL

1     Q.   Did you ever see a copy of the asset
2 purchase agreement that was entered into between
3 Lehman and Barclays on Tuesday, the 16th?
4     A.   I believe -- there was some document
5 that was made public.  I don't remember what day,
6 whether it was Tuesday or Wednesday or Thursday.
7 And I do remember it had -- it was -- it was up on
8 the Web, and I remember it had like hand-scribbled
9 notes all over it on the Web.  That got e-mailed
10 around everywhere.  I don't know if that is that
11 document, but there was some document that --
12     Q.   Did you read it?
13     A.   That I -- I -- I glanced through it.
14 I didn't specifically --
15     Q.   Do you recall anything about it?
16     A.   I recall that there was -- there was a
17 connotation of specific numbers of people that had
18 to come to Barclays as part of the arrangement, or
19 part of whatever the deal was.
20     Q.   Did you ever see the master repurchase
21 agreement between Lehman and Barclays?
22     A.   No.
23     Q.   Did you ever know there was one?
24     A.   No.

FELDER - HIGHLY CONFIDENTIAL

1
2      Q.    Just so we are not in terrible doubt,
3  we will find out whether it was the APA you looked
4  at.
5      A.    OK.
6      Q.    You don't know anything else about the
7  document that you saw online that had all the
8  handwriting on it that would help me determine
9  what it was you might have seen?
10      A.    I remember it got sent to me, because
11  this concept of eight people, like they started
12  calling it the elite eight, whatever document that
13  was in was getting sent around at the firm.  So
14  that, whatever that document was --
15      Q.    That's the document?
16      A.    That would have been the one.
17      Q.    And you were one of the elite eight,
18  correct?
19      A.    I wasn't aware that I was.
20      Q.    The document didn't identify the
21  eight?
22      A.    I was never told that I --
23      Q.    No, but when you read the document,
24  was your name in it?
25      A.    No, I didn't see my name.

FELDER - HIGHLY CONFIDENTIAL

1
2      (Exhibit 1, asset purchase agreement
3  dated September 16, 2008 marked for
4  identification, as of this date.)
5      MR. CARDEN:  I think what -- who knows
6  how we will end up with this, but we will
7  make this Felder Exhibit 1.  I think we will
8  end up with depositions being taken
9  simultaneously at some point later in the
10  schedule, which will make it awkward if we
11  do it any other way.
12      MR. STERN:  What we had proposed, to
13  avoid duplicate exhibits, we have a system
14  of numerical numbering sequential, and when
15  we have multiple depositions, we just say
16  this deposition will take from 200 to 300.
17      MR. CARDEN:  That's fine.
18      MR. STERN:  This is the first
19  deposition.  Why don't we start out that way
20  and see how it works.
21      MR. CARDEN:  OK.  So what we will do
22  is, 1 through 25, if we get that far, will
23  be Mr. Felder.  OK, that's fine by me.
24      So it is Exhibit 1.  Not Felder 1,
25  just Exhibit 1.

FELDER - HIGHLY CONFIDENTIAL

1
2      Q.    Have you ever seen this document
3  before, Mr. Felder?
4      A.    No, not -- the document I saw had hand
5  notes on it.  So this --
6      Q.    This clearly was not the document that
7  was the elite eight, I appreciate that.  The
8  question is not whether this is that document, the
9  question is, have you ever seen this one before?
10      A.    This document, no.
11      Q.    OK.  I would like to direct your
12  attention to page 6, and subparagraph D at the end
13  there, do you see the reference to government
14  securities approximating 70 billion?
15      A.    Yes.
16      Q.    Do you ever recall having heard from
17  anybody that Barclays was going to purchase
18  approximately 70 billion in government securities
19  from Lehman Brothers?
20      MR. STERN:  Objection to the form.
21      Q.    That's commercial paper, corporate
22  debt.  I'm just talking about --
23      MR. STERN:  What it says in section D.
24      Q.    Whatever it says in section D.  I will
25  rephrase that.

FELDER - HIGHLY CONFIDENTIAL

1
2      Did you ever hear from anyone that
3  Barclays was going to purchase those types of
4  securities identified in subparagraph D which
5  approximated $80 billion?
6      A.    No.  I heard they were going to
7  purchase the broker dealer, which I assumed had
8  assets.  I didn't know the exact numbers.
9      Q.    You never heard a number 70 billion?
10      A.    I don't recall.
11      Q.    For that matter, you never heard a
12  number 72 billion?
13      A.    I don't know.
14      Q.    Did you ever hear at any time a
15  specific number of the value given to the assets
16  that were purchased by Barclays from Lehman
17  Brothers?
18      A.    After the fact -- after everything, I
19  do recall Eric Bommensath, people throwing around
20  the number 50 billion afterwards.
21      Q.    So this is after the transaction
22  closed, Mr. -- I am having trouble with the name?
23      A.    Bommensath.
24      Q.    Bommensath.
25      A.    I do recall him throwing out the

FELDER - HIGHLY CONFIDENTIAL
1
2    number 50 billion.
3        Q.    50 billion of assets had been
4    purchased by Barclays?
5        A.    I recall that.
6        Q.    Did he say that to you personally?
7        A.    I was -- I don't know if it was just
8    me and him or whether it was a group.  I remember,
9    I remember him saying we have 50 billion worth of
10   assets.
11       Q.    And do you remember when he told you
12   that?
13       A.    It was already over at 200 Park.  It
14   was probably in October.
15       Q.    Do you remember what occasioned him to
16   have this conversation with you?  Were you talking
17   about the transaction?
18       A.    We were going through, we were going
19   through, you know, set -- he wanted to set up
20   a series of reports to keep track of -- that the
21   sales force was working on selling, once the firms
22   were together, and I asked the question is there
23   anything that, is there anything that now that we
24   are up and running, that the sales force should be
25   working on, and those -- he said, well, that, that

FELDER - HIGHLY CONFIDENTIAL
1
2    50 billion is off in a different -- the 50 billion
3    is off in a different group basically.
4        Q.    So the 50 billion in assets that had
5    been purchased by Barclays were not in your
6    group --
7        A.    Right, exactly.
8        Q.    -- for the purposes of the sale?
9        A.    Exactly.
10           MR. STERN:  Let him finish the
11   question.
12           Can I hear the question?
13           (Record read)
14           MR. STERN:  Objection to the form.
15           You can answer.
16       A.    They weren't in, they weren't in the
17   credit business that I was going to be responsible
18   for.
19       Q.    Did he tell you where they were?
20       A.    It was in a group called P -- PMTG.
21       Q.    Do you know who -- do you know what
22   that group is, what it does?
23       A.    I believe it is -- I believe PMTG
24   stands for principal mortgage -- I don't know the
25   last two letters.  So it was principal positions.

FELDER - HIGHLY CONFIDENTIAL
1
2        Q.    Do you know who is head of that group
3    at Barclays?
4        A.    It is either Stephen King or I believe
5    at the time it was David Martin.  It was one --
6    David Martin is no longer with the firm.  It is
7    one of those two people, and it might roll up into
8    John Mann now.  I don't know the exact setup.
9        Q.    Do you have an understanding of what
10   that group at Barclays does?
11       A.    Not with precision.  I know that they
12   have assets and that they -- and that they trade
13   in the securities.
14       Q.    Am I right in understanding what you
15   are saying is that that group deals with
16   proprietary positions at Barclays?
17       A.    I don't know if it was proprietary.  I
18   have only heard the word "principal."
19       Q.    So you don't have an understanding of
20   whether that's a category of investments, or
21   pardon me, a category of assets that are
22   considered proprietary assets to Barclays?
23       A.    I don't know how they categorize it.
24       Q.    Before that conversation with
25   Mr. Del Missier in which he said there had been

FELDER - HIGHLY CONFIDENTIAL
1
2    $50 billion dollars assets --
3           MR. STERN:  Objection, objection.
4        A.    Mr. Bommensath.
5        Q.    I'm sorry, Mr. Bommensath.
6           MR. STERN:  Objection to the form.
7        Q.    Before the conversation with
8    Bommensath in which he told you there had been
9    $50 billion of assets purchased by Barclays, did
10   you have any conversations with anyone in which
11   the value of the assets purchased by Barclays was
12   discussed?
13       A.    No, just those -- the meetings that I
14   had mentioned over the weekend.
15       Q.    Let's make this Exhibit 2.
16           (Exhibit 2, e-mail with attachment
17           dated September 18, 2008 marked for
18           identification, as of this date.)
19       Q.    Have you ever seen Exhibit 2 before,
20   Mr. Felder?  Let me rephrase.
21           Have you ever seen any part of
22   Exhibit 2 before, if you haven't seen the whole?
23       A.    No, I don't recall seeing this.
24       Q.    Have you ever seen a document like
25   page 2?  This chart, summary chart?

**FELDER - HIGHLY CONFIDENTIAL**

1
2     A.    I would have summary risk reports for
3  my business -- for the businesses.  But it was
4  credit.  We hadn't gotten to the point in fixed
5  income where -- because it was only four days.
6     Q.    Which of the areas identified on
7  page 2, if you could tell me, were the areas for
8  which you had responsibility, which asset classes?
9     A.    At what -- when?
10     Q.    The week of September 15, or the last
11  days of the week before, if you weren't really
12  doing anything the 15th.  Let me say it another
13  way.
14          Which of these asset classes were,
15  given your understanding of what position you were
16  to have starting on September 8, would have been
17  within your areas of responsibility?
18     A.    Total CDs and nonmoney market.
19     Q.    OK.
20     A.    I don't know what the second term
21  means with "spot."  If it is just corporate bonds,
22  then it would, but I don't know what the term
23  "spot" --
24     Q.    Are you talking about total corp.
25  obligations and spot, that category?

**FELDER - HIGHLY CONFIDENTIAL**

1
2     A.    Yeah.  If it is corporate credit risk
3  and bonds, then it would.  But I don't know what
4  corporate obligations -- I don't know what that
5  phrase means.
6     Q.    OK.
7     A.    A portion of derivatives, if it was
8  within fixed income.
9     Q.    OK.
10     A.    And this would have been in my role as
11  cohead of fixed income if I had been told what I
12  would have been responsible for.  Governments and
13  agencies and mortgages and mortgage backs.
14     Q.    Do you ever remember participating in
15  any effort to create a balance sheet for just LBI
16  itself?
17     A.    No.
18     Q.    And did you ever do any kind of
19  calculations to determine the value, the marks of
20  the positions if you will, that were within your
21  area of responsibility?
22     A.    No.
23     Q.    And do you know if there at page 2 of
24  this exhibit is, in fact, an effort to do just
25  that as to certain aspects of the portfolio?

**FELDER - HIGHLY CONFIDENTIAL**

1
2     A.    I don't know.
3     Q.    Do you recognize the spreadsheets that
4  follow page 2 as being listings of the investments
5  or the securities within the various asset classes
6  and the summary page 2?
7          MR. STERN:  Objection to the form.
8     A.    It looks like a list of securities to
9  me.
10     Q.    And the valuations that are provided
11  would have been provided by the various traders on
12  the desks in question, correct, whoever was
13  trading these particular securities?
14     A.    I don't know what the data -- where
15  this -- where the data from this report would have
16  come from.
17     Q.    Could the valuations have come from
18  anyone other than the traders?
19          MR. STERN:  Objection to the form.
20     A.    I don't know.
21     Q.    And in any event, you didn't provide
22  any valuations?
23     A.    No.
24     Q.    To any of these positions?
25     A.    No.

**FELDER - HIGHLY CONFIDENTIAL**

1
2     Q.    Now, did there ever come a time,
3  Mr. Felder, where you were asked to help prepare
4  Mr. McDade for his testimony on Friday before the
5  bankruptcy court?
6     A.    No.
7     Q.    Did there come a time when you were
8  asked to provide a fire sale liquidation price for
9  the positions within your area of responsibility?
10     A.    No.
11          (Exhibit 3, document Bates stamped
12      1029780 marked for identification, as of
13      this date.)
14     Q.    Mr. Felder, I show you what has been
15  marked as Exhibit 3, which is an e-mail from
16  Mr. Kirk to some unknown address.  But it has with
17  it underneath an e-mail that was sent from -- by
18  Mr. Flores to a group of people including yourself
19  on Thursday evening at 8:40.
20          Do you recall having gotten this
21  e-mail, sir?
22     A.    I don't.
23     Q.    Do you have an understanding of what
24  is meant by the phrase a fire sale liquidation of
25  the securities that are being transferred to

Page 58

FELDER - HIGHLY CONFIDENTIAL
1
2    Barclays?
3          MR. STERN:  Objection to the form.
4      A.    Can you repeat the question.
5          (Record read)
6      A.    My understanding of the term "fire
7    sale" would be someone who had to sell securities
8    in a very short time frame.
9      Q.    Most of the securities in your area of
10   responsibility were very high grade, were they
11   not?
12     A.    In credit, there was high grade, there
13   was high yield, there was distressed.  There were
14   different types of securities within credit.
15     Q.    Would you just go back to Exhibit 2
16   for a moment and look at the summary chart.  The
17   listing there for total governments and agencies
18   at 37.6 billion long, do you see that?
19     A.    Yes.
20     Q.    Those are very high grade, are they
21   not?
22     A.    I don't know what's in there, but if
23   it is -- if it was U.S. Government bonds, that
24   would be very high grade.  If it was senior agency
25   paper, that would be very high grade, that would

Page 59

FELDER - HIGHLY CONFIDENTIAL
1
2    be high quality.  But if it was subordinated, it
3    might not be.
4      Q.    Anything else that would be very high
5    grade that would be within the asset classes that
6    were in your area of responsibility, other than
7    those two?
8      A.    Investment grade corporate bonds would
9    be high quality.  And then I would assume that
10   there is some very high quality mortgage paper,
11   but I'm not a mortgage expert.
12     Q.    The sale of those kinds of high-grade
13   securities, does it ever -- strike that.
14          The markets for those very high grade
15   securities that you just articulated are quite
16   large, are they not?
17     A.    The aggregate markets, yes.
18     Q.    And the amounts that are listed here
19   of 37 billion, if that includes all of them,
20   that's not a very big number in terms of the
21   overall market in those securities, is it?
22     A.    No.
23     Q.    The market can easily absorb those
24   sales without changing the market, couldn't it?
25     A.    It would depend on -- it would depend

Page 60

FELDER - HIGHLY CONFIDENTIAL
1
2    on the securities.  If there were ten-year
3    Treasuries, the market could withstand that, yes.
4      Q.    Could you contemplate a situation in
5    which there would ever be a fire sale price for
6    the sale of ten-year securities -- ten-year
7    Treasuries?  I mean you would have to actually
8    sell it for a lower price because the market
9    couldn't bear it?
10     A.    There have been times in history where
11   even the government market had has been very
12   illiquid, like around long-term capital
13   management, for example.
14     Q.    OK.  That wasn't the case on the week
15   of September 15, though, was it?
16     A.    The markets were certainly very
17   volatile, given everything that happened to
18   Lehman.  But government bonds were trading
19   liquidly, I believe.
20     Q.    Do you have any understanding or
21   recollection of what was meant then in connection
22   with the phrase "fire sale liquidation" when -- I
23   know you don't remember getting the e-mail, I'm
24   not trying to suggest that.
25          MR. STERN:  Can I hear the question.

Page 61

FELDER - HIGHLY CONFIDENTIAL
1
2      Q.    It really is -- I have got to rephrase
3    it.
4          I'm trying to understand, if you can
5    assist me, Mr. Felder, what possibly could have
6    been meant by that "fire sale liquidation" phrase
7    on that Thursday night in this memo.
8          MR. STERN:  Objection to the form.
9      A.    I can only make a -- I can only make
10   an assumption, if I had -- what I would think, not
11   what the writer meant.
12     Q.    Of course.  Tell me what you think.
13   You -- I mean after all, you presumably were --
14   let me start again.
15          Someone asked you to make this
16   assumption for the purposes of valuing a portion
17   of the portfolio for which you had responsibility,
18   correct?  That's what this is asking you for?
19          MR. CERESNY:  Objection.
20          MR. STERN:  Objection to the form.
21          What's the question?
22          (Record read)
23     Q.    Let me be more precise.  Mr. Daniel
24   Flores asked you on Thursday evening,
25   September 18, to assume a fire sale scenario for

Page 62

FELDER - HIGHLY CONFIDENTIAL

1
2  the purposes of valuing the portfolio for which
3  you had responsibility, did he not?
4      A.  That's what this e-mail looks like it
5  requested.
6      Q.  So what you thought "fire sale
7  liquidation" meant means something to me.  How
8  would you have understood this when you received
9  it?  Even if you don't recall having gotten
10  it, what would be your assumption as to what was
11  meant?
12      MR. STERN:  Objection to the form.  I
13  think he has already answered that.
14          But you can answer again.
15      A.  I would say it would mean what would
16  the price be for selling the securities in a very
17  short time frame.
18      Q.  What time frame?
19      A.  Basically instantaneously -- like --
20  close to instantaneously.
21      Q.  Would the need to sell U.S. Treasuries
22  instantaneously, let's call it on Friday morning,
23  the 19th, have resulted in significantly or any
24  lower price for the Treasuries in your mind?
25      A.  I'm not a Treasury expert.

TSG Reporting - Worldwide  (877) 702-9580

Page 63

FELDER - HIGHLY CONFIDENTIAL

1
2      Q.  Let me ask it this way.  Of the asset
3  classes for which you had responsibility on Friday
4  morning, September 19, which, if any, would have
5  had a reduction in their value as a consequence of
6  having to sell them instantaneously, given the
7  quantities involved and the asset classes
8  involved?
9      A.  I don't -- I can really talk about
10  credit.
11      Q.  Talk about what you can talk about,
12  Mr. Felder.
13      A.  I think credit, credit, there would be
14  a credit -- the liquidity in the credit market is
15  substantially lower than the government bond
16  market.  So that there would be, in my opinion, a
17  discount to move a block of corporate credit in an
18  instantaneous fashion.
19      Q.  Without regard to the quantity?
20      MR. STERN:  Objection.
21          Have you finished your answer?
22          I mean there was a question pending
23  and an answer being given.  Can I get the
24  question?
25      (Record read)

TSG Reporting - Worldwide  (877) 702-9580

Page 64

FELDER - HIGHLY CONFIDENTIAL

1
2      THE WITNESS:  What was my answer?
3      (Record read)
4      MR. STERN:  Did you finish?
5      THE WITNESS:  Yes, I am finished.
6      Q.  Finished?  OK.
7          Look at Exhibit 2, if you will, on the
8  summary chart that has been helpful to us in the
9  past.  Can you tell us which securities to which
10  you were just referring were corporate credits?
11      A.  I don't know what these definitions
12  are.
13      Q.  OK.
14      A.  As I have said.  So if the definition
15  of this second bucket, corporate obligations,
16  would be corporate credit, then I would say that
17  that would -- that would be an example.
18      Q.  You are referring now to the second
19  entry there in the column "Total Corporate
20  Obligations and Spot," which shows a long position
21  of 4 -- about 4.9 billion?
22      A.  That's what it looks like.
23      Q.  Are there any other securities on this
24  chart that you think would, if they had to be sold
25  instantaneously on Friday morning, have resulted

TSG Reporting - Worldwide  (877) 702-9580

Page 65

FELDER - HIGHLY CONFIDENTIAL

1
2  in a diminution in their value in the market?
3      MR. STERN:  Objection to the form.
4      A.  I'm really only comfortable talking
5  about credit, because that's the market I knew.
6      Q.  OK.  But you did have responsibility
7  for derivatives, right?  In the fixed income area.
8      A.  For credit derivatives.
9      Q.  Credit derivatives?
10      A.  Correct.
11      Q.  Would they have had significant
12  diminution in their value on Friday morning as a
13  consequence of the need to sell them
14  instantaneously?
15      A.  They would trade like a credit
16  product, so there would be -- to move a big block
17  of CDS would definitely create -- you would need
18  some discount.
19      Q.  What would you mean by a big block?
20      A.  I would say north of 2 billion.
21      Q.  OK.  What kind of discount would you
22  give it?
23      MR. STERN:  Objection to the form.
24      A.  It would depend on the names that were
25  in the portfolio.

TSG Reporting - Worldwide  (877) 702-9580

Page 66

FELDER - HIGHLY CONFIDENTIAL

1
2    Q.   Can you give me a range?  I'm just
3    trying to get a feel, half a percent, 20 percent?
4    I'm trying to get a feel for what the discount
5    would be in your mind.
6        A.   It would depend -- the market trades
7    on spread, so it would depend on which the
8    specific credits were and then what the aggregate
9    size was.
10        So, for example, financials were under
11    a tremendous amount of pressure at this point.  If
12    it was an entire financial credit portfolio, that
13    would be very difficult to move.
14        Q.   Would your answer be different if they
15    were exchange traded?  And by that I mean would
16    the discount be either nonexistent or small in the
17    disposition of an exchange-traded derivative on an
18    instantaneous basis the morning of September 19?
19        A.   If it was a liquid product traded
20    on -- if there was more liquidity in the product
21    based on it being on an exchange, then the answer
22    would be yes.
23        Q.   Yes, that there would be --
24        A.   If the product were more liquid
25    because it was on an exchange, then a discount

TSG Reporting - Worldwide  (877) 702-9580

Page 67

FELDER - HIGHLY CONFIDENTIAL

1
2    would be lower if there was more liquidity because
3    of that.
4        Q.   Why would there be a discount at all
5    on -- you would either be able to sell it on the
6    exchange or you couldn't.  Why would there be a
7    discount in any respect with regard to the
8    exchange-traded derivative?
9        A.   What I mean by discount, if you went
10    to go on -- in any market, there is a size on
11    let's say the bid or the offer, and if you go to
12    transact, when you're done transacting, the price
13    isn't necessarily at the same spot that you
14    started.
15        Q.   OK.
16        A.   So I would mean the average price that
17    you ultimately sold compared to where it started
18    could be different, even on an exchange.
19        Q.   OK, OK.  Let's go back to our chart
20    here for a moment.  You covered corporate
21    obligations and you covered the derivatives.  You
22    say you don't --
23        MR. STERN:  Objection to the form.
24        Q.   You say you don't have specific or
25    personal knowledge of the Treasuries, but the

TSG Reporting - Worldwide  (877) 702-9580

Page 68

FELDER - HIGHLY CONFIDENTIAL

1
2    Treasuries is a huge market and the -- clearly
3    there would not be any meaningful discount with
4    regard to the disposition of those on an emergency
5    basis, would there?
6        A.   I would say for on-the-run Treasuries,
7    I wouldn't think there would be, but I assume
8    there are some Treasury securities that have less
9    liquidity than others.  But in aggregate the U.S.
10    Treasury market is a very, very liquid market.
11        Q.   Let me ask it this way.  Did there
12    ever come a time, Mr. Felder, where you asked your
13    traders to price the securities in Exhibit 2 as
14    though they were going to be sold on a fire sale
15    basis on Friday, September 19?
16        A.   I don't recall doing that.
17        Q.   Do you recall having been asked by
18    anybody to do that?
19        A.   I don't, because I don't recall that
20    e-mail.
21        Q.   Is there -- do you have any
22    explanation for me at all as to why anybody would
23    have wanted you to do that?
24        A.   I can make an assumption.
25        Q.   Tell me.

TSG Reporting - Worldwide  (877) 702-9580

Page 69

FELDER - HIGHLY CONFIDENTIAL

1
2        A.   That to put a theoretical price on a
3    pool of assets that would be a worst-case
4    scenario.
5        Q.   But you never recall having done that?
6        A.   No.
7        Q.   Or having talked to Mr. McDade or
8    Mr. Flores or Mr. Kirk about having done so?
9        A.   No.
10        Q.   Did you ever hear anybody else at the
11    firm had done so with regard to the portfolios for
12    which they had responsibility?
13        A.   I recall getting a -- I recall getting
14    an e-mail around the -- around mortgages and
15    around a discount, a discount to the market price
16    for mortgages, and I believe I forwarded it to
17    Mike Gelband.  I do remember that.
18        Q.   From whom did you get it?
19        A.   I don't remember.  I would just have
20    to assume that Charlie Spero would have been on it
21    because he ran mortgages.
22        Q.   Did you ever get an explanation for
23    why that -- strike that.
24        OK.  Let's soldier on here with regard
25    to Thursday night.

TSG Reporting - Worldwide  (877) 702-9580

1      **FELDER - HIGHLY CONFIDENTIAL**
2          MR. STERN:  How are we doing in terms
3   of taking a break?  It is about 11.  Are you
4   at a point --
5          MR. CARDEN:  Yeah, maybe in about
6   15 minutes.  Is that OK?
7          THE WITNESS:  I'm fine.
8      **Q.   You told me you don't remember getting**
9   **Exhibit 3, which was Thursday night, right?  Do**
10  **you remember whether you were in the office on**
11  **Thursday evening, the 18th?**
12      A.   I don't.
13      **Q.   You note in Exhibit 3, it references a**
14  **list of top 100 positions, which is going to be**
15  **left on the desks of each of the people to whom**
16  **the e-mail is addressed.  Do you see that?**
17          **Do you recognize or can tell me if**
18  **Exhibit 2 is in fact a list of the 100 largest**
19  **securities in the area for which you had**
20  **responsibility?**
21      A.   I -- only the cover e-mail says, "Here
22  are the position level details for the top hundred
23  longs and shorts," so I can only assume that this
24  document is that.
25      **Q.   I will draw your attention to the fact**
TSG Reporting - Worldwide  (877) 702-9580

1      **FELDER - HIGHLY CONFIDENTIAL**
2   **that Exhibit 3, which is in Greenwich Mean Time,**
3   **with the hour difference then I can tell you is**
4   **four hours.  Do you remember that time period?**
5   **There's about a week or two in the year where the**
6   **time change is four hours.  We are in that period**
7   **right here.**
8          **So to start again, I will tell you**
9   **that Exhibit 3 is 8:41 in the evening on Thursday.**
10      A.   OK.
11      **Q.   And you can observe -- actually this**
12  **is in Greenwich Mean Time as well, but Exhibit 2**
13  **is at 7:17.  So it is within an hour or so, the**
14  **same time period.  Do you see that?**
15          MR. STERN:  You are asking if he sees
16  what?
17      **Q.   Well, let me ask it this way.  Do you**
18  **know, Mr. Felder, whether Exhibit 2 is the list of**
19  **securities, your portion of it, that was left on**
20  **your desk or was going to be left on your desk**
21  **pursuant to the paragraph in Exhibit 3?**
22      A.   I know that this says, "Here are
23  position level details for top hundred longs and
24  shorts," so I would assume that's what this is.
25      **Q.   That's what I had done, but you don't**
TSG Reporting - Worldwide  (877) 702-9580

1      **FELDER - HIGHLY CONFIDENTIAL**
2   **have a recollection of it?**
3      A.   No.
4      **Q.   And you don't remember having sat at**
5   **your desk at Thursday evening and have somebody**
6   **come in and say, here is the hundred largest**
7   **positions in your area, go value them?**
8      A.   No, no.
9      **Q.   And you have no recollection of having**
10  **told anyone in your area to go do that?**
11      A.   No.
12      **Q.   Would there have been anyone else in**
13  **your area that would have done that for you if you**
14  **weren't available?**
15      A.   The people below me, there is always a
16  chance that someone like Alex would have reached
17  out to someone directly if he didn't get me and
18  there was something that was time sensitive.
19      **Q.   You carry a BlackBerry, right?**
20      A.   Yes.
21      **Q.   So there is no doubt in your mind, is**
22  **there, that you would have seen Exhibit 3 on or**
23  **about the time it was sent to you, right?**
24      A.   If I was looking at my BlackBerry, I
25  would have seen it.
TSG Reporting - Worldwide  (877) 702-9580

1      FELDER - HIGHLY CONFIDENTIAL
2      **Q.   And you have no recollection of having**
3   **asked for anybody to assist you in responding to**
4   **the request in Exhibit 3 then?**
5      A.   I don't recall doing that.
6      **Q.   It is a total blank?**
7      A.   I don't remember doing it.
8      **Q.   OK.  Do you remember anything about**
9   **Friday morning, the 19th, where you were, what you**
10  **were doing?**
11      A.   I believe I had breakfast with Tom
12  Montag that morning.
13      **Q.   Who is Tom Montag?**
14      A.   He runs capital markets at Merrill
15  Lynch.  Or Merrill Lynch, B of A.
16      **Q.   Why were you having breakfast with**
17  **him?**
18      A.   He expressed interest in having me
19  come and run the credit business over there.
20      **Q.   Now, by Friday morning, the 19th, had**
21  **you received a contract from Barclays?**
22      A.   I believe I got a draft on Friday, but
23  I don't believe it was Friday morning.  I don't
24  recall exactly.
25      **Q.   Do you recall having gotten a draft**
TSG Reporting - Worldwide  (877) 702-9580

## Page 82

1          **FELDER - HIGHLY CONFIDENTIAL**
2     **BCI-EX70957 marked for identification, as of**
3     **this date.)**
4         **Q.    Mr. Felder, showing you what has been**
5     **marked as Exhibit 7, which is an e-mail from**
6     **Mr. Lowitt to three people, I think, including**
7     **yourself.  Do you see that?**
8         A.    Yes.
9         **Q.    Maybe that's four people.**
10         **Do you recall having gotten this**
11    **e-mail?**
12        A.    No, not specifically.
13        **Q.    Well, do you remember generally having**
14    **met with anybody at Barclays, now that you have**
15    **seen this, on September 19th, to talk about**
16    **positions and marks?**
17        A.    No.
18        **Q.    Do you remember having received, in**
19    **the early morning hours of September 19 and into**
20    **the morning, spreadsheets reflecting positions in**
21    **areas for which you had responsibility?**
22        A.    Not specifically.
23        **Q.    Let's mark a couple of them here.**
24    **Mark this as Exhibit 8.**
25            **(Exhibit 8, e-mail September 19, 2008**

TSG Reporting - Worldwide  (877) 702-9580

## Page 83

1          **FELDER - HIGHLY CONFIDENTIAL**
2     **at 10:51 a.m. with attachment marked for**
3     **identification, as of this date.)**
4         **Q.    Have you ever seen Exhibit 8 before?**
5         A.    No.
6             (Exhibit 9, e-mail dated September 19,
7     2008 at 2:06 p.m. with attachment marked for
8     identification, as of this date.)
9         **Q.    Mr. Felder, showing you what has been**
10    **marked as Exhibit 9, which is an e-mail from**
11    **Mr. Kirk to, again, an address that is**
12    **unrecognizable, but it has attached to it an**
13    **e-mail from Mr. McGarvey to a group of people**
14    **including yourself on Friday morning at**
15    **10 o'clock.**
16        **Do you remember having gotten this**
17    **e-mail?**
18        A.    I don't.
19        **Q.    And I take it you have no recollection**
20    **of having gotten the attachment?**
21        A.    Correct.
22        **Q.    And this CD and MM pricing, CD and MM,**
23    **that would be in your area, right?  That would be**
24    **money market and CDs.  That was something that you**
25    **identified previously as being something that was**

TSG Reporting - Worldwide  (877) 702-9580

## Page 84

1          **FELDER - HIGHLY CONFIDENTIAL**
2     in fixed income?
3         A.    That would have been in fixed income.
4         **Q.    Does this document assist you in any**
5     **respect in recalling what was taking place on**
6     **Friday morning with regard to the valuation of**
7     **positions that were within your area of**
8     **responsibility?**
9         A.    No.  I don't recall being in the
10    meeting.
11        **Q.    And it is still your recollection --**
12    **strike that.**
13        **It is still the fact that you don't**
14    **recall having met with anybody from Barclays about**
15    **pricing of any of these securities?**
16        A.    I don't recall.
17        **Q.    Going back to Exhibit 7 for just a**
18    **moment.  Would there have been anyone else in --**
19    **among Mr. Amin and Mr. Donini and Mr. Spero who**
20    **would have understood or known the process of**
21    **providing valuations for assets within your area?**
22        A.    Hyung Lee was the cohead of fixed
23    income, and then within the different asset
24    classes, Jim Seery or Fred Orlan would have been a
25    high yield or leveraged loan person.  Charlie

TSG Reporting - Worldwide  (877) 702-9580

## Page 85

1          FELDER - HIGHLY CONFIDENTIAL
2     would have been a mortgage person.
3         **Q.    Charlie?**
4         A.    Charlie Spero.
5             Kaushik would have been rates,
6     commodities and FX.  John Coughlin would have been
7     repo or anything short term, and Mike Gelband and
8     Alex would have been the other two.
9         **Q.    What about corporates?  Who would**
10    **have --**
11        A.    Anything for corporates, for
12    corporates, it would have been me.
13        **Q.    So pricing for any corporate**
14    **obligations would have been something that you**
15    **would have been most familiar with as opposed to**
16    **the people you just mentioned?**
17        A.    Yes.  If they asked for a price on an
18    investment grade corporate bond that -- they would
19    have come to me or someone below me.
20        **Q.    What was happening in -- let's take it**
21    **a step at a time.  If you go back to, I think it**
22    **was Exhibit 2, just as a frame of reference, this**
23    **summary of asset classes, is it possible for you**
24    **to assist me as to what was going on in the market**
25    **in a general respect from, say, the end of the**

TSG Reporting - Worldwide  (877) 702-9580

FELDER - HIGHLY CONFIDENTIAL

1
2   week of September 15 for each of these asset
3   classes?
4       A.   I could really only talk to the credit
5   side.
6       Q.   OK, give me that.
7       A.   Spreads were widening significantly on
8   the back of the Lehman bankruptcy, specifically
9   within financials.
10          We weren't -- we weren't trading so I
11  could -- because we were bankrupt, so there
12  weren't -- you could only just watch your
13  Bloomberg screen, so obviously the equity markets
14  were going down a lot.  There was a lot of
15  volatility, and in general, spreads were
16  significantly wider.
17      Q.   No way for you to quantify that in any
18  general respect or -- did it change through the
19  week?  Did it spike, did it flatten, did it --
20      A.   No.  I -- I don't remember the exact
21  numbers on things, but there were some things that
22  were north of a hundred basis points wider over
23  the course of that week.
24      Q.   You said Coughlin was responsible for
25  repos?  I think that's what you said in passing.

FELDER - HIGHLY CONFIDENTIAL

1
2       A.   He ran financing for fixed income.
3       Q.   Let's go back to Tuesday.  We were
4   talking about Tuesday, September 16, and what you
5   were doing that day.
6           If you had come into the office, I
7   would like you to tell me as best you can, just
8   try to walk through the week as to what else you
9   were doing on that Tuesday and the Wednesday and
10  Thursday as well.
11      A.   On the Tuesday, there was the meeting
12  with, I believe it was Tuesday, with Jerry and --
13      Q.   That's where we left you, we left you
14  with Mr. Diamond and Mr. Del Missier.
15      A.   Right.
16          I recall that most of the rest of the
17  week was trying to keep the team together and
18  talking to all the individual people within the
19  credit business who were out interviewing and
20  getting job offers to try to keep the team
21  together.
22      Q.   Were you meeting with Barclays during
23  that time period on what I'll characterize as, you
24  know, the asset classes for which you had
25  responsibility or anything else?  Other than your

FELDER - HIGHLY CONFIDENTIAL

1
2   compensation.
3       A.   Yeah.  I had coffee with Eric
4   Bommensath, I don't remember which day it was, it
5   was either -- I believe it was Tuesday or
6   Wednesday, who was going to be my boss.  And we
7   started -- he wanted the names of what I deemed to
8   be the top people within the credit space.  So we
9   spent time going through that and just talking
10  about the business overall.
11          Away from that, I don't recall any
12  specific meetings with Barclays.
13      Q.   Did you meet with any lawyers that
14  week?  Going on from Tuesday or the Tuesday
15  meeting with Mr. Diamond, after that --
16      A.   Right.
17      Q.   -- did you meet with any lawyers?
18      A.   No.
19      Q.   Did you ever meet privately with
20  Mr. McDade?
21      A.   I don't recall meeting with him
22  privately.
23      Q.   Did you ever have a private meeting
24  with Mr. Kirk concerning the transaction and, you
25  know, what had been agreed upon by the parties?

FELDER - HIGHLY CONFIDENTIAL

1
2       A.   No.
3       Q.   What about Mr. Kelly?  Did you have
4   any conversation with Mr. Kelly that week?  Martin
5   Kelly?
6       A.   Martin -- no.
7       Q.   Do you even know Martin Kelly?
8       A.   I know the name.
9       Q.   Who do you know him to be?
10      A.   I knew him to be sort of a -- I don't
11  know what his exact function is, but I knew him to
12  be sort of a right-hand person to the CFO, to Ian.
13  But I couldn't tell you exactly what his function
14  is.
15      Q.   Did you ever tell or write to anybody
16  that Barclays was cherry-picking assets?
17      A.   I don't recall doing that.
18      Q.   Do you recall ever having written
19  anybody to the effect that Barclays was choosing
20  the assets which they wanted to purchase?
21      A.   I did think that Barclays was choosing
22  and pricing assets.  That was just the
23  impression -- that was the impression.
24      Q.   What was that impression based on?
25      A.   I guess I remember Mike Keegan at --

FELDER - HIGHLY CONFIDENTIAL
1   in one of the meetings, I think it was, I guess
2   that Monday.
3       Q.   Monday, the 15th?
4       A.   I believe.  Just the way he asked
5   about -- on the corporate side, I remember him
6   asking about auction rate securities and saying
7   like what -- like are you comfortable with these,
8   and I remember saying, yes, we were comfortable
9   with them.
10      Q.   Anything else?
11      A.   No, that's what I -- I remember that.
12      Q.   It may be my confusion, I apologize if
13  it is, but I thought I understood you to say that
14  you thought that Barclays was buying the entire
15  broker dealer.  How does that square with the fact
16  that they are selecting assets to purchase?  I
17  don't understand how those things are consistent.
18  Maybe they are, but I don't understand.
19      MR. STERN:  Objection to the form.
20      A.   I don't know that -- I just know what
21  I had heard about what the transaction was, that
22  they were looking at buying the broker dealer.  I
23  don't know the specifics of how a transaction like
24  this would occur.

FELDER - HIGHLY CONFIDENTIAL
1
2       Q.   But you also knew during that week,
3   did you not, that Barclays was picking the assets
4   they wanted to purchase?
5       A.   I knew they were looking at the -- at
6   all the different assets and forming opinions on
7   them.
8           (Exhibit 10, e-mail dated September
9   17, 2008 at 12:34 p.m. marked for
10  identification, as of this date.)
11      Q.   Mr. Felder, I show you what has been
12  marked as Exhibit 10.  Midway on the first page,
13  there is an e-mail from you to a collection of
14  people where you are stating that the Barclays
15  folks picked the assets and recall them saying
16  they didn't want the auctions carries, but I
17  wasn't in the meeting.
18          Do you see that?
19      A.   Um-hm.
20      Q.   You mentioned about the auction rates
21  in your conversation.
22      A.   Because I remember -- yes.
23      Q.   Does this document refresh your
24  recollection to any extent that Barclays was
25  interested in only purchasing certain assets of

FELDER - HIGHLY CONFIDENTIAL
1
2   Lehman Brothers as opposed to the entire broker
3   dealer?
4       MR. STERN:  I think you should take a
5   chance to read the document.
6       THE WITNESS:  OK.
7       A.   What was the question?
8           (Record read)
9       A.   I just remember them asking opinions
10  on things which led me to believe that a decision
11  process was being made.
12      Q.   OK.  Do you remember them asking you
13  about anything or speaking about anything other
14  than auction rates?
15      A.   That was all I recall being asked.
16      Q.   Did you ever have a conversation with
17  anybody at Barclays about the valuations of any of
18  the positions or asset classes in the area of your
19  responsibility?
20      A.   What do you mean by value -- by
21  valuation?
22      Q.   Marks.
23      A.   Like where are things marked?  Around
24  the auctions, based on the -- where the prices
25  were, I remember them -- I remember Mike Keegan

FELDER - HIGHLY CONFIDENTIAL
1
2   asking, you know, what do you think of these
3   securities at these prices?
4       Q.   OK.
5       A.   And I recall saying to him that I
6   think you're going to get -- ultimately people
7   would get their money back on these securities
8   from -- because they were at a discount.  They
9   weren't marked at par anymore, given what went on
10  in that market.  But that over time, those assets
11  would -- you would ultimately get your money back.
12      Q.   Were the auction rates within your
13  area of responsibility, within fixed income?
14      A.   Yes.
15      Q.   And you know they didn't move to
16  Barclays, right?
17      MR. STERN:  Objection, objection to
18  form.
19      A.   I don't know that they didn't move to
20  Barclays.
21      Q.   The conversation that you had with
22  Mr. Keegan on Monday about -- you think it was
23  Monday -- about the auction rates, was this a
24  face-to-face meeting that you had with him?
25      A.   Yes.  It was in that -- it was up on

1       FELDER - HIGHLY CONFIDENTIAL
2  32.
3       Q.   In that room where you were escorting
4  some people in and occasionally staying yourself?
5       A.   Correct.
6       Q.   Do you recall having spoken about any
7  other asset classes or any other types of assets
8  other than auction rates in that room to Barclays
9  people with regard to marks?
10      A.   No.
11      Q.   Were you aware during the week that
12  there was a real interest or focus on the asset
13  classes or the positions that were being placed on the asset classes, or
14  the positions rather, in your area of
15  responsibility?
16      A.   Well, based on -- based on, for
17  example, that mortgage e-mail, there was focus --
18  the -- I don't want there to be a disconnect
19  between my technical area of responsibility, given
20  the job that I had gotten four days before, and
21  what I -- what I really had a knowledge of, which
22  was the credit piece.  So I -- I did have the
23  sense that there was focus on the marks of
24  positions, but they weren't my areas of expertise.
25      Q.   Did you ever instruct any traders

1       FELDER - HIGHLY CONFIDENTIAL
2  within any area of fixed income during the week of
3  September 15 to provide you marks on any
4  positions?
5       A.   I don't recall specifically asking for
6  marks from people.
7       Q.   Did you ever instruct any traders
8  within your area of responsibility to mark down
9  any assets within the fixed income area?
10      A.   I don't recall instructing anyone to
11  mark.
12      Q.   Can you tell me who would have had the
13  conversation with the trader concerning the
14  mortgages that you have seen previously in terms
15  of providing marks for those?
16      A.   It would have gone through Charlie
17  Spero.
18      Q.   OK.  Did you ever have a conversation
19  with anyone at Lehman Brothers, Mr. Felder, about
20  a discount being provided to Barclays on its
21  purchase of Lehman assets?
22      A.   I don't recall any specific
23  conversations.
24      Q.   Did you ever hear generally that
25  Barclays had been provided a discount in its

1       FELDER - HIGHLY CONFIDENTIAL
2  purchase of Lehman assets?
3       A.   Well, that mortgage e-mail, for
4  example, would give that indication, so that would
5  be an example of something that --
6       Q.   OK, thank you for that.  Other than
7  the indication and the specific instance
8  concerning the mortgages, did you ever hear of
9  any, I'll call it global discount given to
10  Barclays for -- in purchase of the Lehman assets?
11      A.   No, I don't recall hearing about that.
12      Q.   Did you ever read anywhere or hear
13  from anyone that Barclays had purchased certain
14  valuation or value of Lehman assets for a
15  discount?
16      A.   No, not specifically.
17      Q.   Were you aware that on Tuesday
18  morning, Mr. Diamond and I think others at
19  Barclays had an analyst conversation, telephone
20  conversation?
21      A.   Analysts?
22      Q.   Yeah.  They had a telephone
23  conversation with various people?
24      A.   No.
25      Q.   You weren't on it, in any event?

1       FELDER - HIGHLY CONFIDENTIAL
2       A.   No.  What do you mean by analyst?
3       Q.   Not analysts, they were investors.  It
4  was an investor call and a collection -- I don't
5  know who got access to the call.  All I've seen is
6  a transcript, there was an investor call --
7       A.   No.
8       Q.   -- of some kind, and my question is,
9  were you on that call?
10      A.   No.
11      MR. STERN:  Just so the record is
12  clear, I think in one of the previous
13  answers Mr. Felder referred to "that
14  mortgage e-mail," and I believe he was
15  referring to Exhibit 6, just to avoid any
16  confusion.
17      MR. CARDEN:  Let's mark this
18  Exhibit 11.
19      (Exhibit 11, document Bates stamped
20  10284073 marked for identification, as of
21  this date.)
22      Q.   Have you seen Exhibit 11 before,
23  Mr. Felder?
24      A.   I believe Dan was the one who was
25  sending out the updates.  He was a lawyer, so he

## Page 102

1      **FELDER - HIGHLY CONFIDENTIAL**
2   the evening, or 5 rather.  No, 10.
3           **Do you recall having gotten this?**
4      MR. STERN:  Let's read it first.
5      A.   I don't recall it specifically.
6      **Q.   Well, do you recall generally there**
7   **being any conversation about the need to shrink**
8   **the matched book?**
9      A.   I don't recall that.  I recall the --
10  I recall instructions from Ian to make sure that
11  the traders weren't doing things that sent cash
12  out of the firm.  I remember that as a broad
13  instruction that he gave.
14     **Q.   Do you have an understanding of what**
15  **is meant by shrinking the matched book in this**
16  **e-mail from Mr. Lowitt?**
17     A.   A matched book is a repo book where it
18  is matched, so there are two sides to it.  So if
19  you shrunk a matched book, you would eliminate
20  both sides and then the aggregate size would be
21  smaller.
22     **Q.   Do you have any memory at all as to**
23  **why there was a need in his mind to shrink the**
24  **matched book?**
25     A.   No.

## Page 103

1       FELDER - HIGHLY CONFIDENTIAL
2      **Q.   Did you have any conversations with**
3   **anybody about needing to shrink the matched book**
4   **during the week of September 15?**
5      A.   Not that I recall.
6      **Q.   What did you mean when you wrote here,**
7   **"What about the line from BACR," that's Barclays**
8   **credit?  Is that what that is supposed to mean?**
9      A.   I would assume that's Barclays.
10     **Q.   What did you mean by that?**
11     A.   I had -- I -- guess I was asking
12  whether there was -- whether Barclays was going to
13  finance Lehman, whether that was --
14     **Q.   Were you aware at or about this time**
15  **that the Fed had done a repo with Lehman?**
16     A.   No.
17     **Q.   So I take it you're not aware of**
18  **whether Barclays was going to take over the Fed's**
19  **position in connection with that repo?**
20     A.   No, not aware of that.
21     MR. CARDEN:  I'm done.
22           _ _ _ _

## Page 104

1      FELDER - HIGHLY CONFIDENTIAL
2   EXAMINATION BY
3   MS. TAGGART:
4      **Q.   My name is Erica Taggart.  I represent**
5   **the creditors committee.**
6           **I have some question, mostly directed**
7   **to finding out who might have some of the**
8   **information you didn't know.**
9           **Did you work at all -- I believe**
10  **Mr. Carden asked you that you weren't involved in**
11  **any repurchase agreement with the Federal Reserve,**
12  **right?**
13     A.   Correct.
14     **Q.   Do you know anyone who was involved**
15  **from Lehman in dealing with the Federal Reserve in**
16  **connection with the primary dealer credit**
17  **facility?**
18     A.   I can only make an assumption as to
19  who it would be.
20     **Q.   OK.  Who do you know that that might**
21  **fall under their responsibilities at Lehman?**
22     A.   I would think it would fall within the
23  Treasury function.  So either Ian Lowitt or Paolo
24  Tonucci, who would be the treasurer.  Those would
25  be the two people.

## Page 105

1       FELDER - HIGHLY CONFIDENTIAL
2      **Q.   Did you speak with Mr. Lowitt or**
3   **Mr. Tonucci about anything related to the Federal**
4   **Reserve at this time?**
5      A.   No.  Not that I recall.
6      **Q.   Did you speak to anyone related to the**
7   **repurchase agreement related to the Federal**
8   **Reserve?**
9      A.   No.
10     **Q.   Now, I understand that you didn't**
11  **prepare any witnesses for the sale hearing; is**
12  **that correct?**
13     A.   I am sorry, prepare any?
14     **Q.   Witnesses for the sale hearing that**
15  **happened on September 19.**
16     A.   No.
17     **Q.   Do you know anyone at Lehman who did**
18  **prepare anyone for the sale hearing?**
19     A.   No.
20     **Q.   Did you ever have any interaction with**
21  **JP Morgan during the week of September 15?**
22     A.   No.
23     **Q.   Do you know who at Lehman did have any**
24  **interaction with JP Morgan at this time?**
25     A.   I would only be assuming again.  I can

Page 106

1    FELDER - HIGHLY CONFIDENTIAL
2  give you a list of people who it might be, but I
3  don't know.
4      Q.   Who are the people at Lehman that it
5  was your understanding within their
6  responsibilities would be working with JP Morgan
7  prior to the sale transaction?
8      A.   I would think it would be Ian and
9  Paolo, again.
10     Q.   Besides the people that you mentioned
11 earlier today, do you know anyone else at Lehman
12 who was involved in valuing any assets or
13 securities that became part of the sales
14 transaction?
15     A.   Not specifically.
16     Q.   Is there anybody else besides those
17 that you have mentioned today who it was within
18 their area of responsibility to do valuations of
19 securities or assets at Lehman?
20     A.   Can you repeat the question.
21         (Record read)
22     A.   What do you mean by -- obviously
23 traders mark --
24     Q.   Right.  Besides the traders, I think
25 you said that the traders then give their

TSG Reporting - Worldwide  (877) 702-9580

Page 107

1      FELDER - HIGHLY CONFIDENTIAL
2  information to the different department heads.
3  You deal with the credit and fixed income.  Is
4  there anyone else that you know of who during this
5  time was collecting information from traders about
6  valuation of assets that might go to Barclays?
7      A.   The -- oh, specifically -- no, not
8  specifically.
9      Q.   And it is my understanding you weren't
10 involved in the negotiation of any of the
11 contracts that related to the sale of assets to
12 Barclays, correct?
13     A.   Correct.
14     Q.   Who do you know at Lehman who was
15 involved in that negotiation?
16     A.   I could only -- I could only make an
17 assumption. I don't know specifically.
18     Q.   Who were the people that you believe
19 might have been involved in negotiations with
20 Barclays over the sale?
21     A.   Bart McDade, Alex Kirk, Mike Gelband.
22 These are just -- this is just -- would be my
23 assumption.
24         Potentially Skip McGee, ran investment
25 banking.  Mark Schaefer.

TSG Reporting - Worldwide  (877) 702-9580

Page 108

1      FELDER - HIGHLY CONFIDENTIAL
2      Q.   What was Mark Schaefer's role?
3      A.   He -- I think he was head of M&A.
4      Q.   Did you ever speak to anybody about
5  any terms or conditions about the sale
6  transaction?
7      A.   No.
8      Q.   Did you ever have any involvement with
9  the DTC, Depository Trust and Clearing
10 Corporation?
11     A.   No.
12     Q.   Do you know who at Lehman was
13 interacting with the DTC at this time?
14     A.   I don't.
15     Q.   Were you involved at all in the
16 decision about what amount, if any, of the
17 residential mortgage backed securities would be
18 part of that transaction?
19     A.   No.
20     Q.   Do you know who was involved in those
21 decisions?
22     A.   I don't.
23     Q.   The weekend between -- the weekend of
24 September 20 and 21, were you involved in any
25 meetings with Barclays during that time?

TSG Reporting - Worldwide  (877) 702-9580

Page 109

1      FELDER - HIGHLY CONFIDENTIAL
2      A.   Weekend of the 20th and 21st?  I
3  was -- that weekend I was working with Eric
4  Bommensath around coming up with contracts for the
5  people that would be on the team in credit.
6      Q.   Any other meetings with anyone from
7  Barclays?
8      A.   No.
9      Q.   Were you involved at all in the
10 assessment of the value of the goodwill of LBI
11 that was purchased by Barclays?
12     A.   No.
13     Q.   Do you know who was involved in that
14 valuation?
15     A.   No.
16     Q.   Were you involved in any valuation of
17 real estate?
18     A.   No.
19     Q.   Do you know who would be involved in
20 that valuation?
21     A.   Mark Walsh ran our real estate group,
22 but I don't know who was involved in valuing it.
23         (Exhibit 15, document Bates stamped
24 BCI-EX30865 with attachment marked for
25 identification, as of this date.)

TSG Reporting - Worldwide  (877) 702-9580

## Page 110

FELDER - HIGHLY CONFIDENTIAL

1            FELDER - HIGHLY CONFIDENTIAL

2       Q.   Exhibit 15 goes from the numbers

3   BCI-EX30865 -- actually that's the cover e-mail,

4   and then there is a number of documents of a

5   spreadsheet that are attached to it, and it was an

6   e-mail from Stephen King dated September 17, 2008.

7           Have you ever seen Exhibit 15?

8      A.   No, I don't recall seeing it.

9      Q.   Who is Stephen King?

10     A.    Steven works at Barclays.  He -- and

11  at least now he is in -- he was in that PMTG

12  group.

13     Q.   And it is to C. Spero.  Is it your

14  understanding that's Charles Spero?

15     A.   Yeah, that's what it looks like.

16     Q.   Who is Jasen Yang?

17     A.   I don't know.

18     Q.   You will see in the middle of this

19  e-mail, it says, "I am going to have to do the

20  same on the rest of the portfolio.  I guess that

21  is Felder, right?"  Do you see that?

22     A.   Yes.

23     Q.   Is it your understanding that's

24  referring to you?

25     A.   It looks that way, yes.

TSG Reporting - Worldwide  (877) 702-9580

## Page 111

FELDER - HIGHLY CONFIDENTIAL

1            FELDER - HIGHLY CONFIDENTIAL

2      Q.   Did any of these people, Stephen King,

3   Charles Spero or Jasen Yang ever contact you about

4   doing any work with the portfolio that is

5   described here?

6      A.   No.  Not that I recall.

7     Q.   Do you have an understanding under "BB

8  takes" what's being described here?

9     A.   "BB takes."  BB -- well, it says takes

10  and leaves, so I assume it is securities being

11  taken and securities being left.

12     Q.   Were you involved in putting together

13  these numbers that are on Exhibit 15?

14     A.   No.

15      (Exhibit 16, e-mail dated September

16  18, 2008 at 12:23 p.m. marked for

17  identification, as of this date.)

18     Q.   The next exhibit, 16, is an e-mail

19  from Gilles Aublin dated September 18, 2008, to

20  Fred Orlan and others, I believe you are on the cc

21  line, with the subject "Asset Transfer Update."

22          Do you remember receiving this e-mail?

23     A.   I don't recall specifically.

24     Q.   Is that your e-mail address on the cc

25  line?

TSG Reporting - Worldwide  (877) 702-9580

## Page 112

FELDER - HIGHLY CONFIDENTIAL

1            FELDER - HIGHLY CONFIDENTIAL

2     A.   Yes.

3     Q.   And who is Gilles Aublin?

4     A.   He was in product control for credit.

5     Q.   You will see that in the first of the

6  bullet points, it says, "You will be provided

7  later today the updated final list of assets that

8  will be carried over to the new entity."

9          Do you see that?

10     A.   Yes.

11     Q.   Were you provided with an updated

12  final list of assets that would be carried over to

13  the new entity?

14     A.   I don't recall.

15     Q.   Do you know what this is referring to?

16     A.   Only just what it says in the e-mail.

17     Q.   Did you receive any list from

18  Mr. Aublin or his team that reflected assets that

19  were carried over to the new entity?

20     A.   I don't recall specifically getting

21  one.

22     Q.   Then you see in the third bullet point

23  it says, "Today it is critical that all positions

24  are marked carefully, as this mark will be the

25  basis of the transfer."  Do you see that?

TSG Reporting - Worldwide  (877) 702-9580

## Page 113

FELDER - HIGHLY CONFIDENTIAL

1            FELDER - HIGHLY CONFIDENTIAL

2     A.   Yes.

3     Q.   Were you involved at all in marking

4  the assets on or about September 18?

5     A.   No.

6     Q.   And did you speak to Mr. Aublin at all

7  about the issues of valuation of the asset

8  transfer?

9     A.   No.

10     Q.   You testified earlier today that you

11  returned the $25 million back to Lehman.

12     A.   Correct.

13     Q.   Why did you do that?

14     A.   I thought it was the right thing to

15  do.  Given what had happened, I felt it was the

16  proper, proper thing to do.

17     Q.   When had you received that amount?

18     A.   I received part in June of '08 and

19  part in September.

20     Q.   In addition to the $25 million from

21  Lehman, had you been receiving an ongoing salary?

22     A.   I had my normal salary, yes.

23     Q.   And did you return any of the normal

24  salary?

25     A.   No.

TSG Reporting - Worldwide  (877) 702-9580

Page 122

1    FELDER - HIGHLY CONFIDENTIAL
2  in any of the businesses that you bumped into
3  about whether or not the business was within its
4  risk appetite limits?
5      A.  I do recall Alex Kirk saying -- and I
6  couldn't tell you when, this is going back
7  pre-September, I do recall Alex saying that his
8  business had to get risk appetite lower.
9      Q.  And which business would he have been
10  talking about?
11      A.  This was when he was the co-COO of
12  fixed income.  So --
13      Q.  So it was the fixed income division
14  that had to get limits lower?
15      A.  I recall him saying that.
16      Q.  Usage lower or limits lower?
17      A.  Risk appetite usage.
18      Q.  OK.  Thank you.  I don't have any
19  further questions.
20          MR. CARDEN:  We have been admirably
21      efficient, but I have a few more questions.
22      Won't take long.
23              _ _ _ _
24
25

Page 123

1      FELDER - HIGHLY CONFIDENTIAL
2  EXAMINATION BY
3  MR. CARDEN:
4      Q.  The traders who are responsible for
5  certain aspects of the fixed income portfolio are
6  the ones who do the marks every night, correct?
7      A.  Correct.
8      Q.  How many traders, just roughly
9  speaking, were there within the fixed income area
10  in the days when you were the cohead, who would
11  have prepared such marks?
12      A.  Oh, I don't know how many specific
13  trade -- I know there were about 3,000 people in
14  fixed income.  And I think that the split was
15  about a third, a third, a third, sales, trading,
16  research, so I would give an estimate without real
17  knowledge specifically of maybe about a thousand.
18      Q.  A lot of people?
19      A.  A significant number.
20      Q.  And those people, when they did their
21  marks for the portfolios for which they were
22  responsible, did they have a responsibility to
23  provide those marks up to an immediate supervisor
24  every day?
25          Or said another way, how were they

Page 124

1      FELDER - HIGHLY CONFIDENTIAL
2  input into the system?
3      A.  No, the traders input their own marks.
4      Q.  On the evening of Thursday, I know you
5  don't recognize, or pardon me, don't recall having
6  gone forth to get valuations.
7      A.  Right.
8      Q.  But had you done so and just don't
9  remember, who would have asked to provide the
10  marks for the portions of the portfolio that were
11  provided to you Thursday evening?
12      A.  I would -- if I had to ask that
13  question, I probably would have asked someone like
14  a Gilles in product control, because product
15  control was responsible for month-end variance
16  testing, so they had -- they could get all of the
17  different marks all together in one spot.  Each
18  trader would only have their book.  So the only
19  place where you could go to get an aggregate list
20  of marks would be out of product control.
21      Q.  That would only be on a once monthly
22  basis, correct?  You had to go back to the end of
23  August, or is that done on a --
24      A.  Product control could get all the
25  marks on any given day.

Page 125

1      FELDER - HIGHLY CONFIDENTIAL
2      Q.  So I know you, again, you don't
3  remember, I'm just trying to get what the process
4  would have been.
5          When you're given -- if you were given
6  the sheet that had the hundred largest positions
7  in fixed income on the evening of Thursday or
8  Friday morning, and you had to get fire sale marks
9  for those positions, is it your testimony that you
10  would have gone to Gilles?
11          MR. STERN:  Objection to the form.
12      A.  No.  If things had already been marked
13  and I was asked to get what are the marks, I would
14  go to Gilles.
15      Q.  Fair enough.
16          If you were asked to get fair sale
17  marks for those same positions on late Thursday
18  night or Friday morning, to whom would you have
19  gone to get those fire sale marks?
20      A.  Within credit?
21      Q.  Yes.
22      A.  The people under me in credit would
23  have been Fred Orlan, who ran the high-yield
24  business.  Within the investment grade business,
25  it would have been Jason Quinn and Anthony

1          **FELDER - HIGHLY CONFIDENTIAL**
2    **that.**
3                  **Would there be any way that you could**
4    **have avoided going to each and every one of them**
5    **in order to make the process more efficient?  In**
6    **other words, is there some one person above all of**
7    **them to whom you might have gone to say get this**
8    **done and that they in turn would have gone to the**
9    **collection of people you described?  Or is that**
10   **person you?**
11       A.   Can you repeat the question.
12       **Q.   Yeah, I am happy to rephrase the**
13   **question.**
14               **I know you don't have a recollection**
15   **of this, I am simply trying to determine what you**
16   **would have done if it in fact happened.**
17               **You were asked to give fire sale**
18   **prices for the securities in Exhibit 2.  You have**
19   **got to find the people who are in a position to do**
20   **it.  You have described to me the people in each**
21   **of the various asset classes who are in a position**
22   **to talk to the relevant traders and get those fire**
23   **sale marks, correct?**
24       A.   Correct.
25               MR. STERN:  Objection to the form.

TSG Reporting - Worldwide  (877) 702-9580

1          FELDER - HIGHLY CONFIDENTIAL
2    Wait.  Objection to the form, because the
3    question incorporates all kinds of
4    statements.
5          MR. CARDEN:  That's fine.  I am happy
6    with the question.  You can object to the
7    form.
8       Q.   So the question I have for you now is,
9    is there --
10          MR. STERN:  The point is if you are
11   creating a misleading record, I just can't
12   let that stand.  So what exactly are you
13   asking?
14          MR. CARDEN:  We have done beautifully
15   this far.  I am perfectly happy with the
16   answer.  I am just trying to identify people
17   who are involved.  Let's just move on.  I am
18   happy to stand by the question.  I have
19   reformulated questions in the past when I
20   thought you were correct.  I thought you
21   were mistaken about this.  I don't really
22   care about this.
23       **Q.   What I really want to know,**
24   **Mr. Felder, is, if you had chosen to do so and**
25   **were asked to provide fire sale prices for a wide**

TSG Reporting - Worldwide  (877) 702-9580

1          **FELDER - HIGHLY CONFIDENTIAL**
2    **collection of positions in the fixed income area,**
3    **is there some one person you could have called as**
4    **opposed to contacting all the people that you have**
5    **described?**
6       A.   I could have gone to one person who
7    would have gone to those people.  So Mike Gelband
8    would know all of those people, Alex Kirk would
9    know all of those people.
10       **Q.   But at the end of the day, what you**
11   **are saying to me, in order to provide the fire**
12   **sale prices, you would have had to have gone back**
13   **to the people that you have identified to get**
14   **those prices, correct?  Somebody would have had to**
15   **have gone to them?**
16       A.   That would be the process I would go
17   through.
18       **Q.   That's what I am asking for.  OK.**
19               **And it is your testimony you have no**
20   **recollection of having done that on Thursday night**
21   **or Friday morning?**
22       A.   I have no recollection of having done
23   that.
24       **Q.   OK, thank you, sir.**
25

TSG Reporting - Worldwide  (877) 702-9580

1          FELDER - HIGHLY CONFIDENTIAL
2    EXAMINATION BY
3    MS. TAGGART:
4       Q.   I will ask a couple of follow-up
5    questions to this.
6               When you talk about the traders are
7    the ones who put together marks, do they do that
8    on a routine basis?
9       A.   They mark their books every day.
10       Q.   And what's involved in marking the
11   books every day?
12       A.   For what type of a trader?
13       Q.   It varies from trade to trade?  Let me
14   ask this:  Where do they put the information on a
15   daily basis, or did they at this time?
16       A.   Whatever the front office system of
17   that asset class is would be where the marks would
18   be put in.
19       Q.   When you say a front office system,
20   are you talking about a computerized database?
21       A.   An application.  There were different
22   applications for different products, that would
23   all feed into the middle office or the back office
24   of the firm.  So depending on what the product
25   was, whatever system that was used would be the --

TSG Reporting - Worldwide  (877) 702-9580

## Page 134

FELDER - HIGHLY CONFIDENTIAL

1 
2 would be -- that is where they would put the
3 prices into.
4     Q.   When you talk about a system, a
5 computerized system?
6     A.   Computerized system.
7     Q.   So every day traders would be entering
8 marks for the securities that they were involved
9 in on some sort of computer system; is that
10 correct?
11    A.   To my knowledge, that -- a computer
12 system was used in the products I knew.
13    Q.   Did you ever personally access on a
14 computer system daily marks?
15    A.   In risk systems, you can see -- you
16 can see the marks of securities.
17    Q.   How do you see them?
18    A.   On the computer screen.
19    Q.   Did the computer screen -- is there a
20 database that you remember, a name of a database
21 where you personally could go and access daily
22 marks?
23    A.   In -- within credit, our main risk
24 system was called ICE, I-C-E.  And that
25 consolidated the derivative systems and the cash

## Page 135

FELDER - HIGHLY CONFIDENTIAL

1 
2 systems.
3     Q.   Did marks ever change from the close
4 of the market on Friday to the opening of the
5 market on Mondays?
6     A.   From the close on a Friday to the open
7 on a Monday?
8     Q.   Yes.
9     A.   I don't think you could do -- I don't
10 think the system would let you -- you can get an
11 end-of-day mark, and then I don't think you could
12 go in and change -- as far as I know, you couldn't
13 go in and change a mark once it was committed for
14 that day until the mark for the next day.
15    Q.   In particular on the weekend of
16 September 19 -- from the close of the market on
17 September 19 to the opening of the market on
18 September 22, would there be any reason for any of
19 the marks from the credit business to change over
20 that weekend?
21    A.   Not that I would be aware of.
22    Q.   OK, that is all.
23           _ _ _ _
24
25

## Page 136

FELDER - HIGHLY CONFIDENTIAL

1 
2 EXAMINATION BY
3 MR. BYMAN:
4     Q.   I apologize.  Every time somebody asks
5 a question, somebody else thinks of another
6 question.
7          When the traders do their marks, and I
8 understand, I think, that process, is there any
9 other group such as the product control group that
10 does an independent analysis of where they think
11 certain assets should be valued?
12    A.   That would be done monthly, and there
13 would be variance reports.  I only know this
14 specifically within credit because I hadn't gone
15 through that process in the other asset classes.
16 So within credit, we had a monthly variance
17 meeting with product control to go through any
18 positions that they felt -- they got external data
19 from third parties and they compared the marks to
20 that external data, and then the desk heads would
21 sit down with product control, and then ultimately
22 I would sit down to make sure that the business
23 was properly marked from the product control --
24 from a -- essentially a third party's perspective.
25    Q.   So I want to make sure that I

## Page 137

FELDER - HIGHLY CONFIDENTIAL

1 
2 understand the process then.  So on a daily basis,
3 the traders would mark the assets that they were
4 responsible for.  On a monthly basis, product
5 control would do its own evaluation.  To the
6 extent there was a variance, it would escalate to
7 you, and you would decide who was right or whether
8 it was someplace in the middle?
9     A.   No.  The product controllers
10 ultimately had the -- you couldn't overrule a
11 product controller because they had the
12 third-party data.  So if they said this, this is
13 off, then the book just got marked down by where
14 it was.
15          If there was a situation where -- if
16 there was a situation where there was other data
17 in the market that the product controllers didn't
18 have, for example, then --
19    Q.   You would reason with them, but you
20 couldn't overrule them?
21    A.   Right.  That was my experience within
22 credit.
23    Q.   And so far as you know, is that the
24 same system that other businesses use within
25 Lehman?

Page 1

1

2              UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4

5     In re:                    )

                                )  Chapter 11

6     LEHMAN BROTHERS            )  Case No. 08-13555(JMP)

                                )

7     HOLDINGS, INC., et al.,    )

                                )

8              Debtors.          )

      -------------------------)

9

10

11

12

13

14

15         HIGHLY CONFIDENTIAL DEPOSITION OF

16              DANIEL JOSEPH FLEMING

17              New York, New York

18           Friday, August 28, 2009

19

20

21

22

23    Reported by:

24    KRISTIN KOCH, RPR, RMR, CRR, CLR

25    JOB NO. 24123

Page 10

```
 1            Fleming - Highly Confidential
 2    in 1998?
 3         A.   I reported in to an individual by
 4    the name of Robert Murack.
 5         Q.   And was there a time when that
 6    changed and you started to report to someone
 7    else or did you report --
 8         A.   Yes.  Robert left the organization.
 9    I was then reporting in to an individual by the
10    name of Kathy Bopp Flynn, who was in charge of
11    cash and collateral management, as well as
12    network management and possibly some other
13    functions.  I don't recall.  She was a direct
14    report to the treasurer at the time who was
15    Daniel Minerva.  Kathy Bopp Flynn moved into a
16    new role at some point after I was reporting in
17    to her.  A new individual by the name of Robert
18    van Zwieten was hired.  Robert was responsible
19    for global cash management as well as some
20    other functions.  Upon Robert --
21         Q.   Go ahead.  Finish.
22         A.   Upon Robert's departure -- I don't
23    recall exactly when that was, it was probably
24    2005, 2006.  2006.  At that time I was named
25    the global head of cash and collateral
```

Page 11

```
 1            Fleming - Highly Confidential
 2    management reporting in to Ian Lowitt, who at
 3    the time was the treasurer.
 4         Q.   So if I can just step back to
 5    clarify, in 2001, 2002 you became the U.S. head
 6    of cash and collateral management and then in
 7    2006 you became the global head of cash and
 8    collateral management; is that correct?
 9         A.   That sounds approximately correct,
10    yes.
11         Q.   And at the time that you were the
12    U.S. head of cash and collateral management,
13    were you reporting to the then global head of
14    cash and collateral management or directly to
15    the treasurer?
16            MR. C. GREEN:  Object to form.
17            You can answer.  Go right ahead.
18         A.   There was a change in organizational
19    structure during my time at Lehman Brothers.
20    When I first joined, there was no global head.
21    Each region ran their own treasury group.  At
22    some point, I don't exactly remember when that
23    was, they created global heads for each
24    function within treasury.
25         Q.   So to clarify, when you were going
```

Page 12

```
 1            Fleming - Highly Confidential
 2    through the people you reported to prior to
 3    becoming global head, Kathy Bopp Flynn, at the
 4    time that you reported to her, what was her
 5    title?
 6         A.   She was senior vice president.  That
 7    was her official title.
 8         Q.   Let's move on.  Let's go back to you
 9    became global head of cash and collateral
10    management in 2006.  What were your duties as
11    global head?
12         A.   Most of my time was spent focusing
13    on the U.S. operations of Lehman Brothers.  I
14    did have global responsibility.  In that
15    capacity I was responsible for overseeing
16    strategic direction and objectives of the team,
17    but each of my directs -- I had a direct in
18    Europe and a direct in Asia -- reported in to
19    the treasurer of those respective regions and
20    the day-to-day operations were managed within
21    the region.
22         Q.   And did you have direct reports in
23    the U.S.?
24         A.   Yes, I did.
25         Q.   Could you name those individuals?
```

Page 13

```
 1            Fleming - Highly Confidential
 2            MR. C. GREEN:  I'm sorry, at the
 3    time he became global head or throughout
 4    the period of time that he was global head?
 5         Q.   Why don't we say at the time you
 6    became global head, how many direct reports did
 7    you have?
 8         A.   I don't really recall.  It could
 9    have been three.  I don't remember exactly what
10    it was.
11         Q.   Did it change substantially over
12    time?
13         A.   I think towards the end there were
14    two direct reports in the U.S.
15         Q.   And at the end who were those two
16    direct reports?
17         A.   Craig Jones and Mandeep Seekond.
18         Q.   Could you spell the last name?
19         A.   S-E-E-K-O-N-D.
20         Q.   Were you and your two direct
21    reports, Craig Jones and Mandeep Seekond, the
22    only members of the U.S. cash and collateral
23    management team?
24         A.   No.
25         Q.   Who else would have comprised
```

Page 34

1         Fleming - Highly Confidential
2    Joseph Bellingeri.  That does not constitute
3    the whole repo desk.  There were many other
4    things that the repo desk was doing that we
5    were not liaising with them on, so those two
6    individuals were our primary contacts and those
7    two individuals were the ones that were
8    executing the bulk of Lehman Brothers, Inc.'s
9    secured financing.
10        Q.    And were Servidio and Bellingeri the
11   individuals to whom your group would send
12   reports?
13        MR. C. GREEN:  Object to form.
14        A.    The information that we provided, I
15   believe, went to a broader distribution than
16   just those two individuals.
17        Q.    If you could take me through
18   starting September 12th, 2008, the weekend
19   before Lehman Brothers Holdings, Inc. filed for
20   bankruptcy, what you were doing that weekend
21   before the filing.
22        MR. C. GREEN:  Object to form.
23        A.    The weekend prior to bankruptcy, the
24   holding company bankruptcy?
25        Q.    Yes.

Page 35

1         Fleming - Highly Confidential
2         MR. C. GREEN:  This would be the
3    weekend of the 13th and 14th?
4         MS. CARRERO:  Yes, September 13th
5    and 14th.
6         A.    I don't recall.  I don't remember if
7    I was working or not working.
8         Q.    Do you have any recollection of
9    being involved in any sort of negotiations
10   either directly or indirectly for the sale of
11   any part of Lehman that weekend?
12        A.    No.
13        Q.    Were you ever involved in any
14   negotiations for the sale of any part of Lehman
15   or its assets?
16        A.    No.
17        Q.    Do you recall generally what you
18   were doing on September 15th, the date that
19   Lehman Brothers Holding had filed for
20   bankruptcy?
21        A.    That would be Monday?
22        Q.    That would be Monday, September
23   15th.
24        A.    I mean, generally speaking, we were
25   trying to figure out how we were going to

Page 36

1         Fleming - Highly Confidential
2    continue to run LBI.
3         Q.    And what decisions were made in
4    terms of how to continue running LBI?
5         MR. C. GREEN:  Object to form.  What
6    decisions were made by him?
7         Q.    Do you have any recollection of what
8    decisions were made in terms of running LBI?
9         MR. C. GREEN:  By whom?
10        Q.    On the 15th what's your
11   recollection -- you had testified that on the
12   15th what was going on was conversations in
13   terms of how to run LBI.  Could you expand upon
14   that, please.
15        MR. C. GREEN:  Object to form.
16        A.    Okay.  So the thought that -- Lehman
17   Brothers was an integrated organization,
18   meaning that legal entities were not simply
19   stand-alone entities, that it was an integrated
20   organization.  Systems were integrated,
21   processes were integrated.  The notion that,
22   you know, the 15th of September that we can say
23   that, you know, the holding company is bankrupt
24   and the broker/dealer is not and people just go
25   about their day is just not a reality, so

Page 37

1         Fleming - Highly Confidential
2    trying to shut down the holding company and its
3    subsidiaries, which, quite frankly, at the time
4    there was ambiguity around which legal entities
5    were in bankruptcy and which ones were not, and
6    trying to run LBI required a tremendous amount
7    of coordination and effort between operations,
8    technology, finance, treasury, right, to
9    effectively shut down the pipes and plumbing as
10   we could for that portion of the business that
11   we believed was in bankruptcy while keeping
12   within that same grid the portion that we
13   thought was still a functioning entity open for
14   business and being able to satisfy the
15   obligations that came about on Monday morning.
16   We had issued checks.  We had -- there were
17   debit cards clients were using.  The banks are
18   coming to us Monday morning saying, you know,
19   how are you going to pay for this, how are you
20   going to do this, how are you going to do that.
21   So that was what I was spending the bulk of my
22   time on, in addition to fielding questions from
23   many, many different people internally and
24   externally as it related to our ability to
25   remit payment or fund for certain types of

## Page 134

1        Fleming - Highly Confidential
2    Q.  And could you explain to me the
3 difference between the two OCC margin accounts?
4    A.  I'm not an expert in the margin.  I
5 didn't control the OCC processing.  My
6 understanding is that the house represents the
7 proprietary positions and that the customer
8 represents customer positions or the margin
9 associated with each.
10    Q.  And would Lehman funds be used to
11 post margin to the customer margin accounts at
12 OCC?
13      MR. C. GREEN:  Object to the form of
14 the question.
15      Do you have the question in mind?
16      THE WITNESS:  Am I supposed to be
17 answering the question?
18      MR. C. GREEN:  Do you want to read
19 back the question.
20      (Record read.)
21    A.  We would use firm assets to pledge
22 to the customer requirement.  There is no
23 correlation between the customer margin and the
24 margin that's actually collected from clients,
25 because the margin treatment that we give

## Page 135

1        Fleming - Highly Confidential
2 clients, such as New York Stock Exchange
3 portfolio margin treatment, allows for the
4 netting of options and other types of
5 instruments that are housed within the client's
6 account whereby the OCC is only looking at the
7 option position, so there never is a
8 correlation, so you could never locate the
9 client asset applicable to a margin -- I
10 shouldn't say never.  We couldn't.  We didn't.
11 So it was firm assets that were pledged to the
12 OCC.
13    Q.  And if you would turn your attention
14 to column F, which is entitled IM Excess
15 Deficit, could you explain for me what column F
16 is tracking?
17    A.  IM stands for initial margin, which
18 is determined by the exchange.
19    Q.  If there is an excess under IM
20 excess deficit, is the excess available to be
21 returned to Lehman?
22    A.  I believe so.
23    Q.  If you turn your attention to
24 column H of Exhibit 304B, the column is headed
25 Exchange Margin Available.

## Page 136

1        Fleming - Highly Confidential
2    Do you have any understanding as to
3 the meaning of the numbers in that column?
4    A.  I don't know.
5    Q.  And do you know if the excess margin
6 in the OCC customer and house accounts, which
7 can be found in lines 58, 59 and 60, were
8 growing on the 16th as opposed to the numbers
9 on the 15th if you turn to the fourth page of
10 the attachment and look at the same lines 58,
11 59 and 60?
12      MR. C. GREEN:  Object to the form of
13 the question.
14    Q.  Because of any particular event?
15    A.  I'm not sure I'm looking at the
16 right thing.  So the second --
17    Q.  So page 2 of the attachment, lines
18 58 through 60, and then page 4 of the
19 attachment to Exhibit 304B, lines 58 through
20 60.
21    A.  And which columns?
22    Q.  I'm sorry, column K on page 4.
23    A.  So column F is the equivalent of
24 column K?  Is that what --
25      MS. CARRERO:  Off the record.

## Page 137

1        Fleming - Highly Confidential
2      (Discussion off the record.)
3      MS. CARRERO:  Withdraw the pending
4 question.
5 BY MS. CARRERO:
6    Q.  Mr. Fleming, are you aware of excess
7 margin growing in the margin accounts at OCC
8 over the week of September 15th?
9      MR. C. GREEN:  Object to the form of
10 the question.
11    A.  I would say that I was -- nothing
12 stood out or nothing was brought to my
13 attention as it related to issues with -- let
14 me rephrase that.  I was not aware of issues
15 with a growing amount of excess in the
16 accounts, so I think it's fair to say that
17 there was always some amount of excess in the
18 accounts.  I also think it's fair to say that
19 there was a tremendous amount happening during
20 that time frame, not only as it relates to, you
21 know, positions that we were trading in or
22 clients were trading in, but the market in
23 general.  So the volatility of, you know, the
24 positions, not the positions but the value of
25 those positions, was very, very significant, so

## Page 138

Fleming - Highly Confidential

1
2    the fact that we had excess there doesn't come
3    as a surprise.
4        Q.    If there is excess in the account,
5    does that suggest any volatility in the market
6    was in Lehman's favor in aggregate?
7        MR. C. GREEN:  Object to the form.
8        A.    I wouldn't draw any conclusion like
9    that.  All I am saying is there was, you know,
10    unprecedented volatility in the marketplace.
11        Q.    Could you explain to me how the
12    margin accounts at an exchange like OCC work in
13    tandem with the position accounts?
14        MR. C. GREEN:  Object to the form.
15        A.    I cannot describe to you the
16    calculation of margin at the exchanges that
17    they perform.  I don't know what that
18    calculation consists of.
19        Q.    Could you explain to me how the
20    margin account is related to any account
21    holding exchange-traded derivatives?
22        MR. C. GREEN:  Object to the form.
23        A.    There is a margin calculation based
24    on the positions and then there is a designated
25    account whereby qualified assets need to be

## Page 139

Fleming - Highly Confidential

1
2    deposited to satisfy the margin requirement.
3        Q.    So for the customer margin account
4    at OCC there would be a related account holding
5    any exchange-traded derivatives; is that
6    accurate?
7        MR. C. GREEN:  Object to the form.
8        A.    There would be customer trades that
9    correspond to the customer margin.
10        (Exhibit 305B, e-mail dated
11    September 23, 2008, Bates stamped
12    BCI-EX-(S)-000191987 through
13    BCI-EX-(S)-000191194, marked for
14    identification.)
15        Q.    Mr. Fleming, you have before you
16    what's been marked Exhibit 305B.
17        A.    Yes.
18        Q.    Do you know what this document is?
19        A.    This appears to be a statement from
20    the OCC.
21        Q.    Do you recall receiving these
22    statements on September 23rd from Susie Chen?
23        A.    Not specifically, but it shows here
24    that -- well, there is a memo here.  I don't
25    recall actually reviewing or doing anything

## Page 140

Fleming - Highly Confidential

1
2    with these statements.
3        Q.    Do you recall attending a meeting
4    regarding OCC margin around September 23rd?
5        A.    I don't.  There were a lot of
6    meetings happening at the time and I didn't --
7    I wasn't actively managing the day-to-day
8    business, the detail, so it's likely that
9    someone else would have been attending those
10    meetings who was more familiar with the
11    details.
12        Q.    Do you have any idea of who would
13    have been attending those meetings?
14        MR. C. GREEN:  Object to the form of
15    the question.  When you say "those
16    meetings," you mean this particular meeting
17    you are referring to or --
18        MS. CARRERO:  Mr. Fleming said that
19    it was likely that somebody else would have
20    been attending those meetings who was more
21    familiar with the details.  I am asking him
22    to clarify who those individuals might have
23    been.
24        MR. C. GREEN:  He said there were a
25    lot of meetings.

## Page 141

Fleming - Highly Confidential

1
2        Q.    Particularly with respect to OCC
3    margin, who, if not you, would have attended
4    any meetings taking place on the issue?
5        A.    It's conceivable that Craig Jones
6    may have attended the meeting you are
7    referencing.
8        Q.    And at this point on September 23rd
9    are you employed by Lehman or are you employed
10    by Barclays at this point?
11        MR. C. GREEN:  Object to the form.
12        A.    I don't know.  I don't know.
13        Q.    Do you recall if at any point during
14    the week of September 15 you received an offer
15    of employment from Barclays?
16        A.    I recall receiving an offer of
17    employment.  I don't recall what day it was
18    that that occurred.
19        Q.    Do you recall how you received that
20    offer of employment?
21        A.    I received a phone call from
22    Mr. Lowitt advising me that Barclays would like
23    to hire me.
24        Q.    And do you recall if you received a
25    written offer following Mr. Lowitt's call?

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4

5    In re:                    )
                               ) Chapter 11
6    LEHMAN BROTHERS           ) Case No. 08-13555(JMP)
                               )
7    HOLDINGS, INC., et al.,   )
                               )
8               Debtors.       )
     -------------------------)

9

10

11

12

13

14

15    HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF

16                  JAMES FOGARTY

17              New York, New York

18           Friday, January 15, 2010

19

20

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR, CLR

25   JOB NO. 27091

Page 6

1
2         THE VIDEOGRAPHER:  This is the start
3    of tape number 1 of the videotaped
4    deposition of James Fogarty in the matter
5    in re Lehman.
6         Today's date is January 15th, 2010
7    at approximately 9:36 a.m.
8         Will the court reporter please swear
9    in the witness.
10   J A M E S   F O G A R T Y,
11        called as a witness, having been duly sworn
12        by a Notary Public, was examined and
13        testified as follows:
14   EXAMINATION BY
15   MR. THOMAS:
16        Q.   Good morning, Mr. Fogarty.
17        A.   Good morning.
18        Q.   Would you please state your full
19   name and address for the record, please.
20        A.   James Fogarty, and I am at 14 Old
21   Roaring Brook Road, Mount Kisco, New York,
22   10549.
23        Q.   And can you please -- have you been
24   deposed before?
25        A.   Once.

Page 7

1         Fogarty - Highly Confidential
2         Q.   So you are familiar with how this
3    process works?
4         A.   Very, very pleasant experience.
5         Q.   Okay.  If at any point you are not
6    sure what I am asking, please ask me to
7    rephrase the question.  I will be happy to try.
8         Could you please briefly describe
9    your employment history.
10        A.   I was with Alvarez and -- I am with
11   Charming Shoppes now.  I am the CEO at Charming
12   Shoppes.  I started there April of this year.
13   And prior to that I was with Alvarez & Marsal
14   for over 15 years, and prior to that I was with
15   KPMG Peat Marwick for six years, five years,
16   something like that.
17        Q.   And can you please describe your
18   educational background.
19        A.   Bachelor of arts, Williams College,
20   and MBA from Stern School and a master's in
21   accounting from The Stern School.
22        Q.   What did you do for Alvarez?
23        A.   I was, the back half of my career
24   there, mostly an interim manager in distress
25   situations.

Page 8

1         Fogarty - Highly Confidential
2         Q.   And can you describe in a little
3    more detail what duties and responsibilities
4    you had in that position.
5         A.   So I was -- I was really on sort of
6    a handful of cases over that period of time.  I
7    was the CFO of Warnaco Group for about two and
8    a half years.  I was the CFO then at Levi
9    Strauss for about two and a half years.  And
10   then I was the CEO of American Italian Pasta
11   Company, again, about two years, give or take,
12   something like that.  And then after that I was
13   at Lehman Brothers as the chief operating
14   officer post filing.
15        Q.   So Alvarez & Marsal would come in to
16   distressed companies and you would then
17   essentially function as the company's
18   management?
19        A.   That's correct.
20        Q.   And when was the first time you had
21   any involvement or connection with the
22   Lehman/Barclays sale transaction that occurred
23   in September of 2008?
24        MR. TAMBE:  Objection to the form of
25   the question.

Page 9

1         Fogarty - Highly Confidential
2    You can answer.
3         THE WITNESS:  Say that again.  I
4    missed --
5         MR. TAMBE:  I just object to the
6    form of the question.  You can answer the
7    question.
8         THE WITNESS:  I can answer.  Okay.
9         A.   I was -- well, it's probably
10   easier -- I guess the 15th of September was the
11   date that Lehman filed and our firm became
12   involved, basically, that day or we got a call
13   the night before, Brian Marsal got a call, and
14   we started that day over at the offices and
15   there was -- you know, the sort of first I had
16   heard of Barclays and Lehman was probably that
17   day, that there was continuing work on trying
18   to put a transaction together.
19        Q.   And can you describe your first
20   involvement in the working in connection with
21   Lehman during that assignment?
22   I mean, did you start working on the
23   15th or the 16th?  Can you just describe a
24   little what you did that week of the 15th.
25        A.   So the first week it was myself with

Page 10

Fogarty - Highly Confidential

2  a few others; Brian Marsal, John Suckow, David
3  Coles, myself and a couple others, and we spent
4  a lot of the first week -- we had some
5  connection with the management team, but,
6  frankly, the management team was connected in
7  working on the transaction, so there wasn't as
8  much connection, frankly, as we are used to in
9  the first week, but we had a number of
10  conversations with management over that first
11  week.  Really our main goal in the first week
12  was understanding the liquidity of the business
13  and understanding -- trying to get our arms
14  around the business.
15     Q.   And can you describe in a little
16  more detail what you mean by the liquidity of
17  the business?
18     A.   Well, the company had, of course,
19  just filed and we needed to, you know,
20  understand the basics of how the business was
21  going to operate in Chapter 11 and whether
22  there was going to be, you know, liquidity to
23  run the business during that time frame.
24     Q.   On starting with that Monday,
25  September 15th, did you physically go over to

Page 11

Fogarty - Highly Confidential

2  Lehman's offices?
3     A.   Yes.
4     Q.   So on that Monday can you describe
5  what you did when you went over to their
6  offices?
7     A.   We went to the office, went to
8  connect with Brian Marsal, and went in a
9  conference room.
10     Q.   What did you do in the conference
11  room?
12     A.   We then had a meeting with -- I
13  think the first meeting we had we met with Tom
14  Russo, we met with Steve Berkenfeld.  We
15  had a -- I can't remember all of the -- we had
16  a couple of connection meetings initially on
17  those first couple of days.
18        MR. THOMAS:  Let me go ahead and
19  show you a document we will mark as 561-B.
20        (Exhibit 561-B, e-mail dated
21  September 19, 2008, marked for
22  identification.)
23        MR. TAMBE:  Just before you get
24  started --
25        MR. THOMAS:  We are looking for a

Page 12

Fogarty - Highly Confidential

2  production copy.  If I have it, we can
3  introduce that also.
4        MR. TAMBE:  Yes, or just read it
5  into the record later on just what the
6  Bates number is, but there appears to be a
7  Bates number that is cut off.
8        MR. THOMAS:  Sure.
9     Q.   This is an e-mail which you are in
10  the e-mail chain.  It's -- the initial e-mail
11  is an e-mail from David Coles to Kristie Wong
12  at Lehman dated September 18th.
13        Do you see that?
14     A.   I do.
15     Q.   Do you recognize this document?
16     A.   I recall it.
17     Q.   In the e-mail -- and who is David
18  Coles?
19     A.   David Coles is my partner,
20  another -- well, former partner, another
21  managing director at Alvarez & Marsal.  He is
22  one of the fellows I mentioned earlier.
23     Q.   What was his role with respect to
24  Lehman Brothers at this time?
25     A.   David became the chief financial

Page 13

Fogarty - Highly Confidential

2  officer and his role was to understand the
3  finances of the company and particularly, you
4  know, focus on liquidity measures and so forth,
5  and my focus was more of the operating side, to
6  make sure that we could function in the back
7  end of the business and have people in place
8  and so forth over time.  I mean, initially we
9  are all working things together, but that was
10  how the duties delineated over time.
11     Q.   In the e-mail from David to Kristie
12  Wong at Lehman, it says:  "Some colleagues and
13  I met with Martin Kelly on Tuesday."
14        Do you recall meeting with Martin
15  Kelly on Tuesday of that week, it would be
16  September 16th?
17     A.   I do not.
18     Q.   Do you know if you were a part of
19  that meeting?
20     A.   I don't recall.  I know David was
21  spending time with Martin Kelly.  I may have
22  met Martin once in the hallway, but I don't
23  believe I was ever spending quality time with
24  Martin.
25     Q.   The e-mail goes on to say that they

Page 14

1  Fogarty - Highly Confidential
2  discussed the consolidated balance sheet and
3  the likely post Barcap sale BS.
4      Do you see that?
5  A.   I see that.
6  Q.   What do you understand the post
7  Barcap sale BS to refer to?
8      MR. TAMBE:  Objection to the form of
9  the question.
10     You can answer.
11     MR. THOMAS:  Some of these
12  objections he will state an objection just
13  to preserve something about the question
14  and but then you can go ahead and answer
15  unless he instructs you not to.
16     THE WITNESS:  Okay.
17  A.   Post Barcap sale BS presumably means
18  post Barcap -- post sale to Barclays capital
19  balance sheet.
20  Q.   Was that something you guys were
21  trying to work up, Alvarez & Marsal, at this
22  time?
23  A.   I was not spending time on it.
24  David was.
25  Q.   And do you know why Alvarez folks

Page 15

1  Fogarty - Highly Confidential
2  were trying to work up this post Barcap sale
3  balance sheet?
4  A.   Well, we were trying to understand
5  what assets will be our responsibility, in
6  other words, what assets will be left behind,
7  and start to think about what we need to do to
8  manage that process of optimizing the answer
9  for our creditors.
10  Q.   Let me go ahead and show you a
11  document which has been previously marked as
12  Exhibit 485.
13      (Document review.)
14  Q.   Do you recognize this as an e-mail
15  from you to quite a few people at Alvarez --
16  A.   Yes.
17  Q.   -- dated September 20th, 2008
18  concerning the deal status?
19  A.   Yes.
20  Q.   And which deal is that referring to?
21  A.   Well, let me -- let me read it here.
22      (Document review.)
23  A.   Okay.  I read it.  Sorry.  I missed
24  the question.
25  Q.   Sure.  Is the deal being referred to

Page 16

1  Fogarty - Highly Confidential
2  here the sale transaction between Lehman and
3  Barclays?
4  A.   Yes.
5  Q.   In the first line you write:  "Bill
6  Gordon is point on the TSA negotiation.  The
7  deal is not 'paper closed' and the TSA has not
8  been agreed to yet."
9      When you are referring to the deal
10  that is not paper closed, are you referring to
11  the Barclays sale transaction?
12  A.   Correct.
13  Q.   And what did you mean by it is not
14  paper closed?
15  A.   Not closed.  In other words, it's a
16  period of time between -- well, it hasn't
17  closed yet.  I can't remember exactly where
18  it's between.
19  Q.   By saying it hasn't paper closed --
20  A.   It's not closed.
21  Q.   Is it your understanding that
22  agreement has been reached, but they haven't
23  finalized the documents and executed them?
24      MR. TAMBE:  Object to the form of
25  the question.

Page 17

1  Fogarty - Highly Confidential
2  A.   It's just not closed, so, you know,
3  when a deal is not yet closed, it's still --
4  it's still --
5  Q.   Right.  I am asking you, you use the
6  term "hasn't paper closed," which is it fair to
7  draw from that that there is an agreement, but
8  it just -- they haven't finalized the papers?
9      MR. TAMBE:  Object to the form of
10  the question.
11  A.   There was an evolving agreement,
12  because there was -- again, I was not -- my
13  job was not to understand what was going on.  I
14  wasn't part of that negotiating process.  My
15  job was to understand for the estate how we
16  were going to get services for the estate after
17  it closed.  So what I am referring to, the TSA
18  is the Transition Service Agreement where my
19  focus was.
20  Q.   I understand.  But when you refer to
21  paper closed, does that reflect your
22  understanding that by this point in time,
23  Saturday morning, September 20th, essentially
24  agreement had been reached, but it hadn't been
25  reduced to writing and the documents hadn't

Page 18

Fogarty - Highly Confidential
1  been executed yet?
2      MR. TAMBE:  Object to the form of
3  the question.  Asked and answered a number
4  of times now.
5      A.   It hadn't closed as of this time, so
6  there were still things being worked on.
7      Q.   So when you wrote --
8      A.   In other words, the TSA was a
9  critical part of the process as well.
10      Q.   And so when you wrote "paper
11  closed," you really just meant closed?
12      A.   I mean closed.
13      Q.   Not paper closed.  Okay.
14      What did you do to prepare for
15  today's deposition?
16      A.   I didn't prepare.
17      Q.   Did you meet with anyone in
18  connection with it?
19      A.   I met with counsel.
20      Q.   And who is your counsel?
21      A.   Well, the -- I met with Jones Day.
22      Q.   Is Jones Day representing you here
23  today?
24      A.   Correct.

Page 19

Fogarty - Highly Confidential
1      Q.   Did you meet with anyone else
2  concerning the deposition?
3      A.   No.
4      Q.   Did you discuss the deposition with
5  anyone?
6      A.   No.
7      Q.   Is it fair to say --
8      A.   Can I -- I -- in addition to Jones
9  Day, I was called about the deposition by Phil
10  Kruse, my partner at Alvarez & Marsal,
11  basically to just tell me to expect a call from
12  Jones Day.
13      Q.   Okay.  There was no substantive
14  discussion --
15      A.   No.
16      Q.   -- about any issues involved in this
17  case or the deal?
18      A.   Other than at a generic level that
19  the dispute was continuing.  Other than sort of
20  at a generic level.  We didn't get into any
21  details.
22      Q.   And how did he describe the dispute
23  to you?
24      A.   Just from a public standpoint in

Page 20

Fogarty - Highly Confidential
1  terms of -- I forget the phrase -- the words he
2  would have used, but from a public standpoint
3  that XYZ motions had been filed back and forth.
4  That's about all I can recall.
5      Q.   And did he describe the substance of
6  those motions?
7      A.   No.
8      Q.   Have you ever reviewed those
9  motions?
10      A.   I have not.
11      Q.   Is it fair to say that you were at
12  least following the deal the week of September
13  15th?
14      MR. TAMBE:  Object to the form of
15  the question.
16      A.   Yes.  And you can see following it
17  even in the press, because...
18      Q.   And about midway down it says:
19  "Interesting details from this and other
20  reports."
21      Can you describe where you were
22  getting your information about the deal?
23      And if I say "deal," I am referring
24  to the Lehman/Barclays sale transaction.

Page 21

Fogarty - Highly Confidential
1      A.   We were having a very difficult time
2  following what was going on and we were working
3  very hard to understand it, again, from a
4  perspective of understanding how to have a
5  control process around what was going to be
6  left in the estate and how to manage what was
7  going to be left in the estate.  So we were
8  trying to get ahead of it and it was very
9  difficult to understand what was going on.
10      Q.   And but you were trying to?
11      A.   Our firm was -- yes, we were trying
12  to for purposes of understanding -- we were not
13  asked to be involved other than for purposes of
14  understanding what was left for our creditors
15  and how we would prepare for managing those
16  assets.
17      Q.   You wanted to understand what assets
18  and liabilities were going over to Barclays and
19  what were staying with Lehman; correct?
20      A.   We wanted to understand the latter
21  and part of understanding the latter is
22  understanding the former.
23      Q.   Can I take that as a yes?
24      A.   Yes.

Page 22

Fogarty - Highly Confidential

1
2  Q.   Okay.  And that would be important
3  in developing the post Barclays balance sheet
4  as well; correct?
5     A.   I wasn't thinking about it from a
6  development of a post Barclays balance sheet.
7  I was thinking about it from the standpoint of
8  what as assets were we going to have to manage.
9     Q.   When you refer here to this and
10 other reports that you seem to be drawing
11 information from, can you describe what reports
12 those are?  For example, were you speaking with
13 someone, were you reading materials, attending
14 hearings?
15    A.   I think the other report
16 I'm refer -- or this report I'm referring to is
17 this -- I can't recall, but I think it's this
18 link here that's on the second page from my
19 colleague, Robert Hershan.
20    Q.   The Bloomberg summary?
21    A.   I believe, but, again, I can't
22 recall exactly what I was thinking about at the
23 time.
24    Q.   So you were reading about the deal
25 in the press, for instance?

Page 23

Fogarty - Highly Confidential

1
2     A.   Right.
3     Q.   Were you also getting -- speaking
4  with anyone directly involved in the deal?
5     A.   September 20th.  No.  Other -- well,
6  let me -- Steve Berkenfeld around just how, you
7  know, sort of how is the deal going kind of a
8  thing as opposed to -- again, I wasn't intimate
9  to any of the details of what was transpiring
10 and I was more interested in understanding
11 whether it was still happening and timing so
12 that we could, again, be prepared for the
13 assets that we would need to manage for the
14 estate.
15    Q.   Well, you are reporting a number of
16 details to your colleagues; correct?
17       MR. TAMBE:  Object to the form of
18    the question.
19    A.   I'm recapping a number of details
20 that were -- that were referenced in the press.
21    Q.   At the bottom of this page, the last
22 bullet point, you write: "Well said - Daniel
23 Golden of Akin Gump," quoting him to say "we
24 believe this was a flawed sale process.  It
25 benefits Barclays and the federal government,

Page 24

Fogarty - Highly Confidential

1
2  but not the creditors of this estate."  Do you
3  see that?
4     A.   I see that.
5     Q.   Were you expecting an opinion that
6  this was a flawed sale process?
7     A.   Say that again.  Was I expecting --
8     Q.   Were you expressing the opinion to
9  your colleagues that this was a flawed sales
10 process?
11    A.   I think it meant it was an
12 interesting comment, my phrase, "well said,"
13 interesting comment about the process -- the
14 accelerated process of the sale transaction.
15    Q.   Did you believe it was a flawed
16 sales process?
17       MR. TAMBE:  Object to the form of
18    the question.
19    A.   I didn't know enough about the
20 details.
21    Q.   Did you -- were you aware after the
22 sale hearing on Friday night that the parties
23 continued to work on finalizing the sale
24 documents over the weekend?
25    A.   Yes.

Page 25

Fogarty - Highly Confidential

1
2     Q.   Did you keep yourself apprised of
3  those final document efforts?
4        MR. TAMBE:  Object to the form of
5     the question.
6     A.   I was staying apprised of the
7  Transition Service Agreement negotiation
8  through my team.  Bill Gordon in particular was
9  working on that piece for me.
10    Q.   And how were you staying apprised
11 of --
12    A.   E-mails, telephone.
13    Q.   With whom?
14    A.   Bill Gordon.
15    Q.   Do you know how he was staying
16 apprised of the deal?
17    A.   He was, again, physically on site,
18 working on the transition -- there was a team
19 working on the Transition Services Agreement
20 and they were physically on site working on it.
21 I can't remember what law firm.
22    Q.   Was he at Weil Gotshal the weekend,
23 that Saturday and Sunday, when the deal papers
24 were being finalized?
25    A.   I believe -- I believe they were at

1          Fogarty - Highly Confidential
2     Weil.  I believe so.
3     Q.    Was anyone else from Alvarez over at
4  Weil?
5     A.    I don't think so.  I don't recall,
6  but I don't think so.
7     Q.    Let me go ahead and show you a
8  document previously marked as 487.
9          (Document review.)
10    Q.    Do you recognize this as an e-mail
11  from yourself dated September 22nd, 2008?
12    A.    Are you asking me about both of
13  these things?  Just so I understand what I am
14  referring to.
15    Q.    Let me see that.
16    A.    (Handing.)
17    Q.    No.
18    A.    Okay.
19        MR. TAMBE:  Put 488 away?  Are you
20  going to ask about -- there is a 488
21  attached.
22        MR. THOMAS:  Just go ahead and take
23  that.  It must have just got stapled in the
24  production process.
25    A.    So yes, I am familiar with this.

1          Fogarty - Highly Confidential
2     Q.    Let me just start over again.
3          On document 487 do you recognize
4  that as an e-mail from yourself dated September
5  22nd, 2008?
6     A.    Yes.
7     Q.    And there is a couple of back and
8  forth e-mails here involving you.
9          John Suckow, can you tell me what
10  his role was?
11    A.    I am trying -- I don't recall John's
12  title, but, again, John, David Coles and I were
13  working for Brian on the matter, on Lehman, the
14  Lehman matter.
15    Q.    And were you trying to keep some of
16  your colleagues up to date about the final
17  discussions over the weekend at Weil concerning
18  the transaction?
19    A.    Yes.
20    Q.    And at the bottom it says:  "The M&A
21  deal was that Barclays was getting about 47
22  billion in trading assets."  Do you see that?
23    A.    Yes.
24    Q.    Do you know where you got that
25  information from?

1          Fogarty - Highly Confidential
2     A.    This was all secondhand information
3  coming through Bill Gordon's understanding in
4  Weil's offices, which was secondhand from
5  others in the Weil offices.
6     Q.    And the last sentence beginning on
7  this page and continuing over to the other, it
8  says:  "Barclays does not have that kind of
9  capital, so playing it out, this has the
10  potential to not only tank our deal but tank
11  Barclays."
12        Is it your understanding that
13  Barclays was undertaking a lot of risk in doing
14  this transaction?
15        MR. TAMBE:  Object to the form of
16  the question.
17    A.    I don't know.
18    Q.    Let me go ahead and ask you to look
19  at 488 now.
20        (Document review.)
21    A.    Okay.
22    Q.    Do you recognize this as an e-mail
23  to a number of your colleagues dated September
24  22nd, 2008?
25    A.    Yes.

1          Fogarty - Highly Confidential
2     Q.    And was this part of your continuing
3  effort to keep your colleagues up to date
4  concerning the final deal negotiations and
5  documenting process?
6     A.    Yes.  I am keeping, yes, Brian and
7  others updated.
8     Q.    Okay.  And why were you keeping them
9  updated about the deal at 4:16 in the morning
10  Greenwich mean time?
11        MR. TAMBE:  Objection.
12    Q.    Strike that.
13        Is that Greenwich mean time there?
14        Strike that.
15        Why were you trying to keep your
16  colleagues up to date in a timely fashion
17  concerning the final deal negotiations over the
18  weekend at Weil?
19    A.    We are very concerned about the --
20  making sure that the TSA goes as well as it can
21  so that we can have -- the TSA meaning the
22  Transition Services Agreement, so that we can,
23  you know, have an effective process to manage
24  the remaining assets, and we are concerned
25  about timing of communication of the

Page 30

```
 1            Fogarty - Highly Confidential
 2   transaction should it close.
 3        Q.   The last sentence you write:
 4   "Robert, let's continue to hold back
 5   communication until we get the TSA closure."
 6        What did you mean by "continue to
 7   hold back communication"?
 8        A.   I can't recall specifically
 9   what the -- but there was an intent to
10   communicate to the employees of the estate or
11   Lehman in conjunction with this transaction.
12        Q.   Is that an actual recollection that
13   you have that that's what you meant by this,
14   "let's continue to hold back communication" was
15   hold back communication with the employees of
16   Lehman?
17        A.   Absolutely, yes.
18        Q.   That's your recollection, you are
19   not speculating, you recall that's what you
20   meant?
21        A.   Yes, because Robert Hershan, his
22   responsibility for me was human resources and
23   communication, so that -- well -- I don't
24   have -- let me say I don't have a direct
25   recollection of the writing of the e-mail, but
```

Page 31

```
 1            Fogarty - Highly Confidential
 2   that is my -- yeah, that's my interpretation of
 3   it based on the fact that Robert was working
 4   for me on communication, employee
 5   communication.
 6        MR. THOMAS:  Let me show you a
 7   document that we will mark as 562-B.
 8        (Exhibit 562-B, e-mail dated
 9   9/27/2008, Bates stamped WGM-LEHMAN-E
10   00000812 through WGM-LEHMAN-E 00000815,
11   marked for identification.)
12        Q.   If you would like, please go ahead
13   and take a moment to read through this e-mail
14   chain.
15        (Document review.)
16        A.   Okay.
17        Q.   Do you recognize this as an e-mail
18   chain that you were involved with on September
19   27th, 2008?
20        A.   Yes.
21        Q.   And if you look at I guess the
22   second oldest in time e-mail, the earliest
23   e-mail appears to be an e-mail from Weil to
24   yourself on Friday, September 26th.  Do you see
25   that?
```

Page 32

```
 1            Fogarty - Highly Confidential
 2        A.   Yes.
 3        Q.   And then the next earliest in time
 4   is an e-mail from yourself to quite a number of
 5   people at both Alvarez and -- well, strike
 6   that.
 7        The folks you are e-mailing on
 8   Friday, September 26, are those all Alvarez
 9   people?
10        A.   Yes.  Well, let me just
11   double-check.  Yes.
12        Q.   Towards the bottom of your e-mail
13   where you write "a few thoughts," you write:
14   "After you guys spend a little time with these
15   things we should probably arrange a call with
16   the Barclays guys (aka former Lehman - the guys
17   at the table early Monday morning were
18   apparently Paolo and Alex Kirk) and Weil to
19   make sure we all understand these details and
20   make sure these are disseminated appropriately
21   through Barclays - so there is no confusion
22   about "what stuff be ours", and to ensure
23   appropriate security controls (which the TSA
24   requires they keep)."
25        Was this part of your effort to make
```

Page 33

```
 1            Fogarty - Highly Confidential
 2   sure you understood what assets and liabilities
 3   went over with the transaction and what assets
 4   and liabilities stayed with Lehman?
 5        A.   This was more -- this was focused on
 6   what assets were remaining with us, this
 7   comment here.
 8        Q.   And is that a function of
 9   understanding what assets went over to
10   Barclays?
11        A.   Correct.
12        Q.   And did you try to do this?
13        A.   Yes.
14        Q.   Then the next e-mail chain -- next
15   e-mail response in this chain is from Brian
16   Marsal to yourself.
17        Can you identify Mr. Marsal's
18   position?
19        A.   Where is the e-mail from Brian?
20        Q.   I believe it's the very bottom --
21   next -- it's the response.
22        A.   Oh, I see.  It's cut over on the
23   other page.
24        Q.   It's the response to your e-mail.
25        (Document review.)
```

Page 34

```
 1        Fogarty - Highly Confidential
 2     A.   Yes, I recall.
 3     Q.   Okay.  And can you -- what was
 4  Mr. Marsal's position at this time?
 5     A.   Chief restructuring officer.
 6     Q.   For Lehman?
 7     A.   Correct.
 8     Q.   He writes:  "Jim, I think that your
 9  team needs to be the fail safe on both the
10  Barclays and Bain transaction to outline what
11  was sold and what was kept per the agreement
12  and confirm that that is actually what
13  happened.  Can you take responsibility and
14  develop a plan to complete the above."
15        Did you, in fact, undertake that
16  responsibility?
17     A.   I undertook -- I undertook it
18  initially and elements of it then would
19  transfer to David Coles and his team.
20     Q.   So part of the assignment was to
21  first understand what was sold and kept per the
22  agreement, and the other part was to make sure
23  that that's what actually happened, both parts
24  of that?
25     A.   Correct.
```

Page 35

```
 1        Fogarty - Highly Confidential
 2     Q.   And turning to the previous page
 3  where you are writing back to Harvey Miller, do
 4  you see that?
 5     A.   Yes.
 6     Q.   You write:  "I spent some time on
 7  this with David Murgio of your shop last night.
 8  We plan to get a group together for a
 9  walk-through of the final deal and detailed
10  schedules early next week, including a number
11  of people from Weil, Lehman, Alvarez."
12        Did you go ahead and do that?
13     A.   We did.  At least with some parts of
14  this group.  I can't recall all of the folks.
15     Q.   Let me show you a document
16  previously marked as Exhibit 464-A.
17        (Document review.)
18     Q.   Do you recognize this as an e-mail
19  chain that you were involved with?
20     A.   Yes.
21     Q.   And do you recognize the attachments
22  to the e-mail?
23     A.   Yes.
24     Q.   And the initial e-mail appears to be
25  from Glenn West to a number of people at
```

Page 36

```
 1        Fogarty - Highly Confidential
 2  Alvarez dated September 27th?
 3        MR. TAMBE:  Objection.  I'm not sure
 4  you are reading that right.
 5     Q.   Okay.  Let me start over again.
 6  Well, there is an initial forwarding.
 7        Do you recall receiving this e-mail
 8  that begins on the bottom of the first page,
 9  which is 2287, from Weil Gotshal?
10     A.   I don't recall it.
11     Q.   But you recall the attachments and
12  you recall getting the attached from Weil
13  Gotshal in this time frame?
14     A.   I recall this attempt to recap
15  assets and liability of the transaction.
16     Q.   And you don't have any reason to
17  believe you didn't receive this --
18     A.   No.
19     Q.   -- document at the time indicated on
20  the face of the e-mail?
21     A.   No.
22     Q.   And looking at the attachment, if
23  you would look at Bates page AM 2289 down at
24  the bottom right-hand corner.
25     A.   I don't have that.
```

Page 37

```
 1        Fogarty - Highly Confidential
 2        MR. TAMBE:  I don't either.
 3        MR. MILLS:  It looks like 89 through
 4  92.
 5        MR. THOMAS:  Okay, in this
 6  document apparently there is two.  It's out
 7  of order.  This is --
 8     Q.   Exhibit 464-A has two attachments to
 9  it and they may be in reversed order at least
10  in terms of the Bates stamping.
11     A.   Okay.
12     Q.   So looking at Exhibit 464-A and the
13  attachment at A&M Bates stamp 2289, do you see
14  the bottom bullet point that says:  "During the
15  period of 60 days following the closing
16  Barclays has the right to assume or reject
17  contracts that are related to the assets that
18  it has purchased from the Lehman entities"?
19     A.   Yes.
20     Q.   Is that consistent with your
21  understanding of the deal at the time?
22        MR. TAMBE:  Objection to the form of
23  the question.  Lack of foundation.
24     A.   I recall -- I can't recall 60 days
25  or not.  I recall there were -- there wasn't
```

Fogarty - Highly Confidential

1          Fogarty - Highly Confidential
2  perfect clarity on contracts -- wasn't perfect
3  clarity on these contracts as to who was going
4  to need what contracts to run the respective
5  businesses and this was the way that the
6  agreement had -- my understanding that Barclays
7  had the 6- -- this some day period, I don't
8  recall 60 days, but had some days to make some
9  determinations on these contracts.
10     Q.  So any liability assumed by Barclays
11  with respect to contracts would be based upon
12  Barclays' discretion in choosing what contracts
13  to accept; correct?
14     MR. TAMBE:  Object to the form of
15     the question and lack of foundation.
16     A.  I don't know the -- I didn't study
17  the exact legal issues involved in the right
18  to -- on these contract rights personally.
19     Q.  Was that your understanding, though?
20     A.  I had a fellow on my team, Bill
21  Gordon, who was running a process to work in --
22  to work on the contracts and what I am thinking
23  is contracts around things like printers and
24  copier machines and this kind of thing.  That's
25  what I recall on this.

1         Fogarty - Highly Confidential
2     Q.  So was Bill Gordon trying to figure
3  out which contracts were going to be assumed by
4  Barclays and which were not to understand which
5  contracts Lehman would still be responsible
6  for?
7     A.  Correct.
8     Q.  And if you would turn the page,
9  please, to Bates stamp 2290, do you remember
10  receiving this chart from Weil?
11     A.  I don't recall this chart.
12     Q.  Do you know if this chart was sent
13  to Alvarez to help Alvarez understand
14  consistent with the assignment of understanding
15  what assets went over pursuant to the agreement
16  and which didn't?
17     MR. TAMBE:  Objection to the form of
18     the question.
19     A.  I don't recall this being something
20  we focused on, that I -- I didn't focus on this
21  table.
22     Q.  You don't recall why Weil Gotshal
23  was sending to you on September 27th a chart
24  listing the assets that were included as
25  purchased assets and those that were excluded

1         Fogarty - Highly Confidential
2  as assets?
3     A.  I recall this document.  I don't
4  recall this table.
5     Q.  Do you recall why Weil Gotshal was
6  sending you this information concerning the
7  deal?
8     A.  I recall --
9     MR. TAMBE:  Object to form.
10     Go ahead.
11     A.  I recall a -- I recall the attempt
12  to -- the very difficult attempt to figure out
13  what the estate had left in to manage.
14     Q.  What does that mean, what the estate
15  had left to match?
16     A.  Manage.
17     Q.  To manage.  Okay.
18     Couldn't you just pick up the
19  contract and read it and see what went over and
20  what didn't?
21     A.  I tried that too.
22     Q.  Did you need help -- why didn't that
23  work?
24     A.  It was -- it wasn't all in the
25  contract.  It was schedules and conversations

1         Fogarty - Highly Confidential
2  that I wasn't part of understanding how it
3  all came together was incredibly difficult.
4     Q.  Were there any assets that you
5  recall that were transferred as part of the
6  sale agreement that weren't identified in the
7  sale documents?
8     A.  Restate.
9     Q.  Were you aware of any assets that
10  were transferred as part of the agreement that
11  you didn't believe were reflected in the sale
12  agreement?
13     A.  There was, I recall, people working
14  on things like stadium tickets, all sorts of
15  things, and trying to figure out what was
16  transferred and what was not and I remember
17  people working on that process.
18     Q.  Let me ask you to look at another
19  part of the attachment here, which is AM 2293.
20  It's a document entitled Lehman Bothers
21  Barclays Transaction, Division of Assets and
22  Liabilities.  Do you recognize this document?
23     (Document review.)
24     A.  I recall this document being
25  prepared by Weil.  I can't say I recall the --

Fogarty - Highly Confidential

1
2     I recall all of this detail or this detail.
3         Q.    Do you recall seeing this document?
4         A.    Yes, I recall this document.
5         Q.    And under -- did you understand this
6     to be describing which assets were included in
7     the sale transaction?
8             MR. TAMBE:  Object to the form of
9         the question.
10        A.    Did I -- I'm sorry, rephrase.  Did
11    I --
12        Q.    Did you understand this document to
13    be describing the assets that were included in
14    the sale transaction with Barclays?
15        A.    Yes.
16        Q.    And on 2293 under Purchased Assets
17    and under Security and Trading Operations do
18    you see the first bullet point that says:  "The
19    securities set forth on Schedule A to the
20    Clarification Letter, i.e., the securities
21    subject to the Barclays repurchase agreement"?
22        A.    I see that.
23        Q.    Did you understand at this time that
24    Barclays was acquiring all of the collateral
25    associated with the Fed repo loan?

Fogarty - Highly Confidential

1
2         A.    No.
3         Q.    Well, did you understand that after
4     you got this document and read it?
5         A.    I understood that there were a lot
6     of documents trying to pull together -- that
7     tried to -- clarification letters and documents
8     and schedules and we had a process to try to
9     understand numerically, you know, what that
10    left us with, what exactly did we have left, I
11    mean, sort of detail trying to understand
12    exactly what securities we had left.
13        Q.    In roughly this time period of
14    September 27th, you understood that as part of
15    the sale transaction Barclays was getting all
16    the collateral associated with the repo;
17    correct?
18            MR. TAMBE:  Objection.  Asked and
19        answered.
20        A.    I did not understand -- I did not
21    understand the transaction completely.
22        Q.    Not my question.
23            The question is you understood that
24    as part of the sale transaction all of the
25    collateral associated with what was the Fed

Fogarty - Highly Confidential

1
2     repo -- do you know what I am referring to when
3     I say the Fed repo?
4         A.    I do.
5         Q.    And you know there was collateral
6     associated with that repo?
7         A.    Yes.
8         Q.    And you understood that all of that
9     collateral was supposed to be conveyed to
10    Barclays as part of the sale transaction;
11    correct?
12        A.    I don't know about all.  I know that
13    collateral was associated with that Fed repo
14    and that was supposed to be -- that was
15    supposed to be part of this transaction.
16        Q.    Did you ever have a belief that some
17    portion of the repo was supposed to not be
18    transferred to Barclays?
19        A.    No.
20        Q.    Okay.  And you understood that what
21    Weil is telling you here is confirming that all
22    of the repo collateral was included as a
23    purchased asset; right?
24            MR. TAMBE:  Objection to the form of
25        the question.

Fogarty - Highly Confidential

1
2         A.    I believe that was the case.
3         Q.    Okay.  And you -- in this rough time
4     frame you would have reviewed the Clarification
5     Letter?
6         A.    Made an attempt to understand it,
7     yes.
8         Q.    Okay.  So you read it and you saw in
9     there that it transferred the Fed repo
10    collateral to Barclays; correct?
11            MR. TAMBE:  Objection to the form of
12        the question.
13        A.    I recall the Fed repo.  I don't
14    recall whether it was in the Clarification
15    Letter or not.
16        Q.    Let me go ahead and show you a
17    document marked 25, and we will come back to
18    the current document so you can just leave it
19    there.  This is a copy.
20            Do you recognize Exhibit 25?
21            (Document review.)
22        A.    I do not.
23            (Document review.)
24            MR. TAMBE:  Do you want him to read
25        it?

Page 46

Fogarty - Highly Confidential

1
2          MR. THOMAS:  No, but what he is
3      doing is good, flipping through it.
4          MR. TAMBE:  So you want him to flip
5      through it?
6          MR. THOMAS:  Yes.
7          (Document review.)
8      A.   Okay.
9      Q.   Having had a chance to now flip
10     through the document, do you recognize it as
11     what is referred to as the Clarification
12     Letter?
13     A.   I do.
14     Q.   And do you see under Purchased
15     Assets section 1(a)(ii) towards the bottom of
16     the first page there, and then capital A that
17     it includes the securities owned by LBI and
18     transferred to purchaser or its affiliate under
19     the Barclays repurchase agreement?
20     A.   I see those words.
21     Q.   Okay.  And if you turn to paragraph
22     13 of page 5 entitled Barclays Purchase
23     Agreement, it says:  "Effective at closing all
24     securities and other assets held by purchaser
25     under the September 18th, 2008 repurchase

Page 47

Fogarty - Highly Confidential

1
2      agreement among purchaser and/or its affiliate
3      and LBI and/or its affiliates and the Bank of
4      New York as collateral agent (the Barclays
5      repurchase agreement) shall be deemed to
6      constitute part of the purchased assets in
7      accordance with paragraph 1(a)(ii) above."  Do
8      you see that?
9      A.   I see those words.
10     Q.   Okay.  And when it says "all
11     securities and others assets," do you
12     understand that to be conveying all of the repo
13     collateral to Barclays as part of the sale
14     transaction?
15         MR. TAMBE:  Objection to the form of
16     the question.
17     A.   I do.
18     Q.   Does this refresh your recollection
19     that, in fact, all of the repo collateral was
20     being conveyed to Barclays as part of the sale
21     transaction?
22     A.   That is my understanding.
23     Q.   And was that your understanding at
24     the time?
25     A.   I haven't looked at any of this

Page 48

Fogarty - Highly Confidential

1
2      since April, prior to April of this year, so I
3      just don't recall all the details.
4      Q.   I appreciate that, but at any time
5      did you have some belief that not all the
6      collateral was going over to Barclays?
7      A.   Because I didn't fully understand
8      the transaction, we were -- I was never sure of
9      anything in that transaction.
10     Q.   Would you agree that --
11     A.   I was never sure.
12     Q.   Do you agree that that language is
13     pretty clear, that means that all the repo
14     collateral was going over to Barclays?
15         MR. TAMBE:  Objection to the form of
16     the question.
17     A.   I can see those -- the words that
18     say that, yes.
19     Q.   Okay.  Going back to 2293, the
20     second bullet point, the last bullet point on
21     the page, says:  "The securities and other
22     assets held in LBI's clearance boxes as of the
23     time of closing."  Do you see that?
24     A.   Yes.
25     Q.   Is that consistent with your

Page 49

Fogarty - Highly Confidential

1
2      understanding of the Barclays sale transaction?
3      A.   Yes.
4      Q.   Turning the page, the first bullet
5      point says:  "All exchange-traded derivatives
6      and any property that may be held to security
7      obligations under such derivative," is that
8      also consistent with your understanding of the
9      transaction, that that was going over to
10     Barclays as part of the sale transaction?
11     A.   Rephrase "understanding of the" --
12     say that again.
13     Q.   Is that consistent with your
14     understanding of the sales transaction, that
15     all exchange-traded derivative and any property
16     that may be held to security obligations under
17     such derivative was part of the purchased
18     assets and was being transferred to Barclays as
19     part of the sale transaction?
20     A.   That -- yes.
21     Q.   And the parenthetical there where it
22     refers to "and any property that may be held to
23     security obligations under such derivative," do
24     you understand that to be referring to
25     collateral associated with the exchange-traded

Page 50

Fogarty - Highly Confidential

1
2    derivatives?
3         MR. TAMBE:  Object to the form of
4    the question.
5         A.   I don't understand this piece.
6         Q.   Do you recall asking Weil at any
7    point to clarify it?
8         A.   I don't.
9         Q.   Do you know if you had an
10   understanding of that at the time?
11        A.   I don't recall focusing on the
12   exchange-traded derivatives.
13        Q.   And just to be clear, it's your
14   testimony that you are not sure if the
15   parenthetical, "and any property that may be
16   held to security obligations under such
17   derivative," is referring to collateral or not?
18        A.   I don't --
19        MR. TAMBE:  Object to the form of
20   the question.
21        You can answer.
22        A.   I don't understand what that means.
23        Q.   Do you believe it to be referring to
24   collateral?
25        A.   Property -- I read it to -- it reads

Page 51

Fogarty - Highly Confidential

1
2    as property.
3         Q.   It reads as any property that may be
4    held to security obligations under such
5    derivative.
6         My question to you is do you believe
7    that that's referring to collateral?
8         MR. TAMBE:  Objection.
9         A.   Property held for security
10   obligations and collateral presumably are the
11   same thing.
12        Q.   And when it says "any property,"
13   assuming it's referring to collateral, that
14   would include both securities and cash;
15   correct?
16        MR. TAMBE:  Objection to the form of
17   the question.
18        A.   I don't know.
19        Q.   How do you read that, assuming
20   that's referring to collateral when it says
21   "any property," how would you interpret "any
22   property" to include things like security and
23   cash?
24        MR. TAMBE:  Object to the form of
25   the question.

Page 52

Fogarty - Highly Confidential

1
2         A.   Yes.
3         Q.   When you received this from Weil on
4    September 27th, do you recall going back to
5    Weil with any follow-up questions concerning
6    the document they sent you?
7         A.   I recall attempting to summarize the
8    transaction -- not the transaction.  To
9    summarize what was -- what was -- well,
10   summarize the transaction and to summarize what
11   was left for the estate to manage as the
12   outgrowth of all of this effort.
13        Q.   Was Weil cooperative with Alvarez in
14   providing information to Alvarez?
15        A.   Yes.
16        Q.   If you would look at 2295, please.
17   The top of the page -- well, strike that.
18        Let's go ahead and go to 2296,
19   please.  And do you see where it says at the
20   top of the page:  "Purchaser shall receive" and
21   then the second point says:  "To the extent
22   permitted by applicable law and as soon as
23   practicable after the closing 769 million of
24   securities as held by or on behalf of LBI on
25   the date hereof pursuant to Rule 15C3-3 of the

Page 53

Fogarty - Highly Confidential

1
2    Securities and Exchange Act of 1934 as amended
3    or securities of substantially the same nature
4    and value," do you see that written there?
5         A.   I see that.
6         Q.   Is that also consistent with your
7    understanding of the deal, that the securities,
8    that value, was going over to Barclays as part
9    of the sale transaction?
10        MR. TAMBE:  Object to the form of
11   the question.
12        A.   I don't recall this particular piece
13   of the -- this particular 769 piece of the
14   transaction.
15        Q.   Okay.  You don't recall one way or
16   the other?
17        A.   I don't.
18        Q.   Did you subsequently come to learn
19   at some point in time -- strike that.
20        Do you recall learning at some point
21   in time that this was listed as a purchased
22   asset in the sale transaction documents?
23        A.   I recall something we termed the --
24   that was being termed the unencumbered box and
25   I can't recall if this relates to that or not.

## Page 54

Fogarty - Highly Confidential

1  Fogarty - Highly Confidential
2      Q.   Do you have an understanding that
3  the unencumbered box referred to the clearance
4  boxes?
5      A.   Yes.
6      Q.   Does that help you recall that the
7  clearance box is something separate than the
8  15C3 assets?
9          MR. TAMBE:  Object to the form of
10  the question.
11     A.   The way we were, again, attempting
12  to understand the transaction, there were those
13  two pieces.
14          MR. THOMAS:  Let me show you a
15  document that we will mark as 563-B.
16          (Exhibit 563-B, handwritten notes,
17  Bates stamped AM 004887 through AM 4892,
18  marked for identification.)
19          (Document review.)
20     Q.   Do you recognize this document?
21     A.   No.
22     Q.   Do you recall there being discussion
23  in the other e-mails that we looked at about
24  you getting together a meeting or discussion
25  with Alex Kirk, Paolo Tonucci, Rod Miller at

## Page 55

1  Fogarty - Highly Confidential
2  Weil among potentially others?
3      A.   I do.
4      Q.   And do you see this at the top says
5  "9/29 MTG" for meeting?
6      A.   I see that.
7      Q.   And do you see Alex, Rod Miller,
8  Paolo?
9      A.   I do.
10     Q.   Do you know whose handwriting this
11  is?
12     A.   I do not.  I don't know.
13     Q.   It's not yours?
14     A.   It's not my handwriting, no.
15     Q.   Do you recall having a meeting with
16  Alex Kirk, Paolo Tonucci and Rod Miller at
17  about this time?
18     A.   I recall meeting with Alex Kirk and
19  Paolo.  I can't recall -- I can't recall Rod --
20  whether Rod was there or not, and I recall a
21  bigger -- others in the room as well.  I can't
22  recall.
23     Q.   And who else do you recall being
24  there?
25     A.   Bill Gordon.  I believe David Coles.

## Page 56

1  Fogarty - Highly Confidential
2  And I can't recall beyond -- there are others
3  that might have been there, but I can't recall.
4      Q.   And anyone else from Weil?  Was Bob
5  Messineo there?
6      A.   I don't recall Bob.
7      Q.   How about Lori Fife?
8      A.   I don't recall her being there
9  either.
10     Q.   And who kind of ran that meeting
11  from the Alvarez perspective?
12     A.   I think we -- I don't know that
13  there was sort of a runner of -- it would have
14  been a combination of myself and Bill and David
15  Coles and others.  I can't remember there being
16  a specific runner of the meeting.
17          MR. THOMAS:  And, counsel, this was
18  produced to us a couple days ago.  Do you
19  know whose notes these are?
20          MR. TAMBE:  I don't.
21          MS. DelMEDICO:  We are providing you
22  with metadata today that will be produced
23  electronically.
24          MR. THOMAS:  Today.  Okay.  Can you
25  tell me whose notes they are?

## Page 57

1  Fogarty - Highly Confidential
2          MS. DelMEDICO:  I can't.  I can try
3  to find out for you.
4          MR. THOMAS:  Okay.
5      Q.   Do you remember that meeting?  Where
6  was that meeting held?
7      A.   I think the Lehman offices, the old
8  Lehman offices, but it could be -- we were in
9  this -- I think it was the old Lehman offices
10  in a conference room, or it could have been the
11  new Lehman offices.  I can't recall.  All the
12  conference rooms were the same, but there were
13  two offices across the street from one another
14  and I can't recall which place we were in at
15  the time.
16     Q.   And was the purpose of that meeting
17  to understand the final deal both in terms of
18  what was in the agreement and what actually
19  occurred?
20     A.   Yes.
21     Q.   And did Mr. Kirk and Mr. Tonucci,
22  were they cooperative and answered your
23  questions?
24     A.   They were rushed, they each had only
25  a little bit of time to give us, so we did not

Fogarty - Highly Confidential

1
2  accomplish the task.
3      Q.   In what sense did you not accomplish
4  the task?
5      A.   We left the room somewhat more
6  befuddled than when we entered the room.
7      Q.   And what befuddled you?
8      A.   We still didn't understand the
9  transaction clearly at that time.
10     Q.   Did there come a point in time when
11  you understood the transaction clearly?
12     A.   No.
13     Q.   Still even today you don't
14  understand the transaction?
15     A.   I haven't tried to in a long time.
16     Q.   When did you leave Alvarez?
17     A.   Beginning of April, late March.
18     Q.   And at that time you still didn't
19  understand the transaction?
20     A.   Correct.
21     Q.   What do you mean when you say you
22  didn't understand the transaction?
23     A.   I didn't -- there were lots of
24  moving parts and I don't -- I never could put
25  them all together, because things kept changing

Fogarty - Highly Confidential

1
2  along the way.  My understanding of things kept
3  changing along the way.
4      Q.   Did you feel there was some
5  ambiguity in the language of the purchase
6  agreement which you reviewed?
7      A.   I didn't study it from that
8  standpoint.  There was ambiguity in my
9  understanding of what happened.  I could never
10  quite -- and I am pretty -- usually pretty good
11  at this stuff.  I could never quite put it all
12  together as to what -- because I wasn't there
13  and that's where it was.
14     Q.   What aspect of the deal could you
15  not put together?
16     A.   The interrelations of all the
17  different -- just the actual math -- the
18  ultimate mathematics of the transaction I
19  couldn't put together ultimately.
20     Q.   Did you ever identify any term of
21  the purchase agreement that you thought was
22  vague or unclear?
23         MR. TAMBE:  Objection.  Asked and
24  answered.  Objection to the form of the
25  question.

Fogarty - Highly Confidential

1
2      A.   I couldn't ever understand exactly
3  how the transaction ultimately came together
4  and closed.
5      Q.   Well, I am asking a little bit
6  different question, I think.
7         Could you understand the transaction
8  as spelled out in the purchase agreement in
9  terms of what assets were supposed to be
10  included in the purchased assets and which
11  weren't?
12     A.   I would come to a I will call it a
13  draft understanding of the transaction and find
14  something out different and it continued to
15  evolve and I couldn't -- the tasks that Brian
16  asked me to pursue, I could never get enough
17  cooperation from the other side through my
18  teams, and this wasn't all just me trying to --
19  through my teams to really understand the
20  transaction.
21     Q.   Has there been any asset or bucket
22  of assets or type of assets that you had
23  difficulty understanding were conveyed or not
24  conveyed as part of the transaction?
25     A.   There was a -- there was -- you

Fogarty - Highly Confidential

1
2  mentioned the two pieces of the transaction.
3  Put the unencumbered asset piece.  The other
4  piece, and I am recalling there being a haircut
5  that was taken against -- again, I'm not a
6  valuation person.  I am trying to just follow
7  what happened in terms of control -- asset
8  control, and there was a haircut taken in the
9  transaction that I never quite understood and
10  there was liabilities that others on the team,
11  David Coles' team, were trying to understand
12  that were being assumed by Barclays that we
13  could never get good detail and understand.
14     Q.   Anything else you can think of not
15  having clarity on?
16     A.   Then there were other things like
17  the stadium tickets and the who got to sell
18  Lehman's, you know, caps and bags.  Just this
19  kind of stuff.  There was lots of this kind of
20  stuff that we never had great clarity on.
21     Q.   Anything that you would consider
22  material?
23         MR. TAMBE:  Objection to the form of
24  the question.
25     A.   The initial two things I mentioned

Page 62

```
 1            Fogarty - Highly Confidential
 2     were more material than the latter piece that I
 3     mentioned.
 4          Q.   Did you consider the stadium seats
 5     or anything else material to the transaction?
 6          A.   No.
 7            MR. TAMBE:  Now is a good time for a
 8     break, Tom.
 9            MR. THOMAS:  Okay.  Let me finish up
10     with the current document.
11            MR. TAMBE:  That's fine.
12          Q.   Are you okay to finish up with this
13     document?
14          A.   Sure.
15          Q.   Let me ask you to turn to page 4889
16     of Exhibit 563-B, and I understand these are
17     not your notes and obviously we are going to
18     depose whoever it is who wrote the notes as
19     soon as we are told that information, but this
20     is notes of a meeting that you were at and
21     participated in; correct?
22            MR. TAMBE:  Objection to the form of
23     the question.  I don't think you have ever
24     established that.
25          A.   I do -- I was at a meeting with the
```

Page 63

```
 1            Fogarty - Highly Confidential
 2     people I mentioned earlier.  I can't tell you
 3     for sure that this is that same meeting.
 4          Q.   Is there any doubt in your mind that
 5     you were at this meeting that the notes are
 6     referring to?
 7            MR. TAMBE:  Object to the form of
 8     the question.
 9          A.   There actually is some doubt,
10     because there may have been other meetings that
11     I wasn't at with either Paolo or Alex, so I
12     can't for sure know that this is the same one,
13     the same meeting.
14          Q.   Okay.
15          A.   I assume it is, but I don't know for
16     sure.
17          Q.   You assume so because it's obviously
18     a detailed discussion of the deal on September
19     29th shortly after you were tasked to meet with
20     these people and find out all you can about the
21     actual final deal; correct?
22            MR. TAMBE:  Object to the form.
23          A.   I assume so, because it's in the
24     same week that I probably had that same
25     meeting.
```

Page 64

```
 1            Fogarty - Highly Confidential
 2          Q.   Do you think there might have been
 3     other people at Alvarez secretly meeting with
 4     Paolo and Alex discussing the deal's that you
 5     didn't know about?
 6          A.   I don't know for sure.  I know
 7     that -- well, there were others on the Alvarez
 8     team that were trying to help understand this,
 9     including Bill Gordon and Al Lakhani and some
10     of the folks that were referenced, and they
11     were having meetings that I wasn't at together.
12     I don't know -- I just don't know exactly
13     whether they got any time with Alex or Paolo in
14     addition to the time that I was in a meeting
15     with them.  I just don't know.
16          Q.   So in addition to the description of
17     the deal that you got from Alex and Paolo, your
18     colleagues at Alvarez & Marsal may have also
19     gotten additional descriptions of the deal from
20     them?
21          A.   I don't know.
22          Q.   Would you take a few minutes to flip
23     through these notes.  Perhaps that will refresh
24     your recollection whether these notes are from
25     a meeting that you attended.
```

Page 65

```
 1            Fogarty - Highly Confidential
 2          (Document review.)
 3          A.   I can't -- I can't read all the
 4     handwriting, but...
 5          (Document review.)
 6          A.   Okay.
 7          Q.   And having looked at the substance
 8     of what the notes are referring to, does this
 9     appear to be the subject matter discussed in
10     the meeting that you attended on or about 9-29
11     with Mr. Tonucci and Mr. Kirk?
12          A.   Parts of this would have been the
13     subject matter that we discussed and I can't be
14     absolutely sure on all of the pieces, but the
15     parts of this are subject matter for what we
16     would have discussed in the meeting with those
17     two.
18          Q.   And having reviewed the notes of
19     this meeting, do you believe that this is a
20     meeting that you attended?
21          A.   I -- I don't -- I think so, but I
22     can't tell you for sure.  I don't know that
23     there wasn't another meeting.
24          Q.   If you would turn, please, to page
25     4889.  Do you recall in your meeting with
```

Page 66

Fogarty - Highly Confidential

1    Fogarty - Highly Confidential
2    Mr. Tonucci and Mr. Kirk whether they gave you
3    a description of what happened with the we will
4    refer to it as the $7 billion that did not go
5    to Barclays that was supposed to?
6         MR. TAMBE:  Objection to the form of
7    the question.
8         A.   I recall trying to piece the
9    transaction together.  That's what I recall.
10        Q.   Do you recall there being an issue
11   with Barclays having sent over $45 million in
12   cash and having not gotten all the assets in
13   return that it was supposed to get?
14        A.   I recall there was an issue between
15   JPMorgan, Barclays and Lehman.
16        Q.   And you recall it generally
17   involving the fact that Barclays had put out
18   $45 billion in cash and not gotten all the
19   securities that it was supposed to have gotten?
20        A.   Yes.
21        Q.   And do you recall Mr. Kirk or
22   Mr. Tonucci explaining to you in this meeting
23   what happened?
24        A.   Yes.
25        Q.   Okay.  Do you see a chart at the top

Page 67

Fogarty - Highly Confidential

1    Fogarty - Highly Confidential
2    of 4889?
3         A.   Yes.
4         Q.   Do you have an understanding of what
5    that chart is showing?
6         MR. TAMBE:  Object to the form of
7    the question.
8         A.   In a general sense, yes.
9         Q.   Can you explain what it's showing in
10   a general sense, please.
11        A.   I understand it to be generally
12   trying to follow the transaction.
13        Q.   And do you see the box where it says
14   kept 8.6 something cash, 8.6 billion cash?
15        A.   Uh-huh.
16        Q.   Do you know what that's referring
17   to?
18        A.   I do not, other than it says "held
19   back from Fed" next to it.
20        Q.   Turning down a couple of lines it
21   says "Sunday Barclays talked to JPM, resolve
22   $7 billion cash."  Do you see that?
23        A.   I see that.
24        Q.   The next line it says "8.4 billion
25   securities worth half amount."  Do you see

Page 68

Fogarty - Highly Confidential

1    Fogarty - Highly Confidential
2    that?
3         A.   I see that.
4         Q.   Do you recall in this meeting you
5    attended a discussion about the securities
6    being only worth half of what they were marked
7    at?
8         MR. TAMBE:  Objection to the form of
9    the question.
10        A.   I do not.
11        Q.   Do you recall generally in this part
12   of this discussion that some of the securities
13   that were associated with the repo collateral
14   were not, in fact, worth what they were marked
15   at?
16        A.   I recall the $45 billion number
17   having been thought to be $50 billion worth of
18   value and there was a description of a -- I
19   don't recall if it was in this meeting.  A
20   description of a fight about whether it was
21   worth 50 billion or 45 billion.
22        Q.   There was a question discussed as to
23   whether it was really worth the amount that it
24   was nominally marked at; is that right?
25        MR. TAMBE:  Object to the form of

Page 69

Fogarty - Highly Confidential

1    Fogarty - Highly Confidential
2    the question.
3         A.   There was a dispute on what that
4    was -- on what the 50 billion was worth, yes.
5    I recall that.
6         Q.   And you understood that Barclays did
7    not believe it was worth 50 billion, but
8    believed it was worth roughly in the
9    neighborhood of about $5 billion less than
10   that?
11        MR. TAMBE:  Objection to the form of
12   the question.
13        A.   I do not know what Barclays believed
14   it was worth.  I don't know.
15        Q.   Do you know -- then what was the
16   disagreement about in terms of -- was there any
17   disagreement in terms of the valuation of those
18   securities?
19        A.   I wasn't there, so I don't know
20   specifically, but I know it was described as
21   there was a fight about -- there was a fight
22   where the management team was -- believed the
23   securities -- that the management team was -- I
24   don't know what people believed, but there was
25   a $50 billion number and a $45 billion number

```
 1              Fogarty - Highly Confidential
 2    and Barclays was at 45 and the Lehman folks,
 3    Alex and Paolo, were at -- they were at 50 and
 4    there was a fight about it.  That's what I
 5    recall.
 6          Q.    Are you sure Alex and Paolo were at
 7    50 or was it the case that those were the
 8    marks?
 9             MR. TAMBE:  Object to the form of
10    the question.
11          A.   I don't recall where Alex and Paolo
12    would have been at.  I don't know where they
13    were -- what they -- I remember there being a
14    $50 billion number, though.
15             THE VIDEOGRAPHER:  The time is
16    11:06.  We are going off the record.
17             (Recess was taken from 11:06 to
18    11:06.)
19             THE VIDEOGRAPHER:  The time is
20    11:06.  We are back on the record.
21    BY MR. THOMAS:
22          Q.    Do you recall anyone from Lehman
23    ever expressing a belief as to what they
24    believe the actual value of those securities
25    was?
```

```
 1              Fogarty - Highly Confidential
 2             MR. TAMBE:  Objection to the form of
 3    the question.
 4          A.   No.
 5          Q.   If you would turn the page to 4890.
 6    About three-quarters of the way down there
 7    appears to be a reference to "paid 38" I am
 8    going to say billion "in cash to buy 42.9B
 9    Lehman asset" and it says "different" --
10    appears to say "different valuation."  Is that
11    how you read that?
12             MR. TAMBE:  Object to the form of
13    the question.
14          Q.   Then underneath it says "5.1"?
15          A.   I see that.  "Different" -- yeah, I
16    don't know what that word is, but it could be
17    valuation.
18          Q.   The last word is "valuation"; right?
19    "5.1."
20             MR. TAMBE:  Object to the form.
21          Q.   Does that sound like the difference
22    in valuation that you were discussing allowing
23    for the fact that there were $7 billion that
24    didn't get transferred?
25             MR. TAMBE:  Objection to the form of
```

```
 1              Fogarty - Highly Confidential
 2    the question.
 3          A.   I see two numbers.  I see 42.9 and I
 4    see 38, which are different to the tune of 4.9,
 5    and I don't know what the 5.1 is.
 6          Q.   And if you take the 48 -- take the
 7    38 cash and add 7, you get the 45 billion that
 8    Barclays paid in cash; right?
 9             MR. TAMBE:  Object to the form of
10    the question.  Does 38 plus 7 equal 45?
11    The math?
12             MR. THOMAS:  It's a speaking
13    objection.  I've got the objection.
14             MR. TAMBE:  These are not his notes.
15             MR. THOMAS:  You kind of yelled the
16    objection, so I don't know if it was
17    like -- you know, what's going on here.
18             MR. TAMBE:  I will tell you what's
19    going on.  What's going on here is --
20             MR. THOMAS:  The federal rules
21    require you to not make these kind of
22    speaking objections in the middle of a
23    question and I will just ask you -- you
24    have stated your objection.  You have
25    preserved it.
```

```
 1              Fogarty - Highly Confidential
 2             MR. TAMBE:  Well, what the rules
 3    also require is that you have a fair
 4    examination.  He has already told you this
 5    is not his handwriting.  You are asking him
 6    to do math based on numbers you are reading
 7    on a piece of paper.
 8             MR. THOMAS:  You are arguing to give
 9    the witness coaching.
10             MR. TAMBE:  It's an improper
11    question.
12             MR. THOMAS:  Improper objection.
13          A.   What's the question?
14          Q.   Do you understand if you add the 38
15    billion -- at this meeting where this was
16    discussed that you intended as part of your
17    assignment to figure out what the deal was --
18             MR. TAMBE:  Objection.  Lack of
19    foundation.
20             MR. THOMAS:  I haven't even asked
21    the question yet.
22          Q.   When you add the 38 billion and the
23    7 billion that didn't get transferred, that
24    adds up to the 45 billion that Barclays paid in
25    cash; correct?
```

1        Fogarty - Highly Confidential
2            MR. TAMBE:  Object to the form of
3    the question.  Lack of foundation.
4        A.   38 and 7 is 45, correct.
5        Q.   Okay.  Is there any doubt in your
6    mind that when it says here "paid 38 billion in
7    cash" that that's referring to the 45 billion
8    that Barclays paid minus the 7 billion that
9    went missing?
10       A.   I do not know.
11           MR. TAMBE:  Objection to the form of
12   the question.
13       Q.   You don't know?  You have no idea?
14       A.   I didn't write this.
15       Q.   I understand, but that's not my
16   question.
17           Is it your understanding that the 38
18   billion is 38 billion there in paid cash
19   because it's taking out from the 45 billion in
20   cash that Barclays paid the 7 billion which
21   ended up not going across in the transaction
22   and ended up being the subject of an extensive
23   settlement agreement in which you were
24   involved?
25           MR. TAMBE:  Object to the form of

1        Fogarty - Highly Confidential
2    the question.  Lack of foundation.  Asked
3    and answered.
4        A.   I'm sorry.  Is there a question?
5        Q.   Yes.  Do you understand the
6    reference to the 38 billion there paid in cash
7    to be simply the 45 billion that Barclays paid
8    in cash minus the 7 billion over which there
9    was a dispute because Barclays didn't get the
10   assets that it was supposed to get?
11           MR. TAMBE:  Object to the form of
12   the question.  Lack of foundation.  Asked
13   and answered.
14       A.   I don't know what this means.
15       Q.   So it's your testimony that you have
16   no idea what that "paid 38 billion in cash" is
17   referring to?
18       A.   What I recall is -- the numbers I
19   recall is a $50 billion number and a
20   $45 billion number.  That's what I recall from
21   this meeting.
22       Q.   And you recall there being a dispute
23   about $7 billion for which Barclays did not
24   receive the securities that it was supposed to
25   receive on the night of that Thursday and that

1        Fogarty - Highly Confidential
2    subsequently it was supposed to receive
3    $7 billion back in cash and then ultimately was
4    the subject of a settlement agreement in
5    December of 2008?
6            MR. TAMBE:  Objection to the form of
7    the question.  Asked and answered.
8        A.   I don't know.  I don't know.  I
9    don't know the settlement that you -- I don't
10   know the settlement you mentioned.
11       Q.   Do you recall that there was a
12   $7 billion issue with Barclays not getting
13   securities it was supposed to get in return for
14   that $7 billion?
15       A.   I recall that there was some sort of
16   settlement, yes, between JPMorgan and Barclays
17   and LBI and I can't remember the details.
18       Q.   Do you recall when you were
19   following the deal over the weekend and your
20   references in your e-mails to JPM being at
21   Weil, do you recall those e-mails?
22       A.   I do.
23       Q.   Do you recall at some point over the
24   weekend it being agreed that Barclays was just
25   going to get paid back the $7 billion?

1        Fogarty - Highly Confidential
2        A.   I don't recall that over that
3    weekend, no.
4        Q.   Do you recall the $7 billion figure
5    being an issue?
6        A.   I recall there being an issue with
7    JPMorgan in the transaction.
8        Q.   And do you recall the $7 billion
9    figure?
10       A.   I recall -- I recall the $7 billion
11   figure, yes.
12       Q.   Is there any doubt in your mind that
13   paid 38 billion here in cash is simply
14   referring to the $45 billion paid by Barclays
15   minus the $7 billion?
16           MR. TAMBE:  Objection, asked and
17   answered.  Objection, lack of foundation.
18   Objection, form.
19       A.   I do not know.
20       Q.   No idea how they -- what that
21   $38 billion is referring to?
22       A.   I didn't write it, so I don't know.
23       Q.   Do you recall in the meeting a
24   $38 billion figure being discussed?
25       A.   No.  I recall discussing 50 and 45.

1          Fogarty - Highly Confidential
2    That's what I recall.
3          Q.   Now, when you say 50, do you recall
4    there being a nominal valuation of 49.9 or
5    49.7?
6          A.   I don't recall that number.
7          Q.   In any event, you do recall this
8    approximately $5 billion difference in
9    valuations being discussed in the meeting with
10   Kirk and Tonucci?
11         MR. TAMBE:  Objection to the form of
12   the question.
13         A.   I recall them describing -- fighting
14   about the difference between 50 and 45.
15         Q.   And you understood that to be a
16   difference in valuation --
17         MR. TAMBE:  Objection to form.
18         Q.   -- of what -- question of what
19   securities were actually worth versus what they
20   were nominally marked at?
21         MR. TAMBE:  Object to the form of
22   the question.
23         A.   I recall, yes, there being two
24   different numbers relative to the transaction.
25         Q.   And if you would turn the page,

1          Fogarty - Highly Confidential
2    please, to 4891.
3          At the top of the page does this
4    appear to you to be an effort at some type of
5    balance sheet?
6          A.   Yes.
7          Q.   And if you recall the 45 and the 50
8    billion numbers, do you have any explanation
9    for why we are dealing with the 38 and 43
10   numbers?
11         MR. TAMBE:  Objection to the form of
12   the question.  Lack of foundation.
13         A.   I don't recall.
14         Q.   Do you see under Assets at the top
15   of that page it says "repo" and then to the
16   right it says "38," then it says "5" and then
17   it says "43.1B"?
18         A.   I see that.
19         Q.   Do you understand that to be
20   referring to, again, this $5 billion valuation
21   issue?
22         MR. TAMBE:  Objection to the form of
23   the question.  Lack of foundation.
24         A.   I do not know what they are
25   referring to.

1          Fogarty - Highly Confidential
2          Q.   And in the right-hand column there
3    is a reference to where it says "deal hits,
4    3.45."  Do you see that?
5          A.   I see that.
6          Q.   Do you remember there being -- first
7    of all, do you have -- just from reading this,
8    do you have an understanding what that's
9    referring to?
10         MR. TAMBE:  Objection to the form of
11   the question.  Lack of foundation.
12         A.   Sorry.  Restate the question.
13         Q.   Sure.  From reading this do you have
14   an understanding of what "deal hits" is
15   referring to there, the 3.45?
16         MR. TAMBE:  Same objection.
17         A.   I don't know what they meant by that
18   phrase.
19         Q.   Do you have any understanding of it?
20         MR. TAMBE:  Same objections.
21         A.   I don't know.
22         Q.   What do you think it means?
23         MR. TAMBE:  What those words mean?
24         Q.   What do you think he means by these
25   words, "deal hits"?

1          Fogarty - Highly Confidential
2          MR. TAMBE:  Same objection.  Lack of
3    foundation.
4          A.   Should I answer as to what I think?
5          Q.   Yes.
6          MR. TAMBE:  You can answer what
7    those words mean to you, yes.
8          A.   It looks like an accountant trying
9    to have the two sides add up to the same
10   number, 47.34, 47.34, and that being a number
11   they need to get to add it up.
12         Q.   And specifically the reference to
13   "deal hits," do you understand that to be a
14   loss on the deal?
15         MR. TAMBE:  Objection to the form.
16   Lack of foundation.
17         A.   No.
18         Q.   What do you understand it to be?
19         A.   I just understand it to be an
20   accountant trying to make the two sides add up
21   and calling the remaining number something
22   there.  They called it deal hits.
23         Q.   Do you recall any discussion about
24   deal hits or loss on the deal at this meeting?
25         A.   I recall the $5 billion discussion

Page 82

1    Fogarty - Highly Confidential
2  at the meeting, the difference between 50 and
3  45 that I mentioned before, that's what I
4  recall.
5       Q.   Right.  Do you recall any discussion
6  about a loss on the deal or deal hits?
7       A.   No.
8       Q.   And having looked at this, you have
9  no understanding of whose handwriting this is?
10      A.   I don't know.
11           MR. TAMBE:  Objection.  Asked and
12  answered.
13      Q.   Did you take notes at that meeting?
14      A.   No.
15      Q.   Do you know who was taking notes?
16      A.   I don't know.
17      Q.   Let me go ahead and show you a
18  document we will mark as --
19           MR. TAMBE:  Can we take a break
20  before you show him the next document?
21           MR. THOMAS:  Sure, yes, go ahead.
22           THE VIDEOGRAPHER:  The time is
23  11:20.  We are going off the record.
24           (Recess was taken from 11:20 to
25  11:31.)

Page 83

1    Fogarty - Highly Confidential
2           THE VIDEOGRAPHER:  The time is
3  11:31.  We are back on the record.
4  BY MR. THOMAS:
5       Q.   Mr. Fogarty, do you know a Mary
6  Korycki at Alvarez & Marsal?
7       A.   Yes.
8       Q.   And was she at this meeting that you
9  attended with Mr. Tonucci and Mr. Kirk?
10      A.   She probably was, but I don't recall
11  specifically.
12           MR. THOMAS:  Let me go ahead and
13  show you a document we will mark as
14  Exhibit 564-B.
15           (Exhibit 564-B, Lehman
16  Brothers/Barclays APA Lead Sheet, Bates
17  stamped AM 004893 through AM 004896, marked
18  for identification.)
19           MR. TAMBE:  Just before you ask
20  about the document, I just want to be clear
21  that we did tell you at the break whose
22  handwritten notes those were.
23           MR. THOMAS:  Right.
24           MR. TAMBE:  I just want to be clear
25  on the record that you were given that

Page 84

1    Fogarty - Highly Confidential
2  information.
3           MR. THOMAS:  Okay.
4       Q.   Does that refresh your recollection
5  at all about who was at the meeting, the fact
6  that Miss Korycki was there?
7           MR. TAMBE:  Object to the form of
8  the question.
9       A.   No.
10      Q.   Do you now have a recollection that
11  Mrs. Korycki was at the meeting?
12           MR. TAMBE:  Asked and answered.
13      A.   I -- she worked for me, she was on
14  my team, so she was at a lot of the meetings
15  that Bill Gordon or I would be at.  I just -- I
16  can't -- I can't sort of visualize and sort of
17  see her there, if you will.  I don't recall.  I
18  don't doubt that she would have been there.
19      Q.   Did you say she worked for you?
20      A.   Yeah.  Well, she was with Alvarez &
21  Marsal.  She was a senior associate on my team.
22      Q.   So she reported up to you?
23      A.   She did, through Bill Gordon, but
24  she reported -- she worked for me on certain
25  things as well.

Page 85

1    Fogarty - Highly Confidential
2       Q.   Assuming these are her notes, does
3  that make it more likely that this was, in
4  fact, a meeting you were at?
5       A.   Yes, more likely.
6       Q.   Let me show you a document marked
7  Exhibit 564-B.
8           (Document review.)
9       Q.   Do you recognize this document?
10          (Document review.)
11      A.   I recognize the footnotes.  I don't
12  recognize the document with the handwritten --
13  the handwritten stuff.  So no, I don't
14  recognize this document.
15      Q.   When you say "the footnotes," do you
16  mean the printed materials or just literally
17  the footnotes?  Well, strike that.
18          Do you recognize the chart on 4893
19  minus the handwriting?
20      A.   I don't know if I -- I recognize the
21  chart.  I don't know if I recognize the numbers
22  on this particular version of this chart.
23      Q.   Do you know who prepared this chart?
24      A.   The -- this is likely Mary Korycki
25  that prepared this chart.

1         Fogarty - Highly Confidential
2     Q.    Under your direction?
3     A.    Correct.
4     Q.    And what was the purpose of
5    preparing this chart?
6     A.    To understand what securities had
7    transferred under the agreement so that the
8    asset teams -- our asset teams at Lehman would
9    know what was transferred.
10     Q.    Do you know if you ever saw this
11    document before with the handwriting?
12     A.    Definitely not.
13     Q.    You definitely have not seen it
14    before?
15     A.    No.  I don't recall it anyway.  I
16    don't recall this.
17     Q.    Let me go ahead and show you a
18    document that's been previously marked as 493.
19        (Document review.)
20     Q.    Do you recognize this as an e-mail
21    from yourself dated September 29th, 2008?
22     A.    29th or 28?
23     Q.    Well, at the top it appears to say
24    from James Fogarty, Monday, September 29th.
25     A.    I thought you said 28th.  29th, yes,

1         Fogarty - Highly Confidential
2    this one at the top, yes.
3     Q.    Do you recognize this as an e-mail
4    that you sent on or about this time?
5     A.    Let me read it here.
6        (Document review.)
7     A.    Okay.  Yes, I recognize this.
8     Q.    And can you describe what the
9    attachment is?
10     A.    This was certain securities that
11    were -- my recollection is certain securities
12    that were to move as part of the transaction.
13     Q.    Are these the clearing box
14    securities?
15        MR. TAMBE:  Object to the form of
16    the question.
17     A.    The -- what I recall is the
18    unencumbered box was the way I recall it and
19    that was -- that this was part of that process.
20     Q.    And why were you obtaining this
21    information?  Was that part of your effort to
22    make sure you understood what assets went over
23    as part of the transaction and which didn't?
24     A.    We were obtaining this to make sure
25    that we understood what was really ultimately

1         Fogarty - Highly Confidential
2    going to be -- that we had control over what
3    was going over and what was -- that we
4    understood what was going over and what was
5    then left behind.
6        MR. THOMAS:  Let me show you a
7    document we will mark as Exhibit 565-B.
8        (Exhibit 565-B, e-mail dated
9        9/29/2008, Bates stamped WGM-LEHMAN-E
10        00000868 through WGM-LEHMAN-E 00001147,
11        marked for identification.)
12     Q.    Do you recognize this as an e-mail
13    from Mary Korycki to yourself dated September
14    29th, 2008?
15     A.    I do.
16     Q.    And is this also part of the effort
17    and process to gather information to make sure
18    you understood what assets and liabilities were
19    being transferred as part of the sale
20    transaction and which weren't?
21     A.    Yes.
22     Q.    Was there ever a point in time
23    that -- during this period of time, the last
24    week of September when you were undertaking
25    these efforts that we have been looking at in

1         Fogarty - Highly Confidential
2    the e-mails, was there ever any point in time
3    where anyone at Lehman or Weil or anywhere else
4    refused to give you information that you
5    thought was important to understanding what
6    assets and liabilities were transferred and
7    what weren't?
8     A.    Yes.
9     Q.    What was that time?
10     A.    During this time we had a very
11    difficult time getting an understanding.  We
12    would get documents, but getting an
13    understanding was very difficult and that was
14    not my -- that was through my team.  Our team
15    had a difficult time getting an understanding
16    of the transaction.
17     Q.    Let me ask a more specific question
18    again.  Was there any point in time when anyone
19    refused to provide you any specific information
20    or specific documents?
21        MR. TAMBE:  Objection to the form of
22    the question.
23     A.    I don't recall specifically, but I
24    know folks that were working on the project had
25    a difficult time getting time with people to

Page 90

Fogarty - Highly Confidential

1
2   understand the transaction, yes.
3       Q.   Is that because it was a very busy
4   time, tumultuous time?
5       A.   I don't -- I don't know why that
6   there wasn't more time -- the estate took a
7   back seat to the interests of Barclays in
8   general.
9       Q.   What's your basis for that
10  statement?
11      A.   We had these attempts under way and
12  then we had attempts under way to get services
13  under the transition services agreement, which
14  I was responsible for with Bill Gordon, and we
15  had a difficult time getting Barclays to
16  provide support in that -- under that
17  agreement, and we had a difficult time getting
18  Barclays to help us understand -- understand
19  the estate and what we were managing.
20      Q.   Putting aside the Transition
21  Services Agreement, the TSA, just with respect
22  to your efforts to understand the sale
23  transaction and what assets and liabilities
24  were conveyed and what weren't, was there
25  any -- were there any documents or pieces of

Page 91

Fogarty - Highly Confidential

1
2   information that you asked for but didn't get?
3       A.   Personally?
4       Q.   You personally, yes.
5       A.   No.
6       Q.   To your knowledge, anyone else on
7   the Alvarez team?
8       A.   Yes.  The team had a difficult time
9   getting things that they asked for along the
10  way, yes.
11      Q.   Well, we are going to have to be
12  more specific.  Can you identify any particular
13  documents or specific information that someone
14  on your team asked for but did not get?
15      A.   I can recall a number of various
16  things that Al Lakhani's team was trying to
17  obtain from Barclays along the way and we were
18  having Al Lakhani, Phil Kruse and others trying
19  to understand this transaction over time and we
20  had a difficult time getting the things that we
21  were asking for.
22      Q.   Can you identify something
23  specifically?
24      A.   No.
25      Q.   I mean, you had CUSIP lists of the

Page 92

Fogarty - Highly Confidential

1
2   securities that went over as part of the deal;
3   correct?
4       A.   Well, we had lists, yes, and
5   there -- let's see.  We had lists by security,
6   yes.
7       Q.   Was there -- so did you at least
8   feel like you fully understood the assets that
9   went over, putting aside this kind of general
10  understanding of hows and whys about the deal,
11  did you understand what assets went over and
12  what assets didn't?
13          MR. TAMBE:  Objection to the form of
14  the question.
15      A.   Completely, no.
16      Q.   What asset did you not know went
17  over but you at some later point in time found
18  out did go over?
19      A.   I don't recall any.
20      Q.   Do you recall ever asking anyone for
21  any additional information about the securities
22  that went over that you didn't receive?
23      A.   I wasn't making the requests
24  directly myself.
25      Q.   Do you recall anyone on your team

Page 93

Fogarty - Highly Confidential

1
2   asking for something like the list of
3   securities that we are looking at here and that
4   we looked at in previous documents but they
5   didn't receive?
6       A.   I don't recall any specific item,
7   no.
8       Q.   So is it fair to say, putting aside
9   information about the difference in the
10  valuation, the approximately $5 billion
11  difference in valuation, putting aside that,
12  you understood in September what assets were
13  actually conveyed as part of the transaction?
14          MR. TAMBE:  Objection to the form of
15  the question.
16      A.   We had lists of securities that we
17  understood -- we understood those lists of
18  securities were the things that had moved
19  across, yes.
20      Q.   You had lists of securities, you had
21  briefings from Weil, you had a detailed
22  description that we looked at from Weil
23  identifying the purchased assets that were sold
24  as part of the sale transaction; correct?
25      A.   We had a lot of lists, yes.

## Page 94

Fogarty - Highly Confidential

1
2  Q.   Okay.  And at some later point in
3  time after September did you learn that some
4  asset was conveyed that you didn't know about
5  back in September?
6  A.   There were things that came up and I
7  can't recall the specifics.
8  Q.   Do you believe --
9  A.   Whether it was in the private equity
10 book or -- I just can't recall the specifics.
11 There were various things that would come up
12 over time that we didn't completely understand
13 had moved or not moved in the transaction.
14 Q.   Can you identify any of those?
15 A.   I can't.
16 Q.   Were any of those items what you
17 would consider material?
18     MR. TAMBE:  Objection to the form of
19 the question.
20 A.   There were material things that --
21 yes.
22 Q.   Can you identify those?
23 A.   I can't recall the specifics where
24 I -- there were things that we were
25 understanding about the transaction over time

## Page 95

Fogarty - Highly Confidential

1
2  that we didn't understand initially.
3  Q.   But you can't identify any?
4  A.   No.  It's been a while.  I can't
5  recall.
6  Q.   But in any event you had lists of
7  the securities that went over in connection
8  with the repo and that went over in connection
9  with the clearing box, correct, the
10 unencumbered box?
11 A.   Yes.
12 Q.   Let me go ahead and show you a
13 document that's been previously marked as
14 463-B.
15     (Document review.)
16 Q.   This is an e-mail from Conor Tully.
17 Do you know who Conor Tully is?
18 A.   He was on the FTI team.
19 Q.   And what was FTI's role?
20 A.   Working for the creditors.
21 Q.   And what were they doing for the
22 Creditors Committee?
23 A.   Advisory services to the Creditors
24 Committee for the case.
25 Q.   In terms of financial advice?

## Page 96

Fogarty - Highly Confidential

1
2  A.   They had -- yeah, they basically had
3  Houlihan Lokey and FTI and FTI was the
4  accounting advisory part of the exercise,
5  accounting, you know, reorganization kind of
6  advisory.
7  Q.   What was your understanding of FTI's
8  specific role at this point in time, early
9  October?
10 A.   It was a pretty broad role in
11 advisory of the committee.
12 Q.   And they were looking at, among
13 other things, the Barclays sales transaction;
14 correct?
15     MR. TECCE:  Objection to form.
16 A.   I honestly don't recall -- I don't
17 recall them looking at the -- FTI looking at
18 the -- I don't recall Conor Tully in particular
19 looking at this part of the transaction.  I
20 just don't recall it.
21 Q.   When you say "this part of the
22 transaction," what do you mean?
23 A.   This part of the case I meant to
24 say.  I misspoke.
25 Q.   You don't recall FTI looking at,

## Page 97

Fogarty - Highly Confidential

1
2  examining the Barclays sale transaction?
3      MR. TECCE:  Objection to form.
4  A.   I don't recall.
5  Q.   Who is William Fox?
6  A.   William Fox is one of the other
7  managing directors on the Alvarez team.
8  Q.   What was his role in this?
9  A.   Bill was working on the finance end
10 and he would ultimately take over for David
11 Coles as the CFO of the estate.
12 Q.   And why were there communications
13 between FTI and Alvarez & Marsal at this time?
14     MR. TAMBE:  Objection to form.  Lack
15 of foundation.
16 A.   I do not know.
17 Q.   Are you surprised to see this?
18 A.   No, I'm not surprised.  I just -- I
19 don't know what this particular -- I don't
20 know.
21 Q.   Did you ever speak with anyone from
22 FTI?
23 A.   No.
24 Q.   Did you ever attend a meeting --
25 A.   Oh, I'm sorry, speak to them, of

1        Fogarty - Highly Confidential
2    course. I was connecting it to this. I, of
3    course, spoke to the people from FTI.
4        Q.    And what did you speak with people
5    at FTI about?
6        A.    We actually spent most of our
7    connection -- most of my connection with FTI
8    was through the HR process when we were -- we
9    had to build a workforce to manage the Lehman
10   estate assets.
11       Q.    Let me ask you to turn to the
12   attachment. Let me ask, have you ever seen
13   this document before, the e-mail from Conor
14   Tully?
15       A.    I have not.
16       Q.    Looking at the attachment, at the
17   bottom it says "Alvarez & Marsal."
18       Let me ask do you recognize the
19   attachment?
20       A.    I do not. I recognize these
21   footnotes. I don't recognize this exact
22   document.
23       Q.    What are the footnotes? Can you
24   describe what the footnotes are?
25       A.    The A and the B. The assets

1        Fogarty - Highly Confidential
2    transferred under the repo and the unencumbered
3    box.
4        Q.    The sheet that has the assets and
5    liabilities, the first page of the attachment,
6    do you see that?
7        A.    I see that.
8        Q.    Have you ever seen this sheet
9    before?
10       A.    There were so many versions of this.
11   I can't -- I've seen stuff like this. I can't
12   recall that this -- that this version -- I
13   can't recall this version.
14       Q.    Do you know who put together this
15   version or this document?
16       A.    Mary Korycki was also working with
17   the finance guys and this is an accounting kind
18   of an approach to understanding things, and
19   working with the finance guys on some of this
20   over time, which would have been Bill Fox, so
21   that's what I presume.
22       Q.    And, I'm sorry, Bill Fox worked with
23   your group or separately?
24       A.    We would all work together on things
25   over time, but Bill Fox was -- yeah, we were

1        Fogarty - Highly Confidential
2    all on the same Alvarez & Marsal team.
3        Q.    Was he on your particular team
4    within Alvarez & Marsal or was it separate?
5        A.    No, he and David Coles were working
6    the finance specific pieces of the case,
7    accounting/finance pieces.
8        Q.    You think it may have been Bill Fox
9    that would have put together this document?
10       A.    Perhaps.
11       Q.    Was either Bill Fox or David Coles
12   with you at the September 29th meeting with
13   Tonucci and Kirk?
14       MR. TAMBE: Objection to form.
15       A.    I'm fairly certain David Coles was
16   there and I can't recall if Bill Fox was there.
17       Q.    And, again, looking at the first
18   sheet of the attachment, do you see where it
19   says "38 billion repo assets negotiated a
20   haircut and the assets transferred under
21   repo" slash then parentheses "stale marks"?
22       A.    I see that.
23       Q.    Do you understand this to be
24   referring to that same approximately $5 billion
25   valuation issue that was discussed in your 9-29

1        Fogarty - Highly Confidential
2    meeting between the 38 and the 43?
3        MR. TAMBE: Objection to the form of
4    the question. Lack of foundation.
5        A.    The 5 billion is, again, unless it's
6    serendipity here, this is the 5 billion that I
7    had in my head from the meeting and I had in my
8    head a difference between 50 and 45.
9        Q.    And do you recall there being a
10   $7 billion box loan?
11       MR. TAMBE: Objection to the form of
12   the question.
13       A.    I don't know what that phrase means.
14       Q.    Box loan?
15       A.    I don't know what that phrase means.
16       Q.    Do you see in the -- well, strike
17   that.
18       Do you see where it says "net book
19   loss, 3.27"?
20       A.    I do.
21       Q.    What is your understanding of what
22   "net book loss" means?
23       MR. TAMBE: Objection to form. Lack
24   of foundation.
25       A.    My understanding is it's an

1              Fogarty - Highly Confidential
2   accountant's approach to have the two sides
3   equal one another, to have the 47.31 and the
4   47.31 equate, and that is the then plug to make
5   the two add up.
6       Q.   Would that reflect the loss on the
7   deal from the Lehman perspective?
8          MR. TAMBE:  Objection to the form.
9   Lack of foundation.
10      A.   This is not how -- again, I'm not a
11  valuation person.  This is an attempt to do
12  accounting as -- my understanding of what it
13  is, it's an attempt to do the accounting.
14      Q.   So you don't understand "net book
15  loss" to be referring to a loss on the
16  transaction --
17      A.   No, because --
18          MR. TAMBE:  Objection to form.  Lack
19  of foundation.
20      A.   I understand -- accounting and value
21  are not the same, and so book means book values
22  as opposed to value.
23      Q.   So there might be a difference
24  between the book value of assets and their
25  actual market value?

1              Fogarty - Highly Confidential
2       A.   Correct.
3       Q.   And do you know why FTI would have
4   an Alvarez & Marsal sheet like that attached to
5   Exhibit 463-B?
6          MR. TECCE:  Objection to form.
7       A.   It's fairly common that in our
8   business we work very closely with the advisors
9   to the committees and try to -- and share our
10  understanding, because we are ultimately
11  working for the creditors who they advise.
12      Q.   And is that what happened in this
13  case?
14          MR. TECCE:  Objection.
15      A.   I do not know.
16      Q.   Well, with respect to the Barclays
17  sale transaction, did you work with and
18  cooperate with the committee's advisors?
19          MR. TAMBE:  Objection to the form of
20  the question.
21      A.   I did not work with the FTI folks in
22  any understanding of this transaction
23  personally.
24      Q.   Do you know if Alvarez & Marsal did?
25      A.   I actually did not know -- I did not

1              Fogarty - Highly Confidential
2   have an understanding of that until I saw Bill
3   Fox's name on this, so I didn't know what they
4   were doing.
5       Q.   Let me show you a document
6   previously marked as 494.
7          (Document review.)
8       A.   Okay.
9       Q.   Do you recognize this document?
10      A.   I do not.  I recognize that I'm
11  listed on it, but I -- or am I listed on it?
12  Hold on a minute.  No, I'm not listed on it, I
13  don't think.  No, I don't -- the -- some of the
14  footnotes in the thing I recognize, but I don't
15  recognize the document.
16      Q.   And which footnotes do you
17  recognize?
18      A.   The -- page 3, 4 -- I actually don't
19  recognize 5.  I recognize 3, 4 and 6 as, at
20  least in form, the kinds of schedules that I
21  recall.
22      Q.   And is this the Mary Korycki that
23  worked with your group and reported up to you?
24      A.   It is.
25      Q.   It refers -- do you see this is an

1              Fogarty - Highly Confidential
2   e-mail from her dated October 6th, 2008?
3       A.   I do.
4       Q.   Do you see that it refers to
5   materials for a 6 p.m. meeting?
6       A.   I do.
7       Q.   Do you have any understanding
8   what -- and then in the subject line it says
9   "materials for 6 p.m. meeting with Paolo
10  Tonucci re JPM $7 billion."  Do you see that?
11      A.   I see that.
12      Q.   Do you know if you were a
13  participant in that meeting?
14      A.   I do not believe so.
15      Q.   Did you know that that meeting was
16  going on?
17      A.   I knew we had that overall effort
18  under way to continue to try to understand the
19  transactions and so forth.
20      Q.   If you would look at the attachment
21  at -- titled A Recap of Week Ended 9-19, page
22  AM 3877.
23      A.   Yes.
24      Q.   Do you know if you have seen this
25  page before?

## Page 106

```
 1          Fogarty - Highly Confidential
 2     A.   I don't recall this page.
 3     Q.   If you would -- do you see under
 4  Wednesday -- well, strike that.
 5          Do you see under Thursday a
 6  description concerning the Fed repo
 7  transaction?
 8     A.   I see Thursday 9/18 and I see words
 9  there.
10     Q.   Okay.  Do you see the third bullet
11  point says:  "JPM repaid the Fed 38 billion out
12  of the Barclays 45 plus an additional 7 billion
13  by selling or lending against other Lehman
14  securities previously held by JPM, the
15  remaining 7 billion from the Barclays 45
16  billion," then it says, parentheses, "45
17  billion minus 38 billion" --
18     A.   Uh-huh.
19     Q.   -- "was held by JPM in a separate
20  account for the benefit of Barclays," do you
21  see that?
22     A.   I see that.
23     Q.   Does this refresh your recollection
24  that the $38 billion number that was being
25  discussed in the meeting you attended and
```

## Page 107

```
 1          Fogarty - Highly Confidential
 2  reflected in the meeting notes was, in fact,
 3  the 45 billion paid by Barclays minus the 7
 4  billion?
 5          MR. TAMBE:  Objection to form and
 6     lack of foundation.
 7     A.   I don't know this page.  I don't
 8  know what -- I mean, it's -- the numbers are
 9  similar numbers from the other pages.  I just
10  don't -- I don't know this page.
11     Q.   The question is does the information
12  on this page refresh your recollection that the
13  38 billion paid by Barclays was simply the 45
14  billion minus the 7 billion over which there
15  was a dispute involving JPM?
16          MR. TAMBE:  Objection to the form of
17     the question.
18     A.   I remember there was -- yes, there
19  was a $50 billion number and a $45 billion
20  number and the differential was 5 and there was
21  a piece of it that related to JPMorgan that was
22  part of that settlement we referred to earlier
23  and I don't recall the 38 and the 7
24  specifically.
25     Q.   But the 38 and the 43 that we
```

## Page 108

```
 1          Fogarty - Highly Confidential
 2  discussed earlier reflected in the meeting
 3  notes is simply the 45 and the 50 minus the 7
 4  billion on each side; right?
 5          MR. TAMBE:  Objection to the form
 6     and lack of foundation.
 7     A.   I don't know.
 8     Q.   Is that what you assume it to be?
 9          MR. TAMBE:  Objection.  Calls for
10     speculation.
11     A.   I assume that -- at my level what I
12  understood and focused on was there was a
13  $50 billion number and there was a conversation
14  about 45 versus 50 and it was different by 5,
15  and I also understood that there was a piece of
16  it relative to JPMorgan and I can't remember
17  the specific details of that piece of it.
18     Q.   And when you heard about the
19  difference in the meeting, 38 billion versus 43
20  billion, did you --
21          MR. TAMBE:  Objection.
22     A.   I don't recall those numbers.  I
23  don't recall 43 billion.
24     Q.   The 42.9 that we looked at in the
25  meeting notes, you don't recall that number?
```

## Page 109

```
 1          Fogarty - Highly Confidential
 2     A.   I don't recall that number.
 3     Q.   Do you have any other explanation
 4  for the difference being discussed in the
 5  meeting between the 38 billion and the 43
 6  billion other than the fact that it's simply
 7  the 45 billion versus the 50 billion but
 8  backing out the 7 billion on each side?
 9          MR. TAMBE:  Objection to form.  Lack
10     of foundation.  Calls for speculation.
11     A.   No.
12          MR. TAMBE:  Asked and answered.
13     Q.   At the bottom here, the last
14  footnote on page AM 3877, it says:  "The Fed
15  loaned 45 billion via JPM in exchange for
16  approximately 48 billion of collateral.  When
17  the Fed returned the collateral, JPM held the
18  balance of collateral, approximately
19  8.6 billion, revalued marked at approximately 7
20  billion."
21          Are you knowledgeable about the
22  basis for that remarking?
23     A.   No.
24     Q.   Let me ask you to turn the page.  On
25  AM 3878 under Consideration do you see in the
```

## Page 110

Fogarty - Highly Confidential

1
2 box where it says "loss on sale, 3.1 billion"?
3     A.   I see that.
4     Q.   Do you understand that to be
5 indicating that Lehman had a loss on the sale
6 transaction of about 3.1 billion?
7          MR. TAMBE:  Objection to the form.
8 Lack of foundation.
9     A.   I understand that to be another form
10 of an accountant trying to have a plug to add
11 up the two columns so that they equal, and you
12 see very precisely the 47666.89 on both sides.
13     Q.   And so that could be just an
14 accounting loss as opposed to an actual value
15 loss?
16     A.   Correct.
17     Q.   And if it was the case that the
18 assets -- some assets were -- had a higher book
19 value than an actual market value, that would
20 be one basis for explaining why it would be an
21 accounting loss; correct?
22          MR. TAMBE:  Objection to the form of
23 the question.  Lack of foundation.
24     A.   An accounting loss has to do with
25 the difference between GAAP carrying value and

## Page 111

Fogarty - Highly Confidential

1
2 proceeds by transaction.
3     Q.   Let me show you a document
4 previously marked as 461-A.
5          Do you recognize this document?
6     A.   Yes.
7     Q.   Would you describe what it is,
8 please.
9     A.   It's a report to the Creditors
10 Committee.  We would report on an ongoing basis
11 to the Creditors Committee.
12     Q.   And have you seen this document
13 recently?
14          THE WITNESS:  Will I answer that?
15          MR. TAMBE:  You can answer that.
16          THE WITNESS:  Okay.
17     A.   I saw this document recently in my
18 meeting with counsel.
19     Q.   How much time did you spend with
20 Jones Day preparing for this deposition?
21     A.   Too much.  Seriously, was it an hour
22 and a half?  Just discussing the upcoming day
23 and then I threw them out and went back to the
24 daily business.
25          MR. TAMBE:  He did throw us out.

## Page 112

Fogarty - Highly Confidential

1
2     Q.   And what is the purpose for making
3 this report to the Creditors Committee?
4     A.   Again, they are the key constituent
5 in the bankruptcy case and we are -- this is --
6 this would be a normal practice of the
7 management team of the bankruptcy estate making
8 sure they keep the creditor group well informed
9 of what we are trying to accomplish.
10     Q.   And the section entitled Significant
11 Transactions, is that a section of this
12 document that you helped prepare?
13     A.   Yes.
14     Q.   And more specifically, did you
15 prepare the page that has the Bates stamp
16 number AM 4531?
17     A.   I wouldn't have typed it, but I
18 would have been absolutely aware of the page.
19 My name, of course, is at the top of the page.
20     Q.   And did you make this part of the
21 presentation to the Creditors Committee?
22     A.   I did.
23     Q.   Were members of Weil Gotshal at this
24 presentation also?
25     A.   I believe Harvey and Lori Fife would

## Page 113

Fogarty - Highly Confidential

1
2 have been there, the two I would recall, from
3 Weil Gotshal.
4     Q.   And under Assets --
5     A.   At least one or the other of them.
6 They weren't always both there.  I just can't
7 remember exactly.  One or the other of them
8 would have been there, sure.  Maybe both.
9     Q.   Under Assets Purchased, the
10 "43.1 billion repo assets, book value per
11 Lehman stale marks, negotiated a $5 billion
12 reduction," do you see that?
13     A.   I do.
14     Q.   Is that the same $5 billion
15 valuation difference that we have discussed
16 previously in this deposition?
17     A.   It is.
18     Q.   And what was the basis for your
19 understanding that Lehman's marks were stale?
20          MR. TAMBE:  Objection to the form of
21 the question.
22     A.   I specifically put the word "stale"
23 in quotes because that was how -- there was
24 some conversation around the marks not having
25 been -- from that meeting we referred to

Page 114

Fogarty - Highly Confidential

1
2  earlier with Paolo, some conversation around
3  the marks not having been trued up in a couple
4  of days or something like that.
5      Q.   Was it a couple days or was it since
6  Friday, September 12th, the last business day
7  before the bankruptcy filing?
8          MR. TAMBE:  Objection to the form.
9      A.   I don't recall the exact time frame
10  that was referred to.
11      Q.   And who was that discussion with?
12          MR. TAMBE:  Objection.  Asked and
13  answered.
14      A.   I believe that was with Alex Kirk.
15      Q.   Was this part of that same meeting
16  with Mr. Kirk and Mr. Tonucci?
17      A.   Yes.
18      Q.   And independent of that did you also
19  understand that Lehman's marks --
20      A.   Can I just clarify?
21      Q.   Sure.
22      A.   I don't know that they were both
23  there for that meeting at the same time.
24      Q.   Okay.  Independent of that
25  discussion, were you aware that -- the week of

Page 115

Fogarty - Highly Confidential

1
2  September 15th that Lehman was not fully
3  updating its marks on a daily basis?
4          MR. TAMBE:  Objection.  Lack of
5  foundation.  Objection to form.
6      A.   I did not know specifically other
7  than I knew via the Transition Services
8  Agreement we were not getting updated marks on
9  a timely basis subsequent to, you know, the
10  filing date.
11      Q.   When you say "we were not
12  getting" --
13      A.   Sorry, subsequent to -- actually, I
14  had no -- subsequent to the transaction --
15  after the transaction closing and pursuant to
16  the Transition Services Agreement we were not
17  getting updated marks during that time.
18      Q.   The week of September 15th did you
19  see any updated marks during that week?
20      A.   No.
21          MR. TAMBE:  Objection to the form.
22  Lack of foundation.
23      Q.   Were you aware of whether Lehman's
24  marks were being updated daily the week of
25  September 15th?

Page 116

Fogarty - Highly Confidential

1
2      A.   Not aware.
3      Q.   As you sit here today, do you have
4  any knowledge about whether Lehman's marks were
5  being updated the week of September 15th on a
6  daily basis?
7      A.   Any knowledge -- I have knowledge --
8  not -- I recall the conversation with Alex Kirk
9  in that meeting that there was some, again,
10  number of days where the marks hadn't been
11  updated.
12      Q.   Had not been updated?
13      A.   Had not been updated prior to the
14  closing some number of days, and I can't recall
15  what was referenced.
16      Q.   Okay.  Did you ever have any reason
17  to doubt the accuracy of that?
18      A.   No.
19      Q.   When you made this presentation,
20  were you trying to be as accurate as possible
21  to the committee?
22      A.   I was trying to be -- yes.
23      Q.   And did anyone in response to your
24  presentation, your description of this $5
25  billion difference between the 45 and 50 or the

Page 117

Fogarty - Highly Confidential

1
2  38 and 43, did anyone raise any questions
3  concerning that?
4      A.   Yes.  I recall -- I can't recall the
5  specifics, but I recall -- I recall framing in
6  my presentation, you know, a general concern
7  for not understanding the $5 billion reduction
8  and I recall either in that meeting that day or
9  the day before, the day after, somewhere around
10  that period of time, a conversation with Mike
11  Fazio of Houlihan Lokey where they were
12  concerned about that $5 billion reduction on
13  behalf of their committee.
14      Q.   And did they express the nature of
15  their concern?
16          MR. TECCE:  Objection to form.
17      A.   Did they express the nature -- yes.
18  Mike had a lot of -- Mike expressed concern
19  that it -- that there wasn't a fair reduction
20  in the value.
21      Q.   And did he explain why --
22          MR. TECCE:  Objection to form.
23      Q.   -- he thought it wasn't a fair
24  reduction in the value?
25      A.   He had been doing some work on it

Page 118

Fogarty - Highly Confidential

1
2  and believed that it wasn't a fair -- that it
3  wasn't a fair answer, but was struggling to
4  have complete understanding of what transpired.
5     Q.   Do you have any knowledge of the
6  work he was doing on it?
7        MR. TECCE:  Objection to form.
8     A.   I don't have any specific knowledge
9  of the work.
10    Q.   Do you have any general knowledge of
11 the work he was doing?
12    A.   Just that he was doing work.  I
13 don't know anything specific to the work he was
14 doing.
15    Q.   Did you understand that to be
16 attempting to value -- do an independent
17 valuation of those assets?
18        MR. TECCE:  Objection to form.
19    A.   I -- you know, I don't know the
20 nature -- the detailed nature of what he was
21 doing other than he was concerned about it and
22 trying to understand it.
23    Q.   Do you recall anything else he said?
24    A.   No, nothing -- nothing in
25 particular, no.

Page 119

Fogarty - Highly Confidential

1
2     Q.   In general, any other general sense
3  of the conversation from him?
4     A.   Just very annoyed.  Very annoyed by
5  it all.
6     Q.   By the sale process or by the
7  difference in valuation?
8     A.   The difference.
9        MR. TECCE:  Objection to form.
10    Q.   Do you recall him saying anything
11 else --
12    A.   No.
13    Q.   -- in that conversation?
14    A.   No.
15    Q.   Now, you said in your presentation
16 you framed it as not having a full
17 understanding of the $5 billion difference; is
18 that right?
19    A.   Correct.
20    Q.   Do you recall what you said?
21    A.   Not verbatim.
22    Q.   Would you please tell me as best you
23 recall what you said.
24    A.   I probably -- well, I recall
25 generally talking about there being a dispute

Page 120

Fogarty - Highly Confidential

1
2  at the closing table about the value of the
3  repo assets being conveyed in the transaction
4  and that there was a $5 billion reduction in
5  the -- what do you call it -- the -- against
6  that 50 billion -- again, I keep having this
7  $50 billion number in my head, but obviously I
8  see the 43 here, but that there was a
9  $5 billion reduction in the asset value and
10 there was a lot of fighting about it at the
11 closing table and that we didn't have an
12 understanding -- a complete understanding of
13 what transpired.
14    Q.   A lot of fighting about it between
15 whom?
16    A.   Between management and the -- Lehman
17 management and the Barclays representatives.
18    Q.   Do you know if you used the word --
19 any synonyms for "reduction" in your
20 presentation?
21        MR. TAMBE:  Object to the form of
22 the question.
23    A.   I don't recall.
24    Q.   Do you know if you recall -- you
25 used the word "haircut" or "discount"?

Page 121

Fogarty - Highly Confidential

1
2        MR. TECCE:  Objection to form.
3     A.   That's possible.  I can't recall.
4  Haircut is possible.  That would be a word I
5  might have used.  I can't recall the specific
6  word I used.
7     Q.   And approximately how many people
8  were at this presentation, just roughly?
9     A.   I don't know.  Thirty people, maybe.
10 Something like that.
11    Q.   From the Creditors Committee, from
12 Alvarez, from Weil Gotshal, from any other
13 entities represented there?
14    A.   Creditors Committee, Houlihan, FTI,
15 Alvarez, Weil.
16    Q.   Anyone from the trustee or their
17 representative, Deloitte?
18    A.   No.  That wouldn't have been
19 typical.  No.
20    Q.   Where was this presentation held?
21    A.   We -- it was either at the Weil
22 offices or Milbank's offices.  I didn't
23 mention, of course, Milbank would there be too.
24    Q.   Other than Mike Fazio, did anyone
25 else have any questions about this $5 billion

Page 122

```
 1            Fogarty - Highly Confidential
 2   difference?
 3            MR. TECCE:  Objection to form.
 4            MR. TAMBE:  Object to the form.
 5        A.    Possible.  I can't recall
 6   specifically who might have -- at least
 7   possible some of the creditor -- I can't recall
 8   exactly who might have had questions there.  I
 9   don't...
10        Q.    Do you know what, if anything, Mike
11   Fazio did after this point in time to follow up
12   on his concern?
13            MR. TECCE:  Objection to form.
14            MR. TAMBE:  Lack of foundation.
15        A.    In general there was pressing for
16   more information over time, but I don't know
17   what Mike specifically did after -- with his
18   process.  I don't know.
19        Q.    Do you recall anyone asking you or
20   Alvarez for additional information about this
21   issue?
22        A.    No.  No.  Other than a recognition
23   that we were working on -- continuing to work
24   on trying to understand -- understand.
25        Q.    I'm sorry, I didn't understand the
```

Page 123

```
 1            Fogarty - Highly Confidential
 2   last part.  You are speculating that they
 3   understood that you were continuing to try to
 4   understand?
 5        A.    Well, because that's --
 6            MR. TECCE:  Objection.
 7            MR. TAMBE:  Object to the form.
 8        A.    That's what we would have said at
 9   the -- when we were talking about it with the
10   Creditors Committee, that we were continuing to
11   try to understand the transaction.
12        Q.    Do you recall saying that about this
13   point?
14        A.    Yes.
15        Q.    And did you -- what did you do to
16   further try to understand?
17        A.    It's the same process I referred to
18   earlier, that -- and the process moved over
19   towards the finance team under Dave Coles to
20   continue the effort with Bill Fox to try to
21   continue to understand this transaction.
22        Q.    The 43 billion or 50 billion, you
23   had a CUSIP list, so you knew which assets were
24   at issue; correct?
25            MR. TAMBE:  Objection to the form of
```

Page 124

```
 1            Fogarty - Highly Confidential
 2   the question.
 3        A.    Correct, we had a CUSIP list.
 4        Q.    Did you make any efforts to
 5   independently value those at the time?
 6        A.    No.
 7        Q.    Why not?
 8        A.    Not my skill set.  I'm not a
 9   valuation person.
10        Q.    Do you know if someone else at
11   Alvarez did?
12        A.    No.  Not our -- it wouldn't
13   typically -- we didn't have that skill set in
14   our direct team at Alvarez, the team that was
15   on the Lehman case, we didn't have that skill
16   set.
17        Q.    So when repo collateral goes over to
18   Barclays, or at least part of it goes over to
19   Barclays that Thursday, Friday, Barclays looks
20   at it and says "we don't think it's worth this,
21   we think it's worth less," and ultimately the
22   Lehman executives agree that it's valued less,
23   is that your understanding?
24            MR. TAMBE:  Objection to the form of
25   the question.  Lack of foundation.
```

Page 125

```
 1            Fogarty - Highly Confidential
 2        A.    Rephrase that one.  Ultimately --
 3        Q.    Ultimately the -- a negotiated
 4   valuation of a lower amount was reached?
 5            MR. TAMBE:  Objection.
 6        A.    That's my understanding.
 7            MR. TAMBE:  Objection to the form of
 8   the question.
 9        Q.    And if there was a question about
10   whether the updated valuation reached by the
11   two sides was reasonable or not and you had a
12   list of securities, "you" being Alvarez &
13   Marsal, why not just independently value them
14   and see if they are worth that amount?
15            MR. TAMBE:  Objection to the form of
16   the question.  Argumentative.  Lack of
17   foundation.
18        A.    We continued to through the teams
19   ask questions of Barclays and there came a
20   point in time where we weren't -- the
21   response -- they were not being responsive, I
22   think, is what really happened in that process.
23        Q.    Not being responsive.  I mean, did
24   you make any independent effort to value those
25   securities?
```

Page 126

```
 1              Fogarty - Highly Confidential
 2          MR. TAMBE:  Objection to the form of
 3     the question.
 4     A.    No.
 5          MR. TAMBE:  Lack of foundation.
 6     Q.    Who was being not responsive?  Is
 7     there some particular information that was
 8     asked of an individual at Barclays that the
 9     information wasn't provided concerning the
10     valuation of these assets?
11     A.    Yes.  There was a number of requests
12     to spend time with Barclays understanding the
13     transaction and understanding what transpired
14     and we were not receiving information.
15     Q.    Can you identify a specific request
16     to a specific individual?
17          MR. TAMBE:  Objection.  Asked and
18     answered.
19     A.    I can't.
20     Q.    But you had the list of securities,
21     you had the CUSIPs, and you didn't make any
22     effort to value those independently?
23          MR. TAMBE:  asked and answered.
24     answered.  Objection, lack of foundation.
25     A.    Sorry.
```

Page 127

```
 1              Fogarty - Highly Confidential
 2          MR. TAMBE:  Isn't that like four
 3     times you have asked that question now?  He
 4     has answered it.
 5     A.    Give me that question one more time.
 6     Q.    Sure.  You had a list of securities,
 7     you had the CUSIPs, and you didn't make any
 8     effort to value those assets independently;
 9     correct?
10          MR. TAMBE:  Objection.  Asked and
11     answered.  Lack of foundation.
12     A.    No.
13     Q.    Is that correct?
14          MR. TAMBE:  Objection.
15     Q.    When you say "no," are you saying
16     no, you didn't make that effort, or you --
17          MR. TAMBE:  Objection.
18     A.    I did not personally make that
19     effort.
20          MR. TAMBE:  Objection, form.
21     Objection, foundation.
22     Q.    Did anyone at Alvarez?
23     A.    I don't recall that anyone did.
24          THE VIDEOGRAPHER:  The time is
25     12:36.  We are going off the record.
```

Page 128

```
 1              Fogarty - Highly Confidential
 2          (Recess was taken from 12:36 to
 3     12:52.)
 4          THE VIDEOGRAPHER:  The time is
 5     12:52.  We are back on the record.
 6     BY MR. THOMAS:
 7     Q.    Mr. Fogarty, did you ever study the
 8     value of the derivatives or related collateral
 9     of those transfers as part of the transaction?
10          MR. TAMBE:  Objection to the form of
11     the question.
12     A.    No.
13     Q.    Have you ever reviewed the original
14     APA?
15     A.    Have I -- parts of it I have flipped
16     through.  I can't say I have read the whole
17     APA.
18     Q.    Have you ever made any effort to
19     analyze what assets were included as purchased
20     assets as part of the original APA?
21     A.    Yes.
22     Q.    What was the purpose of that
23     exercise?
24     A.    To -- really to understand for the
25     asset teams what we have -- what we have left
```

Page 129

```
 1              Fogarty - Highly Confidential
 2     to manage.  That was the purpose of it.
 3     Q.    And when I say "original APA," let
 4     me go ahead and show you what I am referring
 5     to.  It's previously marked as Exhibit 1 dated
 6     September 16th.
 7          (Document review.)
 8     Q.    Do you have a general understanding
 9     that this is the initial agreement between
10     Lehman and Barclays but that it had to be
11     modified during the course of the week because
12     of a bunch of changes in Lehman's business and
13     assets?
14     A.    I generally understand -- yes.
15     Q.    And so this, if I refer to the
16     original APA, will you understand that I am
17     referring to just this document dated September
18     16th and not the purchase agreement which
19     includes the revisions and the Clarification
20     Letter that were eventually executed and
21     closed?
22     A.    I can't say I understand that there
23     were those multiple versions.  I can't say I --
24     Q.    Sure.  And I'm not trying to trick
25     you up on contract stuff.  I just want to
```

Page 130

Fogarty - Highly Confidential

1
2  understand when you went back and looked at
3  assets that were conveyed, were you looking at
4  this original document or this document as
5  modified by the Clarification Letter that we
6  looked at earlier which made revisions to this
7  document including changing the definition of
8  purchased assets?
9       A.   I actually recall doing work with --
10 trying to have an understanding of the assets
11 purchased and excluded in this document or in a
12 document like this and actually not
13 understanding initially that there was a
14 clarification agreement, and then I don't
15 recall going back to sort of this in concert
16 with that Clarification Letter.  I don't recall
17 doing that step.
18      Q.   Did you ever have an opinion as to
19 whether -- or understanding as to whether the
20 unencumbered assets were part of the purchased
21 assets identified in Exhibit 1?
22      A.   I'm sorry?
23      Q.   Did you ever have an opinion or
24 understanding as to whether the unencumbered
25 clearance box assets we discussed previously

Page 131

Fogarty - Highly Confidential

1
2  were part of the purchased assets contained in
3  Exhibit 1?
4       MR. TAMBE:  Object to the form.
5       Q.   And you are welcome to flip to --
6       A.   I had understood not based on
7  reading the document, but based on
8  conversations with the lawyers that the
9  unencumbered assets were part of the
10 transaction.
11      Q.   When you say "part of the
12 transaction," they also were a part of the
13 original purchase agreement before it was
14 modified by the later letter agreement?
15      MR. TAMBE:  Objection to the form of
16 the question.
17      A.   I can't recall that I cared whether
18 it was in the original or in the clarifi- -- I
19 can't recall caring about that.
20      Q.   Okay.  Same question for the 15C3
21 assets.  Do you recall if you ever had an
22 opinion or understanding as to whether those
23 assets were not only included in the ultimate
24 purchase transaction, but in the original APA?
25      A.   I can't recall understanding whether

Page 132

Fogarty - Highly Confidential

1
2  they were -- if 15C3 is one in the same as
3  those repo assets, I can't remember all the
4  codes here, I can't recall whether they were --
5  whether it was in the original or in the
6  clarifi- -- I can't remember sort of worrying
7  about that or thinking that through.
8       Q.   And if the 15C3 is the 769 million,
9  does that --
10      A.   Oh, then that's not -- I don't
11 know -- I don't know the specificity of that
12 769 number.
13      Q.   And did you ever make any effort to
14 go back and see if the derivatives and
15 associated collateral were a purchased asset as
16 part of the original APA?
17      A.   I don't recall deriv- -- I don't
18 recall thinking about derivatives in
19 conjunction with an understanding of this
20 transaction.
21      Q.   One way or the other?
22      A.   Right.
23      Q.   Did you attend any of the court
24 hearings?  Let me clarify.  In September.
25      A.   Oh, in September?

Page 133

Fogarty - Highly Confidential

1
2       Q.   Related to the sale transaction.
3       A.   Not this sale transaction.
4       Q.   So not the September 16th, 17th or
5  19th sale hearings?
6       A.   No.
7       Q.   Did you ever read the transcripts of
8  any of those hearings?
9       A.   No.
10      Q.   Have you spoken with anyone other
11 than your lawyers about this case?
12      A.   When?
13      Q.   In the say last two months.
14      A.   No.
15      Q.   When did you --
16      A.   I'm sorry, other than the Phil Kruse
17 conversation I mentioned.
18      Q.   When did you leave Alvarez?
19      A.   I left Alvarez in late March, early
20 April.  I can't remember specifically.
21      Q.   Do you still have any contractual
22 relationship with them at all?
23      A.   I do.
24      Q.   What is the nature of that
25 relationship?

Page 134

1          Fogarty - Highly Confidential
2          MR. THOMAS:  He can designate it
3   confidential.
4          THE WITNESS:  Okay.
5          MR. TAMBE:  If you don't want to go
6   into the numbers, you don't have to go into
7   the numbers.  You can just describe
8   generally the relationship and take it one
9   question at a time.
10         THE WITNESS:  Okay.
11         A.   I have a note that they need to pay
12   me out on over time.
13         Q.   When did that note arise?
14         A.   December.
15         Q.   What was the reason for this
16   arrangement?
17         A.   I was a shareholder of Alvarez &
18   Marsal prior to that.
19         Q.   So they are still paying you out
20   quarterly or monthly on this note?
21         A.   Annually.
22         Q.   Do you have any other contractual
23   relationship with them other than the fact that
24   they are paying you money?
25         A.   Not sitting here today.  Well,

Page 135

1          Fogarty - Highly Confidential
2   not -- other than that note and that agreement,
3   whatever that has in it.
4          MR. THOMAS:  Let me take a short
5   break.  I may be done.
6          THE VIDEOGRAPHER:  The time is 1:02.
7   We are going off the record.
8          (Recess was taken from 1:02 to
9   1:03.)
10         THE VIDEOGRAPHER:  The time is 1:03.
11   We are back on the record.
12   BY MR. THOMAS:
13         Q.   Did you ever do any analysis of or
14   effort to understand how certain potential
15   exposures, potential liabilities, relating to
16   contracts than Barclays might assume, how those
17   estimates of potential exposure were
18   calculated?
19         MR. TAMBE:  I will only caution the
20   witness to the extent he did any work in
21   that regard at the direction of in-house
22   counsel or other outside counsel, that's
23   work product and you should not be
24   testifying about that.
25         MR. THOMAS:  You can identify that

Page 136

1          Fogarty - Highly Confidential
2   you did it.  Then we won't go into any of
3   the substance.
4          THE WITNESS:  Okay.
5          A.   We did -- we did work -- my team
6   did -- Phil Gordon had counsel working with him
7   to work on those printer, you know, leases and
8   all these various things that were in that
9   process where Barclays would either take those
10   obligations, and if they didn't, then we had to
11   figure out whether on behalf of the estate we
12   would assume or reject those various contracts,
13   so there was a process under way under Bill and
14   that team to review that.
15         Q.   Did you know that the week of the
16   sale hearing there were certain estimates made
17   as to the potential exposure, meaning potential
18   amount of liability that could be assumed under
19   those contracts if Barclays elected to assume
20   all the contracts?
21         MR. TAMBE:  Objection to form.
22         A.   I was aware that there was numbers
23   bandied around regarding accruals for severance
24   and bonus and other -- really those two pieces.
25   Those are the pieces I was aware of numbers

Page 137

1          Fogarty - Highly Confidential
2   being bandied around.
3          Q.   The number for severance and bonus,
4   do you have any knowledge as to how those
5   estimates were calculated prior to closing?
6          A.   I had no knowledge of how that was
7   calculated.
8          Q.   Okay.  You are just aware that there
9   was some estimate of potential liability for
10   severance and bonus, but you are not aware of
11   how -- who calculated it or how?
12         A.   Correct.
13         MR. TAMBE:  Objection to form.
14         Q.   And do you have any knowledge as
15   to --
16         MR. THOMAS:  Let me go ahead and
17   mark one more document.  We will mark this
18   as Exhibit 566-B.  This doesn't have Bates
19   stamps, but I will try to find the
20   production copy.
21         (Exhibit 566-B (subsequently
22   withdrawn), e-mail dated September 19,
23   2008, marked for identification.)
24         Q.   This is an e-mail from Martin Kelly
25   on which you are copied.  Do you recognize the

1       Fogarty - Highly Confidential
2   document?
3       A.   I recognize the document generally,
4   yes.
5       Q.   Okay.  And do you recall receiving
6   this document at or about the time of September
7   19th, 2008, or September 18th?
8           MR. TAMBE:  I think you have asked
9   him about this document.
10          MR. THOMAS:  I think you are right.
11          MR. TAMBE:  I just didn't know if
12  there was a deeper plan here, but probably
13  not.
14          MR. THOMAS:  This has all been a
15  test.  Let me just -- what I am going to
16  do, I do have another follow-up question
17  about this document, but I am going to go
18  back to the exhibit.
19          MR. TAMBE:  561-B.
20          MR. THOMAS:  This is why -- so we
21  are striking 566-B, because that's been
22  previously marked as 561-B.
23      Q.   Mr. Fogarty, do you recognize
24  Exhibit 561-B that we discussed previously?
25      A.   Yes.

1       Fogarty - Highly Confidential
2       Q.   And I believe you indicated you
3   recognize the attachment to the e-mail?
4       A.   Yes, the general form of the thing I
5   recognize.
6       Q.   Okay.  And can you describe
7   generally what the attachment is?
8       A.   My partner, David Coles, was just
9   keeping me copied on his attempt to track the
10  accounting of what we had, you know, pro forma
11  for the transaction.
12      Q.   And how would you describe the
13  attachment itself?
14      A.   I'll be honest, I never studied the
15  attachment.  Well, I'm supposed to be honest
16  all day, but it's a figure of speech.
17      Q.   That wasn't the first time.
18      A.   Right, that wasn't the first time,
19  yes.
20      Q.   And this is a document you would
21  have -- the attachment you would have received
22  on September 18th of 2008; is that right?
23      A.   Say that again.  This was a --
24      Q.   This is a document, the attachment
25  that you received on September 18th, 2008?

1       Fogarty - Highly Confidential
2       A.   I'm sure I did.
3       Q.   And if you would look at the first
4   page of the attachment, do you see the line
5   about a third of the way down that says
6   "payables"?
7       A.   I'm on the assets page.  You are on
8   the --
9       Q.   Under Liabilities.
10      A.   What line am I on?
11      Q.   You are looking for payables under
12  Liabilities.
13      A.   Oh, there.  Okay.
14      Q.   Okay.  And do you see a line
15  entitled Bonus Payable and a line entitled Cure
16  Payments, Accounts Payable?
17      A.   I do.
18      Q.   Okay.  And do you see -- reading
19  across, do you see the column Transaction
20  Adjustments?
21      A.   I do.
22      Q.   Do you see that there was a
23  transaction adjustment to both the bonus
24  payable and the cure amount accounts payable?
25      A.   I do.

1       Fogarty - Highly Confidential
2       Q.   Were you aware that week that there
3   was a transaction adjustment?
4           MR. TAMBE:  Objection to the form of
5   the question.
6       A.   No.
7       Q.   Do you know if your colleagues who
8   received this document were aware of that?
9       A.   I do not know.
10      Q.   Do you recall any discussions about
11  the transaction adjustment?
12      A.   No.
13      Q.   Do you have any understanding for
14  why that transaction adjustment was made for
15  either one of those two lines?
16          MR. TAMBE:  Objection to the form of
17  the question.
18      A.   No.
19      Q.   What is your understanding of what a
20  transaction adjustment is?
21      A.   An adjustment made in a transaction.
22      Q.   Do you have a more specific
23  understanding than that, the purpose of a
24  transaction adjustment?
25      A.   It could be many different purposes,

Page 142

1    Fogarty - Highly Confidential
2    I suppose.
3        Q.    Do you know if -- do you know if
4    Alvarez -- anyone at Alvarez discussed or
5    investigated why these transaction adjustments
6    were made?
7            MR. TAMBE:  Objection to form.
8        A.    No.
9        Q.    You don't know one way or another
10   whether somebody else at Alvarez was following
11   up and asking questions about the transaction
12   adjustment?
13           MR. TAMBE:  When?
14           MR. THOMAS:  At any time.
15           MR. TAMBE:  Objection to the form,
16       and I caution him not to disclose any
17       privilege or work product that he may be
18       aware of.
19       A.    Give me your question again.
20       Q.    Sure.  Do you know if anyone else at
21   Alvarez investigated or looked into why there
22   was a transaction adjustment being made to
23   these two items?
24           MR. TAMBE:  Objection to form.  Same
25       instruction as before.

Page 143

1    Fogarty - Highly Confidential
2        You can answer.
3        A.    I'm not aware of people specifically
4    trying to understand transaction adjustments.
5        Q.    So they may or may not have, but you
6    are not aware either way?
7        A.    I am aware of people trying to
8    understand 2 billion and 2 billion 250, but I
9    am not aware of people trying to understand
10   transaction adjustments.
11       Q.    Okay.  Well, those numbers come from
12   a transaction adjustment; correct?
13           MR. TAMBE:  Objection to the form of
14       the question.
15       A.    I don't know.  I see the thing that
16   says "transaction adjustments" like you do, but
17   I don't know anything about that.
18       Q.    So when you got this document, you
19   don't recall following up on the nature of this
20   transaction adjustment?
21       A.    I did not study this document, no.
22       Q.    Was someone -- was this someone --
23   was this issue and document more in Mr. Coles'
24   bailiwick?
25       A.    Yes.

Page 144

1    Fogarty - Highly Confidential
2        Q.    Okay.  Did you have a general
3    understanding that if Barclays elected at its
4    discretion not to assume any of the contracts,
5    that the liability for cure would be zero?
6            MR. TAMBE:  Objection to the form of
7        the question.  Lack of foundation.
8        A.    I'm sorry, one more time.
9        Q.    Did you have an understanding that
10   it was Barclays' discretion as to what
11   contracts that it elected to assume or reject?
12       A.    I actually thought about that in the
13   context of copier leases and those kinds of
14   things.  I don't know that I was ever thinking
15   about it in the context of severance and
16   bonuses.
17           MR. THOMAS:  Okay, thank you.  I
18       have nothing further.
19           MR. TECCE:  I have one question,
20       actually.
21   EXAMINATION BY
22   MR. TECCE:
23       Q.    Mr. Fogarty, my name is James Tecce.
24   I am an attorney at Quinn Emanuel.  We
25   represent the Creditors Committee.

Page 145

1    Fogarty - Highly Confidential
2        Just going back, you mentioned a
3    conversation with Michael Fazio of Houlihan.
4    Correct?  Do you remember when that
5    conversation took place?
6        A.    I remember it was -- I don't recall.
7    It was around that time frame of that
8    presentation to the Creditors Committee.  I
9    just can't remember --
10       Q.    The October 2008 presentation?
11       A.    Correct.
12           (Continued on next page to include
13       jurat.)

Page 1

1

2              UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4    --------------------------X

5    IN RE:

6                         Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,

9

10                  Debtors.

11   --------------------------X

12

13

14

15        HIGHLY CONFIDENTIAL DEPOSITION OF

16              ANSON FRELINGHUYSEN

17              New York, New York

18              Thursday, March 4, 2010

19

20

21

22

23

24   Reported by:
     JOMANNA DeROSA, CSR
25   JOB NO. 27494

Page 2

```
1
2
3
4        March 4, 2010
5        9:40 a.m.
6
7
8            HIGHLY CONFIDENTIAL Deposition of
9    ANSON FRELINGHUYSEN, held at the offices of
10   Boies Schiller & Flexner, LLP, 575 Lexington
11   Avenue, New York, New York, pursuant to
12   Notice, before Jomanna DeRosa, a Certified
13   Shorthand Reporter and Notary Public of the
14   States of New York, New Jersey, California
15   and Arizona.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2    A P P E A R A N C E S:
3
4
5        JONES DAY, LLP
6        Attorneys for Lehman Brothers, Inc.
7          222 East 41st Street
8          New York, New York 10017-6702
9        BY:  JENNIFER L. DEL MEDICO, ESQ.
10
11
12       BOIES SCHILLER & FLEXNER, LLP
13       Attorneys for Barclays
14         5301 Wisconsin Avenue, N.W.
15         Washington, D.C. 20015
16       BY:  JONATHAN SHAW, ESQ.
17
18
19       HUGHES HUBBARD & REED, LLP
20       Attorneys for SIPA Trustee
21         One Battery Park Plaza
22         New York, New York 10004
23       BY:  SETH D. ROTHMAN, ESQ.
24
25
```

Page 4

```
1
2    A P P E A R A N C E S (Continued):
3
4
5        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
6        Attorneys for the Creditors Committee
7          51 Madison Avenue, 22nd Floor
8          New York, New York 10010
9        BY:  ERIC M. KAY, ESQ.
10
11
12   ALSO PRESENT:
13       JOSH LIPSON, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1        FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
2            THE VIDEOGRAPHER:  This is the
3    start of tape No. 1 of the videotaped
4    deposition of Anson Frelinghuysen in the
5    matter In re Lehman.
6            Today's date is March 4th, 2010, at
7    approximately 9:40 a.m.
8            Will the court reporter please
9    swear in the witness.
10   A N S O N  F R E L I N G H U Y S E N, called as
11       a witness, having been duly affirmed by a
12       Notary Public, was examined and testified
13       as follows:
14   EXAMINATION BY
15   MR. SHAW:
16       Q.   Mr. Frelinghuysen, my name is
17   Jonathan Shaw.  We met off the record a moment
18   ago.  I'm with Boies, Schiller & Flexner, and I
19   represent Barclays Capital, Inc.
20           You're an associate of Hughes
21   Hubbard & Reed.  Is that correct?
22       A.   That's correct.
23       Q.   And you were an associate of Hughes
24   Hubbard & Reed in September of 2008.  Is that
25   right?
```

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2       A.   I was.
3       Q.   How long at law school were you?
4       A.   I graduated from Brooklyn Law
5  School in June of 2007.
6       Q.   And you've been at Hughes Hubbard
7  your entire career?
8       A.   I have been.
9       Q.   Since September 2008 you've been
10  working on the SIPA liquidation of Lehman
11  Brothers, Inc.  Is that correct?
12      A.   Yes.
13      Q.   When were you first assigned to
14  that matter?
15      A.   I was first assigned to the Lehman
16  Brothers, Inc. matter on September 13th.
17      Q.   And how did you learn on
18  September 13th that you would be working on that
19  matter?
20      A.   I received a call from Mr. Margolin
21  that he would like for me to come into the office
22  the next morning.
23      Q.   "The next morning" being Saturday
24  the 14th?
25      A.   Sunday the 14th.

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2       Q.   Sunday the 14th.  Okay.
3            And did you get any further
4  instruction in the course of that phone call?
5       A.   No.
6       Q.   Can you give me an overview of what
7  you did in connection with that matter between
8  starting work on September the 14th and the
9  closing of the transaction on the morning of
10  September 22nd.
11           MR. ROTHMAN:  You can give him a
12  general overview without revealing any
13  privileged information.
14      A.   As a first-year associate, I
15  prepared some of the documents associated with the
16  filing of the SIPA liquidation.  I attended the
17  district court hearing in which Lehman Brothers,
18  Inc. was placed in liquidation.  I also attended
19  the closing of the transaction between Lehman
20  Brothers, Inc. and Barclays.
21      Q.   I take it, then, that you did not
22  attend the September 19th sale hearing?
23      A.   I was -- I was at the
24  September 19th sale hearing before it began.
25      Q.   And you left to go where?

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2       A.   There were other documents that
3  needed to be prepared in connection with the
4  Trustee's appointment.
5       Q.   And I take it you also did not
6  attend the September 17th hearing?
7       A.   I did not attend that hearing.
8       Q.   Over the weekend following the sale
9  hearing, did you participate in any discussions
10  concerning the documentation of the sale
11  transaction?
12      A.   I did, yes.
13      Q.   Setting aside any purely internal
14  discussions between you and the Trustee or the
15  Trustee's lawyers at Hughes Hubbard, tell me what
16  discussions concerning the documentation with the
17  transaction you were involved in.
18      A.   Primarily I was there to discuss
19  the signing of a multitude of signature pages for
20  the related documents for the closing of the
21  transaction.
22      Q.   So that would be early on the
23  morning of the 22nd?
24      A.   No.  Most of the signature pages
25  were signed on Saturday, September 20th.  Still

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  others were signed on Sunday, September 21st.
3       Q.   Were any signed on the morning of
4  the 22nd?
5       A.   If they were signed on the morning
6  of the 22nd it would have been, you know, between
7  midnight and 2:00 a.m.  And actually, there were
8  further documents signed later in the morning.
9       Q.   Later in the morning of the 22nd?
10      A.   Yes.
11      Q.   What documents were signed later in
12  the morning of the 22nd?
13      A.   The services and settlement
14  agreement was signed in the morning, as well as
15  the DTCC letter.
16      Q.   Were you physically present at the
17  offices of Weil Gotshal at any time during that
18  weekend?
19      A.   I was -- yes, I was.
20      Q.   How much of the weekend were you
21  present at Weil Gotshal?
22      A.   I was present for large portions of
23  both Saturday, Sunday, and I was there from
24  midnight Monday morning until about 8:00 a.m.
25      Q.   Tell me what you were doing there.

3 (Pages 6 to 9)

Page 10

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2     A.   I was monitoring the closing
3  proceedings for the Trustee and reporting back
4  information as necessary.
5     Q.   When you say you were "monitoring
6  the closing proceedings," what do you mean?
7     A.   There were a number of people there
8  discussing issues related to the closing, and I
9  would listen to them and let other attorneys at
10  HHR and the Trustee know what was going on.
11     Q.   And when you say "issues related to
12  the closing," do you mean substantive issues or
13  just logistical issues about how the documents
14  were going to be signed, or both?
15     A.   There would be both document
16  signing and logistical issues that really were not
17  relevant.  That was just, what does my signature
18  block look like, you know, that kind of thing,
19  which is not relevant.
20          Primarily, the discussion was
21  between Barclays and JPMorgan Chase over an issue
22  that they were having that was holding up the
23  closing.
24     Q.   And when were those discussions
25  taking place?

Page 11

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2     A.   Those discussions took place all
3  day Saturday, all day Sunday and into Monday
4  morning.
5     Q.   Were you involved -- were there any
6  other representatives of the Trustee at Weil
7  Gotshal?
8     A.   Yes.  Mr. Kiplok arrived around
9  4:00 or 5:00 on Sunday the 21st.
10     Q.   5:00 a.m. or p.m.?
11     A.   Oh, p.m.
12     Q.   And how long did he stay?
13     A.   Mr. Kiplok and I left together
14  around 8:00 a.m. on Monday morning.
15     Q.   Why did you sign the documents
16  rather than Mr. Kiplok or someone else more
17  senior?
18     A.   Most of the documents were signed
19  before Mr. Kiplok got there.
20     Q.   Apart from the -- strike that.
21          You talked about discussions
22  between Barclays and JPMorgan that stretched from
23  Saturday through some point on Monday.
24          Were you present for any portion of
25  those discussions?

Page 12

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2     A.   Those discussions were behind
3  closed doors when they were between the parties
4  themselves, and they then made various
5  presentations to the larger group, which I would
6  have been present for.
7     Q.   How many such presentations do you
8  recall?
9     A.   There were two or three or -- two
10  or three of them.
11     Q.   And who did the presenting?
12     A.   Mr. Cox did some of the presenting,
13  people who -- you know, I didn't know who they
14  were at the time.
15     Q.   Representatives of JPMorgan?
16     A.   Representatives of JPMorgan,
17  representatives of Barclays, both lawyers and
18  business individuals.
19     Q.   What was your understanding of the
20  substance of the issue that was being discussed
21  between JPMorgan and Barclays?
22     A.   I understood from their discussions
23  to have been a holdup in collateral transfers,
24  with assets stuck at JPMorgan that were
25  purportedly due to Barclays.

Page 13

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2     Q.   Would that be the $7 billion?
3     A.   Yes, that's -- I recall that being
4  one of the issues that was discussed.
5     Q.   What other issues do you recall
6  being discussed?
7     A.   That was the primary kind of
8  blockage that they were unable to resolve for
9  quite some time.
10     Q.   Can you tell me anything about what
11  was discussed during these presentations, as much
12  detail as you can recall?
13     A.   You know, at the presentations,
14  some of them were at the beginning where they
15  presented the issue, and then some of them were
16  later when they had reached a -- what they
17  believed to be a resolution to the issue.
18          Yes.  Since they didn't necessarily
19  affect what we were doing there, I don't remember
20  the details of them.
21     Q.   When Mr. Kiplok was present on
22  Sunday going through to Monday morning, what were
23  his responsibilities as compared with your
24  responsibilities?
25     A.   Mr. Kiplok had other -- I mean, I

4 (Pages 10 to 13)

Page 18

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1  or late afternoon/early evening when I was told
2  that they would not be closing that night because
3  they were working on a few other matters,
4  primarily what had been discussed was the
5  JPMorgan/Barclays issue, but also he said there
6  was this clarification letter.
7         And I said that we should probably
8  have a copy of that.
9     Q.   And what did he tell you?
10    A.   He didn't give me a copy.
11    Q.   Do you know if there was a copy to
12 give you at that point?
13    A.   I didn't know that.
14    Q.   Did you later learn that there was
15 a copy to give you?
16    A.   I've seen documents that have, you
17 know, earlier dates.
18    Q.   You ultimately did receive various
19 drafts of the clarification letter.  Is that
20 correct?
21    A.   I did receive various drafts of it,
22 yes.
23    Q.   Over the course of the weekend?
24    A.   Beginning on Sunday evening, yes.

Page 19

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1     Q.   You mentioned PIK notes.
2          What do you mean by the "PIK
3  notes"?
4     A.   PIK notes are the payment-in-kind
5  notes; that I understood the holding company moved
6  all the subsidiaries out from underneath LBI in
7  return for a PIK note to be valued at a later
8  date, and that PIK note was to be delivered to the
9  Trustee.
10    Q.   Aside from the discussion you've
11 already testified about that involved both
12 Mr. Messineo and Ms. Fife concerning the 15c3-3
13 account, what other discussions did you have on
14 Saturday with Ms. Fife?
15    A.   With Ms. Fife?
16    Q.   Yes.
17    A.   None.
18    Q.   What discussions did you have with
19 Mr. Gruszecki or Grabowski, the gentleman from
20 Cleary Gottlieb?
21    A.   That -- those conversations would
22 have been three-way with Ms. Clausen as we
23 discussed the signature pages.  Those two
24 associates were primarily working on getting the

Page 20

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1  signature pages to all the ancillary documents to
2  the APA in order and signed in triplicate or
3  quadruplicate as necessary.
4     Q.   Anything else of significance that
5  you did on Saturday?
6     A.   No.  When I left in the evening I
7  gave my contact details to Ms. Clausen and
8  Mr. Gruszecki in case they needed to contact me in
9  the event that the deal would actually be able to
10 close that night, and I could sign any of the
11 final documents.
12    Q.   What time did you leave?
13    A.   I think I left at 6:30 or 7:00.
14    Q.   Any additional activity that
15 evening or that night?
16    A.   Yes.
17    Q.   What happened that night?
18    A.   I communicated with attorneys from
19 Hughes Hubbard.
20    Q.   Did you return to Weil Gotshal on
21 Sunday?
22    A.   I did, yes.
23    Q.   At what time?
24    A.   I arrived later that day, probably

Page 21

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1  between 11:00 and 12:00.
2     Q.   Okay.  And what did you do on
3  Sunday?
4     A.   Sunday was similar to Saturday.  We
5  re-signed some of the documents with the proper
6  date because it was -- now another day had passed.
7  I monitored proceedings again on behalf of the
8  Trustee and reported back any developments.
9     Q.   And when you say you "monitored"
10 the proceedings, what proceedings are you talking
11 about?
12    A.   There were people in and out of
13 various rooms, and I was in the hallway.  I was
14 listening.
15    Q.   And what did you hear when you
16 listened?
17    A.   Primarily discussions regarding the
18 Barclays transaction with -- and the issue with
19 JPMorgan.
20    Q.   Anything about the terms of the
21 transaction?
22    A.   The terms of the Barclays
23 transaction?
24    MR. ROTHMAN:  Which transaction?

6  (Pages 18 to 21)

```
1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2     Q.   The sale transaction.
3     A.   No, that was -- that was not really
4  being discussed.
5     Q.   Anything concerning the terms of
6  the clarification letter that you were involved in
7  discussing on Sunday?
8     A.   Yes.  We would have discussed the
9  clarification letter beginning much later on
10 Sunday night.
11    Q.   And who would you have had those
12 discussions with?
13    A.   Mr. Kiplok and I went into a room
14 with Mr. Messineo, Mr. Murgio.  Both of those
15 individuals are from Weil.  Mr. McLaughlin, an
16 attorney from Cleary Gottlieb.  And there were a
17 few other associates in both of those firms
18 sitting in the perimeter of the office.  And, you
19 know, we reviewed the clarification letter.
20    Q.   About what time did that -- did
21 that occur?
22    A.   We were in that room probably
23 beginning around 1:00 a.m. on Monday morning
24 through until about 6:00 or 7:00 in the morning.
25    Q.   Tell me in as much detail as you
```

```
1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  can what you remember about that session between
3  1:00 a.m. and 6:00.
4     A.   Primarily, Mr. Messineo or
5  Mr. Murgio, both of whom had laptops, would make
6  changes to the clarification letter as they were
7  discussed between Mr. Murgio and Mr. Messineo and
8  Mr. McLaughlin.  Mr. McLaughlin would suggest
9  various changes.  Mr. Murgio would discuss it with
10 him.  They would then make or not make the change.
11    Q.   Did you or Mr. Kiplok offer any
12 input into this process?
13    A.   No.  We were reading along while
14 they made suggestions to the document.  We were
15 not familiar with the document that they had been
16 drafting together, so you, you know, let them
17 finish it.
18    Q.   Do you recall any of the
19 substantive issues that were discussed during that
20 meeting?
21    A.   We discussed certain changes to the
22 customer account section, which is what we
23 primarily were focused on.  The transfer of
24 customer accounts.  There was a section about some
25 sort of insurance liability that remained after
```

```
1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  the fact and where that cash would go.
3          You know, those were the two areas
4  I remember discussing.
5     Q.   Do you remember that there was
6  discussion about other issues; you just don't
7  remember what it was -- or what they were?
8     A.   They may have discussed other, you
9  know, parts.  Those were the ones I remember.  It
10 was five hours.
11    Q.   Did you or Mr. Kiplok ask any
12 questions during the course of that session?
13    A.   I don't recall any specific
14 questions.
15    Q.   Were you excluded from any portion
16 of the discussions?
17    A.   There were a lot of different rooms
18 in which people were having a lot of different
19 conversations.  We were not present at all
20 conversations regarding the clarification letter.
21    Q.   Did anyone ever tell you that you
22 were not welcome at any particular discussion?
23    A.   Certainly we were not welcome at
24 the discussions between JPMorgan and Barclays.
25    Q.   Any other discussions you were not
```

```
1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  welcome at?
3     A.   Those people went into separate
4  rooms to have private conferences with their
5  attorneys with themselves, and we were not welcome
6  at those.
7     Q.   Any multilateral discussions in
8  which you were not welcome?
9     A.   Not that I know of.  But people
10 went into different rooms all the time.
11    Q.   Did you attend or participate in
12 any discussion of the terms of the DTCC letter?
13    A.   I did.
14    Q.   When did those discussions take
15 place?
16    A.   I believe those discussions were
17 parallel to the clarification letter discussions,
18 and then probably I started looking at it around
19 6:00 in the morning.
20    Q.   When you say those discussions
21 "were parallel to the clarification letter
22 discussions," what do you mean?
23    A.   The first letter that I received
24 was at 6:00 a.m., and it had already been written,
25 so it had to have been written while I was working
```

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  the sale transaction over that weekend?
3       A.   I did.
4       Q.   Okay.  When was that?
5       A.   There was a presentation to the
6  larger group that had gathered at Weil Gotshal on
7  Sunday night with various individuals from the Fed
8  and the SEC on the phone.
9       Q.   What time Sunday night was that?
10      A.   That call remained open from about
11 4:00 p.m. until 1:00 a.m.
12      Q.   And were you on that call
13 constantly from 4:00 p.m. until 1:00 a.m.?
14      A.   When I was in the room in which the
15 line was open.  There was a lot of down time on
16 that call.
17      Q.   Okay.  Do you know who else was on
18 that call for the Trustee?
19      A.   Mr. Kobak, Mr. Kiplok, the Trustee.
20      Q.   Kobak, Kiplok and the Trustee?
21      A.   You know, it's impossible to say
22 when people were on and off the call.  It lasted
23 for a long time.
24           MR. ROTHMAN:  He was just asking
25      you to clarify your prior answer.

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2           MR. SHAW:  Yeah.  I just wasn't --
3           MR. ROTHMAN:  It wasn't clear when
4      you said Kobak, Kiplok, whether they were --
5           MR. SHAW:  For the Trustee or also
6      with the Trustee.
7           MR. ROTHMAN:  -- for the Trustee or
8      also with.
9       A.   Oh.  Also with.
10      Q.   Tell me in as much detail as you
11 can recall anything of substance discussed on that
12 call.
13      A.   Again, the focus of that call was
14 the Barclays/JPMorgan issue and resolution of
15 that.  The SEC and the Fed were adamant that the
16 deal be closed before business opened on Monday
17 and that those two parties reach a resolution so
18 the deal as discussed on Friday night, the sale
19 hearing, would close.
20           And primarily they went through
21 their resolution of the issue.  And one part of
22 that resolution that I recall was that the
23 $250 million of collateral that originally was
24 going to be paid to LBI was going to be paid to --
25 not collateral; sorry -- consideration was going

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  to be paid to DTCC.
3       Q.   What did paying the collateral to
4  DTCC have to do with the JPMorgan/Barclays issue?
5       A.   It was consideration, not
6  collateral.
7       Q.   Okay.  What did payment of the
8  $250 million of consideration to DTCC have to do
9  with the JPMorgan/Barclays issue?
10      A.   I don't know.
11      Q.   But your understanding was it was
12 somehow related to that?
13      A.   I understand if the
14 JPMorgan/Barclays issue was holding up the
15 transaction, that there would be some relation.
16      Q.   You said a moment ago that the SEC
17 and the Fed were adamant that the deal be closed
18 before business opened on Monday.
19           What's your basis for saying that?
20      A.   I recall voices on the telephone
21 saying, Please resolve this issue before the
22 markets open on Monday.
23      Q.   Anything else?
24      A.   Not that I recall specifically.
25      Q.   Do you recall anything else about

1    FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  what was discussed on that call that was open from
3  about 4:00 p.m. until about 1:00 a.m.?
4       A.   No, not in detail.
5       Q.   Approximately how much of that call
6  were you present for between 4:00 p.m. and
7  1:00 a.m.?
8       A.   Between 4:00 p.m. and 1:00 a.m. the
9  call was probably active for two and a half to
10 three hours, and I was probably present for all of
11 the active moments of it.
12      Q.   And what were you doing when it was
13 inactive?
14      A.   We had various side conversations
15 with Hughes Hubbard attorneys, and we had -- that
16 was pretty much it.
17      Q.   Did you or any other representative
18 of the Trustee request any changes to any of the
19 deal documents over the course of that weekend?
20      A.   Yeah.  We had a lot of changes to
21 the signature blocks of the documents.  The DTCC
22 letter we did have some substantive changes to.
23      Q.   You did or you did not have?
24      A.   Did, positive.
25      Q.   Okay.  What substantive changes did

Page 34

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2   the Trustee request in the DTCC letter?
 3        A.  I don't recall what they were.  I
 4   just remember that there were other discussions
 5   going on.
 6        Q.  And you requested changes.
 7            Were those changes made?
 8        A.  I don't know.
 9        Q.  Who requested changes on behalf
10   of the Trustee?
11        A.  Mr. Kobak and Mr. Kiplok.
12        Q.  And you don't recall what any of
13   those requested changes were?
14        A.  Not at this time.
15        Q.  And you don't know whether the
16   changes that were requested, whatever they were,
17   were actually incorporated in the final letter; do
18   you?
19        A.  If we signed the letter, they must
20   have been acceptable to us.
21            MR. ROTHMAN:  Well, don't guess.
22        A.  No, I don't know what the changes
23   were and whether they were incorporated.
24        Q.  Do you know whether any requests
25   for changes were made orally or in writing?
```

Page 35

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2        A.  Do you mean via e-mail?
 3        Q.  E-mail, somebody marking up an
 4   agreement; anything like that?
 5        A.  You know, we were not physically
 6   present with DTC attorneys or themselves, so I
 7   would -- my recollection is that they would be
 8   oral requests.
 9        Q.  And you were not personally
10   involved in any discussions concerning the
11   contents of the DTCC letter.  Is that right?
12        A.  Not with DTCC, no.
13        Q.  With anyone other than internally
14   at Hughes, Hubbard & Reed?
15        A.  My discussions about the DTCC
16   letter were with Mr. Kiplok.
17        Q.  Did the Trustee -- aside from
18   changes you've mentioned to the signature block,
19   perhaps, did the Trustee or any of its
20   representatives request changes to the
21   clarification letter at any time?
22        A.  I don't know what they did.
23        Q.  You're not aware of it if they did?
24        A.  I'm not aware of anything else than
25   what I was there for on Monday morning.
```

Page 36

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2        Q.  While you were there over the
 3   weekend, did anyone ever state or suggest the deal
 4   as documented in the final version of the
 5   clarification letter had not been approved by the
 6   Court?
 7        A.  My understanding of the deal
 8   documents was that they reflected what had been
 9   presented to the Court on Friday night, and that
10   the reason that I was signing was because no
11   substantive changes were being made.
12            MR. SHAW:  I'll show you what's
13   been previously marked as Exhibit 25 in this
14   case.
15        Q.  I'm just going to ask if you
16   recognize that as the clarification letter that
17   you signed on the Trustee's behalf?
18            MR. ROTHMAN:  Objection to the
19   form.
20        Q.  Do you recognize that document?
21        A.  I do recognize this document.
22        Q.  Did you -- and what is the document
23   you recognize?
24        A.  The document appears to be the
25   clarification letter.
```

Page 37

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2        Q.  And did you sign the clarification
 3   letter?
 4        A.  I signed the signature page that's
 5   attached to this letter, yes.
 6        Q.  Okay.  And you did so on behalf of
 7   the -- of James Giddens, Trustee for the SIPA
 8   liquidation of Lehman Brothers, Inc.?
 9        A.  That's correct.
10        Q.  When did you sign that signature
11   page?
12        A.  I signed the signature page on the
13   late evening of Sunday, September 21st or in the
14   early morning of September 22nd, probably before
15   1:00 or 2:00 a.m.
16        Q.  And where were you physically when
17   you signed that page?
18        A.  I believe at this point for the
19   signing of this one, I went to some internal
20   office at Weil Gotshal where Mr. Gruszecki and
21   Ms. Clausen had been set up once the larger office
22   they had been using had been taken for other
23   purposes.  That was the room where all the
24   signature pages were being kept in those accordion
25   files.
```

10 (Pages 34 to 37)

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1   FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2       Q.   And when they gave it to you to
3   sign, was there just a signature page or was there
4   an agreement attached to the signature page when
5   you were signing it?
6       A.   It was just the signature page; no
7   agreement.
8       Q.   Was there at some point any further
9   authorization you were required to give before
10  they could use the signature page that you signed?
11      A.   The deal was closed around
12  8:00 a.m. on Monday morning when the signature
13  pages were released by the various parties.
14      Q.   And how was -- how was the -- how
15  were the signature pages that you signed released
16  by the Trustee?
17      A.   We were in another conference room
18  at Weil Gotshal, and all the documents had been
19  signed and reached and the funds transferred.
20      Q.   Let me unpack that for a moment.
21          You were in a conference room at
22  Weil Gotshal at around 8:00 a.m. Monday morning.
23  Is that correct?
24      A.   That's correct.
25      Q.   And who else was in this conference

1   FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   room?
3       A.   More people than I could remember
4   or describe.  It was not the larger conference
5   room.  It was kind of small, and it was full.
6       Q.   Representatives of Barclays?
7       A.   There were representatives of
8   Barclays, of JPMorgan, of -- you know, there were
9   Cleary lawyers, Weil lawyers, Shearman lawyers; a
10  lot of people.
11      Q.   Anyone for the creditors committee?
12      A.   I recall that there were members of
13  the creditors committee there during the course
14  of -- earlier in the evening.  I assumed they
15  didn't go home.
16      Q.   And so you're in this room with
17  representatives of various parties.
18          And did they have final versions of
19  all the contract documents?
20      A.   No, not at all.
21      Q.   So how was it that the documents
22  were -- or that the signature pages were released?
23          I mean, did a representative, for
24  example, of the Trustee say, "Okay, our signature
25  pages are now released," or what happened?

1   FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2       A.   I don't actually recall that
3   moment, but --
4       Q.   But in some way, was it you or some
5   other representative of the Trustee indicated that
6   it was okay to release the signature pages?
7       A.   I didn't.
8       Q.   Do you know who did?
9       A.   No, I can't recall.
10      Q.   Had you read a final version of the
11  clarification letter at that point?
12      A.   I had seen drafts of the
13  clarification letter and had read what I thought
14  was the final version, yes.
15      Q.   And when you say "what I thought
16  was the final version," do you still believe that
17  was the final version that you read?
18      A.   I assumed there were no changes
19  made after we wrapped up.
20      Q.   If you'd take a look at the first
21  page of Exhibit 25, and particularly the paragraph
22  that is at the bottom of that page, No. 1(a)(ii).
23          Do you see that?
24      A.   Yes, I see that paragraph, yes.
25      Q.   And you'll see that that paragraph

1   FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   references a Schedule A and a Schedule B.
3          Do you see that?
4       A.   I do see the references to
5   Schedule A and Schedule B.
6       Q.   Had you seen those references prior
7   to signing this?
8       A.   Had I seen those references?
9       Q.   Yes.
10      A.   Yes, I had.
11      Q.   Did you make any effort to examine
12  Schedule A or Schedule B?
13      A.   These schedules were never
14  delivered to us for review.
15      Q.   When you say they were not
16  "delivered to us for review," do you mean they
17  were never delivered to the Trustee for review?
18      A.   That's -- I never received a copy
19  of them.
20      Q.   And when you say "never," I take it
21  you mean that weekend?
22      A.   That's correct.
23      Q.   Do you know whether anyone else, a
24  representative of the Trustee, ever received a
25  copy of those this weekend -- that weekend?

11 (Pages 38 to 41)

Page 42

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2        A.   I don't know what other people
 3   received.
 4        Q.   Do you know if anyone representing
 5   the Trustee ever asked for copies of either
 6   Schedule A or Schedule B?
 7        A.   I did not.
 8        Q.   And you don't know whether anyone
 9   else did?
10        A.   I don't know.
11        Q.   Are you aware that final versions
12   of Schedule A and Schedule B were filed with the
13   Court on September 30th, 2008?
14        A.   I'm -- am I aware of that?
15        Q.   Yes.
16        A.   No.
17        Q.   Did you ever have occasion to
18   review the final filed versions of Schedule A or
19   Schedule B?
20        A.   I have seen them.
21        Q.   In what context?
22        A.   As .pdf documents.
23        Q.   When approximately did you see
24   them?
25        A.   At some point in the months
```

Page 43

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2   following.
 3        Q.   And for what purpose were you
 4   looking at them?
 5        A.   To transmit them.  They -- I was
 6   just passing through.  They weren't really
 7   something that I could read.
 8        Q.   To whom did you transmit them?
 9        A.   To Deloitte.
10        Q.   And when you transmitted them to
11   Deloitte, did you transmit them with any
12   instruction?
13        MR. ROTHMAN:  That's a yes-or-no
14   question.
15        A.   No.
16        Q.   Were you involved in the process of
17   preparing those final versions of Schedule A and
18   Schedule B?
19        A.   No.
20        Q.   Do you know if any representative
21   of the Trustee was involved in preparing the final
22   versions of Schedule A or Schedule B?
23        A.   I do not know.
24        Q.   Do you know if anyone representing
25   the Trustee ever requested to be involved in the
```

Page 44

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2   preparation of those final versions of Schedule A
 3   and Schedule B?
 4        A.   I do not know.
 5        Q.   Other than the Trustee and his
 6   counsel, have you ever discussed the preparation
 7   or contents of Schedule A or Schedule B with
 8   anyone?
 9        A.   No.
10        Q.   Are the terms "636 box" and
11   "074 box" familiar to you?
12        A.   I don't normally refer to them that
13   way.
14        Q.   Okay.
15        MR. ROTHMAN:  That wasn't what he
16   asked you, but go ahead.
17        Q.   If I were to say the 636 box, what
18   would your understanding of that be?
19        A.   The DTCC participant account of
20   LBI's.
21        Q.   Okay.  And the 074 box, what would
22   your understanding of that be?
23        A.   It's another participant account
24   member of LBI's.
25        Q.   At the DTCC?
```

Page 45

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2        A.   At DTCC.
 3        Q.   When did you learn that?
 4        A.   I learned that on Monday,
 5   September 22nd or Tuesday, September 23rd.
 6        Q.   And how did you come to learn that?
 7        A.   I began the process of the customer
 8   account transfers which involved the transfer of
 9   assets to the benefit of those customers, and the
10   assets had to transfer through DTC.
11        Q.   And did someone explain to you what
12   the 636 and 074 boxes were?
13        A.   Yes.
14        Q.   Who would that be?
15        A.   Mr. Ullman at Lehman Brothers,
16   Inc., who became a Barclays Capital employee.
17        Q.   Do you know when Mr. Ullman became
18   a Barclays Capital employee?
19        A.   I assume he became a Barclays
20   Capital employee the moment that the transaction
21   changed.
22        MR. SHAW:  Can we take a short
23   break.  This is a logical stopping point.
24        THE VIDEOGRAPHER:  The time is
25   10:29.  We are going off the record.
```

12 (Pages 42 to 45)

Page 46

```
1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2            (Recess taken.)
3            THE VIDEOGRAPHER:  The time is
4        10:40.  We are back on the record.
5            Q.   Mr. Frelinghuysen, could you please
6        give me an overview of what you did in connection
7        with this matter between the closing and the end
8        of September 2008.
9            A.   Between the closing on
10       September 22nd through the end of September 2008,
11       I was -- I worked primarily on the transfer of
12       customer assets to Neuberger Berman, Barclays and
13       Prime Brokerage.
14           Q.   Anything else?
15           A.   I worked on various other kind of
16       administrative matters within, you know, the
17       liquidation.
18           Q.   And what was entailed by the
19       transfer of customer assets to Neuberger Berman,
20       Barclays and the Prime Brokerage?
21           A.   Primarily it involved authorization
22       to DTC to transfer customer assets from LBI's
23       accounts at DTC to accounts -- other participant
24       accounts at DTC, Barclays, Ridge, or whomever the
25       Prime Brokerage people designated.
```

Page 47

```
1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2            Q.   And you had other responsibilities
3        as well over the course of that week or so.  Is
4        that correct?
5            A.   I worked on some other matters,
6        yes.
7            Q.   Were you involved with approving
8        payments from the LBI estate?
9            A.   "Approving payments"?  I'm not
10       sure --
11               MR. ROTHMAN:  Objection to the
12       form.
13           A.   I don't know what that means.
14           Q.   Were the request -- strike that.
15               What did you understand the limits
16       on your authority to act for the Trustee were?
17           A.   I was --
18               MR. ROTHMAN:  Objection to the
19       form.
20           Q.   You can answer.
21           A.   I was there to transfer customer
22       assets and to facilitate those movements through
23       the holders of those securities.
24           Q.   In your understanding, did the
25       scope of your authority differ depending on which
```

Page 48

```
1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2        entity you were interacting with?
3                MR. ROTHMAN:  Objection to the
4        form.
5            A.   The purpose remained to have
6        custodial banks, such as DTC or any of the others
7        around the world, transfer customer assets as
8        needed.
9            Q.   And in order to accomplish these
10       asset transfers, did you understand that you had
11       been invested with some measure of authority to
12       act on the Trustee's behalf in his dealings -- or
13       in your dealings with these custodial entities?
14           A.   Yes.
15           Q.   And what did you understand the
16       scope of the authority you had been given to be?
17           A.   That I should encourage or instruct
18       the banks to transfer LBI's assets that were
19       related to customers as necessary.
20           Q.   Do you understand yourself to have
21       more or less -- strike that.
22               Did you understand yourself to have
23       more, less or the same authority in dealing with,
24       say, JPMorgan as you did in dealing with the DTC
25       or the OCC?
```

Page 49

```
1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2                MR. ROTHMAN:  Objection to the
3        form.
4            A.   My authority with the DTC and JPMC
5        with respect to LBI's accounts at those banks
6        where customer assets were stored was identical.
7            Q.   You were on site in Jersey -- at
8        Lehman Brothers' Jersey City facility for much of
9        that period.  Is that right?
10           A.   It's been -- yes.  I was at
11       70 Hudson Street.
12           Q.   Okay.  Was Mr. Kiplok there as
13       well?
14           A.   No, he was not.
15           Q.   Were there any other
16       representatives of the Trustee on site in
17       Jersey City?
18           A.   In what time period?
19           Q.   Between closing and the end of
20       September.
21           A.   No.
22           Q.   Were there any other
23       representatives of the Trustee who were involved
24       in authorizing the transfers of assets from the
25       DTC and OCC and JPMorgan custodial accounts during
```

13 (Pages 46 to 49)

Page 50

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  that time period?
3      A.   There were.
4      Q.   Who were they?
5      A.   Mr. Kiplok.
6      Q.   How were responsibilities allocated
7  between you and Mr. Kiplok during that period?
8      A.   I worked most entirely with DTCC
9  and with JPMC after Mr. Kiplok had established
10 those channels of dealings.
11     Q.   And he had responsibility for what,
12 as you understood it?
13     A.   He did the JPMC transfers
14 initially, and I took over for those since I was
15 located at the operations center.  And that's it.
16     Q.   How much supervision did you
17 receive from more senior lawyers or other
18 representatives of the Trustee during that week?
19         MR. ROTHMAN:  Objection to the
20     form.
21     Q.   You can answer.
22     A.   I received general instruction to
23 transfer customer assets as they were presented to
24 me.
25     Q.   One of the responsibilities you had

Page 51

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  that week was to determine if proposed transfers
3  of assets should be authorized by the Trustee or
4  denied.  Correct?
5      A.   My role was to assure that the
6  assets that Barclays' personnel were asking be
7  transferred got transferred to the extent they
8  were customer assets.
9      Q.   When you say to the extent that
10 they were customer assets, who -- strike that.
11         Who gave you your instructions
12 about what your role was?
13     A.   About what my role was?
14     Q.   Yes.
15     A.   Hughes Hubbard attorneys.
16     Q.   Which Hughes Hubbard attorneys
17 particularly?
18     A.   Mr. Kobak, Mr. Kiplok and the
19 Trustee.
20     Q.   As exactly as possible, what were
21 you told was your role?
22         MR. ROTHMAN:  I instruct you not to
23     answer that question.
24     Q.   In deciding which transfers to
25 approve and which to deny approval to, how did

Page 52

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  you -- how did you do that?
3         MR. ROTHMAN:  Again, you can give a
4     general idea, but please don't reveal any
5     privileged communications you may have had
6     with other lawyers at Hughes Hubbard or with
7     the Trustee.
8      A.   Okay.  I instructed Mr. Ullman that
9  when he had a request for me to transfer assets,
10 that he had to state where they were going and for
11 what purpose, and that that purpose needed to be a
12 customer transfer.
13     Q.   When did you have this discussion
14 with Mr. Ullman?
15     A.   That discussion would have taken
16 place on September 23rd, which is a Tuesday.
17     Q.   What time on September 23rd?
18     A.   I believe I arrived at his offices
19 at the 70 Hudson location around 11:00 a.m.  We
20 had numerous conferences throughout the day going
21 over, you know, what needed to be done, how it
22 would be done.  And in the course of those
23 conversations, that discussion happened.
24     Q.   When in the course of those
25 discussions did that conversation happen?

Page 53

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2      A.   It would have happened multiple
3  times in the course of that conversation.
4      Q.   And tell me as exactly as you can
5  precisely what you instructed Mr. Ullman with
6  respect to -- with respect to requesting transfers
7  of assets.
8      A.   That I needed appropriate
9  instructions as to where the assets would be going
10 and where they would be coming from.  I needed
11 appropriate contact information.  I needed
12 confirmation from him that those assets were
13 related to customers.
14     Q.   What were your exact words to
15 Mr. Ullman?
16     A.   I don't recall.
17     Q.   Did you put any of these
18 instructions in writing?
19     A.   Not to Mr. Ullman.
20     Q.   To anyone?
21     A.   On certain occasions where I
22 received instructions that did not match what I
23 needed to have them, I would refuse the
24 instructions and address the short-falling.
25     Q.   Do you recall any specific examples

14 (Pages 50 to 53)

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    of situations like that?
3          A.   I do not.  I just recall that it
4    happened more than once.
5          Q.   With Mr. Ullman or with others?
6          A.   With Mr. Ullman or any of his
7    personnel working for him.
8          Q.   And who were the personnel working
9    for him that you're thinking of?
10         A.   My primary people with whom I
11   worked on those customer account transfers and the
12   transfer of customer assets would have been
13   Mr. Fondacaro, Mr. Gallagher and Mr. Borzi.
14   Mr. Crispino was -- worked for them and was also
15   involved.
16         Q.   What about Laura Vecchio; did you
17   have any contact with her during that period of
18   time?
19         A.   I did.
20         Q.   And what was your contact with her?
21         A.   Ms. Vecchio was assisting to
22   coordinate some of the operations.
23         Q.   And did you understand her to be a
24   Barclays employee?
25         A.   Yes.

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2          Q.   A former Lehman person who became a
3    Barclays employee effective with the closing.
4             Is that your understanding?
5          A.   That was -- my understanding is
6    that she was -- that that was her position, yes.
7             (Exhibit 669-B marked for
8    identification.)
9          MR. SHAW:  I'm showing you what's
10   been marked as Exhibit 669-B.
11         Q.   Take a moment to look at it and
12   then tell me if you recognize this as a
13   September 26th, 2008, e-mail chain, parts of which
14   you wrote and parts of which were addressed to
15   you.
16         A.   What was your question?
17         Q.   Sure.  Do you recognize this as a
18   September 26th, 2008, e-mail -- or e-mail chain,
19   rather, parts of which you wrote and parts of
20   which -- of which were addressed to you?
21         A.   Yes, I do recognize it as that.
22         Q.   Okay.  If you take a look at the
23   earliest e-mail in the chain, that is, the first
24   chronologically, do you recognize that as an
25   e-mail to you from Mr. Borzi, requesting that the

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    Trustee authorize the transfer of PIM Plant
3    Securities from LBI's 074 box to Barclays 229 box?
4          A.   I do not see the word "box," but I
5    understand it to be a request to move PIM customer
6    assets from LBI's participant account 074 to
7    Barclays' participant account.
8          Q.   Take a look at the next e-mail in
9    the chain.
10            Does that indicate to you that at
11   about 13 minutes after receiving that request that
12   you forwarded that e-mail, along with the
13   Trustee's authorization, to the DTCC?
14         A.   Yes.  This shows that I forwarded
15   it to various attorneys and operations personnel
16   at DTCC with the Trustee's authorization.
17         Q.   How did you decide it was
18   appropriate to authorize that transfer?
19         A.   This transfer in particular had
20   been discussed offline and in very close detail
21   with Mr. Borzi and Mr. Ullman, so I was expecting
22   it.
23            And also, it had the appropriate
24   language from Mr. Borzi to me, stating that it was
25   customer assets going to Barclays, and that the

1       FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    PIM business was the business of -- that I had
3    known Barclays to have acquired.
4          Q.   When we talk about customer assets,
5    there were PIM customer assets, there were PAM
6    customer assets, P-A-M, and there were Prime
7    Brokerage assets.  Is that correct?
8          A.   Those are some of the classes of
9    assets.
10         Q.   Okay.  What other customer assets
11   were you involved -- what other classes of
12   customer assets were you involved in transferring
13   during that period of time?
14         A.   We only would have done PIM and
15   PAM, and PB didn't actually start until October.
16         Q.   Okay.  So when you talk about
17   customer assets, at least in that time period,
18   you're talking about the PIM and the PAM assets?
19         A.   That's correct.
20         Q.   Take a look at the most recent
21   e-mail in the string on Exhibit 669-B.  You
22   thanked Mr. Borzi for the clarity and precision of
23   his instructing e-mail.
24            What specifically were you
25   commenting on?

Page 58

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

2      A.    Mr. Borzi had included references
3  that I had specifically asked him to include, such
4  as which participant account number it was going
5  to, that it was related to PIM clients and
6  customers.  That's it.
7      Q.    And so it was important to you that
8  Mr. Borzi specify that the assets to be
9  transferred were PIM customer assets.  Is that
10  right?
11      A.    Yes, and that they were being
12  transferred in connection with Barclays' purchase
13  of the PIM customers under --
14      Q.    Okay.  And if I understand you
15  correctly, when transfers of customer assets were
16  requested, you required that the assets be
17  identified as customer assets.  Is that right?
18      A.    Well, my understanding was that
19  only customer assets were being transferred.
20      Q.    Where did you get that
21  understanding from, sir?
22      A.    That's what I understood the
23  transaction to include.  And certainly that's all
24  I understood to be going on in those first couple
25  of weeks.

Page 59

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

2      Q.    Did you consult on the transfers of
3  any assets with more senior attorneys at Hughes
4  Hubbard & Reed or other representatives of the
5  Trustee?
6      A.    Yes.
7      Q.    With whom did you consult during
8  that period of time?
9      A.    Mr. Kobak, Mr. Kiplok.
10      Q.    Anyone else?
11      A.    At Hughes Hubbard?
12      Q.    At Hughes Hubbard or anyone else
13  representing the Trustee.
14      A.    No.
15      Q.    To the best of your recollection,
16  did requests that you authorize the transfer of
17  customer assets always specify that the assets in
18  question were customer assets?
19      A.    Requests to me?
20      Q.    Yes.
21      A.    No, they very often did not, and I
22  wouldn't approve them.
23      Q.    Okay.  How did -- when you received
24  such a request, how did you verify that the assets
25  requested were actually customer assets?

Page 60

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

2      A.    Based on the information and the
3  representation from the Lehman/Barclays employee.
4      Q.    In connection with any request for
5  the transfer of assets, was anyone from Barclays
6  ever dishonest with you?
7          MR. ROTHMAN:  Objection to the
8  form.
9      A.    Was anyone ever dishonest with me?
10      Q.    Do you believe that anyone from
11  Barclays ever lied to you or attempted to mislead
12  you about the transfer of any assets?
13          MR. ROTHMAN:  Same objection.
14      A.    I would have always understood them
15  to be asking that I transfer customer assets.
16      Q.    That's not responsive to my
17  question, sir.
18          My question was:  In connection
19  with any requests for transfers of assets, do you
20  believe that anyone from Barclays was ever
21  dishonest with you?
22          MR. ROTHMAN:  Same objection.
23      A.    No.
24      Q.    Did you communicate with Alastair
25  Blackwell concerning any asset transfers during

Page 61

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

2  September 2008?
3      A.    I did.
4      Q.    Who was Mr. Blackwell, sir?
5          Or who -- rather, who did you
6  understand Mr. Blackwell to be?
7      A.    I understood Mr. Blackwell to be
8  the head of global operations of Barclays.
9      Q.    A former Lehmanite?
10      A.    I actually wasn't clear on that.
11      Q.    How many times did you discuss the
12  transfer of assets with Mr. Blackwell in September
13  2008?
14      A.    It's hard to say when in
15  September -- you know, a number of times.
16      Q.    Tell me about any specific
17  discussions you recall having with Mr. Blackwell
18  about the transfer of assets.
19      A.    I recall a specific discussion the
20  first week after the closing with Mr. Blackwell.
21      Q.    One discussion or more than one
22  discussion?
23      A.    One discussion with him in his
24  office, or an office he was using, followed up by
25  some phone calls.

16  (Pages 58 to 61)

Page 62

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2    Q.   So was this in Jersey City?
3    A.   This was in Jersey City.
4    Q.   Do you recall when during the week
5 your discussion with Mr. Blackwell took place?
6    A.   I think that it must have been a
7 Thursday.
8    Q.   Thursday the --
9    A.   It should have been the 25th.
10    Q.   The 25th.
11         Tell me everything you remember
12 about that discussion.
13    A.   Mr. Blackwell and I discussed the
14 customer transfers that were ongoing and that we
15 were in the process of completing for PIM and PAM.
16 We discussed some other customer transactions and
17 that there was an additional transfer of assets
18 that needed to occur that valued around
19 $1 billion.
20    Q.   And what did you understand that
21 $1 billion in assets to be?
22    A.   I don't recall what he said it was.
23    Q.   Well, do you recall what you
24 thought it was?
25    A.   No.

Page 63

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2    Q.   How long did that discussion in an
3 office in Jersey City last?
4    A.   Around half an hour probably.
5    Q.   Can you recall anything else about
6 the discussion?
7    A.   No.
8    Q.   Can you recall anything else about
9 the approximately $1 billion in other assets that
10 you discussed with Mr. Blackwell?
11    A.   He never asked me to transfer it.
12    Q.   What did he ask you?
13    A.   He asked me what steps would be
14 necessary to transfer it.
15         And I said I would get back to him.
16    Q.   And did you get back to him?
17    A.   I did.
18    Q.   And what did you tell him?
19    A.   I drafted him a representation from
20 him that the assets were appropriate to transfer,
21 and he never responded.
22    Q.   Did you record your time on this
23 case?
24    A.   As a matter of course, I record my
25 time.

Page 64

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2    Q.   Do you do it daily?
3    A.   I keep daily track of my time.  I
4 sometimes catch up at the end of the week.
5    Q.   Was that true in September of 2008
6 that you were keeping daily track of your time?
7    A.   Yes.
8    Q.   Is it fair to say that you
9 attempted to record your time accurately?
10    A.   Yes.
11    Q.   And that's at least in part because
12 you understood that your time entries would
13 ultimately be submitted to the Court in connection
14 with Hughes Hubbard's fee submission.  Is that
15 correct?
16    A.   That is correct.
17         (Exhibit 670-B marked for
18 identification.)
19         MR. SHAW:  I'm showing you what has
20 been marked as Exhibit 670-B.  I will
21 represent to you that this is an excerpt from
22 a much larger document submitted by Hughes
23 Hubbard & Reed in connection with its request
24 for fees for the period from September 13,
25 2008, through January 31st, 2009.

Page 65

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2    Q.   Are you aware that such a
3 submission was made?
4    A.   I am aware of that submission, yes.
5         MR. ROTHMAN:  Just for the record,
6    it's a three-page document.  The first page
7    appears to be a cover page, and then it has
8    pages 46 and 47.
9    Q.   If you'll take a look at the entry
10 that appears at the bottom of page 46 and carries
11 onto the top of page 47 of this document.
12         Do you recognize that as a
13 description of your time for September 24th, 2008?
14    A.   Yes, I do recognize it as that.
15    Q.   And do you believe that that time
16 is -- that is recorded there -- or that the entry
17 that's recorded there is as you wrote it?
18    A.   I have no reason to believe it's
19 not.
20    Q.   Do you have any reason to believe
21 that that entry is inaccurate?
22    A.   No, I do not.
23    Q.   The first part of that entry
24 discusses the PAM customer accounts.  Is that
25 correct?

17 (Pages 62 to 65)

Page 66

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      And when I say "part," I'm
3  referring to the segments that end with a number
4  in parentheses and a semicolon.
5      A.  Yeah.  The first part of the entry
6  that ends with a number on page 47 is with respect
7  to PAM transfers.
8      Q.  And what were the PAM customer
9  accounts?
10     A.  The PAM customer accounts were the
11 private asset management customer accounts that
12 were transferred to Ridge as the new broker-dealer
13 for Neuberger Berman.
14     Q.  And if you look at the second and
15 third portions of the entry for that date, you'll
16 see that they talk about PIM transfers.  Is that
17 correct?
18     A.  That is correct.  They do talk
19 about PIM transfers.
20     Q.  Okay.  And what did you mean by
21 "PIM transfers"?
22     A.  PIM transfers was the private
23 investment management business of Lehman Brothers,
24 Inc. that was purchased by Barclays.
25     Q.  And then the fourth section talks

Page 67

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2  about what appears to be a three-hour discussion
3  with David Aronow concerning PB accounts.
4      Q.  What did you mean by "PB accounts"?
5      A.  Those were the prime brokerage
6  accounts.
7      Q.  And what did you talk about with
8  Mr. Aronow about the transfer of prime brokerage
9  accounts?
10     A.  We had been discussing in the -- in
11 the course of the day how to gather assets related
12 to customers to effectuate their transfer to a new
13 broker-dealer.
14         Most of the PIM customers were
15 relatively simple accounts.  PB accounts hold a
16 lot of other financial products and have more
17 complicated trading arrangements.  We were trying
18 to figure out a way operationally to move those
19 accounts and their assets.
20     Q.  And then the final section of your
21 time entry talks about a discussion with
22 A. Blackwell Re: Transfer of other LBI assets in
23 relation to asset purchase agreement.  Is that
24 correct?
25     A.  That is correct.

Page 68

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      Q.  And when you wrote about other
3  assets, you're referring to the $1 billion of
4  other assets that Mr. Blackwell had discussed with
5  you?
6      A.  Yes.  It appears that conversation
7  was on the 24th.
8      Q.  And when you write "other" assets,
9  that's to distinguish it from the PAM, PIM and
10 prime brokerage assets that are discussed in
11 earlier sections of your time entry.  Is that
12 correct?
13     A.  Yes.
14     Q.  Does this refresh your recollection
15 that what you discussed with Mr. Blackwell is the
16 transfer of the remaining clearance box assets
17 pursuant to the clarification letter?
18         MR. ROTHMAN:  Objection to the
19 form.
20     A.  This is -- reflects my recollection
21 that Mr. Blackwell was requesting assets --
22 requesting transfer of non-customer assets.
23     Q.  And the assets he was requesting
24 were assets in the 636 and 074 box.  Is that
25 correct?

Page 69

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1
2      A.  He did not disclose to me which
3  assets they were; only their value.
4      Q.  Now having read your time entry for
5  the 24th, do you have any further recollection of
6  your conversation with Mr. Blackwell on this
7  topic?
8      A.  Nothing further to what was just
9  discussed.
10     Q.  And after your discussion with
11 Mr. Blackwell, what did you do with respect to his
12 request concerning the transfer of those assets?
13         MR. ROTHMAN:  Object -- go ahead.
14 Objection.  Asked and answered.
15         You can answer again.
16     A.  I contacted other -- I contacted
17 other attorneys at Hughes Hubbard.
18     Q.  And who specifically did you
19 contact?
20     A.  Mr. Kobak, Mr. Kiplok.
21         (Exhibit 671-B marked for
22 identification.)
23     Q.  If you would look at what has been
24 marked as Exhibit 671-B.
25         Have you had a chance to look at

18  (Pages 66 to 69)

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  it?
3      A.  I have reviewed this document, yes.
4      Q.  Do you recognize that as an e-mail
5  that you wrote to Mr. Blackwell on the 25th of
6  September, 2008?
7      A.  Yes, I do.
8      Q.  And you copied Mr. Giddens,
9  Mr. Kobak and Mr. Kiplok on that e-mail.  Is that
10  correct?
11      A.  That's correct.
12      Q.  And why did you copy them
13  particularly?
14      A.  I copied my supervisors on a
15  regular basis.
16      Q.  Okay.  And you had discussed this
17  issue between your conversation with
18  Mr. Blackwell -- strike that.
19      Between your conversation with
20  Mr. Blackwell on the 24th and the time you sent
21  this e-mail on the 25th, you had discussed this
22  with at least Mr. Kobak and Mr. Kiplok.  Is that
23  right?
24      A.  That's correct.
25      Q.  Had you run a draft of this past

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  them?
3          MR. ROTHMAN:  I'm going to instruct
4      him not to answer that question.  I think
5      you're getting into the privilege.
6      Q.  Attached to this e-mail is a letter
7  that you sent to Mr. Blackwell which he would need
8  to submit before the Trustee would:
9          "... authorize the movement of the
10  positions discussed earlier that are due as part
11  of the LBI/Barclays transaction."
12      Is that right?
13      A.  It says:
14          "... which were sold to Barclays
15  Capital pursuant to the asset purchase."
16      Q.  I was actually quoting from your
17  e-mail.  Sorry.  I asked a confusing question.
18  Let me start again.
19      You sent Mr. Blackwell a letter
20  that he needed to submit before the Trustee would:
21          "... authorize the movement of the
22  positions discussed earlier that are due as part
23  of the LBI/Barclays transaction."
24      Is that correct?
25      A.  That's correct.

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2      Q.  And when you say "discussed
3  earlier," you're referring to the discussions
4  shown on your time records for the 24th.  Right?
5      A.  Yes, that's correct.
6      Q.  And why did you need that letter?
7      A.  Because he had stated that they
8  were due as part of the asset purchase agreement,
9  and we were going to be basing that movement on
10  his representation.
11      Q.  And you didn't request a similar
12  letter when Mr. Borzi asked you to authorize
13  transfer of pending client securities; did you?
14      A.  No.
15      Q.  Why did you request a letter from
16  Mr. Blackwell in connection with the transfer you
17  discussed with him, but didn't request a similar
18  letter from Mr. Borzi in connection with the
19  earlier transfer we looked at?
20          MR. ROTHMAN:  Objection to the
21      form.
22      A.  The nature of the transfer was
23  different.
24      Q.  In what -- I'm sorry.  Go ahead.
25      A.  The customer transfers had been

1      FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2  discussed between me and Mr. Borzi, Mr. Ullman and
3  Mr. Gallagher.  The file had been discussed.
4      Mr. Blackwell had brought me into a
5  separate room to discuss this, closed the door,
6  and represented these were certain accounts that
7  they needed to have transferred -- certain assets.
8  Pardon me.
9      Q.  You say he took you into a separate
10  room and closed the door.
11      You mean the two of you went and
12  sat at a desk in an office?
13      A.  Yeah.  We went into his office.
14      Q.  Okay.  And did you attach any
15  significance to his closing the door?
16      A.  Most of the discussions I had had
17  regarding transfer of customer assets had been on
18  the operations floor with, you know, ten or 15
19  people who were on the team working on it.
20      Q.  Take a look at the draft letter
21  attached to 671-B, the attachment.
22      In that letter you ask
23  Mr. Blackwell to confirm that the requested assets
24  were:
25          "... assets of Lehman Brothers,

Page 74

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1   FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   Inc. which were sold to Barclays Capital, Inc.
3   pursuant to the asset purchase agreement dated as
4   of September 16, 2008, as amended."
5            Right?
6            A.   That's a correct reading of the
7   letter -- draft of the letter.
8            Q.   And beyond just a correct reading
9   of the letter, that was, in fact, what you were
10   asking him to do.  Right?
11            A.   I was, in fact, asking him to
12   represent that these were assets under the APA.
13            Q.   And you understood that they were
14   proprietary assets of LBI, not customer assets.
15   Right?
16            MR. ROTHMAN:  Objection to the
17   form.
18            A.   I understood them to not be
19   customer assets.
20            (Exhibit 672-B marked for
21   identification.)
22            Q.   Have you had a chance to read
23   through Exhibit 672-B?
24            A.   I have.  Thank you.
25            Q.   And do you recognize that as an

Page 75

1   FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2   e-mail string that was sent to you by Neal Ullman
3   at 4:19 p.m. on Friday, September 26, 2008?
4            A.   I do recognize it to be that, yes.
5            Q.   And that string was about the
6   transfer of approximately $269 million in
7   collateral from the 636 box at DTC to Barclays.
8   Is that correct?
9            A.   Yes, it appears to discuss that
10   transfer.
11            Q.   And in the most recent e-mail in
12   that string, Mr. Ullman says to you:
13            "Be over in a minute."
14            Right?
15            A.   That's correct.
16            Q.   Okay.  Did he, in fact, come over
17   to your office to discuss that transfer?
18            A.   I can't recall.
19            Q.   Were you physically located near
20   Mr. Ullman during this period of time?
21            A.   We were on the same floor of the
22   building.  He was 100 yards away and around the
23   corner.
24            Q.   Do you remember ever discussing
25   this request with Mr. Ullman?

Page 76

1   FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2            A.   No, I do not.
3            Q.   Do you remember ever discussing
4   this request with Ms. Vecchio?
5            A.   No, I do not.
6            Q.   Do you remember ever discussing
7   this request with anyone?
8            A.   Then, no -- well, this wouldn't
9   have been sufficient for me.
10            MR. ROTHMAN:  That wasn't the
11   question he asked you.
12            Q.   Why would this not have been
13   sufficient for you?
14            A.   It didn't contain an instruction.
15            Q.   What do you mean by "didn't contain
16   an instruction"?
17            A.   It says:
18            "Be over in a minute."
19            There's no instruction of what to
20   do with it.
21            Q.   Are you aware that you had six
22   minutes earlier actually already sent the
23   instruction and authorization to the DTC on this
24   transaction -- for this transfer, rather?
25            A.   No.

Page 77

1   FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2            Q.   Would it surprise you to learn
3   that?
4            MR. ROTHMAN:  Objection to the
5   form.
6            A.   Would it surprise me now?
7            Q.   Yes.
8            A.   Yes.
9            Q.   Did you understand the
10   approximately $269 million in securities
11   referenced in this e-mail string to be a portion
12   of the assets that Mr. Blackwell had discussed
13   with you a couple of days earlier?
14            MR. ROTHMAN:  Objection to the
15   form.
16            A.   No, I did not know what these
17   assets were, and I did not know them to be related
18   to the conversation I'd had with Mr. Blackwell.
19            Q.   Do you see anywhere on here any
20   indication that these are customer assets?
21            MR. ROTHMAN:  Objection to the
22   form.
23            A.   No.
24            Q.   Take a look at the earliest e-mail
25   in this string.  That's an e-mail from Monty

20  (Pages 74 to 77)

Page 78

FRELINGHUYSEN - HIGHLY CONFIDENTIAL

1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2 Forrest to Mister -- to Mr. Blackwell.
3         Do you see that?
4      A.  I do see that, yes.
5      Q.  Okay.  And if you look at the last
6 sentence of the first paragraph of the e-mail,
7 you see that Mr. Forrest writes that:
8        "The list has changed a bit since
9 this morning as Paolo asked to take out the very
10 small pieces (under $10)."
11       Do you see that?
12    A.  I do see that sentence, yes.
13    Q.  Would it have been acceptable to
14 leave behind even small pieces if these were, in
15 fact, customer assets?
16      MR. ROTHMAN:  Objection to the
17 form.
18    A.  In the course of transferring
19 customer assets we did many transfers, some of
20 which were to catch up on transfers that had been
21 left out in the initial files.
22    Q.  Can you think of any reason why, if
23 you were transferring customer assets, you would
24 exclude small portions of the customer assets --
25      MR. ROTHMAN:  Objection to --

Page 79

1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2    Q.  -- from a particular customer
3 account?
4      MR. ROTHMAN:  Objection to the
5 form.
6    A.  DTCC is a complicated place.  They
7 were doing the operations for us.  We were trying
8 to get a bulk of the assets across.  We wouldn't
9 have wanted to gum up their systems with small
10 transfers.
11    Q.  Is that just your speculation now,
12 or do you have any recollection of thinking that
13 at the time?
14    A.  That's my understanding of how the
15 transfers were effected.
16    Q.  Can you think of any other
17 transfers where small pieces of the -- of the
18 accounts to be transferred were excluded from the
19 transfer of DTC?
20      MR. ROTHMAN:  Objection to the
21 form.  It assumes facts not in evidence.
22    Q.  You can answer.
23    A.  As a matter of fact, I know that,
24 you know, over the course of doing these transfers
25 the smaller bits of securities had to be cut up

Page 80

1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2 later, so they were not always included in the
3 initial files.
4    Q.  Not quite what I was asking, or at
5 least may not what I intended to ask.  Let me try
6 it again.
7      Can you think of any other
8 transaction where small amounts of securities were
9 deliberately excluded from a planned transfer of
10 customer assets?
11      MR. ROTHMAN:  Objection to the
12 form.
13    A.  No.
14      THE VIDEOGRAPHER:  The time is
15 11:27.  We are going off the record.
16      (Recess taken.)
17      THE VIDEOGRAPHER:  The time is
18 11:36.  We are back on the record.
19      (Exhibit 673-B marked for
20 identification.)
21    Q.  Have you had a chance to look at
22 Exhibit 673-B?
23    A.  I have, thank you.
24    Q.  And do you see this is an e-mail
25 from you to various people at the DTCC, copying

Page 81

1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
2 Mr. Ullman, Ms. Vecchio, Mr. Kobak, Mr. Kiplok,
3 among others?
4    A.  Yes, that's correct.
5    Q.  And this was an e-mail that you
6 sent at 4:13 p.m. on Friday the 26th of September,
7 2008?
8    A.  That's correct.
9    Q.  And you were authorizing on
10 behalf of the -- strike that.
11      And you were transmitting to the
12 DTCC the Trustee's authorization of the transfer
13 of approximately $269 million in securities.  Is
14 that correct?
15    A.  There's no dollar figure.
16    Q.  If you'd take a look at the bottom
17 of the first attachment.
18    A.  269 units, yes.
19    Q.  And you think it's units, not
20 dollars?
21    A.  It doesn't say dollars.  A lot of
22 times they transferred numbers of shares.
23    Q.  Do you know whether that's the
24 same -- strike that.
25      Do you know whether this is the

Page 86

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2   "Lehman Market Value" it has a sum of
 3   $269,921,368.
 4             Do you see that?
 5        A.   Yes, I see that.
 6        Q.   Does this refresh your recollection
 7   that the amount of the transfer you authorized --
 8   or strike that.
 9             Does this refresh your recollection
10   that the amount of the transfer authorized in
11   Exhibit 673-B was, in fact, $269 million?
12             MR. ROTHMAN:  Objection to the
13        form.
14        A.   The authorization from Mr. Kiplok
15   doesn't state a value.
16        Q.   Well, if you look at the chart that
17   immediately precedes the authorization by
18   Mr. Kiplok, you'll see it contains almost the same
19   number.  It's off by, it looks like, about $20 as
20   the one attached to Exhibit 674-B that we looked
21   at a moment ago.
22        A.   Yes, I see that the numbers are
23   approximate and that the attachment on 674-B
24   contains two additional lines.
25        Q.   Those being the lines:
```

Page 87

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2             "Schultz Securities and securities
 3   delivered.
 4             Is that what you're referring to?
 5        A.   Yes.
 6        Q.   Looking at the -- at
 7   Exhibit 674-B --
 8        A.   Yes.
 9        Q.   -- does that refresh your
10   recollection that you were informed by Mr. Fleming
11   on the 29th that a transfer of $269 million in
12   securities had taken place?
13             MR. ROTHMAN:  Objection to the
14        form.
15             MR. SHAW:  You can answer.
16        A.   By Mr. Fleming?
17        Q.   Yes.
18        A.   I don't recall that.
19        Q.   Well, you note that Mister -- it
20   says "Dan" -- this is an e-mail from Mr. Tonucci
21   to Mr. Fleming, copying Mr. Marsal.
22             Do you see where it says "Dan" --
23   this is an e-mail from Mr. Tonucci to Mr. Fleming.
24             "Dan, can you advise the SIPC team
25   with this transfer of assets that's been
```

Page 88

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2   completed."
 3        A.   That is what's written.
 4        Q.   Okay.  And do you remember
 5   Mr. Fleming ever advising any members of the SIPC
 6   team that it had been completed?
 7        A.   I have no recollection of that.
 8             MR. SHAW:  You can put 674-B aside.
 9             (Exhibit 675-B marked for
10        identification.)
11             MR. SHAW:  Take a moment to read
12        what's now been marked as Exhibit 675-B,
13        please.
14        Q.   Have you had a chance to read
15   through that?
16        A.   I have.
17        Q.   Do you recognize that as an e-mail
18   string between you and Mr. Ullman, dated
19   September 29th, 2008?
20        A.   I do, yes.
21        Q.   If you'd look at the most -- at
22   the -- sorry -- at the oldest e-mail in the string
23   at the bottom of the first page.  It says:
24             "Anson, I am seeking authorization
25   to transfer the securities in the attached
```

Page 89

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2   spreadsheets as part of the transfer of assets to
 3   Barclays Capital."
 4             Do you see that?
 5        A.   I do see that.
 6        Q.   And then it attaches two worksheets
 7   which are not attached to this exhibit.
 8             Do you see that?
 9        A.   I do see that.
10        Q.   Do you recall this transfer?
11        A.   No.
12        Q.   Do you know why this is headed
13   forward resending?
14        A.   No.
15        Q.   Take a look at the second e-mail in
16   the string.  You see that your response to
17   Mr. Ullman was that you asked him to confirm that:
18             "... the attachments to the e-mail
19   below represent assets of Lehman Brothers, Inc.
20   that were sold to Barclays Capital, Inc. pursuant
21   to the Asset Purchase Agreement dated as of
22   September 16, 2008."
23             Do you see that?
24        A.   I see that, yes.
25        Q.   Okay.  That is substantially the
```

23 (Pages 86 to 89)

Page 90

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2     same as the representation that you asked
 3     Mr. Blackwell to make in the draft letter that you
 4     e-mailed to him a few days earlier.  Is that
 5     right?
 6              MR. ROTHMAN:  Objection to the
 7         form.
 8         A.   I communicated with Mr. Ullman and
 9     Mister -- and Mr. Blackwell on different subjects.
10         Q.   That's not my question, sir.
11              My question is:  The confirmation
12     you were seeking from Mr. Ullman with respect to
13     these transfers was substantially the same as the
14     confirmation you sought from Mr. Blackwell in the
15     letter that you -- in the draft letter that you
16     sent him on the 25th?
17              MR. ROTHMAN:  Same objection.
18         Q.   Is that correct?
19         A.   It does seem similar, yes.
20         Q.   Okay.  And now -- because you
21     understood that what Mr. Ullman was asking you to
22     transfer were non-customer assets, just as the
23     ones Mr. Blackwell had discussed with you earlier.
24     Right?
25         A.   No.  I only understood Mr. Ullman
```

Page 91

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2     to be requesting transfer of customer securities.
 3         Q.   Then why are you asking for this
 4     confirmation?
 5         A.   I asked for confirmation that the
 6     assets being transferred were appropriate for
 7     transfer every time I made a transfer.
 8         Q.   Okay.  You didn't ask him to
 9     confirm that these were customer assets.  Right?
10         A.   My understanding with Mr. Ullman is
11     that we were transferring customer assets.
12         Q.   That's not my question, sir.
13              My question is:  You did not ask --
14     you did not ask him to confirm that these were
15     customer assets being transferred.  Right?
16              MR. ROTHMAN:  Objection.  Asked and
17         answered.
18         Q.   You can answer.
19         A.   I asked him to -- no.
20         Q.   And you previously stated that --
21         strike that.
22              And Mr. Ullman confirmed at about
23     3:50 p.m. on the 29th that what you had asked him
24     to confirm was correct.  Is that right?
25         A.   Yes.
```

Page 92

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2              MR. SHAW:  Showing you what's been
 3         previously marked as Exhibit 449 in this case.
 4         Q.   Do you recognize that as an e-mail
 5     that you sent to various personnel at the DTCC and
 6     copied to Mr. Kobak, Mr. Ullman, Ms. Vecchio and
 7     Mr. Gallagher on the 29th of September, 2008, at
 8     approximately 3:52 p.m.?
 9         A.   Yes.
10         Q.   And do you understand that to be
11     you're transmitting the authorization that
12     Mr. Ullman was requesting you to transmit in
13     Exhibit 675-B?
14         A.   Yes, I do.
15         Q.   And you did that without any
16     confirmation that these were customer assets.  Is
17     that correct?
18         A.   I transferred them as -- in
19     connection with the Asset Purchase Agreement,
20     which I understood to effect the transfer of
21     customer assets.
22         Q.   You'd also had a discussion with
23     Mr. Blackwell a few days earlier where you had
24     discussed with him a billion dollars of other
25     assets that were -- that were to be transferred
```

Page 93

```
 1        FRELINGHUYSEN - HIGHLY CONFIDENTIAL
 2     pursuant to the Asset Purchase Agreement.  Isn't
 3     that correct?
 4         A.   I had asked Mr. Blackwell at that
 5     time to transmit to me a file and a signed letter
 6     from him that those assets were being transferred,
 7     not Mr. Ullman.
 8              MR. SHAW:  Move to strike as
 9         nonresponsive.
10         Q.   My question, sir, was:  And you'd
11     had a conversation with Mr. Blackwell a few days
12     earlier about a billion dollars of other assets.
13     Correct?
14              MR. ROTHMAN:  Objection to the
15         form.
16              You can answer.
17         A.   I had had a conversation with
18     Mr. Blackwell about the transfer of other assets.
19         Q.   Yes.  And those other assets were
20     assets that you understood were conveyed under the
21     Asset Purchase Agreement.  Correct?
22         A.   I was asking him to represent that
23     they were conveyed under the Asset Purchase
24     Agreement.
25         Q.   Yes.  But you understood that the
```

24  (Pages 90 to 93)

FRELINGHUYSEN -  HIGHLY CONFIDENTIAL

1   FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
2   Asset Purchase Agreement dealt with things other
3   than customer assets.  Correct?
4       MR. ROTHMAN:  Objection to the
5   form.
6       A.   I was asking him to make that
7   representation.
8       Q.   And you were asking Mr. Ullman --
9   going back to Exhibit 675-B, you were asking
10  Mr. Ullman to make that same representation in
11  connection with these two transfers.  Correct?
12      MR. ROTHMAN:  Objection to the
13  form.
14      A.   I asked Mr. Ullman to confirm that
15  we were transferring customer assets in connection
16  with the APA.
17      Q.   Where does -- where do you see the
18  words "confirm that these were customer assets"?
19      A.   My normal course of dealing with
20  Mr. Ullman was with customer assets.
21      Q.   Okay.  But you did not ask
22  Mr. Ullman to confirm that these were, in fact,
23  customer assets; did you?
24      MR. ROTHMAN:  Objection to the
25  form.  He just said that he did.

1   FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
2       Q.   Can you show me where on this -- on
3   Exhibit 675-B you asked Mr. Ullman to confirm that
4   these were customer assets.
5       A.   I asked that they were being
6   transferred pursuant to the Asset Purchase
7   Agreement, which I understood to transfer customer
8   assets.
9       Q.   And which you also understood to
10  transfer non-customer assets.  Right?
11      A.   I had asked other personnel to
12  inform me or to represent to me that it
13  transferred other assets.
14      Q.   So you were asking Mr. Blackwell to
15  give you legal advice on what the Asset Purchase
16  Agreement transferred?
17      MR. ROTHMAN:  Objection to the
18  form.
19      A.   Representation is not legal advice.
20      MR. SHAW:  Let's take a five-minute
21  break.  I may be done.  I just want to look at
22  a couple of things.
23      THE VIDEOGRAPHER:  The time is
24  11:58.  We are going off the record.
25      (Recess taken.)

1   FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
2       THE VIDEOGRAPHER:  The time is
3   12:03.  We are back on the record.
4       MR. SHAW:  Mr. Frelinghuysen, I
5   have no further questions for you at this
6   time.  Thank you very much.
7       THE WITNESS:  Thank you.
8   EXAMINATION BY
9   MR. ROTHMAN:
10      Q.   I'd like to just clarify one thing
11  with you, if I may, Mr. Frelinghuysen.
12      Do you recall telling Mr. Shaw that
13  you saw a draft of the clarification letter on
14  Monday morning, the 23rd or 22nd?
15      A.   22nd.
16      Q.   And you assumed that that was the
17  final version?
18      A.   Yes.
19      Q.   When did you see that draft?
20      A.   I saw that draft around 6:00 a.m.
21      Q.   And why did you assume it was the
22  final version?
23      A.   We stopped talking about the
24  clarification letter at that point.
25      Q.   Did you get any further drafts of

1   FRELINGHUYSEN -  HIGHLY CONFIDENTIAL
2   the clarification after 6:00 that morning?
3       A.   I don't recall receiving or seeing
4   any further drafts of the clarification letter
5   that morning.
6       Q.   Do you know if the draft that you
7   got at 6:00 a.m. that morning is the same as the
8   exhibit that you've been shown here today?
9       A.   I do not know that.
10      MR. ROTHMAN:  That's all I have.
11      MR. SHAW:  Just one question
12  following up on that.
13  EXAMINATION BY
14  MR. SHAW:
15      Q.   Mr. Rothman asked you if you got
16  any further drafts of the clarification letter
17  after 6:00 that morning, and you said no.
18      Were you speaking only for
19  yourself, or were you purporting to speak for
20  the -- for any representative of the Trustee --
21  let me -- let me take that question out and shoot
22  it and start again.
23      When Mr. Rothman asked you if you
24  recalled receiving any further drafts of the
25  clarification letter after 6:00 that morning, and